```
 1                    IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF CALIFORNIA
 2                 BEFORE THE HONORABLE KIMBERLY J. MUELLER


 3


 4


 5     RALPH COLEMAN, et al.,

 6                    Plaintiffs,
       vs.                              Sacramento, California
 7                                      No. 2:90-CV-00520
       GAVIN NEWSOM, et al.,            Thursday, September 24, 2020
 8                                      9:08 a.m.
                      Defendants.
 9     _____/


10


11


12                            --oOo--


13             REPORTER'S TRANSCRIPT OF PROCEEDINGS


14       RE: MOTION TO MODIFY COURT ORDERS UNDER RULE 60(b),


15     STATUS CONFERENCE AND THIRD QUARTERLY STATUS CONFERENCE


16           (Proceedings held via Zoom video conference.)


17                            --oOo--


18


19


20


21     Official Reporter:       KACY PARKER BARAJAS

22                              CSR No. 10915, RMR, CRR, CRC
                                UNITED STATES DISTRICT COURT
23                              501 I Street
                                Sacramento, CA  95814
24                              kbarajas.csr@gmail.com


25     Proceedings recorded by mechanical stenography.  Transcript
       produced by computer-aided transcription.
```

```
 1   APPEARANCES:

 2   For the Plaintiffs:      ROSEN BIEN GALVAN & GRUNFELD LLP
                              BY:  MICHAEL BIEN
 3                                 ERNEST GALVAN
                                   JESSICA WINTER
 4                                 MARC SHINN-KRANTZ
                                   LISA ELLS
 5                                 JENNY YELIN
                                   Attorneys at Law
 6                            101 Mission Street, 6th Floor
                              San Francisco, CA  94105
 7
     For the Defendants:      DEPARTMENT OF JUSTICE
 8                            OFFICE OF THE ATTORNEY GENERAL
                              BY:  TYLER V. HEATH
 9                                 LUCAS L. HENNES
                                   ELISE THORN
10                                 Attorneys at Law
                              1300 I Street
11                            Sacramento, CA  95814

12                            DEPARTMENT OF JUSTICE
                              OFFICE OF THE ATTORNEY GENERAL
13                            BY:  KYLE LEWIS
                                   ADRIANO HRVATIN
14                                 Attorneys at Law
                              455 Golden Gate Ave., Suite 11000
15                            San Francisco, CA  94102

16                            ROBINS KAPLAN LLP
                              BY:  ROMAN M. SILBERFELD
17                                 Attorney at Law
                              2049 Century Park East, Suite 3400
18                            Los Angeles, CA  90067-3208

19                            HANSON BRIDGETT LLP
                              BY:  PAUL B. MELLO
20                                 Attorney at Law
                              1676 N. California Blvd., Suite 620
21                            Walnut Creek, CA  94596

22                            HANSON BRIDGETT LLP
                              BY:  SAMANTHA D. WOLFF
23                                 Attorney at Law
                              425 Market Street, 26th Floor
24                            San Francisco, CA  94105

25
```

```
1    APPEARANCES (Continued):

2    Also Present:          Matthew Lopes, Special Master

3                           James Spurling
                            General Chief Counsel, OIG
4
                            Gregg Adam, CCPOA
5                           David Sanders, CCPOA
                            Attorneys at Law
6

7                                 --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      SACRAMENTO, CALIFORNIA, THURSDAY, SEPTEMBER 24, 2020, 9:08 AM

2                                  --oOo--

3           THE CLERK:  The United States District Court for the

4      Eastern District of California is now in session.  Chief Judge

5      Kimberly J. Mueller now presiding.  Calling civil case 90-520,

6      Coleman et al. versus Newsom et al.  This is on for a motion

7      hearing, a status conference, and a third quarterly status

8      conference.

9           THE COURT:  All right.  Good morning.  I'd like

10     counsel to state their appearances.  What I'm going to do this

11     morning is ask for lead counsel to state his or her appearance,

12     and then I think at this point I'm going to rely on you to

13     identify the members of your team; and then you can also tell

14     me who will be speaking this morning.

15          So Mr. Bien, you could lead off.

16          MR. BIEN:  Good morning, your Honor.  Appearing today

17     on behalf of plaintiffs are, in addition to myself, Ernest

18     Galvan, Lisa Ells, Jenny Yelin, Mark Shinn-Krantz, Jessica

19     Winter.  I think I have everybody.  And my understanding is

20     that we're beginning with the staffing hearing?

21          THE COURT:  Correct.

22          MR. BIEN:  Yes.  Mr. Galvan will be taking the lead on

23     that for plaintiffs, and Ms. Ells will be taking the lead on

24     the status conference later.

25          THE COURT:  All right.  Thank you.

1          And for the defense, Mr. Lewis, you're leading off?

2          MR. LEWIS:  Yes.  Good morning, your Honor.  Appearing

3   for defendants will be myself, Kyle Lewis, Roman Silberfeld,

4   Elise Thorn, Adriano Hrvatin, Tyler Heath, Lucas Hennes, Paul

5   Mello, and Samantha Wolff.

6          Mr. Mello will take the lead on the staffing portion

7   of the hearing, and I will take the lead on the quarterly

8   status conference.

9          THE COURT:  All right.  My thought would be

10  immediately following the staffing that we turn to the DSH

11  motion and then deal with the rest of the matters on the

12  quarterly status conference.

13         So just so I'm clear, would Ms. Ells be addressing

14  that issue?

15         MS. ELLS:  Yes, your Honor.

16         THE COURT:  All right.  And you, Mr. Lewis?

17         MR. LEWIS:  That issue will be handled by Tyler Heath,

18  your Honor, for defendants.

19         THE COURT:  All right.  I believe Mr. Hrvatin signed

20  the brief, correct?

21         MR. LEWIS:  Yes, your Honor.

22         THE COURT:  All right.  Well, with the understanding

23  that Mr. Heath is fully knowledgeable.

24         MR. LEWIS:  Yes, your Honor.  It was a collective

25  effort.

1              THE COURT:  All right.

2              All right.  I do see the Special Master.  He's lurking

3    in the shadows.  That may be a matter of lighting from where he

4    is appearing.  But Special Master Lopes, just to confirm you're

5    able to see and hear us?

6              SPECIAL MASTER LOPES:  Yes, I am, your Honor.

7              THE COURT:  All right.

8              All right.  So just some introductory comments, and as

9    always, I have focused questions.  So I'm going to pose my

10   questions to the parties, and then I would allow brief wrap-up

11   argument if any party believes there is something not fully

12   covered by the briefing or our colloquy here this morning.  The

13   parties should not repeat what is in their briefing.  I should

14   say, I see Mr. Spurling there, but as always, Mr. Spurling,

15   you're monitoring the hearing, correct?

16             MR. SPURLING:  (Nods head.)

17             THE COURT:  Yes, all right.

18             So this hearing is set for the Court to consider

19   enforcement of its October 10th, 2017, order requiring the

20   coming into compliance with the Court's -- the order requiring

21   compliance with the 2009 staffing plan and the June 13th, 2002,

22   order requiring the maximum 10 percent vacancy rate.  I did ask

23   the parties to address specific questions.  I have reviewed the

24   briefs addressing those questions to the extent the parties

25   chose to do so.

1          I should say that to the extent the briefs go beyond

2     the questions the Court posed, I'm not prepared to hear

3     argument beyond the parameters of my orders this morning.  I do

4     believe the defense brief requests reconsideration or

5     revisitation of matters that are a law of the case at this

6     point.  I can once again attempt to explain myself with that

7     respect in whatever order I issue following this hearing, but

8     for now I do have specific questions I'd like to pose.

9          So first, Mr. Mello, with the understanding you are

10    speaking for the defendants this morning, the point of the

11    Court's question about targeted reduction was to probe the

12    defendants' voluntary willingness to engage in reductions, and

13    so again without repeating what's in your briefing, is it fair

14    for me to draw from the defense briefing that defendants are

15    not planning to or prepared to voluntarily undertake any

16    reductions including targeted reductions at this time?

17         Mr. Mello.

18         MR. MELLO:  Good morning, your Honor.  You are

19    correct.  Defendants will continue to do the population

20    reductions that have been set forth and are being used with

21    respect to the COVID-19 pandemic considering target --

22    voluntary targeted reductions with respect to the MHSDS class

23    as presented in your question.

24         THE COURT:  And can I discern anything in what the

25    defendants have provided the reasoned basis for declining to

1    engage in reductions targeting the Coleman class, Mr. Coleman

2    and his fellow class members?

3         MR. MELLO:  You can discern several things from that.

4    One, that defendants believe that the Court should put this

5    back to where we were successfully going in 2018 with respect

6    to the all parties work group and address the staffing issues.

7    Plaintiffs' counsel have indicated a willingness in their brief

8    to meet and confer in good faith regarding our 9/8 letter.  The

9    parties were close to agreement on many items with respect to

10   the 2009 plan at that time.  That's one reason.

11        A second reason is that the population has

12   substantially reduced.  As of this morning, the population at

13   CDCR is down over 21,200 since the beginning of March, and the

14   population of the MHSDS is down over 8,500, maybe 8,600 since

15   this Court issued its October 2017 hearing.

16        Another reason, your Honor, is because the population

17   is not static.  As this Court, the parties and Special Master

18   know, the population in the MHSDS is not static.  It changes

19   over time.  People move through the system at different levels

20   of care.

21        THE COURT:  Okay.  At this point you're telling the

22   Court things it knows well.  I have not heard you in a pointed

23   way respond to my question.  Can I tell from this record the

24   reasoned basis for not creating targeted plans for reduction of

25   the Coleman class consisting of Mr. Coleman and his fellow

1    class members?

2         MR. MELLO:  And I apologize if my answer did not

3    address your question.  Again, I believe the answer is because

4    there have been significant population reductions.  The 2009

5    staffing plan is outdated.  The persons who provide care, the

6    methods for providing care have all changed, and therefore, an

7    evaluation of appropriate staffing levels and ratios should

8    occur through the all parties work group process so that we can

9    see --

10        THE COURT:  All right.  All right.  Do defendants

11   acknowledge that there is a particular problem with the EOP

12   class and its growth in size in considering whether or not

13   to -- I mean, not in determining that no targeted reduction

14   plan is needed with respect to the Coleman class?

15        MR. MELLO:  So your Honor, I believe the evidence that

16   was presented and it's probably more meaningful since the

17   population has dropped more is that that population has reduced

18   substantially.  It reduced by many in the last several months,

19   and I think our position is -- and it's stated in the

20   September 8th order and our papers -- is that this is an

21   important issue at the very core of the case, and so it

22   requires analysis, not reliance upon faulty assumptions and

23   calculations based upon an old plan with old technology, old

24   providers, and old systems.

25        So while we may determine that we want to do more with

1    the EOP population as part of the all parties work group, we're

2    saying it is premature, and it ignores the massive changes that

3    have occurred since October of 2017 and even since March of

4    2020.

5         THE COURT:  Let me just ask Mr. Galvan if he has

6    anything to say in response to what he's heard without

7    repeating what's in the plaintiffs' brief.

8         MR. GALVAN:  Thank you and good morning, your Honor.

9    We -- in our declarations, we accounted for the drop in the

10   population since the pandemic started, and we showed that

11   they're still out of compliance, and we showed how they could

12   get in compliance.  So I think all this about the population

13   having dropped is beside the point because even with the drop

14   they are still in trouble.

15        And also Mr. Mello is absolutely right that the

16   population is not stable.  So we are standing here in the

17   trough of the greatest population reduction we've ever seen in

18   this system, and we are not going to stay in the trough.  They

19   opened -- they reopened intake this month, and the population

20   is going to rise again.

21        The other thing that's not in our briefs, and I think

22   the numbers will bear me out, is that even during this massive

23   overall population reduction, the percentage, the share of the

24   population represented by our clients has not gone down.  It's

25   increased.  And so we're again seeing the same problem we've

1    always seen and we've seen since 2009 is that the relief, you

2    know, ordered by the three-judge court, it helps everyone else

3    much more than it helps the Coleman class, and so it is time

4    for targeted relief to address that.  Those are the main things

5    that I would add, your Honor.

6         If I may add one other thing, yesterday we saw the

7    Special Master's suicide prevention expert's report, and that

8    report shows how serious and life threatening the ongoing

9    violations in this case are.  The suicide rate has gone up to

10   32 per 100,000.  Five years ago it was 20 per 100,000.  It's

11   gone up every year since five years ago.  And the Special

12   Master wrote that a significant part of those or his expert

13   wrote more than a quarter of last year's suicides involved

14   cases with people who asked for help, they were in trouble,

15   they expressed suicidal ideation or engaged in some

16   self-injurious behavior, and the resulting clinical response

17   did not recommend a higher level of care or it rescinded a

18   higher level of care.  And Mr. Hayes, the expert wrote, quote,

19   better clinical decisions need to be made if CDCR is to see a

20   reduction of preventable suicides, end quote.

21        Overworked clinicians don't make better decisions.

22   They don't make them without appropriate suicide support and

23   oversight, and they're not in compliance with supervising

24   psychiatrist ratios.  They're way far from compliance.

25        This is not a time to make cuts.  Cuts in staffing

1    lead to shortcuts in clinical judgments.  This is a time to

2    meet the existing staffing requirements, respond to the

3    emergency, and not to go back and redo something that they did

4    three years ago in terms of a long study while everything

5    remains frozen in the terrible state it's in.

6         Thank you, your Honor.

7         THE COURT:  All right.  Mr. Mello, a brief response.

8    I think I saw your eyebrows go up, and I want to make certain I

9    understand why that is.  But in any brief rebuttal, Mr. Galvan

10   referenced the numbers that the plaintiffs have provided in a

11   series of charts, and I do need to understand what is the

12   defendants', you know, substantive response on those numbers

13   concerning the size of the mental health population at each

14   level of care that could be served by existing staff?

15        Mr. Mello.

16        MR. MELLO:  Yes.  And if my eyebrows sold me out

17   again, I'm not a good poker player, so I apologize, number one.

18        Number two, I will address the graphs.  As this Court

19   knows, we submitted objections to the declarations including

20   the declaration of Ms. Ells which provides various sort of

21   expert testimony and analysis of the staffing ratios, we

22   believe that should be granted.

23        With respect to those charts, they are flawed in many

24   respects.  For example, they rely upon -- and Mr. Galvan just

25   touched upon it -- supervisor staffing ratios which were not

1   part of the 2009 plan and so, therefore, should not be

2   considered.  They rely upon PIP staffing ratios.  Again CDCR

3   did not run the PIPs in 2009, and the staffing ratios in the

4   PIPs were not part of the 2009 plan.  They rely upon -- they

5   fail to acknowledge the reality that providers are providing

6   care including the nurse practitioners.

7        But what's lost is -- in all of that discussion is the

8   fact that this plan needs to be revisited and that the idea

9   that it's going to involve cuts presupposes what the findings

10  of any experts or the all parties work group process will bear

11  out.  I think it's premature to suggest and we are not

12  suggesting that it's going to involve cuts, rather it's going

13  to involve analysis and agreement as we were working towards in

14  2018.

15       If I may speak to a couple other points raised by

16  Mr. Galvan?

17       THE COURT:  If they're rebuttal and they don't repeat

18  what's in your briefs.

19       MR. MELLO:  Yes.  With respect to the trough, the idea

20  that we are in a trough, first of all, to say that plaintiffs

21  are overstating the impact of intake is an understatement.  The

22  population went down with the resumption of intake by over a

23  thousand last week alone.  Intake is limited.  Even if every

24  person who was in a county jail were returned to the system, we

25  would still be significantly down.

1        With respect to the argument that the --

2        THE COURT:  For how long?  For how long?  Do you agree

3   3,000 a month?

4        MR. MELLO:  Do I agree 3,000 a month was an average

5   intake in the past prior to the pandemic?  I would have to look

6   at the numbers, but that sounds accurate to me.  What's also

7   accurate is that our population continues to decrease and will

8   even after the pandemic.

9        THE COURT:  So when you talk about our population, I

10  need you to focus on Coleman only, not giving me broad numbers.

11  Focus on Coleman.

12       MR. MELLO:  Okay.  Well, focusing on Coleman, again

13  we're down over 8,600 since the issuance of the 2017 order.  We

14  were down 1,300 class members in the month of July, a

15  proportion of any additional releases will be Coleman class

16  members.  That we actually presented, verified evidence in the

17  record.  See the declaration of Mr. Powell with respect to the

18  MHSDS population.

19       Moreover, there are credit changes that are happening

20  in January, and again, those changes will impact all

21  populations including those subsets that are Coleman class

22  members.

23       THE COURT:  What's defendants' current estimate of the

24  numbers of intake?  If it's not 3,000 now, what does CDCR

25  currently project will be the monthly numbers now that intake

1    is reopened?

2            MR. MELLO:  Well, so last week it was supposed to be

3    150 or 300 inmates were going to be taken into the system or

4    this week.  I'm not sure that they even reached that number.

5    It is being evaluated on a weekly basis as to how much.  It's

6    throttled up and down based on circumstances and public health

7    guidance and interplay between the CDCR, BAI, and CCHCS, and so

8    I don't think we can anticipate what it will be until after the

9    pandemic because we are still in the midst of a pandemic unlike

10   we've seen in over a century; and the primary goal is to

11   protect the incarcerated population and staff.  And so any

12   projections are speculative beyond belief because we're in

13   unprecedented times.

14           THE COURT:  Regardless of what the intake number is,

15   is it not the case that the percentage of the intake population

16   has been at least 25, 30 percent persons who become members of

17   the Coleman class?

18           MR. MELLO:  I believe that's the case.  I also --

19   going back to again a rebuttal point, I don't believe that the

20   evidence is that the Coleman class members have not benefited

21   from the global releases in a similar percentage to the overall

22   population.  I don't believe that's in this record in front of

23   this Court in this briefing.  And but with respect to your

24   question, your Honor, are they 25 to 30 percent, that is my

25   general understanding, your Honor, to your question.

1          THE COURT:  All right.  I'm just going to allow

2     Mr. Galvan, because of the content of Mr. Mello's rebuttal, one

3     more round.  Anything to say in response to what you heard

4     without repeating what's in the briefs or what you said before,

5     Mr. Galvan?

6          MR. GALVAN:  Thank you, your Honor.  With regard to

7     supervisors, supervisors are in the plan.  The plan is at 3693,

8     ECF number 3693, and the exhibits are "-1."  And the

9     supervisors are in there.  And the supervisors are essential.

10    So I would not dismiss them the way that counsel dismisses

11    them.

12          Regarding the need to -- defendants expressed a need

13    to revisit the ratios.  They can do two things at once.  They

14    could comply with this Court's orders and still study the

15    ratios and come forward with evidence.  I mean, this -- they've

16    been invited to do this, to bring some sort of motion to modify

17    the ratios in 2016, 2017, 2018, 2019.  But it's always -- it's

18    always over the horizon.  I don't know why it should be over

19    the horizon.  They sent a bunch of experts led by Joseph Penn

20    in 2018 for this purpose.  I don't know what happened to that.

21    They maybe did not like the results, but they -- this plea of

22    inability to address changing circumstances is just hollow.

23          This Court can issue an OSC now returnable in a

24    reasonable time during which they can show a good faith effort

25    to come into compliance.  And what a good faith effort would

1    look like would be the concrete steps in Dr. Bick's

2    declaration.  Dr. Bick laid out some very concrete steps to

3    make it possible for telepsychiatrists to work remotely, to

4    increase the supervision, and come up with something we've

5    never had in this case which is a clear supervision policy for

6    psychiatric nurse practitioners.  They can do all those things

7    right now while they do their study.

8         One other point in rebuttal, your Honor, and then I'll

9    stop is that counsel says there are problems with our charts

10   and with our numbers showing how they are still understaffed

11   even in this trough.  I think I would defend our numbers.  I

12   think the objections are completely unfounded.  Our numbers

13   come from their numbers.  All we did was apply some arithmetic

14   to them.

15        But the point is undisputed because Ms. Poncianno at

16   6855-3, paragraph 5, agrees perfectly with our numbers.  She

17   says, as of August 26th, 2020, right in the trough, they are

18   still 80 percent in psychiatric fill.  They're still out of

19   compliance in psychiatric fill even in the trough.  She used

20   the same numbers, and that 80 percent is exactly what

21   Ms. Ells's chart says.  So there's no dispute about they are

22   still out of compliance even in the trough.

23        Thank you, your Honor.

24        THE COURT:  All right.  Mr. Mello, one minute rebuttal

25   at this point.

1          MR. MELLO:  Sure.  If we were in the trough in August,

2     that wouldn't explain the population reduction that occurred in

3     the last week and with respect to this population, number one.

4          Number two, Mr. Galvan just pointed out the fact that

5     additional work should be done that as of the date in

6     Ms. Poncianno's declaration we were at a fill rate of 86

7     percent which is almost there.

8          We are not suggesting that this issue should not be

9     addressed, but we are following the Court's lead, when we

10    hinted at doing a motion to modify the staffing orders in the

11    past, and the Court rightly said you make much more progress

12    when the parties work collaboratively with the Special Master

13    when they solve problems through the all parties work group

14    process.  And that is what we are suggesting occur here.

15         And with that, I thank you, your Honor.

16         THE COURT:  So for you, Mr. Mello, just probing this

17    position on staffing broadly, previously the three-judge court

18    and the Supreme Court found significant ongoing deficiencies in

19    staffing and delivery of adequate mental health care to members

20    of the class.  So just focusing on staffing levels and delivery

21    of mental health care, without telling me COVID changes

22    everything, COVID means we need to just put everything on ice

23    for a year, how would the findings of the prior courts be

24    different today, and on what evidence are you relying?

25         MR. MELLO:  So the findings of the three-judge court

1  that a general population should be issued at 137.5 percent of

2  design bed capacity and the Court then provided a process for

3  parties to seek modification if they thought it should be

4  lower --

5          THE COURT:  No.  I'm just focusing on the mental

6  health care, the finding regarding mental health care that

7  ultimately led to that decision.

8          MR. MELLO:  Right.

9          THE COURT:  Significant ongoing deficiencies in

10  staffing and the delivery of adequate mental health care, would

11  those findings be different today?

12          MR. MELLO:  Again, if there were a proceeding in front

13  of the existing three-judge court on this issue, we believe the

14  findings would be different.  It's a totally different system

15  than existed then, not just in terms of population where our

16  population was very high, and it's now 109, not just because

17  our population was 38,900 in October and the MHSDS population

18  was 39,000 -- or 38,900 in October 2017 and is now, as of

19  today's date, below 29,000 or about 29,000 as of today's date.

20  In addition, the modalities and the providers have changed, so

21  I think, yes, if there were a proceeding, if this matter were

22  referred back to the existing three-judge court on this issue,

23  I believe that they would make different findings.

24          And remember that court, your Honor, the result of

25  their ultimate findings was to establish a systemwide cap of

1   137.5.  It was not to order staffing changes, et cetera.  So if

2   there were such a proceeding, I do believe that the findings

3   would be different because the circumstances have changed so

4   dramatically.

5          THE COURT:  So are you saying you believe that a

6   reviewing court or a three-judge court would find no

7   significant ongoing deficiency in staff and delivery of

8   adequate mental health care?

9          MR. MELLO:  I am not suggesting that.  I am suggesting

10  that the findings would be different.  I am suggesting that

11  that staffing ratio and staffing mix is different and should be

12  different and that they might make different findings.  We are

13  not seeking relief from the underlying, you know, injunction in

14  this case at this time as you know.  And so -- but I do believe

15  that the proceedings would be vastly different, and the

16  findings that might base a future or modification of that order

17  would have to be different based upon the changed circumstances

18  that exist now in September of 2020 versus then, your Honor.

19         THE COURT:  Mr. Galvan, anything to say briefly in

20  response?

21         MR. GALVAN:  The Supreme Court in affirming the

22  population cap dealt with the argument that the population cap

23  alone would not remedy the constitutional violations.  It was

24  advanced by the state as a reason to deny the population cap.

25  And so it was -- it was fully understood by the Supreme Court,

1    by the parties, and the three-judge court that the population

2    cap was deficient but not necessary to bring about

3    constitutional compliance.  And one of the other necessary

4    components was staffing which is why in 2009 in the midst of

5    the three-judge court proceedings we were working hard on

6    staffing.  Everyone was working hard on staffing.  So I do

7    not -- I do not -- to the extent that counsel's argument is

8    that because they're in compliance with the cap they can relax

9    on the staffing, I think that's just misguided.

10           Thank you, your Honor.

11           THE COURT:  All right.  Mr. Mello, I'd like to turn to

12   the staffing allocations.

13           MR. MELLO:  Yes, your Honor.

14           THE COURT:  I have a question about the midcycle

15   adjustment, but first a more basic question.  So defendants do

16   prepare the mental health staffing allocations in January and

17   July to authorize the number of mental health staff required to

18   serve the mental health services delivery system inmate

19   population.  That calculation could be done using the number of

20   mental health staff positions actually filled including

21   telepsychiatrists and some number of regular contractors to

22   determine the size of the mental health population that can be

23   served under the 2009 plan, could it not?

24           MR. MELLO:  It could if we included all -- if we

25   appropriately included all providers, it could.  And if --

1   again, I believe Mr. Galvan is wrong.  We don't count

2   supervisors.  And again, PIPs were not part of the plan, but it

3   could be done, your Honor.

4          THE COURT:  When you say "all," do you mean all

5   contracted positions, for example?

6          MR. MELLO:  Contractors, providers, PNPs, significant

7   providers who work under the supervision of psychiatrists,

8   that's what I mean, your Honor.  I'm sorry if I wasn't clear.

9          THE COURT:  No.  I just wanted to get clear on the

10  method that you would use if you ran that calculation.

11         Anything to say in response to that, Mr. Galvan?

12         MR. GALVAN:  Well, supervisors count.  They're in the

13  plan, and I think it is clear that they can make the

14  calculation.  They can make a calculation what population they

15  can serve.

16         THE COURT:  All right.  In terms of the midcycle

17  adjustment, Mr. Mello, I think defendants can do that, but how

18  is that not, as the plaintiffs point out, incredibly

19  shortsighted, defendants digging a hole for themselves when the

20  numbers incredibly rise again if CDCR stays on the current

21  path?  I heard what you said about intake numbers, but unless

22  there's some radical shift in the population feeding intake

23  ultimately given that the reductions CDCR says are only

24  temporary, how is that not digging -- digging defendants a hole

25  that they'll never come out of if they stick with a midcycle

1   adjustment?

2        MR. MELLO:  So a couple of reasons.  Even before the

3   pandemic, your Honor, the population was decreasing in the

4   system, number one.

5        Number two, remember and I think your Honor said it,

6   the midcycle allocation happens twice a year, in January and

7   July, so -- or the allocation occurs in January and July.  The

8   reason why this midcycle allocation occurred is because the

9   precipitous drop that happened after that allocation occurred.

10  But remember in January another allocation will occur, and it

11  will be based upon that population at that time.

12       And again, plaintiffs seem to presuppose that the

13  allocation adjustment is going to result in a decrease in

14  staffing or layoffs, and that's just speculation.  And

15  moreover, the safety is, your Honor, that it will be done again

16  in January, and if God willing we're in a current different

17  place and COVID-19 has been addressed -- doubtful -- it can be

18  adjusted at that point.

19       Moreover, I think the evidence demonstrates quite

20  significantly that we've had a great deal of success with

21  telepsychiatrists.  I just heard and was heartened to hear

22  Mr. Galvan indicate that they are receptive to increasing

23  telepsychiatry and increasing the areas and ways by which they

24  can provide those services.  So those are meaningful changes

25  that could occur.  All we're asking for, appropriately, is that

1   staffing be given the look that it deserves in light of

2   circumstances.

3           But with respect to the midcycle allocation

4   adjustment, again in January it will be revisited, so I don't

5   think it's the sky-is-falling moment with respect to staffing

6   on that particular front, your Honor.

7           THE COURT:  Why engage in a midcycle adjustment taking

8   advantage of an obvious trough if it's mere speculation or

9   could be layoffs and reductions in staff?

10          MR. MELLO:  So again, maybe there might be a

11  misunderstanding.  The allocations are based upon actual

12  numbers as opposed to projections.  So that's a

13  misunderstanding.  They're based upon actual numbers.  So it's

14  appropriate to do and it's also appropriate to determine where

15  you need to provide resources.  And again, the safety net, your

16  Honor, is that in January it will be readjusted again, and if

17  circumstances change, and of course they will, it will be

18  readjusted at that point.  And we are not going to presuppose

19  that it's going to result in a bunch of layoffs and we can't

20  fill them because we understand staffing is important.

21          THE COURT:  Is that a representation there won't be

22  layoffs creating positions impossible to fill?

23          MR. MELLO:  I can't make that representation.  I don't

24  know.  I don't believe that the thinking is it's going to

25  result in layoffs.  But again, the analysis hasn't been

1    completed, and that's why we wanted to work in collaboration

2    with the Special Master's team and the parties pursuant to the

3    all work group process.

4              THE COURT:  Mr. Galvan, anything to say in response?

5              MR. GALVAN:  Yes, two things, your Honor.  One,

6    counsel will not commit to no layoffs, and there don't have to

7    be layoffs because their cadre of psychiatrists are -- tend to

8    be older, and they're retiring all the time.  And so they need

9    to be recruiting at full speed at all times to stay where they

10   are with people retiring.  And as the Special Master's labor

11   economist pointed out, they have been neglectful of the working

12   environment that they need to pay attention to to keep these

13   psychiatrists, and so many of them are making decisions to

14   start their retirement.  So any easing up on the 2009 plan just

15   results in a reduction of the clinicians available to serve the

16   class.

17             The second thing, the second reason, and this may be

18   even more important, why a midcycle allocation is a mistake is

19   that we're in the middle of the COVID-19 pandemic modification

20   of the entire program.  No one's getting care, and people are

21   not getting to the higher levels of care that they need.  Their

22   COVID dashboard -- we put this in the record -- shows 500 EOPs

23   were out of EOP care.  And so the idea that they're going to

24   take a snapshot now of where people are and apply the ratios to

25   where they are rather than the ratios of where they would be if

1   we weren't in this freeze of treatment, is it going to further

2   suppress the resources available and amplify the harm to the

3   class doing this kind of hasty attempt to consolidate your

4   gains -- I'll call them gains; I don't know what to call

5   them -- just to take advantage of an awful situation to make

6   their compliance numbers look better.

7            Thank you.

8            THE COURT:  All right.  Let me move on.  If you have

9   wrap-up, you can address it in your closing statements.

10           So Mr. Mello, defendants float several proposals for

11  addressing the ongoing staffing deficiencies, a new point in

12  time workload study, the PNPs, increased use of telepsychiatry.

13  The Court's approved the parties' stipulation.  I might have

14  done that even as you were finalizing or filing the brief.

15  Here are my specific questions about each component.  I'm not

16  even going to ask about time workload study.  My understanding

17  is defendants contemplated that a decade ago and rejected that

18  approach and proposed a staffing plan.  So I just don't even

19  want to go there.

20           On the PNPs, my understanding -- I mean, looking at

21  the plaintiffs' brief, I think it's clear no one is opposed to

22  psychiatric nurse practitioners playing an important role if

23  properly trained, if properly supervised, without displacing

24  psychiatrists.  My understanding is the defendants have floated

25  proposals, floated one in early 2019, have had a chance to

1   follow through and explain how PNPs fit, if you're really

2   thinking about qualitative values of the treatment that's

3   required here, if you're thinking about the substance of what

4   the Coleman class needs, and -- I mean, I did ask the Special

5   Master about the Bick declaration, is that finally a plan for

6   how PNPs will be used.  I don't think we can say it's a plan.

7   It signals some hopeful thinking.  So why would the Court now

8   think that the defendants are finally ready to follow through

9   and explain what their proposal is for PNPs having had three

10  years to work on the issue?

11          MR. MELLO:  So responding to the crux of your

12  question, we raised the issue of PNPs, your Honor, when

13  discussing potential things the Court can do short of a

14  population reduction of MHSDS.  We raised the PNPs because it

15  goes to staffing ratios, and they are not currently counted as

16  staffing ratios.  And we identified in Dr. Bick's declaration

17  that the policies with respect to those PNPs would be coming

18  out, and I don't have his declaration at the top of my head

19  right now but shortly, and so what we are suggesting is that

20  the PLRA requires before the Court issue orders that more

21  narrowly tailored focused orders be considered, and that's why

22  we broached the subject of a time-in-motion study based upon

23  current circumstances or PNPs and also expanded use of

24  telepsychiatry.  That's why we raised them in response to the

25  Court's question and in light of the confines of the PLRA needs

1    narrowness/intrusiveness requirements, your Honor.

2            THE COURT:  Mr. Galvan.

3            MR. GALVAN:  To the extent the PLRA requires a prior

4    order, without conceding that it does, there is a prior order

5    directing them to get their PNP policy together.  It's included

6    in the October 2017 order that led to this hearing.  So there's

7    no -- there is no reason to hesitate to order them to do things

8    now.  That's the same order that approved their plan to use

9    PNPs to treat the CCCMS population.

10           THE COURT:  Let me just ask about telepsychiatry.  I

11   approved the stip.  Is there more you're suggesting at this

12   point, Mr. Mello, even though I just approved that stip?  I

13   should say it's come to my attention that there may not be

14   sufficient telepresenter staffing on the receiving end of the

15   class represented by Mr. Coleman, so perhaps you could address

16   that as well in helping me understand your current position

17   regarding telepsychiatry despite a period of study I've

18   authorized.  This Court has not ruled out telepsychiatry, a

19   proper role.  Are you saying I should blow past that now and do

20   more?

21           MR. MELLO:  Your Honor, I think what I'm saying is

22   that there were two sort of ships passing at the same time you

23   issued your order and that what we are suggesting is that

24   telepsychiatry is an important piece both in our system, in the

25   community, and in other systems, and that it should be

1    evaluated when, as we suggest, a real look and as plaintiffs

2    say they will do in good faith when we meet and confer about

3    our staffing proposals pursuant to the all parties work group

4    process.  That's all I'm suggesting.  Again, it's in its --

5    infancy is not the right level, but it's shown great success

6    both in the system, and it is being evaluated as the Court just

7    indicated.  But again, that may have been as much of a timing

8    issue as anything.  It's an important tool that's used in the

9    community, and we think that it can be and should be expanded;

10   but we believe the evaluation should occur.

11          THE COURT:  Mr. Galvan, anything more on that?

12          MR. GALVAN:  On telepsychiatry, I think that counsel

13   said something about how I had represented that plaintiffs were

14   in support of expanding telepsychiatry.  I think what I meant

15   to say by encouraging action on Dr. Bick's promises in his

16   declaration was to get the telepsychiatry situation under

17   control and effective within its existing scope.  I think that

18   the Court and the Special Master are correct in the scope that

19   has been defined for telepsychiatry, and in all these numbers

20   that we've been talking about in staffing, they get full credit

21   for telepsychiatrists.  Telepsychiatrists count.  And they're

22   still behind.  They're still behind even in this population

23   reduction plan.

24          And so I think that what needs to happen with

25   telepsychiatry is Dr. Bick needs to do the things he said he

1   would do so that they can get in compliance with telepsychiatry

2   within its current scope.  It's not the time to expand

3   telepsychiatry to inpatient populations or to populations for

4   which they're not appropriate, but they should be using

5   telepsychiatry within its scope to get in compliance with the

6   staffing plan.

7            Thank you.

8            THE COURT:  All right.  Let me ask about the

9   possibility of additional remedial orders which I believe both

10  parties suggest.  So I'm just trying to understand is it the

11  position of each of you that there are proposed remedies not

12  included in the list of options known to defendants and

13  included in the Court's October 2017 order that still need to

14  be ordered?  I realize, Mr. Mello, you're going to tell me just

15  send everything to the all parties work group.  I'm glad you're

16  happy with the work group.  But answer this question, please.

17  What proposed remedies specifically are not included in the

18  list of options the Court previously put out there in its 2017

19  order?

20           MR. MELLO:  Beyond what we have in our papers, I'm not

21  sure that there are others that come to me at this particular

22  moment, your Honor, and -- but I will give that some thought.

23  I apologize.  I can't think of others that aren't already

24  raised in our papers or -- and as identified in Dr. Bick's

25  declaration and as identified in the staffing proposal letter

1   dated 9/8/2020.  I cannot think of others, your Honor.

2          THE COURT:  Mr. Galvan, specifically am I to read your

3   papers correctly as saying you do believe there's a need for

4   additional orders based on what the labor economist has to say?

5   I realize that matter is submitted.  So are you suggesting the

6   Court needs to order higher pay, for example, at this point,

7   and that's a remedy not covered by any prior order including

8   the 2017 order?

9          MR. GALVAN:  There are prior orders that ordered

10  higher pay in specific circumstances, but the problem addressed

11  by the labor economist, which was higher pay in the out years

12  for psychiatrists, I don't think has been specifically

13  addressed, and the differentials from the central valley have

14  not been specifically addressed in prior orders.  And so I

15  think that it is on the table for the Court what to do with

16  those recommendations, whether to order them as a substantive

17  thing they must do or whether to point to them in order to show

18  cause re contempt as the kind of measures that would show good

19  faith compliance which still would leave it to the defendants

20  to choose how to comply given a menu of options without

21  micromanaging how they do it.  But I think that they in

22  this -- on this record with all of the evidence that the

23  Special Master's labor economist's recommendations are sound,

24  they would ignore them at their peril if they had to return to

25  this Court in a reasonable time to show why they should not be

 1   held in contempt.

 2          THE COURT:  I can't really take account of the fact

 3   that there are negotiations going on, can I?  I mean, I have a

 4   letter from the union.  I've ordered it be docketed, if you

 5   haven't seen it.  It's not a formal filing, but I believe in

 6   transparency.  I know Mr. Mello's brief refers, but I can't

 7   really assume the outcome of any negotiations, agreed,

 8   Mr. Galvan?

 9          MR. GALVAN:  Yes, your Honor.

10          THE COURT:  Mr. Mello?

11          MR. MELLO:  Yes.  There are ongoing collective

12   bargaining efforts in that regard.  And with respect to, as

13   your Honor mentioned, that the Special Master's labor

14   economist's report is under submission and we did file robust

15   objections to that report, so I won't speak to it since it's

16   already in the record, your Honor.

17          THE COURT:  Follow-up, if I did try to follow the path

18   suggested by the plaintiffs, given your reference to the OSC

19   possibility, Mr. Galvan, there's no suggestion that if I were

20   to ultimately consider ordering an increase in pay that I would

21   need to have further evidentiary hearings?

22          MR. GALVAN:  No, your Honor.  I believe the record is

23   complete on that point.

24          THE COURT:  All right.  Mr. Mello, on that point?

25          MR. MELLO:  Well, again, we've submitted our

1   objections, but I believe that we should be able to, as we do

2   in our report, attack the underlying basis for those

3   recommendations and some of the flaws and methodology of that

4   process.  That would be our position with respect to those

5   recommendations.

6          THE COURT:  And finally for you, Mr. Galvan, is it

7   fair to construe your position, thinking about everything

8   you've said and what's in the brief, that the Court has not

9   exhausted all efforts to address staffing problems created by

10  overcrowding, meaning that any referral to a three-judge court

11  would be premature?

12         MR. GALVAN:  Your Honor, it's very hard to take that

13  position in the fourth year of only the most recent round of

14  the Court's efforts to address staffing which, if we consider

15  all the rounds, it goes all the way back to 1999.  I would

16  stand by the position that we laid out in our July 15th brief

17  that your Honor could order a three-judge court referral now

18  and that no other relief but population reduction would

19  actually bring them into compliance.  Population reduction

20  targeted at the Coleman class is necessary.  It's not

21  completely sufficient.  They still need to work on staffing,

22  but it's not our position that a reference would be premature,

23  your Honor.

24         THE COURT:  Would it be premature before -- I'm just

25  playing out what you seem to be suggesting, so I want to

1    understand.  You're saying I can issue an OSC.  Wouldn't that

2    at least have to play itself out by your description of perhaps

3    the most appropriate next step?

4           MR. GALVAN:  I do not believe that the Court would

5    have to wait because on this record you can find that staffing

6    compliance is a necessary component but that it will never be

7    sufficient without population measures as well.  And in

8    during -- when the -- during the pendency of the prior

9    three-judge court proceeding ten years ago, the Court continued

10   to issue remedial orders and continued to work on the other

11   elements that were necessary, and so there certainly is

12   precedent for that.  And I don't believe that the Supreme Court

13   gave any credence to the argument that because Judge Karlton

14   was still acting that the three-judge court had erred in some

15   way.

16          THE COURT:  Again, just trying to understand, why

17   should I not insist on a motion for referral to the three-judge

18   court directing plaintiffs, if they really believe that, to

19   bring a motion?

20          MR. GALVAN:  I think that our July 15th filing could

21   be construed as a motion.  I think we laid out all the reasons

22   to make the referral and -- but certainly as a matter of

23   managing the case you could order us to make a motion.

24          THE COURT:  Mr. Mello, any final -- we don't need to

25   get off on a tangent there, but I'm just clarifying plaintiffs'

1   position.  Anything more to say that you haven't already said

2   in response to what you've just heard?

3           MR. MELLO:  Just that as we did in response to the

4   prior briefing on this particular issue that the appropriate

5   vehicle is a motion to modify the existing cap to the existing

6   three-judge court if plaintiffs think that's appropriate.  As

7   we indicated last time around on this issue, this Court could,

8   I guess, sua sponte refer it to the existing three-judge court.

9   But with that, I won't repeat what we had in our earlier

10  briefs, and I know it was more of a question for opposing

11  counsel.

12          THE COURT:  All right.  Final question on the

13  staffing, and I'll start with Mr. Galvan on this one.  Is the

14  threat of monetary sanctions viable here to insist on

15  compliance?  That is, is there sufficient mental health staff

16  available to serve Mr. Coleman and his classmates such that the

17  threat of a financial penalty, as with transfers, would be

18  effective?

19          MR. GALVAN:  Yes, your Honor.  I think that --

20          THE COURT:  Go ahead.

21          MR. GALVAN:  It proved effective on inpatient

22  transfers, and it gives the defendants the maximum leeway to

23  decide how to comply.  I mean, to the extent that one of the

24  aims is to be respectful of this Court, and it's sovereign, the

25  State of California.  Monetary sanctions, that's as respectful

1   as you can be.  You're respecting their ability as a sovereign

2   to make decisions and to suffer the consequences of their

3   decisions without telling them specifically what to do.  They

4   simply need to get in compliance.  How to do it is their job.

5   So monetary sanctions fit very well within that framework from

6   our point of view, your Honor.

7        THE COURT:  And would not avoid the risk.  Your brief,

8   in passing, points out the risk of spotlighting an area.  I

9   mean, it's -- staffing has been in the spotlight for some time

10  but that you do point to the risk of spotlighting areas, as

11  much as the Court has tried to reinforce in its benchmarks

12  order, you know, this is a global package of remedies that has

13  to fit all together as one big puzzle, does the approach you're

14  suggesting here avoid the spotlighting that means inevitable

15  slideage, backsliding in other areas?

16       MR. GALVAN:  Well, nothing is ever perfect, your

17  Honor, but I think the Court has done everything that the Court

18  could do with last year's evidentiary hearing to put the

19  parties on notice that that sort of spotlighting and

20  backsliding is not acceptable.  And I think that's appropriate,

21  and I think that that message needs to be repeated over and

22  over.

23       THE COURT:  All right.  On that point, Mr. Mello?

24       MR. MELLO:  Just observation number one, I've never

25  heard respectfully issue monetary sanctions, it being

1          respectful of a process, number one.

2                  Number two, with respect to this issue, it should be

3          addressed.  Staffing should be addressed.  It should be

4          addressed by looking at the current system and the current

5          staffing mix, et cetera.  I don't want to repeat myself.  So of

6          course we don't believe that an OSC re contempt is appropriate.

7          Of course we don't believe that sanctions are appropriate.  Of

8          course we're ignoring significant means to provide care and

9          we're not counting certain providers when we come up with

10         staffing ratios.  Of course we're sort of gleefully ignoring

11         that under a Poncianno declaration were 86 percent.  Of course

12         we're ignoring the population continues to drop and that

13         services have changed.

14                 So again, I don't want to repeat myself, and I don't

15         believe it does much good to go -- for me to go tit for tat

16         with opposing counsel.

17                 THE COURT:  But you do concede defendants have had

18         three years, two years before COVID to be focused on staffing.

19         And as I realize the Court shares your assessment, COVID is

20         with us for a while but not forever.  And there's been -- at

21         this point, there's been some stasis achieved in figuring out

22         how to manage circumstances two years before COVID.  What's to

23         make the Court think that the defendants are prepared to

24         voluntarily step up and solve this?

25                 MR. MELLO:  Our actions, the proposals that were

1   almost agreed upon in 2018 when the Court said let's obviate

2   the need for a motion to modify.  You do better when you work

3   collaboratively.  When we almost struck an agreement on certain

4   aspects recognizing that the 2009 plan needed adjustment, we

5   shouldn't ignore that history, and that is what is appropriate

6   here in our estimation, your Honor.

7           THE COURT:  You've heard the Court --

8           MR. MELLO:  I'm sorry.

9           THE COURT:  You've heard the Court's questions.  Brief

10  wrap-up argument before we move on briefly to the DSH motion?

11          Mr. Galvan, you can go first.

12          MR. GALVAN:  Thank you, your Honor.  One thing about

13  Ms. Poncianno's declaration I wanted to correct, she says it's

14  80 percent, not 86.  86 is if you fully count the nurse

15  practitioners, but it's 80 percent the way the numbers are

16  calculated now.

17          Your Honor, your questions, the Court's questions have

18  elicited everything I wanted to say in this argument.  So just

19  in wrap-up, I would say that it is very -- it would be very

20  appropriate now for the Court to issue an OSC returnable in a

21  reasonable period of time that points to the many things that

22  the defendants could do to come into compliance including

23  implementing the labor economist's recommendations,

24  implementing the concrete steps in Dr. Bick's declaration, and

25  in addition, addressing the continued discrimination against

1     the Coleman class in processes that ease transition to the

2     community for other non-Coleman people.  We are still

3     discriminated against in parole hearings.  We are still

4     discriminated against in credit earnings.  And so without doing

5     any kind of release, just by removing that discrimination and

6     making an effort at that, they could continue the work of

7     getting the Coleman population down to the level that they

8     could care for, and all of those things would show a good faith

9     attempt to finally meet the levels in this staffing plan.

10             Thank you, your Honor.

11             THE COURT:  Mr. Mello.

12             MR. MELLO:  Your Honor, I think our briefs and the

13    answers to your questions address the issues.  I will of course

14    stick to staffing and not other issues that were just raised.

15    The appropriate process is not the litigation route.  The

16    appropriate process is to work in the all parties work group.

17    The appropriate process is to give this issue the revisit and

18    rethink that it deserves in light of changed circumstances,

19    changed providers, changed technology, and that's what we think

20    is appropriate here.  And we will continue to strive to provide

21    care and to provide adequate staffing going forward.

22             Thank you.

23             THE COURT:  All right.  On the DSH motion, that would

24    be Ms. Ells and Mr. Heath, as I understand.

25             For Mr. Heath, I would agree I can decline.  I can

1    exercise discretion and simply decline to act on the motion in

2    light of the pending appeal, correct?

3                MR. HEATH:  Your Honor, it was defendants's position

4    in their joint status report that you were deprived of

5    jurisdiction over the April 24th and dated May 7th orders due

6    to defendants' appeal, but defendants have also asked for

7    relief from the March 8th, 2017, order and so are also seeking

8    relief, and so defendants believe it would still be appropriate

9    to seek relief or to -- pardon me -- to rule on that portion of

10   the motion or at least that motion to modify because we are

11   seeking Rule 60 consideration of that order as well.

12               THE COURT:  I don't think that was a direct answer to

13   my question.  Do you agree that I could decline, even though

14   that's what you're asking for now.  I'm not -- I'm thinking

15   about this as a judge.  I've read the applicable rules.  I'm

16   thinking about what's before me.  Even if I have jurisdiction,

17   I can decline and just say I'm going to wait to see what the

18   appellate court says, right?

19               MR. HEATH:  I believe the Court good decline to rule

20   in that instance, but defendants would at least request that

21   the Court has determined she has jurisdiction over this to

22   issue a ruling.

23               THE COURT:  You're not saying it would be an abuse of

24   discretion to just decline?

25               MR. HEATH:  Your Honor, I think that if this motion is

1   left to be continuing and not ruled on for a certain amount of

2   time, it could potentially get to the point of an abuse of

3   discretion particularly after the Court has determined she has

4   jurisdiction over a particular motion.  It could get to that

5   point, defendants believe.

6          THE COURT:  I don't really want to go into the tit for

7   tat.  I understand defendants' position.  They tried to work

8   this out to prevent litigation, and what happened then just

9   contributed to the litigation.  But I just -- it does appear to

10  me the defense has significantly overreacted to the Court's

11  order.  Do you concede that possibility?  The Court's good

12  faith effort to clarify just got taken in a whole direction

13  that this -- I guess the Court at this point should be prepared

14  for that kind of thing.  I'm just -- when I sit back and look

15  at what's gone on here, it just -- it perplexes me to say the

16  least.

17         MR. HEATH:  Your Honor, it was certainly not

18  defendants' intentions to overreact or to cause the Court to be

19  confused as to the reason for bringing the relief.  Defendants

20  having received the Court's April 24th and May 7th orders and

21  the provisions of those orders realize in that instance that

22  there is a situation in fact where something more akin to

23  preapproval to reducing the number of beds in the possible

24  emergency or, you know, seeking specific relief in an emergency

25  before doing anything that may contravene or restrict the

1    program guide's requirements for transfers could prevent

2    immediate action.  And I understand what the Court may be

3    saying that there was -- the Court believes there was an

4    overreaction, but at the same time, defendants don't believe

5    that's so because they're seeking a clear process, the one that

6    they proposed going forward so that defendants can fulfill the

7    Court's orders completely and also take the necessary action

8    that they see in potentially life-threatening situations.

9           THE COURT:  Well, just so it's clear, if this gets

10   argued in front of the circuit, if defendants have a chance to

11   make their case there, it would be a misrepresentation of this

12   Court's order to say it calls for -- it requires the Special

13   Master's preapproval or it gives the Special Master a veto.

14   That is not what this Court's order says.  That is a -- sorry,

15   distortion.

16          Anything to say in response to what you've heard?

17          MS. ELLS:  I'm sorry.  Was that directed at me, your

18   Honor?

19          THE COURT:  Yes.  Just anything to say based on what

20   you heard from Mr. Heath?

21          MS. ELLS:  No.  I was going to make the exact point

22   you did, that it's very clear in the history of this case and

23   the text of the Court's order that there is no Special Master

24   veto.  The buck stops with this Court, as it always has.  It

25   just merely requires defendants to talk to the Special Master

1    when they make calculated decisions like the one that happened

2    here to shut down hundreds of beds to Coleman class members.

3    That's all it requires.

4         THE COURT:  So Mr. Heath, let's assume I think about

5    the merits of the motion.  This has come up for some time now

6    going back to the Court's statuses beginning in this spring.  I

7    continue to struggle to understand the DSH position required by

8    law to admit OHMDs, and without explaining why it's not

9    required by law to admit Coleman class understanding the law

10    properly.  It elevates the state's statutory requirement far

11    above this Court's orders.  I don't -- can you help me

12    understand?  Yet again, I have thought about this since the

13    spring.  I don't understand it.  If you can clarify it for me

14    now, then I can let that issue, you know, go.

15         (Reporter requests counsel to mute while others are

16    speaking due to interference.)

17         THE COURT:  All right.  So Mr. Heath, on that point?

18         MR. HEATH:  And I apologize for not muting while other

19    parties are speaking.  I'll be sure to do that.  Your Honor,

20    with response to that, I think we did address this in our OSC,

21    the difference with the OMDs there and the fact that they have

22    been confined for a determinate sentence, and there's -- at the

23    end of that determinate sentence, their psychiatrist or

24    clinician has stated that they need to go into additional

25    treatment, and CDCR cannot hold them any longer in detention.

1    So that's defendants' position there.

2         With regards to Coleman patients, and I don't think

3    it's necessarily your Honor that defendants are elevating their

4    discretion above the Court's order, but recognizing in a crisis

5    that they are able to take certain -- certain steps in

6    emergencies to potentially -- that may potentially restrict

7    those rights or the purpose or the time of the emergency and

8    relying on *Jacobson*, which defendants realize the Court has

9    previously determined in an order that's on appeal that

10   *Jacobson* may not apply on this, but defendants believe that

11   that also is one of the grounds for their ability to

12   potentially take that emergency step in this kind of emergency

13   situation.

14        THE COURT:  And anything further on that, Ms. Ells?  I

15   think I understand your position.  I don't know that you have

16   anything to add, but if you do, briefly.

17        MS. ELLS:  No.  I don't have anything to add on that

18   except that I think we're going to be discussing this same

19   issue very shortly with respect to the DSH hearing later in the

20   status conference.

21        THE COURT:  All right.  I have no further questions on

22   the DSH motion.

23        Anything further not covered by the briefing or our

24   discussion just now, Ms. Ells?

25        MS. ELLS:  No, your Honor.

1          THE COURT:  Mr. Heath?

2          MR. HEATH:  No, your Honor.

3          THE COURT:  All right.  We're ready to move to the

4    status conference, which I do believe will take, you know, up

5    to half an hour.  I'd like to take a break for the court

6    reporter's sake, and this is a logical breaking point.  So

7    we'll come back.  We'll talk about quarantine and isolation

8    space.  We'll hear an update from the Special Master.  And then

9    I'll hear from the parties anything they have to say.  We'll

10   talk about the evidentiary hearing currently set for

11   October 23rd.  We'll hear if there are any other matters, and

12   then the Court will have a few closing remarks.

13          So let's take a 15-minute break.  I'll see you back

14   here in 15 minutes.

15          Ms. Schultz?

16          THE CLERK:  That's all, your Honor.  I was going to

17   ask how long the break is.  Thank you.

18          (Recess taken 10:20 a.m. to 10:36 a.m.)

19          THE COURT:  Thank you, Ms. Schultz.

20          All right.  We're back on the record, and we'll turn

21   to the next matter.  We're officially beginning the status

22   conference, the third quarterly status.  And we'll begin with a

23   report from the Special Master on quarantine and isolation

24   space issues.  My understanding is despite some initial

25   concerns that the Special Master was not in the loop for

1    essential discussions.  He has been brought into the loop, but

2    I'll let him report, let us know if he believes he's getting

3    all the information he needs, and otherwise bring us all

4    up-to-date.

5              Special Master Lopes.

6              SPECIAL MASTER LOPES:  Thank you, your Honor.  We have

7    had a number of discussions with the parties in the Receiver's

8    Office as well regarding isolation and quarantine space, and in

9    a recent coordination meeting we have further tried to iron out

10   any concerns that we may have.  The ongoing discussions are

11   evolving and are somewhat -- I hate to use this word --

12   organic.  Things are changing all the time in terms of the

13   matrix that's been put out and concerns around its use and

14   applicability particularly to the EOP population.

15             I think in terms of the EOP population and those

16   needing higher levels of care where my experts are reasonably

17   comfortable with having treatment in place for those in MHCBs

18   and possibly in PIPs and the quarantine and isolation space

19   conversations around CCCMS Coleman class inmates, we're

20   comfortable with that as well.

21             There are discussions that are ongoing regarding where

22   to put EOPs and whether they can be put in separate housing as

23   required by the program guide.  It's unclear to us how that

24   will occur and if it will occur, but those discussions are

25   ongoing and have been productive.

1          So at this point, your Honor, I don't have concerns

2     that we're not getting proper information.  It's more of a

3     concern of understanding where the defendants are going in

4     terms of space for EOPs.  But I'm reasonably confident that we

5     can resolve any concerns that we have, and we are engaging in

6     conversation regularly.

7          THE COURT:  My understanding is you have good

8     coordination with the Armstrong --

9          SPECIAL MASTER LOPES:  Yes.  Yes, your Honor.  So --

10          THE COURT:  -- the Armstrong special master, right?

11    Is that the right --

12          SPECIAL MASTER LOPES:  The Armstrong expert.

13          THE COURT:  The Armstrong expert.  And that also

14    Dr. Bick is your primary contact person at this point?  I

15    realize that Dr. Bick has multiple hats, but is he your primary

16    contact for Plata purposes?

17          SPECIAL MASTER LOPES:  Dr. Bick does have multiple

18    hats, but the receiver has facilitated conversation for us

19    either through the coordination or he has brought some of his

20    staff to our ongoing task force meetings as well where they've

21    presented their overview on the matrix process and the

22    isolation and quarantine issues.  Now nothing is perfect.

23    We're still working through that whole process, but the

24    receiver has been very actively involved with us.

25          THE COURT:  All right.  Thank you Special Master

1   Lopes.  Let me ask if there's any question based on that report

2   or anything to add from a party's perspective, Mr. Lewis?

3           MR. LEWIS:  Yes, your Honor.  Good morning.  The

4   Special Master did summarize the current status of the

5   meetings, and there are many ongoing conversations about this.

6   So we appreciate his summary in that regard.  The only thing I

7   would ask or the only thing I would add is that, correct, there

8   are a lot of people looking at this issue.  This is squarely in

9   front of the receiver.  He owns the matrix.  He also owns the

10  idea of isolation and quarantine space per the Plata court.  In

11  fact, there was an order issued regarding this just this week.

12  I think it was either yesterday or the day before.  So the

13  Plata court's involved in this.  So CDCR is making sure to

14  coordinate with the Special Master but also the receiver,

15  Dr. Bick being central to all of that, because CDCR has been

16  medically quarantining and isolating patients for decades, for

17  all time.  Because it's not just COVID that's happened, it's

18  been previous outbreaks.  So this is something they're very

19  familiar with.  They are very attuned to some of the concerns

20  that are being raised, and they look forward to continuing

21  those discussions, defendants, Dr. Bick, et cetera, in the

22  various work groups the Special Master has mentioned.

23          THE COURT:  All right.  Ms. Ells?

24          MS. ELLS:  Yes, your Honor.  We remain deeply

25  concerned about what is happening with the quarantine and

1    isolation space planning.  Defendants just last night sent us a

2    letter saying that they will not separate EOPs in quarantine

3    housing.  That is consistent with the position that they have

4    taken in task force meetings recently.  They've been very clear

5    on that, but they haven't sought any approval from this Court

6    to do that.  Obviously that is in contravention of the program

7    guide, and we are very concerned that the Plata court has

8    already approved plans to build or I mean to activate the space

9    that has already been identified, and that space does not

10   account for separating EOPs, much less people in the PIPs, into

11   separate areas as part of that planning process.  So we feel

12   like it's an urgent issue.  We feel like it is something this

13   Court should address.

14          And the other point I'd like to make is that during

15   this process defendants, although they say quarantine is the

16   same as it's always been, it's obviously not.  It is much

17   deadlier than quarantining for the flu.  That is why the Plata

18   court is requiring proactive bed planning, to ensure that there

19   is appropriate and adequate space.  And moreover, defendants

20   have repeatedly stipulated in the Armstrong court to provide

21   accommodations fully for people that are in the quarantine and

22   isolation spaces to allow for their programmatic and

23   architectural access to programs and services.  But not only

24   are they not willing to do that here, they won't even agree to

25   attempt to separate EOP and higher levels of care in these

1    spaces.

2            And moreover, as I just said, there's also a concern

3    that, in the meantime while we are determining, I guess,

4    whether or not EOPs will actually be separated as required by

5    the program guide, there is no directive or policy issued to

6    the hundreds of quarantine units that are operating right now

7    to keep EOPs separate to ensure that they program separately,

8    to ensure that they don't mix on the yards or in medication

9    lines.

10           We've heard reports from at least two prisons in the

11   last month at the end of August that quarantine spaces were not

12   appropriately keeping people separate, not only from people

13   that were not supposed to be on quarantine status but also that

14   patients are just mixing with everybody else in the units while

15   on quarantine status.  There needs to be some clear directives

16   from defendants telling institutions that they do have to

17   provide programming and treatment, and they do have to make

18   sure the EOPs are separate for that process.

19           So our request is that the Court issue an order to

20   show cause why the program guide's requirements for keeping

21   EOPs and higher levels of care separate from the general

22   population should not carry over into these preplanned

23   carefully coordinated quarantine and isolation spaces that are

24   already being rolled out without accounting for class members'

25   needs.

1          THE COURT:  Can plaintiffs not bring a motion on an

2    expedited basis?

3          MS. ELLS:  We certainly could.

4          THE COURT:  Doesn't need to take a lot of words.  But

5    there was motion practice in the Armstrong court.  You know, I

6    appreciate the confidence that some seem to place in this

7    Court's ability just to reach out, and I understand the program

8    guide is the subject of court orders.  But really, given the

9    complexity of this case, it would assist the Court in deciding

10   yea or nay, if I can see focused -- I will say, I'm prepared to

11   set this issue for hearing afternoon of October 1st.

12   Plaintiffs get something in by the end of this week.

13   Defendants by the end of the day next Tuesday.  And I'll make a

14   decision.  That's -- for this burdened court, that would be the

15   most helpful if plaintiffs really believe I should go there.

16         MS. ELLS:  We understand, your Honor.  As Mr. Mello

17   said, we have been trying to work in this cooperative process.

18   We just received defendants' letter last night responding to

19   our concerns.  We understand that the Court wants action from

20   us, and we agree that that is appropriate.  We also do believe

21   that an OSC, given that there are program guide requirements

22   that are not being met, is appropriate, but we understand that

23   the Court would prefer motion practice; and we appreciate that.

24         THE COURT:  I think it can be expedited, and it

25   wouldn't necessarily need to lead to an OSC.  I could just cut

1   to the chase and decide one way or the other.  I did have great

2   concern going back more than a week, just so the parties know,

3   based on what I was hearing from the Special Master because I

4   understood he was not being provided the information that he

5   required to report to the Court and to understand what is going

6   on.  At least now he believes he's getting information.  I'm

7   aware of the issues that the plaintiffs are raising.  You know,

8   there aren't regular convenings of the Armstrong, Plata, and

9   Coleman courts.  I certainly know how to communicate with those

10  colleagues, and there have at least been passing references to

11  mental health, you know, without the granular detail that might

12  be called for here.

13          So I am prepared to issue orders if they are required,

14  but I think at this point I would direct, if the plaintiffs

15  want the Court to issue something, filing a focused brief, I

16  think it could be less than ten pages by the end of the day

17  Friday.  Defendants, any response end of the day September

18  29th, Tuesday.

19          (Reporter requests counsel to mute while the Court is

20  speaking due to interference.)

21          THE COURT:  Plaintiffs to file an ex parte request end

22  of the day Friday the 25th.  Defendants any response end of the

23  day -- I mean 5:00 p.m.  You know, if you take 22 minutes

24  longer, I'm going to approve that, but not midnight.  So end of

25  the day September 29th, and I will put on the calendar for now,

1     if Ms. Schultz confirms I can be available the afternoon of

2     October 1st at 2:00 p.m., I'll put as a placeholder a hearing

3     on the matter and be prepared to issue a bench order if I

4     decide one is called for.

5              Ms. Schultz, does that date work?

6              THE CLERK:  Yes, your Honor.

7              THE COURT:  All right.  I'm not prejudging, but I'm

8     aware of this issue; and I'm prepared to move quickly if need

9     be.  We've already -- in other proceedings this morning

10    defendants have not called out the Coleman class and made

11    targeted arrangements.  And Mr. Coleman and his class members,

12    they are a specialized class.  And they could argue they are

13    the least of the least.  And it doesn't mean they get to be

14    left at the back of the line repeatedly.  Defendants may tell

15    me that's not what's going on, but there are times when this

16    Court has serious concerns.  So I have a process for addressing

17    this issue now.  Anything more on quarantine and isolation,

18    Ms. Ells?  And then final word, Mr. Lewis.

19              MS. ELLS:  No.  Thank you.  We appreciate that.

20              THE COURT:  Mr. Lewis?

21              MR. LEWIS:  Yes, your Honor.  Your Honor, we heard one

22    thing from the Special Master, and the plaintiffs obviously

23    went a different direction.  There's so many things to unpack

24    there.  I will just say that first things first.  Sometimes --

25    setting aside Coleman class members in isolation or quarantine

1    sometimes is not clinically necessary here.  It's contrary to

2    client -- to public health for their clients.  There are

3    ongoing conversations with many public health experts about

4    this.  The numbers of EOP inmates that are currently infected

5    right now are below ten.  We're talking about relatively small

6    numbers here, very serious numbers nonetheless, but we're now

7    talking about a very small subclass here.  It's not that -- the

8    defendants of course are taking care of them and meeting their

9    obligations to care for the health and safety of all inmates

10   regardless of their classification.  In the case of the

11   Armstrong inmates, that's a disability case.  That's an access

12   to cell.  That's an access to quarantine space.  It's very

13   different than say the Coleman class members which may not have

14   the same access issues.

15          We also have issues with an expedited motion on this

16   because it does seem that there is a real process that's going

17   on right now we're having a lot of fruitful discussions that

18   doesn't need to generate filings or orders.  But if your Honor

19   decides that that is something that happens and if plaintiffs

20   file, we of course will respond.  The shortened time frame does

21   cause concern given the very ongoing and frankly timely

22   conversations that are happening.  So I don't know if it needs

23   to be as expedited as plaintiffs' claim, particularly when

24   there's such a low amount of people within this population.

25          So I would say that an expedited motion is not exactly

1   the right way to go about this given that it's such an

2   important issue and frankly if there's coordination that has to

3   happen given that the Plata sphere is now being involved.  This

4   is something that's happening in the Plata court as well.  So I

5   would be concerned that an expedited motion could cause

6   basically confusion because you're going to have two different

7   things going on.  But your Honor, we will address this in our

8   written papers if it's there, but I don't believe the expedited

9   motion schedule is necessary at this time.

10          THE COURT:  When you say small number, what's the

11  number?

12          MR. LEWIS:  Your Honor, if you give me a minute, I'll

13  look that up.  As of yesterday, I believe that we had ten

14  infected EOP patients, one ICF and one in MHCB.  I don't have

15  their locations, your Honor.  But now granted the number can

16  change.  We're not talking about --

17          THE COURT:  I thought you were referring to the

18  Coleman class.  You said it's a "small subclass."  What did you

19  mean by "small subclass"?

20          MR. LEWIS:  A small subset of the total infected

21  population of COVID inmates, your Honor.  12 EOP, ICF, and MHCB

22  all together this week.  So we're talking about a very small

23  population.  And most importantly, quarantine and isolation is

24  not permanent.  It is a very temporary housing situation to

25  allow -- quarantine is questioning.  We're trying to figure out

1   if that person has COVID.  Isolation is we're trying to help

2   them deal with the symptoms and get them out.  These are not

3   permanent situations, and the care follows the patient at each

4   level.  So this is not a situation --

5           THE COURT:  So I hear what you're saying, and you may

6   be saying that in good faith following the members of the

7   Coleman class.  That may be a question for a different day.

8   The question is are the quarantine and isolation efforts being

9   driven by other courts squeezing the Coleman class?  That is

10  the question in a way that is not to be countenanced by this

11  Court.  So the schedule can focus minds.  If you can meet and

12  confer and work out a stip that I can enter as an order, of

13  course I am open to that.

14          I have concerns that the landscape is changing

15  underneath this Court's feet and that there will be a request

16  for forgiveness rather than permission.  And I'm trying to, at

17  what may even now be a late date, to prevent that by allowing

18  this focused effort --

19          MR. LEWIS:  Yes, your Honor.  And --

20          THE COURT:  -- the parties to an agreement, then

21  that's fine.  But the least of the least cannot remain at the

22  back of the line.

23          MR. LEWIS:  Yes, your Honor.  And I hope that my

24  statements did not imply at all and I hope there's been no

25  implication at all that Coleman patients are at the back of the

1   line in any regard.  I've never seen any indication of that.

2   I've never seen anything like that in any filing that we've

3   made or anything that I've heard of, and I hope that I did not

4   insinuate that at all.

5          THE COURT:  You're not saying that, Mr. Lewis.  When I

6   look at the totality of what's before me, you have to respect

7   that I have to worry about that.

8          MR. LEWIS:  Absolutely, your Honor.  And I understand

9   that.

10          Your Honor mentioned working in the collaborative

11  process, and that's, I think, what the Special Master has

12  mentioned is going on.  My concern is that such an expedited

13  schedule that your Honor is talking about with basically

14  briefing being due when there's going to be task force meetings

15  going on could be counterproductive.  And so I would ask that

16  the Court consider, if it's a briefing schedule, expedited

17  could mean a week or two weeks because there is time that would

18  be needed to have these conversations.  We didn't have a task

19  force meeting this week because of the preparation for this

20  hearing.  We're going to be having one next Tuesday right when

21  this brief would be due for defendants, and that would put us

22  in a very tough situation given that we would want to make the

23  5:00 deadline.

24          I would ask the Court consider moving it out just a

25  few days possibly to the end of the week or even the beginning

1    of next week to allow some of the conversations that your Honor

2    has mentioned to allow plaintiffs and defense to talk about the

3    letter that we did file last night.  We would ask for that

4    consideration because there are conversations going on.

5    Dr. Bick wants to talk with plaintiffs about this.  We want to

6    talk to special experts and to the public health experts about

7    this.  Expedited briefing in four days will not allow that to

8    happen considering that there's further task force meetings

9    going on and small work groups going on where this very issue

10   is being discussed.

11        THE COURT:  Well, the Special Master assures me that

12   he regularly tells you that he has bosses, and I'm not going to

13   change the briefing schedule.  But if you meet and confer and

14   tell me more time is needed, that's fine.  I'm open to that.  I

15   want meaningful discussion, but I don't want the ground

16   underneath me to shift any further without assurances that --

17   enough detail to back up what you're saying, Mr. Lewis.  I

18   assume and expect that you're operating in complete good faith,

19   but some of what I hear and see has caused sleepless nights on

20   this end.  I continue to have -- I'm willing to continue to

21   have sleepless nights, but I can't just countenance, you know,

22   endless referrals to work groups as that agenda piles up.  If

23   you meet and confer and work out a stipulated different

24   schedule, you can let me know.

25        Let's talk about the evidentiary hearing currently set

1    for October 23rd.  Ms. Lewis, your position on that?

2            MR. LEWIS:  Your Honor, defendants maintain that the

3    evidentiary hearing, as we've said in our previous papers, is

4    not necessary.  Your order talked about whether or not

5    defendants were meeting the COVID guidelines that have been put

6    in place.  As we have gone through now for five months since

7    your order was issued back in April and now I believe it's up

8    to 35 task force meetings that we've had.  Consistently we've

9    been having conversations both among just the clinicians as

10   well as in a larger task force setting where we've talked about

11   how the DSH transfers are going.  They may be stalled right now

12   because of closed movements and the movement matrix and

13   concerns over COVID spread, but they are nevertheless -- the

14   guidelines that are out there that have been agreed to and have

15   been proposed through the Special Master's processes are being

16   followed and are being utilized.  And we believe that at this

17   time a further evidentiary hearing on DSH staffing on now an

18   order that is now five months in the past one month from now is

19   simply not necessary, and we just don't believe that it should

20   go forward as scheduled.

21           THE COURT:  All right.  Ms. Ells?

22           MS. ELLS:  We strongly disagree with that.  In the six

23   weeks since we've filed our request to continue the hearing by

24   60 days, there has not been a single transfer in six weeks.  At

25   the same time, in that same six-week period 56 OMD admissions,

1    and that includes from institutions that were closed to

2    transfer due to COVID.  There have been 242 OMD admissions in

3    the same time that there had been 81 admissions total for

4    Coleman class members since the April hold was lifted.  In the

5    last six weeks since we filed our request to continue the

6    hearing by 60 days, the number of open ASH beds has doubled

7    from 40 to 80.  The number of patients waiting past program

8    guide time lines was nine at the time we filed.  It's now 35.

9         And additionally, we have discovered that there are

10   significant delays even for patients for whom COVID holds have

11   been lifted.  Those patients are waiting weeks, if not a month,

12   to transfer into DSH, although they are admitted for care at

13   DSH and although there is no COVID hold on them.  They are

14   nonetheless waiting to transfer for up to a month.  And that

15   happened for every single person that was admitted and

16   transferred in the month of August after a COVID hold was

17   issued.  Every single one of them saw weeks, if not a month, of

18   delays before they actually received that care.  We are very,

19   very concerned at this point that the process has completely

20   broken down.  No one's moving.  And we think that it is time

21   for this evidentiary hearing.

22        THE COURT:  All right.  I understand those respective

23   positions.  I'll consider them and make a decision.

24        All right.  Let me ask do the parties have other

25   business they wish to bring to the Court's attention,

1    Mr. Lewis?

2                MS. ELLS:  Pardon me, did you direct plaintiffs --

3                THE COURT:  I'm sorry.  I said Mr. Lewis.  I might

4    have said it while looking down at my agenda.  Mr. Lewis first,

5    then Ms. Ells.

6                MR. LEWIS:  Your Honor, the defense does not have

7    anything additional to add at this time.  Does your Honor have

8    any other matters?  I only ask because there was the other

9    matters line within the agenda that was released back on Friday

10   of last week.  Were there other issues your Honor wanted to

11   address?

12               THE COURT:  Nothing in particular.  I'll always give

13   advance notice if I have something in mind.  I know there are

14   many other things out there.  I know there are many things

15   referred to the Special Master, and we'll come back to those.

16   But I did not have a need to discuss anything in particular

17   unless you wanted to bring something.

18               MR. LEWIS:  Your Honor, the only thing I would ask is

19   if I may revisit -- and I don't like to move back when the

20   Court has already moved on -- but on the DSH issue, many of

21   these things are driven by conditions related to COVID,

22   obviously the movement matrix which is owned by the receiver

23   and CCHCS and which is something that is out there to protect

24   the health and safety of all patients to include Coleman class

25   members.

1          Your Honor, on the issue of the OMHDs, on the

2     offenders with mental health disorders, the reason why there

3     are so many of them transferring, whereas not there are Coleman

4     members, it is a shall versus a may.  And I don't want to

5     belabor this point, but in case the Court has any questions,

6     the Penal Code says that CDCR upon the conclusion of an

7     individual sentence if they are deemed by their treatment team

8     to be a danger and they cannot go out to the public, they must

9     be transferred to DSH.  Those are Coleman class members that

10    have completed their sentence, and now they are out.  But they

11    must be transferred if, at the opinion of their clinicians,

12    they are a danger to themselves or others.  So they must go to

13    DSH.  Whereas, many of the things that guide Coleman class

14    members are DSH can accept them or CDCR my transfer them.  In

15    this particular situation, there is simply nowhere else for the

16    OMHDs to go.  These are people determined to be violent or

17    possibly a danger to themselves or others, like I've said, and

18    the place they need to go is DHS.

19          Coleman class members are receiving care at their

20    current institutions, and while they may not be able to go due

21    to COVID holds or things associated with the movement matrix

22    have to -- there is a priority that they do keep receiving

23    their care at their institution.  Whereas OMHDs, there is

24    nowhere else for them to go other than to on the street where

25    there would be no care.

1          So CDCR has a situation and DSH does too where they

2     must do something about the OMHDs vis-a-vis DSH.  But with

3     Coleman class members, they can leave them, or they can let

4     them stay at their current institution to keep on receiving

5     care there.  If they were to go to DSH, there's a risk that

6     they would be stuck in isolation or quarantine at the DSH

7     facilities not receiving care.  So by staying at CDCR, they are

8     receiving that care there.  Whereas, DSH has the obligation to

9     take the OMDs.

10          And Ms. Ells mentions about how -- that there have

11     been OMDs that have transferred from closed institutions.  Yes,

12     there are vigorous conversations that are going on about

13     whether or not those people can transfer.  But once again there

14     is layered over all of this the concept that statutorily they

15     must move those individuals, those OMHDs to DSH on the

16     completion of their sentence because clinically they are not

17     able to be on the streets, otherwise they would be a danger to

18     themselves or others.

19          So your Honor, I apologize for going back in an agenda

20     item, but I just wanted to make that point for defendants,

21     please.  Thank you.

22          THE COURT:  All right.  I'm listening.

23          Given that Mr. Lewis revisited, anything that you want

24     to say, Ms. Ells?

25          The parties have addressed this previously.  I

1   understand the defense position as articulated here today.

2   I'm -- I can't say I'm persuaded by it.  I've already said that

3   previously but I understand.

4            Anything else you want to say on that point, Ms. Ells?

5            MS. ELLS:  Just very quickly, I won't belabor the

6   point.  The Court has already ruled that sitting in a

7   noninpatient unit is not constitutional for people that need

8   inpatient care.  As of the data they provided this week, 39 out

9   of the 49 accepted DSH referrals are in a prison.  They are not

10  in a PIP.  The point is that defendants view this Court's

11  orders as optional.  They believe it is a shall, not a may, as

12  they've stated, but the constitution requires otherwise.  And

13  defendants set up a process to safely transfer OMHDs, and they

14  do it every week.  And they could apply that process to Coleman

15  class members if they felt that they were obliged by the

16  constitution to do so, and they just don't feel that way.  So

17  we need a hearing.

18           THE COURT:  All right.  I understand that position.

19  So nothing further, correct, Mr. Lewis?

20           MR. LEWIS:  Nothing at this time, your Honor.

21           THE COURT:  Ms. Ells?

22           MS. ELLS:  Yes, your Honor.  Moving on to new

23  business, I just want to raise the fact that plaintiffs in

24  recent weeks have become increasingly concerned that these

25  agreements or emergency policies that were put in place very

1   early in the pandemic have now remained static for six months.

2   Our expectation was always that defendants would be taking

3   steps to ensure constitutionally adequate care, that they would

4   revisit the policies to ensure that care was being provided.

5   This Court's July 28th order echoed exactly that requirement,

6   and yet we've seen no change in the care being provided to

7   class members in the system.  It's still terrible.  There is

8   nobody moving.  By and large, there are people sitting in units

9   receiving enhanced level of care that defendants literally told

10  us they cannot track at this point, and they don't know what is

11  happening to those class members in terms of the mental health

12  care being provided.

13       Segregation stays have gone up for class members.  You

14  know, it's become very apparent to us that the focus has not

15  been on how to provide care during this longstanding pandemic,

16  and that's what the focus needs to turn to.  Our understanding

17  from task force meetings is that defendants currently have no

18  plans for what steps they will take to return to constitutional

19  levels, and we are just very concerned that perhaps the focus

20  on having been in meetings about policies and about changes is

21  perhaps taking away the time that defendants should be spending

22  on actually figuring out how to comply with the Court's orders.

23  And we really feel like that's got to be the focus of all of

24  the parties and the Special Master's attention right now

25  because it's not happening, and we're seeing no improvement or

1    even any adaptation of those early emergency policies to

2    account for the fact that this pandemic is not going anywhere.

3          So I guess I just wanted to raise that with the Court

4    and possibly discuss reducing the number of task force

5    meetings.  They consume a lot of time and energy.  They don't

6    seem to really be achieving anything at this point.  And I

7    guess that's something that we wanted to raise for the Court is

8    we feel like perhaps all the time spent in those work groups

9    could be better spent elsewhere, but really the attention of

10   the defendants at this point needs to be on how to provide

11   care.

12         THE COURT:  All right.  Let me ask.  I don't know if

13   he's hearing this for the first time.  Special Master Lopes, do

14   you have a thought at this point?  We of course can follow up,

15   but any thoughts to put on the record about the schedule for

16   task meetings?

17         SPECIAL MASTER LOPES:  Your Honor, I have robust views

18   about that and a few other topics that have been discussed, if

19   I may --

20         THE COURT:  All right.

21         SPECIAL MASTER LOPES:  -- unpack this.  I totally

22   disagree with Ms. Ells about the meetings.  We have had

23   meetings to discuss restoring program guide requirements.

24   They've been slower than what we would like, but they have been

25   scheduled.  I find that the task force meetings and the small

1    work group meetings focus minds more than silence because, if

2    people feel like they have to come to the table and have a

3    discussion, a robust discussion, sometimes an uncomfortable

4    discussion, they're more likely to do the work and share

5    information with us.

6         It's not like the days when we would be out physically

7    touring all the time and the need for immediacy with meetings

8    wasn't there.  We are not physically in the facilities

9    regularly, and the information flow has been very important.

10   Now are there times where you sit there in frustration with a

11   meeting or something doesn't get done that was promised, sure,

12   that is going to occur.  But if we take all these meetings off

13   line, we don't have those regular robust conversations which

14   are taking place more now than they ever were before, then we

15   will lose some of the momentum that has occurred.  So I

16   strongly disagree with Ms. Ells.

17        I strongly agree with Ms. Ells that it is frustrating.

18   It is troubling and it has been for years and years, maybe

19   decades, that OMD admissions occur, and those from the Coleman

20   class to DSH don't occur as frequently a lot of times, and

21   there is a shall and a may, yes, as she so put it, around these

22   admissions.  There haven't been any transfers in weeks to DSH

23   notwithstanding a looming waitlist that is rising every day.

24   The number of OMDs being admitted is soaring.  The

25   corresponding number of admissions to ASH from Coleman class is

1    dipping.  It is below 200.  There are below 200 people in ASH

2    right now.  There are a number of people that need care and

3    treatment.  And while I understand the argument about closed

4    institutions and transfers and the concerns, many of the OMDs

5    are being transferred from closed institutions to DSH, and

6    there is a need to reboot the admission and transfer process.

7    It's my understanding that Dr. Bick and others are considering

8    the same.  But today as we sit here, there are -- there's a

9    large number of waitlisted inmates ready for transfer while an

10   OMD from the same facility could be moved in.  That is really

11   concerning and has always been concerning.

12         I have and my team has always had going back to

13   isolation and quarantine, we've always had concerns, and we've

14   held the line on the separation of EOPs from other inmates.  We

15   feel very strongly about it.  When there have been efforts to

16   water that down, we have resisted.  And in this case it's no

17   different.

18         However, while Dr. Bick has had robust views and my

19   clinicians have sparred with him periodically and at times he

20   has taken on a rigid position, I think that the last meetings

21   we had with Dr. Bick around EOPs and separation, he left the

22   door open for other conversations, and I look forward to having

23   those conversations.

24         That is not -- I'm not opining on an expedited

25   briefing schedule.  I'm not opining on a letter that I have yet

1   to review because we were filing a suicide prevention report

2   late into the evening last night, but I can say that those

3   conversations have been robust.  We have real concerns about

4   the lack of clear direction, as Ms. Ells said, to the field

5   about what will happen when someone is quarantined or isolated,

6   will they receive any treatment?  How will they be moved from

7   yard to yard?  Will they be receiving yard, if at all, with

8   other JP inmates?  She is absolutely correct that some of

9   the -- there's a lack of clarity there.  I don't disagree with

10  that.

11          And while some of my experts will probably take

12  umbrage with this because there has been tension in terms of

13  Dr. Bick's position and in terms of what my experts might feel,

14  I again left my last discussion with him thinking that the door

15  was open to more discussions, and I would be the first one,

16  your Honor, to come to you to say that I thought that we had

17  reached an impasse and that this was definitely going to hurt

18  the EOP class.  That is not to suggest there isn't a need to

19  focus minds by, you know, a briefing schedule.  That's not to

20  mean that more shouldn't occur.  I am not arguing that.  I'm

21  just saying that, you know, the discussions I've had in terms

22  of Armstrong and the discussions I've had with Ed Swanson, they

23  have been very productive, and there's nothing that Ed Swanson

24  has told me where there would be a reduction in the number of

25  cells available for EOPs.

1          So I have broad views.  But I will go back to, if we

2     take all these meetings off, the lines of communication which

3     have been developed over the last six months when things

4     couldn't have been more tense for any of us.  And I share your

5     views, your Honor.  I'm losing a lot of sleep as well on all of

6     these issues, but if we stop communicating in these work group

7     meetings and small work group meetings, there will be no

8     communication, and then we won't find things out quickly, and

9     we won't be able to stop or shape things that are going in a

10    wrong direction.  And it is in my best interest from a selfish

11    standpoint to take all of it off because then we're all freed

12    up to do other things.  This is not the time.  That's my

13    report, your Honor.

14          THE COURT:  All right.  The Special Master has spoken

15    his mind, as he is always encouraged to do with this Court on

16    the record and when he is briefing me off the record.  So I

17    will -- the work group meetings, the task force meetings should

18    not be black holes, but I will -- so I'll bear in mind what the

19    parties have said, and I'll follow up with the Special Master;

20    but I've heard the positions of the parties and the Special

21    Master.

22          Ms. Ells, anything further?

23          MS. ELLS:  One request.  Your Honor, we do have a

24    joint update to the Court that's due at noon on this Friday

25    regarding the task force process.  Those short reports are very

1    time consuming.  Given the expedited hearing schedule on the

2    isolation and quarantine process, I would request that perhaps

3    we move that deadline to next week if the Court would be

4    amenable?

5              THE COURT:  Is there a new schedule that would make

6    more sense if part of the time-consuming -- time being consumed

7    is the frequency of those reports?  Should we move to a new

8    schedule?  I'm happy to grant a week's continuance of this one

9    report.

10             MR. LEWIS:  Your Honor, perhaps if I could be heard on

11   this.

12             THE COURT:  All right.

13             MR. LEWIS:  And my apologies for interjecting,

14   Ms. Ells.  This was actually something that I was going to

15   mention to plaintiffs, and simply with the preparations this

16   week we haven't had the time.  I share the Special Master's

17   statements.  The meetings are very time consuming both in the

18   small work group and task force, but they do open lines of

19   communication; and lines of communication are the most

20   important thing right now.  So I would support that they

21   continue.

22             But I think where Ms. Ells may be going is that the

23   protection of the joint written status reports is incredibly

24   time consuming, and perhaps we could do a longer cycle maybe

25   due every three weeks or four weeks.  This is something that I

1    was going to broach because that does take an inordinate amount

2    of time to prepare that, those written summaries, because we do

3    talk about so much within the task force setting.  So perhaps

4    some relief --

5              THE COURT:  At this point this Court is not interested

6    in making work, and so I am -- and we have moved to a different

7    phase of the pandemic.  So what's your position?  Do you think

8    I should still receive reports, or should I just rely on the

9    Special Master to brief me?  I can set up regular briefings to

10   make certain he's distilling for me.  And I'm prepared to

11   entertain that as well if your time spent on those reports

12   currently is better spent elsewhere.  Is that an option?  Your

13   position on that possibility, Mr. Lewis?

14             MR. LEWIS:  Yes, your Honor.  I think your Honor has

15   it correct.  We do provide a lot of information to the Special

16   Master, and if there's something that he believes is important

17   to give to you or if you would like information from him, and I

18   don't want to make work for his team, but I think it would be a

19   better use of everyone's time if we didn't have those reports

20   anymore.  They are so incredibly time consuming.  But the

21   Special Master still gets the information that he needs during

22   the task force regarding population or things like that.  So

23   that would be my position and defense position that the reports

24   are no longer needed.

25             THE COURT:  Ms. Ells?

1          MS. ELLS:  We disagree with that, your Honor.  We cite

2     to those reports a lot in various briefings to this Court.  We

3     think they're a very important record.  If we're going to have

4     these meetings, it should be clear that there are -- that they

5     are moving things forward or not and that they are clarifying

6     positions or not.  And the joint statements crystallize that.

7     We often find out when we are drafting those joints statements

8     that actually defendants thought that we disagreed with some

9     policy, and we can clarify it during the process of writing

10    that report that that's not accurate.

11         So we do think that they are an important part of the

12    process.  We do think they should continue.  I would suggest

13    that a four-week schedule makes more sense, however.

14         THE COURT:  All right.  Let me take those thoughts in

15    mind.  For now, the next report is due a week from Friday.

16         MS. ELLS:  Thank you.  It's currently this Friday.  We

17    would request that it be due next Friday.

18         THE COURT:  That's what I'm saying.  So it's due a

19    week from this coming Friday.

20         MS. ELLS:  Thank you.

21         THE COURT:  That's the schedule unless or until I tell

22    you otherwise.  I'll move at least to monthly if I retain the

23    reporting requirement.

24         All right.  Anything further, Ms. Ells?

25         MS. ELLS:  No.  Thank you, your Honor.

1          THE COURT:  Anything further, Special Master Lopes,

2   just checking?

3          SPECIAL MASTER LOPES:  I'm sorry, your Honor.  I have

4   one last thing.

5          THE COURT:  All right.

6          SPECIAL MASTER LOPES:  The task force meetings are an

7   hour and a half every Tuesday.  They are small work group

8   meetings of an hour to an hour and a half maybe once --

9   actually twice in a week, and then there's probably a one-hour

10   meeting with DSH.  I would argue that the parties spend more

11   hours working on this draft report than they do prepping for

12   the meetings that I just outlined which the plaintiffs wanted

13   to take off calendar so, if anything, there's more hours

14   plugged in, I would imagine, to doing this report.  And while

15   it's important to the record, there may be a strong argument

16   for moving it from every two weeks to another time period.

17          THE COURT:  All right.  I'll follow up with the

18   Special Master, and also I understand the plaintiffs' point

19   about memorializing.  So let me try to think about the best

20   resolution.

21          So anything further, Special Master Lopes?  Just

22   making certain.

23          SPECIAL MASTER LOPES:  No, your Honor.

24          THE COURT:  All right.  Let me just make some brief

25   wrap-up comments of my own before we sign off.  And I want to

1   start by emphasizing the positive.  There's a great jazz song

2   that says we should all do that, accentuate the positive when

3   we can.  And I don't always do that, and I want to be certain

4   I'm doing that.  I did -- it's a draft, but Special Master

5   Lopes did share with me and so I'm assuming I can acknowledge

6   that there is, in what appears to be a pretty good final draft

7   form, an in-service training document entitled Overview of the

8   MHSDS Legal Bases, Programs, Objectives, Treatment Issues and

9   Multidisciplinary Collaboration.  Ms. Bentz shared it with a

10  member of the Special Master's team.  It's not replacing any

11  previously required court training, but it is following through

12  on observations this Court has made and additional orders it

13  has made.

14         I have not had a chance to review the entire document,

15  but certainly the initial pages and the way it's framed appears

16  to the Court very constructive, and it gives the Court a hope

17  that there are steps being made to ensure that all of those

18  concerned within CDCR are being fully informed regarding this

19  case, the reasons for it, and being reminded who it is they

20  serve.  They serve the public, but in doing that, they serve

21  the Coleman class to the extent the law requires.

22         So I just want to acknowledge Ms. Bentz, thanks to

23  Ms. Bentz for sharing that with the Special Master's team.

24  Thank you for those who worked on it, Jeremy Brown,

25  Correctional Lieutenant, Stacy Lopez, Deputy Director, and

1    others as well.  There are people identified in the document.

2    And I want to acknowledge that effort and just note that it

3    does provide some reassurance that the point of the Coleman

4    case is not lost.

5         And I say that because I just need to also say this.

6    And I've gotten past the point of where I was gnashing my

7    teeth.  I've heard the arguments of the attorneys this morning.

8    They are very helpful.  They are professional.  They are making

9    important points.  But I want to hold up a mirror for you

10   regarding some of the briefing that I reviewed coming into this

11   proceeding.  And I want to clarify to the extent this Court's

12   intent and its goal and its perception of its role is perhaps

13   misperceived.  When I tee up issues, when I say it's time to

14   focus, when I say time is running out, if it hasn't run out, I

15   don't mean to throw down a gauntlet.  I mean to bring focus,

16   and I mean to give the defendants an opportunity to rise to the

17   occasion and to demonstrate their understanding of what's going

18   wrong, what's going right, to request the Court's indulgence

19   while demonstrating their first concern is the members of the

20   Coleman class, and I'm starting to use Mr. Coleman's name

21   because we have to not just think of this as an amorphous

22   group.  This is a group of persons which has been waiting for a

23   long time, and some of the briefing gave the Court the

24   impression that the defendants in particular did not understand

25   that opportunity.  There are elephants in the room here, and

1   they aren't invisible elephants.  It is not for this Court to

2   reach out and tame all of those elephants.  This Court requires

3   the parties who know the most about this case to help it focus

4   and do its job.  It is prepared to do its job.

5        I've already said some of the briefing appears to

6   overreact.  Some of it I can rise above it.  Some of it appears

7   to condescend.  Some of it obfuscates and twists the Court's

8   words.  There's finger pointing.  There's dredging up old ideas

9   that defendants rejected years ago.  There does seem to be at

10  times a desire simply to delay because the goal cannot be met.

11       And of course there's the appeal.  There is a right to

12  appeal, but it seems every time this Court turns around there's

13  another appeal.  If that's really what needs to happen, it

14  needs to happen, and I can live with that.  I can draw lines.

15  I can know when I'm asked it of jurisdiction, and I can know

16  when I'm not.

17       And maybe what I'm doing is making an observation

18  about litigation tactics in drafting briefs, looking to an

19  appellate record, but I want to ask all of those involved in

20  this long-running case to take the opportunity to rise above

21  that if you possibly can.  That does not move this case

22  forward.  And it may be -- I've said this once before.  I

23  believe it is at least several years ago now.  It may be that

24  litigation tactics obscure the Court's ability to clearly see

25  what's happening on the ground, and there are positive things

1  happening on the ground as I started these closing comments by

2  observing.  I know there are many people who are putting

3  service to the Coleman class first, and I want to acknowledge

4  that.  It does not do them the proper service, the proper

5  respect to not convey that while recognizing the challenges to

6  bringing this case home.  I've adjusted my thinking about how

7  and when and this Court's role in bringing the case home, but

8  this should be something that everyone together can be focusing

9  on, not just in the work groups but in sessions before this

10  Court.

11       I would note there was a lot of talk in defense

12  briefing about efficiencies.  This Court would like to see more

13  discussion of effectiveness.  I think there's an acknowledgment

14  of that, but this is not achieving efficiencies and generating

15  numbers to make it look as if there's progress when there is

16  not.  So I implore all parties, the defense in particular, to

17  remember every time you use the word "efficiency," tell this

18  Court what that means for effectiveness in terms of compliance

19  with the Coleman remedy.  Both matter.

20       Of course COVID has changed the landscape, but it --

21  at this point it's laid bare issues that have been there for a

22  long, long time as this Court has previously observed.  It is

23  not a reason particularly at this point as certain policies and

24  procedures have settled into place to delay moving forward with

25  the Coleman remedy and taking it seriously in full.

1        I'm going to think hard about the suggestions about

2   next steps.  I'll issue something shortly.  To the extent I'm

3   prepared to resolve motions pending, I'll resolve them.  I will

4   likely direct some focused briefing to be wrapped up with the

5   fourth quarter hearing.  So we'll probably have another motion

6   hearing at the time of the fourth quarterly hearing.

7        I'll consult with the Special Master.  I may request

8   that a top decision-maker who owns Coleman be present at the

9   fourth quarterly hearing to make certain that I'm understanding

10  what the persons charged at the very highest levels with

11  clients are thinking and what they have to tell the Court

12  because there is not more time.  COVID does not buy time for

13  addressing what's happening with the Coleman class and its need

14  for treatment.  And it does not create a cloud of dust that

15  prevents the Court from seeing what the clear trends are.

16        So with that, I am going to adjourn.  I will carefully

17  consider whether or not I can now issue targeted orders.  If I

18  need input from the parties, I will let them know.  And as I do

19  that, I will bear in mind the issue I've discussed briefly in

20  passing, the need to avoid spotlighting, because this is a

21  complex, comprehensive remedy as reviewed in the order

22  clarifying what benchmarks mean but moreover what the total

23  remedy comprises.

24        So with that, I do thank you.  This hearing overall

25  has been helpful, and it allows the Court to focus its mind.

1    So with that, we are in recess.

2            (The proceedings adjourned at 11:34 a.m.)

3                        --oOo--

4    I certify that the foregoing is a correct transcript from the

5    record of proceedings in the above-entitled matter.

6                            /s/ Kacy Parker Barajas

                    _____
7                    KACY PARKER BARAJAS
                    CSR No. 10915, RMR, CRR, CRC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25