XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
KYLE A. LEWIS, State Bar No. 201041
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
LISA M. POOLEY, SBN 168737
SAMANTHA D. WOLFF, SBN 240280
LAUREL E. O'CONNOR, SBN 305478
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:    925-746-8460
Facsimile:    925-746-8490

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>            Plaintiffs,<br><br>     v.<br><br>GAVIN NEWSOM, et al.<br><br>            Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR AN ORDER REGARDING QUARANTINE AND ISOLATION**<br><br>Date:    October 1, 2020<br>Time:    2:00 p.m.<br>Crtrm.:  3, 15th Floor (Videoconference)<br><br>Judge:   Hon. Kimberly J. Mueller |

Case No. 2:90-CV-00520- KJM-DB
DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR AN ORDER REGARDING QUARANTINE AND ISOLATION

16907048.7

# INTRODUCTION

Plaintiffs' demand for separate quarantine and isolation space for class members at the Enhanced Outpatient Program ("EOP") and higher levels of care, in part to facilitate group programing, is not required by the Program Guide or the Eighth Amendment, runs contrary to established CDCR precedent to address the spread of communicable diseases, and is contraindicated by Plaintiffs' own public health expert and Centers for Disease Control and Prevention guidance. Nonetheless, Plaintiffs are undeterred and present their irresponsible request to this Court without any expert testimony, legal authority, or precedential support. Indeed, contrary to Plaintiffs' assertions, the Program Guide is silent with respect to separate housing for EOP and more acute patients who, for public health reasons, must quarantine or isolate from the prison population. Plaintiffs have never challenged this practice in the past and do not proffer any explanation as to why COVID-19 presents less of a public health threat than, for instance, influenza, MRSA, or tuberculosis. Additionally, Plaintiffs ignore that *Coleman* class members are indeed receiving mental health treatment while under quarantine or isolation, albeit within the confines of what services can be safely delivered in the midst of confronting a highly communicable disease. The vast majority of EOP and more acute patients currently under quarantine remain in their regular housing unit, and therefore the order Plaintiffs seek is unnecessary. Plaintiffs' motion should be denied.

# BACKGROUND

**I.     CDCR Worked with CCHCS, Public Health Experts, Plaintiffs' Counsel at the Prison Law Office, the Office of the *Coleman* Special Master, and the *Armstrong* Court Expert to Identify Appropriate Quarantine and Isolation Space.**

On July 7, 2020, the *Plata* Court ordered the parties to meet and confer with the Receiver regarding "the number and type of beds [that] are required to isolate and quarantine patients at each institution." *Plata* ECF No. 3381 at 1:20-21. The parties were unable to reach agreement and, on July 15, each submitted a response and proposed order. *See Plata* ECF Nos. 3391-2, 3392. Plaintiffs' counsel, including those at the Prison Law Office who have long represented both the *Plata* and *Coleman* classes, did not propose separate quarantine and isolation space be set aside for *Coleman* class members, or any other class members for that matter. *See Plata* ECF No.

-1-    Case No. 2:90-CV-00520- KJM-DB

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR AN ORDER REGARDING QUARANTINE AND ISOLATION

16907048.7

3391-2.

On July 22, the *Plata* Court adopted a modified version of Defendants' proposed order and required CDCR to quickly identify and disclose (by August 5) and vacate or reserve (within 2 weeks of identifying such space) at least 100 beds for quarantine and isolation purposes at each prison. *See* ECF No. 3401 at 3-4, ¶¶ 1-2. The *Plata* Court's July 22 order also required CDCR to assess whether additional space was required at each prison, and to include the Receiver and the parties' public health experts in this process. *See* ECF No. 3401 at 4, ¶ 3. As a result, on July 31 and August 4, 2020, officials from California Correctional Health Care Services (CCHCS), public health experts from the Court's advisory panel, the parties' public health experts, and CDCR officials met to discuss the need for isolation and quarantine space in the prisons. CDCR and CCHCS hosted a lengthy conference call on August 7 to review and discuss the designations at 21 prisons with the respective wardens and health care chief executive officers. *Plata* Plaintiffs' counsel participated on the call along with counsel for the *Coleman*, *Armstrong*, and *Clark* plaintiffs, the *Coleman* Deputy Special Master, the *Armstrong* Court Expert, and members of the Court's Advisory Board. On August 12, a second meeting was held with most of the same attendees to address eleven additional prisons.

On August 18, the Public Health Workgroup (comprised of *Plata* Plaintiffs' Expert, *Plata* Defendants' Expert, and CCHCS experts) issued guidance regarding quarantine and isolation space at each prison. Based on this guidance, CCHCS's Quality Management team recommended specific numbers of beds to reserve for quarantine and isolation purposes at each prison.

Based on the July 22 order in *Plata*, this Court ordered Defendants to "work with the Special Master throughout their process of identification and implementation of the new quarantine bed space to ensure no further harm results to the delivery of mental health care to members of the Coleman class." ECF No. 6791, 4-5. Additionally, Defendants were ordered to file the following information by July 31, 2020, and to update the information by August 7: (1) using the monthly maps filed under seal, ECF No. 6777, identify the location of any unit or units at each prison proposed to be vacated to comply with the Plata court quarantine space order; (2) whether any *Coleman* class members reside in any units proposed to be vacated and, if so, how

-2-    Case No. 2:90-CV-00520- KJM-DB

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR AN ORDER REGARDING QUARANTINE AND ISOLATION

many reside in each unit and what is their mental health classification level; and (3) if there are *Coleman* class members who defendants propose to move, where do defendants propose to move them and what level of mental health care will they receive in their proposed new location. *Id.* Defendants provided this information on July 31, 2020, ECF No. 6801 and ECF No. 6802 (sealed documents), and updated information on August 7, 2020, ECF N0, 6807.

The Special Master reported to the Court at the September 24, 2020 quarterly status conference that he has since been satisfactorily involved in the process with the *Plata* receiver and *Armstrong* expert. ECF No. 6889 at 46:6-10. The Special Master noted that he and his experts were involved in the discussions and "reasonably comfortable" with the discussions surrounding treatment in place for inmate-patients in CCCMS, MHCB, and inpatient care. Ct. Tr. 46:15-20, Sept. 24, 2020, ECF No. 6889. The Special Master further indicated that discussions regarding placement of EOP patients were "ongoing and productive" and he was "reasonably confident that [the parties] can resolve any concerns that we have, and we are engaging in conversation regularly." *Id*. at 46:21-25, 47:4-6

## II. The *Armstrong* Court Orders Relating to Quarantine and Isolation Do Not Contravene Public Health Guidance.

As described above, because infectious disease control is a medical issue, the analysis and identification of quarantine and isolation space was spearheaded by the *Plata* Court and its Receiver, but included the parties and Court representatives from the *Plata, Coleman,* and *Armstrong* cases. On July 20, 2020, the *Armstrong* Court issued an order requiring CDCR to ensure that there is sufficient accessible housing for all *Armstrong* class members during the pandemic. *Armstrong* ECF No. 3015. This order also directed the *Armstrong* Court Expert to conduct a review of the sufficiency of CDCR's existing supply of accessible housing, including for purposes of medical isolation and quarantine in the event of COVID-19 outbreaks, and to present his recommendations to the Court. *Id.*

On August 19, 2020, the *Armstrong* Court Expert filed a report and recommendations regarding the housing of class members during the COVID-19 Pandemic. *Armstrong* ECF No. 3048. The report and recommendations found that: (1) quarantine and isolation housing at each

institution must provide appropriate architectural accommodations for all class members housed at that institution; (2) quarantine and isolation housing must contain an adequate number of accessible beds; (3) CDCR must appropriately rehouse any displaced *Armstrong* class members; (4) CDCR must provide accessible showers; and (5) CDCR must provide non-architectural accommodations for class members. *Id.*

On September 9, 2020, the *Armstrong* Court issued a second order requiring CDCR to provide isolation and quarantine space for *Armstrong* class members consistent with the *Armstrong* Court Expert's report and recommendations. *Armstrong* ECF No. 3072. This order was the result of the *Armstrong* Court expert's actions to evaluate and ensure sufficient accessible housing. The minor modifications sought by the *Armstrong* Court expert did not conflict with or jeopardize CCHCS's and CDCR's public health response to the COVID-19 pandemic, they merely required that institutions be able to accommodate their disabled populations within their designated quarantine and isolation spaces.

## ARGUMENT

**I.   There Is No Basis for Quarantining and Isolating EOP Patients Separate From the General Population.**

**A.   The Program Guide Does Not Mandate That EOP Patients Be Quarantined and Isolated Separately From the General Population.**

Plaintiffs assert that separate housing for EOP patients is "a necessary cornerstone of the remedy in this case," and claim that the Mental Health Services Delivery System Program Guide ("Program Guide") has "always required CDCR to house *Coleman* class members at the [EOP] level of care in housing that is separate from the general population." (Plaintiffs' Mem. of Points and Authorities in Supp. of Expedited Mot. for an Order Re Quarantine and Isolation ("Pltfs.' Mot.") at 1:2-5, 6:2-3.) Yet, Plaintiffs fail to even acknowledge that the Program Guide makes no mention of the delivery of mental health care to patients in medical housing, including to incarcerated persons suffering from, or at risk of contracting, a highly contagious disease. This omission is telling, particularly in light of CDCR's accepted custom and practice with respect to the delivery of mental health care under similar circumstances in the past.

CDCR has medically quarantined or isolated patients before the rise of the COVID-19 pandemic, which is not the first contagious illness to infect, and spread throughout the incarcerated population. CDCR's quarantine and isolation practices have been in place for years and, until recently, were unchallenged by Plaintiffs' counsel. (Declaration of J. Bick ("Bick Decl.") ¶ 4.) Under these established procedures, CDCR quarantines and isolates exposed or infected patients according to accepted medical practices, including physical separation or isolation from others until they are medically cleared. (*Id*.) In these situations, *Coleman* class members are subject to the same medically accepted standard of care for isolation and quarantine as non-class members. (*Id*.) *Coleman* class members may be quarantined or isolated within their housing unit, or they may be quarantined in a medical unit. (*Id.*) Quarantine and isolation for disease management are not new concepts in CDCR, and Plaintiffs are aware of these practices. (*Id.*) Plaintiffs' current motion, however, does not explain why CDCR's practices with respect to COVID-19 quarantine and isolation specifically are objectionable, whereas CDCR's past (and similar) practices with respect to influenza or tuberculosis, for instance, are not. And in fact, Plaintiffs even acknowledge that "[t]he current pandemic is far different in scope and deadliness" than "'influenza-like illness, tuberculosis, and gastroenteritis.'" (Pltfs.' Mot. at 3:23-25.) This statement makes Plaintiffs' position with respect to COVID-19 quarantine and isolation even more perplexing.

Further, Plaintiffs' heavy reliance on the Program Guide's reference to EOP housing separate from the general population as the basis for their motion inaccurately applies those requirements to isolation and quarantine space. (Bick Decl. ¶ 7.) Quarantine and isolation housing is not akin to the general population. (*Id*.) Rather, isolation and quarantine space is similar to Outpatient Housing Units or Correctional Treatment Center medical treatment space. (*Id.*) It is a strictly controlled environment that is meant to provide time-limited medical housing during the patient's course of treatment, or in this case, quarantine or isolation. (*Id*.) Patients are carefully monitored by medical and custody staff and do not program with other patients on the unit. (*Id*.) Based on the medical milieu and strict controls in the unit, EOP patients housed in the quarantine and isolation space are unlikely to have negative interactions with non-EOP patients. (*Id*.)

Moreover, Plaintiffs' assertion that separate housing of EOP patients is "always required" ignores a number of exceptions to this rule that are specified within the Program Guide. For instance, condemned EOP patients are "housed according to institutional custody determination, and appropriate mental health treatment services are then provided." (Program Guide, ECF No. 5864-1 at 12-4-17.) Additionally, EOP patients are regularly housed alongside non-MHSDS patients in Correctional Treatment Centers and Outpatient Housing Units, yet Plaintiffs have not objected to that practice. Finally, EOP-endorsed incarcerated persons may remain in non-EOP housing for up to 60 days while awaiting transfer. (*Id.* at 12-1-16.) The 60-day timeframe is far longer than almost any EOP class member would be subjected to continuous isolation or quarantine. (Declaration of A. Mehta ("Mehta Decl.") ¶ 3.) The typical EOP class member with a potential COVID-19 exposure would generally be held for a short period of 14 days. (*Id.*) These timeframes fall well within the Program Guide's accepted 60-day transfer window to EOP-level care. (ECF No. 5864-1 at 18.) The fact that the Program Guide specifically permits EOP patients to be comingled with the general population in certain circumstances contradicts the premise of Plaintiffs' motion that EOP patients must always be separated. Furthermore, it supports Defendants' contention that housing EOP patients in a non-EOP setting for a limited period of time, and for the sole purpose of preventing the spread of a highly-contagious and deadly disease, is not prohibited under the Program Guide. This is particularly true in the absence of any evidence suggesting that EOP patients are not receiving mental health treatment during their period of quarantine or isolation, as discussed below. (*See* Mehta Decl. ¶¶ 4-5.)

### B. Quarantined and Isolated EOP Patients Are Still Receiving Mental Health Treatment.

Plaintiffs' request for separate quarantine and isolation space is unnecessary and ignores the realities of the current situation. The overwhelming majority of inmates quarantined because of possible coronavirus exposure, including *Coleman* class members, are quarantined as a group within their own housing unit. (Bick Decl. ¶ 5.) By far, the vast majority of EOP patients placed on quarantine status remain in their regular, EOP housing unit, where they continue to receive EOP treatment (other than group therapy). (*Id.*) Only a small minority of patients are housed

elsewhere, such as inpatient settings, Mental Health Crisis Beds, Temporary Mental Health Units, or designated quarantine or isolation space outside of mental health units. (Bick Decl. ¶5.)

To the extent EOP patients are moved to a separate, non-EOP unit for quarantine or isolation, CDCR is willing to make its best effort to keep EOP patients clustered together within the designated quarantine or isolation space. (Bick Decl. ¶ 5; Mehta Decl. ¶ 4.) Defendants are in the process of meeting and conferring with *Coleman* Plaintiffs' counsel on this issue, and understand that the Special Master substantially agrees with Defendants' proposal. (Bick Decl. ¶ 11.) Additionally, contrary to Plaintiffs' unsupported assertions, *Coleman* class members placed on quarantine or isolation status and housed out of their normal housing unit do continue to receive mental health care in the quarantine or isolation unit. (Bick Decl. ¶ 8; *see* Pltfs.' Mot. at 5:6-7 (stating, "The people living there receive *reduced* or no mental health treatment," but providing no supporting citation).) This is true for any such patient housed in an Outpatient Housing Unit or Correctional Treatment Center, or housed in quarantine for any contagious illness, be it the COVID-19 virus, influenza, norovirus, or tuberculosis. (*Id.*) The EOP patient's treatment team is expected to ensure the patient's treatment needs are met wherever they are located. (Mehta Decl. ¶ 5.)

Because the number of quarantined or isolated EOP patients is so minimal, any requirement to set aside separate space for EOP patients within the existing quarantine or isolation units would be enormously wasteful. Unlike the *Armstrong* orders discussed above, which ensures that *Armstrong* class members have access to the set aside quarantine and isolation space if need but do not otherwise dictate any special conditions or additional space, here, the Plaintiffs' request would impose additional and unnecessary requirements on the beds. This burdensome request is simply not warranted and could instead serve to divert resources and attention from wider efforts to combat the spread of COVID-19, without necessarily demonstrably improving the health of the *Coleman* class members. (Mehta Decl. ¶ 6.)

Further, any such order to require CDCR to set aside separate quarantine or isolation space specifically for *Coleman* class members would be tantamount to a prisoner release order given the purpose or effect such an order would have on limiting the prison population. *See* Mehta Decl. ¶

6; 18 U.S.C. § 3626(g)(4).  Such an order would violate the PLRA, where Defendants have not been deliberately indifferent to COVID-19 generally, or to the *Coleman* class' mental health needs during periods of quarantine and isolation during this public health crisis.  Further, less-intrusive alternatives exist, including permitting CDCR to cluster EOP patients within quarantine and isolation space, and providing mental health treatment to class members during quarantine and isolation that comport with public health recommendations.  Even if the Court does not accept that the requested relief is tantamount to a prisoner release order, it would still violate the PLRA's needs-narrowness requirement, particularly given that Defendants have proposed a narrower, workable plan that is consistent with public health advice.  18 U.S.C. § 3626(a)(1)(A).

**C.     Plaintiffs' Request Ignores Public Health Guidance, Including That of Their Own Expert.**

Plaintiffs' request to separate EOP patients during quarantine and isolation in order to "facilitate treatment" blithely ignores the reality of this pandemic. (Pltfs.' Mot. at 6:19.)  While nobody disputes that COVID-19 is a highly contagious disease that is easily transmitted through close contact, Plaintiffs nonetheless request clustering of EOP patients in quarantine and isolation so that, "[t]o the extent group treatment can resume in a quarantined unit, [there can be] proximity among the patients." (Pltfs.' Mot. at 6:19-20.)  Notably, this suggestion does not appear to include any safeguards, such as mask wearing or social distancing.  In any event, Plaintiffs' request to ensure "proximity among the patients," and suggestion that group treatment resume, sharply conflicts with Plaintiffs' own expert's testimony just six months ago, that "[c]ontrolling the spread of the virus by limiting person to person contact is critical to saving lives," and that "[t]he only way to control the virus is to use preventive strategies, including social distancing." (Decl. Marc Stern in Supp. of Pltfs.' Emergency Mot. ("Stern Emergency Decl."), ECF 6524 at 2:23-24, 4-5.) Plaintiffs fail to explain why social distancing or limiting person-to-person contact is no longer required, or why that public health guidance is inapplicable to the EOP population while in quarantine or isolation for COVID-19.

Patients are temporarily housed in COVID-19 quarantine space because CCHCS medical professionals believe they may have been infected with a highly contagious and potentially lethal

-8-    Case No. 2:90-CV-00520- KJM-DB

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR AN ORDER REGARDING QUARANTINE AND ISOLATION

16907048.7

virus. (Bick Decl., ¶ 6.) To the extent possible, these patients should not intermingle with others until it is clear that they can safely do so – either following a negative test or 14-day quarantine without the onset of symptoms consistent with COVID-19. (*Id.*) Although face coverings decrease the likelihood that COVID-19 will be transmitted between individuals, they do not eliminate this risk, particularly because people often do not wear them appropriately or continuously. (*Id.*) While in quarantine, it must be assumed that all patients are infected with COVID-19, and that they therefore pose a risk to other patients and staff during face-to-face clinical contacts, groups, and during time spent with others in a dayroom. (*Id.*) Plaintiffs' reckless and irresponsible request, which is likely to lead to further spread of the disease, ignores this reality and must therefore be denied by this Court for the simple reason that the health and safety of the EOP population must not be disregarded.

## CONCLUSION

Plaintiffs' request for separate quarantine and isolation space for *Coleman* class members at the EOP and higher levels of care fails to address CDCR's established quarantine and isolation practices and is neither clinically warranted nor feasible for *Coleman* patients. This irresponsible request – which is, in part, premised on Plaintiffs' desire to facilitate group treatment and "proximity among the patients" – directly contradicts public health guidance with respect to COVID-19, including that of Plaintiffs' own expert, and will result in the further spread of the virus. Further, because the vast majority of *Coleman* class members are quarantined in their normal housing unit, and very few patients require isolation in a separate housing unit, Plaintiffs' request is also unnecessary and wasteful. Plaintiffs' request must therefore be denied.

## CERTIFICATION

Defendants' counsel certifies that she/he reviewed the following orders relevant to this filing: ECF Nos. 6791 and 6883.

| | | |
|---|---|---|
| DATED: September 29, 2020 | | HANSON BRIDGETT LLP |

By: ___*/s/ Paul B. Mello*___
PAUL B. MELLO
LISA M. POOLEY
SAMANTHA D. WOLFF
Attorneys for Defendants

Dated: September 29, 2020     Respectfully Submitted,

Xavier Becerra
Attorney General of California
Adriano Hrvatin
Supervising Deputy Attorney General

/s/ *Kyle Lewis*
Deputy Attorney General
*Attorneys for Defendants*

DATED: September 29, 2020     ROBINS KAPLAN LLP

By: ___*/s/ Roman Silberfeld*___
ROMAN SILBERFELD
GLENN A. DANAS
Special Counsel for Defendants