XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS L. HENNES, State Bar No. 278361
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7325
 Fax: (916) 324-5205
 E-mail: Tyler.Heath@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
LISA M. POOLEY, SBN 168737
SAMANTHA D. WOLFF, SBN 240280
LAUREL E. O'CONNOR, SBN 305478
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:    925-746-8460
Facsimile:    925-746-8490

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>          Plaintiffs,<br><br>     v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>          Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**SIXTH JOINT UPDATE ON THE WORK OF THE COVID-19 TASK FORCE** |

At the June 26, 2020 status conference, the Court directed the parties to file a joint report with updates "on the work of the Task Force" by July 15, 2020 and "every two weeks thereafter." (ECF No. 6741.)  The Court modified this schedule on August 26, 2020, directing the parties to file COVID-19 Task Force updates every other Friday by 12:00 p.m., beginning on August 28, 2020.  (ECF No. 6837.)  On September 25, 2020, the Court extended the deadline to file the sixth joint update to October 2, 2020 at 12:00 p.m. and directed that further joint updates be filed every four weeks.  (ECF No. 6886.)  This report provides the parties' sixth COVID-19 Task Force joint update and covers issues discussed since the fifth joint update filed on September 11, 2020.  This report covers the Thirty-Fifth (September 15) and Thirty-Sixth (September 29) COVID-19 Task Force meetings, and various small workgroup meetings between representatives from Defendants and the Special Master's team.  Unless otherwise indicated, the small workgroup meetings include members of Defendants' leadership and the Special Master's team, and not Plaintiffs. The Special Master holds meetings with Plaintiffs to update them on the status of the workgroups.

I. **UPDATE REGARDING COVID-19 CASES IN CDCR AND DSH**

   A. **CDCR's Report On COVID-19 Cases And Testing.**

The following table shows, as of September 29, 2020, CDCR's report on the total number of confirmed COVID-19 cases, currently active, resolved to date, currently hospitalized, hospitalized to date, deaths to date, and the number and percentage of those cases who are *Coleman* class members and their level of care.

| COVID Result | Total Patients | MHSDS Patients Only | MHSDS patients as % of total |
|---|---|---|---|
| **Active** | 2,048 | 513 (502 CCCMS, 8 EOP, 1 ICF, 2 MHCB | 25% |
| **Resolved** | 10,425 | 2,783 (2,528 CCCMS, 214 EOP, 19 ICF, 7 ACUTE, 15 MHCB) | 27% |
| **TOTAL Active + Resolved** | 12,473 | 3,296 (3,030 CCCMS, 222 EOP, 20 ICF, 7 ACUTE, 17 MHCB) | 26% |
| **Currently Hospitalized** | 31 | 10 (10 CCCMS, 0 EOP) | 32% |
| **Cumulative Hospitalized** | 515 | 179 (152 CCCMS, 27 EOP) | 35% |
| **Deaths** | 67 | 26 (25 CCCMS, 1 EOP) | 39% |

CDCR reports the above hospitalization numbers include re-admissions of some patients who were discharged and then re-admitted.  It also reports that the numbers exclude patients who were COVID-19 positive and admitted to outside hospitals for reasons other than COVID-19.

According to CDCR, as of September 29, it had tested 93,398 unique prisoners and former prisoners, 76,679 of whom are still in CDCR custody.  Of the total number of in-custody prisoners tested, 23,796 or 31%, of those tested were part of the MHSDS.  CDCR's rate of tests per 1,000 incarcerated people (790 per 1,000) is higher than the rates in California (362 per 1,000) and the United States as a whole (307 per 1,000); CDCR's publicly available Population COVID-19 Tracking dashboard reports, as of September 28, that CDCR's rate of confirmed cases per 1,000 incarcerated people (141.2 per 1,000) is higher than the rates in California (20.6 per 1,000) and the United States (21.6 per 1,000).

As of September 29, 2020, twenty-four of CDCR's thirty-five institutions are closed or mostly closed to movement as a COVID-19 measure, including all five institutions with Psychiatric Inpatient Programs ("PIPs").  Out of the twenty-four institutions, three continued to have exceptions allowing some movement—North Kern State Prison and Wasco State Prison continue to be open for the limited purpose of Reception Center intake, and California Correctional Center continues to remain open for the limited purpose of allowing incarcerated people with resolved cases to transfer to fire camp.  On September 21, 2020, CDCR issued a memorandum allowing transfers of incarcerated people who (1) previously received confirmed positive COVID-19 tests, (2) are now released from isolation, (3) are currently asymptomatic, and (4) whose first test positive date or first onset of symptoms was within the last 12 weeks.  These movements are currently being coordinated by headquarters.

**B.    DSH Report Regarding COVID-19 Cases and Facilities.**

As of September 29, there were no confirmed positive cases in DSH's *Coleman* patient population.  As of September 29, DSH has performed 19,427 tests on a cumulative total of 5,107 patients across all five hospitals, and a total of 318 patients and 403 staff have tested positive to date, with a total of one patient and 14 staff testing positive in the past 14 days across the five hospitals.

DSH-Patton restarted admissions on August 31.  As of September 25, DSH-Patton had three housing units on quarantine and one isolation unit.  DSH-Atascadero is currently open to admissions, has no housing units on quarantine, and has one unit on isolation status.  DSH-Coalinga is currently open to new admissions, although the *Coleman* unit at DSH-Coalinga had been on quarantine from September 8 to September 24, 2020.  As of September 25, DSH-Coalinga had 12 housing units on quarantine and one isolation unit.

**II.     UPDATES ON DSH CENSUS, WAITLIST, AND ADMISSIONS**

At the Task Force meetings, DSH and CDCR provided their census, waitlist, and admission reports.  Since DSH lifted its temporary suspension of admissions effective April 16, 2020, DSH has admitted a total of 83 *Coleman* class members.  DSH admitted two *Coleman* patients from CDCR during the workweek of September 21-25, 2020.  These are the first two patients admitted from CDCR since those transferred during the workweek of August 10-14, 2020, due in large part to CDCR's closure of prisons for movement where there were existing outbreaks of COVID-19.  As of the September 25, 2020 data discussed at the September 29 Task Force meeting, there were 177 *Coleman* class members at DSH-Atascadero (with 79 available beds), 36 at DSH-Coalinga (with 14 available beds), and 8 at DSH-Patton (with 22 available beds).

As of September 25, 2020, Defendants report there are 53 patients awaiting admission to DSH, for an average of 47.2 days (maximum of 115 days).  This includes 46 patients awaiting admission to DSH-Atascadero and DSH-Coalinga, including 33 ICF patients awaiting admission for more than 30 days.  Of the 46 patients awaiting admission to DSH-Atascadero and DSH-Coalinga, all are housed at institutions CDCR has closed to movement.  There are 7 patients awaiting admission to DSH-Patton, all of whom are currently at CIW, which CDCR has closed to movement, including 2 ICF patients awaiting admission for more than 30 days.  At the September 15 and 29, 2020 Task Force meetings, Defendants reported they are working on developing a process to begin refining the closed institution designation to allow movement of patients from uninvolved units at otherwise closed institutions, which they expect would permit more transfers to DSH.  Defendants have not yet provided a proposal in this respect and could not at this stage

commit to a timeframe in which they would.

At the September 15 Task Force meeting, the parties discussed DSH's continued admission of patients discharged from CDCR and committed to DSH as Offenders with Mental Health Disorders (OMDs) in contrast with the *Coleman* class members who have not transferred to DSH for the past few weeks due to CDCR's closure of institutions from movement. Plaintiffs expressed concerns that there have been numerous OMD patients discharged from CDCR and admitted to DSH in the weeks since the last *Coleman* admissions during the workweek of August 10-14, 2020. Plaintiffs asked whether Defendants employed different OMD admissions processes for CDCR institutions that are open to movement versus those that are closed. Defendants reported that they admit these patients from both closed and open institutions on the day of parole due to a state statutory mandate for DSH to treat individuals who have been deemed dangerous to others as a result of a severe mental health disorder. Defendants reported that, in order to balance the statutory mandate that DSH admit OMD patients with the risk of COVID-19 transmission and exposure, if these incoming OMD patients have had COVID-19 exposure, DSH-Atascadero may admit them into its COVID-19 Isolation Unit, Unit 31. Unit 31 is a 46-bed unit, when this unit is not in use for the treatment of patients who are positive for COVID-19. DSH indicated it has not determined exactly how many patients could be safely housed in that unit in its current use.

Also at the September 15 meeting, Defendants also reported that DSH and CDCR are still working out a discrepancy with CDCR's current movement matrix that requires celled housing for discharges even though DSH does not have celled housing. DSH reported its position that the discharge issue is not currently impacting admissions. At the September 29 meeting, Defendants reported DSH and CDCR had worked out a mutually agreeable solution to the movement matrix issue whereby patients do not quarantine at DSH prior to discharge, and instead quarantine upon arrival back in CDCR.

### III. UPDATES ON THE CDCR AND DSH SMALL WORKGROUP ACTIVITIES.

#### A. CDCR Workgroup.

The Special Master's experts have held small workgroups with CDCR and DSH leadership, without Plaintiffs or Defendants' counsel, focused on specific topics including: meeting Program

Guide requirements, updates to the April 10 and 17, 2020 COVID-19 transfer memoranda, *Armstrong* ADA workers in EOP units, and desert institution transfers, discussed further in Section IV below.  In particular, over the past two weeks, the CDCR workgroup has focused on drafting a plan for meeting Program Guide requirements during the pandemic in light of the Court's July 28, 2020 order, and revising the transfer guidance.

**B.     DSH Workgroup.**

The DSH small workgroup has met three times since the September 11, 2020 joint update and reported its activities to the Task Force.  At the September 29, 2020 Task Force meetings, the parties discussed information sent by CDCR to the Special Master at his team's request that reported, as of the week of September 21-27, 2020, a total of 66 patients with pending acute referrals (65 men and 1 woman) and 303 total patients with pending ICF referrals (293 men and 10 women), of which 53 are referrals to DSH.  All of the 53 patients have been referred by CDCR and accepted by DSH, but their transfers are on hold while the transferring CDCR institution is closed.  Plaintiffs requested that Defendants provide a copy of the information reported and expressed concerns that the ICF waitlist numbers being discussed on the call varied significantly from the numbers currently listed on the COVID-19 Dashboard.  Following the meeting, Defendants provided a copy of the tables to Plaintiffs and explained that the tables,  include 106 referrals for patients who are already in a PIP but require placement in a different least restrictive housing setting or a different level of inpatient care.  Those patients do not appear on the COVID-19 Dashboard because they are already in a PIP bed.

**C.     Behavioral Treatment Workgroup.**

Members of CDCR and DSH leadership had been meeting with the Special Master's experts for the last few months as part of a Behavioral Treatment small workgroup discussing options to address class members with predominate behavioral disorders in addition to serious mental illness.  Predominate behavioral issues are chronic, maladaptive behaviors that are secondary to poor coping skills in the context of environmental stressors.  At the September 15 and 29, 2020 Task Force meetings, the parties discussed the status of the workgroup.

///

Defendants ultimately confirmed at the September 29 meeting their position that CDCR Headquarters and staff in the field do not have the workload capacity to undertake a new project related to these patients. Defendants also stated their position that CDCR is already providing adequate treatment to the forty to fifty patients who CDCR has defined as high utilizers of mental health and custody resources. One of the Special Master's experts noted that the experts disagree that this group of patients is currently receiving adequate treatment, and expressed the view that these patients consequently consume significant departmental resources. The expert sympathized with Defendants' workload concerns but noted that not planning a timeline to treat these individuals means there is no timeline. Plaintiffs noted the group may be larger than forty to fifty patients, and agreed with the Special Master's expert that this group of patients has never received adequate treatment within Defendants' existing programs. Plaintiffs stated their strong concern that Defendants would not commit to even begin the process of developing a program to treat these patients despite presenting promising ideas to the small workgroup, and that failing to do so has consequences for the entire system because this subset of the class is very disruptive and draining to all patients and clinicians, and that the Department's current methods for dealing with them involve intrusive custody measures such as employing Maximum Custody status and lockdowns in the PIPs that prevent the provision of effective mental health care not only to those patients, but to all patients in the program. Defendants informed Plaintiffs and the Special Master that CDCR is working on refining the Clozaril care guide and providing additional training regarding the use of Clozaril that may benefit this small subset of forty to fifty patients, but gave no timeline for the project.

## IV. ADDITIONAL COVID-19 RELATED UPDATES

### A. Returning to Program Guide Requirements and Transfer Guidance.

At the September 15, 2020 Task Force meeting, Defendants reported that in the past two weeks, CDCR has been focused on drafting a plan for meeting Program Guide requirements during the pandemic in light of the Court's July 28, 2020 order. Plaintiffs expressed their deep concerns that Defendants still had not developed any plan to try to meet Program Guide requirements. At the September 29, 2020 Task Force meeting, Defendants reported that they had

recently provided a draft plan for returning to Program Guide standards to the Special Master small workgroup, but did not feel it was ready to present to Plaintiffs yet. Defendants also reported that CDCR has continued working on revisions to the April 10 and 17, 2020 COVID-19 transfer and treatment policies for patients needing higher levels of care and provided a draft to the small workgroup, but have not yet provided it to Plaintiffs.

### B. Psychiatric Inpatient Admissions Unit Policy.

At the September 15, 2020 Task Force meeting, the parties discussed CDCR's plans for admissions to the Psychiatric Inpatient Units for inpatient levels of care, which would set aside beds at all five PIPs for use as admissions/quarantine units. Defendants provided a draft plan to the Task Force on September 4, 2020. The parties discussed the plan at the September 15, 2020, Task Force meeting and Plaintiffs provided additional written comments on September 22, 2020. Plaintiffs' September 22 letter noted their support for the plan and that they do not object to flexing beds in the admissions units assuming there is no barrier to care and that Defendants provide adequate staffing. Plaintiffs' letter also asked for more information about how Defendants plan to manage internal LRH moves at CHCF (which does not have lower-custody units) and about whether the PIPs will have sufficient bed space once inpatient admissions restart under the movement matrix in earnest. Plaintiffs requested that Defendants provide updates when the admissions units are ready for use. Defendants have not provided further updates on this topic since Plaintiffs sent their September 22 letter.

### C. ADA Workers in EOP Dorms (*Armstrong/Clark/Coleman*).

During the September 15, 2020 Task Force meeting, Defendants discussed an August 14 directive issued as a COVID-19 precaution pursuant to the *Armstrong* case requiring incarcerated ADA workers assisting *Armstrong* class members to be housed together. Defendants raised a request—specific to only Valley State Prison (VSP) at this time—to rehouse non-EOP ADA workers in the EOP unit so those workers can continue to assist the EOP patients with *Armstrong/Clark* disabilities while COVID-19 measures are active. Plaintiffs discussed their tentative position and noted that they would discuss the issue with their co-counsel in the *Armstrong* matter and counsel in the *Clark* matter to refine their position on the matter. On

September 28, 2020, Plaintiffs confirmed their position in writing that the best solution is to hire EOP patients already living in the EOP building to be screened, trained, and supervised to be ADA workers because it is important to preserve separate housing of EOP class members. Plaintiffs also explained their position that there is no reason why EOP individuals cannot serve as ADA helpers, and obtain the benefits and credits that come from working in these positions, and that one possible solution is to create part-time assignments if the absence of such assignments is a barrier at VSP. Plaintiffs also outlined additional protections that would need to be developed if VSP screens its EOP population and determines it truly does not have enough eligible EOP patients to serve as ADA workers. At the September 29, 2020 Task Force meeting, the parties further discussed this issue. One of the Special Master's experts expressed support for Plaintiffs' proposed solution. Defendants agreed to assess whether there are EOP patients who are eligible to work as ADA workers in the EOP building, and confirmed that the non-EOP ADA workers had not been moved into the EOP building to date.

### D. EOP Participation in ISUDT Draft Policy.

During the September 15 meeting, the parties also discussed Defendants' proposal that EOP patients' Integrated Substance Use Disorder Treatment (ISUDT) hours partially count towards the Program Guide-required ten hours of EOP programming. The Special Master's experts indicated that their concern with the proposal was the level of coordination between ISUDT and Cognitive Behavioral Interventions (CBI) treatment, but with appropriate coordination, the proposed substitution could be adequate. Plaintiffs noted an additional concern that the quality of the ISUDT groups may not be adequate.

Plaintiffs also raised their concern that implementation of this policy may skew Defendants' data metrics and compliance reporting. Under the draft policy, up to ten hours of ISUDT treatment can count toward the Program Guide-required minimum 10 hours of structured therapeutic activity for EOP patients, so long as the patients get four hours of substantive therapeutic groups with a CDCR mental health clinician. Because data on EOP treatment is monitored with averages for the whole group of EOP patients, this data could easily be skewed by the excess ISUDT hours. For example, if half an EOP program was in the ISUDT and receiving

10 hours of ISUDT groups plus 4 hours of EOP groups (a total of 14 hours of credit), the program could deliver only 6 hours to the non-ISUDT patients yet still appear to average 10 hours of therapeutic groups.  A member of the Special Master's team stated that this might not be a concern if the number of EOP patients enrolled in the full 10 hours of ISUDT treatment in each program was only a small percentage of the EOP population in that program.  Plaintiffs requested that Defendants consider how best to address this issue in their compliance reporting, including whether ISUDT patients could be excluded from reporting on the number of group hours offered. Defendants agreed to examine this issue, report on how many EOP patients would be enrolled in the ISUDT program, and determine whether distinguishing between which ISUDT hours do and do not count towards EOP treatment hours in their metrics and reporting is feasible.  Plaintiffs recommended a cap of 10 hours treatment credit per patient whenever ISUDT hours are counted towards the total hours for that individual.

### E. Impact of Wildfires on Programming and Treatment.

At the September 15 meeting, Defendants reported that as a result of the wildfires burning throughout the state, one institution California Medical Facility (CMF) had been on modified program due to poor air quality.  Gym was offered for each day that outdoor exercise was cancelled.  The modified program ended as of September 15, 2020.  At the September 29 meeting, Defendants reported that as of that day, there had been a modified program at San Quentin (SQ) on September 14 due to poor air quality, but otherwise statewide there have been no modified programs in the 35 institutions due to wildfires since that time.  As of September 29, one of the fire camps is without phone service due to the fires.

### F. Desert Transfers

At the September 29, 2020 Task Force, the Special Master's experts reported on their review of 82 class members listed on an August 12, 2020 point-in-time roster provided by Defendants. The Special Master's clinical experts found that 10% of the individuals should have been identified as class members in advance of their transfer, which is not a violation of the desert transfer policy but a quality issue for the sending facilities.  The clinical experts found that 30% of class members at the desert institutions were not receiving Program Guide mandated care,

particularly with respect to insufficient clinical contacts and inadequate suicide risk and self-harm evaluations.  The clinical experts stated they reported these findings to the CDCR workgroup and that CDCR's review did not contain significantly different findings.  The clinical experts further reported that the regionals had previously identified some of the issues found by the Special Master team and were taking action, and that transfers out of the desert institutions were done according the COVID-19 policies and procedures in place at the time.

The Special Master's custody experts reviewed and found that 43 of the 82 individuals had been at desert institutions that were listed as open to movement and were endorsed to non-desert institutions that also were open to movement.  The list of 43 patients was provided to CDCR for review and explanations were provided regarding the movement of each inmate.  One of the Special Master's custody experts confirmed that based on his review, CDCR was in compliance with the COVID-19 transfer policies in place at that time with respect to the patients at the desert institutions. Defendants did not provide a separate report during the September 29 Task Force. Plaintiffs noted their position that they are concerned the desert institutions are becoming a dead end where people are transferred in, not receiving care, and not transferred out.  One of the Special Master's custody experts confirmed that CDCR had informed him that one of the first priorities was to transfer patients out of segregation and then focus on transfers out of the desert institutions.  Plaintiffs agreed with this prioritization.

**G.     Milestone Credits During COVID-19.**

On May 21, 2020, Defendants provided the Task Force a draft memorandum regarding the provision of Milestone Completion Credits for participation in mental health care during COVID-19.  Plaintiffs provided written comments on May 29, Defendants sent written answers on September 24, and on September 29 Plaintiffs expressed written agreement that the guidance memorandum should be finalized and issued to the field as soon as possible.  Plaintiffs raised two remaining concerns:  First that class members are not receiving sufficient opportunities to earn mental health milestone credits, particularly for programs operating at Tiers 3 and 4 due to programming cancelation and shorter cell-front contacts; and second that the status of milestone credit-earning at DSH is unclear.  The parties discussed this issue at the September 29 Task Force

meeting, where Defendants explained that the purpose of the memorandum is to expand provision of milestones to be granted for in-cell activities in situations where groups are not being run due to COVID-19. Defendants also explained that there will be no COVID-19 changes to earning credits at DSH. The parties agreed that Defendants will issue the memorandum to the field with clarifications on those points.

### H. Decreased Inpatient Referrals During Pandemic

At the September 29 Task Force meeting, Plaintiffs reiterated a request previously stated at the September 8, 2020 Task Force meeting that Defendants agree to issue a directive or other memo informing institution-level clinicians that they should continue referring patients for inpatient care consistent with the Program Guide requirements during the pandemic, even though patient movement is limited. *See* Fifth Joint Task Force Update ECF No. 6850 at 12. Plaintiffs expressed concern that, according to the COVID-19 Dashboard, acute referrals are at approximately one-quarter of where they were this time last year, and ICF referrals are at less than one-half. Defendants did not dispute those facts, and stated that they had conveyed in monthly calls with the institutions' inpatient coordinators the need to continue referring patients as clinically necessary. Defendants also stated that such a reminder is included in the draft revision to the April 10th and April 17th policies regarding transfers and treatment that is currently with the small workgroup for review. Plaintiffs maintained that Defendants' verbal reminders did not appear to have been effective, as the pattern of significantly decreased referrals has been persistent since the start of the pandemic and has not improved, and asked for more aggressive steps. The parties and Special Master agreed to discuss this issue further at the next task force meeting. In response to Plaintiffs' concerns, CDCR reports that it issued an email on September 30, 2020, to all of the Chiefs of Mental Health asking them to remind all clinical staff to continue to refer patients to inpatient levels of care and to continue to follow the referrals procedures.

/ / /

/ / /

/ / /

DATED: October 2, 2020

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Marc J. Shinn-Krantz*
Marc J. Shinn-Krantz

Attorneys for Plaintiffs

DATED: October 2, 2020

XAVIER BECERRA
Attorney General
Adriano Hrvatin
Supervising Deputy Attorney General

By: */s/ Lucase L. Henness*
Lucas L. Hennes
Deputy Attorney General

Attorneys for Defendants

[3620316.10]

13