1   DONALD SPECTER – 083925
STEVEN FAMA – 099641
2   MARGOT MENDELSON – 268583
PRISON LAW OFFICE
3   1917 Fifth Street
Berkeley, California  94710-1916
4   Telephone:    (510) 280-2621

5   CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
6   AND DEFENSE FUND, INC.
Ed Roberts Campus
7   3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
8   Telephone:    (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

10   Attorneys for Plaintiffs

11

12                       UNITED STATES DISTRICT COURT

13                      EASTERN DISTRICT OF CALIFORNIA

14

15   RALPH COLEMAN, et al.,                   Case No. 2:90-CV-00520-KJM-DB

16              Plaintiffs,                    **PLAINTIFFS' RESPONSE TO
                                               DEFENDANTS' OBJECTIONS TO
17        v.                                   SPECIAL MASTER'S REPORT ON
                                               HIS EXPERT'S FOURTH RE-AUDIT
18   GAVIN NEWSOM, et al.,                     AND UPDATE OF SUICIDE
                                               PREVENTION PRACTICES IN THE
19              Defendants.                    PRISONS OF THE CDCR**

20                                             Judge:   Kimberly J. Mueller

21

22

23

24

25

26

27

28

[3628714.3]

**INTRODUCTION**

Defendants have been ordered to implement the Special Master's Suicide Prevention Expert Lindsay Hayes's recommendations for nearly six years.  Those recommendations have not changed, and Defendants have worked closely with Mr. Hayes to monitor institutions' compliance with them and develop and implement corrective action plans to meet them.  Yet because the Court has now signaled that it will move to enforcement of the recommendations if Defendants do not fully comply with them, Defendants suddenly claim not to understand the methodology and metrics Mr. Hayes has employed since his first audit.  Defendants' objections to Mr. Hayes's monitoring methods and the Special Master's use of 90 and 100 percent compliance benchmarks are unfounded, and, as Mr. Hayes has noted, "disingenuous" and "alarming" in light of the long remedial history and Defendants' continually rising suicide rate.  *See* Special Master's Report on his Expert's Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the CDCR ("Special Master's Report"), Sept. 23, 2020, ECF No. 6879, at 70, 74.  Defendants should stop quibbling with Mr. Hayes's long-standing methodologies and shift their focus to complying fully with all of his outstanding recommendations.  The Court should reject Defendants' objections.

I.    **MR. HAYES'S METHOD OF MEASURING COMPLIANCE WITH NURSING CHECK REQUIREMENTS IS APPROPRIATE AND NECESSARY TO PREVENT FALSIFICATION OF RECORDS**

For years, Mr. Hayes identified serious deficiencies in Defendants' suicide precaution nursing observations, which the Program Guide requires occur at 15-minute intervals.  Program Guide at 12-10-18.  Mr. Hayes's original audit report found that staff had falsified checks on the manual nursing observation logs at six institutions.  An Audit of Suicide Prevention Practices in the Prisons of the CDCR ("First Audit"), Jan. 14, 2015, ECF No. 5259, at 5, 32.  Subsequent audits made similar findings.  *See* A Re-Audit and Update on Suicide Prevention Practices in the Prisons of the CDCR ("Re-Audit"), Jan. 13, 2016, ECF No. 5396, at 28 (documentation of observation forms found to be falsified at two prisons, and at four prisons, logs were kept at the nurses' station and not at the

[3628714.3]                                   1

1 patients' cells where checks occur); The Second Re-Audit and Update of Suicide

2 Prevention Practices in the Prisons of the CDCR ("Second Re-Audit"), Sept. 7, 2017, ECF

3 No. 5672, at 11 (falsification of suicide precaution observation forms found at six

4 facilities, and noting significant increase in the problem since the last round); The Third

5 Re-Audit and Update of Suicide Prevention Practice in the Prisons of the CDCR ("Third

6 Re-Audit"), Nov. 5, 2018, ECF No. 5994, at 4, 11-12 (finding inadequate suicide

7 precaution observation practices at 86 percent of audited facilities, and noting that at two

8 facilities, nurses were seen falsifying forms).

9      Defendants have lauded EHRS as a tool for automating the process of documenting

10 patient contacts such as suicide precaution checks and reducing the likelihood of falsifica-

11 tion or fraud.  *See* Third Re-Audit at 5994 (noting that Defendants' own May 2018 CAP

12 indicated that Defendants had implemented an "EHRS modification to trigger tasking of

13 MH observation orders" that would "trigger staggered rounding and allow determination

14 of at what point the task was completed (real time)"); Declaration of Jenny S. Yelin in

15 Support of Plaintiffs' Response to Defendants' Objections to the Special Master's Report

16 on his Expert's Fourth Re-Audit ("Yelin Decl."), filed herewith, at ¶ 2 & Ex. A at 4 n. 4

17 (noting that CDCR was addressing non-compliance with nursing rounding, including

18 falsification of records, "via the use of regional monitoring, fixes to the Electronic Health

19 Record System, training, and the use of CDCR's Continuous Quality Improvement Tool").

20 Yet they now complain that Mr. Hayes's audit reviews when the checks are *logged* in

21 EHRS rather than when the nurse *says* he or she performed the check.  Defendants'

22 Objections to the Special Master's Report on his Expert's Fourth Re-Audit and Update of

23 Suicide Prevention Practices in the Prisons of the CDCR ("Defs.' Objections"), Oct. 5,

24 2020, ECF No. 6898, at 3.

25      Reliance on *post-hoc* self-reports by staff is exactly the type of inaccurate, false

26 reporting Mr. Hayes noted with the prior paper logs.  As the Special Master notes, there

27 can be no margin of error with suicide precaution checks of patients in crisis beds—

28 nursing checks that are off by even minutes could mean the difference between life and

1  death.  *See* Special Master's Report at 22 ("100 percent compliance is required" with

2  recommendation regarding 15-minute suicide precaution checks "because failure to

3  observe a suicidal patient can result in death by suicide within CDCR facilities").  It is

4  appropriate for Mr. Hayes to review the intervals between when the checks are logged,

5  rather than when nurses report that they performed them, as using the latter measure would

6  enable errors and fraud.  His methodology certainly is not clearly erroneous, and the Court

7  should accept it over Defendants' objections.  *See* Order of Reference, Dec. 11, 1995, Dkt.

8  No. 640, at 8.

9          Defendants also complain that Mr. Hayes relies partially on the CQIT Guidebook to

10  support his finding that suicide precaution checks should be logged when they occur, at a

11  patient's cell front, claiming that "CQIT and the guidebook have not been finalized or

12  implemented."  Defs.' Objections at 4.  But as Mr. Hayes pointed out, the same

13  requirement about logging suicide precaution checks in real time, while observing the

14  patient at his or her cell, has been in place in "all draft versions" of the Guidebook, so

15  Defendants have had plenty of opportunities to modify that requirement.  Special Master's

16  Report at 73.

17          Moreover, in response to his draft report, Defendants claimed that the only sections

18  of the CQIT self-audit tool not yet finalized were those related to local SPRFITs, meaning

19  those related to nursing checks were presumably ready for use.  Special Master's Report at

20  45.  They also argued that they should be allowed to test the tool for a complete round

21  prior to Mr. Hayes commencing the Fifth Re-Audit.  *Id.* at 45-46.  In other contexts,

22  Defendants have also argued that the CQIT tools are final and ready to use.  *See, e.g.*,

23  Yelin Decl. at ¶ 3 & Ex. B at 4-8 (Sept. 28, 2020 letter from Nick Weber to the Special

24  Master and Plaintiffs' counsel noting that Defendants' "institution leadership use the ASU

25  EOP Hub portion of the current CQIT guidebook to conduct self-monitoring" and that the

26  "CQIT guidebook is the blueprint of the hub certification process").

27          Defendants cannot have it both ways—insisting that CQIT is final and ready for use

28  when convenient for them, and disclaiming parts of their own Guidebook when it indicates

[3628714.3]

3

1  that an apparently widespread practice is not compliant.  Rather than dispute Mr. Hayes's

2  methodology for measuring suicide precaution checks, Defendants should focus on finally

3  implementing the Recommendation that checks be completed—and logged—every fifteen

4  minutes to prevent patients in crisis from self-harming or committing suicide.

5  **II.**    **THE SPECIAL MASTER'S AND HIS EXPERT'S COMPLIANCE STANDARDS ARE BOTH CLEAR AND CONSISTENT WITH THE PLRA**

6

7         Defendants' objections rehash the same argument they have repeatedly made—that

8  requiring them to achieve at least 90% compliance with long-standing remedial

9  requirements, such as Mr. Hayes's recommendations, exceeds what is required by the

10  Eighth Amendment and violates the PLRA.  Defs.' Objections at 4-6.  The Court has

11  squarely rejected this or similar arguments multiple times, as has the Ninth Circuit.  *See,*

12  *e.g.*, Order, Sept. 3, 2020 ("Sept. 3, 2020 Order"), ECF No. 6846, at 10-11, 23-24; *see also*

13  *Coleman v. Brown*, 756 F. App'x 677, 679 (9th Cir. 2018).

14         One of Defendants' specific gripes, that the Special Master will only find them

15  compliant with the suicide prevention training Recommendation if at least 90 percent of

16  custody, medical, and mental health staff at each institution receive training, is misplaced

17  and inappropriate.  First, Defendants have been under a Court order to "ensure that *all*

18  custody and health care staff" receive annual suicide prevention training that is "conducted

19  by qualified mental health personnel" for nearly six years.  *See* Sept. 3, 2020 Order,

20  Appendix A, at 31 (emphasis added).  Defendants can hardly complain that requiring them

21  to meet a 90% benchmark for training is unexpected or unfair, given that they have had

22  years of notice.  Second, as Mr. Hayes points out, "the methodology and compliance

23  indicators (i.e. 90 percent) used by this reviewer have remained consistent throughout all

24  of the suicide prevention assessment reports, and those facilities who have achieved and/or

25  maintained compliance with suicide prevention practices did not appear confused by

26  them." Special Master's Report at 64.  And when the harm to be remedied is a deficient

27  suicide prevention program that has failed to stem the tide of a rising suicide rate for years,

28  requiring 90 or 100 percent compliance is both reasonable and necessary to prevent death.

[3628714.3]

4

1   *See* Special Master's Report at 22.

2         Regardless, given Defendants' long history of failing to remedy their deficient

3   suicide prevention program despite numerous court orders and the remedial assistance of

4   two experts, requiring specific benchmarks for compliance does not run afoul of the

5   PLRA, especially since neither Mr. Hayes nor the Court has told Defendants how to

6   implement the recommendations, only that they must do so.  *See* generally Sept. 3, 2020

7   Order; *see also Armstrong v. Brown*, 768 F.3d 975, 985-86 (9th Cir. 2014).[1]  The Court

8   should adopt the Special Master's and his expert's recommended compliance benchmarks

9   despite Defendants' objections.

10   **III.   DEFENDANTS HAVE KNOWN THE AUDITING CRITERIA MR. HAYES
      HAS USED FOR YEARS AND DO NOT NEED ANY FURTHER**
11   **CLARIFICATION IN ORDER TO ACHIEVE COMPLIANCE**

12         Defendants complain that they do not understand the compliance metrics or

13   methodology for monitoring certain of Mr. Hayes's Recommendations.  Defs.' Objections

14   at 6-8.  But Mr. Hayes's Recommendations have remain unchanged since 2015, when he

15   issued his first report regarding CDCR's suicide prevention practices, and the Court

16   ordered CDCR to implement them forthwith.  *See* Order, July 3, 2019, ECF No. 6212 at

17   13.  And as Mr. Hayes pointed out in his responses to CDCR's June 15, 2020 letter

18   regarding his Draft Fourth Re-Audit report, Defendants have participated fully in each

19   stage of Mr. Hayes's auditing process, so cannot reasonably claim that they do not

20   understand his methodology or criteria:

21         There are no secrets or surprises with this reviewer's overall methodology
      for auditing. Consistent with all Coleman reports, members of the local
22         facility (usually the SPRFIT), regional and/or headquarters staff routinely
      follow this reviewer around and observe what this reviewer observes. In
23         addition, during PT rounds and R&R screening, a nursing supervisor is
      usually shadowing this reviewer. All of these findings and observations are
24         reported out at each facility exit meeting, and there are ample opportunities

25   

26   [1] *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), relied upon by Defendants, is completely
      inapposite, because the Supreme Court was considering whether a new injunction was
27   necessary under the Eighth Amendment, not a compliance measure in a decades-long post-
      judgment case with numerous court orders finding failures to remedy the Eighth
28   Amendment harm.

[3628714.3]

5

1   for clarification at that time.

2   Special Master's Report at 65.  It is clear that Defendants' purported confusion about

3   Mr. Hayes's findings is simply a delay tactic aimed at avoiding imminent court

4   enforcement.  *See* Order, Jan. 7, 2020, ECF No. 6441 at 8; Sept. 3, 2020 Order at 5.

5       Specifically, Defendants request that Mr. Hayes separate out the compliance

6   measures for the various deficiencies Mr. Hayes identified in intake screening performed

7   by nurses.  Defs.' Objections at 7.  This is clearly unnecessary.  Each of Mr. Hayes's five

8   reports has provided detailed, institution-level information about each deficiency he

9   identified.  *See* First Audit at 9-12 and Appendix; Re-Audit at 6-8 and Part V; Second Re-

10  Audit at 3-4 and Appendix A; Third Re-Audit at 4-5 and Appendix A; Fourth Re-Audit at

11  7-9 and Appendix A.  Defendants do not need to be told more percentages in order to

12  figure out how to improve their intake screening spaces and procedures; they simply need

13  to implement the Recommendations they have been ordered to implement for nearly six

14  years.  Mr. Hayes's refusal to break down the compliance percentages for Recommend-

15  ations 6, 7, and 8 is therefore reasonable and not clearly erroneous, *see* Special Master's

16  Report at 71, and the Court should not order him to provide any additional information to

17  Defendants.

18      Similarly, Defendants' request for additional detail about the sample size and

19  "number of observations made" regarding psychiatric technician rounding is disingenuous.

20  Mr. Hayes's report provides detailed information for each institution found not to be in

21  compliance with the PT Rounding Recommendation, with descriptions of which units had

22  problematic practices, and often with descriptions of the specific non-compliant inter-

23  actions and notes that Mr. Hayes provided feedback at the institution to supervisorial staff.

24  *See, e.g.*, Fourth Re-Audit at 51 (describing PT rounding issues at SAC and noting that

25  "rounds by one of the PTs in the STRH unit were problematic because the PT simply

26  approached each cell and asked, "Want to answer some questions today?" Due to the

27  manner in which the question was asked, many inmates responded "No" and the PT moved

28  to the next cell. The PT supervisor was informed of the problem."); *id.* at 120 (describing

[3628714.3]

6

1   PT rounding at KVSP and noting that he "observed daily rounds by two PTs assigned to

2   GP administrative segregation and STRH units on January 8, 2019" and that "the PT [in

3   the STRH] was observed to be entering Psych Tech Daily Rounds information into EHRS

4   for each caseload inmate, [but] there was very brief interaction with each inmate, with

5   inquiry limited to 'eating and sleeping okay' and 'any medication concerns'" and "no

6   inquiry regarding SI/HI or out-of-cell programming"); *id.* at 232 (describing PT rounding

7   at Assessment Center at SQ and noting "that the PT (who was not normally assigned to the

8   post) was inadequately conducting rounds by simply asking caseload inmates 'Any issues

9   of concern?'").  Defendants were present during these tours and should know precisely

10  which staff performed the non-compliant rounds, and which patients they saw.  Defendants

11  do not need more information about how Mr. Hayes measured their non-compliance.  They

12  need to instead train their staff to perform the checks properly so that they can be found

13  compliant with this long-standing recommendation during the Fifth Re-Audit.

14          The Court should reject Defendants' request to order Mr. Hayes to modify his

15  monitoring or reporting methodology.

16                                    **CONCLUSION**

17          Plaintiffs respectfully request that the Court overrule Defendants' objections and

18  adopt the Special Master's Report and attached Fourth Re-Audit Report as submitted.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

[3628714.3]

7

1

## CERTIFICATION

2       The undersigned counsel for Plaintiffs certifies that she reviewed the following

3  relevant court orders: Dkt. No. 641, ECF Nos. 6212, 6441, 6846.

4

5  DATED:  October 14, 2020          Respectfully submitted,

6                                    ROSEN BIEN GALVAN & GRUNFELD LLP

7                                    By:  */s/ Jenny S. Yelin*

8                                         Jenny S. Yelin

9                                    Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3628714.3]

8