DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF JENNY S. YELIN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT ON HIS EXPERT'S FOURTH RE-AUDIT AND UPDATE OF SUICIDE PREVENTION PRACTICES IN THE PRISONS OF THE CDCR**

Judge: Hon. Kimberly J. Mueller

[3631715.1]

DECLARATION OF JENNY S. YELIN

I, Jenny S. Yelin, declare:

1.      I am an attorney duly admitted to practice before this Court.  I am a Senior Counsel in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration based in support of Plaintiffs' Response to Defendants' Objections to the Special Master's Report on his Expert's Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the CDCR.

2.      Attached hereto as **Exhibit A** is a true and correct copy of an email I received via auto-forward from Michael Bien, which forwarded an email from Defendant's attorney, Nick Weber, to Special Master Lopes on October 3, 2018.  The email included an October 3, 2018 letter in response to Lindsay Hayes's draft report of his Third Re-Audit, a true and correct copy of which is also attached hereto as Exhibit A, excluding its exhibits.

3.      Attached hereto as **Exhibit B** is a true and correct copy of an email I received from Nick Weber on September 28, 2020, attaching a letter of the same date regarding the ASU EOP Hub Certification process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 14th day of October, 2020.


*/s/ Jenny S. Yelin*
Jenny S. Yelin

# Exhibit A

**From:** Michael W. Bien
**Sent:** Wednesday, October 3, 2018 7:13 PM
**To:** Coleman Team - RBG Only
**Subject:** FW: Coleman - CDCR Comments and Objections to the Draft Lindsay Hayes's Third Re-Audit of CDCR's Suicide Prevention Practices
**Attachments:** Ltr. NW- ML re Suicide Prevention Audit 10.3.18.pdf

---

**From:** Weber, Nicholas@CDCR
**Sent:** Wednesday, October 3, 2018 7:11:21 PM (UTC-08:00) Pacific Time (US & Canada)
**To:** Michael W. Bien; Steve Fama; Lisa Ells; Jessica Winter; Cara Trapani; Michael Nunez; Marc Shinn-Krantz; Thomas Nolan; Cynthia Radavsky; Henry D. Dlugacz; Jeff Metzner; 'JNavarro@pldw.com' (JNavarro@pldw.com); Kerry Courtney Hughes, MD; Kristina Hector (KHector@pldw.com); 'kwalsh@pldw.com' (kwalsh@pldw.com); Lindsay Hayes; L M. Hunt; Maria Masotta; mjones@pldw.com; 'mlopes@pldw.com' (mlopes@pldw.com); Mary Perrien; Patricia M. Williams; Karen Rea-Williams; Rachel Gribbin; rcosta@pldw.com; Rod Hickman; Roxie Dunbar; 'sraffa@PLDW.com'; Tim Rougeux
**Cc:** Elise Thorn; Tyler Heath; Andrew Gibson (Andrew.Gibson@doj.ca.gov); Ian Ellis; Tobias Snyder (Tobias.Snyder@doj.ca.gov); Tebrock, Katherine@CDCR; Bentz, Melissa@CDCR; Hockerson, Dillon@CDCR; Hessick, Jerome@CDCR
**Subject:** Coleman - CDCR Comments and Objections to the Draft Lindsay Hayes's Third Re-Audit of CDCR's Suicide Prevention Practices

All,

Defendants thank the Special Master for extending the deadline to reply to Mr. Hayes's draft Re-Audit of CDCR's Suicide Prevention Practices. Attached are CDCR's comments and objections to the draft report. Please note that attachments within the letter are subject to the protective order.

Thanks.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA 95811-7243
(916) 323-3202

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



October 3, 2018

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Dear Special Master Lopes:

I write in response to Lindsay Hayes's draft report "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation" (Audit) provided to Defendants on August 27, 2018. CDCR thanks Mr. Hayes for his suicide prevention audits and his recommendations, which have been adopted in their entirety by the California Department of Corrections and Rehabilitation (CDCR).

Over the past several years, CDCR has successfully developed and piloted its Continuous Quality Improvement Tool to conduct self-monitoring of CDCR's mental health programs. More recently, CDCR has added suicide prevention indicators to the tool. As discussed below, CDCR believes that the parties should soon begin discussions on transitioning suicide prevention monitoring to CDCR.

Also discussed below are CDCR's general and specific responses and objections to the Audit. Additionally, CDCR objects to the finding that CDCR's proposed unlicensed crisis bed unit at R.J. Donovan Correctional Facility (RJD) is unsuitable to provide patient care. Mr. Hayes's opinion is based on hypothetical concerns – not monitoring of the activated unit. CDCR should be permitted to activate the unit, subject to monitoring, to ensure that CDCR can provide ready access to crisis care for patients in southern California.

    I.   The Parties Should Discuss Transitioning Suicide Prevention Monitoring to CDCR

Since 2012, with input from the Special Master and Plaintiffs, CDCR has developed its own self-monitoring tool, the Continuous Quality Improvement Tool (CQIT). CQIT has been successfully piloted and recently updated to include suicide prevention audit criteria. Following the current round of CQIT audits, expected to be completed by November 2018, CDCR will release reports outlining the suicide prevention practices for the ten audited institutions. Coupled with chart review audits, CDCR's suicide case reviews and headquarters' Suicide Prevention and Response Focused Improvement Teams (SPRFIT), CDCR is thoroughly analyzing its own

Special Master Lopes
October 3, 2018
Page 2

suicide prevention practices and is in the best position to assess its prevention practices and respond to identified deficiencies with corrective action.

During the development of CQIT, the Special Master has monitored CDCR's suicide prevention practices. The most recent cycle of monitoring, now entering its sixth year, began in July 2013 when the Court ordered Defendants to "establish a suicide prevention/management work group . . . to work under the guidance of the Special Master to timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause." (ECF No. 4693 at 5-6.) There is currently no established end date for the workgroup or a plan to transition monitoring to CDCR.

By utilizing CQIT, which incorporates the compliance indicators developed by the Suicide Prevention and Management Workgroup and applied by Mr. Hayes during his audits, CDCR can quickly assess and respond to deficiencies by adjusting practices or modifying policies, as necessary. The CQIT process also memorializes its audit findings and recommendations in reports addressed to each institution. By combining CQIT, headquarters SPRFIT, and the suicide case review process, CDCR is positioned to provide strong suicide prevention oversight. CDCR invites a discussion about how best to transition monitoring these issues.

    II.  Specific Objections and Comments

CDCR objects to additional Corrective Action Plans because they are unnecessary to cure deficiencies identified in the Audit. CDCR is responsive to deficiencies when they are identified and works to immediately remedy them. Outlined below are specific objections and requests for modification to the report. CDCR provides these objections and comments in addition to its general objection to additional corrective action plans.

        A.  Use of Suicide-Resistant Cells for Newly-Admitted Inmates in Administrative
            Segregation Units (Pages 8-9)

The report states that CDCR should develop Corrective Action Plans (CAPs) to address deficiencies at ten institutions related to intake cell placement during the first seventy-two hours of segregation. (Audit at 9.) Specifically, the report recommends that "[s]ome of the CAPs will involve creating additional retrofitted new intake cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-new intake cells when new intake cells are available."

Notwithstanding the Audit's findings, there has been no determination that new intake cells remedy the deficiencies found during the monitoring period. As the report notes, the segregation population has decreased statewide. And CDCR was found to be more compliant with intake cell requirements in prior rounds than in the current round. CDCR has also undertaken

Special Master Lopes
October 3, 2018
Page 3

improvements to remedy intake cell issues since the start of the last monitoring period.  For instance, on September 17, 2017, CDCR directed the affected institutions to apply a standardized stencil to each intake cell that identifies them as such.  All institutions complied with this requirement by October 27, 2017.

CDCR will independently assess whether new intake cells are required to remedy the issues at these institutions.  However, until there has been such a determination, CDCR requests that the language at page nine be modified to read that "[s]ome of the CAPs ~~will~~ may involve creating additional retrofitted new intake cells . . . ."  This language should also be reflected at the third bullet of page thirty-seven.

### B.  Use of "Alternative Housing" for Suicidal Inmates (Pages 9-10)

At page ten, the report recommends that CDCR "develop CAPs in each of the four facilities (CIW, CCWF, CSP/Corcoran, and RJD) that continue to have alternative housing lengths of stay well in excess of 24 hours."[1]  Such a CAP is unnecessary, especially as applied to individual institutions.  Crisis bed transfers are managed by headquarters, and their timeliness depends on statewide bed availability.  There is nothing in the report to suggest that slower transfer times are the result of deficiencies at the local level.[2]  Moreover, CDCR has already undertaken or proposed remedies to reduce the time patients wait to transfer to a crisis bed.

With respect to California Institution for Women (CIW) and Central California Women's Facility (CCWF), CDCR and Plaintiffs entered into a stipulated agreement to activate nineteen unlicensed beds at CIW to ensure quicker access to crisis beds for patients referred from CIW and CCWF.  These beds are expected to be activated by year's end.

In addition, as discussed in CDCR's July 30, 2018 letter regarding its proposal to activate an unlicensed crisis bed unit at R.J. Donovan Correctional Facility (RJD), there are an insufficient number of crisis beds in southern California.  (Exhibit A.)  As a result, patients will often wait longer in the southern region because they must spend more time on transport vehicles heading to available beds, generally, in the central region.  Accordingly, RJD's crisis bed wait times exceed those at other institutions.  That is why CDCR is proposing to activate a twenty crisis-bed unit at RJD.[3]

Corcoran's noncompliance is tied to the inadequate number of crisis beds in southern California.  Although Corcoran is in the central region, it has a relatively large crisis bed unit, and is often

---

[1] This recommendation is repeated at page thirty-seven, bullet four.
[2] While CDCR has undertaken measures at the local level aimed at improving transfers, further local fixes are unlikely to positively impact transfer timeframes at these four institutions given the need for female crisis beds and beds in the southern region, the lack of which impacts bed availability in the central region.
[3] That Mr. Hayes has rejected this proposal outright makes this particular CAP even more objectionable.  This issue is discussed in more detail in section III, below.

Special Master Lopes
October 3, 2018
Page 4

used as overflow for patients from southern California. Accommodating these patients can delay the time it takes for Corcoran patients to arrive in a crisis bed. This issue further supports the need for additional crisis beds in southern California.

Accordingly, directing a CAP at these four institutions is unnecessary because crisis bed wait times are directly related to the availability of statewide beds, and not based on correctable local practices. Further, since the availability of statewide beds is being addressed with additional beds at CIW, and potentially at RJD, the underlying issue is likely to be resolved in the near future.

C.  Practices for Observing MHCB Patients (Pages 11-13)

Page eleven of the report states, "the problem of falsification of observation forms of suicidal patients had not been resolved and, in fact, had been exacerbated. This reviewer's preceding assessment found falsification of observation forms in 26 percent (six of 23) of the audited facilities." It is unclear from the report which six institutions falsified forms. Only California Institution for Men and Mule Creek State Prison are noted to have falsified form in the appendix.

As drafted, the report gives the impression that there is a systemwide issue with falsification of records. However, the sentences and paragraph following the statement regarding falsification appear to discuss noncompliance with CDCR's frequency of rounding policy. It is unclear whether falsification is at issue, or if the real issue is noncompliance with frequency of rounding policy[4]. If the issue is noncompliance with frequency of rounding, CDCR requests that the word "falsification" be struck at pages eleven and twelve and replaced with appropriate verbiage identifying the issue as one of "noncompliance with rounding policies."

If form falsification occurred, as alleged at page eleven, CDCR requests that Mr. Hayes specifically identify the six institutions alleged to have falsified forms, or that the compliance rate be adjusted to reflect the true number of institutions determined to have falsified records. This information will provide an accurate picture of whether there is a systemwide issue, as opposed to a handful of staff who are not compliant with CDCR policy.

D.  Safety Planning for Suicidal Inmates (Pages 17-21)

Mr. Hayes recommends that CDCR develop CAPs for safety plan training with a "proposed reassessment to ensure that the CAPs have sufficiently resolved the deficiencies." (Audit at 21.) CDCR is in the process of updating its safety planning process. CDCR presented proposed changes to the Special Master team on July 19, 2018, and to Plaintiffs on September 5, 2018.

---

[4] The report notes that rounding noncompliance was found in over 86% of the institutions. CDCR is addressing that issue via the use of regional monitoring, fixes to the Electronic Health Record System, training, and the use of CDCR's Continuous Quality Improvement Tool.

Special Master Lopes
October 3, 2018
Page 5

CDCR anticipates training the field on these changes in October 2018. In light of the imminent change in practice, monitoring should be suspended until such time that CDCR can properly train and fully implement the new safety planning protocol statewide. Otherwise, any reassessment would be based on outdated protocols.

   E. MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody Welfare Checks (Pages 22-23)

Mr. Hayes recommends that CDCR should "[d]evelop CAPs for the 'Discharge Custody Check Sheet' (CDCR MH-7497) form process in the 20 facilities identified above that were below 90-percent compliance." (Audit at 23.) The new CAP is redundant because CDCR already developed and implemented a CAP to address this issue in May 2018. Instead of initiating a new CAP, CDCR should be allowed to complete implementation of its May 2018 CAP, followed by further assessment by the Special Master.

   F. Local SPRFITs (Pages 23-25)

The report states at page twenty-four that "[d]ue to a perceived lack of urgency in finalizing the revised SPRFIT policy, the court ruled on January 25, 2018 that '[g]ood cause appearing, defendants will be directed to provide to the Special Master a local SPRFIT policy revised in accordance with Mr. Hayes' critique and the requirements of the Revised Program Guide, not later than thirty days from the date of this order.' (ECF No. 5762 at 3.)"

CDCR objects to the contention that CDCR has not acted timely to develop and implement revisions to its SPRFIT policy and requests that the Special Master strike the phrase "[d]ue to a perceived lack of urgency in finalizing the revised SPRFIT policy." Over the past two-years, CDCR has developed and implemented countless initiatives resulting from the *Coleman* class action. The Special Master's most recent report on inpatient care identifies forty-nine such initiatives. (See ECF no. 5894 at 89-90, fns. 20 and 21.) This mischaracterization of CDCR's commitment to suicide prevention discounts the tremendous amount of work Defendants have accomplished in the last two years.

   G. Suicide Prevention Training (Pages 25-28)

     i. Basic Correctional Officers Academy Training

Mr. Hayes reports that he is concerned about the "currently allotted 2.5 hour time frame" for pre-service training. (Audit at 26.) CDCR has expanded the Basic Correctional Officers Academy Training to four hours. CDCR requests this sentence be struck or edited appropriately.

Special Master Lopes
October 3, 2018
Page 6

      ii.   Training Compliance Rates

For unexplained reasons, CDCR's forty-three percent compliance with in-service training is highlighted in both bold and italics on page twenty-six. Conversely, CDCR's 100-percent compliance with cardiopulmonary resuscitation (CPR) and automated external defibrillator (AED) training is relegated to a footnote on the same page. CDCR requests that the CPR and AED training compliance rates be moved to the body of the report.

      iii.   Recommendation

Mr. Hayes recommends that CDCR provide him with the revised pre-service *Mental Health Services Delivery System Instructor Guide* curriculum and a schedule of possible dates in which presentation of the revised curriculum can be observed at the Basic Correctional Officers Academy Training. (Audit at 27-28.) This recommendation is unnecessary.[5] CDCR provided this information to Mr. Hayes on August 23, 2018.

    H.  Continuous Quality Improvement Tool (Pages 28-29)

Mr. Hayes recommends that "[t]he reporting out of all of this reviewer's 19 suicide prevention audit measures should be encompassed in one final CQIT-formatted report for each facility, and not in various 'regional reports' as described in defendants' May 2018 CAP." (Audit at 29.) This recommendation is unnecessary[6] because these are reports of individual institutions, not "regional reports." The reference to "regional reports" in CDCR's CAP refers to the author of the CQIT reports, the leadership in CDCR's regional mental health offices. The regional chiefs and their staff conduct the CQIT audit and draft reports for each audited institution. CDCR is processing an overarching CQIT report that will aggregate the findings of the institution reports.

    I.  Reception Center Suicide Prevention Posters (Pages 30-32)

Mr. Hayes recommends a CAP "to ensure that suicide prevention posters are placed and maintained in visible locations in and around RC housing units, including, but not limited to, housing unit bulletin boards, [sic] nurse's offices where intake screening is administered, and pill call windows."[7] (Audit at 32.) While CDCR agrees that suicide posters should be placed in visible locations within Reception Centers, they cannot block visibility through windows or be placed outdoors. CDCR requests that the sentence include provisional language such as "when conditions allow."

---

[5] The recommendation is separately repeated as the last bullet on page thirty-seven.

[6] The recommendation is repeated at the first bullet of page thirty-eight.

[7] This recommendation is repeated at the second bullet of page thirty-eight.

Special Master Lopes
October 3, 2018
Page 7

III. CDCR Objects to Mr. Hayes's Rejection of the RJD Crisis Bed Proposal

To increase crisis bed capacity in the region where beds are most needed, CDCR proposed a temporary twenty crisis-bed unit at RJD pending construction of a permanent facility on site. This unit is especially important to ensure prompt access to crisis beds for the large number of patients housed in southern California. The need for additional crisis beds has also been recognized by the Court. On April 19, 2017, the court found that CDCR does "not presently have sufficient capacity to meet the need for MHCB level of care" and that the Eighth Amendment required perfect compliance with the twenty-four hour MHCB transfer timeframe. (*See* ECF 5610 at pages 11-12.)

As noted in CDCR's July 30, 2018 letter on this proposal, patients wait longer to access crisis beds in southern California than in any other region and, "each crisis bed in the southern region must provide services to twenty-five Enhanced Outpatient Program (EOP) patients while MHCBs in the central and northern regions provide services to fifteen and seventeen EOP patients, respectively." (Exhibit A at 2.) Mr. Hayes notes that transfer timeframes are not currently being met at RJD. (Audit at 10.) RJD, which houses over 2,300 mentally-ill inmates, but has only fourteen crisis beds, is the ideal location for additional beds.

Despite the need to timely transfer patients in crisis, Mr. Hayes rejected this common sense approach outright. Instead of rejecting CDCR's proposal, CDCR should fully activate the unit and only then should Mr. Hayes should monitor and opine on its adequacy.

    A. CDCR's RJD Crisis Bed Proposal is Sound and Will Ensure Crisis Bed Access for Patients in Southern California

CDCR toured the proposed site with Plaintiffs and Special Master in March 2018 and visited it separately with a member of the Special Master team and Mr. Hayes in April 2018. Following comments from Plaintiffs and the Special Master team, CDCR provided additional details on the project in a series of meetings. CDCR also detailed the RJD proposal in two letters provided to Plaintiffs and the Special Master in April and July 2018, which are attached to this letter as Exhibits A and B. The RJD proposal, which transfers funding and staff allocation from SAC's unlicensed crisis beds to RJD, was approved in the 2018 budget.

CDCR has carefully considered the placement of the RJD crisis-bed unit. CDCR proposes to convert one side of a housing unit to a crisis-bed unit which will contain patient cells, office and treatment space, observation and restraint rooms, nursing and medication rooms, and storage. While the proposed building currently shares space with an administrative segregation unit, that section will be reserved for overflow to minimize the administrative-segregation population. The units will be divided by a fence, and because it shares space with an administrative segregation unit, there will be no disruptions from the adjacent day-room.

Special Master Lopes
October 3, 2018
Page 8

The RJD cells will be similar in size to those approved at the California Medical Facility L1 unit, which successfully double cells patients in inpatient beds. RJD patients will be single celled and will each receive additional out of cell time, in part due to adjacent yard space. CDCR will ensure that the cells are suicide resistant.

CDCR will provide RJD with sufficient staffing to run a crisis bed unit. As noted above, CDCR plans to remove its unlicensed crisis bed unit at SAC and move all allocated staff and funding to RJD. The new RJD unit will be monitored regularly by headquarters and regional staff.

   B. Rejecting the Proposal Outright is Improper

Mr. Hayes reports on at least a dozen items in his suicide-prevention audit to measure CDCR's compliance with its suicide-prevention policies. Yet the RJD proposal was rejected without analyzing the unit using under the same audit criteria. The Audit does not adequately explain why the proposal is rejected nor does it explain why concerns about the proposal's physical plant outweigh the transfer timeline concerns expressed by the Court. Mr. Hayes fails to provide a reasonable basis to conclude that the RJD project is inadequate.

Many of the current audit criteria and past audit reports focus on the operations of MHCBs. According to the draft report, Mr. Hayes audited the following crisis bed related items:

- Suicide-Resistant MHCBs (Audit at 6)
- Practices for observing MHCB Patients (*id.* at 11)
- MHCB Practices for Possessions and Privileges (*id.* at 13)
- Safety Planning for Suicidal Inmates (*id.* at 17)
- MHCB Discharge (*id.* at 22)
- Emergency medical response equipment in housing units (*id.* at 2)

Mr. Hayes takes issue with the proposed temporary MHCB unit at RJD, but those purported concerns have no foundation in the audit criteria. Under the proposal, RJD would follow the same observation, property, and privileges practices as any other approved CDCR crisis bed. Additionally, the same safety planning and discharge policies would apply. In sum, there is no evidence that the RJD unit, as proposed, would present a greater suicide risk as compared to other crisis bed units.

   C. Mr. Hayes's Bases for Rejecting the Proposal Are Inconsistent with Past Suicide Prevention Findings and Recommendations and Ignore CDCR's Proposed Amendments.

Mr. Hayes agrees that the unit would be suicide resistant, which should satisfy the inquiry into suicide prevention. Yet, he objects to the proposed unit based on the physical plant and

Special Master Lopes
October 3, 2018
Page 9

hypothetical operational challenges. Mr. Hayes rejects the proposed physical plant of the crisis bed because, in his opinion, the cells would resemble suicide resistant *intake* cells. Mr. Hayes also attacks the cells as cold, dark, and with limited floor space well below any licensed MHCB unit. But CDCR presented remedies to address those concerns, all of which would provide cells with better natural light than many licensed crisis bed units, and with sufficient out-of-cell time to adjust for smaller foot-print in each cell.

In fact, and as mentioned previously, the proposed cells are similar in size to the unlicensed beds in California Medical Facility's L1 unit. However, unlike L1, RJD would not double cell patients, now or in the future. Like L1, CDCR proposes to remedy any square footage shortcomings with increased out-of-cell time. The RJD unit is located next to small management yards, typically used for segregation inmates. These yards can be used for crisis bed patients and will allow for increased out of cell time.

CDCR has also proposed to replace the cell doors with models that have larger windows and also proposed to replace light bulbs on the unit to provide more light. However, Mr. Hayes rejected these proposals as insufficient before ever seeing the doors or lights in place, or the impact of the larger windows on his stated concerns.

Also questionable is Mr. Hayes's rejection of the office and treatment space on the basis that sound easily travels between cells which are dozens of feet apart. The Audit states, "[g]iven the *fact* that inmates freely converse through the ventilation grates and cell doors, even with clinical offices and interview rooms located at the end of each tier, privacy and confidentiality could still be compromised by the proposed location of these offices on each tier." (Emphasis added.) This characterization of the unit and potential impact on confidentiality is exaggerated and hypothetical. It is true that inmates will loudly shout at their adjacent neighbor in an attempt to converse with one another. Yet, CDCR is unaware of any finding that sound travels so clearly that a patient in one cell can clearly overhear an individual clinical session several cells away. As noted in CDCR's July 30, 2018, letter, CDCR will examine whether individual sessions can be clearly heard several cells away and, if so, take corrective action to ensure confidentiality.

Mr. Hayes also rejects the proposed use of small management yards ignoring that this proposal has ample yard space and superior beds to the unit at SAC it will replace. There is no real risk that CDCR will be unable to ensure inmates have adequate out-of-cell time. CDCR should be permitted to activate the unit and illustrate that it can offer the out of cell time it committed to, much like it did with L1 wherein CDCR committed to offering twelve hours out of cell time each day.

Finally, Mr. Hayes opines that because the SAC unlicensed crisis bed is "problematic," CDCR should not close and move that program to RJD. This objection ignores the fact that the RJD

Special Master Lopes
October 3, 2018
Page 10

project is located in the part of the state where additional beds are needed and that, unlike SAC, the RJD project is time limited.  The unit is planned to remain open only until the approved and budgeted permanent crisis bed unit opens at RJD in 2022.

In sum, CDCR's proposal to open an unlicensed crisis-bed unit at RJD is sound and Mr. Hayes's contrary suggestion lacks foundation.  Accordingly, CDCR should be permitted to immediately open the unit and provide faster crisis bed access to patients in southern California.

Thank you for your consideration of these objections and comments.


Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
Office of Legal Affairs

# Exhibit B

**From:**         Nick Weber
**Sent:**         Monday, September 28, 2020 9:11 AM
**To:**           Coleman Team - RBG Only; Coleman Special Master Team; Steve Fama; Elise Thorn; Tyler Heath;
                  Lucas Hennes; Kyle Lewis; Christine Ciccotti; Nina Raddatz; Kent, Kristopher@DSH-S; Stafford,
                  Carrie@CDCR; Melissa Bentz; Hockerson, Dillon@CDCR; Mehta, Amar@CDCR; Ponciano,
                  Angela@CDCR; Laura Ceballos; Lorey, Dawn@CDCR; Steven Cartwright
**Subject:**      Coleman - ASU EOP Hub Certifications
**Attachments:**  Ltr. NW- ML re ASU EOP Hub Certs 9.28.20.pdf

All,

Attached please see a letter regarding Defendants' ASU EOP Hub Certification Process.

Thanks.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243
(916) 323-3202

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
**General Counsel**
P.O. Box 942883
Sacramento, CA 94283-0001



September 28, 2020

Special Master Lopes                              *Coleman* Plaintiffs' Counsel
Pannone Lopes Devereaux and O'Gara LLC           Rosen Bien Galvan and Grunfeld LLP
Northwoods Office Park, Suite 215N               101 Mission Street, Sixth Floor
1301 Atwood Avenue                               San Francisco, A 94105
Johnston, RI 02919

VIA EMAIL

Special Master Lopes and *Coleman* Plaintiffs' Counsel,

I write regarding the Administrative Segregation Unit (ASU) Enhanced Outpatient Program (EOP) Hub Certification process. Defendants remain committed to the robust certification process which, since its inception in 2014, has significantly improved internal oversight and operation of every ASU EOP Hub. The California Department of Correction and Rehabilitation's (CDCR) meetings with the Special Master's experts in the small workgroup process have proven useful to collaboratively assess the entirety of the ASU EOP Hub Certification process. While CDCR is encouraged that Dr. Potter's data review is ongoing, CDCR has also identified several issues that can be immediately remedied. These improvements are in line with the mission of the underlying certification tool, the Continuous Quality Improvement Tool, which was designed to be regularly updated to reflect current policy and procedures as well as to take advantage of modern data collection practices.

Discussed below is the history, components, and process of the ASU EOP Hub certification process as well as proposed process improvement initiatives. These improvements will ensure that the certification process remains robust and durable, addressing the Plaintiffs' and Special Master's concerns, while also ensuring that the certification process becomes more transparent for all stakeholders.

I.      History of the ASU EOP Hub certifications

Following litigation surrounding, among other things, segregation of the mentally ill, the court, in its April 10, 2014, order found that

> "[D]efendants cannot house seriously mentally ill inmates in settings where defendants know those inmates cannot receive minimally adequate mental health care required by the Program Guide. Whether or not the care provided in each EOP ASU hub meets Program Guide requirements is, again, a clinical judgment and one that must be exercised by [former Deputy Director of the Statewide Mental Health Program] Dr. Belevich and his staff. Accordingly, defendants will be required to provide monthly reports on

whether each EOP ASU hub meets Program Guide requirements for an EOP ASU level of care and they will be prevented from admitting any Coleman class member at the EOP level of care to any EOP ASU hub that does not meet or exceed Program Guide requirement for a period of more than two consecutive months. Moreover, defendants will also be prevented from placing any Coleman class member at the EOP level of care in any administrative segregation unit during any period in which there are an insufficient number of EOP Ad Seg Hub beds available."

(Order, ECF No. 5131 at 63.) The parties subsequently met and conferred over a period of months to develop this self-audit process. CDCR first met with the Special Master team on June 6, 2014, to discuss the order and developed the first draft of the plan on June 17, 2014. Following further meetings with the Special Master, CDCR presented its revised plan to the Plaintiffs on July 2, 2014, following which CDCR amended its plan to address concerns raised by Plaintiffs during negotiations of CDCR's proposed plan in July 2014. (See Defendants' Plans and Policies in Response to the April 10, 2014 Order, ECF No. 5190 at 18.) As part of the parties' negotiated agreement, before CDCR issued its ASU EOP Hub Certification reports, it would first "compete an in-depth evaluation of the hubs, modeled after the Continuous Quality Improvement…[Tool] (CQIT) process, working in coordination with the Special Master's team." (Id.) [1]

CDCR began tours of its ASU EOP hubs on July 29, 2014 in order to train local staff on conducting audits and to ensure each hub passes certification for at least two consecutive months. (See Id. at 19 and Exhibit B to Plaintiffs' June 19, 2020, letter.) The purpose of the tours was to develop a baseline assessment of compliance to allow the institutions to later certify whether the ASU EOP Hubs remained compliant with the Program Guide. During those tours, CDCR used the ASU EOP Hub portion of the Continuous Quality Improvement Tool (CQIT) to assess the hubs. Plaintiffs' counsel and members of the Special Master's team attended the tours and were consulted about CDCR's findings. [2] Self-certification at the local level could not begin until the ASU EOP Hub showed two consecutive months of compliance. (ECF No. 5190 at 18.)[3]

After completion of the two-month CQIT audit process of each hub, CDCR agreed to complete the audit which would be "certified by the local chief of mental health, the regional administrator, and the [Deputy] Director of Mental Health[4]." (Id.) The Deputy Director of the Statewide Mental

---

[1] Plaintiffs refer to this process in their June 19, 2020, letter at page 4, stating that "details of Defendants' plan were extremely vague, and their pleading acknowledged that 'the Special Master proposed a different process for evaluating the EOP ASU hubs, and Defendants have not completed the initial report contemplated by the order.' [ECF No. 5190] at 18 n.2." That "different process" is the initial baseline certification CQIT tours conducted at least twice at every ASU EOP Hub. (Id. at 18.) This process was clearly outlined in the same pleading.

[2] See also Special Master's 26th Round Monitoring Report (ECF No. 5439 at 112) noting that the parties agreed that "CDCR would use the CQIT measures pertaining to administrative segregation in its audits of CDCR's administrative segregation EOP hubs for certification. These audits were conducted during September and October 2014, with the Special Master's expert and plaintiffs' counsel observing the process."

3 Following each baseline tour, CDCR issued reports with findings and recommendations. Those reports were shared with the Special Master and Plaintiffs in late 2014 and early 2015.

[4] The "Director" in this case referred to the Deputy Director overseeing the Statewide Mental Health Program. At the time it was Dr. Timothy Belavich who was later replaced by Katherine Tebrock, Eureka Daye, and now Dr. Amar Mehta.

Special Master Lopes and Plaintiffs' Counsel
Page 3

Health Program would "then review the snapshot of monthly data" gathered by the institutions to finalize the certification. (Id. at 19.)  The plan and draft forms were filed with the court on August 1, 2014, and subsequently approved by the court on August 11, 2014.  (Order, ECF No. 5196.)

II.    ASU EOP Hub Certification Process

The ASU EOP Hub certification process involves a robust and holistic approach in analyzing a hub's compliance with existing policy and procedure.  The hub certification combines quantitative data, collected via automated data systems and in the field, with on-site observations to assess quality of care.

In advance of the monthly self-audit, the Statewide Mental Health Program sends *weekly* notification emails to the respective Chiefs of Mental Health to alert them to any performance issues in advance of their self-audit.  On the third Friday of each month, the Statewide Mental Health Program supplies the Chiefs of Mental Health with a Heat Grid tailored to ASU EOP Hubs.

**Monthly ASU EOP HUB (Only) Performance Report Heat Grid**
**August 1 through August 31, 2020**

| | CDCR | Region I | | | | Region II | | Region III | | Region IV | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CHCF | CMF | MCSP | SAC | CCWF | CMC | COR | LAC | CIW | RJD |
| Timely MH Referrals | 98% | 100% | 97% | 96% | 97% | 100% | 98% | 100% | 98% | 100% | 99% |
| | 337/344 | 6/6 | 29/30 | 54/56 | 30/31 | 9/9 | 55/56 | 26/26 | 46/47 | 8/8 | 74/75 |
| Treatment Offered | 37% | 65% | 1% | 52% | 0% | 100% | 6% | 100% | 61% | 100% | 0% |
| | 517/1396 | 45/69 | 1/118 | 77/147 | 0/240 | 17/17 | 12/215 | 219/219 | 145/236 | 1/1 | 0/134 |
| Timely IDTTs | 99% | 100% | 99% | 100% | 100% | 100% | 91% | 100% | 100% | 100% | 100% |
| | 1993/2020 | 108/108 | 179/180 | 280/280 | 303/303 | 28/28 | 253/279 | 281/281 | 339/339 | 4/4 | 218/218 |
| Timely PC Contacts | 99% | 100% | 96% | 100% | 100% | 100% | 99% | 100% | 98% | 100% | 100% |
| | 3453/3492 | 137/137 | 191/198 | 554/555 | 307/308 | 52/52 | 364/367 | 586/591 | 842/862 | 5/5 | 415/417 |
| Timely Psychiatry Contacts | 98% | 75% | 99% | 100% | 100% | 100% | 99% | 100% | 97% | 100% | 100% |
| | 2010/2055 | 81/108 | 190/191 | 287/287 | 307/309 | 28/28 | 271/275 | 281/281 | 333/344 | 5/5 | 227/227 |
| Discharge Follow-ups | 99% | 100% | 100% | 100% | 91% | 100% | 100% | 100% | 100% | N/A | 99% |
| | 325/327 | 2/2 | 98/98 | 49/49 | 10/11 | 15/15 | 28/28 | 28/28 | 26/26 | 0/0 | 69/70 |
| *CCII & Captain Review for LOS over 90 days | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | N/A | 100% | 100% |
| *Warden Review of Cases over 90 days | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | N/A | 100% | 100% |
| Mental Health Screens | 99% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 95% | N/A | 100% |
| | 120/121 | 3/3 | 17/17 | 23/23 | 22/22 | 4/4 | 7/7 | 6/6 | 19/20 | 0/0 | 18/18 |
| IDTT Staffing | 97% | 100% | 100% | 96% | 97% | 100% | 91% | 94% | 98% | N/A | 96% |
| | 230/238 | 9/9 | 25/25 | 43/45 | 34/35 | 5/5 | 10/11 | 29/31 | 53/54 | 0/0 | 22/23 |
| ** Psych Tech Rounds Completed According to PG Requirements (Qtrly) | | | | | | | | | | | |
| *** Medication Administration (Monthly) | 92% | 96% | 94% | 91% | 87% | 86% | 95% | 88% | 91% | 90% | 87% |

** Psych Tech Rounds information includes all ASUs, not just HUBs (data not available)
*** Medication Administration is institution-specific, not just HUBs

Special Master Lopes and Plaintiffs' Counsel
Page 4

### A. Local Auditors

The Chief of Mental Health or designee (generally a Senior Psychologist Supervisor) conducts the on-site audit in the ASU EOP Hub. Each month, institution leadership use the ASU EOP Hub portion of the current CQIT guidebook to conduct self-monitoring. The auditor has the option of using the Audit Worksheet which encapsulates the audit outlined in the CQIT ASU EOP Hub Guidebook. (See Attached Audit Guidebook and Audit Worksheet.) The auditor conducts a space review, observes morning meetings, Institutional Classification Committee (ICC) meetings, Interdisciplinary Treatment Team (IDTT) meetings, group treatment, and conducts patient interviews. The auditor collects psychiatric technician rounding information from nursing and collects yard and shower data from custody staff.

Local auditors monitor the On Demand Performance Report regularly to ensure the institution and the ASU EOP Hub are providing adequate numbers of EOP treatment hours, timely primary clinician and psychiatry contacts, timely IDTTs, appropriate discharge follow ups, adequate mental health screening, appropriate IDTT staffing, and timely mental health referrals. Leadership also closely follow the Performance Report to ensure custody length of stay reviews are being conducted.

Once the auditor completes the certification review packet, the documents are forwarded to the Chief of Mental Health who reviews that the packet is complete and accurate. The Chief of Mental Health will also address any areas found to be out of compliance. After the Chief of Mental Health approves and signs the certification form, the documents are forwarded to the institution's Warden and Chief Executive Officer for review and signature.

### B. Regional Mental Health Teams

CDCR Regional Mental Health teams regularly monitor the ASU EOP Hubs throughout the month. Should problems arise, Regional Mental Health teams work together with local staff to develop plans to address deficiencies. Regionals conduct monthly ASU EOP Hub calls with institutions. Regional custody lieutenants are invited to attend. During the call, the Regional Mental Health team and local leadership discuss the prior month's certification findings and results as well as the current month's Heat Grid data, any challenges the Hub is facing, results of Corrective Action Plans put in place during previous months, as well as input from local custody and clinical staff.

When certification packets are received from institutional staff with all required signatures (i.e. Chief of Mental Health, Warden, Chief Executive Officer), the Regional Mental Health team reviews the data. Teams also review the audit checklists and review the quality of the comments. Should discrepancies be found, the Regional Mental Health team will contact local staff for correction or clarification. After completing the review and obtaining the signature of the Regional Mental Health Administrator and Regional Healthcare Executive, the certification packet is sent to headquarters' Statewide Mental Health Program by the tenth of the month.

Special Master Lopes and Plaintiffs' Counsel
Page 5

Regional Mental Health and custodial teams also conduct on-site inspections of ASU EOP Hubs during sustainable process visits or during the quarterly Regional lieutenant reviews, which provides additional data to assess the monthly certification packet. During on-site visits, the team conducts tier walks, observes IDTTs and ICCs, and reviews patient records. The Regional lieutenants review the custodial items from the CQIT. This allows them to compare their own on-site observations with the monthly certification information they receive and consider.

C. Headquarters' Certification Process

Each month, the Headquarters certification team collects and reviews the ASU EOP Hub certification packets and, as needed, requests clarification and correction from the Regional Teams and institutions. The Headquarters Certification team drafts the certification letter and packet for the headquarters' Mental Health Administrator's review. Individual institutional data and certification letters are provided to the Mental Health Administrator, along with the draft letter. The certification team and Mental Health Administrator meet monthly to review and discuss the audit findings at the ten ASU EOP Hub institutions.

Mid-month, the Mental Health Administrator meets with the Deputy Director to discuss the audits and certification letter. The Deputy Director reviews audit data, the Heat Grid, and any written comments on the certification forms. The Deputy Director also discusses any issues with the Mental Health Administrator. The Deputy Director then finalizes the ASU EOP Hub certification letter, certifying whether or not an ASU EOP Hub met Program Guide standards for the reporting period, and sends the letter to counsel for distribution to the Special Master and Plaintiffs.[5]

In the event that the Deputy Director determines that an ASU EOP Hub does not meet certification requirements, the Mental Health Administrator notifies the Health Care Population Oversight Program, which manages endorsements to and from all ASU EOP Hubs.[6]

III.    CDCR Uses the Continuous Quality Improvement Tool to Conduct the ASU EOP Hub Certification

From its inception in 2014, CDCR has used the ASU EOP Hub portion of CQIT to conduct the ASU EOP Hub certifications. The use of CQIT in the certification process is well documented and was noted to be the governing document in Defendants' August 1, 2014, Plans and Policies in Response to the April 10, 2014 Order. (ECF No. 5190 at 18-19.) CQIT is an evolving audit tool meant to audit the quality of care provided at an institution. The tool is regularly updated,

---

[5] The Deputy Director makes the final decision using his clinical judgment and by taking into account all qualitative and quantitative data provided by the institution and Regional team in the certification packets.

[6] Plaintiffs allege that CDCR does not close ASU EOP Hubs when they do not certify in two consecutive months. (June 19, 2020, letter at 5-6.) Plaintiffs point to only one instance, in early May 2020, in which the CHCF ASU EOP Hub remained open over two weeks after the issuance of the final certification letter. This is not a systemic failure of the ASU EOP Hub process as Plaintiffs allege. This single issue also occurred at the beginning of a global pandemic when CDCR staff were focused on saving lives and preventing the spread of a deadly virus throughout CDCR.

Special Master Lopes and Plaintiffs' Counsel
Page 6

including the subsection addressing ASU EOP Hubs, to address current policy and practice.[7]  The CQIT guidebook and subsequent updates has been shared with the Special Master and Plaintiffs many times over the past seven years including prior to the initial ASU EOP Hub certifications in 2014, prior to CQIT monitoring rounds that occurred in 2016 and 2018, and as part of the parties' discussions on the Suicide Prevention portion of CQIT in 2019.

The CQIT ASU EOP Hub Guidebook, a current copy of which is attached, directs the reviewer to:

- Review treatment space, including group, individual and IDTT space,
- Conduct patient interviews,
- Attend morning meetings,
- Observe and audit Institutional Classification Committees,
- Observe and audit IDTTs,
- Attend group treatment,
- Collect data on psychiatric technician rounds,
- Review relevant performance report data on the ASU EOP Hub.

In addition, the guidebook outlines a robust custody audit[8] which includes:

- Thermometer checks,
- Treatment module standards,
- Review of Guard One welfare check data,
- Ensure custody staff is current on training,
- Review out of cell time and shower logs,
- Audit ASU intake procedures,
- Audit whether patients have access to entertainment appliances,
- Audit whether custody staff is familiar with the custody mental health referral process,
- Ensure officers have CPR mouth shields and cut down tools,
- Review relevant custody related performance report data on the ASU EOP Hub.

Following the initial baseline certifications conducted by the Regional Mental Health teams, CDCR issued written reports for each site visit in late 2014 and early 2015.  Once the institution passed two consecutive months of Regional lead audits, the institution began self-certifying using the same tool.  CDCR developed an audit form on which local auditors could record their results,

---

[7] Plaintiffs question why the ASU EOP Hub certification process guidebooks have changed between 2014 and 2019 citing first to a version two ("v2") provided on July 29, 2014, and version five ("v5") provided on March 29, 2019. (June 19, 2020, letter at 4.)  These versions reflect updates to the CQIT guidebook made as the process improved over the past six years.  Defendants have shared updates to the CQIT guidebook regularly with the Special Master and Plaintiffs.

[8] CDCR believes the custody audit covers many of the areas Plaintiffs inquire about in their June 19, 2020, letter at pages 7 through 8.  Custody participation in the ASU EOP Hub Certification ensures that a complete picture of the therapeutic milieu is available to the Deputy Director for his certification decision.

Special Master Lopes and Plaintiffs' Counsel
Page 7

which would be forwarded up to institutional leadership, the Regional team, and finally to headquarters. CDCR did not mandate use of this form, however, and institutions were permitted to document the audit results as they saw fit.

IV.    Process Improvements

Prior to the establishment of the ASU EOP Hub Certification small workgroup, CDCR had been developing several improvements to the ASU EOP Hub Certification process. Further conversations during the small workgroup have also helped CDCR to identify other areas for process improvement. CDCR takes a multidisciplinary approach to updating its certification tool. Improvements to the certification tool are made with input from mental health, custody, and nursing staff.

Discussed below, CDCR has identified five main process improvement goals. First, CDCR will update the CQIT ASU EOP Hub guidebook to reflect current policy and procedures for those units which in turn will help standardize its hub certification process. Second, CDCR will ensure that local auditors record the results of the certification on standardized forms and provide those data to Regional teams and headquarters in a uniform manner. This goal will be served by improved data automation for many of the on-site audits. Third, CDCR will issue statewide training to ensure all staff involved in the certification process are aware of the improvements and how to conduct their certification audits. Fourth, CDCR will increase transparency of its hub certification process as a result of these projects. Fifth, while making these improvements, CDCR will work on a parallel track with Dr. Potter as he conducts his review of CDCR's data collection practices.

A.   Updates to the CQIT ASU EOP Hub Guidebook

The CQIT guidebook is the blueprint of the hub certification process. As with any CQIT audit, the ASU EOP Hub portion of the CQIT guidebook must grow and adapt as statewide policies and procedures change. CDCR is planning several improvements to the guidebook. First, CDCR will ensure all current hub certification requirements are addressed in the guidebook. Also, the guidebook will be updated to include additional chapters detailing Headquarters' review requirements as well as those for the Deputy Director. The revised guidebook will also include explicit directions on how to document audits.

Updating the guidebook will also allow CDCR to reiterate its expectation that the hub certifications are conducted in a standardized manner at each institution. The guidebook will provide direction on the duties of Headquarters staff, which should help standardize the final decision making process while still allowing for the clinical judgment mandated under the April 10, 2014 order. (ECF No. 5131 at 63.)

CDCR proposes to develop a draft revision of the guidebook and provide to the Plaintiffs and Special Master for their review and input by October 30, 2020.

Special Master Lopes and Plaintiffs' Counsel
Page 8

    B.  Standardization of Forms and Data Collection Practices

Every hub certification audit collects significant amounts of data each month.  Much of the data collection is already automated using Performance Report data.  (See Section II, *infra.*)  However, the local auditor also collects quantitative data during monthly certifications.  CDCR will improve that process by developing data collection tools that will allow for the data to be centrally stored.  To meet this goal, CDCR is developing a SharePoint website where all the audit information will be collected and stored.  CDCR is still in the development phase of this project.

In addition to a SharePoint, CDCR's information services staff are developing a web-based tool that will largely automate the hub certification audit form.  The current form, which is not uniformly used amongst the institutions, will be folded into this web-based solution.  In addition to standardization and centralization, CDCR believes this project will also reduce the time between the completed audit and the headquarters' level review and decision[9].

    C.  Statewide Training

In order to ensure compliance with the statewide revisions to the ASU EOP Hub Certification process, CDCR will train local and Regional staff who are responsible for conducting the audit, collecting relevant data, forwarding data to headquarters, and making certification decisions.  These trainings will reinforce updates to the CQIT guidebook and data collection practices.

    D.  Transparency

As stated above, CDCR is committed to the robust ASU EOP Hub Certification process. Over the past six years, CDCR has improved its oversight of the ASU EOP Hubs by using the ASU EOP Hub Certification process.  There is continuous feedback between the institutions, the Regional teams, and Headquarters.  At the end result of this robust process, a final certification determination is transmitted via letter to the Special Master and Plaintiffs.

To ensure a greater understanding of the work that goes into that final certification, as well as to provide insight into how ASU EOP Hubs area assessed against Program Guide requirements, CDCR proposes to expand access to the underlying certification data.  Part of that process has already occurred with Plaintiffs' access to CDCR's On Demand reporting system.  This does not include data that is collected outside of the Performance Report, data that has not been provided with the certification reports in the past.  As part of CDCR's efforts to standardize data collection and increase data automation of the on-site audit, CDCR will look for solutions to provide this data to Plaintiffs and the Special Master.

---

[9] The parties have discussed the time between the local audit and the final certification form before.  (See Plaintiffs' June 19, 2020, letter at page 6.)

Special Master Lopes and Plaintiffs' Counsel
Page 9

    E.  CDCR is Committed to Working with Dr. Potter to Certify Data Used in the ASU
        EOP Hub Certification Process

Regular review and improvement is the cornerstone of any quality improvement process, and the
ASU EOP Hub Certification process is no different.  While CDCR engages in the revisions to the
guidebook, data collection processes, and training, CDCR will continue to work in parallel with
Dr. Potter on looking at *how* data is collected and reported.  This review has already begun and as
part of it, CDCR will work with Dr. Potter to review the automated data systems already in place
and the on-site data collection processes.  Finally, CDCR will work with Dr. Potter to discuss
improvements or recommendations on CDCR's data collection practices as well as plans to
automate data that is currently manually gathered via on-site audits.  Through this process, CDCR
will help restore trust in its data collection systems and ensure that the data used in the ASU EOP
Hub Certification process is reliable.

    V.     Conclusion

CDCR's ASU EOP Hub Certification process has been successful at improving the care provided
in its ASU EOP Hubs over the past six years.  Nonetheless, CDCR acknowledges there are issues
with the reporting process that have left Plaintiffs with an incomplete picture of the comprehensive
audit process.  CDCR's certification process must be allowed to continue to grow and improve, as
originally intended and Court-approved.  Revisions to the CQIT guidebook will ensure
standardized application and data collection practices across all ASU EOP Hub institutions.
Increased transparency over the process and, especially, the underlying findings and data for each
certification will help ensure trust in the final certification decisions.  CDCR looks forward to the
Special Master and Plaintiffs' feedback and participation in this process.

Sincerely,

Nick Weber

*/s/ Nick Weber*

Attorney
CDCR
Office of Legal Affairs

# ATTACHMENT A

ASU EOP HUB GUIDEBOOK AND AUDIT WORKSHEET

## ASU EOP HUB Certification Requirements and Process

1. The mental health regional and custody audit teams will assess each ASU EOP HUB to collect baseline information. The Mental Health Program and Division of Adult Institutions leadership will then utilize this information to focus improvement where required. The audit teams will use the structured questions with the Continuous Quality Improvement Tool.
   - The mental health regional and custody audit teams will then assess each ASU EOP HUB program, using the same criteria, one month after the initial visit. Visits will occur monthly until the institution is certified.
   - The HQ auditors will train local staff regarding how to conduct audits.
   - The regional administrative team will assist each program with barriers to certification.
2. Once certification is achieved, the CMH and Warden are responsible to ensure audits and data review as outlined on the "EOP HUB Certification Audit" document occur.
   - Audits will be conducted by local staff.
   - Institution staff will establish a method to collect the audit information systematically.
   - The local staff will notify the regional administrator immediately if performance issues are identified.
3. The Chief of Mental Health and Warden will use the institution self assessment to determine if their institution can be re-certified each month.
4. The Chief of Mental Health and Warden will submit the certification letter to the mental health Regional Administrator as instructed on the certification form.
5. Upon receipt of the certification form (after it has been vetted through all parties on the signature blocks of the form), the mental health Chief of Quality Management will review each form against the institution EOP HUB's performance. Any disagreements regarding certification will be discussed with the regional administrator, Chief of Mental Health, Custody Team, and/or Warden as necessary.
6. Once approved, the certification letter, and a recommendation from the mental health Chief of Quality Management, will be provided to Dr. Belavich. Recommendation will be provided by the 12th of each month to ensure a report to the court is made by the 15th of each month.

**Introduction:**

The Administrative Segregation Unit Enhanced Outpatient Program Hub (ASU EOP Hub) self audit form will assist institutions in identifying local areas that may require improvements. It is designed to provide context on qualitative areas that are not easily articulated through scores. Corrective action plans should be discussed in the monthly Mental Health Program Subcommittee.

**Instructions:**

1. Select one response per question. i.e "yes" , "no" or "n/a" if applicable- No other responses are acceptable
2. Comments are required for each and every audit. If comments are not included, the report will be rejected. Revisions must be made and resubmitted within 24 hours of return.
3. Complete one sheet per patient for IDTT and ICC observations. DO NOT COMBINE RESULTS
4. For those reviews involving patients (IDTT, ICC), comments must be related to the audit itself and not the patient. For instance, a patient's tabe score noted on the requirement for effective communication. This information is not relevant .The review is based on the whether the team established effective communication with the patient who appear to have difficulty due to mental illness. This has nothing to do with the patient's tabe score. A more appropriate comment would have been "the team asked the patient to repeat back what was said because he appeared to be responding to internal stimuli during the meeting." or N/A- the patient's mental status did not appear to have an impact on his understanding.
5. Some areas require more frequent reviews than others in order to assess the need for improvement.  However, institutions may perform self audit reviews as often as needed outside of the required certification period.

**How scores are calculated:**

1. Calculations are based on the total number of yes responses over the total number of responses.  You MUST respond to all questions.
2. For IDTT observation, in which there are two different sets of criteria, follow calculation method in item 1 above; criteria are not separated for overall IDTT performance, they are separated on the hub cert form simply to make each person aware of the entire set of criteria used to measure this item. Count N/A responses as "yes".

   example: There are 23 IDTT questions, you observed 5 patients. You add up total number of yes, N/A, and no responses for all patients. You had 90 total yes responses,

15 total N/A responses, and 10 total No responses. Your numerator is 105/ denominator of 115 for a percentage of 91%.

3. Percentages are required for certification. If percentages are not included, the report will be rejected. Revisions must be made and resubmitted within 24 hours of return.

# EOP HUB Certification Assessment

The following items will be assessed to determine if the institution meets certification requirements. All performance report items are listed exactly as they are in the performance report for easy detection. Each item is described in further detail throughout this document.

| Indicator | Data Source(s) | Discipline Responsible for Review |
|---|---|---|
| Adequate Individual Treatment Space | On site audit | Mental Health |
| Adequate Group Treatment Space | On site audit | Mental Health |
| Adequate IDTT Space | On site audit | Mental Health |
| ASU Morning Meetings meeting all audit criteria | On site audit | Mental Health |
| ICCS with MH clinician presence and relevant information provided | On site audit | Mental Health |
| Percentage of all IDTTs observed in which a health record and C-file are available | On site audit | Mental Health |
| IDTTS in which PC intake evals were completed prior to initial | On site audit | Mental Health |
| IDTTS in which psychiatry intake evals were completed prior to initial | On site audit | Mental Health |
| Groups where leader related content to treatment issues | On site audit | Mental Health |
| Groups started on time and attempts made to engage all participants | On site audit | Mental Health |
| IDTTs meeting all audit criteria | On site audit | Mental Health |
| IDTTs with Measurable treatment goals | On site audit | Mental Health |
| EOP tx hours offered | Performance Report | Mental Health |
| Timely PC contacts | Performance Report | Mental Health |

1

| Timely Psychiatry Contacts | Performance Report | Mental Health |
|---|---|---|
| Timely IDTTs | Performance Report | Mental Health |
| Discharge follow ups (five day clinical) | Performance Report | Mental Health |
| Daily PC Contact for high refusers | Performance Report* | Mental Health |
| Timely MH referrals (referral response timeliness) | Performance Report | Mental Health |
| Completion of PT rounds daily | Performance Report | Nursing/Mental Health |
| Medication Administration | Performance Report | Mental Health |
| ASU Pre-Screen | Performance Report | Mental Health |
| IDTT Staffing | Performance Report | Mental Health |
| ASU Out of Cell Time Offered | On site audits | Custody |
| ASU Welfare checks completed on time and staggered | On site audit/performance report* | Custody |
| Warden review for LOS over 90 days | Performance Report | Custody |
| Thermometer Checks completed and accurate | On site audit | Custody |
| Peace officers observed carrying their CPR mouth shield | On site audit | Custody |
| Entertainment Appliances | On site audit | Custody |
| Treatment Module Standards | On site audit | Custody |
| Custody MH Referrals | On site audit | Custody |
| Custody Officers with CPR training | On site audit | Custody |
| Custody Officers with suicide prevention training | On site audit | Custody |
| ASU Intake Inmates appropriately housed | On site audit | Custody |
| ASU inmates on 21 day intake status with markers posted | On site audit | Custody |

*These items are in the process of being programmed into the MH Performance Report.

## Mental Health Assessment Criteria and Instructions

### I. Treatment Space

a. General instructions
- The standardized questions below do not need to be assessed each month, once an initial treatment space audit has been conducted, the reviewer only needs to note any changes to space.
- Respond one time for each treatment room observed.
- If possible, ask staff about accessibility to each space; otherwise enter the overall response each time you enter data for the space.
- In the audit sections relating to staff's report of access to space, respond one time for each staff person interviewed.
- In auditing treatment space, it is not necessary to observe a room in use. Instead, staff may be asked about the size of the space.
- If possible, complete the IDTT and group tx space audits while observing IDTT and group.

b. Group Treatment Space
1. Is the group treatment space confidential?
   - Confidential means other inmates cannot see or hear the interaction and other staff cannot hear the interaction.
2. Is the space large enough to accommodate chairs for each participant?
   - If you do not respond to this question while observing a group, you may need to ask staff if they usually (more than half of the time) have enough chairs for everyone.
3. Does the space have adequate ventilation and temperature control (not too hot)?
   - Noting that everyone prefers a different room temperature, respond if the room is judged by the auditor to be too "stuffy" or if participants report it is too hot.

c. Individual Treatment Space
1. Is the treatment space observed confidential?
   - Confidential means other inmates cannot see or hear the interaction and other staff cannot hear the interaction.
2. Is there space enough for two chairs?
   - If you do not respond to this question while observing an individual session, you will need to determine if the space has enough room for two chairs to fit in comfortably.

3

3.  Is the space configured so the space is safe?
    - Examples of unsafe space include:
        o The space is set up so the inmate has to sit by the door, blocking the door from custody being able to get in if there were an emergency.
        o The space is used for storage of items (ie. broom closet, storage for beds or other items).
        o The space is in a remote area with no custody supervision or proximity to respond in case of an emergency.
        o The space is in an area where an alarm will not work.
4.  Is the space well ventilated and temperature controlled (not too hot)?
    - This is more difficult to assess in an individual room with no people using the space.  To assess you may:
        o Interview staff and ask about ventilation.
        o Noting that everyone prefers a different room temperature, respond if the room is judged to be too "stuffy".
5.  Do staff report that they have access to confidential individual tx space when needed?
    - Confidential means other inmates cannot see or hear the interaction and other staff cannot hear the interaction.

d.  IDTT Treatment Space
    - Complete this audit while observing the quality of the IDTT
1.  Is there enough space for each participant to have a chair?
    - Do not count the audit team.  Only determine this by judging if there is enough space for regular institution team members.
2.  Is there a chair for each participant?
    - Do not count the audit team.  Only determine this by judging if there is a chair for regular institution team members.
    - This includes the inmate-patient having a chair, but the custody escort does not require a chair.
3.  Is there a conference table?
    - Some rooms have a small side table in the middle used as a conference table.  This is not adequate and does not count as a "yes".
4.  Is the space free from unnecessary and distracting noise?
    - Some examples of unnecessary and distracting noise are:
        o Loud fans that make it difficult to hear.
        o A crowd of people and activity right outside the room that make it difficult to hear.

5. Is the space free from unnecessary interruptions (i.e. People walking through)?
   - Some examples of unnecessary interruptions include:
     - o Space in which people have to walk through the meeting to get to other locations in the facility.
     - o Space in a large area (such as the dining room) where many people are regularly entering and exiting the area during the meeting.

6. Is the space well ventilated and temperature controlled (not too hot)?
   - o Noting that everyone prefers a different room temperature, respond if the room is judged by the auditor to be too "stuffy" or if participants report it is too hot.

## II. Patient Interviews

Patient Interviews will be used to inform your assessment of the program. A 90% threshold is not required on these interviews since information obtained will not be verified. These interviews are only designed to help you determine if the program is performing well.

## III. Morning Meeting Observation

a. General guidelines
   - To respond to questions related to the morning meeting, you may either interview the ASU sergeant and ASU MH clinical staff about the morning meeting the day of the audit OR observe the morning meeting.

b. Responding to questions.
   1. Did MH staff identify high risk inmates?
      - Mental health staff should explicitly state which inmates are identified as high risk. On the rare occasion there are none identified, they should also state this or the response on this item is "no".
   2. Were the ASU Sgt and MH clinician in attendance?
      - If both the ASU sgt or designee and a MH clinician were not is attendance, the response on this item is "no."
   3. Were new arrivals discussed?
   4. Method of measurement: (interview or observation)
      - Select the method you utilized to respond to the questions above.

## IV. ICC Observation

a. General guidelines

5

- Ask for a list of inmates scheduled to attend the ICC before the meeting begins. This is often referred to as the "call sheet".
- You may have to look up the inmate in the eUHR to determine who is in the mental health program.
- Respond to questions for each MH inmate's ICC.
- Before the first inmate is brought in, introduce yourself to the group and tell them:
  - o You want to introduce yourself to each inmate
  - o Other than your initial introduction, proceed with the meeting as they typically would. You want to see business as usual.

b. Responding to questions.
1. Is a MH clinician in attendance?
   - If this isn't apparent, after the inmate leaves ask if a clinician was present.
2. Did the MH clinician provide useful information regarding each inmate's current mental condition (e.g. need for medication, tendency for behavioral difficulties, suggested interventions, LOC, need for staff assistant)?
   - Some examples from the program guide (p. 12-7-2) are:
     - o Inmate-patient's current participation in treatment
     - o Medication compliance
     - o Suitability of single or double celling
     - o Risk assessment of self-injurious or assaultive behavior
     - o Status of ADLs
     - o Ability to understand Due Process proceedings
     - o Likelihood of decompensation if retained in ASU
     - o Recommendations for alternative placement
     - o Any other custodial and clinical issues that have an impact on inmate-patients' mental health treatment.
   - Not all of the items above must be included to qualify for a "yes" response on this question, but relevant information regarding an inmate's current mental health condition is expected. For example, if the clinician only addresses effective communication, the response to this question is "no."
3. Did the committee chair consider both the clinical and custody needs of the inmate patient for program review?
   - It is expected that this consideration will occur after the mental health clinician provides input but may also surface in terms of a discussion regarding the inmate's level of care and/or questions the committee chair asks the MH clinician.

6

4. If it appears that the inmate's mental health status had an impact on his/her understanding of the ICC, did staff members ensure effective communication?
    - This applies only to inmate patients who you, as a clinician, observe are having difficulty paying attention to or understanding what ICC members are saying. This is NOT required for all inmate-patients.
    - Note N/A if you judge the inmate-patient as being able to understand.
    - Note this as a "yes" if any member in the ICC checked the inmate for understanding by asking him/her to restate what was said.

## V. IDTT Observation
a. General Guidelines
    - You are only required to observe five patient IDTTs but you must observe the IDTT of different treatment teams. If there are less than five to observe in any given program, observe all.
    - Before the first inmate is brought in, introduce yourself to the team and tell them:
        o You want to introduce yourself to each inmate-patient.
        o Other than your initial introduction, they should proceed with the meeting as they typically would. Do NOT present to you.
        o To the extent that any of the attendees are present at the IDTT due solely to the audit, politely request that they not attend so that the audit fairly represents the quality of the treating team members.
        o Ask for a list of inmates scheduled to be seen by the IDTT. This will help you with entering the patient CDCR numbers as they are brought in.
b. IDTT observations
    1. Did the IDTT start on time?
        - Judge this using the schedule you received in planning your visit. If the meeting is more than 5 minutes late starting, note this as a "no" unless there was a legitimate reason (such as one of the team members attending to an emergency), that does not appear to the norm.
    2. Did the IDTT Leader State the purpose of the IDTT.
        - This will be apparent. The IDTT leader is expected to tell the inmate the reason they are having the meeting.
    3. Did the primary clinician complete the 7386 intake evaluation or update prior to the IDTT meeting?

- The PC must complete either a new 7386 or update the current 7386 on a progress note or 7389.
- You may need to ask the PC after the inmate leaves if you can see this paperwork; other times it may be obvious as they will be looking at it in the IDTT.

4. Did the psychiatrist complete the 7230-G intake evaluation prior to the IDTT meeting?
   - The psychiatrist must complete an initial evaluation (intake evaluation documented on a progress note) prior to the IDTT.
   - You may need to ask the psychiatrist after the inmate leaves if you can see this paperwork; other times it may be obvious as they will be looking at it in the IDTT.

5. If it appears that the inmate's mental health status had an impact on his/her understanding of proceedings, did staff members in IDTT ensure effective communication?
   - This applies only to inmate-patients who you, as a clinician, observe to have difficulty paying attention to or understanding what the IDTT members are saying. This is NOT required for all inmate-patients.
     - *Training discussion – what are some of the things you might observe with an inmate-patient who is having difficulty understanding?*
   - Note N/A if you judge the inmate-patient as being able to understand.
   - Note this as a "yes" if any member in the IDTT checked the inmate for understanding by asking him/her to restate what was said.

6. Did the PC provide relevant treatment information (e.g., functional impairments, diagnosis, areas of distress)?
   - Relevant treatment information may include but is not limited to:
     - Functional impairments
     - Diagnosis
     - Areas of distress
     - Strengths
     - Weaknesses
     - History of mental illness, hospitalizations, suicide attempts

7. Did the psychiatrist provide relevant information regarding diagnosis, medications to address the diagnosis, and discuss side effects?

8

- The psychiatrist should express what was prescribed and the rationale, or if no medication were prescribed the rationale.
- The psychiatrist should talk *with the inmate* about side effects and benefits (risks and benefits) of the medication prescribed, if medication is prescribed.

8. Was the inmate-patient invited to the IDTT and asked open ended questions that enhance his or her understanding of the treatment plan?

- Select N/A if the inmate declined to attend or there is good clinical rationale for not inviting the inmate.
- If the inmate/patient attends, one can assume he/she was invited to attend.
- Asking only whether the inmate "has any questions" is insufficient.
- Some examples of questions you might look for to qualify as a "yes" response are:
  - o Can you tell me what we said we would be working on together?
  - o Can you tell me what we said is your diagnosis? What does that mean?
  - o Can you tell me what this meeting is about?

9. Was the Correctional Counselor engaged in the discussion, knowledgeable, and provided relevant information to the case?
   - The Correctional Counselor does not have to give an entire case presentation but is expected to provide relevant custody information and engage in the team's discussion.

10. Did the IDTT leader facilitate a team discussion by attempting to engage all participants (including staff and the inmate-patient)?
    - If the IDTT leader asked other team members questions to prompt their input, this response is "yes" even if the team leader was unsuccessful in his/her attempt.

11. Did the overall IDTT include interactive discussion of all staff participants toward the treatment plan?
    - This is about the interaction of all team members; if team members present information in isolation, and then disengage, the response to this item is "no."

- If one staff participant on the inmate's treatment team does not interact, the response is "no".
- You may exclude staff attendees who are NOT on the inmate-patients treatment team but are in attendance (this should be clear from introductions at the beginning of the meeting).

12. Was the inmate-patient talked to rather than about in language that is at the patient's level?
   - This will be evident. It is the expectation that IDTT staff members discuss treatment options with the inmate-patient, rather than present their case to other team members or discuss treatment options with other team members and not engage the inmate-patient.

13. Were measurable treatment goals discussed?
   - All treatment goals must be measurable.
     o For example: "Your short-term goal is to be free of auditory hallucinations for 2 weeks. Your long-term goal is to come out of your cell for yard time at least two times per week for the next two months."

14. Were considerations on the 7388B and appropriateness of level of care Discussed?
   - Statements such as "doesn't meet any indicators on 7388B" are not acceptable – this will not be meaningful to the inmate-patient.
   - Look for statements such as "you are doing well at the EOP level of care so I am recommending we keep you at this level of care, you have not had any MHCB admissions, you are going to most of your treatment appointments, and we are making progress on your treatment goals."

15. For IDTT updates ONLY: Did the team leader discuss progress towards the treatment goals?
   - The PC is expected to discuss with the IDTT what progress, if any, has been made toward measurable treatment goals.
     o For example: "Mr. Y has reported that he accomplished his goal of being free from auditory hallucinations for two weeks. He is working towards his long term goal of coming out for yard at least

three times per week for two months and has done this for one week so far."

   o

## I.     Group Treatment Observation (ML EOP, ASU, SHU, PSU)

a. General Guidelines
   - Only observe "talking" groups. Not art or exercise groups.
   - Before the first inmate is brought in, introduce yourself to the group leader and tell him or her:
     o You want to introduce yourself to the group
     o Other than your initial introduction, proceed with the group as they typically would.  Do NOT present to you.
   - If the CMH or chief psychiatrist is in attendance, ask them if they usually attend group; if they don't tell them you want to see business as usual and politely ask them not to attend.
   - If the group leader was changed as a result of your visit, ask if there is another group you can attend.  If not, note that this change was made and advise the chief that a change in group leader should not be made during future visits.

b. Group Observations
   1. Did the group leader start the group on time?
      - If the group starts more than 5 minutes after the scheduled time, mark "no" unless there is a legitimate reason (such as the leader attending to a patient emergency) that does not appear to be the norm.
   2. Did the group leader attempt to engage each participant?
      - If the group leader asked each group participant a question in an attempt to engage them, this response is "yes" regardless if all the inmates actually engaged.
   3. If media or music is used, is it only used for short periods of time to illustrate?
      - If a movie or music is used consistently throughout the group, without any pause to apply the contents to treatment, the response to this item is "no."
   4. Does the leader facilitate interaction between all group members on the clinical topic?
      - This is about the group leader attempting to get each participant to engage with others about the clinical topic.
   5. For clinician led groups, is clinical process addressed during the group?

- Clinician led groups are those led by a social worker, psychologist, or psychiatrist.
- For example, if the clinician is using cognitive behavioral techniques to address treatment issues in a stress reduction group, he/she may help group members to dispel stressors that are not real and to focus on steps to address stressors that are real.

## VI.  Psych Tech Rounds

This item is currently audited locally by nursing staff. The following audit questions are asked. The CMH should obtain the audit results from nursing staff until this information is available on the mental health performance report.

Indicator: Percentage of required rounds for inmates in lock up units audited that were completed according to PG requirements.

Question on nursing audit: Did the PT complete all rounds as indicated by policy?

## Mental Health Performance Report Items to Review

The following items are collected via MHTS.net or at HQ. The mental health performance report shall be utilized to assess performance in these areas.

Below is the link to the performance report. If the link does not work, you will need to put in a solution center ticket to obtain access:

http://mhts-reporting.cphcs.ca.gov/Reports/Pages/Report.aspx?ItemPath=%2fProgram_Reports%2fON_DEMAND%2fPerformance+Report

1.  EOP Treatment Hours Offered
    Complete Indicator:
    Percentage of EOP patient-weeks during which required minimum number of structured treatment hours required by MH Program Guide were offered.

2.  Timely PC Contacts
    Complete Indicator:
    Percent of PC contacts completed within policy timelines

3.  Timely Psychiatry Contacts
    Complete Indicator:
    Percentage of patient-weeks during which patients were up-to-date on their required psychiatry contacts.

4.  Timely IDTTs
    Complete Indicator:
    Percentage of patient-weeks during which patients were up-to-date on their required IDTT contacts.

5.  Discharge Follow Ups
    Complete Indicator:
    On-time completion of all required clinical follow-ups after discharge from a higher level of care.

6.  Daily PC contact for high refusers*
    Complete Indicator:

Percentage of inmates on modified treatment who receive increased PC contact as required by PG.

7. Timely Mental Health Referrals
   Complete Indicator:
   Percentage of emergent, urgent, and routine referrals that are completed within required time frames.

8. Completion of PT rounds daily*
   Complete Indicator:
   Percentage of required rounds for inmates in lock up units audited that were completed according to PG requirements.

9. Medication Administration
   Complete Indicator:
   Percentage met on MAPIP MEDICATION ADMINISTRATION measures (M20-24)

10. ASU Pre-Screen
    Complete Indicator:
    Percentage of ASU screenings that occurred within 72 hours of placement/arrival.

11. Staff Attendance at IDTTs
    Complete Indicator:
    Percentage of IDTTs that include all Program Guide required staff.

# Custody Audit Instructions

## I.  Thermometer Checks

a. General Instructions:
- Only required once per year between the months of May – October.
- Physically check the thermometer in every housing unit in which MHSDS inmates are housed.
- Respond to audit questions for each thermometer and log checked.

b. Questions:
1. Is a working thermometer present?
2. Is the thermometer in a location that gives an accurate reading of the temperature (e.g., not in front of a fan)?
3. Is there a heat log that is current? (logged within the past one hour)?
4. Are the staff documenting the highest reading (not averaging temperatures)?

## II.  Treatment Module Standards

a. General Instructions:
- While visiting areas of the institution for other purposes, view treatment modules to respond to each question.
- You may need to ask staff which modules are used for MH treatment to determine which are used as treatment modules.
- For institutions and program in which ADA TTMs are required, note in comments if an ADA TTM is not available and address in comments and provide to regional for reporting.

b. Treatment (Tx) Module Questions:
1. For groups, are the modules in a semi-circle?
   - This would primarily relate to segregated units where treatment modules are used for group.
2. Are the modules in an area where other inmates and/or staff are not able to hear the interaction?
   - Locate all Therapeutic Treatment Modules used for clinical interaction with inmates and confirm that they are located in an area where other inmates and/or staff are not able to hear the interaction.
3. Do the modules meet PIA approval standards?
   - PIA standards are: 42 inches wide, 72 inches tall, depth 49.5 inches. Must have a fold down desk and fold down chair (May 3, 2012 Memorandum: *Therapeutic Treatment Module Specifications*).
4. Do staff report sufficient number of Tx modules for providing treatment?

15

- Ask several MH clinicians if they usually have a sufficient number of Tx modules available to provide treatment.

5. Are the Tx modules clean? (free of debris, spider webs, clean walls, floor)
   - Look for garbage on the floors, grime on the walls and floor, spider webs. If any are present, mark "no."

## III.    Welfare Checks

**Welfare Check Completion** – A report is being developed by HQ to automate a report on completion of ASU welfare checks using guard one data. Until further notice that this has been completed, audit the following:

a. General Instructions:
   - Review the Guard 1 Rounds Tracker report for the prior 30 day period.

b. Questions
   i. How many checks were required?
   ii. Of those, how many were staggered (no checks with the exact same interval between them), occurred within 30 minutes, and in which there were two per hour?

## Supervisor Review

a. General Instructions:
   - Review the Guard 1 Rounds Tracker report summaries for the prior 30-day period.

b. Questions:
   1. How many rounds tracker summaries were reviewed?
   2. Of those, how many were signed by the custody supervisor?

## IV.   Custody Training

a. General Instructions
   - Use Staffing information for your institution prior to the visit to determine overall custody staffing numbers in your ASU EOP program.
   - Use the IST foxpro program to determine who has received training.

b. Custody Training Questions

   1. How many custody staff are there (less long term leave).

   2. Of those, how many are current with biennial CPR training?

   3. Of the total staff how many are current with annual suicide prevention training?

## V.    ASU Out of Cell Time and Showers

a.  General Instructions:

- Count "R" refused times as offered.
- Review twenty (20) randomly selected 114-A's per ASU program (to qualify, the inmate's length of stay must be over 4 weeks).  If you select one and the inmate's length of stay is less than 4 weeks, skip that file, select another, and move on.

b.  Questions:

1. Out of the past 4 weeks, how many weeks were required (note: when safety and security issues preclude out of cell/yard time the week is not counted as required)?

- For each of the randomly selected inmate files, enter the total number of weeks in which there were no documented safety or security issues that would have prevented the institution staff from offering out of cell/yard time.

2.  Of those, for how many weeks was ten hours of exercise outside the room (out of cell) offered?

- For each of the randomly selected inmate files, enter the number of weeks in which he/she was offered out of cell/yard time for at least ten hours.

3.   Out of the past 4 weeks, how many weeks were showers offered at least three times per week?

- For each of the randomly selected inmate files, enter the number of weeks in which showers were offered at least three times per week.

## VI.   ASU Intake Procedures

a.  General Instructions.

- On the day of the audit:
  - Utilize the 21 day ASU placement report from the COMSTAT ASU tracking system provided by the institution in the custody binder.
  - Generate a SOMS housing roster for ASU buildings.
  - Cross reference the two reports to determine current 21 day inmate roster.
- Identify ASU inmates on 21-day Intake Status by reviewing the "Intake Markers" posted outside the cell door.  Cross reference that information

17

with the ASU placement information from COMSTAT ASU tracking and SOMS.

b. Questions.

1. How many inmates are in ASU 21 days or less on "intake" status?
2. How many inmates on intake status have "intake" identifying markers posted on the outside of their cell doors?
3. How many inmates housed in ASU for the first 72 hours are either double celled with an appropriate cell partner or are celled alone in a retrofitted intake cell?
   - Identify ASU inmates housed in ASU for the first 72 hours of confinement.
   - Input the total number of those inmates who are celled appropriately – either celled alone in a retrofitted cell or double celled.

## VII.    ASU Entertainment Appliances

a. General Instructions.
   - Spot check presence of entertainment appliances and/or hand crank radios in cells.
   - Enter yes or no per unit observed
   - Ask inmates and staff if hand crank radios and/or entertainment appliances are allowed.

b. Questions.
1. Are entertainment appliances or, for I/Ps within 21 days of intake to ASU, are hand crank radios allowed and/or provided when available?

## VIII.   Custody MH Referral Process

a. Questions
1. Is housing unit staff aware of their responsibility to complete a 128-MH5 Mental Health Referral Chrono when inmates exhibit signs of mental illness?
   - Interview all staff in housing units regarding awareness of their responsibility to complete a 128-MH5, Mental Health Referral Chrono, when inmates exhibit signs of mental illness.
   - Respond to the question once for each individual housing unit staff person interviewed.

2. Are CDCR Forms 128-MH5 (revised 5/14), Mental Health Referral Chronos accessible and available to staff?
   - Physically check each housing unit for availability of 128MH-5.
   - Respond once for each housing unit observed.

## IX.    Peace Officer CPR Mouth Shield

a. General Instructions.
   - Go to all housing units on site and ask to see each officer's Cardiopulmonary Resuscitation (CPR) mouth shield.
   - The mouth shield MUST be carried by the staff member to qualify as a "yes" response.

b. Questions.
   1. How many peace officers were observed?
      - Enter the total number of peace officers queried about their mouth shield in each unit.

   2. Of those, how many peace officers were observed to carry a personal Cardiopulmonary Resuscitation (CPR) mouth shield on person?

      - Total the number of officers you queried who were carrying their mouth shield and enter that number.

## X.    Cut Down Tool

a. General Instructions:
   - Go to all housing units on site and ask to see their cut-down tool kit and inventory log.

b. Questions:
   1. Does the housing unit /inmate living area have an approved cut-down kit?
      - Respond once per housing unit based upon if there is an APPROVED cut-down kit present.
      - Kit includes lockable medical box containing:
        - Inventory list
        - Emergency cut-town tool
        - Single patient-use resuscitator
        - One CPR mask
        - Minimum of 10 latex gloves
        - Disposable oral airway

19

2. Is the cut down kit being inventoried daily on an equipment inventory log?
   - Select one random date over the past thirty days that is prior to visit and check the log in each applicable unit/area for compliance for that day.
   - Respond once per housing unit and log reviewed.

## Custody Performance Report Items to Review

The following items are collected via MHTS.net or at HQ. The mental health performance report shall be utilized to assess performance in these areas.

Below is the link to the performance report. If the link does not work, you will need to put in a solution center ticket to obtain access:

http://mhts-reporting.cphcs.ca.gov/Reports/Pages/Report.aspx?ItemPath=%2fProgram_Reports%2fON_DEMAND%2fPerformance+Report

Warden Review for LOS Over 90 days

Complete Indicator:

Percentage of EOP-ASU Hubs reviewed where all cases beyond 90 days are reviewed by the Warden.

# Attachment A

MENTAL HEALTH ASSESSMENT CRITERIA WORKSHEET

**Evaluator/Auditor(s):**                                                                 **Date:**

---

**I. Treatment Space**

**General Instructions:** This area does not need assessment every month, once an initial treatment space audit has been conducted, the reviewer only needs to note any changes to space (i.e. too small, sound proofing necessary, etc.) Respond one time for each treatment room observed.  Ask staff about accessibility to each space, the size, etc. and respond one time for each staff person interviewed.  When auditing treatment space, it is not necessary to observe a room in use.  If possible, complete the IDTT and group treatment space audits while observing IDTT and group.

**A. Group Treatment Space**

| | | |
|---|---|---|
| 1. Is the group treatment space confidential? | Yes ☐ No ☐ | *Comments:* |
| 2. Is the space large enough to accommodate chairs for each participant? | Yes ☐ No ☐ | |
| 3. Does the space have adequate ventilation and temperature control (i.e. not too hot, too stuffy, etc.)? | Yes ☐ No ☐ | |

**B. Individual Treatment Space**

| | | |
|---|---|---|
| 1. Is the treatment space observed confidential? | Yes ☐ No ☐ | *Comments:* |
| 2. Is there space enough for two chairs? | Yes ☐ No ☐ | |
| 3. Is the space configured so the space is safe? | Yes ☐ No ☐ | |
| 4. Is the space well ventilated and temperature controlled (not too hot)? | Yes ☐ No ☐ | |
| 5. Does staff report that they have access to confidential individual treatment space when needed? | Yes ☐ No ☐ | |

**C. IDTT Treatment Space (Complete this audit while observing the quality of IDTT)**

| | | |
|---|---|---|
| 1. Is there enough space for each participant to have a chair? | Yes ☐ No ☐ | *Comments:* |
| 2. Is there a chair for each participant? | Yes ☐ No ☐ | |
| 3. Is there a conference table? | Yes ☐ No ☐ | |
| 4. Is the space free from unnecessary and distracting noise? (i.e. loud fans, crowd of people and activity outside the room) | Yes ☐ No ☐ | |
| 5. Is the space free from unnecessary interruptions (i.e. people walking through)? | Yes ☐ No ☐ | |
| 6. Is the space well ventilated and temperature controlled (not too hot)? | Yes ☐ No ☐ | |

**II. Morning Meeting Observation**

**General Guidelines:** In responding to questions related to the morning meeting, you may either interview the ASU Sergeant and ASU MH clinical staff about the morning meeting the day of the audit OR observe the morning meeting.

| | | |
|---|---|---|
| 1. Did the MH staff identify high risk inmate-patients? MH staff should state, specifically and by name, which I/Ps are identified as high risk. | Y ☐ N ☐ N\|A ☐ | *Comments:* |
| 2. Were the ASU Sgt and MH clinician in attendance?  (If both were not in attendance, response should be, "No.") | Y ☐ N ☐ N\|A ☐ | |
| 3. Were new arrivals discussed? | Y ☐ N ☐ N\|A ☐ | |
| 4. Method of measurement (interview or observation).  Select the method you utilized to respond to the questions above. | ☐ Interview ☐ Observation | |

1

# Mental Health Assessment Criteria Worksheet

**III. ICC Observation**

**General Guidelines:**

*Ask for a list of inmates scheduled to attend the ICC before the meeting begins.  This is often referred to as "Call Sheet."

*Look up the inmate in the e-UHR to determine who is in the mental health (MH) program.

*Respond to questions for each MH inmate's ICC.

*Before the first inmate is brought in, introduce yourself to the group and tell them you want to introduce yourself to each inmate before you proceed with the meeting.

| PATIENT | | |
|---|---|---|
| **Name:** | | **CDCR#:** |
| 1.  Is a MH clinician in attendance? | Yes ☐  No ☐ | *Comments:* |
| 2.  Did the MH clinician provide useful information regarding each inmate-patient's current mental condition? Please answer what information was provided below: *Note that these are examples from the MHPG. All are not required for a "yes" response.  However, relevant information regarding the patient's current mental health condition and recommendations when appropriate are required.* | Yes ☐  No ☐ | |
| **a) Inmate-patient's current participation in treatment.** | ☐ | |
| **b) Medication compliance** | ☐ | |
| **c) Suitability of single or double ceiling.** | ☐ | |
| **d) Risk assessment of self-injurious or assaultive behavior** | ☐ | |
| **e) Status of ADLs** | ☐ | |
| 3. Did the committee chair consider both the clinical and custody needs of the patient for program review? | Yes ☐  No ☐ | |
| 4. If it appears that the inmate-patient's mental status had an impact on his/her understanding of the ICC, did staff members ensure effective communication? *Applies only to the patient the clinician observes having difficulty paying attention to or understanding what ICC members are saying. This is not required for all patients.  If the clinician observes that the patient is able to understand, the response is N/A. If any member of the ICC confirms understanding by asking the patient to repeat what was said, the response is "yes".* | Y ☐ N ☐ N|A ☐ | |
| 5. Did the ICC start on time? | Yes ☐  No ☐ | |

# Mental Health Assessment Criteria Worksheet

**IV. IDTT Observation**

**General Guidelines:** This section requires observing five (5) inmate-patient IDTTs but you must also observe the IDTT of different treatment teams.  If there are less than 5 to observe in any given program, observe ALL. Before the first inmate is brought in, introduce yourself to the team and tell them you want to introduce yourself to each inmate, before you proceed with the meeting.

| PATIENT | |
|---|---|
| Name: | CDCR#: |
| 1.  Did the IDTT start on time? *(Judge this using the schedule you received in planning your visit.  If the meeting is more than 5 minutes late starting, note that this is a "NO" unless there was a legitimate reason such as one of the team members attending to an emergency, that is not the norm.)* | Y ☐ N ☐ |
| 2.  Did the IDTT Leader state the purpose of the IDTT?  *(The IDTT leader is expected to tell the inmate-patient the reason they are having the meeting. This should be more than simply: This is your IDTT - it should provide the patient with the context needed to understand why the meeting is held.)* | Y ☐ N ☐ |
| 3.  Did the Primary Clinician complete the 7386 Intake Evaluation or update prior to the IDTT meeting?  *(The PC must complete either a new 7386 or update the current 7386 on a progress note or 7389.  Ask the PC after the inmate leaves if you can see this paperwork; other times it may be obvious as they will be looking at it in the IDTT.)* | Y ☐ N ☐ |
| 4.  Did the psychiatrist complete the 7230-G intake evaluation prior to the IDTT meeting?  *(The psychiatrist must complete an initial/intake evaluation prior to IDTT.  You may need to ask the psychiatrist after the inmate leaves if you can see this paperwork; sometimes it may be obvious as they will be looking at it in the IDTT.)* | Y ☐ N ☐ |
| 5.  If it appears that the inmate's mental health status had an impact on his/her understanding of proceedings, did staff members in IDTT ensure effective communication?  *(This is NOT required for all inmate-patients.  Check "N/A" if you assess the inmate-patient as being able to understand.  Check "Yes" if any member in the ICC checked the inmate-patient for understanding by asking them to restate what was said.)* | Y ☐ N ☐  N\|A ☐ |
| 6.  Did the PC provide a succinct case formulation (formed out of the Four P's)  to inform relevant treatment information that may include, but is not limited to: | Y ☐ N ☐ |
| a) Diagnosis | ☐ |
| b) Areas of distress | ☐ |
| c) Strengths | ☐ |
| d) Weaknesses | ☐ |
| e) History of mental illness, hospitalizations, suicide attempts | ☐ |
| f) Functional Impairments | ☐ |
| 7.  Did the psychiatrist provide relevant information regarding diagnosis, medications and side effects?  *(The psychiatrist should provide the rationale for the prescribed medications and explain the reason if medications were not prescribed.)* | Y ☐ N ☐ |

3

# Mental Health Assessment Criteria Worksheet

| | |
|---|---|
| 8. Was the inmate-patient asked open-ended questions during the IDTT? Select N/A if the i/p declined to attend (note reason) or if there was good clinical rationale for not inviting the i/p. *Some examples of questions you might look for to qualify as a "yes" response are, "Can you tell me what we said we would work together on?""Can you tell me your diagnosis? What does that mean?" Asking at the end of the IDTT only if the I/P "has any questions" is insufficient.* | Y ☐ N ☐ |
| 9. Was the Correctional Counselor knowledgeable and engaged in the discussion, and did s/he provide relevant information? | Y ☐ N ☐ |
| 10. Did the IDTT leader facilitate a team discussion by attempting to engage all participants (including staff and inmate-patient)? | Y ☐ N ☐ |
| 11. Did the overall IDTT include interactive discussion of all staff participants related to the treatment plan? | Y ☐ N ☐ |
| 12. Was the inmate-patient talked to rather than about in a language that is at the patient's level? | Y ☐ N ☐ |
| 13. Were measurable treatment goals discussed? | Y ☐ N ☐ |
| 14. Were considerations on the 7388B and appropriateness of level of care discussed? | Y ☐ N ☐ |
| 15. For IDTT updates ONLY: Did the team leader discuss progress towards the treatment goals? | Y ☐ N ☐ |
| 16. Can the clinician access the health record and is s/he using it as needed? | Y ☐ N ☐ |
| 17. Can the correctional counselor access the c-file/ERMS and is s/he accessing it as needed? | Y ☐ N ☐ |
| 18. For initial EOP IDTTs and IDTTs in which an IP does not have a work/educ assignment, was eligibility (clinical appropriateness) for program assignment discussed? | Y ☐ N ☐ |
| 19. Did the treatment team discuss what, if any, reasonable accommodations may be needed for program assignment? | Y ☐ N ☐ |
| 20. Is management of treatment resistant patients addressed through the inclusion of custody input in the creation of individualized treatment interventions and goals? | Y ☐ N ☐ |
| 21. Did the treatment team discuss any RVR write ups? | Y ☐ N ☐ |
| 22. Were any behaviors correlating with the RVR addressed in the treatment plan? | Y ☐ N ☐ |
| 23. Suicidal patients only: Is the safety plan discussed? | Y ☐ N ☐  N\|A ☐ |

*Comments:*

# Mental Health Assessment Criteria Worksheet

## V.  Group Treatment Observation

**General Guidelines:**

* In this section, you are only to observe "Talking" groups.  Not art or exercise groups.

* Before the first inmate-patient is brought in, introduce yourself to the group leader and tell him/her that you want to introduce yourself to the group.  Other than initial introduction, proceed with the group as they typically would.  Do NOT present to you.

* If the CMH or Chief Psychiatrist is in attendance, ask them if they usually attend group; if they don't, tell them you want to see business as usual and politely ask them not to attend.

* If the group leader was changed as a result of your visit, ask if there is another group you can attend.  If not, note that this change was made and advise the chief that a change in group leader should not be made during future visits.

| | | Comments: |
|---|---|---|
| 1.  Did the group leader start the group on time?  If answer is "NO" provide explanation | Y ☐ N ☐  N\|A ☐ | |
| 2.  Did the group leader attempt to engage each participant? <br> *Note:  If the group leader asked each group participant a question in an attempt to engage them, this response is "YES" regardless if all the inmates actually engaged.* | Y ☐ N ☐  N\|A ☐ | |
| 3.  If media or music is used, is it only used for short periods of time to illustrate? <br> *Note:  If a movie or music is used consistently throughout the group, without any pause to apply the contents to treatment, the response to this item is "NO."* | Y ☐ N ☐  N\|A ☐ | |
| 4.  Does the leader facilitate interaction between all group members on the clinical topic? | Y ☐ N ☐  N\|A ☐ | |
| 5.  For clinician led groups, is clinical process addressed during the group? | Y ☐ N ☐  N\|A ☐ | |

## VI. Psych Tech Rounds

This item is currently audited locally by nursing staff.  The CMH should obtain the audit results from nursing staff until this information is available on the mental health performance report. The questions below are simply included as a prompt for the ASU EOP HUB team to obtain and discuss the findings of the SRN's PT rounds audits.

| | | Comments: |
|---|---|---|
| 1.  Did the PT complete all rounds as indicated by policy? | Y ☐ N ☐  N\|A ☐ | |
| 2.  Did PT rounds meet documentation requirements? | Y ☐ N ☐  N\|A ☐ | |

5