**Appendix A**

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **\*COVID-19 Mental Health Delivery of Care Guidance & Tier Document (Mar. 25, 2020)** | Stipulation and Order Approving CDCR's Telepsychiatry Policy, ECF No. 6539 (Mar. 27, 2020)<br><br>Program Guide 12-1-12 & Attachment A (confidentiality) | • Permits telepsychiatry broadly, including in PIPs and MHCBs, without a finding of emergency<br><br>• Telepsychiatry not treated as a supplement, but rather a substitute, for in-person psychiatry at EOP and higher levels of care<br><br>• Permits use of tele-psychology<br><br>• Approval for use of telepsychiatry is made by the hiring authority, and may be preferred modality of providing psychiatry services<br><br>• Telepsychiatrists may provide telepsychiatry services from their homes during regular work hours, rather than from telepsychiatry hubs<br><br>• Each institution can decide which telepresenters can be used, including: MA or CNA, and any healthy staff unable to perform their assigned duties during the crisis (with training).<br><br>• Telepsychiatry providers not required to conduct site-visits at any particular frequency<br><br>• Registry telepsychiatrists may be used without limitation |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | • Patients may not have an option to refuse telepsychiatry as a treatment modality<br><br>• On-site psychiatrists may not be available if a clinical emergency occurs during a telepsychiatry session<br><br>• Confidential space for telepsychiatry contacts may not be available<br><br>• Nurse practitioners may provide telepsychiatry services<br><br>• Requires telepresenters for telepsychiatry, but clinical and other telepsychiatry support-staff may not be available |
| | Mental Health Services Delivery System Program Guide, 2020 Revision ("Program Guide") at 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-6 to 8, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-1, 12-5-3 to 10, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, | Decisions on admission and discharge subject to day-to-day analysis of staffing, individual patient needs, space availability, social distancing, restrictions on movement, quarantine and isolation status, and the degrees of risk when making these decisions. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) | |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21; 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities) | Groups may not be offered, depending on space, staffing, and quarantine or isolation status. Groups that do continue may be reduced in size in order to adhere to social distancing requirements.<br><br>Larger classrooms or vocational space could be used to allow for smaller groups.<br><br>Patients in isolation and/or quarantine will not attend groups but shall be provided with activities and receive daily rounding. |
| | Program Guide 12-1-12 & Attachment A (confidentiality requirements) | Groups may not be confidential if placed in an alternative location (e.g. day room, class rooms) or due to social distancing purposes. |
| | Program Guide 12-1-12 & Attachment A (confidentiality requirements) | Contacts with IDTT may be cell front and non-confidential |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21; 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, | Patients may be limited to in-cell activities only<br><br>Patients housed in an MHCB awaiting transfer to a higher level of care and patients in alternative housing awaiting |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities) | transfer to an MHCB will be provided enhanced out-of-cell time and therapeutic activities as well as daily rounds, as operations allow. |
| | Program Guide at 12-5-7 to 8, 12-5-10, 12-5-31, 12-10-7 to 12 | Patients may not receive SRASHEs if suicidal, but may instead be screened using the Columbia screening tool |
| | Program Guide at 12-1-6, 12-1-16, 12-3-1 to 2, 12-5-4<br><br>Order, ECF No. 5710 (Oct. 10, 2017)<br><br>CCHCS Policy 12.05.301: Housing of Patients Pending Mental Health Crisis Bed Transfers | Depending on the institution's Tier level, patients may be placed in alternative housing for longer than 24 hours. Within 24 hours of placement or if patient remains longer than 24 hours, a full SRASHE must be completed |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 13, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide Chapters 5, 6 | As patients wait for inpatient referrals to process, they may not receive treatment commensurate with their level of care. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-3 to 10, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12, 12-8-1, 5 to 7, 9, 11 to 12, 12-9-2 to 3, 4 to 5, 6, 12 to 14, 12-10-12 to 13, 19 to 21 (access to higher levels of care)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 10, 12-8-4, 10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities) | Symptomatic patients shall be isolated from other patients in the general population and will not transfer absent showing of legal or medical necessity |
| | Program Guide at 12-1-4, 12-3-3 to 4, 12-4-10 to 11, 12-4-13<br><br>Memo: Release Planning for Inmates Participating in the Institution's Mental Health Services Delivery System (Mar. | Pre-release planning activities may be limited to varying degrees.<br><br>All required activities to occur when social distancing can be followed. |

[3633276.1]

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 11, 2010), Program Guide, Appendix C, *see* ECF No. 5864-1 at 276-82. | |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14  (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | 1:1 contacts with psychiatrists may not occur within timeframes. |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15,12-4-19, | 1:1 contacts with psychologists or social workers may not occur within timeframes. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-10-15 to 19 (availability of treatment modalities) | 1:1 suicide watch may not occur where clinically indicated |
| | Program Guide 12-3-2 (psychiatrists as primary clinicians)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | Any physician, nurse practitioner, or physician assistant can serve as psychiatrist |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12- | Psychiatrist duties may be triaged only to serve urgent or emergent needs |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **COVID-19 Pandemic – Guidance Regarding Field Operations (Mar. 18, 2019, revised Mar. 20, 2020)** | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-15, 12-5-33 to 34, 12-7-7, 10, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>February 14, 2017 memorandum titled Mental Health Crisis Bed Privileges Revision, Program Guide, Appendix C, *see* ECF No. 5864-1 at 349. | Not congregating in groups of 10 or more individuals and suspending group programs where participants are likely to be in close contact |
| **Restricted housing, Reception Centers, PIP Phone Calls (Apr. 8, 2020)** | September 22, 2016, memorandum regarding Reception Center Privileges for EOPs, *see* ECF No. 6431 at 4. | Extends phone call privileges for those in segregated housing, reception centers, and PIPs beyond what is permitted by privilege group. |
| **\*COVID-19 Programming Opportunities for Inmates Participating in the MHSDS in Restricted Housing (Apr. 1, 2020)** | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12- | Implementation of third watch programming opportunities within restricted housing.  If mental health groups and 1:1 clinical contacts cannot occur in the restricted housing units, wardens will ensure PM yard is offered to those in the MHSDS. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | |
| **COVID-19 Electronic Appliance Loaner Program (Apr. 1, 2020)** | January 22, 2014 Memo – Multi-Powered Radio Loaner Program in Administrative Segregation Units; and March 12, 2007 Memo – Televisions in Segregation Units, *see* ECF No. 6431 at 4. | Increase patient access to loaner electronic appliances |
| **\*COVID Emergency Mental Health Treatment Guidance and COVID Temporary Transfer Guidelines and Workflow (Apr. 10, 2020)** | Program Guide 12-1-8 to 9, 12-5-1, 12-5-32 to 34 (MHCB care provided in licensed settings)<br><br>Program Guide 12-1-12 & Attachment A (confidentiality)<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5- | Creation of TMHUs<br><br>• Replaces in many circumstances transfers to hospitals and MHCBs to provide inpatient mental health care<br><br>• Group Therapy may be reduced to 3-4 people and may be eliminated. If no groups can be run, then yard time in the evening should be considered.<br><br>• Decisions on admission and discharge subject to day-to-day analysis by Clinical Leadership regarding the available workforce, space availability, social distancing, restrictions on |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-9-19 to 21 (access to higher levels of care)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21,12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide 12-3-9, 12-4-6, 12-5-11 to 12, 12-7-12 to 13, 12-8-8, 12-9-5 (required IDTT staffing)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts)<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – | movement, individual patient needs, facility-system flows, and quarantine and isolation status<br><br>• IDTTs may occur by teleconference<br><br>• IDTT staffing level varies based on availability of staff<br><br>• Content and delivery of treatment will be based on a daily evaluation of the proportion of staff available for patient care and direct activities<br><br>• Huddles may be telephonic, but only if in-person huddles cannot be conducted safely<br><br>• Daily out-of-cell individual treatment offerings with psychiatrist or primary clinician will occur whenever possible<br><br>• When possible, all PC and Psychiatrist contacts shall be conducted in a confidential space.  Where necessary due to staffing, available treatment team members may engage in collaborative cell front tele-heath treatment sessions using portable equipment.  It is preferable for cell doors to be open when conducting this cell side treatment modality. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Referrals and Admissions | • Permits cell-front tele-mental health<br><br>• Each institution can decide which telepresenters can be used, including: MA or CNA, and any healthy staff unable to perform their assigned duties during the crisis (with training).<br><br>• Upon discharge from TMHU and the IDTT determines the patient no longer requires inpatient mental health treatment, then referral to higher level of care shall be rescinded<br><br>• If an inpatient bed opens, only the patient that the institution triaged as the most acutely mentally ill will be assigned to the bed |
| | Program Guide 12-1-12 & Attachment A (confidentiality)<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 | Enhanced Treatment-in-Place<br><br>• When a patient is referred to an inpatient level of care and is unable to transfer to an inpatient bed, a TMHU, or is not already in an inpatient setting, treatment will be provided in the patient's housing unit until transfer can occur ("treatment-in-place")<br><br>• Decisions on admission and discharge subject to day-to-day analysis by Clinical Leadership regarding the available |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15,12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts)<br><br>Orders, ECF Nos. 6095, 6314 (Feb. 20, 2019, Oct. 8, 2019) (requirement implementation of Custody and Mental Health Partnership | workforce, space availability, social distancing, restrictions on movement, individual patient needs, facility-system flows, and quarantine and isolation status<br><br>• When possible, all treatment, including groups and clinical contacts, shall be provided in confidential setting, however that may not always be possible<br><br>• Primary clinical contacts may not occur on a daily basis<br><br>• Group Therapy may be reduced to 3-4 people and may be eliminated. If no groups can be run, then yard time in the evening should be considered.<br><br>• If in-person Huddles cannot be conducted safely, then huddles should but are not required to occur telephonically |

[3633276.1]

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Plan, including inter-disciplinary huddles)<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions | |
| | Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-5-2,12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care)<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions | Transfer Guidelines and Workflow<br><br>• In an attempt to limit the transmission of COVID-19, transfers to external inpatient hospitalization, including PIPs and MHCBs, will occur only where necessitated by an imminent, life-threatening emergency, or serious mental health decompensation, and the life-threatening condition or serious decompensation cannot be treated at the same institution<br><br>• External transfers to an MHCB or inpatient hospital require an additional layer of review by regional and headquarters inpatient referral unit (IRU) staff<br><br>• Medical risk for COVID-19 will factor into an evaluation as to whether an external transfer will occur<br><br>• Plaintiffs will not seek contempt sanctions for failures to transfer patients in a timely |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | manner when the failure resulted from COVID-19<br><br>• Patients will be discharged to the same facility unless irreconcilable custodial considerations prevent doing so, in which case an additional screening step will occur |
| **Department of State Hospitals Directive on Suspension of Admissions from CDCR to DSH (Apr. 15, 2020)** | Program Guide 12-1-9<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care)<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions | Coleman admissions to DSH resumed after a 30-day suspension with additional guidelines and protocols required to effectuate transfers from CDCR to DSH. |
| ***COVID Emergency Mental Health Treatment** | Program Guide 12-1-12 & Attachment A (confidentiality) | • When referred to an inpatient bed, MAX custody patients shall be placed in an inpatient |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **Guidance for MAX Custody Patients and COVID EOP Temporary Transfer Guidelines and Workflow (Apr. 17, 2020)** | Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, | bed, if one is available within the institution, by Health Care Placement Oversight Program (HCPOP). If no inpatient bed is available within the institution, then the patient is placed under observation as clinically appropriate until a MAX custody review is completed within the next 24 hours of referral.<br><br>• Patients referred to an inpatient bed for whom MAX custody status is lifted will proceed through the standard COVID Emergency Mental Health Treatment Guidance and COVID Temporary Transfer Guidelines and Workflow (Apr. 10, 2020)<br><br>• Patients referred to an inpatient bed who remain on MAX custody status following review can be sent to a MAX TMHU for a maximum of 10 days<br><br>• Permits the creation of TMHUs specific to MAX patients. MAX Custody TMHUs will be located in a segregation setting, according to the following priority: EOP ASU Hub/PSU; STRH/LTRH; ASU.<br><br>• Patients offered 5 hours weekly of structured treatment and 15 |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 12-9-6 to 8 (primary clinician contacts)<br><br>Memo: Creation of Correctional Clinical Case Management System Short Term and Long Term Restricted Housing (Jan. 15, 2015), Program Guide, Appendix C, *see* ECF No. 5864-1 at 420-24.<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions | hours weekly of unstructured out of cell time<br><br>• Group therapy occurs only where done safely<br><br>• IDTT held within 72 hours of placement in MAX TMHU and again at 7 days from date of placement<br><br>• At 7-day IDTT, if the patient is not stabilizing or improving, they are referred to MHCB and transferred to an inpatient setting, potentially at another institution, within 10 days from date of placement following procedures described in the COVID-19 Temporary Emergency Transfer Guidelines.<br><br>• Decisions on admission and discharge subject to day-to-day analysis by Clinical Leadership regarding the available workforce, space availability, social distancing, restrictions on movement, individual patient needs, facility-system flows, and quarantine and isolation status<br><br>• Content and delivery of treatment will be based on a daily evaluation of the proportion of staff available for patient care and direct activities |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | • If the inpatient referral is based on acute suicidality, the patient will be placed on 1:1 watch until the Treatment Team determines what level of observation is clinically necessary |
| | | • If in-person huddles cannot be accomplished safely then huddles shall occur telephonically |
| | | • Individual out-of-cell treatment by psychiatrist or primary clinician shall occur daily whenever possible |
| | | • Group Therapy may be reduced to 3-4 people and should only be performed where it can safely be done. It may be eliminated entirely, in which case only in-cell treatment would be provided. If no groups can be run, then yard time in the evening should be considered. |
| | | • Psychiatrist and primary clinician contacts may not be confidential |
| | | • Permits tele-mental health treatment |
| | | • Permits the following staff members to act as tele-presenter: Medical Assistant; |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | any staff unable to perform their assigned duties during the crisis, provided the staff member has been provided adequate training; any mental health provider; an LVN, RN, CAN, Psych Tech; or any medical provider<br><br>• Upon discharge from a MAX TMHU, and the IDTT determines the patient no longer requires inpatient mental health treatment, then the referral to higher level of care shall be rescinded |
| | Program Guide 12-1-8, 12-4-1, 12-4-4 (EOP patients housed in designated units only)<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-9-7 to 9 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-14 to 15, 12-4-19, 12-4-20, 12-9-6 to 8 (primary clinician contacts) | COVID EOP Temporary Transfer Guidelines and Workflow<br><br>• In an attempt to limit the transmission of COVID-19 all non-emergency transfers shall be immediately curtailed. All movement within a facility can continue while taking into consideration COVID status<br><br>• Inter-facility transfers subject to review and approval by regional or headquarters staff<br><br>• Outpatient external transfers or releases from segregated housing to mainline mental health programs at other institutions, to include transfers from desert institutions, transfers from stand-alone ASUs to STRH, CCCMS to |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Program Guide at 12-4-4 to 5 (access to EOP level of care) | EOP, and EOP to CCCMS, will only occur if the treatment team determines, and the Regional Clinical Leadership agrees, that the transfer is necessitated by an imminent, life-threatening emergency or serious mental health decompensation, and the life-threatening condition or serious decompensation cannot be reasonably treated at current institution<br><br>• EOP-level treatment provided when full staffing is available; otherwise subject to tier status<br><br>• Patients discharged from EOP ASU who cannot transfer internally to an EOP may be placed on a local CCCMS yard |
| **COVID-19 Temporary Transfer Restriction Psychiatric Inpatient Programs FLEX Guidance (May 14, 2020)** | Program Guide Chapter 6 | • The treatment team shall not be required to complete a new intake evaluation because the treatment team will be the same, as the patient continues to remain in the same licensed unit; however, an intake IDTT and updated treatment plan for the new level of care will be required.<br><br>• While patients receiving intermediate and acute inpatient care typically will have different treatment goals, there currently is not a significant difference in treatment |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | modalities provided to patients at the intermediate and acute inpatient levels of care |
| **\*Tele-Mental Health Memorandum (May 22, 2020)** | Stipulation and Order Approving CDCR's Telepsychiatry Policy, ECF No. 6539 (Mar. 27, 2020) | • Permits the provision of tele-mental health services beyond those permitted by the parties' stipulated telepsychiatry policy, including by psychologists and social workers |
| **COVID-19 Guidance for Daily Program Regarding Social Distancing for Cell or Alternative/Dorm Style housing of Eight Persons (May 11, 2020) and COVID-19 Operational Guidelines Monitoring and Accountability (May 27, 2020)** | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-15, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>February 14, 2017 memorandum titled Mental Health Crisis Bed Privileges Revision, *see* Dkt. 5864-1 at 349. | • Goal of having patients maintain at least six feet apart from each other, and attendant impacts on programming:<br><br>• Requires social distancing in the workplace<br><br>• Reduced numbers to allow for increased social distancing may result in no dayroom activities<br><br>• Educational programs shall be provided in such a manner as to allow for social distancing, once group activities resume.  Until such time, education materials will be provided to housing unit/dorm/cells.<br><br>• The May 27 memo operationalizes and creates an accountability procedure to assure that the modifications to programming directed by the May 11 Social Distancing Guidance are being implemented; enforces |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | departures directed by the May 11 Guidance |
| **\*COVID-19 Patient Movement for Mental Health Treatment (May 11, 2020)[1]** | Program Guide 12-1-16 (timelines for level of care transfers)<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions & Exceptions Addendum<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 7, 12-7-11, 12-7-12, 12-8-5 to 7, 12-8-11 to 12, 12-9-4 to 5, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) | • Provides direction on transfers between DSH and CDCR that may impact timeframes<br><br>• Prevents certain individuals who otherwise qualify for transfer from CDCR to DSH from doing so, where the patient tests positive for COVID or screens positive for COVID risk. |

---

[1] Defendants issued this policy without negotiating it with Plaintiffs, and the parties agreed in their May 18, 2020 stipulation that Defendants' current practices do not conform with these or any other existing written guidelines. *See* ECF No. 6676 at 2. Plaintiffs maintain their objection to this policy pursuant to the pending October 23, 2020 evidentiary hearing, but have agreed to include it here because Defendants have confirmed that it was issued and has not been rescinded.

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **Updated Draft COVID Temporary Guidelines for Transfer to DSH Inpatient Care (July 16, 2020, superseding April 15, 2020, May 15, 2020, June 12, 2020 and June 19, 2020 versions)[2]** | Program Guide 12-1-16 (timelines for level of care transfers)<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions & Exceptions Addendum<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) | •   Provides direction on transfers between DSH and CDCR that may impact timeframes<br><br>•   Provides additional individualized clinical review and a COVID-19 screening process.<br><br>•   Delays certain individuals who otherwise qualify for transfer from CDCR to DSH from doing so, where the patient tests or screens positive for COVID.<br><br>•   For referrals to DSH from a CDCR institution closed due to a COVID-19 outbreak, patient transfers to DSH will occur on a rare, case-by-case basis. CDCR and DSH leadership will discuss the details of such referrals, including exposure risk, availability and use of PPE, testing and results, and the extent of staff crossover between units with active cases and those without cases to evaluate the possibility of transfer. Patients considered for transfer pursuant to this process will be quarantined for 14 days, and tested for COVID-19 twice, followed by a further discussion between CDCR and DSH |

---

[2]   The July 16, 2020 COVID Temporary Guidelines for Transfer to DSH are final, operative, and used in the field to review, accept, and transfer patients. Defendants represent that they anticipate updating these guidelines soon.

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | leadership regarding any interim exposure risks that occurred during the quarantine period.[3] |
| | | • DSH collaborates at least weekly with the Special Master's experts in small group meetings to discuss and refine the referral process, resolve conflicts and respond to COVID-related impacts on referrals and transfers due to the changing nature of the pandemic. |
| | | • The Special Master continues to closely monitor all referrals, rejections and completed transfers to and from the DSH inpatient programs, and to evaluate compliance with the Court's April 24, 2020 Order. *See* ECF Nos. 6622 at 3; 6639. |
| **Memo re 90-Day Supply of Medications for Expedited Releases (July 7, 2020)** | Program Guide 12-3-14 (prescribed medication supply for CCCMS patients who parole)<br><br>Memorandum: Release Planning for | • Permits the provision of a 90-day supply of certain medications for individuals subject to expedited release due to COVID-19 population density reduction measures. |

---

[3] Defendants are in the process of updating this language. Plaintiffs have requested that any such update be provided to the Task Force for comment prior to being issued or finalized.

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Inmates Participating in the Institution's Mental Health Services Delivery System (Mar. 11, 2010) at 4-5, 6 | • Psychiatric providers are directed to write medication orders, as clinically appropriate and within legal confines, for a 90-day, rather than 30-day, duration for those subject to expedited release. |
| **Memo re Cell-Front Nursing Activities (June 26, 2020)** | Program Guide 12-5-32, 12-10-4, 12-10-15 to 19 (describing suicide watch and observation procedures)<br><br>Memorandum: Level of Observation and Property for Patients in Mental Health Crisis Beds (Mar. 15, 2016) at 2 (describing suicide watch as primarily observation) | • Permits IDTTs to recommend that nursing staff provide cell-front activities to patients<br><br>• Requires these activities to be performed while designated nursing staff are performing 1:1 observations of patients; in the past, nursing staff had only one primary task during 1:1 observation—observing the patient<br><br>• Provides a library of cell-front nursing activities for patients |
| **\*Institutional Roadmap to Reopening (August 14, 2020); Memo re Reintroduction of In-Person Rehabilitative Programming (Sept. 25, 2020) (directing institutions to create plans to implement portions** | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-15, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide 12-1-16 (timelines for level of care transfers) | Based on several factors, including the number of new COVID-19 cases, the availability of adequate testing, nursing and custody staff, and PPE, adequacy of physical distancing practices, and status of employee testing and contract tracing, each institution may be placed, at the discretion of its Warden and Chief Executive Officer, in one of four "phases." The phases range from most to least restrictive on the institution's general operation, healthcare services, and inmate programs. Depending on |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **of Roadmap to Reopening)** | Program Guide at 12-3-1 to 2, 12-2-8 to 10, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) Memorandum: Transfer of Correctional Clinical Case Management System Inmate-Patients to Male Short Term Restricted Housing Units (Mar. 3, 2016)<br><br>Memorandum: Creation of Correctional Clinical Case Management System Short Term and Long Term Restricted Housing (Jan. 15, 2015)<br><br>Memorandum: Short-Term Restricted Housing Mental Health Requirements | an institution's phase, restrictions may be placed on:<br><br>• Mental health treatment modalities and quantities that can be provided<br><br>• Movement between or within institutions or facilities, including movement to and from restricted housing, to and from desert institutions, and between levels of care, which may result in class members remaining in settings not designed to provide the level of treatment and programming contemplated by the Program Guide and other negotiated policies for their level of care.<br><br>• Out of cell and other yard time |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | (Feb. 8, 2016) (mandates movement of CCCMS class members with an ASU term to STRH)<br><br>Memorandum: Long Term Restricted Housing Mental Health Requirements (Feb. 8, 2016) (mandates movement of CCCMS class members with a SHU term to LTRH)<br><br>Memorandum: Short-Term and Long-Term Restricted Housing Policies (Feb. 4, 2016) (mandates movement of CCCMS class members with ASU and SHU terms to STRH and LTRH, respectively)<br><br>Stipulation & Order, ECF No. 6296 (Sept. 27, 2019) (approving and attaching policy for reducing transfer timeframes from desert institutions) | |
| **\*Movement Matrix (revised Aug. 19, 2020)** | Program Guide 12-1-16 (timelines for level of care transfers) | For each type of movement between and within institutions that are not closed to movement, sets the COVID testing strategy, required type of |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Program Guide at 12-3-1 to 2, 12-2-8 to 10, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care).<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions<br><br>Memorandum: Transfer of Correctional Clinical Case Management System Inmate-Patients to Male Short Term Restricted Housing Units (Mar. 3, 2016)<br><br>Memorandum: Creation of Correctional Clinical Case Management System Short Term and Long Term | quarantine housing, and process for moving an inmate who refuses a COVID test.<br><br>• Testing and quarantine procedures in some cases may impact timeframes for transfers to higher levels of care, from desert institutions and reception centers, and to and from restricted housing units, which may result in class members remaining in settings not designed to provide the level of treatment and programming contemplated by the Program Guide and other negotiated policies for their level of care. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Restricted Housing (Jan. 15, 2015)<br><br>Stipulation & Order, ECF No. 6296 (Sept. 27, 2019) (approving and attaching policy for reducing transfer timeframes from desert institutions) | |
| **COVID-19 Operations EOP Hub Certification Process & Addendum for Certifying Met with Explanation due to COVID-19 Restrictions (Sept. 11, 2020)** | Program Guide Chapters 7, 8, 9<br><br>Order, ECF No. 5131 (Apr. 10, 2014); Order, ECF No. 5196 (Aug. 11, 2014)<br><br>Defs' Plans & Policies Submitted in Resp. to Apr. 10, 2014 and May 13, 2014 Orders, ECF No. 5190 at 17-19 (Aug. 1, 2014) | • Permits audits of PSU and EOP ASU units to be conducted remotely, by video equipment or telephone, due to COVID-19-related staffing limitations<br><br>• If no institution staff are available to conduct remote audits, then those audits will be conducted by a regional staff member<br><br>• COVID-19-related limitations or changes to standard audit procedure or mental health treatment provisions—including whether audits are conducted remotely or by regional staff, groups or other treatment are not offered, and IDTTs or ICCs are held in absentia—shall be documented on the audit form<br><br>• If an institution's failure to meet certification requirements is due purely to COVID-19-related restrictions, the institution may pass certification "with explanation," assuming certain |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
|  |  | criteria are met.  Documentation of the rationale for any such "with explanation" certification is required. |

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date:   **September 25, 2020**

To:     Associate Directors, Division of Adult Institutions
        Wardens
        Correctional Counselors III, Division of Rehabilitative Programs
        Community Resources Managers
        Principals
        Chaplains and Native American Spiritual Leaders

Subject:   **REINTRODUCTION OF IN-PERSON REHABILITATIVE PROGRAMMING - REVISED**

The purpose of this memorandum is to provide direction and guidance to the adult institutions in reintroducing in-person programming for Inmate Activity Groups (IAG); Integrated Substance Use Disorder Treatment (ISUDT) programming; Education classes; and religious services, while supporting the California Department of Corrections and Rehabilitation's (CDCR) continuing efforts to mitigate the impact of the Coronavirus (COVID-19) pandemic.

Effective immediately, Wardens shall collaborate with their Chief Executive Officers to determine which programming measures may be utilized in keeping with the document titled *Roadmap to Reopening,* dated August 14, 2020. Wardens shall send their agreed upon institutional reopening plans to their respective mission Associate Director for review prior to implementation.

Submitted plans shall identify the maximum number of program participants for each activity, taking into account physical distancing protocols. Where appropriate, in-person programming may be implemented utilizing institution staff; Self-Help Sponsors (SHS); Alcohol and other Drug (AOD) Counselors; Education staff; Chaplains; and Native American Spiritual Leaders (NASLs), in keeping with the guidance provided by the Centers for Disease Control and Prevention (CDC).

When the number of staff program facilitators, AOD Counselors, Education staff, Chaplains, NASLs, and inmate participants exceed the modified room capacity of the programming space, institutions shall implement a plan to accommodate all inmates assigned to the programs. For example, an IAG Alcoholics Anonymous (AA) program has 20 assigned participants and normally meets once per week. If the modified room capacity is six persons, the group would be separated into four cohorts of five inmates each, with one facilitator per session. Each cohort would attend AA on a rotating basis, ensuring all assigned participants were afforded equal access to the program. ISUDT programs operating beyond Phase One will not divide into rotating cohorts, and will continue with their assigned number of participants in the identified spaces and timeframes consistent with physical distancing and all other CDC protocols.

It is the expectation that all staff, program facilitators, and inmate participants wear face masks and maintain physical distancing at all times for the duration of programming sessions.

For religious services, staff are encouraged to cohort participants, ensuring all inmates are afforded equal access. In keeping with Department Operations Manual, Section 101060.8, chapel facilities are designated for daily religious uses and programs. Use of the chapels for other than religious activities shall require the approval of the Warden.

For facilities unable to resume in-person programming, institutions shall support alternative in-cell or cell-front programming through the distribution of printed religious literature, rehabilitative programming and independent study materials provided by Community Based Organizations (CBOs), AOD Counselors, Education staff, Chaplains, and NASLs.

Associate Directors, Division of Adult Institutions
Wardens
Correctional Counselors III, Division of Rehabilitative Programs
Community Resources Managers
Principals
Chaplains and Native American Spiritual Leaders
Page 2

All rehabilitative programming materials provided shall be in accordance with the memorandums titled, *Collection and Distribution of Printed Rehabilitative Programming Materials,* dated April 10, 2020, and *Approved Usage of Independent Study for Class Closures* dated, February 4, 2020, as provided by the Chaplains and NASLs, or as directed by the Division of Rehabilitative Programs (DRP). Identified ISUDT participants shall receive Program Engagement Packets directly from institutional AOD Counselors. AOD Counselors shall frequently make contact with participants within their housing units as needed to deliver and collect packet programming materials, or answer brief questions regarding curriculum (approximately 10 minutes per participant).

Institutions shall work with CBOs, colleges, and volunteers to identify individuals who may be interested in facilitating programs virtually by two-way video conference. To facilitate this type of programming, staff shall coordinate with their local Enterprise Information Systems team to identify viable program locations and equipment. Programs utilizing video conferencing require a staff or SHS program facilitator; existing video conferencing equipment; and a program location with available internet access. A staff member or SHS shall schedule and initiate video conferences as the host; remain on-site to provide supervision; and conduct program attendance. Cisco and Polycom equipment, and/or specialized conferencing through Education's Canvas Learning Management System assigned to the institution should be used for this purpose where available, and are currently the only departmental approved platforms for this activity. The following warning shall be included in the body of each video conference invitation:

> *"Notice: Recording program sessions is not authorized. All participants are expressly restricted from conducting audio or video recording. Failure to comply with this restriction may result in termination of services and may result in the violator being held criminally or civilly liable."*

In preparing programming spaces for use, chairs shall be strategically placed and visual floor markings affixed in all programming areas to assist facilitators and participants in complying with physical distancing requirements. Programming areas shall be cleaned and disinfected before and after each session, as outlined by the guidance provided by the CDC. Inmate participants shall be utilized to clean these areas with staff program facilitator oversight. Program facilitators shall ensure the Cleaning Schedule Log is completed for each session. All cleaning and sanitization product instructions and best practices shall be followed, as outlined within the memorandum titled, *COVID-Related Cleaning Protocols for Institutions,* dated April 8, 2020.

Appropriate Personal Protective Equipment (PPE) shall be issued and worn by inmates and staff at all times as part of cleaning and sanitization. Each institution shall ensure sufficient PPE is available for this purpose. When required cleanings occur during scheduled programming hours, this time shall be counted as part of the inmates' program attendance and participation. In recognizing some inmates may not feel comfortable attending IAG held in a group setting, absences from voluntary program sessions shall not be counted for the purpose of removing participants until further notice. Inmates assigned to ISUDT and Education programs are expected to attend classes and complete independent study packets. Library services and Education assessments shall continue utilizing physical distancing practices.

All individuals entering the institutions shall be subject to the following screening protocols: touchless temperature screening, verbal screening questionnaires, and ensuring a facemask is worn at all

Associate Directors, Division of Adult Institutions
Wardens
Correctional Counselors III, Division of Rehabilitative Programs
Community Resources Managers
Principals
Chaplains and Native American Spiritual Leaders
Page 3

times. With the exception of CDCR staff, individuals shall provide their own facemasks which comply with institution dress standards (i.e., no obscene/offensive language, gang affiliation, etc.). Hand sanitizer shall be accessible to all facilitators and participants. At a minimum, one hand sanitizer station will be available at the institution entrance and within each programming area. In recognizing mitigation of COVID-19 is a fluid process, all programs may be subject to suspension without notice.

We applaud your ongoing efforts to assist the Department in maintaining a healthy, safe environment which is conducive to rehabilitative programming. Ensuring the availability of programming opportunities is an important aspect of rehabilitation, and serves to preserve the peace by giving inmates a positive focus for their energy and attention. Your dedication to sustained rehabilitative programming within the institutions is appreciated.

If you have any questions regarding IAG programs, please contact Crystal LeSieur, Community Partnerships Manager, Office of Policy Standardization, at Crystal.LeSieur@cdcr.ca.gov. For questions regarding ISUDT, please contact Andre Gonzales, Chief, Rehabilitative Programs, DRP, at Andre.Gonzales@cdcr.ca.gov. For questions regarding Education programs, please contact Hillary Iserman, Deputy Superintendent, Office of Correctional Education, at Hillary.Iserman@cdcr.ca.gov. For questions regarding religious services, please contact Charles Richey, Community Resources Manager, Religious Programs Oversight Unit, OPS, Division of Adult Institutions, at Charles.Richey@cdcr.ca.gov.

CONNIE GIPSON
Director
Division of Adult Institutions

BRANT R. CHOATE, Ed.D.
Director
Division of Rehabilitative Programs

Attachments

cc:  Charles W. Callahan
     Kimberly Seibel
     Kevin Hoffman
     Shannon Swain
     Hillary Iserman
     Andre Gonzales
     Ralph Jackson
     Dougless Snell
     Mark Tillotson
     Stephen Zanini
     Robert Fields
     Associate Superintendents
     Marco Barragan
     Charles Richey
     Crystal LeSieur

# Institutional Roadmap to Reopening-August 14, 2020

## Introduction

This document outlines, at a high-level, the Roadmap to Reopening major programs within the California Department of Corrections Rehabilitation (CDCR) and California Correctional Health Care Services (CCHCS). In an effort to mitigate the spread of COVID-19, the Departmental Operations Center (DOC) was established to provide statewide oversight and direction for COVID-19 efforts. The following are examples of actions taken to decrease exposure and increase physical distancing in California's prisons:

- Expedited release of inmates.
- Suspended normal visiting.
- Suspended intake from county jails.
- Modified housing assignments in dorm settings to facilitate physical distancing.
- Screening to include both a verbal questionnaire and temperature checks for all individuals entering state prisons.
- Conducted Board of Parole Hearings via videoconference.
- Continued to reinforce the importance of hand-washing and frequent cleaning.
- Provided and mandated the use of reusable cloth barrier masks

- Provided hand sanitizer to staff/inmates.
- Provide face coverings to staff/inmates
- Modified programming at all institutions to increase physical distancing and implemented enhanced cleaning.
- Implemented a screening process for all inmate workers.
- Provided daily updates on the CDCR website to ensure transparent communications with staff, families, stakeholders, and the public.
- Continued communication with local and state authorities to determine current mitigation levels in the community.

The CDCR-CCHCS Roadmap to Reopening incorporates a multi-phased approach to reopen statewide operations, relying on the recommended guidelines set forth by the Centers for Disease Control and Prevention (CDC), the California Department of Public Health (CDPH), and other stakeholders. It is important to note that multiple considerations may affect the speed at which institutions and various program areas reopen. Institutions will continuously evaluate and monitor positive COVID cases and will reinstate precautionary measures, as needed, to protect all of those who live and work in California's prisons. This document is not intended to replace other COVID-related policies, but to work in concert with companion policies. As such, and as an example, specific questions related to transferring of inmates between institutions would be detailed via the CDCR/CCHCS test-and-transfer policy.

## Phases Defined

> Phase 1: Most restrictive modifications
>
> Phase 2: Ease Phase 1 restrictions
>
> Phase 3: Expand opportunities outside housing units
>
> Phase 4: Return to "new" normal program for all staff and the population

Movement between the phases will be at the discretion of the Warden and Chief Executive Officer who shall report daily to the Department Operations Center (DOC) their current phase, and any plans to move to different phases in subsequent days. Depending on institutional design, movement between phases may apply to the entire institution or individual facilities within an institution, at the discretion of the Warden and CEO. This is to recognize significant differences related to design, dorm/cell housing, and intermixing of inmates and staff in various facilities. Throughout the phases, the Department is committed to ensuring the safety, security, and well-being of all staff and inmates by continuing to perform the precautionary measures listed above.

## Factors for Determining Movement from One Phase to the Next

When assessing an institution's readiness to move from one phase to the next, whether loosening or tightening restrictions, the following factors will be considered:

1. Is the institution experiencing a stabilizing or decreasing disease burden for the inmate population? Case Rate:
   - Phase I to II: No new cases on a rolling 14-day cumulative new case rate.
   - Phase II to III: No new cases on a rolling 60-day cumulative new case rate.
   - Phase III to IV: No positive or new cases for a 90-day period.
   - Phase IV: Reopening to new normal operations. Note that this may include continuing precautionary measures such as face coverings, more frequent cleanings, etc.
2. Is the institution able to sustain adequate testing levels to monitor the ongoing health of the institution? If inadequate, remain in Phase 1.
3. Is the institution able to sustain adequate staffing coverage for both custody and nursing posts? If inadequate, remain in Phase 1.
4. Does the institution have access to an adequate supply of personal protective equipment (PPE) and hand sanitizer should an outbreak occur? If inadequate, remain in Phase 1.
5. Has the institution instituted Physical Distancing with the ability to monitor, sustain, and enforce the measures successfully? If inadequate, remain in Phase 1.
6. Ongoing employee testing and contact tracing program in place.

## General Operation Provisions

*Phase 1*
- The institution has a current outbreak – three or more COVID-19 positive patients
- Movement and programming access severely restricted within the individual facility or institution

*Phase 2*
- The institution has outbreak contained
- Movement and program-area access within the facility or institution eased based on location and COVID status of the inmate population

*Phase 3*
- No current positive inmates
- Increased movement and program access

*Phase 4*
- Resumption of pre-COVID-19 programming. Note that this may include continuing precautionary measures such as face coverings, more frequent cleanings, etc.

## Health Care Operations

*Phase 1*
- Essential and critical health care appointments only.

*Phase 2*
- Careful resumption of routine clinical operations:
  - Episodic non-essential
  - High-risk and chronic care patients
  - Telemedicine (including ISUDT)
  - On-site specialty services

- Allow Mental Health services where physical distancing can be maintained
- Resume Dental

*Phase 3*
− Resume all clinical operations

## Institutional Operations

*Phase 1*
− The institution is closed to visitors, volunteers, and activities involving outside groups.
− No outside vendors, non-essential contractors, or non-employees permitted on institutional grounds, other than those who are essential for supplying the institution with needed goods.
  - ISUDT Program Providers, including Alcohol And Other Drug (AOD) Counselors; are essential contractors
− Inmate workforce limited to essential functions.
− Yard/feeding with the same population within the same housing unit.
− Limited dayroom access to the same rotating groups. Physical distancing to be maintained.
− No family visiting (overnight visits).
− Limited recreational dayroom access to allow physical distancing.

*Phase 2*
− Visitation limited to one visitor for one hour, per inmate per month. Tables in visiting rooms must be six feet apart, staggered schedule, mandatory masks, and tables disinfected between visits.
− Outside vendors, non-essential contractors, or non-employees may be permitted.
− Inmate workforce limited to essential functions.
− Continue yard/feeding access with the same population groups cohort.
− Continue limited dayroom access to the same rotating groups. Physical distancing to be maintained.
− Family visiting still prohibited.

*Phase 3*
− Expand visitation to allow two visitors to visit for one hour per inmate, twice per month. Tables set six feet apart, staggered schedule, mandatory masks, and tables disinfected between visits.
− Inmate workforce may be expanded beyond essential functions.
− Expand yard access to up to two housing units at a time or by isolated/quarantined, orientation status, or general population status cohorts.
− Expand dayroom access to allow for more inmates while ensuring they maintain physical distance.
− Re-open family visiting to allow for one family visit per week, per family visiting unit.

## Inmate Programs

Rather than prescribing a particular response to apply to all, individual institutions shall adapt to their local, changing needs. To that end, the roadmap conceptualizes many potential programming options as a "menu" from which institutions may select the program delivery methods which meet current operational and safety needs within the phased guidelines. These options include reduced group sizes, staggered schedules, outdoor, or programming in other non-traditional spaces to allow for physical distancing, tents, canopies, or modified hours. Best practices and solutions will be collected and shared with all institutions to add to the operations menu. The Division of Rehabilitative Programs (DRP) will

work with the In-Prison DRP CCIII to collect data on the conditions, and rationale leading to each institutional program decision and modification for historical and reporting purposes.

*Phase 1*
- All students receive independent study packets and teachers telework 2-4 days per week.
- Active Integrated Substance Use Disorder Treatment (ISUDT) participants receive Program Engagement Packets from ISUDT AOD Counselors.
- Inmates with legal deadlines may go to the law library so long as physical distancing is maintained. All others may request books, forms, and paging for library and law library access.
- Students may be administered educational assessments with approval from the Warden.
- The following programs remain closed: Offender Mentor Certification Program and Innovative Grants Program/Arts in Corrections.

*Phase 2*
- Law library limited to paging and where physical distancing can be achieved.
- Blended instruction: The number of students in class will be dependent on appropriate physical distancing. The remainder of students will receive independent study while not in class.
- Students shall be administered educational assessments if physical distancing permits.
- ISUDT Allow for Integrated/ Offender Mentor Certification Program services to resume in a group setting, but not to exceed a 1:6 ratio. Institutions may exceed these ratios if reasonable alternatives such as outdoor programming are available.
- Arts in Corrections/Innovative Grants Program/Inmate Self Help Groups where appropriate capacity exists to allow physical distancing.

*Phase 3*
- Continue blended instruction: Number of students in class will depend on appropriate physical distancing. The remainder of students will receive independent study while not in class.
- Inmates may use the library and law library, physical distancing permitting.
- Inmates are administered educational assessments, physical distancing permitting.
- ISUDT continues as in Phase 2. Integrated/Interventions for Sexual Offenders Program/Offender Mentor Certification Program services in a group setting using program option 'menu'.
- Expand reopening of Arts in Corrections/Innovative Grants Program/Inmate Self Help Groups by allowing the institution discretion to allow volunteers to return. Continue physical distancing.

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date:   April 10, 2020

To:     Associate Directors, Division of Adult Institutions
        Wardens
        Community Resources Managers

Subject: **COLLECTION AND DISTRIBUTION OF PRINTED REHABILITATIVE PROGRAMMING MATERIALS**

The purpose of this memorandum is to provide direction and guidance for the immediate acceptance and distribution of printed self-help rehabilitative programming materials from program providers for the inmate population.

The Division of Adult Institutions is authorizing acceptance of donated printed programming materials in the absence of in-person Inmate Activity Group (IAG) programming resulting from measures put into place to mitigate the spread of COVID-19. This initiative is distinct from IAG programming, and is not Rehabilitative Achievement Credit eligible.

The Wardens shall work with the Community Resources Manager (CRMs) Offices, Community Based Organizations (CBOs), and volunteers to determine which program providers are able to provide printed materials for distribution to the inmate population. The CRM Offices will take a lead role in this process, and shall be responsible for communicating with the CBOs and volunteers to secure printed materials; for reviewing submitted materials for inappropriate content and contraband; and for the collection and distribution of printed materials to the inmate population. Staff shall use appropriate Personal Protective Equipment when processing program material.

Based on the availability of printed materials and institution staffing, some institutions may be able to facilitate the collection and distribution of materials from various program providers to all program participants, while others may have to develop a plan to cycle through programs and/or facilities. Institution CRMs are encouraged to communicate and to share best practices throughout this initiative.

If you have any questions, please contact Crystal LeSieur, Staff Services Manager I, Community Partnerships Unit, Office of Policy Standardization, Division of Adult Institutions, via email at Crystal.LeSieur@cdcr.ca.gov.

CONNIE GIPSON
Director
Division of Adult Institutions

cc: Brant Choate      Paul Hail         Marco Barragan
    Kimberly Seibel   Kevin Hoffman     Crystal LeSieur
    Ryan Souza        Chantel Quint     Mark Tillotson

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date:    February 4, 2020

To:    Wardens
       Principals

Subject:    **APPROVED USAGE OF INDEPENDENT STUDY FOR CLASS CLOSURES**

An important part of the education process is the ability to continue to provide education services during lockdowns, program modifications, and specified class closures. Continuing education services to the inmate student population during modified programs and lockdowns is an expectation determined by the Warden with assistance from the principal. Providing education services to inmates housed in Administrative Segregation and/or Security Housing Units will be at the discretion of the Warden, as outlined in the institutions local operating procedures. This memo does not apply to the college programs.

Utilize the following process during lockdown and modified program status:

1.  A lockdown/modified program is determined by the institution administration and updated on the Program Status Report (PSR).

2.  When deemed appropriate by institution administration and articulated on the PSR, teachers will be authorized to begin distribution of independent study coursework to those inmate students locked down or on modified program.

3.  Upon extended lockdowns, where feasible, education instruction for inmate students may be televised over the Division of Rehabilitative Programs Television (DRP TV.) Teachers will remain responsible for the distribution and grading of independent study coursework related to instruction.

4.  Teachers will organize initial independent study coursework prior and during the first 72 hours of a lockdown in anticipation of potential lockdowns and modified programs.

5.  Teachers will prepare individual independent study coursework consistent with the individual inmate student's performance level and with course curriculum. Inmate students who have not been assessed by Education will not qualify to receive independent study coursework. Inmate students enrolled in Career Technical Education (CTE) courses are limited to 20% of the total course hours completed through independent study coursework. Coursework totals are listed in the curriculum tracking documents.

Wardens
Principals
Page 2

6. Teachers will be available to meet with their inmate students daily during inmate student class hours. It is possible that teachers may not be able to teach all inmates each day. However, teachers will see as many inmate students as possible within inmate student class hours and provide coursework from the adopted textbooks and approved supplemental materials. The principal will determine any exceptions.

7. Teachers will be responsible for wearing a Personal Alarm Device in the housing units.

8. Teachers will review and grade all coursework and provide appropriate feedback.

9. Inmate students must demonstrate understanding and knowledge of the curriculum prior to receiving the appropriate X time for completing the coursework.

The Office of Correctional Education (OCE) will identify any additional circumstances, if any, that allow independent study coursework to be utilized. Independent study coursework is required for inmate students enrolled in eLearning and Alternative Education (AE) classes. The AE coursework is to equal 8 hours weekly.

There is only one OCE approved independent study coursework option for class closures. No other class closure will qualify to continue education services via independent study coursework. The approved class closure is for a two-hour Professional Learning Community (PLC) meeting once a month. The principal will determine the time and location of the monthly meetings. The following is required prior to crediting the inmate student with the appropriate X (Assignment) credit.

Teachers will review and grade all inmate student coursework and provide appropriate feedback. Inmate students must demonstrate understanding and knowledge of the curriculum standards.

Utilize The following X time codes to reflect the type of inmate student contact time:

X: Apply X time when the inmate student is present in their assigned Education class, or is meeting face to face with a teacher.

X Modified (XM): Apply XM for inmate students assigned to Education classes who have completed independent study coursework due to an extended lockdown of over 72 hours. X Modified hours will align to the time associated with completed independent study coursework.

Wardens
Principals
Page 3


**X Assignment Credit (XA):** Apply XA for inmate students who participate in Education programs and have completed independent study coursework that corresponds to the number of hours established based on the average amount of time for completion.

Principals shall provide input regarding education class closures or delays to executive staff as PSRs are discussed.

If you have any questions regarding this memorandum, please contact the appropriate Regional Associate Superintendent:

| Central Region | Southern Region | Northern Region |
|---|---|---|
| Rod Braly | Jennie Wynn | Jennifer Winistorfer |
| (916) 708-7398 | (916) 508-5954 | (916) 217-7643 |
| Rod.Braly@cdcr.ca.gov | Jennifer.Wynn@cdcr.ca.gov | Jennifer.Winistorfer@cdcr.ca.gov |


SHANNON SWAIN
Superintendent
Division of Rehabilitative Programs

cc:    Ryan Souza
       Associate Directors-Division of Adult Institutions
       Shannon Swain
       Associate Superintendents
       Hillary Iserman
       Vice Principals

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date:   April 8, 2020

To:     Associate Directors, Division of Adult Institutions
        Wardens

Subject:   **COVID-RELATED CLEANING PROTOCOLS FOR INSTITUTIONS**

The California Department of Corrections and Rehabilitation's priority is to protect the health and well-being of our staff and the offender population as well as providing a safe environment. The purpose of the memorandum is to reduce staff and inmate exposure to the coronavirus (COVID-19) within our institutions by providing guidance on cleaning and disinfection protocols as recommended by the Centers for Disease Control and Prevention (CDC). Due to the current COVID-19 pandemic, and out of an abundance of caution, we are distributing information on best practices for cleaning and disinfecting your work areas.

According to the CDC definitions, retrieved March 3, 2020, from: https://cdc.gov/Coronavirus/2019-ncov/comunity/organizations/cleaning-disinfection:

*Cleaning - refers to the removal of dirt and impurities, including germs, from surfaces. Cleaning alone does not kill germs. But by removing the germs, it decreases their number and therefore any risk of spreading infection.*

*Disinfecting - works by using chemicals, for example EPA-registered disinfectants, to kill germs on surfaces. This process does not necessarily clean dirty surfaces or remove germs. But killing germs remaining on a surface after cleaning further reduces any risk of spreading infection.*

Staff are to ensure that assigned porters are thoroughly cleaning communal areas (dayrooms, showers, restrooms, offices, etc.) a minimum of twice per shift during second and third watches with the option to clean more often if needed. The area porters will initial the cleaning schedule template (see attachment) documenting the time it was complete. Staff will sign the sheet verifying that they have reviewed and ensured the additional cleaning was completed. As we increase our cleaning times, we must continue to practice social distancing when possible.

It is recommended staff increase the frequency in which they disinfect the touchpoints (i.e. telephones, tables, door knobs, desk areas, etc.) by using Sani Guard 24/7 in their work area. Once the Sani Guard has been applied to a surface, it should be allowed to set for 10 minutes to maximize its effectiveness.

Attached is essential information on the cleaning solutions used in the institutions, and dilution ratios for mixing Cell Block and Sani Guard 24/7.

If you have any additional questions, please contact your Mission Associate Director.

CONNIE GIPSON
Director
Division of Adult Institutions

# PROTOCOL:  CLEAN AND DISINFECT for emerging pathogen COVID-19

**Best Practices** :  CLEAN AND DISINFECT for emerging pathogen COVID-19

**Option 1** -

CELL BLOCK 64 - Refer to label instructions for Adenovirus type7. Mix 8oz of CELL BLOCK 64 to one gallon of water. Apply to surface, lightly agitate and let disinfectant set on the surface for a minimum of 10 minutes, then wipe clean.

**Option 2**  -

Clean with Cell Block 64 at the normal dilution ratio of 2 oz per gallon of water (chemical dispensers are set to this ratio). Apply Cell Block 64, agitate and let set on surface for a minimum of 10 minutes and wipe dry.  Apply SANI-GUARD 24/7 at 3 oz per 5 gallons of water (refer to Sani Guard 24/7 label instructions for H1N1).  Allow disinfectant to remain wet on the surface for a minimum of 10 minutes and wipe off or let air dry.

**Option 3**-

Disinfect only - **PLEASE NOTE**, surface must be free of debris and clean before applying Sani Guard 24/7.

Refer to product label instructions for H1N1.  Dilute 3oz of Sani Guard 24/7 to 5 gallons of water. Apply solution to non porous surfaces and remain wet for a minimum of 10 minutes.  Wipe or let air dry.

# CELL BLOCK 64 LABEL

**Please review the entire bottle label before use.**

## From the Cell Block 64 Label:

| | | | |
|---|---|---|---|
| DILUTION (1:64)<br>(650 ppm quat) | 2 oz per gallon of water<br>4 oz per 2 gallons of water | 8 oz per 4 gallons of water<br>10 oz per 5 gallons of water | 12 oz per 6 gallons of water |

### DIRECTIONS FOR USE

It is a violation of Federal law to use this product in a manner inconsistent with its labeling.

This product is not for use on medical device surfaces.

DISINFECTION /CLEANING/DEODORIZING DIRECTIONS: Remove heavy soil deposits from surface, then thoroughly wet surface with a use-solution of 2 ounces of the concentrate per gallon of water. Use 8 oz per gallon of water to kill Adenovirus Type 7.

The use-solution can be applied with a cloth, mop, sponge, or coarse spray or by soaking. For sprayer applications, use a coarse spray device. Spray 6-8 inches from the surface, rub with a brush, cloth or sponge. Do not breathe spray. Let solution remain on surface for a minimum of 10 minutes. Rinse or allow to air dry. Rinsing of floors is not necessary unless they are to be waxed or polished.

Food contact surfaces must be thoroughly rinsed with potable water. This product must not be used to clean the following food contact surfaces: utensils, glassware and dishes.

Continued directions for use

CLEANING AND DISINFECTING HARD NONPOROUS SURFACES ON PERSONAL PROTECTIVE EQUIPMENT RESPIRATORS:

Preclean equipment if heavily soiled to ensure proper surface contact. Add 2 oz of this product to one gallon of water. Use 8 oz per gallon of water to kill Adenovirus Type 7. Gently mix for a uniform solution. Apply solution to hard, nonporous surfaces of the respirator with a brush, coarse spray device, sponge, or by immersion. Thoroughly wet all surfaces to be disinfected. Treated surfaces must remain wet for 10 minutes. Remove excess solution from equipment prior to storage. Comply with all OSHA regulations for cleaning respiratory protection equipment (29 CFR §1910.134).

## From the Sani-Guard 24-7 Label:

**Sani-Guard 24-7** is a hospital Disinfectant. Bactericidal according to the current AOAC Disinfectants Use-Dilution Method. Fungicidal according to the AOAC Fungicidal Test; and Virucidal according to the virucidal qualification, modified in the presence of 5% organic serum, against Bacteria

| Bacteria | | |
|---|---|---|
| Burkholderia cepacia | Staphylococcus aureus [Staph] | *Hepatitis C Virus [HCV] |
| Campylobacter jejuni [Campylobacter] | Staphylococcus aureus | *Herpes Simplex Virus Type 1 [Herpes] |
| Corynebacterium ammoniagenes | Community Associated Methicillin-Resistant [CA MRSA] [NRS123] [USA400] | *Herpes Simplex Virus Type 2 [Herpes] |
| Escherichia coli [E. coli] | | *Human Coronavirus |
| Escherichia coli pathogenic strain O157:H7 [pathogenic E. coli] | Staphylococcus aureus - Methicillin-Resistant [MRSA] | *Human Immunodeficiency Virus Type 1 [HIV-1] [AIDS Virus] |
| Klebsiella pneumoniae [Klebsiella] | Yersinia enterocolitica | *Influenza A2 / Hong Kong Influenza Flu Virus |
| Listeria monocytogenes [Listeria] | Viruses | *Norovirus - Feline Calicivirus |
| Pseudomonas aeruginosa [Pseudomonas] | *Adenovirus Type 5 | *SARS Associated Human Coronavirus |
| Salmonella enterica [Salmonella] | *Adenovirus Type 7 | *Vaccinia Virus [Pox Virus] |
| Salmonella typhi [Salmonella] | *Hepatitis B Virus [HBV] | Fungi |
| Shigella dysenteriae [Shigella] | | Aspergillus niger |
| | | Trichophyton mentagrophytes |

**DILUTION:**

| | | |
|---|---|---|
| Disinfection (1:213) ...... 3 oz per 5 gallons of water<br>(450 ppm active quat) | Sanitizer (1:512) | 1:4 oz per gallon of water<br>(1 oz per 4 gallons of water) |
| Sanitizer (1:256) ...... 1:2 oz per gallon of water<br>(2 1/2 oz per 5 gallons of water) | | (1 1/4 oz per 5 gallons of water)<br>(200 ppm active quat) |
| (400 ppm active quat) | Sanitizer (1:640) | 1:5 oz per gallon of water<br>(1 oz per 5 gallons of water)<br>(150 ppm active quat) |

### DIRECTIONS FOR USE

It is a violation of Federal law to use this product in a manner inconsistent with its labeling.

### DISINFECTION / VIRUCIDAL*/ FUNGICIDAL / MOLD AND MILDEW CONTROL DIRECTIONS:

Add 3 oz of Sani-Guard 24-7 per 5 gallons of water (or equivalent dilution) to disinfect hard, nonporous surfaces.

Before use in federally inspected meat and poultry food processing plants and dishes. Food products and packaging materials must be removed from the room or carefully protected. When used on surfaces in areas such as locker rooms, dressing rooms, shower and bath areas and exercise facilities, this product is an effective fungicide against Trichophyton mentagrophytes, the athlete's foot fungus. Apply use-solution with a cloth, mop, sponge, coarse spray or by immersion thoroughly wetting surfaces. For sprayer applications, use a coarse spray device. Spray 6 - 8 inches from surface, rub with brush, sponge or cloth. Do not breathe spray.

**Note:** For spray applications, cover or remove all food products.

Treated surfaces must remain wet for 10 minutes. Wipe dry with a clean cloth, sponge or mop or allow to air dry. Rinse food contact surfaces such as counter tops, tables, picnic tables, exteriors of appliances and/or stove tops with potable water prior to reuse. Do not use on glasses, dishes or utensils as a disinfectant. For heavily soiled areas, preclean first.



Quality Products ★ Changed Lives ★ A Safer California

**Memorandum**

**Date:** March 25, 2020

**To:** CALPIA Healthcare Customers

**From:** California Prison Industry Authority ● 560 East Natoma Street ● Folsom, California 95630-2200

**Subject:** **SARS-CoV-2 Supplemental Communication**

CALPIA was notified by Lonza, LLC, manufacturer of components used in the production of Cell Block 64 and Sani-Guard 24-7, of the following:

On March 13, 2020 (updated March 19), EPA published an updated list N (https://www.epa.gov/pesticide-registration/list-n-disinfectants-use-against-sars-cov-2) for disinfectant products with emerging viral pathogen and Human Coronavirus claims for use against SARS-CoV-2, the cause of COVID disease.

"Inclusion on this list does not constitute an endorsement by EPA. There may be additional disinfectants that meet the criteria for use against SARS-CoV-2. EPA will update this list with additional products as needed."

Lonza, LLC offers many registrations that were evaluated and accepted by EPA under the Emerging Viral Pathogen program (EVP) listed in Annex 1, and Human Coronavirus listed in Annex 2.

Key clarification:
Annex 1 listed products can make efficacy claims against SARS-CoV-2 in accordance with EPA's Emerging Viral Program.

Annex 2 listed products can be used against SARS-CoV-2 by people only when Annex 1 products are not available. Lonza has submitted Annex 2 products to the EPA to make efficacy claims against SARS-CoV-2 in accordance with EPA's Emerging Viral program. This communication will be updated when Annex 2 product reviews are completed and accepted by the EPA to make claims.

For any supplemental registration based upon any of these listed EPA registered products, customers may make off-label* communications in the following formats:

Cell Block 64 (HWS-64)
COVID-19 is caused by SARS-CoV-2, a novel coronavirus. Cell Block 64 kills similar viruses and therefore can be used against SARS-CoV-2 when used in accordance with the directions for use against Adenovirus type 7 on hard, non-porous surfaces. Refer to the CDC website at https://www.cdc.gov/coronavirus/2019-ncov/index.html for additional information.

Sani-Guard 24-7 (BARDAC 205M-10)
COVID-19 is caused by SARS-CoV-2, a novel coronavirus. Sani-Guard 24-7 (BARDAC 205M-10) kills similar viruses and therefore can be used against SARS-CoV-2 when used in accordance with the directions for use against Norovirus on hard, non-porous surfaces. Refer to the CDC website at https://www.cdc.gov/coronavirus/2019-ncov/index.html for additional information.

If you have any questions, please contact CALPIA at chemicals@calpia.ca.gov.

*Label: The written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers. (https://www.epa.gov/sites/production/files/2018-04/documents/chap-03-mar-2018_1.pdf)



Specialty Ingredients

## ANNEX 1

| NUGEN® MB⁵A Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| NUGEN® MB⁵A-256 | 6836-361 | Norovirus (Norwalk Virus) or Rotavirus |
| NUGEN® MB⁵A -128 | 6836-362 | Norovirus (Norwalk Virus) or Rotavirus |
| NUGEN® MB⁵A -64 | 6836-363 | Norovirus (Norwalk Virus) or Rotavirus |

| NUGEN® MB⁵N Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| NUGEN® MB⁵N-256 | 6836-364 | Norovirus (Norwalk Virus) |
| NUGEN® MB⁵N-128 | 6836-365 | Norovirus (Norwalk Virus) |
| NUGEN® MB⁵N-64 | 6836-366 | Norovirus (Norwalk Virus) |

| Lonzagard® RCS™ Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| Lonzagard® RCS-256 Plus | 6836-349 | Enterovirus D68 or Norovirus |
| Lonzagard® RCS-256 | 6836-346 | Enterovirus D68 or Norovirus |
| Lonzagard® RCS-128 Plus | 6836-348 | Enterovirus D68 or Norovirus |
| Lonzagard® RCS-128 | 6836-347 | Enterovirus D68 or Norovirus |

| Lonzagard® R-82 Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| Lonzagard® R-82 | 6836-78 | Norovirus (Norwalk Virus) |
| Lonzagard® S-18 | 6836-77 | Norovirus (Norwalk Virus) |
| Lonzagard® S-21 | 6836-75 | Norovirus (Norwalk Virus) |
| Lonzagard® DC-103 | 6836-152 | Norovirus (Norwalk Virus) |
| Lonzagard® R-82F | 6836-139 | Norovirus (Norwalk Virus) |
| Lonzagard® S-18F | 6836-136 | Norovirus (Norwalk Virus) |
| Lonzagard® S-21F | 6836-140 | Norovirus (Norwalk Virus) |

| Lonzagard® HWS Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| Lonzagard® HWS-256 | 47371-129 | Adenovirus type 7 |
| Lonzagard® HWS-128 | 47371-130 | Adenovirus type 7 |
| Lonzagard® HWS-64 | 47371-131 | Adenovirus type 7 |
| Lonzagard® HWS-32 | 47371-192 | Adenovirus type 7 |

| Lonzagard® Bardac® 205M Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| Bardac® 205M 1.3% | 6836-277 | Norovirus (Norwalk Virus) |
| Bardac® 205M 2.6% | 6836-302 | Norovirus (Norwalk Virus) |
| Bardac® 205M 5.2% | 6836-303 | Norovirus (Norwalk Virus) |
| Bardac® 205M 7.5% | 6836-070 | Norovirus (Norwalk Virus) |
| Bardac® 205M 10% | 6836-266 | Norovirus (Norwalk Virus) |
| Bardac® 205M 14.08% | 6836-278 | Norovirus (Norwalk Virus) |
| Bardac® 205M 23% | 6836-305 | Norovirus (Norwalk Virus) |
| Bardac® 205M RTU | 6836-289 | Norovirus (Norwalk Virus) |

| Disinfecting Wipes Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| Lonzagard® Disinfectant Wipes | 6836-313 | Rotavirus |
| Lonzagard® Disinfectant Wipes Plus 2 | 6836-340 | Norovirus (Norwalk Virus) |

| NUGEN® EHP Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| NUGEN® EHP RTU | 6836-385 | Norovirus (Norwalk Virus) |
| NUGEN® EHP Wipe | 6836-388 | Norovirus (Norwalk Virus) |

COVID-19 Communication 3-25-2020



**Specialty Ingredients**

**Lonza**

### ANNEX 2

| Bardac® 205M Family | EPA Reg. # | Coronavirus Claim |
| --- | --- | --- |
| Bardac® 205M 50% | 6836-233 | Human Coronavirus |
| | | SARS Associated Coronavirus |

| Disinfectant wipes Family | EPA Reg. # | Coronavirus Claim |
| --- | --- | --- |
| NUGEN® 2M Disinfectant wipes | 6836-372 | Human Coronavirus |
| | | SARS Associated Coronavirus |
| Lonzagard® Disinfectant Wipes Plus | 6836-336 | Human Coronavirus |
| | | SARS Associated Coronavirus |

COVID-19 Communication 3-25-2020

## Cleaning Schedule Week of:_____

| | 1st Watch | | 2nd Watch | | 3rd Watch |
|---|---|---|---|---|---|

**Monday**

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

**Tuesday**

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

**Wednesday**

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

**Thursday**

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

**Friday**

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

**Saturday**

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

**Sunday**

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

Area:_____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom | | | |

Inmate Name:_____
Staff Signature:_____

*Please ensure there are disinfectant and paper towels near ALL telephones
*Cleaning at a minimum of every 3 hours

## Camp Cleaning Schedule Week of: _____

| 1st Watch | 2nd Watch | 3rd Watch |
|---|---|---|

**Monday** — Date: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

**Tuesday** — Date: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

**Wednesday** — Date: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

**Thursday** — Date: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

**Friday** — Date: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

**Saturday** — Date: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

**Sunday** — Date: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

Area: _____

| Areas | Time | Time | Time |
|---|---|---|---|
| Restroom | | | |
| Showers | | | |
| Sinks | | | |
| Dayroom/TV room | | | |
| Kitchen | | | |
| Weight Pile | | | |

Inmate Name: _____
Staff Signature: _____

*Please ensure there are disinfectant and paper towels near ALL telephones
*Cleaning at a minimum of every 3 hours

DocuSign Envelope ID: 96967D6B-6DA1-449D-A177-06A3AC5C6A13

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| Date: | 9/11/2020 |
|---|---|
| **To:** | Chief Executive Officers- Enhanced Outpatient Program Hub Institutions |
| | Chiefs of Mental Health- Enhanced Outpatient Program Hub Institutions |
| | Chief Psychiatrists |
| | Senior Psychiatrist, Supervisors |
| **From:** | *Amar Mehta* |
| | AMAR MEHTA, M.D. |
| | Deputy Director |
| | Statewide Mental Health Program |
| **Subject:** | **COVID-19 OPERATIONS EOP HUB CERTIFICATION PROCESS** |

During the time in which COVID-19 impacts day-to-day operations within the California Department of Corrections and Rehabilitation (CDCR), Statewide Mental Health Program, the following process shall be followed for the Enhanced Outpatient Program (EOP) Administrative Segregation Unit (ASU) Hub and Psychiatric Services Unit (PSU) certifications. This process is temporary in conjunction with all other COVID-19 operational plans and will be assessed for continuous use as normal operations resume.

    **I.**    **On-site audits shall be conducted as follows:**

1. On site by qualified institution staff per standard EOP ASU HUB and PSU certification requirements. Audits shall be conducted on-site, unless limited by COVID-19 issues.

2. If there are no qualified institution staff available to conduct on-site audits in person due to staffing reductions secondary to COVID-19 issues, auditors may use video equipment or call into the Inter-Disciplinary Treatment Teams (IDTTs), Institution Classification Committees (ICCs), groups, and huddles to conduct audits.

   Completion of these remote audits shall be noted on the hub certification audit form and any limitations shall be documented in the audit summary.

3. If there are no qualified institution staff available to conduct the audit, either in person or via tele/video conference, the institution Chief of Mental Health shall request assistance from the Mental Health Regional Administrator, who will assign a qualified regional staff member to complete the audit remotely.

DocuSign Envelope ID: 96967D6B-6DA1-449D-A177-06A3AC5C6A13

# MEMORANDUM

Completion of these remote audits by regional staff shall be noted on the hub certification audit form, and any limitations shall be documented on the audit worksheet and in the audit summary (e.g., section II, number 1b, *IDTTs Meeting All Audit Criteria*).

## II.    Addressing program changes related to COVID:

1. IDTTs or ICCs held in absentia (i.e., patient is not present) due to COVID-19 risks or restrictions shall be documented on the hub certification audit form. Any limitations shall be documented on the audit worksheet and in the audit summary on the certification form (e.g., section II, number 1b, *IDTTs Meeting All Audit Criteria*).

2. If any audits cannot be conducted due to COVID-19 restrictions (e.g., group audits are not done because groups are not offered), these limitations shall be documented on the audit form where audit results are captured and in section III of the hub certification audit form that is signed by the Chief of Mental Health and Chief Executive Officer. Justification shall include the reason the audit could not be conducted, which must be directly related to COVID-19 restrictions.

## III.    Not Meeting Hub Certification Criteria

1. <u>Certification Recommendation</u>

   If performance limitations are directly due to COVID-19 restrictions, "has met with explanation" may be selected certification recommended if all the following are true:

   - Performance gaps are not due to a systemic issue unrelated to COVID-19; the program was meeting performance requirements before COVID-19 restrictions and is expected to return to prior performance standards.
     - This will be measured in comparison to the prior two months of performance. If performance met standards and new long term issues unrelated to COVID-19 restrictions are not impacting performance then certification may be recommended if the following are also true.
   - Despite not meeting certification criteria due to COVID-19 limitations, there continues to be on site institutional and regional (remotely) oversight of the program.
   - Clinically effective alternative treatment and other offerings (e.g. in cell activities, rounds, additional small yard time, etc.), that  mitigate the effects of the performance limitations caused by COVID-19, are being provided, and are documented as described in section 2 below.

DocuSign Envelope ID: 96967D6B-6DA1-449D-A177-06A3AC5C6A13

# MEMORANDUM

2. <u>Documentation</u>
If certification criteria are not met as a result of COVID-19 restrictions and "has met with explanation" is selected, document the following in section III of the hub certification audit form.

- The audit or indicator name
- The percentage achieved, including numerator and denominator
- The reason the certification criteria was not achieved, which must be directly related to COVID-19 restrictions.
  - Note that the performance concern is temporary and due to COVID-19 restrictions/limitations and provide specific limitations. If this is due to a systemic issue NOT related to COVID-19, DO NOT recommend certification.
- A description of treatment and services, including clinically effective alternative treatment and other offerings that mitigate the effects of the performance limitations caused by COVID-19 (e.g. in cell activities, rounds, additional small yard time, provision of tablets, phone calls, etc.) for each item that is designated "has met with explanation."
- The date(s) the programming was reduced (e.g., ASU building 12 was on quarantine from March 3, 2020 to March 12, 2020. During this time, group treatment was not offered, and there was no patient movement. The quarantine was lifted March 13, 2020 and offering 10 hours of group treatment per week resumed).

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@CDCR.

cc: Steven Cartwright, Psy.D.
Angela Ponciano
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Travis Williams, Psy.D.
Shama Chaiken, Ph.D.
Amber Carda, Psy.D.
Andrew Mendonsa, Psy.D
Daisy Minter, Ph.D.
Jennifer Johnson
Regional Mental Health Administrators
Regional Health Care Executives

Addendum for Certifying Met With Explanation Due to COVID-19 Restrictions

If a hub meets certification with explanation due to COVID-19 restrictions, the below section must be completed for each audit or indicator that failed to meet 90% compliance and included with certification form.

The audit or indicator name:


The percentage achieved, including numerator and denominator:


The reason the certification criteria was not achieved, which must be directly related to COVID-19 restrictions.


The treatment and services, including constructive mitigation factors, provided instead of the Program Guide required services not being offered.


The date(s) the programming was reduced: