1              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF CALIFORNIA
2                      --oOo--

3   RALPH COLEMAN, ET AL,      ) Docket No. 90-CV-520
                                ) Sacramento, California
4                  Plaintiffs,  ) October 23, 2020
                                ) 9:24 a.m.
5           v.                  )
                                )
6   GAVIN NEWSOM, ET AL.,       ) Re: Evidentiary Hearing
                                )
7                  Defendants.  )

8              TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE KIMBERLY J. MUELLER
9            UNITED STATES DISTRICT JUDGE

10  APPEARANCES (Via Zoom):

11  For the Plaintiffs:    ROSEN BIEN GALVAN & GRUNFELD, LLP by
                           MR. ERNEST GALVAN
12                         MR. MICHAEL BIEN
                           MS. LISA ADRIENNE ELLS
13                         MR. THOMAS NOLAN
                           50 Fremont Street, 19th Floor
14                         San Francisco, CA 94105

15                         MS. JESSICA WINTER
                           MS. AMY XU
16                         101 Mission Street, Sixth Floor
                           San Francisco, CA 94105
17
        (Appearances continued next page.)
18
                 JENNIFER COULTHARD, RMR, CRR
19                   Official Court Reporter
                   501 I Street, Suite 4-200
20                   Sacramento, CA 95814
                     jenrmrcrr2@gmail.com
21                      (530)537-9312

22      Mechanical Steno - Computer-Aided Transcription

23

24

25

```
 1    APPEARANCES (Via Zoom Cont'd)

 2    For the Defendant:        OFFICE OF THE ATTORNEY GENERAL by
                                MR. KYLE ANTHONY LEWIS
 3                              MR. ADRIANO HRVATIN
                                MS. ELISE THORN
 4                              MS. MONICA ANDERSON
                                MS. NAMRATA KOTWANI
 5                              455 Golden Gate Avenue, Suite 11000
                                San Francisco, CA 94102
 6
                                OFFICE OF THE ATTORNEY GENERAL by
 7                              MR. LUCAS L. HENNES
                                1300 I Street, Suite 125
 8                              Sacramento, CA 94244

 9
      Also Present:            MATTHEW LOPES
10                             Special Master
                               HAVEN GRACEY
11                             Law Clerk for Chief Judge Mueller

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2    WITNESSES                                          PAGE

3    DR. KATHERINE WARBURTON
          Direct By Mr. Hennes ...................... 36
4         Cross By Ms. Ells ........................ 63
          Redirect By Mr. Hennes ................... 86
5         Recross By Ms. Ells ...................... 89

6    DR. AMAR MEHTA
          Direct By Mr. Lewis ...................... 92
7         Cross By Ms. Winter ..................... 123
          Redirect By Mr. Lewis ................... 149
8         Recross By Ms. Winter ................... 151
          Redirect By Mr. Lewis ................... 154
9
     DR. JOSEPH BICK
10        Direct By Mr. Lewis ..................... 156
          Cross By Mr. Galvan ..................... 170
11        Redirect By Mr. Lewis ................... 201

12   DR. ADAM LAURING
          Direct By Ms. Ells ...................... 212
13        Cross By Ms. Thorn ...................... 231
          Redirect By Ms. Ells .................... 253
14
     DR. PABLO STEWART
15        Direct By Mr. Nolan ..................... 256
          Cross By Ms. Thorn ...................... 277
16
     DR. JOSEPH BICK
17        Rebuttal By Mr. Lewis ................... 288

18   DR. KATHERINE WARBURTON
          Rebuttal By Mr. Hennes .................. 292
19
     DR. AMAR MEHTA
20        Rebuttal By Mr. Lewis ................... 298
          Cross on Rebuttal By Mr. Galvan ......... 302
21

22

23

24

25
```

1                        E X H I B I T S

2    DEFENSE EXHIBITS                                     PAGE

         No. 22     ................................. 48
3          No. 9      ................................. 123
         No. 10     ................................. 123
4          No. 12     ................................. 123
         No. 32     ................................. 170
5          No. 43     ................................. 170

6          No. 15     ................................. 183
         No. 101    ................................. 123
7          No. 56     ................................. 181
         No. 97     ................................. 201
8          No. 99     ................................. 215
         No. 103    ................................. 228
9          No. 107    ................................. 228
         No. 100    ................................. 273

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          SACRAMENTO, CALIFORNIA, FRIDAY, OCTOBER 23, 2020

2                              --oOo--

3      (In open court.)

4          THE CLERK:  The United States District Court for the

5   Eastern District of California is now in session.  Chief

6   District Judge Kimberly J. Mueller now presiding.

7          Calling Civil Case No. 90-520, Coleman, et al. v.

8   Newsom, et al.  This is on for an evidentiary hearing.

9          THE COURT:  All right.  Good morning.  I'm going to

10  ask for appearances, and I'll have lead counsel -- I'll call on

11  lead counsel and then have lead counsel introduce the team for

12  today.  So Mr. Bien, is that you for the plaintiffs?

13         MR. BIEN:  Yes, Your Honor.

14         Michael Bien, Rosen, Bien, Galvan & Grunfeld,

15  appearing on behalf of plaintiffs along with Lisa Ells, Earnest

16  Galvan, Tom Nolan, Jessica Winter and Amy Xu.

17         THE COURT:  All right.  Good morning to all of you.

18         And for the defense, Mr. Lewis, you're lead?

19         MR. LEWIS:  Yes.  Good morning, Your Honor.

20         Kyle Lewis appearing for defendants.  Appearing with

21  me will be Elise Thorn, Lucas Hennes, Monica Anderson, Adriano

22  Hrvatin and Namrata Kotwani.  Thank you, Your Honor.

23         THE COURT:  All right.  Good morning to you all.  And

24  Special Master Lopes is monitoring the proceeding.  I see you

25  there, Special Master Lopes.  You can see and hear the Court?

1          SPECIAL MASTER LOPES:  I can, Your Honor.

2          THE COURT:  All right.  And then quite a few other

3    persons are monitoring the hearing.

4          Several housekeeping matters.  Most of them we can run

5    through quickly, I believe, and then there's a motion in

6    limine.  I've received the stipulation regarding the

7    authenticity of documents.  Thank you for that.

8          I note that there may be rebuttal witnesses.  We'll

9    address that question when we come to it.

10          In terms of exhibits, we're using a new tool.  This is

11    the Court's first day for using this tool, but Ms. Schultz

12    tells me we're ready to go.  I'm really dependent on her and

13    appreciate her doing what she has needed to do to be certain

14    the Court is ready and also helping you be oriented to use of

15    that tool.

16          The Court's plan would be to retain electronic copies

17    of the exhibits.  I would, if I understand correctly, would be

18    making a copy and retaining the copies for as long as needed

19    for me to finish my work following the hearing, but then I

20    would not retain the exhibits after that.  My initial reaction

21    is, it's too vague to be useful, but I'll let you know if I

22    need more.  I know there's a request to exclude witnesses, so

23    before we turn to the motion in limine, is it plaintiffs only

24    that are moving to exclude witnesses?  Who's handling this?

25          MS. ELLS:  I will, Your Honor.

1    Yes.  Plaintiffs are moving to exclude witnesses from

2    the courtroom until after they've completed their testimony.

3    THE COURT:  All right.  And the defense is opposing

4    that request in full and, if so, who's responding to that?

5    MR. LEWIS:  That will be me, Your Honor, Kyle Lewis.

6    Your Honor, given the breadth of this -- potential

7    breadth of this hearing as well as both the important issues

8    that are going to be discussed across the three witnesses, two

9    of which Your Honor had called for, we believe that the

10    witnesses should be allowed to attend the hearing because they

11    will be able to provide information particularly in the short

12    timeframe which we envision so that we can be most efficient to

13    provide information to the Court and respond to all the

14    questions that may come up.  So we would ask that the three

15    witnesses be allowed to attend the hearing for the purposes of

16    supplementing their testimony and making sure that they are

17    addressing all of the issues that come up.

18    THE COURT:  So is the representation that their

19    presence is essential to presenting the defense position?

20    MR. LEWIS:  Yes, Your Honor, as well as in an

21    efficient manner.

22    THE COURT:  All right.  Efficiency is one thing.

23    Essential to the presentation of the defense position is

24    another.

25    Your response to the defense position that the

 1    witnesses' presence is essential to the defense presentation of

 2    its case?

 3          MS. ELLS:  Your Honor, it's not.  The attorneys are

 4    perfectly capable of controlling to ensure efficiency of

 5    testimony, to ensure things are not covered and not what other

 6    witnesses have already spoken about, and there is a real effect

 7    of witnesses being influenced by the testimony that they hear

 8    before them.  And on that basis, we feel like it's

 9    inappropriate, particularly in this type of situation, to allow

10    the witnesses to hear other testimony.  It's traditional that

11    rebuttal to new materials occurs and the witnesses should be

12    excluded.

13          THE COURT:  All right.  I'm going to grant the motion,

14    given the nature of this proceeding, a contested proceeding.  I

15    think it's consistent with preserving the integrity of the

16    proceeding.  If there's some inefficiency, we'll work with

17    that, and if we need more time, we'll work with that, but I

18    think under the text and the spirit of Rule 615, the motion is

19    supported.

20          We don't really need to think about it, but I gather

21    the parties are contemplating that an oral closing argument

22    will be sufficient without any request for briefing.  Do I have

23    that right?  And who can answer that for the plaintiffs?

24          MS. ELLS:  Your Honor, we're always open to briefing

25    by paper, but defendants had requested an oral closing only, so

1   we are amenable to either one.

2           If the Court would find it more helpful for us to

3   provide a brief about the hearing today, we are certainly

4   amenable to doing that, and it may help the Court sift through

5   the record.

6           THE COURT:  Mr. Lewis?

7           MR. LEWIS:  Your Honor, one of the reasons why we

8   proposed that schedule was because Your Honor did set this for

9   a hearing on one day, so we were trying to make sure to -- as

10  I've said, efficiency being one of the main things.  However,

11  if it comes out at the end of the day that perhaps written

12  closings, for lack of a better word, are a way to encapsulate

13  all the information both for time and to educate the Court as

14  best as possible, defendants can assess that towards the end of

15  the hearing.

16          THE COURT:  All right.  We'll revisit that when we get

17  to the point for closing argument.

18          I don't have any other housekeeping before we turn to

19  the motion in limine.  Let me just ask is there any other

20  housekeeping before I hear some argument on that motion,

21  Mr. Bien, Ms. Ells?

22          MS. ELLS:  No, Your Honor.

23          MR. BIEN:  I'm just going to ask, the Court made a

24  reference to a declaration from the Secretary Clendenin.  I'm

25  not sure that we have received that or are concerned with that.

1   Is that correct?  I don't know what you're talking about, Your

2   Honor.

3            THE COURT:  I think it might be buried on the docket

4   someplace --

5            MR. BIEN:  Okay.

6            THE COURT:  -- and in an electronic folder.  It's on

7   the docket.  It's very -- it's very short, so . . .

8            MR. BIEN:  Okay.  I apologize for missing it.

9            THE COURT:  The suggestion was that it mooted the need

10  to have her called as a witness.  She's not identified as a

11  witness for today.  I'll determine if I need to hear more from

12  her.

13           MS. ELLS:  Your Honor, I realize there actually is one

14  more bit of housekeeping.  We have agreed to let a number of

15  representatives for the defendants observe the proceedings.  We

16  would request that they not be permitted to communicate with

17  witnesses in advance of their testimony or during their

18  testimony.

19           THE COURT:  All right.  That would be consistent with

20  the motion to exclude, agreed, Mr. Lewis?

21           MR. LEWIS:  Actually, no, Your Honor, the reason being

22  that many of the people that are in the observation room are

23  either counsel for some of the witnesses, actually defendants.

24  There are at least two defendants in the observation room.  And

25  I believe that preventing -- defendants have absolutely no

1    problem with the idea that they would not communicate with the

2    witnesses while they're testifying.  No one will be

3    communicating with anyone during -- of course during testimony

4    except for, obviously, the questioning attorney.  But it would

5    be improper to not allow counsel or defendants to confer with

6    either the people that work for them or their clients, who may

7    be witnesses, before their testimony.  Obviously during their

8    testimony, absolutely, but before their testimony we believe

9    tramples upon the attorney-client relationship and is not

10   called for.

11           THE COURT:  Ms. Ells, brief reply?

12           MS. ELLS:  Your Honor, in a traditional hearing we

13   would be communicating with clients or witnesses over breaks

14   only, so the constant stream of possible communication that can

15   occur during a virtual hearing is more problematic, so we would

16   request that any such communications occur during breaks.

17           THE COURT:  All right.  Does that work for you,

18   Mr. Lewis?

19           MR. LEWIS:  No, Your Honor, because if we are to look

20   at this as a courtroom, a virtual courtroom, there's nothing to

21   say that a person who's sitting next to a potential witness

22   cannot lean over during a proceeding and talk about things or

23   anything like that.  So I would say that that would be

24   inappropriate, just an inappropriate muzzling of possibly an

25   attorney trying to confer with their client.

1    THE COURT:  Well, if the witnesses are excluded, that

2    can't be happening during a hearing that an attorney is

3    monitoring.

4        So look, Rule 615, the purpose of exclusion is so that

5    witnesses cannot hear other witnesses' testimony.  So any

6    transmission of the content of a witness's testimony as given

7    during the proceeding is precluded by the Court's exclusion

8    order; the consultation on breaks is not.  So hopefully that

9    provides sufficient clarity.  And this subject can be the

10   subject of questioning, of course, once the witness is called.

11       Any other housekeeping from the plaintiffs?

12       MS. ELLS:  No, Your Honor.

13       THE COURT:  Housekeeping for the defendants,

14   Mr. Lewis, other than the motion in limine?

15       MR. LEWIS:  Nothing at this time, Your Honor.

16       THE COURT:  All right.  On the motion in limine, who's

17   going to argue in response to that?  Is that Ms. Ells or

18   Ms. Winter?

19       MS. ELLS:  I will, Your Honor.

20       THE COURT:  All right.  All right.  Five minutes max,

21   response to the motion filed last night.

22       MS. ELLS:  Thank you, Your Honor.  Obviously we

23   received it after business hours last night so have not had

24   much ability to prepare; however, the same issues that are

25   raised in here, the defendants raised in their joint statement

1    regarding witnesses and exhibits.  The issue was essentially

2    briefed at that point.  These are witnesses that are well known

3    to defendants.  Dr. Stewart has testified many times in this

4    case.  Dr. Lauring was a public health expert for the Plata

5    receiver in recent months, and he has submitted testimony

6    multiple times in the Plata case as well.  We followed the

7    procedures of structure permitted by the Court, and defendants

8    asked us for the topics that our witnesses would testify to,

9    and we gave them to them.  There was no additional request for

10   documents.  We have disclosed all of the documents that they

11   will be relying on in their testimony, and there's no prejudice

12   here.

13          I will also note that when the trial was originally

14   scheduled back in May, this Court gave defendants five days

15   notice of our witness.  We submitted our witness disclosure

16   five days in advance of when that trial would be, and

17   defendants didn't complain at all at that point.  They have had

18   two weeks to consider these witnesses.  We had told them what

19   the topics they will testify about will be, and we have

20   provided every document to them that these witnesses have been

21   provided and will rely on.

22          THE COURT:  How does Dr. Stewart, in particular, fall

23   within the scope of the hearing?

24          MS. ELLS:  So defendants' obligation here is to prove

25   that the denial of in-patient care is warranted and does not

 1    exacerbate the constitutional violations.

 2         Dr. Stewart will testify to the harm of in-patient

 3    delays for the people that are being excluded from DSH right

 4    now, the lasting harm to them caused by the suffering that they

 5    are undergoing while they're waiting months to transfer for

 6    care that everybody agrees that they need.  And he will testify

 7    as well to the lack of adequate care in the settings where they

 8    are right now to treat their mental health disabilities.

 9         THE COURT:  How is that not, at most, potentially a

10    rebuttal?  Is that not rebuttal testimony?  I'm looking at the

11    three -- I mean, there's three factual issues before the Court,

12    right?  So how does harm fit within those factual issues?

13         MS. ELLS:  So the first -- the defendants have said

14    that they will maintain their position that they are in

15    compliance with the program guide and the April 24th order and

16    that the deviations that they are undertaking are warranted,

17    and we think the harm goes directly to whether or not they are

18    warranted.  This is about a balancing of mental health risk

19    versus COVID risk and a balancing of mental health clinical

20    care against COVID risk.  That is directly what the basis for

21    the justification for these deviations will be about.  It's

22    about whether or not these specific restrictions are

23    appropriate, given the need for in-patient care for these

24    clients and what happens to them if the restrictions are

25    continued.

1          THE COURT:  All right.  And is it your representation

2    that Dr. Stewart is not available?  Do I understand that

3    correctly?

4          MS. ELLS:  Your Honor, he has limited availability in

5    general, and Dr. Lauring also was more up to speed on the

6    issues in this case, given his role in the Plata public health

7    proceedings.

8          THE COURT:  All right.  So Ms. Thorn, you're

9    responding?

10         MS. THORN:  Yes, Your Honor.

11         THE COURT:  Let me just ask -- help me understand

12   prejudice.  How can there be prejudice given -- if plaintiffs

13   are correct -- the defense knowledge of these witnesses and

14   what they would say, first of all; and then secondly, your

15   response to the arguments regarding Dr. Stewart's fitting under

16   the -- within the parameters for this hearing.

17         MS. THORN:  First of all, I take exception with

18   Ms. Ells' representation that the plaintiffs provided us with

19   all of the information regarding their expert's opinions.

20         In fact, we just heard Ms. Ells give several examples

21   or details on the nature of Dr. Stewart's testimony and

22   opinions which we have not received so far.  We simply got a

23   statement that Dr. Stewart will speak to the harm to patients

24   denied timely access.  So that, in and of itself, is not a

25   representation regarding the opinions Dr. Stewart will speak

1    to.

2         The same is true for Dr. Lauring.  Plaintiff said --

3    only provided the information that he will speak to the

4    appropriateness of defendants' COVID-related restrictions on

5    transfers to DSH from a public health perspective.

6         Just eleven days ago we received the identification of

7    these witnesses.  We asked from the get-go, please let us know

8    what are they going to be saying.  And so this motion is about

9    the notion of fair play and the ability of defendants to put on

10   a case and defend against any opinions that these experts are

11   going to be providing.

12        We did get some documents recently; plaintiffs have

13   identified additional exhibits.  But that identification didn't

14   specify which of the experts would be handling which exhibits

15   and didn't provide any details on the opinions, and it's simply

16   contrary to Rule 26 that these kind of disclosures should be

17   provided in advance of trial, and we're simply asking for that

18   opportunity.  To have to learn what their opinions are today is

19   simply unfair.

20        I note that Ms. Ells talked about the traditional

21   application of court rules and procedures when it comes to the

22   exclusion of witnesses.  We would ask for that same

23   consideration, Your Honor, in obtaining more information

24   upfront about these witnesses or at least an opportunity to be

25   able to hear their opinions, digest them and then have some

1    kind of response, perhaps in writing.  As far as --

2        THE COURT:  So any prejudice could be cured.

3        Let me just understand.  Have the parties scrupulously

4    been proceeding on the assumption that Rule 26 applies

5    reciprocally?  Ms. Thorn, that's your --

6        MS. THORN:  That's true, Your Honor.  I mean,

7    typically, and even in Coleman, we've had an expert witness or

8    an expert designated, and they would provide a declaration

9    setting forth their opinions.  That has been the situation in

10   this proceeding, absolutely.

11       And so we expected plaintiffs, when they represented

12   to us during our meet and confer that they would be providing

13   us information regarding what their experts would be testifying

14   to, we expected to receive that information.  We did not and we

15   were asked repeatedly, as you can see in the exhibits to my

16   declaration.  And so we're simply asking for that opportunity.

17   It's impossible for us to guess, based on the very broad

18   description of the nature of their opinions.  We just have a

19   description of the nature of them.

20       THE COURT:  I've read those.

21       MS. THORN:  Okay.

22       THE COURT:  Let me ask Ms. Ells that question, I

23   guess, first.  So to the extent the defense has any expert

24   they've provided exactly what they're asking for to plaintiffs.

25   Ms. Thorn?

1          MS. THORN:  Well, Your Honor, we haven't called

2    expert -- testifying experts for our proceeding here.  We

3    have -- actually are calling our percipient witnesses to

4    address the Court's questions, so that hasn't even been raised.

5    And we didn't discuss that at our meet and confer before filing

6    the joint statement.

7          THE COURT:  All right.  Ms. Ells, brief response to

8    the points Ms. Thorn has just made?

9          MS. ELLS:  Your Honor, nobody has referenced Rule 26

10   before I saw it in the papers last night.  There was no request

11   for a Rule 26 disclosure.  If defendants wanted something along

12   the lines of a report or a discovery in advance of this

13   proceeding, they should have moved for that.

14         This Court's procedure specifically said to identify

15   the witnesses.  It didn't even say to identify the topics, but

16   we did so, and we disclosed every document that they are

17   relying on and every document that they reviewed.

18         Moreover, Ms. Thorn represents that they've had eleven

19   days to consider these witnesses, but their own papers say that

20   October 8th was the date that we had meet-and-confer discussion

21   and provided information about these witnesses.  It's been well

22   over two weeks.

23         And if they wanted to file a motion seeking additional

24   discovery about these witnesses, they could have done so, but

25   they waited until the night before trial to even mention Rule

1    26 at all, and that's simply, you know, that's simply not

2    appropriate.

3            THE COURT:  So two follow-up questions.  Have the two

4    witnesses challenged by the motion in limine -- are --

5            COURT REPORTER:  I'm sorry, Your Honor, I'm not

6    hearing your audio.

7            Am I the only one that can't hear her audio?

8            MR. BIEN:  No.  She was frozen for me as well, Madam

9    Court Reporter.

10           COURT REPORTER:  Okay.  I'm sorry, Your Honor.  I lost

11   your audio.  The last thing I have you saying is "Have the two

12   witnesses challenged by the motion in limine . . . "

13           THE COURT:  All right.  I'm actually at the courthouse

14   to make certain I have the best possible Wi-Fi connection, but

15   please let me know any time that occurs.

16           So the two witnesses challenged by the motion, the

17   plaintiffs do plan to elicit an expert opinion from them; is

18   that correct, Ms. Ells?

19           MS. ELLS:  Yes.

20           THE COURT:  All right.  Have they prepared a report

21   for the plaintiffs or a declaration?

22           MS. ELLS:  No.

23           THE COURT:  All right.

24           MS. THORN:  Your Honor, if I may respond just to --

25           THE COURT:  Just briefly on the -- the last thing -- I

1    just want to understand your position on scope, and

2    particularly with respect to Dr. Stewart.  Ms. Thorn?

3              MS. THORN:  So, Your Honor, the description of what

4    he's going to testify to is rather broad.  So we understand

5    that plaintiffs believe that I guess it was the harms of the

6    inpatient delays or harm of transfer to inpatient care caused

7    by the COVID delays responds to whether or not the defendants

8    have complied with the program guide requirements for the

9    transfer to inpatient care.

10             Certainly whether or not the program guide transfer

11   timelines of 30 days to ICF care in DSH as well as the policy

12   approved by this Court setting forth the addendum to the

13   transfer guide timelines, really that question has nothing to

14   do with whether or not the patients have been harmed by any

15   length of delay that they may have incurred.

16             So, you know, I -- without having more from

17   Dr. Stewart, it's hard to actually answer that question,

18   frankly, but I think Lisa -- Ms. Ells said that Dr. Stewart's

19   testimony goes to that first question, and so we would dispute

20   that his testimony falls within the scope of this hearing --

21             THE COURT:  All right.

22             MS. THORN:  -- in that representation.

23             THE COURT:  The defendants are going first in this

24   proceeding; is that correct?

25             MS. THORN:  That's right, Your Honor.

1          THE COURT:  All right.  I've heard enough to get my

2     arms around this, so I'm going to defer a final decision.

3          I want to hear the defendants' testimony to help make

4     a final decision about scope and whether Dr. Stewart or the

5     testimony proposed for Dr. Stewart would fall under the scope

6     of the hearing as developed through the testimony.

7          In terms of opinions, I would direct the plaintiffs,

8     to the extent there are summary opinions, to provide those to

9     the defendants before calling those witnesses.

10         We will take a lunch break, and so during the lunch

11    break the plaintiffs could do that.  It would be just bullet

12    point, executive summary of bottom line opinions the plaintiffs

13    would expect to elicit.

14         All right.  So that's what I am deciding for now.

15    I'll let you know before the plaintiffs begin their

16    presentation of evidence whether or not I'm granting a full

17    exclusion.

18         MS. THORN:  Thank you.

19         THE COURT:  Is that sufficient clarity for you to work

20    with, Ms. Ells -- Ms. Thorn?

21         MS. THORN:  Yes.  Thank you, Your Honor.

22         THE COURT:  Ms. Ells?

23         MS. ELLS:  Thank you, Your Honor.

24         THE COURT:  All right.  I believe now we're prepared

25    to begin with the presentation of evidence, so any witnesses

1   that are currently in the virtual courtroom should excuse

2   themselves except for the first defense witness.

3          MR. LEWIS:  Your Honor, if I may, this is Kyle Lewis.

4   We had discussed possibly having opening statements to possibly

5   frame what's going to be happening today as part of the

6   parties' agreement.  Defendants are able to make an opening

7   statement, if you will allow that.

8          THE COURT:  All right.  I'm prepared to allow that if

9   the parties request it, and so that would mean that all

10  witnesses would leave, and I'll leave it up to the parties to

11  police that for me.  And then the defense can call back the

12  first witness once opening is completed.

13         So Mr. Lewis, let me know once all witnesses have

14  excused themselves and moved back into the waiting room.

15         MR. LEWIS:  All right, Your Honor.  I will try to

16  figure that out now.  I apologize.

17         MR. BIEN:  Your Honor, do you -- excuse me.  This is

18  Michael Bien.

19         Do you need people to go off video?  I don't know what

20  your experience has been with so many videos at the same time.

21         THE COURT:  It is helpful for those who are not

22  presenting to turn off their video cameras.

23         MR. BIEN:  Thank you.

24         THE COURT:  So thank you for asking.

25         THE CLERK:  Your Honor, I don't believe any of the

1    witnesses were admitted to the virtual courtroom or they were

2    admitted, I confirmed a connection, moved them back into the

3    waiting room.  In the waiting room we have Dr. Mehta, Dr. Bick

4    and Dr. Warburton, if that's helpful.

5            THE COURT:  All right.  And just looking, I assume

6    that Mr. Lewis can see the same screen the Court can.  I see

7    two pages of Hollywood Squares, Coleman Hollywood Squares.  And

8    so if the representation is no one appearing on the screens is

9    a witness, I'll ask Ms. Ells if she agrees, and then we can

10   proceed to opening.

11           MS. ELLS:  Yes.  I don't see anyone in the video that

12   is a witness.  Thank you.

13           THE COURT:  All right.  Agreed, Mr. Lewis?

14           MR. LEWIS:  Agreed, Your Honor.  I don't see anyone

15   either.

16           THE COURT:  Right.  All right.  Then the defense will

17   make the first opening.  Is that the plan, Mr. Lewis?

18           MR. LEWIS:  That's correct, Your Honor.  We had

19   planned to keep it under five minutes.

20           THE COURT:  All right.  You may do that now.

21           MR. LEWIS:  Thank you.  Good morning, Your Honor.

22           Over six months ago, as the severity of the COVID-19

23   pandemic continued to grow in the state of California and

24   around the nation, the Court set a focused evidentiary hearing

25   to address the issue of Coleman class member access to

1  inpatient hospital care at the Department of State Hospitals.

2  And since that hearing was set in April of this year,

3  plaintiffs and defendants have met 26 times in the special

4  master's task force, a forum that was created by the Court to

5  specifically address COVID-19's impacts on the California

6  Department of Corrections and Rehabilitation's mentally ill

7  inmates.

8         At each meeting the issue of access to DSH inpatient

9  care was discussed; and moreover, DSH and CDCR clinicians have

10 separately attended countless small workgroup meetings with the

11 special master's experts to discuss transfers to inpatient care

12 in the COVID-19 environment, including review of individual

13 clinical decisions on whether to transfer a class member.  And

14 these are followed up by robust discussions in the task force

15 where plaintiffs were present in each discussion.

16        As a result of these collaborative discussions, DSH

17 and CDCR developed COVID-19 screening guidelines to facilitate

18 transfers to DSH's inpatient facilities in a manner that

19 minimizes risk of transmission of the COVID-19 virus.

20        These countless or these screening guidelines were

21 developed with the participation of the special master's

22 experts and provided to plaintiffs for review.

23        As the pandemic and defendants' response to it

24 evolved, so did the agency's screening and transfer guidelines.

25 At each turn, defendants formulated guidelines that weighed

1    COVID-19 risks and transferred Coleman patients to DSH

2    inpatient beds with safety and public health guidance as the

3    primary considerations.  These guidelines were continually

4    discussed in the task force and small workgroup meetings.

5         DSH inpatient transfers were going so well that the

6    parties stipulated three times to extend the hearing.  And

7    plaintiffs most recently moved to continue the hearing by 60

8    days.

9         In August, as COVID-19 outbreaks occurred at various

10   CDCR facilities, the department curtailed movement among its

11   institutions to protect the health of inmates and staff.  This

12   caused the number of patients transferring to DSH inpatient

13   beds to fall to zero.  But as the outbreak became sustained,

14   the number of Coleman patients waiting to transfer to DSH also

15   grew.  But even while these patients were awaiting transfer,

16   they continued to receive mental healthcare at their CDCR

17   institutions.

18        And in just the past few weeks, DSH and CDCR, again

19   working with the special master's experts in a small workgroup

20   setting, revised the COVID-19 screening and transfer guidelines

21   to meet the challenges posed by the pandemic.  As a result of

22   these new guidelines, Coleman patient transfers have resumed

23   and the list of patients awaiting transfer has already

24   dramatically reduced.

25        Despite the fact that transfers are proceeding,

1   defendants are now held to an evidentiary hearing to determine

2   whether CDCR and DSH have complied with program guide

3   requirements, as modified by the temporary addition of COVID-19

4   screening to transfer class members to inpatient beds.  The

5   answer to that question is yes.

6         Defendants will demonstrate through the testimony of

7   Drs. Warburton, Mehta and Bick, senior clinicians at DSH and

8   CDCR, that inpatient transfers are occurring in compliance with

9   program guide requirements subject to the current COVID-19

10   screening and transfer guidelines.

11         The parties need not reach the Court's remaining

12   questions because the defendants will demonstrate that the

13   program guide requirements are being met.

14         The evidence will demonstrate that over 100 patients

15   have been reviewed, accepted and transferred into DSH

16   facilities since the pandemic was declared.

17         DSH has carefully developed protocols under the close

18   guidance of the California Department of Public Health for

19   screening, testing before transfer, transferring, cohorting

20   upon admission and then serially testing to ensure that Coleman

21   patients are admitted but not exposed to COVID-19.

22         CDCR has, likewise, developed transfer protocols

23   focused on patient safety combating the spread of this

24   dangerous disease while recognizing that inpatient care is

25   necessary.

1          These witnesses will testify concerning the constant

2    weighing of COVID-19 risks when deciding whether patients'

3    mental health needs warrant the risks inherent in transfers and

4    that these protocols have worked.

5          Over 100 Coleman patients have been transferred to DSH

6    with zero patients testing positive for COVID-19.  Defendants

7    expect that the witnesses will testify that DSH inpatient

8    transfer issues have been the subject of numerous task force

9    meetings and small workgroups.

10          Special master's experts have been involved in the

11    continual development of the COVID-19 screening and transfer

12    guidelines, and the most recent guidelines released just this

13    week have now been adapted and refined so as to safely transfer

14    inmates even when they are currently housed at institutions

15    that CDCR has closed movement to, due to concerns of rising

16    COVID-19 outbreaks.

17          The witnesses will testify that after a few weeks

18    without DSH transfers due to these COVID-19 considerations, the

19    revised screening and transfer guidelines have resulted in 26

20    transfers over the past 2 weeks with continual transfers

21    scheduled for the coming weeks.

22          The evidence will also show that while these patients

23    waited to transfer, they continued to receive mental health

24    services at CDCR institutions, and their mental health has been

25    constantly observed.

1          Further, the evidence will show that DSH does not

2     accept offenders with mental health disorders, commonly

3     referred to as OMHDs, at the exclusion of Coleman class

4     members.  DSH has admitted all Coleman patients that have been

5     referred to it and accepted by it.  Defendants expect that

6     these witnesses will testify that DSH has denied no Coleman

7     patient care nor denied or rejected Coleman patients due to

8     OMHD admissions.

9          Moreover, the witnesses will testify that DSH is

10    statutorily compelled to take OMDs who are actually CDCR mental

11    health patients that have completed their prison terms, but, as

12    clinicians have determined, that they are a danger to

13    themselves or others and must be hospitalized.

14         Since the pandemic swept over the state and impacted

15    this case, DSH and CDCR have tirelessly pursued policies that

16    protect Coleman patients from COVID-19 in accordance with sound

17    public health advice while also ensuring their mental health

18    care.

19         The agencies have proactively enacted screening and

20    transfer guidelines to foster safe transfer to DSH inpatient

21    care and have revised those guidelines in conference with the

22    special master's experts.

23         With the addition of these guidelines the agencies

24    have complied with the program guide requirements for transfers

25    to inpatient care and related policies.

1          Both agencies demonstrate transparency by producing

2     additional monthly reports, and they willingly engage with

3     plaintiffs and the special master in the COVID-19 task force

4     setting.  These processes initiated by the Court have worked,

5     and defendants believe that collaboration among the parties has

6     led to successes during this unprecedented pandemic.

7          Now, as transfers to DSH resume under the latest

8     iteration of the screening and transfer guidelines, the task

9     force is positioned to continue handling this issue that this

10    hearing is intended to address.

11         At the conclusion of this hearing, defendants request

12    that the Court should refer any issues concerning access to DSH

13    inpatient care to the task force for the continued

14    collaborative work that has generated positive results thus

15    far.

16         Thank you, Your Honor.

17         THE COURT:  All right.  Ms. Ells?

18         MS. ELLS:  Good morning, Your Honor.

19         We're here today right now because defendants are,

20    once again, denying timely access to adequate inpatient care

21    for the Coleman class.  Clinicians in CDCR have determined --

22         COURT REPORTER:  I am not hearing Ms. Ells.

23         MS. ELLS:  Can anyone else hear me?

24         THE COURT:  I'm hearing Ms. Ells quite clearly.

25         COURT REPORTER:  I am sorry.  I did not hear Ms. Ells.

1    MS. ELLS:  Okay.

2    THE COURT:  Are you able to hear her now?

3    Try again, Ms. Ells.

4    MS. ELLS:  Okay.  Good morning.  We're here today

5    because right now defendants are, once again, denying timely

6    access to adequate inpatient care for the Coleman class.

7    Clinicians in CDCR have determined that more than 50

8    men and women are so critically ill that they cannot be safely

9    treated in the prison units where they live and need to be

10    transferred to DSH's inpatient psychiatric hospitals.  Both DSH

11    and CDCR agree that these patients need treatment in DSH's

12    hospitals and should be there.  But, as has occurred far too

13    often in the history of this case, the patients are not

14    transferring to DSH.  Instead of admitting the patients into

15    one of the more than 100 empty court ordered DSH beds

16    specifically reserved for their care, defendants are allowing

17    them to languish in CDCR's outpatient prison blocks where

18    clinicians have already determined they are too sick to remain

19    and in CDCR's PIPs, which remain woefully understaffed and

20    routinely provide less care than even EOP programs.  These

21    patients suffer every day without the treatment that DSH can

22    and must provide them, and they are getting sicker.  And the

23    vast majority of them are waiting well past the 30-day transfer

24    timeline allowed by the program guide.

25    As this Court and the special master have documented

1   time and time again, this is part of the pattern.  When the

2   beds at (inaudible) class members who need care there, the

3   denial of access reverberates throughout the system.

4        Defendants' most recent waitlist and census report

5   shows that there are currently more people waiting for access

6   to CDCR's PIP beds than there are available beds, and that is

7   during a timeframe when there are more than 80 beds available

8   at Ash out of the 256 reserved for class members.  When the Ash

9   beds sit empty, the waitlist grows throughout the system and

10  unconstitutional denials of inpatient psychiatric care result.

11       Defendants' latest excuse for denying class members

12  access to DSH is COVID-19.  They will tell you that it's simply

13  not safe to transfer these patients to DSH and that their

14  restrictive protocols are reasonable.  But the evidence will

15  show Coleman class members and mental health hospitalization

16  are being treated differently than other transfers and, as

17  usual, Coleman class members are being harmed.

18       CDCR transfers hundreds of incarcerated people between

19  its prisons each week to and from prisons that it claims are

20  closed to all movement because of COVID-19 outbreaks, but they

21  refuse to transfer Coleman class members from these same

22  institutions to DSH.

23       DSH accepts patients from county jails and from CDCR

24  but refuses to accept Coleman class members, applying different

25  COVID-19 protocols that have resulted in almost no Coleman

1   patients moving to DSH for months.

2         While some extra caution was appropriate in the early

3   spring with the onset of COVID-19, we are now seven months into

4   a pandemic that is going to last for one or more years.  We

5   know the appropriate COVID-19 mitigation policies and protocols

6   that are necessary to allow hospitals to function daily.  DSH

7   has those protocols in place.

8         Hospitals across the country provide care to patients

9   every day in the midst of this pandemic, yet defendants

10  continue to deny Coleman class members access to their

11  hospitals and delay care unnecessarily.

12        Just days ago, on the eve of this trial, defendants

13  finally issued a new draft of their guidelines governing DSH

14  transfers and began moving some of the waitlisted patients from

15  closed institutions into DSH, but the guidelines that they now

16  propose still impose unnecessary restrictions and delays on

17  Coleman class member access to care that have no basis in

18  public health guidance.  Their actions are too little too late.

19        This Court must intervene, as it has many times

20  before, to ensure class members can access the care that

21  everyone agrees they need at DSH's hospitals.

22        The evidence will show today that defendants are

23  imposing restrictions far beyond those permitted by the April

24  24th order and the program guide.

25        In addition to the COVID-19 screening allowed by this

1    Court, defendants require patients at prisons with no active

2    COVID cases who are otherwise cleared for transfer to DSH to

3    secure a negative COVID test before they can go.  They require

4    patients to quarantine at both CDCR and DSH, and they refuse to

5    admit patients from CDCR prisons that are closed to movement,

6    which can happen when a prison of 3,000 people has a single

7    COVID positive test somewhere in the prison, and can stay

8    closed for many many months on end.

9        In those situations, defendants are suggesting that

10   they should employ a case-by-case analysis to determine if

11   patients from those prisons can transfer to DSH even though

12   those same prisons are transferring people internally within

13   CDCR to and from other closed institutions every day.

14       For these people to make it to DSH from closed

15   institutions even under defendants' newest guidelines, they

16   have to pass an amorphous public health analysis with no

17   defined criteria.  And even if they quarantine and test

18   negative, they still may not transfer to DSH.

19       These are not patients who have COVID.  These are

20   patients at prisons where there are cases of COVID who may be

21   in entirely different facilities and yards than where these

22   patients live.

23       Adam Lauring will -- Dr. Adam Lauring, our infectious

24   disease expert, will testify today that none of these

25   restrictions are necessary to curb COVID spread in DSH, given

1    the robust protocols that DSH already has in place and that

2    they apply to every other patient class except Coleman.

3           Meanwhile, our psychiatry expert will attest to the

4    fact that patients sitting on the waitlist are suffering and

5    getting worse because of these unconscionable denials of

6    access.

7           Mr. Lewis referred to the fact that patients are

8    getting care where they are within CDCR as part of his opening

9    statement.  It is clear that the testimony of Dr. Stewart will

10   be necessary to rebut the sufficiency of that to ensure

11   constitutionally adequate care in the system.

12          The restrictions defendants have imposed on class

13   members' transfers to DSH are unwarranted and unjust.  While

14   it's true that the special master and his experts have spent

15   countless hours with defendants in meetings, many of which

16   plaintiff counsel have been also permitted to participate in,

17   it's clear that these issues are no longer appropriate for the

18   workgroup process.  They must be resolved by this Court.

19          Delayed access to inpatient psychiatric

20   hospitalization is causing unnecessary and avoidable pain and

21   suffering to Coleman class members.  The average time on the

22   waitlist for DSH is now close to two months.  Some patients are

23   waiting much much longer.  DSH hospitals must immediately and

24   fully reopen to the Coleman class as soon as possible.

25          Thank you.

1          THE COURT:  All right.  With that, we'll turn to the

2     presentation of evidence.  Mr. Lewis, your first witness.

3          MR. HENNES:  Good morning, Your Honor.  This is Deputy

4     Attorney General Lucas Hennes.  The defendants will call

5     Dr. Katherine Warburton.

6          THE COURT:  All right.  Do we have Dr. Warburton

7     present, Ms. Schultz?

8          THE CLERK:  He's joining us now.

9          THE COURT:  All right.  I see Dr. Warburton on the

10    screen.  Dr. Warburton, are you able to see and hear the Court?

11         DR. WARBURTON:  Yes, Your Honor.

12         THE COURT:  All right.  Ms. Schultz, could you please

13    swear Dr. Warburton?

14         THE CLERK:  Yes, Your Honor.

15         Dr. Warburton, please raise your right hand.

16    Dr. Warburton, please raise your right hand.  Oh, sorry.  The

17    screen was blocking it.  I apologize.

18         (Witness sworn.)

19         THE WITNESS:  Yes, I do.

20         THE CLERK:  Thank you.  You may put your hand down.

21         THE COURT:  All right.  Mr. Hennes, you may proceed.

22         MR. HENNES:  Thank you, Your Honor.

23

24

25

Dr. Warburton - Direct by Hennes

1       DR. KATHERINE WARBURTON, defendants' WITNESS, SWORN

2                       DIRECT EXAMINATION

3    BY MR. HENNES:

4    Q    Good morning, Dr. Warburton.

5    A    Good morning.

6    Q    Could you please state your name and spell your last name

7    for the record?

8    A    My name is Katherine Warburton, W-A-R-B-U-R-T-O-N.

9    Q    And are you currently employed with the State of

10   California, Dr. Warburton?

11   A    Yes, I am.

12   Q    And who do you work for?

13   A    I work for the California Department of State Hospitals.

14   Q    What is your current position with DSH?

15   A    I'm the medical director and deputy director of clinical

16   operations for DSH.

17   Q    And what are your duties as DSH's medical director?

18   A    Large-scale state-wide policy development for clinical

19   care, continuous performance improvement, monitoring of

20   clinical care, training, that type of thing.

21   Q    And with the onset of the COVID-19 pandemic this year, have

22   your duties been focused at all on the pandemic response by

23   DSH?

24   A    I would say my duties have been almost completely focused

25   on the pandemic response.

1    Q    Dr. Warburton, are you aware that the purpose of this

2    hearing is to answer this Court's questions regarding

3    defendants' compliance with the Court's order on inpatient

4    transfers?

5    A    Yes.

6    Q    With that in mind, I have some background questions for you

7    regarding DSH's operation.  How many hospitals does DSH

8    currently have?

9    A    Five.

10   Q    And do all of those hospitals serve Coleman class members?

11   A    No.  Three out of the five hospitals serve Coleman class

12   members.

13   Q    And what sort of space is available in these three

14   hospitals for Coleman class members?

15   A    There's approximately 250 beds at Atascadero, 50 at

16   Coalinga, and 30 at Patton, I believe.

17   Q    And are these patients kept in single individual rooms or

18   cells, or how are they housed at DSH?

19   A    We have mostly large congregant living units.  Most of our

20   units throughout our hospital system are multi-person

21   dorm-style rooms where patients share living space, dining

22   space, common areas and bathrooms.

23   Q    In your experience, Dr. Warburton, does that pose any

24   particular problems with COVID-19 transmission?

25   A    Yes.  I believe and other people have written about the

1    exquisite and unique vulnerabilities that psychiatric hospitals

2    have for that reason.

3    Q    You mentioned psychiatric hospitals, Dr. Warburton.  Would

4    you differentiate DSH's hospitals from your typical medical

5    care general hospital?

6    A    Well, we don't deliver general medical services beyond, in

7    most cases, first aid and routine sort of chronic primary care,

8    preventive care types of things, diabetes management, but any

9    type of serious medical issue needs to go out to medical.

10   Q    So in your opinion does it make sense to compare DSH's

11   hospitals with the experience of hospitals in the community?

12   A    No.  Our hospitals are fairly unique, and that's one of the

13   things that's made this pandemic response particularly

14   difficult.

15   Q    Is that just due to the congregant nature of the space, or

16   are there other reasons?

17   A    There are other reasons.  We take very seriously mentally

18   ill individuals, a lot of whom have cognitive issues.  So even

19   simple public health measures like social distancing, cough

20   covering, hand washing is difficult in our population because

21   we are psychiatric facilities.

22        We can't ask or tell patients to stay in their room or stay

23   anywhere on the unit for that matter.  That's considered

24   seclusion and can only be used when there's an imminent risk or

25   a threat.  So it's very difficult to manage any type of public

 1    health measure that's reliant upon patient behavior and/or

 2    environmental safeguards.

 3    Q   With that in mind, Dr. Warburton, what's the best way to

 4    prevent your patients from being exposed to COVID-19?

 5          MS. ELLS:  Objection, Your Honor.  This witness is not

 6    a public health expert.  She cannot opine on the best way to

 7    keep her patients from getting COVID-19.

 8          THE COURT:  Your response?

 9          MR. HENNES:  Your Honor, may I be heard?

10          THE COURT:  You may.

11          MR. HENNES:  Thank you, Your Honor.

12          Dr. Warburton manages a patient population at DSH.  I

13    think if there's anyone who would be qualified to talk to how

14    DSH's preventing COVID-19 from spreading to their patient

15    population, it would be Dr. Warburton.

16          THE COURT:  She can describe what DSH is doing.

17    Perhaps you can clarify her credentials as relevant to this

18    question to clarify the scope of her expertise and the limits

19    to it.  So if you --

20          MR. HENNES:  Certainly, Your Honor.

21          THE COURT:  -- remind us of Dr. Warburton's

22    credentials.

23          The defense point may be well taken.  Do you agree

24    that she's not a public health expert?

25          MR. HENNES:  I believe that -- I can lay the

1    foundation for Dr. Warburton's health bona fides, Your Honor.

2            THE COURT:  All right.

3    BY MR. HENNES:

4    Q    Dr. Warburton, are you a medical doctor?

5    A    Yes.  I'm a doctor of osteopathic medicine.  I did four

6    years of medical school, four years of residency, which

7    included a year of sort of general medicine and a year of

8    forensic fellowship, and I've been licensed to practice

9    medicine in the state of California for approximately 15 years.

10   Q    And you're currently licensed to practice medicine in the

11   state of California?

12   A    Yes, I am.

13   Q    Are you familiar with DSH's practices in preventing

14   infectious diseases?

15   A    Yes.

16   Q    Does that include DSH's practices in preventing COVID-19?

17   A    Yes.  I was largely involved in designing the initial

18   pandemic response.

19   Q    Keeping in mind your expertise and your experience, in

20   preparing DSH's response to the COVID-19 pandemic,

21   Dr. Warburton, how is DSH preventing COVID-19 from spreading to

22   its patient population?

23           MS. ELLS:  Your Honor, objection again.  He referred

24   to her expertise.  She is not a public health expert.  She has

25   no expertise in public health issues.  She has experience in

Dr. Warburton - Direct by Hennes

1   implementing the protocols and she can describe those

2   protocols, but she is not a public health expert.

3           THE COURT:  The objection is noted and the point is

4   made and the Court can assign appropriate weight to

5   Dr. Warburton's testimony.  She may answer the question.

6           Are you clear on the question, Dr. Warburton?

7           THE WITNESS:  I'm sorry, no.  I lost the thread with

8   the -- is the question how we responded to the pandemic?

9           THE COURT:  Let me have Mr. Hennes restate; or, if he

10  wishes, he can request that the court reporter read back.

11          MR. HENNES:  I'll restate the question, Your Honor.

12  BY MR. HENNES:

13  Q    How is DSH preventing COVID-19 from spreading to its

14  patient population?

15  A    Because of the unique vulnerabilities of our hospitals that

16  I described earlier, we identified very early in this process

17  that the most important step that we can take is to try to

18  prevent introduction of the virus into our facilities because

19  once it comes into our facilities, we first hypothesized and

20  now our experience has borne out it's very difficult to control

21  because of the congregant living, shared spaces and other

22  issues I described before.

23      So very early on in the pandemic, almost immediately when

24  we realized the risk that this virus posed and we heard about

25  what was happening in other states, we suspended all admissions

1   that we were able to suspend.  We suspended all but the most

2   essential visitation.  We began screening, taking the

3   temperature of and masking our staff.  That was a difficult

4   decision to make in mid-March, to put masks on staff when there

5   was limited PPE, but we made that decision to try to limit the

6   introduction of the virus into our facilities.

7       We then really scrambled quite a bit to try to obtain

8   testing, access to testing, which was difficult to obtain, and

9   we took all the public health guidelines that we could find, we

10  developed response protocols and consulted extensively with

11  expert physicians from the California Department of Public

12  Health on those protocols.  You know, things evolved.  Guidance

13  evolved.  We developed an emergency response meeting where all

14  the hospitals met every morning at 7:30, oftentimes for well

15  over an hour or two to talk about our response.  And then we

16  organized the medical directors from each facility, along with

17  whatever public health experts we have in our facilities, to

18  help us design our response protocols.

19      We had a team of nurses and space experts kind of try to

20  locate and develop isolation and quarantine space, which is

21  something we didn't have in abundance.

22      We had a task force of administrators constantly calling

23  trying to get us access to adequate amounts of PPE.

24      So that's what we did in the first eight weeks or so of the

25  pandemic was try to -- as large congregant living forensic

Dr. Warburton - Direct by Hennes

1    psychiatric facilities that take patients from the most

2    vulnerable institutions in our state, we just needed that time

3    to build up that response so that we could start safely

4    admitting people again.

5    Q    Dr. Warburton, do you consider yourself a public health

6    expert?

7    A    I am certainly more of one now than I was in March, but I

8    rely heavily on the public health experts that we have in our

9    own facilities as well as those at the California Department of

10   Public Health.  I am a forensic psychiatrist.

11   Q    Before getting into DSH's specific guidelines for transfer,

12   I'd like to talk a little bit -- just take a step back and talk

13   a little bit about the Coleman patients that DSH admits to its

14   care.  Can you describe the criteria for Coleman patients that

15   are admitted to be treated at DSH?

16   A    Well, it's ICF level of care, so things like psychotropic

17   medications, stabilization, development of coping skills.  If

18   people need certain types of consultation or long term 24-hour

19   care, they come to us for ICF treatment.

20   Q    So is this an acute level of care?

21   A    No.  Psychiatric patients within the Department of

22   Corrections who need acute level of care go to their crisis

23   beds and/or their acute level of care.

24   Q    And are you currently involved in the process for

25   transferring inmates from the Department of Corrections during

1    this corona virus pandemic?

2    A    Yes.

3    Q    What is your involvement?

4    A    Well, we have developed a small workgroup that consists of

5    me and physicians from my institutions, the psychologists from

6    my institutions, the physicians on the team of the Office of

7    the Special Master and physicians and psychologists from the

8    Department of Corrections mental health team and we meet every

9    Monday to talk about the evolving nature of the pandemic and

10   how to respond to it.

11       At times we've invited other folks, such as expert

12   infectious disease specialists from the California Department

13   of Public Health to advise and guide our processes.  And more

14   recently when we started transferring people from closed

15   institutions, we started inviting the chief medical officer

16   from the closed institution to share realtime public health

17   data with us to guide us in our decision-making.

18   Q    Would you say the special master's expert team take a

19   role -- play a role in this small workgroup?

20   A    Yes.  I would describe them as the facilitators of the

21   small workgroup.

22   Q    And in this small workgroup have there been any specific

23   policies or protocols created for the transfer of CDCR inmates

24   to DSH hospitals?

25   A    Yes.  We've worked on the temporary transfer guidelines for

Dr. Warburton - Direct by Hennes

1    those individuals and we've updated those guidelines as the

2    pandemic has changed and as the various situations have

3    changed.

4    Q    When were those policies first created, do you remember?

5    A    I believe it was the end of April.  I'm sorry.  I don't

6    have the exact date.

7    Q    And you mentioned that those policies have evolved over the

8    past six months; is that correct?

9    A    Yes.

10   Q    What is that evolution based on?

11   A    Well, initially, as I mentioned, the beginning of the

12   pandemic was a very dire and, frankly, frightening time, so at

13   that point, not knowing how widespread the transmission was in

14   our communities, in our hospitals or in our prisons, we

15   started -- and we had no access to testing at that time -- we

16   started out with a position that only rare cases should be

17   transferred until we had a handle on the amount of transmission

18   and we had adequate public health measures in place.

19       Once we got testing and access to testing, we worked with

20   our partners at CDCR and Office of the Special Master to

21   develop a protocol for testing and screening folks who are

22   coming to us, and that worked out well for a period of time,

23   and we were able to transfer a lot of people.

24       And we also added an additional layer of individual case

25   review to make sure it was an appropriate transfer from a

1    psychiatric perspective.

2         When CDCR began closing institutions, we recognized that we

3    needed to address what we would do about individuals coming

4    from closed institutions, so we had, I believe, two meetings.

5    And I can remember that date, it was the last Monday --

6    starting the last Monday in June.  And so we met with the

7    special master's physician experts, experts from the California

8    Department of Public Health, the CDCR team and our team to talk

9    about the closure of those institutions and how to address

10   transfers from those.  We decided as a group at that time that

11   that should be a rare occasion because of the risks of

12   morbidity and mortality associated with widespread transmission

13   of the virus.  Unfortunately, a lot of CDCR institutions

14   closed, and it had the effect of not having transfers for a

15   period of weeks.

16        So at the beginning of October, we began addressing that in

17   the small workgroup and worked out a process that's based

18   somewhat on the experience that we've had with our OMD

19   population where CDCR -- and it took -- it took the CDCR mental

20   health clinicians a period of time to be able to compile this,

21   but CDCR is now providing us with the same type of realtime

22   public health data from the closed institutions so that we can

23   make good decisions about who's potentially been exposed to the

24   virus and who would be safe to transfer.  So for the last few

25   weeks, we've been reviewing that realtime public health data

1    with the small workgroup as well as consulting with the chief

2    medical executive at the referring institution.  And so we've

3    successfully developed a process for the safe transfer of

4    individuals from closed institutions, and that's where we stand

5    now.

6        Now, that particular version of the guidelines, unlike all

7    the other versions, has not been approved by all the lawyers,

8    but all the other versions, including the version on taking

9    only rare cases, was approved by all the lawyers.

10   Q    On that last point, it's your understanding that the

11   plaintiffs saw and approved of the transfer guidelines from

12   previous small workgroup?

13   A    Yes, including the last iteration, which said that

14   transfers from closed institutions should only happen rarely.

15   We self-identified that that was becoming an issue.  We had not

16   anticipated so many closed institutions or such a limitation on

17   transfers, which is why at the beginning of this month we began

18   proactively trying to identify a process to find individuals in

19   closed institutions who would be safe to transfer.

20   Q    Dr. Warburton, I'd like to call your attention to one of

21   the exhibits that's been marked, Exhibit 22.

22       And with the Court's permission, I will display that to the

23   witness and to everyone.

24              THE COURT:  Any objection, Ms. Ells?

25              MS. ELLS:  (Indicating.)

1          THE COURT:  All right.  Exhibit 22 will be displayed.

2    BY MR. HENNES:

3    Q    Dr. Warburton, do you recognize this document?

4    A    Yes.  That's one of the iterations of our transfer

5    guidelines.

6    Q    And is it a true and accurate copy of these guidelines that

7    were created by the small workgroup and provided to all the

8    parties?

9    A    It appears to be.

10          MR. HENNES:  Your Honor, the defendants would like to

11    offer this into evidence.

12          THE COURT:  Any objection?

13          MS. ELLS:  No.

14          THE COURT:  All right.  Exhibit 22 is admitted.

15    (Defendants' Exhibit 22 admitted in evidence.)

16    BY MR. HENNES:

17    Q    Dr. Warburton, I'd like to call your attention to the first

18    page of this Exhibit 22 marked letter n.  That discusses

19    referrals from closed institutions.  Do you see that part?

20    A    Yes.  That's the portion we added into this iteration when

21    the institutions on CDCR's side started closing.

22    Q    Are you familiar with the reasons why CDCR institutions

23    might close?

24    A    Yes.  I think they had a large-scale problem with

25    widespread transmission.  And while I'm not privy to all the

Dr. Warburton - Direct by Hennes

1    details, I think they took the very correct step of stopping as

2    much movement as they could to try to get the virus under

3    control and do their public health protocols.

4    Q    And to your knowledge does DSH have any control over which

5    institutions are closed due to COVID-19?

6    A    No.  We're totally uninvolved with all of that.

7    Q    You mentioned that this is not the most current version of

8    these guidelines; is that correct?

9    A    That's correct.  This is the last version that was approved

10   by all the lawyers.  This is the version that we've been

11   following since mid-July.

12       Unfortunately, since so many institutions closed, this

13   version had the effect of not having a lot of patient transfer.

14   So we have updated that version and provided it to the lawyers

15   to represent the new process that we're doing, which involves

16   realtime communication of public health data to try to identify

17   individuals in closed institutions who can safely transfer to

18   us.

19   Q    Under the current guidelines that are active -- forgive me.

20   I'll back up.  You mentioned that there are new guidelines.  Is

21   DSH currently processing intakes according to those new

22   guidelines?

23   A    Yes, and it's working very well.  Our partners at CDCR have

24   done a very nice job of summarizing the realtime public health

25   data and connecting us to the medical personnel at the

Dr. Warburton - Direct by Hennes

1    referring institutions.  So I think, as of today, we

2    transferred 26 folks from closed institutions based on our new

3    process.  We have identified, I think, another 18 who are

4    scheduled in for admission.

5    Q    And are those intakes all coming from the current waitlist

6    of Coleman patients?

7    A    Yes.  These are the individuals -- I think there was

8    approximately 55 at one time who were in closed institutions

9    that we'd cleared for acceptance but that were on hold because

10   of the closed status of those institutions.  So this process

11   that we developed in early October was to try to overcome that

12   barrier and identify patients on that list who could safely

13   come to us based on effective and safe communication of

14   realtime public health data.

15   Q    Now, you mentioned earlier, Dr. Warburton, that you

16   consulted with the Department of Public Health in creating

17   these guidelines as well; is that correct?

18   A    Yes.  I've also consulted with a medical bioethicist.

19   Q    And what was the purpose of consulting with a bioethicist?

20            COURT REPORTER:  I'm sorry.  I am not hearing

21   Dr. Warburton.

22            THE COURT:  When did you stop hearing, Madam Court

23   Reporter?

24            COURT REPORTER:  I hear you now.

25            THE COURT:  What did you last hear?

1        COURT REPORTER:  I heard:  "Yes, I often --"

2        THE COURT:  All right.  Mr. Hennes, do you want to

3    reconstruct starting from that point?

4        MR. HENNES:  I will do my best, Your Honor.

5    BY MR. HENNES:

6    Q    So you mentioned earlier that you've consulted with the

7    Department of Public Health in creating these guidelines; is

8    that right?

9    A    Yes, I have.  I've also consulted with a medical

10   bioethicist from the University of California Irvine Medical

11   Center.

12   Q    And what was the purpose of consulting with a bioethicist?

13   A    Well, in the crisis that we're in with the pandemic, we

14   wanted to ensure that we are doing the right thing for all of

15   our patients from a bioethical perspective.

16        These types of situations put very unusual strains and

17   limitations on our ability to deliver care, and we have to do a

18   lot of balancing.  We have to do a lot of balancing of needs

19   and risks, and so we just check in with the bioethicist to make

20   sure we're proceeding correctly as it relates to the standard

21   of care and the care of our patients.

22        We've also consulted with him on things like surge planning

23   we had some concerns about because we don't provide any type of

24   intensive medical care in our facilities.  We had concerns

25   about what to do if our patients were sent out and refused by

1    actual general medical hospitals, for example.  So he's been

2    advising us on a number of things.  But we certainly had him

3    weigh in on our processes related to the transfer of Coleman

4    patients.

5         MS. ELLS:  Your Honor, I would move to strike that

6    whole answer as hearsay.  She's reciting conversations with

7    people who are not testifying and saying that they advised her

8    to do the things that she's doing.  That's all hearsay.

9         THE COURT:  Why is it not, Mr. Hennes?

10        MR. HENNES:  It's not hearsay, Your Honor, because

11   she's not offering these things for the truth of the matter

12   asserted.  She's offering them to describe how they informed

13   her actions and the actions of DSH.  This just isn't hearsay.

14        THE COURT:  Ms. Ells?

15        MS. ELLS:  Your Honor, the implication of her

16   testimony is that she received affirmation of the steps that

17   she has taken from these conversations that are out-of-court

18   statements from parties that are not testifying.  It is

19   definitionally hearsay.

20        Additionally, none of this information was ever

21   provided to the plaintiffs.  We never received any information

22   about these conversations or any written discussions about

23   them.  These are conversations that happened without anyone

24   present outside the courtroom, and they're all hearsay.

25        THE COURT:  I construe her testimony as describing a

1    process without conveying content of any conversations.  Do you

2    think I have that wrong?

3            MS. ELLS:  My understanding of what she is saying is

4    that she sought advice and took that advice and that her

5    actions are coming from these other people.

6            Now, to the extent that the testimony can be clarified

7    so that that's not the testimony, then that may be different,

8    but this testimony is that she took the advice of these people

9    that she consulted with.

10           THE COURT:  I understand that implication.  I'm going

11   to let the testimony stand, but I may ultimately give it no

12   weight.  I construe it as describing a process, but I'm not

13   going to assume that persons who aren't present before the

14   Court blessed the process followed.

15           MS. ELLS:  Thank you, Your Honor.

16           THE COURT:  All right.

17           MR. LEWIS:  Thank you, Your Honor.

18   BY MR. LEWIS:

19   Q   Dr. Warburton, is it your belief that DSH is currently

20   following Department of Public Health guidance when it comes to

21   the intake of patients?

22   A   Yes, we are.  We work very very closely with the California

23   Department of Public Health.  All of our protocols --

24           MS. ELLS:  Your Honor, same objection.  The

25   implication is that she's consulting with people who have told

1   her, that she is following their guidance.

2          THE COURT:  Understood.

3          THE WITNESS:  We have a process --

4          THE COURT:  In terms of describing the process, I'm

5   going to allow that, but specific details -- this testimony

6   would not allow me to conclude that Department of Public Health

7   has signed off on what DSH is doing or any public health expert

8   has signed off, just so it's clear.

9          MR. LEWIS:  Understood, Your Honor.

10          THE WITNESS:  Our process is that we take all

11   guidance, we try to understand it.  There's no guidance out

12   there that specifically applies to our system, so we have to

13   try to gain an understanding of the public health rationale

14   behind the guidance.

15          And we do have physicians who work in our system who

16   do have that public health expertise, so they participate in

17   that.  That's largely done by my associate medical director and

18   the medical director's counsel.  Then they take that process

19   that they developed or protocol or algorithm that they

20   developed, synthesizing written guidance, and they present it

21   to expert physicians from the California Department of Public

22   Health.

23          When the expert physicians from the California

24   Department of Public Health have weighed in, we then bring it

25   to our larger executive team for system-wide approval and then

1   we post it to our website.  That's our process.

2          MS. ELLS:  Your Honor, just to maintain the record,

3   same objection.

4          THE COURT:  Understood.  And that is preserved.

5          Mr. Hennes?

6          MR. HENNES:  Thank you, Your Honor.

7   BY MR. HENNES:

8   Q   Dr. Warburton, based on your current transfer guidelines of

9   Coleman patients from closed institutions, do you believe that

10  it complies with this Court's requirements for intake of

11  Coleman patients to DSH?

12  A   Well, yes.  You know, the last set of guidelines that were

13  approved -- I want to just clarify my answer.  The last set of

14  guidelines that were approved by all the attorneys on all the

15  sides, that was in July, and that was stating that the

16  transfers should be rare.  So in a way, we're not complying

17  with that because we developed a new process to try to identify

18  more folks in closed institutions who can come.  And my

19  understanding is that that iteration has not yet been approved

20  by all the lawyers.  So we are doing more than I would say the

21  last approved version of the temporary transfer guidelines,

22  which asserted these transfers from closed institutions should

23  only be rare.

24  Q   And what has changed since October that allows DSH to start

25  taking more patients from closed institutions?

1   A    The data that they've been able to provide us.  You know,

2   I'm obviously not in a position to speak about the amount of

3   transmission at those facilities, but they had some very

4   impacted facilities, and I think they've implemented new

5   procedures, gotten those facilities under control from a public

6   health perspective and can now provide us data showing, you

7   know, what the rate of transmission is, who's been exposed,

8   et cetera, so that we can feel confident that our -- the

9   individuals we're transferring are not high risk of infecting

10  an entire admission unit.

11  Q    And these guidelines were approved by the special master's

12  experts in the small workgroup as well?

13  A    Yes.

14       MS. ELLS:  Your Honor, objection.

15       THE WITNESS:  They're in agreement.

16       MS. ELLS:  Objection, hearsay.

17       THE COURT:  Sustained.  The Court will disregard that

18  response.

19  BY MR. HENNES:

20  Q    One last topic for you, Dr. Warburton.  You mentioned

21  previously there were a class of patients known as OMDs that

22  DSH has learned from.  What are OMDs?

23  A    OMDs are offenders with mental disorders.  They're

24  individuals who were prisoners in CDCR who are evaluated

25  through a process to be committed to us as a condition of their

1    parole after they do their time in CDCR.  And they're sent to

2    us because of a severe mental disorder that poses a substantial

3    risk of physical harm if they're released to the community.

4        So these particular commitment types, while when we

5    suspended all admissions, we tried very hard to suspend these

6    admissions too.  And I know our lawyers spent a lot of time

7    talking with CDCR lawyers to see if there was any way that we

8    could prevent any movement because that's really what we needed

9    to do.  Movement is sort of the fuel of this particular virus.

10   We didn't have a choice.  It was a very risky and difficult

11   situation and we worked very hard with our partners at CDCR to

12   develop a process so that we could get as much information as

13   possible about each one of these patients and make sure that

14   they're tested within -- we like to see a PCR test within 7

15   days.  I think they're trying to do it within 72 hours for

16   these individuals so that we know what we're dealing with

17   because if we know what we're dealing with and we understand

18   what the exposure risks are, we know how to admit that person

19   in the safest possible way.

20        MS. ELLS:  Your Honor, I would move to strike the

21   portion of that answer that addresses whether or not she is or

22   the department is authorized to refuse to take OMDs.  That

23   calls for a legal opinion, and she is not a lawyer.

24        MR. HENNES:  Your Honor?

25        THE COURT:  Why should I not grant that request,

1   Mr. Hennes?

2          MR. HENNES:  Dr. Warburton is speaking to her

3   understanding of why a particular class of patients is being

4   admitted.  She is not offering a legal opinion.  She is simply

5   offering her understanding of why specific patients have been

6   accepted for her care and at a point where she would not want

7   to accept any.

8          MS. ELLS:  Your Honor, her testimony was that she

9   tried to find ways to not take those patients as well, but the

10  lawyers told her that she couldn't and that -- and therefore

11  she did because she felt she was legally obliged to.  That's

12  both hearsay and is a legal opinion.

13         THE COURT:  That objection is sustained.  It's

14  essentially through the portion of the answer, "I know our

15  lawyer spent a lot of time talking to CDCR" through "We didn't

16  have a choice."  All right.

17         MR. HENNES:  Thank you, Your Honor.

18         THE COURT:  So I will not rely on that portion of the

19  response.

20         Anything further, Mr. Hennes?

21         MR. HENNES:  Briefly, Your Honor.

22  BY MR. HENNES:

23  Q   Just to be clear, Dr. Warburton, is it your understanding,

24  yes or no, that DSH has the ability to delay on the admissions

25  while they're waiting for a COVID test of that patient?

1          MS. ELLS:  Again, Your Honor, same objection.  This is

2     a legal opinion.

3          MR. HENNES:  It's a yes-or-no question, Your Honor.

4          MS. ELLS:  And it's leading.

5          THE COURT:  Well, that doesn't respond to the -- to

6     the extent -- I'm not going to construe the response.  DSH's

7     position has been clear.

8          If Dr. Warburton wants to answer the question, she

9     can, but it certainly is not going to be accepted by this Court

10    as a legal conclusion.  So if you want to answer the question,

11    you may, Dr. Warburton.

12         THE WITNESS:  Well, I guess I'll try to answer it

13    through a clinical lens, which is we were, as clinicians,

14    medical directors, very concerned about admitting OMDs.  We

15    voiced that repeatedly and quite strongly to our legal team

16    that we felt we should suspend all admissions until we were

17    able to develop safe admissions protocols because of the unique

18    and exquisite risk of this virus once it's introduced into our

19    patient population.

20    BY MR. HENNES:

21    Q    What is the current process that DSH uses to intake OMDs,

22    Dr. Warburton?

23    A    On the CDCR side, I think once a person is determined to be

24    an OMD, CDCR sends an email that I'm copied on to the

25    institution that has all the requirements for the screening and

Dr. Warburton - Direct by Hennes

1    testing of that individual as well as the requirement that that

2    institution call the medical director at the receiving facility

3    to communicate all that information.

4         Once all that information is communicated -- it's usually

5    our medical director at Atascadero most of the time -- the

6    medical director at the receiving institution looks at their

7    overall space and makes decisions about the safest way to admit

8    that individual.

9              MS. ELLS:  Objection, Your Honor, to the extent this

10   calls for the process on the CDCR's side.  She's not privy

11   unless it -- I understand she's been copied on an email about

12   it, but anything else about the CDCR process is beyond her

13   knowledge.

14             THE COURT:  Conceded, Mr. Hennes?

15             MR. HENNES:  I will clarify, Your Honor.

16             THE COURT:  Okay.

17   BY MR. HENNES:

18   Q   Dr. Warburton, are you personally aware of the process that

19   CDCR uses on OMD admissions?

20   A   Yes, because I am copied on those emails.

21             THE COURT:  If that's the --

22             MR. HENNES:  Does that satisfy the Court?

23             THE COURT:  I'll assign the appropriate weight.

24             MR. HENNES:  Thank you, Your Honor.

25             THE WITNESS:  And they did discuss the process with me

1    before they implemented it.

2            THE COURT:  Wait for the question, please.

3            THE WITNESS:  I'm sorry, Your Honor.

4            THE COURT:  Are you concluded, Mr. Hennes?

5            MR. HENNES:  Almost, Your Honor.

6            THE COURT:  Okay.

7    BY MR. HENNES:

8    Q   Dr. Warburton, does DSH attempt to isolate OMD patients

9    when they're intaked into DSH?

10   A   It depends on the circumstances that are communicated to

11   the medical directors.

12       We have gone so far as to admit an OMD who is COVID

13   positive to an external facility until that person was no

14   longer contagious.

15       Dr. Fennell, the medical director at Atascadero, uses his

16   medical judgment in consultation with his public health team to

17   make a decision about each individual admission on a

18   case-by-case basis based on the data that he's provided through

19   that process.

20   Q   When placing a patient into an isolation space, does that

21   have any implications for available bed space?

22   A   Yes.  I do want to caveat that.  I'm not a bed management

23   expert or patient movement expert, but the spaces that we have

24   are very limited.  For example, Atascadero only has five true

25   isolation beds.  Those beds are needed to manage any outbreaks

1    as they happen, any other positive patients and our spaces in

2    our facilities is just very very limited.  He has a unit that's

3    been cleared out for so-called PUIs or persons under

4    investigation.  One caveat is as we're heading into flu season,

5    we're working now on our protocols for influenza.  And because

6    influenza and COVID have very similar presentations at times,

7    we're going to have separate spaces for PUIs with influenza,

8    PUIs potentially with COVID, et cetera, et cetera.  It's going

9    to get very complicated, and we have very very limited space.

10       I can give you another example, which is we had an

11   admission cohort at another hospital.  Yesterday we had two of

12   those patients test positive on day 14, so then we had to pull

13   those patients into isolation, quarantine that unit and restart

14   the serial testing process.  So all of that affects our ability

15   to do any other admissions or to manage outbreaks as they

16   happen, and the space is a very difficult aspect of this for

17   us.

18   Q    And my final question for you, Dr. Warburton, are you aware

19   of any time that a Coleman patient has not been admitted to DSH

20   due to an OMD admission?

21   A    No.  The only patients that were not admitted to DSH as

22   soon as they were psychiatrically cleared are the people who

23   are coming from closed institutions.

24   Q    And that's due to COVID screening, Dr. Warburton?

25   A    That's due to the July guidelines and CDCR's closing of

Dr. Warburton - Cross by Ells

1    their institutions and putting those people on a COVID hold.

2              MR. HENNES:  Thank you, Dr. Warburton.  I have no

3    further questions, Your Honor.

4              THE COURT:  All right.  Ms. Ells?

5              MS. ELLS:  Thank you, Your Honor.

6                        CROSS-EXAMINATION

7    BY MS. ELLS:

8    Q    Good morning, Dr. Warburton.

9    A    Good morning.

10   Q    You require a negative COVID test before you will admit

11   Coleman patients to your hospitals, right?

12   A    Yes.

13   Q    And you do that for patient safety, right?

14   A    Yes.

15   Q    But you don't require a negative COVID test before you

16   admit OMDs to the hospital, do you?

17   A    May I caveat my response?

18   Q    Which response are you talking about?

19   A    We don't always require a negative COVID test.  We have

20   taken Coleman patients who have refused testing based on what's

21   going on, on what their exposure is.

22   Q    Your policy requires a negative COVID test before you will

23   admit someone, correct?

24   A    We make clinical decisions based on the best interest of

25   that patient and our patient population.  We require that they

Dr. Warburton - Cross by Ells

1  try to get a COVID test, but we have taken Coleman patients who

2  have refused testing if their risk of transition and exposure

3  is low enough.

4  Q   I appreciate that.  I'd like you to answer my question.

5  Your policy requires a negative Coleman [sic] test for

6  Coleman -- a negative COVID test for Coleman patients before

7  you will admit them, correct?

8  A   I'd have to look at the policy to see.

9  Q   Okay.  I'm happy to show it to you.  It's Defendants'

10 Exhibit 22.  You've already discussed it with your counsel.

11 Can you see this document?

12 A   No.

13       THE COURT:  I think we're seeing your desktop.

14 BY MS. ELLS:

15 Q   Can you see it now?

16 A   Yes.  Yes.

17 Q   Okay.  Thank you.  Sorry about that.  So I'm looking at --

18 so, first of all, this is the July 16th version of your policy;

19 is that correct?

20 A   Yes.

21 Q   Okay.  And this is the one that was in place -- I think you

22 said you changed it two days ago; is that right?

23 A   I think we changed it on the 19th was the date of the new

24 policy.

25 Q   Okay.  So your counsel sent it to us two days ago, but you

1    changed it a few days before.  Okay.

2              MR. HENNES:  Objection, Your Honor.

3              MS. ELLS:  Objection to what?

4              THE COURT:  Just proceed.

5              MS. ELLS:  Okay.

6              THE COURT:  This is not a jury proceeding.

7              MS. ELLS:  Thank you.

8    BY MS. ELLS:

9    Q   I'd like you to look at item 1i here.

10   A   Yes.

11   Q   This specifically says that once a negative COVID test is

12   obtained, CDCR shall promptly endorse the patient.

13   A   Yes.

14   Q   And that's only for open institutions.  You have a separate

15   process under this policy for closed institutions, correct?

16   A   Yes.

17   Q   Okay.  So for open institution your policy requires a

18   negative COVID test to be obtained before transfer?

19   A   Yes.

20   Q   And this provision is maintained in the current iteration

21   of your policy, correct?

22   A   Yes.

23   Q   But you don't require a negative COVID test before you

24   admit OMDs to your hospitals, correct?

25   A   We definitely try to obtain one, but we don't require it.

Dr. Warburton - Cross by Ells

1    Q    Correct.  And you also discharge patients back to CDCR

2    without securing a negative COVID test, correct?

3    A    You know, I think we do test all the discharges.

4    Q    Right.  My question is do you require a negative COVID test

5    before you will discharge people to CDCR, not whether you test

6    them.

7         And I'll direct you to section 2 here, which governs DSH

8    discharges.  Do you see anywhere in here that people will not

9    transfer back to CDCR unless a negative COVID test is obtained?

10   A    You know --

11   Q    I think that's a yes-or-no answer.  I would appreciate it

12   if you would speak to the policy.

13   A    So I'm sorry, Ms. Ells, what's the question?

14   Q    The question is, this is your policy of discharges to CDCR.

15        Now, it clearly says that you will obtain a test and test

16   people before they transfer.  Do you see anything in here

17   indicating that patients will not be returned to CDCR unless

18   they have a negative test?

19   A    No.  This is error in the way we wrote the policy,

20   apparently, because they do require the negative test.

21   Q    But your policy here does not?

22   A    No.  I think, as I mentioned, it's just an error in the way

23   we summarize the process in the written guideline.

24   Q    Sometimes the requirement that a Coleman patient have a

25   negative test can delay somebody's admission to DSH, right?

1    A    Yes.

2    Q    And sometimes, by the time CDCR secures a negative COVID

3    test for a patient, your admissions cohort is too full to admit

4    them, and you have to wait until the next week to try and

5    transfer them again; is that correct?

6    A    I don't have firsthand knowledge of that.  I'm sorry.

7    Q    Okay.  I'd like to show you a document here.  This is

8    Plaintiffs' Exhibit No. 95.  Now, this is a letter from counsel

9    for CDCR that says for patients in the month of August -- if

10   you look here under No. 1 -- now, we've redacted the patient

11   name and information here.  This says -- again, this is from

12   CDCR's lawyer -- that on July 29th DSH advised that this

13   patient could not be admitted at the time due to a full

14   admission cohort for that week in DSH, and Mr. Blank would be

15   scheduled for transfer the following week.  Do you recall that

16   situation now?

17   A    I'm sorry, I don't.

18   Q    Okay.  And again, on this next page we see for patient

19   No. 2 that this person received a negative test, was endorsed

20   to DSH Atascadero.  On July 29th DSH advised that Mr. Blank

21   could not be admitted at that time due to a full admission

22   cohort for that week at DSH.

23         MR. HENNES:  Your Honor, I'd like to object to this

24   exhibit on foundation and hearsay grounds.

25         MS. ELLS:  This is a letter written by --

1          THE COURT:  Well, the exhibit has not been moved yet,

2     so it's just been shown to the witness.

3          MR. HENNES:  Well, Ms. Ells is basically reading it

4     into the record.

5          THE COURT:  Well, Ms. Ells, you're not seeking to

6     admit the exhibit at this time; do I have that right?

7          MS. ELLS:  That's correct, Your Honor.

8          THE COURT:  All right.

9     BY MS. ELLS:

10    Q    So Dr. Warburton, you don't remember that incident either?

11    A    No.  I'm sorry.  Patient movement isn't in my area, so I

12    wasn't aware.

13    Q    Okay.  And I'll just say for the record this third patient,

14    same thing, could not be admitted due to a full admission

15    cohort for that week at DSH.  Now, you testified earlier that

16    there haven't been any situations where admission cohorts,

17    filled with OMD's, restricted Coleman patients' access to the

18    hospital; is that right?

19         MR. HENNES:  Objection, misstates prior testimony.

20    BY MS. ELLS:

21    Q    Dr. Warburton, are you aware of any situations where

22    admissions for OMDs delayed or deferred Coleman patient

23    admissions to DSH?

24         THE COURT:  You may answer that question,

25    Dr. Warburton.

1            THE WITNESS:  No.  Patient movement is not in my area,

2    so . . .

3    BY MS. ELLS:

4    Q    So you're not aware of whether or not that's happened?

5    A    No.

6    Q    Okay.  Sometimes the requirement for a negative COVID test

7    is not -- excuse me.  Let me restate that question.

8         Sometimes the requirement for a negative COVID test before

9    a Coleman patient is admitted requires a second retest if you

10   are unable to admit that patient within a certain amount of

11   time after receiving the COVID test; is that right?

12   A    Yes.

13   Q    And in essence --

14            THE COURT:  Ms. Ells, just so we're clear, I think

15   again we are seeing your screen.

16            MS. ELLS:  Okay.  I will stop the screen share.  Thank

17   you for alerting me to that.

18            THE COURT:  All right.

19            MS. ELLS:  Thank you.  I appreciate that.

20   BY MS. ELLS:

21   Q    Now, Dr. Warburton, you've always admitted OMD patients to

22   your hospitals no matter where they're coming from during the

23   pandemic, correct?

24   A    No.  We did have a positive patient that we admitted to a

25   different facility until he was no longer contagious.

Dr. Warburton - Cross by Ells

1   Q    Okay.  With the exception of that patient, have you always

2   admitted OMD patients to your hospitals during the pandemic?

3   A    Yes.

4   Q    And that includes admitting OMDs from CDCR prisons that are

5   closed to movement for outbreaks of COVID?

6   A    Yes.

7   Q    But until last week, you didn't admit any Coleman patients

8   from closed CDCR prisons to your hospitals, right?

9   A    Correct.

10  Q    And in fact, you admitted OMDs to Patton State Hospital

11  even when it was closed to other admissions, including Coleman,

12  in June through August due to an active COVID outbreak there,

13  correct?

14  A    Correct.

15  Q    You have a process that you described for admitting OMDs

16  from closed institutions safely, correct?

17  A    As safe as possible.  It would be our preference not to.

18  Q    But you have a policy in place for admitting OMDs safely,

19  to the best your ability, to your hospitals, do you not?

20  A    I would strike the words "safely" and say we have a process

21  for admitting OMDs to our hospitals.

22  Q    For male patients, you can admit them into your isolation

23  unit, unit 31 at Ash, correct?

24  A    I believe that's a PUI unit, but space is not my area.

25  Q    I'll represent to you that your weekly reports to us

1    describe it as a 46-bed isolation unit.  And are you -- if

2    you'd like, I can show that to you.  You seem to question that.

3    A    I'm sorry.  Space isn't my issue, so I shouldn't speak to

4    it.  I know we have five true isolation rooms at Atascadero.

5    Q    That's right.  And that's why I was following up because

6    your documents show that there is a unit of 46 single rooms on

7    unit 31 that are described as isolation units.  You're not

8    aware of whether or not that's true?

9    A    I know that in terms of negative pressure rooms that have

10   bathrooms that are true isolation spaces --

11   Q    Right.

12   A    -- that there's five.

13   Q    That's not my question.  Are you aware that the department

14   represents that there are 46 single rooms in an isolation unit,

15   unit 31, where patients can be admitted --

16   A    I'm not sure.

17   Q    -- beyond the five that you have described?

18   A    You know, there are different terms.  They do have a unit

19   where they put PUIs or higher risk individuals.

20   Q    And that includes patients from -- excuse me.  Let me start

21   that again.

22        That includes OMDs from closed institutions.  That's where

23   you can put them if you are afraid that they have COVID

24   exposure, correct?

25   A    I know that Dr. Fennell does admit people to a PUI unit

Dr. Warburton - Cross by Ells

1   based on his analysis of each case.

2   Q    And in addition to testing negative for COVID, you require

3   Coleman patients coming from open, not closed CDCR institutions

4   to quarantine at CDCR for 14 days before you will admit them,

5   correct?

6   A    Your question -- can you restate your question, Ms. Ells?

7   Q    Yes.  In addition to the negative COVID tests that we

8   described earlier, you also require Coleman patients coming

9   from open Coleman CDCR institutions, you require them to

10  quarantine at CDCR for 14 days before you will admit them to

11  your hospitals, correct?

12  A    Can we look at the guidelines again?  I need to double

13  check that.

14  Q    Yes.  Now, can you confirm that you're seeing the document

15  and not my desktop?

16  A    Yes, I can.

17  Q    Thank you.  Let me find the provision here.  Okay.  I'm

18  looking at provision h.  This says, "CDCR will order a COVID

19  test and quarantine those patients who have been accepted."

20  A    Yes, but I don't think it's like a true 14-day quarantine.

21  I think it's just to ensure that they don't have any exposures

22  after the test.  So we could take them -- you know, if the test

23  came back in 24 hours, I think we'd be willing to take them

24  then, if that makes sense.

25       The purpose of that quarantine is really just to make sure

Dr. Warburton - Cross by Ells

1    that the test, you know, is valid because the patient hasn't

2    had any exposure risk after the test.

3    Q    Thank you.  Now, are you familiar with the movement matrix

4    that CDCR uses?

5    A    I am aware and have seen it, but it's not something I've

6    become an expert on.

7    Q    So you don't know whether or not that requires a 14-day

8    quarantine before moving to DSH?

9    A    You know, I think it did and I think we've been talking

10   with them about that and that we're planning to change that.

11   Q    But right now it's your understanding that CDCR's

12   procedures require them to do a 14-day quarantine of anybody

13   from an open institution with no outbreaks to your hospital?

14   A    May I see it, Ms. Ells?  I'm sorry.  I'm just not an expert

15   in their processes on their side in that regard.

16   Q    It's okay.  I appreciate it.  Thank you.

17        So in addition to this, you -- I'm sorry.  Let me start

18   that question again.

19        So we've discussed the 14-day quarantine that you have at

20   Ash for male patients coming from CDCR right now, correct?

21   A    Yes.

22   Q    Okay.  And you test those people three times during that

23   period, correct?

24   A    Yes.

25   Q    And you test them and confirm they're negative and make

Dr. Warburton - Cross by Ells

1    them stay in your admissions and observation unit for a minimum

2    of 14 days before they can go into the dorm housing that you

3    described, right?

4    A    Yes.

5    Q    And you do that to protect the patients?

6    A    Yes.

7    Q    But you discharge patients back to CDCR without

8    quarantining them for 14 days?

9              MR. HENNES:  Objection, Your Honor, relevance.  The

10   question is intake into DSH, not outtake.

11             THE COURT:  Ms. Ells?

12             MS. ELLS:  Your Honor, the question is whether or not

13   the protocols are necessary to ensure patient safety.

14             THE COURT:  I'll allow the question.  You may respond,

15   Dr. Warburton.

16             THE WITNESS:  I'm sorry, Ms. Ells.  Can you repeat the

17   question?

18   BY MS. ELLS:

19   Q    You discharge patients back to CDCR without quarantining

20   them for 14 days first, correct?

21   A    That's a little bit of a complicated answer.

22   Q    I believe it calls for a yes or no.  Your attorney can draw

23   out more information on redirect, if appropriate.

24   A    I'm just simply not sure how to answer it honestly or

25   accurately.  Ask me one more time, and I will do my best to

1  answer accurately with the caveat that it's a complicated

2  answer.

3  Q    Thank you.  You discharge patients back to CDCR without

4  quarantining them for 14 days before doing so, right?

5  A    Yes, with a caveat.

6  Q    And nothing in your protocol that you've said is the

7  protocol you use requires any sort of 14-day quarantine before

8  discharge, correct?

9  A    Correct.

10  Q    And you also don't confirm that Coleman patients have a

11  negative COVID test before you discharge them to CDCR, correct?

12          MR. HENNES:  I have a relevance objection, Your Honor.

13          THE WITNESS:  Yes, I do.

14          THE COURT:  The objection is overruled.

15          THE WITNESS:  We do.  We make sure they have a

16  negative test.

17  BY MS. ELLS:

18  Q    You do.  But nothing in your policy requires that?

19  A    I think I mentioned that's an oversight in the way we wrote

20  the policy.

21  Q    You'll amend that.  Okay.

22      Now, your first priority for admission in your hospitals

23  are OMDs, correct?

24  A    We have to admit OMD patients on their parole date.

25  Q    Now, you were involved in the development of the COVID

Dr. Warburton - Cross by Ells

1    response protocols for DSH?

2    A    Initially, yes.

3    Q    Yes.  So are you familiar with the May 10th, 2020, DSH

4    COVID planning resuming admissions and discharges document?

5    A    Could you put it up for me, please.

6    Q    Sure.  Are you familiar with this document?  Can you see

7    it?

8    A    Yes, I can see it.

9    Q    Okay.

10    A    And I'm familiar with it, although I was not as involved

11    with this as some of the initial work.

12    Q    Okay.  Thank you.  Now, this is Plaintiffs' Exhibit 38.

13    I'd like to draw your attention to page 6.

14        Okay.  Now, this says that "When the admission observation

15    process is defined and operational, DSH has identified the

16    following priority admissions:"

17        MR. HENNES:  Your Honor, objection, relevance to

18    current state of affairs.

19    BY MS. ELLS:

20    Q    Is this not an operative policy, Dr. Warburton?

21        THE COURT:  I'm allowing the questioning.  I

22    understand the objection, but it's overruled.

23    BY MS. ELLS:

24    Q    Is this a governing document right now?

25    A    You know, it appears to be out of date.

Dr. Warburton - Cross by Ells

1    Q    Have you provided any superceding copy of this?

2    A    I'm sorry, Ms. Ells.  These patient movement issues are not

3    my specific -- you know, I don't know the answer to your

4    question.

5    Q    Okay.  You accept patients from county jails into your

6    hospitals, correct?

7    A    Yes.

8    Q    Now, for patients who refuse to go -- undergo a COVID test

9    from a jail, you accept them as long as they otherwise pass the

10   COVID screening, correct?

11   A    You know, I think that depends.  I think, if I recall

12   correctly, earlier this week they actually turned around a van

13   from LA because they did not have adequate testing.

14   Q    But you're not sure?

15   A    Yeah, I'm not sure.  I think we need that screen and that

16   test and that's our requirement.

17   Q    So you testified earlier that you require a test and a

18   screen but you don't require a negative test to admit patient

19   classes other than Coleman, correct?

20   A    Well, we have admitted Coleman patients without a negative

21   test too.  We just -- you know, clinically, Ms. Ells, we're

22   doing the best that we can.

23   Q    I appreciate that.  I'm just trying to get information on

24   the -- on your procedures.  I appreciate that you're working

25   hard and this is a complicated situation.  I do get that.  But

Dr. Warburton - Cross by Ells

1    I'm just asking, are there other patient classes that you will

2    refuse to admit unless they have a negative COVID test, which

3    your policy, you admit, requires?

4    A    Can you ask me that question one more time?  I'm sorry.

5    I'm struggling here.

6    Q    That's okay.  Do you require a negative COVID test for any

7    other patient class besides Coleman before you will admit them?

8    And again, as we discussed, your policy says you require a

9    negative COVID test for those patients.

10   A    I apologize.  I'm just not -- I'm not up to the -- I don't

11   think so.

12   Q    Okay.  Thank you.  Appreciate that.

13        So I'd like to look again at Exhibit 22, which is the

14   policy.  So I'd like to talk now a little bit about the

15   procedure for closed institutions.  Can you see the document

16   again?

17   A    Yes.

18   Q    Thank you.  So section n here covers closed institutions.

19   And it describes a process for what happens during this

20   case-by-case analysis of patients from closed institutions; is

21   that right?

22   A    Yes.

23   Q    Is that accurate?

24   A    Yes.

25   Q    And it says that details about these individual cases will

Dr. Warburton - Cross by Ells

1   be discussed between Dr. Bick and you're the DSH deputy

2   director of clinical operations, right?

3   A    Yes.

4   Q    So that's referring to you.  And do you personally have

5   these conversations about the case-by-case analysis of closed

6   institution patients?

7   A    We do now.  It's not Dr. Bick.  It's the CME from the

8   referring closed institution.

9   Q    Okay.  But so this -- I'll just scroll up again.  This is

10  the policy that's been in place since July?

11  A    Correct.

12  Q    And it requires a case-by-case analysis for individuals at

13  closed institutions who have been referred for your facility,

14  right?

15  A    Well, I think the idea when we did these guidelines was

16  that we would look at cases on a rare basis, so not that we

17  would look through -- and we identified later that this was a

18  problem and we've since fixed it but that if CDCR had a case

19  where they really need us to consider taking someone from a

20  closed institution, that we would look at it in this way.

21       And we did have conversations in the small workgroup that

22  they did not have any of those cases.  I don't know if that's

23  clear.

24  Q    Okay.  So I believe, and correct me if I'm wrong, what

25  you're saying is CDCR never represented that there were any

Dr. Warburton - Cross by Ells

1    appropriate cases falling in this category; is that correct?

2            MR. HENNES:  Objection, misstates testimony.

3            THE COURT:  I think Ms. Ells is trying to get

4    clarification, so I'll allow the doctor to respond, but with

5    the understanding Ms. Ells is not trying to put words in your

6    mouth.

7            THE WITNESS:  May I just describe the process which

8    is, you know, in the small workgroup, you know, we would --

9    Dr. Metzner would say, okay, how many of the people in closed

10   institutions are in PIPs; how many are in TMHUs, how many are

11   in -- you know.  And so we would just sort of see if there was

12   someone that needed to come to us.  And we did not have people

13   to review on a rare case-by-case basis because it did not

14   appear that there was anyone at that time who overcame that

15   threshold of the risk of COVID transmission in the closed

16   facilities.

17   BY MS. ELLS:

18   Q    Okay.  And so you're a psychiatrist, correct?

19   A    Yes.

20   Q    Okay.  Did you ever evaluate the medical records of any of

21   the patients that were waiting to come to your facility that

22   you had accepted as appropriate for your facility during the

23   three months that this was in place?

24   A    In general or from closed institutions?

25   Q    This policy regarding closed institutions.

Dr. Warburton - Cross by Ells

1   A    No.  I did not review any of the cases from closed

2   institutions.

3   Q    Did you look at what kind of care they were receiving in

4   CDCR while you were waiting?

5   A    Not beyond the discussions held in the small workgroup.

6   Q    Did you speak with their clinicians about how they were

7   doing and if they were struggling in their current setting?

8   A    No.

9   Q    Did you ask their clinicians whether they could be safely

10  managed where they were?

11  A    No.

12  Q    And so again, correct me if I'm wrong, my understanding is

13  that you didn't have an individualized discussion of any of

14  these patients during the three months or so that this

15  provision applied; is that accurate?

16  A    Can you define "individualized"?

17  Q    Right.  So I think we've now confirmed that there have been

18  upwards of around 55 people waiting and accepted for DSH but in

19  institutions closed for movement by CDCR.  Did anyone from DSH

20  have an individualized conversation with anyone from CDCR under

21  this provision about those 55 patients to see if they were safe

22  to come?

23  A    Not beyond the conversations I've described in the small

24  workgroup.

25  Q    Thank you.  Now, at the time of the July 16th policy's

1  issuance, there were 28 people on the DSH waitlist according to

2  the records that you've produced in the weekly workgroup and

3  there were 9 that were waiting past program guide timelines.

4  Now, in early October those numbers had essentially doubled,

5  but you didn't make any changes to your policy until just

6  before this hearing; is that accurate?

7  A    Well, we made changes to our process.

8  Q    Right.  A couple weeks ago, correct?  The first patients

9  you admitted from closed institutions were last week, right?

10  A    I don't know if it was last week or the week before.  I

11  think late September we started having internal discussions

12  about this issue.  I think we started talking to CDCR about it

13  around the first week in October.

14      What we really need is that, you know, public health

15  information.  We need to understand what's going on at the

16  institution the individual is coming from.  So I think it

17  took -- but we were able to communicate that to CDCR.  They

18  were able to find a way to get us that information.  And I

19  think that was in the first week or so of October.

20      So, I mean, it's just a process, you know, it takes -- but

21  we did identify, Ms. Ells, that we needed to address the fact

22  that so many institutions were closed and that we needed to get

23  people in.  We did do it proactively and we have started doing

24  it.

25  Q    Thank you.  Now, this kind of public health information

1    that you've been describing that you needed before you could

2    change the policy, is that the same type of public health

3    information you get to assess the risk for the OMDs coming from

4    closed institutions?

5    A    It's similar.

6    Q    When was the first time you asked for it with respect to

7    Coleman patients?

8    A    At closed institutions?

9    Q    Yes.

10   A    It was late September or early October.

11   Q    Dr. Warburton, you've described some public health

12   conversations you had surrounding your protocols that you have

13   in place at DSH earlier, right?  You've consulted with public

14   health officials?

15   A    Yes.

16   Q    Okay.  Are you aware of any published guidelines from the

17   Department of Public Health recommending that hospitals refuse

18   to admit patients who don't have a negative COVID test?

19   A    Well, there's lots of different guidance that's come out.

20   Q    Are you aware of any published guidance from the California

21   Department of Public Health or the CDC recommending that

22   hospitals refuse to admit patients who don't have a negative

23   COVID test?

24   A    What type of hospitals, Ms. Ells?

25   Q    Any type of hospitals.

Dr. Warburton - Cross by Ells

1    A    You know, there's a lot of guidance; I've reviewed it.  I

2    can't give you an answer to your question that I'm aware of.

3    Q    Okay.  And are you aware, in fact, that the California

4    Department of Public Health's FAQs for behavioral health

5    programs --

6         DSH is a behavioral health program, correct?

7    A    No.

8    Q    You wouldn't consider yourself a behavioral health program?

9    A    We're a long-term forensic psychiatric facility.

10        A behavioral health program I would characterize as a

11   community facility taking people from a vastly different -- a

12   patient population for vastly different reasons.  They would

13   have a completely other type of health guidance than us.

14   Q    Are you aware of any CDC guidance that specifically

15   pertains to your type of facility?

16   A    No.  That's why we work so much with the CDPH experts.

17   We've looked at SNIFF's (phon.) guidance, correctional

18   guidance, psychiatric hospital guidance, acute care hospital

19   guidance.  You know, it's guidance.  It's generalized guidance

20   out to the field, but we're sort of uniquely situated in the

21   California Department of State Hospitals.  So what happens is

22   our medical directors go through the guidance, they try to come

23   up with protocols --

24   Q    I appreciate that you have a process, but I'm just asking

25   are you aware of any published guidance that's specific to your

1    situation, since you don't consider yourself a behavioral

2    health facility?

3    A    No.    There is no specific guidance for forensic state

4    hospitals that we're aware of.

5               THE COURT:  Ms. Ells, let me ask how much more you

6    have?

7               MS. ELLS:  I think maybe five more minutes, maximum

8    ten minutes.  Your Honor, I would appreciate -- could you tell

9    me how long I have been going?

10              THE COURT:  Well, let's see.  It is -- you've been

11   going just over half an hour.  I'll give you exact counts at

12   lunch.  I think we need a break because we've been going long

13   enough.  So even though we're getting close to the lunch hour,

14   let's get a 10-minute break and then we'll come back, the

15   plaintiff will finish and we'll see if we can get through

16   Dr. Warburton before a lunch break.  My current plan is to take

17   a lunch break at noon for 45 minutes.  That will squeeze our

18   time today, given the 3 hours each, but assuming you're going

19   to use the 3 hours, we may go just a little bit past 5:00.

20              MS. ELLS:  Thank you, Your Honor.

21              THE COURT:  Ten minute break now.  It's 11:27.  Be

22   back at 11:37.

23              MR. HENNES:  Thank you, Your Honor.

24       (Recess at 11:27 to 11:38 a.m.)

25              THE COURT:  All right.  We're back on the record.

1    Defendants have used 44 minutes and plaintiffs 33, so you know.

2              MS. ELLS:  Thank you.

3              THE COURT:  And I know I've been checking time

4    manually, but I have retrieved my chess clock from the bench

5    and the batteries still work, so I'll be supported by that as

6    well.

7              So Ms. Ells, you may continue for another five or ten

8    minutes.

9              MS. ELLS:  Thank you, Your Honor.  I actually have no

10   further questions.

11             THE COURT:  All right.  Mr. Hennes, do you have any

12   redirect?  I would allow it.

13             MR. HENNES:  Brief redirect, Your Honor.

14             THE COURT:  All right.  You may proceed.

15                        REDIRECT EXAMINATION

16   BY MR. HENNES:

17   Q    Dr. Warburton, on cross you testified that DSH has accepted

18   some Coleman patients despite not having a negative test; is

19   that correct?

20   A    Yes.

21   Q    Why would you do that?

22   A    We just try to do what we think is in the best medical

23   interest of the patient.  So if there's an individual and CDCR

24   is able to communicate with us about that individual, you

25   know -- we do have patients that refuse tests, for example.

Dr. Warburton - Redirect by Hennes

1    You know, if the exposure risk is low enough, you know, we --

2    our medical directors of the facilities who are responsible for

3    the health and welfare of their patients kind of make those

4    decisions based on their medical judgment.

5    Q    You also mentioned on cross that there was a risk to

6    admitting OMD patients; is that correct?

7    A    Yes.

8    Q    What is that risk?

9    A    Well, especially from closed institutions, given the

10   situation that some of those institutions had in CDCR, you

11   know, the virus is insidious and oftentimes silent.  You can

12   have negative tests.  We've had this experience repeatedly.

13   You can have a negative test and still have someone who tests

14   positive later.  And once the virus comes in to our facilities,

15   based on many of the factors I discussed earlier this morning,

16   it's extremely hard to contain and very easy to -- it's very

17   infectious, easily transmissible virus.  So each one of those

18   OMDs represents a risk, especially if they're coming from a

19   high-risk environment.

20   Q    Do you have to balance that risk against anything?

21   A    Yes.  And, you know, medicine is about balancing.  It's

22   about looking at risks and benefits.  It's about looking at --

23   when you're utilizing a crisis standard of care, which is

24   different than your regular time standard of care, you have to

25   balance the good of the group against the good of the

Dr. Warburton - Redirect by Hennes

1    individual.  And so this entire period since March has been

2    about balancing and trying to find the least worst path

3    forward, given the deadly nature of this pandemic.

4    Q    Dr. Warburton, since April has DSH admitted Coleman

5    patients for inpatient admissions?

6    A    Yes.  They gave me the numbers.  I believe the number is

7    111 Coleman patients have been admitted.

8    Q    And of those 111 admissions, have any been positive for

9    COVID-19?

10   A    Not yet, but I'd just like everyone to knock wood.

11   Q    Understandable.  So today would you say that DSH's

12   procedures for preventing COVID-19 from spreading to its

13   patient population has been successful?

14   A    We have been as successful as I think we can be under the

15   circumstances, yes.  We have been very conservative and

16   cautious, given how deadly this virus is.  I am not ready to

17   declare victory.  I will be very glad when this pandemic is

18   over.

19              MR. HENNES:  Thank you, Your Honor.  We have no

20   further questions on redirect.

21              THE COURT:  All right.  Is this witness excused,

22   Ms. Ells?

23              MS. ELLS:  I have about two questions, Your Honor.

24              THE COURT:  All right.

25              MS. ELLS:  Thank you.

1                              RECROSS-EXAMINATION

2      BY MS. ELLS:

3      Q    Dr. Warburton, you talked about how all of this period is

4      about balancing.

5      A    Yes.

6      Q    But you don't look at the patient's psychiatric care that

7      they're receiving in CDCR during that balancing, right?

8      A    Well, I think we do.  We've participated in this small

9      workgroup with CDCR and the Office of the Special Master and

10     that's what we talk about everything week is balancing and --

11     you know, for example, you know, is there anyone over there in

12     a TMHU or -- so I haven't read individual case records, no, but

13     in terms of the large-scale policies that we're trying to put

14     into place, refine in an iterative fashion, it is all about

15     trying to balance providing care to people without increasing

16     the risk of mortality.

17     Q    So those conversations you described in the workgroup, they

18     were never about a specific patient and how that patient was

19     doing.  They were about where that patient was; is that

20     accurate?

21     A    In the closed institutions discussions, yes.

22                 MS. ELLS:  That's all.  Thank you, Your Honor.

23                 THE COURT:  Anything further, Mr. Hennes?

24                 MR. HENNES:  Nothing from defendants, Your Honor.

25                 THE COURT:  All right.  Now, is Dr. Warburton excused,

Dr. Warburton - Recross by Ells

1    Mr. Hennes?

2           MR. HENNES:  Yes, Your Honor.

3           THE COURT:  Ms. Ells?

4           MS. ELLS:  Yes, Your Honor.  Thank you.

5           THE COURT:  All right.  Dr. Warburton, you're excused.

6    You may sign off and at this point you may remain and observe,

7    if you wish.  It's up to you.

8           DR. WARBURTON:  Thank you, Your Honor.  I will do

9    that.

10          THE COURT:  Mr. Hennes?

11          MR. HENNES:  I would just like to say defendants may

12   need to recall Dr. Warburton to respond to plaintiff's experts'

13   testimony in the event that they are permitted to testify.

14          THE COURT:  Ah.  In that case, Dr. Warburton, we would

15   ask that you go back into the waiting room.

16          DR. WARBURTON:  Okay.  Thank you, Your Honor.

17          THE COURT:  All right.  Do you know how to do that?

18          MR. HENNES:  Thank you, Your Honor.

19          DR. WARBURTON:  I have no idea, Your Honor.

20          THE COURT:  Maybe it's Ms. Schultz moving you there.

21          Ms. Schultz, you can do that?

22          THE CLERK:  Yes, Your Honor.

23          THE COURT:  All right.  All right.  Very good.  Thank

24   you.

25          All right.  The next witness for the defendants.  We

1    can go for about 15 minutes before our lunch break.

2            MR. HENNES:  All right, Your Honor.  I will actually

3    defer to Mr. Lewis for the remaining questions.

4            THE COURT:  All right.  Mr. Lewis?

5            MR. LEWIS:  Yes, Your Honor.  Defendants will now call

6    Dr. Amar Mehta.

7            THE COURT:  Ms. Schultz will bring Mr. Mehta in.

8            MS. ELLS:  My colleague will be handling this witness,

9    so I will take myself off video and he will join.

10           THE COURT:  All right.  Because we're in court that

11   means Mr. Galvan?

12           MS. ELLS:  I'm very sorry.  Yes.  Mr. Galvan.

13   Apologies.

14           THE COURT:  All right.  Mr. Galvan, are you seeing and

15   hearing the Court and able to turn your video camera on?

16           MS. ELLS:  I'm sorry.  One more mistake, Your Honor.

17   It's my colleague Jessica Winter that will be with this

18   witness.

19           THE COURT:  Okay.

20           MS. ELLS:  Defendants did not list this person on

21   their witness list, so we're surprised he's being called.

22           THE COURT:  But not registering a formal objection?

23           MS. ELLS:  No.  Thank you.

24           THE COURT:  All right.  Ms. Winter, are you able to

25   turn your video camera on?  All right.

1           MS. WINTER:  Yes.  There I am.  I'm sorry, Your Honor.

2           MR. GALVAN:  I apologize.  That might have been me,

3     but I turned it off.

4           THE COURT:  All right.  All right.  As long as we

5     observe the best practice of muting when not speaking, that

6     should help.  But if we have problems, we'll address those.

7           All right.  So Ms. Schultz, can you please swear

8     Dr. Mehta?

9           THE CLERK:  Sir, will you please raise your right

10    hand?

11        (Witness duly sworn.)

12          THE WITNESS:  I do.

13          THE CLERK:  Thank you.  You may put your hand down.

14          THE COURT:  All right.  Mr. Lewis, you may proceed.

15          MR. LEWIS:  Thank you, Your Honor.

16          DR. AMAR MEHTA, defendants' WITNESS, SWORN

17                      DIRECT EXAMINATION

18    BY MR. LEWIS:

19    Q    Good morning, Dr. Mehta.  Could you please state your name

20    and spell it for the record, please.

21    A    Sure.  My name is Amar Mehta.  First name A-M-A-R, last

22    name M-E-H-T-A.

23    Q    And are you currently employed by the California Department

24    of Corrections and Rehabilitation?

25    A    Yes, I am.  My position is deputy director of state-wide

Dr. Mehta - Direct by Lewis

1  mental health.

2  Q    And are you a medical doctor?

3  A    I am, yes.

4  Q    Do you have any specialties?

5  A    Yeah.  I am board certified in adult psychiatry, child and

6  adolescent psychiatry and forensic psychiatry.

7  Q    And how long have you held your current position as the

8  deputy director?

9  A    It's been about three and a half months, almost four, two

10  of which were in an acting capacity and about a month and a

11  half since official.

12  Q    And before that what was your position at CDCR?

13  A    I was the state-wide chief of tele-psychiatry.

14  Q    And when were you in that capacity, roughly?

15  A    It was around September 2019 until this most recent

16  promotion.

17  Q    So have you been in an executive leadership role at CDCR

18  since the start of the COVID-19 pandemic?

19  A    Yes.

20  Q    And do you understand that you have been called here today

21  to testify concerning CDCR mental health patient access to

22  inpatient hospital care at the Department of State Hospitals?

23  A    Yes.

24  Q    Are you familiar with the mental health delivery or mental

25  health services delivery system program guide?

Dr. Mehta - Direct by Lewis

1    A    Yes, I am.

2    Q    So in general terms, what is the program guide?

3    A    Program guide is a list of all of the policies and

4    procedures that guide and inform mental health treatment within

5    CDCR.  It's a document that is agreed upon by the Office of the

6    Special Master representing the Court is my understanding and

7    all other parties.

8    Q    And what are the program guide's requirements for the

9    transfer of Coleman patients to inpatient beds?

10    A    So there are a set of timelines, depending on the level of

11    care that the patient is classified as.  For DSH, we only send

12    intermediate or ICF patients.  And so the timeline for that is

13    30 days after the completion of the referral packet the patient

14    has to transfer.

15    Q    And are there policies that provide for exceptions to those

16    timeframes?

17    A    Yeah.  If there's an exception such as a hold, a medical

18    hold or something like that, then after the hold is lifted, the

19    patient has to transfer within five days.  I believe that comes

20    from addendums later, not from the specific chapter.

21          COURT REPORTER:  I'm sorry, Your Honor.  I lost the

22    witness at -- let me repeat what I just wrote.

23          (Record read.)

24          THE WITNESS:  The patient has to transfer within five

25    days, but that comes from later addendums and modifications to

Dr. Mehta - Direct by Lewis

1    the program guide is my understanding.

2    BY MR. LEWIS:

3    Q    And have you been involved in the CDCR mental health

4    program's response to COVID-19?

5    A    Yes, from the very beginning.

6    Q    And what have some of those correspondences that you've

7    been part of entailed?

8    A    So starting, I want to say, end of March, beginning of

9    April, we began the task force.  It was originally every other

10   day including, you know, weekends and holidays.

11        The task force spun off a series of workgroups, the biggest

12   one probably being our Wednesday workgroup with subject matter

13   experts from the OSM and many of our CDCR staff but not either

14   legal parties.

15        And those workgroups -- that workgroup and others like it

16   have helped to fine tune our response, make sure everyone is on

17   the same page and understanding what is going on, raise and

18   answer any questions or anything that isn't clear and kind of

19   generally coordinate and move things forward as quickly as

20   possible.

21   Q    So just to be clear, there's larger task force meetings and

22   then there's smaller sub workgroups?

23   A    Yeah, exactly.  So task forces are now weekly, every

24   Tuesday afternoon.

25        On Wednesday we have a workgroup which started out as 60

1    minutes, it's currently 90 minutes.

2        On Monday we have a separate workgroup for DSH transfer

3    issues and Dr. Warburton, Dr. Fennell and others who are

4    involved in the process at different times can join that group

5    and it also includes representatives of the Office of the

6    Special Master and CDCR staff, of course.

7        We also spun off an EOP ad seg hub certification workgroup,

8    behavioral treatment workgroup, for high utilizing patients.

9    Those have since morphed into different settings, but they all

10   came from that.

11   Q    And then are the small workgroups, are they a collaborative

12   process?  Does it produce things that kind of have input from

13   all the attendees at the small workgroups?

14   A    Yeah.  By and large, things that are identified in the task

15   force where the plaintiffs are present get moved to the

16   appropriate workgroup for further development.  And then when

17   things are done in the workgroup and the special master's

18   experts and the CDCR staff are all in agreement about the

19   wording and how these things are to be implemented, then it's

20   brought back into the task force where the plaintiffs have a

21   chance to comment on it, ask questions and, you know, even make

22   modifications or suggest modifications.

23   Q    And forgive me if I asked this:  When did the task force --

24   or if you said this, when did the task force begin?

25   A    Late March, early April was when it began.  I apologize.  I

Dr. Mehta - Direct by Lewis

1    can't recall the exact date of the first one.

2    Q    Okay.  So as the COVID-19 pandemic began impacting CDCR's

3    mental health operations, did CDCR take actions to ensure that

4    Coleman patients were transferred to inpatient care?

5    A    Yeah.  That was probably the first major task of the task

6    force and workgroups was to come up with the wording and the

7    processes that would be able to transfer these patients as

8    safely as possible.

9         There's a lot of different factors to be taken into

10   consideration, as I'm sure everyone here today is aware.  And

11   spelling out how that would occur involved a lot of different

12   parties, including custody and nursing, mental health, medical,

13   public health, all these different groups.

14   Q    And did this process of kind of creating a response, did it

15   include formulating screening and transfer guidelines?

16   A    Yeah.  The way in which we can be confident that patients

17   are going to be safe or safe themselves and also safe to other

18   inmates and other staff members, those -- the specifics of that

19   have evolved and we've been constantly modifying it, but that's

20   when they all started, yes.

21   Q    All right.  So I'm now going to show you an exhibit and I'm

22   going to try to get this to work well, so bear with me.  I'm

23   going to try to put a screen up so that we review it on your

24   screen.

25   A    Okay.

1   Q    I'm going to show you what has previously been marked as

2   Defendants' Exhibit 9.  It's an April 15th, 2020, memo by CCHCS

3   the California Correctional Health Care Services.  So bear with

4   me and I will try to do this.  Pardon me while I get this

5   right.  All right.  Here we go.  Hopefully this will work.  My

6   apologies for the delay.

7        All right.  Do you see this document on your screen,

8   Dr. Mehta?  It's an April 5th, like I said, 2020 memorandum.

9   A    I do, yes.

10  Q    All right.  Could you read the title of the document,

11  please.

12  A    Yeah.  We refer to the subject as the title, so it says

13  "COVID-19 Screening Prior to Mental Health Transfers."

14  Q    Are you familiar with this document?

15  A    I am, yeah.  I was part of the workgroup that developed it

16  and wrote it.

17  Q    So you had a role in creating the document and/or its

18  subject matter?

19  A    Yes.

20  Q    All right.  So was this document prepared with input from

21  the special master's experts, et cetera, in the small

22  workgroup?

23  A    Yeah, definitely.  So this was originally a part of a memo

24  that eventually was completed and released on the 10th of

25  April.  This part was done a little quicker.  And while we were

Dr. Mehta - Direct by Lewis

1    making sure we got everything right on the other one, we didn't

2    want the field to wait, so we released this one immediately,

3    but it was definitely reviewed by all parties and agreed upon

4    in exactly how it should look.

5               MS. WINTER:  Your Honor, we object.  We object and

6    move to strike the suggestion that plaintiffs approved this

7    policy.  We didn't approve the policy.  It did go forward.

8               THE COURT:  Response, Mr. Lewis?

9               MR. LEWIS:  If the witness said the plaintiffs agreed

10   to it, I'm not sure he exactly said that he was talking about

11   the parties in general or -- but I could try to rehabilitate or

12   ask further questions on this, Your Honor.

13              THE COURT:  Well, the objection is noted, and I will

14   not -- I understand the objection, given that the testimony is

15   definitely reviewed by all parties and agreed upon.  So the

16   objection is sustained to the extent that testimony could be

17   construed as saying plaintiffs agreed, but otherwise the

18   testimony stands.

19              MR. LEWIS:  Very well, Your Honor.  I'll continue on,

20   if I'm allowed to.

21   BY MR. LEWIS:

22   Q    So it was raised during the task force meetings, this

23   particular document, Exhibit 9, correct?

24   A    Yes.

25   Q    So I'd like to call your attention to the first paragraph.

Dr. Mehta - Direct by Lewis

1    Could you read the first two sentences of that paragraph that

2    begins "referrals"?

3    A    Sure.   "Referrals to mental health inpatient care shall

4    continue when a patient requires such placement to prevent

5    serious harm to self or others or to address serious mental

6    health decompensation.   Transfers must take place in a manner

7    that minimizes the risk for transmission of COVID-19."

8    Q    So what are your concerns about the risk of or what were

9    your concerns about the risk of transmission of COVID-19?

10   A    So at the time nobody, to my knowledge, had a good

11   understanding of exactly how dangerous this was going to be,

12   what the mortality rate was going to be.  I would say that

13   there's a range of things that -- problems COVID-19 can cause

14   other than death, but that was looming large, I think, in

15   everyone's mind.

16        Just to kind of put things in perspective the way we were

17   trying to consider all of these risks at once, which was a

18   complicated process, we now know, and at the time we suspected

19   that the risk of death from COVID-19 massively outweighs the

20   risk of death from other causes, especially mental health

21   causes, such as suicide.

22        And as with COVID-19, there is a wide range of suffering

23   that can occur other than suicide in mental health patients.

24   But that being said, I'll give you an example.  We've had 21

25   tragic suicides at this point during the year 2020.  Just since

Dr. Mehta - Direct by Lewis

1     April when our first COVID case was identified we have now had

2     27 deaths from COVID.  So 21 out of the full class size of

3     30,000 versus 27 out of the roughly 3,000 people that have --

4     in the mental health system that have been infected, that --

5     the rate -- the percentage of death from suicide is about .07

6     percent.  The percentage of death from COVID is about .8, which

7     is more than ten times greater.

8         So we were trying to balance these very complicated things,

9     especially at a time when we didn't have as much data as we did

10    today -- as we do today -- to make sure that we were doing

11    everything we can to keep our patients safe.

12    Q    Thank you.

13            THE COURT:  On that note, we've reached the time for

14    our lunch break.

15            MR. LEWIS:  Yes, Your Honor.

16            THE COURT:  And so I would just note that the

17    defendants have used almost 62 minutes, 61 minutes 46 seconds

18    and the plaintiffs 34 minutes, 17 seconds.  So let's make this

19    a 45-minute break in an effort to keep things moving in the

20    afternoon and get through what we need to.  So please be back

21    here at 12:45.

22            MR. LEWIS:  Thank you, Your Honor.

23            THE COURT:  We'll see you then.

24        (Recess at 12:02 p.m. to 12:46 p.m.)

25            THE COURT:  All right.  We're back on the record.  I

1   understand there's some housekeeping, Mr. Lewis?  Oops.  You're

2   muted.

3          MR. LEWIS:  Thank you, Your Honor.  My apologies.  Two

4   very quick housekeeping things, Your Honor.

5          First of all, defendants do believe that possibly

6   written closing arguments might be best, just in -- for sake of

7   time.  And we can discuss that later, but I wanted to make the

8   Court aware of that now so we could think about that as we

9   proceed through the afternoon.

10         THE COURT:  All right.  And then the other matter?

11  Was there another one?

12         MR. LEWIS:  I'm sorry, Your Honor.  Defendants at this

13  time would like to ask the Court to take judicial notice of a

14  specific document.  This is actually one of our documents.

15  It's Exhibit No. 44 within our proposed exhibits.  And I will

16  put it up on the screen with Your Honor's permission now.

17         This is a stipulation that the parties had reached to

18  extend one of the hearings back in May.  And I will share it

19  now as long as my system, of course, works.  And I'll need to

20  do this if you'll give me a minute.

21         THE COURT:  It's D44?

22         MR. LEWIS:  Correct, Your Honor.

23         THE COURT:  What's the date?

24         MR. LEWIS:  It is 5/18/20.  And let me see if I can do

25  this.  I believe we're sharing the screen now, Your Honor.  Do

1    you see the document 6676, 5/18/20 at the top?

2           THE COURT:  I see the first page.

3           MR. LEWIS:  Yes.  I'll scroll down, Your Honor.  And

4    the reason why I'm bringing this up is this will address the

5    issue of whether plaintiffs have agreed to certain things.

6           I would call Your Honor's attention to page 3, line

7    15, in which the plaintiffs stated -- and this was a joint

8    stipulation that Your Honor signed.

9           THE COURT:  You don't need to read it.  I don't think

10   we need to take time for that because the document speaks for

11   itself.  Is there any objection to the Court's taking notice of

12   this document?  I don't know.  I mean, it's on the docket.  Any

13   objection, Ms. Ells?

14          MS. ELLS:  It's already part of the record.  Judicial

15   notice isn't required.

16          THE COURT:  That would be my thought.  Is there

17   anything added by my taking notice, Mr. Lewis?

18          MR. LEWIS:  Yes, Your Honor.  This goes to actually

19   testimony issues.

20          Here the plaintiffs agree that the defendants were

21   complying with the program guide at a certain point in time,

22   and they also agreed that current procedures were captured in

23   the defendants' written guidelines.

24          So when plaintiffs are saying that they did not agree

25   to something that predates this document, there's a bit of a --

 1   that's why we're asking the witnesses some of the questions

 2   we're asking.  We're going off a stipulation that they signed

 3   that maybe the witnesses don't have exact knowledge of because

 4   they didn't see this document, but obviously they talked about

 5   that's things within the task force setting and things like

 6   that.

 7            MS. ELLS:  Your Honor --

 8            THE COURT:  Again -- just again, I'm not -- I think

 9   you can argue that in any closing.  I don't know that I would

10   take notice.  You're asking me to take notice to give a certain

11   weight to the contents, right?

12            MR. LEWIS:  Yes, Your Honor.

13            THE COURT:  Yeah.  I'm declining to take notice at

14   this time.  You can renew the request in any closing, but it is

15   on the docket.  It's part of the record of the case.

16            MR. LEWIS:  Yes, Your Honor --

17            THE COURT:  All right.

18            MR. LEWIS:  -- but I just wanted to -- I did not want

19   to shoot back and get into a debate in front of the witness,

20   Your Honor, on this particular issue, so I'm raising it now.

21   But I understand Your Honor's points.  Thank you.

22            THE COURT:  All right.  And what's the docket number

23   again, 6676?

24            MR. LEWIS:  6676, Your Honor.

25            THE COURT:  All right.  All right.  On the closings

anything to say, Ms. Ells? At this point would you be requesting written closing argument?

MS. ELLS: Yeah. That's fine. We're amenable to that.

I will say I can't actually read the document that was projected onto the scene, so I can't really comment on it, but we can address anything that we need to in the closings.

THE COURT: All right. So should we bring Dr. Mehta back?

MR. LEWIS: Yes, Your Honor.

THE COURT: All right. As soon as he's back, then remind me who's asking questions of Dr. Mehta. That's you, Mr. Lewis, correct?

MR. LEWIS: Correct, Your Honor.

THE COURT: All right. All right, Mr. Lewis. You may proceed.

BY MR. LEWIS:

Q All right. Dr. Mehta, can you hear me?

A I can, yes.

Q All right. Thank you. So picking up with your testimony, I'd like to now show you what has been previously marked as Defendants' Exhibit 10. It is an April 10th, 2020, CCHCS memorandum. I'm going to share my screen now. Please tell me if you can see a document, a memorandum dated April 10th, 2020. Do you -- that's not it. Excuse me. Do you see that?

1    A    I'm still seeing the old document, the one we've already

2    discussed from April 5th.

3    Q    Are you looking at this date right here -- it says April

4    10th, 2020 -- or am I not screening it?  So according to my

5    screen I'm sharing it.

6    A    I don't know if it's a lag, but my screen is still on the

7    April 5th and I just lost it.

8    Q    I'll try to resume it.

9    A    Cool.

10   Q    How about that?

11   A    Yes.  Now I see it.

12   Q    All right.  Are you familiar or could you read the title of

13   this document, please.

14   A    Sure.  Title is "COVID Emergency Mental Health Treatment

15   Guidance and COVID Temporary Transfer Guidelines and Workflow."

16   Q    Are you familiar with this document?

17   A    Yes, definitely.

18        MS. WINTER:  Your Honor, I'm sorry, I can't read the

19   document.  It's not zoomed in sufficiently.

20        MR. LEWIS:  All right.  I will try to do that, Your

21   Honor.

22        THE COURT:  Ms. Schultz is suggesting that you enlarge

23   to 100 percent.

24        MR. LEWIS:  I'm at 200 now, Your Honor, at least on my

25   screen.

Dr. Mehta - Direct by Lewis

1          THE COURT:  All right.  Are you able to see that now,
2    Ms. Winter?
3          MS. WINTER:  You know, it's only showing part of the
4    screen, so it's only showing one half of the document now.
5          MR. LEWIS:  Is that getting better?
6          MS. WINTER:  Yeah --
7          THE COURT:  Is there a way for us to enlarge the size
8    of the display box?  Is that something Mr. Lewis can do?
9          THE CLERK:  I believe --
10         THE COURT:  I'll allow Ms. Schultz to -- yeah.
11         THE CLERK:  I believe he can, but let me reach out to
12   IT and then I will get an answer and get back to you.
13         MS. WINTER:  The way it's set up now it's slightly
14   better too.  I think it's at 125.
15         MR. LEWIS:  Right.  I'll try 150.  Is that good for
16   everyone?
17         THE COURT:  That cuts off some things, so I'd stick
18   with 125 for now.
19         MR. LEWIS:  Yes, Your Honor.  All right.
20   BY MR. LEWIS:
21   Q   Dr. Mehta, are you familiar with this document?
22   A   Yes, I am.
23   Q   And did you have a role in creating this document or its
24   subject matter?
25   A   Yes.  Definitely.

Dr. Mehta - Direct by Lewis

1    Q    And was this document created with the input of the special

2    master's experts in the small workgroup?

3    A    Uh-huh.  Yep.  A lot of feedback, a lot of back and forth

4    and discussion of what all the terms meant.

5    Q    Was it raised during the task force meetings?

6    A    Yes, it was.

7    Q    And what was the purpose of this document?

8    A    So this is the document -- this is the first big document

9    other than the April 5th one which was much smaller where we

10   really laid out how we wanted these emergency transfers to

11   occur, how to designate the patients, how to -- who's going to

12   be in charge of it, meaning we have different teams that review

13   these cases and everything.  And so this laid out answers to

14   all of those questions.

15   Q    So was this April 10th memorandum intended to build upon

16   the April 5th memorandum, which I previously showed you as

17   Exhibit 9?

18   A    Yeah.  And we actually incorporated that memo -- that

19   screening tool into the bottom of this memo as well.  So that

20   that one was -- like we said, we tried to get it out as quick

21   as we could, but this was the main one that we were all working

22   on.

23   Q    Okay.  So I'm going to scroll down, and I will do it slowly

24   so that it does not lag through.  I'm going to go to page 3.

25            THE COURT:  Actually, Mr. Lewis, we have IT on hand,

Dr. Mehta - Direct by Lewis

1    and so our IT staff may be able to explain how to enlarge the

2    size of the display box.

3              MR. LEWIS:  Perhaps I could do this, Your Honor.

4              THE COURT:  Let me have our IT staff -- tech support.

5              You may proceed, ma'am.  You're muted.

6              TECHNICAL SUPPORT:  Yes, Your Honor.  It's Kristin

7    from IT.

8              THE COURT:  Yes.

9              KRISTEN:  So it appears -- do you have Adobe to the

10   maximum screen size?

11             MR. LEWIS:  I do, but perhaps this would be -- I have

12   two screens and this particular screen is in a vertical

13   position.  Perhaps if I moved it to a horizontal screen, it

14   would help.

15             TECHNICAL SUPPORT:  Yes, that would -- yes.  Let's

16   attempt that.

17             MR. LEWIS:  So I will stop share and I will drag it

18   over here and attempt to do this now.  Does that improve the

19   situation?

20             DR. MEHTA:  Yeah.

21             THE COURT:  Yes, and for the Court.

22             Ms. Winter, agreed?

23             MS. WINTER:  Yes, I agree.

24             THE COURT:  All right.

25             MR. LEWIS:  And I also increased the size of it, Your

1    Honor, to 150, so this should work hopefully.

2            THE COURT:  All right.  Thank you very much, Kristin.

3            TECHNICAL SUPPORT:  You're welcome, Your Honor.

4            THE COURT:  All right.  That was easy.  None of us

5    would have figured it out.  I didn't charge the defense for

6    this time.

7            MR. LEWIS:  Thank you, Your Honor.  I need my 30

8    seconds.

9    BY MR. LEWIS:

10   Q    All right.  So I will call your attention to page 3 and

11   I'll go there slowly so I don't create lag issues.  In the

12   middle of the page do you see the line that says "Inpatient

13   Referrals to a Different Facility"?

14   A    Yes.

15   Q    Does that section describe the criteria for transferring a

16   patient out of his or her current facility?

17   A    Yes.

18   Q    Is the purpose of putting this criteria in the transfer

19   guideline an attempt to limit the transmission of COVID-19 by

20   mental health patients?

21   A    Yes.

22   Q    Now, can you describe your thought process, Dr. Mehta, for

23   weighing the risks and benefits of a transfer?

24   A    Yeah.  So we want to take into account a pretty broad range

25   of possible outcomes, such as infection with COVID, you know,

Dr. Mehta - Direct by Lewis

1    the mental illness itself, the severity of the patient, the

2    level of care when we assign a level of care to the patient.

3    And in this document we sort of go through -- as I said, we

4    spent a really long time on the exact wording with the Office

5    of the Special Master experts, and we go through kind of what

6    we all agreed -- in the workgroup agreed that raised these

7    issues to the level of transfer.

8    Q    So you're --

9         MS. WINTER:  Your Honor, objection to the extent that

10   this witness could not speak to what everybody agreed to.

11        THE COURT:  Sustained in that respect, so I'll

12   disregard that portion of the testimony.

13        MR. LEWIS:  Very good, Your Honor.

14   BY MR. LEWIS:

15   Q    So then basically you're trying to weigh the risks as best

16   you can?

17   A    Yes.  So weighing the risks of movement against the

18   benefits and the risks of staying against the benefits as well.

19   Q    Thank you, Dr. Mehta.

20        I'm going to now show you what has been previously marked

21   as Defendants' Exhibit 12.  And I will stop share on this if I

22   can do this.

23        All right.  I'm showing you a document that's previously

24   been marked as Exhibit 12.  It's titled "COVID-19 Temporary

25   Guidelines for Transfer to DSH Inpatient Care."  Are you

Dr. Mehta - Direct by Lewis

 1   familiar with this document?

 2           COURT REPORTER:  I'm sorry, Mr. Lewis, I did not hear

 3   the beginning of your question.  You said, "I will stop share

 4   on this and do this," and you started your question and I

 5   didn't get the beginning.

 6   BY MR. LEWIS:

 7   Q   All right.  So I'm showing you now what has been marked as

 8   Exhibit 12 for defendants, a document titled "COVID-19

 9   Temporary Guidelines for Transfer to DSH Inpatient Care."

10       I'm sorry, madam court reporter, about that.

11       Dr. Mehta, could you please look at this document?  Would

12   you like me to scroll down, or are you okay with looking at it

13   this way?

14   A   I'm okay with it this way.

15   Q   Does this document look familiar to you?

16   A   Yes.

17   Q   To your knowledge, was this document created by DSH?

18   A   This one was by -- I believe this one is a CDCR one, if I'm

19   not mistaken.

20   Q   All right.

21   A   But it was in use by both, yes.

22   Q   Okay.  And what is the purpose of this document?

23   A   We wanted to define exactly when transfer rose to the level

24   of DSH -- sorry -- when a case rose to the level of DSH

25   transfer.  And it uses a lot of the exact language that was in

Dr. Mehta - Direct by Lewis

1    the prior memo we were just looking at, so we were very much --

2    we're trying to keep it consistent.

3    Q    So then this grew off of the two previous memos, Exhibit 10

4    or Exhibit 9 and Exhibit 10 that I showed you?

5    A    Yes.  Correct.

6    Q    So Dr. Mehta, based on your knowledge of the program guide

7    requirements and the Court-approved timeframe exceptions, has

8    CDCR been complying with the program guide requirements for the

9    transfer of Coleman patients to DSH inpatient bed as modified

10   by the addition of these COVID-19 screening and transfer

11   guidelines?

12   A    Yes, as modified we have.

13   Q    All right.  And since these COVID-19 transfer and screening

14   guidelines were first devised in April 2020, et cetera, have

15   they been modified further?

16   A    Yeah.  It's a constant process.  We learn more, we get new

17   resources.  Rapid testing was something we didn't start out

18   with.  We -- the PCR, preliminary center reaction test, is more

19   accurate, but it also takes longer.  So there are cases where

20   that is the best test to use and then the rapid test sometimes

21   gives us false positives or something but comes back much

22   quicker.  So as our technology improves, as our understanding

23   of COVID improves, we've modified this pretty much day-to-day

24   constantly trying to work on new ways.

25   Q    And is CDCR continuing to weigh the risks and the benefits

1    of transferring mental health patients to inpatient care under

2    COVID-19 conditions?

3    A    Yes, definitely.  That's our main goal.

4    Q    And then have these modifications that you've talked about,

5    have they been further discussed in the special master's

6    COVID-19 task force and in the small workgroups?

7    A    Yep.  And in several recent small workgroups we've gone

8    over changes to the April 10th and April 17th memos, which

9    we're hoping will be finalized very soon.

10        We've looked at the transfer procedures back from DSH.  I

11   believe we got a memo out on that just yesterday.  We've been

12   sort of continuously working together and in that Monday

13   workgroup with our DSH colleagues and the special master

14   experts present.

15   Q    All right.  And returning to this document, Exhibit 12,

16   towards the bottom, I believe, and I'll try to get there.  I'm

17   sorry.  I'm scrolling through it right now.

18        And pardon me, Your Honor.  I'm just going to organize

19   something here.  And strike that, Your Honor.  I mean, I'll

20   stop sharing that exhibit and I'll move on to a different

21   question.

22        Now, at some point did CDCR encounter a rise in COVID cases

23   as the summer progressed, which caused institutions to close

24   down?

25   A    Yeah.  The first case in CDCR was in April, and there

1    were -- yeah, there were -- it was increasing in fits and

2    starts all along.

3    Q    And did that have an impact on backlog transfers or

4    anything like that?

5    A    Yeah.  When we have -- it changes depending on the mental

6    health -- the public health guidance, but when we have two or

7    three cases identified in an institution, in the past we have

8    been closing that institution, using the term "closed," which

9    means all movement in and out is limited.  We can still

10   elevate, as per our guidelines, to an emergency transfer even

11   into or out of a closed institution, but by and large we try to

12   limit or stop all movement.

13        COVID has just been very very difficult to contain, as

14   we've seen many times, and we want to make sure that everything

15   we can do is being done.  And I think that's a similar thing

16   that has been adopted within the state and the country, you

17   know, close it quickly, close it as soon as you can and then

18   get everything under control.

19   Q    And at some point did CDCR mental health program staff work

20   with DSH colleagues to kind of take actions to revise the

21   COVID-19 screening and transfer guidelines so that patients

22   could transfer?

23   A    Yeah.  Yeah.  In July we did a revision and, like I said,

24   even in between revisions we're constantly tweaking and making

25   every effort we can to move people.

Dr. Mehta - Direct by Lewis

1  Q    And then you mentioned July.  I'm going to show you what I

2  believe may have already been previously shown by -- in our

3  case it's Exhibit No. 22.  I will do a share screen now.

4  Pardon me.

5      Dr. Mehta, can you see this document which has previously

6  been marked as Exhibit 22 and titled updated draft COVID-19 or

7  "COVID temporary guidelines for transfer to DSH inpatient

8  care," dated July 16th, 2020?

9  A    I can, but it's in portrait mode again.

10 Q    All right.  And I need to move this screen, so let me do

11 that.  My apologies.  Let's see if this works.

12     Is that better, Dr. Mehta?

13 A    Yes.  Thanks.

14 Q    All right.  Towards the bottom in section n it says -- it

15 mentions four referrals from closed institutions the following

16 process shall apply.  What does on a rare case basis or rare

17 case-by-case basis mean there?

18 A    So it means that, you know, we're going to be clinically

19 evaluating the risks versus benefits for each patient.  That

20 did come out of one of our workgroups.

21     Again, the very specific wording here was discussed and I

22 think in this case was actually suggested by one of the Coleman

23 experts and we agreed, we all adopted -- sorry.  I should say I

24 and my team agreed and adopted this.  And what we're saying is

25 that we're going to be -- we're never going to say no to

1   everybody, that's just not -- that doesn't make a lot of sense

2   either.  And so we're just going to be taking things

3   case-by-case because the situation is evolving so quickly.

4       I will say that this is the DSH policy document, to my

5   understanding, and there's a new draft of this being circulated

6   right now, which modifies primarily letter n here, which I

7   think went out earlier this week to different parties for

8   consideration.  It's not signed yet.

9           MS. WINTER:  Your Honor, I'm sorry.  I didn't want to

10  interrupt the witness but just object to the extent that this

11  witness was presenting hearsay in the form of the special

12  master expert's statements about this -- adding this provision

13  to this document.

14          MR. LEWIS:  Your Honor, if I may, it goes to the

15  impression of the witness.  It's not so much for the truth of

16  the matter asserted.  It talks about how this was addressed

17  within the small workgroups.

18          The witness has been very consistent about that

19  throughout his testimony about all of the policies and

20  procedures that have been coming through.

21          THE COURT:  I lost my ability to unmute, so

22  Ms. Schultz assisted me there.

23          That objection is acknowledged and sustained.  It can

24  stand as -- it can serve as a standing objection.

25          So the Court understands that any time any defense

1    witness suggests that the special master, his team, approved or

2    suggested or agreed to something, the objection is sustained.

3            MS. WINTER:  Thank you, Your Honor.

4    BY MR. LEWIS:

5    Q    Dr. Mehta, but regardless, this policy memo or this

6    document here in front of you was addressed within the small

7    workgroup setting, correct?

8    A    Yes.

9    Q    All right.  And it came out of the small workgroup setting

10   in this form?

11   A    Yes.

12   Q    Would have normally a document like this have come out of

13   the small workgroup setting if there were changes that the

14   special master's team had said would have to happen or had

15   insisted upon?

16   A    I believe so.  So yes, that was the standard procedure in

17   our small workgroups, yes.

18   Q    Thank you.  And this document is dated July 16th, I

19   believe.  You just mentioned that there has been a further

20   iteration of the temporary compliance for transfer; is that

21   correct?

22   A    Yes.  That one's in near final draft form, I would say, as

23   of this week.

24   Q    And so there was a realization among CDCR and it sounds

25   like DSH that the guidelines need to be revised so that -- for

1    the transfer of patients; is that correct?

2    A    Yeah.    Pretty much as soon as these things are signed we

3    start tweaking again.    And then by the time we accumulate

4    enough changes to justify another release, we get to that

5    point, and so we're at about that point now.    But as soon as

6    they're out, we start hearing back from the field and hearing

7    about different ways that this is being interpreted or

8    implemented, and we start tracking our changes for the next

9    version.

10   Q    Okay.    So I'm now going to show you a new document.    Let's

11   see if I can do this right, please.

12       All right.    I'm showing you what has previously been marked

13   as Plaintiffs' Exhibit No. 101.    It is titled "Updated Draft

14   COVID-19 Temporary Guidelines for Transfer to DSH Inpatient

15   Care, October 20th, 2020."    Do you recognize this document,

16   Dr. Mehta?

17   A    Yes.    Our team has been working on this document for a few

18   weeks now.

19   Q    Can you describe what you mean by "our team" has been

20   working on it?

21   A    I should clarify.    This is a DSH document, a DSH policy

22   document.    And so our CDCR IRU, inpatient referral unit, and

23   other CDCR staff have been working on the CDCR version of this.

24   We have our, like, mirror document, essentially sister document

25   and also offering edits and feedback to DSH on their document,

Dr. Mehta - Direct by Lewis

1    as they do with ours.

2    Q    And what are some of the changes that are encapsulated by

3    this document and some of the other changes that CDCR has been

4    making to its own to help get transfers going again?

5    A    So if you can scroll down to letter n.

6    Q    Is that what you need, Dr. Mehta?

7    A    Perfect, yeah.

8        So this is the one where in the other document it said in

9    rare case-by-case basis we'll be doing X, Y and Z.  So this is

10   substantially different, especially in the letter n.  There are

11   other changes, of course, but this is the big one where we're

12   talking about how do we move patients where the institution is

13   closed to movement.  How do we determine whether there has been

14   exposure or whether there's a way to safely do this in a more

15   open and clear way so all the people who are involved in the

16   transfer, all the different groups can all kind of be on the

17   same page.  And so we worked on this to make sure that we were

18   being as realistic as possible about the amount of risk that

19   the patient posed.

20   Q    And when -- so this is dated October 20th, but it sounds --

21   did the stuff that goes into this, these changes that were

22   made, did this preexist October 20th?  When did these things

23   start happening, these changes that were made to the previous

24   policy that resulted in this?

25   A    Oh.  Yeah.  So I think you show the last memo was, like,

Dr. Mehta - Direct by Lewis

1  July 16th.  I would say probably July 17th they started

2  happening where -- you know, as I mentioned, we kind of track

3  the changes as we go, keep track of the complaints or problems

4  that come in and then do our best to clarify them in the memo.

5  So I can't speak to exactly when each edit occurred, but, in

6  general, our procedure with these policies is we start tweaking

7  right away and then send out the new memo when there's enough

8  to be a substantive change.

9  Q   And although this memo hasn't been used, have you been

10 using it or has CDCR been using it to move patients in recent

11 weeks?

12 A   Yeah, exactly.  We would always use the best practice, the

13 safest practice.  And so a lot of these changes are in the

14 interest of keeping up with our sort of ability to track and

15 manage the disease.

16 Q   And so how many or has this resulted in transfers?

17 A   Yeah.  Yeah.  We've been transferring over the last few

18 weeks.  I think two weeks ago we had 9, I believe.  Please

19 don't hold me too closely to these numbers, but we went from 9

20 a couple weeks ago, I think, up to 11 or 13 last week.  And we

21 have about 17, give or take, scheduled for this week, including

22 a couple today and so on.  I think we have 21 for next week.

23 Q   All right.  And then has CDCR issued a memo in just the

24 past couple of days that addresses discharges from DSH?

25 A   Yeah.  That's another place where we -- you know, we work

1    pretty well together in that Monday workgroup, in my opinion.

2    And that was another example of that being a success, which is

3    that DSH doesn't pretransfer quarantine these patients when

4    they're coming back to us.

5        When we're sending from institution to institution

6    internally, if they're stepping down from a higher level of

7    care and they don't need to transfer like imminently, then

8    we'll pretransfer quarantine them for 14 days, transfer, and

9    then post-transfer quarantine for another 14 days.

10       When we're going back and forth from DSH, in the interests

11   of working with the best aspects of both of our systems, we no

12   longer do the pretransfer quarantine -- not no longer.  We

13   never have done the pretransfer quarantine for patients coming

14   from DSH to CDCR.  So we released a memo yesterday just

15   memorializing that saying that this is the testing that we

16   expect to happen but that this is a -- we recognize that this

17   is a safe procedure, and we have enough data to understand it

18   and move forward.

19   Q    All right.  And Dr. Mehta, based on your knowledge of the

20   program guide and the court-approved timeframe exceptions, has

21   CDCR been complying with program guide requirements for the

22   transfer of Coleman patients to inpatient beds, as modified by

23   these now modified screening procedures?

24   A    Yeah, with all of the modifications that we've discussed.

25   Yes, we've been sticking to it.

Dr. Mehta - Cross by Winter

1           MR. LEWIS:  All right.  Your Honor, I would move to

2    enter at this time Defense Exhibits 9, 10, 12, 22 and

3    Plaintiffs' 101 into evidence.

4           THE COURT:  I think 22 is already in.

5           MR. LEWIS:  Yes, Your Honor.  I wasn't sure if it had

6    been entered, but belt and suspenders there.

7           THE COURT:  Yeah.  D22 has been admitted, but D9, 10,

8    12 and Plaintiffs' 101, any objection, Ms. Winter?  You're

9    muted.

10          MS. WINTER:  Sorry.  No objection, Your Honor.

11          THE COURT:  All right.  Those exhibits are admitted,

12   D9, D10, D12 and P101.

13       (Defendants' Exhibits 9, 10, 12 admitted in evidence.)

14       (Plaintiffs' Exhibit 101 admitted in evidence.)

15          THE COURT:  Does that conclude your --

16          MR. LEWIS:  No further direct questions, Your Honor.

17          THE COURT:  All right.  Ms. Winter?

18          MS. WINTER:  Thank you, Your Honor.  And if you could

19   let me know when I'm approaching 30 minutes, I would be

20   grateful.

21          THE COURT:  All right.  Will do.

22                       CROSS-EXAMINATION

23   BY MS. WINTER:

24   Q   Hi, Dr. Mehta.  I'm finding you on my screen.  Let's see.

25   So you are the deputy director of mental health services for

Dr. Mehta - Cross by Winter

1    CDCR; is that correct?

2    A    Yes.

3    Q    Sorry.  You have to speak.

4    A    Yeah.  No problem.  Yes.

5    Q    And you're a psychiatrist --

6    A    I am.

7    Q    -- correct?

8         How many years have you been practicing as a psychiatrist?

9    A    So I worked in New York for six years.  That was including

10   my sort of training time after you got the M.D.  And then I've

11   been in CDCR for almost seven now.

12   Q    Okay.  And you treated patients in CDCR as a psychiatrist?

13   A    Yes.

14   Q    Did you treat --

15   A    Go ahead.

16   Q    And did you treat them -- I know that for a period of time

17   that you worked as the director of tele-psychiatry, roughly

18   that role.  Did you treat patients on site as well when you

19   were a line staff member?

20   A    So I treated patients for six years through the tele-psych

21   department, so under those guidelines we do psych visits at

22   least every six months, and so I would go to High Desert, for

23   example, which is the prison I was assigned to for the vast

24   majority of that and meet the patients and do face-to-face

25   treatment for a few days at a time during my visits.

Dr. Mehta - Cross by Winter

1    Q    So but what you're saying is you never worked as an on-site

2    psychiatrist, although you would visit prisons as a

3    tele-psychiatrist?

4    A    Right.  Visit prisons and see patients during those visits,

5    yeah.

6    Q    Okay.  Thank you.  So let's see.  I'm going to try and go

7    back and just respond to a couple items that your attorney went

8    through with you on direct.

9         So you testified that DSH accepts only class members who

10   require intermediate level inpatient care; is that correct?

11   A    Yeah.  To my knowledge, yeah.

12   Q    Are you aware that DSH Patton will take female patients who

13   require acute level care?

14   A    I apologize.  Yes.  I should have kept that in my head.

15   Yes, that's correct.

16   Q    Thanks.  So you also discussed -- you presented a

17   calculation about the risk of death by COVID versus the risk of

18   death in CDCR by suicide.  And I'm not going to take the time,

19   I don't think it will be worth it, to break down that

20   calculation, but I do have a couple questions.  Do you have a

21   way to quantify the long-term mental health effects of not

22   transferring patients to inpatient psychiatric hospitalization?

23   A    No.  No.

24   Q    Okay.  So that calculation necessarily can't include deaths

25   that might occur in a year or two or as a result of someone not

Dr. Mehta - Cross by Winter

1    receiving the care they needed when they needed it?

2    A    Not only that, but I fully agree that there is a broad

3    range of suffering other than death by suicide, and that was

4    just a sort of a marker to compare to death by COVID, but also

5    COVID can cause suffering too.  So by no means do I mean to say

6    that's the only outcome here.  You're absolutely right.

7    Q    I appreciate you acknowledging there are other ways to

8    suffer other than death.

9    A    Yes.

10   Q    So you also just a few moments ago talked about a memo

11   discussing discharges from DSH?

12   A    Uh-huh.

13   Q    A CDC memo.  And that was issued yesterday; is that

14   correct?

15   A    Yes.

16   Q    Do you know if it has been shared with plaintiffs?

17   A    So it was actually not released by the mental health

18   department.  It was released by the DOC, which I believe is the

19   Department of Corrections, but they're the ones who designate

20   the institution is open or closed and things like that.  That's

21   where we get that information.  So they released that memo

22   because it was an exception to the movement matrix.  But it was

23   specifically addressing DSH pretransfer quarantine.  I believe

24   that it was sent to the plaintiff immediately after its release

25   by DOC, but I didn't personally do that.  That's what I was

Dr. Mehta - Cross by Winter

1   told.

2   Q   Okay.  And are you aware that there were -- that plaintiffs

3   requested or at least I will represent to you that plaintiffs

4   requested from CDCR clarification regarding challenges that

5   were happening between CDCR and DSH in terms of who should

6   quarantine and when, when they're discharging from DSH to CDCR?

7   A   Was I aware that that discussion was ongoing?  I'm not sure

8   of the question.  I'm sorry.

9   Q   Were you aware that plaintiffs requested clarification

10  regarding that multiple times?

11  A   Prior to yesterday?

12  Q   Prior to yesterday.

13  A   Yes.  I think that has come up that we've been sort of

14  figuring out how to finalize that, yeah.

15  Q   Okay.  And do you recall when those discussions might have

16  happened?

17  A   I don't.  I'm sorry.  I'm sure it came up in a few task

18  forces, but I'm not sure when.

19  Q   Okay.  I'm going to represent to you that that discussion

20  occurred two months ago, started two months ago.

21         MR. LEWIS:  Your Honor, I will object.  Counsel is

22  testifying and it's been clear that this witness does not

23  understand what this line of questioning is about.

24         THE COURT:  Well, counsel can't testify, but she can

25  ask -- she can say if, in fact, this was requested two months

1    ago.  She can ask questions to explore the timeframe.  I'm

2    assuming that it was two months, so I'll look to other parts of

3    the record for clarification on that.

4            MS. WINTER:  Okay.  I'll move on.  Thank you.

5    BY MS. WINTER:

6    Q    So let's see.  You said a couple times also, Dr. Mehta,

7    that it's your understanding that CDCR has been complying with

8    the transfer guidelines from the timeline, sorry, for transfer

9    of class members to inpatient care since the pandemic began.

10   Is that accurate?

11   A    As modified by all of the other policies and procedures

12   we've discussed.

13   Q    Okay.  Thank you.  So I'm going to direct you to a document

14   once I get there.  And this document was already displayed

15   earlier.  This is plaintiffs' or, sorry, Exhibit 85.  I'm going

16   to pull it up.

17   A    Can I make a clarification to my last statement?

18   Q    Go ahead.

19   A    Thanks.  Prior to July 6th, I was not in the position of

20   deputy director and I will freely admit that I had a pretty

21   keyhole view on what was going on prior to that time.

22   Q    Okay.  So when you testified earlier about the April 10th

23   policies about mental health treatment, you were not the deputy

24   director at that time?

25   A    Correct.  I was in the workgroup that drafted those, but I

1    was not the deputy director at that time, right.

2    Q    And that goes for also when the emergent transfer standard

3    and so forth was being drafted, that you were not responsible

4    for drafting that?

5    A    Was not responsible meaning, again, I was helping with the

6    writing of it in the group, but I didn't sign -- didn't do the

7    final signature.  If that's what you mean, then that's correct,

8    yeah.

9    Q    Yes, thanks.

10    A    Yeah.  Sure.

11    Q    And I'm going to clarify.  I'm actually looking for

12    Plaintiffs' 95.  So I'm going to try and pull it up.  Okay.

13    Can you see this document labeled Plaintiffs' 95?

14    A    Yes.

15    Q    Okay.  So if you see the date of this document --

16    A    Yes.  October 13th, 2020.

17    Q    Thank you.  And I'm scrolling down to the signature on this

18    letter.  I'm going to represent to you that it's a letter.  Do

19    you see who signed that document?

20    A    Melissa Bentz.

21    Q    Melissa Bentz.  Are you familiar with Melissa Bentz?

22    A    Yes.  She's one our OLA attorneys.

23    Q    Okay.  Are you familiar with this letter?

24    A    I am sure I have looked at it.  It's been a long week and I

25    can't speak to how thoroughly I've read it recently.

1  Q    Okay.  I'm going to represent to you that this letter --

2  you can see where I'm scrolled.  The top line says that this is

3  a letter in response to plaintiffs' September 21st letter

4  regarding alleged delayed transfers from CDCR to DSH.  And this

5  is with regard to five patients from Salinas Valley State

6  Prison PIP to DSH in August.  Do you see where I'm reading

7  that?

8  A    Yes.

9  Q    Okay.  So you spoke earlier about the transfer timelines to

10 get people to an inpatient program, correct?

11 A    Yes.

12 Q    And you note that there is -- not only is there a 30-day

13 timeframe for people to get to intermediate level care, but

14 there's also a five-day timeframe from when a medical hold is

15 lifted for someone to actually transfer; is that correct?

16 A    Yes.

17 Q    Okay.  So under heading 1 -- so this heading that reads

18 "Difference Between Date Institution Opens and Date COVID-19

19 Hold is Lifted."  Do you see that?

20 A    Yes.

21 Q    Okay.  So I'm going to direct you to the sentence -- can

22 you see where my cursor is pointing?

23 A    Yeah.  "An individual"?

24 Q    Yeah.  So this sentence reads "An individual patient's

25 COVID-19 hold is not lifted until CDCR receives a negative

1    COVID-19 test result for that patient indicating that they can,

2    in fact, be transferred."  Do you see that?

3    A    Yes.

4    Q    Okay.  Let's see.  Okay.  And if you move to heading 2,

5    this heading reads process patient -- I believe this heading is

6    supposed to read "Process For Patient Transfers to DSH After an

7    Institution Opens to Movement," but it currently reads "Process

8    Patient Transfers to DSH After an Institution Opens to

9    Movement."  Do you see that heading?

10   A    I do.

11   Q    Okay.  So given that heading, what do you understand this

12   paragraph to describe?

13   A    So when a patient is referred and then there is a hold,

14   such as by a COVID hold or a closed institution or whatever

15   else, then of course the timeline stops during that period.

16   And when the timeline resumes, that's what this section is

17   referring to is when the timeline resumes how does the patient

18   make it -- complete the transfer.

19   Q    Okay.  So this describes the steps after an institution

20   reopens for a patient actually to transfer from a formerly

21   closed institution to an opened one or, sorry, from a formerly

22   closed institution that has become open to DSH?

23   A    Just based on my reading of the title, but, yeah, that's

24   what I would assume, yes.

25   Q    Okay.  And so do you see -- I'm scrolling down.  Do you see

1    this list of -- there's one, two, three, four, five items in

2    that list.  Do you see that?

3    A    Uh-huh.  Yes.

4    Q    I'll scroll back up, if that's helpful.  So here's one,

5    two, three, four and five, and the fifth item on this list is

6    that the patient transfers to DSH; is that correct?

7    A    Yes.

8    Q    Okay.  And if you go back to item No. 4, this is the step

9    where when a patient receives a negative COVID-19 test, then

10   DSH will issue an acceptance transfer chrono; is that right?

11   Do you see that?

12   A    Yes.

13   Q    Okay.  So if you go back -- so this shows that there are at

14   least three steps, administrative steps, one here that I'm

15   pointing to, two and three that happen after an institution has

16   opened to movement but before a patient receives a negative

17   test and, therefore, the COVID [sic] took place; is that

18   accurate?

19   A    I would have to read them in more detail.  I understand

20   that's what you're describing it as.

21   Q    You can take -- if you like to, you can take a moment to

22   read.

23   A    Yeah, please.  Thanks.  Thank you.  Yeah.

24       Okay.  I was thinking -- thank you for scrolling down.  I'm

25   not quite done.  Thanks.

Dr. Mehta - Cross by Winter

1    Q    Oh, okay.  I'm sorry.

2    A    No problem.

3         Yes.  Okay.

4    Q    Okay.  And do you think that this is an accurate

5    representation of the steps that occur between the time that a

6    hold is lifted and a patient receives a negative test and then

7    transfers?

8    A    Yeah.

9         I will just comment briefly that in normal non-COVID times

10   the deputy director doesn't actually have any particular

11   involvement with this process, it just goes by procedure, and

12   so I've never known the job without this part of it, but it is

13   something that is relatively new to me.  But, yes, this is my

14   understanding.

15   Q    Okay.  Thank you.

16        All right.  So I'm going to move on to heading No. 3.  Do

17   you see the heading that says "Individual Patient Review"?

18   A    Yes.

19   Q    Okay.  And so there's a list here.  I'm going to scroll

20   slowly so that you can see that there's a list of one, two,

21   three, four and five patient circumstances described here.  Did

22   you see that as I scrolled through?

23   A    Yeah.  Very generally speaking, yes.

24   Q    Okay.  I just wanted to show you that there was a full

25   list.

Dr. Mehta - Cross by Winter

1   A    I appreciate it.

2   Q    And so I'm going to start with patient 1.  So I'm going to

3   try and summarize this paragraph to you.  If you want to take a

4   moment to just read through this description of -- well,

5   actually, maybe I'll read it.  It might be a little bit faster

6   that way.  So this is patient 1.  The names are redacted.  It

7   reads "The Salinas Valley PIP was open to transfer on July

8   16th, 2020.  That same day the IRU requested Salinas Valley to

9   test Mr. Blank for COVID-19.  On July 23rd, Salinas Valley

10  administered the COVID-19 test and a negative result was

11  received on July 26th, 2020.  The next day Mr. Blank was

12  endorsed to DSH Atascadero.  On July 28th, 2020, DSH requested

13  COVID-19 test results and screening, which CDCR had already

14  uploaded for DSH's review.  On July 29th, DSH advised that

15  Mr. Blank could not be admitted at that time due to a full

16  admission cohort for that week at DSH and Mr. Blank was

17  scheduled for transfer the following week."

18       So the next paragraph it reads, "On July 31st, 2020, IRU

19  requested that Mr. Blank be administered another COVID-19 test.

20  On August 2nd, 2020, CDCR received notice that Mr. Blank's test

21  was negative.  On August 4, 2020, Mr. Blank was transferred to

22  DSH and placed on the COVID-19 isolation unit as a precaution

23  due to exposure to two positive CDCR employees at Salinas

24  Valley State Prison."

25  A    Uh-huh.

1    Q    So I'm going to summarize this.  So if you look at this,

2    the Salinas Valley was open to movement on July 16th.  The

3    patient received a negative test result on July 26th.  Is that

4    accurate, based on my reading of this letter?

5    A    Yeah.  That is what the letter says, yes.

6    Q    Okay.  And but at that point the patient was not able to

7    move to DSH due to a full admission cohort.  Is that accurate,

8    based on my reading of this letter?

9    A    It looks like he was endorsed, the packet was received and

10   then, yeah, a few days later it was clear that there was a full

11   admission cohort for a week.

12   Q    Okay.  So he was administered another test on July 31st

13   with a negative result on August 2nd but ultimately transferred

14   on August 4th.  So if you count the days from July 26 until

15   August 4th, that would be 19 days.  Do you want to take a

16   moment to do that calculation in your head and confirm that

17   that's correct?

18   A    Sure.

19        July 26th to August 4th?

20   Q    Yes.  Sorry.  July 16th to August 4th.

21   A    Yes.  That was 19.

22   Q    Okay.  So that was 19.  So although there's this

23   requirement in the transfer timelines that after a hold is

24   lifted, within 5 days the patient needs to move, given CDCR's

25   interpretation of this policy as requiring a negative test and

1    then transfer, it actually takes 19 days from the day an

2    institution opens for the person to transfer; is that accurate?

3    A    Well, I mean, the modification being that we don't have

4    admission cohorts outside of COVID.  So, I mean, this is all

5    COVID exceptions and COVID things that when they say that could

6    not be admitted due to a full admission cohort, that's because

7    they receive a certain number of patients and they quarantine

8    them together and they can't add to that group otherwise the

9    new person -- the whole group will have to stay for the full

10   amount of time after the last person arrives.  So all of this I

11   think is covered by COVID exceptions and what was going on --

12   Q    So we talked about the fact that you guys are claiming

13   COVID exceptions.  I just wanted to point out the length of

14   time it actually happens --

15   A    Okay.

16   Q    -- between when the COVID hold is lifted to when someone

17   actually transfers.

18   A    Gotcha.  Okay.

19   Q    I'm going to move on to patient No. 2 and I'm going to

20   summarize this just so we don't have to walk through -- take

21   the time to walk through, but I'm going to represent to you --

22          MR. LEWIS:  Your Honor, if I may, objection.  Counsel,

23   again, is testifying.

24          If there's something that she wants the witness to

25   read in this letter and then ask him questions, he can read it

1    for himself and form his own ideas about what is written in the

2    letter.

3              THE COURT:  I think that's fair at this point,

4    Ms. Winter.

5              MS. WINTER:  Okay.  All right.

6    BY MS. WINTER:

7    Q    So I'm going to actually skip this example and I'm going to

8    go on to patients 4 and 5.  So I'm scrolling down to patient 4

9    and then I'm going to go to patient 5.  So if you look at

10   patient 4 in this case, can you take a moment to just read the

11   first paragraph regarding patient 4?

12   A    To myself or --

13   Q    Yeah.  Go ahead and read it to yourself, just to take a

14   moment.

15   A    Sure.  Okay.  The first paragraph I've read it.

16   Q    Okay.  So I'm going to point you to the sentence that reads

17   "Mr. Blank was tested on July 16th and CDCR received negative

18   test results on July 20th."  Do you see that sentence?

19   A    I do, yes.

20   Q    Okay.  And then I'm scrolling down to the last paragraph

21   and the last paragraph starts -- do you see where I'm pointing?

22   "On July 28th, Mr. Blank was again tested for COVID-19 --"

23   A    Uh-huh.

24   Q    "-- and received a negative test on August 3rd, 2020"?

25   A    Uh-huh.

1    Q    Okay.  And then he was transferred to DSH the next day, so

2    presumably August 4th.  Do you see that?

3    A    Right.  Uh-huh.

4    Q    So this person received a negative test on July 20th but

5    didn't actually transfer until August 4th; is that correct?

6    A    Yeah.  In July I think we were having some delays still on

7    those tests getting back, so there was some delays in there

8    from waiting for tests to get back, but, yeah, it looks like

9    August 4th was the transfer date, yeah.

10   Q    So would you agree that's 15 days after the date of the

11   negative test that this patient actually transferred to DSH?

12   A    Scroll back up for a second, please.  So from the 20th

13   to -- yes.  Uh-huh.

14   Q    Okay.  So is that within five days after the medical hold

15   was lifted?

16   A    No.

17   Q    No.  So were you complying in this case with the transfer

18   timeframes for this patient to transfer to inpatient care?

19   A    I would say yes because the delays were in the testing.  It

20   takes some time for the PCR results to get back.  We can't do

21   certain following steps until after we get the negative result,

22   so we were --

23   Q    But do you -- I'm sorry to interrupt.  So do you see the

24   negative test results were on July 20th?

25   A    Yes.

Dr. Mehta - Cross by Winter

1    Q    Do you see that?

2    A    Yes, that's correct.

3    Q    Okay.  So that's the date -- we already went through the

4    date that the medical hold is lifted is the date that this

5    person receives the negative test.

6    A    Uh-huh.

7    Q    Okay.  So would you agree that that is not within five days

8    from the date of the negative test results?

9    A    It is not.  I would say, though, that we agree that the

10   letter said the medical hold was lifted on the day they

11   received the negative test.  The medical hold is also something

12   which is also in the system which has to be rescinded and all

13   of that.

14          COURT REPORTER:  Doctor, Doctor, I'm sorry.  You went

15   off there really fast and I could not understand your answer.

16   I have your answer:  It is not.  I would agree that --

17          THE WITNESS:  Yeah.  It is not within five days and I

18   just wanted to clarify that we agreed the letter said that the

19   hold is lifted on the day that the negative test arrives, but

20   there is implementation to that where there is -- the hold is

21   actually an order that has to be taken off of the electronic

22   medical record system.

23   BY MS. WINTER:

24   Q    Okay.  But that step is not reflected in this letter?

25   A    Right.  In this letter, right, correct.

 1  Q    Okay.  So I'm going to just go through one more example.

 2  This is patient No. 5.  I've scrolled down to patient No. 5.

 3  So I'm going to direct you to the sentence that says "Mr. Blank

 4  was tested on July 16th, 2020, and CDCR received negative test

 5  results on July 20th, 2020."  Do you see that?

 6  A    Uh-huh.

 7  Q    And then I'm going to go to this next paragraph that says

 8  "Mr. Blank was transferred to DSH on August 5th, 2020."  Do you

 9  see that?

10  A    I do, yes.

11  Q    Okay.  So if you -- so from July 20th to August 5th, that's

12  16 days, would you agree?

13  A    That's 16 days, yes.

14  Q    Okay.  And so this person had a negative test result on

15  July 20th but didn't actually transfer for 16 days after that?

16  A    That's what it looks like, yes.

17  Q    Okay.  Thank you.  So I'm going to move on.

18         THE COURT:  Just so you know, Ms. Winter, you're just

19  over 25 minutes.

20         MS. WINTER:  Okay.  I'm going to try and move quickly.

21  BY MS. WINTER:

22  Q    So I'm actually going to show you Exhibit P96, Plaintiffs'

23  96.  Let's see.  I think this is it.  Okay.  Do you see P96

24  here, Dr. Mehta?

25  A    I do not see any document yet, no.  Can other people see

1    that?

2    Q    Okay.  Maybe there's a lag.  I'm sorry.  I'm going to try

3    again.

4            THE COURT:  The Court is not seeing any document.

5    BY MS. WINTER:

6    Q    Okay.  There we go.  Do you see P96?

7    A    Yes.  Now I can.  Thank you.

8    Q    All right.  So this document is titled Defendants' --

9    actually it's titled "Defendants' Census Waitlist And Transfer

10   Timelines Compliance Reports for Inpatient Mental Health Care."

11   And I'm going to move down.  Do you understand what the census

12   waitlist and transfer timelines compliance reports are,

13   Dr. Mehta?

14   A    Yeah.  In context, yes.

15   Q    Okay.  So they describe basically whether patients are

16   transferring to inpatient care in the time that they are

17   supposed to transfer; is that accurate?

18   A    Yeah, I think so.

19   Q    Okay.  So I'm going to scroll down to page 6.  I believe

20   this is page 6.  Is this big enough that you can see?

21   A    Yes, I can.  Thank you.

22   Q    All right.  So I'm going to show you if you move -- I think

23   you can just barely see this box that shows the total patients

24   awaiting admission.  Do you see that box?

25   A    Yes.

Dr. Mehta - Cross by Winter

1    Q    And this is the number of patients awaiting admission to

2    DSH, to male patients awaiting admission to DSH; is that

3    correct?

4    A    I believe so.  Scroll back to the left, please, for a

5    moment.

6    Q    Yes.

7    A    I don't see it says male; but yes, I think that makes

8    sense.

9    Q    Okay.  Well, I'm going to represent to you that down here

10   it says --

11   A    Oh, there.

12   Q    -- female for Patton.

13   A    Okay.

14   Q    So you see that there's 47 individuals in this box,

15   correct?

16   A    Yes, correct.

17   Q    And if you scroll up to the next box that refers to female

18   patients waiting for DSH at Patton, you can see that 7 patients

19   are waiting; is that correct?

20   A    Yes.

21   Q    Okay.  So as of this date that you can see at the top that

22   it reflects that the date of this data is September 2nd; is

23   that correct?

24   A    Yes.

25   Q    Okay.  So if you add 47 and 7, you get 54 patients; is that

1  correct?

2  A   Uh-huh.

3  Q   Okay.  So I'm going to scroll down to page 13.  Okay.  So

4  this report, I'll represent to you, shows the number of people

5  waiting for the psychiatric -- the PIP programs within CDCR.

6  Do you see that at the top?

7  A   Uh-huh.  Yes.  Yes, I do.

8  Q   Okay.  And so down here there's a sort of dark blue box

9  that says "Grand Totals all PIPs" and it says "Total waitlist"

10 here.  Do you see that --

11 A   Yes.

12 Q   -- 280 patients?  Okay.

13 A   Uh-huh.

14 Q   So those are the -- I'm going to represent to you that

15 those are the number -- or would you agree that that's the

16 number of patients that are waiting for transfer to the CDCR

17 PIP as of September 20?

18 A   Yes.  As some of those patients are already in PIPs and

19 need to transfer to their least restrictive housing setting, so

20 some of them are already in a PIP and just need a different

21 housing setting within the PIP; but yes, that's the full

22 waitlist is my understanding.

23 Q   So have you assigned anyone within CDCR to review the

24 adequacy of care that these patients waiting on these waitlists

25 are receiving?

Dr. Mehta - Cross by Winter

1          MR. LEWIS:  Objection, Your Honor.  Beyond the scope

2    of this hearing, lacks foundation for the question.

3          THE COURT:  Overruled.  You may answer, Doctor.

4          THE WITNESS:  Yes.  I think that the -- there's

5    multiple layers, so patients that are in TMHUs appear on the

6    dashboard and the treatment that they're receiving appears

7    there.  We have the regional mental health administrators who

8    do audits and keep quality control, so there's -- yeah.

9    There's multiple ways in which to capture that.

10   BY MS. WINTER:

11   Q    And so those multiple layers -- there are ways to capture

12   that and there are multiple layers of the administration, but

13   are people actually systematically reviewing, for example,

14   patient records for these patients who are waiting on this

15   waitlist?

16   A    Yes.  I mean, I think all of these patients are being

17   tracked, and we are doing quality improvement, which includes

18   record review for some of the patients, representative sample.

19   Q    But not for all of the patients?

20   A    All of 280?  No.  No.  I mean, each treatment team does,

21   but no, nobody at headquarters will be looking at everyone,

22   every case in detail.

23   Q    Okay.  And so are you familiar with the COVID-19 mental

24   health dashboard?

25   A    Yes.

1    Q    Okay.  What -- and so that -- I'm going to represent to

2    you, and you can tell me if that's accurate, that that is a

3    data reporting system that helps give sort of an overview of

4    the impacts on mental health care due to the pandemic within

5    CDCR.  Do you think that that is an accurate characterization?

6    A    Yeah.  Yeah.  Overall, yes.

7    Q    Are you aware that that -- that the COVID dashboard does

8    not provide data on all of these patients who are awaiting

9    inpatient care?

10            MR. LEWIS:  Objection, Your Honor, vague.

11            MS. WINTER:  I can be more specific.

12            THE COURT:  All right.  And just so you know, at your

13    request, I'm letting you know you're just over --

14            MS. WINTER:  Oh, Your Honor, you cut out for a moment

15    there.  I couldn't hear what you said.

16            THE COURT:  You're just over 31 minutes.  Did you hear

17    that?

18            MS. WINTER:  Yes, I did.  So I'm going to try to

19    squeeze in about 5 more minutes.

20            THE COURT:  It's up to you to manage your total time

21    with your cocounsel, so.

22            MS. WINTER:  Okay.  Thanks.

23    BY MS. WINTER:

24    Q    So I am going to show you Exhibit -- Defendants' Exhibit

25    39.  And so I'm moving -- so this is -- I'm showing you the

1    title page, "The Sixth Joint Update on the Work of the COVID-19

2    Task Force."  Do you see that?

3    A   Yes.

4    Q   Okay.  So I'm going to move down to page 6.  Okay.  So

5    here.  Sorry.  I'm just trying to orient us.  So let's see.

6    Can you read this?  So starting at this paragraph, the DSH

7    small workgroup -- actually, hold on just one second.  I just

8    want to make sure.  I'm trying to be as efficient as possible.

9    A   Sure.

10   Q   Okay.  So let's see.  Really trying hard to be efficient.

11   Sorry.  So can you just read this paragraph quickly to

12   yourself?

13   A   Sure.

14   Q   Thank you.  Let me know when you're done.

15   A   Okay.  I just completed, yeah.

16   Q   Okay.  So if you look at this last sentence or, sorry, the

17   second-to-last sentence "Following the meeting, defendants

18   provided a copy of the tables to plaintiff and explained that

19   the tables," referring to those in the COVID dashboard -- I'm

20   sorry, on the census and waitlist report "include 106 referrals

21   for patients who are already in a PIP but require placement in

22   a different, least restrictive setting or different level of

23   inpatient care."  Do you see that part?

24   A   Yes.

25   Q   Okay.  So this is where I'm referring to trying to be a

1    little bit more specific.  The COVID dashboard does not reflect

2    these patients, these 106 patients who are already in a PIP or

3    who need movement to a less restrictive setting like DSH; is

4    that correct?

5    A    So the indicators compare the level of care assigned to the

6    patient and the level of care of the housing that they're

7    currently in.  So insofar as some of those PIP patients would

8    be in a matching set even if they need to be in a different

9    least restrictive housing setting, that is true.  There are

10   other ways we captured, I think as we may have discussed in

11   that task force, but I think that there was a potential that

12   those patients would not appear on the dashboard, yes.

13   Q    Okay.  So just to confirm, the COVID dashboard that is

14   meant to represent a snapshot or an overview of the pandemic

15   imposed restrictions on care or the type of mental health care

16   being provided to class members in CDCR custody does not

17   reflect a significant proportion of the patients who are

18   actually waiting for inpatient care; is that accurate?

19   A    No.  They're getting inpatient care.  They're in an

20   inpatient setting, they're just not --

21   Q    That was a yes-or-no question.

22        MR. LEWIS:  Objection, Your Honor.  If the witness is

23   saying that the question was uncertain, he needs to be able to

24   finish his explanation.

25        THE COURT:  Are you clear on the question that

1    Ms. Winter originally posed, Dr. Mehta?

2              THE WITNESS:  I apologize.  If she could restate it,

3    please.

4    BY MS. WINTER:

5    Q    Yeah.  My point is just going back to this original

6    discussion we had about the COVID dashboard and what it's meant

7    to do, does the COVID dashboard actually report on all of the

8    patients who are waiting to transfer to an inpatient bed,

9    including those waiting to transfer to a less restrictive

10   setting like DSH?

11   A    Yes.  If you say another inpatient bed, I would agree with

12   that statement, yes.

13   Q    The COVID dashboard does report all of those -- all of the

14   patients who are waiting to move to another inpatient bed?

15   A    Sorry.  No.  No.  So I apologize.  I got that confused.  So

16   right.  If I could just say I see what you're saying and I

17   understand that the patients who are awaiting transfer to an

18   LRH are not represented in the dashboard according to this

19   discussion here, yes.

20   Q    Okay.  Thank you.

21             MS. WINTER:  Your Honor, I'm going to stop at this

22   point, but I do actually -- I would like to move Exhibit 95

23   into evidence.

24             THE COURT:  And that's P95?

25             MS. WINTER:  P95, yes.  Plaintiffs' 95.

1          THE COURT:  Any objection, Mr. Lewis?

2          MR. LEWIS:  I'm looking at it now, Your Honor.  No

3    objection, Your Honor.

4          THE COURT:  All right.  P95 is admitted.  Further

5    questions of this witness, Mr. Lewis?

6          MR. LEWIS:  Yes, Your Honor.  Very briefly.

7                     REDIRECT EXAMINATION

8    BY MR. LEWIS:

9    Q    Dr. Mehta, plaintiffs were involved in the creation of the

10   COVID-19 dashboard, weren't they?

11   A    Yeah.  There was a presentation, a demo that we did.  We

12   went through each of the business rules that were associated

13   with all of the different indicators.

14          And I would just say that the dashboard, like all of our

15   documents, are works in progress.  We have indicators that are

16   currently being tested and validated.  We have indicators where

17   we're correcting bugs and things like that.  No system is

18   perfect, but we are constantly looking at improving it and

19   adding functionality.

20   Q    And when patients -- when -- if it's something that can

21   always be improved, these are the kinds of things that you

22   could bring up in the task force and improvements could be made

23   based from that, right?

24   A    Yeah.  Most, if not many -- I mean many if not most of the

25   improvements are suggested in task forces and workgroups, yeah.

1    Q    Right.  So is, once again, the task force becoming a

2    collaborative process which could generate results like

3    improving the dashboard?

4    A    Yeah.  I think it's an opportunity for all the different

5    parties to give their feedback, their advice and that to be

6    taken into account.

7    Q    All right.  And then you were asked questions about

8    Plaintiffs' Exhibit No. 96.  That was the defendants' census,

9    waitlist, et cetera.  Part of those documents in that was

10   like -- they were DSH documents, correct?

11   A    I saw the logo, so, yeah, some of them I think, right, were

12   from DSH.

13   Q    And so you're not the one that authors DSH documents that

14   would be attached to a census report?

15   A    Correct.  No, I'm not.

16          MR. LEWIS:  And give me a minute.  I'm going to look

17   at my notes here very quickly, and I apologize.

18          THE WITNESS:  Sure.

19   BY MR. LEWIS:

20   Q    Now, plaintiffs asked you about that October letter, I

21   believe it was Exhibit 95.  It had -- it talked about five

22   patients that apparently they were asking questions about

23   timelines.  Aside from those inmates that were described there,

24   is it your general experience that CDCR is complying with

25   COVID -- with timelines for transfers right now under the

Dr. Mehta - Recross by Winter

1   program guide requirements with the addition of the COVID-19

2   screening and some of the exceptions that exist?

3            MS. WINTER:  Objections, Your Honor, leading.

4            THE COURT:  Sustained.

5   BY MR. LEWIS:

6   Q    So aside from the five that you saw there, is CDCR

7   complying with program guide transfer timelines for the

8   majority of its inmates?

9   A    Yeah.  For -- I mean, yeah.  A very large majority I would

10  say.  And I think in the cases where those sort of delays

11  happen, those delays, in my experience, are related to COVID.

12  Q    And is that something that you would, again, want to bring

13  to the task force or the small workgroups to discuss these

14  delays?

15  A    Yeah.  Yeah.  I think that's the kind of thing that, you

16  know, when we noticed that happening, we bring it up if that

17  happens.  And when others notice it, they bring it up so that

18  we can all work together to correct it.

19            MR. LEWIS:  All right.  I have no further questions at

20  this time, Your Honor.

21            THE COURT:  Anything further, Ms. Winter?

22            MS. WINTER:  Yeah.  I just have a couple questions on

23  redirect.

24                      RECROSS-EXAMINATION

25  BY MS. WINTER:

Dr. Mehta - Recross by Winter

1    Q    So your attorney stated that in the task force changes can

2    be made to the COVID dashboard; is that correct?

3    A    Suggestions can be made for changes.

4    Q    Suggestions can be made and then there's this process of

5    improving the reports; is that accurate?

6    A    Yes.

7    Q    Okay.  So was any improvement made to that COVID dashboard

8    in response to plaintiffs pointing out that it didn't report

9    all inpatient referrals?

10   A    Yeah.  That's definitely been added to the list.  Since

11   those patients are sitting in inpatient already, it's not the

12   highest priority because we have a lot of changes, obviously,

13   and we have to rank them according to priority.  Since those

14   patients are sitting in an inpatient setting, that wasn't the

15   first thing we're going to fix, but it's definitely on the

16   list.  And it was added to the list because it was raised in

17   that setting, yeah.

18   Q    So it was added to the list, but it has not been changed?

19   A    Correct.

20   Q    So a clinician, for example, who wants to see how patients

21   are doing and whether they're moving to DSH wouldn't see,

22   necessarily, all the numbers of the patients who are waiting to

23   go to DSH if they looked at that dashboard today?

24   A    Clinicians use the dashboard as much as the courts.  The

25   clinicians -- the way that we were able to see that discrepancy

1    is because the clinicians can have different -- they can view

2    different data.  The dashboard is more of a really kind of

3    high-level overview.  It wouldn't be as useful to a day-to-day

4    clinician who has a defined caseload, doesn't need to know

5    about how many patients at each institution or in what state.

6    Q    But if they did look, it wouldn't represent all the

7    patients who need to go to DSH?  That's just a yes-or-no

8    question.

9    A    Yes.  If they went to the dashboard and nowhere else, yeah.

10   Q    Okay.  Thanks.  And then so with regard to Melissa Bentz's

11   October 13th letter, have the transfers discussed in that

12   letter been raised by defendants in the workgroup?

13   A    They were anonymized.  I don't know.  I couldn't tell from

14   that letter alone.

15   Q    Okay.  Do you recall whether a discussion of the transfer

16   timelines at the time that a medical hold was lifted was ever

17   discussed in the workgroup?

18   A    Yes, yes.  That was a topic that was raised.

19   Q    Okay.  With regard to some of these patients transferring?

20   A    I would agree that it was likely in regards to specific

21   cases.  I just can't recall.  But, yes, that sounds reasonable.

22             MS. WINTER:  Okay.  I'll leave it at that.  Thanks.

23             THE COURT:  Anything further, Mr. Lewis?

24             MR. LEWIS:  Yes.  One very quick or two very quick

25   questions, Your Honor.

1                    REDIRECT EXAMINATION

2    BY MR. LEWIS:

3    Q   Dr. Mehta, aside from the dashboard, there's other

4    resources for the information about the status of inpatient

5    transfers, correct?

6    A   Yes.  We have registries.  We have a couple different

7    programs called, like, Psalms and Herms (phon.) and things

8    where -- all these different things where they're where they're

9    supposed to be and where their level of care is right now is

10   there.  But also, I mean, a clinician wouldn't need to look at

11   any of those of because they have a defined caseload and they

12   know what the status of their patients are.

13       So, I mean, you know, the registries, we will use them to

14   look up who needs blood tests and stuff, but we know where our

15   patients are supposed to be and what level of care they're at,

16   so we don't -- yeah.  At least that was my experience as a

17   clinician.

18   Q   All right.  And one last question, Dr. Mehta.  The letter

19   that the plaintiffs were asking you about, Plaintiffs'

20   Exhibit No. 95 that was offered by Ms. Bentz, do you remember

21   the date on that letter?

22   A   I believe it was October 13th.

23   Q   What's today's date?

24   A   October 23rd.

25           MR. LEWIS:  All right.  No further questions, Your

1    Honor.

2         THE COURT:  All right.  Is this witness excused,

3    Mr. Lewis?

4         MR. LEWIS:  Your Honor, this witness may be a

5    potential rebuttal witness, depending on some of the expert

6    issues, et cetera, that will be discussed later.

7         THE COURT:  All right.  Dr. Mehta, we will return you

8    to the waiting room.  You may step down virtually for now.

9         All right.  So defendants have used 92 minutes and

10   plaintiffs 74, just so that's clear.

11        Does the defense have an additional witness at this

12   time?  We can start and go for about 15 minutes.

13        MR. LEWIS:  Yes, Your Honor.  Defendants will call

14   Dr. Joseph Bick.

15        THE COURT:  All right.  Ms. Schultz, if you could

16   obtain Dr. Bick.

17        THE CLERK:  Dr. Bick, can you see and hear me?

18        THE COURT:  Did you get a response?  No?

19        THE CLERK:  I did not, Your Honor.

20        Dr. Bick, can you see and hear me?  This is the

21   courtroom deputy.

22        DR. BICK:  I can.  Thank you.  And can you hear and

23   see me okay?

24        THE CLERK:  I can.  Will you please raise your right

25   hand.

Dr. Bick - Direct by Lewis

1          DR. BICK:  One moment, please.  I just need to get

2     situated here.

3          (Witness duly sworn and takes the stand.)

4          THE WITNESS:  I do.

5          THE CLERK:  Thank you.  You may put your hand down.

6          THE COURT:  All right.  Mr. Lewis, you may proceed.

7          Mr. Galvan, you're handling this witness?

8          MR. GALVAN:  Yes, Your Honor.  Thank you.

9          THE COURT:  All right.  And Dr. Bick, I was saying

10    we'll go for about 15 minutes and then take a break, but we'll

11    at least get started with your testimony.

12          Mr. Lewis?

13          MR. LEWIS:  Thank you, Your Honor.

14           DR. JOSEPH BICK, defendants' WITNESS, SWORN

15                       DIRECT EXAMINATION

16    BY MR. LEWIS:

17    Q    Good afternoon, Dr. Bick.  Could you please state your name

18    for the record and spell your last name?

19    A    Joseph Bick.  B, as in "boy," I-C-K.

20    Q    And are you currently employed by the State of California?

21    A    Yes.

22    Q    What is your position?

23    A    I am the director of healthcare services for CDCR and

24    CCHCS.

25    Q    And are you a medical doctor?

1    A    Yes.

2    Q    Do you have any specialties?

3    A    Internal medicine, and I've trained in infectious diseases.

4    Q    Could you explain what you mean by you've trained in

5    infectious diseases?

6    A    I completed an infectious diseases fellowship after

7    completing an internal medicine residency and I sat for my

8    infectious diseases boards in 1996 and I believe again in 2006.

9    Q    And do you have experience with infectious diseases in

10   congregant living environments such as prisons?  Have you had

11   experience as a doctor in those situations?

12   A    Yes, on many occasions.

13   Q    And before you held your current position at CDCR, what was

14   your previous position?

15   A    Prior to July 6th of this year, I was the statewide

16   director of mental health and dental for the CDCR.

17   Q    All right.  And how long did you hold that position for?

18   A    From approximately January 13th through July 6th.

19   Q    So is it fair to say that you have been in an executive

20   leadership position at CDCR since the start of the COVID-19

21   pandemic?

22   A    Yes.

23   Q    And do you understand that you've been called here to

24   testify today concerning CDCR's mental health patient access to

25   inpatient hospital care at the Department of State Hospitals?

1  A    Yes.

2  Q    Okay.  And in general, what has been your role in CDCR's

3  response to COVID-19?

4  A    Well, in my previous position as the statewide director of

5  mental health and dental, my primary roles had to do with

6  addressing issues as it might relate to our Coleman class

7  patients and our dental patients with respect to prevention of

8  COVID.

9  Q    And in the process of your response or your work on the

10 COVID response, did you become involved with the Coleman

11 special master's COVID-19 task force?

12 A    Yes.

13 Q    Can you describe what the task force is and what some of

14 your interaction with it was?

15 A    Certainly.  In response to the evolving COVID outbreak, a

16 task force was set up to provide a venue for CDCR and the

17 Office of the Special Master and plaintiffs' attorneys to

18 discuss some of the pressing issues as it related to COVID.  I

19 believe we met about a half a dozen times in March and,

20 similarly, another half dozen times in April and then at some

21 point it transitioned to a weekly meeting that continues until

22 this time.

23 Q    And to your knowledge, did -- there's the main task force

24 meeting.  Were there sub task force that came out of this or

25 sub groups that came out of the task force meeting?

Dr. Bick - Direct by Lewis

1  A    Yes.  There was also a regularly scheduled small working

2  group which was established to deal with some of the clinical

3  issues.  Most often clinical issues related to care and

4  treatment of patients as they move back and forth between CDCR

5  and DSH.

6  Q    And did you participate in those workgroups in your role as

7  the execute director?

8  A    I did.

9  Q    Did you find those workgroups were useful?

10 A    Absolutely.  I think it was an opportunity for clinicians

11 to speak together, clinicians from DSH, CDCR, and the Office of

12 the Special Master and work together in a collaborative way to

13 come up with the best way to manage our mentally ill patients.

14 Q    And what were some of the policies or guidelines that were

15 developed by CDCR in response to the COVID-19 outbreak?

16 A    Well, initially in March when we started meeting we were

17 dealing with a pandemic involving an organism that none of us

18 had any experience with and first and foremost, our concerns

19 were trying to ensure that we can continue to provide mental

20 health care in a way that didn't put our patients at risk for

21 COVID.  So much of our initial actions and deliberations were

22 how best to continue to provide individual and group treatment

23 and to, when necessary, move patients from one location to

24 another.

25 Q    And the policies that were created, were they created

1    within or were they brought to the small workgroup setting and

2    addressed within that workgroup setting?

3              MR. GALVAN:  Objection, relevance, Your Honor.

4              THE COURT:  Mr. Lewis?

5              MR. LEWIS:  Your Honor, the relevance of this is to

6    demonstrate that these are well-known procedures.  These

7    documents or these policies and procedures are out there and

8    they are out there for all the parties to have knowledge about.

9              THE COURT:  The objection was relevance?

10             MR. GALVAN:  Yes, Your Honor.

11             THE COURT:  I'll allow a brief response without going

12   too far afield.

13             Dr. Bick, you may respond.

14             THE WITNESS:  Could you repeat the question, please.

15   BY MR. LEWIS:

16   Q   Were these policies and procedures to address COVID-19

17   brought to the small workgroup?

18   A   Yes.

19   Q   And in the small workgroup were they addressed within it?

20   Did they have a chance to be put out there so that everyone

21   would look at them?

22   A   Absolutely.  In fact, they weren't moved forward from the

23   small workgroup unless there was consensus among the people in

24   the workgroup.

25             MR. GALVAN:  Objection, Your Honor.  It's vague and

1   ambiguous and misleading as to who's in what workgroup meeting.

2   I mean, this is all trying to point -- to imply that someone

3   somewhere agreed to everything they did and it really --

4            THE COURT:  Understood the objection.  So that's a

5   standing objection and I will not reach any such conclusions

6   based on this very generalized testimony.

7            The objection is a valid one, Mr. Lewis but if you're

8   describing, you know, a summary review of processes, I

9   understand that as background, but it's not being used to argue

10  that there are admissions in place.

11           MR. LEWIS:  Yes, Your Honor.

12           THE COURT:  Particularized enough.

13  BY MR. LEWIS:

14  Q    Dr. Bick, were the policies and procedures that came out of

15  the small workgroup, did they contain input from the special

16  master's group?

17  A    Yes.

18  Q    But they also contained input from CDCR and DSH as well,

19  right?

20  A    Yes.

21  Q    Do the policies that come out, I mean, do they weigh the

22  risks and benefits of transferring a patient to a different

23  facility under COVID-19 conditions?

24  A    From my standpoint that was the primary purpose of what we

25  were doing.  It's very common to everything we do in medicine,

1    which is balancing that potential for risks and benefits.

2         At the time we were meeting, we were in the middle of a

3    extreme outbreak at one of our facilities in the south that

4    ultimately led to infections of over a thousand people and at

5    that one facility over 20 deaths.  So that's what was informing

6    our decisions as we were trying to continue to provide care in

7    a way that wouldn't put our patients at risk.

8    Q    And have you and CDCR -- have CDCR or CCHCS taken public

9    health guidance into account when formulating these policies?

10   A    Yes.

11   Q    And what have you -- what have you learned about public

12   health guidelines that's relevant to these policies or to

13   congregant living environments?

14   A    Well, we had some prior knowledge about the danger of

15   congregant living environments as it relates to airborne and

16   respiratory spread diseases, but since this was a new and

17   evolving pandemic, we didn't have as much information as we

18   would have liked.

19        And so ultimately what happened, even in spite of best

20   efforts, as the cases kept mounting, we had severe episodes

21   that were related to movement of patients from facility to

22   facility and transmission of COVID.  That's basically what

23   happened on through March, April, May and culminated in a huge

24   outbreak at San Quentin that was related to movement of

25   patients from an outbreak facility to San Quentin.  So always

1  in the forefront of our mind was none of us wanted to see

2  another San Quentin.

3  Q   So then since then have the guidelines been developed and

4  refined to weigh the risks and benefits of inmate transfer?

5  A   Yes, they have.

6  Q   And when you say, "Yes, they have," is that because -- does

7  that mean that they are taking in the public health guidance,

8  they're taking in experience?  What is going into these

9  policies to drive those considerations?

10 A   So we relied, as much as possible, on existing guidelines

11 from the Centers for Disease Control, the California Department

12 of Public Health.  We also sought input from public health

13 experts both internally and external from the department and

14 then our decisions were also informed by our own experience.

15 Ultimately, that led to the creation of a conservative but, I

16 feel, appropriate movement matrix to govern all types of

17 movement throughout our organization and back and forth from

18 DSH.

19 Q   So you mentioned a movement matrix.  Was the movement

20 matrix developed in response to something or in response to

21 COVID conditions at the prisons at that time?

22 A   Yes.  There was a project, actually, that I took the lead

23 on, and it was driven, in large part, due to our experience

24 with the outbreak at San Quentin.  And it was constructed to

25 minimize the risk any such transmission happening going

1   forward.

2   Q   So I'm now going to show you a document and, for the

3   record, it is document No. -- Defendants' Exhibit No. 32.  And

4   it is a pleading from Court.  I will try to share my screen

5   now, so bear with me, please.

6           THE COURT:  It appears to be a joint report filed with

7   the Court.

8           MR. LEWIS:  Yes, Your Honor.  And if I may have a

9   minute, I believe it's right here, if I can get this right.  I

10  apologize, Your Honor.

11          THE COURT:  We're actually at a good time for a break,

12  so why don't we go ahead and take the break and by the time we

13  come back, you can have figured out how to display the

14  document.

15          MR. LEWIS:  Yes, Your Honor.  I need to clear out some

16  exhibits that I have open, so thank you.  That would be very

17  good, Your Honor.  How long would you say, Your Honor?

18          THE COURT:  Let's say a 10-minute break.  At this

19  point if we go with one more break, just so you know, if both

20  of you use the total of three hours we'll end up going until

21  5:30 or even a little later.  That's the Court's plan

22  currently.

23          MR. LEWIS:  Very well, Your Honor.

24          THE COURT:  Ten minute break.  Be back at 2:26.

25          MR. LEWIS:  Thank you.

1        (Recess at 2:16 p.m. to 2:23 p.m.)

2            THE COURT:  All right.  Mr. Lewis, you may continue.

3            MR. LEWIS:  All right.  Thank you, Your Honor.

4            And Your Honor, if you could tell us what our current

5     time is right now for defendants?

6            THE COURT:  You are at 120 minutes and 45 seconds.

7            MR. LEWIS:  Thank you, Your Honor.

8            THE COURT:  All right.

9     BY MR. LEWIS:

10    Q    Dr. Bick, I'm going to show you a document that has been

11    marked as Defendants' Exhibit -- I believe it was 43.  Can you

12    see that document on your screen, Dr. Bick?  It's titled

13    "Population COVID-19 Tracking."

14    A    Yes, I can.

15    Q    All right.  Now, this appears to be a document which tracks

16    a large number of statistics about CDCR's, I guess, COVID-19

17    trends.  I'll just put it that way because it's in front of me.

18    Can you talk about what this document represents and what you

19    can tell us about particularly this blue chart that's kind of

20    right here in the middle that says, "Active cases in custody

21    curve"?

22    A    Yeah.  So what this describes for us, in a very graphic

23    sense, is what we were facing through April and May and June as

24    we were deliberating about the best way to take care of our

25    patients in a way that balances the risks and benefits to

1    movement and to various locations for treatment.  So we were

2    seeing this rapid rise of active cases within the department.

3    And as you can see here, we ended up peaking at about 3,000

4    active cases in the first week of July.  Overall, we've had so

5    far over 15,000 patients infected and over 70 patient deaths

6    and 10 staff deaths related to COVID.  This was weighing

7    heavily on our minds as we were balancing how best to provide

8    care to our patients.

9         The other thing that I take away from this is seeing the

10   impact of some of the measures that we've taken to try to

11   ensure that we move patients safer, in terms of using a

12   movement matrix and increased attention to things such as

13   masking and hand sanitizing and physical distancing, et cetera.

14   As of today, we're now at the lowest number of active cases

15   among our inmate patients that we've had since the end of

16   April.

17   Q    And Dr. Bick, realizing that this demonstrates all of

18   CDCR's population, you value all of the inmates at CDCR, not

19   just certain classifications but all inmate life, correct?

20             MR. GALVAN:  Objection, leading.

21             THE COURT:  Sustained.

22   BY MR. LEWIS:

23   Q    Dr. Bick, are all patients important to you?

24   A    Well, I would say throughout my career I haven't really

25   paid much difference to whether it's an inmate patient or a

 1    staff person.  We've been concerned about all of their health

 2    equally.

 3    Q    And then from the perspective of the Coleman patients, you

 4    honor and respect the safety of those patients?

 5                MR. GALVAN:  Objection, leading.

 6                THE COURT:  Sustained.

 7    BY MR. LEWIS:

 8    Q    Do you harbor any ill will towards Coleman patients?

 9    A    No.  In fact, I would say that I see it as my primary

10    responsibility to ensure their safe treatment.

11    Q    And I'm going to show you now a document that has been

12    previously marked as Defense Exhibit -- I'll open it up right

13    now -- 32.  Can you see that document on your screen?

14    A    Not yet, I don't.

15    Q    My apologies.  Thank you.

16         Still learning how to master this.  How about now?

17    A    Yes, I do.

18    Q    All right.  So I'm showing you what has been previously

19    marked as Defendants' Exhibit No. 32.  It is ECF No. 6866 from

20    the Court's record.  I would like to refer you to page 44,

21    which is where I am right now within the document.  Can you see

22    44 of 107 in kind of the blue writing at the top right corner?

23    A    Yes, I can.

24    Q    All right.  So what is this document?

25    A    So this is the second version of our screening and testing

1  matrix that was created to provide very granular detail to the

2  field on how to move patients from one location to another in

3  the safest manner possible.

4  Q   And was this done in response to the rise in outbreaks at

5  CDCR facilities?

6  A   It was.  I'm a very detail-oriented person.  And although

7  we had a policy in place previous to this that said patients

8  will be tested and screened before they're moved, it wasn't to

9  this level of detail.  And my three decades of experience

10  working in prisons taught me that if you don't have this

11  specific level of detail, the movement will not routinely

12  happen safely.

13  Q   And then before this came out, had there started to -- was

14  there a backup or a backlog of inpatient transfers happening at

15  this time?

16  A   The steps we took to protect staff and patients led to

17  decreased movement of all types of patients throughout the

18  state.  And this did contribute to backlogs of movement to DSH

19  from anywhere.

20  Q   And then after this was enacted, and it's dated August

21  19th, 2020, has movement started resuming for Coleman DSH

22  patients?

23  A   Yes.  Initially the movement, as we gained more experience

24  with this, was primarily within CDCR.  We started liberalizing

25  movement of other patients who had a critical need to move; ADA

1   patients, people who were in segregated housing, for example.

2       Throughout all of this, we continued emergency movements of

3   patients for any reason, whether that was medical or mental

4   health movements, but we did start decreasing our various

5   backlogs through August and September.

6   Q   And in your opinion, does this movement matrix represent a

7   responsible movement policy for CDCR under the current COVID-19

8   conditions?

9           MR. GALVAN:  Objection, calls for expert testimony.

10          THE COURT:  Sustained.

11  BY MR. LEWIS:

12  Q   Did you intend this to be a responsible movement policy for

13  CDCR under current COVID conditions?

14  A   Yes.

15  Q   In what ways?

16  A   Again, getting back to just what's a fundamental part of

17  clinical care, which is always balancing the potential risks

18  and benefits of any of the steps that we take in consultation

19  with a wide variety of internal and external stakeholders we

20  felt that this was the most prudent steps to take to ensure

21  that when we did move patients for clinical necessity, that it

22  was done in a manner that didn't put them at risk for life

23  threatening illness and didn't expose others unnecessarily

24  either.

25  Q   Thank you, Dr. Bick.

Dr. Bick - Cross by Galvan

1          MR. LEWIS:  Your Honor, at this time I would move to

2    enter Defendants' Exhibits 32 and 43 into evidence.

3          THE COURT:  Any objection, Mr. Galvan?

4          MR. GALVAN:  No objection, Your Honor.

5          THE COURT:  All right.  D32 and D43 are admitted.

6      (Defendants' Exhibits 32 and 43 admitted in evidence.)

7          MR. LEWIS:  Yes, Your Honor.

8          THE COURT:  That concludes your questioning,

9    Mr. Lewis?

10         MR. LEWIS:  Direct, yes.

11         THE COURT:  All right.  Mr. Galvan, you may proceed.

12         MR. GALVAN:  Thank you, Your Honor.

13                        CROSS-EXAMINATION

14   BY MR. GALVAN:

15   Q    Good afternoon, Dr. Bick.

16   A    Good afternoon.

17   Q    What's the criteria for closing an institution to movement

18   now?

19   A    That's an interesting question, and it's evolving.  We have

20   been closing institutions when there are three or more cases

21   among patients at an institution.  But now over the last

22   several weeks what we're trying to do is to refine that so that

23   the entire institution isn't closed but just those areas that

24   are actively involved in the outbreak.

25   Q    And when you say you're trying to refine it now, if I

1   looked at the closed institutions list now, I wouldn't see that

2   reflected, right?  It's still all or nothing in the

3   institutions?

4   A   That's correct.

5   Q   And do you have an estimate of when you're going to change

6   that and start partially opening institutions?

7   A   Well, functionally it's changing already.  By that I mean

8   all along the designation of a closed institution didn't mean

9   that someone couldn't move.  It meant that it wouldn't happen

10  without a higher level of review.  So we continued to move

11  people in and out of closed institutions throughout the

12  outbreak.  Now what we're doing is being more liberal with that

13  specifically as it applies to movements to DSH.

14  Q   And it's true, isn't it, that even during the time when --

15  this last few months when you've had institutions closed

16  entirely, there have been hundreds of movements to and from

17  closed institutions all during that time, correct?

18  A   There have been for both medical, mental health and other

19  reasons.

20  Q   And that that includes movement from closed institutions of

21  offenders with mental health disorders or OMDs, as we've been

22  saying in this proceeding?

23  A   Well, the OMDs wouldn't be moving within our system, but

24  they did move from CDCR to DSH.

25  Q   And they moved from CDCR closed institutions to DSH,

Dr. Bick - Cross by Galvan

1    correct?

2    A    Yes.  They moved without respect to where they were housed

3    or whether they were diagnosed with COVID.

4    Q    And when you move a patient from a closed institution to a

5    medical hospital for treatment, you don't require a negative

6    COVID test before you move them, correct?

7    A    I'm sorry.  When we -- could you repeat that?

8    Q    When you move a patient or an inmate patient from a closed

9    CDCR institution to a medical facility for treatment, you don't

10   first require a negative COVID test before you'll move them,

11   correct?

12   A    Actually, for most cases we do within our system.

13   Q    And does that include for emergency treatment?

14   A    It would depend how you define emergency.  If you're

15   talking about someone who is having a heart attack or a stroke

16   or an arterial bleed, no, they would be bundled up and sent to

17   an outside emergency room as promptly as we can.

18   Q    So your examples would include someone displaying symptoms

19   of a stroke, like, for example, one side of the face is

20   paralyzed or they're disoriented.  You wouldn't wait for a

21   negative COVID test, correct?

22   A    That's correct.

23   Q    Or another example, chest pain that radiates to the arm you

24   wouldn't wait for a negative COVID test; is that right?

25   A    That's right.

1        MR. LEWIS:  Objection, calls for speculation, Your

2  Honor, and assumes an incomplete hypothetical.

3        THE COURT:  I'll allow the answer to stand.

4  BY MR. GALVAN:

5  Q   Your standard for COVID testing now is the PCR test; is

6  that right?

7  A   It depends upon the situation in which we're doing the

8  test, but that is considered the gold standard.

9  Q   And is it correct that in CDCR most of your PCR tests come

10  back within 48 hours?

11  A   The current average turnaround time is about 2.5 days.

12  Q   And CDCR also has access to faster tests; is that right?

13  A   We do employ a rapid antigen test, which does have a higher

14  rate of false positives and negatives.

15  Q   What do you use the rapid test for?

16  A   It's most appropriately used in the setting of an outbreak

17  when you need to rapidly identify people who are infected so

18  you can separate them from others; or, in the case of a

19  symptomatic person who you have a high probability of having

20  COVID and you want to test them, but it's not supposed to be

21  used as a general screening tool.  That being said, our matrix

22  does say if there's a reason to move someone rapidly and you

23  don't have a PCR to get a rapid test.

24  Q   And what's the speed with which you get the rapid test

25  back?

1    A    Generally the turnaround time is about 20 minutes.

2    Q    Do you have a shortage of supply of those rapid tests?

3    A    Periodically and depends upon the facility, but, in

4    general, we've been able to get enough to meet our needs.

5    Q    I'm going to show you an exhibit.  Are you able to see my

6    screen right now?

7    A    Yes, I can.

8    Q    It should be mostly blank but just have an exhibit label

9    now.

10   A    Yes.

11   Q    This is Exhibit P056.  And I'll represent it's the same

12   thing that came in as part of Defendants' 32, it's just

13   free-standing.  You identified this during your direct

14   examination as your movement matrix; is that correct?

15   A    Yes.  It's the department's movement matrix.

16   Q    Looking at this first page here -- and there's an item here

17   at No. 1 that says, "To reduce the likelihood of COVID-19

18   spreading from one location to another, movement shall be

19   limited to that which is necessary for clinical care."  And

20   I'll stop there.  There are other categories.  When you wrote

21   that, did you mean for that to include transfers to an

22   intermediate care facility from CDCR?

23   A    I'm sorry.  I missed -- did you say within CDCR?  Could you

24   repeat that one more time?

25   Q    Sure.  When you wrote that you were trying to limit

1  movement to that which is necessary for clinical care, did you

2  mean to include movement from CDCR to an intermediate care

3  facility?  And I'll just make it more specific; at DSH.

4  A    It was intended to apply to any movement that was deemed to

5  be clinically necessary.

6  Q    And is movement to an intermediate care facility at DSH

7  deemed to be clinically necessary?

8  A    In many cases, yes.

9  Q    How do you determine in which cases?

10  A    Well, I don't because I'm not a mental health professional.

11  That decision is made by mental health clinicians based upon

12  their diagnosis.  The timeframe of the movement may be another

13  matter.  They may come to a different decision about that.

14  Q    Moving down to numbered item 6, you wrote "Inmates moving

15  into higher level of care (HLOC) beds," and then you have

16  another paren "(medical CTC, OHU, MHCB, PIP) shall be

17  quarantined in the HLOC."  Does that mean if you need to

18  quarantine a patient, you won't keep them where they are but

19  you'll just move them and quarantine them in the higher level

20  of care?

21  A    No.  What it means is that when a patient is moved into a

22  higher level of care, rather than put them in some separate

23  intake unit that they would have their post-movement quarantine

24  in the higher level of care.

25  Q    I see.  So you meant to also have a premovement quarantine?

1   A    Yes.  In most cases of movement, as described in the matrix

2   below, there are pre- and post-movement quarantines.

3   Q    Moving forward a few pages to pages 5 and 6, if you look at

4   the bottom here in Exhibit PO56 where it says "Admission to DSH

5   from CDCR," you wrote this provision to govern movement from

6   CDCR to DSH; is that right?

7   A    Yes.

8   Q    Moving to the second page -- I'm sorry, the next page after

9   that, the sixth page where that same cell continues, the first

10  complete line there says, "Test symptomatic patients."  Did

11  that mean that you were limiting the premovement testing to

12  those who were symptomatic?

13  A    No.

14  Q    What did that mean?

15  A    So this follows from the line that's quite -- just above,

16  which is bifurcated, I can't see the beginning of it, but I

17  believe "Screen daily for symptoms."  The intent there is to,

18  again, provide that granular level.  One would assume that if

19  someone became positive -- symptomatic that someone would test

20  them, but I don't like to assume, so we wrote in there "Test

21  the symptomatic patients if they become symptomatic during

22  their daily screens."

23  Q    And then the next -- a couple of steps down there's "Test

24  for COVID after 14 days in quarantine," and then it says the

25  method.  And then it says, "If inmate tests negative, transfer

1    as soon as possible."

2        What did you intend to happen if the test did not come back

3    within the transfer timeline?

4    A    So I don't believe that this version consistently talked

5    about what to do if that didn't come back, but it is in other

6    parts, I believe, of this document and in the next version that

7    if there -- we don't get the results back in time that you can

8    substitute a rapid test at the end of that quarantine period.

9    Q    So you said two things there that I want to break apart,

10   one, that it's somewhere else in this document?

11   A    Well, I haven't scrolled through this.  I can't scroll

12   through it with you.  I don't recall if that's in this version

13   or the subsequent one where we put in that bit about

14   allowing -- after a 14-day quarantine, allowing a method other

15   than PCR.  That was put in place to facilitate movement in some

16   facilities that were having prolonged turnaround times for

17   their PCR tests.

18   Q    And when you talk about a subsequent version, is that

19   something you're working on but haven't finished yet?

20   A    Yes.  It's something that is almost ready for circulation

21   to external stakeholders for input.

22   Q    But you would agree with me that this Exhibit 56, this is

23   the only version that's been actually sent out beyond your

24   office, right?

25   A    August 19th is the most current one, yes.

1    Q    So under this version, the August 19th version, the patient
2    cannot go to DSH until you get the negative test back; is that
3    correct?
4    A    That was the intention, one of the intentions, yes.
5    Q    So the intention was to hold the patient at CDCR until you
6    got the test back, correct?
7    A    For routine movement, yes.
8    Q    I'm sorry, but what do you mean by routine movement?
9    A    Well, this wasn't the only thing that was going on along
10   these -- you know, over these many months.  We were having
11   weekly meetings in the small working group with the OSM and
12   with DSH talking about updating various emergency guidelines
13   that governed movement and there was always the possibility in
14   those guidelines of moving people if there was an emergent need
15   to do so.
16   Q    But there was -- you would agree that there was a period
17   where no one moved at all to DSH, right, a period of weeks or
18   months, correct?
19   A    Yes.
20   Q    And that occurred under this policy, correct?
21   A    Well, this was one of several policies or documents that
22   controlled movement, but it did take place during this time.
23   Q    And under this policy, if a patient who is waiting to go to
24   DSH tests positive for COVID, does that patient move to DSH or
25   not?

1   A    This policy is not intended to make clinical decisions

2   about needs to move.  So movement could happen from CDCR to DSH

3   during that timeframe.  That would be a separate process when

4   there's a clinical decision that someone must move.

5   Q    To your knowledge, has that ever happened?

6   A    I don't know if we've sent anybody outside of the OMD

7   process who was known to be infected with COVID.

8   Q    Have you sent anyone inside the OMD process who has been

9   infected with COVID?

10  A    Well, we don't actually send those.  Those are paroled.  We

11  have no authority to do anything else other than have them go

12  to DSH.  So, yes, there are patients, regrettably, with COVID

13  who left CDCR in an active state and moved to DSH.

14  Q    And to your knowledge does DSH -- do you agree with

15  Dr. Warburton that DSH has practices in place in order to

16  handle that situation?

17         MR. LEWIS:  Objection, Your Honor, to the extent that

18  it purports Dr. Warburton without this witness's personal

19  knowledge of that.

20         MR. GALVAN:  I'll withdraw the question because he

21  wasn't --

22         THE COURT:  I was going to say sustained.  Sustained.

23  BY MR. GALVAN:

24  Q    You were not here.

25         From your personal knowledge of what DSH has done to

1    respond to the pandemic, does DSH have practices in place to

2    handle an incoming positive patient?

3        MR. LEWIS:  Objection, Your Honor, to the extent that

4    it calls for speculation.  Perhaps the witness -- I'm sorry --

5    the counsel could lay a little more foundation for the basis

6    for this question.

7        THE COURT:  That's fair.  That's fair, Mr. Galvan.

8    You could lay a foundation to see if there's a basis for asking

9    that question.

10   BY MR. GALVAN:

11   Q   Do you have knowledge, Dr. Bick, about the measures that

12   DSH has put into place in its hospitals to prevents outbreaks

13   of COVID?

14   A   I don't have specific knowledge and I haven't visited the

15   DSH facilities.  What I do know is that they've put in place

16   measures to, as best as possible, as they say, deal with that

17   possibility.

18   Q   So you're aware that they do have measures to deal with the

19   arrival of a positive patient from CDCR, correct?

20   A   Yes.  I can't speak to how effective those are based on

21   their physical plan.

22   Q   In your work do you communicate regularly with

23   Dr. Warburton?

24   A   I did in my previous position.  Not so much in my current

25   position.

1          MR. GALVAN:  At this time I'd like to move

2    Exhibit P056 into evidence.

3          THE COURT:  Any objection, Mr. Lewis?

4          MR. LEWIS:  No, Your Honor.

5          THE COURT:  All right.  P56 is admitted.  You're done

6    with your questions for now?

7       (Plaintiffs' Exhibit 56 admitted in evidence.)

8          MR. GALVAN:  No, Your Honor.  I'm sorry.  I was just

9    making sure I moved that in before I forgot about it.

10         THE COURT:  All right.  You may proceed.

11   BY MR. GALVAN:

12   Q    Thank you.  Dr. Bick, I'm now showing you Exhibit D15.  Are

13   you familiar with this document?

14   A    I'm still seeing the matrix on my screen.

15   Q    Ah.  Well, I better fix that.

16        Are you now seeing Exhibit D15?  It's -- I think mainly

17   you'll see a memo, a CCHCS memo.

18   A    Sorry.  I'm trying to expand it so that I can see it.

19   Q    Just try to make it bigger.

20   A    Yes.  I have it on my screen.  Unfortunately, it's a hand

21   phone and it's small.  So I'll lean into it so that I can see

22   it.

23         THE COURT:  Mr. Galvan, there's a question?

24   BY MR. GALVAN:

25   Q    Yell.

1        Did you author this memo, Dr. Bick?

2    A   Yes, I did.

3    Q   And at the bottom of the page that I'm showing, are you

4    able to see the heading "Offender With Mental Health Disorder

5    Process"?

6    A   Yes.

7    Q   And do you recall setting out the process for moving people

8    in the OMD category to DSH in this memo?

9    A   It's almost five and a half months ago, so I don't have a

10   very good memory of this memo at this time.

11   Q   Based on your recollection of how the OMD process is

12   working, would you say that it is correct to say that you

13   have -- that CDCR has never required waiting for a negative

14   COVID test in order to move an OMD to DSH; is that correct?

15   A   No.  I think that would be a mischaracterization of what

16   actually happens.

17   Q   What would be the correct characterization?

18   A   The patient has a parole date and on that date they go.  We

19   don't have the ability to keep that person beyond that date,

20   even if we thought that it was prudent from a public health

21   standpoint, whether they have tuberculosis or COVID or Ebola.

22   We don't have a choice.

23   Q   So for whatever the reason --

24        MR. GALVAN:  Well, first of all, I would move to

25   strike the preceding as a legal opinion, which the witness is

1   not qualified to offer.

2           THE COURT:  Granted.

3   BY MR. GALVAN:

4   Q   As a practical matter, it is correct you have never

5   required a negative COVID test before you move an OMD to DSH,

6   correct?

7   A   I didn't.  I guess that's correct.  It's an interesting way

8   because it suggests that we could require such a thing, but

9   you're correct.

10  Q   Thank you.  I'm going to just switch exhibits for a moment.

11          MR. GALVAN:  Oh.  Before I do that, I would like to

12  move D15 into evidence.

13          THE COURT:  Any objection, Mr. Lewis?

14          MR. LEWIS:  None, Your Honor.

15          THE COURT:  All right.  D15 is admitted.

16      (Defendants' Exhibit 15 admitted in evidence.)

17  BY MR. GALVAN:

18  Q   And now I'm going to switch to another exhibit.  And right

19  now you should see mostly a blank page, Dr. Bick, which is --

20  contains the sticker for P071-2.  And I'll scroll forward so we

21  can see what that actually is.  Oh, that's going to be hard to

22  see on a phone.  I'll zoom in on part of this, Dr. Bick, so

23  that it will make more sense.

24      Dr. Bick, are you aware of the practice of making transfer

25  lists from CDCR institutions during the pandemic?

Dr. Bick - Cross by Galvan

1   A   I apologize.  It's just kind of a vague question.  There

2   are lists that are made all the time about patients who are

3   transferring.  Could you be more specific?

4   Q   Yes.  If you take a look at P071-2, is this a transfer

5   list?

6   A   I'm trying to read the top columns there.  It looks like

7   you have a list of mental health classifications and a transfer

8   date, a mental health level of care.

9           MR. LEWIS:  Your Honor -- pardon me, Your Honor.  I'm

10  going to object to this line of questioning as to this document

11  because it is unclear, I think to all of us, what exactly this

12  is.  So perhaps Mr. Galvan can lay a little bit more foundation

13  as to what this is so that we can have the witness answer any

14  questions on it.

15          THE COURT:  I think you have the answer you're going

16  to get to your last question, Mr. Galvan.  How about the next

17  question?

18          MR. GALVAN:  Okay.  I'll move to another exhibit, Your

19  Honor.

20  BY MR. GALVAN:

21  Q   I don't see Dr. Bick.  Did we lose Dr. Bick?

22  A   I can hear you, but the video has stopped.  Are you able to

23  see me?

24  Q   No, but I can hear you.

25          THE COURT:  Is that acceptable to you to proceed in

1    this way?

2           Oh, there.  Dr. Bick is back, it appears.

3           Are you able to see him?

4           MR. GALVAN:  Yes, I can see Dr. Bick.  Thank you.

5    BY MR. GALVAN:

6    Q   Dr. Bick, can you see the exhibit I'm currently displaying,

7    which is Exhibit D22?

8    A   I cannot.  For some reason my screen has gone blank.  I

9    apologize.  I can hear you well, though.

10   Q   Okay.

11          THE COURT:  Let me just ask if this is a -- is this

12   going to hamper the defense cross of Dr. Bick?

13          MR. GALVAN:  Yes, Your Honor.

14          THE COURT:  Dr. Bick, I mean, is there a way for you

15   to quickly figure out why you aren't able to see exhibits

16   currently?

17          DR. BICK:  I can switch to another -- I can switch to

18   another device, Your Honor.

19          THE COURT:  I think that would be important.  Does

20   that mean you're going to have to come back into the waiting

21   room?

22          THE WITNESS:  I can't answer that, Your Honor.

23          THE COURT:  Ms. Schultz, do you know if Dr. Bick

24   switches to a different device does that mean we'll have to let

25   him back in through the waiting room?

1      THE CLERK:  Yes, Your Honor.

2      THE COURT:  If you can do that as quickly as possible,

3  Dr. Bick, we'll take the shortest recess possible and wait

4  until Ms. Schultz tells you you're back in -- tells us you're

5  back in.

6      DR. BICK:  Understood.

7    (Brief pause.)

8      THE COURT:  All right.  I understand Dr. Bick can see

9  the document, he can -- and we can see Dr. Bick and we're not

10  getting feedback.  So all right.  For a remaining few minutes,

11  Mr. Galvan, you may proceed.

12      MR. GALVAN:  Thank you, Your Honor.

13  BY MR. GALVAN:

14  Q   Dr. Bick, I'm showing you what's previously been admitted

15  as D22.  Do you recognize this document?

16  A   I do.

17  Q   Were you involved in drafting it?

18  A   Yes.

19  Q   Looking at the steps here that are in this first page, I

20  want to direct your attention to the steps labeled C, D and E,

21  sir.  Is it your understanding that you believed this policy

22  for each referral that CDCR makes to DSH, for a patient to go

23  to ICF, the DSH can ask for consultation between the DSH

24  medical director and a CDCR clinical designee?

25  A   Yes.

1    Q    And that's different from the program guide practice.  This

2    is a COVID policy, this consultation?

3    A    Yes.  This is, I believe, a third or fourth iteration of

4    the temporary guidelines for transfer of patients.

5    Q    And it's true, isn't it, that under this guideline if DSH

6    doesn't agree with what happens in that first consultation,

7    they can ask the case to go up for another consultation to the

8    DSH medical director and the CDCR chief psychiatrist?

9    A    Yeah.  It's just a normal type of appeal process.

10   Q    When you say "normal," was it normal before COVID or is it

11   new?

12   A    I had limited experience with this prior to COVID, but yes,

13   there is a process if there's disagreement between referring

14   clinicians and accepting clinicians to elevate that to

15   higher-level folks in both departments.

16   Q    And it's true, isn't it, that when it goes up to that

17   higher level that if those two people, the DSH medical director

18   and the CDCR chief psychiatrist don't agree, if they don't

19   reach consensus to the word that's used in paragraph e here,

20   that then the patient is considered rejected; is that right?

21   A    Rejected to include a CCAT, yes.

22   Q    Okay.  What happens at a CCAT?

23   A    So there's a more extensive discussion that involves

24   additional team members and then that would also, as is

25   documented here, that would involve review by the Office of the

1    Special Master.

2    Q    And then moving down the page to the paragraph labeled n as

3    in "November," where it says, "For referrals from closed

4    institutions," is it correct this is another review process on

5    top of the ones we just talked about?

6    A    I'm sorry.  I don't understand your question.

7    Q    So we talked about a process of review if DSH wants to have

8    a referral reviewed by higher -- some higher officials, right,

9    that are in c, d and e of this exhibit.  And then when we go

10   down to n, I see there's another process it says, "For

11   referrals from closed institutions, the following process

12   should apply."  So is that in addition to all those things we

13   just went over?

14   A    That was, in my mind, intended so that regardless of

15   whether a patient was at a closed institution or not, that they

16   would still have an avenue for admission to DSH.

17   Q    So say more about that because -- well, let me ask a

18   specific question about it.

19        The first -- the ones we went over that are at c, d and e,

20   those reviews -- did those apply to open and closed

21   institutions or just one of them?

22   A    Our concern was that in the initial part, the a through m,

23   that patients could be called out if they were at a closed

24   institution because there are separate documents that have been

25   circulated about patients not moving from closed institutions.

1   The purpose of this was to ensure that there was always an
2   avenue for patients to move from CDCR to DSH even if they were
3   at a closed institution.
4   Q   So the steps in c, d and e only apply to people at open
5   institutions?
6   A   I think that could very well have been the case because
7   patients may not have been considered if they were at a closed
8   institution.
9   Q   I see.  So before this document if you were at a closed
10  institution you just weren't going at all; is that right?
11  A   No, that's not accurate.  In fact, there were repeated
12  directions given to the field from leadership, including
13  myself, where there was very specific direction going back into
14  March and April that referrals were to continue.  But we wanted
15  to be explicitly clear that patients who were coming from
16  closed institutions would still be considered.
17  Q   And the patients coming from closed institutions, they
18  would go through the c, d and e review process or no?
19  A   I haven't looked at this document in about four months, but
20  if you like, I can take time to read through it.
21  Q   Okay.
22  A   Okay.  I'm ready.
23  Q   Okay.  So for the people coming from closed institutions,
24  would their cases go through the c, d and e review process?
25  A   No.  That started at n for the closed institutions.

Dr. Bick - Cross by Galvan

1   Q    Okay.  The closed institutions people.  So they -- it's

2   your testimony that they start at n.  Okay.  Okay.  So in the n

3   process they get to go if they're a rare case -- on a rare

4   case-by-case basis, correct?

5   A    Yes.

6   Q    And then their case has -- the next bullet point their case

7   has to be discussed between you, the CDCR director of

8   healthcare services, right, and the DSH deputy director of

9   clinical operations, Dr. Warburton; is that correct?  Looking

10  at the bottom of the page.

11  A    Yes.

12  Q    And then the next -- I'm going to flip the page to the next

13  page because I think it says here what you're supposed to talk

14  about.  It says, "The discussion will include relevant public

15  health information, such as potential exposure to infected

16  employees and/or inmate patients, effects of physical plant on

17  exposure risk, availability and use of PPE, status of serial

18  location-based testing, floating of staff to and from relevant

19  units."  Are those the -- and et cetera.  Are those the topics

20  that you would discuss in reviewing the closed patient

21  referral?

22  A    Yes.

23  Q    And with regard to potential exposure to infected

24  employees, what were you looking for?  What would militate in

25  favor of letting the patient go to DSH?

1    A    If they had not been in a direct close contact of someone

2    with active COVID.

3    Q    And what about effects of physical plant, what were you

4    looking for there in terms of letting someone go to DSH?

5    A    So contact investigations depend upon sharing air.  And

6    there are some facilities, such as San Quentin -- and it should

7    be remembered that at the time of this document, July 16th,

8    there were over 3,000 people infected in the state.  We had a

9    huge outbreak at San Quentin.  Those patients are in cells but

10   they're open-doored cells, and so the impact was essentially

11   that five floors of the building was one big open dorm.  And so

12   although a patient may be three stories below someone else

13   who's infected, they could easily have become infected from

14   that person because of the airflow in that building.  That's

15   what was the intent of this line.

16   Q    So a person who was in a celled institution with closed

17   doors would be more likely to have been approved for DSH under

18   this?

19   A    They would be less likely to have been determined to be a

20   close contact of somebody who was two doors down as opposed to

21   somebody who was in a housing unit where they had open doors.

22   Q    And therefore, they'd be more likely to be approved to go

23   to DSH?

24   A    Yes.

25   Q    The next one is "Availability and use of PPE."  What were

1   you looking for there to militate in favor of allowing the

2   person to go to the DSH?

3   A   It's part of the standard contact investigation.  So if I'm

4   in close proximity with you and you have active COVID but I'm

5   wearing an N95 mask appropriately that's been fit tested and I

6   have a face shield, even if I'm providing care to you, the risk

7   to me is low.  And so that's what is meant by the use of PPE.

8   Q   And then the factor:  Status of serial location bed spaced

9   testing.  What were you looking for there to militate in favor

10  of the transfer to DSH?

11  A   What type of testing is available and being done at the

12  location where the patient resides.

13  Q   Is that something that you control?

14  A   No, but it's data that we have access to.

15  Q   And as you sit here today, do you recall having some of

16  these discussions with Dr. Warburton?

17  A   I remember having conversations with Dr. Warburton, CDCR

18  staff and OSM about the construction of this version of the

19  emergency guidelines, but on July 6th I assumed a new role, and

20  so these conversations were conducted by the deputy director

21  for mental health.

22  Q   That would be Dr. Mehta?

23  A   Yes.

24  Q   And when you say "these conversations," do you mean patient

25  by patient as to whether a person could transfer?

1    A    Anywhere in the document here where it referred to the

2    director, those responsibilities were transitioned to the

3    deputy director.  Prior to Dr. Mehta being in that position,

4    there wasn't a physician in that position, and so it wouldn't

5    have been as appropriate to have someone else have those

6    conversations.

7    Q    And so you never had any of these conversations patient by

8    patient?

9    A    After July 6th, no.

10   Q    How about before July 6th?

11   A    Yes, we did have some conversations about patients who were

12   at closed institutions.

13   Q    And in those discussions did you also evaluate the mental

14   health care that the patient was receiving where he or she was

15   currently located?

16           MR. LEWIS:  Objection, Your Honor, exceeds the scope

17   of questioning on direct.

18           THE COURT:  Overruled.

19           THE WITNESS:  So I did not personally review the

20   mental health care.  I based my decisions on the

21   recommendations of the patient's providers who were providing

22   that care.

23   BY MR. GALVAN:

24   Q    Based on these public health factors that we went over, you

25   were allowed to overrule the patient's providers regarding the

1  transfer to DSH, correct?

2  A   Well, that wasn't my role.  My role was more to facilitate

3  movement of a patient who the providers felt needed to go even

4  if they were at a closed institution.

5  Q   But, in fact, you had the ability to decide they wouldn't

6  go regardless of what the provider said, correct?

7  A   In discussion with DSH these guidelines allow for a

8  decision that says that the risk of movement is greater than

9  the benefit of treatment, yes.

10 Q   So you were allowed to overrule the mental health clinician

11 on the transfer, correct?

12 A   When you say "you," who do you mean, please?

13 Q   Dr. Bick.

14 A   No.  I didn't personally make any decisions to overrule

15 patients from moving that were against the decisions of the

16 clinicians.

17 Q   What did you mean then when you said -- when we talked

18 about balancing the COVID risk and the mental health need, what

19 were you doing there?

20 A   That's how these urgency movement guidelines are

21 constructed.  But as I said, I was not in that role from July

22 6th on, so I didn't have any role in saying that a patient

23 couldn't go.

24 Q   I'm sorry.  You testified you had been in some of these

25 patient-by-patient discussions before July 6th with

1  Dr. Warburton about a minute ago.  Are you saying now you

2  weren't in any of those discussions?

3  A   No, I'm not.

4  Q   You were in some of those discussions?  So you did have a

5  role, then, in deciding whether patients would go, correct?

6  A   The emergency guidelines that were in place in the prior

7  version had different language in them.

8  Q   But you implemented that language, correct?

9  A   No.

10 Q   What did you do?

11 A   I was one of many people who was involved in the creation

12 of these emergency guidelines, which included mental health

13 staff from CDCR, DSH staff and Office of Special Master staff.

14 Q   But there did come a time, multiple times, when there were

15 patients referred to DSH and you and Dr. Warburton got together

16 and discussed whether that patient could go, correct?

17        MR. LEWIS:  Objection, Your Honor, misstates the

18 testimony.  The word "multiple times" was never mentioned.

19 There's never been any numbers.  And I'll also say asked and

20 answered.  Mr. Galvan has been over this many many times.  This

21 ground is now well trodden now, Your Honor.

22        THE COURT:  I think he's seeking clarification.

23 Overruled.

24        THE WITNESS:  Can you reask your question, please.

25

1    BY MR. GALVAN:

2    Q    Did there not occur before July 6th multiple occasions

3    where you and Dr. Warburton consulted to decide whether a

4    particular patient referred from CDCR to DSH could go using

5    these public health factors?

6    A    I don't recall ever being involved in that conversation

7    with Dr. Warburton or anybody from DSH about a patient who the

8    clinicians believed had a necessity to go where I played a role

9    in saying that that patient could not go.

10   Q    Do you recall any conversations where you played a role in

11   saying the patient could go?

12   A    From a public health standpoint, that was generally my

13   contribution to the conversations because I'm not a mental

14   health clinician.

15   Q    So your contribution was to green light the transfer?

16   A    My contribution was generally -- and we're talking about a

17   June -- May and June timeframe -- is to work with the

18   institutions and the public health nurses, obtain the

19   information necessary so that the group could make a decision

20   about movement.  And by that I mean whether the patient had any

21   exposure or came from a closed institution and to share that

22   with the group in the meeting.

23   Q    And then ultimately who would make the decision?

24   A    It was generally the small working group, as described in

25   the prior page.

1   Q   Prior page of D22?

2   A   I think that's up at the top there.

3   Q   Which subparagraph do you mean?

4   A   So again, the process that you described is up above.

5   There would be conversations with -- between the sending and

6   receiving institutions.  And that included information

7   regarding COVID risk and COVID testing and quarantining.

8       My role primarily in that was to obtain that information

9   from the sending institutions and share it with the clinicians

10  who then had those conversations.

11  Q   So earlier you testified that for people from a closed

12  institution, they skipped straight to subparagraph n.  Are you

13  saying now that they were also part of the c, d and e reviews

14  too?

15  A   I apologize.  I'm not understanding the distinction that

16  you're trying to make.

17      I was not involved in the conversations to determine who

18  could and could not go.  My role here was providing the

19  information from a public health standpoint about the COVID

20  status of the patient and the institution from which they were

21  coming.

22  Q   So when we go back down to the last sentence that starts at

23  the bottom of this page, the first page of D22, when it says,

24  "Details will be discussed between the CDCR/CCHCS director of

25  healthcare services and the DSH deputy director of clinical

1    operations," in fact, that never occurred?

2    A    As I mentioned previously, this was eventually published on

3    July 16th.  It was in the works through June and early July.  I

4    assumed a new role on July 6th, and so I was not in that

5    position.  And shortly thereafter, we clarified that these

6    decisions would be made by the deputy director for healthcare

7    services in CDCR.

8    Q    I'm going to move to another exhibit, see if I can do this

9    without turning off my screen sharing.  I'll stop and restart.

10        Dr. Bick, are you able to see -- sorry -- this exhibit that

11   says in big letters "Personal Protective Equipment"?

12   A    Yes.  Your video -- the screen of you covers part of it,

13   but I can move it around, yes.

14   Q    And for the record, this is P97.  Do you recognize this

15   document?

16   A    Yes.  I think this is a screen shot from our website.

17   Q    And to your knowledge, does it reflect the personal

18   protective equipment state-wide inventory for CDCR?

19   A    That is the title of the document.

20   Q    And when I circle my cursor around this bold number, April

21   8th, 2022, can you see that?

22   A    Yes.

23   Q    Does that mean to you that you are -- at current average

24   usage per day, you're equipped with PPE until that date?

25   A    I'd have to review this document more carefully to see what

1    that means.  Did you want me to do that?

2    Q    No, thank you.

3              MR. GALVAN:  I would like to move this document into

4    evidence, P97.

5              MR. LEWIS:  Objection.  Defendants object to this

6    document, Your Honor.  The witness has testified that he

7    doesn't even know what -- he would need more time to figure out

8    what this is.  There's actually no real question out here about

9    this document.  I would say this is irrelevant and should not

10   be coming in, Your Honor.

11             THE COURT:  Mr. Galvan?

12             MR. GALVAN:  Your Honor, the relevance of this

13   document goes to this balance that all the State's witnesses

14   have been talking about between the public health risk and the

15   mental health risk.  And the witness testified that one of the

16   factors in the balance is how much PPE, personal protective

17   equipment, do they have in the place where the prisoner is

18   coming from.  It's one of the things they consider.  And so

19   this is their report and we've stipulated to the authenticity

20   of their reports on how much PEE they have.  So to the extent

21   the Court needs to evaluate this -- the way they balance these

22   risks, this PPE inventory is quite relevant.

23             MR. LEWIS:  Your Honor, if I may.

24             THE COURT:  You may.  And just so I'm clear, is it

25   clear on what date this was created, Mr. Galvan?

Dr. Bick - Cross by Galvan

1            MR. GALVAN:  It has on the left side, and I hope that

2     my whole screen is visible, dates -- "SAP entry date 3/31/2020

3     to 10/15/2020."

4            THE COURT:  So it's covering that time period is the

5     representation?

6            MR. GALVAN:  Yes, Your Honor.

7            THE COURT:  Mr. Lewis, your further comments?

8            MR. LEWIS:  Your Honor, I would point out that that is

9     plaintiffs' counsel's representation.  Plaintiffs' counsel is

10    not qualified to be the authenticator or describe this

11    document.  It's obvious the witness doesn't appear to be

12    either.  There's no foundation to bring this document in,

13    particularly when it has all of these numbers on it that would

14    be quite difficult to understand exactly.

15           Plaintiffs had an opportunity to call witnesses.  If

16    they made the mistake of not calling the right witness for this

17    document, it shouldn't come in.

18           MR. GALVAN:  Your Honor, if I may respond briefly.

19           THE COURT:  Briefly.  It may be it doesn't come in

20    now.

21           MR. GALVAN:  We tried to avoid this kind of argument

22    by sending over a stipulation as to documents, and I'm

23    surprised that counsel no longer wants to honor that

24    stipulation.

25           MR. LEWIS:  Your Honor, there's one thing --

1          THE COURT:  There's a stipulation you're saying

2    counsel did not agree to?

3          One at a time.  Wait for me, Mr. Lewis.

4          You proposed a stipulation but it wasn't agreed to?

5          MR. GALVAN:  No, Your Honor.  It was agreed to.  It

6    was entered into the record.  I could get the docket number.  I

7    signed it and Mr. Hennes signed it.

8          THE COURT:  So authenticity.

9          MR. LEWIS:  Not relevant, Your Honor.

10          THE COURT:  Well, if it's only relevance -- if it's

11    only relevance, I'm going to overrule that.  So I do have the

12    stipulation in front of me.  So overruled.  P97 comes in.

13      (Plaintiffs' Exhibit 97 admitted in evidence.)

14          MR. GALVAN:  Thank you, Your Honor.  That is my

15    cross-examination.

16          THE COURT:  Any further questions, Mr. Lewis?

17          MR. LEWIS:  Yes, Your Honor.  If I may just have a few

18    minutes to look at my notes.

19          And Dr. Bick, please bear with me.

20                     REDIRECT EXAMINATION

21    BY MR. LEWIS:

22    Q   Dr. Bick, you mentioned -- you talked about rapid tests and

23    you said they're not a general screening test; was that

24    correct?

25    A   Correct.  In most situations, correct.

1   Q    Is it true that the rapid tests have an up to 30 percent

2   false rate of positive -- of negative test?

3   A    The most recent data for the testing method that we employ

4   is between 15 to 20 percent false negative, meaning they would

5   miss 15 to 20 percent of patients who are actually infected.

6        They also have a smaller rate of false positives where

7   patients are identified as having COVID and they don't

8   actually.

9   Q    So the rapid tests are not ideal, are they?

10  A    They're not an ideal method for diagnosing COVID in most

11  situations.

12  Q    You mentioned that there's a revised screening matrix

13  that's coming out.  I believe plaintiffs have brought up the

14  August, I believe, 19th -- and I'm sorry if I get the dates

15  wrong -- movement matrix and that there's a new one coming out;

16  is that correct?

17  A    Yes.

18  Q    And that's something that would go through the task force,

19  wouldn't it?

20  A    The movement matrix is not a Coleman document but it is

21  shared with plaintiffs from both Coleman and Plata.

22  Q    And the concept of sharing it, it's to inform the

23  plaintiffs and possibly the special master that it's coming?

24  A    And to receive their feedback and any suggested changes.

25  Q    Okay.  Can CDCR put any -- to your knowledge.  To your

1   knowledge, can CDCR put any conditions on OMHD discharges?

2           MR. GALVAN:  Objections, calls for a legal opinion.

3           MR. LEWIS:  I'm just asking for his knowledge, Your

4   Honor.  I'm just curious.

5           THE COURT:  Well, you can -- overruled, but only if

6   it's Dr. Bick's understanding.

7   BY MR. LEWIS:

8   Q   Based on your understanding, Dr. Bick, can you put any

9   conditions on an OMHD discharge?

10  A   No.

11  Q   It sounds like in your discussions about the July transfer

12  and screening matrix that these were collaborative movement

13  decisions, weren't they?

14  A   Yes.

15  Q   So there's collaboration going on between the special

16  master and CDCR, correct?

17  A   Yes.

18          MR. GALVAN:  Objection as to his knowledge about what

19  the special master is doing.

20          THE COURT:  Sustained.

21  BY MR. LEWIS:

22  Q   Was there collaboration among CDCR and DSH?

23  A   Yes.

24  Q   Were these movements presented to the special master?

25  A   Which movements?

Dr. Bick - Redirect by Lewis

1    Q    I'm sorry.  Were these movements -- were these ideas that

2    there were coming up through this movement matrix, were these

3    presented in the small workgroup to the special master's

4    experts?

5    A    More than that.  The special master's experts contributed

6    language.

7              MR. GALVAN:  Objection, hearsay as to the special

8    master's language.

9              THE COURT:  Sustained.

10   BY MR. LEWIS:

11   Q    But they were submitted to this -- for some kind of input

12   from the special master and the small workgroup?

13   A    Not the special master himself.  The special master's

14   experts contributed to a shared document that was passed around

15   and edits were made by the special master's experts.

16             MR. LEWIS:  Thank you.  I appreciate that

17   clarification, Dr. Bick.  And I didn't mean to say that.

18             Your Honor, I have no further questions.  Thank you.

19             THE COURT:  All right.  Anything further, Mr. Galvan?

20             MR. GALVAN:  No, Your Honor.  Thank you.

21             THE COURT:  All right.  Is Dr. Bick excused,

22   Mr. Lewis?

23             MR. LEWIS:  Dr. Bick may be relevant to follow-on

24   testimony, Your Honor, so he would possibly be called for

25   rebuttal.

1          THE COURT:  All right.  Dr. Bick, you may -- we're

2     going to move you into the waiting room, and you should remain

3     on call, according to your counsel.

4          DR. BICK:  Thanks, Your Honor.

5          THE COURT:  All right.  Does the defense have a next

6     witness?

7          MR. LEWIS:  No, Your Honor, but I would like to have a

8     few minutes so that I could confer -- recess maybe ten minutes

9     so I can confer with my cocounsel.

10          THE COURT:  All right.  We'll take a recess now.  It's

11     a bit earlier than I would normally, but we'll just factor that

12     in.

13          MR. LEWIS:  Thank you, Your Honor.

14          THE COURT:  So ten-minute recess.  Be back here at

15     3:41.

16          MR. LEWIS:  And if I could, Your Honor, maybe it would

17     be helpful if the parties could know what their time limits

18     are?  And I hate to ask for your indulgence on that.  What are

19     our times at right now?

20          THE COURT:  I show the defense at almost 116, 116

21     minutes and the plaintiff at 123 minutes.

22          MR. LEWIS:  Thank you, Your Honor.

23          THE COURT:  All right.  So now 3:42.

24          MR. LEWIS:  Yes, Your Honor.

25        (Recess at 3:32 p.m. to 3:42 p.m.)

1          THE COURT:  All right.  We're back on the record.

2     Mr Lewis, does that conclude the defense case-in-chief?

3          MR. LEWIS:  Yes, Your Honor, but we do have one

4     housekeeping issue first.

5          THE COURT:  All right.  What is that?

6          MR. LEWIS:  We would like to readdress the motion in

7     limine that we filed earlier this morning.  We've now heard

8     testimony and we also have --

9          THE COURT:  Let me ask first did you receive from the

10    plaintiffs the summary opinions?

11         MR. LEWIS:  Yes, we did, Your Honor; and yes, we did

12    receive those bullets, so I'd like Ms. Thorn now to address

13    these issues.  She has been -- as you saw earlier in the

14    morning, she was working on this issue.

15         THE COURT:  All right.  And just so I'm clear from Ms.

16    Ells, is the plaintiffs' plan at this point subject to the

17    Court's ruling on the motion to still call both Drs. Stewart

18    and Lauring?

19         MS. ELLS:  Yes.

20         THE COURT:  All right.  Ms. Thorn.  Where is

21    Ms. Thorn?

22         MS. THORN:  I'm here, Your Honor.  I'm just trying to

23    restart my video.  I'm not sure --

24         THE COURT:  All right.

25         MS. THORN:  Okay.  Start my video.  There we go.

1      Your Honor, we did receive plaintiffs' proposed

2    opinions that they are going to offer through Dr. Stewart and

3    Dr. Lauring during the lunch hour, lunch recess.  It is still

4    our position that both experts should be excluded, as their

5    opinions are not directed to the questions before the Court at

6    this hearing today.

7      First, Dr. Stewart, the opinions that have been listed

8    for him do not address any inpatient transfer policies or

9    protocols.  He does provide or he is purporting to provide

10   opinions regarding harm to patients pending their transfer, but

11   this is during their stays within CDCR and it doesn't address

12   any program guide transfer requirements or related policies,

13   such as the addendum and any other policies regarding transfer

14   to DSH, and so he should not be allowed to testify as --

15   although his opinions may be important and -- but they are not

16   at issue for the court hearing today.

17     With respect to Dr. Lauring's opinions, we believe

18   they're, likewise, not relevant for this hearing.  In the first

19   instance, the Court's question was to call the hearing to

20   determine whether CDCR and DSH have complied with program guide

21   requirements as modified by the temporary addition of COVID

22   screening to transfer class members to inpatient beds.  We

23   believe that defendants have put on evidence today that we are

24   in compliance with the program guide requirements as modified

25   and, therefore, we don't get to the second and third questions

1    the Court has posed.

2            We understand that plaintiffs disagree with that.  And

3    even if the Court disagrees with that, the second and third

4    questions, similarly, are not covered by Dr. Lauring's

5    purported opinions.  His opinions are general public policy

6    opinions.  He does not mention at all CDCR or DSH policies, he

7    does not mention the program guide, and for that reason we're

8    not sure why his opinions would be relevant or would be

9    directed to answer the Court's -- any of the Court's questions

10   today.

11           THE COURT:  Ms. Ells?

12           MS. ELLS:  I understand that defendants would like to

13   just discuss their policies today, but this case is about

14   patients and it's about constitutionally adequate inpatient

15   access and Dr. Stewart is the right person to address what is

16   happening to those people who are sitting waiting past program

17   timelines for inpatient care.

18           The only modification that this Court approved to the

19   program guide and its related addenda was a screening form of

20   reading some questions.  There was nothing in the document that

21   this Court approved that permitted refusals to transfer from

22   open institutions.  There was nothing regarding requiring a

23   negative test before a patient could transfer.  None of that

24   has been approved by the Court.  Those are all modifications

25   that defendants are seeking to prove are appropriate.  And that

1  goes to the second and third questions, are those modifications

2  appropriate.

3       They (inaudible) beyond the program guide and beyond

4  what the April 24th order permit.  There's no question about

5  that after the testimony you've heard today patients are

6  waiting past program guide timelines.

7       We provided specific examples that defendants

8  themselves wrote up of people that are waiting past the

9  timelines, even assuming that they're appropriately applying

10 the exceptions, which we roundly dispute.  So there's no

11 question that Dr. Stewart's testimony is relevant.  Patients

12 are being harmed by this practice.

13      And similarly, the testimony of Dr. Lauring is

14 obviously relevant as well.  COVID is the only thing that you

15 have heard from these defendants all day about why they're not

16 complying with the program guide.  He is an infectious disease

17 expert, and he has reviewed and will testify to the policies

18 that DSH and CDCR have in place limiting restrictive transfers

19 for patients going to DSH from CDCR.  Prepared to testify about

20 that in his expert opinion, and that's obviously a relevant

21 consideration here.

22      THE COURT:  All right.  Without deciding at this point

23 whether defendants have established compliance with the first

24 factual issue before the Court, given the testimony elicited by

25 the defense and even statements made in opening regarding the

1    defense's defining of the issues, I'm finding that the

2    testimony could be relevant if not to the second factual issue,

3    the third, and so I'm going to allow it.  It could be subject

4    to a motion to strike.  If plaintiffs want to use their time to

5    elicit testimony from these witnesses, they may.  So the motion

6    is denied at this point as to both witnesses.

7            So Ms. Ells, you're calling your first witness?

8            MS. ELLS:  Yes, Your Honor.  I would like to call

9    Dr. Adam Lauring.  He's in the waiting room.

10            THE COURT:  All right.  Ms. Schultz, if you could

11    bring Dr. Lauring in.

12            THE CLERK:  Yes, Your Honor.

13            Dr. Lauring?

14            MR. LEWIS:  Excuse me, Your Honor.  This is Kyle

15    Lewis.  I have one question.

16            Your Honor, I believe that you said that the witnesses

17    could observe the testimony of Drs. Lauring and Stewart after

18    their testimony was done if, perchance, they would be called as

19    rebuttal witnesses to what they have to say.  Was that correct?

20            THE COURT:  I did not say that.

21            MR. LEWIS:  I'm sorry, Your Honor.  I was just trying

22    to clarify that.  There's a little confusion on defense side.

23    So can the witnesses observe the testimony of Drs. Stewart and

24    Lauring?

25            THE COURT:  It did not come up at all earlier.  Your

1    position on that, Ms. Ells?

2            MS. ELLS:  No.  We think that's inappropriate, Your

3    Honor.  The witnesses should be excluded until they are done

4    testifying for the day.  That was the ruling that I understood

5    Your Honor to make.  They've reserved the right to call these

6    witnesses again.  It's not appropriate for them to be in the

7    courtroom listening to testimony.

8            THE COURT:  And there are no defense experts, right,

9    Mr. Lewis?  You clarified that at the beginning.

10           MR. LEWIS:  No, Your Honor.  But to the extent that

11   they are obviously percipient witnesses with a unique

12   understanding and capability, yes, they are, Your Honor, for

13   those purposes.  That's why we would want to sit there and say

14   if Dr. Lauring is testifying about his perception of policies

15   and he's giving his expert opinion, we should have the

16   clinicians be able to essentially be able to listen to them to

17   understand what they are.

18           THE COURT:  Well, that request is denied.

19           All right.  Ms. Ells, you may proceed.

20           Dr. Lauring, you're able to see and hear the Court?

21           DR. LAURING:  Yes, I am.

22           THE COURT:  Actually, Ms. Schultz, I believe you still

23   need to swear this witness.

24           THE CLERK:  Yes, Your Honor.

25           Dr. Lauring, please raise your right hand.

Dr. Lauring - Direct by Ells

1    (Witness duly sworn and takes the stand.)

2         THE WITNESS:  I do.

3         THE CLERK:  Thank you.  You may put your hand down.

4         THE COURT:  All right.  Ms. Ells, now you may proceed.

5         MS. ELLS:  Thank you, Your Honor.

6         DR. ADAM LAURING, PLAINTIFFS' WITNESS, SWORN

7                    DIRECT EXAMINATION

8    BY MS. ELLS:

9    Q   Dr. Lauring, could you please spell your name for the

10   record.

11   A   Adam, A-D-A-M, Lauring, L-A-U-R-I-N-G.

12   Q   Dr. Lauring, could you please briefly describe your

13   training and licensure background?

14   A   Sure.  I have a medical degree and a Ph.D. from the

15   University of Washington in Seattle.  I then had training in

16   internal medicine and infectious disease at the University of

17   California, San Francisco.  I've been licensed to practice

18   medicine since 2003, first in California and now in the State

19   of Michigan.  I am board certified first in internal medicine

20   and currently in infectious diseases.  I'm currently an

21   associate professor at the University of Michigan.

22   Q   Do you have a particular research focus?

23   A   Yes.  In addition to my clinical work, I direct a research

24   laboratory that studies the genetics and transmission of

25   influenza and other respiratory viruses.  And since early this

1    year we've expanded our work to also include SARS-CoV-2, the

2    virus that causes COVID-19.

3    Q    Beyond that study do you have any particular experience

4    with COVID?

5    A    Yes.  I believe I have extensive clinical and research

6    experience with COVID.  When the virus first hit in Michigan,

7    which was early March, I was instrumental in developing our

8    institution's response.  I spent five weeks taking care of

9    patients on our intensive care units.  I developed our testing

10   protocols.  I worked with our infection prevention team to

11   figure out the patient flow, how to cohort patients, how to

12   manage patients in the hospital.  And since then I've also been

13   involved in continuing discussions on infection control in our

14   healthcare system and testing.

15   Q    And do you have any forthcoming publication that would be

16   relevant to this proceeding today?

17   A    Sure.  Through this work, I'm now a member of a team that's

18   writing a consensus document for the Society for Healthcare

19   Epidemiology of America or SHEA, which is the main society for

20   people who work in infection prevention and infection control

21   in healthcare settings, nursing homes, other, you know,

22   healthcare associated environments.

23   Q    Have you ever served as an expert witness regarding

24   COVID-19 in other litigation concerning prisons or jails?

25   A    Yes.  I've been involved in two cases with county jails

Dr. Lauring - Direct by Ells

1   here in Michigan, also litigation with the State of Michigan

2   Department of Corrections, some individual cases and then will

3   also have been involved with the Plata v. Newsom litigation.

4   Q    Would you describe your role in the Plata litigation?

5   A    Sure.  Since early in the summer, I have worked with

6   plaintiffs' counsel to provide advice, you know, lend my

7   expertise and knowledge to help them understand the issues.

8        And then in July I was part of a team of public health

9   experts who the receiver convened to discuss at that time

10  issues with managing space availability for quarantine and

11  isolation within the correctional system.

12       And then since then I've also had additional conversations

13  and contacts with plaintiffs' counsel with respect to testing,

14  movement, and other matters related to the healthcare of

15  inmates in the California prison system.

16            MS. ELLS:  We would like to modify or to offer

17  Dr. Lauring today as an expert in infectious disease.

18            THE COURT:  Do you wish to voir dire, Ms. Thorn?

19            MS. THORN:  No, Your Honor.

20            THE COURT:  All right.  I'll allow Dr. Lauring to

21  state his opinion --

22            MS. ELLS:  And we'd like to offer -- I'm sorry.  I

23  didn't mean to interrupt you.

24            THE COURT:  -- within that field.

25            MS. ELLS:  Yes.  I'd like to offer his CV into

1    evidence.  It's Plaintiffs' 99.

2              THE COURT:  Any objection?

3              MS. ELLS:  No objection, Your Honor.

4              THE COURT:  All right.  Exhibit 99 is admitted.

5         (Plaintiffs' Exhibit 99 admitted in evidence.)

6    BY MS. ELLS:

7    Q    Dr. Lauring, I'd like to talk to you about your experience

8    in inpatient healthcare settings.  Are you familiar generally

9    with inpatient healthcare settings?

10   A    Yes.  In infectious disease we spend most of our clinical

11   work in inpatient settings.  So, since very early on in my

12   training, I've worked in a variety of inpatient settings and

13   that includes mainly hospitals, medical hospitals, but I also

14   routinely do consultation and see patients who are in inpatient

15   psychiatric units.  I've also taken care of incarcerated

16   patients in inpatient settings and incarcerated patients in

17   psychiatric units.

18   Q    Have you spent any part of your training or experience

19   specifically on inpatient psychiatric hospital settings beyond

20   what you've described?

21   A    Sure.  As a trainee, I spent time in a variety of

22   psychiatric hospital settings, including locked units.  People

23   were -- units where people were involuntarily committed and

24   held.  And then when I was a resident and fellow, I routinely

25   would see patients in the jail ward of San Francisco General

1    Hospital.

2    Q    And have you ever spent any time in the state hospitals of

3    Washington State?

4    A    Yes.  As a trainee, I spent time and gained exposure to

5    that state's state hospital system, yes.

6    Q    Are you familiar with the appropriate practices for

7    managing COVID risk in inpatient hospital settings?

8    A    Yes, I am.

9    Q    How?

10   A    As I indicated earlier, from very early on in the pandemic

11   I interacted very closely with our hospital systems head of

12   infection control and prevention.  We worked together to

13   develop protocols for things such as how to test, how to

14   identify patients, how to move them, how to isolate them, how

15   to ensure engineering controls, how to cohort patients with

16   COVID together and separate them from people who do not.  And

17   then since then I have had frequent conversations with our

18   infection prevention team at the hospital as new data comes

19   online to, you know, tailor our policies as needed.

20   Q    Do you keep up with the public health guidance and the

21   literature regarding COVID spread and mitigation?

22   A    Yes, I do.  Through my work on transmission I follow that

23   area very closely.  And then again with its obvious relevance

24   to how we manage patients in healthcare systems I've paid

25   particular attention to those issues, yes.

Dr. Lauring - Direct by Ells

1    Q    In your expert opinion, is it possible to fully mitigate

2    COVID risk in inpatient hospital settings?

3    A    Yes, it is.  I think we're far away from where we were in

4    March and April through all the knowledge gained, and I think

5    most healthcare systems have developed, you know, a variety of

6    protocols that will help mitigate that risk.

7    Q    Could you describe the protocols?

8    A    Sure.  For example, at our hospital everyone who's admitted

9    to the hospital is tested prior to being moved up to a unit

10   where they get care.  We have universal masking protocols,

11   we've got protocols that dictate when people -- when and what

12   type of PPE staff will use.  We have screening protocols for

13   everyone who comes into our hospital.  We have protocols for

14   transferring patients within the hospital for tests, how to

15   discharge patients.  Pretty much any aspect of patient care

16   we've had to rethink and, you know, tailor our flows to this

17   new pathogen.

18   Q    And I think you mentioned this, but that includes admitting

19   patients who may or may not have COVID; is that correct?

20   A    Right.  We routinely every day are admitting people who are

21   PUIs or people under investigation who may have COVID.  We have

22   people who we're admitting who are COVID positive and, of

23   course, as a large hospital we're admitting many patients who

24   don't have COVID who need our help for other conditions.

25   Q    Are the protective measures that you've described

Dr. Lauring - Direct by Ells

1   sufficient for hospital settings that include inpatient

2   congregant living settings?

3   A   Generally, yes, in that we have -- for example, at our

4   hospital, we have a whole psychiatric unit and our protocols

5   are for testing people at the time of admission.  If they have

6   a negative test, they can then go up in the unit which has, you

7   know, private and semi-private rooms but also, you know, kind

8   of group settings, as most psychiatric units will.

9        Now, you know, some hospitals and healthcare systems will

10  have additional measures because it's recognized that, you

11  know, some units with more of a congregant setting are -- you

12  know, have unique factors or risks relative to, you know,

13  single bed, you know, single room hospital units.

14  Q   Is there anything in particular that it would be

15  appropriate for those kinds of facilities to focus on in terms

16  of the protective measures you've described?

17  A   Sure.  For example, at our institution we will -- you know,

18  they've -- in the psychiatric unit they've reduced, you know,

19  group sizes.  When they have group therapy there's social

20  distancing.  We do -- our entire hospital has universal masking

21  for anyone who goes anywhere to prevent, you know, the virus

22  from being introduced by someone else.  And then of course we

23  do all the testing of anyone admitted to our hospital and all

24  staff are screened routinely.

25  Q   And are the types of protective measures that you're

1    describing specific?  Is there anything specific that you would

2    do during the admissions process to make sure that people are

3    safe to go into a congregant living setting that you might not

4    do in a place where everyone was in a single bed?

5    A    I think, you know -- for example, I mean, from my review of

6    documents, DSH does additional serial testing and quarantine.

7    That is a very conservative approach because that would, you

8    know, provide extra safety to know that these individuals being

9    admitted to this congregant -- more congregant setting in a

10   hospital do not have COVID-19 and would not, therefore, be a

11   risk of spreading it to others.

12   Q    So you've now described a number of protocols generally for

13   inpatient settings, inpatient hospital settings.  Do the

14   protocols you described address appropriately the risks of

15   admitting people with potential COVID exposure into those

16   settings?

17   A    Certainly, yes, in our hospital system we found that, yes.

18   Q    And can the protocols that you've described address the

19   risks of admitting COVID positive people into inpatient

20   settings?

21   A    Yes, in that we -- you know, since early March we've been

22   admitting COVID positive patients.

23        Initially we were, of course, concerned that there would

24   be, you know, spread, but we've found that our measures are,

25   you know, very good at, you know, segregating out the COVID

Dr. Lauring - Direct by Ells

1  positive patients and reducing or mitigating the risk of

2  within-hospital transmission.

3  Q    Is it necessary as a public health matter for hospitals to

4  refuse admission to patients unless they have tested negative

5  for COVID in order to control viral spread?

6  A    No, it is not.  And in fact, it's not a recommendation that

7  I'm aware of that healthcare facilities do that.

8  Q    And is it appropriate, as a public health matter, to

9  restrict hospital admissions to only people that need emergency

10  care at this point in the pandemic?

11  A    No.  At this point in the pandemic I think hospitals have

12  learned enough about how to manage these risks that we can take

13  care of COVID positive patients and take care of COVID negative

14  patients.  And at this point it's my opinion that we're going

15  to be with COVID for months, if not years, so it's important

16  that we are able to manage this so that we can take care of

17  patients who have all range of medical problems and not just

18  absolute emergencies.

19  Q    Are there any downsides or risks, in your view as a doctor,

20  to denying people care unless they meet an emergency threshold?

21  A    Yes.  People who have not emergent but urgent medical

22  conditions certainly need care in a timely fashion, then also

23  people with any range of medical problems or people who even

24  need evaluation for a diagnosis or perhaps a change of therapy.

25  If they go a period of time without that, their condition could

1   worsen and people could, you know, suffer severe outcomes or

2   even death for not being managed in a timely fashion.

3   Q    And do those same conversations and risks apply for mental

4   health care in addition to medical care?

5   A    In my opinion, yes, it does.

6   Q    Doctor, I'd like to talk to you about the specific

7   protocols in place for the Department of State Hospital.  As

8   part of your preparation for today's testimony, did you review

9   any materials describing the COVID-19 protocols for the

10  Department of State Hospitals of California?

11  A    Yes.  I reviewed a number of documents that detailed DSH

12  policies for admission, how patients were going to be screened,

13  how they were going to be tested, how they were quarantined,

14  the PPE required by staff, when someone would clear quarantine

15  and be admitted to the general care areas of DSH, how things

16  would be managed if people developed COVID, if people would

17  need a higher level of medical care.  All that is contained

18  across multiple documents that were provided.

19  Q    Specifically turning your attention to the protocols for

20  mitigating COVID risk for newly admitted patients, do you have

21  an opinion about whether or not these protocols employed by the

22  Department of State Hospitals are appropriate for mitigating

23  COVID risk?

24  A    I think they're fully appropriate and they're fairly

25  conservative, which is good and totally reasonable in terms of

1   the risk.

2        In my reading of the policies, they're basically

3   assuming -- they're tailored to essentially assuming that

4   everyone who is being admitted to a DSH hospital has been

5   exposed very recently.  It's essentially the same protocol you

6   would treat someone who had a recent exposure to COVID-19 in

7   that they have serial testing and then a 14-day quarantine

8   before someone then goes to the general care areas, and that's

9   what you would do in contact tracing or other investigations

10  where someone had a known exposure to someone with COVID-19 and

11  you were suspicious that they could have become positive.

12  Q   And you mentioned earlier that it might need to be --

13  policies might need to be a little more protective in settings

14  that involve large congregant living.  Were these policies that

15  you reviewed for DSH sufficient for that purpose?

16  A   Yes.  They're entirely appropriate and sufficient because,

17  again, it's assuming that someone is coming in and that they

18  have a high probability of having COVID-19, and so you're

19  essentially treating them as if that were the case.  And 14

20  days is what, you know, has been recommended in those

21  situations, and that's -- you know, that's consistent with CDC

22  guidance.

23  Q   And in your review of the protocols did you look

24  specifically at those that relate to the admission of the

25  offenders with mental health disorders or OMDs?

1    A    Yes, I did.

2    Q    And do you have an opinion on whether those protocols are

3    appropriate?

4    A    I think they are in that the OMDs, as they're referred to,

5    are sometimes tested just prior to transfer to DSH.  And so --

6    and often a test result is relayed to DSH when it comes back,

7    but there's not a requirements that they be tested prior to DSH

8    and then prior to being transferred to DSH.

9         And I think, like I said before, the DSH protocols are for

10   treating someone who -- or managing someone who would have been

11   recently exposed or your high risk of potentially developing

12   COVID, and so they have that 14-day quarantine with testing.

13   And so that is appropriate and reasonable to address the risk

14   that someone could -- whose test status you don't know arrives

15   at your hospital.

16   Q    And as part of your preparation for today's testimony, did

17   you review any materials describing the COVID protocols for

18   movement within CDCR?

19   A    Yes.  I received the movement matrix document P-056.

20   Q    And were you familiar with that document from your work in

21   the Plata case?

22   A    Yes.  I think it was in August plaintiffs' counsel in the

23   Plata case showed me the document because they were in

24   discussions with the receiver on that case about other issues

25   related to testing and transfer of inmates.  But I was not, of

1    course, involved in developing that matrix.

2    Q    Thank you.  I'd like to show it to you so we can discuss a

3    couple provisions.  Can you see my screen?

4    A    I can, yes.

5    Q    You can.  Okay.  So this document is marked Plaintiffs' 56,

6    and it's entitled "COVID-19 Screening and Testing Matrix for

7    Patient Movement," and it's dated August 19th, 2020.  Do you

8    see that?

9    A    Yes, I do.

10   Q    Okay.  And is this the document that you were describing

11   that you've already seen?

12   A    Yes.

13   Q    Okay.  I'm going to move to this portion of the document

14   right here where in the left-hand column it says, "Admission to

15   DSH from CDCR."  Have you already reviewed this provision?

16   A    Yes, I have.

17   Q    Given what you know of DSH's protocols for admitting

18   patients, do you have an opinion on whether these steps are

19   necessary for infectious disease control before a patient can

20   transfer to DSH for treatment?

21   A    Given the protocols we discussed at DSH when they receive a

22   patient, I think this -- these criteria from CDCR are not

23   needed.

24   Q    And in particular is it necessary, in your view, to hold up

25   somebody's healthcare in order to secure a negative COVID test

1    before they are admitted?

2    A    No, it is not necessary to do that.  And I -- again, given

3    that the risks of delaying someone's healthcare for an

4    additional 14 days or perhaps longer, given, you know, issues

5    with quarantine and testing and turnaround, that could

6    introduce, you know, unnecessary delays in terms of the people

7    getting the care that they need.

8    Q    Are you familiar with CDCR's closed institution concept?

9    A    Yes, I am.

10   Q    What's your understanding of that?

11   A    My understanding is that there -- certain institutions are

12   designated as closed facilities, which essentially means that

13   there's no transfers from those facilities and that there's

14   criteria which aren't entirely clear to me what makes something

15   a closed facility versus not a closed facility, but it's based

16   on how many people are -- test positive in a given amount of

17   time.  And I think I saw somewhere or heard somewhere that it

18   was three.  More than three individuals who are positive, that

19   would be considered an outbreak or -- and make a facility

20   close.

21   Q    Is it necessary, in your view, to restrict patient movement

22   to DSH when an institution is closed for movement?

23   A    I'm sorry.  Can you repeat again?  I think I missed part of

24   that.

25   Q    Is it necessary, in your view, to restrict patient movement

1   to DSH, given the protocols DSH has in place when a CDCR

2   institution is closed for movement due to an outbreak?

3   A    Right.   No.   I don't think it's necessary.   I don't think

4   it's -- I don't think you have to restrict movement in DSH.

5   Again, DSH is assuming with their protocols that people are,

6   you know, likely to have been recently exposed to COVID-19, and

7   so it kind of assumes what is -- already would be the case in a

8   closed facility where that's presumably why a place is closed

9   is because -- a designated closed facility is because there's

10  concern that there's spread of the virus in that facility.

11  Q    And do you have a view on whether or not in general it's

12  appropriate to restrict movement for a prison of, say, 3,000

13  patients when there have been outbreaks of around 3 people?   Is

14  it appropriate to restrict movement to necessary inpatient

15  care?

16  A    It seems to me like a very -- it doesn't seem necessary to

17  restrict movement and it seems this could -- the situation you

18  highlight would indicate that this rule is sort of a blunt

19  instrument, that, you know, with as few as three individuals in

20  a large institution that essentially you're shutting everything

21  down.

22  Q    Doctor, I'd like to talk to you now about the most recent

23  version of the protocols governing transfers to DSH that we

24  were provided by the defendants a couple days ago.   Can you see

25  my screen?

1    A    Yes, I can.

2    Q    So this is document that we've marked as P101.  It's

3    entitled "Updated Draft COVID-19 Temporary Guidelines for

4    Transfer to DSH Inpatient Care" dated October 20th, 2020.  Have

5    you reviewed this document?

6    A    Yes, I have.

7    Q    I'd like to direct your attention to section i.  My screen

8    here.

9    A    Yep.

10   Q    Okay.  Do you see that provision right here?

11   A    Yes.

12   Q    It starts with "Once a negative COVID test"?

13   A    Yes.

14   Q    Do you have any thoughts on the appropriateness of this

15   provision?

16   A    Again, I don't think it's -- it's not consistent with what

17   I know of public health guidance in that it's not routine that

18   hospitals and other healthcare facilities require a negative

19   test before someone can be admitted.

20        For instance, CDC does not make this recommendation and

21   then documents from the California Department of Public Health

22   also say that a negative test is not really required for

23   admission to a hospital.

24   Q    And I'm going to turn to a different document for a moment.

25   So you just referenced a couple of California Department of

Dr. Lauring - Direct by Ells

 1    Health documents that you reviewed.  This one is marked

 2    Plaintiffs' 103, and it's entitled "California Behavioral

 3    Health Programs COVID-19 Mitigation Strategies, October 1,

 4    2020."  Is this one of the documents you were referring to?

 5    A    Yes, that is the document I was referring to.

 6    Q    And then I'd also like to show you a second document.  This

 7    one is marked as Plaintiffs' 107.  It's from -- it's hard to

 8    read here, but on the right there's a symbol that says

 9    California Department of Public Health.  It's dated June 27th,

10    2020, entitled "Subject:  Infection Mitigation in Behavioral

11    Health Facilities COVID-19 FAQs."  Is this another document

12    that you looked at?

13    A    I did look at that, yes.

14            MS. ELLS:  We'd move for Plaintiffs' Exhibits 103 and

15    107 into evidence.

16            THE COURT:  Any objection?

17            MS. ELLS:  I think you're muted, Elise.

18            MS. THORN:  Yeah.  I'm trying to find it.  No

19    objection, Your Honor.

20            THE COURT:  All right.  P103 and P107 are admitted.

21            MS. ELLS:  Thank you.

22       (Plaintiffs' Exhibits 103 and 107 admitted in evidence.)

23    BY MS. ELLS:

24    Q    Now, I believe you mentioned this, but in review of this

25    provision i here, did you say that -- or what is your opinion

1    on whether or not that kind of restriction or limitation is

2    required by the guidance that you've reviewed?

3    A    I don't think it -- it shouldn't be required, in my

4    opinion.

5         Another issue which I didn't mention is, you know, it

6    doesn't -- it's not clear what you would do if someone had

7    recovered from COVID-19 and, you know, would they be denied

8    admission because we know that people can be positive by PCR

9    test or molecular tests for weeks after they've recovered from

10   COVID-19, so it's not clear whether someone would be denied

11   admission or transfer to DSH simply because they had a positive

12   test even though they were better.

13        This happened -- this sort of thing happened early on in

14   the pandemic, I'm aware, in the state of Michigan with people

15   being transferred to nursing homes after leaving the hospital

16   after they were better.  They were denied admission simply

17   because of the positive test even though that didn't mean they

18   were at any increased risk of spreading the disease.

19   Q    I'd like to draw your attention now to subsection n here.

20   It begins with the words "For referrals from closed

21   institutions, the following processes shall apply."

22   A    Yes.

23   Q    Have you reviewed the protocols described there?

24   A    Yes, I have.

25   Q    Do you have any thoughts on whether they're appropriate?

Dr. Lauring - Direct by Ells

1  A    I think, of course, it's appropriate for information to be

2  relayed about individuals being transferred from CDCR to DSH.

3  It's useful for the, you know, the doc-to-doc conversations

4  that are important during patient transfer.  However, this

5  particular provision, it seems quite vague in determining, you

6  know, how these decisions are made about who can get

7  transferred and who can't.  It doesn't really define what the

8  acceptably low risk of exposure is.  It doesn't talk about

9  what -- the public health data that are going to be used to

10  make those decisions.  And all these things are very important

11  if there's going to be a policy like this in terms of

12  transfers.

13  Q    And even if they were better defined, would you agree that

14  it's appropriate to strict movement to necessary inpatient care

15  when there is potential for exposure at a prison?

16  A    As we discussed earlier, I think the concept of a closed

17  institution is problematic in this case because, again, DHS's

18  policies are equipped to handle someone who would have been

19  recently exposed to COVID-19 regardless of whether they test

20  positive or not or regardless of how much there is at that CDCR

21  institution because you're effectively assuming that everyone

22  who's coming into DSH could have recently been exposed.  So

23  again, I just think it doesn't -- it has the potential to add a

24  barrier to people getting transferred to DSH where they might,

25  you know, really need medical attention.

1          MS. ELLS:  At this time I'd like to move this document

2   P101 into evidence.

3          MS. THORN:  No objection.

4          THE COURT:  All right.  P101 is admitted.

5   BY MS. ELLS:

6   Q    Doctor, final question:  Did your hospital ever, even in

7   the midst of the height of the pandemic, shut off admission to

8   patients in its inpatient unit?

9   A    No.  We continue to admit patients into both our general

10  medical wards, our surgical wards and even our psychiatric

11  wards.

12         MS. ELLS:  Thank you.

13         THE COURT:  All right.  P101 was previously admitted.

14         MS. ELLS:  Oh.  Thank you.  Appreciate that.

15         THE COURT:  There's no need to admit it again.

16         All right.  Ms. Thorn?

17         MS. THORN:  Yes.  I'm sorry.  Is Ms. Ells finished?

18         MS. ELLS:  Yes.

19         THE COURT:  Yes.

20         MS. THORN:  Trying to get my screen in order here.

21  One moment.  Here we go.

22                        CROSS-EXAMINATION

23  BY MS. THORN:

24  Q    Good afternoon, Dr. Lauring.

25  A    Hello.

1    Q    My name is Elise Thorn.  I'm a deputy attorney general for

2    the State of California representing the defendants in this

3    case.

4         Now, let me understand you correctly.  You have no

5    expertise in mental health care; is that correct?

6    A    Outside of my training as a medical student and my working

7    with patients in, you know, psychiatric units, no.  No

8    specialized training in mental health care.

9    Q    How long ago was your training?

10        COURT REPORTER:  I'm sorry, Counsel, I need to

11   interrupt.  I did not hear his answer.  He started it, he said

12   "Outside my training," and that's all I heard.  Could you

13   please repeat?

14        THE WITNESS:  Yes.  So I received training as a

15   medical student in mental health care.  Since then my

16   training -- my exposure and training have been limited to

17   seeing patients with mental health issues in a variety of

18   settings, yes.

19   BY MS. THORN:

20   Q    Why don't you tell me a little bit about those settings.

21   What are those -- what type of settings have you --

22   A    Sure.

23   Q    Have you seen the patients, or you have actually been

24   treating patients in mental health?

25   A    Sure.  I don't give mental health treatment because that's

1    not my training since medical school.  But as an internist and

2    as an infectious disease physician, I'm routinely called both

3    in the outpatient setting and the inpatient setting to see

4    people who have mental illnesses as their primary diagnosis.

5    Particularly in the hospital you will frequently have someone

6    with mental illness with also a medical problem that needs

7    attention, and so I will see those patients.  And that includes

8    seeing patients on inpatient psychiatric units.

9    Q    And where would those inpatient psychiatric units be

10   located, what type of facility?

11   A    Currently, where I see patients now at the University of

12   Michigan, we have an entire floor of our hospital that are a

13   variety of inpatient psychiatric units, including, you know,

14   lock-down units and the like.

15   Q    Okay.  And do you want to just -- would you please describe

16   the lock-down units?

17   A    Sure.  So there's, of course, controlled access.  You can't

18   even get up there onto that floor without, you know,

19   appropriate identification, you know, locked doors.  The units

20   have people with, you know, one -- a single, you know,

21   occupancy, you know, one bed, you know, per room.  They also

22   have, you know, various areas where people can interact with

23   groups and then also a variety of rooms for therapy as well.

24   Q    Thank you.  Earlier you testified that you'd reviewed a

25   number of protocols and policies that defendants -- CDCR and

1   DSH have developed in order to address COVID-19.  Aside from

2   those, what, if any, documents have you reviewed that speak to

3   Department of State Hospitals' policies and CDCR's policies

4   regarding patient movement?

5   A    The main document -- I mean, there's probably -- I'm just

6   looking at my files here.  There's probably ten documents that

7   deal with various DSH policies.  Some of those talk about

8   things like, you know, admissions and discharges and transfers

9   to and from CDCR.  And then there's, of course, the main one is

10  the movement matrix, which goes into all the different ways

11  that people are transferred within the correctional system in

12  California and also into and out of the correctional system in

13  California.

14  Q    Have you read the mental health services delivery system

15  program guide?

16  A    Let me see.  I don't know if I have.  You could -- if you

17  have the document number, I might be able to see it.

18  Q    I don't have a document, sorry.

19  A    Oh, no.  I mean, I did -- in terms of programming, are you

20  talking about various things that people in mental health, you

21  know, care would have as part of their care, because I do

22  remember seeing various documents that talked about how groups

23  and things like that would be managed due to COVID-19 in

24  behavioral facilities?

25  Q    Have you read or are you familiar with any policies that

Dr. Lauring - Cross by Thorn

1   speak to patient movement between CDCR and DSH?

2   A    Again, the main one that I reviewed was the movement

3   matrix, P-056.  And then, of course, many of the DSH documents

4   talk about, you know, who comes in the facility, the different

5   classes of patients that are taken care of at DSH facilities.

6   And included among those are people coming from CDCR.

7   Q    Are you familiar or do you have an understanding of the

8   different type of patients that CDCR sends to DSH for

9   treatment?

10  A    As I understand it, the main categories are referred to as

11  OMDs, which we talked about earlier and then the Coleman class

12  patients.

13  Q    Do you understand the nature of the Coleman class patients'

14  mental acuity when they -- as a criteria to be referred to DSH

15  for treatment?

16  A    I'm not quite sure what you mean specifically in terms of

17  criteria.

18  Q    Level of mental health acuity.  Do you know what I mean by

19  mental health acuity?

20  A    Yes.

21  Q    Okay.  So do you understand the criteria for transferring a

22  patient from CDCR to DSH for mental health treatment --

23  A    Sure.

24  Q    -- what level of acuity?

25  A    Yeah.  My assumption is that these individuals went through

1    a normal process, you know, and are awaiting transfer and that

2    the treating physician looks at their records in their case and

3    determines that these individuals need care at DSH, what would

4    be like a level-of-care assessment and that they've been

5    appropriately referred.

6    Q    And are you aware that CDCR does not send high acuity --

7    acute care -- strike that -- patients needing acute level of

8    care to DSH for treatment?

9    A    Again, I'm not sure what we're talking about in terms of

10   acuity and what levels of care go to DSH.

11        Again, my assumption is that there's a process where

12   physicians, I assume, at CDCR and DSH, you know, can make

13   decisions about who needs what sort of care and that these

14   people go through a process where it's determined, you know,

15   whether they need treatment at DSH for their psychiatric

16   illness.

17   Q    Would your opinion about the ability or appropriateness to

18   transfer a psychiatric patient from CDCR to DSH change if you

19   knew that CDCR sends nonemergent -- patients needing

20   nonemergent psychiatric care to DSH, nonemergent?

21   A    No, that doesn't change my opinion.  I think there's a

22   range of, I guess, emergent, nonemergent.  There are people who

23   probably need care for diagnostic evaluation or changes in

24   their treatment and observation.  And again, I assume that the

25   physicians involved, you know, are making those sorts of

1  assessments just as physicians do for any sort of transfer for

2  medical care.

3  Q   Are you also making an assumption not only about the

4  patient's acuity, patients who are transferred to DSH, but also

5  about the nature of their living conditions?  Do you know

6  anything about the nature of their living conditions once they

7  are transferred to DSH?

8  A   I'm not making any assumptions because I have no specific

9  knowledge about their living conditions.

10  Q   Doctor, did you review any patient records or any

11  individualized assessments of patients in coming to your

12  conclusions and opinions today?

13  A   I was not provided with any individual assessments, no.

14  Q   Are you aware that part of the transfer protocols for the

15  transfer of patients from CDCR to DSH involved a clinical

16  review of the patient's records to assess COVID-19 risk to

17  determine whether mental health needs warrant the transfer?

18  A   So are you -- if I understand your question, you're telling

19  me that people review the records to determine whether someone

20  needs mental health transfer, which is, again, what I was

21  assuming to your prior question, but then also that their COVID

22  status is reviewed?

23  Q   Correct.

24  A   Yes.  I mean, I assume because at CDCR they keep track of,

25  you know, COVID status on the inmates and then there's also a

1    CDCR policy regardless of their COVID status in terms of

2    quarantining for 14 days and testing.  So I assume that that's

3    something that's tracked on all inmates in CDCR's system.

4    Q    And you would agree that that individualized assessment is

5    an appropriate part of the protocols for transfer?

6    A    No.  I don't think it's necessary, given what has been done

7    on the DSH side, as I discussed earlier, that DSH is

8    essentially assuming that any one transfer could or has a

9    likelihood of having COVID.  And so having this additional

10   assessment and incorporation of COVID status before considering

11   transfer seems unnecessary and could potentially delay care for

12   these individuals.

13   Q    So wouldn't you agree that someone with a vulnerability, a

14   medical vulnerability, maybe should not be transferred

15   depending on their individual risk factors?

16   A    Could you repeat the question?

17   Q    Right.  Part of this individualized assessment is looking

18   at patient vulnerability to increased risk of infection from

19   COVID.  Don't you agree that that's also an important part of

20   the protocols before -- to review the individual patient's

21   vulnerability?

22   A    As I stated earlier, I don't think that COVID status, in

23   and of itself, needs to determine whether someone needs care

24   for another condition.

25   Q    And what's the basis for that opinion?

Dr. Lauring - Cross by Thorn

1  A   As I discussed earlier, hospitals are well equipped with

2  their protocols to manage someone regardless of their COVID-19

3  status, and so the requirement for someone to be COVID negative

4  is potentially a barrier for them getting care for, you know,

5  other conditions that may need medical attention.

6  Q   Doctor, are you familiar with any protocols adopted and

7  applied by state mental health hospitals with respect to

8  COVID-19?

9  A   Yes.  I mean, I reviewed California's policies, as we just

10  discussed, with P103 and P107, which talk about how behavioral

11  health facilities should be managing things with COVID.  And

12  then I reviewed many documents in terms of DSH policies, as we

13  discussed earlier.

14  Q   And have you visited -- other than California, are you

15  familiar with any other state mental health hospital's

16  protocols?

17  A   So I -- no, I'm not.

18  Q   Have you visited any state mental health hospitals?

19  A   I indicated earlier I visited the state of Washington's

20  state mental hospital when I was a medical student.

21  Q   Oh, okay.  And you have never visited a DSH facility,

22  correct?

23  A   No, I have not.

24  Q   Are you aware that -- you talked about a little bit

25  about -- on your direct testimony about congregant living

Dr. Lauring - Cross by Thorn

1    situations and that I believe that those did not pose a risk

2    because DSH has protective measures in place.

3    A    I think it could be --

4    Q    Is that accurate?

5    A    I think it would be more accurate to say that there are

6    increased risks in congregant living settings, but these risks

7    are well mitigated by DSH's policies.

8    Q    And can you explain what you understand how they mitigated

9    the risk in the COVID living -- I'm sorry, in the

10   congregational living setting?

11   A    Sure.  I mean, any congregant setting the key thing is to

12   prevent the virus from coming in.  And so you have a population

13   that's all there together and DSH, you know, takes care, if

14   they follow their policies, to test and quarantine people for

15   14 days before going into that congregant setting and then they

16   do screening of staff and have masking policies and other PPE

17   policies to mitigate the risk that someone else will bring the

18   virus into that congregant setting.

19   Q    And do you understand the nature of the congregant settings

20   at DSH as far as the sharing of common spaces by the patients?

21   A    Only in that I've been in a number of psychiatric

22   facilities analogous to DSH, and so I assume, you know, that

23   there are congregant spaces where people either come together

24   for programming, for therapy, things like that, and so -- and I

25   assume that there's, you know, people being -- perhaps eating,

Dr. Lauring - Cross by Thorn

1    you know, in these congregant settings at the same time as

2    well.

3    Q    So with that knowledge, would you agree that DSH should not

4    house patients who are positive for COVID with patients who are

5    negative for COVID?

6    A    I think we need to clarify what positive for COVID means.

7    If someone is not currently infectious with COVID-19, it is --

8    their policy is they're fine because those people are not

9    transmitting or a risk of transmitting the virus to others.

10        If you're talking about someone who's tested positive for

11   COVID, I think that's problematic because people who have

12   recovered and are no longer infectious can still test positive.

13   And so if that's the criteria, I think that's potentially

14   problematic.

15   Q    Can you explain what, if any, specific vulnerabilities that

16   psychiatric facilities face due to the COVID-19 virus?

17   A    I think the only thing that is specific to a psychiatric

18   facility would be that there is this element of congregant

19   living.  So that makes it different from, you know, many other

20   inpatient facilities where there's, you know, less interaction

21   among the other patient population.  And so I think that is

22   something that makes a psychiatric facility different.  But,

23   again -- and so that is why DSH has policies that are more

24   stringent than, you know, a typical hospital would.

25   Q    Now, you've already testified that you don't have a good

 1  understanding of the nature of the patients who are transferred

 2  to DSH from CDCR.  How --

 3          MS. ELLS:  Objection.

 4          THE WITNESS:  I don't think that's --

 5          MS. ELLS:  That misstates his testimony.

 6          THE WITNESS:  I'm sorry.  I don't think that's the

 7  case.

 8  BY MS. THORN:

 9  Q   Okay.  I'm sorry.

10          THE COURT:  Counsel?

11  BY MS. THORN:

12  Q   I thought --

13          THE COURT:  No.  Let me just -- I think there was an

14  objection.  I just want to --

15          MS. ELLS:  Yes.

16          THE COURT:  Okay.  You made a record.

17          MS. ELLS:  The objection was misstates the testimony.

18          THE COURT:  All right.

19          MS. THORN:  And it certainly wasn't my intent to do

20  that.

21          THE COURT:  All right.  I'm going to sustain the

22  objection.  I believe the doctor was attempting to clarify, so

23  you may follow up, Ms. Thorn, with a new question.

24  BY MS. THORN:

25  Q   Dr. Lauring, do you -- I think you testified that you

1    understood that there are OMDs who are transferred to DSH from

2    CDCR as well as patients needing inpatient psychiatric care.

3    Do you understand the other challenges that DSH faces with

4    their other commitments, the other patients they have that

5    might preclude the patients following safety measures when it

6    comes to preventing the spread of COVID-19, such as social

7    distancing, hand washing, type of thing?

8    A    Sure.  I think I do understand that DSH, like other state

9    psychiatric hospitals, deal with a variety of patients, not

10   just people who come from the correctional system, and that

11   psychiatric patients present unique issues in terms of

12   following guidance.  There's certainly -- I'm well familiar

13   with people -- psychiatric patients who will refuse treatment,

14   who will -- you know, at times could become combative.  These

15   are all things that psychiatric hospitals are well acquainted

16   with dealing with.  And psychiatric hospitals, it should be

17   noted, certainly manage this with other potentially

18   transmissible, you know, diseases within their walls.

19   Q    Now, Ms. Ells showed you exhibits -- I think it's P103 and

20   P107 --

21   A    Yes.

22   Q    -- which I'll try to bring this up for you.

23   A    I'm able to pull them up on my screen and look at them

24   while you're looking at it, too, if that would be helpful.

25   Q    Okay.  Well, let me just ask you.  I'm sorry.  My mind is

Dr. Lauring - Cross by Thorn

1    turning right now.

2         In any event --

3    A    Um-hmm.

4    Q    Let's see.  Still not coming up.

5         Doctor, are there any specific COVID-19 guidelines that

6    apply to forensic state hospitals?

7    A    I'm not aware of any guidelines that separate out forensic

8    state hospitals from other, you know, behavioral health

9    facilities, no.  I'm not aware of any.

10   Q    And the Exhibits P103 and P107, the California Department

11   of Public Health documents and guidelines on mitigation

12   strategies for COVID-19, those aren't specifically applicable

13   to forensic mental health hospitals, correct?

14   A    I think they are applicable in that they're not specified

15   as having different policies for forensic hospitals.  So the

16   CDPH doesn't make a distinction that I saw in those documents,

17   in terms of types of facilities.

18   Q    But the two guidelines in those -- set forth in those

19   exhibits don't have any specific guidelines for psychiatric --

20   for forensic psychiatric inpatient care, correct?

21   A    Again, they don't have specific guidelines, but I think

22   that's assuming that they're -- that they make a distinction,

23   so I don't think that's necessarily a fair assumption.  That

24   document plays to behavioral health facilities, and so my

25   reading of it is that that applies to behavioral health

1   facilities and the -- because they don't make a distinction

2   doesn't necessarily mean that they believe that there should be

3   separate guidance for, you know, in my reading, a forensic

4   psychiatric facility.

5   Q    But you can't point to anything in either of the documents

6   that say that, correct?

7   A    That say what, in particular?

8   Q    That they apply to the handling of COVID-19 mitigation in

9   forensic psychiatric hospitals.

10  A    Again, you know, evidence of absence isn't absence of

11  evidence, and so I don't -- it's not specified, so I can't

12  assume either way that it means that they think that it could

13  be or should be a different set of criteria.  They don't

14  specify, so I can't decide -- I can't tell you why it's not

15  specified, correct.

16  Q    Have you been involved or do you have any knowledge of any

17  discussion between DSH and the California Department of Public

18  Health regarding their specific patients or facilities?

19  A    I have not been provided any information on that, no.

20  Q    Were you provided with any information from plaintiffs'

21  counsel or did you obtain any information concerning the

22  development of any of the COVID-19 guidelines, including the

23  individuals involved and the criteria considered?

24  A    I didn't receive any information on the specific

25  individuals, like I don't have individual case histories.  I

1    know that there's, I believe, somewhere on the order of 50

2    individuals that are in question who've been cleared for

3    transfer, and I know that there's -- you know, have been issues

4    or time limits in terms of when transfers need to happen, but

5    that's kind of the extent of my granular knowledge on the

6    particular cases on that hand.

7    Q   Now, Ms. Ells showed you an Exhibit 56, which is the

8    movement matrix.

9    A   Yes.

10   Q   Are you familiar with that exhibit?

11   A   Yes.

12   Q   Let me see if I can share that exhibit with you.

13       There we go.  This worked yesterday, I promise.

14   A   I see your screen.

15           THE COURT:  I think you're on the first page, so if

16   you can --

17           THE WITNESS:  Scroll down.

18           THE COURT:  Yeah.  Because the first page, if I

19   recall, is like a cover page.

20           MS. ELLS:  That's right.  It's the sticker page.

21           THE COURT:  There you go.

22   BY MS. THORN:

23   Q   Can you see that?

24   A   Yes, I can.

25   Q   All right.  Okay.  So as I recall your testimony, you

1  identified subsection -- let's see.  What was it?  Well, let me

2  just ask you the question:  Are there items in the matrix that

3  you believe are not supported by public health guidelines?

4  A    I can't speak to all aspects of the matrix because I really

5  focused on the items, as I understand it, specific to this

6  case, which would be CDCR to DSH.  There's a lot of other

7  transfers and things on this matrix.  The CDCR to DSH criteria,

8  I think it's not consistent with the public health guidance.

9  Q    So that's the one that says "Admission to DSH from CDCR"?

10 A    Yes.

11 Q    And I'm sorry, I don't have the page number on this.

12 A    No, I see it.  I see it right here on the screen.  So

13 basically, yes.  As I testified earlier, given the protocols

14 available and stated at DSH that it's unnecessary to have this

15 additional 14-day quarantine with testing prior to transferring

16 someone.

17 Q    And what is the basis for your disagreement?

18 A    As stated earlier, DSH protocols effectively assume that

19 everyone coming in for admission has potentially been exposed

20 recently to COVID-19, and they manage them as such, with a

21 14-day quarantine and serial testing; therefore, adding an

22 additional time period prior to transfer is not necessary, as

23 DSH's protocols effectively mitigate the risk.

24 Q    Okay.  Now I'm going to look -- I'd like to show you

25 Exhibit P101.  All right.  Do you see that, Doctor?

Dr. Lauring - Cross by Thorn

1   A    No.  It might be the screen.  I don't know if you're

2   sharing the screen.  There we go.

3   Q    Okay.  Thank you.  All right.  So Ms. Ells drew your

4   attention to section 1, subsection i, and that says "Once a

5   negative COVID test is obtained, CDCR shall promptly endorse

6   the patient to the DSH program."  And I believe you said that

7   according to the California Department of Public Health that a

8   negative test is not required for admission to a hospital.  Is

9   that -- was that your testimony?

10  A    Yes.

11  Q    Okay.  Now, is that also your testimony and your

12  understanding that that same requirement or guidance is that it

13  does apply to mental health hospitals or does not apply to

14  mental health hospitals?

15  A    I would need to look at -- I think it was P103 and 107

16  again.  You know, I don't remember, but I guess I don't -- I

17  wouldn't understand why it would be different at a mental

18  health hospital versus a -- you know, a, quote, standard

19  hospital.

20       And then, as I indicated, DSH does have a program for

21  testing people on the receiving end, so it seems unnecessary to

22  require a negative test on the CDCR end, given that DSH already

23  has testing and quarantining on the receiving end.

24  Q    Okay.  Thank you.

25       And looking at subsection n --

Dr. Lauring - Cross by Thorn

1  A    Yes.

2  Q    -- you testified that it's appropriate for information to

3  be relayed regarding inpatient transfers, and you talked about

4  the small workgroup.  And I'm just wondering if you understand

5  what the small workgroup consists of and what its function is,

6  as referenced in this paragraph?

7  A    I don't know for certain, but up above, you know, there's

8  discussion of, you know, the various parties and protocols,

9  including, I think, the special master and things like that.  I

10  don't know if that's the same group that's referred to here as

11  the small workgroup, but I assume -- when reading it I assume

12  that the small workgroup are people who are knowledgeable about

13  these particular inmates and their care.

14  Q    Thank you.  Doctor, you testified earlier that you've been

15  involved in the Plata litigation.  You know what I mean when I

16  say "Plata"?

17  A    Yes, I do.

18  Q    Okay.  And you recently submitted a declaration in that

19  case dated July 24, 2020.  Do you recall that declaration?

20  A    I don't recall a -- I remember seeing a declaration around

21  that time.  I would need to review it to remember exactly what

22  it covered.

23  Q    Okay.  Well, you state in that declaration, quote, "To

24  mitigate against the risk of a COVID-19 outbreak in a

25  correctional setting, it is critical to quickly identify and

1    test staff members with symptoms of COVID-19 so that

2    appropriate outbreak investigations can be completed.  Because

3    COVID-19 can be transmitted by asymptomatic and presymptomatic

4    carriers, it is vital that those exposed to the virus be

5    quickly identified and tested," closed quote.  Does that sound

6    like an accurate recitation of your -- from your declaration?

7    A    That sounds accurate in terms of what is in that

8    declaration.

9    Q    Okay.  So wouldn't the same hold true for testing of

10   Coleman patients transferred to DSH?  In other words, those --

11   A    Again --

12   Q    -- those --

13   A    -- again --

14   Q    Who are exposed --

15   A    I'm sorry.

16   Q    I'm sorry.  I'm not done with my question.

17        Those who are exposed should also be tested to mitigate

18   against the risks of COVID-19, including delaying patient

19   transfers until that testing can be completed?

20   A    I don't think so in this case.  I think it's very different

21   because, again, they're testing on the receiving end of DSH and

22   they're effectively assuming that that test is positive because

23   they're quarantining these people for 14 days, which is beyond

24   even the CDC's recommended length of time for how long someone

25   needs to be kept if they're COVID positive to reduce the risk

Dr. Lauring - Cross by Thorn

1    of transmission.  So these policies would essentially handle

2    that, and so it's a very different situation than managing, you

3    know, an outbreak within a prison.

4    Q    Do you agree that COVID-19 poses a significant risk of harm

5    to the incarcerated population as well as staff?

6    A    Yes, I agree that COVID-19 presents risk of harm in jails

7    and prisons.

8    Q    In fact, you also agree that COVID-19 causes death in some

9    cases?

10   A    Yes, I do.

11   Q    And you understand that persons can become infected with

12   COVID-19 even when they're placed in quarantine?

13   A    If someone is placed in quarantine, if the quarantine is

14   effective and the policies -- the risks are controlled with PPE

15   and other policies, it's extremely unlikely that someone would

16   become infected while in quarantine.

17   Q    But it's possible, correct?

18   A    Anything's possible.

19   Q    And you understand that persons can become infected if they

20   previously tested positive for COVID-19?

21   A    There have been a few reported cases of reinfection with

22   COVID-19, yes.

23   Q    Do you agree that persons should not be transferred without

24   complying with the movement matrix?

25   A    Do I agree that people should not be transferred?

Dr. Lauring - Cross by Thorn

1    Q    Correct.

2    A    Well, as stated, I think that there's problems with

3    specific aspects of the movement matrix, so, you know, I think

4    I've made that clear.

5    Q    Would you advise, as a medical matter, the transfer of

6    people who are negative for COVID-19 into an area where people

7    are positive for COVID-19?

8    A    I think, as a medical matter, it has to do with how these

9    various institutions are managing keeping people who are

10   negative safe and not exposed to COVID-19.  And I think, you

11   know, DSH's policies really go into that and most hospital

12   policies go into that because hospitals, including psychiatric

13   hospitals, are routinely admitting people who are COVID

14   positive and COVID negative, and that's the way things are

15   working now in healthcare systems and will be for some time.

16            THE COURT:  How much longer do you have, Ms. --

17            MS. THORN:  I'm finished.  Thank you, Your Honor.

18            No further questions, Dr. Lauring.  Thank you.

19            THE COURT:  All right.  Let me just ask Ms. Ells.  Do

20   you have any further questions and, if so, for how long?

21            MS. ELLS:  Two questions, both very short.

22            THE COURT:  All right.  Let's take those and then

23   we'll take a final break.

24

25

1                          REDIRECT EXAMINATION

2    BY MS. ELLS:

3    Q   Dr. Lauring, Ms. Thorn asked you -- pressed you on this

4    guidance and whether or not it applied to the Department of

5    State Hospitals.  Are you aware of any public health guidance

6    saying that a hospital of any sort should refuse to admit

7    patients unless they have a negative COVID test?

8    A   Not aware of any such guidance.

9    Q   Are you aware of any hospital that's doing that?

10   A   No, I'm not.

11             MS. ELLS:  Thank you.  That's all.

12             THE COURT:  Is he excused?  Ms. Thorn?

13             MS. THORN:  Nothing further.  Thank you.

14             THE COURT:  All right.  And so Dr. Lauring, you are

15   excused.  That would mean at this point you can stay and watch,

16   if you'd like, or you may sign off entirely.

17        (Witness excused.)

18             DR. LAURING:  I'll sign off.

19             THE COURT:  All right.

20             DR. LAURING:  Thank you.

21             MS. ELLS:  Thank you.

22             THE COURT:  We will take one last 10-minute break.

23             The defense has used 143, almost 144 minutes and the

24   plaintiff is just over 153 minutes.  So I think that means the

25   defense has about 27 minutes left and -- I'm sorry.  Plaintiffs

1    would have 27 minutes, the defense 37 minutes.  Does that sound

2    right?  I don't know if you are running your clocks, but I

3    think that -- I'm just doing my quick math here.

4              MS. ELLS:  That's consistent with what our records

5    show as well.

6              THE COURT:  All right.  So at this point the

7    plaintiffs are going to call Dr. Stewart.  And then do you

8    anticipate a case in rebuttal, Ms. Thorn or Mr. Lewis?

9              MR. LEWIS:  Yes, Your Honor, a brief one.  Obviously

10   mindful of our time, but we will anticipate a brief rebuttal.

11   Yes, Your Honor.

12             THE COURT:  All right.  So that has us going to at

13   least 6:00, I think.  So let's take a 10-minute break and see

14   if we need all of that time.  If we do, we'll take it.  Is that

15   working for you, madam court reporter?

16             COURT REPORTER:  (Indicating.)

17             THE COURT:  All right.  And court staff knows that

18   we're running over and with a smile have said they would

19   remain.  We can't really continue without Ms. Schultz, so

20   10-minute break.  Be back here at 5:12.

21        (Recess at 5:02 to 5:13 p.m.)

22             THE COURT:  All right.  We're back on the record.

23             I know the sun in the face late afternoon when I'm in

24   my home, but you can operate, Ms. Coulthard?

25             COURT REPORTER:  Well, yeah.  I just didn't want you

1    to think something was wrong.

2              THE COURT:  All right.  Some housekeeping, Ms. Ells?

3              MS. ELLS:  Yes.  I think I misheard you when I

4    confirmed the times of remaining testimony.  Our understanding

5    is defendants have 153 minutes used.  I think you may have said

6    143.

7              THE COURT:  That's what I'm showing for defendants.

8              MS. ELLS:  143?

9              THE COURT:  Plaintiffs 153.

10             MS. ELLS:  Let me confer with my co-counsel.  Yeah.

11   So the defendants were at 116 minutes before the testimony that

12   was just taken, and that testimony was 37 minutes.

13             THE COURT:  You're correct.  You're correct.

14             MS. ELLS:  Thank you.

15             THE COURT:  But you're basically equal.  You each have

16   27 minutes.

17             MS. ELLS:  Yes.

18             THE COURT:  Yeah.  Sorry about that.  No.  That is

19   right.  I carried the 1, but I didn't write it down correctly.

20             MS. ELLS:  Thanks.

21             THE COURT:  All right.  So 27 minutes each.

22             And plaintiffs next witness.  Mr. Nolan, you're

23   calling the witness?

24             MR. NOLAN:  I am, Your Honor.  Thank you.

25             Your Honor, plaintiffs would like to offer Dr. Pablo

1   Stewart as an expert in psychiatry and correctional psychiatry.

2            THE COURT:  All right.  Well, you can elicit some

3   questions first and then make that formal request.

4            MR. NOLAN:  Dr. Stewart's CV is Exhibit P100.

5            THE COURT:  Well, wait, wait.  We need to swear

6   Dr. Stewart.

7            MR. NOLAN:  I'm sorry.

8            THE COURT:  All right.  Ms. Schultz, could you please

9   swear Dr. Stewart.

10           THE CLERK:  Yes, Your Honor.

11           Dr. Stewart, please raise your right hand.

12      (Witness duly sworn and takes the stand.)

13           MR. NOLAN:  Dr. Stewart, I think you --

14           THE WITNESS:  I do.

15           THE COURT:  You need to -- yes.

16           THE CLERK:  Thank you.  You may put your hand down.

17           THE COURT:  We heard that I do.

18           Mr. Nolan, you may proceed.

19           DR. PABLO STEWART, plaintiffs' WITNESS, SWORN

20                         DIRECT EXAMINATION

21   BY MR. NOLAN:

22   Q   Good afternoon, Dr. Stewart.

23   A   Good afternoon.

24   Q   Could you please state your name for the record and spell

25   it.

Dr. Stewart - Direct by Nolan

1    A    My name is Pablo, P-A-B-L-O, Stewart, S-T-E-W-A-R-T.

2    Q    Dr. Stewart, could you briefly describe your licensure and

3    qualifications?

4    A    Well, I'm a psychiatrist.  I graduated from UCSF in 1982,

5    completed a residency in '86 and since that I've been working

6    as a correctional psychiatrist, among other things.

7    Q    Have you previously testified about -- to this -- to the

8    Coleman court?

9    A    I have on previous occasions.

10   Q    Have you testified about DSH programs previously?

11   A    I know I've submitted written materials about that.  I

12   can't recall offhand if I've testified about the same issues.

13           MR. NOLAN:  Your Honor, do you want to hear more about

14   Dr. Stewart's qualifications?

15           THE COURT:  Well, with the CV in the record doesn't

16   mean I can see it necessarily.  Any voir dire, Ms. Thorn?

17           MS. THORN:  No.  I'm sorry, Tom.  Can you describe

18   again what you're offering him for?

19           MR. NOLAN:  As an expert in the field of psychiatry

20   and correctional psychiatry.

21           MS. THORN:  No voir dire, Your Honor.

22           THE COURT:  All right.  And I understand your -- I

23   mean, your position is preserved, Ms. Thorn.

24           MS. THORN:  Thank you.

25           THE COURT:  All right.  So you may proceed and Mr. --

1    Dr. Stewart may state his opinion in response to questions in

2    that field.

3                MR. NOLAN:  Thank you, Your Honor.

4    BY MR. NOLAN:

5    Q    Dr. Stewart, what issues have you been asked to provide an

6    expert opinion about for today's hearing?

7    A    I was asked to offer opinions about whether any of the 55

8    patients that are awaiting transfer to DSH facilities are

9    experiencing any clinical harm as well as are they receiving

10   adequate care during this waiting period?

11   Q    Dr. Stewart, did you come to a opinion regarding these

12   issues?

13   A    Yes.  After my initial review, I came to the opinion that

14   all 55 certainly are seriously mentally ill, and I agree with

15   the CDCR clinicians that they all require inpatient treatment

16   and further opinions were that they're not receiving adequate

17   care during this waiting period and they are not receiving

18   equivalent care in their current situations as they would

19   receive in a DSH facility.

20   Q    Dr. Stewart, do patients who need inpatient care need to be

21   given that level of care quickly?

22   A    Yes.

23   Q    Why is that?

24   A    Well, delays cause harm and suffering and sometimes this

25   harm can be irreparable.  For example, in the scientific

Dr. Stewart - Direct by Nolan

1    literature or psychiatric literature, it's very clear that

2    delaying aggressive treatment for major depressive disorders

3    puts the patient at higher risk for developing Alzheimer's

4    disease sometime in the future.  And the literature is also

5    clear that in the absence of progressive treatment for

6    psychotic symptoms, meaning if you allow a person to remain

7    psychotic, it worsens the overall prognosis throughout the

8    lifetime of the patient in question.  Those are the potentially

9    irreparable harms.  But there's also a harm that the longer a

10   patient remains symptomatic and not receiving proper care, the

11   longer it will take for that person to be returned to a

12   baseline of mental health stability, and during that time

13   they're suffering harm.

14       And the last thing I just want to mention on suffering harm

15   is that when you have a patient at a level of care that's not

16   able to adequately manage that patient, it's likely that that

17   person will have behavioral manifestations of the mental

18   illness, resulting in things like assaults, fights, throwing

19   urine and feces at guards and other patients as well as

20   increase in self-injurious behaviors, and these sorts of issues

21   put both the patient at risk for harm as well as the staff and

22   other patients.

23   Q    Thank you, Dr. Stewart.  Dr. Stewart, when somebody is

24   referred and accepted for inpatient treatment at a hospital,

25   how soon should they be moved?

Dr. Stewart - Direct by Nolan

1    A    My opinion they should be moved as soon as possible.

2    Q    Dr. Stewart, do you have any personal experience working in

3    a hospital during the pandemic?

4    A    Yes.  I currently work in a hospital.  My current position

5    is the clinical professor at the University of Hawaii School of

6    Medicine here in Honolulu where I work in the emergency

7    departments as well as covering the inpatient unit.

8    Q    Is the hospital accepting new patients with psychiatric

9    issues?

10   A    Yes.  The psychiatric -- the psychiatric wards of the

11   hospital -- it's called the Queens Medical Center, which is a

12   big general hospital, public hospital, receives patients during

13   pandemic for psychiatric reasons.

14   Q    Do they require a negative COVID test for admission?

15   A    The policy that we adhere to here is that --

16             MS. THORN:  Excuse me, Doctor.

17             I'd like to lodge an objection, Your Honor.

18             THE COURT:  What's the objection?

19             MS. THORN:  Well, Dr. Stewart was offered to talk

20   about mental health care pending transfer to DSH.  This topic

21   goes beyond that, so I would ask that his testimony be limited

22   to the proffer we received.

23             THE COURT:  Why is that not fair, Mr. Nolan?

24             MR. NOLAN:  I mean, the proffer -- what we sent today

25   included that issue at lunchtime.  It's the last bullet point,

1    and it's clearly relevant to the issue of whether these

2    kinds -- the kinds of precautions and restrictions that CDCR

3    and DSH are using are necessary to prevent the kinds of harms

4    that Dr. Stewart is going to talk more about.

5            THE COURT:  Read for me the last bullet point.  I did

6    not receive that.

7            MR. NOLAN:  I would have to take a minute to find it.

8    Sorry.

9            THE COURT:  You concede -- do you agree, Ms. Thorn,

10   that there's a last bullet point that covers this general area?

11           MS. THORN:  Your Honor, the last bullet point says he

12   will testify to his experience in Hawaii treating inpatient

13   mental health patients not withstanding COVID, including

14   treating COVID-positive individuals.  That hardly goes to the

15   care and alleged harm the patients within CDCR are experiencing

16   while they're awaiting transfer to DSH.  It's plaintiffs' topic

17   and issue that they identify in response to our motion in

18   limine.  And although we did receive these topics, we certainly

19   didn't agree that they were well within the four corners of the

20   plaintiffs' proposed areas of testimony for Dr. Stewart.

21           THE COURT:  Well, I'm going to allow the testimony if

22   plaintiff wants to elicit it, and I'll give it appropriate

23   weight when the time comes.

24           MR. NOLAN:  Thank you, Your Honor.

25           THE COURT:  But the objection is recorded.

Dr. Stewart - Direct by Nolan

1   BY MR. NOLAN:

2   Q    Dr. Stewart, are you running groups in the inpatient

3   psychiatric unit at that hospital?

4   A    Yes.

5   Q    Dr. Stewart, do you have any experience with state mental

6   health hospitals during the pandemic?

7   A    Yes, I do.  My main experience there comes from my work as

8   a federal monitor in the *Rasho v. Baldwin* settlement agreement

9   where I am the federal monitor, and it covers the Illinois

10  Department of Corrections where --

11  Q    Sorry.  Go ahead.  Go ahead.

12  A    Where mentally ill inmates are referred to a former state

13  hospital for inpatient care.

14  Q    And do they require a negative COVID test before

15  transferring people?

16  A    Yes.  They receive a COVID test prior to transfer.  If they

17  refuse a COVID test, they are made to medically quarantine for

18  14 days, during which time they still receive mental health

19  care.

20  Q    They quarantine at the hospital?

21  A    No.  They quarantine at the facility.  But I want to

22  emphasize, they still receive mental health care.

23  Q    Okay.  Turning back to the preparation of your opinion

24  regarding California and DSH, what work did you perform in

25  order to arrive at your opinion?

1    A    I asked for the mental health master treatment plan on the

2    55 people that had been referred and accepted by the DSH

3    facility as well as there's a mental health master treatment

4    plan and there's a psychiatric portion of it too, so I asked to

5    see both of those for all the 55 people awaiting transfer.

6    Q    And what was the next step?

7    A    Well, after that, I'd asked your firm to create a

8    spreadsheet of these patients initially just listing what their

9    diagnoses were, as stated in the mental health master treatment

10   plan, and what their medications were, as stated in the

11   psychiatric portion of the mental health master treatment plan.

12   Q    Your Honor, is this -- sorry.  Dr. Stewart, is this the

13   spreadsheet that you -- I could show it on the computer for

14   everybody.

15   A    Yes.  I have my own right here.

16        MR. NOLAN:  Okay.  Your Honor, is it okay if I show

17   this exhibit, Plaintiffs' Exhibit 102, to the witness?

18        THE COURT:  You can show it.  It doesn't mean it's

19   being admitted --

20        MR. NOLAN:  No.

21        THE COURT:  -- by your showing it, but --

22        MR. NOLAN:  Yeah.

23        THE COURT:  -- P102 you're showing.  All right.

24        MR. NOLAN:  Yes.  Yes, Your Honor.  I want to use it

25   to illustrate Dr. Stewart's process.

1    BY MR. NOLAN:

2    Q    So based on this chart and your review of the treatment

3    plans, were you able to come to any initial opinions about this

4    group of 55 individuals waiting for a transfer?

5    A    Yes.  After my initial review, based on the data from this

6    spreadsheet regarding diagnoses and medications, I noticed that

7    there was some issues regarding diagnoses.  Sometimes there was

8    several unspecified diagnoses.  There was actually an example

9    of a contradictory diagnosis and there was also multiple

10   diagnoses, all of which raised a question in my mind about the

11   quality of care that a person's getting.

12       In addition, I looked at the medications and I found many

13   examples of very complex polypharmacy going on.  Sometimes

14   polypharmacy is the right treatment for patients, but based on

15   this initial review, it just raised a question in my mind about

16   what else is going on with these patients when they're being

17   treated, for example, with two different antipsychotic

18   medications or just, you know, a lot of patients were on four

19   and five different medications, so it was those areas that I

20   looked at.

21   Q    Dr. Stewart, if I could ask you what is the problem with

22   unspecified diagnoses?

23   A    Well, there's not a problem, per se, but an unspecified

24   diagnosis is -- say there's a whole list of psychotic

25   diagnoses, like schizophrenia, schizo-affective disorder.  But

Dr. Stewart - Direct by Nolan

1    in that general category of psychotic disorders there's also an

2    unspecified category that means that the clinician is aware

3    that the person is psychotic but they're unclear about exactly

4    what exact diagnosis explains the psychotic symptoms.

5         And it's okay for a little while, while you try to figure

6    the case out, but these should be resolved quickly, as quick as

7    you can.  And I found that there was several unspecified

8    diagnoses.  These are the types of things, diagnostic

9    clarification, that are indicative of patients who require

10   inpatient treatment.

11   Q   Dr. Stewart, you also mentioned the contradictory diagnoses

12   that you saw.  Why are those appropriate for inpatient

13   treatment?

14   A   Well, there was an example, I believe it was patient 016

15   that was diagnosed with schizo-affective disorder, bipolar

16   type, which is a psychotic-level diagnosis, but the patient was

17   also diagnosed with delusional disorder, which is its own

18   separate psychotic diagnosis.  And according to the DSM-IV,

19   which is the current diagnostic manual that psychiatry uses in

20   the United States, you cannot have those two diagnoses

21   simultaneously.  You have one or the other.  So again, these

22   are the types of diagnostic clarifications that are best done

23   in an inpatient setting where you have the ability to closely

24   monitor and observe patients.

25   Q   Dr. Stewart, you also mentioned polypharmacy issues.  Why

1    are polypharmacy issues concerning?

2    A    Well, you know, like I mentioned, it's not concerning.

3    They may be the result of good care over a period of time and

4    the clinician had found that it takes two or three or even four

5    medicines to address all the person's symptoms and different

6    disorders.

7         The presence of polypharmacy, in and of itself, though,

8    raises the question whether or not the clinician is just sort

9    of chasing symptoms rather than basing their treatment on a

10   specific diagnosis.  So these types of sophisticated and

11   nuanced medication monitoring is best done in an inpatient

12   setting.

13        And again, these are people that have already been referred

14   and accepted into inpatient settings.  So these are the things

15   I notice as far as diagnosis and the polypharmacy on my initial

16   pass through the 55 cases.

17   Q    Dr. Stewart, generally speaking, what is it about an

18   inpatient program that makes it the right place to address

19   these kinds of issues?

20        MS. THORN:  Objection, Your Honor.  That question

21   definitely doesn't go to the harms that are allegedly being

22   suffered by the patients within CDCR pending transfer.  He's

23   asking -- this testimony is -- are generalized statements about

24   psychiatric illness as well as differing treatments available

25   within the prison and the hospital setting.  There's nothing

1    specific that really addresses any three of the Court's

2    questioning.

3              THE COURT:  All right.  All right.  That's enough.

4              Mr. Nolan, brief response to that?

5              MR. NOLAN:  These are all issues -- these are all

6    things that need to be managed in an inpatient setting.  People

7    are harmed by not getting these issues addressed by a quick

8    transfer to inpatient care.

9              THE COURT:  I'll allow it and I'll assign appropriate

10   weight.

11             And I'm going to let you know when you hit 20 minutes.

12             MR. NOLAN:  That would be great.  Thank you, Your

13   Honor.

14             THE COURT:  All right.

15   BY MR. NOLAN:

16   Q    So Dr. Stewart, briefly, what was the next step in your

17   review?

18   A    The next step is, I asked your firm to add columns to the

19   spreadsheet regarding the incidence of suicide attempts,

20   self-injurious behaviors, disciplinary infractions and

21   placement in mental health crisis bed during the period that

22   they're waiting for transfer.

23   Q    And what did you do with this additional information?

24   A    Well, with this additional information I was looking for

25   examples to speak to the Court about of harm and suffering that

1  are more generally or broadly exemplary of all the 55 patients

2  that are awaiting transfer.

3  Q    And Dr. Stewart, can I ask you -- and how many examples did

4  you find?

5  A    Well, I found a large number and I eventually got the

6  number down to 11 knowing that we're limited in our time to

7  present to the Court and that I felt were exemplary of the

8  overall cohort of 55 patients waiting.

9  Q    And what documents did you review for those eleven?

10 A    I asked for their medical records for two months prior to

11 their referral to DSH and up to the present time or the most

12 current records that were available, and I looked further at

13 them.

14 Q    Dr. Stewart, what is persistent psychosis?

15 A    Say that again, please.

16 Q    What is persistent psychosis?

17 A    It's psychosis that continues to be present even in the

18 face of being treated with antipsychotic medication or other

19 types of medication.

20 Q    Did you see many examples of persistent psychosis among

21 the --

22 A    Yeah.

23 Q    -- patients you looked at?

24 A    Yes.

25 Q    What is the danger from persistent -- for a patient from

Dr. Stewart - Direct by Nolan

1    persistent psychosis?

2    A    Well, as I mentioned earlier, untreated psychosis

3    contributes to a poorer prognosis overall in the lifetime of

4    the patient.  It is similar to like a seizure disorder.  You

5    don't allow patients to seize because the more they seize, the

6    more they will seize.  Same thing about psychiatric.  The same

7    thing has been studied with psychotic symptoms.  The more you

8    allow a patient to be psychotic, the more they will be

9    psychotic in the future and it will be harder to address those

10   persistent psychotic symptoms.

11   Q    And isn't an inpatient hospital the best place to address

12   persistent psychotic symptoms?

13   A    In my opinion, based on my experience working in various

14   correctional systems and observing various correctional

15   systems, persistent psychosis is an indicator for the need of

16   inpatient hospitalization and close monitoring.

17   Q    Okay.  What else did you find in your more detailed review

18   of the eleven cases you selected?

19   A    Well, again, there were antipsychotics; and yet, they

20   continued to have command auditory hallucinations that were

21   telling them to hurt themselves.  I had cases where people were

22   being treated with multiple medications and they had persistent

23   symptoms; not just auditory hallucinations but persistent

24   suicidal ideation, they had persistent self-injurious behaviors

25   and to the extent that some of the patients that I reviewed

Dr. Stewart - Direct by Nolan

1    their cases, they were unable to be safely held outside of a

2    mental health crisis bed, which then feeds back into even

3    making their condition worse due to the lack of out-of-cell

4    activities and psychosocial treatments available in the mental

5    health crisis bed situation.

6    Q   Were there some particular examples you wanted to

7    highlight?

8    A   Yes.

9             MS. THORN:  I'd like to object again for the record

10   that we asked plaintiffs for the specific medical records that

11   Dr. Stewart was provided from the patients' EHRS records and we

12   weren't given those.

13            Apparently they had a specific range of records that

14   they were focusing on, and we didn't get those, despite asking

15   for them.  Thank you.

16            THE COURT:  Your response to that, Mr. Nolan?

17            MR. NOLAN:  We had provided the names of the eleven

18   individuals as soon as we knew the names and that the records

19   are in defendants' control.  We would have -- you know, we --

20            MS. THORN:  That was not an accurate --

21            THE COURT:  Wait a minute.  You had to look at records

22   to prepare the chart, right, Mr. Nolan?

23            MR. NOLAN:  Yes.

24            THE COURT:  So those have not been provided?

25            MR. NOLAN:  No.  We told defendants that those were

1    the -- that we had provided information about those 55

2    individuals, the treatment plans.  And then when we narrowed it

3    down and Dr. Stewart looked at eleven cases, we told them the

4    names of the eleven people that he was focused on.

5                THE COURT:  But didn't provide the records for those

6    eleven?

7                MR. NOLAN:  We did not.  We told -- I mean, these are

8    CDCR records that we have access to.

9                THE COURT:  Well, at this point I'm going to sustain

10   that objection, so -- and you're also past -- you're at 21 and

11   a half minutes.

12               MR. NOLAN:  Okay.

13               THE COURT:  I haven't counted this time against you.

14               MR. NOLAN:  Okay.

15               MS. THORN:  Your Honor --

16               THE COURT:  Next question.

17               MS. THORN:  -- defendants would like the opportunity

18   to respond in writing after we've reviewed these patients'

19   records for the past two months or the two months prior to

20   their referral to inpatient care and be able to respond after

21   this hearing to Dr. Stewart's testimony.  And these --

22               THE COURT:  Well, to the extent the testimony has come

23   in, yes; but to the extent I've cut it off now, no.

24               MR. NOLAN:  Well, so you -- sorry.  I apologize, Your

25   Honor, but just to be clear, I can't talk to -- I can't ask

1    Dr. Stewart about these eleven cases that he reviewed in

2    greater detail?

3              THE COURT:  Not in greater detail.

4              If Ms. Thorn is telling me she's going to respond in

5    full detail in writing, I'll disregard what goes beyond the

6    scope of what's already been elicited, just so that's clear.

7    This issue was not made clear to me until just now.

8              MR. NOLAN:  Okay.  Can I just speak once more to it,

9    Your Honor?  I mean, the way we have access to medical records

10   is that we have the ability, as plaintiffs' counsel, to go look

11   at records for our clients, and the medical records are within

12   the control of defendants.  And obviously the records he would

13   be looking at are the ones in the time since referral, which is

14   all we provided to him, and maybe one month before his

15   referral, so I --

16             THE COURT:  But you provided a set of records to him

17   and you have a set of -- a copy of records redacted,

18   presumably?

19             MR. NOLAN:  Yeah, like three days ago.  Yeah.  I mean,

20   it's been a very compressed process.

21             THE COURT:  And those were not provided to the

22   defendants?  Even if it's compressed, that set of records were

23   not provided?

24             MR. NOLAN:  They were not.

25             THE COURT:  Yeah.  No.  The objection is sustained.

1          MR. NOLAN:  Okay.  Thank you, Your Honor.

2     BY MR. NOLAN:

3     Q    Dr. Stewart, in your opinion, were all 55 of the

4     individuals whose information you reviewed suffering needlessly

5     due to the delay in sending them to the hospital?

6     A    Yes.

7     Q    In your opinion, is there any clinical reason not to

8     transfer these patients to the hospital right away?

9     A    Not that was apparent to me through my reviews.

10          MR. NOLAN:  Your Honor, I would like to offer his CV.

11    We did provide defendants two medical records that I was going

12    to use as an exhibit, but I really don't -- I think I'm kind of

13    short on time anyway.

14          MS. THORN:  I wouldn't object to this coming in.  The

15    CV, you know, we've had that for a long time.

16          MR. NOLAN:  Okay.

17          THE COURT:  P100 comes in.

18      (Plaintiffs' Exhibit 100 admitted in evidence.)

19          MR. NOLAN:  What about P102, the chart that

20    Dr. Stewart created?

21          MS. THORN:  Defendants object to the admission of

22    P102.  It's clear from the testimony that that was actually not

23    created by Dr. Stewart but created by someone within RBGG yet

24    to be determined, so I would say there's a lack of foundation

25    for this chart, and it shouldn't come in to evidence on that

Dr. Stewart - Direct by Nolan

1   basis.

2        THE COURT:  All right.  That objection is sustained.

3   Plaintiffs are at 22 and a half minutes.

4        MR. NOLAN:  I guess we have a very few minutes.  If

5   possible, Your Honor, is it -- for these two -- Exhibits P105

6   and P106 were provided to defendants.  Is it okay if I ask

7   Dr. Stewart about those documents?

8        THE COURT:  You can ask about them.

9        All right.  I'm turning the clock back on.

10       MR. NOLAN:  Okay.  Thank you.

11       MS. THORN:  And I'd just note for the record that

12  defendants object to these exhibits.  We were provided them but

13  late yesterday, Your Honor.  Thank you.

14       THE COURT:  The objection is noted but I haven't heard

15  an offer to move them in yet.

16  BY MR. NOLAN:

17  Q   So Dr. Stewart, this is a -- do you recognize this

18  document?  I'll go to the first page.  Are you able to see this

19  document?

20  A   Yes.  I'm looking at -- it's the Mental Health Master

21  Treatment Plan, yes.

22  Q   And do you know which patient it's for?

23  A   I do not offhand.

24  Q   Okay.  I think it says patient 24.

25  A   Patient No. 24.

1    Q    Okay.  In the Bates numbering.

2         So let me just go to the page -- treatment plan.  So in

3    this section on, you know, higher-level-of-care considerations

4    do you see under the second paragraph where it says, "Summarize

5    treatment modifications," the last three sentences there where

6    it says, "Because it is not clear that patient will transfer to

7    the PIP-ICF any time soon, patient is also engaged in a plan to

8    meet the goals of ICF hospitalization within the next four

9    weeks in MHCB."  Do you remember reading that?

10   A    Yes.

11   Q    Dr. Stewart, is it possible for somebody to get -- receive

12   ICF care in a mental health crisis bed?

13   A    No, it is not.  I'm very familiar with mental health crisis

14   beds in correctional settings as well as inpatient care for the

15   correctional settings, and a patient cannot receive inpatient

16   equivalent care in a crisis bed.

17   Q    What are the features of an inpatient setting that a mental

18   health crisis bed does not have?

19   A    Well, it allows the patient to be part of the milieu that

20   the psychiatrist and the rest of the staff, nursing staff,

21   et cetera, can observe and monitor.  This is especially

22   important for diagnostic clarification as well as we're doing

23   these -- hopefully we're doing these nuanced medication

24   monitoring in adding new medication or removing medication.

25   That can only happen in the inpatient setting.  It really

Dr. Stewart - Direct by Nolan

1    cannot happen in a crisis bed setting.

2    Q    Dr. Stewart, what is psychosocial rehabilitation?

3    A    Psychosocial rehabilitation is everything else besides

4    medications.

5         And the psychiatric literature is very clear that although

6    meds are important, they are not treatment, in and of itself.

7    They have to be combined with psychosocial treatments in order

8    to be effective.  And the absence of psychosocial treatments

9    would be just as bad as if you didn't offer medications to

10   people and just offered them psychosocial treatments.

11   Q    Is there a unique kind of psychosocial treatment that

12   inpatient --

13             THE COURT:  You have one minute.

14             MR. NOLAN:  This is my last question.

15             THE COURT:  All right.

16   BY MR. NOLAN:

17   Q    Is there a unique kind of psychosocial rehabilitation that

18   inpatient programs provide?

19   A    Well, they provide community meetings, they provide groups,

20   they provide individual therapy sessions.  All of this is not

21   available for a person in a mental health crisis bed.

22             MR. NOLAN:  All right.  Thank you, Dr. Stewart.

23   That's all my questions.

24             THE COURT:  All right.  Plaintiff has half a minute

25   left.  So Ms. Thorn, you have questions for this witness?

Dr. Stewart - Cross by Thorn

1          You're muted.

2          MS. THORN:  Sorry.  Yes, I have questions, Your Honor.

3          THE COURT:  All right.

4                          CROSS-EXAMINATION

5    BY MS. THORN:

6    Q    Good afternoon, Dr. Stewart.  My name is Elise Thorn.  I'm

7    a deputy attorney general for the State of California

8    representing the defendants.

9    A    Good afternoon.

10   Q    So just going back to the -- your review of the patient's

11   records, you were just testifying to this patient who was in

12   the mental health crisis bed pending transfer to DSH.  Isn't it

13   true that while the patient within the crisis bed may not

14   receive the group treatment that those patients do receive

15   daily contacts with their mental health clinicians?

16   A    Yes.  I'm not challenging that.

17   Q    And then also, do you understand that during the COVID-19

18   pandemic that some of the treatment methods, especially group

19   treatment and some type -- some of the therapies are not being

20   able to be provided for social distancing concerns and public

21   safety as well as the safety of all the patients?

22   A    I'm very aware that correctional facilities use COVID to

23   not provide care.  The care can be provided in the COVID

24   setting that's safe for everyone involved, patients and staff

25   alike.

1   Q    Okay.  Let's turn to the work --

2        So you testified, Doctor, to render your opinions today

3   that you reviewed the treatment plans for 55 of the -- 55

4   patients; is that correct?

5   A    Yes.

6   Q    And how long -- much time did you spend reviewing those

7   treatments plans?

8   A    I think I did it over a couple of days, many hours.  I

9   couldn't give you an estimate, no.  At least three or four.

10  Q    How many pages did you review?  How many pages of records

11  did you review?

12  A    I couldn't tell you the pages, the actual number of pages.

13  Q    Can you guesstimate it?

14  A    I really couldn't.

15  Q    Okay.  So based on that initial review, you made some

16  initial opinions, correct?

17  A    Based on that initial review, yes, I arrived at some

18  initial opinions.

19  Q    And then the Rosen Bien law firm created a document and

20  added some of their own information to that document and, based

21  on your review of that information, you made some additional

22  requests for more patient records?

23  A    Yes, but you're missing a step that after my initial review

24  where I looked at all 55 of the Master Mental Health Treatment

25  Plans, then I asked the firm to just categorize it by diagnosis

Dr. Stewart - Cross by Thorn

1    and medication that I had already reviewed.  I asked them --

2    Q    Did you give that information over to RBG -- to the Rosen

3    Bien law firm, or did they do their own review of the medical

4    records to provide those categories?

5    A    Well, I asked them to separate it in those two categories

6    and then I saw what they provided, and they were consistent

7    with my own review.

8    Q    For those 55 patients, you said -- you base your opinions

9    on your review of their medical records, and I think you

10   specifically referenced their treatment plan.

11   A    The Master Mental Health Plan.

12   Q    Master -- right.  Right.  Did you review any other parts of

13   the mental health records in the electronic health record; for

14   example, the clinicians' notes, those type of things, the

15   nursing notes, those types of things in order to reach the

16   opinions you've given today?

17   A    Not for the cohort of 55.  I did do that for when I finally

18   had limited it to 11.  Then I looked at the entire records.

19   Q    So at least for all but the 11, all of the opinions you've

20   rendered today regarding the 55 excluding the 11 were not based

21   on a full review of the patient's mental health records?

22   A    Right.  And the full review of the mental health record

23   wasn't necessary because my initial opinions were based on what

24   I could see in the mental health treatment plans, both from the

25   psychosocial side and the psychiatric side.  It was diagnoses

1    and medications.  That's what I looked at initially.

2    Q    But you didn't look at the clinical notes and the follow-up

3    notes from the clinicians and the nursing staff?

4    A    Not my initial review of all 55, you're correct.

5    Q    Now, you gave a definition for the term "persistent

6    psychosis," and I just want to ask you whether it's true that

7    patients who receive treatment in Department of State Hospitals

8    also suffer from persistent psychosis, not withstanding therapy

9    in DSH?

10   A    I would have to speculate because I've never examined

11   patients in the Department of State Hospitals, so I would

12   imagine, in my experience as a psychiatrist, there are patients

13   that experience persistent psychotic symptoms in other

14   settings.

15   Q    Dr. Stewart, so as you sit here today, you have no

16   knowledge or information regarding the 55 patients' current

17   mental health acuity or the treatment they're receiving,

18   correct?

19   A    Again, I know it as of the data that I was provided.

20   Q    And what was the end date for that data?

21   A    I couldn't tell you offhand.

22   Q    And so have you made any attempts to follow up on the

23   current stability or mental acuity of any of the patients

24   you've reported on as either the 11 or the 55?

25   A    Not up to, like, say -- I don't know what their mental

1   status is today.

2   Q   So you can't say with any degree of accuracy or certainty

3   that any of the patients were harmed in any manner, ultimately,

4   once they were transferred to DSH?

5           MR. NOLAN:  Objection.  It misstates the evidence.

6   These patients have not been transferred to DSH, most of them.

7           THE COURT:  All right.  I don't know if Ms. Thorn

8   would have the information to know that.

9           Can you reframe your question?

10          MS. THORN:  Yes, I will do that.

11          THE COURT:  -- rather than make an assumption?  All

12  right.

13  BY MS. THORN:

14  Q   Dr. Stewart, are you aware of whether any of the patients

15  you reviewed have, in fact, been transferred to the Department

16  of State Hospitals for treatment?

17  A   I believe in one of the cases of the eleven where I looked

18  at the medical record more closely that one of the persons had

19  been transferred, is currently in DSH, as best that I know.

20  But that's the only one I know for sure.

21  Q   Okay.  Thank you.  Did the Rosen Bien law firm provide you

22  any information regarding the operational dashboard that tracks

23  the mental health care provided to the patients during the time

24  of COVID?

25  A   I did not review any operational dashboards.

1    Q    Did they provide -- offer it to you for review to inform

2    your opinions regarding the nature of care provided to the

3    patients pending transfer?

4    A    I did not review any operational -- I'm not sure what the

5    operational dashboards are.  They certainly didn't provide it

6    to me because I didn't review it.

7    Q    Okay.  Thank you.  Is it your opinion that the risk to the

8    patients' mental health, patients waiting to transfer to ICF

9    care is greater than the risk of infection from exposure to

10   COVID-19?

11   A    Okay.  I'm not trying to be smart, but those are mixed

12   metaphors.  They're not -- you can't compare those, in my

13   opinion.

14        Certainly we're all dealing with COVID-19 and there are

15   proper public health measures that correctional facilities can

16   take to ensure, the best that they can, limiting the spread of

17   COVID-19.  In the meantime, people still require to have

18   treatment at all levels of care.  So that's not a comparison

19   that I make.

20   Q    So you didn't take into account the risk to these patients'

21   possible health, even including death, in reaching your

22   opinions today?

23   A    Well, everything we do now is taken in the context of

24   COVID, so I'm not sure exactly where their risk of exposure is.

25   Is it while they're waiting?  Is it while they're in transport?

1    Is it while they -- when they go to DSH?  So I'm -- again, I'm

2    not trying to be difficult.  I just want to understand exactly

3    what we're weighing against.

4            MS. THORN:  Okay.  Thank you.  I have no further

5    questions.

6            THE COURT:  Do you want to use your last 30 seconds

7    for any question, Mr. Nolan?

8            MR. NOLAN:  No.  Thank you, Your Honor.

9            THE COURT:  All right.  So is Dr. Stewart excused?

10           MR. NOLAN:  I would like to just clarify something,

11   which is, Your Honor, we -- the operational dashboards are

12   behind an electronic -- in an electronic records system and to

13   show it to Dr. Stewart we would have had to get him access,

14   which would take weeks, in our experience, getting access to

15   CDCR's computer system, so . . .

16           THE COURT:  Understood.  If you want to cover this in

17   any briefing, you can complete your record.

18           All right.  So plaintiff has no further evidence to

19   present, Mr. Nolan, Ms. Ells?

20           MR. NOLAN:  I just would check with Lisa.

21           THE COURT:  Ms. Ells?

22           MS. ELLS:  That's correct.  Thank you.

23           THE COURT:  All right.

24           MR. BIEN:  Wait, wait, wait, wait.  Wait.  Wait.

25   excuse me.

1           THE COURT:  All right.

2           MR. BIEN:  Sorry.  It's Mike.

3           THE COURT:  Mr. Bien.

4           MR. BIEN:  Yes.  I think we want to --

5           THE COURT:  We're still in court.  We're still in

6    court, so Mr. Bien.

7           MR. BIEN:  Sorry.

8           THE COURT:  All right.

9           MR. BIEN:  Excuse me.  I thought we were going to move

10   into evidence various documents.

11          MS. ELLS:  Oh, yes.  I'm sorry, Your Honor.  I thought

12   you meant witnesses.

13          THE COURT:  No.  I said evidence.

14          MS. ELLS:  I apologize.  Yes.  We have a number of

15   documents we'd like to move into evidence.

16          THE COURT:  All right.  So which ones are those?

17          MS. ELLS:  P1 through 6.  And those have various

18   subparts to them.  They are weekly reports that have been

19   provided to the task force by DSH every week.

20          THE COURT:  All right.  Just read the whole list.

21          MS. ELLS:  P13 through 25, P29 through 46, P49, P51

22   through 53, P56 through 58, P60 and 61, P63 through 67, P71

23   and -- I'm sorry, 71 through 76, P78 through 80, P82 through

24   91.

25          THE COURT:  What was the first number, P82?

1          MS. ELLS:  82, yes.

2          THE COURT:  Through 91?

3          MS. ELLS:  Correct.

4          THE COURT:  All right.

5          MS. ELLS:  P93 through 95.  I'm sorry.  94 and 95 has

6    already been admitted.  P97 -- I'm sorry.  That was admitted as

7    well.  P -- that's -- oh, I'm sorry.  And then there's -- I'll

8    need assistance from my paralegal.  I believe the last exhibit

9    is P108, but let me confirm that.

10          THE COURT:  There's no P108 on the list I've been

11   using.

12          MS. ELLS:  It was produced to us as part of the

13   ongoing discovery that this Court ordered around midnight last

14   night.  It's the update of certain discovery from DSH that this

15   Court ordered.

16          MS. THORN:  Plaintiffs didn't get -- I mean defendants

17   didn't get that either, so . . .

18          MS. ELLS:  What do you mean?

19          THE COURT:  It sounds like --

20          MS. THORN:  It means we don't have that exhibit.

21          THE COURT:  Plaintiff --

22          MS. ELLS:  We emailed it --

23          THE COURT:  It was produced by defendant.

24          MS. ELLS:  Go ahead.

25          THE COURT:  Plaintiff was saying it's produced by

1    defendants.  Even if you don't know, plaintiffs identified it

2    as 108.  Do you know what document plaintiffs' counsel is

3    referring to, Ms. Thorn?

4         MS. THORN:  I do not.  I'm trying to look at the

5    Court's in box right now.

6         MS. ELLS:  We emailed you about it earlier today.  And

7    we --

8         MS. THORN:  Oh.  Well, I was a little busy, so --

9         MS. ELLS:  Well, I understand.  I understand.  But it

10   is uploaded to the box, and we have updated the exhibit list as

11   well.

12        THE COURT:  Well, let me --

13        Ms. Thorn, are you prepared to respond?  Do you have

14   any objection to admission of that list of exhibits?

15        MS. THORN:  I'm going to --

16        THE COURT:  Let's put aside 108.  Any objection?

17        MR. LEWIS:  Your Honor, defendants do object on the

18   grounds that many of the exhibits obviously never came in

19   through a witness, and it's hard to even tell what the

20   probative value of these is, considering that -- I mean, I'm

21   looking at a binder behind me, and it's probably a legitimate

22   800 pages, if not more, probably more like a thousand.  So I

23   don't actually know what this is, Your Honor, and I think there

24   needs to be a little bit more than just "This is stuff we want

25   to move in."

1         THE COURT:  Well, I don't have time to sort through
2    these this evening yet, and so the plaintiffs' motion is made,
3    and you may meet and confer.  And to the extent there's an
4    objection to admission, then you could brief that separately
5    from closing argument.
6         MR. LEWIS:  Yes, Your Honor.
7         THE COURT:  All right.  And that will give you time to
8    identify what is identified as P108.
9         All right.  So plaintiff made every motion it needs to
10   before it rests, recognizing the Court will decide at a later
11   date what exhibits are in the record.  Ms. Ells?
12        MR. BIEN:  Yes, Your Honor.  Thank you.
13        THE COURT:  Mr. Bien.  All right.  All right.
14   Mr. Bien was awake.  All right.  So plaintiff rests with that
15   caveat.
16        So what is the case in rebuttal?  Ms. Schultz is
17   asking if anyone in the waiting room can be excused, so what is
18   the plan, Mr. Lewis?
19        MR. LEWIS:  If perhaps plaintiffs' counsel could tell
20   me, I believe Dr. Bick should be in the waiting room still, if
21   I'm correct.  I can contact him and find out if he is or isn't.
22   I contacted him during a recess, so I think he was available
23   last --
24        THE COURT:  The last I knew he was there.  Let me --
25   all right.  Dr. Bick, Dr. Mehta and Dr. Warburton are all in

1    the waiting room.

2              MR. NOLAN:  Your Honor, I'm sorry.  Could we excuse

3    Dr. Stewart?

4              THE COURT:  Yes.  Dr. Stewart is excused.  Sorry.

5         (Witness excused.)

6              MR. NOLAN:  Thank you, Your Honor.

7              THE COURT:  You may sign off, Dr. Stewart.  All right.

8    So do you need all of those witnesses for rebuttal, Mr. Lewis?

9              MR. LEWIS:  Yes.  We'll hold them all for now, Your

10   Honor.  I believe we can start with Dr. Bick first.

11             THE COURT:  All right.

12             MR. LEWIS:  And I will try to make this as brief as

13   possible, fully understanding the schedule, Your Honor, and the

14   timeframe.

15             THE COURT:  You have about 16 minutes.

16             MR. LEWIS:  Yes, Your Honor.

17             THE COURT:  All right.  Ms. Schultz, let's bring

18   Dr. Bick back and tell the others that we need them to remain

19   on call.

20             DR. JOSEPH BICK, defendants' WITNESS, SWORN

21                        REBUTTAL EXAMINATION

22   BY MR. LEWIS:

23   Q   All right.  Thank you for coming in, Dr. Bick.  I remind

24   you that you're still under oath.

25        I am going to try to show you a document, and please bear

Dr. Bick - Rebuttal by Lewis

1    with me.  Give me a minute here.  Let's see if I can get this

2    right.

3        All right.  Dr. Bick, do you recognize this which was

4    previously marked as Defendants' Exhibit 32?

5    A    Yes.

6    Q    All right.  So at the bottom of this document, and I will

7    try to slide this over, bottom of page -- let's see if it's

8    page -- for the Court's record it's page 48 of -- I'm sorry, 47

9    of 107, and on the Bates stamping it's D-32-47.  There's that

10   admission to DSH from CDCR block.  I'm kind of circling it with

11   my mouse right now.

12   A    Yes, I see that.

13   Q    I want to ask you about this.  Why is it that you have

14   constructed this matrix with a pre- and post-transfer

15   quarantine and testing protocol for transfers to DSH?

16   A    This was constructed to ensure that we did not

17   inadvertently transfer people who were infected with COVID.

18       The patients that we were transferring over the past

19   several of months have been coming from a prison system that

20   has had over 15,000 cases of COVID and over 70 patient deaths.

21   Our goal was to make sure that while we are transferring

22   patients to the appropriate level of care, we did it in a way

23   where they did not inadvertently transmit COVID with them.

24   Q    And why do you quarantine in your -- in your understanding

25   of the dangers and the concerns that you have at CDCR with

1    transfers to DSH, why would you quarantine on both ends?  What

2    would be your reason for doing that?

3    A    These transfers are very different from what you might see

4    in the community.  This isn't a situation of a patient who's

5    living by themselves or with a couple few people in a home and

6    then is being admitted to an inpatient mental health unit.

7    These are people who are coming from large congregant living

8    environments where we have had outbreaks of COVID for more than

9    six months, and so we found, based on our experience and our

10   clinical judgment and in consultation with California

11   Department of Public Health and others, that it's safest for

12   the patient and for everyone else involved to ensure that

13   they're quarantined and tested on both the sending and

14   receiving side.

15   Q    And how many transfers -- are you aware of how many

16   transfers to DSH there have been in the past few weeks since

17   this matrix went into effect and allowed movement to start?

18   A    Well, initially when this matrix went into effect in August

19   there were less movements because of the strict screening

20   criteria.  But what's happened over the last several weeks is

21   with our continued efforts to send patients, even from

22   facilities that have COVID, as long as we ensure that the unit

23   they're coming from doesn't have COVID, we've been very

24   successful in getting patients to move.  So two weeks ago I

25   believe we moved 11, this week 17.  Next week I'm told we're on

 1    track to transfer 21.

 2              MR. LEWIS:  All right.  No further questions, Your

 3    Honor.

 4              THE COURT:  All right.  Who is conducting -- there's

 5    actually no time left for plaintiffs.

 6              MR. LEWIS:  Yes, Your Honor.  That's correct.

 7              THE COURT:  Except there's half a minute, Mr. Galvan.

 8    Do you want to use half a minute?

 9              MR. GALVAN:  No questions for Dr. Bick.  Thank you,

10    Your Honor.

11              THE COURT:  All right.

12              MR. LEWIS:  No further questions for Dr. Bick, Your

13    Honor.

14              THE COURT:  All right.  So Dr. Bick is now excused.

15    You may sign off.

16         (Witness excused.)

17              THE COURT:  All right.  Next witness for rebuttal?

18              MR. LEWIS:  I believe it will be Dr. Warburton.  I

19    believe that Deputy Attorney General Lucas Hennes will be

20    handling those questions.

21              THE COURT:  All right.  Let's bring Dr. Warburton back

22    in, Ms. Schultz.

23              All right.  Dr. Warburton, you're being recalled on

24    rebuttal.  You continue to testify under oath.

25              Mr. Hennes.

1    MR. HENNES:  Thank you, Your Honor.

2    DR. KATHERINE WARBURTON, defendants' WITNESS, SWORN

3    REBUTTAL EXAMINATION

4    BY MR. HENNES:

5    Q    Good afternoon, Dr. Warburton.  Thanks for coming back.  I

6    have a few quick questions related to DSH's transfer of

7    patients.

8        During their case-in-chief, plaintiffs' expert described a

9    hospital setting with a psychiatric ward.  Do you believe such

10   a setting is analogous to DSH's facilities?

11   A    No, not at all, having worked in both types of facilities.

12   Psychiatric units in general medical hospitals have a much --

13   much more access to medical care, much more access to things

14   like infectious disease specialists, PPE, et cetera.

15       The general inpatient psychiatric units are generally

16   pretty small in terms of the numbers of patients.  You know,

17   we'll have a 1,200-bed hospital or a 1,500-bed hospital.  A

18   general medical or, excuse me, a general adult inpatient unit

19   in a general hospital is much much smaller, much less of a

20   congregant living risk.

21       And of course if someone were to test positive in a general

22   medical unit or, excuse me, in an adult psychiatric unit in a

23   general medical hospital, they would have isolation and

24   quarantine space as per the medical protocols of the general

25   hospital, so it's a different situation for us in state

1   hospitals.

2   Q    Does DSH have areas where it can isolate any patient with a

3   positive COVID test?

4   A    We have very small areas where we can isolate positive

5   COVID patients.  We can only use those for positive COVID

6   patients.  We can't put PUI patients in there, we can't put

7   influenza positive patients in there.  We have to only put

8   COVID-positive patients.

9        We had some confusion earlier, but in terms of pure

10  isolation beds, for example, at Atascadero, they have five, you

11  know, negative pressure isolation rooms that have bathroom

12  facilities.  That's it.

13           MS. ELLS:  Your Honor, I would move to strike the

14  portion of that answer about the number of beds.  This witness

15  specifically testified that she did not know how many beds

16  there were at Atascadero or any other hospital because she

17  wasn't involved in the space planning.

18           THE COURT:  I think that's fair.

19           Mr. Hennes, agreed?

20           MR. HENNES:  Conceded, Your Honor.

21           THE COURT:  All right.  Granted.

22  BY MR. HENNES:

23  Q    Dr. Warburton, you described a difference between total

24  isolation beds and something else.  What's the difference

25  between a total isolation bed and just a place were you would

1  quarantine patients in a cohort?

2         MS. ELLS:  Your Honor, objection.  She's not a public

3  health or infectious disease expert.  This is beyond her

4  testimony.

5         THE COURT:  Sustained.

6  BY MR. HENNES:

7  Q   Dr. Warburton, what is DSH's capability of isolating

8  patients in a separate -- I'm sorry -- strike that.

9      You described an isolation unit with a bathroom; is that

10  right?

11  A   Yes.

12  Q   And it's your understanding that that -- without getting

13  into the number of beds that DSH has that can fulfill that, you

14  understand that that's a limited amount?

15  A   Yes.

16         MS. ELLS:  Your Honor, it's leading.

17         THE COURT:  Sustained.

18  BY MR. HENNES:

19  Q   Would you say that DSH has a significant amount of those

20  types of units?

21         MS. ELLS:  Objection, vague and ambiguous.

22         THE COURT:  Sustained.  I know it's late, Mr. Hennes.

23  Are you able to frame a question that can --

24         MR. HENNES:  I will frame a capable question, Your

25  Honor.

1          THE COURT:  All right.

2    BY MR. HENNES:

3    Q    What is the -- are you aware of where people are kept under

4    investigation?  Are you aware of where people under

5    investigation are kept in DSH?

6          MS. ELLS:  Objection, vague as to which hospital.

7          THE COURT:  Overruled.

8          THE WITNESS:  We underwent a process, as I mentioned,

9    at the beginning of the pandemic.  We have very very limited

10   space.  We run at over 95 percent bed occupancy most of the

11   time.  There was a group of people who went hospital by

12   hospital to identify space to deal with the pandemic, both

13   isolation space, true isolation space and then some of our dorm

14   units or congregant living units that they cleared out, and

15   those spaces are used in a somewhat flexible fashion to

16   accommodate persons under investigation for possibly having

17   COVID.  We've had to just, as I said, be flexible.

18         So, for example, at one hospital when we had an

19   outbreak, we ran out of isolation and quarantine space and had

20   to turn the unit that the patients were on into isolation

21   space/quarantine space.

22         Quarantine space is for the people that we are hoping

23   are healthy and we're trying to keep healthy.  Isolation space

24   is where we remove people to who are sick, and those beds are

25   very limited in our system, very limited.  And we can't put

1   anyone else in those beds other than people who are -- test

2   COVID positive.

3            MS. ELLS:  Objection again, Your Honor.  This witness

4   again is testifying contrary to what she testified earlier,

5   that she didn't know about the bed planning process and what

6   beds they had for COVID risk mitigation.

7            MR. HENNES:  Your Honor, this is not a -- I apologize.

8            THE COURT:  Well, sustained.  It's not responsive to

9   the question either, for that matter.

10  BY MR. HENNES:

11  Q   Dr. Warburton, do you know if these flexible rooms that you

12  described have shared bathrooms?

13  A   Yes.

14  Q   And is that a problem?

15           MS. ELLS:  Again, this witness has testified she does

16  not know where the spaces are that people are housed for COVID

17  mitigation purposes.

18           THE COURT:  I think that's also fair.

19           Can you go back to your last question and see if she

20  can answer that one, Mr. Hennes?  The question was:  Do you

21  know where people are kept under investigation in DSH?

22           MR. HENNES:  Thank you, Your Honor.

23           THE COURT:  Can you answer that question,

24  Dr. Warburton?  First, yes or no.

25           THE WITNESS:  Yes.  I'm not the person who keeps the

1  details of the exact unit numbers, numbers of rooms, what units

2  are being used in which capacity at what time, but I was part

3  of the overall process looking for PUI and isolation space, and

4  we do have units that we cleared out that are general

5  congregant living units with shared bathrooms, shared living

6  areas where we put people under investigation, which is

7  different than the isolation space, which is where we put

8  people who are positive.  Those numbers vary from hospital to

9  hospital, but they are limited system-wide.

10         MS. ELLS:  Objection.  Again, this witness has

11  testified she doesn't know the numbers and, therefore, cannot

12  testify that they are limited.  She was not aware earlier in

13  her testimony of where these spaces were or how many there

14  were.  I move to strike that answer.

15         THE COURT:  I'm going to let it stand, but defense has

16  now two minutes.

17         MR. HENNES:  Thank you, Your Honor.

18  BY MR. HENNES:

19  Q   One final question, Dr. Warburton:  To your knowledge, has

20  DSH rejected any transfer of Coleman patients due to a positive

21  COVID test?

22  A   No.

23         MR. HENNES:  Nothing further, Your Honor.

24         THE COURT:  All right.  Do you want to use half a

25  minute for a question, Ms. Ells?

1          MS. ELLS:  No, thank you.

2          THE COURT:  All right.  Is Dr. Warburton excused?

3          MR. HENNES:  Yes, Your Honor.

4          THE COURT:  Ms. Ells, agreed?

5          MS. ELLS:  Oh, yes.  Thank you, Your Honor.

6          THE COURT:  All right.  Dr. Warburton, you may sign

7    off.  You're excused.

8          Does that conclude the rebuttal case at this point?

9       (Witness excused.)

10         MR. LEWIS:  Your Honor, we'll be calling -- Kyle Lewis

11   here.  We'll be calling Dr. Mehta for one brief question, and

12   then we'll take care of a housekeeping issue on our end.

13         THE COURT:  All right.  Let's bring Dr. Mehta back in.

14         I see a box for Dr. Mehta.  Dr. Mehta, you can hear

15   the Court?  We can't hear you.

16         DR. MEHTA:  Sorry.  Now.  Sorry.  Now I'm unmuted.

17         THE COURT:  All right.  So you continue to testify

18   under oath.  Mr. Lewis has a question for you.

19         MR. LEWIS:  Thank you, Your Honor.

20          DR. AMAR MEHTA, defendants' WITNESS, SWORN

21                   REBUTTAL EXAMINATION

22   BY MR. LEWIS:

23   Q   Dr. Mehta, earlier today we heard testimony from another

24   physician that the care at CDCR for patients pending transfer

25   to DSH was inadequate.  Can you tell me what kind of care do

1     people who are awaiting transfer to DSH receive, in general, at

2     CDCR's facilities and why you think it's adequate, as well as

3     any comments that you have about what you're doing at CDCR to

4     make sure that patients are receiving adequate care during

5     COVID times?  Thank you.

6          MR. GALVAN:  Objection, vague and ambiguous.  Some

7     people wait in outpatient units, some people wait in PIPs, some

8     in crisis beds.

9          THE COURT:  I think that's fair, Mr. Lewis.

10          MR. LEWIS:  All right, Your Honor.  I'm just trying to

11     respect the Court's time here, but . . .

12     BY MR. LEWIS:

13     Q   Can you speak to the adequacy of care for patients awaiting

14     transfer to DSH coming out of the ICF facilities?

15     A   Yes.  So patients that are in PIP beds, in PIP-ICF beds

16     that need to transfer for their least restrictive housing --

17     Q   Yes.

18     A   -- to start with?  Yes?

19          So those patients are receiving individual appointments

20     with their primary psychiatrist and primary clinician.  They're

21     receiving whatever rec therapy and other forms of -- the rec

22     therapist is part of the treatment team in the PIP, and so

23     whatever other forms of treatment that rec therapist is able to

24     offer.

25          In the PIPs right now we're kind of -- we're taking

Dr. Mehta - Rebuttal by Lewis

1  everything we can get, so we have people who know -- like staff

2  members who know how to play music will come and play music on

3  the tiers.  They've done a lot of sort of group-building and

4  morale-building exercises, like talent shows and things like

5  that.

6      We have rounding at least twice a day, and then most of

7  them get another check-in when the site tech or whoever is

8  bringing medications comes around.

9      If there's any concerns, specific concerns that the patient

10  is voicing, that gets elevated, and the appropriate attention

11  is brought to bear on that.

12      They do do groups in most of our PIPs to varying degrees,

13  so they'll do it where they have the rooms to do alternate

14  seating -- alternate seating groups for the --

15          THE COURT:  You need to wrap up.  I don't know if you

16  knew, but there were two minutes left.

17          THE WITNESS:  I'm sorry, I did not, but, yeah.  So

18  that, yes.  That.

19          THE COURT:  All right.  All right.  Then Dr. Mehta is

20  excused, Mr. Lewis?

21          MR. LEWIS:  Yes, Your Honor.  Thank you.

22          THE COURT:  All right.  Dr. Mehta, you may sign off.

23          MR. GALVAN:  Could I use my half a minute on

24  Dr. Mehta?

25          THE COURT:  Whoops.  I think we just lost him.

Dr. Mehta - Rebuttal by Lewis

1              MR. GALVAN:  Thank you.

2              THE COURT:  Is he -- I think -- I gave him permission

3      to sign off.

4              THE CLERK:  Yeah.  He's no longer in the waiting room.

5              THE COURT:  He had a trigger finger.

6              MR. LEWIS:  Trying to escape San Quentin right now,

7      Your Honor.

8              THE COURT:  Meet and confer with Mr. Lewis and see if

9      you can get in declaration form an answer to a 30-second

10     question.

11             MR. GALVAN:  Thank you.

12             MR. LEWIS:  I'll have a timer for that one, Ernie.

13             THE COURT:  All right.

14             MR. LEWIS:  Your Honor, the one housekeeping --

15             THE COURT:  All right.  The housekeeping.

16             MR. LEWIS:  Yeah.  Very briefly, defendants' exhibits.

17     And I think Your Honor had talked about -- We are very

18     respectful of the Court's time.  We will work with plaintiffs

19     to discuss their exhibits.  We also want to do introduction of

20     exhibits as well.  Perhaps we can talk schedule for some things

21     because I know with the --

22             THE COURT:  Let me give you the schedule.  Unless you

23     negotiate around this, can you finalize a stipulation regarding

24     exhibits letting me know which ones I need to rule on within

25     the next week?  Does that give you enough time --

1        THE CLERK:  Your Honor.

2        THE COURT:  -- on exhibits?

3        THE CLERK:  Dr. Mehta must have known that we were

4   trying to stop him because he's now in the waiting room.

5        THE COURT:  Do you want your last question,

6   Mr. Galvan?

7        MR. GALVAN:  Well, since he came back, yes.

8        THE COURT:  All right.  All right.  We'll bring him

9   back in.

10       Thank you, Ms. Schultz.  You wouldn't have had to do

11  that.

12       It turns out, Dr. Mehta, that Mr. Galvan has 30

13  seconds left and he's going to use it, wouldn't you know.

14       So Mr. Galvan.

15                      CROSS-EXAMINATION

16  BY MR. GALVAN:

17  Q   Dr. Mehta, when you testified about what's going on in the

18  PIPs, did you base that on your review of any patient records

19  of people in the PIPs now awaiting DSH care?

20  A   That was based on my discussion with clinicians and the

21  clinician supervisors out of the PIPs.

22  Q   So the answer is no, no patient records?

23  A   I did review the eleven records that were pointed out by

24  one of the witnesses earlier this week for us to review.

25       MR. GALVAN:  Thank you, Dr. Mehta.

1      THE COURT:  All right.  Now you're excused, Dr. Mehta.

2      THE WITNESS:  Thank you.

3   (Witness excused.)

4      THE COURT:  Although that raises a question, and you

5   can let me know your positions on that based on what Dr. Mehta

6   just said.  You have ten days to finalize -- I mean, really, we

7   don't have time, but that raised a huge question in the Court's

8   mind, just so you know, and I would think it would raise a

9   question in the plaintiffs' mind, and the defense may need

10  significant explanation.

11     And anyway --

12     MS. THORN:  Just to that, Your Honor, we didn't have

13  time and/or the actual documents to take Dr. Mehta through the

14  documents that --

15     THE COURT:  I don't have time to hear it now.  You got

16  to put it in writing now and if we need to reconvene a live

17  hearing, I'll do that.

18     So seven days unless you negotiate a different

19  schedule to finalize the exhibit list and let me know and then

20  just meet and confer to tell me what you agree to on closing

21  argument.  So agree to a date simultaneous filing of closing

22  argument.  And I would think, given that you were looking at 20

23  minutes each, that the page limit would be 20 pages max for

24  closing argument.  So those are your defaults.  If you

25  stipulate to different dates, that's fine to the Court.

1          On the exhibits, tell me what date you agree to on

2     closing argument.  And if you need more pages, let me know, but

3     I doubt you will.

4          Anything else we must cover tonight, Mr. Bien?

5          MR. BIEN:  I don't think so, Your Honor.  Thank you

6     very much.

7          THE COURT:  All right.  Mr. Lewis?

8          MR. LEWIS:  I don't believe so.  I don't have

9     anything, Your Honor.

10         THE COURT:  All right.  Thank you all, in particular

11    to court staff, Ms. Schultz and Ms. Coulthard for going above

12    and beyond and staying until this late hour.  Have a good

13    evening and good weekend.

14         THE CLERK:  Court is in recess.

15      (Concluded at 6:26 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I certify that the foregoing is a true and correct

4   transcript of the record of proceedings in the above-entitled

5   matter.

6
    /s/ JENNIFER L. COULTHARD              November 2, 2020
7                                               DATE

8

9   JENNIFER L. COULTHARD, RMR, CRR
    Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25