1  XAVIER BECERRA, State Bar No. 118517
   Attorney General of California
2  ADRIANO HRVATIN, State Bar No. 220909
   Supervising Deputy Attorney General
3  KYLE A. LEWIS, State Bar No. 201041
   ELISE OWENS THORN, State Bar No. 145931
4  TYLER V. HEATH, State Bar No. 271478
   LUCAS HENNES, State Bar No. 278361
5  Deputy Attorneys General
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone:  (916) 210-7318
     Fax:  (916) 324-5205
8    E-mail:  Elise.Thorn@doj.ca.gov
   Attorneys for Defendants

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone:  (310) 552-0130
  Fax:  (310) 229-5800
  E-mail:  RSilberfeld@RobinsKaplan.com
Special Counsel for Defendants

10  HANSON BRIDGETT LLP
    PAUL B. MELLO, SBN 179755
11  SAMANTHA D. WOLFF, SBN 240280
    LAUREL E. O'CONNOR, SBN 305478
12  DAVID C. CASARRUBIAS, SBN 321994
    1676 N. California Blvd., Suite 620
13  Walnut Creek, California 94596
    Telephone:     925-746-8460
14  Facsimile:     925-746-8490

15  Attorneys for Defendants

16

17              UNITED STATES DISTRICT COURT

18             EASTERN DISTRICT OF CALIFORNIA

19                 SACRAMENTO DIVISION

20

21  RALPH COLEMAN, et al.,

22              Plaintiffs,

23        v.

24  GAVIN NEWSOM, et al.

25              Defendants.

Case No. 2:90-CV-00520- KJM-DB

**DEFENDANTS' RESPONSE TO THE
COURT'S SEPTEMBER 3, 2020 ORDER**

Judge:     Hon. Kimberly J. Mueller

26

27

28

16973981.8

# TABLE OF CONTENTS

Page

INTRODUCTION................................................................................................................1

BACKGROUND.................................................................................................................1

I.    Development of CDCR's Continuous Quality Improvement Tool.........................1

RESPONSE.........................................................................................................................4

I.    Defendants' Response to Inquiries 1 and 4: CQIT Should Be Reviewed and
      Updated in Light of Changes to Material Provisions of the Program Guide and the
      New Compendium.....................................................................................................5

II.   Defendants' Response to Inquiries 2 and 5: Constitutionally-Mandated
      Requirements Should Be Identified in CQIT and Aggregated Into "Key" Indicators
      of Constitutionality..................................................................................................7

III.  Defendants' Response to Inquiries 3 and 6: A 90 Percent Compliance Rate for All
      Key Indicators Is Inflexible and Fails to Account for a Holistic Remedy. ............8

IV.   Defendants' Response to Inquiry 7: This Court Should Not Set a 90 Percent
      Compliance Rate for the Administrative Segregation Unit Enhanced Outpatient
      Program Treatment Improvement Plan, Which Is Already Subjected to Review...............11

CONCLUSION .................................................................................................................13

16973981.8

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Braggs v. Dunn*,
   No. 2:14cv601 (MHT), 2020 WL 5231302 (M.D. Ala. Sept. 2, 2020) ................................... 9

*Cagle v. Sutherland*,
   334 F.3d 980 (11th Cir. 2003) ............................................................................................ 10

*Fortin v. Commissioner of Massachusetts Dept. of Public Welfare*,
   692 F.2d 790 (1st Cir. 1982) ......................................................................................... 9, 10

*Hammler v. Alvarez*,
   No. 18-CV-326-AJB(WVG), 2019 WL 422575 (S.D. Cal. Feb. 4, 2019) ............................ 10

*Jeff D. v. Otter*,
   643 F.3d 278 (9th Cir. 2011) ............................................................................................. 10

*Labor/Community Strategy Center v. Los Angeles Metropolitan Transp. Auth.*,
   564 F.3d 1115 (9th Cir. 2009) ........................................................................................ 9, 10

*Parsons v. Ryan*,
   949 F.3d 443 (9th Cir. 2020) ............................................................................................. 10

*Rouser v. White*,
   825 F.3d 1076 (9th Cir. 2016) ........................................................................................... 10

**Statutes**

18 U.S.C. § 3626(a)(2) ............................................................................................... 8, 12

**INTRODUCTION**

The remedial phase of this case has run a quarter of a century. Over this time, Defendants have worked tirelessly to develop and implement the Mental Health Services Delivery System (MHSDS) to ensure that their patients are afforded access to appropriate mental health care. In its September 3, 2020 order, the Court asks the parties to respond to seven related questions concerning the Continuous Quality Improvement Tool (CQIT) and the evaluation of Defendants' compliance with the Eighth Amendment. Defendants answer those questions below, recognizing that the implementation of the CQIT self-monitoring tool is critical to establishing a constitutionally adequate mental health care delivery system. However, certain indicators identified by the Court are more related to the Eighth Amendment than others, and constitutional compliance must ultimately be judged based on the overall delivery of care within the system as a whole. Accordingly, and as discussed below, Defendants look forward to the opportunity to work with the Special Master to identify CQIT indicators that measure compliance with constitutionally-mandated requirements, to establish benchmarks for when Eighth Amendment obligations are satisfied, and to take the next steps in fortifying their self-monitoring tool.

**BACKGROUND**

**I.    Development of CDCR's Continuous Quality Improvement Tool**

Over twenty years ago, the Special Master stated that "[q]uality assurance is the critical key to an enduring remedy," and that "its impact will inure to the benefit of the plaintiff class long after the court has ceased to monitor this case." Special Master's Recommended Schedule for Implementation of Defendants' Quality Assurance Plans, July 20, 1998, ECF No. 958, at 3. Subsequently, in his Twenty-Fourth Round Monitoring report, the Special Master recommended that the Defendants be ordered to develop an enhanced quality improvement process. Twenty-Fourth Round Monitoring Report, July 2, 2012, ECF No. 4205. In making this recommendation, the Special Master observed that "[a]n important goal of the remedial phase of this case is … for CDCR itself to assume the mantle of ultimate responsibility for diagnosing of its own problems, i.e. conduct its own 'qualitative analysis,' and create a quality improvement process that it can use to achieve and maintain compliance, and move on to eventual removal from federal court

16973981.8

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER

Case No. 2:90-CV-00520- KJM-DB

1  oversight." *Id.* at 65.  This Court agreed, and ordered Defendants to "develop an improved quality

2  improvement process by which they can address issues with the quality of the care that is

3  delivered," noting that this would be "the beginning of a transition by CDCR into self-

4  monitoring."  Aug. 30, 2012 Order, ECF No. 4232, at 5:12-13, 15.

5        Since that time, Defendants have worked with the Special Master's team to develop the

6  quality improvement tool, which was designed to provide detailed reports on levels of institutional

7  compliance with Defendants' own policies and procedures, as well as to help improve

8  performance in areas of weakness.  Twenty-Sixth Round Monitoring Report, May 6, 2016, ECF

9  No. 5439, at 108.  By January 2013, the CQIT indicators were identified and a prototype of the

10  tool was developed.  *Id.* at 98.  From May 22, 2013 to June 26, 2013, the CQIT tool was piloted at

11  eight institutions.  *Id.* at 99.  Following the pilot, which was attended by members of the Special

12  Master's team and plaintiffs' counsel, the Special Master reported that more work remained to be

13  done but that the tool was "fundamentally sound and 'off to a good start.'"  *Id.* at 100.

14        CDCR has continued to further develop and refine the tool in consultation with the Special

15  Master's team.  *See*, *e.g*., Twenty-Sixth Round Monitoring Report, May 6, 2016, ECF No. 5439, at

16  102.  As part of this process, "Plaintiffs were provided ample opportunities during the period [July

17  to September 2015] to comment and propose revisions, which were appropriately considered by

18  CDCR."  *Id.* at 103.  Defendants submitted their own draft monitoring reports using CQIT for the

19  first ten institutions during the twenty-seventh round of monitoring by the Special Master, from

20  May 3, 2016 to January 26, 2017.  Twenty-Seventh Round Monitoring Report, Feb. 13, 2018,

21  ECF No. 5779, at 16.

22        CQIT was not designed to measure CDCR's provision of the minimum level of services

23  and care that should be provided to *Coleman* class members to meet constitutional standards.  *See*

24  Aug. 30, 2012 Order, ECF No. 4232, at 5:12-13, 15 (ordering development of a quality

25  improvement process designed to address issues with the quality of the care delivered).  Rather,

26  CQIT was (and is) intended to be aspirational by establishing best practices and encouraging

27  improvement.  *See id.*; *see also* Twenty-Fourth Round Monitoring Report, July 2, 2012, ECF No.

28  4205 at 65 (recognizing that an important goal is for CDCR to "diagnos[e] its own problems, i.e.

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER

1   conduct its own 'qualitative analysis,' and create a quality improvement process"); Declaration of

2   Steven Cartwright, Psy.D. (Decl. Cartwright) at ¶ 2.  Indeed, CQIT measures compliance with

3   many indicators that are not Program Guide requirements, including the following:

4           • Patient satisfaction with access to care

5           • Patient perception of individual or group treatment

6           • Percent of Mental Health Crisis Bed and alternative housing cells that were

7               observed to be clean

8           • Percent of the rules violation reports mitigated

9    Although all of these indicators are a part of CQIT, none reflect Program Guide requirements.

10  (Decl. Cartwright at ¶ 3.)

11          Even certain CQIT indicators from the Program Guide do not necessarily relate to or

12  evaluate whether the system is constitutionally compliant.  For example, CQIT measures the

13  percent of accepted referrals to Department of State Hospitals (DSH) inpatient programs and the

14  percent of Mental Health Crisis Bed stays that did not exceed 10 days.  (Decl. Cartwright, ¶ 4.)  In

15  other words, the mere fact that a CQIT indicator also appears in the Program Guide does not, in

16  and of itself, demonstrate that the indicator is a constitutionally-mandated component of the

17  MHSDS.  This is particularly true because CQIT was initially and primarily designed as a quality

18  improvement tool, used to identify and correct problems with compliance, and to improve the

19  MHSDS and make it one of the best correctional mental health care systems in the world.  ECF

20  No. 4730 at 4; Decl. Cartwright, ¶ 2.  CDCR has always desired to create and maintain a system

21  grounded in best practices, far exceeding constitutional minima, and CQIT was developed with

22  that goal in mind.  (Decl. Cartwright, ¶ 2.)  Thus, while CQIT was never intended to evaluate

23  constitutional minima, it is CDCR's hope to further refine CQIT to do so, at least in part.

24          As explained further in Defendants' responses to the Court's inquiries below, CDCR

25  strongly desires to work in collaboration with the Special Master to narrow and identify the

26  specific metrics within CQIT which may be used for the purpose of demonstrating constitutional

27  compliance (in addition to CQIT's initial and broader goal of identifying areas for improvement).

28  Indeed, it is CDCR's hope that CQIT will "set the course and lead to the conclusion of the

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER

1   *Coleman* case" as was previously envisioned by the Special Master.  *See* Twenty-Sixth Round

2   Monitoring Report, May 6, 2016, ECF No. 5439, at 12.

## RESPONSE

4    The September 3 order requested the Parties' responses to the following seven questions:

5    1. Should this Court require Defendants (under the Special Master's supervision and

6     working with Plaintiffs as appropriate) to update the key indicators in CQIT to

7     reflect any changes required by the 2018 Update to the Program Guide?

8    2. Should this Court confirm that the updated list of key indicators in CQIT that

9     pertain to Program Guide requirements may properly be considered a

10    comprehensive list of the material provisions of the Program Guide, that, taken as a

11    whole and met at the requisite degree of compliance, signal constitutionally

12    adequate compliance with the Program Guide?

13   3. Should this Court confirm that a 90 percent compliance rate for each key indicator

14    for which the Court has not previously expressly established a different compliance

15    requirement will indicate, as to that key indicator, the constitutional minimum has

16    been met?

17   4. Should this Court required Defendants (under the Special Master's supervision and

18    working with Plaintiffs as appropriate) to update the key indicators in CQIT to

19    reflect the material provisions of the Compendium?

20   5. Should this Court confirm that the updated list of key indicators in CQIT that

21    pertain to the Compendium may properly be considered a comprehensive list of the

22    material provisions of the Compendium, that, taken as a whole and met at the

23    requisite degree of compliance, signal constitutionally adequate compliance with

24    the Compendium?

25   6. Should this Court confirm that a 90 percent compliance rate for each key indicator,

26    for which the Court has not previously expressly established a different compliance

27    requirement will indicate, as to that key indicator, the constitutional minimum has

28    been met?

16973981.8 DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER

7.      Should this Court confirm that a 90 percent compliance rate be set for all elements of defendants' Administrative Segregation Unit Enhanced Outpatient Program Treatment Improvement Plan?

Because the first six inquiries are closely related, Defendants address inquiries 1 and 4, 2 and 5, and 3 and 6 together, below.

**I.    Defendants' Response to Inquiries 1 and 4: CQIT Should Be Reviewed and Updated in Light of Changes to Material Provisions of the Program Guide and the New Compendium.**

The Court's first and fourth inquiries ask the parties to address whether the Defendants should work with the Special Master to update the key indicators in CQIT to reflect changes required by the 2018 Update to the Program Guide and material provisions of the new Compendium. Defendants welcome the opportunity to review the CQIT indicators with the Special Master's team and to update CQIT if necessary to ensure that the indicators are measuring compliance with the applicable policies included in the 2018 Update to the Program Guide and the new Compendium.[1] Because CQIT is intended to monitor compliance with policies and procedures, it is critical that the CQIT indicators reflect the most current and applicable policies and procedures.

It also bears noting that not all indicators in CQIT are indicative of constitutional requirements, nor are indicators weighted to reflect the importance of certain indicators over others. Instead, CQIT measures CDCR's compliance with its policies, which were designed to inspire best practices and for administrative coordination, among other reasons, and not simply to reflect what is minimally required in a constitutionally adequate system. (Decl. Cartwright, ¶ 2.) Thus, as discussed above, not all CQIT indicators are designed to monitor CDCR's compliance with the Constitution.

Certainly, some CQIT indicators do measure compliance with provisions of the Program

---

[1] In responding to these questions, Defendants expressly reserve all rights consistent with their pending appeal of the August 3, 2020 order. In particular, and as is relevant here, Defendants contend that this Court erred in finding that certain policies constitute a constitutional floor or that annual updating through the process established by the Court is required.

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER

1  Guide that reflect constitutional obligations.  For instance, CQIT measures the timely completion

2  of mental health transfers to Mental Health Crisis Beds and the timely completion of primary

3  clinician and psychiatry contacts.[2]  (Decl. Cartwright, ¶ 4.)  These measurements are critical to the

4  provision of constitutionally adequate mental health treatment.  Constitutional standards pertaining

5  to the delivery mental health care are unlikely to change annually such that yearly revision to

6  CQIT will be necessary.  But to the extent CDCR updates its policies and procedures that relate to

7  constitutionally mandated services within its MHSDS, CQIT should be evaluated annually to

8  ensure that it is measuring compliance with those updated policies.

9      Certain other CQIT indicators, however, measure CDCR's compliance with policies or

10  practices that do not reflect constitutionally-mandated requirements, and are not even in the

11  Program Guide or Compendium.  Such indicators are instead designed to measure compliance

12  with process improvement metrics, such as clean cells, patient satisfaction with access to care, and

13  patient perception of individual or group treatment.  (*See* Decl. Cartwright, ¶ 2.)  It is critical to

14  assessing the constitutionality of CDCR's MHSDS that the indicators that measure compliance

15  with constitutionally-mandated functions are identified and distinguishable from those that do not

16  carry such import, but instead are used to enhance or improve performance.  While both types of

17  indicators serve important functions, they cannot and should not be used interchangeably.

18      Accordingly, Defendants welcome the opportunity to work with the Special Master to

19  review and potentially update CQIT.  The next step, discussed below in response to the Court's

20  second and fifth inquiries, is to determine which of those CQIT indicators are "key," *i.e.*,

21  mandated by, or necessary components of, a constitutionally adequate mental health system.

22  / / /

23  / / /

24

25

26

27

28

_____

[2] While it is indisputable that a constitutionally adequate mental healthcare system provides timely access to mental health services, it does not mandate that such services be provided within a specific number of hours or days.  Thus, while patients must be seen "timely," a patient who receives routine psychiatry contact on the 31st day, rather than the 30th day, or who is transferred to a Mental Health Crisis Bed within 25 hours, rather than 24 hours of referral, has nonetheless received constitutionally adequate care.

-6-

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER                    Case No. 2:90-CV-00520- KJM-DB

1   **II.    Defendants' Response to Inquiries 2 and 5: Constitutionally-Mandated Requirements Should Be Identified in CQIT and Aggregated Into "Key" Indicators of Constitutionality.**

2

3          The Court's second and fifth inquiries ask whether the Court should confirm that the

4   updated list of "key indicators" in CQIT that pertain to Program Guide and Compendium

5   requirements may be considered a comprehensive list of the material provisions of the Program

6   Guide and Compendium, such that compliance with those provisions at the requisite level

7   demonstrates constitutionality.  Defendants agree with the premise underlying this inquiry—that a

8   critical step to establishing a self-monitoring system that measures constitutional compliance is the

9   identification of those material Program Guide and Compendium provisions (and corresponding

10  CQIT indicators) that are actually relevant to assessing constitutional compliance.  This process

11  has not yet occurred and Defendants have long welcomed the opportunity to take this next step.

12  (Decl. Cartwright, ¶ 5.)

13          As explained previously, not all CQIT indicators measure constitutionally-mandated

14  requirements, or even Program Guide requirements, and a constitutionally adequate system could

15  exist even in the absence of compliance with certain indicators.  For instance, MHSDS patients

16  could be unhappy with the mental health care they have been provided by CDCR, a low number of

17  peace officers could be observed to be carrying a CPR shield, and a high number of MHSDS

18  patients could require the use of restraints during group therapy, all of which are CQIT indicators,

19  and yet CDCR could still provide constitutionally adequate mental health care.

20          It is therefore critical that Defendants work with the Special Master to identify those

21  material CQIT indicators that undeniably measure a constitutionally adequate mental health care

22  delivery system.[3]  Not all CQIT indicators meet this high standard, nor would the Prison Litigation

23  Reform Act (PLRA) permit such a finding.  Indeed, a determination that Defendants must achieve

24  some level of compliance with *all* CQIT indicators, or that *all* CQIT indicators are "key

25  indicators" inferring some sort of constitutional mandate would far exceed that which is required

26  

27  _____

28  [3] In many cases, a "key" indicator will emerge from grouping together indicators reflective of an Eighth Amendment obligation.  For instance, an "access to care" key indicator might be comprised of various sub-indicators that measure timely transfer rates and appointments, among other things.

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER

1    under the Constitution.  Such a broad finding would run afoul of the PLRA's needs-narrowness-

2    intrusiveness requirement, which mandates that preliminary injunctive relief be "narrowly drawn,

3    extend no further than necessary to correct the harm the court finds requires preliminary relief, and

4    be the least intrusive means necessary to correct the harm."  18 U.S.C. § 3626(a)(2).

5        To date, this Court has not determined which CQIT indicators meet the PLRA's exacting

6    standards, and the Special Master has explicitly indicated his reluctance to do so.  Special Master's

7    Report on Defendants' Quality Improvement Process, Aug. 2, 2013, ECF No. 4730 at 2 fn. 1

8    ("This statement is not intended to offer, nor should it be construed as representing, any legal

9    opinion by the special master with respect to compliance or noncompliance with applicable

10   constitutional standards and/or grounds for termination of federal court oversight in this matter.

11   The special master is not charged with the duty or responsibility to opine on constitutional

12   requirements or legal issues of any kind.  That role is reserved exclusively to the court.").

13   Defendants therefore look forward to working with the Special Master to identify the

14   constitutionally-mandated "key indicators."  Once compliance with a key indicator is durably

15   achieved, that requirement should be terminated from this case, as envisioned by this Court's July

16   12, 2018 order.  July 12, 2018 Order, ECF No. 5852 at 8:12-17.  As both the Special Master and

17   the Court previously stated, this process will ensure a lasting remedy and ultimately lead to the

18   conclusion of this case.

19   **III.    Defendants' Response to Inquiries 3 and 6: A 90 Percent Compliance Rate for All**
     **Key Indicators Is Inflexible and Fails to Account for a Holistic Remedy.**
20

21       The Court's third and sixth inquiries ask the parties to confirm whether a 90 percent

22   compliance rate is appropriate for each key indicator for which the Court has not previously

23   expressly established a different compliance requirement, which, when met, will indicate the

24   constitutional minimum has been established.  As explained below, a 90 percent compliance rate

25   for every key indicator should not be the standard for measuring whether or not the constitutional

26   minimum has been met because it is inflexible and fails to account for contextual differences

27   between such indicators.

28       In assessing compliance with remedial indicators, "no particular percentage of compliance

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER

1   can be a safe-harbor figure, transferable from one context to another." *Fortin v. Commissioner of*

2   *Massachusetts Dept. of Public Welfare*, 692 F.2d 790, 795 (1st Cir. 1982).  Rather, the appropriate

3   level should be whether Defendants have substantially complied with the indicators.  *E.g. Braggs*

4   *v. Dunn*, No. 2:14cv601 (MHT), 2020 WL 5231302, at *24 (M.D. Ala. Sept. 2, 2020).  This

5   approach reflects due regard for contextual differences between indicators, honors the parties'

6   expectations, and is in line with other institutional reform cases.

7          Substantial compliance, as opposed to rigid quantitative percentages, accounts for

8   contextual differences between indicators and is therefore a better measure of constitutional

9   remediation.  *See Braggs*, 2020 WL 5231302, at *24 (observing that substantial compliance can

10  take into account qualitative criteria for certain indicators that are not otherwise susceptible to

11  quantitative measurement).  This standard reflects a more critical analysis of whether the overall

12  purposes of the remedy was fulfilled, and necessarily requires courts to "do more than simply

13  count the number of technical deviations from the [remedy]" to assess whether remediation has

14  been achieved.  *See Labor/Community Strategy Center v. Los Angeles Metropolitan Transp. Auth.*,

15  564 F.3d 1115, 1122-23 (9th Cir. 2009).  Thus, the appropriate standard, "using a holistic view of

16  all the available information," is whether Defendants' overall compliance with the remedial plan is

17  substantial, notwithstanding some minimal levels of noncompliance.  *Id.* at 1122.

18         The alternative, a rigid 90 percent threshold for every indicator (even those that are not

19  dictated by the Program Guide or prior court order), would prove unworkable.  Indeed, certain

20  indicators—such as the number of use of force incidents, the number of clinical restraint

21  occurrences within the Mental Health Crisis Bed level of care, the number of suicides, and the

22  number of appointments cancelled due to custody—are not susceptible to measurement using the

23  same level of compliance (*i.e.*, 90 percent) and require a different, qualitative approach to

24  determine constitutional compliance.  For instance, constitutionality is not premised on the

25  number of times patients engaged in self harm, but rather, whether CDCR's actions to prevent and

26  respond to such conduct were consistent with policy.  Meanwhile, other indicators—such as those

27  evaluating whether access to higher levels of care occurred timely—may require a higher,

28  numerical figure to reflect the Court's understanding of the constitutional minimum.  In short, no

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER

1  particular percentage of compliance can be easily transferred from one context to another without

2  being overinclusive or underinclusive.[4]  *See Fortin*, 692 F.2d at 795.

3          Applying substantial compliance to CQIT indicators is consistent with the parties'

4  expectations.  For instance, the Special Master's Fifth Report on the Defendants' Compliance with

5  Provisionally Approved Plans, Policies, and Protocols provided that "[a]ny CDC institution *that*

6  *can demonstrate substantial compliance* with [the] list of issues meets applicable Coleman

7  requirements.  Institutions, in short, can escape Coleman monitoring by complying with the listed

8  requirements."  April 14, 2000, ECF No. 1144 at 2 (emphasis added); *see also id.* at 4 (requiring

9  "substantial compliance").  Consequently, Defendants' position that the proper standard is

10  substantial compliance, rather than a plenary 90 percent figure, is neither unique nor unheard of,

11  and is consistent with the parties' expectations going back two decades.

12          Other institutional reform cases in this circuit have followed a substantial compliance

13  approach to evaluate performance indicators.  *See Labor/Community Strategy Center*, 564 F.3d at

14  1122 (concluding that in analogous consent decree cases, where the court is considering providing

15  relief from a final judgment, "the question is whether there was substantial compliance"); *accord*,

16  *Jeff D. v. Otter*, 643 F.3d 278, 283 (9th Cir. 2011); *see also Rouser v. White*, 825 F.3d 1076, 1082

17  (9th Cir. 2016) (holding that a district court erred when it applied the wrong legal standard for

18  substantial compliance).

19          In some cases, the parties agree to a specific definition for substantial compliance.  *E.g.*

20  *Parsons v. Ryan*, 949 F.3d 443, 458 (9th Cir. 2020) (stipulating to a definition of substantial

21  compliance as 85 percent compliance with a performance measure).  But here, the parties have not

22  agreed to a 90 percent compliance threshold, either between themselves, or in consultation with

23  the Special Master or the Court.  That's because the parties need to first evaluate each indicator to

24  identify which indicators are susceptible to quantitative measurement, which indicators are "key"

25

26  [4] Notably, constitutional remediation plans, including consent decrees, often go beyond the
   constitutional minimum.  *See Hammler v. Alvarez*, No. 18-CV-326-AJB(WVG), 2019 WL
27  422575, at *7 (S.D. Cal. Feb. 4, 2019) (citing *Cagle v. Sutherland*, 334 F.3d 980, 986-87 (11th
   Cir. 2003)).  Thus, 90 percent, or even 100 percent, compliance, with any given indicator may be
28  sufficient to satisfy the constitutional minimum, but not necessary.

Case No. 2:90-CV-00520- KJM-DB

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER

1   indicators that may require a heightened level of compliance by virtue of the fact that they

2   measure compliance with constitutionally-mandated requirements, and which indicators would be

3   best evaluated by taking a flexible approach that combines other, qualitative, factors.  Only then

4   can the parties brief the Court on necessary compliance rates for each key indicator, for which the

5   Court has not previously expressly established a different compliance requirement, to satisfy the

6   constitutional minimum.

7          In sum, a 90 percent compliance rate may very well amount to the constitutional minimum

8   for certain key indicators.  However, it should not be the standard across the board because it is

9   inflexible and fails to account for contextual differences between the indicators.  Further,

10  substantial compliance also demands inquiry beyond the simple numerical indicator to determine

11  whether, for those indicators where 90 percent was not achieved, prompt self-identification and

12  remediation occurred such that substantial compliance may be inferred from the response.

13  **IV.    Defendants' Response to Inquiry 7: This Court Should Not Set a 90 Percent
            Compliance Rate for the Administrative Segregation Unit Enhanced Outpatient**
14          **Program Treatment Improvement Plan, Which Is Already Subjected to Review.**

15         The Court's final inquiry asks whether the Court should confirm a 90 percent compliance

16  rate for all elements of Defendants' Administrative Segregation Unit Enhanced Outpatient

17  Program (EOP) Treatment Improvement Plan, including the conduct of a review every 30 days of

18  all EOP inmates housed in ASU hubs for over 90 days.  Such a rate of compliance here is

19  inappropriate because it is already subject to the Special Master's review, and because certain

20  indicators do not lend themselves to a numerical threshold.

21         As a general matter, the Administrative Segregation Unit EOP Treatment Improvement

22  Plan has been incorporated into the EOP Hub certification process.  (Decl. Cartwright, ¶ 6.)  The

23  EOP Hub certification process involves a thorough and holistic approach to analyzing compliance

24  with existing policy and procedure.  (*Id*.)  This process combines quantitative data collected

25  through automated systems (via CQIT) with onsite observations to assess the quality of care

26  provided.  These Administrative Segregation EOP Hubs are evaluated with respect to their

27  provision of adequate numbers of EOP treatment hours, timely primary clinician and psychiatry

28  contacts, timely Interdisciplinary Treatment Teams (IDTT), timely discharge follow-ups, adequate

-11-

1    mental health screening, appropriate IDTT staffing, and timely mental health referrals.  (*Id.*)

2          This EOP Hub certification process, developed in 2014 and 2015 under the Court's August

3    11, 2014 order (ECF No. 5196), is currently under review by the Special Master, including the

4    compliance levels required for indicators.  Some core items within that certification must indeed

5    meet a 90 percent threshold for compliance[5], including timely mental health referrals, EOP

6    treatment hours offered, 10 hours of out-of-cell time offered, and ICC reviews with a mental

7    health clinician present.  (Decl. Cartwright, ¶ 11.)  However, other indicators are not required to

8    meet a 90 percent compliance rate because such a requirement would not logically apply.  For

9    instance, a 90 percent threshold is not required for patient interviews, because the information that

10   is obtained is not verified.  (*Id.*)  Instead, the interviews are only designed to help determine if the

11   program is performing well from the patient's perspective.  (*Id.*)  Similarly, a 90 percent threshold

12   is not required for whether the Interdisciplinary Treatment Team space is well ventilated and

13   temperature controlled, whether there was a conference table available, or whether the

14   Interdisciplinary Treatment Team or group started on time.  For these items, the inquiry must be a

15   simple "yes" or "no" standard, and not a numerical evaluation.  (*Id.*)  Thus, those items are

16   considered when completing a holistic review of the hub and are not independently measured at a

17   90 percent compliance rate.  (*Id.*)

18          Accordingly, the imposition of a 90 percent across-the-board standard would exceed what

19   is currently required and would impose new, unwarranted and unworkable standards.  Such an

20   indiscriminate standard would run afoul of the PLRA's needs-narrowness-intrusiveness

21   requirement.  18 U.S.C. § 3626(a)(2).  Because a number of requirements do not lend themselves

22   to a numeric assessment, this Court should not order a 90 percent compliance rate for all elements

23   of the Administrative Segregation Unit EOP Treatment Improvement Plan.

24   / / /

25   / / /

26   _____

27   [5] Defendants note that the 90 percent threshold for certification of the Administrative Segregation

28   EOP hubs pertains to compliance with Program Guide requirements for monitoring purposes, and
     not necessarily compliance with the Eighth Amendment.

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER

Case No. 2:90-CV-00520- KJM-DB

1

## **CONCLUSION**

2          Defendants agree with this Court and the Special Master that a quality assurance tool is

3   essential to ensuring lasting reform and a constitutionally adequate mental health system.  If used

4   correctly, CQIT can be a "key component of a durable remedy."  March 3, 2014 Order, ECF No.

5   5092, at 4-5.  In order to create such a remedy, it is critical that CQIT measure not only

6   Defendants' compliance with policies and aspirational goals, but also with those indicators that are

7   essential to a constitutionally adequate mental health care delivery system.  Those constitutionally-

8   mandated requirements must be clearly identified and closely monitored.  Compliance with key

9   indicators can then be measured individually through CQIT, as well as holistically as required by

10  binding judicial precedent.  Defendants look forward to the opportunity to work with the Special

11  Master to identify the constitutionally-mandated key indicators within CQIT and, in turn, to

12  ensuring lasting reform.

13  DATED:  November 2, 2020                    HANSON BRIDGETT LLP

14

15                                          By:    _/s/ Samantha Wolff_____

16                                              PAUL B. MELLO
                                                SAMANTHA D. WOLFF
17                                              LAUREL E. O'CONNOR
                                                DAVID C. CASARRUBIAS
18                                              Attorneys for Defendants

19   Dated:  November 2, 2020                 Xavier Becerra
                                             Attorney General of California
20                                           Adriano Hrvatin
                                             Supervising Deputy Attorney General
21

22                                           ____/s/ Kyle A. Lewis_____
                                             Deputy Attorney General
23                                           _Attorneys for Defendants_

24  DATED:  November 2, 2020                    ROBINS KAPLAN LLP

25

26                                          By:    _/s/ Roman Silberfeld_____
27                                              ROMAN SILBERFELD
                                                GLENN A. DANAS
28                                              Special Counsel for Defendants

16973981.8

DEFS.' RESPONSE TO SEPT. 3, 2020 ORDER