DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

        Plaintiffs,

        v.

GAVIN NEWSOM, et al.,

        Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' RESPONSE TO ORDER OF SEPT. 3, 2020**

Judge: Hon. Kimberly J. Mueller

On September 3, 2020, this Court entered an order on benchmarks for constitutional compliance. (Docket No. 6846.) The Order reviewed the history of the compliance requirements in this case, including development of the Program Guides, specific remedial orders, and staffing requirements. The Court directed further briefing within 60 days on four questions:

(1) why the Court should not require a set of interim steps toward full and durable implementation of the Program Guide based on use of the Continuous Quality

[3630890.7]

Improvement Tool ("CQIT") for Defendants' self-monitoring of the key mental health components of the remedy, after a six month period to update the key CQIT indicators based on the 2018 Program Guide, with a 90 percent compliance rate for each key indicator except where the Court has previously set a different compliance rate. (*Id.* at 25);

(2) why the Court should not require a set of interim steps toward full and durable implementation of the parties' Supplemental Joint Submission of Custody-Related Policies and Orders ("Compendium") based on use of the CQIT, after a six-month period to update the key CQIT indicators that pertain to the Compendium, and with a 90 percent compliance rate for each key indicator except where the court has previously set a different compliance rate.  (*Id.* at 26);

(3) "whether the CQIT tool, once finalized, should be subject to annual updates when the Program Guide and Compendium are updated."  (*Id.* at 24 n.11).

(4) why compliance rates should not be confirmed at 90 percent for defendants' Administrative Segregation Unit Enhanced Outpatient Program Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in ASU hubs for over 90 days (*id.* at 27).

I.  **PROGRAM GUIDE CQIT INDICATORS SHOULD BE UPDATED AS PART OF A SYSTEMIC VIEW OF COMPLIANCE.**

The Court's briefing instruction regarding the CQIT indicators asked why the Court should not require the following three interim steps:

> First, allow a period of six months for defendants, under the supervision of the Special Master who may seek input from plaintiffs as appropriate, to update the key indicators in CQIT to reflect any changes required by the 2018 Update to the Program Guide;

> Second, confirm that the updated list of key indicators in CQIT that pertain to Program Guide requirements may properly be considered a comprehensive list of the material provisions of the Program Guide, that, taken as a whole and met at the requisite degree of compliance, signal constitutionally adequate compliance with the Program Guide; and

> Third, confirm that a 90 percent compliance rate for each key

[3630890.7]

indicator for which the court has not previously expressly established a different compliance requirement will indicate, as to that key indicator, the constitutional minimum has been met.

(Docket No. 6846 at 25.)  Plaintiffs address each step in turn below.

###    A.    UPDATING THE CQIT INDICATORS SHOULD INCLUDE FULL PARTICIPATION BY THE PLAINTIFFS.

The Court's question refers to the Special Master seeking "input from the plaintiffs as appropriate."  (Docket No. 6846 at 25.)  The process is more likely to succeed in moving this case toward resolution if Plaintiffs' counsel is included in the process from the start.  The Court has deferred to the Defendants in developing the Program Guide and related policies.  In the development and use of data to measure Program Guide compliance, however, Defendants took advantage of that deference to engage in "end runs and hiding the ball to create a false picture for the court."  (Order of Dec. 17, 2019, Docket No. 6427 at 5; *see also id.* at 20-22, 41 (finding that "defendants have knowingly presented misleading information to the court in numerous areas critical to the remedy in this case and measuring compliance with that remedy").)  The CQIT tool, like the Mental Health Dashboard examined in the 2019 evidentiary hearing, is organized around a set of measures that drive color-coded reports in which indicators turn "green" to show compliance.  (*Compare id.* at 14 n. 11, 27, 29, 45 (describing "[t]he push to get dashboards from red to green"), *with* Exhibit A to Declaration of Ernest Galvan, CQIT Report for LAC, August 2017 at 6-21, 32 (showing dashboard-style indicators).)  The 2019 evidentiary hearing revealed that the "business rules" behind these indicators are important—they can be developed in ways that obscure the actual state of compliance, or in ways that reveal it.  (Docket No. 6427 at 24-25.)  Transparency during this process is essential.

Plaintiffs therefore request that the wording of any order regarding the CQIT development process be changed to remove the words "who may seek input from plaintiffs as appropriate," and replace them with "with input from plaintiffs' counsel."

**B.     AN UPDATED CQIT CAN BE USED TO POINT TO COMPLIANCE—WITH THE QUALIFICATION THAT THE MENTAL HEALTH SYSTEM MUST FUNCTION AS A WHOLE TO PREVENT SERIOUS INJURY TO CLASS MEMBERS.**

In the order directing this briefing, the Court cautioned the parties that component indicators such as those in the CQIT should not lead to a fractured view of compliance that loses sight of the safety of the *Coleman* class.  As the Court stated, with a class of persons numbering around 30,000, even a 90% compliance rate leaves thousands of people "without access to one or more components of a constitutionally adequate mental health delivery system or receiving custodial treatment that falls below constitutional minimum requirements." (Docket No. 6846 at 23.)  A class member who falls into the 10% non-compliance group for a large number of measures, or for just a few that are directly related to safety and health, has been denied the benefit of a minimally adequate mental health system.  Such denials often result in serious injury or death.  As the Supreme Court instructed in *Horne v. Flores,* 557 US 433 (2009), the remedial focus must be on whether a durable remedy has been implemented to address requirements of federal law, and not just on individual remedial steps.  *Id.* at 450.

The answer to the Court's second question, therefore, is that the CQIT indicators may signal constitutionally adequate compliance with the Program Guide but only in combination with an overall systemic view of the system that includes review of a significant number of individual patient cases to determine whether failures are occurring in a pattern that creates a substantial risk of serious harm to patients.  Practically, this would require the Defendants to develop a system that reviews indicators not only as components across a patient population, but also measures the indicators from a patient point of view, asking whether such non-compliance—at any overall frequency and not just 90 percent--contributed to poor patient outcomes such as self-injurious behavior or repeated decompensation and hospitalizations.

In addition, even though CQIT has "quality" in its name, the tool does very little to measure the quality of care.  Instead, it focuses on counting and dating events.  The tool

cannot be considered complete until it includes qualitative measures.  For example, the question of whether Program Guide requirements for group therapy are being met cannot be assessed just by counting the sessions, if those sessions are limited to gathering patients to view the same video over and over again.

### C.    A 90 PERCENT COMPLIANCE RATE FOR KEY INDICATORS NOT ALREADY SET AT ANOTHER LEVEL BY THE COURT INDICATES ADEQUATE COMPLIANCE WHEN CONSIDERED IN CONTEXT.

As the Court has pointed out, a 90% compliance rate is nothing to be celebrated, as it indicates inadequate care for thousands of persons on each item measured.  The Court would be well within its discretion to set a higher standard of compliance as the default for key indicators.  The Court should set the 90% level only provisionally, subject to resetting certain key indicators at a higher level, if the patient-centered measures discussed in the section above show the 90% level is not adequate to prevent substantial risk of serious harm.

## II.    ANNUAL CQIT UPDATES PARALLEL TO ANNUAL PROGRAM GUIDE UPDATES ARE APPROPRIATE.

In footnote 11 of the September 3, 2020 Order, the Court directed that the parties address "whether the CQIT tool, once finalized, should be subject to annual updates when the Program Guide and Compendium are updated"  (Docket No. 6846 at 24.)  The CQIT should be updated to reflect Program Guide revisions as they occur, or at least annually. Doing so would prevent wasted efforts trying to catch up with the Program Guide updates at some later date.  No changes to the CQIT indicators, including annual updates, should become final without Court approval.

## III.    COMPENDIUM (CUSTODY) CQIT INDICATORS CAN BE UPDATED AND FORM PART OF A SYSTEMIC REVIEW OF COMPLIANCE

The Court's briefing instruction regarding the CQIT indicators asked why the Court should not require the following three interim steps:

> First, allow a period of six months for defendants, under the supervision of the Special Master who may seek input from plaintiffs as appropriate, to identify key indicators for CQIT to reflect the material provisions of the Compendium;

1

2

3

4

5

6

> Second, confirm that the updated list of key indicators in CQIT that pertain to the Compendium may properly be considered a comprehensive list of the material provisions of the Compendium, that, taken as a whole and met at the requisite degree of compliance, signal constitutionally adequate compliance with the Compendium; and
>
> Third, confirm that a 90 percent compliance rate for each key indicator, for which the court has not previously expressly established a different compliance requirement will indicate, as to that key indicator, the constitutional minimum has been met.

7   (Docket No. 6846 at 26.)

8       Plaintiffs' response is the same as that for the use of CQIT as a Program Guide

9   compliance indicator.

10      The same issues addressed above regarding the context and limitations of a 90%

11  compliance standard apply to the Compendium.  The component compliance scores must

12  be accompanied by a significant number of patient reviews to check for patterns of non-

13  compliance that put patients at risk.

14      Incorporating the custody requirements into the CQIT will be a major undertaking.

15  The most recent CQIT guidebook that Plaintiffs have received has some custody

16  indicators, but does not come close to including the entire Compendium.  (Galvan

17  Declaration, Exhibit B, CQI Assessment Guide Book, at 33-45.)

18      The custody topics in the current CQIT guidebook are limited to the heat plan,

19  treatment module physical standards, MHCB mechanical restraint and treatment module

20  usage, welfare checks in administrative segregation, STRH, LTRH, PSU and SHU, out of

21  cell time and showers in ASU, PSU and SHU, classification committee timelines in ASU

22  and STRH, ASU and STRH intake procedures, ASU, STRH and LTRH entertainment

23  appliances, unclothed body searches in ASU EOP hubs and PSU, custody mental health

24  referral process, emergency response equipment, custody MHCB discharge follow-ups,

25  rules violation reports (RVRs)[1] mental health assessments, training, and non-disciplinary

26  _____

27  [1] As discussed below in the text, the rules violation report process is broken and needs to

28  be revisited.

1  segregation privileges, property and transfer timelines.

2          The Compendium, by contrast includes not only the above-listed custody functions,

3  but also other custody functions.  These include but are not limited to the remedies for

4  excluding persons with psychiatric disabilities from Defendants' programs, services and

5  activities, as litigated in *Hecker v. CDCR,* as this Court noted in the Order of September 3,

6  2020, directing this briefing.  (Docket No. 6846 at 14.)  The Compendium addressed the

7  following custody functions not yet measured by CQIT:

8          1.      Removal of classification points previously added due to mental illness,

9          2.      Access to cognitive behavioral health and substance abuse treatment

10  programs,

11         3.      Milestone completion credits for EOP class members,

12         4.      Reception Center privileges for EOP class members,

13         5.      Work Group C (Unassigned) privileges,

14         6.      Segregation property matrix,

15         7.      SHU/PSU pre-Minimum Eligible Release Date (MERD) hearings,

16         8.      Out to court transfers,

17         9.      MHCB clothing and bedding,

18         10.     Use of force policies,[2]

19         11.     Prohibition on Management Cell use for MHSDS participants.

20         12.     Excluding behaviors related to mental illness from rules violation reports,

21  and other changes in documenting rules violations,

22         13.     Amended policy for adult males referred for treatment of exhibitionism,

23         14.     Indecent exposure and sexual disorderly conduct management,

24         15.     Policy housing review/least restrictive housing,

25         16.     DSH rules violation policy,

26  _____

27  [2] As discussed below in the text, the use of force process is broken and needs to be
28  revisited in its entirety.

17.   Case conferences before returning DSH patients to SHU,

18.   Medical records review,

19.   Double/single celling due to mental health concerns,

20.   "Psych and return" case work expectations and time frames,

21.   CCCMS housing and program availability,

22.   PSU Behavioral incentive plan,

23.   Suicide prevention—notification of attempted or completed suicides during non-business hours,

24.   Documenting reasons for retaining inmates in segregation, removal of medical hold,

25.   Change in credit earning status for inmates eligible for day for day work credit and assigned minimum A/B custody,

26.   Minimum A/B custody criteria,

27.   Favorable behavior points for EOP class members,

28.   Segregation log reviews by supervisors,

29.   PIP STEP policy,

30.   Health care appliance removal policy,

31.   Rules violation report process,

32.   Housing assignments during screening and housing process,

33.   Assistance for class members during Administrative Segregation classification hearings,

34.   Administrative Determinants and access to rehabilitative programs,

35.   Movement to higher or lower level within the same institution,

36.   Provision of suicide resistant beds in MHCB,

37.   Suicide prevention steps resulting from Orders regarding audits by Special Master's suicide prevention expert,

38.   Uses and limitations of Guard One to document custody checks,

39.   Reporting and tracking of self-injurious behavior incidents.

[3630890.7]

PLAINTIFFS' RESPONSE TO ORDER OF SEPT. 3, 2020

1    In both lists above, the current CQIT custody measures and the Compendium

2 elements not yet included in CQIT, there are references to the rules violation report (RVR)

3 and use of force (UOF) processes.  Although this Court held a trial on these processes in

4 2013, and issued a remedial order in 2014, *Coleman v. Brown,* 28 F. Supp. 3d 1068, 1089-

5 1090 (E.D. Cal. 2014)[3], the effectiveness of the remedy has been overwhelmed by a wave

6 of retaliatory uses of force and rules violation reports.

7    This statewide degeneration of the use of force and rules violation report processes

8 _____

9 [3] The Order directing this briefing notes that the April 10, 2014 order published at 28 F.

10 Supp. 3d 1068 was followed by a series of orders modifying and extending time for its

requirements.  Docket No. 6846 at 13 n.2 (citing Order at Docket No. 5150 (extending

11 time for compliance with segregation parts of the published order, changing the

requirements for non-disciplinary segregation ); Order at Docket No. 5212 (modifying

12 segregation remedy to incorporate Long Term Restrictive Housing plan).

13 Defendants' plans regarding the use of force changes required by the April 10, 2014 Order

14 were filed with the Court on August 1, 2014 (Docket No. 5190), and approved by the

Court on August 11, 2014 (Order at Docket No. 5196).  The revised use of force policy

15 "requires custody staff to consider the mental health condition of the inmate before using

controlled force and to examine the totality of the circumstances so that staff employ the

16 least amount of force necessary to resolve the situation."  (Docket No. 5190 at 6.)  The

17 policy also requires evaluation by a mental health practitioner and a cool-down period

before a controlled use of force.  (*Id.* at 8.)  The policy bans the use of chemical agents in

18 controlled use of force incidents within mental health treatment facilities absent high level

19 authorization, and sets other limits on their use.  (*Id.* at 9.)  The policy sets similar limits on

"immediate use of force" and the use of expandable batons.  (*Id.* at 11.)  It also adds

20 clinical input to the incident review process after a use of force.  (*Id.* at 12.)

21 The April 10, 2014 Order directed the Special Master to submit a report on RVR policies

22 and procedures.  The Special Master's January 2015 report on the RVR process made four

recommendations concerning use of inmate clerks, and incorporation of the process in the

23 CQIT and training.  (Docket No. 5266.)  The parties met and conferred during early 2015

on substantive changes to the RVR process.  The parties developed a revised RVR

24 regulation, a revised Department Operating Manual section, a revised Mental Health

25 Assessment form, and a memorandum to the field on the RVR process for *Coleman* class

members.  These documents are attached to the Order of May 4, 2015, Docket No. 5305.

26 The basic purpose of the revised RVR procedures is to remove behaviors "strongly

influenced by symptoms of mental illness" from the disciplinary process, and to clarify the

27 requirements for mitigating punishments for those cases that remain in the disciplinary

28 process.  Docket No. 5305-1 (Amended Title 15, Section 3371.1).

1  has been extensively documented in *Armstrong v. Newson,* 4:94-cv-2307 (N.D. Cal.).  On

2  September 8, 2020, the *Armstrong* Court granted a permanent injunction against staff

3  retaliation at one institution, RJD, after finding that staff had used force against and

4  threatened to file false rules violation reports against incarcerated persons with disabilities

5  who asked for reasonable accommodations.  *Armstrong v. Newsom*, 2020 WL 5511523, at

6  *9, *12 (N.D. Cal. 2020).  Pending before the *Armstrong* Court is a motion to extend the

7  injunction statewide based on hundreds of declarations of incarcerated persons who were

8  abused and threatened with retaliation.  *See Armstrong v. Newson,* Plaintiffs' Reply In

9  Support Of Plaintiffs' Motion To Stop Defendants From Assaulting, Abusing And

10  Retaliating Against People With Disabilities, *Armstrong* Dkt. No. 3110.

11      Many of the incarcerated persons who provided declarations for the *Armstrong*

12  motion are also *Coleman* class members.  Plaintiffs' counsel so notified counsel for the

13  *Coleman* Defendants in a letter dated September 24, 2020, with detailed summaries of

14  each incident and supporting documents.  (Galvan Decl. Exhibit C, Redacted Copy of

15  Sept. 24, 2020 Letter, without Exhibits.)  With the use of force and RVR processes as

16  broken as they are, it would be a mistake to attempt to measure constitutional compliance

17  based on any indicators that measure the current process.  The processes must be fixed

18  before any useful measurements can be made.

19  **IV.   THE ADMINISTRATIVE SEGREGATION UNIT ENHANCED**

20  **OUTPATIENT PROGRAM TREATMENT IMPROVEMENT PLAN CAN BE MEASURED ON A 90% STANDARD BUT WILL NOT RESOLVE THE CONSTITUTIONAL VIOLATIONS ON ANY STANDARD OF**

21  **MEASUREMENT.**

22      If CDCR is permitted to keep housing EOP patients in Administrative Segregation

23  units, then the Court should confirm the compliance rate of 90 percent for Defendants'

24  Administrative Segregation EOP Treatment Improvement Plan.  The Special Master has

25  been using a 90 percent compliance standard to monitor Defendants' progress toward

26  achieving this "critically important" goal, (*see* Order, Aug. 30, 2012, ECF No. 4232, at 5

27  n.3), for years.  (*See, e.g.*, Twenty-Seventh Round Monitoring Report of the Special

28  Master on the Defendants' Compliance With Provisionally Approved Plans, Policies, And

1  Protocols, Feb. 13, 2018, ECF No. 5779, at 135-36.)

2       The idea of trying to "improve" treatment in segregated housing, however, is

3  outdated.  The Administrative Segregation EOP Treatment Improvement Plan was first

4  developed in 2007.  (Docket No. 2311.)  Seven years later, after a trial that included

5  testimony about the Treatment Improvement Plan, the Court found that confinement in

6  Administrative Segregation units creates substantial risks of serious harm to the health and

7  safety of all persons with serious mental illness, including and particularly persons at the

8  EOP level of care.  *Coleman v. Brown,* 28 F. Supp. 3d 1068, 1093-95, 1103 (E.D. Cal.

9  2014).  Class members face these harms from prolonged administrative segregation

10  conditions even if they receive a review of their placement every 30 days, and even if

11  Defendants reach 90% compliance with the other elements of the ASU EOP Treatment

12  Improvement Plan.  Instead of endless chasing the chimera of "improved" solitary

13  confinement, CDCR should simply abolish it.

14       At a minimum the parties should be directed to revisit the ASU EOP Treatment

15  Improvement Plan to address current issues regarding ASU and PSU conditions.  For

16  example, Plaintiffs object to the continued use of Therapeutic Treatment Modules (cages)

17  in the ASU and PSU.  In addition, treatment and activities in the newer types of *Coleman*

18  segregation facilities for CCCMS patients, the STRH and LTRH, must be evaluated and

19  addressed.  And Defendants must come up with a replacement for their failed remedy

20  regarding class members held in segregation for non-disciplinary purposes ("NDS").

21  These and other issues should be resolved before the parties can shift to negotiating over

22  measurements of compliance.

23
                              **CONCLUSION**
24
25       Plaintiffs request that any order entered by the Court on the first set of questions,

26  the use of the CQIT indicators for Program Guide compliance include a requirement that

27  the CQIT update will be undertaken with input from Plaintiffs' counsel.

28       Plaintiffs request that any order entered by the Court on the second set of questions,

the development of CQIT indicators for the Compendium, direct the parties to meet and confer regarding problems with the use of force and rules violation report processes, and bring disputed issues to the Court by motion.

Plaintiffs request that any order entered by the Court on the third question regarding the Administrative Segregation Unit Enhanced Outpatient Program Treatment Improvement Plan, direct the Defendants to update the plan, with the assistance of the Special Master and with input from Plaintiffs, to address PSUs, STRH and LTRH.

## **CERTIFICATION**

The undersigned counsel for Plaintiffs certifies that he reviewed the following relevant court orders:

| Dkt. No. | Date | Subject |
|----------|------|---------|
| 6846 | 2020-09-03 | Benchmarks |
| 6806 | 2020-08-03 | Program Guide & Compendium Update Processes |
| 6460 | 2020-02-11 | Approving Compendium of Custody Remedies (6431) |
| 6435 | 2019-12-23 | Order on Remedial Measures After Evidentiary Hearing |
| 6427 | 2019-12-17 | Evidentiary Hearing Findings on Mental Health System Data |
| 6314 | 2019-10-08 | Custody and Mental Health Partnership Plan (CMHPP) |
| 6296 | 2019-09-27 | Desert Institution Expedited Transfers |
| 6295 | 2019-09-27 | MHCB Transfer Timeline Exceptions |
| 6214 | 2019-07-09 | 2018 Program Guide Revision |
| 6212 | 2019-07-03 | Suicide Prevention |
| 6095 | 2019-02-20 | Custody and Mental Health Partnership Plan (CMHPP) |
| 5852 | 2018-07-12 | Adopting 27th Monitoring Report ( CQIT Standards) |
| 5762 | 2018-01-25 | Suicide Prevention |
| 5711 | 2017-10-10 | Staffing |
| 5610 | 2017-04-19 | Inpatient Care |

| Dkt. No. | Date | Subject |
|---|---|---|
| 5477 | 2016-08-09 | Adopting Recommendations of 26th Monitoring Report (Staffing; Custody and Mental Health Partnership Plan; CQIT) |
| 5305 | 2015-05-01 | Rules Violation Report Process |
| 5271 | 2015-02-03 | Suicide Prevention |
| 5212 | 2014-08-29 | Administrative Segregation |
| 5196 | 2014-08-11 | Use of Force (approving plan filed at Docket No. 5190) |
| 5150 | 2014-05-13 | Use of Force; Administrative Segregation |
| 5092 | 2014-02-27 | CQIT |
| 5131/5133 | 2014-04-10 | Use of Force; Administrative Segregation (28 F. Supp. 3d 1068) |
| 4951 | 2013-12-10 | Death Row |
| 4688 | 2013-07-11 | Inpatient Care |
| 4361 | 2013-02-28 | Ruling on objections to 25th Monitoring Report |
| 4232 | 2012-08-30 | Adopting Recommendations of 24th Monitoring Report |
| 3629 | 2009-07-09 | Population Projections |
| 3613 | 2009-06-18 | Staffing Plan |
| 3556 | 2009-03-31 | Short-term, intermediate and long-range bed plans. |
| 1998 | 2006-10-20 | Population Projections |
| 1229 | 2000-12-22 | *Gates/Coleman* Merger |

DATED:  Nov. 2, 2020

Respectfully submitted,
ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Ernest Galvan*

Ernest Galvan

Attorneys for Plaintiffs

**ACRONYMS USED**

| ACRONYM | FULL TEXT |
|---|---|
| CQIT | Continuous Quality Improvement Tool |
| EOP | Enhanced Outpatient Program |
| ASU | Administrative Segregation Unit |
| MHCB | Mental Health Crisis Bed |
| STRH | Short Term Restrictive Housing |
| LTRH | Long Term Restrictive Housing |
| SHU | Security Housing Unit |
| PSU | Psychiatric Services Unit |
| RVR | Rules Violation Report |
| MERD | Minimum Eligible Release Date |
| MHSDS | Mental Health Services Delivery System |
| DSH | Department of State Hospitals |
| CCCMS | Correctional Clinical Case Management System |
| PIP | Psychiatric Inpatient Program |
| STEP | System to Encourage Progress |