California Correctional Health Care Services | Mental Health | LAC

# REGION III SITE VISIT: CALIFORNIA STATE PRISON, LOS ANGELES COUNTY

## CONTINUOUS QUALITY IMPROVEMENT/QUARTER 3 SUSTAINABLE PROCESS REVIEW

VISIT DATE: OCTOBER 17-21, 2016

REPORTING PERIOD: MARCH 1, 2016 THROUGH AUGUST 31, 2016

## Participants

| | |
|---|---|
| Regional Administrator | Chris Cornell, Psy.D. |
| Senior Psychologist Specialist | Brent Patterson, Ph.D. |
| Senior Psychologist Specialist | Yamileth Fisher, Psy.D. |
| Senior Psychologist Specialist | Sean Mintz, Psy.D. |
| Associate Health Program Advisor | Felicia Lopez |
| Lieutenant Region III | Efren Castro |
| Lieutenant Region III | Randy Thompson |

## Observers

| | |
|---|---|
| Chief Psychologist | John Rekart, Ph.D. |
| Staff Services Analyst | Ashley Caluag |
| Attorney General's Office | Maneesh Sharma, Esq |
| Deputy Special Master | Mohamedu Jones, Esq |
| Court Monitor | Kerry Hughes, M.D.. |
| Court Monitor | Regina Costa, Esq |
| Court Monitor | Sarah Clifton, Esq |
| Court Monitor | Maria Massotta, Psy.D. |
| Court Monitor | Kristina Hector, Esq |
| Court Monitor | Mary Perrien, Ph.D. |
| Court Monitor | Henry Dlugacz, JD, MSW |
| Court Monitor | Karen Rea, MSN, NP |
| Plaintiff's Attorney | Thomas Nolan, Esq |

California Correctional Health Care Services | Mental Health | LAC

## Table of Contents

CONTINUOUS QUALITY IMPROVEMENT TOOL AUDIT PROCESS ....................................................... ii

ABOUT CALIFORNIA STATE PRISON-LOS ANGELES COUNTY ........................................................ ii

EXECUTIVE SUMMARY ................................................................................................. 1

EXECUTIVE SUMMARY - FINDINGS ................................................................................. 2

EXECUTIVE SUMMARY - RECOMMENDATIONS ..................................................................... 2

DETAILED REPORT ..................................................................................................... 4

STAFFING AND ACCESS TO CARE ................................................................................... 6

DIAGNOSIS AND TREATMENT PLANNING .......................................................................... 8

GROUP THERAPY ...................................................................................................... 10

MEDICATION MANAGEMENT ........................................................................................ 11

SUICIDE PREVENTION ................................................................................................ 12

CUSTODY HOUSING UNIT AUDITS ................................................................................. 13

MENTAL HEALTH CRISIS BED ...................................................................................... 16

ALTERNATIVE HOUSING .............................................................................................. 17

DEPARTMENT OF STATE HOSPITAL REFERALS AND DISCHARGES ......................................... 19

ADMINISTRATIVE SEGREGATION UNIT & SHORT TERM RESTRICTED HOUSING ....................... 21

RULES VIOLATION REPORTS ........................................................................................ 26

QUALITY MANAGEMENT ............................................................................................. 27

ATTACHMENT A: CASE EXAMPLES ................................................................................. 28

ATTACHMENT B: ACRONYMS…………………………………………………………………………………………………30

California Correctional Health Care Services | Mental Health | LAC

# CONTINUOUS QUALITY IMPROVEMENT TOOL AUDIT PROCESS

Continuous Quality Improvement Tool (CQIT) audits combine trended performance data, document reviews, patient and staff interviews, healthcare record reviews, and on-site observations of day-to-day operations to present a point-in-time picture of the quality of mental health services at an individual institution. Each area is rated on performance as follows:

**Urgent Concerns:** *Potential patient safety issue that is addressed immediately by the Chief Executive Officer and the Mental Health Regional Administrator while the regional team is on site.*

**Significant Improvement Needed:** *Multiple concerns in the area or concerns are such that the development of an action plan by the Quality Management Support Unit (QMSU) is necessary within one week after receipt of your performance report to resolve the key concerns resulting in performance concerns.*

**Improvement Needed:** *One or more performance issues identified that require an action plan after significant and urgent concerns are addressed, generally to be developed by the QMSU within three months after receipt of your performance report.*

**Proficient:** *Criteria met in this area.*

*The purpose of the CQIT is to improve the quality mental health services and patient outcomes through:*

- *Providing institution leaders with an independent and detailed assessment of mental health services to inform quality improvement efforts.*
- *Identifying service gaps or failures that pose a significant risk to patients and ensure immediate action to protect patients.*
- *Finding best practices that can be shared with institutions statewide.*
- *Ensuring sustainability of quality over time through repeated assessments/feedback to staff.*
- *Identifying persistent weak areas that surface in multiple institutions that may be the focus for statewide initiatives.*

This first CQI assessment performed at California State Prison, Los Angeles County (LAC) provides baseline results for the institution.

## ABOUT CALIFORNIA STATE PRISON-LOS ANGELES COUNTY

California State Prison, Los Angeles County (LAC) is primarily a Level IV institution that also has a Level I General Population yard. LAC has a large mental health mission as services are provide at the Correctional Clinical Case Management (CCCMS), Enhanced Outpatient (EOP) and Mental Health Crisis Bed (MHCB) Levels of Care. In addition, LAC has General Population, Administrative Segregation, Sensitive Needs Yards (SNY) and also operates a Progressive Programming Facility housed on A-Yard. LAC is also an ASU EOP Hub institution, and operates a Short Term Restricted Housing (STRH) Program. The MHCB at LAC is a licensed facility that also has a safety cell and a restraint and seclusion cell at its disposal.

| | |
|---|---|
| **Mission** | Level IV ML & SNY with ASU EOP Hub |
| **Population as of October 2016** | 3,334 inmates, 45% of the total population is in MHSDS |
| **CCCMS** | 991 patients |
| **EOP** | 347 patients |
| **MHCB** | 10 patients with 12 bed capacity |
| **ASU EOP** | 77 patients with a 100 patient capacity |
| **STRH** | 87 |

# EXECUTIVE SUMMARY

| LAC Overall Rating: | IMPROVEMENT NEEDED |
|---|---|

| AREA | CATEGORY DESCRIPTION | RATING |
|---|---|---|
| Staffing and Access to Care | *Ability to recruit and retain leadership and line staff positions critical to the delivery of mental health services; timeliness of referrals for services, mental health clinician and psychiatrist contacts, group therapy, and Interdisciplinary Treatment Team (IDTT) services; availability and confidentiality of treatment space.* | Improvement Needed |
| Diagnosis and Treatment Planning | *IDTT activities to diagnose mental illness and collaborate with patients to arrive at a treatment plan to improve outcomes; includes treatment planning for special populations, such as patients who use services more frequently than others (high utilizers) and patients who often refuse care (high refusers).* | Improvement Needed |
| Group Therapy | *Quality of group therapy sessions, including format and content, facilitation approach, patient engagement, and adequacy of the treatment space.* | Improvement Needed |
| Medication Management | *Timely access to mental health medications, access to and quality of medication non-adherence counseling, adherence to statewide guidelines for medication side effect monitoring.* | Improvement Needed |
| Suicide Prevention and Response | *Custody and mental health staff follow-up for patients returning from a higher level of care; the extent to which Suicide Risk Evaluations are timely and appropriate; suicide prevention training.* | Proficient |
| Custody Housing Unit Audits | *Measures availability of custody suicide response tools and patient safety responsibilities, including maintaining cut-down kits, carrying Cardio-Pulmonary Resuscitation (CPR) masks, providing inmates with ready access to forms used to seek mental health care, and monitoring the temperature of housing units.* | Proficient |
| MHCB | *Crisis care provided in a licensed inpatient setting (available at a subset of CDCR institutions), including nursing rounds, suicide observation, and use of clinical and mechanical restraints.* | Improvement Needed |
| Alternative Housing | *Processes to temporarily house and monitor patients while arranging transfer to a MHCB.* | Improvement Needed |
| DSH / Sustainable Process | *Timely processing and appropriateness of referrals to DSH Programs.* | Improvement Needed |
| ASU | *Services for patients at higher risk of poor mental health outcomes due to their placement in a restricted housing unit.* | Proficient |
| RVRs | *Processes to ensure that mental health staff provides meaningful information to officers adjudicating disciplinary actions for patients with mental illness so mitigating factors relative to mental health are taken into account.* | Improvement Needed |
| Quality Management | *Effectiveness/efficiency of the local Mental Health Program Subcommittee, the Suicide Prevention and Response Focus Improvement Team, and other quality improvement teams in identifying and resolving quality problems in the Mental Health Services Delivery System.* | Proficient |

## EXECUTIVE SUMMARY - FINDINGS

While Performance Report indicators suggest that LAC is providing adequate Mental Health Care in most areas, on-site observation and reports from both patients and mental health staff suggest that improvement in multiple areas is required. Although sufficiently staffed in most critical areas, the shortage of psychiatrists was reported by institution leadership as the single largest driver of several Performance Report deficiencies. Specifically, Routine Psychiatry Referrals, Medication Non-Adherence Referrals, Psychiatry Continuity of Care, and Psychiatry attendance in CCCMS IDTTs are below expectations, due to the vacancy rate for psychiatrists.

A review of on-site Quality Management efforts in weekly Mental Health Program Subcommittee Meeting Minutes revealed the Quality Management staff did not sufficiently identify systemic issues, which results in difficulty developing long term sustainable improvements. Staff and patients both report patterns of unprofessional treatment by custody staff in the ASU EOP and ML CCCMS programs. Additionally, mental health treatment groups in both the ASU EOP Hub and ML EOP programs were observed starting late and ending prematurely. Finally, patients report that requests for mental health services often go ignored unless they resort to extreme measures like reporting suicidality. Similarly, patients and staff from across the institution report that the denial of timely access to allowable property is a significant driver of distress and frustration among the patient population. While data suggests that patients are being afforded an adequate level of health care in the STRH, patients complained of not having scheduled individual sessions, and the frequency of group and individual treatment refusals strongly suggests that more attention should be given to self-monitoring of performance.

## *EXECUTIVE SUMMARY - RECOMMENDATIONS*

**The items below, although only part of overall recommendations that are listed in the larger section of this report, are the key items that must be addressed before any further improvements are likely to be sustained. The local Mental Health Program Subcommittee (MHPS) and the Quality Management Committee will develop corrective action items for each of the following items.**

1. Psychiatry appointments will be scheduled based on Current Due Dates reports. Medication Non-Compliance Referrals need to be seen, cleared, and then addressed in IDTT more successfully.
2. Access to psychiatry providers will be streamlined, so that providers can begin seeing patients earlier in the day and are not hindered having to wait for patients to arrive at scheduled appointments.
3. Patients who refuse psychiatric medications with high frequency will be better managed and medications with high refusal rates will be reviewed more regularly for modification or discontinuation.
4. Patients whose sole reason for prescription of psychiatric medication is sleep problems will be re-evaluated for an appropriate medication regimen. Essentially, the justification for a prescription will match the medication.
5. EOP program supervisors will monitor, track and report in a weekly Executive Staff Meeting where custody leadership is present, the actual start and stop times of all treatment groups in order to ensure that the information appearing in the Performance Report regarding Structured Treatment Hours is valid.
6. STRH individual contacts will be scheduled in advance and tracked via the AQR system and any patients refusing a significant number of PC contacts will be evaluated for the reasons for refusal and the need for either a higher level of care or discharge from CCCMS.
7. ASU EOP group scheduling processes shall be evaluated by the Mental Health Program Subcommittee (MHPS). The MHPS shall design and implement a scheduling system to insure all patients are afforded adequate access to yard in a manner that does not conflict with their mental health treatment.
8. Custody Management will review current practice regarding the timely distribution of inmate property and develop an auditing system to ensure that their actual practice is consistent with statewide policy. It is strongly suggested that the institution develop a system for tracking inmate arrival/transfers and the actual time they receive their property.
9. Health Care and Custody Executive Staff will survey staff and patients using the standardized statewide self-monitoring tool on a monthly basis to assess how the institution's culture is impacting patient care, and conduct regular custody-mental health collaboration trainings focused on improving patients' negative perceptions of patient-custody interactions.

10. The MHPS will adopt a uniform reporting format for its weekly meetings. In addition, attendance at weekly meetings will be tracked to ensure the presence of all required stakeholders.

11. Reports of unprofessional conduct by custodial staff were discussed on-site with institutional executive staff before the audit team concluded the site visit.

# DETAILED REPORT

The CQIT includes a group staff interview facilitated by the Regional Mental Health Administrator while on-site, with representation present primarily from the ASU EOP and STRH programs within this facility with a variety of disciplines (Social Worker, Psychologist and Recreation Therapists) represented. At LAC, the majority of the responses and concerns were vocalized by staff members.

### Staff Feel Unsupported by Healthcare Management

- *STRH and ASU EOP staff report that mental health management is indifferent to their recommendations for how existing system of care can be improved.*
- *Mental Health staff report that management is inconsistent in holding individuals accountable for their performance so standards are not uniform across individuals or programs and this dynamic has a negative impact on staff morale.*

### Patients and Staff Report that Custody Treats Patients Unprofessionally

- *By staff and patient report and onsite observation, there is no systematic way to ensure loaner radios are distributed consistently and inmates' allowable property is dispensed on time*

### Self-Monitoring Institution with a Functional DSH Referral System

- *Well run Mental Health Crisis Bed characterized by strong Safety Planning at discharge and adherence to length of stay requirements with generally well run IDTT meetings.*

**Healthcare Management.** Staff resource management will be reviewed to improve efficiency and timely performance in meeting program guidelines. Over the last year, the average daily number of clinical contacts being completed by Primary Clinicians has dropped from 10.5 per day in October 2015 to 5.7 per day in October 2016, a 46% reduction in daily contacts being completed by this classification, while for Psychiatrists, the number went from 11.6 per day in October 2015 to 9.2 per day in October 2016, a 21% reduction in daily contacts being completed by this classification.

### Staff Survey - Concerns by Program Area / Discipline

| ASU EOP | *Program Supervisors and the CMH are unresponsive to line staff feedback for how existing systems of care can be improved.* |
|---|---|
| STRH | *Requests for additional individual treatment space have gone unaddressed for extended periods of time and that a lack of escort officers negatively impacts clinicians' access to patients.* |
| CCCMS/ EOP | *A patient in the ML EOP was retained in a cell for up to 14 days without a working toilet and custody staff have spoken to Recreation Therapist staff unprofessionally. No ML CCCMS staff attended the staff survey. Patients in both ASU settings complained of custody staff delaying their receipt of property to an extent that it exacerbated mental health symptoms.* |
| Psychiatry | *No psychiatrists attended the staff survey.* |

## Patient Interview Themes

CQI evaluators interviewed 41 of patients in every mental health treatment setting at LAC. Nine major themes surfaced throughout the institution.

1.  Patients report needing to report suicidal ideation in order to be seen by mental health staff for routine issues, otherwise their requests to be seen went ignored by custody staff.
2.  Patients and staff report that allowable property is not distributed to segregated patients in a timely manner and that some custody staff use this as a method of exerting control over patients to the extent to which it is negatively impacting the patients' mental health.
3.  Patients in the CCCMS program report that their CDCR-602 Inmate Appeals are not being appropriately directed by custody to the appeals coordinators.
4.  Patients in the ASU EOP program report that staff assault them and then write 115s for assaulting staff or speak to them in belittling and demeaning ways.
5.  ASU EOP Hub patients as well as ML SNY CCCMS patients also reported that custody does not follow the Uniform Heat Index Policy, however a review by Region III custody monitors discovered that there were no Level II Heat Alerts recorded during the reporting period, nevertheless this would be an area that management is encouraged to follow-up on and address in more detail.
6.  STRH patients reported that their mental health care is helpful but would like to have individual PC contacts scheduled in advance, which may improve the frequency of confidential PC contacts.
7.  Patients reported they receive their medications on time and their psychiatrist is helpful, but when their medications expire they are not renewed on time and it takes a long time to be seen by psychiatry.
8.  Patients reported that groups don't always last for the entire scheduled time and that if there is a schedule, it is often not adhered to and groups are frequently cancelled because providers are not available. They requested more groups and longer individual sessions.
9.  Patients reported that custody is often unresponsive to their needs, do not provide radios and orientation manuals as required, and that request for services forms and sick call slips, are not always available to them and their property is not issued in a timely manner.

### Actions to Address Findings

1.  The Chief of Mental health will assign a supervisor to ensure a plan is in place so individual PC initial and routine encounters in the STRH are scheduled in advance and the patients provided advanced notice of when they will be seen by their Primary Clinicians.
2.  The manner in which psychiatrist appointments are managed should be streamlined so that patients are seen in as an efficient manner as possible without undue wait times for either patient or provider. A QIT should be done to determine the average amount of time a psychiatrist spends waiting for patients to arrive and determine if there are steps the programs can take to make this process more efficient, considering the shortage of available staff in this classification and the number of referrals and contacts that are not being seen on time.
3.  The CMH will charter a QIT to investigate responsiveness to referrals for mental health care which shall include custody representatives.

## STAFFING AND ACCESS TO CARE

| Overall Rating: | Improvement Needed |
|---|---|

### Mental Health Program Position Authority

#### LAC Staffing as of November 2016 – Critical Mental Health Program Classifications

| Position | Allocated | Filled | Vacancies | % Filled | Notes |
|---|---|---|---|---|---|
| Chief Psychiatrist | 1 | 1 | 0 | 100% | |
| Psychiatrists | 16 | 5.5 | 12 | 34% | 1.5 positions filled with registry or telepsychiatry. |
| Chief Psychologist | 2 | 1 | 0 | 100% | HQ approval to fill one position |
| Senior Psychologist Supervisor | 8 | 7 | 1 | 88% | |
| Senior Psychologist Specialist | 6 | 5 | 1 | 83% | |
| Psychologist | 50 | 52 | 0 | 104% | |
| Supervising Social Worker | 1 | 1 | 0 | 100% | |
| Clinical Social Worker | 19 | 17 | 2 | 89% | |
| Recreational Therapist | 21 | 8 | 13 | 38% | |
| Office Technician | 22.5 | 16 | 6.5 | 71% | |

### Access to Care

Current statewide standards set minimum timeframes for different types of mental health services, which vary depending on the urgency of a service (e.g., 24 hours for an urgent mental health referral, and five days for a routine referral) and the acuity of the patients (e.g., contact with a PC at least every 90 days for a CCCMS patient, and every seven days for an EOP patient with more severe illness).  Access to care may vary across facilities due to the staffing patterns, physical plant, and other dynamics within individual housing units.

| | MONTHLY MEASURES | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|
| Performance Data | Referral Timeframes | 69% | 71% | 71% | 73% | 70% | 72% |
| | EOP Structured Treatment Offered | 97% | 97% | 95% | 72% | 96% | 95% |
| | Contact Timeframes | 96% | 96% | 99% | 92% | 91% | 93% |
| | Primary Clinician Contact Timeframes | 99% | 99% | 99% | 98% | 98% | 99% |
| | Psychiatrist Contact Timeframes | 89% | 89% | 89% | 78% | 75% | 79% |
| | IDTT Contact Timeframes | 100% | 100% | 100% | 100% | 100% | 100% |
| | ON SITE MEASURES | OCT | | | | | |
| | Patients Reporting Satisfactory Access to Mental Health Services | 29% | | | | | |

- **IDTT Staffing.** Percent of required staff present during IDTT was affected by the lack of psychiatrists in the STRH and CCCMS programs.

- **Effective Communication.** Effective Communication was 97% during the reporting period.

- **Mainline EOP, Facility D.** With the exception of Routine Psychiatric and Medication Non-Compliance Referrals, the ML EOP program on Facility D operated within timelines during the reporting period. The timely completion of Suicide Risk Evaluations averaged 83% during the reporting period.

- **Custody Escorts – Mainline EOP, and STRH.** The provision of Mental Health services was not negatively impacted by a lack of custody escorts.

- **Access to IDTTs in CCCMS.** All IDTTs occurred on time during the reporting period.

- **Access to Care in ASU Compared to Other Programs.** There was no significant access to care issues related to ASU when compared to other program areas.

## Actions to Address Findings

1. The MHPS shall commission a workgroup to develop an action plan to address timely completion of all mental health referrals utilizing current resources.

## Treatment Space

Effective mental health services delivery requires accessible treatment space, including confidential locations for individual therapy sessions, regularly-scheduled treatment groups, and interdisciplinary team case reviews.

| Performance Data | MONTHLY MEASURES | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|
| | Group Treatment in a Confidential Setting | 100% | 100% | 100% | 100% | 100% | 100% |
| | ONSITE MEASURES | OCT | | | | | |
| | Group Treatment Space Meeting Requirements | 100% | | | | | |
| | IDTT Space Meeting Requirements | 100% | | | | | |
| | Individual Treatment Space Meeting Requirements | 100% | | | | | |

California Correctional Health Care Services | Mental Health | LAC

| DIAGNOSIS AND TREATMENT PLANNING | Overall Rating: | Improvement Needed |
|---|---|---|

To establish initial diagnoses for patients and modify diagnoses as the course of mental illness changes, and to develop comprehensive treatment plans with clear and measurable objectives, institutions convene multi-disciplinary teams to review clinical factors and treatment options with patients. There are minimum staffing standards for IDTTs; required preparation for each IDTT, such as intake assessments completed by both a psychologist and psychiatrist; and standards for treatment plan documentation, including required elements for special patient situations, such as interventions for patients who use mental health resources much more frequently than other patients (high utilizers) or often refuse treatment (high refusers).

**Performance Data**

| MONTHLY MEASURES | APR | MAY | JUN | JUL | AUG |
|---|---|---|---|---|---|
| Diagnosis and Treatment Planning Composite (summary of all indicators) | 80% | 82% | 74% | 84% | 86% |
| IDTT Staffing | 68% | 75% | 60% | 67% | 76% |
| Timely IDTTs | 100% | 100% | 100% | 100% | 100% |
| Treatment Plans with Satisfactory Documentation | 91% | 78% | 62% | 78% | 65% |

| ON SITE MEASURES | OCT |
|---|---|
| IDTTs Observed with a Health Record and C-File Available | 100% |
| IDTTs with PC Intake Evaluations Completed Prior to meeting | 90% |
| IDTTS with Psychiatry Intake Evaluations Completed Prior to meeting | 90% |
| IDTTs Meeting All Audit Criteria | 45% |
| IDTTs with Measurable Treatment Goals set | 93% |
| Perception of IDTT | 36% |
| Perception of Individual Treatment | 48% |

| QUARTERLY MEASURES | Q2 2016 | Q3 2016 |
|---|---|---|
| Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers | 58% | 91% |
| Treatment Plans with Satisfactory Documentation | 76% | 66% |

| BI-ANNUAL MEASURES | OCT |
|---|---|
| Treatment Plans with Documented and Implemented Pre-Release Plans | 0% |
| Treatment Plans with Interventions for High Utilizers Tailored to Decrease Risk | 25% |

- **MHCB IDTT/Treatment Planning.** See MHCB Section

- **ASU Treatment Planning.** See ASU/STRH section

- **Patients' Role in Treatment Planning.** Patients were engaged in the discussions of their treatment plans.

- **IDTT - Mainline EOP, Facility D.** Five IDTTs were observed, two IDTTs were completed in absentia, two were initial and three were updates. In attendance were the presenting clinician, the psychiatrist, and a correctional counselor. The program supervisor joined the IDTT late. The team had a brief talk prior to bringing the patient into the room, however it was unclear why the patient could not have participated in that discussion. The treatment team introduced themselves and the purpose of the IDTT was explained in lay terms. Case formulations were not discussed or presented when the patients attended the IDTT but were discussed during cases presented in absentia. Concrete, specific, measurable treatment goals were discussed in each IDTT. For the initial IDTTs, Initial Psychiatry Evaluations CDCR Form 7230G were completed, however the Initial Mental Health Assessments CDCR form 7386 or an update was not. An IDTT Level of Care Decision CDCR form 7388B was reviewed in three of the five IDTTs. Cross-talking among the disciplines had the net effect of making the process appear disjointed and unfocused. The pattern further hindered the complete establishment of communication as patients appeared to have a difficult time tracking the conversation. In addition, questions for the IP appeared with no particular order or rationale and as a result patients disengaged from the IDTT process. The psychiatrist did address medication and side effects but he used jargon and overly sophisticated medical terms. The correctional counselor did not contribute to the majority of case presentations and when he did offer information, it was minimal. The IDTT took place in a confidential room, well ventilated, with sufficient space and seating to accommodate all team members. A conference table was available. The CCI and psychiatrist had laptops available to them. At one point the IDTT was interrupted by the CCI having a telephone conversation.

## Actions to Address Findings

1. The IDTT Leader should ensure that the patient is engaged in the entire treatment team discussion including the presentation of the clinical summary and case formulation.

2. All patients should have a detailed case formulation presented that is clearly related to their history, diagnosis, functional impairment, and treatment plan regardless of if the patient is present or not.

3. The Mental Health Program Subcommittee (MHPS) will establish a work group to develop a plan for local monitoring and oversight of IDTTs to include: appropriateness of the current level of care; documentation of treatment planning decisions; and progress or barriers towards meeting treatment plan goals.

4. The IDTT leader should ensure that meetings start on time and all required members participate, and ensure effective communication.

5. Supervisors shall ensure treatment plans are individualized to the patient's specific issues.

C A L I F O R N I A   C O R R E C T I O N A L   H E A L T H   C A R E   S E R V I C E S   |   M e n t a l   H e a l t h   |   L A C

| GROUP THERAPY | Overall Rating: | Improvement Needed |
|---|---|---|

The Mental Health Services Delivery System offers both individual and group therapy. For patients at the EOP level of care, group therapy is a major component of the requirement for a minimum of 10 hours of structured treatment weekly. Because patients in restricted housing are at higher risk of suicidality, patients in STRH are also provided with access to groups.

| Performance Data | MONTHLY MEASURES | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|
| | Group Treatment in a Confidential Setting | 100% | 100% | 100% | 100% | 100% | 100% |
| | ON SITE MEASURES | OCT | | | | | |
| | Groups Started On-time and Attempts Made to Engage All Participants | 75% | | | | | |
| | Groups where Leader Related Content to Treatment Issues | 75% | | | | | |
| | Perception of Group Benefits | 59% | | | | | |

- **Mainline EOP, Facility D.** Groups frequently did not last for the full scheduled time. Additionally, the facilitator observed engaged in complex language and jargon in a group targeted for the chronically mentally ill. There appeared to be miscommunication between custody staff and mental health clinician about when groups start and stop and the role that custody officers play in managing this. Lastly, a staff member did not respond adequately when a patient alluded to suicidal ideation during the course of a group.

- **STRH.** See ASU/STRH section.

- **ASU EOP, Facility D.** See ASU/STRH section.

## Actions to Address Findings

1. Custody and Mental Health Supervisors should discuss the role of custody escort staff and group facilitators so that groups are starting and ending at the appropriate times to ensure the two disciplines work more efficiently.

C a l i f o r n i a   C o r r e c t i o n a l   H e a l t h   C a r e   S e r v i c e s  |  M e n t a l   H e a l t h  |  L A C

# MEDICATION MANAGEMENT

**Overall Rating:** Improvement Needed

Institutions statewide monitor timely access to mental health medications through monthly Medication Administration Process Improvement Program (MAPIP) audits, which measure whether patients are receiving medications in accordance with timeframes in policy across a variety of treatment programs, such as during transfers from one institution to another or one housing unit to another and upon returning from a MHCB or DSH Program. MAPIP also looks at medication non-adherence counseling for different groups, including immediate intervention when patients refuse high-risk mental health medications, like Clozaril. Lastly, the Mental Health Program verifies that psychiatrists are monitoring medication side effects per statewide guidelines through a series of performance metrics reported monthly on the Health Care Services Dashboard (Diagnostic Monitoring).

| | MEDICATION MANAGEMENT MEASURES | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|
| **Performance Data** | Medication Continuity-Transfer | 88% | 91% | 76% | 74% | 79% | 82% |
| | M5: NA/DOT/KOP Meds Inter-Institutional | 95% | 95% | 95% | 90% | 90% | 60% |
| | M6: NA/DOT Meds Intra-Institutional | 88% | 86% | 44% | 60% | 79% | 92% |
| | M7: Mental Health Crisis Bed Transfers | 73% | 88% | 69% | 64% | 88% | 71% |
| | M8: ASU/SHU/PSU Inter-Institutional | 93% | 87% | 74% | 73% | 49% | 85% |
| | M9: Discharge from Community Hosp/DSH | 94% | 100% | 100% | 82% | 88% | 100% |
| | Medication Non-Adherence Counseling | 93% | 78% | 81% | 76% | 83% | 75% |
| | M11: Non-Adherence MH Prescribed | 87% | 55% | 62% | 52% | 65% | 50% |
| | M12: Non-Adherence PC2602 Meds | 100% | 100% | 100% | 100% | 100% | 100% |
| | M14: Non-Adherence Insulin/HIV/Clozaril | N/A | N/A | N/A | N/A | N/A | N/A |
| | Medication Administration | 96% | 98% | 93% | 100% | 99% | 94% |
| | M22: New Outpatient Orders-Psychiatrist | 100% | 97% | 86% | 100% | 97% | 88% |
| | M23: New Outpatient Orders-Medical | 93% | 100% | 100% | 100% | 100% | 100% |
| | **DIAGNOSTIC MONITORING MEASURES** | APR | MAY | JUN | JUL | AUG | SEP |
| | Diagnostic Monitoring | 77% | 79% | 81% | 78% | 85% | 88% |

## Actions to Address Findings

1. The Chief Psychiatrist should ensure that Diagnostic Monitoring for patients on High Risk Psychiatry medications is occurring timely, by more closely monitoring the process around which these reviews are being scheduled and completed.

2. The CNE should form a QIT to address Medication Continuity-Transfer. Primary Clinicians should be used to address medication non-adherence counseling consultations when clinically appropriate and should consider making this a focus on the patient's treatment plans in order to work collaboratively with the patient's psychiatrist so medications can be discontinued when the patient is not consistently taking them and when mental health symptoms do not appear to warrant the need for ongoing medication.

| SUICIDE PREVENTION | Overall Rating: | Proficient |
|---|---|---|

Among other standards, the CQIT assesses elements relative to Suicide Prevention, including a review of Suicide Risk Evaluation (SRE) timeliness and quality, suicide prevention training requirements for custody and health care staff, and completion of daily follow-ups for MHCB discharges.

| | MONTHLY MEASURES | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|
| Performance Data | 5-Day Follow Up After MHCB/DSH Admission | 94% | 98% | 98% | 98% | 97% | 93% |
| | SRE Mentor Program Completion | 91% | 91% | 90% | 90% | 90% | 85% |
| | SREs Completed Within Required Timeframes | 97% | 96% | 94% | 93% | 95% | 85% |
| | QUARTERLY MEASURES | Q2 2016 | Q3 2016 | | | | |
| | Psych Tech Rounds Completed According to PG Requirements | 100% | 100% | | | | |
| | SREs Meeting All Audit Criteria | 84% | 83% | | | | |
| | Five Day Follow Up with Documentation of Current Suicidality | 9% | 78% | | | | |
| | ON SITE MEASURES | OCT | | | | | |
| | Hours Custody MHCB Discharge Checks Completed as Required | 91% | | | | | |
| | Custody Officers with CPR Training | 100% | | | | | |
| | Custody Officers with Suicide Prevention Training | 100% | | | | | |
| | Mental Health Staff with Suicide Prevention Training | 94% | | | | | |

- **Five-Day Follow-Ups.** The documentation of current suicidality increased from 78% to 100% between Quarters 3 and 4 of 2016. Quality of five-Day Follow-Ups improved from 9% to 78% as a result of a new process where follow-ups are reviewed by clinical staff for completion and quality each working day.

- **Custody Discharge Checks.** Fifteen Custody MHCB discharge follow-ups were reviewed for the prior quarter. The audit showed 654 of the required 720 thirty-minute checks documented for the first 24 hours.

- **Psych Tech Round Completion.** PT rounding in the ASU EOP Hub should consistently involve the use of the Guard One system for each patient encounter. The system was not observed in use as required for each patient encounter. Otherwise, the PT rounds were exceptional in terms of patient assessment and overall engagement with each patient. PT rounding in the STRH met audit criteria.

### Actions to Address Findings

1. Continue with audits of Five-Day Follow Ups, to ensure the quality of documentation continues to improve.

C a l i f o r n i a   C o r r e c t i o n a l   H e a l t h   C a r e   S e r v i c e s   |   M e n t a l   H e a l t h   |   L A C

| CUSTODY HOUSING UNIT AUDITS | Overall Rating: | Proficient |

During CQIT assessments, evaluators review several areas to ensure that custody staff has been trained and have the appropriate equipment at hand to respond to suicide attempts and help inmates access mental health services. Because many psychotropic medications may disrupt patients' ability to regulate body temperature and patients can become ill if subjected to higher temperatures, the custody building audit also includes thermometer readings and heat log documentation.

| Performance Data | LOCATION | Cut-Down Kit | CPR Mouth Shields | Form 128-MH5 | Thermo meter | Heat Logs Current |
|---|---|---|---|---|---|---|
| | Mainline EOP, Facility C/D | 100% | 93% | 87% | 100% | 100% |
| | Mainline CCCMS | 100% | 96% | 79% | 100% | 93% |

**MHCB.** See MHCB section.

**STRH.** See ASU/STRH section.

**ASU EOP Hub.** *See ASU/STRH section.*

**Mainline CCCMS Yards A/B/C/D**

- **Cut Down Kit.** Eleven mainline CCCMS housing units on Facilities A, B, C, and D were audited for an approved cut down kit and inventory. All buildings have complete cut down kits accessible, however a daily inventory was not being completed in all housing units. Cut down kits are located in the units control booths in a box with a clear Plexiglas front secured with a security tag. Staff in some housing units were only inventorying that the tag was intact while others stated they could not inventory all items because they could not see all the pieces. Some staff stated; "as long as the tag was intact all pieces should be there." Per policy a daily inventory will be conducted. The audit revealed 26 of the 27 Custody Staff observed had their CPR mouth shields on their person.

- **Heat Plan.** All the mainline CCCMS units were audited about the Institutional Heat Plan. All the housing units had a working thermometer located in an area which gives an accurate reading of the temperature. Heat logs were current and Custody staff was documenting the highest reading. Staff informed us that during times when temperatures rose above 90 degrees outside and Stage One of the Heat Plan was activated, inmates prescribed heat-risk medication were returned to their housing units and allowed access to dayroom activities as an alternative to yard. The Daily Activity Reports (DAR) was reviewed for each facility and no entries of alternative activities were noted. Policy requires that when reasonable accommodations are provided to inmates due to heat alerts, those accommodations provided shall be memorialized in the institution's Daily Activity Report.

- **Mental Health Referrals.** Custody staff in the mainline CCCMS units were given scenarios which would require a mental health referral (Form 128-MH5) be made. Of the 19 Mainline CCCMS Custody staff questioned throughout the housing units, 16 were aware of their responsibility to complete a CDCR Form 128-MH5 when inmates exhibit signs of mental illness. The Mental Health Referral forms were not always readily available in the housing units. Building A5, buildings B1 thru B4 and building D4 did not have referral forms. The Facility B Captain was made aware of the missing forms in the housing units before we departed the yard.

**Mainline EOP Units C5-D1 thru D3**

- **Cut Down Kit.** Four mainline Enhanced Outpatient Program (EOP) housing units on Facilities C and D were audited for an approved cut down kit and inventory. All buildings have complete cut

down kits accessible, however a daily inventory was not being completed in all housing units. Cut down kits are located in the units control booths in a box with a clear Plexiglas front secured with a security tag. The audit team found that not all of the four units where inventorying the cut down kit on a daily basis. The same issue with the security tag was addressed. Per policy a daily inventory will be conducted.

Fifteen custody staff members were audited and had their CPR mouth shields.

- **Heat Plan.** All Mainline EOP units were audited about the Institutional Heat Plan. All had a working thermometer in the unit located in an area that gave an accurate reading of the temperature. Heat logs were current and custody staff was documenting the highest reading. Staff informed us that during times when temperatures rose above 90 degrees outside and Uniform Heat Trigger was activated, inmates identified as heat risk were offered dayroom when they returned from yard; however, this was not logged on the Facility Daily Activity Report.

- **Mental Health Referrals.** Custody Staff in the mainline EOP units were given scenarios which would justify a CDCR 128-MH5 being generated. Of the 15 Mainline EOP Custody Staff questioned throughout the housing units, 13 were aware of their responsibility to complete a CDCR Form 128-MH5 when inmates exhibit signs of mental illness. The Mental Health Forms were readily available in the units with the approved version date of 05/14 with the exception of C5 which did not have the form available. The Facility C Lieutenant was made aware of the missing forms and stated he would have them delivered immediately.

# MENTAL HEALTH CRISIS BED

| Overall Rating: | Improvement Needed |
|---|---|

In institutions that maintain inpatient beds for short-term mental health crisis treatment, the CQIT assessment considers adherence to program standards in a number of areas, including lengths of stay, services and supplies for patients under observation, cleanliness, nursing rounds, and use of clinical and mechanical restraints. The CQIT also looks at the rate at which inmates are readmitted to the MHCB within 30 days of a prior stay as a quality indicator.

**Performance Data**

| MONTHLY MEASURES | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|
| Discharges from MHCB with Clinician Review of D/C Summary | 0% | 50% | 50% | N/A* | N/A* | 0% |
| MHCB 30-Day not Readmitted | 87% | 71% | 88% | 85% | 79% | 83% |

| CUSTODY AUDITS | Cut-Down Kit | CPR Mouth Shields | Form 128-MH5 | Thermometer | Heat Logs Current |
|---|---|---|---|---|---|
| MHCB | 100% | 100% | 100% | 100% | 100% |

- **Psychiatry Coverage.** Psychiatry indicators were all within the expected ranges for timeliness and IDTT attendance.

- **Lengths of Stay.** Eighty-four percent of MHCB clinical stays were ten days or less during the reporting period. Cases of more than 10 days were largely due to patients who had been referred to DSH and who were waiting for bed placement.

- **Limited Issue State Bedding and Clothing.** There was only one patient on limited issue during this observation. That patient was on suicide watch and had just been moved into the MHCB from Alternative Housing that day so consequently, there was no documentation in the eUHR justifying the limited issue.

- **Nursing Rounds.** Nursing 15-minute check forms were on the door and were staggered per policy in the MHCB.

- **Readmission Rates.** The 30-day readmission rate was 76% during the reporting period.

- **Janitorial Support.** The MHCB at LAC utilizes PIA for regular janitorial services. Cells were clean, and cleaning logs were up-to-date in both the MHCB and in Alternative Housing Cells.

- **Clinical Restraints Procedures/Safety Cell Use.** The restraint log was present in the nursing station and was reviewed. Between July 1, 2016 and September 30, 2016 there were no restraint incidents. Restraint checklists were present in the binder and ready for use if necessary.

- **IDTT.** The IDTT began on time and was held in a room with adequate seating. The correctional counselor and clinical team accessed pertinent custodial and mental health information throughout the IDTTs. Five MHCB IDTTs were observed, one of which was an initial. Two were discharge IDTTs to lower levels of care and three were Acute Psychiatric Program (APP) referrals, one of which was initiated at that day's IDTT. The IDTTs overall were well run, had a strong cohesive team quality to it, and included discussion of measurable goals, privileges, level of care considerations, and level of observation. Psychiatry appropriately covered target symptoms and side effects. The correctional counselor was engaged and discussed endorsement, case factors, RVRs, and encouraged program participation. Safety plans and discharge planning were discussed with each patient. Progress on treatment goals was discussed during each follow up IDTT. For the Initial IDTT, the Treatment Plan and

IDTT Level of Care Decision forms were not completed prior to IDTT. Clothing and restraint status for non-ASU patients corresponded to level of observation. Non-ASU patients on full issue were appropriately dressed in blues, sat outside the treatment module, and were not cuffed. However for ASU status patients, mechanical restraints but not clothing issue, corresponded to level of observation. ASU status patients appropriately had mechanical restraints removed in the treatment module, yet were dressed in white cottons. Although the program supervisor has ordered jumpsuits three times for full issue for ASU patients, to date the jumpsuits have not been delivered. Patients were equal participants of the IDTT team process and several self-disclosed significant feedback to the treatment team. One stated "mental health saved my life" and another "I have never been treated before, like I am being treated here." During the IDTTs, there was a concerted effort to have seamless wrap-around treatment planning by incorporating DSH treatment goals from patients who had been to DSH and by recommending treatment goals for patients discharging to lower levels of care. Overall LAC has a good IDTT process, characterized by collaborative treatment planning.

**Custody MHCB Review:**

- **Escorts.** The Custody Audit Team observed inmate-patients not on MAX custody status being escorted without mechanical restraints. At the time of this audit there were no General Population inmate-patients housed in the MHCB with a 128B Mechanical Restraint Chrono. The Custody Audit Team also observed that General Population inmates were given access to phone calls and noted no concerns related to the use of therapeutic treatment modules during IDTT.

- **Cut Down Kit.** The MHCB cut down kit was complete and the inventory was conducted per policy and procedures. One Custody Staff member was audited for having their CPR mouth shield which was on their person.

- **Heat Plan.** The MHCB had a working thermometer located in the hallway of the MHCB which was deemed an accurate location and the temperature was being logged accurately by Custody Staff.

- **Mental Health Referrals.** Custody staff was given scenarios which would justify a CDCR 128-MH5 being generated. The MHCB Custody staff was aware of their responsibility to complete a CDCR Form 128-MH5 when inmates exhibit signs of mental illness. The Mental Health Forms were readily available in the unit and had the current revision date of 05/14.

## Actions to Address Findings

1. Adherence to clinical review of Discharge Summaries within timeframe should be added as a standing agenda item to the monthly MHPS meeting.

2. IDTT discussions should include more discussion of clinical formulations, especially discussing more detailed history both in prison and out in the community related to suicide, for patients admitted for a suicide attempt.

## ALTERNATIVE HOUSING

**Overall Rating:**    Improvement Needed

Institution alternative housing is intended to provide inmates in mental health crisis with brief housing while awaiting MHCB placement, which requires coordination with the Health Care Placement Oversight Program (HCPOP) that handles medical and mental health patient movement statewide. The Statewide Mental Health Program has issued direction to all institutions about the hierarchy of locations that may be used for Alternative Housing (ATH), and institutions are required to follow that priority order when housing patients. Because Alternative Housing locations are not designed to provide the full range of equipment and staff support necessary to protect patients at high risk of self-harm or decompensation, patients shall not be housed in Alternative Housing for more than 24 hours. Evaluation of the patient's mental health condition continues during the patient's stay in Alternative Housing; if a patient's condition improves or is clarified to the extent that a crisis bed is no longer appropriate, the patient's referral to a MHCB can be rescinded.

| Performance Data | MONTHLY MEASURES | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|
| | Timely MHCB Transfers | 74% | 30% | 20% | 0% | 24% | 27% |

- **Usage.** Alternative Housing cells were used in a manner consistent with statewide policy.

- **Lengths of Stay.** The timely transfers of patients in Alternative Housing cells was 35% during the reporting period, primarily due to availability of inpatient beds.

- **Patient Observation.** At the time of this observation, two patients were on direct continuous 1:1 observation in Alternative Housing. The patient had been placed in the C Visiting dry holding cell, and had appropriate safety issue. The observer maintained direct continuous 1:1 observation. The patient placed in D5 127 Alternative Housing was placed in a cell not consistent with LAC's Alternative Housing policy. Additionally, the health care worker observing the patient in D5 cell 127, was sitting facing the cell window in a low chair, which did not allow her to maintain direct observation of the patient, who was lying down at the time. The patient in D5 had appropriate safety Issue in his Alternative Housing cell, however he was dressed in his whites and was refusing to relinquish his cotton clothing. The lead Alternative Housing clinician reported that due to recent assaults and the patient's agitated clinical presentation, it was determined not to be in the best interests of either the patient or staff, to initiate a cell extraction in order to obtain his cotton clothing. An order was written to allow the patient to keep his cottons while in Alternative Housing, unless the patient became harmful to himself or others, and the rationale for this order was documented in a 7230A.

- **Housing Policy.** LAC's LOP #23 (Housing of Inmate-Patients Pending Mental Health Crisis Bed Transfer) reviewed at the Mental Health Program Subcommittee on 10/18/16, identifies the following preferred housing locations for Alternative Housing, stating that placement into these cells is based on their housing and custody factors: small holding cells in the A/B and C/D Complexes (wet cells), large holding cells in the A/B and C/D Complexes during non-business hours (wet cells), ASU1 wet holding tank, ASU1 any cell except A Pod, Facility D Building 5 lower tier except cells 122 through 128, wet holding tanks in Central Health
(non-business hours only), and Facilities A, B, C and D Visiting dry holding tanks.

Several building related issues arose during the observation of Alternative Housing cells. The cells located in A/B Complexes and C/D Complexes, are physically located in buildings identified as A and B yard Primary Care Clinic Clinics and C and D yard Primary Care Clinics. This is confusing to those not familiar with the institution. Also, the wet holding tanks located in Central Health Care are not currently operational due to construction. Finally, ASU cells with the exception of the one wet holding tank, contain lights with switches located on the inside of the cell. At night if a patient refused to turn on his light, the correctional officer is required to continuously shine a flash light into the cell to maintain direct observation.

Alternative Housing cells observed were generally clean and free of debris, with the exception of Facility B & D Visiting dry holding tanks. Cleaning logs were available for only the small and large holding cells in the A/B and C/D Complexes (wet cells). These logs were posted and the documentation was current.

## Actions to Address Findings

1. All cells identified in the Alternative Housing Policy should be listed in a manner consistent with the way they are identified within the institution so as to avoid confusion by anyone reading or attempting to adhere to the policy.

2. Institution leadership will commission a team to develop an improvement plan for oversight to ensure only cells identified in the institution's policy on Alternative Housing will be used for that purpose.

| DEPARTMENT OF STATE HOSPITAL REFERRALS AND DISCHARGES | Overall Rating: | Improvement Needed |
|---|---|---|

Patients requiring longer term inpatient care are referred to Department of State Hospitals (DSH). Acute referrals must be submitted to CDCR Headquarters on the same day of the referral and ICF referrals must be submitted within three business days. Consideration for referral to higher level of care is documented at every IDTT on a form 7388B; quality of 7388B documentation is reviewed by the regional team.

| Performance Data | QUARTERLY MEASURES | Q2 2016 | Q3 2016 |
|---|---|---|---|
| | DSH Discharge with Clinician-to-Clinician Contact within 5 days | 100% | 0%* |

*No audits conducted

- **ICF Referrals.** During the reporting period from July through September, 2016, 34 referrals were initiated at LAC; 19 to APP and 15 to ICF. Per the referral log, 20 were referred from the MHCB and 14 from EOP. All 34 referrals were submitted to HQ within timeframes. One referral was rescinded, LAC developed a thorough behavior plan that assisted in stabilizing the patient. There were a total of seven due process hearings, with no patient prevailing on the hearings during the quarter. Based upon this data, it appears that overall the referral process is adequate.

  During the reporting period from July through September 2016, there were a total of 232 7388Bs with positive considerations for referrals to a higher level of care but were not referred (72 for July, 80 for August, and 80 for September).

- **Non-Referral Documentation.** For the third quarter of 2016, eight patients were selected randomly from the non-referral log using a random numbers generator. The 7388Bs were compared to clinical documentation during the month prior to the IDTT to determine the level of consistency between the 7388B and clinical documentation. All of the eight 7388Bs were found to be consistent with the clinical documentation present in the health record.

- **Documentation Quality.** The HQ Sustainability Process Review is a random sample of 7388Bs generated from various sources at HQ. The accuracy of objective considerations and qualitative assessment of the narrative reports is performed by the DSH Coordinator (DSHC) at the institution. This analysis is repeated at HQ.

  The Sustainable Process Data review from HQ for the fourth quarter resulted in 80%. For Q4, a total of 91 randomly selected 7388Bs were reviewed. LAC found 75 (82%) had good responses while HQ identified 73 (80%) to have good responses. For 73 of the 91 documents reviewed, the quality and the justifications for not referring was acceptable. In addition, the interventions provided in lieu of the referral, was also deemed to be good. The reasons for the unacceptable 7388Bs had overall themes. The themes varied from not fully completing the 7388B, not indicating appropriate housing or type of IDTT, to not specifically addressing the indicator, insufficient treatment interventions, and the narrative not supporting the rationale for non-referral. Nonetheless, only four discrepant analyses were identified between the HQ and the institution review. LAC is currently in the process of providing follow-up response to the HQ review, whereby they will revise the 7388Bs to specifically address indicators, interventions, and justifications as well as ensure the forms are completed in their entirety.

  As the percentage of good responses is at 80% and is below the 85% threshold, LAC will have to complete a HQ review for every sustainable audit (minor and major) until the 85% threshold is met. Poorly completed

forms was by far the largest driver of the observed, as only four cases were due to discrepant analyses between HQ and the institution.

An internal log of DSH returnees is maintained by the DSH Coordinator. Although it is not required it is a best practice as it ensures that all required aspects of clinical care follow-up are adhered to and are being tracked.

## Actions to Address Findings

1. There was no audit data for the documentation of clinician-to-clinician contact reviews. It was not determined if these were not completed because there were no new arrivals from DSH during Q3 or if the audits were not conducted. The CMH shall ensure supervisory staff review the data for this and all time periods and ensure audits are conducted when required.

California Correctional Health Care Services | Mental Health | LAC

| ADMINISTRATIVE SEGREGATION UNIT & SHORT TERM RESTRICTED HOUSING | Overall Rating: | Proficient |
|---|---|---|

Statewide data on inmate suicide deaths has shown that the risk of suicide and suicide attempts is increased when inmates are housed in segregated housing. For this reason, institutions take special precautions to provide inmates with additional support while held in these settings. The CQIT assessment confirms that institutions conduct pre-screenings to identify potential mental health issues before an inmate is moved to restricted housing, screen for mental health needs within 72 hours of placement, meet each morning to discuss inmates and individual factors that may place them at elevated risk for mental health crisis, provide inmates with 10 hours of yard time and 3 showers per week, and monitor inmates via Guard One. The CQIT also monitors whether inmates housed in restricted housing for non-disciplinary reasons are moved out of restricted housing within 72 hours.

| | ON SITE MEASURES | OCT |
|---|---|---|
| **Performance Data** | ASU Intake Inmates Appropriately Housed | 100% |
| | ASU EOP Out of Cell Time Offered | 83% |
| | ASU, STRH, Morning meetings Meeting All Audit Criteria | 100% |
| | Weeks in which Shower Access in ASU was Offered | 100% |
| | ICCs with MH Clinician Presence and Relevant Information Provided | 90% |
| | STRH Out of Cell Time Offered | 100% |
| | Weeks in which Shower Access in STRH was offered | 100% |

| CUSTODY AUDITS | | | | | |
|---|---|---|---|---|---|
| LOCATION | Cut-Down Kit | CPR Mouth Shields | Form 128-MH5 | Thermometers | Heat Logs Current |
| STRH | 100% | 100% | 100% | 100% | 100% |
| ASU EOP HUB | 100% | 100% | 100% | 100% | 100% |

## STRH

- **Morning meeting.** The morning meeting started on time and all required personnel were present including the program sergeant (relief), clinician, psych tech, and program supervisor. The morning meeting discussed all required areas including new arrivals, high risk patients, DD patients, behavioral issues or concerns, hunger strikes, and accommodations. The discussion was collaborative. Documentation for the review period 4/3/16 – 10/3/16 was audited. The morning meeting was documented to have occurred on 162 of 184 days.

- **Treatment Space.** The Custody Audit Team reported the Treatment Modules within the STRH unit were situated in a semi-circle and appeared to be clean of and in good condition. The treatment modules meet PIA approval standards with a sufficient number of treatment modules/security desks for providing appropriate inmate treatment.

- **Welfare Checks.** The Custody Audit Team reviewed the Guard1 summaries for each designated shift, for the period September 18, 2016 through October 17, 2016. Of the 90 reports requested, 80 (89%) were signed by a Custody Supervisor indicating the welfare rounds were reviewed for discrepancies at the end of each shift. The audit found 9 reports printed late with 8 of the 9 being for First Watch.

- **Yard and Shower Time.** The Custody Audit Team reviewed 20 STRH 114-A's for documentation specific to offerings of yard and showers. The audit encompassed the weeks of September 19, 2016 through October 16, 2016, which is equivalent to 80 weeks of review. Of the 80 weeks reviewed, all 80 had the proper documentation of the inmates being offered the required 18.5 hours of yard time per week. The

audit of the allotted three showers per week revealed that out of the 80 weeks audited, all 80 weeks had documentation of the inmates being offered showers at least three times per week.

- **Entertainment Appliances.** The STRH is equipped with electricity and allows inmates to possess personal entertainment appliances. During the audit the custody team observed inmate-patients on 21-day intake status, were all in possession of the Hand Crank Loaner Radio. One intake status inmate-patient did not have a radio due to him receiving a bed move that morning. The inmate had left the radio in his prior cell. This was brought to the sergeant's attention and inmate was provided a radio prior to the audit team leaving the unit. A tour of the housing unit revealed multiple inmates were in possession of their personal entertainment appliances.

- **Intake Status.** During the Custody Audit there were 15 inmates-patients on 21-day intake status. All 15 inmates-patients had the "Intake" identifying placard on their cell doors. The Team also identified two inmates housed in the STRH within the initial 72 hours who were housed in a retrofitted cell or double-celled.

- **ICC Timelines.** The Custody Audit Team reviewed 20 random selected 114 files. Of the files reviewed, all 114-A's had documentation indicating the inmates were seen by the Institutional Classification Committee (ICC) within 10 working days of placement in the STRH unit.

- **Non-Disciplinary Segregation (NDS)/Transfer Timelines.** There were six inmate-patients on Non-NDS during our review. There was no NDS tracking system in place for tracking inmate privileges (phone calls, property). This was brought to the Captain's attention. They are working on implementing a system to correct this.

- **Heat Alert.** There were no heat alert activations during the reporting period.

- **IDTT.** IDTT began as scheduled in STRH. Four IDTTs were observed, three follow-ups and one initial, and three were done in absentia. The IDTT was attended by the treating PC, psychiatrist, CCI, PT, and senior supervisor. The case presentations focused on relevant and detailed information, including demographics, recent stressors, mental status, mental health, and criminal history. The overall interactions focused on treatment planning and all team members interacted spontaneously. The CCI provided information and clarification as needed. Psychiatry discussed medications and their side effects. For each IDTT the treatment goals and progress towards treatment plans were discussed. Rule violation reports were discussed in every IDTT. While the potential for a higher level of care was discussed specific indicators on the 7388B need to be addressed individually and the overall appropriateness of the current level of care justified. The 7386 was completed for the initial IDTT, the 7230G was not.

  The IDTT took place in a confidential room, well ventilated, with sufficient space to accommodate all team members. A conference table was available where clinicians, supervisor and psychiatrist had access to a computer. The space was free of distracting noises or interruptions.

- **Group Therapy.** The group facilitator did a good job engaging the patients in a clinically meaningful manner, allowing them to discuss and process the group topics and their issues in a supportive manner with both the group facilitator and their peers.

- **ICC.** Eight ICCs in STRH were observed, five were at the CCCMS LOC with one completed in absentia. The ICC started late because all required members were not present at the scheduled start time. Computer access was available to all team members, making Health Records and Custodial information accessible during each ICC. There was a MH clinician present, and while she provided information about each patient, it was done in a piecemeal fashion and did not appear to have been prepared in advance, which while eventually covering all the required areas, with the exception of addressing the potential risk of decompensation. The Warden was attentive and attuned to the mental health information provided and engaged the patient meaningfully based in part on feedback provided from mental health.

During the absentia presentation, the chair requested the patient be seen by mental health; since his refusal to attend ICC was both out of character for him and he had no known support system. The committee chair continuously elicited feedback from the mental health clinician and incorporated relevant feedback into the committee process. The clinician assessed for suicidality and inquired if the patient knew how to access MH services or if they had any mental health concerns. The committee members ensured that the patient was able to both ask questions as well as have questions answered. Throughout the ICCs there were multiple interruptions that included individuals walking in and out, side conversations, and the use of the telephone and the microwave.

- **PT Rounds.** A PT was observed during her rounds at STRH. She was able to easily establish rapport with patients and was open and receptive to engaging in a spontaneous dialogue with them. She asked about sleep, appetite, program participation, and suicidal and homicidal ideation in every case. She had with her a clipboard with the correct version of the rounds form, as well as several inmate self-referrals and crossword puzzles. She asked each patient if he wanted either a puzzle or a self-referral and she provided these to each patient who requested them. There was one patient who endorsed feelings of anxiety and reported having had recent panic attacks. The PT appropriately and skillfully inquired more deeply about SI, which the patient denied. The PT then told the patient she would consult with his clinician and complete a mental health referral. She immediately documented after each contact. She used the Guard One system and used a flashlight when needed.

- **Individual Treatment Space.** Individual contacts are offered in confidential settings in the STRH, however, because appointments are not scheduled in advance, and because patients refuse confidential encounters, 40% of individual PC contacts occurred at cell front during the reporting period.

## EOP HUB

- **NDS Timely Transfers.** The Custody Audit Team audited the EOP Hub unit for the NDS inmate procedures. The team determined there were 19 patients on NDS during our review. A tracking system is in place for inmates-patients on NDS status and their privileges (phone calls, property).

- **PT Rounds.** While the PT in the ASU EOP assessed each patient thoroughly, engaged each patient fully, and documented on each patient timely. He established rapport and talked at length to most patients who wished to speak with him and he also submitted medical and mental health referrals appropriately. Although the PT reported using the Guard One system, this was not observed.

- **ICC Observation.** ASU EOP ICC started late and was disorganized in that a required approved Spanish Language translator had not been secured in advance and the delay interfered with the smooth running of the committee. In addition, some required attendees were late. The MH clinician provided relevant and pertinent MH information and adequately discussed the potential for decompensation. The ICC clearly incorporated feedback from MH in every case and Effective Communication was established in every appropriate case observed. The ICC interacted well with the patient, dialoguing with each patient about their program and transfer issues, and allowed patients to ask questions. Victimization concerns for patients were also discussed in every case observed.

- **Timeliness of ICC.** Of the 20 114-A's reviewed, all had documentation indicating the patients were seen by Institution Classification Committee (ICC) within 10 calendar days of placement.

- **ASU IDTT.** Five IDTTs were observed. There were four follow-up IDTTs and one initial. All IDTTs started on time with required attendees present. Computers were available and used to access the health care record and custodial records. In all cases, the clinician ensured that the patient understood the purpose of the IDTT. In the one initial case, the program supervisor ensured that the treatment plan was completed prior to the initial IDTT and ensured that it was available and although the primary psychiatrist reported having completed the 7230G prior to the initial IDTT, it was not in the clinical records and was not available

at the IDTT. In only one of the cases did it appear that the patient's mental health condition impacted his ability to understand the proceedings and in one other case, the patient's ability to understand the proceedings was impacted by a low Test of Adult Basic Education (TABE) score. In both cases, the clinician ensured that Effective Communication was established. In all five cases, the clinician provided a brief clinical summary but did not appropriately provide a relevant case formulation and the patient's diagnosis was only discussed in one of the five IDTTs. In four of the five cases, the assigned psychiatrist provided information regarding diagnosis, medications to address diagnosis, and relevant side effects. The correctional counselor was engaged in the discussion, was knowledgeable, and provided relevant information.

The IDTT leader facilitated a team discussion by attempting to engage all participants and although very PC driven, the IDTT involved an interactive discussion of all staff about the treatment plan. The PT and psychiatrist did not participate in one of the IDTTs. Although not a required attendee, the officer in attendance was an active participant and provided meaningful information. Patients were spoken 'to' rather than 'about' them in language at their level. Measurable treatment goals were discussed but could have been more specific.

None of the five patients met criteria for a higher level of care. In only one case did a clinician discuss the criteria for higher level of care. Progress towards treatment goals were discussed in all four of the IDTT follow-ups. In two of the five cases, the patients were treatment resistant in the form of poor medication adherence and in both of those cases, the clinician and the psychiatrist did a good job of incorporating this resistance into the treatment plan. In one of the two cases, the psychiatrist educated the patient on PC2602 criteria and briefly assessed to determine if relevant criteria were met. While none of the five patients were actively suicidal, two patients had recent suicidal ideation and as such, the safety plans were adequately addressed in the IDTT.

During the reporting period the ASU EOP hub completed both initial and follow-up IDTTs within program guide timelines at 100% for both non-modified program patients and modified program. Observation indicated that 100% of the required staffing was present for all five IDTTs during this visit.

- **Group Therapy.** The facilitator engaged patients in the group process. The efficacy of the group could be improved by ensuring that all patients are engaged with each other on the group topic and modeling coping skills to address issues that surface during the course of the group.

- **Treatment Space.** The Custody Audit Team reported the Treatment Modules are located within the EOP treatment building. They were observed to be situated in a semi-circle, and appeared to be clean and in good condition. The Treatment Modules meet PIA approval standards with a sufficient number of treatment modules/security desks for providing appropriate treatment to inmates.

- **Welfare Checks.** The Custody Audit Team reviewed the Guard One summaries for each designated shift, covering the time period of September 18, 2016 through October 17, 2016. Of the 90 reports reviewed, 77 were signed by a Custody Supervisor indicating the rounds were reviewed for discrepancies at the end of each shift. The overall score in ASU is 86%.

- **Intake Status**. Eighteen inmates were on 21-day initial intake status and all had an "intake" placard on their cell doors. The Custody Audit Team also identified four inmates in the EOP Hub within the initial 72 hours housed in a retrofitted cell or double celled.

- **Yard and Shower Time.** The Custody Audit Team reviewed 20 CDC Form 114-A, Inmate Segregation Records (114-A) for yard and showers times. The audit covered September 19, 2016 through October 16, 2016, which is equivalent to 80 weeks of review. Of the 80 weeks reviewed, 66 (83%) had the proper documentation of the inmates being offered the required 10 hours of yard time per week. The audit of the allotted three showers per week revealed that out of the 80 weeks audited, all 80 weeks had documentation of the inmates being offered showers at least three times per week.

- **Entertainment Appliances.** The EOP Hub at LAC is equipped with electricity and allows inmates to possess personal entertainment appliances. During the audit of inmates on the initial 21-day intake status, all 18 were in possession of entertainment appliance/the Hand Crank Loaner Radio.

- **NDS/Transfer Timelines.** The Custody Audit Team audited the EOP Hub unit for with the NDS inmate procedures. The Custody Audit Team determined there were 19 inmate-patients on NDS during our review. A tracking system is in place for inmates-patients on NDS status and their privileges (phone calls, property).

- **Cut Down Kit.** The ASU was audited for with the approved cut down kit and inventory. The unit was found to be in this area and the cut down kit was being inventoried appropriately.

  All 10 Custody Staff observed in D5 were in possession of their CPR mouth shields on their person.

- **Heat Plan.** D5 was audited about the Institutional Heat Plan requirements. The unit has a working thermometer located in an area which gives an accurate reading of the temperature. Heat logs were current and staff is documenting the highest reading.

- **Mental Health Referrals.** Custody Staff in D5 was given scenarios which would justify a CDCR 128-MH5 being generated. Of the 10 Custody Staff questioned throughout the unit, all were aware of their responsibility to complete a CDCR Form 128-MH5 when inmates exhibit signs of mental illness. The Mental Health Referral Forms were available in the housing unit with the current revision date of 05/14.

## Actions to Address Findings

1. STRH: The Warden will ensure an NDS tracking system is implemented.

2. A custody supervisor will ensure that 100% of Guard One checks are reviewed for discrepancies at the end of each shift.

3. IDTT leaders will ensure that each patient is actively engaged in the IDTT process at a level that is commensurate with their ability to communicate, comprehend, and participate appropriately so that they are an active member of their own treatment plan development and review.

4. ML EOP Clinical Supervisors will ensure that all groups start and end when scheduled.

5. ML EOP Clinical Supervisors will ensure that group topics and content are appropriate for the EOP patient population needs, level of cognitive functioning and education level so patients can more readily understand and relate to the focus of the groups being offered.

6. MHPS will develop a plan to ensure that the appropriateness of each patient's level of care is clearly discussed, incorporating appropriate review of relevant criteria necessary for consideration for referral to a higher level of care, as well as review of treatment progress, response, current symptoms and existing functional impairment necessary to determine if a patient may be appropriate for a lower level of care.

7. Mental Health Executive leadership will convene a QIT to address STRH and ASU staff's ideas for improving healthcare at LAC.

C a l i f o r n i a   C o r r e c t i o n a l   H e a l t h   C a r e   S e r v i c e s   |   M e n t a l   H e a l t h   |   L A C

## RULES VIOLATION REPORTS          Overall Rating:   Improvement Needed

Mental Health Program standards require that mitigating information about mental health status be provided when a patient is charged with a rule violation (RVR) and senior hearing officers (SHO) are required to take this information into account when hearing the RVR and assessing penalties or findings of guilt.

Mental Health providers shall conduct an assessment and complete the Rules Violation Report: Mental Health Assessment for a patient or inmate who receives a Rules Violation Report and meets the following criteria: 1) placed in EOP or MHCB level of mental health care, 2) participants in the DDP, 3) participants in the CCCMS program with Division A, B, or C offenses or any offense that may result in a SHU term, 4) patients that display bizarre or unusual behavior, and 5) patients who are engaged in IEX behavior.

| Performance Data | ON SITE RVR MEASURES | OCT |
|---|---|---|
| | Completed RVRs Requiring MH Assessment | 96% |

A total of 1,568 RVR's were issued for the prior period of July 1, 2016 thru September 30, 2016. Below are the statistics for the quarter:

- ➢ 750 issued to inmates not in the Mental Health Delivery System.
- ➢ 552 issued to inmates in the Correctional Clinical Case Management System (CCCMS).
- ➢ 242 issued to inmate the Enhanced Outpatient (EOP) Program.
- ➢ 20 issued to inmates in the Mental Health Crisis Bed (MHCB).
- ➢ 3 issued to inmates in the Intermediate Care Facility (ICF).
- ➢ 1 issued to an inmate in the Acute Level of Care.

Three RVRs that required a Mental Health Assessment and the clinician recommended the offense be documented in an alternative manner. None of these were reviewed by the Facility Captain in accordance with current policy and procedure. Review of data demonstrates 24 RVRs were written on patients while in a MHCB or higher level of care.

Five adjudicated RVRs were reviewed that could result in a SHU term. Two of the five RVRs audited are noted as having ICC consider and properly documenting the input of the Mental Health Clinician.

The audit revealed the MH Assessments forms were being processed timely and within Policy and Procedure. But, it was discovered custody staff was submitting the incorrect form to mental health. Mental health would complete the last five pages of the 115-MHA on the correct form. These issues were addressed with management on site and had already been rectified before the team left.

### Actions to Address Findings

1. The Facility Captain will review all instances where a MH clinician recommends that an RVR be written in an alternative manner during the adjudication of RVRs when the recommendation is not being followed.
2. A Quality Improvement Team should review these 24 RVRs that were written to determine if disciplinary action was the most appropriate course of action for these patients, given their psychiatric condition(s), or if the behavior could have been better addressed through other means. Special consideration should be paid to the four 'exceptional circumstances' when an RVR should not be written, including if the behavior occurred in connection with a cell extraction for the administration of involuntary medication, cell extraction, inpatient unit, mental health restraints, or attempted suicide. Additionally, a review of the corresponding Mental Health Assessments should be conducted to ensure the assessing clinician considered the patient's acute psychiatric condition and any other relevant factors when completing the assessment and provided the necessary information to custody for the purposes of adjudication of the RVR.

California Correctional Health Care Services | Mental Health | LAC

## QUALITY MANAGEMENT                   Overall Rating:    **Proficient**

Each institution maintains a Mental Health Program Subcommittee (MHPS) to routinely review performance data, prioritize opportunities for improvement, and take action to improve care. The institution's Suicide Prevention and Response Focus Improvement Team (SPR FIT) supervises local activities to protect patient safety by reducing risk of self-harm. The CQIT assessment evaluates the effectiveness of both of these groups in finding and resolving quality problems.

| Performance Data | QUARTERLY QM MEASURES | Q1 2016 | Q2 2016 |
|---|---|---|---|
| | MHPS Meeting Audit Criteria | 100% | 100% |
| | Satisfactory SPR FIT Meeting | 100% | 100% |

- **Mental Health Program Subcommittee.** During the reporting period from July through September 2016, the Mental Health Program Subcommittee (MHPS) met weekly. The audits for timely DSH referrals and of 7388Bs were presented as attachments to the MHPS for all three months reviewed. In all three months the data was presented in the correct Table V format.

- **Suicide Prevention and Response Focused Improved Team (SPR FIT).** Suicide Prevention meetings occur regularly, are well attended, and address the required components necessary of policy.

### Actions to Address Findings

1. The institution needs to continue to sustain gains made and address the root causes of issues for stability of performance.

# ATTACHMENT A: CASE EXAMPLES

## MENTAL HEALTH

**Interdisciplinary Treatment Team (IDTT) Observation:** Reviewers attend five patient IDTTs in one unit of each program. Team members are told they should proceed with the meeting as they typically would, and not present to the visitors. Once the patient enters the room, each team member introduces themselves. The lead for the review explains where they are from and that they are there to observe the proceedings.

MHCB Case Examples:

MHCB patients were equal participants of the IDTT team process and several self-disclosed significant feedback to the treatment team. One stated "mental health saved my life" (          ) and another "I have never been treated before, like I am being treated here" (          ). During the IDTTs, there was a concerted effort to have seamless wrap around treatment planning by incorporating DSH treatment goals for a patient who had been to DSH (          ) and by recommending treatment goals for patients discharging to lower levels of care (          ;          ).

MHCB Case Example          :

I/P was referred by custody due to the patient showing a range of affect - from tearfulness to anger. He was cooperative, with good eye contact, clean attire with his hair combed back. His affect was restricted and his thought processes clear. He endorsed AH/VH but reported medications help. He appeared to have limited mobility, attributing it to a UOF incident a few days prior. He also stated he had appendix surgery which resulted in a herniated disc. He stated he has submitted 602 appeals in order to get physical therapy and/or surgery for his limited range of motion. He reported he is unhappy with the lack of medical care he is receiving, which is also a source of frustration that leads to suicidal ideation (SI). He uses a cane to ambulate. He endorsed SI indicating he is a burden to his family and he is tired of going through the motions. He stated he is writing letters to his family to say good-bye. He was fixed on SI. The patient was admitted to MHCB due to a suicide attempt - he superficially cut his left wrist and took a "handful" of pills. He was subsequently referred to DSH. His medications are being adjusted and there's pending MRI results to determine his course of treatment. During his stay, he was visited by his family which is his support system. He was seen on a daily basis both by a PC and a Psychiatrist until his transfer to DSH.

EOP Case Example          :

Patient is a high refuser. Patient is oriented x3, cooperative, and stable. He reports that he is eating adequately and sleeping an average of 12 hours per day.  ADLS are adequate. Patient reports that meds are helping to reduce the agitation from auditory hallucinations. Mood was within normal limits. His thought process was logical and oriented. He denies suicidal or homicidal ideas. He reports missing groups because of depression and that his clinician referred him today to psychiatry for a medication consult. Custody reports that patient showers, does not go to yard, sleeps a lot, and is overall cooperative. Nursing reports that he is medication compliant. Records indicate that the patient has had several prison terms and arrived for most recent term on 6/6/2016 and at LAC on 7/19/16.  His diagnosis is Schizoaffective Disorder and he is prescribed Zyprexa, Remeron, Buspar, & Cogentin. The Mental Health Treatment Plan dated 10/18/16 denotes progress on reducing distress from his hallucinations, but not on attendance. However, the treatment plan does not have a goal to directly address either increased group participation or depression. The IDTT Level of Care Decision form states the patient will be referred to psychiatry for medication consult to discuss medication changes, but there is no evidence in eUHR that this referral took place.  Also, the patient is not placed on a Modified Treatment Plan, despite 85% refusal over the past 11 weeks, per Sustainability report. The patient should be referred back to IDTT for consideration of Modified Treatment Plan, to consider specific goals of increasing group attendance and reducing depression, ensure follow through with named psychiatry consult, and continue to monitor proactively for decompensation or lack of sufficient coping skills etc. which may warrant a DSH ICF referral.

# ATTACHMENT B: ACRONYMS LIST

| | |
|---|---|
| ASP | Avenal State Prison |
| AGPA | Associate Governmental Program Analyst |
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| ASU | Administrative Segregation Unit |
| ASU CCCMS | Administrative Segregation Unit  Correctional Clinical Case Management System |
| ASU EOP | Administrative Segregation Enhanced Outpatient Program |
| BPT | Board of Prison Terms |
| C&PR | Classification and Parole Representative |
| CAL | Calipatria State Prison |
| CC I | Correctional Counselor I |
| CC II | Correctional Counselor II |
| CCAT | Correctional Clinical Assessment Team |
| CCC | California Correctional Center |
| CCCMS | Correctional Clinical Case Management System |
| CCHCS | California Correctional Health Care Services |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CDCR Form 114A | Inmate Segregation Record |
| CDCR Form 115-MHA | Mental Health Assessment |
| CDCR Form 128A/128B | Mental Health Screening Chrono |
| CDCR Form 7365 | Suicide Watch/Suicide Precaution form |
| CDCR Form 7388B | Interdisciplinary Treatment Team Level of Care Decision form |
| CDCR Form MH-7709 | Administrative Segregation Unit Screening Questionnaire (formerly referred to as 31 Item Questionnaire) |
| CEN | Centinela State Prison |
| CEO | Chief Executive Officer |
| CHCF | California Health Care Facility |
| CHSA | Correctional Health Services Administrator |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CMH | Chief of Mental Health |
| CNE | Chief Nurse Executive |
| COR | California State Prison, Corcoran |
| CPR | Cardio Pulmonary Resuscitation |
| CQIT | Continuous Quality Improvement Tool |
| CQI | Continuous Quality Improvement |
| CRC | California Rehabilitation Center |
| CTC | Correctional Treatment Center |

| | |
|---|---|
| CTF | California Training Facility |
| CVSP | Chuckawalla Valley State Prison |
| D/C | Discharge |
| DAI | Division of Adult Institutions |
| DCHCS | Division of Correctional Health Care Services |
| DOT | Direct Observed Therapy |
| DSH | Department of State Hospitals |
| DVI | Deuel Vocational Institution |
| EHRS | Electronic Health Records System |
| EOP | Enhanced Outpatient Program |
| ERRC | Emergency Response Review Committee |
| eUHR | Electronic Unit Health Record |
| FIT | Focused Improvement Team |
| FOL | Folsom State Prison |
| GP | General Population |
| HCPOP | Health Care Placement Oversight Program |
| HDSP | High Desert State Prison |
| HPS I | Health Program Specialist I |
| HQ | Headquarters |
| ICC | Institutional Classification Committee |
| ICF | Intermediate Care Facility |
| IDTT | Interdisciplinary Treatment Team |
| ISP | Ironwood State Prison |
| KOP | Keep On Person |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison, Los Angeles County |
| LOC | Level of Care |
| LOP | Local Operating Procedure |
| LTRH | Long Term Restrictive Housing |
| MA | Medical Assistant |
| MAPIP | Medication Administration Process Improvement Plan |
| MCSP | Mule Creek State Prison |
| MH | Mental Health |
| MHCB | Mental Health Crisis Bed |
| MHPS | Mental Health Program Subcommittee |
| MHSDS | Mental Health Services Delivery System |
| MHTS.net | Mental Health Tracking System |
| ML | Mainline |
| ML CCCMS | Mainline Correctional Clinical Case Management System |
| ML EOP | Mainline Enhanced Outpatient Program |
| MSF | Minimum Support Facility |
| NA | Nurse Administered |
| NDS | Non Disciplinary Segregation |
| NKSP | North Kern State Prison |
| OA | Office Assistant |

| OT | Office Technician |
|---|---|
| PBSP | Pelican Bay State Prison |
| PBST | Positive Behavior Support Team |
| PC | Primary Clinician |
| PIP | Psychiatric Inpatient Program |
| PSU | Psychiatric Services Unit |
| PT | Psychiatric Technician |
| PVSP | Pleasant Valley State Prison |
| QIP | Quality Improvement Plan |
| QIT | Quality Improvement Team |
| QMSU | Quality Management Support Unit |
| R & R | Receiving and Release |
| RC | Reception Center |
| RJD | Richard J. Donovan Correctional Facility |
| RN | Registered Nurse |
| RT | Recreation Therapist |
| RVR | Rules Violation Report |
| SAC | California State Prison, Sacramento |
| SATF | Substance Abuse Treatment Facility |
| SCC | Sierra Conservation Camp |
| SHO | Senior Hearing Officer |
| SHU | Security Housing Unit |
| SNY | Sensitive Needs Yard |
| SOL | California State Prison, Solano |
| SOMS | Strategic Offender Management System |
| SPR FIT | Suicide Prevention and Response Focus Improvement Team |
| SQ | San Quentin State Prison |
| SRE | Suicide Risk Evaluation |
| SRN II | Supervising Registered Nurse II |
| SRN III | Supervising Registered Nurse III |
| SSA | Staff Services Analyst |
| STRH | Short Term Restricted Housing |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP | Salinas Valley State Prison |
| T 4 T | Training for Trainers |
| TCMP | Transitional Case Management Program |
| TTA | Treatment and Triage Area |
| UM | Utilization Management |
| UOF | Use of Force |
| VPP | Vacaville Psychiatric Program |
| VSP | Valley State Prison |
| WSP | Wasco State Prison |

California Correctional Health Care Services | Mental Health | LAC

# DASHBOARD LEGEND

Score of 85% or higher represents proficiency in this measurement and/or indicator

Score between 75-85% represents the need for improvement in this measurement and/or indicator

Score of 74% or lower represents the need for corrective action from the institution in this measurement and/or indicator