

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104

www.rbgg.com

Thomas Nolan
Email:  tnolan@rbgg.com

September 24, 2020

VIA ELECTRONIC MAIL ONLY

Nick Weber
Melissa Bentz
CDCR Office of Legal Affairs
Nicholas.Weber@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov

PRIVILEGED AND
CONFIDENTIAL

SUBJECT TO
PROTECTIVE ORDERS

Re:   *Coleman v. Newsom*:  Plaintiffs' Concerns about the Issuance of False and Retaliatory Rule Violation Reports Against Class Members
      Our File No. 0489-03

Dear OLA Coleman Team:

We write regarding CDCR's pattern of issuing false and retaliatory rule violation reports ("RVRs") against *Coleman* class members (as well as class members in *Armstrong* and other cases).

As you are likely aware, the Office of the Inspector General ("OIG") has documented and condemned this practice twice in recent reports.  In addition, documents produced by Defendants in discovery related to Plaintiffs' pending staff misconduct motions in *Armstrong* corroborate the OIG's findings.

A third source of evidence of this practice is the declarations from *Armstrong* and *Coleman* class members Plaintiffs have shared with Defendants as part of the pending *Armstrong* staff misconduct motions.  In those declarations, we have provided dozens of examples that show it is a routine practice for CDCR employees to assault, abuse, and retaliate against *Coleman* and *Armstrong* class members and then issue false and retaliatory RVRs to those they victimize.  This practice serves the dual purpose of discrediting victims and discouraging future reporting of similar misconduct.  These false RVRs are sometimes followed up by false referrals to local district attorneys for criminal prosecution.  Those referrals can result in additional criminal charges and extended prison sentences, on top of the punishments meted out in the RVR process.

[3607898.3]

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA Legal Team
September 24, 2020
Page 2

      In these cases, RVR write-ups are followed by one-sided disciplinary hearings where class member testimony is routinely discounted, even when it is supported by documentary evidence and/or multiple witnesses. This bias against evidence from incarcerated individuals appears to exist at all levels in the CDCR and even seems to be shared by some sections of OLA itself. *See* OIG Sentinel Report No. 20-01, January 10, 2020 (attached hereto as **Exhibit A**) ("The OIG is concerned that the department attorneys' actions suggest an apparent bias and hostility against inmate testimony and evidence provided by inmates, and set a dangerous precedent in which widespread officer misconduct, which in some cases cannot be proven by any means other than evidence or testimony provided by inmates, will go undiscovered and unpunished. The OIG believes that evidence concerning staff misconduct provided by an inmate and subsequent testimony proffered in a legal proceeding should not be disregarded, based simply on the fact that it came from an inmate.").

      Not surprisingly, these RVR hearings almost always result in "guilty" findings that seriously harm class members in myriad ways, including resulting in raised custody levels, punitive SHU terms in units likely to cause mental health decompensation, significantly reduced chances for parole for life prisoners, and additional time served due to loss of good time credits for incarcerated individuals serving fixed terms. The punishments can be very severe. For example, *Coleman* class member Mr. ▇▇▇▇ ▇▇▇▇▇▇▇, lost 360 days of credit and is reportedly serving a four-year SHU term for battery with a deadly weapon after he allegedly threw his walker at officers during a cell extraction allegedly done for mental health reasons. *See* **Exhibit B**, attached hereto. These false guilty findings occur even when the evidence available tends to undermine staff's version of events and corroborate the version told by incarcerated people. Hearing officers are frequently incompetent and biased against class members. Parallel staff misconduct investigations demonstrate the same bias against class member testimony and evidence. In most cases, it is clear, as Inspector General Roy Wesley said in testimony to the State Senate regarding the staff complaint process, that "the process appears entirely driven by the purpose to exonerate staff." *See* March 4, 2019 State Assembly Budget Subcommittee at 1:53:53.

      This pattern and practice violates the Constitution and basic due process requirements, as well as the *Coleman* Program Guide and associated Court-approved *Coleman* RVR policies. The time has come for Defendants to take swift action to put an end to this practice. We request that Defendants develop a plan to address the problems outlined in and illustrated by the examples this letter.

[3607898.3]

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA Legal Team
September 24, 2020
Page 3

1.  **On Multiple Occasions, the OIG Has Found that CDCR Officers Issue False RVRs to Victims of Staff Misconduct**

Attached hereto as **Exhibit C** is OIG Sentinel Case Number 20-04, issued on August 19, 2020. The case is titled, "The Department Made an Egregious Error in Judgment and Relied on Poor Legal Advice When It Did Not Sustain Dishonesty Allegations and Dismiss Two Officers in a Use-of-Force Case."

This disturbing Sentinel Case recounts a November 21, 2018 incident in which two officers at California State Prison – Sacramento ("SAC") used unreasonable force on a *Coleman* class member, ███████████████, who was subsequently found guilty of battery on a peace officer. Ex. C, at 1-2. Video surveillance footage of the incident, produced to Plaintiffs' counsel in *Armstrong*, clearly shows staff escort Mr. █████ through an obstructed gate, signal non-verbally to one another, and then throw Mr. █████ to the ground, punching and hitting him for approximately one minute while he lay on the ground with his hands cuffed behind his back and showing no signs of resistance in any way. There does not appear to be any justification for the initial use of force against Mr. █████, nor the multiple punches and kicks he suffered while compliant and restrained on the ground.

In response to this video, the Warden of SAC requested an Office of Internal Affairs ("OIA") investigation into the incident, given the evident discrepancy between officers' reports and the video surveillance footage. *Id.* at 2. After an investigation was conducted by OIA, the Warden elected to sustain the allegations that both officers had used unreasonable force. *Id.* at 3. The OIG reports that attorneys for CDCR opposed the Warden's disciplinary conclusions, escalating the case through the executive review process multiple times, which is "exceedingly rare" in the view of the OIG. *Id.* at 4. During the executive review process, the OIG found that three CDCR attorneys made arguments that were not supported by the facts of the case or the law. *Id.*

Ultimately, the undersecretary of CDCR elected to sustain the allegations regarding the unreasonable use of force, but did not sustain the dishonesty allegations even when the OIG found that there was a preponderance of evidence supporting the allegation that the officers had been "dishonest in their reports and interview." *Id.* at 5. Despite finding that the officers had used unreasonable force against the *Coleman* class member, the class member was "left with an unjust guilty finding resulting from the first officer falsely accusing him of battery during this use-of-force incident." *Id.* at 5. Both officers continue to work as peace officers for the CDCR. *Id.*

PRIVILEGED AND CONFIDENTIAL
CDCR OLA Legal Team
September 24, 2020
Page 4

We demand that the RVR against ▮▮▮▮▮▮▮ be reviewed and rescinded immediately, and that all attendant effects of the RVR, including, for example, any credit forfeiture or increase in security points, be promptly reversed.

Attached hereto as **Exhibit D** is an excerpt from the June 2020 Complaint Intake and Field Inquiries Report issued by the OIG on June 2, 2020. The report chronicles a June 2018 incident in which an incarcerated individual was issued an RVR that was later contradicted by video surveillance evidence. Ex. D, at 53-55. While the person's RVR was ultimately reduced to a counselling chrono, CDCR executive staff declined the OIG's recommendation to refer the dishonest staff member to OIA because the executive staff "did not believe the officer was 'blatantly dishonest,'" when reporting facts that proved to be inaccurate based on the video surveillance evidence. *Id.* at 55.

Even though the RVR was rescinded after it was proved false, the incarcerated person was still issued a counselling chrono that remains in their file to this day. This is a blatant due process violation, and one that inflicts substantial harm on incarcerated people. As the OIG notes, "because a counseling chrono documents an inmate's actions the department considers misconduct, it can still reflect poorly on the inmate's suitability for parole during future parole hearings." *Id.* In our experience, such counseling chronos are often given great weight by the BPH and can be the sole grounds for a denial of parole to a lifer.

We ask that the counseling chrono against this individual be dismissed.

Unfortunately, these horrendously unjust outcomes seem to be commonplace within CDCR, although how common is not measurable, given that many such incidents are not caught on camera and therefore are not subject even to the ineffective and biased CDCR investigations and disciplinary processes that resulted in these cases.

### 2. Documents Produced by Defendants in the Staff Misconduct Proceedings Tell the Same Story: Custody Staff Abuse *Coleman* Class Members, and then Issue False RVRs

Documents produced by Defendants in *Armstrong* and *Coleman* provide further evidence that class members are commonly issued false and retaliatory RVRs *even after* officers involved in the incident underlying the RVR are found to have been intentionally dishonest in their reporting of the incident.

In one such case, *Coleman* class member ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ reported being kicked in the head twice by an officer at RJD. A psychologist who observed the incident submitted an incident report stating that, at the time the officer kicked the

[3607898.3]

incarcerated person in the head twice with "extreme force," the incarcerated person was not resisting and compliant on the floor. *See* **Exhibit E,** attached hereto. The incarcerated person complained about the excessive use of force and, in turn, was charged and found guilty of an RVR for assaulting an officer during the incident.

The hearing officer adopted the assaulting officer's version of events—that the officer slipped on discharged pepper spray, causing him to accidentally strike the incarcerated person with his foot—notwithstanding the psychologist's report to the contrary and the fact that other correctional officer witnesses did not corroborate the assaulting officer's story. *See* Letter from P. Godbold to N. Weber, October 4, 2019, **Exhibit F**, attached hereto. Although the officer was ultimately terminated for his unnecessary use of force and dishonesty, Mr. ▇▇▇ RVR was not rescinded. *See* Letter from U. Stuter to P. Godbold, December 26, 2019 and CDCR 402 dated May 2, 2019, **Exhibit G** and **Exhibit H**, attached hereto.

We demand that the RVR given to Mr. ▇▇▇ be reviewed and rescinded immediately, and that all attendant effects of the RVR, including for example, any credit forfeiture or increase in security points, be promptly reversed.

In another case, *Coleman* class member ▇▇▇▇▇▇ reported that he was thrown out of his walker by RJD staff without justification. In their incident reports, three staff members claimed that Mr. ▇▇▇ threw himself out of his walker and attempted to assault staff. *See* **Exhibit I,** attached hereto. Mr. ▇▇▇ was charged with and found guilty of a serious RVR for obstructing staff. *See* **Exhibit J,** attached hereto. Video surveillance evidence clearly contradicted the version of events offered by reporting staff and corroborated Mr. ▇▇▇'s allegation that he was thrown from his walker by staff without justification. (We have a copy of the video and can make it available upon request.) All three staff members involved in the incident were terminated for dishonesty and failure to report the use of force, among other allegations. *See* **Exhibit K,** attached hereto. Despite this, Defendants have produced no documentation that the RVR issued to Mr. ▇▇▇ was rescinded after it was found that all three of the officers' reports and statements about the incident had been intentionally dishonest.

Please provide documentation that Mr. ▇▇▇'s RVR has been rescinded, or else please make sure that it is rescinded now. Please also ensure that all attendant effects of the RVR are reversed, including any resulting credit forfeiture or increase in security points. Note that Mr. ▇▇▇ is now out of prison, but we would still like the RVRs removed from his file, as it will affect his custody score if he is ever returned to prison, and it could have other potential adverse consequences.

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA Legal Team
September 24, 2020
Page 6

### 3. Plaintiffs' Counsel Has Already Provided Defendants with Overwhelming Evidence of these Practices

In Plaintiffs' Motions to Stop Defendants from Assaulting, Abusing and Retaliating against People with Disabilities, filed on February 28, 2020 and June 3, 2020, Plaintiffs' counsel in *Armstrong* has created a substantial record of false and retaliatory RVRs issued to *Coleman* and *Armstrong* class members, usually in the wake of an unnecessary or excessive use of force by staff.

All such class member declarations have been shared with Defendants in *Coleman* as well as *Armstrong*. In total, Plaintiffs' counsel has brought evidence that 76 *Coleman* and *Armstrong* class members have suffered false and retaliatory RVRs at the hands of Defendants' staff; attached as **Appendix A** is a table listing those class members, the institution at which the violations allegedly took place, the violations with which they were charged, and the date of the alleged violations. In what follows, Plaintiffs' counsel outlines a few additional particularly egregious instances where staff issued RVRs to class member declarants at RJD, LAC, and COR in order to discredit their allegations of serious staff misconduct, retaliate against them as victims of misconduct, and punish class members for their mental illness.

### RJD

Recently, the *Armstrong* Court issued a Preliminary Injunction ordering the transfer of two *Coleman* class members from RJD due to retaliation. *See* Dkt. 3026. In its Order Granting in Part Plaintiffs' Motion for Preliminary Injunction, the *Armstrong* Court found that *Armstrong* and *Coleman* class member ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ was assaulted by staff at RJD on June 17, 2020 in retaliation for his participation as a declarant in the RJD Motion. Mr. ▇▇▇ was also issued two false RVRs in connection with the incident, one for battery on a peace officer, and another for possession of alcohol.

Even though the Court found Mr. ▇▇▇'s version of what happened on June 17, 2020 more credible than CDCR's, Defendants found Mr. ▇▇▇ guilty of the false RVR in a rushed and unfair proceeding. *See Armstrong* ECF No. 3025, at 14, 16 ("The Court finds the description of the June 17 incident in the declarations of Inmates 2, 1, and 3 to be credible," and "Defendants' description of the June 17 incident lacks credibility.").

Mr. ▇▇▇ was denied the opportunity to present the Court's findings at his RVR hearing, was not allowed to question the reporting employees, and was not allowed to bring any witnesses on his behalf. *See Armstrong* ECF No. 3052-1, Ex. A. As a result,

Mr. ▇▇ was subjected to a 120 days of credit loss and 10 days of confinement to his quarters after the senior hearing officer elected to mitigate the suspension of privileges in light of Mr. ▇▇'s mental health factors. Mr. ▇▇ was also deprived of access to a paid job for a year as a result of the guilty finding. Most importantly, this RVR would have substantially reduced the likelihood of Mr. ▇▇'s being found suitable for parole at his scheduled hearing in January 2021. Only after filing multiple briefs about this issue in *Armstrong* did CDCR drop both of Mr. ▇▇'s RVRs.

Very recently, *Coleman* class member ▇▇ was excessively pepper-sprayed without any justification by staff at RJD on August 21, 2020, who then issued a false and retaliatory RVR. *See* Supplemental Declaration of ▇▇ ("Suppl. ▇▇ Decl."), shared with Defendants on September 1, 2020, ¶¶ 6-19. Although Mr. ▇▇ has not yet received his final RVR paperwork, his medical records indicate that he has been charged with battery on a peace officer. *See* **Exhibit L**, attached hereto (RVR MH Assessment Note, August 30, 2020). The records further indicate that officers claim that Mr. ▇▇ "punched the cell-front window causing it to break and send glass fragments onto the officer's face." *Id.* Immediately following the incident, Mr. ▇▇ was examined by multiple medical professionals. Suppl. ▇▇ Decl. ¶¶ 17-18. In these evaluations, medical staff did not document any injuries to either of his hands consistent with his having punched a glass window. *See, e.g.,* **Exhibit M,** attached hereto (August 21, 2020 clinical note ["no signs of physical wounds, no swelling, no bleeding, no obvious bruises…"]). Mr. ▇▇'s RVR has not yet been heard.

## LAC

Staff at LAC frequently assault class members in the throes of mental health decompensation and crisis, and then issue false RVRs to the victims of their misconduct. Custody staff also routinely ignore class members' requests for assistance during medical and mental health emergencies, demean them after suicide attempts, and issue them punitive RVRs for behavior strongly influenced by severe mental illness.

On March 21, 2020, *Coleman* class member ▇▇ was subjected to an unnecessary emergency cell extraction while he was experiencing mental health crisis. *See* Declaration of ▇▇, shared with Defendants on May 22, 2020, ¶¶ 14-21. After Mr. ▇▇ requested to speak with a clinician about his ongoing suicidal ideation, officers falsely claimed that he was unresponsive, rushed into his cell, and assaulted him so badly that he was hospitalized. *Id.* ¶¶ 17-19. Mr. ▇▇ was issued and found guilty of a false RVR for battery on a peace officer in connection with the extraction. *Id.* ¶¶ 25-27. During the RVR hearing, he was denied the opportunity to

present witnesses or question the reporting employees. *Id.* As a result, he suffered a loss of privileges and a loss of 120 days of credit. *Id.*

In another shocking case, *Coleman* class member ▇▇▇▇▇▇▇▇▇▇▇▇ was assaulted by staff at LAC on April 15, 2020 while in handcuffs after he protested being housed with an incarcerated person who had tested positive for COVID-19. *See* Declaration of ▇▇▇▇▇▇▇ ("▇▇▇▇▇ Decl."), shared with Defendants on August 28, 2020, ¶¶ 8-20. Mr. ▇▇▇▇ was also charged with an RVR for battery on a peace officer after officers claimed that Mr. ▇▇▇▇ grabbed, punched, and resisted them. *Id*, ¶ 29. When Mr. ▇▇▇▇'s RVR was heard on May 13, 2020, Mr. ▇▇▇▇ pointed out that the officers' version of events lacked credibility; for example, he was accused of punching officers even though his hands were cuffed behind his back for the entirety of the incident. *Id.* ¶¶ 30-35. In response, the Hearing Officer stated that the serious deficiencies identified in the official report were "simple errors officers tend to make in the heat of battle." *Id.* ¶ 35. The hearing officer found him guilty of the RVR and issued him a 121-day loss of credit, 60-day loss of canteen, phone privileges, yard, and dayroom, and a 21-month SHU-term (which was later rescinded due to mental health considerations). *Id.* We ask that Mr. ▇▇▇▇'s RVR be reviewed and reversed, and that all attendant effects be reversed.

## COR

At COR, the issuance of patently false RVRs to severely mentally ill class members is an everyday occurrence. Class members are subjected to lengthy losses of privileges and placements in dangerous segregated housing that render them much more likely to suffer serious mental health decompensation. These false RVRs are also often referred to and prosecuted by the District Attorney, resulting in substantial collateral harm to *Coleman* class members.

On May 30, 2020, *Coleman* class member ▇▇▇▇▇▇▇▇▇▇ was assaulted by staff and issued a false RVR in response to his expressing suicidality to staff. *See* Declaration of ▇▇▇▇▇▇▇ shared with Defendants on September 4, 2020, ¶¶ 11-20. After custody staff encouraged him to kill himself, Mr. ▇▇▇▇ was thrown to the ground and beaten into unconsciousness. *Id.* ¶¶ 13-15. Mr. ▇▇▇▇ was then charged with and found guilty of a false RVR for delaying staff. *Id.* ¶ 25. He was denied the opportunity to call any witnesses during the hearing. *Id.* ¶ 26. A 90-day credit loss was imposed as a result of the false RVR. *Id.* ¶ 25. We ask that Mr. ▇▇▇▇'s RVR be thrown out, and that all attendant effects be reversed, not only because the RVR was false, but also because it was issued in connection with an effort to seek help with feelings of suicidality.

*Coleman* class member ▓▓▓▓▓▓ was assaulted by staff on December 16, 2019 after staff made racist remarks toward Mr. ▓▓ and refused to let him out of his cell to shower. *See* Declaration of Jahmari ▓▓ shared with Defendants on September 1, 2020, ¶¶ 6-18. Mr. ▓▓ suffered a concussion, a fracture in his hand, a dislocated and nerve-damaged thumb, and an unspecified jaw injury. *Id.* ¶¶ 24-30. Mr. ▓▓ received an RVR for battery on a peace officer in connection with this incident. *Id.* ¶ 31. In an incredible story that parallels that of Mr. ▓▓ discussed above, officers claimed that Mr. ▓▓'s injuries were caused by him *accidentally slipping on pepper-spray*. *Id.* At his classification committee meeting, staff told Mr. ▓▓ that he was guilty of the RVR before it had been heard and disposed of. *Id.* ¶ 32. Mr. ▓▓'s false RVR was referred to the District Attorney for possible criminal prosecution, and it is still pending as of the date of his declaration. *Id.* ¶ 32. He is also facing an eight-month SHU-term. *Id.* We ask that this false RVR and all attendant effects be reversed immediately.

*Coleman* class member ▓▓▓▓▓▓ received two RVRs after he was assaulted by staff at COR in June 2019 and May 2020. *See* Declaration of Peter ▓▓ shared with Defendants on August 28, 2020, ¶ 17. The first RVR – which Mr. ▓▓ incurred after being beaten by staff in June 2019 in retaliation for reporting misconduct to the CDCR Ombudsman – was criminally prosecuted by the District Attorney. *Id.* COR referred the second RVR to the District Attorney, and it is still pending as of the date of his declaration. *Id.* We ask that the false RVRs and all attendant effects be reversed immediately.

On May 10, 2019, *Coleman* and *Armstrong* class member ▓▓▓▓▓▓ was thrown to the ground and beaten after he protested that he could not attend yard because his assistive device was broken at the time. *See* **Exhibit N**, attached hereto (medical notes documenting his injuries, and the fact that his walker is broken). Mr. ▓▓ reports that officers suggested that they could tape the walker or that Mr. ▓▓ could sit on the ground outside. When Mr. ▓▓ refused, the officers assaulted him and issued him a false RVR for "Assault on a Peace Officer by means not likely to cause GBI." He was found guilty and sentenced to a 12-month SHU term, despite the fact that the clinician doing his RVR mental health assessment determined that he posed "some risk of decompensation" in a SHU setting. *See* Mr. ▓▓ RVR MHA Note, **Exhibit O,** attached hereto. We ask that this false RVR and all of the attendant effects be reversed.

[3607898.3]

**4.      This Pattern and Practice Harms Class Members**

The harm that results from the issuance of false and retaliatory RVRs against class members is substantial and multifaceted.

First, the points added to class members' classification scores as a result of false RVRs puts class members at risk and jeopardizes institutional safety and security. Because class members who receive false RVRs are housed in more restrictive facilities than necessary, they are more likely to be subjected to unnecessary victimization and modifications of program that affect their mental health symptoms. This practice runs counter to the stated goals of the CDCR classification system, to: "provide[] a standard evaluation for placement of inmates *at the least restrictive institution*, commensurate with their custodial requirements." DOM § 62010.5 (emphasis added).

The issuance of false RVRs also undermines CDCR's efforts to promote rehabilitative programming. Class members with serious RVRs incurred in the past twelve months are unable to participate in many desirable and beneficial programs and activities offered by CDCR. And for the many class members issued lengthy sentences in segregated housing after being found guilty of a falsified RVR, access to programming is virtually non-existent.

These harms are compounded by the fact that *Coleman* class members sentenced to a segregated housing term or a loss of privileges after being found guilty of an RVR are at an acute risk of mental health decompensation due to the restrictive housing setting. Segregation can also cause class members to act out and get in further trouble, and it is also characterized by significantly higher suicide rates for class members than elsewhere. *See Coleman v. Brown*, 28 F. Supp. 3d 1068, 1095 (E.D. Cal. 2014) ("placement of seriously mentally ill inmates in California's segregated housing units can and does cause serious psychological harm, including decompensation, exacerbation of mental illness, inducement of psychosis, and increased risk of suicide"); *see also* Special Master Expert Fourth Re-Audit and Update of Suicide Prevention Practices in CDCR, Sept. 23, 2020, ECF No. 6879-1, at 46 (noting one-third of all suicides occurred in segregation units in past four years).

Class members punished for false RVRs are also denied the right to earn credits and deprived of already-earned credits that might expedite their release. For example, the recent Positive Programming Credits launched by Secretary Diaz on July 9, 2020 provides 12 weeks of credit to all persons incarcerated in CDCR except for those found guilty of a serious RVR between March 1, 2020 and June 5, 2020. Mr. ████, for example, was denied these credits due to the false and retaliatory RVR issued to him.

[3607898.3]

Similarly, the Milestone Credits earned by EOP class members who participate in mental health programming are often forfeited after class members are found guilty of a false RVR. *See* Cal. Code Regs. tit. 15 § 3323.

Most importantly, the presence of a false RVR in an individual's custody file substantially reduces the likelihood that the Board of Parole Hearings ("BPH") will find that individual is suitable for parole. Regardless of whether an incarcerated person is found guilty of a RVR or given a counseling chrono, any disciplinary record has a significant negative impact on the outcome of the BPH hearing. Recent disciplinary write-ups of either type are so harmful to a prisoner's chances for release that it is common for attorneys representing prisoners who have been found guilty of an RVR or received a counseling chrono in the year before the hearing to move to postpone the BPH hearing for at least another year. In all of the hearings observed or hearing transcripts reviewed over the past ten years, Plaintiffs' counsel cannot recall a single case where a prisoner received a counseling chrono or an RVR within the year preceding the hearing and was granted parole.

**5. These Practices Violate the Constitution, the Program Guide, and the *Coleman* Court's Orders**

Defendants' actions and inactions have directly impeded class members' basic Fourteenth Amendment due process rights, including, for example, their abilities to have fair RVR hearings. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974) (requiring adequate notice of and opportunity to present a meaningful defense in disciplinary proceedings); *Armstrong v. Davis*, 275 F.3d 849, 865 (9th Cir. 2001); *Ashker v. Newsom*, No. 09-CV-05796-CW (RMI), 2019 WL 330461, *13 (N.D. Cal. Jan. 25, 2019) (knowing reliance on fabricated evidence in RVR hearing violates due process). As we have also shown, *Coleman* class members are routinely denied access to witnesses or other exculpatory evidence during RVR hearings. Staff frequently decide that class members are guilty of the alleged conduct before the matter has been heard and in spite of compelling evidence that the reporting employees' version of events is not credible.

The pattern and practices documented in this letter also violate the Program Guide and the RVR policies developed by Defendants in response to findings by the Special Master and orders issued by the *Coleman* Court.

In his 27th Round Monitoring Report, the Special Master found multiple deficiencies with CDCR's implementation of its disciplinary policies, ranging from a lack of adequate training to poor adherence to the alternate documentation policy. Special Master's 27th Round Monitoring Report, ECF No. 5779 at 106-15 (Feb. 13, 2018) ["27th

[3607898.3]

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA Legal Team
September 24, 2020
Page 12

Round Report"]. **Of 19,983 RVRs the Special Master team reviewed, CDCR only documented one in an alternate manner.** *Id.* **at 111-13**. The Special Master found additional monitoring was necessary to "work with CDCR to address the deficiencies." *Id.* at 115. The Special Master's 2018 Inpatient Monitoring Report raised similar concerns, finding that "mental health assessments did not reflect consideration of mental health factors where patients were found guilty," "notable credit forfeitures were imposed," and many RVR mental health assessments were not "timely completed and returned by mental health." Special Master's Report on Inpatient Programs, ECF No. 5894 at 67-70 (Aug. 30, 2018).

CDCR's implementation of its disciplinary policies remain deficient. The misconduct discussed in the class member declarations violates the safeguards ordered by the *Coleman* court that are intended to protect the rights of mentally ill patients in the RVR process, as implemented in § 3317.2 of Title 15 of the California Code of Regulations. The fact that class members are routinely issued RVRs as a result of cell extractions and in retaliation for expressing or acting upon suicidal ideation violates the *Coleman* Court's May 4, 2015 Order regarding CDCR's Implementation of Policies and Procedures on RVRs. *See* ECF No. 5305. Despite evidence that many of the incidents discussed in the class member declarations were strongly influenced by severe mental illness, there is no evidence that Defendants have chosen to review and document the incidents in any of the declarations through the alternate process outlined in § 3317.1 rather than the standard RVR process.

### 6. Conclusion

The evidence outlined above demonstrates a pattern of CDCR employees issuing RVRs to *Coleman* class members in order to discredit allegations of staff misconduct, retaliate against those who report misconduct, and punish class members for their mental illness. Class members are substantially harmed by the frequent issuance of false and retaliatory RVRs, which violates the Constitution, the Program Guide, and the Orders of the *Coleman* Court.

Defendants must take steps to rectify the harm suffered by *Coleman* class members. Please immediately review the allegations contained in the class member declarations listed in **Appendix A**, review the associated RVRs of which these class members were found guilty, and, in light of the evidence offered in the declarations and any other relevant information, immediately rescind the RVRs and expunge them from the class members' custody files. Please also reverse all attendant effects of these RVRs.

[3607898.3]

PRIVILEGED AND CONFIDENTIAL
CDCR OLA Legal Team
September 24, 2020
Page 13

    Defendants also must take immediate steps to address this pattern and practice to minimize its effects on the entire *Coleman* class.

    We look forward to your responses to these important concerns.

                                                     Sincerely,

                                                   ROSEN BIEN
                                                   GALVAN & GRUNFELD LLP

                                                   */s/ Thomas Nolan*

                                                   Thomas Nolan
                                       By:   Of Counsel

TN:JRG
Enclosures
cc:     Coleman Special Master Team
        Ed Swanson
        Clark Kelso
        Co-counsel
        Dillon Hockerson
        Jerome Hessick
        Michael Golding
        Adriano Hvratin
        Elise Thorn
        Kyle Lewis
        Tyler Heath
        Damon McClain
        Roman Silberfeld
        Glenn Danas
        Lucas Hennes
        Dawn Lorey
        Angela Ponciano
        Adam Fouch
        RBGG Armstrong Team
        Armstrong Co-Counsel
        Tamiya Davis
        Lex Powell

[3607898.3]

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA Legal Team
September 24, 2020
Page 14

    Nicholas Meyer
    Patricia Ferguson
    Joanna Hood
    Sean Lodholz
    Trace Maiorino
    Jeremy Duggan
    Anthony Tartaglio
    Bruce Beland
    Connie Gipson

[3607898.3]