DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:    (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' CLOSING BRIEF FOR OCTOBER 23, 2020 DEPARTMENT OF STATE HOSPITALS EVIDENTIARY HEARING**<br><br>Judge:   Hon. Kimberly J. Mueller |

[3642030.16]

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND LEGAL STANDARD .................................................................. 1

I.    DEFENDANTS HAVE NOT COMPLIED WITH THE PROGRAM GUIDE
      REQUIREMENTS AS MODIFIED BY THE APRIL 24, 2020 ORDER ................. 2

II.   DEFENDANTS ARE DEVIATING FROM PROGRAM GUIDE
      REQUIREMENTS IN WAYS THAT ENDANGER THE SAFETY OF
      CLASS MEMBERS WHO REQUIRE INPATIENT CARE .................................... 6

      A.    The July 16, 2020 Transfer Policy Deviates From Program Guide
            Requirements ............................................................................................ 6

      B.    The Blocking of DSH Transfers Harms Patients ............................................. 8

      C.    The October 20, 2020 Transfer Policy Deviates From Program Guide
            Requirements ................................................................................................. 11

      D.    Prison-Based Crisis Beds and Inpatient Programs Are Not Equivalent
            to DSH Inpatient Programs ........................................................................... 12

III.  THE PROFFERED PUBLIC HEALTH RATIONALE DOES NOT
      JUSTIFY ENDANGERING CLASS MEMBERS BY DELAYING DSH
      CARE .............................................................................................................. 14

      A.    There Is No Public Health Case For Closing Or Delaying DSH
            Admissions ..................................................................................................... 14

      B.    DSH Is Picking and Choosing Which CDCR Patients To Take and Is
            Preferring Legal Status Over Medical Necessity ......................................... 17

CONCLUSION .................................................................................................................... 19

CERTIFICATION ............................................................................................................... 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Hook v. Arizona Dep't of Corrections*,
    107 F.3d 1397 (9th Cir. 1997) ................................................................. 19

*Horne v. Flores*,
    557 U.S. 433 (2009) ............................................................................. 1, 2

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*,
    61 F. Supp. 2d 1058 (N.D. Cal. 1999) ..................................................... 18

*Paralyzed Veterans of Am. v. McPherson*,
    2008 WL 4183981 (N.D. Cal. Sept. 9, 2008) ......................................... 18

*Rufo v. Inmates of Suffolk Cty. Jail*,
    502 U.S. 367 (1992) ............................................................................... 1

*Valdivia v. Schwarzenegger*,
    599 F.3d 984 (9th Cir. 2010) ................................................................. 19

## STATUTES

Cal. Penal Code § 2962 ............................................................................. 18

Cal. Penal Code § 2964 ............................................................................. 18

## RULES

Fed. R. Civ. P. 60 ................................................................................. 1, 2

# INTRODUCTION AND LEGAL STANDARD

The Court set three factual issues for the hearing on October 23, 2020:

(1) as required by the April 24, 2020 order, have DSH and CDCR been complying with the Program Guide requirements, as modified by the temporary addition of COVID-19 screening, for transfer of class members to inpatient hospital beds;

(2) if they are not complying with those requirements, in what way or ways are they deviating from those requirements; and

(3) what is the rationale for any deviation.

ECF No. 6660 at 2. Defendants have the burden of proving that deviations from the Program Guide requirements are justified. *Id.* at 3. The standard for justifying such deviations, is the same as for modifying a court order under Rule 60 of the Federal Rules of Civil Procedure. *Id.* at 2.

The applicable part of the rule is 60(b)(5), which "permits a party to obtain relief from a judgment or order if, among other things, 'applying [the judgment or order] prospectively is no longer equitable.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009). Defendants, as the party seeking relief from a judgment, "[bear] the burden of establishing that a significant change in circumstances warrants a revision of the decree." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992). If the objective of an order has already been achieved, and "a durable remedy has been implemented, continued enforcement of the order is not only necessary, but improper." *Horne*, 557 U.S. at 450.

Here, the order from which Defendants would need to seek relief is the Court's April 24, 2020 order, which stated that with the exception of a temporary modification to include COVID-19 screening, the *Coleman* Program Guide requirements remain in full force for transfers to inpatient Department of State Hospitals ("DSH") beds. *See* ECF Nos. 6639 at 10; 6660 at 2. But in the hearing, Defendants identified no changed circumstances that would warrant relief under Rule 60(b)(5). The rise of COVID-19 is certainly not a changed circumstance, as the April 24, 2020 order was issued specifically to address DSH transfers during the pandemic. *See* ECF No. 6639. Plaintiffs are aware of no other change in legal or factual circumstances that would make enforcement of the Court's April 24,

1   2020 order "detrimental to the public interest." *See Horne*, 557 U.S. at 447. Nor can

2   Defendants credibly argue that the objective of the April 24 order has been met, when the

3   evidence proves that significant numbers of *Coleman* class members wait beyond Program

4   Guide timelines to transfer. *See, e.g.*, Ex. P-003-21 (October 9 DSH CDCR Patient Census

5   and Waitlist Report showing 39 patients waiting more than 30 days to transfer).

6   Defendants have not met their burden under Rule 60(b)(5).[1]

7       Defendants have failed to carry their burden to justify blocking *Coleman* class

8   members from inpatient beds at the DSH facilities. On the contrary, the evidence

9   demonstrates that delaying inpatient transfers harms the *Coleman* class and exposes them

10  to serious risks of harm. Defendants have not properly balanced those harms against the

11  harms of exposure to COVID-19, but have instead applied blanket policies that disregard

12  mental health treatment needs. *Coleman* class members have languished for months in

13  crisis beds and outpatient settings, including segregation units, as a result. The Court

14  should issue orders to put a stop to such delays in care.

15  **I.    DEFENDANTS HAVE NOT COMPLIED WITH THE PROGRAM GUIDE**
    **REQUIREMENTS AS MODIFIED BY THE APRIL 24, 2020 ORDER**
16

17      Defendants have imposed restrictions on patient transfers to DSH that contravene

18  the Program Guide's requirements and extend far beyond the COVID-19 screening

19  permitted by the April 24, 2020 order. The Program Guide requires that transfers from

20  "[a]ny institution/level of care" to "[a]ny Intermediate Care DMH placement" must be

21  completed "[w]ithin 30 days of referral, if accepted to DMH." Ex. D-1-16; *see also*

22  Ex. D-4-1, (expressly incorporating Program Guide timelines and stating all ICF

23  admissions "shall be completed as soon as possible and shall not exceed 30 calendar days

24  from DSH receipt of the referral"); Ex. D-3-3 (2017 CDCR-DSH Memorandum Of

25

26  ───────────────────────

27  [1] To the extent that Defendants present any new theories not presented at the hearing or
    prior briefing for why they should be able to obtain relief under Rule 60, Plaintiffs request
28  an opportunity to respond.

1  Understanding stating that transfers will not exceed Program Guide timelines,

2  incorporating Ex. D-4's provisions, and stating "referrals, admissions, movement within

3  the programs to appropriate levels of care or housing" must be completed timely in

4  accordance with incorporated Program Guide timelines).[2]  These restrictions have led

5  *Coleman* patients to wait far beyond Program Guide timelines to transfer to inpatient care.

6  As of October 8, there were 55 *Coleman* patients pending transfer to DSH stuck at CDCR

7  institutions deemed "closed" due to COVID-19 concerns, and 39 of them were waiting

8  past the 30-day transfer timeline.  *See* Ex. P-001-20 (55 patients on hold and referred from

9  closed CDCR institutions, including prisons without PIPs); Ex. P-003-21 (39 patients

10  waiting over 30 days).  And while over 100 beds reserved for *Coleman* class members

11  remain empty at DSH, *see* Ex. P-003-21 (116 available *Coleman* beds at Atascadero,

12  Coalinga, and Patton state hospitals as of October 9, 2020), there are not enough CDCR

13  PIP beds for all of the people currently waiting for inpatient care.  *See* Waitlist and Census

14  Report, October 15, 2020, ECF No. 6912 at 13 (280 patients on the PIP waitlist, with only

15  245 available beds).  The effect of vacancies at DSH is felt throughout all of Defendants'

16  institutions and results in unconstitutional denials of inpatient psychiatric care for the

17  *Coleman* class.  *See* Apr. 24, 2020 Order, ECF No. 6639, at 2-3 & n.2.

18        Nor do the carefully negotiated, Court-ordered exceptions to the Program Guide

19  timelines excuse delayed and denied access to inpatient psychiatric care at DSH.  The

20  narrow medical exception requires a patient to have a medical condition more urgent than

21  the patient's need for inpatient psychiatric hospitalization, with an individualized

22  assessment of that patient's particular needs.  Ex. D-5 at 8.  But Defendants presented no

23  evidence that any of the patients awaiting transfer to DSH have any relevant medical

24

25

_____

26  [2] Despite the clear language of their policies, Defendants have insinuated that the Program Guide timelines do not apply to transfers to least restrictive housing settings, including

27  transfers from PIPs to DSH.  *See* ECF No. 6867 at 4.  To the extent the Court's ruling requires determination of that issue, and the Court is inclined to agree with Defendants,

28  Plaintiffs request the opportunity to provide further briefing.

1    condition whatsoever, much less one that cannot be treated at DSH or that is more critical

2    than his need for psychiatric hospitalization.  Indeed, both Dr. Warburton and Dr. Bick

3    testified that they did not look at patient's medical records at all and could not speak to

4    their individual circumstances.  *See* RT 80:20-81:24, 89:3-21 (Warburton); RT

5    192:24-193:22 (Bick).  Instead, Defendants applied a blanket ban on transfers of patients

6    admitted for treatment at DSH if they happened to be at a "closed institution," regardless

7    of whether the patient had actually been exposed to COVID-19, much less contracted it,

8    and regardless of what type of mental health care the patient was receiving while waiting

9    to transfer to inpatient psychiatric care.  *See* RT 89:3-21 (Warburton); RT 170:17-171:4,

10   196:2-197:21 (Bick).  Meanwhile, patients suffer while waiting to transfer to DSH to

11   receive the care their treating clinicians and headquarters representatives from both DSH

12   and CDCR agree they need, which can cause lasting damage to the class members.  RT

13   258:11-260:1 (Stewart); RT 220:8-221:5 (Lauring).

14        Nor does the exception for unusual circumstances apply to excuse Defendants'

15   persistent, months-long denial of inpatient psychiatric care at DSH.  Defendants' decision

16   to restrict all access to DSH for class members at closed institutions—regardless of their

17   personal level of COVID-19 exposure or need for inpatient care—is a direct result of

18   Defendants' joint policy decisions, not an "unusual circumstance[] outside the control of

19   CDCR."  Ex. D-5-9; *cf.* Apr. 24, 2020 Order, ECF No. 6639, at 10-11 (discussing

20   application of unusual circumstances exception and DSH admissions).  While the onset of

21   the pandemic may have initially excused delayed transfers in the early Spring, the

22   pandemic is, as this Court has now stated many times, the "new normal."  ECF No. 6799 at

23   5.  It will be with us for many months, if not years.  RT 220:8-18 (Lauring).  Unless this

24   Court is prepared to hold that any risk of COVID-19 transmission qualifies as an unusual

25   circumstance outside of Defendants' control warranting indefinite suspension of the

26   Program Guide's timelines, this blanket exception cannot apply to excuse the delays and

27   denials of care at issue here, which are based on Defendants' policy choices, not the

28   pandemic itself.

[3642030.16]

4

1    Moreover, even if this Court were to hold that either of the aforementioned

2  exceptions to the transfer timelines applied in the first instance here, it is clear Defendants

3  still are non-compliant with the Program Guide.  Both exceptions require that patients

4  transfer to ICF hospital care within five days of the resolution of the relevant medical

5  condition or unusual circumstance causing the delay.  Ex. D-5 at 8-9.  But the five patients

6  who actually managed to transfer to DSH in August after their institution reopened for

7  movement waited far longer than five days to do so, again due to bureaucratic breakdowns

8  and denials of care that were entirely within Defendants' control.  P-72; P-95; *see also* RT

9  130:9-140:16, 150:20-151:11 (Mehta); RT 66:24-67:1, 69:8-12 (Warburton); *cf.* D-42 at 7

10 (noting Defendants' report that testing problems delayed DSH admissions).

11    Finally, while this Court approved a temporary modification to the Program Guide

12 providing that "no transfers to DHS inpatient health care are taking place without a

13 COVID-19 screening," the screening tool referenced and approved by this Court consists

14 of a list of questions accompanying the transferring patient that describes the patient's risk

15 for transmitting COVID-19.  ECF No. 6639 at 10 (citing ECF No. 6616 at 17 &

16 Attachment V); *see also* Ex. D-09 (approved screening memo).  Defendants' witnesses

17 admit that their policies and procedures go far beyond that.  RT 105:20 -122:25 (Mehta,

18 describing multiple iterations of guidelines and testifying to compliance with the Program

19 Guide requirements "with all of the modifications we've discussed"); RT 128:6-12 (same);

20 *see also* Exs. D-22 (imposing requirements on top of screening tool approved in April 24

21 order), P-101 (same).

22    Defendants opened the hearing by promising to prove compliance with the Program

23 Guide standards as modified by the April 24, 2020 order.  *See* RT 26:6-10.  They did not

24 keep that promise.  Defendants were thus obliged to meet their second and third burdens,

25 to show that deviations from the Program Guide were warranted.  *See* ECF No.6660 at 2.

26 They failed to meet those burdens as well.

27

28

## II.    DEFENDANTS ARE DEVIATING FROM PROGRAM GUIDE REQUIREMENTS IN WAYS THAT ENDANGER THE SAFETY OF CLASS MEMBERS WHO REQUIRE INPATIENT CARE

### A.    The July 16, 2020 Transfer Policy Deviates From Program Guide Requirements

Defendants did not meet their burden of showing that the July 16, 2020 transfer policy provided for the timely transfer of *Coleman* class members to DSH in accordance with Program Guide requirements.  *See* Exs. P-058 & D-22.  The July 16, 2020 policy, which remained in effect until just two days before the evidentiary hearing, prohibited as a matter of practice all transfers from closed institutions for months.  Class members housed at prisons that are open to movement—i.e., where CDCR has determined there is no COVID-19 outbreak whatsoever—and who are accepted for treatment at DSH are prohibited from actually transferring to the hospital unless they quarantine for fourteen days and test negative for COVID-19 at CDCR prior to transfer to DSH.  Ex. D-22 at § I(h), (i); D-32-44 at 47 (operative version of movement matrix requiring 14-day quarantine at CDCR for DSH transfer, and qualifying transfer on negative test).  Further, under Defendants' policies, patients at closed CDCR institutions are generally prohibited from transferring to DSH at all.  Ex. D-22 at § I(n).  Although the July 16 policy allows for consideration of a patients' transfer from a closed institution "[o]n a rare case by case basis," *id.*, Defendants never engaged in any individualized review of patients' need for psychiatric care and indeed produced no evidence that a single patient ever transferred under this hollow provision.  *See* RT 70:7-9, 80:20-81:24, 89:3-21 (Warburton); RT 192:24-193:22 (Bick).

The July 16 policy effectively prevented all patients at closed CDCR institutions from ever transferring to DSH.  The concept of a "closed" institution is not defined in any CDCR policies, and is subject solely to Defendants' discretion.  According to Dr. Bick's description of the unwritten and "evolving" criteria for closure, three or more positive COVID-19 cases in a prison of thousands can lead to closure of the whole institution, even for patients in entirely different parts of the prison who have had no known contact with

1  the infected patients. *See* RT 170:17-171:4 (Bick); *see also* RT 226:11-21 (Lauring). By

2  September 29, 2020, twenty-four of CDCR's thirty-five institutions were closed for

3  movement for months on end. *See* D-39 at 3; *see also* Ex P-087 at 6. Though Defendants

4  maintain that their July 16 policy provided a way, in the right circumstances, for *Coleman*

5  patients in closed institutions to transfer to DSH, in actuality, Defendants did not transfer

6  any *Coleman* patients to DSH from closed institutions for nearly three months—not until

7  the evidentiary hearing was confirmed and imminent. RT 70:7-9, 82:8-13 (Warburton);

8  *see also* Exs. P-001-21 (no *Coleman* transfers to DSH between Oct. 5-9); P-001-20 (none

9  for Sept. 28-Oct. 2); P-001-18 (none for Sept. 8-11); P-001-17 (none for Aug. 31-Sept. 4);

10  P-001-16 (none for Aug. 24-28); P-001-12 (none for July 20-24). Meanwhile, CDCR

11  transferred internally hundreds of patients to and from closed institutions, and DSH

12  admitted offenders with a mental health disorder ("OMHDs") from the same closed

13  institutions where *Coleman* class members sat waiting. RT 171:14-172:3 (Bick); RT

14  69:21-70:9; *compare* P-087 at 6 (closed institution list), *with* Ex. P-071-05 (652 internal

15  CDCR transfers, including from closed institutions), *and* Ex. P-006-22 (OMHD

16  admissions to DSH from closed institutions between September 21 and 25).

17      Under the July 16 policy, Defendants did not conduct *any* individualized assessment

18  of *Coleman* patients to determine if they should transfer to DSH from closed institutions,

19  thereby ignoring the harm that occurred to patients arising from these delayed transfers.

20  Instead, Defendants focused solely on the public health risks of such a transfer, rather than

21  the patient's clinical needs for psychiatric hospitalization based on the treatment they were

22  receiving in CDCR. *See* RT 82:14-19 (Warburton).

23      In deciding whether a *Coleman* patient should transfer to DSH, Defendants' process

24  failed to consider the type of treatment the patient was currently receiving and if the

25  patient could safely be managed in their current setting—erroneously assuming that the

26  patient's current treatment at CDCR meets minimal constitutional standards. *See* RT 81:3-

27  11 (Warburton testimony). Defendants did not review medical records or speak with

28  clinicians before refusing to transfer patients from closed institutions. *Id.* This process is

1   surely insufficient to comply with the Program Guide requirement of providing
2   constitutionally adequate inpatient access to *Coleman* class members.  Under this policy,
3   *Coleman* patients, who were admitted to DSH but resided at closed institutions, waited for
4   periods well over the Program Guide timelines, with at least one patient waiting more than
5   four months.  *See, e.g.*, Exs. D-25 and P-002-10 (waitlist as of Oct. 2 was 50.4 days, with a
6   maximum wait of 122 days).

7        **B.**     **The Blocking of DSH Transfers Harms Patients**

8        Defendants did not contest the qualifications of psychiatrist Dr. Pablo Stewart to
9   testify regarding the harms of delayed inpatient placement.  RT 257:13-21 (declining *voir*
10  *dire*).  Dr. Stewart reviewed medical records of *Coleman* class members waiting for DSH
11  placement.  He testified that any delay in providing necessary inpatient psychiatric
12  hospitalization may cause needless harm and suffering.  RT 258:20-259:13; *see also* RT
13  220:8-221:5 (Lauring).  Additionally, the harm caused by a delay in treatment can be
14  irreparable, as delays may worsen a patient's prognosis for psychotic symptoms.  RT
15  258:20-259:13 (Stewart).  Further, a patient who is not receiving needed inpatient care
16  may demonstrate behavioral manifestations of their mental illness, resulting in assaults,
17  acts of aggression, and an increase in self-injurious behavior.  RT 259:14-22.  Dr. Stewart
18  identified numerous treatment needs of the patients that needed to be addressed in an
19  inpatient setting.  *See* RT 262:23-266-12 (Stewart testimony describing review of
20  treatment records demonstrating contradictory diagnoses, multiple diagnoses, and
21  polypharmacy issues).

22       As Dr. Stewart was about to provide the Court with specific examples from eleven
23  patient records, Defendants objected that they had not been provided with the records in
24  advance, and so could not have prepared for the testimony, and the Court sustained the
25  objection.  RT 270:6-271:11.  Later in the hearing, however, CDCR's statewide mental
26  health director, Dr. Mehta, confirmed the representations of Plaintiffs' counsel that
27  Plaintiffs had identified the eleven patients in advance of the hearing, so that Dr. Mehta
28  had also reviewed the records before the hearing.  RT 302:17-24 (Mehta).  Plaintiffs

1  therefore request that the Court revisit its ruling on the objection to Dr. Stewart's

2  testimony regarding the eleven patients.  Plaintiffs have with this brief provided a written

3  declaration from Dr. Stewart on his review of the eleven patients, the results of which are

4  briefly summarized below.

5      Among the patients still waiting for a DSH bed at the time of the hearing, is a man

6  at SATF who has been waiting in a 10-day crisis bed placement for over five months.

7  Stewart Decl. ¶ 39.  The man identified in the Stewart Declaration as Patient 24 arrived at

8  the crisis bed in SATF after a suicide attempt in late May 2020 in which he nearly died.

9  He had cut his neck and arms so badly that he lost several liters of blood and had to be

10  airlifted to a hospital for emergency transfusions.  Stewart Decl. ¶ 40.  This was the second

11  serious suicide attempt in recent months for Patient 24, and his clinicians wrote that the

12  risk of recurrence was high.  Stewart Decl. ¶¶ 40-42.  As Dr. Stewart explains, Patient 24's

13  case is the type that urgently requires inpatient hospital care to clarify diagnoses and

14  develop an effective treatment plan.  Stewart Decl. ¶ 45.  As the weeks turned into months,

15  clinicians recorded statements of distress from Patient 24, *see* Stewart Decl. ¶ 46, but could

16  do nothing to get him to DSH because of Defendants' practices regarding transfer.  Stewart

17  Decl. ¶ 41.

18      Patient 10 at the CMF PIP had been waiting for a DSH transfer for four months.

19  Patient 10 suffers episodes of catatonia so severe that "he loses his capacity to attend to his

20  bodily needs, and will, e.g., urinate on himself and stand immobile at the cell door."

21  Stewart Decl. ¶ 92.  Patient 10 needs to be treated outside the locked-down setting of the

22  PIP.  Stewart Decl. ¶ 93

23      Patient 3 at CHCF Stockton was also referred to DSH care in June 2020, and had

24  not been transferred as of mid-October.  Stewart Decl. ¶ 19.  While waiting at CHCF

25  Stockton in the PIP, Patient 3 stopped coming out of his cell, began refusing clinical

26  contacts, and experienced ongoing suicidal ideation and self-cutting, which he said he did

27  in response to the voices in his head.  Stewart Decl. ¶¶ 20-23.  Furthermore, Patient 3 was

28  being treated with medication for PTSD, despite not having such a confirmed diagnosis,

1  indicating a need for diagnostic clarification.  Stewart Decl. ¶ 22.  The manner in which

2  Patient 3 received treatment at CHCF failed to stabilize his severe, active mental health

3  symptoms.  Stewart Decl. ¶¶ 25-26.

4          Patient 28 at California Men's Colony ("CMC") was referred to DSH on August 21,

5  2020, but had not yet been transferred as of mid-October.  Stewart Decl. ¶¶ 27-28.

6  Patient 28 is diagnosed with Schizoaffective Disorder, Bipolar Type and has a documented

7  developmental disability.  Stewart Decl. ¶ 30.  In the last several months, Patient 28 has

8  cycled back and forth between the MHCB and the Administrative Segregation Unit

9  ("ASU") where he is purportedly receiving EOP level treatment, despite having an active

10  referral to DSH.  Stewart Decl. ¶¶ 31-35.  In September, Patient 28 experienced significant

11  decompensation in the MHCB and among other symptoms, reported command auditory

12  hallucinations telling him to cut his wrist and ingested a pen filler.  Stewart Decl. ¶ 33.

13  Dr. Stewart concluded that Patient 28's severe and chronic mental health symptoms and

14  complex medication issues cannot be safely managed in either a MHCB or ASU, and that

15  Patient 28 needs to be transferred to an inpatient program immediately.  Stewart Decl.

16  ¶¶ 36-37.

17          Patient 11 has also been waiting four months for a DSH transfer.  Stewart Decl.

18  ¶¶ 50-52.  She has cut herself with a razor and was sent to an outside hospital for treatment

19  in late July, only to be returned to CDCR to await care at DSH.  Stewart Decl. ¶ 53.  In

20  August she started to refuse treatment meetings, and in September was found with a noose

21  around her neck.  Stewart Decl. ¶ 54.

22          Patient 39 has been waiting almost two months in the EOP at CMC for a DSH

23  transfer.  Stewart Decl. ¶ 57.  Patient 39 has experienced suicidal ideation and auditory

24  hallucinations.  Stewart Decl. ¶¶ 60-61.  He has a history of traumatic brain injury.

25  Stewart Decl. ¶ 59.  In referring him, his clinician stated that he needs "a neurological

26  evaluation, which cannot be provided at the current level of care."  Stewart Decl. ¶ 64.

27  Dr. Stewart testified that delaying transfer to inpatient care is dangerous for Patient 39.

28  Stewart Decl. ¶ 66.

1   Patient 7 has been waiting in the MHCB at CMF for transfer to DSH since July.

2   Stewart Decl. ¶¶ 67-68.  He had five crisis bed admissions between April and July 2020.

3   Stewart Decl. ¶ 70.  After two months in the MHCB, his clinician recorded psychomotor

4   agitation consistent with medication side effects.  Stewart Decl. ¶ 75.

5   Patient 16 has been waiting for a DSH transfer from SATF for over two months.

6   Stewart Decl. ¶ 77.  He has experienced paranoid delusions and has conflicting diagnoses.

7   Stewart Decl. ¶¶ 78-79.  His clinicians have recorded continued auditory hallucinations

8   and hypomania while he awaits transfer.  Stewart Decl. ¶¶ 82, 84.

9   Patient 15 has also been waiting for a DSH transfer from SATF for almost two

10   months.  Stewart Decl. ¶ 94.  Clinicians have recorded that he has a noticeable bald spot

11   from pulling his own hair out.  Stewart Decl. ¶ 96.

12   Patient 38 has been waiting for two months for a DSH transfer from the MHCB at

13   SATF.  Stewart Decl. ¶ 98.  He suffers from the effects of a traumatic brain injury, and

14   needs to go to the hospital for neurological assessment and diagnostic clarification.

15   Stewart Decl. ¶ 99.  He has cut his wrist at least twice during his long MHCB stay, and has

16   engaged in headbanging in his cell.  Stewart Decl. ¶¶ 102, 107.

17   Patient 52 has been waiting for over a month to transfer to DSH from SATF.

18   Stewart Decl. ¶ 109.  His clinicians report that his condition is not improving in the MHCB

19   despite medication compliance.  Stewart Decl. ¶ 110.  Patient 52 opposed transfer and

20   invoked his right to a due process hearing under *Vitek v. Jones*.  Stewart Decl. ¶ 111.  The

21   hearing officer, a psychologist, determined that inpatient care over the patient's objections

22   was necessary.  Stewart Decl. ¶ 111.

23   Dr. Stewart's review demonstrates that patients are suffering real harms from

24   Defendants' delay of DSH care.

25   **C.   The October 20, 2020 Transfer Policy Deviates From Program Guide
        Requirements**

26

27   Just before the hearing, Defendants presented a new DSH transfer policy, herein-

28   after the "October 20" policy, Exhibit P-101.  The new policy still imposes restrictions far

[3642030.16]

11

1   beyond those permitted by this Court's April 24 order.  *See* Order, April 24, 2020, ECF

2   No. 6639 at 10.  The only material change in the October 20 policy is a statement that

3   Defendants will now "consider" *Coleman* patient referrals from closed institutions when

4   "there is adequate public health data demonstrating an acceptably low risk of exposure to

5   the patient."  *Id.* at § I(n).  This new public health assessment turns on factors that have

6   nothing to do with the patient's mental health care needs, but rather addresses factors such

7   as the nature of the physical plant at the closed institution and the institution's inventory of

8   Personal Protective Equipment.  *Id.* at § I(n); *see* RT 82:14-83:10 (Warburton).

9        Dr. Warburton testified that the information assessed for potential transfers from

10   closed institutions under the October 20 policy is essentially the same as what DSH has

11   been getting from CDCR for OMHD admissions for the last eight months.  RT 81:25-83:5

12   (Warburton testimony).  But DSH never asked for that data to individually assess *Coleman*

13   patients until after the Court confirmed this hearing (RT 83:6-10), despite many weeks

14   when not a single class member transferred to DSH and dozens languished and suffered in

15   CDCR past Program Guide timelines awaiting desperately needed psychiatric

16   hospitalization.  *See* Exs. P-001-21 (no *Coleman* transfers to DSH between Oct. 5-9);

17   P-001-20 (none for Sept. 28-Oct. 2); P-001-18 (none for Sept. 8-11); P-001-17 (none for

18   Aug. 31-Sept. 4); P-001-16 (none for Aug. 24-28); P-001-12 (none for July 20-24).

19        **D.    Prison-Based Crisis Beds and Inpatient Programs Are Not Equivalent to**
20   **DSH Inpatient Programs**

21        Defendants erroneously argue that the care that *Coleman* class members receive at

22   CDCR, whether in the PIPs or in outpatient beds, is a comparable replacement for

23   psychiatric hospitalization at DSH.  *See* RT 25:15-17.  But this argument is not supported

24   by the evidence, as Dr. Mehta testified that Defendants merely conduct a record review for

25   a subset of patients waiting to transfer to DSH as a way of doing "quality control," and that

26   no group is specifically responsible for reviewing the adequacy of care that *Coleman*

27   patients on the waitlist for DSH are receiving.  *See* RT 143:23-144:22 (Mehta testimony).

28   Furthermore, the treatment offered at CDCR, even in an MHCB, is no substitute for

1  inpatient hospitalization at DSH.  As Dr. Stewart testified, the inpatient setting at DSH

2  allows for diagnostic clarification, nuanced medication monitoring, and psychosocial

3  rehabilitation, which are integral for the treatment of severe mental illnesses.  *See* RT

4  275:19-276:4.

5        And even when patients are admitted to a PIP program, the care that patients

6  receive in those inpatient programs fails to meet constitutional standards.  Due to profound

7  understaffing and custodial interference, most of the PIP programs delivered only minimal

8  treatment even before the coronavirus pandemic further exacerbated existing deficiencies.

9  In April 2020, the Special Master reported that "CDCR's PIPs are not providing adequate

10  mental health care to patients, and the care that is being provided has been further

11  constricted by the COVID-19 pandemic."  Special Master Amended Report re Status of

12  Class Member Access to Inpatient Care ("2020 Inpatient Access Report"), April 6, 2020,

13  ECF No. 6579 at 29.  "In the period preceding the onset of the COVID-19 pandemic,

14  staffing vacancies and the lack of appropriate treatment at CHCF-PIP, CMF-PIP, and

15  SVSP-PIP were known to CDCR, the Special Master and plaintiffs' counsel to have

16  seriously limited what mental health care was available to patients in these programs."  *Id.*

17  at 19.  PIP patients on maximum custody status rarely left their cells at all.  *Id.* at 20. The

18  Special Master described the dismal conditions in the PIPs as "institutional program

19  failures," and reported that, even before the pandemic, the State's top psychiatric programs

20  for class members suffered from "significant functional vacancies" in all clinical

21  categories, offered patients "minimal" clinical structured therapeutic activities, poor access

22  to individual treatment, and "problematic" treatment planning.  *Id.* at 19-21.

23        Care in the PIPs remains below minimally adequate levels, as the pandemic has

24  exacerbated the pre-existing deficiencies.  Dr. Stewart's testimony bears out that patients

25  awaiting DSH transfer in the PIPs are not receiving the treatment they need.  *See supra*,

26  section II (C).  And Dr. Mehta's testimony confirms that the treatment in the PIPs remains

27  bare bones.  RT 299:13-300:11 ("In the PIPs right now we're kind of – we're taking

28  everything we can get.").

[3642030.16]

13

### III.    THE PROFFERED PUBLIC HEALTH RATIONALE DOES NOT JUSTIFY ENDANGERING CLASS MEMBERS BY DELAYING DSH CARE

#### A.    There Is No Public Health Case For Closing Or Delaying DSH Admissions

Defendants have the burden of proof on the rationale for delaying DSH care.  They failed to carry this burden because they did not point to any public health guidance that directs hospitals of any kind to close their doors to persons who may have been exposed to COVID-19.  Nor did they present any expert witness to testify that closing or delaying hospital admissions is necessary at this stage of the pandemic.  Plaintiffs, by contrast, presented Dr. Adam Lauring, a well-qualified infectious disease expert who is a physician board certified in infectious diseases and directs a research laboratory on the virus that causes COVID-19.  RT 212:14-213:2.  Dr. Lauring spent the early weeks of the pandemic developing hospital safety protocols to prevent spread of COVID-19, and was chosen to co-author a consensus document for the Society for Healthcare Epidemiology in America, a leading professional organization for infection prevention in health care settings.  RT 213:3-22.  Dr. Lauring studiously tracks the public health guidance on COVID-19 transmission and mitigation.  RT 216:20-24.   Defendants accepted his qualifications without objection.  RT 214:19.

Asked directly whether it was necessary for hospitals to refuse admission to patients unless they have tested negative for COVID-19, he answered, "No."  RT 220:3-7.  Dr. Lauring offered this opinion with a full understanding of the unique needs of an inpatient psychiatric facility with patients living in congregate settings.  RT 217:25-219:11.  Dr. Lauring reviewed DSH's robust protocols for preventing COVID-19 from spreading in its hospitals, and stated that these protocols, which essentially treat all patients as if they are potentially infected with COVID-19, are adequate to prevent outbreaks without barring or delaying admissions from CDCR.  RT 221:6-223:15; *see also* Exs. P-23 (Atascadero pandemic plan), P-34 (admission protocols), P-35 (employee testing), P-36 (patient testing), P-38 (admission resumption plan), P-39 (Atascadero admission/discharge plan), P-40 (same for Coalinga), P-43 (same for Patton), P-45 (serial testing), P-49 (space

1  planning), P-51 (patient-under-investigation management), P-52 (staff screening), P-53

2  (COVID-19 precautions and testing).

3      And in fact, DSH does admit patients without arbitrary bars or delays when DSH

4  policy makers believe they are legally required to.  Dr. Warburton testified that DSH has a

5  policy in place for safely admitting patients from CDCR and county jails.  *See* RT 63:18-

6  21; *see also* Ex. D-39 at 5 (Oct. 2 Joint Report on COVID-19 Task Force stating

7  that Defendants admit OMHDs "from both closed and open institutions on the date of

8  parole").  All patients who are admitted to DSH undergo serial testing over a 14-day period

9  before they are released into regular congregate living spaces.  *See* Exs. D-26; P-45.

10  Patients who are symptomatic when admitted are categorized as a person under

11  investigation ("PUI") and admitted to separate rooms from patients who are not

12  symptomatic when admitted.  *Id.*  DSH treats OMHDs from closed institutions as PUIs.

13  *See* Ex. D-39 at 5.  All admitted patients—regardless of whether they are categorized as a

14  PUI or not—are tested on day 1, between days 5-7, and on day 14.  *See* Ex. D-26; P-45.  If

15  a patient tests positive for COVID-19, they are admitted to an isolation unit and managed

16  according to additional protocols.  *Id.*  Through these policies, DSH continued to admit

17  post-conviction civil commitments from CDCR to Patton State Hospital from June through

18  August, even though the hospital was closed to other admissions, including *Coleman* class

19  members, because of an active COVID-19 outbreak at the hospital.  RT 70:10-14

20  (Warburton); Ex. D-36 at 6.

21      The only relevant public health guidance offered as evidence in the trial confirmed

22  Dr. Lauring's view that behavioral health facilities like DSH should not close or defer

23  admissions as a means of controlling COVID-19.  California Department of Public

24  Health's ("CDPH") frequently asked questions dated June 27, 2020 for behavioral health

25  programs specifically says, in bold print, that "[a] negative test in an asymptomatic

26  individual should not be required for admission to a [behavioral] treatment facility," and

27  makes clear that testing is not required by any CDPH guidance before patient admission.

28  P-107 at 3.  It does not say that such programs can or should refuse to admit patients, even

1   if those patients are suspected of having COVID-19 exposure.  *See* RT 220:3-7 (Lauring).

2   Similarly, October 1, 2020 joint guidance from CDPH and the California Department of

3   Health Care Services ("CDHCS"), which focuses on residential behavioral health facilities

4   (Ex. P-103 at 2), recommends the exact steps that DSH is already taking at intake and

5   admission to control the spread of the virus—without any of the additional steps

6   Defendants impose prior to transfer, such as requiring a negative test and quarantine for

7   patients with no known exposure and banning transfers from closed institutions, that are

8   causing delays and denials of care to class members.  P-103 at 4, 6-7; *see also* RT 224:13-

9   226:21, RT 229:19-230:25 (Lauring).  DSH already applies the guidance CDPH and

10  CDHCS recommends for admitting exposed individuals for every patient admitted to their

11  hospitals (P-103 at 7), which means they already have the recommended policies and

12  protocols in place to safely admit *Coleman* patients coming from "closed institutions," like

13  the OMHDs they routinely accept from those same prisons.  *See* RT 221:6-222:22

14  (Lauring); *see also* RT 222:23-223:15 (Lauring).

15      DSH has sufficient space available at its hospitals to implement its isolation and

16  quarantine procedures.  As of September 28, there were 115 vacant beds at Atascadero

17  State Hospital ("ASH"), Coalinga State Hospital ("CSH"), and Patton State Hospital

18  ("PSH") reserved for *Coleman* class members.  *See* ECF No. 6912 at 6 (Sept. 28 DSH

19  Patient Census and Waitlist Report).  As of October 1, all five DSH hospitals are operating

20  below maximum capacity, with 649 total vacant beds available.  *See* Ex. P-108 (DSH Net

21  Bed Capacity Report for October 1, 2020).  Various units at each hospital have been

22  reserved for implementing admission procedures.  *See id.*  In particular, DSH had

23  confirmed that ASH has "an adequate number of isolation and admission observation beds

24  to manage admissions and prevent an outbreak of COVID-19 within the hospital."  Ex. P-

25  39 at 2.  This includes 5 admissions observation units set aside for quarantine upon

26  admission (Ex. P 38 at 5), as well as a 46-person medical isolation unit (Unit 31) with its

27  own HVAC system that can be totally isolated from the rest of the hospital (Exs. P-4-13,

28  P-23 at 1) with a second identical unit (Unit 32) on reserve if needed (Ex. P-23 at 1-2),

1  plus five beds set aside for PUIs in Unit 1 (Ex. P 4-13).  DSH also has the option of

2  admitting patients directly to CSH.  *See* Ex. P 1-22.

3      All of the units set aside as admission units at Atascadero have vacancies, indicating

4  that DSH certainly has the capacity to safely admit more *Coleman* patients, even under its

5  own cautious admissions procedures.  *See* Ex. P-108 at 1 (Units 12, 21, 6, 8, and 23 are

6  ASH admissions units with 2, 10, 14, 1, and 30 vacant beds, respectively, as of October 1).

7  Therefore, the lack of space at DSH is not a credible reason to deny admission to *Coleman*

8  class members.

9      **B.    DSH Is Picking and Choosing Which CDCR Patients To Take and Is
            Preferring Legal Status Over Medical Necessity**

10

11      In addition to *Coleman* class members referred due to medical necessity, DSH also

12  receives former CDCR prisoners who are civilly committed under the OMHD statute.

13  OMHDs come directly from the same CDCR institutions at which *Coleman* class members

14  are lingering, waiting for DSH to accept them.  At no time during the pandemic has DSH

15  closed OMHD admissions.  In fact, DSH has displaced *Coleman* patients in favor of

16  OMHD admissions.  *See* Ex. P-095 (Oct. 13 letter from CDCR stating that patients did not

17  timely transfer to DSH due to a "full admission cohort for that week"); *see also* P-6-14

18  (reporting 29 OMHD admissions the same week *Coleman* patients were refused due to full

19  admission cohort).  The only reason DSH gives for preferring OMHD admissions is that

20  DSH policy makers perceive a legal obligation to accept OMHDs.  *See* RT 70:17, 75:24

21  (Warburton), 182:18-22 (Bick); *see also* P-38 at 6 (reporting OMHD admissions are top

22  priority, above all other patient classes including *Coleman* admissions).  By necessary

23  implication, the same policy makers perceive admission of *Coleman* patients as optional.

24  This attitude is extremely dangerous, as the *Coleman* patients are in need of life-saving

25  inpatient mental health treatment, whereas the OMHDs are merely being placed at DSH

26  due to a legal status.

27      DSH's perception of its legal obligations is wrong both as to the OMHDs and as to

28  the *Coleman* patients.  First, as to the OMHDs, the state has authorized agencies like DSH

to "[waive] any provision … of the Penal Code that affects the execution of laws relating to care, custody, and treatment of persons with mental illness …." *See* Cal. Executive Order N-35-20.[3]  In addition, OMHD treatment need not be inpatient at a DSH hospital. The law allows DSH to provide the treatment on an outpatient basis, if DSH "certifies to the Board of Parole Hearings that there is reasonable cause to believe that the parolee can safely and effectively be treated on an outpatient basis."  Cal. Penal Code Section 2964(a). Nothing in the law requires DSH to wait until the end of the prisoner's term to make such a certification.  DSH can do so at any point during OMDH certification process set forth in Section 2962(d)(1) of the California Penal Code.  State law does not require DSH to favor OMHDs over *Coleman* patients.

Nor is DSH correct in perceiving the admission of *Coleman* patients as optional. Full and timely access to the 336 DSH beds reserved for *Coleman* class members' treatment is critically necessary to Defendants' ability to ever meet that constitutional obligation.  *See* 2018 Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation ("2018 Inpatient Report"), ECF No. 5894, at 22 (finding "timely access to DSH beds for all inmates who meet clinical and custodial requirements for placement at DSH-Atascadero, DSH-Coalinga, and PSH, is essential to the remedial process in the *Coleman* case.").  Therefore, Defendants' asserted interests in carrying out the statutory scheme that requires them to admit OMHDs has minimal relevance and does not excuse them from

---

[3] Available at: https://www.gov.ca.gov/wp-content/uploads/2020/03/3.21.20-EO-N-35-20-text.pdf (last accessed on Nov. 10, 2020).  Courts routinely take judicial notice of government documents, particularly where they are posted on the government agency's official website.  *See, e.g.*, *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 61 F. Supp. 2d 1058, 1066 (N.D. Cal. 1999) (taking judicial notice of document posted on agency's website and "readily accessible through the Internet"); *Paralyzed Veterans of Am. v. McPherson*, 2008 WL 4183981, * 5 (N.D. Cal. Sept. 9, 2008) (noting that "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web.  This is particularly true of information on government agency websites, which have often been treated as proper subjects for judicial notice," and collecting cases (citation omitted)).

1   complying with this Court's prior orders.  *Compare Hook v. Arizona Dep't of Corrections*,

2   107 F.3d 1397, 1402-3 (9th Cir. 1997) (federal court's remedial order in prison conditions

3   litigation preempted conflicting state statute, where the court expressly found that the

4   relevant remedial provision "was necessary to vindicate the prisoners' constitutional

5   rights"), *with Valdivia v. Schwarzenegger*, 599 F.3d 984, 994-95 (9th Cir. 2010) (federal

6   court's remedial order did not preempt conflicting state statute because "the district court

7   made no express determination" that the relevant provision of its order was "necessary to

8   remedy federal constitutional violations").  This Court must clarify to Defendants that they

9   cannot defy this Court's orders to provide constitutionally adequate mental health

10  treatment and admit *Coleman* class members simply because Defendants believe they are

11  legally bound to admit OMHDs.

## CONCLUSION

13      The Court should order Defendants to revise their admissions and transfer policies

14  for *Coleman* class members referred to inpatient care at DSH facilities during the

15  COVID-19 pandemic to comply with the Program Guide requirements, as modified by the

16  temporary addition of COVID-19 screening.  *See* ECF No. 6660 at 2.  Plaintiffs propose

17  the following specific revisions to Defendants' current transfer policies:

18      First and foremost, all *Coleman* class members, including patients being transferred

19  to their least restrictive housing, shall be admitted to DSH in compliance with the Program

20  Guide timelines.  Transfers of *Coleman* patients shall not be delayed or held based on

21  screening or testing for COVID-19.  If Defendants require a negative COVID-19 test at the

22  originating institution prior to transferring to DSH, such testing must occur within Program

23  Guide timelines and shall not qualify as an exception to transfer timelines.  Under no

24  circumstances should Program Guide timelines be put on hold while *Coleman* patients are

25  screened or tested.  If, for example, testing or test results for a *Coleman* class member is

26  delayed prior to admission, the transfer shall proceed as scheduled, with the use of a rapid

27  test and/or with the result provided to DSH as soon as it arrives.

28      Second, transfers of *Coleman* patients admitted to DSH shall not be delayed or put

on hold because the patient originates from an institution that CDCR has designated as closed to movement.  Instead, a *Coleman* patient who originates from a closed CDCR institution shall be treated as having a positive indicator for COVID-19 exposure for purposes of the Medical Director's decision regarding initial placement into an isolation room or unit upon admission to DSH.

Third, if a *Coleman* patient who tests positive for COVID-19 and cannot transfer within Program Guide timelines may only be claimed as an exception if Defendants conclude that s/he "has a medical condition that cannot be treated at [DSH] and that is deemed more urgent than the mental health treatment need at or after the time of the referral, as determined by a joint team of medical and mental health clinicians …." Ex. D-5 (Exceptions to Program Guide Inpatient transfer timelines).

### CERTIFICATION

The undersigned counsel for Plaintiffs certifies that he reviewed the following relevant court orders:

| Dkt. No. | Date | Subject |
|---|---|---|
| 6934 | 11/2/2020 | Approving Stipulation on Post-Trial Briefing |
| 6886 | 9/25/2020 | Confirming 10/23/2020 Evidentiary Hearing |
| 6885 | 9/25/2020 | Denying Motion to Modify Order at 6639 |
| 6660 | 5/7/2020 | Denying Motion for Reconsideration and Clarifying Order Setting Evidentiary Hearing |
| 6600 | 4/10/2020 | Pandemic Measures, Opening Discovery on DSH Issues, Setting Evidentiary Hearing |
| 6572 | 4/3/2020 | Show Cause Re DSH Transfers |
| 4688 | 7/11/2013 | Inpatient Care |

1

DATED:  Nov. 13, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,
ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Ernest Galvan*
     Ernest Galvan

Attorneys for Plaintiffs

1

## ACRONYMS USED

2

| ACRONYM | FULL TEXT |
|---------|-----------|
| ASH | Atascadero State Hospital |
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System |
| CDCR | California Department of Corrections and Rehabilitation |
| CDHCS | California Department of Health Care Services |
| CDPH | California Department of Public Health |
| CMF | California Medical Facility |
| CSH | Coalinga State Hospital |
| DSH | Department of State Hospitals |
| EOP | Enhanced Outpatient Program |
| HVAC | Heating Ventilation and Air Conditioning |
| MHCB | Mental Health Crisis Bed |
| OMHD | Offender with Mental Health Disorder |
| PIP | Psychiatric Inpatient Program |
| PSH | Patton State Hospital |
| PSU | Psychiatric Services Unit |
| PTSD | Post Traumatic Stress Disorder |
| PUI | Person Under Investigation |
| SATF | Substance Abuse Treatment Facility |
| SHU | Security Housing Unit |
| SVSP | Salinas Valley State Prison |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28