1   DONALD SPECTER – 083925               MICHAEL W. BIEN – 096891
    STEVEN FAMA – 099641                  JEFFREY L. BORNSTEIN – 099358
2   MARGOT MENDELSON – 268583             ERNEST GALVAN – 196065
    PRISON LAW OFFICE                     LISA ELLS – 243657
3   1917 Fifth Street                     THOMAS NOLAN – 169692
    Berkeley, California  94710-1916      JENNY S. YELIN – 273601
4   Telephone:   (510) 280-2621           MICHAEL S. NUNEZ – 280535
                                          JESSICA WINTER – 294237
5   CLAUDIA CENTER – 158255               MARC J. SHINN-KRANTZ – 312968
    DISABILITY RIGHTS EDUCATION           CARA E. TRAPANI – 313411
6   AND DEFENSE FUND, INC.                ALEXANDER GOURSE – 321631
    Ed Roberts Campus                     AMY XU – 330707
7   3075 Adeline Street, Suite 210        ROSEN BIEN
    Berkeley, California  94703-2578      GALVAN & GRUNFELD LLP
8   Telephone:   (510) 644-2555           101 Mission Street, Sixth Floor
                                          San Francisco, California  94105-1738
9                                         Telephone:   (415) 433-6830

10  Attorneys for Plaintiffs

11

12                   UNITED STATES DISTRICT COURT

13                   EASTERN DISTRICT OF CALIFORNIA

14

15  RALPH COLEMAN, et al.,                Case No. 2:90-CV-00520-KJM-DB

16            Plaintiffs,                  **EXPERT DECLARATION OF
                                          PABLO STEWART, M.D.
17       v.                               REGARDING DEFENDANTS'
                                          DELAYED TRANSFER OF CLASS
18  GAVIN NEWSOM, et al.,                 MEMBERS TO DSH INPATIENT
                                          HOSPITALS**
19            Defendants.
                                          Judge:   Hon. Kimberly J. Mueller
20

21

22

23

24

25

26

27

28

[3646336 3]

EXPERT DECLARATION OF PABLO STEWART, M.D. RE: DEFENDANTS' DELAYED TRANSFER OF
CLASS MEMBERS TO DSH INPATIENT HOSPITALS

I, Pablo Stewart, M.D., declare:

1.  I am a board-certified psychiatrist and Clinical Professor in the Department of Psychiatry at the University of Hawaii, in Honolulu.  My curriculum vitae is attached hereto as **Exhibit A,** which was Plaintiffs' Exhibit P-100 for the October 23, 2020 trial.

2.  I make this Declaration in support of Plaintiffs' Closing Brief for the October 23, 2020 Department of State Hospitals Evidentiary Hearing.  This Declaration sets forth in written form the testimony I would have provided live at the October 23, 2020 hearing, had the Court permitted me to testify concerning the eleven patient records for individuals waiting for transfer to treatment units at the Department of State Hospital ("DSH") that I reviewed in the most detail.  All eleven records were for individuals on the CDCR waiting list of individuals accepted for DSH inpatient care, who were waiting to go to one of the inpatient hospital programs at DSH.

3.  I have over 30 years of experience in correctional mental health care, including serving as the courts' expert in several class action cases challenging the provision of mental health care to prisoners.  After medical school, I completed my psychiatric residency at the University of California, San Francisco in part as Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and the San Francisco Veterans Affairs Medical Center, including service at the VA's Substance Abuse Inpatient Unit.  During my residency, I also practiced at several community health programs.  Between 1986 and 1990, I was the Senior Attending Psychiatrist for the Forensic Unit of UCSF, which was located at San Francisco General Hospital.  In that capacity, I had administrative and clinical responsibility for a 12-bed maximum-security psychiatric ward and worked as the liaison with the Jail Psychiatric Services of the City and County of San Francisco.  Between August 1988 and December 1989, I was the Director of Forensic Psychiatric Services for the City and County of San Francisco.  In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the inmate population in San Francisco at both the county jails and in the locked inpatient treatment unit at San Francisco General Hospital.

4.      From 1990 through 1996, I served in various medical leadership posts at the Department of Veterans Affairs Medical Center, San Francisco, including serving as Chief of the Substance Abuse Inpatient Unit, as Chief of the Intensive Psychiatric Community Care Program, focusing on services for homeless veterans, and as Medical Director of the VA's Comprehensive Homeless Center.

5.      From 1996 to the present, I have served as a psychiatric consultant to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues, with a focus on correctional psychiatry.  I have served as a psychiatric expert or consultant to various federal courts, the United States Department of Justice, and other organizations evaluating the provision of mental health treatment and implementing remedial decrees covering the provision of mental health care in correctional institutions.  Beginning in May 2016, and continuing in the present, I am serving as the court-appointed monitor in *Rasho v. Baldwin*, No. 1:07-CV-1298 (C.D. Ill.), a class action case concerning mental health care in the Illinois Department of Corrections.

6.      I have submitted a number of declarations in connection with this case that opine on the adequacy of the mental health care in the CDCR and in DSH facilities.  I have conducted numerous tours of CDCR prisons, including DSH units in those prisons, in the last 25 years.  My first experience with the CDCR was in the mid-1990s, when I spent several years monitoring mental health care at California Medical Facility ("CMF"), a CDCR prison in Vacaville, California, as a court expert for Judge Karlton in the *Gates v. Deukmejian* case.  During those years, two of the main inpatient programs for CDCR prisoners were operated at CMF by the Department of Mental Health, and CDCR patients who needed intermediate inpatient care would also be sent to Atascadero State Hospital, a DSH facility, similar to today.  However, there are now numerous inpatient programs at higher custody levels than ASH operated by the CDCR inside its own prisons.

7.      In 2013, I toured six CDCR prisons as Plaintiffs' expert witness in opposing the termination motion filed by Defendants in this matter.  I also provided several declarations and gave testimony in several live hearings before Judge Karlton in support of

1  subsequent enforcement motions filed by Plaintiffs later in 2013, after the termination

2  motion was denied, including an enforcement motion about the quality of care in DSH

3  programs, which at the time included programs like the Psychiatric Inpatient Program

4  ("PIP") at Salinas Valley State Prison ("SVSP").  I also testified on behalf of the Plaintiffs

5  in the overcrowding proceedings that took place in this case starting in approximately

6  2007.  In the overcrowding and termination phases of this case alone, I have spoken with

7  well over 150 CDCR inmate patients, toured numerous prisons, and reviewed scores of

8  inmate patient medical and custody records in the CDCR. The following docket orders

9  reflect my past testimony to this Court:  ECF No. 3317-1 (testimony on 11/18/08 regarding

10  overcrowding); ECF No. 3396-1 (testimony on 12/11/08 regarding overcrowding); ECF

11  No. 4663 (testimony on 6/20/13 regarding DSH treatment enforcement motion); ECF No.

12  4873 (testimony on 10/16/13 re: enforcement motion seeking creation of SQ Inpatient

13  Program for death row patients); ECF No. 4949 (testimony on 12/5/13 in Plaintiffs'

14  enforcement motion regarding ASU and use of force).

15      8.    My publications and presentations address a broad range of treatment and

16  assessment problems for mentally ill patients in both community and institutional settings.

17  My CV at **Exhibit A** lists presentations and publications I have authored at pages 12

18  through 25.

19      9.    In preparing this report, I reviewed the most recent treatment plans,

20  including a psychiatrist medication review done at the time of each treatment plan, for all

21  55 patients on the CDCR list of patients awaiting transfer to DSH.  *See* Ex. P-093.  Of

22  particular relevance to this report, I then selected 11 individual cases from that list for

23  more detailed review.  I was provided comprehensive medical records for those 11

24  individuals, including all of their mental health treatment records in the CDCR electronic

25  medical records, for the period from two months prior to their referral to DSH, until the

26  week before the October 23, 2020 hearing.  Using the numeric code to protect patient

27  confidentiality, which Plaintiffs' counsel has shared with Defendants, I closely reviewed

28  the records for these eleven patients, whose situation I review in detail below:  Patient 3,

EXPERT DECLARATION OF PABLO STEWART, M.D. REGARDING DEFENDANTS' DELAYED TRANSFER
OF CLASS MEMBERS TO DSH HOSPITALS

1  Patient 7, Patient 10, Patient 11, Patient 15, Patient 16, Patient 24, Patient 28, Patient 38,

2  Patient 39, and Patient 52.  I also reviewed the *Coleman* Special Master's two most recent

3  reports about inpatient care in the CDCR and in DSH.  *See* Exs. P-068 (ECF No. 6579),

4  P-069 (ECF No. 5894).

5       10.     In preparing my opinion before the trial, I also reviewed the most recent

6  treatment plans for all 55 patients on the CDCR list of patients approved for and waiting

7  for admission to DSH hospital programs.  I also reviewed Plaintiffs' Exhibit P-102, which

8  is a chart summarizing some key clinical facts in the records I reviewed for the 55 cases on

9  Defendants' waiting list for transfer to DSH programs.

10      **THE ELEVEN INDIVIDUAL CASES THAT I REVIEWED IN DEPTH
        DEMONSTRATE THE SIGNIFICANT HARM TO CLASS MEMBERS FROM
11      DELAYED TRANSFERS TO DSH INPATIENT HOSPITAL PROGRAMS**

12      11.     My review of the treatment plans and current medication records for the 55

13  individuals on CDCR's waiting list for transfer to DSH hospital programs just prior to the

14  hearing led me to some general conclusions, which I testified about during the October 23,

15  2020 hearing.  First, the treatment plans and medication records for these patients led me

16  to conclude that they were appropriate cases for transfer to DSH, and that they were

17  appropriately accepted for treatment in DSH hospital programs, including at Atascadero

18  State Hospital ("ASH"), Patton State Hospital ("PSH"), and Coalinga State Hospital

19  ("CSH").  Second, based on these treatment plans and medication records, I concluded

20  that, as a whole, this group of patients had serious issues that required prompt transfer to

21  inpatient hospital level of care.  Third, based on their treatment needs, their medication

22  issues, and their serious diagnoses and serious diagnostic issues needing clarification, I

23  concluded that as whole this group was experiencing significant harm from having their

24  transfer to DSH inpatient hospital programs delayed.  My in depth review of the eleven

25  cases discussed below confirmed and strengthened these conclusions.

26      12.     In my experience as a practitioner in other inpatient hospital settings, and

27  based on my knowledge and training regarding proper clinical care, patients who require

28  inpatient hospital care must be moved immediately to that level of care.  Delays of even

[3646336 3]                                    4

1   days in transferring such patients to the hospital causes unnecessary, avoidable harm and

2   suffering.  For example, patients may become suicidal, and at times attempt to commit

3   suicide.  They also can become assaultive before their illness can be properly treated.

4   Waiting over four months, as is the case for a number of people on the CDCR list, is

5   shocking and appalling, and does not meet the minimum standard of care.

6        13.     In reviewing the 55 cases waiting for DSH transfer, I noted a number of

7   cases on the waiting list with multiple indeterminate diagnoses or sometimes with

8   contradictory diagnoses, indicating a need for diagnostic clarification, which is one of the

9   tasks that can be performed skillfully and safely in an inpatient hospital program.  I also

10  saw that there were a number of cases with medication issues, such as complex poly-

11  pharmacy medication regimens, or other medication issues I felt should be addressed in an

12  inpatient setting.  Once again, these conclusions were confirmed by my in depth review of

13  the eleven cases discussed below, which include examples of these broader problems.

14       14.     In my review of treatment plans, and of the cases discussed below, I also

15  noted a number of patients with persistent psychosis.  Persistent psychosis is a matter of

16  great clinical concern.  First, someone in a psychotic state is suffering, and suffering badly.

17  They often experience auditory and visual hallucinations.  Sometimes these disembodied

18  voices tell them derogatory things about themselves, or tell them to commit self-injurious

19  acts.  They need treatment to bring their psychotic symptoms under control and reduce

20  their suffering.  Second, individuals with chronic untreated or undertreated psychosis have

21  a much higher suicide rates than the general population.  Third, the medical and psychiatric

22  harm to the patient from delays in treatment can be irreparable.  For example, untreated

23  depression has been linked to increased rates of Alzheimer's disease.  In addition, the

24  literature shows that delays in the treatment of psychotic disorders results in a worse

25  prognosis over the lifetime of the illness—the patient ends up with more severe form of the

26  illness than if the treatment had been initiated in a timely manner.

27       15.     The patients I reviewed were very seriously mentally ill.  One indicator of

28  the severity of their illness is the fact that many of the patients I reviewed were on

EXPERT DECLARATION OF PABLO STEWART, M.D. REGARDING DEFENDANTS' DELAYED TRANSFER
OF CLASS MEMBERS TO DSH HOSPITALS

Clozapine.  Clozapine is considered the psychiatric medication of last resort.  By that, I mean that Clozapine is reserved for patients with intractable psychotic symptoms, who have been unresponsive to previous trials of other anti-psychotic medications.

16.     As I testified, inpatient hospital programs like the DSH are the necessary level of care to address these kinds of issues for several reasons, the first two of which are related to intensity of staff.  First, there is generally better psychiatrist staffing in these inpatient hospital programs than in CDCR mental health programs, including CDCR-run inpatient programs.  This staffing allows psychiatrists to focus intensively on a single patient and work through their issues comprehensively, and often in collaboration with other psychiatrists.  Second, there is a better ability to closely observe and monitor patients in an inpatient program, which is also due to higher ratios of clinical staff, including nursing staff on the housing units.  That ability to closely observe the patient, especially while adjusting medications, makes inpatient settings a better, safer place to adjust medications and resolve medication issues.  Third, the DSH hospital programs provide an inpatient hospital treatment environment with a broader set of psychosocial treatment interventions that can help calm, stabilize and heal individuals who are very seriously mentally ill.  These are the minimally adequate conditions to treat these patients.

17.     I am aware that some of the cases on the list of 55 accepted individuals waiting to go to DSH were waiting in a CDCR PIP.  In my opinion, a CDCR PIP is not an adequate substitute for a DSH hospital.  First, the CDCR PIPs, even if working well, would not provide the same kind of care available in the hospital inpatient programs.  The reason is that the CDCR PIPs, with the exception of a few small units at CMF, are all high custody, and do not permit the kinds of socialization and psycho-social treatment interventions that these patients require to get better.  Second, the CDCR PIPs are not working well.  My understanding from the two Special Master reports I reviewed about those programs is that the CDCR-run PIPs at CHCF, SVSP and CMF are very troubled programs that have staffing shortages and deliver only very limited, inadequate care.  For example, the April 6, 2020 Special Master report noted that the "Special Master's experts

raised concerns about the already inadequate treatment being provided in the PIPs [pre-pandemic] and stated that any reduction in staff or services would exacerbate those problems." Report at 7 (quotation) and 17-28 (discussion of inadequate care in the PIPs at CHCF, SVSP and CMF). Moreover, the Special Master report emphasized the unique and highly therapeutic environment at the DSH hospitals: "The least restrictive housing (LRH) offers a therapeutic milieu for treating patient who are clinically and custodially suitable for receiving treatment in an environment that is less punitive and more therapeutic." Report at 13. Based on my review of this report and the Special Master's prior report on inpatient programs for CDCR prisoners, I do not believe the CHCF PIP currently offers the same therapeutic, hospital level care that is provided in DSH hospitals.

18.     I explained my selection process for these eleven cases that I reviewed in greater depth in my testimony on October 23, 2020. Briefly, I directed personnel at the law firm of RBGG to assist me by making a chart summarizing the key information in the treatment plans for the 55 cases on the waiting list, including the current diagnosis and current medications. I was able to confirm the accuracy of this information in the chart made for me as I reviewed the treatment plans and medication reports that I had received for the full group of 55 cases. Next, for 29 cases, I directed RBGG staff to add columns to the chart reflecting the following during the period these individuals were waiting for transfer to DSH hospital programs: (1) suicide attempts, (2) self-injurious behavior, (3) rules violations, and (4) crisis bed admissions. I then selected 11 individuals from this list, for whom I requested and was provided the full mental health treatment records from the period two months before their DSH referral to the present. Those cases are discussed in detail below.

### Patient 3

19.     I reviewed CDCR mental health treatment records for Patient 3 reflecting his care at the Correctional Health Care Facility ("CHCF"), a prison in Stockton, California, from April 24, 2020, through October 14, 2020. Patient 3 was referred to DSH on June 24, 2020, and was "accepted" by DSH on July 14, 2020. I put the word "accepted" in quotes

because the term as used by CDCR and DSH is misleading.  It means that DSH has accepted the patient for transfer *on paper*.  It does not mean that the patient actually goes to DSH.  Many patients who are accepted wait weeks and months to go.  Some may never go at all.  At the time of the referral, Patient 3 was receiving psychiatric care in the CDCR Psychiatric Inpatient Program (PIP) at CHCF.  [PT 03 000368.]  From the last records in his file, it appeared that Patient 3 was preparing to finally transfer to ASH in mid-October.  [PT 03 000893.]  I do not know whether he actually transferred there.

20.     Patient 3 suffers from a very serious mental health condition which includes persistent, severe psychotic symptoms.  His treatment plans note that he has a high chronic risk of suicide.  [PT 03 000215, 000588.]  As of mid-October, 2020, he had diagnoses of Schizoaffective Disorder, Depressive Type, of Unspecified Depressive Disorder, and of Unspecified Schizophrenia Spectrum and Other Psychotic Disorders listed in his Psychiatrist Notes.  [PT 03 000893.]  These diagnoses are consistent with his last treatment plan in the records I reviewed, dated September 16, 2020.  [PT 03 000686.]  Starting in early September, Patient 3 began to refuse virtually all out of cell activity, including yard, leisure time activities, and his out of cell treatment groups.  [PT 03 000615-640.]  He even refused to talk to the Recreational Therapist at cell front, and refused to come out of his cell for his treatment team meeting in mid-September.  [PT 03 000687.]  This is a very significant sign of the ongoing decompensation in this patient.  At the time he had been waiting for nearly three months to go to an appropriate inpatient care unit.

21.     During the last few months, he also reported ongoing psychotic symptoms, overwhelming anxiety, suicidal ideation, and self-injurious behavior.  He also reported PTSD-like symptoms when around people.  In early August he continued to report derogatory auditory hallucinations, anxiety, paranoia and depression.  [PT 03 000552-576.]

22.     While waiting to transfer to DSH, Patient 3 was in grave need of an appropriate inpatient hospital treatment program of the kind available at ASH.  He was carrying two unspecified diagnoses, which suggests a need for diagnostic clarification.  He was also being treated with two different anti-psychotics, along with Prazosin, which is

1  only prescribed for PTSD.  However, Patient 3 did not have a confirmed diagnosis of

2  PTSD at the time (although it appears staff were considering the diagnosis).

3      23.    Patient 3 also experienced ongoing suicidal ideation and some self-injurious

4  behavior while waiting to be transferred to DSH, including cutting himself on

5  September 18, 2020, which resulted in his placement on 1:1 observation.  [PT 03 000737.]

6  He told staff he cut himself because the voices he hears were getting louder and because he

7  was not feeling safe.  These factors highlight some of the potential risks of delaying

8  treatment in an inpatient hospital for someone like Patient 3—self-harm or even suicide.

9      24.    My review of his treatment records also showed that CHCF is not doing

10  anything for Patient 3's diagnosed Depressive Disorder.  His treatment plan is focused on

11  addressing his psychotic symptoms and does not include elements to address his

12  depression.

13      25.    During his entire period waiting for transfer, Patient 3 was in need of

14  stabilization and diagnostic clarification.  He had severe, active symptoms and was not

15  responding to his treatment.  He needed the intensive management and diagnostic

16  clarification that can only be provided in a functional inpatient program like ASH.  He also

17  was very much in need of the socialization and psycho-social rehabilitation groups that are

18  available in the positive, therapeutic environment that exists at Atascadero State Hospital

19  and the other DSH programs.

20      26.    As an example of inadequate care, although Patient 3 was frequently meeting

21  with a psychiatrist while he waited for transfer to DSH, he had very infrequent meetings

22  with his case manager.  In my opinion, the care being provided to Patient 3 while he was

23  waiting for treatment in DSH was not adequate, as evidenced by his declining participation

24  in treatment, active psychotic symptoms, and self-injurious behavior while he waited for

25  transfer.

26                          **Patient 28**

27      27.    I reviewed the mental health treatment records for Patient 28 reflecting his

28  care at the California Men's Colony ("CMC"), a CDCR prison in San Luis Obispo, from

[3646336 3]

9

June 13, 2020, through mid-October 2020.  Patient 28 was referred to DSH while in the process of being discharged from the Mental Health Crisis Bed ("MHCB") unit at CMC to an Administrative Segregation Unit ("ASU") at the same prison on August 13, 2020.  [PT 28 000959-974, 000994.]   He was "accepted" by DSH on August 21, 2020.

28.     Under the 30 day transfer mandate in the Program Guide, Patient 28 should have been transferred to DSH for intermediate inpatient care by September 12, 2020.  However, he was still at CMC when I reviewed his records in mid-October, around 60 days after his referral.

29.     Patient 28 has a history of repeated transfers to DSH for inpatient care, including prior transfers for inpatient care in 2000, 2001, 2004, 2005, 2006, 2008, 2014, 2015, 2015 (second time same year), and 2017.  [PT 28 001035-1039.]  His records also reflect referrals to MHCB units within the CDCR on 41 different occasions since 2010.  [*Id.*]

30.     Patient 28 has a very serious mental health condition.  He has a diagnosis of Schizoaffective Disorder, Bipolar Type.  [PT 28 001815.]  He also has a Developmental Disability and has a code of DD2 in the *Clark* program for CDCR prisoners with developmental disabilities, meaning, among other things, that he needs to be protected given potential victimization concerns.  [PT 28 001849.]  He also has a history of mental health instability and persistent psychotic symptoms.  His records note circumstantial and delusional thought processes, which were present even in mid-May 2020 when he reported (according to a later treatment plan) that he was doing well to clinicians in his treatment team meeting.  [PT 28 000086.]

31.     His treatment records reflect repeated admissions to the MHCB unit at CMC in March, April, early May, July through early August, and late August through September of 2020.  [PT 28 001881, 1438.]

32.     In mid-August, while his referral to DSH was pending, he was discharged again to the Administrative Segregation Unit ("ASU") at CMC, where his mental health quickly decompensated.  He reported within a few days of being placed in the ASU there

1  that the voices he was hearing were scaring him, and he was noted to be hypomanic,

2  pacing, and talking incessantly.  [PT 28 001769.]

3       33.     He was returned to the MHCB on August 18, 2020, after about 6 days in the

4  ASU, and he continued to decompensate.  Around this time, he stopped eating because of

5  the voices he was hearing.  [PT 28 001033-1056.]  Despite his ongoing symptoms,

6  Patient 28 wanted to return to the ASU unit, but his treatment team kept him in the MHCB

7  for an extended period.  [PT 28 001276.]  In early September, he continued to

8  decompensate in the MHCB and reported command auditory hallucinations telling him to

9  cut his wrist.  He reported that he superficially scratched his wrist and ingested a pen filler,

10  and that he was considering banging his head on the wall.  He was placed on suicide

11  watch.  [PT 28 001281-1291.]  Around this time, on September 9, 2020, his Penal Code

12  2602 Involuntary Medication Order was renewed on the grounds that he is a danger to

13  himself when off of his medications.  [PT 28 001451.]

14       34.     Patient 28 clearly has a hard time tolerating the lengthy stays in the MHCB

15  necessitated by his chronic severe symptoms.  That is not surprising, since MHCB

16  programs are designed to provide short term crisis care for up to 10 days, and are not

17  appropriate for longer term care -- patients in MHCB units spend most of their time alone

18  in their cells.

19       35.     Unfortunately, Patient 28 is also unable to tolerate ASU.  Leading up to and

20  during the months he was waiting for transfer to a DSH inpatient hospital, Patient 28 was

21  transferred back and forth between the EOP ASU and the MHCB unit at CMC multiple

22  times.  When returned to the ASU, he would quickly decompensate until he needed to

23  return to the MHCB.  In an August 18, 2020 Clinical Summary Note in his Treatment

24  Plan, staff wrote that Patient 28 "is well known to the MHCB due to his low distress

25  tolerance for managing ASU."  [PT 28 001463.]  Apparently the normal ASU restrictions

26  were made even worse by COVID-19 conditions.  His primary clinician noted on

27  September 7, 2020 that "much of I/P's admissions recently appear related to being housed

28  in ASU with low distress tolerance for that particular environment *in conjunction with*

[3646336 3]

11

1   *COVID-19 restrictions of program*."  [PT 28 001369.]  (emphasis added)  Despite his low

2   tolerance for ASU, he was returned to the ASU unit at CMC on September 28, 2020,

3   where he remained in October up to the time I stopped reviewing his records.  [PT 28

4   001769, 001960.]

5        36.    Patient 28 also has complex medication issues.  His medications do not

6   appear to be addressing his psychotic and manic symptoms, and he needs a close

7   medication assessment and review, of the type that typically should be done in an inpatient

8   hospital setting.  The hospital setting is the place to do this, because staff there will be able

9   to monitor him closely and see how he responds to changes in his medication.  The reason

10  a prison mental health system needs a program like the DSH hospital, is for when someone

11  like Patient 28 cannot be stabilized at a lower level of care.  This lack of stabilization at the

12  lower level care often times can be a life threatening emergency that requires inpatient

13  care.  It is my opinion that it is not safe to keep this patient in the ASU at CMC.

14       37.    In my opinion, for someone like Patient 28 who needs an inpatient hospital

15  program, Administrative Segregation is clinically contraindicated, even if EOP treatment is

16  provided in the unit.  In cycling between the MHCB and ASU at CMC, Patient 28

17  demonstrates that he cannot be safely managed in either environment.  He needs to be

18  transferred to an inpatient program as soon as possible, if he has not been transferred

19  already.

20       38.    Patient 28's care is inadequate and inappropriate.  You cannot provide the

21  equivalent of inpatient hospital care in a MHCB unit, and you definitely cannot provide it

22  in a segregation unit.

23       **Patient 24**

24       39.    I also reviewed the mental health treatment records for Patient 24, who was

25  housed at the Substance Abuse Training Facility ("SATF"), including records from

26  June 12, 2020 through mid-October, 2020.  Patient 24 was referred to DSH on August 12,

27  2020.  DSH "accepted" Patient 24 on August 17, 2020.  Patient 24 has remained in the

28  MHCB at SATF, from the time of his referral in June to at least mid-October when my

12

1    review of his records stopped.  [PT 24 003037.]  By early October, Patient 24's clinicians

2    documented in his treatment plan that he no longer needed MHCB care, but that they were

3    still holding him there while waiting for an opening in the Level IV EOP.  [PT 24 002715.]

4    They did not rescind his referral to ICF, however, but had cleared him to return to the EOP

5    while awaiting ICF transfer.  To my knowledge, Patient 24 has still not been transferred to

6    DSH.

7        40.    Patient 24 had a very serious suicide attempt on May 25, 2020.  His records

8    describe the suicide attempt as a "very serious SA [suicide attempt], making cuts on the

9    left side of his neck and both forearms."  [PT 24 000527.]  "He bled out so profusely that

10   he required several quarts of blood transfusion and flight by helicopter to local hospital to

11   survive."  [PT 24 00709.]  Six months before this attempt, Patient 24 had another very

12   similar, very serious suicide attempt on November 19, 2019, in which he also cut his neck

13   and wrists.  [PT 23 000892.]

14       41.    Patient 24 was referred to Acute care in the PIP at CMF or CHCF on June 2,

15   2020, but never transferred due to restrictions on movement related to the pandemic.  [PT

16   24  000044.]  At the same time, clinical staff in the MHCB reported in his June 16 Master

17   Treatment Plan that he could not be released from the MHCB because he "remains at high

18   acute risk due to propensity for severe regression to suicide when placed on yard."  [PT 24

19   000046,]

20       42.    Patient 24 is clearly a challenging, complex clinical case.  He has refused

21   psychiatric medications consistently, and was unable to give his treatment team a reason

22   for his actions in attempting to kill himself, other than that he was having "a bad day."  [PT

23   24 000091.]  In a treatment plan note in mid-June, his clinicians explained that with

24   respect to his two serious suicide attempts, the "use of same mean and escalation thereof

25   suggest some preoccupation.  Both attempts appear to have been impulsive [without]

26   warning, to have precipitated abruptly.  [*Without a] more detailed understanding of the*

27   *factors that led to these attempts, it is not possible to establish that such factors can be*

28   *addressed; risk of recurrence is high and appears to be increasing in severity*."  (emphasis

1   added)  [PT 24 000107.]

2   43.     His diagnoses during his long stay in the MHCB were Unspecified Anxiety

3   Disorder and Unspecified Depressive Disorder.  These diagnoses remained provisional

4   during his MHCB stay.  He reported little history of mental health issues but had an

5   ADHD diagnosis as a juvenile.  These "unspecified" diagnoses need to be clarified, and a

6   long-term treatment plan needs to be developed to keep him safe.

7   44.     It appears that Patient 24 tried Prozac for a time while in the MHCB, but he

8   stopped taking it in early October.  [PT 24 000786, 2488.]  He also likely needs to be on

9   medication.

10   45.     Patient 24 is the type of patient who needed a quick, emergency referral to

11   acute and then intermediate inpatient care.  Waiting to find the root cause of his suicidality

12   and waiting to address it may make both tasks more difficult.  At the present time, he

13   needs stabilization, and a therapeutic intermediate care setting like the one at ASH, where

14   he can explore the reasons for his serious suicide attempts, and address them.  He also

15   needs diagnostic clarification, and close observation for his own safety.  He is scheduled to

16   be released in about a year, and ASH also has parole planning expertise and can help him

17   address anxiety over the transition back into the community.  ASH would also be a good

18   place to encourage him to begin taking anti-depressants and monitoring their effectiveness.

19   46.     It is clear that Patient 24's long stay in the MHCB has been very frustrating

20   for him.  He repeatedly expressed his understandable frustrations at not being transferred

21   and being held in the MHCB unit for such a long time.  [PT 24 000118.]  In early August

22   he had a suicide risk assessment that noted he was very angry and "has struggled with the

23   very limited stimulation that has been proved in MHCB."  [PT 24 000709.]  In late August,

24   his psychiatrist noted that he "continues to struggle with being in [the] MHCB for a long

25   time."  [PT 24 001221.]  At the time of my review in October, Patient 24 had been in the

26   MHCB for more than four months, but just 20 days into his MHCB stay, he told his

27   psychiatrist, "That's crazy? We're going on 20 days" and asked if they were legally

28   allowed to keep him in the MHCB so long.  He said "*I'm the one that is stuck in a cell all*

EXPERT DECLARATION OF PABLO STEWART, M.D. REGARDING DEFENDANTS' DELAYED TRANSFER
OF CLASS MEMBERS TO DSH HOSPITALS

1  *day!  You gotta put yourself in the shoes of patients*."  [PT 24 000054.]

2        47.     Starting in mid-September, there are notes in his records reporting that

3  Patient 24 is "engaged in a plan to meet the goals of ICF hospitalization within the next 4

4  weeks in MHCB."  [PT 24 001876.]  This timeline for this goal was apparently repeatedly

5  extended, since the same language and the same timeline of four weeks appears in

6  treatment plans on September 29, October 6, and October 13.  [PT 24 002487, 2715,

7  3037.]

8        48.     In my opinion, it is not possible to provide the equivalent of intermediate

9  inpatient hospital care in an MHCB unit.  Patient 24 requires the specialized services, the

10  clinical expertise, the psycho-social rehabilitative services, and the therapeutic milieu of an

11  inpatient hospital program like ASH to stabilize him and work on a better understanding of

12  his severe suicidal behavior.  A long, careful course of treatment in that environment is

13  urgent for his present and future safety.

14        49.     In my opinion, Patient 24 should have been given an emergency transfer to

15  DSH immediately after his admission to the MHCB in May.  Instead, he has lingered in the

16  MHCB at SATF nearly five months.  The delay is dangerous and unconscionable.

17                                      **Patient 11**

18        50.     I also reviewed the treatment records for Patient 11 for the period from

19  approximately May 19, 2020 to mid-October 2020.  Patient 11 was referred for treatment

20  in a DSH hospital on July 17, 2020 and was "accepted" by DSH on July 23, 2020.

21        51.     Patient 11 is a transgender woman with diagnoses of Schizoaffective

22  Disorder, Bipolar Type, and Trauma Related Seizures and Headaches.  [PT 11 00008.]

23  Patient 11's psychiatric decompensation appears to have begun at CMF around February

24  2020, when she experienced housing concerns and harassment related to her gender

25  identity.  [PT 11 000012.]  According to her treatment records, she "experienced an

26  increase in psychotic symptoms including command auditory hallucinations beginning in

27  February."  [*Id*.]  In addition, she "began to withdraw socially, which then exacerbated her

28  symptoms."  [*Id*.]

[3646336 3]

15

EXPERT DECLARATION OF PABLO STEWART, M.D. REGARDING DEFENDANTS' DELAYED TRANSFER
OF CLASS MEMBERS TO DSH HOSPITALS

52.     She was admitted to the Acute Level of Care in the CMF PIP on March 12, 2020, where she remained through October 2020 when I concluded my review of her records.  [PT 11 000026.]  On April 17, 2020, she was noted to have increased paranoia and ideas of reference, and she periodically reported increased paranoia at other times afterwards.  [PT 11 000026, 000085.]  By late May, she was seen as returning to baseline and was referred to an intermediate inpatient care, or "ICF" hospital program.  [PT 11 000026, 000084.]  However, even on May 20, 2020, she reported that instruments were put in her body against her consent during a past surgery and that clinicians could measure he feelings using their computers.  [PT 11 000011.]  She was given a least restrictive housing (LRH) designation of locked dorm, which would in theory have allowed her in to go to one of the ICF level of care dorms in the PIP at CMF.  [PT 11 000085.]  However, for reasons that are not clear from the records, it appears she was never transferred out of the acute program to the ICF program at CMF.  At the time her level of care was lowered to ICF, her primary clinician noted that the trigger for her delusions and paranoia is isolation, and that when paranoid, she may be at a higher risk of violence against herself and others. [PT 11 000075.]

53.     While waiting for transfer to a DSH hospital intermediate program in the acute program at CMF, Patient 11 has clearly struggled.  In May, her psychiatrist noted that she "continues to have active psychotic symptoms that include [auditory hallucinations], paranoia, and delusion."  [PT 11 000008.]  In late July, she cut her forearm with a razor and was sent to an outside hospital.  [PT 11 000201-000206.]  The seven lacerations on her arm extended into the subcutaneous tissue and required sutures.  [PT 11 000201.]  She later reported to her clinicians that she planned to hurt herself two days before she did so, and that she did so because she felt other people were talking about her in code.  [PT 11 000232-000234.]

54.     In August, she was refusing to attend her IDTT and other treatment meetings, refused even routine nursing checks of her vitals, and refused some meals.  [PT 11 000287, 000292, 000321, 000391, 000410].  A late August clinical note states that "Pt.

1    was technically discharged on 6/10/20 [from the acute program] and is awaiting transfer."

2    [PT 11 000363.]  In September, she began to decompensate further, explaining that she

3    was having auditory hallucinations, and reporting paranoid beliefs about being tracked and

4    having had a transmitter in her neck.  [PT 11 000515.]  She started refusing groups and

5    clinical contact more frequently in early September, and refused to cooperate with a

6    suicide risk assessment.  [PT 11 000451].  On September 8, she was found with a noose

7    around her neck.  [PT 11 000413.]   Afterwards, she reported receiving messages from the

8    television and that she was being watched.  [PT 11 000515.]

9          55.    I am very concerned about the medications being given to Patient 11.  She is

10   diagnosed with a Seizure Disorder.  She is on an the anti-seizure medication Neurontin, but

11   she appears to be on that medication to manage her mood.  [PT 11 000417, 000481.]  At

12   the same time, she is also on four different medications that are known to lower the seizure

13   threshold, and she remain very symptomatic and continues to engage in self-harming

14   behavior.  [*Id*.]  These medication issues need to be resolved in a fully functional inpatient

15   setting like ASH where she can be closely monitored while the psychiatric staff work on

16   adjusting and possibly simplifying her medications.  It may be possible to better manage

17   her mental health symptoms with a treatment regimen that does not put her at risk for

18   seizures.

19         56.    I am also very concerned about the welfare of Patient 11.  Her current care is

20   not adequate.  This patient has very active psychotic symptoms, including ideas of

21   reference.  She believes she has a chip to track her in her head.  She seems to be getting

22   steadily worse, and was refusing her groups and her one-to-one therapy sessions with her

23   clinicians in September and October.  This is a very egregious example of the harm in not

24   sending someone to inpatient care.  She needs to be sent to a DSH hospital as soon as

25   possible.

26                                  **Patient 39**

27         57.    I also reviewed the mental health treatment records for Patient 39 from

28   approximately July 3, 2020 to October 15, 2020.  During this period, Patient 39 was in the

mainline EOP program at the California Men's Colony ("CMC") in San Luis Obispo, California.  Patient 39 was referred to DSH on August 28, 2020, and "accepted" by DSH on September 3, 2020.

58.     Patient 39 has a current diagnosis of Major Depressive Disorder, Recurrent Episode, Unspecified, and a Major Neurocognitive Disorder due to Traumatic Brain Injury ("TBI"), With Behavioral Disturbance, and Unspecified Schizophrenia Spectrum and Other Psychotic Disorder.  [PT 39 000185-000188.]  These serious and yet unspecified diagnoses alone demonstrate that there is a strong need for diagnostic clarification for this patient in an inpatient hospital program.

59.     Patient 39's case is a complex one.  He comes from a family with a history of serious psychiatric illness, including Schizophrenia and anxiety.  [PT 39 000194.]  At the same time, his mental health issues seem to stem most directly from a traumatic brain injury he experienced when he was assaulted at a college football game in 2001 and lost consciousness for six hours.  [*Id.*]  As reported in his October 13, 2020 Treatment Plan, "[t]he TBI … appears to have significantly changed his life: personality change, violent behavior, cognitive decline (poor memory), and psychotic break."  [*Id.*]  He was transformed from being shy to, in his own words, being "loud and confident" and began to hear voices and see shadows. [*Id.*]

60.     Patient 39 experienced a great sense of guilt and remorse, which led to multiple suicide attempts, and severe depressive symptoms, including chronic passive suicidal ideation, depressive feelings, and feelings of hopelessness and helplessness.  [PT 39 000130.]

61.     At the time of his referral to DSH in late August, Patient 39 was experiencing depression, passive suicidal thoughts, remorse and anger.  [PT 39 000129-130.]  He told his clinicians that he hears derogatory auditory hallucinations:  "I hear voices:  male and female that talk and tell me to kill myself or that I am worthless and other people are worthless."  [PT 39 00129.]

62.     At the time of my review, Patient 39 was not on any medications, according

his October 13, 2020 Master Treatment Plan, where the note says he reported not taking his Lithium and said "I spit the meds."  [PT 39 000194.]  Patient 39's medication history shows his clinicians have long struggled to find a medication or combination of medications that works for him.  A psychiatrist note from October 1, 2020, reported that Patient 39 wanted to be taken off of Cymbalta because it was making him tired.  The psychiatrist also noted the following poor responses to past medications and medication combination:  "Celexa, Cybalta, Depakote – 'sluggish'; Effexor – emotional numbing; Geodon; Lamotrigine – rash *2; Lithium, Loxapine, Paxil, Prozac – 'I got really depressed'; Remeron – 'it made my heart beat super fast and I had anxiety attacks"; Risperdal – metabolic Sx; Seroquel, Thorazine, Trileptal – nausea, sedations; Zyprexa." [PT 39 000173.]

63.    Clearly, Patient 39 is a difficult patient whose doctors have struggled over a long period of times to find a medication regimen that works for him.  This is one of the primary tasks where an inpatient hospital program like ASH excels.

64.    Patient 39 records indicate that he "is being referred to ICF due to the need for neurological evaluation, which cannot be provided at the current level of care."  [PT 39 000112.]  The same August 26, 2020 record explained that "clarification and increased understanding of the impact of [PT 39's] TBI on current symptomology, behavior, and functioning is needed."  [*Id*.]  More concretely, the referral was made due to chronic and severe suicidal ideation and increased frequency of auditory hallucinations, which his treatment team felt may have increased in the recent past due to the quarantine and resulting program lockdowns at CMC.  [*Id*.]

65.    These are all the kinds of clinical tasks that are appropriate grounds for referral to an intermediate inpatient psychiatric program.  Such programs, like ASH, are properly staffed for patients who need this kind of hospital care with clinicians at all levels, including psychiatrists.  These programs also have ready access to medical specialists, such as neurologists, whom they can consult to help clarify the complex interplay between this patient's Traumatic Brain Injury, and his psychotic mental health symptoms.  Such

EXPERT DECLARATION OF PABLO STEWART, M.D. REGARDING DEFENDANTS' DELAYED TRANSFER OF CLASS MEMBERS TO DSH HOSPITALS

1  programs are also well equipped to come up with a treatment and medication plan to

2  address the patient's chronic problems, and implement it.  Only through such a process can

3  the proper treatment decisions be pursued to hopefully stabilize this patient.  This patient

4  represents one of the more complicated categories of cases that psychiatrists routinely deal

5  with.  His condition requires that he be in an inpatient setting where his care can be

6  managed by a team of psychiatrists and neurological consultants, and where ample lower

7  level psychiatric and nursing staff allows for very close monitoring.

8       66.    I also want to stress the importance of avoiding delay in transferring

9  Patient 39 to a DSH hospital.  This patient is high risk to himself and others while his

10  mental health condition remains poorly understood and poorly controlled.  He needed to be

11  transferred to an inpatient program immediately.

12                                  **Patient 7**

13      67.    I reviewed the mental health records for Patient 7 from May 2, 2020 through

14  October 17, 2020.

15      68.    Patient 7 was referred to DSH on July 3, 2020 and was "accepted" on July 8,

16  2020.  Since his referral, he has been waiting in the MHCB unit at CMF the entire time.

17  Although he is allegedly being treated at the ICF level of care, he is in an MHCB unit,

18  which is designed for short term crisis care and cannot provide the equivalent of

19  intermediate inpatient hospital care.

20      69.    Patient 7 is diagnosed with Major Depressive Disorder, Recurrent, Severe

21  with Psychotic Features.  [PT 7 000753.]  He also has PTSD and struggles with

22  hallucinations.  [PT 7 001918.]  For much of his time waiting in the MHCB for a transfer,

23  Patient 7 was very symptomatic, with ongoing auditory and visual hallucinations, anxiety

24  and paranoia.  [PT 7 000713, 000967 000973.]  Remaining in the highly restrictive

25  MHCB setting for months seemed to be making him worse.  [PT 7  001042 (still having

26  auditory and visual hallucinations on July 22, 2020).]  However, he seems to have

27  stabilized somewhat in early September and October, but is still very depressed and

28  anxious, and reports being "antsy" to get to ASH.  [PT 7 001932-33.]

70.     Patient 7 had numerous admissions to the MHCB unit in the months leading up to his referral to DSH.  He was admitted to the crisis beds at CMF for danger to self and suicide ideation on April 3, 2020, May 6, 2020, May 19, 2020, May 29, 2020, and June 17, 2020.  [PT 7 000753.]  According to his treatment records, Patient 7 has "been in a psychic tailspin since" his cell mate died of an overdose in April 2020.  {PT 7 000247.]  His treatment plan on June 19, 2020 noted that "the root cause of [PT 7's] repeated admissions [to the crisis bed unit] is exacerbation of his pre-existing problems [due to] his cellie's death.…"  [PT 7 000535 and 000753.]  Patient 7 tried to save his cellmate with CPR, but did not succeed.  [PT 7 00535.]  After his cellie's death, Patient 7 was placed into ASU, where he was investigated and cleared of any wrongdoing relating to his cell mate's death. [PT 7 00535.]

71.     However, the experience, his treatment notes explain, and despair over failing to save his cell mate, was "well suited to increasing Pt's specific sources of distress: guilt, futility, existential angst, insomnia, sadness, and feeling trapped."  [PT 7 000753.] After getting out of segregation, Patient 7 developed safety concerns that his treating clinicians believe are unwarranted, paranoid beliefs that reflect his mental health decompensation in the wake of these events.  [PT 7 001297 (August 22, 2020 Case Manager note indicating paranoid beliefs still present).]

72.     Even before these events, Patient 7 struggled with chronic psychotic symptoms, and a history serious suicide attempts, including an attempt in 2015 when he slit his throat.  [PT 7 000102.]  According to his July 22, 2020 treatment plan, even before the difficult events this year, Patient 7 struggled "with insomnia that worsens his depression, chronic feelings of worthlessness and guilt, anxiety paranoia that other inmates target his as a snitch, and a sense of being trapped." [PT 7 001043]

73.     During his long stay in the MHCB, these paranoid beliefs have remained the same.  In a note from his psychologist on October 11, 2020, it states "he continues to have paranoid beliefs that other inmates are out to get him.  He claims to hear voices that tell him they want to hurt [him]."  [PT 7 001895.]

74.     On August 1, 2020, after a few weeks of waiting, he told his psychiatrist he was experiencing anxiety and depression "due to nothing happening as far as his movement to ICF."  [PT 7 001130.]  He has also reported feeling "antsy" to move to DSH on August 12, 2020, August 26, 2020, September 2, 2020, September 9, 2020, September 20, 2020, and September 30, 2020.  [PT 7 001401, 001494, 001586, 001643, 001761.]   On September 23, 2020, he told his treatment team "I'm ready to go" and reported being "anxious to move."  [PT 7 001663.]  These feelings are understandable.  The delay in transferring Patient 7 to an inpatient program is not.

75.     During a September 16, 2020 treatment team meeting, and in later notes, his clinicians recorded his "[p]sychomotor agitation/retardation … caused by drug induced Parkinson's Disease," which is also noted in other records  [PT 001586, 001655, 001663, 001934.]  Psychotropic drug induced Parkinson's Disease is often encountered in cases with poor medication management.  Typically, it arises from a combination of overmedication and inadequate monitoring of side effects, and it causes needless, avoidable suffering to the patient.  This is a reflection of the poor care this patient has been getting, and a condition like this can be immediately remediated in an inpatient hospital setting.

76.     On June 26, 2020, there was a mental health note that says that, according to his treatment team, Patient 7 "does not meet criteria for emergency transfer and will be retained in the PIP." [PT 7 000850.]  I strongly disagree with this conclusion.  Patient 7 needed and continues to needs a referral to ASH or another DSH facility to address his ongoing psychotic symptoms, paranoid beliefs, depression and suicidality.  It was dangerous not to transfer him immediately, and they delay has needlessly exacerbated his suffering.

**Patient 16**

77.     I reviewed Patient 16's records from May 26, 2020 through October 17, 2020.  Patient 16 was referred from SATF to DSH on July 27, 2020, and he was "accepted" by DSH on August 3, 2020.  I have several concerns about his case.

EXPERT DECLARATION OF PABLO STEWART, M.D. REGARDING DEFENDANTS' DELAYED TRANSFER OF CLASS MEMBERS TO DSH HOSPITALS

78.     My first concern is that Patient 16 has conflicting diagnoses.  His diagnoses from throughout the period I reviewed included both Schizoaffective Disorder, Bipolar Type, and also a diagnosis of Delusional Disorder.  [PT 16 000025, 000173, 000190, 000723, 000885, 001034-35.]  However, based on DSH-5 criteria, an individual cannot have both of these diagnoses.  This kind of diagnostic issue is one that an inpatient hospital like ASH or the other DSH hospitals is particularly well-suited to work through.

79.     Second, this patient has very serious issues.  He has persistent untreated paranoia.  During his admission to a CDCR PIP acute care unit for grave disability starting in February 2020, "he appeared confused/disoriented, poor attention span, bizarre behaviors, crying, incoherent speech and victimization concerns.  It was revealed that he was experiencing paranoid delusions believing his eyes were camera lens.  He also displayed psychomotor agitation.  At times he was observed to be talking to himself as well." [PT 16 000240]

80.     He has a history in inpatient hospitalization in the community, including stays at Patton State Hospital in 1989, 1999, 2015 through 2017, and 2017 through early 2019.  [PT 16 000327.]  As the case summary below makes clear, he seems to be unable to tolerate being in a CDCR EOP program for any length of time without decompensating and returning to the MHCB.  However, his case manager also at one point recommended moving him to the EOP program while waiting for the DSH program, because he was having trouble managing the MHCB without decompensating "due to limited stimulation in the MHCB."  [PT 16 000520.]  He also has a developmental disability, and has a DD2 code, meaning he needs to be monitored for undue influence by peers, needs to be prompted regarding activities of daily living, and, were he not in the protective housing of an EOP or higher level of care program, would need to be in a separate, sheltered housing unit to protect him from abuse by peers.  [PT 16 000078.]

81.     Patient 16 was sent to the acute unit at CHCF in on March 13, 2020 for grave disability, from the MHCB unit at Wasco State Prison, where staff noted they were unable to stabilize him in the MHCB.  They noted "minimal changes overall in his functioning"

while in the MHCB, and noted "bizarre, aggressive and inappropriate behavior patterns which he cannot manage at a lower level of care." He was reportedly hypomanic and disruptive, paranoid, and making threatening statements and yelling obscenities. He reported having a camera lenses in his eye. [PT 16 000169.]

82. After stabilization in the acute unit at CMF, he was returned to Wasco State Prison, to the Reception Center EOP program there, in mid-April 2020. [PT 16 000025.] In the first records I reviewed, from early June, it appears that he was still at Wasco State Prison, in the Reception Center EOP program, refusing most treatment. [PT 16 000012, 000013, 000017, 000023, 000030, 00086.] In a note from June 3, 2020, his psychiatrist noted that he reported hearing voices and feeling agitated at times, and that the voices sometimes tell him good things and sometimes tell him to hurt himself, but that he does not listen. [PT 16 000025.]

83. A Recreational Therapist treatment note from June 4, 2020, noted he did not make contact with Patient 16 at the suggestion of custody staff and the primary clinician, noting that Patient 16 "reportedly had bizarre behaviors which made him inappropriate for contact." [PT 16 000036.] At SATF, Patient 16 continued to refuse groups and out of cell treatment, including medical treatment. [PT 16 000505, 000507, 000509.] His treatment team focused on remaining signs of grave disability, including not taking care of his personal hygiene and throwing trash around his cell. The team also noted ongoing psychotic symptoms, poor ADLs, suicidal ideation, deficits in social skills, low frustration tolerance, impulse control issues, and emotional liability. [PT 000363-000377.]

84. He was sent to SATF on June 17, 2020. At SATF, he continued his pattern of not attending any group treatment. [PT 16 000204.] In his intake assessment, he was noted to be mildly disorganized in his thoughts, but otherwise doing pretty well, with no current signs of grave disability. [PT 16 000190.] He was reported to be overfamiliar and inappropriate with his female clinicians at SATF. [PT 16 000207.] After about two weeks at SATF, he was referred to the Crisis Intervention Team (CIT) because he was yelling at staff that he could not stay in his cell and was displaying thought delusions (telling staff he

had a tape worm), and "was observed to display symptoms congruent with hypomania, psychotic [symptoms], and labile mood (yelling aggressively, cursing, singing, crying, agitation/angry." [PT 16 000374.]   His cell mates complained about him being malodorous and too loud and talking all the time.  [PT 16 000356.]  He was admitted to the MHCB.  [*Id*.]

85.    On around July 16, 2020, a *Vitek* hearing was held because he would not consent to be moved to an intermediate or acute hospital setting.  [PT 16 000443.]

86.    This is another example of a patient in need of intermediate inpatient care who, rather than being quickly transferred, has for months cycled in and out of an MHCB environment while waiting for the level of care he requires.

87.    In the records I reviewed, Patient 16 was first admitted to the MHCB unit at SATF on July 2, 2020.  [PT 16 000356.]   He was referred to the PIP Acute program on July 9, 2020. [PT 16 000463.]  He stayed in the unit for 22 days, unit July 24, 2020, when he was discharged to the EOP.  [PT 16 000597 (Discharge Instructions).]   Five days after his discharge to EOP, on July 29, 2020 he reported feeling suicidal, in part due to the locked down quarantine conditions at the time.  He told his clinician "They treat us like we are not human" and said that "Atascadero is better.  I need to go to Atascadero.   I will die in prison, I need to go to a mental institution, not a prison!"  [PT 16 000664.]  He was referred to the Crisis Intervention Team.  [PT 16 000664, 000667.]  It appears that he struggled throughout his stay in the EOP waiting for his ASH transfer, and on October 5, 2020, he was admitted to the MHCB again, where he remained through the rest of the records that I reviewed.  [PT 16 000680 (noting struggles with socialization), 001046, 001210 (noting Patient 16 "struggles to adapt to EOP setting").]

88.    Since late August, he has been experiencing increasing auditory hallucinations and paranoia.  [PT 16 001024 (October 5, 2020), 001019-1020 (August 23, 2020)]   On September 2, 2020, he complained that auditory hallucinations were making it hard to sleep.  [PT 16 001019.]   Patient 16 has also frequently complained to his clinicians about being locked down all the time at SATF, and has expressed his desire to go to ASH,

1  raising this issue on July 29, August 11, and August 23, September 9, and October 7.  [PT

2  16 000664, 000722, 000857, 000915, 001020, 001095.]

3       89.     Given the intensity and severity of his psychiatric symptoms, in my opinion

4  it is cruel to delay Patient 16's transfer to the appropriate level of care.

5                                            **Patient 10**

6       90.      I reviewed Patient 10's records from June 12, 2020 through October 14,

7  2020.  Patient 10 was referred from the CMF PIP to DSH on July 17, 2020, and he was

8  "accepted" by DSH on July 28, 2020.  As of October 14, 2020, it appeared that he had not

9  been transferred to DSH on this referral.

10      91.     CDCR has diagnosed Patient 10 with unspecified psychosis, Schizophrenia,

11 Psychogenic Polydipsia, and Atypical Depression.  [PT 10 0000320-322.]  His current

12 medications list as of August 5, 2020 include Clozapine, Depakote, Haldol, Remeron and

13 Atropine.  He has a complex medical history, including hepatitis and other conditions. [PT

14 10 000353.]   He was on an involuntary medication order, which was recently renewed for

15 a year, out to August 2021.  [PT 10 000109.]

16      92.     The progress notes for Patient 10 describe a person with "debilitating anxiety

17 to the point of pseudo-catatonia," and reports incidents in which "he becomes extremely

18 frightened and then enters a catatonic state in which he loses his capacity to attend to his

19 bodily needs, and will, e.g., urinate on himself and stand immobile at the cell door, almost

20 unresponsive to external questions or reality demands of the most trivial nature."  The

21 same note rules out manipulation for secondary gain, and notes that Patient 10 has no

22 violent or aggressive behaviors that would prevent him from being housed in hospital-type

23 setting, where he could benefit from treatment.  [PT 10 000002.]

24      93.     Patient 10 presents an example of why it is necessary for the CDCR mental

25 health system to include an inpatient level of care in a hospital setting.  Some patients

26 cannot benefit from treatment in the locked-down settings of the CDCR PIPs, but require a

27 true hospital setting.  Leaving a person like Patient 10 in a locked down PIP when

28 clinicians acknowledge the fact that this patient's illness requires a hospital setting,

[3646336 3]

EXPERT DECLARATION OF PABLO STEWART, M.D. REGARDING DEFENDANTS' DELAYED TRANSFER
OF CLASS MEMBERS TO DSH HOSPITALS

1    subjects this patient to needless harm and suffering.

2                                    **Patient 15**

3           94.    I reviewed Patient 15's records from June 1, 2020 to October 16, 2020.

4    CDCR referred Patient 15 to DSH  from SATF on July 27, 2020, and DSH "accepted" the

5    referral on August 4, 2020.  As of October 16, 2020, he had not transferred to my

6    knowledge.

7           95.    CDCR diagnosed Patient 15 with major depressive disorder and psychosis,

8    as well as unspecified schizophrenic spectrum and other psychotic disorder.  [PT 15

9    000832.]   As a general matter, unspecified psychiatric diagnoses can often be clarified in

10   an inpatient setting.  Patient 15's records showed several active prescriptions including

11   Haldol, Olanzapine, Wellbutrin and Zoloft.  [PT 15 00008, 000025.]

12          96.    Patient 15's record shows multiple crisis bed admissions before and after his

13   referral to DSH, and lifetime history of eight suicide attempts.  [PT 15 000644-645.]

14   Patient 15 reported that he tried to cope with anxiety by pulling his hair out, and a clinician

15   observed "a notifiable bald spot on the top of his head which he reported is from hair

16   pulled when stressed."  [PT 15 000795.]

17          97.    In my opinion, CDCR clinicians are correct in responding to patients like

18   Patient 15 –with a history of self-harm, polypharmacy, suicide attempts and current self-

19   harming behavior, and for whom there is a lack of diagnostic clarity – by referring them to

20   inpatient care at DSH, at a minimum for diagnostic clarification and medication

21   adjustment.  Failing to implement such physician orders puts the patient at serious risk of

22   harm.

23                                   **Patient 38**

24          98.    I reviewed Patient 38's records from June 26, 2020, through October 16,

25   2020.  CDCR referred Patient 38 to DSH for inpatient care on August 28, 2020, and DSH

26   "accepted" him on September 3, 2020.  At the time of the referral, Patient 38 was housed

27   in the MHCB unit at the Substance Abuse Training Facility ("SATF") in Corcoran,

28   California, where he had been housed since mid-July and where he remained in the last

1   records I reviewed for him from mid-October.

2       99.     Patient 38 is in some respects a similar case to Patient 39, discussed above,

3   in that he suffers from a Traumatic Brain Injury ("TBI") and needs to be transferred to an

4   inpatient hospital for a neurological assessment and diagnostic clarification, among other

5   things.  In addition to his TBI, Patient 38 has diagnoses of Other Specified Disruptive,

6   Impulse-Control, and Conduct Disorder; Other Specified Trauma- and Stressor-Related

7   Disorder; and Agitation.  [PT 38 000688-691.]  His records indicate he struggles with

8   depression, and that he has a history of psychotic and paranoid delusions.  He does not

9   have a current diagnosis of Depression, or a current diagnosis reflecting his psychotic

10  condition, which pre-dates his TBI.  [PT 38 001704.]

11      100.    Patient 38 was assaulted on the yard at Avenal State Prison during a prior

12  term in 2006, just before being released, and this assault caused his TBI.  [PT 38 000199,

13  000791, 001328 (report from mother that TBI was two weeks before parole in 2006).]  He

14  returned to a CDCR prison for his current term in June 2008.

15      101.    As noted, even before the assault, Patient 38 had a history of ongoing

16  auditory hallucinations.  Indeed, Patient 38 reported hearing voices beginning around the

17  age of 12 or 13.  [PT 38 001614.]   He has a history of psychiatric hospitalization, which

18  occurred twice in his 30s while in the community for a suicide attempt and threat.  [*Id*.]  In

19  addition, he was treated at DSH Vacaville for six months in 2014.  [PT 38 001616.]

20  Despite his history of depression and psychotic symptoms, Patient 38 was not on any

21  psychotropic medications at the time I reviewed his records in mid-October.  A psychiatrist

22  note from September 27, 2020 states that ammonia levels were elevated when he was on

23  Depakote, and reports that "he says … he has been off medications for a while."  [PT 38

24  001489.]

25      102.    Patient 38 reported to clinical staff that since he was assaulted, he has

26  paranoia and aggressive urges that have no trigger.  [PT 38 001614.]  While at SATF, he

27  was victimized by other prisoners on the yard.  [PT 38 000740.]  He also appears to have

28  had a paranoid belief that a yard captain wanted to hurt him.  [PT 38 000328.]  During his

long MHCB stay beginning in July 2020 at SATF, Patient 38 cut his wrist twice, resulting in minor wounds.  His MHCB clinicians report that he had five prior crisis bed admissions for suicide attempts or suicidal ideation, and two PIP admissions.  [PT 38 000190.]   Two times he was found with a bag on his head, and once he tried to hang himself.  [PT 38 000001.]  Once he threatened to kill himself and was admitted to the MHCB.  He also reported several serious suicide attempts in the community, including by crashing a car and an attempt to suffocate himself.  [PT 38 000287.]  He reports that he gets urges to hit people which makes him depressed.  [PT 38 000151.]  He also reports some symptoms similar to PTSD.  [PT 38 000146.]  In a suicide risk assessment on July 18, 2020, he was found to have a high chronic risk of suicide and a high acute risk.  [PT 38 000071.]

103.    In June of 2020, Patient 38 was allowed to go off of his psychiatric medications, and his level of care was reduced to CCCMS.  [PT 30 000001, 001627.]  He was reported to be angry at the time because he wanted to talk to a psychiatrist before being placed back into CCCMS so he could ask about going onto Trileptal to control his anger.  [PT 38 00012.]  Given his long history of repeated MHCB admissions and psychiatric hospitalizations, it is concerning that SATF passively allowed him to go off his medications and return to CCCMS level of care.

104.    On July 15, 2020, Patient 38 reported recent heroin use to a physician's assistant and asked to be referred to the Medication Assisted Therapy ("MAT") program.  [PT 38 000028.]  On July 18, 2020, Patient 38 received bad news from his wife, who wanted a separation, and he was admitted to the MHCB for suicidal ideation.  [PT 38 000145.]  He planned to overdose on drugs.  [*Id*.]  He also reported planning to use his cane to hurt himself.  [*Id*.]  He told staff he had been selling his appliances for the last few days to purchase enough drugs with which to overdose.  [*Id*.]

105.    Patient 38 experienced auditory hallucinations and told the MHCB staff, "I hear the voices … they pretty much shadow my movements."  [PT 38 000067.]  He was given a suicide risk evaluation and found to have both a high acute risk and a high chronic risk of suicide.  [PT 38 000071.]  In the MHCB, he missed meals and reported ongoing

EXPERT DECLARATION OF PABLO STEWART, M.D. REGARDING DEFENDANTS' DELAYED TRANSFER
OF CLASS MEMBERS TO DSH HOSPITALS

1   suicidal ideation.  [PT 38 000246, 000254.]  Over time he decompensated while in the

2   MHCB.  On August 7, 2020, he reported hearing voices telling him that nine of his family

3   members, including his estranged wife, had been killed.  [PT 38 000435.]  He continued to

4   report auditory hallucinations and frequent delusions.  [PT 38 000443.]  In August he was

5   inconsistent in coming out of his cell for his daily contacts in the MHCB or even

6   participating in nursing assessments.  [PT 38 000543, 000921.]  On August 27, 2020, he

7   reported to staff in the MHCB that he was currently committed to killing himself and that

8   he had engaged in self-harm without intent to die on three occasions while in the MHCB,

9   on July 23, 25, and 30.  [PT 38 000753-755.]

10       106.    At the time of this report of self-harm in on August 27, 2020, Patient 38 was

11   still waiting for transfer to a PIP Acute unit, but he was referred to the DSH intermediate

12   program instead on or around August 28, 2020.  [PT 38 000765, 000778.]

13       107.    On September 4, 2020, nursing staff reported that Patient 38 was engaging in

14   head banging in his cell, and he was moved into a safety cell.  [PT 38 000940.]  The next

15   day he told nursing staff, "*I feel really depressed right now.  I just want to kill myself.  I*

16   *don't think I'm going to make that birthday…*" [*Id.*]  By the end of September, some of

17   his symptoms began to ease, but he was reporting hearing "chanting" that was growing

18   more bothersome.  [PT 38 001351.]  Despite these ongoing symptoms, Patient 38 was

19   discharged to the EOP yard on September 30, 2020, despite self-reporting paranoia,

20   sudden urges to hit people, and auditory hallucinations in the form of "chanting."  [PT 38

21   001698.]

22       108.    In my opinion, Patient 38 has a very severe mental health condition that

23   required transfer to an inpatient program when he was first referred to one in early August,

24   if not sooner.  It is cruel and clinically inappropriate to keep him in an MHCB, and

25   especially to discharge him to the EOP, while he is still struggling with his suicidality and

26   psychotic symptoms.

27                                   **Patient 52**

28       109.    I reviewed Patient 52's records for the period from July 22, 2020 to

EXPERT DECLARATION OF PABLO STEWART, M.D. REGARDING DEFENDANTS' DELAYED TRANSFER
OF CLASS MEMBERS TO DSH HOSPITALS

October 16, 2020.  Patient 52 was referred to DSH care on September 22, 2020 from SATF.  At the time I reviewed his file, in mid-October, there was no evidence that DSH has "accepted" the referral yet, but he was on the list of 55 people pending transfer to DSH that I was provided.

110.    CDCR clinicians diagnosed chronic residual schizophrenia and psychosis. He arrived at the SATF MHCB on September 16, 2020, after his clinician noted "bizarre behaviors, picking skin, pitting and perceived mania."  [PT 52 000236.]  An MHCB clinician noted that he took his prescribed medication, but his condition did not improve. [*Id*.]  He was prescribed Seroquel, Thorazine and Vistaril.  [PT 52 000246.]  Although the referring clinician noted the need for a higher level of care, he simultaneously acknowledged the reality that transfer would be delayed, and he stated that the patient could be managed safely at SATF.  [*Id*.]  These are contradictory conclusions – either the patient needs inpatient care or he does not.

111.    Patient 52 opposed transfer to DSH, denying mental illness but stating that his problems were physical.  CDCR held a *Vitek* hearing on September 25, 2020.  The psychologist president over the hearing affirmed the inpatient referral.  [PT 52 000261.]  In my experience, when a clinician affirms a referral against a patient's objection at a *Vitek* hearing, that is confirmation that the inpatient care is necessary.

112.    Nevertheless, by October 13, 2020, Patient 52 was still at SATF and had been discharged back to the EOP program.  His referral to DSH was not rescinded, however, and his clinicians still described him as needing inpatient care.  A Recreational Therapist noted that he continued to "display gross disorganization, minimal affect, and constant rambling with no identifiable connection in his sentences, with loose topics touching on race, the Bible, the Illuminati, and rap music," and that he appeared to be "responding to internal stimuli."  [PT 52 000425.]  The extent of this person's overt symptoms makes clear that this individual does not belong in an EOP program.

113.    As with the other cases reviewed here, it is my opinion that Patient 52's is experiencing needless harm and suffering by the continued inaction on his clinicians'

1  orders that he be transferred to DSH inpatient care.  Furthermore, it is my opinion that it is
2  problematic, to say the least, that SATF staff are willing to tolerate such a high level of
3  disfunction and such intensity of psychotic symptoms in a patient in their EOP program.

4                                                    **CONCLUSION**

5          114.    These 11 cases highlight the significant harms patient suffer when they are
6  not promptly transferred to the higher inpatient level of care that they require.

7          115.    It is also my opinion that these eleven cases illustrate that the appropriate
8  level of care for patients who need ASH or other DSH Hospital Treatment cannot be
9  provide in lower levels of care in the CDCR, like an EOP program, or in a CDCR MHCB,
10 or even in one of the CDCR's own inpatient level of care programs.

11 / / /
12 / / /
13 / / /
14 / / /
15 / / /
16 / / /
17 / / /
18 / / /
19 / / /
20 / / /
21 / / /
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

[3646336 3]

32

1       I declare under penalty of perjury under the laws of the United States of America

2   that the foregoing is true and correct to the best of my knowledge, and that this declaration

3   was executed at Honolulu, Hawaii this 12th day of November, 2020.

4

5

6                                     Pablo Stewart, M.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E X H I B I T    A

<u>CURRICULUM VITAE</u>

***PABLO STEWART, M.D.***
**3021 La Pietra Circle**
**Honolulu, HI 96815**
**(415) 264-0237**
**e-mail: pablo.stewart.md@gmail.com**
**(Updated August 2020)**



PLAINTIFF'S EXHIBIT
CASE NO. 2:90-cv-520-KJM-DB
EXHIBIT NO. P-100

<u>Personal Statement:</u>

As evidenced in my CV, my psychiatric career is based on several guiding principles. These include, but are not limited to a commitment to diversity at all levels of medical education, including medical students, residents and faculty members. Also, I have always believed that health care is a right and not a privilege. I have demonstrated this fact by my passion for social justice and health equity for everyone.

<u>Language Competency:</u>

Fluent in both Spanish and English.

<u>EDUCATION:</u>

University of California, San Francisco, Teaching Certificate in General Medical Education, 2017

University of California, San Francisco, School of Medicine, Department of Psychiatry, Psychiatric Residency Program, 1986

University of California, San Francisco, School of Medicine, M.D., 1982

United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry

<u>LICENSURE:</u>

California Medical License #GO50899
Hawai'i Medical License #MD-11784
Federal Drug Enforcement Administration #BS0546981
Hawaii Controlled Substances Certificate of Registration #E14341
Diplomate in Psychiatry, American Board of
Psychiatry and Neurology, Certificate #32564

<u>ACADEMIC APPOINTMENTS:</u>

July 1, 2019-
Present

Clinical Professor/Psychiatrist, University Health Partners (UHP), University of Hawaii, John A. Burns School of Medicine.

February 22, 2018-
February 22, 2019

<u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of Hawaii, John A. Burns School of Medicine.

September 2006-
Present

<u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco.

1

School of Medicine.

July 1995 -
August 2006

<u>Academic Appointment:</u>  Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

August 1989 -
June 1995

<u>Academic Appointment:</u>  Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

August 1986 -
July 1989

<u>Academic Appointment:</u>  Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine.


<u>EMPLOYMENT:</u>

July 2019-
Present

Attending Psychiatrist John A. Burns School of Medicine, Department of Psychiatry, University of Hawaii. Current duties include supervising psychiatric residents in their provision of acute and chronic care to the mentally ill inmate population housed at the Oahu Community Correctional Center. In this capacity I was also involved with local agencies in formulating the jail's response to Covid-19. I also present a lecture series to the psychiatric residents regarding Forensic Psychiatry.

December 1996-
Present

<u>Psychiatric Consultant</u>
Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation and correctional psychiatry.

January 1997-
September 1998

<u>Director of Clinical Services, San Francisco Target Cities Project</u>.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court  Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance.

February 1996 -
November 1996

<u>Medical Director, Comprehensive Homeless Center, Department of Veterans Affairs Medical Center, San Francisco.</u> Overall responsibility for the medical and psychiatric services at the Homeless Center.

March 1995 -
January 1996

<u>Chief, Intensive Psychiatric Community Care Program, (IPCC) Department of Veterans Affairs Medical Center, San Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community-based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans.

| | |
|---|---|
| April 1991 -<br>February 1995 | Chief, Substance Abuse Inpatient Unit, (SAIU), Department of Veterans Affairs Medical Center, San Francisco.<br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | Psychiatrist, Substance Abuse Inpatient Unit, Veterans Affairs Medical Center, San Francisco.  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | Director, Forensic Psychiatric Services, City and County of San Francisco.  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | Senior Attending Psychiatrist, Forensic Unit, University of California, San Francisco General Hospital.  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |
| July 1985<br>June 1986 | Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital.  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 -<br>March 1987 | Physician Specialist, Westside Crisis Center, San Francisco, CA.  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | Psychiatric Consultant, Marin Alternative Treatment, (ACT).  Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA.  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982- | Psychiatric Resident, University of California, San Francisco. |

| | |
|---|---|
| July 1985 | Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 - July 1978 | <u>Infantry Officer - United States Marine Corps.</u><br>Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Officer in Charge of a Vietnamese Refugee Camp. Received an Honorable Discharge.  Highest rank attained was Captain. |

<u>HONORS AND AWARDS:</u>

| | |
|---|---|
| June 2020 | Recognized by the Department of Psychiatry, John A.Burns School of Medicine, University of Hawaii as the recipient ot the 2019-2020 Excellence in Teaching Award-Psychiatry. |
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |

| | |
|---|---|
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award for Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident.  The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship.  One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry.  Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |

| | |
|---|---|
| November 1992 - January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000- April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001- September 2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002- June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003- April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003- January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004- June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004- January 2006; February 2017- October 2018 | Member of Human Services Commission, City and County of San Francisco. |
| February 2006- January 2007; April 2013- January 2015 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007- March 2013; February 2015- 2017 | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| June 2020 | Member of the John A. Burns School of Medicine, University of Hawaii Scholarship Committee for 2020-2021 academic year. |
| June 2020 | Member of the resident selection committee for the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii. |
| October 1999- October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999- July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |

6

| | |
|---|---|
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.  Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic.<br>Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| December 2018-<br>May 2019 | Lecturer, Department of Psychiatry, JABSOM, University of Hawaii. |
| September 2016-<br>June 2018 | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*, University of California, San Francisco, School of Medicine. |
| August 2014-<br>June 2018 | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |

7

| | |
|---|---|
| July 2003-<br>June 2018 | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| September 1990-<br>December 2002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - | Off ward supervisor, PGY II psychiatric residents, |

8

| | |
|---|---|
| November 1996 | Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine.  Designed, planned and taught course, Psychiatry 170.02, "Alcoholism".  This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional.  This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital,  Department of Psychiatry.  Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 – August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital.  Teach and supervise medical residents in interviewing and communication skills.  Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| | |
|---|---|
| May 2016-<br>Present | Court-appointed monitor in *Ashoor Rasho, et al. v. Director John R. Baldwin, et al.*, No.:1:07-CV-1298-MMM-JEH (District Court, Peoria, Illinois.) This case involves the provision of constitutional mental health care to the inmate population of the Illinois Department of Corrections. |
| June 2015-<br>May 2017 | Senior Fellow, University of California, Criminal Justice & Health Consortium. |
| April 2014-<br>Present | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |
| January-December 2014 | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |
| August 2012-present | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |
| October 2007-<br>Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM.  The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners.  My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order.  *See Brown v. Plata,* __ U.S. __, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011). |
| July/August 2008-Present | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.)  This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |

| | |
|---|---|
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD). This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project. This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities. NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |

11

| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
|---|---|
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 - December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues.  Special emphasis on dual diagnostic patients. |
| July 1981- December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

## SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| January 1996 - June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
|---|---|
| September 1994 - June 2002 | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991- June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 - July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 - May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

## PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1.  (10/12/1990).  "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds.  Department of Psychiatry, University of California, San Francisco, School of Medicine.  (12/5/1990).  "Advances in the Field of Dual Diagnosis."

3.    Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.    24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.    Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.    Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.    First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.    American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.    Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10.   University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11.   American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12.   Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13.   Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14.   Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15.   Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.   University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17.   National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18.   Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19.     Grand Rounds.  Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry.  (1/24/1995).  "Models of Addiction."

20.     San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project.  (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21.     First Annual Conference on the Dually Disordered.  (3/10/1995).  "Assessment of Substance Abuse."  Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22.     Delta Memorial Hospital, Antioch, California, Medical Staff Conference.  (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient."  Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23.     Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada.  (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24.     The Labor and Employment Section of the State Bar of California.  (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession."  MCCE Conference, San Francisco, CA.

25.     American Group Psychotherapy Association, Annual Training Institute.  (2/13-2/14/96), National Instructor - Designate training group.

26.     American Group Psychotherapy Association, Annual Meeting.  (2/10/96).  "The Process Group at Work."

27.     Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.     International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29.     Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30.     Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.     Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.     Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.     DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California.  (7/31/97)

34. The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35. The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36. American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37. "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38. "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39. Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40. Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41. Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42. "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44. Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45. "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46. 9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues

and Pain Management for Chemically Dependent Patients."   San Francisco, CA. (9/10/98)

47.     Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000."  "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA.  (9/18/98)

48.     Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder."  Napa, CA. (9/23/98)

49.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA.  (9/30/98)

50.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA.  (10/13/98)

51.     California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA.  (10/15/98)

52.     California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel.  (10/15/98)

53.     Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada.  (10/23/98)

54.     1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA.  (12/11/98)

55.     "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA.  (1/7/99)

56.     Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder."  (1/19/99)

57.     "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA.  (1/22/99 & 2/5/99)

58.     Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High-Risk Offender."  (2/17/99)

59.     American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999).  Entry Level Process Group Leader.

60.     "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61.     "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

62.  "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA.  (3/11/99)

63.  "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA.  (3/17/99)

64.  Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i.  Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies.  Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility.  (4/2-4/9/99)

65.  "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA.  (4/14/99)

66.  "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA.  (4/21/99)

67.  California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California.  (4/29/99)

68.  "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69.  State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70.  "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71.  11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72.  The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.  "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California.  (5/13/99)

74.  "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association.  Anaheim, California.  (5/21/99)

75.     15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho.  (5/25/99)

76.     "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California.  (6/3/99)

77.     "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan.  (6/14/99)

78.     "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan.  (6/17/99)

79.     "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan.  (6/26/99)

81.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California.  (7/13/99)

82.     "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California.  (7/15/99)

83.     "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.     1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry.  Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness.  What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering."  La Jolla, California.  (8/3/99)

85.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center.  Kahului, Maui.  (8/23/99)

86.     "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California.  (9/13/99)

87.     "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California.  (9/14/99)

88.     "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.     "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.   "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.   "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.   "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.   "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.   "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.   "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.   "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.   "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.   "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.   "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.  "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101.  "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.  National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.  "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.  "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California.  (6/29 & 7/27/00)

105.  "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.   "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

19

107.   Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.   "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.   "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.   (11/1/00, 3/13/01)

109.   "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California.  (11/12-11/17/00)

110.   "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California.  (12/5/00)

111.   "Wasn't One Problem Enough?"  Mental Health and Substance Abuse Issues.  2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California.  (3/2/01)

112.   "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."  County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113.   "Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California.  (3/13/01)

114.   "Dual Diagnosis-Assessment and Treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California.  (5/8/01)

115.   Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California.  (5/10/01)

116.   National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."   I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol.  New Orleans, LA.  (6/1-6/2/01)

117.   Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California.  (6/15/01)

118.   Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington.  (11/15/01)

119.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

120.   First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas."   El Centro, California.  (1/28/02)

121.   The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California.  (4/25/02)

122.  Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123.  3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System."  (6/5/02)

124.  New Mexico Department of Corrections, "Group Psychotherapy Training."  Santa Fe, New Mexico.  (8/5/02)

125.  Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002."  Berkeley, California.  (8/15/02)

126.  California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis."  Sacramento, California.  (8/22/02)

127.  Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128.  Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129.  "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (10/1/03), (12/3/03)

130.  "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California.  (10/18/03)

131.  "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California.  (4/2/04)

132.  Lecture tour of Japan (4/8-4/18/04).  "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.  San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (9/9/04)

134.  "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Sacramento, California.  (4/8/05)

135.  "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.  Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.  Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.   "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.   Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.   "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.   Sacramento, California. (4/25/06)

141.   "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.   "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.   "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.   "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.   San Francisco, California.  (8/2/07)

145.   "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.   "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.   "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.   "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149.   "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.   "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151.   Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.   2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.   Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154. Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155. 2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156. 2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157. Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158. Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159. "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160. San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.

161. Administrative Office of the United States Courts, Federal Death Penalty Resource Counsel Projects, 2016 Strategy Session: "Ethnocultural Competency Issues in Working with Experts;" "Understanding Drug Use and Abuse by our Clients and Strategies for Effectively Incorporating this Information into the Mitigation Narrative." Denver, Colorado, November 17-19, 2016.

162. "Evaluating the mentally ill and substance abusing client." Idaho Association of Criminal Defense Lawyers, Sun Valley, Idaho, March 10, 2017.

163. Mental Health & Death Penalty Training, Community Legal Aid Institute (LBH Masyarakat), Jakarta, Indonesia, February 12 -16, 2019.

PUBLICATIONS:

1) Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients.*  Hospital and Community Psychiatry, 39, 437-439.

2) Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.*  Group, Volume 13, Number 2, Summer 1989, 67-73.

3) Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.*  Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

23

4)   Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5)   Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6)   Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996) *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7)   Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)   Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)   Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)  Stewart, P., Inaba, D.S., and Cohen, W.E.  (2004). *Mental Health & Drugs.*  Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)  James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)  Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)  Stewart, P., Inaba, D.S., and Cohen, W.E.  (2007). *Mental Health & Drugs.*  Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon.

14)  Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon.

15)  Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.

16)    Brief of Medical and Other Scientific and Health-Related Professionals as Amici Curiae in Support of Respondents and Affirmance: Ahmer Iqbal Abbasi, et al., Respondents v. James W. Ziglar, John D. Ashcroft, et al., and Dennis Hasty, et al. Petitioners, On Writs of Certiorari to the United States Court of Appeals for the Second Circuit, In the Supreme Court of the United States, Nos. 15-1358, 15-1359 and 15-1363.

17)    Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine as Amici Curiae in Support of Plaintiff-Appellant Eric Joseph Depaola, Denis Rivera & Luis Velazquez, Plaintiffs v. Virginia Department of Corrections, et al., External Review Team, et al., Defendants. On appeal from the United States District Court for the Western District of Virginia, Case No. 7:14-cv-00692 in the United States Court of Appeals for the Fourth Circuit, No. 16-7358.

*18)*    Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Petitioner Shawn T. Walker v. Michael A. Farnan, et al., Respondents on petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit in the Supreme Court of the United States, No. 17-53.

*19)*    Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Plaintiff-Appellant Edgar Quintanilla v. Homer Bryson, Commissioner, State of Georgia's Department of Corrections, et al., On appeal from the United States District Court for the Southern District of Georgia, Case No. 6:17-cv-00004-JRH-RSB in the United States Court of Appeals for the Eleventh Circuit, No. 17-14141.