XAVIER BECERRA, State Bar No. 118517
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
LISA M. POOLEY, State Bar No. 168737
SAMANTHA D. WOLFF, State Bar No. 240280
LAUREL E. O'CONNOR, State Bar No. 305478
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' CLOSING BRIEFING FOLLOWING OCTOBER 23, 2020 EVIDENTIARY HEARING ON TRANSFERS TO INPATIENT CARE** |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................ 1

ARGUMENT .............................................................................................................................. 3

    I.    Events Leading to the October 23 Evidentiary Hearing. ........................................ 3

    II.   DSH and CDCR Are Complying with Program Guide Requirements for Transfer of Patients to Inpatient Beds, As Modified by the Temporary Addition of COVID-19 Screening and Attendant Transfer Guidelines. ................. 4

        A.    Program Guide Requirements for Inpatient Transfers. ............................... 5

        B.    Defendants Are Transferring Patients to DSH Inpatient Facilities Under COVID-19 Screening Measures and Attendant Transfer Guidelines. ................................................................................................... 5

    III.  Any Deviations from the Program Guide Inpatient Transfer Timeframes Are Permitted under the Transfer Timeframe Exceptions or as Necessary Actions to Safeguard Patient and Staff Safety. ...................................................... 8

    IV.  DSH Does Not Prioritize Admission of Offenders with Mental Health Disorders (OMHDs) At the Expense of Coleman Class Members. ..................... 10

    V.   Dr. Lauring's Testimony Is Irrelevant to The Court's Inquiry. ........................... 12

    VI.  Dr. Stewart's Testimony Failed to Establish That Any Class Member Is Suffering Individualized Harm. ............................................................................ 13

CONCLUSION ......................................................................................................................... 15

i

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing  (2:90-cv-00520 KJM-DB (PC))

# INTRODUCTION

Faced in March 2020 with an unprecedented pandemic that threatened the lives of patients and staff, the California Department of State Hospitals (DSH) suspended admission of patients from the California Department of Corrections and Rehabilitation (CDCR) to its inpatient hospital beds for thirty days. Shortly afterwards, DSH and CDCR, working closely with the Special Master's experts in the COVID-19 Task Force framework ordered by the Court and with Plaintiffs' full participation, created patient screening and transfer guidelines for *Coleman* patients. Over the last seven months, DSH and CDCR have continued to work within the Court's COVID-19 Task Force structure to refine and adapt the screening and transfer guidelines. Combined with other COVID-19 mitigation strategies that included robust screening of staff, reduced patient movement, and the creation of isolation and quarantine space within their facilities, the patient screening and transfer guidelines successfully prevented *Coleman* patients at DSH from becoming infected with this deadly disease, while still ensuring the successful transfer of over 100 *Coleman* patients since March.

As recently as July 30, Plaintiffs agreed that Defendants were continuing to ensure access to inpatient care consistent with this Court's orders, despite a pandemic. And at the evidentiary hearing on October 23, Defendants conclusively demonstrated that DSH and CDCR have complied with the Program Guide requirements for transfers to inpatient beds as modified by COVID-19 screening and transfer guidelines that balance the dual imperatives of protecting the health of patients and staff at DSH and CDCR facilities by minimizing the risk of COVID-19 transmission, and addressing some patients' need for mental health treatment at another facility. These guidelines include patient quarantine and testing requirements before and during transfers to DSH, consistent with public health guidance provided to the agency clinicians. All agree that this balancing of risks is necessary, and the October 23 hearing showed that Defendants are being criticized for being too cautious in their efforts to limit and manage the spread of the coronavirus.

When patients are transferred to DSH beyond the Program Guide timeframes due to quarantine and testing protocols contained in the COVID-19 guidelines, such deviations are permitted under the Program Guide. In addition, such deviations are permissible because DSH

1

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing (2:90-cv-00520 KJM-DB (PC))

and CDCR have inherent authority to take immediate steps informed by their experts to respond to a public health emergency and limit the spread of COVID-19 between DSH and CDCR facilities. The guidelines represent a responsible balancing of risks inherent in patient transfers during the pandemic and comport with public health guidance. Plaintiffs' infectious disease expert testified at the hearing that the agencies' quarantine and testing protocols are too restrictive and not necessary to curb the spread of COVID-19 to DSH—that testimony lacks foundation and is based on a flawed understanding of DSH operations and the recent outbreaks throughout CDCR facilities. Moreover, the suggestion by Plaintiffs and their experts that Defendants should loosen COVID-19 precautions is irresponsible and hypocritical, especially when the same Plaintiffs are arguing that Defendants are deliberately indifferent to the risks posed by COVID-19, and when COVID-19 transmission rates are increasing at alarming rates across the state and country. And while these necessary precautions may delay transfers temporarily at times, patients are receiving mental health treatment while awaiting transfer. Plaintiffs' mental health expert provided no valid contrary testimony.

Since April, over 100 *Coleman* patients have safely and timely transferred to DSH inpatient beds under the COVID-19 screening and transfer guidelines developed by DSH and CDCR with input from the Special Master's experts. DSH has accepted all patients but one referred to its care. Indeed, of the 55 patients who were waiting at CDCR facilities to transfer to DSH in the weeks before the October 23 hearing due to these facilities closing from movement as a result of COVID-19 outbreaks, dozens have since transferred. Through the individualized review process reached with the Special Master and his experts, patients will continue to transfer to DSH. The transfer guidelines and other aspects of the agencies' response to the COVID-19 pandemic are continually discussed among the parties through the Court's Task Force framework. If the Court determines that further actions are needed concerning *Coleman* patient access to DSH, it should refer these items to the Special Master's Task Force.

2

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing  (2:90-cv-00520 KJM-DB (PC))

# ARGUMENT

## I. EVENTS LEADING TO THE OCTOBER 23 EVIDENTIARY HEARING.

In March 2020, as the world began to realize the gravity of the COVID-19 pandemic, DSH and CDCR took immediate steps to protect patients and staff from the disease. Dr. Katherine Warburton, DSH's Medical Director, testified that DSH quickly determined that preventing introduction of the disease into the agency's facilities was critical because it could spread rapidly among the patient population that lived in congregate settings with shared spaces. (10/23/20 Hrg. Tr. at 41:15-22.) Accordingly, DSH suspended admissions for *Coleman* patients and almost all other patients, limited visitation, and commenced screening, temperature testing, and masking of all staff to limit introduction of the disease. (*Id.* at 41:23-42:5.)

Following a March 20 status conference, the Court directed the Special Master to convene a COVID-19 Task Force to assess the pandemic's impact on the *Coleman* class and Defendants' response to the pandemic. (3/20/20 Hrg. Tr. at 22:18-23:21; ECF No. 6513.) According to Dr. Amar Mehta, CDCR Deputy Director of Statewide Mental Health Program, and Dr. Joseph Bick, Director of Healthcare Services for CDCR and California Correctional Health Care Services, the Task Force quickly convened and began addressing CDCR's mental health program's response to COVID-19. (10/23/20 Hrg. Tr. at 95:3-20; 158:15-22.) The Task Force generated regular weekly all-parties meetings and numerous small work groups comprised of agency program staff and the Special Master's experts, including a separate work group that Dr. Warburton attended focusing on DSH transfers. (*Id.* at 95:21-96:6; 159:1-24.) Items identified in the large all-parties meetings would be discussed at the smaller work groups, where Defendants' clinicians and the Special Master's experts would address an issue and implementation plan, then return them to the larger group for Plaintiffs to ask questions or suggest modifications. (4/10/20 Hrg Tr. at 12:8-18; 10/23/20 Hrg. Tr. at 96:11-22.)

On April 3, the Court ordered Defendants to show cause why they should not be ordered to admit *Coleman* patients to DSH inpatient beds consistent with the admission protocols for Offenders with Mental Health Disorders (OMHDs), a patient group whose admissions had not been suspended in March due to state law requirements. (ECF No. 6572 at 2.) Following

3

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing  (2:90-cv-00520 KJM-DB (PC))

Defendants' response, the Court set a "focused" evidentiary hearing concerning *Coleman* class member access to DSH hospitals for April 21. (ECF No. 6600 at 4.) As DSH and CDCR's response to the evolving pandemic took shape, including with the filing of CDCR's Strategic COVID-19 Management Plan, the Court extended the hearing and further defined Defendants' obligation to transfer patients. (*See* ECF Nos. 6616, 6639.)

On April 24, the Court directed that *Coleman* patient transfers to DSH inpatient beds occur consistent with Program Guide requirements, subject to a temporary modification "tailored to the current circumstances during which the coronavirus pandemic has not been curbed nor a cure identified. That modification allows that no transfers to DSH inpatient mental health care are taking place without a COVID-19 screening." (ECF No. 6639 at 10.) This screening was contained in an April 5 CDCR memorandum titled "COVID-19 Screening Prior to Mental Health Transfers." (*Id.*; ECF No. 6616-1 at 237; Defs.' Ex. 9.) This memorandum's screening requirements have since been incorporated in subsequent guidelines addressing transfers to DSH. (*See* Defs' Exs. 10, 12, 22; Pls.' Ex. 101.) On May 7, the Court clarified that the issues for the hearing are: (1) DSH and CDCR's compliance with the Program Guide requirements, as modified by the temporary addition of COVID-19 screening, for transfer of class members to inpatient hospital beds; (2) if they are not complying with those requirements, in what way or ways are they deviating from those requirements; and (3) the rationale for any deviation from compliance. (ECF No. 6660 at 2.)

**II.    DSH AND CDCR ARE COMPLYING WITH PROGRAM GUIDE REQUIREMENTS FOR TRANSFER OF PATIENTS TO INPATIENT BEDS, AS MODIFIED BY THE TEMPORARY ADDITION OF COVID-19 SCREENING AND ATTENDANT TRANSFER GUIDELINES.**

The April 5 COVID-19 screening memorandum was the first in a series of criteria developed by DSH and CDCR to safely and responsibly transfer patients to DSH inpatient care. Defendants' screening and transfer guidelines have evolved with their understanding of the pandemic, the need for balancing risks to safeguard patient health, and experiences in managing this unprecedented health crisis. (10/23/20 Hrg. Tr. at 113:13-24.) Moreover, these guidelines have been developed using individualized guidance provided by California Department of Public Health experts and with the input of all relevant stakeholders, including the Special Master, his

4

extensive expert team, and Plaintiffs, particularly through this Court's 39 Task Force meetings and the smaller work group meetings the Special Master organized to complement the Task Force. DSH and CDCR have been and are complying with the Program Guide's requirements for inpatient transfers during the pandemic, as modified by the temporary addition of these screening and transfer guidelines.

### A. Program Guide Requirements for Inpatient Transfers.

The Mental Health Services Delivery System (MHSDS) Program Guide provides that for CDCR patients whose conditions cannot be successfully treated in an outpatient setting, they may be referred to inpatient programs provided by DSH. (ECF No. 5864-1 at 11.) These patients must, in the judgment of their treating CDCR clinician, meet certain admission criteria for referral to DSH for inpatient hospitalization. (*Id*. at 112-14.) Patients in need of inpatient care at DSH must be transferred within 30 days, if accepted by DSH. (*Id*. at 18.) This 30-day transfer timeframe may be temporarily suspended due to exceptions, including patient refusal to transfer, placement of a medical hold on a transfer so that a more urgent medical condition can be resolved, and unusual circumstances outside of the control of CDCR. (Addendum to Program Guide Section 12.11.2101 (A); *see* ECF No. 5744.) Only patients needing Intermediate Care Facility (ICF) level of care are transferred to DSH, which is defined as patients needing longer intermediate and sub-acute mental health treatment. (ECF No. 5864-1 at 111.)

### B. Defendants Are Transferring Patients to DSH Inpatient Facilities Under COVID-19 Screening Measures and Attendant Transfer Guidelines.

At the October 23 hearing, Dr. Mehta testified that CDCR's April 5 memorandum regarding COVID-19 screening for mental health patients prior to transfer reflected CDCR's balancing of risks associated with COVID-19 and the risk of death associated with mental health causes, such as suicide. (10/23/20 Hrg. Tr. at 99:22-100:21.) According to Dr. Mehta, recent statistics show that the death rate for CDCR inmates in the MHSDS from COVID-19 infection is nearly ten times higher than the death rate from suicide among inmates in this same group, and supports CDCR's efforts to balance risks to keep its patients safe. (*Id*. at 100:22-101:11.) Following the April 5 screening memorandum, CDCR developed subsequent memoranda that

5

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing (2:90-cv-00520 KJM-DB (PC))

incorporated its screening criteria, including the April 10 "COVID Emergency Mental Health Treatment Guidance and COVID Temporary Transfer Guidelines and Workflow." (Defs' Ex. 10; 10/23/20 Hrg. Tr. at 108:1-22.) The April 10 guidance, created in collaboration with the Special Master's experts, discussed guidelines for transfer to inpatient care, including possible quarantine and isolation, transfer procedures, and the inclusion of a "medical transfer note" that was identical to the COVID-19 screening criteria contained in the April 5 memorandum. (*See, e.g.,* Defs.' Exs. 9-1, 10-4, 10-6.) CDCR mental health program staff later developed and released the "COVID-19 Temporary Guidelines for Transfer to DSH Inpatient Care," which was based on the April 5 and April 10 memoranda, and was intended to maintain consistency regarding DSH transfers. (Defs.' Ex 12; 10/23/20 Hrg. Tr. at 112:7-113:5.)[1]

As the pandemic continued to impact CDCR facilities, and more institutions began to close to any type of movement due to COVID-19 outbreaks, a number of patients whom DSH had accepted for admission but were not safe to move under the Defendants' guidelines due to the outbreaks at the sending facilities, could not transfer. As a result of this growing list of accepted patients at institutions closed to movement, DSH then revised its guidelines in July to allow for

---

[1] These memoranda existed at the time of the April 24 order directing Defendants to comply with Program Guide requirements regarding patient transfer to DSH with the addition of COVID-19 screening, and were known to the parties and the Court. (*See* ECF No. 6616 at 239.) Likewise, the Special Master reported during the April 17 status conference that "[a]fter several revisions and approval from all of the parties, the so-called COVID-19 Temporary Transfer Guidelines and the COVID-19 Emergency Mental Health Treatment Guidance documents were distributed to the institutions on the evening of April 10, 2020." (4/17/20 Hrg. Tr. at 9:23-10:2 (emphasis added).) Further, on May 18, Plaintiffs agreed "that Defendants current processes for transferring class members to DSH hospital beds are consistent with Program Guide requirements, subject to temporary modifications to permit COVID-19 screening consistent with this Court's April 24, 2020 Order." (ECF No. 6676 at 3.) Thus, it was acknowledged by all parties that Defendants were screening patients for transfer to DSH inpatient hospital beds under guidelines that sprang from the April 5 memorandum, and these actions were based on similar concerns for patient safety and risks balancing—with full transparency among stakeholders. And in a June 23 stipulation, Plaintiffs agreed that "Defendants are following the requirements of the Court's April 24 order, and Defendants represent they are doing so. Additionally, on June 12, 2020, Defendants provided Plaintiffs with an updated proposed written protocol for transfers to DSH, which they revised and recirculated on June 19, 2020. Defendants developed these protocols with the guidance of the Special Master's experts and the parties are discussing them in the ongoing task force meetings." (ECF No. 6734 at 4.) These facts show again that the initial April 5 COVID-19 screening memorandum, which was intended to minimize the risk of transmission of COVID-19, was further developed into transfer guidelines following input from all interested parties.

6

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing  (2:90-cv-00520 KJM-DB (PC))

transfers from these closed prisons on a case-by-case basis and considering the risks for each patient. (10/23/20 Hrg. Tr. at 115:3-116:20; Defs.' Ex. 22.)

By the first week of July, the number of active COVID-19 cases among CDCR inmates peaked at 3,000. (10/23/20 Hrg. Tr. at 166:3-6; Defs.' Ex. 43.) The dangers of the virus were a primary concern of health care leadership, which included the federal Receiver in *Plata v. Newsom* and his team, as they balanced how best to provide care to CDCR's patients without needlessly exposing inmates and staff to the insidious disease. (*Id*. at 166:4-8.) According to Dr. Bick, CDCR then further revised its guidelines, relying on guidance from the federal Receiver, the Centers from Disease Control, and the California Department of Public Health to create a movement matrix to minimize the risk of COVID-19 transmission for all CDCR inmates going forward. (*Id.* at 163:3-164:1; Defs.' Ex. 32.) As a result of this movement matrix, and the updated guidelines allowing for case-by-case assessments of COVID risk, patient transfers to DSH resumed and the number of patients awaiting transfer from closed institutions started decreasing. (*Id*. at 168:13-169:5.)

Furthermore, DSH recently released its "Updated Draft COVID-19 Temporary Guidelines for Transfer to DSH Inpatient Care." (10/23/20 Hrg. Tr. at 119:19-120:1; Pls.' Ex. 101.) This policy, issued October 20, memorializes the process CDCR and DSH had already been operating under for several weeks, to address transfers from institutions closed to movement, and which have resulted in numerous transfers to DSH. (*Id*. at 120:8-121:22.) And according to Dr. Warburton, Defendants' initial development of its transfer guidelines were created after consultation with California Department of Public Health staff and a bioethicist. (*Id*. at 51:6-21.) DSH has carefully continued to develop its guidelines with public health expertise, and this newest process "involves real time communication of public health data to try to identify individuals in closed [CDCR] institutions who can safely transfer to [DSH]." As CDCR has been providing thorough and accurate public health data to DSH about the actual risk to each patient, this enabled approximately 26 of 55 inmates on the waitlist to transfer to DSH from prisons closed to movement due to COVID-19 by the time of the October 23 hearing. (*Id*. at 50:1-10.)

7

1    Despite the significant challenges posed by the pandemic, CDCR has been complying with
2    the Program Guide's requirement for transfers of *Coleman* patients to DSH inpatient beds, as
3    modified by the addition of COVID-19 screening and transfer guidelines. (10/23/20 Hrg. Tr. at
4    113:6-24; 122:19-25.) Plaintiffs' attempt to argue that a few patients in Salinas Valley State
5    Prison's Psychiatric Inpatient Program (PIP) transferred to DSH more than five days after a
6    medical hold was lifted, and thus demonstrated noncompliance with transfer time lines, relies on
7    a strained reading of the Program Guide. (*Id*. at 135:22-136:2; 138:14-139:13; 140:1-17; Pls.'
8    Ex. 95.) These patients were transferring from one inpatient setting (Salinas Valley's PIP) to
9    another inpatient setting (DSH) within the *same* level of care; they were not patients waiting for
10   access to an inpatient bed. (*See* Pls.' Ex. 95 at 2-4.) The five-day transfer timeline following
11   resolution of a medical hold, or other exception, is intended for patients in need of Acute or
12   Intermediate Care Facility beds, not patients already receiving that level-of-care. (Addendum to
13   Program Guide Section 12.11.2101 (A), ECF No. 5744.) The alleged delay in moving five
14   patients from one inpatient bed to another does not demonstrate that CDCR failed to comply with
15   Program Guide requirements concerning inpatient transfers to DSH. Instead, the evidence shows
16   that since the pandemic infiltrated state facilities in March 2020, CDCR and DSH have worked
17   together to transfer 111 patients to DSH inpatient beds under the COVID-19 screening and
18   transfer guidelines. (10/23/20 Hrg. Tr. at 88:4-7.) Defendants have demonstrated their
19   compliance with the Program Guide's requirements.

20   **III.  ANY DEVIATIONS FROM THE PROGRAM GUIDE INPATIENT TRANSFER TIMEFRAMES ARE PERMITTED UNDER THE TRANSFER TIMEFRAME EXCEPTIONS OR AS**
21   **NECESSARY ACTIONS TO SAFEGUARD PATIENT AND STAFF SAFETY.**
22
23   To the extent that adherence to the COVID-19 transfer guidelines developed by DSH and
24   CDCR has resulted in deviations from the Program Guide timeframes for the transfer of *Coleman*
25   patients to DSH inpatient beds, such deviations are permitted under the Program Guide inpatient
26   transfer timeframe exceptions. Addendum to 12.11.2101(A), PIP Policy and Procedure Referral
27   and Admission provides that certain situations, including medical conditions and unusual
28   circumstances, can temporarily suspend transfer timelines. (ECF No. 5744.) Delaying a patient's

8

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing  (2:90-cv-00520 KJM-DB (PC))

1  transfer to a DSH inpatient bed while, for example, awaiting completion of quarantine before
2  transfer or receipt of COVID-19 test results for as little as a week or two falls within the medical
3  conditions exception to the transfer timeframes.  These situations also fall within the unusual
4  circumstance exception, because neither CDCR nor DSH have sufficient control over testing
5  times or the spread of this insidious disease, particularly where carriers can be asymptomatic.
6  Application of these exceptions to Defendants' transfer guidelines is further justified by
7  Defendants' legitimate balancing of the risks and benefits of enacting effective transfer policies
8  and the consideration of public health guidance underlying those policies.  (10/23/20 Hrg. Tr. at
9  46:6-13; 169:12-24.)  Timely transferring patients only for them to be infected with COVID-19
10 does not increase their access to mental health care.  Instead, it results in unacceptable risks to
11 patients' health and safety, without any benefitting care.  Patients suffering COVID-19 must
12 isolate, further limiting their treatment and delaying improvement of their psychiatric symptoms.
13 Transferring patients timely, for timeliness sake, during an infectious disease pandemic, runs
14 contrary to public health guidance, puts *Coleman* patients at more risk for mental
15 decompensation, and erodes the parties' commitment to providing access to mental health care.
16      To the extent that this Court determines that Defendants' actions deviate from the Program
17 Guide's requirements for inpatient transfers, such deviations are further authorized in response to
18 the COVID-19 public health emergency.  The Supreme Court has recognized that unique public
19 health emergences, such as the outbreak of a deadly disease, temporarily shift the balance of
20 constitutional interests and give State officials greater leeway to take actions that infringe on
21 individual liberty.  *See Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 29 (1905) (upholding a
22 mandatory vaccination law with criminal penalties for noncompliance over a Fourteenth
23 Amendment challenge during a smallpox outbreak).  Under the *Jacobson* framework, a public
24 health emergency magnifies the State's inherent police power, granting it more flexibility to take
25 actions in pursuit of public health and safety, so long as these actions are not unconstitutional.  *Id.*
26 at 24–31; *see also In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) ("The bottom line is this: when
27 faced with a society-threatening epidemic, a state may implement emergency measures that
28 curtail constitutional rights so long as the measures have at least some 'real or substantial

9

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing  (2:90-cv-00520 KJM-DB (PC))

relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" (quoting *Jacobson*)).

Here, it is indisputable that the deviations from the Program Guide inpatient transfer timeline requirements contained in the CDCR and DSH transfer guidelines have a real and substantial relation to the public health emergency. The proposed deviations, developed in the COVID-19 Task Force structure, are designed to minimize the spread of infection between CDCR and DSH institutions, and among the *Coleman* class members and agency staff, by enacting responsible protocols for transfers to DSH inpatient beds. Such rationally-minded protective protocols are not "a plain, palpable invasion" of patients' Eighth Amendment rights. *Jacobson*, 197 U.S. at 31; s*ee Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). Therefore, under *Jacobson*, the temporary Program Guide deviations are permissible. *See S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 590 U.S. --- (2020), 2020 WL 2813056 (May 29, 2020) (noting that the "Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect," and that "[w]hen those officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad'") (quoting *Jacobson*). The Court should reject Plaintiffs' efforts to micromanage Defendants' response while Defendants work to develop, implement, and adjust measured and informed guidelines to keep inmates and staff safe.

## IV. DSH DOES NOT PRIORITIZE ADMISSION OF OFFENDERS WITH MENTAL HEALTH DISORDERS (OMHDs) AT THE EXPENSE OF *COLEMAN* CLASS MEMBERS.

Plaintiffs have repeatedly pointed to DSH's admission of OMHDs over the past eight months as evidence that DSH is prioritizing other patients over *Coleman* patients, as well as claiming—without support—that if DSH can admit OMHDs safely, the same can be done for *Coleman* patients. Notwithstanding how often Plaintiffs beat this drum, the contention is a red herring that has no bearing on the questions asked by this Court. In actuality, DSH's standard process is the same for both OMHDs and *Coleman* patients—to test them and transfer only upon receipt of a negative test. In the exceptional circumstance when DSH must admit an OMHD

10

1  patient without a test result, upon the expiration of their prison term at CDCR, the process carries

2  far higher risks than the current process for admitting *Coleman* patients.

3        As Dr. Warburton testified, at the onset of the pandemic, DSH sought to temporarily

4  suspend *all* intake into its hospitals. (10/23/20 Hrg. Tr. at 57:4-6.) Movement is the fuel of

5  COVID-19, and with little knowledge about the spread of the virus, let alone ways to treat it, this

6  decision was made to protect the entire DSH patient population and staff, not just *Coleman*

7  patients. DSH successfully halted admission of six out of seven patient types between March 16

8  and April 16, but DSH does not have discretion to halt or even delay OMHD discharges to their

9  facilities, either for COVID-19 screening or any other reason. *See* Cal. Penal Code § 2962. As a

10 condition of their parole, DSH admits OMHD patients to its facilities upon discharge from CDCR

11 for mental health care. These patients, who are *Coleman* patients until their moment of discharge,

12 have reached the end of their prison sentences and would be over-detained by holding them in

13 CDCR institutions. But they have been deemed a serious threat to their own safety and that of

14 others and legally must be committed to DSH care rather than paroled to the community. There

15 is no mechanism for holding these patients while awaiting a COVID-19 test, and if they reach

16 their parole date, they must be transferred to DSH or released to the community. As Dr.

17 Warburton testified, this has resulted in the transfer to a DSH inpatient facility of at least one

18 OMHD who tested positive for COVID-19. (10/23/20 Hrg. Tr. at 61:12-14.) This is by no means

19 a "safe" process, nor is it standard practice; when this occurs, it exposes transportation staff, DSH

20 physicians, and the entire patient population of DSH to infection. But it is the best of several bad

21 options. By contrast, this Court has authorized Defendants to perform necessary COVID-19

22 screening of *Coleman* patients before transferring them to inpatient care at DSH, a process that

23 resulted in zero known positive cases among DSH's *Coleman* population as a result of transfers.

24 (10/23/20 Hrg. Tr. at 88:4-10.)[2]

---

25    [2] Plaintiffs argue that the OMHD transfer process could be used to transfer *Coleman* patients to DSH. But as Dr. Warburton stated, that could not be done safely. (10/23/20 Hrg. Tr.
26 at 70:15-21.) Requiring DSH to accept *Coleman* patients with a positive test result or high exposure risk would jeopardize the entire *Coleman* population who Plaintiffs claim have
27 heightened vulnerability to COVID-19. (ECF No. 6751.) Plaintiffs' suggestions that *Coleman* patients could simply be admitted into quarantine space has no factual support or basis in public
28 health best practices.

11

Plaintiffs also accuse Defendants of preferential treatment in choosing to admit other patients to DSH over *Coleman* class members. But DSH has admitted over 100 *Coleman* patients since the pandemic began and has rejected only a single referral. (10/23/20 Hrg. Tr. at 88:4-7.) More importantly, Plaintiffs have not identified a single *Coleman* patient who was denied transfer to DSH because of lack of space. Delaying transfers of patients to ensure that COVID-19 is not introduced into DSH's congregate living environment is a critical prevention tool, and one that has effectively protected *Coleman* class members from this deadly disease. Requiring Defendants to discard this tool and admit patients whom have not been tested or are COVID-19 positive, and who could otherwise continue to receive care while they stay at CDCR until those processes are complete, would place *Coleman* patients—and DSH's patients as a whole—at unnecessary and grave risk. *Coleman* patients are not being put at the back of the line. To the contrary, Defendants' transfer and screening protocol are succeeding in keeping them safe.

## V. DR. LAURING'S TESTIMONY IS IRRELEVANT TO THE COURT'S INQUIRY.

Plaintiffs offered Dr. Lauring as an expert in infectious disease. (10/23/20 Hrg. Tr. at 214:16-17.) But his opinions concerning DSH treatment, facilities, and patients lack foundation, are based largely on speculation, and do not help address the Court's three questions. Dr. Lauring's background does not equate to expertise in providing care in any forensic psychiatric hospitals. Instead, his experience is limited to working at a single University of Michigan hospital with a variety of inpatient psychiatric units. (*Id*. at 232:23-233:14.) Moreover, he is not familiar with DSH's mission, its facilities' layouts, or the Program Guide. (*Id*. at 239:32-23; 240:19-241:2; 234:1-24.) Dr. Lauring was also unfamiliar with the level of care DSH provides to the *Coleman* class and the living conditions for patients transferred to DSH. (*Id.* at 237:3-9; 235:13-236:10.)

Dr. Lauring's opinions are likewise unhelpful in answering the Court's questions because his criticisms of Defendants' COVID-19 mitigation policies are not grounded in guidelines designed for large locked forensic inpatient programs. (*Id*. at 227:20-228:13.) He opined that Defendants' COVID-19 mitigation policies, are inconsistent with public health guidance because hospitals and other healthcare facilities "do not require a negative test before someone can be

12

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing  (2:90-cv-00520 KJM-DB (PC))

admitted." (*Id*. at 227:2-19.)  But DSH is a long-term forensic psychiatric facility, not a behavioral health program.  (*Id.* at 84:8-13.).  For that reason, the California Department of Public Health publications proffered by Plaintiffs are not appropriate guidance for transfer and admission of patients to DSH facilities.  (Pls.' Exs. 103 and 107.)  And Dr. Lauring is not aware of any specific COVID-19 guidelines that apply to state mental hospitals.  (10/23/20 Hrg. Tr. at 244:5-9.)

Based on his review of Defendants' transfer protocols, Dr. Lauring agreed that DSH's protocols were acceptable and his only objection was to CDCR's 14-day quarantine before transfer to DSH.  (*Id*. at 221:3-222:11.)  Dr. Lauring believes that the negative test requirement and quarantine requirements set forth in CDCR's Movement Matrix cause unnecessary delays and holds up transfers.  (*Id*. at 224:5-23, 225:2-7.)  But as Dr. Bick testified, CDCR and DSH are very different from a community mental health facility, and the quarantine, testing, and movement procedures developed in the Movement Matrix reflect CDCR's experience following outbreaks in a large prison system that infected 15,000 inmates and caused 70 deaths.  The goal with CDCR's matrix was to ensure that they did not inadvertently transfer infected people.  (*Id*. at 289:13-23.)  CDCR and DSH transfers are markedly different from community transfers, and CDCR created its recent quarantine and testing protocols based upon their unique experience, clinical judgment, and in consultation with the California Department of Public Health.  (*Id*. at 290:3-14.)  Indeed, Dr. Lauring's criticism that Defendants are being too cautious with their COVID-19 screening procedures is irresponsible and invites an unconscionable risk of harm for CDCR and DSH patients.  Agencies must be given due discretion to respond to emergencies— DSH and CDCR developed quarantine testing procedures based on public health information and evolving experience with the pandemic to protect their patients and the public. The Court should reject Dr. Lauring's testimony.

**VI.  DR. STEWART'S TESTIMONY FAILED TO ESTABLISH THAT ANY CLASS MEMBER IS SUFFERING INDIVIDUALIZED HARM.**

Plaintiffs identified Dr. Stewart as an expert in the field of psychiatry and correctional psychiatry, and he was asked to provide opinions about whether 55 patients waiting for transfer to

13

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing  (2:90-cv-00520 KJM-DB (PC))

DSH were experiencing any clinical harm and receiving adequate care while awaiting transfer. (10/23/20 Hrg. Tr. at 257:17-20; 258:5-12.) But Dr. Stewart's testimony about the 55 patients was vague and highly speculative, and he testified only generally about the effects of delayed treatment, such as the potential for developing Alzheimer's disease (*id.* at 258:24-259:4); worsening prognosis over a patient's lifetime (*id*. at 259:5-8); and the potential for behavioral manifestations of mental illness when patients are treated at a level of care different than the patient's needs. (*Id.* at 259:14-22.) None of this testimony is relevant.

Dr. Stewart also testified that some of the 55 patients had diagnoses that are properly treated in an inpatient setting. (10/23/20 Hrg. Tr. at 264:1-5; 265:5-10; 265:21-24; and 266:7-12.) But his opinions were based on a limited review of only one document in the patients' medical records, the Master Mental Health Plan. (*Id*. at 279:8-280:3.) Furthermore, Dr. Stewart did not offer specific details on these patients as his testimony and opinions were based on a cursory review of limited patient records and data on a spreadsheet created by Plaintiffs' counsel. (*Id.* 267:18-268:2.) While Dr. Stewart reviewed the records for a subset of 11 patients, Plaintiffs only provided Defendants those patients' names—not the records that Dr. Stewart reviewed, which he limited to a set period of time. (ECF No. 6922; Thorn Decl. Ex B.)

Further, Dr. Stewart provided no testimony to establish that patients who waited beyond Program Guide timelines for transfer to DSH suffered any actual harm. (10/23/20 Hrg. Tr. at 280:15-281:1.) And when asked whether the conditions the patients suffered as a result of delay in admission to an inpatient setting could also afflict patients admitted to inpatient care at DSH, he acknowledged such opinions would be speculation without having actually examined the patients. (*Id.* at 280:5-14.) On the other hand, Dr. Mehta testified that patients in the PIPs waiting for admission to DSH are receiving care, including individual appointments, recreational therapy, group-building and morale-building exercises, and rounding. (*Id*. at 299:13-300:11.)

Dr. Stewart's testimony regarding mental health treatment under COVID-19 conditions is based on his work with the Illinois Department of Corrections and work at an inpatient unit at a hospital in Hawaii. (*Id*. at 260:2-13; 262:5-19.) There is no evidence that Dr. Stewart was provided any information concerning the mitigation of treatment as a result of COVID-19 in

14

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing  (2:90-cv-00520 KJM-DB (PC))

CDCR or DSH. He did not review any information from the COVID-19 operational dashboard that tracks the mental health care provided to the patients during COVID-19 (*id.* at 281:21-282:6), nor did he consider any policies regarding patient care or movement within CDCR or DSH, including the movement matrix, the COVID-19 inpatient transfer policies, or the DSH transfer guidelines, even though these policies were designed to weigh risks of movement against the need to continue to provide care. (*Id.* at 161:21-162:7.) Like Dr. Lauring, Dr. Stewart's testimony does little to address the Court's three questions.

## CONCLUSION

The evidence shows that Defendants' COVID-19 policies and guidelines are working to transfer *Coleman* class members as safely as possible to inpatient beds at DSH during the continually evolving pandemic. Defendants' COVID-19 screening and transfer guidelines properly balance the risks of spreading the disease with the benefits of transfer to inpatient beds and comport with public health guidance. DSH has accepted all but one patient referred during the pandemic, and transferred all but those patients currently housed at CDCR facilities with uncontrolled outbreaks of COVID-19, where the risk of potential transmission is too great at this time. Any order requiring immediate transfers would contradict public health advice, infringe upon Defendants' discretion to operate their prison and hospital systems, and would threaten the safety of class members. If the Court established the COVID-19 Task Force to monitor and address the ever-changing nature of the pandemic, Defendants submit any changes to their transfer policies be addressed in that forum, not in further adversarial trial proceedings.

Dated: November 13, 2020

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California

*Elise Owens Thorn*

ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003

15

Defs.' Closing Briefing Following October 23 Inpatient Transfers Hearing  (2:90-cv-00520 KJM-DB (PC))