1
DONALD SPECTER – 083925
STEVEN FAMA – 099641
2
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
3
1917 Fifth Street
Berkeley, California 94710-1916
4
Telephone: (510) 280-2621

5
CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
6
AND DEFENSE FUND, INC.
Ed Roberts Campus
7
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
8
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

9

10
Attorneys for Plaintiffs

11

12
UNITED STATES DISTRICT COURT

13
EASTERN DISTRICT OF CALIFORNIA

14

15
RALPH COLEMAN, et al.,

16
                    Plaintiffs,

17
            v.

18
GAVIN NEWSOM, et al.,

19
                    Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO THE COURT'S SEPTEMBER 3, 2020 ORDER**

Judge: Hon. Kimberly J. Mueller

20

21

22

23

24

25

26

27

28

[3652298.3]

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO THE COURT'S SEPTEMBER 3, 2020 ORDER

1

**TABLE OF CONTENTS**

Page

2

3   INTRODUCTION ........................................................................................................ 1

4   I.    CQIT SHOULD BE UPDATED TO INCLUDE ALL PROGRAM GUIDE
          AND COMPENDIUM REQUIREMENTS AND DEFENDANTS MUST
5         COMPLY WITH ALL CQIT INDICATORS, BUT PLAINTIFFS ARE
          WILLING TO WORK WITH THE SPECIAL MASTER AND
6         DEFENDANTS TO IDENTIFY THOSE INDICATORS THAT SHOULD
          BE PRIORITIZED .......................................................................................... 1

7

      II.   NINETY PERCENT COMPLIANCE IS NOT SUFFICIENT FOR SOME
8           KEY INDICATORS ....................................................................................... 4

9   III.   CDCR SHOULD NOT BE PERMITTED TO CONTINUE HOLDING EOP
           CLASS MEMBERS IN ADMINISTRATIVE SEGREGATION, BUT 90
10         PERCENT IS THE APPROPRIATE STANDARD FOR MEASURING
           COMPLIANCE WITH THE TREATMENT IMPROVEMENT PLAN ................. 6

11

      CONCLUSION ............................................................................................................. 8

12

      CERTIFICATION ........................................................................................................ 8

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3652298.3]

i

**INTRODUCTION**

Defendants' Response to the Court's September 3, 2020 Order repeats an argument a version of which this Court and the Ninth Circuit have repeatedly rejected—that the Constitution does not require compliance with all CQIT indicators at 90 percent. With their laser focus on avoiding a particular numerical benchmark, Defendants lose sight of the overall purpose of CQIT, which is to provide a quantitative and qualitative picture of their compliance with the remedial plans so that the Court can perform an ultimate determination of whether Defendants have cured the Eighth Amendment violations at issue in this case. Plaintiffs are willing to work with the Special Master and Defendants on updating CQIT and the certification process for EOP ASU Hubs and PSUs, as well as determining how to prioritize the remedial efforts, but Defendants must be required to comply with all CQIT indicators, because even those they claim do not correlate directly to a Program Guide requirement are important components of or prerequisites to achieving compliance with the Program Guide. The Court should set 90 percent as the minimum compliance standard, but for some indicators, especially those related to patient safety, 90 percent is not sufficient. Ultimately, the Court must undertake a comprehensive assessment of Defendants' compliance, and even if Defendants have achieved a numerical benchmark for components of their remedial plan, the system may not meet a constitutional standard if patient outcomes and quality of care remain poor.

Replies to Defendants' responses to the Court's specific inquires follow.

**I.    CQIT SHOULD BE UPDATED TO INCLUDE ALL PROGRAM GUIDE AND COMPENDIUM REQUIREMENTS AND DEFENDANTS MUST COMPLY WITH ALL CQIT INDICATORS, BUT PLAINTIFFS ARE WILLING TO WORK WITH THE SPECIAL MASTER AND DEFENDANTS TO IDENTIFY THOSE INDICATORS THAT SHOULD BE PRIORITIZED**

Defendants assert that they are willing to work with the Special Master to update CQIT "to ensure that the indicators are measuring compliance with the applicable policies included in the 2018 Update to the Program Guide and the new Compendium" and recognize that "CQIT should be evaluated annually to ensure that it is measuring

[3652298.3]

1

1    compliance with those updated policies." Defendants' Response to the Court's

2    September 3, 2020 Order ("Defs.' Resp."), Nov. 2, 2020, ECF No. 6936, at 8-9. Yet they

3    also contend that some CQIT indicators "measure compliance with policies or practices

4    that do not reflect constitutionally-mandated requirements, and are not even in the Program

5    Guide or Compendium" and insist that those indicators must be distinguished from the

6    ones that "measure compliance with constitutionally-mandated functions." *Id.* at 9.

7          First, as Plaintiffs noted in their November 2, 2020 response to the Court's

8    September 3, 2020 Order, Plaintiffs must be included in the process of reviewing the CQIT

9    indicators and updating them to reflect all changes in the Program Guide and

10   Compendium, especially given Defendants' history of modifying business rules to

11   confound an analysis of their actual compliance. *See* Plaintiffs' Response to Order of

12   Sept. 3, 2020 ("Pls.' Nov. 2 Resp."), Nov. 2, 2020, ECF No. 6937, at 3. Plaintiffs agree

13   that CQIT should be updated annually, and Plaintiffs must be included in the annual

14   update process for the same reasons.

15         Defendants contend that some CQIT indicators do not measure compliance with

16   constitutionally-required policies, and that therefore they should not be counted as

17   benchmarks to compliance. Defs.' Resp. at 8-11. This is incorrect. All policies

18   incorporated into the 2018 Program Guide Update and Compendium are part of the

19   Program Guide. *See* Order, July 3, 2019, ECF No. 6211; Parties' Supplemental Joint

20   Submission of Custody-Related Policies and Orders Required by July 9, 2019 Order,

21   Dec. 19, 2019, ECF No. 6431; Order, Feb. 11, 2020, ECF No. 6460. "[T]he Program

22   Guide sets out the objective standards that the Constitution requires." *See Coleman*

23   *v. Brown*, 756 F. App'x 677, 679 (9th Cir. 2018). All CQIT indicators that measure

24   compliance with policies now incorporated into the Program Guide and Compendium

25   therefore are direct measures of the constitutionality of Defendants' mental health system.

26         Even those indicators that may not map perfectly onto a Program Guide

27   requirement are still relevant, as those indicators may nonetheless track a prerequisite for

28   implementing a Program Guide requirement. Defendants contend, for example, that the

1  indicators related to whether MHCB and alternative housing cells are clean do not reflect

2  Program Guide Requirements.  Defs.' Resp. at 6.  But the Program Guide very clearly

3  requires that Defendants provide treatment to "control symptoms of serious mental illness"

4  of patients in the MHCB level of care, *see* Program Guide at 12-5-2, create individualized

5  treatment plans, and implement them to enable the patient to discharge within the

6  anticipated ten-day crisis bed stay.  *See id.* at 12-5-12 – 12-5-14.  None of those

7  constitutionally-mandated goals can be achieved if the patient is languishing in a filthy

8  cell.

9          Similarly, Defendants' suggestion that "a low number of peace officers could be

10  observed to be carrying a CPR shield… and yet CDCR could still provide constitutionally

11  adequate mental health care" relies on a false premise.  *See* Defs.' Resp. at 10.  CQIT

12  measures the percentage of peace officers in housing units who carry a CPR mouth shield

13  because those tools are necessary for a prompt emergency medical response when a patient

14  attempts suicide.  The Program Guide in fact specifically mandates that "[a]ll peace

15  officers [] carry a personal CPR mouth shield."  *Id.* at 12-10-21.  But even if it did not

16  contain those precise words, the indicator would still be a necessary measure of the

17  constitutionality of the mental health system, because the CPR shield is an essential

18  component of an effective and timely emergency response, and the Program Guide

19  mandates that custodial officers take all available steps to save a patient's life.  *Id.*  The

20  same is true with the other indicator cited by Defendants as not

21  constitutionally-mandated—how many MHSDS patients require the use of restraints

22  during group therapy.  Defs.' Resp. at 10.  It is irrelevant whether Defendants' remedial

23  plan explicitly says that it is forbidden to have too many patients in restraints during group

24  therapy.  That indicator is an important component of Defendants' overall success in

25  meeting the larger Program Guide requirements of, for example, providing treatment to

26  EOP patients in a PSU by "provid[ing] clinical intervention to return the individual to the

27  least restrictive clinical and custodial environment."  *Id.* at 12-9-1.  Those larger Program

28  Guide requirements sometimes cannot be practically measured by an audit tool, and

[3652298.3]

3

1   therefore the more precise and mechanistic indicators are necessary for enabling an overall

2   assessment of Defendants' compliance.

3          Moreover, as Defendants recognize, some CQIT indicators require a "qualitative

4   approach," but are still crucial in assessing constitutional compliance.  Defs.' Resp. at 12.

5   Those CQIT indicators that are driven by class member interviews or staff have an

6   important role to play in assessing compliance.  Low class member or staff satisfaction

7   results likely point to a problem with the system that requires investigation and potentially

8   remediation, particularly if those satisfaction results are chronically poor.  And the

9   individual experiences of patients and staff can help inform the Court's ultimate

10  determination of the system's constitutionality because even in a system where numerical

11  benchmarks are met, if patient outcomes are still poor, the system may be failing to

12  provide constitutionally adequate care.  For this reason, it is important that Defendants

13  prioritize the qualitative aspects of CQIT, including the interviews and visual inspections,

14  and modify the tool and audit process to focus more on assessing the quality of the care

15  provided—by examining for example, the content of a group treatment session, rather than

16  simply the length of the session or how many patients attended, and by developing ways of

17  sampling patients and measuring their subjective experiences and objective outcomes over

18  time.

19         Plaintiffs are willing to work with the Special Master and Defendants in modifying

20  the tool to incorporate a greater focus on qualitative assessment, and identifying the most

21  important indicators of Program Guide and Compendium compliance, so that Defendants

22  can have guidance about where to prioritize their remedial efforts.

23  **II.   NINETY PERCENT COMPLIANCE IS NOT SUFFICIENT FOR SOME**
        **KEY INDICATORS**

24

25         The Court's September 3, 2020 Order required the parties to brief, among other

26  issues, whether a "90 percent compliance rate for each key indicator for which the court

27  has not previously expressly established a different compliance requirement will indicate,

28  as to that key indicator, the constitutional minimum has been met," and directed that the

[3652298.3]
                                          4

1    parties should not use the briefing as an opportunity to "depart from the law of the case."

2    Sept. 3 Order at 25.

3          Yet that is precisely what Defendants did.  Their response argues that a 90 percent

4    compliance rate "should not be the standard for measuring whether or not the

5    constitutional minimum has been met because it is inflexible and fails to account for

6    contextual differences between such indicators."  Defs.' Resp. at 11.  This argument—a

7    version of one Defendants have made repeatedly, that requiring an "inflexible" standard

8    for compliance with the Program Guide exceeds what is required by the Eighth

9    Amendment and violates the Prison Litigation Reform Act ("PLRA")—has been

10   repeatedly and unambiguously rejected by this Court and the Ninth Circuit, and is

11   therefore the law of the case.  *See Coleman*, 756 F. App'x at 679; *see also* Sept. 3 Order at

12   10-11, 23-24; Order, Feb. 28, 2013 ("Feb. 28 2013 Order"), ECF No. 4361, at 9.

13   Specifically, Defendants have litigated whether a 90 percent monitoring standard—long-

14   used by the Special Master—is appropriate for their self-monitoring using CQIT, and the

15   Court has clearly ordered that it is.  Sept. 3 Order at 11, 19; Order, July 12, 2018, ECF

16   No. 5852, at 2; *see also* Feb. 28, 2013 Order at 9.

17         The Court should reject Defendants' blatant attempt to relitigate the well-settled

18   90% compliance standard, and should set that standard as the minimum acceptable

19   standard for all CQIT indicators.  But as Plaintiffs pointed out in their November 2 brief,

20   some indicators may well require a higher level of compliance in order to provide

21   constitutionally adequate care and prevent harm to patients.  For example, indicators

22   related to whether nursing rounds are performed timely in MHCB units, whether staff are

23   properly observing patients in alternative housing, whether sufficient treatment space

24   exists to allow staff to see patients confidentially, whether SRASHEs are adequately

25   performed, and whether staff are documenting plans of action to address high refusal rates

26   for patients in segregation are all directly related to patient safety, and even allowing for a

27   10% non-compliance rate could well result in incidents of self-harm or death.  *See* Sept. 3,

28   2020 Order at 23 ("In a prison system where the size of the mentally ill population is

1   approximately 30,000 inmates, even a 90 percent compliance standard risks leaving

2   thousands of mentally ill inmates without access to one or more components of a

3   constitutionally adequate mental health delivery system or receiving custodial treatment

4   that falls below constitutional minimum requirements."); *see also* Order, Oct. 10, 2017,

5   ECF No. 5610, at 11-12 (requiring 100%, rather than 90%, compliance with MHCB

6   transfer timeline, subject to negotiated exceptions), *aff'd at* 756 F. App'x at 679.

7         Defendants are correct that "substantial compliance also demands inquiry beyond

8   the simple numerical indicator." Defs.' Resp. at 14.  Indeed, the Court has made clear that

9   the determination of substantial compliance is a comprehensive one, in which the Court

10   will analyze the constitutionality of Defendants' mental health system in the aggregate,

11   and the specific compliance measures of each CQIT indicator will be only a component.

12   While the Court should adopt a 90% standard for all CQIT indicators, the Court must also

13   make clear that Defendants' ability to attain 90% compliance with individual metrics does

14   not dictate that the system has achieved a constitutional standard of care.

15   **III.   CDCR SHOULD NOT BE PERMITTED TO CONTINUE HOLDING EOP**
           **CLASS MEMBERS IN ADMINISTRATIVE SEGREGATION, BUT 90**
16              **PERCENT IS THE APPROPRIATE STANDARD FOR MEASURING**
           **COMPLIANCE WITH THE TREATMENT IMPROVEMENT PLAN**

17

18         Defendants again repeat their oft-rejected argument that requiring 90%

19   compliance—this time with respect to the ASU EOP Treatment Improvement Plan—

20   exceeds what the Constitution requires and violates the PLRA.  Defs.' Resp. at 15.  For the

21   same reasons provided above, the 90% monitoring standard is the law of this case. *See*

22   Section II, *supra*.  While Defendants are correct that assessment of the EOP Hub

23   Certification Process currently under review must ultimately provide for a "holistic

24   review" of the care provided to EOP patients in segregated settings, they are wrong to

25   imply that the factors they claim do not "lend themselves to a numeric assessment" should

26   not be monitored as mandatory components of a constitutionally-adequate system.  Defs.'

27   Resp. at 15.  Indicators that require a "yes" or "no" response, such as Defendants'

28   examples of whether a treatment group or IDTT started on time and whether space was

1  well ventilated, are still necessary (though not sufficient) for assessing whether the

2  treatment substantially complies with the Program Guide, and therefore

3  one-hundred-percent compliance—yes answers to all of those indicators—should be

4  expected.  Similarly, the patient interviews that Defendants claim are "only designed to

5  help determine if the program is performing well from the patient's perspective," *id.*,

6  should be considered a central focus of the review, because a system that meets numerical

7  metrics but provides care that its patient population overwhelmingly finds inadequate or

8  ineffective cannot possibly be considered satisfactory, especially in the harsh and

9  dangerous environments of segregation.

10         As Plaintiffs stated in their November 2 brief, it remains wholly inappropriate for

11  CDCR to continue placing EOP patients in ASU Hubs and PSUs.  *See* Pls.' Nov. 3 Resp.

12  at 10-11.  There is plentiful evidence in the record of the harm caused by housing *Coleman*

13  patients in segregation, and it is clear that the existing Certification process has failed to

14  remedy that harm.  *See Coleman v. Brown*, 938 F. Supp. 2d. 955, 979-80 (E.D. Cal. 2013);

15  *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1094 (E.D. Cal. 2014); Decl. of Michael W. Bien

16  in Support of Plaintiffs' Response to Order of July 2, 2020, July 15, 2020, ECF No. 6767,

17  at ¶¶ 48-89 (segregation suicide rate in 2019 was 211.2 suicides per 100,000, compared to

18  23.2 in the non-segregated CDCR population); *see also* Pls.' Proposed Remedies

19  Following Evidentiary Hearing, Oct. 30, 2019, ECF No. 6374, at 15-16.  Plaintiffs remain

20  willing to work with the Special Master and Defendants on improving the certification

21  process for EOP ASU Hubs and PSUs, but object to the practice of housing seriously

22  mentally ill patients in solitary confinement.

23         Ultimately, to the extent that the certification process survives, it must become

24  much more robust.  And at a minimum, the process must incorporate measures that are

25  currently omitted, but which are critical to ensuring that the experience of patients in EOP

26  ASU Hubs and PSUs approach a constitutionally adequate level—measures such as what

27  steps custody staff and DAI take to expedite transfers out of segregation, the average

28  number of hours of out-of-cell treatment, including yard and recreation time, that are

[3652298.3]

7

1  offered to class members each week, and the status of available entertainment devices and

2  other in-cell activities.

### CONCLUSION

4  Plaintiffs respectfully request that the Court enter an Order that: (1) requires that

5  Plaintiffs be included in the process of updating CQIT; (2) makes clear that Defendants

6  must comply with all CQIT indicators; (3) sets 90% as the benchmark compliance rate for

7  all CQIT indicators, but makes clear that a higher rate of compliance may be required for

8  some indicators; and (4) sets 90% as the benchmark compliance rate for the EOP ASU

9  Treatment Improvement Plan.

### CERTIFICATION

11  The undersigned counsel for Plaintiffs certifies that she reviewed the following

12  relevant court orders:

| Dkt. No. | Date | Subject |
|---|---|---|
| 6846 | 2020-09-03 | Benchmarks |
| 6806 | 2020-08-03 | Program Guide & Compendium Update Processes |
| 6460 | 2020-02-11 | Approving Compendium of Custody Remedies (6431) |
| 6314 | 2019-10-08 | Custody and Mental Health Partnership Plan (CMHPP) |
| 6214 | 2019-07-09 | 2018 Program Guide Revision |
| 5852 | 2018-07-12 | Adopting 27th Monitoring Report ( CQIT Standards) |
| 5477 | 2016-08-09 | Adopting Recommendations of 26th Monitoring Report (Staffing; Custody and Mental Health Partnership Plan; CQIT) |
| 5212 | 2014-08-29 | Administrative Segregation |
| 5196 | 2014-08-11 | Use of Force (approving plan filed at Docket No. 5190) |
| 5150 | 2014-05-13 | Use of Force; Administrative Segregation |
| 5092 | 2014-02-27 | CQIT |

| Dkt. No. | Date | Subject |
|----------|------|---------|
| 4539 | 2013-04-05 | Termination |
| 4361 | 2013-02-28 | Ruling on objections to 25th Monitoring Report |

DATED:  November 30, 2020            Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  /s/ Jenny S. Yelin
          Jenny S. Yelin

Attorneys for Plaintiffs

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO THE COURT'S SEPTEMBER 3, 2020 ORDER