XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
KYLE A. LEWIS, State Bar No. 201041
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
DAVID C. CASARRUBIAS, SBN 321994
425 Market Street, 26th Fl.
San Francisco, CA 94105
Telephone:   415-777-3200
Facsimile:   415-541-9366

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM, et al.<br><br>　　　　Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DEFENDANTS' REPLY TO PLAINTIFFS' BRIEF IN RESPONSE TO THIS COURT'S SEPTEMBER 3, 2020 ORDER**<br><br>Judge:　Hon. Kimberly J. Mueller |

# INTRODUCTION

The California Department of Corrections and Rehabilitation's Continuous Quality Improvement Tool (CQIT) was designed, as its name suggests, to allow CDCR to self-monitor, identify areas needing improvement, self-correct and ultimately improve the delivery of care to patients in the MHSDS. It was not only designed to measure CDCR's provision of the minimum level of services and care that should be provided to *Coleman* class members to meet constitutional standards. *See* Aug. 30, 2012 Order, ECF No. 4232, at 5:12-13, 15 (ordering development of a quality improvement process designed to address issues with the quality of the care delivered). Rather, CQIT was (and is) also intended to be aspirational, reflecting best practices and encouraging improvement. *See id.*; *see also* Twenty-Fourth Round Monitoring Report, July 2, 2012, ECF No. 4205 at 65 (recognizing that an important goal is for CDCR to "diagnos[e] its own problems, i.e. conduct its own 'qualitative analysis,' and create a quality improvement process.").

Based upon the parties' initial responses to the Court's September 3, 2020 order, it is clear there are areas where the parties agree with respect to foundational issues underlying CQIT, including the usefulness of the tool and its potential to guide the parties and this Court to conclusion of this case. For instance, Defendants agree with Plaintiffs that certain indicators, when achieved at a set compliance rate, should signal constitutional compliance. Defendants further agree that where compliance with an indicator has not been achieved, it is critical to consider whether the non-compliance contributed to poor patient outcomes. But much of Plaintiffs' response to this Court's September 3, 2020 order seeks to capitalize on the briefing opportunity afforded by this Court to provide argument on topics not presently before the parties and challenge previously settled disputes. Their briefing contains argument that is far afield of the limited questions posed by this Court, and is ultimately irrelevant to the usefulness of CQIT and its potential in this case. Equally concerning is that Plaintiffs' briefing seems aimed at guaranteeing that clear benchmarks are never identified, or if they are identified, are never attainable. This is neither responsive to the Court's questions nor helpful in advancing the ultimate goal: development of a means for CDCR to identify and continually improve the delivery

of care to its patients.

## ARGUMENT

### I. Establishment and Maintenance of CQIT Indicators

#### A. Plaintiffs' Request To Participate in The Process To Update Key Indicators in CQIT Is Premature.

The Court's first and fourth inquiries asked the parties to address whether the Defendants should work with the Special Master to update the key indicators in CQIT to reflect changes required by the 2018 Update to the Program Guide and material provisions of the new Compendium. Plaintiffs responded that updating the CQIT indicators should include full participation by the Plaintiffs on the theory that "[t]he process is more likely to succeed in moving this case toward resolution if Plaintiffs' counsel is included in the process from the start." Plaintiffs' Response, Nov. 2, 2020, ECF No. 6937, at 3. Plaintiffs' position goes too far.

The Court's inquiry reflects an understanding that the Special Master is in the best position to advise and consult Defendants with respect to their updating of key indicators in CQIT to reflect changes required by the 2018 Update to the Program Guide and material provisions of the new Compendium. Sept. 3, 2020 Order, ECF No. 6846 at 25:3-6. Consequently, if in Defendants' process of updating the key indicators in CQIT the Special Master determines that it would be appropriate to seek Plaintiffs' input, the Special Master has the discretion to do so. *Id.* However, that determination is best left for the Special Master and for after Defendants have had the initial opportunity to make the appropriate updates to CQIT. After all, the only way for Defendants to achieve a durable remedy is to demonstrate autonomy over their prison system "that gives the Court confidence that defendants will not resume their violations of plaintiffs' constitutional rights once judicial oversight ends." *Evans v. Fenty*, 701 F.Supp.2d 126, 171 (D.D.C. 2010). Plaintiffs suggest that their counsel's involvement in the update process from the beginning would "move this case toward resolution," but the history of this case demonstrates that the opposite is true. Plaintiffs' Response, Nov. 2, 2020, ECF No. 6937, at 3:7-8.

Accordingly, Defendants oppose Plaintiffs' request that the wording of any order regarding the CQIT development process include a precondition that Plaintiffs' counsel be involved from the

start and, instead, request that the Court maintain its initial position that Plaintiffs' input be solicited by the Special Master as appropriate. Sept. 3, 2020 Order, ECF No. 6846 at 25:4.

### B.  Annual Review of CQIT Indicators Is Appropriate But Annual Revisions May Not Be.

Next, Plaintiffs take the position that CQIT should be updated to reflect Program Guide revisions as they occur, or at least annually, but that no final changes to the CQIT indicators should occur without court approval. Plaintiffs' Response, Nov. 2, 2020, ECF No. 6937, at 5:14-22. Defendants acknowledge that CQIT is intended to monitor compliance with policies and procedures and that the CQIT indicators should reflect the most current and applicable policies and procedures. Defendants' Response, Nov. 2, 2020, ECF No. 6936, at 5:14-16. However, constitutional standards pertaining to the delivery of mental health care do not change annually such that yearly revision to CQIT will be necessary. *Id.* at 6:4-6. Accordingly, CQIT should be evaluated annually only to ensure that if CDCR updates its policies and procedures regarding the delivery of *constitutionally mandated services* within its MHSDS, then it is also measuring compliance with those updated policies. *Id.* at 6:6-8.

### C.  Court Approval of All CQIT Indicators Would Be Overly Burdensome.

As for Plaintiffs' latter point that final changes to the CQIT indicators require court approval, and without conceding this Court even has the authority to require its approval, it would be unduly burdensome to both CDCR and the Court to require a final approval prior to incorporating updates into CQIT. Ultimately, CQIT is a tool – an apparatus used by CDCR to not only monitor compliance, but also, facilitate discussion, inform CQIT tours, and provide an overview for meetings regarding the process as a whole. While many CQIT indicators measure constitutionally mandated services, there are various other indicators that do not. Defendants' Response, Nov. 2, 2020, ECF No. 6936, at 6:9-11. Accordingly, and for the tool to maintain its utility, the Court should decline the invitation to enmesh itself in an ancillary process such as CDCR updating the indicators in CQIT.

/ / /

/ / /

II. **CQIT's Thorough Review Of Institutional And Systemic Performance Already Includes Individual Patient Reviews.**

In its September 3, 2020 order, this Court's second and fifth questions asked whether it should confirm that the updated list of "key indicators" in CQIT that pertain to the Program Guide and Compendium requirements may be considered a comprehensive list of the material provisions of the Program Guide and Compendium, such that compliance with those provisions at the requisite level demonstrates constitutionality. Plaintiffs responded to this inquiry by claiming that, while CQIT indicators may signal constitutionality, a "significant number" of individual patient cases must nonetheless be reviewed "to determine whether failures are occurring in a pattern that creates a substantial risk of serious harm to patients." Pltfs.' Response to Order of Sept. 3, 2020, ECF No. 6937 at 4:19-21.

As an initial matter, Defendants agree that part of a systemic review of constitutionality should include an inquiry into "whether [] non-compliance … contributed to poor patient outcomes such as self-injurious behavior or repeated decompensation and hospitalizations." Pltfs.' Resp. to Order of Sept. 3, 2020, ECF No. 6937 at 4:23-26. But the standard Plaintiffs advocate for here – a pattern of substantial risk of serious harm – is not the Eighth Amendment standard. Rather, as Plaintiffs must know, the standard is whether the State is acting with deliberate indifference to *Coleman* class members' right to adequate mental health care, including whether any deprivation is "sufficiently serious" and whether Defendants are acting with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), internal citations omitted.

Moreover, Plaintiffs' suggestion to conduct reviews of individual patient cases in addition to CQIT reviews to assess constitutionality misunderstands or ignores the extent of the current CQIT review process, which already contains a qualitative component that includes both patient interviews and a review of individual patient files, in concert with an extensive onsite tour over several days. (Declaration of Steven Cartwright, Psy.D. Supp. Defs.' Reply to Pltfs.' Brief in Resp. to Sept. 3, 2020 Order ("Decl. Cartwright") ¶ 3.) During this time, not only is data collected, but the overall quality of group therapy, classification committee meetings, and

interdisciplinary treatment team meetings, among other things, are observed and evaluated. (*Id*.) Plaintiffs' request is therefore unnecessary and duplicative.

CDCR's Continuous Quality Improvement On Site Audit Guidebook (the Guidebook), which was developed in consultation with the Special Master and provided to Plaintiffs' counsel in July of 2018, advises auditors to "pay special attention to qualitative items that may not be explicitly written in CQIT." (Decl. Cartwright, Ex. A at p. 10.) The Guidebook urges auditors to utilize "all information available … to paint a complete picture on institution performance." (*Id.*) As is particularly relevant here, CQIT audits include case reviews at each level of care within a facility. (Decl. Cartwright ¶ 4.) The Guidebook advises auditors to obtain a random targeted sample that may be done as a result of a specific issue or question. (Decl. Cartwright ¶ 4 & Ex. A at p. 64.) For instance, the auditor may randomly select EOP patients if the inquiry is specific to the EOP level of care. (Decl. Cartwright ¶ 4 & *see also* Ex. A at p. 29 [auditors reviewing the Mental Health Crisis Bed program must randomly select ten patients who are on "limited issue" and review their health record to evaluate whether orders are inconsistent with policy and decisions are justified].)

Patients are also selected at random and interviewed by auditors to obtain feedback that is considered during the review process. (Decl. Cartwright ¶ 5.) Patients are asked, among other questions, what keeps them from going to their mental health appointments, do they feel they are being seen as often as they need to be, are they seen quickly when they need to be, do they know their mental health treatment plan, are they satisfied with their mental health treatment team meetings, and how can their treatment be improved, among many other questions. (*Id.* & Ex. A at pp. 19-23.) Thus, CQIT already includes the qualitative inquiry that is contemplated by Plaintiffs in their briefing. Plaintiffs fail to specify how – or even if – their suggested patient reviews would differ from the reviews already called for under the current CQIT audit process (which Plaintiffs have observed firsthand). (*See* Decl. Cartwright ¶ 6.) In short, the CQIT reviews are a holistic process that provide more insight and information than Plaintiffs seem to understand or acknowledge.

Next, Plaintiffs reference a number of Compendium requirements that are not yet

measured by CQIT. Pltfs.' Response to Order of Sept. 3, 2020, ECF No. 6937 at 7:6-8:28. Plaintiffs seem to infer that these requirements should be added to CQIT, but also state that use of force and rules violation report processes, currently at issue in *Armstrong v. Newsom*, must be "fixed" before the parties make any attempt to measure compliance with the current processes. As Defendants previously explained in their response to this Court's September 3, 2020 order, not all Program Guide and Compendium provisions are relevant to assessing constitutional compliance, nor have the material Program Guide and Compendium provisions that are actually relevant to assessing constitutional compliance been identified. *See* ECF No. 6936 at 7:7-11. Defendants welcome the opportunity to consult with the Special Master to take this important initial step to identify the constitutionally-mandated "key indicators."

However, Plaintiffs' reference to the *Armstrong* proceedings, including allegations that officers are violating use of force policy and then issuing retaliatory rules violation reports, is misplaced here. The issues surrounding alleged improper use of force and falsified rules violation reports are currently before the *Armstrong* Court. While some of those claims include patients who are plaintiffs in both class actions, there is no pending motion in this proceeding. Further, inasmuch as the concern here seems to pertain to false reporting and improper uses of force, those are issues with alleged abuses of authority, not with inadequate or broken policies.

### III. There Is No Bright-Line Compliance Rate for Each Indicator; Instead, Substantial Compliance Is the Standard.

The Court's third and sixth inquiries asked the parties to confirm whether a 90 percent compliance rate is appropriate for each key indicator for which the Court has not previously expressly established a different compliance requirement, which, when met, will indicate the constitutional minimum has been established. Plaintiffs responded that this Court should provisionally set a 90 percent compliance rate subject to resetting certain key indicators at a higher level. Plaintiffs' Response, Nov. 2, 2020, ECF No. 6937, at 5:5-13. This conclusion is hasty and premature – particularly because "key" indicators have not yet been identified – and fails to recognize that bright line figures can be both overinclusive and underinclusive.

As Defendants established in their response, a 90 percent compliance rate for every key

indicator should not be the standard for measuring whether or not the constitutional minimum has been met because it is inflexible, fails to account for contextual differences between such indicators, and fails to look at the system as a whole. Defendants' Response, Nov. 2, 2020, ECF No. 6936, at 8:19-11:12; *accord, Fortin v. Commissioner of Massachusetts Dept. of Public Welfare*, 692 F.2d 790, 795 (1st Cir. 1982) ("[N]o particular percentage of compliance can be a safe-harbor figure, transferable from one context to another."). Indeed, though a 90 percent compliance rate for indicators not already set at another level may indicate adequate compliance, as Plaintiffs argue, it also may not. *See id.* at 9:26-28 (acknowledging that certain indicators may require a higher numerical figure to reflect the Court's understanding of the constitutional minimum).

If the Court desires to provisionally set a compliance rate before the key indicators are even defined, then that rate should be set at "substantial compliance" until there is an appropriate evaluation of each indicator to identify which indicators are susceptible to quantitative measurement, which indicators are "key" indicators that may require a heightened level of compliance, and which indicators would be best evaluated by taking a flexible approach that combines other, qualitative, factors. *See* Defendants' Response, Nov. 2, 2020, ECF No. 6936, at 9:7-10:2, 10:23-11:3. That standard would require the Court to take a holistic view of all the available information to determine whether Defendants' overall compliance with the remedial plan is substantial, notwithstanding some minimal levels of noncompliance. *Id.* at 9:15-17; *see also Braggs v. Dunn*, No. 2:14cv601 (MHT), 2020 WL 5231302, at *24 (M.D. Ala. Sept. 2, 2020) (recognizing that a substantial compliance standard is innately loose and subjective, but ultimately concluding that it is the superior form of measurement in a complex institutional reform case). The end goal being a system with "assessments [that] can be objectively and empirically determined." *Braggs*, 2020 WL 5231302, at *24.

Plaintiffs' additional rhetoric that a 90 percent compliance rate "indicates inadequate care for thousands of persons on each item measured" is an oversimplification of a very complicated

system.[1] There are many indicators used in CQIT that only apply to a small number of patients, such as indicators measuring Wasco State Prison's compliance with timelines applicable to its six-bed Mental Health Crisis Bed population, for instance, where only 23 patients would be considered in the 30-day readmission rate in the last quarter. In that case, the difference between reaching a 90 percent compliance rate and falling below it could be just a handful of patients. Contrary to Plaintiffs' bold position, such a scenario would not mean that CDCR is failing to provide constitutionally adequate care to "thousands" of patients.

In other instances, CDCR might fall short of a 90 percent compliance rate because, for example, a patient is seen one day after the relevant time period being measured, or EOP patients receive nine, rather than 10, hours of group therapy per week (in which case, the institution would score 0% for that program, not 90%). That minimal level of noncompliance, ignoring all other information regarding the adequacy of the patient's care, would not necessarily mean that the patient received constitutionally inadequate treatment, let alone that the system is deficient under the Eighth Amendment. That is precisely why a holistic approach, considering all the available information, is a superior method to test the sufficiency of the remedy in this action,[2] and that can be best achieved by utilizing a substantial compliance rate of measurement unless and until the parties can evaluate each indicator to identify which indicators are susceptible to quantitative measurement. Defendants' Response, Nov. 2, 2020, ECF No. 6936, at 9:7-17, 10:23-11:6.

### IV. Plaintiffs' Request To Revisit Policies Underlying The Administrative Segregation Enhanced Outpatient Program Treatment Improvement Plan Is Misplaced, Untimely, And Inappropriate.

The Court's seventh question asked whether it should set a 90 percent compliance rate for the Administrative Segregation Unit Enhanced Outpatient Program Treatment Improvement Plan. In their response, Plaintiffs challenge the underlying premise of the Court's question and attempt

---

[1] It is also a gross overstatement of the Court's observation that "a 90 percent compliance standard *risks* leaving thousands" of inmates without constitutionally adequate treatment. Sept. 3, 2020 Order, ECF No. 6846 at 23:24-28, emphasis added. A risk is potential, not actual, and is not the equivalent of an indication or actual showing of inadequate care, much less resulting harm.

[2] It appears that Plaintiffs agree. *See* Plaintiffs' Response, Nov. 2, 2020, ECF No. 6937, at 4:16-20 (advocating for an approach that considers "an overall systemic view of the system").

to revisit the entire concept of Administrative Segregation housing for EOP patients, suggesting that, "[a]t a minimum the parties should be directed to revisit the ASU EOP Treatment Improvement Plan to address current issues regarding ASU and PSU conditions." Pltfs.' Response to Order of Sept. 3, 2020, ECF No. 6937 at 11:14-16. Plaintiffs further object to the continued use of Therapeutic Treatment Modules in the Administrative Segregation Unit and Psychiatric Services Unit, and contend that treatment and activities in the Short Term Restricted Housing (STRH) and Long Term Restricted Housing (LTRH) must be "evaluated and addressed." *Id.* at 11:18-19. Plaintiffs claim that these issues must be "resolved" before the parties can negotiate measurements of compliance. *Id.* at 11:21-22. Plaintiffs' response is far afield of the question asked by this Court and serves only to reverse progress and revisit issues previously decided by this Court and the parties.

The policies pertaining to STRH and LTRH, which were negotiated with Plaintiffs years ago, are not up for discussion. Nor is Defendants' use of Therapeutic Treatment Modules, which was designed with the Special Master's input and monitored for compliance. Nor is the court-ordered Administrative Segregation EOP Treatment Improvement Plan process subject to renegotiation. Plaintiffs' request here—which is entirely unrelated to the concept of benchmarks—is misplaced and inappropriate. If Defendants must renegotiate a policy each time they seek to set a benchmark for compliance, as Plaintiffs seem to demand, this case will never resolve and forward progress can never occur.

As Defendants previously indicated in response to this inquiry, the Administrative Segregation Unit EOP Treatment Improvement Plan has been incorporated into the EOP Hub certification process, which is under review by the Special Master (including the compliance levels required for indicators). While some core items within that certification must meet a 90 percent threshold for compliance, other indicators need not meet that level of compliance. Thus, an across-the-board standard for Administrative Segregation Unit EOP Treatment Improvement Plan would exceed current requirements and impose new and unworkable standards.

/ / /

/ / /

-9-   Case No. 2:90-CV-00520- KJM-DB
17062298.6
DEFS.' REPLY TO PLTFS.' BRIEF RE SEPTEMBER 3, 2020 ORDER

## CONCLUSION

Defendants are committed to ensuring the constitutional delivery of mental healthcare to all incarcerated patients long after this case is terminated. The establishment of CQIT is critical to safeguarding the reforms that have been implemented as a result of this case. CDCR's ability to self-monitor is a necessary precondition to the termination of this case, and CQIT represents a durable and sustainable means of ensuring compliance. But work remains, including identifying the "key" indicators that measure compliance with constitutionally mandated requirements and the level of compliance that should be required. This important work must be completed without further delay, notwithstanding Plaintiffs' improper and untimely requests to reverse course and revisit previously settled policies.

## CERTIFICATION

Defendants' counsel certifies that she/he reviewed the following orders relevant to this filing: ECF Nos. 6846, 6946.

DATED: November 30, 2020        HANSON BRIDGETT LLP

By: */s/ Samantha Wolff*
PAUL B. MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS
Attorneys for Defendants

DATED: November 30, 2020        Xavier Becerra
Attorney General of California
Adriano Hrvatin
Supervising Deputy Attorney General

By: */s/ Kyle Lewis*
KYLE A. LEWIS
Deputy Attorney General
*Attorneys for Defendants*

DATED: November 30, 2020        ROBINS KAPLAN LLP

By: */s/ Roman Silberfeld*

-10-    Case No. 2:90-CV-00520- KJM-DB
17062298.6   DEFS.' REPLY TO PLTFS.' BRIEF RE SEPTEMBER 3, 2020 ORDER

ROMAN SILBERFELD
GLENN A. DANAS
Special Counsel for Defendants