DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | Case No. 2:90-CV-00520-KJM-DB <br><br> **PLAINTIFFS' SUPPLEMENTAL BRIEF FOLLOWING EVIDENTIARY HEARING ON DEPARTMENT OF STATE HOSPITAL TRANSFERS** <br><br> Judge: Hon. Kimberly J. Mueller |

## INTRODUCTION

On November 19, 2020, the Court directed the parties to brief whether "the court [can or should] presume cognizable harm to class members whose transfer to necessary inpatient care is delayed beyond Program Guide timelines and for reasons outside the court-approved exceptions to those timelines." ECF No. 6961.

The court need not presume cognizable harm. There is ample evidence of cognizable harm from delays in inpatient care. The Court may infer harm to patients from the undisputed facts regarding the operation of the CDCR mental health system. Defendants' own witnesses have

testified that inpatient psychiatric hospital care, both acute and intermediate, is reserved for the most acutely ill patients. They have testified that these patients require 24-hour, 7-day a week care that can only be delivered in the inpatient programs. While a patient waits to be transferred to inpatient care, Defendants' clinicians review the patient's case regularly, and these clinicians rescind the referrals for patients whose conditions have improved. A patient's continued presence on a waiting list therefore demonstrates the professional judgment of Defendants' clinicians that inpatient care remains necessary. The only reasonable inference from these undisputed facts is that delays in inpatient care harm patients. In addition to this undisputed evidence, Plaintiffs have presented powerful evidence that patients have been actually harmed by the delays at issue here. Dr. Stewart's October 23, 2020 testimony and his November 13, 2020 declaration demonstrate harm to patients currently waiting for inpatient care.

The applicable legal standard under the Eighth Amendment recognizes not only harms that have already injured the plaintiffs, but also conditions that expose plaintiffs to substantial risks of serious harms in the future. A defendant who exposes plaintiffs to such risks cannot evade Eighth Amendment liability based on the lucky chance that the harm has not yet occurred. The undisputed evidence here shows that a referral to inpatient care, whether acute or intermediate, cannot be delayed without exposing the patient to a substantial risk of serious harm.

In short, the Court need not rely on any legal presumption of harm. Instead the Court must draw the only possible inference from the undisputed evidence, which is that patients are harmed by delays in access to necessary inpatient care. In addition, the Court should credit Dr. Stewart's testimony of actual harm suffered by patients whose access to inpatient care at DSH has been delayed for months.

**LEGAL STANDARD**

The Court's question uses the term "cognizable harm." The legal standard for cognizable harm under the Eighth Amendment recognizes both harms that the plaintiff has already suffered, as well as future harms that may arise from conditions to which the defendants expose the plaintiff. *Helling v. McKinney,* 509 U.S. 25, 33 (1993). In *Helling,* the Nevada prison authorities argued for a narrower view of the Eighth Amendment, under which there would be no protection

against "prison conditions that merely threaten to cause health problems in the future, no matter how grave and imminent the threat." *Id.* at 32-33. The Supreme Court rejected Nevada's argument, holding that the Eighth Amendment protects incarcerated persons not only from current harm, but also from likely harms that would not "occur immediately," and that "might not affect all of those exposed." *Id.* at 33. The *Helling* Court cited with approval lower court decisions which "recognized that a remedy for unsafe conditions need not await a tragic event." *Id.* at 33-34.

One year later, in *Farmer v. Brennan,* 511 U.S. 825 (1994), the Court again addressed an Eighth Amendment claim based on a "failure to prevent harm." *Id.* at 834. Again, the Court held that the cognizable harms include not only actual harm but also "a substantial risk of serious harm." *Id.* at 842. In describing the test for deliberate indifference under the Eighth Amendment, the Court rejected a requirement that the plaintiff already have suffered actual harm: "Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* The Court relied on *Helling* to reject the idea that the Eighth Amendment required a showing that the defendant knew that a specific incarcerated person would be harmed. Instead, the Court re-affirmed *Helling*'s focus on whether the conditions at issue posed a "'risk of serious damage to [the incarcerated person's] future health.'" *Id.* at 843 (quoting *Helling,* 509 U.S. at 35). The Court held that the risk need not be "personal to" a particular incarcerated person, but could be one that "all prisoners in his situation face." *Id.* And, *Farmer* reaffirmed *Helling*'s holding that the incarcerated plaintiff need not wait for the injury to occur before securing an injunction against the life-threatening conditions. *Id.* at 845.

The Supreme Court revisited the question of cognizable harms in this case, in affirming the three-judge court overcrowding relief. *Brown v. Plata,* 563 U.S. 493 (2011). The Court held that in this "systemwide" case, the cognizable harms from delays in care include the "substantial risk of serious harm" that result, not just individual instances of actual harm. *Id.* at 505 n. 3.

# ARGUMENT

From the beginning of this case, the Court has not presumed harm from delayed access to care, but rather has found harm based on overwhelming evidence. This was the finding after the 1994 trial: "The evidence also demonstrates that inmates have in fact suffered significant harm as a result of those deficiencies; seriously mentally ill inmates have languished for months, or even years, without access to necessary care. They suffer from severe hallucinations, they decompensate into catatonic states, and they suffer the other sequela to untreated mental disease." *Coleman v. Wilson,* 912 F. Supp. 1282, 1316 (E.D. Cal. 1995); *see also id.* at 1316 n. 48 ("In the matter at bar members of the plaintiff class are not only facing substantial risks of serious injury, they are experiencing actual harm as a result of the systemic deficiencies identified in this order.").

Plaintiffs are aware that Defendants have asked the Court to disregard the evidence of harm to patients submitted in the Declaration of Dr. Pablo Stewart on November 13, 2020, ECF No. 6948-1. *See* Defs' Rebuttal Brief, ECF No. 6960 at 4-5. Defendants' objections to Dr. Stewart's declaration are unfounded, and the Court should consider the evidence of harm that Dr. Stewart presents. *See* ECF No. 6948 at 11-12 (Plaintiffs' Closing Brief for October 23, 2020 Evidentiary Hearing demonstrating that Defendants' objection to Dr. Stewart's patient review testimony was groundless). But even if the Court chooses not to consider Dr. Stewart's recent declaration, the Court may still rely on undisputed facts to find that delays in access to inpatient care cause harms.

The evidence of harm from delays in access to inpatient psychiatric hospital treatment has been reviewed in several evidentiary hearings over the past two decades. In June 2013, the Court conducted a three and a half-day evidentiary hearing addressing deficiencies in intermediate inpatient care at the DSH-run Salinas Valley Psychiatric Program. July 11, 2013 Order, ECF No. 4688. As part of their case in chief to show that CDCR and DSH were providing adequate inpatient care, Defendants put on Senior Supervising Psychiatrist Dr. Troncoso. Galvan Decl. Exh. A, 6/21/2013 RT 2:1-13. Dr. Troncoso testified that CDCR patients referred for intermediate inpatient hospitalization are in fact "are some of the sickest people in the state hospital system, as well as in CDCR." 6/21/2013 RT 19:18-20:1. "These patients present with major psychiatric

disorders. For example, psychotic disorders, mood disorders and major anxiety disorders." 6/21/2013 RT 20:2-4. Dr. Troncoso testified that the intermediate care programs receive incarcerated persons who are suicidal, and who are considered a serious risk to themselves or others. 6/21/2013 RT 77:8-16. Dr. Troncoso explained that patients in an intermediate inpatient program are seen by staff "almost continuously," with "eyes on these patients 24/7," and that the setting is "a therapeutic milieu in which the patient is immersed in." 6/21/2013 RT 11:15-12:4. Dr. Troncoso testified that this immersion in a therapeutic environment starts at the first moment that the patient arrives. 6/21/2013 RT 24:8-25:4. Dr. Troncoso testified that one of the needs addressed at an inpatient unit is diagnostic clarification, which in some cases results in urgent referrals to even higher levels of care. 6/21/2013 RT 23:5-21.

Dr. Troncoso's testimony regarding the importance of prompt access to inpatient care was confirmed by Plaintiffs' expert, psychiatrist Pablo Stewart, who testified at the same June 2013 evidentiary hearing. Dr. Stewart testified that the DSH intermediate inpatient level of care was similar to an "intensive care unit" in a hospital, "where the sickest patients would go." Galvan Decl. Exh. B, 6/19/2013 RT 26:23-25. "In a psychiatric system the inpatient hospital programs are where the people that are suicidal, that due to mental illness are suicidal, a danger to others, and are gravely disabled, such as not eating or drinking properly, and need to receive this level of care." 6/19/2013 RT 27:1-5. Dr. Stewart's testimony was based on five facility tours in early 2013, including interviews with staff and patients. 6/19/2013 RT 27:7-28:15. Dr. Stewart was asked whether patients who needed an inpatient level of treatment could be adequately served with a lower level of care. He explained why this is unsafe: "These are the most severely ill people in the system. They're in the hospital where every moment of their waking hours should be therapeutic in nature, from the time they get up to the time they go to bed." 6/19/2013 RT 49:23-50:2. The Court focused directly on the question at issue here, asking Dr. Stewart whether delay causes harm:

> THE COURT: … is it your view that any time somebody is sent to the hospital, that's an indication of a requirement for urgent care and something must be done relatively early in order to ensure that something like the suicide doesn't occur?
>
> THE WITNESS: Yes, Your Honor.

6/19/2013 RT 69:2-12.  Dr. Stewart explained that inpatient treatment needs to begin immediately—without days-long delays for custody reasons—in order to prevent harm to the patient.  *See* 6/19/2013 RT 72:23-73:16; 78:16-23.

Dr. Stewart's testimony in the October 23, 2020 trial confirms that patients are harmed by delays in access to inpatient care:

> Q  Dr. Stewart, do patients who need inpatient care need to be given that level of care quickly?
>
> A  Yes.
>
> Q  Why is that?
>
> A  Well, delays cause harm and suffering and sometimes this harm can be irreparable. … And the literature is also clear that in the absence of progressive treatment for psychotic symptoms, meaning if you allow a person to remain psychotic, it worsens the overall prognosis throughout the lifetime of the patient in question.  Those are the potentially irreparable harms.  But there's also a harm that the longer a patient remains symptomatic and not receiving proper care, the longer it will take for that person to be returned to a baseline of mental health stability, and during that time they're suffering harm.

10/23/2020 RT 258:20-259:13.

Dr. Stewart testified specifically about the ways in which inpatient transfer delays harm patients.  Like Dr. Troncoso in 2013 (*see* Galvan Decl. Exh. A, 6/21/2013 RT 23:5-21), Dr. Stewart pointed to the importance of diagnostic clarification.  A patient who is not getting better through outpatient treatment will often have unclear or conflicting diagnoses, which must be clarified quickly to allow the right kind of care to be delivered.  Dr Stewart identified the need for diagnostic clarification in the medical files of the 55 persons awaiting transfer to DSH at the time of the October 2020 hearing:

> Q  So based on this chart and your review of the treatment plans, were you able to come to any initial opinions about this group of 55 individuals waiting for a transfer?
>
> A  Yes.  After my initial review, based on the data from this spreadsheet regarding diagnoses and medications, I noticed that there was some issues regarding diagnoses.  Sometimes there was several unspecified diagnoses.  There was actually an example of a contradictory diagnosis and there was also multiple diagnoses, all of which raised a question in my mind about the quality of care that a person's getting.

Galvan Decl. Exh. C, 10/23/2020 RT 264:1-11.  Dr. Stewart further testified that he saw many

Case 2:90-cv-00520-KJM-DB   Document 6975   Filed 12/07/20   Page 7 of 11

examples of "persistent psychosis" among the persons waiting for access to DSH.  10/23/2020 RT 268:20-24.  "Persistent psychosis" is "psychosis that continues to be present even in the face of being treated with antipsychotic medication or other types of medication." *Id.* at 268:16-19.  Dr. Stewart testified that delaying treatment for persistent psychosis causes permanent harm:

> It is similar to like a seizure disorder.  You don't allow patients to seize because the more they seize, the more they will seize.  Same thing about psychiatric.  The same thing has been studied with psychotic symptoms.  The more you allow a patient to be psychotic, the more they will be psychotic in the future and it will be harder to address those persistent psychotic symptoms.

10/23/2020 RT 269:4-10.  Defendants will say that they are preventing harm by treating the patients in their current programs, such as in an EOP unit, crisis bed, or PIP.  This misses the point about the harm of "persistent psychosis."  By definition a patient in persistent psychosis is not responding to the current treatment.  That is why the clinician refers the patient to a higher level of care which has available the tools for diagnostic clarification and 24-hour treatment modalities that Dr. Troncoso, Dr. Stewart, as well as Dr. Warburton, testified about.  *See* 10/23/2020 RT 43:11-19 (Dr. Warburton testifying that intermediate inpatient care is for "people [who] need certain types of consultation or long-term 24-hour care").  Patients who need intermediate inpatient care due to persistent psychosis, or for other reasons such as the need for prompt diagnostic clarification, cannot be treated safely in a mental health crisis bed, much less an outpatient unit.  10/23/2020 RT 275:13-16 (Dr. Stewart: "I'm very familiar with mental health crisis beds in correctional settings as well as inpatient care for the correctional settings, and a patient cannot receive inpatient equivalent care in a crisis bed."); *see also* 12/9/16 Order, ECF No. 5529 at 3 ("MHCBs are not … a substitute for the inpatient care provided through DSH programs.  Referrals to DSH inpatient care represent the considered judgment of CDCR clinicians that those inmate patients need a higher level of care than is available in CDCR's EOP and MHCB programs.  Thus, at most, defendants' representation suggests that efforts are being made to maintain an unacceptable status quo for these inmates while access to essential inpatient care is delayed.").

Defendants have not disputed any of the facts above regarding the need for inpatient care, most of which are confirmed by their own witnesses.  The only reasonable inference from these

[3657643.8]
7
PLAINTIFFS' SUPPLEMENTAL BRIEF FOLLOWING EVIDENTIARY HEARING ON DEPARTMENT OF STATE HOSPITAL TRANSFERS

undisputed facts is that people whose transfers to inpatient care are delayed face a substantial risk of serious harm that is cognizable based on the Eighth Amendment under the Supreme Court's holdings in *Brown v. Plata,* 563 U.S. 493, 505 n.3 (2011), *Farmer v. Brennan,* 511 U.S. 825 (1994), and *Helling v. McKinney,* 509 U.S. 25, 33 (1993).

     As is well-documented in the case, *Coleman* class members waiting to be transferred to DSH in the PIPs do not receive adequate inpatient mental health treatment.  PIP patients often receive less treatment than they do in an EOP program.  *See, e.g.*, Special Master Amended Report re Status of Class Member Access to Inpatient Care, April 6, 2020, ECF No. 6579 at 29 ("CDCR's PIPs are not providing adequate mental health care to patients, and the care that is being provided has been further constricted by the COVID-19 pandemic."); Special Master's Monitoring Report on Inpatient Care Programs, Aug. 30, 2018, ECF No. 5894 at 27 ("Individual treatment was rarely offered or provided across inpatient programs, and where provided was either woefully inadequate, or not accurately tracked."); *id.* ("Across programs, structured and unstructured out-of-cell activities were found wanting during site visits.").  Furthermore, not only do Defendants' staffing rates in the PIPs consistently fall abysmally short of this Court's order to limit to ten percent the vacancy rate among psychiatrists, they routinely are among the lowest in the system. *See* Oct. 10, 2017 Order, ECF No. 5711 at 3; Defs.' Monthly Psychiatry Vacancy Report, ECF No. 6970 at 5 (Nov. 30, 2020) (reporting filled psychiatry rates of only 62% and 69%, respectively, at CMF PIP and SVSP PIP as of October 2020); *see also* Special Master's Monitoring Report on Inpatient Care Programs, Aug. 30, 2018, ECF No. 5894 at 17 ("[S]taffing vacancies in multiple disciplines across programs remained a significant impairment to providing appropriate care in inpatient settings.").

     In addition to the testimonial evidence regarding inpatient care, the Court may look to undisputed facts regarding the ways in which the Defendants constantly review the waiting lists to remove people whose conditions improve while they are waiting for transfer.  For example, on December 19, 2019, DSH Deputy Director of Hospital Strategic Planning and Implementation, Catherine Hendon, filed a declaration at ECF No. 6411-1, sponsoring a table that she identified as the Psychiatric Inpatient Timelines Report for the period from July 2017 through November 2019.

ECF No. 6411-1 at 4.  The table shows a monthly average of 46 referrals to DSH care.  *Id.*  Patients are only accepted for treatment at DSH hospitals after DSH reviews each of those referrals "to ensure that clinical criteria are met."  CDCR – DSH MOU dated 11/21/17, Defs' Exhibit D-3, at D-3-5; *see also* Joint Policy and Procedure No. 3601 re: Referral, Admission, and Movement, Defs' Exhibit D-4, at 6-7 (outlining clinical criterial utilized by DSH to determine if a patient qualifies for ICF admission).  On average, 4 referrals, or 8.7%, were rescinded each month.  *Id.*  Referrals may be rescinded only "[i]f a treatment team determines that it is clinically appropriate."  Mental Health Services Policy No. 12.11.2101, Defs' Exhibit D-5, at D-5-6.  The patient's continued presence on a waitlist therefore shows Defendants' clinical determination that the patient needs 24-hour inpatient care.

In addition to these direct harms, the delays harm other patients who are waiting behind the directly impacted patients.  After an evidentiary hearing in January 2017 on inpatient delays at DSH, this Court issued 26 pages of findings and conclusions.  Order, March 24, 2017, ECF No. 5583.  The Court reviewed earlier findings by the Special Master that inpatient transfer delays have a "resounding ripple effect" throughout the system.  *Id.* at 5.  Patients currently waiting for DSH beds are occupying crisis beds, or CDCR PIP beds that are needed by other patients.  Currently, there is a waiting list of approximately 365 patients awaiting transfer to a PIP or DSH inpatient program, many of whom have been waiting for hundreds of days.  *See* Galvan Decl. Exh. D (waitlist for ICF and APP level of care as of December 3, 2020); Eighth Joint Update on the Work of the COVID-19 Task Force, Dec. 4, 2020, ECF No. 6974 at 7 n.2.

Some of the patients being harmed by transfers delays are occupying CDCR PIP beds awaiting transfer to DSH hospital beds.  By blocking these transfers Defendants harm not only the patients waiting in the PIPs, but also the patients waiting in crisis beds or outpatient units for the PIP beds that would be freed up by timely transfers to DSH.  These are patients who have gone through an extensive clinical and custodial review process to determine that they can move to a "Least Restrictive Housing" (LRH) placement.  *See generally* Joint Policy and Procedure No. 3601 re: Referral, Admission, and Movement, Defs' Exhibit D-4.  LRH placements are a "therapeutic milieu for treating patients who are clinically and custodially suitable for receiving

treatment in an environment that is less punitive and more therapeutic" and are clinically beneficial to the referred patients because they allow treatment outside the high custody, locked down environment of the CDCR PIPs. *See* Special Master's Amended Report on Status of *Coleman* Class Member Access to DSH, April 6, 2020, ECF No. 6579 at 15. Honoring the LRH placement also benefits other patients who are still deemed to need a higher security bed in the CDCR PIP. These beds are in short supply, and when they are needlessly occupied by a patient who can move to an LRH, the higher security patients behind them languish in crisis beds and other placements that cannot provide inpatient care. *See* Special Master's 2016 Monitoring Report on Inpatient Care Programs, May 25, 2016, ECF No. 5448 at 9 ("[W]hen DSH-Atascadero beds are not open to CDCR patients, there is a resounding ripple effect throughout all of the DSH inpatient programs which treat these patients, creating almost instantly a re-shuffling for other beds at other DSH programs, and at CDCR a back-up of patients awaiting DSH placement.").

## CONCLUSION

The Court need not employ any legal presumption to find that delays in accessing inpatient care harm incarcerated persons in need of psychiatric hospitalization. The record in this case is replete with undisputed facts establishing the harms caused by delays in access to inpatient care. The only reasonable inference from these facts is that such delays cause cognizable harms to the *Coleman* class.

DATED: December 7, 2020

Respectfully submitted,
ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Ernest Galvan*
Ernest Galvan
Attorneys for Plaintiffs

## ACRONYMS USED

| **ACRONYM** | **FULL TEXT** |
|---|---|
| CDCR | California Department of Corrections and Rehabilitation |
| DSH | Department of State Hospitals |

[3657643.8]

10

| ACRONYM | FULL TEXT |
|---------|-----------|
| EOP | Enhanced Outpatient Program |
| ICF | Intermediate Care Facility |
| LRH | Least Restrictive Housing |
| MHCB | Mental Health Crisis Bed |
| MOU | Memorandum of Understanding |
| PIP | Psychiatric Inpatient Program |
| SVSP | Salinas Valley State Prison |

## CERTIFICATION

The undersigned counsel for Plaintiffs certifies that he reviewed the following relevant court orders:

| Dkt. No. | Date | Subject |
|----------|------|---------|
| 6961 | 11/19/2020 | Order on Supplemental Post-Trial Briefing |
| 6885 | 9/25/2020 | Denying Motion to Modify Order at 6639 |
| 6660 | 5/7/2020 | Denying Motion for Reconsideration and Clarifying Order Setting Evidentiary Hearing |
| 6639 | 4/24/2020 | DSH Transfers and Screening |
| 6600 | 4/10/2020 | Pandemic Measures, Opening Discovery on DSH Issues, Setting Evidentiary Hearing |
| 6572 | 4/3/2020 | Show Cause Re DSH Transfers |
| 5711 | 10/10/2017 | Staffing |
| 5583 | 3/24/2017 | Inpatient Care Order After Evidentiary Hearing |
| 5343 | 8/21/2015 | Access to DSH Inpatient Beds |
| 4688 | 7/11/2013 | Inpatient Care, Order After Evidentiary Hearing |

DATED: Dec. 7, 2020

Respectfully submitted,
ROSEN BIEN GALVAN & GRUNFELD LLP

By: /s/ Ernest Galvan
    Ernest Galvan

Attorneys for Plaintiffs

[3657643.8]