1   DONALD SPECTER – 083925
    STEVEN FAMA – 099641
2   MARGOT MENDELSON – 268583
    PRISON LAW OFFICE
3   1917 Fifth Street
    Berkeley, California  94710-1916
4   Telephone:   (510) 280-2621

5   CLAUDIA CENTER – 158255
    DISABILITY RIGHTS EDUCATION
6   AND DEFENSE FUND, INC.
    Ed Roberts Campus
7   3075 Adeline Street, Suite 210
    Berkeley, California  94703-2578
8   Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

10  Attorneys for Plaintiffs

12              UNITED STATES DISTRICT COURT

13            EASTERN DISTRICT OF CALIFORNIA

15   RALPH COLEMAN, et al.,

16          Plaintiffs,

17       v.

18   GAVIN NEWSOM, et al.,

19          Defendants.

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF ERNEST GALVAN IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF FOLLOWING EVIDENTIARY HEARING ON DEPARTMENT OF STATE HOSPITAL TRANSFERS**

Judge:   Hon. Kimberly J. Mueller

[3659465.1]

I, Ernest Galvan, declare:

1.      I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' Supplemental Brief Following Evidentiary Hearing on Department of State Hospital Transfers.

2.      Attached hereto as **Exhibit A** is a true and correct copy of excerpts of the transcript of a hearing in this case that occurred on June 21, 2013, which includes the testimony of CDCR Senior Supervising Psychiatrist Dr. Troncoso.

3.      Attached hereto as **Exhibit B** is a true and correct copy of excerpts of the transcript of a hearing in this case that occurred on June 19, 2013, which includes the testimony of Plaintiffs' expert, psychiatrist Dr. Pablo Stewart.

4.      Attached hereto as **Exhibit C** is a true and correct copy of excerpts of the transcript of a hearing in this case that occurred on October 23, 2020, which includes the testimonies of Plaintiffs' expert, psychiatrist Dr. Pablo Stewart and DSH Medical Director, Dr. Katherine Warburton.

5.      Attached hereto as **Exhibit D** is a true and correct copy of an email and an excerpt of an attached document that I received from counsel for CDCR on December 3, 2020, which shows the waitlist for intermediate and acute inpatient level of care.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at El Cerrito, California this 7th day of December, 2020.

*/s/ Ernest Galvan*
Ernest Galvan

# EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---O0O---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                          CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12   _____/

13

14

15

16                        ---o0o---

17

18                  REPORTER'S TRANSCRIPT

19         RE:  EXCERPT OF EVIDENTIARY HEARING - DAY 3

20                   JUNE 21ST, 2013

21

22                        ---o0o---

23

24

25   Reported by:              CATHERINE E.F. BODENE,
                               CSR. No. 6926

1                       DIRECT EXAMINATION

2     BY MR. RUSSELL:

3     Q.      Good morning, Dr. Troncoso.

4     A.      Good morning, sir.

5     Q.      Are you presently employed by the California

6     Department of State Hospitals?

7     A.      I am.

8     Q.      What is your present position with DSH?

9     A.      Senior supervising psychiatrist.

10    Q.      Where do you work?

11    A.      At DSH Salinas Valley.

12    Q.      The Salinas Valley Psychiatric Program?

13    A.      Yes.

14    Q.      How long in your current position have you been at

15    Salinas Valley Psychiatric Program?

16    A.      Well, I'm not sure I understand.  I've been at

17    Salinas Valley Psychiatric Program for four and a half years.

18    Then I had a small hiatus of six weeks and then I returned.

19    Q.      So there was a period of time in which you left?

20    A.      Correct.

21    Q.      When did you return?

22    A.      June 17th.

23    Q.      So that was on Monday?

24    A.      Correct.

25    Q.      Before I get into your position with the Department

```
 1   comes in, or just patients who are going to be on your

 2   workload?

 3           THE WITNESS:  The patients that are going to be on my

 4   workload.  But if I'm the only psychiatrist there, I see

 5   everybody.

 6           THE COURT:  Okay.

 7           THE COURT:  As a supervising psychiatrist, do you see

 8   everybody or just get reports or what do you do?

 9           THE WITNESS:  No, I don't get reports.  I follow -- I

10   have a caseload so I see those --

11           THE COURT:  Just that portion.

12           THE WITNESS:  -- individually.

13           THE COURT:  Okay.  Thank you, sir.

14   BY MR. RUSSELL:

15   Q.      Do other staff also see the patient while they're on

16   orientation status?

17   A.      It's amazing, but there is a lot of staff that really

18   see the patient almost continuously.  From the time they

19   arrive in our facility, from the MTAs that escort our patient

20   from the receiving and release unit to our unit, staff

21   interacts with that patient constantly.

22           And by constantly, it seems like they have eyes on

23   these patients 24/7.  I'm not the only person that sees the

24   patient.  There is the registered nurse.  There is the

25   psychologist, the social worker who has a caseload, the
```

1  recreational therapist and others, like psych-techs, for

2  example, that really have created a milieu, so to speak, a

3  therapeutic milieu in which the patient is immersed in.  So

4  I'm not the only one.

5  Q.     What is your understanding of the orientation status,

6  what the patient -- well, what is your understanding of the

7  orientation status?

8  A.     It's a time period where they're given an opportunity

9  to adjust to a new program.  They may have come from another

10  type of care in CDCR.  And if they're, for example, EOP, they

11  go to our intermediate facility, and they need a period of

12  adjustment, so to speak.

13         We get to know the patient.  They get to know us.

14  And it is almost like a handshaking type of encounter.

15         THE COURT:  Except they're in handcuffs.

16         THE WITNESS:  Except they're in handcuffs.  But we

17  have a Level IV maximum security prison so we have that

18  component to sort of contend with.

19  BY MR. RUSSELL:

20  Q.     Your Honor anticipated my question.  The inmates

21  remain in cuffs during orientation status?

22  A.     They do.

23  Q.     They're in cuffs when outside of their cell, correct?

24  A.     Only outside of their cell.

25  Q.     During orientation status are patients prohibited

1    something because I'm assuming that they're really sick

2    people.

3           Expecting them to fill out a form is, I would assume,

4    frequently unreasonable -- not a reasonable expectation?

5           THE WITNESS:  Well, they don't necessarily have to

6    fill out a form, Your Honor.  They can communicate to

7    somebody else that they need to be seen.

8           THE COURT:  To see people who are, I gather -- I

9    mean, we've heard testimony that you see people who are

10   essentially catatonic.

11          THE WITNESS:  Well, I have to differ.  We don't see

12   the people with catatonia.  That is more of an acute

13   situation that has to be addressed at a higher level of

14   care.

15          THE COURT:  Okay.  Let's say you're a Level IV and

16   you're catatonic.  Where do you go?  Where do they send you?

17          THE WITNESS:  You would go to Vacaville.

18          THE COURT:  Okay.  Okay.  So you have people who are

19   intermediate, but they're still quite sick.

20          Try and tell me, I know that there is no typical, but

21   as a general matter can you describe the nature of the

22   problems that have sent the patient to your hospital?

23          THE WITNESS:  Well, the problems that we have sent to

24   our hospital are quite different.  We have the maximum

25   security component, but we also have some of the sickest

1    people in the state hospital system, as well as in CDCR.

2           These patients present with major psychiatric

3    disorders.  For example, psychotic disorders, mood disorders

4    and major anxiety disorders.  So we come across a wide

5    spectrum.  They are usually medicated, some of them not.

6    And -- I'm sorry.

7           THE COURT:  No.  No.  I was afraid that the lawyer

8    was about to interrupt you.  I was trying to stop him.

9           Go ahead.

10          THE WITNESS:  With those major categories, like take

11   schizophrenia for example, we see all types of

12   schizophrenia.

13          THE COURT:  So you see people with schizophrenia.

14   They may not even recognize where they are?

15          THE WITNESS:  In rare cases.  If they are gravely

16   disabled, that may be so.

17          THE COURT:  In any event, being schizophrenia --

18   asking you, not telling you.  I can hear myself as if I'm

19   telling you, and I don't mean to.

20          Whatever the level is, they are probably not able to

21   accurately evaluate where they are and what's happening to

22   them?

23          THE WITNESS:  They're well aware of where they are

24   because we check for that on initial assessment.  We also

25   make room for things that -- for instances where they are

1          In other words, there's -- we can't get the right

2     treatment tailored to that patient, and they need a higher

3     level of care.  So I only know of Vacaville by referral.  We

4     send those people to Vacaville.

5     Q.      Who are the people that you keep that, as you say,

6     have moderate acuity?

7             Again, can you explain what you mean by that and the

8     kind of patients that you are treating in layman's terms?

9     A.      The patients that we treat are patients that are

10    severely mentally ill.  You know, if you look at a bell

11    curve, there is going to be some outliers on the tail end of

12    the curve on both ends.

13            That tail end of the curve going forward represents

14    people who are severely mentally ill and that need a higher

15    level of care.

16            And sometimes they come from CDCR with that level of

17    care, and we recognize it early, we make a referral early.

18            When we work with them and we establish that their

19    diagnosis, for example, may not be the clearest, or they need

20    more attention because they're chronically suicidal, then we

21    sends them to Vacaville.

22    Q.      Now, going back to the IDTT, the Interdisciplinary

23    Treatment Team, they meet on a formal basis every 30 days,

24    correct?

25    A.      Correct.

1    Q.      That's not the only time in which the patient is

2    seen; is that correct?

3    A.      No.  I gave you examples of when we see them outside

4    of the IDT.

5    Q.      In addition to you as the staff psychiatrist, who

6    else treats the patients?

7    A.      The whole milieu.

8    Q.      Can you describe what that milieu is?

9    A.      Well, a therapeutic environment.  The environment

10   that starts from the moment they're in reception -- receiving

11   and release.  There are two MTAs that bring them to our

12   facility.  That's the start of the therapeutic milieu.

13           Then when they come to our unit, they are essentially

14   immersed in a therapeutic environment.  Every contact with

15   them is therapeutic in nature, from the MTAs, from the

16   nursing staff, the psych-techs, the med nurse, and so on so

17   forth, even down to the cleaning people.  That's part of the

18   therapeutic milieu.  They are immersed in that.

19           So we have a multitude of people actually

20   contributing to that milieu.  Very therapeutic.  You may not

21   think that the guy that cleans the floor is therapeutic, but

22   he cleans the cell of some of our patients, and he can tell

23   us a lot of information about what they find in the cell that

24   helps us direct our treatment.

25           Or the cook, for example, has special diets that

1    these patients are on, whether for religious or medical

2    reasons.  The cook plays a part in all of this.

3            So there is a hierarchy of people that contribute to

4    this therapeutic milieu.

5    Q.      As part of the treatment that is offered by you as

6    one of the staff psychiatrists, you mentioned that you see

7    patients on an individual basis.

8            Do you see them at their cell front?

9    A.      Sometimes.

10   Q.      When do you do that?

11   A.      Well, for example, maybe they don't want to come out

12   for some reason, then it is either myself or the whole team

13   that actually goes to the cell front and tries to encourage

14   the patient to come out and meet with us.

15   Q.      Are there instances in which -- well, let me back up.

16           Are you, as a staff psychiatrist, able to provide

17   what you consider to be effective care when you meet with a

18   patient at their cell front?

19   A.      It's not the most ideal of circumstances because

20   there's a lack of confidentiality that goes with a cell front

21   meeting, but it is sufficient enough to get an idea of where

22   they are.

23   Q.      If you do not believe that is sufficient, what do you

24   do?

25   A.      Then we ask them to come out again and repeatedly

1    Q.      He was referred to the intermediate care program

2    following that suicide attempt?

3    A.      I don't see that.  I see a referral from Sacramento

4    to the mental health crisis bed in San Quentin.

5    Q.      Then the next line?

6    A.      DSH Intermediate Care Program.  Referral to the

7    program was made.

8    Q.      You testified earlier about the kinds -- the acuity

9    of the patients who come into the ICF program.  Is it fair to

10   say that after serious suicide attempts, inmates who are

11   seriously suicidal is one type of inmate referred to your

12   program?

13   A.      Yes.

14   Q.      That inmate might be considered a serious risk to

15   himself or others?

16   A.      Yes.

17   Q.      After this suicide, while you were at the Salinas

18   Valley Psychiatric Program, was there any discussion that you

19   were privy to about changing the process of cuff status?

20   A.      No discussion.

21   Q.      Were any changes to the orientation status made?

22   A.      No.

23   Q.      Were any additional clinical monitoring obligations

24   added to cuff status?

25   A.      No.

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3

    STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5

6

7           I certify that the foregoing is a correct transcript

    from the record of proceedings in the above-entitled matter.
8

9

10               IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13      /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
14          Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---oOo---

4      BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5


6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                        CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11         Defendants.

12   _____/

13

14

15

16                        ---oOo---

17

18                 REPORTER'S TRANSCRIPT

19        RE:  EXCERPT OF EVIDENTIARY HEARING - Day 1

20                   JUNE 19TH, 2013

21

22                        ---oOo---

23

24

25   Reported by:            CATHERINE E.F. BODENE,
                             CSR. No. 6926

1    MR. NOLAN:  Not unless the Court would like it -- Oh.

2    THE COURT:  It is not your business.

3    MS. VOROUS:  No.  Defendants do not, Your Honor.

4    THE COURT:  You may proceed, Mr. Nolan.

5    MR. NOLAN:  Also I just want to point out that the

6    paragraphs in Dr. Stewart's declaration in the termination

7    proceedings that concern DSH are paragraphs 51 to 56, 377 to

8    391, 398 to 408, 411 to 451.

9                         DIRECT EXAMINATION

10   BY MR. NOLAN:

11   Q.    Dr. Stewart, your report discusses problems with

12   premature discharges from inpatient care at Department of

13   State Hospitals' programs and with the quality of care in DSH

14   hospital programs.  Why are these serious problems?

15   A.    Well, they're serious problems in that hospital-based

16   care in a given system is where the sickest patients go to

17   receive care.

18   THE COURT:  Sixth?

19   THE WITNESS:  Sickest.

20   Most impaired, Your Honor.  Excuse me.

21   THE COURT:  That's all right.  I just didn't hear

22   you.

23   THE WITNESS:  You can liken it to a medical hospital

24   where the sickest patients would go to something like the

25   intensive care unit.

1    In a psychiatric system the inpatient hospital

2    programs are where the people that are suicidal, that due to

3    mental illness are suicidal, a danger to others, and are

4    gravely disabled, such as not eating or drinking properly,

5    and need to receive this level of care.

6    BY MR. NOLAN:

7    Q.    In your report you discuss the problem of premature

8    returns, premature discharges from DSH hospitals.

9    How did you learn about this problem?

10   A.    As you're aware, I did a number of tours of five

11   facilities; Salinas Valley, the State Prison Sacramento,

12   Lancaster, R.J. Donovan and San Quentin.  In each one of

13   these facilities I toured and spent a lot of time in the

14   mental health crisis bed unit areas.

15   There, speaking with staff, the staff brought up to

16   me, when I asked about the patients that they were taking

17   care of in the mental health crisis bed units, that the staff

18   were complaining that many of these people had recently been

19   treated at the Department of State Hospital facilities,

20   either intermediate care facilities or acute facilities, and

21   had been sent back to the facility.

22   THE COURT:  Sent back to?

23   THE WITNESS:  To the state prison, Your Honor, from

24   the DSH.  And that the clinicians found that these

25   individuals were in a similar psychiatric condition that they

1    had when they were sent.  So they were unable to be housed in

2    the general housing units, in the Ad. Seg. Units, et cetera.

3    So they had to house them, for their own safety, in the

4    mental health crisis bed units.

5          And then shortly thereafter, they were re-referred

6    back to the Department of State Hospital.  And this

7    occurred -- this occurred in every mental health crisis bed

8    unit I toured in the five facilities that I mentioned.

9    Q.      Doctor, did you interview and evaluate some

10   individuals who fall into this category of "Individuals

11   Prematurely Discharged"?

12   A.      Yes.  And then as part of my tour in the mental

13   health crisis bed, I did spend time and had these particular

14   patients pulled out.  And I interviewed them, and I had the

15   opportunity to review their records also.

16   Q.      Do you recall how many individuals you evaluated who

17   were in this category of recently returned from Department of

18   State Hospitals and going back?

19   A.      In my tours that occurred at the end of January,

20   beginning of February, there were six individuals who had

21   recently been discharged from the state hospital, had been

22   returned to the sending institutions, and at the time -- at

23   that time CDCR staff, not myself, but CDCR had determined

24   that they needed to be sent back to the state hospital.  And

25   they were being housed in the mental health crisis beds.

1          So they were getting -- they confirmed they were

2     getting maybe five hours a week, which was later brought up

3     with both Dr. Brim and Dr. Badeaux's declaration and in their

4     deposition testimony.

5     Q.      Doctor, I want to call your attention to the Exhibit

6     D in your binder.  These are photographs that were attached

7     to your declaration, Docket 4381 at pages 245 through 247 --

8     I'm sorry -- through 250.

9          And it's appendix UU, VV and WW and XX, photographic

10    appendixes.

11         Does this capture what the rooms looked like when you

12    were touring?

13    A.      Yes.  The first two photos are of the permanent unit

14    and the last two are of the temporary unit.  See, this is

15    exactly how they were.  They were empty.

16         Sometimes when we go on tours, we take pictures of

17    the units, we have to move patients out for confidentiality

18    reasons.  But there was no reason to do that in the pictures

19    because there was nobody getting any treatment.

20    Q.      In your opinion, Doctor, is five hours a week of

21    therapeutic group activity sufficient for patients at the

22    intermediate level of care?

23    A.      I want to go back to this.  These are the most

24    severely ill people in the system.  They're in the hospital

25    where every moment of their waking hours should be

1    therapeutic in nature, from the time they get up to the time

2    they go to bed.  And these people were getting around five

3    hours a week.

4            In the next lower level of care in the CDCR system,

5    which is EOP, the program guide calls for a minimum of ten

6    hours of treatment.

7            So this thing was all turned upside down.  From the

8    lower level, from a referring level to the hospital where

9    you're supposed to get more care, they ended up getting less.

10   So to answer your question, five hours is very inadequate in

11   my opinion.

12   Q.      Do you have an opinion about what level of treatment

13   should be provided in an intermediate inpatient care program?

14   A.      I believe that, as I was saying, the entire day

15   should be therapeutic.  People need to be out of their cells,

16   they need to be attending recreation or therapy groups,

17   meeting with clinicians, meeting with therapists, maybe even

18   just going to yard, these sorts of things.

19           So given that, you know, a fair estimate would be 40

20   hours a week of some sort of activity, including recreation,

21   including yard time.

22   Q.      So tab E in the exhibit binder that I have given you

23   is a declaration previously filed by defendants in this case

24   in September of 2010.  It was Docket 3913-3.  The document is

25   a declaration by Victor Brewer.

1          THE WITNESS:  You're right, Your Honor.

4  2          THE COURT:  Is it your view -- I'm asking you, not

3     telling you, I want to make clear, you're the expert, not

4     me -- is it your view that any time somebody is sent to the

5     hospital, that's an indication of a requirement for urgent

6     care and something must be done relatively early in order to

7     ensure that something like the suicide doesn't occur?

8          THE WITNESS:  Yes, Your Honor.

9          THE COURT:  Is that an ideal requisite or is that

10    something that is realistically what happens in hospitals?

11         THE WITNESS:  I think it is very realistically what

12    happens in hospitals.

13         THE COURT:  Other than prison hospitals?

14         All right.  Thank you.

15   BY MS. VOROUS:

16   Q.     Doctor, isn't it correct that you don't have any

17   knowledge what treatment that this inmate was receiving prior

18   to being cleared for programming?

19   A.     What I do know is that for the three weeks there, the

20   only thing that was pointed out as far as treatment that he

21   received was the two groups, the one the night before he hung

22   himself and the one the morning before he hung himself.

23   Q.     Doctor, would you look at page 9 of the suicide

24   report.

25   A.     Yes.

1    Q.      Please refer to the last paragraph on page 9 that

2    begins with the word "During" and continues on "the first two

3    weeks."

4           If you look further down in that paragraph, isn't it

5    correct that at the very least he was seen by his treatment

6    team for 72 hours and a seven day team meeting?

7    A.      That's what it says, yes.

8    Q.      Doctor --

9           THE COURT:  I'm sorry.  I don't have any idea what

10   those words mean.  Do those words mean -- (Reading:)

11           During his orientation period he was described as

12           pleasant and frequently asked staff for books.  He

13           has been seen by his treatment team for 72 hours and

14           seven-day team meetings.

15           (Reading concluded.)

16           Do you know what that means?

17           THE WITNESS:  How I understand what that is, Your

18   Honor, is that within 72 hours the treatment team would meet

19   with the patient to have --

20           THE COURT:  So they would have one meeting?

21           THE WITNESS:  One meeting.  Then have another meeting

22   at the end of seven days.

23           THE COURT:  Excuse me, Miss Vorous.  I'm just trying

24   to read and understand it.

25           He was seen by his treatment team.  Doesn't that

1    indicate to you there was a treatment team?

2         I don't know what it means, but there was something

3    called the "treatment team"?

4         THE WITNESS:  Yes.

5         THE COURT:  Do you have any idea what that means?

6         THE WITNESS:  The treatment team, as I understand it

7    from reading the records of other cases, it includes a

8    psychiatrist, as well as other members of the staff that

9    would provide -- that work in that particular unit that

10   provides some sort of care.

11        THE COURT:  And as far as you can tell what that

12   means is he met with them once -- met once within 72 hours;

13   is that correct?

14        Is that the same thing?

15        THE WITNESS:  He met with them for a 72 hour and

16   seven day team meeting.

17        Now, we don't know exactly when that occurred, but

18   they're calling it so I'm assuming this was within the 72

19   hours, the first meeting, then seven days -- within seven

20   days for the second meeting.

21        THE COURT:  In your opinion would that be sufficient

22   for somebody who was being hospitalized for acute care?

23        THE WITNESS:  No, Your Honor, it isn't, to answer

24   your question.

25        THE COURT:  Tell me what else.

1           THE WITNESS:  When a person first comes into the

2   hospital, they need to be met at the door almost.  Once

3   they're processed and made sure that, you know, they have the

4   clothing and whatever, assigned to a room, they need to be

5   seen then for an initial assessment to make sure that they're

6   not at risk or what is going on with them or what kind of

7   meds, all these sort of things.

8           They need to be met initially by, at a minimum, a

9   psychiatrist and probably members of the nursing staff or

10   other members of the staff that are there so you can get an

11   idea.

12           And then once you have the person in the facility,

13   and you get some initial idea of what is going on, based on

14   what the initial eval included and reviewing the records,

15   then you may have a little more leisurely time to have a more

16   comprehensive team meeting.

17           So if they wish to initiate treatment right away,

18   when he comes in, which they should, then they want to wait

19   for three days to have a more comprehensive treatment

20   meeting, then I don't see anything wrong with that.

21           But they need to be seen immediately when they step

22   in the door, and the treatment needs to begin right then.

23           THE COURT:  In an ideal situation that may be the

24   most desirable procedure, but you're not in an ideal

25   situation.  You're in a prison situation, a prison hospital,

1    but still a prison situation.  Do you believe that by virtue

2    of that some other procedure would be acceptable?

3            THE WITNESS:  Given that it is in a prison hospital,

4    Your Honor, no, I don't.  Because what they basically

5    admitted to here is that for three days this guy was on his

6    own.  And fortunately nothing bad happened during that

7    three-day period, but it wasn't because of anything the staff

8    did.  They had no idea what was going on with this guy for

9    the first three days.

10           He needed -- in any hospital setting, be it a prison

11   hospital or at the university hospital, when the people come

12   into the room, come into the hospital, they're seen initially

13   so that the staff, especially the psychiatrist, has an idea

14   of what's going on with the person and can initiate a

15   treatment plan that is then subject to modification when they

16   see him more thoroughly, maybe a couple days later.

17           THE COURT:  You may proceed, Miss Vorous.

18   BY MS. VOROUS:

19   Q.      Dr. Stewart, I would like to clarify the record, if I

20   may.

21           The question that you were asked related to acute

22   care.  The Salinas Valley Psychiatric Program is an

23   intermediate care facility, correct?

24   A.      It is intermediate care.  I was referring to

25   hospital-based care.

1    A.       (Reading:)

2             The delay in transfer to the Department of State

3             Hospital Salinas Valley may have frustrated him, but

4             certainly the delay in his ability to program out of

5             his cell aggravated him.   Inmate A had been

6             programming on the yard at State Prison Sacramento,

7             but when transported to DSH Salinas Valley, he

8             was placed alone in his cell and was not allowed to

9             program as he had at Sacramento.

10            (Reading concluded.)

11            Do you wish me to continue?

12   Q.       One more sentence.

13   A.       (Reading:)

14            This was compounded by the one week delay of the ICC.

15            (Reading concluded.)

16   Q.       So Doctor, in your opinion what would be an

17   appropriate time to start group treatment and out-of-cell

18   treatment for this individual?

19   A.       I think after you have your initial assessment of him

20   and the initial treatment plan and whatever custody things

21   need to occur, they need to occur in that same time frame

22   simultaneously.  And the treatment should begin, you know,

23   literally the same day or the next day at the latest.

24            MR. NOLAN:  Thank you, Doctor.

25            THE COURT:  Further cross, ma'am?

1                        REPORTER'S CERTIFICATE

2                            ---o0o---

3

   STATE OF CALIFORNIA   )
4  COUNTY OF SACRAMENTO  )

5

6

7          I certify that the foregoing is a correct transcript

   from the record of proceedings in the above-entitled matter.
8

9

10                IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13     /S/_Catherine E.F. Bodene_____
           CATHERINE E.F. BODENE, CSR NO. 6926
14         Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF CALIFORNIA
2                              --oOo--

3    RALPH COLEMAN, ET AL,        ) Docket No. 90-CV-520
                                  ) Sacramento, California
4                    Plaintiffs,  ) October 23, 2020
                                  ) 9:24 a.m.
5              v.                 )
                                  )
6    GAVIN NEWSOM, ET AL.,        ) Re: Evidentiary Hearing
                                  )
7                    Defendants.  )

8                       TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE KIMBERLY J. MUELLER
9                    UNITED STATES DISTRICT JUDGE

10   APPEARANCES (Via Zoom):

11   For the Plaintiffs:    ROSEN BIEN GALVAN & GRUNFELD, LLP by
                            MR. ERNEST GALVAN
12                          MR. MICHAEL BIEN
                            MS. LISA ADRIENNE ELLS
13                          MR. THOMAS NOLAN
                            50 Fremont Street, 19th Floor
14                          San Francisco, CA 94105

15                          MS. JESSICA WINTER
                            MS. AMY XU
16                          101 Mission Street, Sixth Floor
                            San Francisco, CA 94105
17
            (Appearances continued next page.)
18
                       JENNIFER COULTHARD, RMR, CRR
19                        Official Court Reporter
                          501 I Street, Suite 4-200
20                         Sacramento, CA 95814
                           jenrmrcrr2@gmail.com
21                            (530)537-9312

22          Mechanical Steno - Computer-Aided Transcription

23

24

25
```

```
 1    APPEARANCES (Via Zoom Cont'd)

 2    For the Defendant:        OFFICE OF THE ATTORNEY GENERAL by
                                MR. KYLE ANTHONY LEWIS
 3                              MR. ADRIANO HRVATIN
                                MS. ELISE THORN
 4                              MS. MONICA ANDERSON
                                MS. NAMRATA KOTWANI
 5                              455 Golden Gate Avenue, Suite 11000
                                San Francisco, CA 94102
 6
                                OFFICE OF THE ATTORNEY GENERAL by
 7                              MR. LUCAS L. HENNES
                                1300 I Street, Suite 125
 8                              Sacramento, CA 94244

 9
       Also Present:            MATTHEW LOPES
10                              Special Master
                                HAVEN GRACEY
11                              Law Clerk for Chief Judge Mueller

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   psychiatric facilities that take patients from the most

2   vulnerable institutions in our state, we just needed that time

3   to build up that response so that we could start safely

4   admitting people again.

5   Q   Dr. Warburton, do you consider yourself a public health

6   expert?

7   A   I am certainly more of one now than I was in March, but I

8   rely heavily on the public health experts that we have in our

9   own facilities as well as those at the California Department of

10  Public Health.  I am a forensic psychiatrist.

11  Q   Before getting into DSH's specific guidelines for transfer,

12  I'd like to talk a little bit -- just take a step back and talk

13  a little bit about the Coleman patients that DSH admits to its

14  care.  Can you describe the criteria for Coleman patients that

15  are admitted to be treated at DSH?

16  A   Well, it's ICF level of care, so things like psychotropic

17  medications, stabilization, development of coping skills.  If

18  people need certain types of consultation or long term 24-hour

19  care, they come to us for ICF treatment.

20  Q   So is this an acute level of care?

21  A   No.  Psychiatric patients within the Department of

22  Corrections who need acute level of care go to their crisis

23  beds and/or their acute level of care.

24  Q   And are you currently involved in the process for

25  transferring inmates from the Department of Corrections during

1   Dr. Stewart may state his opinion in response to questions in

2   that field.

3               MR. NOLAN:   Thank you, Your Honor.

4   BY MR. NOLAN:

5   Q   Dr. Stewart, what issues have you been asked to provide an

6   expert opinion about for today's hearing?

7   A   I was asked to offer opinions about whether any of the 55

8   patients that are awaiting transfer to DSH facilities are

9   experiencing any clinical harm as well as are they receiving

10  adequate care during this waiting period?

11  Q   Dr. Stewart, did you come to a opinion regarding these

12  issues?

13  A   Yes.  After my initial review, I came to the opinion that

14  all 55 certainly are seriously mentally ill, and I agree with

15  the CDCR clinicians that they all require inpatient treatment

16  and further opinions were that they're not receiving adequate

17  care during this waiting period and they are not receiving

18  equivalent care in their current situations as they would

19  receive in a DSH facility.

20  Q   Dr. Stewart, do patients who need inpatient care need to be

21  given that level of care quickly?

22  A   Yes.

23  Q   Why is that?

24  A   Well, delays cause harm and suffering and sometimes this

25  harm can be irreparable.  For example, in the scientific

Dr. Stewart - Direct by Nolan

1   literature or psychiatric literature, it's very clear that

2   delaying aggressive treatment for major depressive disorders

3   puts the patient at higher risk for developing Alzheimer's

4   disease sometime in the future.  And the literature is also

5   clear that in the absence of progressive treatment for

6   psychotic symptoms, meaning if you allow a person to remain

7   psychotic, it worsens the overall prognosis throughout the

8   lifetime of the patient in question.  Those are the potentially

9   irreparable harms.  But there's also a harm that the longer a

10  patient remains symptomatic and not receiving proper care, the

11  longer it will take for that person to be returned to a

12  baseline of mental health stability, and during that time

13  they're suffering harm.

14      And the last thing I just want to mention on suffering harm

15  is that when you have a patient at a level of care that's not

16  able to adequately manage that patient, it's likely that that

17  person will have behavioral manifestations of the mental

18  illness, resulting in things like assaults, fights, throwing

19  urine and feces at guards and other patients as well as

20  increase in self-injurious behaviors, and these sorts of issues

21  put both the patient at risk for harm as well as the staff and

22  other patients.

23  Q   Thank you, Dr. Stewart.  Dr. Stewart, when somebody is

24  referred and accepted for inpatient treatment at a hospital,

25  how soon should they be moved?

Dr. Stewart - Direct by Nolan

1   BY MR. NOLAN:

2   Q   So based on this chart and your review of the treatment

3   plans, were you able to come to any initial opinions about this

4   group of 55 individuals waiting for a transfer?

5   A   Yes.  After my initial review, based on the data from this

6   spreadsheet regarding diagnoses and medications, I noticed that

7   there was some issues regarding diagnoses.  Sometimes there was

8   several unspecified diagnoses.  There was actually an example

9   of a contradictory diagnosis and there was also multiple

10  diagnoses, all of which raised a question in my mind about the

11  quality of care that a person's getting.

12      In addition, I looked at the medications and I found many

13  examples of very complex polypharmacy going on.  Sometimes

14  polypharmacy is the right treatment for patients, but based on

15  this initial review, it just raised a question in my mind about

16  what else is going on with these patients when they're being

17  treated, for example, with two different antipsychotic

18  medications or just, you know, a lot of patients were on four

19  and five different medications, so it was those areas that I

20  looked at.

21  Q   Dr. Stewart, if I could ask you what is the problem with

22  unspecified diagnoses?

23  A   Well, there's not a problem, per se, but an unspecified

24  diagnosis is -- say there's a whole list of psychotic

25  diagnoses, like schizophrenia, schizo-affective disorder.  But

Dr. Stewart - Direct by Nolan

1   are more generally or broadly exemplary of all the 55 patients

2   that are awaiting transfer.

3   Q    And Dr. Stewart, can I ask you -- and how many examples did

4   you find?

5   A    Well, I found a large number and I eventually got the

6   number down to 11 knowing that we're limited in our time to

7   present to the Court and that I felt were exemplary of the

8   overall cohort of 55 patients waiting.

9   Q    And what documents did you review for those eleven?

10  A    I asked for their medical records for two months prior to

11  their referral to DSH and up to the present time or the most

12  current records that were available, and I looked further at

13  them.

14  Q    Dr. Stewart, what is persistent psychosis?

15  A    Say that again, please.

16  Q    What is persistent psychosis?

17  A    It's psychosis that continues to be present even in the

18  face of being treated with antipsychotic medication or other

19  types of medication.

20  Q    Did you see many examples of persistent psychosis among

21  the --

22  A    Yeah.

23  Q    -- patients you looked at?

24  A    Yes.

25  Q    What is the danger from persistent -- for a patient from

1    persistent psychosis?

2    A    Well, as I mentioned earlier, untreated psychosis

3    contributes to a poorer prognosis overall in the lifetime of

4    the patient. It is similar to like a seizure disorder. You

5    don't allow patients to seize because the more they seize, the

6    more they will seize. Same thing about psychiatric. The same

7    thing has been studied with psychotic symptoms. The more you

8    allow a patient to be psychotic, the more they will be

9    psychotic in the future and it will be harder to address those

10   persistent psychotic symptoms.

11   Q    And isn't an inpatient hospital the best place to address

12   persistent psychotic symptoms?

13   A    In my opinion, based on my experience working in various

14   correctional systems and observing various correctional

15   systems, persistent psychosis is an indicator for the need of

16   inpatient hospitalization and close monitoring.

17   Q    Okay. What else did you find in your more detailed review

18   of the eleven cases you selected?

19   A    Well, again, there were antipsychotics; and yet, they

20   continued to have command auditory hallucinations that were

21   telling them to hurt themselves. I had cases where people were

22   being treated with multiple medications and they had persistent

23   symptoms; not just auditory hallucinations but persistent

24   suicidal ideation, they had persistent self-injurious behaviors

25   and to the extent that some of the patients that I reviewed

1    Q    Okay.  In the Bates numbering.

2         So let me just go to the page -- treatment plan.  So in

3    this section on, you know, higher-level-of-care considerations

4    do you see under the second paragraph where it says, "Summarize

5    treatment modifications," the last three sentences there where

6    it says, "Because it is not clear that patient will transfer to

7    the PIP-ICF any time soon, patient is also engaged in a plan to

8    meet the goals of ICF hospitalization within the next four

9    weeks in MHCB."  Do you remember reading that?

10   A    Yes.

11   Q    Dr. Stewart, is it possible for somebody to get -- receive

12   ICF care in a mental health crisis bed?

13   A    No, it is not.   I'm very familiar with mental health crisis

14   beds in correctional settings as well as inpatient care for the

15   correctional settings, and a patient cannot receive inpatient

16   equivalent care in a crisis bed.

17   Q    What are the features of an inpatient setting that a mental

18   health crisis bed does not have?

19   A    Well, it allows the patient to be part of the milieu that

20   the psychiatrist and the rest of the staff, nursing staff,

21   et cetera, can observe and monitor.  This is especially

22   important for diagnostic clarification as well as we're doing

23   these -- hopefully we're doing these nuanced medication

24   monitoring in adding new medication or removing medication.

25   That can only happen in the inpatient setting.  It really

1          C E R T I F I C A T E

2

3        I certify that the foregoing is a true and correct

4   transcript of the record of proceedings in the above-entitled

5   matter.

6
    */s/ JENNIFER L. COULTHARD*              November 2, 2020
7                                                    DATE

8

9   JENNIFER L. COULTHARD, RMR, CRR
    Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

**Greg Gonzalez**

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov> |
| **Sent:** | Thursday, December 3, 2020 5:26 PM |
| **To:** | Hockerson, Dillon@CDCR; Marc Shinn-Krantz; Melissa Bentz; Stafford, Carrie@CDCR; CDCR OLA Coleman CAT Mailbox; Rashkis, Sean@DSH-S; Nina Raddatz; Christine Ciccotti; Kent, Kristopher@DSH-S; Adriano Hrvatin; Damon McClain; Elise Thorn; Kyle Lewis; Lucas Hennes; Tyler Heath; Ryan Gille; Namrata Kotwani |
| **Cc:** | Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama |
| **Subject:** | RE: Coleman:  Renewed Information Request Re Inpatient Transfers; Request for Two Prompt Transfers from CMF MHCB [IWOV-DMS.FID6429] |
| **Attachments:** | IRU Data Waitlist and Admissions 12.3.2020.pdf |

Marc,

Please find attached point in time waitlist data, broken out by referred level of care.  The last section includes a list of patients transferred externally over the past six months.  Please note that this data is point in time and not validated between HCPOP and IRU, as is the practice more monthly court filings, and is provided on an expedited basis in order to give the parties as close to real time information as possible.  Any discrepancies found in this data during the monthly validation process will be corrected prior to court filing.  Please also note that some patients on the referred list may also be under consideration by their IDTTs for rescission.  Finally, the ICF to ICF referral list should not be confused with an LRH referral list as not all patients on the ICF to ICF referral list are necessarily being referred to a less restrictive housing.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243
█████████████

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Sent:** Thursday, December 3, 2020 3:34 PM
**To:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>; Rashkis, Sean@DSH-S <Sean.Rashkis@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Christine Ciccotti <Christine.ciccotti@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Ryan Gille <Ryan.Gille@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>

**Cc:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>
**Subject:** RE: Coleman: Renewed Information Request Re Inpatient Transfers; Request for Two Prompt Transfers from CMF MHCB [IWOV-DMS.FID6429]

Dear Marc,

I write in response to Plaintiffs' December 2, 2020, Email (12/2/20 Email) requesting two patients to immediately transfer to the Intermediate Care Facility (ICF) Level of Care (LOC). Specifically, Plaintiffs' request pertains to ███████████████, and ███████████████, both of whom have been in the Mental Health Crisis Bed (MHCB) LOC at California Medical Facility (CMF) for several months. On December 3, 2020, CDCR reviewed case factors for both patients to assess appropriate LOC.

First, Ms. ██████ was referred to ICF LOC on October 29, 2020, due to the emergence of trauma-related symptoms. On December 2, 2020, CDCR rescinded the referral to ICF because of Ms. ██████ improved progress and presentation with her symptoms. Specifically, Ms. ██████ has refrained from self-harm behavior and she is able to resist suicide ideations by identifying protective factors. Ms. ██████ also presents herself as intact, motivated, and optimally ready for a trauma psychotherapy in a less restrictive level of care. Currently, the rescission note is pending as CMF's MHCB has been placed on quarantine since November 25, 2020, and is expected to come off quarantine status on December 9, 2020.

Second, Mr. ██████ was referred to ICF on July 23, 2020. There were no ICF beds available at CMF PIP, and patients were admitted to available ICF beds based on emergency transfer requests, facility priority moves, and local admissions by waitlist date. On November 16, 2020, a bed became available but further analysis was required for potential safety concerns. CDCR decided to place Mr. ██████ on MAX custody status to resolve the potential safety concern. On November 19, 2020, Mr. ██████ was endorsed to ICF and a COVID test was ordered. On November 25, 2020, Mr. ██████ test results were obtained, however as stated above, the MHCB was placed on quarantine that same day. Mr. ██████ should transfer to ICF LOC shortly after the quarantine status is lifted.

CDCR will follow-up with Plaintiffs' remaining requests in the immediate future. If you have any questions regarding Ms. ██████ or Mr. ██████ feel free to contact me.

Respectfully,

Attorney
CDCR Office of Legal Affairs
Email: Dillon.Hockerson@cdcr.ca.gov
Phone: ████████████
Cell: ████████████

THIS DOCUMENT IS CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT PERMISSION OF THE SENDER. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY THE SENDER IMMEDIATELY.

**From:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
**Sent:** Wednesday, December 2, 2020 4:35 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>; Rashkis, Sean@DSH-S <Sean.Rashkis@dsh.ca.gov>;

Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Christine Ciccotti <Christine.ciccotti@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Ryan Gille <Ryan.Gille@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>

**Cc:** Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>

**Subject:** Coleman: Renewed Information Request Re Inpatient Transfers; Request for Two Prompt Transfers from CMF MHCB [IWOV-DMS.FID6429]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear OLA Team,

Plaintiffs write to state our deep concern regarding the ongoing and widespread delays in transfers to inpatient care and to again ask for related information about *Coleman* class members.  At the November 10, 2020 Task Force meeting, Defendants committed to provide a list of the names and CDCR numbers of patients awaiting transfer to a PIP or DSH, including LRH moves, their lengths of time waiting, and their needed level of care.  Defendants have previously reported there are about 300-400 people systemwide awaiting transfer to a PIP or DSH.  *See* Sixth Joint Task Force Report ECF 6895 at 6 (as of the week of September 21-27, 2020, a total of 66 patients with pending acute referrals and 303 patients with pending ICF referrals).  But Defendants have never provided a list of the individual patients.  Also at the November 10, 2020 Task Force meeting, Defendants repeated their prior commitment to provide a list of all emergency transfers that have been made from a closed institution to a PIP over the last six months.  On November 16, 2020, we wrote to follow up on Defendants' commitments to provide those two lists, and other commitments.  At the November 17, 2020 Task Force meeting, Defendants again committed to provide this information, as memorialized in Plaintiffs' November 18, 2020 Commitments letter.  (Attached here for reference).  But we still have not received it.  This information is critical to our ability to perform our role as class counsel, and we are entitled to it.  Defendants have previously stated that they routinely track this information and have ready access to it.  Please provide it.

We also write to raise concerns about two specific class members at CMF who we understand to be among the hundreds of class members awaiting inpatient care.  We ask that each be promptly transferred to ICF care, which can be accomplished through internal movement at CMF.  Ms. ████████████████████████) has been at the MHCB at CMF since June 17, 2020, when she was admitted due to suicidal ideation and being deemed a danger to herself.  Despite being discharged to EOP on June 26, 2020, Ms. ██████ remained in the MHCB for months until her symptoms deteriorated to the point that she was referred to the ICF level of care on October 28, 2020.  Ms. ██████ still remains in the MHCB, where she has been housed for nearly six months.  Recent clinical notes document that Ms. ██████ is experiencing "unprecedented sudden intense depression, accompanied by suicidal ideation" and state that she demonstrates a pattern of "decompensating into suicidal depression without disclosing to anyone, indicating significantly increased risk of successful suicide."  *See* 12/1/20 MHPC Progress Note.  Clinicians agree that Ms. ██████ needs the increased monitoring and treatment available at the ICF level of care, yet she continues to be housed in the solitary and restrictive environment of the MHCB.

Similarly, Mr. ████████████████████) was first transferred to the MHCB nearly five months ago on July 8, 2020, following a suicide attempt at MCSP.  On July 18, 2020, Mr. ██████ IDTT referred him to the ICF level of care.  Mr. ██████ treatment team has repeatedly referred him for transfer to ICF level of care at weekly IDTT meetings but he still has not transferred.  Mr. ██████ continues to report to mental health staff that he wants to transfer out of the MHCB.  Clinical notes document "he is still frustrated that he remains housed in MHCB" and that Mr. ██████ understands "he may have to wait until ICC in January to be given an endorsement for another institution."  *See* November 20, 2020 MHPC Inpatient Progress Note.  Notes from his November 24, 2020 IDTT indicate that he was finally endorsed for an

internal transfer to the CMF-PIP, yet his latest IDTT notes from yesterday, December 1, 2020, show he still has not transferred.

Please promptly and safely transfer Ms. ███ and Mr. ███ from the CMF MHCB to the CMF PIP (or a different PIP).  If this internal movement within CMF cannot be promptly accomplished for some reason, please explain why given that Defendants routinely report that CMF PIP has dozens of vacant beds including in the most recently filed Inpatient Census and Waitlist Report filed Nov. 16, 2020 (ECF No. 6956).

Thank you for your attention to these individual class members' wellbeing, and please provide the requested systemwide information promptly.

Best,
Marc

**Marc J. Shinn-Krantz**
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
MShinn-Krantz@rbgg.com
Pronouns: he/him/his

CONFIDENTIALITY NOTICE: The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com

IRS CIRCULAR 230 NOTICE: As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

# NEW ACUTE REFERRALS AS OF DECEMBER 3, 2020

| CDCR# | LAST NAME-FIRST INITIAL | Ref CDCR Facility | APP/ICF | Total Days since COVID Hold / Complete |
|---|---|---|---|---|
| | | COR | APP | 220 |
| | | COR | APP | 213 |
| | | CMC | APP | 209 |
| | | LAC | APP | 189 |
| | | COR | APP | 160 |
| | | MCSP | APP | 142 |
| | | COR | APP | 134 |
| | | COR | APP | 118 |
| | | SAC | APP | 105 |
| | | VSP | APP | 104 |
| | | COR | APP | 101 |
| | | COR | APP | 98 |
| | | CMC | APP | 97 |
| | | COR | APP | 91 |
| | | SATF | APP | 91 |
| | | SAC | APP | 84 |
| | | SAC | APP | 78 |
| | | COR | APP | 66 |
| | | SAC | APP | 59 |
| | | SAC | APP | 58 |
| | | CMC | APP | 49 |
| | | COR | APP | 49 |
| | | COR | APP | 44 |
| | | SAC | APP | 43 |
| | | CMC | APP | 43 |
| | | SAC | APP | 42 |
| | | SAC | APP | 42 |
| | | SAC | APP | 42 |
| | | SAC | APP | 41 |
| | | SAC | APP | 38 |
| | | CHCF | APP | 37 |
| | | SAC | APP | 36 |
| | | MCSP | APP | 36 |
| | | MCSP | APP | 35 |
| | | SAC | APP | 31 |
| | | RJD | APP | 30 |
| | | CIM | APP | 28 |
| | | MCSP | APP | 28 |
| | | SAC | APP | 28 |
| | | SAC | APP | 24 |
| | | SAC | APP | 24 |
| | | SAC | APP | 24 |

| | | | | | |
|---|---|---|---|---|---|
| | | | SAC | APP | 24 |
| | | | CHCF | APP | 23 |
| | | | KVSP | APP | 23 |
| | | | LAC | APP | 21 |
| | | | CHCF | APP | 21 |
| | | | WSP | APP | 21 |
| | | | SAC | APP | 20 |
| | | | SAC | APP | 17 |
| | | | CMF | APP | 17 |
| | | | CMF | APP | 17 |
| | | | CMC | APP | 16 |
| | | | COR | APP | 16 |
| | | | WSP | APP | 15 |
| | | | RJD | APP | 15 |
| | | | CMF | APP | 13 |
| | | | CMC | APP | 13 |
| | | | LAC | APP | 13 |
| | | | CMF | APP | 10 |
| | | | CMF | APP | 10 |
| | | | MCSP | APP | 10 |
| | | | LAC | APP | 10 |
| | | | SAC | APP | 9 |
| | | | SATF | APP | 9 |
| | | | LAC | APP | 9 |
| | | | SAC | APP | 9 |
| | | | CMF | APP | 9 |
| | | | CMC | APP | 9 |
| | | | SAC | APP | 3 |
| | | | CMF | APP | 3 |
| | | | NKSP | APP | 2 |
| | | | SAC | APP | 2 |
| | | | SAC | APP | 2 |
| | | | RJD | APP | 2 |
| | | | SAC | APP | 2 |

# NEW ICF REFERRALS AS OF DECEMBER 3, 2020

| CDCR# | LAST NAME-FIRST INITIAL | Ref CDCR Facility | APP/ICF | Total Days since COVID Hold / Complete |
|---|---|---|---|---|
| | | CMF-SAC | ICF | 282 |
| | | SAC | ICF | 280 |
| | | LAC | ICF | 275 |
| | | LAC | ICF | 275 |
| | | LAC | ICF | 262 |
| | | LAC | ICF | 262 |
| | | CIM | ICF | 262 |
| | | SAC | ICF | 260 |
| | | LAC | ICF | 260 |
| | | SAC | ICF | 260 |
| | | COR | ICF | 259 |
| | | SATF | ICF | 260 |
| | | SATF | ICF | 254 |
| | | LAC | ICF | 251 |
| | | KVSP | ICF | 244 |
| | | LAC | ICF | 245 |
| | | MCSP | ICF | 245 |
| | | COR | ICF | 238 |
| | | LAC | ICF | 232 |
| | | CMC | ICF | 232 |
| | | SAC | ICF | 227 |
| | | SAC | ICF | 225 |
| | | SAC | ICF | 216 |
| | | SAC | ICF | 211 |
| | | MCSP | ICF | 210 |
| | | SAC | ICF | 210 |
| | | CIM | ICF | 203 |
| | | CIM | ICF | 203 |
| | | SATF | ICF | 198 |
| | | COR | ICF | 197 |
| | | LAC | ICF | 197 |
| | | SAC | ICF | 196 |
| | | LAC | ICF | 196 |
| | | SAC | ICF | 191 |
| | | SQ | ICF | 188 |
| | | LAC | ICF | 189 |
| | | RJD-NKSP | ICF | 185 |
| | | CMC | ICF | 184 |
| | | KVSP | ICF | 182 |
| | | CMC | ICF | 182 |
| | | CIM | ICF | 182 |
| | | LAC | ICF | 182 |

| | | | | SATF | ICF | **176** |
|---|---|---|---|---|---|---|
| | | | | CMC | ICF | **175** |
| | | | | LAC | ICF | **170** |
| | | | | LAC | ICF | **168** |
| | | | | LAC | ICF | **162** |
| | | | | CMC | ICF | **161** |
| | | | | LAC | ICF | **156** |
| | | | | CIM | ICF | **155** |
| | | | | SAC | ICF | **148** |
| | | | | SATF | ICF | **154** |
| | | | | SAC | ICF | **154** |
| | | | | LAC | ICF | **154** |
| | | | | LAC | ICF | **150** |
| | | | | LAC | ICF | **149** |
| | | | | LAC | ICF | **147** |
| | | | | LAC | ICF | **147** |
| | | | | CIM | ICF | **148** |
| | | | | SATF | ICF | **147** |
| | | | | SATF | ICF | **147** |
| | | | | SAC | ICF | **146** |
| | | | | CMF | ICF | **146** |
| | | | | KVSP | ICF | **143** |
| | | | | SAC | ICF | **142** |
| | | | | COR | ICF | **135** |
| | | | | LAC | ICF | **141** |
| | | | | COR | ICF | **141** |
| | | | | SATF | ICF | **140** |
| | | | | CMC | ICF | **140** |
| | | | | LAC | ICF | **139** |
| | | | | KVSP | ICF | **139** |
| | | | | SATF | ICF | **139** |
| | | | | SATF | ICF | **139** |
| | | | | SATF | ICF | **136** |
| | | | | LAC | ICF | **135** |
| | | | | SAC | ICF | **134** |
| | | | | LAC | ICF | **129** |
| | | | | NKSP | ICF | **129** |
| | | | | CMF | ICF | **133** |
| | | | | MCSP | ICF | **132** |
| | | | | SAC | ICF | **132** |
| | | | | CMC | ICF | **128** |
| | | | | SATF | ICF | **126** |
| | | | | LAC | ICF | **126** |
| | | | | LAC | ICF | **126** |
| | | | | SAC | ICF | **112** |
| | | | | MCSP | ICF | **125** |
| | | | | MCSP | ICF | **125** |

| | | | | |
|---|---|---|---|---|
| | | KVSP | ICF | 125 |
| | | SAC | ICF | 125 |
| | | SATF | ICF | 122 |
| | | LAC | ICF | 122 |
| | | CMF | ICF | 122 |
| | | CMC | ICF | 120 |
| | | LAC | ICF | 115 |
| | | SAC | ICF | 119 |
| | | SATF | ICF | 113 |
| | | SATF | ICF | 113 |
| | | RJD-LAC | ICF | 112 |
| | | CMF | ICF | 112 |
| | | CMC | ICF | 92 |
| | | LAC | ICF | 107 |
| | | COR | ICF | 106 |
| | | LAC | ICF | 101 |
| | | CMC | ICF | 100 |
| | | SAC | ICF | 99 |
| | | SATF | ICF | 98 |
| | | LAC | ICF | 98 |
| | | SATF | ICF | 93 |
| | | SATF | ICF | 91 |
| | | CMF | ICF | 91 |
| | | CMC | ICF | 73 |
| | | SAC | ICF | 84 |
| | | SAC | ICF | 80 |
| | | SATF | ICF | 78 |
| | | SAC | ICF | 78 |
| | | SATF | ICF | 78 |
| | | LAC | ICF | 76 |
| | | CMC | ICF | 72 |
| | | CMC | ICF | 73 |
| | | CMC | ICF | 73 |
| | | VSP | ICF | 72 |
| | | MCSP | ICF | 72 |
| | | LAC-RJD | ICF | 70 |
| | | SATF | ICF | 71 |
| | | LAC | ICF | 70 |
| | | SAC | ICF | 69 |
| | | SATF | ICF | 66 |
| | | CMF | ICF | 66 |
| | | COR | ICF | 65 |
| | | CMC | ICF | 64 |
| | | CMC | ICF | 62 |
| | | CMC | ICF | 58 |
| | | SQ | ICF | 59 |
| | | SAC | ICF | 59 |

| | | | | |
|---|---|---|---|---|
| | | CMF | ICF | 59 |
| | | CMC | ICF | 52 |
| | | SAC | ICF | 58 |
| | | SATF | ICF | 58 |
| | | CMF | ICF | 57 |
| | | SAC | ICF | 57 |
| | | SATF | ICF | 56 |
| | | SAC | ICF | 55 |
| | | SAC | ICF | 55 |
| | | SATF | ICF | 51 |
| | | CHCF | ICF | 51 |
| | | MCSP | ICF | 50 |
| | | SAC | ICF | 50 |
| | | SAC | ICF | 45 |
| | | SATF | ICF | 42 |
| | | CMC | ICF | 43 |
| | | NKSP | ICF | 38 |
| | | COR | ICF | 38 |
| | | CMC | ICF | 37 |
| | | LAC | ICF | 42 |
| | | SAC | ICF | 41 |
| | | SAC | ICF | 38 |
| | | CHCF | ICF | 35 |
| | | SATF | ICF | 37 |
| | | LAC-RJD | ICF | 36 |
| | | CMC | ICF | 36 |
| | | NKSP | ICF | 35 |
| | | SAC | ICF | 35 |
| | | CMC | ICF | 35 |
| | | KVSP | ICF | 35 |
| | | CMF | ICF | 35 |
| | | CMF | ICF | 35 |
| | | CMC | ICF | 31 |
| | | LAC | ICF | 30 |
| | | LAC | ICF | 30 |
| | | CHCF | ICF | 21 |
| | | LAC | ICF | 20 |
| | | LAC | ICF | 23 |
| | | VSP | ICF | 28 |
| | | LAC-RJD | ICF | 20 |
| | | LAC | ICF | 23 |
| | | MCSP | ICF | 24 |
| | | CMF | ICF | 24 |
| | | CMF | ICF | 24 |
| | | CMC | ICF | 23 |
| | | VSP | ICF | 23 |
| | | CHCF | ICF | 21 |

| | | | | | |
|---|---|---|---|---|---|
| | | | CHCF | ICF | 17 |
| | | | LAC | ICF | 17 |
| | | | VSP | ICF | 16 |
| | | | SAC | ICF | 16 |
| | | | RJD | ICF | 16 |
| | | | SAC | ICF | 16 |
| | | | CIW | ICF | 10 |
| | | | CMC | ICF | 15 |
| | | | KVSP | ICF | 10 |
| | | | VSP | ICF | 13 |
| | | | RJD | ICF | 14 |
| | | | KVSP | ICF | 13 |
| | | | CMF | ICF | 10 |
| | | | CMF | ICF | 10 |
| | | | CMF | ICF | 10 |
| | | | CMF | ICF | 9 |
| | | | CMF | ICF | 9 |
| | | | VSP | ICF | 9 |
| | | | CIM | ICF | 9 |
| | | | CMF | ICF | 9 |
| | | | CMF | ICF | 9 |
| | | | SVSP | ICF | 9 |
| | | | CMF | ICF | 8 |
| | | | WSP | ICF | 8 |
| | | | SATF | ICF | 3 |
| | | | COR | ICF | 3 |
| | | | SVSP | ICF | 3 |
| | | | SAC | ICF | 1 |
| | | | CMC | ICF | 1 |
| | | | CMC | ICF | 1 |
| | | | SAC | ICF | 1 |
| | | | CIM | ICF | 1 |
| | | | RJD | ICF | 1 |

# ICF TO ICF REFERRALS AS OF DECEMBER 3, 2020

| CDCR# | LAST NAME-FIRST INITIAL | Ref CDCR Facility | APP/ICF | Total Days since COVID Hold / Complete |
|---|---|---|---|---|
| | | CHCF-PIP | ICF | 213 |
| | | SVSP-PIP | ICF | 195 |
| | | CHCF-PIP | ICF | 189 |
| | | CHCF-PIP | ICF | 182 |
| | | CHCF-PIP | ICF | 181 |
| | | CHCF-PIP | ICF | 167 |
| | | CHCF-PIP | ICF | 167 |
| | | CHCF-PIP | ICF | 161 |
| | | SVSP-PIP | ICF | 161 |
| | | SVSP-PIP | ICF | 154 |
| | | CHCF-PIP | ICF | 153 |
| | | CHCF-PIP | ICF | 149 |
| | | SVSP-PIP | ICF | 141 |
| | | CHCF-PIP | ICF | 136 |
| | | SVSP-PIP | ICF | 135 |
| | | CHCF-PIP | ICF | 129 |
| | | CHCF-PIP | ICF | 129 |
| | | CHCF-PIP | ICF | 127 |
| | | CMF-PIP | ICF | 122 |
| | | SVSP-PIP | ICF | 114 |
| | | CMF-PIP | ICF | 111 |
| | | CMF-PIP | ICF | 85 |
| | | SVSP-PIP | ICF | 84 |
| | | SVSP-PIP | ICF | 59 |
| | | CHCF-PIP | ICF | 57 |
| | | CMF-PIP | ICF | 55 |
| | | SVSP-PIP | ICF | 48 |
| | | SVSP-PIP | ICF | 28 |
| | | CMF-PIP | ICF | 23 |
| | | CMF-PIP | ICF | 20 |
| | | CHCF-PIP | ICF | 16 |
| | | SVSP-PIP | ICF | 16 |
| | | CHCF-PIP | ICF | 14 |
| | | SVSP-PIP | ICF | 13 |
| | | SVSP-PIP | ICF | 10 |
| | | CHCF-PIP | ICF | 3 |

# ACUTE TO ICF  REFERRALS AS OF
# DECEMBER 3, 2020

| CDCR# | LAST NAME-FIRST INITIAL | Ref CDCR Facility | APP/ICF | Total Days since COVID Hold / Complete |
|---|---|---|---|---|
| | | CMF-PIP | ICF | 135 |
| | | CMF-PIP | ICF | 134 |
| | | CMF-PIP | ICF | 105 |
| | | CMF-PIP | ICF | 84 |
| | | CMF-PIP | ICF | 80 |
| | | CMF-PIP | ICF | 79 |
| | | CHCF-PIP | ICF | 79 |
| | | CHCF-PIP | ICF | 77 |
| | | CHCF-PIP | ICF | 76 |
| | | CHCF-PIP | ICF | 76 |
| | | CMF-PIP | ICF | 76 |
| | | CHCF-PIP | ICF | 72 |
| | | CHCF-PIP | ICF | 71 |
| | | CHCF-PIP | ICF | 71 |
| | | CHCF-PIP | ICF | 69 |
| | | CHCF-PIP | ICF | 69 |
| | | CHCF-PIP | ICF | 65 |
| | | CMF-PIP | ICF | 58 |
| | | CHCF-PIP | ICF | 56 |
| | | CHCF-PIP | ICF | 55 |
| | | CHCF-PIP | ICF | 51 |
| | | CHCF-PIP | ICF | 50 |
| | | CHCF-PIP | ICF | 48 |
| | | CMF-PIP | ICF | 44 |
| | | CHCF-PIP | ICF | 34 |
| | | CHCF-PIP | ICF | 34 |
| | | CHCF-PIP | ICF | 30 |
| | | CHCF-PIP | ICF | 30 |
| | | CHCF-PIP | ICF | 30 |
| | | CHCF-PIP | ICF | 29 |
| | | CHCF-PIP | ICF | 14 |
| | | CMF-PIP | ICF | 14 |
| | | CHCF-PIP | ICF | 13 |
| | | CMF-PIP | ICF | 9 |
| | | CMF-PIP | ICF | 3 |
| | | CMF-PIP | ICF | 2 |

# ICF TO ACUTE REFERRALS AS OF DECEMBER 3, 2020

| CDCR# | LAST NAME-FIRST INITIAL | Ref CDCR Facility | APP/ICF | Total Days since COVID Hold / Complete |
|---|---|---|---|---|
| ███ | ██████ | SVSP-PIP | **APP** | **111** |