1  XAVIER BECERRA, State Bar No. 118517
   Attorney General of California
2  MONICA N. ANDERSON, State Bar No. 182970
   Senior Assistant Attorney General
3  ADRIANO HRVATIN, State Bar No. 220909
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   KYLE A. LEWIS, State Bar No. 201041
5  LUCAS HENNES, State Bar No. 278361
   NAMRATA KOTWANI, State Bar No. 308741
6  Deputy Attorneys General
     1300 I Street, Suite 125
7    P.O. Box 944255
     Sacramento, CA 94244-2550
8    Telephone: (916) 210-7318
     Fax: (916) 324-5205
9    E-mail: Elise.Thorn@doj.ca.gov
   *Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
LISA M. POOLEY, State Bar No. 168737
SAMANTHA D. WOLFF, State Bar No. 240280
LAUREL E. O'CONNOR, State Bar No. 305478
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                                    Plaintiffs,<br><br>        v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                                    Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE TO NOVEMBER 19, 2020 ORDER** |

1    In its November 19, 2020 order following the October 23 inpatient transfers evidentiary

2    hearing, the Court asked the parties to address a new question regarding whether it could

3    "presume" harm in the case of delayed transfers, separate from the three narrow questions the

4    Court indicated for months was the focus of the evidentiary hearing, and which in fact were the

5    subject of the hearing.  For the reasons set forth below, the Court cannot and should not presume

6    harm to *Coleman* class members from delayed transfers.  It is not consistent with the required

7    analysis under the Eighth Amendment or the Prison Litigation Reform Act.  In addition, the

8    Court's approval of exceptions to the Program Guide transfer timelines itself demonstrates that

9    constitutional harm cannot be simply presumed due to a patient's delayed transfer.  Such a

10   presumption is also improper because it would deprive Defendants of the ability to demonstrate

11   that it had remedied any harm in individual cases.  In fact, Defendant can demonstrate that

12   patients were not harmed by awaiting transfer to Department of State Hospital inpatient beds in

13   recent months.

**ARGUMENT**

**I.    THE PRESUMPTION OF HARM HAS NO LEGAL SUPPORT.**

16   To evaluate a claim of harm under the Eight Amendment, the Court must find: (1) an

17   "objective component" which shows "the alleged wrongdoing was objectively harmful enough to

18   establish a constitutional violation;" and (2) a "subjective" inquiry into whether prison staff

19   acted "with a sufficiently culpable state of mind."  *Bearchild v. Cobban*, 947 F.3d 1130, 1140

20   (9th Cir. 2020) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)); *see also Farmer v. Brennan*,

21   511 U.S. 825, 837 (1994).  After a full-day evidentiary proceeding on October 23, the evidence is

22   clear—neither Eighth Amendment element is met and there is no basis to presume cognizable

23   harm from delayed transfers.  To the contrary, delayed transfers are justified considering the risks

24   and medical needs applicable to the *Coleman* class, the letter and spirit of the Program Guide,

25   Department of State Hospital (DSH) and California Department of Corrections and

26   Rehabilitation's (CDCR) competing constitutional duties, and the law of this case.

27

28

1

**A.    Objective Harm Must Be Evaluated In The Context Of COVID-19.**

"What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause depends upon the claim at issue." *Hudson*, 503 U.S. at 8.  The objective harm analysis is "therefore contextual and responsive to 'contemporary standards of decency.'" *Id.* (citing *Estelle v. Gamble,* 429 U.S. 97, 103 (1967)).  Accordingly, the potential harm from delay in inpatient transfers must be evaluated in light of current conditions, *i.e.*, considering Court-ordered COVID-19 screening and the systemic and unprecedented public health constraints that Defendants face.  Harm cannot simply be presumed under the Eighth Amendment.  *See, e,g., Helling v. McKinney*, 509 U.S. 25, 36 (1993) (articulating the high quantum of proof required to show proscribed harm as "risk" that society refuses to tolerate and does not expose anyone to it).

There is no doubt that the pandemic presents exigent circumstances where health and public safety may inform the proper scope of constitutional rights. *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905); *see also* Three-Judge Court Order, ECF No. 6574 at 9 (finding that Defendants are confronting an "unprecedented pandemic" that "the entire world was unprepared for").  "Prison officials may be more restrictive than they otherwise may be if a genuine emergency exists, and certain services may be suspended temporarily." *Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2010); *see also Noble v. Adams*, 646 F.3d 1138, 1143-47 (9th Cir. 2011) (a post-riot lockdown of prison that resulted in denial of Eighth Amendment rights was reasonable to furnish safety); *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010) (recognizing that the right to outdoor exercise may be temporarily denied where officials must quickly respond to violence threatening inmate safety).  In "genuine emergencies," prison officials may impose a temporary denial of constitutional rights and are afforded "reasonable leeway" to make these "delicate" decisions. *Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980) (internal citations omitted).

Here, an analysis of harm under the Eight Amendment must take into account this Circuit's "genuine emergency" standard and "contemporary standards of decency"—a pandemic-era evaluation that must consider the health and safety of *all* prisoners, including *Coleman* class members, DSH patients, state health and correctional employees and their families, and conserve healthcare resources within and outside the custodial environment.  (*See* ECF No. 6843-1, at 12-

2

13 ("[A]llowing contagion to be introduced into a DSH facility could have wide-ranging impact on communities throughout the state.").)  Defendants' conduct has been (and continues to be) objectively reasonable under these unprecedented circumstances.  *See Kevin M. A. v. Decker*, 457 F. Supp. 3d 445, 458 (D.N.J. 2020) (enumerating reasonable steps taken for infection control).  In March 2020, DSH acted quickly to prevent infection because it could spread unchecked among its patients who resided in congregate settings.  (*See* ECF No. 6949 at 5.)  At the same time, over 100 *Coleman* patients have safely and timely transferred to DSH inpatient beds under the COVID-19 screening and transfer guidelines developed by DSH and CDCR with input from the Special Master's experts since April 2020.  (*See id.*, at 5-8.)  Through the individualized review process established with the Special Master and his experts, patients will continue to transfer to DSH.  (*Id.*)  Plaintiffs concede that the "onset of the pandemic may have initially excused delayed transfers in the early Spring."  (ECF No. 6948-1 at 4.)  They, however, contend that the pandemic is the "new normal" and allege that the current "indefinite suspension of the Program Guide's timelines" harms *Coleman* patients.  (*Id.*)  The argument fails.

First, there is no "indefinite suspension"; that is a mischaracterization.  The evidence shows clearly that patients continue to be transferred to DSH, some within Program Guide timelines.  Second, the "new normal" Plaintiffs reference has resulted in the unprecedented suspension of assembly and travel, including restrictions applicable to worship services; unprecedented regulation of economic and social activity, including requiring certain types of businesses to close and prohibiting landlords from evicting tenants even in cases of nonpayment of rent; and an unprecedented disruption of medical services for persons in the community as well as persons in prison.[1]  During a "public health crisis," government action is unconstitutional only if it has "no real or substantial relation . . . to [protect public health and safety], or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  *In re Rutledge*, 956 F.3d

---

[1] Inpatient psychiatric units are tightening admission criteria following "a growing amount of media coverage describing frequent and severe outbreaks occurring on psychiatric units, with some outbreaks leading to multiple COVID-19 related deaths."  Ermal Bodiani, et al., *COVID-19 Pandemic: Impact on psychiatric care in the United States*, 289 Psychiatry Res. 113069, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7200362/pdf/main.pdf.

3

1018, 1027 (8th Cir. 2020) (quoting *Jacobsen*).  That is not the case here.  Plaintiffs have not shown that Defendants' policy choices bear *no* relation to safety and health—accordingly, a presumption of harm would be contrary to well-established public health law and the genuine emergency exception in Eighth Amendment jurisprudence.[2]  Third, Plaintiffs' assertion that the COVID-19 pandemic is no longer an emergency and no longer presents unusual circumstance warranting delayed transfers contradicts reality and conflicts with the consensus of public health experts.  *See, e.g., Foster v. Comm'r of Correction*, 484 Mass. 698, 732, 146 N.E.3d 372, 402 (2020) ("At this juncture, it appears that the COVID-19 pandemic will continue to demand extraordinary, and coordinated, efforts by all parties, as well as the courts.")  With a potentially effective vaccine still only on the horizon, and far from ready for distribution to inmates, the current emergency is anything but "normal."  Finally, Defendants have the authority and discretion to be nimble, adjust, and take informed and reasonable steps to address a pandemic like COVID-19, just as quickly as it evolves over time.  If community transmission increased and caused rampant staff infection at either a DSH or CDCR facility, transfers would need to be delayed until appropriate screening were performed and safe passage assured.  The Court should not endorse an inflexible approach to Program Guide timelines risking inmate and staff safety.

> **B.    Harm Arising From Delayed Transfer Is An Individualized Medical Determination Rather Than A Class-Wide Determination.**

A class-wide presumption of harm is incompatible with the clinical balancing of risks that CDCR and DSH's mental health personnel and leaders have been carrying out with the assistance and input of the Special Master's experts to inform their transfer decisions during the COVID-19 pandemic.  (*See* ECF No. 6949, at 5-6.)  This balancing evinces a good-faith effort to comply with Program Guide timelines for inpatient transfers, as modified by the temporary addition of COVID-19 screening.[3]  Plaintiffs concede an individualized analysis of risk is appropriate.  (ECF

---

[2] A presumption of harm would also violate the well-established tradition of judicial deference to the executive during public health emergencies.  "Deference . . . is due to prison authorities to determine which additional measures must be taken to avoid catastrophic results."  Three-Judge Court, ECF No. 6574, at 13 (citing *Turner v. Safley*, 482 U.S. 78, 84–85 (1987)).

[3] Defendants have previously established that when patients are transferred to DSH beyond the Program Guide timeframes due to quarantine and testing protocols contained in the

4

No. 6948-1, at 9, 10.)  Such an individualized determination of risk is necessarily fluid and changes with circumstances.  Generally, clinicians are required to balance the benefits and risks before providing a specific treatment to individual patients.  Here, Defendants were required to weigh the increased infection risk caused by transfer against the benefits of treatment at DSH.  (10/23/20 Hrg. Tr. at 87:5 – 88:3, 111:15-18, 161:21 – 162:7.)  When pandemic crisis care standards apply, this analysis is extended further to allow clinicians to balance the obligation to save the greatest possible number of lives against the need to care for each patient.  (Kheriaty Decl. ¶ 9.)

Plaintiffs impugn the balancing of harms that informs Defendants' decision to delay inpatient transfers, but their position is not supported by the record.  Plaintiffs want patients to transfer within a rigid and uncompromising timeline, even when that would pose catastrophic individual and collective risk to class members and other DSH patients.  The California Department of Public Health, federal, and professional guidance regarding crisis care standards supports the finding that the harms, both individual and collective, of immediate transfer clearly outweigh the harms of a temporary delay in transfer.  (Kheriaty Decl. ¶ 10.)  Transferring COVID-19 positive patients to DSH risks facilitating the spread of COVID-19 throughout a congregate setting that treats a vulnerable population.  (*Id.* at ¶ 13.)  Even a single transferred asymptomatic COVID-19 patient would introduce a highly virulent disease with a high mortality rate to an extraordinarily vulnerable and confined patient population and into the community, threatening to consume scarce medical resources, overburden professionals, and upend the state's medical infrastructure.  (*Id.* at ¶ 19.)  This elevated risk of systemic compromise is not acceptable when compared to the relatively modest risk to an individual of having his or her transfer delayed for safety reasons.  (*Id.* at ¶ 12.)  Further, transferring untested patients, as Plaintiffs propose, exposes them to potential infection, and easily avoidable morbidity and mortality.  (*Id.* at ¶ 21.)

At the start of the pandemic, when Defendants (like the rest of the world) were trying to understand how best to curtail the spread of the insidious coronavirus, all but the most pressing

COVID-19 guidelines, such deviations are permitted under the Program Guide under the medical and unusual circumstances exceptions.  (ECF No. 6949, at 8-9.)

1   transfers to DSH were suspended to mitigate individual and collective harm.[4]  Subsequently, with

2   the benefit of greater clinical knowledge and guidance about the nature of this disease, CDCR and

3   DSH developed protocols to expedite transfers and prioritize those patients from closed

4   institutions who could be safely transferred without getting infected or causing infections at

5   CDCR or DSH.  (ECF No. 6949, at 13.)  This approach was reasonable and responsible.  In any

6   event, CDCR patients awaiting transfer still receive adequate psychiatric evaluation and treatment

7   (*see* ECF No. 6949, at 14) and at least a subset of those patients would be clinically inappropriate

8   candidates for transfer, which establishes that any generalized presumption of class-wide harm, as

9   the Court suggests, is improper.  (Mehta Decl. ¶ 3.)  Rather than presuming generalized harm to

10  the entire class, which would force Defendants to take actions that contravene public health

11  guidance, the Court should allow Defendants to continue to conduct case-by-case patient reviews

12  with the input of the Special Master's experts to make responsible transfer decisions to keep

13  patients and staff safe.

14          **C.       There Is No Evidence of Culpable Intent.**

15          Even if the Court presumes an objective harm arising from delayed inpatient transfers,

16  Eighth Amendment liability only attaches if Defendants acted with a subjectively culpable state

17  of mind.  Prison officials are not liable if they responded reasonably to a known risk, even if the

18  harm ultimately was not averted.  *Farmer*, 511 U.S. at 844.  Here, Defendants' conduct

19  demonstrates a recognition that CDCR and DSH faced two competing constitutional duties and

20  sought to act diligently and reasonably to keep inmate and staff safe—the opposite of a culpable

21  state of mind under the Eighth Amendment.  On the one hand, CDCR and DSH were obligated to

22  act with utmost caution to keep their patients in congregate living settings safe during the

23  pandemic and mitigate COVID-19 transmission.  *See Farmer*, 511 U.S. at 847; *Helling*, 509 U.S.

24  _____

25          [4] Initially, DSH suspended admissions and focused on developing an emergency plan and
    infection control protocols to safely treat patients while securing protective equipment and testing
    resources.  (ECF No. 6843-1, at 9.)  Subsequently, DSH took steps to allow transfers, on a case-
26  by-case basis, considering the risks for each patient.  (ECF No. 6949, at 12-13.)  CDCR
    developed its movement matrix based on guidance from the *Plata* Receiver, the Centers for
27  Disease Control and Prevention, and the California Department of Public Health (CDPH)—which
    increased patient transfers to DSH in conjunction with updated guidelines that required case-by-
28  case assessments of COVID risk.  (*Id.* at 13.)

1   at 33; *DeGidio v. Pung*, 920 F.2d 525, 533 (8th Cir. 1990) (finding that prison officials were

2   deliberately indifferent to inmates' serious medical needs in failing to prevent and control prison's

3   tuberculosis epidemic); *Dunn v. White*, 880 F.2d 1188, 1195 (10th Cir. 1989) (observing that a

4   failure to protect inmates from HIV-infection may violate Eighth Amendment); *Smith v. Sullivan*,

5   553 F.2d 373, 380 (5th Cir. 1977) (housing scabies- and gonorrhea-infected inmates with healthy

6   prisoners violates Eighth Amendment).  On the other hand, Defendants had to adhere to *Coleman*

7   Program Guide transfer timelines, subject to limited Court-approved exceptions.  CDCR and

8   DSH swiftly moved to develop transfer protocols that they continuously refined in collaboration

9   with the Special Master's experts.  As CDCR and DSH were "act[ing] in areas fraught with

10  medical and scientific uncertainties," this Court must afford "especially broad" latitude rather

11  than presuming harm signaling an Eighth Amendment violation.  *See S. Bay United Pentecostal*

12  *Church v. Newsom*, No. 19A1044, 140 S.Ct. 1613, 1614 (2020) (Roberts, C.J., concurring).

13  **II.    THE PRESUMPTION OF HARM FROM DELAYS IN THE INPATIENT TRANSFER**
        **TIMELINES IS INCONSISTENT WITH THE PROGRAM GUIDE ADDENDA SETTING**
14      **FORTH EXCEPTIONS TO THE TIMELINES BASED ON JUSTIFIABLE DELAYS.**

15          In December 2017, the Court approved an addendum to the Program Guide that recognized

16  exceptions to the requirement to transfer patients to the intermediate level of care within thirty

17  days from the date of referral.  (ECF No. 5750.)  The Court ordered the parties to develop a

18  policy that explicitly provided for departures from the Program Guide.  (ECF No. 5610.)  After

19  months of negotiation, the parties and the Special Master agreed on exceptions under the

20  Addendum to 12.11.2101 (A) PIP Policy and Procedure Referral and Admission.  (ECF No.

21  5744.)  Each month for over three years, Defendants have been reporting patients transfer outside

22  of the required thirty-day timeline to the Court.[5]  The record is devoid of any evidence or

23  acknowledgment in the policy or in the Court's orders approving and ordering the Addendum that

24  patients who were transferred under an exception were presumed to have suffered harm as a result

25  of the delayed transfer.

26

27          [5] *See* ECF Nos. 5636, 5647, 5664, 5684, 5715, 5731, 5751, 5757, 5789, 5804, 5819, 5827,
    5837, 5856, 5882, 5923, 5960, 6004, 6046, 6072, 6090, 6110, 6128, 6152, 6198, 6222, 6245,
28  6286, 6342, 6394, 6423, 6446, 6470, 6505, 6611, 6670, 6719, 6762, 6823, 6867, 6912, and 6956.

The Program Guide Addendum implicitly recognizes that conditions or situations exist that outweigh the need for complying with the Program Guide timelines for placing a patient in an inpatient bed.  A presumption of constitutional harm whenever a patient is not transferred to an intermediate care program within thirty days from referral cannot be reconciled with the April 19, 2017 order that recognized the need for reasonable delays in the transfer timelines.  The parties and the Special Master worked for months to identify those reasonable delays, and determined that acceptable reasons for delaying transfer to an inpatient bed include when a patient refuses to be transferred to inpatient care, the placement of a patient at a prison to attend court proceedings and the retention of a patient at a prison to obtain or complete medical treatment that the patient cannot receive at the inpatient program.  (ECF No. 5744 at 5-6.)  Each exception allows for the suspension of the transfer timelines pending resolution of the exception.  (*Id.*)  Other than in the circumstance of a patient refusing inpatient care, there are no outer limits placed on the delays allowed under the exceptions.  Given the absence of a presumption of harm in the case of court-sanctioned delays under the Addendum, there is similarly no justification to presume harm from delays attributed to an unprecedented tragedy such as COVID-19 pandemic.  All of the same balancing of risks and other safeguards under the Addendum are applied to the delays attributed to the pandemic, and have been exercised by Defendants in evaluating inpatient transfers to DSH.

Indeed, the Court found that exceptions applied to the initial suspension of transfers to DSH inpatient facilities in March 2020, and did not ascribe a harm to that action that occurred over eight months ago now.  (ECF No. 6639 at 11.)  Defendants have shown that there is no clearer circumstance than a world-wide pandemic to justify the application of the unusual circumstance exception to the inpatient transfer timelines.  Any contrary position flouts the public health directives guiding Defendants' policies designed to safeguard the *Coleman* class from COVID-19 exposure and disregards the harm posed to class members by catching COVID-19 and suffering serious and potentially fatal symptoms.

1

**III.    THE COURT CANNOT PRESUME HARM BECAUSE DEFENDANTS MAY USE OTHER MEANS TO ADDRESS ANY NON-COMPLIANCE WITH PROGRAM GUIDE TIMELINES.**

2

3          Even if this Court determines that delaying transfers beyond Program Guide timelines

4    because of an unprecedented and ongoing global pandemic is presumptively a constitutional

5    violation, the Court still cannot presume that class members are harmed by these delays.  Because

6    Defendants have alleviated any harm, or abated it entirely, through other means, the Court must

7    evaluate, based on particularized evidence, whether Defendants' efforts to abate harm through

8    other ways were successful.  *See Glover v. Johnson*, 138 F.3d 229, 243 (6th Cir. 1998) (holding

9    that defendants must be allowed to demonstrate that they have remedied underlying constitutional

10   violations even without compliance with remedial orders).  Presuming harm *solely* from

11   Defendants' failure to comply with Program Guide timelines undermines this foundational

12   principle and is inconsistent with the PLRA.  *See Hadix v. Johnson*, 228 F.3d 662, 670-71 (6th

13   Cir. 2000) ("The fundamental problem with the district court's order is that it focused not on the

14   inquiry required by the [Prison Litigation Reform Act], but rather on the question whether the

15   consent decree had been substantially complied with.").  The October 23 hearing did not call for

16   this evidence, as the Court's three narrow questions made no mention of alleged patient harm.

17   The Court has now asked an entirely new question—after the close of evidence—concerning

18   whether harm should be presumed, inviting new evidence to which Defendants have objected.[6]

19   And it's exclusively to Defendants' prejudice.

20         The questions asked at the hearing and in the recent minute order are fundamentally

21   different.  To the extent that Plaintiffs attempt to yet again submit evidence from Dr. Stewart

22   demonstrating alleged harm to patients from delayed transfers, and this evidence is admitted by

23   the Court, Defendants submit expert and clinician declarations showing that Dr. Stewart's

24   opinions are unsupported and overgeneralized, that Defendants acted ethically in weighing the

25   _____

26         [6] Plaintiffs attempted to introduce evidence of alleged harm from delayed inpatient transfers through Dr. Pablo Stewart, but his opinions and testimony were properly excluded. (10/23/20 Hrg. Tr. at 270:9 – 271:11.)  After evidence closed, Plaintiffs improperly submitted a voluminous declaration from Dr. Stewart containing his anticipated testimony, to which Defendants objected.  (ECF No. 6948-1.)  None of Dr. Stewart's testimony should be considered in evaluating the questions posed at the October 23 inpatient transfers hearing.

27

28

9

1   harms of transferring patients to DSH facilities during a pandemic, and that patients did not suffer

2   harm while awaiting transfer to DSH inpatient beds.  (*See*, *e.g*., Scott Decl. ¶¶ 33-34; Meyer Decl.

3   ¶ 15; Kheriaty Decl. ¶¶ 16-21; Stahl Decl. ¶¶ 11, 29-30; Mehta Decl. ¶¶ 3-4, 16-17.)  To be clear,

4   Defendants restate all prior objections to late-filed evidence in conjunction with the hearing.

5         Dr. Stewart maintains that the 55 patients previously awaiting transfer to DSH were

6   suffering potential irreparable harm by this delay of transfer.  (Kheriaty Decl. ¶ 14.)  He claims

7   that some of these patients are suffering from major depression and psychotic disorders, which

8   require inpatient treatment.  (*Id.*)  This analysis is incorrect—the medical records show that these

9   patients can and are being treated by CDCR psychiatrists and psychologists adept at treating

10   depression, psychotic disorders, and other mental illnesses with safe and effective medication and

11   psychotherapeutic interventions.  (*Id.* at ¶ 15; s*ee* Meyer Decl. ¶ 10 (finding that Patient 10

12   remained psychiatrically stable awaiting transfer, was appropriately prescribed clozapine,

13   received biweekly hematological monitoring and treatment for constipation and drooling that may

14   occur with clozapine, and subsequently, was eager to return to his dorm as an EOP); Scott Decl. ¶

15   33 (opining that a transfer to DSH for diagnostic clarification was not indicated as asserted by Dr.

16   Stewart, when such a clarification could be properly provided at CDCR and asserting that a

17   finding of harm awaiting transfer was "grossly misleading" as contemporaneous records showed

18   that Patient 3's symptoms of depression, suicidality, auditory hallucinations, and paranoia

19   improved to the extent he was "active and engagement" in attending group therapy); Stahl Decl.

20   ¶¶ 24-27 (finding that Dr. Stewart's reading of the record missed that Patient 38 had a history of

21   feigning exaggerated psychiatric symptoms to obtain a transfer to his preferred setting at DSH

22   and because the record did not support serious illness, a finding of cognizable harm was not

23   sustainable).)  Accordingly, a presumption of harm from delayed inpatient transfers is

24   unwarranted and unsupported by clinical records.

25                        **CONCLUSION**

26         The Court's request for supplemental briefing raises, for the first time, a question of

27   presumed harm from delayed transfers.  However, the Court cannot and should not presume such

28   harm where patients are undeniably receiving care while awaiting for transfer.

1    Dated:  December 7, 2020                          Respectfully Submitted,

2                                                       XAVIER BECERRA
                                                        Attorney General of California
3                                                       ADRIANO HRVATIN
                                                        Supervising Deputy Attorney General
4
                                                        /s/ ELISE OWENS THORN
5                                                       ELISE OWENS THORN
                                                        Deputy Attorney General
6                                                       Attorneys for Defendants

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28