1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   MONICA N. ANDERSON, State Bar No. 182970
    Senior Assistant Attorney General
3   ADRIANO HRVATIN, State Bar No. 220909
    Supervising Deputy Attorney General
4   ELISE OWENS THORN, State Bar No. 145931
    NAMRATA KOTWANI, State Bar No. 308741
5   KYLE A. LEWIS, State Bar No. 201041
    LUCAS HENNES, State Bar No. 278361
6   Deputy Attorneys General
      1300 I Street, Suite 125
7     P.O. Box 944255
      Sacramento, CA 94244-2550
8     Telephone: (916) 210-7318
      Fax: (916) 324-5205
9     E-mail: Elise.Thorn@doj.ca.gov
    Attorneys for Defendants

    PAUL B. MELLO, State Bar No. 179755
    LISA M. POOLEY, State Bar No. 168737
    SAMANTHA D. WOLFF, State Bar No. 240280
    LAUREL E. O'CONNOR, State Bar No. 305478
    HANSON BRIDGETT LLP
      1676 N. California Boulevard, Suite 620
      Walnut Creek, CA 94596
      Telephone: (925) 746-8460
      Fax: (925) 746-8490
      E-mail: PMello@hansonbridgett.com
    Attorneys for Defendants

    ROMAN M. SILBERFELD, State Bar No. 62783
    GLENN A. DANAS, State Bar No. 270317
    ROBINS KAPLAN LLP
      2049 Century Park East, Suite 3400
      Los Angeles, CA 90067-3208
      Telephone: (310) 552-0130
      Fax: (310) 229-5800
      E-mail: RSilberfeld@RobinsKaplan.com
    Special Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                                    Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>                                    Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF AARON KHERIATY, M.D., IN SUPPORT OF DEFENDANTS' RESPONSE TO NOVEMBER 19, 2020 ORDER** |

I, Aaron Kheriaty, M.D., declare:

1.   I am over 18 years of age and am competent to testify.  I submit this declaration in support of Defendants' response to the Court's November 19, 2020 order.  I have personal knowledge of the facts stated in this declaration and, if called to testify to those facts, I could and would do so competently.

1

2.     I received my M.D. degree from Georgetown University School of Medicine in 2003. I completed my residency training in psychiatry at the University of California, Irvine in 2007. Since 2009, I have been a board-certified psychiatrist.  I am currently a Health Sciences Clinical Professor of Psychiatry and Human Behavior at University of California Irvine (UCI) School of Medicine.  I have served as Director of Medical Education in the UCI Department of Psychiatry since 2007.  I have also served as chairman of the Medical Ethics Committee and Director of the Ethics Consultation Service at UCI Health since 2008, as well as Director of the Medical Ethics Program at UCI School of Medicine since 2013.  I direct the required course in ethics for medical students at UCI.  I also serve as chair of the statewide Bioethics Committee at the California Department of State Hospitals (DSH).

3.     In my capacity as Ethics Committee Chair and director of the Ethics Consult Service at UCI Health, and chair of the statewide Bioethics Committee at DSH, I have conducted thousands of ethics consultations on complex clinical cases.  In this capacity, I assist treatment providers to resolve some of DSH's most ethically complicated and difficult cases and clinical decisions.  Each DSH hospital has its own local bioethics committee; however, cases with particularly complex ethical issues, or cases that have implications for systemwide DSH policies, are referred to the statewide committee that I chair for review, recommendations, and resolution.

4.     I also have experience and expertise developing crisis standards of care and policies for pandemic triage and allocation of scarce resources during COVID-19 at the statewide and regional levels, including serving as a member of committees and task forces to develop these policies at the University of California Office of the President, the California Department of Public Health, the Orange County Department of Public Health, and the University of California Irvine.  This experience is relevant to my expertise regarding the professional judgments and opinions provided in this declaration.  As a medical ethicist, I also rely on knowledge of ethical guidelines, landmark court cases, legal standards, and familiarity with the relevant research literature.

5.     In my clinical work as a psychiatrist, I have evaluated and treated thousands of patients with severe, persistent mental illness, including patients hospitalized in DSH settings

2

1    during my residency training.  This clinical experience, as well as familiarity with the relevant

2    research literature, informs my opinions in this declaration.  For a complete listing of my

3    professional background, experience, research, responsibilities, and publications, please see my

4    Curriculum Vitae, which is attached to this declaration as Exhibit A.

5         6.   I have been asked by DSH to offer my professional opinion regarding the ethical

6    justifiability of the steps that DSH has taken to protect their patients from COVID-19 infection.

7    My opinions are based upon my medical education, training, research, and over 16 years of

8    clinical experience as a psychiatrist and bioethicist, as well as my familiarity with the medical and

9    bioethics literature.  These opinions are my own and do not represent those of the institutions with

10   which I am affiliated.  In preparing this declaration I have reviewed the transcript of the hearing

11   before District Judge Kimberly J. Mueller of October 23, 2020.

12        7.   Due to widespread community transmission of COVID-19, it is clear that we have

13   moved from the containment phase to the mitigation phase of responding to this unprecedented

14   pandemic.  Public health emergencies such as the current COVID-19 pandemic require difficult

15   decisions in situations of time pressure, limited resources, clinician strain, and broader social

16   upheaval.  It is vital that these decisions be guided by widely accepted and publicly endorsed

17   ethical principles.  One of the most familiar frameworks for biomedical ethics centers around a

18   few key principles.[1]  These principles, as well as some of their most important implications for

19   public health crises, include:

20        •   Beneficence and Non-Maleficence.[2]  There is a duty to promote health and avoid

21            harm.  This general principle has several important corollaries:

22   _____

     [1] For a more detailed description of these principles and their application in the context of
23   pandemics and other public health crises, cf. Dicker R., Kheriaty A., et al. *Allocation of Scarce
     Critical Resources under Crisis Standards of Care*, University of California Critical Care
     Bioethics Working Group, April 16, 2020.
24        [2] Veterans Health Administration (VHA), "Meeting the Challenge of Pandemic Influenza:
     Ethical Guidance for Leaders and Health Care Professionals in the Veterans Health
25   Administration." The Pandemic Influenza Ethics Initiative Work Group of The Veterans Health
     Administration's National Center For Ethics In Health Care, July 2010.
26        Centers for Disease Control and Prevention, "Ethical Considerations for Decision Making
     Regarding Allocation of Mechanical Ventilators during a Severe Influenza Pandemic or Other
27   Public Health Emergency." Ventilator Document Workgroup, Ethics Subcommittee of the
     Advisory Committee to the Director, Centers for Disease Control and Prevention, July 1, 2011
28

- o Duty to Care.[3]  Healthcare workers have a duty to care for patients in their charge, and patients should not be abandoned.

- o Duty to Promote the Public Good.  There is also a broader duty to promote the common good of the population as a whole, which includes the duty to save the greatest number of lives possible during a pandemic.[4]

- o Duty to Steward Scarce Resources.[5]  There is a duty to carefully steward scarce resources, such as isolation beds, in order to *save as many lives as possible* and *protect the health of the population as a whole*, including vulnerable populations such as those housed in congregate living settings.

- Respect for Persons.[6]  There is a duty to recognize and respect the inherent and equal dignity and worth of each human being.  This general principle implies, among other things:

- o Respect for Individual Rights and Freedoms.  Individuals have inherent rights and freedoms that must be respected; however, it is also widely accepted that in pandemic situations it might be necessary to curtail some individual liberties during a public health crisis.[7]  This provides the ethical justification for widely utilized measures such as stay-at-home orders, for example.

California Department of Public Health, "California Department of Public Health. Standards and Guidelines for Healthcare Surge during Emergencies: Foundational Knowledge." California Department of Public Health, undated.
[3] Institute of Medicine, "Guidance for Establishing Crisis Standards of Care for Use in Disaster Situations: A Letter Report (2009)." Washington, DC: The National Academies Press, 2009
Institute of Medicine, "Crisis Standards of Care: A Systems Framework for Catastrophic Disaster Response: Volume 1: Introduction and CSC Framework (2012)." Washington, DC: The National Academies Press, 2012
[4] Cf. footnote 2, CDC, CDPH.
[5] Institute of Medicine, "Guidance for Establishing Crisis Standards of Care for Use in Disaster Situations: A Letter Report (2009)." Washington, DC: The National Academies Press, 2009
New York State Task Force on Life and the Law, New York State
[6] Centers for Disease Control and Prevention, "Ethical Guidelines in Pandemic Influenza." Kathy Kinlaw and Robert Levine for the Ethics Subcommittee of the Advisory Committee to the Director, Centers for Disease Control and Prevention, February 15, 2007
[7] California Department of Public Health, "California Department of Public Health. Standards and Guidelines for Healthcare Surge during Emergencies: Foundational Knowledge." California Department of Public Health, undated.

4

- <u>Justice</u>.  There is a duty to enact only those policies that are just. Justice has many aspects:

  o <u>Proportionality</u>.[8]  Crisis planning policies and restrictions must be appropriately limited in time and scale according to the scope and severity of the crisis.

  o <u>Protection for Populations with Special Needs or Vulnerabilities</u>.  Plans and decisions should take into account the special needs or vulnerabilities of certain vulnerable populations.[9]

  o <u>Duty to Collect Information</u>.[10] There is a duty to collect the full range of relevant facts before making decisions—such as the decision to transfer care to another facility—and to revisit decisions as new information emerges.

8.    In a pandemic situation, these principles may sometimes be in tension. For instance, the obligation to provide a needed resource to the extremely ill may conflict with the need to promote the common good by giving those same resources to people who are more likely to survive.  In such situations it is widely accepted that medical institutions must shift from their traditional focus on individual patients to a focus on populations, the common good, and the protection of civil society—that is, a shift to crisis standards of care.[11]  As the National Academy

---

[8] Institute of Medicine, "Guidance for Establishing Crisis Standards of Care for Use in Disaster Situations: A Letter Report (2009)." Washington, DC: The National Academies Press, 2009

[9] California Department of Public Health, "California Department of Public Health Standards and Guidelines for Healthcare Surge during Emergencies: Foundational Knowledge." California Department of Public Health, undated.

[10] Centers for Disease Control and Prevention, "Ethical Guidelines in Pandemic Influenza." Kathy Kinlaw and Robert Levine for the Ethics Subcommittee of the Advisory Committee to the Director, Centers for Disease Control and Prevention, February 15, 2007
Lee Daugherty-Biddison et al, "Maryland Framework for the Allocation of Scarce Life-sustaining Medical Resources in a Catastrophic Public Health Emergency," August 24, 2017

[11] Institute of Medicine, "Guidance for Establishing Crisis Standards of Care for Use in Disaster Situations: A Letter Report (2009)." Washington, DC: The National Academies Press, 2009.
National Academies of Sciences, Engineering, Medicine, "Rapid Expert Consultation," Brett Giroir and Robert Kadlec, March 28, 2020
California Department of Public Health, "California Department of Public Health Standards and Guidelines for Healthcare Surge during Emergencies: Foundational Knowledge." California Department of Public Health, undated.

5

1  of Medicine (formerly, Institute of Medicine) wrote, "Ultimately, this shift represents not a

2  rejection of ethical principles but their embodiment."[12]

3       9.   There is no single formula for resolving every ethical conflict during a pandemic; but

4  following the guidelines of various federal and state agencies as well as the ethical principles

5  applicable in a pandemic, institutions should generally balance the competing needs in this way:

6  seek to achieve the greatest medical benefit for the greatest number of patients, in ways that show

7  proper respect for the intrinsic worth of each person, the moral equality of all people, and the

8  requirements of justice.

9       10.  The State of California's Health and Human Services Agency echoes this principle in

10 the Crisis Standards of Care published by the California Department of Public Health (CDPH).

11 During a pandemic situation such as the one we currently face, "The goal of health care becomes

12 population-based care rather than individual care.  Population based care means that resources are

13 used to do the greatest good for the greatest number rather than providing all resources needed to

14 treat each individual.  Physicians will need to balance the obligation to save the greatest possible

15 number of lives against the need to care for each individual."[13]  This requires that ethical

16 judgments take into account the needs of entire populations and not just the desires or preferences

17 of individual patients.  This applies equally to mental health patients as well as medical patients.

18       11.  DSH patients are among California's very vulnerable populations during this

19 pandemic for the following reasons.  Due to the high rates of schizophrenia and other severe

20 mental illnesses, DSH patients have much higher rates of morbidity and mortality than the general

21 population, *including higher rates of many of the co-occurring medical conditions that increase*

22 *risk of mortality with COVID-19 infection*: it has been repeatedly documented in the research

23 literature that patients with schizophrenia have higher rates of diabetes, hypertension, and obesity

24 than the general population.[14]  Also, DSH has extremely large and vulnerable congregate living

25       [12] *Ibid*.
       [13] California Department of Public Health COVID-19 Healthcare System Mitigation
26 Playbook, March 2020. Cf. also California Department of Public Health Standards and Guidelines
   for Healthcare Surge During Emergencies.
27       [14] Liao, Chun-Hui, et al. "Schizophrenia patients at higher risk of diabetes, hypertension
   and hyperlipidemia: a population-based study." *Schizophrenia research* 126.1-3 (2011): 110-116.
28

6

environments.  Social distancing is extremely challenging for this patient population in this setting: DSH hospitals cannot guarantee the minimum of 6 feet distancing for patients and staff due to the crowded, congregate living situation.  The vast majority of DSH beds are in dorm style rooms, often with five beds to a room.  Hygiene habits such as handwashing and cough covering can be challenging for this patient population, given the severity of their mental illness and their consequent cognitive impairments.  DSH has very high bed occupancy rates, therefore they have very limited quarantine/isolation space for those who do become infected with the novel coronavirus.  For these reasons, DSH patients constitute a very vulnerable population in terms of higher morbidity and mortality in the event of a COVID-19 outbreak.

12.  This brings me to the question at the crux of the Court's November 19 order, namely, can or should the Court presume cognizable harm to class members whose transfer to inpatient care is delayed beyond the typical timelines and for reasons outside the Court-approved exceptions to those timelines?  In my opinion, under crisis standards of care, such as the ones currently in effect statewide during the COVID-19 pandemic, the answer to this question is no. The harms, both individual and collective, of immediate transfer clearly outweigh the harms of a temporary delay of transfer.  The Court should therefore not presume cognizable harm to those whose transfer to DSH may be delayed during the pandemic.

13.  During the COVID-19 pandemic, premature transfer from CDCR to DSH of COVID-19 positive patients or patients awaiting COVID-19 testing risks unnecessarily exposing to infection the untested patients who are transferred (by exposing them to populations in both facilities), as well as risks of spreading infection to the other patients in the DSH system.  These elevated risks are present without commensurate medical or psychiatric benefit to the individual who is transferred.  Thus, the balance of benefits and harms clearly benefits delaying these transfers during the pandemic.

Auquier, Pascal, et al. "Mortality in schizophrenia." *Pharmacoepidemiology and drug safety* 16.12 (2007): 1308-1312.
Sugai, Takuro, et al. "High prevalence of obesity, hypertension, hyperlipidemia, and diabetes mellitus in Japanese outpatients with schizophrenia: a nationwide survey." *PLoS one* 11.11 (2016): e0166429.
Depp, Colin A., et al. "Association of obesity and treated hypertension and diabetes with cognitive ability in bipolar disorder and schizophrenia." *Bipolar disorders* 16.4 (2014): 422-431.

7

14.  I am aware that in his testimony at the October 23 evidentiary hearing, Dr. Pablo Stewart, an expert witness for Plaintiffs, maintained that the 55 patients who were awaiting transfer to DSH are suffering potential irreparable harm by this delay of transfer (cf. page 258 of trial transcript).  After searching the trial transcript, I could not find evidence to support this claim, and furthermore, the evidence presented by Dr. Stewart lacks merit.  He mentions that some of these patients are suffering from major depression, others from psychotic disorders, and that they require inpatient treatment for these conditions—treatment that, his argument suggests, they cannot receive at CDCR.  But it is my understanding from the trial transcript that CDCR employs a spectrum of mental health workers, including psychiatrists and psychologists, to treat depression, psychotic disorders, and other mental illnesses within that system.

15.  There are effective medication and psychotherapeutic interventions for both of these conditions that can be provided for patients in CDCR facilities.  Inpatient hospitalization allows for close monitoring if the individual is deemed suicidal or otherwise dangerous as a result of a mental illness; but according to the trial transcript this monitoring is likewise available in the CDCR system.  Indeed, individuals awaiting transfer to DSH from CDCR are already in the CDCR mental health delivery system and are receiving care. So, Dr. Stewart's conclusion that these 55 patients must be transferred without delay to DSH to avoid suffering irreparable harm is meritless and lacks foundation.

16.  For these reasons, *I concur with DSH leadership that extraordinary measures to limit the introduction of the virus into the DSH facilities is imperative and ethically justifiable*.  Indeed, it would be unethical not to institute such extraordinary measures, as this would place a very vulnerable population at unnecessary risk of potentially lethal infections.  These measures taken by DSH include, among others:

- Restricting almost all admissions, except for a small group of parolees from prison (with quarantining these admissions for 14 days per CDC guidance).

- Restricting all visitation, except in special circumstances.

- Screening all staff using a COVID-19 screening tool and temperature check.

- Cancelling all centralized treatment and movement and sheltering units in place.

- Piloting staff reduction and telehealth protocols to reduce crowding and preserve health care personnel.

- Instituting a mandatory staff masking protocol once sufficient PPE becomes available (most staff have been masking for over two weeks).

- Identifying and preserving spaces for isolation and quarantine where this is feasible.

- Restricting almost all discharges.

- Restricting new admissions.

17.  In their recent published guidance specifically for this pandemic, CDPH indicated, "Patients with confirmed or suspected COVID-19 should not be sent to a long-term care facility via hospital discharge, inter-facility transfer, or readmission after hospitalization without first consulting the local public health department.  This will prevent the introduction of COVID-19 into a highly vulnerable population with underlying health conditions in a congregate setting." DSH hospitals face an analogous situation regarding transfers from CDCR.  Thus, per the mutually agreed upon arrangement between DSH and CDCR, transfers from CDCR to DSH are being carefully vetted with infection prevention protocols until the pandemic is under control in California.  This is entirely consistent with this CDPH guidance regarding discharge to long-term care facilities or inter-facility transfer.

18.  This is an entirely sensible and ethically justified policy during the pandemic, since patients continue to have psychiatric care available to them at CDCR while awaiting transfer to DSH.  According to CDPH, community transmission from mild or asymptomatic persons is a reality in California and poses a risk to our populations: "The reality is that [COVID-19] infection already exists in many California communities but has been undetected because the vast majority of cases have a mild spectrum of illness…. The movement to mitigation also signals the need to further engage the healthcare delivery system to prepare for a rapidly rising number of cases."[15] Moreover, "Once the virus has demonstrated the ability to spread through a community, the

---

[15] California Department of Public Health COVID-19 Healthcare System Mitigation Playbook, March 2020.

9

1    health care delivery system then must shift its response activities to both contain the virus and

2    prepare for mitigation of large-scale healthcare system impacts.  It is this preparation to preserve

3    space capacity, supply chain, and the staffing workforce that determines the health care facility's

4    ability to handle the incoming healthcare needs during mitigation."

5        19.  This is precisely what DSH is doing, including by limiting transfers from CDCR

6    during the current outbreak of COVID.  *All it takes is one transferred asymptomatic COVID*

7    *patient to introduce a highly virulent infection with a high mortality rate to an extraordinarily*

8    *vulnerable and confined patient population.*  CDPH encourages just the kind of creative thinking

9    I see from DSH and CDCR to mitigate the impact of this virus: "Sharing real-time creative

10   solutions during this rapidly evolving pandemic will need to happen quickly among key leaders

11   of large health care systems and public health."[16]

12       20.  Indeed, as CDPH explains, during this pandemic, the healthcare system's typical

13   policies and protocols—including even state and federal statues—will need to be suspended in

14   order to serve the aim of saving as many lives as possible and protecting vulnerable populations

15   from infection: "The State of California recognizes that state and federal statutes will need to be

16   waived when health care facility needs go beyond regulatory changes and require higher level

17   modifications to existing laws governing care delivery such as scope of practice, *movement*

18   *between systems of care, transfer of patients*, EMTALA [Emergency Medical Treatment and

19   Labor Act], medical licensing of retired inactive or outside of California clinicians, use of

20   supplies and equipment beyond manufacturer's recommended use, Medicaid or Medicare

21   requirements, and liability and immunity protections, among others."  Crisis standards of care

22   during a pandemic call for flexibility and include temporary suspension of measures that are

23   routine during non-pandemic times.

24       21.  Transferring patients from CDCR to DSH without current infection control vetting

25   protocols while COVID-19 is still an active threat would be premature, unconscionable, and

26   unethical.  It would place every patient being transferred at unnecessary risk (by exposing him to

27   an entirely new population) and would likewise place all the patients in the DSH system at

28       ───────────────
         [16] Ibid.

10

1  unnecessary risk (by exposing them to potential carriers of the virus).  This could lead to

2  unnecessary and preventable morbidity and mortality.  And to the extent that psychiatric services

3  are available at both at DSH and CDCR, patients awaiting transfer during the pandemic will be

4  afforded access to psychiatric care.

5       22.  The kinds of Crisis Standards of Care for COVID-19 endorsed by CDPH are likewise

6  endorsed by federal healthcare systems and authorities, including the Veteran's Administration,[17]

7  the National Academy of Medicine (formerly Institute of Medicine),[18] which was commissioned

8  by the CDC[19] in 2009 to devise crisis standards of care for pandemics and other disaster

9  situations.  My opinions here are therefore supported by guidelines published by state and federal

10  agencies, as well as the published bioethics research literature on healthcare system ethics during

11  pandemics.

12       I declare under penalty of perjury under the laws of the United States of America that the

13  foregoing is true and correct.

14       Executed in Orange, California on December 7, 2020.

15  */S/ AARON KHERIATY*

16  AARON KHERIATY, M.D.

17  *(original signature retained by attorney)*

18

19

20

21

22  [17] Veterans Health Administration (VHA), "Meeting the Challenge of Pandemic Influenza: Ethical Guidance for Leaders and Health Care Professionals in the Veterans Health Administration."  The Pandemic Influenza Ethics Initiative Work Group Of The Veterans Health Administration's National Center For Ethics In Health Care, July 2010

23

24  [18] Institute of Medicine, "Guidance for Establishing Crisis Standards of Care for Use in Disaster Situations: A Letter Report (2009)."  Washington, DC: The National Academies Press, 2009.  Cf. also, Institute of Medicine, "Crisis Standards of Care: A Systems Framework for Catastrophic Disaster Response: Volume 1: Introduction and CSC Framework (2012)."  Washington, DC: The National Academies Press, 2012.

25

26  [19] Centers for Disease Control and Prevention, "Ethical Considerations for Decision Making Regarding Allocation of Mechanical Ventilators during a Severe Influenza Pandemic or Other Public Health Emergency."  Ventilator Document Workgroup, Ethics Subcommittee of the Advisory Committee to the Director, Centers for Disease Control and Prevention, July 1, 2011.

27

28

11

# Exhibit A

**Aaron Kheriaty, MD**

**Professor of Psychiatry, UCI School of Medicine**
**Director, Medical Ethics Program, UCI Health**

UC Irvine, Department of Psychiatry, Bld 56, Rm 401
101 The City Drive, Orange, CA 92868
mobile: 949-874-4009 | office: 714-456-8774 | fax: 714-456-5112
akheriat@hs.uci.edu

## Licensure

-Medical Board of California: Physician's and Surgeon's License (A89144)
-DEA number BK9083433
-Diplomate, American Board of Psychiatry and Neurology (Board Certified), Jan 2009, renewed Dec 2019, certificate number 59280.

## Residency Training

6/2003 – 6/2007, <u>University of California, Irvine</u> Department of Psychiatry: Completed residency training in Psychiatry

## Education

<u>MD: Georgetown University School of Medicine</u>, 8/1999 - 5/2003
*Center for Clinical Bioethics, Georgetown*, Bioethics research completed under direction of Prof. Edmund Pellegrino, former Chairman of the U.S. President's Council on Bioethics.

<u>B.A University of Notre Dame:</u> 8/1995 - 5/1999
Degree: Honors Philosophy and Pre-Medical Sciences, *Magna Cum Laude*

## Employment

8/2007 – Present, <u>University of California, Irvine, Department of Psychiatry</u>
*Health Sciences Assistant Clinical Professor*, 2007 – 2013
*Health Sciences Associate Clinical Professor*, 2013 – 2019
*Health Sciences Clinical Professor*, 2019 – present

## Professional Positions

**Director, Medical Ethics Program**, UC Irvine Health & UCI School of Medicine
2013 - Present

**Director of Medical Education**, UCI Department of Psychiatry

1

Duties include directing required six-week clerkship in psychiatry for third-year medical students, and all electives in psychiatry for fourth-year medical students
2007 – Present

**Director, Ethics and Behavioral Science Courses**, MS1 & MS2
Required courses for all first- and second-year students in the School of Medicine
2012 – Present

**Director of Residency Training**, UCI Department of Psychiatry
July 2009 – November 2013

Associate Director of Residency Training, UCI Department of Psychiatry
Sept 2008 – June 2009

Founding Director, UCI Psychiatry and Spirituality Forum
Sponsored grants from Metanexus Institute, the George Washington Institute for Spirituality and Health, the Templeton Foundation, the UCI Department of Psychiatry, the Reynold's Foundation, and private benefactors.
2006 – 2011

**Professional Committees & Consulting**

**Member, UC Office of the President (UCOP) Critical Care Bioethics Working Group**
2020 – Present
- Published, *Allocation of Scarce Critical Resources under Crisis Standards of Care*: guidance for all UC Health hospitals in the allocation of ventilators during the COVID-19 pandemic.
- Published, *Allocation Guidelines for Remdesivir if Demand Outstrips Supply*
- COVID Vaccine Allocation Institutional Guidelines

**Consultant, State of California—Health and Human Services Agency, California Department of Public Health**
2020 – Present
- Allocation of Bamlanivimab during COVID pandemic
- California SARS-CoV-2 Pandemic Crisis Care Guidelines

**COVID Task Force, County of Orange—Healthcare Agency**
2020 – Present
- COVID Vaccine Allocation Policy

Medical Ethics Committee, UCI Health
**Committee Chair**, 2008 – Present
Committee Member, 2007 – Present

Medical Ethics Committee, CA Department of State Hospitals

2

**Committee Chair**, 2017 – Present

Advisory Committee, UCI Center for Medical Humanities
2018 – Present

**Co-Director, Executive Committee,** UCI Medical Humanities Program
Collaborative Program with School of Medicine, School of Humanities, and
School of the Arts. Supported by UCI Provost's Interschool Excellence Grant.
2014 – 2018

Academy for Innovation in Medical Education
UC Irvine School of Medicine, 2014 – Present

Clinical Competence Committee, Psychiatry Residency Training Program
2012 – Present

Mentoring Junior Faculty Mentoring Committee, UCI Dept of Psychiatry
2020 – Present

UCI School of Medicine Admissions Committee
2007

UCI Department of Psychiatry Applicant Ranking Committee
2004 – 2013

UCI Dalai Lama Scholarship Award Selection Committee
2007 – 2008
Worked with Vice-Chancellor for Student Affairs to select the undergraduate who
receives this annual scholarship.

UCI Delegate: Spirituality in Higher Education Conference, UCLA
2006
Delegate appointed by Vice Chancellor to represent UCI at a conference
sponsored by the Higher Education Research Institute

Professional journal peer-reviewer, *Medical Education*, 2014 – present.

Professional journal peer-reviewer, *Linacre Quarterly*, 2012 – present.

Professional journal peer-reviewer, *Philosophy, Ethics, and Humanities in
Medicine*, 2017 – present.

**Grants**

*UCI Provost's Interschool Excellence Initiative Grant,* 2013 – 2016.
Three-year, $150,000 per year ($450,000 total)

3

Medical Humanities Program, Co-Director (with Prof. Shapiro and Prof. Haynes)

*Fieldstead and Company*
Bioethics Program, UCI School of Medicine, 2011 – Present.
$50,000 – $60,000 per year.

*Metanexus Institute*, 2006 – 2009
Local Societies Initiative Grant (Primary Investigator)
Three-year, $30,000 grant to support scholarly, educational, and community
outreach initiatives of the UCI Psychiatry and Spirituality Forum

*George Washington Institute for Spirituality and Health,* 2006 – 2009
Spirituality and Medicine Award for Curriculum Development for Psychiatry
Residency Training Programs (Primary Investigator)
Three year, $30,000 grant to support curriculum development, research.

*The Center for Theology and the Natural Sciences, Templeton Foundation*, 2007
Science and Transcendence Advanced Research Series (STARS) Program
$20,000 planning grant.  "Brain Connectivity and Contemplative Experiences":
Structural brain MRI study of long-term effects of contemplation and meditation.

*The Donald W. Reynolds Foundation*, 2008 – 2011
Comprehensive Programs to Strengthen Physicians Training in Geriatrics
Co-investigator (10% time).  Curriculum development for improving training in
geriatric psychiatry for third-year medical students and psychiatric residents.

*Fetzer Institute: Inter-Generational Mentoring Community: Fostering an
Emergence and Transfer of Leadership in Higher Education*, 2009 – 2013
Co-investigator: Three-year project on team of six educators/administrators:
Formation Mentoring Community project development.

## Professional Awards

*County of Los Angeles Board of Supervisors: Commendation.*
For contributions made in the work of integrating spirituality and mental health
for the benefit of citizens of Los Angeles, 5 June 2009.

*Excellence in Teaching Award*
Given by the Office of Medical Education, UCI School of Medicine.
1. 2011 – 2012 Academic Year, Excellence in Clinical Sciences
2. 2012 – 2013 Academic Year, Excellence in Pre-Clinical Sciences
3. 2013 – 2014 Academic Year, Excellence in Pre-Clinical Sciences
4. 2018 – 2019 Academic Year, Excellence in Pre-Clinical Sciences

## Other Appointments and Affiliations

4

Scholar, Paul Ramsey Institute
Center for Bioethics and Culture, San Francisco, CA
2016 – Present

Senior Fellow, Director of Health & Human Flourishing Program
Zephyr Institute, Palo Alto, CA
2016 – Present

**Books**

1. **Kheriaty A**, Bauman D, Taylor E, Felton P, *Transformative Conversations: A Guide to Mentoring Communities Among Colleagues in Higher Education*, Jossey-Bass (2013).

**Book Chapters**

1. **Kheriaty A**. "From Beneficence to Love: Adequate care for the mentally incapacitated," in *Incapacity and Care: Controversies in Healthcare and Research*, Ed. Helen Watt.  The Linacre Center, Oxford: 2009, 24-36.

**Publications – Peer Reviewed**

1. Shapiro J, **Kheriaty A**, Pham T, Chen Y, Clayman R. (2019). The Human Kindness Curriculum: An Innovative Preclinical Initiative to Highlight Kindness and Empathy in Medicine. *Education for Health*, 32(2), 53-61.
2. Chan S, Liao S, Randall LM, **Kheriaty A**, Dayal R, Kuo JV, Nguyen J, Vega C, Bota R, Barrios C, et al. Implementation of a multidisciplinary palliative and supportive care education lecture series. *Journal of Clinical Oncology.* American Society of Clinical Oncology (ASCO). November 01, 2017. 35: 144-144.  DOI: 10.1200/JCO.2017.35.31
3. Aggarwal S. **Kheriaty A**. "Same behavior, different provider: American medical students' attitudes towards reporting risky behaviors committed by doctors, nurses, and classmates," *AJOB Empirical Bioethics*, 8 Sep 2017. http://dx.doi.org/10.1080/23294515.2017.1377780
4. **Kheriaty A**. Social Contagion Effects of Physician-Assisted Suicide: Commentary on ''How Does Legalization of Physician-Assisted Suicide Affect Rates of Suicide?'' *Southern Medical Journal* 2015;108:10, 605-606.  PMID: 26437189.
5. Bota RG, Novac A, **Kheriaty A**. Longitudinal reflections of the recent political shifts in the prescription of opiates.  *Mental Illness*, 2015; 7:6066, 28-29.
6. **Kheriaty A**. Dementia and its Challenges - A Problem-Based Learning Case. *POGOe - Portal of Geriatric Online Education*; 2012 Available from: http://www.pogoe.org/productid/20770.
7. **Kheriaty A**. "Philosophical Anthropology and the Psychological Sciences: A Response to E. Christian Brugger", *Edification*, Vol 3, Issue 1, 2009, 23 – 25.

5

8. **Kheriaty A**. "From Beneficence to Love: Adequate Care for the Mentally Incapacitated," *CMQ*, May 2008, Vol. LVIII.
9. **Kheriaty A**. "The Return of the Unconscious," *Psychiatric Annals*, Vol. 7, Number 4, April, 2007, pp. 285-287.
10. **Kheriaty A**., editor and contributing author: "Psychiatry Board Review Study Guide, Part 1, Part 2, Part 3," *Resident & Staff Physician*, March, April, May 2007.
11. **Kheriaty A**. editor, Unit 4: "Mental Health", *Georgetown University Interacting with the Medical Humanities Curriculum* (peer reviewed MedEd Portal).
12. **Kheriaty A**. "Sterilizing the Erotic", peer reviewed essay, *Georgetown University Interacting with the Medical Humanities Curriculum* (peer reviewed MedEd Portal).
13. **Kheriaty A**. "The Death of Matthew Allen", nonfiction narrative, *Georgetown University Interacting with the Medical Humanities Curriculum* (peer reviewed MedEd Portal).
14. Wise TN, **Kheriaty A**, Sheridan M, "Attribution of Cause by Patients With Depression, Anxiety, and Alexithymia", *Psychological Reports*, 2004; 94 (1), pp. 259-263.

**Publications – Opinion, Essays, Book Reviews (Selected)**

1. Kheriaty, A, "The Latent Fascism of Today's Anti-Fascists," Part III of The Crisis of Our Times, *Arc Digital*, 12 July 2020.
2. Kheriaty, A, "Revolutions vs. The Total Revolution," Part II of The Crisis of Our Times, *Arc Digital*, 26 June 2020.
3. Kheriaty A, "Police Brutality and the Suicide of Revolutionary Violence," Part I of The Crisis of Our Times, *Arc Digital*, 4 June 2020.
4. Kheriaty A, et. al., Moral Guidance on Prioritizing Care During a Pandemic, *Public Discourse*, 5 April 2020.
5. Kheriaty A, "The Impossible Ethics of Pandemic Triage," TheNewAtlantis.com, April 3, 2020.
6. Kheriaty A. "Battlefield Promotions," TheNewAtlantis.com, March 18, 2020.
7. Kheriaty A. "First, Take No Stand," *The New Atlantis*, Number 59, Summer 2019, pp. 22-35.
8. Kheriaty A. "The Physician's Vocation," *MercatorNet*, 14 September 2018. Reprinted in *Bioethics Outlook* (forthcoming).
9. Kheriaty A. "Card-Carrying Precadavers," *First Things*, Number 284, June/July 2018.
10. Kheriaty A. "Cyber Self-Harm," *First Things* web exclusives, 29 January 2018.
11. Kheriaty A. "Dying of Despair," *First Things*, Number 275, August/September 2017.
12. Kheriaty A. "Killer Show," *First Things* web exclusives, 8 May 2017.
13. Kheriaty A. "Why are doctors afraid of the word 'death'?" *Washington Post*, 26 October 2015.
14. Kheriaty A. "The dangerously contagious effect of assisted-suicide laws," *Washington Post*, 20 November 2015.

6

15. Kheriaty A.  "The Assisted-Suicide Movement Goes on Life Support," *The Wall Street Journal*, 22 May 2015.
16. Kheriaty A. "Apostolate of Death," *First Things*, April 2015.
17. Kheriaty A. "Hooked Up and Tied Down: The Neurological Consequences of Sadomasochism," *The Public Discourse*, 17 February 2015.  Reprinted in *MercatorNet*, 25 February 2015.
18. Kheriaty A, McHugh P.  "Assisted suicide places most vulnerable at risk," *Orange County Register*, 13 February 2015.
19. Kheriaty A. "Sterilizing the Erotic," *Plexus: UC Irvine School of Medicine Journal of Arts and Humanities*, 2014.
20. Kheriaty A. "The Era of the Narcissist," *First Things* web exclusives, 16 Feb 2010 (review of, *The Narcissism Epidemic,* by J Twenge and K Campbell).
21. Kheriaty A. "Who Can Heal a Guilty Conscience," *Mercatornet*, 25 March 2010.
22. Kheriaty A. "God and the Unconscious", *The Global Spiral*, also published in Conference Proceedings for "Subject, Self, and Soul: Transdisciplinary Approaches to Personhood", July 13-17, 2008, Metanexus Institute Conference, Madrid, Spain.
23. Kheriaty A. "Cosmetic Drugs for Mental Makeovers: Antidepressants and Our Discontents," *The Digest*, Volume 6, Issue 6, April 2006.

**Invited Lectures (selected)**

1. *Rioters and Revolutionaries: On the Origins of Our Crisis.* Napa Institute Conference, August 2020.
2. *Maintaining Our Mental Health During the COVID Pandemic.* Napa Institute Conference, August 2020.
3. *Bioethics and the Human Future.* Invited seminar for UC Office of the President Legal, UCOP Legal Summer Research Fellows, 23 June 2020.
4. *The Physician's Vocation.*  Keynote address, White Coat Ceremony, UCI School of Medicine, 3 August 2018.
5. *The Moral Foundations of Medicine.*  Stanford University School of Medicine, sponsored by Zephyr Institute, Palo Alto, CA, 19 January 2018.
6. *Dying of Despair: Healing the Depressed, the Lonely, and the Vulnerable.*  Napa Institute Conference, Napa CA, 27 July 2017.
7. *Positive Psychology: The Science of Happiness and the Virtues.*  Napa Institute Conference, Napa CA, 29 July 2017.
8. *Capacity and Informed Consent in Pellegrino's Philosophy of Medicine*, Georgetown University Pellegrino Center for Clinical Bioethics, 4th Annual Pellegrino Seminar, 24 March 2017.
9. *Germline Gene Editing: Perspectives from Science, Ethics, and Law*, ABOG Foundation/Kenneth J. Ryan Ethics Symposium, American Society for Reproductive Medicine Annual Conference, Salt Lake City, UT, 17 October 2016.
10. *Biotechnology and the Human Future: Human-Animal Hybrids, Three Parent Embryos, and the New Genetic Engineering,* Napa Institute Conference, Napa CA, 7 July 2016.

11. *Transhumanism and the Human Future: A Panel Discussion*, Stanford University, sponsored by the Zephyr Institute, Palo Alto, CA, 8 January 2016.
12. *Depression: An Integrated Approach*, Gathering on Mental Health and the Church, Saddleback Church, Lake Forest CA, 9 October 2015.
13. *The Art of Dying*.  TEDx UC Irvine, 3 October 2015.
14. *Problems with Physician Assisted Suicide*, University Synagogue, Irvine CA, 23 September 2015.
15. *Public Debate on Doctor Assisted Suicide with Erwin Chemerinsky*, UC Irvine, 3 September 2015.  Sponsored by UCI Medical Ethics Program, Medical Humanities Initiative, Department of Psychiatry, and School of Law.
16. *Senate Bill 128 Debates: Problems with Legalizing Physician Assisted Suicide*, UC Center, Sacramento CA, 4 August 2015.
17. *Discussion with Medical Ethicists on Aid in Dying*, Sacramento Press Club, 30 June 2015.
18. *Testimony in opposition to Senate Bill 128*, California Senate Health Committee Hearings, 25 March 2015.
19. *Problems with Senate Bill 128*, California Medical Association Council on Legislative Affairs, Sacramento, 20 March 2015.
20. *Gender: Perspectives from the Biological, Psychological, and Social Sciences.* Presentation and panel discussion, Humanum Colloquium, Rome (17 November 2014).
21. *Spirituality and Mental Health* (plenary lecture), and *Depression: An Integrated Approach* (workshop), Gathering on Mental Health and the Church, Lake Forest, CA (28 March 2014).
22. *Depression and Spiritual Health* (plenary lecture and workshop), and panel discussion, MindYourHeart Conference, Biola University (1 February 2014).
23. *Is Hope Healthy for Body and Soul?*  Institute for Psychological Sciences, Cardinal Newman Distinguished Lecture Series, Washington DC (14 November 2013).
24. *Ethical Decisions at the End of Life*: Ethics and Spiritual Care at the End of Life CME Symposium, UC Irvine (18 May 2011)
25. *Compassion in Medicine in the Christian Tradition.*  Compassion in Medicine Panel Discussion, UC Irvine Student Center (10 May 2011)
26. *Compassion in Medicine: The Doctor – Patient Relationship.* Compassion in Medicine Course, UC Irvine Department of Biology (5 April 2011)
27. *Conscience from a Psychiatric Perspective*.  Integritas Institute, University of Illinois, Chicago: Healthcare Ethics Symposium on Conscience (20 Nov 2009)
28. *Spiritually Oriented Psychotherapy: An Introduction.*  Keynote address, Southern California Mental Health and Spirituality Conference, sponsored by the Los Angeles Department of Mental Health and the California Institute of Mental Health, Los Angeles (5 June 2009)
29. *Cosmetic Drugs for Mental Makeovers: Antidepressants and Our Discontents*. Georgetown University Center for Clinical Bioethics (2003), Grand Rounds, U.C. Irvine Department of Psychiatry (2004). Metanexus Institute International Conference: "Continuity and Change: Perspectives on Science and Religion," Philadelphia, PA (June 2006)

30. *Psychopharmacology and Human Enhancement*.  "California Health Systems Pharmacists Annual Conference," Disneyland Hotel, Anaheim, CA (2005)
31. *Ethics at the End of Life: The Death of Terry Schiavo.* Continuing Medical Education Conference, "End of Life: Medical, Religious, Philosophical, and Spiritual Perspectives," U.C. Irvine Medical Center, Irvine, CA (2006)
32. *Metabolic Consequences of Psychotropic Therapy*.  8th Annual American Foundation for Suicide Prevention, Greater Los Angeles Division's Conference, UCLA, Los Angeles, CA (18 November 2006)
33. *Model Psychiatry Residency Programs on Religion and Spirituality*.  "American Psychiatric Association: 160th Annual Conference," San Diego, CA (24 May 2007)
34. *Ethical Care for the Mentally Incompetent.*  Linacre Center for Healthcare Ethics, International Conference, "Incapacity and Care: Moral Problems in Healthcare and Research", St. Mary's University College, London, England (5 July 2007)
35. *Developing Personal Integrity.* UCI 2007 Summer Multicultural Leadership Institute*: Lecture at workshop for incoming undergraduate freshman (10 August 2007).
36. *Ethical Care at the End of Life.* Grand Rounds Lecture, Los Alamitos Hospital, CA (10 December 2007). Grand Rounds Lecture, Lakewood Regional Medical Center, CA (15 February 2008)*.  Grand Rounds Lecture, Orange Coast Medical Center, CA (29 April 2008)
37. *Stress Management and Substance Abuse Prevention.*  MCLE Conference for Lawyers, Thomas More Society of Orange County (26 January 2008)
38. *Spirituality and Mental Health: A Panel Discussion.* Moderator and Panelist, sponsored by Psychiatry and Spirituality Forum. (10 April 2008)
39. *God and the Unconscious.* "Subject, Self, and Soul: Transdisciplinary Approaches to Personhood", July 13-17, 2008, Metanexus Institute Conference, Madrid, Spain.

**Radio Interviews (selected)**

1. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "What Are The Ethical Considerations When Deciding Who Gets The Coronavirus Vaccine First?" 6 August 2020.
2. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "COVID-19: Difficult Ethical Considerations For Care And Treatment," 27 March 2020.
3. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "A Look At The Legal And Personal Ramifications Of Sperm Donation. What's Your Story?" 22 August 2019.
4. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "Embryo Mix Up at SoCal Fertility Center Sheds Lights On Lack Of Regulations For Clinics Nationwide," 11 July 2019.
5. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "The impending ubiquity of DNA-sequencing for infants – and the bioethical challenges," 23 April 2018.

6. Relevant Radio Network, weekly series on mental health and bioethics (episodes available here), A Closer Look with Sheila Liaugminas, 2017 - Present.
7. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), One year of legal doctor-assisted suicide in California, with Michelle Faust, 9 June 2017.
8. KQED Public Radio (NPR/PBS) San Francisco, Forum with Michael Krasney, "California Readies for Aid-in-Dying Law to Take Effect," 9 June 2016.
9. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: "Ethical, legal questions surrounding Pentagon initiative to freeze eggs, sperm," 5 February 2015.
10. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: Oregon family's decision to let 4-year-old daughter choose death sparks ethical debate, 28 October 2015.
11. KABC Los Angeles 790, The Peter Tilden Show: The End of Life Option Act, 20 October 2015.
12. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: What's next now that CA becomes 5th state in nation to allow assisted suicide for the terminally ill?, 6 October 2015.
13. Capital Public Radio (NPR Sacramento), California Governor Signs Hard-Fought End-Of-Life Legislation, News with Ben Adler, 5 October 2015.
14. NPR Los Angeles (Southern California Public Radio, KPCC 89.3), Air Talk with Larry Mantle: Health committee ends consideration of 'End of Life Option Act,' 7 July 2015.
15. CBS Los Angeles Radio (KNX 1070): SB 128 Passes CA Senate, interview with Mike Landa, 4 June 2015.
16. NPR Los Angeles (Southern California Public Radio, KPCC 89.3): 'Assisted suicide' or 'aid in dying?' The semantic battle over SB 128, 4 June 2015.
17. NPR Los Angeles (Southern California Public Radio, KPCC 89.3): Doctors debate the ethics of assisted suicide, 18 May 2015.
18. CBS Los Angeles Radio (KNX 1070): The End of Life Option Act, interview with Margaret Carrero, 7 April 2015.
19. Capitol Public Radio (NPR Sacramento): Insight With Beth Ruyak, "'Right-To-Die' Legislation In California," 25 March 2015.
20. Regular guest 2012 – present: The Drew Mariani Show, *Relevant Radio Network.*
21. Regular guest 2015 – present: A Closer Look with Sheila Liaugminas, *Relevant Radio Network.*

**Television Interviews (selected)**

1. *Fox News*, Happening Now, "Scientists hope human organs grown in animals can save lives," 13 January 2016.
2. *CBS News Los Angeles*, "Brown Signs Hard-Won Right-To-Die Legislation," 5 October 2015.
3. *Fox News*, "Should you have the right to die: California bill would allow assisted suicide," 9 July 2015.
4. *CBS News Los Angeles*, "California's end of life legislation," 7 July 2015.

5. America Tonight on *Al Jazeera*, "Debates over CA Senate Bill 128," 24 June 2015.
6. *CBS News Los Angeles*, "Medical Association No Longer Opposes 'End-Of-Life Option' Act As Bill Goes Through Legislature," 20 May 2015.
7. America with Jorge Ramos, *Fusion*, "Discussion: Brittany Maynard's end of life option," a debate with Dan Diaz (husband of Brittany Maynard), 19 May 2015.
8. *NBC Los Angeles*, NewsConference with Conan Nolan, "Problems with End-of-Life Legislation," 29 March 2015.  Links to 2 segments here and here.
9. "Depression: An Integrated Approach."  Interview with Scott Hahn and Regis Martin, *EWTN*, June 2014.
10. "Understanding and Overcoming Depression."  Five-part interview with Johnnette Benkovic, *EWTN*, 27 Sept 2013.

**Podcast Interviews**

1. "Dr. Aaron Kheriaty on America's pandemic response and the frontline realities confronting our physicians and medical personnel," *Life, Liberty, and Law*, 20 April 2020.
2. "Hospital Ethics in the Face of COVID-19," *The Accad & Koka Report*, 1 April 2020
3. "Simple Ways to Cope with Stress During Challenging Times," *Good Things Radio with Brooke Taylor*, 8 April 2020.
4. "Is Physician Assisted Suicide Good Policy? A discussion with Dr. Aaron Kheriaty," *The Paradocs*, 20 December 2019.
5. "Healing Depression with Dr. Aaron Kheriaty," *The Lila Rose Show*, 24 July 2019.

**Print Interviews, Media Citations, Reviews of My Work**

1. "Could California's psych hospitals be ordered to admit inmates with COVID?" By Lee Romney, *Cal Matters*, 18 November 2020.
2. "These Daily Habits Will Make You Happier," In Person with Aaron Kheriaty, by Joan Frawley Desmond, *National Catholic Register*, 23 August 2017.
3. "Doctors want to end life support for fatally ill baby; his parents want to try experimental therapy," by Alexandra Zavis and Christina Boyle, *Los Angeles Times*, 4 July 2017.
4. "Euthanasia: Quebec, Dutch, Belgian and Oregon laws a 'mess'," by Debra Vermeer, *News Weekly*, 11 February 2017
5. "California Aid-In-Dying Law Concerns Some Latinos, Blacks," by Julie Watson, *Associated Press*, 8 June 2016.  Also ran in *ABC News, Fox News, The New York Times, Orange County Register.*
6. "As California's End of Life act goes into effect, some doctors question where to draw the line," by Soumya Karlamangla, *Los Angeles Times*, 6 June 2016.
7. "Suicides Are up — What to Do About It," by John Burger, Aleteia, 9 May 2016.
8. "Will California's end-of-life law push lethal drugs over costlier care?" by Soumya Karlamangla, *Los Angeles Times*, 18 October 2015.

9. "California Governor Signs Assisted Suicide Bill Into Law," by Ian Lovett and Richard Perez-Pena, *The New York Times*, 5 October 2015.

10. "Joy, concern over passage of California's right-to-die law," by Deepa Bharath, *The Orange County Register*, 5 October 2015.

11. "Will Gov. Jerry Brown Legalize Assisted Suicide in California?" by Joan Desmond, *National Catholic Register*, 15 September 2015.

12. "Will Sacto enact this bad end-of-life bill?" by Debra J. Saunders, *San Francisco Gate*, 14 September 2015.

13. "California Legislature Approves Assisted Suicide," by Ian Lovett, *The New York Times*, 11 September 2015.

14. "Laws allowing assisted suicide can have far-reaching impact," *The Oklahoman*, by The Oklahoman Editorial Board, 20 July 2015.

15. "'Aid in dying' causes a Democratic split: Divisive bill pits Latino Democrats v. wealthy coastal legislators," by Steven Greenhut, *San Diego Union-Tribune*, 6 July 2015.

16. "CMA's Change of Stance on Assisted Suicide Bill Sets Off Wave of Controversy," *Physicians News Network*, 25 May 2015.

17. "Assisted-suicide debate focuses attention on palliative, hospice care," by Lisa Schencker, *Modern Healthcare*, 16 May 2015.

18. "Physician-assisted suicide supporters try courts to win legalization," by Lisa Schencker, *Modern Healthcare*, 16 May 2015.

19. "In end-of-life debate on Sen. Bill Monning's bill, words matter," by Jason Hoppin, *Santa Cruz Sentinel*, 6 April 2015.

20. "Assisted Suicide Promotes a Culture of Death," by Kathryn Jean Lopez, *Chicago Sun Times*, 1 April 2015.

21. "Is there a time to end life," by Deepa Bharath, *Orange County Register*, 1 March 2015.

22. "Woman suing California for her right to die at home," by Stephanie Gallman, *CNN*, 13 February 2015.

23. "Beyond the Misconceptions about Depression," interview with Kathleen Naab, *Zenit*, 9 September 2014.

24. "Depression and Suicide," *National Catholic Register*, 11 October 2014.

25. "Getting Free: Combatting Depression Today," interview with Kathryn Jean Lopez, *National Review Online*, 27 February 2014.

26. "Psychiatrist merges faith and medicine: science and religions intersect at Psychiatry and Spirituality Forum started by a UCI doctor," by Courtney Perkes, *Orange County Register*, 23 March 2008.

27. "A public death," (interview on the topic of suicide prevention), by Courtney Perkes, *Orange County Register*, 23 April 2008.

28. "Patrols, railing are new span's key safeguard," by Lynn Safranak, *Omaha World Herald*, 2 October 2008.

29. "Mind and Soul: A unique forum on psychiatry and spirituality at the University of California, Irvine," an interview with Carolyn Monahan, *Mercatornet*, 29 November 2007.

30. "On Campus at UCI: Forum Fosters Rare Dialogue on Faith," *Daily Pilot*, 26 August 2007.

12

**Expert Witness Testimony**

1. Expert witness for the defense, *Becerra v. Duffy*, Case No. 900-2017-000223, 2020.
2. Expert witness for the defense (Attorney General, State of AZ), declaration dated 11/16/20 in *PPAZ v. Brnovich.*
3. Expert witness for the defense (Attorney General, State of MS), declaration dated 4/24/20 in *Jackson v. Dobbs*, Case No. 3:18-CV-171–CWR-FKB.
4. Expert witness for the defense (LA County), *Haftevani v. LA County*, 2019-2020.
5. Expert witness for the defense (Kaiser Permanente), *Battaglia v. Golden*, 2019-2020.
6. Expert witness for the defense (Attorney General, State of IN), declaration dated 8/26/19 and deposition in *WWHA v. Hill*, Case No.: 1:18-cv-01904-SEB-MJD.
7. Expert witness for the defense (Attorney General, State of IN), declaration dated 10/4/16 in *PPINK v. Commissioner, Indiana State Department of Health*, Case No. 1:16-cv-01807-TWP-DML
8. Declaration for the plaintiffs dated 6/7/16 in *Ahn v. Hestrin*, Case No. RIC 1607135.
9. Testimony in CA mental health LPS conservatorship writ hearings, Riese petition hearings, and 5250 writ hearings.

**Community Service**

1. Board of Directors, *J Serra High School*, San Juan Capistrano, CA, 2012 – 2013.
2. Board of Directors, *Center for Bioethics and Culture*, Pleasant Hill, CA, 2015 – 2019.
3. Board of Directors, *Seymour Institute for Black Church and Policy Studies*, Boston, MA, 2016 – Present.