XAVIER BECERRA, State Bar No. 118517
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
LISA M. POOLEY, State Bar No. 168737
SAMANTHA D. WOLFF, State Bar No. 240280
LAUREL E. O'CONNOR, State Bar No. 305478
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF A. MEHTA, M.D., IN SUPPORT OF DEFENDANTS' RESPONSE TO NOVEMBER 19, 2020 ORDER** |

I, A. Mehta, M.D., declare as follows:

1. I am the Deputy Director of the Statewide Mental Health Program for the California Department of Corrections and Rehabilitation (CDCR). I have held this position in an appointed or Acting position since July 2020, and before that I was the Statewide Chief of Telepsychiatry. I have worked at CDCR since July 2013, during which time I have also served as a staff telepsychiatrist, site director for residency training, institutional clinical lead, and acting

1

1  statewide Chief of Psychiatry.  I attended residency in Adult Psychiatry, and completed
2  fellowships in both Child & Adolescent Psychiatry and Forensic Psychiatry.  I submit this
3  declaration in support of Defendants' response to the Court's November 19, 2020 order regarding
4  the transfer of patients to inpatient care.
5         2.      At the request of the Office of the Attorney General, during the week of November
6  30, 2020 I reviewed the records of 11 CDCR mental health patients identified in a November 13
7  declaration by Dr. Pablo Stewart addressing the treatment those patients received while awaiting
8  transfer to Department of State Hospital (DSH) inpatient beds.  For the evidentiary hearing
9  conducted on October 23, I had previously performed a cursory review of the 55 patients that
10 were awaiting transfer, and my staff assessed a subgroup of 11 patients identified by Dr. Stewart,
11 but we did not have the necessary information to perform a detailed review.  Given the number of
12 patients and the sheer magnitude of the voluminous health records, it was impossible to divine
13 what Dr. Stewart was reviewing for the hearing or the opinions that he was forming.  After the
14 hearing, I was informed for the first time that Dr. Stewart had examined records for his self-
15 selected group of 11 inmates covering the two-month period preceding his testimony.  Below are
16 my analyses of the treatment received by these 11 patients based on a review of these patients'
17 medical records for the months preceding Dr. Stewart's declaration, utilizing his patient
18 identification system.
19        3.      Novel coronavirus 2019 has forced CDCR to walk a tightrope while wearing a
20 blindfold.  This unexpected pandemic has caused harm to the global society that could not be
21 predicted, and the virus's stubborn nature has frustrated medicine's attempts to limit its spread.
22 This has made CDCR's mission to keep our patients safe and improve their health, both mentally
23 and physically, incredibly challenging.  Trying to balance these competing demands of limiting
24 the spread and providing mental health care has consumed many thousands of hours of work in
25 CDCR over the past nine months during which officials have devised innovative strategies to
26 provide care in the COVID-19 environment.  Bringing treatment to the patients is a highly
27 individualized process, and every case requires a deep knowledge of that particular patient.  As
28 such, someone unfamiliar with CDCR systems and capabilities is ill-equipped to sweep in and

2

Mehta Decl. Supp. Defs.' Resp. Nov. 19 Order  (2:90-cv-00520 KJM-DB (PC))

1   claim superior knowledge of all the nuances involved in these decisions, especially when the
2   system is responding to something no one has ever seen before.  We carefully considered the
3   needs of each of the 11 mental health patients selected by Dr. Stewart for his declaration in
4   collaboration with the physicians and therapists that know them best, as we do with all patients.
5   Some of the patients described here were held at the appropriate level-of-care, but were not
6   transferred to their least restrictive housing setting, during a time when quarantines and
7   lockdowns were the norm everywhere anyway.  Some of these patients were held at a higher
8   level-of-care than their referral indicated, while we waited for the data that could help guide
9   future decisions, removing that blindfold.

10          4.      When patients are referred to DSH to receive an Intermediate Care Facility (ICF)
11  level-of-care, CDCR clinicians know exactly what type of care is being requested for those
12  patients.  That is because CDCR provides its own patients with an ICF level-of-care every day,
13  and we share the knowledge and experience that makes that possible.  In the months between
14  acceptance and transfer to DSH for these patients, CDCR was generally able to provide the care
15  that they required.  What Dr. Stewart's selected list of 11 mental health patients addressed in his
16  declaration does not show is the patients that needed more mental health care, and were
17  transferred to other CDCR facilities to receive it.  This list is presented as representative, but it is
18  in fact a cherry-picked list of borderline cases that were inherently complicated to resolve.  The
19  patients that improved were taken off the transfer list; the patients that decompensated were
20  moved to higher levels of care.  The relative few that were particularly difficult to categorize are
21  the ones that we see in Dr. Stewart's declaration.  As shown below, many of these patients
22  received robust mental health services, clinical encounters, and recreational therapy while waiting
23  to transfer, and I disagree with Dr. Stewart's blanket assertion that patients suffered harm during
24  this period.

**Patient 3**

26          5.      Patient 3 has been diagnosed with Schizoaffective Disorder Depressive Type,
27  Unspecified Schizophrenia Spectrum or Other Psychotic Disorder, and Unspecified Depressive
28  Disorder.  The patient was compliant with a medication regimen of lithium, haloperidol,

3

quetiapine, venlafaxine, mirtazapine, prazosin, and PRN haloperidol, benztropine, and hydroxyzine. Patient 3 was admitted to California Health Care Facility's Psychiatric Inpatient Program (CHCF-PIP) at the ICF level-of-care on 3/30/20. DSH was notified of the referral to an unlocked dorm on 6/24/20, accepted the patient on 7/14/20, and the patient was transferred to DSH's Atascadero State Hospital (ASH) on 10/14/20. In the three months between acceptance and transfer, Patient 3 remained at the ICF level-of-care and there were no lapses in individual care or treatment planning. Patient 3 attended individual sessions fairly regularly (at least one clinical contact with a mental health clinician or provider per week), and was offered approximately three to five treatment groups per week, but their attendance was poor due to reported safety concerns and anxiety around others. Nonetheless, the patient was working with the clinician to challenge himself to attend more groups. Symptom changes were addressed with adjustments to the patient's regimen as appropriate, with reports of some success, and the patient was regularly on STEP 3, which allowed access to all of property, leisure groups, yard, and TV on a regular basis. Patient 3 had one episode of superficial self-harm with a staple on 9/18/20, requiring no significant medical attention. Although noteworthy, this was an improvement over the patient's behavior in the preceding months. In my clinical opinion, the attention and treatment that Patient 3 received before transfer to DSH was ardent, effective, and produced some obvious reductions in symptoms. There was no obvious or objective evidence that the delay was the cause of any harm suffered by this patient.

**Patient 7**

6. Patient 7 has been diagnosed with Major Depressive Disorder, Post Traumatic Stress Disorder, and Opioid Use Disorder. The patient has been compliant with prescribed medications, including olanzapine, paroxetine, buspirone, clonidine, hydroxyzine, and PRN hydroxyzine. Patient 7 was referred to the ICF level-of-care from a California Medical Facility (CMF) Mental Health Crisis Bed MHCB (MHCB), of which DSH was notified on 7/3/20. Patient 3 was accepted on 7/8/20, and was transferred to ASH on 10/20/20. In the three-and-a-half months between acceptance and transfer, Patient 7 remained at the MHCB level-of-care. The patient received daily individual contacts or appointments from either psychiatry or psychology

4

during this time, and had weekly Interdisciplinary Treatment Team meetings (IDTTs), all with good attendance. Patient 7 was offered approximately one leisure/recreation group once per week and regular yard time, and attendance increased steadily. The patient's antipsychotic dose was increased to better target their refractory psychotic symptoms, including paranoia, with some reported improvement. The patient was given in-cell activities, and stayed on full issue of regular property, as opposed to receiving suicide-resistant products. In my clinical opinion, there was no obvious or objective evidence that the delay was the cause of any harm suffered by this patient.

**Patient 10**

7. Patient 10 has been diagnosed with Schizophrenia, Amphetamine Use Disorder, and Alcohol Use Disorder. The patient has been on an involuntary medication order (under California Penal Code section 2602), and was compliant with a psychiatric medication regimen of clozapine, divalproex sodium, fluoxetine, and buspirone. Patient 10 at ASH from 11/28/18 until 1/16/20, after which they were housed at the Enhanced Outpatient (EOP) level-of-care. The patient was eventually referred back to the ICF level-of-care on 7/17/20. DSH was notified of the referral on 7/18/20, accepted the patient on 7/28/2020, and transferred to ASH occurred on 10/20/20. In the three months between acceptance and transfer, Patient 10 engaged meaningfully in their treatment. Some medication adjustments and increases were undertaken, resulting in a reduction is symptoms. The patient's clozapine dose was increased, and the mirtazapine was switched to fluoxetine to better target depressive symptoms. The patient was briefly hospitalized in the MHCB from 8/4/20 to 8/14/20 due fleeting suicidal ideation related to relatively minor incompatibilities with a cellmate. During this time, Patient 10 was seen daily by either a psychiatrist or mental health clinician, and five-day follow ups occurred after the patient returned to EOP housing. The patient's condition was notably improved upon return, where they attended required IDTTs and uninterrupted contact with psychiatrist and other mental health clinicians. In my clinical opinion, there was no obvious or objective evidence that the delay was the cause of any harm suffered by this patient.

5

Mehta Decl. Supp. Defs.' Resp. Nov. 19 Order  (2:90-cv-00520 KJM-DB (PC))

**Patient 11**

8.  Patient 11 has been diagnosed with Schizoaffective Disorder Bipolar Type. The patient was compliant with medications including quetiapine, bupropion, diphenhydramine, and PRN chlorpromazine, quetiapine, and diphenhydramine. Patient 11 was admitted to CMF PIP at the Acute Psychiatric Program (APP) level-of-care on 3/12/20. DSH was notified of the referral to ICF on 7/18/20, accepted the patient on 7/23/20, and transferred occurred on 10/19/20. In the three months between acceptance and transfer, the patient remained at the highest level-of-care (APP), and the intense surveillance provided in that setting allowed quick identification of the self-harm incident/suicide attempt on or around 7/30/20, which resulted in placement of 20 sutures. Around the time of this incident, and in order to implement improved treatment strategies to target symptoms that contributed to the incident, thoughtful and significant medication adjustments were made, which resulted in improved symptoms. Bupropion was added and titrated upwards to better target depressive symptoms; low-dose chlorpromazine was added to better target refractory psychotic symptoms and related agitation/anxiety; and the quetiapine dose was increased to better target refractory psychotic symptoms. Following these adjustments, the patient voiced improvement of some symptoms and stated that their auditory hallucinations were well controlled. Patient 11 weekly contacts with her clinician or psychiatrist. Though the patient refused confidential sessions with their clinician, they regularly attended confidential sessions with a psychiatrist, with whom the patient had a particularly positive and trusting relationship. Patient 11 attended weekly IDTTs, and was offered approximately three to seven treatment groups a month. Although attendance at treatment groups was sporadic, the patient engaged day room activities. Regarding the delay in transfer, Patient 11 was quoted as saying: "I do not have a problem waiting, I just wanted know what is going on [referencing the explanation provided to them about COVID-19 outbreaks causing changes to safe transfer timelines]." In my clinical opinion, there was no obvious or objective evidence that the delay was the cause of any harm suffered by this patient.

6

Mehta Decl. Supp. Defs.' Resp. Nov. 19 Order  (2:90-cv-00520 KJM-DB (PC))

**Patient 15**

9. Patient 15 has been diagnosed with Major Depressive Disorder and Unspecified Schizophrenia Spectrum and Other Psychotic Disorder. The patient was compliant with medications including sertraline, bupropion, and PRN olanzapine and hydroxyzine. Patient 15 was referred from the MHCB level-of-care to APP on 5/28/20, and after showing significant improvement, was referred to ICF on 7/16/20. DSH was notified of the referral on 7/28/20, and accepted the patient on 8/4/20. The patient is currently housed in an EOP setting, awaiting transfer. In the four months since acceptance by DSH, Patient 15's sertraline dose was increased in September 2020 in an effort to better target some refractory anxiety and depressive symptoms, and high-dose bupropion has continued. The patient's treatment includes weekly clinician contacts and seeing a psychiatrist once every 30 days, both of which they attend on a regular basis. The patient is offered approximately 8-10 treatment groups per week, with attendance slightly over 50 percent. Records show that Patient 15 is future oriented, and hopeful about an upcoming Parole Board Hearing in January 2021. The patient is in regular contact with their mother, who is a source of emotional support, and reports they are "coping more" and pulling their hair out less. While the patient asks when they will transfer to ICF on a regular basis and is frustrated by the delays caused by the pandemic, there is no obvious or objective evidence that this delay is the cause of any harm to the patient.

**Patient 16**

10. Patient 16 has been diagnosed with Schizoaffective Disorder, Bipolar Type and Delusional Disorder, with a Disability Placement Program code of DD2. The patient was compliant with medications including lithium, divalproex sodium, haloperidol, benztropine, and PRN olanzapine and hydroxyzine. DSH was notified of Patient 16's referral from EOP to the ICF level-of-care on 7/28/20, and accepted the patient on 8/3/20. The patient is currently housed in an EOP setting while awaiting transfer. In the four months since acceptance, several medication adjustments were made to better target some of Patient 16's refractory symptoms. Haloperidol was increased, and lithium was added to the medication regimen. Also during this time, the patient was briefly hospitalized in the MHCB from 10/5/20 to 10/20/20. Special local attention

7

Mehta Decl. Supp. Defs.' Resp. Nov. 19 Order  (2:90-cv-00520 KJM-DB (PC))

has been given to Patient 16 in many aspects of their care—due to anxiety brought about by shared or dorm housing, the patient has been housed in a fashion to give them additional privacy. Patient 16 was offered about 4.74 hours of group treatment per week, but refused about 3.84 hours per week. As the team has become more familiar with this patient, they have noted that the patient's baseline level of functioning appears low and the current level of functioning appears close to it. Patient 16 remains symptomatic (paranoia, anxiety, depressed mood), and is frustrated and reports some anxiety related to transfer delays. While not an ideal situation, the patient's mental health needs are being met while awaiting transfer.

**Patient 24**

11.     Patient 24 has been diagnosed with Unspecified Depressive Disorder and Unspecified Anxiety Disorder. The patient's medications fluoxetine, atomoxetine, and diphenhydramine were discontinued on 9/29/20, and has remained stable without them. Patient 16 was initially referred to APP level-of-care on 6/2/20, but the referral was changed to ICF on 8/6/20. DSH was notified of the referral on 8/12/20, and accepted the patient on 8/21/20, and they are currently housed in the MHCB setting while awaiting transfer. Of note, the patient is unable to transfer to EOP within the same institution during this waiting period due to custody status. In the four months since acceptance, Patient 16's MHCB stay has been uneventful, and they have been seen daily by his psychologist and met timelines for psychiatry contacts and IDTTs. No treatment groups were offered to the patient, but they attended recreation/leisure groups once a week. Some consideration was given to changing the patient's referral to the EOP level-of-care, but due to the serious nature of a relatively recent suicide attempt, it was recommended that they remain at the ICF. Patient 24 reports frustration with the transfer delays, but on the whole, they are receiving sufficient mental health treatment while awaiting transfer.

**Patient 28**

12.     Patient 28 has been diagnosed with Schizoaffective Disorder Bipolar Type and Intellectual Disability, and has a Disability Placement Program designation of DD2. The patient was on an involuntary medication order, and was compliant with medications including lithium, olanzapine, benztropine, and PRN haloperidol and hydroxyzine, and they were reportedly helpful

8

Mehta Decl. Supp. Defs.' Resp. Nov. 19 Order  (2:90-cv-00520 KJM-DB (PC))

for his mental health conditions.  Patient 28 was referred to the ICF level-of-care from EOP, where they were housed in the Administrative Segregation Unit (ASU) for non-disciplinary reasons. DSH was notified of the referral on 8/13/20, accepted the patient on 8/21/20, and transfer occurred transferred on 10/19/20.  Five days after the ICF referral, Patient 28 became more distressed about their hallucinations and delusions, and stated suicidal ideations.  The patient was referred to the MHCB, where they superficially cut their wrist and swallowed plastic.  Patient 28's presentation and anxiety improved steadily until they requested discharge back to ASU, and to rescind their ICF referral.  The patient attended nearly all their individual contact appointments in the MHCB, including 23 sessions with the recreational therapist, and was eating well, had full property issue, and appeared calmer and less distressed.  Patient 28 was discharged from the MHCB back to EOP ASU, with the ICF referral.  In the EOP ASU, the patient was offered and attended five to six treatment groups per week, two weekly individual sessions with a clinician, and an initial evaluation by a psychiatrist.  Patient 28's treatment history and condition indicate that there is no evidence that a delay in transferring them to DSH inpatient care caused any harm.

**Patient 38**

13.     Patient 38 has been diagnosed with ADHD, Other Specified Trauma Disorder, and Other Specified Disruptive, Impulse Control, and Conduct Disorder.  The patient was prescribed the medications olanzapine, divalproex sodium, fluoxetine, and hydroxyzine until they were discontinued 9/17/20, and was later prescribed lamotrigine from 10/20/20.  DSH was notified of the patient's referral to the ICF level-of-care from the MHCB on 8/28/20, and accepted the patient on 9/3/20. The patient is currently housed in an EOP setting, awaiting transfer.  In the three months since acceptance for transfer, Patient 38 began in the MHCB, with safety concerns due to a debt that they owed on the yard.  After the ICF referral was made, the patient was tapered off of psychiatric medications as their endorsed symptoms of psychosis were not believable, and there was a suspicion that the patient was "cheeking" the medications.  After completing the taper, Patient 38 reported that they were feeling good and requested to be discharged.  Since being in the EOP yard, the patient reported feeling "great."  The patient reported on 10/12/20 that they did not believe they needed to go to ICF, unless they were referred to ASH because he could

9

Mehta Decl. Supp. Defs.' Resp. Nov. 19 Order  (2:90-cv-00520 KJM-DB (PC))

use a "cheeseburger and milkshake." On 10/20/20, the patient was prescribed lamotrigine with a slow titration. Patient 38 attended their individual contacts and treatment groups, though it appears they were not offered consistently (at least partially due to quarantine and COVID-19 related program status changes). Based on the records, there is no indication that the delay in transfer has caused harm suffered to this patient.

### Patient 39

14. Patient 39 has been diagnosed with Unspecified Schizophrenia and Other Psychotic Disorder, Major Depressive Disorder, and Major Neurocognitive Disorder due to Traumatic Brain Injury. The patient has a long history of paranoid delusions and psychotic symptomology, which CDCR staff has continually monitored. The patient was prescribed lamotrigine, which was discontinued on 9/11/20 due to side effects, and an atomoxetine trial from 9/23/20 to 10/1/20, which was discontinued due to non-compliance. DSH was notified of Patient 39's referral to the ICF level-of-care from an EOP program on 8/28/20, accepted the patient on 9/3/20, and the patient was transferred to DSH's Coalinga State Hospital on 10/29/20. In the two months between acceptance and transfer, Patient 38 has had individual contacts with their primary clinician one to two times per week, and with their psychiatrist every one-to-two weeks. Although the patient appeared to have only two treatment groups offered in the last month, did not have as many IDTTs as he should have, and documentation of treatment should be improved, staff were responding to his needs. There is no indication that Patient 38 has been harmed by the delay in transfer to DSH.

### Patient 52

15. Patient 52 has been diagnosed with Schizophrenia. The patient was compliant with his prescribed medications including quetiapine and PRN hydroxyzine. The patient was referred to the ICF level-of-care from the MHCB on 9/28/20, and DSH accepted the patient on 10/01/20. When referred two months ago, Patient 52 was in the MHCB due to the severity of their mental illness. While in the MHCB, the patient was medication compliant and their thought process became more linear, the patient was calmer, and was more appropriate staff and peers. Patient 52 was discharged to the EOP level-of-care on 9/29/20, with an ICF referral. The patient

10

Mehta Decl. Supp. Defs.' Resp. Nov. 19 Order  (2:90-cv-00520 KJM-DB (PC))

1 has good rapport with their treatment team as evidenced by attending most confidential individual sessions, as well as participating in some structured out-of-cell therapeutic services that they are offered.  While the patient is reporting and has been observed to be adjusting better to their current housing, it is clear that the patient is severely mentally ill and in need of ongoing treatment.  While no harm can be attributed to a delayed transfer to inpatient care, Patient 52 has continued to exhibit signs of disorganized and bizarre behavior due to psychotic symptoms that significantly impair their functioning, and additional follow up and documentation is important to ensure that the patient's needs are being met.

16.     These patients received all possible treatment while they were being monitored and cared for without exposing them and all of their peers to the greater risks that accompanied transfers during the ongoing COVID-19 pandemic.  This has occurred while California was undergoing various restrictions on travel, gatherings, and services due to concerns over virus spread, and CDCR was reeling from the outbreak at San Quentin and lessons learned from that experience.  We saw that we could offer these patients individual treatment from skilled professionals, both psychiatrists and psychologists; medication adjustments to address changes in symptoms and coping strategies; collaborative, inter-disciplinary team meetings to discuss strategies and successes; support groups wherever it was safe to do so, for both our patients and our staff; recreational activities; in cell activities; psychoeducation; social contact, leisure activities, distractions, and everything else we could think of.  These treatment components were based on CDCR's experience providing care to these same patients over decades, and under the careful supervision of the court through its monitors.

17.     CDCR's mental health patients were not harmed by delays in transfers to DSH inpatient beds, and they were protected from other risks associated with COVID-19.  CDCR weighed the benefits of know mental health treatment against the virus's unknowns and made the safest decision possible for its patients.  Given the potential mortality associated with COVID-19,

//

//

11

Mehta Decl. Supp. Defs.' Resp. Nov. 19 Order  (2:90-cv-00520 KJM-DB (PC))

I agree with the risk balancing that CDCR officials have exercised when examining any transfer to a DSH inpatient bed, and will continue to work with my colleagues to perform this assessment going forward.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in San Quentin, California on December 7, 2020.

                              /s/ A. Mehta
                              A. Mehta, M.D.
                              *(original signature retained by attorney)*

12

Mehta Decl. Supp. Defs.' Resp. Nov. 19 Order  (2:90-cv-00520 KJM-DB (PC))