# Attachment

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



December 11, 2020

Samantha Wolff, Esq.
Hanson Bridgett LLP
1676 N. California Blvd., Suite 620
Walnut Creek, CA 94596


VIA EMAIL


Dear Samantha,

      On November 4, 2020, the court ordered the California Department of Corrections and Rehabilitation (CDCR) to propose modifications to its 2009 Staffing Plan and to file a proposed revision by December 11, 2020.  (ECF No. 6938.)  In accordance with that order, attached are CDCR's Adjustments to the 2009 Staffing Plan.


Sincerely,

*/s/ Nick Weber*

NICK WEBER
Attorney
Office of Legal Affairs

ADJUSTMENTS TO THE 2009 STAFFING PLAN

**A.    Establish a New Psychiatrist Staffing Ratio for CCCMS Patients Not on Medications for Six Months or More**

The Program Guide requires that "[e]ach CCCMS inmate-patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11.)  The 2009 Staffing Plan establishes a psychiatry staffing ratio for every CCCMS patient in the General Population, and does not distinguish between patients on medications and patients who are not.  (2009 Staffing Plan, ECF No. 3693 at 8.)[1]  The 2009 Staffing Plan also assumes that CCCMS patients will be reevaluated by a psychiatrist more frequently than the Program Guide requires—specifically, 1.5 times every ninety days.  (ECF No. 3693-2 at 21.)  In accordance with the 2009 Staffing Plan, to date CDCR has allocated psychiatry positions for every CCCMS patients, not just those patients who are prescribed medications.

For CCCMS patients who are not on medications for six months or more, CDCR will establish a new psychiatry staffing ratio based on a frequency of contact assumption of 0.5 times every 90 days.  This frequency of contact assumption will ensure sufficient psychiatry staff to evaluate these patients prior to any interdisciplinary treatment team meeting or other necessary routine psychiatry contact.

Accordingly, for CCCMS patients off medications for at least six months, CDCR will establish the following staffing ratios[2]:

| Staff Psychiatrist LOC | Ratios |
|---|---|
| CCCMS GP, Off meds | 1:675 |
| CCCMS ASU/CON, Off meds | 1:303 |
| CCCMS SHU, Off meds | 1:483 |

To identify the precise number of CCCMS patients not on medications for at least six months at each institution, CDCR will run ad hoc queries of its medical record system every three months.  CDCR will also employ point in time data from the same query prior to the biannual budget allocations.  This adjustment is intended to reflect best practices in a correctional setting, and should be reviewed and updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care.

**B.    Redirect Psychiatry Positions Allocated for Crisis Intervention on Weekends and Holidays to Night Shift Telepsychiatry.**

The 2009 Staffing Plan allocates 0.52 psychiatry positions at every institution to provide crisis intervention on weekends and holidays. (2009 Staffing Plan, ECF No. 3693 at 50, Exhibit 23.)  CDCR will remove these allocated positions from each institution and

---

[1] CCCMS GP 1:225, CCCMS RC 1:161, CCCMS ASU/Condemned 1:101, CCCMS SHU 1:161.

[2] CDCR will not create a new ratio for CCCMS patients not on medications in a Reception Center program.

assign them to a telepsychiatry pool for night-shift coverage. Telepsychiatrists in this pool will provide after-hours coverage seven days a week at all CDCR institutions.

Because the after-hours workload is not yet clear, CDCR will review this program to ensure that the appropriate number of telepsychiatrists are allocated to provide after-hours services. CDCR reserves the right to make adjustments to the number of night shift telepsychiatrists based on the results of this workload analysis. CDCR will review the night shift allocation before biannual staffing allocation adjustments. CDCR will work with the Special Master and Plaintiffs before making any allocation adjustment to this program.

### C.    Adopt a Formal Policy for Psychiatric Nurse Practitioners (PNPs) to Provide Psychiatry Services; Recognize PNPs in the Psychiatry Position Allocation Fill Rate.

CDCR employs PNPs who provide psychiatry care to patients at several institutions. Attached as Attachment A is CDCR's proposed PNP Policy and Procedure. The Policy and Procedure outlines the appropriate scope of practice and supervisory requirements for PNPs providing psychiatric services. The Policy and Procedure limits PNPs to the CCCMS level of care. PNPs hired and supervised under this policy will count toward the psychiatry position allocation fill rate. Defendants request that the court approve the attached policy and procedure subject to monitoring by the Special Master.

When hiring registry PNPs, consistent with existing practice, CDCR will ensure that it contracts for six month minimum commitments for potential hires.

### D.    Telepsychiatry from Home

On March 27, 2020, the parties entered into an agreement on CDCR's telepsychiatry policy, subject to monitoring. The parties agreed that it will be "CDCR's operative telepsychiatry policy during the provisional [eighteen month] period, unless and until otherwise modified upon agreement of the parties and the Special Master." (ECF No. 6539 at 2.) The provisional policy requires that telepsychiatrists provide services from designated "hub" offices throughout California. (Id. at 5.) To facilitate the delivery of care to patients, while also protecting both patients and staff during the COVID-19 pandemic, many telepsychiatrists are now providing services from their homes

To meet the needs of patients, CDCR will continue to permit telepsychiatrists to provide telepsychiatry services from home in accordance with the Telepsychiatry from Home Plan for the duration of the provisional telepsychiatry policy monitoring period. (Attachment B.) The Plan outlines requirements for transitioning employees from a hub to their home, the hiring of qualified candidates, ensuring the provider has a sufficient home office and adequate internet services, and ensuring there is adequate supervision of telepsychiatrists working from home.

Consistent with the March 27, 2020 telepsychiatry stipulation, after completion of the provisional period, the parties will meet and confer with the assistance of the Special Master concerning a final telepsychiatry from home policy. The parties will have 30 days

from the end of the provisional period to determine whether any alterations to the telepsychiatry from home plan are necessary.

  If no alterations are necessary, Defendants will submit the telepsychiatry policy, including the telepsychiatry from home provisions, for the Court's approval.  If a party proposes to alter this policy or its telepsychiatry from home provisions, the parties, under the guidance of the Special Master, will have a total of 60 days from the end of the provisional period to agree on a modified final policy. If no resolution is reached, the parties have 90 days from the end of the provisional period to submit their positions and proposed language for the final telepsychiatry policy to the Special Master for review.  The Special Master will, within 30 days of receiving the parties' positions, provide the parties with his guidance and recommendation. If the parties are unable to reach an agreement after receipt of the Special Master's input, the Special Master will file a recommendation with the Court within 45 days, after which the parties' will have 30 days to respond consistent with the Order of Reference (ECF No. 640).

# ATTACHMENT A

| **VOLUME 12:**<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| **CHAPTER X:** | Revision Date(s): | NA |
| | Supersedes: | |
| **12.XX.XXX**<br>PSYCHIATRIC NURSE PRACTITIONER POLICY | Attachments: | Yes ☒ No ☐ |
| | Director Approval: | |

**Policy**

The California Department of Corrections and Rehabilitation (CDCR), Division of Health Care Services, Statewide Mental Health Program, may utilize Psychiatric Nurse Practitioners (PNPs) in the Mental Health Services Delivery System (MHSDS) as psychiatric care providers.

PNPs shall work, under the supervision of a supervising psychiatric physician, within their scope of practice as defined in Business and Professions Code, Nursing Practice Act, Section 2725 (b)(4) and further clarified in Title 16, California Code of Regulations, Section 1480.

PNPs shall provide those mental health care services that are specified in the Statewide Standardized Procedures (Attachment A), and shall not be construed to prohibit a PNP from furnishing or ordering drugs when all of the following apply:

1. The PNP's Supervising Psychiatric Physician shall have the discretion to adopt and amend the Statewide Standardized Procedures for each PNP they supervise, based on their training and experience, above the minimum guidelines set forth in this document. Amendments to the Statewide Standardized Procedures shall require the approval by the statewide Chief Psychiatrist.
2. The Supervising Psychiatric Physician shall, along with the PNP, develop and approve:
- The standardized procedures for every nurse practitioner they supervise;
- The drugs or devices that each PNP may order, and under what circumstances; and
- The extent of supervision, the method of periodic review of the nurse practitioner's competence, including peer review, and review of the provisions of the standardized procedure. The minimum requirements of supervision are outlined in the procedure below.
3. The supervising physician shall be available by telephone at the time of patient examination by the psychiatric nurse practitioner.

PNPs shall only treat patients in the Clinical Correctional Case Management System (CCCMS) level of care, and only at institutions with a current permanent Chief Psychiatrist or Senior Psychiatrist, Supervisor who enters an agreement to supervise a PNP. The PNP and Supervising Psychiatric physician must have a tentative agreement in place prior to initiating the credentialing process. The Supervising Psychiatric Physician shall ensure that there is an agreement in place for back up supervision of the PNP when the Supervising Psychiatric Physician is away or absent.

**Purpose**

To establish the duties that PNPs may perform in the MHSDS and provide standardized guidelines for supervising PNPs. This policy is intended to reflect best practices in a

**Responsibilities**

correctional setting, and should be updated periodically to incorporate insights and lessons learned from experience, and to maintain consistency with evolving best practices and new advancements in care recommendations.

It is the Chief Psychiatrist's and/or Senior Psychiatrist, Supervisor's responsibility to ensure all PNPs (civil service and contract employees):

- Receive advanced practice provider onboarding (specifically including, but not limited to, PNPs shadowing psychiatrists);
- Demonstrate clinical competence;
- Receive health care chart reviews within established timeframes as specified in this policy and procedures; and
- Receive complete probationary reports and annual performance evaluations as identified in the procedures.

Supervising Psychiatric Physicians shall adhere to the Collaboration Agreement reached with the PNP and ensure that this policy is assiduously followed. The Supervising Psychiatric Physicians shall have the discretion to adopt and amend the statewide standardized procedures, and the Collaboration Agreement for each PNP they supervise, above minimum guidelines.

**Definitions**

1. Psychiatric Nurse Practitioner – A non-physician psychiatric care provider who is a registered nurse who possesses a master's degree in psychiatric/mental health nursing, plus two years of supervised experience providing services as a psychiatric nurse practitioner, and is certified as a Psychiatric-Mental Health Nurse Practitioner by the American Nurses Credentialing Center (ANCC).
2. Chief Psychiatrist – For the purpose of this policy, a managerial level psychiatrist assigned to an institution overseeing operations and staff.
3. Senior Psychiatrist, Supervisor – For the purpose of this policy, a supervisory level psychiatrist assigned to an institution who administratively supervises staff, and operations.
4. Supervising Psychiatric Physician – A Chief Psychiatrist or Senior Psychiatrist, Supervisor at the same institution as the one the PNP will be assigned to, who enters a Collaboration Agreement to clinically supervise a non-physician psychiatric care provider. Under extenuating circumstances, supervision of the PNP can be maintained by a staff psychiatrist serving as acting Chief Psychiatrist or acting Senior Psychiatrist, Supervisor if an agreement has been reached.
5. Psychiatric medications – Medications ordered by a psychiatrist or non-physician psychiatric care provider to target psychiatric symptoms or side effects.
6. Headquarters Psychiatry Credentialing Team – Team responsible for reviewing credentialing files, and making credentialing decisions regarding psychiatrists and PNPs interested in providing mental health services in California Department of Corrections and Rehabilitation. This team includes Senior Psychiatrist, Specialists providing input regarding the minimum requirements for credentialing to the statewide Chief Psychiatrist and other executive psychiatry leadership.
7. Credentialing and Privileging Support Unit (CPSU) – Team responsible for reviewing and processing all physician and non-physician healthcare providers' applications for credentials. Once the applications are processed, the CPSU

presents them to the Headquarters Psychiatry Credentialing Team for review and the final credentialing decision.

| **Action Required** | The following action is required for your institution to be in compliance with the new policy. Any changes to the local operating procedures (LOP) must be approved by the statewide Chief Psychiatrist. |
| --- | --- |

| If your institution… | then… |
| --- | --- |
| has an LOP | amend the current LOP to meet the new policy via an addendum and submit it to CDCR MHPolicyUnit@CDCR within 30 days of the effective date valid until the next LOP revision date. |
| does not have an LOP | ensure that one is created to meet the new policy requirements and submitted to CDCR MHPolicyUnit@CDCR within 30 days of the effective date.  Ensure the LOP is reviewed annually. |

| **References** | Business and Professions Code, Section 2725(b)(4) |
| --- | --- |

Business and Professions Code, Section 2836.1, 2836.2

California Code of Regulations, Title 16, Section 1379

California Code of Regulations, Title 16, Section 1474

California Board of Registered Nursing Publication NPR-B-20. An Explanation of Standardized Procedure Requirements for Nurse Practitioner Practice (12/1998)

California Board of Registered Nursing Publication NPR-I-16. Criteria for Furnishing Number Utilization by Nurse Practitioners. (12/2004)

| **Questions** | If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.ca.gov. |
| --- | --- |

| **VOLUME 12:**<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| **CHAPTER X:** | Revision Date(s): | NA |
| | Supersedes: | |
| **12.XX.XXX**<br>PSYCHIATRIC NURSE PRACTITIONER PROCEDURE | Attachments: | Yes ☒ No ☐ |
| | Director Approval: | |

| | *Procedure* |
|---|---|
| **1.** | **Approval**<br><br>An institution cannot employ or utilize a Psychiatric Nurse Practitioner (PNP) unless the Supervising Psychiatric Physician has agreed to comply with the applicable standardized procedures, and the agreement has been signed by the Supervising Psychiatric Physician, the PNP, and the Chief Executive Officer. |
| **2.** | **Education and Training**<br><br>The Headquarters Psychiatry Credentialing Team shall be responsible for creating the Mandatory Primary Source Verification Document, and ensuring that program specific standards for credentials and clinical privileges remain current and up-to-date under applicable legal, accreditation, and/or community standards as listed in the Minimum Professional Requirements for Credentialing and Privileging Approval for Psychiatrists and PNPs.<br>All PNPs must meet the following requirements<br>- CA State RN License<br>- CA State NP Certification and NP Furnishing number<br>- Active listing Psychiatric/Mental Health Nurse on California Board of Registered Nursing site.<br>- Certified by the American Nurses Credentialing Center (ANCC) as a Psychiatric-Mental Health Nurse Practitioner<br><br>The Credentialing and Privileging Support Unit will review and confirm necessary education and training through the credentialing process. |
| **3.** | **Service Area/Setting**<br><br>PNPs may perform the approved standardized procedures only when treating the Clinical Correctional Case Management System (CCCMS) level of care.<br><br>PNPs shall only be utilized at institutions with a current permanent on-site Chief Psychiatrist or Senior Psychiatrist Supervisor who enter an agreement to supervise a PNP. At the time of hiring, the Supervising Psychiatric Physician who enters an agreement to supervise a PNP, along with the Chief Executive Officer, shall ensure that there is an agreement in place for back up supervision of the PNP when the Supervising Psychiatric Physician is away or absent. |
| **4.** | **Psychiatric Nurse Practitioner Responsibilities** |

|   |   |
|---|---|
|   | • Performing the standardized procedures in Statewide Standardized Procedures for PNPs (Attachment A)<br>• Consult with supervising physician as described below.<br>• Maintain appropriate record keeping as described below<br>• Obtaining and producing all needed information for a proper evaluation of professional competence, character, ethics, and other qualifications<br>• Maintaining credentialing requirements in good standing and informing the institutional leadership of any changes in the status of these credentials. |
| **5.** | **Psychopharmacologic Treatment**<br><br>Statewide standardized procedures shall authorize the PNP to prescribe Drug Enforcement Administration Category V psychiatric medications. The PNP must obtain permission or approval from the Supervising Psychiatric Physician prior to any new order of non-formulary Category V medication.  The PNP may re-order or "refill" non-formulary medications that patients have been taking routinely for three months or longer. |
| **6.** | **Consultation**<br><br>Consultation with the supervising physician at a minimum shall occur in any of the following circumstances:<br><br>• As outlined in the Statewide Standardized Procedures;<br>• Whenever situations arise which go beyond the intent of the Standardized Procedures or beyond the competence, scope of practice, or experience of the PNP;<br>• For a new psychiatric diagnosis for which medical etiologies of psychiatric presentation must be ruled out;<br>• For new, or worsening psychiatric symptoms which can be possibly attributed to new or ongoing medical concerns;<br>• Whenever patient conditions fail to respond to the treatment plan in an appropriate timeframe (approximately six months for CCCMS);<br>• Any delirium, dementia and medical conditions exacerbating psychiatric syndromes;<br>• Any atypical or unstable patient condition;<br>• Any patient condition that does not fit the commonly accepted diagnostic pattern for a disease or disorder;<br>• Any unexplained historical finding, such that the historical record appears to be highly implausible or impossible;<br>• Any patient on non-formulary medications, or requiring non-formulary medications;<br>• At the PNP's or psychiatrist's request; and<br>• All emergencies during and after initial stabilization;<br>• If determined necessary by the Supervising Psychiatric Physician.<br><br>When consultation occurs, the PNP shall document the consultation, including the full name of the supervising or collaborating psychiatrist, in the health care record. |
| **7.** | **Supervision**<br><br>The Supervising Psychiatric Physician, and PNP shall reach an agreement regarding supervision which shall be memorialized as the "Collaboration Agreement" (Attachment C) signed by the supervising physician, and the PNP. The minimum requirement of supervision are outlined in "Evaluation of Clinical Care" below. The Supervising Psychiatric Physician shall determine the extent of additional supervision, above the minimum required, for each PNP they supervise, and |

is responsible for ensuring that their supervisees receive adequate supervision at all times. Consultation with the supervising physician shall be available at all times either onsite, by telephone, or via teleconferencing.  In order to maintain adequate supervision and ensure adequate patient care, each Supervising Psychiatric Physician shall be limited to supervising two PNPs at one time.

In accordance with Business and Professions Code section 2836.1(d), the ordering of drugs or devices by a PNP must occur under the supervision of the Supervising Psychiatric Physician. The physical presence of the supervising physician in this instance is not required, but the Supervising Psychiatric Physician shall be available by telephone at the time of patient examination by the psychiatric nurse practitioner.

The Supervising Psychiatric Physician shall ensure there is an agreement in place for back up supervision of the PNP when the PNP's Supervising Psychiatric Physician is not available. Supervision of the PNP can be maintained by a staff psychiatrist serving as acting Chief Psychiatrist or acting Senior Psychiatrist, Supervisor if an agreement has been reached, for up to a maximum of 6 weeks, after which they may be directed to non-patient care or nursing duties as described further below. The acting Supervisor is expected to continue adequately supervising each PNP. The designated Supervising Psychiatric Physician should be within a geographical distance, which enables him/her to effectively supervise the Psychiatric Nurse Practitioner in the performance of the standardized procedure function (California Nursing Practice Act Article 8 BPC §2834 §2835 §2835.5 §2835.7 §2836 §2836.1-3 §2837).  The acting Supervising Psychiatric Physician shall be on-site ideally, but no farther than within one hour of the facility during the PNP work shift to provide supervision. The acting Supervising Psychiatric Physician shall be available to come to the institution, within an hour, to take over the care of the patient when necessary.

If supervisory coverage cannot be arranged while the Supervising Psychiatric Physician is on vacation, and a backup Supervising Psychiatric Physician is not available, the PNP must be directed to non-patient care (such as chart review or audits), for up to a period of 6 weeks.
If the PNP's permanent Supervising Psychiatric Physician is out for more than 6 weeks, or leaves that position, and the PNP wishes to continue state service until coverage is available, the PNP must be directed to nursing duties, as determined by the local psychiatry leadership. Alternatively, the PNP may consider a lateral transfer to an institution that is able to hire the PNP by following the usual hiring/transfer process.

| 8. | **Evaluation of Clinical Care** |
|---|---|

The Supervising Psychiatric Physician shall implement a Clinical Evaluation Program for PNP competence as follows:

- For the first month of employment or service:
    1. Supervise (accomplished by shadowing and direct observation) the PNP three times per week or more for half of the day for the purpose of verifying the PNP's competency to operate more independently
    2. Meet with the PNP at least weekly to review clinical cases; and
    3. Review at least 10% of the health care records for patients treated by the PNP.
- For the first 6 months of employment or service:
    1. Continue to ensure that at least 5% of the health care records for patients treated by the PNP are reviewed and discussed monthly with the PNP; and
    2. Continue to meet with PNP weekly to review their active caseload.
- Ongoing evaluation after 6 months:
    1. Meet with PNPs at least every fourteen days to discuss clinical practice issues

|   | and clinical cases. |
|---|---|
|   | 2. Monitor compliance with current practice standards using a peer review process or professional practice evaluation process. A PNP peer is defined as another PNP. The peer review process will be identical to that utilized to review a psychiatrist's practice. When there are no available PNP peers, a psychiatrist manager will perform and manage this review task |
|   | 3. Ensure that an Individual Development Plan is completed annually for all civil service PNPs that have satisfactorily completed probation; and |
|   | 4. Reassess areas requiring increased proficiency as determined by initial or routine evaluation at appropriate intervals until an acceptable skill level is achieved. |
|   | • The Supervising Psychiatric Physician must maintain a log of when supervision has occurred, that can be produced upon request. |
|   | • When applicable, the Supervising Psychiatric Physician shall adhere to the probationary policy by completing three probationary reports for all civil service, PNPs per Statewide policy. |
|   | • Informal consultations shall occur as deemed necessary, and as mutually agreed upon by the Supervising Psychiatric Physician and PNP; and |
|   | • Contract PNPs shall be evaluated at least as often as civil service PNPs, using the methods identified above. |
| 9. | **Record Keeping**<br><br>The PNP shall maintain accurate, timely, complete, and ethical health records for each patient interaction.  All information relevant to patient care shall be documented in the health record including, but not limited to:<br>(A) Assessments<br>(B) Diagnoses<br>(C) Treatment plans<br>(D) Consent forms<br>(E) Physician consultations and/or referrals (including the physician's name)<br>(F) Discharge notes, if applicable<br>(G) Other procedure specific information, as applicable. |

**ATTACHMENT A**

**STATEWIDE STANDARDIZED PROCEDURES FOR PSYCHIATRIC NURSE PRACTITIONERS**

<u>**Psychiatric Nurse Practitioner Functions:**</u>

The PNP is authorized to-
o   Provide psychiatric care in CCCMS treatment programs.
o   PNPs shall receive day-to-day supervision as described elsewhere in this policy.
o   Furnish Psychiatric medications (while adhering to the CDCR Medication Administration Process Improvement Program) in accordance with the PNP policy.
  - PNPs may order Drug Enforcement Administration Category V psychiatric medications.
  - The PNP must obtain permission or approval from the Supervising Psychiatric Physician prior to any new order of non-formulary Category V medication.
  - The PNP may re-order or "refill" non-formulary medications that patients have been taking routinely for three months or longer
o   Order lab work as clinically indicated.
o   Gather evidence supporting petition for involuntary medications under the supervision of the Supervising Psychiatric Physician
o   Participate in the development of treatment plans and treatment team meetings,
o   In consultation with and approval of, the Supervising Psychiatric Physician, order (to start or discontinue) the following. In case of emergencies, the consultation may occur after the order has been placed.
  -   Suicide watch and observation
  -   Seclusion and restraints,
  -   Referrals and consultations,
If a physician (primary care physician or Supervising Psychiatric Physician) determines that restraints are medically contraindicated for the patient after patient is ordered in restraints by a PNP, the patient shall immediately be removed from restraints following a verbal or written order from the physician.
o   Participate in and contribute to the quality improvement process.
o   Document clinical contact: The following is required to be documented in the health record:
  A. Subjective Data: Age appropriate history that includes, but is not limited to, history of present illness; past psychiatric history, social history including tobacco, alcohol, and illicit drug use; family history; past medical history; surgical history; hospitalizations/injuries; allergies; current medications; treatment and review of systems.
  - Ongoing/ Continuity: Patient's report of current symptoms and progress.
  B. Objective Data:
  - Mental status examination, Review of vital signs, laboratory studies, and other relevant diagnostic evaluations.
  - AIMS exams and other physical observations as appropriate
  C. Diagnosis: The PNP shall use the subjective and objective findings to confirm existing diagnoses, and discuss any new symptoms that may indicate worsening of symptoms,

or a new diagnosis with the Supervising Psychiatric Physician for confirmation. These shall be documented in the visit documentation and on the patient's ongoing Problem List. After discussion with the Supervising Psychiatric Physician, documentation may include a statement of current status of disease such as "newly diagnosed," "stable," or "poorly controlled."

D. Plan/Treatment

- As a physician extender, continue managing and treating psychiatric illness as recommended by Supervising Psychiatric Physician

- Lab work and diagnostic studies can be ordered as indicated, and interpreted under the supervision of the Supervising Psychiatric Physician.

- Initiation or adjustment of medication shall be done under the supervision of the Supervising Psychiatric Physician.

- Referral to specialty clinics and supportive services shall be discussed with the Supervising Psychiatric Physician and made as clinically indicated. PNPs shall consult with the Supervising Psychiatric Physician if there are any questions about subsequent management of patients seen by specialists.

E. Patient Education: appropriate to diagnosis including treatment modalities and lifestyle counseling (e.g., diet, exercise) shall be provided and documented at each visit.

F. Follow up: PNP shall order follow-up appointment as clinically appropriate to the patient's health status and diagnosis. Follow up appointment frequency shall at a minimum be as required by the mental health program guide, but more frequently if clinically indicated.

Upon signing document, I verify that I have read the policy and procedure.

Psychiatric Nurse Practitioner

Name: _____

Furnishing Number: _____

DEA Number: _____

Signature: _____

Date: _____


Supervising Physician (Senior Psychiatrist, Supervisor or Chief Psychiatrist)

Name: _____

Signature: _____

Date: _____


Chief Executive Officer, or designee

Name: _____

Signature: _____

Date: _____

**ATTACHMENT B**

| Psychiatric Nurse Practitioner Competency Attestation | | |
|---|---|---|
| **Competency** | **Needs Training** | **Competent** |
| Patient Assessment | | |
| 1. Performs a comprehensive psychiatric evaluation to include mental status, suicide or self-harm behavior, hospitalization and past treatment history, substance abuse, medication history, current or past history of violence, social or developmental history, and gender identity. | | |
| 2. Performs suicide risk assessment | | |
| 3. EKG and lab interpretation | | |
| Diagnosis | | |
| 1. Accurately diagnoses psychiatric problems based on current DSM standards, includes differential diagnosis and rule-out medical diagnoses | | |
| 2. Differentiates between exacerbation or recurrence of a chronic psychiatric disorder and presentation of a new medical or psychiatric disorder | | |
| Treatment Planning | | |
| 1. Develops a treatment plan for psychiatric problems based on current evidence-based standards of care within scope of practice and established procedures for practice | | |
| 2. Evaluates patients for appropriate level of care; immediately refers to MD/DO or consult with MD/DO for those patients requiring transfer to EOP, APP, ICF, or MHCB | | |
| 3. Safely prescribes psychiatric medications for CCCMS patients within scope of practice and established procedures for practice | | |
| Documentation | | |
| 1. Promptly, thoroughly and accurately documents initial history, diagnosis and treatment plan/progress notes in the health care record | | |

By marking my signature below, I attest that I have witnessed the Psychiatric Nurse Practitioner in practice and have assessed his or her competency as denoted above.

_____          _____
Supervising Psychiatric Physician                                          Date

By marking my signature below, I attest that practice areas delineated in this document have been witnessed by the supervising psychiatrist.

_____          _____
Psychiatric Nurse Practitioner                                               Date

**ATTACHMENT C**

**PSYCHIATRIC NURSE PRACTITIONER AND SUPERVISING PSYCHIATRIC PHYSICIAN COLLABORATION AGREEMENT**

**PARTIES DEFINED**

This agreement is entered into by _____, MD/DO (hereinafter "Supervising Psychiatric Physician") and _____, Psychiatric Nurse Practitioner (PNP) and is effective as of _____.

**RECITALS**

A. _____, MD/DO agrees to be the PNP's Supervising Psychiatric Physician.

B. The Supervising Psychiatric Physician will be available in accordance to the requirements set forth by the California Board of Registered Nursing, as described in the attached Psychiatric Nurse Practitioner Policy and Procedures.

C. The Supervising Psychiatric Physician shall be available to come to the institution to take over the care of the patient when necessary.

D. The PNP and Supervising Physician agree to the following collaborative practice agreement for the provision of mental health care services.

**RELATIONSHIP OF PARTIES**

The Supervising Psychiatric Physician and Psychiatric Nurse Practitioner working agreement will be as follows:

A. Psychiatric Nurse Practitioner agrees to practice in adherence to the attached Statewide Standardized Procedures.

B. Psychiatric Nurse Practitioner is responsible for contacting and informing the physician about patient concerns, in a timely manner, in accordance with the practice agreement and standardized procedures. Failure to do so may be considered breach of contract, and subject to termination of contract..

C. Patients will be informed about the physician's role in their care.

D. Psychiatric Nurse Practitioner acknowledges that the Supervising Physician may express his/her preference, at any given time, to be directly involved in the care of any particular patient. Supervising Physician may take over the care of any given patient at any time.

E. Both the Supervising Psychiatric Physician and the PNP are responsible for reviewing the attached policy and procedures, and the Statewide Standardized Procedures (attachment A), and initialing below. Initials on each section implies that those sections have been reviewed by both parties, and both parties were given an opportunity to address any concerns.

| Supervising Psychiatric Physician | PNP | Section |
|---|---|---|
| | | **PNP Procedure 1. Approval** |
| | | **PNP Procedure 2. Education and Training** |
| | | **PNP Procedure 3. Service Area/Setting** |
| | | **PNP Procedure 5. Psychopharmacologic Treatment** |
| | | **PNP Procedure 6. Consultation** |
| | | **PNP Procedure 7. Supervision** |
| | | **PNP Procedure 8. Evaluation of Clinical care** |
| | | **PNP Procedure 9. Record Keeping** |
| | | **Attachment A - Statewide Standardized Procedures: Psychiatric Nurse Practitioner Functions** |
| | | **Attachment B - Psychiatric Nurse Practitioner Competency Attestation** |

**DURATION**

A. This agreement shall be active, and reviewed and signed upon biennial reappointment, relocation to a different institution, or changing of the Supervising Psychiatric Physician.

B. The agreement will be considered active upon the completion of the following conditions:

   1) The Supervising Psychiatric Physician and PNP review and initial all sections in the table above.

   2) The Supervising Psychiatric Physician and the PNP have agreed to a practical work schedule considering –
      i.   Supervision requirement
      ii.  Consultation requirement
      iii. Back up coverage when supervisor is not available ( including any Holidays and RDOs).

   3) This agreement is signed by both the Psychiatric Nurse Practitioner and Supervising Psychiatric Physician.

   4) Applicable Statewide Standardized Procedures for Psychiatric Nurse Practitioners are initialed, and signed by both the Psychiatric Nurse Practitioner and Supervising Physician as per the agreement reached.

   5) This agreement constitutes the complete and final expression of the agreement of the parties.

   6) This agreement may only be amended by a subsequent written agreement executed by the parties.

**SIGNATURES**


SIGNATURE: _____     DATE: _____


SIGNATURE: _____     DATE: _____

# ATTACHMENT B

**Telepsychiatry from Home Plan**

I.    Justification

The Telepsychiatry Program has experienced significant growth over the last decade and serves an indispensable function within CDCR, helping ensure that patients receive critical psychiatric services. Data suggests that the number of on-site psychiatrists has remained relatively static year-to-year, while telepsychiatry has seen significant recent growth. Just over the last 14 months, for example, the department grew from 52 telepsychiatrists to 92 telepsychiatrists.

CDCR's experience since the onset of the COVID-19 pandemic has demonstrated that the provision of telepsychiatry from home is an effective way to deliver care to patients, equivalent from the patient's perspective to the provision of telepsychiatry from a hub. It is also critical to meeting patients' needs during the COVID crisis.  Many telepsychiatrists are currently tele-working from home due to COVID risk status and will continue to work from home while that risk continues. Tele-work from home is necessary to sustain further expansion of psychiatry staffing to meet the needs of all patients in CDCR and to minimize COVID safety issues at the hub locations.  Many telepsychiatrists have expressed increased job satisfaction knowing that their health and safety concerns during COVID are addressed, and they are generating positive word-of-mouth, resulting in an increase in inquiries from candidates interested in the possibility of telepsychiatry from home.

Telepsychiatry from home is also a valuable tool for long-term retention and maintaining competitiveness with other major psychiatry providers, since many private and public entities are moving toward tele-work permanently as the result of the pandemic. Staying specific to both psychiatry and correctional environments, Orbit Health is an example of a company that hires direct to full tele-work from home; indeed, CDCR telepsychiatry has actually lost psychiatrists to that company as a direct result of that company's tele-work from home policy. Other companies that hire direct to full tele-work from home *and* provide care to correctional facilities include innovaTel, FasPsych, e-Psychiatry, and many others. (Note: this plan does not include hiring directly to tele-work from home; it is more conservative and requires certain conditions be met for hub work before transitioning to tele-work from home.) Kaiser Permanente now requires physicians to tele-work from home for at least part of the week. From the onset of the pandemic until the end of May, the Department of State Hospitals (DSH) was allowing clinical staff to do 50% (2 days/week) tele-work from home. Some Veteran's Administration (VA) Hospital systems allow tele-work from home, though this varies widely by state, hospital, service, etc.

It is important for CDCR to think ahead to the next five to ten years and to make plans now to prepare for tele-work from home becoming the new norm while maintaining agility to adapt rapidly to unforeseeable pitfalls that may come from heading in this direction. The success of the telepsychiatry department has always depended on its ability to pivot quickly when needed to respond to changes in the field or provide support to ensure job satisfaction for our psychiatrists. This proposal is similarly a response to worldwide changes in circumstances that need to be taken into account if telepsychiatry is to remain a competitive employer in the healthcare space. It is important that we carefully consider the appropriate rate and scope of the expansion of tele-work from home in California.

All providers in this proposal will be working in accordance with the provisional Telepsychiatry Policy, except as narrowly indicated.

II.    Current Resource Limitations

    a.    Office Space and Staffing Considerations

    Currently there are 103 offices allocated for line staff telepsychiatrists across the state. Counting pending hires, most of this space is already filled or committed, and at the current pace of hiring, the remaining offices are anticipated to be filled within a few months. CDCR thus faces a situation in which it will soon have to stop hiring additional telepsychiatrists to provide care to patients.  This is not acceptable. This proposal would allow telepsychiatrists who are currently tele-working from home due to the COVID crisis to continue working from home, while the department hires new psychiatrists into their offices behind them. This strategy is quick to implement as the providers who are currently tele-working are already fully on-boarded and familiar with providing telepsychiatry services from their home, have proven home setups, and are located near hubs for backup in case of technical failure (or exigent circumstances such as evacuation due to wildfires, which has occurred several times during the COVID-19 pandemic). Moreover, the experience of those providers and their patients over the past seven months indicates that telepsychiatry from home is safe and effective.

    Allowing current tele-working providers to continue working from home while hiring new candidates into their offices behind them would allow the department to continue increasing the number of telepsychiatrists and consequently provide more care to CDCR patients. On top of the usual steady stream of candidates, telepsychiatry could immediately begin processing hires for several new telepsychiatrists currently on waitlists at fully occupied hubs. The hiring manager also has a tentative verbal commitment from multiple physicians in the San Diego area, who could commute to a high-demand Los Angeles-area hub to onboard if space was available. There is also a commitment from one of the most highly qualified contractors to convert from registry to civil service if she were able to tele-work from home more days per week, decreasing the frequency of a lengthy commute. Other contractors have similarly expressed interest in converting to civil service should telepsychiatry from home become a reality. The central hiring unit has also received inquiries from applicants who are not interested in permanently working from a hub but are interested in telepsychiatry from home. The cost of the technological setup to work from home is equivalent to the setup within the office, as the same equipment would be provided in either setting. Similarly, with the exception of additional IT support during initial conversion of future candidates to tele-work from home, the cost of support and supervisory staff could remain largely constant whether providers work from hubs or home.

    This approach is far more efficient than acquiring new office space through leasing or purchase. All hubs and offices require upkeep, and many of them would require retrofitting and special furniture to suit the specific needs of telepsychiatry. Building custom office space on CDCR property has been explored in locations such as the current San Quentin hub, and even more modest alternatives such as adding pre-

fabricated portable modules would require years to implement. There are similar challenges faced in creating new hubs in areas with substantial interest such as San Diego and the Bay Area, where the wait time for obtaining new office space is considerable. Offices requiring retrofitting create significant additions to the timeline.

There will always be psychiatrists who want to work in offices outside of their homes, or can't accommodate tele-work from home for a variety of reasons. CDCR will continue to accommodate those providers in the hub offices. Currently about half of the telepsychiatrists have expressed their preference to remain in a hub whenever it is safe to do so.

III.    <u>Proposed Implementation</u>

The telepsychiatry department recently implemented many of the provisions of a new provisional policy that has been approved by the *Coleman* court. Most of these provisions would not change. The telepsychiatry department would provide consistent supervision and oversight for these psychiatrists tele-working from home, and they would be held to the same standards as outlined in the Telepsychiatry Policy. Candidates would be required to be licensed to practice medicine in the state of California and reside within the state to facilitate site visits and acculturation.

a.    <u>Transition</u>

In the case of temporary tele-work from home being authorized, the department would transition the currently tele-working telepsychiatrists from the status of tele-working under a "COVID exception," to a tele-working under a "probationary policy revision." This temporary authorization would apply until the telepsychiatry policy as a whole was reviewed as per the timeline stipulated at the time of filing that policy. If the policy is then made permanent, the department would start by transitioning the tele-working telepsychiatrists at the San Quentin hub to permanent work from home status. There are many candidates waiting for space at the San Quentin hub to open, and they could immediately enter the hiring process.  The process would then extend to the next highest-demand hub, and continue until all hubs are converted and open for recruitment.  It is anticipated that all hubs could transition within a few months.

CDCR must provide a full technological setup to each tele-working telepsychiatrist mirroring what they are utilizing in their hub offices (a DX80 monitor, work computer/laptop, extra monitors, mouse, keyboard, work phone, scanner/printer/shredder).  Many of the tele-working psychiatrists already have all or most of this setup, other than the specialized DX80 monitors. This equipment must either be shipped to each tele-working provider's home, or picked up at their previously assigned hub.

In order to maintain high standard videoconferencing quality that is consistent with clinical and court requirements, additional IT support is crucial during the set-up and troubleshooting phase. This IT support must include speed testing the connections of tele-work spaces in psychiatrists' homes to confirm an internet connection of sufficient speed and stability to allow a videoconference where patient and telepsychiatrist can be

seen and heard clearly. It is also necessary to register the home equipment for CDCR network use, training and confirming fluency with VPN and other connection procedures, etc.

Seniors Telepsychiatry Supervisors must work with telepsychiatrists transitioning to tele-work to ensure a HIPAA-compliant confidential office space with adequate soundproofing to prevent disruptive sounds from transmitting to the patients' side. Confidential and adequately isolated office space to prevent interruptions from people sharing the same living space, is important to maintain clear boundaries and ensure safety.  Senior Telepsychiatry Supervisors will ensure that there is no identifying or offensive data in the background (CDCR may wish to provide a collapsible backdrop–e.g. a white screen, with logo–to standardize the experience). Candidates also must meet general guidelines in the current statewide tele-work arrangement document.

Telepsychiatry will continue to ensure that the quality of supervision at the hubs and supervision at home will be the same.  Currently, existing supervisors are already spread across the state and supervising telepsychiatrists at various hubs, which has not negatively affected the engagement strategies discussed below.

b.  <u>Hiring of Candidates</u>

The telepsychiatry department would continue to screen and hire civil service candidates as per the current established process to fill offices behind the tele-working telepsychiatrists that have been transitioned to permanently work from home, with minor modifications. The screening and interview process would add a question about technological skills and versatility (e.g. a practical component could be added to the interview) as applicants would need to be more independent and technologically fluent to tele-work from home, even with the full support offered.

From a resource perspective, it is important to allow tele-work from home for civil service telepsychiatrists only (not registry providers). There is a significant investment of time and money to get every individual set up at home; given the ephemeral nature of contract work, it is not worth the initial outlay by IT and personnel for brief periods of service. It is also worth noting, as CDCR does not interview registry providers (they are fully managed by the contracting agency), several registry providers have previously entered EHRS training and were expected to possess rudimentary computer skills but were unable to complete training in a timely manner due to a lack of facility with technological requirements. This aptitude will be significantly more important for tele-working from home, and civil service applicants can be tested directly in the interview process (without requiring changes in contract language).

Telepsychiatry could also extend its reach to tap into geographical areas without ease of permanent access to current hubs, including the physician-dense metropolitan areas of Los Angeles, the East Bay, and San Diego for candidates who are willing to make the longer commute to an existing hub for an onboarding and acculturation period prior to transitioning to tele-work from home.

One of the reasons that telepsychiatry has had recent success in recruitment and retention has to do with the level of individual preparation and attention that each new telepsychiatrist receives. On-boarding of telepsychiatrists takes roughly three weeks, including shadowing other telepsychiatrists at their assigned institutions. This requires a considerable time investment from the program as a whole, but is efficient in the long run for the positive effect it has on retention (the department is confident that the relationship and trust that has been built with each new provider is conducive to longer careers of state service).

In the new system, Senior Telepsychiatry Supervisors must continue to have primary involvement in the hiring and interviewing process, as well as onboarding new psychiatrists, in addition to their direct clinical and administrative duties. Hiring must occur at a sustainable pace to avoid burning out the Senior Telepsychiatrist Supervisors.

Prior to transitioning to permanent work from home, telepsychiatrists must demonstrate mastery of the technology and workflow, adequate integration with their onsite team, and reliability and responsivity while working in the hub.  The length of time required to achieve these standards varies widely for each individual, but the department anticipates that it would take a minimum of one month for even a familiar provider to transition from work in the hub to tele-work from home (and others could take significantly longer). Only once a supervisor is fully satisfied with both the provider's performance while working in the hub and ability to function effectively from home will the transition be allowed. Telepsychiatrists allowed to work from home must also provide proof of adequate home internet requirements (speeds/ bandwidth/ reliability) to support high-quality videoconferencing. Telepsychiatry will continue to utilize speed tests and a bandwidth calculator to help assess the quality of the psychiatrist's home internet connection. If tele-working providers are not able to meet these requirements, their permission to tele-work can be rescinded and they must work out of the hub until the situation can be remedied. Senior Telepsychiatry Supervisors will ensure these standards are maintained on an ongoing basis and monitor feedback from the field.

c.  <u>IT Support and Technological Considerations</u>

Based on the experience of the telepsychiatry department in assisting the setup of statewide tele-work from home services during the COVID pandemic, transitioning new doctors to tele-work from home is a highly time- and knowledge-intensive process. The department must dedicate IT support specialists, based either out of hubs or distributed regionally. A benefit of the plan for hiring new candidates into hub offices that are no longer needed by current telepsychiatrists tele-working from home is that the initial process has been largely completed, so "surge" levels of IT specialists are not required. The current structure and framework should largely be able to accommodate the slow transition of experienced providers to a home setup.

For future transitions, IT specialists can work with Senior Telepsychiatrist Supervisors to set up home workstations and address home-based technological issues (which are significantly different than site-based issues), including different network providers,

firewall configurations, etc. Duty statements for IT specialists may need to be modified to include this new request.

d.  <u>Supervisory and Administrative Support</u>

The workload of supervising telepsychiatrists tele-working from home must be managed by Senior Telepsychiatrist Supervisors to maintain the high standards of personal attention and direct involvement that has characterized the success of the revitalized telepsychiatry department. Telepsychiatry also has the relevant recent experience with tele-work from home to make this model successful on a larger scale.

When adding new services like tele-work from home, there are significant coordination costs, but also important opportunities for policy and quality improvement, leveraging the positive impact they can create across the system when properly utilized.

e.  <u>Legal and Policy Considerations</u>

Current policy explicitly states "telepsychiatrists will work from CDCR-operated California hubs supervised by local civil service psychiatry supervisors." This will be the only line that needs to be changed.

This proposal and any stipulation or policy stemming from it would need to be revisited periodically to maintain consistency with evolving best practices and new advancements in treatment.

f.  <u>Acculturation and Engagement</u>

It is important for supervisors within the department to continuously engage telepsychiatrists working from home and connect them with their peers. Some early strategies which are being implemented include journal clubs, continuing medical education (CME) lectures, periodic scheduled supervision, remote shadowing, both official and informal meetings to share updates and compare strategies, open "office hours" for engagement or questions, slack room/discussion board/forum modalities, and many others. Telepsychiatry will also continue working to engage telepsychiatrists with systemic and institutional issues, ensuring that they are informed and involved in decisions about departmental changes and the effects they have on patient care. Telepsychiatrists also serve as an excellent source of information for headquarters about local institutional procedures and challenges. This establishes a feedback loop of responsiveness and improvement.