XAVIER BECERRA, State Bar No. 118517
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
LISA M. POOLEY, State Bar No. 168737
SAMANTHA D. WOLFF, State Bar No. 240280
LAUREL E. O'CONNOR, State Bar No. 305478
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                                   Plaintiffs,<br><br>         v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                                   Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**JOINT REPORT IN RESPONSE TO DECEMBER 3, 2020 ORDER** |

On December 3, 2020, the Court ordered the parties to file a joint report addressing three issues relative to Defendant California Department of Corrections and Rehabilitation's (CDCR) reporting of suicides in 2015 and 2016 within its institutions. (ECF No. 6973 at 11-12.) The parties address the Court's order in separate statements.

**DEFENDANTS' STATEMENT**

In 2015, the Special Master asked CDCR to prepare to assume responsibility for preparing and publishing annual suicide reports that had been completed in years past by the Special Master. Between May 2016 and November 2017, the Suicide Prevention Management Workgroup, with input from Plaintiffs, developed an annual suicide report template and the Special Master signaled that CDCR may, in the near future, assume reporting on annual suicides. (ECF No. 5779 at 20, 143-44, and 147.) The template was developed in 2017, but the Special Master has yet to formally recommend that CDCR assume responsibility for the reports.[1] Nonetheless, to avoid further delay, CDCR moved forward on its own initiative to complete annual reports for both 2015 and 2016. No other state correctional system has produced reports on suicide of comparable depth, scope, and rigor as CDCR.

At the Special Master's urging, CDCR agreed to include "foreseeable" and "preventable" determinations in its individual suicide reviews and annual suicide reports for 2015 and 2016, notwithstanding longstanding objections to the "foreseeable" and "preventable" definitions used in the Special Master's reports. The definitions underlying these determinations in the 2015 and 2016 annual reports are virtually identical to the definitions used in the Special Master's reports. CDCR also included a footnote in both the 2015 and 2016 reports that does nothing more than state the obvious—that the Special Master's "foreseeable" and "preventable" determinations depart from the normal legal standards for foreseeability, preventability, and the Eighth Amendment. As its numerous reports and other measures demonstrate, CDCR goes to tremendous lengths to provide constitutionally adequate care, including by developing a robust prison suicide prevention program.

**I.   ISSUE 1: DEFENDANTS USED THE SAME FORESEEABLE AND PREVENTABLE DEFINITIONS TO EVALUATE SUICIDES AS THOSE APPROVED BY THE COURT.**

1.   Defendants began drafting the 2015 Annual Suicide Report in 2016. (Weber Decl. ¶ 2, Ex. 1.) Over the past four years, Defendants have worked under the Special Master's

---

[1] Hours before this joint statement was due, the Special Master sent a draft report to the parties, indicating that the Special Master has re-assumed responsibility for drafting suicide reports covering calendar years 2016-2019.

1

Defs.' Resp. Nov. 19, 2020 Order (2:90-cv-00520 KJM-DB (PC))

guidance to produce outlines and drafts of the report, including various drafts of the section pertaining to "foreseeability" and "preventability," and this year CDCR published final versions of the 2015 and 2016 reports. (ECF No. 6973 at 11.) The final reports analyzed the 2015 and 2016 suicides using the same definitions of "foreseeability" and "preventability" used by the Special Master's experts when they drafted annual suicide reports. During the individual suicide case reviews in 2015 and 2016, CDCR applied streamlined versions of the Special Master's definitions when making initial foreseeability and preventability determinations. The definitions used in 2015 and 2016 were distilled from longer definitions previously adopted by the Special Master's experts. CDCR revised the Special Master's definitions to remove examples under the definitions but did not substantively change the terms' actual definitions. The revised definitions were adopted following a meeting with the Special Master's experts on July 9, 2015, and applied in all Suicide Case Reviews from 2015 through early 2017, which the Special Master's experts attended. (Weber Decl. at 3 and 5.) The definitions were shortened to facilitate discussion of the foreseeability and preventability of a suicide. Several months after adopting the revised definitions, CDCR sought to further clarify the revised definitions with the Special Master. CDCR met with the Special Master on December 9, 2015, however, no further revisions were made. (Weber Decl. ¶ 4.)

Although CDCR used slightly truncated definitions to analyze suicides as foreseeable or preventable during the individual case reviews in 2015 and 2016, to address concerns raised by the Special Master and Plaintiffs that the definitions were not perfectly aligned, CDCR re-reviewed any case that was not already determined to be both foreseeable and preventable using the Special Master's definitions. Plaintiffs and the Special Master agreed with this approach. (Weber Decl. ¶ 2, Ex. 1.) CDCR reviewed any cases that met those criteria that occurred in 2015. (2015 Report at 41.) The re-review under the Special Master's definition resulted in one change out of the twelve cases reviewed from not foreseeable to foreseeable. (2015 Report at 42.) All other foreseeability and preventability determinations remained the same.

2

Defs.' Resp. Nov. 19, 2020 Order (2:90-cv-00520 KJM-DB (PC))

## II. ISSUE 2: BECAUSE THE DEFINITIONS ARE SUBSTANTIALLY SIMILAR, TO THE LIMITED EXTENT THAT THERE ARE ANY DIFFERENCES, THEY DO NOT AFFECT THE COURT'S REVIEW OF THE STATUS OF REMEDIATION.

The Court's question appears to assume differences between the sets of definitions used that might affect the Court's review of the status of remediation. However, because the definitions are substantially similar, there are no differences that would affect the Court's review.

## III. ISSUE 3: THE FOOTNOTES REFERENCED IN THE 2015 AND 2016 SUICIDE REPORTS SERVE ONLY TO DISTINGUISH THE SPECIAL MASTER'S DEFINITIONS FROM THEIR USE IN OTHER LEGAL CONTEXTS.

CDCR's reports include a description of the context for the application of the "foreseeability" and "preventability" determinations because the terms are used in a clinical and medical context, not as an admission of causation in cases involving individual inmates. The inclusion of this context for the definitions does not detract from the usefulness of the determinations as part of the suicide prevention remedy. But such terms are not applied by other major health systems (correctional or otherwise) and they mean different things when applied in the context of individual litigation where a litigant is obligated to meet his or her evidentiary burden. The footnotes at issue in the 2015 and 2016 reports are consistent with existing policies and processes, and serve to distinguish the Special Master's "foreseeability" and "preventability" definitions from these terms as defined in separate legal contexts. The Court's prior orders do not prohibit CDCR, when engaging in its own internal processes and annual reporting, from including the footnote in its reports.

As part of the remedy in this case to improve CDCR's suicide response and prevention practices and achieve a constitutionally compliant mental health services delivery system, Defendants have developed a series of suicide-related policies. The policies evaluate a number of descriptors for compliance measurement and improvement, including "foreseeability" and "preventability." The footnotes at issue do not alter foreseeability and preventability determinations, which are made at the end of the suicide review process and any quality improvement plan resulting from the review.

Significantly, the Suicide Case Review Committee's foreseeability and preventability determinations were not part of CDCR's assessment of whether CDCR's suicide prevention

3

Defs.' Resp. Nov. 19, 2020 Order (2:90-cv-00520 KJM-DB (PC))

policies were followed or were part of the quality improvement process that addresses any policy violations. Before CDCR made findings of foreseeability or preventability, CDCR first fully investigated the suicide, determined whether policy was followed, and issued corrective action in situations where policy was found to have been violated. The Suicide Case Review findings and conclusions, coupled with the Quality Improvement Plan, provide the necessary information to signal whether CDCR is compliant with its suicide prevention program and policies, whether inadequacies remain, and to what degree those inadequacies contributed to an inmate's death. (*See* Program Guide, Chapter 10, ECF No. 5864-1 at 190-195.) The foreseeability and preventability determinations do not inform the corrective action process or lend themselves to quality improvement. Instead, identifying, reporting, and correcting any inadequacies is done before any foreseeability and preventability determinations. Any difference in the definitions used to determine foreseeability and preventability also does not impact the Court's ability to review the current status of remediation of any inadequacies because those definitions are not part of the identification and assessment of any noncompliance with policy that contributed to a death. According to Mr. Hayes, the best methodology for determining whether CDCR has fully implemented its suicide prevention program is to (1) assess suicide prevention practices within each CDCR prison, and (2) review each inmate suicide in relation to practices in the prison and determine its degree of preventability. (ECF Nos. 5864-1.) Mr. Hayes measures the adequacy of CDCR's suicide prevention program by determining the degree of preventability it affords. (*Id*.) He monitors whether Defendants are compliant with their robust suicide prevention policies and practices and, like the suicide review process, recommends corrective action plans to remediate any deficiencies. (*Id*.) In sum, the foreseeability and preventability labels have long been separate from the fundamental work done to review suicides, identify any inadequacies in compliance with procedures and protocols, and develop a quality improvement plan to address them. Indeed, suicide reviews have been part of CDCR's quality improvement process separate from the Special Master's reporting and foreseeability and preventability determinations, a process that continues even though those determinations occurred between 2015 and 2017. (Weber Decl. ¶ 5.)

4

Defs.' Resp. Nov. 19, 2020 Order (2:90-cv-00520 KJM-DB (PC))

This practice is consistent with well-established practices in the community. The medical community, for example, has abandoned foreseeability and preventability determinations to assess the need or status of corrective action. The community standard for health care systems' mortality reviews has moved away from a focus on preventability to a focus on quality improvement, which is consistent with the Defendants' goals as they relate to suicide prevention. For example, the California Correctional Health Care System posted a report on mortality reviews, Mortality Review Policy and Practice Report, that shows an industry-wide change in how to approach death reviews. https://cchcs.ca.gov/wp-content/uploads/sites/60/UCSF/Mortality-Review-Report.pdf. The study shows a transition across community integrated health care systems from a mortality review classification scheme focused on labelling each death as "preventable / nonpreventable" to one that classifies each death as "expected / unexpected" (or "anticipated / unanticipated"). For example, the study notes that the reviewers in the Mayo Clinic system determine whether a death is anticipated with no opportunities for improvement, anticipated with opportunities for improvement, or unanticipated with opportunities for improvement. The study notes that the move away from "preventability" reflects a growing awareness that preventability labels are distinct from quality improvement. (Id. at 5-6.) CDCR's approach to mortality reviews is informed by and consistent with changes in protocol implemented by other large health care systems.

The footnotes explain the purpose of the determinations and distinguish that purpose from use of the same terms in a legal context to conclusively establish what must be determined by the trier of fact. Defendants agreed to use the Special Master's definitions in their own reports, but never have agreed to use of the definitions and determinations made under those definitions in all other contexts. These terms have a special meaning in the medical evaluative context and the determinations were made in such a context. The footnotes ensure that the determinations are not used outside of the medical evaluative context to admit civil liability in individual cases. And Defendants have not been ordered to use the foreseeability and preventability in individual suicide reports, or to prepare an annual report. The orders approving the foreseeability and preventability determinations are directed at the Special Master's reports.

5

Defs.' Resp. Nov. 19, 2020 Order (2:90-cv-00520 KJM-DB (PC))

**PLAINTIFFS' STATEMENT**

**I. KEY SUBSTANTIVE DIFFERENCES BETWEEN DEFINITIONS OF FORESEEABILITY AND PREVENTABILITY**

CDCR's definitions of "foreseeability" and "preventability" are narrower than the court-approved definitions. CDCR defines a "foreseeable" suicide as "one which, based upon available information reasonably known, is reasonably anticipated based upon the presence of a substantial or high risk for a suicide attempt which would require reasonable clinical, custodial, or administrative intervention." Annual Report on Suicides in the CDCR, Jan. 1, 2015 – Dec. 31, 2015 ("2015 Report"), at 40. The Special Master's reports define "foreseeable" as "cases in which available information about an inmate indicates the presence of substantial or high risk for suicide, and requires reasonable clinical, custodial, and/or administrative intervention(s)." *Id.* at 41. Thus, Defendants narrowed the definition of "foreseeable" by (1) tying it to information "reasonably known" rather than "available" information, and (2) adding an express "reasonably anticipated" standard that is not included in the definition used by the Special Master.

Similarly, the Special Master's reports define "preventable" as "cases in which the likelihood of completed suicide might have been reduced substantially had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required by existing policy[.]" *Id.* at 41. CDCR, by contrast, more narrowly defines "preventable" as "it is probable that, had some additional information been gathered or some additional interventions undertaken, as required by existing policy, the suicide would not have occurred." *Id.* at 40. Defendants narrowed the definition of "preventable" by adopting language that (1) would explicitly require that the suicide would likely not have occurred had additional information been gathered or additional intervention been undertaken, and (2) limits the types of interventions and information-gathering considered in the preventability analysis to only those required by existing policy. *Id.* at 40-41.

**II. DEFENDANTS' MODIFICATION OF THE FORESEEABILITY AND PREVENTABILITY DEFINITIONS UNDERMINE REMEDIATION**

The suicide review foreseeability and preventability definitions have been repeatedly court-ordered, and the determinations have been frequently relied upon in assessing the

6

Defs.' Resp. Nov. 19, 2020 Order (2:90-cv-00520 KJM-DB (PC))

constitutionality of Defendants' suicide prevention program. *See, e.g.*, Order, Mar. 15, 2013, ECF No. 4394 at 5-10 (overruling Defendants' objections to use of foreseeability and preventability determinations in Special Master's 2011 suicide report, noting that the same "frivolous" objection was "overruled by this court almost ten years ago"); Report on Suicides in the First Six Months of 2012, Mar. 13, 2013, ECF No. 4376, at 18 n.35 (citing Order, July 25, 2003, Docket No. 1536); *see also Brown v. Plata*, 563 U.S. 493, 504 (2011) (citing foreseeability and preventability statistics in finding Defendants' suicide prevention practices inadequate).

Defendants' decision to depart from these well-settled definitions affects the Court's ability to review the current status of Defendants' remediation of their deficient suicide prevention program. It is clear Defendants' modification of the definitions moved the goalpost that had been in use for years—CDCR's own reports admit that their watered-down definitions undercount the number of foreseeable or preventable suicides when compared to the Special Master's. *See* 2015 Report at 42 (one 2015 suicide that was foreseeable under the court-ordered definition was found not to be foreseeable under CDCR's); Annual Report of Suicides in the CDCR, Jan. 1, 2016 – Dec. 31, 2016 ("2016 Report"), at 47 (two 2016 suicides that were foreseeable under the court-ordered definition were found not to be foreseeable under CDCR's). This is yet another example of Defendants' focus on changing compliance metrics to *appear* more compliant rather than simply focusing on remedying the constitutional harm and achieving actual compliance. *See, e.g.,* Order, Dec. 17, 2019, ECF No. 6427 ("Dec. 17, 2019 Order"), at 44-46. Such tactics fundamentally undermine this Court's ability to perform an accurate and comprehensive analysis of Defendants' progress in remedying the constitutional violation over time, because there is no way to compare compliance measures that are not accurate and consistently applied.

It is even more problematic that Defendants unilaterally ceased performing any foreseeability and preventability analysis at all in 2017. *See* Bien Decl. in Support of Pls' Response to July 2, 2020 Order, July 15, 2020, ECF No. 6767, at ¶ 40. Any attempt to analyze Defendants' progress toward fully implementing the twenty-nine recommendations from the Special Master's Suicide Prevention Expert and remedying the deficiencies in their suicide

7

Defs.' Resp. Nov. 19, 2020 Order (2:90-cv-00520 KJM-DB (PC))

prevention program will be fruitless without the continued use of the foreseeability and preventability metrics. Those determinations are the most fine-tuned and specific indicator of whether Defendants have succeeded in remedying the Eighth Amendment harm, because they detect when Defendants' "identifiable and describable inadequacies" have actually caused people to die. Order, Dec. 3, 2020, ECF No. 6973 ("Dec. 3, 2020 Order"), at 11. Defendants' decision to stop conducting this analysis shows their unwillingness to truly grapple with and remediate the fundamental failures in their system.

Ultimately, the differences between Defendants' definitions of foreseeability and preventability and the well-established court-approved versions need not affect the Court's ability to review the current status of remediation of Defendants' constitutionally-deficient suicide prevention program, because the Court should simply ignore Defendants' versions of the definitions. Defendants have shown that they cannot be trusted to analyze and report on suicides that take place under their watch in a manner that is appropriately neutral and self-critical. Rather than take the opportunity handed to them by the Special Master to assume responsibility for conducting a comprehensive review of deficiencies in their system that have caused such an alarmingly high rate of deaths, Defendants attempted to change the governing standard to cover up the true extent of their failings. The foreseeability and preventability determinations are a fundamental component of the overall analysis the Court must perform of the constitutionality of Defendants' suicide prevention system, and provide crucial information about long-term trends. *Compare Plata*, 563 U.S. at 504, 504 n.2 (noting over 72% of 2006 suicides in CDCR were foreseeable and/or preventable, and 82% of 2007 suicides were), *with* 2015 Report at 42 (at least 71% of 2015 suicides were foreseeable and/or preventable), *and* 2016 Report at 47 (at least 81% of 2016 suicides were foreseeable and/or preventable, indicating virtually no improvement in prior ten years). In light of Defendants' decisions to change the standards and stop performing the analyses all together for the last four years, the Court should order the Special Master to continue performing the annual suicide reporting function, including performing individual case reviews using the foreseeability and preventability definitions.

8

Defs.' Resp. Nov. 19, 2020 Order (2:90-cv-00520 KJM-DB (PC))

## III. DEFENDANTS' LEGAL ARGUMENTS IN THEIR ANNUAL SUICIDE REPORTS DEPART FROM THE LAW OF THE CASE AND DISPLAY AN INABILITY TO SELF-MONITOR EFFECTIVELY

Footnotes 25 and 9 in Defendants' 2015 and 2016 Annual Suicide Reports clearly signify their attempt to depart from the well-established "principles of foreseeability and preventability" in this case. *See* Dec. 3, 2020 Order at 11-12. The footnotes also signify that Defendants do not appear to take seriously their obligation to remedy the very serious harm illustrated by their alarmingly high rate of suicide—the vast majority of which were avoidable, according to Defendants' own analyses—because rather than grapple with fixing the unconstitutionally high rate of foreseeable and preventable suicides, Defendants instead focus on disclaiming legal responsibility for them. *See Coleman v. Brown*, 938 F. Supp. 2d 955, 975 (E.D. Cal. 2013) ("To state the obvious, suicide is a serious harm.") (internal quotation marks omitted).

The footnotes' legal argument misrepresents the state of the law[2] and is, in any event, wholly inappropriate for a report purporting to contain a neutral and self-reflective clinical assessment of Defendants' suicide prevention program. More significantly, it strays from the findings of this Court regarding the role of the Special Master's foreseeability and preventability definitions in establishing deliberate indifference for an Eighth Amendment violation. *See, e.g.*, *Plata*, 563 U.S. at 504; *Coleman*, 938 F. Supp. 2d at 973-979 (finding continuing violation because, inter alia, high percentage of suicides were foreseeable and/or preventable, which was evidence Defendants had not "take[n] and adequately implement[ed] all reasonable steps to remedy [the systemic] inadequacies"); *see also Coleman v. Brown*, 756 F. App'x 677, 679 (9th Cir. 2018) (affirming this Court's determination that "the persistence of objectively unconstitutional conditions satisfies the subjective 'deliberate indifference' inquiry"). This Court has already conclusively held that allowing suicides with "significant indications of inadequate treatment"—i.e., those that are foreseeable or preventable—to occur constitutes deliberate indifference; that conclusion is the law of the case. *Coleman*, 938 F. Supp. 2d at 976.

---

[2] Defendants notably omit binding authority regarding the deliberate indifference standard. *See, e.g., Lemire v. CDCR*. 726 F.3d 1062, 1078 (9th Cir. 2013) (subjective component of deliberate indifference standard can be satisfied when officers' failure to comply with policy that required regular security inspections resulted in prisoner's suicide).

9

Defs.' Resp. Nov. 19, 2020 Order (2:90-cv-00520 KJM-DB (PC))

Defendants' argument is an inappropriate attempt to relitigate the role of the foreseeability and preventability analyses in the context of the ongoing remediation in this case. It should be ignored in the Court's assessment of this aspect of the Eighth Amendment violation.

Instead, any review of the constitutionality of Defendants' suicide prevention program must be rooted in honestly assessing their progress toward compliance with the Special Master's Suicide Prevention Expert's twenty-nine recommendations, and the elimination of suicides that meet the settled definitions of foreseeability or preventability. The definitions have been adopted by the Court specifically to identify deficiencies in Defendants' compliance with their own standards for assessment, treatment, and intervention as they relate to suicide prevention, and are the most direct indicator of Defendants' compliance or lack thereof.

To the extent the inclusion of the footnotes in Defendants' reports has any bearing on the Court's remediation evaluation, it should be only to provide further support for a finding of deliberate indifference—Defendants' decision to disclaim responsibility for foreseeable and preventable deaths in its prisons, and to assert that such failings are not as tragic as they are, strongly suggests that Defendants are deliberately indifferent to the life-and-death mental health needs of the people they incarcerate.

Defendants' manipulations of the suicide reporting process also cast serious doubt about their ability to self-monitor effectively in other areas, including the CQIT process, particularly in light of the findings following the Golding report. *See generally* Dec. 17, 2019 Order. If Defendants cannot shift their focus to actually "implement[ing] all reasonable steps to remedy [the constitutional] inadequacies" in their system, rather than continuing to "avoid responsibility for the problem" by changing performance metrics and definitions, they can never be trusted to monitor their own constitutional compliance adequately. *Coleman*, 938 F. Supp. 2d at 975, 979.

10

Defs.' Resp. Nov. 19, 2020 Order (2:90-cv-00520 KJM-DB (PC))

Dated: December 11, 2020

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
ADRIANO HRVATIN
Supervising Deputy Attorney General

*/S/ ELISE OWENS THORN*
ELISE OWENS THORN
Deputy Attorney General
*Attorneys for Defendants*

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */S/ JENNY YELLIN*
    JENNY YELLIN

*Attorneys for Plaintiffs*

11

Defs.' Resp. Nov. 19, 2020 Order (2:90-cv-00520 KJM-DB (PC))