XAVIER BECERRA, State Bar No. 118517
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

PAUL B. MELLO, State Bar No. 179755
LISA M. POOLEY, State Bar No. 168737
SAMANTHA D. WOLFF, State Bar No. 240280
LAUREL E. O'CONNOR, State Bar No. 305478
HANSON BRIDGETT LLP
  1676 N. California Boulevard, Suite 620
  Walnut Creek, CA 94596
  Telephone: (925) 746-8460
  Fax: (925) 746-8490
  E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF N. WEBER IN SUPPORT OF DEFENDANTS' STATEMENT IN THE JOINT REPORT IN RESPONSE TO THE DECEMBER 3, 2020 ORDER** |

I, Nicholas Weber, declare:

1. I am an attorney with the Office of Legal Affairs for the California Department of Corrections and Rehabilitation (CDCR) and work on the *Coleman* class-action matter. I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify. I make this declaration in support of Defendants' statement in the parties' Joint Report in Response to the December 3, 2020 Order.

1

2. Defendants began drafting the 2015 Annual Suicide Report in 2016. Attached as Exhibit 1 is a true and correct copy of a letter dated August 28, 2019, that I drafted and sent to the Special Master and Plaintiffs' counsel on that same date that outlines the efforts undertaken between 2016 and 2019 to prepare a report on the suicides from 2015.

3. In 2015, at the recommendation of the Special Master, CDCR began determining whether a suicide was foreseeable or preventable. To do so, CDCR used definitions based on those used by the Special Master's experts in their annual suicide reports. The definitions were shortened to facilitate discussion of the foreseeability and preventability of a suicide. The revised definitions were adopted following a meeting with the Special Master's experts on July 9, 2015, and used in all Suicide Case Reviews in 2015 and 2016, and in some cases in 2017. Since 2015, the Suicide Case Reviews are attended by the Special Master's experts.

4. Several months after adopting the revised definitions, CDCR sought to further clarify the revised definitions with the Special Master. CDCR met with the Special Master on December 9, 2015, however, no further revisions were made.

5. CDCR conducted foreseeability and preventability determinations for suicides that occurred between 2015 and 2017.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Carmichael, California on December 11, 2020.

                                                  */s/ Nicholas Weber*
                                                  NICHOLAS WEBER
                                                  Attorney
                                                  CDCR Office of Legal Affairs
                                                  *(original signature retained by attorney)*

2

# Exhibit 1

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                                                      GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



August 28, 2019

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Michael Nunez
Rosen Bien Galvan and Grunfeld
101 Mission Street, Sixth Floor
San Francisco, CA 94105

VIA EMAIL

Dear Special Master Lopes and Michael Nunez:

I write in response to Plaintiffs' June 17, 2019 letter regarding the California Department of Corrections and Rehabilitation's (CDCR) May 14, 2019 revision of their 2015 Annual Suicide Report.  A final version of that report is attached and includes both clean and track change versions.  CDCR respectfully requests that the Special Master file the final version of the 2015 Annual Suicide Report.

Defendants have worked diligently to prepare this report while at the same time focusing on addressing the underlying concerns about suicide prevention practices noted in the report.  Since 2015, Defendants have undertaken significant suicide prevention efforts.  For example, Defendants have developed new mental health forms, updated and delivered suicide prevention trainings for custody and healthcare staff, revised suicide prevention practices to ensure the safety of patients, developed new policies, and modified physical plants to ensure patients in crisis or at higher risk for self-harm are housed in suicide resistant cells.  Many of these efforts are discussed within the report.

While working to improve their suicide prevention practices, Defendants also worked closely with the Special Master team to develop the 2015 Annual Suicide Report.  Defendants began drafting the 2015 Annual Suicide Report in early 2016.  On August 11, 2016 Defendants provided the Special Master with an outline of the 2015 Annual Suicide Report.  A revised copy was provided to the Special Master and Plaintiffs on September 22, 2016.  In December 2016, Defendants provided the Special Master's experts with a forty-page draft of the executive summary, the report's introduction, and its summary of findings.  After conferring with the Special Master team about the forty-page draft and further developing the remainder of the

Special Master Lopes
Michael Nunez
Page 2

report, Defendants then provided a complete draft of the report to the Special Master in June 2017.

Following additional meetings with the Special Master team and revisions to the draft, Defendants provided a draft of the report to the Plaintiffs and Special Master in February 2018. Plaintiffs then provided written comments and questions on April 23, 2018. On June 13, 2018, Defendants responded to Plaintiffs' comments and questions and provided them with a revised draft of the report. On May 14, 2019, after conferring with the Special Master, Defendants provided Plaintiffs and the Special Master with another revised draft of the report, in which they removed language the Plaintiffs and Special Master objected to discussing the definitions of "foreseeable" and "preventable." Plaintiffs provided comments and questions on June 19, 2019, many of which were previously raised in their April 23, 2018 letter.

The parties met to discuss the most recent draft and the Plaintiff's June 19, 2019 letter at a June 27, 2019 workgroup. Those concerns are addressed below.

   I.   Definitions of Foreseeability and Preventability

In response to Plaintiffs' prior objections, Defendants made extensive edits to the 2015 Annual Suicide Report and removed language to which Plaintiffs had objected. Nonetheless, and despite having had a draft of the report for nearly a year and a half, Plaintiffs for the first time in their June 19, 2019 letter raise a new objection – that the definitions used by Defendants in their 2015 Annual Suicide Report do not match, word for word, the definitions used by the Special Master's experts in their annual suicide reports. Specifically, Plaintiffs assert that the definitions used by Defendants are narrower than those used by the Special Master. Defendants reject that assertion.

The definitions used in Defendants reports have been used by Defendants since 2015 and were first published in most individual suicide reports issued in 2015 and every suicide report issued in 2016. Defendants acknowledge that the definitions do not match the definitions used by the Special Master word for word. In fact, Defendants developed the definitions in consultation with the Special Master in 2015 after the Special Master team had recommended that CDCR begin determining whether each suicide was foreseeable or preventable during the suicide case review teleconferences. Under the oversight of the Special Master, CDCR intentionally modeled the definitions found in the 2015 Annual Suicide Report after the definitions used by the Special Master's experts in their prior reports. On multiple occasions in 2015, CDCR discussed the process of applying the definitions with the Special Master and his team and received their feedback. The modifications facilitate the consistent and reliable application of definitions to individual case reviews by a multidisciplinary group of CDCR staff.

While the revised definitions may have slightly different wording, Defendants dispute that the changes had any practical impact on the determinations by the suicide case review committees. Defendants' suicide case review process is highly critical of the facts and circumstances surrounding each suicide. Defendants' determination of foreseeability and preventability is no exception. In 2015, forty-six percent of completed suicides were determined to be foreseeable

Special Master Lopes
Michael Nunez
Page 3

and seventy-one percent were determined to be preventable.  For comparison, Kerry Hughes found that nearly seventy-four percent of completed suicides in 2014 were foreseeable or preventable.  (ECF no. 5428 at 5.)

Defendants will not use the Special Master's definitions to re-analyze each 2015 suicide as it would be impractical to reassess each case four years later.  Defendants, however, have removed the statement in the 2015 Annual Suicide Report which stated that Defendants definitions are the same as those used by the Special Master's experts.  (Report at 39-40.)

 II. Case Reviews

Plaintiffs' object to the length and analysis of CDCR's case reviews attached to the 2015 Annual Suicide Report.  This objection lacks merit.  The 2015 Annual Report is derived from CDCR's comprehensive individual suicide reports, some of which are up to thirty pages in length.  Each individual report includes a detailed analysis of the patients' history and mental health treatment in CDCR, as well as quality improvement plans aimed at correcting deficiencies.  Those reports are released to the Special Master and Plaintiffs within months of a patient's death.  Accordingly, it is a waste of time and resources for CDCR to reproduce such comprehensive reports for inclusion in the Annual Report, a report which is intended to analyze the trends and findings of all individual suicide reports from four years ago.  A corrected case review has been included with the revision of this report. (Appendix A).

 III. Revision of Self-Harm Definitions

In their June 19, 2019 letter, Plaintiffs object to CDCR's updated self-harm definitions to comport with community standards and instead request that CDCR revert to outmoded terminology found in the 2009 Program Guide.  (Letter at page 5.)  Plaintiffs do not provide a compelling reason to disregard the community standard definition of self-harm, nor explain why CDCR should instead use outdated Program Guide definitions in CDCR's Annual Suicide Report.  Additionally, Plaintiffs fail to point to any policy or order requiring CDCR to use such definitions, or any definitions at all, in their Annual Suicide Report.  If Plaintiffs are unclear about terminology used in the report, they can easily refer to the definitions of those terms, which are included in the report.  (Report at 8-9.)

 IV. Suicide Trigger Events

CDCR has revised Tables 12 and 13 regarding suicide triggers to clarify the suspected suicide trigger analysis.  (Report at 19-21.)  The purpose of the tables has not changed.  Table 12 includes common suspected precipitants to suicides in 2015, by category. Table 13 provides each individual suicide case's suspected precipitant.  A footnote to Table 13 has been added clarifying that "[p]recipitants tabulated for Table 12 are separated by semicolons in Table 13 (when more than one precipitant was determined by the Suicide Case Reviewer.)"

Special Master Lopes
Michael Nunez
Page 4


V.  Statistical Issues

Plaintiffs re-raise a host of statistical questions in their June 19, 2019 letter. And as stated in CDCR's June 13, 2018 letter, "CDCR has drafted a statistically comprehensive report regarding suicides that occurred in 2015, providing a thorough picture of the suicide prevention system and areas for improvement." Like any statistics based report, there is no end to the number of charts and graphs that could be added to the 2015 Annual Suicide Report. However, adding additional statistics to the report will only serve to further delay the finalization of this report. With limited exception, and as discussed further below, no additional statistical analysis is forthcoming for 2015.

Table 15 was updated to include a footnote clarifying that the population data post-2007 includes both in- and out-of-state inmates. (Report at 23.) CDCR reviews all suicides of CDCR inmates, regardless of whether the suicide occurred in or out of state. Accordingly, CDCR uses the total in-state and out-of-state population to determine the suicide rate.

The report was updated to further clarify that 2014 is the last available year for national suicide data in state prisons and jails, and that comparisons between CDCR and national figures are based on 2014 data. (Report at 35.) Figure 6 has also been updated to provide additional years of data for the table comparing CDCR's suicide rate against the rates for other state prison systems and males in the United States. (Report at 35.)

VI.  Report Implications and Future Steps

During the June 27, 2019 workgroup call, CDCR committed to providing updates on remedial measures outlined in the 2015 Annual Suicide Report. The report has been updated to clarify that updates to each "Report implications and future steps" section will be included in future annual reports. (Report at page 60.)

CDCR thanks you for your comments and suggestions regarding CDCR's 2015 Annual Suicide Report. The final report represents hundreds of hours of painstaking work and analysis designed to provide CDCR administrators and staff with a clear picture of the suicide prevention system and identify areas for improvement. CDCR requests that the Special Master file the final 2015 Annual Suicide Report and recommend Defendants assume the responsibility for producing future annual reports.


Sincerely,

*/s/ Nick Weber*

NICK WEBER
Attorney
Office of Legal Affairs