1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:   (510) 644-2555

9

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

10  Attorneys for Plaintiffs

11

12  UNITED STATES DISTRICT COURT

13  EASTERN DISTRICT OF CALIFORNIA

14

15  RALPH COLEMAN, et al.,

16         Plaintiffs,

17     v.

18  GAVIN NEWSOM, et al.,

19         Defendants.

20

21

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' OBJECTIONS TO AND COMMENTS ON DEFENDANTS' PROPOSED REVISIONS TO 2009 STAFFING PLAN**

Date:    Dec. 18, 2020
Time:    10:00 a.m.
Crtrm.:  Videoconference

Judge:  Hon. Kimberly J. Mueller

22

23

24

25

26

27

28

[3662901.7]

# TABLE OF CONTENTS

**Page**

I.  Defendants' Proposed Revisions to the 2009 Staffing Plan Exacerbate Their Failures to Allocate and Hire Sufficient Chief Psychiatrists and Senior Psychiatrist Supervisors..................................................................................... 1

    A.  Defendants are Allocating Fewer Chief Psychiatrist and Senior Psychiatrist Supervisor Positions than the 2009 Staffing Plan Requires. ................................................................................................. 2

    B.  Defendants are Required to Fill at least 90 Percent of Chief Psychiatrist and Senior Psychiatrist Supervisor Positions. ............................ 7

II.  Defendants' Proposed Revisions Disincentivize On-Site Care and Endanger Compliance with the Telepsychiatry Policy, 2009 Staffing Plan, and 2002 Order. ................................................................................................. 11

III.  Defendants Should Not Be Permitted to Modify the Court-Ordered Monthly Psychiatry Vacancy Report To Include Misleading and Irrelevant Information ............................................................................................. 15

PLAINTIFFS' OBJECTIONS TO AND COMMENTS ON DEFENDANTS' PROPOSED REVISIONS TO 2009 STAFFING PLAN

# TABLE OF AUTHORITIES

**Page**

## CASES

*Coleman v. Brown,*
    28 F. Supp. 3d 1068 (E.D. Cal. 2014) ........................................................ 6

*Coleman v. Wilson,*
    912 F. Supp. 1282 (E.D. Cal. 1995) .......................................................... 9

*Hernandez v. Cty. of Monterey,*
    110 F. Supp. 3d 929 (N.D. Cal. 2015) ...................................................... 6

*Hook v. Arizona Dep't of Corrections,*
    107 F.3d 1397 (9th Cir. 1997) ................................................................... 6

*Whitman v. American Trucking Associations,*
    531 U.S. 457 (2001) .................................................................................... 8

1    Defendants' proposed revisions to their 2009 Staffing Plan and related pleadings

2    suffer from three core defects.  First, the proposed revisions do not address Defendants'

3    persistent failures to allocate and hire the number of supervising psychiatrists their 2009

4    Staffing Plan states are required to properly oversee their psychiatry program.  In fact,

5    Defendants' proposed revisions compound the problem by imposing additional

6    supervisory duties on the same inadequate number of Chief Psychiatrists and Senior

7    Psychiatrist Supervisors they currently employ.  Second, the proposed revisions

8    disincentivize on-site care and thereby endanger compliance with Defendants'

9    telepsychiatry policy, 2009 Staffing Plan, and orders of this Court.  Finally, Defendants

10   propose to modify their monthly reporting of psychiatry vacancies in a way that will clutter

11   the docket with misleading and irrelevant information that does not help this Court assess

12   Defendants' compliance.

## I.    Defendants' Proposed Revisions to the 2009 Staffing Plan Exacerbate Their Failures to Allocate and Hire Sufficient Chief Psychiatrists and Senior Psychiatrist Supervisors.

15   Adequate supervision of Defendants' psychiatry program is a necessary part of any

16   remedy for the constitutional violations at issue in this case.  According to Defendants'

17   own Statewide Chief of Psychiatry, "[w]e need psychiatric supervisors to be helping to

18   organize and manage care so that it's quality care," and the absence of such supervision

19   "decimates[s] the ability of [CDCR's] psychiatrists to take care of our patients."  ECF

20   No. 6377, Oct. 15, 2019 Tr. at 33:17-20.  Recognizing the importance of adequate

21   supervision, Defendants' 2009 Staffing Plan establishes minimum staffing levels for Chief

22   Psychiatrists and Senior Psychiatrist Supervisors, and Defendants themselves have

23   conceded that compliance with the Plan is necessary for them to satisfy their constitutional

24   obligations to *Coleman* class members.  *See* Order (Oct. 10, 2017), ECF No. 5711 at 16.

25   But Defendants have never come close to meeting the supervisory staffing levels outlined

26   in that Plan, and they remain out of compliance today.  Their proposed revisions to the

27   2009 Staffing Plan do nothing to address this problem, and in fact will make the problem

28   worse.

[3662901.7]

### A. Defendants are Allocating Fewer Chief Psychiatrist and Senior Psychiatrist Supervisor Positions than the 2009 Staffing Plan Requires.

Defendants' 2009 Staffing Plan requires that Defendants allocate and fill Chief Psychiatrist and Senior Psychiatrist Supervisor positions according to several criteria: First, Defendants must allocate and fill Chief Psychiatrist positions at "[a]t least half of all prisons," including all "prisons with MHCB units and prisons with complex and multiple mental health programs." Defendants' Staffing Plan (Sept. 30, 2009) (hereafter "2009 Staffing Plan"), ECF No. 3693 at 31. Second, Senior Psychiatrist Supervisor positions must be allocated and filled at all "prisons that do not have a Chief Psychiatrist but have a significant number of staff psychiatrists," as well as "several prisons that have a Chief Psychiatrist and that have large and complex mental health services." *Id*. at 32. Third, the 2009 Plan requires that CDCR allocate and fill at least one Senior Psychiatrist Supervisor position for every for every 50 beds at facilities with MHCB units with six or more beds (which is all of them). *Id.* at 22 & Ex. 20. These requirements are consistent with the Program Guide, which contemplates chief and other supervising psychiatrists providing treatment to MHCB patients and determining whether those patients should remain in an MHCB for longer than 10 days. *See* MHSDS Program Guide at 12-5-1, 12-5-33 (2009).

Defendants have not been complying with these requirements of the 2009 Plan and their proposed revision to the 2009 Plan does not address this deficiency. Not only are Defendants not *filling* the chief and supervising psychiatrist positions required by their 2009 Staffing Plan, they are not even *allocating* many of these positions. They are not, for example, allocating Chief Psychiatrist positions to all institutions with MHCBs, even though, under Defendants' 2009 Staffing Plan, the Chief Psychiatrist position "shares clinical oversight of the MHCB unit and is responsible for appropriate application of involuntary medication and physical restraint use" in those licensed hospital settings. *See* 2009 Staffing Plan at 31. Nor are Defendants allocating enough supervisory positions at many of these institutions to comply with the mandatory ratio of at least one Senior

1    Psychiatrist Supervisor for every 50 MHCB beds,[1] even though these supervising

2    clinicians are supposed to play a key role in MHCB settings.  *See* 2009 Staffing Plan at 22

3    (noting senior psychiatrist supervisors are required to be allocated to MHCBs to "supervise

4    staff psychiatrists, provide clinical care for difficult cases, review documentation initiating

5    involuntary medication and restraints, and monitor use of restraints").

6         For example, HDSP has an MHCB unit with ten beds, but as of September 2020

7    Defendants had not allocated *either* a Chief Psychiatrist or a Senior Psychiatrist Supervisor

8    to HDSP.  *See* Defs' September Monthly Statistics, Enclosure 6a (hereafter "Encl. 6a,

9    Sept. 2020"), Gourse Decl. Ex. A at 1; Defs' October Monthly Maps, ECF No. 6954 at

10   102.   Similarly, CCWF and NKSP have 12-and 10-bed MHCB units, respectively, but

11   Defendants have not allocated a Chief Psychiatrist to either prison to oversee those

12   licensed hospital settings.  *See* Encl. 6a, Sept. 2020, Gourse Decl. Ex. A at 1; Defs'

13   October Monthly Maps, ECF No. 6954 at 101-02.  Similarly, although VSP lacks an

14   MHCB, it has complex and multiple mental health programs, with a 372-bed EOP program

15   and a large CCCMS program; under the 2009 Staffing plan, VSP should therefore have an

16   allocated Chief Psychiatrist, but does not. *See* Encl. 6a, Sept. 2020, Gourse Decl. Ex. A at

17   1; Defs' October Monthly Maps, ECF No. 6954 at 104; *see also* 2009 Staffing Plan at 31.

18        Meanwhile, at several other institutions with six or more MHCB beds—CIM,

19   KVSP, LAC, MCSP, PBSP, PVSP, SATF, SOL, SVSP, and WSP—Defendants have not

20   allocated *any* Senior Psychiatrist Supervisors, despite their obligation to allocate at least

21   one such supervising psychiatrist for every 50 beds.  *See* Encl. 6a, Sept. 2020, Gourse

22   Decl. Ex. A at 1; Defs' October Monthly Maps, ECF No. 6954  at 101-04.

23        Nor are Defendants routinely allocating required Senior Psychiatrist Supervisor

24   positions to institutions with large and complex mental health programs, or to institutions

25

26   ───────────────────

27   [1] As of September 2020, all twenty CDCR institutions with MHCBs had at least six beds
     in their crisis bed units.  *See See* Defs' September Monthly Statistics, Enclosure 6a

28   (hereafter "Encl. 6a, Sept. 2020"), Gourse Decl. Ex. A at 1.

[3662901.7]

3

1  with significant numbers of line psychiatrists treating a largely stable group of patients that

2  lack a Chief Psychiatrist.

3      LAC, for example, has an operational capacity of 1,000 CCCMS patients, 600 EOP

4  patients and a 12-bed MHCB, as well as an allocation of 12 line psychiatrists, but

5  Defendants have not allocated any Senior Psychiatrist Supervisor positions.  *See* Encl. 6a,

6  Sept. 2020, Gourse Decl. Ex. A at 1; Defs' October Monthly Maps, ECF No. 6954 at 103.

7  MCSP has an operational capacity of 1,350 CCCMS patients, 774 EOP patients and an 8-

8  bed MHCB, as well as an allocation of 9 line psychiatrists, but no allocation for any Senior

9  Psychiatrist Supervisors.  *See* Encl. 6a, Sept. 2020, Gourse Decl. Ex. A at 1; Defs' October

10  Monthly Maps, ECF No. 6954 at 103.  SATF has an operational capacity of 2,000 CCCMS

11  patients, 660 EOP patients and a 20-bed MHCB, plus an allocation of 7 line psychiatrists,

12  but no allocation for any Senior Psychiatrist Supervisors.  *See* Encl. 6a, Sept. 2020, Gourse

13  Decl. Ex. A at 1; Defs' October Monthly Maps, ECF No. 6954 at 103.  SVSP has an

14  operational capacity of 850 CCCMS patients and nearly 400 EOP patients, as well as a 10-

15  bed MHCB and a 246-bed PIP-ICF facility, but only 1 allocated Senior Psychiatrist

16  Supervisor (allocated to the PIP).  *See* Encl. 6a, Sept. 2020, Gourse Decl. Ex. A at 1; Defs'

17  October Monthly Maps, ECF No. 6954 at 104. Each of these institutions has a large and

18  complex mental health program, within the meaning of Defendants' 2009 Staffing Plan.

19  *See* Staffing Plan at 17, 20 (describing the "increased services" needed to treat the

20  "severity of mental illness and impairment" among the EOP population).  And even though

21  Defendants concede that ASP qualifies under their 2009 Staffing Plan for a Senior

22  Psychiatrist Supervisor, with over 800 CCCMS class members being treated by 5.59 staff

23  psychiatrists, they have apparently chosen to divert that mandatory allocation to their

24  telepsychiatry program instead.  *See* Encl. 6a, Sept. 2020, Gourse Decl. Ex. A at 1; Defs'

25  October Monthly Maps, ECF No. 6954 at 101 & 104 FN**.

26      These and other institutions need Senior Psychiatrist Supervisors to oversee the

27  administration of their mental health programs, provide supervision to treating

28  psychiatrists, and ensure that Program Guide-level care is provided to *Coleman* class

1    members.  *See* 2009 Staffing Plan at 32.  Indeed, the fact that all of the aforementioned

2    institutions except ASP also has an MHCB makes the need for additional supervising

3    psychiatrists all the more urgent; in the absence of additional Senior Psychiatrist

4    Supervisors, the Chief Psychiatrists at these institutions have little time to devote to

5    treating MHCB patients, as contemplated by the Program Guide.  *See* MHSDS Program

6    Guide at 12-5-1, 12-5-33 (2009); *see also* 2009 Staffing Plan at 31 (requiring Chief

7    Psychiatrist to play central role in MHCB).

8         Defendants' proposed revisions to their 2009 Staffing Plan do nothing to address

9    these deficiencies.  In fact, the proposed revisions make the problem worse by requiring

10   Defendants' already over-worked and under-allocated chief and supervising psychiatrists

11   to take on substantial additional supervisory duties with regard to Psychiatric Nurse

12   Practitioners.  In order for the new PNP Policy and Procedure to work, Chief Psychiatrists

13   and Senior Psychiatrist Supervisors will have to personally supervise PNPs.  Such

14   supervision includes shadowing and observing up to two PNPs for several hours, three

15   days per week during the first month of the PNPs' employment, as well as weekly reviews

16   of the PNPs' clinical cases for the first six months of their employment and biweekly

17   reviews of the PNP's clinical cases thereafter.  *See* ECF No. 6978-1 at 12-13.  Chief

18   Psychiatrists and Senior Psychiatrist Supervisors will also be required to review at least ten

19   percent of the health care records of patients treated by the PNPs for the first month of the

20   PNPs' employment, and at least 5 percent of such records for five months thereafter.  *Id.*

21        In their December 11 submission to the Court, Defendants try to dodge the

22   implications of their proposed revisions by suggesting that "neither the 2009 Staffing Plan

23   itself nor any of [Defendants' proposed revisions to it] are necessary to remedy an Eighth

24   Amendment violation[.]"  *See* ECF No. 6978 at 2.  Defendants are wrong.  In fact, they

25   themselves have admitted that compliance with the Plan is necessary to satisfy their

26   constitutional obligations to *Coleman* class members.  *See* Order (Oct. 10, 2017), ECF

27   No. 5711 at 16 (noting Defendants' representation to the Legislature that "the staffing

28   levels in the 2009 Staffing Plan were 'appropriate' and necessary to meet constitutional

1    standards").  Indeed, the fact that Defendants now deny the need for adequate supervision

2    illustrates why further orders from this Court are necessary.  As the Special Master has

3    explained, repeatedly, Defendants "demonstrate[] no sense of the required urgency" to

4    remedy constitutional deficiencies related to staffing.  Special Master's Report on his

5    Expert's Analysis of Psychiatrist Employment (May 29, 2020), ECF No. 6695 at 3.

6            Defendants also suggest in their December 11 filing that their proposed PNP policy

7    provides for more robust supervision and oversight of PNPs "than is otherwise required of

8    PNPs in the community."  ECF No. 6978 at 2.  Even if this is true, it is irrelevant because

9    California law does not determine the governing standard for constitutionally adequate

10   mental health care under the Eighth Amendment.  *See Coleman v. Brown*, 28 F. Supp. 3d

11   1068, 1079-80 (E.D. Cal. 2014) (accepting CDCR testimony that use of force depicted in

12   six videotapes was not excessive under existing regulations and policy but finding

13   nevertheless that the use of force violated the Constitution); *id.* at 1095-1100 (identifying

14   Title 15 regulations that permit use of administrative segregation for non-disciplinary

15   reasons, and nevertheless finding that the practice violates the Eighth Amendment); *see*

16   *also Hook v. Arizona Dep't of Corrections*, 107 F.3d 1397, 1403 (9th Cir. 1997)

17   ("[O]therwise valid state laws…cannot stand in the way of a federal court's remedial

18   scheme if the action is essential to enforce the scheme."); *cf. Hernandez v. Cty. of*

19   *Monterey*, 110 F. Supp. 3d 929, 945-46 (N.D. Cal. 2015) ("[E]ven if there were a conflict

20   [between the U.S. Constitution and state law], the Supremacy Clause makes it very simple:

21   the Constitution controls.").

22           Nor should PNPs working in the community be subject to the same oversight as

23   PNPs working in a prison.  The challenges of providing psychiatric care in the prison

24   setting are not analogous to those in the community.  Prisoners with severe mental illness

25   are subjected to far more (and far more severe) stressors than similar people in the

26   community, and CDCR's suicide rate is far higher than in the community.  As Defendants

27   themselves concede in their December 11 filing, the supervision requirements in their PNP

28   policy are "critical to eliminating barriers to Defendants ability to deliver constitutionally

1    adequate care[.]"  ECF No. 6978 at 2.

2        The solution to the problem of overburdened Chief Psychiatrists and Senior

3    Psychiatrist Supervisors is not to reduce the supervisory duties of these staff members,

4    which are essential to constitutionally adequate patient care.  Rather, the solution is for

5    Defendants to do what this Court repeatedly has ordered them to do—comply with their

6    own staffing plan by allocating and filling the supervisory positions required by that plan.

7        **B.    Defendants are Required to Fill at least 90 Percent of Chief Psychiatrist**
            **and Senior Psychiatrist Supervisor Positions.**
8

9        Defendants' failure to allocate chief and supervisory psychiatry positions as

10   required by their staffing plan is all the more harmful because they are not filling nearly

11   enough of the positions they do allocate.  At CHCF, for example, Defendants have not

12   filled either of the two Senior Psychiatrist Supervisor positions allocated to the prison, nor

13   either of the two allocated to the PIP.  *See* Defs' October Monthly Maps, ECF No. 6954 at

14   101.  At CMF, they have filled only one of the three Senior Psychiatrist Supervisor

15   positions allocated to the institution (including the PIP).  *Id.* at 102.  At COR, both the

16   Chief Psychiatrist and Senior Psychiatrist Supervisor positions are vacant, as are the Chief

17   Psychiatrist positions at MCSP, PBSP, and WSP, and the lone Senior Psychiatrist

18   Supervisor position in the PIP at SVSP.  *Id.* at 102-04.

19       Defendants have argued in the past that they are not obligated to actually fill the

20   supervisory psychiatry positions required by their court-ordered 2009 Staffing Plan

21   because the Court's June 13, 2002 Order only applies to non-supervisory psychiatry

22   positions.  That Order states that "Defendants shall maintain the vacancy rate among

23   psychiatrists and case managers at a maximum of ten percent, including contracted

24   services."  Order (June 13, 2002), ECF No. 1383 at 4.  In Defendants' view, the inclusion

25   of the term "case managers" in this sentence "shows that the application of the ten percent

26   vacancy rate is limited to line staff, not supervisors," because the Program Guide

27   supposedly excludes supervisory psychologists from the category of case managers.  *See*

28   Email from Melissa Bentz (Nov. 29, 2018), Ex. F to Special Master Labor Economist

[3662901.7]                                         7

1    Report, ECF No. 6695 at 56 (citing Program Guide Appendix A at A-1).

2         Even if the Program Guide were as clear on this point as Defendants suggest—the

3    provision cited by Defendants simply lists some of the tasks that "case managers" perform,

4    which is far from dispositive—the language of the June 13, 2002 Order is unambiguous.

5    The Court states that Defendants must comply with the 90-percent fill rate for two groups

6    of employees: "psychiatrists" and "case managers." *See* Order (June 13, 2002), ECF No.

7    1383 at 4. If the Court had intended to limit the application of its Order to only a subset of

8    psychiatrists, such as psychiatrists who are neither Chief Psychiatrists nor Senior

9    Psychiatrist Supervisors, it would have done so by referring to "staff psychiatrists" or "line

10   psychiatrists"—just as, in Defendants' interpretation, it purportedly used the term "case

11   managers" (rather than the broader categories of "psychologists" and "social workers") to

12   refer to the subset of non-supervisory psychologists and social workers. But the Court did

13   not do this. Instead, it stated that Defendants must maintain a 90-percent fill rate among

14   "psychiatrists"—a category it did not define but whose plain meaning clearly includes staff

15   psychiatrists, Chief Psychiatrists, and Senior Psychiatrist Supervisors alike. There is no

16   reason to believe that the Court intended to create a major exception to the 90-percent fill

17   requirement but failed to do so explicitly. *Cf. Whitman v. American Trucking*

18   *Associations*, 531 U.S. 457, 468 (2001) ("Congress…does not alter the fundamental details

19   of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say,

20   hide elephants in mouseholes.").

21        This interpretation of the June 13, 2002 Order is consistent with how the parties and

22   the Court have used the term "psychiatrist" in the past. In 2006, for example, Defendants

23   stipulated that all newly hired "psychiatrists" would meet certain minimum credentialing

24   criteria. *See* ECF No. 1968 at 1-3. The stipulation did not distinguish between line

25   psychiatrists and chief or supervising psychiatrists, and to this day Defendants' chief and

26   supervising psychiatrists are required to satisfy the criteria to which Defendants'

27   stipulated.

28

It is consistent with the Court's purposes in imposing the mandatory 90-percent staffing requirement to apply it to chief and supervising psychiatrists. Doing so is necessary to ensure that *Coleman* class members receive constitutionally adequate care. *See* Order (Oct. 10, 2017), ECF No. 5711 at 16 (noting that Defendants themselves represented to the California Legislature that "the staffing levels in the 2009 Staffing Plan were 'appropriate' and necessary to meet constitutional standards"). And the 2009 Staffing Plan itself makes it clear that adequate supervision of psychiatrists is necessary to provide constitutionally adequate care. Senior Psychiatrist Supervisors, according to the Plan, provide many essential functions, including "clinical supervision of staff psychiatrists," "various administrative tasks related to formulary, medication management, and continuity of psychiatric medications," "generation and periodic review of LOPs," ensuring psychiatry practice at the institution conforms to department policy, and "quality improvement activities including peer/professional review[.]" 2009 Staffing Plan at 32. In MHCB units in particular, Senior Psychiatrist Supervisors not only supervise staff psychiatrists, they also "provide clinical care for difficult cases, review documentation initiating involuntary medication and restraints, and monitor use of restraints." *Id.* at 22.

Defendants also depend on supervisory psychiatrists to carry out the quality assurance plan that Defendants have adopted to satisfy their constitutional obligation to implement a process for ensuring adequate care. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1308 (E.D. Cal. 1995) (finding that Defendants cannot provide adequate mental health care without quality assurance to ensure staff competence); MHSDS Program Guide (2018), ECF No. 5864-1 at 265, 267 (July 23, 2013 Policy on Mental Health Program Subcommittee 12.01.100, providing for the participation on chief psychiatrists on MHPS committees); MHSDS Program Guide at 12-10-5 (2009) (requiring the service of chief and supervising psychiatrists on SPR FIT committees); *see also* ECF No. 6377, Oct. 15, 2019 Tr. at 33:10-13 (Statewide Chief of Psychiatry testifying that without adequate numbers of supervisory psychiatrists, "each little bit of care that is done per patient is less complete and less well done and, thus, fewer supervisors creates a need for greater

1  frequency of care"), 73:11-74:1 (further testifying that the absence of adequate numbers of

2  supervisory psychiatrists "means you need far more staff psychiatrists" because the quality

3  of care provided is lower); ECF No. 6406, September 19, 2019 Kuich Deposition Tr. at

4  34:11 – 35:12 (former Statewide Chief of Telepsychiatry describing importance of

5  supervising psychiatrists in MHSDS).  On top of those supervisory duties, this Court has

6  found that supervising psychiatrists in the MHSDS today "have clinical responsibilities far

7  in excess of those contemplated by the 2009 staffing plan."  ECF No. 6380, Oct. 23, 2019

8  Golding Bench Ruling Tr. at 455:14-16 (noting testimony from Statewide Chief of

9  Psychiatry and former Statewide Chief of Telepsychiatry that supervisors provide direct

10  patient care between a third to half the time).  In short, compliance with the 90-percent fill

11  rate for chief and supervising psychiatrists is a necessary prerequisite for the provision of

12  constitutionally adequate mental health care in Defendants' institutions.

13       Defendants' proposed revisions to their Staffing Plan do nothing to address the

14  longstanding failure to fill vacant chief and supervising psychiatrist positions.  As

15  discussed above, the proposed revisions *exacerbate* these failures by piling additional

16  supervisory duties onto the same constitutionally inadequate number of chief and

17  supervising psychiatrists.  In fact, without additional changes to the compensation structure

18  for Defendants' chief and supervising psychiatrists, Defendants' proposed PNP policy will

19  do little to address their failures to fill *line* psychiatrist positions either.  That policy

20  permits Chief Psychiatrist and Senior Psychiatrist Supervisors to supervise a maximum of

21  two PNPs at a time, and forbids remote supervision.  *See* ECF No. 6978-1 at 11-13.  But

22  Defendants have not even allocated (let alone filled) enough Chief Psychiatrist and Senior

23  Psychiatrist Supervisor positions to provide the necessary oversight of those PNPs *already*

24  *working for them*.  *Compare* Defs' Monthly Psychiatry Vacancy Report (Nov. 30, 2020),

25  ECF No. 6970 at 5 (showing that CDCR currently employs 4.16 PNPs at CCWF, 2.96

26  PNPs at CMF., 2.94 PNPs at KVSP, 2.89 PNPs at NKSP, and 4.52 PNPs at SATF), *with*

27  Encl. 1(c) to Defs' Sept. 2020 Monthly Statistics, Gourse Decl. Ex. B at 4, 9-10, 18, 21, 26

28  (showing that Defendants currently employ only one Chief Psychiatrist and no Senior

1 Psychiatrist Supervisors at CMF, KVSP, and SATF, and only one Senior Psychiatrist

2 Supervisor and no Chief Psychiatrist at CCWF and NKSP).  For Defendants' proposed

3 PNP policy to have any hope of *reducing* the longstanding and severe shortage of line

4 psychiatrists, Defendants will need to increase both the number of allocations for chief and

5 supervising psychiatrist positions and the percentage of those positions that are filled.

6 Moreover, for this Court to properly track Defendants' compliance with the 90-percent

7 mandate and the PNP Policy's supervisory ratio limits, Defendants should be required to

8 include Chief Psychiatrists and Senior Psychiatrist Supervisors in their monthly psychiatry

9 vacancy report, which currently (and misleadingly) only includes staff psychiatry

10 positions.

11 **II.    Defendants' Proposed Revisions Disincentivize On-Site Care and Endanger**
12 **Compliance with the Telepsychiatry Policy, 2009 Staffing Plan, and 2002**
**Order.**

13 Defendants' efforts to hire sufficient numbers of psychiatrists to comply with the

14 2009 Staffing Plan requirements and the Court's June 13, 2002 Order threaten to

15 undermine the Court-approved policies for the appropriate use of telepsychiatry.

16 Specifically, Defendants' dramatic expansion of its telepsychiatry program in recent

17 months, coupled with its new Telepsychiatry from Home Plan (ECF No. 6978-1 at 22-27

18 (Attach. B)), has been undertaken without sufficient emphasis on ensuring that adequate

19 numbers of on-site psychiatrists exist to treat class members at the EOP and higher levels

20 of care, in accord with Defendants' Telepsychiatry Policy.  *See* Ex. A to  Order (Mar. 27,

21 2020), ECF No. 6539 at 5-12 (hereinafter "Telepsychiatry Policy").

22 The parties, Special Master, and this Court agree that unlimited use of

23 telepsychiatry is only appropriate at the CCCMS level of care.  *See* Telepsychiatry Policy

24 at 7.  Telepsychiatrists may be utilized to treat EOP patients only as a supplement to on-

25 site psychiatry, and only in short-term, emergency situations in inpatient settings.  *Id.* at 7-

26 8.  Defendants have committed to prioritizing on-site psychiatry for non-CCCMS class

27 members, including agreeing to make good-faith efforts to recruit and retain on-site

28 psychiatrists in lieu of telepsychiatrists at the EOP and higher levels of care.  *Id.*

1    Defendants' expansion of its telepsychiatry program – including the Telepsychiatry

2    from Home Plan – has the potential to erode Defendants' on-site psychiatry staffing

3    beyond what the limitations of the Telepsychiatry Plan will tolerate.  The vast majority of

4    line-staff psychiatry positions called for by the 2009 Staffing Plan and Defendants'

5    existing PIP staffing allocations are dedicated to the EOP and higher levels of care.  *See*

6    Ells Decl. ISO Pls' Response to July 30, 2020 Order, ECF No. 6856-1 at 2, 4, 8.  And

7    Defendants' proposed PNP Policy also precludes those providers from treating all but

8    CCCMS patients, while Defendants' revised staffing proposal reduces overall allocations

9    of psychiatrists for a subset of patients at CCCMS level of care.  *See* ECF No. 6978-1 at 3

10   & Attach. A (PNP Policy).  Essentially, Defendants are increasing their ability to recruit

11   and retain telepsychiatrists, who can be used without limitation to treat only CCCMS class

12   members, even while the urgency of their need for psychiatry providers at that level of care

13   is decreasing.  *See* ECF No. 6978-1 at Attach. B (noting telepsychiatry department has

14   grown from 52 to 92 in last 14 months,[2] and stating intent to hire additional

15   telepsychiatrists beyond the 103 existing office spaces at hubs by allowing some existing

16   telepsychiatrists to work from home in lieu of a hub during provisional telepsychiatry

17   policy period).

18    While Plaintiffs do not oppose Defendants' provisional Telepsychiatry from Home

19   Plan, Defendants' existing plan for complying with the Court's June 13, 2002 Order and

20   the 2009 Staffing Plan runs the risk of backfiring in the long-term unless some sort of

21   course correction is made to encourage psychiatrists to continue treating patients on-site.

22   The exodus from in-person to remote psychiatry that the Special Master and this Court

23   warned Defendants to prevent is already occurring.  *See* Order (Oct. 10, 2017), ECF No.

24   5711 at 21, 30 (adopting Special Master findings and recommendations regarding

25

26   _____

27   [2] These numbers notably do not align with Defendants' reports to this Court about the size
     of their telepsychiatry program.  *See, e.g.*, Oct. 2020 Psych. Vacancy Report, ECF No.
     6970 at 5 (reporting 59.54 civil service telepsychiatrists and 16.54 telepsychiatry registry
28   FTEs, for a total of 76.08 telepsychiatrists, as of October 2020).

[3662901.7]

12

1    telepsychiatry, including quoting Special Master finding that "[t]he convenience of

2    telepsychiatry should … not serve as a reason to allow on-site psychiatrists to migrate to

3    the comfort of remote off-site offices. *It cannot be emphasized enough that telepsychiatry*

4    *should not replace-on-site psychiatry.*").

5         In the same fourteen-month period that Defendants represent their telepsychiatry

6    program has almost doubled, they lost over 16 (or 11 percent) on-site civil service staff

7    psychiatrists. *Compare* Sept. 2019 Psych. Vacancy Report, ECF No. 6375, at 5, *with* Oct.

8    2020 Psych. Vacancy Report, ECF No. 6970, at 5.  In addition,  Defendants' reliance on

9    registry psychiatry expanded by over 12.5 FTEs and telepsychiatry registry went from

10   essentially nothing to comprising 22 percent of Defendants' total telepsychiatry positions.

11   *Compare* Sept. 2019 Psych. Vacancy Report, ECF No. 6375 at 5, *with* Oct. 2020 Psych.

12   Vacancy Report, ECF No. 6970 at 5.  In fact the total number of on-site civil service staff

13   psychiatrists employed by CDCR has plummeted steadily since Defendants began filing

14   their monthly psychiatry vacancy update in March 2018 in preparation for enforcement

15   proceedings:  CDCR has lost almost 30 on-site staff psychiatrists in this time frame.

16   *Compare* Feb. 2018 Psych. Vacancy Report, ECF No. 5813 at 5*, with* Oct. 2020 Psych.

17   Vacancy Report, ECF No. 6970 at 5.

18        Indeed, even ostensibly on-site psychiatrists are increasingly providing care

19   remotely under Defendants' pandemic tele-work policy.  *See, e.g.*, Defs' October Monthly

20   Maps, ECF No. 6954 at 101 (reporting 5 out of 5.59 on-site psychiatrists at ASP

21   teleworking), 102 (12 out of 18.79 on-site psychiatrists at CMF PIP teleworking; all 7 on-

22   site psychiatrists at CRC teleworking; all 3 on-site psychiatrists at FSP teleworking), 103

23   (5 out of 10.23 on-site psychiatrists at LAC teleworking; 3 out of 6.81 on-site psychiatrists

24   at MCSP teleworking); 104 (5 out of 11.61 on-site psychiatrists at SQ teleworking).

25        It is not surprising that, all else being equal, psychiatrists prefer to work remotely or

26   at home rather than treating patients in the prisons given the findings of the Special

27   Master's labor economist expert that the majority of CDCR's on-site psychiatrists

28   (particularly in the hard-to-hire Central Valley) are not satisfied with their working

[3662901.7]

13

1  conditions, including CDCR's chronically deficient office space.  *See* Special Master

2  Labor Economist Report, ECF No. 6695 at 223-30; *see also* Golding Report (Oct. 31,

3  2018), ECF No. 5988-1 at 69, 75-76 (describing deficient space and other working

4  conditions at various institutions).  But that does not diminish the critical need for in-

5  person psychiatric treatment at the higher levels of care reflected in the stipulated

6  Telepsychiatry Policy, and Defendants' obligation to take steps in good faith to hire and

7  retain on-site psychiatrists to comply with that policy's terms.

8      Absent corrective action, the future is clear:  CDCR will continue to expand its

9  telepsychiatry department.  Existing telepsychiatrists who are teleworking will continue to

10  do so and others may well follow suit.  CDCR will hire additional telepsychiatrists to work

11  in their now-empty hub offices.  And existing and potential future on-site psychiatrists will

12  see little reason to put up with the difficult and often unpleasant realities of providing

13  direct patient care inside CDCR's prisons when they can dial in from the comfort of their

14  own homes.  All of this will erode patient care and may well result in Defendants being

15  unable to comply with the Telepsychiatry Policy, the 2009 Staffing Plan, and the Court's

16  June 13, 2002 Order.

17      The parties and Special Master have discussed ways to mitigate or forestall this

18  side-effect of Defendants' Telepsychiatry from Home Plan during the negotiations over the

19  instant revised staffing proposal.  Plaintiffs have proposed, for instance, that Defendants

20  institute a differential pay scale to combat this slide and move Defendants closer to a

21  durable staffing remedy.  The scale should pay most for on-site care in higher levels of

22  care: PIPs, MHCBs and EOP programs, less for telepsychiatry care from a hub, and the

23  least for telepsychiatry from home.  This proposal is supported by the findings of the

24  Special Master's Labor Economist expert that targeted pay differentials can successfully

25  incentivize clinicians to work in positions they otherwise find undesirable.  *See* Special

26  Master Labor Economist Report, ECF No. 6695 at 250-51.  These findings are borne out

27  by the Receiver's sustained success employing the same strategy in hiring and retaining

28  medical doctors in hard-to-hire-locations.  *See also* Receiver's 44th Tri-Annual Report,

ECF No. 6698 at 13-14. Other proposals discussed in the staffing workgroup have included instituting a cap on the number of telepsychiatrists to be hired to ensure Defendants do not overstaff their telepsychiatry department beyond what the limitations of the Telepsychiatry Policy will support, and concomitantly to ensure an appropriate focus remains on recruiting and retention of the necessary on-site psychiatry staff required by the Telepsychiatry Policy, the 2009 Staffing Plan, and the June 13, 2002 order.

Defendants have indicated in recent meetings concerning their staffing proposal that they are open to discussing further appropriate action on this issue. Plaintiffs therefore request that the Court order the parties to continue discussions with the assistance of the Special Master and report on any progress or need for further action on this front by the next quarterly status conference.

III.    **Defendants Should Not Be Permitted to Modify the Court-Ordered Monthly Psychiatry Vacancy Report To Include Misleading and Irrelevant Information**

Defendants' December 11 response previews their intent to modify their existing monthly psychiatry vacancy report to provide "additional data ... that measures the psychiatry fill rate based on crisis bed and inpatient census as opposed to the number of beds in that program." ECF No. 6978 at 3. As Defendants note, the report they want to change was ordered by this Court in February 2018 in order to permit clear oversight of Defendants' progress toward achieving staffing compliance as part of the enforcement proceedings initiated by the October 10, 2017 order. Because Defendants' proposal would not help this Court assess Defendants' compliance, and would instead clutter the docket with misleading and irrelevant information, this Court should decline to permit Defendants to modify their monthly reporting.

CDCR's allocations for the PIPs and MHCBs are bed-based, not census-based, for a reason: these are licensed hospital settings reserved for patients who need them, when they need them. The number of operative inpatient beds in the MHSDS is driven by Defendants' own projections of need, and indeed Defendants continue to operate hundreds of unlicensed inpatient beds because their anticipated need is so great. That need is

1  projected to grow even higher under Defendants' Spring 2020 Bed Projections. *See* Ells

2  Decl. ISO Pls' Brief re Staffing and Population, ECF No. 6856-1 at ¶ 72 & Ex. H at 185

3  (projecting a 64.9 percent increase in male bed need for APP, a 32.7 percent increase for

4  ICF-Low Custody, a 21.9 percent increase for ICF-High Custody, and a 20.3 percent

5  increase for MHCB).

6      Defendants wish to provide census-based, rather than capacity-based, numbers for

7  their inpatient beds because swaths of those beds currently sit empty, which Defendants

8  will undoubtedly use to assert that it is constitutionally permissible to not fill psychiatry

9  positions allocated to those hospitals. But as this Court well knows that is not an accurate

10  picture of the system, and would only serve to underestimate both class members' need for

11  inpatient care and the number of psychiatrists necessary to treat those patients. Even

12  before the pandemic, the record was clear that Defendants were, once again, failing to

13  identify and refer patients in need of inpatient psychiatric hospitalization. *See* Order

14  (Oct. 8, 2019), ECF No. 6312 at 5-6 (noting probable need for unmet needs study); ECF

15  No. 6753, June 29, 2020 Status Conf Tr. at 21:1-14 (signaling intent to order unmet needs

16  study to be conducted as early as this fall). And that was before it became clear that

17  clinicians have responded to the restrictions on class member transfers during the

18  pandemic by simply ceasing to refer class members to inpatient care.

19      Indeed, Defendants' data shows that referrals to MHCBs, ICFs, and especially

20  acute-level inpatient beds are consistently a fraction of where they were pre-pandemic.

21  *See* Nov. 16, 2020 Joint Report re COVID-19 Program Guide Departures, ECF No. 6952

22  at 363-65 (Defendants' COVID-19 dashboard reports showing dramatic declines in

23  inpatient referrals post-pandemic, as compared to same month in 2019). This has resulted

24  in dramatically fewer class members receiving care in the inpatient programs since the

25  start of the pandemic. *Compare* Bien Decl. ISO Pls' Response to July 2, 2020 Order, ECF

26  No. 6766-1 at ¶ 8, Ex. I (showing 354 patients in MHCBs and 1,527 patients in inpatient

27  hospitals in February 2020), *with id.* ¶ 8, Ex. J (showing 276 patients in MHCBs and 1,396

28  patients in inpatient programs in July 2020). Class member referrals for crisis care are

1  being rescinded days later at unprecedented rates after patients simply never transfer to

2  MHCBs.  *See* Nov. 16, 2020 Joint Report re COVID-19 Program Guide Departures, ECF

3  No. 6952 at 363 (COVID-19 dashboard reporting 2020 rates of rescission well above those

4  of 2019, including rates of 10% or higher one or more days after referral for many 2020

5  months as compared to essentially 0% in 2019).  Meanwhile, class member rates of

6  self-injurious behavior, including with intent to die, have either remained roughly the same

7  as they were last year, or have increased.  *See id.* at 362.  And numbers of completed

8  SRASHEs—even when supplemented with the use of the inferior Columbia Screeners—

9  have plummeted by upwards of 40 percent when compared to 2019 despite these troubling

10 trends.  *Id.*  There is no question that the under-identification of class members in need of

11 treatment in Defendants' inpatient hospital settings is at an extreme high, and can be

12 expected to uncover more than even the thousand-plus patients in need of psychiatric

13 hospitalization found in prior unmet needs studies ordered by this Court.

14      Changing the ratios for court-reporting purposes serves no function other than

15 moving the litigation goalposts.  The inpatient beds are in place at the level Defendants

16 have deemed necessary to meet projected patient need, and will be close to full or full in a

17 functioning system.  The bed-based allocations remain necessary, and even Defendants do

18 not assert in their revised staffing proposal that they should be changed.  Instead of

19 changing their system for reporting to the Court, Defendants should be removing obstacles

20 preventing patients from accessing the inpatient beds currently sitting vacant while class

21 member need continues unabated.

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

PLAINTIFFS' OBJECTIONS TO AND COMMENTS ON DEFENDANTS' PROPOSED REVISIONS TO 2009
STAFFING PLAN

1

**CERTIFICATION OF ORDERS REVIEWED**

2

      Plaintiffs' counsel certifies that he reviewed the following orders relevant to this

3

filing: ECF and Dkt. Nos. 1383, 1968, 5711, 6312, 6539, 6938.

4

DATED:  December 15, 2020         Respectfully submitted,

5

         ROSEN BIEN GALVAN & GRUNFELD LLP

6

7

         By:  */s/ Alexander Gourse*

8

            Alexander Gourse

9

         Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28