1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF CALIFORNIA
2        BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE

3

4

5     RALPH COLEMAN, et al.,

6                    Plaintiffs,
      vs.                              Sacramento, California
7                                      No. 2:90-CV-00520
      GAVIN NEWSOM, et al.,            Friday, December 18, 2020
8                                      10:10 a.m.
                     Defendants.
9     _____/

10

11

12                         --oOo--

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14          RE: FOURTH QUARTERLY STATUS CONFERENCE

15         (Proceedings held via Zoom video conference.)

16                         --oOo--

17

18

19

20

21    Official Reporter:        KACY PARKER BARAJAS
                                CSR No. 10915, RMR, CRR, CRC
22                              UNITED STATES DISTRICT COURT
                                501 I Street
23                              Sacramento, CA  95814
                                kbarajas.csr@gmail.com
24
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.

```
 1    APPEARANCES:

 2    For the Plaintiffs:      ROSEN BIEN GALVAN & GRUNFELD LLP
                               MICHAEL BIEN
 3                             ERNEST GALVAN
                               JESSICA WINTER
 4                             THOMAS NOLAN
                               LISA ELLS
 5                             JENNY YELIN
                               ALEXANDER GOURSE
 6                             Attorneys at Law
                               101 Mission Street, 6th Floor
 7                             San Francisco, CA  94105

 8                             PRISON LAW OFFICE
                               STEVE FAMA
 9                             Attorney at Law
                               1917 Fifth Street
10                             Berkeley, CA  94710

11    For the Defendants:      DEPARTMENT OF JUSTICE
                               OFFICE OF THE ATTORNEY GENERAL
12                             KYLE LEWIS
                               Attorney at Law
13                             455 Golden Gate Ave., Suite 11000
                               San Francisco, CA  94102
14
                               DEPARTMENT OF JUSTICE
15                             OFFICE OF THE ATTORNEY GENERAL
                               ELISE THORN
16                             MONICA ANDERSON
                               LUCAS HENNES
17                             Attorneys at Law
                               1300 I Street
18                             Sacramento, CA  95814

19                             ROBINS KAPLAN LLP
                               ROMAN M. SILBERFELD
20                             Attorney at Law
                               2049 Century Park East, Suite 3400
21                             Los Angeles, CA  90067-3208

22                             HANSON BRIDGETT LLP
                               PAUL B. MELLO
23                             Attorney at Law
                               1676 N. California Blvd., Suite 620
24                             Walnut Creek, CA  94596

25
```

```
1    APPEARANCES (Continued):

2    For the Defendants:     HANSON BRIDGETT LLP
                             SAMANTHA D. WOLFF
3                            Attorney at Law
                             425 Market Street, 26th Floor
4                            San Francisco, CA  94105

5    Special Master:         Matthew Lopes

6    Also Present:           Kathleen Allison
                             Dr. Travis Williams
7                            Dr. Amar Mehta
                             Dr. Joseph Bick
8                            Christine Ciccotti
                             Antonina Raddatz
9                            Kristopher Kent
                             Diana Toche
10                           Jennifer Neill
                             Nick Weber
11                           Melissa Bentz
                             Namrata Kotwani
12                           James Spurling
                             Gregg Adam
13

14                           --oOo--

15

16

17

18

19

20

21

22

23

24

25
```

1      SACRAMENTO, CALIFORNIA, FRIDAY, DECEMBER 18, 2020, 10:10 AM

2                              --oOo--

3           (Admonition given.)

4           THE CLERK:  The United States District Court for the

5    Eastern District of California is now in session.  Chief Judge

6    Kimberly J. Mueller now presiding.

7           Calling civil case 90-520, Coleman, et al. versus

8    Newsom, et al.  This is on for a fourth quarterly status

9    conference.

10          THE COURT:  All right.  Good morning.  I'm going to,

11   in this case, allow lead counsel to identify themselves for

12   each side, identify then the persons appearing with them here

13   today.  At this point we know who is monitoring the hearing,

14   and I'm not going to ask for those persons to be identified.

15          So Mr. Bien, you're serving as lead counsel this

16   morning for the plaintiffs?

17          MR. BIEN:  Yes, your Honor.

18          THE COURT:  All right.  You can make a formal

19   appearance and identify who is appearing with you.

20          MR. BIEN:  Good morning, your Honor.  Michael Bien,

21   Lisa Ells, Tom Nolan, Jessica Winter, Alex Gourse, on behalf --

22   and Steve Fama of the Prison Law Office on behalf of the

23   plaintiff class.  I think I've got everybody.  And Ernie

24   Galvan, I'm sorry, apologize.

25          THE COURT:  All right.  Good morning to you all.

1          And for the defense, Mr. Lewis, are you lead counsel?

2          MR. LEWIS:  Yes.  Good morning, your Honor.  Kyle

3   Lewis for defendants.  I'm joined today by Paul Mello, Roman

4   Silberfeld, Sam Wolff -- Samantha Wolff, I'm sorry, and Monica

5   Anderson.

6          THE COURT:  And Elise Thorn or not?

7          MR. LEWIS:  Yes.  And Ms. Thorn, you are correct, your

8   Honor.

9          THE COURT:  All right.  Good morning to you all.

10          The Special Master is present.  Mr. Lopes, you can see

11   and hear the Court?

12          SPECIAL MASTER LOPES:  I can, your Honor.  Good

13   morning.

14          THE COURT:  All right.  Good morning to you.

15          MR. BIEN:  Your Honor, I may have neglected to

16   introduce Jessica Winter who also is appearing from my

17   office.

18          THE COURT:  All right.  I thought I heard her name,

19   but if not, that is clarified.  Secretary Allison is present as

20   well, correct?

21          MS. ALLISON:  Yes, ma'am.

22          THE COURT:  Okay.  There I see her.  I have to check

23   my screen.

24          And Dr. Williams also.

25          DR. WILLIAMS:  Yes, I am here.

1          THE COURT:  I see Dr. Williams.

2          MR. BIEN:  Judge Mueller, excuse me again, it was

3     Jenny Yelin I failed to introduce from my office.

4          THE COURT:  All right.  So that appearance is

5     clarified for the plaintiffs.

6          The Court has shared the agenda.  I have some brief

7     opening observations, and under other matters, I didn't really

8     fill that in.  I wanted to clarify that I do want to talk

9     briefly about inpatient care there if we don't cover certain

10    issues before we get there.

11         So here are my observations.  As it appears that

12    the -- however you want to think about it, the chaos of COVID

13    or the fog of COVID is perhaps starting to lift with vaccines

14    being distributed starting this month, the Court really intends

15    to look to the future, and one thing the Court has accomplished

16    this year, it believes, is to clarify to the extent necessary

17    any outstanding questions to the extent there could possibly

18    have been any with respect to the remedy in this case.  And the

19    Court has completed providing its guidance as to how to move

20    forward to accomplish that remedy.

21         The Court does not anticipate continuing to churn any

22    issues that the parties may want to talk about.  This is not a

23    Coleman salon.  Although, some of the informal dialogue has

24    been very helpful during COVID, we aren't engaging in preparing

25    for Easter here with Easter eggs being hidden on the Court's

1   docket.

2          And that's really what I want to clarify.  I certainly

3   understand the way in which the Court has invited certain

4   statuses and certain filings, but I'm going to do my best to

5   exercise discipline going forward and also clarify the rules.

6   And that is that in the future, unless I have invited a brief,

7   I'm not calling for briefing unless it is in support of a

8   motion.

9          And so if the parties have motions to bring, they can

10  do that through their attorneys.  And the attorneys know how to

11  do that.  We've had some of that discussion in the past, but

12  I'm clarifying now.

13         To the extent there is other larding of the docket

14  with legal positions, those are not allowed, and they will be

15  stricken if they still appear.  And some of -- frankly, the

16  Court invited a joint status on suicides.  Some of what's in

17  that joint status looks like a brief without carrying that

18  title.

19         And so just to give you examples of things that, as I

20  look back just to the very recent past and to give you some

21  guidance for the future, the kind of briefing that is not

22  allowed at this point includes -- I have four examples for you.

23  The plaintiffs' response to the benchmark's order that EOP

24  inmates should not be in ad seg.  I'm disregarding that.  If

25  there's a motion there, file a motion.  The defendants' brief

1   attached to the staffing proposal.  In the future, if I ask to

2   see the staffing proposal, I want a notice of filing and a

3   staffing proposal.  If there's a motion, parties can bring a

4   motion.

5          We've hashed this issue over.  I'm not going to issue

6   any order, but the suggestion that the Court interpret the

7   plaintiffs' briefing in the past to allow the Court sua sponte

8   referral to a three-judge court as a motion for such a

9   referral, I'm not going to do that.

10         And talking about the suicide prevention issue, to the

11  extent defendants' separate statement going on at some length

12  about foreseeability and preventability, referring to those

13  definitions as the Special Master's, there's a passing

14  acknowledgment of the Court's adoption of those definitions.

15  The Court has adopted those definitions.

16         So I'm -- I'm striking the matters I've just referred

17  to, and I'm clarifying going forward that if matters like that

18  are filed in the future, they will be stricken unless there's

19  express permission granted in advance.  And this is consistent

20  with the Court's having stepped back, again as the fog is

21  lifting, preparing to focus only going forward.

22         And my request to hear from Secretary Allison today is

23  consistent with the Court's desire to hear from those who are

24  doing the work, the hard work, in many cases the good work, and

25  the ones who have to really get the work done to complete the

1    remedy here.

2            To the extent the Court has opened a vein of

3    litigation, I'm cauterizing that vein.  That's the message.

4            All right.  I would like to turn to the staffing

5    proposal, and I'm focusing on ECF 6978-1, the proposal itself,

6    to the extent there are any proper objections before the Court,

7    I'll deal with those, but I really would like to turn to

8    Secretary Allison with a primary focus on proposed adjusted

9    psychiatrist ratios and the PNP policy.  That's my primary

10   focus.  Is that understood, Secretary Allison?

11           MS. ALLISON:  Yes, ma'am.

12           THE COURT:  All right.  I'm having a little difficulty

13   hearing you.  I'm wondering if you can get closer to a

14   microphone.

15           MS. ALLISON:  It's on my laptop.  I apologize.  I

16   appreciate you asking that instead of at the end, so to maybe

17   wait until the end and say I wasn't sure I heard you and I'm

18   like, oh, no.

19           THE COURT:  I didn't hear you well when you checked

20   in, but at this point I'm hearing you much better.

21           MS. ALLISON:  Thank you.  I so apologize.

22           THE COURT:  All right.  And you're hearing Secretary

23   Allison, Ms. Barajas?

24           THE COURT REPORTER:  Yes, your Honor.

25           THE COURT:  All right.  Thank you.

1           All right.  So with the focus on adjusted psychiatrist

2    ratios as proposed and the PNP policy, and just for sake of

3    argument assuming I'm looking at the proposed policy, again,

4    I'll address objections as needed to the extent they don't go

5    outside the bounds of what I've already referenced here this

6    morning.

7           So I laid out three items, A, B, and C, in my order

8    setting the agenda for today.  And so if you could go through

9    those, Secretary Allison, and share with me your thoughts.

10   First, the specific steps and is there an action plan that's

11   been developed or will be developed soon.  Secondly, any

12   obstacles and how will they be removed, and third, earliest

13   date of implementation.

14          Secretary Allison.

15          MS. ALLISON:  Thank you, ma'am.  First of all, I want

16   to start out by saying, you know, I take my role and

17   responsibility very seriously as it relates to being the

18   secretary of this agency.  And so with all of that said, I am

19   very engaged in a variety of things, but it is a very large

20   agency, as you know, and I do have wonderful, wonderful,

21   experts, Dr. Toche, Dr. Mehta, Dr. Williams, Dr. Bick, who

22   support those efforts.  So sometimes I'm not as granular and I

23   may have to defer some individual questions, but obviously I am

24   familiar with the overall premise of what we're trying to do

25   here with the staffing plan.

1        THE COURT:  Understood.  And if you ever request to

2   yield the floor to someone else or bring other persons to any

3   meeting with the Court, please let me know.

4        MS. ALLISON:  Thank you.  Thank you.  I appreciate

5   that.

6        So I will say one of the things that I -- it's my

7   understanding that is not disputed, which is establish new

8   staffing and psychiatrist ratio as it relates to CCCMS not on

9   medication.  That needs some support, some coping mechanisms

10  within the facility but not necessarily psychiatric treatment.

11  So it would change that -- those ratios slightly.

12        Redirecting some psychiatric positions from crisis

13  intervention on weekends, we have a pretty solid on-call

14  psychiatry as well as what we would like to do is pivot those

15  as having night coverage via telepsychiatry.  The

16  telepsychiatry has worked phenomenally as it relates to

17  allowing our psychiatric staff to rest but have somebody else

18  cover that in the evening.  We still have psychiatrists on call

19  if they're needed to come into the institutions for any reason,

20  but for simple questions or immediate interventions, we utilize

21  telepsychiatry for that purpose.

22        The psychiatric nurse practitioners, that is fairly

23  new to us.  It's not new in the community.  So finalizing our

24  policies as it relates to psychiatric nurse practitioners for

25  utilization and supervision of those are key elements.  But you

1   know, we need to go -- we need to finalize.

2          And then of course telepsychiatry from home policy.  I

3   will say COVID has taught us a lot, and I was honestly myself a

4   little resistant to telework.  I'm like, wait a minute.  I'm

5   not as effective but I am.  I mean, I'm working just as hard,

6   if not harder, and we found that this does help even with

7   recruitment and retention.  You know, many of our psychiatrists

8   live in more metropolitan areas, and many of our institutions

9   are not.  And so it has been a substantial retention and

10  recruitment tool for us, as it is with other agencies, Kaiser,

11  other large medical and mental health providers utilize

12  telepsych.

13         It is also part of our Governor's initiative to reduce

14  the carbon footprint, and I'm sure you've heard him say this

15  out loud, as it relates to telework in the future, even past

16  COVID.  There is an expectation that we will reduce the number

17  of our employees, in particular in our headquarters areas, to

18  reduce the numbers actually physically coming to the downtown

19  Sacramento area and being able to telework more frequently.  So

20  State Personnel Board is adopting policies.  Those are being

21  negotiated with unions right now.  So there's a pretty

22  significant initiative for multiple reasons.

23         I will say that we've seen it to be extremely

24  effective with our Board of Prison Terms.  We're able actually

25  to have more hearings because we don't lose travel time for our

1   commissioners.  So there's a variety of ways that that has

2   certainly helped us.

3          Did I answer your question?

4          THE COURT:  I understand that generally.

5          So in terms of what -- is there an action plan?  Let's

6   say the Court approves the proposed staffing plan.  What then

7   are the specific steps to implement?  Do you already have an

8   action plan drafted, or what are the steps that would comprise

9   that action plan?

10         MS. ALLISON:  And this is one of the --

11         THE COURT:  How soon after the Court's approval of any

12  plan could an action plan be finalized?  Sorry.

13         MS. ALLISON:  You know, I think that's a fair

14  question, and I would have to defer to Dr. Mehta to actually

15  respond to that.  I know that staff are working on those now,

16  but I wouldn't have the specifics as far as to tell you, I'll

17  have it done by January 30th, right?  I don't have that

18  specific level of detail, and I'm sure Dr. Mehta could address

19  that.

20         THE COURT:  All right.  I see it appears that

21  Dr. Mehta is monitoring.  Would you like him to respond to

22  that, Secretary Allison, briefly?

23         MS. ALLISON:  Yes.

24         THE COURT:  All right.  Dr. Mehta.

25         MS. ALLISON:  Dr. Mehta, did you hear the question?

1          THE COURT:  Can you unmute and respond?  You're muted.

2     And this is Dr. Mehta, M-e-h-t-a.  You're still muted.

3          DR. MEHTA:  Sorry about that.  Can you hear me now?

4          THE COURT:  Yes.

5          DR. MEHTA:  Okay.  Great.  Thanks.

6          So we have a number of different things that would

7     happen if the plan was approved.  I think the CCCMS adjustments

8     would be done with the next rounds of the staffing allocation

9     adjustments.  We're actually doing the July round right now,

10    and it would probably go into effect in the May allocation

11    round.  It would be a smaller adjustment than other things, so

12    there wouldn't be any special midcycle adjustment.

13         The PNP policy, we're already -- we've already reached

14    out to our institutions that have psychiatric nurse

15    practitioners and informed them of a lot of the details of the

16    policy as a preliminary policy, just saying these are the sorts

17    of things we're going to be enforcing and looking at, so please

18    make sure we're getting in line with all of that.  So I believe

19    that should happen fairly quickly.  It would be a matter of

20    moving some of the nurse practitioners around -- I would say on

21    the order of a month or two at the most moving the nurse

22    practitioners around to places and making sure we're filling

23    behind them with telepsychiatry and other things to make sure

24    that we're following all of the details of the policy.

25         We would also be working on our night shift policy so

1   the -- we currently have two doctors doing the night shift on

2   evenings overnight, and we would be expanding that based on

3   those positions moving from the crisis intervention team

4   allocations.  So that policy is part of our next big push.

5   We've done a lot of policies for this hearing and other things.

6   So we would be working -- we have an initial draft that we're

7   still looking at, but we would be working on that with

8   plaintiffs and the Special Master -- Special Master's team in

9   our joint meetings.

10          And then the -- let's see.  The fourth one was -- I

11  apologize.  What was the fourth issue on the staffing policy?

12          THE COURT:  Well, I'm asking how soon can the action

13  plans be put in place.  It sounds like you're talking about two

14  tracks at least.

15          DR. MEHTA:  Yes.

16          THE COURT:  And then are there any -- are there

17  obstacles to full implementation?  And if so, how can those be

18  removed?

19          DR. MEHTA:  Gotcha.  Okay.  I don't think we have any

20  major obstacles to full implementation at this time, and some

21  of the things will be able to happen within one or two months,

22  as I mentioned.  The next one would have to go with the next

23  staffing allocation which would be May, but we don't anticipate

24  there being any trouble preventing those things from occurring

25  on schedule.

1          THE COURT:  And then so what would the earliest date

2     of full implementation be for a given policy?

3          DR. MEHTA:  Gotcha.  So for each element to the

4     policy, is that what you mean?  I'm sorry, your Honor.

5          THE COURT:  Well, you separated out PNPs, for

6     example.

7          DR. MEHTA:  Right.  Okay.  Gotcha.

8          THE COURT:  Yeah.

9          DR. MEHTA:  So PNP, yeah, I would say that we

10    shouldn't require more than a month or two after signing in

11    order to bring all of the PNP's in the state in line with that.

12    As I said, we've already started.

13          The allocations would be by June, and the other

14    things -- I apologize.  I'm forgetting the other two elements

15    of the plan or sorry, the last one element of the plan which

16    was?

17          MS. ALLISON:  Psychiatry and working from home.

18          DR. MEHTA:  Thank you, yes.  Telepsych working from

19    home.  That one we've already actually -- we're already in

20    compliance with that.  Thank you.  Sorry about that.  Which is

21    we are using the COVID exception right now.  That would simply

22    be moving them over to another bucket where we're using this

23    new probationary policy, and so that one, we're already in

24    compliance.

25          THE COURT:  All right.  Let me ask one more question,

1    and then I'd ask Secretary Allison if she has more to say on

2    the staffing plan issue before I see if the parties have

3    anything to say.  The Court has approved an 18-month period, I

4    believe, testing telepsychiatry, and that was actually -- it's

5    not just COVID related.  That's the result of longstanding

6    discussions in this case.  Is there anything changing as a

7    result of what the defendants may think they're learning about

8    telehealth and telepsychiatry in light of COVID?  In other

9    words, is that test period adequate to capture whatever can be

10    learned about telepsychiatry?

11        Secretary Allison, do you have a response to that, or

12    is this also for Dr. Mehta in the first instance?

13        MS. ALLISON:  You can go ahead and let him respond.

14    He's obviously the closest to it.  I will just say, from a

15    global perspective, that seems to have been working out well

16    for us, but I'll let him address the specifics.

17        THE COURT:  All right.  Dr. Mehta.

18        DR. MEHTA:  Thank you, your Honor.  Yes, I believe

19    that is sufficient time.  The experience we've gained over the

20    last six months will also inform the next remaining, I think,

21    14 months or something on that probationary period, but I

22    believe that will be enough time, your Honor.

23        THE COURT:  All right.  Secretary Allison, anything

24    further you would like the Court to know about the proposed

25    staffing plan, recognizing the Court still needs to issue any

1    order?

2         MS. ALLISON:  There is a key element within the

3    staffing plan as it relates to vacant beds versus total beds,

4    and part of the plan is to actually staff according to the

5    filled beds.  That's not unlike anything different in any acute

6    care hospital as relates to nursing or doctor staffing.  They

7    do it based on acuity every day.  I mean, when I was doing

8    nursing staff a hundred years ago, that's how we did it, and

9    they still do that to this day based on actual patients versus

10   beds.  So just it's another point that I definitely wanted to

11   highlight.

12        I think that going forward that flexibility in our

13   staffing is going to be critical for us to receive, you know,

14   full compliance.  I'm very confident.  I've been involved in

15   this case for over 33 -- well, I've been with the department

16   over 33 years, even before the case, so -- and I've seen its

17   evolution, and I'm very confident that, you know, with some of

18   these relatively minor changes that I think will overall

19   improve patient care and access to care.

20        THE COURT:  The issue of vacant versus total beds, is

21   that issue fully covered by the proposed plan, or is there

22   something else there you're alluding to that needs to be

23   addressed?

24        MS. ALLISON:  Dr. Mehta, can you address that?

25        DR. MEHTA:  Yes, your Honor.  So that was the fifth

1    point in your order, and we discussed that with the Special

2    Master and the plaintiffs, and CDCR actually decided to step

3    back from that proposal.  So we want to be able to provide all

4    the information that the Court could possibly need on those

5    issues, but we don't want to push the issue of having a

6    complete change to the reporting.  We would just propose adding

7    additional data to our reports moving forward that might

8    reflect some of those issues.

9              THE COURT:  All right.  So nothing standing in the way

10   of the Court considering the plan?

11             DR. MEHTA:  Correct, yes.  Thank you, your Honor.

12             THE COURT:  From defendants' point of view.

13             All right.  Let me ask the parties if there is

14   anything more, without repeating what's already before the

15   Court, that the parties believe I need to know.  Let

16   me -- before I hear from the parties, let me just ask Special

17   Master Lopes, is there anything you want to say for the record

18   here?

19             SPECIAL MASTER LOPES:  Thank you, your Honor.  The

20   only thing that I would say at this point is Secretary Allison

21   has a wealth of knowledge as it applies to the Coleman case

22   globally and worked with us closely on a number of remedial

23   measures over the year -- over the years, excuse me.

24             As it applies to what Dr. Mehta just was referring to,

25   if I understand it correctly, your Honor, it would be reporting

1   on your docket.  They're to expand a report that is put on the

2   docket.  Beyond that, I have nothing further to add.  Thank

3   you.

4           THE COURT:  All right.  Understood.  I'll keep that in

5   mind, to the extent I need to clarify what's allowed on the

6   Court's docket.

7           So Mr. Bien, anything that you or any member of your

8   team would like to make certain the Court is thinking about

9   regarding the staffing plan apart from what's already before

10  the Court?

11          MR. BIEN:  Yes, your Honor.  I would like to defer to

12  Lisa Ells.

13          THE COURT:  All right.  Ms. Ells.  You appear unmuted.

14          MS. ELLS:  Pardon me.  That took longer than I

15  anticipated.  Excuse me.

16          Our primary concerns beyond the ones that we laid out

17  in our objections that are already under your consideration

18  have to do more with the overall durability of this as a

19  remedy.  We believe that even if defendants fill all of these

20  positions, there is no assurance that constitutionally adequate

21  care can be provided particularly during the pandemic.  We have

22  seen that care is indicated everywhere is needed more now than

23  it ever was.  People are turning to mental health care that

24  didn't previously receive it.  People that are currently class

25  members are needing it even more than they ever did, and they

1   are receiving it typically less than they ever did.

2          And we think overall that the impact of the pandemic

3   has been particularly acute on class members.  We know that

4   they are at higher risk due to COVID for serious outcomes and

5   death in CDCR's experience to date, and we also know there are

6   lasting effects of the pandemic that are going to result in

7   longstanding trauma even after the pandemic is over.

8          So we do not object to these proposals, but we do

9   think that there is a serious concern that there may actually

10  be insufficient staff even if they are adopted in accordance

11  with everything that the Court requires.

12         We also just want to continue to highlight the point

13  that the population is not going to stay where it is, and we

14  have very serious concerns that CDCR is not going to be

15  prepared to adequately staff psychiatry given the current

16  recruiting efforts when the population goes back up.  We know

17  that there are over 8,000 people waiting in intake right now or

18  waiting in jails to come to CDCR.  Roughly a third of those

19  people will be class members.  When intake resumes as normal,

20  that will be 3,000 people a month.  And generally, we are

21  concerned that this is, as my co-counsel Mr. Galvan has

22  referred to in prior hearings, we are in a trough, and this is

23  not a sustainable level of recruiting to come out of that

24  trough when that population inevitably goes back up.

25         And of particular concern in that respect is the

1   department's continuing focus on telepsychiatry, which we

2   appreciate during the pandemic is necessary to provide care

3   including our agreement to temporarily and provisionally agree

4   to telepsychiatry from home which is a departure from the

5   telepsychiatry policy this Court has accepted.

6        And we are continuing to be concerned that there are

7   serious limitations on what the efforts defendants have made

8   will do for people at higher levels of care because the

9   PNP policy and the CCCMS policy and therefore the

10  telepsychiatry policy from home are all essentially limited to

11  treatment of CCCMS patients, but we know that the majority of

12  psychiatrists called for in the 2009 staffing plan treat the

13  higher levels of care.  And these current initiatives are not

14  going to help cure the deficiencies in on-site care that is

15  needed for those patients that are more acutely ill.

16       And we worry that without some sort of pay

17  differential or other incentive to permit people to make a

18  reasonable choice to actually come on site and deal with very

19  difficult and deficient working conditions that -- of on-site

20  psychiatrists that we have seen, there's been an 11 percent

21  drop in on-site psychiatry in the same time period that the

22  telepsychiatry department has essentially doubled.

23       So the gains that are being made in hiring with

24  telepsychiatry and PNPs are not sustainable for the future if

25  defendants plan to comply with the telepsychiatry policy and

1    the PNP policy which both provide for on-site psychiatric care

2    at the higher levels of care.

3            So that's a significant concern, and we don't feel

4    that the defendant has adequately addressed it.  There isn't

5    any current incentive for anybody to come on site and actually

6    provide psychiatry, and yet that is exactly what's required at

7    the higher levels of care.

8            And finally, we have raised this concern in our papers

9    before you about the ongoing dispute between the parties about

10   the meaning of your 2002 (sic) order with respect to the

11   requirements for providing supervisory psychiatrists, whether

12   defendants are actually required to allocate and fill those

13   positions.  Unless your Honor corrects me, however, I believe

14   that your -- the implication of your statement is that you

15   would like a motion on that, and we are prepared to do that.

16   But we do think that a clarification of your prior order is

17   necessary to ensure that supervision is provided to psychiatry.

18   It's a critical component of the overall 2009 plan.  It is

19   absolutely necessary for the proper functioning of this system,

20   and constitutional compliance just cannot be achieved if

21   supervisors are not allocated and filled at the rates that they

22   are required to be by the existing court orders.  And they are

23   currently not.

24           So that's all I have, unless your Honor has additional

25   questions for me.

1        THE COURT:  I understand all of that.  You said my

2    2002 order.  So I think in that respect you misspoke.

3        MS. ELLS:  Yes.

4        THE COURT:  All right.  I understand and appreciate

5    your paying attention to the line drawing I'm attempting to

6    accomplish here.  Let me think about the motion you've

7    signaled, but my initial reaction is that's right.  And if I

8    can provide further clarification, I'll do so.  But in the

9    meantime, I would say, yes, a motion would be the way to focus

10   that issue after meeting and conferring and really representing

11   to the Court you've exhausted other efforts.

12       Mr. Lewis, do you have anything to say, or do you

13   yield to someone on your team?  Again, anything that's not

14   currently before me.

15       MR. LEWIS:  Yes, your Honor.  As to this particular

16   issue, I will yield to Mr. Mello.

17       MR. MELLO:  Good morning, your Honor.  If I may

18   respond quickly.  Defendants' filing with respect -- on

19   December 11th responding to those five questions at issue, as

20   Dr. Mehta indicated, we have walked back from the census-based

21   issue, the fifth question.  We spoke to those four items that

22   you raised, and as plaintiffs just acknowledged, they do not,

23   in principle, object.  Rather, they rate with respect to

24   revisiting telepsychiatry, trying to limit it only to COVID,

25   trying to pin it down with respect to the level of care that

1   can be provided.  But in short, we tried to respond to those

2   four items.

3          With respect to the barriers and obstacles, you're

4   hearing some of those barriers and obstacles now.  What the

5   secretary said and what Dr. Mehta alluded to is that we need to

6   be able to recruit and retain.  We are competing against other

7   jurisdictions, private public entities, and items that impede

8   our ability to recruit and retain presumably are not what the

9   parties and the Court want here.  What the parties and the

10  Court want is the ability to provide timely adequate care to

11  the class members.

12         With respect to this concept that we have seen a

13  decline in providers in the system versus outside the system

14  and somehow they were tethered or joined to each other, that's

15  just not -- there's just not evidence of that, or it's unknown

16  at this time.  There are many reasons why people could be

17  leaving the system.  There are many reasons why people want to

18  work from home both during the pandemic and after the pandemic.

19  And one of the items is one of the constraining items for

20  defendants is this temporary nature.  We are hiring people

21  under provisional policies, and there is concern that at the

22  end of the provisional period is, whether it be work from home

23  or during the telepsych provisional policy, that persons are

24  going to lose their jobs or not going to be able to stay in

25  those positions at the end of that time.  But I think that

1    needs to play out.

2            And with respect to this last issue, this issue of

3    supervisors, in plaintiffs' briefing on the issue on page 15,

4    lines 7 through 13, they say that defendants have indicated in

5    recent meetings and in their papers, essentially, that they

6    would like to discuss more staffing and modernizing staffing in

7    light of the changes and that they are open to that.  As

8    indicated in the September letter in our previous briefing on

9    this issue, we fully believe the staffing needs to continue to

10   be looked at, and we continue to want to work with them and the

11   Special Master to make sure that staffing is appropriate and

12   that we are in the best position to staff up and provide

13   patients care.

14           And with that, I don't want to repeat anything.  We

15   responded to the Court's questions.  We did not respond to

16   issues that may be related to those subjects or replied to

17   plaintiffs' add-ons.  And with that, I don't have anymore, your

18   Honor.

19           THE COURT:  Let me go back to Secretary Allison and

20   Dr. Mehta.  I asked earlier are there obstacles to full

21   implementation of the plan.  Are defendants saying

22   recruitment/retention is an obstacle to implementation of the

23   proposed plan before me?  This is where I appreciate hearing

24   from the principals, that is, the client.  I just want to know

25   if Mr. Mello modified the defense position on that point, or is

1   it a broader point that Mr. Mello is making, which arguably is

2   my basic question --

3                    (Court reporter interruption for clarification.)

4                    THE COURT:  I can reconstruct the record there.  My

5   basic question is, did Mr. Mello modify the defense response to

6   my question are there obstacles to full implementation to the

7   proposed plan?  Dr. Mehta.

8                    DR. MEHTA:  I don't believe so, your Honor.  I think

9   we're currently hiring tele -- or sorry.  We're currently

10  allowing telepsychiatrists to work from home under the plan,

11  and if that provisional policy is not approved at the end of

12  the evaluation period, we are concerned about loss of some of

13  those providers, that they wouldn't want to continue working

14  within our system.  I believe that was the

15  recruitment/retention part that Mr. Mello was pointing out

16  which is consistent with what we were discussing.

17                    THE COURT:  All right.  Secretary Allison, any final

18  word?  Again, right now we can't hear you.

19                    MS. ALLISON:  My computer is open.  Can you hear me?

20                    THE COURT:  That's better.

21                    MS. ALLISION:  Oh, interesting.  I moved a piece of

22  paper that far.  Anyway, so as it relates to population, I

23  think everybody here knows our population is as low as it's

24  been in 30 years.  Part of that is due to being closed to

25  intake.  Since we've been closed on and off for intake since

1    March, we have taken in about 4,000 offenders.  You are

2    correct, we have about 8,000 pending in the county jails.  We

3    are focusing a lot of energy on making sure those dates are

4    calculated while they're in the county jails so they may not

5    even have to come to us.

6          We have some additional population reduction measures

7    that have been ongoing since the beginning of COVID.

8    Obviously, the 180-day-to-release group, that is still ongoing.

9    We had a 12-month release group at certain high-risk medical

10   facilities.  That was suspended.

11         When I took the job, this great challenge, yay, I

12   started reviewing high-risk medical cases, and I discovered a

13   theme.  And in that theme, I discovered that many offenders had

14   a base term but were only serving enhancement time today for

15   enhancements that are now by law discretionary.  They were

16   mandatory at the time.  We all know the '90s was kind of the

17   tough-on-crime era.

18         So when I evaluated these cases, some of them have a

19   date in 2042, but the case is robbery second with a base term

20   of three years, but he had a five-year nickel prior, for every

21   prior he had a five-year enhancement.  Now you've got a 43-year

22   sentence.  He's now 70-something years old.  It doesn't make

23   any logical sense to me, nor would anybody would that make

24   logical sense for.

25         So I solicited some support from the administrative

1    office of the courts and asked, if I were to send these back to

2    the court under a COVID high-risk medical review, would the

3    court consider these and expedite those reviews for me.  I had

4    overwhelming response.  L.A. County, in particular, has our

5    largest population.  About 40 percent of our population comes

6    from L.A. County.  Very receptive.  Our first cases have left.

7    I personally reviewed them.  I have personally made sure that

8    DSH patients, all levels of care are included in this group.

9    And the first cases have left this -- left us.  The courts have

10   committed additional retired judges to help with this process.

11   I do expect it to net quite a few.  I don't want to put numbers

12   to it yet.  I think it's premature.  All I can do is ask a

13   court.  I cannot compel.

14        But there are -- I think a lot of our thought

15   processes have changed since the '90s as it relates to criminal

16   justice reform, a lot of the efforts that we've done.

17        In addition, and I hate to put a date to this also,

18   we're doing some credit earning changes as it relates to

19   violent offenders.  So we did some minor changes in Proposition

20   57 that took some people from -- you know, anyway, we're taking

21   offenders that were previously 80 percent serving their time

22   down to what we call 66.  So they get 33 percent credit

23   earning.  We're hoping to have that implemented the early part

24   of next year.  We're looking at credit earning for nonviolent

25   second strikers.

1           One thing that COVID did teach us is the county jail's

2    presentencing gives them 50 percent, and we only give them

3    33 1/3.  I'm like, well, that doesn't make sense.  Let's fix

4    this.  I think it's under my authority to do so.  And so we're

5    trying to go forward and finally analyzing that.

6           I'm sure you're aware of the Penal Code Commission and

7    the substantial changes that are expected there.  Also, in

8    light of the new DA in L.A. County who has made a very clear

9    statement to the media and the public and to our offenders who

10   just videotaped yesterday a notice on our offenders about how

11   he's going to exercise his ability, as it relates to 1170(d) as

12   well as sentencing on the front end.  So I do see our

13   population drastically reducing in the near future.

14           THE COURT:  All right.  Thank you for that.  And we've

15   segued into the second item of the agenda, resumption of

16   program guide level delivery with mental health care because my

17   final question was really going to be there about population

18   stabilization, and so some of this discussion feeds into that.

19           Let me follow up.  What you're describing, Secretary

20   Allison, is prison population across the board including the

21   Coleman class, right?

22           MS. ALLISON:  Yes, ma'am.

23           THE COURT:  And based on everything you've said,

24   including -- I'm interested in hearing a little bit more about

25   the 8,000 waiting in the jails and whether or not some of them

1    never go through intake into CDCR, and the Court assumes that

2    about a third of those are Coleman class, at least CCCMS.  So

3    help me understand what your current thoughts are about when

4    the population may stabilize globally but also Coleman in

5    particular, and are there targeted efforts being made to

6    address Coleman class members in that entire calculus.

7         MS. ALLISON:  So we've overall seen about a 6,000

8    reduction since last year in Coleman class members.  In our

9    early release cohort, if I remember correctly, it's about 25,

10   2,600 that were included in those, and that's not counting the

11   12-week positive programming credit that every offender

12   received as long as they hadn't had disciplinary action in the

13   specific amount of time.  That was implemented I want to say in

14   July.

15        And so as it relates to when I look at cases, because

16   they are eyes on, these are secretary review cases.  I work

17   countless hours as well as many of my partners on this call

18   today, but I spend every evening looking at whatever is in

19   my -- what I call my bucket for review.  And how -- so needless

20   to say, I prioritize highest risk COVID risk factor for death

21   related to COVID, right?  And so many of those are class

22   members.

23        How I give deference for mental health is typically if

24   somebody has some rules violations, that would be exclusionary

25   factors.  I take into consideration -- I have, as many said,

1    extensive experience with the mental health population, and one

2    of the key components for those guys is impulse control, right?

3    They get mad.  They react.  They throw a medicine cup.  As a

4    nurse who had a lot of medicine cups thrown at me in my day, I

5    understood that for what it was.  And so I basically forgive

6    those and still proceed with either a release under my

7    authority or a referral to a court if it's got a really

8    extended date out.  So I think that's important to note.

9         And I did have another thought, and I think I've lost

10   it.  So I apologize.  Did I -- I'm not sure I answered your

11   full question.

12        THE COURT:  Well, here's a follow-up at least, and

13   then we'll get back to program guide resumption a little more

14   in a more focused manner.  But to the extent Coleman class

15   folks are pending in county jails, you've already mentioned

16   your efforts to reach out to the state courts.  At least one

17   state I'm aware has worked with some fairly robust programming

18   in the jail system that includes cognitive behavioral therapy,

19   the type of programming that might address issues faced by a

20   CCCMS class, at least in part.  Are you contemplating trying to

21   improve programming prior to any release from county jails pre

22   intake that would address Coleman class, potential future

23   Coleman class issues?

24        MS. ALLISON:  So I will say other states have what we

25   call a unified system, meaning their county jails and their

1    state system are one.  Ours are not.  I have no control over

2    the county jails at all.  I will say we've shared whatever

3    programming that we have both for adult basic education and

4    cognitive behavioral therapy and those kind of things, we've

5    shared with the jails, but it cannot compel them to do anything

6    with that.

7        I will say that we have prioritized mental health

8    offenders as when they're coming in and when we open up for

9    intake.  And like I said, we brought in 4,000.  The county

10   jails get to tell me, hey, I've got this person who is at

11   highest risk or has significant mental health issues.  We've

12   taken those guys to the front of the line.  Whether that county

13   was up next or not, we still take that population to the front

14   of the line, and there's daily communication with the sheriffs.

15   And of course, they're not happy with us right now, but the

16   second we open up, they know the first patients to send us; and

17   we expedite those as soon as possible.

18       THE COURT:  And zero ability in California given the

19   way in which prisons and jails are structured to see if the

20   state courts are in a position to help with programming in

21   jails?  Just so I'm clear on your response to that question.

22       MS. ALLISON:  So my response to that question is we're

23   not a unified system.

24       THE COURT:  Right.

25       MS. ALLISON:  Meaning I don't manage the jails.  Those

1   are managed by oftentimes the County Board of Supervisors, so

2   we have no direct authority over the jails themselves.

3          THE COURT:  I believe the chief of California issued

4   some directives to superior courts early on in the pandemic

5   encouraging release from jails.  So I'm just -- I realize I may

6   be asking folks to think about pushing the envelope here, but I

7   just wonder if there are opportunities there.

8          A related question, not so much about the jails but

9   about releases of Coleman class members from BO -- not BOP --

10  I'm dealing with a lot of motions for compassionate release

11  myself from CDCR.  Is there any effort to improve systems on

12  the outside?  We all know it's, you know, not even just the

13  elephant in the room, the mental health infrastructure in the

14  state is pretty well shot.  But is there -- are there efforts,

15  are there creative corrective efforts given the current

16  landscape to try to rebuild that in part at least for those

17  being released and to create an increased possibility that

18  Coleman class members can be released earlier than their

19  current release date to more appropriate treatment facilities,

20  Secretary Allison?

21          MS. ALLISON:  Yes, ma'am.  So I will say, and I can't

22  remember the exact month, but when we were doing all of the

23  early releases, and it was pretty substantial in the beginning,

24  we had to know -- it was not lost on the Governor that we had

25  to provide services.  We were able to secure a $15 million

1    grant from the Board of Community Corrections, and in addition

2    to that, there was $15 million of what we call philanthropy

3    money to assist in their reentry.

4           We asked our STOP program providers to help establish

5    what we call specialized beds, right, help us to take care of

6    this population that is most at risk, and that's the mentally

7    ill.  And they stepped up in a big way, and we were able to

8    activate -- and I couldn't tell you the exact number of beds.

9    I just know I don't have a wait list.  And they activate beds

10   as I need them.

11          So money is not an obstacle.  Beds are not an

12   obstacle.  Now are they inpatient treatment beds?  No.  But

13   they are cognitive behavior therapy, supportive services, kind

14   of what we call wrap-around, Medi-Cal, getting them to

15   appointments, getting them connected to providers, all of that

16   is included in these programs that we stood up very, very fast.

17   We modeled it after our parole reentry programs, and those are

18   the same providers that stepped up and helped us out in this

19   arena.

20          I will say in my conversations with the DSH director

21   that on the cases that I'm referring back to the court, to give

22   them ample time to provide that highest level of care that's

23   needed for that, what we call the warm handoff, so, you know, a

24   bed in the community.

25          In addition, we have nurses assisting with the

1    reentry.  You know, we've always had what we call our TCNP,

2    transitional treatment plan.  I might have the -- I have had

3    TCNP in my mind over 20 years.  We've augmented those nurses to

4    assist in ensuring patients that need that higher level of

5    care, whether it's EOP, PIP level of care, intermediate

6    facility level of care, they have all of that assistance ahead

7    of time pre release.

8         THE COURT:  So is the suggestion that there is a new

9    infrastructure emerging that could become a permanent

10   infrastructure for release of Coleman class members from CDCR

11   with some wrap-around treatment?

12        MS. ALLISON:  Okay.  So I need to be really clear.

13   The RN positions -- and Dr. Mehta or Dr. Toche, correct me if

14   I'm wrong.  I think those are permanent positions.  They were

15   originally tied to our -- I'm losing the abbreviation.  I

16   apologize, for our substance abuse, for our Medicaid-assisted

17   therapy, that was what their initial intention was, but we

18   always knew that was not enough work for them.  And so we knew

19   that they were going to go to our higher levels of care, our

20   CTC, our PIP levels of care, and be able to support.  They have

21   been able to support all of the efforts at the institutions

22   because they are dedicated to the individual institutions.  So

23   those are permanent.

24        As it relates to the funding, well $30 million

25   funding, that is emergency COVID funding that was part of a

1   federal grant, and so ongoing there's not a -- we have various

2   programs for reentry we are already funded for.  This was in

3   addition to those, if that answers your question.

4          THE COURT:  It does for now.  I'll let you know if I

5   would like to learn more about that effort.

6          With regard to program guide resumption, program guide

7   level delivery of mental health care, I understand there's a

8   tool that CDCR is using for monitoring quote, unquote,

9   departures from the program guide.  Is that tool going to

10  inform specific plans to resume, and what can you tell me now

11  about specific plans resumption?  And while recognizing that,

12  you know, using my fog is lifting, it's lifting but we don't

13  know exactly when it will disperse.  So do you currently have

14  kind of a working time line by which you think full resumption

15  of program guide will be possible, or is it this tool that will

16  tell you, Secretary Allison?

17         MS. ALLISON:  So I will say, you know, we have resumed

18  programming at different times at different institutions,

19  right?  So we developed it as it relates to COVID.  So COVID,

20  at one time our numbers were down into the 200s.  We were

21  getting ready to activate visiting that weekend.  And, you

22  know, we were really excited, and we had started some

23  programming.  And unfortunately, it was an EOP small group

24  because we had cut the groups in half.  But they had social

25  distanced and wore masks, but still there was some transmission

1    from one EOP patient to another, and so needless to say, we

2    have to do it in a safe manner.

3            So currently during our extreme outbreak, you know, we

4    are in the 8,000s today.  We got as high as I think 92 or 93

5    last week.  When you say the fog has lifted, unfortunately it's

6    not lifted for us.  We do see light at the end of the tunnel.

7            THE COURT:  Yeah.  I don't think it's lifted.  I think

8    it's only that it may be starting to lift because of the

9    vaccines.

10            MS. ALLISON:  Right, right.  That's the end of the

11    tunnel for me is the vaccines.  But you know, needless to say,

12    I have an obligation to keep our patients safe.  We have had to

13    be on a modified program for the last several weeks.  You know,

14    it's heartbreaking to me to see -- you know, I always say COVID

15    is hard enough on all of us, but we get to go home to our

16    families.  Inmates don't get to go home to their families.  You

17    know, so we've implemented phone calls, video calls or video

18    visitation for the offenders, you know, just as some kind --

19    trying to get something for them.  But it's very concerning.

20    And to give you a date when we're going to activate, I could

21    not tell you, and it will be a case by case given that

22    individual institution, their outbreak status at the time, and

23    then of course, you know, once we have vaccines, that obviously

24    will change the progression of how we're able to -- what we

25    call roadmap to reopen, reopen our facilities in a safe manner.

1        We do have clinicians providing treatment.  I mean, I

2    don't want that -- you to think we don't have any kind of

3    treatment.  We do.  Dr. Mehta could probably speak in more

4    detail to that.

5        But as far as being able to facilitate groups and

6    those kind of things, it's just not safe.  And so my number one

7    job is to keep our patients safe.  You know, I have a different

8    perspective.  I mean, care and treatment is not only the

9    foundation of my education, it's who I am to my core, and

10   that's my number one thing is to make sure everybody's safe.

11       THE COURT:  All right.  I understand that.  Thank you

12   for articulating that.

13       You mentioned vaccines.  I had the opportunity to be

14   briefed by the Receiver.  The Special Master was present,

15   Judge Tigar, Judge Wilken, and I all heard from the Receiver

16   with Dr. Bick present regarding what the Receiver currently

17   knows about vaccine prioritization.  I've reviewed state

18   documents.  I understand there are three institutions that have

19   been prioritized, quite a few Coleman class members at those

20   institutions.

21       So help me understand, if every inmate who has not had

22   COVID is vaccinated say in the next four months just for sake

23   of argument.

24       MS. ALLISON:  Uh-huh.

25       THE COURT:  And if there's some assumption, and you

1   could tell me if I'm right about this, I gather there is an

2   assumption further bolstered by the CDC's evolving position, if

3   someone has COVID, they are immune.  It appears to be a

4   position that CDCR is taking that immunity may last for at

5   least three months, at least for much of the population that

6   has had COVID.  So let's say within four months, again, just

7   putting that out there as a possibility, everyone who has not

8   had COVID is vaccinated, and then over time, those who have had

9   COVID are vaccinated, also it's voluntary, not mandatory, but

10  does that mean full program guide compliance, efforts to comply

11  could begin four months from now?

12          MS. ALLISON:  Okay.  So I'm going to kind of rephrase

13  that a bit if that's okay just for my own mind.  So if our

14  patients are safe, whether it's through vaccine or public

15  health tells me they're fine, and I'm able to resume program, I

16  am anxious to resume full programming within our institutions.

17  It has a greater benefit for everybody if we're resuming full

18  programming within our facilities to include all of the

19  expectations outlined in the program guide.

20          THE COURT:  So who exactly will you look to to tell

21  you?  Is that Dr. Bick?  Is that the Receiver in Plata?  Who

22  exactly?

23          MS. ALLISON:  Dr. Bick is our lead doctor who guides

24  both Receiver Kelso and myself.

25          THE COURT:  All right.  Just finally, are there

1    lessons learned from this pandemic that -- regarding

2    durability?  I think the pandemic has laid bare durability

3    issues.  Ms. Ells is correct in that point.  I mean, I don't

4    think we can assume that it's going to be another hundred years

5    before a full pandemic of this nature.  Let's assume that

6    that's not the case.  We've staved off other potential

7    pandemics, very different kinds of viruses.  So is CDCR

8    developing some assumptions about a readiness to confront

9    pandemics in the future based on what it is learning from this

10   time around, Secretary Allison?

11        MS. ALLISON:  Yes, ma'am.  I will say that we are

12   evaluating all the various aspects and the lessons learned

13   within this on how we house patients, on physical plant design,

14   a variety of things that we are currently under evaluation for

15   for any future efforts.

16        THE COURT:  All right.  I think it's something we all

17   need to keep in mind.

18        Let me just ask, without raising any issue that I've

19   said I've stricken or raising an issue I don't need to hear

20   today, does either party have anything to say about program

21   guide resumption?  If you have not heard the details on

22   prioritization of vaccines, I'm going to ask Special Master

23   Lopes to share that with the parties so you get up to speed on

24   that.

25        First, Special Master Lopes, anything in particular

1  you want to say?  Perhaps you can identify those three

2  institutions.

3          SPECIAL MASTER LOPES:  Certainly, your Honor.  Skilled

4  nursing facilities, Stockton facility CHCF, CCWF, and CMF are

5  the three facilities that you're referring to.

6          THE COURT:  All right.  Anything else you want to say

7  at this point?

8          SPECIAL MASTER LOPES:  I just want to, if I may, to

9  take a step back.  What Secretary Allison is talking about in

10  terms of population reduction reviews is extremely important

11  work, and it will yield some good results for those people who

12  are at high risk, and the state's important work in terms of

13  reducing the population over 22,000 inmates has had an impact

14  on the global Coleman population, but it hasn't made a

15  significant dent in the EOP population which I believe is still

16  higher today than it was when the three-judge court met years

17  ago and when the Supreme Court reviewed the three-judge court's

18  findings.

19          EOP population drives referring to higher levels of

20  care, and it drives other services and causes a bright light to

21  be shown on staffing issues, in-person staffing issues and the

22  like.  And I know that Secretary Allison is sensitive to those

23  topics, but until population measures are targeted at that

24  population, we will struggle, I believe, in this case.  Thank

25  you, your Honor.

1   THE COURT:  Thank you, Special Master Lopes.  I've

2   heard that from you before.  Thank you for making that

3   statement for the record this morning.

4   Let me ask again, briefly, I don't have pressing

5   questions on this, but it's something we'll need to closely

6   monitor.  We'll have more data within the next several months,

7   even more data in the next month or two, I believe, on how many

8   inmates are being vaccinated, what the uptake is, and what that

9   means for program guide resumption.

10   Mr. Bien, anything to say on this point?

11   MR. BIEN:  Yes, your Honor.  I've been trying to

12   closely follow the vaccination, the vaccine access, and track

13   what's going on nationally and in California and in CDCR, and

14   I've also had some conversations, communications with the

15   Receiver.  I do think it's important to point out that who gets

16   the vaccine beyond this first group is not clear.  In other

17   words, nationally it's not clear.  The recommendations, there's

18   going to be more coming out this weekend.  The states then have

19   discretion whether they follow those recommendations.

20   I've been appreciative that California has been far

21   more supportive of the vaccines going to the incarcerated

22   population than some other states as a high priority which we

23   obviously support.  We think that not only on behalf of my

24   clients and the people that work in the prisons, but for public

25   health reasons, the prisons are a major source of COVID

1   outbreaks in society, and it would be good for everyone if the

2   prisons received vaccines as a very high priority.

3          There is no assurance at this point that it's going to

4   continue to be a high priority, and I think we're concerned and

5   we're following, and I think that the Special Master and

6   Receiver I know are following too to assure that we continue,

7   we being collectively the prison system continues to be a high

8   priority as the next -- you know, as the vaccine flows out.

9          There are a lot of people competing for the vaccine in

10  society.  They have a lot of good arguments why they should

11  come farther up on the ladder, and it seems to be both a

12  scientific process and a political process, and so I just think

13  we need to be conscious of the fact that it's still in play.

14  This first group I want to laud, you know, the CDCR and the

15  Receiver and the Governor's Office for prioritizing the prison

16  system so that they receive the vaccine at the same time or

17  close to the same time as hospitals and skilled nursing

18  facilities on the outside.

19         I would argue that the prisons are equal and higher

20  priority as we go farther down, and I hope that we can continue

21  to be -- see that California prioritize incarcerated

22  populations.  I'm also concerned, as I'm sure I know that the

23  Receiver and CDCR are in terms of the education process and

24  communication process that will be necessary to convince both

25  the incarcerated population and the people who work in the

1    prisons, both clinical and custody staff, that the vaccine is

2    safe and appropriate and something that they should, you know,

3    accept.

4           And there are a lot of fears in society in general

5    about the vaccines.  I think we need to listen to those and

6    respond to them, and especially in the incarcerated population

7    where there has been -- there is not a lot of trust in in

8    custody or even in the medical system.  You know, people have

9    good reason to be distrustful of both because of what has

10   happened in prisons, in general, and also what's happened to

11   people of different ethnicities and races in our society with

12   medical experimentation.

13          So I am a full supporter of the vaccine.  I think it's

14   very important, but I think we need to have a full-on effort to

15   communicate with people who live and work in the prisons about

16   the vaccine, why they should consider it.  I assume it's going

17   to be voluntary for incarcerated population.  I know the CDCR

18   is considering, you know, how it can best make sure that the

19   largest amount of its staff also accept the vaccine.  But I

20   think it's a challenge that's not just in our -- in the prison

21   society but in greater society.  There's a lot of --

22   unfortunately, there's a lot of skepticism about everything

23   about the pandemic.  And that's been an obstacle to us as a

24   society moving forward, and now we see it in the prison system.

25          Judge Tigar next week is going to be dealing with the

1    issues of mask compliance and testing compliance and -- both

2    for staff and, you know, whether there should be discipline or

3    not.  Again, these are difficult issues and -- but, you know,

4    again I think that we also see the vaccine as a great hope at

5    the end of the tunnel, you know, to turn this around.  But we

6    have a long way to go to make sure we have full access to the

7    vaccine and then to convince everyone to accept it.

8          THE COURT:  Understood.  The Court's hope is that it's

9    the least of a long road for the Coleman class.  I understand.

10   I understand we're in a very difficult tunnel now, but I didn't

11   mention education.  Dr. Bick described the methods of educating

12   the inmate class, and of course the staff that works, the staff

13   that has been the protector in so many cases that works with

14   all Coleman class members, that's this Court's focus are a part

15   of the package.  I understand there's an aggressive goal of 70

16   percent vaccination, a very aggressive goal but hopefully will

17   drive uptake and possibly, you know, waves.  First wave and

18   then a second wave sees how that first wave goes and gets on

19   board.

20         If the parties here see a way for this Court to

21   clarify the intersection of provision of the vaccine with

22   compliance with the constitution when it comes to adequate

23   mental health care, they should let me know.  Courts have let

24   the Governor know that they request relative priority.  Federal

25   courts have let the Governor know because of the constitutional

47

1    need to hold jury trials for criminal defendants as soon as

2    possible.  But to the extent this Court can clarify the high

3    priority that Coleman class members should receive given their

4    constitutional rights, I'm prepared to consider doing that.

5            Mr. Lewis, anything on this point?

6            MR. LEWIS:  Yes, your Honor, very briefly.  As you

7    just pointed out, there are a series of meetings that are going

8    on about this continually.  Your Honor was present with the

9    people that are making the decisions on this, and they have a

10   robust plan to roll out.  This is firmly in the ambit of the

11   Receiver's Office and the Plata litigation, and I think we all

12   hear.  We've heard an update that there are robust steps being

13   taken.  So I believe that, while many of Mr. Bien's comments

14   are appropriate and maybe they are how he feels, it's best

15   positioned in the Receiver's Office, and the Receiver appears

16   to have a plan to do this.

17           So I would say that we don't need to worry about

18   prioritization of certain inmate groups at this time because

19   the Receiver's Office has a plan for vaccinations.  It hasn't

20   even started yet.  So I think we have to clearly see how that

21   rolls out before we take any steps to try to put certain

22   classes maybe above others.  We know that the vaccination plan

23   is focused on the people that need it the most in terms of both

24   staff and inmates.  So I think that is a good place to start.

25   And frankly, we are not doctors.  We are here to obviously work

1    on litigation.  The people that are the professionals are the

2    ones that are making these decisions, and I think we should

3    defer to them first.

4         Very briefly, your Honor, on the program guide stuff

5    and program guide compliance, the CDCR is working on this

6    holistically.  Each institution is developing corrective action

7    plans and corrective action processes that the Special Master

8    is working with us on.  We look forward to continuing that work

9    and to rolling forward on improving program guide compliance.

10        But obviously, as you pointed out, we're still in the

11   fog of COVID, and that is having massive order of effects

12   throughout the state, the nation, and CDCR's not immune from

13   those.  So programming is affected and things like that.  But

14   we are working on moving forward with improvements, and we will

15   continue to do so as COVID hopefully -- we're talking about the

16   light at the end of the tunnel -- hopefully we can deal with

17   that and move forward.

18        But the time line item -- or the time line issue just

19   is simply too unknown right now.  As we're talking about it

20   right now, we don't even have a complete activation schedule on

21   the COVID vaccinations.  So we have to let those play out, and

22   that will of course inform further steps on program guide

23   compliance.  Thank you, your Honor.

24        THE COURT:  All right.  I'm satisfied that Secretary

25   Allison is remaining alert.  I do think it makes sense to start

1    thinking about parallel tracks.  I don't know if it's

2    institution by institution.  We're not going to get into those

3    details now.  I also just want to -- of course the Receiver's

4    Office has a lead role.  But Dr. Bick has told this Court

5    before he has a dual assignment, and he is available with this

6    Court with respect to the mental health class.  And

7    Secretary Allison has said she looks to Dr. Bick.

8         So I just repeat, if this Court has a role to play in

9    clarifying the need to prioritize the mental health class, I'm

10   satisfied that it's being considered now based on what I heard

11   from Dr. Bick working with the Receiver.  But if there's more

12   this Court can do, the parties should let me know.

13        I want to talk briefly about data.  I don't know how

14   much we need to talk about data today.  Let me tell you the

15   thing I'm most interested in hearing from the parties, if

16   Special Master Lopes could make a brief report initially, then

17   we'll take a break, and we'll come back and finish the rest of

18   the agenda.  My plan would be to work through lunch, get us

19   done by a late lunch around 1:00.

20        On data I am, as I've signaled, interested in setting

21   a firm date for completion of the data cleanup process that's

22   under way.  I understand it's complicated.  These kind of

23   issues can open up black holes.  I don't think that's going on

24   at this point.  I'd like to ask the Special Master to briefly

25   summarize the status.  I want to keep a close watch on this.

1   If any party believes there's a specific time frame by which I

2   can in fact say with confidence now this issue will be fixed so

3   that the Court can have full confidence in the data, including

4   what's coming out of EHRS, I'm happy to hear that.  I don't

5   know that I'm quite at the point where I can set such a firm

6   time line.  Any time line I set I want to be reliable.

7          Special Master Lopes, briefly.

8          SPECIAL MASTER LOPES:  Thank you, your Honor.  As

9   you're aware, Dr. Potter was appointed as data expert at the

10  end of April.  He started work in May through no fault of

11  anyone's.  Just the normal process of getting up to speed and

12  getting permission to use certain systems and the like, that

13  took approximately two months.  So for the last four months or

14  three or four months Dr. Potter has been working with some of

15  the specialists at CDCR on data for EOP ad seg hub

16  certification, and while there has been back-and-forth about

17  streamlining the process, how that gets done, who should be

18  part of it, we've all landed at trying to organize quality

19  improvement groups, work groups with Dr. Cartwright,

20  Dr. Leidner, who has testified before this Court, Dr. Potter,

21  and my expert, Henry Dlugacz.

22          So they're working on a written plan.  The work

23  group's first agenda is going to be a project plan, and they're

24  scheduled for meeting with the Receiver's IT group as well to

25  work through some of the IT issues that exist right now.

1        So we've been working collaboratively with a smaller

2    work group, and our hope is to start to get more progress made

3    on the EOP certification process.  So to this point, the groups

4    are working at least two hours.  They're meeting weekly in

5    two-hour meetings.

6        The indicators for -- it's so complicated that the

7    indicators for ASU certification have all types of subsets to

8    them.  But we feel that once we're able to work through some of

9    those problems, issues, and concerns, that we can then

10   replicate the process for other indicators and move forward

11   collaboratively.

12       I think everyone recognizes that there are so many

13   unknowns here, that putting a time line on the work that's to

14   be done is something that CDCR is uncomfortable doing.

15   Dr. Potter feels, I believe, the same.

16       Notwithstanding that, there may be a need for the

17   Court to have regular updates from me to discuss what is being

18   done, what goals and objectives we are looking at going forward

19   so that the Court is also always assured that the ball is

20   rolling and moving in the right direction, and that way we can

21   keep everybody that's involved in the process on task.

22       Just for your Honor's edification, once you get the

23   EOP ad seg certification process completed and it can be looked

24   at and validated, it is a subset of CQIT.  So you can't build

25   out CQIT until you have at least one example of how to do it.

1    So once we get through the EOP ad seg portion of this review,

2    then we can have a better sense of how to guide the Court in

3    terms of what will happen with CQIT.  Certainly with CQIT we

4    can all talk about the indicators because CQIT has a number of

5    indicators.  How you build that out is a different calculus.

6         I think that there's a roadmap for having us work

7    together in those small work groups.  We will then bring the

8    reports from the small work groups out to a larger group

9    including the plaintiffs so that they are hearing about things

10   at least weekly, if not biweekly.  That's a short report, your

11   Honor.

12        THE COURT:  All right.  Mr. Bien, do you have anything

13   to say anyone on your team briefly?  In particular, do you

14   think the Court should set a firm schedule at this point or ask

15   for regular updates for a relatively short period of time yet?

16        MR. BIEN:  I'm going to defer to Mr. Galvan.

17        THE COURT:  All right.  Mr. Galvan.

18        MR. GALVAN:  Thank you, your Honor.  I think that

19   regular updates would be the appropriate course.  I think we

20   have to be mindful of the Court's order of yesterday which said

21   set a three-month time line for updating CQIT, and these two

22   things, although they are not the same thing, we can update

23   CQIT and then work on a different track to make sure what the

24   data that goes into it and flows out of it is validated.  But I

25   still think that the two things at some point have to be

1   married up together.

2           But, you know, having been now in several meetings

3   with the Special Master's team and Dr. Potter and the

4   defendants, I think it is correct to say that a specific

5   arbitrary date certain at the moment would not work, but we do

6   need some accountability through regular updates.

7           THE COURT:  Mr. Lewis, anything to say, or do you

8   yield to someone on your team?

9           MR. LEWIS:  No, your Honor.  I will take this.  In the

10  past few weeks the Special Master is correct that the parties

11  have convened a series of meetings to discuss data remediation

12  validation.  We do agree that giving regular updates to the

13  Court is probably the best way to go about it because it is

14  going to be a very important and worthy project.  CDCR will

15  create a roadmap, but it's difficult to assign dates to it

16  right now just given all of the variables.

17          We're looking forward to further information that

18  we'll be receiving from Dr. Potter on data certification and

19  data validation.  We think that that will drive a lot, and we

20  look forward to working with the Special Master's team and his

21  data expert to receive their advice on how we can create the

22  plan and the roadmap for data remediation and validation.

23  Thank you.

24          THE COURT:  All right.  The Court's plan is to check

25  in with the Special Master on this issue at least monthly, and

1    I will talk with him following this hearing about whether or

2    not I'm asking him to provide more formal reports.  But I'm

3    going to stay on top of this.  I'm going to talk with the

4    Special Master at least monthly about it, and he's hearing me

5    say that.

6          All right.  Let's take a 15-minute break, and then

7    we'll come back.  I'll hear from Dr. Williams on suicide

8    prevention.  Remind me is anyone else prepared to talk about

9    that?  You're the person most knowledgeable being offered

10   today, correct, Dr. Williams?

11         DR. WILLIAMS:  Yes.  That is correct.

12         THE COURT:  All right.  We'll take some time on that.

13   We'll talk a bit about quarantine and isolation space.  I would

14   have to say I've seen a flurry of information coming even this

15   morning to the Court's email box.  I have not had time to look

16   at it, but I will allow the Special Master to provide some kind

17   of update, and I will be reviewing what I have received after

18   the hearing.  I had looked for a stip from the parties.  So I

19   will be asking where that stip is.

20         So again, I think we'll be done by 1:00.  Suicide will

21   take a while.  But a 15-minute break and then we'll go no later

22   than 1:00 p.m. PST.

23         That works for you to remain for the balance of the

24   time, Secretary Allison?  I think that was a yes.  I'm going to

25   assume that.

1          MS. ALLISON:  Yes, it is.  I'm getting ready to run to

2     the restroom.  I apologize.

3          THE COURT:  All right.  15 minutes, see you back here.

4          (Recess taken 11:40 a.m. to 11:59 a.m.)

5          THE COURT:  All right.  We're back on the record.

6     Thank you for your patience with the Court.

7          Before we get into the questions that I've posed and

8     in response to those, I would give Secretary Allison a brief

9     chance to say something and then hear from Dr. Williams, but

10    suicide prevention is one of those issues that allows the Court

11    to put in stark terms how serious the delays in this case are.

12    And this was an issue before COVID.  COVID, the Court believes,

13    has exacerbated issues with respect to CDCR suicides.  The

14    numbers are not fully before the Court at this point, but I

15    just wanted to review the information the Court has received,

16    just one recent case to try to provide the focus that the Court

17    has tried to suggest we all need to maintain on the entire

18    remedy here, but certainly suicides.  And the Court is

19    distressed by the delay and the inability to get suicide

20    prevention addressed properly as required by the Court's prior

21    orders.

22          And so I want to just state for the record the details

23    with respect to one case.  I'm not using a name, of course, but

24    what I do know is the person was a 24-year-old Hispanic male

25    found unresponsive in his psychiatric inpatient program PIP

1    cell on September 29th, 2020, and it was determined he had

2    asphyxiated himself with A T-shirt.

3          This is someone who entered CDCR on May 21st, 2019, to

4    serve a two-year sentence.  He was a participant in MHSDS at

5    the acute level in the PIP.  He was first placed there in

6    February 2020 for a grave disability.  He was readmitted to an

7    MHCB in July 2020.  His level of care thereafter was increased

8    to acute, was transferred to the PIP on August 13th, 2020,

9    where he remained until he died.

10         While in the PIP, he had maximum custody status, was

11   denied group treatment, and most out-of-cell activities he was

12   reportedly victimized by an inmate peer who was housed next to

13   him.  He attempted to strangle himself on September 23rd, 2020,

14   and then again on September 26th, 2020.  He was placed on

15   constant observation and clothed in a safety smock.

16         But on the morning of his death, September 29th, he

17   requested his clothing.  A psychiatrist met with him,

18   discontinued the safety smock, returned his clothing, ordered

19   observations be decreased from constant to 15-minute checks.

20   The psychiatric notes, as the Court understands it, incorrectly

21   stated with reference to a nursing note the patient exhibited

22   no further self-harm behaviors and no negative behaviors last

23   five days, apparently not reviewing the inmate's suicide

24   attempt just three days earlier on September 26th, not to

25   mention the September 23rd date.  And even the 15-minute checks

1   were not observed, and the inmate committed suicide a few hours

2   later.

3        Once he was found, there was an eight-minute delay in

4   911 notification.  The review of that case conducted by CDCR,

5   as the Court understands it, identifies 30 recommendations for

6   corrective action, most directed at the PIP where he was housed

7   but numerous, numerous inadequacies, and most significantly, I

8   understand -- I mean, people can tell me here if they disagree,

9   but most significantly, most of the actions appear tied back to

10  the lack of a written suicide prevention policy, not only at

11  that PIP but no policy in any PIP.

12       Assuming I have that right, it's incomprehensible to

13  this Court, and I understand that this is an area where I

14  intend to try to take the reins more tightly and starting with

15  ordering that a policy for the PIPs be provided to the Special

16  Master pronto and that that be provided for final approval

17  within ten days at the outside.

18       I understand the Special Master's expert has been

19  requesting a policy since August of 2019.  Here's a case where

20  the Court with the Special Master had hoped that the defendants

21  could demonstrate that they can get a hold of this issue,

22  demonstrate the ability to get all of the Special Master's

23  experts' recommendations implemented.  I'm going to hear from

24  Dr. Williams in just a minute on specific recommendations and

25  also demonstrate the ability to exercise appropriate clinical

58

1   judgment.

2          This is just one case.  If we aren't talking about

3   this kind of case when we think about why there's a remedy in

4   Coleman, we are -- and include the Court in this, we are

5   failing in our obligation.  And so the order to provide the

6   policy now is a bench order, and I'll look for the Special

7   Master to forward that to the Court within ten days.

8          So that is framing the Court's thinking about -- it's

9   not the only case.  It's the most recent.  I've got more, but

10  I'm not going to take the time because I think everyone here

11  knows about these cases.  It's what's happening to ensure

12  foreseeability and preventability, as the Court has defined it,

13  that requires the Court's full attention.

14         So with that, I'm going to turn to the specific

15  questions I had posed.  I'm going to allow Secretary Allison to

16  make introductory comments, understanding she will likely yield

17  to Dr. Williams.  I would ask Dr. Williams to be thinking

18  about, in his comments, prioritizing comments about

19  recommendations 12, 13, 17, and 21.  Again, 12, 13, 17 and 21.

20  I understand the Special Master's expert has telegraphed those

21  are his highest priorities, and I want to understand that those

22  are the CDCR's highest priorities and then can move on to the

23  others.

24         So with that, Secretary Allison.

25         MS. ALLISON:  Thank you, your Honor.

1          THE COURT:  Again, we need to speak up.

2          MS. ALLISON:  I'm sorry.  Needless to say, suicide

3   prevention is all of our number one job.  There's nothing more

4   serious than suicide.  It's -- how do I say this.  I -- I have

5   vivid memories of my first experience with suicide within the

6   correctional environment, and it still haunts me to this day 33

7   years later.  So this subject is very, very dear to my heart,

8   and so I do meet with staff bimonthly.  I have Coleman

9   meetings.  I have specialized meetings, what I call mental

10  health suicide prevention coordination meetings, making sure

11  that mental health custody, our facilities management division,

12  which also has a piece of this, we meet on a regular basis.  I

13  review those reports to ensure that I can help break down any

14  barriers necessary in our processes.

15          So Dr. Travis is wonderful.  He's very, very

16  responsive to all of our needs, but it -- I will say, as one

17  that's reviewed many, many suicide reports in my career, that

18  the tragedy of our patients' lives are not like anything you

19  and I or anybody else on this call can understand, and I will

20  say that our new state surgeon general has recognized that

21  early childhood traumas really impact the mentally ill, in

22  particular those within the criminal justice process.  So I

23  look forward to working with mental health outside experts to

24  include Matty's team, you know, who I intimately know, going

25  forward trying to resolve this very, very quickly.

1    THE COURT:  All right.  I appreciate those comments.

2    And you would defer now to Dr. Williams for the balance of the

3    department's response to the Court's questions?

4    MS. ALLISON:  Yes, ma'am.

5    THE COURT:  All right.  Dr. Williams.

6    DR. WILLIAMS:  Good afternoon.

7    THE COURT:  First address those recommendations I

8    called out and then I might have a follow-up question before I

9    move on to the other recommendations.

10    DR. WILLIAMS:  Of course.  I'll start with item 12

11    that's related to the intake cells.  So we have received

12    funding for this, and we have been working with the facilities

13    management department to ensure that these are moving forward.

14    As of right now, we have 38 of those intake cells within four

15    institutions CCI, CCWF, Corcoran, and High Desert.  That

16    constitutes about 58 percent of the new intake cells.  They are

17    going through the process of being submitted to the state fire

18    marshal, the plans, so that is anticipated by mid-January with

19    approval from the state fire marshal by the end of March, and

20    then they can begin material procurement and construction

21    schedules.

22    I have been assured by the facilities leadership that

23    this is a high priority.  They will work diligently to make

24    sure that these are done as quickly as possible.  The remaining

25    ten intake cells that were included in this budget will be

1   scheduled to go to the state fire marshal by the end of June of

2   2021, and then they will begin working on again the material

3   procurement and the construction schedule after that point.

4        They anticipate that some of the procurement could

5   take several months to obtain depending upon the institution.

6   Every institution is very different when you're retrofitting a

7   cell based upon when the institution was built, the different

8   factors within those cells that need to be modified to make

9   them suicide resistant, and they're also dependent upon the

10  inmate labor.  They are the ones that participate in the

11  construction of it.  With COVID, it has restricted some of the

12  ability to utilize inmates as broadly as we would want pre

13  COVID, but they do assure me that that is one of their highest

14  priorities.

15       THE COURT:  So in state government speak, what's the

16  shortest period of time and the longest period of time from

17  state fire marshal approval to completion of construction?

18       DR. WILLIAMS:  It depends upon the procurement

19  process.  That could take three to five months to procure all

20  of the materials.  I don't have information from facilities

21  about then how long it would take to actually construct it.

22  Again with some of those concerns related to the workforce, if

23  they are under quarantine restrictions, that obviously would

24  exacerbate the amount of time that it would take.  But I can

25  get some further information about that time line.  I have not

1  been involved historically in any construction schedule, so I'm

2  not entirely sure about that piece.

3          THE COURT:  Do you know?  Maybe the secretary knows.

4  Does the secretary have the ability to expedite procurement?

5          MS. ALLISON:  Procurement, I can necessarily.

6  Procurement takes time, right?  I can certainly break down any

7  barriers that are specific.  I will say that in a COVID world

8  we have had to change some of our methodology on our workforce

9  to use more of day labor, meaning community contractors versus

10  an inmate crew supervised by a community contractor.  So we've

11  had to pivot those, and we will continue to do that if in fact

12  it's needed.

13          You know, I can't remember.  I know that we've had

14  numerous ASU retrofits in years past, and I think once they get

15  started, it's relatively short, I want to say within a couple

16  months.  We could provide you that data.  But I know that we --

17  it's a relatively simple correction once we physically are able

18  to get into those cells.  Because we have to vacate cells and

19  prepare them for the retrofits.

20          THE COURT:  All right.  Thank you.

21          Dr. Williams, you may continue.

22          DR. WILLIAMS:  Okay.  So that's item 12.

23          Item 13 is also closely tied to it.  We have the same

24  schedule for that item as well for item 13.

25          Moving on to item 17, this is related to safety

1    planning.  So we underwent in 2018 a modification to how we do

2    safety planning.  We instituted a safety planning initiative

3    that took 18 months to implement to roll out to the

4    institutions.  We worked with the Special Master team on that.

5    What we found in Mr. Hayes's most recent rounding and in our

6    own reviews is that it didn't -- it didn't work the way that we

7    had intended it.  The institutional staff struggled to adopt

8    this process.

9         As a result and in collaboration with the Special

10   Master's expert on suicide prevention, we are taking another

11   stab at this.  We are -- we have developed a draft proposal,

12   and we have been working with him closely on this proposal.

13   This is an item, in speaking to him earlier this week, he made

14   very clear that while there is urgency to this, this is one of

15   our top priorities.  It's one of his top priorities.  It's one

16   that we want to get right this time.  And he has encouraged to

17   be very methodical about how we were building out the concept

18   of a safety plan to be constructed with a patient when they are

19   coming out of the crisis bed or out of an inpatient setting to

20   set them up for success when they are in the outpatient.

21        So my team, in collaboration with Mr. Hayes, have

22   worked on this.  We continue to work on it.  We are hammering

23   out some details as we speak.  We had a meeting as recently as

24   yesterday, I believe, on this topic to further identify how we

25   can build out this structure.

1        I anticipate that, with Mr. Hayes's support, we will

2    be able to get this developed in the electronic health record

3    in the next three or so months.  We then also obviously need to

4    train the institutional staff on how to utilize the new form.

5    But our goal with creating a new safety plan is to be able to

6    make it individualized for our patients but also easier for our

7    clinicians to be able to digest and to be able to actively

8    utilize using clinical judgment and collaboration with the

9    patients.

10        So all of that needs to be talked to the clinicians.

11   So that schedule, we will -- once we have it being built in

12   EHRS, the concept of the safety plan, we will simultaneously be

13   working on a training modality utilizing our training unit

14   staff to help support that, and then we will be able to roll

15   that out hopefully very close to when it is completed in the

16   electronic health record so it can have a rollout simultaneous

17   with completion of training.  So my target for this is in the

18   spring of this coming year, either April/May, that time frame,

19   to be able to have that new format in place.  But again,

20   working very closely with Mr. Hayes and other members of the

21   Special Master's team, we want to get this right, and Mr. Hayes

22   has encouraged us to be very methodical and slow about making

23   sure this is done correctly at this time.

24        THE COURT:  All right.  So it sounds to me as if

25   you're describing an action plan that includes all the specific

1    steps that are needed.

2              DR. WILLIAMS:  Uh-huh.

3              THE COURT:  Does that extend to every recommendation

4    on the list while prioritizing the ones the Court called out?

5              DR. WILLIAMS:  Yes.  I have a plan in place for all of

6    them, yes.

7              THE COURT:  All right.  And so for all of them by

8    April or May you'll have the plan finalized.

9              DR. WILLIAMS:  It's varying stages of implementation

10   for all of them.  For that one in particular, the safety plan,

11   that's what we're talking about May, April or May time frame.

12   Each one has a different rollout, but many of them I am

13   targeting to hopefully have done in quarter one or quarter two

14   of 2021.

15             THE COURT:  The detailed plans for implementation; is

16   that right?

17             DR. WILLIAMS:  Hopefully the actual implementation.

18             THE COURT:  The actual implementation, all right.  And

19   you are, I think based on what you just said, you're

20   acknowledging their two remedial tracks.  One is the clinical

21   judgment track, right?

22             DR. WILLIAMS:  Uh-huh, yes.

23             THE COURT:  That's what I heard you saying, that

24   that's clearly identified as a need to overcome patterns of

25   deficiency in the exercise of clinical judgment.

1          DR. WILLIAMS:  Absolutely.  That is an item that we

2     have seen in many of the suicide case reviews.  Clinical

3     judgment is often a deficiency that we note and sign a

4     corrective action plan for.  But we also recognize that at a

5     statewide level we need to do something to support the

6     institutional staff as well, that we can't just continue to

7     assign improvement plans to institutional staff without

8     recognizing that there are trends that we need to tackle.  This

9     is a prime example of that that we know that we need to

10    intervene and provide the clinical staff that training and that

11    support to be able to utilize their clinical judgment

12    appropriately when they are assessing patients and when they

13    are helping establish these safety plans for them when we have

14    patients that are in crisis.

15          THE COURT:  All right.

16          DR. WILLIAMS:  So the next item, item 21, this is the

17    observation levels for the nursing staff in the rounding in the

18    inpatient settings.  I've spoken at length with our nursing

19    leadership about this.  The current plan for this is to work to

20    build out an indicator so that -- that mirrors Mr. Hayes's

21    methodology in his rounding for this that will then be reported

22    out at the institutional suicide prevention committees.

23          We will also simultaneously at the headquarters level

24    monitor this in our statewide suicide prevention committee to

25    make sure that any institutions that have these deficiencies

1    have corrective action plans in place to resolve those

2    deficiencies in the observation of those patients that are on

3    suicide watch or suicide precautions.

4          So that is our goal, to have that indicator built, and

5    I know that nursing has been working with CCHCS QM on this.  We

6    have undertaken, and this speaks to one of the other items in

7    here but it speaks to this as well, rebooting our SPRFIT

8    committees at the institutions to build out better metrics, to

9    build out better agenda items that help the institutional

10   committees target those deficiencies at their institutions.

11   This will be one of those items that will monthly be required

12   to be reviewed, and it will be expected that any time that

13   there is a deficiency in this that the institutional staff are

14   taking an active role in improving that.  The regional teams,

15   the regional C and E's will be involved in this as well as,

16   like I said, the headquarters suicide prevention committee will

17   also be involved in oversight and governance of this item.

18         THE COURT:  All right.  I'm glad to finally know how

19   to pronounce the acronym SPRFIT.

20         DR. WILLIAMS:  Yes.

21         THE COURT:  All right.  And then additional comments

22   on the other recommendations identified in the Court's order.

23         DR. WILLIAMS:  So all of the outstanding

24   recommendations, like I said, we have an action plan in place

25   for each one of those.  I'm not sure how you would -- I can go

1  through all of them.  I'm not sure how best to use your time,

2  your Honor.

3        THE COURT:  Help me understand the time frame.  It

4  sounds to me as if you're focused appropriately, generally, but

5  so you said March/April for the safety plan.  If -- I want to

6  talk about how the Court convenes with the parties and the

7  secretary.  I believe at this point the most useful way for the

8  Court to be updated is by hearing from the secretary.  So the

9  next -- the next meaningful date I've just set is the PIP

10 policy due in ten days.  And so I'm thinking I want to check in

11 on that in January sometime.  But on these others, you tell me,

12 and plaintiffs will have a chance to respond, and I'm going to

13 hear from the Special Master as well, what's the time frame in

14 your mind by which the Court can expect meaningful -- a

15 meaningful update on all of the recommendations I've called out

16 and perhaps, you know, it's broken down by category of

17 recommendation.  But how do I -- when is the next time for me

18 to ask for an update that tells me you're on track and this is

19 getting fixed in the next year at the outside?

20       DR. WILLIAMS:  Yes.  So I brief the secretary monthly

21 on these items, and we review these monthly in our suicide

22 prevention -- the SPRFIT committee, and in between obviously we

23 are doing active work.  So I would say on a quarterly basis we

24 would be able to demonstrate that we are making meaningful

25 progress on a lot of these items.  Many of them have been in

1    the works for the past six months I would say.  So we are close

2    to rolling out improvements on all -- on many of these items.

3              Speaking specifically to the 7497, the custody

4    discharge check process.  We are revising that.  We are

5    building out an auditing tool for that for the institutions to

6    utilize to again report out their deficiencies both to the

7    institutional SPRFIT but also to us at headquarters so that we

8    can monitor those.  So that process has been in place.  We've

9    been working on that.  We have a meeting scheduled I believe

10   next week to review that with the Special Master team for them

11   to provide comment and feedback on it.

12             I do want to underscore the amount of collaboration

13   that we have with Mr. Hayes and other members of the Special

14   Master team.  My goal is to make sure that everything that we

15   are doing is something that they review, look at, and provide

16   comment to.  So as we work through this, I would think that on

17   a quarterly basis we would be able to demonstrate that we are

18   moving forward on every single one of these items.

19             THE COURT:  All right.  What I'm signaling is that,

20   you know, quarterly statuses can lull folks into, well, we're

21   going to come up with something to say for our quarterly

22   status.  I'm more interested in organically, given the process

23   you're describing and given the urgency you're saying is being

24   attributed to this and the secretary is saying what are the

25   markers so that this Court, by setting deadlines, can move this

1    along as quickly as possible.

2            My tentative is to set a status in January focused on

3    suicide to hear any update I need on the PIP policy, and

4    perhaps it's at that time that I can get a further update on

5    the time line contemplated, not just for implementation, but

6    the steps being taken towards implementation compliance with

7    all of the recommendations and the clinical judgment piece.

8    And then what does the time frame look like for durability, you

9    know, all towards something the Court thinks about, what you're

10   saying today sounds encouraging, but until now, the Court might

11   conclude it's exhausted the efforts it can take to get

12   compliance here.

13           So I understand what you're saying.  I'm thinking of

14   dispensing with the quarterly status reports and having

15   something that tracks more naturally the key times as relevant

16   to achieving the remedy here.

17           Let me just ask Secretary Allison.  I just want to --

18   I want to cut through some of what I signaled I might have been

19   willing to listen to having considered what the parties have

20   filed and signaling what I think about that at the beginning of

21   the hearing, does the department accept the Court's orders with

22   respect to foreseeability and preventability and accept the

23   Court's definitions of those which is law of the case?

24           MS. ALLISON:  Right, right.  I want to say yes.  But

25   I'm not an attorney, and so in my prior experience I thought we

1    had agreed to that.  But I want my attorneys to correct me

2    because I did have a short time where I was out retired, and so

3    I just want to make sure I'm not misspeaking.

4         THE COURT:  Well, I've told the attorneys how I'm

5    willing to hear from them.

6         MS. ALLISON:  Okay.

7         THE COURT:  So I'm surfacing the issue.  This Court's

8    view is this Court has defined those terms.  It's law of the

9    case.  There have not been objections lodged, and so if your

10   attorney is working for you, Secretary Allison --

11        MS. ALLISON:  Thank you, ma'am.

12        THE COURT:  -- knows something, you're the boss the

13   last I checked.

14        MS. ALLISON:  Yes, ma'am.

15        THE COURT:  All right.  Let me ask the Special Master,

16   anything you want to say regarding suicide prevention at this

17   point?

18        SPECIAL MASTER LOPES:  Your Honor, I echo what

19   Dr. Williams said.  We're working collaboratively with

20   Dr. Williams and his staff on these issues.  In terms of

21   wanting to chart or track something, perhaps the Court may

22   consider having some sort of activation schedule where you get

23   a report on what is being done and the stages of which it's

24   being done and the completion dates, and that may focus minds

25   in terms of moving forward on a consistent basis.  And it may

1    also help you as you're tracking this issue.

2         THE COURT:  All right.  I like the sound of an

3    activation schedule.  Perhaps you can assist in developing that

4    so I can use it in setting dates that track the case that

5    aren't artificial quarterly dates.

6         SPECIAL MASTER LOPES:  Yes.  Be happy to do that, your

7    Honor.

8         THE COURT:  All right.

9         Mr. Bien, without repeating whatever is in anything

10   else before the Court including what I might have stricken at

11   the beginning of this hearing, anything you would like me to

12   know, including with respect to a schedule going forward, or

13   are you deferring to someone else?

14        MR. BIEN:  Ms. Ells is going to address this, your

15   Honor.

16        THE COURT:  All right.  Ms. Ells.

17        MS. ELLS:  Thank you, your Honor.  I think the Special

18   Master's suggestion of an activation schedule with actual dates

19   and a plan is necessary at this point.  This report was replete

20   with references to a preexisting cap that was in place to cure

21   the remedies or to cure the violations from the last round,

22   many of which had no completion date even filled in.  This is

23   not an issue that the department appears to be taking as

24   seriously as they need to, and at this point we think that

25   there needs to be very, very focused attention with some

1    accountability and the type of reporting, detailed reporting

2    with time lines that the Special Master is referencing is just

3    absolutely necessary.

4          I also just would note that a number of the items that

5    are recommendations, including some of the ones that the Court

6    has said should be prioritized, are custody related.  They are

7    nursing related.  They are construction related.  And even

8    Dr. Williams' discussion indicates that he is not the person

9    most knowledgeable on many of those issues.  He can't speak to

10   the construction process whether or not things can be waived.

11   For instance, we don't understand why procurement can't happen

12   at the same time as fire marshal approval.  We don't understand

13   why inmate labor, if that's a holdup, has to be utilized here.

14   And similarly, there's a number -- while this particular item

15   that for the intake cells has been funded, there are other

16   items that are longstanding that appear to have no funding or

17   time line according to Mr. Hayes' report.

18         And, you know, some of these -- the intake cells that

19   we're now talking about focusing on, they have been recommended

20   to be fixed since 2017, and some of the cells that purportedly

21   were fixed, Mr. Hayes found they were not fixed appropriately

22   and they remain suicide unsafe.  So there's just a real concern

23   that the right people aren't focused on this issue.

24         No disrespect to Dr. Williams of course, but, you

25   know, he is not in charge of construction.  He is not in charge

1    of custody.

2           I note that he skipped right over recommendation 13

3    which is related to number 12 which is about -- actually,

4    number 12 is about having enough intake cells.  Number 13 is

5    are you just putting people in the right cells if they exist.

6    And what Mr. Hayes has found repeatedly is that even when there

7    are open intake cells, plenty of intake cells, people are not

8    always being put into those safe places, and there have been

9    suicides that have resulted from just a lack of appropriate

10   custody policy and implementation.

11          And again, Dr. Williams is not in charge of custody,

12   and the fact that he didn't even speak to the side accept to

13   say that it's trailing alongside recommendation 12, there's

14   absolutely no reason that custody staff can't be more quickly

15   instructed to put people in the right safe cells right now.  It

16   could happen right now.  There's no reason to wait for

17   construction in a subset of these places when this is a

18   widespread issue that has been longstanding in this case and

19   has actually led to suicides.

20          The other issue that we would just bring up is that

21   there's also some fundamental coordination issues that have

22   been referenced, nursing staff obviously not controlled, the

23   hiring of the nursing staff is not controlled by this Court.

24   It is controlled by the Receiver.  As to whether or not nursing

25   staff are appropriately conducting rounds at the right level of

1    observation and timing, which is the other recommendation that

2    we spoke about, it's not clear to us that there are enough

3    nurses to do that properly.  So there may be a real question as

4    to whether or not, you know, rolling out a plan in EHRS and

5    then cracking it at the headquarters level may not be

6    sufficient.  We're curious if anyone has actually looked as to

7    whether or not there are enough nurses to really do this right

8    in the first place.  And that's an issue that requires some

9    coordination and planning with the Receiver staff.

10          But overall, it just seems to us that this is a lot

11   of -- many of these are longstanding problems, as this Court

12   knows and as this Court referenced.  And we continue to be

13   frustrated by the fact that there isn't a real time line for

14   many of these things.

15          And, you know, the suicide rate is still where it is.

16   There have been 14 suicides since mid-July which is when the

17   population dropped precipitously.  That is more than 50 percent

18   of the suicides to date this year.  So the population drop is

19   not changing the suicide rate.  It is still a massive problem,

20   and, you know, there's 30 percent of the suicides this year

21   have been in segregation units.  Those are the same units where

22   a lot of these policies apply and all of these recommendations,

23   again, many of them longstanding.  So we continue to be

24   frustrated that it doesn't appear there is sufficient effort to

25   expedite and fix these problems.  Again, they have been

1    longstanding.

2            THE COURT:  Do you agree -- so say the Court sets a

3    next status in January, maybe it's the end of January, to look

4    at the -- to make certain I've got that PIP policy and an

5    activation schedule.  Is that the right way to go forward from

6    here?

7            MS. ELLS:  I think it is.  I do think that we may --

8    you know, there is a real problem with -- an ongoing problem

9    with clinical staff failing to refer people for higher levels

10   of care or discharging them early and rescinding referrals, and

11   I think that really needs some focused attention right now too.

12   There have been five suicides within eight days of a level of

13   care change this year, including four after an MHCB discharge.

14   There was one yesterday of a man who has been sent to a crisis

15   bed five times in six months, and he has never been considered

16   for a higher level of care.  He just keeps getting discharged

17   to segregation units, and he finally killed himself.

18           I will note that this dovetails somewhat with our

19   conversation about supervisors.  He killed himself at High

20   Desert State Prison, which is a prison with a MHCB, and not a

21   single supervising psychiatrist at the entire institution, not

22   even allocated, much less funded.  So these issues tie

23   together.

24           And I think that the type of conversation we're having

25   is holistic, and it is important to keep our eyes on the

1    particular details of these recommendations.  But this clinical

2    focus on referring people to appropriate levels of care is

3    another area that really needs focused attention right now.

4         THE COURT:  So in part, that's the clinical judgment

5    piece.

6         MS. ELLS:  Correct.

7         THE COURT:  I understand the staffing piece, but so if

8    we focus on suicides again in January, we can -- that's

9    included on the agenda.  Any other particular -- apart from

10   putting those items on the agenda, anything equivalent to an

11   activation schedule that would allow -- I'm just asking as I

12   think about how to do this -- that would allow proper focus

13   again in January?

14        MS. ELLS:  I think the recommendation for an

15   activation schedule is important.  I also do think though that

16   having -- Dr. Williams can speak to many of the issues and

17   recommendations, but HE can't speak to a lot of them as well.

18   There are a number here that are outside of his purview as a

19   clinician.  They relate to custody staff.  They relate to

20   nursing staff.  They relate to construction.  So having the

21   right people accountable and able to speak to this Court's

22   questions on an ongoing basis I think is necessary too,

23   including --

24        THE COURT:  I can invite recommendations for who I

25   should ask or a person most knowledgeable orders.

```
 1          All right.  Mr. Lewis, anything to say or someone from
 2   your team.  Mr. Lewis?
 3          MR. LEWIS:  Your Honor, I apologize.  I'm starting my
 4   video.  Your Honor, this issue is being handled by Elise Thorn
 5   of my office.
 6          THE COURT:  All right.  Ms. Thorn.
 7          MS. THORN:  Your Honor, I apologize.  My video got
 8   blocked a few minutes ago, so here we are.
 9          THE COURT:  I'm not hearing you well.
10          MS. THORN:  Okay.  How is that?  Is that better?
11          THE COURT:  That's better.
12          MS. THORN:  All right.  So with respect to
13   Dr. Williams' ability to provide the Court the information he
14   spoke about today on the plan to address all of the
15   recommendations, he -- as he stated, he works closely with his
16   colleagues within CDCR, DAI, and nursing as well as facilities.
17   So he's able to collect that information, and he is actually
18   the point person on working through the recommendations and
19   developing a plan and seeing that plan through to address all
20   of the recommendations.
21          So if there's more information the Court needs from
22   him or plaintiffs need, he's certainly available to provide
23   that information.
24          THE COURT:  All right.  I may ask the Special Master
25   to work with Secretary Allison and identify other persons the
```

1    Court may need to hear from in January.

2            MS. THORN:  That's fine, your Honor.

3            THE COURT:  All right.

4            All right.  I believe I have what I need.  I would

5    like to set, just so it's clear before we leave this subject,

6    another status on suicide prevention alone essentially

7    structured by the discussion we've just had.  At this point I'm

8    going to say January 29th at 10:00 a.m., Friday, January 29th.

9    And request that Secretary Allison be present with staff

10   members who can address the Court's questions, and Mr. Lopes

11   will be in touch about that.

12           All right.  On quarantine and isolation space, I'm

13   just going to ask for a brief update from Special Master Lopes.

14   And again, I understand a raft of information has come in this

15   morning I have not had a chance to digest, let alone read.

16           Special Master Lopes, what does the Court need to

17   know, and what do the parties need to hear; and what are your

18   recommendations on follow-through after this hearing?

19           SPECIAL MASTER LOPES:  Thank you, your Honor.  After

20   the last status conference or at the last status conference you

21   expressed a desire to hear more about isolation and quarantine

22   space, particularly for the EOP population, and I convened a

23   number of meetings with the plaintiffs, defendants, a

24   representative from the Receiver's Office, and director of

25   adult institutions for CDCR to go through an institution by

1    institution review of where isolation and quarantine space

2    should be set aside.  We had very productive discussions.  We

3    reached a number of agreements.  We had an agreement on almost

4    all EOP programs and some of the concerns around PIP.

5            I believe that there may have been three institutions

6    where we didn't have an agreement and agreed to work further

7    with the Receiver's Office on identifying space.  And those

8    institutions included San Quentin where they don't have a lot

9    of single cells that are without bars, if you will.  Doors

10   aren't on the single cells, on many of the single cells.  And

11   San Quentin has two large EOP units of 100 persons each.  So

12   there's no convenient or appropriate place to quarantine and

13   isolate EOP class inmates in the event of a serious outbreak.

14   There were also around RJD and maybe Mule Creek.

15           So the parties decided to stipulate to an agreement

16   setting aside those three institutions.  I think I have them

17   right, but there may be one other, setting aside those

18   institutions.  And then the lawyers went to drafting a

19   stipulation.  And the defendants took the first swipe at it,

20   and they sent something over to the plaintiffs.  The plaintiffs

21   responded.  It was then in the defendants' court.  Earlier this

22   week I was informed that defendants were going to work on

23   finalizing that, and it was my hope that you would have

24   something to sign today.

25           Yesterday one of CDCR's lawyers sent us an email

1    saying that the state wasn't in a position right now because of

2    recent outbreak and public safety -- I mean, concerns from

3    Department of Public Health to enter into such a stipulation.

4    That's as much as I know from the CDCR side, if you will.  And

5    we haven't had any discussions.  I'm just learning about this

6    pretty much within the last 24 hours.

7           On a separate track, this morning I received a

8    statement from the Receiver's Office through the Receiver's

9    attorney, Roscoe Barrow, stating that -- perhaps that the

10   Receiver was reconsidering where to put people for isolation

11   and quarantine space purposes because the movement or the whole

12   process may have caused a spike in cases, just the process

13   itself, and that he was concerned about that and wanted to seek

14   the guidance of public health officials as to how to proceed.

15   I'm not sure if the two dovetail at all.

16          Again, earlier this week I had assumed that you would

17   have a stipulation today, and I received an updated memo from

18   the Receiver's Office this morning.  I didn't have an

19   opportunity to call Receiver Kelso and find out whether there

20   was a nexus between the two, but that's what I know at this

21   point.

22          I would imagine, your Honor, that perhaps the

23   secretary knows whether there is a nexus and can guide the

24   Court further.  I'm sorry that I don't have more information on

25   this topic.

1    THE COURT:  The question really the Court has, in

2    terms of the role it can fulfill here, should I set a date

3    certain by which I will receive whatever stipulation the

4    parties can reach, recognizing everything Special Master Lopes

5    has just said.  Secretary Allison, do you have anything to say

6    at this point?

7        MS. ALLISON:  Ma'am, I know that there's been some

8    email traffic this morning, but because of this meeting, I

9    haven't been paying attention to that.  So I don't know if

10   Dr. Bick -- I know that we were analyzing our data to make some

11   decisions as it relates to isolation, quarantine, and the

12   movement, but as far as the details of that, I'm not caught up

13   as of now.

14       THE COURT:  All right.  I see Dr. Bick appears to be

15   monitoring.  Dr. Bick, are you able to turn on your video and

16   audio and provide the Court with an update?

17       DR. BICK:  Yes.  Good afternoon, your Honor.  In

18   response to Mr. Lopes, I think the issues are related.  I think

19   he accurately pointed out our concerns that have been growing

20   in consultation with some of our public health consultants that

21   in fact in our efforts to move people into quarantine spaces,

22   that this has resulted in a significant amount of churning of

23   patients throughout the system and may have inadvertently

24   contributed to some of the problems that we're seeing.  And so

25   our thought is to pause and revisit this.  And so I think

1    that's part of what has led to a delay in giving a definitive

2    response to the plaintiffs about their questions.

3              THE COURT:  Based on what you currently understand,

4    what's the earliest that this Court might reasonably expect a

5    stipulation following the defendants reengaging with

6    plaintiffs?

7              DR. BICK:  That will require some input from

8    Mr. Kelso, the Receiver, about the path forward and probably

9    some additional conversations with plaintiffs about that if

10   we're going to come up with a plan that everyone can get on

11   board with.

12             THE COURT:  Obviously, I'm certain there are daily

13   decisions being made given that we're back in the thick of

14   it.

15             DR. BICK:  They certainly are.

16             And just as an example of some of the challenges that

17   are coming from the patient side of things, they're seeing so

18   many movements that they don't seem to believe are helping

19   things.  In fact, it's becoming a strongly held belief among

20   some of them that this is actually what's putting them at risk.

21   So they're now in many facilities not only declining to move,

22   but they're declining to test.  And so we're having large

23   swaths of our patient population who are not being routinely

24   tested.  And then people that are known to be infected are

25   declining to move, and their cellmates who are not known to be

1    infected are declining to move away from them.  And we don't

2    want to do cell extractions or resort to that type of thing,

3    but it's becoming increasingly challenging.

4           So I think that the original plan for quarantine and

5    isolation was well thought out and based upon best available

6    data and expert opinion at the time, but I think that the facts

7    on the ground have changed.

8           THE COURT:  All right.  Thank you, Dr. Bick.

9           Well, it appears to the Court that I should -- I will

10   digest what's come in this morning, but it appears to the Court

11   some breathing room makes sense.  The parties of course may

12   continue their discussions.  We could put this on the agenda

13   for that status I just set at the end of January.  I realize

14   that's quite some time out.  And then if the parties have some

15   kind of stipulation before then, of course I'm happy to

16   entertain it.

17          My tentative based on what I've just heard is it just

18   does not make sense to provide a tighter deadline.

19          Do you disagree with that, Special Master Lopes?

20          SPECIAL MASTER LOPES:  Your Honor, I found the

21   coordination process worked incredibly well with the meetings

22   that we had on quarantine and isolation space.  And I believe

23   that you are accurate some breathing room is necessary.

24   Dr. Bick has been very helpful in facilitating information in

25   that regard, and I expect that to continue.

1          THE COURT:  All right.  Also the issues he's raised

2   could dovetail with vaccine uptake.

3          SPECIAL MASTER LOPES:  Absolutely.

4          THE COURT:  So that's a backdrop obviously.

5          All right.  Let me just ask if either party disagrees

6   with providing breathing room, allowing a stipulation, if one

7   is reached before January 29th, but otherwise hearing any

8   update then.

9          Mr. Bien, does that work for you?

10          MR. BIEN:  I think the process has been positive.  I

11   just wanted to make it clear that one of the problems with the

12   quarantine and isolation space is there's just not enough of it

13   given the current population and the fact that population

14   reduction has really slowed or stopped.  There simply is not

15   enough quarantine and isolation space to take care of the

16   outbreaks that are occurring.

17          So, you know, while I'm sure it's true what Dr. Bick

18   is saying, I think that we also need to realize that Dr. Bick

19   and Secretary Allison are operating in a system that remains

20   severely overcrowded for pandemic conditions, and I just want

21   to make sure that's clear here that, if the population was

22   reduced with releases, we could develop appropriate quarantine

23   and isolation space.

24          THE COURT:  I understand that position.

25          For you, Mr. Lewis, any disagreement about providing

1    breathing room and hearing any update by January 29th at least?

2            MR. LEWIS:  Your Honor, Mr. Mello will be handling

3    this particular issue.

4            MR. MELLO:  Your Honor, we agree that public health

5    guidance is the important guidance with respect to this issue.

6    We agree that everything is changing, both in terms of the

7    roll-out of the vaccine, the current conditions in the state of

8    California and in our system with respect to the current surge.

9    And in addition, co-counsel in this case has a current

10    isolation and quarantine motion that is set for hearing next

11    Wednesday.  It seems that that motion is now premature.

12            But this issue is out there.  We agree that the

13    process worked well before, and the public health experts along

14    with assistance from the Special Master and the parties I think

15    should continue to evaluate this issue.  The January 29th

16    deadline seems appropriate to us.  Thank you.

17            THE COURT:  All right.  If the parties have anything

18    to let this Court know between now and the 29th of January,

19    they may of course, and I'll stay in touch with the Special

20    Master on this point.  But we'll check in again on

21    January 29th.

22            In terms of inpatient care, I would just entertain --

23    I know I have the DSH matter pending, and I'm going to resolve

24    that.  I just was going to give the parties an opportunity to

25    provide if there's any material update.

1          I do have information on the pending referrals, so I'm

2     showing, at least as of sometime this week, I believe, number

3     of pending referrals for transfers to inpatient care at the

4     PIPs has risen significantly, 84 inmates on this list for

5     transfer to acute inpatient care and 283 inmates on the list to

6     transfer to intermediate care facilities.

7          So are those pending referral lists the same as what's

8     been called wait lists, a nomenclature question, and

9     regardless, recognizing we're fast approaching the 1:00 hour,

10    is there anything briefly you want to tell me about this issue,

11    Mr. Bien, or whoever on your team is handling it?

12          MR. BIEN:  Mr. Galvan will handle this.

13          THE COURT:  All right.  Mr. Galvan.

14          MR. GALVAN:  Your Honor, just to fill in some more

15    details from the census.  The census and wait list are numbers

16    that you were just quoting which I think come from ECF 6990.

17    There's also 24 patients waiting for DSH, 16 of them beyond 30

18    days.  And you know, at the same time, the census at Atascadero

19    of Coleman patients is lower than it's been through the entire

20    pandemic.  It's down to 167.

21          So I think these numbers point to the fact that an

22    order is still needed on the DSH issue as a result of our

23    evidentiary hearing in October.  And we looked at some of the

24    wait times for those people who are waiting, and the average

25    wait time for those 24 patients that are on COVID-19 hold still

1    to go to DSH is 70 days.  The longest one is 147 days.  So

2    these are people with very serious needs waiting for DSH care.

3           And although we have seen recently a draft -- a

4    revision to the movement matrix, which is the guideline that

5    tells people how to operate with regard to these moves, that is

6    still in draft form, and we still seem to be operating under a

7    presumption that, if an institution is declared closed, then

8    movement won't happen unless there's extraordinary efforts from

9    headquarters officials.  And we think that presumption needs to

10   be disrupted by an order from this Court, as shown from the

11   evidence in the evidentiary hearing.  So that's all I have to

12   add, your Honor.

13          THE COURT:  Right.  And is it your understanding that

14   pending referral lists is the same as what's been called wait

15   lists?

16          MS. ELLS:  My understanding it's a little imperfect as

17   to all that, but I would say that those are the same things.  I

18   know there's some parsing of when someone becomes a wait list,

19   if you're at the 30 days or before the 30 days, but I think the

20   intention of these time lines in the program guide has always

21   been that a person should move to care -- inpatient care as

22   soon as possible after the referral, and 30 days was meant to

23   be an outside limit and that most people should move earlier

24   than that.  So yes, I would call a referral list a wait list.

25          THE COURT:  All right.  Mr. Lewis or a member of your

1    team?

2          MR. LEWIS:  Your Honor, I'll deal with this very

3    briefly.  As for DSH, Mr. Galvan was correct.  DSH has admitted

4    30 patients since the October hearing, and I'm looking at some

5    statistics.  So my apologies, your Honor.  Let me get these

6    straight.  DSH has admitted 30 patients since the October

7    hearing, 18 of which were within the time frames, and those

8    over the time frames were actually holds from closed

9    institutions or, as you've heard, impacted by COVID holds and

10   COVID restrictions.

11         It would be irresponsible to promote additional

12   movement, particularly right now, given the rather extensive

13   COVID surge that we're seeing.  Indeed, other state hospital

14   systems have shut down complete hospitals because of just one

15   or two COVID patients.  Whereas, DSH has active COVID but is

16   trying to both deal with it at its facilities but also safely

17   transfer intake CDCR patients.

18         So referrals may still be on hold from closed

19   institutions where specific public health information indicates

20   that they are at significant risk of exposure, but once those

21   holds are lifted at the CDCR institutions, DSH is moving

22   quickly to admit them.  And meanwhile, DSH is continuing to

23   participate with the Special Master's experts in the work

24   groups and the subgroups that your Honor heard about at the

25   evidentiary hears to make sure that those transfers are being

1    looked at and being responsibly assessed and that their

2    patients are getting moved into the inpatient care.

3            As for the larger wait list issue, I think we're all

4    seeing the impacts of COVID still present.  The fog has not

5    lifted.  And we're trying to and defendants are trying to make

6    sure that they protect the inmates -- the patients, I'm sorry,

7    as much as possible, not only from their mental needs -- or for

8    their mental needs, but from the very real needs of COVID, and

9    these are some of the delays that we are seeing.

10           THE COURT:  All right.  The Court has nothing else.

11           Let me just ask Special Master Lopes, is there

12   anything else you believe needs to be made of record or raised

13   with the parties?

14           SPECIAL MASTER LOPES:  Yes, your Honor, four quick

15   points.  To Mr. Lewis's point, the small work group has had a

16   collaborative practice around transfers, and we're working

17   closely with representatives from DSH.  And notwithstanding

18   that, to Mr. Galvan's point, the census at a place like ASH is

19   lower than it has been in recent memory.  And that is -- that

20   is troubling.  And as you know, I shouldn't say any more about

21   that.

22           The pending -- the question about pending -- the

23   pending list, I believe it is another term for a wait list, and

24   those numbers are climbing.  And that leads to, you know, a

25   discussion earlier with Secretary Allison is that, when you

1    have all those people who are pending some sort of referral,

2    then the -- you may find that they're being treated and placed

3    somewhere, but they're not where they need to be which

4    dovetails with the question about whether this should be at a

5    MHCB.  Not to belabor that point, but everything kind of

6    swells.

7            And the only other point that I would make is that I

8    go back to the state's great efforts to reduce and the Court's

9    efforts to reduce the population, but a targeted population

10   reduction on the EOP population takes away some of these

11   pressures, and it could burst a bubble that exists here and

12   allow people to receive appropriate care on a timely basis and

13   safely because there would be less congestion in some of these

14   prisons.

15           Thank you, your Honor.

16           THE COURT:  All right.  I had some internet

17   instability, but I saw Mr. Lopes turn on his mute button.  You

18   got all of that, Ms. Barajas?

19           THE COURT REPORTER:  Yes, your Honor.

20           THE COURT:  All right.  Well, it's just past 1:00.  I

21   have heard what I need to hear.  The attorneys know how to

22   bring matters to my attention taking into account what I said

23   at the beginning of this hearing.  We will see those of you who

24   need to be here, attorneys on January 29th, and Secretary

25   Allison, I'll look for you again on the 29th.  Special Master

1    Lopes will work with you on who else you would like to see.

2           Thank you very much, Secretary Allison and

3    Dr. Williams.  Your comments today have been very helpful, and

4    I look forward to hearing updates, particularly on suicide

5    prevention in January.

6           All right.  All the best to all of you.  You may sign

7    off.

8           THE CLERK:  Court is in recess.

9           (The proceedings adjourned at 1:02 p.m.)

10                        --oOo--

11   I certify that the foregoing is a correct transcript from the

12   record of proceedings in the above-entitled matter.

13                        /s/ Kacy Parker Barajas
                         _____
14                        KACY PARKER BARAJAS
                         CSR No. 10915, RMR, CRR, CRC
15

16

17

18

19

20

21

22

23

24

25