**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.**
    **Plaintiffs**


**v.**                                              **No. 2:90-CV-0520 KJM DB**


**GAVIN NEWSOM, et al.**
    **Defendants**


**SPECIAL MASTER'S REPORT ON HIS
EXPERT'S ANALYSIS OF THE CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION'S ANNUAL SUICIDE REPORT
JANUARY 1, 2015 – DECEMBER 31, 2015
AND HIS EXPERT'S REVIEW OF SUICIDES COMPLETED IN THE CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
JANUARY 1, 2016 – DECEMBER 31, 2016**


Attached are: (1) the California Department of Corrections and Rehabilitation's Annual

Report on Suicides in the California Department of Corrections and Rehabilitation January 1,

2015 – December 31, 2015 (hereinafter "2015 CDCR Report"), *see* Appendix A attached

hereto;[1] (2) the *Coleman* Special Master's Expert's Analysis of the California Department of

Corrections and Rehabilitation's (CDCR) Annual Suicide Report January 1, 2015, through

December 31, 2015, *see* Appendix B attached hereto; and (3) the *Coleman* Special Master's

Expert's Report on Completed Suicides in the California Department of Corrections and

Rehabilitation from January 1, 2016, through December 31, 2016 (hereinafter "2016 Special

---

[1] References to the 2015 CDCR Report contained herein are to the version of the report as posted on CDCR's website, unless otherwise noted.  *See* 2015 CDCR Report available at https://cchcs.ca.gov/wp-content/uploads/sites/60/SR/2015-Annual-Suicide-Report.pdf.

Master's Report"), *see* Appendix C attached hereto.[2]  The Special Master's expert[3] has authored seventeen prior reports on completed suicides by CDCR inmates, the most recent of which was filed on March 29, 2016, covering completed suicides between January 1, 2014 through December 31, 2014.  ECF No. 5428.

The Special Master created an internal Suicide Report Workgroup to direct and guide the development of the review of the 2015 CDCR Report and the Special Master's analysis of suicides completed from 2016 through 2019.  The Workgroup is comprised of Lindsay M. Hayes, M.S., Jeffrey L. Metzner, M.D., Sharen Barboza, Ph.D., Kahlil A. Johnson, M.D., and Kerry C. Hughes, M.D., who authored the last Special Master's suicide report in 2014. Analysis of the 2015 CDCR Report was completed by Sharen Barboza, Ph.D., and Kahlil A. Johnson, M.D., nationally recognized experts on mental health care and suicide prevention in correctional settings.  Sharen Barboza, Ph.D. also authored the 2016 Special Master's Report. In preparation for the 2016 Special Master's Report, Dr. Barboza, with support from other experts, conducted in-depth clinical reviews and assessments of the health care records and CDCR death review reports for all CDCR inmate suicide deaths during that year.

As indicated above, this filing includes two reports on inmate suicides among the CDCR population: one written by CDCR, *see* Appendix A, and one by the Special Master's expert.  *See* Appendix C.  This filing also includes the Special Master's Analysis of the 2015 CDCR Annual Report.  *See* Appendix B.

---

[2] Because the Special Master oversaw the drafting of the 2015 CDCR Report, he has provided both the report and his expert's critical analysis of the report rather than duplicate efforts and draft a separate report for 2015.  In contrast, neither the Special Master nor his expert oversaw or were involved with the drafting of CDCR's 2016 suicide report.  Accordingly, the Special Master's expert reviewed CDCR's 2016 inmate suicides and drafted a report that is consistent in format and scope with the Special Master's prior reports.

[3] Members of the Special Master's staff who are mental health experts are referred to collectively as "the Special Master's expert."  Where applicable, the Special Master's suicide prevention expert, Lindsay Hayes, is referred to as "the Special Master's suicide prevention expert."

In 2016, the Special Master began meeting with the then-Secretary of the CDCR about ways to reduce the Special Master's monitoring responsibilities. These discussions led, for instance, to the piloting of the Continuous Quality Improvement Tool (CQIT) in ten facilities and the formation of a plan to develop and implement the desert transfer policy. *See* ECF No. 6296 (order regarding desert institution transfer policy). The Special Master's annual suicide report was included as part of these broader discussions about the scope of the Special Master's responsibilities. As documented in prior orders and reports from the Special Master, Dr. Raymond Patterson, one of the Special Master's suicide prevention experts, "left his assignment with the Special Master [in 2013] 'because of his frustration arising from the defendants' repeated failure to implement his recommendations.'" *See* ECF 6212 at 13 (quoting *Coleman v. Brown*, 938 F.Supp.2d 955, 971 n.26 (E.D. Cal. 2013)). It was clear at that time that the Special Master and parties had to redouble their efforts to improve the efficacy of CDCR's suicide prevention efforts.

To aid in this effort to reduce inmate suicides— and to support opportunities to reduce the scope of the Special Mastership — the Special Master offered to permit CDCR to write the 2015 annual report under his supervision and in coordination with his expert. If CDCR's report was consistent in format and scope with the Special Master's expert's prior reports, the Special Master also agreed to consider recommending to the court the delegation of his authority to draft the annual suicide report to CDCR going forward.

As will be demonstrated in more detail below, the defendants had every opportunity to collaborate with the Special Master on the 2015 report and ultimately reduce the scope of the Special Master's monitoring responsibilities. When faced with the opportunity to self-monitor and report, it became clear that defendants were only willing to take on the responsibility for

suicide review and reporting on their terms. CDCR improperly altered the standard by which suicides are deemed foreseeable and/or preventable. Defendants were subsequently given an opportunity to utilize the court-approved definitions of foreseeable and preventable. They refused and, as a result, the Special Master has re-assumed responsibility for drafting suicide reports beginning with the 2016 annual report. The Special Master has also provided his expert's critical review of the 2015 CDCR suicide report.

A number of factors contributed to the significant delay in completing the 2015 annual suicide report. The primary contributing factor was defendants' refusal to commit to using court-approved standards to conduct their foreseeability and preventability analysis, a core component of the annual report. In addition to refusing to use the court-approved definitions, CDCR also discontinued determinations regarding foreseeable and preventable suicides in their case reviews. In order to bring the record in this case up to date, the Special Master intends to complete and send to the parties in draft form suicide reports for calendar year 2017 by February 28, 2021; calendar year 2018 by May 31, 2021; and calendar year 2019 by September 30, 2021.

On December 11, 2020, the Special Master provided the *Coleman* parties with draft versions of this report, the Special Master's Expert's Analysis of the CDCR Annual Suicide Report January 1, 2015, through December 31, 2015, and the 2016 Special Master's Report. In accordance with regular practice for the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the draft reports. Plaintiffs' counsel submitted their comments to the 2016 Special Master's Report on January 11, 2021. *See* Letter from Michael S. Nunez, Esq. to Special Master Lopes (January 11, 2021), attached hereto as Appendix D. On January 11, 2021, defendants submitted their comments and

objections to the draft report. *See* Letter from Nicholas Weber, Esq. to Special Master Lopes (January 11, 2021), attached hereto as Appendix E.

**Plaintiffs' Response to the Draft Reports**

In their January 11, 2021 response, plaintiffs offered three comments regarding the 2016 Special Master's Report. First, plaintiffs requested the 2016 Special Master's Report be revised to include yearly comparison data regarding inmates with prior medical conditions who committed suicide. Appendix D at 2. Plaintiffs also requested yearly comparison data regarding foreseeability and preventability determinations. *Id.* Finally, Plaintiffs requested that the Special Master provide a breakdown of suicides by sexual orientation in future annual suicide reports. *Id.* at 2-3.

The Special Master's expert intends to include comparison tables regarding inmates with prior medical conditions as well as foreseeability and preventability determinations beginning with the 2017 annual suicide report. Regarding plaintiffs' third recommendation, information regarding inmate sexual orientation is not available to the Special Master's expert to conduct the comparison plaintiffs' request as part of the annual suicide report.

**Defendants' Response to the Draft Reports**

Defendants provided comments and objections to each of the three draft reports. Defendants' responses, organized by report, are outlined in further detail below.

**Defendants' Comments and Objections to the Special Master's Report**

In their response to the Special Master's Report on his Expert's Review of the 2015 CDCR Report and the 2016 Special Master's Report, defendants' repeat legal arguments regarding foreseeability and preventability of suicides made in prior proceedings. *See* Appendix E at 2-6. Notably, defendants do not suggest at any time that the Special Master authorized

CDCR to use modified definitions of foreseeable and preventable, nor could they, as the Special Master does not have the authority to modify existing court orders. The relevant factual record, which is discussed in detail herein and the substance of which defendants do not dispute, is clear. Contrary to defendants' assertion otherwise, there was no agreement to change the definitions of foreseeability and preventability. *Contra* Appendix E at 4. Given the court's desire to avoid clogging the *Coleman* docket with legal arguments not invited by the court or accompanied by a motion, no further response to the defendants' discussion of foreseeability and preventability is warranted.

Defendants also commented on the Special Master's expert's critique of CDCR's use of statistics in the 2015 CDCR Report. *See* Appendix E at 6-9. After careful review and consideration, the Special Master has incorporated clarifications in the discussion of statistics where appropriate. *See infra* Section I.C.

**Defendants' Comments and Objections to the Special Master's Expert's Review of the 2015 CDCR Report**

In their comments to the Special Master's Expert's Review of the 2015 CDCR Report, defendants reiterated certain concerns regarding the expert's critique of CDCR's use of statistics and rankings. S*ee* Appendix E at 9-11. Defendants also object to the expert's observations regarding suicide among Caucasian inmates, those in Special Housing Units, and segregated housing. *See id.* at 11-12. Further, defendants take issue with the expert's criticism of the lack of case reviews in the 2015 CDCR Report. *See id.* at 12. Finally, defendants argue in favor of their preferred definition of "rigor mortis" and reiterate their arguments regarding foreseeability and preventability. *See id.* at 12-14.

After careful review and consideration, the Special Master has clarified relevant portions of his expert's review of the 2015 CDCR Report where warranted. *See* Appendix B at 3, 3 n.2, 4, 5, 5 n.6, 6, and 9.

**Defendants' Comments and Objections to the Special Master's Expert's 2016 Annual Suicide Report**

The defendants' responses to the Special Master's expert's 2016 Annual Suicide Report were similar in scope and substance to the comments and objections previously discussed. Defendants repeated objections regarding the calculation of the total inmate population, see Appendix E at 14, and the foreseeability and preventability definitions. *See id.* at 15-16. Defendants raised several statistical discrepancies and urged the Special Master's expert to validate the numbers in the draft report. *See id.* at 14-15. Defendants objected to a section of the expert's report which discussed suicides occurring outside of normal work hours for mental health clinical staff. *See id.* at 15. Finally, defendants objected to the Special Master's expert's recommendations and argued that the draft report's recommendations overlapped or conflicted with the recommendations of the Special Master's suicide prevention expert, Mr. Lindsay Hayes ("Mr. Hayes"). *See id.* at 16-19.

After careful review and consideration, the Special Master has revised and clarified relevant portions of his expert's 2016 Annual Suicide Report where warranted. Specifically, the section regarding suicides occurring during "normal" mental health clinician work hours has been removed. The Special Master and his expert have reviewed each of the recommendations contained in the draft report and have not found any recommendations which exceed or conflict with Mr. Hayes' suicide prevention recommendations. However, in consideration of the concerns defendants' raised, the final version of the 2016 Special Master's Report includes the

Special Master's expert's observations and conclusions rather than recommendations.  *See*
Appendix C at 29-32.

I.  **BACKGROUND**

A.  **Suicide Prevention in *Coleman***

Suicide prevention has been a key issue since the early stages of this matter and continues
to be a predominant challenge.  *See* ECF No. 1229 at 1 n.1 ("Suicide prevention and policy
became an issue subject to monitoring by the special master in late 1998 when the court
approved the parties' agreement for merger of *Gates v. Deukmejian* … into this action… ."); *see
also Coleman v. Wilson*, 912 F. Supp. 1282, 1297 (E.D. Cal. Sept. 13, 1995) (discussing the
Magistrate Judge's findings regarding suicide prevention).  The Special Master's expert has
authored and filed with the court seventeen prior reports on completed suicides.  In addition, the
Special Master's suicide prevention expert has also conducted several audits and re-audits of
CDCR's suicide prevention practices.  *See, e.g.*, ECF No. 6879-1.

In 2009, after referral from this court and the *Plata* court, a three-judge panel of the Ninth
Circuit Court of Appeals considered a prison population reduction order.  In its opinion and
order, the panel described CDCR's mental health system as "woefully and constitutionally
inadequate," ECF No. 3641 at 6, and brought light to the problem of inmate suicides: "Seriously
mentally ill inmates languish in horrific conditions without access to necessary mental health
care, raising the acuity of mental illness throughout the system and *increasing the risk of inmate
suicide*."  *See id.* at 7 (emphasis added).  Throughout the opinion and order, the high rate of
inmate suicides in CDCR facilities, *see id.* at 86-87 (comparing California's inmate suicide rate
to the national average), and the nexus between ongoing Eighth Amendment violations and
suicide risk were discussed.  *See id.* at 86 ("All of the above problems, caused by crowded

conditions, ultimately contribute to unacceptably high numbers of both preventable or possibly preventable deaths, including suicides, and extreme departures from the standard of care."); *see also id.* at 100 ("[C]rowding worsens many of the risk factors for suicide among California inmates and increases the prevalence of mental illness throughout the prison system."). The Special Master's expert's analysis of preventable suicides was also highlighted. *See id.* at 86-87. Ultimately, the ongoing problems associated with inmate suicides in CDCR were cited as evidence in support of the panel's population reduction order. *See id.* at 86-88, 100.[4]

Suicide and suicide prevention remained key issues during proceedings surrounding defendants' 2013 motion to terminate this matter. The court noted that "inmate suicides [were] occurring at virtually the same rate" as the time of the Three-Judge Court decision. ECF No. 4539 at 33-34. The high rate of inmate suicides and the high percentage of completed suicides that were deemed foreseeable or preventable were evidence of the "ongoing violation of the Eighth Amendment rights of members of the plaintiff class." *Id.* at 34. The court also discussed an "ongoing pattern of repeating inadequacies" in CDCR's suicide prevention efforts as well as the Special Master's expert's recommendations for improvement, which the court noted "ha[d] been repeated periodically since 1999." *Id.* at 40. The court's discussion of suicide prevention in the 2013 order concluded as follows:

> [F]or over a decade a disproportionately high number of inmates have committed suicide in California's prison system. Review of those suicides shows a pattern of identifiable and describable inadequacies in suicide prevention in the CDCR. Defendants have a constitutional obligation to take and adequately implement all reasonable steps to remedy those inadequacies. The evidence shows they have not yet done so. In addition, while defendants represent that they have fully implemented their suicide prevention programs, they have not. An ongoing constitutional violation therefore remains.

---

[4] Affirming the Three-Judge Court's population reduction order, the Supreme Court noted ongoing problems with suicide prevention. *See Brown v. Plata*, 563 U.S. 493, 504, 506, 519, 520 (2011); *see also* ECF No. 4539 at 32-33 (discussing the Supreme Court's opinion in *Brown v. Plata*).

*Id.* at 43.

Following the Special Master's expert's report on inmate suicides during the first six months of 2012, the court ordered the establishment of a Suicide Prevention Management Workgroup (SPMW). ECF No. 4693 at 5-6. Its purpose was to target and resolve the lingering barriers to reducing the elevated rate of suicides among CDCR inmates in a significant and lasting way. Following a series of meetings in 2013, the SPMW quickly reached a consensus that it needed an audit of current suicide prevention practices in all 34 CDCR prisons in order to accurately identify the existing issues and conditions on which the group should focus its efforts. The court granted the Special Master's request to appoint Lindsay Hayes to his staff as a suicide prevention expert on October 2, 2013. ECF No. 4857. At the direction of the Special Master, Mr. Hayes conducted an initial audit of all 34 CDCR institutions, from November 2013 through July 2014. Mr. Hayes' report on his findings and recommendations was filed on January 14, 2015. ECF No. 5259. On February 3, 2015, the court ordered the defendants to adopt the recommendations in that report and "to work with the Special Master in the [SPMW] and otherwise as may be necessary on the development of strategies and the implementation of the changes and practices contained in the recommendations" within the Hayes Report. ECF No. 5271 at 3.

In the intervening years, Mr. Hayes has completed several re-audits of CDCR's suicide prevention practices, *see* ECF No. 6879 at 2-5, the most recent of which was filed on September 23, 2020. ECF No. 6879-1. In the court's September 3, 2020 order, it noted that defendants have "for over five years…been under court order to adopt and implement the twenty-nine recommendations that remained after Mr. Hayes' second re-audit." ECF No. 6846 at 22. In light of this significant and ongoing deficiency, the court was clear that "defendants must complete

any outstanding work on these recommendations before [the Special Master's suicide prevention expert's fifth re-auditing] round begins." *Id.* Moreover, Mr. Hayes' 29 recommendations were to "be completely and durably implemented to allow comprehensive assessment of their efficacy in reducing the ongoing number of foreseeable and/or preventable inmate suicides" in CDCR institutions. *Id.* In his September 23, 2020 report, the Special Master recommended the defendants be deemed in compliance with 11 of Mr. Hayes' recommendations, leaving 18 recommendations yet to be fully implemented. ECF No. 6879 at 27.[5] The court adopted the Hayes Report in full on December 3, 2020. ECF No. 6973 at 12.[6]

> **B.** **The 2015 Report Writing Process**

>> 1. Timeline of Events

Against this backdrop, the defendants and Special Master began discussing improvements to the suicide report writing process and reducing the number of inmate suicides in the first half of 2015. Initially, the Special Master and defendants agreed that the Special Master's expert would serve in a consultative role and participate in the suicide case conferences, receive the draft and edited suicide case reports, and attend the Suicide Case Review Committee (SCRC) meetings when they occurred.[7] In addition to the Special Master's expert's participation in the case review process, the Special Master and defendants agreed to explore giving CDCR the opportunity to draft the 2015 annual suicide report under the Special Master's supervision and in coordination with his expert. If the 2015 report conformed to the

---

[5] Recommendation 32 was deemed partially compliant and accordingly is included in the 18 recommendations that have not been "fully" implemented. ECF No. 6879 at 27.

[6] On January 15, 2021, defendants filed their activation schedule for the 18 suicide prevention recommendations that remain to be fully implemented. *See* ECF No. 7024.

[7] As of the time of this writing, the Special Master's expert continues to participate in these committee meetings.

Special Master's prior suicide reports in format and scope, the Special Master agreed to consider recommending to the court that his suicide review and reporting responsibilities be delegated to CDCR.

Accordingly, the Special Master's expert began attending SCRC meetings in June 2015. During a June 23, 2015 case review, the expert recommended that the committee make a determination of preventability and/or foreseeability of the suicide in the case reviews. Following the June 23, 2015 case review, the expert met with CDCR Mental Health Headquarters staff to further discuss incorporating foreseeability and preventability analyses into CDCR's case reviews. CDCR agreed to formalize and operationalize foreseeability and preventability definitions and to incorporate this analysis into their case reviews.[8]

At a July 9, 2015 meeting, the Special Master and defendants discussed the process for determining foreseeability and preventability of inmate suicides. At this meeting, CDCR agreed to use the definitions of "foreseeable" and "preventable" utilized by the Special Master and approved by the court with only minor and insignificant amendments.

At the August 25, 2015, SCRC meeting, the committee made foreseeability and preventability determinations for the first time.

During a November 23, 2015 case review, CDCR clinicians expressed discomfort with the definitions of "foreseeable" and "preventable" that CDCR previously agreed to incorporate into their case reviews. CDCR representatives felt that cases would be determined preventable even if the clinicians did not believe that the omissions noted were contributory to the suicide.

---

[8] As defendants acknowledge in their response to the Special Master's draft reports, the SCRC stopped conducting foreseeability and preventability determinations in their suicide case reviews in 2017. *See* Appendix E at 3 n.4; *see also id.* at 5-6 (discussing "avoidable and unnecessary liability concerns" associated with conducting suicide foreseeability and preventability analyses).

Further, CDCR expressed their interest in additional discussions with the Special Master's expert to reexamine the definitions.

Throughout this initial time period, either the annual suicide report generally or the 2015 CDCR Report specifically was a topic of discussion among the parties and Special Master in a variety of forums.[9]  Furthermore, the Special Master and his experts were clear that the defendants' review and reports needed to conform to the Special Master's prior practice, including foreseeability and preventability reviews.

The Special Master had multiple calls with both an administration official and CDCR's General Counsel discussing the suicide report.  On September 15, 2017, the Special Master met with the California Governor's Deputy Legal Affairs Secretary and a representative from CDCR's Office of Legal Affairs at San Quentin State Prison.  The Deputy Legal Affairs Secretary indicated the defendants wished to discuss "a few broader topics concerning the suicide report process" as well as a selection of specific 2015 and 2016 suicide cases.  Email from Gabriel Sanchez, Deputy Legal Affairs Secretary, Office of the Governor, to Special Master Lopes (Sept. 14, 2017), attached as Exhibit A.  Regarding foreseeability and preventability, defendants expressed concern that including this analysis in their suicide report would expose the defendants to tort liability.  In addition, defendants were concerned that admitting their lack of progress in reducing foreseeable and preventable inmate suicides in their reports could extend judicial oversight indefinitely.

The Special Master fundamentally disagreed with the position taken at the September 2017 meeting.  Rather than extend the length of this case, defendants were offered the chance to

---

[9] For instance, the annual suicide report was included on the agendas of both the All-Parties Workgroup (August 17, 2016, October 26, 2016, and December 7, 2016) and the *Coleman* Policy meeting (January 18, 2018, November 9, 2018, August 29, 2019, and January 16, 2020) during this time period.

reduce the Special Master's responsibilities. In addition, the defendants' reports—including the foreseeability and preventability analysis—could demonstrate their ability to self-identify and correct suicide prevention deficiencies. At the meeting, the Special Master informed defendants that the definitions were approved by the court and he did not have the authority to change them. Moreover, the Special Master made it clear that any potential recommendation to the court to formally delegate his suicide review and reporting responsibilities to CDCR would be conditioned on CDCR's use of the court-approved definitions and process.

Several drafts of the 2015 suicide report or portions thereof were shared with the Special Master and/or plaintiffs between August 2016 and January 2020.[10] An initial draft, shared with the Special Master in June 2017, did not discuss inmate suicide foreseeability or preventability. *See* Draft Annual Report on Suicides in the CDCR January 1, 2015 – December 31, 2015, as of June 5, 2017, attached as Exhibit B. On February 7, 2018, defendants shared a full version of the draft report with the Special Master and plaintiffs. This version of the report included foreseeability and preventability analyses and represented that the definitions used by CDCR were the same as those used in the Special Master's expert's prior reports. Draft Annual Report on Suicides in the CDCR January 1, 2015 – December 31, 2015, as of February 7, 2018, at 40, attached as Exhibit C. In a cover letter accompanying the February 7, 2018 draft report, CDCR indicated it intended to continue conducting foreseeability and preventability reviews in the 2017 annual report. However, defendants "reserved the right to change these definitions in future reports." Letter from Andrea S. Moon, CDCR Office of Legal Affairs to the Special

---

[10] CDCR representatives shared an initial outline of the report with the Special Master on August 11, 2016 and a revised outline on September 22, 2016. A draft executive summary, introduction, and summary of findings was shared with the Special Master in December 2016. CDCR provided a complete draft report to the Special Master in June 2017. A revised draft was shared with both the plaintiffs and Special Master in February 2018; plaintiffs provided written comments on April 23, 2018. CDCR sent further revisions to the 2015 report on June 13, 2018. Additional changes were made, and another draft was shared on May 14, 2019. *See* Exhibit G at 1-2.

Master (Feb. 7, 2018), attached as Exhibit D.  A June 13, 2018 revised draft included the same

definitions as the February 7th draft and similarly indicated that the definitions were equivalent

to the Special Master's definitions.  Draft Annual Report on Suicides in the CDCR January 1,

2015 – December 31, 2015, as of June 13, 2018, at 40, attached as Exhibit E.  Contrary to these

representations, the definitions of "foreseeable" and "preventable" included in these draft reports

were not the same as the court-approved definitions used by the Special Master.

In May 2019, defendants distributed another draft of the 2015 report, which continued to

deviate from the court-approved definitions of "foreseeable" and "preventable."  Draft Annual

Report on Suicides in the CDCR January 1, 2015 – December 31, 2015, as of May 14, 2019, at

39-40, attached as Exhibit F.  At a June 27, 2019 *Coleman* Policy meeting, the May 2019 draft

report was discussed.  The Special Master again informed the parties that he would not

recommend delegation of his suicide review and reporting responsibilities to CDCR unless their

reports conformed to prior reports of the Special Master's expert in form and substance.

Following the June 27, 2019 meeting, by letter dated August 28, 2019, defendants

attached another revised draft of the 2015 report and described "extensive edits" that had been

made to the report in response to the Special Master and plaintiffs' objections regarding CDCR's

discussion of inmate suicide foreseeability and preventability.  Letter from Nicholas Weber,

CDCR Office of Legal Affairs, to Special Master Lopes (Aug. 28, 2019) at 2, attached as Exhibit

G.  In that letter, CDCR confirmed that they had changed the definitions of "foreseeable" and

preventable" but rejected plaintiffs' argument that CDCR's definitions were "narrower" than the

court-approved definitions.  *Id.*  Further, defendants argued that the "slightly different wording"

of the definitions had no "practical impact on the determinations by the suicide review

committees."  *Id.*  Rather, defendants' new definitions were "modeled" on the Special Master's

definitions and were intended to "facilitate the consistent and reliable application of definitions to individual case reviews by a multidisciplinary group of CDCR staff." *Id.*[11] Finally, CDCR stated that they were unwilling to "re-analyze each 2015 suicide" using the Special Master's established definitions and requested the Special Master to file the 2015 report. *Id.* at 3.

Subsequently, CDCR changed the position stated in their August 28, 2019 letter and agreed to "re-review" a selection of the 2015 suicide cases using the court-approved definitions of "foreseeable" and "preventable." *See* Appendix A at 41-42. In addition to re-reviewing these cases, the Special Master requested that the 2015 report include a statement that future reports would use the Special Master's "foreseeable" and "preventable" definitions. During an April 23, 2020 teleconference, CDCR representatives indicated that the department was having internal discussions about the use of the court-approved definitions in future suicide reports. During this call, the Special Master again emphasized his desire to be in a position to recommend delegating his suicide review and reporting responsibilities to CDCR and urged the defendants to conclude their internal discussions so the parties and Special Master could move forward and bring the record up to date.

---

[11] The 2015 CDCR Annual Report offers a similar justification for the new definitions: "The definitions … were distilled from longer definitions previously adopted by the Special Master's experts. The definitions were shortened for the purpose of facilitating discussion of the foreseeability and preventability of a suicide…." Appendix A at 40. Further, "CDCR acknowledges slight differences between the Special Master's definitions and those used by the suicide case review committee when they reviewed the cases originally in 2015. CDCR agreed to a request by the *Coleman* plaintiffs to re-review the 2015 suicides using the Special Master's definitions. The Special Master's experts concurred with this request. After meeting and conferring with the Special Master's experts, it was agreed that all cases not previously found as both foreseeable and preventable by the SCRC would be reviewed again using the Special Master's definition. As twelve cases had originally been found as both foreseeable and preventable, twelve cases remained for re-review." *Id.* at 41-42.

In the weeks following the April 23, 2020 teleconference,[12] defendants participated in dozens of conference calls, virtual meetings, and other conversations[13] with the Special Master and his team on a variety of topics, including suicide prevention generally and the 2015 annual report specifically.  Despite having ample opportunity to discuss the 2015 report with the Special Master and his experts, defendants chose to move forward without consensus on this critically important component of the annual suicide report.  On July 2, 2020, CDCR informed the Special Master that they planned to publish the 2015 suicide report on the department's website and would not be making any additional changes to the report.  Letter from Nicholas Weber, CDCR Office of Legal Affairs, to Special Master Lopes (July 2, 2020), attached as Exhibit H.  After receiving the July 2, 2020 letter, the Special Master again asked the defendants to reconsider their position in a teleconference with an administration official.  Defendants informed the Special Master that they intended to publish their own suicide reports on their public website going forward, and the Special Master could draft and file parallel reports.  The defendants thereafter published the 2015 CDCR Report on CDCR's website.  *See supra* note 1.

2.    Significance of Foreseeability and Preventability Determination

Determining whether an inmate suicide was foreseeable or preventable is of paramount importance to the court's ability to evaluate CDCR's suicide prevention practices.  Accordingly, foreseeability and preventability assessments have been part of the Special Master's suicide reports for two decades, and the associated definitions have been approved by the court.  *See*

---

[12] In a May 7, 2020 teleconference, defendants continued to indicate that there were ongoing internal discussions about the Special Master's definitions.

[13] For instance, during this time: the COVID-19 Task Force, which included representatives from both parties and the Special Master's team, met weekly beginning in March 2020; the Special Master's experts met in small workgroup settings with defendants at least weekly; the Special Master's Central Office Monitoring team attended multiple meetings per day with CDCR officials; and the Special Master had weekly calls scheduled with defense counsel to discuss outstanding action items and commitments.

ECF No. 4693 (order affirming the Special Master's definitions of "foreseeable" and "preventable" and rejecting defendant's objections to characterizing suicides as "foreseeable" or "preventable" as "disingenuous at best."); *see also* ECF No. 1213 (Special Master's Expert's Suicide Report, appended to the Special Master's Sixth Monitoring Report on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols, filed October 6, 2000); ECF No. 4693 at 5 (denying defendants' motion to strike or modify portions of the Special Master's January – June 2012 suicide report which discussed, among other items, foreseeability and preventability of suicides).

To assess the defendants' ability to provide mental health care in conformance with the Eighth Amendment, the court must be equipped with timely, transparent information regarding the quality and efficacy of CDCR's suicide prevention efforts. At a minimum, if suicides are foreseeable or preventable, there are substantial opportunities to improve CDCR's implementation of their prevention strategies. The court recognized the same in a 2013 order:

> [The] terms ["foreseeable" and "preventable"] and their definitions are set out and applied in every annual report on inmate suicides since the report for Calendar Year 2000. As used by the Special Master's expert, findings that suicides were preventable implicates, at least, the adequacy of defendants' training, implementation, and supervision of suicide prevention policies and procedures, as well as the adequacy of clinical judgment exercised by staff. Defendants are responsible for development and implementation of a program to 'identify, treat, and supervise inmates at risk for suicide"… and identification of the number of preventable inmate suicides is an integral part of that responsibility.

ECF No. 4693 at 3-4 (citations omitted).

With this context in mind, it is clear that the definitional dilemma that plagued the 2015 report drafting process was not a trivial disagreement about the 2015 report's "formatting and content" as CDCR has suggested. Exhibit H at 1. As indicated, there are twenty years of suicide

reports filed by the Special Master's expert analyzing inmate suicide foreseeability and preventability and court orders directly on point.  ECF No. 4693 at 3-4.

The Supreme Court recognized the profound importance of analyzing the foreseeability and preventability of inmate suicides in its 2011 opinion affirming the Three-Judge Court's population reduction order:

> In 2006, the suicide rate in California's prisons was nearly 80% higher than the national average for prison populations; and a court-appointed Special Master found that 72.1% of suicides involved "some measure of inadequate assessment, treatment, or intervention, and were therefore most probably foreseeable and/or preventable."

*Brown v. Plata*, 563 U.S. 493, 504 (2011) (citations omitted).  Accordingly, defendants have had more than ample notice of the importance of the foreseeability and preventability analysis to the inmate suicide review and reporting process.

Moreover, CDCR's prior suggestion that the CDCR definitions' "slightly different wording"[14] did not impact the foreseeability and preventability analysis rings hollow in light of both CDCR's re-analysis and the Special Master's critique of 2015 cases: CDCR's re-review resulted in one additional "foreseeable" case, *see* Appendix A at 39-40, while the Special Master's expert's analysis of the 2015 CDCR Report characterized one additional case as "foreseeable" and two additional cases as "preventable" when applying the Special Master's definitions.  *See* Appendix B at 2.  Likewise, in the 2016 suicide report posted on its public website, CDCR's re-review of 2016 suicides resulted in two cases previously determined not foreseeable to be recharacterized as foreseeable using the court-approved standard definitions. *See* Annual Report of Suicides in the California Department of Corrections and Rehabilitation

---

[14] Exhibit G at 2.

January 1, 2016 – December 31, 2016 at 47, available at https://cchcs.ca.gov/wp-content/uploads/sites/60/SR/2016-Annual-Suicide-Report.pdf.[15]

Finally, while CDCR may wish to suggest that the protracted nature of the 2015 report writing process was due to the Special Master's or plaintiffs' conduct, the record is clear: CDCR's refusal to use court-approved standards to assess inmate suicide foreseeability and preventability—and the numerous report drafts, meetings, negotiations, and other discussions resulting therefrom—delayed this process significantly.  Based in part on their concerns about admitting tort liability, the defendants have repeatedly tried to convince the Special Master to authorize CDCR to use the revised definitions or omit the foreseeability and preventability discussion completely.  The Special Master consistently and on numerous occasions informed the defendants that the definitions are subject to court orders that he does not have the authority to alter, but they were free to seek leave of court to use different definitions.  Accordingly, the publication delays are attributable to the defendants' refusal to draft the 2015 report in a manner that would allow the Special Master to recommend delegating his suicide review and reporting responsibilities to CDCR.

Like the definitions themselves, the defendants' apparent opposition to considering foreseeability and preventability of inmate suicides is not a new development.[16]  In 2003, the Special Master's Eleventh Monitoring Report characterized the defendants' objection to the Special Master's expert's suicide prevention recommendations as follows:

> The defendants argued that the monitor had no business reviewing completed suicides, but should stick to monitoring CDC[R]'s suicide prevention policy… .
> The defendants also rejected the experts' "foreseeable" and "preventable"

---

[15] As noted previously, the Special Master did not have a role in drafting the 2016 CDCR report that is posted on the CDCR website.  *See supra* note 2.

[16] Indeed, this is yet another example of defendants seeking to relitigate long-settled issues, which the court recently warned the parties against.  ECF No. 6846 at 18.

standards as improper because they were based on "hindsight," but offered no alternative standard.

ECF No. 1519 at 286-87. Similarly, in 2013, the state moved to strike the Special Master's Report on Suicides Occurring in CDCR in the First Half of 2012 in its entirety based partly on their continued opposition to the Special Master's expert opining on the preventability of inmate suicides at all. *See* ECF No. 4527 at 2 ("[T]he special master's conclusions that these suicides were 'preventable' [] generally amounts to an impermissible exercise in second-guessing and conjecture."); *see also id.* at 5 (describing the Special Master's discussion of preventable suicides as "spurious").

As the court recently recognized, CDCR's failure to fully implement the Special Master's suicide prevention expert's recommendations is grounds enough to conclude the defendants are not ready to "assume full responsibility for quality management of their suicide prevention program as well as the review and reporting requirements currently provided by the Special Master." ECF No. 6846 at 22. As noted, the Special Master and his experts were clear throughout the 2015 report writing process that the definitions of "foreseeable" and "preventable" used in the 2015, 2016, and future suicide reports must conform to the court-approved standard. Contrary to two decades of prior practice and in the face of the Special Master and plaintiffs' strong concerns, defendants unilaterally changed these definitions and failed to commit to using the court-approved process for determining foreseeability and preventability of inmate suicides in future reports.

Following their refusal to commit to using the Special Master's definitions in the 2015 and 2016 reports, CDCR has also informed the Special Master that it will not be utilizing the court-approved definitions in any future reports. Knowing this, it would be irresponsible for the Special Master to recommend delegating his suicide review and reporting responsibilities to

21

CDCR at this time.  Doing so would deprive the court of critical information about the efficacy

of CDCR's suicide prevention efforts.  Unfortunately, this is more evidence that "the time is not

yet ripe to determine when defendants should assume full responsibility for their suicide

prevention program."  ECF No. 6846 at 22.

C.    **Suicide Rate Comparisons**

Another significant deficiency found in CDCR's 2015 Report—and repeated in a

subsequent report posted on its website[17]—relates to the discussion and comparison of suicide

rates.  CDCR's use of suicide rate data departs from prior practice in this case.  First, CDCR's

use of state-by-state suicide rate comparisons does not include specific comparisons to large state

prison systems, which are likely to be more similar to California in their dynamics and processes

than smaller systems.  In its 2015 report, CDCR compared California's inmate suicide rate to

that of all state correctional systems with significantly different inmate populations, both in terms

of size and demographics.  The defendants offered: "California ranks in the middle one-third of

states in rank and rate. In 2015, California's rate of prison suicides ranked as 20th among state

prisons." Appendix A at 33.  As the Three-Judge Court recognized in 2011, such state-by-state

comparisons are of "limited value" when they fail to "control for demographics of each state's

inmate population."  ECF No. 3641 at 88.[18]   The report did not comport with the Special

Master's prior practice of including comparisons between CDCR and the ten largest prison

---

[17] California law requires CDCR to publish annual reports on inmate suicide.  Cal. Penal Code § 2064.1.  In July
2020, CDCR informed the Special Master that the annual report submitted to the legislature and the annual *Coleman*
report will be consolidated.  *See* Exhibit H.

[18] Regarding these state-by-state comparisons, the Three-Judge Court concluded: "In any event, serious deficiencies
continue to exist in the California prison system such that California inmates are not receiving adequate care. This is
true regardless of where California might rank in a valid comparison of inmate death rates among the states." ECF
No. 3641 at 88.

systems in the country.  *E.g.*, ECF No. 5428 at 2.  The following is a table of suicide rates within the ten largest prison systems from 2001 through 2016.[19]

| Correctional System | 2001-2016 Suicide Rate per 100,000 Inmates |
|---|---|
| Florida | 9 |
| Federal Bureau of Prisons | 10 |
| Georgia | 11 |
| Ohio | 14 |
| Pennsylvania | 16 |
| Texas | 17 |
| Illinois | 17 |
| Arizona | 17 |
| **California** | **20** |
| New York | 22 |

As shown above, although CDCR might like to rank itself with an inmate suicide rate of "20th among state prisons," it would be far more accurate to state that CDCR had the 2nd highest suicide rate of the ten largest prison systems from 2001-2016.

Second, CDCR improperly offered comparisons between California's inmate suicide rate and that of the general population of the United States without acknowledging the limitations of such a comparison.  Appendix A at 34-35.

Defendants' use of statistics seems intended to suggest there is nothing out of the ordinary with CDCR's suicide rate when compared with both adult males in the general

---

[19] *See* Carson, E. & Cowhig, M. (2020), *Mortality in State and Federal Prisons, 2001-2016 – Statistical Tables*, at 15, NCJ 251920.

population and all other state prison systems. The continued annual publication of these statistics in this manner, without clear acknowledgment of the limitations, is misleading.

With that said, if the defendants insist upon continuing to publish reports that display comparisons between themselves and other prison systems, such reporting should be meaningful. As stated in previous reports by the Special Master's suicide prevention expert, caution should always be exercised when viewing data on inmate suicide rates. Suicide rates are most meaningful when viewed over a sustained period of time. Moreover, while the total number of inmate suicides and the corresponding suicide rate in any prison system can be important indicators, they are not the sole barometer by which adequacy of suicide prevention practices should be measured. The best methodology for determining whether a correctional system has fully implemented its suicide prevention program continues to be: (1) the assessment of suicide prevention practices within each prison, and (2) a review of each inmate suicide in relation to practices in the prison for determining its degree of preventability and/or foreseeability.

## II.   THE 2015 CDCR REPORT

As noted, the Special Master agreed to permit CDCR to draft the 2015 annual report on inmate suicides. CDCR chose to utilize its own definitions of foreseeability and preventability and published its report on its public website in July 2020. Because the Special Master oversaw the 2015 report writing process, he directed his experts to conduct a thorough review of the 2015 CDCR Annual Report and document their analysis in the report attached hereto as Appendix B.

Several deficiencies with the 2015 report have been discussed in detail and need not be repeated. Despite these problems, the Special Master's expert highlighted a number of positive aspects about the defendants' 2015 report and their suicide case review process.

The Special Master's expert found the following:

The report was well-organized and comprehensive.   It included an examination of trends, including the timing of suicides, types of crimes committed by those who died by suicide, sentencing information, length of incarceration, job assignments, and precipitants to suicide.  The report included detailed demographic factors and the frequency of various psychiatric diagnoses among those who died by suicide, as well as a comprehensive discussion of initiatives that have been undertaken to reduce suicides, including policy changes, monitoring enhancements, programmatic changes, and training.

## III.     THE 2016 SPECIAL MASTER'S REPORT

For the reasons discussed above, the Special Master concluded that CDCR did not demonstrate their fitness to self-monitor and report on their suicide prevention practices and performance.  Despite the Special Master's efforts to get the defendants to reconsider their position on foreseeability and preventability, defendants informed the Special Master that CDCR and the Special Master would be creating parallel suicide reports going forward.  Accordingly, the Special Master and his expert re-assumed responsibility for drafting the 2016 annual suicide report attached hereto as Appendix C.  The 2016 report is consistent in format, use of statistics, and analysis of inmate suicide foreseeability and preventability as the Special Master's prior annual suicide reports.

The Special Master's expert found the following:

In 2016, 27 inmates died by suicide, producing the highest rate of suicide (21 deaths per 100,000 inmates) since 2013.  Of these 27 deaths, 23, or 85 percent were determined to be foreseeable, preventable, or both.  Similarities were found with regard to location, method, crime type, and security level when compared to deaths by suicide from previous years.  Those who

died by suicide in 2016 were comparatively older and more likely to be receiving mental health services at the Enhanced Outpatient Program level of care than in previous years. The Special Master's expert noted inadequacies in suicide risk evaluations and subsequent risk determinations; treatment planning and treatment interventions; failures to consider patient's needs regarding higher levels of care; and problems regarding interdisciplinary communication among the cases of the patients who died by suicide in 2016. The Quality Improvement Plan (QIP) process was also assessed to require enhancements to make it more effective regarding outcomes.

## IV.    CONCLUSION

As with other issues discussed herein, the persistence of the inmate suicide epidemic in California prisons, sadly, is nothing new to this case. The inmate suicide rate among CDCR's population is at its highest since the commencement of this action. *See* ECF No. 6879-1 at 45-46. In recent years, the inmate suicide rate has increased 74 percent, from 18.6 per 100,000 in 2015[20] to a staggering 32.3 per 100,000 in 2019. ECF No. 6879-1 at 45. In 2015, a CDCR inmate committed suicide every 15.2 days, Appendix A at 9; in 2016, there was an inmate suicide every 13.5 days. Appendix C at 1.

In its 2013 order denying defendants' motion to terminate this action, the court noted the following:

> Despite the fact that current evidence shows that inmate suicides are occurring at virtually the same rate and with virtually the same degree of inadequacies in assessment, treatment and intervention, defendants now seek termination of all relief in this action. The facts show, however, that the rate of inmate suicide is not declining, and more than seventy percent of inmate suicides in California involve significant inadequacies about which defendants have known for years. These facts demonstrate an ongoing violation of the Eighth Amendment rights of members of the plaintiff class.

---

[20] See Appendix B at 3 for a detailed discussion of CDCR's calculation of the suicide rate in their 2015 report.

ECF No. 4539 at 33-34.

While progress has been made in many areas, the court's observations regarding suicide and suicide prevention in its 2013 order remain applicable today. As was the case during the Three-Judge Court (2011) and termination motion (2013) proceedings, large proportions of inmate suicides – 85 percent in 2016 – continue to be determined foreseeable and/or preventable. And defendants have been unable to implement 18 of the Special Master's suicide prevention expert's remaining recommendations to improve the situation.

Further attempts to rewrite the law of this case will not prevent future inmate suicides from occurring. Instead of offering misleading and inaccurate explanations for its rising suicide rate, the defendants would be better served by acknowledging the crisis, fully implementing and sustaining all of the recommendations previously submitted by the Special Master's suicide prevention experts, and focusing its efforts on significantly reducing the number of preventable and foreseeable suicides within CDCR.

The Special Master agrees with the conclusions included in his expert's analysis of the 2015 CDCR Report and his expert's review of suicides completed in CDCR January 1, 2016 – December 31, 2016. Because these conclusions track prior court orders and the general mission of the SPMW, they need not be reiterated in additional court orders at this time. Accordingly, the Special Master requests that the Court adopt in full the attached Reports: (1) the Special Master's Expert's Analysis of the California Department of Corrections and Rehabilitation's Annual Suicide Report January 1, 2015 through December 31, 2015, and (2) the Special Master's Expert's Report on Completed Suicides in the California Department of Corrections

and Rehabilitation from January 1, 2016 through December 31, 2016, and does not request the entry of any orders by the Court at this time.

Respectfully submitted,


/s/ *Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master



January 28, 2021

# EXHIBIT A

| | |
|---|---|
| **From:** | Tavares, Zelia M |
| **To:** | Ryan, Jr., Michael F. |
| **Subject:** | FW: Suicide Reports discussion |
| **Date:** | Thursday, December 10, 2020 5:51:09 PM |

**From:** Gabriel Sanchez <Gabriel.Sanchez@GOV.CA.GOV>
**Sent:** Thursday, September 14, 2017 3:17 PM
**To:** Lopes Matthew <mlopes@pldolaw.com>; 'dockc99@aol.com' <dockc99@aol.com>;
'jeffrey.metzner@ucdenver.edu' <jeffrey.metzner@ucdenver.edu>
**Cc:** Rei Onishi <Rei.Onishi@GOV.CA.GOV>; McKinney, Patrick@CDCR
(Patrick.McKinney@cdcr.ca.gov) <Patrick.McKinney@cdcr.ca.gov>
**Subject:** Suicide Reports discussion

Matty,

Thanks again for making yourselves available tomorrow to discuss the suicide reports at San
Quentin. We plan to cover a few broader topics concerning the suicide report process and delve
into some cases from 2015 and 2016 for illustration. My apologies for not sending this proposed list
to you sooner; I was incorrectly informed that the meeting was scheduled for Friday, September
22nd, not tomorrow. The list is as follows:

2015:



2016:



Regards,

Gabe


Gabriel P. Sanchez
Deputy Legal Affairs Secretary
Office of Governor Edmund G. Brown Jr.
(916) 445-0873

# EXHIBIT B

**ANNUAL REPORT ON SUICIDES IN THE
CALIFORNIA DEPARTMENT OF CORRECTIONS AND
REHABILITATION
JANUARY 1, 2015 – DECEMBER 31, 2015**

Prepared by:
Robert J. Horon, Ph.D.
Senior Psychologist, Specialist
Statewide Mental Health Program
Division of Health Care Services

## Table of Contents

*List of Tables*                                                                 4

*List of Figures*                                                                5

*List of Appendices*                                                             6


Executive Summary of the Annual Suicide Report                                   7


1. Introduction and Summary of Findings                                          8
   a. Suicide definitions and terms used                                         8
   b. Review of Findings,  Section 1: Current Year                               10
        i.   Number and rate of suicide in reporting year                        10
        ii.  Demographic factors                                                 10
        iii. Marital status                                                      11
        iv.  Education, juvenile history, and work history                       11
        v.   Languages spoken                                                    11
        vi.  Health factors                                                      11
        vii. Temporal factors                                                    12
        viii. Custodial and correctional factors                                 12
        ix.  Cell occupancy                                                      16
        x.   Job assignment                                                      16
        xi.  Means or method of suicide                                          16
        xii. Mental health factors                                              17
        xiii. Diagnoses                                                          17
        xiv. Suicide attempt history                                            18
        xv.  Suicide triggers, motivation, and behavior                         19
   c. Review of Findings, Section 2:  Current Year vs. Prior Years               22
        i.   Comparison of rate between current and prior years                  22
        ii.  Suicides by institution, current year vs. 15-year average           24
        iii. Suicides in the CDCR by month, current year and                     27
             10-year average
        iv.  Demographic factors                                                 27
        v.   Suicides by housing type                                            29
        vi.  Time in segregated housing prior to death                           30
        vii. Suicides by method                                                  31
        viii. Involvement in mental health services                             31
        ix.  Suicides in mental health vs. non-mental health populations        32
   d. Review of Findings, Section 3:  Comparison of CDCR Suicide                 33
      Rates with Other State Prison Systems and Relevant U.S. Rates
        i.   CDCR rates versus other state and federal prison rates              33
        ii.  Comparison of rate between CDCR and the community                   34

  e. Summary Review of Findings and Trends    35

2. Response to suicide and suicide attempts    37
  a. Institutional reporting of self-harm incidents   37
  b. Determination of unknown causes of death   37
  c. Suicide attempts and suicides prevented   38
  d. External review processes   39
  e. Determination and tracking of Quality Improvement Plans 39
  f. Audits of SCR Quality   40
  g. Timeliness of Suicide Case Reviews and Suicide Reports 41

3. Findings in individual case reviews    42
  a. Introduction to individual case reviews   42
  b. Commonalities in individual case reviews   42

4. Review of suicide prevention initiatives in 2015   48
  a. Introduction   48
  b. Suicide prevention initiatives developed/implemented during the 48
    reporting year

5. Conclusions    58
  a. Introduction   58
  b. Summary of findings   58
  c. Report implications and future steps   60

*Appendices*    65

**List of Tables**

Table 1. *Racial/Ethnic Groupings of Suicides in the CDCR, 2015*    10

Table 2. *Age Groupings of Suicides in the CDCR, 2015*    11

Table 3. *Frequency of Suicide by the CDCR Institution, 2015*    12

Table 4. *Frequency of Suicide by Housing Type, 2015*    13

Table 5. *Type of Commitment Offense in Inmate Suicides, 2015*    14

Table 6. *Suicides by Security Level, 2016*    14

Table 7. *Suicides in the CDCR by Length of Sentence, 2015*    15

Table 8. *Suicides in the CDCR by Amount of Time Served, 2015*    15

Table 9. *Suicides in the CDCR by Time Left to Serve, 2015*    16

Table 10. *Suicides in the CDCR by MHSDS Participation, 2015*    17

Table 11. *Mental Health Diagnoses of Suicides in the CDCR, 2015*    18

Table 12: *Suspected Motives/Precipitants to Suicides in CDCR by frequency, 2015*    20

Table 13: *Individual Precipitants/Motivations for Suicides within the CDCR, 2015*    21

Table 14. *Annual Frequency and Rate of Suicide in the CDCR for 20 years,*    23
*by Gender and Overall, 1996-2015*

Table 15. *Frequency of Suicide by CDCR Institution, 2015 and by prior*    25
*15-year total and average (1999-2014)*

Table 16. *Frequency of Suicide within Segregated Housing, 2010-2015*    30

Table 17. *Frequency of Suicide within MHSDS Levels of Care, 2010-2015*    32

Table 18. *Frequency of Suicide in MH versus non-MH populations, 2006-2015*    32

Table 19. *Rate and rank of suicides by state, 2001-2014 (14 years)*    33

Table 20. *QIPs assigned within the CDCR by recipient, 2015*    39

Table 21: *Results of Quality Audits, 2015 Suicide Case Review reports*    40

Table 22: *Findings of Individual Case Reviews, part 1*    43

Table 23: *Findings of Case by Case Reviews, part 2*    46

**List of Figures**

Figure 1:  *CDCR Suicide Rate and Frequency, with trend line, 2006-2015*     24

Figure 2:  *CDCR Frequency by Month, 2015 and 10-Year Average*     27

Figure 3:  *Suicide Frequency by Race, 2005-2015, with trend line*     28

Figure 4:  *Number of Suicides by Age Group, 2010-2015*     29

Figure 5:  *Length of Time in ASU before suicide, 2009-2015*     31

Figure 6:  *Suicide rates for adult males in the CDCR, State Prisons, & the U.S., 2010-15*     35

**List of Appendices**

I.     Sample High Risk Management Program policy                                                  65

II.    Suicide response procedures                                                                 77

III.   Review of unknown deaths and overdose deaths                                               85

IV.    Suicide response court-ordered and internal deadlines for suicide reports                  90

V.     Memorandum "Designation of Suicide Prevention, Assessment and                             91

       Training Coordinator"

VI.    Memorandum "Completed Contacts Associated with Suicide Risk Evaluation"                   96

VII.   Memorandum "Suicide Prevention Pamphlets for Inmates and Family/Friends"                 100
       (with pamphlets attached)

## Executive Summary of the Annual Suicide Report

In 2015 a total of 24 inmate suicides occurred within the CDCR. This number is an increase of one from 2014.  The frequency of suicides in 2014 and 2015 are the lowest consecutive yearly number of suicides in the CDCR since 2002.  The rate of suicide in the CDCR was 18.7 suicides per 100,000 inmates in 2015 and 17.0 per 100,000 in 2014.  The suicide rate in U.S. state prisons ranged from 14-17 per 100,000 per year between 2000 and 2013[1] and 20 per 100,000 in 2014.[2] The suicide rate in the CDCR is thus lower than the average rate in U.S. prisons.  Additionally, male prisoners in the CDCR had a lower rate of suicide rate than U.S. males in the community in 2014 and 2015.[3]

Suicides in 2015 largely match prior year's patterns with respect to time of year,  prevalence in spring and fall months, greater frequency in high custody inmates (75% in Level III and Level IV housing), and  a relatively high percentage of suicides in inmates involved in mental health programming (typically 50-60%).  Suicides in 2015 were somewhat unlike prior year's patterns in that there were two female suicides and three suicides of inmates aged 70 and older.

Both the frequency and the rate of suicide have declined in the CDCR over the past 10 years (2006-2015), which represents steady progress.  The frequency of suicide in the CDCR decreased from 43 in 2006 to and 2015, while the rate of suicide in the CDCR declined from 24.9 per 100,000 in 2006 to 18.7 per 100,000 in 2015.  The decline in suicide rate in the CDCR in 2015 compared to the prior 10 years can chiefly be attributed to fewer suicides within segregated housing units, lower rates of suicides in Caucasian and Hispanic/Latino inmates, and fewer suicides in inmates aged age 35-54.

Many suicide prevention initiatives are underway and/or continuing in the CDCR.  These initiatives have emerged from Quality Improvement Plans on deaths by suicide, from recommendations generated by tours, reviews, and audits, from advances in the field of Suicidology, from opportunities arising from the Mental Health Tracking System and the Electronic Health Record System, and so forth.  These initiatives are meant to enhance a comprehensive, integrated system of suicide prevention and are detailed in the report that follows.

---

[1] Noonan, M, Rohloff, H., & Ginder, S., Mortality in Local Jails and State Prisons, 2000-2013 Statistical Tables, US DOJ, Bureau of Justice Statistics, August, 2015 NCH 248756
[2] Noonan, M. Mortality in Local Jails and State Prisons, 2001-2014 Statistical Tables, US DOJ, Bureau of Justice Statistics, December, 2016, NCJ 250150
[3] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870

# I.  Introduction and  Review of Findings

This report reviews the 24 suicides by inmates of the California Department of Corrections and Rehabilitation (CDCR) which occurred during 2015.  The report is submitted as part of joint efforts by the CDCR and the Office of the Special Master's (OSM) experts to work together to reduce the number of suicides within California's state prisons and is part of the CDCR's compliance with court-ordered remediation specified by the Special Master as part of the continuing review in the matter of *Coleman v. Brown*, No. (CIV S-90-0520 KJM KJN E.D.Cal.). Kerry Hughes, M.D. and Jeffrey Metzner, M.D. provided consultation for this report from the *Coleman* court.   Amy Eargle, Ph.D., Robert Canning, Ph.D., Adinn Phean, AGPA, Harutyun Grigoryan, OT, and Byron Russell, HPS1 provided assistance and review from the Statewide Mental Health Program (SMHP) at the CDCR.

This report is unlike prior reports in that the report is generated by the SMHP with consultation by *Coleman* court experts.  Prior reports submitted to the Special Master were written by the *Coleman* court's experts.  The purpose of the report remains the same:  To report on ongoing efforts to monitor suicides in the CDCR, to identify any trends in suicide that may indicate targets for suicide prevention efforts, and to provide recommendations for continued improvement.  Additional detail is provided in this report as to the definitions, response efforts, monitoring, and other improvement processes and programs implemented by or used by the SMHP to prevent suicide.   The report is prepared for the Special Master and has implications for the CDCR and for the work of the *Coleman* court's experts.

The primary source of data used for this report is the suicide case reviews completed by members of the SMHP who are trained in conducting these reviews.  Additional sources include data obtained from the CDCR Offender Information Services Branch, information garnered from reports by the CDCR Death Review Committee, information from prior annual suicide reports, and publically available information regarding suicide rates in community and incarcerated settings.  Each suicide was also independently reviewed by this author in order to assess trends in data or findings.  Input made by the OSM's experts, who attend each suicide case review by teleconference and consult on case review, provided added information for this report.  Finally, members of the Quality Management unit, a separate unit within the SMHP, provide input through auditing each suicide case review report.

## A.  Suicide definitions and terms used

The CDCR is in the process of adopting definitions related to suicide that were developed by the Centers for Disease Control and the World Health Organization and have been widely-adopted in community settings.  The OSM has been provided with a draft of the proposed changes to these definitions. As these changes are pending, the definitions used in the MHSDS Program Guide, 2009 Revision are listed below.  Terms and definitions now considered obsolete are omitted

from the listed provided here.  Additionally, the term self-injurious is synonymous with self-harm.  The term self-harm is used frequently in this report as it conforms to both existing definitions and proposed definitions and is routinely qualified by the phrases "with intent" or "without intent."

1.  <u>Suicide</u>:  An intentional self-injurious behavior that causes or leads to death.

2.  <u>Suicide Attempt</u>:  An intentional self-injurious behavior which is apparently designed to deliberately end one's life, and may require medical and/or custody intervention to reduce the likelihood of death or serious injury.

3.  <u>Suicidal Ideation</u>:  Thoughts of suicide or death, which can be specific or vague, and can include active thoughts of committing[4] [that is, dying by] suicide or the passive desire to be dead.

4.  <u>Suicidal Intent</u>:  The intention to deliberately end one's own life.

5.  <u>Self-injurious Behavior</u>:  A behavior that causes, or is likely to cause, physical self-injury.  [Note:  The terms self-injurious behavior, self-mutilation, and suicide gesture are found in the MHSDS Program Guides, 2009 Revision, but are not used in this report.  The term 'self-harm without intent' is used instead as the meaning is the same, self-harm for other reasons than death by suicide, and does not have the potentially negative connotations of terms such as 'gesture.']

**B.  <u>Review of findings</u>**

<u>*Section 1:  Current Year*</u>

**<u>Number and rate of suicide in reporting year</u>:**  There were 24 suicides in the CDCR in 2015.  This represents an increase of one over the total in 2014, or an increase of 4%.  The suicide rate in the CDCR for 2015 was 18.7 per 100,000.  Rates of suicide are standardized by the number per 100,000 in order to make standardized comparisons between samples and populations.   The total number of suicides in 2015 corresponds to a suicide on average every 15.2 days.

**<u>Demographic Factors</u>:**  In 2015, twenty-two men and two women died by suicide in the CDCR.  The rate of suicides in the CDCR was 17.9 per 100,000 for men and 34.7 per 100,000 for women.  The rate of suicide for women fluctuates more dramatically than the rate for men, as there are many more males (122,874) than females (5,769) in the CDCR.  To illustrate, one fewer female suicide would have lowered the female rate in 2015 by one-half, from 34.7 to 17.3

---

[4] The term 'committing' has fallen out of favor with Suicidologists, as the term implies some sort of success in carrying out a pledge or obligation.  The favored term is rather straightforward—'died by suicide.'

per 100,000.  The same decline of one suicide in males would have lowered the rate by one in twenty-two, or from a rate of 17.9 to a rate of 17.1 per 100,000.  A listing of suicides by gender per year over 10 and 20 year periods is found in Table 14 later in this report.

The racial and ethnic backgrounds of inmates who died by suicide are represented in Table 1.  As can be seen in Table 1, Caucasians represented over half of all suicides despite comprising only 22% of the population within the CDCR.  This finding has been typical of the racial breakdowns of suicides within the CDCR for many years.

Table 1.  *Racial/Ethnic Groupings of Suicides in the CDCR, 2015*

| Racial Group | Frequency | Percent of Suicides | Percent of race within the CDCR |
|---|---|---|---|
| African-American | 5 | 21% | 29% |
| Caucasian | 13 | 54% | 22% |
| Hispanic/Latino | 4 | 17% | 42% |
| Other* | 2 | 8% | 6% |

*1 Chinese American female, 1 Japanese American male*

Table 2 contains a listing of age groupings within the CDCR, with the number and percentage of suicides for each group compared with the prevalence of the age group within the CDCR.  Of note, four age groups had higher rates of suicide than their corresponding representation within the CDCR population during the reporting year (2015):  Inmates ages 30-34, 45-54, 60-64, and 65 and older.  The overrepresentation of older inmates in the year's suicides may bear further monitoring as a possible emerging trend.  The three suicides of older inmates occurred in individuals aged 70-73.  The average age of those who died by suicide was 42.9.

Table 2.  *Age Groupings of Suicides in the CDCR, 2015*

| Age Group | Frequency | Percentage of 2015 Suicides | Percentage of CDCR Population |
|---|---|---|---|
| 18-24 | 2 | 8 | 12 |
| 25-29 | 3 | 13 | 16 |
| 30-34 | 5 | 21 | 16 |
| 35-39 | 2 | 8 | 14 |
| 40-44 | 2 | 8 | 11 |
| 45-54 | 4 | 17 | 10 |
| 55-59 | 1 | 4 | 6 |
| 60-64 | 2 | 8 | 3 |
| 65 + | 3 | 13 | 3 |

**Marital Status:**  Marital relationships are thought to be a protective factor for inmates. This variable is protective for males in community studies and may function in a similar way for

inmates as these relationships may offer support during incarceration. [5]  In 2015, two suicides (one male, one female) occurred in married individuals, whereas nine suicides occurred in separated or divorced inmates (including the second female) and thirteen suicides occurred in single or never-married inmates.

**Education, Juvenile History, and Work History:**  Three suicides occurred in inmates with some college education.  The remaining twenty-one inmates had secondary educations, ranging from the 8th to 12th grade.  Fifty-seven percent had a history of juvenile arrest, with 33% having a history of gang involvement.  The majority of suicides occurred in inmates with limited employment history, typically in work classified as "unskilled labor."  None of the suicides occurred in inmates who were in the Developmental Disability Program (DDP), though two inmates had some history of special education involvement.

**Languages Spoken:**  One female inmate who died by suicide spoke Mandarin as her primary language.  All others were primarily English-speaking.

**Health Factors**:  Nearly half (46%) of the inmates who died by suicide in 2015 were considered to have serious and/or chronic medical problems.  This ranged from problems with low back pain or headaches to cases of liver disease, diabetic neuropathy, cardiac problems, and legal blindness.  In all cases, medical needs were determined to be adequately addressed according to nursing reviews.  Implications of this finding for service delivery are explored later in this report.

**Temporal Factors:**  Suicides occurred within the CDCR in nine months in 2015.  That is, zero suicides occurred in three months.  Four suicides occurred in one month (March) and five suicides occurred in each of two months (May and October).  The prevalence of suicides in spring and fall months has been noted in prior years as well (*Figure 2* contains a breakdown of suicides by month over the current year and by a 10-year average).

In 2015, time of day of discovery did not vary significantly, with seven suicides occurring during first watch (2200 hours to 0600 hours), seven during second watch (0600 hours to 1400 hours), and ten during third watch (1400 hours to 2200 hours).  This finding is similar to prior years.

---

[5] Kposowa, A. (2000).  Marital status and suicide in the National Longitudinal Mortality Study.  *Journal of Epidemiology and Community Health,* 54, 254-261.

**Custodial and Correctional Factors**:  In 2015, suicides occurred at 13 institutions including an out-of-state facility.  Table 3 lists suicides by institution.  Any institutions that are not listed did not have a death by suicide in 2015.

Table 3.  *Frequency of Suicide by CDCR Institution, 2015*

| Institution | Frequency |
|---|---|
| California State Prison, Sacramento | 3 |
| San Quentin State Prison | 3 |
| Duel Vocational Institute | 3 |
| California Men's Colony | 3 |
| California Institution for Women | 2 |
| California State Prison, Corcoran | 2 |
| RJ Donovan Correctional Facility | 2 |
| California Medical Facility | 1 |
| California Correctional Institution | 1 |
| California Institution for Men | 1 |
| Folsom State Prison | 1 |
| California Health Care Facility | 1 |
| Tallahatchie County Correctional Facility | 1 |
| Total | 24 |

As can be seen, one-half of the suicides in 2015 occurred in four institutions, and eighteen (75%) of the suicides occurred within seven institutions.

During 2015, nine of the twenty-four suicides occurred in segregated housing settings (37%); seven in Administrative Segregation Units (ASU), one in a Security Housing Unit (SHU), and one in Short-Term Restricted Housing (STRH).  Two inmates were in Reception Centers, one in a Correctional Treatment Center (CTC), and one in a Sensitive Needs Yard (SNY).  The remaining eleven suicides occurred in general population settings.  This information is depicted in Table 4.

Table 4. *Frequency of Suicide by Housing Type, 2015*

| Housing Type | Frequency | Percent |
|---|---|---|
| Administrative Segregation | 7 | 29 |
| Security Housing Unit | 1 | 4 |
| Short-Term Restricted Housing | 1 | 4 |
| Reception Center | 2 | 8 |
| Correctional Treatment Center | 1 | 4 |
| Sensitive Needs Yard | 1 | 4 |
| General Population | 11 | 46 |
| Total | 24 | 99 |

A common finding in prison and jail settings is a preponderance of suicides in violent inmates and in inmates with higher level security needs; violent inmates have nearly three times the risk of suicide as non-violent inmates[6]. The commitment offenses of inmates who died by suicide in 2015 are listed below in Table 5. Notably, half of suicides occurred in individuals who had committed murder. Four other inmates had commitments for assault resulting in great bodily injury, one inmate had a commitment for battery, and two had a commitment for armed robbery (and thus the threat of assault was implied). Of the five commitment offenses considered non-violent, two resulted in significant injury but were seen as unintentional (driving under the influence resulting in injury or death). The remaining three suicides occurred in inmates who were committed for vehicle theft, burglary, or drug charges.

| Table 5. *Commitment Offenses in Inmate Suicides, 2015* | | |
|---|---|---|
| Type of Commitment Offense | N | Percent |
| **Violent Crimes Overall** | **19** | **79** |
| Murder | 12 | 50 |
| Assault w/ Great Bodily Injury | 4 | 17 |
| Armed Robbery | 2 | 8 |
| Battery | 1 | 4 |
| Sex Offense | 0 | 0 |
| | **5** | **21** |

---

[6] Mumola, C. (2005), Bureau of Justice Statistics, located at: http://www.bjs.gov/content/pub/pdf/ardus05.pdf

| **Non-Violent Crimes Overall** | | |
|---|---|---|
| DUI with injury/vehicular manslaughter | 2 | 8 |
| Vehicle theft | 1 | 4 |
| Burglary | 1 | 4 |
| Drug Charges | 1 | 4 |

In regards to security level, suicides occurred predominantly in higher security (Level III and Level IV) settings in 2015. Table 6 lists the number of suicides by security classification level. Level IV suicides have traditionally represented more than half of all suicides within CDCR. Of note, the classification system used by the CDCR was modified prior to 2015, with fewer inmates classified at the highest level, Level IV, which may account for some of the decline in Level IV inmate suicides in 2015.

| Table 6. *Suicides per Security Level, 2015* | | |
|---|---|---|
| Security/Classification Level | N | Percent |
| Level IV | 9 | 37.5 |
| Level III | 9 | 37.5 |
| Level II | 6 | 25 |
| Level I | 0 | 0 |

Another variable unique to correctional settings is the issue of sentence length: Total length of sentence, how much time an inmate has served prior to a suicide, and how much time an inmate had left to serve in prison prior to a suicide. These variables are captured in Tables 7, 8, and 9.

Table 7 shows that a slight majority of suicides (54%) occurred in inmates with Life sentences (including condemned individuals) in 2015. Inmates with Life sentences have historically made up roughly 20% of the population within the CDCR and are overrepresented in individuals who die by suicide. No suicides occurred in inmates with medium length sentences (11 to 20 years) in 2015.

Table 7. *Suicides in the CDCR by Length of Sentence, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| 1-5 years | 7 | 29 |
| 6-10 years | 3 | 13 |
| 11-20 years | 0 | 0 |

Table 7. *Suicides in the CDCR by Length of Sentence, 2015*

| | | |
|---|---|---|
| 20+ years | 1 | 4 |
| Life with Possibility of Parole | 11 | 46 |
| Life without Possibility of Parole | 1 | 4 |
| Condemned | 1 | 4 |
| Total | 24 | 100 |

As seen in Table 8, individuals early within their sentence represent a high risk group. Five inmates died by suicide within their first year of incarceration; this included two individuals who died within 30 days of imprisonment.  Three inmates who had served 20 years or more were among those who died by suicide in 2015.

Table 8. *Suicides in the CDCR by Amount of Time Served, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| 0-1 year | 5 | 21 |
| 1-5 years | 5 | 21 |
| 6-10 years | 7 | 29 |
| 11-20 years | 4 | 17 |
| 21+ years | 3 | 12 |
| Total | 24 | 100 |

The length of time remaining in sentences for those who died by suicide are shown in Table 9. There was nearly an even split between those with short to moderate sentences left to serve (46%) and those with lengthy sentences or indeterminate/life sentences (54%).

Table 9. *Suicides in the CDCR by Time Left to Serve, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| 0-1 year | 0 | 0 |
| 1-5 years | 10 | 42 |

Table 9. *Suicides in the CDCR by Time Left to Serve, 2015*

| | | |
|---|---|---|
| 6-10 years | 1 | 4 |
| 11-15 years | 0 | 0 |
| 16 years or more (including Lifers) | 13 | 54 |
| Total | 24 | 100 |

The implications for the findings represented in Tables 7, 8, and 9 are considerable, suggesting the need to.  These considerations will be discussed later in this report.

**Cell Occupancy:**  In 2015, 25% of suicides occurred in inmates housed in designated double cells and 75% of suicides occurred within designated single cells.  Of the six suicides in designated double cells, two suicides occurred in cells without a currently assigned cellmate, two inmates waited for a cellmate to leave for work or other programming before dying by suicide, one occurred outside of the cell (by jumping from a tier), and one occurred with a cellmate present but asleep.  Of the nine suicides occurring in segregated housing settings, eight of the suicides occurred in single-person cells.  The ninth suicide occurred in a double cell but without an assigned cellmate.  Overall, 23 of the 24 suicides occurred within a single cell or within a solely occupied (at the time) double cell.

**Job Assignment:**  The majority of inmates (62.5%) who died by suicide in 2015 did not have a job assignment or educational placement.  Of the nine inmates who had program assignments, two were placed in educational settings, one (female) in a substance abuse program, and six were in traditional jobs (e.g., as a porter).

**Means or Method of Suicide**:  Correctional settings necessarily limit the methods or means inmates can use to die by suicide.  For example, suicides by firearms or carbon monoxide poisoning are unheard of in correctional systems.  As with most correctional systems, hanging is the primary means used by inmates in the CDCR to die by suicide.  Inmates have ready access to clothing and linen items that can be used for nooses and ligature points can be found in nearly all cells.  In 2015, both female suicides were by hanging and 20 of the 24 suicides overall were by hanging (83%).  The remaining four inmates (males) died by intentional overdose (2), asphyxiation (1), and jumping from a high place (1).

**Mental Health Factors:**  The number and percentage of inmates who died by suicides in the CDCR in 2015 who were participants in the Mental Health Services Delivery System (MHSDS) is listed in Table 10.  Mental health patients continue to be overrepresented in the year's suicides, a pattern that is typical in correctional and community settings.

Table 10.  *Suicides in the CDCR by MHSDS Participation, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| No MHSDS participation | 10 | 42 |
| Correctional Clinical Case Management System | 9 | 37 |
| Enhanced Outpatient Program | 5 | 21 |
| Total | 24 | 100 |

Ten inmates were not in the MHSDS at the time of death.  Six of these inmates (25% of the total number of suicides) had no history of participation in the MHSDS.  Four inmates who were not in the MHSDS system at the time of death had previously been in the MHSDS at the Correctional Clinical Case Management System (CCCMS) level of care.

In 2015, fifteen (62.5%) of the inmates who died by suicide had a history of mental health treatment prior to incarceration.   Of these, eleven were in the MHSDS at the time of death, with one other having previously participated in the MHSDS.  Eight cases (33%) had a family history of mental illness and/or family history of substance abuse treatment.

Upon entrance to the CDCR, inmates are screened for the possible presence of significant mental health disorders.  Thirteen (55%) of the inmates who died by suicide in 2015 were identified as possibly having significant mental health disorders during initial screening.  On subsequent mental health evaluations, 69% of those positive on screening were also found to have mental health conditions qualifying them for MHSDS services.

At the time of suicide, fourteen inmates (58%) were on psychiatric medications.  Three individuals (13%) had involuntary medication orders in place per Penal Code 2602.  Eleven of the twenty-four (46%) had a history of Mental Health Crisis Bed placement or inpatient hospitalization.  Eight (33%) had been psychiatrically hospitalized in the year prior to their suicide.

**Diagnoses:**  The mental health diagnoses of individuals who died by suicide in 2015 are summarized in Table 11 and are listed by frequency.  Please note that people can have multiple mental health diagnoses, thus the frequency of diagnoses in Table 11 exceeds the number of annual suicides. Additionally, all inmate suicides in 2015 involved individuals with some history of substance use or abuse.  However, the diagnoses listed in Table 11 include substance use disorders *only* if formally reported as a diagnosis.  All diagnoses are based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 4th Edition or 5th Edition (DSM-IV or DSM-5).

When present, mood disorders and psychotic disorders were listed as the primary diagnosis of record. Of the individuals diagnosed with mood disorders, five were diagnosed with Major Depressive Disorder and four with Bipolar I Disorder. Five individuals were diagnosed with psychotic disorders; three with Schizophrenia, one with Delusional Disorder, and one with Psychotic Disorder NOS. Six inmates were diagnosed with Antisocial Personality Disorder and two of these six inmates were concurrently diagnosed with Narcissistic Personality Disorder.

Table 11. *Mental Health Diagnoses of Suicides in the CDCR, 2015*

| Diagnostic Category | Frequency | Percent |
|---|---|---|
| Any DSM Disorder | 20 | 83 |
| Substance Abuse or Dependence | 13 | 54 |
| Mood Disorder | 8 | 33 |
| Personality Disorder | 6 | 25 |
| Psychotic Disorder | 5 | 21 |
| Adjustment Disorder | 4 | 17 |
| No Diagnosis | 4 | 17 |
| Anxiety Disorder | 1 | 4 |

**Suicide Attempt History:** A history of suicide attempts was found in sixteen (67%) of the 24 cases of suicide in 2015. Of the group of sixteen, ten had made multiple past suicide attempts (42% of the overall total). Of those that had prior suicide attempts, ten had reported at least one suicide attempt while in the community and eight had at least one suicide attempt while incarcerated. For the eight individuals who had suicide attempts during incarceration, a range of one to five prior attempts in prison were noted. The finding of ten suicides within *Multiple Attempters,* a term indicating the presence of two or more suicide attempts with the intent to die, is significant as this is a group with known high chronic risk.[7] Implications of this finding are discussed later in this report.

**Suicide Triggers, Motivation, and Behavior:** Seven of the twenty-four individuals (29%) who died by suicide in the CDCR in 2015 wrote suicide notes. This is a bit higher than the rate (one in six or 17%) found in community samples.[8] A small percentage (17%) of the deaths occurred

---

[7] Rudd, Joiner, & Rajab (1996). Relationships among suicide ideators, attempters, and multiple attempters in a young-adult sample. *Journal of Abnormal Psychology*, 105, 541-550.
[8] Gelder, Mayou, and Geddes (2005). Incidence of note-leaving remains constant despite increasing suicide rates. *Psychiatry and Clinical Neurosciences*, 4 (1).

in inmates who reported having no interpersonal supports, while two reported having one person in their support system. The majority (75%) endorsed two or more supports during their most recent mental health or suicide risk evaluations. Only one of the twenty-four (4%) of the suicides occurred in a patient who was believed to be feigning distress or suicidality. Five of the twenty-four inmates who died by suicide in 2015 did so on a holiday, with one each on Christmas Eve, Memorial Day, 4th of July, Halloween, and Chinese New Year.

The motives or precipitants to the current year suicides listed or suspected by Mental Health Suicide Reviewer's (MHSR's) were examined and are presented in Table 12.

Table 12. *Suspected Motives/Precipitants to Suicides in the CDCR by frequency, 2015*

| Precipitant Category | Frequency | Percent of Total |
|---|---|---|
| Receipt of new charges, convictions, disciplinary actions, or added time in prison | 9 | 20 |
| Safety concerns, drug debts, fears of victimization | 7 | 15 |
| Mental health symptoms, e.g. anxiety, psychosis | 7 | 15 |
| Medical illness and/or pain issues; medical disability | 5 | 11 |
| Holidays or anniversaries of losses, crimes, etc. | 5 | 11 |
| Disruption in prison 'program;' e.g., transfer between facilities, cellmate change, loss of single cell housing | 4 | 9 |
| Conflict or losses of external supports | 4 | 9 |
| Conflict or losses of within prison supports | 3 | 6 |
| Receipt of or anticipation of negative outcomes with the Board of Prison Hearings | 1 | 2 |
| Loss of parole to the community (e.g., due to added sentence, finding of MDO or SVP) | 1 | 2 |
| Totals: | 46 | 100 |

The motivations listed in suicide case review reports can be divided roughly into ten categories as represented in Table 12. The frequency of precipitant motivations is greater than the total number of suicides, as nearly all suicide case reviews listed more than one hypothesized motivation. In many cases, motives were not entirely clear. Rather, the motives and precipitants identified by suicide case reviewers are marked by each inmate's rather idiosyncratic reasons for

ending one's life.  The frequency of certain categories of suicide precipitants has implication for prevention efforts as explored later in this report.

Additionally, Table 13 indicates the precipitant factors for suicides occurring in the CDCR in 2015 on a case by case basis.  As is apparent, the majority of inmates had multiple motivations or precipitants for the action.  Also, in-prison events or stresses are noted in most, but not all, cases. Greg Dear and colleagues reported similar findings in Australian prisons with suicide attempters. When interviewed, prisoners reported two or more of five categories related to motivations for attempts, with the most common category (71% of incidents) being termed "stressful event that occurred within the prison" and second most common category (43% of incidents) being a consequence of imprisonment (e.g. placing a strain on family).[9]  These themes are mirrored in the 2015 suicides within the CDCR and have been presented to CDCR clinicians in monthly suicide prevention videoconferences and in revised trainings in suicide risk evaluation.

| Case | Table 13:  *Individual Precipitants/Motivations for Suicides within the CDCR, 2015*<br><br>**Precipitants/ Motivations Noted** |
|------|-------------------------------------------------------------------------------------------------------------------------------|
| A | Medical illness (terminal) and pain issues; housing issues (SNY status; safety concerns); conflict with spouse |
| B | Health concerns and complaints of pain; panic attacks; tearfulness around "no hope" of getting better medically; holiday (Chinese New Year) |
| C | Multiple disciplinary actions; anniversary of step-son's suicide; accrual of drug debt; time added to sentence; cellmate moved out of cell; told of positive lab test (Hepatitis C); familial estrangement |
| D | Received 3 year sentence extension (assault on peace officer); long ASU stay |
| E | Inability to move in with in-prison romantic partner; reported having an enemy to move 'yards' and was taken to ASU rather than desired 'yard' |
| F | Parole denied by BPH; argument with main family support (daughter); new RVR; hoarded medication (for overdose) was found and charged for possession for sales |
| G | Agitation from hallucinations and delusions, increasing depression, facing SHU term |
| H | Concerned about losing single cell and large amount of personal property; pending transfer; reports  can't cell with others |
| I | Interpersonal problems/perceived rejection from other inmates on living unit |
| J | Convicted of murder of another inmate (incident occurred in 2012); received 45 years to life sentence and 25-month SHU term; lengthy ASU stay |
| K | Gang pressures; attempted to debrief; conflict with custody officers |
| L | Health concerns (headaches); close custody status due to RVR; holiday (4th of July) |
| M | Concern about transfer (to a different prison) and feared losing single cell status; feelings of depression/worthlessness |
| N | Safety concerns/fear of victimization (went into protective custody); anxiety |
| O | Paranoia/belief that family or other inmates intended to have the inmate stabbed |
| P | Dysphoria/hopelessness about the possibility of parole; requested/given CCCMS |

[9] Dear, Thomson, Hall, & Howells (2001).  Non-fatal self-harm in Western Australian prisons:  Who, where, when, and why. *Australian & New Zealand Journal of Criminology*, 34, 47-66.

| | |
|---|---|
| | discharge; disciplinary infraction at work (faced losing assignment) |
| Q | Chronic illness/pain; 'bad news' about medical condition (liver cancer); researched Christian beliefs about suicide and the 'unforgiveable sin' prior to suicide |
| R | Fought with inmate and reported safety concerns; transferred during 5-day follow-up period after MHCB stay rescinded |
| S | Safety concerns; requested Sensitive Needs Yard (SNY); complained of hallucinations and reported delusional beliefs |
| T | Serious medical disabilities; possible distress regarding transfer |
| U | Interpersonal losses/estrangement; notified of additional charges (rape case pending investigation); holiday (Halloween) |
| V | Concern about drug debts and substance use relapse; familial estrangement; bothersome hallucinations; depression; holiday (Memorial Day) |
| W | Delusions/hallucinations; less faith that legal appeal would be won |
| X | Interviewed for Mentally Disordered Offender (MDO) status; found to meet MDO criteria—upset by this; somatic delusions; holiday (Christmas) |

## C. Review of findings

*Section 2:  Current Year vs. Prior Years*

**Comparison of suicide rate between current and prior years:**  The suicide rate in the CDCR in 2015 was 18.7 per 100,000.  This rate is higher than in 2014, when the rate was 17.0 per 100,000, reflecting both one more suicide in 2015 than in 2014 and a decrease in the inmate population of nearly 7,000 from 2014 to 2015.  The rate of 18.7 per 100,000 is the third lowest rate in the past 10 years.  During the ten-year period, 2006 to 2015, the rate of suicide in the CDCR was 20.5 per 100,000.

Table 14 shows the rate and frequency of suicide in the CDCR for the past twenty years.  The table shows the rate and frequency of suicides by gender during each year as well.  Of note, the frequency of suicides over the period has ranged from a low of fifteen in 2000 to a high of forty-three in 2006.

As mentioned earlier, the rate of suicide in female inmates fluctuates considerably compared to a relatively stable rate in male inmates.  In eleven of the past 20 years, there were no female suicides.  The number of suicides in female institutions has ranged from a low of 0 to a high of 4 within the time period, with 2 occurring in 2015.

For reference, population figures in all years were garnered from the Offender Information Services Branch. From 1996 through 2010 the population figures are as of June 30th of the year, following the practice of the federal Bureau of Justice Statistics, and reflecting relatively stable institutional populations. From 2011 through 2015 the figures are of the average daily population which better reflects the institutional population during years with large declines of population (due to Assembly Bill 109).

Table 14. *Annual Frequency and Rate of Suicide in the CDCR for 20 years, by Gender and Overall, 1996-2015\**

| Year | Male | | | Female | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Population | Freq | Rate | Population | Freq | Rate | Population | Freq | Rate |
| 1996 | 131,273 | 19 | 14.5 | 9,744 | 0 | 0 | 141,017 | 19 | 13.5 |
| 1997 | 141,669 | 18 | 12.7 | 10,837 | 0 | 0 | 152,506 | 18 | 11.8 |
| 1998 | 147,001 | 21 | 14.3 | 11,206 | 0 | 0 | 158,207 | 21 | 13.3 |
| 1999 | 150,581 | 24 | 15.9 | 11,483 | 0 | 0 | 162,064 | 24 | 14.8 |
| 2000 | 150,793 | 15 | 9.9 | 11,207 | 0 | 0 | 162,000 | 15 | 9.3 |
| 2001 | 150,785 | 29 | 19.2 | 10,712 | 1 | 9.3 | 161,497 | 30 | 18.6 |
| 2002 | 148,153 | 22 | 14.8 | 9,826 | 0 | 0 | 157,979 | 22 | 13.9 |
| 2003 | 150,851 | 37 | 24.5 | 10,080 | 0 | 0 | 160,931 | 37 | 23.0 |
| 2004 | 152,859 | 23 | 15.0 | 10,641 | 3 | 28.2 | 163,500 | 26 | 15.9 |
| 2005 | 153,323 | 37 | 24.1 | 10,856 | 0 | 0 | 164,179 | 37 | 22.5 |
| 2006 | 160,812 | 39 | 24.3 | 11,749 | 4 | 34.0 | 172,561 | 43 | 24.9 |
| 2007 | 161,424 | 33 | 20.4 | 11,888 | 1 | 8.4 | 173,312 | 34 | 19.6 |
| 2008 | 159,581 | 36 | 22.6 | 11,392 | 0 | 0 | 170,973 | 36 | 21.1 |
| 2009 | 156,805 | 25 | 15.9 | 11,027 | 0 | 0 | 167,832 | 25 | 14.9 |
| 2010 | 155,721 | 34 | 21.8 | 10,096 | 1 | 9.9 | 165,817 | 35 | 21.1 |
| 2011 | 150,690 | 33 | 21.9 | 9,381 | 0 | 0 | 160,071 | 33 | 20.6 |
| 2012 | 130,189 | 32 | 23.8 | 6,594 | 1 | 15.2 | 136,783 | 33 | 24.1 |
| 2013 | 127,341 | 29 | 22.8 | 5,919 | 1 | 16.9 | 133,260 | 30 | 22.5 |
| 2014 | 129,268 | 21 | 16.2 | 6,216 | 2 | 32.2 | 135,484 | 23 | 17.0 |
| 2015 | 122,874 | 22 | 17.9 | 5,769 | 2 | 34.7 | 128,643 | 24 | 18.7 |
| 1996-2015 | 2,931,993 | 549 | 18.7 | 196,623 | 16 | 8.1 | 3,128,616 | 565 | 18.1 |
| 2006-2015 | 1,454,705 | 304 | 20.9 | 90,031 | 12 | 13.3 | 1,544,736 | 316 | 20.5 |

Notably, the rate of suicide within the CDCR has trended downward over the past 10 years. This downward trend can be seen in Figure 1. Whereas the frequency of suicide has declined rapidly, part of this decline can be attributed to a reduction in the number of prisoners housed within the CDCR during the time period. Both the frequency and the rate of suicide has declined, representing progress in adding interventions and improving risk management practices to prevent suicides in the CDCR.

Figure 1: *CDCR Suicide Rate and Frequency, with trend line, 2006-2015*



**CDCR Suicide Rate and Frequency, 2006-2015**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| Frequency | 43 | 34 | 36 | 25 | 35 | 33 | 33 | 30 | 23 | 24 |
| Rate | 24.9 | 19.6 | 21.1 | 14.9 | 21.1 | 20.6 | 24.1 | 22.5 | 16.9 | 18.6 |

**Suicides by institution, current year vs. 15-year average**: Whereas Figure 1 represents suicides throughout the whole of the CDCR; the frequency of suicides by institution is a less stable variable. The higher frequency of suicide at some facilities versus others has many explanations. Variables such as the number of patients in the institution's mental health program, the mental health mission of the facility, the predominance of violent offenders at the site, and the total number of inmates at the institution are just some of the factors that contribute variance to *where* suicides occur. Fluctuations can occur in the number of suicides at an

institution in given years due to cluster effects[10], changes in the use or mental health mission of the institution, and other factors.  There are also subsets of suicides that occur during or upon transfer of an inmate from one institution to another, further complicating the interpretation of *why* suicides occur at certain institutions more frequently than others.

Table 15 lists the number of suicides at CDCR Institutions in 2015 along with the total and average number of suicides at each institution over a 15-year period.   The inclusion of 15-years of data allows current year data to be compared to averages over a significant period of time. The range of suicides on average per year for all facilities was 0.0 to 2.1.  The mean for suicide for all institutions from 1999-2014 was 30.2 suicides per year.

| Table 15.  *Frequency of Suicide by CDCR Institution, 2015 and by prior 15-year total and average (1999-2014)* | 2015 Frequency | Prior 15-year total (1999-2014) | Prior 15-year average (1999-2014) |
|---|---|---|---|
| Institution | | | |
| California Health Care Facility | 1 | 0 | 0 |
| Tallahatchie County Correctional Facility | 1 | 0 | 0 |
| Department of State Hospitals-Salinas Valley | 0 | 1 | 0.1 |
| California Rehabilitation Center | 0 | 1 | 0.1 |
| Chuckawalla Valley State Prison | 0 | 1 | 0.1 |
| Valley State Prison | 0 | 2 | 0.1 |
| California Correctional Center | 0 | 2 | 0.1 |
| Ironwood State Prison | 0 | 2 | 0.1 |
| Atascadero State Hospital | 0 | 4 | 0.3 |
| Calipatria State Prison | 0 | 5 | 0.3 |
| Sierra Conservation Center | 0 | 5 | 0.3 |
| Centinella State Prison | 0 | 6 | 0.4 |
| California Institution for Women | 2 | 6 | 0.4 |
| Avenal State Prison | 0 | 7 | 0.5 |
| Department of State Hospitals-Vacaville | 0 | 7 | 0.5 |

---

[10] Hawton, Linsell, Adeniji, Sariaslan, & Fazel (2014).  Self-harm in prisons in England and Wales:  An epidemiological study of prevalence, risk factors, clustering, and subsequent suicide. *Lancet,* Vol. 383.

| Institution | 2015 Frequency | Prior 15-year total | Prior 15-year average |
| --- | --- | --- | --- |
| Central California Women's Facility | 0 | 7 | 0.5 |
| California State Prison, Solano | 0 | 10 | 0.7 |
| North Kern State Prison | 0 | 10 | 0.7 |
| Kern Valley State Prison | 0 | 11 | 0.7 |
| Pleasant Valley State Prison | 0 | 13 | 0.9 |
| Wasco State Prison | 0 | 13 | 0.9 |
| Mule Creek State Prison | 0 | 14 | 0.9 |
| California Substance Abuse Treatment Facility | 0 | 15 | 1.0 |
| California Correctional Institution | 1 | 15 | 1.0 |
| California Training Facility | 0 | 16 | 1.1 |
| Pelican Bay State Prison | 0 | 16 | 1.1 |
| High Desert State Prison | 0 | 17 | 1.1 |
| Folsom State Prison | 1 | 18 | 1.2 |
| Deuel Vocational Institute | 3 | 19 | 1.3 |
| California Medical Facility | 1 | 21 | 1.4 |
| California Institution for Men | 1 | 22 | 1.5 |
| California State Prison, Los Angeles County | 0 | 22 | 1.5 |
| California State Prison, Corcoran | 2 | 24 | 1.6 |
| RJ Donovan Correctional Facility | 2 | 24 | 1.6 |
| California Men's Colony | 3 | 27 | 1.8 |
| San Quentin State Prison | 3 | 29 | 1.9 |
| Salinas Valley State Prison | 0 | 30 | 2 |
| California State Prison, Sacramento | 3 | 31 | 2.1 |
| Total | 24 | 453 | 30.2 |

**Suicides in the CDCR by month, current year and 10-year average:** CDCR data covering a 10-year period (2006-2015) shows little or no trend in the frequency of suicides in any given month. As in 2015, suicides tend to occur in the spring and fall months of the year. Suicides in the CDCR have traditionally not been associated with specific holiday periods, though in 2015 there were five suicides on holiday days (21%) spread over five different months. See Figure 2. The prevalence of suicides in March, May, and October has not been explained. CDCR clinicians have noted this trend over several years.

Figure 2: *CDCR Frequency by Month, 2015and 10-Year Average*



**Demographic Factors:** Demographic variables specific to 2015 suicides are presented earlier in this report. These factors are presented here only as a means of comparing information from prior years with 2015 suicide data.

A depiction of suicides by race in 2015 and over the past 10 years is found in Figure 3. Caucasians comprise the largest group, comprising 48% of the suicides over the 10-year period and 54% of the suicides in 2015. Caucasian suicides have consistently fallen within a range of 14 to 20 per year. Hispanics/Latinos make up the second largest group, accounting for 30% of the suicides over the years represented. Hispanic/Latino suicides have a more variable range, from 5 to 15 in any given year. African-Americans account for 13% of the suicides during these years with a range from 2 to 7. The frequency of suicides in other racial groups is relatively small and typically at a range of 0 to 2 per year. The trend lines in Figure 3 suggest that the

relative decline in suicides within the CDCR during 2014 and 2015 are in Caucasians and Hispanics/Latinos, the two groups who historically have the highest numbers of suicides within the CDCR.

Figure 3: *Suicide Frequency by Race, 2005-2015, with trend line*



Age is divided into five adult age brackets in Figure 4: Ages 18-24, 25-34, 35-44, 45-54, and 55 and above. In all but one year, 2012, the largest frequency of suicides in any age group was in individuals aged 25-34. Compared to the prior five years, 2010 to 2014, suicides in 2015 were somewhat lower in inmates aged 35-44 and 45-54, and slightly higher than most past years in ages 55 or older. The 55 and older age group had the second highest total in the past 6 years. In 2015, 25% of the suicides occurred in this age group, an age group that comprises 12% of the population of the CDCR. This number (25%) is similar to 2010, when 22% of suicides were in the 55 and over group, and dissimilar to other years: 9% in 2011, 15% in 2012, 7% in 2013, and 8% in 2014.

Figure 4:  *Number of Suicides by Age Group, 2010-2015*



| | 18-24 | 25-34 | 35-44 | 45-54 | 55+ |
|---|---|---|---|---|---|
| 2010 | 3 | 10 | 8 | 7 | 7 |
| 2011 | 3 | 12 | 10 | 5 | 3 |
| 2012 | 0 | 8 | 12 | 8 | 5 |
| 2013 | 1 | 11 | 8 | 8 | 2 |
| 2014 | 2 | 7 | 7 | 5 | 2 |
| 2015 | 2 | 8 | 4 | 4 | 6 |

**Suicides by housing type:**  Historically and in national and international studies,[11] segregated housing units have been a high-risk setting for suicide, particularly in single cell housing.[12]  In the CDCR, segregated housing includes ASU, SHU, STRH, Long Term Restricted Housing (LTRH), Psychiatric Services Units (PSU), and the Condemned units at San Quentin State Prison and California Correctional Institution for Women.  During 2015, nine of the year's twenty-four suicides occurred in segregated housing settings, representing 37.5% of all suicides.  For reference, approximately 6.5% of inmates were housed in segregated housing at the mid-year point of 2015 (June 30, 2015).   Calculating a rate per 100,000 in segregated housing may be misleading as the overall population is quite small and subject to wide swings in rate based on a single suicide.[13]

Of the nine suicides that occurred in segregated settings in 2015, seven were in ASU, one in a SHU, and one in STRH.  The number and percentage of suicides in segregated housing settings for 2015 and over the prior five year period is found in Table 16.  As can be seen, the frequency of suicides in segregated housing decreased significantly in 2015 compared to prior years (2010-

---

[11] World Health Organization (2007).  *Preventing suicide in jails and prisons.*  WHO Document Production, Geneva, Switzerland.

[12] *Id.*

[13] Based on a segregated housing population of 8,325 inmates on June 30, 2015.

2014).  Whereas 47% of suicides within the CDCR occurred in a segregated housing setting in the ten year period between 2004 and 2014 and 45% of suicides occurred in segregated housing on average in the ten year period from 2010 to 2014, 37,5% of suicides occurred in this setting during 2015.  This may represent changes adopted within the CDCR leading up to and occurring within the reporting year, such as implementation of safety/wellness checks using the Guard One system and initiation of enhanced mental health services for MHSDS participants in segregated settings (e.g., STRH and LTRH units).  Also of note, inmates in single-cell housing accounted for eight of the nine suicides (89%) within segregated housing units in 2015.  This percentage is consistent with prior years.  The percentage of suicides in segregated housing units that occurred in single cell housing in the prior five years was 100% in 2010, 86% in 2011, 91% in 2012, 100% in 2013, and 86% in 2014.

Table 16.  *Frequency of Suicide within Segregated Housing, 2010-2015*

| Year | Frequency | Percent of Annual Suicides |
|------|-----------|----------------------------|
| 2010 | 13 | 37 |
| 2011 | 14 | 42 |
| 2012 | 13 | 41 |
| 2013 | 14 | 47 |
| 2014 | 13 | 57 |
| 2015 | 9 | 37.5 |

**Time in Segregated Housing Prior to Death:**  In 2015, nearly half of the suicides that occurred in segregated housing occurred soon after placement.  Three of the nine suicides occurred in intake cells, indicating stays of less than 72 hours (Cases E, F, and O).  A fourth case had been in ASU for six days and had just arrived for a temporary stay at an institution while in route to another institution (Case R).  The remaining five cases were in segregated housing units for 100 days or more at the time of death (Cases D, G, J, K, and N).

Data on the number of days between ASU placement and deaths by suicide has been tracked since 2009.  Over this seven-year period (2009-2015), suicides tended to occur shortly after placement, particularly in the first 72 hours after placement.  Of course, fewer inmates are present in ASU as lengths of stay increase.   Figure 5 shows the distribution of deaths by suicide following placement.

Figure 5:  *Length of Time in ASU before suicide, 2009-2015*



**Suicides by Method:**  The rate of suicide by hanging, easily the most frequent method for suicides in prison settings, has remained relatively stable over the past number of years.  In 2015, 83% of suicides were by hanging.  The percentage of suicides that were by hanging was 77% in 2010, 88% in 2011, 91% in 2012 and 2013, and 87% in 2014.

**Involvement in Mental Health Services:**  The percentage of suicides that occur in inmates with identified mental health needs is a complex variable.  Suicide is a phenomenon that can occur in individuals who do not have a traditional mental health diagnosis and in inmates with no prior identified mental health needs.  Inmates can avoid mental health services by choice, such as by denying symptoms on screening or by masking symptoms in order to be discharged from the Mental Health Services Delivery System (MHSDS).  It is not uncommon for suicidal individuals to distrust mental health clinicians when contemplating suicide, concerned that clinicians may in some way remove a valued option (death) should life so dictate.[14]  Yet suicides occur in individuals who have been identified as meeting criteria for participation in the MHSDS and who were receiving services in the MHSDS at the time of death.  Table 17 lists the numbers of suicides at each level of MHSDS involvement for 2015 and for the prior five years.

---

[14] Jobes, D. (2016).  <u>Managing Suicidal Risk:  A Collaborative Approach</u> (2nd Edition).  Guilford Press, New York.

Table 17.  *Frequency of Suicide within MHSDS Levels of Care, 2010-2015*

| Year | Non-MHSDS | CCCMS | EOP | MHCB /DSH | % in MHSDS |
|------|-----------|-------|-----|-----------|------------|
| 2010 | 15 | 12 | 8 | 0 | 57 |
| 2011 | 10 | 10 | 13 | 0 | 69 |
| 2012 | 14 | 12 | 5 | 1 | 55 |
| 2013 | 14 | 9 | 6 | 1 | 53 |
| 2014 | 1 | 12 | 9 | 1 | 96 |
| 2015 | 10 | 9 | 5 | 0 | 58 |

**Suicides in Mental Health vs. Non Mental Health Populations:**  Table 18 shows the suicide rate for MHSDS vs. non-MHSDS populations over the past ten years, including 2015.  As can be seen, the rate of suicide in those involved in the MHSDS is significantly higher than for individuals who have not been included in the MHSDS.  This suggests a need to carefully work with existing mental health population members to reduce the risk of suicide.  Targeted, suicide-specific interventions for individuals within the MHSDS remain an area that is potentially fruitful in preventing suicides; this will be discussed further later in this report.

Table 18.  *Frequency of Suicide in mental health versus non-mental health populations, 2006-2015*

| Year | MH Pop | MH Freq | MH Rate | Non-MH Pop | Non-MH Freq | Non-MH Rate | Total Pop | Total Freq | Total Rate |
|------|--------|---------|---------|------------|-------------|-------------|-----------|------------|------------|
| 2006 | 32,127 | 20 | 62.3 | 140,434 | 23 | 16.4 | 172,561 | 43 | 24.9 |
| 2007 | 35,078 | 25 | 71.3 | 138,234 | 9 | 6.5 | 173,312 | 34 | 19.6 |
| 2008 | 36,570 | 18 | 49.2 | 134,403 | 18 | 13.4 | 170,973 | 36 | 21.1 |
| 2009 | 37,262 | 19 | 51.0 | 130,570 | 6 | 4.6 | 167,832 | 25 | 14.9 |
| 2010 | 39,150 | 20 | 51.1 | 126,667 | 15 | 11.8 | 165,817 | 35 | 21.1 |
| 2011 | 39,854 | 23 | 57.7 | 120,217 | 10 | 8.3 | 160,071 | 33 | 20.6 |
| 2012 | 37,632 | 18 | 47.8 | 99,151 | 15 | 15.1 | 136,783 | 33 | 23.4 |
| 2013 | 38,030 | 16 | 42.1 | 95,229 | 14 | 14.7 | 133,259 | 30 | 22.5 |
| 2014 | 38,722 | 21 | 54.2 | 96,978 | 2 | 2.1 | 135,700 | 23 | 16.9 |
| 2015 | 37,670 | 15 | 39.8 | 91,230 | 9 | 9.9 | 128,900 | 24 | 18.6 |
| **Average** | **37,210** | **20** | **52.6** | **117,311** | **12** | **10.3** | **154,521** | **32** | **20.4** |

## D.  Review of Findings

_Section 3:  Comparison of CDCR Suicide Rates with Other State Prisons Systems and Relevant U.S. Rates_

**CDCR Rates vs. Other State and Federal Prison Rates**:  State prison suicide rates have varied little over a number of years.  The rate of suicide in U.S. state prisons ranged from 14 per 100,000 to 17 per 100,000 from 1999 to 2013[15], with a rate of 15 suicides per 100,000 prisoners in U.S. state prisons in 2013.  However, the U.S. prison rate jumped by 30% between 2013 and 2014, rising to 20 per 100,000 inmates.[16]  No explanation for this increase has been offered.  Rates for U.S. prisons for 2015 are not available at this time.

Suicide rates for all federal and state prisons were calculated by the Bureau of Justice Statistics for the years 2001-2014.[17]  A listing of state rates is found in Table 19.  California's rate is listed twice in Table 19.  One listing is for the composite rate for the CDCR from 2001-2014 and the second rate is for the year 2015 only.  California ranks in the middle one-third of states in rank and rate.  In 2015, California's rate of prison suicides ranked as 20th among state prisons.

Table 19.  _Rate and rank of suicides by state, 2001-2014 (14 years)_

| State Name | Rank (Highest to Lowest Rate) (t=tie) | Suicide Rate per 100,000 |
|---|---|---|
| Rhode Island | 50 | 45 |
| Utah | 49 | 44 |
| Montana | 48 | 34 |
| Massachusetts | 47 | 32 |
| New Hampshire | 46 | 31 |
| Alaska | 46t | 31 |
| Hawaii | 44 | 29 |
| Idaho | 43 | 28 |
| South Dakota | 43t | 28 |
| Delaware | 41 | 26 |
| Vermont | 41t | 26 |
| Connecticut | 39 | 24 |
| New Mexico | 38 | 23 |
| Nebraska | 37 | 21 |
| New York | 37t | 21 |
| _All State Prisons, 2015_ | | _20_ |
| Iowa | 35 | 20 |
| _Chart continues on next page_ | | |

---

[15] Noonan, M. _Mortality in Local Jails and State Prisons_, 2000-2013 – Statistical Tables, August 2015, Website, U.S. Department of Justice, Bureau of Justice Statistics.

[16] Noonan, M. Mortality in Local Jails and State Prisons, 2001-2014 Statistical Tables, US DOJ, Bureau of Justice Statistics, December, 2016, NCJ 250150

[17] _Id._

| State Name | Rank (Highest to Lowest Rate) | Suicide Rate per 100,000 |
|---|---|---|
| Maryland | 35t | 20 |
| California (2001-2014) | 35t | 20 |
| Wisconsin | 32 | 19 |
| Oklahoma | 32t | 19 |
| *California (2015)* | | *18.6* |
| Colorado | 30 | 18 |
| Minnesota | 30t | 18 |
| Wyoming | 30t | 18 |
| Arizona | 27 | 17 |
| Nevada | 27t | 17 |
| Arkansas | 27t | 17 |
| *All State Prisons, 2001-2014* | | *16* |
| Indiana | 24 | 16 |
| Illinois | 24t | 16 |
| Texas | 24t | 16 |
| Oregon | 24t | 16 |
| Pennsylvania | 24t | 16 |
| Tennessee | 18 | 15 |
| Kansas | 17 | 14 |
| Ohio | 16 | 13 |
| South Carolina | 16t | 13 |
| New Jersey | 16t | 13 |
| Washington | 16t | 13 |
| Mississippi | 16t | 13 |
| Missouri | 11 | 12 |
| Maine | 10 | 11 |
| *U.S. Federal Prisons (2001-2014)* | | *10* |
| Virginia | 9 | 10 |
| Georgia | 9t | 10 |
| Kentucky | 7 | 9 |
| Louisiana | 7t | 9 |
| West Virginia | 5 | 8 |
| Florida | 5t | 8 |
| North Carolina | 3 | 7 |
| Alabama | 2 | 6 |
| North Dakota | 1 | 5 |

**CDCR Rates vs. Community Rates:** It is notable that the rate of suicide in the community within the United States reached a 30 year high in 2014, reaching an overall national rate of 13.4 per 100,000. The rate of suicide rose 24% overall between 1999 and 2014[18]. The U.S. rate increased again in 2015 to 13.8 per 100,000.[19] For adult males in the U.S., the rate of suicides

[18] http://www.nytimes.com/2016/04/22/health/us-suicide-rate-surges-to-a-30-year-high.html?_r=0
[19] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870

was 21.1 per 100,000 in 2014[20] and 21.5 per 100,000 in 2015[21], topping the rate of suicides in the (mostly male) CDCR in 2014 (17.0 per 100,000) and 2015 (18.6 per 100,000). Figure 6 shows the rate of suicides in adult males in the U.S., in U.S. prisons, and in the CDCR for the years 2010 to 2015. Suicide rates for state prisons are not available after 2014.

Figure 6: *Suicide rates for adult males in the CDCR, State Prisons, and the U.S., 2010-2015*



|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| CDCR Overall | 21.1 | 20.6 | 24.1 | 22.5 | 17 | 18.7 |
| U.S. State Prisons | 16 | 14 | 16 | 15 | 20 | |
| CDCR Males | 21.8 | 21.9 | 23.8 | 22.8 | 16.2 | 17.9 |
| U.S. Males | 19.8 | 20 | 20.4 | 20.3 | 20.7 | 21.5 |

CDCR Overall ◆   U.S. State Prisons ■   CDCR Males ▲   U.S. Males ✕

## E.  Summary Review of Findings and Trends

In reviewing suicides within the CDCR during the reporting year, 2015, a suicide rate of 18.7 per 100,000 is noted, which represents part of a declining trend over the past 10 years. The rate of CDCR suicides is below the average rate of all U.S. state prison systems combined in 2015[22]. The rate of suicides in the CDCR in 2014 was also lower than the average suicide rate for state prisons in 2014, the last year in which such data is available. Finally, the declining trend in the CDCR stands in contrast with community rates of suicide, which have increased significantly over the past decades. Adult males in the community in the U.S. are more likely to die by suicide than male inmates within the CDCR; this was the case in both 2014 and 2015.

To what reasons can we attribute this declining trend? First, in both 2014 and 2015, fewer inmates aged 25-54 died by suicide than in prior years. Second, the rates of suicide in Caucasian and Hispanic inmates in CDCR have fallen rather significantly in the past 10 years. The

---

[20] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2014/StatesSexTABLE2014.pdf
[21] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870
[22] Based on 2014 U.S. Prison data

majority of suicides in the CDCR have occurred within these two racial groups for many years, making this finding particularly encouraging.  Third, a decline in the frequency of suicides in segregated housing units was noted in 2015; this finding may reflect the decreasing percentage of the inmate population housed in such settings as well as the many efforts implemented to improve safety from suicide in these settings.  Other factors reviewed appear to simply indicate yearly and/or unstable fluctuations in suicides, such as in timing of suicides (e.g. month of suicide, time of discovery), frequency in specific institutions, and the rate of involvement in mental health systems of care.  These factors do not appear explanatory for the downward trend.

In looking at the group of individuals who died by suicide in 2015 within the CDCR, specific risk factors remain clear:  Caucasian race, single/divorced marital status, serious or chronic medical disease or pain, Spring and Fall months, history of violent offenses, housing in higher security settings, Life or long sentences, single-cell housing, lack of job assignment, mental health treatment prior to and during incarceration, prior suicide attempts, and prior psychiatric hospitalization.  Other variables seem to be  possible trends to monitor, such as increased suicides in older inmates (those age 60 or above), fewer suicides within segregated housing units, fewer suicides where clinicians minimized genuine risk by attributing behavior to manipulation or malingering, and more suicides on or around holiday periods.  The reason for suicide for inmates within the CDCR remains rather idiosyncratic and complex, with most suicide reviewers determining multiple precipitants or motivations for suicide.  Suicides most commonly occurred on account of in-prison stresses (safety concerns, receipt of additional charges, transfers, etc.); medical illness, pain or disability; acute psychiatric symptoms; conflicts with others; and important dates (anniversaries of losses or crimes, holidays).

## Chapter II. Response to Suicide and Suicide Attempts

**Institutional reporting of self-harm incidents and suicides:**  All incidents of self-harm in the CDCR are reviewed by institutional staff members (including mental health clinicians) and all incidents of self-harm are entered and tracked on a self-harm database.  These processes allow for tracking patients in High Risk Management Lists or Program(s) within a facility.  A sample High Risk Management Program policy is found in Appendix I.  Suicides are reported by the Chief Medical Officer or designee to stakeholders, including the SMHP and the Office of the Special Master.  Processes involved in institutional reporting of self-harm events and suicides are found in Appendix II.

**Determination of unknown causes of death**: When deaths occur in a CDCR institution in which the cause of death is not immediately determined, the cases are classified as "Unknown Deaths." These cases receive special attention until the cause of death is determined, particularly as any that could possibly involve suicide need to be determined in a timely fashion.  The process for reviewing these deaths and making a determination may be found in Appendix XXXXX.

In 2015, a total of forty-four cases were tracked as the cause of death was listed provisionally as unknown.  Nineteen of the forty-four cases had no provisional cause of death, whereas twenty-five cases had a suspected or "probable" cause of death listed.  In two cases, suspicion of a suicide was present and was confirmed by autopsy, toxicology finding, and/or coroner's report.  These cases, Case M, who died of an overdose on a prescribed medication, and Case V, who died of asphyxiation during an acute intoxication illicit drug, are reviewed later in this report.  Additionally, two cases were determined to be accidental overdoses due to findings of ingested balloons during autopsy; ingesting balloons filled with narcotics is a method for concealing and/or transporting illicit drugs in prison (Cases OO and PP).

Of the remaining four cases, twenty-three were determined by the Death Review Committee (DRC) to have died by natural causes:  Pulmonary embolism, myocardial infarction, coronary artery disease, hypertension, cardiomyopathy, and so forth.  Three of the remaining cases were determined to be deaths by homicide.

The fourteen remaining cases met criteria for additional review, as they involved either overdose (ten cases), the case was pending further information (three cases), or the death potentially related to mental health treatment needs (one case).  In this later death (Case AA), the cause of death was provisionally termed inanition secondary to acute psychosis.  That is, the patient was thought to have died on account of the medical consequences of refusing to eat.  His lack of intake was attributed to acute psychosis.  Though the initial finding of inanition was mentioned, reviewers on the Combined Death Review Summary noted the pathologist's use of the term "well-nourished" and determined the patient had gained roughly twenty pounds in the two years prior to his death.  The patient denied suicidal ideation upon evaluation six days before his death

and there was no indication that he purposefully engaged in any behavior with the intention of dying or hastening his death. The category of death was changed by the DRC to natural, unexpected.

The three cases pending further information were determined by the DRC to be deaths of various causes. The cause of one death was due to "excitement delirium." In this case (Case BB), the inmate struggled with officers who were trying to apply restraints; this exertion led to neuronal excitotoxic injury per autopsy. The second case (Case CC) was determined to have ingested both morphine and Citalopram, though both medications were prescribed. The inmate had multiple additional medical problems, including cardiovascular disease, and the death was determined to be accidental. The inmate's cellmate at the time reported normal mood, participation in routines, and so forth the evening of the death, with no history of suicide attempts or statements of wishes to die. The third case (Case DD) was unknown for a period of time due to the complexity of medical symptoms present prior to the death, including reports of blackouts, other neurological symptoms, and cardiovascular issues. The final cause of death was determined to be natural and secondary to cardiovascular disease.

The ten remaining cases (Cases EE to NN) were reviewed using the guidelines noted above as the cause of death in each was overdose. Upon review of these cases, the best explanation for each was unintentional, accidental overdose. In each case, the Combined Death Review Summary determined that the cause of death was an accidental overdose. None of the cases involved ingestion of medications that do not have abuse potential (e.g., Tylenol). Rather, all nine deaths involved intoxication/ingestion with an illicit drug or drug(s) of abuse. Specifically, three cases died due to methamphetamine intoxication (Cases EE, FF, and GG), two to Fentanyl intoxication (a powerful synthetic Opioid; Case HH and II), one case to a combination of heroin and methamphetamine intoxication (Case JJ), one to heroin intoxication (Case KK), one to morphine intoxication (Case LL), one to methadone and morphine intoxication (Case MM), and one to intoxication with an unknown or unspecified opiate (Case NN). Of these ten cases, none left a suicide note and none made recent statements suggesting suicidal ideation or desire. Appendix II contains additional information on the SMHP's review of overdose cases.

**Suicide Attempts and Suicides Prevented:** In 2015, there were a total of 502 incidents of self-harm with intent to die that did not result in death. That is, 502 suicide attempts were in some way prevented, interrupted, aborted, averted, or otherwise were not fatal during the year.

Of the 502 attempts, 285 involved incidents of self-harm with intent to die that resulted in either no injury or mild injury. An additional 217 incidents of self-harm involving moderate-to-severe injury and intent to die (suicide attempts) were reported to the CDCR's self-harm database. These 217 incidents include some combination of: The inmate used non-lethal means and intended to die but was discovered, the inmate reported having recently engaged in self-harm with the intent to die but was not discovered and did not perish, or CDCR staff members interrupted a suicide attempt in progress by an inmate that may otherwise have been lethal.

**Determination and tracking of Quality Improvement Plans**: Each Suicide Case Review report may include formal Quality Improvement Plans (QIPs) as applicable to the case. QIPs are developed based on the concerns raised by custody, nursing/medical, and/or mental health case reviewers. In 2015, a total of 115 QIPs were generated from Suicide Case Reviews, resulting in an average of 4.8 QIPs per suicide. Nursing QIPs are referred to the DRC. Custody and mental health QIPs are typically addressed to the institution where the deceased person resided but may also be written for prior institutions and/or for the DHCS SPR FIT. Table 20 provides a listing of responsible persons or teams for the QIPs assigned in 2015.

Table 20. *QIPs assigned within the CDCR by recipient, 2015 Suicides*

| Quality Improvement Plan | Frequency | Percent of Total |
|---|---|---|
| Chief of Mental Health/Chief Executive Officer | 53 | 46 |
| Warden/Custody | 32 | 28 |
| Death Review Committee/Nursing/Medical | 17 | 15 |
| DHCS SPR FIT | 11 | 10 |
| Design Standards Branch | 1 | <1 |
| Contract Bed Facility | 1 | <1 |
| Total | 115 | 100 |

As can be seen in Table 20, the Suicide Case Review process generates quality improvement plans that are multidisciplinary. The responses to an inmate's suicide are therefore addressed with a broad lens, looking at many ways of addressing what went wrong (if applicable; one case of the 24 had no listed QIPs). Notably, nearly half of the formal QIPs generated in 2015 were focused on mental health concerns, with the Chief of Mental Health and/or Chief Executive Officer of a CDCR facility tasked to address the concern(s). Mental health concerns ranged from evaluations not completed within timeframes established by policy to poor quality of suicide risk evaluation to inadequate treatment and safety planning. The specific reasons for individual QIPs are presented in the individual case review section (Chapter 3).

**Audits of SCR Quality:** The DHCS Quality Management Unit audits all Suicide Case Reviews (SCRs) for fifteen items. SCRs are scored with required elements marked present or absent. In 2015, SCRs generally met audit criteria at a high rate, reported in Table 21.

Table 21: *Results of Quality Audits, 2015 Suicide Case Review reports*

| Audit Item | Present | Absent | % Present |
|---|---|---|---|
| 1. Does the Executive Summary describe the means of death, the emergency response taken, and the MH LOC of the patient? | 23 | 1 | 96 |
| 2. Are the sources for the SCR identified? | 24 | 0 | 100 |
| 3. Are substance abuse issues reported, if applicable? | 24 | 0 | 100 |
| 4. Does the Institutional Functioning section include information | 24 | 0 | 100 |

| | | | |
|---|---|---|---|
| on institutional behavior, including disciplinary history? | | | |
| 5. Does the Mental Health History review the adequacy of mental health care and screening? | 24 | 0 | 100 |
| 6. Are medical concerns discussed (e.g., chronic pain, terminal illness) or is the absence of medical conditions noted? | 24 | 0 | 100 |
| 7. Is the quality of the most recent SREs (past year) reviewed, with comment on risk level, safety planning, and risk and protective factors? | 14 | 6 (4 N/A) | 70 |
| 8. Does the Suicide History section review all prior attempts, as applicable? | 24 | 0 | 100 |
| 9. Are significant pre-suicide events discussed (e.g., receipt of bad news or existence of a safety concern)? | 23 | 1 | 96 |
| 10. Was a risk formulation offered specific as to why the person was vulnerable to suicide? | 24 | 0 | 100 |
| 11. Does the review comment on the adequacy of the emergency response? | 18 | 4 (2 N/A) | 82 |
| 12. Are all violations of policy and breaches of standards of care in mental health, medical, and nursing addressed in the reviewer's concerns, if applicable? | 24 | 0 | 100 |
| 13. Were custody policies followed?  If not, were violations noted in the report? | 23 | 0 (1 N/A) | 100 |
| 14. Were all concerns raised by reviewers (custody, nursing, and mental health) represented in Quality Improvement Plan recommendations? | 24 | 0 | 100 |
| 15. Were the Quality Improvement Plan recommendations adequate to address the concerns? (e.g., QIP should not simply say conduct an inquiry and report findings). | 23 | 1 | 96 |
| Total | 339 | 13 | 96 |

As evident in Table 21, on most audit criteria, reviewers were found to meet quality standards with 96% of all audit items marked as present.  A notable exception in quality audits appears to be in reviewing most recent SREs.  In examining this finding, six SCRs did not comment on *all* aspects of the most recent SREs.  For example, the reviewer discussed risk factors but did not provide an analysis of the adequacy of risk formulation. One other item was absent in four cases: Comments on the adequacy of emergency response.  Emergency response timelines were reported by nursing and custody in all SCRs.  In the four cases, reviewers did not specifically state that the emergency response was adequate, though this appears to be the case in each occasion.

**Timeliness of Suicide Case Reviews and Suicide Reports:**  The process of responding to suicides, completing reviews, writing and editing reports, tracking QIP compliance, and so on is involved.  Timelines for each step in suicide response have been developed and are specified in the MHSDS Program Guides, 2009 Revision.  Internal deadlines have also been developed as a way to ensure timelines for each step of the suicide response process is met.  The number of days

specified for each step in suicide response, for both Program Guide and internal deadlines, is found in Appendix III.

In reviewing timeliness of 2015 suicides, the assignment of a suicide reviewer and the visit of the reviewer to the institution were completed on time in all but two cases; both cases were originally "unknown deaths" (Cases M and V) and thus not determined to be suicides until further information was obtained.  Due dates on Cases M and V were recalculated when the cases were determined to be suicides.  Both were then reviewed in a timely manner.

Original suicide reports are generally completed within thirty to forty days after the death.  The established 30-day limit was met in nine cases (of twenty-four reports).  Five reports (including Cases M and V) were completed forty days or more after the death.  All reports were available by the time Suicide Case Reviews were held.  Fifteen of the twenty-four SCRs were completed within timelines.  Of the nine SCRs held late, delays ranged from one day to nine days.

Once suicide reports are reviewed at the SCR, edits are made and a final report is due to be sent to institutions within sixty days of the death.  Timeline compliance becomes increasingly difficult at this step, with only five of the twenty-four reports finalized and sent to institutions by the sixty day mark.  Delays at this step can affect the ability of institutions and other recipients of QIPs to complete QIPs by the deadline (150 days after the death).  However, in thirteen cases, QIP response timelines were met.  QIP responses also require review and approval, with a report of QIP implementation due to the OSM by 180 days after the suicide.

As the CDCR endeavors to complete all steps of the suicide review process in a timely manner, a focus on ensuring original reports are completed on time, on decreasing the number of days used for editing suicide reports after the SCR, and on accelerating the review, response, and approval of QIPs is underway.  The DHCS SPR FIT will explore further ways to expedite review processes for implementation during the 2017 calendar year.

## Chapter III. Findings in Individual Case Reviews

**Introduction to Individual Case Reviews:** The presentation of information such as suicide rates and demographic variables in suicide deaths provides a sense of data trends, comparisons between correctional systems, and so forth.  That is, suicide rates and numbers give us a *macro* look at causes and contributors to suicide and to variables that require monitoring.  The data presented in prior chapters has implications for practice within the CDCR, implications that will be reviewed in the Conclusions section to follow.

Individual case reviews, on the other hand, represent a *micro* look at the idiosyncratic, often multi-determined reasons that an individual takes his or her own life.  The sources of distress noted in the cases below range from a response to gang threats to an inmate's family to the vagaries of severe medical and mental illness to grief over the loss of lovers and loved ones.  No two cases look quite alike.

What cannot be overly idiosyncratic are the actions of staff members of all disciplines. These staff members as a whole are responsible to prevent suicide. Suicide prevention in correctional settings is no small task. CDCR staff of all disciplines must follow policy and procedure, must show diligence and compassion in their work, and must be professional in their day-to-day interactions and responsibilities. Individual case reviews thus speak not only to the idiosyncrasies of the suicidal patient but also to the actions and professionalism of staff leading up to a suicide, in reaction to a suicide in progress, and in response to the death.

**Commonalities in individual case reviews:** Tables 22 and 23 list variables commonly found between suicides. The tables contain either factual data or qualitative determinations about the adequacy of staff response and/or the ability of staff members to meet quality of care expectations. Narrative comments are noted after each table.

Before presenting these tables, it should be noted that inadequacy of risk assessment, treatment planning, custody rounds, and so forth result in QIPs. In Suicide Case Review (SCRs) reports, reviewers *may* comment on what was done well within an institution and *may* state areas where policy was correctly followed. However, these comments are not required as it is assumed staff members will follow policy and will do a professional job in working with inmates. In contrast, reviewers *must* identify any and all departures from policy or from standards of care, creating formal Quality Improvement Plans (QIPs) applicable to each identified issue. Reviewers may also point out clinical or custodial practices that could be improved either at an institutional level or throughout all institutions; these practice suggestions can be addressed through QIP processes as well. It should also be noted here that institutional responses to QIPs are sent to the SMHP and DAI leadership for review. If any QIP response is felt to be inadequate, the SMHP and/or the DAI will contact the institution to request clarification or request additional development or implementation of the QIP. QIPs are not considered finished until approved at the headquarters level.

Table 22 lists qualitative judgments of staff performance in suicide cases. A "no" answer can reflect anything from a singular error in the treatment or care of the patient to a pattern of poor care, whereas a "yes" finding reflects a range of actions and behaviors that were consistently professional and adequate.

Table 22: *Findings of Individual Case Reviews, part 1*

| Inmate | Suicide Risk Adequately Assessed? | Adequate Suicide Risk Management? | Adequate Treatment Plan? | Good Quality Mental Health Contacts? | Adequate Nursing Rounds? | Adequate Custody Checks? | Adequate Emergency Response? | Treatment Refusal? |
|---|---|---|---|---|---|---|---|---|
| A | N | N | N | N | N | Y | Y | N |
| B | Y | Y | Y | Y | N/A | Y | Y | Y |
| C | N | N | N | N | Y | N* | Y | Y |
| D | Y | N/A | N/A | Y | Y | Y | Y | Y |
| E | N | N | N | N | Y | Y | N | Y |
| F | N | N | N/A | Y | Y | Y | N | Y |
| G | Y | Y | Y | N** | Y | N*** | Y | Y |
| H | Y | Y | N/A | N**** | N/A | Y | Y | Y |
| I | N | N | Y | Y | N | N | N | Y |
| J | N | N | N | N | N | N | N | Y |
| K | Y | N/A | N/A | N/A | N/A | N | N | Y |
| L | Y | N/A | N/A | N/A | Y | Y | N | Y |
| M | N | N | N | N | Y | Y | Y | Y |
| N | N | N | N/A | N | Y | N | Y | N |
| O | Y | Y | Y | Y | N/A | Y | Y | Y |
| P | Y | Y | N | N | N/A | Y | N | Y |
| Q | Y | Y | Y | Y | N/A | Y | N | Y |
| R | N | N | N | N | Y | Y | N | N |
| S | Y | Y | Y | Y | N/A | Y | Y | Y |
| T | Y | N/A | N/A | N/A | N | N | Y | Y |
| U | Y | Y | N/A | Y | Y | Y | Y | Y |
| V | N | N | N | N | N/A | Y | N | Y |
| W | Y | Y | Y | Y | Y | Y | Y | Y |
| X | Y | Y | N | Y | Y | Y | Y | Y |

*Based on allowance of window covering.  **Based on frequent refusal of services; HRL was provided.  ***Based on allowance of an obstruction to viewing  ****Based on poor documentation of last visit.

Starting from the far left column, problems with at least one suicide risk evaluation were found in 10 cases (42%).  Problems ranged from issues with reviewing or gaining access to suicide attempt histories (two cases), failing to include information already reported about suicide attempt history (two cases), poor identification or documentation of risk factors (four cases), to failure to complete suicide risk evaluations when they were required by clinical standards or policies (two cases).  Issues with suicide risk evaluations are particularly problematic, as inadequate assessment most likely leads to difficulties with safety planning (e.g., not having information on what triggered past attempts) and risk management (e.g., not managing the actual level of risk as risk had been underestimated).  Therefore, it is not surprising that *all* cases identified as having problems with SREs are also considered to have problems with risk management.

Issues with adequacy of suicide risk management practices were noted in 11 cases (46%).  In at least one situation, risk management efforts were inadequate or failed to address the level of suicide risk indicated.  Additionally, in some cases suicide risk evaluations indicated very low

risk and in some cases policies were followed such that the inmate did not require evaluation; these cases are marked as not applicable (N/A). In cases marked N or No in Table 22, issues were quite varied. These included placement of a patient on suicide precautions in an unsafe cell in one case, a failure to conduct a SRE within timelines in another case, problems with full implementation of high risk management lists or programs in two cases, failure to plan for an inmate's reaction to bad news in one case, and provision of KOP medications in another case where the inmate had mentioned a previous plan to die by overdose.

Another area impacted by the quality of suicide risk evaluation is mental health treatment planning. If risk for suicide is underestimated in a case, it stands to reason that treatment planning will also miss key components of what should be addressed clinically. In six cases, adequate treatment planning was noted. In seven cases, poor treatment planning was found. In the remaining two cases, risk evaluation and treatment planning was hampered by a patient's unwillingness to engage in treatment or evaluation services. In such cases, treatment planning should focus on efforts to engage the patient, attempts to gain historical and collateral information, and so forth.

The quality of mental health contacts was rated as not applicable in three cases where there were few or no evaluations beyond mental health screening. For cases rated Y (nine cases or 43% of applicable cases), the decided majority of clinical contacts were positive and in line with professional expectations. For the twelve cases rated N (57%), at least one clinical contact was below standards, such as incidents where poor documentation was present or where patient treatment refusals were not addressed.

Nursing rounds and/or nursing observations are required for inmates in segregated housing settings, inpatient settings, and while a patient is on suicide watch or precautions either in alternative housing or in MHCB. Cases marked N/A are those in which the inmate or patient was never in such a setting. Problems in nursing rounds were found in five of the remaining sixteen cases (31%), specifically: One case where required psychiatric technician rounds were not documented (in ASU), one case where nursing observations for a patient on 15 minute checks were not staggered, one case where a nursing check required each shift did not ensure that the patient was living/ breathing, one case of delays in starting an order for 15 minute checks, and one case where checks in alternative housing were not documented or staggered. In eleven (69%) of applicable cases nursing rounds were done adequately.

Custody checks occur in all institutions for all inmates. For example, custody conducts institutional counts multiple times in each 24 hour period. In seventeen cases (71%), custody checks were rated as adequate and conducted per policy. Of the remaining seven cases, four involved situations where window coverings or draping of bunks was allowed despite custody policy forbidding the practice. In another case, an inmate kept a blanket over his head, with custody checks not ensuring living/breathing. In the remaining two cases, rounds were completed later than specified by policy around the time of the death.

Emergency response by custody officers, nursing staff, and medical staff are considered in ratings of emergency response.  In fourteen cases (58%), no issues with emergency response were noted.  In four cases, issues with bringing complete cut-down kits were found.  In three cases, issues with timely AED placement or AED functioning were reported, and in two cases delays in emergency response occurred.  Other issues were rather idiosyncratic; such as the incident of an ambulance going to the wrong institution and a case where CPR was discontinued during transport to the TTA.

Issues related to patient refusal of evaluation were cited in three cases (12.5%).  In these cases, patients with safety or privacy concerns declined to be brought out to confidential settings for clinical contacts while also likely withholding information when contacted at cell-front was noted.  In these cases, reviewers recommended QIPs to address patient refusal and to promote treatment planning when a patient declines to come out of cell for confidential contacts.  The problem of patients not wanting to be seen talking to mental health, yet needing these services, is a difficult issue to combat.

Table 23 lists additional common findings of case by case reviews.

Rigor mortis is a condition of the body postmortem that indicates a person has been deceased for at least four hours.[23]  In 2015, only one case was found to be in rigor mortis at discovery. This case occurred in a CTC.   By comparison, four cases were found in rigor mortis in 2014.  This may suggest improvements in the quality of safety/welfare checks, the implementation and use of Guard One throughout institutions in the CDCR, or simple chance variance.

The method used for each suicide is listed for the reader's reference.  As in prior years and in other prison systems, hanging is easily the most common method of suicide in incarcerated populations, accounting for the means for 83% of the suicides in the CDCR in 2015.

Table 23:  *Findings of Individual Case Reviews, part 2*

| Inmate | Patient Found in Rigor Mortis? | Method Used | Prior Suicide History/ # of Prior Attempts | Higher Level of Care Indicated? | Housing/ Cellmate Present? | MHSDS Status at Time of Death & LOC? |
|---|---|---|---|---|---|---|
| A | N | Jump | Y/1 | Y | SNY/N | CCCMS |
| B | N | Hanging | Y/1 | N | GP/N (out to work) | N |
| C | N | Hanging | Y/6 | Y | GP/N | CCCMS |
| D | N | Hanging | N/0 | N | ASU/N | N |
| E | N | Hanging | Y/3-7 | Y* | ASU/N | EOP |
| F | N | Overdose | Y/1 | N | ASU/N | N |
| G | N | Hanging | Y/2 | Y** | ASU/N | EOP |
| H | N | Hanging | Y/2 | N | GP/N | N |
| I | N | Hanging | Y/1 | N | GP/N | CCCMS |

[23] https://en.wikipedia.org/wiki/Rigor_mortis

| J | N | Hanging | Y/1 | Y | STRH/N | CCCMS |
|---|---|---|---|---|---|---|
| K | N | Hanging | N/0 | N | SHU/N | N |
| L | N | Hanging | N/0 | N | GP/N | N |
| M | N | Overdose | Y/5 | Y | GP/N | EOP |
| N | N | Asphyxiation | N/0 | Y*** | ASU/N | N |
| O | N | Hanging | Y/3 | N | ASU/N | CCCMS |
| P | N | Hanging | N | Y**** | GP/N | N |
| Q | N | Hanging/ Cutting | Y/3 | N | GP/N | CCCMS |
| R | N | Hanging | Y/1-3***** | Y | ASU/N | CCCMS |
| S | N | Hanging | Y/1 | N | GP/N | CCCMS |
| T | Y | Asphyxiation | N/0 | N | CTC(GP)/N | N |
| U | N | Hanging | Y/2 | N | GP/Y | N |
| V | N | Asphyxiation/ Overdose | Y/3 | N | CTC/N | CCCMS |
| W | N | Asphyxiation | N/0 | N | GP/N (out to work) | EOP |
| X | N | Hanging | N/0 | N | GP/N | EOP |

*Recommended during Regional Team visit, December, 2014 **Due to worsening psychosis ***Inclusion in the MHSDS seemed warranted ****Per policy should not have been discharged from CCCMS *****Incidents on 1/7/14, 4/22/14, and 10/7/15 were without clear intent

There is a robust literature on the heightened chronic risk of suicide for individuals with prior attempts. This risk is especially robust when a person has a history of two or more suicide attempts.[24] It is thus not surprising that sixteen of the twenty-four cases (67%) who died by suicide in 2015 also had a history of prior attempts, with ten cases (42%) having a history of multiple attempts. Deaths occurring on a person's first attempt are correlated with the use of a highly lethal method, such as firearms in the community and hanging in the case of prisons. Hanging is a highly accessible means for suicide in prisons. The ability of a person to abort a suicide attempt mid-way through the event is usually impossible in hanging.[25]

Clinicians can use several interventions for risk management purposes, including transfer to inpatient hospitalization, transfer to a more intensive level of care, or placement in a high risk management program. Inpatient psychiatric hospitals, for example, are able to restrict means to hanging by eliminating tie off points. In 2015, reviewers found reason to indicate that more intensive risk management may have been needed in nine cases (37.5%). Of these cases, one was recommended for a higher level of care by a visiting Regional Team, two should have been considered for placement or retention in the MHSDS, one showed signs of psychotic decompensation, two should have been considered for higher levels of care due to frequent refusal of services, two were removed from high management lists or programs, and one had received bad news and had threatened to harm himself if this news was received.

---

[24] E.g., Forman, Berk, Henriques, Brown, & Beck, 2004. History of multiple suicide attempts as a behavioral marker of severe psychopathology, American Journal of Psychiatry, 161, 437-443.
[25] https://www.hsph.harvard.edu/means-matter/means-matter/case-fatality/

Housing status is listed next with findings regarding whether a cellmate was present or not at the time of the suicide. In twenty-three cases (96%), there was either no cellmate present or the deceased had been in a single cell at the time of the suicide. In the one case where a cellmate was present, the deceased hung himself during the overnight hours.

Finally, the level of care for each case at the time of death is listed. The high frequency of suicides within the MHSDS is both to be expected and a cause for continued quality improvement efforts.

## Chapter IV. Review of Suicide Prevention Initiatives in 2015

**Introduction:** The development and implementation of Quality Improvement Plans following deaths by suicide is but one of many pieces of a comprehensive suicide prevention strategy. These plans occur too late for the deceased, but correct problems and offer training and prevention plans that may contribute to decreasing the risk of suicide in an institution and in a system in the future.

There are many additional aspects of a comprehensive suicide prevention strategy.[26] Such a strategy includes ensuring a solid screening process occurs at various points of incarceration, establishing a referral process, written procedures and policies for suicide prevention are maintained and updated as needed, and there are effective methods for evaluating proof of practice of existing and/or on-going suicide prevention programs and initiatives. In addition, comprehensive suicide prevention programs must have a commitment to staff training, with the provision of on-going training on suicide risk detection and referral to all correctional employees. In addition, the complexities and specifics of suicide risk evaluation, risk management, and intervention training must be provided to mental health staff. Comprehensive programs also assure easily available mental health services for inmates who request and/or are referred for these services, along with a variety of care options and levels. Suicide prevention materials must be readily provided for inmates and for those who interact with inmates (e.g., family members, work supervisors). Communication between disciplines and shifts must be prioritized, particularly regarding high risk inmates.[27]

The CDCR has worked diligently to ensure that a comprehensive suicide prevention program is in place. This effort has been shared with and reviewed by the Office of the Special Master and the OSM's experts for many years. It is beyond the scope of this report to review all suicide prevention program efforts over these many years. Rather, the information provided in this section reviews advancements in the CDCR suicide prevention program during the 2015 calendar year and shortly thereafter.

---

[26] Hayes, L.M. (2013). Suicide Prevention in Correctional Settings: Reflections and Next Steps. International Journal of Law and Psychiatry, 36, 188-194.
[27] Preventing Suicide in Jails and Prisons, World Health Organization, 2007

**Suicide prevention efforts developed, initiated, and/or implemented during the reporting year**: Numerous initiatives were either under development at the close of 2015 or had been implemented during the year. Each initiative is described below with notation of the status of the project on December 31, 2015 as well as the current status of each effort.

- New Five-Day Follow-Up Form: Patients are known to be at elevated risk for suicide upon release from inpatient settings per studies conducted in the community.[28] The Five-Day Follow-Up Form (CDCR MH-7230-B) used by the CDCR is intended to ensure clinical contacts with patients returning from inpatient settings in cases where the reason for admission was danger to self. Whereas the old form had been contained on one page for all five days, leaving little room for documentation, the new form developed has two pages with sufficient room for recording the patient's comments and the clinician's assessment of the patient. The new form also contains several structured, suicide-specific questions so as to ensure clinicians and psychiatric technicians are asking about suicidal thoughts, desire, and intention. The new form also requires mental health clinicians to complete a safety/treatment plan with the patient. The new form was routed and approved by all required committees by the end of 2015. Involved unions were noticed. The form was readied for distribution and materials for Training for Trainers were prepared and delivered by webinar in January, February, and May, 2016. Training for Trainers materials were co-taught by mental health and nursing staff. The form was released for use on June 10, 2016.

- ASU Post-Placement Screening Questionnaire: All inmates are screened prior to placement in segregated housing units for mental health symptoms. Once placed in segregated housing, all inmates are contacted daily by psychiatric technicians. In addition, identified mental health patients are seen on a regular basis by mental health clinicians. As inmates may experience distress upon placement, the ASU Post-Placement Screening Questionnaire is a brief measure (twelve to thirteen items) that is administered by a psychiatric technician to non-MHSDS inmates and assesses an inmate's level of distress and the presence or absence of suicidal thoughts or behavior. The screening questionnaire has set scoring rules that, once scored, guide the psychiatric technician regarding whether a referral to mental health is indicated, and if so, to what degree of urgency. Inmates who refuse the screen are to be referred to mental health on an urgent basis. The new form (CDCR MH-7790) was also routed and approved by all required committees by the end of 2015. Involved unions were noticed. The form was readied for distribution and trainings (co-taught by mental health and nursing staff) were prepared, again via the Training for Trainers format. The PowerPoint presentation for the form had been reviewed and approved. This form was also released for use on June 10, 2016.

---

[28] Qin, P., & Nordentoft, M. (2005). Suicide Risk In Relation to Psychiatric Hospitalization, Archives of General Psychiatry, 62, 427

- <u>Provision of Beds for Alternative Housing Cells</u>: Several tours and audits of suicide prevention practices at various institutions had noted the lack of a physical bed in certain alternative housing cells. These cells are used with patients who are awaiting transfer to a MHCB and patients in these cells are typically on Suicide Watch (direct, one-on-one observation). Without available beds, patients were placed temporarily in cells with mattress placed directly on the floor. As this could be experienced as punishment, the CDCR agreed to ensure beds were placed in all alternative housing cells. A bed (Norix Stack-a-Bunk) was selected and was purchased for this purpose. Beds were delivered to all institutions in need of them by the end of 2015. A Mental Health Services policy was drafted for patients pending MHCB transfer that includes provision of a Stack-a-Bunk in alternative housing. This policy remains under review currently.

- <u>Updated Initial SRE Mentoring Training for Trainers</u>: The SRE Mentoring training slides and webinar were updated to place more emphasis on mentoring safety/treatment planning, to develop more of an understanding of the interplay of chronic and acute risk factors in cases, to further explore the role of the mentor in assessing and expanding clinician competencies around suicide risk evaluation, and to further teach the Quality of Care Tool for SRE Mentors. The revised training was offered on several occasions in 2015 and 2016 and was well received. Additional revisions were made to the presentation in November, 2016.

- <u>Development of a SRE Mentoring 'Booster' Training</u>: The requirement for an annual 'booster' training was discussed and a presentation developed for current mentors. The 'booster' training was re-cast as an advanced course in suicide risk evaluation mentoring, with a focus on risk assessment competencies, methods for competency assessment, and ways to enhance SRE skills in clinicians at all levels of proficiency. The training was undergoing revisions at the end of 2015 with a plan to implement training in 2016. This training indeed occurred in 2016, with the mentoring booster training attended live by 50 current mentors in November, 2016 and with numerous others taking the course by webinar in December, 2016.

<u>Memorandum Clarifying SRE Mentoring Requirements</u>: A memorandum was drafted in 2015 outlining and revising the requirements for SRE Mentoring. Clinicians working in Mental Health Crisis Bed settings were required to complete mentoring annually, whereas other clinicians were maintained on an every two year schedule. Clinicians were also notified of two SRE audits; one to be conducted by institutional program supervisors and the other by headquarters staff. Each mental health clinician will have an audit of a completed SRE at least once every six months. Processes for corrective action when audit criteria are not met were described as well. Finally, the expectation that SRE

Mentors would receive annual 'booster' training was written. This memorandum was released on March 15, 2016. Institutional program supervisors began auditing SREs using the Chart Audit Tool, reporting results through the Quality Management Portal. Headquarters audits have been modified to solely focus on inter-rater reliability checks on institutional audits.

- <u>Memorandum Clarifying SRE Training</u>: SRE Training is a 7-hour CME-approved course that is provided to all CDCR mental health clinicians within 180 days of hire and every two years thereafter. The SMHP updates the 7-hour SRE class annually. The updated class is provided to a large group of institutional clinicians who then teach the class at their home institutions. This process of annual updates in Training for Trainers also ensures trainers are adherent to the content and focus of the course. A memo clarifying SRE Training requirements was drafted in 2015, noting that the requirement extends to clinicians hired through a registry and to telepsychiatrists. Training for Trainers occurred in October, 2014 for the 2015 training year and in October, 2015 for the 2016 training year. This memorandum was pending release at the end of 2015 and was released on March 24, 2016.

- <u>Memorandum Clarifying SPR FIT Coordinator Duties</u>: A memorandum was released on August 14, 2015 instructing all institutions to designate one Senior Psychologist, Specialist to the role of institutional SPR FIT Coordinator, tasked with leading suicide prevention efforts at each facility. The role also includes coordination of mental health assessments/evaluations and mental health training/orientation. A duty statement for the position was attached to the memorandum. The memorandum and clarification of duties was designed to ensure all institutions had dedicated resources within mental health programs to coordinate suicide prevention efforts. This memorandum was released on August 14, 2015 and implemented; the memorandum is found in Appendix IV.

- <u>Memorandum Regarding SRE Tracking</u>: A memorandum was released on October 23, 2015 mandating that all institutions use appointment schedulers to simultaneously enter SREs completed by clinicians into the patient record and into the Mental Health Tracking System (MHTS). Clinicians were required to enter scheduled and unscheduled SRE appointments on daily work logs. This process is automated in EHRS institutions, but must be entered in this manner in institutions using the eUHR. The memorandum ensures proper tracking of suicide risk evaluations and timely scheduling and completion of follow-up risk evaluations. This memorandum is found in Appendix V.

- <u>Updated Cadet Training</u>: An update to training provided at the cadet training academy on the Mental Health Services Delivery System (MHSDS) and on Suicide Prevention was drafted and reviewed in 2015. Training for trainers on the updated version was provided

on November 30, 2015.  Lindsay Hayes attended the updated training as it was being given to a cadet class, providing feedback on the training in December, 2015.  The training and accompanying lesson plans were undergoing revisions in light of Mr. Hayes' feedback at the end of 2015.  These revisions were approved and distributed on May 11, 2016.

- Workgroup on Keep-on-Person (KOP) Medications:  In response to a headquarters QIP (from Case F in 2015), a workgroup was assembled to discuss how prescribed medications should be distributed in high-risk settings, such as in ASU Intake Cells.  The workgroup met several times, considering input from pharmacy, custody, nursing, medical, and mental health representatives.  Suggestions for limiting KOP medications in certain settings, relying on the Complete Care Model to communicate when medications should be administered as Direct Observation Therapy (DOT), and other potential solutions were discussed.  Workgroup meetings focused on integrating clinical practices with KOP medications with new policy on the use of Over-The-Counter (OTC) medications. In addition, concerns about KOP medications will be an issue to be discussed at morning huddles.

- Training in Safety Planning:  In response to reviews by regional staff, headquarters staff, and Mr. Hayes, training entitled "Safety/Treatment Planning for Suicide Risk Assessment" was created in 2014 by Dr. Robert Canning.  The class was updated in 2015 with a slightly revised title, "Safety/Treatment Planning within Suicide Risk Assessment and Management."  The class included new content focusing on the on-going role of safety planning in managing suicide risk within the inmate population.  Continuing medical education (CME) units are available to clinicians who take this course; attendance is mandatory for all clinical staff.  The revised class was provided on four occasions between August and October, 2015Safety planning training was offered on multiple occasions in 2016, with training then planned every six months in order to accommodate newly-hired clinical staff.  The role of safety/treatment planning was also incorporated into other updated trainings in 2016 (e.g., in suicide prevention videoconferences, the 7-hour SRE course, and in SRE Mentoring classes).

- Training in Complex Diagnostic Cases:  This training, entitled, "Differential Diagnosis in Complex Mental Health Cases" was developed to assist treatment teams in considering cases involving self-harm.  Clinicians and clinical teams can err in underestimating or overestimating risk for suicide,[29] particularly when cases present with complex

---

[29] Horon, McManus, Schmollinger, Barr, & Jimenez (2013).  A study of the use and interpretation of standardized suicide risk assessment measures within a psychiatrically hospitalized correctional population. *Suicide and Life-Threatening Behavior, 43,* 17-38.

diagnostic presentations and when patients engage in negative[30] or positive impression management.[31] The under- or over-reporting of symptoms of distress and the within-patient variances in reporting suicidal ideation or desire for death can cause considerable clinical confusion. For example, a patient who reports self-harm behavior due to "needing to get off the yard" can be seen as manipulative and may represent little else in the case. However, for a more vulnerable patient the pressure exerted by other inmates can be a source of considerable distress and may indeed give rise to a desire to die. An approved version of this training was presented to mental health clinicians on multiple occasions in 2016.

- Training in Culturally-Competent Suicide Risk Assessment: In response to a 2015 QIP (Case B), training was designed to offer primary care physicians and mental health clinicians specific approaches and tools to assess suicide risk in patients of various cultures and belief systems. Training included introductions to the DSM-5's Cultural Formulation Interview,[32] the Cultural Assessment of Risk for Suicide (CARS),[33] and the Cultural and Protective Suicide Scale for Incarcerated Persons (CAPSSIP).[34] Interactive vignette-based practice of suicide risk inquiry in diverse cases was integrated within the training. The course was offered, with CME credits, on four occasions in 2015. Several hundred physicians and mental health clinicians attended the course.

- Training of Board of Prison Hearings (BPH) Commissioners: Two informational talks were developed for the BPH. First, the perception that participation in the MHSDS would cause a BPH denial (and the reaction of clinicians to this perception) was listed as a QIP in Case F. Case F requested to be taken out of the MHSDS prior to an upcoming BPH appearance, a request that was granted by his IDTT. In addition, two cases in 2015 (also Cases F and P) *may* have considered receiving a RVR as removing the possibility of parole. For these reasons, members of the SMHP met with administrators within the BPH on two occasions in 2015 to discuss the best way of going about offering information to commissioners. After these meetings, two trainings were developed. The first occurred in October, 2015, with commissioners briefed on the topic of how mental health clinicians evaluate RVRs and the role depression, psychosis, and other mental

---

[30] Sullivan & King (2010). Detecting faked psychopathology: A comparison of two tests to detect malingering psychopathology using a simulation design. *Psychiatry Research,* 176, 75-81.
[31] Bagby & Marshall (2003). Positive impression management and its influence… A comparison of analog and differential preference group designs. *Psychological Assessment*, 15. 333-339.
[32] Lewis-Fernandez, Aggarwal, Hinton, L, Hinton, D, & Kilmayer (2015). Handbook on the Cultural Formulation Interview. American Psychiatric Association Publishing, Washington, DC.
[33] Chu, Floyd, Diep, & Bongar (2013). A tool for the culturally competent assessment of suicide: The Cultural Assessment for Suicide (CARS) Measures. *Psychological Assessment,* 25, 424-434.
[34] Horon, Williams, & McManus (Manuscript in review). The Culture and Protective Suicide Scale for Incarcerated Persons (CAPSSIP): A measure for evaluating suicide risk and protection within correctional populations. Submitted to *Psychological Services.*

health conditions in influencing behavior temporarily or when untreated. The second training was scheduled with the intention of exploring perceptions about mental illness and future risk of violence. An area of focus for the second training was on encouraging treatment participation and treatment compliance as a way of decreasing violence risk. This second training occurred in January, 2016.

- <u>BPH Commissioner and BPH Evaluator Access to the Urgent Response Mailbox:</u> As a result of discussions between BPH administrators and SMHP representatives, a letter was sent to all BPH commissioners and all evaluators working for the BPH to notify them of the availability of the Urgent Response mailbox. The mailbox allows BPH commissioners or evaluators to alert headquarters mental health staff regarding any concerns for suicide in inmates or patients who are scheduled to go before the BPH or who appear distressed at or after a BPH hearing. For example, a patient who makes concerning statements during a pre-BPH evaluation can be referred to headquarters mental health personnel, who then notify the mental health program at the patient's institution. Similarly, an inmate who appears highly distressed by a parole denial during a BPH hearing can be referred by any of the commissioners present, ensuring a mental health contact occurs on that same day. This project has been implemented. The Urgent Response Mailbox was being used by BPH commissioners and evaluators by the close of 2015.

- <u>Suicide Prevention Pamphlets: Inmate and Family Member</u>: Suicide prevention pamphlets were designed for inmates and for family members during 2015. The pamphlets were specifically intended for suicide prevention purposes. Inmate pamphlets provided information on how to ask for help, noted common myths about suicide, and described feelings that may go along with suicidal thoughts. The varieties of ways inmates can be referred or self-referred for mental health contact are listed. The family and friends pamphlet provides a list of warning signs for suicide, clarifies common myths about suicidal people, and provides a mental health contact number. The pamphlets were distributed in July, 2015, accompanied by a memorandum dated July 30, 2015. The memorandum specified that inmate pamphlets were to be made available in all housing units, with family/friend pamphlets available in visiting areas. The process for ordering additional pamphlets was also detailed. Both pamphlets were distributed during the year in English. Pamphlets in Spanish for both inmates and friends/family members had been prepared and were moving towards printing by the end of 2015. All pamphlets are currently available and can be reordered and redistribution at any time. The memorandum sent to institutions and the pamphlets created and distributed are found in Appendix VI.

- <u>ASU Activity Workbooks:</u>  ASU Workbooks were created in order to provide in-cell activities for inmates and patients in segregated housing units.  The workbooks contain a variety of activities that inmates might use to distract themselves from the stress of the ASU placement, as ASU, particularly early in the placement, is known to be a high risk time/location for suicide. In addition, the workbooks contain suicide prevention messages and referral information scattered throughout the other content. The workbooks also serve as an item that custody officers and psychiatric technicians can use to encourage interaction with inmates and patients.  Version 1 of the workbooks was re-ordered during the calendar year 2015, an indication of the regular use of these workbooks.  The workbooks are available in English and Spanish.  Additionally, a second version of the workbook was in development.  The use of tablet-based activity booklets, using the tablets currently available in the inmate canteen, was also discussed.  Implementation of Version 1 of the workbook had been very successful.  Version 2 of the ASU Activity Workbook was approved by the end of 2015 and workbooks were distributed throughout 2016.

-  Columbia Suicide Severity Rating Scale (C-SSRS) Training and Inclusion in the EHRS:  The C-SSRS is a well-established, empirically established, standardized suicide risk measure[35] that has been incorporated as part of all suicide risk evaluations in the CDCR's Electronic Health Record System (EHRS) beginning in 2015.  The primary author of the measure, Kelly Posner, Ph.D. (from Columbia University, New York), was invited to present on the measure in 2015.  She accepted and presented the C-SSRS to a group of fifty CDCR clinician-trainers from over 30 institutions in October, 2015.  The training was video-recorded and was just under two hours long.  A group of handouts and a brief PowerPoint slideshow was constructed to aide clinicians in becoming familiar with administering the C-SSRS.  The C-SSRS assists mental health clinicians by providing a structured way to inquire about suicidal history, to evaluate the intensity of suicidal ideation, and to assess the potential and actual lethality of suicide attempts.  The recorded video presentation by Dr. Posner, handouts and other materials were distributed in February, 2016.  Clinician trainers received two hours of approved CME credit on the C-SSRS based on the recorded (DVD) presentation.  All institutions that received the EHRS in 2016 held C-SSRS training prior to their respective EHRS start dates.

- <u>Collaborative Assessment and Management of Suicidality (CAMS) training:</u>  The CDCR began discussions with David Jobes, Ph.D., a clinical researcher at the Catholic University of America (Washington, D.C.) during 2015.  Discussions centered on training a group of clinicians within the CDCR on CAMS.  Dr. Jobes agreed to present on

---

[35] Posner, Brown, Stanley, (2011).  The Columbia-Suicide Severity Rating Scale:  Initial validity and internal consistency findings from three multisite studies with adolescents and adults. *American Journal of Psychiatry*, 168, 1266-1277.

the principles of CAMS, a treatment intervention specific to working with suicidal patients, during a statewide suicide prevention videoconference in October, 2015.  CAMS represents a promising intervention for mental health clinicians within the CDCR, as the therapy has wide community use, good empirical backing,[36] good support with other established treatments,[37] and flexibility to be used in a variety of settings.  CAMS may be effective in targeting patients with high chronic risk for suicide, patients on high risk lists or in high risk programs, and patients with recent contemplation of or engagement in self-harm with intent.   By the end of 2015, a purchase order to train an initial group of 50 clinicians in CAMS was in process.  A list of clinicians was identified at all institutions with mental health missions to be the first group to receive and use CAMS.  CAMS note templates were under preparation for inclusion in the EHRS.  Training began in January, 2016 and continued until July, 2016.  CAMS trainings occurred by using on-line training modules and a series of follow-up consultation calls with CAMS experts.  A second round of clinician training is being arranged for 2017.

- Self-Harm Tracking and Predictive Algorithm:  Self-harm incidents at every institution continue to be entered in MHTS. The data is used to identify institutions with high numbers of events and to track trends within and between institutions.  In addition, using a technique called machine learning, the data will be used in developing a predictive algorithm.  Machine learning algorithms can identify variables and variable combinations that may not at the surface appear related to increased short-term risk of self-harm, but can statistically establish these risks.  The model allows for refinement as additional data points are entered.  Work on a machine learning algorithm was begun in 2015, led by David Leidner, Ph.D., a specialist in informatics and data science.  Dr. Leidner piloted an initial algorithm for predicting self-harm.  Initial inquiries were made with several academic institutions regarding partnerships in developing the algorithm.  More recently, a federal grant was application was submitted in consultation with Drs. Ronald Kessler and Matthew Nock at the Harvard Medical School.  The grant project hopes to refine the machine learning algorithm, increasing its predictive power and potentially alerting clinicians to patients with high degrees of likelihood of self-harm in the near future.

- On-Going Training through Monthly Suicide Prevention Videoconferences:  Monthly suicide prevention videoconferences continue to occur.  Institutional SPR FIT teams and mental health clinicians participate in the videoconference by viewing presentations in conference rooms using VTC connections or, when unable to attend in this manner,

---

[36] Jobes, Wong, Conrad, Drozd, & Neal-Walden (2005).  The Collaborative Assessment and Management of Suicidality versus treatment as usual:  A retrospective study with suicidal outpatients.  *Suicide and Life-Threatening Behavior*, 25, 483-497.

[37] Andreasson, et al. (2016).  Effectiveness of Dialectical Behavior Therapy versus Collaborative Assessment and Management of Suicidality for reduction of self-harm in adults with borderline personality disorder and traits.  *Depression and Anxiety*, 33, 520-530.

through phone lines.  In 2015, the suicide prevention videoconference was used to review suicides and trends in suicides within the department, to brief staff on new or revised policies and procedures, to notify staff of suicide prevention trainings and resources (e.g., membership in the American Association of Suicidology), and to provide didactic trainings.  Trainings covered during the year included:

- o  Behavioral markers for suicide, even when suicide is denied
- o  Introductions to evaluating suicide risk in the EHRS
- o  Methods for improving safety plans
- o  The use of suicide intention scales (with vignette practice)
- o  Understanding chronic risk for suicide
- o  Understanding the interplay between chronic and acute risk for suicide and imminent/warning signs for suicide
- o  Staff self-care and monitoring of reactions to suicidal patients
- o  Introduction to CAMS.

The suicide prevention videoconference is a continuing suicide prevention effort. Presentations continued in 2016.

- **Revisions to the SRE and inclusion of additional suicide risk assessments in the EHRS**: As noted above, the inclusion of the C-SSRS as part of every SRE conducted within the CDCR is planned as part of EHRS implementation.  The C-SSRS adds a structured set of questions inquiring about the intensity of suicidal ideation and about the range of suicide attempts and suicidal behaviors in which the patient has engaged over his or her lifetime. In addition, the SRE in the EHRS adds detailed information about past suicide attempts when applicable, noting the timing of the attempt, the means used, the potential and actual lethality/medical consequence, and so forth.  These additions should help clinicians construct more accurate judgments of acute and chronic risk, while ensuring greater accuracy in considering historic vulnerability to suicide.  In addition, the EHRS contains seven suicide risk assessment tools that may be used as needed by clinicians. These additional tools can help with understanding cultural protective and risk factors in cases,[38] evaluate readiness[39] and/or capability for suicide,[40] evaluate motivations for suicide attempts,[41] and so forth.  Each of these tools was provided by researchers to the CDCR.  All of the measures mentioned above had been included in the 'build' of the EHRS, with the C-SSRS prominently featured within the EHRS SRE.  Training in the additional suicide risk assessment tools available in the EHRS occurred via webinar in

---

[38] CAPSSIP; *ibid*
[39] Chronic Readiness Questionnaire; Horon, McManus, & Sanchez-Barker (2013)
[40] Acquired Capability for Suicide Scales—Fearlessness About Death; Ribeiro, Witte, Van Orden, Selby, Gordon, Bender, & Joiner (2014)
[41] Reasons for Attempting Suicide Questionnaire; Holden & Delisle (2006)

2016, with additional trainings offered in monthly videoconferences. Live and webinar trainings are planned for 2017.

Progress on each of these initiatives during 2016 will be reviewed in the 2016 Annual Report, along with all new initiatives undertaken in the 2016 calendar year.

## Chapter V. Conclusions

**Introduction:** The numerous efforts undertaken by the California Department of Corrections and Rehabilitation (CDCR) to reduce suicides, aided by the consultation of the OSM, have been productive. Many suicides that may have occurred during 2015 were prevented, on-going efforts are helping to reduce rates, and new initiatives hold promise in further reducing suicides within the CDCR. The rate of suicide in the CDCR in 2014 and 2015 dipped below the average rate of suicides in U.S. prisons in 2014 (the last reporting year available) and the percentage of suicides occurring in segregated housing units declined in both years. Efforts during the reporting year ranged from QIPs at the institutional level to continuing work to train clinicians in suicide risk evaluation and risk management to changes in policy and procedure to innovative projects. Yet, work remains to be done and efforts are on-going.

**Summary of Findings:** In 2015, twenty-four suicides occurred within the CDCR, twenty-two males and two females, at a rate of 18.6 per 100,000 inmates. Caucasian inmates and inmates in the age groups 30-34, 45-54, and over 60 died by suicide at a higher frequency then would be expected given their respective percentages within the CDCR population. Suicides occurred more commonly in unmarried inmates with limited educational and vocational experiences. Health factors were implicated in nearly half of the deaths by suicide in 2015. The frequency of suicide in segregated housing has declined, but remains an area of continued focus. Inmates sentenced to life also had a higher risk of suicide than inmates with determinant sentences. The first year of incarceration was also correlated with higher risk. Only one (4%) suicide occurred in a cell with a cellmate present (the cellmate was sleeping at the time), suggesting a protective impact of dual person or dorm housing. Suicides were more likely in individuals with past attempts (67%), a finding that is both expected and suggestive of potential interventions for (living) suicide attempters/survivors. A broad range of motivations or triggers for suicide were found in 2015, with in-prison stresses repeatedly seen as underlying suicidal motives.

In comparison to the past ten years, the suicide rate in the CDCR in 2015 of 18.7 per 100,000 is the third lowest rate, with 2014 (17.0 per 100,000) and 2009 (14.9 per 100,000) the years with the lowest rates. Two suicides of female inmates occurred in 2014 and 2015, higher than the number of suicides in such settings in all but two of the prior 20 years. The frequency of suicide over a 15-year period is highest in prisons with large mental health programs (1-2 suicides per year) and lowest in settings with either minimal mental health programs or predominantly inpatient missions (0.0 to 0.4 suicides per year on average). In 2015 and in the past 10 years in general, suicides occur most frequently in March, May, and October.

The frequency and rate of suicide within the CDR has declined over the past 10 years. This decline is seen in fewer suicides by Caucasians and Hispanic/Latinos, the two groups with the highest frequency of suicide in the CDCR, and in fewer suicides in individuals ages 25-54. Suicides of inmates age 55 and over are the only group to have trended higher in 2015 compared to the previous five years. Suicides in segregated housing units have also declined in frequency compared to prior years, though the setting continues to have an elevated risk of suicide compared to other housing types. Inmates who qualify and have been placed in the MHSDS likewise continue to have an increased risk for suicide, with MHSDS rates of 52.6 per 100,000 in the past 10 years versus a rate of 10.3 per 100,000 in non-MHSDS inmates over the same period.

As referenced above, the rate of suicide in U.S. Prisons rose to 20.0 per 100,000 inmates in 2014, the last year such statistics are available. This rate is higher than the rate of suicide in the CDCR in 2014 and in 2015. It is notable that the rate of suicides in the CDCR has declined in the past 10-years at a time when both the community rate and U.S. Prison rate has increased. Men incarcerated in the CDCR had a lower rate of suicide then men in the community in 2014 and 2015.

When a non-lethal self-harm incident occurs within the CDCR, institutions are required to report the event using a database of such incidents. When a suicide occurs, a broad and intensive series of reviews is set in motion. These internal and external reviews evaluate the performance of staff members within and across disciplines, evaluate the emergency response, discuss the event in terms of procedural and policy considerations, and determine what corrective action plans must be put in place to ensure qualitative improvements to suicide prevention programs. In 2015, a total of 115 quality improvement plans were initiated and completed, addressing case-specific, institution-specific, and departmental level actions need to enhance suicide prevention efforts. Personnel at the headquarters level review all deaths within the CDCR and carefully evaluate all deaths initially listed as "unknown" or as caused by overdose in conjunction with the Death Review Committee. Suicide case reports are carefully edited and reviewed for quality, with quality audits completed by Quality Management staff. With very few exceptions, Suicide Case Reviews meet all or nearly all audit criteria. Experts working with the OSM participate in SCRs.

Suicides occurring in the CDCR in 2015 were understandably rather idiosyncratic and often multi-determined. Each of the twenty-four suicides in the year was reviewed to illustrate the complexities of the case and how suicidal outcomes can manifest within very different individuals. Case findings are also tabulated to look at key issues in improving suicide prevention. Among these findings are continued difficulties with suicide risk evaluations, suicide risk management, and treatment planning by mental health clinicians, manifested in a variety of ways over the ten to eleven cases where these issues were identified. The need for higher levels of care considerations was also indicated in a number of cases. Issues with custody rounds, such as allowance of in-cell draping, concerns with emergency response, such as failing

to bring full cut-down kits to an emergency, and problems with nursing/psychiatric technician checks were noted in a number of cases as well. Only one inmate was found in a state of rigor mortis in 2015, an improvement over past years.

Numerous suicide prevention initiatives continued, created, or initiated in 2015 were also reviewed. These initiatives strive to ensure a comprehensive suicide prevention strategy remains in place and continues to grow and develop as the population of the CDCR changes. Initiatives arose from many sources: QIPs, suggestions by Mr. Lindsay Hayes, audits of clinician performance, results of mentoring of clinicians trained in suicide risk evaluation and treatment planning, discussions and coordination with others (e.g., BPH commissioners), inspiration from public suicide prevention campaigns, discussions with and consultation with renowned suicidologists, and even advances in informatics and other technologies. The development of the EHRS also set in motion a number of opportunities for innovation in the service of improving patient safety.

**Report implications and future steps:** A group of ten report implications are enumerated below. The order of these implications is based on the order in which each finding was presented in the annual report. Future steps regarding each implication are to be discussed upon during DHCS SPR FIT meetings in 2017.

1. Suicides in older adults: As was noted in Table 2, inmates over the age of 60 make up 6% of the population within the CDCR. However, 21% of suicides within the CDCR in 2015 were within this age group, making this the age group most overrepresented in number of suicides. High rates of suicide are found in the community in elderly males, particularly Caucasian males, during their mid- and late 70s and 80s. For mental health clinicians, the use of measures of connectedness with elderly patients should be discussed. The Interpersonal Needs Questionnaire (INQ)[42] is included as an optional assessment in the EHRS and is a fine choice in such cases.

2. Suicides in inmates with co-morbid medical conditions: Nearly half (46%) of the inmates who died by suicide in 2015 were considered to have serious and/or chronic medical problems. This group of inmates had medical problems ranging from chronic low back pain or headaches to cases of liver disease, cancer, hemiparesis, diabetic neuropathy, cardiac problems, and worsening blindness. Community surveys of suicide in patients with significant medical problems have had varying results, with roughly 10% of suicides seen as attributable to medical disorder or to terminal illness.[43] In comparison, the one year (2015) total of 11 suicides of 24 in the CDCR is rather elevated

---

[42] Cukrowicz, Cheavens, Van Orden, Ragain, & Cook (2013). Perceived burdensomeness and suicide ideation in older adults. *Psychology and Aging*, 26, 331-338.
[43] https://www.theguardian.com/society/2011/aug/23/suicide-chronic-illness-study

and thus a potentially promising area to increase suicide prevention efforts. Several institutions have implemented pain management committees and pain management groups for inmates, and the success of these endeavors is being looked at closely.

3. <u>Suicides in segregated housing units</u>: Despite a significant decline in the frequency of suicide in segregated housing units, the rate of suicide in these units remains high compared to other housing settings within the CDCR. The three deaths occurring in dedicated intake cells is also concerning. Each of these three suicides occurred using different methods (hanging from a sprinkler head, hanging from ventilation grate holes, and overdose on KOP medications). A great deal of effort has already gone into improving safety and suicide prevention procedures in these settings, and it may be too early to fully ascertain the success of those efforts. However, further discussion of the implications of this finding may lead to new innovations.

4. <u>Suicides in Inmates with Life Sentences</u>:  As 54% of suicides in 2015 occurred in patients with life sentences, compared with a roughly 20% proportion of the population overall, 'Lifers' represent a target for intervention. From a prevention standpoint, a number of efforts have been taken to try to combat this finding, including conducting training for BPH commissioners and evaluators, broadening the Urgent Response referral system to commissioners and evaluators, and training clinicians to 'bracket' BPH hearings with mental health contacts. Clinicians were advised during suicide prevention videoconference training to evaluate the degree of a patient's distress present before and after the hearing, to discuss the patient's thoughts on the outcome of the hearing, and to respond proactively to what may be experienced as bad or distressing news. Further education regarding the risk of suicide in inmates with sentences of Life without the Possibility of Parole is planned. Further interventions may also include holding "open lines" on general population lines, where inmates who do not require placement in MHSDS may seek time-limited services.

5. <u>Suicides in Inmates during the First Year of Incarceration</u>:  In 2015, five of the twenty-four suicides occurred within the first year of incarceration, representing 21% of suicides. Three of the suicides occurred in inmates who were in reception centers (Cases I, S, & U). In reviewing the five cases, there is not a great deal of consistent or readily attributable commonalities between the deaths. However, based on 2015 data, additional attention to the variable 'early in sentence' is important to consider. The DHCS SPR FIT may wish to discuss ways to encourage clinicians in reception centers and those working with new arrivals to institutions (who are in their first year of incarceration) to exercise a

more conservative approach to risk management with these individuals, to possibly include enhanced outreach.

6. <u>Prevalence of Suicide in Single Cells and Double Cells without Assigned Cellmates</u>:  The CDCR has recognized the potential protective gain of cellmates for many years, noting the majority of suicides occur in cells with single occupancy.  The same is true for 2015, with 96% of suicides occurring without a cellmate present at the time of the death.  While it is true that inmates can wait for their cellmates to leave the cell for work or programming (this was true in two cases in 2015), there is still a preponderance of suicides in inmates with no assigned cellmate (twenty of the twenty-four in 2015).  Cellmates have interrupted suicide attempts, called for help during attempts, talked others into aborting attempts, and provided social support in many cases.  The DHCS SPR FIT may discuss ways to encourage double cell or dorm placements in institutions, understanding that this is an optimal arrangement for most inmates.

7. <u>Suicide Attempt History</u>:  Ten of the inmates who died by suicide in 2015 had made multiple past suicide attempts, with another six having made one prior attempt.  Thus, two-thirds of those who died by suicide had made at least one prior attempt.  The lifetime risk of death by suicide increases with single attempts and much more so after a second attempt; this is true in psychiatric and non-psychiatric samples.  In psychiatric samples, the finding is particularly true in individuals with schizophrenia and bipolar disorder[44] and in patients shortly after release from hospitalization.[45]  The CDCR has already instituted post-hospitalization follow-up contacts by policy, with procedures such as five-day follow-ups, MHCB discharge custody checks, and so forth.  For other patients with high chronic risk, the use of high risk lists and high risk management programs has been implemented.  The DHCS SPR FIT will be further developing a standardized policy and procedure regarding high risk lists. The DHCS SPR FIT may consider and discuss additional interventions for suicide survivors, such as developing a pilot program to pilot the use of CAMS treatment with identified high risk patients; patients who have recent suicide attempts or a history of multiple prior attempts.  As noted, CAMS is a targeted intervention that is specific to suicide risk.  The treatment includes patient ratings of what most fuels suicidal desire for them and what has historically contributed to a wish to die by suicide, while challenging this wish for death with considerations of making life worth living.

---

[44] Tidemalm, Langstrom, Lichtenstein, & Runeson (2008).  Risk of suicide after suicide attempt according to coexisting psychiatric disorder:  Swedish cohort study with long-term follow-up.  *British Medical Journal*, 337.
[45] Haukka, Suominen, Partonen, & Lonnquist (2008).  Determinants and outcomes of serious attempted suicide:  A nationwide study of Finland, 1996-2003.  *American Journal of Epidemiology*, 167, 1155-1163.

8. <u>Focus on Common Triggers or Motives for Suicide</u>:  Logically, in-prison stresses such as safety or enemy concerns, victimization fears, gang pressures, or new charges can be seen as sufficient to trigger or motivate suicidal contemplation.  These motives were well represented in suicide case reviews conducted in 2015.  However, mental health clinicians can sometimes underestimate the impact of in-prison stresses, noting either the inmate's role in the difficulty or the responsibility of custody staff in managing these issues.  In other occasions, clinicians rely on reported mental health symptoms without assessing current distress.  Additional highlighting of ways to integrate the role of in-prison stresses in inmate suicide within on-going suicide risk evaluation and suicide prevention trainings may be helpful.

9. <u>Prevalence of Suicide in Mental Health Patients</u>:  The difference in rates of suicide over a 10-year period between identified mental health patients (52.6 per 100,000) and non-mental health inmates (10.3 per 100,000) is striking.  While this suggests the CDCR has been doing a good job of screening and identifying inmates in need of mental health services, it also suggests that more can be done to prevent suicide in identified MHSDS participants.  Of course, suicide is associated with a number of mental health disorders, and individuals who self-harm are placed in the MHSDS, suggesting that the rate in mental health populations will always be larger.[46]  However, MHSDS staff members receive increasingly extensive and intensive suicide risk evaluation and suicide risk management training in the service of their patients.  Increasing the focus on and training for suicide-specific interventions and suicide-specific treatment planning may be the most advantageous next step and may be carried forward by the headquarters SPR FIT.  The provision of specialized training in CAMS,[47] DBT,[48] and/or CBT for Suicidality[49] is a worthwhile consideration for discussion.

10. <u>Capitalizing on Innovations</u>:  The introduction of the Mental Health Tracking System (MHTS) in 2014 and the creation of an electronic health record system in 2015 created significant opportunities.  First, in creating MHTS, critical information is entered daily into a data warehouse; this information can be used not only to track incidents of self-harm but also to correlate with other system information.  The EHRS is also able to load information into the data warehouse.  In this way, information is available to generate predictive algorithms for self-harm incidents in the CDCR, another way of identifying high-risk inmates that can alert clinicians to inmates in need of intervention.

---

[46] http://depts.washington.edu/mhreport/facts_suicide.php
[47] Jobes, D. (2016).  <u>Managing Suicidal Risk:  A Collaborative Approach</u> (2nd Edition).  Guilford Press, New York.
[48] Linehan, M. (1993).  <u>Cognitive-Behavioral Treatment of Borderline Personality Disorder</u>.  Guilford Press, New York.
[49] Byran, C., Ed. (2015). <u>Cognitive-Behavioral Therapy for Preventing Suicide Attempts</u>.  Routledge Press, New York.

Additionally, the EHRS provides a way to integrate empirically-supported measures for evaluating suicide risk into clinical practice, lends tools for tracking the impact of safety and treatment planning efforts, and offers ways to evaluate the effectiveness of specific treatment interventions.  These innovations should be embraced as advancements in suicide prevention.

Appendix I:  Sample High Risk Management Program Policy

<u>Appendix II:  Suicide Response Procedures</u>

**Institutional reporting of self-harm incidents:**  All incidents of self-harm in the CDCR are reviewed by institutional staff members, including mental health clinicians.  When an incident of self-harm occurs, regardless of the severity of injury sustained, mental health clinicians discuss the event with the patient and determine whether the intent was to die (thus a suicide attempt) or if the self-harm served some other purpose, such as to relieve tension states, without any intention to die.  The self-harm database also includes data on self-harm incidents that result in death.

All incidents of self-harm are entered on a self-harm database.  The self-harm database serves as a way for mental health clinicians to track incidents within a facility, to allow Regional and SMHP staff members a view of the frequency of self-harm across facilities, to identify patients for High Risk Management Lists or Program(s) within a facility, and to further examine risk factors.  A sample High Risk Management Program policy is found in Appendix I.

When a suicide attempt involving serious bodily injury occurs in the CDCR, the incident is documented using CDCR Form 837, Serious Incident Report, and institution mental health staff members are notified of the incident.  Each incident is also relayed through one of two reporting processes; the Daily Briefing Report (DBR) or the Administrative Officer of the Day (AOD) report.  The information in either report is sent to the administration of the Division of Adult Institutions (DAI) and forwarded to the CDCR's SMHP.   In some cases, a suicide attempt involving serious bodily injury results in death at a later time; the DBR or AOD report are updated in this case to reflect that a death by suicide has occurred.  In such cases, the DBR or AOD report is updated to inform the DAI and the DAI Mental Health Compliance Team of a death by suicide.

**Institutional reporting of suicide:**  In the event of the discovery of a suicide attempt in progress, emergency medical interventions are made until such time as the individual is pronounced deceased by a qualified physician.  Correctional officers who come upon a suicide attempt in progress are to sound an alarm and initiate life saving measures until relieved by health care personnel.  Officers are trained in CPR and in procedures to respond to emergencies, including in bringing cut-down kits to the scene of a suicide in progress.[50]   Custody officers will assist health care staff members, including institutional responders and paramedics, in transporting the patient to the TTA and/or ambulance.  In cases in which emergency interventions are not successful, the watch commander or senior custody officer is notified of the suicide and in turn notifies the Warden or the AOD of the death.[51]   A CDCR Form 837, Serious Incident Report, is completed on all suicides.

---

[50] MHSDS Program Guides, 2009 Revision, pages 12-10-21 to 12-10-23
[51] MHSDS Program Guides, 2009 Revision, pages 12-10-24

The Chief Medical Executive or physician designee makes a report of the death by suicide within eight hours of the event.   Medical information is provided in the CDCR Form 7229A *Initial Inmate Death Report*.  This form, once completed, is distributed internally, to the county coroner's office, and to the Death Review Coordinator at headquarters.  A separate form is completed by institutional mental health staff, form CDCR MH-7229B *Inmate Suicide*.  This form is typically completed by the institutional SPR FIT Coordinator and contains information on prior suicide attempts, the results of recent suicide risk evaluations, etc.[52] The form is retained at the facility and sent to the SMHP.  Once received, SMHP support staff ensures the suicide is entered into a log, reports the event to nursing leadership, and alerts the SMHP Suicide Response Coordinator to the event.

**Reporting of a suicide to stakeholders:** When an inmate dies by suicide, members of the SMHP complete two formal notification processes.  First, a death notification is written and sent to the Office of the Special Master and contains details of the suicide.  Second, a summary of the suicide is composed and sent to the Deputy Director of the SMHP and the Undersecretary of the DHCS.  The Public Information Officer at the institution is assigned with any local notifications or reports regarding the death, including notifying the next of kin of the suicide.

**Determination of unknown causes of death**:  On occasion, a death will occur within a CDCR institution in which the cause of death is not immediately determined.  These cases are classified as "Unknown Deaths." These cases receive special attention until the cause of death is determined.

In order to track these deaths, a group of employees at the SMHP are assigned to review *all* notifications of deaths within the CDCR.  As noted, each institution within the CDCR is required to make a report of death and to provide documentation on the provisional cause of a death in a CDCR 7229A.  A completed CDCR 7229A contains a preliminary summary of the circumstances of the death and lists any underlying/significant medical conditions.  These documents are uploaded to a SharePoint site that can be accessed by members of the Death Review Committee and the SMHP.  Additionally, the Death Review Coordinator for the CCHCS produces a daily report on all CDCR deaths.

In 2015, a total of 330 inmates perished in the CDCR, with 159 of the decedents (48%) involved in the MHSDS at the time of death.  Whenever a *Coleman* class member dies, the OSM is notified of the circumstances and cause of the death by the SMHP.  In all cases in which the cause of death is provisionally listed as a suicide, an additional mental health review is completed by the institution and documented using a CDCR 7229B.  In all such cases and whenever any inmate dies from suicide, the OSM is notified of the circumstances and the specifics of the suicide.  At times, notifications to the OSM may be updated with the receipt of additional information, such as results from autopsies, toxicology screens, and so forth.

---

[52] *Id.*

In the event that a death notification lists the cause of death as unknown or undetermined, the SMHP will track the case until the death is classified.  On some occasions, the cause of death is classified quickly by institutional medical review.  In other cases, the cause of death remains undetermined pending the receipt of autopsy or toxicology results.  In such cases, the Death Review Committee will investigate the death and produce an initial cause of death as well as a final cause of death determination.  In the meantime, the SMHP communicates with the institution and with the DRC on these cases until the cause of death is determined.  A member of the SMHP also sits on the DRC to ensure all unknown deaths are reviewed and, when applicable, that the possibility of suicide has been closely and objectively considered.

The SMHP reviews unknown deaths in order to ensure that all deaths are accurately identified as either due to suicide or not due to suicide.  Cases are identified for this additional review when the cause of death is overdose, to determine if the overdose is most likely accidental or intentional (suicide).  Other cases are identified when the cause of death is potentially related to mental health treatment needs and/or when the death may have resulted as the long-term consequence of a self-harm behavior.

The following guidelines are used to determine unknown deaths:

Reviewers Determination of Unknown Deaths Guidelines

1. Review the method of death to determine if there may have been an alternative reason (other than suicide) for the behavior (e.g., autoerotic asphyxiation, confusion and inability to form intent, purposeful intoxication, etc.)

2. If an overdose on substances is it reasonable the substance (illicit or prescribed) may have been used in an attempt to become intoxicated?  (e.g., Tylenol is not likely to be used to become intoxicated; Klonopin may be).

3. Review recent mental health history and any past history of suicide attempts/self-harm behavior (check self-harm log). Did the inmate:
   - Voice suicidal ideation (including conditional suicidal ideation)?
   - Have admits to MHCB?
   - Engage in self-harm behavior?
   - Have a history of depression or mood disturbance?
   - Have a history of psychosis?

4. Review substance abuse history.
   - What substances were used?
   - Have there been any past overdoses?
     - If yes, what did the inmate say about them at the time?
   - What substance abuse treatment was offered?
   - How recent are reports of current use?

5. Review recent custodial information.
   - Was the inmate facing criminal charges?
   - Did the inmate lose an appeal?
   - Did the inmate have any recent losses?
   - Was there any bad news readily apparent?

6. Review medical information for the presence of:
   - Chronic pain
   - Terminal illness

7. Was there a suicide note or a note that could be construed as such?

**Institutional internal review process**:  The internal process for reviewing suicides at CDCR institutions includes reviews by mental health, custody, and nursing/medical personnel employed at that site.  The reviews are conducted first within disciplines and then within joint institutional reviews, such as during SPR FIT and emergency medical response committee meetings.

Each institution within the CDCR has a Suicide Prevention and Response Focused Improvement Team, or SPR FIT, with a Senior Psychologist-Specialist assigned to coordinate local prevention and response efforts.  The institution's SPR FIT is established and maintained by the Mental Health Program subcommittee, with both committees part of local Quality Management Committees.[53]  Each institutional SPR FIT is responsible for monitoring and tracking all self-harm events, ensuring that appropriate treatment and follow-up interventions occur.  When deaths by suicide occur, the local SPR FIT Coordinator is required to notify the SMHP, to provide assistance to mental health, custody, and nursing suicide reviewers, and to ensure the implementation of Quality Improvement Plans (QIPs) resulting from the suicide review.[54]

**External review processes**:  CDCR's response to suicides includes several external reviews by trained representatives from various disciplines, including nursing, medical, custody, and mental health. Within three days of the suicide, reviewers are assigned from these disciplines at what is commonly referred to as the headquarters level.  The role of each discipline's review is discussed separately below, but these disciplines collaborate with each other during the suicide review process, sharing initial findings, conducting reviews together, etc.

Trained custody and mental health reviewers conduct an on-site visit together within seven days of a suicide.  Reviewers look at the deceased's property, listen to recorded phone calls, check trust account records, and talk with the Investigative Services Unit (ISU) of the specific prison. Reviewers evaluate the emergency response that took place during or after the suicide and review the medical and mental health services rendered in the case, if applicable.  Reviewers will also talk with officers, clinicians, work or school supervisors, and cellmates who may have

---

[53] MHSDS Program Guides, 2009 Revision, pages 12-10-2 to 12-10-4
[54] *Id*

known the patient.  Reviewers may gather information from other sources as well, such as through interviews of family members. After thorough chart review, reports are generated by each discipline, with a combined report, the Suicide Report, distributed and discussed in the Suicide Case Review.

Suicide Case Review (SCR) meetings review findings in the case within and across disciplines while sharing information with institutional leadership.  The Suicide Report contains quality improvement plans (QIPs) that are presented at the SCR; these plans cross disciplines as well. Nursing, medical, and mental health disciplines additionally have peer review bodies that are able to review staff member performance whenever such a need is indicated.  The external review process is completed when all QIPs have been successfully implemented or resolved in the case.

**DAI Mental Health Compliance Team (MHCT) reviews:**  The reviews completed by DAI's MHCT focuses on the performance of custody staff members related to the suicide.  The MHCT member reviews custody documentation and institutional records (i.e., SOMS).  The MHCT member's role is to determine whether departmental suicide prevention practices and policies were followed by custody and counseling staff involved in the case.  The MHCT reviewer, for example, evaluates whether custody officers followed procedure within an emergency response, how quickly the response was called once a suicide in progress has been discovered, and whether all custody staff responding to the suicide had received required training (e.g., in CPR) within set timelines (e.g., annually).  The context of the suicide may necessitate additional review items. Most notably, if the individual was in a segregated or restricted housing unit at the time of the suicide, the MHCT reviewer will evaluate performance on tasks such as timeliness and quality of welfare checks, as specified by policy, whether inmates new to an ASU were placed in intake cells, and so forth.  The MHCT reviewer also determines a timeline for the emergency response and for significant events leading up to the suicide.  Finally, the MHCT reviewer will document any concerns noted and will recommend corrective action/QIPs.

**Nursing reviews:**  At the same time as a suicide is reviewed by DAI's MHCT, a Nurse Consultant Program Reviewer (NCPR) is assigned by a Headquarters Chief Nurse Executive. The NCPR does not make an on-site visit, but reviews all health care record documentation as to the quality of nursing care in the case.  Psychiatric technician practice is also covered within the nursing review.  The NCPR and mental health case reviewer frequently consult on cases during the review period.

The NCPR generates a Nursing Death Review Summary (NDRS).  The NDRS lists the primary cause of death, notes whether coexisting conditions were present prior to the death, summarizes medical history, reports what medications and medical treatment the patient was receiving, and documents significant events that occurred medically for the patient prior to and at the time of discovery.  The NCPR determines if nursing standards of care were met within the emergency

response to the suicide and whether nursing standards of care were met in the overall medical care of the patient prior to the time of death.

**Death Review Committee reviews:** The CCHCS DRC reviews all causes of inmate mortality within the CDCR. When suicides occur, the DRC assigns a physician to serve as the medical reviewer. This physician works with the NCPR to look at all aspects of medical care received by the patient and will yield an opinion as to the cause of death. As needed, the SMHP reviewer may also consult with the CCHCS physician reviewer. The physician and NCPR produce a Combined Death Review Summary (CDRS) on each case. The CDRS contains both an administrative review and a clinical mortality review of the case. In cases of suicide, the suicide case review report (discussed below) is reviewed by the Death Review Unit and addends or is integrated with the Combined Death Review Summary.[55]

**Statewide Mental Health Program (SMHP) reviews:** Simultaneously to custody, medical, and nursing reviews, a trained member of the SMHP is assigned to review each suicide. The assigned Mental Health Suicide Reviewer (MHSR) is typically a Sr. Psychologist, Specialist, who is tasked with completing a Suicide Case Review (SCR). The MHSR schedules an on-site visit with the institution and is accompanied by the custody reviewer. The site-visit is conducted within seven calendar days of the death. The site review consists of an inspection of the location of the suicide and of the means used in the death, a review of the deceased's personal property, and interviews of inmates, officers, medical, or mental health staff members who knew, interacted with, and/or treated the deceased. The deceased's property is inspected to see if there is any information present related to the suicide, such as a suicide note, letters to the inmate informing he/she of bad news, and so forth. Interviews focus on behavior and statements made in the days prior to the suicide, with questions about anything the deceased may have said about being distressed or suicidal in past days, weeks, or months. Photographs of the scene at the time of death and photographs of the autopsy are also made available. Phone records, trust accounts, toxicology reports, and other sources of information are also made available. The MHSR may contact family members of the deceased to gain additional information about the individual's state of mind, statements made prior to the suicide, etc.

In addition to the on-site review, the MHSR reviews extensive documentation from medical and custodial files. The focus of the MHSR's review will vary based on the factors in the case, though all relevant information is reviewed in each case. In some cases, the review will concentrate on mental health treatment while in the CDCR, in others on the quality of suicide risk assessment, in others on the presence or absence of distress when an inmate is placed in administrative segregation, and so on. SMHP psychiatry staff review the psychiatric care and consult with the MHSR. The MHSR will review information from each of the institutions where the deceased resided and will look at whether mental health policy and procedure was followed at each setting.

---

[55] IMSPP Volume 1, Chapter 29.2

**Joint CDCR/DSH Suicide Reviews**:  When a suicide occurs of an individual who resides at a DSH facility, or when a suicide occurs within thirty days of transfer from a DSH hospital, a joint review is conducted.  The DSH's Mortality Interdisciplinary Review Committee (MIRC) reviews suicides that occur within the DSH, with input from the Suicide Case Review Committee (SCRC) at the CDCR.  Joint CDCR MHSRs and MIRC reviewers look at the case collaboratively to evaluate the mental health, medical, custodial, and nursing care rendered in the case.  A joint report is generated in each situation, with corrective action plans developed jointly. [56]  The SCRC reviews QIP responses created through this process conjointly with the MIRC.

**Determination and tracking of Quality Improvement Plans**: Each Suicide Case Review report may include formal Quality Improvement Plans (QIPs) as applicable to the case.  QIPs are developed based on the concerns raised by custody, nursing/medical, and/or mental health case reviewers.  QIPs may represent areas of deviation from policy or procedure, departures from standards of care, or systemic issues that require examination, modification or innovation. QIPs may be written for any discipline and can focus on the specific institution where the suicide occurred.  If systemic issues are identified, the QIP can be directed to the DCHS Suicide Prevention and Focused Response Team (DCHS SPR FIT), a team that can address statewide policies and practices.  The DCHS SPR FIT team includes representatives from nursing, custody, legal, mental health, and mental health quality management.  This representation allows the team to review issues and find solutions in a manner that is inclusive of disciplines and effective in addressing problems.

During Suicide Case Review teleconferences, the Suicide Case Review Committee (SCRC) will assemble and the case reviewer will read sections of the Suicide Report.  The SCRC is made up of members of the CDCR Statewide Mental Health Program, DAI MHCU, Nursing Executives, the Office of Legal Affairs, and medical personnel (as needed).  The SCRC also discusses the QIPs raised within the Suicide Case Review with the institution.  Institutional staff can respond to and/or clarify concerns raised in the report, can raise additional concerns, or can discuss ways of meeting the requirements of QIPs.  Since late 2015, experts from the *Coleman* court are present by phone and can raise additional concerns or issues.  QIPs can also be written as pending concerns that need to be addressed *if* a fact or finding awaits further information, such as awaiting the results of a coroner's report to determine the time of death.

**Audits of SCR Quality:** The DHCS Quality Management Unit audits all SCRs for fifteen items. SCR's are scored with required elements marked present or absent.

---

[56] DSH Administrative Letter AL2015-19, issued November 2015.

Appendix III:  Review of Unknown Deaths and Overdose Deaths

Cases **EE to NN** were deaths initially classified as unknown deaths.  Each of these cases was eventually determined to involve death due to drug overdose.

Case EE was provisionally determined to have had an illicit drug overdose per the CDCR 7229A completed at this death.  Toxicology results indicated methamphetamine intoxication.  Autopsy reports also determined no other cause of death; the death was ruled as an accidental drug overdose secondary to methamphetamine intoxication.  Additionally, three baggies containing methamphetamine were found on EE during autopsy, secreted in various bodily orifices.  The Combined Death Review Summary (CDRS) also determined methamphetamine overdose to be the cause of death.  The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note.  Case EE had an extensive substance abuse history as well.  All evidence in the case argued for an accidental overdose and not an intentional overdose (a suicide).

Case FF was provisionally determined to have had an anoxic brain injury that occurred on account of an illicit drug overdose (per the CDCR 7229A completed at his death).  Toxicology results indicated methamphetamine intoxication.  Autopsy reports determined the cause of death as an accidental drug overdose secondary to methamphetamine intoxication.  Case FF was known to have significant substance abuse problems and had been found by custody officers the day before his death in possession of inmate-manufactured alcohol.  The Combined Death Review Summary (CDRS) also determined methamphetamine overdose to be the cause of death.  The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note.  He had a history of chronic back pain but pain medications were not implicated in his death.  The evidence in this case is strong for an accidental overdose rather than for an intentional overdose (a suicide).

Case GG was listed as an unknown death per the CDCR 7229A.  However, toxicology results were positive for methamphetamine intoxication.  Autopsy reports determined the cause of death to be acute methamphetamine intoxication.  Additionally, multiple bindles were found on Case GG during autopsy.  The Combined Death Review Summary (CDRS) determined methamphetamine toxicity to be the cause of death.  The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note.  Case GG had an extensive substance abuse history as well.  He had a history of knee pain for which he was treated with Tylenol; however, this medication was not implicated in his death.  The evidence in the case argues for an accidental overdose and not an intentional overdose (a suicide).

Case HH was listed as an unknown death/probable overdose on his CDCR 7229A.  However, toxicology results were positive for Fentanyl, a synthetic opioid.  Autopsy reports determined the cause of death to be acute Fentanyl intoxication.  The Combined Death Review Summary (CDRS) determined Fentanyl toxicity to be the cause of death.  Additionally, the inmate's cell was searched, with a syringe and drug paraphernalia found in his property.  No suicide note was found.  Case HH had an extensive substance abuse history as well and had received a RVR on 6/29/15 for Possession of a Controlled Substance for Distribution.  He was placed in ASU for several weeks but had returned to general population housing.   On the other hand, Case HH did have a history of suicide attempts, including an intentional overdose attempt in 1995.  He had also received recent bad news three months prior to his death.  He was informed that his grandmother had died and he responded by swallowing a razor blade at the time.  Case HH had a history of chronic back pain for which he was treated with Tylenol and Naproxen.  These medications were not implicated in his death.  The evidence in the case is complex, though there appears to be stronger evidence for an accidental overdose than for an intentional overdose.

Case II was listed as possible drug overdose on the CDCR 7229A completed at his death.  Toxicology results were positive for Fentanyl intoxication.  Autopsy reports determined the cause of death to be accidental drug overdose/Fentanyl intoxication.  The Combined Death Review Summary (CDRS) also determined Fentanyl toxicity to be the cause of death.  The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note.  He also had no known chronic pain issues.  Case II had an extensive substance abuse history and was found at autopsy with multiple needle marks on his arm, with illicit drugs and syringes found in his cell as well.  The evidence in the case argues strongly for an accidental overdose rather than an intentional overdose.

Case JJ was listed as an unknown death and provisionally as a death due to respiratory failure secondary to drug overdose (on CDCR 7229A).  Case JJ was discovered in his cell with a syringe in his hand.  The syringe was found to contain heroin, acetyl codeine, and papaverine (an opioid).  Methamphetamine was not found in the tested syringe but was present per toxicology results.  Prescribed medications were also found in his system but reported to "not excessive."  The autopsy report determined the cause of death to be accidental drug overdose by the combined effects of acute heroin and methamphetamine intoxication and the prescribed medications.  Multiple drug injection marks were found on the body.  The Combined Death Review Summary (CDRS) also determined the cause of death to be overdose.  The case had a history of suicide attempts, using attempted hanging and exsanguination.  He was treated at the EOP level of care and had prior inpatient stays.  The patient's father had passed away one month before the death.  Mental health notes reported that clinicians were working with the patient on bereavement issues and that Case JJ was denying suicidal thoughts, plans, or intent.  Case JJ also had known chronic back pain and an extensive substance abuse history.  The evidence in the case argues is somewhat equivocal, suggesting that suicidal motive could have been present but

denied by the patient. However, the evidence is stronger for ongoing IV drug use, as noted by the track marks found in many places on the body, and for an accidental overdose, as noted from the contents of the syringe found at the time of discovery.

Case KK was listed as possible drug overdose per his CDCR 7229A. Toxicology results were positive for heroin intoxication. Autopsy reports similarly determined the cause of death to be heroin intoxication. Additionally, a number of hypodermic needles were found in Case KK's cell, suggesting a pattern of illicit drug use. The Combined Death Review Summary (CDRS) determined heroin toxicity to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. Case KK had an extensive substance abuse history. He had a history of back pain. The majority of evidence in the case argues for an accidental overdose rather than an intentional overdose (a suicide).

Case LL was listed as an unknown death per the CDCR 7229A. Case LL was known to have significant medical issues, including hepatic cirrhosis and Hepatitis C, prior to his death. However, toxicology results were positive for morphine intoxication. Autopsy reports determined that morphine intoxication was a tertiary cause of death with cirrhosis being the primary cause of death. The Combined Death Review Summary (CDRS) agreed with this determination; that is, that morphine ingestion was not the primary cause of death. Notably, Case LL did have a history of chronic neck and low back pain and he was treated with opiates. He also had a history of substance abuse problems. Case LL did not have a known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. The evidence in the case is suggestive of a death from medical illness with secondary accidental overdose with morphine. There is little or no evidence of an intentional overdose (a suicide).

Case MM was listed as an unknown death on the CDCR 7229A completed at the time. Toxicology results were elucidating, with both morphine and methadone found. The patient did have chronic back pain and was on multiple prescribed medications for pain. However, upon Death Review Committee study, both medications were found to be elevated, suggesting acute toxicity/intoxication. Additionally, Case MM's cell was found to have syringes, despite the fact that his opioid medications were crushed for administration. The medications were crushed on account of the severity of the inmate's substance abuse difficulties. The autopsy report on the case determined the cause of death was "acute morphine and methadone intoxication (hours)." The autopsy noted left-ventricular cardiac hypertrophy, pulmonary edema, and cirrhosis of the liver as well. Case MM was known to have hypertension, diabetes mellitus, type 2, hepatitis C, and end-stage liver disease. Case MM was in the MHSDS at the CCCMS level of care. He was treated for anxiety and was in treatment groups for pain management. Mental health notes do not document concerns about suicidality and largely focus on pain symptoms. No suicide note was found in the case and there was no known receipt of bad news. The majority of evidence in the case argues for an accidental overdose rather than an intentional overdose (a suicide).

Case NN was provisionally listed as an unknown/possible drug overdose death on CDCR 7229A. His cellmate was initially suspected in his death, but no signs of trauma were found on the body. A cell search produced drug packaging materials. Case NN was known to have significant substance abuse issues. Post-mortem toxicology findings were positive for opiates, with autopsy results indicating acute opiate toxicity as the cause of death. The Combined Death Review Summary (CDRS) concluded that opiate ingestion/toxicity was the cause of death. Case NN was in the MHSDS at the CCCMS level of care. He reportedly was placed in CCCMS after being charged with heroin possession in 2014; he reported some distress upon placement in ASU. He improved while in ASU but was retained in CCCMS. Case NN had no known history of suicide attempts. He did have back pain issues, for which he was treated with Ibuprofen. Case NN had not received recent bad news and did not leave a suicide note. The evidence in the case weighs strongly on the side of an accidental overdose of opiates. There is little or no evidence of an intentional overdose (a suicide).

| *Coleman* Deadlines per Program Guide * | Internal Deadlines |
|---|---|

Appendix IV:  Suicide Response Court-Ordered and Internal Deadlines for Suicide Reports

| | | | |
|---|---|---|---|
| Assign suicide reviewer | Within 2 days | | |
| Reviewer visits institution | Within 7 days | | |
| Suicide report received at HQ | Within 30 days | | |
| | | Report reviewed, edited, QIPs developed and sent to all case review participants with request for feedback from reviewers | 5 days prior to case review<br><br>(no later than DAY 40 after DOD) |
| Suicide Case Review | Within 45 days | | |
| | | Final report edits | Within 1-2 days |
| | | Signed by MH Deputy Director | Within 1-2 days |
| | | Signed by DAI | Within 3-5 days |
| Final suicide report to institution | Within 60 days | | |
| QIPs completed at the Institution | Within 120 days<br><br>(**See internal deadline that requires this sooner from institution) | **_Please note_: this internal deadline is set for institutions to ensure SPR-FIT ability to comply with the Coleman deadline in the event that QIPs are inadequate and require amendment<br><br>QIPs completed and QIP report submitted to HQ | Within 45 days of institution's receipt of final report<br><br>(no later than DAY 105 after DOD) |
| Institution's QIP Report completed and submitted to HQ | Within 150 days<br><br>(**See internal deadline that requires this sooner from institution) | | |
| | | QIPs reviewed by committee | Within 10 days |
| | | QIPs signed by MH Deputy Dir. | Within 1-2 days |
| | | QIPs signed by DAI | Within 3-5 days |
| Implementation of QIP report sent to Special Master | Within 180 days | | |
| | | | |
| **\* deadlines are calculated from date of death (DOD)** | | | |

Appendix V:  Memorandum "Designation of Suicide Prevention, Assessment and Training Coordinator"

Appendix VI:  Memorandum "Completed Contacts Associated with Suicide Risk Evaluation"

Appendix VII:  Memorandum "Suicide Prevention Pamphlets for Inmates and Family/Friends"
(with pamphlets attached)

# EXHIBIT C

# ANNUAL REPORT ON SUICIDES IN THE
# CALIFORNIA DEPARTMENT OF CORRECTIONS AND
# REHABILITATION
# JANUARY 1, 2015 – DECEMBER 31, 2015

Prepared by:
Robert J. Horon, Ph.D.
Senior Psychologist, Specialist
Statewide Mental Health Program
Division of Health Care Services

**Table of Contents**

*List of Tables* ..... 4

*List of Figures* ..... 5

*List of Appendices* ..... 6

Executive Summary of the Annual Suicide Report ..... 7

1. Introduction and Summary of Findings ..... 8
   a. Suicide definitions and terms used ..... 8
   b. Review of Findings, Section 1: Current Year ..... 9
      i. Number and rate of suicide in reporting year ..... 9
      ii. Demographic factors ..... 9
      iii. Marital status ..... 10
      iv. Education, juvenile history, and work history ..... 11
      v. Languages spoken ..... 11
      vi. Health factors ..... 11
      vii. Temporal factors ..... 11
      viii. Custodial and correctional factors ..... 11
      ix. Cell occupancy ..... 16
      x. Job assignment ..... 16
      xi. Means or method of suicide ..... 16
      xii. Mental health factors ..... 17
      xiii. Diagnoses ..... 17
      xiv. Suicide attempt history ..... 18
      xv. Suicide triggers, motivation, and behavior ..... 19
   c. Review of Findings, Section 2: Current Year vs. Prior Years ..... 22
      i. Comparison of rate between current and prior years ..... 22
      ii. Suicides by institution, current year vs. 15-year average ..... 24
      iii. Suicides in the CDCR by month, current year and 10-year average ..... 26
      iv. Demographic factors ..... 27
      v. Suicides by housing type ..... 29
      vi. Time in segregated housing prior to death ..... 30
      vii. Suicides by method ..... 31
      viii. Involvement in mental health services ..... 31
      ix. Suicides in mental health vs. non-mental health populations ..... 32
   d. Review of Findings, Section 3: Comparison of CDCR Suicide Rates with Other State Prison Systems and Relevant U.S. Rates ..... 33
      i. CDCR rates versus other state and federal prison rates ..... 34
      ii. Comparison of rate between CDCR and the community ..... 34

    e.   Summary Review of Findings and Trends    35

2.   Response to suicide and suicide attempts    36
    a.   Institutional reporting of self-harm incidents    37
    b.   Determination of unknown causes of death    37
    c.   Suicide attempts and suicides prevented    38
    d.   Determination and tracking of Quality Improvement Plans    39
    e.   Determination whether a suicide is preventable or foreseeable    39
    f.   Audits of SCR Quality    41
    g.   Timeliness of Suicide Case Reviews and Suicide Reports    42

3.   Findings in individual case reviews    42
    a.   Introduction to individual case reviews    42
    b.   Commonalities in individual case reviews    43

4.   Review of suicide prevention initiatives in 2015    48
    a.   Introduction    48
    b.   Suicide prevention initiatives developed/implemented during the    48
        reporting year

5.   Conclusions    57
    a.   Introduction    57
    b.   Summary of findings    58
    c.   Report implications and future steps

## List of Tables

Table 1. *Racial/Ethnic Groupings of Suicides in the CDCR, 2015*    *10*

Table 2. *Age Groupings of Suicides in the CDCR, 2015*    *10*

Table 3. *Frequency of Suicide by the CDCR Institution, 2015*    *12*

Table 4. *Frequency of Suicide by Housing Type, 2015*    *13*

Table 5. *Type of Commitment Offense in Inmate Suicides, 2015*    *13*

Table 6. *Suicides by Security Level, 2016*    *14*

Table 7. *Suicides in the CDCR by Length of Sentence, 2015*    *14*

Table 8. *Suicides in the CDCR by Amount of Time Served, 2015*    *15*

Table 9. *Suicides in the CDCR by Time Left to Serve, 2015*    *16*

Table 10. *Suicides in the CDCR by MHSDS Participation, 2015*    *17*

Table 11. *Mental Health Diagnoses of Suicides in the CDCR, 2015*    *18*

Table 12: *Suspected Motives/Precipitants to Suicides in CDCR by frequency, 2015*    *19*

Table 13: *Individual Precipitants/Motivations for Suicides within the CDCR, 2015*    *21*

Table 14. *Annual Frequency and Rate of Suicide in the CDCR for 20 years,*    *22*
*by Gender and Overall, 1996-2015*

Table 15. *Frequency of Suicide by CDCR Institution, 2015 and by prior*    *25*
*15-year total and average (1999-2014)*

Table 16. *Frequency of Suicide within Segregated Housing, 2010-2015*    *30*

Table 17. *Frequency of Suicide within MHSDS Levels of Care, 2010-2015*    32

Table 18. *Frequency of Suicide in MH versus non-MH populations, 2006-2015*    *32*

Table 19. *Rate and rank of suicides by state, 2001-2014 (14 years)*    *33*

Table 20. *QIPs assigned within the CDCR by recipient, 2015*    *39*

Table 21: *Results of Quality Audits, 2015 Suicide Case Review reports*    *41*

Table 22: *Findings of Individual Case Reviews, part 1*    *44*

Table 23: *Findings of Case by Case Reviews, part 2*    *47*

## List of Figures

Figure 1: *CDCR Suicide Rate and Frequency, with trend line, 2006-2015*    *24*

Figure 2: *CDCR Frequency by Month, 2015 and 10-Year Average*    *27*

Figure 3: *Suicide Frequency by Race, 2005-2015, with trend line*    *28*

Figure 4: *Number of Suicides by Age Group, 2010-2015*    *29*

Figure 5: *Length of Time in ASU before suicide, 2009-2015*    *31*

Figure 6: *Suicide rates for adult males in the CDCR, State Prisons, & the U.S., 2010-15*    *35*

**List of Appendices**

I.    Sample High Risk Management Program policy                                    64

II.    Self-harm and Incident Reporting                                            72

III.    Determinations of Unknown Causes of Death                                  74

IV.    Review of unknown deaths and overdose deaths                               76

V.    Suicide Response Procedures                                                  80

VI.    Suicide response court-ordered and internal deadlines for suicide reports    84

VII.    Memorandum "Designation of Suicide Prevention, Assessment and              85
        Training Coordinator"

VIII.    Memorandum "Completed Contacts Associated with Suicide Risk Evaluation"    89

IX.    Memorandum "Suicide Prevention Pamphlets for Inmates and Family/Friends"     92
        (with pamphlets attached)

## Executive Summary of the Annual Suicide Report

In 2015 a total of 24 inmate suicides occurred within the California Department of Corrections and Rehabilitation (CDCR). This number is an increase of one from 2014. The frequency of suicides in 2014 and 2015 are the lowest consecutive yearly number of suicides in the CDCR since 2002. The rate of suicide in the CDCR was 18.7 suicides per 100,000 inmates in 2015 and 17.0 per 100,000 in 2014. The suicide rate in U.S. state prisons ranged from 14-17 per 100,000 per year between 2000 and 2013[1] and 20 per 100,000 in 2014.[2] The suicide rate in the CDCR is thus lower than the average rate in U.S. prisons. Additionally, male prisoners in the CDCR had a lower rate of suicide rate than U.S. males in the community in 2014 and 2015.[3]

Suicides in 2015 largely match prior year's patterns with respect to time of year, prevalence in spring and fall months, greater frequency in high custody inmates (75% in Level III and Level IV housing), and a relatively high percentage of suicides in inmates involved in mental health programming (typically 50-60%). Suicides in 2015 were somewhat unlike prior year's patterns in that there were two female suicides and three suicides of inmates aged 70 and older.

Both the frequency and the rate of suicide have declined in the CDCR over the past 10 years (2006-2015), which represents steady progress. The frequency of suicide in the CDCR decreased from 43 in 2006 to and 2015, while the rate of suicide in the CDCR declined from 24.9 per 100,000 in 2006 to 18.7 per 100,000 in 2015. The decline in suicide rate in the CDCR in 2015 compared to the prior 10 years can chiefly be attributed to fewer suicides within segregated housing units, lower rates of suicides in Caucasian and Hispanic/Latino inmates, and fewer suicides in inmates aged age 35-54.

Many suicide prevention initiatives are underway and/or continuing in the CDCR. These initiatives have emerged from Quality Improvement Plans on deaths by suicide, from recommendations generated by tours, reviews, and audits, from advances in the field of Suicidology, from opportunities arising from the Mental Health Tracking System and the Electronic Health Record System, and so forth. These initiatives are meant to enhance a comprehensive, integrated system of suicide prevention and are detailed in the report that follows.

---

[1] Noonan, M, Rohloff, H., & Ginder, S., Mortality in Local Jails and State Prisons, 2000-2013 Statistical Tables, US DOJ, Bureau of Justice Statistics, August, 2015 NCH 248756

[2] Noonan, M. Mortality in Local Jails and State Prisons, 2001-2014 Statistical Tables, US DOJ, Bureau of Justice Statistics, December, 2016, NCJ 250150

[3] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870

## I. Introduction and Review of Findings

This report reviews the 24 suicides by inmates of the CDCR which occurred during 2015. The report is submitted as part of joint efforts by the CDCR and the Office of the Special Master's (OSM) experts to work together to reduce the number of suicides within California's state prisons and is part of the CDCR's compliance with court-ordered remediation specified by the Special Master as part of the continuing review in the matter of *Coleman v. Brown*, No. (CIV S-90-0520 KJM KJN E.D.Cal.). Kerry Hughes, M.D. and Jeffrey Metzner, M.D. provided consultation for this report from the *Coleman* court. Amy Eargle, Ph.D., Robert Canning, Ph.D., Amber Carda, Psy.D., Adinn Phean, AGPA, Harutyun Grigoryan, OT, and Byron Russell, HPS1 provided assistance and review from the Statewide Mental Health Program (SMHP) at the CDCR.

This report is unlike prior reports in that the report is generated by the SMHP with consultation by *Coleman* court experts. Prior reports submitted to the Special Master were written by the *Coleman* court's experts. The purpose of the report remains the same: To report on ongoing efforts to monitor suicides in the CDCR, to identify any trends in suicide that may indicate targets for suicide prevention efforts, and to provide recommendations for continued improvement. Additional detail is provided in this report as to the definitions, response efforts, monitoring, and other improvement processes and programs implemented by or used by the SMHP to prevent suicide. The report is prepared for the Special Master and has implications for the CDCR and for the work of the *Coleman* court's experts.

The primary source of data used for this report is the suicide case reviews completed by members of the SMHP who are trained in conducting these reviews. Additional sources include data obtained from the CDCR Offender Information Services Branch, information garnered from reports by the CDCR Death Review Committee, information from prior annual suicide reports, and publically available information regarding suicide rates in community and incarcerated settings. Each suicide was also independently reviewed by this author in order to assess trends in data or findings. Input made by the OSM's experts, who attend each suicide case review by teleconference and consult on case review, provided added information for this report. Finally, members of the Quality Management unit, a separate unit within the SMHP, provide input through auditing each suicide case review report.

### A.  Suicide definitions and terms used

The CDCR is in the process of adopting definitions related to suicide that were developed by the Centers for Disease Control and the World Health Organization and have been widely-adopted in

community settings. The OSM has been provided with a draft of the proposed changes to these definitions. As these changes are pending, the definitions used in the MHSDS Program Guide, 2009 Revision are listed below. Terms and definitions now considered obsolete are omitted from the listed provided here. Additionally, the term self-injurious is synonymous with self-harm. The term self-harm is used frequently in this report as it conforms to both existing definitions and proposed definitions and is routinely qualified by the phrases "with intent" or "without intent."

1. <u>Suicide</u>: An intentional self-injurious behavior that causes or leads to death.

2. <u>Suicide Attempt</u>: An intentional self-injurious behavior which is apparently designed to deliberately end one's life, and may require medical and/or custody intervention to reduce the likelihood of death or serious injury.

3. <u>Suicidal Ideation</u>: Thoughts of suicide or death, which can be specific or vague, and can include active thoughts of committing[4] [that is, dying by] suicide or the passive desire to be dead.

4. <u>Suicidal Intent</u>: The intention to deliberately end one's own life.

5. <u>Self-injurious Behavior</u>: A behavior that causes, or is likely to cause, physical self-injury. [Note: The terms self-injurious behavior, self-mutilation, and suicide gesture are found in the MHSDS Program Guides, 2009 Revision, but are not used in this report. The term 'self-harm without intent' is used instead as the meaning is the same, self-harm for other reasons than death by suicide, and does not have the potentially negative connotations of terms such as 'gesture.']

**B. <u>Review of findings</u>**

*<u>Section 1: Current Year</u>*

**<u>Number and rate of suicide in reporting year</u>:** There were 24 suicides in the CDCR in 2015. This represents an increase of one over the total in 2014, or an increase of 4%. The suicide rate in the CDCR for 2015 was 18.7 per 100,000. Rates of suicide are standardized by the number per 100,000 in order to make standardized comparisons between samples and populations. The total number of suicides in 2015 corresponds to a suicide on average every 15.2 days.

**<u>Demographic Factors</u>:** In 2015, 22 men and 2 women died by suicide in the CDCR. The rate of suicides in the CDCR was 17.9 per 100,000 for men and 34.7 per 100,000 for women. The rate of suicide for women fluctuates more dramatically than the rate for men, as there are many more males (122,874) than females (5,769) in the CDCR. To illustrate, one fewer female suicide would

---

[4] The term 'committing' has fallen out of favor with Suicidologists, as the term implies some sort of success in carrying out a pledge or obligation. The favored term is rather straightforward—'died by suicide.'

have lowered the female rate in 2015 by one-half, from 34.7 to 17.3 per 100,000. The same decline of one suicide in males would have lowered the rate by 1 in 22, or from a rate of 17.9 to a rate of 17.1 per 100,000. A listing of suicides by gender per year over 10 and 20 year periods is found in Table 14 later in this report.

The racial and ethnic backgrounds of inmates who died by suicide are represented in Table 1. Caucasians represented over half of all suicides despite comprising only 22% of the population within the CDCR. This finding has been typical of the racial breakdowns of suicides within the CDCR for many years.

Table 1. *Racial/Ethnic Groupings of Suicides in the CDCR, 2015*

| Racial Group | Frequency | Percent of Suicides | Percent of race within the CDCR |
|---|---|---|---|
| African-American | 5 | 21% | 29% |
| Caucasian | 13 | 54% | 22% |
| Hispanic/Latino | 4 | 17% | 42% |
| Other* | 2 | 8% | 6% |

*1 Chinese American female, 1 Japanese American male*

Table 2 contains a listing of age groupings within the CDCR, with the number and percentage of suicides for each group compared with the prevalence of the age group within the CDCR. Of note, four age groups had higher rates of suicide than their corresponding representation within the CDCR population during the reporting year (2015): Inmates ages 30-34, 45-54, 60-64, and 65 and older. The overrepresentation of older inmates in the year's suicides may bear further monitoring as a possible emerging trend. The three suicides of older inmates occurred in individuals aged 70-73. The average age of those who died by suicide was 42.9.

Table 2. *Age Groupings of Suicides in the CDCR, 2015*

| Age Group | Frequency | Percentage of 2015 Suicides | Percentage of CDCR Population |
|---|---|---|---|
| 18-24 | 2 | 8 | 12 |
| 25-29 | 3 | 13 | 16 |
| 30-34 | 5 | 21 | 16 |
| 35-39 | 2 | 8 | 14 |
| 40-44 | 2 | 8 | 11 |
| 45-54 | 4 | 17 | 10 |
| 55-59 | 1 | 4 | 6 |
| 60-64 | 2 | 8 | 3 |
| 65 + | 3 | 13 | 3 |

**Marital Status:** Marital relationships are thought to be a protective factor for inmates. This variable is protective for males in community studies and may function in a similar way for inmates

as these relationships may offer support during incarceration. [5] In 2015, two suicides (one male, one female) occurred in married individuals, whereas nine suicides occurred in separated or divorced inmates (including the second female) and 13 suicides occurred in single or never-married inmates.

**Education, Juvenile History, and Work History:** Three suicides occurred in inmates with some college education. The remaining 21 inmates had secondary educations, ranging from the 8th to 12th grade. Fifty-seven percent had a history of juvenile arrest, with 33% having a history of gang involvement. The majority of suicides occurred in inmates with limited employment history, typically in work classified as "unskilled labor." None of the suicides occurred in inmates who were in the Developmental Disability Program (DDP), though two inmates had some history of special education involvement.

**Languages Spoken:** One female inmate who died by suicide spoke Mandarin as her primary language. All others were primarily English-speaking.

**Health Factors**: Nearly half (46%) of the inmates who died by suicide in 2015 were considered to have serious and/or chronic medical problems. This ranged from problems with low back pain or headaches to cases of liver disease, diabetic neuropathy, cardiac problems, and legal blindness. In all cases, medical needs were determined to be adequately addressed according to nursing reviews. Implications of this finding for service delivery are explored later in this report.

**Temporal Factors:** Suicides occurred within the CDCR in nine months in 2015. That is, zero suicides occurred in three months. Four suicides occurred in one month (March) and five suicides occurred in each of two months (May and October). The prevalence of suicides in spring and fall months has been noted in prior years as well (*Figure 2* contains a breakdown of suicides by month over the current year and by a 10-year average).

In 2015, time of day of discovery did not vary significantly, with seven suicides occurring during first watch (2200 hours to 0600 hours), seven during second watch (0600 hours to 1400 hours), and ten during third watch (1400 hours to 2200 hours). This finding is similar to prior years.

**Custodial and Correctional Factors**: In 2015, suicides occurred at 13 institutions including an out-of-state facility. Table 3 lists suicides by institution. Any institutions that are not listed did not have a death by suicide in 2015.

---

[5] Kposowa, A. (2000). Marital status and suicide in the National Longitudinal Mortality Study. *Journal of Epidemiology and Community Health, 54*, 254-261.

Table 3. *Frequency of Suicide by CDCR Institution, 2015*

| Institution | Frequency |
|---|---|
| California State Prison, Sacramento | 3 |
| San Quentin State Prison | 3 |
| Duel Vocational Institute | 3 |
| California Men's Colony | 3 |
| California Institution for Women | 2 |
| California State Prison, Corcoran | 2 |
| RJ Donovan Correctional Facility | 2 |
| California Medical Facility | 1 |
| California Correctional Institution | 1 |
| California Institution for Men | 1 |
| Folsom State Prison | 1 |
| California Health Care Facility | 1 |
| Tallahatchie County Correctional Facility | 1 |
| Total | 24 |

As can be seen, one-half of the suicides in 2015 occurred in four institutions, and 18 (75%) of the suicides occurred within seven institutions.

During 2015, nine of the 24 suicides occurred in segregated housing settings (37%); seven in Administrative Segregation Units (ASU), one in a Security Housing Unit (SHU), and one in Short-Term Restricted Housing (STRH). Two inmates were in Reception Centers, one in a Correctional Treatment Center (CTC), and one in a Sensitive Needs Yard (SNY). The remaining 11 suicides occurred in general population settings. This information is depicted in Table 4.

Table 4. *Frequency of Suicide by Housing Type, 2015*

| Housing Type | Frequency | Percent |
|---|---|---|
| Administrative Segregation | 7 | 29 |
| Security Housing Unit | 1 | 4 |
| Short-Term Restricted Housing | 1 | 4 |
| Reception Center | 2 | 8 |
| Correctional Treatment Center | 1 | 4 |
| Sensitive Needs Yard | 1 | 4 |
| General Population | 11 | 46 |
| Total | 24 | 99 |

A common finding in prison and jail settings is a preponderance of suicides in violent inmates and in inmates with higher level security needs; violent inmates have nearly three times the risk of suicide as non-violent inmates[6]. The commitment offenses of inmates who died by suicide in 2015 are listed below in Table 5. Notably, half of suicides occurred in individuals who had committed murder. Four other inmates had commitments for assault resulting in great bodily injury, one inmate had a commitment for battery, and two had a commitment for armed robbery (and thus the threat of assault was implied). Of the five commitment offenses considered non-violent, two resulted in significant injury but were seen as unintentional (driving under the influence resulting in injury or death). The remaining three suicides occurred in inmates who were committed for vehicle theft, burglary, or drug charges.

---

[6] Mumola, C. (2005), Bureau of Justice Statistics, located at: http://www.bjs.gov/content/pub/pdf/ardus05.pdf

| Table 5. *Commitment Offenses in Inmate Suicides, 2015* | | |
|---|---|---|
| Type of Commitment Offense | N | Percent |
| **Violent Crimes Overall** | **19** | **79** |
| Murder | 12 | 50 |
| Assault w/ Great Bodily Injury | 4 | 17 |
| Armed Robbery | 2 | 8 |
| Battery | 1 | 4 |
| Sex Offense | 0 | 0 |
| | | |
| **Non-Violent Crimes Overall** | **5** | **21** |
| DUI with injury/vehicular manslaughter | 2 | 8 |
| Vehicle theft | 1 | 4 |
| Burglary | 1 | 4 |
| Drug Charges | 1 | 4 |

In regards to security level, suicides occurred predominantly in higher security (Level III and Level IV) settings in 2015. Table 6 lists the number of suicides by security classification level. Level IV suicides have traditionally represented more than half of all suicides within CDCR. Of note, the classification system used by the CDCR was modified prior to 2015, with fewer inmates classified at the highest level, Level IV, which may account for some of the decline in Level IV inmate suicides in 2015.

| Table 6. *Suicides per Security Level, 2015* | | |
|---|---|---|
| Security/Classification Level | N | Percent |
| Level IV | 9 | 37.5 |
| Level III | 9 | 37.5 |
| Level II | 6 | 25 |
| Level I | 0 | 0 |

Another variable unique to correctional settings is the issue of sentence length: Total length of sentence, how much time an inmate has served prior to a suicide, and how much time an inmate had left to serve in prison prior to a suicide. These variables are captured in Tables 7, 8, and 9.

Table 7 shows that a slight majority of suicides (54%) occurred in inmates with Life sentences (including condemned individuals) in 2015. Inmates with Life sentences have historically made up roughly 20% of the population within the CDCR and are overrepresented in individuals who die by suicide. No suicides occurred in inmates with medium length sentences (11 to 20 years) in 2015.

Table 7. *Suicides in the CDCR by Length of Sentence, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| 1-5 years | 7 | 29 |
| 6-10 years | 3 | 13 |
| 11-20 years | 0 | 0 |
| 20+ years | 1 | 4 |
| Life with Possibility of Parole | 11 | 46 |
| Life without Possibility of Parole | 1 | 4 |
| Condemned | 1 | 4 |
| Total | 24 | 100 |

As seen in Table 8, individuals early within their sentence represent a high risk group. Five inmates died by suicide within their first year of incarceration; this included two individuals who died within 30 days of imprisonment. Three inmates who had served 20 years or more were among those who died by suicide in 2015.

Table 8. *Suicides in the CDCR by Amount of Time Served, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| 0-1 year | 5 | 21 |
| 1-5 years | 5 | 21 |
| 6-10 years | 7 | 29 |
| 11-20 years | 4 | 17 |
| 21+ years | 3 | 12 |
| Total | 24 | 100 |

The length of time remaining in sentences for those who died by suicide are shown in Table 9. There was nearly an even split between those with short to moderate sentences left to serve (46%) and those with lengthy sentences or indeterminate/life sentences (54%).

Table 9. *Suicides in the CDCR by Time Left to Serve, 2015*

| Sentence Length | Frequency | Percent |
| --- | --- | --- |
| 0-1 year | 0 | 0 |
| 1-5 years | 10 | 42 |
| 6-10 years | 1 | 4 |
| 11-15 years | 0 | 0 |
| 16 years or more (including Lifers) | 13 | 54 |
| Total | 24 | 100 |

The implications for the findings represented in Tables 7, 8, and 9 are considerable, suggesting the need to. These considerations will be discussed later in this report.

**Cell Occupancy:** In 2015, 25% of suicides occurred in inmates housed in designated double cells and 75% of suicides occurred within designated single cells. Of the six suicides in designated double cells, two suicides occurred in cells without a currently assigned cellmate, two inmates waited for a cellmate to leave for work or other programming before dying by suicide, one occurred outside of the cell (by jumping from a tier), and one occurred with a cellmate present but asleep. Of the nine suicides occurring in segregated housing settings, eight of the suicides occurred in single-person cells. The ninth suicide occurred in a double cell but without an assigned cellmate. Overall, 23 of the 24 suicides occurred within a single cell or within a solely occupied (at the time) double cell.

**Job Assignment:** The majority of inmates (62.5%) who died by suicide in 2015 did not have a job assignment or educational placement. Of the nine inmates who had program assignments, two were placed in educational settings, one (female) in a substance abuse program, and six were in traditional jobs (e.g., as a porter).

**Means or Method of Suicide**: Correctional settings necessarily limit the methods or means inmates can use to die by suicide. For example, suicides by firearms or carbon monoxide poisoning are unheard of in correctional systems. As with most correctional systems, hanging is the primary means used by inmates in the CDCR to die by suicide. Inmates have ready access to clothing and linen items that can be used for nooses and ligature points can be found in nearly all cells. In 2015, both female suicides were by hanging and 20 of the 24 suicides overall were by hanging (83%).

The remaining four inmates (males) died by intentional overdose (2), asphyxiation (1), and jumping from a high place (1).

**Mental Health Factors:** The number and percentage of inmates who died by suicides in the CDCR in 2015 who were participants in the Mental Health Services Delivery System (MHSDS) is listed in Table 10. Mental health patients continue to be overrepresented in the year's suicides, a pattern that is typical in correctional and community settings.

Table 10. *Suicides in the CDCR by MHSDS Participation, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| No MHSDS participation | 10 | 42 |
| Correctional Clinical Case Management System | 9 | 37 |
| Enhanced Outpatient Program | 5 | 21 |
| Total | 24 | 100 |

Ten inmates were not in the MHSDS at the time of death. Six of these inmates (25% of the total number of suicides) had no history of participation in the MHSDS. Four inmates who were not in the MHSDS system at the time of death had previously been in the MHSDS at the Correctional Clinical Case Management System (CCCMS) level of care.

In 2015, 15 (62.5%) of the inmates who died by suicide had a history of mental health treatment prior to incarceration. Of these, 11 were in the MHSDS at the time of death, with one other having previously participated in the MHSDS. Eight cases (33%) had a family history of mental illness and/or family history of substance abuse treatment.

Upon entrance to the CDCR, inmates are screened for the possible presence of significant mental health disorders. Thirteen (55%) of the inmates who died by suicide in 2015 were identified as possibly having significant mental health disorders during initial screening. On subsequent mental health evaluations, 69% of those positive on screening were also found to have mental health conditions qualifying them for MHSDS services.

At the time of suicide, 14 inmates (58%) were on psychiatric medications. Three individuals (13%) had involuntary medication orders in place per Penal Code 2602. Eleven of the 24 (46%) had a history of Mental Health Crisis Bed placement or inpatient hospitalization. Eight (33%) had been psychiatrically hospitalized in the year prior to their suicide.

**Diagnoses:** The mental health diagnoses of individuals who died by suicide in 2015 are summarized in Table 11 and are listed by frequency. Please note that people can have multiple mental health diagnoses, thus the frequency of diagnoses in Table 11 exceeds the number of annual

suicides. Additionally, all inmate suicides in 2015 involved individuals with some history of substance use or abuse. However, the diagnoses listed in Table 11 include substance use disorders *only* if formally reported as a diagnosis. All diagnoses are based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 4th Edition or 5th Edition (DSM-IV or DSM-5).

When present, mood disorders and psychotic disorders were listed as the primary diagnosis of record. Of the individuals diagnosed with mood disorders, five were diagnosed with Major Depressive Disorder and four with Bipolar I Disorder. Five individuals were diagnosed with psychotic disorders; three with Schizophrenia, one with Delusional Disorder, and one with Psychotic Disorder NOS. Six inmates were diagnosed with Antisocial Personality Disorder and two of these six inmates were concurrently diagnosed with Narcissistic Personality Disorder.

Table 11. *Mental Health Diagnoses of Suicides in the CDCR, 2015*

| Diagnostic Category | Frequency | Percent |
| --- | --- | --- |
| Any DSM Disorder | 20 | 83 |
| Substance Abuse or Dependence | 13 | 54 |
| Mood Disorder<br>    Major Depressive Disorder (5)<br>    Bipolar I Disorder (4)<br>    Psychotic Disorder (5) | 9 | 38 |
| Personality Disorder | 6 | 25 |
| Psychotic Disorder<br>    Schizophrenia (3)<br>    Delusional Disorder (1)<br>    Psychotic Disorder NOS (1) | 5 | 21 |
| Adjustment Disorder | 4 | 17 |
| No Diagnosis | 4 | 17 |
| Anxiety Disorder | 1 | 4 |

**Suicide Attempt History:** A history of suicide attempts was found in 16 (67%) of the 24 cases of suicide in 2015. Of the group of 16, ten had made multiple past suicide attempts (42% of the overall total). Of those that had prior suicide attempts, 10 had reported at least one suicide attempt while in the community and eight had at least one suicide attempt while incarcerated. For the eight individuals who had suicide attempts during incarceration, a range of one to five prior attempts in prison were noted. The finding of 10 suicides within *Multiple Attempters,* a term indicating the

presence of two or more suicide attempts with the intent to die, is significant as this is a group with known high chronic risk.[7] Implications of this finding are discussed later in this report.

**Suicide Triggers, Motivation, and Behavior:** Seven of the 24 individuals (29%) who died by suicide in the CDCR in 2015 wrote suicide notes. This is a bit higher than the rate (one in six or 17%) found in community samples.[8] A small percentage (17%) of the deaths occurred in inmates who reported having no interpersonal supports, while two reported having one person in their support system. The majority (75%) endorsed two or more supports during their most recent mental health or suicide risk evaluations. Only one of the 24 (4%) of the suicides occurred in a patient who was believed to be feigning distress or suicidality. Five of the 24 inmates who died by suicide in 2015 did so on a holiday, with one each on Christmas Eve, Memorial Day, 4th of July, Halloween, and Chinese New Year.

The motives or precipitants to the current year suicides listed or suspected by Mental Health Suicide Reviewer's (MHSR's) were examined and are presented in Table 12.

Table 12. *Suspected Motives/Precipitants to Suicides in the CDCR by frequency, 2015*

| Precipitant Category | Frequency | Percent of Total |
|---|---|---|
| Receipt of new charges, convictions, disciplinary actions, or added time in prison | 9 | 20 |
| Safety concerns, drug debts, fears of victimization | 7 | 15 |
| Mental health symptoms, e.g. anxiety, psychosis | 7 | 15 |
| Medical illness and/or pain issues; medical disability | 5 | 11 |
| Holidays or anniversaries of losses, crimes, etc. | 5 | 11 |
| Disruption in prison 'program;' e.g., transfer between facilities, cellmate change, loss of single cell housing | 4 | 9 |
| Conflict or losses of external supports | 4 | 9 |
| Conflict or losses of within prison supports | 3 | 6 |
| Receipt of or anticipation of negative outcomes with the Board of Prison Hearings | 1 | 2 |

[7] Rudd, Joiner, & Rajab (1996). Relationships among suicide ideators, attempters, and multiple attempters in a young-adult sample. *Journal of Abnormal Psychology*, 105, 541-550.
[8] Gelder, Mayou, and Geddes (2005). Incidence of note-leaving remains constant despite increasing suicide rates. *Psychiatry and Clinical Neurosciences*, 4 (1).

Table 12. *Suspected Motives/Precipitants to Suicides in the CDCR by frequency, 2015*

| | | |
|---|---|---|
| Loss of parole to the community (e.g., due to added sentence, finding of MDO or SVP) | 1 | 2 |
| Totals: | 46 | 100 |

The motivations listed in suicide case review reports can be divided roughly into ten categories as represented in Table 12. The frequency of precipitant motivations is greater than the total number of suicides, as nearly all suicide case reviews listed more than one hypothesized motivation. In many cases, motives were not entirely clear. Rather, the motives and precipitants identified by suicide case reviewers are marked by each inmate's rather idiosyncratic reasons for ending one's life. The frequency of certain categories of suicide precipitants has implication for prevention efforts as explored later in this report.

Additionally, Table 13 indicates the precipitant factors for suicides occurring in the CDCR in 2015 on a case by case basis. As is apparent, the majority of inmates had multiple motivations or precipitants for the action. Also, in-prison events or stresses are noted in most, but not all, cases. Greg Dear and colleagues reported similar findings in Australian prisons with suicide attempters. When interviewed, prisoners reported two or more of five categories related to motivations for attempts, with the most common category (71% of incidents) being termed "stressful event that occurred within the prison" and second most common category (43% of incidents) being a consequence of imprisonment (e.g. placing a strain on family).[9] These themes are mirrored in the 2015 suicides within the CDCR and have been presented to CDCR clinicians in monthly suicide prevention videoconferences and in revised trainings in suicide risk evaluation.

---

[9] Dear, Thomson, Hall, & Howells (2001). Non-fatal self-harm in Western Australian prisons: Who, where, when, and why. *Australian & New Zealand Journal of Criminology*, 34, 47-66.

Table 13: *Individual Precipitants/Motivations for Suicides within the CDCR, 2015*

| Case | Precipitants/ Motivations Noted |
|---|---|
| A | Medical illness (terminal) and pain issues; housing issues (SNY status; safety concerns); conflict with spouse |
| B | Health concerns and complaints of pain; panic attacks; tearfulness around "no hope" of getting better medically; holiday (Chinese New Year) |
| C | Multiple disciplinary actions; anniversary of step-son's suicide; accrual of drug debt; time added to sentence; cellmate moved out of cell; told of positive lab test (Hepatitis C); familial estrangement |
| D | Received 3 year sentence extension (assault on peace officer); long ASU stay |
| E | Inability to move in with in-prison romantic partner; reported having an enemy to move 'yards' and was taken to ASU rather than desired 'yard' |
| F | Parole denied by BPH; argument with main family support (daughter); new RVR; hoarded medication (for overdose) was found and charged for possession for sales |
| G | Agitation from hallucinations and delusions, increasing depression, facing SHU term |
| H | Concerned about losing single cell and large amount of personal property; pending transfer; reports can't cell with others |
| I | Interpersonal problems/perceived rejection from other inmates on living unit |
| J | Convicted of murder of another inmate (incident occurred in 2012); received 45 years to life sentence and 25-month SHU term; lengthy ASU stay |
| K | Gang pressures; attempted to debrief; conflict with custody officers |
| L | Health concerns (headaches); close custody status due to RVR; holiday (4th of July) |
| M | Concern about transfer (to a different prison) and feared losing single cell status; feelings of depression/worthlessness |
| N | Safety concerns/fear of victimization (went into protective custody); anxiety |
| O | Paranoia/belief that family or other inmates intended to have the inmate stabbed |
| P | Dysphoria/hopelessness about the possibility of parole; requested/given CCCMS discharge; disciplinary infraction at work (faced losing assignment) |
| Q | Chronic illness/pain; 'bad news' about medical condition (liver cancer); researched Christian beliefs about suicide and the 'unforgiveable sin' prior to suicide |
| R | Fought with inmate and reported safety concerns; transferred during 5-day follow-up period after MHCB stay rescinded |
| S | Safety concerns; requested Sensitive Needs Yard (SNY); complained of hallucinations and reported delusional beliefs |
| T | Serious medical disabilities; possible distress regarding transfer |
| U | Interpersonal losses/estrangement; notified of additional charges (rape case pending investigation); holiday (Halloween) |
| V | Concern about drug debts and substance use relapse; familial estrangement; bothersome hallucinations; depression; holiday (Memorial Day) |
| W | Delusions/hallucinations; less faith that legal appeal would be won |
| X | Interviewed for Mentally Disordered Offender (MDO) status; found to meet MDO criteria—upset by this; somatic delusions; holiday (Christmas) |

## C. Review of findings

*Section 2: Current Year vs. Prior Years*

**Comparison of suicide rate between current and prior years:** The suicide rate in the CDCR in 2015 was 18.7 per 100,000. This rate is higher than in 2014, when the rate was 17.0 per 100,000, reflecting both one more suicide in 2015 than in 2014 and a decrease in the inmate population of nearly 7,000 from 2014 to 2015. The rate of 18.7 per 100,000 is the third lowest rate in the past 10 years. During the ten-year period, 2006 to 2015, the rate of suicide in the CDCR was 20.5 per 100,000.

Table 14 shows the rate and frequency of suicide in the CDCR for the past 20 years. The table shows the rate and frequency of suicides by gender during each year as well. Of note, the frequency of suicides over the period has ranged from a low of 15 in 2000 to a high of 43 in 2006.

As mentioned earlier, the rate of suicide in female inmates fluctuates considerably compared to a relatively stable rate in male inmates. In 11 of the past 20 years, there were no female suicides. The number of suicides in female institutions has ranged from a low of 0 to a high of 4 within the time period, with 2 occurring in 2015.

For reference, population figures in all years were garnered from the Offender Information Services Branch. From 1996 through 2010 the population figures are as of June 30th of the year, following the practice of the federal Bureau of Justice Statistics, and reflecting relatively stable institutional populations. From 2011 through 2015 the figures are of the average daily population which better reflects the institutional population during years with large declines of population (due to Assembly Bill 109).

Table 14. *Annual Frequency and Rate of Suicide in the CDCR for 20 years, by Gender and Overall, 1996-2015\**

| Year | Male | | | Female | | | Total | | |
|------|------------|------|------|------------|------|------|------------|------|------|
| | Population | Freq | Rate | Population | Freq | Rate | Population | Freq | Rate |
| 1996 | 131,273 | 19 | 14.5 | 9,744 | 0 | 0 | 141,017 | 19 | 13.5 |
| 1997 | 141,669 | 18 | 12.7 | 10,837 | 0 | 0 | 152,506 | 18 | 11.8 |
| 1998 | 147,001 | 21 | 14.3 | 11,206 | 0 | 0 | 158,207 | 21 | 13.3 |
| 1999 | 150,581 | 24 | 15.9 | 11,483 | 0 | 0 | 162,064 | 24 | 14.8 |
| 2000 | 150,793 | 15 | 9.9 | 11,207 | 0 | 0 | 162,000 | 15 | 9.3 |
| 2001 | 150,785 | 29 | 19.2 | 10,712 | 1 | 9.3 | 161,497 | 30 | 18.6 |
| 2002 | 148,153 | 22 | 14.8 | 9,826 | 0 | 0 | 157,979 | 22 | 13.9 |

| 2003 | 150,851 | 37 | 24.5 | 10,080 | 0 | 0 | 160,931 | 37 | 23.0 |
|---|---|---|---|---|---|---|---|---|---|
| 2004 | 152,859 | 23 | 15.0 | 10,641 | 3 | 28.2 | 163,500 | 26 | 15.9 |
| 2005 | 153,323 | 37 | 24.1 | 10,856 | 0 | 0 | 164,179 | 37 | 22.5 |
| 2006 | 160,812 | 39 | 24.3 | 11,749 | 4 | 34.0 | 172,561 | 43 | 24.9 |
| 2007 | 161,424 | 33 | 20.4 | 11,888 | 1 | 8.4 | 173,312 | 34 | 19.6 |
| 2008 | 159,581 | 36 | 22.6 | 11,392 | 0 | 0 | 170,973 | 36 | 21.1 |
| 2009 | 156,805 | 25 | 15.9 | 11,027 | 0 | 0 | 167,832 | 25 | 14.9 |
| 2010 | 155,721 | 34 | 21.8 | 10,096 | 1 | 9.9 | 165,817 | 35 | 21.1 |
| 2011 | 150,690 | 33 | 21.9 | 9,381 | 0 | 0 | 160,071 | 33 | 20.6 |
| 2012 | 130,189 | 32 | 23.8 | 6,594 | 1 | 15.2 | 136,783 | 33 | 24.1 |
| 2013 | 127,341 | 29 | 22.8 | 5,919 | 1 | 16.9 | 133,260 | 30 | 22.5 |
| 2014 | 129,268 | 21 | 16.2 | 6,216 | 2 | 32.2 | 135,484 | 23 | 17.0 |
| 2015 | 122,874 | 22 | 17.9 | 5,769 | 2 | 34.7 | 128,643 | 24 | 18.7 |
| 1996-2015 | 2,931,993 | 549 | 18.7 | 196,623 | 16 | 8.1 | 3,128,616 | 565 | 18.1 |
| 2006-2015 | 1,454,705 | 304 | 20.9 | 90,031 | 12 | 13.3 | 1,544,736 | 316 | 20.5 |

Notably, the rate of suicide within the CDCR has trended downward over the past 10 years. This downward trend can be seen in Figure 1. Whereas the frequency of suicide has declined rapidly, part of this decline can be attributed to a reduction in the number of prisoners housed within the CDCR during the time period. Both the frequency and the rate of suicide has declined, representing progress in adding interventions and improving risk management practices to prevent suicides in the CDCR.

Figure 1: *CDCR Suicide Rate and Frequency, with trend line, 2006-2015*



**CDCR Suicide Rate and Frequency, 2006-2015**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| Frequency | 43 | 34 | 36 | 25 | 35 | 33 | 33 | 30 | 23 | 24 |
| Rate | 24.9 | 19.6 | 21.1 | 14.9 | 21.1 | 20.6 | 24.1 | 22.5 | 16.9 | 18.6 |

**Suicides by institution, current year vs. 15-year average**: Whereas Figure 1 represents suicides throughout the whole of the CDCR; the frequency of suicides by institution is a less stable variable. The higher frequency of suicide at some facilities versus others has many explanations. Variables such as the number of patients in the institution's mental health program, the mental health mission of the facility, the predominance of violent offenders at the site, and the total number of inmates at the institution are just some of the factors that contribute variance to *where* suicides occur. Fluctuations can occur in the number of suicides at an institution in given years due to cluster effects[10], changes in the use or mental health mission of the institution, and other factors. There are also subsets of suicides that occur during or upon transfer of an inmate from one institution to another, further complicating the interpretation of *why* suicides occur at certain institutions more frequently than others.

---

[10] Hawton, Linsell, Adeniji, Sariaslan, & Fazel (2014). Self-harm in prisons in England and Wales: An epidemiological study of prevalence, risk factors, clustering, and subsequent suicide. *Lancet,* Vol. 383.

Table 15 lists the number of suicides at CDCR Institutions in 2015 along with the total and average number of suicides at each institution over a 15-year period. The inclusion of 15-years of data allows current year data to be compared to averages over a significant period of time. The range of suicides on average per year for all facilities was 0.0 to 2.1. The mean for suicide for all institutions from 1999-2014 was 30.2 suicides per year.

| Table 15. *Frequency of Suicide by CDCR Institution, 2015 and by prior 15-year total and average (1999-2014)*  Institution | 2015 Frequency | Prior 15-year total (1999-2014) | Prior 15-year average (1999-2014) |
|---|---|---|---|
| California Health Care Facility | 1 | 0 | 0 |
| Tallahatchie County Correctional Facility | 1 | 0 | 0 |
| Department of State Hospitals-Salinas Valley | 0 | 1 | 0.1 |
| California Rehabilitation Center | 0 | 1 | 0.1 |
| Chuckawalla Valley State Prison | 0 | 1 | 0.1 |
| Valley State Prison | 0 | 2 | 0.1 |
| California Correctional Center | 0 | 2 | 0.1 |
| Ironwood State Prison | 0 | 2 | 0.1 |
| Atascadero State Hospital | 0 | 4 | 0.3 |
| Calipatria State Prison | 0 | 5 | 0.3 |
| Sierra Conservation Center | 0 | 5 | 0.3 |
| Centinella State Prison | 0 | 6 | 0.4 |
| California Institution for Women | 2 | 6 | 0.4 |
| Avenal State Prison | 0 | 7 | 0.5 |
| Department of State Hospitals-Vacaville | 0 | 7 | 0.5 |
| Institution | 2015 Frequency | Prior 15-year total | Prior 15-year average |
| Central California Women's Facility | 0 | 7 | 0.5 |
| California State Prison, Solano | 0 | 10 | 0.7 |
| North Kern State Prison | 0 | 10 | 0.7 |

| | | | |
|---|---|---|---|
| Kern Valley State Prison | 0 | 11 | 0.7 |
| Pleasant Valley State Prison | 0 | 13 | 0.9 |
| Wasco State Prison | 0 | 13 | 0.9 |
| Mule Creek State Prison | 0 | 14 | 0.9 |
| California Substance Abuse Treatment Facility | 0 | 15 | 1.0 |
| California Correctional Institution | 1 | 15 | 1.0 |
| California Training Facility | 0 | 16 | 1.1 |
| Pelican Bay State Prison | 0 | 16 | 1.1 |
| High Desert State Prison | 0 | 17 | 1.1 |
| Folsom State Prison | 1 | 18 | 1.2 |
| Deuel Vocational Institute | 3 | 19 | 1.3 |
| California Medical Facility | 1 | 21 | 1.4 |
| California Institution for Men | 1 | 22 | 1.5 |
| California State Prison, Los Angeles County | 0 | 22 | 1.5 |
| California State Prison, Corcoran | 2 | 24 | 1.6 |
| RJ Donovan Correctional Facility | 2 | 24 | 1.6 |
| California Men's Colony | 3 | 27 | 1.8 |
| San Quentin State Prison | 3 | 29 | 1.9 |
| Salinas Valley State Prison | 0 | 30 | 2 |
| California State Prison, Sacramento | 3 | 31 | 2.1 |
| Total | 24 | 453 | 30.2 |

**Suicides in the CDCR by month, current year and 10-year average:** CDCR data covering a 10-year period (2006-2015) shows little or no trend in the frequency of suicides in any given month. As in 2015, suicides tend to occur in the spring and fall months of the year. Suicides in the CDCR have traditionally not been associated with specific holiday periods, though in 2015 there were five suicides on holiday days (21%) spread over five different months.  See Figure 2. The prevalence of suicides in March, May, and October has not been explained. CDCR clinicians have noted this trend over several years.

Figure 2: *CDCR Frequency by Month, 2015and 10-Year Average*



**Demographic Factors:** Demographic variables specific to 2015 suicides are presented earlier in this report. These factors are presented here only as a means of comparing information from prior years with 2015 suicide data.

A depiction of suicides by race in 2015 and over the past 10 years is found in Figure 3. Caucasians comprise the largest group, comprising 48% of the suicides over the 10-year period and 54% of the suicides in 2015. Caucasian suicides have consistently fallen within a range of 14 to 20 per year. Hispanics/Latinos make up the second largest group, accounting for 30% of the suicides over the years represented. Hispanic/Latino suicides have a more variable range, from 5 to 15 in any given year. African-Americans account for 13% of the suicides during these years with a range from 2 to 7. The frequency of suicides in other racial groups is relatively small and typically at a range of 0 to 2 per year. The trend lines in Figure 3 suggest that the relative decline in suicides within the CDCR during 2014 and 2015 are in Caucasians and Hispanics/Latinos, the two groups who historically have the highest numbers of suicides within the CDCR.

Figure 3: *Suicide Frequency by Race, 2005-2015, with trend line*



Age is divided into five adult age brackets in Figure 4: Ages 18-24, 25-34, 35-44, 45-54, and 55 and above. In all but one year, 2012, the largest frequency of suicides in any age group was in individuals aged 25-34. Compared to the prior five years, 2010 to 2014, suicides in 2015 were somewhat lower in inmates aged 35-44 and 45-54, and slightly higher than most past years in ages 55 or older. The 55 and older age group had the second highest total in the past 6 years. In 2015, 25% of the suicides occurred in this age group, an age group that comprises 12% of the population of the CDCR. This number (25%) is similar to 2010, when 22% of suicides were in the 55 and over group, and dissimilar to other years: 9% in 2011, 15% in 2012, 7% in 2013, and 8% in 2014.

Figure 4: *Number of Suicides by Age Group, 2010-2015*



**Suicides by housing type:** Historically and in national and international studies,[11] segregated housing units have been a high-risk setting for suicide, particularly in single cell housing.[12] In the CDCR, segregated housing includes ASU, SHU, STRH, Long Term Restricted Housing (LTRH), Psychiatric Services Units (PSU), and the Condemned units at San Quentin State Prison and California Correctional Institution for Women. During 2015, nine of the year's 24 suicides occurred in segregated housing settings, representing 37.5% of all suicides. For reference, approximately 6.5% of inmates were housed in segregated housing at the mid-year point of 2015 (June 30, 2015). Calculating a rate per 100,000 in segregated housing may be misleading as the overall population is quite small and subject to wide swings in rate based on a single suicide.[13]

Of the nine suicides that occurred in segregated settings in 2015, seven were in ASU, one in a SHU, and one in STRH. The number and percentage of suicides in segregated housing settings for 2015 and over the prior five year period is found in Table 16. As can be seen, the frequency of suicides in segregated housing decreased significantly in 2015 compared to prior years (2010-2014). Whereas 47% of suicides within the CDCR occurred in a segregated housing setting in the

---

[11] World Health Organization (2007). *Preventing suicide in jails and prisons.* WHO Document Production, Geneva, Switzerland.
[12] *Id.*
[13] Based on a segregated housing population of 8,325 inmates on June 30, 2015.

ten year period between 2004 and 2014 and 45% of suicides occurred in segregated housing on average in the ten year period from 2010 to 2014, 37,5% of suicides occurred in this setting during 2015. This may represent changes adopted within the CDCR leading up to and occurring within the reporting year, such as implementation of safety/wellness checks using the Guard One system and initiation of enhanced mental health services for MHSDS participants in segregated settings (e.g., STRH and LTRH units). Also of note, inmates in single-cell housing accounted for eight of the nine suicides (89%) within segregated housing units in 2015. This percentage is consistent with prior years. The percentage of suicides in segregated housing units that occurred in single cell housing in the prior five years was 100% in 2010, 86% in 2011, 91% in 2012, 100% in 2013, and 86% in 2014.

Table 16. *Frequency of Suicide within Segregated Housing, 2010-2015*

| Year | Frequency | Percent of Annual Suicides |
|------|-----------|----------------------------|
| 2010 | 13 | 37 |
| 2011 | 14 | 42 |
| 2012 | 13 | 41 |
| 2013 | 14 | 47 |
| 2014 | 13 | 57 |
| 2015 | 9 | 37.5 |

**Time in Segregated Housing Prior to Death:** In 2015, nearly half of the suicides that occurred in segregated housing occurred soon after placement. Three of the nine suicides occurred in intake cells, indicating stays of less than 72 hours (Cases E, F, and O). A fourth case had been in ASU for six days and had just arrived for a temporary stay at an institution while in route to another institution (Case R). The remaining five cases were in segregated housing units for 100 days or more at the time of death (Cases D, G, J, K, and N).

Data on the number of days between ASU placement and deaths by suicide has been tracked since 2009. Over this seven-year period (2009-2015), suicides tended to occur shortly after placement, particularly in the first 72 hours after placement. Of course, fewer inmates are present in ASU as lengths of stay increase. Figure 5 shows the distribution of deaths by suicide following placement.

Figure 5: *Length of Time in ASU before suicide, 2009-2015*



**Suicides by Method:** The rate of suicide by hanging, easily the most frequent method for suicides in prison settings, has remained relatively stable over the past number of years. In 2015, 83% of suicides were by hanging. The percentage of suicides that were by hanging was 77% in 2010, 88% in 2011, 91% in 2012 and 2013, and 87% in 2014.

**Involvement in Mental Health Services:** The percentage of suicides that occur in inmates with identified mental health needs is a complex variable. Suicide is a phenomenon that can occur in individuals who do not have a traditional mental health diagnosis and in inmates with no prior identified mental health needs. Inmates can avoid mental health services by choice, such as by denying symptoms on screening or by masking symptoms in order to be discharged from the Mental Health Services Delivery System (MHSDS). It is not uncommon for suicidal individuals to distrust mental health clinicians when contemplating suicide, concerned that clinicians may in some way remove a valued option (death) should life so dictate.[14] Yet suicides occur in individuals who have been identified as meeting criteria for participation in the MHSDS and who were receiving services in the MHSDS at the time of death. Table 17 lists the numbers of suicides at each level of MHSDS involvement for 2015 and for the prior five years.

---

[14] Jobes, D. (2016). Managing Suicidal Risk: A Collaborative Approach (2nd Edition). Guilford Press, New York.

Table 17. *Frequency of Suicide within MHSDS Levels of Care, 2010-2015*

| Year | Non-MHSDS | CCCMS | EOP | MHCB /DSH | % in MHSDS |
|------|-----------|-------|-----|-----------|------------|
| 2010 | 15 | 12 | 8 | 0 | 57 |
| 2011 | 10 | 10 | 13 | 0 | 69 |
| 2012 | 14 | 12 | 5 | 1 | 55 |
| 2013 | 14 | 9 | 6 | 1 | 53 |
| 2014 | 1 | 12 | 9 | 1 | 96 |
| 2015 | 10 | 9 | 5 | 0 | 58 |

**Suicides in Mental Health vs. Non Mental Health Populations:** Table 18 shows the suicide rate for MHSDS vs. non-MHSDS populations over the past ten years, including 2015. As can be seen, the rate of suicide in those involved in the MHSDS is significantly higher than for individuals who have not been included in the MHSDS. This suggests a need to carefully work with existing mental health population members to reduce the risk of suicide. Targeted, suicide-specific interventions for individuals within the MHSDS remain an area that is potentially fruitful in preventing suicides; this will be discussed further later in this report.

Table 18. *Frequency of Suicide in mental health versus non-mental health populations, 2006-2015*

| Year | MH Pop | MH Freq | MH Rate | Non-MH Pop | Non-MH Freq | Non-MH Rate | Total Pop | Total Freq | Total Rate |
|------|--------|---------|---------|------------|-------------|-------------|-----------|------------|------------|
| 2006 | 32,127 | 20 | 62.3 | 140,434 | 23 | 16.4 | 172,561 | 43 | 24.9 |
| 2007 | 35,078 | 25 | 71.3 | 138,234 | 9 | 6.5 | 173,312 | 34 | 19.6 |
| 2008 | 36,570 | 18 | 49.2 | 134,403 | 18 | 13.4 | 170,973 | 36 | 21.1 |
| 2009 | 37,262 | 19 | 51.0 | 130,570 | 6 | 4.6 | 167,832 | 25 | 14.9 |
| 2010 | 39,150 | 20 | 51.1 | 126,667 | 15 | 11.8 | 165,817 | 35 | 21.1 |
| 2011 | 39,854 | 23 | 57.7 | 120,217 | 10 | 8.3 | 160,071 | 33 | 20.6 |
| 2012 | 37,632 | 18 | 47.8 | 99,151 | 15 | 15.1 | 136,783 | 33 | 23.4 |
| 2013 | 38,030 | 16 | 42.1 | 95,229 | 14 | 14.7 | 133,259 | 30 | 22.5 |
| 2014 | 38,722 | 21 | 54.2 | 96,978 | 2 | 2.1 | 135,700 | 23 | 16.9 |
| 2015 | 37,670 | 15 | 39.8 | 91,230 | 9 | 9.9 | 128,900 | 24 | 18.6 |
| **Average** | **37,210** | **20** | **52.6** | **117,311** | **12** | **10.3** | **154,521** | **32** | **20.4** |

## D. Review of Findings

_Section 3: Comparison of CDCR Suicide Rates with Other State Prisons Systems and Relevant U.S. Rates_

**CDCR Rates vs. Other State and Federal Prison Rates**: State prison suicide rates have varied little over a number of years. The rate of suicide in U.S. state prisons ranged from 14 per 100,000 to 17 per 100,000 from 1999 to 2013[15], with a rate of 15 suicides per 100,000 prisoners in U.S. state prisons in 2013. However, the U.S. prison rate jumped by 30% between 2013 and 2014, rising to 20 per 100,000 inmates.[16] No explanation for this increase has been offered. Rates for U.S. prisons for 2015 are not available at this time.

Suicide rates for all federal and state prisons were calculated by the Bureau of Justice Statistics for the years 2001-2014.[17] A listing of state rates is found in Table 19. California's rate is listed twice in Table 19. One listing is for the composite rate for the CDCR from 2001-2014 and the second rate is for the year 2015 only. California ranks in the middle one-third of states in rank and rate. In 2015, California's rate of prison suicides ranked as 20th among state prisons.

Table 19. _Rate and rank of suicides by state, 2001-2014 (14 years)_

| State Name | Rank (Highest to Lowest Rate) (t=tie) | Suicide Rate per 100,000 |
|---|---|---|
| Rhode Island | 50 | 45 |
| Utah | 49 | 44 |
| Montana | 48 | 34 |
| Massachusetts | 47 | 32 |
| New Hampshire | 46 | 31 |
| Alaska | 46t | 31 |
| Hawaii | 44 | 29 |
| Idaho | 43 | 28 |
| South Dakota | 43t | 28 |
| Delaware | 41 | 26 |
| Vermont | 41t | 26 |
| Connecticut | 39 | 24 |
| New Mexico | 38 | 23 |
| Nebraska | 37 | 21 |
| New York | 37t | 21 |
| _All State Prisons, 2015_ | | _20_ |

[15] Noonan, M. _Mortality in Local Jails and State Prisons_, 2000-2013 – Statistical Tables, August 2015, Website, U.S. Department of Justice, Bureau of Justice Statistics.

[16] Noonan, M. Mortality in Local Jails and State Prisons, 2001-2014 Statistical Tables, US DOJ, Bureau of Justice Statistics, December, 2016, NCJ 250150

[17] _Id._

| State Name | Rank (Highest to Lowest Rate) | Suicide Rate per 100,000 |
|---|---|---|
| Iowa | 35 | 20 |
| *Chart continues on next page* | | |
| **State Name** | **Rank (Highest to Lowest Rate)** | **Suicide Rate per 100,000** |
| Maryland | 35t | 20 |
| California (2001-2014) | 35t | 20 |
| Wisconsin | 32 | 19 |
| Oklahoma | 32t | 19 |
| *California (2015)* | | *18.6* |
| Colorado | 30 | 18 |
| Minnesota | 30t | 18 |
| Wyoming | 30t | 18 |
| Arizona | 27 | 17 |
| Nevada | 27t | 17 |
| Arkansas | 27t | 17 |
| ***All State Prisons, 2001-2014*** | | *16* |
| Indiana | 24 | 16 |
| Illinois | 24t | 16 |
| Texas | 24t | 16 |
| Oregon | 24t | 16 |
| Pennsylvania | 24t | 16 |
| Tennessee | 18 | 15 |
| Kansas | 17 | 14 |
| Ohio | 16 | 13 |
| South Carolina | 16t | 13 |
| New Jersey | 16t | 13 |
| Washington | 16t | 13 |
| Mississippi | 16t | 13 |
| Missouri | 11 | 12 |
| Maine | 10 | 11 |
| ***U.S. Federal Prisons (2001-2014)*** | | *10* |
| Virginia | 9 | 10 |
| Georgia | 9t | 10 |
| Kentucky | 7 | 9 |
| Louisiana | 7t | 9 |
| West Virginia | 5 | 8 |
| Florida | 5t | 8 |
| North Carolina | 3 | 7 |
| Alabama | 2 | 6 |
| North Dakota | 1 | 5 |

**CDCR Rates vs. Community Rates:** It is notable that the rate of suicide in the community within the United States reached a 30 year high in 2014, reaching an overall national rate of 13.4 per 100,000. The rate of suicide rose 24% overall between 1999 and 2014[18]. The U.S. rate increased

---

[18] http://www.nytimes.com/2016/04/22/health/us-suicide-rate-surges-to-a-30-year-high.html?_r=0

again in 2015 to 13.8 per 100,000.[19] For adult males in the U.S., the rate of suicides was 21.1 per 100,000 in 2014[20] and 21.5 per 100,000 in 2015[21], topping the rate of suicides in the (mostly male) CDCR in 2014 (17.0 per 100,000) and 2015 (18.6 per 100,000). Figure 6 shows the rate of suicides in adult males in the U.S., in U.S. prisons, and in the CDCR for the years 2010 to 2015. Suicide rates for state prisons are not available after 2014.

Figure 6: *Suicide rates for adult males in the CDCR, State Prisons, and the U.S., 2010-2015*



| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| CDCR Overall | 21.1 | 20.6 | 24.1 | 22.5 | 17 | 18.7 |
| U.S. State Prisons | 16 | 14 | 16 | 15 | 20 | |
| CDCR Males | 21.8 | 21.9 | 23.8 | 22.8 | 16.2 | 17.9 |
| U.S. Males | 19.8 | 20 | 20.4 | 20.3 | 20.7 | 21.5 |

◆ CDCR Overall    ■ U.S. State Prisons    ▲ CDCR Males    ✕ U.S. Males

**E. Summary Review of Findings and Trends**

In reviewing suicides within the CDCR during the reporting year, 2015, a suicide rate of 18.7 per 100,000 is noted, which represents part of a declining trend over the past 10 years. The rate of CDCR suicides is below the average rate of all U.S. state prison systems combined in 2015[22]. The rate of suicides in the CDCR in 2014 was also lower than the average suicide rate for state prisons in 2014, the last year in which such data is available. Finally, the declining trend in the CDCR stands in contrast with community rates of suicide, which have increased significantly over the past decades. Adult males in the community in the U.S. are more likely to die by suicide than male inmates within the CDCR; this was the case in both 2014 and 2015.

---

[19] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870

[20] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2014/StatesSexTABLE2014.pdf

[21] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870

[22] Based on 2014 U.S. Prison data

To what reasons can we attribute this declining trend? First, in both 2014 and 2015, fewer inmates aged 25-54 died by suicide than in prior years. Second, the rates of suicide in Caucasian and Hispanic inmates in CDCR have fallen rather significantly in the past 10 years. The majority of suicides in the CDCR have occurred within these two racial groups for many years, making this finding particularly encouraging. Third, a decline in the frequency of suicides in segregated housing units was noted in 2015; this finding may reflect the decreasing percentage of the inmate population housed in such settings as well as the many efforts implemented to improve safety from suicide in these settings. Other factors reviewed appear to simply indicate yearly and/or unstable fluctuations in suicides, such as in timing of suicides (e.g. month of suicide, time of discovery), frequency in specific institutions, and the rate of involvement in mental health systems of care. These factors do not appear explanatory for the downward trend.

In looking at the group of individuals who died by suicide in 2015 within the CDCR, specific risk factors remain clear: Caucasian race, single/divorced marital status, serious or chronic medical disease or pain, Spring and Fall months, history of violent offenses, housing in higher security settings, Life or long sentences, single-cell housing, lack of job assignment, mental health treatment prior to and during incarceration, prior suicide attempts, and prior psychiatric hospitalization. Other variables seem to be possible trends to monitor, such as increased suicides in older inmates (those age 60 or above), fewer suicides within segregated housing units, fewer suicides where clinicians minimized genuine risk by attributing behavior to manipulation or malingering, and more suicides on or around holiday periods. The reason suicide for inmates within the CDCR remains rather idiosyncratic and complex, with most suicide reviewers determining multiple precipitants or motivations for suicide. Suicides most commonly occurred on account of in-prison stresses (safety concerns, receipt of additional charges, transfers, etc.); medical illness, pain or disability; acute psychiatric symptoms; conflicts with others; and important dates (anniversaries of losses or crimes, holidays).

## Chapter II. Response to Suicide and Suicide Attempts

**Institutional reporting of self-harm incidents and suicides:** All incidents of self-harm in the CDCR are reviewed by institutional staff members (including mental health clinicians) and all incidents of self-harm are entered and tracked on a self-harm database. These processes allow for tracking patients in High Risk Management Lists or Program(s) within a facility. A sample High Risk Management Program policy is found in Appendix I. Suicides are reported by the Chief Medical Officer or designee to stakeholders, including the SMHP and the OSM. Processes involved in institutional reporting of self-harm events and suicides are found in Appendix II.

**Determination of unknown causes of death**: When deaths occur in a CDCR institution in which the cause of death is not immediately determined, the cases are classified as "Unknown Deaths." These cases receive special attention until the cause of death is determined, particularly as any that could possibly involve suicide need to be determined in a timely fashion. The process for reviewing these deaths and making a determination may be found in Appendix III

In 2015, a total of 44 cases were tracked as the cause of death was listed provisionally as unknown. Nineteen of the 44 cases had no provisional cause of death, whereas 25 cases had a suspected or "probable" cause of death listed. In two cases, suspicion of a suicide was present and was confirmed by autopsy, toxicology finding, and/or coroner's report. These cases, Case M, who died of an overdose on a prescribed medication, and Case V, who died of asphyxiation during an acute intoxication illicit drug, are reviewed later in this report. Additionally, two cases were determined to be accidental overdoses due to findings of ingested balloons during autopsy; ingesting balloons filled with narcotics is a method for concealing and/or transporting illicit drugs in prison (Cases OO and PP).

Of the remaining four cases, 23 were determined by the Death Review Committee (DRC) to have died by natural causes: Pulmonary embolism, myocardial infarction, coronary artery disease, hypertension, cardiomyopathy, and so forth. Three of the remaining cases were determined to be deaths by homicide.

The 14 remaining cases met criteria for additional review, as they involved either overdose (10 cases), the case was pending further information (three cases), or the death potentially related to mental health treatment needs (one case). In this later death (Case AA), the cause of death was provisionally termed inanition secondary to acute psychosis. That is, the patient was thought to have died on account of the medical consequences of refusing to eat. His lack of intake was attributed to acute psychosis. Though the initial finding of inanition was mentioned, reviewers on the Combined Death Review Summary noted the pathologist's use of the term "well-nourished" and determined the patient had gained roughly 20 pounds in the two years prior to his death. The patient denied suicidal ideation upon evaluation six days before his death and there was no indication that he purposefully engaged in any behavior with the intention of dying or hastening his death. The category of death was changed by the DRC to natural, unexpected

The three cases pending further information were determined by the DRC to be deaths of various causes. The cause of one death was due to "excitement delirium." In this case (Case BB), the inmate struggled with officers who were trying to apply restraints; this exertion led to neuronal excitotoxic injury per autopsy. The second case (Case CC) was determined to have ingested both morphine and Citalopram, though both medications were prescribed. The inmate had multiple additional medical problems, including cardiovascular disease, and the death was determined to be accidental. The inmate's cellmate at the time reported normal mood, participation in routines, and so forth the evening of the death, with no history of suicide attempts or statements of wishes to die. The third case (Case DD) was unknown for a period of time due to the complexity of medical symptoms present prior to the death, including reports of blackouts, other neurological symptoms, and cardiovascular issues. The final cause of death was determined to be natural and secondary to cardiovascular disease.

The 10 remaining cases (Cases EE to NN) were reviewed using the guidelines noted above as the cause of death in each was overdose. Upon review of these cases, the best explanation for each

was unintentional, accidental overdose. In each case, the Combined Death Review Summary determined that the cause of death was an accidental overdose. None of the cases involved ingestion of medications that do not have abuse potential (e.g., Tylenol). Rather, all nine deaths involved intoxication/ingestion with an illicit drug or drug(s) of abuse. Specifically, three cases died due to methamphetamine intoxication (Cases EE, FF, and GG), two to Fentanyl intoxication (a powerful synthetic Opioid; Case HH and II), one case to a combination of heroin and methamphetamine intoxication (Case JJ), one to heroin intoxication (Case KK), one to morphine intoxication (Case LL), one to methadone and morphine intoxication (Case MM), and one to intoxication with an unknown or unspecified opiate (Case NN). Of these 10 cases, none left a suicide note and none made recent statements suggesting suicidal ideation or desire. Appendix IV contains additional information on the SMHP's review of overdose cases.

**Suicide Attempts and Suicides Prevented:** In 2015, there were a total of 502 incidents of self-harm with intent to die that did not result in death. That is, 502 suicide attempts were in some way prevented, interrupted, aborted, averted, or otherwise were not fatal during the year.

Of the 502 attempts, 285 involved incidents of self-harm with intent to die that resulted in either no injury or mild injury. An additional 217 incidents of self-harm involving moderate-to-severe injury and intent to die (suicide attempts) were reported to the CDCR's self-harm database. These 217 incidents include some combination of: The inmate used non-lethal means and intended to die but was discovered, the inmate reported having recently engaged in self-harm with the intent to die but was not discovered and did not perish, or CDCR staff members interrupted a suicide attempt in progress by an inmate that may otherwise have been lethal.

**Determination and tracking of Quality Improvement Plans**: Each Suicide Case Review report may include formal Quality Improvement Plans (QIPs) as applicable to the case. QIPs are developed based on the concerns raised by custody, nursing/medical, and/or mental health case reviewers. In 2015, a total of 115 QIPs were generated from Suicide Case Reviews, resulting in an average of 4.8 QIPs per suicide. Nursing QIPs are referred to the DRC. Custody and mental health QIPs are typically addressed to the institution where the deceased person resided but may also be written for prior institutions and/or for the DHCS SPR FIT. Table 20 provides a listing of responsible persons or teams for the QIPs assigned in 2015.

Table 20. *QIPs assigned within the CDCR by recipient, 2015 Suicides*

| Quality Improvement Plan | Frequency | Percent of Total |
| --- | --- | --- |
| Chief of Mental Health/Chief Executive Officer | 53 | 46 |
| Warden/Custody | 32 | 28 |
| Death Review Committee/Nursing/Medical | 17 | 15 |
| DHCS SPR FIT | 11 | 10 |
| Design Standards Branch | 1 | <1 |
| Contract Bed Facility | 1 | <1 |
| Total | 115 | 100 |

As can be seen in Table 20, the Suicide Case Review process generates quality improvement plans that are multidisciplinary. The responses to an inmate's suicide are therefore addressed with a broad lens, looking at many ways of addressing what went wrong (if applicable; one case of the 24 had no listed QIPs). Notably, nearly half of the formal QIPs generated in 2015 were focused on mental health concerns, with the Chief of Mental Health and/or Chief Executive Officer of a CDCR facility tasked to address the concern(s). Mental health concerns ranged from evaluations not completed within timeframes established by policy to poor quality of suicide risk evaluation to inadequate treatment and safety planning. The specific reasons for individual QIPs are presented in the individual case review section (Chapter 3).

**Determination whether a suicide is preventable or foreseeable**: The following definitions of *foreseeable* and *preventable* used in the review of 2015 suicides and in this report are the definitions previously used in the annual suicide reports written by the Special Master's experts:

Foreseeable: A "foreseeable" suicide is one which, based upon available information reasonably known, is reasonably anticipated based upon the presence of a substantial or high risk for a suicide attempt which would require reasonable clinical, custodial, or administrative intervention. Foreseeability is assessed by determining the adequacy and accuracy of how suicide risk was evaluated. Assessment of the degree of risk may be high, moderate, or low to none. In contrast to a high and immediately detectable risk, a "moderate risk" of suicide, indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as a timely assessment, to determine the level of risk in the most appropriate manner and relevant interventions to prevent suicide.

Preventable: A "preventable" suicide is one in which it is probable that, had some additional information been gathered or some additional interventions undertaken, as required by existing policy, the suicide would not have occurred. Preventability is assessed by determining whether risk management and/or suicide prevention policies and procedures, local operating procedures and the requirements set forth in the Program Guide were followed adequately. Suicides that may have been preventable include not only cases in which additional information might have been

gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff.

This report continues to use these definitions for consistency, subject to CDCR's right to change the definitions in future reports. It is well-settled that Defendants are entitled to deference in managing their internal operations, and such deference should extend to the manner in which Defendants audit and write their performance reports. *See Bell v. Wolfish*, 441 U.S. 520, 562 (1979) ("the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution . . . .") "Suicide is a difficult event to predict and prevent and often occurs without warning. Both the common law and the recently developed constitutional law applying to those in custody have taken this uncertainty into account in developing rules of liability based on foreseeability." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005). Because suicide rests on a complex array of factors and motives, inmates determined to commit suicide are very difficult to stop. *Strickler v. McCord*, 306 F. Supp. 2d 818, 829 (N.D. Ind. 2004).

As the Special Master's experts have acknowledged, the above definitions do not apply the legal standards for causation or deliberate indifference. For these reasons, the use of these definitions in this report should not be confused in any way with legal concepts of causation or foreseeability, nor do they determine personal or systemic culpability. Causation and foreseeability are legal terms of art, and must demonstrate that something caused or produced some effect, or had a quality of being reasonably anticipated, respectively. *Black's Law Dictionary* 249, 721 (9th ed. 2009). Determinations of personal or organizational culpability with respect to causation or foreseeability of suicide prevention are governed by the deliberate indifference standard ("a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety . . . .") *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This not only requires awareness "of facts from which the inference could be drawn that a substantial risk of serious harm exists", but that such an inference is also drawn. *Id.* The development, implementation, and continued improvement of the suicide prevention system is necessarily contrary to any disregard for excessive risks to an inmate's health or safety with respect to suicidality, and meets the Constitutional requirement to create reasonable measures to prevent inmate suicide as a necessary component of any correctional mental-health system. *Balla v. Idaho State Bd. Corr.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984) (citing to standards of minimally adequate care for mental health in *Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D. Tex.1980 *aff'd in part, rev'd in part on other grounds*). The Eighth Amendment does not allow a deliberate-indifference finding based merely on a difference of medical opinion about appropriate treatment. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Cano v. Taylor*, 739 F.3d 1214 (9th Cir. 2014). Thus, "where suicidal tendencies are discovered and preventive measures taken, the question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk." *Rellegert ex rel. Rellegert v. Cape Girardeau County*, Mo., 924 F.2d 794, 796 (8th Cir. 1991).

Using the above definitions, and subject to the foregoing reservations, CDCR's Statewide Mental Health Program's Suicide Case Review Committee determined that in 2015, 11 of the 24 suicides were foreseeable and 17 of the 24 suicides might have been preventable had some additional information been gathered or some additional interventions undertaken.

**Audits of SCR Quality:** The DHCS Quality Management Unit audits all Suicide Case Reviews (SCRs) for 15 items. SCRs are scored with required elements marked present or absent. In 2015, SCRs generally met audit criteria at a high rate, reported in Table 21.

Table 21: *Results of Quality Audits, 2015 Suicide Case Review reports*

| Audit Item | Present | Absent | % Present |
|---|---|---|---|
| 1. Does the Executive Summary describe the means of death, the emergency response taken, and the MH LOC of the patient? | 23 | 1 | 96 |
| 2. Are the sources for the SCR identified? | 24 | 0 | 100 |
| 3. Are substance abuse issues reported, if applicable? | 24 | 0 | 100 |
| 4. Does the Institutional Functioning section include information on institutional behavior, including disciplinary history? | 24 | 0 | 100 |
| 5. Does the Mental Health History review the adequacy of mental health care and screening? | 24 | 0 | 100 |
| 6. Are medical concerns discussed (e.g., chronic pain, terminal illness) or is the absence of medical conditions noted? | 24 | 0 | 100 |
| 7. Is the quality of the most recent SREs (past year) reviewed, with comment on risk level, safety planning, and risk and protective factors? | 14 | 6 (4 N/A) | 70 |
| 8. Does the Suicide History section review all prior attempts, as applicable? | 24 | 0 | 100 |
| 9. Are significant pre-suicide events discussed (e.g., receipt of bad news or existence of a safety concern)? | 23 | 1 | 96 |
| 10. Was a risk formulation offered specific as to why the person was vulnerable to suicide? | 24 | 0 | 100 |
| 11. Does the review comment on the adequacy of the emergency response? | 18 | 4 (2 N/A) | 82 |
| 12. Are all violations of policy and breaches of standards of care in mental health, medical, and nursing addressed in the reviewer's concerns, if applicable? | 24 | 0 | 100 |
| 13. Were custody policies followed? If not, were violations noted in the report? | 23 | 0 (1 N/A) | 100 |
| 14. Were all concerns raised by reviewers (custody, nursing, and mental health) represented in Quality Improvement Plan recommendations? | 24 | 0 | 100 |
| 15. Were the Quality Improvement Plan recommendations adequate to address the concerns? (e.g., QIP should not simply say conduct an inquiry and report findings). | 23 | 1 | 96 |
| Total | 339 | 13 | 96 |

As evident in Table 21, on most audit criteria, reviewers were found to meet quality standards with 96% of all audit items marked as present. A notable exception in quality audits appears to be in reviewing most recent SREs. In examining this finding, six SCRs did not comment on *all* aspects of the most recent SREs. For example, the reviewer discussed risk factors but did not provide an analysis of the adequacy of risk formulation. One other item was absent in four cases: Comments on the adequacy of emergency response. Emergency response timelines were reported by nursing and custody in all SCRs. In the four cases, reviewers did not specifically state that the emergency response was adequate, though this appears to be the case in each occasion.

**Timeliness of Suicide Case Reviews and Suicide Reports:** The process of responding to suicides, completing reviews, writing and editing reports, tracking QIP compliance, and so on is involved. Timelines for each step in suicide response have been developed and are specified in the MHSDS Program Guides, 2009 Revision. Internal deadlines have also been developed as a way to ensure timelines for each step of the suicide response process is met. The number of days specified for each step in suicide response, for both Program Guide and internal deadlines, is found in Appendix VI.

In reviewing timeliness of 2015 suicides, the assignment of a suicide reviewer and the visit of the reviewer to the institution were completed on time in all but two cases; both cases were originally "unknown deaths" (Cases M and V) and thus not determined to be suicides until further information was obtained. Due dates on Cases M and V were recalculated when the cases were determined to be suicides. Both were then reviewed in a timely manner.

Original suicide reports are generally completed within 30 to 40 days after the death. The established 30-day limit was met in nine cases (of 24 reports). Five reports (including Cases M and V) were completed 40 days or more after the death. All reports were available by the time Suicide Case Reviews were held. Fifteen of the 24 SCRs were completed within timelines. Of the nine SCRs held late, delays ranged from one day to nine days.

Once suicide reports are reviewed at the SCR, edits are made and a final report is due to be sent to institutions within 60 days of the death. Timeline compliance becomes increasingly difficult at this step, with only five of the 24 reports finalized and sent to institutions by the 60 day mark. Delays at this step can affect the ability of institutions and other recipients of QIPs to complete QIPs by the deadline (150 days after the death). However, in 13 cases, QIP response timelines were met. QIP responses also require review and approval, with a report of QIP implementation due to the OSM by 180 days after the suicide.

As the CDCR endeavors to complete all steps of the suicide review process in a timely manner, a focus on ensuring original reports are completed on time, on decreasing the number of days used for editing suicide reports after the SCR, and on accelerating the review, response, and approval of QIPs is underway. The DHCS SPR FIT will explore further ways to expedite review processes for implementation during the 2017 calendar year.

## Chapter III. Findings in Individual Case Reviews

**Introduction to Individual Case Reviews:** The presentation of information such as suicide rates and demographic variables in suicide deaths provides a sense of data trends, comparisons between correctional systems, and so forth. That is, suicide rates and numbers give us a *macro* look at causes and contributors to suicide and to variables that require monitoring. The data presented in prior chapters has implications for practice within the CDCR, implications that will be reviewed in the Conclusions section to follow.

Individual case reviews, on the other hand, represent a *micro* look at the idiosyncratic, often multi-determined reasons that an individual takes his or her own life. The sources of distress noted in the cases below range from a response to gang threats to an inmate's family to the vagaries of severe medical and mental illness to grief over the loss of lovers and loved ones. No two cases look quite alike.

What cannot be overly idiosyncratic are the actions of staff members of all disciplines. These staff members as a whole are responsible to prevent suicide. Suicide prevention in correctional settings is no small task. CDCR staff of all disciplines must follow policy and procedure, must show diligence and compassion in their work, and must be professional in their day-to-day interactions and responsibilities. Individual case reviews thus speak not only to the idiosyncrasies of the suicidal patient but also to the actions and professionalism of staff leading up to a suicide, in reaction to a suicide in progress, and in response to the death.

**Commonalities in individual case reviews:** Tables 22 and 23 list variables commonly found between suicides. The tables contain either factual data or qualitative determinations about the adequacy of staff response and/or the ability of staff members to meet quality of care expectations. Narrative comments are noted after each table.

Before presenting these tables, it should be noted that inadequacy of risk assessment, treatment planning, custody rounds, and so forth result in QIPs. In Suicide Case Review (SCRs) reports, reviewers *may* comment on what was done well within an institution and *may* state areas where policy was correctly followed. However, these comments are not required as it is assumed staff members will follow policy and will do a professional job in working with inmates. In contrast, reviewers *must* identify any and all departures from policy or from standards of care, creating formal Quality Improvement Plans (QIPs) applicable to each identified issue. Reviewers may also point out clinical or custodial practices that could be improved either at an institutional level or throughout all institutions; these practice suggestions can be addressed through QIP processes as well. It should also be noted here that institutional responses to QIPs are sent to the SMHP and DAI leadership for review. If any QIP response is felt to be inadequate, the SMHP and/or the DAI will contact the institution to request clarification or request additional development or implementation of the QIP. QIPs are not considered finished until approved at the headquarters level.

Table 22 lists qualitative judgments of staff performance in suicide cases. A "no" answer can reflect anything from a singular error in the treatment or care of the patient to a pattern of poor care, whereas a "yes" finding reflects a range of actions and behaviors that were consistently professional and adequate.

Table 22: *Findings of Individual Case Reviews, part 1*

| Inmate | Suicide Risk Adequately Assessed? | Adequate Suicide Risk Management? | Adequate Treatment Plan? | Good Quality Mental Health Contacts? | Adequate Nursing Rounds? | Adequate Custody Checks? | Adequate Emergency Response? | Treatment Refusal? |
|---|---|---|---|---|---|---|---|---|
| A | N | N | N | N | N | Y | Y | N |
| B | Y | Y | Y | Y | N/A | Y | Y | Y |
| C | N | N | N | N | Y | N* | Y | Y |
| D | Y | N/A | N/A | Y | Y | Y | Y | Y |
| E | N | N | N | N | Y | Y | N | Y |
| F | N | N | N/A | Y | Y | Y | N | Y |
| G | Y | Y | Y | N** | Y | N*** | Y | Y |
| H | Y | Y | N/A | N**** | N/A | Y | Y | Y |
| I | N | N | Y | Y | N | N | N | Y |
| J | N | N | N | N | N | N | N | Y |
| K | Y | N/A | N/A | N/A | N/A | N | N | Y |
| L | Y | N/A | N/A | N/A | Y | Y | N | Y |
| M | N | N | N | N | Y | Y | Y | Y |
| N | N | N | N/A | N | Y | N | Y | N |
| O | Y | Y | Y | Y | N/A | Y | Y | Y |
| P | Y | Y | N | N | N/A | Y | N | Y |
| Q | Y | Y | Y | Y | N/A | Y | N | Y |
| R | N | N | N | N | Y | Y | N | N |
| S | Y | Y | Y | Y | N/A | Y | Y | Y |
| T | Y | N/A | N/A | N/A | N | N | Y | Y |
| U | Y | Y | N/A | Y | Y | Y | Y | Y |
| V | N | N | N | N | N/A | Y | N | Y |
| W | Y | Y | Y | Y | Y | Y | Y | Y |
| X | Y | Y | N | N | Y | Y | Y | Y |

*Based on allowance of window covering. **Based on frequent refusal of services; HRL was provided. ***Based on allowance of an obstruction to viewing ****Based on poor documentation of last visit.

Starting from the far left column, problems with at least one suicide risk evaluation were found in 10 cases (42%). Problems ranged from issues with reviewing or gaining access to suicide attempt histories (two cases), failing to include information already reported about suicide attempt history (two cases), poor identification or documentation of risk factors (four cases), to failure to complete suicide risk evaluations when they were required by clinical standards or policies (two cases). Issues with suicide risk evaluations are particularly problematic, as inadequate assessment most likely leads to difficulties with safety planning (e.g., not having information on what triggered past attempts) and risk management (e.g., not managing the actual level of risk as risk had been underestimated). Therefore, it is not surprising that *all* cases identified as having problems with SREs are also considered to have problems with risk management.

Issues with adequacy of suicide risk management practices were noted in 11 cases (46%). In at least one situation, risk management efforts were inadequate or failed to address the level of suicide risk indicated. Additionally, in some cases suicide risk evaluations indicated very low risk and in some cases policies were followed such that the inmate did not require evaluation; these cases are marked as not applicable (N/A). In cases marked N or No in Table 22, issues were quite varied. These included placement of a patient on suicide precautions in an unsafe cell in one case, a failure to conduct a SRE within timelines in another case, problems with full implementation of high risk management lists or programs in two cases, failure to plan for an inmate's reaction to bad news in one case, and provision of KOP medications in another case where the inmate had mentioned a previous plan to die by overdose.

Another area impacted by the quality of suicide risk evaluation is mental health treatment planning. If risk for suicide is underestimated in a case, it stands to reason that treatment planning will also miss key components of what should be addressed clinically. In six cases, adequate treatment planning was noted. In seven cases, poor treatment planning was found. In the remaining two cases, risk evaluation and treatment planning was hampered by a patient's unwillingness to engage in treatment or evaluation services. In such cases, treatment planning should focus on efforts to engage the patient, attempts to gain historical and collateral information, and so forth.

The quality of mental health contacts was rated as not applicable in three cases where there were few or no evaluations beyond mental health screening. For cases rated Y (nine cases or 43% of applicable cases), the decided majority of clinical contacts were positive and in line with professional expectations. For the 12 cases rated N (57%), at least one clinical contact was below standards, such as incidents where poor documentation was present or where patient treatment refusals were not addressed.

Nursing rounds and/or nursing observations are required for inmates in segregated housing settings, inpatient settings, and while a patient is on suicide watch or precautions either in alternative housing or in MHCB. Cases marked N/A are those in which the inmate or patient was never in such a setting. Problems in nursing rounds were found in five of the remaining 16 cases (31%) , specifically: One case where required psychiatric technician rounds were not documented (in ASU), one case where nursing observations for a patient on 15 minute checks were not staggered, one case where a nursing check required each shift did not ensure that the patient was living/ breathing, one case of delays in starting an order for 15 minute checks, and one case where checks in alternative housing were not documented or staggered. In 11 (69%) of applicable cases nursing rounds were done adequately.

Custody checks occur in all institutions for all inmates. For example, custody conducts institutional counts multiple times in each 24 hour period. In 17 cases (71%), custody checks were rated as adequate and conducted per policy. Of the remaining seven cases, four involved situations where window coverings or draping of bunks was allowed despite custody policy forbidding the practice. In another case, an inmate kept a blanket over his head, with custody checks not ensuring

living/breathing. In the remaining two cases, rounds were completed later than specified by policy around the time of the death.

Emergency response by custody officers, nursing staff, and medical staff are considered in ratings of emergency response. In 14 cases (58%), no issues with emergency response were noted. In four cases, issues with bringing complete cut-down kits were found. In three cases, issues with timely AED placement or AED functioning were reported, and in two cases delays in emergency response occurred. Other issues were rather idiosyncratic; such as the incident of an ambulance going to the wrong institution and a case where CPR was discontinued during transport to the TTA.

Issues related to patient refusal of evaluation were cited in three cases (12.5%). In these cases, patients with safety or privacy concerns declined to be brought out to confidential settings for clinical contacts while also likely withholding information when contacted at cell-front was noted. In these cases, reviewers recommended QIPs to address patient refusal and to promote treatment planning when a patient declines to come out of cell for confidential contacts. The problem of patients not wanting to be seen talking to mental health, yet needing these services, is a difficult issue to combat.

Table 23 lists additional common findings of case by case reviews.

Rigor mortis is a condition of the body postmortem that indicates a person has been deceased for at least four hours.[23] In 2015, only one case was found to be in rigor mortis at discovery. This case occurred in a CTC. By comparison, four cases were found in rigor mortis in 2014. This may suggest improvements in the quality of safety/welfare checks, the implementation and use of Guard One throughout institutions in the CDCR, or simple chance variance.

The method used for each suicide is listed for the reader's reference. As in prior years and in other prison systems, hanging is easily the most common method of suicide in incarcerated populations, accounting for the means for 83% of the suicides in the CDCR in 2015.

Table 23: *Findings of Individual Case Reviews, part 2*

| Inmate | Patient Found in Rigor Mortis? | Method Used | Prior Suicide History/ # of Prior Attempts | Higher Level of Care Indicated? | Housing/ Cellmate Present? | MHSDS Status at Time of Death & LOC? |
|---|---|---|---|---|---|---|
| A | N | Jump | Y/1 | Y | SNY/N | CCCMS |
| B | N | Hanging | Y/1 | N | GP/N (out to work) | N |
| C | N | Hanging | Y/6 | Y | GP/N | CCCMS |
| D | N | Hanging | N/0 | N | ASU/N | N |
| E | N | Hanging | Y/3-7 | Y* | ASU/N | EOP |
| F | N | Overdose | Y/1 | N | ASU/N | N |
| G | N | Hanging | Y/2 | Y** | ASU/N | EOP |

---

[23] https://en.wikipedia.org/wiki/Rigor_mortis

| H | N | Hanging | Y/2 | N | GP/N | N |
|---|---|---|---|---|---|---|
| I | N | Hanging | Y/1 | N | GP/N | CCCMS |
| J | N | Hanging | Y/1 | Y | STRH/N | CCCMS |
| K | N | Hanging | N/0 | N | SHU/N | N |
| L | N | Hanging | N/0 | N | GP/N | N |
| M | N | Overdose | Y/5 | Y | GP/N | EOP |
| N | N | Asphyxiation | N/0 | Y*** | ASU/N | N |
| O | N | Hanging | Y/3 | N | ASU/N | CCCMS |
| P | N | Hanging | N | Y**** | GP/N | N |
| Q | N | Hanging/ Cutting | Y/3 | N | GP/N | CCCMS |
| R | N | Hanging | Y/1-3***** | Y | ASU/N | CCCMS |
| S | N | Hanging | Y/1 | N | GP/N | CCCMS |
| T | Y | Asphyxiation | N/0 | N | CTC(GP)/N | N |
| U | N | Hanging | Y/2 | N | GP/Y | N |
| V | N | Asphyxiation/ Overdose | Y/3 | N | CTC/N | CCCMS |
| W | N | Asphyxiation | N/0 | N | GP/N (out to work) | EOP |
| X | N | Hanging | N/0 | N | GP/N | EOP |

*Recommended during Regional Team visit, December, 2014 **Due to worsening psychosis ***Inclusion in the MHSDS seemed warranted ****Per policy should not have been discharged from CCCMS *****Incidents on 1/7/14, 4/22/14, and 10/7/15 were without clear intent

There is a robust literature on the heightened chronic risk of suicide for individuals with prior attempts. This risk is especially robust when a person has a history of two or more suicide attempts.[24] It is thus not surprising that 16 of the 24 cases (67%) who died by suicide in 2015 also had a history of prior attempts, with 10 cases (42%) having a history of multiple attempts. Deaths occurring on a person's first attempt are correlated with the use of a highly lethal method, such as firearms in the community and hanging in the case of prisons. Hanging is a highly accessible means for suicide in prisons. The ability of a person to abort a suicide attempt mid-way through the event is usually impossible in hanging.[25]

Clinicians can use several interventions for risk management purposes, including transfer to inpatient hospitalization, transfer to a more intensive level of care, or placement in a high risk management program. Inpatient psychiatric hospitals, for example, are able to restrict means to hanging by eliminating tie off points. In 2015, reviewers found reason to indicate that more intensive risk management may have been needed in nine cases (37.5%). Of these cases, one was recommended for a higher level of care by a visiting Regional Team, two should have been considered for placement or retention in the MHSDS, one showed signs of psychotic decompensation, two should have been considered for higher levels of care due to frequent refusal of services, two were removed from high management lists or programs, and one had received bad news and had threatened to harm himself if this news was received.

---

[24] E.g., Forman, Berk, Henriques, Brown, & Beck, 2004. History of multiple suicide attempts as a behavioral marker of severe psychopathology, American Journal of Psychiatry, 161, 437-443.

[25] https://www.hsph.harvard.edu/means-matter/means-matter/case-fatality/

Housing status is listed next with findings regarding whether a cellmate was present or not at the time of the suicide. In 23 cases (96%), there was either no cellmate present or the deceased had been in a single cell at the time of the suicide. In the one case where a cellmate was present, the deceased hung himself during the overnight hours.

Finally, the level of care for each case at the time of death is listed. The high frequency of suicides within the MHSDS is both to be expected and a cause for continued quality improvement efforts.

## Chapter IV. Review of Suicide Prevention Initiatives in 2015

**Introduction:** The development and implementation of Quality Improvement Plans following deaths by suicide is but one of many pieces of a comprehensive suicide prevention strategy. These plans occur too late for the deceased, but correct problems and offer training and prevention plans that may contribute to decreasing the risk of suicide in an institution and in a system in the future.

There are many additional aspects of a comprehensive suicide prevention strategy.[26] Such a strategy includes ensuring a solid screening process occurs at various points of incarceration, establishing a referral process, written procedures and policies for suicide prevention are maintained and updated as needed, and there are effective methods for evaluating proof of practice of existing and/or on-going suicide prevention programs and initiatives. In addition, comprehensive suicide prevention programs must have a commitment to staff training, with the provision of on-going training on suicide risk detection and referral to all correctional employees. In addition, the complexities and specifics of suicide risk evaluation, risk management, and intervention training must be provided to mental health staff. Comprehensive programs also assure easily available mental health services for inmates who request and/or are referred for these services, along with a variety of care options and levels. Suicide prevention materials must be readily provided for inmates and for those who interact with inmates (e.g., family members, work supervisors). Communication between disciplines and shifts must be prioritized, particularly regarding high risk inmates.[27]

The CDCR has worked diligently to ensure that a comprehensive suicide prevention program is in place. This effort has been shared with and reviewed by the Office of the Special Master and the OSM's experts for many years. It is beyond the scope of this report to review all suicide prevention program efforts over these many years. Rather, the information provided in this section reviews advancements in the CDCR suicide prevention program during the 2015 calendar year and shortly thereafter.

**Suicide prevention efforts developed, initiated, and/or implemented during the reporting year**: Numerous initiatives were either under development at the close of 2015 or had been

---

[26] Hayes, L.M. (2013). Suicide Prevention in Correctional Settings: Reflections and Next Steps. International Journal of Law and Psychiatry, 36, 188-194.

[27] Preventing Suicide in Jails and Prisons, World Health Organization, 2007

implemented during the year. Each initiative is described below with notation of the status of the project on December 31, 2015 as well as the current status of each effort.

- New Five-Day Follow-Up Form: Patients are known to be at elevated risk for suicide upon release from inpatient settings per studies conducted in the community.[28] The Five-Day Follow-Up Form (CDCR MH-7230-B) used by the CDCR is intended to ensure clinical contacts with patients returning from inpatient settings in cases where the reason for admission was danger to self. Whereas the old form had been contained on one page for all five days, leaving little room for documentation, the new form developed has two pages with sufficient room for recording the patient's comments and the clinician's assessment of the patient. The new form also contains several structured, suicide-specific questions so as to ensure clinicians and psychiatric technicians are asking about suicidal thoughts, desire, and intention. The new form also requires mental health clinicians to complete a safety/treatment plan with the patient. The new form was routed and approved by all required committees by the end of 2015. Involved unions were noticed. The form was readied for distribution and materials for Training for Trainers were prepared and delivered by webinar in January, February, and May, 2016. Training for Trainers materials were co-taught by mental health and nursing staff. The form was released for use on June 10, 2016.

- ASU Post-Placement Screening Questionnaire: All inmates are screened prior to placement in segregated housing units for mental health symptoms. Once placed in segregated housing, all inmates are contacted daily by psychiatric technicians. In addition, identified mental health patients are seen on a regular basis by mental health clinicians. As inmates may experience distress upon placement, the ASU Post-Placement Screening Questionnaire is a brief measure (12 to 13 items) that is administered by a psychiatric technician to non-MHSDS inmates and assesses an inmate's level of distress and the presence or absence of suicidal thoughts or behavior. The screening questionnaire has set scoring rules that, once scored, guide the psychiatric technician regarding whether a referral to mental health is indicated, and if so, to what degree of urgency. Inmates who refuse the screen are to be referred to mental health on an urgent basis. The new form (CDCR MH-7790) was also routed and approved by all required committees by the end of 2015. Involved unions were noticed. The form was readied for distribution and trainings (co-taught by mental health and nursing staff) were prepared, again via the Training for Trainers format. The PowerPoint presentation for the form had been reviewed and approved. This form was also released for use on June 10, 2016.

- Provision of Beds for Alternative Housing Cells: Several tours and audits of suicide prevention practices at various institutions had noted the lack of a physical bed in certain

---

[28] Qin, P., & Nordentoft, M. (2005). Suicide Risk In Relation to Psychiatric Hospitalization, Archives of General Psychiatry, 62, 427

alternative housing cells. These cells are used with patients who are awaiting transfer to a MHCB and patients in these cells are typically on Suicide Watch (direct, one-on-one observation). Without available beds, patients were placed temporarily in cells with mattress placed directly on the floor. As this could be experienced as punishment, the CDCR agreed to ensure beds were placed in all alternative housing cells. A bed (Norix Stack-a-Bunk) was selected and was purchased for this purpose. Beds were delivered to all institutions in need of them by the end of 2015. A Mental Health Services policy was drafted for patients pending MHCB transfer that includes provision of a Stack-a-Bunk in alternative housing. This policy remains under review currently.

- Updated Initial SRE Mentoring Training for Trainers: The SRE Mentoring training slides and webinar were updated to place more emphasis on mentoring safety/treatment planning, to develop more of an understanding of the interplay of chronic and acute risk factors in cases, to further explore the role of the mentor in assessing and expanding clinician competencies around suicide risk evaluation, and to further teach the Quality of Care Tool for SRE Mentors. The revised training was offered on several occasions in 2015 and 2016 and was well received. Additional revisions were made to the presentation in November, 2016.

- Development of a SRE Mentoring 'Booster' Training: The requirement for an annual 'booster' training was discussed and a presentation developed for current mentors. The 'booster' training was re-cast as an advanced course in suicide risk evaluation mentoring, with a focus on risk assessment competencies, methods for competency assessment, and ways to enhance SRE skills in clinicians at all levels of proficiency. The training was undergoing revisions at the end of 2015 with a plan to implement training in 2016. This training indeed occurred in 2016, with the mentoring booster training attended live by 50 current mentors in November, 2016 and with numerous others taking the course by webinar in December, 2016.

Memorandum Clarifying SRE Mentoring Requirements: A memorandum was drafted in 2015 outlining and revising the requirements for SRE Mentoring. Clinicians working in Mental Health Crisis Bed settings were required to complete mentoring annually, whereas other clinicians were maintained on an every two year schedule. Clinicians were also notified of two SRE audits; one to be conducted by institutional program supervisors and the other by headquarters staff. Each mental health clinician will have an audit of a completed SRE at least once every six months. Processes for corrective action when audit criteria are not met were described as well. Finally, the expectation that SRE Mentors would receive annual 'booster' training was written. This memorandum was released on March 15, 2016. Institutional program supervisors began auditing SREs using the Chart

Audit Tool, reporting results through the Quality Management Portal. Headquarters audits have been modified to solely focus on inter-rater reliability checks on institutional audits.

- Memorandum Clarifying SRE Training: SRE Training is a 7-hour CME-approved course that is provided to all CDCR mental health clinicians within 180 days of hire and every two years thereafter. The SMHP updates the 7-hour SRE class annually. The updated class is provided to a large group of institutional clinicians who then teach the class at their home institutions. This process of annual updates in Training for Trainers also ensures trainers are adherent to the content and focus of the course. A memo clarifying SRE Training requirements was drafted in 2015, noting that the requirement extends to clinicians hired through a registry and to telepsychiatry. Training for Trainers occurred in October, 2014 for the 2015 training year and in October, 2015 for the 2016 training year. This memorandum was pending release at the end of 2015 and was released on March 24, 2016.

- Memorandum Clarifying SPR FIT Coordinator Duties: A memorandum was released on August 14, 2015 instructing all institutions to designate one Senior Psychologist, Specialist to the role of institutional SPR FIT Coordinator, tasked with leading suicide prevention efforts at each facility. The role also includes coordination of mental health assessments/evaluations and mental health training/orientation. A duty statement for the position was attached to the memorandum. The memorandum and clarification of duties was designed to ensure all institutions had dedicated resources within mental health programs to coordinate suicide prevention efforts. This memorandum was released on August 14, 2015 and implemented; the memorandum is found in Appendix VII.

- Memorandum Regarding SRE Tracking: A memorandum was released on October 23, 2015 mandating that all institutions use appointment schedulers to simultaneously enter SREs completed by clinicians into the patient record and into the Mental Health Tracking System (MHTS). Clinicians were required to enter scheduled and unscheduled SRE appointments on daily work logs. This process is automated in EHRS institutions, but must be entered in this manner in institutions using the eUHR. The memorandum ensures proper tracking of suicide risk evaluations and timely scheduling and completion of follow-up risk evaluations. This memorandum is found in Appendix VIII.

- Updated Cadet Training: An update to training provided at the cadet training academy on the Mental Health Services Delivery System (MHSDS) and on Suicide Prevention was drafted and reviewed in 2015. Training for trainers on the updated version was provided on November 30, 2015. Lindsay Hayes attended the updated training as it was being given to a cadet class, providing feedback on the training in December, 2015. The training and accompanying lesson plans were undergoing revisions in light of Mr. Hayes' feedback at the end of 2015. These revisions were approved and distributed on May 11, 2016.

- **Workgroup on Keep-on-Person (KOP) Medications**: In response to a headquarters QIP (from Case F in 2015), a workgroup was assembled to discuss how prescribed medications should be distributed in high-risk settings, such as in ASU Intake Cells. The workgroup met several times, considering input from pharmacy, custody, nursing, medical, and mental health representatives. Suggestions for limiting KOP medications in certain settings, relying on the Complete Care Model to communicate when medications should be administered as Direct Observation Therapy (DOT), and other potential solutions were discussed. Workgroup meetings focused on integrating clinical practices with KOP medications with new policy on the use of Over-The-Counter (OTC) medications. In addition, concerns about KOP medications will be an issue to be discussed at morning huddles.

- **Training in Safety Planning**: In response to reviews by regional staff, headquarters staff, and Mr. Hayes, training entitled "Safety/Treatment Planning for Suicide Risk Assessment" was created in 2014 by Dr. Robert Canning. The class was updated in 2015 with a slightly revised title, "Safety/Treatment Planning within Suicide Risk Assessment and Management." The class included new content focusing on the on-going role of safety planning in managing suicide risk within the inmate population. Continuing medical education (CME) units are available to clinicians who take this course; attendance is mandatory for all clinical staff. The revised class was provided on four occasions between August and October, 2015Safety planning training was offered on multiple occasions in 2016, with training then planned every six months in order to accommodate newly-hired clinical staff. The role of safety/treatment planning was also incorporated into other updated trainings in 2016 (e.g., in suicide prevention videoconferences, the 7-hour SRE course, and in SRE Mentoring classes).

- **Training in Complex Diagnostic Cases**: This training, entitled, "Differential Diagnosis in Complex Mental Health Cases" was developed to assist treatment teams in considering cases involving self-harm. Clinicians and clinical teams can err in underestimating or overestimating risk for suicide,[29] particularly when cases present with complex diagnostic presentations and when patients engage in negative [30] or positive impression management.[31] The under- or over-reporting of symptoms of distress and the within-patient variances in reporting suicidal ideation or desire for death can cause considerable clinical

---

[29] Horon, McManus, Schmollinger, Barr, & Jimenez (2013). A study of the use and interpretation of standardized suicide risk assessment measures within a psychiatrically hospitalized correctional population. *Suicide and Life-Threatening Behavior*, 43, 17-38.
[30] Sullivan & King (2010). Detecting faked psychopathology: A comparison of two tests to detect malingered psychopathology using a simulation design. *Psychiatry Research*, 176, 75-81.
[31] Bagby & Marshall (2003). Positive impression management and its influence… A comparison of analog and differential preference group designs. *Psychological Assessment*, 15. 333-339.

confusion. For example, a patient who reports self-harm behavior due to "needing to get off the yard" can be seen as manipulative and may represent little else in the case. However, for a more vulnerable patient the pressure exerted by other inmates can be a source of considerable distress and may indeed give rise to a desire to die. An approved version of this training was presented to mental health clinicians on multiple occasions in 2016.

- Training in Culturally-Competent Suicide Risk Assessment: In response to a 2015 QIP (Case B), training was designed to offer primary care physicians and mental health clinician's specific approaches and tools to assess suicide risk in patients of various cultures and belief systems. Training included introductions to the DSM-5's Cultural Formulation Interview,[32] the Cultural Assessment of Risk for Suicide (CARS),[33] and the Cultural and Protective Suicide Scale for Incarcerated Persons (CAPSSIP).[34] Interactive vignette-based practice of suicide risk inquiry in diverse cases was integrated within the training. The course was offered, with CME credits, on four occasions in 2015. Several hundred physicians and mental health clinicians attended the course.

- Training of Board of Prison Hearings (BPH) Commissioners: Two informational talks were developed for the BPH. First, the perception that participation in the MHSDS would cause a BPH denial (and the reaction of clinicians to this perception) was listed as a QIP in Case F. Case F requested to be taken out of the MHSDS prior to an upcoming BPH appearance, a request that was granted by his IDTT. In addition, two cases in 2015 (also Cases F and P) *may* have considered receiving a RVR as removing the possibility of parole. For these reasons, members of the SMHP met with administrators within the BPH on two occasions in 2015 to discuss the best way of going about offering information to commissioners. After these meetings, two trainings were developed. The first occurred in October, 2015, with commissioners briefed on the topic of how mental health clinicians evaluate RVRs and the role depression, psychosis, and other mental health conditions in influencing behavior temporarily or when untreated. The second training was scheduled with the intention of exploring perceptions about mental illness and future risk of violence. An area of focus for the second training was on encouraging treatment participation and treatment compliance as a way of decreasing violence risk. This second training occurred in January, 2016.

---

[32] Lewis-Fernandez, Aggarwal, Hinton, L, Hinton, D, & Kilmayer (2015). Handbook on the Cultural Formulation Interview. American Psychiatric Association Publishing, Washington, DC.
[33] Chu, Floyd, Diep, & Bongar (2013). A tool for the culturally competent assessment of suicide: The Cultural Assessment for Suicide (CARS) Measures. *Psychological Assessment, 2*5, 424-434.
[34] Horon, Williams, & McManus (Manuscript in review). The Culture and Protective Suicide Scale for Incarcerated Persons (CAPSSIP): A measure for evaluating suicide risk and protection within correctional populations. Submitted to *Psychological Services.*

- <u>BPH Commissioner and BPH Evaluator Access to the Urgent Response Mailbox:</u> As a result of discussions between BPH administrators and SMHP representatives, a letter was sent to all BPH commissioners and all evaluators working for the BPH to notify them of the availability of the Urgent Response mailbox. The mailbox allows BPH commissioners or evaluators to alert headquarters mental health staff regarding any concerns for suicide in inmates or patients who are scheduled to go before the BPH or who appear distressed at or after a BPH hearing. For example, a patient who makes concerning statements during a pre-BPH evaluation can be referred to headquarters mental health personnel, who then notify the mental health program at the patient's institution. Similarly, an inmate who appears highly distressed by a parole denial during a BPH hearing can be referred by any of the commissioners present, ensuring a mental health contact occurs on that same day. This project has been implemented. The Urgent Response Mailbox was being used by BPH commissioners and evaluators by the close of 2015.

- <u>Suicide Prevention Pamphlets: Inmate and Family Member</u>: Suicide prevention pamphlets were designed for inmates and for family members during 2015. The pamphlets were specifically intended for suicide prevention purposes. Inmate pamphlets provided information on how to ask for help, noted common myths about suicide, and described feelings that may go along with suicidal thoughts. The varieties of ways inmates can be referred or self-referred for mental health contact are listed. The family and friends pamphlet provides a list of warning signs for suicide, clarifies common myths about suicidal people, and provides a mental health contact number. The pamphlets were distributed in July, 2015, accompanied by a memorandum dated July 30, 2015. The memorandum specified that inmate pamphlets were to be made available in all housing units, with family/friend pamphlets available in visiting areas. The process for ordering additional pamphlets was also detailed. Both pamphlets were distributed during the year in English. Pamphlets in Spanish for both inmates and friends/family members had been prepared and were moving towards printing by the end of 2015. All pamphlets are currently available and can be reordered and redistribution at any time. The memorandum sent to institutions and the pamphlets created and distributed are found in Appendix IX.

- <u>ASU Activity Workbooks:</u> ASU Workbooks were created in order to provide in-cell activities for inmates and patients in segregated housing units. The workbooks contain a variety of activities that inmates might use to distract themselves from the stress of the ASU placement, as ASU, particularly early in the placement, is known to be a high risk time/location for suicide. In addition, the workbooks contain suicide prevention messages and referral information scattered throughout the other content. The workbooks also serve as an item that custody officers and psychiatric technicians can use to encourage interaction with inmates and patients. Version 1 of the workbooks was re-ordered during the calendar year 2015, an indication of the regular use of these workbooks. The workbooks are

available in English and Spanish. Additionally, a second version of the workbook was in development. The use of tablet-based activity booklets, using the tablets currently available in the inmate canteen, was also discussed. Implementation of Version 1 of the workbook had been very successful. Version 2 of the ASU Activity Workbook was approved by the end of 2015 and workbooks were distributed throughout 2016.

- **Columbia Suicide Severity Rating Scale (C-SSRS) Training and Inclusion in the EHRS**: The C-SSRS is a well-established, empirically established, standardized suicide risk measure[35] that has been incorporated as part of all suicide risk evaluations in the CDCR's Electronic Health Record System (EHRS) beginning in 2015. The primary author of the measure, Kelly Posner, Ph.D. (from Columbia University, New York), was invited to present on the measure in 2015. She accepted and presented the C-SSRS to a group of 50 CDCR clinician-trainers from over 30 institutions in October, 2015. The training was video-recorded and was just under two hours long. A group of handouts and a brief PowerPoint slideshow was constructed to aide clinicians in becoming familiar with administering the C-SSRS. The C-SSRS assists mental health clinicians by providing a structured way to inquire about suicidal history, to evaluate the intensity of suicidal ideation, and to assess the potential and actual lethality of suicide attempts. The recorded video presentation by Dr. Posner, handouts and other materials were distributed in February, 2016. Clinician trainers received two hours of approved CME credit on the C-SSRS based on the recorded (DVD) presentation. All institutions that received the EHRS in 2016 held C-SSRS training prior to their respective EHRS start dates.

- **Collaborative Assessment and Management of Suicidality (CAMS) training**: The CDCR began discussions with David Jobes, Ph.D., a clinical researcher at the Catholic University of America (Washington, D.C.) during 2015. Discussions centered on training a group of clinicians within the CDCR on CAMS. Dr. Jobes agreed to present on the principles of CAMS, a treatment intervention specific to working with suicidal patients, during a statewide suicide prevention videoconference in October, 2015. CAMS represents a promising intervention for mental health clinicians within the CDCR, as the therapy has wide community use, good empirical backing,[36] good support with other established treatments,[37] and flexibility to be used in a variety of settings. CAMS may be effective in targeting patients with high chronic risk for suicide, patients on high risk lists or in high

---

[35] Posner, Brown, Stanley, (2011). The Columbia-Suicide Severity Rating Scale: Initial validity and internal consistency findings from three multisite studies with adolescents and adults. *American Journal of Psychiatry*, 168, 1266-1277.

[36] Jobes, Wong, Conrad, Drozd, & Neal-Walden (2005). The Collaborative Assessment and Management of Suicidality versus treatment as usual: A retrospective study with suicidal outpatients. *Suicide and Life-Threatening Behavior*, 25, 483-497.

[37] Andreasson, et al. (2016). Effectiveness of Dialectical Behavior Therapy versus Collaborative Assessment and Management of Suicidality for reduction of self-harm in adults with borderline personality disorder and traits. *Depression and Anxiety*, 33, 520-530.

risk programs, and patients with recent contemplation of or engagement in self-harm with intent. By the end of 2015, a purchase order to train an initial group of 50 clinicians in CAMS was in process. A list of clinicians was identified at all institutions with mental health missions to be the first group to receive and use CAMS. CAMS note templates were under preparation for inclusion in the EHRS. Training began in January, 2016 and continued until July, 2016. CAMS trainings occurred by using on-line training modules and a series of follow-up consultation calls with CAMS experts. A second round of clinician training is being arranged for 2017.

- Self-Harm Tracking and Predictive Algorithm: Self-harm incidents at every institution continue to be entered in MHTS. The data is used to identify institutions with high numbers of events and to track trends within and between institutions. In addition, using a technique called machine learning, the data will be used in developing a predictive algorithm. Machine learning algorithms can identify variables and variable combinations that may not at the surface appear related to increased short-term risk of self-harm, but can statistically establish these risks. The model allows for refinement as additional data points are entered. Work on a machine learning algorithm was begun in 2015, led by David Leidner, Ph.D., a specialist in informatics and data science. Dr. Leidner piloted an initial algorithm for predicting self-harm. Initial inquiries were made with several academic institutions regarding partnerships in developing the algorithm. More recently, a federal grant application was submitted in consultation with Drs. Ronald Kessler and Matthew Nock at the Harvard Medical School. The grant project hopes to refine the machine learning algorithm, increasing its predictive power and potentially alerting clinicians to patients with high degrees of likelihood of self-harm in the near future.

- On-Going Training through Monthly Suicide Prevention Videoconferences: Monthly suicide prevention videoconferences continue to occur. Institutional SPR FIT teams and mental health clinicians participate in the videoconference by viewing presentations in conference rooms using VTC connections or, when unable to attend in this manner, through phone lines. In 2015, the suicide prevention videoconference was used to review suicides and trends in suicides within the department, to brief staff on new or revised policies and procedures, to notify staff of suicide prevention trainings and resources (e.g., membership in the American Association of Suicidology), and to provide didactic trainings. Trainings covered during the year included:
  - Behavioral markers for suicide, even when suicide is denied
  - Introductions to evaluating suicide risk in the EHRS
  - Methods for improving safety plans
  - The use of suicide intention scales (with vignette practice)
  - Understanding chronic risk for suicide

   o Understanding the interplay between chronic and acute risk for suicide and imminent/warning signs for suicide
   o Staff self-care and monitoring of reactions to suicidal patients
   o Introduction to CAMS.

The suicide prevention videoconference is a continuing suicide prevention effort. Presentations continued in 2016.

- Revisions to the SRE and inclusion of additional suicide risk assessments in the EHRS: As noted above, the inclusion of the C-SSRS as part of every SRE conducted within the CDCR is planned as part of EHRS implementation. The C-SSRS adds a structured set of questions inquiring about the intensity of suicidal ideation and about the range of suicide attempts and suicidal behaviors in which the patient has engaged over his or her lifetime. In addition, the SRE in the EHRS adds detailed information about past suicide attempts when applicable, noting the timing of the attempt, the means used, the potential and actual lethality/medical consequence, and so forth. These additions should help clinicians construct more accurate judgments of acute and chronic risk, while ensuring greater accuracy in considering historic vulnerability to suicide. In addition, the EHRS contains seven suicide risk assessment tools that may be used as needed by clinicians. These additional tools can help with understanding cultural protective and risk factors in cases,[38] evaluate readiness [39] and/or capability for suicide,[40] evaluate motivations for suicide attempts,[41] and so forth. Each of these tools was provided by researchers to the CDCR. All of the measures mentioned above had been included in the 'build' of the EHRS, with the C-SSRS prominently featured within the EHRS SRE. Training in the additional suicide risk assessment tools available in the EHRS occurred via webinar in 2016, with additional trainings offered in monthly videoconferences. Live and webinar trainings are planned for 2017.

Progress on each of these initiatives during 2016 will be reviewed in the 2016 Annual Report, along with all new initiatives undertaken in the 2016 calendar year.

## Chapter V. Conclusions

**Introduction:** The numerous efforts undertaken by the CDCR to reduce suicides, aided by the consultation of the OSM, have been productive. Many suicides that may have occurred during 2015 were prevented, on-going efforts are helping to reduce rates, and new initiatives hold promise in further reducing suicides within the CDCR. The rate of suicide in the CDCR in 2014 and 2015

---

[38] CAPSSIP; *ibid*
[39] Chronic Readiness Questionnaire; Horon, McManus, & Sanchez-Barker (2013)
[40] Acquired Capability for Suicide Scales—Fearlessness About Death; Ribeiro, Witte, Van Orden, Selby, Gordon, Bender, & Joiner (2014)
[41] Reasons for Attempting Suicide Questionnaire; Holden & Delisle (2006)

dipped below the average rate of suicides in U.S. prisons in 2014 (the last reporting year available) and the percentage of suicides occurring in segregated housing units declined in both years. Efforts during the reporting year ranged from QIPs at the institutional level to continuing work to train clinicians in suicide risk evaluation and risk management to changes in policy and procedure to innovative projects. Yet, work remains to be done and efforts are on-going.

**Summary of Findings:** In 2015, 24 suicides occurred within the CDCR, 22 males and two females, at a rate of 18.6 per 100,000 inmates. Caucasian inmates and inmates in the age groups 30-34, 45-54, and over 60 died by suicide at a higher frequency then would be expected given their respective percentages within the CDCR population. Suicides occurred more commonly in unmarried inmates with limited educational and vocational experiences. Health factors were implicated in nearly half of the deaths by suicide in 2015. The frequency of suicide in segregated housing has declined, but remains an area of continued focus. Inmates sentenced to life also had a higher risk of suicide than inmates with determinant sentences. The first year of incarceration was also correlated with higher risk. Only one (4%) suicide occurred in a cell with a cellmate present (the cellmate was sleeping at the time), suggesting a protective impact of dual person or dorm housing. Suicides were more likely in individuals with past attempts (67%), a finding that is both expected and suggestive of potential interventions for (living) suicide attempters/survivors. A broad range of motivations or triggers for suicide were found in 2015, with in-prison stresses repeatedly seen as underlying suicidal motives.

In comparison to the past 10 years, the suicide rate in the CDCR in 2015 of 18.7 per 100,000 is the third lowest rate, with 2014 (17.0 per 100,000) and 2009 (14.9 per 100,000) the years with the lowest rates. Two suicides of female inmates occurred in 2014 and 2015, higher than the number of suicides in such settings in all but two of the prior 20 years. The frequency of suicide over a 15-year period is highest in prisons with large mental health programs (1-2 suicides per year) and lowest in settings with either minimal mental health programs or predominantly inpatient missions (0.0 to 0.4 suicides per year on average). In 2015 and in the past 10 years in general, suicides occur most frequently in March, May, and October.

The frequency and rate of suicide within the CDR has declined over the past 10 years. This decline is seen in fewer suicides by Caucasians and Hispanic/Latinos, the two groups with the highest frequency of suicide in the CDCR, and in fewer suicides in individuals ages 25-54. Suicides of inmates age 55 and over are the only group to have trended higher in 2015 compared to the previous five years. Suicides in segregated housing units have also declined in frequency compared to prior years, though the setting continues to have an elevated risk of suicide compared to other housing types. Inmates who qualify and have been placed in the MHSDS likewise continue to have an increased risk for suicide, with MHSDS rates of 52.6 per 100,000 in the past 10 years versus a rate of 10.3 per 100,000 in non-MHSDS inmates over the same period.

As referenced above, the rate of suicide in U.S. Prisons rose to 20.0 per 100,000 inmates in 2014, the last year such statistics are available. This rate is higher than the rate of suicide in the CDCR

in 2014 and in 2015. It is notable that the rate of suicides in the CDCR has declined in the past 10-years at a time when both the community rate and U.S. Prison rate has increased. Men incarcerated in the CDCR had a lower rate of suicide then men in the community in 2014 and 2015.

When a non-lethal self-harm incident occurs within the CDCR, institutions are required to report the event using a database of such incidents. When a suicide occurs, a broad and intensive series of reviews is set in motion. These internal and external reviews evaluate the performance of staff members within and across disciplines, evaluate the emergency response, discuss the event in terms of procedural and policy considerations, and determine what corrective action plans must be put in place to ensure qualitative improvements to suicide prevention programs. In 2015, a total of 115 quality improvement plans were initiated and completed, addressing case-specific, institution-specific, and departmental level actions need to enhance suicide prevention efforts. Personnel at the headquarters level review all deaths within the CDCR and carefully evaluate all deaths initially listed as "unknown" or as caused by overdose in conjunction with the Death Review Committee. Suicide case reports are carefully edited and reviewed for quality, with quality audits completed by Quality Management staff. With very few exceptions, Suicide Case Reviews meet all or nearly all audit criteria. Experts working with the OSM participate in SCRs.

Suicides occurring in the CDCR in 2015 were understandably rather idiosyncratic and often multi-determined. Each of the 24 suicides in the year was reviewed to illustrate the complexities of the case and how suicidal outcomes can manifest within very different individuals. Case findings are also tabulated to look at key issues in improving suicide prevention. Among these findings are continued difficulties with suicide risk evaluations, suicide risk management, and treatment planning by mental health clinicians, manifested in a variety of ways over the 10 to 11 cases where these issues were identified. The need for higher levels of care considerations was also indicated in a number of cases. Issues with custody rounds, such as allowance of in-cell draping, concerns with emergency response, such as failing to bring full cut-down kits to an emergency, and problems with nursing/psychiatric technician checks were noted in a number of cases as well. Only one inmate was found in a state of rigor mortis in 2015, an improvement over past years.

Numerous suicide prevention initiatives continued, created, or initiated in 2015 were also reviewed. These initiatives strive to ensure a comprehensive suicide prevention strategy remains in place and continues to grow and develop as the population of the CDCR changes. Initiatives arose from many sources: QIPs, suggestions by Mr. Lindsay Hayes, audits of clinician performance, results of mentoring of clinicians trained in suicide risk evaluation and treatment planning, discussions and coordination with others (e.g., BPH commissioners), inspiration from public suicide prevention campaigns, discussions with and consultation with renowned suicidologists, and even advances in informatics and other technologies. The development of the EHRS also set in motion a number of opportunities for innovation in the service of improving patient safety.

**Report implications and future steps:** A group of 1 report implications are enumerated below. The order of these implications is based on the order in which each finding was presented in the annual report. Future steps regarding each implication are to be discussed upon during DHCS SPR FIT meetings in 2017.

1. Suicides in older adults: As was noted in Table 2, inmates over the age of 60 make up 6% of the population within the CDCR. However, 21% of suicides within the CDCR in 2015 were within this age group, making this the age group most overrepresented in number of suicides. High rates of suicide are found in the community in elderly males, particularly Caucasian males, during their mid- and late 70s and 80s. For mental health clinicians, the use of measures of connectedness with elderly patients should be discussed. The Interpersonal Needs Questionnaire (INQ)[42] is included as an optional assessment in the EHRS and is a fine choice in such cases.

2. Suicides in inmates with co-morbid medical conditions: Nearly half (46%) of the inmates who died by suicide in 2015 were considered to have serious and/or chronic medical problems. This group of inmates had medical problems ranging from chronic low back pain or headaches to cases of liver disease, cancer, hemiparesis, diabetic neuropathy, cardiac problems, and worsening blindness. Community surveys of suicide in patients with significant medical problems have had varying results, with roughly 10% of suicides seen as attributable to medical disorder or to terminal illness.[43] In comparison, the one year (2015) total of 11 suicides of 24 in the CDCR is rather elevated and thus a potentially promising area to increase suicide prevention efforts. Several institutions have implemented pain management committees and pain management groups for inmates, and the success of these endeavors is being looked at closely.

3. Suicides in segregated housing units: Despite a significant decline in the frequency of suicide in segregated housing units, the rate of suicide in these units remains high compared to other housing settings within the CDCR. The three deaths occurring in dedicated intake cells is also concerning. Each of these three suicides occurred using different methods (hanging from a sprinkler head, hanging from ventilation grate holes, and overdose on KOP medications). A great deal of effort has already gone into improving safety and suicide prevention procedures in these settings, and it may be too early to fully ascertain the success of those efforts. However, further discussion of the implications of this finding may lead to new innovations.

---

[42] Cukrowicz, Cheavens, Van Orden, Ragain, & Cook (2013). Perceived burdensomeness and suicide ideation in older adults. *Psychology and Aging*, 26, 331-338.
[43] https://www.theguardian.com/society/2011/aug/23/suicide-chronic-illness-study

4. <u>Suicides in Inmates with Life Sentences</u>: As 54% of suicides in 2015 occurred in patients with life sentences, compared with a roughly 20% proportion of the population overall, 'Lifers' represent a target for intervention. From a prevention standpoint, a number of efforts have been taken to try to combat this finding, including conducting training for BPH commissioners and evaluators, broadening the Urgent Response referral system to commissioners and evaluators, and training clinicians to 'bracket' BPH hearings with mental health contacts. Clinicians were advised during suicide prevention videoconference training to evaluate the degree of a patient's distress present before and after the hearing, to discuss the patient's thoughts on the outcome of the hearing, and to respond proactively to what may be experienced as bad or distressing news. Further education regarding the risk of suicide in inmates with sentences of Life without the Possibility of Parole is planned. Further interventions may also include holding "open lines" on general population lines, where inmates who do not require placement in MHSDS may seek time-limited services.

5. <u>Suicides in Inmates during the First Year of Incarceration</u>: In 2015, five of the 24 suicides occurred within the first year of incarceration, representing 21% of suicides. Three of the suicides occurred in inmates who were in reception centers (Cases I, S, & U). In reviewing the five cases, there is not a great deal of consistent or readily attributable commonalities between the deaths. However, based on 2015 data, additional attention to the variable 'early in sentence' is important to consider. The DHCS SPR FIT may wish to discuss ways to encourage clinicians in reception centers and those working with new arrivals to institutions (who are in their first year of incarceration) to exercise a more conservative approach to risk management with these individuals, to possibly include enhanced outreach.

6. <u>Prevalence of Suicide in Single Cells and Double Cells without Assigned Cellmates</u>: The CDCR has recognized the potential protective gain of cellmates for many years, noting the majority of suicides occur in cells with single occupancy. The same is true for 2015, with 96% of suicides occurring without a cellmate present at the time of the death. While it is true that inmates can wait for their cellmates to leave the cell for work or programming (this was true in two cases in 2015), there is still a preponderance of suicides in inmates with no assigned cellmate (20 of the 24 in 2015). Cellmates have interrupted suicide attempts, called for help during attempts, talked others into aborting attempts, and provided social support in many cases. The DHCS SPR FIT may discuss ways to encourage double cell or dorm placements in institutions, understanding that this is an optimal arrangement for most inmates.

7. <u>Suicide Attempt History</u>: Ten of the inmates who died by suicide in 2015 had made multiple past suicide attempts, with another six having made one prior attempt. Thus, two-thirds of those who died by suicide had made at least one prior attempt. The lifetime risk of death by suicide increases with single attempts and much more so after a second attempt; this is true in psychiatric and non-psychiatric samples. In psychiatric samples, the finding is particularly true in individuals with schizophrenia and bipolar disorder[44] and in patients shortly after release from hospitalization.[45] The CDCR has already instituted post-hospitalization follow-up contacts by policy, with procedures such as five-day follow-ups, MHCB discharge custody checks, and so forth. For other patients with high chronic risk, the use of high risk lists and high risk management programs has been implemented. The DHCS SPR FIT will be further developing a standardized policy and procedure regarding high risk lists. The DHCS SPR FIT may consider and discuss additional interventions for suicide survivors, such as developing a pilot program to pilot the use of CAMS treatment with identified high risk patients; patients who have recent suicide attempts or a history of multiple prior attempts. As noted, CAMS is a targeted intervention that is specific to suicide risk. The treatment includes patient ratings of what most fuels suicidal desire for them and what has historically contributed to a wish to die by suicide, while challenging this wish for death with considerations of making life worth living.

8. <u>Focus on Common Triggers or Motives for Suicide</u>: Logically, in-prison stresses such as safety or enemy concerns, victimization fears, gang pressures, or new charges can be seen as sufficient to trigger or motivate suicidal contemplation. These motives were well represented in suicide case reviews conducted in 2015. However, mental health clinicians can sometimes underestimate the impact of in-prison stresses, noting either the inmate's role in the difficulty or the responsibility of custody staff in managing these issues. In other occasions, clinicians rely on reported mental health symptoms without assessing current distress. Additional highlighting of ways to integrate the role of in-prison stresses in inmate suicide within on-going suicide risk evaluation and suicide prevention trainings may be helpful.

9. <u>Prevalence of Suicide in Mental Health Patients</u>: The difference in rates of suicide over a 10-year period between identified mental health patients (52.6 per 100,000) and non-mental health inmates (10.3 per 100,000) is striking. While this suggests the CDCR has been doing a good job of screening and identifying inmates in need of mental health services, it also suggests that more can be done to prevent suicide in identified MHSDS participants. Of course, suicide is associated with a number of mental health disorders, and

---

[44] Tidemalm, Langstrom, Lichtenstein, & Runeson (2008). Risk of suicide after suicide attempt according to coexisting psychiatric disorder: Swedish cohort study with long-term follow-up. *British Medical Journal*, 337.
[45] Haukka, Suominen, Partonen, & Lonnquist (2008). Determinants and outcomes of serious attempted suicide: A nationwide study of Finland, 1996-2003. *American Journal of Epidemiology*, 167, 1155-1163.

individuals who self-harm are placed in the MHSDS, suggesting that the rate in mental health populations will always be larger.[46] However, MHSDS staff members receive increasingly extensive and intensive suicide risk evaluation and suicide risk management training in the service of their patients. Increasing the focus on and training for suicide-specific interventions and suicide-specific treatment planning may be the most advantageous next step and may be carried forward by the headquarters SPR FIT. The provision of specialized training in CAMS,[47] DBT,[48] and/or CBT for Suicidality[49] is a worthwhile consideration for discussion.

10. Capitalizing on Innovations: The introduction of the Mental Health Tracking System (MHTS) in 2014 and the creation of an electronic health record system in 2015 created significant opportunities. First, in creating MHTS, critical information is entered daily into a data warehouse; this information can be used not only to track incidents of self-harm but also to correlate with other system information. The EHRS is also able to load information into the data warehouse. In this way, information is available to generate predictive algorithms for self-harm incidents in the CDCR, another way of identifying high-risk inmates that can alert clinicians to inmates in need of intervention. Additionally, the EHRS provides a way to integrate empirically-supported measures for evaluating suicide risk into clinical practice, lends tools for tracking the impact of safety and treatment planning efforts, and offers ways to evaluate the effectiveness of specific treatment interventions. These innovations should be embraced as advancements in suicide prevention.

---

[46] http://depts.washington.edu/mhreport/facts_suicide.php
[47] Jobes, D. (2016). Managing Suicidal Risk: A Collaborative Approach (2nd Edition). Guilford Press, New York.
[48] Linehan, M. (1993). Cognitive-Behavioral Treatment of Borderline Personality Disorder. Guilford Press, New York.
[49] Byran, C., Ed. (2015). Cognitive-Behavioral Therapy for Preventing Suicide Attempts. Routledge Press, New York.

Appendix I: Sample High Risk Management Program Policy



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
<u>**HIGH RISK MANAGEMENT PROGRAM**</u>
**10-0016**
**October 2015**

I.  **PRIMARY REVIEWER/RESPONSIBILITY:**
    Chief of Mental Health

II. **PRIMARY MANUAL/MAINTENANCE:**
    Mental Health Policy and Procedure Manual

III. **POLICY:** This local operating procedure establishes and describes the High Risk Management Program (HRMP) at California Men's Colony (CMC) which is designed to be consistent with the Mental Health Services Delivery System (MHSDS) Program Guide and adhere to suicide prevention and response and risk assessment / evaluation practices and policies. It is implemented to assist in identifying inmate-patients who may be at an elevated risk for self-harm or suicide, provide specific and individualized treatment for these behaviors, and to ensure that clinicians possess the knowledge and skill to adequately evaluate inmate-patients (IPs) for high risk.

IV. **PURPOSE:** The identification and management of inmates presenting as high risk is critical in order to address inmate suicides and self harm behavior. Inmates who present as high risk may include those who display signs of psychiatric decomposition, unstable medical conditions, grave disability, self-harm behavior, dangerousness to others, frequent Department of State Hospitals (DSH) or Mental Health Crisis Bed (MHCB) admissions, or who have safety and/or housing or custody concerns. Those who engage in self harm behaviors, or who attempt suicide, fall into the general category of inmates who are at risk. Research reveals that prior suicide attempts correlate with risk of eventual successful suicide.

V.  **REFERENCES:**
    - Mental Health Services Delivery System Program Guide, 2009 Revision
    - CMC Local Operational Procedure (LOP) 10-0006 Suicide Prevention and Response
    - CMC Operational Procedure (OP) No. 3012: Medical Report of Injury or Unusual Occurrence CDCR Form 7219
    - Memorandum dated February 5, 2013 from Timothy G. Belavich, Deputy Director Statewide Mental Health Program: "Implementation of the Suicide Risk Evaluation Mentor Program"
    - Memorandum dated February 15, 2013 from Timothy G. Belavich, Deputy Director Statewide Mental Health Program: "Suicide Risk Assessment Training"
    - 2010 submittal to the *Coleman* Court regarding Suicide Prevention efforts
    - Memorandum dated April 12, 2013 from T. Belavich, Deputy Director(A), Statewide Mental Health Program: "Suicide Attempts Data Collection"
    - Memorandum dated May 29, 2013 from E. Valenzuela, CMC Warden and T. Fox, CMC Chief Executive Officer: "Reporting Inmate Attempted Suicides and Self Harm"
    - Addendum Memorandum to DOM Supplement Section 51030.3 Reportable Incidents, Sub Section 51030.6 Format and Content – Reporting Inmate Attempted Suicides and Self Harm dated January 28, 2014 signed by E. Valenzuela, CMC Warden and T. Fox, CMC Chief Executive Officer
    - Memorandum dated August 13, 2013 from T. Belavich, Director (A), division of Health Care Services and Deputy Director, Statewide Mental Health Program: "Suicide Prevention and Response Focused Improvement Team Coordinator Attendance at Inmate Advisory Councils and Inmate Family Councils"
    - Memorandum dated May 8, 2015 from T. Belavich, Director (A), Division of Correctional Health Care Services (DCHCS) and Deputy Director, Statewide Mental Health Program: "Consulting Staff Name Documentation in Health Care Records"
    - Memorandum dated May 12, 2015 from T. Belavich, Director (A), DCHCS and Deputy Director, Statewide Mental Health Program: "Documentation of Mental Health Evaluations and Treatment Plans"

(Orig: 3/2013) Revised: 8/2014, 10/2015          **Mental Health**                    Page 1 of 7



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
**October 2015**

- Memorandum dated July 30, 2015 from T. Belavich, Director (A), DCHCS and Deputy Director, Statewide Mental Health Program and K. Harrington, Director, Division of Adult Institutions: "Suicide Prevention Pamphlets for Inmates and Family/Friends"
- Memorandum dated September 28, 2015 from T. Belavich, Director (A) DCHCS and Deputy Director, Statewide Mental Health Program: "Revision to the Suicide Risk Evaluation Mentoring Program"
- CMC Local Operational Procedure (LOP) 14-0004, Adverse Events and Unusual Occurrences

VI.    **APPROVAL AND REVIEW:**
This procedure shall be updated annually.  Last revision: August 2014

VII.    **PROCEDURE DETAILS**

A.    **ONGOING EDUCATION AND TRAINING FOR CLINICAL STAFF**

**Higher Level of Care Issues and Training**
Trainings are conducted as needed and ongoing with all Mental Health (MH) clinical staff regarding DSH referral and sustainability processes and monitored by Program Supervisors. Monthly and quarterly audits are additionally conducted by the DSH Coordinator (reference LOP 10-0010 DSH Referrals).

**Suicide Risk Assessment Training**
All MH clinical staff receives mandatory 7.0 hour training on suicide risk assessment. This is repeated every two years.

**Suicide Risk Evaluation (SRE) Mentoring Program**
All clinical staff is mentored by headquarters trained CMC staff on administration of the SRE. This mentoring is conducted with all new staff and is repeated every two years for all staff. Effective September 2015 SRE Mentoring will be provided on an annual basis to all MHCB staff. In addition, when an audited SRE is determined to not meet standards, additional SRE Mentoring may be required (Reference September 28, 2015 Memorandum "Revision to the Suicide Risk Evaluation Mentoring Program.")

**Self Harm Behavior Reporting**
All staff including nursing and custody are trained on self harm behavior reporting (see below Section D Other High Risk Management Protocols, item 7).

**SRE Form 7447 Training**
All clinical staff is trained locally and via Headquarters' Suicide Prevention and Response Department on completion of this form and Suicide Safety/Treatment Planning.

**New Employee Orientation**
All new employees are provided orientation to suicide prevention and response in the prison setting and an overview of all protocols and policies, in addition to the above trainings.

B.    **HIGH RISK MANAGEMENT PROGRAM**
The Coordinator for the HRMP shall be a Senior Psychologist Supervisor or Senior Psychologist Specialist as appointed by the Chief of Mental Health. The HRMP Team is comprised of the HRMP Coordinator, Primary Clinician (PC) (s) and other treatment team members as indicated.

(Orig: 3/2013) Revised: 8/2014, 10/2015          **Mental Health**          **Page 2 of 7**



**California Men's Colony Health Care Services**
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
**10-0016**
**October 2015**

1. Identification of High Risk IP

   The process of identifying High Risk IPs shall be done by all MH clinical staff at CMC. Any IP requiring short or long-term intervention and treatment for high risk factors shall be considered for referral to the program.

   High Utilizer Report
   All IPs included on the High Utilizer Report generated from the MH Patient Registry on the Quality Improvement share site, are considered "high utilizers" of higher levels of care, and this must be documented on the IPs treatment plan as long as he is on the list. Consideration of referral to the HRMP must also be documented and referral made if clinically indicated. If a referral is not made or the clinician does not consider the IP's high utilization as indicative of high risk behavior, then the clinician must document the rational for non-inclusion on a CDCR 7230, Interdisciplinary Progress Note, and reference this note on every treatment plan as long as the IP remains on the list. This list and protocol is audited semi-annually at minimum and training is provided in all cases of non-compliance.

   Other sources that may be utilized to identify high risk IPs may include the following:

   a. DSH Indicator Report (generated from Mental Health Tracking System (MHTS.net)). Staff is required to document and integrate any positive criteria into Interdisciplinary Treatment Team Plans (IDTT).

   b. Weekly Treatment Hours Summary (High Refusers) Report (generated from MHTS.net). Staff is required to document and address IPs refusing treatment into IDTT Plans.

   c. All DSH returns and MHCB discharges remaining at CMC will be considered for referral to the HRMP.

2. Staff Referrals to the HRMP

   In addition to those inmates identified through the steps above, any clinician can make a referral to the high risk program at any time.

   a. The HRMP referral form (ATTACHMENT A) shall be used for referrals to the high risk program.

   b. The referral is made to the HRMP group facilitators or Coordinator. The HRMP Team will perform a file review focused on review of risk factors as well as protective factors that may contribute to the IPs high risk status and conduct a screening interview with the IP. Suicide and self-harm history, methods of suicide attempts, frequency of suicide attempts or self-harm, and other relevant MH and medical conditions are among the areas focused upon in the chart review. If appropriate and in coordination with the PC, the IP will be assigned to the HRMP.

   c. Final determination for inclusion is at the discretion of the HRMP Team. If placement is not appropriate for the HRMP, the reviewer will notify the PC for further assessment of the need for a possible higher level of care, or other appropriate treatment referrals or recommendations.

(Orig: 3/2013) Revised: 8/2014, 10/2015          **Mental Health**          **Page 3 of 7**



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
October 2015

3.  Management and Treatment of High Risk Inmates

    a.  A High Risk Management Program will be provided in mainline Enhanced Outpatient Program (EOP) and Correctional Clinical Case Management System programs and in Administrative Segregation Unit (ASU).

    b.  High risk factors must be documented on every treatment plan as a specific area of focus with measurable and objective goals defined and documented.

    c.  The IDTT will formulate a treatment plan specific to the IPs inclusion in the HRMP including high utilization or high risk factors as applicable. The plan will include and document developmental history; criminal history, including a description of the commitment offense and past offenses; history of violence; substance abuse/dependence history; mental health history; history of suicide attempts and self harm behaviors; family history of suicide attempts or completed suicide; review of diagnoses; provision of treatment recommendation and treatment management; and frequency of clinical contact and IDTT meetings.

    d.  Completion of Treatment Plans, SREs and all documentation shall be completed within all required timeframes as stipulated in the MHSDS Program Guide, 2009 Revision, and per all applicable California Correctional Health Care Services Memoranda to include: "Documentation of MH Evaluations and Treatment Plans" dated May 12, 2015 and "Consulting Staff Name Documentation in Health Records" dated May 8, 2015. Changes to the Treatment Plan due to identified high risk factors may necessitate completion of a full plan instead of an addendum or summary. SREs must also be completed as clinically indicated by presence of high risk factors.

    e.  The HRMP treatment for IPs identified as high risk will be provided in a group format with ongoing consultation and involvement of the PC. The focus of the group will be on distress tolerance, affect regulation, coping skills, and suicide risk management utilizing a Dialectical Behavior Therapy informed treatment. For IPs not appropriate for group treatment, this treatment may be provided individually by the PC as determined by the IDTT and may include increased individual sessions.

4.  Movement/Housing Changes

    Whenever an IP identified as "High Chronic" or "High Acute" risk on the most recent SRE, and/or is enrolled or referred to the HRMP and is re-assigned to a new PC for any reason, or moves to a different part of the institution, the PC will communicate with appropriate clinics about the arrival/departure of the IP. If the IP is transferring to a different institution, the PC will make every effort to communicate with the receiving facility to provide clinical and high risk information. Reference below for specific treatment for this population as well.

**C. SUICIDE PREVENTION REVIEW - FOCUS IMPROVEMENT TEAM (SPRFIT)**

The goal of CMC SPRFIT is to provide focus on appropriate suicide risk assessment and evaluation, training and education. The SPRFIT meets monthly and discusses all suicide attempts and self-harm incidents that occurred that month, and/or the previous month.

Written summaries that include all incidents of self-harm, with or without the intent to die are provided for extensive review and discussion by the multidisciplinary staff. These summaries



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
**October 2015**

incorporate file reviews and clinical consultations; list identified risk and protective factors; clinical and suicide history; and relevant mental health and medical conditions.

1. A formal clinical presentation of a suicide attempt or serious incident from the previous month is made at each meeting with extensive multi-disciplinary staff discussion.

2. All self harm incidents are presented and discussed.

3. The SPRFIT Coordinator attends the Emergency Medical Response Review Committee and presents all self-harm incidents and receives information regarding medical codes. These codes are reviewed and if any mental health issues are indicated further clinical review and consultation will be conducted as applicable.

4. The SPRFIT Coordinator maintains ongoing dialogue with Facility Captains, other custody and medical staff, and shall be notified of all incidents and shall receive the Daily Briefing Report in addition to all applicable Incident Reports.

5. The SPRFIT Coordinator attends and reports to the Mental Health Program Subcommittee (MHPS) twice monthly. All relevant incidents are reviewed and discussed and reports or audits are presented as indicated. The SPRFIT Coordinator maintains monthly logs of all self-harm incidents and suicide attempts. These logs include clinical and demographic information, and track known high risk factors as well and any trends which are analyzed, reported and discussed at the SPRFIT meetings and/or in other forums as needed. The monthly data is provided to the DCHCS Suicide Prevention SharePoint site. A clinical high risk / self harm summary is provided on each case and provided to clinicians and to all Peer Review Committees for further review as indicated.

**D. OTHER HIGH RISK MANAGEMENT PROTOCOLS**

1. IPs with repeat admissions to higher levels of care are tracked and monitored and if clinically indicated provided specialized group and/or individualized treatment specifically regarding high utilization as described above.

2. All DSH returnees and MHCB discharges are evaluated and screened by a designated clinical staff and referred as clinically indicated to the HRMP Transitions Group Treatment program specifically designed for this purpose.

3. The Program Supervisors and/or DSH Coordinator or designee reviews all Interdisciplinary Treatment Team Level of Care Decision, CDCR MH-7388-B forms. Positive indicators are discussed including consultation with the HRMP team as needed.

4. HRMP team members attend IDTTs as requested when any IP in the HRMP is presented, or for any other consultative purpose as needed.

5. The DSH Coordinator or designee performs two 7388-B audits and presents findings to the institution MHPS and HRMP Coordinator.

6. The DSH Coordinator or designee coordinates and ensures that MHCB and DSH returnee information is provided to staff.

7. Self Harm Reporting:



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
October 2015

a. Nursing responds to self-harm incidents and consults with the MH Clinician of the Day, assigned clinician, other responding clinician, or the Psychiatrist on Call after hours to obtain a determination if the event was a self-harm behavior with or without intent to die. Nursing then provides the Self-Harm Mental Health Chrono 128-C to the SPRFIT Coordinator or designee.

b. The responding MH clinician shall provide, no later than the following business day, a full Incident Notification of the self harm behavior to the SPRFIT Coordinator or designee. An additional follow up report may be required as well. This notification shall be made via email and shall include:
   i. The inmate's name, CDCR number and level of care
   ii. Location/cell number
   iii. A very brief description of what specifically occurred, including IP statement
   iv. Date of incident, Time of incident
   v. What the clinical determination was regarding the incident (intent to die, no intent to die, or unknown and further review required)
   vi. What the disposition was (e.g. returned to housing, admitted to MHCB, etc.)

c. The SPRFIT Coordinator or designee shall provide the Self Harm Chrono to relevant Custody and Nursing staff and the clinical information to relevant clinical staff.

d. These protocols are also defined in the Suicide Prevention LOP 10-0006 and OP No. 3012: Medical Report of Injury or Unusual Occurrence CDCR Form 7219.

e. Self harm behaviors are specifically addressed in the HRMP Group Treatment.

f. All self harm must also be reported in accordance with CMC Local Operational Procedure (LOP) 14-0004, Adverse Events and Unusual Occurrences.

8. IPs Transferring from CMC

   Transfer from CMC has been identified as a high risk factor for CMC IPs. To address this risk, a specific clinical group was devised and implemented. The *Preparation for Transfer* group focuses on preparing EOP IPs for transfer to either a corresponding CDCR institution or to a DSH facility. The group is facilitated by a MH clinician (psychologist or clinical social worker) and may include a correctional counselor as indicated. The facilitators assist IPs by providing ways to reduce anxiety, discuss safety concerns, building and maintaining positive coping strategies utilizing Cognitive Behavioral Therapy (CBT), and focus on reality-based information, in order to pave the way for a smooth transition by processing concerns and incorporating psycho-education and CBT.

9. Keep on Person (KOP) Medications

   KOP medications may be contraindicated for high risk IPs. The DCHCS SPRFIT is discussing possible policy changes regarding KOP medications and high risk IPs. CMC shall implement this policy as soon as it is available. In the interim, all IPs enrolled in or referred to the HRMP; who have a "High Chronic" or "High Acute" risk level determination on their last SRE; or who demonstrate significant high risk factors, shall be assessed by the PC and the IDTT regarding KOP medications as applicable. This



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
<u>**HIGH RISK MANAGEMENT PROGRAM**</u>
10-0016
October 2015

assessment shall include consultation with the primary medical provider. This consultation shall be appropriately documented. Through this process review an IP may be referred to medical for possible exclusion of KOP medications. This decision shall be reviewed at minimum, every IDTT.

**OUTREACH**

CMC will provide the following outreach and communication:

1. A Suicide Prevention DVD written and performed by CMC inmates is played on the local television system for all inmates. This DVD has been provided to all institutions statewide for utilization.

2. An outreach/referral system is integrated on general population yards including both CMC East and West Facilities.

3. Suicide prevention and general MH outreach fliers are posted throughout the institution to include chapel locations and where inmates meet with Board of Prison Terms and attorneys.

4. Outreach and communication is ongoing with non-MH staff, including custody, medical/nursing, and religious services.

5. Senior Supervisors routinely tour ASU and EOP housing units, meeting with staff and inmates to identify at-risk inmates.

6. The SPRFIT Coordinator or designee attends Inmate Family Council (IFC) and Men's Advisory Council (MAC) meetings to represent MH and provide information regarding suicide prevention.

7. Suicide Prevention information pamphlets are provided throughout the institution for visiting personnel and inmates alike, and provided at IFC and MAC meetings.

**E. AUDITS**

Audits on processes described above will be conducted and reported to the Suicide Prevention and Response Focused Improvement Team and to the MHPS as indicated. Reference LOP 10-0006 Suicide Prevention and Response for details.
APPROVED:

*F. Meyers, MD*                    10/15/15
CHIEF OF MENTAL HEALTH            Date

*Teresa Bracier*                  10/28/15
QUALITY MANAGEMENT COMMITTEE       Date

*Teresa Bracier*                  10/28/15
LOCAL GOVERNING BODY              Date

ATTACHMENT:
Attachment A – HRMP Referral

(Orig: 3/2013) Revised: 8/2014, 10/2015          **Mental Health**          **Page 7 of 7**

**HRMP Group Referral Form** (08/12/2014)

Inmate name _____    CDC#_____    DOB _____

LOC (circle one)   MHCB/ EOP/CCCMS    Release Date_____    TABE score_____

Reason for referral to HRMP

_____

_____

Suicide attempt / self-harm history

_____

_____

The HRMP group utilizes a modified DBT skills model.  Each group will meet twice weekly for approximately 6 months.  There are currently several HRMP groups available, based on the IP's level of functioning.

_____    _____

Referring Clinician (print legibly)    Today's Date

Appendix II: Self-harm and Incident Reporting

**Institutional reporting of self-harm incidents:** All incidents of self-harm in the CDCR are reviewed by institutional staff members, including mental health clinicians. When an incident of self-harm occurs, regardless of the severity of injury sustained, mental health clinicians discuss the event with the patient and determine whether the intent was to die (thus a suicide attempt) or if the self-harm served some other purpose, such as to relieve tension states, without any intention to die. The self-harm database also includes data on self-harm incidents that result in death.

All incidents of self-harm are entered on a self-harm database. The self-harm database serves as a way for mental health clinicians to track incidents within a facility, to allow Regional and SMHP staff members a view of the frequency of self-harm across facilities, to identify patients for High Risk Management Lists or Program(s) within a facility, and to further examine risk factors. A sample High Risk Management Program policy is found in Appendix I.

When a suicide attempt involving serious bodily injury occurs in the CDCR, the incident is documented using CDCR Form 837, Serious Incident Report, and institution mental health staff members are notified of the incident. Each incident is also relayed through one of two reporting processes; the Daily Briefing Report (DBR) or the Administrative Officer of the Day (AOD) report. The information in either report is sent to the administration of the Division of Adult Institutions (DAI) and forwarded to the CDCR's SMHP. In some cases, a suicide attempt involving serious bodily injury results in death at a later time; the DBR or AOD report are updated in this case to reflect that a death by suicide has occurred. In such cases, the DBR or AOD report is updated to inform the DAI and the DAI Mental Health Compliance Team of a death by suicide.

**Institutional reporting of suicide:** In the event of the discovery of a suicide attempt in progress, emergency medical interventions are made until such time as the individual is pronounced deceased by a qualified physician. Correctional officers who come upon a suicide attempt in progress are to sound an alarm and initiate life saving measures until relieved by health care personnel. Officers are trained in CPR and in procedures to respond to emergencies, including in bringing cut-down kits to the scene of a suicide in progress.[50] Custody officers will assist health care staff members, including institutional responders and paramedics, in transporting the patient to the TTA and/or ambulance. In cases in which emergency interventions are not successful, the watch commander or senior custody officer is notified of the suicide and in turn notifies the Warden or the AOD of the death.[51] A CDCR Form 837, Serious Incident Report, is completed on all suicides.

The Chief Medical Executive or physician designee makes a report of the death by suicide within eight hours of the event. Medical information is provided in the CDCR Form 7229A *Initial Inmate Death Report*. This form, once completed, is distributed internally, to the county coroner's office, and to the Death Review Coordinator at headquarters. A separate form is completed by institutional mental health staff, form CDCR MH-7229B *Inmate Suicide*. This form is typically completed by the institutional SPR FIT Coordinator and contains information on prior suicide attempts, the results of recent suicide risk evaluations, etc.[52] The form is retained at the facility and sent to the SMHP. Once received, SMHP support staff ensures the suicide is entered into a log, reports the event to nursing leadership, and alerts the SMHP Suicide Response Coordinator to the event.

---

[50] MHSDS Program Guides, 2009 Revision, pages 12-10-21 to 12-10-23
[51] MHSDS Program Guides, 2009 Revision, pages 12-10-24
[52] *Id.*

Appendix III: Determination of Unknown Causes of Death

**Determination of unknown causes of death**: On occasion, a death will occur within a CDCR institution in which the cause of death is not immediately determined. These cases are classified as "Unknown Deaths." These cases receive special attention until the cause of death is determined. In order to track these deaths, a group of employees at the SMHP are assigned to review *all* notifications of deaths within the CDCR. As noted, each institution within the CDCR is required to make a report of death and to provide documentation on the provisional cause of a death in a CDCR 7229A. A completed CDCR 7229A contains a preliminary summary of the circumstances of the death and lists any underlying/significant medical conditions. These documents are uploaded to a SharePoint site that can be accessed by members of the Death Review Committee and the SMHP. Additionally, the Death Review Coordinator for the CCHCS produces a daily report on all CDCR deaths.

In 2015, a total of 330 inmates perished in the CDCR, with 159 of the decedents (48%) involved in the MHSDS at the time of death. Whenever a *Coleman* class member dies, the OSM is notified of the circumstances and cause of the death by the SMHP. In all cases in which the cause of death is provisionally listed as a suicide, an additional mental health review is completed by the institution and documented using a CDCR 7229B. In all such cases and whenever any inmate dies from suicide, the OSM is notified of the circumstances and the specifics of the suicide. At times, notifications to the OSM may be updated with the receipt of additional information, such as results from autopsies, toxicology screens, and so forth.

In the event that a death notification lists the cause of death as unknown or undetermined, the SMHP will track the case until the death is classified. On some occasions, the cause of death is classified quickly by institutional medical review. In other cases, the cause of death remains undetermined pending the receipt of autopsy or toxicology results. In such cases, the Death Review Committee will investigate the death and produce an initial cause of death as well as a final cause of death determination. In the meantime, the SMHP communicates with the institution and with the DRC on these cases until the cause of death is determined. A member of the SMHP also sits on the DRC to ensure all unknown deaths are reviewed and, when applicable, that the possibility of suicide has been closely and objectively considered.

The SMHP reviews unknown deaths in order to ensure that all deaths are accurately identified as either due to suicide or not due to suicide. Cases are identified for this additional review when the cause of death is overdose, to determine if the overdose is most likely accidental or intentional (suicide). Other cases are identified when the cause of death is potentially related to mental health treatment needs and/or when the death may have resulted as the long-term consequence of a self-harm behavior.

The following guidelines are used to determine unknown deaths:

<u>Reviewers Determination of Unknown Deaths Guidelines</u>

1. Review the method of death to determine if there may have been an alternative reason (other than suicide) for the behavior (e.g., autoerotic asphyxiation, confusion and inability to form intent, purposeful intoxication, etc.).

2. If an overdose on substances is it reasonable the substance (illicit or prescribed) may have been used in an attempt to become intoxicated? (e.g., Tylenol is not likely to be used to become intoxicated; Klonopin may be).

3. Review recent mental health history and any past history of suicide attempts/self-harm behavior (check self-harm log). Did the inmate:
   - Voice suicidal ideation (including conditional suicidal ideation)?
   - Have admits to MHCB?
   - Engage in self-harm behavior?
   - Have a history of depression or mood disturbance?
   - Have a history of psychosis?

4. Review substance abuse history.
   - What substances were used?
   - Have there been any past overdoses?
     - If yes, what did the inmate say about them at the time?
   - What substance abuse treatment was offered?
   - How recent are reports of current use?

5. Review recent custodial information.
   - Was the inmate facing criminal charges?
   - Did the inmate lose an appeal?
   - Did the inmate have any recent losses?
   - Was there any bad news readily apparent?

6. Review medical information for the presence of:
   - Chronic pain
   - Terminal illness

7. Was there a suicide note or a note that could be construed as such?

Appendix IV: Review of Unknown Deaths and Overdose Deaths

Cases **EE to NN** were deaths initially classified as unknown deaths. Each of these cases was eventually determined to involve death due to drug overdose.

Case EE was provisionally determined to have had an illicit drug overdose per the CDCR 7229A completed at this death. Toxicology results indicated methamphetamine intoxication. Autopsy reports also determined no other cause of death; the death was ruled as an accidental drug overdose secondary to methamphetamine intoxication. Additionally, three baggies containing methamphetamine were found on EE during autopsy, secreted in various bodily orifices. The Combined Death Review Summary (CDRS) also determined methamphetamine overdose to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. Case EE had an extensive substance abuse history as well. All evidence in the case argued for an accidental overdose and not an intentional overdose (a suicide).

Case FF was provisionally determined to have had an anoxic brain injury that occurred on account of an illicit drug overdose (per the CDCR 7229A completed at his death). Toxicology results indicated methamphetamine intoxication. Autopsy reports determined the cause of death as an accidental drug overdose secondary to methamphetamine intoxication. Case FF was known to have significant substance abuse problems and had been found by custody officers the day before his death in possession of inmate-manufactured alcohol. The Combined Death Review Summary (CDRS) also determined methamphetamine overdose to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. He had a history of chronic back pain but pain medications were not implicated in his death. The evidence in this case is strong for an accidental overdose rather than for an intentional overdose (a suicide).

Case GG was listed as an unknown death per the CDCR 7229A. However, toxicology results were positive for methamphetamine intoxication. Autopsy reports determined the cause of death to be acute methamphetamine intoxication. Additionally, multiple bindles were found on Case GG during autopsy. The Combined Death Review Summary (CDRS) determined methamphetamine toxicity to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. Case GG had an extensive substance abuse history as well. He had a history of knee pain for which he was treated with Tylenol; however, this medication was not implicated in his death. The evidence in the case argues for an accidental overdose and not an intentional overdose (a suicide).

Case HH was listed as an unknown death/probable overdose on his CDCR 7229A. However, toxicology results were positive for Fentanyl, a synthetic opioid. Autopsy reports determined the cause of death to be acute Fentanyl intoxication. The Combined Death Review Summary (CDRS) determined Fentanyl toxicity to be the cause of death. Additionally, the inmate's cell was searched, with a syringe and drug paraphernalia found in his property. No suicide note was found. Case HH had an extensive substance abuse history as well and had received a RVR on 6/29/15 for Possession of a Controlled Substance for Distribution. He was placed in ASU for several weeks but had returned to general population housing. On the other hand, Case HH did have a history of suicide attempts, including an intentional overdose attempt in 1995. He had also received recent bad news three months prior to his death. He was informed that his grandmother had died and he responded by swallowing a razor blade at the time. Case HH had a history of chronic back pain for which he was treated with Tylenol and Naproxen. These medications were not implicated in his death. The evidence in the case is complex, though there appears to be stronger evidence for an accidental overdose than for an intentional overdose.

Case II was listed as possible drug overdose on the CDCR 7229A completed at his death. Toxicology results were positive for Fentanyl intoxication. Autopsy reports determined the cause of death to be accidental drug overdose/Fentanyl intoxication. The Combined Death Review Summary (CDRS) also determined Fentanyl toxicity to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. He also had no known chronic pain issues. Case II had an extensive substance abuse history and was found at autopsy with multiple needle marks on his arm, with illicit drugs and syringes found in his cell as well. The evidence in the case argues strongly for an accidental overdose rather than an intentional overdose.

Case JJ was listed as an unknown death and provisionally as a death due to respiratory failure secondary to drug overdose (on CDCR 7229A). Case JJ was discovered in his cell with a syringe in his hand. The syringe was found to contain heroin, acetyl codeine, and papaverine (an opioid). Methamphetamine was not found in the tested syringe but was present per toxicology results. Prescribed medications were also found in his system but reported to "not excessive." The autopsy report determined the cause of death to be accidental drug overdose by the combined effects of acute heroin and methamphetamine intoxication and the prescribed medications. Multiple drug injection marks were found on the body. The Combined Death Review Summary (CDRS) also determined the cause of death to be overdose. The case had a history of suicide attempts, using attempted hanging and exsanguination. He was treated at the EOP level of care and had prior inpatient stays. The patient's father had passed away one month before the death. Mental health notes reported that clinicians were working with the patient on bereavement issues and that Case JJ was denying suicidal thoughts, plans, or intent. Case JJ also had known chronic back pain and an extensive substance abuse history. The evidence in the case argues is somewhat equivocal, suggesting that suicidal motive could have been present but denied by the patient. However, the

evidence is stronger for ongoing IV drug use, as noted by the track marks found in many places on the body, and for an accidental overdose, as noted from the contents of the syringe found at the time of discovery.

Case KK was listed as possible drug overdose per his CDCR 7229A. Toxicology results were positive for heroin intoxication. Autopsy reports similarly determined the cause of death to be heroin intoxication. Additionally, a number of hypodermic needles were found in Case KK's cell, suggesting a pattern of illicit drug use. The Combined Death Review Summary (CDRS) determined heroin toxicity to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. Case KK had an extensive substance abuse history. He had a history of back pain. The majority of evidence in the case argues for an accidental overdose rather than an intentional overdose (a suicide).

Case LL was listed as an unknown death per the CDCR 7229A. Case LL was known to have significant medical issues, including hepatic cirrhosis and Hepatitis C, prior to his death. However, toxicology results were positive for morphine intoxication. Autopsy reports determined that morphine intoxication was a tertiary cause of death with cirrhosis being the primary cause of death. The Combined Death Review Summary (CDRS) agreed with this determination; that is, that morphine ingestion was not the primary cause of death. Notably, Case LL did have a history of chronic neck and low back pain and he was treated with opiates. He also had a history of substance abuse problems. Case LL did not have a known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. The evidence in the case is suggestive of a death from medical illness with secondary accidental overdose with morphine. There is little or no evidence of an intentional overdose (a suicide).

Case MM was listed as an unknown death on the CDCR 7229A completed at the time. Toxicology results were elucidating, with both morphine and methadone found. The patient did have chronic back pain and was on multiple prescribed medications for pain. However, upon Death Review Committee study, both medications were found to be elevated, suggesting acute toxicity/intoxication. Additionally, Case MM's cell was found to have syringes, despite the fact that his opioid medications were crushed for administration. The medications were crushed on account of the severity of the inmate's substance abuse difficulties. The autopsy report on the case determined the cause of death was "acute morphine and methadone intoxication (hours)." The autopsy noted left-ventricular cardiac hypertrophy, pulmonary edema, and cirrhosis of the liver as well. Case MM was known to have hypertension, diabetes mellitus, type 2, hepatitis C, and end-stage liver disease. Case MM was in the MHSDS at the CCCMS level of care. He was treated for anxiety and was in treatment groups for pain management. Mental health notes do not document concerns about suicidality and largely focus on pain symptoms. No suicide note was found in the case and there was no known receipt of bad news. The majority of evidence in the case argues for an accidental overdose rather than an intentional overdose (a suicide).

Case NN was provisionally listed as an unknown/possible drug overdose death on CDCR 7229A. His cellmate was initially suspected in his death, but no signs of trauma were found on the body. A cell search produced drug packaging materials. Case NN was known to have significant substance abuse issues. Post-mortem toxicology findings were positive for opiates, with autopsy results indicating acute opiate toxicity as the cause of death. The Combined Death Review Summary (CDRS) concluded that opiate ingestion/toxicity was the cause of death. Case NN was in the MHSDS at the CCCMS level of care. He reportedly was placed in CCCMS after being charged with heroin possession in 2014; he reported some distress upon placement in ASU. He improved while in ASU but was retained in CCCMS. Case NN had no known history of suicide attempts. He did have back pain issues, for which he was treated with Ibuprofen. Case NN had not received recent bad news and did not leave a suicide note. The evidence in the case weighs strongly on the side of an accidental overdose of opiates. There is little or no evidence of an intentional overdose (a suicide).

Appendix V: Suicide Response Procedures

**Reporting of a suicide to stakeholders:** When an inmate dies by suicide, members of the SMHP complete two formal notification processes. First, a death notification is written and sent to the OSM and contains details of the suicide. Second, a summary of the suicide is composed and sent to the Deputy Director of the SMHP and the Undersecretary of the DHCS. The Public Information Officer at the institution is assigned with any local notifications or reports regarding the death, including notifying the next of kin of the suicide.

**Institutional internal review process**: The internal process for reviewing suicides at CDCR institutions includes reviews by mental health, custody, and nursing/medical personnel employed at that site. The reviews are conducted first within disciplines and then within joint institutional reviews, such as during SPR FIT and emergency medical response committee meetings.

Each institution within the CDCR has a Suicide Prevention and Response Focused Improvement Team, or SPR FIT, with a Senior Psychologist-Specialist assigned to coordinate local prevention and response efforts. The institution's SPR FIT is established and maintained by the Mental Health Program subcommittee, with both committees part of local Quality Management

Committees.[53] Each institutional SPR FIT is responsible for monitoring and tracking all self-harm events, ensuring that appropriate treatment and follow-up interventions occur. When deaths by suicide occur, the local SPR FIT Coordinator is required to notify the SMHP, to provide assistance to mental health, custody, and nursing suicide reviewers, and to ensure the implementation of Quality Improvement Plans (QIPs) resulting from the suicide review.[54]

**External review processes**: CDCR's response to suicides includes several external reviews by trained representatives from various disciplines, including nursing, medical, custody, and mental health. Within three days of the suicide, reviewers are assigned from these disciplines at what is commonly referred to as the headquarters level. The role of each discipline's review is discussed separately below, but these disciplines collaborate with each other during the suicide review process, sharing initial findings, conducting reviews together, etc.

Trained custody and mental health reviewers conduct an on-site visit together within seven days of a suicide. Reviewers look at the deceased's property, listen to recorded phone calls, check trust account records, and talk with the Investigative Services Unit (ISU) of the specific prison. Reviewers evaluate the emergency response that took place during or after the suicide and review the medical and mental health services rendered in the case, if applicable. Reviewers will also talk with officers, clinicians, work or school supervisors, and cellmates who may have known the patient. Reviewers may gather information from other sources as well, such as through interviews

---

[53] MHSDS Program Guides, 2009 Revision, pages 12-10-2 to 12-10-4
[54] *Id*

of family members. After thorough chart review, reports are generated by each discipline, with a combined report, the Suicide Report, distributed and discussed in the Suicide Case Review.

Suicide Case Review (SCR) meetings review findings in the case within and across disciplines while sharing information with institutional leadership. The Suicide Report contains quality improvement plans (QIPs) that are presented at the SCR; these plans cross disciplines as well. Nursing, medical, and mental health disciplines additionally have peer review bodies that are able to review staff member performance whenever such a need is indicated. The external review process is completed when all QIPs have been successfully implemented or resolved in the case.

**DAI Mental Health Compliance Team (MHCT) reviews:** The reviews completed by DAI's MHCT focuses on the performance of custody staff members related to the suicide. The MHCT member reviews custody documentation and institutional records (i.e., SOMS). The MHCT member's role is to determine whether departmental suicide prevention practices and policies were followed by custody and counseling staff involved in the case. The MHCT reviewer, for example, evaluates whether custody officers followed procedure within an emergency response, how quickly the response was called once a suicide in progress has been discovered, and whether all custody staff responding to the suicide had received required training (e.g., in CPR) within set timelines (e.g., annually). The context of the suicide may necessitate additional review items. Most notably, if the individual was in a segregated or restricted housing unit at the time of the suicide, the MHCT reviewer will evaluate performance on tasks such as timeliness and quality of welfare checks, as specified by policy, whether inmates new to an ASU were placed in intake cells, and so forth. The MHCT reviewer also determines a timeline for the emergency response and for significant events leading up to the suicide. Finally, the MHCT reviewer will document any concerns noted and will recommend corrective action/QIPs.

**Nursing reviews:** At the same time as a suicide is reviewed by DAI's MHCT, a Nurse Consultant Program Reviewer (NCPR) is assigned by a Headquarters Chief Nurse Executive. The NCPR does not make an on-site visit, but reviews all health care record documentation as to the quality of nursing care in the case. Psychiatric technician practice is also covered within the nursing review. The NCPR and mental health case reviewer frequently consult on cases during the review period.

The NCPR generates a Nursing Death Review Summary (NDRS). The NDRS lists the primary cause of death, notes whether coexisting conditions were present prior to the death, summarizes medical history, reports what medications and medical treatment the patient was receiving, and documents significant events that occurred medically for the patient prior to and at the time of discovery. The NCPR determines if nursing standards of care were met within the emergency response to the suicide and whether nursing standards of care were met in the overall medical care of the patient prior to the time of death.

**Death Review Committee reviews:** The CCHCS DRC reviews all causes of inmate mortality within the CDCR. When suicides occur, the DRC assigns a physician to serve as the medical

reviewer. This physician works with the NCPR to look at all aspects of medical care received by the patient and will yield an opinion as to the cause of death. As needed, the SMHP reviewer may also consult with the CCHCS physician reviewer. The physician and NCPR produce a Combined

Death Review Summary (CDRS) on each case. The CDRS contains both an administrative review and a clinical mortality review of the case. In cases of suicide, the suicide case review report (discussed below) is reviewed by the Death Review Unit and addends or is integrated with the Combined Death Review Summary.[55]

**Statewide Mental Health Program (SMHP) reviews:** Simultaneously to custody, medical, and nursing reviews, a trained member of the SMHP is assigned to review each suicide. The assigned Mental Health Suicide Reviewer (MHSR) is typically a Sr. Psychologist, Specialist, who is tasked with completing a Suicide Case Review (SCR). The MHSR schedules an on-site visit with the institution and is accompanied by the custody reviewer. The site-visit is conducted within seven calendar days of the death. The site review consists of an inspection of the location of the suicide and of the means used in the death, a review of the deceased's personal property, and interviews of inmates, officers, medical, or mental health staff members who knew, interacted with, and/or treated the deceased. The deceased's property is inspected to see if there is any information present related to the suicide, such as a suicide note, letters to the inmate informing he/she of bad news, and so forth. Interviews focus on behavior and statements made in the days prior to the suicide, with questions about anything the deceased may have said about being distressed or suicidal in past days, weeks, or months. Photographs of the scene at the time of death and photographs of the autopsy are also made available. Phone records, trust accounts, toxicology reports, and other sources of information are also made available. The MHSR may contact family members of the deceased to gain additional information about the individual's state of mind, statements made prior to the suicide, etc.

In addition to the on-site review, the MHSR reviews extensive documentation from medical and custodial files. The focus of the MHSR's review will vary based on the factors in the case, though all relevant information is reviewed in each case. In some cases, the review will concentrate on mental health treatment while in the CDCR, in others on the quality of suicide risk assessment, in others on the presence or absence of distress when an inmate is placed in administrative segregation, and so on. SMHP psychiatry staff review the psychiatric care and consult with the MHSR. The MHSR will review information from each of the institutions where the deceased resided and will look at whether mental health policy and procedure was followed at each setting.

**Joint CDCR/DSH Suicide Reviews**: When a suicide occurs of an individual who resides at a DSH facility, or when a suicide occurs within 30 days of transfer from a DSH hospital, a joint review is conducted. The DSH's Mortality Interdisciplinary Review Committee (MIRC) reviews suicides that occur within the DSH, with input from the Suicide Case Review Committee (SCRC)

---

[55] IMSPP Volume 1, Chapter 29.2

at the CDCR. Joint CDCR MHSRs and MIRC reviewers look at the case collaboratively to evaluate the mental health, medical, custodial, and nursing care rendered in the case. A joint report is generated in each situation, with corrective action plans developed jointly. [56] The SCRC reviews QIP responses created through this process conjointly with the MIRC.

**Determination and tracking of Quality Improvement Plans**: Each Suicide Case Review report may include formal Quality Improvement Plans (QIPs) as applicable to the case. QIPs are developed based on the concerns raised by custody, nursing/medical, and/or mental health case reviewers. QIPs may represent areas of deviation from policy or procedure, departures from standards of care, or systemic issues that require examination, modification or innovation. QIPs may be written for any discipline and can focus on the specific institution where the suicide occurred. If systemic issues are identified, the QIP can be directed to the DCHS Suicide Prevention and Focused Response Team (DCHS SPR FIT), a team that can address statewide policies and practices. The DCHS SPR FIT team includes representatives from nursing, custody, legal, mental health, and mental health quality management. This representation allows the team to review issues and find solutions in a manner that is inclusive of disciplines and effective in addressing problems.

During Suicide Case Review teleconferences, the Suicide Case Review Committee (SCRC) will assemble and the case reviewer will read sections of the Suicide Report. The SCRC is made up of members of the CDCR Statewide Mental Health Program, DAI MHCU, Nursing Executives, the Office of Legal Affairs, and medical personnel (as needed). The SCRC also discusses the QIPs raised within the Suicide Case Review with the institution. Institutional staff can respond to and/or clarify concerns raised in the report, can raise additional concerns, or can discuss ways of meeting the requirements of QIPs. Since late 2015, experts from the *Coleman* court are present by phone and can raise additional concerns or issues. QIPs can also be written as pending concerns that need to be addressed *if* a fact or finding awaits further information, such as awaiting the results of a coroner's report to determine the time of death.

**Audits of SCR Quality:** The DHCS Quality Management Unit audits all SCRs for 15 items. SCR's are scored with required elements marked present or absent.

---

[56] DSH Administrative Letter AL2015-19, issued November 2015.

Appendix VI: Suicide Response Court-ordered and Internal Deadlines for Suicide Reports

| *Coleman* Deadlines per Program Guide * | | Internal Deadlines | |
|---|---|---|---|
| Assign suicide reviewer | Within 2 days | | |
| Reviewer visits institution | Within 7 days | | |
| Suicide report received at HQ | Within 30 days | | |
| | | Report reviewed, edited, QIPs developed and sent to all case review participants with request for feedback from reviewers | 5 days prior to case review<br><br>(no later than DAY 40 after DOD) |
| Suicide Case Review | Within 45 days | | |
| | | Final report edits | Within 1-2 days |
| | | Signed by MH Deputy Director | Within 1-2 days |
| | | Signed by DAI | Within 3-5 days |
| Final suicide report to institution | Within 60 days | | |
| QIPs completed at the Institution | Within 120 days<br><br>(**See internal deadline that requires this sooner from institution) | **Please note: this internal deadline is set for institutions to ensure SPR-FIT ability to comply with the Coleman deadline in the event that QIPs are inadequate and require amendment*<br><br>QIPs completed and QIP report submitted to HQ | Within 45 days of institution's receipt of final report<br><br>(no later than DAY 105 after DOD) |
| Institution's QIP Report completed and submitted to HQ | Within 150 days<br><br>(**See internal deadline that requires this sooner from institution) | | |
| | | QIPs reviewed by committee | Within 10 days |
| | | QIPs signed by MH Deputy Dir. | Within 1-2 days |
| | | QIPs signed by DAI | Within 3-5 days |
| Implementation of QIP report sent to Special Master | Within 180 days | | |
| | | | |
| **\* deadlines are calculated from date of death (DOD)** | | | |

Appendix VII: Memorandum "Designation of Suicide Prevention, Assessment and Training Coordinator"

 

## MEMORANDUM

| | |
|---|---|
| **Date:** | 8/14/2015 |
| **To:** | Chief Executive Officers<br>Chiefs of Mental Health |
| **From:** | Timothy G. Belavich, Ph.D., MSHCA, CCHP-MH<br>Director (A), Division of Health Care Services and<br>Deputy Director, Statewide Mental Health Program |
| **Subject:** | DESIGNATION OF SUICIDE PREVENTION, ASSESSMENT AND TRAINING COORDINATOR |

Per the approved 2009 Mental Health Staffing Model, every institution with a mental health mission was allocated a fractional staff position for: Suicide Prevention (0.3), Mental Health Assessments/Evaluations (0.3) and Mental Health Training/Orientation (0.3) Coordination. These fractional responsibilities shall now be combined into one coordinator position.

Effective immediately, each institution must designate one Senior Psychologist, Specialist who will be responsible for the coordination of Suicide Prevention, Assessments/Evaluations, and Training/Orientation. The attached duty statement must be used for this position. No additional staff positions will be allocated for these duties.

For questions please contact Amy Eargle, Chief, Clinical Support, Statewide Mental Health Program via email at Amy.Eargle@cdcr.ca.gov.

Attachment

cc:  Angela Ponciano
     Amy Eargle, Ph.D.
     Laura Ceballos, Ph.D.
     Daryl Brown
     Nancy Whitham
     Regional Mental Health Administrators
     Regional Personnel Administrators
     Regional Health Care Executives

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

P.O. Box 588500
Elk Grove, CA 95758

STATE OF CALIFORNIA

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

*SHADED AREA TO REFLECT RECLASS POSITION NUMBER ONLY*

## DUTY STATEMENT

| RPA | EFFECTIVE DATE: |
|-----|-----------------|

| CDCR INSTITUTION OR DEPARTMENT | POSITION NUMBER (Agency – Unit – Class – Serial) |
|---|---|
| California Correctional Health Care Services | 042-XXX-9287-XXX |

| UNIT NAME AND CITY LOCATED | CLASS TITLE |
|---|---|
| | Senior Psychologist, CF (Specialist) |

| WORKING DAYS AND WORKING HOURS | SPECIFIC LOCATION ASSIGNED TO |
|---|---|
| a.m. to p.m. (Approximate only for FLSA exempt classifications) | |

| PROPOSED INCUMBENT (If known) | CURRENT POSITION NUMBER (Agency – Unit – Class – Serial) |
|---|---|

YOU ARE A VALUED MEMBER OF THE DEPARTMENT'S TEAM. YOU ARE EXPECTED TO WORK COOPERATIVELY WITH TEAM MEMBERS AND OTHERS TO ENABLE THE DEPARTMENT TO PROVIDE THE HIGHEST LEVEL OF SERVICE POSSIBLE. YOUR CREATIVITY AND INGENUITY ARE ENCOURAGED. YOUR EFFORTS TO TREAT OTHERS FAIRLY, HONESTLY AND WITH RESPECT ARE CRITICAL TO THE SUCCESS OF THE DEPARTMENT'S MISSION.

Under the general direction of the Chief Psychologist, Correctional Facility (CF) or Chief of Mental Health Services, the Senior Psychologist, CF (Specialist), Suicide Prevention, Assessment, and Training Coordinator will be responsible for the Department's assessments, evaluations, suicide prevention, training, and orientation programs. Some travel is associated with this position.

| % of time performing duties | Indicate the duties and responsibilities assigned to the position and the percentage of time spent on each. Group related tasks under the same percentage with the highest percentage first. *(Use addition sheet if necessary)* |
|---|---|
| | **ESSENTIAL FUNCTIONS** |
| 30% | Coordinate the institution's Suicide Prevention Program, Suicide Risk Evaluation Mentor Program, and mental health screening; consult with institution health care, custodial, and management staff on improving suicide prevention policies and procedures; chair the institution's Suicide Prevention and Response Focused Improvement Team; audit the institution's suicide prevention practices; collect and interpret data and other information on the institution's suicides, remain current in the field of suicide prevention; work with institution management to develop best practices; consult with clinical, custody, and management staff regarding mental health assessments and evaluations; perform quality management functions, prepare reports, and generate action plans as related to suicide prevention duties to improve mental health services delivery. |
| 20% | Provide training to institutional, clinical, and custody staff on suicide prevention, mental health issues and policies (e.g., completing the Mental Health Assessment for Rules Violation Reports [RVR], new employee orientation, Suicide Prevention/Crisis Intervention,) in order to ensure that inmate-patients have timely access to continuity of mental health care. Provide health care staff with the knowledge and specific strategies to interact more effectively with inmate-patients in the Mental Health Services Delivery System and Developmental Disabilities Program as directed by the Chief of Mental Health, and at the request of the In-Service Training Program; ensure training efficacy; address deficiencies as necessary. |
| 20% | Develop and provide training on clinical topics to mental health staff; provide training on mental health policy and initiatives; maintain training logs for clinical staff; ensure mandatory trainings for mental health staff are offered as needed; work closely with the Statewide Mental Health Program Training Unit to ensure training requirements are met; ensure integrity of training; remain current in the latest research, techniques, and tools in the field of correctional mental health. Use knowledge of criminal behavior, mental health issues, correctional settings, State and Federal mental health laws and regulations, and knowledge of each classification's scope of practice, to determine training requirements. |

STATE OF CALIFORNIA

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

| | |
|---|---|
| 15% | Provide coordination of mental health assessments. Maintain psychological testing library. Remain current on available psychological tests and measures and evaluation techniques. Provide training and consultation regarding assessments and testing reports as needed. Perform audits of Mental Health Assessments for RVRs and review audit results. Develop action plans to address noted deficiencies. |
| 10% | Provide assessments and crisis interventions to inmate-patients within the program as needed. Perform special projects as assigned; interpret the objectives and procedures of the program to other staff. Implement time-limited projects in area of expertise in order to enhance existing programs, comply with departmental policies and procedures and/or court mandates, using consultations, organizational skills, communication skills, and research skills. Serve as a member of the Quality Improvement Team (QIT), as required. |
| 5% | Other related duties as assigned. |

**KNOWLEDGE AND ABILITIES**

*Knowledge of:* Principles, techniques, and trends in psychology with particular reference to normal and disordered behavior, human development, motivation, personality, learning, individual differences, adaptation, and social interaction; methods for the assessment and modification of human behavior; forensic psychology; characteristics and social aspects of mental and developmental disabilities; research methodology and program evaluation; institutional and social process, group dynamics; functions of psychologists in various mental health services; current trends in the field of mental health; professional training; and community organization and allied professional services.

*Ability to:* Provide professional consultation; teach and participate in professional training; recognize situations requiring the creative application of technical skills; develop and evaluate creative approaches to the assessment, treatment, and rehabilitation of mental disabilities, to the conduct of research, and to the development and direction of a psychology program; plan, organize, and conduct research, data analysis, and program evaluation; conduct the more difficult assessment and psychological treatment procedures; analyze situations accurately and take effective action; and communicate effectively.

**DESIRABLE QUALIFICATIONS**

Special Personal Characteristics: Empathetic understanding of patients of a State correctional facility; willingness to work in a State correctional facility; scientific and professional integrity; emotional stability; patience; alertness; tact; and keenness of observation.

**SPECIAL PHYSICAL CHARACTERISTICS**

Persons appointed to this position must be reasonably expected to have and maintain sufficient strength, agility, and endurance to perform during stressful (physical, mental, and emotional) situations encountered on the job without compromising their health and well-being or that of their fellow employees or that of inmates. Assignments may include sole responsibility for the supervision of inmates and/or the protection of personal and real property. Must be able to travel.

Adopted:
Revised:

STATE OF CALIFORNIA                                    CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

| SUPERVISOR'S STATEMENT: *I HAVE DISCUSSED THE DUTIES OF THE POSITION WITH THE EMPLOYEE* | | |
|---|---|---|
| SUPERVISOR'S NAME (Print) | SUPERVISOR'S SIGNATURE | DATE |

| EMPLOYEE'S STATEMENT: *I HAVE DISCUSSED WITH MY SUPERVISOR THE DUTIES OF THE POSITION AND HAVE RECEIVED A COPY OF THE DUTY STATEMENT* | | |
|---|---|---|
| The statements contained in this duty statement reflect general details as necessary to describe the principal functions of this job. It should not be considered an all-inclusive listing of work requirements. Individuals may perform other duties as assigned, including work in other functional areas to cover absence of relief, to equalize peak work periods or otherwise balance the workload. | | |
| EMPLOYEE'S NAME (Print) | EMPLOYEE'S SIGNATURE | DATE |

Revised:_____

Adopted:
Revised:

Appendix VIII: Memorandum "Completed Contacts Associated with Suicide Risk Evaluation"

 

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

## MEMORANDUM

| | |
|---|---|
| **Date:** | 10/23/2015 |
| **To:** | Chief Executive Officers<br>Chiefs of Mental Health |
| **From:** | Timothy Belavich, Ph.D., MSHCA, CCHP-MH<br>Director (A), Division of Health Care Services and<br>Deputy Director, Statewide Mental Health Program |
| **Subject:** | **COMPLETED CONTACTS ASSOCIATED WITH SUICIDE RISK EVALUATIONS** |

Effective immediately, when a Suicide Risk Evaluation (SRE) Assessment (CDCR MH-7447) is completed by a clinician, the appointment scheduler shall simultaneously enter the SRE and a completed contact into the patient record in the Mental Health Tracking System (MHTS). Please refer to the Suicide Risk Evaluation Completed Contact Entry Process (attached) for instructions.

Additionally, clinicians shall enter their scheduled and un-scheduled SRE appointments on their daily log. The un-scheduled SRE appointments (i.e., MHCB assessment/placement) shall be entered retroactively and include start and stop times.

If you have questions or need additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@cdcr.ca.gov.

Attachment

cc: Angela Ponciano
    Amy Eargle, Ph.D.
    Laura Ceballos, Ph.D.
    Michael Golding, M.D.
    Edward Kaftarian, M.D.
    Jennifer Johnson
    Mental Health Regional Administrators
    Regional Health Care Executives

**HEALTH CARE SERVICES**

P.O. Box 4038
Sacramento, CA 95812-4038

**Suicide Risk Evaluation Completed Contact Entry Process**

When an SRE is completed by a clinician, the appointment scheduler shall simultaneously enter
the SRE and a completed contact into the patient record in MHTS.

1. **Receive** completed SRE form from clinician.
2. **Enter** information from the SRE into MHTS.
   a. **Complete** the 7447-MH: Suicide Risk Assessment portion at the bottom of the
      screen from the information provided on the SRE, including unscheduled SRE's.



3. **Create** a contact to correspond with SRE.
   a. **Complete** the left sections of the screen to correspond with the information provided on the SRE. Include the following:
      i. Appointment date
      ii. Start and stop time
      iii. Clinician name and classification who conducted SRE
      iv. Reason for visit (choose from the drop down menu)



4. **Close** the created contact corresponding with the SRE.

Appendix IX: Memorandum "Suicide Prevention Pamphlets for Inmates" (with pamphlets attached)

## Help is Available Anytime!

The CDCR Mental Health Services Delivery System provides mental health services to all inmates. Mental health services are private and can help you when you don't know where else to turn. Our trained clinical staff are available for:

- Dealing with Change
- Adjustment & Transition Issues
- Crisis Counseling
- Medication Services
- And much more

You are not alone! We are here to offer help & hope for a better today and future.



**CONTACT**
**Mental Health**

## What You Should Know:

- **You are not alone!**
  Though sometimes you may feel like you are. Many people experience hard times and help is available.

- **Think before you act.**
  There are other options.

- **Keep yourself and your surroundings safe.**
  For example, avoid drugs, alcohol and/or storing up your medicine because they can make you feel worse and not think clearly.

- **Take all your medication as prescribed.**
  Don't stop or make changes to your medications unless you and your doctor decide this together.

- **Take only the medications that your doctor has prescribed to you.**

- **Know when you are not doing well and need help.**
  Make a list of how you are feeling and discuss it with someone you trust, like your primary clinician or psychiatrist.

- **Talk to someone you trust!**
  There are people who can help and support you.

**CONTACT**
**Mental Health**

## Warning Signs:

- Using alcohol, drugs and other substances to cope
- Feeling trapped
- Feelings of shame and/or guilt
- Feelings of anger and/or rage
- Feelings of depression and/or anxiety
- Recklessness—feeling you have nothing to lose
- Receiving bad news, such as getting more time, learning an appeal was denied, or something from home
- Feeling isolated or alone (divorce, a death of a loved one, or news of an illness)
- Getting a serious medical diagnosis or chronic pain
- Being placed in administrative segregation
- Poor sleep
- Not enjoying things you used to like to do

**The following are very serious warning signs:**

- Feelings of wanting to die or not wake up
- Hearing voices or seeing things that others don't
- Feeling unbearable emotional or physical pain
- Making plans to kill yourself
- Sleeping all the time or not sleeping at all
- Saying "goodbye" to loved ones — writing letters
- Giving your personal property away

**CONTACT**
**Mental Health**



**_Cuando necesita ayuda:_**

- Hay ayuda disponible para Ud.
- Hable con alguien en quien tiene confianza o de quien se siente cercano
- Siga tomando todos sus medicamentos según las indicaciones
- Sea directo, abierto y honesto acerca de sus problemas
- Vaya a todas sus citas médicas y de salud mental
- Informe a cualquier miembro del personal si Ud. está teniendo dificultades

**Por favor, hable con el personal de la salud mental:**

- Contacte a cualquier miembro de la custodia
- Contacte a cualquier miembro del personal médico
- Contacte a cualquier miembro del personal de salud mental
- Llene un Formulario CDCR 7362 (Solicitud de Servicios de _Atención a la Salud_)

## ¿Verdadero o Falso?

No se puede detener a las personas que quieren suicidarse.
**_Falso_**

La mayoría de las personas con tendencias suicidas no quieren morir, solamente quieren que pare el dolor emocional.
**_Verdadero_**

Hablar sobre el suicidio sólo lo hará peor.
**_Falso_**

Hablar de sus sentimientos y de lo que está experimentando puede ayudarle a darse cuenta que necesita ayuda.
**_Verdadero_**

Si le digo a alguien que necesito ayuda, me pondrán en el programa de salud mental para siempre.
**_Falso_**

Todos necesitamos un poco de ayuda cuando tenemos dificultades. Hay ayuda a corto plazo y a largo plazo disponible para Ud.
**_Verdadero_**



¿Se siente solo?   ¿Se siente desamparado?

¿Está experimentando sentimientos de pérdida?   ¿Se siente temeroso?

¿Tiene apoyo familiar?

¿Tiene vergüenza?   ¿Se siente deprimido?

¿Se siente culpable?

¿Se siente confundido?

*¡Hay Esperanza y Ayuda!*
*El Programa de*
*Salud Mental*
*CDCR*

**Favor de contactar el Departamento de Salud Mental**

**Favor de contactar el Departamento de Salud Mental**

# EXHIBIT D

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



February 7, 2018

Matty Lopes, Special Master
Pannone Lopes Devereaux & O'Gara LLC
1301 Atwood Avenue, Suite 215 N
Johnston, RI 02919

VIA EMAIL

Dear Mr. Lopes:

Defendants have agreed to prepare and publish the *Annual Report on Suicides in the California Department of Corrections and Rehabilitation* (CDCR), previously published by you and your experts, beginning with the report covering the time period January 1, 2015 – December 31, 2015. Enclosed please find CDCR's Annual Report for 2015. The report summarizes the findings of CDCR's Statewide Mental Health Program's Suicide Case Review Committee, which has been assessing the "foreseeability" and "preventability" of suicides based on definitions of those terms used in the Special Master's prior reports. Please note that, as explained in the report, none of the findings regarding foreseeability or preventability apply legal standards for causation or deliberate indifference, nor do they constitute an admission of personal or systemic culpability.

Beginning with the Annual Report covering the time period January 1, 2017 – December 31, 2017, CDCR will meet in a small group, to include the Deputy Director of Statewide Mental Health, the DAI Deputy Director for Facility Support, and the General Counsel or designee, to consider each death and apply the foreseeable and preventable definitions to each case. The reviews will continue to use the definitions of "foreseeable" and "preventable" previously used in the annual suicide reports written by the Special Master's experts.

In addition, to make the application of these definitions more precise going forward, the reviews may determine not only whether the death was "foreseeable" or "not foreseeable," but whether in some instances it was alternatively "possibly foreseeable" or "likely not foreseeable." Similarly, in order to assess preventability more accurately, the reviews may determine whether the death was "preventable," "possibly preventable," "likely not preventable," or "not preventable" when the facts of a particular case present some ambiguity as to a determination. Additional designations like these have been used by the Special Master's experts in prior reports. For each determination, CDCR will prepare a summary explaining how the facts of the case support the determination. CDCR reserves the right to change the definitions in future reports.

Matty Lopes
Page 2


We welcome the opportunity to discuss the report and the suicide review process.

Sincerely,


ANDREA S. MOON
Attorney
Office of Legal Affairs

Enclosure:

Annual Report On Suicides In The California Department Of Corrections And Rehabilitation
January 1, 2015 – December 31, 2015

cc:

Co-Counsel

# EXHIBIT E

**ANNUAL REPORT ON SUICIDES IN THE
CALIFORNIA DEPARTMENT OF CORRECTIONS AND
REHABILITATION
JANUARY 1, 2015 – DECEMBER 31, 2015**

Prepared by:
Robert J. Horon, Ph.D. &
Amber Carda, Psy.D.
Senior Psychologist, Specialists
Statewide Mental Health Program
Division of Health Care Services

# Table of Contents

| | | |
|---|---|---|
| | *List of Tables* | 4 |
| | *List of Figures* | 5 |
| | *List of Appendices* | 6 |
| | Executive Summary of the Annual Suicide Report | 7 |
| 1. | Introduction and Summary of Findings | 8 |
| | a. Suicide definitions and terms used | 8 |
| | b. Review of Findings, Section 1: Current Year | 9 |
| | i. Number and rate of suicide in reporting year | 9 |
| | ii. Demographic factors | 9 |
| | iii. Marital status | 10 |
| | iv. Education, juvenile history, and work history | 11 |
| | v. Languages spoken | 11 |
| | vi. Health factors | 11 |
| | vii. Temporal factors | 11 |
| | viii. Custodial and correctional factors | 11 |
| | ix. Cell occupancy | 16 |
| | x. Job assignment | 16 |
| | xi. Means or method of suicide | 16 |
| | xii. Mental health factors | 17 |
| | xiii. Diagnoses | 17 |
| | xiv. Suicide attempt history | 18 |
| | xv. Suicide precipitants and behavior | 19 |
| | c. Review of Findings, Section 2: Current Year vs. Prior Years | 22 |
| | i. Comparison of rate between current and prior years | 22 |
| | ii. Suicides by institution, current year vs. 15-year average | 24 |
| | iii. Suicides in the CDCR by month, current year and 10-year average | 27 |
| | iv. Demographic factors | 27 |
| | v. Suicides by housing type | 29 |
| | vi. Time in segregated housing prior to death | 30 |
| | vii. Suicides by method | 31 |
| | viii. Involvement in mental health services | 31 |
| | ix. Suicides in mental health vs. non-mental health populations | 32 |
| | d. Review of Findings, Section 3: Comparison of CDCR Suicide Rates with Other State Prison Systems and Relevant U.S. Rates | 33 |
| | i. CDCR rates versus other state and federal prison rates | 34 |
| | ii. Comparison of rate between CDCR and the community | 34 |

| | | |
|---|---|---|
| | e. Summary Review of Findings and Trends | 35 |
| 2. | Response to suicide and suicide attempts | 36 |
| | a. Institutional reporting of self-harm incidents | 36 |
| | b. Determination of unknown causes of death | 36 |
| | c. Suicide attempts and suicides prevented | 38 |
| | d. Determination and tracking of Quality Improvement Plans | 38 |
| | e. Determination whether a suicide is preventable or foreseeable | 39 |
| | f. Audits of SCR Quality | 41 |
| | g. Timeliness of Suicide Case Reviews and Suicide Reports | 42 |
| 3. | Findings in individual case reviews | 43 |
| | a. Introduction to individual case reviews | 4 |
| | b. Commonalities in individual case reviews | 43 |
| 4. | Review of suicide prevention initiatives in 2015 | 48 |
| | a. Introduction | 48 |
| | b. Suicide prevention initiatives developed/implemented during the reporting year | 48 |
| 5. | Conclusions | |
| | a. Introduction | 57 |
| | b. Summary of findings | 58 |
| | c. Report implications and future steps | 60 |

**List of Tables**

Table 1. *Racial/Ethnic Groupings of Suicides in the CDCR, 2015*    *10*

Table 2. *Age Groupings of Suicides in the CDCR, 2015*    *10*

Table 3. *Frequency of Suicide by the CDCR Institution, 2015*    *12*

Table 4. *Frequency of Suicide by Housing Type, 2015*    *13*

Table 5. *Type of Commitment Offense in Inmate Suicides, 2015*    *13*

Table 6. *Suicides by Security Level, 2016*    *14*

Table 7. *Suicides in the CDCR by Length of Sentence, 2015*    *15*

Table 8. *Suicides in the CDCR by Amount of Time Served, 2015*    *15*

Table 9. *Suicides in the CDCR by Time Left to Serve, 2015*    *16*

Table 10. *Suicides in the CDCR by MHSDS Participation, 2015*    *17*

Table 11. *Mental Health Diagnoses of Suicides in the CDCR, 2015*    *18*

Table 12: *Suspected Precipitants to Suicides in CDCR by frequency, 2015*    *19*

Table 13: *Individual Precipitants for Suicides within the CDCR, 2015*    *21*

Table 14. 2015 *In-state, Out-of-state, mid-year*
    *Frequency and Rate of Suicide, by Gender*    *22*

Table 15. *Annual Frequency and Rate of Suicide in the CDCR for 20 years,*    *23*
    *by Gender and Overall, 1996-2015*

Table 16. *Frequency of Suicide by CDCR Institution, 2015 and by prior*    *25*
    *15-year total and average (1999-2014)*

Table 17. *Frequency of Suicide within Segregated Housing, 2010-2015*    *30*

Table 18. *Frequency of Suicide within MHSDS Levels of Care, 2010-2015*    32

Table 19. *Frequency of Suicide in MH versus non-MH populations,*
    *average total population 2006-2015*    *32*

Table 20. *Rate and rank of suicides by state, 2001-2014 (14 years)*    *33*

Table 21. *QIPs assigned within the CDCR by recipient, 2015*    *39*

Table 22: *Results of Quality Audits, 2015 Suicide Case Review reports*          *41*

Table 23: *Findings of Individual Case Reviews, part 1*          *44*

Table 24: *Findings of Case by Case Reviews, part 2*          *47*

**List of Figures**

Figure 1: *CDCR Suicide Rate and Frequency, with trend line, 2006-2015*          *24*

Figure 2: *CDCR Frequency by Month, 2015 and 10-Year Average*          *27*

Figure 3: *Suicide Frequency by Race, 2005-2015, with trend line*          *28*

Figure 4: *Number of Suicides by Age Group, 2010-2015*          *29*

Figure 5: *Length of Time in ASU before suicide, 2009-2015*          *31*

Figure 6: *Suicide rates for adult males in the CDCR, State Prisons, & the U.S., 2010-15*   *35*

**List of Appendices**

I.      Sample High Risk Management Program policy                                    64

II.     Self-harm and Incident Reporting                                               72

III.    Determination Review of unknown deaths and overdose deaths                     74

IV.     Review of Individual Suicide Case Reviews                                       76

V.      Suicide Response Procedures                                                     80

VI.     Suicide Response Court-Ordered and Internal Deadlines for Suicide Reports       84

VII.    Memorandum "Designation of Suicide Prevention, Assessment and Training
        Coordinator"                                                                    85

VIII.   Memorandum " Completed Contacts Associated with Suicide Risk Evaluations"       89

IX.     Memorandum "Suicide Prevention Pamphlets for Inmates"                           92
        (with pamphlets attached)

## Executive Summary of the Annual Suicide Report

In 2015 a total of 24 inmate suicides occurred within the California Department of Corrections and Rehabilitation (CDCR). This number is an increase of one from 2014. The frequency of suicides in 2014 and 2015 are the lowest consecutive yearly number of suicides in the CDCR since 2002. The rate of suicide in the CDCR was 18.6 suicides per 100,000 inmates in 2015 and 17.0 per 100,000 in 2014. The suicide rate in U.S. state prisons ranged from 14-17 per 100,000 per year between 2000 and 2013[1] and 20 per 100,000 in 2014.[2] The suicide rate in the CDCR is thus lower than the average rate in U.S. prisons. Additionally, male prisoners in the CDCR had a lower rate of suicide rate than U.S. males in the community in 2014 and 2015.[3]

Suicides in 2015 largely match prior year's patterns with respect to time of year, prevalence in spring and fall months, greater frequency in high custody inmates (75% in Level III and Level IV housing), and a relatively high percentage of suicides in inmates involved in mental health programming (typically 50-60%). Suicides in 2015 were somewhat unlike prior year's patterns in that there were two female suicides and three suicides of inmates aged 70 and older.

Both the frequency and the rate of suicide have declined in the CDCR over the past 10 years (2006-2015), which represents steady progress. The frequency of suicide in the CDCR decreased from 43 in 2006 to 23 in 2015, while the rate of suicide in the CDCR declined from 24.9 per 100,000 in 2006 to 18.6 per 100,000 in 2015. The decline in suicide rate in the CDCR in 2015 compared to the prior 10 years can be attributed to fewer suicides within segregated housing units, lower rates of suicides in Caucasian and Hispanic/Latino inmates, and fewer suicides in inmates aged age 35-54.

Many suicide prevention initiatives are underway and/or continuing in the CDCR. These initiatives have emerged from Quality Improvement Plans (QIP) on deaths by suicide, from recommendations generated by tours, reviews, and audits, from advances in the field of Suicidology, from opportunities arising from the Mental Health Tracking System and the Electronic Health Record System, and so forth. These initiatives are meant to enhance a comprehensive, integrated system of suicide prevention and are detailed in the report that follows.

---

[1] Noonan, M, Rohloff, H., & Ginder, S., Mortality in Local Jails and State Prisons, 2000-2013 Statistical Tables, US DOJ, Bureau of Justice Statistics, August, 2015 NCH 248756
[2] Noonan, M. Mortality in Local Jails and State Prisons, 2001-2014 Statistical Tables, US DOJ, Bureau of Justice Statistics, December, 2016, NCJ 250150
[3] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870

## I. Introduction and Review of Findings

This report reviews the 24 suicides by inmates of the CDCR which occurred during 2015. The report is submitted as part of joint efforts by the CDCR and the Office of the Special Master's (OSM) experts to work together to reduce the number of suicides within California's state prisons and is part of the CDCR's compliance with court-ordered remediation specified by the Special Master as part of the continuing review in the matter of *Coleman v. Brown*, No. (CIV S-90-0520 KJM KJN E.D.Cal.). Kerry Hughes, M.D. and Jeffrey Metzner, M.D. provided consultation for this report from the *Coleman* court. Amy Eargle, Ph.D., Robert Canning, Ph.D., Amber Carda, Psy.D., Adinn Phean, AGPA, Harutyun Grigoryan, OT, and Byron Russell, HPS1 provided assistance and review from the Statewide Mental Health Program (SMHP) at the CDCR.

This report is unlike prior reports in that the report is generated by the SMHP with consultation by *Coleman* court experts. Prior reports submitted to the Special Master were written by the *Coleman* court's experts. The purpose of the report remains the same: To report on ongoing efforts to monitor suicides in the CDCR, to identify any trends in suicide that may indicate targets for suicide prevention efforts, and to provide recommendations for continued improvement. Additional detail is provided in this report as to the definitions, response efforts, monitoring, and other improvement processes and programs implemented by or used by the SMHP to prevent suicide. The report is prepared for the Special Master and has implications for the CDCR and for the work of the *Coleman* court's experts.

The primary source of data used for this report is the suicide case reviews completed by members of the SMHP who are trained in conducting these reviews. Additional sources include data obtained from the CDCR Office of Research, information garnered from reports by the CDCR Death Review Committee, information from prior annual suicide reports, and publically available information regarding suicide rates in community and incarcerated settings. Each suicide was also independently reviewed by this author in order to assess trends in data or findings. Input made by the OSM's experts, who attend each suicide case review by teleconference and consult on case review, provided added information for this report. Finally, members of the Quality Management unit, a separate unit within the SMHP, provided input through auditing each suicide case review report.

### A. Suicide definitions and terms used

The CDCR is in the process of adopting definitions related to suicide that were developed by the Centers for Disease Control and the World Health Organization and have been widely-adopted in

community settings. The OSM has been provided with a draft of the proposed changes to these definitions. As these changes are pending, the definitions used in the MHSDS Program Guide, 2009 Revision are listed below. Terms and definitions now considered obsolete are omitted from the listed provided here. Additionally, the term self-injurious is synonymous with self-harm. The term self-harm is used frequently in this report as it conforms to both existing definitions and proposed definitions and is routinely qualified by the phrases "with intent" or "without intent."

1. <u>Suicide</u>: An intentional self-injurious behavior that causes or leads to death.

2. <u>Suicide Attempt</u>: An intentional self-injurious behavior which is apparently designed to deliberately end one's life, and may require medical and/or custody intervention to reduce the likelihood of death or serious injury.

3. <u>Suicidal Ideation</u>: Thoughts of suicide or death, which can be specific or vague, and can include active thoughts of committing[4] [that is, dying by] suicide or the passive desire to be dead.

4. <u>Suicidal Intent</u>: The intention to deliberately end one's own life.

5. <u>Self-injurious Behavior</u>: A behavior that causes, or is likely to cause, physical self-injury. [Note: The terms self-injurious behavior, self-mutilation, and suicide gesture are found in the MHSDS Program Guides, 2009 Revision, but are not used in this report. The term 'self-harm without intent' is used instead as the meaning is the same, self-harm for other reasons than death by suicide, and does not have the potentially negative connotations of terms such as 'gesture.']

**B.  <u>Review of findings</u>**

*<u>Section 1: Current Year</u>*

**<u>Number and rate of suicide in reporting year</u>:** There were 24 suicides in the CDCR in 2015. This represents an increase of one over the total in 2014, or an increase of 4%. The suicide rate in the CDCR for 2015 was 18.6 per 100,000. Rates of suicide are standardized by the number per 100,000 in order to make standardized comparisons between samples and populations. The total number of suicides in 2015 corresponds to a suicide on average every 15.2 days.

**<u>Demographic Factors</u>:** In 2015, 22 men and 2 women died by suicide in the CDCR. The rate of suicides in the CDCR was 17.8 per 100,000 for men and 35.5 per 100,000 for women. The rate of suicide for women fluctuates more dramatically than the rate for men, as there are many more

---

[4] The term 'committing' has fallen out of favor with Suicidologists, as the term implies some sort of success in carrying out a pledge or obligation. The favored term is rather straightforward—'died by suicide.'

males (123,268) than females (5,632) in the CDCR. To illustrate, one fewer female suicide would have lowered the female rate in 2015 by one-half, from 35.5 to 17.6 per 100,000. The same decline of one suicide in males would have lowered the frequency by 1 in 22, or from a rate of 17.8 to a rate of 17.0 per 100,000. A listing of suicides by gender, per year over 10 and 20 year periods is found in Table 15 in this report.

The racial and ethnic backgrounds of inmates who died by suicide are represented in Table 1. Caucasians represented over half of all suicides despite comprising only 22% of the population within the CDCR. This finding has been typical of the racial breakdowns of suicides within the CDCR for many years.

Table 1. *Racial/Ethnic Groupings of Suicides in the CDCR, 2015*

| Racial Group | Frequency | Percent of Suicides | Percent of race within the CDCR |
|---|---|---|---|
| African-American | 5 | 21% | 29% |
| Caucasian | 13 | 54% | 22% |
| Hispanic/Latino | 4 | 17% | 42% |
| Other* | 2 | 8% | 6% |

*1 Chinese American female, 1 Japanese American male*

Table 2 contains a listing of age groupings within the CDCR, with the number and percentage of suicides for each group compared with the prevalence of the age group within the CDCR. Of note, four age groups had higher rates of suicide than their corresponding representation within the CDCR population during the reporting year (2015): Inmates ages 30-34, 45-54, 60-64, and 65 and older. The overrepresentation of older inmates in the year's suicides may bear further monitoring as a possible emerging trend. The three suicides of older inmates occurred in individuals aged 70-73. The average age of those who died by suicide was 42.9.

Table 2. *Age Groupings of Suicides in the CDCR, 2015*

| Age Group | Frequency | Percentage of 2015 Suicides | Percentage of CDCR Population |
|---|---|---|---|
| 18-24 | 2 | 8 | 12 |
| 25-29 | 3 | 13 | 16 |
| 30-34 | 5 | 21 | 16 |
| 35-39 | 2 | 8 | 14 |
| 40-44 | 2 | 8 | 11 |
| 45-54 | 4 | 17 | 10 |
| 55-59 | 1 | 4 | 6 |
| 60-64 | 2 | 8 | 3 |
| 65 + | 3 | 13 | 3 |

**Marital Status:** Marital relationships are thought to be a protective factor for inmates. This variable is protective for males in community studies and may function in a similar way for inmates as these relationships may offer support during incarceration.[5] In 2015, two suicides (one male, one female) occurred in married individuals, whereas nine suicides occurred in separated or divorced inmates (including the second female) and 13 suicides occurred in single or never-married inmates.

**Education, Juvenile History, and Work History:** Three suicides occurred in inmates with some college education. The remaining 21 inmates had secondary educations, ranging from the 8th to 12th grade. Fifty-seven percent had a history of juvenile arrest, with 33% having a history of gang involvement. The majority of suicides occurred in inmates with limited employment history, typically in work classified as "unskilled labor." None of the suicides occurred in inmates who were in the Developmental Disability Program (DDP), though two inmates had some history of special education involvement.

**Languages Spoken:** One female inmate who died by suicide spoke Mandarin as her primary language. All others were primarily English-speaking.

**Health Factors:** Nearly half (46%) of the inmates who died by suicide in 2015 were considered to have serious and/or chronic medical problems. This ranged from problems with low back pain or headaches to cases of liver disease, diabetic neuropathy, cardiac problems, and legal blindness. In all cases, medical needs were determined to be adequately addressed according to nursing reviews. Implications of this finding for service delivery are explored later in this report.

**Temporal Factors:** Suicides occurred within the CDCR in nine months in 2015. That is, zero suicides occurred in three months. Four suicides occurred in one month (March) and five suicides occurred in each of two months (May and October). The prevalence of suicides in spring and fall months has been noted in prior years as well (*Figure 2* contains a breakdown of suicides by month over the current year and by a 10-year average).

In 2015, time of day of discovery did not vary significantly, with seven suicides occurring during first watch (2200 hours to 0600 hours), seven during second watch (0600 hours to 1400 hours), and ten during third watch (1400 hours to 2200 hours). This finding is similar to prior years.

**Custodial and Correctional Factors:** In 2015, suicides occurred at 13 institutions including an out-of-state facility. Table 3 lists suicides by institution. Any institutions that are not listed did not have a death by suicide in 2015.

---

[5] Kposowa, A. (2000). Marital status and suicide in the National Longitudinal Mortality Study. *Journal of Epidemiology and Community Health, 54*, 254-261.

Table 3. *Frequency of Suicide by CDCR Institution, 2015*

| Institution | Frequency |
|---|---|
| California State Prison, Sacramento | 3 |
| San Quentin State Prison | 3 |
| Duel Vocational Institute | 3 |
| California Men's Colony | 3 |
| California Institution for Women | 2 |
| California State Prison, Corcoran | 2 |
| RJ Donovan Correctional Facility | 2 |
| California Medical Facility | 1 |
| California Correctional Institution | 1 |
| California Institution for Men | 1 |
| Folsom State Prison | 1 |
| California Health Care Facility | 1 |
| Tallahatchie County Correctional Facility | 1 |
| Total | 24 |

As can be seen, one-half of the suicides in 2015 occurred in four institutions, and 18 (75%) of the suicides occurred within seven institutions.

During 2015, 9 of the 24 suicides occurred in segregated housing settings (37%); seven in Administrative Segregation Units (ASU), one in a Security Housing Unit (SHU), and one in Short-Term Restricted Housing (STRH). Two inmates were in Reception Centers, one in a Correctional Treatment Center (CTC), and one in a Sensitive Needs Yard (SNY). The remaining 11 suicides occurred in general population settings. This information is depicted in Table 4.

Table 4. *Frequency of Suicide by Housing Type, 2015*

| Housing Type | Frequency | Percent |
|---|---|---|
| Administrative Segregation | 7 | 29 |
| Security Housing Unit | 1 | 4 |
| Short-Term Restricted Housing | 1 | 4 |
| Reception Center | 2 | 8 |
| Correctional Treatment Center | 1 | 4 |
| Sensitive Needs Yard | 1 | 4 |
| General Population | 11 | 46 |
| Total | 24 | 99 |

A common finding in prison and jail settings is a preponderance of suicides in violent inmates and in inmates with higher level security needs; violent inmates have nearly three times the risk of suicide as non-violent inmates[6]. The commitment offenses of inmates who died by suicide in 2015 are listed below in Table 5. Notably, half of suicides occurred in individuals who had committed murder. Four other inmates had commitments for assault resulting in great bodily injury, one inmate had a commitment for battery, and two had a commitment for armed robbery (and thus the threat of assault was implied). Of the five commitment offenses considered non-violent, two resulted in significant injury but were seen as unintentional (driving under the influence resulting in injury or death). The remaining three suicides occurred in inmates who were committed for vehicle theft, burglary, or drug charges.

---

[6] Mumola, C. (2005), Bureau of Justice Statistics, located at: http://www.bjs.gov/content/pub/pdf/ardus05.pdf

| Table 5. *Commitment Offenses in Inmate Suicides, 2015* | | |
|---|---|---|
| Type of Commitment Offense | N | Percent |
| **Violent Crimes Overall** | **19** | **79** |
| Murder | 12 | 50 |
| Assault w/ Great Bodily Injury | 4 | 17 |
| Armed Robbery | 2 | 8 |
| Battery | 1 | 4 |
| Sex Offense | 0 | 0 |
| **Non-Violent Crimes Overall** | **5** | **21** |
| DUI with injury/vehicular manslaughter | 2 | 8 |
| Vehicle theft | 1 | 4 |
| Burglary | 1 | 4 |
| Drug Charges | 1 | 4 |

In regards to security level, suicides occurred predominantly in higher security (Level III and Level IV) settings in 2015. Table 6 lists the number of suicides by security classification level. Level IV suicides have traditionally represented more than half of all suicides within CDCR. Of note, the classification system used by the CDCR was modified prior to 2015, with fewer inmates classified at the highest level, Level IV, which may account for some of the decline in Level IV inmate suicides in 2015.

| Table 6. *Suicides per Security Level, 2015* | | |
|---|---|---|
| Security/Classification Level | N | Percent |
| Level IV | 9 | 37.5 |
| Level III | 9 | 37.5 |
| Level II | 6 | 25 |
| Level I | 0 | 0 |

Another variable unique to correctional settings is the issue of sentence length: Total length of sentence, how much time an inmate has served prior to a suicide, and how much time an inmate had left to serve in prison prior to a suicide. These variables are captured in Tables 7, 8, and 9.

Table 7 shows that a slight majority of suicides (54%) occurred in inmates with Life sentences (including condemned individuals) in 2015. Inmates with Life sentences have historically made up roughly 20% of the population within the CDCR and are overrepresented in individuals who die by suicide. No suicides occurred in inmates with medium length sentences (11 to 20 years) in 2015.

Table 7. *Suicides in the CDCR by Length of Sentence, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| 1-5 years | 7 | 29 |
| 6-10 years | 3 | 13 |
| 11-20 years | 0 | 0 |
| 20+ years | 1 | 4 |
| Life with Possibility of Parole | 11 | 46 |
| Life without Possibility of Parole | 1 | 4 |
| Condemned | 1 | 4 |
| Total | 24 | 100 |

As seen in Table 8, individuals early within their sentence represent a high risk group. Five inmates died by suicide within their first year of incarceration; this included two individuals who died within 30 days of imprisonment. Three inmates who had served 20 years or more were among those who died by suicide in 2015.

Table 8. *Suicides in the CDCR by Amount of Time Served, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| 0-1 year | 5 | 21 |
| 1-5 years | 5 | 21 |
| 6-10 years | 7 | 29 |
| 11-20 years | 4 | 17 |
| 21+ years | 3 | 12 |
| Total | 24 | 100 |

The length of time remaining in sentences for those who died by suicide are shown in Table 9. There was nearly an even split between those with short to moderate sentences left to serve (46%) and those with lengthy sentences or indeterminate/life sentences (54%).

Table 9. *Suicides in the CDCR by Time Left to Serve, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| 0-1 year | 0 | 0 |
| 1-5 years | 10 | 42 |
| 6-10 years | 1 | 4 |
| 11-15 years | 0 | 0 |
| 16 years or more (including Lifers) | 13 | 54 |
| Total | 24 | 100 |

The implications for the findings represented in Tables 7, 8, and 9 are considerable, suggesting the need to. These considerations will be discussed later in this report.

**Cell Occupancy:** In 2015, 25% of suicides occurred in inmates housed in designated double cells and 75% of suicides occurred within designated single cells. Of the six suicides in designated double cells, two suicides occurred in cells without a currently assigned cellmate, two inmates waited for a cellmate to leave for work or other programming before dying by suicide, one occurred outside of the cell (by jumping from a tier), and one occurred with a cellmate present but asleep. Of the nine suicides occurring in segregated housing settings, eight of the suicides occurred in single-person cells. The ninth suicide occurred in a double cell but without an assigned cellmate. Overall, 23 of the 24 suicides occurred within a single cell or within a solely occupied (at the time) double cell.

**Job Assignment:** The majority of inmates (62.5%) who died by suicide in 2015 did not have a job assignment or educational placement. Of the nine inmates who had program assignments, two were placed in educational settings, one (female) in a substance abuse program, and six were in traditional jobs (e.g., as a porter).

**Means or Method of Suicide**: Correctional settings necessarily limit the methods or means inmates can use to die by suicide. For example, suicides by firearms or carbon monoxide poisoning are unheard of in correctional systems. As with most correctional systems, hanging is the primary means used by inmates in the CDCR to die by suicide. Inmates have ready access to clothing and linen items that can be used for nooses and ligature points can be found in nearly all cells. In 2015, both female suicides were by hanging and 20 of the 24 suicides overall were by

hanging (83%). The remaining four inmates (males) died by intentional overdose (2), asphyxiation (1), and jumping from a high place (1).

**Mental Health Factors:** The number and percentage of inmates who died by suicides in the CDCR in 2015 who were participants in the Mental Health Services Delivery System (MHSDS) is listed in Table 10. Mental health patients continue to be overrepresented in the year's suicides, a pattern that is typical in correctional and community settings.

Table 10. *Suicides in the CDCR by MHSDS Participation, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| No MHSDS participation | 10 | 42 |
| Correctional Clinical Case Management System | 9 | 37 |
| Enhanced Outpatient Program | 5 | 21 |
| Total | 24 | 100 |

Ten inmates were not in the MHSDS at the time of death. Six of these inmates (25% of the total number of suicides) had no history of participation in the MHSDS. Four inmates who were not in the MHSDS system at the time of death had previously been in the MHSDS at the Correctional Clinical Case Management System (CCCMS) level of care.

In 2015, 15 (62.5%) of the inmates who died by suicide had a history of mental health treatment prior to incarceration. Of these, 11 were in the MHSDS at the time of death, with one other having previously participated in the MHSDS. Eight cases (33%) had a family history of mental illness and/or family history of substance abuse treatment.

Upon entrance to the CDCR, inmates are screened for the possible presence of significant mental health disorders. Thirteen (55%) of the inmates who died by suicide in 2015 were identified as possibly having significant mental health disorders during initial screening. On subsequent mental health evaluations, 69% of those positive on screening were also found to have mental health conditions qualifying them for MHSDS services.

At the time of suicide, 14 inmates (58%) were on psychiatric medications. Three individuals (13%) had involuntary medication orders in place per Penal Code 2602. Eleven of the 24 (46%) had a history of Mental Health Crisis Bed placement or inpatient hospitalization. Eight (33%) had been psychiatrically hospitalized in the year prior to their suicide.

**Diagnoses:** The mental health diagnoses of individuals who died by suicide in 2015 are summarized in Table 11 and are listed by frequency. Please note that people can have multiple mental health diagnoses, thus the frequency of diagnoses in Table 11 exceeds the number of

annual suicides. Additionally, all inmate suicides in 2015 involved individuals with some history of substance use or abuse. However, the diagnoses listed in Table 11 include substance use disorders *only* if formally reported as a diagnosis. All diagnoses are based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 4th Edition or 5th Edition (DSM-IV or DSM-5).

When present, mood disorders and psychotic disorders were listed as the primary diagnosis of record. Of the individuals diagnosed with mood disorders, five were diagnosed with Major Depressive Disorder and four with Bipolar I Disorder. Five individuals were diagnosed with psychotic disorders; three with Schizophrenia, one with Delusional Disorder, and one with Psychotic Disorder NOS. Six inmates were diagnosed with Antisocial Personality Disorder and two of these six inmates were concurrently diagnosed with Narcissistic Personality Disorder.

Table 11. *Mental Health Diagnoses of Suicides in the CDCR, 2015*

| Diagnostic Category | Frequency | Percent |
| --- | --- | --- |
| Any DSM Disorder | 20 | 83 |
| Substance Abuse or Dependence | 13 | 54 |
| Mood Disorder | 9 | 38 |
|     Major Depressive Disorder (5) | | |
|     Bipolar I Disorder (4) | | |
|     Psychotic Disorder (5) | | |
| Personality Disorder | 6 | 25 |
| Psychotic Disorder | 5 | 21 |
|     Schizophrenia (3) | | |
|     Delusional Disorder (1) | | |
|     Psychotic Disorder NOS (1) | | |
| Adjustment Disorder | 4 | 17 |
| No Diagnosis | 4 | 17 |
| Anxiety Disorder | 1 | 4 |

**Suicide Attempt History:** A history of suicide attempts was found in 16 (67%) of the 24 cases of suicide in 2015. Of the group of 16, ten had made multiple past suicide attempts (42% of the overall total). Of those that had prior suicide attempts, 10 had reported at least one suicide attempt while in the community and eight had at least one suicide attempt while incarcerated. For the eight individuals who had suicide attempts during incarceration, a range of one to five prior attempts in prison were noted. The finding of 10 suicides within *Multiple Attempters,* a term

indicating the presence of two or more suicide attempts with the intent to die, is significant as this is a group with known high chronic risk.[7] Implications of this finding are discussed later in this report.

**Suicide Precipitants and Behavior:** Seven of the 24 individuals (29%) who died by suicide in the CDCR in 2015 wrote suicide notes. This is a bit higher than the rate (one in six or 17%) found in community samples.[8] A small percentage (17%) of the deaths occurred in inmates who reported having no interpersonal supports, while two reported having one person in their support system. The majority (75%) endorsed two or more supports during their most recent mental health or suicide risk evaluations. Only one of the 24 (4%) of the suicides occurred in a patient who was believed to be feigning distress or suicidality. Five of the 24 inmates who died by suicide in 2015 did so on a holiday, with one each on Christmas Eve, Memorial Day, 4th of July, Halloween, and Chinese New Year.

Suspected precipitants are event(s) that precede a death by suicide. These events may also be referred to as potential triggers to one's decision to end their life. The precipitants to the current year suicides listed or suspected by Mental Health Suicide Reviewer's (MHSR's) in their suicide case review reports were examined, and are presented in Table 12.

Table 12. *Suspected Precipitants to Suicides in the CDCR by frequency, 2015*

| Precipitant Category | Frequency | Percent of Total |
|---|---|---|
| Receipt of new charges, convictions, disciplinary actions, or added time in prison | 9 | 20 |
| Safety concerns, drug debts, fears of victimization | 7 | 15 |
| Mental health symptoms, e.g. anxiety, psychosis | 7 | 15 |
| Medical illness and/or pain issues; medical disability | 5 | 11 |
| Holidays or anniversaries of losses, crimes, etc. | 5 | 11 |
| Disruption in prison 'program;' e.g., transfer between facilities, cellmate change, loss of single cell housing | 4 | 9 |
| Conflict or losses of external supports | 4 | 9 |

---

[7] Rudd, Joiner, & Rajab (1996). Relationships among suicide ideators, attempters, and multiple attempters in a young-adult sample. *Journal of Abnormal Psychology*, 105, 541-550.

[8] Gelder, Mayou, and Geddes (2005). Incidence of note-leaving remains constant despite increasing suicide rates. *Psychiatry and Clinical Neurosciences,* 4 (1).

Table 12. *Suspected Precipitants to Suicides in the CDCR by frequency, 2015*

| | | |
|---|---|---|
| Conflict or losses of within prison supports | 3 | 6 |
| Receipt of or anticipation of negative outcomes with the Board of Prison Hearings | 1 | 2 |
| Loss of parole to the community (e.g., due to added sentence, finding of MDO or SVP) | 1 | 2 |
| Totals: | 46 | 100 |

The precipitants listed in suicide case review reports can be divided roughly into ten categories as represented in Table 12. The frequency of precipitants is greater than the total number of suicides, as nearly all suicide case reviews listed more than one hypothesized precipitant. In many cases, the precipitants were not entirely clear. Rather, the precipitants identified by suicide case reviewers are marked by each inmate's idiosyncratic reasons for ending one's life. The frequency of certain categories of suicide precipitants has implication for prevention efforts as explored later in this report.

Additionally, Table 13 indicates the precipitant factors for suicides occurring in the CDCR in 2015 on a case by case basis. As is apparent, the majority of inmates had multiple potential triggers for the action. Also, in-prison events or stresses are noted in most, but not all, cases. Greg Dear and colleagues reported similar findings in Australian prisons with suicide attempters. When interviewed, prisoners reported two or more of five categories related to precipitants for attempts, with the most common category (71% of incidents) being termed "stressful event that occurred within the prison" and second most common category (43% of incidents) being a consequence of imprisonment (e.g. placing a strain on family).[9] These themes are mirrored in the 2015 suicides within the CDCR and have been presented to CDCR clinicians in monthly suicide prevention videoconferences and in revised trainings in suicide risk evaluation.

---

[9] Dear, Thomson, Hall, & Howells (2001). Non-fatal self-harm in Western Australian prisons: Who, where, when, and why. *Australian & New Zealand Journal of Criminology*, 34, 47-66.

Table 13: *Individual Precipitants for Suicides within the CDCR, 2015*

| Case | Precipitants Noted |
|------|--------------------|
| A | Medical illness (terminal) and pain issues; housing issues (SNY status; safety concerns); conflict with spouse |
| B | Health concerns and complaints of pain; panic attacks; tearfulness around "no hope" of getting better medically; holiday (Chinese New Year) |
| C | Multiple disciplinary actions; anniversary of step-son's suicide; accrual of drug debt; time added to sentence; cellmate moved out of cell; told of positive lab test (Hepatitis C); familial estrangement |
| D | Received 3 year sentence extension (assault on peace officer); long ASU stay |
| E | Inability to move in with in-prison romantic partner; reported having an enemy to move 'yards' and was taken to ASU rather than desired 'yard' |
| F | Parole denied by BPH; argument with main family support (daughter); new RVR; hoarded medication (for overdose) was found and charged for possession for sales |
| G | Agitation from hallucinations and delusions, increasing depression, facing SHU term |
| H | Concerned about losing single cell and large amount of personal property; pending transfer; reports can't cell with others |
| I | Interpersonal problems/perceived rejection from other inmates on living unit |
| J | Convicted of murder of another inmate (incident occurred in 2012); received 45 years to life sentence and 25-month SHU term; lengthy ASU stay |
| K | Gang pressures; attempted to debrief; conflict with custody officers |
| L | Health concerns (headaches); close custody status due to RVR; holiday (4th of July) |
| M | Concern about transfer (to a different prison) and feared losing single cell status; feelings of depression/worthlessness |
| N | Safety concerns/fear of victimization (went into protective custody); anxiety |
| O | Paranoia/belief that family or other inmates intended to have the inmate stabbed |
| P | Dysphoria/hopelessness about the possibility of parole; requested/given CCCMS discharge; disciplinary infraction at work (faced losing assignment) |
| Q | Chronic illness/pain; 'bad news' about medical condition (liver cancer); researched Christian beliefs about suicide and the 'unforgiveable sin' prior to suicide |
| R | Fought with inmate and reported safety concerns; transferred during 5-day follow-up period after MHCB stay rescinded |
| S | Safety concerns; requested Sensitive Needs Yard (SNY); complained of hallucinations and reported delusional beliefs |
| T | Serious medical disabilities; possible distress regarding transfer |
| U | Interpersonal losses/estrangement; notified of additional charges (rape case pending investigation); holiday (Halloween) |
| V | Concern about drug debts and substance use relapse; familial estrangement; bothersome hallucinations; depression; holiday (Memorial Day) |
| W | Delusions/hallucinations; less faith that legal appeal would be won |
| X | Interviewed for Mentally Disordered Offender (MDO) status; found to meet MDO |

| | |
|---|---|
| | criteria—upset by this; somatic delusions; holiday (Christmas) |

## C. Review of findings

### Section 2: Current Year vs. Prior Years

**Comparison of suicide rate between current and prior years:** The suicide rate in the CDCR in 2015 was 18.6 per 100,000. This rate is higher than in 2014, when the rate was 17.0 per 100,000, reflecting both one more suicide in 2015 than in 2014 and a decrease in the inmate population of a little over 6500 from 2014 to 2015. The rate of 18.6 per 100,000 is the third lowest rate in the past 10 years. During the ten-year period, 2006 to 2015, the rate of suicide in the CDCR was 20.5 per 100,000.

Table 14, presents two mid-year (June 30th) frequency and rate of suicide calculations, by gender. The first calculation is in-state only and does not include the out-of-state CDCR inmate population in order to ensure consistency with past reports prepared by members of the OSM. The second rate includes the out-of-state population and is consistent with past internal methodology used by CDCR. The rate including the out-of-state population is the more meaningful number, as out of state suicides, when they occur, are included in the rate calculations. Furthermore, these individuals were remanded to CDCR custody which maintains responsibility for their welfare.

Table 14. *2015 In-state, Out-of-state and Overall Mid-year Frequency and Rate of Suicide, by Gender*

| | Male | | | Female | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Population | Freq | Rate | Population | Freq | Rate | Population | Freq | Rate |
| Mid-year In-state only | 115,835 | 22 | 19.0 | 5,632 | 2 | 35.5 | 121,467 | 24 | 19.8 |
| Mid-year In-state and out-of-state total | 123,268 | 22 | 17.8 | 5,632 | 2 | 35.5 | 128,900 | 24 | 18.6 |

Table 15 shows the rate and frequency of suicide in the CDCR for the past 20 years. The table shows the rate and frequency of suicides by gender during each year as well. Of note, the frequency of suicides over the period has ranged from a low of 15 in 2000 to a high of 43 in 2006.

As mentioned earlier, the rate of suicide in female inmates fluctuates considerably compared to a relatively stable rate in male inmates. In 11 of the past 20 years, there were no female suicides. The number of suicides in female institutions has ranged from a low of 0 to a high of 4 within the time period; with 2 occurring in 2015.

For reference, population figures in all years were garnered from the CDCR's Office of Research. The population figures are reflective of mid-year (June 30th) of the respective year, following the previous practice of reports prepared by members of the OSM, the practice of the Federal Bureau of Justice Statistics and to remain consistent in CDCR's methodology for calculating suicide frequency and rate.

Table 15. *Annual Frequency and Rate of Suicide in the CDCR for 20 years, by Gender and Overall, 1996-2015\**

| Year | Male | | | Female | | | Total | | |
|------|------------|------|------|------------|------|------|------------|------|------|
| | Population | Freq | Rate | Population | Freq | Rate | Population | Freq | Rate |
| 1996 | 131,273 | 19 | 14.5 | 9,744 | 0 | 0 | 141,017 | 19 | 13.5 |
| 1997 | 141,669 | 18 | 12.7 | 10,837 | 0 | 0 | 152,506 | 18 | 11.8 |
| 1998 | 147,001 | 21 | 14.3 | 11,206 | 0 | 0 | 158,207 | 21 | 13.3 |
| 1999 | 150,581 | 24 | 15.9 | 11,483 | 0 | 0 | 162,064 | 24 | 14.8 |
| 2000 | 150,793 | 15 | 9.9 | 11,207 | 0 | 0 | 162,000 | 15 | 9.3 |
| 2001 | 150,785 | 29 | 19.2 | 10,712 | 1 | 9.3 | 161,497 | 30 | 18.6 |
| 2002 | 148,153 | 22 | 14.8 | 9,826 | 0 | 0 | 157,979 | 22 | 13.9 |
| 2003 | 150,851 | 37 | 24.5 | 10,080 | 0 | 0 | 160,931 | 37 | 23.0 |
| 2004 | 152,859 | 23 | 15.0 | 10,641 | 3 | 28.2 | 163,500 | 26 | 15.9 |
| 2005 | 153,323 | 37 | 24.1 | 10,856 | 0 | 0 | 164,179 | 37 | 22.5 |
| 2006 | 160,812 | 39 | 24.3 | 11,749 | 4 | 34.0 | 172,561 | 43 | 24.9 |
| 2007 | 161,424 | 33 | 20.4 | 11,888 | 1 | 8.4 | 173,312 | 34 | 19.6 |
| 2008 | 159,581 | 36 | 22.6 | 11,392 | 0 | 0 | 170,973 | 36 | 21.1 |
| 2009 | 156,805 | 25 | 15.9 | 11,027 | 0 | 0 | 167,832 | 25 | 14.9 |
| 2010 | 155,721 | 34 | 21.8 | 10,096 | 1 | 9.9 | 165,817 | 35 | 21.1 |
| 2011 | 152,803 | 33 | 21.6 | 9,565 | 0 | 0 | 162,368 | 33 | 20.3 |
| 2012 | 128,829 | 32 | 24.8 | 6,409 | 1 | 15.6 | 135,238 | 33 | 24.4 |
| 2013 | 126,992 | 29 | 22.8 | 5,919 | 1 | 16.9 | 132,911 | 30 | 22.6 |
| 2014 | 129,268 | 21 | 16.2 | 6,216 | 2 | 32.2 | 135,484 | 23 | 17.0 |
| 2015 | 123,268 | 22 | 17.8 | 5,632 | 2 | 35.5 | 128,900 | 24 | 18.6 |

| 1996-2015 | 2,932,791 | 549 | 18.7 | 196,485 | 16 | 8.1 | 3,129,276 | 565 | 18.1 |
| 2006-2015 | 1,455,503 | 304 | 20.9 | 89,893 | 12 | 13.3 | 1,545,396 | 316 | 20.5 |

Notably, the rate of suicide within the CDCR has trended downward over the past 10 years. This downward trend can be seen in Figure 1. Whereas the frequency of suicide has declined rapidly, part of this decline can be attributed to a reduction in the number of prisoners housed within the CDCR during the time period. Both the frequency and the rate of suicide has declined, representing progress in adding interventions and improving risk management practices to prevent suicides in the CDCR.

Figure 1: *CDCR Suicide Rate and Frequency, with trend line, 2006-2015*



| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| Frequency | 43 | 34 | 36 | 25 | 35 | 33 | 33 | 30 | 23 | 24 |
| Rate | 24.9 | 19.6 | 21.1 | 14.9 | 21.1 | 20.3 | 24.4 | 22.6 | 17 | 18.6 |

**Suicides by institution, current year vs. 15-year average**: Whereas Figure 1 represents suicides throughout the whole of the CDCR; the frequency of suicides by institution is a less stable variable. The higher frequency of suicide at some facilities versus others has many explanations. Variables such as the number of patients in the institution's mental health program, the mental health mission of the facility, the predominance of violent offenders at the site, and the total number of inmates at the institution are just some of the factors that contribute variance to *where* suicides occur. Fluctuations can occur in the number of suicides at an institution in given years due to cluster effects[10], changes in the use or mental health mission of the institution,

---

[10] Hawton, Linsell, Adeniji, Sariaslan, & Fazel (2014). Self-harm in prisons in England and Wales: An epidemiological study of prevalence, risk factors, clustering, and subsequent suicide. *Lancet,* Vol. 383.

and other factors. There are also subsets of suicides that occur during or upon transfer of an inmate from one institution to another, further complicating the interpretation of *why* suicides occur at certain institutions more frequently than others.

*Table 16* lists the number of suicides at CDCR Institutions in 2015 along with the total and average number of suicides at each institution over a 15-year period. The inclusion of 15-years of data allows current year data to be compared to averages over a significant period of time. The range of suicides on average per year for all facilities was 0.0 to 2.1. The mean for suicide for all institutions from 1999-2014 was 30.2 suicides per year.

| Table 16. *Frequency of Suicide by CDCR Institution, 2015 and by prior 15-year total and average (1999-2014)*<br><br>Institution | 2015 Frequency | Prior 15-year total (1999-2014) | Prior 15-year average (1999-2014) |
|---|---|---|---|
| California Health Care Facility | 1 | 0 | 0 |
| Tallahatchie County Correctional Facility | 1 | 0 | 0 |
| Department of State Hospitals-Salinas Valley | 0 | 1 | 0.1 |
| California Rehabilitation Center | 0 | 1 | 0.1 |
| Chuckawalla Valley State Prison | 0 | 1 | 0.1 |
| Valley State Prison | 0 | 2 | 0.1 |
| California Correctional Center | 0 | 2 | 0.1 |
| Ironwood State Prison | 0 | 2 | 0.1 |
| Atascadero State Hospital | 0 | 4 | 0.3 |
| Calipatria State Prison | 0 | 5 | 0.3 |
| Sierra Conservation Center | 0 | 5 | 0.3 |
| Centinella State Prison | 0 | 6 | 0.4 |
| California Institution for Women | 2 | 6 | 0.4 |
| Avenal State Prison | 0 | 7 | 0.5 |
| Department of State Hospitals-Vacaville | 0 | 7 | 0.5 |
| Institution | 2015 Frequency | Prior 15-year total | Prior 15-year average |
| Central California Women's Facility | 0 | 7 | 0.5 |

| | | | |
|---|---|---|---|
| California State Prison, Solano | 0 | 10 | 0.7 |
| North Kern State Prison | 0 | 10 | 0.7 |
| Kern Valley State Prison | 0 | 11 | 0.7 |
| Pleasant Valley State Prison | 0 | 13 | 0.9 |
| Wasco State Prison | 0 | 13 | 0.9 |
| Mule Creek State Prison | 0 | 14 | 0.9 |
| California Substance Abuse Treatment Facility | 0 | 15 | 1.0 |
| California Correctional Institution | 1 | 15 | 1.0 |
| California Training Facility | 0 | 16 | 1.1 |
| Pelican Bay State Prison | 0 | 16 | 1.1 |
| High Desert State Prison | 0 | 17 | 1.1 |
| Folsom State Prison | 1 | 18 | 1.2 |
| Deuel Vocational Institute | 3 | 19 | 1.3 |
| California Medical Facility | 1 | 21 | 1.4 |
| California Institution for Men | 1 | 22 | 1.5 |
| California State Prison, Los Angeles County | 0 | 22 | 1.5 |
| California State Prison, Corcoran | 2 | 24 | 1.6 |
| RJ Donovan Correctional Facility | 2 | 24 | 1.6 |
| California Men's Colony | 3 | 27 | 1.8 |
| San Quentin State Prison | 3 | 29 | 1.9 |
| Salinas Valley State Prison | 0 | 30 | 2 |
| California State Prison, Sacramento | 3 | 31 | 2.1 |
| Total | 24 | 453 | 30.2 |

**Suicides in the CDCR by month, current year and 10-year average:** CDCR data covering a 10-year period (2006-2015) shows little or no trend in the frequency of suicides in any given month. As in 2015, suicides tend to occur in the spring and fall months of the year. Suicides in the CDCR have traditionally not been associated with specific holiday periods, though in 2015

there were five suicides on holiday days (21%) spread over five different months.  See Figure 2. The prevalence of suicides in March, May, and October has not been explained. CDCR clinicians have noted this trend over several years.

Figure 2: *CDCR Frequency by Month, 2015and 10-Year Average*



**Demographic Factors:** Demographic variables specific to 2015 suicides are presented earlier in this report. These factors are presented here only as a means of comparing information from prior years with 2015 suicide data.

A depiction of suicides by race in 2015 and over the past 10 years is found in Figure 3. Caucasians comprise the largest group, comprising 48% of the suicides over the 10-year period and 54% of the suicides in 2015. Caucasian suicides have consistently fallen within a range of 14 to 20 per year. Hispanics/Latinos make up the second largest group, accounting for 30% of the suicides over the years represented. Hispanic/Latino suicides have a more variable range, from 5 to 15 in any given year. African-Americans account for 13% of the suicides during these years with a range from 2 to 7. The frequency of suicides in other racial groups is relatively small and typically at a range of 0 to 2 per year. The trend lines in Figure 3 suggest that the relative decline in suicides within the CDCR during 2014 and 2015 are in Caucasians and Hispanics/Latinos, the two groups who historically have the highest numbers of suicides within the CDCR.

Figure 3: *Suicide Frequency by Race, 2005-2015, with trend line*



Age is divided into five adult age brackets in Figure 4: Ages 18-24, 25-34, 35-44, 45-54, and 55 and above. In all but one year, 2012, the largest frequency of suicides in any age group was in individuals aged 25-34. Compared to the prior five years, 2010 to 2014, suicides in 2015 were somewhat lower in inmates aged 35-44 and 45-54, and slightly higher than most past years in ages 55 or older. The 55 and older age group had the second highest total in the past 6 years. In 2015, 25% of the suicides occurred in this age group, an age group that comprises 12% of the population of the CDCR. This number (25%) is similar to 2010, when 22% of suicides were in the 55 and over group, and dissimilar to other years: 9% in 2011, 15% in 2012, 7% in 2013, and 8% in 2014.

Figure 4: *Number of Suicides by Age Group, 2010-2015*



| | 18-24 | 25-34 | 35-44 | 45-54 | 55+ |
|---|---|---|---|---|---|
| 2010 | 3 | 10 | 8 | 7 | 7 |
| 2011 | 3 | 12 | 10 | 5 | 3 |
| 2012 | 0 | 8 | 12 | 8 | 5 |
| 2013 | 1 | 11 | 8 | 8 | 2 |
| 2014 | 2 | 7 | 7 | 5 | 2 |
| 2015 | 2 | 8 | 4 | 4 | 6 |

**Suicides by housing type:** Historically and in national and international studies,[11] segregated housing units have been a high-risk setting for suicide, particularly in single cell housing.[12] In the CDCR, segregated housing includes ASU, SHU, STRH, Long Term Restricted Housing (LTRH), Psychiatric Services Units (PSU), and the Condemned units at San Quentin State Prison and California Correctional Institution for Women. During 2015, nine of the year's 24 suicides occurred in segregated housing settings, representing 37.5% of all suicides. For reference, approximately 6.5% of inmates were housed in segregated housing at the mid-year point of 2015 (June 30, 2015). Calculating a rate per 100,000 in segregated housing may be misleading as the overall population is quite small and subject to wide swings in rate based on a single suicide.[13]

Of the nine suicides that occurred in segregated settings in 2015, seven were in ASU, one in a SHU, and one in STRH. The number and percentage of suicides in segregated housing settings for 2015 and over the prior five year period is found in Table 17. As can be seen, the frequency of suicides in segregated housing decreased significantly in 2015 compared to prior years (2010-2014). Whereas 47% of suicides within the CDCR occurred in a segregated housing setting in

---

[11] World Health Organization (2007). *Preventing suicide in jails and prisons.* WHO Document Production, Geneva, Switzerland.

[12] *Id.*

[13] Based on a segregated housing population of 8,325 inmates on June 30, 2015.

the ten year period between 2004 and 2014 and 45% of suicides occurred in segregated housing on average in the ten year period from 2010 to 2014, 37,5% of suicides occurred in this setting during 2015. This may represent changes adopted within the CDCR leading up to and occurring within the reporting year, such as implementation of safety/wellness checks using the Guard One system and initiation of enhanced mental health services for MHSDS participants in segregated settings (e.g., STRH and LTRH units). Also of note, inmates in single-cell housing accounted for eight of the nine suicides (89%) within segregated housing units in 2015. This percentage is consistent with prior years. The percentage of suicides in segregated housing units that occurred in single cell housing in the prior five years was 100% in 2010, 86% in 2011, 91% in 2012, 100% in 2013, and 86% in 2014.

Table 17. *Frequency of Suicide within Segregated Housing, 2010-2015*

| Year | Frequency | Percent of Annual Suicides |
| --- | --- | --- |
| 2010 | 13 | 37 |
| 2011 | 14 | 42 |
| 2012 | 13 | 41 |
| 2013 | 14 | 47 |
| 2014 | 13 | 57 |
| 2015 | 9 | 37.5 |

**Time in Segregated Housing Prior to Death:** In 2015, nearly half of the suicides that occurred in segregated housing occurred soon after placement. Three of the nine suicides occurred in intake cells, indicating stays of less than 72 hours (Cases E, F, and O). A fourth case had been in ASU for six days and had just arrived for a temporary stay at an institution while in route to another institution (Case R). The remaining five cases were in segregated housing units for 100 days or more at the time of death (Cases D, G, J, K, and N).

Data on the number of days between ASU placement and deaths by suicide has been tracked since 2009. Over this seven-year period (2009-2015), suicides tended to occur shortly after placement, particularly in the first 72 hours after placement. Of course, fewer inmates are present in ASU as lengths of stay increase. Figure 5 shows the distribution of deaths by suicide following placement.

Figure 5: *Length of Time in ASU before suicide, 2009-2015*



**Suicides by Method:** The rate of suicide by hanging, easily the most frequent method for suicides in prison settings, has remained relatively stable over the past number of years. In 2015, 83% of suicides were by hanging. The percentage of suicides that were by hanging was 77% in 2010, 88% in 2011, 91% in 2012 and 2013, and 87% in 2014.

**Involvement in Mental Health Services:** The percentage of suicides that occur in inmates with identified mental health needs is a complex variable. Suicide is a phenomenon that can occur in individuals who do not have a traditional mental health diagnosis and in inmates with no prior identified mental health needs. Inmates can avoid mental health services by choice, such as by denying symptoms on screening or by masking symptoms in order to be discharged from the Mental Health Services Delivery System (MHSDS). It is not uncommon for suicidal individuals to distrust mental health clinicians when contemplating suicide, concerned that clinicians may in some way remove a valued option (death) should life so dictate.[14] Yet suicides occur in individuals who have been identified as meeting criteria for participation in the MHSDS and who were receiving services in the MHSDS at the time of death. Table 18 lists the numbers of suicides at each level of MHSDS involvement for 2015 and for the prior five years.

---

[14] Jobes, D. (2016). <u>Managing Suicidal Risk: A Collaborative Approach</u> (2nd Edition). Guilford Press, New York.

Table 18. *Frequency of Suicide within MHSDS Levels of Care, 2010-2015*

| Year | Non-MHSDS | CCCMS | EOP | MHCB /DSH | % in MHSDS |
|------|-----------|-------|-----|-----------|-----------|
| 2010 | 15 | 12 | 8 | 0 | 57 |
| 2011 | 10 | 10 | 13 | 0 | 69 |
| 2012 | 14 | 12 | 5 | 1 | 55 |
| 2013 | 14 | 9 | 6 | 1 | 53 |
| 2014 | 1 | 12 | 9 | 1 | 96 |
| 2015 | 10 | 9 | 5 | 0 | 58 |

**Suicides in Mental Health vs. Non Mental Health Populations:** Table 19 shows the suicide rate for MHSDS vs. non-MHSDS, as the average total CDCR populations over the past ten years, including 2015. This information was derived from the Health Care Placement Oversight Programs (HCPOP) monthly trends reports. The population totals may vary slightly from other referenced population totals within this report, as the data from HCPOP is collected a different points of time, and utilizes total population averages.  As can be seen, the rate of suicide in those involved in the MHSDS is significantly higher than for individuals who have not been included in the MHSDS. This suggests a need to carefully work with existing mental health population members to reduce the risk of suicide. Targeted, suicide-specific interventions for individuals within the MHSDS remain an area that is potentially fruitful in preventing suicides; this will be discussed further later in this report.

Table 19. *Frequency of Suicide in mental health versus non-mental health, average total populations, 2006-2015*

| Year | MH Pop | MH Freq | MH Rate | Non-MH Pop | Non-MH Freq | Non-MH Rate | Total Pop | Total Freq | Total Rate |
|------|--------|---------|---------|-----------|-------------|-------------|-----------|-----------|-----------|
| 2006 | 32,327 | 20 | 61.8 | 139,015 | 23 | 16.5 | 171,342 | 43 | 25.1 |
| 2007 | 33,148 | 25 | 75.4 | 138,431 | 9 | 6.5 | 171,579 | 34 | 19.8 |
| 2008 | 34,854 | 18 | 51.6 | 131,887 | 18 | 13.6 | 166,741 | 36 | 21.6 |
| 2009 | 35,677 | 19 | 51.0 | 125,201 | 6 | 4.8 | 160,878 | 25 | 15.5 |
| 2010 | 37,140 | 20 | 53.8 | 119,555 | 15 | 12.6 | 156,695 | 35 | 22.3 |
| 2011 | 37,140 | 23 | 61.9 | 113,182 | 10 | 8.8 | 150,322 | 33 | 20.3 |
| 2012 | 33,613 | 18 | 53.5 | 93,892 | 15 | 16.0 | 127,505 | 33 | 25.9 |
| 2013 | 34,477 | 16 | 46.4 | 90,098 | 14 | 15.5 | 124,575 | 30 | 24.1 |
| 2014 | 37,322 | 21 | 56.3 | 89,192 | 2 | 2.2 | 126,514 | 23 | 18.2 |
| 2015 | 37,146 | 15 | 43.1 | 92,197 | 9 | 9.8 | 129,343 | 24 | 18.6 |
| **Average** | **35,284** | **20** | **55.5** | **113,265** | **12** | **10.6** | **148,549** | **32** | **21.1** |

## D. Review of Findings

_Section 3: Comparison of CDCR Suicide Rates with Other State Prisons Systems and Relevant U.S. Rates_

**CDCR Rates vs. Other State and Federal Prison Rates**: State prison suicide rates have varied little over a number of years. The rate of suicide in U.S. state prisons ranged from 14 per 100,000 to 17 per 100,000 from 1999 to 2013[15], with a rate of 15 suicides per 100,000 prisoners in U.S. state prisons in 2013. However, the U.S. prison rate jumped by 30% between 2013 and 2014, rising to 20 per 100,000 inmates.[16] No explanation for this increase has been offered. Rates for U.S. prisons for 2015 are not available at this time.

Suicide rates for all federal and state prisons were calculated by the Bureau of Justice Statistics for the years 2001-2014.[17] A listing of state rates is found in Table 19. California's rate is listed twice in Table 19. One listing is for the composite rate for the CDCR from 2001-2014 and the second rate is for the year 2015 only. California ranks in the middle one-third of states in rank and rate. In 2015, California's rate of prison suicides ranked as 20th among state prisons.

Table 20. _Rate and rank of suicides by state, 2001-2014 (14 years)_

| State Name | Rank (Highest to Lowest Rate) (t=tie) | Suicide Rate per 100,000 |
|---|---|---|
| Rhode Island | 50 | 45 |
| Utah | 49 | 44 |
| Montana | 48 | 34 |
| Massachusetts | 47 | 32 |
| New Hampshire | 46 | 31 |
| Alaska | 46t | 31 |
| Hawaii | 44 | 29 |
| Idaho | 43 | 28 |
| South Dakota | 43t | 28 |
| Delaware | 41 | 26 |
| Vermont | 41t | 26 |
| Connecticut | 39 | 24 |
| New Mexico | 38 | 23 |
| Nebraska | 37 | 21 |
| New York | 37t | 21 |
| _All State Prisons, 2015_ | | _20_ |

---

[15] Noonan, M. _Mortality in Local Jails and State Prisons_, 2000-2013 – Statistical Tables, August 2015, Website, U.S. Department of Justice, Bureau of Justice Statistics.

[16] Noonan, M. Mortality in Local Jails and State Prisons, 2001-2014 Statistical Tables, US DOJ, Bureau of Justice Statistics, December, 2016, NCJ 250150

[17] _Id._

| State Name | Rank (Highest to Lowest Rate) | Suicide Rate per 100,000 |
|---|---|---|
| Iowa | 35 | 20 |
| *Chart continues on next page* | | |
| **State Name** | **Rank (Highest to Lowest Rate)** | **Suicide Rate per 100,000** |
| Maryland | 35t | 20 |
| California (2001-2014) | 35t | 20 |
| Wisconsin | 32 | 19 |
| Oklahoma | 32t | 19 |
| *California (2015)* | | *18.6* |
| Colorado | 30 | 18 |
| Minnesota | 30t | 18 |
| Wyoming | 30t | 18 |
| Arizona | 27 | 17 |
| Nevada | 27t | 17 |
| Arkansas | 27t | 17 |
| *All State Prisons, 2001-2014* | | *16* |
| Indiana | 24 | 16 |
| Illinois | 24t | 16 |
| Texas | 24t | 16 |
| Oregon | 24t | 16 |
| Pennsylvania | 24t | 16 |
| Tennessee | 18 | 15 |
| Kansas | 17 | 14 |
| Ohio | 16 | 13 |
| South Carolina | 16t | 13 |
| New Jersey | 16t | 13 |
| Washington | 16t | 13 |
| Mississippi | 16t | 13 |
| Missouri | 11 | 12 |
| Maine | 10 | 11 |
| *U.S. Federal Prisons (2001-2014)* | | *10* |
| Virginia | 9 | 10 |
| Georgia | 9t | 10 |
| Kentucky | 7 | 9 |
| Louisiana | 7t | 9 |
| West Virginia | 5 | 8 |
| Florida | 5t | 8 |
| North Carolina | 3 | 7 |
| Alabama | 2 | 6 |
| North Dakota | 1 | 5 |

**CDCR Rates vs. Community Rates:** It is notable that the rate of suicide in the community within the United States reached a 30 year high in 2014, reaching an overall national rate of 13.4 per 100,000. The rate of suicide rose 24% overall between 1999 and 2014[18]. The U.S. rate

---

[18] http://www.nytimes.com/2016/04/22/health/us-suicide-rate-surges-to-a-30-year-high.html?_r=0

increased again in 2015 to 13.8 per 100,000.[19] For adult males in the U.S., the rate of suicides was 21.1 per 100,000 in 2014[20] and 21.5 per 100,000 in 2015[21], topping the rate of suicides in the (mostly male) CDCR in 2014 (17.0 per 100,000) and 2015 (18.6 per 100,000). Figure 6 shows the rate of suicides in adult males in the U.S., in U.S. prisons, and in the CDCR for the years 2010 to 2015. Suicide rates for state prisons are not available after 2014.

Figure 6: *Suicide rates for adult males in the CDCR, State Prisons, and the U.S., 2010-2015*



| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| CDCR Overall | 21.1 | 20.3 | 24.4 | 22.6 | 17 | 18.6 |
| U.S. State Prisons | 16 | 14 | 16 | 15 | 20 | |
| CDCR Males | 21.8 | 21.6 | 24.8 | 22.8 | 16.2 | 17.8 |
| U.S. Males | 19.8 | 20 | 20.4 | 20.3 | 20.7 | 21.5 |

◆ CDCR Overall   ■ U.S. State Prisons   ▲ CDCR Males   ✕ U.S. Males

## E. Summary Review of Findings and Trends

In reviewing suicides within the CDCR during the reporting year, 2015, a suicide rate of 18.6 per 100,000 is noted, which represents part of a declining trend over the past 10 years. The rate of CDCR suicides is below the average rate of all U.S. state prison systems combined in 2015[22]. The rate of suicides in the CDCR in 2014 was also lower than the average suicide rate for state prisons in 2014; the last year in which such data is available. Finally, the declining trend in the CDCR stands in contrast with community rates of suicide, which have increased significantly over the past decades. Adult males in the community in the U.S. are more likely to die by suicide than male inmates within the CDCR; this was the case in both 2014 and 2015.

---

[19] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870

[20] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2014/StatesSexTABLE2014.pdf

[21] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870

[22] Based on 2014 U.S. Prison data

To what reasons can we attribute this declining trend? First, in both 2014 and 2015, fewer inmates aged 25-54 died by suicide than in prior years. Second, the rates of suicide in Caucasian and Hispanic inmates in CDCR have fallen rather significantly in the past 10 years. The majority of suicides in the CDCR have occurred within these two racial groups for many years, making this finding particularly encouraging. Third, a decline in the frequency of suicides in segregated housing units was noted in 2015; this finding may reflect the decreasing percentage of the inmate population housed in such settings as well as the many efforts implemented to improve safety from suicide in these settings. Other factors reviewed appear to simply indicate yearly and/or unstable fluctuations in suicides, such as in timing of suicides (e.g., month of suicide, time of discovery), frequency in specific institutions, and the rate of involvement in mental health systems of care. These factors do not appear explanatory for the downward trend.

In looking at the group of individuals who died by suicide in 2015 within the CDCR, specific risk factors remain clear: Caucasian race, single/divorced marital status, serious or chronic medical disease or pain, spring and fall months, history of violent offenses, housing in higher security settings, life or long sentences, single-cell housing, lack of job assignment, mental health treatment prior to and during incarceration, prior suicide attempts, and prior psychiatric hospitalization. Other variables seem to be possible trends to monitor, such as increased suicides in older inmates (those age 60 or above), fewer suicides within segregated housing units, fewer suicides where clinicians minimized genuine risk by attributing behavior to manipulation or malingering, and more suicides on or around holiday periods. The reason suicide for inmates within the CDCR remains rather idiosyncratic and complex, with most suicide reviewers determining multiple precipitants (or triggers) for suicide. Suicides most commonly occurred on account of in-prison stressors (safety concerns, receipt of additional charges, transfers, etc.); medical illness, pain or disability; acute psychiatric symptoms; conflicts with others; and important dates (anniversaries of losses or crimes, holidays).

## Chapter II. Response to Suicide and Suicide Attempts

**Institutional reporting of self-harm incidents and suicides:** All incidents of self-harm in the CDCR are reviewed by institutional staff members (including mental health clinicians) and all incidents of self-harm are entered and tracked on a self-harm database. These processes allow for tracking patients in High Risk Management Lists or Program(s) within a facility. A sample High Risk Management Program policy is found in Appendix I. Suicides are reported by the Chief Medical Officer or designee to stakeholders, including the SMHP and the OSM. Processes involved in institutional reporting of self-harm events and suicides are found in Appendix II.

**Determination of unknown causes of death**: When deaths occur in a CDCR institution in which the cause of death is not immediately determined, the cases are classified as "Unknown Deaths." These cases receive special attention until the cause of death is determined, particularly as any that could possibly involve suicide need to be determined in a timely fashion. The process for reviewing these deaths and making a determination may be found in Appendix III

In 2015, a total of 44 cases were tracked as the cause of death was listed provisionally as unknown. Nineteen of the 44 cases had no provisional cause of death, whereas 25 cases had a suspected or "probable" cause of death listed. In two cases, suspicion of a suicide was present and was confirmed by autopsy, toxicology finding, and/or coroner's report. These cases, Case M, who died of an overdose on a prescribed medication, and Case V, who died of asphyxiation during an acute intoxication illicit drug, are reviewed later in this report. Additionally, two cases were determined to be accidental overdoses due to findings of ingested balloons during autopsy; ingesting balloons filled with narcotics is a method for concealing and/or transporting illicit drugs in prison (Cases OO and PP).

Of the remaining four cases, 23 were determined by the Death Review Committee (DRC) to have died by natural causes: Pulmonary embolism, myocardial infarction, coronary artery disease, hypertension, cardiomyopathy, and so forth. Three of the remaining cases were determined to be deaths by homicide.

The 14 remaining cases met criteria for additional review, as they involved either overdose (10 cases), the case was pending further information (three cases), or the death potentially related to mental health treatment needs (one case). In this later death (Case AA), the cause of death was provisionally termed inanition secondary to acute psychosis. That is, the patient was thought to have died on account of the medical consequences of refusing to eat. His lack of intake was attributed to acute psychosis. Though the initial finding of inanition was mentioned, reviewers on the Combined Death Review Summary noted the pathologist's use of the term "well-nourished" and determined the patient had gained roughly 20 pounds in the two years prior to his death. The patient denied suicidal ideation upon evaluation six days before his death and there was no indication that he purposefully engaged in any behavior with the intention of dying or hastening his death. The category of death was changed by the DRC to natural, unexpected

The three cases pending further information were determined by the DRC to be deaths of various causes. The cause of one death was due to "excitement delirium." In this case (Case BB), the inmate struggled with officers who were trying to apply restraints; this exertion led to neuronal excitotoxic injury per autopsy. The second case (Case CC) was determined to have ingested both morphine and Citalopram, though both medications were prescribed. The inmate had multiple additional medical problems, including cardiovascular disease, and the death was determined to be accidental. The inmate's cellmate at the time reported normal mood, participation in routines, and so forth the evening of the death, with no history of suicide attempts or statements of wishes to die. The third case (Case DD) was unknown for a period of time due to the complexity of medical symptoms present prior to the death, including reports of blackouts, other neurological symptoms, and cardiovascular issues. The final cause of death was determined to be natural and secondary to cardiovascular disease.

The 10 remaining cases (Cases EE to NN) were reviewed using the guidelines noted above as the cause of death in each was overdose. Upon review of these cases, the best explanation for each

was unintentional, accidental overdose. In each case, the Combined Death Review Summary determined that the cause of death was an accidental overdose. None of the cases involved ingestion of medications that do not have abuse potential (e.g., Tylenol). Rather, all ten deaths involved intoxication/ingestion with an illicit drug or drug(s) of abuse. Specifically, three cases died due to methamphetamine intoxication (Cases EE, FF, and GG), two to Fentanyl intoxication (a powerful synthetic Opioid; Case HH and II), one case to a combination of heroin and methamphetamine intoxication (Case JJ), one to heroin intoxication (Case KK), one to morphine intoxication (Case LL), one to methadone and morphine intoxication (Case MM), and one to intoxication with an unknown or unspecified opiate (Case NN). Of these 10 cases, none left a suicide note and none made recent statements suggesting suicidal ideation or desire. Appendix IV contains additional information on the SMHP's review of overdose cases.

**Suicide Attempts and Suicides Prevented:** In 2015, there were a total of 502 incidents of self-harm with intent to die that did not result in death. That is, 502 suicide attempts were in some way prevented, interrupted, aborted, averted, or otherwise were not fatal during the year.

Of the 502 attempts, 285 involved incidents of self-harm with intent to die that resulted in either no injury or mild injury. An additional 217 incidents of self-harm involving moderate-to-severe injury and intent to die (suicide attempts) were reported to the CDCR's self-harm database. These 217 incidents include some combination of: The inmate used non-lethal means and intended to die but was discovered, the inmate reported having recently engaged in self-harm with the intent to die but was not discovered and did not perish, or CDCR staff members interrupted a suicide attempt in progress by an inmate that may otherwise have been lethal.

**Determination and tracking of Quality Improvement Plans**: Each Suicide Case Review report may include formal Quality Improvement Plans (QIPs) as applicable to the case. QIPs are developed based on the concerns raised by custody, nursing/medical, and/or mental health case reviewers. In 2015, a total of 115 QIPs were generated from Suicide Case Reviews, resulting in an average of 4.8 QIPs per suicide. Nursing QIPs are referred to the DRC. Custody and mental health QIPs are typically addressed to the institution where the deceased person resided but may also be written for prior institutions and/or for the DHCS SPR FIT. Table 20 provides a listing of responsible persons or teams for the QIPs assigned in 2015.

Table 21. *QIPs assigned within the CDCR by recipient, 2015 Suicides*

| Quality Improvement Plan | Frequency | Percent of Total |
|---|---|---|
| Chief of Mental Health/Chief Executive Officer | 53 | 46 |
| Warden/Custody | 32 | 28 |
| Death Review Committee/Nursing/Medical | 17 | 15 |
| DHCS SPR FIT | 11 | 10 |
| Design Standards Branch | 1 | <1 |
| Contract Bed Facility | 1 | <1 |
| Total | 115 | 100 |

As can be seen in Table 20, the Suicide Case Review process generates quality improvement plans that are multidisciplinary. The responses to an inmate's suicide are therefore addressed with a broad lens, looking at many ways of addressing what went wrong (if applicable; one case of the 24 had no listed QIPs). Notably, nearly half of the formal QIPs generated in 2015 were focused on mental health concerns, with the Chief of Mental Health and/or Chief Executive Officer of a CDCR facility tasked to address the concern(s). Mental health concerns ranged from evaluations not completed within timeframes established by policy to poor quality of suicide risk evaluation to inadequate treatment and safety planning. The specific reasons for individual QIPs are presented in the individual case review section (Chapter 3).

**Determination whether a suicide is preventable or foreseeable**: The following definitions of *foreseeable* and *preventable* used in the review of 2015 suicides and in this report are the definitions previously used in the annual suicide reports written by the Special Master's experts:

Foreseeable: A "foreseeable" suicide is one which, based upon available information reasonably known, is reasonably anticipated based upon the presence of a substantial or high risk for a suicide attempt which would require reasonable clinical, custodial, or administrative intervention. Foreseeability is assessed by determining the adequacy and accuracy of how suicide risk was evaluated. Assessment of the degree of risk may be high, moderate, or low to none. In contrast to a high and immediately detectable risk, a "moderate risk" of suicide, indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as a timely assessment, to determine the level of risk in the most appropriate manner and relevant interventions to prevent suicide.

Preventable: A "preventable" suicide is one in which it is probable that, had some additional information been gathered or some additional interventions undertaken, as required by existing policy, the suicide would not have occurred. Preventability is assessed by determining whether risk management and/or suicide prevention policies and procedures, local operating procedures

and the requirements set forth in the Program Guide were followed adequately. Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff.

This report continues to use these definitions for consistency, subject to CDCR's right to change the definitions in future reports. It is well-settled that Defendants are entitled to deference in managing their internal operations, and such deference should extend to the manner in which Defendants audit and write their performance reports. *See Bell v. Wolfish*, 441 U.S. 520, 562 (1979) ("the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution . . . .") "Suicide is a difficult event to predict and prevent and often occurs without warning. Both the common law and the recently developed constitutional law applying to those in custody have taken this uncertainty into account in developing rules of liability based on foreseeability." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005). Because suicide rests on a complex array of factors and motives, inmates determined to commit suicide are very difficult to stop. *Strickler v. McCord*, 306 F. Supp. 2d 818, 829 (N.D. Ind. 2004).

As the Special Master's experts have acknowledged, the above definitions do not apply the legal standards for causation or deliberate indifference. For these reasons, the use of these definitions in this report should not be confused in any way with legal concepts of causation or foreseeability, nor do they determine personal or systemic culpability. Causation and foreseeability are legal terms of art, and must demonstrate that something caused or produced some effect, or had a quality of being reasonably anticipated, respectively. *Black's Law Dictionary* 249, 721 (9th ed. 2009). Determinations of personal or organizational culpability with respect to causation or foreseeability of suicide prevention are governed by the deliberate indifference standard ("a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety . . . .") *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This not only requires awareness "of facts from which the inference could be drawn that a substantial risk of serious harm exists", but that such an inference is also drawn. *Id.* The development, implementation, and continued improvement of the suicide prevention system is necessarily contrary to any disregard for excessive risks to an inmate's health or safety with respect to suicidality, and meets the Constitutional requirement to create reasonable measures to prevent inmate suicide as a necessary component of any correctional mental-health system. *Balla v. Idaho State Bd. Corr.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984) (citing to standards of minimally adequate care for mental health in *Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D. Tex.1980 *aff'd in part, rev'd in part on other grounds*). The Eighth Amendment does not allow a deliberate-indifference finding based merely on a difference of medical opinion about appropriate treatment. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Cano v. Taylor*, 739 F.3d 1214 (9th Cir. 2014). Thus, "where suicidal tendencies are discovered and preventive measures

taken, the question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk." *Rellegert ex rel. Rellegert v. Cape Girardeau County*, Mo., 924 F.2d 794, 796 (8th Cir. 1991).

Using the above definitions, and subject to the foregoing reservations, CDCR's Statewide Mental Health Program's Suicide Case Review Committee determined that in 2015, 11 of the 24 suicides were foreseeable and 17 of the 24 suicides might have been preventable had some additional information been gathered or some additional interventions undertaken.

**Audits of SCR Quality:** The DHCS Quality Management Unit audits all Suicide Case Reviews (SCRs) for 15 items. SCRs are scored with required elements marked present or absent. In 2015, SCRs generally met audit criteria at a high rate, reported in Table 21.

Table 22: *Results of Quality Audits, 2015 Suicide Case Review reports*

| Audit Item | Present | Absent | % Present |
|---|---|---|---|
| 1. Does the Executive Summary describe the means of death, the emergency response taken, and the MH LOC of the patient? | 23 | 1 | 96 |
| 2. Are the sources for the SCR identified? | 24 | 0 | 100 |
| 3. Are substance abuse issues reported, if applicable? | 24 | 0 | 100 |
| 4. Does the Institutional Functioning section include information on institutional behavior, including disciplinary history? | 24 | 0 | 100 |
| 5. Does the Mental Health History review the adequacy of mental health care and screening? | 24 | 0 | 100 |
| 6. Are medical concerns discussed (e.g., chronic pain, terminal illness) or is the absence of medical conditions noted? | 24 | 0 | 100 |
| 7. Is the quality of the most recent SREs (past year) reviewed, with comment on risk level, safety planning, and risk and protective factors? | 14 | 6 (4 N/A) | 70 |
| 8. Does the Suicide History section review all prior attempts, as applicable? | 24 | 0 | 100 |
| 9. Are significant pre-suicide events discussed (e.g., receipt of bad news or existence of a safety concern)? | 23 | 1 | 96 |
| 10. Was a risk formulation offered specific as to why the person was vulnerable to suicide? | 24 | 0 | 100 |
| 11. Does the review comment on the adequacy of the emergency response? | 18 | 4 (2 N/A) | 82 |
| 12. Are all violations of policy and breaches of standards of care in mental health, medical, and nursing addressed in the reviewer's concerns, if applicable? | 24 | 0 | 100 |
| 13. Were custody policies followed? If not, were violations noted in the report? | 23 | 0 (1 N/A) | 100 |
| 14. Were all concerns raised by reviewers (custody, nursing, and mental health) represented in Quality Improvement Plan recommendations? | 24 | 0 | 100 |
| 15. Were the Quality Improvement Plan recommendations adequate to address the concerns? (e.g., QIP should not simply say conduct an inquiry and report findings). | 23 | 1 | 96 |

| Total | 339 | 13 | 96 |

As evident in Table 21, on most audit criteria, reviewers were found to meet quality standards with 96% of all audit items marked as present. A notable exception in quality audits appears to be in reviewing most recent SREs. In examining this finding, six SCRs did not comment on *all* aspects of the most recent SREs. For example, the reviewer discussed risk factors but did not provide an analysis of the adequacy of risk formulation. One other item was absent in four cases: Comments on the adequacy of emergency response. Emergency response timelines were reported by nursing and custody in all SCRs. In the four cases, reviewers did not specifically state that the emergency response was adequate, though this appears to be the case in each occasion.

**Timeliness of Suicide Case Reviews and Suicide Reports:** The process of responding to suicides, completing reviews, writing and editing reports, tracking QIP compliance, and so on is involved. Timelines for each step in suicide response have been developed and are specified in the MHSDS Program Guides, 2009 Revision. Internal deadlines have also been developed as a way to ensure timelines for each step of the suicide response process are met. The number of days specified for each step in suicide response, for both Program Guide and internal deadlines, is found in Appendix VI.

In reviewing timeliness of 2015 suicides, the assignment of a suicide reviewer and the visit of the reviewer to the institution were completed on time in all but two cases; both cases were originally "unknown deaths" (Cases M and V) and thus not determined to be suicides until further information was obtained. Due dates on Cases M and V were recalculated when the cases were determined to be suicides. Both were then reviewed in a timely manner.

Original suicide reports are generally completed within 30 to 40 days after the death. The established 30-day limit was met in nine cases (of 24 reports). Five reports (including Cases M and V) were completed 40 days or more after the death. All reports were available by the time Suicide Case Reviews were held. Fifteen of the 24 SCRs were completed within timelines. Of the nine SCRs held late, delays ranged from one day to nine days.

Once suicide reports are reviewed at the SCR, edits are made and a final report is due to be sent to institutions within 60 days of the death. Timeline compliance becomes increasingly difficult at this step, with only five of the 24 reports finalized and sent to institutions by the 60 day mark. Delays at this step can affect the ability of institutions and other recipients of QIPs to complete QIPs by the deadline (150 days after the death). However, in 13 cases, QIP response timelines were met. QIP responses also require review and approval, with a report of QIP implementation due to the OSM by 180 days after the suicide.

As the CDCR endeavors to complete all steps of the suicide review process in a timely manner, a focus on ensuring original reports are completed on time, on decreasing the number of days used

for editing suicide reports after the SCR, and on accelerating the review, response, and approval of QIPs is underway. The DHCS SPR FIT will explore further ways to expedite review processes for implementation during the 2017 calendar year.

## Chapter III. Findings in Individual Case Reviews

**Introduction to Individual Case Reviews:** The presentation of information such as suicide rates and demographic variables in suicide deaths provides a sense of data trends, comparisons between correctional systems, and so forth. That is, suicide rates and numbers give us a *macro* look at causes and contributors to suicide and to variables that require monitoring. The data presented in prior chapters has implications for practice within the CDCR, implications that will be reviewed in the Conclusions section to follow.

Individual case reviews, on the other hand, represent a *micro* look at the idiosyncratic, often multi-determined reasons that an individual takes his or her own life. The sources of distress noted in the cases below range from a response to gang threats to an inmate's family to the vagaries of severe medical and mental illness to grief over the loss of lovers and loved ones. No two cases look quite alike.

What cannot be overly idiosyncratic are the actions of staff members of all disciplines. These staff members as a whole are responsible to prevent suicide. Suicide prevention in correctional settings is no small task. CDCR staff of all disciplines must follow policy and procedure, must show diligence and compassion in their work, and must be professional in their day-to-day interactions and responsibilities. Individual case reviews thus speak not only to the idiosyncrasies of the suicidal patient but also to the actions and professionalism of staff leading up to a suicide, in reaction to a suicide in progress, and in response to the death.

**Commonalities in individual case reviews:** Tables 22 and 23 list variables commonly found between suicides. The tables contain either factual data or qualitative determinations about the adequacy of staff response and/or the ability of staff members to meet quality of care expectations. Narrative comments are noted after each table.

Before presenting these tables, it should be noted that inadequacy of risk assessment, treatment planning, custody rounds, and so forth result in QIPs. In Suicide Case Review (SCRs) reports, reviewers *may* comment on what was done well within an institution and *may* state areas where policy was correctly followed. However, these comments are not required as it is assumed staff members will follow policy and will do a professional job in working with inmates. In contrast, reviewers *must* identify any and all departures from policy or from standards of care, creating formal Quality Improvement Plans (QIPs) applicable to each identified issue. Reviewers may also point out clinical or custodial practices that could be improved either at an institutional level or throughout all institutions; these practice suggestions can be addressed through QIP processes as well. It should also be noted here that institutional responses to QIPs are sent to the SMHP and DAI leadership for review. If any QIP response is felt to be inadequate, the SMHP and/or the

DAI will contact the institution to request clarification or request additional development or implementation of the QIP. QIPs are not considered finished until approved at the headquarters level.

Table 22 lists qualitative judgments of staff performance in suicide cases. A "no" answer can reflect anything from a singular error in the treatment or care of the patient to a pattern of poor care, whereas a "yes" finding reflects a range of actions and behaviors that were consistently professional and adequate.

Table 23: *Findings of Individual Case Reviews, part 1*

| Inmate | Suicide Risk Adequately Assessed? | Adequate Suicide Risk Management? | Adequate Treatment Plan? | Good Quality Mental Health Contacts? | Adequate Nursing Rounds? | Adequate Custody Checks? | Adequate Emergency Response? | Treatment Refusal? |
|---|---|---|---|---|---|---|---|---|
| A | N | N | N | N | N | Y | Y | N |
| B | Y | Y | Y | Y | N/A | Y | Y | Y |
| C | N | N | N | N | Y | N* | Y | Y |
| D | Y | N/A | N/A | Y | Y | Y | Y | Y |
| E | Y | N | N | N | Y | Y | N | Y |
| F | N | N | N/A | Y | Y | Y | N | Y |
| G | Y | Y | Y | N** | Y | N*** | Y | Y |
| H | Y | Y | N/A | N**** | N/A | Y | Y | Y |
| I | N | N | Y | Y | N | N | N | Y |
| J | N | N | N | N | N | N | N | Y |
| K | Y | N/A | N/A | N/A | N/A | N | N | Y |
| L | Y | N/A | N/A | N/A | Y | Y | N | Y |
| M | N | N | N | N | Y | Y | Y | Y |
| N | N | N | N/A | N | Y | N | Y | N |
| O | Y | Y | Y | Y | N/A | Y | Y | Y |
| P | Y | Y | N | N | N/A | Y | N | Y |
| Q | Y | Y | Y | Y | N/A | Y | N | Y |
| R | N | N | N | N | Y | Y | N | N |
| S | Y | Y | Y | Y | N/A | Y | Y | Y |
| T | Y | N/A | N/A | N/A | N | N | Y | Y |
| U | Y | Y | N/A | Y | Y | Y | Y | Y |
| V | N | N | N | N | N/A | Y | N | Y |
| W | Y | Y | Y | Y | Y | Y | Y | Y |
| X | Y | Y | N | N | N | Y | Y | Y |

*Based on allowance of window covering. **Based on frequent refusal of services; HRL was provided. ***Based on allowance of an obstruction to viewing ****Based on poor documentation of last visit.

Starting from the far left column, problems with at least one suicide risk evaluation were found in 10 cases (42%). Problems ranged from issues with reviewing or gaining access to suicide attempt histories (two cases), failing to include information already reported about suicide attempt history (two cases), poor identification or documentation of risk factors (four cases), to failure to complete suicide risk evaluations when they were required by clinical standards or policies (two cases). Issues with suicide risk evaluations are particularly problematic, as

inadequate assessment most likely leads to difficulties with safety planning (e.g., not having information on what triggered past attempts) and risk management (e.g., not managing the actual level of risk as risk had been underestimated). Therefore, it is not surprising that *all* cases identified as having problems with SREs are also considered to have problems with risk management.

Issues with adequacy of suicide risk management practices were noted in 11 cases (46%). In at least one situation, risk management efforts were inadequate or failed to address the level of suicide risk indicated. Additionally, in some cases suicide risk evaluations indicated very low risk and in some cases policies were followed such that the inmate did not require evaluation; these cases are marked as not applicable (N/A). In cases marked N or No in Table 22, issues were quite varied. These included placement of a patient on suicide precautions in an unsafe cell in one case, a failure to conduct a SRE within timelines in another case, problems with full implementation of high risk management lists or programs in two cases, failure to plan for an inmate's reaction to bad news in one case, and provision of KOP medications in another case where the inmate had mentioned a previous plan to die by overdose.

Another area impacted by the quality of suicide risk evaluation is mental health treatment planning. If risk for suicide is underestimated in a case, it stands to reason that treatment planning will also miss key components of what should be addressed clinically. In six cases, adequate treatment planning was noted. In seven cases, poor treatment planning was found. In the remaining two cases, risk evaluation and treatment planning was hampered by a patient's unwillingness to engage in treatment or evaluation services. In such cases, treatment planning should focus on efforts to engage the patient, attempts to gain historical and collateral information, and so forth.

The quality of mental health contacts was rated as not applicable in three cases where there were few or no evaluations beyond mental health screening. For cases rated Y (nine cases or 43% of applicable cases), the decided majority of clinical contacts were positive and in line with professional expectations. For the 12 cases rated N (57%), at least one clinical contact was below standards, such as incidents where poor documentation was present or where patient treatment refusals were not addressed.

Nursing rounds and/or nursing observations are required for inmates in segregated housing settings, inpatient settings, and while a patient is on suicide watch or precautions either in alternative housing or in MHCB. Cases marked N/A are those in which the inmate or patient was never in such a setting. Problems in nursing rounds were found in five of the remaining 16 cases (31%) , specifically: One case where required psychiatric technician rounds were not documented (in ASU), one case where nursing observations for a patient on 15 minute checks were not staggered, one case where a nursing check required each shift did not ensure that the patient was living/ breathing, one case of delays in starting an order for 15 minute checks, and

one case where checks in alternative housing were not documented or staggered. In 11 (69%) of applicable cases nursing rounds were done adequately.

Custody checks occur in all institutions for all inmates. For example, custody conducts institutional counts multiple times in each 24 hour period. In 17 cases (71%), custody checks were rated as adequate and conducted per policy. Of the remaining seven cases, four involved situations where window coverings or draping of bunks was allowed despite custody policy forbidding the practice. In another case, an inmate kept a blanket over his head, with custody checks not ensuring living/breathing. In the remaining two cases, rounds were completed later than specified by policy around the time of the death.

Emergency response by custody officers, nursing staff, and medical staff are considered in ratings of emergency response. In 14 cases (58%), no issues with emergency response were noted. In four cases, issues with bringing complete cut-down kits were found. In three cases, issues with timely AED placement or AED functioning were reported, and in two cases delays in emergency response occurred. Other issues were rather idiosyncratic; such as the incident of an ambulance going to the wrong institution and a case where CPR was discontinued during transport to the TTA.

Issues related to patient refusal of evaluation were cited in three cases (12.5%). In these cases, patients with safety or privacy concerns declined to be brought out to confidential settings for clinical contacts while also likely withholding information when contacted at cell-front was noted. In these cases, reviewers recommended QIPs to address patient refusal and to promote treatment planning when a patient declines to come out of cell for confidential contacts. The problem of patients not wanting to be seen talking to mental health, yet needing these services, is a difficult issue to combat.

Table 23 lists additional common findings of case by case reviews.

Rigor mortis is a condition of the body postmortem that indicates a person has been deceased for at least four hours.[23] In 2015, only one case was found to be in rigor mortis at discovery. This case occurred in a CTC. By comparison, four cases were found in rigor mortis in 2014. This may suggest improvements in the quality of safety/welfare checks, the implementation and use of Guard One throughout institutions in the CDCR, or simple chance variance.

The method used for each suicide is listed for the reader's reference. As in prior years and in other prison systems, hanging is easily the most common method of suicide in incarcerated populations, accounting for the means for 83% of the suicides in the CDCR in 2015.

Table 24: *Findings of Individual Case Reviews, part 2*

---

[23] https://en.wikipedia.org/wiki/Rigor_mortis

| Inmate | Patient Found in Rigor Mortis? | Method Used | Prior Suicide History/ # of Prior Attempts | Higher Level of Care Indicated? | Housing/ Cellmate Present? | MHSDS Status at Time of Death & LOC? |
|---|---|---|---|---|---|---|
| A | N | Jump | Y/1 | Y | SNY/N | CCCMS |
| B | N | Hanging | Y/1 | N | GP/N (out to work) | N |
| C | N | Hanging | Y/6 | Y | GP/N | CCCMS |
| D | N | Hanging | N/0 | N | ASU/N | N |
| E | N | Hanging | Y/3-7 | Y* | ASU/N | EOP |
| F | N | Overdose | Y/1 | N | ASU/N | N |
| G | N | Hanging | Y/2 | Y** | ASU/N | EOP |
| H | N | Hanging | Y/2 | N | GP/N | N |
| I | N | Hanging | Y/1 | N | GP/N | CCCMS |
| J | N | Hanging | Y/1 | Y | STRH/N | CCCMS |
| K | N | Hanging | N/0 | N | SHU/N | N |
| L | N | Hanging | N/0 | N | GP/N | N |
| M | N | Overdose | Y/5 | Y | GP/N | EOP |
| N | N | Asphyxiation | N/0 | Y*** | ASU/N | N |
| O | N | Hanging | Y/3 | N | ASU/N | CCCMS |
| P | N | Hanging | N | Y**** | GP/N | N |
| Q | N | Hanging/ Cutting | Y/3 | N | GP/N | CCCMS |
| R | N | Hanging | Y/1-3***** | Y | ASU/N | CCCMS |
| S | N | Hanging | Y/1 | N | GP/N | CCCMS |
| T | Y | Asphyxiation | N/0 | N | CTC(GP)/N | N |
| U | N | Hanging | Y/2 | N | GP/Y | N |
| V | N | Asphyxiation/ Overdose | Y/3 | N | CTC/N | CCCMS |
| W | N | Asphyxiation | N/0 | N | GP/N (out to work) | EOP |
| X | N | Hanging | N/0 | N | GP/N | EOP |

*Recommended during Regional Team visit, December, 2014 **Due to worsening psychosis ***Inclusion in the MHSDS seemed warranted ****Per policy should not have been discharged from CCCMS *****Incidents on 1/7/14, 4/22/14, and 10/7/15 were without clear intent

There is a robust literature on the heightened chronic risk of suicide for individuals with prior attempts. This risk is especially robust when a person has a history of two or more suicide attempts.[24] It is thus not surprising that 16 of the 24 cases (67%) who died by suicide in 2015 also had a history of prior attempts, with 10 cases (42%) having a history of multiple attempts. Deaths occurring on a person's first attempt are correlated with the use of a highly lethal method, such as firearms in the community and hanging in the case of prisons. Hanging is a highly accessible means for suicide in prisons. The ability of a person to abort a suicide attempt mid-way through the event is usually impossible in hanging.[25]

---

[24] E.g., Forman, Berk, Henriques, Brown, & Beck, 2004. History of multiple suicide attempts as a behavioral marker of severe psychopathology, American Journal of Psychiatry, 161, 437-443.
[25] https://www.hsph.harvard.edu/means-matter/means-matter/case-fatality/

Clinicians can use several interventions for risk management purposes, including transfer to inpatient hospitalization, transfer to a more intensive level of care, or placement in a high risk management program. Inpatient psychiatric hospitals, for example, are able to restrict means to hanging by eliminating tie off points. In 2015, reviewers found reason to indicate that more intensive risk management may have been needed in nine cases (37.5%). Of these cases, one was recommended for a higher level of care by a visiting Regional Team, two should have been considered for placement or retention in the MHSDS, one showed signs of psychotic decompensation, two should have been considered for higher levels of care due to frequent refusal of services, two were removed from high management lists or programs, and one had received bad news and had threatened to harm himself if this news was received.

Housing status is listed next with findings regarding whether a cellmate was present or not at the time of the suicide. In 23 cases (96%), there was either no cellmate present or the deceased had been in a single cell at the time of the suicide. In the one case where a cellmate was present, the deceased hung himself during the overnight hours.

Finally, the level of care for each case at the time of death is listed. The high frequency of suicides within the MHSDS is both to be expected and a cause for continued quality improvement efforts.

## Chapter IV. Review of Suicide Prevention Initiatives in 2015

**Introduction:** The development and implementation of Quality Improvement Plans following deaths by suicide is but one of many pieces of a comprehensive suicide prevention strategy. These plans occur too late for the deceased, but correct problems and offer training and prevention plans that may contribute to decreasing the risk of suicide in an institution and in a system in the future.

There are many additional aspects of a comprehensive suicide prevention strategy.[26] Such a strategy includes ensuring a solid screening process occurs at various points of incarceration, establishing a referral process, written procedures and policies for suicide prevention are maintained and updated as needed, and there are effective methods for evaluating proof of practice of existing and/or on-going suicide prevention programs and initiatives. In addition, comprehensive suicide prevention programs must have a commitment to staff training, with the provision of on-going training on suicide risk detection and referral to all correctional employees. In addition, the complexities and specifics of suicide risk evaluation, risk management, and intervention training must be provided to mental health staff. Comprehensive programs also assure easily available mental health services for inmates who request and/or are referred for these services, along with a variety of care options and levels. Suicide prevention materials must be readily provided for inmates and for those who interact with inmates (e.g.,

---

[26] Hayes, L.M. (2013). Suicide Prevention in Correctional Settings: Reflections and Next Steps. International Journal of Law and Psychiatry, 36, 188-194.

family members, work supervisors). Communication between disciplines and shifts must be prioritized, particularly regarding high risk inmates.[27]

The CDCR has worked diligently to ensure that a comprehensive suicide prevention program is in place. This effort has been shared with and reviewed by the Office of the Special Master and the OSM's experts for many years. It is beyond the scope of this report to review all suicide prevention program efforts over these many years. Rather, the information provided in this section reviews advancements in the CDCR suicide prevention program during the 2015 calendar year and shortly thereafter.

**Suicide prevention efforts developed, initiated, and/or implemented during the reporting year**: Numerous initiatives were either under development at the close of 2015 or had been implemented during the year. Each initiative is described below with notation of the status of the project on December 31, 2015 as well as the current status of each effort.

- New Five-Day Follow-Up Form: Patients are known to be at elevated risk for suicide upon release from inpatient settings per studies conducted in the community.[28] The Five-Day Follow-Up Form (CDCR MH-7230-B) used by the CDCR is intended to ensure clinical contacts with patients returning from inpatient settings in cases where the reason for admission was danger to self. Whereas the old form had been contained on one page for all five days, leaving little room for documentation, the new form developed has two pages with sufficient room for recording the patient's comments and the clinician's assessment of the patient. The new form also contains several structured, suicide-specific questions so as to ensure clinicians and psychiatric technicians are asking about suicidal thoughts, desire, and intention. The new form also requires mental health clinicians to complete a safety/treatment plan with the patient. The new form was routed and approved by all required committees by the end of 2015. Involved unions were noticed. The form was readied for distribution and materials for Training for Trainers were prepared and delivered by webinar in January, February, and May, 2016. Training for Trainers materials were co-taught by mental health and nursing staff. The form was released for use on June 10, 2016.

- ASU Post-Placement Screening Questionnaire: All inmates are screened prior to placement in segregated housing units for mental health symptoms. Once placed in segregated housing, all inmates are contacted daily by psychiatric technicians. In addition, identified mental health patients are seen on a regular basis by mental health clinicians. As inmates may experience distress upon placement, the ASU Post-Placement Screening Questionnaire is a brief measure (12 to 13 items) that is administered by a

---

[27] Preventing Suicide in Jails and Prisons, World Health Organization, 2007
[28] Qin, P., & Nordentoft, M. (2005). Suicide Risk In Relation to Psychiatric Hospitalization, Archives of General Psychiatry, 62, 427

psychiatric technician to non-MHSDS inmates and assesses an inmate's level of distress and the presence or absence of suicidal thoughts or behavior. The screening questionnaire has set scoring rules that, once scored, guide the psychiatric technician regarding whether a referral to mental health is indicated, and if so, to what degree of urgency. Inmates who refuse the screen are to be referred to mental health on an urgent basis. The new form (CDCR MH-7790) was also routed and approved by all required committees by the end of 2015. Involved unions were noticed. The form was readied for distribution and trainings (co-taught by mental health and nursing staff) were prepared, again via the Training for Trainers format. The PowerPoint presentation for the form had been reviewed and approved. This form was also released for use on June 10, 2016.

- **Provision of Beds for Alternative Housing Cells:** Several tours and audits of suicide prevention practices at various institutions had noted the lack of a physical bed in certain alternative housing cells. These cells are used with patients who are awaiting transfer to a MHCB and patients in these cells are typically on Suicide Watch (direct, one-on-one observation). Without available beds, patients were placed temporarily in cells with mattress placed directly on the floor. As this could be experienced as punishment, the CDCR agreed to ensure beds were placed in all alternative housing cells. A bed (Norix Stack-a-Bunk) was selected and was purchased for this purpose. Beds were delivered to all institutions in need of them by the end of 2015. A Mental Health Services policy was drafted for patients pending MHCB transfer that includes provision of a Stack-a-Bunk in alternative housing. This policy remains under review currently.

- **Updated Initial SRE Mentoring Training for Trainers:** The SRE Mentoring training slides and webinar were updated to place more emphasis on mentoring safety/treatment planning, to develop more of an understanding of the interplay of chronic and acute risk factors in cases, to further explore the role of the mentor in assessing and expanding clinician competencies around suicide risk evaluation, and to further teach the Quality of Care Tool for SRE Mentors. The revised training was offered on several occasions in 2015 and 2016 and was well received. Additional revisions were made to the presentation in November, 2016.

- **Development of a SRE Mentoring 'Booster' Training:** The requirement for an annual 'booster' training was discussed and a presentation developed for current mentors. The 'booster' training was re-cast as an advanced course in suicide risk evaluation mentoring, with a focus on risk assessment competencies, methods for competency assessment, and ways to enhance SRE skills in clinicians at all levels of proficiency. The training was undergoing revisions at the end of 2015 with a plan to implement training in 2016. This training indeed occurred in 2016, with the mentoring booster training attended live by 50

current mentors in November, 2016 and with numerous others taking the course by webinar in December, 2016.

Memorandum Clarifying SRE Mentoring Requirements: A memorandum was drafted in 2015 outlining and revising the requirements for SRE Mentoring. Clinicians working in Mental Health Crisis Bed settings were required to complete mentoring annually, whereas other clinicians were maintained on an every two year schedule. Clinicians were also notified of two SRE audits; one to be conducted by institutional program supervisors and the other by headquarters staff. Each mental health clinician will have an audit of a completed SRE at least once every six months. Processes for corrective action when audit criteria are not met were described as well. Finally, the expectation that SRE Mentors would receive annual 'booster' training was written. This memorandum was released on March 15, 2016. Institutional program supervisors began auditing SREs using the Chart Audit Tool, reporting results through the Quality Management Portal. Headquarters audits have been modified to solely focus on inter-rater reliability checks on institutional audits.

- Memorandum Clarifying SRE Training: SRE Training is a 7-hour CME-approved course that is provided to all CDCR mental health clinicians within 180 days of hire and every two years thereafter. The SMHP updates the 7-hour SRE class annually. The updated class is provided to a large group of institutional clinicians who then teach the class at their home institutions. This process of annual updates in Training for Trainers also ensures trainers are adherent to the content and focus of the course. A memo clarifying SRE Training requirements was drafted in 2015, noting that the requirement extends to clinicians hired through a registry and to telepsychiatry. Training for Trainers occurred in October, 2014 for the 2015 training year and in October, 2015 for the 2016 training year. This memorandum was pending release at the end of 2015 and was released on March 24, 2016.

- Memorandum Clarifying SPR FIT Coordinator Duties: A memorandum was released on August 14, 2015 instructing all institutions to designate one Senior Psychologist, Specialist to the role of institutional SPR FIT Coordinator, tasked with leading suicide prevention efforts at each facility. The role also includes coordination of mental health assessments/evaluations and mental health training/orientation. A duty statement for the position was attached to the memorandum. The memorandum and clarification of duties was designed to ensure all institutions had dedicated resources within mental health programs to coordinate suicide prevention efforts. This memorandum was released on August 14, 2015 and implemented; the memorandum is found in Appendix VII.

- <u>Memorandum Regarding SRE Tracking</u>: A memorandum was released on October 23, 2015 mandating that all institutions use appointment schedulers to simultaneously enter SREs completed by clinicians into the patient record and into the Mental Health Tracking System (MHTS). Clinicians were required to enter scheduled and unscheduled SRE appointments on daily work logs. This process is automated in EHRS institutions, but must be entered in this manner in institutions using the eUHR. The memorandum ensures proper tracking of suicide risk evaluations and timely scheduling and completion of follow-up risk evaluations. This memorandum is found in Appendix VIII.

- <u>Updated Cadet Training</u>: An update to training provided at the cadet training academy on the Mental Health Services Delivery System (MHSDS) and on Suicide Prevention was drafted and reviewed in 2015. Training for trainers on the updated version was provided on November 30, 2015. Lindsay Hayes attended the updated training as it was being given to a cadet class, providing feedback on the training in December, 2015. The training and accompanying lesson plans were undergoing revisions in light of Mr. Hayes' feedback at the end of 2015. These revisions were approved and distributed on May 11, 2016.

- <u>Workgroup on Keep-on-Person (KOP) Medications</u>: In response to a headquarters QIP (from Case F in 2015), a workgroup was assembled to discuss how prescribed medications should be distributed in high-risk settings, such as in ASU Intake Cells. The workgroup met several times, considering input from pharmacy, custody, nursing, medical, and mental health representatives. Suggestions for limiting KOP medications in certain settings, relying on the Complete Care Model to communicate when medications should be administered as Direct Observation Therapy (DOT), and other potential solutions were discussed. Workgroup meetings focused on integrating clinical practices with KOP medications with new policy on the use of Over-The-Counter (OTC) medications. In addition, concerns about KOP medications will be an issue to be discussed at morning huddles.

- <u>Training in Safety Planning</u>: In response to reviews by regional staff, headquarters staff, and Mr. Hayes, training entitled "Safety/Treatment Planning for Suicide Risk Assessment" was created in 2014 by Dr. Robert Canning. The class was updated in 2015 with a slightly revised title, "Safety/Treatment Planning within Suicide Risk Assessment and Management." The class included new content focusing on the on-going role of safety planning in managing suicide risk within the inmate population. Continuing medical education (CME) units are available to clinicians who take this course; attendance is mandatory for all clinical staff. The revised class was provided on four occasions between August and October, 2015Safety planning training was offered on multiple occasions in 2016, with training then planned every six months in order to

accommodate newly-hired clinical staff. The role of safety/treatment planning was also incorporated into other updated trainings in 2016 (e.g., in suicide prevention videoconferences, the 7-hour SRE course, and in SRE Mentoring classes).

- Training in Complex Diagnostic Cases: This training, entitled, "Differential Diagnosis in Complex Mental Health Cases" was developed to assist treatment teams in considering cases involving self-harm. Clinicians and clinical teams can err in underestimating or overestimating risk for suicide,[29] particularly when cases present with complex diagnostic presentations and when patients engage in negative [30] or positive impression management.[31] The under- or over-reporting of symptoms of distress and the within-patient variances in reporting suicidal ideation or desire for death can cause considerable clinical confusion. For example, a patient who reports self-harm behavior due to "needing to get off the yard" can be seen as manipulative and may represent little else in the case. However, for a more vulnerable patient the pressure exerted by other inmates can be a source of considerable distress and may indeed give rise to a desire to die. An approved version of this training was presented to mental health clinicians on multiple occasions in 2016.

- Training in Culturally-Competent Suicide Risk Assessment: In response to a 2015 QIP (Case B), training was designed to offer primary care physicians and mental health clinician's specific approaches and tools to assess suicide risk in patients of various cultures and belief systems. Training included introductions to the DSM-5's Cultural Formulation Interview,[32] the Cultural Assessment of Risk for Suicide (CARS),[33] and the Cultural and Protective Suicide Scale for Incarcerated Persons (CAPSSIP).[34] Interactive vignette-based practice of suicide risk inquiry in diverse cases was integrated within the training. The course was offered, with CME credits, on four occasions in 2015. Several hundred physicians and mental health clinicians attended the course.

---

[29] Horon, McManus, Schmollinger, Barr, & Jimenez (2013). A study of the use and interpretation of standardized suicide risk assessment measures within a psychiatrically hospitalized correctional population. *Suicide and Life-Threatening Behavior,* 43, 17-38.
[30] Sullivan & King (2010). Detecting faked psychopathology: A comparison of two tests to detect malingered psychopathology using a simulation design. *Psychiatry Research,* 176, 75-81.
[31] Bagby & Marshall (2003). Positive impression management and its influence… A comparison of analog and differential preference group designs. *Psychological Assessment,* 15. 333-339.
[32] Lewis-Fernandez, Aggarwal, Hinton, L, Hinton, D, & Kilmayer (2015). Handbook on the Cultural Formulation Interview. American Psychiatric Association Publishing, Washington, DC.
[33] Chu, Floyd, Diep, & Bongar (2013). A tool for the culturally competent assessment of suicide: The Cultural Assessment for Suicide (CARS) Measures. *Psychological Assessment,* 25, 424-434.
[34] Horon, Williams, & McManus (Manuscript in review). The Culture and Protective Suicide Scale for Incarcerated Persons (CAPSSIP): A measure for evaluating suicide risk and protection within correctional populations. Submitted to *Psychological Services.*

- <u>Training of Board of Prison Hearings (BPH) Commissioners</u>: Two informational talks were developed for the BPH. First, the perception that participation in the MHSDS would cause a BPH denial (and the reaction of clinicians to this perception) was listed as a QIP in Case F. Case F requested to be taken out of the MHSDS prior to an upcoming BPH appearance, a request that was granted by his IDTT. In addition, two cases in 2015 (also Cases F and P) *may* have considered receiving a RVR as removing the possibility of parole. For these reasons, members of the SMHP met with administrators within the BPH on two occasions in 2015 to discuss the best way of going about offering information to commissioners. After these meetings, two trainings were developed. The first occurred in October, 2015, with commissioners briefed on the topic of how mental health clinicians evaluate RVRs and the role depression, psychosis, and other mental health conditions in influencing behavior temporarily or when untreated. The second training was scheduled with the intention of exploring perceptions about mental illness and future risk of violence. An area of focus for the second training was on encouraging treatment participation and treatment compliance as a way of decreasing violence risk. This second training occurred in January, 2016.

- <u>BPH Commissioner and BPH Evaluator Access to the Urgent Response Mailbox:</u> As a result of discussions between BPH administrators and SMHP representatives, a letter was sent to all BPH commissioners and all evaluators working for the BPH to notify them of the availability of the Urgent Response mailbox. The mailbox allows BPH commissioners or evaluators to alert headquarters mental health staff regarding any concerns for suicide in inmates or patients who are scheduled to go before the BPH or who appear distressed at or after a BPH hearing. For example, a patient who makes concerning statements during a pre-BPH evaluation can be referred to headquarters mental health personnel, who then notify the mental health program at the patient's institution. Similarly, an inmate who appears highly distressed by a parole denial during a BPH hearing can be referred by any of the commissioners present, ensuring a mental health contact occurs on that same day. This project has been implemented. The Urgent Response Mailbox was being used by BPH commissioners and evaluators by the close of 2015.

- <u>Suicide Prevention Pamphlets: Inmate and Family Member</u>: Suicide prevention pamphlets were designed for inmates and for family members during 2015. The pamphlets were specifically intended for suicide prevention purposes. Inmate pamphlets provided information on how to ask for help, noted common myths about suicide, and described feelings that may go along with suicidal thoughts. The varieties of ways inmates can be referred or self-referred for mental health contact are listed. The family and friends pamphlet provides a list of warning signs for suicide, clarifies common myths about suicidal people, and provides a mental health contact number. The pamphlets were

distributed in July, 2015, accompanied by a memorandum dated July 30, 2015. The memorandum specified that inmate pamphlets were to be made available in all housing units, with family/friend pamphlets available in visiting areas. The process for ordering additional pamphlets was also detailed. Both pamphlets were distributed during the year in English. Pamphlets in Spanish for both inmates and friends/family members had been prepared and were moving towards printing by the end of 2015. All pamphlets are currently available and can be reordered and redistribution at any time. The memorandum sent to institutions and the pamphlets created and distributed are found in Appendix IX.

- ASU Activity Workbooks: ASU Workbooks were created in order to provide in-cell activities for inmates and patients in segregated housing units. The workbooks contain a variety of activities that inmates might use to distract themselves from the stress of the ASU placement, as ASU, particularly early in the placement, is known to be a high risk time/location for suicide. In addition, the workbooks contain suicide prevention messages and referral information scattered throughout the other content. The workbooks also serve as an item that custody officers and psychiatric technicians can use to encourage interaction with inmates and patients. Version 1 of the workbooks was re-ordered during the calendar year 2015, an indication of the regular use of these workbooks. The workbooks are available in English and Spanish. Additionally, a second version of the workbook was in development. The use of tablet-based activity booklets, using the tablets currently available in the inmate canteen, was also discussed. Implementation of Version 1 of the workbook had been very successful. Version 2 of the ASU Activity Workbook was approved by the end of 2015 and workbooks were distributed throughout 2016.

- Columbia Suicide Severity Rating Scale (C-SSRS) Training and Inclusion in the EHRS: The C-SSRS is a well-established, empirically established, standardized suicide risk measure[35] that has been incorporated as part of all suicide risk evaluations in the CDCR's Electronic Health Record System (EHRS) beginning in 2015. The primary author of the measure, Kelly Posner, Ph.D. (from Columbia University, New York), was invited to present on the measure in 2015. She accepted and presented the C-SSRS to a group of 50 CDCR clinician-trainers from over 30 institutions in October, 2015. The training was video-recorded and was just under two hours long. A group of handouts and a brief PowerPoint slideshow was constructed to aide clinicians in becoming familiar with administering the C-SSRS. The C-SSRS assists mental health clinicians by providing a structured way to inquire about suicidal history, to evaluate the intensity of suicidal ideation, and to assess the potential and actual lethality of suicide attempts. The recorded video presentation by Dr. Posner, handouts and other materials were distributed in

---

[35] Posner, Brown, Stanley, (2011). The Columbia-Suicide Severity Rating Scale: Initial validity and internal consistency findings from three multisite studies with adolescents and adults. *American Journal of Psychiatry*, 168, 1266-1277.

February, 2016. Clinician trainers received two hours of approved CME credit on the C-SSRS based on the recorded (DVD) presentation. All institutions that received the EHRS in 2016 held C-SSRS training prior to their respective EHRS start dates.

- Collaborative Assessment and Management of Suicidality (CAMS) training: The CDCR began discussions with David Jobes, Ph.D., a clinical researcher at the Catholic University of America (Washington, D.C.) during 2015. Discussions centered on training a group of clinicians within the CDCR on CAMS. Dr. Jobes agreed to present on the principles of CAMS, a treatment intervention specific to working with suicidal patients, during a statewide suicide prevention videoconference in October, 2015. CAMS represents a promising intervention for mental health clinicians within the CDCR, as the therapy has wide community use, good empirical backing,[36] good support with other established treatments,[37] and flexibility to be used in a variety of settings. CAMS may be effective in targeting patients with high chronic risk for suicide, patients on high risk lists or in high risk programs, and patients with recent contemplation of or engagement in self-harm with intent. By the end of 2015, a purchase order to train an initial group of 50 clinicians in CAMS was in process. A list of clinicians was identified at all institutions with mental health missions to be the first group to receive and use CAMS. CAMS note templates were under preparation for inclusion in the EHRS. Training began in January, 2016 and continued until July, 2016. CAMS trainings occurred by using on-line training modules and a series of follow-up consultation calls with CAMS experts. A second round of clinician training is being arranged for 2017.

- Self-Harm Tracking and Predictive Algorithm: Self-harm incidents at every institution continue to be entered in MHTS. The data is used to identify institutions with high numbers of events and to track trends within and between institutions. In addition, using a technique called machine learning, the data will be used in developing a predictive algorithm. Machine learning algorithms can identify variables and variable combinations that may not at the surface appear related to increased short-term risk of self-harm, but can statistically establish these risks. The model allows for refinement as additional data points are entered. Work on a machine learning algorithm was begun in 2015, led by David Leidner, Ph.D., a specialist in informatics and data science. Dr. Leidner piloted an initial algorithm for predicting self-harm. Initial inquiries were made with several academic institutions regarding partnerships in developing the algorithm. More recently, a federal grant application was submitted in consultation with Drs. Ronald Kessler and

---

[36] Jobes, Wong, Conrad, Drozd, & Neal-Walden (2005). The Collaborative Assessment and Management of Suicidality versus treatment as usual: A retrospective study with suicidal outpatients. *Suicide and Life-Threatening Behavior*, 25, 483-497.
[37] Andreasson, et al. (2016). Effectiveness of Dialectical Behavior Therapy versus Collaborative Assessment and Management of Suicidality for reduction of self-harm in adults with borderline personality disorder and traits. *Depression and Anxiety*, 33, 520-530.

Matthew Nock at the Harvard Medical School. The grant project hopes to refine the machine learning algorithm, increasing its predictive power and potentially alerting clinicians to patients with high degrees of likelihood of self-harm in the near future.

- On-Going Training through Monthly Suicide Prevention Videoconferences: Monthly suicide prevention videoconferences continue to occur. Institutional SPR FIT teams and mental health clinicians participate in the videoconference by viewing presentations in conference rooms using VTC connections or, when unable to attend in this manner, through phone lines. In 2015, the suicide prevention videoconference was used to review suicides and trends in suicides within the department, to brief staff on new or revised policies and procedures, to notify staff of suicide prevention trainings and resources (e.g., membership in the American Association of Suicidology), and to provide didactic trainings. Trainings covered during the year included:
  - Behavioral markers for suicide, even when suicide is denied
  - Introductions to evaluating suicide risk in the EHRS
  - Methods for improving safety plans
  - The use of suicide intention scales (with vignette practice)
  - Understanding chronic risk for suicide
  - Understanding the interplay between chronic and acute risk for suicide and imminent/warning signs for suicide
  - Staff self-care and monitoring of reactions to suicidal patients
  - Introduction to CAMS.

The suicide prevention videoconference is a continuing suicide prevention effort. Presentations continued in 2016.

- Revisions to the SRE and inclusion of additional suicide risk assessments in the EHRS: As noted above, the inclusion of the C-SSRS as part of every SRE conducted within the CDCR is planned as part of EHRS implementation. The C-SSRS adds a structured set of questions inquiring about the intensity of suicidal ideation and about the range of suicide attempts and suicidal behaviors in which the patient has engaged over his or her lifetime. In addition, the SRE in the EHRS adds detailed information about past suicide attempts when applicable, noting the timing of the attempt, the means used, the potential and actual lethality/medical consequence, and so forth. These additions should help clinicians construct more accurate judgments of acute and chronic risk, while ensuring greater accuracy in considering historic vulnerability to suicide. In addition, the EHRS contains seven suicide risk assessment tools that may be used as needed by clinicians. These additional tools can help with understanding cultural protective and risk factors in cases,[38] evaluate readiness[39] and/or capability for suicide,[40] evaluate motivations for

---

[38] CAPSSIP; *ibid*
[39] Chronic Readiness Questionnaire; Horon, McManus, & Sanchez-Barker (2013)

suicide attempts,[41] and so forth. Each of these tools was provided by researchers to the CDCR. All of the measures mentioned above had been included in the 'build' of the EHRS, with the C-SSRS prominently featured within the EHRS SRE. Training in the additional suicide risk assessment tools available in the EHRS occurred via webinar in 2016, with additional trainings offered in monthly videoconferences. Live and webinar trainings are planned for 2017.

Progress on each of these initiatives during 2016 will be reviewed in the 2016 Annual Report, along with all new initiatives undertaken in the 2016 calendar year.

## Chapter V. Conclusions

**Introduction:** The numerous efforts undertaken by the CDCR to reduce suicides, aided by the consultation of the OSM, have been productive. Many suicides that may have occurred during 2015 were prevented, on-going efforts are helping to reduce rates, and new initiatives hold promise in further reducing suicides within the CDCR. The rate of suicide in the CDCR in 2014 and 2015 dipped below the average rate of suicides in U.S. prisons in 2014 (the last reporting year available) and the percentage of suicides occurring in segregated housing units declined in both years. Efforts during the reporting year ranged from QIPs at the institutional level to continuing work to train clinicians in suicide risk evaluation and risk management to changes in policy and procedure to innovative projects. Yet, work remains to be done and efforts are on-going.

**Summary of Findings:** In 2015, 24 suicides occurred within the CDCR, 22 males and two females, at a rate of 18.6 per 100,000 inmates. Caucasian inmates and inmates in the age groups 30-34, 45-54, and over 60 died by suicide at a higher frequency then would be expected given their respective percentages within the CDCR population. Suicides occurred more commonly in unmarried inmates with limited educational and vocational experiences. Health factors were implicated in nearly half of the deaths by suicide in 2015. The frequency of suicide in segregated housing has declined, but remains an area of continued focus. Inmates sentenced to life also had a higher risk of suicide than inmates with determinant sentences. The first year of incarceration was also correlated with higher risk. Only one (4%) suicide occurred in a cell with a cellmate present (the cellmate was sleeping at the time), suggesting a protective impact of dual person or dorm housing. Suicides were more likely in individuals with past attempts (67%), a finding that is both expected and suggestive of potential interventions for (living) suicide attempters/survivors. A broad range of precipitants for suicide were found in 2015, with in-prison stresses repeatedly seen as underlying suicidal motives.

---

[40] Acquired Capability for Suicide Scales—Fearlessness About Death; Ribeiro, Witte, Van Orden, Selby, Gordon, Bender, & Joiner (2014)

[41] Reasons for Attempting Suicide Questionnaire; Holden & Delisle (2006)

In comparison to the past 10 years, the suicide rate in the CDCR in 2015 of 18.6 per 100,000 is the third lowest rate, with 2014 (17.0 per 100,000) and 2009 (14.9 per 100,000) the years with the lowest rates. Two suicides of female inmates occurred in 2014 and 2015, higher than the number of suicides in such settings in all but two of the prior 20 years. The frequency of suicide over a 15-year period is highest in prisons with large mental health programs (1-2 suicides per year) and lowest in settings with either minimal mental health programs or predominantly inpatient missions (0.0 to 0.4 suicides per year on average). In 2015 and in the past 10 years in general, suicides occur most frequently in March, May, and October.

The frequency and rate of suicide within the CDR has declined over the past 10 years. This decline is seen in fewer suicides by Caucasians and Hispanic/Latinos, the two groups with the highest frequency of suicide in the CDCR, and in fewer suicides in individuals ages 25-54. Suicides of inmates age 55 and over are the only group to have trended higher in 2015 compared to the previous five years. Suicides in segregated housing units have also declined in frequency compared to prior years, though the setting continues to have an elevated risk of suicide compared to other housing types. Inmates who qualify and have been placed in the MHSDS likewise continue to have an increased risk for suicide, with MHSDS rates of 52.6 per 100,000 in the past 10 years versus a rate of 10.3 per 100,000 in non-MHSDS inmates over the same period.

As referenced above, the rate of suicide in U.S. Prisons rose to 20.0 per 100,000 inmates in 2014, the last year such statistics are available. This rate is higher than the rate of suicide in the CDCR in 2014 and in 2015. It is notable that the rate of suicides in the CDCR has declined in the past 10-years at a time when both the community rate and U.S. Prison rate has increased. Men incarcerated in the CDCR had a lower rate of suicide then men in the community in 2014 and 2015.

When a non-lethal self-harm incident occurs within the CDCR, institutions are required to report the event using a database of such incidents. When a suicide occurs, a broad and intensive series of reviews is set in motion. These internal and external reviews evaluate the performance of staff members within and across disciplines, evaluate the emergency response, discuss the event in terms of procedural and policy considerations, and determine what corrective action plans must be put in place to ensure qualitative improvements to suicide prevention programs. In 2015, a total of 115 quality improvement plans were initiated and completed, addressing case-specific, institution-specific, and departmental level actions need to enhance suicide prevention efforts. Personnel at the headquarters level review all deaths within the CDCR and carefully evaluate all deaths initially listed as "unknown" or as caused by overdose in conjunction with the Death Review Committee. Suicide case reports are carefully edited and reviewed for quality, with quality audits completed by Quality Management staff. With very few exceptions, Suicide Case Reviews meet all or nearly all audit criteria. Experts working with the OSM participate in SCRs.

Suicides occurring in the CDCR in 2015 were understandably rather idiosyncratic and often multi-determined. Each of the 24 suicides in the year was reviewed to illustrate the complexities

of the case and how suicidal outcomes can manifest within very different individuals. Case findings are also tabulated to look at key issues in improving suicide prevention. Among these findings are continued difficulties with suicide risk evaluations, suicide risk management, and treatment planning by mental health clinicians, manifested in a variety of ways over the 10 to 11 cases where these issues were identified. The need for higher levels of care considerations was also indicated in a number of cases. Issues with custody rounds, such as allowance of in-cell draping, concerns with emergency response, such as failing to bring full cut-down kits to an emergency, and problems with nursing/psychiatric technician checks were noted in a number of cases as well. Only one inmate was found in a state of rigor mortis in 2015, an improvement over past years.

Numerous suicide prevention initiatives continued, created, or initiated in 2015 were also reviewed. These initiatives strive to ensure a comprehensive suicide prevention strategy remains in place and continues to grow and develop as the population of the CDCR changes. Initiatives arose from many sources: QIPs, suggestions by Mr. Lindsay Hayes, audits of clinician performance, results of mentoring of clinicians trained in suicide risk evaluation and treatment planning, discussions and coordination with others (e.g., BPH commissioners), inspiration from public suicide prevention campaigns, discussions with and consultation with renowned suicidologists, and even advances in informatics and other technologies. The development of the EHRS also set in motion a number of opportunities for innovation in the service of improving patient safety.

**Report implications and future steps:** A group of 10 report implications are enumerated below. The order of these implications is based on the order in which each finding was presented in the annual report. Future steps regarding each implication are to be discussed during DHCS SPR FIT meetings in 2017.

1. Suicides in older adults: As was noted in Table 2, inmates over the age of 60 make up 6% of the population within the CDCR. However, 21% of suicides within the CDCR in 2015 were within this age group, making this the age group most overrepresented in number of suicides. High rates of suicide are found in the community in elderly males, particularly Caucasian males, during their mid- and late 70s and 80s. For mental health clinicians, the use of measures of connectedness with elderly patients should be discussed. The Interpersonal Needs Questionnaire (INQ)[42] is included as an optional assessment in the EHRS and is a fine choice in such cases.

2. Suicides in inmates with co-morbid medical conditions: Nearly half (46%) of the inmates who died by suicide in 2015 were considered to have serious and/or chronic medical problems. This group of inmates had medical problems ranging from chronic low back

---

[42] Cukrowicz, Cheavens, Van Orden, Ragain, & Cook (2013). Perceived burdensomeness and suicide ideation in older adults. *Psychology and Aging*, 26, 331-338.

pain or headaches to cases of liver disease, cancer, hemiparesis, diabetic neuropathy, cardiac problems, and worsening blindness. Community surveys of suicide in patients with significant medical problems have had varying results, with roughly 10% of suicides seen as attributable to medical disorder or to terminal illness.[43] In comparison, the one year (2015) total of 11 suicides of 24 in the CDCR is rather elevated and thus a potentially promising area to increase suicide prevention efforts. Several institutions have implemented pain management committees and pain management groups for inmates, and the success of these endeavors is being looked at closely.

3. <u>Suicides in segregated housing units</u>: Despite a significant decline in the frequency of suicide in segregated housing units, the rate of suicide in these units remains high compared to other housing settings within the CDCR. The three deaths occurring in dedicated intake cells is also concerning. Each of these three suicides occurred using different methods (hanging from a sprinkler head, hanging from ventilation grate holes, and overdose on KOP medications). A great deal of effort has already gone into improving safety and suicide prevention procedures in these settings, and it may be too early to fully ascertain the success of those efforts. However, further discussion of the implications of this finding may lead to new innovations.

4. <u>Suicides in Inmates with Life Sentences</u>: As 54% of suicides in 2015 occurred in patients with life sentences, compared with a roughly 20% proportion of the population overall, 'Lifers' represent a target for intervention. From a prevention standpoint, a number of efforts have been taken to try to combat this finding, including conducting training for BPH commissioners and evaluators, broadening the Urgent Response referral system to commissioners and evaluators, and training clinicians to 'bracket' BPH hearings with mental health contacts. Clinicians were advised during suicide prevention videoconference training to evaluate the degree of a patient's distress present before and after the hearing, to discuss the patient's thoughts on the outcome of the hearing, and to respond proactively to what may be experienced as bad or distressing news. Further education regarding the risk of suicide in inmates with sentences of Life without the Possibility of Parole is planned. Further interventions may also include holding "open lines" on general population lines, where inmates who do not require placement in MHSDS may seek time-limited services.

---

[43] https://www.theguardian.com/society/2011/aug/23/suicide-chronic-illness-study

5. <u>Suicides in Inmates during the First Year of Incarceration</u>: In 2015, five of the 24 suicides occurred within the first year of incarceration, representing 21% of suicides. Three of the suicides occurred in inmates who were in reception centers (Cases I, S, & U). In reviewing the five cases, there is not a great deal of consistent or readily attributable commonalities between the deaths. However, based on 2015 data, additional attention to the variable 'early in sentence' is important to consider. The DHCS SPR FIT may wish to discuss ways to encourage clinicians in reception centers and those working with new arrivals to institutions (who are in their first year of incarceration) to exercise a more conservative approach to risk management with these individuals, to possibly include enhanced outreach.

6. <u>Prevalence of Suicide in Single Cells and Double Cells without Assigned Cellmates</u>: The CDCR has recognized the potential protective gain of cellmates for many years, noting the majority of suicides occur in cells with single occupancy. The same is true for 2015, with 96% of suicides occurring without a cellmate present at the time of the death. While it is true that inmates can wait for their cellmates to leave the cell for work or programming (this was true in two cases in 2015), there is still a preponderance of suicides in inmates with no assigned cellmate (20 of the 24 in 2015). Cellmates have interrupted suicide attempts, called for help during attempts, talked others into aborting attempts, and provided social support in many cases. The DHCS SPR FIT may discuss ways to encourage double cell or dorm placements in institutions, understanding that this is an optimal arrangement for most inmates.

7. <u>Suicide Attempt History</u>: Ten of the inmates who died by suicide in 2015 had made multiple past suicide attempts, with another six having made one prior attempt. Thus, two-thirds of those who died by suicide had made at least one prior attempt. The lifetime risk of death by suicide increases with single attempts and much more so after a second attempt; this is true in psychiatric and non-psychiatric samples. In psychiatric samples, the finding is particularly true in individuals with schizophrenia and bipolar disorder[44] and in patients shortly after release from hospitalization.[45] The CDCR has already instituted post-hospitalization follow-up contacts by policy, with procedures such as five-day follow-ups, MHCB discharge custody checks, and so forth. For other patients with high chronic risk, the use of high risk lists and high risk management programs has been implemented. The DHCS SPR FIT will be further developing a standardized policy and procedure regarding high risk lists. The DHCS SPR FIT may consider and discuss additional interventions for suicide survivors, such as developing a pilot program to pilot

---

[44] Tidemalm, Langstrom, Lichtenstein, & Runeson (2008). Risk of suicide after suicide attempt according to coexisting psychiatric disorder: Swedish cohort study with long-term follow-up. *British Medical Journal*, 337.
[45] Haukka, Suominen, Partonen, & Lonnquist (2008). Determinants and outcomes of serious attempted suicide: A nationwide study of Finland, 1996-2003. *American Journal of Epidemiology*, 167, 1155-1163.

the use of CAMS treatment with identified high risk patients; patients who have recent suicide attempts or a history of multiple prior attempts. As noted, CAMS is a targeted intervention that is specific to suicide risk. The treatment includes patient ratings of what most fuels suicidal desire for them and what has historically contributed to a wish to die by suicide, while challenging this wish for death with considerations of making life worth living.

8. <u>Focus on Common Triggers or Motives for Suicide</u>: Logically, in-prison stresses such as safety or enemy concerns, victimization fears, gang pressures, or new charges can be seen as sufficient to trigger or motivate suicidal contemplation. These motives were well represented in suicide case reviews conducted in 2015. However, mental health clinicians can sometimes underestimate the impact of in-prison stresses, noting either the inmate's role in the difficulty or the responsibility of custody staff in managing these issues. In other occasions, clinicians rely on reported mental health symptoms without assessing current distress. Additional highlighting of ways to integrate the role of in-prison stresses in inmate suicide within on-going suicide risk evaluation and suicide prevention trainings may be helpful.

9. <u>Prevalence of Suicide in Mental Health Patients</u>: The difference in rates of suicide over a 10-year period between identified mental health patients (52.6 per 100,000) and non-mental health inmates (10.3 per 100,000) is striking. While this suggests the CDCR has been doing a good job of screening and identifying inmates in need of mental health services, it also suggests that more can be done to prevent suicide in identified MHSDS participants. Of course, suicide is associated with a number of mental health disorders, and individuals who self-harm are placed in the MHSDS, suggesting that the rate in mental health populations will always be larger.[46] However, MHSDS staff members receive increasingly extensive and intensive suicide risk evaluation and suicide risk management training in the service of their patients. Increasing the focus on and training for suicide-specific interventions and suicide-specific treatment planning may be the most advantageous next step and may be carried forward by the headquarters SPR FIT. The provision of specialized training in CAMS,[47] DBT,[48] and/or CBT for Suicidality[49] is a worthwhile consideration for discussion.

[46] http://depts.washington.edu/mhreport/facts_suicide.php
[47] Jobes, D. (2016). <u>Managing Suicidal Risk: A Collaborative Approach</u> (2nd Edition). Guilford Press, New York.
[48] Linehan, M. (1993). <u>Cognitive-Behavioral Treatment of Borderline Personality Disorder</u>. Guilford Press, New York.
[49] Byran, C., Ed. (2015). <u>Cognitive-Behavioral Therapy for Preventing Suicide Attempts</u>. Routledge Press, New York.

10. <u>Capitalizing on Innovations</u>: The introduction of the Mental Health Tracking System (MHTS) in 2014 and the creation of an electronic health record system in 2015 created significant opportunities. First, in creating MHTS, critical information is entered daily into a data warehouse; this information can be used not only to track incidents of self-harm but also to correlate with other system information. The EHRS is also able to load information into the data warehouse. In this way, information is available to generate predictive algorithms for self-harm incidents in the CDCR, another way of identifying high-risk inmates that can alert clinicians to inmates in need of intervention. Additionally, the EHRS provides a way to integrate empirically-supported measures for evaluating suicide risk into clinical practice, lends tools for tracking the impact of safety and treatment planning efforts, and offers ways to evaluate the effectiveness of specific treatment interventions. These innovations should be embraced as advancements in suicide prevention.

Appendix I: Sample High Risk Management Program Policy



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
October 2015

I. **PRIMARY REVIEWER/RESPONSIBILITY:**
Chief of Mental Health

II. **PRIMARY MANUAL/MAINTENANCE:**
Mental Health Policy and Procedure Manual

III. **POLICY:** This local operating procedure establishes and describes the High Risk Management Program (HRMP) at California Men's Colony (CMC) which is designed to be consistent with the Mental Health Services Delivery System (MHSDS) Program Guide and adhere to suicide prevention and response and risk assessment / evaluation practices and policies. It is implemented to assist in identifying inmate-patients who may be at an elevated risk for self-harm or suicide, provide specific and individualized treatment for these behaviors, and to ensure that clinicians possess the knowledge and skill to adequately evaluate inmate-patients (IPs) for high risk.

IV. **PURPOSE:** The identification and management of inmates presenting as high risk is critical in order to address inmate suicides and self harm behavior. Inmates who present as high risk may include those who display signs of psychiatric decomposition, unstable medical conditions, grave disability, self-harm behavior, dangerousness to others, frequent Department of State Hospitals (DSH) or Mental Health Crisis Bed (MHCB) admissions, or who have safety and/or housing or custody concerns. Those who engage in self harm behaviors, or who attempt suicide, fall into the general category of inmates who are at risk. Research reveals that prior suicide attempts correlate with risk of eventual successful suicide.

V. **REFERENCES:**
- Mental Health Services Delivery System Program Guide, 2009 Revision
- CMC Local Operational Procedure (LOP) 10-0006 Suicide Prevention and Response
- CMC Operational Procedure (OP) No. 3012: Medical Report of Injury or Unusual Occurrence CDCR Form 7219
- Memorandum dated February 5, 2013 from Timothy G. Belavich, Deputy Director Statewide Mental Health Program: "Implementation of the Suicide Risk Evaluation Mentor Program"
- Memorandum dated February 15, 2013 from Timothy G. Belavich, Deputy Director Statewide Mental Health Program: "Suicide Risk Assessment Training"
- 2010 submittal to the *Coleman* Court regarding Suicide Prevention efforts
- Memorandum dated April 12, 2013 from T. Belavich, Deputy Director(A), Statewide Mental Health Program: "Suicide Attempts Data Collection"
- Memorandum dated May 29, 2013 from E. Valenzuela, CMC Warden and T. Fox, CMC Chief Executive Officer: "Reporting Inmate Attempted Suicides and Self Harm"
- Addendum Memorandum to DOM Supplement Section 51030.3 Reportable Incidents, Sub Section 51030.6 Format and Content – Reporting Inmate Attempted Suicides and Self Harm dated January 28, 2014 signed by E. Valenzuela, CMC Warden and T. Fox, CMC Chief Executive Officer
- Memorandum dated August 13, 2013 from T. Belavich, Director (A), division of Health Care Services and Deputy Director, Statewide Mental Health Program: "Suicide Prevention and Response Focused Improvement Team Coordinator Attendance at Inmate Advisory Councils and Inmate Family Councils"
- Memorandum dated May 8, 2015 from T. Belavich, Director (A), Division of Correctional Health Care Services (DCHCS) and Deputy Director, Statewide Mental Health Program: "Consulting Staff Name Documentation in Health Care Records"
- Memorandum dated May 12, 2015 from T. Belavich, Director (A), DCHCS and Deputy Director, Statewide Mental Health Program: "Documentation of Mental Health Evaluations and Treatment Plans"



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
**October 2015**

- Memorandum dated July 30, 2015 from T. Belavich, Director (A), DCHCS and Deputy Director, Statewide Mental Health Program and K. Harrington, Director, Division of Adult Institutions: "Suicide Prevention Pamphlets for Inmates and Family/Friends"
- Memorandum dated September 28, 2015 from T. Belavich, Director (A) DCHCS and Deputy Director, Statewide Mental Health Program: "Revision to the Suicide Risk Evaluation Mentoring Program"
- CMC Local Operational Procedure (LOP) 14-0004, Adverse Events and Unusual Occurrences

VI.   **APPROVAL AND REVIEW:**
      This procedure shall be updated annually.  Last revision: August 2014

VII.  **PROCEDURE DETAILS**

      A.   **ONGOING EDUCATION AND TRAINING FOR CLINICAL STAFF**

           **Higher Level of Care Issues and Training**
           Trainings are conducted as needed and ongoing with all Mental Health (MH) clinical staff regarding DSH referral and sustainability processes and monitored by Program Supervisors. Monthly and quarterly audits are additionally conducted by the DSH Coordinator (reference LOP 10-0010 DSH Referrals).

           **Suicide Risk Assessment Training**
           All MH clinical staff receives mandatory 7.0 hour training on suicide risk assessment. This is repeated every two years.

           **Suicide Risk Evaluation (SRE) Mentoring Program**
           All clinical staff is mentored by headquarters trained CMC staff on administration of the SRE. This mentoring is conducted with all new staff and is repeated every two years for all staff. Effective September 2015 SRE Mentoring will be provided on an annual basis to all MHCB staff. In addition, when an audited SRE is determined to not meet standards, additional SRE Mentoring may be required (Reference September 28, 2015 Memorandum "Revision to the Suicide Risk Evaluation Mentoring Program.")

           **Self Harm Behavior Reporting**
           All staff including nursing and custody are trained on self harm behavior reporting (see below Section D Other High Risk Management Protocols, item 7).

           **SRE Form 7447 Training**
           All clinical staff is trained locally and via Headquarters' Suicide Prevention and Response Department on completion of this form and Suicide Safety/Treatment Planning.

           **New Employee Orientation**
           All new employees are provided orientation to suicide prevention and response in the prison setting and an overview of all protocols and policies, in addition to the above trainings.

      B.   **HIGH RISK MANAGEMENT PROGRAM**
           The Coordinator for the HRMP shall be a Senior Psychologist Supervisor or Senior Psychologist Specialist as appointed by the Chief of Mental Health. The HRMP Team is comprised of the HRMP Coordinator, Primary Clinician (PC) (s) and other treatment team members as indicated.

(Orig: 3/2013) Revised: 8/2014, 10/2015            **Mental Health**                    Page 2 of 7



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
October 2015

1. Identification of High Risk IP

   The process of identifying High Risk IPs shall be done by all MH clinical staff at CMC. Any IP requiring short or long-term intervention and treatment for high risk factors shall be considered for referral to the program.

   <u>High Utilizer Report</u>
   All IPs included on the High Utilizer Report generated from the MH Patient Registry on the Quality Improvement share site, are considered "high utilizers" of higher levels of care, and this must be documented on the IPs treatment plan as long as he is on the list. Consideration of referral to the HRMP must also be documented and referral made if clinically indicated. If a referral is not made or the clinician does not consider the IP's high utilization as indicative of high risk behavior, then the clinician must document the rational for non-inclusion on a CDCR 7230, Interdisciplinary Progress Note, and reference this note on every treatment plan as long as the IP remains on the list. This list and protocol is audited semi-annually at minimum and training is provided in all cases of non-compliance.

   Other sources that may be utilized to identify high risk IPs may include the following:

   a. DSH Indicator Report (generated from Mental Health Tracking System (MHTS.net)). Staff is required to document and integrate any positive criteria into Interdisciplinary Treatment Team Plans (IDTT).

   b. Weekly Treatment Hours Summary (High Refusers) Report (generated from MHTS.net). Staff is required to document and address IPs refusing treatment into IDTT Plans.

   c. All DSH returns and MHCB discharges remaining at CMC will be considered for referral to the HRMP.

2. Staff Referrals to the HRMP

   In addition to those inmates identified through the steps above, any clinician can make a referral to the high risk program at any time.

   a. The HRMP referral form (ATTACHMENT A) shall be used for referrals to the high risk program.

   b. The referral is made to the HRMP group facilitators or Coordinator. The HRMP Team will perform a file review focused on review of risk factors as well as protective factors that may contribute to the IPs high risk status and conduct a screening interview with the IP. Suicide and self-harm history, methods of suicide attempts, frequency of suicide attempts or self-harm, and other relevant MH and medical conditions are among the areas focused upon in the chart review. If appropriate and in coordination with the PC, the IP will be assigned to the HRMP.

   c. Final determination for inclusion is at the discretion of the HRMP Team. If placement is not appropriate for the HRMP, the reviewer will notify the PC for further assessment of the need for a possible higher level of care, or other appropriate treatment referrals or recommendations.

(Orig: 3/2013) Revised: 8/2014, 10/2015          **Mental Health**          Page 3 of 7



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
**October 2015**

3. Management and Treatment of High Risk Inmates

    a. A High Risk Management Program will be provided in mainline Enhanced Outpatient Program (EOP) and Correctional Clinical Case Management System programs and in Administrative Segregation Unit (ASU).

    b. High risk factors must be documented on every treatment plan as a specific area of focus with measurable and objective goals defined and documented.

    c. The IDTT will formulate a treatment plan specific to the IPs inclusion in the HRMP including high utilization or high risk factors as applicable. The plan will include and document developmental history; criminal history, including a description of the commitment offense and past offenses; history of violence; substance abuse/dependence history; mental health history; history of suicide attempts and self harm behaviors; family history of suicide attempts or completed suicide; review of diagnoses; provision of treatment recommendation and treatment management; and frequency of clinical contact and IDTT meetings.

    d. Completion of Treatment Plans, SREs and all documentation shall be completed within all required timeframes as stipulated in the MHSDS Program Guide, 2009 Revision, and per all applicable California Correctional Health Care Services Memoranda to include: "Documentation of MH Evaluations and Treatment Plans" dated May 12, 2015 and "Consulting Staff Name Documentation in Health Records" dated May 8, 2015. Changes to the Treatment Plan due to identified high risk factors may necessitate completion of a full plan instead of an addendum or summary. SREs must also be completed as clinically indicated by presence of high risk factors.

    e. The HRMP treatment for IPs identified as high risk will be provided in a group format with ongoing consultation and involvement of the PC. The focus of the group will be on distress tolerance, affect regulation, coping skills, and suicide risk management utilizing a Dialectical Behavior Therapy informed treatment. For IPs not appropriate for group treatment, this treatment may be provided individually by the PC as determined by the IDTT and may include increased individual sessions.

4. Movement/Housing Changes

    Whenever an IP identified as "High Chronic" or "High Acute" risk on the most recent SRE, and/or is enrolled or referred to the HRMP and is re-assigned to a new PC for any reason, or moves to a different part of the institution, the PC will communicate with appropriate clinics about the arrival/departure of the IP. If the IP is transferring to a different institution, the PC will make every effort to communicate with the receiving facility to provide clinical and high risk information. Reference below for specific treatment for this population as well.

**C. SUICIDE PREVENTION REVIEW - FOCUS IMPROVEMENT TEAM (SPRFIT)**

    The goal of CMC SPRFIT is to provide focus on appropriate suicide risk assessment and evaluation, training and education. The SPRFIT meets monthly and discusses all suicide attempts and self-harm incidents that occurred that month, and/or the previous month.

    Written summaries that include all incidents of self-harm, with or without the intent to die are provided for extensive review and discussion by the multidisciplinary staff. These summaries



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
**October 2015**

incorporate file reviews and clinical consultations; list identified risk and protective factors; clinical and suicide history; and relevant mental health and medical conditions.

1. A formal clinical presentation of a suicide attempt or serious incident from the previous month is made at each meeting with extensive multi-disciplinary staff discussion.

2. All self harm incidents are presented and discussed.

3. The SPRFIT Coordinator attends the Emergency Medical Response Review Committee and presents all self-harm incidents and receives information regarding medical codes. These codes are reviewed and if any mental health issues are indicated further clinical review and consultation will be conducted as applicable.

4. The SPRFIT Coordinator maintains ongoing dialogue with Facility Captains, other custody and medical staff, and shall be notified of all incidents and shall receive the Daily Briefing Report in addition to all applicable Incident Reports.

5. The SPRFIT Coordinator attends and reports to the Mental Health Program Subcommittee (MHPS) twice monthly. All relevant incidents are reviewed and discussed and reports or audits are presented as indicated. The SPRFIT Coordinator maintains monthly logs of all self-harm incidents and suicide attempts. These logs include clinical and demographic information, and track known high risk factors as well and any trends which are analyzed, reported and discussed at the SPRFIT meetings and/or in other forums as needed. The monthly data is provided to the DCHCS Suicide Prevention SharePoint site. A clinical high risk / self harm summary is provided on each case and provided to clinicians and to all Peer Review Committees for further review as indicated.

**D. OTHER HIGH RISK MANAGEMENT PROTOCOLS**

1. IPs with repeat admissions to higher levels of care are tracked and monitored and if clinically indicated provided specialized group and/or individualized treatment specifically regarding high utilization as described above.

2. All DSH returnees and MHCB discharges are evaluated and screened by a designated clinical staff and referred as clinically indicated to the HRMP Transitions Group Treatment program specifically designed for this purpose.

3. The Program Supervisors and/or DSH Coordinator or designee reviews all Interdisciplinary Treatment Team Level of Care Decision, CDCR MH-7388-B forms. Positive indicators are discussed including consultation with the HRMP team as needed.

4. HRMP team members attend IDTTs as requested when any IP in the HRMP is presented, or for any other consultative purpose as needed.

5. The DSH Coordinator or designee performs two 7388-B audits and presents findings to the institution MHPS and HRMP Coordinator.

6. The DSH Coordinator or designee coordinates and ensures that MHCB and DSH returnee information is provided to staff.

7. Self Harm Reporting:

(Orig: 3/2013) Revised: 8/2014, 10/2015          **Mental Health**          **Page 5 of 7**



**California Men's Colony Health Care Services**
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
**10-0016**
**October 2015**

   a. Nursing responds to self-harm incidents and consults with the MH Clinician of the Day, assigned clinician, other responding clinician, or the Psychiatrist on Call after hours to obtain a determination if the event was a self-harm behavior with or without intent to die. Nursing then provides the Self-Harm Mental Health Chrono 128-C to the SPRFIT Coordinator or designee.

   b. The responding MH clinician shall provide, no later than the following business day, a full Incident Notification of the self harm behavior to the SPRFIT Coordinator or designee. An additional follow up report may be required as well. This notification shall be made via email and shall include:
      i. The inmate's name, CDCR number and level of care
      ii. Location/cell number
      iii. A very brief description of what specifically occurred, including IP statement
      iv. Date of incident, Time of incident
      v. What the clinical determination was regarding the incident (intent to die, no intent to die, or unknown and further review required)
      vi. What the disposition was (e.g. returned to housing, admitted to MHCB, etc.)

   c. The SPRFIT Coordinator or designee shall provide the Self Harm Chrono to relevant Custody and Nursing staff and the clinical information to relevant clinical staff.

   d. These protocols are also defined in the Suicide Prevention LOP 10-0006 and OP No. 3012: Medical Report of Injury or Unusual Occurrence CDCR Form 7219.

   e. Self harm behaviors are specifically addressed in the HRMP Group Treatment.

   f. All self harm must also be reported in accordance with CMC Local Operational Procedure (LOP) 14-0004, Adverse Events and Unusual Occurrences.

8. IPs Transferring from CMC

   Transfer from CMC has been identified as a high risk factor for CMC IPs. To address this risk, a specific clinical group was devised and implemented. The *Preparation for Transfer* group focuses on preparing EOP IPs for transfer to either a corresponding CDCR institution or to a DSH facility. The group is facilitated by a MH clinician (psychologist or clinical social worker) and may include a correctional counselor as indicated. The facilitators assist IPs by providing ways to reduce anxiety, discuss safety concerns, building and maintaining positive coping strategies utilizing Cognitive Behavioral Therapy (CBT), and focus on reality-based information, in order to pave the way for a smooth transition by processing concerns and incorporating psycho-education and CBT.

9. Keep on Person (KOP) Medications

   KOP medications may be contraindicated for high risk IPs. The DCHCS SPRFIT is discussing possible policy changes regarding KOP medications and high risk IPs. CMC shall implement this policy as soon as it is available. In the interim, all IPs enrolled in or referred to the HRMP; who have a "High Chronic" or "High Acute" risk level determination on their last SRE; or who demonstrate significant high risk factors, shall be assessed by the PC and the IDTT regarding KOP medications as applicable. This

(Orig: 3/2013) Revised: 8/2014, 10/2015      **Mental Health**      **Page 6 of 7**



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
<u>**HIGH RISK MANAGEMENT PROGRAM**</u>
10-0016
October 2015

assessment shall include consultation with the primary medical provider. This consultation shall be appropriately documented. Through this process review an IP may be referred to medical for possible exclusion of KOP medications. This decision shall be reviewed at minimum, every IDTT.

**OUTREACH**

CMC will provide the following outreach and communication:

1. A Suicide Prevention DVD written and performed by CMC inmates is played on the local television system for all inmates. This DVD has been provided to all institutions statewide for utilization.

2. An outreach/referral system is integrated on general population yards including both CMC East and West Facilities.

3. Suicide prevention and general MH outreach fliers are posted throughout the institution to include chapel locations and where inmates meet with Board of Prison Terms and attorneys.

4. Outreach and communication is ongoing with non-MH staff, including custody, medical/nursing, and religious services.

5. Senior Supervisors routinely tour ASU and EOP housing units, meeting with staff and inmates to identify at-risk inmates.

6. The SPRFIT Coordinator or designee attends Inmate Family Council (IFC) and Men's Advisory Council (MAC) meetings to represent MH and provide information regarding suicide prevention.

7. Suicide Prevention information pamphlets are provided throughout the institution for visiting personnel and inmates alike, and provided at IFC and MAC meetings.

**E. AUDITS**

Audits on processes described above will be conducted and reported to the Suicide Prevention and Response Focused Improvement Team and to the MHPS as indicated. Reference LOP 10-0006 Suicide Prevention and Response for details.
APPROVED:

_T. Meyers, MD_                          _10/15/15_
CHIEF OF MENTAL HEALTH                    Date

_Terese Macias_                          _10/28/15_
QUALITY MANAGEMENT COMMITTEE             Date

_Terese Macias_                          _10/28/15_
LOCAL GOVERNING BODY                     Date

ATTACHMENT:
Attachment A – HRMP Referral

(Orig: 3/2013) Revised: 8/2014, 10/2015          **Mental Health**          **Page 7 of 7**

**HRMP Group Referral Form** (08/12/2014)

Inmate name _____     CDC#_____     DOB _____

LOC (circle one)   MHCB/ EOP/CCCMS     Release Date_____     TABE score_____

Reason for referral to HRMP

_____

_____

Suicide attempt / self-harm history

_____

_____

The HRMP group utilizes a modified DBT skills model.  Each group will meet twice weekly for approximately 6 months.  There are currently several HRMP groups available, based on the IP's level of functioning.

_____                    _____
Referring Clinician (print legibly)                      Today's Date

Appendix II: Self-harm and Incident Reporting

**Institutional reporting of self-harm incidents:** All incidents of self-harm in the CDCR are reviewed by institutional staff members, including mental health clinicians. When an incident of self-harm occurs, regardless of the severity of injury sustained, mental health clinicians discuss the event with the patient and determine whether the intent was to die (thus a suicide attempt) or if the self-harm served some other purpose, such as to relieve tension states, without any intention to die. The self-harm database also includes data on self-harm incidents that result in death.

All incidents of self-harm are entered on a self-harm database. The self-harm database serves as a way for mental health clinicians to track incidents within a facility, to allow Regional and SMHP staff members a view of the frequency of self-harm across facilities, to identify patients for High Risk Management Lists or Program(s) within a facility, and to further examine risk factors. A sample High Risk Management Program policy is found in Appendix I.

When a suicide attempt involving serious bodily injury occurs in the CDCR, the incident is documented using CDCR Form 837, Serious Incident Report, and institution mental health staff members are notified of the incident. Each incident is also relayed through one of two reporting processes; the Daily Briefing Report (DBR) or the Administrative Officer of the Day (AOD) report. The information in either report is sent to the administration of the Division of Adult Institutions (DAI) and forwarded to the CDCR's SMHP. In some cases, a suicide attempt involving serious bodily injury results in death at a later time; the DBR or AOD report are updated in this case to reflect that a death by suicide has occurred. In such cases, the DBR or AOD report is updated to inform the DAI and the DAI Mental Health Compliance Team of a death by suicide.

**Institutional reporting of suicide:** In the event of the discovery of a suicide attempt in progress, emergency medical interventions are made until such time as the individual is pronounced deceased by a qualified physician. Correctional officers who come upon a suicide attempt in progress are to sound an alarm and initiate life saving measures until relieved by health care personnel. Officers are trained in CPR and in procedures to respond to emergencies, including in bringing cut-down kits to the scene of a suicide in progress.[50] Custody officers will assist health care staff members, including institutional responders and paramedics, in transporting the patient to the TTA and/or ambulance. In cases in which emergency interventions are not successful, the watch commander or senior custody officer is notified of the suicide and in turn notifies the Warden or the AOD of the death.[51] A CDCR Form 837, Serious Incident Report, is completed on all suicides.

The Chief Medical Executive or physician designee makes a report of the death by suicide within eight hours of the event. Medical information is provided in the CDCR Form 7229A *Initial Inmate Death Report*. This form, once completed, is distributed internally, to the county coroner's office, and to the Death Review Coordinator at headquarters. A separate form is completed by institutional mental health staff, form CDCR MH-7229B *Inmate Suicide*. This form is typically completed by the institutional SPR FIT Coordinator and contains information on prior suicide attempts, the results of recent suicide risk evaluations, etc.[52] The form is retained at the facility and sent to the SMHP. Once received, SMHP support staff ensures the suicide is entered into a log, reports the event to nursing leadership, and alerts the SMHP Suicide Response Coordinator to the event.

---

[50] MHSDS Program Guides, 2009 Revision, pages 12-10-21 to 12-10-23
[51] MHSDS Program Guides, 2009 Revision, pages 12-10-24
[52] *Id.*

Appendix III: Determination of Unknown Causes of Death

**Determination of unknown causes of death**: On occasion, a death will occur within a CDCR institution in which the cause of death is not immediately determined. These cases are classified as "Unknown Deaths." These cases receive special attention until the cause of death is determined. In order to track these deaths, a group of employees at the SMHP are assigned to review *all* notifications of deaths within the CDCR. As noted, each institution within the CDCR is required to make a report of death and to provide documentation on the provisional cause of a death in a CDCR 7229A. A completed CDCR 7229A contains a preliminary summary of the circumstances of the death and lists any underlying/significant medical conditions. These documents are uploaded to a SharePoint site that can be accessed by members of the Death Review Committee and the SMHP. Additionally, the Death Review Coordinator for the CCHCS produces a daily report on all CDCR deaths.

In 2015, a total of 330 inmates perished in the CDCR, with 159 of the decedents (48%) involved in the MHSDS at the time of death. Whenever a *Coleman* class member dies, the OSM is notified of the circumstances and cause of the death by the SMHP. In all cases in which the cause of death is provisionally listed as a suicide, an additional mental health review is completed by the institution and documented using a CDCR 7229B. In all such cases and whenever any inmate dies from suicide, the OSM is notified of the circumstances and the specifics of the suicide. At times, notifications to the OSM may be updated with the receipt of additional information, such as results from autopsies, toxicology screens, and so forth.

In the event that a death notification lists the cause of death as unknown or undetermined, the SMHP will track the case until the death is classified. On some occasions, the cause of death is classified quickly by institutional medical review. In other cases, the cause of death remains undetermined pending the receipt of autopsy or toxicology results. In such cases, the Death Review Committee will investigate the death and produce an initial cause of death as well as a final cause of death determination. In the meantime, the SMHP communicates with the institution and with the DRC on these cases until the cause of death is determined. A member of the SMHP also sits on the DRC to ensure all unknown deaths are reviewed and, when applicable, that the possibility of suicide has been closely and objectively considered.

The SMHP reviews unknown deaths in order to ensure that all deaths are accurately identified as either due to suicide or not due to suicide. Cases are identified for this additional review when the cause of death is overdose, to determine if the overdose is most likely accidental or intentional (suicide). Other cases are identified when the cause of death is potentially related to

mental health treatment needs and/or when the death may have resulted as the long-term consequence of a self-harm behavior.

The following guidelines are used to determine unknown deaths:

<u>Reviewers Determination of Unknown Deaths Guidelines</u>

1. Review the method of death to determine if there may have been an alternative reason (other than suicide) for the behavior (e.g., autoerotic asphyxiation, confusion and inability to form intent, purposeful intoxication, etc.).

2. If an overdose on substances is it reasonable the substance (illicit or prescribed) may have been used in an attempt to become intoxicated? (e.g., Tylenol is not likely to be used to become intoxicated; Klonopin may be).

3. Review recent mental health history and any past history of suicide attempts/self-harm behavior (check self-harm log). Did the inmate:
   - Voice suicidal ideation (including conditional suicidal ideation)?
   - Have admits to MHCB?
   - Engage in self-harm behavior?
   - Have a history of depression or mood disturbance?
   - Have a history of psychosis?

4. Review substance abuse history.
   - What substances were used?
   - Have there been any past overdoses?
     - o  If yes, what did the inmate say about them at the time?
   - What substance abuse treatment was offered?
   - How recent are reports of current use?

5. Review recent custodial information.
   - Was the inmate facing criminal charges?
   - Did the inmate lose an appeal?
   - Did the inmate have any recent losses?
   - Was there any bad news readily apparent?

6. Review medical information for the presence of:
   - Chronic pain
   - Terminal illness

7. Was there a suicide note or a note that could be construed as such?

<u>Appendix IV: Review of Individual Suicide Case Reviews</u>

Cases **EE to NN** were deaths initially classified as unknown deaths. Each of these cases was eventually determined to involve death due to drug overdose.

Case EE was provisionally determined to have had an illicit drug overdose per the CDCR 7229A completed at this death. Toxicology results indicated methamphetamine intoxication. Autopsy reports also determined no other cause of death; the death was ruled as an accidental drug overdose secondary to methamphetamine intoxication. Additionally, three baggies containing methamphetamine were found on EE during autopsy, secreted in various bodily orifices. The Combined Death Review Summary (CDRS) also determined methamphetamine overdose to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. Case EE had an extensive substance abuse history as well. All evidence in the case argued for an accidental overdose and not an intentional overdose (a suicide).

Case FF was provisionally determined to have had an anoxic brain injury that occurred on account of an illicit drug overdose (per the CDCR 7229A completed at his death). Toxicology results indicated methamphetamine intoxication. Autopsy reports determined the cause of death as an accidental drug overdose secondary to methamphetamine intoxication. Case FF was known to have significant substance abuse problems and had been found by custody officers the day before his death in possession of inmate-manufactured alcohol. The Combined Death Review Summary (CDRS) also determined methamphetamine overdose to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. He had a history of chronic back pain but pain medications were not implicated in his death. The evidence in this case is strong for an accidental overdose rather than for an intentional overdose (a suicide).

Case GG was listed as an unknown death per the CDCR 7229A. However, toxicology results were positive for methamphetamine intoxication. Autopsy reports determined the cause of death to be acute methamphetamine intoxication. Additionally, multiple bindles were found on Case GG during autopsy. The Combined Death Review Summary (CDRS) determined methamphetamine toxicity to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. Case GG had an

extensive substance abuse history as well. He had a history of knee pain for which he was treated with Tylenol; however, this medication was not implicated in his death. The evidence in the case argues for an accidental overdose and not an intentional overdose (a suicide).

Case HH was listed as an unknown death/probable overdose on his CDCR 7229A. However, toxicology results were positive for Fentanyl, a synthetic opioid. Autopsy reports determined the cause of death to be acute Fentanyl intoxication. The Combined Death Review Summary (CDRS) determined Fentanyl toxicity to be the cause of death. Additionally, the inmate's cell was searched, with a syringe and drug paraphernalia found in his property. No suicide note was found. Case HH had an extensive substance abuse history as well and had received a RVR on 6/29/15 for Possession of a Controlled Substance for Distribution. He was placed in ASU for several weeks but had returned to general population housing. On the other hand, Case HH did have a history of suicide attempts, including an intentional overdose attempt in 1995. He had also received recent bad news three months prior to his death. He was informed that his grandmother had died and he responded by swallowing a razor blade at the time. Case HH had a history of chronic back pain for which he was treated with Tylenol and Naproxen. These medications were not implicated in his death. The evidence in the case is complex, though there appears to be stronger evidence for an accidental overdose than for an intentional overdose.

Case II was listed as possible drug overdose on the CDCR 7229A completed at his death. Toxicology results were positive for Fentanyl intoxication. Autopsy reports determined the cause of death to be accidental drug overdose/Fentanyl intoxication. The Combined Death Review Summary (CDRS) also determined Fentanyl toxicity to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. He also had no known chronic pain issues. Case II had an extensive substance abuse history and was found at autopsy with multiple needle marks on his arm, with illicit drugs and syringes found in his cell as well. The evidence in the case argues strongly for an accidental overdose rather than an intentional overdose.

Case JJ was listed as an unknown death and provisionally as a death due to respiratory failure secondary to drug overdose (on CDCR 7229A). Case JJ was discovered in his cell with a syringe in his hand. The syringe was found to contain heroin, acetyl codeine, and papaverine (an opioid). Methamphetamine was not found in the tested syringe but was present per toxicology results. Prescribed medications were also found in his system but reported to "not excessive." The autopsy report determined the cause of death to be accidental drug overdose by the combined effects of acute heroin and methamphetamine intoxication and the prescribed medications. Multiple drug injection marks were found on the body. The Combined Death Review Summary (CDRS) also determined the cause of death to be overdose. The case had a history of suicide attempts, using attempted hanging and exsanguination. He was treated at the EOP level of care and had prior inpatient stays. The patient's father had passed away one month before the death.

Mental health notes reported that clinicians were working with the patient on bereavement issues and that Case JJ was denying suicidal thoughts, plans, or intent. Case JJ also had known chronic back pain and an extensive substance abuse history. The evidence in the case argues is somewhat equivocal, suggesting that suicidal motive could have been present but denied by the patient. However, the evidence is stronger for ongoing IV drug use, as noted by the track marks found in many places on the body, and for an accidental overdose, as noted from the contents of the syringe found at the time of discovery.

Case KK was listed as possible drug overdose per his CDCR 7229A. Toxicology results were positive for heroin intoxication. Autopsy reports similarly determined the cause of death to be heroin intoxication. Additionally, a number of hypodermic needles were found in Case KK's cell, suggesting a pattern of illicit drug use. The Combined Death Review Summary (CDRS) determined heroin toxicity to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. Case KK had an extensive substance abuse history. He had a history of back pain. The majority of evidence in the case argues for an accidental overdose rather than an intentional overdose (a suicide).

Case LL was listed as an unknown death per the CDCR 7229A. Case LL was known to have significant medical issues, including hepatic cirrhosis and Hepatitis C, prior to his death. However, toxicology results were positive for morphine intoxication. Autopsy reports determined that morphine intoxication was a tertiary cause of death with cirrhosis being the primary cause of death. The Combined Death Review Summary (CDRS) agreed with this determination; that is, that morphine ingestion was not the primary cause of death. Notably, Case LL did have a history of chronic neck and low back pain and he was treated with opiates. He also had a history of substance abuse problems. Case LL did not have a known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. The evidence in the case is suggestive of a death from medical illness with secondary accidental overdose with morphine. There is little or no evidence of an intentional overdose (a suicide).

Case MM was listed as an unknown death on the CDCR 7229A completed at the time. Toxicology results were elucidating, with both morphine and methadone found. The patient did have chronic back pain and was on multiple prescribed medications for pain. However, upon Death Review Committee study, both medications were found to be elevated, suggesting acute toxicity/intoxication. Additionally, Case MM's cell was found to have syringes, despite the fact that his opioid medications were crushed for administration. The medications were crushed on account of the severity of the inmate's substance abuse difficulties. The autopsy report on the case determined the cause of death was "acute morphine and methadone intoxication (hours)." The autopsy noted left-ventricular cardiac hypertrophy, pulmonary edema, and cirrhosis of the liver as well. Case MM was known to have hypertension, diabetes mellitus, type 2, hepatitis C, and end-stage liver disease. Case MM was in the MHSDS at the CCCMS level of care. He was

treated for anxiety and was in treatment groups for pain management. Mental health notes do not document concerns about suicidality and largely focus on pain symptoms. No suicide note was found in the case and there was no known receipt of bad news. The majority of evidence in the case argues for an accidental overdose rather than an intentional overdose (a suicide).

Case NN was provisionally listed as an unknown/possible drug overdose death on CDCR 7229A. His cellmate was initially suspected in his death, but no signs of trauma were found on the body. A cell search produced drug packaging materials. Case NN was known to have significant substance abuse issues. Post-mortem toxicology findings were positive for opiates, with autopsy results indicating acute opiate toxicity as the cause of death. The Combined Death Review Summary (CDRS) concluded that opiate ingestion/toxicity was the cause of death. Case NN was in the MHSDS at the CCCMS level of care. He reportedly was placed in CCCMS after being charged with heroin possession in 2014; he reported some distress upon placement in ASU. He improved while in ASU but was retained in CCCMS. Case NN had no known history of suicide attempts. He did have back pain issues, for which he was treated with Ibuprofen. Case NN had not received recent bad news and did not leave a suicide note. The evidence in the case weighs strongly on the side of an accidental overdose of opiates. There is little or no evidence of an intentional overdose (a suicide).

Appendix V: Suicide Response Procedures

**Reporting of a suicide to stakeholders:** When an inmate dies by suicide, members of the SMHP complete two formal notification processes. First, a death notification is written and sent to the OSM and contains details of the suicide. Second, a summary of the suicide is composed and sent to the Deputy Director of the SMHP and the Undersecretary of the DHCS. The Public Information Officer at the institution is assigned with any local notifications or reports regarding the death, including notifying the next of kin of the suicide.

**Institutional internal review process**: The internal process for reviewing suicides at CDCR institutions includes reviews by mental health, custody, and nursing/medical personnel employed at that site. The reviews are conducted first within disciplines and then within joint institutional reviews, such as during SPR FIT and emergency medical response committee meetings.

Each institution within the CDCR has a Suicide Prevention and Response Focused Improvement Team, or SPR FIT, with a Senior Psychologist-Specialist assigned to coordinate local prevention and response efforts. The institution's SPR FIT is established and maintained by the Mental Health Program subcommittee, with both committees part of local Quality Management

Committees.[53] Each institutional SPR FIT is responsible for monitoring and tracking all self-harm events, ensuring that appropriate treatment and follow-up interventions occur. When deaths by suicide occur, the local SPR FIT Coordinator is required to notify the SMHP, to provide assistance to mental health, custody, and nursing suicide reviewers, and to ensure the implementation of Quality Improvement Plans (QIPs) resulting from the suicide review.[54]

**External review processes**: CDCR's response to suicides includes several external reviews by trained representatives from various disciplines, including nursing, medical, custody, and mental health. Within three days of the suicide, reviewers are assigned from these disciplines at what is commonly referred to as the headquarters level. The role of each discipline's review is discussed separately below, but these disciplines collaborate with each other during the suicide review process, sharing initial findings, conducting reviews together, etc.

Trained custody and mental health reviewers conduct an on-site visit together within seven days of a suicide. Reviewers look at the deceased's property, listen to recorded phone calls, check trust account records, and talk with the Investigative Services Unit (ISU) of the specific prison. Reviewers evaluate the emergency response that took place during or after the suicide and review the medical and mental health services rendered in the case, if applicable. Reviewers will

---

[53] MHSDS Program Guides, 2009 Revision, pages 12-10-2 to 12-10-4
[54] *Id*

also talk with officers, clinicians, work or school supervisors, and cellmates who may have known the patient. Reviewers may gather information from other sources as well, such as through interviews of family members. After thorough chart review, reports are generated by each discipline, with a combined report, the Suicide Report, distributed and discussed in the Suicide Case Review.

Suicide Case Review (SCR) meetings review findings in the case within and across disciplines while sharing information with institutional leadership. The Suicide Report contains quality improvement plans (QIPs) that are presented at the SCR; these plans cross disciplines as well. Nursing, medical, and mental health disciplines additionally have peer review bodies that are able to review staff member performance whenever such a need is indicated. The external review process is completed when all QIPs have been successfully implemented or resolved in the case.

**DAI Mental Health Compliance Team (MHCT) reviews:** The reviews completed by DAI's MHCT focuses on the performance of custody staff members related to the suicide. The MHCT member reviews custody documentation and institutional records (i.e., SOMS). The MHCT member's role is to determine whether departmental suicide prevention practices and policies were followed by custody and counseling staff involved in the case. The MHCT reviewer, for example, evaluates whether custody officers followed procedure within an emergency response, how quickly the response was called once a suicide in progress has been discovered, and whether all custody staff responding to the suicide had received required training (e.g., in CPR) within set timelines (e.g., annually). The context of the suicide may necessitate additional review items. Most notably, if the individual was in a segregated or restricted housing unit at the time of the suicide, the MHCT reviewer will evaluate performance on tasks such as timeliness and quality of welfare checks, as specified by policy, whether inmates new to an ASU were placed in intake cells, and so forth. The MHCT reviewer also determines a timeline for the emergency response and for significant events leading up to the suicide. Finally, the MHCT reviewer will document any concerns noted and will recommend corrective action/QIPs.

**Nursing reviews:** At the same time as a suicide is reviewed by DAI's MHCT, a Nurse Consultant Program Reviewer (NCPR) is assigned by a Headquarters Chief Nurse Executive. The NCPR does not make an on-site visit, but reviews all health care record documentation as to the quality of nursing care in the case. Psychiatric technician practice is also covered within the nursing review. The NCPR and mental health case reviewer frequently consult on cases during the review period.

The NCPR generates a Nursing Death Review Summary (NDRS). The NDRS lists the primary cause of death, notes whether coexisting conditions were present prior to the death, summarizes medical history, reports what medications and medical treatment the patient was receiving, and documents significant events that occurred medically for the patient prior to and at the time of discovery. The NCPR determines if nursing standards of care were met within the emergency

response to the suicide and whether nursing standards of care were met in the overall medical care of the patient prior to the time of death.

**Death Review Committee reviews:** The CCHCS DRC reviews all causes of inmate mortality within the CDCR. When suicides occur, the DRC assigns a physician to serve as the medical reviewer. This physician works with the NCPR to look at all aspects of medical care received by the patient and will yield an opinion as to the cause of death. As needed, the SMHP reviewer may also consult with the CCHCS physician reviewer. The physician and NCPR produce a Combined

Death Review Summary (CDRS) on each case. The CDRS contains both an administrative review and a clinical mortality review of the case. In cases of suicide, the suicide case review report (discussed below) is reviewed by the Death Review Unit and addends or is integrated with the Combined Death Review Summary.[55]

**Statewide Mental Health Program (SMHP) reviews:** Simultaneously to custody, medical, and nursing reviews, a trained member of the SMHP is assigned to review each suicide. The assigned Mental Health Suicide Reviewer (MHSR) is typically a Sr. Psychologist, Specialist, who is tasked with completing a Suicide Case Review (SCR). The MHSR schedules an on-site visit with the institution and is accompanied by the custody reviewer. The site-visit is conducted within seven calendar days of the death. The site review consists of an inspection of the location of the suicide and of the means used in the death, a review of the deceased's personal property, and interviews of inmates, officers, medical, or mental health staff members who knew, interacted with, and/or treated the deceased. The deceased's property is inspected to see if there is any information present related to the suicide, such as a suicide note, letters to the inmate informing he/she of bad news, and so forth. Interviews focus on behavior and statements made in the days prior to the suicide, with questions about anything the deceased may have said about being distressed or suicidal in past days, weeks, or months. Photographs of the scene at the time of death and photographs of the autopsy are also made available. Phone records, trust accounts, toxicology reports, and other sources of information are also made available. The MHSR may contact family members of the deceased to gain additional information about the individual's state of mind, statements made prior to the suicide, etc.

In addition to the on-site review, the MHSR reviews extensive documentation from medical and custodial files. The focus of the MHSR's review will vary based on the factors in the case, though all relevant information is reviewed in each case. In some cases, the review will concentrate on mental health treatment while in the CDCR, in others on the quality of suicide risk assessment, in others on the presence or absence of distress when an inmate is placed in administrative segregation, and so on. SMHP psychiatry staff review the psychiatric care and consult with the MHSR. The MHSR will review information from each of the institutions where

---

[55] IMSPP Volume 1, Chapter 29.2

the deceased resided and will look at whether mental health policy and procedure was followed at each setting.

**Joint CDCR/DSH Suicide Reviews**: When a suicide occurs of an individual who resides at a DSH facility, or when a suicide occurs within 30 days of transfer from a DSH hospital, a joint review is conducted. The DSH's Mortality Interdisciplinary Review Committee (MIRC) reviews suicides that occur within the DSH, with input from the Suicide Case Review Committee (SCRC) at the CDCR. Joint CDCR MHSRs and MIRC reviewers look at the case collaboratively to evaluate the mental health, medical, custodial, and nursing care rendered in the case. A joint report is generated in each situation, with corrective action plans developed jointly. [56] The SCRC reviews QIP responses created through this process conjointly with the MIRC.

**Determination and tracking of Quality Improvement Plans**: Each Suicide Case Review report may include formal Quality Improvement Plans (QIPs) as applicable to the case. QIPs are developed based on the concerns raised by custody, nursing/medical, and/or mental health case reviewers. QIPs may represent areas of deviation from policy or procedure, departures from standards of care, or systemic issues that require examination, modification or innovation. QIPs may be written for any discipline and can focus on the specific institution where the suicide occurred. If systemic issues are identified, the QIP can be directed to the DCHS Suicide Prevention and Focused Response Team (DCHS SPR FIT), a team that can address statewide policies and practices. The DCHS SPR FIT team includes representatives from nursing, custody, legal, mental health, and mental health quality management. This representation allows the team to review issues and find solutions in a manner that is inclusive of disciplines and effective in addressing problems.

During Suicide Case Review teleconferences, the Suicide Case Review Committee (SCRC) will assemble and the case reviewer will read sections of the Suicide Report. The SCRC is made up of members of the CDCR Statewide Mental Health Program, DAI MHCU, Nursing Executives, the Office of Legal Affairs, and medical personnel (as needed). The SCRC also discusses the QIPs raised within the Suicide Case Review with the institution. Institutional staff can respond to and/or clarify concerns raised in the report, can raise additional concerns, or can discuss ways of meeting the requirements of QIPs. Since late 2015, experts from the *Coleman* court are present by phone and can raise additional concerns or issues. QIPs can also be written as pending concerns that need to be addressed *if* a fact or finding awaits further information, such as awaiting the results of a coroner's report to determine the time of death.

**Audits of SCR Quality:** The DHCS Quality Management Unit audits all SCRs for 15 items. SCR's are scored with required elements marked present or absent.

---

[56] DSH Administrative Letter AL2015-19, issued November 2015.

Appendix VI: Suicide Response Court-ordered and Internal Deadlines for Suicide Reports

Appendix VII: Memorandum "Designation of Suicide Prevention, Assessment and Training

| *Coleman* Deadlines per Program Guide * | | Internal Deadlines | |
|---|---|---|---|
| Assign suicide reviewer | Within 2 days | | |
| Reviewer visits institution | Within 7 days | | |
| Suicide report received at HQ | Within 30 days | | |
| | | Report reviewed, edited, QIPs developed and sent to all case review participants with request for feedback from reviewers | 5 days prior to case review<br><br>(no later than DAY 40 after DOD) |
| Suicide Case Review | Within 45 days | | |
| | | Final report edits | Within 1-2 days |
| | | Signed by MH Deputy Director | Within 1-2 days |
| | | Signed by DAI | Within 3-5 days |
| Final suicide report to institution | Within 60 days | | |
| QIPs completed at the Institution | Within 120 days<br><br>(**See internal deadline that requires this sooner from institution) | **_Please note_: this internal deadline is set for institutions to ensure SPR-FIT ability to comply with the Coleman deadline in the event that QIPs are inadequate and require amendment<br><br>QIPs completed and QIP report submitted to HQ | Within 45 days of institution's receipt of final report<br><br>(no later than DAY 105 after DOD) |
| Institution's QIP Report completed and submitted to HQ | Within 150 days<br><br>(**See internal deadline that requires this sooner from institution) | | |
| | | QIPs reviewed by committee | Within 10 days |
| | | QIPs signed by MH Deputy Dir. | Within 1-2 days |
| | | QIPs signed by DAI | Within 3-5 days |
| Implementation of QIP report sent to Special Master | Within 180 days | | |
| | | | |

**\* deadlines are calculated from date of death (DOD)**

Coordinator"

 

## CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | 8/14/2015 |
| **To:** | Chief Executive Officers |
| | Chiefs of Mental Health |
| **From:** | |
| | Timothy G. Belavich, Ph.D., MSHCA, CCHP-MH |
| | Director (A), Division of Health Care Services and |
| | Deputy Director, Statewide Mental Health Program |
| **Subject:** | **DESIGNATION OF SUICIDE PREVENTION, ASSESSMENT AND TRAINING COORDINATOR** |

Per the approved 2009 Mental Health Staffing Model, every institution with a mental health mission was allocated a fractional staff position for: Suicide Prevention (0.3), Mental Health Assessments/Evaluations (0.3) and Mental Health Training/Orientation (0.3) Coordination. These fractional responsibilities shall now be combined into one coordinator position.

Effective immediately, each institution must designate one Senior Psychologist, Specialist who will be responsible for the coordination of Suicide Prevention, Assessments/Evaluations, and Training/Orientation. The attached duty statement must be used for this position. No additional staff positions will be allocated for these duties.

For questions please contact Amy Eargle, Chief, Clinical Support, Statewide Mental Health Program via email at Amy.Eargle@cdcr.ca.gov.

Attachment

cc:  Angela Ponciano
     Amy Eargle, Ph.D.
     Laura Ceballos, Ph.D.
     Daryl Brown
     Nancy Whitham
     Regional Mental Health Administrators
     Regional Personnel Administrators
     Regional Health Care Executives

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

P.O. Box 588500
Elk Grove, CA 95758

STATE OF CALIFORNIA

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

*SHADED AREA TO REFLECT RECLASS POSITION NUMBER ONLY*

## DUTY STATEMENT

| | RPA | EFFECTIVE DATE: |
|---|---|---|

| CDCR INSTITUTION OR DEPARTMENT | POSITION NUMBER (Agency – Unit – Class – Serial) |
|---|---|
| California Correctional Health Care Services | 042-XXX-9287-XXX |

| UNIT NAME AND CITY LOCATED | CLASS TITLE |
|---|---|
| | Senior Psychologist, CF (Specialist) |

| WORKING DAYS AND WORKING HOURS | SPECIFIC LOCATION ASSIGNED TO |
|---|---|
| a.m. to p.m.  (Approximate only for FLSA exempt classifications) | |

| PROPOSED INCUMBENT (If known) | CURRENT POSITION NUMBER (Agency – Unit – Class – Serial) |
|---|---|

YOU ARE A VALUED MEMBER OF THE DEPARTMENT'S TEAM.  YOU ARE EXPECTED TO WORK COOPERATIVELY WITH TEAM MEMBERS AND OTHERS TO ENABLE THE DEPARTMENT TO PROVIDE THE HIGHEST LEVEL OF SERVICE POSSIBLE.  YOUR CREATIVITY AND INGENUITY ARE ENCOURAGED.  YOUR EFFORTS TO TREAT OTHERS FAIRLY, HONESTLY AND WITH RESPECT ARE CRITICAL TO THE SUCCESS OF THE DEPARTMENT'S MISSION.

Under the general direction of the Chief Psychologist, Correctional Facility (CF) or Chief of Mental Health Services, the Senior Psychologist, CF (Specialist), Suicide Prevention, Assessment, and Training Coordinator will be responsible for the Department's assessments, evaluations, suicide prevention, training, and orientation programs. Some travel is associated with this position.

| % of time performing duties | Indicate the duties and responsibilities assigned to the position and the percentage of time spent on each.  Group related tasks under the same percentage with the highest percentage first. *(Use addition sheet if necessary)* |
|---|---|
| | **ESSENTIAL FUNCTIONS** |
| 30% | Coordinate the institution's Suicide Prevention Program, Suicide Risk Evaluation Mentor Program, and mental health screening; consult with institution health care, custodial, and management staff on improving suicide prevention policies and procedures; chair the institution's Suicide Prevention and Response Focused Improvement Team; audit the institution's suicide prevention practices; collect and interpret data and other information on the institution's suicides, remain current in the field of suicide prevention; work with institution management to develop best practices; consult with clinical, custody, and management staff regarding mental health assessments and evaluations; perform quality management functions, prepare reports, and generate action plans as related to suicide prevention duties to improve mental health services delivery. |
| 20% | Provide training to institutional, clinical, and custody staff on suicide prevention, mental health issues and policies (e.g., completing the Mental Health Assessment for Rules Violation Reports [RVR], new employee orientation, Suicide Prevention/Crisis Intervention,) in order to ensure that inmate-patients have timely access to continuity of mental health care. Provide health care staff with the knowledge and specific strategies to interact more effectively with inmate-patients in the Mental Health Services Delivery System and Developmental Disabilities Program as directed by the Chief of Mental Health, and at the request of the In-Service Training Program; ensure training efficacy; address deficiencies as necessary. |
| 20% | Develop and provide training on clinical topics to mental health staff; provide training on mental health policy and initiatives; maintain training logs for clinical staff; ensure mandatory trainings for mental health staff are offered as needed; work closely with the Statewide Mental Health Program Training Unit to ensure training requirements are met; ensure integrity of training; remain current in the latest research, techniques, and tools in the field of correctional mental health. Use knowledge of criminal behavior, mental health issues, correctional settings, State and Federal mental health laws and regulations, and knowledge of each classification's scope of practice, to determine training requirements. |

STATE OF CALIFORNIA                                    CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

| 15% | Provide coordination of mental health assessments. Maintain psychological testing library. Remain current on available psychological tests and measures and evaluation techniques. Provide training and consultation regarding assessments and testing reports as needed. Perform audits of Mental Health Assessments for RVRs and review audit results. Develop action plans to address noted deficiencies. |
|---|---|
| 10% | Provide assessments and crisis interventions to inmate-patients within the program as needed. Perform special projects as assigned; interpret the objectives and procedures of the program to other staff. Implement time-limited projects in area of expertise in order to enhance existing programs, comply with departmental policies and procedures and/or court mandates, using consultations, organizational skills, communication skills, and research skills. Serve as a member of the Quality Improvement Team (QIT), as required. |
| 5% | Other related duties as assigned. |

**KNOWLEDGE AND ABILITIES**

*Knowledge of:* Principles, techniques, and trends in psychology with particular reference to normal and disordered behavior, human development, motivation, personality, learning, individual differences, adaptation, and social interaction; methods for the assessment and modification of human behavior; forensic psychology; characteristics and social aspects of mental and developmental disabilities; research methodology and program evaluation; institutional and social process, group dynamics; functions of psychologists in various mental health services; current trends in the field of mental health; professional training; and community organization and allied professional services.

*Ability to:* Provide professional consultation; teach and participate in professional training; recognize situations requiring the creative application of technical skills; develop and evaluate creative approaches to the assessment, treatment, and rehabilitation of mental disabilities, to the conduct of research, and to the development and direction of a psychology program; plan, organize, and conduct research, data analysis, and program evaluation; conduct the more difficult assessment and psychological treatment procedures; analyze situations accurately and take effective action; and communicate effectively.

**DESIRABLE QUALIFICATIONS**

Special Personal Characteristics: Empathetic understanding of patients of a State correctional facility; willingness to work in a State correctional facility; scientific and professional integrity; emotional stability; patience; alertness; tact; and keenness of observation.

**SPECIAL PHYSICAL CHARACTERISTICS**

Persons appointed to this position must be reasonably expected to have and maintain sufficient strength, agility, and endurance to perform during stressful (physical, mental, and emotional) situations encountered on the job without compromising their health and well-being or that of their fellow employees or that of inmates. Assignments may include sole responsibility for the supervision of inmates and/or the protection of personal and real property. Must be able to travel.

Adopted:
Revised:

STATE OF CALIFORNIA

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

| SUPERVISOR'S STATEMENT: *I HAVE DISCUSSED THE DUTIES OF THE POSITION WITH THE EMPLOYEE* | | |
|---|---|---|
| SUPERVISOR'S NAME (Print) | SUPERVISOR'S SIGNATURE | DATE |

| EMPLOYEE'S STATEMENT: *I HAVE DISCUSSED WITH MY SUPERVISOR THE DUTIES OF THE POSITION AND HAVE RECEIVED A COPY OF THE DUTY STATEMENT* | | |
|---|---|---|
| The statements contained in this duty statement reflect general details as necessary to describe the principal functions of this job. It should not be considered an all-inclusive listing of work requirements. Individuals may perform other duties as assigned, including work in other functional areas to cover absence of relief, to equalize peak work periods or otherwise balance the workload. | | |
| EMPLOYEE'S NAME (Print) | EMPLOYEE'S SIGNATURE | DATE |

Revised:_____

Adopted:
Revised:

Appendix VIII: Memorandum "Completed Contacts Associated with Suicide Risk Evaluation"

  CALIFORNIA CORRECTIONAL

# HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| **Date:** | 10/23/2015 |
| **To:** | Chief Executive Officers<br>Chiefs of Mental Health |
| **From:** | Timothy Belavich, Ph.D., MSHCA, CCHP-MH<br>Director (A), Division of Health Care Services and<br>Deputy Director, Statewide Mental Health Program |
| **Subject:** | **COMPLETED CONTACTS ASSOCIATED WITH SUICIDE RISK EVALUATIONS** |

Effective immediately, when a Suicide Risk Evaluation (SRE) Assessment (CDCR MH-7447) is completed by a clinician, the appointment scheduler shall simultaneously enter the SRE and a completed contact into the patient record in the Mental Health Tracking System (MHTS). Please refer to the Suicide Risk Evaluation Completed Contact Entry Process (attached) for instructions.

Additionally, clinicians shall enter their scheduled and un-scheduled SRE appointments on their daily log. The un-scheduled SRE appointments (i.e., MHCB assessment/placement) shall be entered retroactively and include start and stop times.

If you have questions or need additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@cdcr.ca.gov.

Attachment

cc: Angela Ponciano
    Amy Eargle, Ph.D.
    Laura Ceballos, Ph.D.
    Michael Golding, M.D.
    Edward Kaftarian, M.D.
    Jennifer Johnson
    Mental Health Regional Administrators
    Regional Health Care Executives

**HEALTH CARE SERVICES**

P.O. Box 4038
Sacramento, CA 95812-4038

**Suicide Risk Evaluation Completed Contact Entry Process**

When an SRE is completed by a clinician, the appointment scheduler shall simultaneously enter the SRE and a completed contact into the patient record in MHTS.

1. **Receive** completed SRE form from clinician.
2. **Enter** information from the SRE into MHTS.
   a. **Complete** the 7447-MH: Suicide Risk Assessment portion at the bottom of the screen from the information provided on the SRE, including unscheduled SRE's.



3. **Create** a contact to correspond with SRE.
   a. **Complete** the left sections of the screen to correspond with the information provided on the SRE. Include the following:
      i. Appointment date
      ii. Start and stop time
      iii. Clinician name and classification who conducted SRE
      iv. Reason for visit (choose from the drop down menu)



4. **Close** the created contact corresponding with the SRE.

Appendix IX: Memorandum "Suicide Prevention Pamphlets for Inmates" (with pamphlets attached)

**Help is Available Anytime!**

The CDCR Mental Health Services Delivery System provides mental health services to all inmates. Mental health services are private and can help you when you don't know where else to turn. Our trained clinical staff are available for:

- Dealing with Change
- Adjustment & Transition Issues
- Crisis Counseling
- Medication Services
- And much more

You are not alone! We are here to offer help & hope for a better today and future.



**CONTACT**
**Mental Health**

**What You Should Know:**

- **You are not alone!**
  Though sometimes you may feel like you are. Many people experience hard times and help is available.

- **Think before you act.**
  There are other options.

- **Keep yourself and your surroundings safe.**
  For example, avoid drugs, alcohol and/or storing up your medicine because they can make you feel worse and not think clearly.

- **Take all your medication as prescribed.**
  Don't stop or make changes to your medications unless you and your doctor decide this together.

- **Take only the medications that your doctor has prescribed to you.**

- **Know when you are not doing well and need help.**
  Make a list of how you are feeling and discuss it with someone you trust, like your primary clinician or psychiatrist.

- **Talk to someone you trust!**
  There are people who can help and support you.

**CONTACT**
**Mental Health**

**Warning Signs:**

- Using alcohol, drugs and other substances to cope
- Feeling trapped
- Feelings of shame and/or guilt
- Feelings of anger and/or rage
- Feelings of depression and/or anxiety
- Recklessness—feeling you have nothing to lose
- Receiving bad news, such as getting more time, learning an appeal was denied, or something from home
- Feeling isolated or alone (divorce, a death of a loved one, or news of an illness)
- Getting a serious medical diagnosis or chronic pain
- Being placed in administrative segregation
- Poor sleep
- Not enjoying things you used to like to do

**The following are very serious warning signs:**

- Feelings of wanting to die or not wake up
- Hearing voices or seeing things that others don't
- Feeling unbearable emotional or physical pain
- Making plans to kill yourself
- Sleeping all the time or not sleeping at all
- Saying "goodbye" to loved ones — writing letters
- Giving your personal property away

**CONTACT**
**Mental Health**



**Cuando necesita ayuda:**
- Hay ayuda disponible para Ud.
- Hable con alguien en quien tiene confianza o de quien se siente cercano
- Siga tomando todos sus medicamentos según las indicaciones
- Sea directo, abierto y honesto acerca de sus problemas
- Vaya a todas sus citas médicas y de salud mental
- Informe a cualquier miembro del personal si Ud. está teniendo dificultades

**Por favor, hable con el personal de la salud mental:**
- Contacte a cualquier miembro de la custodia
- Contacte a cualquier miembro del personal médico
- Contacte a cualquier miembro del personal de salud mental
- Llene un Formulario CDCR 7362 (Solicitud de Servicios de Atención a la Salud)

**¿Verdadero o Falso?**

No se puede detener a las personas que quieren suicidarse.
**_Falso_**

La mayoría de las personas con tendencias suicidas no quieren morir, solamente quieren que pare el dolor emocional.
**_Verdadero_**

Hablar sobre el suicidio sólo lo hará peor.
**_Falso_**

Hablar de sus sentimientos y de lo que está experimentando puede ayudarle a darse cuenta que necesita ayuda.
**_Verdadero_**

Si le digo a alguien que necesito ayuda, me pondrán en el programa de salud mental para siempre.
**_Falso_**

Todos necesitamos un poco de ayuda cuando tenemos dificultades. Hay ayuda a corto plazo y a largo plazo disponible para Ud.
**_Verdadero_**



¿Se siente solo?    ¿Se siente desamparado?

¿Está experimentando sentimientos de pérdida?    ¿Se siente temeroso?

¿Tiene apoyo familiar?

¿Tiene vergüenza?    ¿Se siente deprimido?

¿Se siente culpable?    ¿Se siente confundido?

*¡Hay Esperanza y Ayuda!*
*El Programa de*
*Salud Mental*
*CDCR*

Favor de contactar el Departamento de Salud Mental

Favor de contactar el Departamento de Salud Mental

# EXHIBIT F

**ANNUAL REPORT ON SUICIDES IN THE
CALIFORNIA DEPARTMENT OF CORRECTIONS AND
REHABILITATION
JANUARY 1, 2015 – DECEMBER 31, 2015**

**Table of Contents**

| | |
|---|---|
| *List of Tables* | 4 |
| *List of Figures* | 5 |
| *List of Appendices* | 6 |
| Executive Summary of the Annual Suicide Report | 7 |
| 1. Introduction and Summary of Findings | 8 |
|    a. Suicide definitions and terms used | 8 |
|    b. Review of Findings, Section 1: Current Year | 9 |
|       i. Number and rate of suicide in reporting year | 9 |
|       ii. Demographic factors | 9 |
|       iii. Marital status | 10 |
|       iv. Education, juvenile history, and work history | 11 |
|       v. Languages spoken | 11 |
|       vi. Health factors | 11 |
|       vii. Temporal factors | 11 |
|       viii. Custodial and correctional factors | 11 |
|       ix. Cell occupancy | 16 |
|       x. Job assignment | 16 |
|       xi. Means or method of suicide | 16 |
|       xii. Mental health factors | 17 |
|       xiii. Diagnoses | 17 |
|       xiv. Suicide attempt history | 18 |
|       xv. Suicide precipitants and behavior | 19 |
|    c. Review of Findings, Section 2: Current Year vs. Prior Years | 22 |
|       i. Comparison of rate between current and prior years | 22 |
|       ii. Suicides by institution, current year vs. 15-year average | 24 |
|       iii. Suicides in the CDCR by month, current year and 10-year average | 27 |
|       iv. Demographic factors | 27 |
|       v. Suicides by housing type | 29 |
|       vi. Time in segregated housing prior to death | 30 |
|       vii. Suicides by method | 31 |
|       viii. Involvement in mental health services | 31 |
|       ix. Suicides in mental health vs. non-mental health populations | 32 |
|    d. Review of Findings, Section 3: Comparison of CDCR Suicide Rates with Other State Prison Systems and Relevant U.S. Rates | 33 |
|       i. CDCR rates versus other state and federal prison rates | 33 |
|       ii. Comparison of rate between CDCR and the community | 34 |

    e.   Summary Review of Findings and Trends    35

2.   Response to suicide and suicide attempts    36
    a.   Institutional reporting of self-harm incidents    36
    b.   Determination of unknown causes of death    36
    c.   Suicide attempts and suicides prevented    38
    d.   Determination and tracking of Quality Improvement Plans    38
    e.   Determination whether a suicide is preventable or foreseeable    39
    f.   Audits of SCR Quality    40
    g.   Timeliness of Suicide Case Reviews and Suicide Reports    41

3.   Findings in individual case reviews    42
    a.   Introduction to individual case reviews    42
    b.   Commonalities in individual case reviews    42

4.   Review of suicide prevention initiatives in 2015    47
    a.   Introduction    47
    b.   Suicide prevention initiatives developed/implemented during the reporting year    47

5.   Conclusions    57
    a.   Introduction    57
    b.   Summary of findings    57
    c.   Report implications and future steps    59

## List of Tables

Table 1. *Racial/Ethnic Groupings of Suicides in the CDCR, 2015*                    10

Table 2. *Age Groupings of Suicides in the CDCR, 2015*                    10

Table 3. *Frequency of Suicide by the CDCR Institution, 2015*                    12

Table 4. *Frequency of Suicide by Housing Type, 2015*                    13

Table 5. *Type of Commitment Offense in Inmate Suicides, 2015*                    13

Table 6. *Suicides by Security Level, 2016*                    14

Table 7. *Suicides in the CDCR by Length of Sentence, 2015*                    15

Table 8. *Suicides in the CDCR by Amount of Time Served, 2015*                    15

Table 9. *Suicides in the CDCR by Time Left to Serve, 2015*                    16

Table 10. *Suicides in the CDCR by MHSDS Participation, 2015*                    17

Table 11. *Mental Health Diagnoses of Suicides in the CDCR, 2015*                    18

Table 12: *Suspected Precipitants to Suicides in CDCR by frequency, 2015*                    19

Table 13: *Individual Precipitants for Suicides within the CDCR, 2015*                    21

Table 14. 2015 *In-state, Out-of-state, mid-year
                Frequency and Rate of Suicide, by Gender*                    22

Table 15. *Annual Frequency and Rate of Suicide in the CDCR for 20 years,                    23
                by Gender and Overall, 1996-2015*

Table 16. *Frequency of Suicide by CDCR Institution, 2015 and by prior                    25
                15-year total and average (1999-2014)*

Table 17. *Frequency of Suicide within Segregated Housing, 2010-2015*                    30

Table 18. *Frequency of Suicide within MHSDS Levels of Care, 2010-2015*                    32

Table 19. *Frequency of Suicide in MH versus non-MH populations,
                average total population 2006-2015*                    32

Table 20. *Rate and rank of suicides by state, 2001-2014 (14 years)*                    33

Table 21. *QIPs assigned within the CDCR by recipient, 2015*                    39

Table 22: *Results of Quality Audits, 2015 Suicide Case Review reports*          *40*

Table 23: *Findings of Individual Case Reviews, part 1*          *43*

Table 24: *Findings of Case by Case Reviews, part 2*          *46*

**List of Figures**

Figure 1: *CDCR Suicide Rate and Frequency, with trend line, 2006-2015*          *24*

Figure 2: *CDCR Frequency by Month, 2015 and 10-Year Average*          *27*

Figure 3: *Suicide Frequency by Race, 2005-2015, with trend line*          *28*

Figure 4: *Number of Suicides by Age Group, 2010-2015*          *29*

Figure 5: *Length of Time in ASU before suicide, 2009-2015*          *31*

Figure 6: *Suicide rates for adult males in the CDCR, State Prisons, & the U.S., 2010-15*   *35*

## List of Appendices

I.   Sample High Risk Management Program policy                                      63

II.   Self-harm and Incident Reporting                                              71

III.   Determination Review of unknown deaths and overdose deaths                   73

IV.   Review of Individual Suicide Case Reviews                                     75

V.   Suicide Response Procedures                                                    79

VI.   Suicide Response Court-Ordered and Internal Deadlines for Suicide Reports     83

VII.   Memorandum "Designation of Suicide Prevention, Assessment and Training
        Coordinator"                                                               83

VIII.   Memorandum " Completed Contacts Associated with Suicide Risk Evaluations"   88

IX.   Memorandum "Suicide Prevention Pamphlets for Inmates"                         91
        (with pamphlets attached)

## Executive Summary of the Annual Suicide Report

In 2015 a total of 24 inmate suicides occurred within the California Department of Corrections and Rehabilitation (CDCR). This number is an increase of one from 2014. The frequency of suicides in 2014 and 2015 are the lowest consecutive yearly number of suicides in the CDCR since 2002. The rate of suicide in the CDCR was 18.6 suicides per 100,000 inmates in 2015 and 17.0 per 100,000 in 2014. The suicide rate in U.S. state prisons ranged from 14-17 per 100,000 per year between 2000 and 2013[1] and 20 per 100,000 in 2014.[2] Male prisoners in the CDCR had a lower rate of suicide rate than U.S. males in the community in 2014 and 2015.[3]

Suicides in 2015 largely match prior year's patterns with respect to time of year, prevalence in spring and fall months, greater frequency in high custody inmates (75% in Level III and Level IV housing), and a relatively high percentage of suicides in inmates involved in mental health programming (typically 50-60%). Suicides in 2015 were somewhat unlike prior year's patterns in that there were two female suicides and three suicides of inmates aged 70 and older.

Both the frequency and the rate of suicide have declined in the CDCR over the past 10 years (2006-2015). The frequency of suicide in the CDCR decreased from 43 in 2006 to 23 in 2015, while the rate of suicide in the CDCR declined from 24.9 per 100,000 in 2006 to 18.6 per 100,000 in 2015. The decline in suicide rate in the CDCR in 2015 compared to the prior 10 years can be attributed to fewer suicides within segregated housing units, lower rates of suicides in Caucasian and Hispanic/Latino inmates, and fewer suicides in inmates aged age 35-54.

Many suicide prevention initiatives are underway and/or continuing in the CDCR. These initiatives have emerged from Quality Improvement Plans (QIP) on deaths by suicide, from recommendations generated by tours, reviews, and audits, from advances in the field of Suicidology, from opportunities arising from the Mental Health Tracking System and the Electronic Health Record System, and so forth. These initiatives are meant to enhance a comprehensive, integrated system of suicide prevention and are detailed in the report that follows.

---

[1] Noonan, M, Rohloff, H., & Ginder, S., Mortality in Local Jails and State Prisons, 2000-2013 Statistical Tables, US DOJ, Bureau of Justice Statistics, August, 2015 NCH 248756

[2] Noonan, M. Mortality in Local Jails and State Prisons, 2001-2014 Statistical Tables, US DOJ, Bureau of Justice Statistics, December, 2016, NCJ 250150

[3] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870

**I. Introduction and Review of Findings**

This report reviews the 24 suicides by inmates of the CDCR which occurred during 2015. The report is submitted as part of joint efforts by the CDCR and the Office of the Special Master's (OSM) experts to work together to reduce the number of suicides within California's state prisons and is part of the CDCR's compliance with court-ordered remediation specified by the Special Master as part of the continuing review in the matter of *Coleman v. Brown*, No. (CIV S-90-0520 KJM KJN E.D.Cal.).

This report is unlike prior reports in that the report is generated by the SMHP with consultation by *Coleman* court experts. Prior reports submitted to the Special Master were written by the *Coleman* court's experts. The purpose of the report remains the same: To report on ongoing efforts to monitor suicides in the CDCR, to identify any trends in suicide that may indicate targets for suicide prevention efforts, and to provide recommendations for continued improvement. Additional detail is provided in this report as to the definitions, response efforts, monitoring, and other improvement processes and programs implemented by or used by the SMHP to prevent suicide. The report is prepared for the Special Master and has implications for the CDCR and for the work of the *Coleman* court's experts.

The primary source of data used for this report is the suicide case reviews completed by members of the SMHP who are trained in conducting these reviews. Additional sources include data obtained from the CDCR Office of Research, information garnered from reports by the CDCR Death Review Committee, information from prior annual suicide reports, and publically available information regarding suicide rates in community and incarcerated settings. Each suicide was also independently reviewed by this author in order to assess trends in data or findings. Input made by the OSM's experts, who attend each suicide case review by teleconference and consult on case review, provided added information for this report. Finally, members of the Quality Management unit, a separate unit within the SMHP, provided input through auditing each suicide case review report.

**A. Suicide definitions and terms used**

The CDCR is in the process of adopting definitions related to suicide that were developed by the Centers for Disease Control and the World Health Organization and have been widely-adopted in community settings. The OSM has been provided with a draft of the proposed changes to these definitions. As these changes are pending, the definitions used in the MHSDS Program Guide, 2009 Revision are listed below. Terms and definitions now considered obsolete are omitted from the listed provided here. Additionally, the term self-injurious is synonymous with self-harm. The

term self-harm is used frequently in this report as it conforms to both existing definitions and proposed definitions and is routinely qualified by the phrases "with intent" or "without intent."

1. <u>Suicide</u>: An intentional self-injurious behavior that causes or leads to death.

2. <u>Suicide Attempt</u>: An intentional self-injurious behavior which is apparently designed to deliberately end one's life, and may require medical and/or custody intervention to reduce the likelihood of death or serious injury.

3. <u>Suicidal Ideation</u>: Thoughts of suicide or death, which can be specific or vague, and can include active thoughts of committing[4] [that is, dying by] suicide or the passive desire to be dead.

4. <u>Suicidal Intent</u>: The intention to deliberately end one's own life.

5. <u>Self-injurious Behavior</u>: A behavior that causes, or is likely to cause, physical self-injury. [Note: The terms self-injurious behavior, self-mutilation, and suicide gesture are found in the MHSDS Program Guides, 2009 Revision, but are not used in this report. The term 'self-harm without intent' is used instead as the meaning is the same, self-harm for other reasons than death by suicide, and does not have the potentially negative connotations of terms such as 'gesture.']

**B.  Review of findings**

*Section 1: Current Year*

**Number and rate of suicide in reporting year:** There were 24 suicides in the CDCR in 2015. This represents an increase of one over the total in 2014, or an increase of 4%. The suicide rate in the CDCR for 2015 was 18.6 per 100,000. Rates of suicide are standardized by the number per 100,000 in order to make standardized comparisons between samples and populations. The total number of suicides in 2015 corresponds to a suicide on average every 15.2 days.

**Demographic Factors:** In 2015, 22 men and 2 women died by suicide in the CDCR. The rate of suicides in the CDCR was 17.8 per 100,000 for men and 35.5 per 100,000 for women. The rate of suicide for women fluctuates more dramatically than the rate for men, as there are many more males (123,268) than females (5,632) in the CDCR. To illustrate, one fewer female suicide would have lowered the female rate in 2015 by one-half, from 35.5 to 17.6 per 100,000. The same decline of one suicide in males would have lowered the frequency by 1 in 22, or from a rate of 17.8 to a rate of 17.0 per 100,000. A listing of suicides by gender, per year over 10 and 20 year periods is found in Table 15 in this report.

---

[4] The term 'committing' has fallen out of favor with Suicidologists, as the term implies some sort of success in carrying out a pledge or obligation. The favored term is rather straightforward—'died by suicide.'

The racial and ethnic backgrounds of inmates who died by suicide are represented in Table 1. Caucasians represented over half of all suicides despite comprising only 22% of the population within the CDCR. This finding has been typical of the racial breakdowns of suicides within the CDCR for many years.

Table 1. *Racial/Ethnic Groupings of Suicides in the CDCR, 2015*

| Racial Group | Frequency | Percent of Suicides | Percent of race within the CDCR |
|---|---|---|---|
| African-American | 5 | 21% | 29% |
| Caucasian | 13 | 54% | 22% |
| Hispanic/Latino | 4 | 17% | 42% |
| Other* | 2 | 8% | 6% |

*1 Chinese American female, 1 Japanese American male*

Table 2 contains a listing of age groupings within the CDCR, with the number and percentage of suicides for each group compared with the prevalence of the age group within the CDCR. Of note, four age groups had higher rates of suicide than their corresponding representation within the CDCR population during the reporting year (2015): Inmates ages 30-34, 45-54, 60-64, and 65 and older. The overrepresentation of older inmates in the year's suicides may bear further monitoring as a possible emerging trend. The three suicides of older inmates occurred in individuals aged 70-73. The average age of those who died by suicide was 42.9.

Table 2. *Age Groupings of Suicides in the CDCR, 2015*

| Age Group | Frequency | Percentage of 2015 Suicides | Percentage of CDCR Population |
|---|---|---|---|
| 18-24 | 2 | 8 | 12 |
| 25-29 | 3 | 13 | 16 |
| 30-34 | 5 | 21 | 16 |
| 35-39 | 2 | 8 | 14 |
| 40-44 | 2 | 8 | 11 |
| 45-54 | 4 | 17 | 10 |
| 55-59 | 1 | 4 | 6 |
| 60-64 | 2 | 8 | 3 |
| 65 + | 3 | 13 | 3 |

**Marital Status:** Marital relationships are thought to be a protective factor for inmates. This variable is protective for males in community studies and may function in a similar way for inmates as these relationships may offer support during incarceration.[5] In 2015, two suicides (one male, one female) occurred in married individuals, whereas nine suicides occurred in

[5] Kposowa, A. (2000). Marital status and suicide in the National Longitudinal Mortality Study. *Journal of Epidemiology and Community Health,* 54, 254-261.

separated or divorced inmates (including the second female) and 13 suicides occurred in single or never-married inmates.

**Education, Juvenile History, and Work History:** Three suicides occurred in inmates with some college education. The remaining 21 inmates had secondary educations, ranging from the 8th to 12th grade. Fifty-seven percent had a history of juvenile arrest, with 33% having a history of gang involvement. The majority of suicides occurred in inmates with limited employment history, typically in work classified as "unskilled labor." None of the suicides occurred in inmates who were in the Developmental Disability Program (DDP), though two inmates had some history of special education involvement.

**Languages Spoken:** One female inmate who died by suicide spoke Mandarin as her primary language. All others were primarily English-speaking.

**Health Factors**: Nearly half (46%) of the inmates who died by suicide in 2015 were considered to have serious and/or chronic medical problems. This ranged from problems with low back pain or headaches to cases of liver disease, diabetic neuropathy, cardiac problems, and legal blindness. In all cases, medical needs were determined to be adequately addressed according to nursing reviews. Implications of this finding for service delivery are explored later in this report.

**Temporal Factors:** Suicides occurred within the CDCR in nine months in 2015. That is, zero suicides occurred in three months. Four suicides occurred in one month (March) and five suicides occurred in each of two months (May and October). The prevalence of suicides in spring and fall months has been noted in prior years as well (*Figure 2* contains a breakdown of suicides by month over the current year and by a 10-year average).

In 2015, time of day of discovery did not vary significantly, with seven suicides occurring during first watch (2200 hours to 0600 hours), seven during second watch (0600 hours to 1400 hours), and ten during third watch (1400 hours to 2200 hours). This finding is similar to prior years.

**Custodial and Correctional Factors**: In 2015, suicides occurred at 13 institutions including an out-of-state facility. Table 3 lists suicides by institution. Any institutions that are not listed did not have a death by suicide in 2015.

Table 3. *Frequency of Suicide by CDCR Institution, 2015*

Table 3. *Frequency of Suicide by CDCR Institution, 2015*

| Institution | Frequency |
|---|---|
| California State Prison, Sacramento | 3 |
| San Quentin State Prison | 3 |
| Duel Vocational Institute | 3 |
| California Men's Colony | 3 |
| California Institution for Women | 2 |
| California State Prison, Corcoran | 2 |
| RJ Donovan Correctional Facility | 2 |
| California Medical Facility | 1 |
| California Correctional Institution | 1 |
| California Institution for Men | 1 |
| Folsom State Prison | 1 |
| California Health Care Facility | 1 |
| Tallahatchie County Correctional Facility | 1 |
| Total | 24 |

As can be seen, one-half of the suicides in 2015 occurred in four institutions, and 18 (75%) of the suicides occurred within seven institutions.

During 2015, 9 of the 24 suicides occurred in segregated housing settings (37%); seven in Administrative Segregation Units (ASU), one in a Security Housing Unit (SHU), and one in Short-Term Restricted Housing (STRH). Two inmates were in Reception Centers, one in a Correctional Treatment Center (CTC), and one in a Sensitive Needs Yard (SNY). The remaining 11 suicides occurred in general population settings. This information is depicted in Table 4.

Table 4. *Frequency of Suicide by Housing Type, 2015*

Table 4. *Frequency of Suicide by Housing Type, 2015*

| Housing Type | Frequency | Percent |
|---|---|---|
| Administrative Segregation | 7 | 29 |
| Security Housing Unit | 1 | 4 |
| Short-Term Restricted Housing | 1 | 4 |
| Reception Center | 2 | 8 |
| Correctional Treatment Center | 1 | 4 |
| Sensitive Needs Yard | 1 | 4 |
| General Population | 11 | 46 |
| Total | 24 | 99 |

A common finding in prison and jail settings is a preponderance of suicides in violent inmates and in inmates with higher level security needs; violent inmates have nearly three times the risk of suicide as non-violent inmates[6]. The commitment offenses of inmates who died by suicide in 2015 are listed below in Table 5. Notably, half of suicides occurred in individuals who had committed murder. Four other inmates had commitments for assault resulting in great bodily injury, one inmate had a commitment for battery, and two had a commitment for armed robbery (and thus the threat of assault was implied). Of the five commitment offenses considered non-violent, two resulted in significant injury but were seen as unintentional (driving under the influence resulting in injury or death). The remaining three suicides occurred in inmates who were committed for vehicle theft, burglary, or drug charges.

| Table 5. *Commitment Offenses in Inmate Suicides, 2015* | | |
|---|---|---|
| Type of Commitment Offense | N | Percent |
| **Violent Crimes Overall** | **19** | **79** |
| Murder | 12 | 50 |
| Assault w/ Great Bodily Injury | 4 | 17 |
| Armed Robbery | 2 | 8 |
| Battery | 1 | 4 |
| Sex Offense | 0 | 0 |

[6] Mumola, C. (2005), Bureau of Justice Statistics, located at: http://www.bjs.gov/content/pub/pdf/ardus05.pdf

| | | |
|---|---|---|
| **Non-Violent Crimes Overall** | **5** | **21** |
| DUI with injury/vehicular manslaughter | 2 | 8 |
| Vehicle theft | 1 | 4 |
| Burglary | 1 | 4 |
| Drug Charges | 1 | 4 |

In regards to security level, suicides occurred predominantly in higher security (Level III and Level IV) settings in 2015. Table 6 lists the number of suicides by security classification level. Level IV suicides have traditionally represented more than half of all suicides within CDCR. Of note, the classification system used by the CDCR was modified prior to 2015, with fewer inmates classified at the highest level, Level IV, which may account for some of the decline in Level IV inmate suicides in 2015.

| Table 6. *Suicides per Security Level, 2015* | | |
|---|---|---|
| Security/Classification Level | N | Percent |
| Level IV | 9 | 37.5 |
| Level III | 9 | 37.5 |
| Level II | 6 | 25 |
| Level I | 0 | 0 |

Another variable unique to correctional settings is the issue of sentence length: Total length of sentence, how much time an inmate has served prior to a suicide, and how much time an inmate had left to serve in prison prior to a suicide. These variables are captured in Tables 7, 8, and 9.

Table 7 shows that a slight majority of suicides (54%) occurred in inmates with Life sentences (including condemned individuals) in 2015. Inmates with Life sentences have historically made up roughly 20% of the population within the CDCR and are overrepresented in individuals who die by suicide. No suicides occurred in inmates with medium length sentences (11 to 20 years) in 2015.

Table 7. *Suicides in the CDCR by Length of Sentence, 2015*

Table 7. *Suicides in the CDCR by Length of Sentence, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| 1-5 years | 7 | 29 |
| 6-10 years | 3 | 13 |
| 11-20 years | 0 | 0 |
| 20+ years | 1 | 4 |
| Life with Possibility of Parole | 11 | 46 |
| Life without Possibility of Parole | 1 | 4 |
| Condemned | 1 | 4 |
| Total | 24 | 100 |

As seen in Table 8, individuals early within their sentence represent a high risk group. Five inmates died by suicide within their first year of incarceration; this included two individuals who died within 30 days of imprisonment. Three inmates who had served 20 years or more were among those who died by suicide in 2015.

Table 8. *Suicides in the CDCR by Amount of Time Served, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| 0-1 year | 5 | 21 |
| 1-5 years | 5 | 21 |
| 6-10 years | 7 | 29 |
| 11-20 years | 4 | 17 |
| 21+ years | 3 | 12 |
| Total | 24 | 100 |

The length of time remaining in sentences for those who died by suicide are shown in Table 9. There was nearly an even split between those with short to moderate sentences left to serve (46%) and those with lengthy sentences or indeterminate/life sentences (54%).

Table 9. *Suicides in the CDCR by Time Left to Serve, 2015*

| Sentence Length | Frequency | Percent |
| --- | --- | --- |
| 0-1 year | 0 | 0 |
| 1-5 years | 10 | 42 |
| 6-10 years | 1 | 4 |
| 11-15 years | 0 | 0 |
| 16 years or more (including Lifers) | 13 | 54 |
| Total | 24 | 100 |

The implications for the findings represented in Tables 7, 8, and 9 are considerable, suggesting the need to. These considerations will be discussed later in this report.

**Cell Occupancy:** In 2015, 25% of suicides occurred in inmates housed in designated double cells and 75% of suicides occurred within designated single cells. Of the six suicides in designated double cells, two suicides occurred in cells without a currently assigned cellmate, two inmates waited for a cellmate to leave for work or other programming before dying by suicide, one occurred outside of the cell (by jumping from a tier), and one occurred with a cellmate present but asleep. Of the nine suicides occurring in segregated housing settings, eight of the suicides occurred in single-person cells. The ninth suicide occurred in a double cell but without an assigned cellmate. Overall, 23 of the 24 suicides occurred within a single cell or within a solely occupied (at the time) double cell.

**Job Assignment:** The majority of inmates (62.5%) who died by suicide in 2015 did not have a job assignment or educational placement. Of the nine inmates who had program assignments, two were placed in educational settings, one (female) in a substance abuse program, and six were in traditional jobs (e.g., as a porter).

**Means or Method of Suicide**: Correctional settings necessarily limit the methods or means inmates can use to die by suicide. For example, suicides by firearms or carbon monoxide poisoning are unheard of in correctional systems. As with most correctional systems, hanging is the primary means used by inmates in the CDCR to die by suicide. Inmates have ready access to clothing and linen items that can be used for nooses and ligature points can be found in nearly all cells. In 2015, both female suicides were by hanging and 20 of the 24 suicides overall were by hanging (83%). The remaining four inmates (males) died by intentional overdose (2), asphyxiation (1), and jumping from a high place (1).

**Mental Health Factors:** The number and percentage of inmates who died by suicides in the CDCR in 2015 who were participants in the Mental Health Services Delivery System (MHSDS) is listed in Table 10. Mental health patients continue to be overrepresented in the year's suicides, a pattern that is typical in correctional and community settings.

Table 10. *Suicides in the CDCR by MHSDS Participation, 2015*

| Sentence Length | Frequency | Percent |
|---|---|---|
| No MHSDS participation | 10 | 42 |
| Correctional Clinical Case Management System | 9 | 37 |
| Enhanced Outpatient Program | 5 | 21 |
| Total | 24 | 100 |

Ten inmates were not in the MHSDS at the time of death. Six of these inmates (25% of the total number of suicides) had no history of participation in the MHSDS. Four inmates who were not in the MHSDS system at the time of death had previously been in the MHSDS at the Correctional Clinical Case Management System (CCCMS) level of care.

In 2015, 15 (62.5%) of the inmates who died by suicide had a history of mental health treatment prior to incarceration. Of these, 11 were in the MHSDS at the time of death, with one other having previously participated in the MHSDS. Eight cases (33%) had a family history of mental illness and/or family history of substance abuse treatment.

Upon entrance to the CDCR, inmates are screened for the possible presence of significant mental health disorders. Thirteen (55%) of the inmates who died by suicide in 2015 were identified as possibly having significant mental health disorders during initial screening. On subsequent mental health evaluations, 69% of those positive on screening were also found to have mental health conditions qualifying them for MHSDS services.

At the time of suicide, 14 inmates (58%) were on psychiatric medications. Three individuals (13%) had involuntary medication orders in place per Penal Code 2602. Eleven of the 24 (46%) had a history of Mental Health Crisis Bed placement or inpatient hospitalization. Eight (33%) had been psychiatrically hospitalized in the year prior to their suicide.

**Diagnoses:** The mental health diagnoses of individuals who died by suicide in 2015 are summarized in Table 11 and are listed by frequency. Please note that people can have multiple mental health diagnoses, thus the frequency of diagnoses in Table 11 exceeds the number of annual suicides. Additionally, all inmate suicides in 2015 involved individuals with some history of substance use or abuse. However, the diagnoses listed in Table 11 include substance use

disorders *only* if formally reported as a diagnosis. All diagnoses are based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 4th Edition or 5th Edition (DSM-IV or DSM-5).

When present, mood disorders and psychotic disorders were listed as the primary diagnosis of record. Of the individuals diagnosed with mood disorders, five were diagnosed with Major Depressive Disorder and four with Bipolar I Disorder. Five individuals were diagnosed with psychotic disorders; three with Schizophrenia, one with Delusional Disorder, and one with Psychotic Disorder NOS. Six inmates were diagnosed with Antisocial Personality Disorder and two of these six inmates were concurrently diagnosed with Narcissistic Personality Disorder.

Table 11. *Mental Health Diagnoses of Suicides in the CDCR, 2015*

| Diagnostic Category | Frequency | Percent |
| --- | --- | --- |
| Any DSM Disorder | 20 | 83 |
| Substance Abuse or Dependence | 13 | 54 |
| Mood Disorder<br>  Major Depressive Disorder (5)<br>  Bipolar I Disorder (4)<br>  Psychotic Disorder (5) | 9 | 38 |
| Personality Disorder | 6 | 25 |
| Psychotic Disorder<br>  Schizophrenia (3)<br>  Delusional Disorder (1)<br>  Psychotic Disorder NOS (1) | 5 | 21 |
| Adjustment Disorder | 4 | 17 |
| No Diagnosis | 4 | 17 |
| Anxiety Disorder | 1 | 4 |

**Suicide Attempt History:** A history of suicide attempts was found in 16 (67%) of the 24 cases of suicide in 2015. Of the group of 16, ten had made multiple past suicide attempts (42% of the overall total). Of those that had prior suicide attempts, 10 had reported at least one suicide attempt while in the community and eight had at least one suicide attempt while incarcerated. For the eight individuals who had suicide attempts during incarceration, a range of one to five prior attempts in prison were noted. The finding of 10 suicides within *Multiple Attempters,* a term indicating the presence of two or more suicide attempts with the intent to die, is significant as

this is a group with known high chronic risk.[7] Implications of this finding are discussed later in this report.

**Suicide Precipitants and Behavior:** Seven of the 24 individuals (29%) who died by suicide in the CDCR in 2015 wrote suicide notes. This is a bit higher than the rate (one in six or 17%) found in community samples.[8] A small percentage (17%) of the deaths occurred in inmates who reported having no interpersonal supports, while two reported having one person in their support system. The majority (75%) endorsed two or more supports during their most recent mental health or suicide risk evaluations. Only one of the 24 (4%) of the suicides occurred in a patient who was believed to be feigning distress or suicidality. Five of the 24 inmates who died by suicide in 2015 did so on a holiday, with one each on Christmas Eve, Memorial Day, 4th of July, Halloween, and Chinese New Year.

Suspected precipitants are event(s) that precede a death by suicide. These events may also be referred to as potential triggers to one's decision to end their life. The precipitants to the current year suicides listed or suspected by Mental Health Suicide Reviewer's (MHSR's) in their suicide case review reports were examined, and are presented in Table 12.

Table 12. *Suspected Precipitants to Suicides in the CDCR by frequency, 2015*

| Precipitant Category | Frequency | Percent of Total |
|---|---|---|
| Receipt of new charges, convictions, disciplinary actions, or added time in prison | 9 | 20 |
| Safety concerns, drug debts, fears of victimization | 7 | 15 |
| Mental health symptoms, e.g. anxiety, psychosis | 7 | 15 |
| Medical illness and/or pain issues; medical disability | 5 | 11 |
| Holidays or anniversaries of losses, crimes, etc. | 5 | 11 |
| Disruption in prison 'program;' e.g., transfer between facilities, cellmate change, loss of single cell housing | 4 | 9 |
| Conflict or losses of external supports | 4 | 9 |
| Conflict or losses of within prison supports | 3 | 6 |

---

[7] Rudd, Joiner, & Rajab (1996). Relationships among suicide ideators, attempters, and multiple attempters in a young-adult sample. *Journal of Abnormal Psychology*, 105, 541-550.
[8] Gelder, Mayou, and Geddes (2005). Incidence of note-leaving remains constant despite increasing suicide rates. *Psychiatry and Clinical Neurosciences*, 4 (1).

Table 12. *Suspected Precipitants to Suicides in the CDCR  by frequency, 2015*

| | | |
|---|---|---|
| Receipt of or anticipation of negative outcomes with the Board of Prison Hearings | 1 | 2 |
| Loss of parole to the community (e.g., due to added sentence, finding of MDO or SVP) | 1 | 2 |
| Totals: | 46 | 100 |

The precipitants listed in suicide case review reports can be divided roughly into ten categories as represented in Table 12. The frequency of precipitants is greater than the total number of suicides, as nearly all suicide case reviews listed more than one hypothesized precipitant. In many cases, the precipitants were not entirely clear. Rather, the precipitants identified by suicide case reviewers are marked by each inmate's idiosyncratic reasons for ending one's life. The frequency of certain categories of suicide precipitants has implication for prevention efforts as explored later in this report.

Additionally, Table 13 indicates the precipitant factors for suicides occurring in the CDCR in 2015 on a case by case basis. As is apparent, the majority of inmates had multiple potential triggers for the action. Also, in-prison events or stresses are noted in most, but not all, cases. Greg Dear and colleagues reported similar findings in Australian prisons with suicide attempters. When interviewed, prisoners reported two or more of five categories related to precipitants  for attempts, with the most common category (71% of incidents) being termed "stressful event that occurred within the prison" and second most common category (43% of incidents) being a consequence of imprisonment (e.g. placing a strain on family).[9] These themes are mirrored in the 2015 suicides within the CDCR and have been presented to CDCR clinicians in monthly suicide prevention videoconferences and in revised trainings in suicide risk evaluation.

---

[9] Dear, Thomson, Hall, & Howells (2001). Non-fatal self-harm in Western Australian prisons: Who, where, when, and why. *Australian & New Zealand Journal of Criminology*, 34, 47-66.

Table 13: *Individual Precipitants for Suicides within the CDCR, 2015*

| Case | Precipitants Noted |
|------|--------------------|
| A | Interpersonal losses/estrangement; notified of additional charges (rape case pending investigation); holiday (Halloween) |
| B | Received 3 year sentence extension (assault on peace officer); long ASU stay |
| C | Safety concerns/fear of victimization (went into protective custody); anxiety |
| D | Gang pressures; attempted to debrief; conflict with custody officers |
| E | Health concerns and complaints of pain; panic attacks; tearfulness around "no hope" of getting better medically; holiday (Chinese New Year) |
| F | Concerned about losing single cell and large amount of personal property; pending transfer; reports can't cell with others |
| G | Serious medical disabilities; possible distress regarding possible transfer |
| H | Parole denied by BPH; argument with main family support (daughter); new RVR; hoarded medication (for overdose) was found and charged for possession for sales |
| I | Dysphoria/hopelessness about the possibility of parole; requested/given CCCMS discharge; disciplinary infraction at work (faced losing assignment) |
| J | Health concerns (headaches); close custody status due to RVR; holiday (4th of July) |
| K | Paranoia/belief that family or other inmates intended to have the inmate stabbed |
| L | Multiple disciplinary actions; anniversary of step-son's suicide; accrual of drug debt; time added to sentence; cellmate moved out of cell; told of positive lab test (Hepatitis C); familial estrangement |
| M | Interpersonal problems/perceived rejection from other inmates on living unit |
| N | Medical illness (terminal) and pain issues; housing issues (SNY status; safety concerns); conflict with spouse |
| O | Convicted of murder of another inmate (incident occurred in 2012); received 45 years to life sentence and 25-month SHU term; lengthy ASU stay |
| P | Concern about drug debts and substance use relapse; familial estrangement; bothersome hallucinations; depression; holiday (Memorial Day) |
| Q | Fought with inmate and reported safety concerns; transferred during 5-day follow-up period after MHCB stay rescinded |
| R | Chronic illness/pain; 'bad news' about medical condition (liver cancer); researched Christian beliefs about suicide and the 'unforgiveable sin' prior to suicide |
| S | Safety concerns; requested Sensitive Needs Yard (SNY); complained of hallucinations and reported delusional beliefs |
| T | Concern about transfer (to a different prison) and feared losing single cell status; feelings of depression/worthlessness |
| U | Interviewed for Mentally Disordered Offender (MDO) status; found to meet MDO criteria—upset by this; somatic delusions; holiday (Christmas) |
| V | Inability to move in with in-prison romantic partner; reported having an enemy to move 'yards' and was taken to ASU rather than desired 'yard' |
| W | Delusions/hallucinations; less faith that legal appeal would be won |
| X | Agitation from hallucinations and delusions, increasing depression, facing SHU term |

## C. Review of findings

### *Section 2: Current Year vs. Prior Years*

**Comparison of suicide rate between current and prior years:** The suicide rate in the CDCR in 2015 was 18.6 per 100,000. This rate is higher than in 2014, when the rate was 17.0 per 100,000, reflecting both one more suicide in 2015 than in 2014 and a decrease in the inmate population of a little over 6500 from 2014 to 2015. The rate of 18.6 per 100,000 is the third lowest rate in the past 10 years. During the ten-year period, 2006 to 2015, the rate of suicide in the CDCR was 20.5 per 100,000.

Table 14, presents two mid-year (June 30th) frequency and rate of suicide calculations, by gender. The first calculation is in-state only and does not include the out-of-state CDCR inmate population in order to ensure consistency with past reports prepared by members of the OSM. The second rate includes the out-of-state population and is consistent with past internal methodology used by CDCR. The rate including the out-of-state population is the more meaningful number, as out of state suicides, when they occur, are included in the rate calculations. Furthermore, these individuals were remanded to CDCR custody which maintains responsibility for their welfare.

Table 14. *2015 In-state, Out-of-state and Overall Mid-year Frequency and Rate of Suicide, by Gender*

|  | Male | | | Female | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Population | Freq | Rate | Population | Freq | Rate | Population | Freq | Rate |
| Mid-year In-state only | 115,835 | 22 | 19.0 | 5,632 | 2 | 35.5 | 121,467 | 24 | 19.8 |
| Mid-year In-state and out-of-state total | 123,268 | 22 | 17.8 | 5,632 | 2 | 35.5 | 128,900 | 24 | 18.6 |

Table 15 shows the rate and frequency of suicide in the CDCR for the past 20 years. The table shows the rate and frequency of suicides by gender during each year as well. Of note, the frequency of suicides over the period has ranged from a low of 15 in 2000 to a high of 43 in 2006.

As mentioned earlier, the rate of suicide in female inmates fluctuates considerably compared to a relatively stable rate in male inmates. In 11 of the past 20 years, there were no female suicides. The number of suicides in female institutions has ranged from a low of 0 to a high of 4 within the time period; with 2 occurring in 2015.

For reference, population figures in all years were garnered from the CDCR's Office of Research. The population figures are reflective of mid-year (June 30th) of the respective year, following the previous practice of reports prepared by members of the OSM, the practice of the Federal Bureau of Justice Statistics and to remain consistent in CDCR's methodology for calculating suicide frequency and rate.

Table 15. *Annual Frequency and Rate of Suicide in the CDCR for 20 years, by Gender and Overall, 1996-2015\**

| Year | Male | | | Female | | | Total | | |
|------|------------|------|------|------------|------|------|------------|------|------|
|      | Population | Freq | Rate | Population | Freq | Rate | Population | Freq | Rate |
| 1996 | 131,273 | 19 | 14.5 | 9,744 | 0 | 0 | 141,017 | 19 | 13.5 |
| 1997 | 141,669 | 18 | 12.7 | 10,837 | 0 | 0 | 152,506 | 18 | 11.8 |
| 1998 | 147,001 | 21 | 14.3 | 11,206 | 0 | 0 | 158,207 | 21 | 13.3 |
| 1999 | 150,581 | 24 | 15.9 | 11,483 | 0 | 0 | 162,064 | 24 | 14.8 |
| 2000 | 150,793 | 15 | 9.9 | 11,207 | 0 | 0 | 162,000 | 15 | 9.3 |
| 2001 | 150,785 | 29 | 19.2 | 10,712 | 1 | 9.3 | 161,497 | 30 | 18.6 |
| 2002 | 148,153 | 22 | 14.8 | 9,826 | 0 | 0 | 157,979 | 22 | 13.9 |
| 2003 | 150,851 | 37 | 24.5 | 10,080 | 0 | 0 | 160,931 | 37 | 23.0 |
| 2004 | 152,859 | 23 | 15.0 | 10,641 | 3 | 28.2 | 163,500 | 26 | 15.9 |
| 2005 | 153,323 | 37 | 24.1 | 10,856 | 0 | 0 | 164,179 | 37 | 22.5 |
| 2006 | 160,812 | 39 | 24.3 | 11,749 | 4 | 34.0 | 172,561 | 43 | 24.9 |
| 2007 | 161,424 | 33 | 20.4 | 11,888 | 1 | 8.4 | 173,312 | 34 | 19.6 |
| 2008 | 159,581 | 36 | 22.6 | 11,392 | 0 | 0 | 170,973 | 36 | 21.1 |
| 2009 | 156,805 | 25 | 15.9 | 11,027 | 0 | 0 | 167,832 | 25 | 14.9 |
| 2010 | 155,721 | 34 | 21.8 | 10,096 | 1 | 9.9 | 165,817 | 35 | 21.1 |
| 2011 | 152,803 | 33 | 21.6 | 9,565 | 0 | 0 | 162,368 | 33 | 20.3 |
| 2012 | 128,829 | 32 | 24.8 | 6,409 | 1 | 15.6 | 135,238 | 33 | 24.4 |
| 2013 | 126,992 | 29 | 22.8 | 5,919 | 1 | 16.9 | 132,911 | 30 | 22.6 |
| 2014 | 129,268 | 21 | 16.2 | 6,216 | 2 | 32.2 | 135,484 | 23 | 17.0 |
| 2015 | 123,268 | 22 | 17.8 | 5,632 | 2 | 35.5 | 128,900 | 24 | 18.6 |

| 1996-2015 | 2,932,791 | 549 | 18.7 | 196,485 | 16 | 8.1 | 3,129,276 | 565 | 18.1 |
| 2006-2015 | 1,455,503 | 304 | 20.9 | 89,893 | 12 | 13.3 | 1,545,396 | 316 | 20.5 |

Notably, the rate of suicide within the CDCR has trended downward over the past 10 years (2006-2015). The trend line can be seen in Figure 1.

Figure 1: *CDCR Suicide Rate and Frequency, with trend line, 2006-2015*



**CDCR Suicide Rate and Frequency, 2006-2015**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| Frequency | 43 | 34 | 36 | 25 | 35 | 33 | 33 | 30 | 23 | 24 |
| Rate | 24.9 | 19.6 | 21.1 | 14.9 | 21.1 | 20.3 | 24.4 | 22.6 | 17 | 18.6 |

**Suicides by institution, current year vs. 15-year average**: Whereas Figure 1 represents suicides throughout the whole of the CDCR; the frequency of suicides by institution is a less stable variable. The higher frequency of suicide at some facilities versus others has many explanations. Variables such as the number of patients in the institution's mental health program, the mental health mission of the facility, the predominance of violent offenders at the site, and the total number of inmates at the institution are just some of the factors that contribute variance to *where* suicides occur. Fluctuations can occur in the number of suicides at an institution in given years due to cluster effects[10], changes in the use or mental health mission of the institution, and other factors. There are also subsets of suicides that occur during or upon transfer of an inmate from one institution to another, further complicating the interpretation of *why* suicides occur at certain institutions more frequently than others.

*Table 16* lists the number of suicides at CDCR Institutions in 2015 along with the total and average number of suicides at each institution over a 15-year period. The inclusion of 15-years of

---

[10] Hawton, Linsell, Adeniji, Sariaslan, & Fazel (2014). Self-harm in prisons in England and Wales: An epidemiological study of prevalence, risk factors, clustering, and subsequent suicide. *Lancet,* Vol. 383.

data allows current year data to be compared to averages over a significant period of time. The range of suicides on average per year for all facilities was 0.0 to 2.1. The mean for suicide for all institutions from 1999-2014 was 30.2 suicides per year.

| Table 16. *Frequency of Suicide by CDCR Institution, 2015 and by prior 15-year total and average (1999-2014)*<br><br>Institution | 2015 Frequency | Prior 15-year total (1999-2014) | Prior 15-year average (1999-2014) |
|---|---|---|---|
| California Health Care Facility | 1 | 0 | 0 |
| Tallahatchie County Correctional Facility | 1 | 0 | 0 |
| Department of State Hospitals-Salinas Valley | 0 | 1 | 0.1 |
| California Rehabilitation Center | 0 | 1 | 0.1 |
| Chuckawalla Valley State Prison | 0 | 1 | 0.1 |
| Valley State Prison | 0 | 2 | 0.1 |
| California Correctional Center | 0 | 2 | 0.1 |
| Ironwood State Prison | 0 | 2 | 0.1 |
| Atascadero State Hospital | 0 | 4 | 0.3 |
| Calipatria State Prison | 0 | 5 | 0.3 |
| Sierra Conservation Center | 0 | 5 | 0.3 |
| Centinella State Prison | 0 | 6 | 0.4 |
| California Institution for Women | 2 | 6 | 0.4 |
| Avenal State Prison | 0 | 7 | 0.5 |
| Department of State Hospitals-Vacaville | 0 | 7 | 0.5 |
| Central California Women's Facility | 0 | 7 | 0.5 |
| California State Prison, Solano | 0 | 10 | 0.7 |
| North Kern State Prison | 0 | 10 | 0.7 |
| Kern Valley State Prison | 0 | 11 | 0.7 |
| Pleasant Valley State Prison | 0 | 13 | 0.9 |
| Wasco State Prison | 0 | 13 | 0.9 |

| Institution | 2015 Frequency | Prior 15-year total | Prior 15-year average |
|---|---|---|---|
| Mule Creek State Prison | 0 | 14 | 0.9 |
| California Substance Abuse Treatment Facility | 0 | 15 | 1.0 |
| California Correctional Institution | 1 | 15 | 1.0 |
| California Training Facility | 0 | 16 | 1.1 |
| Pelican Bay State Prison | 0 | 16 | 1.1 |
| High Desert State Prison | 0 | 17 | 1.1 |
| Folsom State Prison | 1 | 18 | 1.2 |
| Deuel Vocational Institute | 3 | 19 | 1.3 |
| California Medical Facility | 1 | 21 | 1.4 |
| California Institution for Men | 1 | 22 | 1.5 |
| California State Prison, Los Angeles County | 0 | 22 | 1.5 |
| California State Prison, Corcoran | 2 | 24 | 1.6 |
| RJ Donovan Correctional Facility | 2 | 24 | 1.6 |
| California Men's Colony | 3 | 27 | 1.8 |
| San Quentin State Prison | 3 | 29 | 1.9 |
| Salinas Valley State Prison | 0 | 30 | 2.0 |
| California State Prison, Sacramento | 3 | 31 | 2.1 |
| Total | 24 | 453 | 30.2 |

**Suicides in the CDCR by month, current year and 10-year average:** CDCR data covering a 10-year period (2006-2015) shows little or no trend in the frequency of suicides in any given month. As in 2015, suicides tend to occur in the spring and fall months of the year. Suicides in the CDCR have traditionally not been associated with specific holiday periods, though in 2015 there were five suicides on holiday days (21%) spread over five different months.  See Figure 2. The prevalence of suicides in March, May, and October has not been explained. CDCR clinicians have noted this trend over several years.

Figure 2: *CDCR Frequency by Month, 2015and 10-Year Average*



**Demographic Factors:** Demographic variables specific to 2015 suicides are presented earlier in this report. These factors are presented here only as a means of comparing information from prior years with 2015 suicide data.

A depiction of suicides by race in 2015 and over the past 10 years is found in Figure 3. Caucasians comprise the largest group, comprising 48% of the suicides over the 10-year period and 54% of the suicides in 2015. Caucasian suicides have consistently fallen within a range of 14 to 20 per year. Hispanics/Latinos make up the second largest group, accounting for 30% of the suicides over the years represented. Hispanic/Latino suicides have a more variable range, from 5 to 15 in any given year. African-Americans account for 13% of the suicides during these years with a range from 2 to 7. The frequency of suicides in other racial groups is relatively small and typically at a range of 0 to 2 per year. The trend lines in Figure 3 suggest that the relative decline in suicides within the CDCR during 2014 and 2015 are in Caucasians and Hispanics/Latinos, the two groups who historically have the highest numbers of suicides within the CDCR.

Figure 3: *Suicide Frequency by Race, 2005-2015, with trend line*



Age is divided into five adult age brackets in Figure 4: Ages 18-24, 25-34, 35-44, 45-54, and 55 and above. In all but one year, 2012, the largest frequency of suicides in any age group was in individuals aged 25-34. Compared to the prior five years, 2010 to 2014, suicides in 2015 were somewhat lower in inmates aged 35-44 and 45-54, and slightly higher than most past years in ages 55 or older. The 55 and older age group had the second highest total in the past 6 years. In 2015, 25% of the suicides occurred in this age group, an age group that comprises 12% of the population of the CDCR. This number (25%) is similar to 2010, when 22% of suicides were in the 55 and over group, and dissimilar to other years: 9% in 2011, 15% in 2012, 7% in 2013, and 8% in 2014.

Figure 4: *Number of Suicides by Age Group, 2010-2015*



| | 18-24 | 25-34 | 35-44 | 45-54 | 55+ |
|---|---|---|---|---|---|
| 2010 | 3 | 10 | 8 | 7 | 7 |
| 2011 | 3 | 12 | 10 | 5 | 3 |
| 2012 | 0 | 8 | 12 | 8 | 5 |
| 2013 | 1 | 11 | 8 | 8 | 2 |
| 2014 | 2 | 7 | 7 | 5 | 2 |
| 2015 | 2 | 8 | 4 | 4 | 6 |

**Suicides by housing type:** Historically and in national and international studies,[11] segregated housing units have been a high-risk setting for suicide, particularly in single cell housing.[12] In the CDCR, segregated housing includes ASU, SHU, STRH, Long Term Restricted Housing (LTRH), Psychiatric Services Units (PSU), and the Condemned units at San Quentin State Prison and California Correctional Institution for Women. During 2015, nine of the year's 24 suicides occurred in segregated housing settings, representing 37.5% of all suicides. For reference, approximately 6.5% of inmates were housed in segregated housing at the mid-year point of 2015 (June 30, 2015). Calculating a rate per 100,000 in segregated housing may be misleading as the overall population is quite small and subject to wide swings in rate based on a single suicide.[13]

---

[11] World Health Organization (2007). *Preventing suicide in jails and prisons.* WHO Document Production, Geneva, Switzerland.
[12] *Id.*
[13] Based on a segregated housing population of 8,325 inmates on June 30, 2015.

Of the nine suicides that occurred in segregated settings in 2015, seven were in ASU, one in a SHU, and one in STRH. The number and percentage of suicides in segregated housing settings for 2015 and over the prior five year period is found in Table 17. As can be seen, the frequency of suicides in segregated housing decreased significantly in 2015 compared to prior years (2010-2014). Whereas 47% of suicides within the CDCR occurred in a segregated housing setting in the ten year period between 2004 and 2014 and 45% of suicides occurred in segregated housing on average in the ten year period from 2010 to 2014, 37,5% of suicides occurred in this setting during 2015. This may represent changes adopted within the CDCR leading up to and occurring within the reporting year, such as implementation of safety/wellness checks using the Guard One system and initiation of enhanced mental health services for MHSDS participants in segregated settings (e.g., STRH and LTRH units). Also of note, inmates in single-cell housing accounted for eight of the nine suicides (89%) within segregated housing units in 2015. This percentage is consistent with prior years. The percentage of suicides in segregated housing units that occurred in single cell housing in the prior five years was 100% in 2010, 86% in 2011, 91% in 2012, 100% in 2013, and 86% in 2014.

Table 17. *Frequency of Suicide within Segregated Housing, 2010-2015*

| Year | Frequency | Percent of Annual Suicides |
| --- | --- | --- |
| 2010 | 13 | 37 |
| 2011 | 14 | 42 |
| 2012 | 13 | 41 |
| 2013 | 14 | 47 |
| 2014 | 13 | 57 |
| 2015 | 9 | 37.5 |

**Time in Segregated Housing Prior to Death:** In 2015, nearly half of the suicides that occurred in segregated housing occurred soon after placement. Three of the nine suicides occurred in intake cells, indicating stays of less than 72 hours (Cases H, K, and V). A fourth case had been in ASU for six days and had just arrived for a temporary stay at an institution while in route to another institution (Case Q). The remaining five cases were in segregated housing units for 100 days or more at the time of death (Cases B, C, D, O, and X).

Data on the number of days between ASU placement and deaths by suicide has been tracked since 2009. Over this seven-year period (2009-2015), suicides tended to occur shortly after placement, particularly in the first 72 hours after placement. Of course, fewer inmates are present

in ASU as lengths of stay increase. Figure 5 shows the distribution of deaths by suicide following placement.

Figure 5: *Length of Time in ASU before suicide, 2009-2015*



**Suicides by Method:** The rate of suicide by hanging, easily the most frequent method for suicides in prison settings, has remained relatively stable over the past number of years. In 2015, 83% of suicides were by hanging. The percentage of suicides that were by hanging was 77% in 2010, 88% in 2011, 91% in 2012 and 2013, and 87% in 2014.

**Involvement in Mental Health Services:** The percentage of suicides that occur in inmates with identified mental health needs is a complex variable. Suicide is a phenomenon that can occur in individuals who do not have a traditional mental health diagnosis and in inmates with no prior identified mental health needs. Inmates can avoid mental health services by choice, such as by denying symptoms on screening or by masking symptoms in order to be discharged from the Mental Health Services Delivery System (MHSDS). It is not uncommon for suicidal individuals to distrust mental health clinicians when contemplating suicide, concerned that clinicians may in some way remove a valued option (death) should life so dictate.[14] Yet suicides occur in

---

[14] Jobes, D. (2016). Managing Suicidal Risk: A Collaborative Approach (2nd Edition). Guilford Press, New York.

individuals who have been identified as meeting criteria for participation in the MHSDS and who were receiving services in the MHSDS at the time of death. Table 18 lists the numbers of suicides at each level of MHSDS involvement for 2015 and for the prior five years.

Table 18. *Frequency of Suicide within MHSDS Levels of Care, 2010-2015*

| Year | Non-MHSDS | CCCMS | EOP | MHCB /DSH | % in MHSDS |
|------|-----------|-------|-----|-----------|------------|
| 2010 | 15 | 12 | 8 | 0 | 57 |
| 2011 | 10 | 10 | 13 | 0 | 69 |
| 2012 | 14 | 12 | 5 | 1 | 55 |
| 2013 | 14 | 9 | 6 | 1 | 53 |
| 2014 | 1 | 12 | 9 | 1 | 96 |
| 2015 | 10 | 9 | 5 | 0 | 58 |

**Suicides in Mental Health vs. Non Mental Health Populations:** Table 19 shows the suicide rate for MHSDS vs. non-MHSDS, as the average total CDCR populations over the past ten years, including 2015. This information was derived from the Health Care Placement Oversight Programs (HCPOP) monthly trends reports. The population totals may vary slightly from other referenced population totals within this report, as the data from HCPOP is collected a different points of time, and utilizes total population averages. As can be seen, the rate of suicide in those involved in the MHSDS is significantly higher than for individuals who have not been included in the MHSDS. This suggests a need to carefully work with existing mental health population members to reduce the risk of suicide. Targeted, suicide-specific interventions for individuals within the MHSDS remain an area that is potentially fruitful in preventing suicides; this will be discussed further later in this report.

Table 19. *Frequency of Suicide in mental health versus non-mental health, average total populations, 2006-2015*

| Year | MH Pop | MH Freq | MH Rate | Non-MH Pop | Non-MH Freq | Non-MH Rate | Total Pop | Total Freq | Total Rate |
|------|--------|---------|---------|------------|-------------|-------------|-----------|------------|------------|
| 2006 | 32,327 | 20 | 61.8 | 139,015 | 23 | 16.5 | 171,342 | 43 | 25.1 |
| 2007 | 33,148 | 25 | 75.4 | 138,431 | 9 | 6.5 | 171,579 | 34 | 19.8 |
| 2008 | 34,854 | 18 | 51.6 | 131,887 | 18 | 13.6 | 166,741 | 36 | 21.6 |
| 2009 | 35,677 | 19 | 51.0 | 125,201 | 6 | 4.8 | 160,878 | 25 | 15.5 |
| 2010 | 37,140 | 20 | 53.8 | 119,555 | 15 | 12.6 | 156,695 | 35 | 22.3 |

| 2011 | 37,140 | 23 | 61.9 | 113,182 | 10 | 8.8 | 150,322 | 33 | 20.3 |
| 2012 | 33,613 | 18 | 53.5 | 93,892 | 15 | 16.0 | 127,505 | 33 | 25.9 |
| 2013 | 34,477 | 16 | 46.4 | 90,098 | 14 | 15.5 | 124,575 | 30 | 24.1 |
| 2014 | 37,322 | 21 | 56.3 | 89,192 | 2 | 2.2 | 126,514 | 23 | 18.2 |
| 2015 | 37,146 | 15 | 43.1 | 92,197 | 9 | 9.8 | 129,343 | 24 | 18.6 |
| **Average** | **35,284** | **20** | **55.5** | **113,265** | **12** | **10.6** | **148,549** | **32** | **21.1** |

## D. Review of Findings

*Section 3: Comparison of CDCR Suicide Rates with Other State Prisons Systems and Relevant U.S. Rates*

**CDCR Rates vs. Other State and Federal Prison Rates**: State prison suicide rates have varied little over a number of years. The rate of suicide in U.S. state prisons ranged from 14 per 100,000 to 17 per 100,000 from 1999 to 2013[15], with a rate of 15 suicides per 100,000 prisoners in U.S. state prisons in 2013. However, the U.S. prison rate jumped by 30% between 2013 and 2014, rising to 20 per 100,000 inmates.[16] No explanation for this increase has been offered. Rates for U.S. prisons for 2015 are not available at this time.

Suicide rates for all federal and state prisons were calculated by the Bureau of Justice Statistics for the years 2001-2014.[17] A listing of state rates is found in Table 19. California's rate is listed twice in Table 19. One listing is for the composite rate for the CDCR from 2001-2014 and the second rate is for the year 2015 only. California ranks in the middle one-third of states in rank and rate. In 2015, California's rate of prison suicides ranked as 20th among state prisons.

Table 20. *Rate and rank of suicides by state, 2001-2014 (14 years)*

| State Name | Rank (Highest to Lowest Rate) (t=tie) | Suicide Rate per 100,000 |
| --- | --- | --- |
| Rhode Island | 50 | 45 |
| Utah | 49 | 44 |
| Montana | 48 | 34 |
| Massachusetts | 47 | 32 |
| New Hampshire | 46 | 31 |
| Alaska | 46t | 31 |
| Hawaii | 44 | 29 |
| Idaho | 43 | 28 |
| South Dakota | 43t | 28 |

[15] Noonan, M. *Mortality in Local Jails and State Prisons*, 2000-2013 – Statistical Tables, August 2015, Website, U.S. Department of Justice, Bureau of Justice Statistics.
[16] Noonan, M. Mortality in Local Jails and State Prisons, 2001-2014 Statistical Tables, US DOJ, Bureau of Justice Statistics, December, 2016, NCJ 250150
[17] *Id.*

| State Name | Rank (Highest to Lowest Rate) | Suicide Rate per 100,000 |
|---|---|---|
| Delaware | 41 | 26 |
| Vermont | 41t | 26 |
| Connecticut | 39 | 24 |
| New Mexico | 38 | 23 |
| Nebraska | 37 | 21 |
| New York | 37t | 21 |
| *All State Prisons, 2015* | | *20* |
| Iowa | 35 | 20 |
| ***Chart continues on next page*** | | |
| **State Name** | **Rank (Highest to Lowest Rate)** | **Suicide Rate per 100,000** |
| Maryland | 35t | 20 |
| California (2001-2014) | 35t | 20 |
| Wisconsin | 32 | 19 |
| Oklahoma | 32t | 19 |
| *California (2015)* | | *18.6* |
| Colorado | 30 | 18 |
| Minnesota | 30t | 18 |
| Wyoming | 30t | 18 |
| Arizona | 27 | 17 |
| Nevada | 27t | 17 |
| Arkansas | 27t | 17 |
| ***All State Prisons, 2001-2014*** | | *16* |
| Indiana | 24 | 16 |
| Illinois | 24t | 16 |
| Texas | 24t | 16 |
| Oregon | 24t | 16 |
| Pennsylvania | 24t | 16 |
| Tennessee | 18 | 15 |
| Kansas | 17 | 14 |
| Ohio | 16 | 13 |
| South Carolina | 16t | 13 |
| New Jersey | 16t | 13 |
| Washington | 16t | 13 |
| Mississippi | 16t | 13 |
| Missouri | 11 | 12 |
| Maine | 10 | 11 |
| ***U.S. Federal Prisons (2001-2014)*** | | *10* |
| Virginia | 9 | 10 |
| Georgia | 9t | 10 |
| Kentucky | 7 | 9 |
| Louisiana | 7t | 9 |
| West Virginia | 5 | 8 |
| Florida | 5t | 8 |
| North Carolina | 3 | 7 |
| Alabama | 2 | 6 |
| North Dakota | 1 | 5 |

**CDCR Rates vs. Community Rates:** It is notable that the rate of suicide in the community within the United States reached a 30 year high in 2014, reaching an overall national rate of 13.4 per 100,000. The rate of suicide rose 24% overall between 1999 and 2014[18]. The U.S. rate increased again in 2015 to 13.8 per 100,000.[19] For adult males in the U.S., the rate of suicides was 21.1 per 100,000 in 2014[20] and 21.5 per 100,000 in 2015[21], topping the rate of suicides in the (mostly male) CDCR in 2014 (17.0 per 100,000) and 2015 (18.6 per 100,000). Figure 6 shows the rate of suicides in adult males in the U.S., in U.S. prisons, and in the CDCR for the years 2010 to 2015. Suicide rates for state prisons are not available after 2014.

Figure 6: *Suicide rates for adult males in the CDCR, State Prisons, and the U.S., 2010-2015*



| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| CDCR Overall | 21.1 | 20.3 | 24.4 | 22.6 | 17 | 18.6 |
| U.S. State Prisons | 16 | 14 | 16 | 15 | 20 | |
| CDCR Males | 21.8 | 21.6 | 24.8 | 22.8 | 16.2 | 17.8 |
| U.S. Males | 19.8 | 20 | 20.4 | 20.3 | 20.7 | 21.5 |

◆ CDCR Overall   ■ U.S. State Prisons   ▲ CDCR Males   ✕ U.S. Males

## E. Summary Review of Findings and Trends

In reviewing suicides within the CDCR during the reporting year, 2015, a suicide rate of 18.6 per 100,000 is noted. The rate of CDCR suicides is below the average rate of all U.S. state prison systems combined in 2015[22]. The rate of suicides in the CDCR in 2014 was also lower than the average suicide rate for state prisons in 2014; the last year in which such data is available. Additionally, the rise in the community rates of suicide, particularly for males, has increased

---

[18] http://www.nytimes.com/2016/04/22/health/us-suicide-rate-surges-to-a-30-year-high.html?_r=0
[19] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870
[20] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2014/StatesSexTABLE2014.pdf
[21] http://www.suicidology.org/Portals/14/docs/Resources/FactSheets/2015/2015datapgsv1.pdf?ver=2017-01-02-220151-870
[22] Based on 2014 U.S. Prison data

significantly over the past decade. Adult males in the community in the U.S. were more likely to die by suicide than male inmates within the CDCR in both 2014 and 2015.

Some trends are noted in years 2014 and 2015. First, fewer inmates aged 25-54 died by suicide than in prior years. Second, the rates of suicide in Caucasian and Hispanic inmates in CDCR have fallen rather significantly in the past 10 years. The majority of suicides in the CDCR have occurred within these two racial groups for many years. Third, a decline in the frequency of suicides in segregated housing units was noted in 2015; this finding may reflect the decreasing percentage of the inmate population housed in such settings as well as the many efforts implemented to improve safety from suicide in these settings. Other factors reviewed appear to simply indicate yearly and/or unstable fluctuations in suicides, such as in timing of suicides (e.g., month of suicide, time of discovery), frequency in specific institutions, and the rate of involvement in mental health systems of care.

In looking at the group of individuals who died by suicide in 2015 within the CDCR, specific risk factors remain clear: Caucasian race, single/divorced marital status, serious or chronic medical disease or pain, spring and fall months, history of violent offenses, housing in higher security settings, life or long sentences, single-cell housing, lack of job assignment, mental health treatment prior to and during incarceration, prior suicide attempts, and prior psychiatric hospitalization. Other variables seem to be possible trends to monitor, such as increased suicides in older inmates (those age 60 or above), fewer suicides within segregated housing units, and more suicides on or around holiday periods. The reasons for suicide for inmates within the CDCR remains rather idiosyncratic and complex, with most suicide reviewers determining multiple precipitants (or triggers) for suicide. Suicides most commonly occurred on account of in-prison stressors (safety concerns, receipt of additional charges, transfers, etc.); medical illness, pain or disability; acute psychiatric symptoms; conflicts with others; and important dates (anniversaries of losses or crimes, holidays).

## Chapter II. Response to Suicide and Suicide Attempts

**Institutional reporting of self-harm incidents and suicides:** All incidents of self-harm in the CDCR are reviewed by institutional staff members (including mental health clinicians) and all incidents of self-harm are entered and tracked on a self-harm database. These processes allow for tracking patients in High Risk Management Lists or Program(s) within a facility. A sample High Risk Management Program policy is found in Appendix I. Suicides are reported by the Chief Medical Officer or designee to stakeholders, including the SMHP and the OSM. Processes involved in institutional reporting of self-harm events and suicides are found in Appendix II.

**Determination of unknown causes of death**: When deaths occur in a CDCR institution in which the cause of death is not immediately determined, the cases are classified as "Unknown Deaths." These cases receive special attention until the cause of death is determined, particularly

as any that could possibly involve suicide need to be determined in a timely fashion. The process for reviewing these deaths and making a determination may be found in Appendix III

In 2015, a total of 44 cases were tracked as the cause of death was listed provisionally as unknown. Nineteen of the 44 cases had no provisional cause of death, whereas 25 cases had a suspected or "probable" cause of death listed. In two cases, suspicion of a suicide was present and was confirmed by autopsy, toxicology finding, and/or coroner's report. These cases, Case T, who died of an overdose on a prescribed medication, and Case P, who died of asphyxiation during an acute intoxication illicit drug, are reviewed later in this report. Additionally, two cases were determined to be accidental overdoses due to findings of ingested balloons during autopsy; ingesting balloons filled with narcotics is a method for concealing and/or transporting illicit drugs in prison (Cases OO and PP).

Of the remaining four cases, 23 were determined by the Death Review Committee (DRC) to have died by natural causes: Pulmonary embolism, myocardial infarction, coronary artery disease, hypertension, cardiomyopathy, and so forth. Three of the remaining cases were determined to be deaths by homicide.

The 14 remaining cases met criteria for additional review, as they involved either overdose (10 cases), the case was pending further information (three cases), or the death potentially related to mental health treatment needs (one case). In this later death (Case AA), the cause of death was provisionally termed inanition secondary to acute psychosis. That is, the patient was thought to have died on account of the medical consequences of refusing to eat. His lack of intake was attributed to acute psychosis. Though the initial finding of inanition was mentioned, reviewers on the Combined Death Review Summary noted the pathologist's use of the term "well-nourished" and determined the patient had gained roughly 20 pounds in the two years prior to his death. The patient denied suicidal ideation upon evaluation six days before his death and there was no indication that he purposefully engaged in any behavior with the intention of dying or hastening his death. The category of death was changed by the DRC to natural, unexpected

The three cases pending further information were determined by the DRC to be deaths of various causes. The cause of one death was due to "excitement delirium." In this case (Case BB), the inmate struggled with officers who were trying to apply restraints; this exertion led to neuronal excitotoxic injury per autopsy. The second case (Case CC) was determined to have ingested both morphine and Citalopram, though both medications were prescribed. The inmate had multiple additional medical problems, including cardiovascular disease, and the death was determined to be accidental. The inmate's cellmate at the time reported normal mood, participation in routines, and so forth the evening of the death, with no history of suicide attempts or statements of wishes to die. The third case (Case DD) was unknown for a period of time due to the complexity of medical symptoms present prior to the death, including reports of blackouts, other neurological symptoms, and cardiovascular issues. The final cause of death was determined to be natural and secondary to cardiovascular disease.

The 10 remaining cases (Cases EE to NN) were reviewed using the guidelines noted above as the cause of death in each was overdose. Upon review of these cases, the best explanation for each was unintentional, accidental overdose. In each case, the Combined Death Review Summary determined that the cause of death was an accidental overdose. None of the cases involved ingestion of medications that do not have abuse potential (e.g., Tylenol). Rather, all ten deaths involved intoxication/ingestion with an illicit drug or drug(s) of abuse. Specifically, three cases died due to methamphetamine intoxication (Cases EE, FF, and GG), two to Fentanyl intoxication (a powerful synthetic Opioid; Case HH and II), one case to a combination of heroin and methamphetamine intoxication (Case JJ), one to heroin intoxication (Case KK), one to morphine intoxication (Case LL), one to methadone and morphine intoxication (Case MM), and one to intoxication with an unknown or unspecified opiate (Case NN). Of these 10 cases, none left a suicide note and none made recent statements suggesting suicidal ideation or desire. Appendix IV contains additional information on the SMHP's review of overdose cases.

**Suicide Attempts and Suicides Prevented:** In 2015, there were a total of 502 incidents of self-harm with intent to die that did not result in death. That is, 502 suicide attempts were in some way prevented, interrupted, aborted, averted, or otherwise were not fatal during the year.

Of the 502 attempts, 285 involved incidents of self-harm with intent to die that resulted in either no injury or mild injury. An additional 217 incidents of self-harm involving moderate-to-severe injury and intent to die (suicide attempts) were reported to the CDCR's self-harm database. These 217 incidents include some combination of: The inmate used non-lethal means and intended to die but was discovered, the inmate reported having recently engaged in self-harm with the intent to die but was not discovered and did not perish, or CDCR staff members interrupted a suicide attempt in progress by an inmate that may otherwise have been lethal.

**Determination and tracking of Quality Improvement Plans**: Each Suicide Case Review report may include formal Quality Improvement Plans (QIPs) as applicable to the case. QIPs are developed based on the concerns raised by custody, nursing/medical, and/or mental health case reviewers. In 2015, a total of 115 QIPs were generated from Suicide Case Reviews, resulting in an average of 4.8 QIPs per suicide. Nursing QIPs are referred to the DRC. Custody and mental health QIPs are typically addressed to the institution where the deceased person resided but may also be written for prior institutions and/or for the DHCS SPR FIT. Table 20 provides a listing of responsible persons or teams for the QIPs assigned in 2015.

Table 21. *QIPs assigned within the CDCR by recipient, 2015 Suicides*

| Quality Improvement Plan | Frequency | Percent of Total |
|---|---|---|
| Chief of Mental Health/Chief Executive Officer | 53 | 46 |
| Warden/Custody | 32 | 28 |
| Death Review Committee/Nursing/Medical | 17 | 15 |
| DHCS SPR FIT | 11 | 10 |
| Design Standards Branch | 1 | <1 |
| Contract Bed Facility | 1 | <1 |
| Total | 115 | 100 |

As can be seen in Table 21, the Suicide Case Review process generates quality improvement plans that are multidisciplinary. The responses to an inmate's suicide are therefore addressed with a broad lens, looking at many ways of addressing what went wrong (if applicable; one case of the 24 had no listed QIPs). Notably, nearly half of the formal QIPs generated in 2015 were focused on mental health concerns, with the Chief of Mental Health and/or Chief Executive Officer of a CDCR facility tasked to address the concern(s). Mental health concerns ranged from evaluations not completed within timeframes established by policy to poor quality of suicide risk evaluation to inadequate treatment and safety planning. The specific reasons for individual QIPs are presented in the individual case review section (Chapter 3).

**Determination whether a suicide is preventable or foreseeable**: The following definitions of *foreseeable* and *preventable* used in the review of 2015 suicides and in this report are the definitions previously used in the annual suicide reports written by the Special Master's experts:

Foreseeable: A "foreseeable" suicide is one which, based upon available information reasonably known, is reasonably anticipated based upon the presence of a substantial or high risk for a suicide attempt which would require reasonable clinical, custodial, or administrative intervention. Foreseeability is assessed by determining the adequacy and accuracy of how suicide risk was evaluated. Assessment of the degree of risk may be high, moderate, or low to none. In contrast to a high and immediately detectable risk, a "moderate risk" of suicide, indicates a more ambiguous set of circumstances that requires significant clinical judgment based

on adequate training, as well as a timely assessment, to determine the level of risk in the most appropriate manner and relevant interventions to prevent suicide.

Preventable: A "preventable" suicide is one in which it is probable that, had some additional information been gathered or some additional interventions undertaken, as required by existing policy, the suicide would not have occurred. Preventability is assessed by determining whether risk management and/or suicide prevention policies and procedures, local operating procedures and the requirements set forth in the Program Guide were followed adequately. Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff.

Using the above definitions[23], CDCR's Statewide Mental Health Program's Suicide Case Review Committee determined that in 2015, 11 of the 24 suicides were foreseeable and 17 of the 24 suicides might have been preventable had some additional information been gathered or some additional interventions undertaken.

**Audits of SCR Quality:** The DHCS Quality Management Unit audits all Suicide Case Reviews (SCRs) for 15 items. SCRs are scored with required elements marked present or absent. In 2015, SCRs generally met audit criteria at a high rate, reported in Table 21.

Table 22: *Results of Quality Audits, 2015 Suicide Case Review reports*

| Audit Item | Present | Absent | % Present |
|---|---|---|---|
| 1. Does the Executive Summary describe the means of death, the emergency response taken, and the MH LOC of the patient? | 23 | 1 | 96 |
| 2. Are the sources for the SCR identified? | 24 | 0 | 100 |
| 3. Are substance abuse issues reported, if applicable? | 24 | 0 | 100 |
| 4. Does the Institutional Functioning section include information on institutional behavior, including disciplinary history? | 24 | 0 | 100 |
| 5. Does the Mental Health History review the adequacy of mental health care and screening? | 24 | 0 | 100 |
| 6. Are medical concerns discussed (e.g., chronic pain, terminal illness) or is the absence of medical conditions noted? | 24 | 0 | 100 |
| 7. Is the quality of the most recent SREs (past year) reviewed, with comment on risk level, safety planning, and risk and protective factors? | 14 | 6 (4 N/A) | 70 |
| 8. Does the Suicide History section review all prior attempts, as applicable? | 24 | 0 | 100 |
| 9. Are significant pre-suicide events discussed (e.g., receipt of bad news or existence of a safety concern)? | 23 | 1 | 96 |
| 10. Was a risk formulation offered specific as to why the person was vulnerable to suicide? | 24 | 0 | 100 |

---

[23] These definitions do not apply the legal standards for causation, foreseeability, or deliberate indifference. For these reasons, the use of these definitions in this report do not constitute any admission of causation, fault, or liability.

| | | | |
|---|---|---|---|
| 11. Does the review comment on the adequacy of the emergency response? | 18 | 4 (2 N/A) | 82 |
| 12. Are all violations of policy and breaches of standards of care in mental health, medical, and nursing addressed in the reviewer's concerns, if applicable? | 24 | 0 | 100 |
| 13. Were custody policies followed? If not, were violations noted in the report? | 23 | 0 (1 N/A) | 100 |
| 14. Were all concerns raised by reviewers (custody, nursing, and mental health) represented in Quality Improvement Plan recommendations? | 24 | 0 | 100 |
| 15. Were the Quality Improvement Plan recommendations adequate to address the concerns? (e.g., QIP should not simply say conduct an inquiry and report findings). | 23 | 1 | 96 |
| Total | 339 | 13 | 96 |

As evident in Table 22, on most audit criteria, reviewers were found to meet quality standards with 96% of all audit items marked as present. A notable exception in quality audits appears to be in reviewing most recent SREs. In examining this finding, six SCRs did not comment on *all* aspects of the most recent SREs. For example, the reviewer discussed risk factors but did not provide an analysis of the adequacy of risk formulation. One other item was absent in four cases: Comments on the adequacy of emergency response. Emergency response timelines were reported by nursing and custody in all SCRs. In the four cases, reviewers did not specifically state that the emergency response was adequate, though this appears to be the case in each occasion.

**Timeliness of Suicide Case Reviews and Suicide Reports:** The process of responding to suicides, completing reviews, writing and editing reports, tracking QIP compliance, and so on is involved. Timelines for each step in suicide response have been developed and are specified in the MHSDS Program Guides, 2009 Revision. Internal deadlines have also been developed as a way to ensure timelines for each step of the suicide response process are met. The number of days specified for each step in suicide response, for both Program Guide and internal deadlines, is found in Appendix VI.

In reviewing timeliness of 2015 suicides, the assignment of a suicide reviewer and the visit of the reviewer to the institution were completed on time in all but two cases; both cases were originally "unknown deaths" (Cases P and T) and thus not determined to be suicides until further information was obtained. Due dates on Cases P and T were recalculated when the cases were determined to be suicides. Both were then reviewed in a timely manner.

Original suicide reports are generally completed within 30 to 40 days after the death. The established 30-day limit was met in nine cases (of 24 reports). Five reports (including Cases M and V) were completed 40 days or more after the death. All reports were available by the time

Suicide Case Reviews were held. Fifteen of the 24 SCRs were completed within timelines. Of the nine SCRs held late, delays ranged from one day to nine days.

Once suicide reports are reviewed at the SCR, edits are made and a final report is due to be sent to institutions within 60 days of the death. Timeline compliance becomes increasingly difficult at this step, with only five of the 24 reports finalized and sent to institutions by the 60 day mark. Delays at this step can affect the ability of institutions and other recipients of QIPs to complete QIPs by the deadline (150 days after the death). However, in 13 cases, QIP response timelines were met. QIP responses also require review and approval, with a report of QIP implementation due to the OSM by 180 days after the suicide.

As the CDCR endeavors to complete all steps of the suicide review process in a timely manner, a focus on ensuring original reports are completed on time, on decreasing the number of days used for editing suicide reports after the SCR, and on accelerating the review, response, and approval of QIPs is underway. The DHCS SPR FIT will explore further ways to expedite review processes for implementation during the 2017 calendar year.

## Chapter III. Findings in Individual Case Reviews

**Introduction to Individual Case Reviews:** The presentation of information such as suicide rates and demographic variables in suicide deaths provides a sense of data trends, comparisons between correctional systems, and so forth. That is, suicide rates and numbers give us a *macro* look at causes and contributors to suicide and to variables that require monitoring. The data presented in prior chapters has implications for practice within the CDCR, implications that will be reviewed in the Conclusions section to follow.

Individual case reviews, on the other hand, represent a *micro* look at the idiosyncratic, often multi-determined reasons that an individual takes his or her own life. The sources of distress noted in the cases below range from a response to gang threats to an inmate's family to the vagaries of severe medical and mental illness to grief over the loss of lovers and loved ones. No two cases look quite alike.

What cannot be overly idiosyncratic are the actions of staff members of all disciplines. These staff members as a whole are responsible to prevent suicide. Suicide prevention in correctional settings is no small task. CDCR staff of all disciplines must follow policy and procedure, must show diligence and compassion in their work, and must be professional in their day-to-day interactions and responsibilities. Individual case reviews thus speak not only to the idiosyncrasies of the suicidal patient but also to the actions and professionalism of staff leading up to a suicide, in reaction to a suicide in progress, and in response to the death.

**Commonalities in individual case reviews:** Tables 22 and 23 list variables commonly found between suicides. The tables contain either factual data or qualitative determinations about the

adequacy of staff response and/or the ability of staff members to meet quality of care expectations. Narrative comments are noted after each table.

Before presenting these tables, it should be noted that inadequacy of risk assessment, treatment planning, custody rounds, and so forth result in QIPs. In Suicide Case Review (SCRs) reports, reviewers *may* comment on what was done well within an institution and *may* state areas where policy was correctly followed. However, these comments are not required as it is assumed staff members will follow policy and will do a professional job in working with inmates. In contrast, reviewers *must* identify any and all departures from policy or from standards of care, creating formal Quality Improvement Plans (QIPs) applicable to each identified issue. Reviewers may also point out clinical or custodial practices that could be improved either at an institutional level or throughout all institutions; these practice suggestions can be addressed through QIP processes as well. It should also be noted here that institutional responses to QIPs are sent to the SMHP and DAI leadership for review. If any QIP response is felt to be inadequate, the SMHP and/or the DAI will contact the institution to request clarification or request additional development or implementation of the QIP. QIPs are not considered finished until approved at the headquarters level.

Table 23 lists qualitative judgments of staff performance in suicide cases. A "no" answer can reflect anything from a singular error in the treatment or care of the patient to a pattern of poor care, whereas a "yes" finding reflects a range of actions and behaviors that were consistently professional and adequate.

Table 23: *Findings of Individual Case Reviews, part 1*

| Inmate | Suicide Risk Adequately Assessed? | Adequate Suicide Risk Management? | Adequate Treatment Plan? | Good Quality Mental Health Contacts? | Adequate Nursing Rounds? | Adequate Custody Checks? | Adequate Emergency Response? | Treatment Refusal? |
|--------|------|------|------|------|------|------|------|------|
| A | Y | Y | N/A | Y | Y | Y | Y | Y |
| B | Y | N/A | N/A | Y | Y | Y | Y | Y |
| C | N | N | N/A | N | Y | N | Y | N |
| D | Y | N/A | N/A | N/A | N/A | N | N | Y |
| E | Y | Y | Y | Y | N/A | Y | Y | Y |
| F | Y | Y | N/A | N* | N/A | Y | Y | Y |
| G | Y | N/A | N/A | N/A | N | N | Y | Y |
| H | N | N | N/A | Y | Y | Y | N | Y |
| I | Y | Y | N | N | N/A | Y | N | Y |
| J | Y | N/A | N/A | N/A | Y | Y | N | Y |
| K | Y | Y | Y | Y | N/A | Y | Y | Y |
| L | N | N | N | N | Y | N** | Y | Y |
| M | N | N | Y | Y | N | N | N | Y |
| N | N | N | N | N | N | Y | Y | N |
| O | N | N | N | N | N | N | N | Y |
| P | N | N | N | N | N/A | Y | N | Y |
| Q | N | N | N | N | Y | Y | N | N |

| R | Y | Y | Y | Y | N/A | Y | N | Y |
| S | Y | Y | Y | Y | N/A | Y | Y | Y |
| T | N | N | N | N | Y | Y | Y | Y |
| U | Y | Y | N | N | N | Y | Y | Y |
| V | N | N | N | N | Y | Y | N | Y |
| W | Y | Y | Y | Y | Y | Y | Y | Y |
| X | Y | Y | Y | N*** | Y | N**** | Y | Y |

*Based on poor documentation of last visit. **Based on allowance of window covering. ***Based on frequent refusal of services; HRL was provided. ****Based on allowance of an obstruction to viewing

Starting from the far left column, problems with at least one suicide risk evaluation were found in 10 cases (42%). Problems ranged from issues with reviewing or gaining access to suicide attempt histories (two cases), failing to include information already reported about suicide attempt history (two cases), poor identification or documentation of risk factors (four cases), to failure to complete suicide risk evaluations when they were required by clinical standards or policies (two cases). Issues with suicide risk evaluations are particularly problematic, as inadequate assessment most likely leads to difficulties with safety planning (e.g., not having information on what triggered past attempts) and risk management (e.g., not managing the actual level of risk as risk had been underestimated). Therefore, it is not surprising that *all* cases identified as having problems with SREs are also considered to have problems with risk management.

Issues with adequacy of suicide risk management practices were noted in 11 cases (46%). In at least one situation, risk management efforts were inadequate or failed to address the level of suicide risk indicated. Additionally, in some cases suicide risk evaluations indicated very low risk and in some cases policies were followed such that the inmate did not require evaluation; these cases are marked as not applicable (N/A). In cases marked N or No in Table 22, issues were quite varied. These included placement of a patient on suicide precautions in an unsafe cell in one case, a failure to conduct a SRE within timelines in another case, problems with full implementation of high risk management lists or programs in two cases, failure to plan for an inmate's reaction to bad news in one case, and provision of KOP medications in another case where the inmate had mentioned a previous plan to die by overdose.

Another area impacted by the quality of suicide risk evaluation is mental health treatment planning. If risk for suicide is underestimated in a case, it stands to reason that treatment planning will also miss key components of what should be addressed clinically. In six cases, adequate treatment planning was noted. In seven cases, poor treatment planning was found. In the remaining two cases, risk evaluation and treatment planning was hampered by a patient's unwillingness to engage in treatment or evaluation services. In such cases, treatment planning should focus on efforts to engage the patient, attempts to gain historical and collateral information, and so forth.

The quality of mental health contacts was rated as not applicable in three cases where there were few or no evaluations beyond mental health screening. For cases rated Y (nine cases or 43% of

applicable cases), the decided majority of clinical contacts were positive and in line with professional expectations. For the 12 cases rated N (57%), at least one clinical contact was below standards, such as incidents where poor documentation was present or where patient treatment refusals were not addressed.

Nursing rounds and/or nursing observations are required for inmates in segregated housing settings, inpatient settings, and while a patient is on suicide watch or precautions either in alternative housing or in MHCB. Cases marked N/A are those in which the inmate or patient was never in such a setting. Problems in nursing rounds were found in five of the remaining 16 cases (31%) , specifically: One case where required psychiatric technician rounds were not documented (in ASU), one case where nursing observations for a patient on 15 minute checks were not staggered, one case where a nursing check required each shift did not ensure that the patient was living/ breathing, one case of delays in starting an order for 15 minute checks, and one case where checks in alternative housing were not documented or staggered. In 11 (69%) of applicable cases nursing rounds were done adequately.

Custody checks occur in all institutions for all inmates. For example, custody conducts institutional counts multiple times in each 24 hour period. In 17 cases (71%), custody checks were rated as adequate and conducted per policy. Of the remaining seven cases, four involved situations where window coverings or draping of bunks was allowed despite custody policy forbidding the practice. In another case, an inmate kept a blanket over his head, with custody checks not ensuring living/breathing. In the remaining two cases, rounds were completed later than specified by policy around the time of the death.

Emergency response by custody officers, nursing staff, and medical staff are considered in ratings of emergency response. In 14 cases (58%), no issues with emergency response were noted. In four cases, issues with bringing complete cut-down kits were found. In three cases, issues with timely AED placement or AED functioning were reported, and in two cases delays in emergency response occurred. Other issues were rather idiosyncratic; such as the incident of an ambulance going to the wrong institution and a case where CPR was discontinued during transport to the TTA.

Issues related to patient refusal of evaluation were cited in three cases (12.5%). In these cases, patients with safety or privacy concerns declined to be brought out to confidential settings for clinical contacts while also likely withholding information when contacted at cell-front was noted. In these cases, reviewers recommended QIPs to address patient refusal and to promote treatment planning when a patient declines to come out of cell for confidential contacts. The problem of patients not wanting to be seen talking to mental health, yet needing these services, is a difficult issue to combat.

Table 24 lists additional common findings of case by case reviews.

Rigor mortis is a condition of the body postmortem that indicates a person has been deceased for at least four hours.[24] In 2015, only one case was found to be in rigor mortis at discovery. This case occurred in a CTC. By comparison, four cases were found in rigor mortis in 2014. This may suggest improvements in the quality of safety/welfare checks, the implementation and use of Guard One throughout institutions in the CDCR, or simple chance variance.

The method used for each suicide is listed for the reader's reference. As in prior years and in other prison systems, hanging is easily the most common method of suicide in incarcerated populations, accounting for the means for 83% of the suicides in the CDCR in 2015.

Table 24: *Findings of Individual Case Reviews, part 2*

| Inmate | Patient Found in Rigor Mortis? | Method Used | Prior Suicide History/ # of Prior Attempts | Higher Level of Care Indicated? | Housing/ Cellmate Present? | MHSDS Status at Time of Death & LOC? |
|---|---|---|---|---|---|---|
| A | N | Hanging | Y/2 | N | GP/Y | N |
| B | N | Hanging | N/0 | N | ASU/N | N |
| C | N | Asphyxiation | N/0 | Y* | ASU/N | N |
| D | N | Hanging | N/0 | N | SHU/N | N |
| E | N | Hanging | Y/1 | N | GP/N (out to work) | N |
| F | N | Hanging | Y/2 | N | GP/N | N |
| G | Y | Asphyxiation | N/0 | N | CTC(GP)/N | N |
| H | N | Overdose | Y/1 | N | ASU/N | N |
| I | N | Hanging | N | Y** | GP/N | N |
| J | N | Hanging | N/0 | N | GP/N | N |
| K | N | Hanging | Y/3 | N | ASU/N | CCCMS |
| L | N | Hanging | Y/6 | Y | GP/N | CCCMS |
| M | N | Hanging | Y/1 | N | GP/N | CCCMS |
| N | N | Jump | Y/1 | Y | SNY/N | CCCMS |
| O | N | Hanging | Y/1 | Y | STRH/N | CCCMS |
| P | N | Asphyxiation/ Overdose | Y/3 | N | CTC/N | CCCMS |
| Q | N | Hanging | Y/1-3*** | Y | ASU/N | CCCMS |
| R | N | Hanging/ Cutting | Y/3 | N | GP/N | CCCMS |
| S | N | Hanging | Y/1 | N | GP/N | CCCMS |
| T | N | Overdose | Y/5 | Y | GP/N | EOP |
| U | N | Hanging | N/0 | N | GP/N | EOP |
| V | N | Hanging | Y/3-7 | Y**** | ASU/N | EOP |
| W | N | Asphyxiation | N/0 | N | GP/N (out to work) | EOP |
| X | N | Hanging | Y/2 | Y***** | ASU/N | EOP |

---

[24] https://en.wikipedia.org/wiki/Rigor_mortis



\*Inclusion in the MHSDS seemed warranted \*\*Per policy, should not have been discharged from CCCMS \*\*\*Incidents on 1/7/14, 4/22/14, and 10/7/15 were without clear intent \*\*\*\*Recommended during Regional Team visit, December, 2014 \*\*\*\*\*Due to worsening psychosis

There is a robust literature on the heightened chronic risk of suicide for individuals with prior attempts. This risk is especially robust when a person has a history of two or more suicide attempts.[25] It is thus not surprising that 16 of the 24 cases (67%) who died by suicide in 2015 also had a history of prior attempts, with 10 cases (42%) having a history of multiple attempts. Deaths occurring on a person's first attempt are correlated with the use of a highly lethal method, such as firearms in the community and hanging in the case of prisons. Hanging is a highly accessible means for suicide in prisons. The ability of a person to abort a suicide attempt mid-way through the event is usually impossible in hanging.[26]

Clinicians can use several interventions for risk management purposes, including transfer to inpatient hospitalization, transfer to a more intensive level of care, or placement in a high risk management program. Inpatient psychiatric hospitals, for example, are able to restrict means to hanging by eliminating tie off points. In 2015, reviewers found reason to indicate that more intensive risk management may have been needed in nine cases (37.5%). Of these cases, one was recommended for a higher level of care by a visiting Regional Team, two should have been considered for placement or retention in the MHSDS, one showed signs of psychotic decompensation, two should have been considered for higher levels of care due to frequent refusal of services, two were removed from high management lists or programs, and one had received bad news and had threatened to harm himself if this news was received.

Housing status is listed next with findings regarding whether a cellmate was present or not at the time of the suicide. In 23 cases (96%), there was either no cellmate present or the deceased had been in a single cell at the time of the suicide. In the one case where a cellmate was present, the deceased hung himself during the overnight hours.

Finally, the level of care for each case at the time of death is listed. The high frequency of suicides within the MHSDS is both to be expected and a cause for continued quality improvement efforts.

## Chapter IV. Review of Suicide Prevention Initiatives in 2015

**Introduction:** The development and implementation of Quality Improvement Plans following deaths by suicide is but one of many pieces of a comprehensive suicide prevention strategy. These plans occur too late for the deceased, but correct problems and offer training and

---

[25] E.g., Forman, Berk, Henriques, Brown, & Beck, 2004. History of multiple suicide attempts as a behavioral marker of severe psychopathology, American Journal of Psychiatry, 161, 437-443.
[26] https://www.hsph.harvard.edu/means-matter/means-matter/case-fatality/

prevention plans that may contribute to decreasing the risk of suicide in an institution and in a system in the future.

There are many additional aspects of a comprehensive suicide prevention strategy.[27] Such a strategy includes ensuring a solid screening process occurs at various points of incarceration, establishing a referral process, written procedures and policies for suicide prevention are maintained and updated as needed, and there are effective methods for evaluating proof of practice of existing and/or on-going suicide prevention programs and initiatives. In addition, comprehensive suicide prevention programs must have a commitment to staff training, with the provision of on-going training on suicide risk detection and referral to all correctional employees. In addition, the complexities and specifics of suicide risk evaluation, risk management, and intervention training must be provided to mental health staff. Comprehensive programs also assure easily available mental health services for inmates who request and/or are referred for these services, along with a variety of care options and levels. Suicide prevention materials must be readily provided for inmates and for those who interact with inmates (e.g., family members, work supervisors). Communication between disciplines and shifts must be prioritized, particularly regarding high risk inmates.[28]

The CDCR has worked diligently to ensure that a comprehensive suicide prevention program is in place. This effort has been shared with and reviewed by the Office of the Special Master and the OSM's experts for many years. It is beyond the scope of this report to review all suicide prevention program efforts over these many years. Rather, the information provided in this section reviews advancements in the CDCR suicide prevention program during the 2015 calendar year and shortly thereafter.

**Suicide prevention efforts developed, initiated, and/or implemented during the reporting year**: Numerous initiatives were either under development at the close of 2015 or had been implemented during the year. Each initiative is described below with notation of the status of the project on December 31, 2015 as well as the current status of each effort.

- New Five-Day Follow-Up Form: Patients are known to be at elevated risk for suicide upon release from inpatient settings per studies conducted in the community.[29] The Five-Day Follow-Up Form (CDCR MH-7230-B) used by the CDCR is intended to ensure clinical contacts with patients returning from inpatient settings in cases where the reason for admission was danger to self. Whereas the old form had been contained on one page for all five days, leaving little room for documentation, the new form developed has two pages with sufficient room for recording the patient's comments and the clinician's

---

[27] Hayes, L.M. (2013). Suicide Prevention in Correctional Settings: Reflections and Next Steps. International Journal of Law and Psychiatry, 36, 188-194.

[28] Preventing Suicide in Jails and Prisons, World Health Organization, 2007

[29] Qin, P., & Nordentoft, M. (2005). Suicide Risk In Relation to Psychiatric Hospitalization, Archives of General Psychiatry, 62, 427

assessment of the patient. The new form also contains several structured, suicide-specific questions so as to ensure clinicians and psychiatric technicians are asking about suicidal thoughts, desire, and intention. The new form also requires mental health clinicians to complete a safety/treatment plan with the patient. The new form was routed and approved by all required committees by the end of 2015. Involved unions were noticed. The form was readied for distribution and materials for Training for Trainers were prepared and delivered by webinar in January, February, and May, 2016. Training for Trainers materials were co-taught by mental health and nursing staff. The form was released for use on June 10, 2016.

- ASU Post-Placement Screening Questionnaire: All inmates are screened prior to placement in segregated housing units for mental health symptoms. Once placed in segregated housing, all inmates are contacted daily by psychiatric technicians. In addition, identified mental health patients are seen on a regular basis by mental health clinicians. As inmates may experience distress upon placement, the ASU Post-Placement Screening Questionnaire is a brief measure (12 to 13 items) that is administered by a psychiatric technician to non-MHSDS inmates and assesses an inmate's level of distress and the presence or absence of suicidal thoughts or behavior. The screening questionnaire has set scoring rules that, once scored, guide the psychiatric technician regarding whether a referral to mental health is indicated, and if so, to what degree of urgency. Inmates who refuse the screen are to be referred to mental health on an urgent basis. The new form (CDCR MH-7790) was also routed and approved by all required committees by the end of 2015. Involved unions were noticed. The form was readied for distribution and trainings (co-taught by mental health and nursing staff) were prepared, again via the Training for Trainers format. The PowerPoint presentation for the form had been reviewed and approved. This form was also released for use on June 10, 2016.

- Provision of Beds for Alternative Housing Cells: Several tours and audits of suicide prevention practices at various institutions had noted the lack of a physical bed in certain alternative housing cells. These cells are used with patients who are awaiting transfer to a MHCB and patients in these cells are typically on Suicide Watch (direct, one-on-one observation). Without available beds, patients were placed temporarily in cells with mattress placed directly on the floor. As this could be experienced as punishment, the CDCR agreed to ensure beds were placed in all alternative housing cells. A bed (Norix Stack-a-Bunk) was selected and was purchased for this purpose. Beds were delivered to all institutions in need of them by the end of 2015. A Mental Health Services policy was drafted for patients pending MHCB transfer that includes provision of a Stack-a-Bunk in alternative housing. This policy remains under review currently.

- <u>Updated Initial SRE Mentoring Training for Trainers</u>: The SRE Mentoring training slides and webinar were updated to place more emphasis on mentoring safety/treatment planning, to develop more of an understanding of the interplay of chronic and acute risk factors in cases, to further explore the role of the mentor in assessing and expanding clinician competencies around suicide risk evaluation, and to further teach the Quality of Care Tool for SRE Mentors. The revised training was offered on several occasions in 2015 and 2016 and was well received. Additional revisions were made to the presentation in November, 2016.

- <u>Development of a SRE Mentoring 'Booster' Training</u>: The requirement for an annual 'booster' training was discussed and a presentation developed for current mentors. The 'booster' training was re-cast as an advanced course in suicide risk evaluation mentoring, with a focus on risk assessment competencies, methods for competency assessment, and ways to enhance SRE skills in clinicians at all levels of proficiency. The training was undergoing revisions at the end of 2015 with a plan to implement training in 2016. This training indeed occurred in 2016, with the mentoring booster training attended live by 50 current mentors in November, 2016 and with numerous others taking the course by webinar in December, 2016.

- <u>Memorandum Clarifying SRE Mentoring Requirements</u>: A memorandum was drafted in 2015 outlining and revising the requirements for SRE Mentoring. Clinicians working in Mental Health Crisis Bed settings were required to complete mentoring annually, whereas other clinicians were maintained on an every two year schedule. Clinicians were also notified of two SRE audits; one to be conducted by institutional program supervisors and the other by headquarters staff. Each mental health clinician will have an audit of a completed SRE at least once every six months. Processes for corrective action when audit criteria are not met were described as well. Finally, the expectation that SRE Mentors would receive annual 'booster' training was written. This memorandum was released on March 15, 2016. Institutional program supervisors began auditing SREs using the Chart Audit Tool, reporting results through the Quality Management Portal. Headquarters audits have been modified to solely focus on inter-rater reliability checks on institutional audits.

- <u>Memorandum Clarifying SRE Training</u>: SRE Training is a 7-hour CME-approved course that is provided to all CDCR mental health clinicians within 180 days of hire and every two years thereafter. The SMHP updates the 7-hour SRE class annually. The updated class is provided to a large group of institutional clinicians who then teach the class at their home institutions. This process of annual updates in Training for Trainers also ensures trainers are adherent to the content and focus of the course. A memo clarifying SRE Training requirements was drafted in 2015, noting that the requirement extends to

clinicians hired through a registry and to telepsychiatry. Training for Trainers occurred in October, 2014 for the 2015 training year and in October, 2015 for the 2016 training year. This memorandum was pending release at the end of 2015 and was released on March 24, 2016.

- <u>Memorandum Clarifying SPR FIT Coordinator Duties</u>: A memorandum was released on August 14, 2015 instructing all institutions to designate one Senior Psychologist, Specialist to the role of institutional SPR FIT Coordinator, tasked with leading suicide prevention efforts at each facility. The role also includes coordination of mental health assessments/evaluations and mental health training/orientation. A duty statement for the position was attached to the memorandum. The memorandum and clarification of duties was designed to ensure all institutions had dedicated resources within mental health programs to coordinate suicide prevention efforts. This memorandum was released on August 14, 2015 and implemented; the memorandum is found in Appendix VII.

- <u>Memorandum Regarding SRE Tracking</u>: A memorandum was released on October 23, 2015 mandating that all institutions use appointment schedulers to simultaneously enter SREs completed by clinicians into the patient record and into the Mental Health Tracking System (MHTS). Clinicians were required to enter scheduled and unscheduled SRE appointments on daily work logs. This process is automated in EHRS institutions, but must be entered in this manner in institutions using the eUHR. The memorandum ensures proper tracking of suicide risk evaluations and timely scheduling and completion of follow-up risk evaluations. This memorandum is found in Appendix VIII.

- <u>Updated Cadet Training</u>: An update to training provided at the cadet training academy on the Mental Health Services Delivery System (MHSDS) and on Suicide Prevention was drafted and reviewed in 2015. Training for trainers on the updated version was provided on November 30, 2015. Lindsay Hayes attended the updated training as it was being given to a cadet class, providing feedback on the training in December, 2015. The training and accompanying lesson plans were undergoing revisions in light of Mr. Hayes' feedback at the end of 2015. This revised training was distributed on May 11, 2016.

- <u>Workgroup on Keep-on-Person (KOP) Medications</u>: In response to a headquarters QIP (from Case H in 2015), a workgroup was assembled to discuss how prescribed medications should be distributed in high-risk settings, such as in ASU Intake Cells. The workgroup met several times, considering input from pharmacy, custody, nursing, medical, and mental health representatives. Suggestions for limiting KOP medications in certain settings, relying on the Complete Care Model to communicate when medications should be administered as Direct Observation Therapy (DOT), and other potential solutions were discussed. Workgroup meetings focused on integrating clinical practices

with KOP medications with new policy on the use of Over-The-Counter (OTC) medications. In addition, concerns about KOP medications will be an issue to be discussed at morning huddles.

- <u>Training in Safety Planning</u>: In response to reviews by regional staff, headquarters staff, and Mr. Hayes, training entitled "Safety/Treatment Planning for Suicide Risk Assessment" was created in 2014 by Dr. Robert Canning. The class was updated in 2015 with a slightly revised title, "Safety/Treatment Planning within Suicide Risk Assessment and Management." The class included new content focusing on the on-going role of safety planning in managing suicide risk within the inmate population. Continuing medical education (CME) units are available to clinicians who take this course; attendance is mandatory for all clinical staff. The revised class was provided on four occasions between August and October, 2015Safety planning training was offered on multiple occasions in 2016, with training then planned every six months in order to accommodate newly-hired clinical staff. The role of safety/treatment planning was also incorporated into other updated trainings in 2016 (e.g., in suicide prevention videoconferences, the 7-hour SRE course, and in SRE Mentoring classes).

- <u>Training in Complex Diagnostic Cases</u>: This training, entitled, "Differential Diagnosis in Complex Mental Health Cases" was developed to assist treatment teams in considering cases involving self-harm. Clinicians and clinical teams can err in underestimating or overestimating risk for suicide,[30] particularly when cases present with complex diagnostic presentations and when patients engage in negative[31] or positive impression management.[32] The under- or over-reporting of symptoms of distress and the within-patient variances in reporting suicidal ideation or desire for death can cause considerable clinical confusion. For example, a patient who reports self-harm behavior due to "needing to get off the yard" can be seen as manipulative and may represent little else in the case. However, for a more vulnerable patient the pressure exerted by other inmates can be a source of considerable distress and may indeed give rise to a desire to die. An approved version of this training was presented to mental health clinicians on multiple occasions in 2016.

- <u>Training in Culturally-Competent Suicide Risk Assessment</u>: In response to a 2015 QIP (Case E), training was designed to offer primary care physicians and mental health

---

[30] Horon, McManus, Schmollinger, Barr, & Jimenez (2013). A study of the use and interpretation of standardized suicide risk assessment measures within a psychiatrically hospitalized correctional population. *Suicide and Life-Threatening Behavior,* 43, 17-38.
[31] Sullivan & King (2010). Detecting faked psychopathology: A comparison of two tests to detect malingered psychopathology using a simulation design. *Psychiatry Research,* 176, 75-81.
[32] Bagby & Marshall (2003). Positive impression management and its influence… A comparison of analog and differential preference group designs. *Psychological Assessment,* 15. 333-339.

clinician's specific approaches and tools to assess suicide risk in patients of various cultures and belief systems. Training included introductions to the DSM-5's Cultural Formulation Interview,[33] the Cultural Assessment of Risk for Suicide (CARS),[34] and the Cultural and Protective Suicide Scale for Incarcerated Persons (CAPSSIP).[35] Interactive vignette-based practice of suicide risk inquiry in diverse cases was integrated within the training. The course was offered, with CME credits, on four occasions in 2015. Several hundred physicians and mental health clinicians attended the course.

- <u>Training of Board of Prison Hearings (BPH) Commissioners</u>: Two informational talks were developed for the BPH. First, the perception that participation in the MHSDS would cause a BPH denial (and the reaction of clinicians to this perception) was listed as a QIP in Case H. Case H requested to be taken out of the MHSDS prior to an upcoming BPH appearance, a request that was granted by his IDTT. In addition, two cases in 2015 (also Cases H and I) *may* have considered receiving a RVR as removing the possibility of parole. For these reasons, members of the SMHP met with administrators within the BPH on two occasions in 2015 to discuss the best way of going about offering information to commissioners. After these meetings, two trainings were developed. The first occurred in October, 2015, with commissioners briefed on the topic of how mental health clinicians evaluate RVRs and the role depression, psychosis, and other mental health conditions in influencing behavior temporarily or when untreated. The second training was scheduled with the intention of exploring perceptions about mental illness and future risk of violence. An area of focus for the second training was on encouraging treatment participation and treatment compliance as a way of decreasing violence risk. This second training occurred in January, 2016.

- <u>BPH Commissioner and BPH Evaluator Access to the Urgent Response Mailbox</u>: As a result of discussions between BPH administrators and SMHP representatives, a letter was sent to all BPH commissioners and all evaluators working for the BPH to notify them of the availability of the Urgent Response mailbox. The mailbox allows BPH commissioners or evaluators to alert headquarters mental health staff regarding any concerns for suicide in inmates or patients who are scheduled to go before the BPH or who appear distressed at or after a BPH hearing. For example, a patient who makes concerning statements during a pre-BPH evaluation can be referred to headquarters mental health personnel, who then notify the mental health program at the patient's

[33] Lewis-Fernandez, Aggarwal, Hinton, L, Hinton, D, & Kilmayer (2015). <u>Handbook on the Cultural Formulation Interview.</u> American Psychiatric Association Publishing, Washington, DC.
[34] Chu, Floyd, Diep, & Bongar (2013). A tool for the culturally competent assessment of suicide: The Cultural Assessment for Suicide (CARS) Measures. *Psychological Assessment, 2*5, 424-434.
[35] Horon, Williams, & McManus (Manuscript in review). The Culture and Protective Suicide Scale for Incarcerated Persons (CAPSSIP): A measure for evaluating suicide risk and protection within correctional populations. Submitted to *Psychological Services.*

institution. Similarly, an inmate who appears highly distressed by a parole denial during a BPH hearing can be referred by any of the commissioners present, ensuring a mental health contact occurs on that same day. This project has been implemented. The Urgent Response Mailbox was being used by BPH commissioners and evaluators by the close of 2015.

- <u>Suicide Prevention Pamphlets: Inmate and Family Member</u>: Suicide prevention pamphlets were designed for inmates and for family members during 2015. The pamphlets were specifically intended for suicide prevention purposes. Inmate pamphlets provided information on how to ask for help, noted common myths about suicide, and described feelings that may go along with suicidal thoughts. The varieties of ways inmates can be referred or self-referred for mental health contact are listed. The family and friends pamphlet provides a list of warning signs for suicide, clarifies common myths about suicidal people, and provides a mental health contact number. The pamphlets were distributed in July, 2015, accompanied by a memorandum dated July 30, 2015. The memorandum specified that inmate pamphlets were to be made available in all housing units, with family/friend pamphlets available in visiting areas. The process for ordering additional pamphlets was also detailed. Both pamphlets were distributed during the year in English. Pamphlets in Spanish for both inmates and friends/family members had been prepared and were moving towards printing by the end of 2015. All pamphlets are currently available and can be reordered and redistribution at any time. The memorandum sent to institutions and the pamphlets created and distributed are found in Appendix IX.

- <u>ASU Activity Workbooks:</u> ASU Workbooks were created in order to provide in-cell activities for inmates and patients in segregated housing units. The workbooks contain a variety of activities that inmates might use to distract themselves from the stress of the ASU placement, as ASU, particularly early in the placement, is known to be a high risk time/location for suicide. In addition, the workbooks contain suicide prevention messages and referral information scattered throughout the other content. The workbooks also serve as an item that custody officers and psychiatric technicians can use to encourage interaction with inmates and patients. Version 1 of the workbooks was re-ordered during the calendar year 2015, an indication of the regular use of these workbooks. The workbooks are available in English and Spanish. Additionally, a second version of the workbook was in development. The use of tablet-based activity booklets, using the tablets currently available in the inmate canteen, was also discussed. Implementation of Version 1 of the workbook had been very successful. Version 2 of the ASU Activity Workbook was approved by the end of 2015 and workbooks were distributed throughout 2016.

- <u>Columbia Suicide Severity Rating Scale (C-SSRS) Training and Inclusion in the EHRS</u>: The C-SSRS is a well-established, empirically established, standardized suicide risk

measure[36] that has been incorporated as part of all suicide risk evaluations in the CDCR's Electronic Health Record System (EHRS) beginning in 2015. The primary author of the measure, Kelly Posner, Ph.D. (from Columbia University, New York), was invited to present on the measure in 2015. She accepted and presented the C-SSRS to a group of 50 CDCR clinician-trainers from over 30 institutions in October, 2015. The training was video-recorded and was just under two hours long. A group of handouts and a brief PowerPoint slideshow was constructed to aide clinicians in becoming familiar with administering the C-SSRS. The C-SSRS assists mental health clinicians by providing a structured way to inquire about suicidal history, to evaluate the intensity of suicidal ideation, and to assess the potential and actual lethality of suicide attempts. The recorded video presentation by Dr. Posner, handouts and other materials were distributed in February, 2016. Clinician trainers received two hours of approved CME credit on the C-SSRS based on the recorded (DVD) presentation. All institutions that received the EHRS in 2016 held C-SSRS training prior to their respective EHRS start dates.

- Collaborative Assessment and Management of Suicidality (CAMS) training: The CDCR began discussions with David Jobes, Ph.D., a clinical researcher at the Catholic University of America (Washington, D.C.) during 2015. Discussions centered on training a group of clinicians within the CDCR on CAMS. Dr. Jobes agreed to present on the principles of CAMS, a treatment intervention specific to working with suicidal patients, during a statewide suicide prevention videoconference in October, 2015. CAMS represents a promising intervention for mental health clinicians within the CDCR, as the therapy has wide community use, good empirical backing,[37] good support with other established treatments,[38] and flexibility to be used in a variety of settings. CAMS may be effective in targeting patients with high chronic risk for suicide, patients on high risk lists or in high risk programs, and patients with recent contemplation of or engagement in self-harm with intent. By the end of 2015, a purchase order to train an initial group of 50 clinicians in CAMS was in process. A list of clinicians was identified at all institutions with mental health missions to be the first group to receive and use CAMS. CAMS note templates were under preparation for inclusion in the EHRS. Training began in January, 2016 and continued until July, 2016. CAMS trainings occurred by using on-line training modules and a series of follow-up consultation calls with CAMS experts. A second round of clinician training is being arranged for 2017.

---

[36] Posner, Brown, Stanley, (2011). The Columbia-Suicide Severity Rating Scale: Initial validity and internal consistency findings from three multisite studies with adolescents and adults. *American Journal of Psychiatry*, 168, 1266-1277.

[37] Jobes, Wong, Conrad, Drozd, & Neal-Walden (2005). The Collaborative Assessment and Management of Suicidality versus treatment as usual: A retrospective study with suicidal outpatients. *Suicide and Life-Threatening Behavior*, 25, 483-497.

[38] Andreasson, et al. (2016). Effectiveness of Dialectical Behavior Therapy versus Collaborative Assessment and Management of Suicidality for reduction of self-harm in adults with borderline personality disorder and traits. *Depression and Anxiety*, 33, 520-530.

- Self-Harm Tracking and Predictive Algorithm: Self-harm incidents at every institution continue to be entered in MHTS. The data is used to identify institutions with high numbers of events and to track trends within and between institutions. In addition, using a technique called machine learning, the data will be used in developing a predictive algorithm. Machine learning algorithms can identify variables and variable combinations that may not at the surface appear related to increased short-term risk of self-harm, but can statistically establish these risks. The model allows for refinement as additional data points are entered. Work on a machine learning algorithm was begun in 2015, led by David Leidner, Ph.D., a specialist in informatics and data science. Dr. Leidner piloted an initial algorithm for predicting self-harm. Initial inquiries were made with several academic institutions regarding partnerships in developing the algorithm. More recently, a federal grant application was submitted in consultation with Drs. Ronald Kessler and Matthew Nock at the Harvard Medical School. The grant project hopes to refine the machine learning algorithm, increasing its predictive power and potentially alerting clinicians to patients with high degrees of likelihood of self-harm in the near future.

- On-Going Training through Monthly Suicide Prevention Videoconferences: Monthly suicide prevention videoconferences continue to occur. Institutional SPR FIT teams and mental health clinicians participate in the videoconference by viewing presentations in conference rooms using VTC connections or, when unable to attend in this manner, through phone lines. In 2015, the suicide prevention videoconference was used to review suicides and trends in suicides within the department, to brief staff on new or revised policies and procedures, to notify staff of suicide prevention trainings and resources (e.g., membership in the American Association of Suicidology), and to provide didactic trainings. Trainings covered during the year included:
    - Behavioral markers for suicide, even when suicide is denied
    - Introductions to evaluating suicide risk in the EHRS
    - Methods for improving safety plans
    - The use of suicide intention scales (with vignette practice)
    - Understanding chronic risk for suicide
    - Understanding the interplay between chronic and acute risk for suicide and imminent/warning signs for suicide
    - Staff self-care and monitoring of reactions to suicidal patients
    - Introduction to CAMS.

The suicide prevention videoconference is a continuing suicide prevention effort. Presentations continued in 2016.

- Revisions to the SRE and inclusion of additional suicide risk assessments in the EHRS: As noted above, the inclusion of the C-SSRS as part of every SRE conducted within the

CDCR is planned as part of EHRS implementation. The C-SSRS adds a structured set of questions inquiring about the intensity of suicidal ideation and about the range of suicide attempts and suicidal behaviors in which the patient has engaged over his or her lifetime. In addition, the SRE in the EHRS adds detailed information about past suicide attempts when applicable, noting the timing of the attempt, the means used, the potential and actual lethality/medical consequence, and so forth. These additions should help clinicians construct more accurate judgments of acute and chronic risk, while ensuring greater accuracy in considering historic vulnerability to suicide. In addition, the EHRS contains seven suicide risk assessment tools that may be used as needed by clinicians. These additional tools can help with understanding cultural protective and risk factors in cases,[39] evaluate readiness[40] and/or capability for suicide,[41] evaluate motivations for suicide attempts,[42] and so forth. Each of these tools was provided by researchers to the CDCR. All of the measures mentioned above had been included in the 'build' of the EHRS, with the C-SSRS prominently featured within the EHRS SRE. Training in the additional suicide risk assessment tools available in the EHRS occurred via webinar in 2016, with additional trainings offered in monthly videoconferences. Live and webinar trainings are planned for 2017.

Progress on each of these initiatives during 2016 will be reviewed in the 2016 Annual Report, along with all new initiatives undertaken in the 2016 calendar year.

## Chapter V. Conclusions

**Introduction:** The numerous efforts undertaken by the CDCR to reduce suicides, aided by the consultation of the OSM, have been productive. While it may be impossible to say how many suicides were prevented in 2015, the on-going efforts and new initiatives for suicide prevention hold promise in reducing suicides within the CDCR. The rate of suicide in the CDCR in 2014 and 2015 dipped below the average rate of suicides in U.S. prisons in 2014 (the last reporting year available) and the percentage of suicides occurring in segregated housing units declined in both years. Efforts during the reporting year ranged from QIPs at the institutional level to continuing work to train clinicians in suicide risk evaluation and risk management to changes in policy and procedure to innovative projects. Yet, work remains to be done and efforts are on-going.

**Summary of Findings:** In 2015, 24 suicides occurred within the CDCR, 22 males and two females, at a rate of 18.6 per 100,000 inmates. Caucasian inmates and inmates in the age groups 30-34, 45-54, and over 60 died by suicide at a higher frequency then would be expected given

---

[39] CAPSSIP; *ibid*
[40] Chronic Readiness Questionnaire; Horon, McManus, & Sanchez-Barker (2013)
[41] Acquired Capability for Suicide Scales—Fearlessness About Death; Ribeiro, Witte, Van Orden, Selby, Gordon, Bender, & Joiner (2014)
[42] Reasons for Attempting Suicide Questionnaire; Holden & Delisle (2006)

their respective percentages within the CDCR population. Suicides occurred more commonly in unmarried inmates with limited educational and vocational experiences. Health factors were implicated in nearly half of the deaths by suicide in 2015. The frequency of suicide in segregated housing has declined, but remains an area of continued focus. Inmates sentenced to life also had a higher risk of suicide than inmates with determinant sentences. The first year of incarceration was also correlated with higher risk. Only one (4%) suicide occurred in a cell with a cellmate present (the cellmate was sleeping at the time), suggesting a protective impact of dual person or dorm housing. Suicides were more likely in individuals with past attempts (67%), a finding that is both expected and suggestive of potential interventions for (living) suicide attempters/survivors. A broad range of precipitants for suicide were found in 2015, with in-prison stresses repeatedly seen as underlying suicidal motives.

In comparison to the past 10 years, the suicide rate in the CDCR in 2015 of 18.6 per 100,000 is the third lowest rate, with 2014 (17.0 per 100,000) and 2009 (14.9 per 100,000) the years with the lowest rates. Two suicides of female inmates occurred in 2014 and 2015, higher than the number of suicides in such settings in all but two of the prior 20 years. The frequency of suicide over a 15-year period is highest in prisons with large mental health programs (1-2 suicides per year) and lowest in settings with either minimal mental health programs or predominantly inpatient missions (0.0 to 0.4 suicides per year on average). In 2015 and in the past 10 years in general, suicides occur most frequently in March, May, and October.

The frequency and rate of suicide within the CDR has declined over the past 10 years (2006-2015). In 2015, there were fewer suicides by Caucasians and Hispanic/Latinos, the two groups with the highest frequency of suicide in the CDCR, and fewer suicides in individuals ages 25-54. Suicides of inmates age 55 and over trended higher in 2015 compared to the previous five years. Suicides in segregated housing units have also declined in frequency compared to prior years, though the setting continues to have an elevated risk of suicide compared to other housing types. Inmates who qualify and have been placed in the MHSDS likewise continue to have an increased risk for suicide, with MHSDS rates of 52.6 per 100,000 in the past 10 years (2006-2015) versus a rate of 10.3 per 100,000 in non-MHSDS inmates over the same period.

As referenced above, the rate of suicide in U.S. Prisons rose to 20.0 per 100,000 inmates in 2014, the last year such statistics are available. This rate is higher than the rate of suicide in the CDCR in 2014 and in 2015. The community rate and U.S. Prison rate increased in 2014 and 2015. Men incarcerated in the CDCR had a lower rate of suicide then men in the community in 2014 and 2015.

When a non-lethal self-harm incident occurs within the CDCR, institutions are required to report the event using a database of such incidents. When a suicide occurs, a broad and intensive series of reviews is set in motion. These internal and external reviews evaluate the performance of staff members within and across disciplines, evaluate the emergency response, discuss the event in terms of procedural and policy considerations, and determine what corrective action plans must

be put in place to ensure qualitative improvements to suicide prevention programs. In 2015, a total of 115 quality improvement plans were initiated and completed, addressing case-specific, institution-specific, and departmental level actions need to enhance suicide prevention efforts. Personnel at the headquarters level review all deaths within the CDCR and carefully evaluate all deaths initially listed as "unknown" or as caused by overdose in conjunction with the Death Review Committee. Suicide case reports are carefully edited and reviewed for quality, with quality audits completed by Quality Management staff. With very few exceptions, Suicide Case Reviews meet all or nearly all audit criteria. Experts working with the OSM participate in SCRs.

Suicides occurring in the CDCR in 2015 were understandably rather idiosyncratic and often multi-determined. Each of the 24 suicides in the year was reviewed to illustrate the complexities of the case and how suicidal outcomes can manifest within very different individuals. Case findings are also tabulated to look at key issues in improving suicide prevention. Among these findings are continued difficulties with suicide risk evaluations, suicide risk management, and treatment planning by mental health clinicians, manifested in a variety of ways over the 10 to 11 cases where these issues were identified. The need for higher levels of care considerations was also indicated in a number of cases. Issues with custody rounds, such as allowance of in-cell draping, concerns with emergency response, such as failing to bring full cut-down kits to an emergency, and problems with nursing/psychiatric technician checks were noted in a number of cases as well. Only one inmate was found in a state of rigor mortis in 2015, an improvement over past years.

Numerous suicide prevention initiatives continued, created, or initiated in 2015 were also reviewed. These initiatives strive to ensure a comprehensive suicide prevention strategy remains in place and continues to grow and develop as the population of the CDCR changes. Initiatives arose from many sources: QIPs, suggestions by Mr. Lindsay Hayes, audits of clinician performance, results of mentoring of clinicians trained in suicide risk evaluation and treatment planning, discussions and coordination with others (e.g., BPH commissioners), inspiration from public suicide prevention campaigns, discussions with and consultation with renowned Suicidologists, and even advances in informatics and other technologies. The development of the EHRS also set in motion a number of opportunities for innovation in the service of improving patient safety.

**Report implications and future steps:** A group of 10 report implications are enumerated below. The order of these implications is based on the order in which each finding was presented in the annual report. Future steps regarding each implication are to be discussed during DHCS SPR FIT meetings in 2017.

1. Suicides in older adults: As was noted in Table 2, inmates over the age of 60 make up 6% of the population within the CDCR. However, 21% of suicides within the CDCR in 2015 were within this age group, making this the age group most overrepresented in number of suicides. High rates of suicide are found in the community in elderly males, particularly

Caucasian males, during their mid- and late 70s and 80s. For mental health clinicians, the use of measures of connectedness with elderly patients should be discussed. The Interpersonal Needs Questionnaire (INQ)[43] is included as an optional assessment in the EHRS and is a fine choice in such cases.

2. <u>Suicides in inmates with co-morbid medical conditions</u>: Nearly half (46%) of the inmates who died by suicide in 2015 were considered to have serious and/or chronic medical problems. This group of inmates had medical problems ranging from chronic low back pain or headaches to cases of liver disease, cancer, hemiparesis, diabetic neuropathy, cardiac problems, and worsening blindness. Community surveys of suicide in patients with significant medical problems have had varying results, with roughly 10% of suicides seen as attributable to medical disorder or to terminal illness.[44] In comparison, the one year (2015) total of 11 suicides of 24 in the CDCR is rather elevated and thus a potentially promising area to increase suicide prevention efforts. Several institutions have implemented pain management committees and pain management groups for inmates, and the success of these endeavors is being looked at closely.

3. <u>Suicides in segregated housing units</u>: Despite a decline in the frequency of suicide in segregated housing units, the rate of suicide in these units remains high compared to other housing settings within the CDCR. The three deaths occurring in dedicated intake cells is also concerning. Each of these three suicides occurred using different methods (hanging from a sprinkler head, hanging from ventilation grate holes, and overdose on KOP medications). A great deal of effort has already gone into improving safety and suicide prevention procedures in these settings, and it may be too early to fully ascertain the success of those efforts. However, further discussion of the implications of this finding may lead to new innovations.

4. <u>Suicides in Inmates with Life Sentences</u>: As 54% of suicides in 2015 occurred in patients with life sentences, compared with a roughly 20% proportion of the population overall, 'Lifers' represent a potential target for intervention. From a prevention standpoint, a number of efforts have been taken to try to combat this finding, including conducting training for BPH commissioners and evaluators, broadening the Urgent Response referral system to commissioners and evaluators, and training clinicians to 'bracket' BPH hearings with mental health contacts. Clinicians were advised during suicide prevention videoconference training to evaluate the degree of a patient's distress present before and after the hearing, to

---

[43] Cukrowicz, Cheavens, Van Orden, Ragain, & Cook (2013). Perceived burdensomeness and suicide ideation in older adults. *Psychology and Aging*, 26, 331-338.
[44] https://www.theguardian.com/society/2011/aug/23/suicide-chronic-illness-study

discuss the patient's thoughts on the outcome of the hearing, and to respond proactively to what may be experienced as bad or distressing news. Further education regarding the risk of suicide in inmates with sentences of Life without the Possibility of Parole is planned. Further interventions may also include holding "open lines" on general population lines, where inmates who do not require placement in MHSDS may seek time-limited services.

5. <u>Suicides in Inmates during the First Year of Incarceration</u>: In 2015, five of the 24 suicides occurred within the first year of incarceration, representing 21% of suicides. Three of the suicides occurred in inmates who were in reception centers (Cases A, M, & S). In reviewing the five cases, there is not a great deal of consistent or readily attributable commonalities between the deaths. However, based on 2015 data, additional attention to the variable 'early in sentence' is important to consider. The DHCS SPR FIT may wish to discuss ways to encourage clinicians in reception centers and those working with new arrivals to institutions (who are in their first year of incarceration) to exercise a more conservative approach to risk management with these individuals, to possibly include enhanced outreach.

6. <u>Prevalence of Suicide in Single Cells and Double Cells without Assigned Cellmates</u>: The CDCR has recognized the potential protective gain of cellmates for many years, noting the majority of suicides occur in cells with single occupancy. The same is true for 2015, with 96% of suicides occurring without a cellmate present at the time of the death. While it is true that inmates can wait for their cellmates to leave the cell for work or programming (this was true in two cases in 2015), there is still a preponderance of suicides in inmates with no assigned cellmate (20 of the 24 in 2015). Cellmates have interrupted suicide attempts, called for help during attempts, talked others into aborting attempts, and provided social support in many cases. The DHCS SPR FIT may discuss ways to encourage double cell or dorm placements in institutions, understanding that this is an optimal arrangement for most inmates.

7. <u>Suicide Attempt History</u>: Ten of the inmates who died by suicide in 2015 had made multiple past suicide attempts, with another six having made one prior attempt. Thus, two-thirds of those who died by suicide had made at least one prior attempt. The lifetime risk of death by suicide increases with single attempts and much more so after a second attempt; this is true in psychiatric and non-psychiatric samples. In psychiatric samples, the finding is particularly true in individuals with schizophrenia and bipolar disorder[45]

---

[45] Tidemalm, Langstrom, Lichtenstein, & Runeson (2008). Risk of suicide after suicide attempt according to coexisting psychiatric disorder: Swedish cohort study with long-term follow-up. *British Medical Journal*, 337.

and in patients shortly after release from hospitalization.[46] The CDCR has already instituted post-hospitalization follow-up contacts by policy, with procedures such as five-day follow-ups, MHCB discharge custody checks, and so forth. The DHCS SPR FIT may consider and discuss additional interventions for suicide survivors, such as developing a pilot program to pilot the use of CAMS treatment with identified high risk patients; patients who have recent suicide attempts or a history of multiple prior attempts. As noted, CAMS is a targeted intervention that is specific to suicide risk. The treatment includes patient ratings of what most fuels suicidal desire for them and what has historically contributed to a wish to die by suicide, while challenging this wish for death with considerations of making life worth living.

8. <u>Focus on Common Triggers or Motives for Suicide</u>: Logically, in-prison stresses such as safety or enemy concerns, victimization fears, gang pressures, or new charges can be seen as sufficient to trigger or motivate suicidal contemplation. These motives were well represented in suicide case reviews conducted in 2015. However, mental health clinicians can sometimes underestimate the impact of in-prison stresses, noting either the inmate's role in the difficulty or the responsibility of custody staff in managing these issues. In other occasions, clinicians rely on reported mental health symptoms without assessing current distress. Additional highlighting of ways to integrate the role of in-prison stresses in inmate suicide within on-going suicide risk evaluation and suicide prevention trainings may be helpful.

9. <u>Prevalence of Suicide in Mental Health Patients</u>: The difference in rates of suicide over a 10-year period between identified mental health patients (52.6 per 100,000) and non-mental health inmates (10.3 per 100,000) is striking. While this suggests the CDCR has been doing a good job of screening and identifying inmates in need of mental health services, it also suggests that more can be done to prevent suicide in identified MHSDS participants. Of course, suicide is associated with a number of mental health disorders, and individuals who self-harm are placed in the MHSDS, suggesting that the rate in mental health populations will always be larger.[47] However, MHSDS staff members receive increasingly extensive and intensive suicide risk evaluation and suicide risk management training in the service of their patients. Increasing the focus on and training for suicide-specific interventions and suicide-specific treatment planning may be the most advantageous next step and may be carried forward by the headquarters SPR FIT. The provision of specialized training in CAMS,[48] DBT,[49] and/or CBT for Suicidality[50] is a worthwhile consideration for discussion.

---

[46] Haukka, Suominen, Partonen, & Lonnquist (2008). Determinants and outcomes of serious attempted suicide: A nationwide study of Finland, 1996-2003. *American Journal of Epidemiology*, 167, 1155-1163.
[47] http://depts.washington.edu/mhreport/facts_suicide.php
[48] Jobes, D. (2016). <u>Managing Suicidal Risk: A Collaborative Approach</u> (2nd Edition). Guilford Press, New York.

10. <u>Capitalizing on Innovations</u>: The introduction of the Mental Health Tracking System (MHTS) in 2014 and the creation of an electronic health record system in 2015 created significant opportunities. First, in creating MHTS, critical information is entered daily into a data warehouse; this information can be used not only to track incidents of self-harm but also to correlate with other system information. The EHRS is also able to load information into the data warehouse. In this way, information is available to generate predictive algorithms for self-harm incidents in the CDCR, another way of identifying high-risk inmates that can alert clinicians to inmates in need of intervention. Additionally, the EHRS provides a way to integrate empirically-supported measures for evaluating suicide risk into clinical practice, lends tools for tracking the impact of safety and treatment planning efforts, and offers ways to evaluate the effectiveness of specific treatment interventions. These innovations should be embraced as advancements in suicide prevention.

Appendix I: Sample High Risk Management Program Policy

---

[49] Linehan, M. (1993). <u>Cognitive-Behavioral Treatment of Borderline Personality Disorder</u>. Guilford Press, New York.
[50] Byran, C., Ed. (2015). <u>Cognitive-Behavioral Therapy for Preventing Suicide Attempts</u>. Routledge Press, New York.



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
**October 2015**

I.    **PRIMARY REVIEWER/RESPONSIBILITY**:
Chief of Mental Health

II.   **PRIMARY MANUAL/MAINTENANCE:**
Mental Health Policy and Procedure Manual

III.  **POLICY:** This local operating procedure establishes and describes the High Risk Management Program (HRMP) at California Men's Colony (CMC) which is designed to be consistent with the Mental Health Services Delivery System (MHSDS) Program Guide and adhere to suicide prevention and response and risk assessment / evaluation practices and policies.  It is implemented to assist in identifying inmate-patients who may be at an elevated risk for self-harm or suicide, provide specific and individualized treatment for these behaviors, and to ensure that clinicians possess the knowledge and skill to adequately evaluate inmate-patients (IPs) for high risk.

IV.   **PURPOSE**: The identification and management of inmates presenting as high risk is critical in order to address inmate suicides and self harm behavior. Inmates who present as high risk may include those who display signs of psychiatric decomposition, unstable medical conditions, grave disability, self-harm behavior, dangerousness to others, frequent Department of State Hospitals (DSH) or Mental Health Crisis Bed (MHCB) admissions, or who have safety and/or housing or custody concerns. Those who engage in self harm behaviors, or who attempt suicide, fall into the general category of inmates who are at risk. Research reveals that prior suicide attempts correlate with risk of eventual successful suicide.

V.    **REFERENCES**:
- Mental Health Services Delivery System Program Guide, 2009 Revision
- CMC Local Operational Procedure (LOP) 10-0006 Suicide Prevention and Response
- CMC Operational Procedure (OP) No. 3012:  Medical Report of Injury or Unusual Occurrence CDCR Form 7219
- Memorandum dated February 5, 2013 from Timothy G. Belavich, Deputy Director Statewide Mental Health Program: "Implementation of the Suicide Risk Evaluation Mentor Program"
- Memorandum dated February 15, 2013 from Timothy G. Belavich, Deputy Director Statewide Mental Health Program: "Suicide Risk Assessment Training"
- 2010 submittal to the *Coleman* Court regarding Suicide Prevention efforts
- Memorandum dated April 12, 2013 from T. Belavich, Deputy Director(A), Statewide Mental Health Program: "Suicide Attempts Data Collection"
- Memorandum dated May 29, 2013 from E. Valenzuela, CMC Warden and T. Fox, CMC Chief Executive Officer: "Reporting Inmate Attempted Suicides and Self Harm"
- Addendum Memorandum to DOM Supplement Section 51030.3 Reportable Incidents, Sub Section 51030.6 Format and Content – Reporting Inmate Attempted Suicides and Self Harm dated January 28, 2014 signed by E. Valenzuela, CMC Warden and T. Fox, CMC Chief Executive Officer
- Memorandum dated August 13, 2013 from T. Belavich, Director (A), division of Health Care Services and Deputy Director, Statewide Mental Health Program:  "Suicide Prevention and Response Focused Improvement Team Coordinator Attendance at Inmate Advisory Councils and Inmate Family Councils"
- Memorandum dated May 8, 2015 from T. Belavich, Director (A), Division of Correctional Health Care Services (DCHCS) and Deputy Director, Statewide Mental Health Program: "Consulting Staff Name Documentation in Health Care Records"
- Memorandum dated May 12, 2015 from T. Belavich, Director (A), DCHCS and Deputy Director, Statewide Mental Health Program:  "Documentation of Mental Health Evaluations and Treatment Plans"

(Orig: 3/2013) Revised: 8/2014, 10/2015          **Mental Health**          Page 1 of 7



| California Men's Colony Health Care Services |
| --- |
| **MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL** |
| <u>**HIGH RISK MANAGEMENT PROGRAM**</u> |
| 10-0016 |
| **October 2015** |

- Memorandum dated July 30, 2015 from T. Belavich, Director (A), DCHCS and Deputy Director, Statewide Mental Health Program and K. Harrington, Director, Division of Adult Institutions: "Suicide Prevention Pamphlets for Inmates and Family/Friends"
- Memorandum dated September 28, 2015 from T. Belavich, Director (A) DCHCS and Deputy Director, Statewide Mental Health Program: "Revision to the Suicide Risk Evaluation Mentoring Program"
- CMC Local Operational Procedure (LOP) 14-0004, Adverse Events and Unusual Occurrences

VI. **APPROVAL AND REVIEW:**
    This procedure shall be updated annually. Last revision: August 2014

VII. **PROCEDURE DETAILS**

    A. **ONGOING EDUCATION AND TRAINING FOR CLINICAL STAFF**

        **Higher Level of Care Issues and Training**
        Trainings are conducted as needed and ongoing with all Mental Health (MH) clinical staff regarding DSH referral and sustainability processes and monitored by Program Supervisors. Monthly and quarterly audits are additionally conducted by the DSH Coordinator (reference LOP 10-0010 DSH Referrals).

        **Suicide Risk Assessment Training**
        All MH clinical staff receives mandatory 7.0 hour training on suicide risk assessment. This is repeated every two years.

        **Suicide Risk Evaluation (SRE) Mentoring Program**
        All clinical staff is mentored by headquarters trained CMC staff on administration of the SRE. This mentoring is conducted with all new staff and is repeated every two years for all staff. Effective September 2015 SRE Mentoring will be provided on an annual basis to all MHCB staff. In addition, when an audited SRE is determined to not meet standards, additional SRE Mentoring may be required (Reference September 28, 2015 Memorandum "Revision to the Suicide Risk Evaluation Mentoring Program.")

        **Self Harm Behavior Reporting**
        All staff including nursing and custody are trained on self harm behavior reporting (see below Section D Other High Risk Management Protocols, item 7).

        **SRE Form 7447 Training**
        All clinical staff is trained locally and via Headquarters' Suicide Prevention and Response Department on completion of this form and Suicide Safety/Treatment Planning.

        **New Employee Orientation**
        All new employees provide orientation to suicide prevention and response in the prison setting and an overview of all protocols and policies, in addition to the above trainings.

    B. **HIGH RISK MANAGEMENT PROGRAM**
        The Coordinator for the HRMP shall be a Senior Psychologist Supervisor or Senior Psychologist Specialist as appointed by the Chief of Mental Health. The HRMP Team is comprised of the HRMP Coordinator, Primary Clinician (PC) (s) and other treatment team members as indicated.

(Orig: 3/2013) Revised: 8/2014, 10/2015         **Mental Health**          Page 2 of 7



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
October 2015

1.  Identification of High Risk IP

    The process of identifying High Risk IPs shall be done by all MH clinical staff at CMC. Any IP requiring short or long-term intervention and treatment for high risk factors shall be considered for referral to the program.

    High Utilizer Report
    All IPs included on the High Utilizer Report generated from the MH Patient Registry on the Quality Improvement share site, are considered "high utilizers" of higher levels of care, and this must be documented on the IPs treatment plan as long as he is on the list. Consideration of referral to the HRMP must also be documented and referral made if clinically indicated. If a referral is not made or the clinician does not consider the IP's high utilization as indicative of high risk behavior, then the clinician must document the rational for non-inclusion on a CDCR 7230, Interdisciplinary Progress Note, and reference this note on every treatment plan as long as the IP remains on the list. This list and protocol is audited semi-annually at minimum and training is provided in all cases of non-compliance.

    Other sources that may be utilized to identify high risk IPs may include the following:

    a.  DSH Indicator Report (generated from Mental Health Tracking System (MHTS.net)). Staff is required to document and integrate any positive criteria into Interdisciplinary Treatment Team Plans (IDTT).

    b.  Weekly Treatment Hours Summary (High Refusers) Report (generated from MHTS.net). Staff is required to document and address IPs refusing treatment into IDTT Plans.

    c.  All DSH returns and MHCB discharges remaining at CMC will be considered for referral to the HRMP.

2.  Staff Referrals to the HRMP

    In addition to those inmates identified through the steps above, any clinician can make a referral to the high risk program at any time.

    a.  The HRMP referral form (ATTACHMENT A) shall be used for referrals to the high risk program.

    b.  The referral is made to the HRMP group facilitators or Coordinator. The HRMP Team will perform a file review focused on review of risk factors as well as protective factors that may contribute to the IPs high risk status and conduct a screening interview with the IP. Suicide and self-harm history, methods of suicide attempts, frequency of suicide attempts or self-harm, and other relevant MH and medical conditions are among the areas focused upon in the chart review. If appropriate and in coordination with the PC, the IP will be assigned to the HRMP.

    c.  Final determination for inclusion is at the discretion of the HRMP Team. If placement is not appropriate for the HRMP, the reviewer will notify the PC for further assessment of the need for a possible higher level of care, or other appropriate treatment referrals or recommendations.

(Orig: 3/2013) Revised: 8/2014, 10/2015          **Mental Health**          Page 3 of 7



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
**10-0016**
**October 2015**

3. Management and Treatment of High Risk Inmates

    a. A High Risk Management Program will be provided in mainline Enhanced Outpatient Program (EOP) and Correctional Clinical Case Management System programs and in Administrative Segregation Unit (ASU).

    b. High risk factors must be documented on every treatment plan as a specific area of focus with measurable and objective goals defined and documented.

    c. The IDTT will formulate a treatment plan specific to the IPs inclusion in the HRMP including high utilization or high risk factors as applicable. The plan will include and document developmental history; criminal history, including a description of the commitment offense and past offenses; history of violence; substance abuse/dependence history; mental health history; history of suicide attempts and self harm behaviors; family history of suicide attempts or completed suicide; review of diagnoses; provision of treatment recommendation and treatment management; and frequency of clinical contact and IDTT meetings.

    d. Completion of Treatment Plans, SREs and all documentation shall be completed within all required timeframes as stipulated in the MHSDS Program Guide, 2009 Revision, and per all applicable California Correctional Health Care Services Memoranda to include: "Documentation of MH Evaluations and Treatment Plans" dated May 12, 2015 and "Consulting Staff Name Documentation in Health Records" dated May 8, 2015. Changes to the Treatment Plan due to identified high risk factors may necessitate completion of a full plan instead of an addendum or summary. SREs must also be completed as clinically indicated by presence of high risk factors.

    e. The HRMP treatment for IPs identified as high risk will be provided in a group format with ongoing consultation and involvement of the PC. The focus of the group will be on distress tolerance, affect regulation, coping skills, and suicide risk management utilizing a Dialectical Behavior Therapy informed treatment. For IPs not appropriate for group treatment, this treatment may be provided individually by the PC as determined by the IDTT and may include increased individual sessions.

4. Movement/Housing Changes

    Whenever an IP identified as "High Chronic" or "High Acute" risk on the most recent SRE, and/or is enrolled or referred to the HRMP and is re-assigned to a new PC for any reason, or moves to a different part of the institution, the PC will communicate with appropriate clinics about the arrival/departure of the IP. If the IP is transferring to a different institution, the PC will make every effort to communicate with the receiving facility to provide clinical and high risk information. Reference below for specific treatment for this population as well.

**C. SUICIDE PREVENTION REVIEW - FOCUS IMPROVEMENT TEAM (SPRFIT)**

    The goal of CMC SPRFIT is to provide focus on appropriate suicide risk assessment and evaluation, training and education. The SPRFIT meets monthly and discusses all suicide attempts and self-harm incidents that occurred that month, and/or the previous month.

    Written summaries that include all incidents of self-harm, with or without the intent to die are provided for extensive review and discussion by the multidisciplinary staff. These summaries

(Orig: 3/2013) Revised: 8/2014, 10/2015        **Mental Health**        Page 4 of 7



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
**HIGH RISK MANAGEMENT PROGRAM**
10-0016
**October 2015**

incorporate file reviews and clinical consultations; list identified risk and protective factors; clinical and suicide history; and relevant mental health and medical conditions.

1. A formal clinical presentation of a suicide attempt or serious incident from the previous month is made at each meeting with extensive multi-disciplinary staff discussion.

2. All self harm incidents are presented and discussed.

3. The SPRFIT Coordinator attends the Emergency Medical Response Review Committee and presents all self-harm incidents and receives information regarding medical codes. These codes are reviewed and if any mental health issues are indicated further clinical review and consultation will be conducted as applicable.

4. The SPRFIT Coordinator maintains ongoing dialogue with Facility Captains, other custody and medical staff, and shall be notified of all incidents and shall receive the Daily Briefing Report in addition to all applicable Incident Reports.

5. The SPRFIT Coordinator attends and reports to the Mental Health Program Subcommittee (MHPS) twice monthly. All relevant incidents are reviewed and discussed and reports or audits are presented as indicated. The SPRFIT Coordinator maintains monthly logs of all self-harm incidents and suicide attempts. These logs include clinical and demographic information, and track known high risk factors as well and any trends which are analyzed, reported and discussed at the SPRFIT meetings and/or in other forums as needed. The monthly data is provided to the DCHCS Suicide Prevention SharePoint site. A clinical high risk / self harm summary is provided on each case and provided to clinicians and to all Peer Review Committees for further review as indicated.

**D.  OTHER HIGH RISK MANAGEMENT PROTOCOLS**

1. IPs with repeat admissions to higher levels of care are tracked and monitored and if clinically indicated provided specialized group and/or individualized treatment specifically regarding high utilization as described above.

2. All DSH returnees and MHCB discharges are evaluated and screened by a designated clinical staff and referred as clinically indicated to the HRMP Transitions Group Treatment program specifically designed for this purpose.

3. The Program Supervisors and/or DSH Coordinator or designee reviews all Interdisciplinary Treatment Team Level of Care Decision, CDCR MH-7388-B forms. Positive indicators are discussed including consultation with the HRMP team as needed.

4. HRMP team members attend IDTTs as requested when any IP in the HRMP is presented, or for any other consultative purpose as needed.

5. The DSH Coordinator or designee performs two 7388-B audits and presents findings to the institution MHPS and HRMP Coordinator.

6. The DSH Coordinator or designee coordinates and ensures that MHCB and DSH returnee information is provided to staff.

7. Self Harm Reporting:



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
<u>**HIGH RISK MANAGEMENT PROGRAM**</u>
10-0016
October 2015

a. Nursing responds to self-harm incidents and consults with the MH Clinician of the Day, assigned clinician, other responding clinician, or the Psychiatrist on Call after hours to obtain a determination if the event was a self-harm behavior with or without intent to die. Nursing then provides the Self-Harm Mental Health Chrono 128-C to the SPRFIT Coordinator or designee.

b. The responding MH clinician shall provide, no later than the following business day, a full Incident Notification of the self harm behavior to the SPRFIT Coordinator or designee. An additional follow up report may be required as well. This notification shall be made via email and shall include:
   i. The inmate's name, CDCR number and level of care
   ii. Location/cell number
   iii. A very brief description of what specifically occurred, including IP statement
   iv. Date of incident, Time of incident
   v. What the clinical determination was regarding the incident (intent to die, no intent to die, or unknown and further review required)
   vi. What the disposition was (e.g. returned to housing, admitted to MHCB, etc.)

c. The SPRFIT Coordinator or designee shall provide the Self Harm Chrono to relevant Custody and Nursing staff and the clinical information to relevant clinical staff.

d. These protocols are also defined in the Suicide Prevention LOP 10-0006 and OP No. 3012: Medical Report of Injury or Unusual Occurrence CDCR Form 7219.

e. Self harm behaviors are specifically addressed in the HRMP Group Treatment.

f. All self harm must also be reported in accordance with CMC Local Operational Procedure (LOP) 14-0004, Adverse Events and Unusual Occurrences.

8. IPs Transferring from CMC

   Transfer from CMC has been identified as a high risk factor for CMC IPs. To address this risk, a specific clinical group was devised and implemented. The *Preparation for Transfer* group focuses on preparing EOP IPs for transfer to either a corresponding CDCR institution or to a DSH facility. The group is facilitated by a MH clinician (psychologist or clinical social worker) and may include a correctional counselor as indicated. The facilitators assist IPs by providing ways to reduce anxiety, discuss safety concerns, building and maintaining positive coping strategies utilizing Cognitive Behavioral Therapy (CBT), and focus on reality-based information, in order to pave the way for a smooth transition by processing concerns and incorporating psycho-education and CBT.

9. Keep on Person (KOP) Medications

   KOP medications may be contraindicated for high risk IPs. The DCHCS SPRFIT is discussing possible policy changes regarding KOP medications and high risk IPs. CMC shall implement this policy as soon as it is available. In the interim, all IPs enrolled in or referred to the HRMP; who have a "High Chronic" or "High Acute" risk level determination on their last SRE; or who demonstrate significant high risk factors, shall be assessed by the PC and the IDTT regarding KOP medications as applicable. This

(Orig: 3/2013) Revised: 8/2014, 10/2015          **Mental Health**          Page 6 of 7



California Men's Colony Health Care Services
**MENTAL HEALTH DEPARTMENT POLICY AND PROCEDURE MANUAL**
<u>**HIGH RISK MANAGEMENT PROGRAM**</u>
10-0016
October 2015

assessment shall include consultation with the primary medical provider. This consultation shall be appropriately documented. Through this process review an IP may be referred to medical for possible exclusion of KOP medications. This decision shall be reviewed at minimum, every IDTT.

**OUTREACH**

CMC will provide the following outreach and communication:

1. A Suicide Prevention DVD written and performed by CMC inmates is played on the local television system for all inmates. This DVD has been provided to all institutions statewide for utilization.

2. An outreach/referral system is integrated on general population yards including both CMC East and West Facilities.

3. Suicide prevention and general MH outreach fliers are posted throughout the institution to include chapel locations and where inmates meet with Board of Prison Terms and attorneys.

4. Outreach and communication is ongoing with non-MH staff, including custody, medical/nursing, and religious services.

5. Senior Supervisors routinely tour ASU and EOP housing units, meeting with staff and inmates to identify at-risk inmates.

6. The SPRFIT Coordinator or designee attends Inmate Family Council (IFC) and Men's Advisory Council (MAC) meetings to represent MH and provide information regarding suicide prevention.

7. Suicide Prevention information pamphlets are provided throughout the institution for visiting personnel and inmates alike, and provided at IFC and MAC meetings.

**E. AUDITS**

Audits on processes described above will be conducted and reported to the Suicide Prevention and Response Focused Improvement Team and to the MHPS as indicated. Reference LOP 10-0006 Suicide Prevention and Response for details.
APPROVED:

_T. Meyers, MD_                    _10/15/15_
CHIEF OF MENTAL HEALTH                Date

_Leese Macias_                     _10/28/15_
QUALITY MANAGEMENT COMMITTEE          Date

_Leese Macias_                     _10/28/15_
LOCAL GOVERNING BODY                 Date

ATTACHMENT:
Attachment A – HRMP Referral

(Orig: 3/2013) Revised: 8/2014, 10/2015          **Mental Health**          Page 7 of 7

**HRMP Group Referral Form** (08/12/2014)

Inmate name _____    CDC#_____    DOB_____

LOC (circle one)  MHCB/ EOP/CCCMS    Release Date_____    TABE score_____

Reason for referral to HRMP

_____

_____

Suicide attempt / self-harm history

_____

_____

The HRMP group utilizes a modified DBT skills model.  Each group will meet twice weekly for approximately 6 months.  There are currently several HRMP groups available, based on the IP's level of functioning.

_____          _____
Referring Clinician (print legibly)                Today's Date

Appendix II: Self-harm and Incident Reporting

**Institutional reporting of self-harm incidents:** All incidents of self-harm in the CDCR are reviewed by institutional staff members, including mental health clinicians. When an incident of self-harm occurs, regardless of the severity of injury sustained, mental health clinicians discuss the event with the patient and determine whether the intent was to die (thus a suicide attempt) or if the self-harm served some other purpose, such as to relieve tension states, without any intention to die. The self-harm database also includes data on self-harm incidents that result in death.

All incidents of self-harm are entered on a self-harm database. The self-harm database serves as a way for mental health clinicians to track incidents within a facility, to allow Regional and SMHP staff members a view of the frequency of self-harm across facilities, to identify patients for High Risk Management Lists or Program(s) within a facility, and to further examine risk factors. A sample High Risk Management Program policy is found in Appendix I.

When a suicide attempt involving serious bodily injury occurs in the CDCR, the incident is documented using CDCR Form 837, Serious Incident Report, and institution mental health staff members are notified of the incident. Each incident is also relayed through one of two reporting processes; the Daily Briefing Report (DBR) or the Administrative Officer of the Day (AOD) report. The information in either report is sent to the administration of the Division of Adult Institutions (DAI) and forwarded to the CDCR's SMHP. In some cases, a suicide attempt involving serious bodily injury results in death at a later time; the DBR or AOD report are updated in this case to reflect that a death by suicide has occurred. In such cases, the DBR or AOD report is updated to inform the DAI and the DAI Mental Health Compliance Team of a death by suicide.

**Institutional reporting of suicide:** In the event of the discovery of a suicide attempt in progress, emergency medical interventions are made until such time as the individual is pronounced deceased by a qualified physician. Correctional officers who come upon a suicide attempt in progress are to sound an alarm and initiate life saving measures until relieved by health care personnel. Officers are trained in CPR and in procedures to respond to emergencies, including in bringing cut-down kits to the scene of a suicide in progress.[51] Custody officers will assist health care staff members, including institutional responders and paramedics, in transporting the patient to the TTA and/or ambulance. In cases in which emergency interventions are not successful, the watch commander or senior custody officer is notified of the suicide and in turn notifies the Warden or the AOD of the death.[52] A CDCR Form 837, Serious Incident Report, is completed on all suicides.

The Chief Medical Executive or physician designee makes a report of the death by suicide within eight hours of the event. Medical information is provided in the CDCR Form 7229A *Initial Inmate Death Report*. This form, once completed, is distributed internally, to the county coroner's office, and to the Death Review Coordinator at headquarters. A separate form is completed by institutional mental health staff, form CDCR MH-7229B *Inmate Suicide*. This form is typically completed by the institutional SPR FIT Coordinator and contains information on prior suicide attempts, the results of recent suicide risk evaluations, etc.[53] The form is retained at the facility and sent to the SMHP. Once received, SMHP support staff ensures the suicide is entered into a log, reports the event to nursing leadership, and alerts the SMHP Suicide Response Coordinator to the event.

---

[51] MHSDS Program Guides, 2009 Revision, pages 12-10-21 to 12-10-23
[52] MHSDS Program Guides, 2009 Revision, pages 12-10-24
[53] *Id.*

Appendix III: Determination of Unknown Causes of Death

**Determination of unknown causes of death**: On occasion, a death will occur within a CDCR institution in which the cause of death is not immediately determined. These cases are classified as "Unknown Deaths." These cases receive special attention until the cause of death is determined. In order to track these deaths, a group of employees at the SMHP are assigned to review *all* notifications of deaths within the CDCR. As noted, each institution within the CDCR is required to make a report of death and to provide documentation on the provisional cause of a death in a CDCR 7229A. A completed CDCR 7229A contains a preliminary summary of the circumstances of the death and lists any underlying/significant medical conditions. These documents are uploaded to a SharePoint site that can be accessed by members of the Death Review Committee and the SMHP. Additionally, the Death Review Coordinator for the CCHCS produces a daily report on all CDCR deaths.

In 2015, a total of 330 inmates perished in the CDCR, with 159 of the decedents (48%) involved in the MHSDS at the time of death. Whenever a *Coleman* class member dies, the OSM is notified of the circumstances and cause of the death by the SMHP. In all cases in which the cause of death is provisionally listed as a suicide, an additional mental health review is completed by the institution and documented using a CDCR 7229B. In all such cases and whenever any inmate dies from suicide, the OSM is notified of the circumstances and the specifics of the suicide. At times, notifications to the OSM may be updated with the receipt of additional information, such as results from autopsies, toxicology screens, and so forth.

In the event that a death notification lists the cause of death as unknown or undetermined, the SMHP will track the case until the death is classified. On some occasions, the cause of death is classified quickly by institutional medical review. In other cases, the cause of death remains undetermined pending the receipt of autopsy or toxicology results. In such cases, the Death Review Committee will investigate the death and produce an initial cause of death as well as a final cause of death determination. In the meantime, the SMHP communicates with the institution and with the DRC on these cases until the cause of death is determined. A member of the SMHP also sits on the DRC to ensure all unknown deaths are reviewed and, when applicable, that the possibility of suicide has been closely and objectively considered.

The SMHP reviews unknown deaths in order to ensure that all deaths are accurately identified as either due to suicide or not due to suicide. Cases are identified for this additional review when the cause of death is overdose, to determine if the overdose is most likely accidental or intentional (suicide). Other cases are identified when the cause of death is potentially related to

mental health treatment needs and/or when the death may have resulted as the long-term consequence of a self-harm behavior.

The following guidelines are used to determine unknown deaths:

Reviewers Determination of Unknown Deaths Guidelines

1. Review the method of death to determine if there may have been an alternative reason (other than suicide) for the behavior (e.g., autoerotic asphyxiation, confusion and inability to form intent, purposeful intoxication, etc.).

2. If an overdose on substances is it reasonable the substance (illicit or prescribed) may have been used in an attempt to become intoxicated? (e.g., Tylenol is not likely to be used to become intoxicated; Klonopin may be).

3. Review recent mental health history and any past history of suicide attempts/self-harm behavior (check self-harm log). Did the inmate:
   - Voice suicidal ideation (including conditional suicidal ideation)?
   - Have admits to MHCB?
   - Engage in self-harm behavior?
   - Have a history of depression or mood disturbance?
   - Have a history of psychosis?

4. Review substance abuse history.
   - What substances were used?
   - Have there been any past overdoses?
     - If yes, what did the inmate say about them at the time?
   - What substance abuse treatment was offered?
   - How recent are reports of current use?

5. Review recent custodial information.
   - Was the inmate facing criminal charges?
   - Did the inmate lose an appeal?
   - Did the inmate have any recent losses?
   - Was there any bad news readily apparent?

6. Review medical information for the presence of:
   - Chronic pain
   - Terminal illness

7. Was there a suicide note or a note that could be construed as such?

Appendix IV: Review of Individual Suicide Case Reviews

Cases **EE to NN** were deaths initially classified as unknown deaths. Each of these cases was eventually determined to involve death due to drug overdose.

Case EE was provisionally determined to have had an illicit drug overdose per the CDCR 7229A completed at this death. Toxicology results indicated methamphetamine intoxication. Autopsy reports also determined no other cause of death; the death was ruled as an accidental drug overdose secondary to methamphetamine intoxication. Additionally, three baggies containing methamphetamine were found on EE during autopsy, secreted in various bodily orifices. The Combined Death Review Summary (CDRS) also determined methamphetamine overdose to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. Case EE had an extensive substance abuse history as well. All evidence in the case argued for an accidental overdose and not an intentional overdose (a suicide).

Case FF was provisionally determined to have had an anoxic brain injury that occurred on account of an illicit drug overdose (per the CDCR 7229A completed at his death). Toxicology results indicated methamphetamine intoxication. Autopsy reports determined the cause of death as an accidental drug overdose secondary to methamphetamine intoxication. Case FF was known to have significant substance abuse problems and had been found by custody officers the day before his death in possession of inmate-manufactured alcohol. The Combined Death Review Summary (CDRS) also determined methamphetamine overdose to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. He had a history of chronic back pain but pain medications were not implicated in his death. The evidence in this case is strong for an accidental overdose rather than for an intentional overdose (a suicide).

Case GG was listed as an unknown death per the CDCR 7229A. However, toxicology results were positive for methamphetamine intoxication. Autopsy reports determined the cause of death to be acute methamphetamine intoxication. Additionally, multiple bindles were found on Case GG during autopsy. The Combined Death Review Summary (CDRS) determined methamphetamine toxicity to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. Case GG had an extensive substance abuse history as well. He had a history of knee pain for which he was treated

with Tylenol; however, this medication was not implicated in his death. The evidence in the case argues for an accidental overdose and not an intentional overdose (a suicide).

Case HH was listed as an unknown death/probable overdose on his CDCR 7229A. However, toxicology results were positive for Fentanyl, a synthetic opioid. Autopsy reports determined the cause of death to be acute Fentanyl intoxication. The Combined Death Review Summary (CDRS) determined Fentanyl toxicity to be the cause of death. Additionally, the inmate's cell was searched, with a syringe and drug paraphernalia found in his property. No suicide note was found. Case HH had an extensive substance abuse history as well and had received a RVR on 6/29/15 for Possession of a Controlled Substance for Distribution. He was placed in ASU for several weeks but had returned to general population housing. On the other hand, Case HH did have a history of suicide attempts, including an intentional overdose attempt in 1995. He had also received recent bad news three months prior to his death. He was informed that his grandmother had died and he responded by swallowing a razor blade at the time. Case HH had a history of chronic back pain for which he was treated with Tylenol and Naproxen. These medications were not implicated in his death. The evidence in the case is complex, though there appears to be stronger evidence for an accidental overdose than for an intentional overdose.

Case II was listed as possible drug overdose on the CDCR 7229A completed at his death. Toxicology results were positive for Fentanyl intoxication. Autopsy reports determined the cause of death to be accidental drug overdose/Fentanyl intoxication. The Combined Death Review Summary (CDRS) also determined Fentanyl toxicity to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. He also had no known chronic pain issues. Case II had an extensive substance abuse history and was found at autopsy with multiple needle marks on his arm, with illicit drugs and syringes found in his cell as well. The evidence in the case argues strongly for an accidental overdose rather than an intentional overdose.

Case JJ was listed as an unknown death and provisionally as a death due to respiratory failure secondary to drug overdose (on CDCR 7229A). Case JJ was discovered in his cell with a syringe in his hand. The syringe was found to contain heroin, acetyl codeine, and papaverine (an opioid). Methamphetamine was not found in the tested syringe but was present per toxicology results. Prescribed medications were also found in his system but reported to "not excessive." The autopsy report determined the cause of death to be accidental drug overdose by the combined effects of acute heroin and methamphetamine intoxication and the prescribed medications. Multiple drug injection marks were found on the body. The Combined Death Review Summary (CDRS) also determined the cause of death to be overdose. The case had a history of suicide attempts, using attempted hanging and exsanguination. He was treated at the EOP level of care and had prior inpatient stays. The patient's father had passed away one month before the death. Mental health notes reported that clinicians were working with the patient on bereavement issues

and that Case JJ was denying suicidal thoughts, plans, or intent. Case JJ also had known chronic back pain and an extensive substance abuse history. The evidence in the case argues is somewhat equivocal, suggesting that suicidal motive could have been present but denied by the patient. However, the evidence is stronger for ongoing IV drug use, as noted by the track marks found in many places on the body, and for an accidental overdose, as noted from the contents of the syringe found at the time of discovery.

Case KK was listed as possible drug overdose per his CDCR 7229A. Toxicology results were positive for heroin intoxication. Autopsy reports similarly determined the cause of death to be heroin intoxication. Additionally, a number of hypodermic needles were found in Case KK's cell, suggesting a pattern of illicit drug use. The Combined Death Review Summary (CDRS) determined heroin toxicity to be the cause of death. The case had no known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. Case KK had an extensive substance abuse history. He had a history of back pain. The majority of evidence in the case argues for an accidental overdose rather than an intentional overdose (a suicide).

Case LL was listed as an unknown death per the CDCR 7229A. Case LL was known to have significant medical issues, including hepatic cirrhosis and Hepatitis C, prior to his death. However, toxicology results were positive for morphine intoxication. Autopsy reports determined that morphine intoxication was a tertiary cause of death with cirrhosis being the primary cause of death. The Combined Death Review Summary (CDRS) agreed with this determination; that is, that morphine ingestion was not the primary cause of death. Notably, Case LL did have a history of chronic neck and low back pain and he was treated with opiates. He also had a history of substance abuse problems. Case LL did not have a known history of suicide attempts, had not received recent bad news, and did not leave a suicide note. The evidence in the case is suggestive of a death from medical illness with secondary accidental overdose with morphine. There is little or no evidence of an intentional overdose (a suicide).

Case MM was listed as an unknown death on the CDCR 7229A completed at the time. Toxicology results were elucidating, with both morphine and methadone found. The patient did have chronic back pain and was on multiple prescribed medications for pain. However, upon Death Review Committee study, both medications were found to be elevated, suggesting acute toxicity/intoxication. Additionally, Case MM's cell was found to have syringes, despite the fact that his opioid medications were crushed for administration. The medications were crushed on account of the severity of the inmate's substance abuse difficulties. The autopsy report on the case determined the cause of death was "acute morphine and methadone intoxication (hours)." The autopsy noted left-ventricular cardiac hypertrophy, pulmonary edema, and cirrhosis of the liver as well. Case MM was known to have hypertension, diabetes mellitus, type 2, hepatitis C, and end-stage liver disease. Case MM was in the MHSDS at the CCCMS level of care. He was treated for anxiety and was in treatment groups for pain management. Mental health notes do not document concerns about suicidality and largely focus on pain symptoms. No suicide note was

found in the case and there was no known receipt of bad news. The majority of evidence in the case argues for an accidental overdose rather than an intentional overdose (a suicide).

Case NN was provisionally listed as an unknown/possible drug overdose death on CDCR 7229A. His cellmate was initially suspected in his death, but no signs of trauma were found on the body. A cell search produced drug packaging materials. Case NN was known to have significant substance abuse issues. Post-mortem toxicology findings were positive for opiates, with autopsy results indicating acute opiate toxicity as the cause of death. The Combined Death Review Summary (CDRS) concluded that opiate ingestion/toxicity was the cause of death. Case NN was in the MHSDS at the CCCMS level of care. He reportedly was placed in CCCMS after being charged with heroin possession in 2014; he reported some distress upon placement in ASU. He improved while in ASU but was retained in CCCMS. Case NN had no known history of suicide attempts. He did have back pain issues, for which he was treated with Ibuprofen. Case NN had not received recent bad news and did not leave a suicide note. The evidence in the case weighs strongly on the side of an accidental overdose of opiates. There is little or no evidence of an intentional overdose (a suicide).

Appendix V: Suicide Response Procedures

**Reporting of a suicide to stakeholders:** When an inmate dies by suicide, members of the SMHP complete two formal notification processes. First, a death notification is written and sent to the OSM and contains details of the suicide. Second, a summary of the suicide is composed and sent to the Deputy Director of the SMHP and the Undersecretary of the DHCS. The Public Information Officer at the institution is assigned with any local notifications or reports regarding the death, including notifying the next of kin of the suicide.

**Institutional internal review process**: The internal process for reviewing suicides at CDCR institutions includes reviews by mental health, custody, and nursing/medical personnel employed at that site. The reviews are conducted first within disciplines and then within joint institutional reviews, such as during SPR FIT and emergency medical response committee meetings.

Each institution within the CDCR has a Suicide Prevention and Response Focused Improvement Team, or SPR FIT, with a Senior Psychologist-Specialist assigned to coordinate local prevention and response efforts. The institution's SPR FIT is established and maintained by the Mental Health Program subcommittee, with both committees part of local Quality Management

Committees.[54] Each institutional SPR FIT is responsible for monitoring and tracking all self-harm events, ensuring that appropriate treatment and follow-up interventions occur. When deaths by suicide occur, the local SPR FIT Coordinator is required to notify the SMHP, to provide assistance to mental health, custody, and nursing suicide reviewers, and to ensure the implementation of Quality Improvement Plans (QIPs) resulting from the suicide review.[55]

**External review processes**: CDCR's response to suicides includes several external reviews by trained representatives from various disciplines, including nursing, medical, custody, and mental health. Within three days of the suicide, reviewers are assigned from these disciplines at what is commonly referred to as the headquarters level. The role of each discipline's review is discussed separately below, but these disciplines collaborate with each other during the suicide review process, sharing initial findings, conducting reviews together, etc.

Trained custody and mental health reviewers conduct an on-site visit together within seven days of a suicide. Reviewers look at the deceased's property, listen to recorded phone calls, check trust account records, and talk with the Investigative Services Unit (ISU) of the specific prison.

---

[54] MHSDS Program Guides, 2009 Revision, pages 12-10-2 to 12-10-4
[55] *Id*

Reviewers evaluate the emergency response that took place during or after the suicide and review the medical and mental health services rendered in the case, if applicable. Reviewers will also talk with officers, clinicians, work or school supervisors, and cellmates who may have known the patient. Reviewers may gather information from other sources as well, such as through interviews of family members. After thorough chart review, reports are generated by each discipline, with a combined report, the Suicide Report, distributed and discussed in the Suicide Case Review.

Suicide Case Review (SCR) meetings review findings in the case within and across disciplines while sharing information with institutional leadership. The Suicide Report contains quality improvement plans (QIPs) that are presented at the SCR; these plans cross disciplines as well. Nursing, medical, and mental health disciplines additionally have peer review bodies that are able to review staff member performance whenever such a need is indicated. The external review process is completed when all QIPs have been successfully implemented or resolved in the case.

**DAI Mental Health Compliance Team (MHCT) reviews:** The reviews completed by DAI's MHCT focuses on the performance of custody staff members related to the suicide. The MHCT member reviews custody documentation and institutional records (i.e., SOMS). The MHCT member's role is to determine whether departmental suicide prevention practices and policies were followed by custody and counseling staff involved in the case. The MHCT reviewer, for example, evaluates whether custody officers followed procedure within an emergency response, how quickly the response was called once a suicide in progress has been discovered, and whether all custody staff responding to the suicide had received required training (e.g., in CPR) within set timelines (e.g., annually). The context of the suicide may necessitate additional review items. Most notably, if the individual was in a segregated or restricted housing unit at the time of the suicide, the MHCT reviewer will evaluate performance on tasks such as timeliness and quality of welfare checks, as specified by policy, whether inmates new to an ASU were placed in intake cells, and so forth. The MHCT reviewer also determines a timeline for the emergency response and for significant events leading up to the suicide. Finally, the MHCT reviewer will document any concerns noted and will recommend corrective action/QIPs.

**Nursing reviews:** At the same time as a suicide is reviewed by DAI's MHCT, a Nurse Consultant Program Reviewer (NCPR) is assigned by a Headquarters Chief Nurse Executive. The NCPR does not make an on-site visit, but reviews all health care record documentation as to the quality of nursing care in the case. Psychiatric technician practice is also covered within the nursing review. The NCPR and mental health case reviewer frequently consult on cases during the review period.

The NCPR generates a Nursing Death Review Summary (NDRS). The NDRS lists the primary cause of death, notes whether coexisting conditions were present prior to the death, summarizes medical history, reports what medications and medical treatment the patient was receiving, and documents significant events that occurred medically for the patient prior to and at the time of

discovery. The NCPR determines if nursing standards of care were met within the emergency response to the suicide and whether nursing standards of care were met in the overall medical care of the patient prior to the time of death.

**Death Review Committee reviews:** The CCHCS DRC reviews all causes of inmate mortality within the CDCR. When suicides occur, the DRC assigns a physician to serve as the medical reviewer. This physician works with the NCPR to look at all aspects of medical care received by the patient and will yield an opinion as to the cause of death. As needed, the SMHP reviewer may also consult with the CCHCS physician reviewer. The physician and NCPR produce a Combined

Death Review Summary (CDRS) on each case. The CDRS contains both an administrative review and a clinical mortality review of the case. In cases of suicide, the suicide case review report (discussed below) is reviewed by the Death Review Unit and addends or is integrated with the Combined Death Review Summary.[56]

**Statewide Mental Health Program (SMHP) reviews:** Simultaneously to custody, medical, and nursing reviews, a trained member of the SMHP is assigned to review each suicide. The assigned Mental Health Suicide Reviewer (MHSR) is typically a Sr. Psychologist, Specialist, who is tasked with completing a Suicide Case Review (SCR). The MHSR schedules an on-site visit with the institution and is accompanied by the custody reviewer. The site-visit is conducted within seven calendar days of the death. The site review consists of an inspection of the location of the suicide and of the means used in the death, a review of the deceased's personal property, and interviews of inmates, officers, medical, or mental health staff members who knew, interacted with, and/or treated the deceased. The deceased's property is inspected to see if there is any information present related to the suicide, such as a suicide note, letters to the inmate informing he/she of bad news, and so forth. Interviews focus on behavior and statements made in the days prior to the suicide, with questions about anything the deceased may have said about being distressed or suicidal in past days, weeks, or months. Photographs of the scene at the time of death and photographs of the autopsy are also made available. Phone records, trust accounts, toxicology reports, and other sources of information are also made available. The MHSR may contact family members of the deceased to gain additional information about the individual's state of mind, statements made prior to the suicide, etc.

In addition to the on-site review, the MHSR reviews extensive documentation from medical and custodial files. The focus of the MHSR's review will vary based on the factors in the case, though all relevant information is reviewed in each case. In some cases, the review will concentrate on mental health treatment while in the CDCR, in others on the quality of suicide risk assessment, in others on the presence or absence of distress when an inmate is placed in administrative segregation, and so on. SMHP psychiatry staff review the psychiatric care and

---

[56] IMSPP Volume 1, Chapter 29.2

consult with the MHSR. The MHSR will review information from each of the institutions where the deceased resided and will look at whether mental health policy and procedure was followed at each setting.

**Joint CDCR/DSH Suicide Reviews**: When a suicide occurs of an individual who resides at a DSH facility, or when a suicide occurs within 30 days of transfer from a DSH hospital, a joint review is conducted. The DSH's Mortality Interdisciplinary Review Committee (MIRC) reviews suicides that occur within the DSH, with input from the Suicide Case Review Committee (SCRC) at the CDCR. Joint CDCR MHSRs and MIRC reviewers look at the case collaboratively to evaluate the mental health, medical, custodial, and nursing care rendered in the case. A joint report is generated in each situation, with corrective action plans developed jointly. [57] The SCRC reviews QIP responses created through this process conjointly with the MIRC.

**Determination and tracking of Quality Improvement Plans**: Each Suicide Case Review report may include formal Quality Improvement Plans (QIPs) as applicable to the case. QIPs are developed based on the concerns raised by custody, nursing/medical, and/or mental health case reviewers. QIPs may represent areas of deviation from policy or procedure, departures from standards of care, or systemic issues that require examination, modification or innovation. QIPs may be written for any discipline and can focus on the specific institution where the suicide occurred. If systemic issues are identified, the QIP can be directed to the DCHS Suicide Prevention and Focused Response Team (DCHS SPR FIT), a team that can address statewide policies and practices. The DCHS SPR FIT team includes representatives from nursing, custody, legal, mental health, and mental health quality management. This representation allows the team to review issues and find solutions in a manner that is inclusive of disciplines and effective in addressing problems.

During Suicide Case Review teleconferences, the Suicide Case Review Committee (SCRC) will assemble and the case reviewer will read sections of the Suicide Report. The SCRC is made up of members of the CDCR Statewide Mental Health Program, DAI MHCU, Nursing Executives, the Office of Legal Affairs, and medical personnel (as needed). The SCRC also discusses the QIPs raised within the Suicide Case Review with the institution. Institutional staff can respond to and/or clarify concerns raised in the report, can raise additional concerns, or can discuss ways of meeting the requirements of QIPs. Since late 2015, experts from the *Coleman* court are present by phone and can raise additional concerns or issues. QIPs can also be written as pending concerns that need to be addressed *if* a fact or finding awaits further information, such as awaiting the results of a coroner's report to determine the time of death.

**Audits of SCR Quality:** The DHCS Quality Management Unit audits all SCRs for 15 items. SCR's are scored with required elements marked present or absent.

---

[57] DSH Administrative Letter AL2015-19, issued November 2015.

Annual Suicide Report | 2015

Appendix VI: Suicide Response Court-ordered and Internal Deadlines for Suicide Reports

Appendix VII: Memorandum "Designation of Suicide Prevention, Assessment and Training Coordinator"

| *Coleman* Deadlines per Program Guide * | | Internal Deadlines | |
|---|---|---|---|
| Assign suicide reviewer | Within 2 days | | |
| Reviewer visits institution | Within 7 days | | |
| Suicide report received at HQ | Within 30 days | | |
| | | Report reviewed, edited, QIPs developed and sent to all case review participants with request for feedback from reviewers | 5 days prior to case review (no later than DAY 40 after DOD) |
| Suicide Case Review | Within 45 days | | |
| | | Final report edits | Within 1-2 days |
| | | Signed by MH Deputy Director | Within 1-2 days |
| | | Signed by DAI | Within 3-5 days |
| Final suicide report to institution | Within 60 days | | |
| QIPs completed at the Institution | Within 120 days (**See internal deadline that requires this sooner from institution) | ***Please note*: this internal deadline is set for institutions to ensure SPR-FIT ability to comply with the Coleman deadline in the event that QIPs are inadequate and require amendment* QIPs completed and QIP report submitted to HQ | Within 45 days of institution's receipt of final report (no later than DAY 105 after DOD) |
| Institution's QIP Report completed and submitted to HQ | Within 150 days (**See internal deadline that requires this sooner from institution) | | |
| | | QIPs reviewed by committee | Within 10 days |
| | | QIPs signed by MH Deputy Dir. | Within 1-2 days |
| | | QIPs signed by DAI | Within 3-5 days |
| Implementation of QIP report sent to Special Master | Within 180 days | | |
| | | | |
| **\* deadlines are calculated from date of death (DOD)** | | | |



# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES



## MEMORANDUM

| | |
|---|---|
| **Date:** | 8/14/2015 |
| **To:** | Chief Executive Officers<br>Chiefs of Mental Health |
| **From:** | Timothy G. Belavich, Ph.D., MSHCA, CCHP-MH<br>Director (A), Division of Health Care Services and<br>Deputy Director, Statewide Mental Health Program |
| **Subject:** | **DESIGNATION OF SUICIDE PREVENTION, ASSESSMENT AND TRAINING COORDINATOR** |

Per the approved 2009 Mental Health Staffing Model, every institution with a mental health mission was allocated a fractional staff position for: Suicide Prevention (0.3), Mental Health Assessments/Evaluations (0.3) and Mental Health Training/Orientation (0.3) Coordination. These fractional responsibilities shall now be combined into one coordinator position.

Effective immediately, each institution must designate one Senior Psychologist, Specialist who will be responsible for the coordination of Suicide Prevention, Assessments/Evaluations, and Training/Orientation. The attached duty statement must be used for this position. No additional staff positions will be allocated for these duties.

For questions please contact Amy Eargle, Chief, Clinical Support, Statewide Mental Health Program via email at Amy.Eargle@cdcr.ca.gov.

Attachment

cc:  Angela Ponciano
     Amy Eargle, Ph.D.
     Laura Ceballos, Ph.D.
     Daryl Brown
     Nancy Whitham
     Regional Mental Health Administrators
     Regional Personnel Administrators
     Regional Health Care Executives

STATE OF CALIFORNIA

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

SHADED AREA TO REFLECT RECLASS POSITION NUMBER ONLY

# DUTY STATEMENT

| | RPA | EFFECTIVE DATE: |
|---|---|---|

CDCR INSTITUTION OR DEPARTMENT
California Correctional Health Care Services

POSITION NUMBER (Agency – Unit – Class – Serial)
042-XXX-9287-XXX

UNIT NAME AND CITY LOCATED

CLASS TITLE
Senior Psychologist, CF (Specialist)

WORKING DAYS AND WORKING HOURS
a.m. to p.m.  (Approximate only for FLSA exempt classifications)

SPECIFIC LOCATION ASSIGNED TO

PROPOSED INCUMBENT (If known)

CURRENT POSITION NUMBER (Agency – Unit – Class – Serial)

YOU ARE A VALUED MEMBER OF THE DEPARTMENT'S TEAM. YOU ARE EXPECTED TO WORK COOPERATIVELY WITH TEAM MEMBERS AND OTHERS TO ENABLE THE DEPARTMENT TO PROVIDE THE HIGHEST LEVEL OF SERVICE POSSIBLE. YOUR CREATIVITY AND INGENUITY ARE ENCOURAGED. YOUR EFFORTS TO TREAT OTHERS FAIRLY, HONESTLY AND WITH RESPECT ARE CRITICAL TO THE SUCCESS OF THE DEPARTMENT'S MISSION.

Under the general direction of the Chief Psychologist, Correctional Facility (CF) or Chief of Mental Health Services, the Senior Psychologist, CF (Specialist), Suicide Prevention, Assessment, and Training Coordinator will be responsible for the Department's assessments, evaluations, suicide prevention, training, and orientation programs. Some travel is associated with this position.

| % of time performing duties | Indicate the duties and responsibilities assigned to the position and the percentage of time spent on each. Group related tasks under the same percentage with the highest percentage first. *(Use addition sheet if necessary)* |
|---|---|

### ESSENTIAL FUNCTIONS

**30%** Coordinate the institution's Suicide Prevention Program, Suicide Risk Evaluation Mentor Program, and mental health screening; consult with institution health care, custodial, and management staff on improving suicide prevention policies and procedures; chair the institution's Suicide Prevention and Response Focused Improvement Team; audit the institution's suicide prevention practices; collect and interpret data and other information on the institution's suicides, remain current in the field of suicide prevention; work with institution management to develop best practices; consult with clinical, custody, and management staff regarding mental health assessments and evaluations; perform quality management functions, prepare reports, and generate action plans as related to suicide prevention duties to improve mental health services delivery.

**20%** Provide training to institutional, clinical, and custody staff on suicide prevention, mental health issues and policies (e.g., completing the Mental Health Assessment for Rules Violation Reports [RVR], new employee orientation, Suicide Prevention/Crisis Intervention,) in order to ensure that inmate-patients have timely access to continuity of mental health care. Provide health care staff with the knowledge and specific strategies to interact more effectively with inmate-patients in the Mental Health Services Delivery System and Developmental Disabilities Program as directed by the Chief of Mental Health, and at the request of the In-Service Training Program; ensure training efficacy; address deficiencies as necessary.

**20%** Develop and provide training on clinical topics to mental health staff; provide training on mental health policy and initiatives; maintain training logs for clinical staff; ensure mandatory trainings for mental health staff are offered as needed; work closely with the Statewide Mental Health Program Training Unit to ensure training requirements are met; ensure integrity of training; remain current in the latest research, techniques, and tools in the field of correctional mental health. Use knowledge of criminal behavior, mental health issues, correctional settings, State and Federal mental health laws and regulations, and knowledge of each classification's scope of practice, to determine training requirements.

STATE OF CALIFORNIA

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

| | |
|---|---|
| 15% | Provide coordination of mental health assessments. Maintain psychological testing library. Remain current on available psychological tests and measures and evaluation techniques. Provide training and consultation regarding assessments and testing reports as needed. Perform audits of Mental Health Assessments for RVRs and review audit results. Develop action plans to address noted deficiencies. |
| 10% | Provide assessments and crisis interventions to inmate-patients within the program as needed. Perform special projects as assigned; interpret the objectives and procedures of the program to other staff. Implement time-limited projects in area of expertise in order to enhance existing programs, comply with departmental policies and procedures and/or court mandates, using consultations, organizational skills, communication skills, and research skills. Serve as a member of the Quality Improvement Team (QIT), as required. |
| 5% | Other related duties as assigned. |

**KNOWLEDGE AND ABILITIES**

*Knowledge of:* Principles, techniques, and trends in psychology with particular reference to normal and disordered behavior, human development, motivation, personality, learning, individual differences, adaptation, and social interaction; methods for the assessment and modification of human behavior; forensic psychology; characteristics and social aspects of mental and developmental disabilities; research methodology and program evaluation; institutional and social process, group dynamics; functions of psychologists in various mental health services; current trends in the field of mental health; professional training; and community organization and allied professional services.

*Ability to:* Provide professional consultation; teach and participate in professional training; recognize situations requiring the creative application of technical skills; develop and evaluate creative approaches to the assessment, treatment, and rehabilitation of mental disabilities, to the conduct of research, and to the development and direction of a psychology program; plan, organize, and conduct research, data analysis, and program evaluation; conduct the more difficult assessment and psychological treatment procedures; analyze situations accurately and take effective action; and communicate effectively.

**DESIRABLE QUALIFICATIONS**

Special Personal Characteristics: Empathetic understanding of patients of a State correctional facility; willingness to work in a State correctional facility; scientific and professional integrity; emotional stability; patience; alertness; tact; and keenness of observation.

**SPECIAL PHYSICAL CHARACTERISTICS**

Persons appointed to this position must be reasonably expected to have and maintain sufficient strength, agility, and endurance to perform during stressful (physical, mental, and emotional) situations encountered on the job without compromising their health and well-being or that of their fellow employees or that of inmates. Assignments may include sole responsibility for the supervision of inmates and/or the protection of personal and real property. Must be able to travel.

Adopted:
Revised:

STATE OF CALIFORNIA

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

| SUPERVISOR'S STATEMENT:  *I HAVE DISCUSSED THE DUTIES OF THE POSITION WITH THE EMPLOYEE* | | |
|---|---|---|
| SUPERVISOR'S NAME (Print) | SUPERVISOR'S SIGNATURE | DATE |

| EMPLOYEE'S STATEMENT: *I HAVE DISCUSSED WITH MY SUPERVISOR THE DUTIES OF THE POSITION AND HAVE RECEIVED A COPY OF THE DUTY STATEMENT* | | |
|---|---|---|
| The statements contained in this duty statement reflect general details as necessary to describe the principal functions of this job.  It should not be considered an all-inclusive listing of work requirements.  Individuals may perform other duties as assigned, including work in other functional areas to cover absence of relief, to equalize peak work periods or otherwise balance the workload. | | |
| EMPLOYEE'S NAME (Print) | EMPLOYEE'S SIGNATURE | DATE |

Revised:_____

Adopted:
Revised:

Appendix VIII: Memorandum "Completed Contacts Associated with Suicide Risk Evaluation"



## CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES



## MEMORANDUM

| | |
|---|---|
| **Date:** | 10/23/2015 |
| **To:** | Chief Executive Officers |
| | Chiefs of Mental Health |
| **From:** | |

Timothy Belavich, Ph.D., MSHCA, CCHP-MH
Director (A), Division of Health Care Services and
Deputy Director, Statewide Mental Health Program

**Subject:** **COMPLETED CONTACTS ASSOCIATED WITH SUICIDE RISK EVALUATIONS**

Effective immediately, when a Suicide Risk Evaluation (SRE) Assessment (CDCR MH-7447) is completed by a clinician, the appointment scheduler shall simultaneously enter the SRE and a completed contact into the patient record in the Mental Health Tracking System (MHTS). Please refer to the Suicide Risk Evaluation Completed Contact Entry Process (attached) for instructions.

Additionally, clinicians shall enter their scheduled and un-scheduled SRE appointments on their daily log. The un-scheduled SRE appointments (i.e., MHCB assessment/placement) shall be entered retroactively and include start and stop times.

If you have questions or need additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@cdcr.ca.gov.

Attachment

cc: Angela Ponciano
    Amy Eargle, Ph.D.
    Laura Ceballos, Ph.D.
    Michael Golding, M.D.
    Edward Kaftarian, M.D.
    Jennifer Johnson
    Mental Health Regional Administrators
    Regional Health Care Executives

**HEALTH CARE SERVICES**

P.O. Box 4038
Sacramento, CA 95812-4038

### Suicide Risk Evaluation Completed Contact Entry Process

When an SRE is completed by a clinician, the appointment scheduler shall simultaneously enter the SRE and a completed contact into the patient record in MHTS.

1. **Receive** completed SRE form from clinician.
2. **Enter** information from the SRE into MHTS.
   a. **Complete** the 7447-MH: Suicide Risk Assessment portion at the bottom of the screen from the information provided on the SRE, including unscheduled SRE's.



3. **Create** a contact to correspond with SRE.
    a. **Complete** the left sections of the screen to correspond with the information provided on the SRE.  Include the following:
        i. Appointment date
        ii. Start and stop time
        iii. Clinician name and classification who conducted SRE
        iv. Reason for visit (choose from the drop down menu)



4. **Close** the created contact corresponding with the SRE.

Appendix IX: Memorandum "Suicide Prevention Pamphlets for Inmates" (with pamphlets attached)

**Help is Available Anytime!**

The CDCR Mental Health Services Delivery System provides mental health services to all inmates. Mental health services are private and can help you when you don't know where else to turn. Our trained clinical staff are available for:

- Dealing with Change
- Adjustment & Transition Issues
- Crisis Counseling
- Medication Services
- And much more

You are not alone! We are here to offer help & hope for a better today and future.



**What You Should Know:**

- **You are not alone!**
  Though sometimes you may feel like you are. Many people experience hard times and help is available.

- **Think before you act.**
  There are other options.

- **Keep yourself and your surroundings safe.**
  For example, avoid drugs, alcohol and/or storing up your medicine because they can make you feel worse and not think clearly.

- **Take all your medication as prescribed.**
  Don't stop or make changes to your medications unless you and your doctor decide this together.

- **Take only the medications that your doctor has prescribed to you.**

- **Know when you are not doing well and need help.**
  Make a list of how you are feeling and discuss it with someone you trust, like your primary clinician or psychiatrist.

- **Talk to someone you trust!**
  There are people who can help and support you.

**Warning Signs:**

- Using alcohol, drugs and other substances to cope
- Feeling trapped
- Feelings of shame and/or guilt
- Feelings of anger and/or rage
- Feelings of depression and/or anxiety
- Recklessness—feeling you have nothing to lose
- Receiving bad news, such as getting more time, learning an appeal was denied, or something from home
- Feeling isolated or alone (divorce, a death of a loved one, or news of an illness)
- Getting a serious medical diagnosis or chronic pain
- Being placed in administrative segregation
- Poor sleep
- Not enjoying things you used to like to do

**The following are very serious warning signs:**

- Feelings of wanting to die or not wake up
- Hearing voices or seeing things that others don't
- Feeling unbearable emotional or physical pain
- Making plans to kill yourself
- Sleeping all the time or not sleeping at all
- Saying "goodbye" to loved ones — writing letters
- Giving your personal property away

**CONTACT Mental Health**    **CONTACT Mental Health**    **CONTACT Mental Health**



### Cuando necesita ayuda:

- Hay ayuda disponible para Ud.
- Hable con alguien en quien tiene confianza o de quien se siente cercano
- Siga tomando todos sus medicamentos según las indicaciones
- Sea directo, abierto y honesto acerca de sus problemas
- Vaya a todas sus citas médicas y de salud mental
- Informe a cualquier miembro del personal si Ud. está teniendo dificultades

### Por favor, hable con el personal de la salud mental:

- Contacte a cualquier miembro de la custodia
- Contacte a cualquier miembro del personal médico
- Contacte a cualquier miembro del personal de salud mental
- Llene un Formulario CDCR 7362 (Solicitud de Servicios de Atención a la Salud)

### ¿Verdadero o Falso?

No se puede detener a las personas que quieren suicidarse.
**Falso**

La mayoría de las personas con tendencias suicidas no quieren morir, solamente quieren que pare el dolor emocional.
**Verdadero**

Hablar sobre el suicidio solo lo hará peor.
**Falso**

Hablar de sus sentimientos y de lo que esté experimentando puede ayudarle a darse cuenta que necesita ayuda.
**Verdadero**

Si le digo a alguien que necesito ayuda, me pondrán en el programa de salud mental para siempre.
**Falso**

Todos necesitamos un poco de ayuda cuando tenemos dificultades. Hay ayuda a corto plazo y a largo plazo disponible para Ud.
**Verdadero**



¿Se siente solo?   ¿Se siente desamparado?

¿Está experimentando sentimientos de pérdida?   ¿Se siente temeroso?

¿Tiene apoyo familiar?

¿Tiene vergüenza?   ¿Se siente deprimido?

¿Se siente culpable?

¿Se siente confundido?

*¡Hay Esperanza y Ayuda!*
*El Programa de*
*Salud Mental*
*CDCR*

Favor de contactar el Departamento de Salud Mental

Favor de contactar el Departamento de Salud Mental

# EXHIBIT G

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



August 28, 2019

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Michael Nunez
Rosen Bien Galvan and Grunfeld
101 Mission Street, Sixth Floor
San Francisco, CA 94105

VIA EMAIL

Dear Special Master Lopes and Michael Nunez:

I write in response to Plaintiffs' June 17, 2019 letter regarding the California Department of Corrections and Rehabilitation's (CDCR) May 14, 2019 revision of their 2015 Annual Suicide Report. A final version of that report is attached and includes both clean and track change versions. CDCR respectfully requests that the Special Master file the final version of the 2015 Annual Suicide Report.

Defendants have worked diligently to prepare this report while at the same time focusing on addressing the underlying concerns about suicide prevention practices noted in the report. Since 2015, Defendants have undertaken significant suicide prevention efforts. For example, Defendants have developed new mental health forms, updated and delivered suicide prevention trainings for custody and healthcare staff, revised suicide prevention practices to ensure the safety of patients, developed new policies, and modified physical plants to ensure patients in crisis or at higher risk for self-harm are housed in suicide resistant cells. Many of these efforts are discussed within the report.

While working to improve their suicide prevention practices, Defendants also worked closely with the Special Master team to develop the 2015 Annual Suicide Report. Defendants began drafting the 2015 Annual Suicide Report in early 2016. On August 11, 2016 Defendants provided the Special Master with an outline of the 2015 Annual Suicide Report. A revised copy was provided to the Special Master and Plaintiffs on September 22, 2016. In December 2016, Defendants provided the Special Master's experts with a forty-page draft of the executive summary, the report's introduction, and its summary of findings. After conferring with the Special Master team about the forty-page draft and further developing the remainder of the

Special Master Lopes
Michael Nunez
Page 2

report, Defendants then provided a complete draft of the report to the Special Master in June 2017.

Following additional meetings with the Special Master team and revisions to the draft, Defendants provided a draft of the report to the Plaintiffs and Special Master in February 2018. Plaintiffs then provided written comments and questions on April 23, 2018. On June 13, 2018, Defendants responded to Plaintiffs' comments and questions and provided them with a revised draft of the report. On May 14, 2019, after conferring with the Special Master, Defendants provided Plaintiffs and the Special Master with another revised draft of the report, in which they removed language the Plaintiffs and Special Master objected to discussing the definitions of "foreseeable" and "preventable." Plaintiffs provided comments and questions on June 19, 2019, many of which were previously raised in their April 23, 2018 letter.

The parties met to discuss the most recent draft and the Plaintiff's June 19, 2019 letter at a June 27, 2019 workgroup. Those concerns are addressed below.

I.    Definitions of Foreseeability and Preventability

In response to Plaintiffs' prior objections, Defendants made extensive edits to the 2015 Annual Suicide Report and removed language to which Plaintiffs had objected. Nonetheless, and despite having had a draft of the report for nearly a year and a half, Plaintiffs for the first time in their June 19, 2019 letter raise a new objection – that the definitions used by Defendants in their 2015 Annual Suicide Report do not match, word for word, the definitions used by the Special Master's experts in their annual suicide reports. Specifically, Plaintiffs assert that the definitions used by Defendants are narrower than those used by the Special Master. Defendants reject that assertion.

The definitions used in Defendants reports have been used by Defendants since 2015 and were first published in most individual suicide reports issued in 2015 and every suicide report issued in 2016. Defendants acknowledge that the definitions do not match the definitions used by the Special Master word for word. In fact, Defendants developed the definitions in consultation with the Special Master in 2015 after the Special Master team had recommended that CDCR begin determining whether each suicide was foreseeable or preventable during the suicide case review teleconferences. Under the oversight of the Special Master, CDCR intentionally modeled the definitions found in the 2015 Annual Suicide Report after the definitions used by the Special Master's experts in their prior reports. On multiple occasions in 2015, CDCR discussed the process of applying the definitions with the Special Master and his team and received their feedback. The modifications facilitate the consistent and reliable application of definitions to individual case reviews by a multidisciplinary group of CDCR staff.

While the revised definitions may have slightly different wording, Defendants dispute that the changes had any practical impact on the determinations by the suicide case review committees. Defendants' suicide case review process is highly critical of the facts and circumstances surrounding each suicide. Defendants' determination of foreseeability and preventability is no exception. In 2015, forty-six percent of completed suicides were determined to be foreseeable

Special Master Lopes
Michael Nunez
Page 3

and seventy-one percent were determined to be preventable.  For comparison, Kerry Hughes found that nearly seventy-four percent of completed suicides in 2014 were foreseeable or preventable.  (ECF no. 5428 at 5.)

Defendants will not use the Special Master's definitions to re-analyze each 2015 suicide as it would be impractical to reassess each case four years later.  Defendants, however, have removed the statement in the 2015 Annual Suicide Report which stated that Defendants definitions are the same as those used by the Special Master's experts.  (Report at 39-40.)

II.    Case Reviews

Plaintiffs' object to the length and analysis of CDCR's case reviews attached to the 2015 Annual Suicide Report.  This objection lacks merit.  The 2015 Annual Report is derived from CDCR's comprehensive individual suicide reports, some of which are up to thirty pages in length.  Each individual report includes a detailed analysis of the patients' history and mental health treatment in CDCR, as well as quality improvement plans aimed at correcting deficiencies.  Those reports are released to the Special Master and Plaintiffs within months of a patient's death.  Accordingly, it is a waste of time and resources for CDCR to reproduce such comprehensive reports for inclusion in the Annual Report, a report which is intended to analyze the trends and findings of all individual suicide reports from four years ago.  A corrected case review has been included with the revision of this report. (Appendix A).

III.    Revision of Self-Harm Definitions

In their June 19, 2019 letter, Plaintiffs object to CDCR's updated self-harm definitions to comport with community standards and instead request that CDCR revert to outmoded terminology found in the 2009 Program Guide.  (Letter at page 5.)  Plaintiffs do not provide a compelling reason to disregard the community standard definition of self-harm, nor explain why CDCR should instead use outdated Program Guide definitions in CDCR's Annual Suicide Report.  Additionally, Plaintiffs fail to point to any policy or order requiring CDCR to use such definitions, or any definitions at all, in their Annual Suicide Report.  If Plaintiffs are unclear about terminology used in the report, they can easily refer to the definitions of those terms, which are included in the report.  (Report at 8-9.)

IV.    Suicide Trigger Events

CDCR has revised Tables 12 and 13 regarding suicide triggers to clarify the suspected suicide trigger analysis.  (Report at 19-21.)  The purpose of the tables has not changed.  Table 12 includes common suspected precipitants to suicides in 2015, by category. Table 13 provides each individual suicide case's suspected precipitant.  A footnote to Table 13 has been added clarifying that "[p]recipitants tabulated for Table 12 are separated by semicolons in Table 13 (when more than one precipitant was determined by the Suicide Case Reviewer.)"

Special Master Lopes
Michael Nunez
Page 4

V.    Statistical Issues

Plaintiffs re-raise a host of statistical questions in their June 19, 2019 letter.  And as stated in CDCR's June 13, 2018 letter, "CDCR has drafted a statistically comprehensive report regarding suicides that occurred in 2015, providing a thorough picture of the suicide prevention system and areas for improvement."  Like any statistics based report, there is no end to the number of charts and graphs that could be added to the 2015 Annual Suicide Report.  However, adding additional statistics to the report will only serve to further delay the finalization of this report.  With limited exception, and as discussed further below, no additional statistical analysis is forthcoming for 2015.

Table 15 was updated to include a footnote clarifying that the population data post-2007 includes both in- and out-of-state inmates.  (Report at 23.)  CDCR reviews all suicides of CDCR inmates, regardless of whether the suicide occurred in or out of state.  Accordingly, CDCR uses the total in-state and out-of-state population to determine the suicide rate.

The report was updated to further clarify that 2014 is the last available year for national suicide data in state prisons and jails, and that comparisons between CDCR and national figures are based on 2014 data.  (Report at 35.)  Figure 6 has also been updated to provide additional years of data for the table comparing CDCR's suicide rate against the rates for other state prison systems and males in the United States.  (Report at 35.)

VI.    Report Implications and Future Steps

During the June 27, 2019 workgroup call, CDCR committed to providing updates on remedial measures outlined in the 2015 Annual Suicide Report.  The report has been updated to clarify that updates to each "Report implications and future steps" section will be included in future annual reports.  (Report at page 60.)

CDCR thanks you for your comments and suggestions regarding CDCR's 2015 Annual Suicide Report.  The final report represents hundreds of hours of painstaking work and analysis designed to provide CDCR administrators and staff with a clear picture of the suicide prevention system and identify areas for improvement.  CDCR requests that the Special Master file the final 2015 Annual Suicide Report and recommend Defendants assume the responsibility for producing future annual reports.

Sincerely,

*/s/ Nick Weber*

NICK WEBER
Attorney
Office of Legal Affairs

# EXHIBIT H

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 2, 2020

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Special Master Lopes:

I write regarding the Annual Report on Suicides in the California Department of Corrections and Rehabilitation January 1, 2015 – December 31, 2015.

The close collaboration on this report with you and your team over the years, and the multiple rounds of detailed feedback the California Department of Corrections and Rehabilitation (CDCR) has received from your team and Plaintiffs, have helped CDCR create an important tool to self-monitor and improve its suicide prevention processes. While CDCR understands that you and Plaintiffs have requested further edits to the report, the report has been waiting to be published in roughly its current form now for over two years, and Plaintiffs have expressed frustration that CDCR has not yet published the report.

Since we have been unable to reach complete agreement on all issues with respect to formatting and content, CDCR is moving forward without further delay in publishing the 2015 Annual Suicide Report on CDCR's public website. (https://www.cdcr.ca.gov/reports/) The report will be published on the website as soon as it is formatted for accessibility. However, CDCR will continue to welcome the feedback of your team and Plaintiffs as future reports are developed.

Also, with the enactment of SB 960 in 2018, CDCR now has a statutory obligation to submit to the Legislature an annual suicide report on CDCR's efforts to respond to and prevent suicides and attempted suicides among inmates. CDCR produced its first report last October and submitted it to the Legislature, and plan in the future to consolidate its annual suicide reports into a single comprehensive suicide report that will be made available to the Legislature, the court, and the public at large.

Sincerely,

*/s/ Nick Weber*

NICK WEBER
Attorney
Office of Legal Affairs