**SPECIAL MASTER'S EXPERT'S ANALYSIS OF
THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
ANNUAL SUICIDE REPORT
JANUARY 1, 2015 – DECEMBER 31, 2015**

I.     Executive Summary

On July 2, 2020, the Special Master was notified that the California Department of Corrections and Rehabilitation (CDCR) formally published its "Annual Report on Suicides in the California Department of Corrections and Rehabilitation January 1, 2015 – December 31, 2015" (hereinafter "2015 CDCR Annual Suicide Report"). In a letter to the Special Master, CDCR's Office of Legal Affairs noted that CDCR published the 2015 CDCR Annual Suicide Report despite failure to reach an agreement with the Special Master and the plaintiffs on "all issues with respect to formatting and content."

The 2015 CDCR Annual Suicide Report was CDCR's first attempt to complete a critical, written analysis of suicides of sufficient scope and quality to satisfy the requirements of the court. Prior to 2015, the Special Master's experts completed and filed annual suicide reports. It was the expectation of the Special Master that with the input and guidance of the Special Master's experts, CDCR could move toward a sustainable process of self-analysis regarding deaths by suicide.

On August 11, 2016, CDCR provided an outline of the 2015 CDCR Annual Suicide Report to the Special Master and an updated version of the outline to the Special Master and the plaintiffs on September 22, 2016. An initial draft of the 2015 CDCR Annual Suicide Report, including three sections, was provided to the Special Master in December 2016. A complete draft, including all sections, was provided to the Special Master in June 2017. CDCR made revisions and provided an updated draft of the 2015 CDCR Annual Suicide Report to plaintiffs and to the Special Master in February 2018. The plaintiffs provided written questions and comments on April 23, 2018. On June 13, 2018, CDCR responded to the plaintiffs' concerns and submitted an updated draft of the 2015 CDCR Annual Suicide Report.

On May 14, 2019, CDCR provided the Special Master and plaintiffs with an updated version of their annual report, intended to address concerns raised by the Special Master's team. The parties met on June 27, 2019, to discuss the updated draft and the plaintiffs' concerns. Specifically, the Special Master and the plaintiffs noted ongoing concerns regarding the definitions of "foreseeable" and "preventable" as used by CDCR. The definitions were noted to be narrower than those used by the Special Master in previous reports. In a letter dated August 28, 2019, CDCR strongly objected to this characterization of their definitions and asserted that these changes had no impact on their determinations of foreseeability and preventability. In that letter, CDCR stated that it was not willing to reanalyze each of the 2015 suicides previously determined not to be foreseeable and preventable, using the original definitions set forth by the Special Master.

Despite this statement, CDCR ultimately agreed to re-review the 2015 suicides using the Special Master's definitions of foreseeable and preventable. The re-review was limited to those cases that were not previously determined to be foreseeable and preventable. As a result, one change was made. Specifically, one case that had been determined not to be foreseeable was

1

recharacterized as foreseeable under the Special Master's original definition. In the face of continuing concerns with content and format from the Special Master, CDCR notified the Special Master on July 2, 2020, that it had published its report and would be making no further edits.

Given the foregoing set of circumstances and pursuant to the Special Master's court-ordered obligation to report on deaths by suicides, the Special Master's experts drafted the following critical analysis of the final version of the 2015 CDCR Annual Suicide Report, published on their website[1].

The 2015 CDCR Annual Suicide Report stated there were 24 suicides within the population of CDCR inmates. Twenty-two male inmates and two female inmates died by suicide in 2015. Of these 24 total deaths, 13 of the 24 were determined by CDCR to have been foreseeable, and 17 of the 24 were determined to have been preventable.

Several of the Special Master's experts analyzed the 2015 CDCR Annual Suicide Report content, comments from the plaintiffs and other members of the Special Master's team, and each Suicide Case Review (SCR) report completed by CDCR. SCRs were analyzed for content as well as conclusions drawn about foreseeability and preventability. The report that follows includes the results of this analysis.

The Special Master's experts determined that 19 of the 24 suicides were preventable, while CDCR determined that 17 of the cases were preventable. In this report, the Special Master's experts provide a rationale when the experts' determinations differed from the CDCR's determinations of preventability. Regarding foreseeability, the Special Master's experts determined that 13 of the suicides were foreseeable, which is consistent with the foreseeability determinations indicated in the 2015 CDCR Annual Suicide Report.

In light of the course of events surrounding CDCR's drafting of the 2015 Annual Suicide Report, the Special Master has resumed his comprehensive analysis of suicides within CDCR, beginning with deaths by suicide in 2016.

II.   Report Content Review

The Special Master's experts found the 2015 CDCR Annual Suicide Report to be a comprehensive and thoughtful analysis of the deaths by suicide within CDCR during 2015. Specifically:

- The 2015 CDCR Annual Suicide Report was well-organized and comprehensive.
- The 2015 CDCR Annual Suicide Report examined trends, including the timing of suicides, types of crimes committed by those who died by suicide, sentencing information, length of incarceration, job assignments, and precipitants to suicide.
- The 2015 CDCR Annual Suicide Report included detailed demographic factors associated with the individuals who died by suicide.
- The 2015 CDCR Annual Suicide Report included the frequency of various psychiatric diagnoses among those who died by suicide.

---

[1] https://cchcs.ca.gov/wp-content/uploads/sites/60/SR/2015-Annual-Suicide-Report.pdf.

- The 2015 CDCR Annual Suicide Report included an analysis of deaths for which cause was unknown (i.e., accidental or intentional).
- The 2015 CDCR Annual Suicide Report included a comprehensive discussion of initiatives that have been undertaken to reduce suicides, including policy changes, monitoring enhancements, programmatic changes, and training.

While the 2015 CDCR Annual Suicide Report was comprehensive in scope, the Special Master's experts noted some concerns with conclusions made regarding the accuracy of statistical comparisons. Those concerns are as follows:

- CDCR noted that the suicide rate for males incarcerated within CDCR in 2015 (17.8 per 100,000) was lower than the suicide rate for males in the United States overall (21.5 per 100,000). This comparison is not particularly useful in that the comparison does not control for differences in the demographic composition of these populations. Where the 2015 CDCR Annual Suicide Report made comparisons with other state prison systems, these comparisons were relevant.

- CDCR reported the 2015 suicide rates and previous years' rates used for comparison, using the population of both in-state and out-of-state inmates. This represents a change in the calculation of suicide rates from previous reports authored by the Special Master's expert, and in all instances where discrepancies with previous years were noted, the use of out-of-state inmates decreased the rate of suicides. This decision was understandable given that one of the suicides in 2015 occurred out-of-state. In 2015, the inclusion of out-of-state inmates decreased the rate of suicide within CDCR from 19.8 per 100,000 to 18.6 per 100,000.

  This discrepancy raises the issues of previous, current, and future calculations of suicide rates within CDCR. Calculation of suicide rates per 100,000 is completed by dividing the number of suicides in a year (the numerator) by the population of CDCR (the denominator) and then multiplying that number by 100,000. At issue is the number placed in the denominator.

  Historically, annual suicide reports to the court have used the population of inmates incarcerated within the state of California's CDCR facilities as of June 30th of a given year.[2] For the 2015 CDCR Annual Suicide Report, CDCR added to this number by including CDCR inmates who were housed out-of-state. As noted above, this appeared to be done for 2015 because one of the suicides occurred in an out-of-state facility. As this was the case, that inmate's death was added to the numerator, but the population from which he came (the out-of-state inmate population) was not traditionally added to the denominator, possibly artificially inflating the suicide rate in comparison to other years where out-of-state suicides may not have occurred.

---

[2] In CDCR's 2015 report, it is recognized that this has been the previous method by explaining on page 22: "The first calculation is in-state only and does not include the out-of-state CDCR inmate population; this is provided in order to ensure consistency with past reports prepared by members of the OSM."

3

    Based on the discrepancies related to the inclusion of inmates and populations, the Special Master's experts recommend that in subsequent reports, suicide rates be reported in two ways. First, it is recommended that, for the sake of consistency and the ability to compare rates across years, the previous method of placing all CDCR deaths by suicide (in-state and out-of-state) in the numerator and the CDCR in-state population in the denominator be continued. Additionally, it is recommended that in years where a suicide occurs out-of-state, rates be calculated using both in-state and out-of-state inmates in the denominator, as was done in the 2015 CDCR Annual Suicide Report.

- In Table 20 of the 2015 CDCR Annual Suicide Report, there is an error. The table notes a suicide rate for "All State Prisons, 2015" when it should read "All State Prisons, 2014" as the 2015 rates were not yet available at the time of the 2015 CDCR Annual Suicide Report. In February 2020, the Bureau of Justice Statistics reported that the suicide rate for "All State Prisons, 2015" was 18 per 100,000.[3] CDCR's rate of suicide for 2015 remains higher than the average of all state prisons. Individual suicide rate data for each state were not available for comparison in the 2015 CDCR Annual Suicide Report.

- On page 33, the 2015 CDCR Annual Suicide Report indicates, "California's rate of prison suicides ranked as 20th among state prisons." This statement is misleading. The table included in this section of the 2015 CDCR Annual Suicide Report (Table 20) rank orders the 50 states such that the state with the most suicides per 100,000 (Rhode Island) is ranked 1st and the state with the least suicides per 100,000 inmates is ranked 50th (North Dakota). A more traditional ranking system places the most favorable as first and the least favorable as last. With this more traditional system, California's 2015 suicide rate per 100,000 would be tied for 30th, not 20th. Additionally, it is a skewed comparison to rank a single year's rate against averages of the previous 13 years. When the average for California's past 13 to 14 years is used, California is tied for 35th.

- On page 7, the 2015 CDCR Annual Suicide Report states that one of the factors contributing to the decline in the suicide rate in 2015 "compared to the prior ten years" was "lower rates of suicides in Caucasian and Hispanic/Latino inmates." Conversely, on page 10, the 2015 CDCR Annual Suicide Report indicates that "Caucasians represented over half of all suicides despite comprising only 22 percent of the population within CDCR. This finding has been typical of the racial breakdown of suicides within CDCR for many years." Further, on page 27, the 2015 CDCR Annual Suicide Report states, "Caucasians comprise the largest group, comprising 48% of the suicides over the 10-year period and 54% of the suicides in 2015." This does not support the assertion on page 7 of a lower rate of suicides in Caucasian inmates in 2015 when compared to the previous ten years. However,

---

[3] Carson, E, Cowhig, M. *Mortality in Local Jails and State Prisons*, 2001-2016 -Statistical Tables, US DOJ, Bureau of Justice Statistics, February 2020, NCJ 251920.

4

there was a decline in the rate of suicides by Hispanic/Latino inmates in 2015 (17%)[4] when compared to the previous ten years (30%).[5]

- On page 12, the 2015 CDCR Annual Suicide Report discusses housing locations for the inmates who died by suicide. It notes that two inmates were in reception centers (RC), and one inmate was housed in a special needs yard (SNY). The Special Master's experts noted that the two inmates whose deaths occurred in RCs were endorsed or classified to SNYs at the time of their deaths. As they were awaiting transfer and completion of RC processing, these inmates were housed in a "special housing unit" and a "special processing unit" while at the RC according to the SCRs. The Special Master's experts understand that these housing units provide safety protections to inmates awaiting transfer to an SNY. This is notable as it reveals that in 2015, 12.5 percent of the inmates who died by suicide were in some form of special needs housing to address safety concerns at the time of their suicide. Looking purely at the housing type, as listed in the 2015 CDCR Annual Suicide Report, fails to recognize the safety concerns with the sample of inmates who died by suicide in 2015.

- Overall, the Special Master's experts were concerned about the trend analyses and conclusions resulting from those analyses with the use of frequency (i.e., raw number) data rather than rates or percentages. Frequency data was used in Figure 2 (month of suicides), Figure 3 (race), and Figure 4 (age group) to compare changes over time. Comparing frequencies without including the size of the overall sample does not provide information useful to understanding trends or formulating remedial actions to reduce suicide. There is no method to determine the meaning of a change from 10 to 8 without knowing the overall size of the sample. This difference can be elucidated by looking at the fact that two suicides in 2013 equated with 6.7 percent of the suicides that year, while in 2014, two suicides equated with 8.7 percent of the suicides. Another way to look at these differences in reporting is that for individuals aged 55+, there were seven suicides in 2010 and six suicides in 2015. Figure 4 within the 2015 CDCR Annual Suicide Report shows that the number of suicides in this age group was higher in 2010 than in 2015. Yet, if percentages for each of those years are used, individuals aged 55+ comprised 20 percent of the suicides in 2010 and 25 percent of the suicides in 2015. The use of frequency data shows a decrease, while the percentages show an increase.

- On pages 29-30, there are errors in the reporting of suicides that occurred in segregation over time. The 2015 CDCR Annual Suicide Report states that "47% of suicides within the CDCR occurred in a segregated housing setting in the ten-year period between 2004 and 2014 and 45% of suicides occurred in a segregated housing setting on average in the ten year period between 2010 and 2014." First,

---

[4] 2015 CDCR Annual Report at 10.

[5] Id. at 28.

the period between 2004 and 2014 is eleven years. Second, the period between 2010 and 2014 is five years, not ten, as indicated in the text.[6]

III.    Case Reviews and Overall Findings

The Special Master's experts completed an analysis of case reviews and case review findings. It is important to note that the 2015 CDCR Annual Suicide Report did not include any case reviews or detailed discussion of individual cases. The 2015 CDCR Annual Suicide Report included a reference to de-identified individual cases only with respect to the presence or absence of certain factors such as clinical risk factors, case review report elements, clinical interventions, adequacy of response during the suicide incident, etc., without discussing the individual cases in any detail. Critical analyses of individual cases could only be completed using SCRs made available to the Special Master but not available as part of the official 2015 CDCR Annual Suicide Report.

Results of the critical review of these findings are as follows:

- The 2015 CDCR Annual Suicide Report indicated that 11 cases were noted to have issues with the adequacy of suicide risk management, yet only ten of the cases listed in Table 23 have a "N" indication (i.e., a "no" response[7]) in the column, "Adequate Suicide Risk Management?"

- In the second paragraph on page 46, there is an erroneous reference to Table 22 rather than Table 23.

- The Special Master's experts noted that the 2015 Annual Suicide Report indicated that there was one inmate found in rigor mortis at the time of death. Citing Wikipedia, the 2015 CDCR Annual Suicide Report defined rigor mortis as a condition that indicates a person has been deceased for four hours. In previous reports by the Special Master's experts, a period of two to four hours was used to define when rigor mortis begins, citing the *Collins English Dictionary* (2003 ed.). The change in definition impacted the classification of rigor mortis for the deaths in 2015 based on the SCRs. Using the Special Master's previous definition of rigor mortis and body temperature at the time of death, an additional case[8] was found in the early stages of rigor mortis based on the estimated time of the death[9]

---

[6] In response to a draft of this report, CDCR acknowledged that these were typographical errors.

[7] This language is taken from a description of Table 23 on page 45 of the 2015 CDCR Annual Suicide Report.

[8] Case H. It was noted in this patient's medical review that he had "jaw stiffness" that prevented him from being intubated despite two attempts during the emergency medical response. At the time he was pronounced dead, a core body temperature was taken. The Special Master's expert was able to estimate, using a standard calculation to approximate time of death using core body temperature, that his time of death was approximately three hours before he was pronounced dead. The time of death and his jaw stiffness correlate with the early stages of rigor mortis which commonly begins in the smaller muscle groups (e.g., the jaw) and works its way to the larger muscle groups.

[9] The Algor Mortis Formula to estimate time of death is: (98.6 degrees Fahrenheit minus Temperature at time of death)/1.5 degrees Fahrenheit. The formula is considered accurate for up to 12 hours after death. This formula was taken from: Christensen, A., Passalacqua, A., & Bartelink, E. (2019) Chapter 5: Forensic taphonomy. *Forensic Anthropology: Current Methods and Practice*. (2nd ed, pgs. 145 – 181). Academic Press.

and the details of the emergency medical response.  This finding increases the number of cases in 2015 found in rigor mortis from one to two.

IV.   Suicide Case Reviews and Analyses of Foreseeability and Preventability

Overall, the individual SCRs were found to be comprehensive and contained thoughtful analyses of the personal, environmental, and clinical elements surrounding each suicide.  It appeared that CDCR review committees took into consideration inmate-related factors as well as treatment and custodial factors in their critical self-analysis of each suicide.  Likely due to competing timeframes, most reports did not include information from Medical Examiners' reports.

The 2015 CDCR Annual Suicide Report indicated that 13 of the 24 suicides were foreseeable, and 17 of the 24 suicides were preventable when using these terms as defined in previous reports by the Special Master's experts.  CDCR noted during their initial analysis, using modified definitions of these terms, that 12 of the 24 suicides were determined to be foreseeable.  However, CDCR did not provide information about which specific cases were determined to have been foreseeable and preventable within the body of the 2015 CDCR Annual Suicide Report.

Further, the SCRs included determinations of foreseeability and preventability in 13 cases.  Eleven of the 24 SCRs[10], or 45.8 percent, did not include a conclusion about the foreseeability and preventability of the suicide.  Information regarding the determinations of foreseeability and preventability for those 11 SCRs was obtained from CDCR to support analyses by the Special Master's experts.

| Case | CDCR: Foreseeable? | Special Master: Foreseeable? | CDCR: Preventable? | Special Master: Preventable? |
|---|---|---|---|---|
| A | Yes | Concur - Yes | Yes | Concur - Yes |
| B | No | Concur - No | No | Concur - No |
| C | Yes | Concur - Yes | Yes | Concur - Yes |
| D | No | Concur - No | No | Concur - No |
| E | Yes | Concur - Yes | Yes | Concur - Yes |
| F | Yes | Concur - Yes | Yes | Concur - Yes |
| G | Yes | Concur - Yes | Yes | Concur - Yes |
| H | No | Concur - No | No | *Disagree - Yes* |
| I | Yes | Concur - Yes | Yes | Concur - Yes |
| J | Yes | Concur - Yes | Yes | Concur - Yes |
| K | Yes | Concur - Yes | Yes | Concur - Yes |
| L | No | Concur - No | Yes | Concur - Yes |
| M | Yes | Concur - Yes | Yes | Concur - Yes |
| N | Yes | Concur - Yes | Yes | Concur - Yes |
| O | No | Concur - No | No | Concur - No |
| P | No | Concur - No | Yes | Concur - Yes |

---

[10] Cases A - K.

| Q | No | Concur - No | Yes | Concur - Yes |
|---|---|---|---|---|
| R | Yes | Concur - Yes | Yes | Concur - Yes |
| S | No | Concur - No | No | ***Disagree - Yes*** |
| T | No | Concur - No | Yes | Concur - Yes |
| U | No | Concur - No | No | Concur - No |
| V | Yes | Concur - Yes | Yes | Concur - Yes |
| W | No | Concur - No | No | Concur - No |
| X | Yes | Concur - Yes | Yes | Concur - Yes |

The table that follows provides the CDCR's findings of foreseeability and preventability along with the Special Master's experts' findings of foreseeability and preventability. Of note, the Special Master's experts determined that 13 of the suicides were foreseeable, findings that were in agreement with those provided in the 2015 CDCR Annual Suicide Report. As to preventability, the Special Master's experts determined that 19 cases were preventable, while CDCR determined that 17 cases were preventable. A discussion of the rationale supporting the Special Master's experts' determinations of preventability on those cases where agreement was not reached follows the table.

**Case H**

CDCR determined a lack of foreseeability and preventability in this case. The Special Master's expert's analysis found this case to have been preventable but not foreseeable. In April 2015, mental health staff failed to adequately assess the patient's risk of suicide after he referenced his serious suicide attempt in 2009 as a reason for continued single-cell status. The clinician also failed to satisfactorily document a clear rationale for neglecting to explore the patient's other complaints and did not include adequate information about suicide risk factors. Had the patient's risk been properly assessed, a safety plan or possibly a higher level of care would likely have been warranted and subsequently prevented the patient's death by suicide.

**Case S**

This patient's suicide was determined in the SCR to be neither foreseeable nor preventable. The Special Master's expert's analysis agreed regarding foreseeability but determined the suicide was preventable. This decision was based on the following facts:

The inmate entered the CDCR RC, was assessed by an RC clinician, and was placed at the Correctional Clinical Care Management System (CCCMS) level of care. He was diagnosed with delusional disorder and amphetamine dependence in a controlled environment. A suicide risk assessment was completed and appeared adequate. There was no mention of plans for following up with the patient. The patient was seen by a psychiatrist twice over the two months following his arrival and was prescribed an antidepressant. The psychiatrist diagnosed the patient as having borderline intellectual functioning and noted the need to clarify the presence of mild intellectual disability, yet no evaluation was conducted.

The inmate had no further contacts with mental health staff prior to his death nearly two months later. The Program Guide requires that patients placed at the CCCMS level of care while

in a reception center be seen by a primary clinician within 30 days of placement and every 90 days thereafter. Case S was not seen within 30 days of his placement in CCCMS level of care. In addition to the lack of clinical follow-up with a primary clinician, the patient was in protective custody. In the middle of the night, at 1:15 AM, on the day of his death, the patient reported safety concerns to an officer making rounds. The officer indicated that the patient denied suicidal ideation at the time. The officer determined that there was no indication to intervene secondary to the patient's safety concern at that time. The patient died less than two hours later.

It appears that had the patient been seen as required by his primary clinician and had the officer taken further steps to determine the root of the patient's safety concerns alone in his cell in the middle of the night, the likelihood of death by suicide would have been substantially reduced and therefore was preventable.

V.   Conclusions

- CDCR annual suicide rates are most informative when they include both in-state and out-of-state inmate populations in the calculations. Using both numbers allows for comparisons with previous annual reports and improves understanding of the rates of suicide within the entire CDCR population.

- Annual suicide reports are most informative when they include individual case determinations of foreseeability and preventability, rather than simply reporting the number of cases. Anonymity can be maintained by removing names and identifying information. Individual determinations allow for a critical review of each case and further the ability of CDCR to identify and address deficiencies and trends over time.

- Inmate housing based on safety needs occurs in locations beyond SNY. When inmates are placed in any location (e.g., RC, Administrative Segregation Unit) specifically to address safety concerns, their inclusion in analyses increases understanding of the impact of safety on suicidality among this population.

- In annual suicide reports, percentages, rather than raw numbers, support understanding and allow for comparisons over time.

Respectfully Submitted,

/s/
Sharen Barboza, Ph.D.

9