**Sharen Barboza, Ph.D.**
**37 Norton Avenue**
**Clinton, NY 13323**
**sharen@sharenbarboza.com**

**REPORT ON SUICIDES COMPLETED IN THE**
**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**JANUARY 1, 2016 – DECEMBER 31, 2016**

## I.    <u>Introduction and Summary of the Findings</u>

This report is the *Coleman* Special Master's expert's review of the 27 deaths by suicide of inmates incarcerated within the California Department of Corrections and Rehabilitation (CDCR) in 2016. It is submitted as part of the Special Master's continuing review of the defendant's compliance with court-ordered remediation in the matter of *Coleman v. Newsom*, No. CIV S-90-0520 KJM KJN E.D.Cal.

This report is similar to other reports in that three other experts from the Special Master's team assisted in its preparation by reviewing records and reports related to the 27 suicides in 2016. All three of these experts are nationally recognized in the field of correctional mental health. They are Kahlil A. Johnson, M.D., Mary Perrien, Ph.D., and James DeGroot, Ph.D.[1]

The primary sources of information for this report were individual Suicide Case Reviews (SCRs) completed by members of CDCR's Statewide Mental Health Program (SMHP) in collaboration with input and feedback from the Suicide Case Review Committee (SCRC). When necessary to clarify clinical or custodial issues, the Special Master's expert included the following additional sources of information: individual inmate healthcare records, coroners' reports, California Correctional Health Care Services (CCHCS) Final Combined Death Review Summaries, CDCR Initial Inmate Death Reports (Form 7229-A), CDCR Inmate Suicide reports (Form 7229-B) and CDCR Crime/Incident Reports (Form 837-A).

The findings can be summarized as follows:

- CDCR's suicide rate in 2016, 21 deaths per 100,000, was its highest since 2013.

- CDCR's suicide rate in 2016 was in keeping with the U.S. national average for suicide rates in state prisons in 2016, but higher than most prison systems of similar size.

- The number of suicides in 2016 corresponds to a suicide every 13.5 days or a suicide every two weeks, on average. This is an increase from 2015 when the rate represented a suicide every 15.2 days, and in 2014, when suicides occurred an average of every 15.9 days.

---

[1] Each expert's curriculum vitae appears in Appendix C.

- In 2016, 52% of the deaths by suicide occurred within four facilities. Those were California Men's Colony (CMC), Kern Valley State Prison (KVSP), California State Prison, Sacramento (CSP/Sac), and Salinas Valley State Prison (SVSP).

- Hanging was the primary method used by those who died by suicide in 2016. It was the cause of death in 70% of the cases. This was a decrease, however, from the previous two years when hanging was the method in 87% of the deaths by suicide in 2014 and 2015.

- There was an increase in deaths by cutting and asphyxiation using means other than hanging in 2016 compared to 2014 and 2015.

- No deaths by suicide occurred in the months of February or August, and the highest rates were seen in April and November. This is in keeping with patterns over previous years when the highest rates of suicide were seen in the Spring and Fall. Atypically, there were also spikes of suicides in January, July, and December in 2016.

- Sixty-seven percent of the deaths by suicide occurred outside of routine business hours, yet only 22% occurred during first watch (22:01 to 06:00).

- There was an increase in the percentage of inmates discovered in rigor mortis[2] in 2016. Upon discovery, nine inmates, or 33%, were noted to have signs of rigor mortis present. Two inmates found in rigor mortis (7.4%) were housed in restrictive housing.

- Suicide rates increased most significantly for female inmates to 52 deaths per 100,000 inmates from 35.5 deaths per 100,000 inmates in 2015. There were three suicides by female inmates in 2016 and two in 2015.

- Rates of death by suicide for male inmates increased from 17.8 deaths per 100,000 inmates in 2015 to 19.5 deaths per 100,000 inmates in 2016.

- There was an increase in suicides among Hispanic/Latinx inmates in 2016 and a decrease in the suicides of Caucasian inmates when compared with 2015.

- By age group, the majority of deaths by suicide were completed by those aged 35-44 (41%). Those who died by suicide in 2016 were older overall when compared to 2015.

---

[2]Rigor mortis is "the state of postmortem stiffening." It "starts developing within 1 to 2 hours after death," "becomes apparent in the small muscle groups first" including "eyelids, lower jaw, face," "but on an average it may be said to commence 2-4 hours after death…" Kori (2018). "Time since death from rigor mortis: Forensic perspective," *Journal of Forensic Sciences and Criminal Investigation, 9 (5), 1-9.*

- Analyses revealed that being married was less of a protective factor against suicide in 2016 than it had been in 2015. Married individuals comprised 22% of the suicides in 2016, up from 8% in 2015.

- There was a much higher rate of death by suicide for individuals for whom English was not their primary language in 2016, 22%, up from 4% in 2015.

- The majority of inmates who died by suicide, 81%, had a diagnosed medical condition.

- High-security inmates, those classified as Level III or Level IV, were overrepresented among those who died by suicide, at 78%, when compared to their overall percentage of the CDCR population, at 38.1%.

- Those incarcerated for violent crimes, including sexual offenses, comprised 81% of those who died by suicide in 2016. This pattern is consistent over time.

- Seventy-four percent of inmates who died by suicide in 2016 were incarcerated with maximum sentences over 21 years, including those sentenced to life in prison. No condemned inmates died by suicide in 2016.

- Just over one-third of inmates (37%) were residing in segregated housing at the time of their deaths by suicide. This is in keeping with findings from 2015 and a significant decrease from the findings in 2014 when 65.2% of suicides occurred in segregated housing.

- There was a 52% increase in deaths by suicide for inmates placed in housing to address their safety concerns.

- Deaths by suicide in solely occupied cells decreased to 82% in 2016 from 92% in 2015.

- Among inmates who died by suicide with a history of job placements while incarcerated, 65% were unassigned at the time of death.

- In 2016, 56% of those who died by suicide were receiving services within Mental Health Services Delivery System (MHSDS) at the Enhanced Outpatient Program (EOP) level of care compared with 21% in 2015.

- The majority of inmates (74%) who died by suicide in 2016 were provided with a primary diagnosis of either a mood disorder or a psychotic disorder. Four inmates, or 15%, had no mental health diagnosis of record.

- Substance use or abuse was present in the histories of 89% of the inmates who died by suicide in 2016, down from 100% in 2015.

- Seventy-four percent of the inmates who died by suicide in 2016 had attempted suicide previously. This is an increase from 2015 (67%) but a decrease from 2014 (87%) with regard to suicide attempt histories.

- Seven inmates, or 26% of those who died by suicide in 2016, were receiving involuntary psychotropic medications under a court order at the time of their deaths. One of these inmates had an active court order for involuntary medication, but his antipsychotic medications were discontinued three weeks prior to his death.

- Fifty-nine percent of inmates who died by suicide had histories positive for trauma exposure. Of these 16 inmates, six (38%) had evidence in their healthcare records of receiving a diagnosis and/or treatment related to trauma.

## II.    **Format**

The following report is presented in a narrative format supported by graphs and tables. It includes a summary of findings related to the deaths by suicide in 2016, including comparisons to findings from previous years, when available. The report ends with conclusions.

Findings and discussion of the findings are organized according to identified risk factors and other elements of analysis, including:

- Suicide Incident Factors
- Individual Risk Factors
- Institutional/Environmental Risk Factors
- Mental Health Risk Factors
- Mental Health Evaluation and Treatment Factors
- Emergency Response Factors
- Individual Suicide Case Review Analyses
- Quality Improvement Plan Content and Analyses
- Foreseeability and Preventability Determinations

Appendices are attached to this report, including:

- o    Appendix A – Summaries of Individual Cases
- o    Appendix B – Tables
- ▪    B1 – Inmate Demographics
- ▪    B2 – Inmate History and Suicide Event Characteristics
- ▪    B3 – Identified Assessment, Treatment, and Communication Concerns
- ▪    B4 – Common Problems Identified as Requiring a Quality Improvement Plan
- o    Appendix C – Experts' Curricula Vitae
- o    Appendix D – List of Acronyms and Abbreviations Used in this Report

### III.    Findings and Discussion

On June 30, 2016, the in-state inmate population included 123,784 inmates (118,015 males and 5,769 females).  With the addition of the population of out-of-state inmates, CDCR had 128,641 inmates in its custody on that date.  As discussed in the Special Master's expert's analysis of 2015 suicides, the inclusion of suicide rates using both the in-state population and the combined in- and out-of-state populations are being reported to allow for comparison with previous reports (in-state) and to present a more accurate rate when accounting for all inmates for whom CDCR is responsible (in- and out-of-state).  As noted in the Special Master's 2015 analysis:

> "Based on the discrepancies related to the inclusion of inmates and populations, the Special Master's experts recommend that in subsequent reports, suicide rates be reported in two ways.  First, it is recommended that for the sake of consistency and the ability to compare rates across years, the previous method of placing all CDCR deaths by suicide (in-state and out-of-state) in the numerator and the CDCR in-state population in the denominator be continued.  Additionally, it is recommended that in years where a suicide occurs out-of-state, rates be calculated using both in-state and out-of-state inmates in the denominator as was done in the 2015 CDCR Annual Suicide Report."[3]

The 2016 suicide rate within CDCR was in line with the overall rate in U.S. State Prisons in 2016.  Over the past ten years, California's suicide rate has been higher than the national average 80% of the time, lower than the national average in 2014 and two years where it was essentially equivalent to the national average (i.e., 2009, 2016) as shown in the table below.

#### CDCR and U.S. State Prison Suicide Rates per 100,000
#### 2007-2016

| Year | CDCR Prisons In-State Only | CDCR Prisons In- and Out-of-State | U.S. State Prisons[4] |
|---|---|---|---|
| 2007 | 19.7 | 19.6 | 16 |
| 2008 | 22.3 | 21.1 | 15 |
| 2009 | 15.7 | 14.9 | 15 |
| 2010 | 21.1 | 21.1 | 16 |
| 2011 | 21.0 | 20.3 | 14 |
| 2012 | 24.5 | 24.4 | 16 |
| 2013 | 22.6 | 22.6 | 15 |
| 2014 | 17.0 | 17.0 | 20 |
| 2015 | 19.8 | 18.6 | 18 |
| 2016 | 21.8 | 21.0 | 21 |

---

[3] *See* "Special Master's Expert's Analysis of The California Department of Corrections and Rehabilitation Annual Suicide Report, January 1, 2015 – December 31, 2015" at. 3.

[4] From Carson, A. & Cowhig, M. (2020).  *Mortality in State and Federal Prisons, 2001-2016 – Statistical Tables*. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, NCJ 251920.

CDCR's suicide rate of 21 suicides per 100,000 inmates in 2016 places it above its 17-year average of 20 suicides per 100,000. When compared to other large prison systems in the country, California's suicide rate is the ninth highest out of the ten largest correctional systems and highest among the largest five systems (highlighted in blue). While comparisons between prison systems have their challenges based on variable demographics among inmate populations, comparisons with large prison systems can be useful as the processes and dynamics within larger systems are more similar than the processes and dynamics within smaller correctional systems.

| Correctional System | 2016 Population | 2016 Suicides | 2016 Suicide Rate per 100,000 |
|---|---|---|---|
| Georgia | 53,627 | 6 | 11.2 |
| Federal Bureau of Prisons | 189,192 | 22 | 11.6 |
| Arizona | 42,320 | 6 | 14.2 |
| Ohio | 52,175 | 8 | 15.3 |
| Florida | 99,974 | 17 | 17.0 |
| Texas | 163,703 | 28 | 17.1 |
| Pennsylvania | 49,244 | 10 | 20.3 |
| Illinois | 43,757 | 9 | 20.6 |
| **California** | **128,641** | **27** | **21.0** |
| New York | 50,716 | 16 | 31.5 |

The Bureau of Justice Statistics[5] reported aggregate data of suicides in state prisons from 2001-2016 by state. The following table ranks state prison systems from the state with the least number of suicides per 100,000 over this 17-year period (i.e., Alabama) through the state with the highest rate of suicides over this period (i.e., Utah). California's rate of 20 suicides per 100,000 during this period places it tied for 33rd out of 50 ranks, above the median rate nationally.

<u>Suicide Rates Across the United States from 2001-2016</u>

| Rank | State | Suicide Rate Per 100,000 |
|---|---|---|
| 1 | Alabama | 7 |
| 2 | Kentucky | 8 |
| 2 | North Carolina | 8 |
| 2 | West Virginia | 8 |
| 5 | Florida | 9 |
| 6 | Virginia | 10 |
| 7 | Georgia | 11 |
| 7 | Louisiana | 11 |
| 9 | Maine | 12 |
| 10 | Missouri | 13 |

| Rank | State | Suicide Rate Per 100,000 |
|---|---|---|
| 10 | New Jersey | 13 |
| 12 | North Dakota | 14 |
| 12 | Ohio | 14 |
| 12 | South Carolina | 14 |
| 12 | Washington | 14 |
| 16 | Mississippi | 15 |
| 17 | Kansas | 16 |
| 17 | Michigan | 16 |
| 17 | Minnesota | 16 |
| 17 | Oregon | 16 |

---

[5] *Id.*

| Rank | State | Suicide Rate Per 100,000 |
|---|---|---|
| 17 | Pennsylvania | 16 |
| 17 | Tennessee | 16 |
| 23 | Arizona | 17 |
| 23 | Illinois | 17 |
| 23 | Indiana | 17 |
| 23 | Nevada | 17 |
| 23 | Texas | 17 |
| 28 | Arkansas | 19 |
| 28 | Colorado | 19 |
| 28 | Iowa | 19 |
| 28 | Maryland | 19 |
| 28 | Wyoming | 19 |
| *33* | *California* | *20* |
| 33 | Oklahoma | 20 |
| 33 | Wisconsin | 20 |

| Rank | State | Suicide Rate Per 100,000 |
|---|---|---|
| 36 | Nebraska | 22 |
| 36 | New York | 22 |
| 38 | Connecticut | 23 |
| 39 | New Mexico | 24 |
| 40 | Delaware | 27 |
| 40 | Idaho | 27 |
| 42 | South Dakota | 28 |
| 43 | Hawaii | 29 |
| 43 | New Hampshire | 29 |
| 43 | Vermont | 29 |
| 46 | Massachusetts | 30 |
| 47 | Alaska | 33 |
| 48 | Montana | 35 |
| 49 | Rhode Island | 40 |
| 50 | Utah | 43 |

A.    Suicide Incident Factors

This section reviews the factors associated with the suicidal event, including its location, method, and timing. The presence of rigor mortis upon discovery was also reviewed.

1.    **Facility Locations**

In 2016, all deaths by suicide occurred within a CDCR facility. There were no deaths by suicide reported in out-of-state institutions or at Department of State Hospital (DSH) facilities. Twenty-seven suicides occurred across 13 facilities. Five facilities experienced one suicide, four facilities experienced two suicides, two facilities experienced three suicides, and two facilities experienced four suicides. As can be seen in the table below, over half of the deaths (14, or 52%) occurred at four facilities (i.e., CMC, KVSP, CSP/Sac, and SVSP).

| Facility | Number of 2016 Suicides | Percentage of 2016 Suicides |
|---|---|---|
| California Correctional Center (CCC) | 1 | 4% |
| Central California Women's Facility (CCWF) | 1 | 4% |
| Folsom State Prison (Folsom) | 1 | 4% |
| North Kern State Prison (NKSP) | 1 | 4% |
| Pelican Bay State Prison (PBSP) | 1 | 4% |
| California Correctional Institute (CCI) | 2 | 7% |
| California Institution for Women (CIW) | 2 | 7% |
| California State Prison, Los Angeles County (CSP/LAC) | 2 | 7% |
| Pleasant Valley State Prison (PVSP) | 2 | 7% |
| California Men's Colony (CMC) | 3 | 11% |

| Facility | Number of 2016 Suicides | Percentage of 2016 Suicides |
|---|---|---|
| Kern Valley State Prison (KVSP) | 3 | 11% |
| California State Prison, Sacramento (CSP/Sac) | 4 | 15% |
| Salinas Valley State Prison (SVSP) | 4 | 15% |

Of note, CMC and CSP/Sac were among the facilities with the highest number of deaths by suicide in 2015 as well. These two facilities have large and complex mental health missions. When suicides were examined over the previous 16 years, 15 facilities experienced more than one suicide per year on average. Of the eight facilities that experienced more than one suicide in 2016, five of them have shown this pattern consistently over time – CCI, CSP/LAC, CMC, SVSP, and CSP/Sac. Conversely, three facilities with historically high suicide rates, over 1.5 per year on average, experienced no suicides in 2016. These facilities were California State Prison, Corcoran (CSP/Corcoran), Richard J. Donovan Correctional Facility (RJD), and San Quentin State Prison (SQ).

## 2.    Method of Suicide

The majority of deaths by suicide in 2016 (70%) occurred by hanging. Additional methods included other asphyxiation (e.g., tying objects around the neck without securing to an object resulting in suffocation) in 11% of the cases, cutting in 7% of the cases, and one incident each, or 4% of deaths by suicide as a result of an overdose, jumping and "other" method.[6]

When compared to 2014 and 2015[7], deaths by hanging decreased by 16%. Deaths by overdose decreased by 25% in 2016 when compared to 2015. The rate of inmates who died by jumping from a high place remained consistent with rates in 2014 and 2015. In 2016, the largest change related to method was two deaths by cutting. No inmate died using that method in 2014 or 2015. There was also an increase in deaths from asphyxiation by means other than hanging in 2016 (11%) over the rates in 2014 and 2015 (4%).

---

[6] The case listed as "other" involved an inmate who initially jumped off a high tier in his housing unit and sustained significant injuries. He was maintained in a hospital setting for over 90 days following the attempt and ultimately died after failing to thrive due to lack of nutrition and dehydration. While the available documentation included differences of opinion, the inmate may have been intentionally avoiding nutrition and hydration in a continued attempt to die.

[7] While percentage comparisons to previous years are made throughout this report, it is important to note that minor changes may appear significant given the low base rate of suicides in a given year.



### 3.    Temporal Factors

In 2016, a death by suicide occurred at least once each month, except during February and August.  The average number of deaths by suicide was 2.25 per month.  Monthly suicides range from one death, or 4% in October, to five deaths, or 19% in April.

| Month | Number of 2016 Suicides | Percentage of 2016 Suicides |
|---|---|---|
| January | 3 | 11% |
| February | 0 | 0% |
| March | 2 | 7% |
| April | 5 | 19% |
| May | 2 | 7% |
| June | 2 | 7% |
| July | 3 | 11% |
| August | 0 | 0% |
| September | 2 | 7% |
| October | 1 | 4% |
| November | 4 | 15% |
| December | 3 | 11% |

In its report of suicides occurring in 2015[8], CDCR examined trends over time with regard to temporal factors and noted that deaths by suicide tended to occur most often in the Spring and Fall months.  This trend was seen in 2015 as well as when suicides were averaged across the previous ten years (2006-2015).  When the suicides from 2016 were compared to those in 2015, the highest rates still appeared in Spring and Fall, but there were also spikes in January, July, and December, as demonstrated in the chart that follows.

---

[8] *Annual Report on the Suicides in the California Department of Corrections and Rehabilitation, January 1, 2015 – December 31, 2015.*



Deaths by suicide in 2016 occurred most frequently on Thursdays (22%), Mondays (19%), and Saturdays (19%). Deaths by suicide occurred least frequently on Tuesdays (7%) and Sundays (7%).

With regard to time, six deaths by suicide (22%) occurred during first watch (22:01 to 06:00), 11 deaths (41%) occurred during second watch (06:01 to 14:00) and ten deaths (37%) occurred during third watch (14:01 to 22:00). This pattern differed slightly from 2015 when 30% of deaths during first watch, 30% during second watch, and 40% during third watch.

### 4.    Rigor Mortis

Upon discovery, nine inmates, or 33%, were noted to have rigor mortis present, meaning that the inmate had likely been dead for at least two hours prior to discovery. In 2015, two inmates, or 8.3%, were found in rigor mortis, and in 2014, four inmates, or 17.4%, were found in rigor mortis. In 2016, two inmates (7.4%) were housed in a restrictive housing unit, indicating that custody checks were not completed as required.

Seven of the nine inmates with rigor mortis present, or 78%, were housed in a general population/mainline housing unit at the time of death. Of those in general population housing, six, or 86%, were receiving EOP levels of care.

### B.    Individual Risk Factors

Findings related to characteristics of individual inmates who died by suicide are reviewed in the section that follows, including gender, ethnicity, age, marital status, education level, primary language, and health concerns.

### 1. Gender

In 2016, 24 of the deaths by suicide, or 89%, were male inmates; three suicides, or 11%, were female inmates. In 2015, there were 22 deaths by suicide for male inmates, representing 91% of the suicides, and two deaths by suicide for female inmates representing 8%. No non-binary nor transgender inmates died by suicide in 2015 or 2016.

Suicide rates per 100,000 inmates were calculated by gender. The rate for male inmates was 19.5 deaths per 100,000 inmates in 2016. This was an increase over the rate of 17.8 per 100,000 inmates seen in 2015. For female inmates, the rate in 2016 was 52.0 deaths per 100,000 inmates, while in 2015, the rate was 35.5 deaths per 100,000 inmates, representing an increase in 2016.

### 2. Ethnicity

Twelve of the inmates who died by suicide in 2016 were Hispanic/Latinx making up 44% of the deaths by suicide. Nine of the inmates, or 33%, who died by suicide were Caucasian, followed by three African American inmates (11%), two Asian inmates (7%), and one Native/Indigenous American inmate (4%).



When compared to 2015, deaths by suicide in 2016 were marked by an increase in the percentage of suicides among Hispanic/Latinx inmates and a decrease in the percentage of suicides by Caucasian inmates. When compared to the previous two years, suicides in 2016 showed a slight decrease in the percentage of suicides among African American and Asian inmates.

African Americans died by suicide with comparatively less frequency, 11% than would be expected by their overall percentage of the CDCR population (29%). Caucasian inmates died with a higher frequency (33%) than would be expected by their overall percentage of the inmate population (22%), as was true for those categorized as "Other" who made up 11% of the deaths by suicide, but only 7% of the CDCR population. Hispanic/Latinx inmates died by suicide at a percentage (44%) on par with their overall representation within CDCR (43%). These data are

illustrated in the chart that follows[9], which also includes the comparative rates of the overall population by race as of December 2016.[10]



### 3. Age

With regard to age, the average age across inmates who died by suicide in 2016 was 43.6 years, higher than the average age on the CDCR population in 2016, which was 39.3 years. Those who died by suicide in 2016 were also older, on average, than those who died by suicide in 2015 (42.9 years) and also higher than the average age of inmates who died by suicide in 2014, which was 37.7 years.

Categorically, inmates aged 35-44 died with the most frequency (40.7%), followed by those aged 55 and older (33.3%) and those 25-34 years old (18.5%). Those under the age of 25 and between 45-54 each represented 3.7% of the deaths.

Inmates aged 55 and older represented a higher percentage of those who died by suicide in 2016 (33.3%) when compared to their percentage of the CDCR population (13.8%). Similarly, those aged 35-44 (40.7%) were overrepresented among those who died by suicide, given their overall percentage within CDCR in 2016 (25.6%). The other age ranges were underrepresented with regard to deaths by suicide when compared to their overall percentage of the CDCR population,

---

[9] Data available from CDCR identified Asian, Native/Indigenous American, Hawaiian/Pacific Islander and those for whom race was not identified as "Other." Subsequently, those groups are reported together in the chart that follows.

[10] *CDCR Offender Data Points – Offender Demographics for the 24-month period ending December, 2016.* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2019/08/DataPoints_122016.pdf.

with the most marked difference occurring for those aged 45-54, who made up 18.8% of the CDCR population in 2016, but only 3.7% of the deaths by suicide.[11]



In 2015, the highest percentage of inmates who died by suicide were those aged 25-34 years (33%). That age group represented only 18.5% of the suicides in 2016.  There was also a decrease in suicides among those aged 45-54 in 2016, down to 3.7% from 17% in 2015.  Conversely, in 2016, those aged 35-44 represented the largest group (41%), while in 2015, this age group represented only 17% of those who died by suicide.  In both years, the 18-24 age group represented the smallest percentage of suicides, 4% in 2016 and 8% in 2015.  In 2016, there was also an increase in suicides among those aged 55 and older, 32% up from 25%.

### 4.    Marital Status

Of the 27 inmates who died by suicide in 2016, six (22%) were married at the time of death. Thirteen (48%) were never married, six (22%) were divorced or separated, and two (7%) were widowed.

In 2015, 8% of the inmates who died by suicide were married, 38% were divorced or separated, and 54% were never married.  Comparisons reveal that there was an increase in deaths by suicide by married inmates in 2016 over the percentage in 2015.

---

[11] *CDCR Offender Data Points – Offender Demographics for the 24-month period ending December, 2016.* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2019/08/DataPoints_122016.pdf.

13



### 5. Education

In 2016, nine (33%) of the inmates who died by suicide were reported to have graduated from high school or completed their General Educational Development (GED) diploma. Another eight inmates, or 30%, completed between grades 8-12 but did not obtain a diploma. Five, or 19%, had completed some college. Four inmates (15%) completed less than eight years in school, and one (4%) had a college degree.

In 2015, education levels were not separated into those who successfully completed a high school education and those who only partially completed secondary education. When the data from 2016 were reanalyzed in order to allow comparison with the data from 2015, it revealed a higher degree of variability among those who died by suicide in 2016 than those in 2015, as the chart that follows demonstrates.



14

### 6.    Primary Language

Of the 27 inmates who committed suicide, English was noted to be the primary language for 21 inmates or 78%. Six (22%) inmates did not speak English as their primary language. Of those, Spanish was the primary language for five of the inmates, and one inmate spoke Korean as her primary language.

In 2015, it was noted that only one inmate who died by suicide (4%) did not speak English as a primary language. The results in 2016 demonstrated a higher number of suicides by individuals for whom English was not their primary language.

For three of the inmates for whom their primary language was Spanish, there appeared to be significant limits with regard to their English proficiency. One of these inmates, Case O, appeared to be consistently treated by Spanish-speaking providers or through the use of interpretation services. For the other two cases, Case C and Case E, there appeared to be no formal recognition of their limited English proficiency and no inquiry into their need for interpretation services. Clinicians documented their reliance on Test of Adult Basic Education (TABE) scores and Disability and Effective Communication (DEC) System determinations as the basis for not engaging interpreters, rather than the needs of the inmate. It appeared that staff did not consider engaging an interpreter simply because available documentation did not indicate that it was required.

### 7.    Health Status/Medical Conditions

Twenty-two or 81% of those who died by suicide in 2016 had a diagnosed medical condition. Of those 22 inmates, 20 of them, or 91%, were prescribed medications to address a medical condition.

Research[12] has shown that certain medical conditions are related to an increased risk for suicide, including asthma, back pain, brain injury, cancer, congestive heart failure, chronic obstructive pulmonary disorder, diabetes, epilepsy, HIV/AIDS, heart disease, hypertension, migraine, Parkinson's disease, psychogenic pain, renal disorder, sleep disorders, and stroke. Nineteen inmates, or 70% of those who died by suicide in 2016, had at least one of these conditions.

### C.    Institutional/Environmental Risk Factors

In this section, issues related to institutional and environmental factors among those who died by suicide are reviewed. These include security level, crime type, sentencing factors, housing location, cell type, issues with custody checks, job placements, institutional transfers, and rule violation reports.

---

[12] Ahmedani, et al. Major Physical Health Conditions and Risk of Suicide. *American Journal of Preventive Medicine*, 2017; DOI: 10.1016/j.amepre.2017.04.001.

### 1.    Security Level

Fourteen inmates, or 52%, who died by suicide in 2016 were classified as Level IV. Six inmates, or 22%, were classified as Level III, six (22%) were classified as Level II, and one inmate (4%) was unclassified at the time of his death[13].

In 2015, it was noted that 75% of inmates who died by suicide were high custody inmates, classified as either Level III or Level IV. The percentage increased slightly in 2016, rising to 78% of inmates being classified as high security but overall, the rates are similar. When the CDCR population was examined as a whole, 38.1% of beds were classified as Level III and Level IV in 2016,[14] indicating an overrepresentation of this group within those who died by suicide.

### 2.    Crime Type

Nineteen (70%) of the inmates who died by suicide in 2016 were convicted of violent crimes. Three inmates (11%) were convicted of sexual offenses, two (8%) were convicted of possession of a firearm, and one inmate (4%) was convicted of each of the following non-violent crimes: drug offense, property offense, and "other." The "other" crime involved the inmate loitering and being discovered to have a knife taped to his leg. When sexual offenses were added to the other violent crimes, it revealed that 81% of the inmates who died by suicide were convicted of violent crimes. This was on par with the findings from 2015, where 79% of those who died by suicide were incarcerated for violent crimes.

### 3.    Sentencing Factors

Twenty individuals, or 74%, who died by suicide in 2016 were serving sentences of over 20 years. This included 16 inmates, or 59%, who were serving sentences up to and including life sentences. None of the suicides in 2016 were completed by individuals condemned to death. When compared to the findings from 2015, there was a decrease in deaths by suicide for individuals with sentences of less than ten years. In 2015, this group comprised 42% of the deaths by suicide in contrast to 11% in 2016.

---

[13] Security level information was obtained from SCRs or Crime/Incident Reports Part B1- Inmate (CDCR Form 837-B1).

[14] *CDCR Offender Data Points – Offender Demographics for the 24-month period ending December, 2016.* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2019/08/DataPoints_122016.pdf. Of note, the CDCR reports the number of beds allotted to each security level, rather than the actual number of inmates who meet criteria for a given security level. The data used for comparison was bed data, not actual inmate population data.

| Sentence Length | Number of 2016 Suicides | Percentage of 2016 Suicides |
|---|---|---|
| 1-5 years | 3 | 11% |
| 6-10 years | 0 | 0% |
| 11-20 years | 4 | 15% |
| 21+ years | 4 | 15% |
| Life with the Possibility of Parole | 10 | 37% |
| Life without the Possibility of Parole | 6 | 22% |
| Condemned | 0 | 0% |

When examining the amount of time served, there was a bimodal distribution. The seven inmates who served 1-5 years and the seven who served 11-20 years each comprised 26% of the deaths, accounting for more than half of the suicides. The five inmates with less than one year served and the five inmates with over 21 years served each comprised 19% of the 2016 deaths by suicide. The remaining three inmates, those who served 6-10 years, comprised 11% of the deaths by suicide. This is illustrated in the graph that follows.



When determining the amount of time remaining on an inmate's sentence, this report used the longest possible sentence, up to and including life. The vast majority (70%) of inmates who died by suicide had over 21 years remaining on their sentences. Individuals with less than one year made up 4% of the suicides and those with less than five years remaining made up 11% of the suicides in 2016. Individuals with six to ten years remaining made up 4% of the suicides, and those with 11-20 years made up the remaining 11%.



For the 16 inmates with up to life sentences, six (38%) had served their minimum time.  In other words, an inmate sentenced to 25 years to life had already served 25 years or more.  On average, these inmates served 6.75 years beyond their minimum sentences, ranging from four months to 10 years beyond the minimum sentence length.

When comparing these data to those observed in 2015, the most obvious change was the decrease in 2016 of suicides by those who had served 6-10 years.  This group comprised 29% of the suicides in 2015, while only 11% in 2016, as illustrated in the following graph.



4.    **Housing Type**

At the time of their suicidal acts, 15 inmates, or 56%, were living in a mainline/general population setting, and two inmates (7%) were living in a Special Needs Yard (SNY).  Of note, two of the female inmates were housed in the Supportive Care Unit (SCU) at CIW, which was a mainline housing unit designated for inmates enrolled in the EOP.  In these analyses, this unit was considered general population housing.  Taken together, 63% of inmates who died by suicide in 2016 were in a general population/mainline setting.  Five inmates, or 19%, were living in Administrative Segregation Units (ASUs).  Two inmates (7%) were living in a Psychiatric Services Unit (PSU), one of which was also classified as a SNY.  Two inmates (7%) were residing in Short-Term Restricted Housing (STRH).  One inmate (4%) was housed in a Security Housing Unit (SHU).  When taken together, ten inmates (37%) were in some form of restrictive housing when they engaged in the behavior that resulted in death by suicide.  This is the same percentage found in 2015 and a decrease compared to 2014, when 65.2% of deaths by suicide occurred in segregated housing.



Of the seven inmates housed in either ASU or PSU, four (57%) were noted to be placed there for safety reasons. When included with the inmates housed in SNY, six inmates, or 22% of those who died by suicide in 2016, were housed in a location specifically to address their safety needs at the time of their deaths. This was an increase from 2015 when 12.5% of those who died by suicide had their housing determined due to safety reasons.

In previous years, there have been concerns about suicides being committed in ASU intake cells. None of the deaths by suicide in 2016 occurred in ASU intake cells or by inmates who had been in ASU less than 72 hours. However, one inmate had transferred from an ASU into a PSU two days before his death by suicide.

### 5.    Cell Type

Of the 27 inmates who died by suicide in 2016, 18, or 67%, engaged in their suicide acts while housed in single cells. Six inmates, or 22%, were housed in double cells; but four of them died when their cellmates were absent from the cell. One inmate (4%) died in a dormitory setting, and two inmates (7%) engaged in their suicidal acts outside of their cells.

When compared to the findings from 2015, deaths by suicide in designated single cells decreased in 2016 by 11%. Also, in 2015 deaths by suicide occurred in cells where the deceased was alone in the cell 92% of the time. This included single cells as well as double-cells where the cellmate was not present at the time of the suicidal act. In 2016, 82% of the deaths by suicide met these criteria.

### 6.    Custody Checks

Five, or 19% of the cases, included concerns about inadequate custody/welfare checks as possible precipitants related to the deaths by suicide. Of these, four cases (80%) occurred within mainline EOP housing units, two of which were within the EOP at CMC. The other mainline EOP locations

were located at SVSP and CSP/Sac. The fifth case occurred at CSP/LAC and was related to a Correctional Clinical Case Management System (CCCMS) level of care inmate housed in STRH.

### 7.    Job Placements while Incarcerated

Of the inmates who died by suicide in 2016, 10, or 37%, had no history of job placements while incarcerated. The remaining 17, or 63% of inmates who died by suicide in 2016, had documentation of at least one job placement during incarceration. Eleven (65%) of the 17 inmates with a history of job placement were noted to be unassigned at the time of their deaths. Three inmates who died by suicide in 2016, or 11%, were noted to be assigned to a job placement at the time of their deaths. The job placement status for three inmates was unknown based on available documentation.

### 8.    Interfacility Transfers

Male inmates who died by suicide in 2016 experienced between one and 23 interfacility transfers over the course of their incarcerations. When examined in relation to the number of years served by each individual, the average was 2.2 transfers per year or more than one transfer every six months. Female inmates were analyzed separately, given the limited number of facilities available to the female population. On average, female inmates experienced 0.2 transfers per year.

### 9.    Rules Violation Reports

The 27 inmates who died by suicide in 2016 received a total of 268 rules violation reports (RVRs), or 9.9 per inmate on average, during their most recent stays within CDCR. Totals for each inmate ranged from no RVRs to 45 RVRs during their incarcerations. When examined in relation to the number of years served by each individual, the average was 1.2 RVRs per year.

### D.    Mental Health Risk Factors

This section reviews mental health conditions and mental health risk factors known to be associated with suicide. More specifically, issues related to inmates' levels of care, mental health treatment histories, primary diagnoses, prior suicide attempts, prior self-injurious behavior, substance use, court-ordered involuntary medications, and trauma histories are discussed.

### 1.    Mental Health Service Levels

Overall, 22 of the 27 inmates (81%) who died by suicide in 2016 were actively receiving services in CDCR's MHSDS at the time of death. In 2016, CDCR reported that 30% of the inmate population was receiving mental health services of some kind.[15] A review of participation in MHSDS among those who died by suicide across previous years revealed variability. While the rate in 2016 represented a significant increase in the rate of MHSDS participation among those who died by suicide over 2015 when 58% were receiving MHSDS services; in 2014, 91% of

---

[15] *CDCR Offender Data Points – Offender Demographics for the 24-month period ending December, 2016.* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2019/08/DataPoints_122016.pdf.

inmates who died by suicide were receiving MHSDS services, and in 2013, 53% of inmates who died by suicide were in MHSDS.  No pattern revealed itself among these data.

Of the five inmates who were not actively receiving services within MHSDS at the time of their deaths in 2016, three had received services previously while incarcerated.

Of the 27 suicides in 2016, 15 or 56% were completed by inmates receiving mental health services at the EOP level of care.  Seven or 26%, were receiving services at the CCCMS level of care.  These findings differed from those in 2015 when 21% of those who died by suicide were receiving EOP level of care, and 37% were receiving services at the CCCMS level of care.  None of the inmates who died by suicide in 2015 or 2016 were being treated at an inpatient level of care.

Relative to the overall percentages within MHSDS in 2016, those who died by suicide within the EOP level of care were markedly over-represented, and those receiving services at the CCCMS level of care were under-represented within those who died by suicide, as seen in the chart below.



In order to evaluate the findings from 2016 and 2015 with regard to levels of care, only those who were participating in MHSDS were compared.  This revealed that of those in MHSDS in 2016, 68% were receiving EOP level of care, and 32% were receiving CCCMS level of care.  In 2015, 36% of inmates in MHSDS who died by suicide were receiving EOP level of care, and 64% were receiving CCCMS level of care.  Comparisons reveal that in 2016, those who died by suicide were receiving services within MHSDS and at a higher level of care than those who died by suicide in 2015.

One additional factor of interest was the housing location as related to inmates' level of care.  Of the 15 inmates receiving EOP level of care services, 11 or 73% were in general population housing.  Four or 57% of the seven inmates receiving CCCMS level of care were in general population housing, and two or 40% of the five non-MHSDS inmates who died by suicide were housed in general population.  Overall, of the 17 inmates who died by suicide in general population housing, 11 or 65% were receiving services at the EOP level of care.

### 2.    Mental Health Treatment Prior to Incarceration

According to available documentation, 16 or 59% of the inmates who died by suicide in 2016 had not received mental health services in the community prior to incarceration.  Of the five inmates who were not actively receiving services within MHSDS at the time of their deaths in 2016, one had received services while in the community.  Two inmates (7%) who died by suicide in 2016 had no history of ever receiving mental health services.

### 3.    Primary Mental Health Diagnosis

In order to assess the mental health conditions afflicting those who died by suicide in 2016, primary mental health diagnoses were analyzed.  Several of the inmates were noted to have multiple diagnoses, some of which changed over time.  The graph below represents the major categories of disorders with which the inmates were diagnosed at the time of their deaths.  Only the primary diagnosis was included for each inmate.  As can be seen from the graph, 12 inmates (44%) were diagnosed with a primary mood disorder, eight inmates (30%) were diagnosed with a primary psychotic disorder, and one each (4%) was diagnosed with an adjustment disorder, anxiety disorder or trauma-related disorder as the primary mental health condition.  Four inmates (15%) had no mental health diagnosis of record.  Reports from 2014 and 2015 did not examine primary diagnoses, so comparisons over time were not possible.



None of the inmates who died by suicide in 2016 were diagnosed as having a developmental disability nor placed in the Developmental Disability Program while incarcerated in CDCR.

### 4.      Substance Use History

Twenty-four inmates (89%) had histories that included substantial and/or problematic substance use.  Three of the inmates (11%) who died by suicide denied any lifetime use of substances beyond experimentation.  In 2015, all inmates who died by suicide reported at least some history of substance use or abuse.

### 5.      Previous Non-suicidal Self-Injury

Of the 27 inmates who died by suicide in 2016, 18 inmates (67%) had reported histories of engaging in acts of self-injury that were determined not to have been attempts at suicide.  Incidents of self-injury among those who died by suicide in 2015 were not available.

### 6.      Previous Suicide Attempts

Twenty (74%) of the 27 inmates who died by suicide in 2016 had reported histories of suicide attempts.  This was higher than in 2015, when 67% of those who died by suicide had histories that included previous attempts.  In 2014, 87% of those who died by suicide had attempted suicide previously.

In total, 21 inmates, or 78%, had histories positive for suicide attempts, non-suicidal self-injury, or both.

### 7.      Involuntary Medications

Of the inmates who died by suicide in 2016, seven[16] (26%) were under a court order (PC 2602) for involuntary psychotropic medications at the time of their deaths.  Of those with active court orders at the time of death, six inmates (86%) had previously been under court orders which expired or were terminated prior to the most recent order being initiated.  One of the inmates with an active court order (Case AA) had his antipsychotic medications discontinued by a DSH psychiatrist three weeks prior to his death; although, the involuntary medication order was still in place.

All seven inmates with involuntary medication orders had histories of suicide attempts.  In only two of the cases (29%) was the involuntary medication order sought to address the inmate's danger to self.  The others referenced either grave disability, danger to others, or both.

### 8.      Trauma History

One inmate was formally diagnosed with a trauma-related disorder as his primary diagnosis, yet a review of documentation revealed that 16 inmates (59%) had documented evidence of trauma exposure in their lives, most often in childhood.  Of those 16 inmates, six (38%) had documentation of receiving formal treatment or a diagnosis related to trauma.  The Special Master's expert is not in a position to determine whether or not the trauma experienced by individual inmates warranted treatment or a diagnosis.  This information is exploratory in nature, but it may indicate a need for

---

[16] Cases E, L, Q, U, X, Z, and AA.

further review.  Additionally, of those with trauma histories, 25% were placed in housing locations for safety reasons at the time of their deaths by suicide.

E.    Mental Health Evaluation and Treatment Factors

In this section, issues related to the evaluation and treatment of the inmates' identified mental health needs are reviewed.  This section examines the quality and content of suicide risk evaluations, mental health evaluations, treatment plans, treatment implementation, higher level of care needs, recent inpatient placements, and concerns related to interdisciplinary communication regarding inmate care.

1.    **Suicide Risk Evaluations**

Nine cases, or 33%, showed evidence of clinicians failing to identify or document known risk factors during suicide risk evaluations.  These omissions likely resulted in an underestimation of the inmate's risk for suicide.  Specifically, nine cases or 33%, evidenced omissions with regard to the situational risk factors; seven cases, or 26%, evidenced omissions with regard to static/historical risk factors; and four cases, or 15%, evidenced omissions with regard to dynamic/clinical risk factors. Of those suicide risk evaluations with omissions, six or 67% showed evidence of omissions in more than one category.

In 15 cases or 56%, the suicide risk level determination was not clearly derived from the suicide risk evaluation and/or other information available regarding the inmate's level of risk. In other words, based on the available information about the inmate at the time, the risk level (i.e., low, moderate, high) did not appear to be accurate.

While reviewing suicide risk evaluations and risk determinations, it was noted that errors and omissions were sometimes based on the clinician's overreliance on inmate self-report.  Rather than considering objective factors and historical risks, clinicians chose to accept the inmate's statements as markers of risk.  Examples include documenting previous suicide attempts based on the inmate's statements rather than documented events within the inmate's healthcare record and accepting the inmate's denial of suicidal ideation, despite no change in situational factors following a serious attempt.

Additionally, 15 cases or 56% evidenced other problems related to suicide risk evaluations.  These included failures to complete evaluations when required, inconsistencies in documentation, and other concerns unrelated to risk factors and/or risk determinations.

2.    **Mental Health Assessments**

Fifteen cases, or 56%, evidenced problems related to the completion of mental health assessments.  These problems included failure to complete required assessments, incomplete assessments, inaccurate assessments, and assessments that were not timely.

3.    **Treatment Planning**

In 16 or 59% of cases, there was evidence of problems related to treatment planning.  These problems included failure to complete a treatment plan, failure to identify the inmate's mental

health needs within the treatment plan, poor goal setting, lack of identified interventions to treat the inmate's needs, inconsistencies within the treatment plan, lack of required membership in the Interdisciplinary Treatment Team (IDTT) and failure to document an appropriate safety plan when one was indicated for the inmate.

### 4.    Treatment Services

The review revealed that in 16 cases or 59%, there were issues and problems related to the delivery of basic mental health treatment. These problems primarily included failure to provide interventions as outlined in the treatment plan or as required by the Program Guide.

### 5.    Higher Level of Care Needs

In 18 cases or 67%, there was evidence of a failure to refer the inmate to a higher level of care when indicated. In most cases, this finding resulted from the fact that despite the presence of criteria for consideration of referral to a higher level of care, the IDTT failed to refer the inmate. In a few cases, however, this determination was also made when an inmate's level of care was reduced inappropriately or when a referral to a higher level of care was rescinded without clear justification or rationale. As noted with regard to suicide risk evaluations, clinicians appeared to have been over-reliant on inmate self-report with regard to higher level of care needs rather than appropriately weighing the importance of objective and historical factors.

### 6.    Inpatient Placement Within Past Year

Thirteen inmates, or 48%, had been admitted to an inpatient setting in the 12 months prior to their suicidal acts. On average, these inmates had been discharged from an inpatient setting 128 days prior to their suicidal acts. The length of time ranged from one day to 313[17] days before death.

### 7.    Interdisciplinary Consultation

In 14 cases or 52%, there were problems related to communication between disciplines. These problems included failures to refer inmates for evaluation, failure to communicate following court appearances, and significant discrepancies in documentation between treatment providers without evidence of an attempt to resolve the discrepancies. Communication problems were noted among all disciplines, including primary clinicians, psychiatrists, nurses, psychiatric technicians, and custody staff.

F.    <u>Emergency Response Factors</u>

This section examines staff response following discovery of the inmate's suicidal act. Included here are any identified issues related to Cardiopulmonary Resuscitation (CPR)/Automatic External Defibrillator (AED) or other identified problems with the emergency response process.

---

[17] Inmate jumped from a second tier ten months after his most recent discharge from MHCB. His death did not occur until over three months later.

### 1.    CPR/AED Issues

Seven or 26% of the cases included documented problems related to CPR and/or AED use during the emergency response procedures. All but one of the cases resulted in a required corrective action plan. In three of the cases (43%), there was a delay in application of the AED. Two cases (29%) identified a lack of documentation of rescue breaths used during CPR. One case noted a problem with the pads on the AED, and in the final case, the problem was related to continuation of CPR despite the body evidencing rigor mortis.

### 2.    Other Emergency Response Issues

Fourteen (52%) of the cases included documented problems associated with emergency response procedures other than those related to CPR/AED use. These included 11 instances where there was a delay in activating 9-1-1, six instances where emergency responders failed to arrive at the scene with the entire cut down kit and three instances where emergency responders failed to relieve pressure on the body prior to cutting the inmate down from hanging. Five cases or 36% of those identified with emergency response issues had more than one of the identified problems noted above during the emergency response.

### G.    Individual Suicide Case Reviews

Every death by suicide was reviewed by a member of the SMHP, resulting in a formal SCR report. SCRs are discussed during SCRC meetings prior to finalization. The Special Master's experts are participants in the SCRC and provide immediate feedback during discussions of each case.

Of the 27 reports reviewed, 17 SCRs (63%) were determined to be adequate summaries of the cases. These reports included descriptions of each inmate's social history, criminal history, incarceration history, and mental health history. The SCRs critically evaluated the mental health treatment provided to the inmates as well as factors precipitating the deaths by suicide. These reviews critically reviewed practices across disciplines with regard to adherence to Program Guide requirements, policies, and local operating procedures. In these 17 reports, recommendations and requirements for corrective action followed clearly from the findings in the SCR and addressed the salient and relevant concerns of the case.

Of the remaining SCRs, six (22%) were noted to be marginally adequate. This determination was made when the reports included adequate summaries of the inmate's history but failed to be sufficiently critical of one or more elements of care and, in the case of one SCR, included errors that resulted in corrective action requirements that were not necessary upon further review.

The remaining four SCRs (15%) were determined to be inadequate summaries of the cases. In these reports, significant omissions were noted with regard to analysis of care provided to the inmate. It was determined that failure to critically evaluate care in these cases resulted in failure to identify areas in need of corrective action.

The majority of omissions noted within the SCRs were related to the failure to critically examine and evaluate routine treatment planning and treatment interventions in the months preceding the

inmate's death by suicide.  Eight SCRs failed to discuss poor treatment planning development, often marked by a lack of goals related to identified inmate needs and inadequate treatment interventions.  In these cases, the treatment provided to the inmate either did not correspond to the treatment outlined in the treatment plan or did not address the inmate's needs, most often with regard to suicidality.  SCRs were silent on these issues.  As noted above, the failure to critically review treatment planning and treatment resulted in missed opportunities to require corrective action to address these deficiencies across institutions.

In three cases, the SCRs failed to note the fact that the inmates had limited English proficiency. There was no discussion of each inmate's need for an interpreter or how the treatment teams either did or did not address this inmate need.  There were no recommendations produced regarding the treatment of inmates for whom English was not their first language despite this group comprising 22% of the deaths by suicide in 2016.

H.    Quality Improvement Plan Content and Analyses

Quality Improvement Plans (QIPs) were developed to address the issues and problems identified in the Suicide Case Reviews.  For all 27 suicides, analyses of the content of QIPs were completed and revealed 24 common issues or problems.  The most common problems, found in 12 cases (44%), included poor or unsupported rationale for suicide risk level determinations and failures in interdisciplinary communication, including necessary referrals.  A table of these issues/problems is found in Appendix B4.

In many cases, QIPs included training for staff, for which evidence was provided through inclusion of the training curricula and staff attendance records in the reports on the implementation of QIPs. When clinical concerns were raised with regard to mental health services, training was supplemented by mental health record audits and mentoring to target the specific needs of individual staff members when indicated.  What was missing from the QIPs was follow up to ensure that training and mentoring had the desired effect over time.

When nursing concerns were identified, QIPs were deferred to the CCHCS's Death Review Committee, and required supporting documents were listed as being located within the Final Combined Death Review Committee Summary.  Review of these summaries revealed that clinical practice issues were referred to the Nursing Professional Practice Committee (NPPC), and no further information was available regarding a plan or actions taken.  Systemic issues were described within the Final Combined Death Review Committee Summaries, and relevant policies were referenced with no indication of how corrective action was being taken to address the issues. The Special Master's expert was unable to evaluate the QIP responses to nursing issues identified within SCRs as a result.

I.    Foreseeability and Preventability

The terms "foreseeable" and "preventable" are used in this report as they have been in previous reports authored by the Special Master's expert.  They describe the adequacy and implications of CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgment, and utilization of clinical and custodial alternatives to reduce the likelihood of completed suicides.

The term "foreseeable" refers to those cases in which available information about an inmate indicates the presence of substantial or high risk for suicide and requires reasonable clinical, custodial, and/or administrative intervention(s). Assessment of the degree of risk may be high, moderate, or low to none. This is an important component in determining foreseeability. In contrast to a high and immediately detectable risk, a "moderate risk" of suicide indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as timely assessment, to determine the level of risk in the most appropriate manner and relevant interventions to prevent suicide. Interventions may include but are not limited to changes in clinical level of care, placement on suicide precautions or suicide watch, and changes in housing, including utilization of safe cells and transfers to higher levels of care, as well as clinically appropriate treatment and management services which may include but not be limited to increased contacts/assessments by mental health professionals, medication management review and changes, other therapeutic interventions, and measures, and/or changes in level of care, including short-term changes such as utilization of MHCBs and/or longer-term level-of-care changes including transfer to DSH programs. Individuals evaluated as "low risk," "no risk," or "negligible risk" may continue to require some degree of clinical and custodial monitoring and subsequent evaluation with appropriate treatment and management by clinical staff of the potential for self-injury and/or suicidal ideation or activity.

The term "preventable" refers to those cases in which the likelihood of completed suicide might have been reduced substantially had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required by existing policy, reflected in the Program Guide and/or local operating procedures. Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken but also cases involving issues with emergency response by custody and clinical staff. The emergency response is reviewed not only by DCHCS mental health staff but also by DCHCS medical staff as part of the death review summary process, as well as by this reviewer.

Of note, the SMHP clinicians used different definitions than those above when making determinations of foreseeability and preventability during the case review process in 2016. The definitions used within the SCRs are as follows[18]:

> A "foreseeable" suicide is one which, based upon available information reasonably known, is reasonably anticipated based upon the presence of a substantial or high risk for a suicide attempt which would require reasonable clinical, custodial, or administrative intervention. Foreseeability is assessed by determining the adequacy and accuracy of how suicide risk was evaluated. Assessment of the degree of risk may be high, moderate, or low to none. In contrast to a high and immediately detectable risk, a 'moderate risk' of suicide indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as timely assessment, to determine the level of risk in the most appropriate manner and relevant interventions to prevent suicide.

---

[18] Language contained within each 2016 SCR report.

A "preventable" suicide is one in which it is probable that, had some additional information been gathered or some additional interventions undertaken, as required by existing policy, the suicide would not have occurred. Preventability is assessed by determining whether risk management and/or suicide prevention policies and procedures, local operating procedures, and the requirements set forth in the Program Guide were followed adequately. Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff.

In the final version of CDCR's Annual Report on Suicides in the California Department of Corrections and Rehabilitation January 1, 2015 – December 31, 2015, acknowledgment was given to the fact that the CDCR's definitions "were distilled from longer definitions previously adopted by the Special Master's experts." CDCR agreed to re-review the suicides from 2015 using the Special Master's definitions and found that an additional case warranted the determination of foreseeable despite having been determined not to be foreseeable using the CDCR definition.

Analyses of the 2016 deaths by suicide considered the SCRC's determinations of foreseeability and preventability that were included within the SCRs, but the Special Master's expert also applied the broader definitions set forth by the Special Master's expert in previous reports as written above in order to remain consistent with previous years' determinations of foreseeability and preventability.

In 2016, the SCRC determined that 12, or 44%, of the 27 suicides were foreseeable and 22, or 81% were preventable based upon conclusions within the SCRs. Overall, 23 cases, or 85%, were determined by the SCRC to be either foreseeable, preventable, or both. The Special Master's expert determined that 16, or 59%, of the suicides were foreseeable and 23, or 85% were preventable, increasing the overall findings to 24, or 89%, of the suicides to have been either foreseeable, preventable, or both. The table below lists the cases and determinations made by SCRC and the Special Master's expert.

| Case | SCRC: Foreseeable | *Special Master's Expert: Foreseeable* | SCRC: Preventable | *Special Master's Expert: Preventable* |
|---|---|---|---|---|
| A | Yes | Concur – Yes | Yes | Concur – Yes |
| B | Yes | Concur – Yes | Yes | Concur – Yes |
| C | Yes | Concur – Yes | Yes | Concur – Yes |
| D | No | Concur – No | Yes | Concur – Yes |
| E | Yes | Concur – Yes | Yes | Concur – Yes |
| F | Yes | Concur – Yes | Yes | Concur – Yes |
| G | No | *Disagree - Yes* | Yes | Concur – Yes |
| H | Yes | Concur – Yes | Yes | Concur – Yes |
| I | No | *Disagree - Yes* | Yes | Concur – Yes |
| J | No | Concur – No | Yes | Concur – Yes |
| K | No | Concur – No | No | Concur – No |
| L | Yes | Concur – Yes | No | Concur – No |
| M | No | Concur – No | Yes | Concur – Yes |
| N | No | Concur – No | Yes | Concur – Yes |
| O | No | *Disagree - Yes* | Yes | Concur – Yes |
| P | Yes | Concur – Yes | Yes | Concur – Yes |
| Q | Yes | Concur – Yes | Yes | Concur – Yes |
| R | No | Concur – No | No | Concur – No |
| S | No | Concur – No | Yes | Concur – Yes |
| T | No | Concur – No | No | Concur - No |
| U | No | Concur – No | Yes | Concur – Yes |
| V | No | Concur – No | No | *Disagree - Yes* |
| W | No | Concur – No | Yes | Concur – Yes |
| X | Yes | Concur – Yes | Yes | Concur – Yes |
| Y | No | *Disagree - Yes* | Yes | Concur – Yes |
| Z | Yes | Concur – Yes | Yes | Concur – Yes |
| AA | Yes | Concur – Yes | Yes | Concur – Yes |

Specific rationales for the determinations by the Special Master's expert are included in the case summaries in Appendix A.

## IV.   Conclusions

Despite considerable effort on the part of CDCR to address and reduce deaths by suicide, the suicide rate in 2016 was at its highest since 2013. The foregoing discussion of factors related to deaths by suicide has resulted in the following conclusions.

- This review revealed an increase in suicide rates among those who did not speak English as their first language. CDCR's Title 15 Regulations explain that effective communication "may be accomplished through reasonable accommodation or assignment of a staff assistant. If the inmate's TABE score is 4.0 or lower, employees are required to query the inmate to determine whether or not assistance is needed to achieve effective communication. The employee is required to

document on appropriate CDCR forms his/her determination of whether the inmate appeared to understand, the basis for that determination, and how it was made. For contacts involving due process, employees shall give priority to the inmate's primary means of communication, which may include but is not limited to; auxiliary communication aids, sign language interpreter, and bilingual interpreter." Mental health staff appeared to over-rely on TABE scores and DEC designations rather than the needs of the inmate with regard to the use of interpreters during the delivery of mental health services and treatment.

Additionally, in 2016, at least two inmates expressed a desire not to attend groups due to their limited ability to understand what was being said. Best practice is for inmates with limited English proficiency to have the necessary accommodations for them to participate fully in group therapy and programming.

- Placing all requirements for QIPs together has the potential to assign equal weight to the importance of the issues as they relate to suicide risk and may serve to decrease staff's understanding of suicide prevention. More specifically, when a facility is asked to simultaneously address the failure to use an updated form and failure to adequately account for an inmate's previous suicide attempts in evaluations, they may not see the relative risk of each failure. Separating the QIPs into sections clearly noted as those which impact future suicide risk and those which speak to policy adherence may help staff better understand "why" the recommendations are necessary and their relative importance in suicide prevention.

- Record reviews, audits, and training were provided as QIPs without any corresponding evidence that these interventions resulted in changes or outcomes that decreased the likelihood of similar problems in the future. On a number of occasions, the Special Master's expert determined that the QIPs were inadequate and/or provided explanations rather than corrective action. A critical review of content of QIPs along with expectations for follow-up regarding the outcome of trainings and corrective actions can strengthen quality improvement processes.

- Quality improvement requires an analysis of the identified problem, action to address the problem, and then assessment of the impact of the corrective action. In many cases, it was noted that QIPs included the provision of training as the single response to the requirement for a QIP. Training may be a remedy to an identified issue, but the need for training cannot be known until the issue is investigated to determine the origin of the lapse. Training is a proper corrective action only when the root of the issue is a lack of knowledge. If staff are already aware of a requirement and simply fail to comply or the unit is understaffed such that staff are not able to complete a requirement, training will do little to change the outcome.

- Suicide risk determinations are best accomplished when historical and objective information, such as behavior and mental status, are considered in addition to inmate self-report.

31

- This review revealed a pattern of failure to identify an inmate's current mental health needs during treatment planning, with an overreliance on the goals and interventions listed in previous treatment plan documents.

- There was a failure to implement interventions noted on the treatment plan or failure to actively engage in interventions targeted to reduce suicidal thoughts and behaviors. In total, 21 inmates, or 78% of those who died by suicide in 2016, engaged in self-harming behavior with or without suicidal intent. One inmate was referred to the Positive Behavioral Support Team (PBST) to address these behaviors. PBSTs and specific cognitive and behavioral treatments can be designed to target these behaviors.

- Results indicated that in 67% of the deaths by suicide in 2016, there were failures to refer inmates to a higher level of care or incidents where an inmate's level of care was reduced without proper rationale based on available clinical data. Supervisory reviews of treatment with inmates who have an MHCB referral rescinded, inmates who engage in self-injury or a suicide attempt following a change to a lower level of care, and inmates who are not referred to a higher level of care despite indications for such a referral are likely to support sound clinical determinations and identify the need for intervention when appropriate.

- While not all trauma exposure leads to a disorder and not all inmates require treatment for trauma symptoms, the fact that 62% of those who died by suicide with histories of trauma had no evidence of a diagnosis or treatment designed to target trauma symptoms warrants monitoring. Further, 25% of inmates with trauma histories were residing in settings specifically for safety concerns.

- In 2016, over half (56%) of the inmates who died by suicide were receiving mental health services at the EOP level of care. Additionally, inmates in EOP levels of care in mainline settings were over-represented with regard to the presence of rigor mortis upon discovery. Monitoring this issue over time will help determine if policy or procedure recommendations are needed with regard to monitoring of patients in EOP levels of care.

- Of the seven inmates actively under a court order for involuntary medications at the time of death, only two (29%) included danger to self as the rationale for the court order, while all of them had histories of previous suicide attempts. Omission of a danger-to-self-rationale may bias the treatment team against seeing the substantial risk for suicide posed by an inmate whenever there is evidence that serious risk for self-injury has been documented during previous episodes of medication nonadherence.

The Special Master's team looks forward to continuing to work with CDCR on addressing deficiencies noted in this report as well as helping to guide the suicide case review process,

development and review of suicide-related policies and procedures, as well as quality improvement initiatives and sustainable process efforts.

Respectfully Submitted,

/s/
_____

Sharen Barboza, Ph.D.

**APPENDIX A**

**CASE SUMMARIES**

**Case A**

I.   <u>Summary of case</u>

Case A was a 25-year-old Latino man who was found hanging in the back of his Administrative Segregation Unit (ASU) single cell on December 10, 2016. This inmate was a participant at the Enhanced Outpatient Program (EOP) level of care at the time of his death.

Records indicated that Case A was raised by his mother along with his siblings with notable mental health and behavioral difficulties once he reached adolescence. Case A was expelled from high school at the beginning of his freshman year for an unknown reason, and he later graduated from a continuation school. Case A reported being "dismissed" by his family around the age of 19 due to worsening behavioral issues related to mental illness. He became homeless at that time and lost contact with his family. One of Case A's siblings reported his behavior significantly worsened after he began to use intravenous methamphetamine. He also used cannabis, alcohol and cocaine. His mental health also worsened around the same time. Case A had a history of attending drug treatment in group homes. He reported an involuntary admission to a psychiatric inpatient hospital near or after the age of 20. While living in group homes, he reportedly engaged in several physical altercations and isolated from others due to paranoia. These behaviors continued in county jail. Case A had a history of juvenile incarcerations. He never married and had no children.

Case A was incarcerated within California Department of Corrections and Rehabilitation (CDCR) in September 2016 for less than three months prior to his death. He was serving a sentence of five years. Case A was placed in a Special Needs Yard (SNY) at the reception center due to fears for his safety secondary to being a gang dropout. Case A had no rules violation reports (RVRs) and infrequently attended yard or group therapy.

Case A reported prior mental treatment for paranoia, auditory hallucinations, depression, anxiety and difficulty with sleep. He reported a history of being prescribed antipsychotic, antidepressant and anti-anxiety medications while in the county jail with poor response for his psychotic symptoms. He reported three suicide attempts by cutting his wrists while in county jail. During his initial mental health screening at CDCR he presented with mood, anxiety, and psychotic symptoms, and he was provided with a diagnosis of Schizophrenia, paranoid type. His psychotic symptoms included command auditory hallucinations, visual hallucinations and paranoid delusions that he was being plotted against or poisoned. He was prescribed psychotropic medications to treat his psychotic, mood, and anxiety symptoms. Case A had no inpatient admissions at Department of State Hospitals (DSH) during his incarceration.

The day after arriving in CDCR, he reported suicidal ideation and was sent to alternative housing and eventually to a Mental Health Crisis Bed (MHCB) at another institution. After spending 13 days in MHCB, he was placed in alternative housing overnight at his home institution for suicidal thoughts. Upon release he was admitted to the ASU for his safety. While in ASU he was placed in the EOP level of care. His psychotropic medications were adjusted several times during his incarceration mostly due to Case A reporting that his

symptoms had not improved. His medications were briefly stopped at one point due to his ongoing medication nonadherence and repeated refusal to attend appointments or other treatments. Psychiatric technicians indicated Case A was medication non-adherent "regularly" in October and November 2016. The inmate self-initiated a request to re-start antidepressant medications on October 28, 2016, but that request was not reviewed by nursing. The inmate was noted to talk to himself, and he refused to leave his cell due to his paranoia and fear of harm. In response to this behavior, he was evaluated, and it was decided that he did not require a higher level of care. His medication was stopped by a psychiatrist on November 21, 2020 due to repeated and ongoing treatment nonadherence, including refusals of his medication.

On November 28, 2016, he was seen by a covering clinician who reported that Case A said he screams at and argues with his command auditory hallucinations. He was seen the next day by a covering psychiatrist and reported that he was sleeping well, experienced auditory hallucinations all the time and denied suicidal or homicidal ideation. Case A was noted to be actively hallucinating during the session. He reported the voices were saying that others were out to get him. The psychiatrist restarted the inmate on antipsychotic medications. An additional antipsychotic medication was added by a psychiatrist six days later, but there was no corresponding note that indicated Case A had been seen face-to-face and evaluated prior to starting the additional medication.

He was being seen daily by his primary clinician due to his treatment refusals. Case A's last clinical contact occurred on December 6, 2016. At that time, he reported continued auditory hallucinations, but he was participating in as many out of cell activities as possible; he also reported medication adherence. His statements related to treatment participation and medication adherence were untrue and did not appear to have been challenged or verified by the primary clinician despite previous daily follow-ups for treatment refusal. Additionally, psychiatric technicians were incorrectly indicating medication adherence in their documentation of rounds; yet nonadherence was noted on the medication administration records. There was no evidence of communication among the psychiatric technicians and the primary clinicians to resolve discrepancies in documentation.

Case A's medical history was significant for hypertension and constipation. He was prescribed medication to treat both conditions. He also had a possible history of loss of consciousness during a fight that he later denied.

Case A reported a history of attempting suicide three times by cutting his wrist while actively hallucinating. All three attempts happened while he was in county jail between the ages of 21 and 24. Case A received five suicide risk evaluations while at CDCR with problems identified in one of them. All five suicide risk evaluations rated his chronic risk as moderate; three rated his acute risk as low and two rated it as moderate. Problems identified in Case A's second suicide risk evaluation were likely related to the evaluation being completed by a psychology intern who was working as a MHCB clinician. Although it was reviewed by a supervising clinician, the suicide risk evaluation missed several acute risk factors which led to Case A's acute risk being rated as low rather than moderate or

high as it should have been. Other problems identified included inadequate discussion of acute and chronic risk factors in the estimation of risk section and having a poor safety plan with risk reduction strategies that were insufficiently developed. After his second MHCB stay in October 2015, the third day in his five-day follow-up course was missed with no documentation that it occurred.

There were no known preparatory behaviors or reports that Case A planned to kill himself prior to his suicide. Events of significance leading up to Case A's suicide included being housed in ASU, believing that he had already reached a point of qualifying for release, complaints from inmates in the cells adjacent to him that they were kept awake by his yelling, and their belief that the racially inappropriate statements he was yelling were directed at them. He also had ongoing refusal of treatment, including medication. Several inmates reported to the CDCR suicide case reviewer that they heard other inmates encouraging Case A to kill himself the day of his death. Case A left a note that may have been a suicide note, but it was unclear based on the confusing nature of the content.

II.    Determination of Foreseeability

This suicide was determined to be foreseeable by the Suicide Case Review Committee (SCRC) due to deficiencies in the suicide risk evaluations and the underestimation of his suicide risk.

The Special Master's expert agrees with this determination. Further, it was clear from a review of this case that staff across multiple settings failed to review the inmate's healthcare records consistently and adequately which led to clinicians missing significant information (e.g., yelling at night, ongoing refusal of treatment). Also, it was problematic that the psychiatrist stopped Case A's medication, given his continued refusal of treatment and medication in the context of ongoing and worsening symptoms of psychosis and isolation.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The Suicide Case Review (SCR) was an adequate summary of Case A. The report identified the significant concerns in this case, and its recommendations followed from the conclusions drawn in the report. There was an adequate description of the inmate's mental health history, criminal history and factors precipitating the suicide, as well as critical analysis of causative factors.

V.    Analysis of Quality Improvement Plan Process

This case resulted in 10 required Quality Improvement Plans (QIPs). Five were related to mental health concerns and included missing documentation, no evidence of a psychiatric evaluation prior to initiation of a new medication, problems with a suicide risk evaluation and poor communication between primary clinicians and psychiatric technicians. The missing documentation was addressed through random audits of documentation and revealed no pattern of concerns. Tracking forms were implemented to address the issue of missing documentation. To address the lack of documentation by a psychiatrist, all psychiatrists were trained by reading a memo which included the requirement to document encounters. The concerns regarding the content of suicide risk evaluations were addressed by random audits and staff training. Specific issues were addressed with clinicians and documented. Concerns with communication were addressed through development of a morning meeting within the ASU to discuss individual inmates and required documentation within the inmate's healthcare record. Overall, these QIPs and responses appeared adequate.

Two QIPs were required to address custody concerns related to failure to provide the inmate with a mattress while in alternative housing and concerns that officers did not complete appropriate monitoring when the inmate covered his cell window in ASU. The first issue was investigated and noted to be a nursing issue, as allowed property was not properly documented. Training was provided. On-the-job training was provided to officers related to cell standards. Content of the training and evidence of attendance was provided.

QIPs were required to address three nursing concerns. Two were related to psychiatric technicians incorrectly reporting that the inmate was medication adherent, and one related to the lack of nursing review of an inmate's request for mental health services. These were addressed by a single memo noting that the issues were referred to the Death Review Committee. The Combined Death Review Summary noted that the issues were referred to the Nursing Professional Practice Committee (NPPC) with no further information available.

The SCR also noted that when the inmate was placed in alternative housing on October 10, 2016, there was no documentation by the psychiatric technician nor the psychiatrist as to the reason for the placement. No QIP was required to address this issue, however.

**Case B**

I.   <u>Summary of case</u>

Case B was a 40-year-old African American man who was found by correctional officers hanging in his single cell in ASU on January 13, 2016. He was not a participant in the Mental Health Services Delivery System (MHSDS) at the time of his death.

He was born in Arkansas and moved to California with his mother and his four younger siblings following his parents' divorce. While not significant, the SCR noted that the family moved when the inmate was three years old, but this would not have been possible

if he had four younger siblings at the time unless they were multiple births. Case B denied abuse during childhood but noted that his mother had substance use issues and was incarcerated when the inmate was 13 years old. He lived in group homes through the age of 18 and never married or fathered any children. He was first arrested at age 12 for attempted robbery and had at least eight additional arrests as a juvenile, including drug charges, property crimes and violent crimes. He did not serve any time for these arrests, nor was he placed on probation. He acquired at least 13 criminal charges in adulthood prior to his incarceration, beginning at age 20. Most of his charges were for violent crimes but also included driving under the influence, trespassing and vandalism. He was placed on probation and also received a probation revocation. He was ordered to participate in a domestic violence program and had a pending warrant when he entered CDCR.

Case B graduated high school, attended college through his junior year and then played football professionally through 2004, when he briefly coached college football. Records indicated that the inmate struggled with substance use and anger problems throughout his career. He reportedly starting using alcohol at age 15 but denied any problems with alcohol, despite a history of treatment and an arrest for a Driving Under the Influence charge. He reported occasional marijuana use. He returned to southern California in 2004 and committed his index offenses in the summer of 2005. Events occurred over a course of days and included assaulting his girlfriend and choking her to the point of unconsciousness more than once, forcing her to drive him to a location, striking children sitting on the grass with a car and attempting to run down other individuals with the car. He entered CDCR in October 2008 to serve a 31-year and four-month sentence for corporal injury to spouse, assault with force, terrorist threats, false imprisonment and vehicle theft. Of note, the inmate had charges pending for killing his cellmate in 2015 at the time of his death.

Records indicated that Case B received a number of RVRs for incidents of battery on other inmates, fighting and refusing to accept a cellmate. It was reported that whenever another inmate was placed in Case B's cell, the cellmate would demand to be removed from the cell. As noted above, Case B reportedly killed his cellmate in 2015 and charges were pending. He received a limited number of visits while incarcerated with the last one occurring in 2012.

Other than a five-day admission to MHCB in December 2013, the inmate did not receive mental health services while incarcerated. His placement in MHCB was due to a "hunger strike" following his placement in ASU for refusing a cellmate. He denied suicidal ideation or any mental health needs, reporting that he was not eating in protest. He was discharged with a diagnosis of Adjustment Disorder with depressed mood and Antisocial Personality Disorder. During his five-day follow-up contacts, he was noted to be stable and denied suicidal ideation. He reported to staff that he did not want to share his cell with gang members.

He received a number of mental health screenings, occurring each time he was transferred between facilities or placed in ASU. He consistently denied symptoms or the need for mental health services. He denied suicidal ideation or intent every time he was assessed.

5

He was referred to mental health by custody staff in March 2014 for hostile behavior; additionally, within one week's time, two potential cellmates asked to be rehoused for their own safety. The assessment did not reveal any significant findings, and the inmate was determined not need mental health services but did "vaguely report" childhood trauma in group settings as the basis for his refusal to accept a cellmate. He submitted a request to be seen by mental health in October 2014 to discuss his cell status and concerns about getting RVRs for refusing a cellmate. He expressed concern that custody staff was setting him up; as he would not accept a cellmate, and he would be willing to act violently if forced to do so. He wanted mental health staff to be aware of his concerns regarding a cellmate. He was not placed in the MHSDS.

After placement in ASU for the final time after killing his cellmate in April 2015, the inmate refused to complete the mental health screening. A suicide risk evaluation was completed at cell front which assessed the inmate with low chronic and acute risk for suicide. It was documented that the inmate reported that he was "not okay" because he was in ASU but did not want to talk. He shook his head in response to crisis questions rather than providing verbal responses. He was last seen by mental health staff on July 1, 2015 after refusing meals. He was noted to be eating canteen items. He stated that he was refusing meals to protest the frequency of his drug testing. A sergeant explained that the frequency may have been due to his housing moves, and this seemed to satisfy the inmate.

On January 12, 2016, Case B returned from a preliminary court hearing related to his pending homicide charge. He denied receiving bad news upon his return and was returned to his ASU cell without further assessment. Later that evening, he was noted to be squatting between his toilet and his bunk with his head in his hands. A supervising nurse instructed custody staff to monitor the inmate more frequently in response to his behavior. Approximately one hour later, a sergeant noted that the inmate was not making eye contact, was not providing verbal responses and looked depressed. The sergeant completed an urgent referral to mental health to see the inmate the following day. At approximately 11:30PM, a supervising nurse instructed the Triage and Treatment Area (TTA) nurse to bring the inmate to the TTA and place him on suicide precautions. The inmate was found hanging in his cell at 12:06AM.

## II.    Determination of Foreseeability

This suicide was determined to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

## III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

## IV.    Critique of Suicide Case Review Report

6

The SCR was an adequate summary of this case and included a discussion of the inmate's social history, criminal history and mental health history. It considered the factors that likely impacted the inmate's decision to kill himself and critically assessed the services provided to him during his incarceration.

V.    Analysis of Quality Improvement Plan Process

This case resulted in two required Quality Improvement Plans. The first was related to the failure on the part of custody staff to bring the full cut-down kit to the emergency response; this was determined to be a statewide issue. A workgroup was formed to address the issue, but clear recommendations had not been made at the time of the QIP response. The outcome from this QIP could not be determined.

The second QIP was required to address three nursing concerns. The first was related to the decision to have custody staff monitor the inmate more frequently, rather than making an emergency referral to mental health. The second involved the failure of nursing and custody staff to discuss the outcome of the inmate's court hearing. The final issue was related to a 30-minute delay between the time that a supervising nurse instructed the TTA nurse to bring the inmate to the TTA and the discovery of the inmate hanging in his cell. All were reviewed by the NPPC, but the follow-up and corrective action on these issues was not reported.

**Case C**

I.    Summary of case

Case C was a 42-year-old Latino man who was found by a correctional officer and a nurse hanging in his ASU single cell on March 3, 2016. He was receiving mental health services at the EOP level of care at the time of his death.

Case C was born in Mexico and entered the United States illegally at age 18. He was raised by his parents and had seven siblings. He reported that he was the victim of sexual abuse at age seven at the hands of a male neighbor. He reported that he completed school through the fifth grade. He was married in 2001 and was the father to nine children. He reported abusing alcohol routinely since the age of 12. He also had a history of daily methamphetamine and cocaine use until 2006. Prior to his current incarceration, he had one arrest for possession of drugs with the intent to sell, and he served a six-month jail term.

He entered the CDCR in July 2015 after being convicted of two counts of lewd and lascivious behavior with a child under 14. The victim was an eight-year-old neighbor. He was placed on a SNY on the day of his arrival at CDCR. He requested protective custody in February 2016, even though he was residing in a SNY at the time. He was placed in ASU for protection on February 25, 2016. He was seen by the Institutional Classification Committee (ICC) on March 2, 2016, and it was determined that he would need to be transferred to another facility to accommodate his non-disciplinary status and his need for

EOP level of care. He died prior to transfer. The SCR noted that he was not provided with a radio or the number of showers allotted to him while in ASU for eleven days prior to his death. Case C had no disciplinary reports and no visits during his incarceration.

Case C had no history of mental health treatment in the community. He reported experiencing command auditory hallucinations telling him to kill his wife; however, he stated that looking at his children stopped the voices. He also reported experiencing suicidal ideation in jail prior to his CDCR arrival, but he did not act on those thoughts at that time. He denied mental health needs at the time of reception into CDCR.

On October 7, 2015, Case C completed a request, written in Spanish, to be interviewed to discuss his distress over childhood sexual abuse and fears for his safety within the prison environment. He was seen that same day, and an interpreter was used. The clinician explained to the inmate that it would be "unethical" to discuss his childhood sexual abuse in reception and encouraged him to seek care in mainline. A referral was completed to address the inmate's report for prior suicidal ideation. On October 14, 2015, he was seen for a suicide risk evaluation and a mental health assessment, and the use of an interpreter was noted. He was assessed with moderate chronic risk and low acute risk for suicide. He was enrolled in the MHSDS at the Correctional Clinical Care Management System (CCCMS) level of care secondary to medical necessity. Five days later, he attempted suicide for the first time. He was discovered with a sheet wrapped tightly around his neck and was transported to a local emergency room. His acute risk for suicide was assessed to be high after he returned from the hospital, and he was referred for MHCB admission. His MHCB treatment plan was completed later than required, on day six, and there was no evidence that an interpreter was used. He did not have a suicide risk evaluation completed prior MHCB discharge. Progress notes mentioned that he denied suicidal ideation. He was started on antipsychotic medications while in MHCB. He was discharged on November 3, 2015, but he was referred immediately back to MHCB after expressing safety fears and verbalizing suicidal ideation. He was temporarily placed in alternative housing. A suicide risk evaluation completed on that date assessed the inmate with high chronic and acute suicide risk, and a number of warning signs were listed. The following day, his chronic and acute risk were both decreased to moderate, and fewer warning signs were noted. There was no rationale provided for the decrease in the inmate's chronic risk level. The inmate reported that his suicide feelings were associated with his safety concerns, and after a discussion with custody, he reported that he felt safe to be returned to an EOP yard. A suicide risk evaluation completed prior to his housing move rated his chronic and acute risk as low, again without documentation regarding the rationale for the decrease in chronic risk for suicide. He was placed on a five-day follow-up in EOP. He reported to a clinician that he would rather kill himself than be killed by someone else. A psychiatrist completed an initial evaluation, and the decision was made to taper the inmate off medications, as his previously identified "paranoia" was seen as reality based and not a psychiatric symptom.

On November 12, 2015, an Interdisciplinary Treatment Team (IDTT) meeting was held without the inmate present, as he was out of the facility at a medical appointment. It is unclear why the IDTT meeting was not rescheduled so the inmate could attend. The goals established were generic. They included a goal to decrease in "symptom severity" although

the inmate's symptoms were undefined, and a goal to continue to take his medications as prescribed even though his medications were in the process of being discontinued through a taper scheduled to end on November 20th.  On November 19, 2015, the inmate reported suicidal ideation with a plan, and he was placed on suicide watch in alternative housing and referred to MHCB the following morning.  He was assessed with moderate chronic and acute risk for suicide, and two warning signs were identified.  A safety plan was developed to increase the frequency of his clinical contacts, consult with psychiatry about his anxiety and prepare for transfer to a mainline institution.  He was not transferred to MHCB but returned to routine housing after a discussion with custody and mental health staff about alternatives to suicide.

Case C attempted suicide three days later on November 23, 2015 by strangulation; subsequently, he was transported to an outside hospital.  He was assessed upon return from the hospital with moderate chronic and high acute risk for suicide.  He was placed in the MHCB where he continued to verbalize that he would rather kill himself than be killed by another inmate.  A suicide risk evaluation completed on November 25th determined that his chronic risk was moderate, and his acute risk continued to be high.  There were no reported symptoms of psychosis, but he was described as depressed and anxious.  He was prescribed mirtazapine to help with sleep, and later an antipsychotic was added to address his paranoia. He was never seen by the IDTT, nor was a treatment plan developed for him while in the MHCB.  He was discharged on December 4th and placed on an EOP yard; at that time, he was assessed with moderate chronic and acute risk for suicide. An order for five-day follow-up was provided.

Upon arrival at the EOP, he was assessed for suicide risk; his acute risk was determined to be low.  His initial assessment by a primary clinician was lacking in discussion of his suicide risk and included errors and contradictory statements.  It did note the inmate's previous suicide attempts.  His medications were renewed on December 14th by a tele-psychiatrist, but there was no documentation that the inmate was seen for clinical contact on that date.  He was seen by the IDTT on December 17, 2015, with a single goal to address depression.  Interventions included cognitive-behavioral techniques, but there was no mention of medications being prescribed or goals to address suicidality.  He was seen as required by his primary clinician and he attended the majority of his assigned groups through late February 2016 when the inmate was transferred to ASU secondary to continued safety concerns and his desire for protective custody.

He was seen by a primary clinician on March 2nd at cell front, as the inmate refused to be seen out of cell. The inmate reportedly denied suicidal ideation, plan, means or intent.  A suicide risk evaluation completed the next day documented an assessment of moderate chronic and low acute risk for suicide, as the inmate reported feeling safer in ASU.  The inmate died by suicide two days later.

Records indicated that upon discovery of the inmate, attempts to intubate the inmate during the emergency medical response were unsuccessful as the inmate's jaw was locked, indicating that rigor mortis had begun.

Additionally, the healthcare record for this inmate noted that his primary language was Spanish. It was noted that while he was in the reception center, documentation indicated the need for an interpreter, and one was used routinely; although, it was noted that security personnel were often engaged in this capacity. In documentation following his first suicide attempt, interpreters were not used; additionally, documentation indicated "no accommodations listed in DEC" as rationale for not using an interpreter. It is not known why the inmate did not have an indication of requiring an interpreter within the Disability and Effective Communication (DEC) System or why this issue was not reassessed at some point.

II.   Determination of Foreseeability

This suicide was determined to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.   Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.   Critique of Suicide Case Review Report

The SCR was not an adequate summary of this case, as it failed to note concerns that required attention and follow up. It included a summary of the inmate's known social history, criminal history and mental health treatment while incarcerated. It provided a critical analysis of his treatment while incarcerated, yet there were a number of issues that the SCR failed to discuss.

The first was related to the inmate's primary language. It was noted that the inmate had submitted a request written in Spanish for an assessment to be conducted early in his incarceration, that interactions with staff during his time at the reception center included translation services and that a cellmate had reported challenges in communicating with Case C secondary to a language barrier; yet the SCR was silent about the language used by staff when working with Case C, or the impact that his limited English proficiency may have played in his care. There was also a lack of formal assessment recognizing his need for an interpreter.

There was no critical discussion about the fact that on two occasions, the inmate was referred to a higher level of care, only to have that referral rescinded after discussions with the inmate about housing. It does not appear that the IDTTs considered his suicide risk or suicide history when making these determinations.

Documentation indicated that the inmate's initial suicide attempt was labelled as a

10

"gesture" and that his second attempt was not properly entered into the statewide tracking system. These two events may have contributed to mental health staff underestimating the inmate's risk when making clinical decisions about his need for a higher level of care. Interestingly, while the SCR noted that mislabeling of his suicide attempts as "gestures" downplayed the seriousness of the acts, the SCR itself referred to the inmate's suicide attempts as "self-harm events" in the recommendations, possibly downplaying the seriousness of his suicide attempts with regard to the need for corrective action. Additionally, the SCR did not critically discuss the inmate's final treatment plan which failed to address his suicidality or his fears for his safety.

Finally, the SCR did not discuss the fact that the inmate's jaw was locked upon discovery, indicating that rigor mortis had begun. As the inmate was housed in ASU, monitoring should have been completed no more than every 35 minutes, but there was no discussion of the adequacy of custody checks in the SCR.

V.    Analysis of Quality Improvement Plan Process

This case resulted in twelve required Quality Improvement Plans, eight of which were related to inmate care. All responses were noted to have been acceptable to the statewide Suicide Prevention and Response Focused Improvement Team (SPRFIT), however, there were concerns identified with almost all of the responses related to superficiality and incomplete action plans.

A QIP was required to address the fact that an IDTT meeting was held without the inmate present because of an outside medical appointment without any attempt to reschedule. The response was to address through training "via memorandum." There was no evidence of an audit of the potential widespread nature of the problem or the impact of the "training." This response was inadequate.

Failure to appropriately log Case C's suicide attempts within the statewide tracking system was addressed by a QIP which involved a meeting with the facility's SPRFIT coordinator to discuss proper logging of self-harm events. The scope of the problem and the outcome of the discussion were not documented. This response was inadequate.

A QIP was required to address the inappropriate labeling of the inmate's serious suicide attempts as "gestures." The QIP response noted that training was provided to clinical staff, custody supervisors and nursing supervisors. There was no investigation into the nature of the problem more broadly, no provision of the training curriculum nor evidence of the training provided. This response was inadequate.

A QIP was required to address the fact that neither of the inmate's suicide attempts resulted in completion of a Crime/Incident Report (Form 837) by custody. The facility administration responded by indicating that they reviewed their local operating procedure and saw no need to update it. The response also indicated that the form "is being used appropriately when indicated" but included no evidence or discussion of how this was determined. This response was inadequate.

11

The California Medical Facility (CMF) MHCB IDTT developed the inmate's treatment plan late and failed to conduct a suicide risk evaluation prior to the inmate's discharge. This required a QIP. The response from the facility noted that these issues had been identified prior to the SCR's identification of them. Challenges with staffing were addressed to ensure timeliness, and the clinician responsible for completing the suicide risk evaluation was noted as consistently failing to complete these required evaluations. The clinician was trained, and the clinician's subsequent work monitored for adherence to policy. This response appeared adequate, although no evidence was provided to support the assertions.

A QIP was required to address the fact that the Kern Valley State Prison (KVSP) MHCB failed to hold an IDTT meeting with the inmate and did not develop a treatment plan with him during his 10-day stay. To address the issue, the facility generated a memo to staff outlining the policy requirements and established a process to follow the policy. There was no evidence that the directions or processes in the memo were followed-up, or that the QIP was assessed for impact. Evidence that staff had been trained on the contents of the memo was provided.

A QIP was required to address the findings that a tele-psychiatrist renewed the inmate's medication following a facility transfer without examining the inmate, despite the inmate placement in the EOP and requiring an initial intake and monthly contacts with a psychiatrist. The facility responded by noting that the inmate had been seen on February 11, 2016. While this fact addressed that the inmate was seen, it did not account for the renewal of medications on December 14, 2015, nor the need for monthly psychiatric contacts. Additionally, the facility produced a plan to address the timely submission of psychiatry documentation for filing in the inmate's healthcare record and the prioritization of clinical appointments through changes in a local operating procedure and production of memos. The impact of these procedural changes and memos was not provided. This response was inadequate.

Errors were noted in clinical documentation including an initial mental health assessment and the inmate's treatment plan at Salinas Valley State Prison (SVSP). The required QIP included the provision of two memos to clinical staff. One addressed the need for timely submission of documents, and the other addressed the need for accuracy in documents. There was no evidence provided that staff had received nor read the memos and no documentation of the impact of these memos. Further, there was no discussion of a review of the individual clinician's work who had produced the errors. This response with inadequate.

A statewide QIP was required to address the fact that clinicians changed the inmate's chronic risk level over a relatively short period time. This demonstrated a lack of understanding regarding the static nature of chronic risk. The SCR indicated that the statewide training should be designed to be delivered at the local level. Statewide training was provided at the monthly suicide videoconference over three months, but there was no indication of whether the training was subsequently provided to staff at the local level. The

training curricula were provided with the response. This response was only partially adequate.

The remaining three required QIPs were needed to address issues that did not appear to be directly related to the inmate's suicide or potential impact on future suicide risk, but instead highlighted deviations from policy. They included: 1) an outdated form for a mental health treatment plan; 2) no evidence that showers were offered to the inmate in keeping with requirements while in ASU and 3) no evidence that the inmate was offered a loaner radio while in ASU. Each was addressed appropriately within the QIPs and responses through a review of the issue and responses in line with the findings of those reviews. Evidence of training, when indicated, was provided.

**Case D**

I.   Summary of case

Case D was a 39-year-old Caucasian man who was found by correctional officers hanging in his cell in ASU on May 25, 2016. He was not a participant in the MHSDS at the time of his death, as he had been removed from the CCCMS level of care one week prior to his death.

Case D was raised with his brother by his mother and stepfather. He reported experiencing emotional and physical abuse by his stepfather during childhood. He reported that there was domestic violence in the home and that his mother suffered from depression and both she and his stepfather had substance use problems. He reported that he did not know his biological father. The inmate reported using drugs since age 13. He completed high school but had a limited work history, as he was involved in criminal activity since adolescence. He was arrested and convicted of a number of crimes and was incarcerated once in Oklahoma and twice previously in CDCR. His prior crimes were non-violent property and drug crimes with a single prior arrest for assault. He was married once for two years, but his wife committed suicide after the loss of their son to Sudden Infant Death Syndrome. There was no record of visits or phone calls during his incarceration.

He was incarcerated within CDCR for his most recent term in 2014, being convicted of attempted second degree murder with enhancements after stabbing a female acquaintance during an altercation related to the sale of narcotics. He was sentenced to serve 18 years. His incarceration in Oklahoma involved sexual battery and as such he was given an "R" suffix within CDCR. He was affiliated with a racial security threat group for white inmates from which he disaffiliated in 2012. He was transferred to a SNY and remained there until June 2015 when he received an RVR for committing battery resulting in serious bodily injury and was sent to the ASU. He received an 18-month Security Housing Unit (SHU) sentence after being found guilty of the offense and was released to an SNY on March 22, 2016. After one month, he returned to ASU for possession of a manufactured weapon and his case was referred for prosecution in the courts. He was facing a possible third strike sentence.

13

Case D reported that he first received mental health services for Attention Deficit Hyperactivity Disorder (ADHD) during adolescence and also reported a history of depression and anxiety. He was treated at the CCCMS level of care during both previous incarcerations within CDCR. He had no history of suicide attempts or placement in a higher level of care at any time while incarcerated.

While he initially denied mental health concerns upon incarceration in 2014, he requested services within days, was placed at the CCCMS level of care and started on medications. Mental health contacts occurred consistent with Program Guide requirements while the inmate was housed in general population, as well as during his stay in ASU through November 2015 when he was removed from the MHSDS after meeting established treatment goals.

On April 25, 2016, Case D returned to ASU following the manufactured weapons RVR described above. He reported to nursing staff that he felt depressed and was referred to mental health. On April 29th, he was assessed by a clinician and returned to CCCMS level of care, a placement that was confirmed by his IDTT on May 4, 2016. His treatment plan noted his stressors as ASU placement and his pending referral for prosecution in the courts. His targeted mental health concerns included depression, anxiety, poor sleep, irritability and anger. He also reported wanting to stop using substances and identified himself as an addict. A suicide risk evaluation completed on the same date rated his chronic risk as moderate and his acute risk as low. The treatment plan noted, however, that the inmate reported that he would like to be dead but stated he did not want to kill himself. Short-term goals were created to address depression, anxiety, agitation, anger and "thoughts of death." On May 12, 2016, his primary clinician noted that he wanted to be removed from CCCMS secondary to some relief in his level of anxiety following a meeting with the classification committee. He reported ambivalence, however, noting that he had issues to work on including the loss of his wife and son. During his IDTT on May 18, 2016, he was removed from CCCMS level of care. IDTT documentation included conflicting information regarding a continuation of symptoms and the inmate's request to be removed from CCCMS. The form included a check in the box to continue CCCMS level of care with a hand-written note to "remove from 3CMS when I/P is asymptomatic w/o medication." There was no documentation indicating that he had met this threshold or any of the short-term goals created less than a week earlier. He died by suicide seven days later.

## II.    Determination of Foreseeability

This suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

## III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

14

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case and included a summary of the inmate's social history, criminal history and mental health history.  It critically reviewed the factors contributing to the inmate's suicide, along with providing recommendations for corrective action that followed from the findings in the review.

V.    Analysis of Quality Improvement Plan Process

This case resulted in three required Quality Improvement Plans.  The first was required to address the lack of clear rationale for deciding to remove the inmate from MHSDS services after having placed him at the CCCMS level of care one week prior.  The plan included review of the clinician's documentation and level of care changes.  No significant issues were identified.  The clinician received training on documentation of level of care changes. This QIP appeared to address documentation, but not clinical decision making; and therefore, is only partially adequate in addressing the issue.

The second QIP was required to address the fact that custody staff who responded to the emergency failed to support the inmate's body prior to cutting him down.  Training was provided to all staff assigned to segregation units on proper procedures during emergencies with a focus on relieving the pressure on the airway prior to cutting someone down during a hanging attempt.  Evidence of training was provided.

The final QIP addressed a nursing concern related to the fact that a nurse referred an inmate to mental health staff in response to an inmate request without assessing the inmate first. It was reported that training was provided to nursing staff regarding proper response to inmate healthcare services requests.  Evidence of training was provided.

**Case E**

I.    Summary of case

Case E was a 41-year-old Latino man who was found by his cellmate hanging in his two-person cell in general population on April 2, 2016.  The inmate was receiving mental health services at the EOP level of care after being discharged from MHCB 27 hours prior to his death.  The inmate's primary language was Spanish, but there was a lack of documentation to identify his need for an interpreter on any formal assessments or documents within the CDCR reporting systems.  Instead, his need for an interpreter was noted in individual documents in his healthcare record. It was noted that his inability to speak English was an ongoing frustration for Case E, and it contributed to his limited attendance in mental health groups.

The inmate was born in Mexico and entered the United States illegally at age 19.  He was raised by both parents until his father died when he was 11 years old.  The inmate denied any history of trauma during childhood.  He reported that he lost contact with his family in

Mexico in 2000 and had been attempting to contact them since. He experienced distress over this loss of contact. The inmate never married but had one child with the victim of his index offense. Case E reported using alcohol, excessively at times, beginning in early adolescence but denied drug use beyond experimentation. Reports indicated that he was intoxicated at the time of his offense which involved stabbing his girlfriend and her friend after the girlfriend had left their home with their son to stay with the friend. During his incarceration, he received one visit from the victim of his offense in 2002 and attempted to contact his son, unsuccessfully, six times on the same date in July 2015. There was no documentation of contact with supports in the community.

Case E was incarcerated for the first time in 2001 for two counts of attempted murder and one count of burglary. He was sentenced to seven years to life. During his incarceration, he received 19 RVRs, most of which were related to refusals or failures to obey orders. Three of his RVRs involved interpersonal violence; specifically, spitting on an inmate (2007), resisting staff requiring a use of force (2007) and throwing bodily fluids on a correctional officer (2009). The majority of RVRs were received in the months leading up to the inmate requiring an increase in his level of care. While he had been employed and received satisfactory work evaluations throughout his incarceration, he had difficulty working during the last nine months of his life secondary to medical issues. The inmate was granted a three-year parole stipulation in November 2015 contingent on program participation, medication adherence and absence of RVRs.

There is no indication that the inmate received mental health services in the community prior to his incarceration. He received services while in jail, shortly after his arrest, for depression and suicidal ideation. He was placed at the CCCMS level of care upon reception into CDCR for reports of depression and auditory hallucinations. He remained stable at the CCCMS level of care through 2008 when he began to exhibit psychotic symptoms, behavioral acting out, self-injurious behavior and medication nonadherence. He was admitted to the MHCB seven times between 2008 and 2016 secondary to suicidal ideation, self-injury and suicide attempts. There was documentation of two inpatient admissions during that time period, the most recent occurring in May 2014. At the time of his death, Case E was receiving psychotropic medication under an involuntary medication court order, based on the inmate's danger to himself and grave disability.

Records indicated that Case E was engaged in individual therapy with his primary clinician who was Spanish speaking. His group attendance was limited by his medical issues and his inability to comprehend English. His group attendance was a condition for his parole. When available, his primary clinician would serve as an interpreter during psychiatric appointments. In the months prior to his death, Case E was seen mostly at cell front due to limitations created by his medical condition, which included gastrointestinal issues, frequent vomiting, weakness and fatigue of unknown etiology despite multiple assessments. He was noted to have been close with his cellmate, who was Spanish speaking.

On March 17, 2016, the inmate reported suicidal ideation and produced a noose when seen by his primary clinician and the psychiatrist at his cell door. He was placed at the MHCB

16

level of care in response and transferred to another facility for treatment. His MHCB IDTT included only a primary clinician and registered nurse, and his treatment plan was developed to target auditory hallucinations and suicidal ideation. It was documented that an interpreter was used during the IDTT meeting. While his limited English proficiency was noted as a barrier to discharge from MHCB, interpreter services were not accessed while the inmate was in MHCB for 13 days. Use of an interpretation service was noted, in error, on multiple documents in the inmate's healthcare record, however. It appears that the text was copied from IDTT notes into subsequent documents. The inmate was seen by a primary clinician on 11 of the 13 days he was in MHCB, and there was documentation entered only twice by a psychiatrist. It was later noted that a psychiatrist had seen the inmate more frequently but failed to enter the documentation into the healthcare record. These documents were not entered into the healthcare record until after his death.

While in the MHCB, the inmate was described as making contradictory statements about his symptoms, having limited insight, appearing confused and minimizing his symptoms; assertions made despite the language barrier. Documentation indicated that the inmate was retained in MHCB beyond 10 days secondary to medication adjustments, yet there were no medications adjustments documented. There was little documentation of treatment interventions while the inmate was housed in the MHCB, and progress notes did not refer to the issues identified in the treatment plan. The rationale used to discharge the inmate was not documented.

A suicide risk evaluation completed prior to his discharge assessed his chronic risk as moderate and acute risk as low. The evaluation lacked recognition of a number of risk factors and documented protective factors which were actually risk factors for Case E, including family contact, social support, physical activity and mental health program participation. The safety plan was not individualized and did not address the inmate's suicidal ideation or previous suicide attempts. Available records indicated that the inmate reported two suicide attempts in the community, and there was documentation of three previous attempts in his healthcare record, with one additional attempt reported but not documented while incarcerated in CDCR. None of these were taken into consideration in the development of the safety plan.

Upon his return to his sending facility on April 1, 2016, a suicide risk evaluation was completed and included significant omissions and an underestimation of the inmate's risk based on his history. He was again assessed with moderate chronic and low acute risk, and the safety plan failed to address his suicidal ideation or history of suicide attempts. Of note, both risk evaluations were completed without an interpreter.

The inmate was placed with a new cellmate upon his return, and another inmate committed suicide in the housing unit 20 minutes after Case E's arrival. He was seen for his initial five-day follow up by a Spanish-speaking clinician; he reported being a little anxious, but he denied suicidal ideation. Case E died by suicide just over four hours later.

II.    <u>Determination of Foreseeability</u>

This suicide was determined to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.   Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.   Critique of Suicide Case Review Report

The SCR was an inadequate summary of this case.  While it summarized his mental health history while incarcerated, it failed to address the adequacy of his routine treatment while in EOP over the final years of his life.  The SCR included a detailed review of concerns with his treatment while in MHCB prior to his death and addressed, through recommendations, lapses in care in the final month of his life.  It was unclear from the SCR if the inmate's treatment had met all Program Guide requirements up to that point and if treatment had been effective for the inmate. It could be assumed that the lack of discussion in the SCR indicated treatment complied with expectations; however, upon a review of documentation, the Special Master's expert noted that in February 2016, the inmate had been refusing his court-ordered medications and as a result, they were discontinued by a psychiatrist.   There was no indication on the nursing report regarding medication nonadherence nor within the note from the psychiatrist that either were aware of the court order.  Additionally, the inmate's treatment was minimal in the months prior to his death secondary to his medical issues.  All contacts occurred at cell front, and little information by way of assessment or provision of interventions was provided in documentation. There was no documentation indicating concern over the inmate's status, given that he was likely not sufficiently ingesting medications if he was vomiting more than once daily.  The SCR made no note of these issues.

The SCR included a summary of the inmate's limited criminal history and known social history.  The resulting recommendations were derived from the findings in the review, limited in scope to the final month of the inmate's life.   One omission in the recommendations was the failure to remedy the fact that formal recording systems did not indicate a need for an interpreter when the inmate clearly required interpretation services. There should have been a recommendation related to developing a plan to address mistakes or omissions regarding inmate's needs in formal reporting systems.

V.   Analysis of Quality Improvement Plan Process

This case resulted in eight required Quality Improvement Plans affecting staff at two facilities.  Five QIPs were required from California Health Care Facility (CHCF) to address concerns while the inmate was housed there for MHCB level of care.  The first response was required to address the fact that not all members of the IDTT were present when conducted.  The response indicated "Prior to May 2016, MHCB staff were directed to

18

complete IDTTs on the weekend in order to shorten the length of stay. Effective May 1st, 2016, MHCB staff are no longer directed to complete IDTTs on the weekends. If the full complement of clinical staff is present IDTTs may be completed on weekends as an exception." This response is problematic for at least two reasons, neither of which were noted by the SMHP leadership. Concerns include the fact that direction was given for staff to violate the Program Guide and that the violation was meant to intentionally shorten an inmate's stay rather than to provide adequate care. There is no further indication that any efforts will be undertaken to address direction from supervisors that violates the Program Guide.

The second QIP response was required to address the inadequate suicide risk evaluation completed prior to the inmate's discharge from the MHCB; it noted that the clinician was mentored and that 15 random charts were audited. The outcome of that audit was not summarized, nor was the impact of the mentoring documented. Auditing forms were attached to the QIP response, however.

The third response was needed to address the fact that psychiatric contacts were not completed in accordance with the Program Guide while the inmate was in the MHCB. The response indicated that the psychiatrist had seen the inmate but failed to file the notes appropriately. The psychiatrist was counseled and referred for peer review.

An initial psychiatric evaluation performed at the time of the inmate's admission to the MHCB was incomplete and required a QIP. Verbal counseling and on-the-job training were provided to the psychiatrist. The psychiatrist had already been referred to the peer review committee. The outcome of these interventions was not documented.

The final QIP required by CHCF addressed the fact that the inmate was Spanish speaking, was noted to require an interpreter and that interpretation services were documented but not actually engaged. The response indicated that information for the interpreter service was now posted in every IDTT room, and staff were educated on using the interpretation service even when the formal records do not indicate the need for an interpreter. There was no mention of the fact that use of interpretation service was documented when actually, it was not utilized. This response was inadequate.

Three QIPs were required from SVSP. One was directed to mental health staff to address deficiencies in the suicide risk evaluation completed upon the inmate's return from the MHCB. The QIP was to provide training, to audit random suicide risk evaluations and to address deficiencies through mentoring. The results of these actions were reported with evidence provided, including the outcome of the mentoring for one identified clinician.

The second QIP required was noted to involve custody staff's failure to conduct 30-minute discharge checks on the inmate following his return to general population from the MHCB level of care. It was noted that an investigation and administrative review were conducted, and a local operating procedure was updated. The updated procedures were included with the QIP response.

A final QIP was required to address two nursing concerns, one related to the emergency response following the suicide and the other to address the failure of the nursing staff to note the inmate's involuntary medication status and to make an immediate referral. The emergency response issue was noted not to have been a violation of practice guidelines, but training was provided to address future potential problems. The issue regarding involuntary medication was addressed through training with evidence provided.

## Case F

I.  Summary of case

Case F was a 35-year-old Latina woman who was found during a routine wellness check hanging in her cell in the Supportive Care Unit (SCU) on April 14, 2016. The SCU was noted to be an outpatient location for individuals receiving services at the EOP level of care. Case F was housed in a double-cell, and her cellmate was present in the cell, but asleep. The inmate was found to be in rigor mortis at the time of discovery.

Case F's history was significant for the presence of abuse and neglect in childhood. She was removed from the home of her grandfather at age 14 and was placed in numerous group homes. Records indicated she often absconded from these placements. She reported dropping out of school in the 10th grade and engaging in substance use beginning in adolescence. She reported using alcohol and drugs daily from age 14 and stopped at age 33.

At age 15, Case F and an accomplice shot a group home supervisor and fled in a stolen vehicle. She was sentenced to 19 years for attempted second degree murder and transferred to CDCR at age 16. Records indicated that upon being released from her juvenile sentence, Case F remained in CDCR secondary to a drug possession charged gained while incarcerated. Her earliest possible release date would have been July 20, 2016, and she had a parole hearing scheduled for April 15, 2016, the day after her death.

The inmate had an extensive history of aggressive and rule violating behavior during incarceration leading to 45 disciplinary actions, three SHU placements and 10 ASU placements. Twelve of her RVRs were issued for violence or threats of violence.

Case F reported experiencing auditory hallucinations and suicidal ideation as early as age seven. She received mental health services while in juvenile detention centers. Upon arrival in CDCR, she was placed at CCCMS level of care within her first year of incarceration and remained at that level of care until 2012, when she was admitted to the MHCB on two occasions within two months. In 2013 she attempted suicide, and she was admitted to the MHCB and discharged to the EOP level of care where she remained until her death. She engaged in multiple incidents of self-injury, including at least eight suicide attempts, prior to her death by suicide. There was documentation of nine MHCB admissions while in CDCR.

In the two years prior to her death, Case F had the same primary clinician and engaged in group and individual therapy, often two or three times per week. Two weeks prior to her

suicide, she was transferred to a new clinician. Documentation indicated that her primary clinician noted concerns with countertransference in March 2016, and the inmate was transferred to another clinician within a week. There was no documentation to indicate that transitional work was completed with the inmate prior to the change in clinicians.

Treatment goals were developed in September 2015 to address the inmate's depression and self-injurious behavior, as well as medication adherence. Despite documentation indicating an increase in depressive symptoms, subsequent treatment plans evidenced no updates to the inmate's goals nor updates to the clinical summary which should capture the inmate's current functioning. Clinical progress notes included plans to continue to work toward her treatment goals without mentioning what those goals were. Additionally, the inmate's presenting problem was copied from note to note over the course of seven to eight months prior to her death; despite information in the body of the note which did not support the presenting problem during the session. The inmate was noted to be experiencing an increase in depressive symptoms and suicidal ideation in November 2015, yet no referrals were made for a higher level of care. Progress notes from these sessions appeared to include copied descriptions of the inmate's mental status which were inconsistent with the reported increased symptomatology.

In February 2016, Case F was seen by a psychiatrist who completed an initial assessment and noted the inmate to be fearful of her safety and concerned about jeopardizing her parole. She also reported flashbacks of trauma and increased anxiety. Her medications were adjusted at that time. On March 31, 2016, the inmate reported having suicidal ideation and was admitted to the MHCB; however, she later retracted this statement, saying she was upset about not receiving as-needed medication upon request earlier in the day. The psychiatrist updated her medication orders, and she was discharged to the EOP the following day. The safety plan developed following this stay did not address her recent reported suicidal ideation nor her increased depression and previous history of suicidal and self-injurious behavior, but instead referred only to attending groups and her perception of having adequate coping skills. Progress notes from her primary clinician following the inmate's return to EOP documented confronting the inmate about her "childish" suicidal threats and noted that the primary clinician "challenged" the inmate "to act in an adult fashion."

During a session on April 11, 2016, the primary clinician noted an attempt to engage the inmate in breathing exercises, but the inmate became distressed and left the session prematurely. The primary clinician noted that the inmate had "improved coping skills but needs more work." The inmate died by suicide three days later. At the time of her death, the inmate was provided with a diagnosis of Major Depressive Disorder, moderate. Previous diagnoses included psychotic disorders, however there was no reference to a trauma-related disorder, despite the inmate's report of flashbacks and her extensive trauma history.

II.   Determination of Foreseeability

This suicide was determined to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. It was appropriately critical of the care provided to the inmate and made note of poor and questionable documentation practices, including the replacement of an initial mental health assessment from November 3, 2015 with content written in April 2016. The SCR included relevant information related to the inmate's social history, criminal history and mental health history, as well as a critical analysis of the factors leading up to her death.

V.    Analysis of Quality Improvement Plan Process

This case resulted in seven required QIPs, all of which were related to the delivery of mental health services. They addressed the failure to adequately update the inmate's treatment goals in response to an increase in symptoms, no documentation related to her treatment progress in the seven months prior to her death by suicide, insufficient documentation of clinical interventions following the inmate's reported increase in symptoms, lack of transition documentation from one clinician to another after two years of treatment with the same clinician, the use of judgmental and possibly demeaning comments to the inmate following the expression of suicidal ideation, inadequate safety planning and failure to document the reason for discontinuation of 30-minute custody checks following the inmate's discharge from the MHCB. Also included as a QIP was the fact that a mental health assessment was entered into the electronic health record in April 2016 as a modification of an assessment completed in November 2015 resulting in the original being removed from the healthcare record.

The QIP responses included a series of trainings to target various topics related to treatment planning and case formulation as well as a statewide plan to address continuity of care when inmates are transferred to other clinicians. Individual clinician case reviews were conducted and when necessary, follow up reviews were completed following training. Patterns were revealed with regard to inadequate safety planning and documentation for discontinuing safety checks, which were addressed. In all responses, evidence of training content and attendance were provided and appeared adequate.

**Case G**

I.    Summary of case

Case G was a 35-year-old Caucasian man who was found during a routine cell check unresponsive on the floor in his single cell in a general population SNY on July 1, 2016. The inmate was receiving mental health services at the CCCMS level of care.

Records revealed Case G had suffered significant and serious trauma at the hands of his mother. During childhood, she intentionally scalded him resulting in severe burns on his torso as well as his upper and lower extremities. He had deformity of his limbs, loss of all toes on both feet and four fingers on his left hand. These injuries required 40 corrective surgeries, and he walked with a cane. He was never married and had no children. His parents divorced, and he lived with his mother until the age of 12, when she died of a drug overdose. He then lived with his father, who died of a drug overdose a year later. After a short stay with his stepmother, he was left to live in group homes and ultimately on his own. He did not have any visits while incarcerated.

He began using drugs and alcohol at age 13 and was arrested as a juvenile. He associated himself with a gang and sold drugs. He dropped out of school in the ninth grade. In 2000, he was convicted of kidnapping for extortion and two counts of attempted murder, and he received four consecutive terms of life without the possibility of parole. The victims of his crime were adolescent girls.

Upon incarceration, he was targeted and assaulted by other inmates secondary to the nature of his crime and was granted SNY status. He received a number of RVRs during his incarceration including six for fighting or assaulting other inmates. He served two SHU terms during his incarceration, each for three months. Given his physical limitations, his programming mostly consisted of office work, and he voluntarily enrolled in General Educational Development (GED) courses, despite having completed his GED previously.

Case G reported that he attempted suicide during adolescence, once by overdose on aspirin at age 13 and once by hanging while in juvenile detention. Despite this, he was not placed within the MHSDS until four years into his incarceration. He received services at the CCCMS level of care between July 2004 and May 2007. He was removed from services until July 2008, when he was returned to the CCCMS level of care. The inmate was briefly placed at the EOP level of care for four days in 2013 and for two months in 2014, prior to returning to the CCCMS level of care where he remained until his death.

In July 2013, Case G attempted to kill himself by cutting his arms and shoulder and swallowing three razor blades following a change in custody status which required that his art supplies be removed from his cell, and he was admitted to the MHCB. Two weeks after being discharged, he continued to demonstrate psychiatric instability and was readmitted to MHCB where he remained for seven days. He was discharged at the EOP level of care and four days later, he again returned to MHCB and stayed for 56 days before being transferred to an intermediate level of care in an inpatient setting. He remained hospitalized for eight months and was discharged at the EOP level of care. He was retained at the EOP level of care for two months and then returned to CCCMS level of care. The SCR noted that documentation from the IDTT meeting that resulted in the level of care change did not contain rationale for the lower level of care. Additionally, the treatment plan noted that

23

the inmate would be seen weekly for mental health sessions over the following 30 days. There was no evidence that he was seen in accordance with this plan.

He was treated at the CCCMS level of care for a year and was prescribed antidepressant medications. In August 2015, the inmate met with the IDTT to develop a treatment plan to target his depression using cognitive interventions on a weekly basis. Weekly cognitive interventions were not provided. In fact, he was seen by a primary clinician on only three occasions over the following eleven months. The SCR noted that he was seen four times, but a fourth entry could not be located in the electronic health record.

In October 2015, the inmate asked medical staff for a reduction in methadone which he received for chronic pain secondary to his childhood injuries and to "give up" his wheelchair. He explained that the requests were to get his life "completely sin free." There was no indication that medical staff communicated this concerning message to mental health. In November 2015, the inmate reported to the psychiatrist that he was no longer depressed and was not experiencing suicidal ideation. He requested to gradually reduce his psychotropic medications. The psychiatrist reduced his medication dosages, but the inmate began refusing medications altogether later that month. In March 2016, the inmate told the psychiatrist that he was "going home soon" and that he wanted to be off medications, despite the fact that the inmate was serving four life sentences. There is no documentation that the psychiatrist explored what Case G meant by "going home soon" given his long sentence and the other potential meanings (e.g., that he was dying soon or possibly delusional). The inmate was documented as reporting no history of suicide attempts and there was no evidence that the psychiatrist reviewed this inmate's history. The inmate was seen by another psychiatrist in April 2016 who noted the inmate's suicide attempt history and agreed to discontinue his medications at the inmate's request. His last contact with his primary clinician occurred on May 2, 2016 and he denied suicidal ideation and reported mild difficulty sleeping. Four subsequently scheduled psychiatric appointments were cancelled secondary to the provider being unavailable. The inmate died on July 1, 2016.

II.    Determination of Foreseeability

This suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert does not agree with this determination. In the eight months prior to his suicide, Case G communicated that he wanted to be "sin free," to give away his wheelchair, and to gradually stop his psychiatric medications because he was "going home soon." There is no indication medical staff explored why he wanted to "give up" his wheelchair or stop methadone and how that related to him being "sin free." These statements are concerning for suicide. However, medical staff did not report this concerning communication to mental health for further evaluation. Psychiatry failed to evaluate what Case G meant when he said he was "going home soon" given he was serving four consecutive terms of life without the possibility of parole. The statement was concerning for suicide. The potential for him to have been suicidal, raising his acute risk level, or delusional was significant and had it been evaluated he would most likely have

24

been referred to higher level of care for further treatment. Finally, several opportunities for follow-up evaluation to further assess his abnormal comments and behaviors were missed in the months leading up to his suicide. In particular, the failure of his primary clinician to see him weekly for cognitive behavioral therapy, and four cancelled appointments with his psychiatrist between May 6, 2016 and June 3, 2016 represented repeated missed opportunities to assess the inmate and possibly intervene before he committed suicide. Information about the presence of substantial risk for this inmate's suicide was available and documented.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was a generally adequate summary of this case. It discussed the inmate's social history, criminal history and mental health history. What was lacking was discussion about the lack of attention paid to the inmate's trauma history by mental health clinicians. There was reference in documentation up to the final year of his life regarding the impact of trauma on his mood, yet no documentation indicated that trauma was a target for treatment. There were errors noted in the SCR. An eight-month inpatient placement was referred to as lasting only five months twice in the SCR, and the SCR included a recommendation related to missing documentation that was found to be present in the inmate's healthcare record. The SCR also stated that the inmate was seen four times by a primary clinician during the final 11 months of his life, but only three progress notes were located in the inmate's healthcare record.

V.    Analysis of Quality Improvement Plan Process

This case resulted in four required Quality Improvement Plans. The first was required to address the frequency of mental health treatment provided to the inmate, as it was not in keeping with the inmate's treatment plan. The QIP noted that training was provided to staff to cover a number of topics and evidence of training attendance was provided.

The second QIP was required to address the fact that the treatment interventions noted in the inmate's treatment plan were not provided to the inmate. Additionally, concerns were noted about the fact that the treatment plan called for more intensive services than are routinely provided at the CCCMS level of care, yet there was no documentation to indicate a higher level of care had been considered. An audit was completed which noted problems with the congruence between treatment plans and actual treatment in a number of instances along with concerns about lack of specificity about treatment interventions. Evidence of staff participation in a 30-minute training was provided, but the content of the training was not included with the QIP. This response did not appear to be adequate.

The SCR noted that an urgent referral to the psychiatrist was revised by a mental health supervisor to a routine referral, yet the inmate was not seen for 12 days. Further, the SCR stated there was no documentation of the psychiatric encounter in the inmate's healthcare record, yet it was present. The required QIP included a review of referral response time over the previous year and noted that responses to routine referrals ranged from 58% to 69% compliance with expected timeframes. The QIP noted that the low response rate was due to psychiatric staffing shortages and that it was elevated to local and statewide leadership. This QIP did not address the identified issue adequately. Evidence of training with supervisors was also provided to address required timeframes for response to referrals.

Finally, a QIP was required to address the formulation of moderate chronic risk given the inmate's suicide history, ongoing lack of protective factors and the recognition by the IDTT that the inmate was experiencing an increase in symptoms that required more frequent contacts. Clinicians were trained for seven hours on the process of suicide risk evaluation and completed a mentoring program. Evidence of training participation was provided.

There was no recommendation for a QIP related to the treating psychiatrist's failure to review the inmate's healthcare record and inaccurate documentation during a session in November 2015. It was during this encounter that the inmate, with multiple life sentences, reported that he was going home soon. The psychiatrist also noted that the inmate reported no history of suicide attempts without verifying the information. A QIP to address these failures appeared necessary.

## Case H

I. Summary of case

Case H was a 40-year-old Latina woman who was found by a correctional officer hanging in an eight-person dorm with two of her cellmates present in general population housing on October 10, 2016. She was receiving mental health services at the CCCMS level of care. Toxicology results were positive for methamphetamine at the time of her death.

Limited information was available regarding Case H's social history. Records indicated that she was raised by her grandmother and mother. She reported being sexually abused in childhood by several different men. She had a son at age 17 with a man who was her boyfriend at the time. After her son was born, Case H identified as homosexual and while she listed her next of kin as her "wife," there was no indication of communication with this individual during her incarceration. She received visits from family members, including her son; however, her son's visits were revoked due to suspicion of his participation in drug trafficking.

Documentation regarding Case H's education level was conflicting; however, all indications are that she did not complete high school. She had an extensive history of substance abuse beginning at the age of six. She reported that she was given marijuana by her aunt to calm her, and she progressed to daily use. During adolescence, her drug use expanded to methamphetamine and heroin use. Records indicated that she received mental health services in the community as a juvenile, but her attendance was limited.

Case H was incarcerated for the third time in CDCR in 2012 for convictions related to possession of a firearm and possession of a controlled substance. She was sentenced to a four-year term but received an additional four-year term after being found in possession of a controlled substance while incarcerated. She spent the majority of her adult life incarcerated, as her history included convictions for nine felonies, all but one involving possession of a controlled substance. While incarcerated, she received seven RVRs, three of which were violent in nature. One of her adult felony convictions and one of her juvenile convictions included violence. She was denied parole in 2015 but was scheduled for a parole hearing in early 2017.

Case H was maintained at the CCCMS level of care throughout her incarceration beginning in 2013 after the death of her mother. There were no documented suicide attempts nor incidents of self-injury while in CDCR. The inmate reported suicide attempts in the community, but accounts were inconsistent. She reported two attempts, one by overdose at age 14 and one by hanging at age 20. She also reported the intent to kill herself when found by police with a handgun at ages 18 and 36. Formal records indicated that she was hospitalized at the age of 18 following her reported intent to kill herself when discovered with a gun.

In 2013, she was enrolled in the MHSDS and treated for depression and suicidal ideation including the use of psychotropic medications. She was only occasionally medication adherent; however, there were no referrals generated regarding her nonadherence, and the issue was not adequately addressed by psychiatry. Case H engaged in individual therapy and assigned treatment groups. Documentation indicated that she experienced chronic suicidal ideation but was able to identify her family relationships as a protective factor.

Despite being in active treatment for depression and suicidal ideation, the inmate's only formal suicide risk evaluation was completed in 2012 which rated both her acute and chronic risk for suicide as moderate. There was no documentation indicating an assessment of risk, triggers or use of any measures to assess the inmate's treatment progress from 2013 through 2016. Suicidal ideation was removed as a target from her treatment plan in October 2015 without any rationale nor evidence that the issue had been addressed or resolved. Treatment documentation was vague and included status updates with little evidence of assessment or treatment.

II.    Determination of Foreseeability

This suicide was determined to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this clinical case and included available information regarding the inmate's social history, mental health and criminal history. It was sufficiently critical of the limited documentation regarding active treatment and the lack of risk assessment in this case. It also criticized the lack of follow up regarding the inmate's chronic medication nonadherence.

V.    Analysis of Quality Improvement Plan Process

This case resulted in nine required Quality Improvement Plans, four addressing mental health concerns, four addressing custody concerns and one for a nursing concern. The initial QIP noted the absence of a primary clinician during an IDTT meeting in 2014, but subsequent review noted this to have been an error.

QIPs were required to address the lack of monitoring for suicidal ideation and the lack of treatment interventions to target suicidal ideation and mood stabilization noted in the treatment plan. These were reviewed at the facility level, and it was found that all clinical staff needed training on these issues. Evidence of the training curriculum and attendance were provided. It should be noted that the facility needed to provide additional information to satisfy this recommendation as their initial responses were inadequate.

A QIP was required to address the lack of follow up with the inmate regarding her medication nonadherence. Medication reports were sent to primary care providers and not psychiatrists and the issue was discussed at huddles where psychiatrists were not present. A number of referrals were generated to address these issues, but the impact of these referrals was unclear from the QIP response. As an example, the issue appeared to have been sent to the technology staff to address problems within the electronic health record, but the most updated response indicated that the issue had not been fully resolved.

QIPs required for custody focused on poor documentation following the emergency response that failed to account for allowing inmates in the room during emergency procedures, failure to document how the inmate was cut down following the hanging, the proper contents of the emergency bag and problems with visibility into dormitories secondary to window coverings and other obstacles found on the unit. Field training exercises were provided to staff at the facility to address each of these issues which included feedback and an assessment. Evidence of attendance was provided along with the training content.

The nursing issue that required a QIP involved poor functioning of the Automated External Defibrillator (AED) pads during the emergency response. The QIP noted that the issue was heard by the NPPC which noted that policy requires routine inspection of all equipment. There was no indication of what action was taken to ensure compliance with policy.

**Case I**

I.    <u>Summary of Case</u>

Case I was a 28-year-old Latino male who was discovered hanging in his single cell by another inmate who notified correctional staff on May 28, 2016. Timelines revealed two officers and a sergeant responded, cutting the ligature. Cardiopulmonary resuscitation (CPR) was initiated by custody staff and continued by institutional medical staff; however, a nurse noted Case I's fingers were slightly rigid. He was receiving mental health services at the EOP level of care at the time of his death.

The inmate's background was characterized by an unstable and traumatic developmental history with few emotional supports, few successes and lots of problems. He was born in California and lived with his mother, older sister and grandparents. He reported his mother physically abused both him and his sister, and his father abused his mother. He had two children, a son and daughter; however, he was never married. He completed the ninth grade and achieved a GED in 2005. Throughout his childhood, his mother used methamphetamine; and both his grandfather and uncles used heroin and methamphetamine. He began drinking alcohol at eight years of age, selling methamphetamine at 12 years of age, and using cannabis as an adolescent. As an adult, he used cocaine, heroin and methamphetamine. His substances of choice were cocaine, alcohol and cannabis. He was self-employed, tattooing, selling and designing shirts, and working as a music producer.

Along with the use of illicit substances, his family also had a criminal history, and he was arrested at age 15 for selling methamphetamine. He was subsequently placed in a residential treatment facility. He failed to complete a six-month residential treatment program and was later arrested for aggravated battery and cocaine related offenses. As an adult, he was charged with multiple felonies and misdemeanors, which were primarily drug-related offenses and assaults. He was incarcerated in CDCR three times. His first incarceration was for an assault with a deadly weapon, and his second was for felony possession of an illegal weapon. He was incarcerated the third time at age 27, in March 2015. He was on parole when he was convicted of attempted murder first degree, with a deadly weapon, after shooting a nightclub bouncer in the stomach. He was sentenced to serve 19 years in CDCR.

His institutional adjustment during his third prison term was difficult because of unresolved mental health and medical concerns. He received two RVRs, one for fighting and the other disobeying an order to board a bus in March 2016. When questioned about not boarding the bus, he stated that he wanted to have his medical issues resolved at the prison rather than at an outside facility. He also received an RVR that was reduced to counseling for initially refusing a cellmate, but then agreeing to accept one the following day. Since August 2015, he had four visits from family members, including his mother, sister and nephew, with his last visit occurring in November 2015. He did not make any phone calls in May 2016, prior to committing suicide.

Case I reported the onset of depression during adolescence, with three suicide attempts starting at age 12. He reported always feeling ashamed of having mental health symptoms and would not seek help. He first received mental health treatment at the county jail for anxiety and depression before transfer to CDCR.

His overall mental status during his third prison term tended to be dysphoric and unstable, which resulted in reporting and denying suicidal ideation, an idiosyncratic perception of reality, and both unusual and unclear thinking. When directly questioned about his mental status, he reported feeling fine and denied suicidal ideation; however, his behavior suggested that he was emotionally distressed, struggling with intense anxiety about "going crazy" and believing that he was dying from a myocardial infarction (MI) or a stroke. While at the reception center following intake, he reported worrying about seeing something so evil that he could not handle it and would be driven "crazy." He remarked that he would rather "take himself out" than be driven "crazy."  He was subsequently placed in the MHSDS at the CCCMS level of care for treatment of depression and anxiety. Within two months he was elevated to an EOP level of care because of increased depression, regret, rumination and anxiety.

The inmate was provided with a diagnosis of Generalized Anxiety Disorder, as well as a secondary diagnosis of a Stimulant Use Disorder, in a controlled environment due to cocaine and methamphetamine use. Additionally, he was provided with a provisional diagnosis of a Somatic Symptom Disorder secondary to his medical concerns for which there was no obvious cause.  In August 2015, he went to the TTA with reported numbness, nausea and dizziness. He underwent a number of medication examinations in the following months for a broad range of potential problems to include heart problems, neurological problems, endocrine problems and gastrointestinal problems. He requested a wheelchair, but the request was denied.  He continued to worry about his health, reporting that he was afraid of dying from a medical illness while incarcerated. Additionally, he reported having severe social anxiety and said that his main mental health symptoms consisted of feeling overwhelmed, anxious, stressed and easily frustrated, resulting in impulsive decisions.

Along with being distressed and somatically preoccupied, his perception of reality was idiosyncratic, and his thinking was unclear and occasionally illogical. For example, at reception he spoke openly about his emotions and his beliefs, saying he was looking for signs of the occult which previously led to a suicide attempt in 2012. He reported "noticing little things" which he associated to unrelated events with tragic outcomes. He stated, "when they (the signs) start piling up like that, I fear that I'll see something so evil that I can't handle it." He continued stating that he perceived "things which other people don't perceive and felt an underlying presence."  In December 2015, he became hyperverbal and appeared delusional, complaining of medical problems. For instance, he reported having neurological problems which traveled to his stomach, resulting in a need for special medication. He also requested to see a medical doctor during an IDTT meeting, stating "I might have a neurological disorder because I can't stand or walk without having tachycardia. I am dehydrated and I am vomiting. I lost 24 pounds. I do not want antipsychotic medication. I just want Benadryl and Ativan." His unusual beliefs and confused thinking led treating clinicians to repeatedly consider the presence of an underlying psychotic disorder.

Case I had a long history of suicidality, reportedly starting at age 12 when he attempted to kill himself by cutting both wrists. At age 23, he attempted suicide by provoking police to use lethal force. He reported pulling a gun on police who shot him with a taser when he did not show his hands as ordered. Instead of showing his hands, he shouted "I am Jesus Christ, and I'm going to kill you." Two years later, he intentionally crashed his car into a pole, relating this suicide attempt to omens and signs from the occult.

His history of suicidality continued during his third prison term. While at the reception center, he denied wanting to harm himself; however, he expressed a desire to be placed in a yard "where he might be harmed by others." He sporadically repeated this request to clinicians throughout his third term, while simultaneously denying active intentions to harm himself. Eight months later, he endorsed suicidal ideation with a plan to hang himself. He presented as anxious and endorsed anxiety and agitation related to recent chest pain. Having just returned from a community hospital in November 2015, he said that he was diagnosed with "Stokes-Adams Syndrome" and received a heart implant. In contrast to his recollections, a nurse reported that a biopsy was obtained to rule out a bacterial infection in his stomach. Additionally, he reported that he could lose consciousness at any time and pass out. He emphasized that he was not going to let the enemy get him. He stated that he would rather take his own life, noting "I just want to die before the disease kills me." In April 2016, he reported experiencing suicidal ideation and deep depression in an appeal. He also stated that he had written the appeal because his psychiatric medication was discontinued without his consent.

Seven suicide risk evaluations were performed for this inmate. His chronic risk level was consistently assessed as moderate, while his acute risk level varied between low, moderate and high. His chronic risk factors included a history of emotional and physical abuse, a history of depression and possibly psychotic symptoms, violence, substance abuse and three suicide attempts in the community. His acute risk factors included suicidal ideation, depression, anxiety, hopelessness/helplessness and single cell placement. His protective factors included religious/cultural beliefs, future orientation, regular exercise, children at home, and positive coping skills.

A review of Case I's medical history revealed two significant head injuries, a seizure disorder, hypertension, tachycardia and cardiovascular disease. During the fourteen months of his third prison term, he was a high utilizer of medical services. He was admitted to the TTA for numbness, nausea and dizziness in August 2015 and to a general hospital and the Correctional Treatment Center (CTC)/MHCB during November to December 2015, due to psychiatric instability. While in the CTC, he was described as "loud and entitled" and denied any kind of mental health issue or suicidal ideation.

His medical history also revealed a substantial increase in his utilization of medical services between September 2015 and May 2016, with reports of tachycardia. During this time, he filed six appeals requesting specific types of treatment for perceived symptoms which he associated with serious heart disease. He also received thirty-four electro-cardiograms. This increased utilization of medical services suggested increased emotional distress and desperation.

In the weeks prior to his death, he was treated at a community hospital and then admitted to the CTC for eleven days from May 16 to May 27, 2016. During that time, he reported

31

expecting to die soon and stated that he did not want to die of a heart attack or a stroke. On May 26, 2016, he was seen by a psychiatrist who documented that "this inmate again states that he would like to resume Remeron. He complains of feeling depressed. He reports that he expects to die soon. He wishes to not die of a heart attack or a stroke or to suffer brain damage. He volunteered that he has no plan for committing suicide. He reports peculiar perceptions including having the image of a cardiac defibrillator triggered by the sound of a slamming door, taking events in his environment as signs of coming demise and inaccurately interpreting the utterances of others, often with ideas of reference." The psychiatrist noted he observed general anxiety, but no acute distress, no clinical symptoms of depression, and no symptoms of psychosis. Before he was released from the CTC on May 27, he requested and completed a Physician Orders for Life Sustaining Treatment (POLST), indicating he did not wish to be resuscitated if in cardiopulmonary arrest because he did not want to be kept alive in a vegetative state. He died by suicide the following day.

Following his death, which occurred within 24-hours of being discharged from the CTC and signing a Do Not Resuscitate (DNR) order, a physician supervisor's review of his records revealed concerns about the lack of diagnoses for his recurrent complaints of tachycardia with exertion/"falling out," his chest pain which fed his fear of dying and/or "becoming a vegetable," and his undiagnosed hypothyroidism. The physician supervisor noted it was difficult to discern if his physical symptoms contributed to his mental health issues or if his mental health medications contributed to his physical symptoms. She recommended a review possible interactions and side effects of his overall medication regimen.

Finally, there was a review of letters and documents which were discovered in his personal effects. A suicide note to the mother of his son stated: "I am extremely sick right now and I have an illness that cannot be treated while in custody. I never thought this type of death would be an option, but here I am serving this death sentence. It's either this or a slow and painful death. It's time for me to man up and just face death with a smile. I love you and I felt you deserved to know what's going through my mind in these final moments of my life." Additionally, an undated note entitled "The choice to depart this life and enter the next." He wrote. "I hope you can understand this act more clearly than people would assume. Oh, he cannot do 19 years in prison. Any dumb ass can sit in a cage for 19 years, eat shit, and sleep when told to. When I took 19 years – I looked around the courtroom and knew my real sentence was death."

II.    Determination of Foreseeability

The suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert does not agree with this determination. This inmate clearly exhibited serious mental illness throughout his third prison term. He also indicated that he was always ashamed of his mental health symptoms, and thus never sought treatment. Given his feelings of shame along with his underlying emotional distress, he covered up the latter with denials of mental health problems and suicidal ideation, while indirectly and behaviorally communicating his overwhelming distress. During a rare moment of candor at the Reception Center, he reported that his "main mental health symptoms were feeling overwhelmed, anxious, stressed, and easily frustrated, resulting in impulsive decisions." His subtle communications were easy to miss, especially since there was no documentation

of any exploration into the underlying circumstances of his three suicide attempts. Without probing for this information, providers were limited in their ability to properly understand his requests to be placed in a yard where he would likely be harmed by others, (reference his second suicide attempt via death by cop), and his reports of seeing signs from the occult, (reference his third suicide attempt, which was attributable to signs from the occult). During moments of feeling especially overwhelmed, he reported suicidal ideation with a plan; however, he would subsequently deny ever having suicidal ideation.

His distress, depression, and desperation, which increased over time, manifested itself by increased utilization of medical and mental health services. During the final nine months of his life, he received 34 electrocardiograms. During the last seven months, he submitted six appeals, reporting "suicidal ideation and deep depression" in one of the appeals. During the month of April 2016, he was admitted to the CTC for sixteen days; and he was referred to mental health twice, once with a routine referral and once with an emergency referral. During the month of May 2016, he was admitted to the TTA for one day in the CTC for eleven days. Forty-eight hours before committing suicide, he told his psychiatric provider that he felt depressed and had been thinking about his family and his own mortality. His comments were significant because he indicated that his biggest regret was not being able to raise his son. He also asserted that he expected to die soon while denying a plan to commit suicide. Additionally, he reported peculiar perceptions of a cardiac defibrillator triggered by the sound of a slamming door. His psychiatric provider noted that he was using events in his environment as signs of his upcoming demise and inaccurately interpreting the utterances of others, with ideas of reference. There was no documentation of any discussion about his reported feelings of depression, his thoughts about his son and his own mortality, his feelings about his impending death, or his unusual and confusing thoughts. These issues needed to be explored, especially given his history of attempting suicide three times, and repeatedly stating that he would rather take his own life than to be killed by the disease. Rather than exploring these issues, his psychiatric provider described him as having general anxiety, but no acute distress, no clinical symptoms of depression, and no symptoms of psychosis.

Finally, 24 hours before he committed suicide, he completed a POLST, indicating that he did not wish to be resuscitated if in cardiopulmonary arrest. Case I was clearly a medical-psychiatric patient; however, there was minimal communication, coordination or collaboration between these two disciplines. In fact, there was no documentation of any communication between medical and mental health about his DNR.

III.    Determination of Preventability

The suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review

The SCR was a marginally adequate review of this case. It summarized the index event, the inmate's background, institutional functioning, mental health history, suicide history, medical history and significant pre-suicidal events. It contained all the critical elements of a review; however, it failed to critically discuss the distinction between the inmate's

explicit denials of suicidality and depression due to shame, and subtle nonverbal expressions of distress and suicidality which impacted risk decisions. Additionally, there was no discussion of the treatment plan goals or treatment interventions. A review of the electronic health record revealed that impulsivity was identified as a problem; however, there were no corresponding goals or interventions. The review also revealed the primary clinician did not appear to be aware of this inmate's distress. Consequently, he was using psychoeducational interventions to teach him relaxation techniques, rather than addressing more salient issues.

V.    Analysis of Quality Improvement Plan Process

The case resulted in one Quality Improvement Plan. The problem involved psychiatry's treatment plans and interventions, documented in three psychiatry notes which were written by two psychiatrists on April 21, May 20, and May 26, 2016. The Chief of Mental Health met individually with both psychiatrists to better understand their thought processes and clinical judgment regarding the lack of documentation and inadequate treatment plans. Both psychiatrists presented their understanding of the inmate's current mental status and responded accordingly. They were instructed to work more closely with the primary clinician, especially when discontinuing medication. They were also instructed to work more closely with the inmate's primary care provider, especially with medical-psychiatric patients. Following their interviews, training was determined to be the best course of action to address the current quality improvement plan. Consequently, they attended two hours of training on psychiatry treatment planning on September 29, 2016 and October 4, 2016. The training participation sign in sheets were attached to the response.

**Case J**

I.    Summary of case

Case J was a 21-year-old Latino man who was found by correctional officers performing custody checks in the Short-Term Restricted Housing (STRH) Unit hanging in his single cell on January 27, 2016. This inmate was hanging from a noose made from his state-issued sheet affixed to the ventilation grate. The inmate was cut down and taken to the vestibule for life-saving measures.  He was taken to a community hospital where he was declared brain dead and later pronounced deceased on January 29, 2016. The inmate had been receiving mental health services at the CCCMS level of care at the time of his death.

Case J was born prematurely with a cardiac defect requiring surgery. His mother was incarcerated for much of his early years requiring him to live with various family members. When he did live with his mother, he suffered documented abuse and parental rights were terminated in 2008. The inmate was shuttled between foster care and residential homes until he aged out of the system at 18 and was homeless up until his arrest and incarceration for his index offense in November 2014. He had several juvenile offenses as well as adult offenses and entered CDCR on the current commitment on May 20, 2015. He pled guilty to having a concealed dirk/dagger for a six-inch knife taped to his leg under his pants, as part of a plea agreement with a 32-month prison sentence. The inmate was a reported Norteño dropout.

Once in CDCR, this inmate was offered SNY status which he accepted and remained throughout his term. When initially evaluated by a psychiatrist at the reception center, he was provided with diagnoses of Depressive Disorder, not otherwise specified and a provisional diagnosis of Posttraumatic Stress Disorder (PTSD). The psychiatrist also noted that the inmate had strong abandonment, trust and attachment issues. At the time of CDCR arrival, the inmate had been prescribed mirtazapine at night; this medication was continued, and paroxetine was added for the depression. While the inmate denied suicide attempts in the past during screening, he ultimately reported three prior attempts during his psychiatric and psychological interviews. While the numbers varied somewhat by provider, the healthcare record consistently documented a history of at least two attempts; one attempt occurred when he was living in a group home at the age of 14 when he drank a toxic substance, and more recently when he started to walk in front of a truck but then stopped himself. It should be noted that there was documentation of another attempt disclosed by a cellmate who reported that this inmate had reported that he had tried to hang himself at the reception center and never told anyone.

The psychological evaluation, conducted 10 days past due, noted self-reported sexual and physical abuse throughout childhood, depressive episodes, substance abuse early in childhood (12 years of age) and psychiatric treatment throughout childhood. The acute risk for suicide was assessed as low, while chronic risk was rated as moderate. There were multiple chronic risk factors including an aunt who had committed suicide. The inmate denied any current suicidality at that time.  The inmate was discovered openly masturbating in his cell by a correctional officer in June 2015. He was placed in the STRH at that time, and the RVR was adjudicated with a six-month SHU term. It was suspended in August 2015, and he was returned to mainline housing.  He was transferred to another facility where he was assigned to an adult basic education class and programmed without incident until January 8, 2016 when he exposed himself to his teacher, later saying that she had behaved in a "flirty" way towards him.

There were two suicide risk evaluations completed for this inmate, one as part of the reception process and one in September 2015 when he was a new arrival following a transfer. It was unclear why a suicide risk evaluation was not completed whenever he was moved to a new treatment team (e.g., in the STRHs) as part of treatment planning at the reception facility or his most recent facility.

When in the STRH at the reception facility in July 2015, he participated in most of his mental health activities until the last month of his stay. He was perceived as mildly depressed, and during his STRH admission his psychiatrist tapered the inmate off of paroxetine and added venlafaxine. This change was made because the inmate had reported that he did not feel the medications were working and that he was "always sad." While the primary clinician documented that the inmate seemed to be improving initially, documentation after July 25, 2015, suggested that he began to deteriorate, reporting anergia, hypersomnia, feeling "stressing out" and with decreased participation in his mental health programming. After discharge to mainline programming, the inmate had his venlafaxine increased significantly. When he was transferred to his final facility, he reported that he believed his medications were working.

35

The transfer form failed to note a history of suicide attempts but did note the history of mental illness. Upon arrival, another suicide risk evaluation was completed, and acute risk was again assessed as low with chronic risk assessed as moderate. Documented risk factors were the same as the those on the initial risk evaluation with the addition of two acute risk factors, housing change and recent disciplinary action. The inmate was seen by a psychiatrist on September 30, 2015 who noted the Depressive Disorder diagnosis but not the PTSD that had been carried through providers at the reception center. Psychotropic medications were continued, as the inmate repeated that they seemed to be working. However, approximately one week later, Case J began to refuse his venlafaxine without clear reason. In fact, when seen in an IDTT meeting that did not include a psychiatrist, the inmate was known to be medication nonadherent; however, this was not identified as a focus of treatment, and there were no interventions established. There was no documentation that the treatment team had discussed the benefits of his medication. Eventually, the inmate stopped taking his remaining antidepressant, reporting to his psychiatrist that he did not believe that he needed it as he felt he was doing well. The medication was discontinued, and a 30-day follow-up visit was scheduled when the inmate reported that he had stable mood and was functioning acceptably.

The inmate was next seen for a routine CCCMS visit by his primary clinician.  Of note, this was not the original primary clinician as that individual had died suddenly, soon after completing the initial paperwork and IDTT documentation in this case.  That clinician's caseload was subsequently redistributed to others in December 2015, before Case J's indecent exposure incident. The inmate reported that he was fine, but with some depression when initially incarcerated; however, he indicated that the medications helped, and he had stabilized.  He requested removal from the CCCMS level of care. The rationale was that the inmate believed that he was going to be paroling in 2016 and did not want to be in the MHSDS.

The inmate was next seen after receiving the RVR for indecent exposure and being placed in the STRH where he refused to attend many of his mental health appointments, including his IDTT and group activities. He also refused many yard opportunities. When the segregation logs were reviewed, it was apparent that the inmate had participated in less than 10 hours of yard time during his 19 days in the STRH. At the time of an indecent exposure evaluation on January 13, 2016, the clinician, who was not the primary clinician in keeping with the indecent exposure/RVR evaluation guidelines, addressed a January 10th referral requesting to "talk to psych about taking meds" that was submitted by the psychiatric technician. After talking to the inmate, the inmate retracted his request and stated that he would be fine without them for the time being. There was no documentation that his primary clinician was informed of the consult, and no referral to psychiatry was made.

On January 26, 2016 he was seen by his primary clinician at cell front, as he had refused a confidential visit. The inmate was described as depressed. He reported having difficulty sleeping, experiencing subjective feelings of depression; although, he did not express any suicidal thoughts. The clinician noted that there had been a decline in the inmate's

functioning as evidenced by his decreased participation in unit and mental health programming. The inmate agreed to discuss restarting psychotropic medication with his primary clinician the following week and agreed to a confidential contact. He died the following day.

II.    Determination of Foreseeability

The suicide was determined to not be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was a generally adequate summary of the case. The reviewer was able to capture the shallow nature of the clinical documentation in the healthcare record. The SCR critically reviewed treatment at both facilities in detail and described what providers could have done to gather more relevant clinical information and to provide more assertive treatment.

The SCR also noted that the original treatment plan after arriving at his second facility was never implemented. While the initial primary clinician tragically died shortly after the initial IDTT meeting, the SCR properly addressed the fragmented way that treatment was subsequently delivered to this inmate while he was in the mainline.

There were two important areas not noted in the SCR: there was no psychiatrist present as required at the inmate's initial IDTT, even though the treatment team knew that the inmate had been nonadherent with his psychotropic medication prior to that meeting. While the inmate may have still opted to stop taking all of his psychotropic medication, at least the proper team members would have been present and had input into his treatment plan. The second area not addressed was the indecent exposure evaluator seeing the inmate for his referral request to see the psychiatrist to discuss starting back on psychotropic medication. Not only was the referral sent to someone other than the psychiatrist, but it was also not given to the inmate's primary clinician to be completed. Instead, the inmate was seen by someone who he had no therapeutic relationship with him and was evaluation him in the context of a rule violation regarding sexual misconduct.  It was inappropriate for this clinician to respond to a referral and possibly determine if the inmate warranted further referral to the psychiatrist within this context. There was no documentation of continuity of care by following up with the inmate's primary clinician or psychiatrist. Given that psychotropic medications had been helpful to this inmate in the past in alleviating some of his depressive symptomatology, these areas seemed to be important areas of concern,

37

though only the lack of a psychiatrist at the IDTT meeting violated explicit Program Guide requirements.

V.    Analysis of Quality Improvement Plan Process

There were two required Quality Improvement Plans. The first plan focused on the failure of the reception center to complete the inmate's initial psychological evaluation timely (within 18 days), instead occurring 10 days past due. The QIP required a two-month analysis using the Mental Health Tracking System (MHTS) to determine timeliness of initial evaluations in the reception center. If the findings were below 90% of evaluations completed timely, the next two-month period was to be analyzed. If that period also fell below 90% compliance, the facility was to determine the cause and produce a corrective action plan to remedy the lack of compliance. This was completed with documentation to support its completion. While that was a reasonable and important QIP, had this inmate been seen timely for his initial evaluation, there was no reason to believe that the outcome, had everything else remained the same, would have been different.

The second QIP focused on the failure of the inmate's treatment team to implement the treatment plan developed for this inmate. This QIP appeared too simplistic and only involved reminding and retraining staff to implement treatment plans, for which proof was provided.  Since this should be a basic component of any clinician's care, the QIP seems inadequate and not targeted to the actual problem. The problem needed to first be identified as a failure in supervision, a failure due to large caseloads, or simply a failure of particular staff to be held accountable.  What may have been more effective was a QIP required to identify the cause of the problem and then to develop a corrective action plan.  This QIP would have been more useful had it focused on identifying the cause for the failure of the treatment team to communicate to the new provider regarding the treatment plan approved in the IDTT meeting or why the treatment provider did not review existing treatment plans when new patients were assigned to his/her caseload. The QIP could have also directed the facility to identify if this issue of concern was unique to this one treatment team or was a systemic issue at the facility by requiring a healthcare record review that examined the implementation of treatment plans.

Given the SCR's identification of qualitative issues in the assessment and treatment of this case, it would appear that a third QIP focused on those issues at both facilities would have been justified. It could have been incorporated into the statewide suicide prevention video meetings/training meetings.

## Case K

I.    Summary of case

Case K was a 67-year-old Caucasian man who jumped from a fifth tier of cells and landed on the third tier on April 26, 2016 sustaining multiple injuries.  He died four days later at a community hospital.  The inmate did not receive mental health services through MHSDS during his incarceration. He was housed in a single cell in general population prior to his death.

The SCR noted that there was limited information available related to Case K's history. He was raised by his parents along with four older half-sisters and one younger brother. His family history included alcohol abuse and a suicide by his father's sister. The inmate was noted to have completed school through the tenth grade and later completed his GED while in the military. He was in the military for 20 months and received an "undesirable" discharge in 1968. Records indicated that the inmate reported problems with alcohol and indicated that alcohol use was a factor in his crimes. The inmate was briefly married and had no children.

Case K's records noted multiple arrests beginning in 1969. He was first incarcerated within CDCR in 1972 for voluntary manslaughter. He reentered in September 1988 to serve a sentence of 20 years to life for second degree murder. Records indicated that he was also convicted of a murder he committed in Texas and pled guilty to avoid trial while incarcerated within CDCR. If he were to have been released from CDCR, he would have been sent to Texas to serve a sentence of life without parole. It was noted that all three of these felony crimes included striking another person in the head and then strangling the person to death.

His most recent incarceration in CDCR included receipt of seven RVRs for oppositional behavior mostly related to work, none of which were violent in nature. He was single-celled during most of his incarceration secondary to cellmates requesting to be moved when celled with him. Records indicated that he received three visits in 2009 with another inmate and that there were no other visits or phone contacts on record. He was denied parole in 2013 and had another hearing scheduled for 2018.

The SCR noted that he was screened for mental health services at intake with no indication that he needed services. There was no further evidence of contact with mental health staff during his incarceration. There was no known history of suicidal ideation or behavior. Due to limited information, no conclusions could be drawn about the factors leading to this inmate's suicide.

II.   Determination of Foreseeability

This suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.   Determination of Preventability

This suicide was determined not to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.   Critique of Suicide Case Review Report

The SCR was an adequate summary of this case given the limited information available. It provided a summary of the inmate's available criminal, social and mental health history.

V.    Analysis of Quality Improvement Plan Process

This case resulted in two required QIPs related to the emergency response following his suicide attempt. The first was related to a delay in activating 9-1-1, and the second was related to nursing practices. The nursing concerns included the fact that three nurses who arrived on the scene and one nurse who cared for the inmate in the TTA did not document vital signs for the inmate. It was also noted that nurses did not activate 9-1-1 in a timely manner.

The QIP developed for the first issue noted that a review of the case was completed and resulted in a decision to develop a statewide policy to standardize emergency activation procedures.

The second QIP noted that the issues were referred to the NPPC. No further information was available.

**Case L**

I.    Summary of case

Case L was a 63-year-old divorced, Caucasian man who was found by correctional officers with a plastic bag covering his head secured with cloth tied around his neck in his SNY single cell on November 20, 2016. At the time of his death, he was receiving mental health services at the EOP level of care.

Records indicated that this inmate had a difficult childhood marked by physical and sexual abuse, beginning when he was four years old. His childhood involved being relocated numerous times as his care was transferred between caretakers, including both family members and a court appointed guardian. Records indicated a family history of mental illness and substance abuse. Case L displayed behavioral problems at school including aggression and fighting with others. He stopped attending school in tenth grade after being expelled for fighting. Records indicated that he was able to complete his GED as an adult. His history includes significant alcohol use beginning during adolescence. Records indicated that he joined the military in 1970 at age 17 and received a "undesirable" discharge in 1971 due to repeated absences without leave. He was married in 1972 but divorced shortly after and had no children.

Case L's records showed multiple arrests and convictions during adolescence and as an adult. He reported that his first crime was stealing from a concession stand at the age of seven, and his first arrest was for fighting when he was 10 years old. Other juvenile crimes included burglary, battery, violating curfew, running away and disorderly conduct. As an adult, he was arrested for drug possession, battery, prostitution, trespassing, auto theft, drunk driving, burglary and murder. His most recent incarceration was his second within CDCR. Previously, he was incarcerated for eight years on two counts of murder, was

released and committed his instant offense after three months in the community. He was received into CDCR in July 1985 to serve a term of 15 years to life plus eight years for second degree murder, grand theft auto, and auto theft with priors. He was unemployed and homeless as well as experiencing hallucinations and paranoia at the time of his offense.

Throughout his incarceration, Case L had difficulty conforming to institutional rules, and he received 19 RVRs during his incarceration along with three additional criminal convictions. He was convicted of possession of a weapon, assault with force likely to produce great bodily injury and two counts of battery. He received two RVRs in 2016, one for battery with a deadly weapon and one for obstructing a peace officer. He was assigned to a single cell in 2003 after an in-cell assault. Other than a brief period in 2011, the inmate was housed in an SNY due to safety concerns related to other inmates. His only approved visitor was his attorney, who last visited in 2008 and there was no record of telephone contacts. He was denied parole in 1999 and 2002 and was granted waivers for hearings in 2005, 2009 and 2014.

The SCR noted that this inmate's mental health history began at age five and included symptoms of depression and mood instability. Auditory hallucinations reportedly began when he was eight years old and continued throughout his life, but there is no evidence that he received treatment for these conditions as a child, beyond possible treatment for ADHD.

During his most recent incarceration, he was committed to a DSH inpatient psychiatric setting on two occasions and was twice placed under court orders for involuntary medication. His history was significant for multiple incidents of self-injury and previous suicide attempts including attempts to kill himself by swallowing razor blades in 1983, cutting his throat in 1986, ingestion of foreign objects resulting in surgery in 1992, and hanging in 2004. His symptoms over time included command auditory hallucinations, mood disturbance, flat affect, delusions, anger, sleep disturbance, paranoia and disorganized behavior. He was treated under a court order for involuntary medications from 2009 to 2011 due to grave disability secondary to psychosis and paranoia accompanied by covering himself in feces, dumping toilet water on his head and being nonresponsive. Psychotropic medications appeared to stabilize him, and his involuntary medication order was allowed to expire.

The inmate received mental health services at the EOP level of care from 2007 to 2015 (except for one episode of MHCB placement in 2011) but was moved to the CCCMS level of care in January 2015. The IDTT treatment plan noted that he had been stable since 2011, was employed and demonstrated an ability to recognize his triggers and to redirect his behavior appropriately. The inmate had requested to be moved to a lower level of care. At that time, his chronic risk for suicide was assessed as moderate, and his acute risk was assessed as low.

Records indicated that at some point between July 2015 and February 2016, the inmate stopped taking his medications, and they were eventually discontinued. He was placed in ASU secondary to safety concerns on February 24, 2016, and the IDTT noted that the inmate requested to remain at CCCMS level of care without medications. Less than a

41

month later, he received an RVR for battery with a deadly weapon and was transferred to STRH. He was assessed, and it was determined that mental health factors did not play a role in his behavior and no mental health factors should be considered regarding placement in SHU. He was found guilty of lesser charges and was not placed in SHU, but he did lose nearly a year of credit and yard privileges for 10 days. He received another RVR for obstructing a peace officer in May 2016, and he was again assessed for consideration of a SHU term. The clinician conducting the assessment noted that the inmate's history "makes considerations of consequences difficult to determine at this time." The inmate lost credits and another 10 days of yard privileges.

During his June 2, 2016 IDTT meeting, he was recommended for a return to EOP level of care due to "recent episodes of decompensation, specifically increased symptoms of tardive dyskinesia (facial twitches), increased agitation, recent suicidal ideation and decrease in program participation." Later that same day, he was placed in the MHCB for grave disability and was noted to be "extremely disorganized and bizarre" with behaviors similar to those seen during his decompensation in 2009. The IDTT petitioned for reinstatement of a court order for involuntary medications due to grave disability, and it was granted on June 13, 2016. The inmate was noted to have been medication adherent until his death in November 2016.

Similar to his previous episode of decompensation, the inmate stabilized rather quickly with medications and was discharged to EOP on June 16, 2016. The suicide risk evaluation conducted on that date omitted several risk factors that had been included previously. It also failed to identify risk factors that may be amenable to treatment in development of the safety plan. His chronic risk was determined to be moderate, and his acute risk was assessed as low.

The inmate appeared to remain stable during the following months despite a facility transfer in July 2016, and then another on November 10, 2016. On November 17, 2016, he was seen by both his primary clinician and his psychiatrist following his transfer. The primary clinician noted dysphoric mood but indicated that the inmate denied psychotic symptoms or thoughts of self-harm. The psychiatrist noted that the inmate's mood appeared "good" and documented no concerns regarding the inmate's level of hopelessness or worthlessness. The inmate died by suicide on November 20, 2016, and he left a suicide note asking that he be cremated, and his ashes thrown out to sea. At the time of his death, the inmate was provided with a diagnosis of Schizoaffective Disorder, bipolar type.

The SCR noted concerns with five of the seven suicide risk evaluations completed between May 15, 2016 and June 16, 2016. Concerns included the failure to identify salient chronic and acute risk factors likely resulting in an underestimation of the inmate's risk for suicide. It was noted that the safety plans on these documents failed to include risk factors that could be addressed through treatment and thus reduce risk. In addition to these concerns, the SCR noted that three of these evaluations failed to draw conclusions about risk that appeared warranted given the risk factors present and assessed his acute risk for suicide as low, despite indications of a higher level of acute risk. A fourth evaluation was noted to have indicated that the inmate did not have a desire to die, despite the inmate giving the

clinician a note with the words "I'm suicidal" and documenting in the body of the evaluation that the inmate had "recent suicidal ideation." None of these evaluations provided rationale or justification for the documented risk ratings.

II.  <u>Determination of Foreseeability</u>

This suicide was determined to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III. <u>Determination of Preventability</u>

This suicide was determined not to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.  <u>Critique of Suicide Case Review Report</u>

The SCR was an adequate summary of this clinical case given the number of years the inmate was incarcerated and his extensive mental health history. The SCR included a summary of his social history, criminal history, mental health history and a critical review of his care during the final year of his life. The findings resulted in recommendations that were justified by the contents of the report.

V.   <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in five required Quality Improvement Plans. The first QIP was required to address the deficiencies related to assessment of risk and development of safety plans in the suicide risk evaluations completed in May and June 2016. The QIP indicated that training was provided regarding the identification of risk factors and the subsequent estimation of risk. Specific attention was paid to reviewing the deficient suicide risk evaluations from this case. Auditing of random evaluations was also completed and noted that five staff members required remedial training. Their evaluations were reaudited following the training. Mentoring was ongoing for two clinicians. Evidence of these actions was provided as part of the QIP.

A second QIP was required to address the fact that a treatment plan reportedly developed on October 12, 2016 was not located in the inmate's healthcare record. The recommendation resulted into an inquiry into what transpired on this date, and the clinician produced evidence that the plan was completed timely. The clinician reported that the plan was signed by all required parties and submitted for filing. Training on submitting documentation was completed to ensure future compliance with evidence provided. Additionally, documentation describing a new protocol implemented to ensure filing was submitted with the QIP.

43

The third QIP was required to address three nursing care concerns related to the following three issues:  1) the initiation of CPR on the inmate following his discovery despite obvious signs of rigor mortis, 2) between July 21, 2016 and November 9, 2016 there were 31 days when psychiatric technicians rounds were not documented because the inmate was not in his cell when rounds were made, and 3) no attempt was made by the psychiatric technician to complete rounds later in the day on those occasions.  The QIP indicated that these issues would be addressed on the final death review which noted the issues related to the psychiatric technician documentation was referred to the NPPC but was silent on how it addressed the use of CPR on an inmate with rigor mortis.  This QIP was incomplete.

A QIP was required to address the three-minute delay in sounding the alarm after finding the inmate unresponsive in his cell.  The QIP noted an investigation and subsequent corrective training with the officer involved with evidence of the training.

A final QIP was required to address the fact that the cut down tool and the single-use resuscitator were retrieved at separate times.  While this was noted not to be a policy violation, the event was noted to warrant review and consideration of changes to existing protocols.  The QIP noted that a workgroup was created at the statewide level to review this recommendation.  It was determined that the contents of the kit would be standardized to include the single-use resuscitator across institutions.

**Case M**

I.  <u>Summary of case</u>

Case M was a 37-year-old Latino man who was found by correctional officers hanging in his single cell in ASU on June 17, 2016.  The inmate did not receive services in the MHSDS during his incarceration.  Records indicated that the inmate's native language was Spanish but noted that he spoke fluent English.

Case M reported that he began engaging in violence, drug use and disobedience from the fourth to the sixth grades, and he completed school through the eleventh grade.  He had juvenile arrests for sexual battery, assault with a deadly weapon and burglary.  He was noted to be unmarried with one child, but there was no evidence of ongoing contact with the child or the child's mother.  His last visit was with his parents and occurred in 2000.  He reported a history of drug use including marijuana, alcohol, methamphetamine and heroin.

Case M entered CDCR in April 1999 after having been convicted of attempted murder, shooting at a person from a motor vehicle, and conspiracy to commit murder.  The shooting appeared to be gang related.  He was sentenced to life in prison and later received an additional 25 years for attempted murder while incarcerated.  He received a number of RVRs from 2000 through 2013.  The majority of his RVRs appeared to be related to gang activity. He remained discipline-free through May 2016, when he received an RVR for involvement in a fight which resulted in an ASU placement. On May 12, 2016 during his ASU pre-placement screening, the inmate responded affirmatively to questions regarding beliefs that people were watching him, beliefs that he was being poisoned or plotted against

and reports that others have noticed a time when he was much more active than usual. By policy, these responses should have resulted in a referral to a mental health clinician, but no referral was completed.

Of note, while his ASU placement resulted from a fight, both the medical death review and the SCR noted that the inmate engaged in a fight in order to be housed in ASU secondary to safety concerns related to a drug debt. He reported this to a Captain and had inquired about protective custody status but then later withdrew this request. It was noted that he routinely attended yard until May 21, 2016, after which he refused to go to the yard. He died on June 17, 2016.

Records indicated that the inmate was screened for mental health needs as required during his incarceration but did not qualify for nor request mental health services. He was never evaluated formally for suicide risk and reported no history of suicide attempts or ideation.

II.    Determination of Foreseeability

At the conclusion of the SCR this suicide was noted to have been foreseeable, however in the Executive Summary of the report, the suicide was noted not to be foreseeable. Verification of the ultimate determination was obtained within the Combined Death Review Summary which indicated that the determination was that the death was not foreseeable.

The Special Master's expert agrees with the determination that this was not a foreseeable suicide.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case and included the inmate's known history. It attempted to identify precipitants to the suicide and offered recommendations that followed from the findings in the review. The only concern was noted above, with regard to conflicting information in the report regarding foreseeability.

V.    Analysis of Quality Improvement Plan Process

This case resulted in two required Quality Improvement Plans, one to address concerns related to the full cut down kit not being transported immediately to the inmate's cell and the other regarding failure of a psychiatric technician to refer the inmate for further evaluation following his responses to screening items of concern. To address the first issue, the QIP noted that the local operational procedure had been updated on June 15, 2016 and

included specific contents of the cut down kit and the fact that its entire contents should be brought to responding staff. Training was provided related to this procedure in July 2016, and evidence of the training was included with the QIP.

To address the second issue, a QIP noted that the issue would be addressed by the death review committee. The committee noted that the issue was referred to the NPPC, and no further information was available.

## Case N

I.  Summary of case

Case N was a 36-year-old Latino man who was found by correctional officers in his single cell on an STRH unit with a cord wrapped around his neck on April 1, 2016. Rigor mortis was noted during emergency response procedures. The inmate was receiving treatment at the CCCMS level of care at the time of his death.

The SCR noted that the inmate's criminal history began at age 14, and he had completed his education through the tenth grade. There were multiple arrests documented in his record, including mostly violent offenses. He had previously served two and a half years in CDCR facilities between 2002 and 2010. Records indicated that the inmate had been married twice and had two children from his first marriage as well as three stepchildren. He reported a history of drug and alcohol use. He had three documented visits from his mother while incarcerated.

The inmate was incarcerated in June 2015 with a sentence of 26 years for charges of possession of a firearm by a felon and committing a felony in association with a street gang. During his 10-month incarceration, he received three RVRs; one for fighting and two for participating in riots. Each of these incidents resulted in ASU placement, and his most recent RVR in December 2015 resulted in a nine-month SHU term. In February 2016, he requested movement to SNY status as he wanted to renounce his gang participation. The ICC approved his request.

Upon arrival at CDCR in June 2015, he denied any mental health history and was determined not to require mental health services. He was screened prior to placement in ASU in August 2015, when he was also determined not to require mental health treatment at that time. In October 2015, he was again screened prior to placement in ASU following a fight, when he reported thoughts of self-harm and auditory hallucinations. His responses were noted to be non-specific. He was referred for an emergency evaluation and placed in alternative housing. The suicide risk evaluation assessed his acute risk as moderate and noted vague and non-specific responses. The clinician noted that the inmate was nonsensical and rambling. Upon placement in an MHCB, the inmate focused on safety concerns related to his gang affiliation but also expressed paranoia and reported hearing music through the vent. Documentation also indicated that he claimed to be reporting symptoms in order to secure a housing move.

46

While his suicidal statements ceased, he continued to report auditory hallucinations over the following week. Specifically, he reported voices telling him that his family had been harmed. He was prescribed an antipsychotic medication. He continued to evidence anxiety but showed enough improvement to be discharged from the MHCB. As the inmate was not being returned to his sending institution, he agreed with the discharge decision. He was retained at the CCCMS level of care to assist in treatment of his anxiety. The risk evaluation and safety plan completed prior to his discharge were noted to have minimal content.

He was placed in ASU upon arrival at his new facility. He denied any mental health concerns and was scheduled to see a psychiatrist within 14 days of arrival and his primary clinician within seven days. His five-day follow up visits were conducted according to policy and documented some depression, but generally good functioning. There were no notable concerns, and the inmate was released to general population 11 days after arriving at ASU.

Once seen by his assigned psychiatrist and primary clinician in general population, he requested discontinuation of his medication and removal from the CCCMS level of care. He reiterated this request at his initial IDTT meeting. In December 2015, he was involved in a riot with over 100 other inmates and was screened for ASU placement on December 10th but not moved until December 15th. There was no documentation that a pre-placement screening was completed on this later date. He was also not seen by his primary clinician until December 28, 2015, beyond the required timeframe for weekly clinical contacts. The session was conducted at cell front due to inmate refusal. The inmate agreed to be seen out of cell for a pre-IDTT meeting with his primary clinician on January 4, 2016, but he ultimately refused to attend the IDTT. He also refused to be seen out of cell for his weekly sessions with the primary clinician for the remainder of January but reported functioning well. He was seen daily on rounds by the psychiatric technicians, and no concerns were noted.

The inmate was transferred to an STRH on January 27, 2016, and he responded negatively to all screening questions regarding mental health needs or concerns. He also denied any history of suicidal ideation or auditory hallucinations during the past year. His assigned primary clinician completed a mental health evaluation and suicide risk evaluation at cell front, as he refused to be seen out of cell for confidential evaluations. Documentation was appropriate and included evidence of contact with his clinician at the prior facility. He refused to attend sessions with his primary clinician as well as the February 2016 IDTT. His treatment plan was developed to address anxiety and relationship issues but did not address his refusals to be seen privately. In February, he requested SNY, and it was granted. During his 65 days in STRH he refused individual sessions, group sessions and the majority of his yard time. On April 1, 2016 he died by suicide. At the time of his death, he was provided with diagnoses of Major Depressive Disorder, single episode, Adjustment Disorder and Polysubstance Dependence. He was not prescribed medications.

II.    Determination of Foreseeability

This suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.   Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.   Critique of Suicide Case Review Report

The SCR was an adequate summary of this case.  It included a summary of his known social history, criminal history and mental health history.  It critically examined his mental health treatment over the course of his incarceration and analyzed known precipitants to his suicide.  It resulted in recommendations that followed from the findings in the report.

V.   Analysis of Quality Improvement Plan Process

This case resulted in six required Quality Improvement Plans.  The first QIP addressed the poor quality of the suicide risk evaluation completed prior to the inmate's discharge from the MHCB in October 2015.  The staff member was trained and mentored with regard to safety planning, and the clinician's healthcare documentation was audited with resulting improvement.  It was noted that monitoring would continue for three months.  Evidence of training and auditing was provided.

The second QIP required was to address the failure to see the inmate within required timeframes following his placement in ASU in December 2015.  It was noted that the delay was the result of poor scheduling, and the scheduler was trained to ensure compliance with the Program Guide.  The clinician also received training regarding the completion of assessments within required timeframes.  Evidence of these trainings was not provided, however.

The third QIP was required to address the failure of the IDTT to include the inmate's treatment refusal on his treatment plan in December 2015.  Documentation of a 15-minute training with staff was provided to address this issue.

The SCR noted that morning meetings between custody and mental health staff in STRH were not documented as required by policy and this required a QIP.  Documentation of 15- and 30-minute trainings with staff were provided as evidence of corrective action for this issue.

Two concerns were raised regarding the emergency response.  The first was the fact that the inmate's jaw was locked, and he was in the early stages of rigor mortis when discovered, despite custody checks noting that the inmate was alive and breathing 30 minutes prior.  The second was that at the time of the inmate's discovery by custody staff,

there was a four-minute delay in activating an alarm. A single QIP was developed, and a request for an internal investigation was submitted, but no further information was provided.

## Case O

I. <u>Summary of case</u>

Case O was a 63-year-old Latino man who was found by correctional officers lying on the floor of his single cell in a general population yard with a plastic bag over his head and a knee sleeve pulled over his face on July 25, 2016. The inmate was found in rigor mortis. He was receiving mental health services at the EOP level of care at the time of his death. It was noted that the inmate's daughter had contacted the facility on July 11, 2016 to report that during a visit, she noted that her father was depressed and giving away his possessions. He was seen on six occasions between that phone call and his subsequent suicide; but he denied suicidal ideation.

The inmate was a primarily Spanish-speaking man who was born and raised in Mexico. He had a sixth-grade education. He reportedly entered the United States illegally in 1971. He was married and had fathered five children. It was noted that during his incarceration, he had 40 visits from friends and family, often with his wife, children and grandchildren. He also had written and telephone communication with his family regularly.

He entered CDCR in March 1996 to serve a sentence of 20 years to life for second degree murder, attempted murder in the second degree and enhancements for use of a firearm. He was reportedly severely intoxicated during commission of the crime which involved shooting two of his brothers following an argument and killing one of them. He was arrested three times previously for driving under the influence of alcohol, one arrest included hit and run charges and another included possession of a loaded firearm. He had no juvenile arrests. It was noted that he was due to have a parole hearing in September 2016. That hearing would have been his third, having previous hearings in 2006 and 2010. He had waived his hearing scheduled for 2015.

During his incarceration, Case O had no RVRs. He attended basic education and English as a second language classes throughout his incarceration and was described as a hard-working student. He also participated in a number of self-help groups and Alcoholics Anonymous. He enrolled in a long-term offenders' pilot program six months prior to his death. Documentation indicated that he was treated by Spanish-speaking staff or interpretation services were used routinely.

Case O had no history of mental health services or substance use treatment prior to committing his index offense. Reports indicated that he had difficulty participating in his defense during trial secondary to believing his attorney was trying to fool him. He underwent an evaluation for competency to stand trial and was noted to be experiencing depression and transient psychosis. He was ultimately determined to be competent and provided with a diagnosis of Alcohol-Induced Psychotic Disorder with delusions.

49

Upon entry to CDCR, the inmate presented with depressive symptoms, and he was placed at the CCCMS level of care. He was retained at this level of care for nine years, with a brief removal in 1999 at his request. Throughout this time, the inmate was described as depressed and ruminative with expressed guilt. He had at least three episodes of acute depression during this time. In December 2004, the inmate discontinued psychotropic medications, and after a year of stability he was removed from the MHSDS.

After nearly 10 years, he was referred for mental health services in July 2015 with report of insomnia and depression. He reported that he was experiencing depressive symptoms triggered by reviewing his paperwork for an upcoming parole hearing. He was evaluated and determined not to need mental health services at that time. The inmate was referred again in September 2015 by a correctional sergeant who heard the inmate make suicidal statements. The sergeant reported that this occurred following a parole board hearing, but it was following a decision made by the inmate and his attorney to waive the scheduled hearing. The attorney noted that the inmate was unable to focus on the discussion or explain his programming.

The inmate was seen for a crisis assessment, but he denied suicidal ideation and was referred for a routine "psychiatric care re-assessment" but not for inpatient services. During his evaluation, he complained of depression, doubts about parole and miscommunication which resulted in his removal from the long-term offenders' pilot program. The inmate denied suicidality and spoke of future plans and family support. He was not placed in the MHSDS but was scheduled to be seen the following week to rule out the need for a contact prior to his parole board hearing. The following week, however, the inmate reported that he engaged in a suicide attempt by cutting his arm. He was admitted to the MHCB where he remained for 10 days. He reported depression, worthlessness and intermittent thoughts of killing himself. He reported an active plan for suicide. He was discharged to the EOP level of care due to ongoing depressive symptoms.

The suicide risk evaluation completed upon his placement in the EOP was noted to be incomplete, as it failed to include a clear risk formulation or a safety plan. The evaluation noted the inmate's guilt, anxiety and sadness, but included no plan to address these symptoms.

Case O briefly agreed to take medications in November 2015, but he discontinued them after 20 days because he said they were not effective. He was assessed as not requiring emergency or involuntary medications.

In January 2016, clinical contacts referenced ongoing feelings of guilt and remorse. A clinician noted that the inmate should be retained at the EOP level of care until his next parole hearing. In May 2016, the inmate became increasingly paranoid. He was described as delusional and paranoid regarding his medications. Specifically, he thought that staff had tricked him and placed him on psychotropic medications without his knowledge. There was no evidence of suicidal ideation. During July 2016, he was referred to mental health by a programming instructor after the inmate appeared confused, disoriented and withdrawn. The inmate reported to a psychiatrist that his symptoms were side effects of

his psychotropic medications; however, he was not prescribed psychotropic medications. The psychiatrist noted that the inmate reported depression, anxiety and feeling overwhelmed in preparation for his parole board hearing. The inmate also reported occasional and vague suicidal ideation. The inmate consented to taking an antidepressant medication, to be started in a week, after a scheduled assessment by medical staff for his reports of dizziness.

Four days later, the inmate was referred for emergency mental health consultation after his daughter called to report that her father appeared hopeless and reported giving away his possessions during a visit the day prior. A suicide risk evaluation completed that same day, July 11, 2016, noted depression and hopelessness along with his medications being ineffective (although he had not yet started his psychotropic medication) and statements that staff are doing "something crooked" to negatively affect his parole. The evaluation noted that he denied suicidal ideation, but he agreed to be evaluated again the following day. He was seen the following day, but he was disagreeable and would not allow his primary therapist to contact his daughter. He ended the session abruptly but returned the following day to apologize and signed a release for staff to talk with his daughter.

The inmate was seen by a psychiatrist on two occasions over the following 10 days and agreed to take an antidepressant medication. On July 22, 2016, the inmate reported that his depression and anxiety had worsened, and the psychiatrist increased the medication dosage. The inmate also reported paranoid thoughts about his phone calls with his attorney being "bugged." The inmate denied suicidal ideation or intent but ultimately died by suicide three days later.

II.    Determination of Foreseeability

This suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert does not agree with this determination. In the three weeks prior to his suicide, the inmate exhibited signs of decompensation and increased symptomatology severe enough to warrant a referral from his vocational program and a phone call from his daughter expressing concern about his mental status. The inmate was evaluated and noted to be experiencing increased depression, anxiety and paranoia regarding the services he was receiving and the intent of correctional staff. While it was noted that he denied suicidal ideation, his paranoia regarding the intentions of staff indicated the need to assess his risk beyond self-report. His presentation was similar to what was noted prior to his suicide attempt a year earlier. There appeared to be enough information available to indicate a substantial risk of suicide that warranted intervention beyond routine services.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

51

IV.    Critique of Suicide Case Review Report

The SCR was a marginally adequate summary of this case.  It noted the inmate's criminal history, medical history and mental health history.  It reviewed the timeline of events prior to his death but did not include a critical review of the treatment provided to the inmate during that time.  There was no discussion of his treatment planning, treatment goals or the specific interventions provided to reduce his symptoms beyond the provision of medications in the weeks prior to his death.  The inmate had been receiving EOP level of care for eight months prior to his death, yet his treatment was not discussed in any detail in the SCR.

V.    Analysis of Quality Improvement Plan Process

This case resulted in three required Quality Improvement Plans.  The first recommendation was to address the lack of a safety plan and failure to include rationale for the risk level determined during a suicide risk evaluation in October 2015.  Healthcare documentation was reviewed for adequacy, and staff was trained to address inadequacies noted.  Those inadequacies included the omission of review of imminent risk factors and little inquiry into past suicide attempts including triggers for previous attempts.  Evidence of the healthcare records reviews and training were provided.

The second QIP was required to address the failure that a custody check completed prior to discovering the inmate had died, noted a living, breathing person.  Despite this, the inmate was found in rigor mortis.  An investigation resulted in a correctional staff member being referred to internal affairs, and training was conducted with approximately 670 staff.  Evidence of training was provided.

The final QIP was required to address the poor visibility into the single cells in the EOP unit.  The issue was discussed by a multidisciplinary team and resulted in pursuit of door replacements and installation of mirrors.

**Case P**

I.    Summary of case

Case P was a 56-year-old married, Korean woman who was found by her cellmate hanging in their double cell in a SCU during the early morning of November 10, 2016.  She was receiving mental health services at the EOP level of care at the time of her death.

Records indicated that Case P was born and raised in South Korea.  She was fluent in English, but Korean was her first language.  She completed high school and attended college for two years.  The inmate had no history of substance use. She was employed during her early adulthood and then met her husband, an American military contractor, and was married in 1991.   She stopped working after their marriage.  The couple lived in Korea, Singapore, Canada and ultimately California.  She had one daughter in 2000 who was the victim of her crime.  Reports indicated that during a psychotic episode, she

murdered her 10-year old daughter by stabbing her and then attempted to take her own life but was stopped by her husband. Medical tests conducted following the crime indicated that she had a brain tumor that was ultimately removed. Based on the presence of the tumor, initial murder charges were reduced to voluntary manslaughter, and she was sentenced to 12 years in prison.

The inmate arrived in CDCR during October 2011. She was immediately placed in a MHCB bed and transferred to a DSH inpatient psychiatric hospital when she remained for over a year. Upon her return to CDCR, she was placed in a Psychiatric Inpatient Program (PIP) for an additional 17 months. At both inpatient locations, she had Korean-speaking therapists. She was discharged to the EOP level of care within the SCU for the final two and a half years of her life where her clinicians spoke English. The SCR noted that there was no evidence that she required translators or that she had any difficulty with communicating in English. Yet, records demonstrate that her results on the Test of Adult Basic Education (TABE) placed her at the third-grade level despite her history of college education.

Case P had no rule violations during her incarceration but there were noted conflicts with her cellmates during the last six months of her life. She was open about her desire to have a single cell. Her husband reportedly visited her monthly during most of her incarceration but missed a few months in 2016. Visitation records and clinical documentation conflicted with regard to four visits in 2016, as the inmate reported having visits with her husband but custody visiting records did not show evidence of such. Records indicated that the inmate's husband told her that he would file for legal separation upon her parole and that she would likely be deported to Korea upon her release. This was reportedly distressing to her.

Case P reportedly had a significant mental health history which included depression and at least seven suicide attempts. She attempted suicide twice during her adolescence, once as an adult prior to her marriage, once during the commission of her crime, and three times in jail prior to CDCR transfer. There were no recorded suicide attempts or episodes of self-injury prior to her death while incarcerated in CDCR.

She was described as severely depressed with intense feelings of guilt and shame throughout her incarceration. From the time of her discharge from the DSH inpatient setting to the PIP, she was accompanied to the restroom due to her high risk for suicide. While she was actively engaged in treatment while residing within the PIP, she experienced only partial resolution of her symptoms. Despite this, she was discharged to the EOP level of care in May 2014. She continued to report high levels of depression and passive suicidal ideation. She was adherent with her medications, attended groups, saw her psychiatrist monthly and had weekly contacts with her primary clinician. Despite her high risk, the inmate was not placed on the High Risk List (HRL) at the institution. She was admitted to the MHCB twice while in the EOP, during January 2015 after reporting chronic suicidal ideation to her psychiatrist and during September 2016 when she reported that she would rather commit suicide than live with her cellmate. Following discharge from the MHCB, her cell was changed, and she was celled with a Korean cellmate where another inmate had committed suicide earlier that year. Case P reported a "ghost" and "feeling a pressure" in

her cell following this relocation. Suicide risk evaluations consistently noted her chronic risk for suicide to be high, with one exception of a moderate rating in March 2015, and her acute risk was assessed primarily as low until September 2016 when it was increased to moderate risk.

During the final months of her life, she reported experiencing increased anxiety and suicidal ideation along with ongoing depression and nightmares. Her group participation decreased. Documentation indicated that her treatment during the final year of her life focused on her ongoing depression and nightmares but did not specifically address her increased anxiety or passive suicidal ideation. She reported numerous medication side effects and worries about her health, but she consistently denied active suicidality. Documentation indicated that the IDTT was considering a PIP referral and had increased her clinical contacts but had not modified her treatment goals or measures of treatment progress. She was seen by her psychiatrist on the day before her death when she denied active intent or a plan to kill herself.

II.    Determination of Foreseeability

This suicide was determined to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. It included a description of the inmate's known history including social, criminal and mental health. Her treatment in CDCR was reviewed critically, and precipitating factors to her death were noted. The recommendations and required QIPs followed from the content of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in six required Quality Improvement Plans. The first QIP was required to address the fact that the inmate had not been placed on the HRL despite local operating procedure requiring such for cases meeting criteria. A review of the issue resulted in findings that staff underutilized the HRL and that training did little to resolve the issue. It was also noted that policy language was inadequate in providing guidance regarding the use of the HRL. Language for the updated policy and a plan to provide training to staff following the policy's approval were included with the QIP, but no follow up was evident after May 2017. It is not known if the training was provided as planned, and more

importantly, if it was effective given that previous training did not seem to have the desired impact. This QIP response was incomplete.

A second QIP was required to address the narrow focus of the inmate's treatment plan and its failure to address recent increased anxiety and the presence of chronic suicidal ideation. Training was provided to staff to address the development of treatment plans and evidence of that training was provided. The impact of that training was not known.

The SCR noted that there was a three-minute delay in activating an alarm following the discovery of Case P hanging in her cell. Investigation into this issue revealed that upon being summoned by the inmate's cellmate, it took approximately three minutes for correctional officers to calm the cellmate and gain adequate visibility into the cell. No corrective action was required.

A QIP was required to address the fact that documentation was unclear regarding whether the entire cutdown kit was taken to the scene as required by policy. Investigation revealed that the entire kit was present at the scene, and no further action was required.

The fifth QIP was required to address the lack of documentation regarding the method employed by staff who removed the ligature from the inmate's body. Responding staff failed to document whether or not her weight was supported and pressure on her neck relieved during the process. The response from the facility indicated that correctional officers did not relieve pressure on the inmate's neck, because training provided to correctional officers did not include that requirement and therefore did not correspond with the requirements of the Program Guide. The finding at the institution noted that the officers who responded to the scene acted in accordance with their training, and so no further action was required regarding those officers. Yet, there was evidence provided that the training curriculum was updated to include the required procedures and evidence of staff re-training was provided.

Finally, the review found that a nursing response to a healthcare request with symptoms submitted by the inmate in November 2016 failed to include an examination of the inmate, but instead simply referred the inmate to mental health staff. The QIP noted that the issue was addressed in the medical death review. The medical death review noted no areas for improvement of action needed, despite the review noting the lack of assessment by the nurse. This QIP response was inadequate.

## Case Q

I.  Summary of case

Case Q was a 69-year-old Caucasian man who died on March 4, 2016. According to a death review report, his death was the result cardiopulmonary arrest due to hypernatremia secondary to his refusal to eat or drink. Case Q attempted suicide on November 24, 2015 by jumping from a second-floor tier in his general population housing unit. In the months that followed, he was treated at community hospitals and a CDCR infirmary for injuries including brain hemorrhaging and multiple fractures of the skull, ribs, thoracic spine, clavicle and scapula. During the weeks prior to his death, multiple feeding problems were

reported. These included refusals of food, poor oral intake and multiple bouts of coughing and vomiting. Providers suspected these incidents to be self-induced, and perhaps suicidal. He had continued weight loss, and in the month before his death; artificial nutrition by a gastronomy tube was recommended. He did not accept this treatment until February 24, 2016. Two days later, he refused the gastronomy tube. He required transfer to a community hospital on March 3, 2016 secondary to dangerously high sodium levels, and he died the following day. The inmate was receiving mental health services at the EOP level of care at the time of his death.

Case Q was born to an intact family with either three or six siblings (accounts varied). He was born in the United States but moved to Mexico as a child with his family secondary to his father's employment. He also spent a part of his childhood in Brazil. He was English-speaking but noted to be fluent in Spanish and partially fluent in Portuguese. He attended college on two occasions but did not obtain a degree. Between his college enrollments, he completed a two-year mission in Uruguay in connection with his Mormon religion. He denied any abuse during childhood and had no history of juvenile arrests or behavior problems. Prior to his index offense, his only previous arrest was for trespassing in 1989. He was married and had one daughter, although his index crime was the murder of his wife in 1992. He was reportedly alcohol dependent but had no history, beyond experimentation, with drug use.

The inmate's mental health history began in his late twenties and was marked by a number of community hospitalizations and at least three suicide attempts. Case Q reportedly met his wife while hospitalized for "suicidal tendencies" in Arizona. She was his treating psychiatrist, and they were married two years after his hospitalization, in 1980. In 1992, his wife filed for divorce, and Case Q ultimately killed her. He was convicted of second degree murder and sentenced to a term of 16 years to life. He was incarcerated in CDCR during April 1994.

During his incarceration, Case Q received a number of RVRs, many of which involved threatening, assaulting or attempting to become overly familiar with custody, medical and mental health staff. Most significantly, he received three RVRs for assaulting custody staff and five RVRs for assaults on non-custody, health and mental health staff. He also sent romantic and sexually explicit letters to female staff across disciplines, including a correctional officer, two psychologists and a mental health clinician. Documentation indicated that the inmate was often too impaired by symptoms of his mental illness to work while incarcerated, but he was able to obtain certificates in auto mechanics as well as proof reading and office services. He reportedly functioned at an above average or superior range of intelligence. Records indicated that he last received a visit in 2007, and he had no phone contacts in the months prior to his death.

Case Q underwent an evaluation to determine his competency to stand trial in 1993. He was determined to be competent, and he was provided with a diagnosis of Bipolar Disorder. The inmate had a history of at least six inpatient psychiatric hospitalizations from the late 1970s through early 1990s. Within three days of his arrival in CDCR, he was referred to mental health staff and ultimately sent to an inpatient facility within the first month of his incarceration secondary to delusions, hallucinations and threats to kill himself by jumping off the top bunk.

Over the next two years, he received treatment in an acute care setting and ultimately transferred to Atascadero State Hospital for intermediate level care. Upon his discharge from the inpatient settings, he was placed at the EOP level of care. He initially refused medications after discharge, but he agreed to take them, appeared to stabilize and was transferred to the CCCMS level of care in December 1996. Over the course of the following 14 months, he was intermittently medication adherent, and he began authoring sexual letters to female staff. In February 1998, he lunged at a psychiatrist and attempted to spit on a mental health clinician resulting in a use of force that dislocated the inmate's hip. He admitted to discontinuing his medication and stated he did not have a mental illness. A court order for involuntary medication was sought and obtained in March 1998. The inmate received medications by an involuntary order through 2013.

Over the course of his incarceration, he was placed in a DSH inpatient setting on six occasions and had over a dozen MHCB placements. He displayed disruptive and bizarre behavior including flooding his cell, yelling, cursing at staff, singing, undressing, claiming to have visitors in his cell, defecating and urinating at his cell door and stating beliefs that his medications were poison. In December 2009, he attempted to kill himself by jumping off a second-floor tier while in an inpatient setting. He broke a bone in his leg and sustained injuries to his knee and ankle. He reported after the incident that he had planned to jump head-first but changed his mind at the last minute. The SCR noted that this incident was omitted from suicide risk evaluations conducted in 2010 and 2011, but this information was finally mentioned in an evaluation conducted in December 2011. Case Q voiced suicidal ideation in 2010 and 2011, referring to thoughts of hanging himself. He reported to staff that he had cut his forearm in June 2012, in what he described as a "poor attempt" at suicide.

His involuntary medication order was allowed to expire during 2013; and in December 2013, he reported hoarding his medications and attempting suicide by overdose. He also discussed thoughts of jumping off the tier. Rather than increasing his level of care or placing him back on involuntary medications, the inmate was placed on five-day follow-up and weekly suicide risk evaluations were completed over the next six months. It was documented that he verbalized not wanting to return to an inpatient setting but wanted to remain in the EOP.

For reasons that were not explained in the SCR, Case Q was placed at the CCCMS level of care in November 2014. A review of the inmate's healthcare record revealed that the inmate requested the reduction in his level of care, and the IDTT indicated the inmate had been relatively stable over the previous 90 days but was described as "more provocative toward other [sic] in group and individual settings, however, situations have not escalated beyond control, thus far." The inmate stopped attending all EOP programming the next day but did not appear to be relocated to another housing unit. After less than a month at CCCMS level of care, but still housed in an EOP unit, the inmate was referred to mental health staff for failing to maintain his hygiene. He was placed on five-day follow-up, but he assaulted a correctional officer and was placed in ASU on the fourth day.

He was admitted to an MHCB on December 31, 2014 and was discharged to the EOP level of care. Additionally, involuntary medications were reestablished secondary to grave disability and danger to others; he continued to receive his psychotropic medications by

court order until his death. Despite these orders, he was noted to be medication nonadherent with "cheeking" of medications. When he was willing to submit to serum level tests for the presence of medications, the levels were often subtherapeutic.

The inmate appeared to stabilize in early 2015, but documentation noted that he expressed thoughts of suicide in February and May of that year. He denied suicidal ideation in July 2015 but reported experiencing suicidal ideation in October and November 2015 during his clinical contacts. He reported thoughts of jumping off the second-floor tier, but no actions were taken to move his cell, which was on the second floor. He refused to meet with his treatment team in October 2015; and subsequently, he was described as depressed and isolative. On November 24, 2015, it was reported that Case Q walked out of his cell and calmly jumped over the railing, falling on his head.

The SCR noted concerns regarding suicide risk determinations in the months prior to his suicidal act. On at least two occasions, staff assessed the inmate with low or moderate risk and did not refer him to a higher level of care, despite overt verbalizations of suicidal ideation with a plan to jump off the tier. Less than two weeks prior to his suicidal act, the inmate reported being suicidal and requested to be sent to an inpatient setting. Five days prior to the incident, he reported suicidal ideation, but told staff he would "await" transfer to an inpatient setting. Despite his risk, staff did not take any steps to relocate the inmate to a lower tier.

While hospitalized following the suicidal incident, the inmate continued to verbalize a suicidal "wish" and appeared to stop eating or vomiting what he did eat in an attempt to die. Ultimately, he died secondary to inadequate food and liquid intake.

II.    Determination of Foreseeability

This suicide was determined to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of a long and complex clinical case. It included a comprehensive summary of his mental health history and course of treatment while incarcerated along with his family history, criminal history and medical history. The SCR critically evaluated the inmate's care prior to his death and made relevant recommendations that followed from the findings.

V.    Analysis of Quality Improvement Plan Process

This case resulted in eight required Quality Improvement Plans. The first QIP was required to address nine separate nursing concerns noted during the care of this inmate. Two were related to failure to stagger 15-minute checks, four were related to improper emergency response and documentation on the day the inmate jumped off the tier, and the remaining were related to monitoring, documenting and notifying a physician related to the inmate's weight loss while in the infirmary following his suicide attempt. The death review in this case noted that these concerns were being addressed, but no evidence was available.

The second QIP was needed to address poor risk evaluation and risk management by a clinician who completed a suicide risk evaluation less than a month prior to the inmate's suicidal act. The clinician documented that the inmate had no "specific plan" despite verbalizing his intent to jump off the tier and noted no imminent warning signs despite documenting four of them. The response indicated that mentoring and monitoring occurred with the identified clinician. She was provided with training to address identified areas of concern and evidence of this training was included in the QIP response.

The third involved poor risk evaluation and risk management by the inmate's primary clinician during the month prior to his suicidal act where he clearly stated his suicidal ideation and intent to jump off the tier. A review of documentation for this clinician revealed a number of concerns which were addressed through training for which there was evidence. The QIP noted that as the clinician was a contractor, it was unclear how best to proceed with follow-up. No further information was available. This was an inadequate response.

A QIP was required to address the drastic change in assessed risk level during a 24-hour period three weeks prior to the inmate's suicidal act and resulting determination to discontinue suicide precautions and rescind an MHCB referral through monitoring and mentoring of the clinician responsible. The QIP noted that the clinician terminated his employment and thus the QIP could not be completed. There was no attempt to determine if this issue was problematic across other clinicians. This response was inadequate.

The SCR required a QIP to address the lack of safety planning in the weeks prior to the inmate's suicidal act. Records were audited, and training was provided to all staff. Evidence of training was provided.

A sixth QIP was required to address the fact that two suicide risk evaluations were completed by the same clinician on the same date and time with two different risk determinations, despite the fact that they contained the same information otherwise. The QIP stated that one of the documents was entered in error and noted that the clinician was educated about how to correct documentation errors.

The seventh QIP was required to address the lack of rationale provided by the clinician who rescinded the MHCB referral in November 2015 by clarifying expectations for such decisions at the statewide level. The issue was discussed during a statewide committee meeting, and training elements were developed for inclusion statewide regarding expectations for clinical rescissions and consultation required.

The final QIP was required to address, at the statewide level, the means by which inmates can be relocated to first floor tiers when significant risk is present. The issue was discussed, and a process was identified to make such recommendations for relocation. Training to all staff was provided.

## Case R

I.   Summary of case

Case R was a 43-year-old African American man who was found by correctional officers hanging in his cell in a general population yard on March 17, 2016. He was housed in a double-cell, but his cellmate was absent at the time of the incident. He was not a participant in the MHSDS. A suicide note was discovered in returned mail. It had been sent to his mother but was marked undeliverable.

Records indicated that Case R was born to an intact family with one sister. It was noted that his parents divorced at some point, and his father had children from other relationships. His father died in 2007. It was reported that after his birth, Case R began having grand mal seizures and was completely deaf in his right ear. He also had significant breathing problems in infancy. It was noted that Case R used a "pocket talker" to amplify sounds, was issued hearing aids and was proficient at lip reading.

He was noted to have close relationships with his mother and sister and an exceptionally close relationship with his maternal grandmother. Following her death, he began to exhibit behavioral problems at school and in the community. He was incarcerated almost continuously beginning at age 13. His crimes involved robberies, car jackings, vehicle theft, possession of a firearm and bank robbery. He was incarcerated for the final time in January 2011 after having been released from prison just over one month prior. He was serving a sentence of 125 years to life for a third-strike conviction of felony possession of firearm, false imprisonment, threat with intent to terrorize, and threats of great bodily injury or death. There was some indication that Case R had been married and was possibly divorced, but records were unclear.

On February 9, 2016, Case R received an RVR for possession of a cell phone that negated his chance to achieve a custody status that would have allowed him to transfer to a facility closer to his family. He had not received an RVR since 2004 during a previous incarceration. He had significant support from his family and was in regular contact with them by phone and mail. He participated in nonviolence workshops in 2014.

Case R did not receive formal mental health services during the period of incarceration prior to his death, but he was received mental health services at the CCCMS level of care for 90 days in 2002 during a previous incarceration. He was provided with a diagnosis of Adjustment Disorder with anxious mood, and he was briefly prescribed hydroxyzine and then trazodone. During his most recent incarceration, he had little contact with mental health providers. He was seen for a routine screening in July 2015, resulting in a determination that mental health services were not indicated. Later that month, he was

referred by a psychiatric technician after observing that Case R was tearful on the yard. He reported that he was having difficulty adjusting to the yard designated for hearing impaired inmates. In October 2015, he was referred to mental health by a correctional counselor who observed him shaking, crying and distraught. He was evaluated and shared that his aunt had died, and he had experienced a number of deaths in his family over the last year. He also reported that it was the anniversary of his son's death, despite no indication of him having a son. Additionally, subsequent interviews with family members did not reveal family deaths that year. At that time, a suicide risk evaluation was completed, and he was assessed with low chronic and acute risk for suicide, with a number of protective factors documented. He was referred again to mental health by a physician's assistant in January 2016 at his request. He discussed his efforts to stay sober and to avoid prison politics. It was reported that Case R asked not to be included in the MHSDS.

Case R reported attempting suicide by hanging in 2014 after the death of his son; however, as noted above, there was no evidence that he had a son. He reported that his cellmate stopped his attempt. Phone calls to his mother prior to his death revealed that he likely had decided to kill himself three days prior to his death. He told her that he was not able to cope any longer. None of his concerns were conveyed to mental health clinicians.

II.   Determination of Foreseeability

This suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.   Determination of Preventability

This suicide was determined not to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.   Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. It included a review of the inmate's family history, mental health history, criminal history and critically reviewed the precipitants to his suicide. The recommendations provided were based on the findings of the review.

V.   Analysis of Quality Improvement Plan Process

This case resulted in four required Quality Improvement Plans. The first QIP was related to a delay of six minutes by correctional officers prior to calling 9-1-1. Training was provided with evidence of attendance. The QIP noted that staff who were not on duty when training was provided would be trained upon their return to work.

A second QIP was developed in response to a recommendation to investigate additional way to make suicide prevention resources available to families. The response included meeting minutes and resources were posted on the CDCR website, pamphlets were made available in visitation areas and challenges with the current hotline available to families were discussed and remedied.

The third QIP was related to three nursing concerns noted during the emergency response which included poor documentation of times during the response by a psychiatric technician, poor completion of the CPR record by a nurse and delayed activation of 9-1-1 by the nurse. The QIP noted that the issues were referred to the NPPC. The outcome of that referral was not available.

The final QIP addressed the fact that a response to a routine mental health referral was late by one day and noted that the response was not late, but that the form had been misdated. No follow up was determined to be needed.

**Case S**

I.   <u>Summary of case</u>

Case S was a 55-year-old Latino man who was found unresponsive and motionless in his cell by correctional officers conducting a cell check after the inmate failed to respond to calls over the public announcement system on December 12, 2016. The inmate had cut the inside of his left thigh; and despite life-saving efforts, the inmate died later that day. Case S was housed in a single cell on the mainline yard, and he was receiving mental health services at the CCCMS level of care at the time of his death.

The inmate was raised by his parents along with three sisters. He was married on two occasions and had one child from each marriage. He also had a stepdaughter, who was the victim of his offenses. Records indicated that he was divorced at the time of his death. The inmate graduated from high school and spent one year in the military before being honorably discharged. Records also indicated that he attended a year of college.

Case S was incarcerated in November 2004, to serve a 42-year sentence for molestation and rape with force. He had no prior criminal history and denied a history of substance abuse. He received one RVR which was reduced to "counseling only" for disobeying orders in March 2016 after partially covering the back window of his cell. At the time of his death, he was scheduled to be transferred to a Level II facility. Documentation indicated that he was active in programming, including self-help courses and religious studies through 2010. His participation in self-help groups ceased in March 2010. He earned a certificate in auto mechanics in 2011. He was employed regularly during his incarceration, except in the months prior to his death; as he had been out of the building for an extended period of time following neck surgery. He had chronic pain associated with his neck along with loss of muscle mass and numbness.

The inmate reportedly maintained contact with his mother by phone. While he had regular visits with his family and friends prior to 2011, visitation all but ceased after October of that year with the exception of one visit with his family in 2014.

The inmate was included in the MHSDS in December 2004 at the CCCMS level of care for medical necessity. He was provided with a diagnosis of Adjustment Disorder with depressed mood which was the precipitant for inclusion in treatment, as well as sexual abuse of a child. The inmate remained at that level of care throughout his incarceration. He was assessed for risk of suicide on three occasions from 2004 to 2007. All three evaluations assessed the inmate with low risk for suicide. There were no formal suicide risk evaluations conducted after February 2007, and there was no documented history of previous suicide attempts.

In 2005, he was provided with a diagnosis of Major Depressive Disorder, and this diagnosis continued throughout his incarceration, with only changes in severity noted. He was rated as having severe symptoms in 2006 marked by guilt, hopelessness and emptiness. In 2011, his severity was noted as moderate, remaining so until his death. In November 2015, he was described as experiencing passive suicidal ideation. The SCR noted that while not required by policy, a suicide risk evaluation was likely indicated. Over the following months, therapy focused on his depressive symptoms and upcoming surgery to address his neck pain. Following the surgery, he reported a significant decrease in pain but reported anger over the process having taken so long. In August 2016, the inmate submitted a health care request for an increase in his antidepressant medication. A medication change to another antidepressant was made as a result, and subsequent documentation indicated that he reported effectiveness.

During an IDTT meeting on August 30, 2016, depression was noted as the inmate's single problem, and a short-term goal was created to decrease his depression over the next 90 days using cognitive interventions, coping skills, exercise and medications. The primary clinician who drafted the treatment plan had been assigned to the inmate one week prior and had not met with the inmate before the IDTT meeting. On that same date, the inmate was noted as having had a session with his psychiatrist and primary therapist; however, there was no documentation in the healthcare record by the primary therapist, and the first clinical contact documented by this therapist was on November 7, 2016. This was also his last primary clinician contact prior to his death. Case S reported growing distant from his family who had previously been identified as a protective factor for this inmate. The inmate also reported, "going through something" to his psychiatrist on November 9, 2016. The inmate died on December 12, 2016, following a number of troubling phone calls with his mother over the course of that final month.

II.    Determination of Foreseeability

This suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case.  It included a review of the inmate's family history, mental health history, criminal history and the course of his treatment during incarceration.  It critically reviewed the precipitants to his suicide and provided recommendations based on the findings of the review.

V.    Analysis of Quality Improvement Plan Process

This case resulted in six required Quality Improvement Plans.  The first QIP was related to the fact that there was no mental health evaluation located in the inmate's healthcare record; despite the requirement to complete one within 10 working days of an inmate's arrival at a new facility.  A healthcare record review revealed that this was not a systemic problem, and staff training was provided.  Evidence of training was included.

The second QIP was related to the fact that Case S's primary clinician was noted to have seen the inmate for a session in November 2016, but no documentation of that encounter was entered into the healthcare record.  The QIP noted that the clinician's documentation was audited, and evidence of training was provided.  It also noted that random records would be reviewed in subsequent months.

The next two QIPs were related to the emergency response by correctional officers and included the lack of documentation of rescue breaths being performed and lack of protective equipment being used by correctional staff when responding to an incident with large amounts of blood.  Training was provided regarding the proper procedures for CPR. It was noted that the blood in the cell was not noticed upon entry, and staff determined that life saving measures were immediately necessary.  These responses appeared adequate.

The two remaining QIPs were related nursing responses and included a delay in activating 9-1-1 and a delay in notifying the TTA about the incident.  It was noted that these were referred to the facility's executive medical management, but no further information was available.

**Case T**

I.    Summary of case

Case T was a 48-year-old Caucasian man who was found by correctional officers hanging in his single cell in a general population EOP yard on April 1, 2016.

Case T was married at the time of his death and was the father of one daughter and one son. His childhood was notable for sexual abuse and the traumatic experience of witnessing his father attempt suicide on two occasions. He began using substances at age seven and participated in three drug treatment programs during his adolescence. He had a history of special education placement and dropped out of school in the eleventh grade. He engaged in superficial self-injury at age 17 and again at age 21. His parents reportedly had substance use issues. Of note, the inmate had a history of head trauma with loss of consciousness, cluster headaches and a seizure disorder. He utilized a cane due to a 35-foot fall at a sports stadium at age 19. He was prescribed methadone beginning in April 2015 for chronic pain.

Case T entered CDCR for the third time in December 2011 with a 50-year-to-life sentence for first degree murder. He had previously been incarcerated for taking an emergency vehicle and later for attempted murder. He was on parole for attempted murder when he committed his index offense. He reported using methamphetamine prior to his index offense which involved the murder of a female stranger. During his incarceration, he received a single RVR for fighting in 2015, which required a use of force by staff. While incarcerated, he had frequent visits from his mother and his wife, and he talked with them by phone almost daily during the final month of his life.

Upon arrival to reception at CDCR in 2011, he was placed at the CCCMS level of care after reportedly receiving medications for depression while in county jail. His initial treatment plan targeted depressive symptoms, drug use and childhood trauma symptoms. In late March 2013, Case T was admitted to the MHCB for a serious suicide attempt by cutting his arm. He admitted to being under the influence of bath salts at the time, with apparent hallucinations and agitation. He was discharged at the CCCMS level of care, but he was placed in ASU due to safety concerns. He reportedly improved during the following months and was removed from the high-risk list. He was placed at the EOP level of care at his request in January 2014, after admitting to his primary clinician that he was not functioning as well as he had been presenting, with continued thoughts of suicide.

Beginning in March 2014, the inmate reported fears of having a cellmate and requested a single cell. It was determined that a single cell was clinically contraindicated given his history of self-injury, but the inmate reported that PTSD symptoms made having a cellmate difficult. Healthcare records documentation did not note a diagnosis of PTSD. The inmate refused to attend groups or to leave his cell as he was awaiting placement in an SNY. His functioning improved briefly, but he regressed; and he was granted a single cell in December 2014. His cell status was to be evaluated during subsequent IDTT meetings.

He was placed with a cellmate in December 2015 by the IDTT in hopes that he would be able to develop the skills needed to live with another inmate. His treatment focused on his trauma symptoms and included both individual and group treatment; these interventions were increased in frequency to support him during this time. The SCR noted that based on an interview with the primary clinician following the inmate's suicide, the inmate reported, in December 2015, that he had been raped by his cellmate in either 2000 or 1999. No documentation related to this report was located in the healthcare record. In January 2016,

his wife contacted the facility to advocate for her husband to have single cell status, and this request was granted. The single cell placement reportedly resulted in an improved presentation in the inmate. In March 2016, the inmate's symptoms were described as having improved significantly, and he denied suicidal ideation. His treatment engagement was high, and no concerns were noted by treating clinicians in the days prior to his death by suicide.

The inmate was evaluated for suicide risk on six occasions between 2014 and 2016. Each evaluation assessed the inmate with low acute risk for suicide. He was assessed with moderate chronic risk through April 2014, and then his chronic risk was assessed as high from September 2014 onward.

While the SCR and death review reports were silent regarding the presence of rigor mortis at the time the inmate was discovered, descriptions of the inmate's body at the time of discovery included a fixed jaw and skin cool to the touch indicating that rigor mortis was likely present.

## II. Determination of Foreseeability

This suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

## III. Determination of Preventability

This suicide was determined not to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

## IV. Critique of Suicide Case Review Report

The SCR was a marginally adequate summary of this case. It included a summary of the inmate's family history, criminal history and mental health history along with an analysis of his treatment during his incarceration. This expert noted that documentation from the primary clinician included unchanged language in the "Objective" section of progress notes beginning in June 2015 until his death in April 2016. This was remarkable as the content included the following apparently contradictory descriptions: "Pt mood was in good spirits" and displayed "marked disappointment." Additionally, this text was entered in all progress notes by the primary clinician and for group and individual sessions; it remained unchanged even when the "Subjective" section of the note included statements such as "Pt came into session expressing fear, anxiety and became emotionally flooded" as was the case on November 5, 2015.

One additional omission was an unclear statement related to the inmate's placement in an SNY. The SCR noted that the inmate was "subsequently endorsed to an EOP/Special Needs Yard (SNY)" in July 2014, but his housing placement at the time of his death was

noted to be general population with no mention of SNY. It was unclear from the report whether the inmate was housed in general population or an SNY at the time of his death.

V.     Analysis of Quality Improvement Plan Process

This case resulted in one required Quality Improvement Plan regarding the use of Narcan at the inmate's cell front, which deviated from protocols. The QIP noted that the statewide protocol changed two months after the inmate's death and allowed for administration of Narcan in housing areas. No further corrective action was warranted. While this single QIP followed from the findings in the report, attention to the unchanged and often contradictory documentation by the primary clinician should have been noted and addressed.

**Case U**

I.     Summary of case

Case U was a 41-year-old Caucasian man who was discovered hanging in his single cell in a Psychiatric Services Unit (PSU) on September 1, 2016. The inmate had transferred two days prior to his death to serve a SHU term for battery on a peace officer. He was receiving mental health services at the EOP level of care at the time of his death.

There was limited information available regarding Case U's social history. His number of siblings, for example, was reported as including one sister, but elsewhere noted five brothers. Records suggested that he was sexually abused as a child. He reportedly dropped out of high school in the ninth grade but later obtained a diploma. He reported occasional alcohol use and heavy methamphetamine use beginning in adolescence. He had an extensive adult criminal history prior to his most recent incarceration, but no evidence of previous incarceration in CDCR. During his most recent incarceration, he had visits from family and friends between 2009 and 2013.

Case U entered CDCR in August 2008 with a sentence of life without the possibility of parole for first degree murder, attempted murder, arson of an inhabited structure, solicitation to commit a criminal offense, child endangerment and first degree burglary. He was reportedly a member of a security threat group and was the victim of a gang-related stabbing in August 2009. While he initially declined housing for safety, he eventually moved to an SNY in 2011. He received eight RVRs for battery on peace officers and one for threatening to kill a correctional officer between 2014 and 2016. He received an RVR for an in-cell assault in 2016. He also received 11 RVRs for refusing urinalysis testing in 2013 and 2014.

Case U had no prior mental health treatment while in the community but did receive treatment for anxiety and depression while in county jail. He received mental health services in CDCR from August 2008 through April 2012 primarily at the CCCMS level of care. He had a number of MHCB admissions during this period for suicidal ideation and grave disability. He engaged in head banging in 2008 and tied a jumpsuit around his neck in 2009. He was diagnosed with mood and psychotic disorders during this period based on

67

symptoms of depressed mood, suicidal thoughts, anxiety and auditory hallucinations. He was also reportedly treatment nonadherent, and he refused to attend to his hygiene with violent outbursts during this time as well. In April 2010, he was placed at the EOP level of care, and a court order for involuntary medications was initiated in September 2010 due to grave disability. Beginning in January 2011, documentation reflected changes in diagnoses and opinions that he might be malingering. In April 2012, he was provided with diagnoses of Malingering and Antisocial Personality Disorder, and he was removed from the MHSDS.

Custody staff generated a number of referrals due to the inmate's refusal to leave his cell with gradual decline in functioning between October 2013 and June 2014. This was also the period of time when he was refusing urinalysis, and visits from his family and friends ceased. In June 2014 he returned to the CCCMS level of care with a diagnosis of Bipolar Disorder; however, he refused to take psychotropic medications. He continued to decline over the following months, became noncommunicative and refused to get out of bed. He received RVRs for battery on peace officers during this time. In February 2015, he attempted to hang himself during a controlled use of force. He reported that the reason for his suicidal behavior was that he did not want to go to the SHU for battery on an officer. He was assessed as having a high acute risk for suicide; despite this, he was maintained at the CCCMS level of care. The suicide risk evaluation from that date noted the following, "he made a noose and tried to hang himself from the bottom of his top bunk while in the middle of a controlled use of force cell extraction. The inmate's behavior was stopped by chemical agents that were thrown into his cell by custody." It should be noted that over the course of the subsequent years, this incident was often mischaracterized by describing simply that a noose was found in his cell. This documentation was often copied by clinicians to support a Malingering diagnosis or to provide rationale for his discharge from inpatient care. This issue was not addressed in the SCR.

In May 2015 he was placed in alternative housing following a cell extraction in the SHU for refusing to take a tuberculosis test. He was described as unresponsive and "possibly catatonic" at that time. In June 2015 he was again placed on involuntary court-ordered medications based on grave disability and danger to others. He received services at the MHCB level of care from May 6, 2015 through July 8, 2015, when he was transferred to an acute inpatient setting. A cell extraction was required in order to complete the transfer to an inpatient setting.

When admitted to the inpatient setting, he presented as "catatonic, naked, paranoid, a danger to others and gravely disabled." He was provided with a diagnosis of Schizoaffective Disorder, bipolar type, most recent episode depressed at admission. He was discharged with diagnoses of Amphetamine Type Substance Use Disorder, severe and Narcissistic Personality Disorder. An alternative diagnosis of Unspecified Schizophrenia and Other Psychotic Disorder was also provided. The discharge summary noted that Malingering was suspected and "admitted" by the inmate in 2011. The inmate was discharged to the EOP level of care after refusing treatment, assaulting staff and reportedly reaching maximum benefit from his inpatient stay.

While in the EOP, his diagnosis was changed to Psychotic Disorder, not otherwise specified. In August 2015, he assaulted staff in ASU during the administration of involuntary medications and was placed in the MHCB. His diagnosis was changed to Schizoaffective Disorder. The goals of placement at the MHCB level of care were to monitor his symptoms and medications. He was referred for inpatient care while in the MHCB. Attempts to engage him in treatment while he awaited transfer were challenged by his assaultive behavior and variable presentation. The healthcare record was difficult to follow, but it appeared that he returned to ASU EOP after a short stay in an acute inpatient setting from September 24 through October 7, 2015.

The inmate was re-admitted to the MHCB on October 21, 2015 due to self-injury. The inmate made, self-inflicted cuts on his arm, and reddening on his hands and face appeared to have resulting from hitting himself in the face. Despite this, the IDTT treatment plan "targeted severe assaultive potential, threatening behavior" and medication management without reference to his self-injury.

He was admitted for inpatient care from the MHCB on November 16, 2015 due to danger to himself, grave disability and psychosis. The admission required a *Vitek* hearing as he refused to voluntarily transfer to the inpatient setting. He was discharged only three days later, despite the MHCB psychiatrist documenting that an extensive stay was warranted. Discharge diagnoses included Methamphetamine Dependence in a controlled environment and Antisocial Personality Disorder. Despite the lack of provision of a major mental illness diagnosis, discharge medications included injectable haloperidol, sertraline and valproic acid.

The inmate was placed in ASU EOP, but he voiced suicidal ideation with a plan to hang himself and was returned to the MHCB two days later. In a progress note during this MHCB placement, a psychiatrist noted, "I have no idea" in the plan section of the note. The psychiatrist noted that neither ASU EOP nor DSH appeared to meet the needs of this inmate. A clinical case conference was requested, but documentation of such meeting was not located in the healthcare record. There was a note indicating that the MHCB treatment team was able to discuss the case with DSH staff prior to his transfer in January 2016.

Case U continued inpatient care for nearly three months and was noted to demonstrate "volitional, calculated assaultiveness." Treatment documentation revealed a consideration of his suicide risk potential and the need for monitoring him for the same. This marked the first occasion where an inpatient team considered the inmate's suicide risk during the final year of his life. Despite this, upon his return to the EOP, he was not monitored for five days as required. An evaluation of his suicide risk completed at the end of the monitoring period included no rating of suicide risk and a comment that he was at higher risk for assaulting others than he was for suicide. On the day following this evaluation, he reported suicidal ideation and was re-admitted to the MCHB.

The inmate was returned to ASU and received an RVR for battery on staff the following day. He was re-admitted for inpatient setting on May 9, 2016, where he remained for two months. While he was admitted for suicidality, he was noted to be assaultive, aggressive

(unprovoked), catatonic, depressed and nonresponsive. He was described as psychotic, and the diagnosis of Schizophrenia was added, which had not previously been the case when admitted to an inpatient setting.

He was discharged on July 8, 2016, but he did not receive five-day follow up contacts until one week later. It was reported that this was due to a failure in communication from the inpatient facility about his discharge, despite evidence of a discharge summary having been received the day before his return and a meeting with a psychologist on July 11, 2016. A suicide risk evaluation was not completed upon his return. Documentation during this time indicated that a clinician confused Case U with another inmate and documented inaccurate information in the healthcare record.

The inmate was placed in ASU while awaiting transfer to EOP ASU housing, and he reportedly stabilized with demonstrated cooperation, pleasantness, maintenance of his hygiene, without suicidal or homicidal ideation. He requested change to the CCCMS level of care during this time. Documentation indicated that the psychiatric technician noted the inmate was participating in groups, but he was not. Additionally, the inmate's August 25, 2016 IDTT noted a mood disorder as his primary diagnosis, while a progress note written by the psychiatrist on the day following the IDTT meeting indicated "schizoaffective disorder versus schizophrenia" as the inmate's primary diagnosis.

The inmate was transferred to the PSU on August 30, 2016, where he denied any mental distress, suicidal ideation, homicidal ideation or having received bad news during his receiving screening. There was no indication that a healthcare record review occurred. He died by suicide two days later.

According to the SCR, Case U was assessed for suicide risk on 11 occasions between September 2014 and April 2016. His chronic risk was elevated from low to moderate in February 2015 following his suicide attempt, where it remained with the exception of a "moderate to high" chronic risk rating in December 2015. His acute suicide risk changed from low to high in February 2015, but it was assessed as moderate from August 2015 through December 2015 when it was again noted to be high. His acute risk was assessed as moderate in March 2016. In April 2016, his suicide risk evaluation was incomplete and omitted a risk assessment of any kind. That evaluation referenced that the inmate feigned distress and noted that he was "far more of an assault risk" than at risk for suicide. No suicide risk evaluation was conducted after April 2016, despite discharge from an inpatient setting and placement in ASU.

Overall, this case was marked by extreme differences of opinion and an overall failure to provide adequate treatment to this inmate. It was clear from a healthcare record review that this inmate exhibited severe character pathology and extreme assaultiveness, but he also evidenced signs of psychosis and disorganization requiring aggressive treatment. The inmate's presentation made engagement in treatment challenging without question; however, frequent transfers, inadequate consideration of alternative medication options, and biased opinions clouded his clinical picture. Documentation indicated that on at least

one occasion, the inmate commented that there was no help for him, likely precipitated from the failures in treatment across multiple levels of care.

II.    Determination of Foreseeability

This suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was a marginally adequate summary of this case. It included a summary of the inmate's social history, criminal history and mental health history along with an analysis of the factors precipitating his death by suicide. While it reviewed his levels of care and his diagnoses, it did not address his provided treatment or treatment planning. Over the course of his incarceration, treatment for this inmate was inadequate. It was marked by ineffective medication trials, housing restrictions, mere monitoring and frequent transfers as the primary forms of treatment. At no time was there evidence of committed attempts to engage the inmate in therapeutic interaction or intentional efforts to address the severity of his symptoms with thoughtful medication trials. The SCR failed to address these issues in any critical way.

In addition, there was a lack of discussion regarding custody checks surrounding the time of the inmate's death. Documentation consistently included the time of discovery of the inmate hanging in his cell, but there was no mention of the time of the previous custody check in any of the available documentation in this case. It is unknown if the inmate was monitored according to policy.

V.    Analysis of Quality Improvement Plan Process

This case resulted in four required Quality Improvement Plans. The first was needed to address failures in five-day follow up monitoring of the inmate upon discharge from an inpatient setting on two occasions (March and July 2016) and failure to complete suicide risk evaluations following discharge from an inpatient setting on two occasions (March and July 2016). One facility noted a "flawed" discharge follow up procedure as the rationale for not completing the five-day follow ups as required in March 2016. They completed an updated operating procedure to improve tracking. They also provided evidence that the suicide risk evaluation had been completed on time.

The second facility noted that the inmate had been placed at the MHCB level of care at the time of discharge in July 2016, thus delaying the required five-day follow-up by one week. There was no evidence of this being the case upon healthcare record review, as an ASU pre-placement evaluation was completed on the day of his return to the facility, and daily rounds were initiated in ASU the following day. This facility made no reference to the lack of a suicide risk evaluation. This QIP was inaccurate and inadequate.

A QIP was required to address the poor quality of a suicide risk evaluation which failed to include an assessment of the inmate's risk for suicide. Training was provided to all staff at the facility and evidence of that training was provided. For the individual clinician who evidenced problems; however, training was not provided as she was noted to be absent from the facility at the time training was provided. The QIP indicated that she should receive training upon her return, but no evidence was provided. This QIP response was inadequate.

Two nursing concerns were identified for follow-up and a required QIP. One was related to a nurse copying vital signs and another addressed inaccurate documentation regarding an inmate's participation in groups by a psychiatric technician. It was noted that training was provided to the identified staff members.

## Case V

I.  Summary of case

Case V was a 25-year-old Caucasian man who died by hanging in his single SHU cell on June 11, 2016. The inmate was included in the MHSDS at the CCCMS level of care. The SCR noted that this inmate was awaiting a Long-Term Restricted Housing (LTRH) transfer at the time of his death.

Case V reported childhood physical and emotional abuse, seizures in childhood and using substances beginning at the age of 11. He reported using injectable methamphetamine and alcohol routinely. There was limited family history documented in the healthcare record, but an indication that he had two sisters and his parents were divorced. He attended high school but did not graduate. He reported a history of suspensions and expulsions in high school due to fighting with other students. He was arrested as a juvenile for battery and fighting in public places. In the months prior to his arrest for his index offense, he was arrested for burglary and battery.

At the time of his death, Case V was serving his first term in CDCR with a sentence of life without the possibility of parole for first degree murder and conspiracy to commit murder with enhancements for aiding and abetting kidnapping and murder. He was severely beaten by his co-defendants after the commission of the crime. He was a gang dropout, and during his trial he had initially agreed to testify against his co-defendants, but then decided against testifying. He was incarcerated in April 2013. He was noted to have enemies, including his co-defendants at the time of his arrival in CDCR. During his first month of incarceration, he fought with two other inmates and was found in possession of a six-inch weapon which he reported that he needed for protection. In 2014, Case V engaged in a

72

fight with his cellmate where he inflicted serious injuries with a weapon made from altered razor blades. He also received RVRs for battery on a peace officer, attempting to acquire a weapon and possession of a weapon. Secondary to this assault, he received additional sentences of nine years and 25 years to life to be served consecutively. He reportedly received visits from family and friends during the first two years of his incarceration, but none since 2014. There was no documentation of phone contacts prior to his death, as he was housed in the SHU.

There is no evidence that Case V received mental health services prior to incarceration, but he did receive mental health services in county jail, prior to his transfer to CDCR. Upon transfer to CDCR in April 2013, he was referred to mental health following his initial health screening as he received psychotropic medication in jail. He was not evaluated until 18 days after his arrival, when a determination was made that he did not require mental health services. He failed to receive a pre-placement mental health screening upon ASU placement in May 2013 for a fight and weapons charges. He was referred for evaluation a week following his ASU placement; however, and he was seen by both a primary clinical and a psychiatrist. During those evaluations he reported a family history of mental illness and suicide, along with a history treatment for depression. He reported symptoms of depression, irritability and panic. He was included in the MHSDS at the CCCMS level of care and prescribed psychotropic medication. His diagnosis was documented as Adjustment Disorder. He reportedly actively participated in treatment targeting anxiety and hypersomnia through August 2013, when his primary clinician changed. After that time, he refused out of cell mental health services. His refusals continued following an interfacility transfer, except for a single IDTT meeting in September 2013. He requested to be removed from the CCCMS caseload in December 2013, and he was removed from the MHSDS in February 2014 following an IDTT meeting. He did not request or receive services for the following two years.

Case V requested to see a mental health clinician in January 2016 and reported sleeping 16 hours a day and "having serious problems." He reported the onset of symptoms coinciding with learning of his mother's death; he was provided with a diagnosis of Major Depressive Disorder. Of note, the SCR indicated that letters from his mother were found in his property dated after her reported death. He was placed at the CCCMS level of care in February 2016 with a treatment plan targeting depressed mood. There was no mention of treatment for grief or hypersomnia. A psychiatrist assessed the inmate one week later and noted that the inmate reported auditory hallucinations and stated that he had been experiencing them for three years. The inmate was prescribed antidepressant and antipsychotic medications. The psychiatrist provided a diagnosis of Major Depressive Disorder, severe with psychotic features. Case V intermittently refused his medications and refused medical testing ordered to monitor medication side effects. He was seen by the psychiatrist to address the refusals when he reported feeling "weak" for needing medications. He described intrusive symptoms related to previous trauma, and he was prescribed propranolol; additionally, a diagnosis of PTSD was added in March 2016.

Despite additional symptoms, diagnoses and medications, his treatment plan remained unchanged in April 2016; and the single problem identified was depressed mood. The

inmate refused to attend the IDTT meeting.  The inmate continued to refuse medications intermittently, had adjustments made to his medications and continued to complain of symptoms to his psychiatrist.  Psychiatric technician rounds documented no abnormalities, and they did not accurately document his medication refusals.

Case V was evaluated for suicide risk on six occasions during his incarceration, three times in 2013 and in January and February 2016.  All but one evaluation noted moderate chronic risk, and all evaluations rated the inmate with low acute risk for suicide.

The SCR did not discuss documentation generated by the primary clinician.  The Special Master's expert noted that in January and February 2016, the content of initial assessments, suicide risk evaluations and clinical contact documentation all included similar information that appeared to be copied from note to note with minor adjustments.  This also appeared true with regard to the treatment plan documented in April 2016.  Monthly primary clinician progress notes described the inmate's current status with minimal changes in the plan and education sections from note to note through May 2016 when the primary clinician appeared to have changed.  None of the primary clinician documentation included documentation that treatment interventions were provided to the inmate.

II.   Determination of Foreseeability

This suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.   Determination of Preventability

This suicide was determined not to be preventable by the SCRC.

The Special Master's expert does not agree with this determination.  The inmate requested to receive mental health services in January 2016 after two years without services, despite being housed in SHU or ASU throughout this period.  The request for services was made due to reported symptoms of grief, depressed mood, auditory hallucination, trauma symptoms, poor appetite and hypersomnia.  Despite these signs and symptoms, treatment plans over this time period were drafted to target the inmate's "depressed mood" with a single intervention of "learn and appropriately implement 2-3 coping skills to re-direct depressed mood."  The responsible discipline on these treatment plans was noted to be the inmate.   There was not a single intervention planned to be provided by a mental health professional, and none of the progress notes produced by primary clinicians over this six-month period documented any treatment or clinical intervention.  It is reasonable to deduce that had a clinician engaged the inmate in treatment designed to address any of his reported symptoms, the inmate's likelihood for suicide would have been reduced.

Additionally, it was noted that ICC reviews were not held for this inmate in over a year prior to his death.  At least two reviews should have been conducted, the last of which would have occurred in April 2016 and would have included a mental health clinician due

74

to the inmate placement at the CCCMS level of care. Additionally, the inmate's CCCMS level of care warranted a transfer to a LTRH, yet this was not reviewed at an ICC meeting, nor discussed in relation to the services required for such inmates housed in a SHU setting. It is reasonable to expect that had a multidisciplinary group convened to discuss this inmate's functioning and appropriate housing needs, concerns may have been revealed which may have led to attention and an appropriate intervention. For these reasons, this case was determined to be preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an inadequate summary of this case. What was missing was a critical evaluation of the services provided by primary clinicians in the final six months of this inmate's life. Lack of treatment interventions were not thoroughly described nor addressed as needing remedy. The SCR did note the substandard treatment planning with regard to goal development and a lack of specified interventions, as well as the omission of updated goals with the addition of a PTSD diagnosis but did not address how the poorly developed treatment plan translated into the absence of treatment.

V.    Analysis of Quality Improvement Plan Process

This case resulted in five required Quality Improvement Plans. The first recommendation that followed from this review noted three concerns related to nursing services and included inaccurate documentation by the psychiatric technician and a failure to refer the inmate to a psychiatrist despite medication nonadherence. These issues were noted to have been referred to the NPPC. The outcome is unknown.

A QIP was developed to address initial evaluations that were not completed timely in accordance with the Program Guide at the time of Case V's reception. The response included measures to improve tracking, referral and timeliness of response. Corrective efforts were enacted but ongoing at the time of the QIP report. This response was incomplete.

With regard to a QIP created to address the fact that a clinician listed the inmate as the responsible discipline on a treatment plan, a review of treatment plans was conducted. It was noted that "no significant issues" were found related to the quality of treatment plans, but a single clinician was noted to "consistently" document the inmate as the responsible discipline for interventions. The Special Master's expert believed that a clinician who consistently documented an inmate as a discipline was a significant issue and should have been noted as such. Training was documented to address this issue with the individual clinician.

A QIP was developed to address the fact that despite the psychiatrist adding PTSD to the inmate's diagnostic profile and documenting on the IDTT treatment review that medications were prescribed to address symptoms of PTSD, there were no changes to the inmate's problem list, goals or interventions. The facility's analysis of the omission indicated that it resulted from the fact that the inmate refused to attend the IDTT. This was

an inadequate response, and both the primary clinician and psychiatrist were trained on communication.

Finally, a QIP was developed to address the finding that ICC reviews were not held for this inmate in accordance with policy. His last ICC action occurred in April 2015, and there should have been two more reviews prior to his death. Training was provided to the correctional staff, and evidence was included with the QIP response.

**Case W**

I.  <u>Summary of case</u>

Case W was a 55-year-old Indigenous American man who was found hanging in his single cell in general population on July 25, 2016. He was receiving mental health treatment at the CCCMS level of care at the time of his death.

Case W was serving his second term in CDCR with a sentence of life without the possibility of parole for first degree murder, burglary and robbery. He had a history of significant substance use beginning at age 12, which included alcohol and marijuana as well as experimentation with other substances. His arrest history began in adolescence. He was arrested for drug possession, grand theft auto, shop lifting, burglary and robbery. He reported engaging in fighting as a child, often secondary to being harassed because of his indigenous heritage. There are reports that his father was shot and killed when he was a child and that two of his siblings committed suicide. He was divorced and fathered either one or two children. He had routine contact with his mother until her death, as well as contact with two of his sisters, other family members and his ex-wife.

He was confined to a California Youth Authority (CYA) facility during adolescence and then incarcerated in CDCR for two years as a young adult. He was arrested for his index crime while on parole in 1985 at age 24. He was found guilty of killing a man during a motel robbery and a number of similar burglaries that he committed with other individuals over a period of time. The inmate earned his GED while housed at the CYA facility. He was affiliated with a gang. He was incarcerated in CDCR beginning in 1988 for his second term, and he appeared to keep to himself throughout his incarceration. Over the course of his 28-year incarceration, he received seven RVRs. Three were for minor violations. In 2010 he received an RVR for fighting, and in 2012 he received an RVR for battery on an inmate with a weapon. In 2014 he was found guilty of possession of a weapon, and in 2016 he was found to be under the influence of morphine.

The inmate received psychiatric care at age 12, and then later at age 17 after a suicide attempt following an arrest. At that time, he was found incompetent to stand trial and was admitted to a DSH facility. He received mental health services in CDCR for the first time in September 2010 at the age of 49 for symptoms of stress, depressed mood and insomnia. He had difficulty coping with the death of his mother and brother who both died in late 2009. He reported mood swings, auditory hallucinations and insomnia for three to four days. Documentation indicated that the inmate was inconsistent in his engagement in therapy, refusing recreational therapy; however, he was generally adherent with his

psychotropic medications until June 2015 when he became variably medication adherent. He requested to have his medications discontinued in September 2015, and he refused all medications after that encounter.

While he remained enrolled at the CCCMS level of care, he often missed appointments and reported being asymptomatic in the months preceding his death. A review of the healthcare record revealed inadequate treatment planning and inaccurate suicide risk evaluations during the last two years of his life. In April 2015, a suicide risk evaluation failed to note his prior suicide attempt, family history of suicide and his chronic back pain, likely resulting in an underestimation of his risk for suicide. One additional concern was that the clinical summary included the name of another inmate, indicating that the clinician may have copied and pasted a formulation from another case into Case W's risk evaluation.

In April 2016, Case W's treatment plan did not include documentation of his previous suicide attempt and indicated that one of the inmate's needs was to remain medication adherent. The inmate was not prescribed medication at that time, and this fact was noted elsewhere in the treatment plan. The plan did not include a description of the inmate's progress toward his previous treatment targets of mood disturbance and ineffective coping. A new problem of modulating mood was created at the time of the treatment plan, but there were no interventions listed to address that problem. Treatment documentation following development of the treatment plan included status notes and no evidence of interventions being provided.

Case W was noted to have chronic back pain, and he received an RVR in March 2016 for being under the influence of morphine. He found blood in his stool in early July 2016 and was scheduled for diagnostic tests related to this. He also had recently lost his prison job due to a number of housing moves. He had recently shared with his primary clinician that he was working with a tribal attorney to move to Kansas and had hopes of being released to Kansas so he could live with his tribe there. He said that he hoped to get clemency, yet there was no formal record of an application for early release. In the final session with his primary clinician before his death, he mentioned stress secondary to not hearing from his tribal attorney.

Finally, the SCR noted that the inmate appeared to have attempted to cut his wrists prior to hanging himself on the day of his death. Lacerations and a blood-soaked towel were found in his cell.

II. Determination of Foreseeability

This suicide was determined not to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III. Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of the case.  It included a mental health history, criminal history, a discussion of precipitating and causative factors leading to the inmate's death and a critical analysis of the mental health care provided to the inmate. Recommendations presented followed from the content of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in four required Quality Improvement Plans.  The first was related to the emergency response by correctional officers who arrived at the inmate's cell with only a cut down tool and not the entire cut down kit as required by policy.  The second noted that there was a delay in activating 9-1-1, which resulted in a delay in the arrival of emergency medical services. Evidence of training was provided to address these issues.

The third and fourth QIPs were designed to address the mental health concerns noted above, including inadequate completion and incorrect information entered in the suicide risk evaluation, resulting in an underestimation of risk and poor concordance between the inmate's treatment plan and subsequent treatment documentation.  The plan included seven sessions of mentoring for the clinician as well as documentation audits.  Evidence of completion for both were presented.


**Case X**

I.    Summary of case

Case X was a 31-year-old Latino man who was found by correctional officers hanging in his single PSU cell on an SNY on January 14, 2016.  He was serving a sentence of 25 years to life for three counts of rape and felony robbery.  At the time of his death, he had been charged with an additional crime stemming from battery on another inmate in 2013.  He was receiving services at the EOP level of care at the time of his death.  Documentation indicated that the inmate was primarily Spanish-speaking with limited proficiency in English.

The SCR noted that the majority of this inmate's history was obtained from DSH records and appeared to rely primarily on the inmate's self-report.  He reported that he was born in Mexico, and his mother had a psychotic episode secondary to Schizophrenia and was hospitalized during his childhood.  She reportedly died at age 32.  He reported that he came to the United States illegally during his adolescence with friends.  He denied childhood trauma and attended some high school but dropped out prior to receiving his diploma.  He had no contact with his family and was homeless prior to his incarceration.  Case X reported using alcohol and marijuana at age 20, later progressing to cocaine and methamphetamine use.

78

He was arrested four times prior to his CDCR incarceration in July 2008 for crimes of theft and public fighting.  He was jailed briefly for each of these crimes and was on probation at the time of his index offense.  While in county jail prior to transfer to CDCR, he was charged with weapons possession, weapons creation and vandalism after being found with a shank created from destroying objects in his cell.

Case X was placed in an SNY within four months of his incarceration in CDCR due to the nature of his crime.  Despite this, he engaged in fights with his cellmates and was determined to be ineligible for a cellmate in 2011.  He received two RVRs for battery on other inmates, three for indecent exposure, one for dangerous contraband and a fourth RVR for minor infractions.  His most serious infraction included assaulting another inmate with a razor blade in 2011.  This assault resulted in criminal charges.  Case X pled not guilty by reason of insanity and attended a court hearing related to these charges three days prior to his suicide.  It was reported that the court determined that he was "sane," and he pled guilty to the crime.  The SCR noted that the inmate was assigned SHU terms on multiple occasions during his incarceration, but that each SHU term expired while he was in an inpatient setting. The SCR noted that the inmate received an "indeterminate" SHU term for the assault in 2011.

Case X's mental health needs were identified during the reception process.  He had not received mental health services in the community prior to his incarceration.  He was initially placed at the CCCMS level of care, and he reported depressive symptoms and auditory hallucinations.  He remained at the CCCMS level of care through February 2010.  He also met criteria for a diagnosis of Exhibitionism related to his acts of indecent exposure.  Other than a two-week period in July 2015 when Case X was returned to CCCMS level of care, he was treated at the EOP level of care or in an inpatient setting from February 2010 until his death.  He had over a dozen psychiatric inpatient placements over the course of his incarceration.  At least two of these placements exceeded 10 months in length.

While an inpatient care, the inmate was treated for self-harm, depression, psychosis and sleep disturbance.  In 2010, he was referred to the Positive Behavioral Support Team (PBST) for treatment planning to address his self-injurious and destructive behaviors along with medication refusal. He was noted to be disengaged from treatment and lacked insight into his mental health needs. In September 2010, Case X was placed on involuntary medications under a court order and remained under this order throughout his incarceration. In 2013, the inmate was successfully treated with clozapine, which was discontinued in 2015 due to the development of dangerous medication side effects.  Despite the use of involuntary medications and inpatient hospitalizations, the inmate continued to engage in self-injury, exhibited delusional thinking and reported auditory hallucinations.  He often engaged in dangerous behavior such as self-injury and refusal to eat, due to his delusions and command auditory hallucinations. Diagnoses throughout his incarceration noted depressive and psychotic symptoms, along with substance use disorders and Antisocial Personality Disorder. His psychotropic medication regimen consistently included medications to target psychotic and mood symptoms.  At the time of his death, he was

prescribed two antipsychotic medications (one by injection), an antidepressant medication and an antihistamine medication.

Case X engaged in frequent self-injurious behavior, including cutting, opening old wounds, starvation and hanging beginning in March 2010.  His last known episode of self-injury prior to the behavior that led to his death by hanging, was a self-reported attempted hanging in August 2015.  Of note, this appears to be the only attempted hanging in his history.  A review of the risk assessments produced from 18 suicide risk evaluations completed during his incarceration, revealed that he was assessed with moderate chronic risk for suicide overall, except for one low chronic risk assessment in January 2012 and three evaluations completed between September 2015 through November 2015 when his chronic risk for suicide was assessed as high.  He was assessed with low acute risk 13 times, including the final three evaluations completed in November and December 2015. He was only assessed to be at high acute risk for suicide on three occasions – September and December 2014 and August 2015.

On July 16, 2015, the IDTT removed Case X from the EOP level of care and placed him at the CCCMS level of care due to lack of participation in programming and "not getting any benefit" from the EOP.  IDTT documentation completed on the day of this decision noted that the inmate had engaged in serious suicide attempts previously and that he reported to his primary clinician that he did not like to attend groups because he could not understand what others were saying.  The primary clinician documented that the meeting with the inmate was conducted in Spanish, and he was noted to have "limited skills in English."  The IDTT meeting documentation did not include participation by a psychiatrist; despite the fact that the inmate was receiving involuntary medications.  It appeared from the content of the treatment plan that the inmate was also not present; and the checkbox to indicate inmate participation was blank.  His previous treatment plan listed his history of suicide attempts as a problem and indicated the inmate had made no progress in addressing that problem.   Suicide attempts were removed from the problem list on the July 2015 treatment plan without rationale.  Case X was placed at the CCCMS level of care for two weeks. During his initial contact at the CCCMS level of care, the inmate was transferred back to EOP; and the primary clinician noted that a mental health evaluation completed at the time he was transferred to CCCMS by the EOP clinician noted preoccupation with internal stimuli despite treatment with involuntary medication.

He returned to the EOP level of care on July 30, 2015, and clozapine was discontinued within a few days due to medication side effects.  He reportedly attempted suicide by hanging and was described as hopeless and significantly decompensated on August 5, 2015. He returned to DSH, and he was discharged on November 9, 2015.  He appeared in court on January 11, 2016, when he plead guilty to charges stemming from his assault on another inmate with a razor blade in 2011.  He had pled not guilty by reason of insanity; however, this plea was denied, and he pled guilty to the crime.  Despite this, the inmate reported to the nurse that he had not received any bad news upon his return to CDCR and told the same to his primary clinician the following day.  No information about the outcome of the court hearing was communicated to healthcare staff by custody staff who were present at the hearing.  The inmate died by suicide two days later.

II.    <u>Determination of Foreseeability</u>

This suicide was determined to be foreseeable by the SCRC.

The Special Master's expert agrees with this determination.

III.    <u>Determination of Preventability</u>

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    <u>Critique of Suicide Case Review Report</u>

The SCR was not an adequate summary of this case. While it included an overall outline of the case and a description of the inmate's treatment while incarcerated, it did not include essential factors and did not appear to critically evaluate this inmate's care over time. Other than a single reference to an officer commenting that the inmate enjoyed speaking to officers in Spanish, the SCR made no mention of the inmate's primary language being Spanish nor his limited proficiency in English. This is significant as the inmate was refusing to attend groups and programming, stating that he could not understand what was being said in groups so did not wish to attend. This comment was made prior to the IDTT's decision to abruptly remove the inmate from the EOP and to place him at the CCCMS level of care due to his lack of program participation. This is a significant factor in this case, as it likely contributed to the inmate's hopelessness and possible lack of willingness to engage with a treatment team that discharged him from care a few months prior to his death.

There were also significant omissions regarding the inmate's history of self-injury and previous suicide attempts in a number of suicide risk evaluations during the final months of his life. These omissions likely contributed to an underestimation of the inmate's risk level prior to his death. These concerns were not raised in the SCR.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in two required Quality Improvement Plans. The first was related to the lack of communication between custody staff and nursing following the inmate's return from court where he pled guilty and learned that he would be sentenced for an additional crime. This resulted in a statewide initiative. The second was related to the inappropriate transfer of the inmate from the EOP to the CCCMS level of care. Evidence of consideration for policy changes was documented, with changes in procedures enacted at the statewide and local level. Training on appropriate transfers was included.

**Case Y**

I.    <u>Summary of case</u>

Case Y was a 29-year-old African American man who was discovered hanging in his cell by other inmates on November 24, 2016. A suicide note was found following his death. He had been incarcerated for just over seven months prior to his death, serving a sentence of 75 years to life for a gang-related shooting. This was his fourth CDCR prison term. Case Y was receiving mental health services at the EOP level of care at the time of his death.

Case Y reportedly experienced physical, emotional and sexual abuse during his childhood. He was an active gang member, and a number of his family members were active in gangs as well. He reported completion of school through the eleventh grade, and he later obtained his GED. He was married with two children. While he reported no formal mental health treatment prior to incarceration, documentation indicated he may have been prescribed methylphenidate (i.e., Ritalin) during adolescence. He had an extensive substance use history beginning in childhood. He reported using marijuana at age seven and then alcohol, methamphetamine, hallucinogens, "pills" and ecstasy; the latter was his drug of choice. It was reported that Case Y had a visit with his mother and his sister in August 2016.

During his incarceration, he received one RVR for assaulting a female correctional officer, for which he received a SHU term of nearly four months from May to September 2016. Following the assault, Case Y disclosed paranoid ideation and he refused to eat due to concerns about plots by the officers to poison him. The SCR referenced an assessment completed following the RVR which determined that his mental illness did not play a role in his assault on the officer, but this document was not located in the inmate's healthcare record. After his release from ASU, the inmate was placed in an EOP in general population where he remained until his death.

Case Y attempted suicide by overdose in 2006 and by hanging while in county jail in December 2015. Records related to the serious suicide attempt at the jail were provided to CDCR upon his transfer. After his arrival to CDCR in April 2016, he exhibited signs of depression and psychosis; subsequently, he was admitted to the MHCB for suicidal ideation. He remained in the MHCB for 10 days and was discharged to the EOP level of care on April 19, 2016.

Clinical documentation included varied assessments of Case Y's mental health needs. His initial treatment plans were developed to target depression, but over the course of treatment, moved to targeting psychotic symptoms and poor coping skills. There was no mention of mood symptoms in his treatment plan dated September 20, 2016, and yet the suicide risk evaluation completed on the same date noted "recent depressive episode" and "disturbance of mood/lability" as acute risk factors. He was prescribed antidepressant, mood stabilizing and antipsychotic medications at that time. Additionally, his September 20, 2016 treatment plan noted that his previous suicide attempts could not be verified, despite documentation in the healthcare record from the county jail clearly describing his serious suicide attempt and the need for close monitoring given his high risk for suicide. His previous treatment plan, dated September 7, 2016, referenced depressed mood and the inmate's desire to address his "extreme childhood trauma"; yet these were never formally added to the inmate's treatment goals.

Case Y presented differently over time and across providers. Some clinicians documented ongoing stability and an absence of symptoms, while others documented paranoia, auditory hallucinations and depressed mood often within the same time period. A few clinicians asserted beliefs that Case Y may have been exaggerating his level of symptoms for secondary gain. There was consistent documentation, however, that Case Y reported issues with trust and was often guarded when meeting with clinicians. Despite these differing views, the inmate was consistently prescribed medications to address psychosis and mood symptoms. Five suicide risk evaluations were completed during his seven-month period of incarceration. His chronic suicide risk ranged from moderate to high, and he was primarily assessed with moderate acute risk for suicide.

Following his death, a recorded phone call revealed that Case Y's wife was planning to end their marriage. This was reportedly not disclosed to his clinicians or to other inmates prior to his death.

II.   Determination of Foreseeability

This suicide was determined to be not foreseeable by the SCRC.

The Special Master's expert does not agree with this determination. The inmate appeared to be guarded with his primary clinicians, but open with his psychiatrist about his level of distress and problems with coping associated with his sentence length and his separation from family. Documentation indicated that the inmate had stopped taking his medications and was described as withdrawn and sad during the final month of his life. His acute suicide risk was assessed as moderate consistently throughout his incarceration, with protective factors related to family contact, which he was lacking in recent months. Conflicting presentations by the inmate, as well as the inmate's admission that he was guarded and lacked trust in clinicians, warranted the need for closer monitoring of the inmate's risk and more comprehensive interdisciplinary communication. The psychiatrist had a responsibility to communicate the inmate's increased risk factors to the primary clinician. Information about this inmate's risk for suicide was available to clinicians; and therefore, this suicide was deemed to be foreseeable.

III.   Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.   Critique of Suicide Case Review Report

Overall, the SCR was a marginally adequate summary of this case. The report described the care of this inmate over time but was not sufficiently critical of the lack of continuity in services. There were examples across time where mental health clinicians failed to document an adequate review of healthcare records and the inmate's history, resulting in

an over-reliance on his self-report. His paranoia, depression and trauma history appeared to result in a guarded presentation and lack of trust with providers. Clinicians' over-reliance on the inmate's current presentation and self-report missed significant distress and risk factors. These issues were not adequately discussed in the SCR. As a result, recommendations regarding mental health care were not generated; however, the recommendations that were generated followed from the conclusions drawn in the report. There was an adequate description of the inmate's mental health history, criminal history, and factors precipitating the suicide in the SCR.

V.    Analysis of Quality Improvement Plan Process

This case resulted in two required Quality Improvement Plans, one related to the provision of life-saving measures and one related to documentation of nursing care. No recommendations were provided regarding mental health services. The QIPs evidenced that training was provided to staff regarding the provision of life-saving interventions and noted that the nursing concerns were addressed by CCHCS and included referral of nurses to the NPPC for lapses in documentation noted in this case. These lapses were not assessed to have directly impacted the suicide.

## Case Z

I.    Summary of case

Case Z was a 60-year-old Asian male who died by suicide secondary to overdose. He was discovered with an altered level of consciousness on the floor of his cell on December 18, 2016, and he died 12 days later at a community hospital. He was housed in a single cell while receiving treatment at the EOP level of care prior to his death. This inmate was serving a sentence of 15 years to life for second degree murder.

Case Z reportedly immigrated to the United States from Japan with his family at age four. His parents divorced when Case Z was a child, and he lived with his father in California after the divorce. He graduated from high school and reportedly attended four years of college with a major in business administration, but he did not complete his degree. He did not have an extensive work history. He had two brief marriages, both ended before the inmate was 28 years old, and he fathered one child with whom he had no contact and did not provide support. The inmate reported a history of "emotional difficulties" throughout his life and reported minimal use of substances beyond experimentation during adolescence. The inmate had no known gang affiliations.

Case Z's crime involved the murder of his sister's husband in 1988. The inmate was 32 years old at the time. Following the crime, Case Z was sent to Atascadero State Hospital (ASH) for a competency evaluation in 1989 and then to Patton State Hospital (PSH) for seven months in 1990 for diagnostic assessment and treatment after he was noted to be decompensating prior to trial. He was provided with a diagnosis of Schizophreniform Disorder. He returned to PSH in 1991 for a competency evaluation, and he was discharged with a diagnosis of Atypical Psychosis in February of that year.

84

Case Z entered CDCR in early 1992. During his incarceration, he received 24 RVRs, 14 of which involved violence or possession of a weapon. His first violent incident while incarcerated occurred in January 1997 and involved causing serious bodily injury to his cellmate. Case Z was placed on single-cell status which continued until his death. The most recent RVR prior to his death was for fighting in May 2015.

Early in his incarceration, the inmate received visits from his parents routinely. His father died in 1993, and his mother died in 1996. After that, he had one personal visit in 2009 and three legal visits, one each year in 2012, 2013 and 2014.

Over the course of his incarceration, this inmate had extensive mental health treatment. He received his psychotropic medications by an involuntary medication order. There was documentation of two previous suicide attempts, one by hanging in 2005 and one by overdose in 2015.

Case Z's mental health needs were recognized during his reception intake, and he was prescribed antipsychotic medication and soon placed in a partial mental health program that was operating in CDCR at that time. He was first placed in the MHCB in March 1995 for passive suicidal ideation. Over the course of the following 21 years, the SCR noted that he was admitted to an inpatient setting on 18 occasions, 12 admissions to a DSH facility and six admissions to the MHCB. Alternatively, the Inmate Suicide report (CDCR MH-7229-B dated January 3, 2017) noted the inmate had six MHCB and four DSH admissions. Review of the table listing institutional transfers in the SCR and the inmate's movement history noted what appeared to be four admissions to an inpatient setting, not 12. Additionally, discharge documentation from DSH in June 2016 noted previous inpatient stays in 2000, 2003 and 2012 with the most recent admission being the fourth. The SCR appeared to be inaccurate.

In 2005, the inmate was sent to a community hospital following a suicide attempt by hanging. This attempt did not prompt a referral for inpatient treatment. In December 2015, Case Z attempted suicide by overdose of an unknown substance. The overdose was serious and required admission to a community hospital. The SCR reported that this incident was never recorded on the self-harm tracking log nor discussed in the Suicide Prevention and Response Focused Improved Team (SPRFIT), despite both procedures being required by local policy. In response to the SCR, however, the facility was able to produce evidence that both procedures were completed. The SCR appeared to be inaccurate.

Upon his return to CDCR, the inmate was admitted to DSH acute care after efforts to stabilize him in an MHCB over 49 days were unsuccessful. He was described as delusional at the time, stating that he was a federal agent. He was prescribed additional antipsychotic medications which appeared to provide some stability; although, he remained preoccupied with religious themes throughout his stay. While at DSH, he was assaulted by another inmate, unprovoked, and suffered injuries to his face resulting in a broken nose. He was discharged with a diagnosis of Schizophrenia Spectrum Disorder on June 13, 2016, after nearly six months in the inpatient setting. The discharge summary noted that the inmate was under an involuntary medication order that was due to expire in September 2016. The

discharge summary noted that the inmate reported taking medications only because he was required under the court order.  The involuntary medication court order was renewed on September 14, 2016, due to the inmate's danger to others.  Danger to self was not part of the rationale for the order.

Upon return to CDCR, the SCR noted that inmate was only seen for day one and day five of his required five-day follow-up contacts after his return from DSH.  The Special Master's expert found six daily follow up contacts documented in the inmate's healthcare record, dating June 14 to June 19, 2016.  Additionally, the facility's response to the SCR included documentation of daily contacts.  The SCR appeared to be inaccurate.  No suicide risk evaluation was completed upon the inmate's return from DSH, despite being required by policy.  Over the next five months (July to December 2016), the majority of clinical contacts were conducted at cell front.  The inmate participated in six total out of cell contacts during this time, two in July, one in September and three in November 2016.  All contacts were with a primary clinician, except one telepsychiatry contact in July 2016.  Cell-front contacts documented that the inmate kept his cell clean and noted that the inmate was attending programming despite reports to the contrary.  Documentation from mental health contacts during this period indicated that the inmate was expressing feelings of loneliness, fear, hopeless and vague suicidal ideation.

The inmate was seen at an offsite medical clinic on July 13, 2016 for follow up related to his nasal fracture. He also attended clinic appointments with medical staff in September, October, and November 2016. This is notable, as the inmate was willing to be seen for medical treatment out of his cell during this time, despite documentation indicating that he refused to be seen for confidential mental health contacts.

Two IDTT meetings occurred over this period. The first occurred in July 2016, and the inmate reportedly participated.  The treatment plan indicated that the inmate had refused 100% of his programming.  The team considered inpatient referral, but no referral was initiated as the clinician indicated that the inmate was stable and medication adherent with no indication of decompensation.  The goal was to increase the inmate's participation to 25% over the next 90 days.  Of note, the narrative within the treatment plan stated that the inmate's involuntary medication order had been extended through September 23, 2017, yet a psychiatric progress note dated after the IDTT meeting noted the need to continue the order, and an assessment for such was completed.

The September IDTT meeting documented that Case Z participated in at least five hours or 50% of scheduled hours, but this was not the case.  He had only three confidential sessions since the previous IDTT and refused all groups.  His treatment goal remained unchanged with no consideration for transfer to a higher level of care or a change in interventions or treatment approaches.  There was no documentation that a psychiatrist participated in either IDTT.

A suicide risk evaluation was completed on September 7, 2016.  The two sections of the evaluation which are used to determine the inmate's level of risk did not include the inmate's attempted suicide in 2015 or his recent isolation and refusal of out-of-cell

treatment. However, a clinical summary included information copied from his treatment plan, describing his history accurately. His risk formulation did not include a review of his recent suicide attempt and poor functioning, resulting in an underestimation of the inmate's risk for suicide. His chronic risk was assessed as moderate, and his acute risk was assessed as low. Of note, the suicide risk evaluation appeared to have been reviewed and approved by a second psychologist, who did not recognize the discrepancies in the document.

In summary, Case Z experienced psychotic and delusional symptoms throughout his incarceration. The focus of his delusions was primarily that he was on a special mission and included religious themes. During the final months of his life, he refused programming, was described as depressed, lonely, anxious and hopeless. He saved and hoarded items in his cell, resulting in unsanitary conditions including moldy food, bugs, trash and papers in disarray in his cell which went undocumented and unnoticed by mental health staff despite cell front contacts.

The autopsy report indicated the cause of death to be "complications of cardiopulmonary arrest of undetermined etiology." The autopsy report noted that the inmate "had a history of drug overdoses and shared prescription medications with other prison inmates. Prison staff presumed he overdosed on something, but the allegation could not be verified. An investigation was completed by this office and the cause of death could not be determined." A comprehensive review of the autopsy report revealed that while coroner's office completed toxicology testing on the inmate, the panel did not include testing for the presence of tricyclic antidepressants. This was relevant as the initial urine toxicology screen completed at the community hospital on the date of discovery revealed the presence of tricyclic antidepressants. While prison staff communicated information about the inmate to the coroner's office, it is unclear why the suspected drug used to overdose was not provided to that office for verification of the cause of death.

One further note is that the autopsy report described the inmate as "Hispanic" while he was noted to be of Japanese-Filipino decent in CDCR reports.

II.   Determination of Foreseeability

This suicide was determined to be foreseeable by the SCRC. The committee noted that the inmate had two previous suicide attempts, including a near fatal attempt by overdose in 2015. He was not placed on a HRL and the committee believed that he should have been monitored more closely. Additionally, there were several risk factors not accurately identified during his treatment and clinical assessments; consequently, his suicide risk was underestimated.

The Special Master's expert agrees with this determination and adds that little to no efforts were made by mental health clinicians to engage the inmate in treatment following his discharge from an inpatient setting following a serious suicide attempt. Documentation was inaccurate and appeared to be an exercise in paperwork production rather than an accounting of thoughtful assessment and clinical interventions.

III.    Determination of Preventability

This suicide was determined to be preventable by the SCRC.

The Special Master's expert agrees with this determination.

IV.    Critique of Suicide Case Review Report

The SCR was a marginally adequate summary of this case. The report included the inmate's mental health history, criminal history, factors precipitating the suicide and a critical analysis of causative factors. The recommendations provided followed logically from the findings in the report. However, there were noted to be a few inaccuracies in the SCR report, as noted above and summarized as follows.

The report indicated that five-day follow-ups were not completed per policy, when they were found in the healthcare record during the current expert review. The facility's response to recommendations noted the same and provided copies of the documentation as evidence.

The report referenced a policy violation that the inmate was not placed on the HRL. In the response from the facility, it was noted that the local operating procedure (LOP) did not include reference to an HRL, but instead outlines a process for inmates to be referred to the PBSTs.

The SCR inaccurately noted that the inmate's previous suicide attempt was not placed on the self-harm tracking log nor was it discussed by the SPRFIT, yet both occurred according to policy.

V.    Analysis of Quality Improvement Plan Process

This case resulted in eight required Quality Improvement Plans. Overall, QIP reports for this case included appropriate responses to the recommendations including evidence of training, remedies and corrections. In the three instances discussed above where the recommendations were produced in error, the facility provided evidence of follow-up and training of staff regarding the identified concerns, despite the recommendations having been made in error.

A few concerns were noted regarding the QIP response to the recommendation regarding treatment planning. The facility's response noted that they failed to "find" the reference to inmate's program attendance in the September 2016 treatment plan and thus did not address the issue appropriately. More specifically, the inmate's treatment plan indicated that the inmate was participating in the minimum amount of programming, which he was not. The Special Master's expert easily found documentation within the treatment plan indicating that the inmate was attending minimum programming. Additionally, the SCR indicated that the IDTT failed to note the development of a modified treatment plan given the inmate's level of participation and did not evidence participation by a psychiatrist. The

facility's response included that the September 2016 treatment plan was completed by a clinician other than the inmate's primary clinician and resulted in the July 2016 treatment plan being copied without changes. This response does not appear adequate given that the treatment plan is the responsibility of the entire IDTT and not a single clinician. It was reported that a random review of treatment plans revealed deficits primarily that clinicians were using abbreviated plans which did not allow room for thorough documentation of treatment progress. The QIP response never addressed the lack of participation on the part of a psychiatrist in this case.

**Case AA**

I.    Summary of case

Case AA was a 56-year-old Caucasian man who was discovered unresponsive and surrounded by a pool of blood in his single cell on September 12, 2016. While life saving measures were attempted initially; the body evidenced rigor mortis, and these interventions ceased as the inmate was pronounced dead.

Case AA had a difficult childhood which included being raised by a mother diagnosed with Schizophrenia who was often hospitalized, being hit by a car resulting in a head injury and coma at age 5 or 6 and reports of childhood physical and sexual abuse. Case AA reportedly completed school through the eighth grade and had an extensive criminal record as a juvenile, resulting in placement with the CYA at age 16. He also had an extensive adult criminal history, mostly involving residential burglary, resulting in four CDCR incarcerations. There was evidence of substance use history, including methamphetamine, cannabis dependence, heroin and cocaine use.

Case AA was incarcerated for the fourth time in CDCR for 18 years prior to his death. He was serving a sentence of 40 years to life under a "third strike" sentence. In comparison to previous periods of incarceration, Case AA demonstrated more mental health needs and more violent behavior including placement in CDCR SHU on four occasions. His violent behavior included mutual combat with another inmate, attacking a correctional lieutenant with a razor blade, punching a correctional staff member and threatening to kill a correctional officer. Case AA had a number of visits from family members during his incarceration and was in routine contact with his sister by phone.

Clinical summaries regarding Case AA noted an extensive mental health history dating back to adolescence which included drug use, delinquency, self-harm and suicide attempts. Early CDCR mental health documentation also noted mood, anxiety and psychotic symptoms and multiple inpatient psychiatric hospitalizations for self-harm and psychotic symptoms. There was also documentation that Case AA was psychiatrically hospitalized between incarcerations while in the community.

During his most recent period of incarceration, Case AA exhibited psychotic agitation and command hallucinations to kill himself. There was documentation of at least nine admissions to DSH for inpatient treatment, most of which were precipitated by serious suicide attempts by cutting and multiple MHCB placements for suicidal ideation and

command hallucinations to kill himself.  Many of his inpatient stays lasted for months and sometimes years, with his most recent inpatient placement beginning in May 2016 and lasting through August 22, 2016.  He was discharged 21 days prior to his death by suicide.

When he was not housed in an inpatient setting, Case AA resided in EOP housing units. He received medications under an involuntary court order from 2002 through 2006 and from 2010 to the time of his death; although, his antipsychotic medications were discontinued during his inpatient stay prior to his death.  From 2006 to 2010, he resided mostly in an inpatient setting where he received medications under observation which were often crushed or delivered sublingually to ensure adherence.  Involuntary medication hearing documentation noted the rationale for medications was "danger to others", despite his extensive history of suicide attempts and danger to himself.  It is unknown how the decision to discontinue his medications may have been affected if the danger to himself had been recognized.  The rationale for discontinuing his medication was in part due to the absence of his assaultive behavior.

Over the previous 15 years, primary diagnoses included Psychotic Disorders or Mood Disorders with psychotic features.  The only exception to this pattern was during the most recent inpatient stay prior to his death (May to August 2016) when he was provided with diagnoses of Mood Disorder, not otherwise specified, Polysubstance Dependence, and Antisocial Personality Disorder with borderline features.  During this time, antipsychotic medications were also discontinued.  Other than a period of time in 2014, Case AA had been prescribed an antipsychotic medication consistently during the previous 15 years. Upon return to a prison in August 2016, the inmate's Mood Disorder diagnosis was changed to Schizoaffective Disorder.  Despite the inclusion of a psychotic disorder, Case AA's antipsychotic medications were not restarted prior to his death.

This inmate engaged in multiple suicide attempts, many of which were nearly lethal, beginning at age eight.  Over the course of his most recent incarceration, there were noted to be at least 14 serious suicide attempts by cutting and at least two by overdose; a number of which required hospitalization.  The SCR estimated Case AA engaged in over 20 suicide attempts since 1998.  Despite this, suicide risk evaluations completed during the course of his incarceration did not consistently capture his serious suicide attempt history nor did the most recent discharge summary following an inpatient stay for a serious suicide attempt. On the most recent suicide risk evaluation completed prior to his death and following discharge from his inpatient placement secondary to a suicide attempt, the clinician noted, "IP [inmate-patient] stated he had 4 suicide attempts in the past, 3 by cutting and 1 by overdosing with ETOH [ethyl alcohol] and phenobarbital on the streets."  The evaluation indicated that inpatient admissions were "due to suicidal ideation, exhibiting self-harm behaviors (cutting and head banging)." This summary statement failed to note the fact that the inmate was admitted to an inpatient unit for cutting his brachial artery so severely that surgical repair was required four months earlier.

In addition to the concerns this raises about the accuracy of suicide risk evaluations, errors and omissions were present in other clinical documentation as well.  In a psychiatric progress note dated August 30, 2016, it was noted that the inmate had two previous suicide

attempts by cutting his wrists and overdose. Additionally, the initial mental health assessment completed by his primary clinician on September 1, 2016 noted "at least 22 MHCB and 9 DSH admits for suicidal ideation and self-harming behaviors such as cutting and head banging" failing to note the severity and lethality of his suicidal behavior.

The inmate's most recent inpatient stay was notable for the description of his suicide attempt and the characterization of the severity of his mental illness. Inpatient records noted that the inmate's suicide attempt in May 2016 was described as "impulsive", despite chronic suicidal ideation and numerous suicide attempts throughout his life. A description of his history noted only two suicide attempts previously, one at age eight and one prior to incarceration. There was no indication that previous healthcare records describing his suicidal behavior while incarcerated were reviewed. His diagnoses were also questioned, as it was noted that his auditory hallucinations did not appear to be "a result of psychosis." Subsequently, his antipsychotic medications were discontinued, and it was noted that he reported being free of auditory hallucinations for "several weeks." It was documented that Case AA wanted to be discharged from the hospital which may have impacted his self-report about his experience of psychotic symptoms, but this was not considered. Also notable, in the alerts section of the inpatient discharge summary, suicide attempt was not circled and there was no clinician-to-clinician contact prior to the inmate's discharge, despite significant changes to his treatment.

On the day of his death, Case AA completed two health care requests for being in "pain" related to the fact that he was not receiving his injectable antipsychotic medications.

## II. Determination of Foreseeability

This suicide was determined to be foreseeable by the SCRC, as it was noted that this inmate had been assessed to be at high chronic risk for suicide for several years.

The Special Master's expert agrees with this determination. Further, it was clear from a review of this case that staff across multiple settings failed to complete a comprehensive review of the inmate's history and available healthcare records. Instead, staff appeared inclined to take the inmate's self-report as accurate, even though it conflicted with evidence contained within the healthcare record. Further, there were concerns about the inpatient psychiatrist's decision to unilaterally discontinue antipsychotic medications for a patient with a long history of involuntary medications for psychosis. The inmate was observed without antipsychotic medication in an inpatient setting for less than three weeks prior to his discharge, and there was no clinician-to-clinician discussion regarding the treatment needs of this inmate prior to his discharge from an inpatient setting.

## III. Determination of Preventability

This suicide was determined to be preventable by the SCRC given his exceptionally high chronic risk for suicide.

The Special Master's expert agrees with this determination and adds that concerns exist about the length of time between security checks of the inmate in his cell on the date of his death. The 80-minute interval exceeded the LOP of 60-minute checks and, given that rigor mortis was present in the inmate, it was unlikely he was appropriately observed during the previous check.  It is also concerning that this inmate was allowed to access razors through canteen, despite alerts that the inmate should not have access to razors and his significant history of suicide attempts by cutting.

IV.   Critique of Suicide Case Review Report

The SCR was an adequate summary of a long and complex clinical case.  The report identified the significant concerns in this case, and its recommendations followed from the conclusions drawn in the report.  There was an adequate description of the inmate's mental health history, criminal history, factors precipitating the suicide and a critical analysis of causative factors.

V.   Analysis of Quality Improvement Plan Process

This case resulted in seven required Quality Improvement Plans. Topics included delays in activation of the alarm upon discovery of the inmate, inadequate suicide risk evaluations, poor safety planning, abrupt discontinuation of antipsychotic medications, the inmate's possession of a razor blade despite warnings about risk and problems with correctional officer safety checks.  System-wide and facility-specific plans were drafted and completed. Overall, QIP reports for this case included appropriate responses to the recommendations including evidence of training, remedies and policy and procedure updates.  Relevant meeting minutes were included.

Concerns were noted regarding the QIP provided by the inpatient facility.  Regarding the unilateral decision by a psychiatrist to discontinue the long-standing use of antipsychotic medication with this inmate, the QIP noted, "The discontinuance of Zyprexa Zydis and Risperdal Consta was based upon the clinical determination of the treating Psychiatrist. The inmate's psychotic symptoms did not appear to vary medications."  It is unclear what this statement was intended to communicate, or why it was considered to be an adequate response to the QIP.

The QIP indicated that policies were updated to ensure additional steps, which included consultation with other psychiatrists when significant medication changes are considered in the future.  The plan also noted that clinician-to-clinician contact would be expected to occur and be documented on the day of discharge.  Based on the content of the discharge form, it appeared that this was already a standing expectation.  The inpatient QIPs provided copies of memos sent to staff documenting planned training on updated policies but did not include evidence that trainings were completed as planned.

The QIP report also included an investigation into the timing of Case AA's death. Documentation indicated that a correctional officer had seen the inmate alive on rounds 80 minutes before his death. The investigation opined that either rigor mortis occurred early

92

for this inmate or was misidentified by the nurse on the scene.  As a result, the investigation concluded that the officer who made rounds prior to the inmate's death did interact with a living, breathing inmate.  The rounds did not occur every 60 minutes, as required, and this was addressed in the QIP through a review of logs which indicated this was not a pattern.

**APPENDIX B1**

**INMATE DEMOGRAPHICS**

Inmate Demographics

| Case | Facility | Age | Gender | Ethnicity | Marital Status | LOC | Primary Diagnosis | Current PC2602 | Recent or Chronic Medical Issues |
|------|----------|-----|--------|-----------|----------------|-----|-------------------|----------------|-----------------------------------|
| A | CMC | 25 | Male | Hispanic/Latinx | Never Married | EOP | Psychotic Disorder | No | Yes |
| B | KVSP | 40 | Male | African American | Never Married | Non-MHSDS | None | No | Yes |
| C | SVSP | 42 | Male | Hispanic/Latinx | Married | EOP | Adjustment Disorder | No | Yes |
| D | CCI | 39 | Male | Caucasian | Widowed | Non-MHSDS | Mood Disorder | No | Yes |
| E | SVSP | 41 | Male | Hispanic/Latinx | Never Married | EOP | Psychotic Disorder | Yes | Yes |
| F | CIW | 35 | Female | Hispanic/Latinx | Never Married | EOP | Mood Disorder | No | Yes |
| G | KVSP | 35 | Male | Caucasian | Never Married | CCCMS | Mood Disorder | No | Yes |
| H | CCWF | 40 | Female | Hispanic/Latinx | Never Married | CCCMS | Trauma-related Disorder | No | Yes |
| I | PBSP | 28 | Male | Hispanic/Latinx | Never Married | EOP | Anxiety Disorder | No | Yes |
| J | PVSP | 21 | Male | Hispanic/Latinx | Never Married | CCCMS | Mood Disorder | No | No |
| K | FOL | 67 | Male | Caucasian | Divorced | Non-MHSDS | None | No | Yes |
| L | LAC | 63 | Male | Caucasian | Divorced | EOP | Mood Disorder | Yes | Yes |
| M | KVSP | 37 | Male | Hispanic/Latinx | Never Married | Non-MHSDS | None | No | No |
| N | LAC | 36 | Male | Hispanic/Latinx | Married | CCCMS | Mood Disorder | No | No |
| O | CMC | 63 | Male | Hispanic/Latinx | Married | EOP | Mood Disorder | No | Yes |
| P | CIW | 56 | Female | Asian | Married | EOP | Mood Disorder | No | Yes |
| Q | SAC | 69 | Male | Caucasian | Widowed | EOP | Psychotic Disorder | Yes | Yes |
| R | CCC | 39 | Male | African American | Divorced | Non-MHSDS | None | No | Yes |
| S | PVSP | 55 | Male | Hispanic/Latinx | Divorced | CCCMS | Mood Disorder | No | Yes |
| T | SVSP | 48 | Male | Caucasian | Married | EOP | Mood Disorder | No | Yes |
| U | SAC | 41 | Male | Caucasian | Never Married | EOP | Psychotic Disorder | Yes | No |
| V | CCI | 25 | Male | Caucasian | Never Married | CCCMS | Mood Disorder | No | No |
| W | NKSP | 55 | Male | Native American | Divorced | CCCMS | Mood Disorder | No | Yes |
| X | SVSP | 31 | Male | Hispanic/Latinx | Never Married | EOP | Psychotic Disorder | Yes | Yes |
| Y | SAC | 29 | Male | African American | Married | EOP | Psychotic Disorder | No | Yes |
| Z | SAC | 60 | Male | Asian | Divorced | EOP | Psychotic Disorder | Yes | Yes |
| AA | CMC | 56 | Male | Caucasian | Never Married | EOP | Psychotic Disorder | Yes | Yes |

**APPENDIX B2**


**INMATE HISTORY AND SUICIDE EVENT CHARACTERISTICS**

Inmate History and Suicide Event Characteristics

| Case | Crime Type | Method | Housing | Cell Type | Mental Health History while Incarcerated | Mental Health History Prior to Incarceration | Previous Self-Harm | Previous Suicide Attempt | Substance Use History |
|------|-----------|--------|---------|-----------|------------------------------------------|----------------------------------------------|--------------------|--------------------------|----------------------|
| A | Violent | Hanging | ASU | Single | Yes | Yes | No | Yes | Yes |
| B | Violent | Hanging | ASU | Single | Yes | No | No | No | Yes |
| C | Sex Offense | Hanging | ASU | Single | Yes | No | No | Yes | Yes |
| D | Violent | Hanging | ASU | Double - cellmate present | Yes | Yes | No | No | Yes |
| E | Violent | Hanging | GP Yard | Double - cellmate absent | Yes | No | Yes | Yes | Yes |
| F | Violent | Hanging | GP Yard | Double - cellmate present | Yes | Yes | Yes | Yes | Yes |
| G | Violent | Hanging | SNY | Single | Yes | No | No | Yes | Yes |
| H | Non-violent drug | Hanging | GP Yard | Dorm | Yes | Yes | No | Yes | Yes |
| I | Violent | Hanging | GP Yard | Single | Yes | Yes | Yes | Yes | Yes |
| J | Other | Hanging | STRH | Single | Yes | Yes | No | Yes | Yes |
| K | Violent | Jumping | GP Yard | Outside of cell | No | No | No | No | Yes |
| L | Violent | Other Asphyxiation | SNY | Single | Yes | Yes | Yes | Yes | Yes |
| M | Violent | Hanging | ASU | Single | No | No | No | No | Yes |
| N | Other | Other Asphyxiation | STRH | Single | Yes | No | No | No | Yes |
| O | Violent | Other Asphyxiation | GP Yard | Single | Yes | No | No | Yes | Yes |
| P | Violent | Hanging | GP Yard | Double - cellmate present | Yes | No | No | Yes | No |
| Q | Violent | Other | GP Yard | Outside of cell | Yes | Yes | Yes | Yes | Yes |
| R | Other | Hanging | GP Yard | Double - cellmate absent | Yes | No | No | Yes | Yes |
| S | Sex Offense | Cutting | GP Yard | Single | Yes | No | No | No | No |
| T | Violent | Hanging | GP Yard | Single | Yes | No | Yes | Yes | Yes |
| U | Violent | Hanging | PSU | Single | Yes | No | Yes | Yes | Yes |
| V | Violent | Hanging | SHU | Single | Yes | No | No | No | Yes |
| W | violent | Hanging | GP Yard | Single | Yes | Yes | No | Yes | Yes |
| X | Sex Offense | Hanging | PSU | Single | Yes | No | Yes | Yes | Yes |
| Y | Violent | Hanging | GP Yard | Double - cellmate absent | Yes | No | No | Yes | Yes |
| Z | Violent | Overdose | GP Yard | Single | Yes | Yes | No | Yes | No |
| AA | Non-violent property | Cutting | GP Yard | Single | Yes | Yes | Yes | Yes | Yes |

**APPENDIX B3**

**IDENTIFIED ASSESSMENT, TREATMENT AND COMMUNICATION CONCERS**

Identified Assessment, Treatment and Communication Concerns

| Case | Suicide Risk Evaluation Omissions | Suicide Risk Level Not Appropriate | Other Suicide Risk Evaluation Issues | Mental Health Assessment Problems | Treatment Planning Problems | Treatment Problems | Failure to Refer to Higher LOC | Problems with Interdisciplinary Consultation |
|------|------|------|------|------|------|------|------|------|
| A | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes |
| B | Yes | Yes | Yes | No | No | No | Yes | Yes |
| C | No | Yes | Yes | No | Yes | Yes | No | No |
| D | No | Yes | No | Yes | Yes | Yes | No | Yes |
| E | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes |
| F | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |
| G | No | Yes | No | Yes | Yes | Yes | Yes | No |
| H | Yes | Yes | Yes | Yes | No | Yes | No | Yes |
| I | No | No | No | Yes | Yes | Yes | Yes | Yes |
| J | No | No | Yes | No | Yes | Yes | No | No |
| K | N/A* | N/A* | No | No | No | No | No | No |
| L | No | Yes | Yes | No | Yes | No | No | No |
| M | N/A* | N/A* | No | No | No | No | No | Yes |
| N | No | No | Yes | Yes | Yes | Yes | No | Yes |
| O | No | No | Yes | Yes | No | No | Yes | No |
| P | No | No | No | No | Yes | No | Yes | No |
| Q | No | Yes | Yes | No | Yes | Yes | Yes | Yes |
| R | No | No | No | No | No | No | No | No |
| S | Yes | Yes | Yes | Yes | No | Yes | No | No |
| T | No | No | No | No | No | No | No | No |
| U | No | Yes | Yes | No | No | No | No | Yes |
| V | No | No | No | Yes | Yes | Yes | No | Yes |
| W | Yes | Yes | No | No | Yes | Yes | No | No |
| X | No | No | No | No | No | No | No | Yes |
| Y | No | No | No | Yes | Yes | Yes | No | Yes |
| Z | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |
| AA | Yes | Yes | Yes | No | No | No | No | No |

* Inmate not seen for a formal suicide risk evaluation during incarceration

**APPENDIX B4**


**COMMON PROBLEMS IDENTIFIED AS REQUIRING A**

**QUALITY IMPROVEMENT PLAN**

Common Problems Identified as Requiring a Quality Improvement Plan

| Identified Issue Requiring Quality Improvement Plan | Number of Cases | Percentage of Cases |
|---|---|---|
| Inmate not placed on High Risk List when indicated | 2 | 7% |
| Problems with 15-Minute checks while inmate on suicide watch (e.g., not documented, not staggered) | 2 | 7% |
| Failure to provide the inmate with property and/or privileges while in segregated housing | 2 | 7% |
| Inmate placed in an inappropriate Level of Care (LOC) or inmate not referred to Higher LOC when indicated | 3 | 11% |
| Failure to complete suicide risk evaluation when required or indicated | 3 | 11% |
| Failure to take pressure off body prior to removal of ligature following a death by hanging | 3 | 11% |
| Noted safety issues related to the inmate's cell (e.g., fixed ligature points, poor visibility) | 3 | 11% |
| Psychotropic medication issues (e.g., noncompliance, improper psychiatric rationale) | 4 | 15% |
| Failure of mental health clinician(s) to conduct adequate record review | 4 | 15% |
| Incomplete 5-day follow-ups | 4 | 15% |
| Failure to make adequate custody checks | 5 | 19% |
| Failure to complete or update a mental health or psychiatric evaluation when required or indicated | 5 | 19% |
| Inaccurate mental health documentation (including copy/paste issues) | 5 | 19% |
| CPR/AED problems following suicidal act | 6 | 22% |
| Failure to respond with required cut down kit/contents | 6 | 22% |
| Psychiatric Technician rounds not completed, inaccurate, or not documented properly | 6 | 22% |
| Referral or mental health routine contact timelines not met | 7 | 26% |
| Treatment provision/services not in line with Treatment Plan | 9 | 33% |
| Nursing documentation issues | 9 | 33% |
| Inadequate safety planning | 9 | 33% |
| Inadequate treatment planning | 10 | 37% |
| Delays activation of personal alarm and/or 9-1-1 following discovery of inmate | 11 | 41% |
| Poor or unsupported rationale for risk level determinations (includes omission of known/documented risk factors) | 12 | 44% |
| Interdisciplinary communication or referral failures | 12 | 44% |

**APPENDIX C**

**SPECIAL MASTER'S EXPERTS**

**CURRICULA VITAE**

**Sharen E. Barboza, Ph.D., CCHP-MH, CiWPP**
Licensed Clinical Psychologist (NY 015436/FL PY9637)

## EDUCATION

### Fairleigh Dickinson University, Teaneck, New Jersey

| | |
|---|---|
| *Ph.D., Clinical Psychology* | 9/2001 |
| Dissertation | 2/2001 |

Discriminant validity of the Abel Screen for Sexual Interest in juvenile sex offenders who admit and deny their offenses

### Tufts University, Medford, Massachusetts

| | |
|---|---|
| *M.S., Experimental Psychology* | 5/1994 |
| *B.S., Psychology*, Cum Laude, Magna Cum Laude en thesi | 5/1992 |

## CERTIFICATIONS

### Certificate in Wholebeing Positive Psychology

| | |
|---|---|
| *Wholebeing Institute* | 9/2019 |

## HONORS/AWARDS

### 2018 B. Jaye Anno Award of Excellence in Communication

| | |
|---|---|
| *National Commission on Correctional Health Care* | 10/2018 |

This award pays tribute to innovative, well-executed communications that have had a positive impact on the field of correctional health care, or to individuals for bodies of work. The award is named after NCCHC's cofounder and first vice president. https://www.ncchc.org/excellence-in-communication-2018

## WORK EXPERIENCE

### Correctional Mental Health Consultant/Expert/Trainer

| | |
|---|---|
| *Barboza Consulting, LLC* | 5/2013-Present |

Provide consultation to correctional systems on behavioral and mental health services. Conduct a comprehensive analysis of current services and programs, comparing those to national standards. Offer training for clinical and correctional staff on the implementation of behavioral health programs and services including self-injury reduction, suicide prevention, managing mental illness in corrections, correctional stress/burnout, and other topics as requested. Provide expert witness evaluation, consultation, and opinion.

***Court Appointed Expert, Correctional Mental Health*** (3/2020 - present). United States District Court of the Eastern District of California – Ordered by Honorable Kimberly J. Mueller, Chief United States District Judge, for a class action lawsuit, Coleman et. al vs. Newsom et. al. As a member of a multi-disciplinary team, provide expert consultation to the Special Master, Mathew A. Lopes, Esq., as part of an ongoing monitoring process of the California Department of Corrections and Rehabilitation and Department of State Hospitals mental health system.

**Vice President**
**Mental Health/Clinical Operations – Mental Health**
*MHM/Centurion*, Vienna, Virginia                                                    9/2014-4/2020
> Supervisors:  Jane Haddad, Psy.D.; Julie Mueller, RN, MBA, Johnny Wu, M.D.
> Oversaw national clinical operations of mental health services provided by the company.  Supervised the Clinical Operations mental health team, audited clinical services and contract/standards compliance of mental health services being provided within correctional and forensic settings.  Created and collaborated on the development of therapeutic program curricula for seriously mentally ill individuals, individuals who engage in self-injury, and sexual offenders.  Developed and delivered training programs to mental health, medical, and corrections professionals.  Provided consultation to correctional systems regarding mental health, behavior change and sexual offender programming.  Assisted with new business development.

**Director of Clinical Operations**
*MHM Services, Inc.*, Vienna, Virginia                                               10/2008-9/2014
> Supervisor:  Jane Haddad, Psy.D.
> Served as a director of the clinical operations team, overseeing the auditing of clinical services and contract compliance of mental health services being provided within correctional and forensic settings.  Created and collaborated on the development of therapeutic program curricula for seriously mentally ill individuals, individuals who self-injure and sexual offenders.  Developed and deliver training programs to mental health, medical health, and corrections professionals.  Provided consultation to correctional systems regarding mental health, behavior change and sexual offender programming.  Assisted with new business development and supervision of clinical operations staff.

**Senior Clinical Operations Specialist**
*MHM Services, Inc.*, Vienna, Virginia                                               2/2007-10/2008
> Supervisor:  Jane Haddad, Psy.D.
> Served as a senior member of the clinical operations team, auditing clinical services and contract compliance of mental health services being provided within correctional and forensic settings.  Created and collaborated on the development of therapeutic program curricula; developed and delivered training programs to mental health, medical health, and corrections professionals; and provided consultation to correctional systems regarding mental health and sexual offender programming.

**Director, Sex Offender Treatment Program**

*NYS OMH & Central New York Psychiatric Center*, Marcy, New York                    11/2005-2/2007

    <u>Deputy Commissioner:</u> Richard Miraglia, C.S.W.

    <u>Executive Director</u>:  Donald Sawyer, Ph.D., MBA

    Served as clinical expert consultant in the development of the Sex
Offender commitment initiative in New York.  Consulted to the Division of
Forensic Services in the development of the comprehensive evaluation and
treatment process for civilly committed sex offenders in New York State.
Consulted to the Commissioner of OMH and the Department of Budget
regarding this initiative.  Provided weekly consultation, staff training, and
clinical supervision to multidisciplinary teams at Manhattan Psychiatric
Center and Kirby Forensic Psychiatric Center.   Made contacts and visited
with civil commitment programs in other states and developed an
inpatient treatment program for this population including intake
assessment process and outcome measurements.  Participated in all
aspects of program development: consulting on construction, developing
and implementing policy, hiring staff, creating staff training programs,
coordinating risk assessments, supervising clinical and direct care staff,
preparing clinicians for court testimony, and overseeing community
reintegration planning

**Chief Psychologist**

*Central New York Psychiatric Center*, Marcy, New York                    1/2004-2/2007

    <u>Executive Director</u>:  Donald Sawyer, Ph.D., MBA

    Served as Chief of Psychology Department for a state psychiatric facility
treating patients incarcerated within New York State; developed,
monitored, and maintained standards of performance for psychologists
throughout the system; developed policies and procedures related to the
delivery of psychological services (e.g., suicide risk assessment and
prevention, violence risk assessment and prevention, behavioral
management policies and programs, special housing unit (SHU) services,
psychological assessment); provided supervision to psychologists and
psychology student interns; developed and conducted research regarding
initiatives and programs; coordinated system-wide risk assessment
initiative; coordinated system-wide implementation and maintenance of
behavioral management program; recruited and hired psychologists;
consulted to physicians, administration, and risk managers with regard to
public safety, accreditation, and quality of care.

**Licensed Psychologist/ Psychologist II**

*Bedford Hills Correctional Facility*, Bedford Hills, New York                    9/2001-1/2004

    <u>Supervisors</u>:  Carolyn Subin, Ph.D., David Stang, Ph.D.

    Provided individual psychotherapy to incarcerated women at a maximum
security correctional facility; conducted assessments of suicidal and
homicidal ideation & intent; provided mental health consultation and
assessment to women in solitary confinement; consulted to Department of
Corrections regarding mentally ill inmates with lengthy confinement

sanctions; provided supervision to Ph.D. level psychologists for licensure; provided mental health training to Department of Corrections staff; participated in crisis intervention and inpatient referral process.

### Sex Offender Risk Assessment Consultant
*Juvenile Sexual Offender Treatment Program*
*Westchester Jewish Community Services*, Hartsdale, New York          8/2001-10/2003
Supervisor:  Kenneth Lau, CSW
Assessed the re-offense risk for adolescents accused of committing sexual offenses within Westchester County, NY; provided pre-sentencing consultation to the courts regarding supervision and treatment needs as well as further assessments and/or agency involvement

### Director, Adolescent Sexual Abuse Program
*Iowa State Training School for Boys*, Eldora, Iowa          1/1995-8/1996
Supervisor:  William Fields, Clinical Director
Treated adolescent male offenders & victims of sexual abuse using group and individual therapy; assessed adolescents; supervised staff of 15-20 and provided training; provided sex education to delinquent male adolescents; received 175 hours of training meeting certification requirements as Sex Offender Treatment Provider for the State of Iowa. Clinical populations included: BD, LD, ADD, ADHD, Pedophilia, Oppositional-Defiant Disorder, Conduct Disorder.

## EDITORIAL DUTIES
### Health Affairs
*Reviewer*          3/2020 -Present

### International Journal of Prisoner Health
*Editorial Board Member*          10/2013-Present

### Journal of Correctional Health Care
*Reviewer*          10/2018-Present

## EXPERT WITNESS & CASE CONSULTANT

*B. Lewis v. Crisis & Counseling Center*
United States Direct Court; Maine
*Retained by defendant – consultation only*          2017

*Klitzka v. NCHC, et al*
United States Direct Court; Western District of Wisconsin
*Retained by defendant*          2020

## COMMITTEE MEMBERSHIPS/AFFILIATIONS
### Mental Health Standards Committee
*Member*
National Commission on Correctional Health Care          11/2020 - Present

**NCCHC Correctional Health Foundation**
*Board Member/Chair Elect (2021)*                                    4/2019-Present
          National Commission on Correctional Health Care

**Education Committee**
*Member*                                                            10/2018-Present
          National Commission on Correctional Health Care

**Certified Correctional Healthcare Professionals (CCHP) Mental Health Subcommittee/Task Force**
*Member*                                                            1/2014-Present
          National Commission on Correctional Health Care

**Certified Correctional Healthcare Professionals (CCHP) Board of Trustees**
*Appointed Trustee*                                                 3/2014-11/2017
          National Commission on Correctional Health Care          11/2020-Present

**Mental Health Subcommittee**
*Member*                                                            4/2013-4/2017
          American Correctional Association

SPECIALIZED TRAINING
          **Leading from Your Strengths:  Positive Psychology and Professional Development**
          *Kripalu Center for Yoga and Health*
          M. Sirois, Psy.D.                                         11/2017

          **The Prison Rape Elimination Act: Understanding the Law and How to Meet Compliance**
          *National Commission on Correctional Healthcare*
          A. Moss                                                   10/2012

          **Sex Offender Treatment**
          *NYS Office of Mental Health, Division of Forensic Services*
          A. Schlank, Ph.D.                                         2/2007

          **PCL-R Training**
          R. Hare, Ph.D., A. Forth, Ph.D.                           11/2006

          **Using the Structured Risk Assessment Model to Guide Treatment Planning**
          D. Thornton, Ph.D., R. Mann, M.Sc. L. Daniels, MSSW       9/2006

          **Penile Plethysmography Training – Level I & Level II**
          *Monarch -- Behavioral Technologies Inc.*, Salt Lake City, UT
          P. Byrne, Ph.D.                                           6/2006

          **Sex Offender Risk Assessment**
          *NYS Office of Mental Health, Division of Forensic Services.*

D. Doren, Ph.D., D. Epperson, Ph.D., D. Anderson, Ph.D.                3/2006

**Legal/Ethical Issues in Mental Health**
*Specialized Training Services, Inc.*
Philip Resnick, MD                                                      6/2004

**Risk Assessment of the Mentally Ill**
*Specialized Training Services, Inc.*
Philip Resnick, MD                                                      6/2004

**Intensive DBT Training**
*Behavioral Tech, Inc.*
Cindy Sanderson, Ph.D.                                                 10/2001

TEACHING EXPERIENCE

**Facilitator for Executive Manager in Correctional Healthcare Training (EMCHT)**
*National Institute of Corrections*, Aurora, Colorado            5/2014-9/2015

**Adjunct Professor**
*Hamilton College*, Clinton, New York                           1/2005-5/2005

**Instructor**
*Marist College*, Goshen Extension Site, Goshen, New York        5/2001-8/2001
*Fairleigh Dickinson University*, Teaneck, New Jersey
5/1997–12/1998

**Adjunct Instructor**
*Correctional Release Center*, Newton, Iowa                      8/1994-1/1995
*Des Moines Area Community College*, Ankeny, Iowa               9/1994-12/1994

PUBLICATIONS

Barboza, S., Blair, R., Cook, G., Elliott, W., and Kern, E. (2019). *Suicide Prevention and Resource Guide: National Response for Suicide Prevention in Corrections.* Chicago, IL. National Commission on Correctional Health Care. www.ncchc.org/suicide-prevention-plan

Boren, E. A., Folk, J. B., Loya, J. M., Tangney, J. P., Barboza, S. E. and Wilson, J. S. (2018), The Suicidal Inmate: A Comparison of Inmates Who Attempt Versus Complete Suicide. *Suicide and Life Threatening Behavior*, 48(5), 570-579. DOI: 10.1111/sltb.12374

Folk, J. B., Loya, J. M., Boren, E. A., Tangney, J. P., Wilson, J. S., & Barboza, S. E. (in press). Differences between inmates who attempt suicide and who die by suicide: Staff-identified psychological and treatment-related risk factors. *Psychological Services.*

Folk, J. B., Disabato, D. J., Daylor, J. M., Tangney, J. P., Barboza, S., Wilson, J. S., Bonieskie, L., & Holwager, J. (2016). Effectiveness of a Self-Administered

Intervention for Criminal Thinking: Taking a Chance on Change. *Psychological Services*, 13(3), 272-82.

Barboza, S. (2016).  Elevating personality disorders:  Changes and challenges in treating incarcerated patients.  *The International Association for Correctional and Forensic Psychology Newsletter*, 48(2), 11-12.

Disabato, D., Folk, J. Wilson, J.S., Barboza, S., Daylor, J. & Tangney, J.  (2015). Psychometric validation of a simplified form of the PICTS in low-reading level populations.  *Journal of Psychopathology and Behavioral Assessment*,38(3), 456-64.

Andrade, J.T., Wilson, J.S., Franko, E., Deitsch, J. & Barboza, S. (2014).  Developing the Evidence Base for Reducing Chronic Inmate Self-Injury: Outcome Measures for Behavior Management.  *Corrections Today*, 76(6), 30-35.

Barboza, S. & Wilson, J. (2013).  Your Patient is My Patient:  The Need for Integrated Medical-Mental Health Care for Inmates with Serious Mental Illness.  *CorrDocs*, 17(5).

Barboza, S. & Wilson, J.S. (2011).  Behavior Management Plans Decrease Inmate Self-Injury.  *Corrections Today*, 73(5).

Wilson, J. & Barboza, S. (2010). The Looming Challenge of Dementia in Corrections. *CorrectCare*, 24(2), 12-14.

Way, B. B., Sawyer, D. A., Barboza, S., & Nash, R. (2007). Inmate suicide and time spent in special disciplinary housing in New York state prison. *Psychiatric Services*, 58, 558-560.

Abel, G. G., Jordan, A., Rouleau, J. L., Emerick, R., Barboza-Whitehead, S., and Osborn, C. (2004). The use of visual reaction time to identify male adolescent child molesters and the frequencies of their acts. *Sexual Abuse: A Journal of Research and Treatment*, 16 (3), 255-265.

## PRESENTATIONS

Barboza, S. "Understanding Personality Disorders: Practical Insights for Nurses" Workshop presented at the National Commission on Correctional Healthcare Conference, October 2019, Fort Lauderdale, FL.

Barboza, S. "Self-Injurious Behavior and Trauma Informed Care" Keynote at Health Care in Secure Settings Conference, Justice Health and Forensic Mental Health Network, May 2019, Sydney, Australia.

Barboza, S. "Vicarious Trauma and Self-Care" Keynote at Health Care in Secure Settings Conference, Justice Health and Forensic Mental Health Network, May 2019, Sydney, Australia.

Masotta, M. & Barboza, S. "Bipolar Disorder, Borderline Personality Disorder and PTSD:  Improving Diagnostic Accuracy" Workshop presented at the National Commission on Correctional Healthcare Conference, April 2019, Nashville, TN.

Riley, K. & Barboza, S.  "Continuous Quality Improvement:  Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Conference, April 2019, Nashville, TN.

Cox, J & Barboza, S.  "An In-Depth Review of NCCHC's 2015 Standards for Mental Health Services" Pre-Conference seminar at National Commission on Correctional Healthcare Conference, November 2017, Chicago, IL; October, 2018, Las Vegas, NV; April 2019, Nashville, TN and October, 2019, Fort Lauderdale, FL.

Barboza, S "Hazardous Duty:  The Invisible Effects of Working in Corrections" Workshop presented at the National Commission on Correctional Healthcare National Conference, October 2015, Dallas, TX and October, 2019, Fort Lauderdale, FL.

Barboza, S & Riley, K.  "Continuous Quality Improvement:  Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S., Andrade, J.T., & Wilson, J.S.  "Trauma in the Practice of Correctional Medicine."  Workshop presented at the American College of Correctional Physicians Fall Conference, October, 2018, Las Vegas, NV.

Barboza, S. "Strategies for Understanding and Working with Personality-Disordered Patients."  Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S. "The Value of Positivity in Correctional Mental Health."  Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Gibson, B., Kern, E., Barboza, S. "The National Response Plan for Suicide Prevention in Corrections."  Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S.  "Measuring Mental Health Treatment Outcomes: Building an Evidence Base" Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S. & Wilson, J.S.  "Trauma-Informed Care:  How We Can Better Support Our Patients" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S.  "Continuous Quality Improvement:  Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S.  "CCHP-MH Exam Content Review Course" National Commission on Correctional Healthcare sponsored webinar, April 12, 2018.

Barboza, S. "Use of Behavior Management Plans to Reduce Self-Injury." National Commission on Correctional Healthcare sponsored webinar, February 21, 2018.

Barboza, S. "Practical Behavior Management Strategies: Decreasing Self-Injurious Behavior" Luncheon presentation at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S. "CCHP-MH Content Review Course." Workshop at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S. & Kearns, J.D. "Crisis Intervention: Planning and Implementing Effective Strategies." Workshop at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S & Puerini, M. "Personality Disorder in Corrections – Affliction, Identity, Label" Workshop at the National Commission on Correctional Healthcare Conference, October 2016, Las Vegas, NV

Barboza, S. "Strategies for Understanding and Working with Personality-Disordered Patients" Workshop at the National Commission on Correctional Healthcare Correctional Mental Health Care Conference, July 2016, Boston, MA.

Barboza, S. Wilson, J.S., McGinty, M., and Brown, L. "Creating Practice-Based Evidence for Mental Health Treatment in Corrections" Workshop presented at the National Commission on Correctional Health Care National Conference, October 2015, Dallas, TX.

Barboza, S "Hazardous Duty: The Invisible Effects of Working in Corrections" Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2015, New Orleans, LA.

Barboza, S. & McGinty, M. "Practice-Based Evidence: Creating Evidence for Mental Health Treatment in Corrections" Workshop presented at the American Correctional Health Services Association National Conference, March 2015, Orlando, FL.

Barboza, S. & Wilson, J.S. "Hazardous Duty: The Invisible Effects of Working in Corrections" Workshop presented at the American Correctional Health Services Association Multidisciplinary Educational Conference, March 2014, New Orleans, LA.

Barboza, S. & Ammons, L. "How Can I Tell If It's Working: Measuring Mental Health Treatment Outcomes." Workshop presented at the American Correctional Association Winter Conference, January 2014, Tampa, FL.

Simpson, M. & Barboza, S. "Times They Are a Changing:  DSM-5 and the Impact on Corrections."  Workshop presented at the American Correctional Association Winter Conference, January 2014, Tampa, FL.

Wilson, J.S., Barboza, S. & Andrade, J.  "Behavior Management:  Strategies for Individual and Group Programs."  Workshop presented at National Commission on Correctional Health Care Correctional Mental Health Care Conference, July 2013, Las Vegas, NV.

Barboza, S.  "Mental Health in Corrections:  An Overview for Health Care Leaders" Workshop presented at Correctional Health Care Leadership Institute, July 2012, Chicago, IL.

Shaw-Taylor, E.; Baker, M.; Tyler, C. & Barboza, S.  "Taking a Chance on Change: In-Cell Programming Success in Maryland" Workshop offered at American Correctional Association Congress of Corrections, July, 2012, Denver, CO.

DeGroot, J.; Cadreche, M.; & Barboza, S.  "Managing Self Harm by Standardizing the Definition, Tracking its Prevalence, and Using a Behavioral Plan" Workshop presented at Academic & Health Policy Conference on Correctional Health, March, 2012.

DeGroot, J.; Thompson, J. M.; Jackson, J. & Barboza, S.  "It's Not Mental Illness, It's Just Behavior: Identifying and Treating Personality Disorders Rather Than Dismissing Them" Workshop presented at Academic & Health Policy Conference on Correctional Health, March, 2012.

Barboza, S. & Wilson, J.S.  "Evidence for the Efficacy of Behavioral Interventions in Reducing Self-Injury" Workshop offered at NCCHC Conference, May, 2011, Phoenix, AZ.

Barboza, S. & Wilson, J.S.  "Real Results: Successful Reduction in Self-Injury in Correctional Settings."  Workshop offered at American Correctional Health Services Association Conference, April, 2011, Orlando, FL.

Barboza, S. & Wilson, J.S.  "Let's Get Practical:  Real Answers to Inmate Self-Injury."  Workshop offered at North American Association of Wardens and Superintendents Conference, April, 2011, Baton Rouge, LA.

Barboza, S. & Wilson, J.S.  "Behavior Management – Effective Reduction in Self-Injury."  Workshop offered at American Correctional Association Winter Conference, February, 2011, San Antonio, TX.

Wilson, J.S. & Barboza, S.  "Addressing the Rising Prevalence of Dementia in Inmate Populations" Pre-Conference Seminar offered at Updates in Correctional Healthcare, National Commission on Correctional Health Care sponsored, April, 2010, Nashville, TN.

Wilson, J.S.; Barboza, S.; & Andrade, J. "Ending It All: Data Informed Suicide Prevention." Presentation at Updates in Correctional Healthcare, National Commission on Correctional Health Care sponsored, April, 2010, Nashville, TN.

Barboza, S. & Wilson, J.S. "Bringing Recovery Inside the Walls: Recovery-Oriented Treatment Plans." Presentation at CMHS National GAINS Center Conference, February, 2010, Orlando, FL.

Wilson, J.S. & Barboza, S. "In Search of Solutions: Does Behavior Management Work?" Presentation at ACHSA Multidisciplinary Professional Development Conference, February 2010, Portland, OR.

Barboza, S. "Mental Health Risk Management." Invited speaker, Academy of Correctional Health Professionals Regional Seminar, June, 2009, Farmington, CT.

Barboza, S. "Mental Health Risk Management." Invited speaker, Academy of Correctional Health Professionals Regional Seminar, May, 2009, Fairfax, VA.

Andrade, J. T. & Barboza, S. "Taking a Chance on Change: Treating Offenders in Restricted Housing." Presentation at Mental Health in Corrections Conference, Forest Institute sponsored, April, 2009, Kansas City, MO.

Barboza, S. "Prison Rape Elimination Act & Draft Standards: Implications for Mental Health Practice." Presentation at Caulking the Seams of Continuity Conference, Drexel University Behavioral Healthcare Education, December 2008, Grantville, PA.

Barboza, S. "Documenting Progress: Writing Good Progress Notes Based on Good Treatment Plans." Presentation at Unlock the Mystery Conference, Indiana Department of Corrections, June 2008, Indianapolis, IN.

Wilson, J.S., and Barboza, S. "Autonomy, Safety, and Connection: Ethical Challenges in Working with Self-Injurious Inmates" Presentation at Mental Health in Corrections Consortium Symposium, April 2008, Kansas City, MO.

Barboza, S. "Strategies for Modifying Programming for Inmates Significantly Impaired by Mental Illness" Presentation at National Conference on Correctional Health Care, NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE sponsored, October 2007, Nashville, TN.

Abel, G. G., Barboza-Whitehead, S., & Rouleau, J. L. "Usefulness of Visual Reaction Times with Adolescents." Paper presentation at Association for the Treatment of Sexual Abusers Conference, October 2003, Saint Louis, MO

Barboza-Whitehead, S., Abel, G. G., & Reddy, L. A. "A Model for Discriminating Juvenile Sex Offenders Who Deny from Those Who Admit Using the Abel Screen for Sexual Interest." Poster presented at Association for the Treatment of Sexual Abusers Conference, September 1999, Lake Buena Vista, FL

**POSTER**

Folk, J. B., Disabato, D. J., Daylor, J. M., Tangney, J. P., Bonieskie, L.,… Barboza, S. &
Wilson, J. S. (2017, November). Effectiveness of a self-administered intervention
for criminal thinking among inmates in restrictive housing. Poster to be presented
at the Annual Meeting of the Association for Behavioral and Cognitive Therapies,
San Diego, CA.

# Kahlil A. Johnson, M.D.

Phone: 240-495-9555
Email: kjohnson@kahliljohnsonpsychiatry.com

## LICENSES AND CERTIFICATIONS:

Current Board Certifications in General and Forensic Psychiatry by the American Board of Psychiatry and Neurology
Current Washington, D.C. and Maryland Medical Licenses
Current Washington, D.C. and Maryland Controlled Substances License
Current DEA License

## POST-GRADUATE TRAINING:

**Forensic Psychiatry Fellow, Saint Elizabeths Hospital, Washington, D.C., July 2016 to June 2017**
Forensic Psychiatry Fellow at Saint Elizabeths Hospital which is part of the Washington D.C. Department of Behavioral Health (DBH). Rotations include: Saint Elizabeths Hospital Forensic Consult Service, Washington D.C. Jail, Comprehensive Psychiatric Emergency Program, Washington D.C. Superior Court Mental Health Urgent Care Clinic, D.C. DBH Outpatient Competency Restoration Program, and the George Washington University Human Rights Clinic.

**Congressional Fellow, American Psychiatric Association, Washington, D.C., January 2009 to November 2009**
Jeanne Spurlock Congressional Health Policy Fellow in the Office of Congressman Edolphus Towns (New York-10[th] Congressional District).

**Psychiatry Resident, George Washington University Hospital, Washington, D.C., June 2005 to June 2009**
Administrative Chief Resident, July 2008 to December 2008; Administrator of Medication Management Clinic, July 2008 to December 2008; Resident Representative, Hospital Emergency Preparedness Committee, July 2006 to December 2009.

## EDUCATION:

**George Washington University School of Public Health, Washington, D.C., September 2006 to July 2008**
Partial coursework completed for a Masters of Public Health

**M.D., Howard University College of Medicine, Washington, D.C., May 2004**
President, Class of 2004 Student Council
Chair, Class of 2004 Scholarship Committee
Recipient, Dr. Charles A. Pinderhughes Psychiatry Scholarship
Delegate, Student National Medical Association
Group Leader, Department of Pediatrics Youth Anger Management Initiative
Student Leader Representative, Liaison Committee for Medical Education
Student Tutor, Howard University College of Medicine Psychiatry Course

**Fellow, University of Regensburg, Regensburg, Germany, September 2003**
Certificate of International Telemedicine Applications, Asklepios International Telemedicine Consortium

**B.S., Howard University, Washington, DC, May 1999**
Major: Biology; Minor: Chemistry

## ACADEMIC APPOINTMENTS:

**Clinical Assistant Professor, May 2020 to Present**
Department of Psychiatry
University of Maryland School of Medicine
Baltimore, MD

**Assistant Professor, August 2017 to Present**
Department of Psychiatry and Behavioral Sciences
George Washington University School of Medicine and Health Sciences
Washington, DC

**Clinical Faculty, July 2015 to 2018**
Forensic Psychiatry Fellowship Program
Saint Elizabeths Hospital
Washington, DC

# WORK EXPERIENCE:

**Emergency Psychiatrist, University of Maryland Medical Center, May 2020 to Present**
- Provide comprehensive emergency psychiatric assessment and treatment, including medication management and crisis and supportive psychotherapy, to patients who are in Psychiatric Emergency Service; and when requested to the hospital psychiatry consultation-liaison service and the emergency department.
- Conduct evaluations for presence of suicidal thoughts, plans and risk as well as evaluations for risk for violence; and, provide evaluation and stabilizing treatment of psychiatric disorders including but not limited to serious mental illnesses, substance use disorders, and underlying medical causes of symptoms presenting as a mental illness.
- Arrange admission to the appropriate level of care for continued treatment when warranted including inpatient, partial hospitalization, and outpatient psychiatric and substance use treatment services.
- Provide clinical and formal instruction on the field of psychiatry to Psychiatry Residents.

**Psychiatric Hospitalist, George Washington University Hospital, August 2017 to Present**
- Provide comprehensive psychiatric assessment and treatment, including medication management and psychotherapy, to inpatients who are on the psychiatry unit, consultation-liaison service, or in the emergency room.
- Conduct evaluations for the decisional capacity, presence of suicidal thoughts, plans and risk as well as evaluations for risk for violence, and underlying medical causes of symptoms presenting as a mental illness.
- Provide clinical and formal instruction on the field of psychiatry to Psychiatry and Neurology Residents, and, Medical and Physician Assistant Students.
- Responsibilities also include: participating in hospital committees, quality improvement endeavors, assisting with educational seminars for residents and medical students, forensic psychiatry evaluations, and participation in research.

**Independent Mental Health Monitor, May 2017 to Present**
- Provide recommendations on evidence-based correctional psychiatry in a jail setting in accordance with the U.S. Department of Justice Consent or Settlement Agreements (CA/SA) with various departments of corrections and/or jail health care provider companies.
- Collaborate with a multi-disciplinary court-appointed team that includes Independent Monitors, Attorneys, and correctional professionals with specialization in correctional standards of operation and policy for officers, evidence-based correctional medicine, and safety in a correctional setting.
- Areas of focus for clinical recommendations include, but are not limited to, psychiatric assessment and treatment, including medication management, psychotherapy, behavioral management, and crisis intervention for patients incarcerated in correctional facilities with psychiatric illness or who presented with psychiatric symptoms.
- Provide recommendations on mental health policies, grievances, quality improvement, and peer review.
- Review incidents of suicide, suicide attempt, self-harm, and violence involving mentally ill patients.
- Work with correctional and correctional health care company leadership on an as needed basis for all areas of focus above.
- Perform site visits to all correctional facilities to assess the progress of all parties towards meeting the

directives in the CA/SA, prepare a report of the findings, and report the findings to the court.
- Provide regular reports to the court regarding the progress of the correctional staff and the correctional health care provider in meeting the directives in the CA/SA.
- Participate in monthly meetings with all parties.

**Owner, Kahlil Johnson Psychiatry, LLC, May 2017 to Present**
- Evaluate and assess human behavior and mental health within a legal context and assist the court, legal professionals, or others with cases involving parties who may have mental disabilities and disorders that interest with my areas of expertise.
- Perform psychiatric assessment and forensic evaluations of persons in correctional institutions, secure hospitals, the community, and other settings.
- Areas of focus include but are not limited to: Correctional Psychiatry, Asylum and Immigration, Competency to Stand Trial, Decisional Capacity, Criminal Responsibility, Risk Assessment, Fitness-for-Duty, and Disability Assessment.

**Psychiatrist, MedOptions, Inc., September 2016 to September 2017**
- Provide psychiatric assessment and treatment, including medication and behavioral management, to patients residing in assisted living and skilled nursing facilities who are in need of evaluation for psychiatric illness or who present with psychiatric symptoms due to underlying medical illness.
- Perform decisional capacity evaluations on patients with dementia or other illnesses.
- Conduct evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence.
- Work with a collaborative treatment team that includes psychiatric nurse practitioners, psychologists, and clinical social workers.
- Coordinate patient care with facility clinicians and administrators.

**Psychiatric Consultant, Bread for the City, May 2013 to July 2016**
- Led monthly on-site meetings to provide training that includes evidenced-based diagnosis, treatment, and best-practice chronic care management of common outpatient psychiatric conditions.
- Reviewed cases with both primary care providers and social work staff and advised on best-practice evidence-based treatment.
- Provided non-urgent Psychiatric consultation via phone, email, or text message with a 24-hour response time and served as an informational resource for psychiatric and mental health service options in the District of Columbia.

**Director of Psychiatry, Unity Health Care, Inc., January 2012 to June 2016**
- Ensured all Psychiatry providers observed HIPAA and other local and federal compliance regulations and functioned collaboratively with the health and human services offered at Unity Healthy Care, Inc. and the Washington, D.C. Department of Corrections and that all personnel of the Department were compliant with the administrative policies and procedures of both organizations.
- Identified, implemented, and supervised the clinical delivery of best practice behavioral healthcare.
- Ensured that Psychiatry providers were fully trained in all aspects of their work; especially in crisis intervention and suicide prevention at the Washington, D.C. Department of Corrections.
- Monitored psychiatric and mental health providers to assure accuracy and quality in their work. Also, periodically monitored psychiatric and mental health records, provided appropriate feedback and took corrective action, when necessary.
- Oversaw and conducted peer review of Psychiatric Providers.
- Established collaborations and partnerships with mental health providers within the District of Columbia and with national networks of Community Health Centers and Departments of Correction.
- Participated effectively as a representative of Unity Health Care, Inc. with the Washington D.C. Departments of Mental Health and Corrections, other offices of the District of Columbia, and local and national community/advocacy groups.
- Prepared testimony on mental health policy and testified under oath on behalf of Unity Health Care, Inc.
- Assessed opportunities to increase reimbursement for mental health services.
- Collaborated with the Medical and Health Center Directors to provide leadership and ensure coverage for all

Unity Health Care, Inc. sites and services.
- Provided leadership with Unity Health Care, Inc. quality improvement efforts, including outside agency evaluation and accreditation review.
- Performed the clinical duties of an adult Psychiatrist at Unity Health Care, Inc. at the Washington, D.C. Department of Corrections, and various Community Health Centers in Washington, D.C.

**Lead Psychiatrist at Washington D.C. Jail, Unity Health Care, Inc., August 2011 to January 2012**
- Developed comprehensive and therapeutic treatment plans for assigned caseload and provided direct services based on established treatment.
- Managed on-site crisis intervention.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.
- Assisted with educational seminars for Unity Health Care, Inc. and the Washington, D.C. Department of Corrections staff, and interviewing potential new hires for psychiatric staff. Supervised the Psychiatrists at the D.C. Central Detention Facility and Central Treatment Facility.
- Performed duties as assigned, which included but were not limited to: psychiatry peer review and quality improvement activities, attending the Washington, D.C. Department of Corrections Quality Improvement monthly meetings, directing the Psychiatry monthly meetings, and attending other meetings as assigned.
- Worked closely with the Mental Health Coordinator, Health Services Administrator, and Medical Director on tasks involving overall mental health care management to effectively promote quality of care, operational efficiency, problem-solving, etc.
- Coordinated psychiatry schedule to include approval of scheduled absences and ensure psychiatry coverage.
- Collaborated to improve or maintain provider/staff/patient satisfaction, quality of care, and productivity, provided feedback to the Medical Director and completed annual psychiatric provider evaluations.
- Represented Unity Health Care, Inc. in city-based mental health functions as determined by the Medical Director of Correctional Medicine.
- Oriented new psychiatric providers to site and served as a psychiatric resource to all providers at site.

**Staff Psychiatrist at Washington D.C. Jail, Unity Health Care, Inc., November 2009 to August 2011**
- Provided comprehensive psychiatric assessment and treatment, including medication management, to inmates who had a previous history of mental illness or who are in need of evaluation for possible mental illness.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.
- Interviewed potential new hires for psychiatric staff.
- Responsibilities also included: participating in quality improvement endeavors at the facility, updating jail mental health policies and clinical procedures, assisting with educational seminars for Unity Health Care, Inc. and Washington, D.C. Department of Corrections staff.

**Congressional Fellow, American Psychiatric Association, January 2009 to November 2009**
- Jeanne Spurlock Congressional Health Policy Fellow in the Office of Congressman Edolphus Towns, Chairman of the Committee on Oversight and Government Reform (NY-10[th] Congressional District), acting as a liaison between the Congressman, constituents, private and public sector representatives and Congressional staff regarding health policy.
- Advised and briefed the Congressman on proposed legislation, laws and contemporary issues of debate within health policy, including providing the Congressman with talking points for speeches and language regarding health care for presentations and letters to Congressional members and constituents.
- Prepared and delivered remarks on the Congressman's behalf.
- Researched health care issues for the Health Counsel on the Committee of Oversight and Government Reform and interviewed expert and lay witnesses for pre-hearing investigation and information gathering.
- Presented on the Health Care Reform Initiative at a Health Care Town Hall meeting, held in Brooklyn, NY and assisted with its planning.
- Facilitated negotiations to include two of the Congressman's bills in the current House of Representatives Affordable Health Choices Act (H.R. 3200). Duties also included writing and altering bill language before

the presentation of bills to the House of Representatives Clerk's Office for assignment of a bill number, performing district health care site visits on behalf of the Congressional office with the Deputy Chief of Staff and staffing several events for the Congressman.

**PRN Psychiatrist, Washington D.C. Jail, Unity Health Care, Inc., February 2008 to November 2009**
- Provided comprehensive psychiatric assessment and treatment, including medication management, to inmates who have a previous history of mental illness or who are in need of evaluation for possible mental illness.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.

**Core Member, Homeland Security Institute Panel on Community Perception of New Technology, August 2007 to February 200**
- Worked with a multi-specialty panel of experts drawn from a cross section of all relevant professions to provide expert opinion on the potential population impact of new technologies in consideration for use by the U.S. Department of Homeland Security.
- Provided specific expert opinion on the potential medical, psychiatric, and behavioral impacts of the new technologies under consideration for use.
- Provided written feedback upon request.

**Research Intern, American Psychiatric Association, August 2004 to February 2005**
- Assisted with the implementation and preparation of a grant proposal for a psychiatric study examining first episode of antipsychotic use.
- Conducted literature reviews for treatment patterns of Attention Deficit Hyperactivity Disorder and literature reviews to identify strategies that have been effective in bringing about quality improvement in physicians' practices, and reported that information to the Director of the American Psychiatric Institute for Research and Education for presentation to the American Board of Psychiatry and Neurology for the physician practice recertification proposal.

## PUBLICATIONS & ARTICLES:

- Johnson K. The Road to Health Policy: One Resident's Story. American Journal of Psychiatry Resident's Online Journal, pg. 4, May 2009.
- Maxwell C.J., Reddy R., White-Coleman D, Taylor G.L., Johnson K.A. A Comparison of Pre/Post-Menopausal HIV Infected African American Women at a Minority Teaching Hospital. Presented at the 15th International AIDS Conference, Bangkok (Thailand), July 11- 16, 2004. Printed in the International Proceedings by Medimond, Bologna, Italy; pg. 127-131. Vol. ISBN 88-7587-065-9.

## MEDIA:
- Arehart-Treichel, J. Nothing Bars This Psychiatrist From Helping Inmates. Psychiatric News, March 2, 2012, Vol 47 (5), pg. 12-29.
- Hausman, K. Resident Finds Rewards Atop Capitol Hill. Psychiatric News, April 2, 2010, Vol 45 (7), pg. 11.

## PRESENTATIONS:

- **"Excellence in Mental Health Advocacy: Case Studies in the Nongovernmental, Federal, and Legislative Arena"** Session, American Psychiatric Association Annual Meeting, May 2019
- **"Depression in Primary Care"** George Washington University School of Medicine and Health Sciences, recurring 3rd year medical student primary care clerkship lecture, March 2019 to present
- **"Substance Related Disorders"** George Washington University School of Medicine and Health Sciences, part of the annual 2nd year medical student Brain and Behavior lecture series, September 2018 to present
- **"Managing Psychiatric Emergencies: A Brief Guide for the Intern"** George Washington University Department of Psychiatry, Annual Lecture, June 2018

- **"Violence Risk: Practice Relevance"** George Washington University Department of Psychiatry, Grand Rounds, January 2018
- **"Risk Factors for Terrorism: A Literature Review"** St. Elizabeths Hospital Forensic Psychiatry Fellowship, Washington, D.C., Presentation, May 2017
- **"The Appropriateness of Psychiatric Diagnosis and Psychotropic Medication Prescribing"** St. Elizabeths Hospital Forensic Psychiatry Fellowship, at the Washington, D.C. Department of Corrections, QI Study Presentation, December 2016
- **"The Appropriateness of Psychotropic Prescribing Practices"** Unity Health Care, Inc., at the Washington, D.C. Department of Corrections, QI Study Presentation, December 2010
- **"Psychiatric Disorders and Treatment Options"** Unity Health Care, Inc. at the Washington, D.C. Department of Corrections, Quarterly Mental Health Correctional Officer's Training, November 2009 to June 2016
- **"Interactions Between ART and Psychiatric Medications"** with Andrew Catanzaro, M.D., Unity Health Care, Inc., Washington, D.C. Department of Corrections Provider Meeting, May 2010
- **"America Can't Afford to Wait for Healthcare Reform"** Health Reform Town Hall, U.S. Representative Ed Towns, May 2009 **"The Man Who Can't Stop Swallowing Sharp Objects: Medical Ethics and Management Limitations in Patients with Chronic Factitious Disorder"** Issue Workshop, American Psychiatric Association Annual Meeting, May 2008
- **"Factitious Disorder: Clinical, Ethical and Legal Management Issues"** Morbidity and Mortality Conference, November 2007
- **"Dying, Death, and Bereavement"** George Washington University Department of Psychiatry, Medical Illness Conference, August 2007
- **"Uncontrollable Swallowing: A Case Conference"** Medical Illness Conference, July 2007
- **"Near Death Experiences: A Closer Look"** George Washington University Department of Psychiatry, Grand Rounds, January 2007

## PROFESSIONAL MEMBERSHIPS:
American Psychiatric Association
American Academy of Psychiatry and the Law
National Commission on Correctional Health Care

## LANGUAGE PROFICIENCY:
Fluent in English.
Beginners level Spanish

**Mary Perrien, Ph.D.**
3313 W. Cherry Lane, Suite 333
Meridian, ID 83642
(208) 965-0875
mperrien@safesocietysolutions.com

| | | |
|---|---|---|
| **EDUCATION** | **University of Hawaii, Manoa** | |
| | Doctor of Philosophy, Clinical Psychology | 1998 |
| | Master of Arts, Clinical Psychology | 1994 |
| | | |
| | **San Jose State University** | |
| | Bachelor of Arts, Psychology | 1991 |

**LICENSURE STATUS** PSY18582 (California)
PSY 202317 (Idaho)

| | | |
|---|---|---|
| **TRAINING** | Internship in Clinical Psychology | 1997-1998 |
| | Atascadero State Hospital | |
| | Atascadero, California | |

| | | |
|---|---|---|
| **PROFESSIONAL EXPERIENCE** | **Expert Consultant** | 3/2019-present |
| | Correct Care Solutions, LLC | |
| | | |
| | **Expert Consultant** | 2017-11/2020 |
| | Alabama Department of Corrections | |
| | | |
| | **Expert Consultant** | 2014-2015 |
| | Idaho Department of Correction | |
| | | |
| | **Expert Consultant** | 2012-2014 |
| | Ohio Department of Rehabilitation and Correction | |
| | | |
| | **Expert Consultant** | 2012-2013 |
| | National Institute of Corrections | |
| | | |
| | **Expert Consultant** | 2011-2012 |
| | Illinois Department of Corrections | |
| | | |
| | **Safe Society Solutions, LLC** | 2010 to present |
| | Sole Proprietor, forensic evaluator and expert Witness (for defendants and plaintiffs) practice | |
| | | |
| | **Expert Consultant** | 2010-present |
| | Department of Homeland Security, Civil Rights and Civil Liberties (function as a subcontractor) | |

**PROFESSIONAL**
**EXPERIENCE**
**Continued**

| | | |
|---|---|---|
| **Expert Consultant** <br> United States District Court, Eastern District of California (*Coleman et al. v. Newsom et al.*) Case No. 90-0520 LKK-JFM | 2007 to present |
| **Chief, Division of Education and Treatment** <br> Idaho State Department of Correction | 2006-2010 |
| **Chief Psychologist/Director of Mental Health** <br> Idaho State Department of Correction | 2005-2006 |
| **Chief Psychologist/Director of Mental Health** <br> **Services – Correctional Facility** <br> California State Prison at Corcoran | 2003-2005 |
| **Senior Psychologist, Supervisor – Correctional** <br> **Facility** <br> California State Prison at Corcoran | 2001-2003 |
| **Psychologist - Clinical, Correctional Facility** <br> California State Prison at Corcoran | 2000-2001 |
| **Staff Psychologist** <br> Federal Correctional Institution, Butner | 1998-2000 |
| **Therapist/Researcher** <br> Honolulu Police Department | 1996-1997 |
| **Therapist/Group Facilitator** <br> Child & Family Services, Hawaii | 1994-1997 |
| **Therapist/Group Facilitator** <br> Department of Public Safety, Hawaii | 1994-1997 |

**TEACHING**
**EXPERIENCE**

| | | |
|---|---|---|
| **Guest Lecturer, various Psychology and** <br> **Criminology courses** <br> **Boise State University** | 2006-2014 |
| **Instructor, Correctional Peace Officers Standards** <br> **& Training Academy (Idaho)** | 2006-2014 |
| **Lecturer** <br> **Department of Psychology, University of Hawaii** | multiple 1994-1997 |

**PUBLICATIONS &
TECHNICAL
REPORTS**

Perrien, M. and O'Keefe, M. (2015). Disciplinary Infractions and Restricted Housing. In *Oxford Textbook of Correctional Psychiatry.* New York NY: Oxford University Press.

Perrien, M. (2010). Mental Health Guidelines and Documentation for Psychotherapists. In *Manual of Forms and Guidelines for Correctional Mental Health.* Washington DC: American Psychiatric Publications.

Perrien, M. (2009).  Sex offenders:  Analysis of best practice and current practice in Idaho for case disposition, assessment, treatment and supervision.  A Report provided to the Idaho Criminal Justice Commission.

Perrien, M. (2008).  Sex offenders: The current practices in the State of Idaho for case disposition, assessment, treatment and supervision. A Report provided to the Idaho Criminal Justice Commission.

Kunitake, M., Perrien, M., Yokoi, E., Perrone, P., Green, T., Sakamoto-Cheung, S., & Richmond, J. (1997).  Felony sexual assault arrests in Hawaii.  <u>Crime Trend Series:  State of Hawaii Department of the Attorney General</u>, 5(2), 1-9.

**PRESENTATIONS**

Perrien, M. (September 2009).  Presenter at the annual Idaho District Judges Retreat Training, Twin Falls, Idaho.

Perrien, M. (January-March 2009).  Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2009).  Presenter at the annual Idaho District Judges Seminar.  Boise, ID.

Perrien, M. (December 2008).  Educating correctional officers to respond to medical emergencies.  A paper presented at the conference Operational Excellence in Correctional Healthcare, Las Vegas, NV.

Perrien, M. (September 2008).  Panel Presenter at the annual Idaho District Judges Retreat Training.  Sun Valley, Idaho.

Perrien, M. (January-March 2008).  Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2008).  Presenter at the annual Idaho District Judges Seminar.  Boise, ID.

Perrien, M. (September 2007).  Panel Presenter at the annual Idaho District Judges Retreat Training.  Sun Valley, Idaho.

Perrien, M. (January-March 2007).  Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2007).  Panel Presenter at the annual Idaho District Judges Seminar, Boise, Idaho.

**PRESENTATIONS**
**Continued**

Perrien, M. (November 2006).  Suicide Risk Management in Corrections.  Paper presented at the Idaho Suicide Prevention Action Network Conference, Boise, Idaho.

Perrien, M. (November 2006).  Mental Health Care in Corrections and Community Corrections.  Presentation to District 7 Judges, Idaho Falls, Idaho.

Perrien, M. (October 2006).  Correctional Mental Health Care in Idaho.  Presentation to the Mental Health and Substance Abuse Treatment Delivery Systems Interim Legislative Committee.

Perrien, M. and Muller, C. (June 2006).  Cultural Competence and Multi-cultural Psychology.  Paper presented at the Idaho Mental Health Coalition Conference, Boise, Idaho.

Perrien, M. (April 2006).  Sex Offender Treatment in Correctional Setting.  Paper presented at the annual National Commission on Correctional Health Care Updates Conference, Las Vegas, Nevada.

Perrien, M. (November 2005).  Sex Offender Risk Assessment.  A training for clinical staff employed by the Idaho Department of Correction and Corrections Corporation of America.

Perrien, M. (October 2005).  Sex Offender Management.  Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Boise, Idaho.

Perrien, M. (September 2005).  Sex Offender Management.  Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Pocatello, Idaho.

Perrien, M. (April 2003).  Cultural Competence and Multi-cultural Mental Health Services.  A training workshop presented to mental health staff at CSP-Corcoran.

Perrien, M. (2002, multiple).  Forensic Evaluations and Courtroom Expert Testimony. A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2001, multiple).  Psychopathy and the Hare Psychopathy Checklist, Revised.  A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2000, February).  The Assessment, Treatment, Management and Community Supervision of the Sex Offender.  A training workshop provided to U.S.Probation Officers, Long Island, NY.

Perrien, M. (1999, July).  Psychopathy and the Hare Psychopathy Checklist, Revised.  A training workshop for predoctoral interns presented at the Federal Correctional Institution at Butner.

Perrien, M. (1999, April).  Psychopathy and the Hare Psychopathy Checklist Revised.  A training workshop for doctoral and masters level staff in the Sex Offender Treatment Program at the Federal Correctional Institution at Butner.

**PRESENTATIONS**

**Continued**   Perrien, M. & Kunitake, M. (1997, February).  Demographic characteristics of felony sex assault arrestees in Hawaii.  Paper presented to the Hawaii State Legislature at an Informational Symposium on Community Notification of Sex Offenders in Honolulu, Hawaii.

      Perrien, M. & Kunitake, M. (1997, February).  Registration and community notification of sex offenders in Hawaii.  Paper presented at the annual meeting of the Western Society of Criminology conference in Honolulu, Hawaii.

      Perrien, M. & Marsella, A.J. (1996, April).  Reported frequencies and perceived severity ratings of traumatic and near-traumatic events among college students.  Paper presented at the meeting of the Western Psychological Association, Santa Clara, California.

**ASSOCIATIONS/MEMBERSHIP**
American Psychological Association, member
American Psychology-Law Society, member
Association for Behavioral and Cognitive Therapies, member
Association for the Treatment of Sexual Abusers, clinical member
National Commission on Correctional Health Care, member
World Professional Association for Transgender Health, member

**COMMUNITY APPOINTMENTS**
Idaho State Planning Council on Mental Health, appointed by the Governor, 2009 and 2010.

**EXPERT WITNESS & CONSULTING**
*Abdiwali Musse v King County et al.* (2020 to present) Assessment of adequacy of care and risk assessment in the assault in custody of jail detainee. Pending expert discovery. King County Superior Court, State of Washington, Seattle Courthouse (Retained by plaintiff, report and possible deposition with testimony expected).

*Lorenzo Mays, et al v County of Sacramento.* (2020 to present) Monitoring Expert. Assessment of implementation of consent decree for mental health services in county jail. U.S. District Court, Eastern Division (Appointed via agreement by both parties).

*Toby Meagher, et al v King County, et al.* (2019 to present) Assessment of adequacy of care in the assault in custody of jail detainee. Pending hearing. U.S. District Court, Western District of Washington (Retained by plaintiff, report and deposition with testimony expected).

*Edward Braggs, et al v Jefferson Dunn (ADOC), et al.* (2018-present) Multiple court-ordered assessment reports including suicide prevention and functional segregation. U.S. District Court, Middle District of Alabama, Northern Division (Retained by defendants).

*The estate of Marc Moreno v Benton County Sheriff et al. (December 2017)* Assessment of adequacy of care in the death in custody of jail detainee. Case in mediation. Benton County, Washington. (Retained by plaintiff, report).

*The estate of Mathew Ajibade et al v Wilcher et al. (June 2017)* Assessment of adequacy of care in the death in custody of jail detainee. Case set for trial; deposition taken. U.S. District Court, Southern District of Georgia. (Retained by plaintiff, report and deposition testimony).

**EXPERT WITNESS & CONSULTING Continued**

*Potter v State of Idaho Department of Health and Welfare.* (May 2017) Provided expert testimony regarding the reliability and validity of recovered memories as well as the adequacy of investigations into allegations of sexual abuse. Idaho state hearing, appeal of finding. (Retained by defendant, report and testimony).

*The estate of Gordon Powell v Barnes et al.* (May 2017) Assessment of mental health staff and the adequacy of care in the murder of an inmate. U.S. District Court, Western District of Washington. (Retained by plaintiff, report).

*Edward Braggs v Jeffrey Dunn (Alabama Department of Correction) (2017)* Expert consultation to defendants post-litigation regarding adequacy and needs of current mental health service delivery system; provide expert assistance in mediation process; provide expert testimony and assistance in failed mediation trial matters, conducted staffing and suicide prevention assessment. (Retained by defendant, report and trial testimony)

*Disability Rights Florida, Inc. v Julie Jones, Secretary Florida Department of Corrections, et al.* (2016-2017) Consulting expert to plaintiffs to conduct assessments of the inpatient units at all facilities except for Dade Correctional Institution and develop recommendations on issues of mental health treatment, staffing, training and quality improvement. U.S. District Court, middle District of Florida. (Retained by plaintiff, report)

*Walker v Wall, Director, Rhode Island Department of Corrections et al*. (February 2016) Evaluated adequacy of care in post-PREA incident. Provided deposition testimony. U.S. District Court, District of Rhode Island. (Retained by defendant, report and deposition testimony).

**JAMES FRANCIS DEGROOT, PH.D.**
Atlanta, GA 30319
Phone: 770-356-1830
upcjdegroot@gmail.com

## Education

WRIGHT STATE UNIVERSITY, DAYTON, OHIO
Psychology Postdoctoral Program 1983-1985

CATHOLIC UNIVERSITY OF AMERICA, WASHINGTON, D.C.
Doctor of Philosophy 1977-1984

ANTIOCH UNIVERSITY, COLUMBIA, MARYLAND
Master of Arts 1974-1977

CARDINAL STRITCH COLLEGE, MILWAUKEE, WISCONSIN
Bachelor of Arts 1967-1971

## License

Licensed Clinical Psychologist in Georgia, 1986 to Present

## Clinical, Correctional and Forensic Experience: Georgia Department of Corrections

➢ **State-Wide Mental Health Consultant,** January 2020-Present (February 2020)
**Employed as a Part-time Employee by Centurion, a vendor contracted by the Georgia Department of Corrections (GDC)**
Consult with the State-Wide Clinical Director and be a liaison between the State-ide Clinical Director and the State-Wide Mental Health Director, focusing on: programs for mentally ill offenders in Restrictive Housing; programs for mentally ill offenders with Substance Use Disorders; and mental health policies and procedures.

➢ **State-Wide Clinical Director**, 2017-2020
**Employed by Centurion, a vendor contracted by the Georgia Department of Corrections (GDC)**
Centurion is responsible for hiring and delivering mental health services to an offender population of approximately 55,000 of whom 11,500 are diagnosed with a mental illness. I directly supervised 18 facility Clinical Directors and 17 staff psychologists, managed 24 facility Mental Health Administrative Directors, collaborated with the Centurion Regional Medical Director (a psychiatrist), oversee 250+ mental healthcare providers, and helped coordinate

operations with the leadership of Georgia Department of Corrections in order to deliver quality and timely mental health services.

➢ **State-Wide Mental Health Director,** 1994-2017
**Employed by the State, Georgia Department of Corrections (GDC)**
Responsible for the delivery of mental health services to inmates and detainees who were diagnosed with a mental illness. I spent much of the fist 10 years working on civil rights litigation with experts and attorneys on two certified class action complaints (Guthrie v Evans and Cason v Seckinger) and on one complaint which was never certified as a class and dropped by plaintiffs after two years, (Fluellen v Wetherington). During that time, we made major revisions to the mental health policies and procedures. The number of offenders receiving mental health services continually grew from 2,000 in 1994 to 11,500 in 2019. The severity, complexity and acuity of mental illness also increased. Consequently, I worked closely with GDC leadership and attorneys from the Attorney General's Office on a myriad of issues to include restrictive housing, implementation of the Prison Rape Elimination Act (PREA), transgender offenders, suicides, drugs, and gangs.

➢ **Staff Psychologist at GA's Maximum-Security Prison,** 2988-1994
**Employed by the State as a part-time employee**
I began working at GA State Prison (GSP) shortly after the tenure of Special Master Vincent Nathan. I was responsible for implementing of a consent decree resulting from Guthrie v Evans and for updating Judge Anthony Alaimo on the status of GSP's mental health delivery system. I worked closely with Warden A. G. Thomas, Commissioner Alan Ault, Assistant AGs, and the Medical College of GA which was providing psychiatric services. During this time, critical incidents at GSP declined and the consent decree became a model for upcoming major revisions in GDC's MH Policies and Procedures.

## Clinical, Correctional and Forensic Experience: Independent Practice

➢ **Mental Health Expert for the Office of the Special Master in the Ninth Circuit on Coleman v Newsom,** October 2019-Present (October 2020)
Responsible for monitoring California Department of Correctional Rehabilitation's (CDCR) implementation of court orders and writing reports for the Special Master.

➢ **Mental Health Expert for the Department of Homeland Security (DHS),** 2016-Present (February 2020)

**Subcontracted to work as part of a team investigating OIG mental health complaints from ICE detainees.**

Responsible for investigating both the specific detainee complaints on the delivery of mental health services and the facility's overall mental health compliance with the National Detention Standards, other applicable professional standards, and best practices. The results of the investigation are presented to facility leadership during an out-briefing and a formal report is written by each team member for DHS.

➢ **Independent Forensic Mental Health Evaluator of VA Complaints,** 2013-Present (February 2020)

Conduct a comprehensive mental health assessment on Viet Nam, Iraqi, and Afghanistan veterans complaining of combat related PTSD and TBI. The evaluation consists of reviewing the veteran's medical and military records, interviewing both collateral informants and the veteran, and administering psychological tests. The results are discussed with a team of attorneys who are Emory University fellows from the Emory Veteran's Clinic, and supervising attorneys from King & Spalding and/or from Ogletree, Deakins, Nash, Smoak & Stewart. A formal report is written for a VA hearing.

➢ **Contracted with the Dept. of Labor as an Independent Forensic Mental Health Evaluator,** 2008-Present (February 2020)

Evaluate individuals who filed disability claims with the Social Security Administration. The claimants are interviewed, psychological tests are usually administered, collateral informants are interviewed, and collateral documents are reviewed. Formal reports are written and submitted in a timely manner for an administrative hearing.

➢ **Psychology Consultant and Direct Care Provider for the GA Department of Juvenile Justice**, 2008-2016

Worked part-time, providing: direct care at a number of facilities (Augusta Youth Development Center, Bill Ireland YDC, and Emanuel YDC); consultation with DJJ leadership by performing psychological autopsies on two juveniles who committed suicide; consultation to DJJ HR by performing Fitness-for-Duty evaluations on custody staff; and clinical supervision for direct care providers in the field.

➢ **Independent Clinical & Forensic Mental Health Evaluator on Miscellaneous Cases,** 1988-2014

Over 26 years, I served as plaintiff and defendant expert on variety of cases. For example, I testified for a number of defendants on deliberate indifference and wrongful death cases in county jails. I also served as an expert witness in adult and juvenile criminal cases, performing competency and responsibility evaluations. I was an expert in one capital punishment case, testifying on behalf of the defendant who was represented by the Southern Center for Human Rights.

In 2010 and 2011 I consulted with The Moss Group as a PREA auditor, participating in PREA audits of ICE facilities managed by Correctional Corporation of America (CCA).

While practicing on St. Simon's Island and in Atlanta, I had contracts with Glynn County School System and with Atlanta City Schools to perform psychological evaluations on students to determine if they qualified for special education services.

Additionally, while teaching at the Medical College of GA, I worked for Richmond County Family Court performing evaluations on families to assist two judges with cases involving custody and termination of parental rights.

## Clinical, Correctional and Forensic Experience: Elected /Appointed Professional Positions

➢ **International Association for Correctional and Forensic Psychology (IACFP)**

**At-Large Board Member** and Chair of the Nominating Committee, January 2019-Present (February 2020)

**Past President** and Chair of the Nominating Committee, January 2017-December 2018

**President**, January 2015-December 2016

**President-Elect**, January 2013-December 2014

➢ **American Board of Correctional Psychology (ABCP)**

**At-Large Board Member**, January 2018-Present (August 2019)

Working with the American Board of Professional Psychology (ABPP), the American Psychological Association and other professional associations to create an ABPP subspecialty board certification for Correctional Psychology.

➢ **National Institute of Corrections, Mental Health Network (NIC)**

**Administrative Committee, Chair**, 2014-2015

**Administrative Committee, Member,** 2011-2014

**Steering Committee, Member,** 2010-2011

**Suicide & Self Injurious Behavior Committee, Chair**,2009-2010

➢ **GA's National Alliance for the Mentally Ill (NAMI)**
**Board Member and Nominating Committee Chair**, 2011-2014

➢ **GA's Crisis Intervention Team (CIT)**
**Advisory Board Member**, 2007-2010
**Steering Committee Member**, 2008-2011

➢ **The Governor's Mental Health Summit**
**Member**, 2006-2009

➢ **GA's Reentry Impact Program**
**Member**, 2005-2008

➢ **GA's Mental Health Planning & Advisory Council (GMHPAC)**
**Member** 2006-2015

➢ **Association for the Advancement of Behavior Therapy (AABT)**
**Legislative Committee, Chair**, 2000-2003

## ACADEMIC APPOINTMENTS

2007-2013 Member of GA State University Institutional Review Board, Atlanta, GA

1990-2016 Clinical Professor of Psychiatry, the Medical College of Georgia, Augusta, GA

1987-1990 Assistant Professor of Psychiatry, the Medical College of Georgia, Augusta, GA

1986-1988 Clinical Faculty, Psychiatry Residence & Child Psychiatry Fellowship at Eisenhower Army Medical
          Center, Fort Gordon, GA

1986-1988 Clinical Psychology Internship at Eisenhower Army Medical Center, Fort Gordon, GA.

1981-1983 Clinical Faculty for the General Psychiatry Residence and Child Psychiatry Fellowship at                     Letterman Army Medical Center, San Francisco, California.

1978-1979  Psychology Instructor, Prince's George's Community College, Largo, Maryland

1977-1979  Teaching Assistant, Catholic University of American, Washington, D.C.

# Military Service

➤ **Duties**
I served as a Captain in the US Army. I worked as a clinical psychologist at Eisenhower Army Medical Center (Fort Gordon, Georgia) and at Letterman Army Medical Center (Presidio in San Francisco, CA). During both tours of duty, I provided direct care to active duty service members and their dependents and I clinically supervised psychology practicum students, psychology interns, and child-adolescent psychiatry fellows.

➤ **MILITARY EDUCATION**
1987 Command and General Staff College, Correspondence
1986 Officer Advanced Courses at the Academy of Health Sciences, San Antonio, Texas
1981 Officer Basic Course at the Academy of Health Sciences, San Antonio, Texas

➤ **MILITARY AWARDS**
1986        Army Commendation Medal
1981 Army Commendation Medal

## PROFESSIONAL PRESENTATIONS

### 1994-Current
As the current State-wide Clinical Director and previous Mental Health Director for Georgia Department of Corrections, between 1994 and 2019 I've presented papers at state, national and international professional meetings and universities at least every few months.  I also testified in numerous hearings to include a PREA Commission Hearing while they were writing the Prison Rape Elimination Act of 2003 and a NIC Advisory Board Public Hearing entitled "Balancing Fiscal Challenges, Performance-Based Budgeting and Public Safety". Details for any of the above will be provided upon request.

NATIONAL

June 1995        "What's Love Got to Do With It?  The Dynamics of Family Violence and Its Implications for the Criminal Justice and Mental Health Systems," (with Annette Z. Henderson).  Presented at the Fifth Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri.

August 1994        "When Staff Burn Out, Students Follow: The Mental Health Consultant's Role in Attenuating Staff's Stress through Consultation and Training." Presented at Job Corps Annual Meeting for Mental Health Consultants in Los Angeles, California.

May 1994        "The Inevitability of the Mental Health Professional Being Sued by Inmates,"(with Margaret Severson).   Presented at the Fourth Annual

|  | Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
|---|---|
| March 1994 | "An Update on the Georgia Prison Study," (with A.R. Bruhn and K. Feigenbaum).  Presented at the Society of Personality Assessment's Mid-Winter Meeting in Chicago, Illinois. |
| May 1993 | "Identification of Unsolved Issues with the Early Memory Procedures: Assessing Violence Potential."  Presented at the Third Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
| March 1993 | "Predicting Aggression Potential with the Early Memory Procedure: The Georgia Prison Study," (with A.R. Bruhn and K. Feigenbaum).  Presented at the Society of Personality Assessment's Mid-Winter Meeting in San Francisco, California. |
| May 1992 | "Hurdles in the Implementation of Treatment Programs in Correctional Settings: A Constructivist's Ruminations from a Maximum Security Prison," (with Joe Owens and Janice Deal).  Presented at the Second Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
| March 1992 | "Identifying and Treating the Basis for Delinquent Behavior via Early Memories."  Presented at the Society of Personality Assessment's Mid-winter meeting in Washington, D.C. |
| August 1989 | Effects of Abuse on Perspective-Talking Skills in Children," (with Fred Garland as primary, Linda Christiansen and Anthony Zold).  Presented at the American Psychological Association's Annual Convention in New Orleans, Louisiana. |
| August 1989 | "The World According to a Distressed Truck Driver: Constructivist Perspectives," (with Fred Garland).  Presented at the American Psychological Association's Annual Convention in New Orleans, Louisiana. |
| March 1989 | "The Rorschach As a Measure of Behavior."  Presented to graduate students and faculty at Stanford University in Palo Alto, California. |
| February 1989 | "Continuity-Discontinuing in Child-Adult Psychopathology:  A Structural-Developmental Perspective," (with Stephen N. Xenakis).  Presented at the AMEDD Clinical Psychology Short Course, sponsored by the Office of the Surgeon General and held in Augusta, Georgia. |
| October 1988 | "Clinical Consideration in Using Parent-Child Rating Scales," (with P.S. Jensen and S.N. Xenakis).  Presented at the 35th Annual Meeting of the American Academy of Child and Adolescent Psychiatry held in Seattle, Washington. |
| October 1988 | "Parents at Risk: An Epidemiological Investigation," (with P.S. Jenson and L.J. Bloedan).  Presented at the World Psychiatric Association Regional Symposium held in Washington, D.C. |

August 1988     "Children at Risk: Psychopathology Correlates in Clinical and Community Samples," (with L.J. Bloedan and P.S. Jensen). Presented at the annual meeting of the American Psychological Association held in Atlanta, Georgia.

May 1988     "Concept of Self in ADD Children: An Application of Piaget and Projective Testing." Presented as part of a symposium entitled "ADD: Psychosocial Issues in Treatment and Research." Presented at the 41st Annual Meeting of the American Psychiatric Association held in Montreal, Canada.

May 1988     "Contributions and Limitations of Projective Tests in the Diagnosis and Treatment of ADHA." Paper presented to Seoul National Psychiatric Institute in Seoul, Korea.

October 1987     "Interrater Agreement Vis-a-Vis Child Behavior Problems: Research Issues, New Evidence, and Future Direction," (with P.S. Jensen). Presented at the Annual Meeting of the American Academy of Child and Adolescent Psychiatry, Washington, D.C.

March 1987     "A Model of Psychological Interventions for Consultations and Liasion with Medical Clinics," (with R.C. Hulsebus, F.M. Tomayo and R. Sullivan). Presented at the U.S. Army Neuropsychology and Behavioral Medicine Conference, San Francisco, California.

March 1987     "Relationships Between Parents' Self-Reported Symptoms and Their Perceptions of Their Children's Symptoms: Implications for Using Parent-Child Rating Scales," (with P.S. Jenson and S.N. Xenakis). Presented at the U.S. Army Neuropsychology and Behavioral Medicine Conference, San Francisco, California.

February 1987     "A Constructivist-Structural Model of Development with Clinical Implications." Presented at the U.S. Army Child and Family Psychiatry Conference, Honolulu, Hawaii.

## STATE

May 1988     "The Mind of the Hyperactive Child." Paper presented at a one-ay seminar entitled, "Working with Families: Parenting the Behavior Disorder Child," sponsored by Charter Hospital of Augusta and the Medical College of Georgia; held in August, Georgia.

February 1988     "Therapeutic Consideration with Military Families. "Presented at the Georgia Psychological Association's Mid-winter Conference, Calloway Gardens, Pine Mountain, Georgia.

February 1988     "Identifying and Managing Problems in Preschool Children." Presented at Open Door Preschool for the Staff Development in August, Georgia.

October 1987     "Working with Resistant Families." Presented at one-day continuing education workshop for public school teachers, sponsored by Charter

|              | Hospital of August and the Medical College of Georgia; held in August, Georgia. |
|--------------|--------------------------------------------------------------------------------|
| April 1987   | "Typical and Atypical Development Problems."  Presented to the Mothers' League of Augusta, sponsored by St. Joseph's Hospital in Augusta, Georgia. |
| February 1987 | "Learning Disabilities: A Development-Neuropsychological Perspective." Presented at a one-day continuing education workshop for special education teachers, sponsored by Richmond County Public School and the Medical College of Georgia, August, Georgia. |
| October 1986 | "Developmental Issues and the Foster Child."  Presented to the Foster Parent Associations of Colombia County in Martinez, Georgia. |
| February 1988 | "A Constructivist Approach to Moral Development."  Presented in Psychiatry Grand Rounds, Medical College of Georgia, Augusta, Georgia. |
| December 1987 | "Instruments and Interview: How to Make Them Work."  Presented a the Research Workshop sponsored by Eisenhower Army Medical Center and the Medical College of Georgia, Fort Gordon, Georgia. |
| November 1987 | "A Developmental Model of the Self."  Presented at Psychiatry Grand Rounds, Eisenhower Army Medical Center, Fort Gordon, Georgia. |

## Professional Publications

DeGroot, J.F., (2015). A Roadmap for Providing Psychiatric Services to Incarcerated Veterans: A challenging Subspecialty. In R. L. Trestman et. al. (Ed.), *Correctional Psychiatry* (pp. 310-314). Oxford Press.

DeGroot, J.F." Behavior Therapy in Correctional Settings." The Behavior Therapist, 2003, Vol.26#1.

Jensen, P.S., Xenakis, S.N., Davis, H., and DeGroot, J.F.: "Child Psychopathology Rating Scales and Interrater Agreement:  Child and Family Characteristics." American Academy of Child and Adolescent Psychiatry, 1988, 17:4, p. 451-461

Jensen, P.S., Xenakis, S.N., Davis, H., and DeGroot, J.F.: "Child Psychopathology Rating Scales and Interrater Agreement:  Child and Family Characteristics." American Academy of Child and Adolescent Psychiatry, 1988, 17:4, p. 451-461.

DeGroot, J.F., Hulsebus, R.C. Tamayo, F.M., and Sullivan, R: "A Model of Psychological Interventions for Consultation and Liaison with Medical Clinics." Proceedings of the 1987 AMEDD Clinical Psychology Short Course, 1987, p. 103-112.

DeGroot, J.F., Jensen, P.S., and Xenakis, S.N.: "Relationships Between Parents: Self-Reported Symptoms and Their Perceptions of Their Children's Symptoms:

Implications for Using Parent-Child Scales." <u>Proceeding for the 1987 AMEDD Clinical Psychology Short Course</u>, 1987, p. 153-162.


DeGroot, J.F.: "Effects of Person Perception on the Development of Children's Moral Judgment." <u>The Journal of Genetic Psychology</u>, 1982, 141, p. 41-48.

Ross, B. and DeGroot, J.F.: "How Adolescents Combine Probabilities." <u>The Journal of Psychology</u>, 1982, 110, p. 75-90.

**APPENDIX D**

**LIST OF ACRONYMS AND ABBREVIATIONS USED IN THIS REPORT**

## ACRONYMS AND ABBREVIATIONS

ADHD:              Attention Deficit Hyperactivity Disorder

ADLs:              Activities of Daily Living

AED:               Automatic External Defibrillator

AIMS:              Abnormal Involuntary Movement Scale

ASH:               Atascadero State Hospital

ASP:               Avenal State Prison

ASU:               Administrative Segregation Unit

ATP:               Adenosine Triphosphate

CAP:               Corrective Action Plan

CBT:               Cognitive Behavioral Therapy

CCC:               California Correctional Center

CCHCS:             California Correctional Health Care Services

CCI:               California Correctional Institution

CCCMS:             Correctional Clinical Case Management System

CCWF:              Central California Women's Facility

CDCR:              California Department of Corrections and Rehabilitation

Centinela:         Centinela State Prison

CHCF:              California Health Care Facility

CIM:               California Institution for Men

1

| | |
|---|---|
| CIW: | California Institution for Women |
| CMC: | California Men's Colony |
| CME: | Chief Medical Executive |
| CMF: | California Medical Facility |
| COVID-19: | Coronavirus Disease 2019 |
| CPR: | Cardiopulmonary Resuscitation |
| CQI: | Continuous Quality Improvement |
| CQIT: | Continuous Quality Improvement Tool |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| CTF: | Correctional Training Facility |
| CVSP: | Chuckawalla Valley State Prison |
| CYA: | California Youth Authority |
| DCHCS: | Division of Correctional Health Care Services |
| DDP: | Developmental Disability Program |

| | |
|---|---|
| DEC: | Disability and Effective Communication |
| DNR: | Do Not Resuscitate |
| DSH: | Department of State Hospitals |
| DVI: | Deuel Vocational Institution |
| ECF: | Electronic Case File |
| EHRS: | Electronic Health Records System |
| ETOH: | Ethyl Alcohol |
| EOP: | Enhanced Outpatient Program |
| FIT: | Focused Improvement Team |
| Folsom: | Folsom State Prison |
| FWF: | Folsom Women's Facility |
| GED: | General Educational Development |
| GP: | General Population |
| HDSP: | High Desert State Prison |
| HIV/AIDS: | Human Immunodeficiency Virus/Acquired Immunodeficiency Syndrome |
| HRL: | High Risk List |
| HS: | *Hora Somni*/Hour of Sleep |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| IP: | Inmate Patient |

IPOC                  Interdisciplinary Plan of Care

IDTT:                 Interdisciplinary Treatment Team

IEX:                  Indecent Exposure

ISP:                  Ironwood State Prison

KVSP:                 Kern Valley State Prison

LOC:                  Level of Care

LOP:                  Local Operating Procedure

LRH:                  Least Restrictive Housing

LTRH:                 Long-Term Restricted Housing

MCSP:                 Mule Creek State Prison

MHCB:                 Mental Health Crisis Bed

MHSDS:                Mental Health Services Delivery System

MHTS:                 Mental Health Tracking System

NKSP:                 North Kern State Prison

NOS:                  Not Otherwise Specified

NPPC:                 Nursing Professional Practice Committee

OHU:                  Outpatient Housing Unit

OLA:                  Office of Legal Affairs

PBSP:                 Pelican Bay State Prison

PBST:                 Positive Behavioral Support Team

4

PC:                    California Penal Code

PIP:                   Psychiatric Inpatient Program

POLST:                 Physician Orders for Life Sustaining Treatment

PSH:                   Patton State Hospital

PSU:                   Psychiatric Services Unit

PTSD:                  Posttraumatic Stress Disorder

PVSP:                  Pleasant Valley State Prison

QIP:                   Quality Improvement Plan

RC:                    Reception Center

RJD:                   Richard J. Donovan Correctional Facility

RVR:                   Rules Violation Report

SCC:                   Sierra Conservation Center

SCR:                   Suicide Case Review

SCRC:                  Suicide Case Review Committee

SCU:                   Supportive Care Unit

SHU:                   Security Housing Unit

SI:                    Suicidal Ideation

SIB:                   Self-Injurious Behavior

SMHP:                  Statewide Mental Health Program

SNY:                   Sensitive Needs Yard

SPMW:                  Suicide Prevention Management Workgroup

| | |
|---|---|
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ: | San Quentin State Prison |
| SRASHE: | Suicide Risk and Self-Harm Evaluation |
| SRE: | Suicide Risk Evaluation |
| SSI: | Supplemental Security Income |
| STRH: | Short-Term Restricted Housing |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| TABE: | Test of Adult Basic Education |
| TTA: | Triage and Treatment Area |
| VSP: | Valley State Prison |
| WIC: | California Welfare and Institutions Code |
| WSP: | Wasco State Prison |