# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**
   **Plaintiffs,**

**v.**                                             No. 2:90-cv-0520-KJM-DB P

**GAVIN NEWSOM et al.,**
   **Defendants.**

### SPECIAL MASTER'S MONITORING REPORT ON THE MENTAL HEALTH INPATIENT CARE PROGRAMS FOR INMATES OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
January 28, 2021

## ACRONYMS and ABBREVIATIONS

3CMS:                Correctional Clinical Case Management System

ADD:                 Assistant Deputy Director

ADL:                 Activities of Daily Living

AIMS:                Abnormal Involuntary Movement Scale

ASH:                 Atascadero State Hospital

BEST:                Behavioral Education and Support Team

BUM:                 Bed Utilization Management

CC I:                Correctional Counselor I

CCAT:                Coordinated Clinical Assessment Team

CCHCS:               California Correctional Health Care Services

CCWF:                Central California Women's Facility

CDCR:                California Department of Corrections and Rehabilitation

CDPH:                California Department of Public Health

CEO:                 Chief Executive Officer

CHCF:                California Health Care Facility

CHCF-PIP:            California Health Care Facility Psychiatric Inpatient Program

CIW:                 California Institution for Women

CIW-PIP:             California Institution for Women Psychiatric Inpatient Program

CMC:                 California Men's Colony

CMF:                 California Medical Facility

CMF L1-PIP:          California Medical Facility L1 Psychiatric Inpatient Program

CMF-PIP:             California Medical Facility Psychiatric Inpatient Program

CNA:                 Certified Nursing Assistant

COBCP:               Capital Outlay Budget Change Proposal

CPR:                 Cardiopulmonary Resuscitation

CQI:                 Continuous Quality Improvement

CQIT:                Continuous Quality Improvement Tool

CRIPA:           Civil Rights of Institutionalized Persons Act

CSH:             Coalinga State Hospital

CSP/LAC:         California State Prison/Los Angeles County

CSP/SAC:         California State Prison/Sacramento

CSR:             Continuous State Record

C-SRRS:          Columbia Suicide Severity Rating Scale

CTC:             Correctional Treatment Center

DAI:             Division of Adult Institutions

DBT:             Dialectical Behavioral Therapy

DD:              Developmental Disability

DPS:             Discretionary Program Status

DSH:             Department of State Hospitals

ECC:             Emergency Care Committee

ED:              Executive Director

EHRS:            Electronic Health Records System

EMRRC:           Emergency Medical Response Review Committee

EMS:             Emergency Medical System

EOP:             Enhanced Outpatient Program

EPRD:            Estimated Parole Release Date

FRC:             Facility Review Committee

FTE:             Full-Time Equivalent

GED:             General Equivalency Diploma

G.O.A.L.S.:      Granting of Activities Level System

HAS:             Hospital Access System

HCITC:           High Custody Intermediate Treatment Center

HCPOP:           Health Care Placement Oversight Program

HS:              *Hora Somni*/Hour of Sleep

HSS:             Health Services Specialist

| | |
|---|---|
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |
| IPOC: | Individual Plan of Care |
| IST: | In-Service Training |
| KVSP: | Kern Valley State Prison |
| LGB: | Local Governing Body |
| LOP: | Local Operating Procedure |
| LRH: | Least Restrictive Housing |
| LVN: | Licensed Vocational Nurse |
| MAPP: | My Activity Participation Plan |
| MCSP: | Mule Creek State Prison |
| MDO: | Mentally Disordered Offender |
| MHCB: | Mental Health Crisis Bed |
| MHSDS: | Mental Health Services Delivery System |
| MIRC: | Mortality Incident Review Committee |
| MOU: | Memorandum of Understanding |
| MTA: | Medical Technical Assistant |
| MVR: | Medication Variance Reporting |
| NCAT: | Non-Clinical Activity Tracking |
| NKSP: | North Kern State Prison |
| NOS: | Not Otherwise Specified |
| PaWSS: | Patient Wellness and Recovery Model Support System |
| PBSP: | Pelican Bay State Prison |
| PBST: | Positive Behavioral Support Team |
| PC: | California Penal Code |
| PICU: | Psychiatric Intensive Care Unit |

| | |
|---|---|
| PIP: | Psychiatric Inpatient Program |
| PIWP: | Performance Improvement Work Plan |
| PRC: | Program Review Committee |
| PRN: | Take As Needed |
| PSH: | Patton State Hospital |
| PSSC: | Psychology Specialist Services Committee |
| PSU: | Psychiatric Services Unit |
| PTSD: | Post-Traumatic Stress Disorder |
| QA: | Quality Assurance |
| QI: | Quality Improvement |
| QIP: | Quality Improvement Plan |
| QPIP: | Quality Performance and Improvement Program |
| QIT: | Quality Improvement Team |
| RJD: | Richard J. Donovan Correctional Facility |
| RMC: | Risk Management Committee |
| RN: | Registered Nurse |
| RVR: | Rules Violation Report |
| SHU: | Security Housing Unit |
| SIR: | Special Incident Report |
| SMTA: | Senior Medical Technical Assistant |
| SNF: | Skilled Nursing Facility |
| SOMS: | Strategic Offender Management System |
| SPC: | Suicide Prevention Committee |
| SPI: | Safety Planning Intervention |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ: | San Quentin State Prison |
| SQ-PIP: | San Quentin Psychiatric Inpatient Program |
| SRA: | Suicide Risk Assessment |

| | |
|---|---|
| SRASHE: | Suicide Risk Assessment and Self-Harm Evaluation |
| SRE: | Suicide Risk Evaluation |
| SRN: | Senior Registered Nurse |
| STA: | Structured Therapeutic Activities |
| STAGE: | Steps Toward Accomplishment Growth and Education |
| STEP: | System to Encourage Progress |
| STP: | Structured Treatment Program |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| SVSP-PIP: | Salinas Valley State Prison Psychiatric Inpatient Program |
| TC: | Treatment Center |
| TC1: | Treatment Center 1 |
| TC2: | Treatment Center 2 |
| TCMP: | Transitional Case Management Program |
| TIC: | Trauma Informed Care |
| TSI: | Therapeutic Strategies and Interventions Training |
| TTM: | Therapeutic Treatment Module |
| UCC: | Unit Classification Committee |
| VPP: | Vacaville Psychiatric Program |
| WaRMSS: | Wellness and Recovery Model Support System |
| WIC: | California Welfare and Institutions Code |

TABLE OF CONTENTS

**ACRONYMS and ABBREVIATIONS**                                              i

**INTRODUCTION**                                                           1

**PART I:  UPDATE ON ACCESS TO MENTAL HEALTH INPATIENT CARE FOR**
**           *COLEMAN* CLASS MEMBERS**                                      12

A.    Coordination Efforts Related to Psychiatric Inpatient Programs        21

    1.    PIP End-to-End Staffing Model Methodology                       22

    2.    PIPs Workgroup – CHCF-PIP and CMF-PIP                           22

    3.    CHCF-PIP Transition Plan Subcommittee                           27

    4.    Therapeutic Treatment Modules                                   27

B.    Areas of Focus:  Issues Defendants Need to Address Regarding Inpatient Care   29

    1.    Staffing Vacancies                                              30

    2.    Referrals and Transfers                                         33

    3.    Least Restrictive Housing Placements                            34

    4.    Access to DSH Facilities                                        35

    5.    Clinical Services and Treatment in Inpatient Programs:  Treatment Planning,
       Group Therapy, and Individual Treatment                         39

**PART II: THE SPECIAL MASTER'S FINDINGS AT THE NINE INPATIENT**
**           PROGRAMS**                                                     43

A.    STAFFING                                                             43

B.    TREATMENT AND CLINICAL SERVICES                                      49

C.    QUALITY OF CARE ISSUES IN IDTTS AND TREATMENT PLANNING IN THE
     INPATIENT CARE PROGRAMS                                           67

    1.    Observed Inadequacies in the IDTT Process                       67

    2.    Deficiencies in Treatment Planning                              69

    3.    Deficiencies in Behavior Plans                                  71

D.    PATIENT ACCESS TO TREATMENT                                          72

E.    REFERRALS AND TRANSFERS                                              78

F.    ADMISSIONS AND DISCHARGES                                            79

G.    LEAST RESTRICTIVE HOUSING                                            82

H.    PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE                    84

I.      USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINTS

                                                                                    88

J.      SUICIDE PREVENTION, EMERGENCY RESPONSE, AND THE DEATH REVIEW

        PROCESS                                                                     89

K.      QUALITY MANAGEMENT AND UTILIZATION REVIEW                                    92

L.      PATIENT COMPLAINTS/PATIENT SATISFACTION                                      98

M.      COLEMAN POSTINGS                                                             101

N.      LAUNDRY AND SUPPLY ISSUES                                                    101

O.      VISITATION/PRIVILEGES/TELEPHONE ACCESS                                       103

P.      LAW LIBRARY ACCESS                                                          105

Q.      EDUCATION                                                                    107

**CONCLUSION AND RECOMMENDATIONS**                                                  108

        APPENDIX A1: DSH-Atascadero                                                  112

        APPENDIX A2: DSH-Coalinga                                                    130

        APPENDIX A3: DSH-Patton                                                      146

        APPENDIX A4: SVSP-PIP                                                        162

        APPENDIX A5: CMF-PIP                                                         193

        APPENDIX A6: CMF L1-PIP                                                      229

        APPENDIX A7: CHCF-PIP                                                        237

        APPENDIX A8: CHCF-PIP Revisit                                               266

        APPENDIX A9: CIW-PIP                                                         290

        APPENDIX A10: SQ-PIP                                                         306

        APPENDIX B-1: DSH-Patton                                                     324

        APPENDIX B-2: SVSP-PIP                                                       330

        APPENDIX B-3: CMF-PIP                                                        336

        APPENDIX B-4: CHCF-PIP                                                       344

        APPENDIX B-5: CIW-PIP                                                        361

        APPENDIX B-6: SQ-PIP                                                         370

## **INTRODUCTION**

This report encompasses the Special Master's full review of the inpatient mental health care programs that provide treatment to inmates in the California Department of Corrections and Rehabilitation (CDCR). All nine inpatient programs are covered in the report, including the six CDCR operated Psychiatric Inpatient Programs (PIPs)—California Health Care Facility Psychiatric Inpatient Program (CHCF-PIP), California Institution for Women Psychiatric Inpatient Program (CIW-PIP), California Medical Facility L1 Psychiatric Inpatient Program (CMF L1-PIP), California Medical Facility Psychiatric Inpatient Program (CMF-PIP), San Quentin Psychiatric Inpatient Program (SQ-PIP), Salinas Valley Psychiatric Inpatient Program (SVSP-PIP)—and the three Department of State Hospitals (DSH) programs located at Atascadero State Hospital (DSH-Atascadero), Coalinga State Hospital (DSH-Coalinga), and Patton State Hospital (DSH-Patton).

The monitor[1] conducted on-site inspections at DSH-Patton, SVSP-PIP, CMF-PIP, CHCF-PIP, CIW-PIP, and SQ-PIP with each program receiving two- to four-day visits between September 17, 2019 and March 12, 2020. As a result of the persistent problems affecting the provision of mental health care to *Coleman* class members that were found during the site visit to CHCF-PIP in September 2019, the Special Master conducted a follow-up visit to CHCF-PIP in March 2020. DSH-Atascadero, DSH-Coalinga and CMF L1-PIP were monitored by means of document review, i.e., the monitor and expert conducted their review by examination of documentation regarding the operations at these programs during the review period.

---

[1] While collected data and findings in this report are the result of members of different monitoring teams, the various monitors are collectively referred to as "the monitor." The Special Master's staff of mental health experts are collectively referred to as "the Special Master's expert."

The monitoring focus areas were:

A.    Staffing

B.    Treatment and Clinical Services

C.    Quality of Care Issues in IDTTs and Treatment Planning in the Inpatient Programs

D.    Patient Access to Treatment

E.    Referrals and Transfers

F.    Admissions and Discharges

G.    Least Restrictive Housing

H.    Patient Disciplinary Process and the Use of Force

I.    Use of Observation Cells/Rooms, Seclusion, and Restraint

J.    Suicide Prevention, Emergency Response, and the Death Review Process

K.    Quality Management and Utilization Review

L.    Patient Complaints/Satisfaction

M.    Coleman Postings

N.    Laundry and Supply Issues

O.    Visitation/Privileges/Telephone Access

P.    Law Library Access

Q.    Education

Following the format of the preceding inpatient report, this report is comprised of two major sections. Part I provides an update on the state of access to mental health inpatient care for *Coleman* class members. Subpart I (A) covers coordination efforts related to PIPs. Subpart I (B) contains a discussion of five core areas—staffing vacancies; referrals and transfers; least

2

restrictive housing (LRH) placements; access to DSH facilities; and clinical services and treatment in inpatient programs—which defendants must address to sustain any progress that has been achieved related to problems with access to and the provision of adequate mental health care for CDCR inmates.

Part II of this report contains the Special Master's summaries of his findings at the nine inpatient programs. The summaries are organized by focus area (i.e. items A through P listed above), and further grouped by common characteristics, i.e., (1) DSH-operated facilities: DSH-Atascadero, DSH-Coalinga, and DSH-Patton; (2) the PIPs now under CDCR's operation as a result of Lift and Shift: SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP[2]; and (3) the PIPs operated by CDCR prior to Lift and Shift: CIW-PIP and SQ-PIP.

The Special Master's individual summaries of his findings at each of the nine inpatient programs are provided in Appendices A1 – A10. His expert's clinical case reviews for six of the nine programs are found in Appendices B-1 – B-6.

On October 22, 2020, the Special Master provided the *Coleman* parties with a draft version of this report. In accordance with regular practice for the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the draft report. On November 23, 2020, the parties submitted their comments and objections to the draft report.[3]

---

[2] Both the September 2019 and the March 2020 monitoring visits to CHCF-PIP are reported on in Part II of this report and in the appendices attached hereto.
[3] *See* Attachment A, Letter dated November 23, 2020 from plaintiffs' counsel, Amy Xu to Special Master Lopes. *See* Attachment B, Letter dated November 23, 2020 from defendants' counsel, Elise Thorn to Special Master Lopes.

**Plaintiffs' Response to the Draft Report**

Plaintiffs' response to the draft report related to two areas: the use of restraints and treatment modules in inpatient programs, and draft report Recommendation 5. The first pertained to a section in the draft report wherein the Special Master reported on a tour of the Psychiatric Intensive Care Unit (PICU) at the Veterans Administration Medical Center in San Francisco. The tour, attended by both parties and members of the Special Master's team, was to learn about alternatives to the use of therapeutic treatment modules (TTMs) in inpatient care units. After their review of the program, the Special Master's team observed that the PICU and *Coleman* class member populations were not comparable such that the treatment milieu observed during the tour would be suitable for adoption in the CDCR PIPs.

In their response to the draft report, plaintiffs made clear their position that similarities between the two patient populations were such that defendants could and should apply the successful practices being used at the PICU in their inpatient programs. Plaintiffs reiterated their staunch opposition to the use of TTMs in treating *Coleman* class members in need of inpatient care and stated their objection to "any implication in the Draft Inpatient Report that cages are necessary for treating *Coleman* class members in need of inpatient care, or to the implication that the staff- and training- intensive strategies employed by a well-managed inpatient unit like the PICU would not work within CDCR's PIPs." They requested that the Special Master revise the draft report to reflect that position, or, in the alternative, to acknowledge that the issue remained a point of contention which warranted further exploration. After consideration of plaintiffs' comments, the Special Master amended the relevant report section within Part I below. (*See infra*, 27, 28)

The second of plaintiffs' requests was that the Special Master revise Recommendation 5. Recommendation 5 called for defendants to develop a report to supplement the data in their monthly census, waitlist, and transfer timeline compliance reports to identify the number of patients on the waitlist specifically out of LRH, their current designated housing, and where they have been endorsed. Plaintiffs requested that Recommendation 5 be revised to include a 14-day deadline for completion. The Special Master made changes to Recommendation 5 since the draft report was issued to the parties. The revision should provide the parties with further clarity. Plaintiffs also asked that defendants be required to meet specific timeframes for evaluating and moving class members into their LRH designations—a request made previously in their response to the 2018 Inpatient Care Report. The Special Master and the parties will attend to matters regarding timeframes to evaluate and move class members to their LRH designation as functions of the workgroup process.

**Defendants' Response to the Draft Report**

Defendants' response to the draft report was divided into four parts: (1) general response and comments, (2) response and objections to the update on access to mental health inpatient care, (3) response from individual PIPs and DSH programs, and (4) defendants' response to the Special Master's six recommendations. Defendants' response, organized by topic, is discussed in further detail below.

### General Response and Comments

This section consisted of a summary of defendants' response to the draft report, the topics of which were addressed in further detail in the sections of their response that followed it. Generally, most of the issues raised by defendants stemmed from their overall position that the Special Master's report findings on the quality of inpatient care, as well as class members' access

thereto, were a direct result of the impact of the COVID-19 pandemic; they requested that a number of areas in the report be revised to reflect that position.  It should be said at the outset that the Special Master disagrees with defendants' position in that regard.  As evidenced by the Special Master's preceding reports on inpatient care (ECF Nos. 4830, 5156, 5448, 5894), defendants have struggled for years with staffing vacancies, providing *Coleman* class members with timely access to inpatient care, and issues with individual treatment, group therapy, and treatment planning.  While the COVID-19 pandemic may have further highlighted, or, in some instances exacerbated, the problems faced by defendants, it most certainly did not create them.[4]

#### **Response and Objections to the Update on Access to Mental Health Inpatient Care**

This section of defendants' response was divided into three parts; 1) staffing issues, 2) focused workgroups for CDCR PIPs need to address issues raised in the report, and 3) the draft report contains misleading findings.  In their response, defendants object to a number of statements and report findings they characterize as misleading.  Defendants made a number of requests for revisions to the draft report to reflect their various positions.

With regard to staffing issues, defendants asserted that "any findings on compliance with staffing should be identified as pending and subject to the ongoing consideration of the staffing plans."  It is not, nor has it ever been, the practice of the Special Master to categorize report findings based on his monitoring as pending.  Should circumstances change such that defendants

---

[4] In their November 23, 2020 letter, defendants request that the Special Master amend his report to "explain the impacts of COVID-19 to the parties and Court to inform and guide further action."  As the impact of the COVID-19 pandemic has been primarily to highlight, and in some instances exacerbate *existing* problems, no further discussion beyond what has already been included is warranted.  Defendants' attempt to conflate the impact of COVID-19 with long-documented existing problems only serves to divert focus from performing the work necessary to ensure class members have timely access to adequate inpatient care—which, it bears repeating is a problem that has plagued defendants for many years.  If unaddressed, these problems will continue well after the COVID-19 pandemic is controlled.

achieve compliance based upon new policies, or court orders, the Special Master will report accordingly at the appropriate time.

Defendants also state that the maximum ten percent staffing vacancy rate required by the court's 2002 order (ECF No. 1383) does not apply to PIPs, individual institutions, or individual DSH hospitals, and noted their objection "to the report's contrary assumption." For reasons described below, the Special Master takes issue with defendants' position as it relates to CDCR and the PIPs. As it relates to DSH, the Special Master acknowledges there exists a question, thus he has amended the draft report accordingly. (*See infra*, 32)

Over 18 years have passed since the court issued its order in June of 2002 requiring defendants to "maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including contracted services." ECF No. 1383 at 4. The operative CDCR staffing plan, which includes staffing ratios, was drafted in 2009 and has been utilized by CDCR for over a decade. July 1, 2021 will mark the fourth anniversary of the implementation of the Lift and Shift where CDCR assumed responsibly for the PIPs at CHCF, CMF, and SVSP. The Special Master has reported on both staffing vacancies and staffing ratios when monitoring CDCR inpatient programs and the two have never been mutually exclusive. Defendants have never lodged a prior objection to the inclusion of this approach to monitoring or reporting

In his 2018 "Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation" ("2018 Inpatient Care Report"), the Special Master reported that "Pursuant to the October 10, 2017 court order, the parties and the Special Master have been conferring at least every 90 days through the All-Parties Workgroup process 'to discuss the status of defendants' progress toward compliance with [the] order,' as well as the steps the CDCR defendants are taking that are necessary to

'come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order.'"  ECF 5894 at 17-18 citing ECF No. 5711 at 29-30.  It was unambiguous in 2018 that the Special Master was monitoring compliance with staffing using the ten percent vacancy rate in addition to staffing ratios, and that requirement has not changed in the present report.

In June of 2006, the court joined the director of the Department of Mental Health as a party-defendant in this action.  ECF No. 1855.  During this same time period, Atascadero State Hospital became subject to a consent decree in another Federal Court as a result of an investigation by the United States Department of Justice under the authority of the Civil Rights of Institutionalized Persons Act (CRIPA).  *United States Department of Justice v. Atascadero State Hospital*, 2:06-cv-02667, (C.D. Cal.)  Staffing was one area that was being addressed for deficiencies.  Whether DSH is bound by the June 13, 2002 order regarding vacancy rates is a legal issue outside of the Special Master's authority to determine.

Defendants asserted that "any report of non-compliance should make clear that your draft report concerns PIP staffing levels based on an order and plan for mental health outpatient programs, not the inpatient programs."  In its order of June 13, 2002, the Court found that defendants "constitutional obligations" include "maintaining adequate levels of staffing to serve the number of class members in their custody at any given time."  ECF No. 1383 at 3.  The requirement to maintain the maximum ten percent vacancy rate was not limited to outpatient programs by the Court and covers the CDCR PIPs.   Defendants also requested that the Special Master revise his report to include defendants' work on proposals and policies that may impact PIP staffing as well as details related to DSH's work on their staffing plan.  Those requests are addressed below within the relevant sections of Part I of this report.  (*See infra*, 22, 30, 31.)

In the section labeled, "focused workgroups for CDCR PIPs need to address issues raised in the report," defendants requested that the Special Master approve the use of TTMs. The Special Master addresses the status of workgroup efforts related to the use of TTMs in Part I below. (*See infra*, 27, 28.)

In the same section, defendants addressed the Special Master's reporting on continuing issues with least restrictive housing (LRH) placements. In his draft report, the Special Master reported that "defendants continued to struggle with placing those patients for whom the setting is not contraindicated for clinical and/or custodial reasons in their LRH." In response to this objectively unambiguous statement, defendants advanced a strawman argument, stating that "CDCR does not track clinicians' clinical determinations regarding patients' ability to be housed at their LRH." Defendants' went on to suggest that the Special Master was questioning that clinical judgment. Following up on his statement regarding defendants' struggle to house patients at their LRH, the Special Master reported that defendants' failure to house patients at their LRH contributed to system backups and helped to grow the waitlist. Defendants attempted to dispute this finding by implying that the waitlist was not affected by LRH transfer issues, but instead was solely a result of COVID-19 restrictions. Defendants also attributed the lower inpatient census in part to reduced referrals. Defendants' responses regarding this issue and their attempts to create an argument where one does not exist warrant no further discussion.

Finally, defendants listed five areas in the draft report where they believed for various reasons that the findings as presented by the Special Master were misleading. Defendants criticized the Special Master's presentation of data on filled beds, objected to a statement regarding the growing waitlist for inpatient care,[5] criticized the Special Master's presentation of

---

[5] The sentence read as follows: "Information and data provided to the COVID-19 Task Force show that there has been a substantial decline in referrals to acute and intermediate care programs, and the waitlist for patients referred

9

inpatient and admissions data in chart form, asserted that the CMF L1-PIP should not be
included in the Special Master's assessment of inpatient care programs, and seemingly disputed
the report's finding that the lack of a sufficient number of inpatient beds remained an issue for
defendants.  The Special Master will not duplicate defendants' reasoning here.  Where he
deemed revisions to the draft report were appropriate based upon defendants' comments, they
have been addressed below, within the relevant sections of Part I of this report.  (*See infra*, 13,
14, 19, 25, 35.)

### Response from Individual PIPs and DSH Programs

Defendants included with their response, letters from CDCR and DSH suggesting certain
corrections or clarifications to the draft report.  After careful review and consideration, the
Special Master has incorporated defendants' requested changes where appropriate.  (*See infra*,
41, 74, 79, 80, 86, 107, 113, 114, 119, 121, 122, 131, 163, 187, 305.)

### Defendants' Response to the Special Master's Six Recommendations

Defendants' requested clarification of certain recommendations and for some they
requested revisions.  For others, they appeared to be making a premature argument requesting
additional time to comply.  Defendants stated that Recommendation 1[6] was vague, not tied to
specific, identified issues in the draft report, and requested further clarification.  Defendants also
asked that the recommendation be revised to allow them additional time to comply.  Defendants'

---

but not yet placed in inpatient care settings is significant and continues to grow." Draft Report, at 24. Defendants'
objection stemmed from their position that the growing waitlist was a result of the limits on patient movement due to
COVID-19.

[6] Recommendation 1: To the extent necessary to remedy any deficiencies identified in the foregoing report, the
CDCR and DSH defendants, under the guidance and supervision of the Special Master, and with input from the
plaintiffs as appropriate, shall develop plans within 90 days to provide structured therapeutic activities, unstructured
out-of-cell activities, treatment planning, and individual treatment, including for maximum custody patients
consistent with a psychiatric inpatient level of care, as well as implement a system for tracking and reporting
adherence to the standards developed.

comments with regard to Recommendation 5[7] suggested their continued misinterpretation of the recommendation, despite a meeting with the Special Master and one of his monitors specifically convened to discuss the recommendation and provide defendants with some clarity.  As previously stated, the Special Master has revised Recommendation 5 since the issuance of the draft report.  The revision should provide defendants with further clarity.  Defendants made no specific requests related to Recommendations 2, 3, 4, or 6,[8] but stated that Recommendation 2 was redundant, and seemed to be suggesting (prematurely) that they might need additional time to comply with Recommendations 4 and 6.

To the extent the Special Master deemed revisions to the recommendations were warranted, they have been incorporated into this report.[9]  (*See infra*, 110, 111.)

The Special Master made one change to this report since it was submitted to the parties in draft form.  (*See infra* p. 151.)

---

[7] Recommendation 5: Under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, defendants shall develop a report to supplement the data in their monthly census, waitlist, and transfer timeline compliance reports to identify the number of patients on the waitlist specifically out of LRH, their current designated housing (e.g. locked dorms, multi-person cell or single cell), and where they have been endorsed to.

[8] Recommendation 2: The *Coleman* Special Master shall continue to work with the CDCR defendants, and with input from the plaintiffs as appropriate, to complete staffing plans for their inpatient programs covering all required disciplines.
Recommendation 3: Under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, the CDCR and DSH defendants shall refer, transfer and admit *Coleman* class members to appropriate inpatient programs in compliance with the requirements of the Program Guide and consistent with public health best practices in the circumstances of the COVID-19 pandemic.
Recommendation 4: Under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, the CDCR defendants shall develop and file plans with the court within 180 days for providing appropriate treatment space for clinical services and activities (e.g. suicide prevention, IDTTs, structured therapeutic activities, unstructured out-of-cell activities, and individual treatment) in Facilities C5 and C6 at SVSP-PIP or implement alternatives to the use of Facilities C5 and C6 at SVSP-PIP for inpatient care.
Recommendation 6: Under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, the CDCR defendants shall develop and implement within 90 days appropriate suicide prevention policies in all PIPs.
[9] After the distribution of the draft report to the parties, Recommendation 6 was superseded by court order issued December 28, 2020 (ECF No. 7006) and has been removed from the list of final recommendations.

## PART I.

## UPDATE ON ACCESS TO MENTAL HEALTH INPATIENT CARE
## FOR *COLEMAN* CLASS MEMBERS

The Twenty-Eighth Monitoring Round, which the includes the monitoring of the inpatient care programs, upon which this report is based, is the most unique of its type. The monitoring round began like most others, with on-site monitoring tours by the Special Master's team of experts and monitors. However, at the onset of the COVID-19 pandemic, the Special Master made the decision to suspend on-site monitoring and move to paper monitoring in an effort to "to mitigate the public health risks to *Coleman* class members and others while continuing to perform his duties and responsibilities with minimal to no interruptions." ECF No. 6512 at 5. As a result, the remainder of the Twenty-Eighth Round of Monitoring was completed while the Special Master simultaneously worked with the parties in the COVID-19 Task Force and oversaw the activities of two COVID-19 Task Force small workgroups comprised of clinicians. The Special Master also supervised his staff's participation in the coordination efforts related to remediating the lack of treatment in the PIPs in the immediate term.

A consequence of this is that the inpatient care report is multi-faceted. The monitoring that was performed on-site revealed what the Special Master has continued to find during the COVID-19 pandemic. Two of the DSH hospitals—DSH-Atascadero and DSH-Coalinga—remain constant performers for the *Coleman* class, despite the difficulties class members encounter in trying to gain admission to their programs. CIW-PIP was also a more constant performer as to a lesser extent was SQ-PIP. The remaining inpatient programs, SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP are low performing due to staffing shortages, among other issues. The section on staffing, in Part II (A) below, outlines the staffing problems that the PIPs continue to face. Those difficulties have greatly contributed to the underperformance of the

12

PIPs in providing mental health care to *Coleman* class members. As reported in the individual program summaries in the appendices to this report, class members uniformly receive less treatment than would be expected in functioning inpatient programs. In certain cases, class members can receive more mental health care in an EOP program in the prisons than in a PIP, which holds true either pre- or post-COVID-19.

One serious issue remains the lack of a sufficient number of inpatient beds. To illustrate, at SVSP-PIP, housing units C5 and C6—which, in 2011, were established for temporary use as intermediate care units due to severe shortages of inpatient beds—remain in use to this day. During the time the conversion of C5 and C6 was in progress, the number of seriously mentally ill inmates waiting for inpatient care beds exceeded 400. ECF No. 3929 at 1. Combined with the uneven care being provided in the PIPs, the shortage of inpatient beds exacerbates an issue defendants have been grappling with for years. At the time of this writing, the list of *Coleman* class members waiting for inpatient care beds remains high, at approximately 300 or more.[10]

As mentioned above, class member access to DSH hospitals remains an issue. This issue was further complicated during the onset of the COVID-19 pandemic, when, on March 16, 2020, DSH made the decision to close admissions to *Coleman* class members for 30 days. ECF No. 6565 at 3. The first three charts below show the number of available beds in comparison to the patient census at the three DSH hospitals from October 2019 to October 16, 2020.[11] The next two charts illustrate the number of available beds at the DSH hospitals versus the number of patients on the waitlist during the same year-long time period.[12] With limited exceptions, the

---

[10] ECF No. 6912, Exhibits A and C.

[11] ECF No. 6394, ECF No. 6423, ECF No. 6446, ECF No. 6470, ECF No. 6505, ECF No. 6611, ECF No. 6670.

[12] DSH CDCR Patient Census and Waitlist Report, covering the period of May 1, 2020 through October 16, 2020, provided by defendants for the COVID-19 Task Force meetings. DSH Psychiatric Inpatient Programs – Census

data in the first three charts reflects a steady and, at times dramatic, decline in class member admissions after DSH closed to *Coleman* class members in March 2020.



---

Reports, covering the period of October 2019 through April 2020, See ECF Nos. 6394 at 11-13; 6423 at 11-13; 6446 at 11-13; 6470 at 11-13; 6505 at 13-15; 6611 at 12-14; 6670 at 12-14.









Considering the size of the waitlist, the number of empty beds is cause for great concern.

Further, it should be noted that, historically, empty beds usually reflect a larger issue of class

members not being referred for inpatient care.  Also, worth noting is that at the same time that

DSH had closed its doors to *Coleman* class members, it continued to accept Offenders with

Mental Health Disorders (OMHDs) into its hospitals.  Although DSH lifted their suspension of

admissions of *Coleman* class members 30 days after it was enacted, the contrast between the

number of OMHD patients being admitted to DSH hospitals versus that of *Coleman* class

member patients is remarkable.  The two charts below show the movement of OMHD and

*Coleman* class patients into DSH hospitals between May 2, 2020 and October 16, 2020.[13]



[13] DSH OMHD admissions, covering the period of May 2, 2020 through October 16, 2020, provided by defendants for the COVID-19 Task Force meetings.  CCHCS/CDCR Open & Closed Institution Movement Report, covering the period of July 17, 2020 through October 16, 2020, provided by defendants.



In his preceding report on inpatient care, the Special Master reported on the July 1, 2017 transfer of administrative responsibility and control of SVSP-PIP, CMF-PIP, and CHCF-PIP from DSH to CDCR—or "Lift and Shift." The Special Master also reported on the opening of CMF's L1 Unit. This report presents the findings of the Special Master's second monitoring review of the three PIPs located at SVSP, CMF, and CHCF since the implementation of Lift and Shift—and of the CMF L1-PIP since its activation.

As in the preceding report, this report also highlights several areas of focus that defendants should continue to address to improve and streamline the referral, acceptance, transfer, and admission of seriously mentally ill *Coleman* class members to inpatient beds, which must include consistent access for those inmates who meet clinical and custodial requirements for admission to the three DSH hospitals. In addition, the update highlights three treatment

issues that require prioritized attention for providing adequate care to patients once admitted to an inpatient program: a) treatment planning, b) group therapy, and c) individual treatment.

## A.     Coordination Efforts Related to Psychiatric Inpatient Programs

As a function of the *Armstrong, Coleman,* and *Plata* courts coordination process, the Special Master and his staff have been engaged with the office of the *Plata* Receiver, staff from California Correctional Health Care Services (CCHCS), and CDCR's Mental Health Program and Division of Adult Institutions (DAI) to address multiple issues limiting delivery of adequate mental health care at both the CHCF-PIP and the CMF-PIP. In addition, the Special Master and his team have begun reviewing proposed staffing models for CHCF-PIP, CIW-PIP, CMF-PIP, SQ-PIP, and SVSP-PIP.

The Special Master's tours of the inpatient programs at CHCF-PIP from September 17, 2019 to September 19, 2019 and March 10, 2020 to March 12, 2020, and CMF-PIP from December 3, 2019 to December 6, 2019, identified a severe lack of adequate treatment at these facilities which is presented in detail in this report. The Special Master was subsequently invited through the court coordination process to participate in special workgroups organized to develop and implement immediate corrective actions to remediate the significant treatment deficiencies existing in the two PIPs. The workgroups' activities are ongoing, and the Special Master's team continues to participate in them. As discussed in detail in this report, the lack of adequate treatment is not limited to CHCF-PIP and CMF-PIP, but extends to other PIPs.

Plaintiffs have not participated in the workgroups but are updated as part of their regular briefing by the Special Master and his team.

1. **PIP End-to-End Staffing Model Methodology**

On January 23, 2020, the Special Master's staff was provided an introductory briefing regarding the draft staffing models under consideration for the PIPs. Subsequently, the Special Master and his staff participated in discussions regarding the "PIP End-to-End Staffing Model Methodology" on September 10 and 28 and October 15, 2020. A draft staffing model for each PIP has been developed. The Special Master was informed that the objective is to establish consistent and adequate staffing methodologies across the PIPs and institute baseline staffing for each PIP consistent with existing mental health program staffing methodologies. Follow-up meetings are planned, and plaintiffs will have the opportunity to offer their input as part of this review process.[14]

2. **PIPs Workgroup – CHCF-PIP and CMF-PIP**

On February 11, 2020, members of the Special Master's staff participated in a CHCF-PIP workgroup and on February 18, 19, and 20, 2020, the Special Master's staff also participated in a three-day on-site workgroup at CMF-PIP. The two workgroups were subsequently merged and are discussed in detail below. The Special Master's team participated in CHCF and CMF joint workgroup meetings on March 5, 2020, April 15, 2020, May 28, 2020, July 7, 2020, August 18, 2020, and October 8, 2020. While there has been some increase in structured therapeutic

---

[14] In their November 23, 2020 response to the draft report, defendants requested that the Special Master revise his report to include the status of their work on developing proposals and policies that may impact PIP staffing. As stated above, since September 2020, there have been three workgroup meetings to discuss PIP staffing plans. A meeting scheduled for January 15, 2021 to review the latest version of PIP staffing model was canceled by defendants. On January 21, 2021, in an effort to reschedule, Deputy Special Master Mohamedu Jones emailed defendants regarding date availability for the next meeting. On January 22, 2021, Mr. Jones received an email reply from defendants stating that the most recent presentation of their proposed PIP staffing plan had been premature, as there were various internal approvals for parts of the plan to go through which could impact the final draft of the proposal for mental health. Even with their efforts to expedite the process, defendants anticipated a further delay of several months.

activities and unstructured out-of-cell activities in both PIPs, the joint workgroup is ongoing and continues to address multiple obstacles to providing consistent access to adequate treatment at these two PIPs.

CHCF-PIP

Under the auspices of the CHCF-PIP workgroup, the mental health program completed a patient risk stratification project that assessed maximum custody patients in the CHCF-PIP. The stratification project identified maximum custody patients that required long-term mental health interventions and/or required programs tailored to address antisocial disorders. Following the completion of the patient risk stratification, CHCF-PIP was expected to institute a more individualized approach to maximum custody designation. On August 18, 2020, CHCF-PIP reported to the workgroup that it had successfully reduced the number of maximum custody patients from just under 90 patients in three housing units to 30 patients housed in one unit.

The workgroup also addressed the subject of training CHCF-PIP staff regarding the inpatient huddle format to be used in the PIP. The huddle was intended to facilitate communication at watch/shift changes regarding patient health care updates. In August 2020, CHCF-PIP reported to the workgroup that huddles had been standardized and implemented in all PIP units and staff attendance for each classification was between 80 to 100 percent.

An assessment of admission and discharge plans in the CHCF-PIP was completed and implemented with local oversight management regarding admission and discharge planning. Admission and discharge planning were reported to be ongoing in the CHCF-PIP with the focus on treatment planning, medications, and overall health assessment, in order to meet the individual treatment needs of patients, including for COVID-19.

As part of the workgroup process, CHCF-PIP developed and finalized a nursing and custody model approach in CHCF-PIP unit B8-A to train custody and nursing staff on expected therapeutic intervention strategies in a PIP. Custody training was focused on patient movement and other custody-related functions while nursing (psych techs) training focused on providing mental health treatment. The plan was rolled out on March 5, 2020 and was later extended to other units. In addition, training regarding the Non-Clinical Activities Tracking (NCAT) system that tracked all non-clinical activities was reported to be ongoing with sufficient equipment, including NCAT tablets available to new custody staff.

In order to address some of the underlying reasons for the inadequate treatment, CHCF-PIP assessed clinical staff work hours and revised the work time for some clinical supervisor staff to the standard five-day, 40-hour work schedule to include Mondays and Fridays. This revision was to ensure adequate clinical coverage during the week. By August 2020, the workgroup was informed that IDTTs were being completed timely. Regional nursing staff reported that there was adequate nursing coverage during the Monday through Friday workweek. Nursing staff was directed to participate in IDTTs; random audits were to be conducted concerning nursing attendance.

During the workgroup process, CHCF-PIP agreed to establish work assignments for clinically appropriate PIP patients to increase their out-of-cell time and promote positive programming and behavior.

Within the workgroup process, CHCF-PIP identified potential physical plant modifications to ensure maximum custody patients have access to non-structured yard. The institution prepared a Capital Outlay Budget Change Proposal (COBCP) that was submitted to Facilities Planning and Construction Management, proposing to install ten outdoor individual

exercise yards for use by maximum custody patients.  The workgroup has been informed that, on August 13, 2020, the capital outlay request had been submitted to CDCR headquarters for its consideration.

The workgroup was regularly updated about notices to bargaining units regarding the several staffing changes that emanated from its activities.

### CMF-PIP

The CMF-PIP workgroup focused on remediating the significantly limited treatment programming available to CMF-PIP patients.  As part of the remedial plan, the CMF-PIP workgroup considered the deployment of mental health regional clinicians to provide clinical services in the PIP.  This proposal was eventually not implemented because of the onset of the COVID-19 pandemic, which required mental health regional staff to attend to matters specifically related to the pandemic, making them unavailable to provide clinical services to the PIP.

Other specific plans developed in the CMF-PIP workgroup included increasing nursing staff to provide nursing groups to PIP patients.  As an outcome of the workgroup, nursing staff was utilized to provide some groups to PIP patients.  However, CMF-PIP reported to the workgroup that Rehabilitation Achievement Credit groups could not be initiated because of the COVID-19 pandemic.  Staff reported that CMF-PIP continued to explore ways of reinitiating nursing-led therapeutic groups.

The workgroup also worked with CMF to develop a plan to reorganize and re-deploy existing custody staff assigned to the CMF-PIP, as well as augment escort officers at a rate of two additional officers for each custody watch.  CDCR's DAI developed and implemented the custody plan, which resulted in the initiation of Second Watch out-of-cell activities, which led to

25

increased offerings of out-cell-time.  This helped to significantly increase the number of hours of out-of-cell activities offered to CMF-PIP patients.

A scheduling issue identified through the workgroup was that CMF-PIP custody staff did not use NCAT to schedule and record non-clinical out-of-cell activities offered in the PIP.  The institution, working through the workgroup, instituted NCAT usage, implemented the ducating system for patients' activities off the unit, and captured off-unit appointments attended by CMF-PIP patients.

Scheduling mental health clinical and structured therapeutic activities was also a serious problem primarily due to a shortage of scheduling staff.  The workgroup addressed the shortage of scheduling personnel at CMF-PIP and worked with the PIP and the mental health program to develop a plan to hire and assign additional schedulers in the PIP.  More scheduling staff was hired and trained to schedule mental health appointments in EHRS, which resulted in the use of the health ducating system in the PIP.

CMF-PIP also indicated that one of the problems facing the PIP was the protracted time required to onboard new clinical staff.  Expediting clinical staff onboarding was subsequently transferred to staff working on the PIP staffing methodologies.

As indicated in the discussion above, while there has been noteworthy progress by the joint CMF-PIP and CHCF-PIP workgroup, achieving and sustaining the provision of adequate care in these and the other PIPs will require an ongoing commitment by defendants.  The Special Master will continue to be engaged in the workgroup or other forum to assist in providing adequate care to *Coleman* patients admitted into PIPs.

### 3. CHCF-PIP Transition Plan Subcommittee

The Special Master's team participated in CHCF-PIP Transition Plan Subcommittee meetings on April 28, 2020, May 29, 2020, June 11, 2020, and July 9, 2020. The purpose of this subcommittee was related to the transition of escorting duties in the PIP from psych techs to custody officers. Thirty officers going through the CDCR custody officers' academy, which had been delayed by two months due to the COVID-19 pandemic, were scheduled to report for duty at the CHCF-PIP during October 2020.

The issues covered in the subcommittee included updates regarding the academy, labor notices, budget, and changes to the post and bid for both psych techs and custody officers. Other areas covered included post assignment schedules, implementation of Telestaff timekeeping for psych techs, and nursing classifications in the PIP. Implementation of NCAT and the use of the ducating system for mental health care appointments in the PIP were also addressed through the workgroup. Revisions to nursing and custody duty statements, staff training, and supervision of the daily PIP program schedule were also discussed in the workgroup.

### 4. Therapeutic Treatment Modules

The use of therapeutic treatment modules (TTMs) continued to be a point of contention between the parties.[15] On November 7, 2018, defendants, plaintiffs, and members of the Special Master's staff toured the Psychiatric Intensive Care Unit (PICU) at the Veterans Administration Medical Center in San Francisco at the request of plaintiffs' counsel to learn about alternatives to the use of TTMs in inpatient care units.

---

[15] The court noted in an order issued July 9, 2019, that the use of TTMs in inpatient settings remained an unresolved issue under consideration by the workgroup. ECF No. 6214 at 18.

The PICU is a 12-bed locked inpatient psychiatric unit with an additional two-bed seclusion and restraint capacity. In addition, the hospital had a Behavioral Education and Support Team (BEST), which was a multidisciplinary team that responded to hospital-wide consults for all patients presenting with dementia/cognitive, psychiatric, and behavioral disorders.

Staff at the PICU reported that they provided care primarily to voluntary patients, and the program had a heavy reliance on early psychotropic medication intervention. They indicated that theirs were not patients who had been convicted of violent crimes or had acted with recent violence toward staff and others. Staff at the PICU reported few incidents of violence by patients.

Following the tour, the Special Master's team determined that the PICU was not comparable in population to the severely mentally ill, which also included some violent patients that were housed in the CDCR PIPs. The treatment milieu observed in the PICU did not appear to be suitable for adoption in the CDCR PIPs.

Plaintiffs have repeatedly informed defendants and the Special Master that they are resolutely opposed to the use of TTMs in inpatient programs and vehemently object to any expansion of their current use.[16] As the issue currently stands, the parties have bargained to an impasse. Any resolution regarding the use of TTMs in inpatient programs will have to be reached through litigation.

---

[16] Plaintiffs have also been consistently vocal about their opposition to the use of TTMs in the outpatient programs in CDCR prisons.

**B.**     **Areas of Focus:  Issues Defendants Need to Address Regarding Inpatient Care**

In his 2018 "Special Master's Monitoring Report on the Mental Health Inpatient Care

Programs for Inmates of the California Department of Corrections and Rehabilitation" ("2018

Inpatient Care Report"), the Special Master "spotlighted specific areas of focus which remain

ongoing regarding the provision of adequate inpatient care to the *Coleman* class" and

emphasized that "these focus areas" needed to be addressed by CDCR and DSH "to ensure

patients are provided with adequate care upon admission to inpatient programs." ECF No. 5894

at 17.

In the "Special Master's Report on the Current Status of *Coleman* Class Members'

Access to Inpatient Care in the Department of State Hospitals," filed on April 2, 2020 ("April

2020 Report"), he reported that

> [p]roviding adequate treatment to *Coleman* class members housed in the
> PIPs has long posed serious challenges first to DSH and then to CDCR
> after Lift and Shift and have been reported in both the 2016 and 2018
> Inpatient Reports of the Special Master, and were found to continue to
> exist in the preliminary findings that have been reported by his experts
> and monitors to the Special Master following their most recent site
> visits."  ECF No. 6565 at 17.

The Special Master pointed out in his April 2020 Report that the "lack of appropriate

treatment at CHCF-PIP, CMF-PIP, and SVSP-PIP were known to CDCR, the Special Master,

and plaintiffs' counsel to have seriously limited what mental health care was available to patients

in these programs."  *Id*. at 17.  The findings from the site visits to those programs are reported in

full in this report.

The core areas highlighted in the 2018 Inpatient Care Report and updated below still require the focused attention of defendants. They are discussed in further detail in Part II of this report.

### 1.     Staffing Vacancies

One of the focus areas that the Special Master identified in his 2018 monitoring report on inpatient care was staffing vacancies. As reported in the April 2020 Report and discussed in detail below, there are significant functional vacancies in the inpatient settings available to the *Coleman* class. The Court has expressed grave concern that "nothing has brought defendants closer to compliance or suggested that defendants can adequately staff the Mental Health Care Delivery System given the present size of the plaintiff class." ECF No. 6794 at 7.

On October 10, 2017, the Court ordered the "DSH defendants to complete development and full implementation of their mental health staffing plan within the one year time frame set by this order." ECF No. 5711 at 29. Subsequent to the order, the DSH defendants submitted staffing plan updates to the Special Master during May, August, and September 2018. The plans submitted by DSH were wholly inadequate. They were ill-thought out, poorly crafted, concept papers, most generously described as a plan for a plan. Following All-Parties Workgroup meetings on July 9, July 23, July 30, September 5, September 7, September 24, and October 1, 2018, further discussions on the DSH staffing plan were tabled pending the completion of CDCR's staffing plan. The expectation was that the CDCR staffing plan could provide a model for DSH to effectively develop their own meaningful staffing plan.

The Special Master filed a request on September 4, 2018 for the appointment of an independent labor economist as additional staff. ECF No. 5903. On September 11, 2018, the Court approved the Special Master's request to hire economist and statistician Dwight Steward,

Ph.D., and the EmployStats research firm. ECF No. 5919. Aware that the CDCR and the DSH defendants shared the same labor market and have historically competed for psychiatrists, the Special Master directed EmployStats to include DSH in its market and salary analyses (ECF No. 6695 at 11), which would factor in the consideration of the DSH staffing plan.

On October 4, 2018, the Special Master received a whistleblower report from the *Plata* Receiver authored by Dr. Michael Golding, CDCR's Chief Psychiatrist (the "Golding Report"), which set off a chain of events including a pause in further action regarding the DSH staffing plan. The Court appointed its own neutral investigator to investigate the allegations contained in the Golding Report. ECF No. 6033. During this period, the DSH defendants submitted an update to their staffing plans in March 2019. The neutral expert conducted a four-month investigation, and on April 22, 2019, submitted a report to the Court. ECF No. 6135 at 1.

On May 29, 2020, the Special Master submitted the report of Dr. Steward and EmployStats to the Court. ECF No. 6695 at 187. The DSH defendants submitted additional updates to their staffing plans during May 2020, and July 2020. The Special Master and his staff and the DSH defendants met on May 6 and 27, 2020, and on July 2, 2020 and August 24, 2020 to discuss their staffing plan. By mutual agreement, meetings between the Special Master and the DSH defendants regarding the DSH staffing plans will re-convene in February 2021.

It is the law of this case that defendants must fully implement their staffing plan as a necessary requirement to meet constitutional standards and end federal court oversight. ECF No. 5711 at 1. This report again demonstrates, as this Court has previously observed, that "the critical staffing shortages in the psychiatric inpatient programs (PIPs) operated by CDCR are extremely troubling." ECF No. 6794 at 6.

Significant staffing vacancies across disciplines at the PIPs continued and substantially impaired the ability of the PIPs to provide appropriate care in inpatient settings, as discussed in the report.  Only SQ-PIP met the court-ordered maximum ten percent vacancy rate in psychiatry. Regarding psychology, three of the six PIPs (SVSP-PIP, CIW-PIP, and SQ-PIP) met or were lower than ten percent vacancies, while the other three PIPs (CMF-PIP, CMF L1-PIP, and CHCF-PIP) reported higher vacancy rates.  One of the six PIPs, SVSP-PIP, was compliant for social workers.

Among the DSH hospitals, DSH-Coalinga and DSH-Patton filled all established positions for the four primary mental health disciplines.

Regarding staff-to-patient ratios, CMF L1-PIP and CIW-PIP reported meeting staffing ratios for the four primary mental health disciplines (psychiatrists, psychologists, social workers, rehabilitation/recreational therapists).  CHCF-PIP also reported meeting the ratios, however, the reliability of this report was called into question because of the significant functional vacancies in that PIP.  The other three PIPs reported that they did not meet the ratios in all disciplines across their inpatient programs.  The three DSH hospitals reported meeting staffing ratios; however; it was observed that if all the *Coleman* class designated beds at DSH-Atascadero were filled, it would exceed the ratios for psychiatrists and psychologists.

As long as mental health staffing in the CDCR PIPs  have not come into compliance with the maximum ten percent vacancy rate of the June 13, 2002 order (ECF No. 1383) and therefore, the October 10, 2017 order (ECF No. 5711), and until the parties under the guidance and supervision of the Special Master reach agreement regarding the DSH staffing plan, defendants must continue to focus on implementing a durable staffing remedy for the *Coleman* class in their mental health programs.

## 2.     **Referrals and Transfers**

Referrals and transfers were also an area of focus outlined in the 2018 Inpatient Care Report and is discussed fully in this report. "[T]imely access to appropriate levels of care at every point in the system" is a requirement for meeting the constitutional standard in this case. ECF No. 4539 at 46. During the review period covered by this report, which was prior to the COVID-19 pandemic, defendants had maintained their "substantial strides in timely transferring referred patients to acute and intermediate inpatient care" that was reported in the 2018 Inpatient Care Report. ECF No. 5894 at 19. In addition, through the All-Parties Workgroup monthly review process, the Special Master and the parties closely monitored compliance with transfer timelines and approved exceptions. *Id*.

During the time period under review in the current report on inpatient care, referrals and transfers to the PIPs were timely. DSH-Patton reported that all patients referred to the hospital were timely transferred. DSH-Atascadero and DSH-Coalinga did not provide referral and transfer data.

As the Court observed in its order, filed September 3, 2020, defendants "have remained consistently in compliance [with transfer timelines to acute and intermediate care], at least until the onset of the COVID-19 pandemic, when CDCR's efforts to comply with public health measures have directly impacted inmate transfers." ECF No. 6864 at 21. This recognition of the impact of the pandemic did not, however, relieve the defendants of the duty to timely transfer because as the Court has already ordered, defendants were to "continue to comply with the requirements of the Program Guide to the full extent possible consistent with public health best practices for members of the *Coleman* class in the circumstances of the COVID-19 pandemic." ECF No. 6791 at 5.

At the time of the writing of this report, the Special Master is closely monitoring referrals, transfers, and admissions to acute and intermediate care programs, as well as program discharges during the COVID-19 pandemic through the COVID-19 Task Force. During each COVID-19 Task Force meeting, DSH and CDCR present a census and waitlist report, as well as a report regarding current admissions. In addition, there is a DSH small workgroup that manages referrals and admissions to DSH hospitals that also reports weekly to the COVID-19 Task Force. Information and data provided to the COVID-19 Task Force show that there has been a substantial decline in referrals to acute and intermediate care programs, and the waitlist for patients referred but not yet placed in inpatient care settings is significant and continues to grow.

The COVID-19 Task Force also attends to discrete matters related to the inpatient care programs such as transfer guidelines, CDCR's movement matrix, quarantine and isolation, and the proposed PIPs admissions unit policy. The Special Master plans to continue to utilize the COVID-19 Task Force to monitor referrals, transfers, and admissions, and to work with the parties to safely transfer patients to inpatient settings during the pandemic.

### 3.    Least Restrictive Housing (LRH) Placements

The Special Master identified the placement of patients in their least restrictive housing (LRH) in inpatient settings, which is required by both CDCR and DSH, as another area of focus for defendants in his 2018 monitoring report on inpatient care. ECF No. 5894 at 21. This area is also discussed in detail in the current report and continues to require defendants' focused attention.

Similar to the findings in the 2018 Inpatient Care Report, current findings also indicate that defendants continued to struggle with placing those patients for whom the setting is not contraindicated for clinical and/or custodial reasons in their LRH.

During the review period, across the PIPs, significant numbers of patients were housed outside their LRH, including those with unlocked dorm status who were eligible for transfer to DSH hospitals. Across PIPs, LRH was not routinely discussed or documented during IDTTs. A review of patients' records showed that in multiple instances where the rationale for placement out of LRH was documented, it was not comprehensive, nor were the symptoms that contributed to the decision not to transfer the patient to their LRH clearly stated. In various cases, intervention plans to focus on their risk factors and thereby assist patients in reaching their LRH were also not adequately documented. In some cases, there was no discernible documented reason why certain patients were outside their LRH. In addition, many patients remained outside their LRH because referrals and transfers were not occurring. The Special Master will monitor, and address issues related to LRH through the workgroup process pending the resumption of on-site monitoring.

### 4. Access to DSH Facilities

Sustained access to DSH hospitals continues to be necessary to ending federal court supervision in this case. The Special Master underscored this in his 2018 monitoring report on inpatient care:

> Providing timely access to DSH beds for all CDCR inmates who meet clinical and custodial requirements for placement at DSH-Atascadero, DSH-Coalinga, and PSH is essential to the remedial process in the *Coleman* case. Maintaining a system that facilitates patient movement to the various programs available to CDCR inmates is likely to prevent repeating the previous cycles of inpatient waitlists while providing appropriate care to patients at the least restrictive housing. ECF No. 5894 at 22

Throughout the *Coleman* case, it has been shown that when CDCR patients are unable to access beds in DSH hospitals, it has ripple effects throughout the inpatient care system. The Court has recognized that the lack of access to DSH hospitals upsets appropriate admissions

along the continuum of inpatient care, which backs up the system and leads to swelling waitlists. ECF No. 5448 at 36.

As reported in detail in this report, during the review period, each DSH facility consistently carried a census lower than their designated number of beds.

    a.    **DSH-Atascadero and DSH-Coalinga**

From January 2020 through March 2020, reporting data filed with the court indicated that 94, 93, and 92 percent of the 256 *Coleman* class beds at DSH-Atascadero were filled.[17]  For DSH-Coalinga, reports filed with the court indicated that 94, 96, and 96 percent of the 50 beds designated for the *Coleman* class were filled.[18]

Reports filed with the court for DSH-Atascadero indicated that patients filled 89, 90, and 87 percent of the *Coleman* class beds at the hospital during the months of April 2020 through June 2020.[19]  In the same time period, reporting for DSH-Coalinga indicated that 90 percent of the *Coleman* class beds were filled each month in the period.[20]

For July 2020 to September 2020, reporting data filed with the court showed that 82, 69, and 69 percent of *Coleman* class bed capacity at DSH-Atascadero was filled.[21]  During the same three-month period, 86, 74, and 72 percent of the *Coleman* class bed capacity at DSH-Coalinga was filled.[22]

This data showed that the percentage of *Coleman* class beds filled at DSH-Atascadero declined from the 94 percent in January 2020 to 69 percent in September 2020.  This was also

---

[17] ECF No. 6470 at 5, ECF No. 6505 at 7, ECF No. 6611 at 6.
[18] ECF No. 6470 at 5, ECF No. 6505 at 7, ECF No. 6611 at 6.
[19] ECF No. 6670 at 6, ECF No. 6719 at 5, ECF No. 6762 at 5.
[20] ECF No. 6670 at 6, ECF No. 6719 at 5, ECF No. 6762 at 5.
[21] ECF No. 6823 at 6, ECF No. 6867 at 6, ECF No. 6912 at 6.
[22] ECF No. 6823 at 6, ECF No. 6867 at 6, ECF No. 6912 at 6.

the case at DSH-Coalinga, which declined from a high of 96 percent in February and March 2020 to 72 percent in September 2020.







| | Jan-20 | Sep-20 |
|---|---|---|
| DSH-Atascadero | 94% | 69% |
| DSH-Coalinga | 94% | 72% |

b.    **DSH-Patton**

There were 30 beds at DSH-Patton designated for the *Coleman* class.  During January through March 2020, reporting data filed with the court indicated that 33, 43, and 53 percent of the designated *Coleman* class beds were filled.[23]  For April 2020 through June 2020, the filled rates for *Coleman* class beds were 43, 40, and 33 percent.[24]  For July 2020 through September 2020, reporting data filed with the court showed that 30, 27, and 27 percent of *Coleman* class bed capacity at DSH-Patton was filled.[25]  Like the other two DSH hospitals, the fill rate at DSH-Patton declined—from a high of 53 percent in March 2020 to 27 percent in September 2020.

[23] ECF No. 6470 at 5, ECF No. 6505 at 7, ECF No. 6611 at 6.
[24] ECF No. 6670 at 6, ECF No. 6719 at 5, ECF No. 6762 at 5.
[25] ECF No. 6823 at 6, ECF No. 6867 at 6, ECF No. 6912 at 6.



As discussed above regarding transfers, while acknowledging the impact of the COVID-19 pandemic, this does not relieve the defendants of the duty to transfer appropriate patients to DSH hospitals. The Special Master will continue to monitor referrals, transfers, and admissions to DSH hospitals, and work with the parties to address issues limiting them through the COVID-19 Task Force.

5.    **Clinical Services and Treatment in Inpatient Programs:  Treatment Planning, Group Therapy, and Individual Treatment**

Issues with clinical services and treatment regarding treatment planning, group therapy, and individual treatment persisted in inpatient programs managed by both CDCR and DSH. Treatment provided to maximum custody patients in the PIPs continued to be inadequate. The PIPs consistently failed to provide appropriate behavior planning and services to indicated patients.

a.    **Treatment Planning**

The quality of IDTTs varied across the PIPs and across units in each PIP.  In general, when required members were not present in IDTTs, it was either psychiatry or custody staff. There were some IDTTs observed that were non-functional or otherwise weak, while other IDTTs appropriately addressed treatment planning as a team.  Some IDTTs engaged in appropriate discussions regarding treatment planning, while others did not.  In multiple IDTTs, diagnosis, treatment plans, discharge planning, and suicide risk and safety planning were not attended to.  Some IDTTs effectively discussed group therapy assignment and patient participation, and related them to treatment goals; however, this was rare across PIPs. Developing measurable goals as a function of treatment planning during IDTTs occurred sporadically in observed IDTTs.  There were IDTTs attended where providers inappropriately conducted patient assessments during their IDTTs, and psychiatrists were observed to adjust medications during certain IDTTs.

Appropriate behavior planning remained elusive in the PIPs for those patients for whom one was clinically indicated.  It was not documented in some cases that primary clinicians who were expected to review plans with patients had done the review.  In general, the need for behavior plans far outweighed the capacity of all the PIPs to develop and effectively implement them.

It was apparent from the site visits that enhanced supervision and ongoing training across the various disciplines were needed to improve and maintain the quality of IDTTs in the PIPs. DSH-Atascadero and DSH-Coalinga were reviewed through paper reviews and thus IDTTs could not be observed.  IDTTs attended at DSH-Patton included the required disciplines, all of

whom engaged in the treatment planning.  Regarding discussions with patients related to group participation, some discussions were adequate while others were minimal.

      **b.**    **Group Therapy**

Across inpatient programs, the level of structured and unstructured activities provided to patients remained inadequate.  It was common for patients at the intermediate level of care in certain PIPs to be offered fewer hours in the inpatient care programs than would be offered in a typical EOP in CDCR.  However, CIW-PIP for example, generally offered more hours of group therapy than other PIPs, which, while insufficient for an intermediate program, exemplified progress in the right direction.  In some PIPs, groups were canceled for unspecified reasons and high refusals remained persistent across PIPs.  Group treatment space in SVSP-PIP's C5 and C6 units continued to be very limited and inadequate, with groups occurring in dayrooms of the housing pods, and in small rooms in the hallway.  Groups in those units were frequently disrupted as a result of the normal functioning of the units.  At multiple PIPs, both structured and unstructured activities were not appropriately tracked.

For DSH hospitals, although DSH-Atascadero provided a summary of treatment hours offered to *Coleman* patients, the hospital did not provide an average number of hours offered weekly to patients, which was necessary to assess the sufficiency of treatment hours available to the *Coleman* class members.  At DSH-Patton, patients were offered significantly fewer hours than EOP inmates.

Maximum custody patients generally received inadequate access to group treatment and extraordinarily little out-of-cell time.

As the Special Master reported in his 2018 monitoring report on inpatient care, CDCR and DSH need to improve the "system and quality of structured and unstructured out-of-cell

activities." ECF No. 5894 at 27. He emphasized that "[o]ffering adequate hours of appropriate core and non-core group activities, as well as adequate hours of access to out-of-cell activities that meet the clinical needs of patients in the various inpatient programs are priorities that need to be addressed by CDCR and DSH." *Id.* Both CDCR and DSH continue to need to accurately track and report "all structured and unstructured out-of-cell activities offered and received," which is necessary to remedy the various problems affecting "the most used treatment modality in inpatient programs." *Id.* CDCR should consider expanding its special workgroups established for CHCF-PIP and CMF-PIP[26] to other PIPs with the level of focused attention needed to address obstacles impeding the provision of adequate treatment.

### c.    Individual Treatment

Individual treatment continued to be rarely offered, provided, or tracked in the inpatient programs at CDCR and DSH and continues to need the focused attention of CDCR and DSH as indicated in the 2018 Inpatient Care Report.

As reported in detail in this report, the nature, form, and frequency of individual treatment varied among the PIPs, and within PIPs, varied from unit to unit. In multiple PIPs, individual treatment, when it did occur, was frequently a brief check-in; much took the form of non-confidential, cell-front contacts. In some PIPs, there were confidential individual contacts; however, the frequency varied from weekly to monthly, and generally were reported to be brief. In the High Custody Intermediate Treatment Center (HCITC) at CMF-PIP, patients reported that they were required to submit a medical request form if they wished to see one of their assigned mental health providers. Individual treatment was specifically discussed in some treatment

---

[26] As reported in Subpart I (A) of this report, representatives of the Special Master participate in these two workgroups.

teams as documented in the records, but not in other treatment teams, or if discussed, was not documented.

The information provided by DSH-Atascadero lacked important information about the nature of individual treatment provided. The data from DSH-Coalinga indicated that individual treatment provided to *Coleman* class members during the review period was negligible. Patients at DSH-Patton received weekly individual treatment early in admission and were able to access content with individual providers as needed.

The need to develop and implement meaningful individual treatment guidelines and tracking systems, as well as train staff regarding providing adequate individual treatment in the inpatient programs, continued to need addressing by CDCR and DSH. Individual treatment should become a subject of the special workgroup established for CHCF-PIP and CMF-PIP, which as indicated above should also be extended to other PIPs.

**PART II.**

**THE SPECIAL MASTER'S FINDINGS AT THE
NINE INPATIENT PROGRAMS**

A.    <u>**STAFFING**</u>

<u>**Background**</u>

As stated above, full implementation of defendants' staffing plan is required to end federal court oversight. ECF No. 5711 at 1. Since the preceding monitoring round, critical staffing shortages across disciplines at the PIPs have continued and remain troubling; as discussed in detail in this report, the PIPs are generally not providing appropriate care.

The designated staff-to-patient ratios for all inpatient facilities and programs were unchanged at 1:15 for admission and acute care units, and 1:35 for intermediate care units. The

ratios remained applicable to psychiatrists, psychologists, social workers, and rehabilitation/recreational therapists.

Staff-to-patient ratios were all within established requirements at DSH-Coalinga and DSH-Patton. For DSH-Atascadero, at the time of reporting, staff-to-patient ratios were within requirements; however, with current staffing vacancies, ratios would be exceeded with full patient capacity. The CMF-PIP failed to meet any of the required clinical staffing ratios for psychiatrists, psychologists, social workers, or rehabilitation therapists in their acute and intermediate care programs, with the exception of the L1 unit where all ratios were met. The CHCF-PIP exceeded all staff-to-patient ratios for the acute program, as well as for psychiatrists in the intermediate program. The SQ-PIP failed to meet staff-to-patient ratios for social workers, and SVSP-PIP exceeded the 1:35 ratio for psychiatrists. The CIW-PIP met staff-to-patient ratios for all clinical disciplines.

1.    **DSH-Atascadero, DSH-Coalinga, and DSH-Patton**

As of February 20, 2020, there were 249 *Coleman* class member patients at DSH-Atascadero, bringing the census to 97 percent of capacity for *Coleman* patients at the facility. Persistent psychiatry vacancies lingered, rendering a 62.5 percent vacancy rate, a marginal decrease from the 63-percent vacancy rate reported in the preceding monitoring round. However, the use of contractors reduced the vacancy rate to a 25 percent functional vacancy rate. Telepsychiatry services were not used at DSH-Atascadero.

At DSH-Atascadero, all social worker positions were filled, while functional vacancy rates for psychologists and rehabilitation therapists were 12.5 percent each. Reported functional vacancy rates for senior psych techs and psych techs were 22 percent and eight percent, respectively. With the use of contractors, RNs had a zero-percent functional vacancy rate. The

staffing data provided indicated that with the vacancies reported, if the *Coleman* units were at designated capacity, DSH-Atascadero would not meet the staff-to-patient ratio in all disciplines for intermediate care established by DSH.

DSH-Atascadero did not report staffing data relative to the admissions unit.

As of January 10, 2020, the census at DSH-Coalinga was 49, which was 98 percent of the 50-bed capacity designated for *Coleman* class member patients at the facility. All clinical positions remained filled including psych techs. All staff-to-patient ratios were within the established requirements of 1:35 for psychiatry, psychology, social work, and rehabilitation therapy.

On February 4, 2020, there were ten *Coleman* class member patients at DSH-Patton, bringing the census to 33 percent of the 30-bed capacity for *Coleman* patients at the facility. DSH-Patton was compliant with all staff-to-patient established ratios for psychiatrists, psychologist, social workers, and rehabilitation therapists. Psych techs reported a 27 percent vacancy rate that was covered by surplus staff from other units to maintain the established staffing ratio of 1:8.

2.    **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

On December 2, 2019, the SVSP-PIP reached 98 percent of its operational capacity with 242 of its 246 beds filled. While the SVSP-PIP met established staff-to-patient ratios for psychology and social workers, it did not for psychiatry. It was unclear whether rehabilitation therapists met the established ratios, as they were not assigned specific caseloads and reported a 30 percent functional vacancy rate. At the time of the site visit, none of the ten staff psychiatrist positions was filled by permanent staff members and the functional vacancy rate increased to 40 percent; a significant increase from 20 percent during the preceding monitoring period.

Additionally, the senior psychiatrist position was vacant, and the chief psychiatrist position was covered by a staff member serving in an acting capacity.  Social worker functional vacancies decreased to ten percent and psych tech functional vacancies remained high at 43 percent.  The elimination of the medical technical assistant (MTA) classification during the review period added to nursing and custody staffing issues impacting patient movement including to treatment, feeding, and other unit activities.  At the time of the site visit, Licensed Vocational Nurses (LVNs) had a functional vacancy rate of 22 percent.

On December 2, 2019, the CMF-PIP housed 364 *Coleman* class members, with 195 at the acute level of care and 169 at the intermediate level of care, representing 92 percent of the total 396 patient capacity, and 95 percent of the 383 available beds (13 beds in the acute care program were closed to admission due to psychiatry staffing shortages).  In the intermediate care program, one bed was redlined.

Psychiatry functional vacancies increased considerably since the preceding monitoring report from 29 percent to 52 percent, and there was a functional vacancy rate of 50 percent for senior psychiatrists.  There was a functional 50 percent vacancy rate for nurse practitioners.  Psychology functional vacancies increased as well, to 31 percent from 22.5 percent during the preceding monitoring report; nine of the 18 permanent staff were unlicensed.  Rehabilitation therapist functional vacancies increased from seven percent to 11 percent.  Social workers reported a slight decrease in functional vacancies from 19 percent to 15 percent, and six of the permanent staff were unlicensed.  Psych techs and registered nurses (RNs) had the lowest functional vacancy rates at nine percent and four percent, respectively.

At the time of the site visit, MTAs reported a functional vacancy rate of 35 percent.  As part of the MTA transition plan, the CMF-PIP hired 22 permanent staff and 16 registry staff to

fill LVN and certified nursing assistant (CNA) positions. The hiring process was also underway for 86 custody officers.

The CMF-PIP did not meet the established ratio of 1:15 in any unit of the acute care program for psychiatrists or social workers. One of the five acute care units met the required ratios for psychologists and rehabilitation therapists. Compliance with clinician-to-patient ratios varied in the intermediate care program units at CMF-PIP, but were generally noncompliant. Within the seven intermediate care units, the 1:35 ratio was met in one unit for psychiatrists, two units for psychologists and social workers, and three units for rehabilitation therapists.

On March 18, 2020, the CMF L1-PIP reached 76 percent of its capacity with 53 of its 70 beds filled. While the CMF L1-PIP met its designated 1:30 staffing ratio for psychiatrists, psychologists, social workers, and recreational therapists, psychologist functional vacancies increased to 20 percent during the review period. Psychiatrist functional vacancies decreased to 20 percent from 30 percent during the preceding monitoring report, and social worker vacancies remained at 20 percent. Psych techs reported a 28 percent functional vacancy rate and RN functional vacancies increased to seven percent since the preceding monitoring report. Rehabilitation therapists continued to report zero vacancies.

During the monitoring round, CHCF-PIP capacity increased from 514 beds to 534 beds. On March 10, 2020, the CHCF-PIP housed 525 *Coleman* patients with 181 at the acute level of care and 344 at the intermediate level of care, representing 98 percent of capacity. Psychiatry functional vacancies appreciably increased from 24.6 percent to 38 percent since the preceding monitoring report; during September of the review period, psychiatry functional vacancies reached 42 percent, necessitating the emergency use of telepsychiatry services.

Both senior psychologist positions were vacant, and the functional vacancy rate for psychologists increased to 21 percent from 10.4 percent since the preceding monitoring report. Social worker functional vacancies significantly increased from ten percent to 32 percent, and rehabilitation specialist vacancies remained at 12.5 percent. RN functional vacancies decreased from 10.4 percent to five percent since the preceding monitoring report. The CHCF-PIP reported a nine-percent functional vacancy rate for licensed psych techs and 39 percent for pre-licensed psych techs. Since the preceding monitoring report, allocated positions for social workers and psych techs decreased by 15 percent and five percent, respectively. Custody staff positions increased by 41 percent and were filled.

During March 2020, CHCF-PIP management reported adequate staff-to-patient ratios; however, functional vacancies of 38 percent in psychiatry, 21 percent in psychology, and 32 percent in social worker staffing raised questions regarding the reliability of the report.

3.    **CIW-PIP and SQ-PIP**

Of the 45 beds available for acute and intermediate care for *Coleman* class members at the CIW-PIP, 32, or 71 percent were occupied as of December 17, 2019. All psychology, recreational therapy, nursing, and psych tech positions remained filled. Psychiatry and social worker functional vacancies increased to 25 percent each since the preceding monitoring report. The CIW-PIP met the staff-to-patient ratio for acute and intermediate care for all clinical disciplines.

On February 18, 2020, the total census for acute and intermediate care patients at the SQ-PIP was 29, or 72 percent of capacity. Thirty of the 40 beds were dedicated to acute and intermediate care condemned patients, and the remaining ten flex beds were used for the care of acute care condemned patients, intermediate care condemned patients, acute care non-

48

condemned patients, and mental health crisis bed (MHCB) condemned and non-condemned patients. The vacancy rate for psychiatry, psychology, and RNs was zero. Social worker functional vacancies increased to 72 percent due to a long-term sick leave, and the functional vacancy rate for recreational therapists decreased from 25 percent to 17 percent since the preceding monitoring report. There was a 16-percent functional vacancy rate for psych techs. The SQ-PIP met established staff-to-patient ratios for all clinical disciplines except for social workers.

**B.    TREATMENT AND CLINICAL SERVICES**

**1.    DSH-Atascadero, DSH-Coalinga, and DSH-Patton**

**a.    IDTTs**

Overall, IDTTs at DSH-Atascadero were conducted timely, within seven days of admission, and patients attended.

At DSH-Coalinga, more information was unknown than known. For example, DSH-Coalinga did not offer much information other than to state that IDTTs were held with or without patient participation. Additionally, although expected treatment outcomes appeared reasonable and measurable, they were difficult to evaluate in terms of a specific patient's diagnosis and symptoms. Regarding timeliness, data reviewed showed that 83 percent of patients had an IDTT within seven days of admission.

During observed IDTTs at DSH-Patton, all patients were present, and all treatment team members offered input. Although most interviewed patients indicated that they were unable to describe their treatment plans, they offered positive feedback on their IDTT meetings overall, and specifically, the ability to ask questions specific to their treatment.

49

b.    **Group Therapy**

DSH-Atascadero provided core, centralized, and supplemental group therapy during the review period; however, the data supplied did not allow for a breakdown of the average number of hours of any category of group therapy offered to patients on a weekly basis. Additionally, while DSH-Atascadero did track cancellations, the documentation provided was not helpful in determining what percentage of scheduled groups were cancelled.

Data received by the facility showed high patient attendance at group and recreational therapy and that on average, newly admitted patients attended their first group therapy session eight days after admission.

DSH-Coalinga continued to offer core and supplemental group therapy treatment. The facility offered data on core groups for 24 weeks during the review period; patients attended 70 percent of offered groups. During the review period, the average number of group treatment hours offered per patient per week was 9.63 and the average number of hours attended was 6.77.

DSH-Coalinga offered data on supplemental activities for 26 weeks during the review period; patients attended 18 percent of offered activities. During the review period, the average number of supplemental activity hours offered per patient per week was 41 and the average number of hours attended was 7.27.

At DSH-Patton, interviewed patients stated that they found the offered group treatment beneficial. That said, patients at DSH-Patton received fewer treatment hours than EOP inmates. The average number of core treatment hours offered per patient per week during the review period was 7.45 and the average number of hours attended was 5.25.

Regarding supplemental activities, DSH-Patton staff estimated that approximately one hour per patient per week was offered.

50

### c.   Individual Treatment

Individual treatment was offered to patients at DSH-Atascadero during the review period, but the documentation provided did not clearly delineate who provided the treatment, nor duration or frequency.

At DSH-Coalinga, individual treatment was sorely lacking. As of January 2020, data provided by the facility indicated that an average of 1.87 individual treatment hours were offered weekly, with 1.17 hours attended. These dismal numbers represented an average of 0.04 hours offered per patient per week and 0.03 hours attended. Of additional concern, and according to documentation provided by the facility, no individual treatment was offered in either June or July 2019.

Individual treatment at DSH-Patton was offered weekly at the beginning of a patient's admission and thereafter on an as-needed basis. Interviewed patients reported adequate access to their psychiatrist.

### d.   Psychiatric Services

Both DSH-Atascadero and DSH-Coalinga failed to provide documentation regarding psychiatric services.

At DSH-Patton, all psychiatry positions were filled, and interviewed patients reported adequate access to their psychiatrist.

### e.   Other Treatment Issues

#### i.   Involuntary Medications (PC 2602)

Neither DSH-Atascadero nor DSH-Coalinga provided data regarding patients under California Penal Code (PC) 2602 orders during the review period and no PC 2602 orders were initiated at DSH-Patton.

51

### ii.     Behavioral Management

At DSH-Atascadero, three patients had behavior plans developed and implemented during the review period.

DSH-Coalinga and DSH-Patton reported that no patients were on individual behavior plans during the review period.

### iii.     Morning and End Shift Meetings

DSH-Atascadero failed to provide any documentation regarding morning and end of shift meetings.

At DSH-Patton, all required staff attended the morning shift meeting and reviewed all patients on the unit, focusing on those with problematic behaviors.

## 2.     **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

### a.     **IDTTs**

At SVSP-PIP, observed IDTTs presented several areas of concern including the following:  limited discussion of LRH, modest psychiatric participation aside from medication management, lack of IDTT cohesiveness, and minimal discussion of the patient's participation and progress in treatment.

SVSP-PIP administrative staff were aware of the poor quality of IDTTs and implemented a performance improvement plan.  At the time of the site visit, the performance improvement plan had not yet made an impact on the quality of the IDTTs.

At CMF-PIP, the quality of IDTTs across units in both the acute and intermediate care programs varied.

In the acute care program, staff indicated that correctional counselors and psychiatrists were the two disciplines most likely to be absent from the treatment team due to staffing

vacancies. During the site visit, all IDTTs observed by the monitor's expert in the acute care program were attended by the required treatment team members.

In the intermediate care program, System to Encourage Progress (STEP) level and LRH were rarely, if ever, discussed without prompting by the regional staff or monitor's expert. In addition, some patients were not seen for their 72-hour IDTT or by their primary clinician or psychiatrist prior to IDTT, as required. As a result, IDTTs for these patients focused more on conducting assessments than discussing the treatment plan.

Observed IDTTs in the HCITC included all required team members with psychiatry present through telepsychiatry.

Information provided by CMF L1-PIP showed more than 90 percent compliance with the attendance of required IDTT participants, an improvement since the preceding site visit.

During the September 2019 site visit to CHCF-PIP, all required disciplines attended observed IDTTs in the acute care program. There was limited reference to treatment plans and at least one patient had not been seen by his psychiatrist or primary clinician prior to the IDTT.

In the intermediate care program, psychiatry was covered by telepsychiatry. While there was discussion of LRH, treatment goals were not discussed in detail, and there were varying degrees of participation by treatment team members, with some actively engaged and others offering no input.

One maximum custody status IDTT was observed at CHCF-PIP during the September 2019 site visit. It was clear that the patient was unstable, and even though he had not met his treatment goals or resolved the reason for his referral to the PIP, he was being discharged to EOP. CHCF-PIP staff reported discharging patients to the EOP level of care because more care was provided in an EOP hub or PSU than in the PIP.

During the March 2020 re-visit to CHCF-PIP, required disciplines were present in most observed IDTTs.  As was the case during the September 2019 site visit, telepsychiatry was used in the intermediate care program.

The quality of observed IDTTs varied during the March 2020 site visit.  Treatment goals and groups were usually not fully discussed and LRH was not discussed at all until prompted by the monitor's expert.  In addition, treatment interventions were often inadequate given patient acuity and many reviewed treatment plans lacked appropriate interventions.

> **b.    Group Therapy**

The provision of group treatment has been a consistent concern at SVSP-PIP.  During the entrance meeting on the first day of the site visit, SVSP-PIP leadership acknowledged that there were continued issues with group treatment, including the quality of the groups and the low number of treatment hours offered.  It was reported that a Performance Improvement Work Plan (PIWP) was developed in September 2019 in an effort to increase weekly treatment hours. SVSP-PIP leadership stated that their initial focus was on increasing the number of treatment hours offered and that once that goal was met, they would turn their attention to the quality of the treatment offered.  At the time of the site visit, the facility reported that patients were offered 11.8 hours of group therapy each week in November 2019; an increase from an average of 4.6 hours in September 2019.

In addition to issues about quality and the lack of treatment hours offered, group therapy in C5 and C6 often occurred in the dayroom or in small rooms in the hallway.  Of even greater concern, several maximum custody status patients were housed in C5 and C6.  These patients did not receive any group therapy and remained in their cells for extended periods of time with little

to no treatment. Staff indicated there were no therapeutic treatment modules (TTMs) located in C5 and C6.

The amount of out-of-cell structured therapeutic activities offered to acute care patients at CMF-PIP was inadequate. Physical plant issues along with a limited number of escort officers were the major barriers in providing adequate treatment.

CMF-PIP failed to provide data specific to the treatment received by maximum custody patients in the acute care program through the use of TTMs. Additionally, none of the eight TTMs in the maximum custody group room were *Coleman* approved modules, nor were they placed in semi-circle style, as required.

In the intermediate care program, group therapy was the primary structured therapeutic activity and was typically provided by recreation therapists. Even though the overall number of hours offered and attended had improved since the preceding review period, they remained inadequate. The hours offered fell well below what would be expected for an intermediate program, and did not even meet requirements for EOP treatment, which is a lower level of care. CMF-PIP leadership explained that they were working on increasing the amount of intermediate care treatment hours offered but said that staffing vacancies were limiting their efforts.

Based on data received from CMF-PIP and interviews with staff and patients, the amount of out-of-cell unstructured activities offered to acute and intermediate care patients was inadequate.

At CMF L1-PIP, the average number of structured and unstructured out-of-cell activities offered during the review period was 11.18 hours; 6.2 hours were refused. Based on the documentation provided by the facility, it was unclear why the refusal rate for out-of-cell activities was greater than 50 percent, an obvious concern.

At CHCF-PIP, a review of the high refusal list showed that in August 2019, roughly 300 acute care patients refused to attend 100 percent of all treatment offered. Additionally, acute care patients were receiving significantly less treatment than what was being provided to inmates in the mainline EOP setting. Reasons for the inadequate treatment included institutional culture, limited availability of correctional officers, and significant staffing vacancies.

The delivery of treatment in the intermediate care program at CHCF-PIP remained poor. Documentation provided by the facility, as well as information received from staff and patient interviews, confirmed that patients were provided significantly less therapeutic activities than what was provided at the EOP level of care.

During the September 2019 site visit, treatment for maximum custody patients in both the acute and intermediate care programs at CHCF-PIP was abysmal. Patients spent the majority of their time locked in their cells. Several requests were made to staff for the number of treatment hours offered and attended for maximum custody patients, but the information was never received. Nonetheless, staff acknowledged that out-of-cell activity was excessively low. Estimates for structured therapeutic activity in the acute program ranged from a low of .5 hours per week to a high of two hours per week. Similar estimates were reported for the intermediate care program. At CHCF-PIP, the maximum custody acute and intermediate care units were functionally restrictive housing units. Staff reported discharging maximum custody patients to the EOP level of care because more treatment was provided in the EOP hub or PSU.

During the March 2020 re-visit to CHCF-PIP, observed groups were well-run and the patients were engaged in the sessions. Interviewed patients reported being offered between two to five hours of structured therapeutic activity per week and approximately 20 hours per week of non-clinical activities.

In the intermediate care program, the provision of care varied. Interviewed patients reported between two to eight hours per week of scheduled group therapy, which represented an improvement, but remained below what would be expected in an intermediate care program.

During the re-visit to CHCP-PIP, the amount of treatment for maximum custody patients continued to be extremely limited. Group therapy was not offered at all and patients were only removed from their cells for individual contacts. Review of documentation provided by the facility showed that, including yard time, these patients received less than ten hours per week of out-of-cell time and intermediate care maximum custody patients received less than acute care maximum custody patients.

### c.    Individual Treatment

At SVSP-PIP, individual treatment was inadequate. In C5 and C6, staff and patient interviews confirmed that individual contacts were short check-ins and cell-front contacts were common. SVSP-PIP did not track the provision of individual treatment.

In TC1, patients reported having individual contacts from weekly to monthly. Staff reported that barriers to treatment included insufficient escort staff and TTMs.

In TC2, clinical contacts routinely occurred cell-front and were short check-ins. Mental health staff reported that cell-front contacts were regularly conducted for maximum custody patients.

In the acute care units at CMF-PIP, weekly clinical contacts between primary clinicians and their assigned patients varied among units. Lack of office space was the primary factor for the variation although mental health and correctional staff vacancies also played a part.

Individual treatment in the intermediate care program remained a challenge for CMF-PIP. The monitor's expert's limited review of records indicated that while the amount of individual

treatment had improved since the preceding site visit, regular access to individual treatment continued to be inadequate.

No data was provided regarding the number of hours of individual treatment provided to patients in the CMF L1-PIP.

During the September 2019 CHCF-PIP site visit, the monitor's expert observed individual treatment being provided to several acute care patients. The observed sessions were all confidential although custody officers or psych techs stood outside the office to observe, reportedly for safety concerns.

For the CHCF-PIP intermediate care program, information regarding the average number of hours of individual therapy received each month was difficult to evaluate. Staff reported that psych tech staffing shortages severely limited programming and out-of-cell clinical activities.

Individual treatment was the primary form of treatment offered to maximum custody patients, but it was not consistently offered. The monitor's expert observed individual treatment provided to maximum custody patents. The observed sessions were confidential although as with acute patients, custody officers or psych techs were present outside the office and visible. Additionally, no documentation was provided regarding the frequency or timeliness of primary clinician contacts.

During the March 2020 visit to CHCF-PIP, acute care patients reported weekly, confidential primary clinician contacts, but stated that the contacts were brief and unhelpful.

In the intermediate care program, patients reported improvement in weekly, out-of-cell primary clinician contacts.

### d.    Psychiatric Services

At SVSP-PIP, patients reported that psychiatric contacts occurred in a confidential setting.

In the acute care program at CMF-PIP, patients reported meeting with their psychiatrist weekly, though not always in a confidential setting.

Patients in the HCITC reported that they were required to submit a medical request form if they wanted to see their psychiatrist.

CMF L1-PIP reported that 82 percent of initial psychiatry contacts were timely.

During the September 2019 site visit, interviewed staff at CHCF-PIP reported poor continuity of care for psychiatry due to constant turnover and CDCR staff acknowledged that the level of psychiatric services being provided to patients was inadequate.  No data was provided by the facility regarding the frequency or timeliness of psychiatric contacts.

During the March 2020 re-visit to CHCF-PIP, acute care patients reported weekly appointments with their psychiatrists in confidential settings.  In intermediate care, telepsychiatry was frequently used due to on-site psychiatry staffing vacancies and the telepsychiatrists were assigned to specific units.  Psychiatry continuity of care continued to be hampered by staffing vacancies, access to patients, and high workload.

### e.    Other Treatment Issues

### i.    Involuntary Medications (PC 2602)

During the review period, there were 28 initial PC 2602 petitions and 29 renewal petitions at SVSP-PIP.

SVSP-PIP did not have a process in place to track non-compliance with PC 2602 medications during the review period.  While on-site, the facility reported that it implemented a

PC 2602 medication log which would be reviewed monthly by the chief psychiatrist. SVSP-PIP reported that training associated with the log was completed in November 2019. The facility reported that it did not submit any reports or tracking related to the PC 2602 process to mental health headquarters.

At CMF-PIP, there were 102 patients with PC 2602 orders within the review period; 82 patients were in the acute program and 20 were in the intermediate care program.

There were no PC 2602 petitions initiated, denied, pending, or withdrawn at CMF L1-PIP during the review period or at the time of the site visit.

During the September 2019 CHCF-PIP site visit, the facility reported that there were between 127 and 153 non-maximum custody patients with PC 2602 orders during the review period; for maximum custody patients, the range varied from 19 to 28.

CHCF-PIP reported three instances where controlled use of force was used to administer involuntary medications during the review period.

### ii. Behavioral Management

At SVSP-PIP, one psychologist served as the point person for the completion of behavioral interventions for self-injurious or aggressive behavior. Staff reported that patients in need of behavioral interventions were identified through the risk management meeting or a review of incident reports. Areas for improvement included individualized rewards, better collaboration between the treatment team and patient, comprehensive behavior analysis, and a maximum of two behaviors addressed at a time.

The Dialectical Behavioral Therapy (DBT) program was suspended at CMF-PIP and a Positive Behavioral Support Team (PBST) was established. The PBST included a psychologist, social worker, and rehabilitation therapist. During the review period, 30 referrals were made to

60

the PBST and behavior plans were made for 27 of the patients. A review of the plans showed that significant progress had been made in the preparation of individual behavior plans since the preceding site visit. Areas for improvement included a better articulated reason for referral, identification of antecedents with a closer temporal relationship to the target behavior, and individualized and meaningful reinforcement.

During the September 2019 site visit review period, the PBST at CHCF-PIP was consulted on 21 patient cases. Referrals were received in various ways including from program management after review of serious incident reports, and to a lesser extent, by treatment teams.

Although the quality of the behavioral guidelines had improved from the preceding site visit, they were not yet comprehensive enough to be considered behavior plans. Areas for improvement included identification of precipitants and existing reinforcers that sustained the target behavior, the use and existence of immediate reinforcers, collaboration with the patient, and a reasonable number of target behaviors.

No progress had been made with the PBST during the March 2020 re-visit to CHCF-PIP. The facility reported that based on current staffing, the PBST was at maximum capacity.

### iii.    Morning and End of Shift Meetings

During the site visit at SVSP-PIP, an afternoon huddle was observed. The meeting was well organized and led by the senior registered nurse (SRN). Topics of discussion included patients with medical concerns, patient transfers, appointments, and programming issues, among others. Although many of the topics covered related to psychiatric care, the psychiatrist offered very little input. On the other hand, custody staff provided valuable feedback regarding patient observations.

61

At CMF-PIP, morning and afternoon huddles were observed.  The meetings were led by nursing.  Topics of discussion included medication compliance, referrals, group attendance, and quantity of out-of-cell time, among others.

During the September 2019 site visit, morning huddles were observed in both acute and intermediate care units at CHCF-PIP.  All required staff were present and participated.

The monitor's expert observed a useful and informative morning huddle in acute care during the March 2020 re-visit to CHCF.

The monitor's expert observed an afternoon huddle in intermediate care that was concerning.  Only nursing staff attended, and no clinical information was provided, other than a brief reference of any "issues reported."

3.    **CIW-PIP and SQ-PIP**

a.    **IDTTs**

During observed IDTTs at CIW-PIP, all necessary disciplines were in attendance.  All treatment team members offered input and actively discussed treatment although custody staff's participation varied.  Staff knew the patients well and patients were actively engaged with the treatment team.

Appropriate discussion of patients' symptoms and current level of functioning varied.  Although treatment goals were measurable and interventions were proper based on the patient's level of functioning, behavior plans were seldom used.

At CIW-PIP, it was the practice to discontinue DPS at the ten-day IDTT.

It was observed that LRH was not regularly discussed or documented during the IDTT; staff explained that LRH was not reviewed until the 30-day IDTT.  A review of patient records showed that the rationale for placement outside of a patient's LRH was abbreviated and lacking

in discussion of behaviors or symptoms that influenced the decision, as well as progress, or lack thereof, of treatment goals.

At SQ-PIP, timeliness of IDTT data was combined for acute and intermediate care; however, a limited review of EHRS indicated that SQ-PIP was in compliance with IDTT timeframes for acute care patients. The IDTT room offered adequate space and contained one TTM. All patients were placed in the TTM for the duration of the IDTT. For all observed IDTTs, patients' assigned treatment providers were in attendance.

Regarding intermediate care, all required treatment team members were present for the observed IDTTs; however, the quality was insufficient. Significant topics such as diagnoses, treatment plans, and expectations for discharge were not discussed. In addition, the behavior of some clinical staff was disruptive to the IDTT.

At SQ-PIP, the quality of treatment plans varied across treatment teams for both the acute and intermediate care programs. At the acute level of care, treatment plans were not always individualized to the patient's needs. At the intermediate level of care, treatment plans lacked measurable treatment goals and treatment specificity. In addition, Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) safety plans were clinically inadequate and consequently, offered minimal utility.

### b.  Group Therapy

At CIW-PIP, 12-week group therapy cycles were offered, and group topics changed according to the needs of the population at the beginning of each new cycle.

During the review period, CIW-PIP reported offering an average of 12.9 hours of treatment per week, with patients averaging 8.7 hours received per week. The escort process

used at CIW-PIP required a minimum of two staff members, was time consuming, and cut into patients' treatment time.

At CIW-PIP, low attendance for group therapy was attributed to treatment cancellations and patient refusals. Although the facility provided both cancellation and refusal data, there were issues with both forms of data which made it difficult to understand and accurately report on.

Interviewed patients and staff provided different accounts regarding the amount of unstructured therapeutic time offered. Regarding out-of-cell time, staff reported that patients were offered two hours per day; patients reported one hour per day, with the exception of weekends.

At SQ-PIP, treatment groups took place in large, confidential treatment rooms with TTMs; all patients were placed in TTMs during group therapy.

The amount of structured therapeutic activity in the acute care program decreased since the preceding site visit. This was mostly due to competing interests for treatment space. During the review period, SQ-PIP offered an average of 4.2 hours of structured therapeutic activity per week, with patients receiving an average of 2.8 hours.

There was a 33 percent refusal rate in the acute care program. In addition, more than half or 56 percent of treatment groups were cancelled for unknown reasons.

For intermediate care, SQ-PIP offered an average of 22.4 hours of structured therapeutic activity per week, with patients receiving an average of 7.8 hours.

There was a 65 percent refusal rate in the intermediate care program. In response to the high number of refusals, SQ-PIP developed a quality improvement team, but the effort was dissolved before any findings or conclusions could be made.

64

Interviewed intermediate care patients spoke positively about their group therapy experiences and patients in observed groups were engaged.

### c.    Individual Treatment

At CIW-PIP, patients reported having confidential contacts with their psychiatrist and primary clinician at least once per week. Interviewed patients reported that they found their primary clinicians to be helpful. Patients reported being able to meet with their psychiatrist or primary clinician upon request.

At SQ-PIP, most treatment provided in the acute care program was done by individual contacts. Staff reported that in both the acute and intermediate care programs, patients met at least weekly with the psychiatrist, psychologist, and social worker.

### d.    Psychiatric Services

During the review period, CIW-PIP met both the acute and intermediate care patient ratios for psychiatry. The facility did not use telepsychiatry.

SQ-PIP had three assigned psychiatrists during the review period. Two additional psychiatrists from San Quentin State Prison (SQ) provided treatment to patients who were on their caseload prior to the patients' admission to the PIP.

The data provided by SQ-PIP did not allow for a determination to be made regarding the amount of psychiatric treatment provided for either acute care or intermediate care patients during the review period.

e.     **Other Treatment Issues**

i.     **Involuntary Medications (PC 2602)**

During the review period, 16 to 21 patients received PC 2602 medications each month at CIW-PIP.  At the time of the site visit, 17 patients had PC 2602 orders in place; three of the patients were in acute care and the remainder were in intermediate care.

During the review period, PC 2602 medications were appropriately managed, and no petitions were denied at SQ-PIP.  Additionally, two PC 2602 petitions were initiated, four were renewed, and one was withdrawn as planned.

ii.     **Behavioral Management**

During the review period, CIW-PIP had begun the development and implementation of behavior support plans.  It was clear that there was both a need for behavior support plans and that behavior support plans were not used as much as they should be.

At SQ-PIP, behavior plans continued to be problematic.  There was no staff member dedicated to the development and oversight of behavior plans.  Additionally, unit staff did not understand the relevance of behavioral treatment and behavior plans were underused in treatment, even when there were stated clinical reasons for a plan.

iii.     **Morning and End of Shift Meetings**

Morning and end of shift meetings were not observed at CIW-PIP during the site visit.

At SQ-PIP, one afternoon end of shift meeting was observed.  The meeting was not interactive and only nursing staff spoke.  Of concern, the psychiatrist and mental health clinicians were not present for any part of the meeting.

C.    **QUALITY OF CARE ISSUES IN IDTTS AND TREATMENT PLANNING IN THE INPATIENT CARE PROGRAMS**

1.    **Observed Inadequacies in the IDTT Process**

As reported in Part II (B) above, although there were some instances in which the IDTT process was working as intended, certain inadequacies remained.

During the preceding monitoring round, correctional counselor attendance at IDTTs at SVSP-PIP, CMF-PIP, and CHCF-PIP was found to be sporadic at best.  While correctional counselor attendance at IDTTs seemed to have improved at SVSP-PIP and CHCF-PIP, it continued to be an issue at CMF-PIP.  Due to staffing vacancies, CMF-PIP also struggled with psychiatry attendance at IDTTs.

As during preceding monitoring rounds, several areas of concern were noted during observed IDTTs.  Discussions of LRH were either limited or did not occur at all in IDTTs observed at SVSP-PIP, CMF-PIP, CHCF-PIP and CIW-PIP.  At SVSP-PIP, the treatment team appeared to be unclear about their role in determining LRH and in clinically preparing the patient to transfer to their LRH.  LRH was rarely discussed in observed IDTTs at CMF-PIP.  Treatment teams did not discuss the behaviors keeping the patient from their LRH or interventions to move patients toward their LRH during observed IDTTs at CHCF-PIP.  LRH was not regularly discussed or documented during observed IDTTs at CIW-PIP, and a review of patient records found rationale for placement outside of LRH to be abbreviated.

Another issue with IDTTs found across programs was a dearth of discussion about treatment plans and goals.  Discussion of the patient's participation and progress in treatment was minimal in observed IDTTs at SVSP-PIP.  At CMF-PIP, observed treatment teams focused more on conducting assessments as part of the IDTT process rather than discussing the treatment plan.  At CHCF-PIP, treatment goals and treatment groups were minimally addressed by

67

treatment team members, with the exception of rehabilitation therapists. The quality of observed IDTTs at SQ-PIP were found to be inadequate, with no discussion of treatment plans, among other pertinent patient treatment issues.

A clinical review of patient health care records confirmed that the problems with IDTTs found during the preceding review had not been remedied. Existing issues previously reported included poor documentation, inadequate treatment planning, and the absence of required attendees at IDTT meetings, among others.

At SVSP-PIP and CHCF-PIP, there were problems with justification for level of care decisions. In the case of Patient F (CHCF-PIP), a decision to indefinitely retain the patient at the acute level of care until his 2021 parole date was inappropriate and not justified. Disorganization and failure to function as a cohesive team were issues with the IDTT of Patient D (SVSP-PIP). The treatment team did not discuss critical clinical information prior to discharging the patient and treatment and discharge plans were vague. Problems with treatment planning were also found in the cases of Patient E (SVSP-PIP), Patient C (CMF-PIP), Patient A (CHCF-PIP), Patient F (CHCF-PIP), Patient R (CHCF-PIP), Patient E (CIW-PIP), Patient F (CIW-PIP), and Patient C (SQ-PIP).

Problems with discharge planning were found in multiple cases at CHCF-PIP. The discharge plan section of the treatment plan for Patient A (CHCF-PIP) was vague, lacked measurable goals, and thus was inadequate. Specific discharge objectives or criteria were not created for Patient D (CHCF-PIP). The plan for Patient F (CHCF-PIP) suffered from a lack of reasonable discharge objectives. For Patient G, despite a recent history of several self-injury incidents, a reported plan to self-harm at discharge, and failure to meet the discharge objectives

outlined in the treatment plan, the high-risk patient was abruptly discharged from the PIP, for reasons which were unclear.

Although clinically indicated, a safety plan was not completed for Patient E (SVSP-PIP). Problems with safety planning were found across multiple programs. Safety plans were not completed for Patient B (CMF-PIP) or Patient F (CHCF-PIP) and safety planning was poor for Patient C (SQ-PIP). Treatment plans were not developed and updated as required for Patient B (CMF-PIP), Patients A, B, C, G and J (CHCF-PIP) or Patient E (CIW-PIP). In the cases of Patients G and H at CMF-PIP, IDTTs failed to address critical patient issues without prompting from the monitor's expert. At SQ-PIP, IDTTs failed to properly review the use of mechanical restraints for Patients K, L, and M. IDTTs were untimely for Patients C and D at CMF-PIP.

Additional issues found during the review included poor/incomplete documentation (Patient B, CMF-PIP); required members not in attendance (Patient C, CMF-PIP); failure to develop a case conceptualization (Patient B, CHCF-PIP); inappropriate discharge decisions/rationale (Patient J, CHCF-PIP); and lack of comprehension of basic behavioral treatment concepts (Patient R, CHCF-PIP).

## 2.    **Deficiencies in Treatment Planning**

A review of patient health care records found deficiencies in treatment planning at SVSP-PIP, CMF-PIP, CHCF-PIP, CIW-PIP and SQ-PIP.

At SVSP-PIP, the treatment plan for Patient A lacked treatment interventions and was not consistent with his health care record. Patient B's treatment plan was vague and did not address the behaviors which resulted in maximum custody placement. The treatment plan for Patient C was also vague and did not include measurable objectives. Patient's E's treatment needs were not addressed in his treatment plan nor were the referring institution's clinical concerns.

Problems with treatment plans at CMF-PIP included the failure to modify or update as appropriate, as in the cases of Patients A and B. Generic treatment goals were identified as an issue with Patient C's treatment plan, along with the plan itself being too vague to allow for implementation of adequate treatment beyond medication management. Inadequate objective goals that did not allow for measurement were contained in the treatment plan of Patient D. Goals were also an issue in Patient E's treatment plan, which included subjective goals and non-specific vague goals.

Copied and pasted notes were among the problems found with treatment plans at CHCF-PIP. The copied and pasted notes in the medication section of Patient A's treatment plan did not accurately describe the patient's worsening mental status. Instead of relevant clinical updates, nine of Patient B's treatment plans contained copied and pasted notes in the clinical summary section. Treatment plans for Patients C and G were not modified when warranted. Inadequate interventions were another issue found in multiple treatment plans at CHCF-PIP. For Patient J, interventions were vague and not evidence based. Interventions provided in the treatment plans for Patients R and S were inadequate for the acuity of the patients' symptoms.

At CIW-PIP, treatment plans left important areas unaddressed. The treatment plan for Patient E did not appropriately address her prior acts of violence. The treatment plan for Patient F did not address the patient's suicidal ideation or the referring institution's treatment recommendations.

Issues found with treatment plan deficiencies varied at SQ-PIP. Patient A's lack of group and IDTT participation were not addressed in his treatment plan. Missing from the treatment plan of Patients C and H were evidence-based interventions. Patient C's plan also lacked measurable objects, while Patient H's treatment plan should have been modified in response to

the patient's lack of progress towards goals. Although Patient E had received PIP services since 2014, their treatment plan did not include a case conceptualization. Patient J's treatment plan should have been revised and included more realistic and achievable goals.

### 3. Deficiencies in Behavior Plans

As outlined in Part II (B) above, while some progress had been made in the use of individual behavior plans and interventions since the preceding monitoring period, there remained improvements to be made.

Although DSH-Atascadero reported that enhanced observations and behavioral issues had increased, behavior plans were developed and implemented for only three *Coleman* patients during the review period. There were no individual behavior plans in use during the review period at DSH-Coalinga or DSH-Patton.

At SVSP-PIP, behavior plans lacked baseline data for targeted behaviors to assess change or determine if goals were realistic, and patients appeared to have limited involvement in the development of the behavior plan. While CMF-PIP's behavior plans had improved significantly since the preceding site visit, refining the reason for referral to be more concise would be a beneficial improvement going forward. At CHCF-PIP, although improved since the preceding site visit, the behavioral guidelines were still not comprehensive enough to be behavior plans. Although CIW-PIP had begun development and implementation of behavior support plans during the review period, they were not being used in equal measure to their need. The same was true for SQ-PIP, where there was no appointed staff member charged with oversight over the development and use of behavior plans.

A review of patient health care records also found that in some cases, behavior plans were not always being utilized when indicated. In other cases, although apparently considered

71

for use, a behavior plan was not located in the patient's health care record.  At CHCF-PIP, progress notes referenced developing a behavior plan for Patient F, however, none was found in the health care record.  For Patient R, despite clear indicators that a behavior plan was indicated, the treatment team did not consider it.  Similar issues were found at SQ-PIP.  The health care records of Patient E and Patient J contained progress notes referencing an existing behavior plan, but a behavior plan was not located in the record.  For Patient H, who could likely have benefitted from a behavior plan to clarify reinforcers for undesirable behaviors and offer incentives for progress towards treatment goals, one does not appear to have been considered.

## D.    PATIENT ACCESS TO TREATMENT

During the review period, most inpatient programs had policies in place which were designed to manage treatment progress, establish expectations for patient behavior, and regulate access to programming and privileges.  Patient participation in treatment and positive behavior were incentivized through structured, goal-oriented programs.

DSH-Atascadero and DSH-Coalinga continued to use the Hospital Access System (HAS), a five-level system that provided increased hospital access as the patient advanced through the system, with Level 1 being the most restrictive and Level 5 being the most permissive.  DSH-Patton used the facility's Security Procedure within Compounds policy to manage patient privileges and the Granting of Activities Level System (G.O.A.L.S.) to incentivize behavior and increase access to programming during the review period.

Most CDCR PIPs employed the System to Encourage Progress (STEP) to measure and promote patients' treatment progress.  The STEP program was described in detail in the 2018 Inpatient Care Report.  ECF 5894 at 58-61.  The STEP program was a structured system of

guidelines that outlined expectations regarding patient behavior and included distinct requirements that patients needed to satisfy to advance through various STEPs.

The first stage of the STEP program was Assessment and Orientation.  At this level, the IDTT performed a clinical evaluation and a custody evaluation was performed by the Institutional Classification Committee (ICC)/Unit Classification Committee (UCC).  Patients were oriented to treatment expectations and program rules.

Following Assessment and Orientation, patients either transitioned to STEP 1 or STEP 2 depending on custodial and clinical factors.  Generally, patients that advanced to STEP 2 were deemed ready to participate in group programming, while STEP 1 patients required additional time in solo treatment.  Advancement through the various STEPs was also contingent on patient participation in defined levels of treatment.  For instance, in order to progress from STEP 1 to STEP 2, among other factors, a patient must have participated in at least 50 percent of treatment activities at STEP 1.

IDTTs were engaged throughout the process to assess patients' satisfaction of prerequisites to STEP program advancement.  IDTT meetings included consideration of a patient's current STEP level and whether adjustments were warranted.  If a patient's STEP level required reduction, the IDTT would meet with the patient to discuss criteria for returning to the prior STEP.

The STEP program included discretionary program status (DPS), a temporary status featuring increased security measures in response to serious behavioral transgressions.  A patient could be placed on DPS for clinical or safety reasons at any point.

CIW-PIP and SQ-PIP continued to use the Steps Toward Accomplishment, Growth, and Education (STAGE) program.  Progression through different STAGE levels reflected a patient's

73

treatment progress and patient behavior could result in advancement or reduction of the patient's level.

1.       **DSH-Atascadero, DSH-Coalinga, and DSH-Patton**

As during the preceding review period, DSH-Atascadero managed patient supervision, privileges, and advancement via the Hospital Access System (HAS). Patients were admitted at HAS Level 1 and thereafter treatment team members determined changes to a patient's assigned level. DSH-Atascadero did not provide a policy governing the HAS level assignment process.

A report produced on January 27, 2020 regarding data collected on January 25, 2020 showed that there were 19 *Coleman* patients at HAS Level 1, 20 at HAS Level 2, 114 at HAS Level 3, 83 at HAS Level 4, and no *Coleman* patients were at HAS Level 5. During the review period, *Coleman* patients spent an average of 14.70 days at Level 1, 11.45 days at Level 2, and 52.63 days at Level 3. Except for unit 13, where no data was provided, *Coleman* patients spent an average of 66.70 days at Level 4. Of concern, there were extended lengths of stay at Level 1 of 18.77 and 21.73 days in units 31 and 34, respectively, which should be examined through the quality improvement process. The number of *Coleman* patients at each HAS level as well as the average lengths of stay at each level are summarized in the table below.

|  | HAS Level 1 | HAS Level 2 | HAS Level 3 | HAS Level 4 | HAS Level 5 |
|---|---|---|---|---|---|
| *Coleman* patients (as of January 27, 2020) | 19 | 20 | 114 | 83 | 0 |
| Average Length of Stay for *Coleman* patients at each level (days) | 14.7 | 11.45 | 52.63 | 66.7* | NA |

DSH-Coalinga indicated that the HAS policy was reviewed in November 2018 and reported that no changes were made to the policy.  The institution did not provide data regarding the number of *Coleman* patients at each HAS level nor the average lengths of stay at each level.

DSH-Patton used both a Security Procedure within Compounds privilege policy as well as the G.O.A.L.S. incentive system during the review period. Regarding the Security Procedure within Compound policy, the treatment team reviewed a patient's privileges at each treatment team meeting.  Among the items this policy covered were staff escort procedures and criteria for suspension and restorations of inner-compound privileges.  Regarding the G.O.A.L.S. system, there was no specific policy governing the incentive system but there was a manual describing how patients earned points.

### 2. SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP

SVSP-PIP had stopped utilizing the STEP program and did not intend to replace the program.  While there were indications that individual behavior plans would be developed to assist in treatment planning, additional staffing allocations were required to effectuate this proposal.  In addition, treatment teams began utilizing behavior chain analysis as part of treatment planning, but challenges in providing individual clinical contacts prevented the effective deployment of this initiative.  Finally, staff indicated that maximum custody patients were the only category automatically subjected to restraints during escorts.  Other patients were restrained if the treatment team or custody staff raised safety concerns.

At CMF-PIP, the STEP program was utilized in both the acute and intermediate care programs, although the institution did not provide data regarding the number of patients at each STEP level.  Staffing and physical plant challenges prevented full implementation of the STEP program in the acute care program.  At both the acute and intermediate care levels, CMF-PIP

used unspecified incentives. Notably, in accordance with an October 11, 2018 statewide CDCR memo, access to a patient's personal property was no longer permitted to be used as an incentive. While personal property was not used as an incentive at CMF-PIP, patients in the intermediate care program were incentivized with access to radios, television, and recreational supplies. Staff reported difficulty establishing effective incentives because some patients had radios or televisions as part of their personal property. Finally, the local governing body (LGB) discontinued to use of DPS at CMF-PIP on August 29, 2019.

CMF L1-PIP discontinued the use of DPS in programming during August 2018.

The STEP program was in place in the acute and intermediate care programs at CHCF-PIP. The acute care program used three STEPs while the intermediate care program used four. Although policy required patients at the Assessment and Orientation level to be evaluated during IDTT regarding the need for mechanical restraints, staff confirmed and the monitor's expert observed that, in practice, all orientation patients were placed on cuff status. In effect, this made all new intakes maximum custody patients. Maximum custody patients were to be seen by the ICC weekly with a PIP clinician present. Supervised by headquarters staff, the ICC reviewed maximum custody patients monthly to determine if the patient could be moved off maximum custody status. Non-maximum custody patients were seen by the UCC; clinicians were only required to attend for developmentally disabled patients. Between the two site visits, CHCF-PIP undertook a maximum-security review project wherein 51 patients were reviewed by both correctional and mental health staff to determine the appropriateness of the patients' custody levels. Twenty-four, or 47 percent, were recommended for lower levels of care and, of these 24, 16 or 67 percent were discharged to an EOP.

3.        **CIW-PIP and SQ-PIP**

There were several concerns with the STAGE program at the CIW-PIP.  First, a patient's ability to access group treatment depended on the patient's STAGE level, resulting in STAGE II inmates receiving more treatment than psychiatrically unstable STAGE I patients.  Moreover, patients were required to stay at a STAGE level for at least 30 days, further limiting treatment availability at STAGE I.

CIW-PIP averaged 14 patients on DPS monthly during the reporting period; patients stayed on DPS for an average of 13.52 days per month.  All new patients at CIW-PIP were placed on DPS, which was concerning because detailed clinical information about the patients' histories, symptoms, and functioning in CDCR was available.  In addition, CIW-PIP's use of DPS lacked a patient-specific approach regarding risk of violence, and documentation regarding the initiation, continuation, and termination of DPS was insufficient.  Per policy, only two DPS patients were permitted to attend groups at a time, resulting in an insufficient number of offered groups to accommodate all DPS patients.  Because of high refusal rates among DPS patients, staff reported that the number of groups offered was adequate.

SQ-PIP continued to use the STAGE program during the review period.  As patients progressed through the STAGE levels, they were to increase their participation in treatment without prompting.  Because there had been no update to the acute care program's policy, which as written only applied to condemned patients, there was confusion regarding mechanical restraint, escort, and pre-release planning policies for the non-condemned population.  Staff reported that DPS was no longer in use at SQ-PIP.

### E.     REFERRALS AND TRANSFERS

#### 1.     DSH-Atascadero, DSH-Coalinga, and DSH-Patton

During the review period, there was a combined total of 331 *Coleman* class members referred for transfer to DSH-Atascadero and DSH-Coalinga.  Thirteen referrals were rejected. Data was not provided regarding referral timeframes or reasons for rejections.

At DSH-Patton, 15 patients were referred during the review period; there were no rejections.  The average time from referral to admission was 12 days with a range of eight to 41 days.  Again, data was not provided regarding referral timeframes or reasons for rejections.

#### 2.     SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP

There were 338 patients referred to SVSP-PIP during the review period.  Twenty-five patients were rejected; there were no rescissions.  Sixteen patients were referred to acute care from SVSP-PIP; 11 of those patients transferred to CMF-PIP, four transferred to CHCF-PIP, and one referral was rescinded.  Transfers were timely.

At CMF-PIP, there were 436 referrals to acute care and 288 referrals to intermediate care.  With two exceptions, all acute care patients were admitted within the Program Guide admission timeframe.  Of the 288 intermediate care referrals, 30 patients were rejected, nine as a result of the reviewing clinician's recommendation that they be referred to acute care instead.  All patients referred to intermediate care during the review period were admitted within the Program Guide timeframe.

There were 115 referrals to CMF L1-PIP during the review period.  Seventeen were rejected, five referrals were rescinded, and five others were re-endorsed to another or the same program.

During the September 2019 monitoring visit, CHCF-PIP reported that 478 patients were referred and timely admitted. There were no rejections. During the March 2020 monitoring visit, CHCF-PIP reported that 18 acute care patients and 15 intermediate care patients were on the admission waitlist. None exceeded transfer timeframes.

3.    **CIW-PIP and SQ-PIP**

There were 43 patients referred to CIW-PIP during the review period. Of those, ten acute care and six intermediate care referrals were rejected. One referral was rescinded. Of the ten rejected referrals to acute care, seven were overturned by the Correctional Clinical Assessment Team (CCAT) and admitted. Another was re-referred to intermediate care and the two remaining rejections were recommended for EOP level of care. Reasons given for the six rejected referrals to intermediate care included housing/secondary gain (four) and intermediate care was not the appropriate level of care for the patient (two).

During the review period, two condemned patients were timely transferred from SQ-PIP for intermediate care.

F.    **ADMISSIONS AND DISCHARGES**

1.    **DSH-Atascadero, DSH-Coalinga, and DSH-Patton**

All admissions were approved by the medical director in accordance with the Memorandum of Understanding (MOU) and joint policies. While previously all new patients were admitted to an admissions unit, as of September 2018, DSH-Atascadero began allowing direct admissions to designated intermediate care units.

DSH-Atascadero discharged 162 patients during the review period. The average length of stay data provided for five of the six months of the review period, indicated the average monthly length of stay was 129 days, with a range of 103 to 179 days. Data was not provided

regarding clinician-to-clinician contact following patient discharge.  According to the data provided, parole planning was provided for 45 *Coleman* class member patients.

At DSH-Coalinga, there were 53 patients admitted during the review period.  Of those, acceptance to admission data was provided only for the 38 patients who remained at the time of reporting which indicated all were admitted within 30 days.  The number of referrals was not provided.

DSH-Coalinga discharged 56 patients during the review period.  According to the length of stay data provided, the monthly average length of stay was 166 days, with a range of 135 days to 183 days.  Data for clinician-to-clinician contact was not reported.

During the review period, DSH-Patton admitted all 15 patients who were referred.  The timeframe from acceptance to admission ranged from two to 14 days, with an average of six days.  While there were two patients who were admitted within 90 days of parole, pre-release planning was not provided pursuant to the current MOU.

DSH-Patton discharged six patients during the review period.  The average length of stay to physical discharge was 156 days, with a range from 77 to 266 days.  For clinical discharge, the average length of stay was 154 days, with a range of stay from 73 to 266 days.  DSH-Patton did not report dates of clinician-to-clinician contact.

## 2.  SVSP-PIP, CMF-PIP, CMF L1-PIP, AND CHCF-PIP

SVSP-PIP admitted 242 patients during the review period.  There was a range of stay of six to 2,612 days, with an average length of stay of 154 days.  SVSP-PIP discharged 144 patients during the review period, with an average clinical length of stay of 75.5 days and an average physical length of stay of 128 days.  SVSP-PIP did not track patients after discharge.

Program Guide transfer timelines were met for all admissions to the CMF-PIP. The average length of stay for patients in acute care during the review period was 57 days, and for patients at the intermediate level of care, the average length of stay was 144 days. CMF-PIP discharged 186 patients from acute care, and 169 patients from intermediate care during the review period. For acute care patients, 81 percent were subjected to administrative delays after clinical discharge ranging from one to 38 days, whereas 82 percent of intermediate care patients experienced administrative delays, with a range of one to 15 days. The reasons for administrative delays were not provided.

During the review period, CMF L1-PIP admitted 88 patients; there were 87 patient discharges. Seventy-three patients discharged to a different program or level of care, and the remaining transferred to other institutions or paroled.

CHCF-PIP reported admitting 197 patients to acute care and 281 patients to intermediate care during the September 2019 site visit. According to combined data, the average length of stay was 76 days. During the March 2020 site visit, CHCF-PIP reported that 514 patients were admitted to acute care, and 275 patients were admitted to intermediate care. The average length of stay was 69.8 days for acute care patients; for intermediate care patients, the average length of stay was 171.5 days.

At the CMF L1-PIP, there were 92 patients admitted during the review period. There were 29 patients discharged—15 to single cells and two to locked dorms at CMF-PIP, and two to unlocked dorms at DSH-Atascadero. The remaining ten were discharged for various reasons, such as parole or transfer to a CDCR EOP program, among others.

During the review period, CHCF-PIP admitted 263 patients to acute care and 47 patients to intermediate care. Of the 356 patients that were discharged, data was provided for 355. The

average length of stay after clinical discharge was 5.32 days; for 50 or 14 percent of patients it exceeded ten days. No reasons were provided for the delays, which were cause for concern as there could be patients awaiting inpatient beds.

### 3.    CIW-PIP and SQ PIP

CIW-PIP admitted 35 patients during the review period; 18 were admitted to acute care and 17 were admitted to intermediate care. There were 12 patients who were 90 days or less from parole, and pre-release planning was done for those patients. There were 57 discharges from CIW-PIP during the review period, with an average wait of 1.5 days after clinical discharges for patients going to the Central California Women's Facility (CCWF) and CIW; the average wait was 14 days for discharge to DSH-Patton.

SQ-PIP admitted 16 patients to acute care during the review period; transfer timelines were met. Five patients were discharged from acute care during the review period. The average length of stay was 58 days, with a range of 18.58 days to 153 days. There were 22 condemned patients admitted to intermediate care during the review period. There were no rescissions or rejections and transfer timeframes were met. Eight intermediate care patients were discharged during the review period. The average length of stay was 109 days with a range from 39.96 days to 183 days. Three patients that were admitted within 30 to 90 days of their parole date received pre-release planning.

### G.    LEAST RESTRICTIVE HOUSING

### 1.    DSH-Atascadero, DSH-Coalinga, and DSH-Patton

LRH was not reviewed at the state hospitals as admissions to state hospitals were restricted to patients with the lowest possible LRH.

2.        **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

SVSP-PIP housed 99 patients out of their LRH designation on December 3, 2019.  Of those, 94 patients or 95 percent, had more restrictive endorsements than their LRH designations, and 43 patients or 43 percent, were housed out of their LRH for over 100 days.  Of the 242 patients in the SVSP-PIP, 188 patients, or 78 percent, had single-cell endorsements.

Although the executive director acknowledged the high number of single-cell endorsements, and offered some potential justifications, he reported a longstanding fear regarding safety on the part of clinical staff.  During staff interviews, staff voiced concerns regarding custody staff trying to move patients to their LRH against the recommendations of mental health staff.

On December 3, 2019, CMF-PIP had 89 patients housed above their LRH, of which 64 patients were housed in single cells and 25 patients were housed in locked dorms.

There were 22 patients at CMF L1-PIP housed out of their LRH on March 18, 2020. Documentation showed IDTTs consistently reviewed transfer to LRH and patient referral unit supervision and input, including at times CCATs.  Delayed referrals to LRH were attributed to the lack of bed availability for unlocked dorms, or due to preparation for their discharge to EOP. For patients who had newly arrived at the unit, further observation was indicated prior to referral and transfer to LRH.  Reviewed treatment plans indicated that treatment goals were identified to prepare for transfer to LRH.  Rationales for placement out of LRH were for acceptable clinical or discharge reasons.

LRH was not reviewed during the September 2019 CHCF-PIP site visit.  On March 10, 2020, 188 intermediate care patients were housed out of their LRH at CHCF-PIP.

3.        **CIW-PIP and SQ-PIP**

At the time of the site visit, three CIW-PIP patients were housed outside of their LRH designation; one acute care patient and two intermediate care patients. During the review period, CIW-PIP housed 17 patients outside of their LRH designation, seven acute care patients and ten intermediate care patients. The average number of days patients were housed outside of their LRH designation was 47, with a range of 11 to 177 days.

As its admissions were limited to patients with condemned status, LRH was not applicable to SQ-PIP.

H.    **PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE**

**Patient Disciplinary Process**

1.        **DSH-Atascadero, DSH-Coalinga, and DSH-Patton**

DSH-Atascadero issued 33 Rules Violations Reports (RVRs) to *Coleman* class members during the review period. Clinicians completed 79 percent of the mental health assessments. Documentation of the mental health assessments and RVR dispositions were not available for review.

There were 14 RVRs issued to *Coleman* class members at DSH-Coalinga during the review period. Timeframes were met for the completion of mental health assessments.

DSH-Patton did not issue RVRs to *Coleman* class members during the review period.

2.        **SVSP-PIP, CMF-PIP, CMF L1-PIP and CHCF-PIP**

SVSP-PIP issued 232 RVRs to patients during the review period. The institution did not review the quality of mental health assessments nor whether the assessment was timely requested from custody. A review of a randomly selected RVRs revealed that clinicians utilized the same language in multiple mental health assessments, and senior hearing officers used the same

language on multiple RVRs when addressing consideration and mitigation based on the mental health assessment. In the cases reviewed, the SVSP senior hearing officers did not mitigate loss of credit.

For SVSP-PIP custody staff who were required to receive RVR training, 70 percent received the training. Mental health clinicians had not received training on the completion of mental health assessments since 2015.

CMF-PIP adjudicated 112 RVRs during the review period. A review of 12 RVRs showed that custody timely requested mental health assessments. Mental health timely returned 75 percent of reviewed cases to custody staff. Senior hearing officers found patients guilty of the reported infraction and assessed the maximum loss of credits in 92 percent of the violations reviewed and reduced eight percent of the violations to a counseling chrono.

Sixty-three percent of CMF-PIP clinical staff completed training on mental health assessments, while 98 percent of required custody staff completed mandatory training on the disciplinary process.

During the CMF L1-PIP site visit, the monitor was provided a list of 59 RVRs issued to patients in Facility A, which included CMF L1-PIP. Six RVRs issued to patients in CMF L1-PIP were reviewed. Custody sent timely requests for mental health assessments in 17 percent of the cases. Mental health clinicians timely completed mental health assessments in 83 percent of the cases. In 83 percent of the cases, the senior hearing officer documented consideration of the mental health assessment. Penalties were mitigated in 76 percent of the RVRs where the mental health assessment recommended mitigation.

During the September 2019 site visit, CHCF-PIP reported that 197 RVRs were issued during the review period. Ninety-three were issued to acute care patients and 104 to intermediate

care patients.  Of the 20 RVRs reviewed for compliance, all were timely delivered to the patient.

Mental health assessment referral requests were timely and completed mental health assessments

were returned timely in all but one instance.  During the March 2020 site visit, 11 RVRs were

reviewed for compliance.  Mental health assessments were requested timely in seven cases, and

ten were completed and timely returned to custody staff.  In ten of the reviewed cases, senior

hearing officers documented consideration of the mental health assessment.

### 3.    CIW-PIP and SQ-PIP

CIW-PIP patients received 19 RVRs during the review period.  A review of mental health

assessments showed that clinicians routinely utilized generic language that was not

individualized to the patient and did not recommend alternative discipline for any of the RVRs,

even those where the clinician found that mental health contributed to the behavior which caused

the RVR.  According to a review of the RVR hearing results reports, custody staff failed to

timely request mental health assessments.  Mental health staff completed and returned all

assessments on time.  Of the seven RVRs that had completed the adjudication process, the senior

hearing officer mitigated all RVRs based on the mental health assessment.

During the reporting period, SQ-PIP issued five RVRs which conformed to policy

through adjudication.

### Use of Force

### 1.    DSH-Atascadero, DSH-Coalinga, and DSH-Patton

There was one use of force incident at DSH-Atascadero; however, the incident report was

not provided for review.  DSH-Coalinga and DSH-Patton reported no use of force incidents.

2.       **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

SVSP-PIP reported 37 use of force incidents, one controlled and 36 immediate. The institution reported that the controlled use of force incident was not PIP related.

CMF-PIP reported 26 immediate use of force incidents during the review period and no controlled use of force incidents. A review of six of the use of force incidents that occurred during the review period showed that the use of force policy was followed, and supervisory review was timely. Seventy percent of clinical staff and 99 percent of custody staff received required use of force training.

CMF L1-PIP reported two immediate use of force incidents during the review period. Both incidents were handled in compliance with CDCR policy and procedures.

During the September 2019 site visit, CHCF-PIP reported five controlled and 70 immediate use of force incidents. Two controlled use of force incidents involved medication refusals. The facility reported that 551 custody staff and 40 mental health staff had completed the use of force training. Five controlled and 66 immediate use of force incidents and 148 instances of non-use of force were reported during the March 2020 site visit. During the March 2020 site visit, it was reported that 30 percent of CHCF-PIP staff had not attended the use of force training.

3.       **CIW-PIP and SQ-PIP**

CIW-PIP reported three immediate use of force incidents; all were found to be compliant with the use of force policy. There were no controlled use of force incidents at CIW-PIP during the reporting period.

SQ-PIP did not report any immediate or controlled use of force incidents during the review period.

I. **USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT**

1. **DSH-Atascadero, DSH-Coalinga, and DSH-Patton**

DSH-Atascadero reported that there were 24 episodes of seclusion, which lasted an average of 34.89 hours. The institution reported 68 uses of restraints, with the average duration lasting 11.66 hours. The rate of physical restraint usage at DSH-Atascadero ranged between 1.49 and 2.93 hours per (1,000) inpatient days, which was above the national average of .53 hours per (1,000) inpatient days.[27]  In several of the cases reviewed by DSH-Atascadero, range of motion was not documented as required by policy.

Seclusion was not utilized at DSH-Coalinga during the review period. One patient was placed in restraints on two occasions during October 2019, with each restraint episode lasting less than one hour. All instances of seclusion and restraint for *Coleman* patients were audited by the psychiatry department and reviewed by Program 7 management on a weekly basis to ensure least restrictive measures were utilized.

DSH-Patton did not use observation rooms or seclusion during the reporting period. Restraints were used on four *Coleman* patients; one patient was restrained four times, another patient was restrained three times, and two patients were restrained once. The time spent in restraints was acceptable, and there was no evidence of problems with DSH-Patton's use of restraints.

---

[27] Source: Department of State Hospitals – Atascadero, Quality Council Meeting Minutes, July 2, 2019.  Minutes were not paginated.

2.    **SVSP-PIP, CMF, CMF L1-PIP, and CHCF-PIP**

At SVSP-PIP, seclusion rooms were utilized for one-to-one suicide monitoring. Uses of seclusion and restraint were not examined during the site visit.

CMF-PIP had three instances of restraint during the reporting period, all of which contained appropriately documented orders and procedures.

CMF L1-PIP had no reported instances of seclusion and restraint since the unit's inception.

During the September 2019 site visit, CHCF-PIP reported five restraint episodes with one patient restrained on three occasions. A review of audited data showed several inaccuracies, which included 15-minute patient checks recorded as not applicable when they were not completed. These inaccuracies were corrected by nursing leadership during the site visit. Seclusion and restraint were not reviewed during the March 2020 site visit.

3.    **CIW-PIP and SQ-PIP**

CIW-PIP did not utilize seclusion during the review period. One patient was placed in restraints for less than one hour.

SQ-PIP did not report any incidents of seclusion or restraint during the review period.

J.    **SUICIDE PREVENTION, EMERGENCY RESPONSE, AND THE DEATH REVIEW PROCESS**

1.    **DSH-Atascadero, DSH-Coalinga, and DSH-Patton**

There were no completed suicides at DSH-Atascadero during the review period.

Staff participation in the Suicide Prevention Committee (SPC) was inadequate. Of the six meetings held during the review period, only two had more than two attendees, two meetings were solely attended by the chairperson, and the committee failed to achieve better than 44 percent attendance during the review period. During the review period, the SPC documented six

89

suicide attempts and 40 self-harm incidents by *Coleman* patients.  In reviewing self-harm and suicide attempt trends, the SPC noted a decrease in such behavior since October 2018.  DSH-Atascadero did not directly address suicide prevention in patient treatment plans.

There were no patient deaths at DSH-Coalinga during the review period; there was one self-harm incident.

There were no completed suicides at DSH-Patton during the review period.

The executive management team reviewed all hospital-wide serious incident reports, including suicide attempts, daily.  There were four levels of enhanced observation, including constant observation and line of sight observation.  DSH-Patton did not have a formal suicide prevention committee.

The death review process at DSH-Patton was a sentinel event review process.

## 2.      SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP

Since the preceding site visit, SVSP-PIP gained a senior psychologist specialist position to serve as the Suicide Prevention and Response Focused Improvement Team (SPRFIT) coordinator.

While on-site, the monitor's expert attended a risk management committee meeting.  This committee consisted of the executive director, chief psychiatrist, SPRFIT coordinator, CEO, associate wardens, and supervisory staff.  Topics discussed included self-harm incidents, maximum custody patients, and new patients of concern.

During the review period, SVSP-PIP reported nine emergency response cases; eight of the cases were reported timely.

There were no reported deaths at SVSP-PIP during the review period.

CMF-PIP reported that it had appointed a suicide prevention coordinator who was responsible for training CMF-PIP staff on suicide prevention policies and procedures. According to the facility, its SPRFIT committee was formed during the review period. Staff reported that the SPRFIT committee established two quality improvement plans related to compliance with timeliness for admission SRASHEs and the use of mental health consult orders. In response to a former CMF-PIP patient's death by suicide, which occurred at a different institution not long after his discharge from the CMF-PIP, five separate quality improvement plans were established.

CMF-PIP's Emergency Medical Response Review Committee (EMRRC) met as required during the review period.

CMF-PIP reported that there were no deaths during the review period.

CMF L1-PIP reported that there were 25 incidents of suicide watch and 12 incidents of suicide precaution during the review period.

At CHCF-PIP, either nursing or psych tech staff were responsible for the EMRRC, patient seclusion and restraint, the death review process, and inpatient huddle practices. Because nursing and psych tech staff reported to separate authority at CHCF-PIP, there were coordination challenges that negatively impacted services.

Three death reviews were completed at CHCF-PIP, and a root cause analysis was conducted by the facility's quality management unit.

Shortly before the March 2020 site visit, CHCF-PIP hired a senior psychologist for the SPRFIT coordinator position. In addition, CHCF-PIP hired 67 registry CNAs and 18 registry LVNs to cover suicide watch in intermediate care. These hires freed up psych techs to perform other duties.

3.        **CIW-PIP and SQ-PIP**

During the review period, the EMRRC at CIW-PIP met monthly and prepared thorough meeting minutes.  Standing agenda items included transport reviews, performance work improvement plans, emergency response, and required drills.

There were no completed suicides at SQ-PIP during the review period.  Five instances of self-harm were reported.

The EMRRC was institution-wide, and therefore, not specific to the SQ-PIP.  During the review period, the EMRRC met four of the six months, and meeting minutes were prepared.

There were no deaths at SQ-PIP during the review period.

K.     **QUALITY MANAGEMENT AND UTILIZATION REVIEW**

1.        **DSH-Atascadero, DSH-Coalinga, and DSH-Patton**

DSH-Atascadero continued to operate a complex and robust quality improvement program comprised of numerous subcommittees that reported to the quality council.  During the review period, there were several quality improvement plans and action items that were carefully monitored until the stated goals were achieved.  Although audits targeting areas of concern were performed, the methodology and the utilization of the audit results were unclear.

The quality council met weekly during the review period, and meeting minutes showed that important information from the various subcommittees was appropriately channeled through the risk management and utilization review committees.

The risk management utilization review committee met monthly.  Several subcommittees, including suicide prevention, medical risk management, treatment support, and violence prevention, reported to the risk management utilization review committee.  Meeting minutes showed that action items and status updates from the subcommittees were regularly monitored.

The program review committee was responsible for reviewing incident reports, monitoring interventions for patients with high-risk behaviors, and providing clinical recommendations to treatment teams. The committee met weekly during the review period, but meeting minutes were not provided for review.

As part of its continuous quality improvement efforts, DSH-Atascadero completed more than 60 routine audits during the review period. The audits focused on areas such as restraint and seclusion, lengths of stay, and treatment groups, among others.

During the review period, DSH-Atascadero conducted quantitative treatment plan audits due to prior issues regarding the methodology and use of treatment plan audit data. Of the 137 treatment plans reviewed, 89 percent were compliant. Areas of deficiency included documented coping skills, timely completion, and reason for hospital admission.

Group treatment compliance audits were conducted by social work and rehabilitation therapy supervisors during the review period, with 100 percent compliance being reported for the 46 groups observed.

DSH-Atascadero received its updated California Department of Public Health (CDPH) license in November 2019 and was re-accredited by The Joint Commission for the full three-year period in July 2017.

DSH-Coalinga had a thorough quality improvement program, but outstanding problems related to *Coleman* patients remained.

At DSH-Coalinga, quality improvement was overseen by the Quality-Council-Administrative and chaired by the executive director. The Quality-Council-Administrative served as the headquarters for all quality improvement activities across programs and disciplines at the facility.

Similar to its quality improvement program, DSH-Coalinga's risk management system was also hearty. The primary makeup of the risk management system was the treatment plan team and the risk management program. The treatment plan team was responsible for addressing the specific risks and benefits of patients' therapeutic and rehabilitation interventions. The risk management program was responsible for identifying high-risk situations for patients and suggesting remedial actions to lessen risk.

The facility's utilization review committee met monthly and reviewed hospitalizations for *Coleman* patients. The committee was responsible for making recommendations regarding discharge or continued stay, as well as interventions that could be beneficial.

DSH-Coalinga reported that audits conducted for *Coleman* patients lacked consistent methodology, which hindered quality improvement efforts.

DSH-Patton's quality management program was comprehensive and overseen by highly motivated and competent staff. That said, data analysis was significantly limited by the facility's use of a paper-based system instead of an electronic one.

DSH-Patton's quality improvement system included the central council administrative committee and the quality council committee.

The clinical operations advisory council visited DSH-Patton during November 2019 and issued positive findings for psychiatry, including stable leadership, effective hiring, and new treatment initiatives. Regarding psychology, issues with staffing vacancies and recruitment challenges were noted.

During the review period, DSH-Patton completed multiple audits that focused on treatment planning, admissions, group treatment, and restraint and seclusion. Although many areas fell below 100 percent compliance, improvement was made.

94

Peer review for psychiatry, psychology, and social work was conducted during the review period. For each discipline, significant clinical services and procedures were thoroughly addressed.

**2**.        **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

SVSP-PIP did not have its own quality management program. Its quality management activities were included in certain SVSP quality management documents. A potential area of concern was the possibility that there could be changes to the utilization management review committee that would be inconsistent with statewide policy. Additional information of the status of this potential change was not located in the provided documentation. During the review period, SVSP held six quality management committee meetings. SVSP-PIP's executive director attended all six meetings and meeting minutes showed that SVSP-PIP issues were thoroughly discussed, including SVSP-PIP's performance improvement work plan.

SVSP-PIP provided documentation from SVSP's SPRFIT and mental health subcommittee meetings; there was no mention of the PIP.

At the time of the site visit, the quality management process at CMF, which included the CMF-PIP, was in the beginning stages of implementation and functioned more like a quality assurance program instead of quality improvement. Indicators addressed by the mental health program subcommittee regarding the PIP included IDTT staffing, suicide risk evaluations, average weekly offered treatment, and average weekly out-of-cell time, among others.

At the time of the site visit, the SPC at CMF-PIP was in its initial development.

CMF's chief of psychiatry chaired the utilization management committee. Utilization review nurses were in charge of the utilization reviews for all CMF-PIP patients out of their LRH.

At the time of the September 2019 site visit, CHCF-PIP had the organization and structure in place for its quality management program. That said, although the quality management processes identified deficiencies that impacted the provision of adequate care, documentation regarding the action items developed to address the issues was not provided. According to CHCF-PIP, there were no systemic quality improvement processes in place for any of the documentation provided for review.

During the review period, issues identified by the quality and improvement program subcommittee included the high number of patients outside their LRH level, decreases in structured treatment, failure to adequately staff IDTTs, an increase in the use of force, and a high number of refusals. No documentation was provided by CHCF-PIP to show how these issues were resolved.

By the time of the March 2020 re-visit, CHCF-PIP had its quality management organization structure firmly in place. Quality Performance Program audits showed that structured treatment schedules were not followed, new admissions were not included in groups, and staffing vacancies impacted group cancellations.

At the time of the March 2020 re-visit, the non-clinical activity tracking program was not fully developed; however, the Quality Performance Program reported that during the review period, the number of patients who were offered a minimum of ten hours of yard per week had doubled since the September 2019 site visit.

3.          **CIW-PIP and SQ-PIP**

At CIW-PIP, the foundation for the quality improvement program was in place, but there were no quality improvement reports, which indicated that the quality improvement system was essentially non-functional.  During the review period, CIW-PIP held regular clinical meetings, quality and performance improvement program committee meetings, and utilization management meetings.  The meeting minutes from the monthly clinical meetings documented numerous clinical and administrative issues that were discussed among staff.

Monthly utilization management meeting minutes showed that topics for discussion included data related to length of stay, LRH, transfer from acute care to intermediate care, and admissions and discharges.

The decline in the quality management process at SQ-PIP since the preceding monitoring period was noticeable.  The monitor's expert observed the primary factors of this recession to be poor efficiency, methodology, accountability, and communication between leadership and line staff.  At SQ-PIP, quality management was monitored through subcommittee meetings.  These meetings were held monthly during the review period; however, a review of the meeting minutes showed that a quorum was only achieved once and required mental health and nursing staff failed to consistently attend.

During the review period, SQ-PIP quality management was focused on improving the quality of IDTTs.  In January 2020, institutional audits indicated 96.6 percent compliance with the IDTT monitoring tool.  However, the monitor's expert's review found the opposite, concluding that the quality of IDTTs remained very poor.

According to SQ-PIP, the local governing body met three times during the review period; however, despite multiple requests, meeting minutes were not provided.

The peer review process at SQ-PIP was active during the review period, and no performance concerns were documented.

## L.   PATIENT COMPLAINTS/PATIENT SATISFACTION

### 1.   DSH-Atascadero, DSH-Coalinga, and DSH-Patton

At DSH-Atascadero, 66 *Coleman* patients filed a total of 222 complaints, a 63-percent increase from the preceding monitoring period.  Patient complaints related to daily living issues, legal concerns, medical care and treatment, mental health treatment, and access to personal property.  Regarding patient satisfaction survey results, there was a 15 percent decrease in survey indicators meeting or exceeding 90-percent satisfaction, with nine of 13 indicators achieving at least 90 percent compared to 11 of 13 in the preceding monitoring period.  Survey responses indicated less than 90 percent satisfaction related to the explanation of patient rights, medication education, patient inclusion in group placement decisions, and a clean and neat environment.

Patient complaints at DSH-Coalinga and DSH-Patton were contracted out to Disability Rights California.  There were no patient complaints at either institution during the review period.

Eleven of 56, or 20 percent of patients discharged from DSH-Coalinga participated in a patient satisfaction survey during the review period; nearly three-quarters of patients refused to participate in the survey.  Ninety-one percent of respondents indicated satisfaction with the following indicators: treatment teams were receptive to patient input; patients felt they could more effectively deal with daily problems; and patients felt their condition had improved during their admission.  Eighty-two percent of respondents indicated satisfaction with the following: staff provided them with information regarding unit and program rules and regulations; patient

preferences and input were incorporated into treatment; and staff encouraged patients to participate in treatment planning, groups, and activities.

DSH-Patton did not conduct a patient satisfaction survey during the review period.

2. **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

At SVSP-PIP, there were 92 appeals during the review period, nearly half of which related to health care. Approximately a third were institutional appeals, and a quarter were staff complaints. Of the 92 total appeals, more than a third related to mental health care. Sixty-eight percent of mental health-related appeals concerned treatment issues. Since the preceding monitoring period, SVSP-PIP discontinued patient councils and the patient mentor program and only deployed patient satisfaction surveys in a limited fashion.

CMF-PIP patient complaints related to cell temperature, telephone access, and access to personal property. Interviewed patients from both the acute and intermediate care programs expressed concern about their cells being cold. Further, patients identified telephone access as a particular problem in the HCITC. Specifically, patients complained about the lack of seating at the telephone as well as the scheduling of phone calls. In response to these complaints, CMF-PIP staff agreed to examine telephone scheduling issues. Finally, patients and staff confirmed that access to personal property remained a problem at CMF-PIP, with some patients waiting weeks to months to receive their personal property. At the time of the site visit, CMF-PIP management confirmed that they had identified this as a problem and were working toward a remedy.

Twenty-three patient appeals were filed at CMF L1-PIP during the review period. Nearly two-thirds of the appeals related to property issues, and the remaining appeals were related to funds, staff, and other issues. Notably, patient complaints regarding property continued to be a

problem at CMF L1-PIP despite an October 11, 2018, CDCR memo that established procedures for transfer and issuance of property in PIPs.

During the September 2019 site visit, CHCF-PIP reported 422 grievances filed during the review period. Of the 73 complaints relating to staff, 70 or 96 percent resulted in no intervention. During the second review period, there were 339 grievances filed and 57 staff complaints. Prior to the March 2020 site visit, the patient grievance process had been transitioned to CCHCS. The transition process resulted in a backlog of 100 cases; dedicated staff members were assigned to help clear the backlog. Quarterly patient satisfaction surveys were conducted, and results indicated lack of out-of-cell time and insufficient treatment as concerns.

### 3. CIW-PIP and SQ-PIP

Eight patient appeals were filed at CIW-PIP during the review period. CIW-PIP administered two patient satisfaction surveys during the review period and received 14 responses. Weekly community meetings and monthly council meetings were utilized in an effort to resolve grievances and address concerns, although patients reported that the meetings were ineffective.

At SQ-PIP, there were two grievances filed during the review period, one of which was withdrawn. The institution did not act on the other grievance. SQ-PIP administered patient satisfaction surveys bi-annually, one of which was administered during the review period. Of the 20 responses received, 13 of 15 areas surveyed received a satisfaction rating of less than 85 percent. SQ-PIP also used a patient advocate to meet with patients and resolve complaints; the patient advocate met with six patients during the review period.

**M.    COLEMAN POSTINGS**

**1.        DSH-Atascadero, DSH-Coalinga, and DSH-Patton**

DSH-Atascadero had no policy and performed no audits regarding *Coleman* postings. DSH-Coalinga did not provide information concerning *Coleman* postings. DSH-Patton had *Coleman* postings in both English and Spanish located in accessible areas.

**2.        SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

SVSP-PIP and CMF-PIP had *Coleman* postings displayed in housing units. CMF-PIP had notices in both English and Spanish. As CMF L1-PIP was monitored via paper review, the monitor was unable to observe the presence of *Coleman* postings during the monitoring round. CHCF-PIP did not have any *Coleman* posters posted in areas accessible by patients during the re-visit but did have them during the initial visit. *Coleman* posters in English and in Spanish were present in each of the toured units; but not always in an area that was accessible to patients.

**3.        CIW-PIP and SQ-PIP**

*Coleman* posters were present in each of the toured units at CIW-PIP in both English and Spanish. At SQ-PIP, *Coleman* posters in English and Spanish were visible in appropriate locations by the end of the SQ-PIP monitoring tour.

**N.    LAUNDRY AND SUPPLY ISSUES**

**1.        DSH-Atascadero, DSH-Coalinga, and DSH-Patton**

DSH-Atascadero did not make laundry logs available for review. DSH-Coalinga supplied information regarding policies and procedures but did not submit proof of compliance. Other than the return of tattered undergarments, no issues were noted with laundry at DSH-Patton during the review period.

2.        **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

At SVSP-PIP, laundry issues continued.  At a meeting on December 3, 2019, the facility stated that there had recently been a structural reorganization of reporting so that more administrators were involved.  The purpose of this reorganization was to increase resources throughout the institution.

Deliveries from the offsite laundry facility continued to cause problems in the CMF-PIP acute and intermediate care units.  For example, staff reported that items went missing after being sent out, and some of those missing items were necessary for patients.  In acute care units, staff reported that it was difficult to get clothing for patients who were exhibiting suicidal behaviors.  Laundry storerooms were observed to be disorganized, and the supply closets had limited stock, as well as limited quantities of personal hygiene supplies.

CMF L1-PIP was monitored via document review.  Audits, reports, or logs for laundry and supplies were not provided for review.

During the September 2019 site visit, patients at CHCF-PIP reported that the quality of clothing was poor and that they did not always receive the full amount they were supposed to receive.  Staff agreed, but did not use laundry and supply logs during the review period.  During the March 2020 site visit, staff reported taking remedial actions.  However, despite these actions, patients continued to report problems receiving clothes and shoes.  Staff did not log when clothing or linen was issued or returned.

**3**.        **CIW-PIP and SQ-PIP**

At the CIW-PIP, patients reported a lack of socks and new underwear after a shower. Patients also reported that after sending clothes to laundry, clothing in incorrect sizes was returned to them.

SQ-PIP reported no laundry or supply issues during the review period.

**O.**    **VISITATION/PRIVILEGES/TELEPHONE**

**1.**        **DSH-Atascadero, DSH-Coalinga, and DSH-Patton**

At DSH-Atascadero, patients were allowed visitation absent a court order to the contrary or termination of visitation privileges for violations of the visitation policy. DSH-Coalinga permitted up to five hours per day of visitation. DSH-Patton made visitation available for up to six hours per day on weekdays and Sundays and four hours on Saturdays. The visitation policy at DSH-Atascadero had not changed since the preceding monitoring round while the policy at DSH-Coalinga was last updated on December 24, 2018 and was not revised during the review period. CDCR oversaw visitation at DSH-Patton pursuant to a MOU.

There were two in-house telephones and one payphone in the *Coleman* housing unit at DSH-Patton. During the review period, there were no complaints regarding telephone access at DSH-Patton.

**2.**        **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

SVSP-PIP limited visitation to two days per week; Thursday and Friday. Further limiting visitation, patients had to choose between visitation or programming if they occurred at the same time. While there were no complaints regarding telephone access, the institution reported difficulty obtaining loaner crank radios for patient use.

CMF-PIP patient visitation was determined by the IDTT, with the exception of patients on one-to-one observation or suicide precautions, who were not allowed to participate in visitation.  Upon return to the unit, patients were required to submit to an unclothed body search. The lack of escort staff and physical plant issues limited visit length.  Regarding telephone access, phones were available for patient use in each of the CMF-PIP units and patients were permitted fifteen-minute phone calls.

At CHCF-PIP, visitation and telephone access were determined by the IDTT.  After the September 2019 site visit, CHCF-PIP had opened a visiting center; no changes were made to the visitation policy.  Regarding telephone access, patients in one unit reported that phone calls were only permitted on Third Watch on a first-come, first-served basis.  Though the STEP policy dictated patients receive radios, televisions, and personal property, there were insufficient radios and significant problems with access to personal property as the STEP program was not functional.  Specifically, patients reported problems accessing legal documents which contributed to patients missing their court dates.  Access to personal property remained a problem during the second site visit.  However, CHCF-PIP added a second property day in November 2019 in an attempt to improve acute care patients' access to their personal property.

### 3.    CIW-PIP and SQ-PIP

At both CIW-PIP and SQ-PIP, patients' visitation privileges were determined by the IDTT.  Regarding CIW-PIP, visitation took place on weekends without any limitations on visit length.  Visitation scheduling at SQ-PIP was consistent with SQ policy and patients did not report any problems with visitation.

CIW-PIP patients' telephone access was governed by STAGE level and the IDTT, with patients at STAGE I granted one phone call per week and STAGE II and III patients allowed

three weekly phone calls.  For all STAGEs, patients could be permitted additional phone calls if clinically indicated.

Patients at SQ-PIP did not report any problems with telephone access.

At CIW-PIP, a patient's STAGE level did not impact their access to personal property, which could only be restricted by the IDTT for safety reasons.  While patients at SQ-PIP did not report any problems with access to personal property, CIW-PIP patients noted issues obtaining personal property after transferring from CCWF.

## P.    LAW LIBRARY ACCESS

### 1.    DSH-Atascadero, DSH-Coalinga, and DSH-Patton

Administrative directives governing law library access were revised in September 2019 at both DSH-Atascadero and DSH-Coalinga.

DSH-Atascadero provided law library access to all patients on a first-come, first-served basis and limited access to 15 patients at a time.

At DSH-Coalinga, patients were permitted one hour of law library access three times per week.

Patients at DSH-Patton were provided access to the law library in 30-minute increments three days a week.  A variety of legal research resources were available, including printed copies of criminal codes, a criminal procedure handbook, jury instructions, court and attorney directories, as well as a computer kiosk with access to Lexis/Nexis.  In addition, patients could make copies free of charge and librarians and interpreters were available to assist patients. Interviewed patients noted that copies of civil codes were not readily available.

2.    **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

At SVSP-PIP, staffing problems negatively impacted patient access to the law library, which was primarily made available via an electronic kiosk.

CMF-PIP law library access was provided Tuesday through Saturday in two-hour blocks. A senior law librarian was responsible for library services for all of CMF, including the PIP, although staff indicated the institution was in the process of hiring additional library staff. There were two library kiosks available in the acute care unit and one in the high-custody intermediate treatment facility, but one of the acute care kiosks was not functioning at the time of the site visit and reportedly required repeated repairs. Another eight kiosks were available in therapeutic treatment modules for use by administrative segregation patients. Maximum custody patients were not permitted to visit the library.

CHCF-PIP law library access was provided via mobile law libraries in each unit and were made available for two hours per week for most patients. Patients with active legal matters were allowed up to four hours of access per week. Records indicated that law library usage was low at the time of the September 2019 site visit. The March 2020 site visit revealed staffing problems, as one librarian and two librarian technical assistant positions had been eliminated.

3.    **CIW-PIP and SQ-PIP**

At CIW-PIP, patients accessed the law library through a computer kiosk available in the housing unit. However, there were several problems with law library access. Staffing limitations hindered patients' ability to navigate the computer kiosk system and legal forms were only made available if a patient filled out a Form 22 request. Further, patients were not aware of a policy providing access to the law library resources only during Third Watch.

106

Law library access was provided via a computer kiosk, which was available upon request, at SQ-PIP.  Patients indicated that law library access was adequate.

## Q.    <u>EDUCATION</u>

### 1.    <u>DSH-Atascadero, DSH-Coalinga, and DSH-Patton</u>

*Coleman* patients at DSH-Atascadero participated in meaningful jobs and education programs at DSH-Atascadero during the review period.  Between 164 to 194 *Coleman* class members had meaningful jobs each month, while 315 *Coleman* class members participated in some form of education during the review period.

No *Coleman* patients participated in education classes at either DSH-Coalinga or DSH-Patton during the review period.

### 2.    <u>SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP</u>

SVSP-PIP reported problems filling staff positions in the education department.  There were plans to revisit this issue in early 2020 in order to increase patient access to educational programming.

The remaining programs did not provide education programming to patients.

### 3.    <u>CIW-PIP and SQ-PIP</u>

Education was limited at both CIW-PIP and SQ-PIP.

Regarding CIW-PIP, the only teacher had been out of work for a month at the time of the site visit.

While education staff were available at SQ-PIP, it was not clear if patients understood that educational services were available and, accordingly, educational services were not used during the review period.

## CONCLUSION AND RECOMMENDATIONS

The findings of this report indicate that *Coleman* class members continue to receive inadequate inpatient care: the PIPs are underperforming in providing appropriate mental health care to *Coleman* class members, and while the DSH hospitals provide more appropriate care, class members encounter difficulties in gaining admission to their programs. As indicated by the specific deficiencies identified in the foregoing report, in the PIPs, across the board, *Coleman* class members uniformly receive less structured therapeutic activities, unstructured out-of-cell activities, and individual treatment than would be expected in functioning inpatient programs. In DSH hospitals, more structured therapeutic activities and individual treatment would benefit the *Coleman* class members.

The core areas of focus first spotlighted in the 2018 Inpatient Report and re-emphasized in this report offer the defendants clear and specific targets to address the deficiencies outlined in this report and provide adequate inpatient care in their acute and intermediate care programs.

Unless the substantial staffing vacancies across disciplines in the PIPs are addressed and resolved the ability of the PIPs to provide appropriate care in inpatient settings will remain significantly impaired. The CDCR PIPs must come into compliance with the court ordered ten-percent vacancy rate for psychiatrists and psychologists and provide sufficient other required and custody staffing in each PIP to meet the mental health inpatient care needs of the *Coleman* class.

Timely referrals, transfers, and admissions to the PIPs and DSH hospitals are necessary elements required to provide appropriate care inpatient care to the *Coleman* class. There has been a considerable decline in referrals, transfers, and admissions to acute and intermediate care programs, as the waitlist for patients referred but have not been placed in inpatient care settings grows daily. Even in the circumstances of the COVID-19 pandemic, defendants must comply

with the requirements of the Program Guide to the full extent possible within the confines of the public health best practices.

Both CDCR and DSH require patients to be in their LRH in inpatient settings as custodially and clinically appropriate. The proper application of LRH enhances the availability of the most suitable mental health care environment for patients and expands the continuum of inpatient care settings available to the *Coleman* class. Many *Coleman* class members for whom a setting is not contraindicated for clinical and/or custodial reasons remain outside of their LRH, sometimes for the duration of their inpatient treatment, including those who are not transferred to DSH hospitals even though they were suitable for admission. This failure to effectively apply LRH as required contributes to system backups and helps to grow the waitlist.

Clinical services and treatment in the inpatient programs were found to be inadequate across PIPs, regarding treatment planning, group therapy and individual treatment. In certain instances, class members were found to be receiving more mental health care (i.e. group therapy and individual treatment) in an EOP program in the prisons than in a PIP, which was true either pre- or post-COVID-19. The defects in treatment planning that were identified in this report, need to be remediated, including through more effective supervision and targeted staff training in the IDTT process in the PIPs. In the DSH hospitals, access to structured therapeutic activities need to be expanded, and in the case of DSH-Atascadero and DSH-Coalinga, patients did not have access to sufficient individual treatment. Appropriate and complete tracking and reporting of the various forms of treatment were lacking in both the PIPs and DSH hospitals.

Finally, while this report does not cover suicide prevention, as reported above, two suicides occurred in the acute program at CHCF-PIP since the end of the monitoring tours:

August 17, 2019 and September 29, 2020.  The Special Master is aware that the PIPs do not presently have suicide prevention policies in place, which needs to be addressed.

The above are the primary areas highlighted in this report and require the full engagement and attention of defendants in order to provide adequate care in PIPs and DSH hospitals.

## RECOMMENDATIONS

In view of the foregoing, the Special Master recommends that the *Coleman* court enter an order directing the following:

1. To the extent necessary to remedy any deficiencies identified in the foregoing report, the CDCR and DSH defendants, under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, shall develop plans within 90 days to provide structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment, including for maximum custody patients consistent with a psychiatric inpatient level of care, as well as implement a system for tracking and reporting adherence to the standards developed.

2. The *Coleman* Special Master shall continue to work with the CDCR defendants, and with input from the plaintiffs as appropriate, to complete staffing plans for their inpatient programs covering all required disciplines.

3. Under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, the CDCR and DSH defendants shall continue to refer, transfer and admit *Coleman* class members to appropriate inpatient programs in compliance with the requirements of the Program Guide and consistent with public health best practices in the circumstances of the COVID-19 pandemic.

4. Under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, the CDCR defendants shall develop and file plans with the court within 180 days for providing appropriate treatment space for clinical services and activities (e.g. suicide prevention, IDTTs, structured therapeutic activities, unstructured out-of-cell activities, and individual treatment) in Facilities C5 and C6 at SVSP-PIP or implement alternatives to the use of Facilities C5 and C6 at SVSP-PIP for inpatient care.

5. Under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, defendants shall develop a monthly report to be provided to the Special Master and plaintiffs, but not filed with the court, identifying all patients

in an inpatient level of care who are not housed in their LRH. For each patient identified, defendants shall provide the following information:

- Patient name and CDCR number
- LRH determination
- Date of LRH determination
- Current housing designation
- Date admitted
- Whether the determination not to transfer to LRH was based on clinical reasons
- Whether a treatment team assessment determined the patient was eligible or not for LRH
- Date of IDTT meeting when the patient was determined to be eligible for transfer to LRH and the date of endorsement
- Most recent IRU review date
- Whether the failure to transfer was due to bed availability
- Physical transfer date to LRH

The timeframe for completion of the monthly reporting system will be determined as part of the process recommended above.


Respectfully Submitted,


_____/s/_____
Matthew A. Lopes, Jr., Esq.
Special Master


January 28, 2021

111

<u>APPENDIX A1</u>
DSH-Atascadero

**DSH-Atascadero**
February 20, 2020 – Paper Review
Review Period – July 1, 2019 to December 31, 2019

## I.    SUMMARY OF THE FINDINGS

- On February 20, 2020, DSH-Atascadero reported a census of 249 *Coleman* class members or 97 percent of capacity.

- During the review period, DSH-Atascadero consolidated *Coleman* class member patients within Program V, resulting in units that housed only *Coleman* class member patients.

- DSH-Atascadero reported a 25 percent functional vacancy rate for psychiatry.

- At the time of reporting, staff-to-patient ratios were met; however, with current vacancies, ratios would be exceeded with full patient capacity.

- DSH-Atascadero did not provide staffing data specific to Program V's admission unit.

- During the review period, five psych tech and ten nursing positions were eliminated at DSH-Atascadero Program V due to a Department of Finance review.

- Upon admission, all required initial evaluations were completed timely.

- With few exceptions, initial treatment team meetings occurred within seven days of admission and patients attended.

- There was general compliance with the multiple elements of treatment plans.

- The presentation of the data did not allow determination of the average number of hours of any of the categories of structured treatment program offered to patients on a weekly basis.

- Data indicated robust patient attendance in group and recreational therapy by *Coleman* class member patients during the reporting period.

- No changes were made to the five-level Hospital Access System (HAS) at DSH-Atascadero since the preceding monitoring visit.

- Patients in units 31 and 34 had extended lengths of stay at HAS Level 1.

- Beginning in September 2018, DSH-Atascadero allowed direct admissions to designated intermediate care units.

- Institution-specific referral data was not provided. However, DSH-Atascadero reported that there was a combined total of 331 referrals to DSH-Atascadero and DSH-Coalinga during the review period; 13 referrals were rejected.

- There were 290 admissions to DSH-Atascadero during the review period.

- For the *Coleman* class member patients at DSH-Atascadero as of February 4, 2020, referrals were timely transferred.

- Referrals were accepted an average of two days after receipt of referral.

- Only 28 or 11 percent of accepted patients were admitted within 72 hours of acceptance.

- DSH-Atascadero discharged 162 *Coleman* class member patients during the review period; 39 percent took longer than 72 hours to transfer after clinical discharge.

- DSH-Atascadero reported that parole planning was provided to 45 *Coleman* class member patients during the review period; however, a description of the parole planning services was not provided.

- DSH-Atascadero issued 33 RVRs to *Coleman* class member patients during the review period, a 45-percent increase from the preceding site visit.

- DSH-Atascadero did not conduct RVR hearings.

- DSH-Atascadero reported one use of force incident during the review period.

- Range of motion during physical restraint usage was not documented as required by policy.

- The suicide prevention committee lacked adequate participation during the review period.

- Audit results for medical emergency response were 99 percent or better.

- The Mortality Incident Review Committee (MIRC) appeared to function properly.

- DSH-Atascadero maintained a complex and robust quality improvement program with numerous subcommittees reporting to the quality council.

- DSH-Atascadero reported that during the review period, 164 to 194 *Coleman* class member patients per month had meaningful jobs that involved at least five hours per week of work.

114

- There were 315 *Coleman* class member patients who participated in some form of education.

## II.    CENSUS

DSH-Atascadero designated 256 intermediate care beds for CDCR patients committed pursuant to California Penal Code commitment number 2684 (*Coleman* class members).  On February 20, 2020, DSH-Atascadero reported a census of 249 *Coleman* class members, or 97 percent of capacity.

In August 2018, DSH-Atascadero consolidated *Coleman* class member patients within Program V, resulting in units that housed only *Coleman* class member patients.  This consolidation afforded greater consistency of care across units due to a single leadership chain. Reviewed documents indicated *Coleman* class member patients remained housed in units 13, 30, 31, 32, 33, and 34.

## III.    STAFFING

### 1.    Administrative and Clinical Staffing

The executive director, hospital administrator, medical director, chief of psychiatry, nurse administrator, nurse coordinator, program director, and program assistant positions were filled. The one allocated clinical administrator position was vacant.

Senior Psychiatrist:  The senior psychiatrist position was filled.

Psychiatrists:  Three of eight psychiatrist positions were filled by permanent staff for a 62.5 percent vacancy rate.  Three positions were filled by contract staff leaving a 25 percent functional vacancy rate.  DSH-Atascadero did not report utilization of telepsychiatrists during the reporting period.

Supervising Psychologist:  The supervising psychologist position was filled.

Psychologists:  Seven of the eight psychologist positions were filled for a 12.5 percent vacancy rate.

Supervising Social Worker:  The supervising social worker position was filled.

Social Workers:  All eight social worker positions were filled.

Supervising Rehabilitation Therapist:  The supervising rehabilitation therapist position was filled.

Rehabilitation Therapists:  Seven of eight rehabilitation therapist positions were filled for a 12.5 percent vacancy rate.

Registered Nurses (RN):  For RN positions, 33 of 37 were filled by permanent staff for an 11 percent vacancy rate.  The use of four contractors reduced the functional vacancy rate to zero percent.

Senior Psych Techs:  Of the 18 senior psych tech positions, 14 were filled with permanent staff, for a 22-percent vacancy rate.

Psych Techs:  Of the 104 psych tech positions, 96 were filled, leaving a functional vacancy rate of eight percent.

Unit Supervisors:  All six unit supervisor positions were filled.

Other:  Both positions for health service specialists were filled.  There were no nurse practitioner positions at DSH-Atascadero.  One of two office technician positions was vacant for a 50-percent vacancy rate.

## 2.  Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

At the time of reporting, clinician-to-patient ratios for each of the psychiatrist, psychologist, social worker and rehabilitation therapist positions met the required 1:35 ratio.  However, if all *Coleman* class member beds were filled, DSH-Atascadero would exceed ratios

for psychiatrists, psychologists, and rehabilitation therapists.  With the existing staff, at full patient capacity, clinician-to-patient ratio for psychiatrists would be 1:42.6, for psychologists 1:36.6, and for rehabilitation therapists 1:42.6.

DSH-Atascadero did not provide staffing data specific to Program V's admission unit where the required clinician-to-patient ratio was 1:15.

During the review period, five psych tech and ten nursing positions were eliminated at DSH-Atascadero Program V due to a Department of Finance mission-based review.

### 3. **Staff Training**

DSH-Atascadero reported that all treatment providers were trained in Trauma Informed Care (TIC) concepts. A TIC curriculum was incorporated in all unit Therapeutic Strategies and Intervention trainings (TSI), and eight hours of TSI trainings were required annually.  All Dialectical Behavior Therapy (DBT) providers received specialized training in this modality.

## IV.    **TREATMENT, CLINICAL SERVICES, AND PROGRAMMING**

On admission, *Coleman* class member patients received a medical history and physical, a psychiatric assessment, a psychological admission assessment, social work assessment, nursing assessment and rehabilitation therapy assessment in a timely manner.  Also, DSH-Atascadero provided a brochure to patients that provided useful information regarding the structured treatment program (STP).

DSH-Atascadero treatment teams included a psychiatrist, psychologist, social worker, and rehabilitation therapist.  Treatment modalities included individual therapy and group therapy.  Psychiatric sick call for urgent conditions was held daily on each unit.

1. **Interdisciplinary Treatment Teams (IDTTs)**

With few exceptions, initial treatment team meetings occurred within seven days of admission and patients attended.  A quality improvement study specific to treatment plans indicated general compliance with the multiple elements of treatment planning.

2. **Group Therapy**

During the review period, DSH-Atascadero provided numerous core, centralized, and supplemental groups.  However, provided data did not allow determination of the average number of weekly STP hours offered to patients in any of these categories.

Data indicated robust patient attendance at STP with 425 *Coleman* class member patients attending group and recreational therapy during the reporting period.  On average, newly admitted patients attended their first group therapy session eight days after admission.

STP cancellations were tracked, although the documentation did not clearly demonstrate what percentage of scheduled groups were cancelled.

Quality management minutes revealed staff vacancies for Spanish-speaking primary clinicians.

3. **Individual Treatment**

Data indicated that individual treatment was offered to 73 patients during the review period. However, data provided did not clearly indicate who provided treatment, nor did it indicate length or frequency of individual treatment.

4. **Psychiatric Services**

DSH-Atascadero did not provide data regarding psychiatric services.

5. **Other Treatment Issues**

   **A. Involuntary Medications (PC 2602)**

DSH-Atascadero did not provide data regarding *Coleman* class member patients under PC 2602 orders.

   **B. Morning and End of Shift Meetings**

DSH-Atascadero did not provide data regarding morning and end of shift meetings.

V.   **PATIENT ACCESS TO TREATMENT**

   **Patient Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures**

No changes were made to the five-level Hospital Access System (HAS) at DSH-Atascadero since the preceding review period. Based on provided data, the HAS consisted of a five-level system with Level 1 being the most restrictive. Each level represented increased hospital access as the patient progressed from Level 1 to Level 5. Presumably, the policy functioned as it had during the preceding review period, with patients admitted to DSH-Atascadero at HAS level 1 and the treatment team determining any changes to the patient's level. DSH-Atascadero did not provide a policy or any description of the current level assignment process.

A report produced on January 27, 2020 regarding data collected on January 25, 2020 showed that, 19 *Coleman* class member patients were at HAS Level 1, 20 *Coleman* class member patients were at HAS Level 2, 114 *Coleman* class member patients were at HAS Level 3, 83 *Coleman* class member patients were at HAS Level 4, and no *Coleman* class member patients were at HAS Level 5. During the review period, *Coleman* class member patients spent an average of 14.70 days at Level 1, 11.45 days at Level 2, and 52.63 days at Level 3. Except for unit 13 where no data was provided, *Coleman* class member patients spent an average of

119

66.70 days at Level 4.  No patients reached Level 5 during the review period.  Data revealed that units 31 and 34 had extended average lengths of stay at Level 1 with 18.77 days and 21.73 days, respectively.  Reasons for the extended lengths of stay for these units were not provided and should be reviewed through the quality improvement process.

## VI.    REFERRALS AND TRANSFERS

DSH-Atascadero did not provide referral data specific to the institution, but instead provided combined referral and rejection data for DSH-Atascadero and DSH-Coalinga.  During the review period, there were a total of 331 referrals to DSH; 13 referrals were rejected.  Data was not provided relative to compliance with referral timeframes or reasons for rejections.

## VII.    ADMISSIONS AND DISCHARGES

### 1.    Admissions

Pursuant to the MOU and joint policies, all admissions to DSH-Atascadero were approved by the medical director.  Previously, all new patients were admitted to an admission unit.  However, during September 2018, DSH-Atascadero allowed direct admissions to designated intermediate care units.  This change provided quicker access to the patient's initial treatment, improved the quality of treatment plans, and improved continuity of care, as the treatment team followed a patient from admission to discharge.

There were 290 admissions to DSH-Atascadero during the review period.  Admissions were particularly high during July and October 2019, with 85 and 63 respectively.  Admission timeframes were not reported for the review period.  For the 249 *Coleman* class member patients at DSH-Atascadero on February 4, 2020, the average time from CDCR referral to receipt by DSH-Atascadero was nine days, with a range from zero to 89 days.  The average time from DSH-Atascadero's receipt of the referral to acceptance was two days, and the average time for

admission after acceptance was 9.5 days. Only 28 or 11 percent of accepted patients were admitted within 72 hours of acceptance. Patients referred to DSH-Atascadero who were admitted were transferred timely.

During the review period, the average length of stay for *Coleman* class member patients was 129 days, with a range of 103 days to 179 days.

DSH-Atascadero did not report any patients admitted with complex medical needs.

Multiple admission data was not provided.

## 2.  **Discharges**

DSH-Atascadero discharged 162 *Coleman* class member patients during the review period. Of those, 63 or 39 percent took longer than 72 hours to transfer after clinical discharge. Reasons for delays were not provided.

Clinician-to-clinician contact information was not provided.

Data indicated that parole planning was provided to 45 *Coleman* class member patients during the review period; however, a description of the services was not provided.

## VIII.  **PATIENT DISCIPLINARY PROCESS**

There were 33 RVRs issued to *Coleman* class member patients during the review period, a 45 percent increase from the preceding reporting period. Of those, DSH-Atascadero clinicians completed 26 or 79 percent of the mental health assessments; the mental health assessments were not provided for review.

As RVR hearings were not held at DSH-Atascadero, documentation of dispositions were not available for review.

IX.    **USE OF FORCE**

DSH-Atascadero reported one use of force incident during the review period.  It was reviewed by the Incident Management Review Committee on December 2, 2019; however, the report was not provided for review.

DSH-Atascadero updated the Office of Protective Services Lexipol Policy 300 Use of Force-Patients policy on August 14, 2019 in accordance with Assembly Bill 392.

X.    **UNUSUAL OCCURRENCES/SERIOUS INCIDENTS**

During the review period, there were a total of 319 serious incident reports.  Of those, 79 incidents or 25 percent were for aggression, 78 incidents or 24 percent were for medical reasons, 70 incidents or 22 percent were for suicide/self-harm and 92 incidents or 29 percent were classified as other.

XI.    **USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT**

During the review period, there were 68 uses of restraints with the average duration lasting 11.66 hours.  There were 24 episodes of seclusion, with each episode lasting an average of 34.89 hours.  A total of 58 episodes or 63 percent of either restraint or seclusion was due to self-injurious behaviors.

DSH-Atascadero reported that in several reviewed cases, range of motion was not documented as required by policy.

XII.    **SUICIDE PREVENTION**

There were no completed suicides at DSH-Atascadero during the review period.

The SPC lacked adequate participation during the review period.  There were 18 identified members of the multidisciplinary SPC, and the chairperson served as recorder.  Of the six meetings held during the review period, only two meetings had more than two attendees, two

meetings were attended by only the chairperson, and at no time during the review period did the SPC achieve over 44 percent attendance.  Minutes routinely repeated information and discussions from prior meetings, including those outside the monitoring period.

The SPC documented six suicide attempts and 40 self-harm incidents by *Coleman* class member patients.  Additionally, there were 17 threats of suicide, 14 threats of self-harm, and 35 reports of ideation with 20 categorized as suicidal ideation and 15 labeled as self-harm ideation.

SPC agenda items included a continuation of topics under review during 2018, as well as a focus on collaboration with the CDCR suicide prevention committee.  The SPC reviewed self-harm and suicide attempt trends and noted a decrease in those behaviors since October 2018.   A project for ligature risk identification and use of heat maps was in process; however, a proposed action plan had not yet been implemented.

Treatment plan audits completed during the review period did not directly address any specific aspect of suicide prevention.

## XIII.   EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1.   Emergency Response

Medical emergency response audit results during the review period were 99 percent or better.

No minutes were provided for the Emergency Care Committee (ECC) meetings during the review period; however, ECC activities were noted in the quality council minutes.  During the review period, the ECC completed quarterly emergency response drills involving multiple scenarios and responded to 15 actual emergencies.  All 15 emergencies were reportedly reviewed by the executive team, program management, and the ECC. However, DSH-Atascadero provided no specifics regarding the incidents.

DSH-Atascadero staff received training in basic life support, first aid, and cardiopulmonary resuscitation (CPR).  During the review period, DSH-Atascadero acquired a new emergency response vehicle for which required training was provided.

### 2. **Death Review Process**

The MIRC remained operational during the review period and appeared to function properly.  During October 2019, the MIRC reviewed the death of a patient who died seven days after discharge and transfer to California State Prison/Sacramento (CSP/Sac).  MIRC minutes noted that the patient received treatment at DSH-Atascadero for approximately eight months prior to discharge when he was determined to be psychiatrically stable. The MIRC identified no gaps in service during the patient's DSH-Atascadero admission nor any need for corrective action plans.

## XIV.  **QUALITY MANAGEMENT AND UTILIZATION REVIEW**

DSH-Atascadero maintained a complex and robust quality improvement program with numerous subcommittees reporting to the quality council.  The institution had a number of quality improvement plans and action items during the review period that were closely monitored until desired goals were achieved.  Further, they performed various audits that targeted appropriate areas of concern; however, the methodology and the utilization of audit results remained unclear.  It was also unclear whether compliance data was shared with management and line staff.

During the review period, the quality council met weekly, and meeting minutes indicated that relevant information from the various subcommittees was effectively funneled through the risk management and utilization review committees.  Regular agenda items included program

proposals, action items, status updates, staff trainings, and staff recruitment and retention efforts. Audit outcome data and quality improvement plans also were discussed during the meetings.

The risk management utilization review committee met monthly and reported information from the various subcommittees to the quality council. Members included the medical director, hospital administrator, clinical administrator, chief of medical staff, health services specialist, senior registered nurse, standards compliance coordinator, chief psychologist, and nurse administrator. The suicide prevention, medical risk management, program review, facility review, treatment support, and violence prevention committees all reported to the risk management and utilization review committee. The meeting minutes reflected that monthly summaries, actions items, and status updates from the various subcommittees were routinely monitored and appropriately elevated.

The program review committee met weekly and was responsible for reviewing incident reports, monitoring interventions for patients exhibiting high risk or problematic behaviors, and providing clinical recommendations to treatment teams. The program director chaired the meeting and attendees included the supervising psychologist, supervising social worker, supervising rehabilitation therapist, unit psychiatrist, health service specialist, nursing coordinator, program assistant, unit supervisor, unit psychologist, and other staff as needed. When indicated, patients were appropriately referred to the treatment support committee, facility review committee, and medical risk management committee. Program review committee meeting minutes were not provided for review.

Minutes from the remaining subcommittees indicated adequate contributions to quality improvement. Monthly summaries from the subcommittees were useful, agenda items were relevant, and the quality improvement plans generated from the subcommittees were appropriate.

The utilization management committee met every two weeks, with the exception of November and December when they met only once.  The committee members included the medical director, clinical administrator, program director, program assistant, nursing coordinator, supervising psychologist, senior rehabilitation therapist, and the utilization management coordinator.  The committee reviewed patients hospitalized for 180 and 240 days, and thereafter, every 30 days.  The meeting minutes provided information regarding treatment obstacles and progress and discharge planning.  The committee also documented recommendations and plans to follow up with providers when indicated.

DSH-Atascadero completed over 60 routine audits as part of their continuous quality improvement efforts.  These ongoing audits focused on areas such as treatment plans, psychiatric discharge summaries, restraint and seclusion, suicide risk assessment, violence risk assessment, social work admission assessments, treatment groups, lengths of stay, and rehabilitation therapy.

Due to prior issues regarding the methodology and use of treatment plan audit data, DSH-Atascadero conducted quantitative treatment plan audits during the review period.  Of the 137 reviewed treatment plans, 89 percent were reported as compliant, a two percent decrease since the preceding auditing period.  Deficient areas included timely completion, inaccurate group treatment hours recorded, lack of approved interventions, documented coping skills, and reason for hospital admission.  It remained unclear how the audit results were used or whether corrective action plans followed.

Supervisors from social work and rehabilitation therapy audited group treatment compliance during the review period and found 100 percent compliance for the 46 groups observed.  DSH-Atascadero did not provide information regarding the areas of focus, whether the audit was qualitative or quantitative, or compliance measurement methodology.

Several action plans were developed and implemented during the review period.  The violence prevention committee developed a work group to address aggressive acts during pill lines, and the quality council identified the need for monitoring treatment hours, enrollments, and attendance to ensure proper clinical care was provided.

DSH-Atascadero did not provide risk management data maintained by the standards and compliance department or documentation of the Wellness and Recovery Model Support System (WaRMSS), which was reportedly used for tracking various treatment related activities during the review period.

DSH-Atascadero's policies and procedures and administrative directives were reviewed annually.  An estimated 50 nursing policies and 138 administrative directives were revised during 2019.

A hospital-wide quality improvement (QI) specific to nursing notes indicated issues with timeliness of notes.  Descriptions of patients' overall progress towards treatment and discharge goals lacked sufficient detail.  Other quality issues were identified, and further training and audits were recommended.

DSH-Atascadero did not provide any incident management reports, committee meeting minutes, or data on hold for psychiatry audits performed in December 2019 for review.

DSH-Atascadero was surveyed twice by the CDPH Licensing and Certification Division (Acute Care Survey November 2017, Intermediate Care Survey August 2018) and The Joint Commission (Hospital Survey July 2017, and Laboratory Survey September 2018).  All surveys were successful, and DSH-Atascadero received its updated CDPH license in November 2019 and was re-accredited by The Joint Commission for the full three-year period in July 2017.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

During the review period, 66 *Coleman* class member patients filed 222 complaints.  Of those, 41 were filed for daily living issues, 24 were filed for legal concerns, 23 were filed for medical care and treatment, 17 were filed for mental health treatment, and 17 were filed for access/use of personal possessions.  For 42 of the filed complaints, staff indicated that they were unable to read or understand them or determined that the complaint was unrelated to the facts stated by the patients.

The patient satisfaction survey results exceeded 90 percent compliance for nine of 13 questions.  This represents a 15 percent decrease from prior monitoring review results, where there was at least 90 percent compliance for 11 of 13 questions.  Explanation of patient rights and medication education remained below 90 percent compliance.  New areas of dissatisfaction included a clean and neat environment and patient inclusion in group placement decisions.

## XVI.   *COLEMAN* POSTINGS

DSH-Atascadero did not have a policy regarding *Coleman* postings, and no audits were performed regarding the same.  DSH-Atascadero indicated that observation of *Coleman* postings would be included in the internal audit checklists for the next reporting period.

## XVII.  LAUNDRY AND SUPPLY ISSUES

DSH-Atascadero updated AD 610.6 Bed Linen and Patient Clothing policy on January 22, 2020.  Laundry logs were not provided for review.

## XVIII. <u>VISITATION/PRIVILEGES/TELEPHONE ACCESS</u>

AD 713 Visiting Room Operations policy was unchanged since the preceding monitoring visit. All patients at DSH-Atascadero had the right to visitors unless otherwise precluded by court order or terminated by the institution for violations of the visitation policy.

## XIX. <u>LAW LIBRARY ACCESS</u>

DSH-Atascadero updated AD 602.2 Access to the Courts by Patients policy, on September 25, 2019. All patients had access to the library, and capacity of the library was limited to 15 patients on a first-come, first-serve basis, staffing and hospital conditions permitting.

## XX. <u>JOBS/EDUCATION</u>

DSH-Atascadero reported that 164 to 194 *Coleman* class member patients per month had meaningful jobs that involved at least five hours per week of work during the review period.

There were 315 *Coleman* class member patients who participated in some form of education, and classes were rarely cancelled.

129

<u>APPENDIX A2</u>
DSH-Coalinga

**DSH-Coalinga**
January 10, 2020 – Paper Review
Review Period – June 1, 2019 to November 30, 2019

## I.    SUMMARY OF FINDINGS

- On January 10, 2020, DSH-Coalinga reported a census of 49 *Coleman* class member patients.

- DSH-Coalinga reported that the census averaged 44 patients per month with a range of 36 to 49 patients.

- DSH-Coalinga was fully staffed during the review period.

- The one full-time equivalent (FTE) telepsychiatrist position was filled.

- All DSH-Coalinga staff-to-patient clinical ratios were within established requirements.

- Eighty-three percent of initial IDTTs were timely and expected treatment outcomes appeared reasonable, although no further IDTT information was provided.

- DSH-Coalinga offered various core and supplemental groups led by different disciplines; however, group activities were heavily weighted toward supplemental activities.

- The average number of core group therapy hours offered per patient per week was 9.63 hours; 70 percent attended.

- DSH-Coalinga offered an average of 41 hours per patient per week of supplemental activities; 18 percent attended.

- Offered individual therapy was negligible according to the data provided; DSH-Coalinga indicated not all hours were captured.

- DSH-Coalinga did not provide any data relative to medication management.

- No patients were on individual behavior plans during the review period.

- Forty-nine percent of patients had access to meaningful employment for five hours or more weekly.

- DSH-Coalinga reported access to Transitional Case Management Program (TCMP) services for pre-release planning.

- DSH-Coalinga admitted 50 *Coleman* patients during the review period.

- For the 49 patients at the facility during January 10, 2020, referrals from CDCR took an average of seven days to reach DSH-Coalinga.

- Average days from referral to acceptance was 2.5 days with two outliers of 16 and 26 days. No reasons for delays were provided.

- Fifty-five percent of patients were not admitted within 72 hours of acceptance. No reasons for delays were provided.

- The average length of stay during the review period was 166 days.

- DSH-Coalinga Unit 21 staff received RVR mental health assessment completion training during May 2019.

- DSH-Coalinga issued 14 RVRs to PC 2684 *Coleman* patients.

- There was no use of force involving PC 2684 *Coleman* patients during the review period.

- There were 50 serious incident reports; 29 or 58 percent were for aggressive acts towards staff or other patients.

- DSH-Coalinga had a robust quality improvement program in place, but it was difficult to ascertain the degree to which many of the activities measured services provided to *Coleman* patients.

- DSH-Coalinga did not provide requested information regarding *Coleman* postings.

- None of the PC 2684 *Coleman* patients at DSH-Coalinga were enrolled in education classes.

## II.    <u>CENSUS</u>

DSH-Coalinga operated a 50-bed intermediate psychiatric care unit under the terms of the MOU with CDCR. Patients were housed in a dormitory setting, which ranged from one to four beds per dormitory. On January 10, 2020, 49 *Coleman* class members were receiving intermediate care at DSH-Coalinga. During the review period, the monthly census averaged 44 patients.

III.    **STAFFING**

1.    **Administrative and Clinical Staffing**

On January 10, 2020, all staffing positions were filled at DSH-Coalinga.  The executive director, clinical administrator, hospital administrator, nurse administrator, medical director, chief psychiatrist, program director, and nursing coordinator positions were filled.  The program assistant position was filled with acting capacity.

Unit Supervisor:  The unit supervisor position was filled.

Senior Psychiatrist:  The senior psychiatrist position was filled.

Psychiatrists:  Both of the psychiatrist positions were filled; one was telepsychiatry.

Supervising Psychologist:  The supervising psychologist position was filled.

Psychologists:  The two psychologist positions were filled.

Supervising Social Worker:  The supervising social worker position was filled.

Social Workers:  The two social worker positions were filled.

Supervising Rehabilitation Therapist:  The supervising rehabilitation therapist position was filled.

Rehabilitation Therapists:  The two rehabilitation therapist positions were filled.

Nurse Practitioner:  The nurse practitioner position was filled.

Registered Nurses (RNs):  The seven RN positions were filled.

Health Services Specialist (HSS):  The HSS position was filled.

Senior Psych Techs:  The three senior psych tech positions were filled.

Psych Techs:  The 30 psych tech positions were filled.

**2.    Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

DSH-Coalinga staff-to-patient clinical ratios were within the established 1:35 requirement.  Psych techs and nursing positions were staffed within 1:8 established staffing ratios for these disciplines.

**3.    Staff Training**

Since the preceding monitoring visit in January 2018, trauma-informed care training was provided to DSH-Coalinga.  In addition, a new patient orientation manual was developed specifically for newly admitted *Coleman* patients.  A new staff orientation manual to assist onboarding all disciplines to the PC 2684 mission (still in draft format) was also implemented.  RVR process and mental health assessment completion training was provided to clinicians in May of 2019.

**IV.    TREATMENT AND CLINICAL SERVICES**

**1.    Interdisciplinary Treatment Teams (IDTTs)**

DSH-Coalinga provided data that indicated initial treatment team conferences occurred within seven days of admission for 59 of 71 patients, or 83 percent of the time.  More information regarding IDTTs could not be ascertained beyond the facility's statement that each conference was held with or without patient participation.

DSH-Coalinga provided expected treatment outcomes for *Coleman* patients that appeared reasonable and measurable in the abstract; however, they could not be evaluated for congruence with the specific patient diagnosis, symptoms, and situation.

**2.    Group Therapy**

DSH-Coalinga divided group treatment into core and supplemental treatment activities.  Core groups included patients enrolled pursuant to their individual treatment plan or My Activity

134

Participation Plan (MAPP). During the review period, core groups included dialectical behavioral skills and cognitive therapy for psychotic symptoms.

Supplemental activities were voluntary and attended by patients as desired. Supplemental groups included a wide range of offerings such as medication education, pet therapy, and karaoke. The various groups were led by different disciplines including psychology, social work, rehabilitation therapy, and nurses.

Offerings of supplemental recreational activities heavily outweighed core group offerings. Supplemental activities, however, experienced high drop-off between the number of hours offered and those attended by the patient. DSH-Coalinga reported that 36 of 38 total cancelled groups were due to staffing issues listed as "other", suggesting patient refusal as the primary reason for low attendance rates.

DSH-Coalinga reported data on core groups for 24 weeks during the review period. During that period, patients attended 70 percent of offered groups. Across the reporting period, the average number of group treatment hours offered per patient, per week was 9.63 with a range of 6.22 hours to 10.83 hours. The average number of hours attended was 6.77 per patient, per week, with a range of 4.18 hours to 8.24 hours.

During a 26-week period, *Coleman* patients attended 18 percent of offered supplemental activities. DSH-Coalinga offered an average of 41 hours per patient, per week with a range of 38.73 hours to 49.6 hours. The average number of hours attended per patient, per week was 7.27 with a range of 4.82 hours to 9.43 hours.

### 3.    Individual Treatment

Data indicated that individual therapy provided to *Coleman* patients during the review period was negligible. DSH-Coalinga reported that a quality improvement project was

135

scheduled to begin during March 2020 to document individual therapy within the MAPP module in WaRMSS. The expected outcome would ensure that all individual treatment hours were captured. As during prior monitoring rounds, the facility indicated that the actual number of hours offered and provided were possibly higher than reflected in the data. Data as of January 10, 2020 indicated DSH-Coalinga offered an average of 1.87 individual treatment hours, with 1.17 hours attended. This represented an average of 0.04 hours offered per patient per week and 0.03 hours attended. Documentation reflected no individual treatment offered or attended in June or July 2019.

Including individual therapy, group treatment, and recreational activities, *Coleman* patients at DSH-Coalinga were offered an average of 49.24 hours of structured hours weekly, but attended only an average of 13.40 hours.

### 4.    Psychiatric Services

DSH-Coalinga did not provide data regarding psychiatric services during the review period.

### 5.  Other Treatment Issues

#### A.  Involuntary Medications (PC 2602)

DSH-Coalinga did not provide audits or statistics regarding medication management.

#### B.  Behavioral Management

Unchanged since the previous monitoring round, DSH-Coalinga reported that no patients were on individual behavior plans during the reporting period.

#### C.  Pre-release Planning

DSH-Coalinga reported that 11 *Coleman* patients had 90 days or less to their parole date during the reporting period. Of the six *Coleman* patients that discharged during that period, five

patients or 83 percent received TCMP services.  No other information regarding pre-release planning was provided.

### D.  Access to Meaningful Jobs and Educational Opportunities

DSH-Coalinga reported that during the reporting period a range of 38 percent to 49 percent of *Coleman* patients had access to meaningful employment for five hours or more weekly.  No *Coleman* patients attended at least five hours per week of educational classes or activities.

## V.    PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures

DSH-Coalinga responded "[n]ot applicable" to the request to provide a list of all patients on HAS status, collectively or by HAS level or documentation of the duration of patients' HAS status and the reasons for the duration.  The facility also noted that the A.D. 558 Hospital Access System policy was reviewed in November of 2018 and no changes were made.

## VI.   REFERRALS AND TRANSFERS

DSH-Coalinga did not provide referral data specific to the institution; but instead, provided combined referral and rejection data for DSH-Atascadero and Coalinga.  During the review period, there were a total of 324 referrals to DSH; ten referrals were rejected.  Data was not provided relative to compliance with referral timeframes or reasons for rejections.

## VII.  ADMISSIONS AND DISCHARGES

### 1.    Admissions

There were 50 admissions to DSH-Coalinga during the review period.  Admissions increased monthly across the review period with two admissions during June, three admissions

during July, seven admissions in August, 11 admissions in both September and October, and 16 admissions in November.  Referral timeframes were not reported; however, for the 49 inmates at DSH-Coalinga on January 10, 2020, the average time from CDCR referral to receipt by DSH-Coalinga was seven days, with a range from zero to 28 days.  Of those, 13 referrals or 26.5 percent took longer than seven days, and six referrals or 12 percent took longer than 14 days.  The average time from referral to DSH acceptance was 2.5 days with two outliers of 16 and 26 days.  No reasons were provided for the outlier delays.  The average time from CDCR's referral of the patient to admission to DSH-Coalinga was 18 days, with a range of zero to 50 days.  Of those, eight referrals or 16 percent took longer than 30 days.

Of the 49 patients, 22 or 45 percent were admitted within 72 hours of acceptance.  The average time from acceptance of a patient to admission was eight days, with a range of zero to 26 days.  No reasons were provided for any of the delays noted above.

The average length of stay during the review period was 166 days with a range of 135 days to 183 days.

DSH-Coalinga did not report any patients admitted with complex medical needs.

2.    **Discharges**

During the review period, DSH-Coalinga discharged 56 patients to CDCR.  On average, there were nine discharges per month with a range of five to 19 discharges monthly.  No patients were discharged to other DSH facilities.  Five patients or nine percent took one to two days longer than 72 hours to transfer upon clinical discharge.  Reasons for delays were not provided.

The dates of clinician-to-clinician contact were not reported.

## VIII.   PATIENT DISCIPLINARY PROCESSS AND USE OF FORCE

DSH-Coalinga Unit 21 mental health staff received RVR mental health assessment completion training during May 21, 2019.  Training was provided by the chief psychologist at Pleasant Valley State Prison.  During the review period, DSH-Coalinga issued 14 RVRs to *Coleman* patients including two for indecent exposure; two batteries on inmate; two physical altercations; four assaults on a peer; one disobeying an order and attempted assault; one verbal threat against staff; and one for kicking the door.  One RVR was cancelled, therefore no information on the charge was included.  Timeframes were met for request and completion of mental health assessments.  Five patients were discharged prior to hearing; one RVR was cancelled; four patients were found guilty and assessed credit losses; two RVRs were reduced to counseling chronos; and two RVRs were logged as unheard at the time of reporting.  RVRs and mental health assessments were not provided for review.

## IX.   USE OF FORCE

DSH-Coalinga reported no use of force incidents during the review period.

## X.   UNUSUAL OCCURENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

DSH-Coalinga reported a total of 50 serious incidents during the review period.  Of those, 29 were reported to be aggressive acts which included aggressive acts towards other patients and staff.  In addition, there were 14 acts of self-harm, including threats of suicide and suicide ideation.  Reports also included accidental falls, contraband, and medical health and safety.  There was one patient's rights incident for an allegation of physical abuse and neglect in October 2019.  Details of the allegation and follow-up information was not provided.

**XI.    USE OF OBSERVATION CELLS/ROOMS, SECULSION, AND RESTRAINT**

The psychiatry department audited 100 percent of seclusion and restraint usage for *Coleman* patients.  One patient was placed in restraints on two occasions during October 2019 with each restraint episode lasting less than one hour.  There was no use of seclusion during the review period.  All incidents of seclusion and restraint were reviewed by Program 7 management on a weekly basis to ensure least restrictive measures were utilized.

**XII.    SUICIDE PREVENTION**

There were no attempted or completed suicides during the review period.  One episode of self-harm was reported.  All staff were required to participate in a two-hour Suicide Prevention and Risk Reduction training upon hire in new employee orientation.  Additionally, all staff were required to participate in a 45-minute Suicide Prevention and Risk Reduction training annually in annual review training.

All psychologists were trained on the new Suicide Risk assessment (C-SSRS) on November 13, 2019.  DSH-Coalinga reported completion of suicide risk assessments on 100 percent of admissions.

**XIII.    EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS**

**1.    Emergency Response**

Mock emergency response drills were conducted and assessed monthly during the review period.

**2.    Death Review Process**

There were no patient deaths during the reporting period.

## XIV.  <u>QUALITY MANAGEMENT AND UTILIZATION REVIEW</u>

DSH-Coalinga had a robust, multi-layered quality improvement program; however, longstanding concerns related to quality improvement efforts specifically for *Coleman* patients persisted.  Stated goals of DSH-Coalinga's quality improvement program included appropriate assessment and documentation of incidents and corrective action to prevent recurrence.

Quality Improvement was overseen by the Quality Council-Administrative which was chaired by the executive director and served as a hub for all quality improvement activities across programs and disciplines at DSH-Coalinga.  Required members of Quality Council-Administrative included the clinical administrator, medical director, nurse administrator, hospital administrator, director of quality improvement, the chiefs of psychiatry and psychology, police, program director and the chief physician and surgeon.  The Quality Council-Administrative met monthly and chartered quality management teams for identified problems.

The Department Executive Committees at DSH-Coalinga reported to the Quality Council-Administrative.  Committees from various areas of the hospital including the medical executive committee and the clinical management team committee were included.  Required committee members included the department executive, department managers and supervisors, and subcommittee chairpersons.  The committee's duties included operational, administrative, and clinical oversight of the quality management sub-committees, as well as chartering quality management teams as needed.  Quality management sub-committees were responsible for monitoring the specific quality improvement efforts.  Quality management teams clarified problems, collected data, and provided recommendations.  Quality management teams provided monthly reports to the committee that created their charter.

DSH-Coalinga's risk management system also included a robust approach with multiple layers of committees. The two primary components of the risk management system were the treatment plan team which addressed the specific risks and benefits of patients' therapeutic and rehabilitation interventions, and the risk management program which identified high risk situations for patients both immediate and long term and suggested remedial actions to reduce risk. The treatment plan team placed inmates on a high-risk list for enhanced monitoring according to specific criteria description in policy. Behavioral and medical components including aggression to self or others and indicia of suicide risk were considered. Opportunities for improvement and risk mitigation moved through various layers of committees.

DSH-Coalinga's utilization review committee met monthly and reviewed concurrent and continued hospitalizations for *Coleman* patients. Reviews included the continued need for hospitalization, extended stays, and the specific services provided to the patient. The committee made recommendations regarding discharge or continued stay, as well as interventions which might be beneficial.

The systemwide Clinical Operations and Advisory Council conducted a three-day review of DSH-Coalinga during October 2019. While broad in scope, the review focused on the entire hospital and was not specific to treatment or other services provided to *Coleman* patients. With the exception of social work, all clinical areas were reviewed. Recommendations included integrating training material related to trauma informed care; developing a standardized approach to documentation of tele-consultations concerning psychopharmacology; and addressing the facility's struggles in providing adequate substance recovery treatment.

Audits or issues identified specific to *Coleman* patients' progress were marginal over the review period. DSH-Coalinga reported that audits conducted for *Coleman* patients lacked

142

consistent methodology which prevented effective analysis and impeded quality improvement efforts. All audits were under review with initial focus on audits of seclusion and restraint, treatment teams and group treatment.

DSH-Coalinga reported one audit of 16 patients' treatment plans during the review period. Findings across 12 measures included whether risk factors were identified to whether a plan was present to discharge the patient. Four areas were found 100 percent complaint and the lowest area of 65 percent compliance was related to whether patients' progress toward each treatment outcome expectation was documented. DSH-Coalinga did not provide methodology or analysis of the results.

## XV.   PATIENT COMPLAINTS/PATIENT SATISFACTION

Patient complaints were contracted out to Disability Rights California. Disability Rights California reported no complaints during the reporting period.

Of the 56 patients that DSH-Coalinga discharged during the reporting period, 11 patients or 20 percent participated in the patient satisfaction of care survey following discharge. Forty-one patients refused to participate, two patients were clinically contraindicated to participate, and three patients were emergently discharged and did not participate.

Survey results revealed that 82 percent of patients strongly agreed that they were appropriately referred to DSH-Coalinga; staff provided them with information concerning the rules and expectations of the unit and program; they felt their preferences and input were incorporated into their treatment; staff encouraged them to participate in treatment planning; patients' preferences and input was incorporated in to their treatment; and, staff encouraged patients to participate in their treatment planning, treatment groups and

143

activities.  Additionally, 91 percent of responding patients indicated that treatment teams were receptive to patient input; they could deal more effectively with daily problems and they had improved during their admission.

Nine of the ten patients that ranked specific staff felt they were extremely helpful or mostly helpful.  Telepsychiatry data was unclear from the information provided.

## XVI.  *COLEMAN* POSTINGS

DSH-Coalinga did not provide documentation regarding *Coleman* postings, responding "[n]ot applicable" to the request for information.

## XVII.  LAUNDRY/SUPPLIES/PROPERTY ISSUES

DSH-Coalinga provided various policies and procedures for issue of clothing, handling of clean and soiled linen and clothing, supply stock, and rotation and delivery of clothing and supplies, but did not provide proof of practice regarding compliance.

## XVIII. VISITATION/PRIVILEGES/TELEPHONE ACCESS

DSH-Coalinga provided Administrative Directive 738, Patient Visiting Guidelines that was last revised on December 24, 2018 for review.  Absent safety or security concerns, patients were entitled to daily visitation, including holidays for up to five hours each day. No changes were made to the policy during the review period.

## XIX.  LAW LIBRARY ACCESS

DSH-Coalinga provided Administrative Directive 608, Patients Access to the Courts that was last revised on September 10, 2019.  Patients had access to the law library for one hour, three times per week.  No other information was provided.

## XX.  EDUCATION

No *Coleman* patients at DSH-Coalinga were in education classes during the review period.

APPENDIX A3
DSH-Patton

**DSH-Patton**
February 4, 2020 – February 5, 2020

I.    **SUMMARY OF THE FINDINGS**

- On February 4, 2020, DSH-Patton's total census was 1,114 male and 430 female patients.

- DSH-Patton operated a 30-bed intermediate care facility that treated PC 2684 *Coleman* class members within a 50-bed unit, Unit 33.

- On February 4, 2020, there were ten *Coleman* class members and 40 PC 1370 patients in Unit 33.

- DSH-Patton reported that the census averaged ten to 15 patients throughout the review period.  The census declined throughout the same period.

- Upon acceptance of *Coleman* class members, PC 1370 patients were moved off Unit 33 as needed.

- As of February 4, 2020, DSH-Patton's executive director, nurse administrator, chief psychiatrist, program director, and program assistant positions were filled.  The clinical administrator, hospital administrator and medical director positions were filled with acting capacities.

- All clinical staff positions were filled; six of 22 psych tech positions were vacant but were covered through staff surplus from other areas of the hospital.

- All DSH-Patton staff-to-patient clinical ratios were within established requirements.

- During the review period, all 15 patients who were referred to DSH-Patton were admitted.

- Referrals from CDCR took an average of four days to reach DSH-Patton; CCWF referrals took a particularly long time.

- DSH-Patton took longer than three business days to accept 40 percent of referrals.

- Eighty percent of patients were not admitted within 72 hours of acceptance.

- The total average time from DSH receipt of referral to actual admission was 11 days excluding a 26-day outlier.

- The average length of stay from patient admission to physical discharge was 156 days.

- MOU agreed pre-release planning was not provided.

- DSH-Patton patients did not receive adequate hours of group therapy.

- Patients reported monthly treatment team meetings as useful; however, they were unable to describe their treatment plan.

- Patients reported adequate access to the psychiatrist.

- Patients received weekly individual treatment during the early part of their admission and could access one-to-ones on an as-needed basis later during their stay.

- Patients found group treatments useful.

- The establishment of a suicide prevention committee would be beneficial to the patients.

- The restraint room did not have a toilet or sink.

- An empty cell with a bed was used for voluntary "time outs."

- There were nine uses of restraints for four patients during the review period and no use of seclusion.

- The observed morning shift meeting was very useful.

- Patients had good access to the outdoor yard and the dayroom.

- DSH-Patton did not use patient orientation, staging, or cuff status.

- DSH-Patton used the Granting of Activities Level Systems.

- The quality management program at DSH-Patton was comprehensive, transparent and run by highly motivated staff; however, the data analysis and reports were tremendously limited by the use of a paper-based system as opposed to an electronic system.

- No patients received RVRs during the review period.

- There were no uses of force during the review period.

- There were 47 serious incident reports; three patients generated 79 percent.

- None of the *Coleman* patients at DSH-Patton were enrolled in education classes.

## II.    CENSUS

On February 4, 2020, DSH-Patton's total census was 1,114 male and 430 female patients. DSH-Patton operated a 30-bed intermediate care facility that treated PC 2684 *Coleman* class members within a 50-bed unit. Prior to June 2019, *Coleman* class members were housed in Program 6, which housed male and female patients. Since June, class members were housed in Unit 33 in Program 4. Unit 33 also housed PC 1370, non-*Coleman* class members. Patients were housed in rooms in a dormitory setting, which ranged from two to five beds per dormitory.

On February 4, 2020, there were ten *Coleman* class members and 40 PC 1370 patients in the unit. DSH-Patton reported that they averaged ten to 15 patients throughout the review period with a high of 24 patients. They further reported that the census declined throughout the same period. DSH-Patton reported that upon acceptance of *Coleman* class members, PC 1370 patients were moved off Unit 33 as needed.

## III.    STAFFING

### 1.    Administrative, Clinical, and Correctional Staffing

As of February 4, 2020, DSH-Patton's executive director, nurse administrator, chief psychiatrist, program director, and program assistant positions were filled. The clinical administrator, hospital administrator and medical director positions were filled in acting capacities.

Senior Psychiatrist:  The senior psychiatrist position was filled.

Psychiatrists:  Both of the psychiatrist positions were filled.

Supervising Psychologist:  The supervising psychologist position was filled.

Psychologists:  The two psychology positions were filled.

Supervising Social Worker:  The supervising social worker position was filled.

Social Workers:  The two social worker positions were filled.

Supervising Rehabilitation Therapist:  The supervising rehabilitation therapist position was filled.

Rehabilitation Therapists:  The two rehabilitation therapist positions were filled.

Nursing Coordinator:  The nursing coordinator position was filled.

Registered Nurses (RNs):  Eight of the nine RN positions were filled.

Health Services Specialist (HSS):  The HSS position was filled.

Licensed Vocational Nurse (LVN):  The LVN position was filled.

Senior Psych Techs:  Two of the three senior psych tech positions were filled.

Psych Techs:  Of the 22 psych tech positions, 16 were filled.

Psych Tech Assistant:  The psych tech assistant position was filled by a certified nursing assistant.

DSH-Patton reported that during the review period, all nursing and psych tech vacancies were covered by utilization of surplus staff from other units and registry staff.

## 2.    Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

All DSH-Patton staff-to-patient clinical ratios were within established requirements. Specifically, the staff-to-patient ratios for psychiatry, psychology, social work, and rehabilitation therapy were all 1:25, which were within the established 1:35 staff-to-patient ratios for these disciplines.  Senior psych techs, psych techs, and nursing positions were all staffed at ratios of 1:6, which were within the established staffing ratios of 1:8 for these disciplines.

3.    **Staff Training**

DSH-Patton's suicide prevention and intervention policy was updated during January 2020.  On Unit 33, five of eight or 63 percent of clinical staff, and 14 of 15 or 93 percent of nursing staff were current with suicide precautions training.

On February 5, 2020, therapeutic strategies and intervention (TSI) annual training was completed by six of eight or 75 percent of clinical staff and 13 of 15 or 87 percent of nursing staff on Unit 33.

IV.    **TREATMENT AND CLINICAL SERVICES**

1.    **Interdisciplinary Treatment Teams (IDTTs)**

In general, patients describe the monthly treatment team meetings as being useful to them because they were able to ask questions about their treatment.  However, the patients indicated to the monitor's experts, with one exception, that they would be unable to describe their treatment plan if asked.  Most patients indicated that they would be able to name the medications they received and the reasons for such medications.

Two of the monitor's experts observed two different treatment teams, which reviewed six PC 2684 patients.  The treatment team included a psychiatrist, psychologist, rehabilitative therapist, social worker, and a nurse.  One of the treatment teams provided patients with a copy of their treatment plan, in contrast to the other treatment team, which did not.  All disciplines provided input during the treatment team meeting.  The patient was also present during the treatment team meeting.  Discussion related to participation in groups with the patients ranged from little discussion to adequate discussion.

2.    **Group Therapy**

Interviewed patients found group treatments at DSH-Patton useful.

While the therapeutic milieu within DSH-Patton was more than available in an EOP, patients at DSH-Patton received fewer treatment hours than EOP inmates.

The average number of "core treatment" hours offered during the review period was 7.45 hours per week per patient, with a range from seven to 8.8 hours. During the same period, the average number of hours per patient attending therapy groups per week ranged from 4.4 to 6.5 hours, with the average of 5.25 hours attended per week. Staff estimated that approximately one hour of supplemental hours (non-clinical groups) per patient per week was offered.

It should be noted that under the Civil Rights of Institutionalized Persons Act (CRIPA) consent decree, 20 hours per week per patient was to be offered regarding core and supplemental therapies.

### 3.    **Individual Treatment**

Patients received weekly individual treatment during the early part of admission and could access one-to-one contacts on an as-needed basis during their admission. Patients also reported adequate access to the psychiatrist.

Individual treatment was provided by a social worker on a weekly basis for the first month following admission and then on a PRN basis by multiple clinicians thereafter.

Staff reported that weekly progress notes were required during the first seven to eight weeks of admission then monthly thereafter. Clinicians at DSH-Patton were responsible for filing their progress notes in the health care record.

### 4.    **Psychiatric Services**

All psychiatry positions were filled at DSH-Patton. Telepsychiatry was not used during the review period. As reported above, patients acknowledged adequate access to the psychiatrist.

5.    **Other Treatment Issues**

It was not uncommon for patients to miss scheduled treatment.  The most common reason reported for non-attendance was patients were sleeping or were too tired to attend.

Patients were not allowed to eat meals in their rooms; they ate in the dining room.

Patients had good access to the outdoor yard and the dayroom.  DSH-Patton did not have a Patient Mentor Program.

DSH-Patton did not discharge patients who were not stable back to prisons.

### A.  Involuntary Medications (PC 2602)

No involuntary medication orders were initiated during the reporting period.  DSH-Patton did not renew medications if the patient was admitted with an involuntary medication order.

### B.  Behavioral Management

Behavioral support plans were not used for any *Coleman* patients during the review period; however, review of patient records suggested that behavioral support plans would be clinically useful.

### C.  Morning and End of Shift Meetings

All necessary staff attended the morning shift meeting which was led by the charge nurse. Staff reviewed all patients on the unit with a focus on problematic behaviors, which was very useful.

## V.    PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS), and Stages:  Standards and Procedures

DSH-Patton did not use patient orientation, staging, or cuff status.

DSH-Patton's Security Procedure within Compounds policy detailed the process for inner-compound privileges.  The policy required the treatment team to review the patient's inner-

compound privileges at each treatment planning conference and to document changes in the patient's treatment plan. Newly admitted patients were to be reviewed by the treatment team at the initial treatment planning conference. The policy also identified criteria for inner-compound privileges access only with staff escort, criterion, and procedure for suspensions and restorations of inner-compound privileges and treatment team responsibilities.

DSH-Patton utilized the Granting of Activities Level System (G.O.A.L.S.) incentive system. There was no policy for the system; however, the manual outlined how patients earned points on a daily basis, how behaviors impacted points earned, the timelines for reviews and the incentives that could be earned. The G.O.A.L.S. incentive system provided patients the opportunity to earn points; however, they did not lose points.

## VI.   REFERRALS AND TRANSFERS

During the review period, all 15 patients who were referred to DSH-Patton were admitted. The average time from referral to receipt by DSH-Patton was four days, with a range from zero to 15 days. The three referrals from CCWF took seven, nine, and 15 days. The average time from CDCR's referral of the patient to admission to DSH-Patton was 12 days, with a range from eight to 22 days, excluding an outlier of 41 days. There were no rejections during the review period.

## VII.   ADMISSIONS AND DISCHARGES

### 1.   Admissions

During the review period, all 15 patients who were referred to DSH-Patton were admitted. The average time from receipt of the completed referral by the Patient Management Unit to patient admission was 11 days, with a range from five days to 19 days, excluding an outlier of 26 days. The average time from acceptance of a patient to admission was six days,

with a range from four to 14 days, and 80 percent of patients were admitted beyond 72 hours of acceptance. These delays should be examined by both CDCR and DSH-Patton.

There were ten direct admissions from CDCR facilities and four from the CIW-PIP.

During the review period, two patients were admitted who were within 90 days of parole at the time of admission. Pre-release planning was not provided as required by the current memorandum of understanding (MOU). The MOU requires DSH clinical staff to provide individualized clinical pre-release planning for all patients who are receiving treatment in a DSH program within one year of their institutional release to help maximize the patient's opportunities for a successful transition into community living as outlined in the MHSDS Program Guide. Further, the MOU requires that pre-release planning provide patients the opportunity (as clinically appropriate) to participate in groups and activities designed to assist the patients to develop reasonable, individualized goals and objectives for community release.

DSH-Patton's pre-release planning was limited to participation in a Pre-Release Coordinated Clinical Assessment Team (CCAT) conference call facilitated by CDCR with other agencies, including Parole, Parole Outpatient Clinic, and County Behavioral Health Department representatives. During the CCAT, DSH-Patton clinicians spoke to the current mental health and behavioral presentation of the patient, as well as their level of functioning and support system if released to the community. DSH-Patton also obtained Releases of Information to allow CDCR/Parole to make preparations for potential release. Clinician-to-clinician contact was made during the CCAT. TCMP referral was determined by CDCR. No specific pre-release group treatment was offered at DSH-Patton. Staff indicated that some discharge information was shared during a coping with incarceration group in which all *Coleman* class members were enrolled.

During the review period, no patients admitted to DSH-Patton had complex medical needs.

There were no patients with multiple admissions during the reporting period.

**2.    Discharges**

During the review period, DSH-Patton discharged six patients.  The average length of stay from patient admission to physical discharge was 156 days, with a range of stay from 77 to 266 days.  The average length of stay from admission to clinical discharge was 154 days, with a range of stay from 73 to 266 days.  One patient remained longer than 72 hours after clinical discharge during the review period.  DSH-Patton was unable to provide information regarding which programs patients discharged to.  The dates of clinician-to-clinician contacts regarding discharges were not reported.

**VIII.    PATIENT DISCIPLINARY PROCESS**

Unit 33 staff received 2.5 hours of RVR mental health assessment completion training during September 2019.  Training was provided by the one CIW psychologist responsible for completion of all mental health assessments at CIW.

No patients received RVRs during the review period.

**IX.    USE OF FORCE**

There were no use of force incidents during the review period.  Any incidents involving pepper spray, restraints, or and/or baton usage required the completion of a serious incident report (SIR); no SIRs were completed for those reasons during the review period.

**X.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS**

Staff reported 47 special incident reports (SIRs) were completed during the review period.  Three patients generated 37 or 79 percent of SIRs.  Nine or 19 percent of SIRs were

related to suicide attempts, suicidal ideation, and self-harm. Twenty-three or 49 percent were for aggressive acts.

## XI.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

Seclusion was not used during the reporting period. Restraints were used nine times on *Coleman* patients; one patient was restrained four times, another patient was restrained three times, and two patients were restrained once. The time spent in restraints was acceptable, ranging from seven to 18 hours. There was no evidence of problems with DSH-Patton's use of restraints.

## XII.    SUICIDE PREVENTION

There were no suicides during the review period.

DSH-Patton psychologists have performed suicide risk assessments during admissions using the Columbia Suicide Severity Rating Scale (C-SSRS) since November 2019. All psychologists were trained to use this instrument during November 2019.

All staff were required to participate in a two-hour Suicide Prevention and Risk Reduction training upon hire during the New Employee Orientation (NEO). All staff were required to participate in a 30-minute Suicide Prevention and Risk Reduction training annually during Annual Recertification Training. Additional training involved mock medical code events.

The executive management team met daily. This meeting included review of all hospital-wide serious incident reports, including suicide attempts. There were four levels of enhanced observation that included constant observation as well as line of sight observation. The facility did not have a formal suicide prevention committee. The establishment of a suicide prevention committee would be beneficial to the patients. The various discipline sheaves were responsible to ensure compliance with the suicide prevention policy and procedure.

Safety cells, except for the use of restraints were not used.  An empty cell with a bed was used for voluntary "time outs."

## XIII.   **EMERGENCY RESPONSE AND DEATH REVIEW PROCESS**

### 1.  **Emergency Response**

There were no code blue occurrences involving *Coleman* patients during the reporting period.  DSH-Patton completed mock code drills on every unit, for every shift per quarter.  The facility achieved greater than 90 percent compliance for the drills completed on Unit 33.  There were no recommendations or remediations.

### 2.  **Death Review Process**

The death review process at DSH-Patton was a sentinel event review process.

## XIV.  **QUALITY MANAGEMENT AND UTILIZATION REVIEW**

The quality management program at DSH-Patton was comprehensive, transparent, and run by highly motivated staff; however, the data analysis and reports were tremendously limited by the use of a paper-based system as opposed to an electronic system.

The quality improvement system at DSH-Patton included Policy Directive 9000 and a number of administrative directives.  The governance structure included the central council administrative committee and the quality council committee.

During the review period, the central council administrative committee met monthly and rotated between the East and West compounds; *Coleman* patients were housed on East compound and meetings were held during June, August, and October 2019.  Issues addressed included quantity of hygiene products, exercise equipment in the courtyards, placement of green trash cans, rehabilitation therapist facilitating inter-compound, package pickup timing, replacements for the shade covers, and soda machines on the central compound.

158

The quality council committee met during July, August, and October 2019. Meeting minutes were comprehensive, and the meetings were attended by the program director, and either the chief psychiatrist or chief psychologist. Issues discussed included staffing, violence reduction, one-to-one observations, increased communication, and collaboration on the unit.

The clinical operations advisory council visited DSH-Patton during November 19 through 21, 2019. Positive findings were noted for psychiatry, including stable leadership, effective hiring, and new treatment initiatives. For psychology, problems with staffing vacancies and challenges with recruiting were noted. Psychology also experienced a reinstatement of quality treatment offerings, such as efforts to develop the enhanced treatment program and trauma-informed care.

DSH completed multiple, regularly scheduled audits throughout the review period that examined treatment planning, admissions, group treatment and restraint and seclusion. While many areas fell below 100 percent compliance, improvement was noted during November 2019, and there were no items that fell beneath 100 percent compliance across patients and over time.

Psychiatry, psychology and social work peer review were performed during the reporting period. Peer review for each discipline comprehensively addressed a number of critical clinical services and procedures. Summaries of peer review findings were not available for review.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

Patient complaints were contracted out to Disability Rights California. Disability Rights California reported five patients filed eight complaints during the reporting period. None of the complaints generated an SIR. All cases were closed.

DSH-Patton did not conduct patient satisfaction surveys during the review period.

## XVI.  *COLEMAN* **POSTINGS**

Current *Coleman* postings in both English and Spanish were posted and accessible to patients on Unit 33.

## XVII.  **LAUNDRY/SUPPLIES/PROPERTY ISSUES**

Other than the return of tattered undergarments, staff and patients reported no issues with laundry during the reporting period and at the time of review.  Patients had access to a washer and dryer.

Hygiene and grooming supplies were available and issued as requested.  Other products and makeup were available for order through canteen and vendors.

A recreation cart was available to all patients on Unit 33.  Supplies were ordered as needed by the rehabilitation therapists.

Patients reported no problems with receipt of their property on admission to DSH-Patton. Patients were allowed to keep all legal paperwork, and electronics were stored in a long-term property locker.  Upon discharge, unit staff inventoried the patients' personal property, as well as the long-term property locker, for transport back to CDCR with the patient.

## XVIII. **VISITATION/PRIVILEGES/TELEPHONE ACCESS**

Pursuant to the MOU, CDCR maintained oversight of visitation at DSH-Patton. Visitation was available daily for up to six hours during weekdays and Sundays.  Additionally, visitation was available for up to four hours on Saturdays and two hours for visits with children.

There were two in-house telephones and one pay telephone on Unit 33.  There were no complaints reported regarding telephone phone access during the reporting period.

## XIX.    <u>LAW LIBRARY ACCESS</u>

DSH-Patton law library was available three days a week for 2.5 hours in the morning and 2.2 hours in the afternoon.  DSH-Patton's law library consisted of one computer kiosk with access to Lexis Nexis.  Additionally, printed copies of criminal codes, a criminal procedures handbook, legal forms, jury instructions, court directory, and a list of attorneys were available.  During interviews, patients complained that copies of civil codes weren't readily available in the library.

Library access was available during all open hours unless a patient had a denial of rights or if the campus was closed due to safety and security issues.  Patients were allotted access in 30-minute increments to accommodate all patients.  Library staff was available for assistance with the computer kiosk, as well as interpreters.  Copies were made at no cost to patients upon request.  If an inmate needed assistance with form completion, social worker staff contacted the patient's attorney for assistance.

## XX.    <u>EDUCATION</u>

None of the *Coleman* patients at DSH-Patton were in education classes during the review period or at the time of the site visit.

APPENDIX A4
SVSP-PIP

**SVSP-PIP**
December 3, 2019-December 6, 2019

## I.    SUMMARY OF THE FINDINGS

- Staffing remained inadequate due to vacancies.

- Additional nursing staff resources were temporarily allocated to the PIP during the MTA transition period; a total of 85 nursing staff were hired between June and November of 2019.

- As of November 25, 2019, with the exception of the psychiatry ratio of 1:40, the facility met the 1:35 ratio for all required disciplines.

- As of October 21, 2019, the facility was allocated one senior psychologist specialist position to function as the SPRFIT coordinator.

- Patients at SVSP-PIP continue to receive markedly less treatment than EOP inmates, which is a longstanding issue that has yet to be resolved.

- Maximum custody patients housed in TC2, C5, and C6 were not offered group treatment.

- Individual treatment was an area of concern. The facility did not track individual encounters and these contacts frequently consisted of brief check-ins, often at cell front, when they occurred.

- The facility did not yet track the provision of individual therapy.

- Observed IDTTs lacked discussion of pertinent clinical matters, meaningful psychiatric input beyond medication management and clinical action regarding LRH as part of treatment planning.

- Discussions with the executive director revealed that the STEP program was discontinued at SVSP-PIP during November 2019.

- The primary issue of concern voiced by patients was the loss of MTAs and their replacement by correctional officers.

- Dry cells continued to be inappropriately used for one-to-one suicide monitoring.

- During the review period, 99 patients were housed out of their LRH designation.

163

- All transfers to acute care from SVSP-PIP occurred within ten days of referral.

- SVSP-PIP did not track the timeliness of RVRs or the quality of RVR mental health assessments during the review period; review of RVRs and RVR mental health assessments suggested the need for additional staff training.

- Longstanding issues with laundry continued throughout the review period and at the time of the site visit.

- Patients complained about the quality and quantity of food provided.

- Visiting was limited to Thursdays and Fridays, making it difficult for family members with jobs to attend.

## II.    **CENSUS**

SVSP-PIP's 246-bed intermediate care facility comprised two stand-alone units, TC1 and TC2, and two 180 housing units on C Yard, C5 and C6.  The majority of beds in the SVSP-PIP were single-celled, however, there were 24 beds in multi-person cells in TC1, housing four patients per cell, and 20 beds in multi-person cells in TC2, housing two patients per cell.

On December 2, 2019, the SVSP-PIP intermediate care program had a census of 242 patients, representing 98 percent of its operational capacity of 246 patients.  There were 206 2684 patients, 30 1370 patients, one 1370/7301 patient, and five 7301 patients.  Of the four beds that were unoccupied, three were reserved for patients either out to court or on a medical hold, and one was redlined for plumbing issues.

During the site visit, 37 patients were on maximum custody status.  Approximately 50 percent of patients were placed on maximum custody status after their arrival to the SVSP-PIP. The facility did not know the reason for this but reported an intent to examine the issue with a review of ICC/UCCs and IDTTs.

### III.    STAFFING

#### 1.    Administrative, Clinical, and Correctional Staffing

Staffing, and particularly psychiatry staffing, was an area that SVSP-PIP management acknowledged needed improvement. Additionally, the facility commented on the effect of the elimination of the medical technical assistant (MTA) position and how SVSP-PIP had made 85 new nursing hires (18 civil service and 67 registry) between June and November 2019 as an interim solution until a determination was made on the facility's permanent staffing needs.

At the time of the site visit, the executive director position was filled. The clinical administrator position was filled by a staff member serving in an acting capacity. Positions for the hospital administrator, three program directors, director of nursing, one chief psychologist, and one program assistant were all filled. Both nursing coordinator positions were also filled. The chief psychiatrist position was covered by a staff member serving in an acting capacity. SVSP-PIP reported that an offer for a civil service hire for this position was accepted on November 15, 2019 with a tentative start date of January 27, 2020. The facility further reported that interviews for a second program assistant position were tentatively scheduled to be held by the end of December 2019.

Senior Psychiatrist: The senior psychiatrist position was vacant.

Psychiatrists: All ten staff psychiatrist positions were vacant. Registry provided six full-time equivalent (FTE) psychiatrists, resulting in a functional vacancy rate of 40 percent.

Senior Psychologist: The senior psychologist position was filled.

Psychologists: Nine of ten staff psychologist positions were filled, leaving a ten-percent vacancy rate. Additional coverage provided by two registry staff reduced the functional vacancy rate to zero percent.

Social Workers:  Eight of ten social worker positions were filled for a 20 percent vacancy rate.  Registry provided one additional social worker, reducing the functional vacancy rate to ten percent.

Rehabilitation Therapists:  Seven of ten rehabilitation therapist positions were filled for a 30-percent vacancy rate.

Supervising Registered Nurses (SRNs):  Eighteen of 19 SRN positions were filled, resulting in a five-percent vacancy rate.  Two SRNs were on medical leave, resulting in a functional vacancy rate of 16 percent.

Registered Nurses (RNs):  Forty-three of fifty established mental health RN positions were filled, leaving a 14-percent vacancy rate.  Additional coverage provided by three registry staff reduced the functional vacancy rate to eight percent.

Licensed Vocational Nurses (LVNs):  All of the 18 LVN positions were vacant.  Coverage provided by 14 FTE registry staff resulted in a functional vacancy rate of 22 percent.

Certified Nursing Assistants (CNAs):  Of 33 CNA positions, five were filled, for a vacancy rate of 85 percent.  Registry provided an additional 43 CNAs, for a functional vacancy rate of zero percent.

Senior Psych Techs:  Both senior psych tech positions were filled.

Psych Techs:  Sixteen of the 49 psych tech positions were filled, leaving a vacancy rate of 67 percent.  An additional 12 positions were covered by registry staff, resulting in a functional vacancy rate of 43 percent.

**2.     Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

SVSP-PIP reported that there was no facility policy on ratios except for nurses.  As of November 25, 2019, the facility met CDCR's established 1:35 ratio for all required disciplines

except psychiatry, which was 1:40.5. The facility reported that the acting chief psychiatrist did not carry a caseload.

While on-site, the facility provided documentation of the breakdown of caseloads by clinician and discipline. As of December 5, 2019, of the six psychiatrists, three met the 1:35 ratio. The psychiatrists' caseloads ranged from 1:28 to 1:59.

All ten psychologists met the 1:35 ratio with caseloads ranging from 1:10 to 1:20. Similarly, all nine social workers met the 1:35 ratio with caseloads ranging from 1:2 to 1:18. The social worker assigned to two patients was providing coverage until the new social worker hire began employment.

The facility reported that rehabilitation therapists were not assigned to patients, but instead, were assigned to a building and paired with an IDTT; however, their attendance at IDTTs was not mandatory.

### 3.     Staff Training

SVSP-PIP provided documentation of the trainings required for all CDCR and PIP staff within 60 days of hire, nursing staff prior to working in PIP housing units, and all staff on an annual basis (block training). Monthly training schedules were provided for review.

### 4.     MTA Transition Plan

While on-site, a meeting was conducted with the Associate Director for High Security Admission, the Associate Warden for Health Care, regional staff, plaintiffs' counsel, and the monitor's expert to discuss the transition plans for the change from MTAs to correctional officers on C5 and C6. The transition was scheduled to occur on TC1 and TC2 at the end of December 2019 and the MTA classification would be discontinued during January 2020.

Patient and staff interviews revealed significant concerns and complaints regarding the behavior of correctional officers, a decrease in programming due to lack of correctional staff, and the presence of inexperienced correctional officers unfamiliar with unit processes and interactions with MHSDS patients.  It was also reported that during the transition, social dining had been discontinued.

Headquarters staff reported that the PSU, local staff, and the union had been meeting regularly to assess the workload, to determine the additional staff needed, and to review the PIP local operating procedures.  This included amending the current practice of two-on-one escort by the MTAs to a model that used one escort officer; however, staff were very concerned and reluctant to change this practice due to safety concerns.  Given these concerns, two extra custody positions were authorized and hired for C5 and C6.

The facility reported that during the transition, temporary staff filled the custody positions in C5 and C6.  Their unfamiliarity with unit procedures and MHSDS patients added to the anxiety and dysfunction on the unit.  It was reported that post and bid would occur during December 2019, which would result in more permanent custody staff on the unit.  Additionally, the facility planned to maintain some management and administrative custody positions which could be filled by prior MTAs who were in the process of completing the custody academy.  The facility believed that their presence would provide some reassurance to the staff and patients on the unit.

Another observation was the chaotic nature of programming in which groups were disrupted by feedings, patient movement, and other unit activities.  Headquarters staff reported that the PSU would work with local staff to develop a 24-hour clock which would document unit

activities and involve a multidisciplinary on-site tour. It was reported that this would allow for appropriate scheduling of activities to prevent conflicts and to increase treatment efficiency.

Headquarters, regional, and local staff indicated that they would conduct town halls and/or community meetings, in addition to the memorandum previously provided to patients to address concerns regarding the stress and anxiety that was noted during the visit regarding the transition.

Despite such measures, C5 and C6 were meant to be temporary units to address an emergency situation during 2009 and 2010. They were not meant to be permanent units lasting for ten or more years. It is not possible to provide the required inpatient care to patients in C5 and C6 due to the physical plant.

## IV.    TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### 1.    Interdisciplinary Treatment Teams (IDTTs)

In C5 and C6, IDTT meetings occurred in small group rooms in the hallway. The monitor's expert attended a portion of a C5 IDTT which was held in absentia as the patient refused to attend. The patient was seen at cell front and IDTT participants performed basic check-ins to determine the patient's status. The necessary participants attended the IDTT. The monitor's expert questioned the IDTT regarding their discussion and knowledge of LRH for patients discussed in the IDTT. The treatment team reported that LRH was discussed; however, there appeared to be some confusion regarding the role of the IDTT in the determination of LRH and in clinically preparing the patient to transfer to their LRH.

In TC1, there was sufficient space for necessary team members, and all had access to computers to access relevant information. Four IDTTs presented by two different clinicians were observed. All patients attended and participated. Staff in attendance were the two primary

clinicians (psychologist and social worker), unit psychiatrist, the correctional counselor, a nurse, and two escort officers (who did not participate).  Introductions were not completed nor was the purpose of IDTT reviewed.  In fact, staff often started IDTT by asking the patient if he felt suicidal.

Overall, team members presented as invested in the patient's care and well-being, knew the patients well, and had positive interactions with the patient.  LRH was referenced, but current placement in or out of LRH and treatment planning was unclear.  IDTTs were conducted in a manner in which staff asked what appeared to be scripted questions.  While each team member participated, the IDTT process was disjointed and at times staff talked over each other. Psychiatric input was limited to medication management.  IDTTs lacked discussion of pertinent psychosocial information, symptoms and functioning to support diagnosis and a review of pertinent treatment history.  Completion of these clinical activities would improve diagnostic assessments, case conceptualization, and treatment planning.  Lastly, discussion of the patient's participation and progress in treatment was minimal.

The quality and quantity of mental health services in TC2 was inadequate for patients at this level of care.  IDTTs failed to discuss critical patient information necessary for treatment planning and level of care considerations.  Individual treatment contacts consisted of brief check-ins that often were conducted cell front.  Patients were randomly assigned to treatment groups by a clerical staff member, without input from the IDTT or consideration of individualized plans of care.  Some patients were inappropriately placed in groups for competency restoration. Maximum custody patients were excluded from group treatment and their primary clinician contacts were typically conducted cell-front with no confidentiality.

SVSP-PIP administrative staff were aware of problems with the quality of IDTTs and implemented a performance improvement plan requiring the chief social worker's attendance at all IDTTs held in TC2.  The administrator and the regional psychologist specialist were present for the IDTTs observed by the monitor's expert during the site visit.  IDTTs were held in a confidential treatment space with all required members present.  Clinical and custody staff accessed available computers in the IDTT room.

Despite recent IDTT training, the IDTTs in TC2 served very little purpose outside of checking in with the patients scheduled for reviews.  The IDTT members did not function cohesively.  Treatment progress and treatment goals were not routinely discussed.  When treatment goals were mentioned, they were often vague and unmeasurable.  The IDTT verbalized reasons for admission and length of stay information for competency related commitments, but not for patients committed to the PIP for treatment and stabilization.  Psychosocial histories, case conceptualizations, medication compliance, level of care considerations, treatment planning modifications, diagnostic agreement and justification, and suicide risk and safety planning were completely absent from the IDTT discussions.  Despite repeated prompts by the regional specialist to include diagnostic information in the discussion, the IDTT did not change their process for subsequent IDTT reviews.  The presence of an administrator in IDTT might improve the quality of IDTT discussions if this individual provided consistent feedback, in vivo training, and education; however, this did not occur during the monitor's expert's IDTT observation.

## 2.    **Group Therapy**

A longstanding concern has been the provision of weekly group therapy treatment at SVSP-PIP.  During the entrance meeting on the first day of the site visit, SVSP-PIP leadership acknowledged the issues with group treatment, including the low number of treatment hours

offered, as well as the quality of the group treatment.  Staff reported that in September 2019, a Performance Improvement Work Plan (PIWP) was developed to increase weekly treatment hours.  At that time, the facility reported that they were providing on average 4.6 hours per week of treatment; that treatment increased to 8.2 hours during October 2019.  According to SVSP-PIP, patients were offered 11.8 hours during November 2019 with 19 hours scheduled.  It was unclear what the issues were that prevented the scheduled hours from being offered.  The facility acknowledged that their initial goal was to increase the number of treatment hours and thereafter, their focus would turn to the quality of the treatment provided.

C5 and C6 units continued to function with limited areas for treatment.  Group therapy primarily occurred in the dayroom of the housing pods.  Groups also occurred in rooms in the hallway; however, these rooms were small and did not allow for large group sessions.  The dayrooms afforded no confidentiality for group participants.  Custody and other staff frequently entered the units during group therapy sessions talking loudly and/or other noise making; this made it difficult for participants to fully participate in the therapy sessions due to the ongoing distractions.  Additionally, other patients in their cells not attending groups occasionally yelled and caused disruption.  Normal functions of the unit, such as feeding, release for yard, and nursing rounds also resulted in group disruption.

The monitor's expert attended two C5 groups.  Both groups were conducted in the dayrooms of the C5 housing pods.  One group was titled "Emotional Regulation" and it was facilitated by a psychologist.  This group provided valuable didactic information, and group participants appeared to benefit from their involvement.  The other group observed was titled "Seeking Safety;" a psychologist also facilitated this group.  Of concern, were the numerous disruptions and distractions that occurred during both groups.

The monitor's expert interviewed SVSP-PIP patients housed in the C5 and C6 units in group and individual settings. The primary issue of concern voiced by patients was the loss of MTAs and their replacement by correctional officers. Patients indicated that the correctional officers were unfamiliar with unit procedures, were disruptive in groups, presented with disrespectful behavior, and ignored patient requests for assistance. They also expressed concerns regarding confidentiality due to officers' presence on the unit or in the control booth. Due to new officers on the unit, they reported that groups frequently began late and ended early. Dayroom was also decreased which was a frequent source of concern. There were also complaints by the patients that their cells were cold.

Although maximum custody patients were primarily housed in TC1 due to the presence of therapeutic modules located there, C5 and C6 housed several maximum custody patients. This was very concerning, as these patients received only individual therapy and yard; these patients were not afforded any group therapy. They remained in their cells for long periods of time with little to no treatment and/or activities. This situation was not significantly different than housing in a segregation unit with its restrictions and limitations. Further, the care provided to those patients was significantly less than that provided to EOP patients. The facility and CDCR must work to ensure that maximum custody patients in need of higher levels of care be provided appropriate care and treatment.

In TC1, three groups were observed: a maximum custody caseload group, a substance abuse group, and a problem-solving group. Attendance ranged from four to six patients. Group quality was variable and ranged from very good to poor, depending on the clinician facilitating the groups. Of concern, a delusional patient who only spoke Spanish was very active in one

group, but the language barrier between him and other group members was disruptive to the group process.

Groups also failed to start on time. Staff reported that this was typical and that when groups started late, the group still ended at the scheduled time; thus, the full treatment time was not provided.

Patients were interviewed after each group. Patients reported that they had limited time out of their cells. When ducats for group were provided, they were not routinely offered group. Patients reported that they were frequently fed in their cells. Staff attributed this to insufficient staffing and the power outages due to generator testing. Dayroom was offered during the week, and at times, started late due to staffing issues, but was not offered on the weekends. Of concern, patients reported that staff were not attentive to suicidal gestures or suicidal statements.

Group treatment spaces in TC2 were confidential; however, the monitor's expert noted other, specific concerns during the site visit. Four one-hour treatment groups started 30 minutes late due to delays in escorting. Staff confirmed these delays were common since the loss of trained MTAs. Group treatment assignments were not individualized and were not decided in IDTT. According to the chief social worker, "a scheduler," who was not a clinician, placed patients in as many groups as possible, without input from the IDTT or consideration of specific treatment needs/plans. Some mental health staff expressed concerns that groups were often overcrowded and unsafe, and that some patients were being inappropriately placed in competency restoration groups to "show compliance."

Group therapy was not offered to maximum custody patients in TC2, and there were no modifications or enhancements to their treatment plans to address this deficit.

A DBT group was observed during the site visit. This group had eight participants and all participants were engaged in the psychoeducation materials. Patients shared insights from previous weeks' topics and utilized a workbook for generating meaningful discussion. The monitor's expert attempted to observe a second group that started 30 minutes late; however, the facilitator planned to show a two-hour movie in the remaining 30 minutes. This was the final group session for these patients and would have been a great opportunity to review the skills learned in previous sessions. As such, this was not a meaningful use of group treatment time or the limited treatment space they had available.

### 3.   <u>Individual Treatment</u>

In C5 and C6, the lack of consistent individual therapy remained problematic. Patient and staff reports indicated that these sessions were frequently brief check-ins. Cell-front contacts were frequent. The facility did not track the provision of individual therapy.

In TC1, the Services and Treatment policy provided as part of the pre-site data indicated that primary clinician contacts should occur at least every other week. However, leadership staff reported that contacts should occur weekly. Patients reported that primary clinician contacts were usually confidential, although at times, an out-of-cell contact was not offered. Patients reported that individual contacts ranged from weekly to monthly and said that barriers to treatment included overwhelmed staff and the lack of custodial escorts. Staff reported that barriers to treatment included insufficient escort staff and insufficient therapeutic modules (eight modules for the twenty maximum custody patients at the time of the visit). Regarding escorts, it was unclear why patients who were not on maximum custody status needed escorts. The regional lieutenant reported that the use of escorts was due to expressed safety concerns from clinical staff. This practice is worth reconsideration.

Staff reported that they had significant time to meet with their patients on an individual basis. However, a review of the weekly schedule indicated that a total of 27 hours was allocated for individual primary clinician contacts which did not provide enough time for appropriate confidential weekly contacts.

In TC2, individual primary clinician contacts routinely occurred cell-front and consisted of brief non-confidential check-ins. According to mental health staff, primary clinician contacts were routinely completed cell-front for maximum custody patients, patients deemed inappropriate for group treatment, and patients absent from primary clinician facilitated groups. When primary clinicians did schedule out-of-cell individual contacts, they often overscheduled for the time they had available, and then completed the remaining appointments cell-front. Regardless of whether individual primary clinician contacts in TC2 occurred out-of-cell or cell-front, the short duration of these encounters was insufficient and did not allow for individualized treatment. According to primary clinicians in TC2, they often had only 45 to 50 minutes to complete six daily scheduled primary clinician contacts due to delays in escorting, lack of movement during custodial counts, and limited treatment space. As a result, even scheduled individual primary clinician contacts were approximately five to ten minutes in duration.

The monitor's expert met with eight TC2 patients in a confidential setting. Patients reported a wide range of concerns, and all expressed dissatisfaction with the quality of treatment at the facility. Patients were frustrated with the limited treatment hours and out-of-cell time offered in TC2. Several stated they had been "begging" to be discharged to the EOP level of care so they could engage in more treatment and exercise to improve their symptoms. Three patients said they only meet with mental health clinicians in group settings or during non-confidential cell-front contacts, which prevented them from discussing more personal matters

176

related to their mental health. A few patients described the IDTTs as useless and uninformative, adding that their questions regarding discharge and transfer timeframes were "never answered." Patients confirmed that visitation was discussed and approved during IDTT; however, they explained that visitation occurred on weekdays making it difficult for family members with jobs to attend.

### 4.    Psychiatric Services

Of concern, the Services and Treatment policy provided in the pre-site data did not include psychiatric services. Overall, patients reported that psychiatric contacts occurred in a confidential setting, but they were dissatisfied with the unit psychiatrist. Complaints included not feeling heard by the psychiatrist regarding medications, custodial presence during clinical contacts, changes to medications without an individual contact, and incomplete informed consent forms.

### 5.    Other Treatment Issues

#### A. Involuntary Medications (PC 2602)

During the review period, there were 28 initial PC 2602 petitions and 29 renewal petitions. At the time of the site visit, there were five pending renewal petitions. SVSP-PIP reported that there were no pending, new petitions.

During the reporting period, SVSP-PIP did not have a process in place to track non-compliance with PC 2602 medications. However, the facility reported that it recently implemented an involuntary medication log to be reviewed monthly by the chief psychiatrist. SVSP-PIP reported that training was completed on November 15, 2019.

Additionally, it was reported that SVSP-PIP had been tracking incidents of involuntary medication requiring use of force, but that the facility was currently amending its process to

177

capture any incidents of involuntary medication, including those where force was not needed. SVSP-PIP reported that during the review period there had been two instances of controlled use of force, one in TC1 and one in C6, involving cell extractions for non-compliant patients.

The facility reported that it did not submit any reports or tracking of the PC 2602 process to mental health headquarters.

### B. Behavioral Management

One psychologist served as the point person for the completion of behavioral interventions for self-injurious or aggressive behavior. Behavioral interventions included the completion of a behavior chain analysis or the development of behavioral guidelines. Staff reported that patients in need of behavioral interventions were identified through the Risk Management meeting or review of incident reports.

Completion of a behavioral chain analysis with a patient after a self-injurious incident requires the patient to identify antecedents and consequences to the behavior. This is a useful intervention that can help facilitate positive change and reduce negative behaviors. Behavioral chain analyses were underutilized as only six were completed during the reporting period. It would be beneficial for SVSP-PIP to routinely integrate behavior chain analyses into treatment. This could be done by training all primary clinicians to utilize the behavior chain analysis after any incident of self-injurious or aggressive behavior. This would be an effective use of primary clinician contacts.

Two behavioral guidelines had been developed for patients during the reporting period. Traditional behavior plans were designed to teach and reward positive behavior by including interventions that reinforced desired behaviors with rewards that were meaningful to the patient with the goal of sustaining positive behavior change. When rewards were utilized, the monitor's

expert was unable to determine if the rewards were individualized and salient.  SVSP-PIP would benefit from the development of a policy for implementation of traditional behavior plans for patients that have a pattern of significant self-injurious or aggressive behavior.  This would be a useful intervention to address problematic behaviors with maximum custody patients and could decrease the number of patients on maximum custody status allowing them to gain access to more treatment and out-of-cell time.

Collaboration is critical for behavior change.  However, "Do not allow the patient to see a copy of this plan" was documented on both behavioral guidelines.  Patients should be involved in the development of their behavior plans and receive a copy, unless clinical or safety concerns preclude the sharing of the plan.

In addition to collaboration, a critical component to address behavior change is a comprehensive, functional, behavioral analysis that assesses the events in the environment that predict and maintain problematic behaviors.  It is important to gather data from all available sources including record review and staff interviews to form a hypothesis of the function of the behavior.  A key component of the analysis is to obtain the baseline frequency of the behavior to facilitate the development of reasonable and measurable goals which allows for ongoing assessment of progress and ultimately discontinuation.  This was not completed on reviewed behavior plans and there was no baseline data for targeted behaviors to assess change or determine if the goal was realistic.

Lastly, reviewed behavior plans targeted multiple behaviors to change; one plan targeted six behaviors.  No more than two behaviors should be addressed at a time.

### C.  Morning and End of Shift Meetings

During the site visit, the afternoon huddle on C6 was observed.  Present at the meeting were staff from the Second and Third Watch including SRNs, psych tech, custody, primary clinician, psychiatrist, and RNs.  Topics of discussion included patients with medical concerns, new patients, medication expirations, PC 2602 and other medication adherence, significant laboratory studies, patient transfers, appointments, and programming issues.  Although many of the topics were directly related to psychiatric care, the psychiatrist provided little input and feedback during the huddle.  The meeting was well organized and led by the SRN.  Custody staff provided valuable feedback regarding patient observations.  Greater participation from the psychiatrist and continued education and encouragement for custody staff, who were newly hired, to continue to participate and to become an integral part of the treatment team would be beneficial.

### V.    PATIENT ACCESS TO TREATMENT

#### Patient Orientation, Discretionary Program Status (DPS), and System to Encourage Progress (STEP):  Standards and Procedures

Discussions with the executive director revealed that the STEP program was discontinued at SVSP-PIP.  There were no plans to replace the program.  There were plans to develop individual behavior plans to assist in treatment planning.  An obstacle to this was the lack of an allocation for a psychology specialist who would head a Positive Behavioral Support Team (PBST) which would act as a consulting team to the treatment teams in the development of behavior plans.

At the time of the site visit, treatment teams had begun utilizing behavior chain analysis which was a preliminary step in the development of treatment planning; however, staff reported difficulty in providing appropriate individual contacts, making the development and

implementation of these behavior chain analyses questionable.  The use of behavioral interventions for patients with problematic behaviors was a positive finding; however, these were only initial steps in addressing a longstanding issue of concern.

According to SVSP-PIP staff, only maximum custody patients were automatically restrained during escorts.  All other patients were escorted without restraints, unless the treatment team or a custody officer raised concerns regarding staff and patient safety.  When the request for restraints stemmed from the IDTT, a chrono was generated for custody staff, and the matter was reviewed at each IDTT.

## VI.    REFERRALS AND TRANSFERS

During the review period, 338 patients were referred to SVSP-PIP (this does not include PC 1370 or Welfare and Institutions Code (WIC) 7301 patients).  Of those, 25 patients, or 7.5 percent, were rejected.  Of the 25 rejections, seven were patients too acute for intermediate care, six were patients unable to be housed as endorsed, five were patients who could not be properly housed in a multi-person cell or maximum custody housing, two were patients scheduled to parole, one patient had no clear Axis I diagnosis, one patient needed a PC 2602 initiated, one patient needed additional lab work, one patient had multiple enemies at SVSP-PIP, and one patient had complex medical needs and transferred to CHCF.  SVSP-PIP reported no rescissions during the review period.

During the review period, 16 patients were referred to acute care from SVSP-PIP.  Of those, 11 patients transferred to CMF-PIP, four transferred to CHCF-PIP, and one referral was rescinded.  SVSP-PIP forwarded the referrals within two days in 14 of 16, or 87.5 percent, of cases; two cases were referred on the third day.  All transfers occurred within ten days of referral.  It was not possible to determine whether patients transferred within 72 hours of bed

assignment from the documents provided. The institution reported that there were no patients on waitlists during the review period.

At the time of the site visit, there was one patient whose referral had been received and who had been waiting for a decision for 22 days. On December 4, 2019, the SVSP-PIP chief psychiatrist emailed the Health Care Placement Oversight Program (HCPOP) to re-endorse the patient due to a lack of pending discharges. The staff services manager I reported that HCPOP sent emails daily reminding the facility of patients waiting for a bed.

## VII.   ADMISSIONS AND DISCHARGES

### 1.   Admissions

On December 3, 2019, 242 patients were housed in SVSP-PIP (this included 34 patients with PC 1370 and WIC 7301 commitments). The average length of stay was 154 days with a range of six to 2,612 days.

### 2.   Discharges

During the review period, SVSP-PIP discharged 144 patients. The average clinical length of stay was 75.5 days, and the average physical length of stay was 128 days. On average, patients remained in SVSP-PIP 12 days beyond clinical discharge. SVSP-PIP reported that upon discharge, they did not notify the receiving institution because HCPOP was responsible for placing the returning patient.

Regarding patients admitted with pending parole dates, a correctional counselor II sent weekly lists of all patients 60 days out pending parole. For all patients within 60 days of parole, the admissions and discharge unit scheduled a Coordinated Clinical Assessment Team (CCAT) to plan discharge arrangements, transportation, MDO evaluations, and release of information form completion. On December 5, 2019, the list included ten patients paroling during December

2019, January 2020, and February 2020.  All the patients, except those paroling in February 2020, had completed MDO evaluations.

Regarding clinician-to-clinician contact upon discharge, SVSP-PIP reported that it was the responsibility of the receiving institution to contact the PIP clinician.  Once discharged, SVSP-PIP no longer tracked the patient.

## VIII.   LEAST RESTRICTIVE HOUSING

The admissions and discharge unit tracked all patients' endorsements and LRH designations.  The endorsement included clinical recommendations from the treatment team regarding housing and bed placement.

On December 3, 2019, four patients who were not endorsed to the SVSP-PIP were housed there and 99 patients were housed out of their LRH designation at SVSP-PIP.  Of those, 94 patients, or 95 percent, had more restrictive endorsements than their LRH designations.  In fact, of the 242 patients in SVSP-PIP, 188 patients, or 78 percent, had single cell endorsements.

The executive director acknowledged the high number of single cell endorsements, and while he offered some potential justifications, he reported a long-standing fear regarding safety on the part of clinical staff.  During staff interviews, staff voiced concerns regarding custody staff trying to move patients to their LRH against the recommendations of mental health staff.

The average length of stay for these patients was 100 days with a range of one day to 685 days.  Forty three percent, or 43 patients, were housed out of their LRH for over 100 days at the time of the site visit.

## IX.   PATIENT DISCIPLINARY PROCESS

Of the 121 custody staff who were required to receive RVR training, 85 or 70 percent attended the training.  Five of six, or 83 percent of correctional administrators, four of five, or 80

percent of captains, 27 of 30, or 90 percent of lieutenants and 49 of 80, or 61 percent of sergeants received the training.

SVSP-PIP mental health clinicians had not received training regarding RVR mental health assessment completion since 2015. SVSP-PIP staff was unable to report which staff received the training. The monitor's review of mental health assessments strongly reflected the need for immediate training.

There were 232 RVRs issued to SVSP-PIP patients during the review period. Of those, 104 were issued to patients in Facility C and 118 were issued to patients in Facility 1. Ten locations were unknown, as the RVRs were removed from SOMS for unknown reasons. Of the 222 RVRs for which there was information, four were reduced to counseling chronos.

During the review period, SVSP-PIP did not review mental health assessment quality nor whether the assessment was requested timely from custody. A review of a random selection of RVRs revealed problems with the quality of the mental health assessments, as well as the senior hearing officers' consideration of the assessment. Clinicians used the same language in multiple mental health assessments related to whether the patients' mental health condition impacted the behavior underlying the RVR and other factors to consider when assessing penalties. Similarly, senior hearing officers used the same language on multiple RVRs when addressing consideration and mitigation based on the mental health assessment.

One patient inappropriately received an RVR for willfully resisting a peace officer during administration of his PC 2602 medication. This RVR was in direct violation of the memorandum dated June 5, 2014 from the Division of Adult Institutions (DAI) specifically prohibiting RVRs for force used during administration of involuntary medications. The senior hearing officer assessed 90 days loss of credit, and 90 days loss of canteen, phone, yard,

dayroom, and package privileges. The RVR was signed off on all levels including the associate warden and was not flagged by the mental health clinician as inappropriate. This RVR was brought to the facility's attention for immediate remedial action.

In another RVR, the clinician noted there was evidence that mental illness contributed to the behavior that led to the RVR. The monitor's review of the patient's record corroborated that he may have been experiencing psychiatric symptoms (auditory hallucinations and impulse control) despite being on psychotropic medication treatment. The clinician recommended the patient be permitted to maintain his ongoing contact with family via visitation, written correspondence, and phone calls as they were a strong source of coping and support for the patient. While the senior hearing officer noted these considerations, he nonetheless concluded that there were no mental health symptoms that contributed to the behavior. The senior hearing officer additionally commented that the patient indicated he was acting out of self-defense not because of his mental illness. Such language was not found anywhere in the patient's mental health assessment. Further, the senior hearing officer's finding that there were no current mental illness indications in the patient's mental health history was incorrect. The patient was found guilty and assessed 90 days loss of credit with no mitigation. The chief disciplinary officer signed the RVR with no changes. This case was also brought to the attention of SVSP-PIP administration.

In many of the reviewed RVRs, senior hearing officers did not mitigate; however, the chief disciplinary officer mitigated privilege loss based on mental health level of care. There was no mitigation of loss of credit.

## X.    **USE OF FORCE**

SVSP-PIP reported 37 use of force incidents during the review period: one controlled and 36 immediate.  The controlled use of force incident took place in August 2019, but the facility reported that it was not PIP related.  For the immediate use of force incidents, four occurred in May 2019, two in June 2019, five in July 2019, 11 in August 2019, and seven for both September and October 2019.

The facility reported that there had not been any changes to its use of force policy or procedures since the preceding site visit.

## XI.    **UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS**

SVSP-PIP reported a total of 93 serious incidents and unusual occurrences for the review period.  There were 15 incidents in both May and June 2019; seven were aggressive patient behaviors, and 11 were suicide/self-harm behaviors.  For July 2019, SVSP-PIP reported 28 unusual occurrences including 17 suicide/self-harm behaviors and four aggressive patient behaviors.  In August 2019, SVSP-PIP reported 17 unusual occurrences including three aggressive patient behaviors and 11 suicide/self-harm behaviors.  There were nine reported unusual occurrences for both September and October 2019.  In September 2019, seven of the nine incidents were for suicide/self-harm behaviors and in October 2019, five of the nine incidents were for suicide/self-harm behaviors.

The facility reported that all serious incidents and unusual occurrences were reported either in the "Report of Unusual Occurrence or Adverse Event," or the use of force incident reports, CDCR form 837.

The facility further reported that there had been no completed suicides at SVSP-PIP since the last site visit.

186

## XII.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

In C5 and C6, suicide monitoring was conducted on the lower level of the housing unit by CNAs who observed the patient outside of his cell.  The cells utilized were dry cells which did not have faucets or toilets.  The result was that the patient had to request to use the restroom and be escorted to a restroom or be provided with a urinal.  This use of dry cells was inappropriate and essentially unchanged from previous observations during past visits.  As a result, the executive director issued a memorandum directing staff to conduct suicide watch in the patient's existing housing cell, on either the lower or upper tier.  Concerns for staff safety prevented such changes in the past; however, the executive director indicated that with the placement of correctional officers on the unit, safety concerns could be better addressed.  This was a considerable positive change for a chronic and concerning problem in the C5 and C6 units.

## XIII.   SUICIDE PREVENTION

At the last visit, SVSP-PIP did not have a SPRFIT coordinator position to adequately address ongoing suicide prevention matters.  As of October 21, 2019, the facility was provided with a senior psychologist specialist position to function as the SPRFIT coordinator.  The SPRFIT coordinator had begun to provide SRASHE mentoring and review patients discussed by the Risk Management Committee (RMC).

The monitor's expert attended the RMC.  This was a multidisciplinary committee for the PIP which included the executive director, chief psychiatrist, SPRFIT coordinator, CEO, associate wardens, and supervisory staff.  Topics of discussion included new patients of concern, self-harm incidents, patients out to hospital, hunger strikes, maximum custody patients, and round table discussions including the provision of radios and safety utensils.  This appeared to be

a good forum to address issues of concern with timelines for completion.  Recommendations were also provided regarding appropriate treatment planning and amendments to treatment.

## XIV.   EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1.   Emergency Response

SVSP-PIP reported that during the review period, nine emergency response cases were reviewed by the EMRRC.  The incidents related to chest pain, suicide attempts, altered mental state, loss of consciousness/stroke-like symptoms, and foreign body ingestion.  According to the facility, eight of the nine incidents were reported timely.

### 2.   Death Review Process

There were no reported deaths during the review period.

## XV.   QUALITY MANAGEMENT AND UTILIZATION REVIEW

SVSP-PIP did not have a separate quality management program.  Instead, SVSP-PIP quality management activities were included in select SVSP quality management documents.  Full integration of the PIP into SVSP's quality management program was needed.

SVSP-PIP provided a summary of the Quality Performance Improvement Committee (QPIC) which was identified as the "main PIP-wide subcommittee."  The committee was chaired by the executive director and met monthly during the reporting period.  It was documented that a quorum (eight members present) was met each month; however, a review of attendees indicated that for at least three months this was not true.  The QPIC reported to the quality management committee; however, QPIC activities were not clearly documented in quality management committee minutes.

Topics to be discussed, as identified in the QPIC policy dated June 2019, were not routinely documented in subsequent meeting minutes.  Action items were identified and

appeared reasonable; however, there was no update in subsequent documentation as to the status of previous actions items.  This required improvement.

One area of potential concern was an indication that there could be changes to the utilization management review committee that may be inconsistent with statewide policy developed under the Memorandum of Understanding and updated accordingly with Lift and Shift.  Further information on the status of this potential change in subsequent documentation was not located.

A review of monthly documentation for the six quality management committee meetings facilitated by SVSP between May and September indicated that SVSP-PIP's executive director attended each meeting.  The PIP's hospital administrator attended two of the meetings.  The PIP was not routinely discussed in monthly quality management committee meetings.  When PIP issues were discussed, documentation was thorough and indicated solid discussion of topic areas.

Discussion of the PIP's Performance Improvement Work Plan (PIWP) was regularly documented in quality management committee minutes.  The purpose of the PIWP was to increase treatment hours to ten hours of weekly structured clinical contact.  Treatment hours at the beginning of the PIWP were 3.9 hours scheduled.  Progress was made in that the most recent documentation showed that 6.5 hours were scheduled.  While SVSP-PIP disclosed during the entrance meeting that tracking of hours was not reliable, this was not documented in quality management committee minutes.  Barriers to treatment included cancellations, lack of escorts, and an insufficient number of therapeutic treatment modules for maximum custody patients. There was a proposal to remove maximum custody patients from the data because they negatively impacted data due to the insufficient number of therapeutic modules which only allowed for the provision of 4.8 to 6 hours on average of treatment depending on the maximum

189

custody patient census.  The request was denied when initially raised but continued to be raised with no further documentation of response.

An issue of concern was that since May 2019, two action items were continuously documented at each meeting, but no update was provided.  The first action item was a meeting between leadership to plan for the reopening of TC2 and the second action item was to convene a committee to ensure that the PIP was fully included on Correctional Treatment Center policies and procedures.

Monthly Local Governing Body documentation between May and October 2019 was reviewed.  The PIP's executive director attended each meeting and was indicated as a required member.  Documentation for the PIP was minimal.

The facility provided documentation from SVSP's SPRFIT and mental health subcommittee meetings.  There was no documentation about the PIP in monthly documentation.

## XVI.  PATIENT COMPLAINTS/PATIENT SATISFACTION

SVSP-PIP discontinued patient councils during the review period.  At the time of the site visit, SVSP-PIP had implemented patient satisfaction surveys regarding offsite specialty appointments only.

Patients reported that the patient mentor program was discontinued when the staff member that led it left the facility.  Patients had submitted a petition for the program to resume.

During the review period, there were 92 appeals.  There were 12 appeals in May 2019, ten in June 2019, 16 in July 2019, 14 in August 2019, 18 in September 2019, and 22 in October 2019.  Nearly half, or 42 appeals, were regarding health care, 27, or 29 percent, were institutional appeals and 23, or 25 percent, were staff complaints.  Thirty four percent, or 31 appeals, related to mental health.  Of those, 21 appeals, or 68 percent, were for treatment issues; four appeals

were complaints against a psychiatrist.  Fourteen of 23, or 61 percent, of staff complaints were regarding MTAs.

## XVII.  *COLEMAN* POSTINGS

Updated *Coleman* postings were displayed in all housing units.

## XVIII. LAUNDRY AND SUPPLY ISSUES

Laundry remained an issue at the facility.  The facility acknowledged its problem with adequate laundry service during the entrance meeting on December 3, 2019 and stated that there had recently been a reorganization of the reporting structure to involve the chief support executive supervising the hospital administrator in an effort to increase the available resources institution-wide.

## XX.  VISITATION/PRIVILEGES/TELEPHONE ACCESS

Visitation continued to occur on Thursdays and Fridays, with none on the weekends, thus making it difficult for visitation.  Further, if patients had visitors and programming at the same time, patients had to choose between the two.

There were no complaints regarding telephone access.

While patients had access to their personal property, SVSP-PIP reported difficulty with access to loaner crank radios during the review period and at the time of the site visit.  No reason was provided for the lack of access.

## XXI.  LAW LIBRARY ACCESS

SVSP-PIP reported that law library access continued to be primarily available via an electronic kiosk and acknowledged that qualified patient assistance for using the system was still a concern.  One primary clinician informed the monitor's expert that patients at the PIP were

often unable to use the library kiosk and that assistance had not been provided due to staffing shortages.

## XXII.  **EDUCATION**

The facility reported that the education department experienced serious difficulties with filling positions due to the minimum qualifications for librarian positions in CDCR.  According to the facility, the SVSP education department, custody staff, and health care PIP staff planned to revisit this issue in early 2020 to identify ways to come into better compliance with the Department Operations Manual Supplement on education access.

APPENDIX A5
CMF-PIP

**CMF-PIP**
December 3, 2019 – December 6, 2019

## I.    SUMMARY OF THE FINDINGS

- Institutional culture issues, physical plant limitations, and staffing allocation and/or vacancies severely limited the ability of CMF-PIP to deliver adequate treatment, clinical services, and programming to patients.

- There were ongoing significant functional vacancies among treating staff at CMF-PIP.

- CMF-PIP did not meet required staff-to-patient ratios in all units.

- CMF-PIP discontinued the practice of program holds that essentially confined patients to quarters during January 2019.

- The quality of IDTTs across the acute and intermediate programs varied from reasonable to inadequate.

- CMF-PIP did not consistently have all required attendees at IDTTs primarily because correctional counselors were not attending regularly.

- Treatment plans did not appear to routinely target the behaviors underlying the reason for placement outside of LRH as required except occasionally in the most general and vague ways.

- Some patients in the intermediate care program were not seen by their primary clinician or psychiatrist prior to IDTTs as required.

- In some IDTTs staff were apparently not aware of the requirements necessary to move from one STEP to the next.

- Data indicated that patients at the acute and intermediate levels of care at CMF-PIP were offered less structured therapeutic activities than was offered in EOP programs in the prisons, which was confirmed by interviewed staff and patients.

- The amount of out-of-cell structured therapeutic activities offered to acute care patients was inadequate.

- The lack of adequate physical plant space in the acute care program and insufficient escort officers to accompany patients to available treatment space on another unit, was a major limiting factor in access to adequate hours of out-of-cell structured therapeutic activities.

- Out-of-cell time provided to maximum custody patients was inadequate.

194

- CMF-PIP continued to struggle to adequately reflect the treatment that is offered to PIP patients because of staffing and management information system issues.

- Interviewed intermediate care patients requested more mental health treatment groups facilitated by clinicians.

- CMF-PIP management acknowledged that they could not increase intermediate treatment offered considering their staffing vacancies.

- Patients were regularly seen by psychiatrists and primary clinicians in the CMF-PIP.

- All clinical contacts did not occur in confidential settings as required.

- Providing individual treatment remained a challenge for CMF-PIP acute and intermediate care programs.

- Staff reported that the formal Dialectical Behavior Therapy (DBT) program had been suspended at the CMF-PIP primarily because of lack of trained staff.

- The CMF-PIP intermediate program implemented "DBT-informed" treatment in August 2019.

- CMF-PIP established a Positive Behavior Support Team (PBST).

- Observed DBT groups were well facilitated and assessed as adequate to good at incorporating DBT principles and practices.

- Substantial progress in individual behavior plans were observed when compared to the last site visit.

- Observed huddles in the acute and intermediate care programs were appropriate.

- On October 11, 2018 a statewide memo was issued directing PIP programs to ensure that all patients were provided access to their personal property.

- Due to physical plant and staffing limitations, the STEP program was not fully functioning in the PIP.

- Developing and implementing a serviceable and durable incentive system suitable for a correctional inpatient treatment program was essential for instituting workable STEP programs in the PIPs.

- Patients were admitted to the acute and intermediate care programs at CMF-PIP within timelines.

195

- On November 7, 2018, the CMF-PIP began using what it designated an "admission suite" as part of its admissions process by utilizing off unit space.

- The majority of discharges from CMF-PIP were administratively delayed following clinical discharges.

- A significant percentage (46 percent) of CMF-PIP's patients were housed above their LRH level.

- Custody staff was compliant with RVR training; mental health staff was noncompliant.

- Custody staff was compliant with use of force training; mental health staff was noncompliant.

- No controlled use of force incidents occurred at CMF-PIP during the review period.

- During the review period, CMF-PIP appointed a suicide prevention coordinator to begin training PIP staff in the statewide suicide prevention policies and procedures.

- The Suicide Prevention Committee in the CMF-PIP was in its early stages of development.

- CMF-PIP reported that it formed its SPRFIT subcommittee during the review period.

- The CMF-PIP Subcommittee was subsumed into the institutional Mental Health Program Subcommittee.

- The quality management process at CMF, which covered the CMF-PIP, was closer to the nature of quality assurance (QA) in contrast to a quality improvement (QI) process.

- Many patients complained during patient interviews that their cells were very cold; this information was shared with mental health staff.

- CMF-PIP provided both visitation and telephone privileges to its patients.

- Multiple patients complained regarding the lack of access to telephones, which was confirmed by staff.

- Timely access to property remained a problem within all care units based on patient and staff interviews.

- A myriad of issues regarding laundry and supplies were observed and reported at the CMF-PIP during the site visit.

196

II.    **CENSUS**

On December 3, 2019, the CMF-PIP operated 396 beds, 218 in the acute care program, and 178 in the intermediate program. Of the 218 acute care beds, staff reported that 13 beds on unit Q-3 were not opened to admission due to psychiatry staffing shortages. Of the remaining 205 beds, 195 or 95 percent were filled, three beds were on hold pending admissions, and five beds were available for admissions. No beds were redlined.

In the intermediate care program, 95 percent, or 169 of 178 intermediate care beds were filled; five beds were unassigned; two were held for patients out to court, one bed was held pending an admission, and one bed was redlined.

III.    **STAFFING**

    1.    **Administrative, Clinical, and Correctional Staffing**

On December 3, 2019, the positions of executive director, hospital administrator, and two program director positions were vacant and covered by staff in "acting" positions. The clinical administrator position was filled and "acting" in the executive director position. The medical director position was abolished. Three of the five program director positions, all four of the program assistant positions, and the nursing coordinator positions were filled.

Chief Psychiatrists: The chief psychiatrist position was filled.

Senior Psychiatrists: One of the two senior psychiatrist supervisor positions was filled for a 50 percent functional vacancy rate.

Psychiatrists: Nine of 28.1 established staff psychiatrist positions were filled, for a vacancy rate of 68 percent. Two full-time and one half-time on-site contractors and two tele-psychiatrists were utilized resulting in a 52 percent functional vacancy rate in psychiatry.

Chief Psychologist: The chief psychologist position was filled.

Senior Psychologists:  Three of the four senior psychologist specialist positions were filled, for a functional vacancy rate of 25 percent.  One senior psychologist specialist was covering as the "acting" clinical administrator and another as an "acting" program director.  All were licensed.

Psychologists:  Eighteen of the 27.5 established staff psychologist positions were filled, for a 35 percent vacancy rate.  With the use of one FTE contractor, the functional vacancy rate was 31 percent.  Nine of the 18 psychologists were unlicensed.

Supervising Social Workers:  The two supervising psychiatric social worker positions were filled; one served as "acting" program director.

Social Workers:  Twenty-one of the 27 clinical social workers were filled, resulting in a vacancy rate of 22 percent.  Two contract social workers provided additional coverage, resulting in a 15 percent functional vacancy rate.  Six of the 21 social workers were unlicensed.

Rehabilitation Therapists:  Twenty-four of the 27 rehabilitation therapist positions were filled, for an 11 percent functional vacancy rate.

Nurse Practitioners:  One of the four established positions were filled for a 75 percent vacancy rate.  With the use of one contractor, the functional vacancy rate was 50 percent.

Supervising Registered Nurses (SRNs):  Twenty-two of the 25 established SRN positions were filled, for a functional vacancy rate of 12 percent.

Registered Nurses (RNs):  Seventy-three of 76.2 established RN positions were filled, for a functional vacancy rate of four percent.

Senior Medical Technical Assistants (SMTAs):  For SMTAs, 26 of 39.1 established positions were filled, resulting in a functional vacancy rate of 34 percent.

<u>Medical Technical Assistants (MTAs)</u>:  Of the 217.1 established MTA positions, 141were filled resulting in a 35 percent functional vacancy rate.

<u>Psych Techs</u>:  Three of the 33 psych tech positions were vacant for a functional vacancy rate of nine percent.

<u>Licensed Vocational Nurses (LVNs)/Certified Nursing Assistants (CNAs)</u>:  Twenty-two civil service and 16 registry staff were hired as LVNs and CNAs to fill behind the phased-out MTA positions.

<u>Health Program Coordinator</u>:  The two allocated positions were filled.

<u>Correctional Staff</u>:  CMF-PIP reported that all its allocated correctional staff positions were filled.

<u>Medical Technical Assistants Transition</u>:  CMF-PIP reported that as part of its MTA transition plan, mental health and custody had had been given authority to fill mental health and custody positions in place of MTAs.  At the time of the site visit, mental health reported that it had hired 22 civil service and 16 registry staff in LVN/CNA positions.  Custody staff reported that they were in the process of hiring and planned to hire 86 custody officers to replace MTA positions.

## 2.    <u>Staff-to-Patient Ratios and the Adequacy of Clinical Staffing</u>

In the seven acute care program units, CMF-PIP met CDCR's established staffing ratio of 1:15 in one unit for psychiatrists and did not for the remaining six units.  For psychologists, six of the seven units did not meet caseload ratios.  Regarding social workers, four units met caseload ratios, while three did not.  For rehabilitation therapists, one unit met the ratio, and six did not meet them.

199

CMF-PIP did not meet their established ratio of 1:35 for psychiatrists in its intermediate care program in three of its five units, for psychologists in one of the five units and for social workers in two of its five units. All five intermediate care units met the ratios for rehabilitation therapists.

### 3.  **Staff Training**

The CMF-PIP clinical staff completed an initial round of IDTT training specific to inpatient units, which was provided by the Statewide Mental Health Training Unit between August 21, 2018 and Sept 6, 2018. A second round of IDTT training was in progress at the time of the site visit. Other trainings provided included the seven-hour SRASHE training, the safety planning intervention training, and SRASHE mentoring. The CMF-PIP also appointed a suicide prevention coordinator to begin training PIP staff in the statewide suicide prevention policies and procedures.

## IV.  **TREATMENT, CLINICAL SERVICES, AND PROGRAMMING**

The Department of State Hospital's (DSH) Administrative Directives were discontinued effective June 24, 2019, and CMF-PIP's policies and procedures were integrated with CDCR's for mental health and California Correctional Health Care Services (CCHCS) for nursing and allied services. At CMF-PIP, the practice of program holds (i.e., essentially confine to quarters) was discontinued during January 2019.

As reported in prior inpatient reports, CMF-PIP continued to face significant problems in both its acute and intermediate care programs during this review period. Institutional cultural issues, physical plant issues, and staffing allocation and/or vacancy issues continued to severely limit its ability to deliver adequate treatment, clinical services, and programming to its patients.

1.    **Interdisciplinary Treatment Teams (IDTTs)**

CMF-PIP continued to struggle with providing adequate mental health treatment because of multiple factors including staffing and physical plant challenges in both the acute and intermediate programs.  The quality of IDTTs across units in the two programs was variable from being reasonable to inadequate.

Acute Care Program

Acute care staff reported that most of the deficits in IDTT staffing were due to lack of correctional counselors although psychiatrists' attendance had also decreased because of staffing vacancies.  CMF-PIP had recently increased the number of correctional counselors to five, and their schedules were coordinated across units to provide complete daily coverage for regular IDTTs.  Staff indicated that the compliance drop during October 2019 was due to correctional counselors' mandatory training.  During November 2019, the attendance of psychiatrists was reported to improve significantly to 94 percent.

During the site visit, the monitor's expert attended IDTTs in unit S-2 and unit Q-3 (maximum custody).  All the observed IDTTs included the required multidisciplinary members.  Each of the IDTT's members were actively involved in the IDTTs, notably the psychiatrist in unit S-2.  Treatment plans were discussed except for patients who were waiting for an intermediate care bed.

IDTTs were also attended in the P-1 acute care unit.  The IDTT started on time and all required staff were in attendance.  Nursing and a musical therapist were also in attendance.  The primary clinician of one patient did not establish a case formulation/conceptualization that focused on the patient's current functional impairments or individualized goals to address the underlying cause of his anxiety and paranoia.  From the

presentation, the anxiety and paranoia were a safety and security concern and not due to a serious mental illness.  There was no acknowledgement of the patient's desire to discharge to the intermediate level of care nor discussion of any discharge plans at all.  The patient's history of MHCB admissions or higher level of care history was not discussed.  The number or types of RVRs were also not discussed along with the lack of information around out-of-cell activities including groups or yard.

During the unit P-1 IDTT, a patient asked the correctional counselor if he could have contact visit with his mother since other patients were allowed.  The correctional counselor explained that all visits in the acute level of care were non-contact visits and that contact visits only occurred in the intermediate level of care.  No other information was given by the correctional counselor and no other discipline spoke up.  The patient was then dismissed.

IDTTs were also attended on unit S-1; three patients were reviewed by the IDTT.  All the required disciplines were present but the IDTT process for at least two of the three patients was inadequate.

IDTTs for three patients were observed in unit Q-1.  All the required disciplines were present during the IDTT process.  Treatment and discharge plans were appropriately presented and discussed.

Intermediate Care Program

Multiple IDTTs were observed during the site visit.  The quality of IDTTs varied across units and by provider.  System to Encourage Progress (STEP) level and least restrictive housing (LRH) were rarely or never discussed unless prompted by the regional staff or in some cases by the monitor's expert.  Treatment plans did not appear to routinely target the behaviors underlying the reason for placement outside of LRH as required

except occasionally in the most general and vague ways (e.g., anger management).

Treatment team members did not spontaneously participate in discussion regarding the

patient's care as would be expected of functional and cohesive treatment teams.  In some

teams, certain members were actively engaged, while in others, members only spoke when

prompted.

In unit A-3, treatment was not discussed in specific detail with newly arriving

patients. One patient was told that he would meet with his primary clinician to discuss

group assignments at another time.  Neither patient was seen for their 72-hour IDTT or had

been seen by their primary clinician or psychiatrist prior to IDTT as required.

Consequently, IDTT was focused more on conducting assessments as part of the process

rather than discussing the treatment plan.  In one IDTT on unit A-3, the primary clinician

had indicated it was the discharge IDTT; the unit supervisor spoke to the patient about

discharge and the focus of IDTT was about discharging the patient to an Enhanced

Outpatient Program (EOP).

However, once the patient left the room, the psychiatrist ultimately stated that she

was uncomfortable discharging the patient.  With significant input and discussion from

regional mental health supervisory staff present as well as local leadership, the team finally

agreed to recall the patient to IDTT to discuss the decision to retain the patient for several

weeks more, make psychiatric medication changes, and review the patient's status for

discharge at the next IDTT.

The treatment team did not appear to function well as a cohesive unit, did not appear

to know what to do when internal disagreements occurred, and did not appear to benefit

from the unit supervisor's presence.  Later information indicated that this was not unusual

for that treatment team.  It was apparent that that treatment team would benefit from education, team-building exercises, problem-solving scenarios, and direct clinical supervision.

IDTTs in the High Custody Intermediate Treatment Center (HCITC) had all required members present; psychiatry was present through telemedicine.  While initially confusing to the telepsychiatrist, the communication was ultimately beneficial as many of the observed deficiencies were remedied in real time during the observation of IDTTs. Overall, the team appeared more cohesive and spoke the most about treatment progress and specific treatment groups to be included in the treatment plan.

IDTTs held in unit A-2 also included a telepsychiatrist but also had an on-site psychiatrist present as well.  The onsite psychiatrist was being moved somewhere else in the program and a psychiatric "hand-off" or transfer of cases was occurring.  This allowed for greater continuity of care and the telepsychiatrist was quite thorough with each patient. There were no technological issues with the telepsychiatrist, nor other issues as seen in HCITC.  The remainder of required team members were present, although the correctional counselor was not always the patient's assigned counselor because several counselors had been assigned to a rotating schedule of "covering" or attending counselors at IDTT. During A2 IDTTs, it was revealed that the treatment team was unaware that patients were expected to maintain 100 percent compliance with treatment attendance to remain at STEP 3 based on the CMF-PIP policy provided.  Another observed problem with implementation of the STEP system in IDTT in A2 was a patient who was determined to be STEP 2 by the primary clinician rather than by the IDTT as a whole.

2. **Group Therapy**

The amount of out-of-cell structured therapeutic activities offered to acute care patients was inadequate. The lack of suitable physical plant space in the acute care program and insufficient escort officers to accompany patients to available treatment space was a major limiting factor in providing access to adequate hours of out-of-cell structured therapeutic activities.

In the intermediate care program, unstructured activity had not been reliably tracked during the review period and was not reported. CMF-PIP management indicated they had a plan to remedy the tracking problem which had reportedly been impacted by the decision to eliminate the MTA positions. CMF-PIP reported that it planned to remediate that tracking problem as it transitioned units from MTA-staffed units to units staffed by nursing and correctional officers without MTAs.

Due to staffing and management information system issues, CMF-PIP continued to struggle to adequately reflect the treatment that is offered to PIP patients.

Acute Care Program

The vast majority of total treatment hours received in the acute care program was delivered by group therapy, with 65 percent of the groups being provided by recreational therapists. The average amount of group therapy offered per week during May to September 2019 was 4.9 hours per patient with a range of 4.5 (May 2019) to 5.4 (September 2019). The average amount of hours received during the period was 3.2 hours per patient with a range of 3.1 hours (May 2019) and 3.6 hours (September 2019). The average refusal rate was 1.7 hours per week.

In October 2019, the average hours offered was reported as 2.6 hours with an average of 1.8 hours attended, and 0.8 hours refused.  CMF-PIP indicated that the reported decrease in hours offered acute care patients did not reflect an actual decrease in treatment offered.  Staff reported that while treatment had occurred, the treatment had not been ordered in EHRS for two weeks (September 30, 2019 to October 14, 2019) due to shortage of scheduling resources and changes in unit staffing.  Paper tracking had been used for the first two weeks of the Fall group cycle.

During March 2018, the CMF-PIP began utilizing off unit treatment spaces in O-Wing, instead of using the dayrooms in the housing areas for group treatment.  Specifically, there were two group rooms used exclusively for acute care patients, but only for four hours per day due to custody staffing issues.

### Acute Care Program – Maximum Custody

 Since January 2019, the CMF-PIP had clustered acute care maximum custody patients in unit Q-3.  Individual treatment was provided in the interview room on the unit in a therapeutic module or in the dayroom while visibly in mechanical restraints because it did not have a therapeutic module.  Patients were also escorted to unit O-3 to use therapeutic modules in the unit's group treatment room for maximum custody treatment and leisure groups.  Additional escort officers were designated for programming off-unit activities.  However, the allocations remained inadequate to meet the needs.  The off-unit treatment area was available to maximum custody patients for 6.5 hours per day.  Even with this development, out-of-cell time provided to acute maximum custody patients was inadequate for reasons related to custody staff allocations and physical plant limitations.  The program was unable to provide data specific to treatment provided in treatment modules.

The eight programming modules in the maximum custody group room, while newly constructed, were not the *Coleman* approved modules and were not placed in semi-circular style as required. CMF-PIP reported that it had obtained compliant replacement modules from the California Health Care Facility (CHCF) and would be installing them after the site visit. Restart chairs and treatment tables were not used at the CMF-PIP.

Intermediate Care Program

CMF-PIP's structured therapeutic activities (STA) in its intermediate care program were comprised primarily of group therapy most frequently provided by recreation therapists who had varying skill sets (e.g., music therapist, rehabilitation therapist). Intermediate care maximum custody patients were housed in the HCITC and are included in the discussion below regarding group therapy.

The CMF-PIP intermediate care program continued to provide treatment groups in 12-week cycles with a one-week break between cycles. While the overall number of hours offered and attended had improved since the last review period, they remained below what would be expected even for EOP patients and far below what would be expected for an inpatient intermediate care program.

The average amount of group therapy offered per week during the review period was 8.03 hours per patient with a range of 7.3 (July 2019) to 8.5 (May 2019). The average amount of hours received during the review period was 5.3 hours per patient with a range of 4.9 hours (July 2019) and 5.8 hours (May 2019). The refusal rate was 34 percent with an average refusal of 2.7 hours per week per patient.

Interviewed intermediate care patients requested more mental health groups that focused specifically on their mental health diagnosis as well as symptoms, triggers, and coping.

While patients were generally positive about the treatment groups they participated in, some patients felt that the groups were too "shallow" and did not go to the proper depth their acuity required.  In addition, all patients requested more group treatment activity and more treatment groups with clinicians facilitating.

CMF-PIP management indicated that they were working on increasing intermediate care treatment offered but believed that they were providing as much as they could, given staffing vacancies at the time of the site visit.

Unstructured Activities

Based on data provided and information obtained from staff and patients, the amount of out-of-cell unstructured activities time offered to acute and intermediate care patients at CMF-PIP was inadequate.  Staff also indicated that the Non-Clinical Activity Tracking (NCAT) system did not accurately reflect the actual amount of unstructured activities being offered to patients on a regular basis because all unstructured activities time was not entered into NCAT by custody staff as required.

### 3.    **Individual Treatment**

Staff reported that on December 31, 2018, CMF-PIP began the Mental Health Primary Clinician model, which required assigning a social worker or psychologist to coordinate care for each patient in order to improve individualized treatment, treatment planning, and increased accountability for coordination and provision of the treatment plan.  Both disciplines were represented on each treatment unit in the acute care program.

Patients in several acute care units confirmed meeting with their primary clinician on a weekly basis, which usually took place in a private setting.  However, this finding varied

depending on the unit.  For example, staff on S-1 reported being unable to meet with patients weekly due to physical space limitations (i.e., not enough available office space).

There was significant variation among the acute care units regarding weekly clinical contacts between the primary clinicians and their assigned patients.  The major limiting factor appeared to be lack of office space, although mental health and correctional staff vacancies were significant contributing factors.  All weekly clinical individual contacts with the psychiatrists were also not occurring in confidential settings.

Like the acute care program, each patient in intermediate care was also assigned a primary clinician to develop and coordinate the patient's care plan with the other treatment team members.  However, providing individual treatment remained a challenge for the CMF-PIP intermediate care program.  While individual treatment was specifically discussed and planned in some treatment teams (e.g. A-3), the same was not the case in other treatment teams.  Patients in HCITC reported that they had been specifically told to submit a medical request form if they wanted to see their psychiatrist, psychologist, or social worker; the apparent implication was that they would not be seen weekly or with any regularity, but only on request.  While only a limited sample of records was reviewed, it did appear that individual treatment was occurring more frequently than during the preceding site visit, but that regular access to individual treatment remained insufficient.

### 4.    Psychiatric Services

In the acute care program, approximately six percent of treatment was provided through individual therapy.  Patients in the acute care program reported meeting with their psychiatrists weekly, although not necessarily in a confidential setting, due to vacancies and space limitations.  As reported above, patients in the HCITC indicated that they were

required to submit a medical request form if they wanted to see their psychiatrist. It was observed that some patients in IDTTs in intermediate care had not been seen by the psychiatrist prior to IDTT as required.

## 5. __Other Treatment Issues__

### A. Involuntary Medications (PC 2602)

CMF-PIP provided data regarding involuntary medications orders (PC 2602) for the period May 1, 2019 through October 31, 2019. There were 102 patients reported with PC 2602 orders within that timeframe, of which 82 patients or 80 percent were in the acute care program and 20 patients or 20 percent were in the intermediate care program. During the reporting period, two orders at the acute level of care were denied and eight were withdrawn or dismissed. At the intermediate level of care, two orders were denied.

### B. Behavioral Management

Dialectical Behavior Therapy (DBT)

Staff reported that the formal Dialectical Behavior Therapy (DBT) program had been suspended at the CMF-PIP for a variety of reasons, primarily because of lack of trained staff. The contract renewal for staff training took far longer than expected to be finalized. Consequently, staff indicated the infrastructure was not present for a "comprehensive DBT program unit." However, 30 additional staff had been trained in DBT, including all staff on unit A-3, the prior DBT unit. The CMF-PIP intermediate care program implemented "DBT-informed" treatment in August 2019 and the first full cycle was to be completed in December 2019 after the site visit.

As part of this effort, CMF-PIP had established a Positive Behavior Support Team (PBST) comprised of a psychologist, social worker, and rehabilitation therapist. During

the reporting period, 30 referrals were made to the PBST by treatment teams. Individual

behavior plans were written for 27 of these patients. After consulting their treatment

teams, behavior plans were deemed unnecessary for the remaining three patients.

Multiple treatment groups were observed during the site visit that utilized DBT

principles with varying degrees of success. One group observed was a DBT-informed

music therapy. While it may not have met all criteria for a DBT group, it did fulfill many

DBT expectations and was well facilitated, despite having a "covering" music therapist.

Other groups were similarly well facilitated and adequate to good at incorporating DBT

principles and practices. One of the goals of the DBT-informed treatment was to reduce

self-harm incidents.

<u>Individual Behavior Plans</u>

There were 30 referrals to the PBST during the review period with 27 of 30 or 90

percent, resulting in completion of an individualized behavior plan. It was noted by CMF-

PIP management that until more staff were allocated to the PBST, this was likely the

maximum of what the current team could provide.

Based on review of the completed plans, feedback provided during the preceding

site had been utilized to improve the plans. Overall, while there were still areas for

improvement, there was substantial progress in individual behavior plans when compared

to the last site visit.

Some areas for improvement remained despite overall progress. For example, the

reason for referral could benefit from further refining so that it would be more concise.

There was notable improvement in identifying a reasonable quantity of targeted behaviors

as previously suggested rather than overwhelming the staff and patient with a voluminous

plan filled with target behaviors.  Once the patient achieved success, that plan can be deemed successful and a subsequent plan for related target behaviors developed separately.

There was also substantial improvement in noting antecedents and behavioral warning signs prior to the target behavior.  Despite these improvements, it may be helpful for the behavior plans to be more concise and focused on the most relevant antecedent information to assist staff in refining their observation of the patient so that interventions would only be deployed at critical points in the behavioral chain.  In addition, the individual behavior plans would be improved by identifying antecedents with a closer temporal relationship to the target behavior, yet do not resemble the target behavior.  For example, if targeting physical aggression, treating staff ought not to wait until verbal aggression has been exhibited to utilize interventions.

There was an increased use of measurable goals which was a substantial improvement from the last review period.  Another significant improvement was the increased use of reinforcement rather than punishment.  However, patients would benefit from efforts to further identify individualized, salient (meaningful) reinforcers to incorporate into the plans. As has been observed at other CDCR sites, treatment providers were limited in their range of available reinforcers.

It would be beneficial for mental health and custody management at headquarters, regional, and the facility to collaborate with PBST staff to identify a broader range of reinforcers that would be available to use with each site's population where PBSTs exist. It would be expected that there would be great overlap, but that PIPs may require some items for reinforcement that an outpatient EOP may not require.  This will likely improve the program and benefit both staff and patients.

### C.  Huddles

Morning and afternoon huddles were attended during the site visit.  The mental health status, medications and treatment of each patient housed in the units were discussed with appropriate interaction from each discipline present.  Topics covered included medication compliance, missed psychotropic medications, referrals, quantity of out-of-cell time, group attendance, individual clinical contacts, along with other mental health related activities were discussed.  The acute care morning huddle in unit P-3 had all required attendees and for the intermediate care afternoon huddle in unit A-3, except for mental health clinicians who were attending a meeting with the monitor's experts, all required attendees were present.  The huddles were chaired by nursing.  Three patients prescribed Clozaril housed in unit A-3 (intermediate care program) were thoroughly discussed with their Medical Administration Records (MAR) present, checking to ensure all doses were timely given.

### V.      PATIENT ACCESS TO TREATMENT

#### Patient Orientation, Discretionary Program Status (DPS), and System to Encourage Progress (STEP): Standards and Procedures

The System to Encourage Progress (STEP) program at CMF-PIP that was used to manage patients had been initially implemented by the Department of State Hospitals (DSH) and revised by the CDCR in April 2019.[28]

On October 11, 2018, a statewide memo consistent with California Code of Regulations Title 15 was released directing PIP programs to ensure that all patients were provided access to their personal property.  As a result, patients' access to their property, packages and/or canteen which had previously been used as incentives in the STEP program was no longer available.

---

[28] Chapter 11: Psychiatric Inpatient Program, Section 2.12: System to Encourage Progress, revised April 18, 2019.

213

Discretionary Program Status (DPS) at CMF-PIP was ended by the Local Governing Body on August 29, 2019.

The STEP program remained in use in CMF-PIP at the time of the site visit pending the development and implementation of CDCR's proposed statewide STEP program. The acute care STEP program did not include any specific incentives, but incentives were permitted to be used as part of the patient's individualized treatment plan as determined by the IDTT. The incentives were not stated. Patients in the intermediate care program, including maximum custody, were permitted to earn unspecified incentives.

The numbers and percentages of patients at each STEP level in both the acute and intermediate care programs was not provided by CMF-PIP.

Acute Care Program

On admission to the acute care program, patients were placed in an Assessment and Orientation STEP to be clinically evaluated and oriented to the rules of the acute care program and their treatment expectations by the IDTT. In the Assessment and Orientation STEP, patients were permitted to participate in solo and/or group treatment activities as well as in-cell recreational activities based on the IDTT's assessment. The next step level decision was required to be made no later than at the seven-day IDTT and documented in the patient's treatment plan.

After Assessment and Orientation, the IDTT was to consider the patient's clinical and custodial factors, and if it was determined that they indicated a need for solo treatment, the patient would be placed at STEP 1. The IDTT was also required to design an individualized solo treatment program for that patient and document it in his treatment plan. In considering the solo treatment plan, the IDTT was also required to determine if the patient would program

214

with or without mechanical restraints or other security measures such as the use of a treatment module.

Successful participation in a solo treatment program and resolution of any clinical or custodial factors that had precluded programming with others as determined by the IDTT during Assessment and Orientation were mandatory requirements for each patient to move to STEP 2 from STEP 1.

Following the clinical evaluation and assessment of a patient's custodial factors during Assessment and Orientation, a patient could also move directly to STEP 2, bypassing STEP 1. Similarly, as in STEP 1, the IDTT was required to develop an individualized group treatment program for the patient and determine whether the patient would participate in group treatment with or without mechanical restraints or other security measures and document them in his treatment plan.

Due to the previously referenced physical plant and staffing limitations, the STEP program was not fully functioning as designed in the acute care program.

<u>Intermediate Care Program</u>

The CMF-PIP's intermediate care program also continued to utilize the STEP program inherited from DSH. While patients were provided their property as stated above, the intermediate care program continued to require patients to earn radios, television, and additional art, music, and recreational supplies as incentives as they moved through the STEP program.

As in the acute care program all patients admitted into the intermediate care program, began with Assessment and Orientation, and included three STEP levels: STEP 1, STEP 2, and STEP 3.

During the Assessment and Orientation, newly admitted patients were to be clinically evaluated and oriented to the rules of the unit/program as well as instructed about their treatment expectations. According to the policy, patients could participate in solo or group programming. In-cell recreational activities may also be provided. Progress was to be determined by the required ten-day IDTT.

STEP 1 also allowed for group or solo treatment activities, based on the patient's treatment plan. The primary goal was to transition patients into socialization and full implementation of the treatment plan. Incentives at this STEP included but were not limited to two colored pocket folders, full (100 percent) attendance at club activities, in-cell recreational activities, and game tournaments.

STEP 2 required 50 percent participation in treatment and compliance with any IDTT-specific criteria which may include criteria related to hygiene and room cleanliness, respecting the rights of others, medication adherence, appropriate social interaction, and compliance with rules. Incentives at this STEP included all incentives from STEP 1 and a certificate of accomplishment, state-issued radio, and eligibility for "patient of the month" and/or the patient council position of secretary.

STEP 3 required 80 percent participation in treatment, respect for the rights of others, and any IDTT-specific criteria. However, the IDTT was to also consider the patient's ability to recover from lapses in judgement without serious disruption and demonstrated motivation for treatment. Incentives at STEP 3 included all those provided at STEP 1 and 2. Additional incentives included a state-issued television, eligibility for weekly game participation and patient council positions of president and vice-president as well as movie/treat activity. Once established at STEP 3, the LOP indicated that the patient must maintain 100 percent

216

participation in treatment and have no disciplinary issues.  The IDTT was also to consider those factors previously described and the patient's leadership skills with peers.

 If a patient was moved between units or from another PIP, the receiving IDTT was to clinically assess the patient and retain the STEP level from the previous unit unless there were behavioral or custody concerns.

 The CMF-PIP staff indicated that they had difficulty establishing effective incentives since patients who have televisions or radios in their property were provided those items when provided with their other property removing them as effective incentives.  In addition to their personal property, patients at all STEP levels can access canteen and quarterly packages based on IDTT review, also removing them as effective incentives.

 It was apparent during the monitor's expert's review of the present STEP program and from discussion with CMF-PIP staff, that developing and implementing a functional and durable incentive system suitable for a correctional inpatient treatment program was essential for instituting workable STEP programs in the PIPs.

## VI.   REFERRALS AND TRANSFERS

 The data provided indicated that there were 436 referrals for acute care treatment at CMF-PIP, of which 434 or 99.5 percent were admitted within the ten-day Program Guide admission timeframe.  Regarding referrals to intermediate care, there were 288 referrals and all 288 were admitted within the 30-day Program Guide admission timeframe.

 Staff reported that during the review period six patients were clinically approved to be transferred from intermediate care to acute care due to decompensation prior to a referral being formally submitted.

217

CMF-PIP reported that the intermediate care program rejected 30 patients. Of those, nine were rejected based on the CMF-PIP's reviewing clinician's recommendation that they should be referred to acute care instead. Five were accepted after Coordinated Clinical Assessment Team (CCAT) or Inpatient Referral Unit (IRU) discussions.

## VII.    ADMISSIONS, DISCHARGES AND LEAST RESTRICTED HOUSING (LRH)

### 1.    Admissions

On November 7, 2018, the CMF-PIP began using what it designated an "admission suite" as part of its admissions process by utilizing off unit space.

As reported above, admissions to the CMF-PIP during the review period occurred within Program Guide transfer timelines. The average length of stay for patients in acute care at the CMF-PIP psychiatric program during the review period was 57 days, and for patients at the intermediate level of care, the average length of stay was 144 days.

### 2.    Discharges

During the review period, 186 patients discharged from CMF-PIP acute care. Of the 186 discharged patients, 151 or 81 percent were administratively delayed following clinical discharge with a range of ranging of one to 38 days. Reasons for administrative delays were not provided by CMF-PIP.

CMF-PIP's intermediate care program discharged 169 patients during the review period. Of the total number of patients discharged from the intermediate care program, 139 or 82 percent were administratively delayed following clinical discharge with a range of one to 15 days. Similar to the acute care program, the reasons for administrative delays were not provided by CMF-PIP.

## VIII.   LEAST RESTRICTIVE HOUSING

CMF-PIP reported that as of December 3, 2019, 89 patients were housed above their least restrictive housing (LRH) level; 64 patients with lower LRHs were housed in single cells and 25 patients with unlocked dorm LRHs were housed in locked-dorm settings.

## IX.   PATIENT DISCIPLINARY PROCESS

During the review period, 112 RVRs were adjudicated, including 99 or 88 percent in the acute care program and 13 or 12 percent in the intermediate care program.  The monitor reviewed a sample of 12 adjudicated RVRs, six from each program.  It was observed that the institution referred three RVRs to the district attorney for possible prosecution.

Requests by custody staff for mental health assessments in the reviewed RVRs were timely.  Completed mental health assessments in nine of the 12 reviewed cases were timely returned to custody staff.

In all cases reviewed, patients were appointed a staff assistant as required by their levels of care.  In the sample, senior hearing officers found patients guilty of the reported infraction and assessed the maximum loss of credits in 11 or 92 percent of the violations reviewed and reduced only one or eight percent of the violations to a Counseling Chrono. Clinicians recommended mitigation regarding privileges in the reviewed cases.  Senior hearing officers documented mitigation where it occurred and elected to mitigate by limiting reduction in privileges while imposing maximum loss of credit.

According CMF-PIP, 63 percent of clinical staff had completed training regarding mental health assessments as part of the RVR process.  Ninety-eight percent of required custody staff completed mandatory training on the disciplinary process.

## X.    USE OF FORCE

CMF-PIP reported 26 immediate and no controlled use of force incidents during the review period.  Twenty-three or 88 percent of the use of force incidents occurred in the acute care program and three or 12 percent took place in the intermediate care program.  The monitor reviewed six or 26 percent of the use of force incidents that occurred during the review period and found that in each the use of force policy was followed and the required supervisory review occurred timely.  Also, where corrective action was indicated, such action was taken and documented.

Seventy percent of CMF-PIP clinical staff and 99 percent of custody staff were compliant with use of force training.

## XI.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

There were 442 serious incident reports (SIRs) completed during the review period, of which 284 were identified as self-injurious behavior.  The other reported incidents consisted of aggressive acts towards staff, swallowing objects, and property damage.

There were no incidents documented as suicide attempts during the review period.

## XII.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

CMF-PIP had restraint and seclusion rooms established in all its units.

Seclusion and restraint logs and cells were reviewed in acute and intermediate units; documentation was missed in multiple logs.  Staff reported that the logs were checked daily.  The nursing supervisor reported that the missed documentation was due to staff shortages and changes in line and supervisory staff.

220

There were three restraints documented for the reporting period.  All three restraints were due to danger to self; all related orders and procedures were appropriately documented.

## XIII.  SUICIDE PREVENTION

The CMF-PIP indicated that it had appointed a suicide prevention coordinator to begin training CMF-PIP staff regarding the statewide suicide prevention policies and procedures.  CMF-PIP also reported that it formed its SPRFIT subcommittee during the review period.  The first meeting of the subcommittee was held on October 22, 2019.  The subcommittee elected to meet every two weeks, rather than monthly, for approximately six months.  The CMF-PIP subcommittee will report to the institutional level SPRFIT committee.

The first SPRFIT report was completed on November 11, 2019.  The report included data from two new but ongoing monthly audits: (i) compliance with SRASHE timelines and (ii) quality of SRASHEs.

According to staff, the plan was for the SPRFIT report to eventually incorporate all applicable responsibilities outlined in the departmental memo "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" dated February 2, 2018.

In addition, staff reported that two local quality improvement plans (QIPs) had been established by the SPRFIT committee: (i) compliance with timelines for admission SRASHEs and (ii) the use of mental health consult orders.

Five separate QIPs were established for CMF-PIP in a suicide report completed at the time of the site visit.  The patient had died by suicide at another institution

several months after discharge from the CMF-PIP. The response to the suicide report was due December 2, 2019, and identified the following QIPs:

1. Create a local policy that provides for requesting past treatment records.

2. Ensure staff have taken the updated SRASHE and SPI training, audit the quality of SRASHEs, and provide training, as necessary.

3. Train local staff to assign substance use diagnoses as indicated and incorporate related interventions into the treatment plan.

4. Create an LOP that address documenting justifications of observation and issue.

5. Train staff to make clinician-to-clinician contact and to recommend treatment interventions that are attainable.

CMF-PIP reported that no quality improvement teams related to suicide prevention were chartered during the review period.

## XIV.  EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1. Emergency Response

The Emergency Medical Review Response Committee met as required by the institution's policies and procedures. The committee reviewed documentation regarding the institution's system surveillance items including emergency response vehicles, carts bags, and defibrillator performance tests. In addition, it examined drills documentation including the required monthly didactic drills for all watches, the quarterly hands-on simulation drills, and the annual institution-wide hands-on simulation drill.

### 2. Death Review Process

CMF-PIP reported that there were no deaths during the reporting period.

## XV.    QUALITY MANAGEMENT AND UTILIZATION REVIEW

At the time of the site visit, it was observed that the quality management process at CMF, which covered the CMF-PIP, was in the early stages of implementation.  The focus of the quality management process during the review period and at the time of the site visit was closer to the nature of quality assurance in contrast to a quality improvement process.

A local governing body meeting occurred during July 9, 2019 (second quarter).  A quorum was present, and the minutes provided a comprehensive summary of the meeting.  The agenda covered multiple policies and procedures, operations which included quality improvement, the *Coleman* review, each health care program (medical, mental health, nursing, dental, pharmacy, allied health care), utilization management and infection control.  Although the meeting had been held, minutes for the third quarter meeting had not been approved at the time of the site visit and were not available for review.

CMF-PIP did not hold PIP subcommittee meetings during the month of June and July due to transition to the mental health program subcommittee reporting structure which was integrated with the CMF-PIP subcommittee into the institution's mental health program subcommittee.  The key indicators addressed by the mental health program subcommittee regarding the PIP during the monitoring period included IDTT staffing; percentage of IDTTs attended by all required staffing; treatment hours; average weekly offered treatment; NCAT; average weekly out-of-cell non-clinical activity offered; suicide risk evaluations; and percentage of SRASHEs completed on time.

The Suicide Prevention Committee at CMF-PIP was in an early stage of development at the time of the site visit.

The monitor's expert attended the institution's Quality Management Executive Steering Committee during the site visit. The Utilization Management Committee, Mental Health Committee/PIP Subcommittee, and the Performance Improvement Committee were represented.

CMF's chief of psychiatry chaired the utilization management committee.  The committee met twice a week.  Utilization review nurses conducted the utilization reviews of all CMF-PIP patients out of their LRH.  The reviews occurred for acute care patients after 30 days and for intermediate care patients after 180 days.  The utilization review nurse reported an excellent relationship with psychiatrist and utilization review nursing.  Barriers to completing timely reviews were the delayed continuous stay record (CSR) report from primary clinicians. Staff reported that some CSRs were submitted between seven to ten days causing delays in the utilization review process.  However, most were provided between one to three days.

The mental health program subcommittee chair reported that the PIP subcommittee and the mental health program subcommittee were now combined.  The chair was working on formal policy and procedures to ensure compliance with reporting guidelines and attendance.

## XVI.    PATIENT COMPLAINTS/PATIENT SATISFACTION

Many acute and intermediate care patients complained during patient interviews that their cells were very cold.  This information was shared with mental health staff.

Multiple patients complained regarding the lack of access to telephones, which was confirmed by staff, particularly in the HCITC. The CMF-PIP staff agreed to re-examine the practice of scheduling phone time so that it would not conflict with times when a patient's family members worked.  In the HCITC, patients reported they were not provided a chair for calls as they had been in other units, making it uncomfortable.  As a result of these expressed

concerns, the regional mental health and custody compliance staff, as well as CMF-PIP management staff began to work on increased and equal telephone access across units, based on custody level.

Timely access to property remained a problem within both the acute and intermediate care programs based on patient and staff interviews. Since March 5, 2019, patients in the CMF-PIP program were supposed to receive their personal property as part of a standardized process for packages, canteen, and property. However, patients reported that there continued to be significant delays (weeks to months) for many patients to actually receive their property. CMF-PIP's management indicated they had already identified that as an ongoing issue and was in the process of devising a remedy at the time of the site visit, including instituting a process to monitor and correct the issue.

The monitor's expert did not collect information regarding patient appeals and satisfaction surveys during the site visit.

## XVII. _COLEMAN_ POSTINGS

_Coleman_ notices in both English and Spanish continued to be posted in areas accessible by patients in all CMF-PIP units.

## XVIII. LAUNDRY AND SUPPLY ISSUES

A myriad of issues regarding laundry and supplies were observed and reported at the CMF-PIP in five of the six acute and intermediate care units toured during the site visit. Clean clothing was made available for inmates after showers. No extra clothing was kept in the rooms of acute or intermediate care patients. Only a single acute maximum custody unit was observed to have an adequate quantity of laundry and supplies.

Laundry for the entire facility was done offsite.  Staff reported that in multiple cases, what was returned did not match what had been delivered, resulting in shortages of specific kinds and sizes of laundered items.  Several of the units reported clean laundry orders were often missing necessary articles of clothing for patients.  As a result, some patients refused to exchange their clothing, opting to launder them in the room with a regular schedule for exchanges.

In acute care units visited, there was not a formal or regular process for the exchange of bed linens, and staff indicated it was challenging to replace soiled or damaged non-tear bed linens.   It was reported to be similarly difficult to obtain smocks for patients who exhibit suicidal behaviors.  When necessary, staff attempted to obtain them from the laundry room if open, or other units if possible.  In an emergency, staff had the ability to contact the control center for after-hours access to the laundry room.

The laundry storage rooms observed were generally disorganized or in disarray. Laundry supply closets were also observed to have limited stock, with extra clothing observed often in larger sizes such as 2XL and 3XL.

A large supply of sheets, blankets, and towels were observed in the supply closet in the HCITC, while noticeably missing from other units.  A box with a limited supply of transgender clothing was also observed in the HCITC.

Severely limited quantities of personal hygiene supplies were observed on units visited.   Liquid soap for showers was the one product delivered weekly to each unit and there was generally a sufficient supply in each of the units.  The remaining personal hygiene supplies were ordered monthly by the nursing staff in each unit.  Staff reported that the supplies which were in limited quantities or not available on most housing units included,

toothpowder, toothbrushes/finger brushes, deodorant, combs, toilet paper, and bars of soap for hands in patient cells.

Staff acknowledged significant challenges in maintaining a sufficient stock of supplies and agreed that the process in place for maintaining personal hygiene supplies on the units was not working. During the site visit, a DAI representative informed the monitor's team that supplies had been delivered to the units overnight.

## XIX.    **VISITATION/PRIVILEGES/TELEPHONE ACCESS**

The CMF-PIP provided both visitation and telephone privileges to its patients.

Access to visitation was determined by IDTT and the team completed a visitation memorandum that was provided to custody officers and documented in the EHRS. A correctional counselor was required to screen for enemy concerns as well. Length of visits were limited to one hour for local visitors and two hours for visitors that traveled 250 miles or further. Maximum custody patients were only allowed non-contact visits.

Patients on one-to-one observation or suicide precautions were not allowed to participate in visitation. Policy and procedure required patients to submit to an unclothed body search in the patient's cell upon return to the unit. Visitation issues reported at the time of the site visit included limited length of visits due to the physical plant limitations/accommodations and the lack of custody staff available for escorting during visits.

There were telephones for patient use on each of the CMF-PIP units. Telephone access was built into the unit schedule and access was not necessarily differentiated for work and privilege group differences. Patients were allowed fifteen-minute phone calls.

California Regulation Title 15 and decisions of the IDTT as clinically indicated, governed privileges, including personal property of patients.

227

## XX.    LAW LIBRARY ACCESS

There was one senior law librarian responsible for library services for the entire institution including the PIP.  Staff reported that two additional employees were in various stages of hiring and a second senior law librarian was out on extended leave.

The law library was open Tuesday through Saturday with varying hours each day. Visits to the library were limited to two hours, which would increase with additional staff.

Three library kiosks were situated in the PIPs; two were in acute units and one was in the HCITC.  The kiosk in unit P-1, an acute care unit was not working.  The kiosk in the HCITC was in the community room but could not be observed because IDTTs were occurring.

The law librarians were responsible for maintaining law library kiosks located in units. The senior law librarian reported that staff was aware that the kiosk in unit P-1 was broken but stated that all others in the institution were working properly.  The librarian reported the kiosk in P-1 had been repeatedly repaired, but it was consistently unplugged by custody staff causing it to fail and a new one had to be ordered.

There were an additional eight kiosks in the library placed inside therapeutic treatment modules designated for use by administrative segregation patients, who were locked in them during visits to the library.  Maximum security custody patients were not allowed to visit the library, but requests from them were managed through the library paging system.

<u>APPENDIX A6</u>
CMF L1-PIP

**CMF L1-PIP**
March 2020 – Paper Review
Review Period – August 1, 2019 – January 31, 2020

## I.    SUMMARY OF THE FINDINGS

- CMF L1-PIP was monitored by document review due to the COVID-19 pandemic.

- The census was 53 patients.

- The overall staffing functional vacancy rate was 22 percent.

- Psychiatrists, psychologists, social workers, and recreation therapists were within staffing ratios.

- Required participants attendance at IDTTs was over 90 percent.

- CMF L1-PIP reported that 82 percent of psychiatric and 60 percent of initial primary clinician contacts were timely.

- Patients' average of both structured and unstructured out-of-cell activities offered during the review period was 11.18 hours, of which 6.2 hours were refused and 1.16 hours were cancelled.

- During the review period, the CMF L1-PIP admitted 88 patients and discharged 87 patients.

- At the time of the document review, 22 patients were housed out of their LRH.

- Patients filed 23 appeals during the review period.

- Property issues persisted in the CMF L1-PIP.

## II.    CENSUS

On March 18, 2020, the CMF L1-PIP had a census of 53 patients, including one patient who was out to court. The average length of stay on that date was 93 days, with a range of four to 315 days.

III.    **STAFFING**

1.    **Administrative and Clinical Staffing**

At the time of the review, the chief psychologist and program director positions were filled.  The program assistant position was vacant.

Senior Psychiatrists:  The senior psychiatrist position was filled.

Psychiatrists:  Two registry psychiatrists filled 2.5 FTE positions, resulting in a 20-percent functional vacancy rate.

Senior Psychologist Specialist:  The .4 FTE senior psychologist specialist position remained vacant.

Psychologists:  Two psychologists filled 2.5 FTE positions, resulting in a 20-percent vacancy rate.

Social Workers:  Two social workers filled 2.5 FTE positions, resulting in a 20 percent vacancy rate.

Recreational Therapists:  All 2.5 recreational therapist positions were filled.

Registered Nurses (RNs):  A total of 13.16 of 14.16 FTE RN positions were filled resulting in a 7.06 percent vacancy rate.

Licensed Vocational Nurses (LVNs):  All 7.08 FTE LVN positions were filled.

Senior Psych Techs:  All five senior psych tech positions were filled.

Psych Techs:  A total of 22.86 of the 31.86 psych tech positions were filled, leaving a 28.25 percent vacancy rate.

2.    **Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

The program met the 1:30 staffing ratio for psychiatrists, psychologists, social workers, and recreational therapists.

IV.    **TREATMENT, CLINICAL SERVICES, AND PROGRAMMING**

1.    **Interdisciplinary Treatment Teams (IDTTs)**

Information provided indicated greater than 90 percent compliance with the necessary IDTT participants, including correctional counselors. This was an area of improvement since the last visit.

2.    **Group Therapy**

During early 2020, reporting of the hours offered of structured and unstructured out of cell activities was changed; the previously reported information included structured, unstructured and cancelled activities in the grand total of average hours.  This reporting resulted in the appearance that the average hours for structured and unstructured offered hours met the 12-hour requirement, when this was not the case.  Subsequent documents provided since January 2020 included separate reporting of average hours of structured and unstructured hours, and a separate category for average hours cancelled, eliminating the combination of these categories in the determination of the total of hours.

The average of structured and unstructured out of cell activities offered during the review period was 11.18 hours; 6.2 hours were refused, and 1.16 hours cancelled.  The reasons for cancellations were primarily custodial, with the exception of the month of December 2019, when cancellations for nursing reasons slightly surpassed custody.  The reasons for cancellations were varied, including custody training, staff shortages, alarms and emergencies, maintenance, lockdowns, and unspecified reasons.  It was unclear from the documents provided why the refusal rate for out-of-cell activities was greater than 50 percent, which was concerning.

3.    **Individual Treatment**

Initial psychology contacts and SRASHEs were completed timely only 60 percent of the time.  Initial social worker assessments were timely 88 percent of the time.  Initial recreation therapist contacts were timely 89 percent of the time.  History and physicals were reportedly timely completed 100 percent of the time.

4.    **Psychiatric Services**

The institution reported that 82 percent of initial psychiatric contacts were timely.

5.    **Other Treatment Issues**

    A.    **Involuntary Medications (PC 2602)**

There were no PC 2602 petitions initiated, denied, withdrawn, or pending during the monitoring period or at the time of review.  One petition was renewed during January 2020.

    B.    **Maximum Custody Patients**

There were 27 instances of maximum custody placement during the review period.  During the teleconference held prior to commencement of the paper review, the staff reported that maximum custody patients were primarily those patients who were placed on maximum custody status during their hospitalization, requiring transfer to another facility for treatment.

V.    **PATIENT ACCESS TO TREATMENT**

**Patient Orientation, Discretionary Program Status (DPS), and Stages:
Standards and Procedures**

CMF L1-PIP discontinued the use of DPS in programming during August 2018.

VI.    **REFERRALS AND TRANSFERS**

During the review period, there were 115 referrals to CMF L1--PIP.  The institution rejected 17 patients.  Five referrals were rescinded, four patients were re-endorsed to another program, and one patient was rejected and re-endorsed.

## VII.    ADMISSIONS AND DISCHARGES

### 1.    Admissions

There were 88 patients admitted into the CMF L1--PIP during the review period.

### 2.    Discharges

There were 87 patient discharges during the review period.  Of those, 41 patients

discharged to an EOP, one patient discharged to a correctional clinical case management (3CMS)

program, 17 patients transferred to acute care, 14 patients transferred to single-cell intermediate

care units, 12 patients transferred to DSH-Atascadero, and two patients paroled.

## VIII.    LEAST RESTRICTIVE HOUSING

On March 18, 2020, 22 patients were housed outside of their least restrictive housing

(LRH) designation.  Review of documentation indicated consistent review in IDTT regarding

transfer to LRH, as well as patient referral unit supervision and input, including at times CCATs.

Several patients were in the process of referral to their LRH which was delayed due to lack of

bed availability for unlocked dorms or preparation for their discharge to EOP.  Some patients had

newly arrived at the unit, and further observation was indicated prior to referral and transfer to

LRH.  Reviewed treatment planning indicated that treatment goals were identified to prepare for

transfer to LRH.  Rationales for placement out of LRH were for acceptable clinical or discharge

reasons.

## IX.    PATIENT DISCIPLINARY PROCESS

The institution provided a list of all RVRs issued to patients in Facility A, which included

CMF L1-PIP patients.  Facility A also included several other housing units.  The report indicated

that 59 RVRs were issued to inmates and patients in Facility A during the review period.  The

institution provided a copy of six adjudicated RVRs, all of which were issued to patients in the

CMF L1-PIP.  The RVRs were issued for unauthorized property, altered TV, battery on a prisoner, possession of alcohol, assault on a peace officer, and disrespect which could lead to violence.

Custody sent the mental health assessment request to mental health staff in a timely manner in one of six cases, or 17 percent of the time.  The range of days overdue was one to four days.  Mental health completed the mental health assessment and returned the form to custody staff in a timely manner in five of six cases, or 83 percent of the time.  The one overdue case was late by one day.

The senior hearing officer documented consideration of the mental health assessment information in five of six cases, or 83 percent of the time.  In the one RVR in which the senior hearing officer did not document consideration, the senior hearing officer quoted the mental health assessment response to the question without stating their consideration.  Mitigation of penalties were documented in four of six RVRs where the mental health assessment recommended mitigation, or 67 percent of the time.  In the two RVRs in which the penalty was not mitigated, the senior hearing officer mitigated penalties not recommended on the mental health assessment.

## X.    USE OF FORCE

There were two immediate use of force incidents during the review period.  There were two uses of physical force and one use of oleoresin capsicum spray.  Physical force was used to stop a fight between two patients and during a resisting a peace officer incident.  The use of oleoresin capsicum spray was during the two-patient fight.  The use of force was in compliance with CDCR policy and procedures.

## XI.  UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

The institution did not provide any unusual occurrences for the review period.

## XII.  USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINTS

There had been no documented restraint usage in the CMF L1-PIP since the opening of the unit.

## XIII.  SUICIDE PREVENTION

Based upon the information provided, several rooms (134, 135, 136, and 137) were utilized for suicide monitoring, as well as temporary placement of maximum custody inmates, and "time-out."  There were 25 incidents of suicide watch during the review period, 12 incidents of suicide precautions, 12 instances of time-out and two alternative housing placements.

## XIV.  PATIENT COMPLAINTS/PATIENT SATISFACTION

There were 23 patient appeals filed during the review period.  Fifteen or 65 percent were for property related issues, three were related to funds, three were related to staff complaints and two for other issues.  One appeal was withdrawn by the patient, four were rejected for failure to provide a document, one was partially granted, and 17 were pending response.  The issue of property complaints has been a concern since the opening of CMF L1-PIP.   Even after the issuance of a CDCR memorandum (dated October 11, 2018, "Inmate Patient Property in the Psychiatric Inpatient Program") establishing a procedure for the transfer and issuance of property to mental health patients in CDCR inpatient beds, the situation remained unchanged.

## APPENDIX A7
CHCF-PIP

**CHCF-PIP**
September 17, 2019 – September 19, 2019

I.    **SUMMARY OF FINDINGS**

- Staff psychiatry vacancies at CHCF-PIP were significant.

- The severe psychiatric shortages in the CHCF-PIP resulted in the emergency use of telepsychiatry.

- Functional vacancies for staff psychologists and social workers were 21 percent and 18 percent, respectively.

- The functional vacancy rate for psych techs was 14 percent and 16 percent for rehabilitation therapists.

- CHCF-PIP was having difficulty meeting clinical staffing ratios for psychiatrists in acute and intermediate care units, and for psychologists, social workers, and rehabilitation specialists in acute care units.

- Units had implemented local practices that were not consistent with policies and procedures, which were often based on a lack of understanding of the relevant policies and procedures. For example, all new intakes were placed on orientation cuff-status until they were reviewed at ICC or UCC.

- Attention to LRH was not consistent in IDTTs, especially given the high number of patients residing outside their least restrictive housing level.

- All appropriate personnel attended observed IDTTs.

- Observed IDTTs were generally lacking in discussion of treatment goals, treatment planning, treatment interventions, case conceptualization, discussion of suicide risk and safety planning.

- The treatment being offered to patients in the acute care program was below the standard of care for an inpatient setting and was significantly less than the treatment being provided to mainline EOP inmates.

- IDTT recommendations included the transfer of CHCF-PIP patients to an EOP where a patient would receive significantly more treatment.

- Maximum custody patients had access to one hour a week of structured or non-structured therapeutic activities.

- The use of "Tortilla Status" was identified and discontinued during the site visit due to being clinically inappropriate.

- Review of the high refusal list indicated that during August 2019, about 300 acute care patients refused to attend 100 percent of all treatments offered.

- PIP leadership acknowledged that while they had a STEP program, it was not functional on any unit.

- Patients in both acute care and intermediate care waited an average of 8.5 days after clinical discharge before leaving their inpatient beds.

## II.    CENSUS

The CHCF-PIP had a bed capacity of 514, 214 acute care beds and 300 intermediate care beds. There were 60 beds designated as swing beds. On September 17, 2019, 201 or 94 percent of acute care beds were filled, and 284 or 95 percent of the intermediate care beds were filled. A high number of patients were residing outside their least restrictive housing (LRH) level. There were 105 maximum custody patients; 44 were in acute care and 61 in intermediate care.

## III.   STAFFING

### 1.    Administrative, Clinical, and Correctional Staffing

The executive director, clinical administrator, hospital administrator, medical director, program director, three program assistants, and three nurse coordinator positions were all filled. The chief psychiatrist position was also filled. The chief psychologist position was vacant.

Senior Psychiatrists:  One of two senior supervising psychiatrist positions was filled. Both established senior psychiatrist positions were vacant.

Psychiatrists:  Of 33 staff psychiatrist positions, 15 FTE positions were filled, leaving a 55 percent vacancy rate; four additional positions were filled by contractors, for a functional vacancy rate of 42 percent.

Senior Psychologists:  The two established senior psychologist supervisor positions and

two established senior psychologist specialist positions were vacant.

Psychologists:  Of 29 staff psychologist positions, 21 were filled leaving a 28 percent vacancy rate; two positions were filled by contract staff, bringing the functional vacancy rate to 21 percent.

Supervising Social Workers:  The two supervising social worker positions were vacant.

Social Workers:  Of 33 social worker positions, 27 were filled leaving an 18 percent vacancy rate.

Supervising Rehabilitation Therapists:  Two of three supervising rehabilitation therapist positions were filled, leaving a 33 percent vacancy rate.

Rehabilitation Therapists:  For rehabilitation therapists, 24 of 32 positions were filled, leaving a 25 percent vacancy rate.  Registry staff filled three additional positions, for a 16 percent functional vacancy rate.

Supervising Registered Nurses (SRNs):  Of 23 supervising registered nurse positions, 21 were filled, for a nine percent vacancy rate.

Registered Nurses (RNs):  For registered nurse positions, 168 of 174 were filled, leaving a three percent vacancy rate.  Registry staff filled two additional positions, leaving a two percent functional vacancy rate.

Certified Nursing Assistants (CNAs):  CHCF-PIP utilized 31 contract CNAs.  The CNAs were used to fill vacancies for 1:1 observation and to support telepsychiatry.

Senior Psych Techs:  Of 37 senior psych tech positions, 36 were filled, leaving a three percent vacancy rate.

<u>Psych Techs</u>:  There were 395 psych tech positions, 336 were filled, leaving a 15 percent vacancy rate; contract staff filled an additional three positions, and an additional position was filled by a pre-licensed psych tech, leaving a 14 percent functional vacancy rate.

<u>Correctional Staff</u>:  Of the 99 established custody staff positions, 98 of 99 were filled.

<u>Mental Health Primary Clinician Model</u>

According to a memorandum dated May 15, 2019, psychologists and social workers no longer performed separate duties in accordance with their specific discipline.  The CHCF-PIP had implemented a mental health primary clinician model, resulting in both disciplines functioning more as case managers similar to outpatient care.  While observing IDTTs, there were psychologists and social workers who complained about the model and noted that their chains of command had become more confusing.  Each mental health primary clinician had their own caseload according to staff, whereas patients previously received treatment from psychologists and social workers.  In the IDTTs observed on the maximum custody units, the social worker and psychologist were both present for treatment planning.  It was unclear how this change would impact the delivery of treatment.

**1.      Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

CDCR's established clinical staffing ratios in the CHCF-PIP were 1:15 for acute care and 1:35 for intermediate care.  In the acute care program, clinical staffing ratios were not always being met for psychiatrists, psychologists, social workers, and rehabilitation specialists, with each carrying caseloads as high as 30, 21, 26, and 28 patients, respectively.  The caseloads for intermediate care were mostly being met, except for psychiatry, where the highest caseload was 1:45.

**3.**    **Staff Training**

According to training records, 100 percent of custody and 94 percent of nursing staff were currently certified in CPR.  In addition, 100 percent of custody staff, 83 percent of medical staff, and 75 percent of mental health received in-service training (IST) suicide prevention training during the previous 12 months.  As of August 2019, 78 percent of mental health clinicians had completed the Suicide Risk Evaluation (SRE) mentoring program, 92 percent had received the seven-hour SRASHE training, and 89 percent had received safety planning intervention (SPI) training.

**IV.**    **TREATMENT, CLINICAL SERVICES, AND PROGRAMMING**

The organizational structure within each unit, from a clinical decisioning making perspective, was nebulous.  Each unit had a program director position, which was filled by a psych tech.  According to mental health leadership, the responsibility for clinical accountability was shared by all clinicians, which essentially resulted in no one being in charge.  Central office staff, along with local leadership, were in the process of formulating both short-term and long-term remedies to the above problem.

**1.**    **Interdisciplinary Treatment Teams (IDTTs)**

Acute Care Program

IDTTs were observed for three acute care patients in Unit B2A and five acute care patients in Unit B2B.  Three of the patients were on cuff status as part of the orientation process.  Staff indicated that the patients' cuff status would be reviewed in approximately ten days via the UCC process.  All required disciplines attended the IDTTs.  There was sparse reference to treatment plans and at least one patient had not been assessed by treatment team members prior to the IDTT.

Intermediate Care Program

Additional IDTTs were observed for three intermediate care patients in Unit 5B.

Psychiatry was covered by telepsychiatry; however, the telepsychiatrist was unable to attend the

first IDTT due to a lack of electricity at San Quentin State Prison, where his office was located.

This telepsychiatrist began working on Unit 5B approximately two weeks prior to the visit,

solely covering 5B.  Prior to this, psychiatric coverage involved two on-site psychiatrists who

also had responsibilities on other units at the facility.  Staff unanimously reported that the on-site

psychiatrists were less responsive to staff requests due to competing responsibilities and that

coverage was inconsistent.  They reported that the telepsychiatrist had been responsive and

available.  The use of telepsychiatry in this inpatient intermediate care unit appeared to be based

upon the severe lack of psychiatric coverage at the CHCF-PIP and was utilized due to the

emergency nature of the psychiatric shortages.

During the observed IDTTs, there was discussion of LRH.  Treatment goals were not

discussed in detail; two of the three patients were new arrivals to the unit after transferring from

acute care, and one was transferring to his LRH at DSH-Atascadero.  Clinical staff reported that

there were difficulties in completing clinician-to-clinician contact with transfers from the acute

care unit.  The telepsychiatrist, CC I, and primary clinicians were actively involved in

interdisciplinary discussions when present.  There was minimal to no participation from the

recreation therapist, and the RN, who was reportedly covering for the regular RN, also provided

little clinically relevant participation.

During the IDTTs on Unit 5B, the staff announced that a patient would not be brought

due to a Code 3 which occurred in another unit at the facility.  The clinical staff reported that

such codes were a frequent occurrence and resulted in discontinuation of programming for

approximately two hours.  During this time, custody officers were present in the unit.  A clinical supervisor was able to have the patient brought to IDTT despite the Code 3 and the IDTT occurred.

IDTTs were also observed on Unit 8A.  The required participants were in attendance. There was poor treatment planning, if any, discussed with the patient during the IDTT. Additionally, the patient's LRH was reported during the IDTT; however, there was no discussion of treatment interventions to assist the patient in movement to their LRH level.  Staff attributed the presence of a custody officer next to the patient during the IDTT meeting as being the result of one patient who had recently been released from DPS due to violence and another patient also with recent violent behavior.

Maximum Custody Status

An IDTT was also observed for a patient on maximum custody status.  The patient, who was extremely ill and unstable, was going to be discharged to EOP.  Staff reported discharging patients to the EOP level of care because more treatment was provided in an EOP hub or PSU than in the inpatient care setting.  The patient had not met his treatment goals or resolved the reason for referral.  Although the treatment team expressed their challenges with limited space and limited custody staff, the monitor's expert discussed with them that discharge to a lower level of care was not an appropriate solution for a patient who had neither met their treatment goals nor resolved the reason for referral.

## 2.  **Group Therapy**

Acute Care Program

During the site visit, the monitor's expert interviewed ten patients in Unit 8B.  These patients reported being offered three to four groups per week, up to 14 hours per week of outdoor

244

recreational time, and 45 minutes each evening of dayroom time.  However, they also indicated

that certain correctional officers did not provide them with either the outdoor yard time or the

dayroom time for various reasons.  The need to offer at least 15 hours per week of out-of-cell

structured therapeutic activities in addition to a significant number of hours out-of-cell

unstructured time per week was discussed with leadership staff.

The monitor's expert also interviewed ten acute care patients housed in Unit B2B.  The

patients reported being offered three to five one-hour groups per week, which generally included

six patients per group.  It was not unusual to be offered less group hours per week due to staffing

shortages.  The patients reported the groups to be helpful.  The patients also reported being

offered four hours per day of out-of-cell unstructured activities, which was higher than the data

reported in pre-site information.

A review of the high refusal list indicated that during August 2019 about 300 acute care

patients refused to attend 100 percent of all treatments offered.

Patients in the acute care program were receiving significantly less treatment than was

being provided to inmates in the mainline EOP setting.  Acute care patients were essentially

being treated as if they were administrative segregation inmates.  There appeared to be multiple

reasons for the inadequate treatment being provided, which included the following:  an

institutional culture that rationalized this treatment, generally due to reported safety concerns; a

deficient number of correctional officers or an inefficient use of the correctional officers

available; significant clinical staff vacancies; and a lack of inpatient experience with many new

clinicians.

Intermediate Care Program

The provision and tracking of structured and unstructured therapeutic activities in the intermediate care program remained problematic. Information was provided regarding the total number of hours provided and the percentage of treatment that patients received; however, inconsistent and difficult to decipher information was provided regarding the average hours per month that patients received for structured and unstructured therapeutic activities, including group and individual treatment. Staff and patients interviewed reported differing information which varied by individual units regarding the provision of treatment, ranging from one to two hours per week to four to six hours per week. All reports indicated that the therapeutic activities provided were significantly less than that received in an EOP; this was especially troubling for maximum custody inmates who received even much less treatment.

Maximum Custody Status

Multiple requests were made to staff for the number of treatment hours offered and attended for maximum custody status patients, but the data was not provided. One reason offered by staff was that the facility did not maintain weekly lists of custody status to allow maximum custody status patients to be culled out. There was staff acknowledgement that out-of-cell activity was very low and management estimates for structured therapeutic activity in the acute program ranged from 0.5 to one hour per week on average, although some supervisory staff estimated that up to two hours per week were averaged. There were similar estimates for structured therapeutic activity in the intermediate care program although unstructured out-of-cell activity was reportedly higher, but still low, in the acute program.

Audits conducted regarding group therapy indicated that the maximum custody units (B4A and B4B) were excluded, likely due to the lack of treatment provided. The maximum

custody acute and intermediate care units functioned primarily as segregation units with patients spending most of their time locked down. Staff reported discharging patients to the EOP level of care because more treatment was provided in an EOP hub or psychiatric services unit (PSU) than in inpatient care.

### 3.    Individual Treatment

Acute Care Program

The monitor's expert observed individual treatment being provided to several acute care patients in a confidential setting from a sound perspective. One to two custody officers or psych techs stood outside the office observing the process due to "safety concerns" despite one of the inmates being handcuffed behind his back.

Intermediate Care Program

As previously stated, information provided regarding the average hours per month that patients received individual treatment was difficult to decipher. Interviewed staff reported that psych tech staffing shortages were one of the primary factors limiting the provision of programming. As psych techs were integral in movement of patients on the units, shortages negatively affected the ability of patients to be seen for individual sessions, and it was the primary reason cited for limited out-of-cell contacts. Interviewed patients confirmed a severe lack of out-of-cell clinical activities and programming.

Maximum Custody Status

Individual therapy was the primary modality of treatment in the maximum custody units, but it was not consistently offered to patients. That was one of the reasons for the low average of structured therapeutic activities in both the acute and intermediate care programs each week. Several meetings were held with CDCR headquarters, regional and CHCF management staff for

discussion on strategies to improve the delivery of the required amount of treatment to patients. All CDCR staff committed to the process, during which CDCR reintroduced the idea to use therapeutic treatment modules to accomplish the task of increasing the treatment provided. However, the use of therapeutic treatment modules remained on hold.

The monitor's expert observed individual treatment being provided to several maximum custody patients in a confidential setting, and although the interaction could not be heard, it was visible to others. One or two correctional officers or psych techs were always outside the clinician's office observing the process due to safety concerns. Additional safety precautions were taken even when a patient was handcuffed during the meeting.

No data was available relative to the frequency or timeliness of primary clinician contacts.

### 4.    Psychiatric Services

Interviewed staff reported issues with poor continuity of care for psychiatrists, with frequent turnover.

The inability to provide an appropriate level of psychiatric services to the patients at the CHCF-PIP was acknowledged by CDCR staff. No data was provided relative to the frequency or timeliness of psychiatric contacts or assessment for maximum custody or non-maximum custody acute or intermediate care housing unit patients.

### 5.    Other Treatment Issues

### A.    Involuntary Medications (PC 2602)

The number of non-maximum custody inmates on PC 2602 involuntary medications on a monthly basis from March to August 2019 ranged from 127 to 153. The number of maximum custody inmates on PC 2602 involuntary medications on a monthly basis from March to August

2019 ranged from 19 to 28. Zero petitions were denied or withdrawn due to non-clinical reasons. From the months of March 2019 to August 2019, CHCF-PIP had three instances where controlled use of force was used to administer involuntary medications.

### B.    Behavioral Management

The Positive Behavioral Support Team (PBST) appeared to be focused primarily on "positive" symptoms such as acting out (aggressive) and self-harm behaviors. It did not appear that they were generating referrals or tracking "negative" behaviors (e.g., withdrawal, poor treatment compliance). As before, the documents completed by PBST were referred to as "unit behavioral guidelines" and were not to be shown to the patient.

During the review period, the PBST reported 21 new behavioral guidelines and eight revisions with a total of 24 existing behavioral guidelines that were active or current at the time of the site visit. They formally consulted on 21 patient cases and attended regular review committees including the Psychologist Specialist Services Committee (PSSC) where they reviewed a total of 13 patients. Referrals to the PBST were generated in several ways. Serious incident reports (SIRs) were regularly reviewed by program management and referrals to the PBST were generated as a result of those reviews. Referrals were also generated by the treatment team, though this was unfortunately not common. More typically, the psychologist or social worker would contact PBST for consultation. PBST also generated referrals through their attendance of daily huddles and other meetings as well as reviewing SIRs.

Observed IDTTs during the site visit did not discuss PBST referrals when indicated. Discussion with the senior psychologist specialist revealed that the behavioral guidelines were being written by the unit psychologist or social worker, although including social workers was a recent change. Including unit staff had negatively influenced referrals to PBST as mental health

primary clinicians may have decided not to refer a patient due to the workload that would result for the clinician. Some mental health primary clinicians specifically indicated as much to the senior specialist. In addition, by having mental health primary clinicians complete the guidelines, individuals who had not received the proper education, training, and supervised experience were responsible for completing a plan that was outside their area of expertise. While this was done in consultation with the PBST, there was insufficient clinical staffing within the PBST to properly review and supervise the primary clinician, particularly if the appropriate number of patients were referred. Once the guidelines were completed, the primary clinician was to review them fully with the patient, especially important in light of the directive to not allow the patient to see a copy of the guidelines. However, there was no tracking system in place to verify that the clinicians had reviewed the guidelines with the patients. A small sample of patient records indicated that this was not occurring as that contact between patient and primary clinician was not documented. The behavioral guidelines were more often referenced in a vague manner in the treatment plan.

The quality of the behavioral guidelines had improved from the last visit, although they were still not comprehensive behavior plans. For example, the guidelines did not identify precipitants, those conditions that exist prior to and are associated with the target behavior. There was also no identification of existing reinforcers that were maintaining the target behavior. On a positive note, the guidelines were being updated, although the trigger for that could not be determined from the data or documentation provided. At least five were out of date with two pending revision.

The lack of comprehensive behavior plans was troubling as patients in this setting frequently require behavioral treatment to be able to function and maintain medication

compliance.  An improvement in the guidelines was the description of the function of the target

behavior.  Interventions were unclear as the guidelines were more of a list of directives for staff

in responding to patient behavior.  The behavioral guidelines included insufficient immediate

reinforcers.  At times, the guidelines covered too many target behaviors.

The guidelines were typically characterized by a lack of interventions prior to the

occurrence of the targeted behavior.  Precipitants associated with the targeted behavior need to

be identified to allow treatment staff to intervene before the problem behavior actually occurred.

In a few guidelines for attention-seeking patients, there was a planned schedule of contact with

particular people that the patient could expect and predict.  More of these types of interventions

would be an improvement.  There was also a lack of immediate reinforcers.  It was unclear how

well unit staff were trained on implementing these guidelines, but in light of staffs' complaints

about workload, it seemed likely they did not receive much training.  The quality of the

guidelines did vary by provider with most being inadequate except for one patient.

### C.    Morning and End of Shift Meetings

Morning meetings were observed on both the acute care and intermediate care units.  All

required staff were present and participated.  During the morning meeting in the acute care unit,

there was a robust discussion about a gravely disabled patient, which resulted in his move to the

Correctional Treatment Center (CTC), where weekly meetings reviewing the patient's condition

would be scheduled.  Custody staff provided useful information and the officers appeared to

have had a good rapport with the inmate.  During the intermediate care unit morning meeting, the

unit supervisor reported on the 29 patients housed in the unit.  Nursing staff and a mental health

clinician participated appropriately.  There were no comments from custody staff present at the

meeting.

D.    "Tortilla Status"

Patients complained about what was referred to as "tortilla status."  It should be noted that there was no actual policy or procedure at CHCF indicating or supporting "tortilla status." The process was described differently by various CHCF-PIP managers and by the patients.  Due to the lack of clarity, a dinner feeding was observed, focusing on patients on "tortilla status." The monitor's expert was accompanied by the Assistant Deputy Director (ADD) for the Division of Adult Institutions (DAI), the ADD for the Statewide Mental Health Program, the CHCF-PIP Executive Director (ED), and counsel for the parties.

One patient who had been on "tortilla status" during observed IDTTs was removed from that status during the day according to the RN (and later confirmed via the medical record) upon the group's arrival to that unit in the evening.  However, other staff thought the patient was still on "tortilla status."  This lack of clarity of communication within a unit was quite troubling, especially for this incident, as the patient had become highly agitated over being placed on "tortilla status" and would consequently engage in self-harm.

Another patient who was observed on "tortilla status" had his food brought in by nursing staff with multiple *tostada* shells stacked atop the trays.  The gloved staff member then placed the trays on a table/desk in the middle of the unit that was not hygienic when there was a more appropriate pantry area that was designed for food containment and processing.  Each food item was then spooned into the tostada shell and the shell would be set on top of a food tray.  When two tostadas were filled, they were handed to the patient without a tray, who then had to place them somewhere in his cell (e.g., on his bed, his storage unit, the floor).  This continued until all food had been given to the patient in the tostada shells.  The patient was provided milk in its carton, but a can of juice was poured into a cup and passed to him.

The monitor's expert asked the patient if staff always separated the food, as some patients had alleged that "tortilla status" meant that staff would mix all food together. The patient indicated that the process was staff-dependent; some staff would separate the food while others would mix it and combine different items, seemingly without concern for the patient's desire to not eat mixed food or palatability of the mixture. When staff were asked for the rationale for "tortilla status," they seemed somewhat unsure, but believed it was due to concerns regarding safety. Staff did not explain what the specific safety concerns were, or the rationale underlying a "tortilla status," while some actions appeared contradictory. One patient was not given a paper tray with his food but was given a paper milk carton.

The health care record for the patient who was observed was reviewed. The review revealed poor communication regarding "tortilla status" and the lack of clinical justification. On August 15, 2019, there was an email from a psych tech to the psychiatrist noting that the patient had been placed on "tortilla status," but that there was no order in the chart. On August 16, 2019, an order was created, but there was no corresponding progress note to identify the rationale, what the patient must do to be removed, and/or length of the status. This order also restricted the patient from receiving cartons and cups, although he received them. "Tortilla status" appeared to be more punitive than it was a clinical process. The DAI ADD indicated that the patients should have received paper trays. The ED indicated that the facility would self-report this violation to their licensing agency. Staff were reportedly instructed by the ADDs (Statewide Mental Health and DAI) that they were to cease this practice immediately. Health care records were reviewed the following day and there were orders discontinuing patients' "tortilla status."

### E.  Usage of Psych Techs and Access/Barriers to Care

Acute and intermediate care staff unanimously reported that psychiatric technician staffing shortages were one of the primary factors limiting the provision of programming.  Psych techs were utilized to escort patients to groups, individual sessions and yard as well as any out-of-cell activities.  Additionally, psych techs were utilized for patient searches, meal distribution, medication administration and for one-to-one suicide observation.  RNs were used as a backup for one-to-one suicide monitoring if psych techs were unavailable.  Due to staffing shortages, psych techs reportedly worked long shifts with mandated overtime.

Possible solutions to address the very severe psych tech staffing shortages present at the facility include utilizing other disciplines for suicide monitoring and decreasing the number of psych techs used for escort.  Supervisory staff indicated that this was an area that they planned to address.

Staff was instructed to complete an Access/Barrier to Care Notification Form in the event of any disruptions in treatment.  This form delineated whether treatment was delayed or interrupted due to custody, psych tech staffing or other issues.  Staff and supervisors alike confirmed that not all incidents were documented on the forms; however, a review of the completed forms did provide confirmation of the reported reasons for treatment disruption.  A summary of the Access to Care forms (custody) revealed that few (less than five per month) reported incidents of custody related disruptions occurred for all acute and intermediate care units.  Conversely, barriers to care due to psych tech and other mental health staffing shortages resulted in from 13 to 70 treatment disruptions per month for all acute and intermediate care units.  Review of other documentation provided by the facility indicated that provider unavailability was also a significant reason for group and individual treatment cancellations.

The treatment offered to patients in the acute care program was below the standard of care for an inpatient setting and was significantly less than the treatment provided to mainline EOP inmates.  These patients were essentially treated as if they were housed in administrative segregation.  There appeared to be multiple reasons for the inadequate treatment being provided, which included the following: (1) an institutional culture that rationalized such treatment, generally based on safety concerns; (2) insufficient correctional officer allocation and inefficient use of correctional officers; (3) significant clinical staff vacancies; (4) institutional beliefs that such inmates were too dangerous not to be locked up when not participating in group therapies; and (5) probable lack of inpatient experience by many of the clinicians.

In addition, units had implemented local practices that were inconsistent with policies and procedures, which were often based on a lack of understanding of the relevant policies and procedures.  For example, interviewed acute care inmates indicated that they were placed on cuff status for seven to ten days as part of the orientation process even if they were not maximum custody.  Across the board, cuff status during orientation was not consistent with policies and procedures for non-maximum custody patients.  Mental health staff indicated that this practice was custody driven and not within their control, which was inaccurate as the responsibility for deciding whether a non-maximum custody patient programmed in mechanical restraints or not rested with the IDTT.  Central office staff, along with local leadership, were in the process of formulating both short-term and long-term remedies to the identified issues.

## V.    PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS), and System to Encourage Progress (STEP): Standards and Procedures

During Assessment and Orientation, the IDTT was required by policy to determine if a non-maximum custody patient would program with or without mechanical restraints or other

security measures such as the use of a treatment module. As reported above, at CHCF, all patients in orientation, including those not on maximum custody status, were apparently placed on cuff status contrary to policy. Staff acknowledged this was the practice and it was observed by several of the monitor's experts during the visit. This essentially made all new intakes maximum custody patients, even when an inmate was returned to the PIP from the MHCB they were placed on cuff-status. Orientation status was to be reviewed for each patient within ten days of arrival at either their ICC or UCC. Orientation status was an additional hindrance to the provision of treatment for new patients and, particularly for patients who remained on cuff-status, post ICC or UCC.

CDCR had submitted a revised System to Encourage Progress (STEP) policy to the monitor that was under review. Consequently, CHCF-PIP was operating under an existing policy dated August 23, 2017. That policy established three STEPs in the acute care program and four STEPs in the intermediate care program. In the acute care program, patients entered at the assessment and orientation STEP. The patient spent up to seven days being oriented to the unit while being evaluated and then transitioned to STEP 1 or 2. The patient may attend solo or small group programming during that time. Per policy, if the patient decompensated, he could be returned to this STEP though it was unclear as to why except for increased restrictions.

The primary difference between STEP 1 and STEP 2 in the acute care program was that STEP 1 indicated the need for solo programming based on custodial and clinical factors, while STEP 2 indicated that the patient had no custodial restrictions and was clinically ready to program with others. The treatment team would determine if group treatment would occur with the patient in mechanical restraints or not.

256

In the intermediate care program, patients also began with an assessment and orientation STEP. This STEP was to last until the patient was seen by the ICC or UCC and had a master treatment conference. As in the acute care program, the patient may return to this STEP if decompensation occurred so that further assessment could be completed. Following this STEP, the patient will progress to STEP 1 or STEP 2. STEP 1 involved transitioning patients into socialization and full implementation of the treatment plan; it could begin as solo or group programming. The behavioral expectations for each STEP differed with a patient remaining at STEP 1 if he does not: attend 50 percent of his treatment, maintain adequate cell and personal cleanliness, respect the rights of others, attain medication adherence, show progress toward treatment goals, and follow community rules.

STEP 2 was characterized by 50 to 79 percent of treatment attendance and compliance with: maintaining personal grooming and cell cleanliness, being respectful of the rights of others, medication compliance, progress toward treatment goals, being socially appropriate, and following community rules. STEP 3 adds that the patient recovered from lapses in judgement without serious disruption, demonstrated motivation for treatment, and participated in 80 percent or more of treatment. The incentives increased with each level with patients not receiving a radio until STEP 2 or a TV until STEP 3.

Per CHCF Operational Procedure (OP) 03-017 Psychiatric Inpatient Program, patients in maximum custody units were to be seen by institutional classification committee (ICC) which occurred each Thursday, as needed. A PIP clinician was required to be present during ICC whereas in non-maximum custody units, patients were seen by the unit classification committee (UCC), which only required a clinician if the patient was part of the developmental disabilities program.

ICCs were observed and were generally found to try to reduce patients from maximum custody status. Of four observed, two patients had their maximum custody status reduced. The DAI ADD provided the monitor's expert with an overview of the process she supervised at headquarters focused on patients at maximum custody status. Every maximum custody status patient underwent a monthly review by a team of staff to determine if the patient could be reduced from maximum custody status. If the team believed that the patient could be, the facility management was contacted and directed to proceed. This headquarters-driven process was a form of a check and balance of the maximum custody status process.

## VI.    REFERRALS AND TRANSFERS

Data provided by CHCF-PIP indicated that 478 patients were referred and admitted during the review period. Referrals to acute and intermediate care were timely admitted and no patient was rejected.

## VII.    ADMISSIONS AND DISCHARGES

### 1.    Admissions

CHCF-PIP reported that 197 patients were admitted to acute care and 281 to intermediate care during the review period. Combined data for acute care and intermediate care patients presented by CHCF-PIP indicated that lengths of stay for patients during the review period averaged 76 days.

### 2.    Discharges

CHCF-PIP discharged 813 patients during the review period. Patients in both acute and intermediate care waited an average of 8.5 days after clinical discharge before leaving their inpatient beds. Of the 813 discharges, 267 or 33 percent were physically discharged more than ten days after their clinical discharge.

Regarding delays after clinical discharge for patients transferring from acute to intermediate care, CHCF-PIP staff reported that the primary reason was because they were awaiting intermediate care inpatient beds. For patients discharged from intermediate care beds back to prison, the reasons for administrative discharge delays after clinical discharge was due to their case factors which directed where they could be placed in CDCR post-discharge.

## VIII.    PATIENT DISCIPLINARY PROCESS

The institution provided a current copy of the local operating procedure for discipline and due process. The policy was reviewed annually and no changes to the procedure were reported.

There were 197 RVRs issued to class members during the reporting period. Of this number, 93 or 47 percent were issued to patients at the acute level of care, and 104 or 53 percent were issued to patients at the intermediate level of care. Twenty RVRs were reviewed for compliance. The sample included eight patients who were maximum custody, five who were acute care patients, and seven patients at the intermediate level of care. All patients in the sample were appointed a staff assistant and received a mental health assessment to determine the impact mental health had on the behavior or activity that led to the RVR. All RVRs were timely delivered to the patient, all referrals for mental health assessment were timely, and the completed mental health assessment was returned timely in all but one instance. Hearings were held timely 58 percent of the time for the RVRs reviewed.

The mental health assessment recommended mitigation 91 percent of the time. The senior hearing officer did not acknowledge or consider the mental health assessment or recommendation for mitigation 25 percent of the time. Mitigation was acknowledged and influenced the hearing officer's decision 20 percent of the time and was acknowledged and did not influence the hearing officer's decision 55 percent of the time. In one instance where

259

mitigation was not recommended by the clinician, the senior hearing officer mitigated the penalty due to other known limitations of the patient. In several instances, the mental health assessment recommended that there not be any interruption in programming, suggesting the assessing clinician was unaware that this was required protocol.

CHCF-PIP provided limited information regarding staff who attended patient disciplinary process mental health assessment training. A report provided by the institution for RVR training identified 12 lieutenants who had received training, but the institution could not provide information on staff members who did not attend the training. Similarly, no information was available regarding the attendance of mental health staff at patient discipline or mental health assessment training.

## IX.    USE OF FORCE

CHCF reported five instances of controlled use of force, of which two involved patients in acute care and three involved patients in intermediate care. Two controlled use of force incidents involved patients who refused to take PC 2602 involuntary medications. The process was properly documented, and included a lengthy cooling off period, as well as repeated efforts to encourage the patients' voluntary cooperation by various custody, mental health, and medical staff members. The patients' medical records were reviewed prior to the event, an appropriate team was assembled, and the cell extractions were video recorded. A chemical agent was used to extract the patients, proper decontamination took place, and the patients were re-housed and provided new smocks upon completion. Both patients received the necessary medications upon extraction. In one of the two incidents, re-training was provided to a custody officer scribe assigned to the incident for failure to properly document the date, time, and type of event.

There were 70 reported instances of immediate use of force: 38 involved acute care patients and 32 involved intermediate care patients.  The institution was not able to provide data regarding the number of controlled or immediate use of force incidents that were specific to maximum custody patients.  Of the 11 reviewed incidents of immediate use of force, eight, or 73 percent followed timely, proper procedure.  In all incidents of non-compliance, the reason for the initial intervention was appropriate.  Timely review by the captain was the reason for non-compliance in one instance, while events that occurred during the incident or immediately following the incident were identified concerns in the two remaining use of force incidents.

The data provided indicated that 551 custody staff and 40 mental health staff completed the use of force training.  CHCF was unable to provide data on mental health or custody staff who did not complete the use of force IST training.

## X.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SETINEL EVENTS

There were 439 serious incident reports completed during the review period for aggressive acts to self and staff for behaviors that included swallowing objects, cutting, and property damage.

## XI.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

CHCF-PIP had two seclusion cells and one restraint cell in the acute care program.  In the intermediate care program, there was one seclusion cell and one restraint cell.  There were five restraint episodes involving three patients between April 1, 2019 and August 11, 2019 for a period of time ranging from 1.75 to four hours.  One patient was restrained on three separate occasions on two different days.

The restraint audit results were provided for April, May, and August 2019.  It consisted of 28 categories and the audits reflected compliance for each of the three months.  However,

261

closer review of the audit tool revealed several data inaccuracies that resulted in corrections by nursing leadership during the site visit. The erroneous data pertained to the required 15-minute patient checks which were recorded as not applicable when not completed. Nursing leadership agreed to correct the information and update the results.

## XII.    EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

The nursing or psych tech staff were responsible for the Emergency Medical Response Review Committee (EMRRC), patient seclusion and restraint, the death review process, and inpatient huddle practices. However, nursing and psych tech staff acted under two separate authorities in the CHCF-PIP, which resulted in some coordination challenges and fragmentation of services. Nurses reported to the coordinator of nursing services and the psych techs reported to the clinical director. This chain of command was different from other PIPs in the state where both disciplines reported to nursing.

### 1.    Emergency Response

The EMRRC's minutes were reviewed. A quorum was reached in only one of the six meetings held during the review period. The EMRRC reviewed emergency response times and emergency response procedures. Of the 29 cases reviewed, 22 patients had a history of co-occurring medical and mental health illnesses. The emergency response deficiencies identified were primarily documentation errors, as well as the inability to start intravenous lines.

### 2.    Death Review Process

The death reviews were completed pursuant to policy and procedure. In all three cases reviewed by staff in the PIP, a root cause analysis was planned or completed, per the Joint Commission's standards. The institution's root cause analysis was conducted by the institution's quality management unit.

## XIII.  QUALITY MANAGEMENT AND UTILIZATION REVIEW

CHCF-PIP had the required organization form for its quality management structure in place at the time of the site visit.  The facility reported that the purpose of its quality performance program (QPP) was to provide oversight regarding licensing and accreditation matters, identify and address deficiencies, and develop and implement corrective action plans (CAPs).  In addition, the QPP was reported to be involved in developing audit tools, collecting data, and providing aggregate data reports to supervisors.  At the center of the QPP was the quality and performance improvement program (QPIP) subcommittee.

However, although the quality management processes identified multiple systemic deficiencies that impeded providing adequate care during the review period, there was minimal documentation that substantiated what, if any, remedies were developed to address the problems identified.  Importantly, there was apparently no systemic quality improvement processes in place at CHCF-PIP in the documentation provided for review.

A review of documents showed that during the reporting period, the QPIP subcommittee identified several substantive issues including the high number of patients outside their least restrictive housing (LRH) levels, failure to adequately staff IDTTs, and a long list of high refusals.  In addition, the issue of persistent decreases in structured treatment in the acute and intermediate care programs was recognized, as well as an increase in use of force in the PIP.  There were no reports in the provided documentation that indicated whether and how these substantive issues of clinical treatment were addressed, or how discovered deficiencies were remedied.

## XIV.  PATIENT COMPLAINTS/PATIENT SATISFACTION

During the review period, patients filed 422 grievances and 30, or seven percent, were

withdrawn.  Of the 73 complaints filed that pertained to staff, 70, or 96 percent resulted in no intervention.

Patient satisfaction surveys were completed quarterly.  There was a total of 49 surveys completed during the review period: 31 by acute care patients and 18 by intermediate care patients.  Common themes among acute care patients included issues receiving orientation packets, lack of out-of-cell time, and insufficient treatment.  Common themes among intermediate care patients related to lack of out-of-cell time, visitation, and insufficient treatment.

## XV.    *COLEMAN* POSTINGS

*Coleman* posters in English and in Spanish were present in each of the units; however, in several units they were in an area that was not accessible to patients.

## XVI.   LAUNDRY AND SUPPLY ISSUES

The CHCF-PIP provided their operational procedure for clothing and laundry, which was current.  Staff did not utilize laundry and supply logs during the review period.  Patients reported and staff agreed that the quality of the clothing was subpar, and although patients received clothing on shower days, they did not always receive a full issue.  Staff indicated that this was due to unpredictable laundry delivery and the delivery of inaccurate sizes.

One issue noted during the tour of an intermediate care unit was a lack of bottled water on weekends, which had been made necessary due to the recent Legionnaires Disease outbreak.

## XVII.  VISITATION/PRIVILEGES/TELEPHONE ACCESS

The institution's visitation policy stated that access to visitation was determined by the IDTT.  Telephone access also required approval by the IDTT and was determined by the

patients' privilege group.  Patients in unit B1A reported that telephone access was only provided during Third Watch on a first come, first served basis.

The CHCF-PIP reported that patients received access to radio, televisions, and personal property pursuant to the STEP policy, which was not working, since the mental health leadership acknowledged that the STEP program was not functional on any units.  The monitor observed and patients reported that in some units there were insufficient radios; thus, staff positioned radios between cells so that patients could share.

Patients routinely reported that they did not receive all or a portion of their personal property, and that they missed court deadlines due to the inability to access legal documents within their personal property.

## XVIII. LAW LIBRARY ACCESS

CHCF-PIP's law library access policy indicated that there was a mobile law library on each unit, and it could be utilized for up to four hours weekly if the patient had an active case and up to two hours if they did not have an active case.  The institution also provided the LexisNexis Electronic Law Library Training Manual.

Patients provided mixed responses on their ability to gain access to the legal materials and on the quality of the materials available.  A review of the law library logs showed rare usage.

<u>APPENDIX A8</u>
CHCF-PIP Revisit

**CHCF-PIP Revisit**
March 10, 2020 – March 12, 2020

## I.    SUMMARY OF THE FINDINGS

- Since the September 2019 visit, regional teams spent a significant amount of time at the facility working with local staff.

- Regional administrators and headquarters staff developed interventions regarding staffing, structured and unstructured treatment, out-of-cell time, treatment scheduling, use of force incidents, laundry, patient movement, suicide monitoring and other issues noted during the last visit.

- Since the September 2019 visit, the total bed capacity at CHCF-PIP increased from 514 to 534 by utilizing 20 MHCBs.

- There were 174 acute care beds, a 40-bed decrease since September 2019.

- There were 360 intermediate care beds, a 60-bed increase since September 2019.

- There were 18 isolation beds including seven for acute care patients and 11 for intermediate care patients.

- On March 10, 2020, there were 181 acute care patients equaling 104 percent of capacity.

- In the intermediate care program, 344 beds or 95.5 percent were filled with intermediate care patients.  The remaining 16 intermediate care beds were filled by acute care patients.

- Intermediate care beds were converted to acute beds as needed.

- There were 44 patients in maximum custody; 20 were acute care patients and 24 were at the intermediate level of care.

- Institutional changes in leadership since the September 2019 visit included a new associate warden, acting chief deputy warden and acting chief executive officer.

- While most executive staff positions were filled, the executive director, hospital administrator, and one program director position were filled by individuals in acting capacities.

- The chief psychiatrist position remained filled.

- Both senior supervising psychiatrist positions were vacant; one had departed since the September 2019 visit.

267

- The chief psychologist position remained filled.

- A senior psychologist specialist position was added since the September 2019 visit. Two were filled and one was converted to a limited term SPRFIT coordinator position.

- While improved from 42 percent during the September 2019 visit, the functional vacancy rate for psychiatry was 38 percent. Psychiatrists reported significant workload issues impacting continuity of care for patients.

- The functional vacancy rate for psychologists remained at 21 percent and there was no change in psychologist vacancies or contract coverage since the September 2019 visit.

- CHCF-PIP filled one of the two vacant supervising social worker positions since the preceding visit, for a 50 percent functional vacancy rate.

- Allocated social worker positions decreased by five positions or 15 percent, yet the functional vacancy rate increased from 18 percent to 32 percent since September 2019.

- The functional vacancy rate for rehabilitation therapists decreased from 16 to 12.5 percent since the previous visit.

- The three nurse coordinator positions remained filled.

- The nine percent vacancy rate for supervising registered nurse positions was unchanged.

- There were five additional registered nurse position vacancies since the September 2019 visit and the functional vacancy rate increased from two percent to nearly five percent.

- The functional vacancy rate for senior psych techs increased from three percent to eight percent.

- Allocations for psych techs were decreased by five percent since the September 2019 visit and the functional vacancy rate was nine percent.

- There were 11 pre-licensed psych techs during the March 2020 visit.

- CHCF-PIP utilized 18 LVN and 67 CNA contractors.

- Custody staff positions increased from 99 to 140 since the September 2019 visit and all custody positions were filled.

- CHCF-PIP management reported adequate staff-to-patient ratios, however, functional vacancies of 39 percent in psychiatry, 20 percent in psychology and 32 percent in social worker staffing raised questions regarding the veracity of the report.

- The organizational structure for clinical decision making within each unit at CHCF-PIP remained nebulous and headquarters staff and local management were working towards short-term and long-term remedies.

- Required disciplines were present in most observed IDTTs.

- In intermediate care, telepsychiatrists attended IDTTs due to on-site psychiatric staffing vacancies and poor audio and visual transmission issues impacted the quality of their attendance.

- The quality of the IDTTs varied and treatment goals and treatment groups were minimally addressed, treatment interventions were often inadequate, and many reviewed treatment plans lacked interventions.

- Least restrictive housing was not discussed in IDTTs until prompted by the monitor's expert.

- Clinical staff appeared uninformed regarding behavioral treatment, specifically brief behavior interventions.

- Discharge planning was not consistently discussed.

- Staffing for maximum custody patients changed from a team of one psychiatrist, one psychologist, and one social worker to only one primary clinician since the September 2019 visit.

- Group therapy was not provided in maximum custody, and patients were removed from their cells only for individual contacts.

- Including yard time, maximum custody patients received less than ten hours per week out-of-cell time.

- In non-maximum custody acute care, observed groups of five to eight patients were well run and patients were engaged in therapy.

- Non-maximum custody acute care patients reported approximately 20 hours per week of non-clinical activities.

- The provision of group therapy was variable for non-maximum custody intermediate care patients with a range of two hours to eight hours per week.

- Since the September 2019 visit, a newly implemented pilot program on Unit B8A allowed dayroom for specified patients, and a third custody officer position was allocated to allow increased out-of-cell time for patients on the unit.  Patients also were allowed to eat meals in the dayroom, dining room, or in their cells.

- Group therapy was not scheduled for patients on solo programming.

- Patients in acute care reported weekly confidential individual primary clinician and psychiatry contacts; however, complained that the primary clinician contacts were very brief and not helpful.

- Barriers to the therapeutic milieu in acute care included lack of patient movement when inmate workers were on the unit; very restrictive rules regarding group size; lack of patient access to dining rooms; lack of patient access to the actual dayrooms for non-clinical activities purposes; custody staff vacancies and/or allocations; lack of adequate access to out of cell time; psychiatrist vacancies and lack of reasonable access to property.

- In intermediate care, patients reported improvement in the provision of out-of-cell weekly primary clinician contacts and psychiatry contacts were provided through telepsychiatry.

- While the provision of meals via "tortilla status" was eliminated, CHCF-PIP did not adequately report the issue to appropriate licensing entities.

- There was no progress with the Positive Behavioral Support Team (PBST) since the September 2019 visit.

- There were no changes in the System to Encourage Progress (STEP) program since the September 2019 visit, although the provided STEP tracking log was not consistent with prior logs.

- Since the September 2019 visit, correctional staff reviewed CHCF-PIP maximum custody patients to determine the appropriateness of their custody level and CHCF-PIP mental health staff reviewed the same patients.

- During the review period, there were 514 acute care admissions and 275 intermediate care admissions.  Six acute patient referrals were rescinded and there were no rejections.

- The average length of stay for acute care patients was 69.8 days.

- The average length of stay for intermediate care patients was 171.5 days.

- Two patients with complex medical needs were admitted and cells were retrofitted to accommodate their medical needs.

- On March 10, 2020, 188 intermediate level of care patients were housed out of their least restrictive housing level.

- During the review period, patients remained in the CHCF-PIP an average of 15.2 days after clinical discharge.  Delays in transfers were largely due to incomplete documentation and unavailability of beds.

- CHCF-PIP did not provide training data relative to the patient disciplinary process.

- A reviewed sample of adjudicated RVRs indicated that mental health assessments were requested timely 64 percent of the time, and mental health completed and returned them to custody timely 91 percent of the time.

- Senior hearing officers documented consideration of the mental health assessment in 91 percent of reviewed cases; although, two did not document how the assessment was considered and simply cut and pasted the clinician's documentation.

- Patients did not participate in 64 percent of RVR hearings.

- As of February 27, 2020, excluding staff on extended leave, 30 percent of CHCF-PIP staff had not attended the use of force training.

- During the review period, there were five instances of controlled use of force that involved one acute care patient and four intermediate level of care patients.  Mental health referrals were made after all five controlled instances.

- Institutional reviews deemed all five cases non-compliant with use of force policy.

- There were 66 instances of immediate uses of force and 148 instances of non-uses of force.

- There were 546 serious incident reports completed during the review period for aggressive acts to self and aggressive acts to staff including cutting themselves, swallowing objects and property damage.

- The new CHCF leadership and CHCF-PIP management reported a recently initiated collaborative process at the executive and custody levels.

- CHCF-PIP had the required quality management organization form in place.

- At the time of the March 2020 visit, the non-clinical activities program which captured all out-of-cell unstructured activities remained under development.  For weekly psychiatry contacts, CHCF-PIP's Quality Performance Program did not provide viable data due to a lack of direction from the psychiatric department.

- Since the September 2019 visit, the patient grievance process was folded into the CCHCS system as planned.  The transition produced a backlog of over 100 cases; however, as of March 13, 2020, the CHCF CEO assigned one PIP employee and two nursing staff to help clear the backlog.

- During the review period, patients filed 339 grievances and 57 staff complaints where common themes included insufficient yard time and treatment.

- *Coleman* posters were not posted in areas accessible by patients.

- Since the September 2019 visit, CHCF focused on the identified laundry issues and reported several remedial actions; however, despite these actions, patients continued to complain they did not receive clothes and shoes, and CHCF-PIP staff reported that supplies dwindled at the end of the week.

- The visiting center opened since the September 2019 visit, and there were no changes to visitation policies.

- Patients reported adequate access to telephones.

- The law library policy was unchanged since the September 2019 visit and no issues with patient access to law library were reported.

- Longstanding issues with patient access to property persisted, although since the September 2019 visit, CHCF-PIP assigned five additional custody staff to the Patient Management Unit, and a second property day for the PIP was added in November 2019.

## II.    CENSUS

Since the September 2019 visit, the total bed capacity at CHCF-PIP increased from 514 to 534 by utilizing 20 MHCBs.  Included in this count were 174 acute care beds, a 30-bed decrease since September 2019, and 360 intermediate care beds, a 60-bed increase since September 2019.  Also included were seven acute care and 11 intermediate care isolation beds.

On March 10, 2020, there were 181 acute care patients or 104 percent of capacity.  Of those, 19 patients were housed in flex beds and overflow units.

There were 344 beds or 95.5 percent filled with intermediate care patients.  The remaining 16 intermediate care beds were filled by acute care patients.  Staff reported that intermediate care beds were converted to acute care beds as needed.

There were 44 maximum custody patients; 20 were acute care and 24 were intermediate care.

Two acute care beds and four intermediate care beds were redlined for retrofitting at the time of the site visit.

### III.    STAFFING

#### 1.    Administrative, Clinical, and Correctional Staffing

Institutional changes in leadership since the September 2019 visit included a new associate warden, acting chief deputy warden, and acting chief executive officer.  The executive director, clinical administrator, hospital administrator, two of three program directors, and three program assistant positions were filled.  Although the executive director, hospital administrator, and program director positions were filled, the individuals served in acting capacities.  The chief psychiatrist and chief psychologist positions remained filled.

Senior Psychiatrist:  Since September 2019, one senior supervising psychiatrist left, leaving both established positions vacant.

Psychiatrists:  For psychiatrist positions 14 of 33 were filled; one civil servant left since the September 2019 site visit.  Contract coverage decreased from four psychiatrists in September 2019 to two during the March 2020 visit, and 4.4 positions were filled with telepsychiatrists.  With the resulting 12.6 vacant positions, the functional vacancy rate for psychiatry decreased from 58 percent to 38.1 percent since the September 2019 visit.

Senior Psychologist Specialist:  Since the September 2019 visit, CHCF-PIP received an additional senior psychologist specialist position, resulting in a total of three positions.  During March 2020, two of the three positions were filled, and the vacant position was converted to a limited-term SPRFIT coordinator position.

Psychologists:  The functional vacancy rate for psychologists remained at 21 percent.  There was no change in psychologist vacancies or contract coverage since the September 2019 visit; 21 of 29 positions were filled with civil servants and two positions were covered by contractors.

Supervising Social Workers:  Since the September 2019 visit, CHCF-PIP filled one of the two vacant supervising social worker positions, for a 50 percent functional vacancy rate.

Social Workers:  Total social worker positions decreased by five positions or 15 percent since September 2019.  On March 10, 2020, 19 of the 28 allocated social worker positions were filled, for a 32 percent functional vacancy rate, a significant increase from the previously reported 18 percent functional vacancy rate.

Supervising Rehabilitation Therapist:  The monitor did not collect data on supervising rehabilitation therapist positions.

Rehabilitation Therapists:  With the addition of one contractor, the functional vacancy rate for rehabilitation therapists decreased from 16 to 12.5 percent since the previous visit.  There were no other changes, and 24 of the 32 allocated rehabilitation therapist positions were filled with civil servants.

Nursing Coordinator:  The three nurse coordinator positions remained filled.

Supervising Registered Nurses (SRNs):  There was no change in the nine percent vacancy rate for SRN positions, with 21 of 23 positions filled.

Registered Nurses (RNs):  There were five additional RN vacancies since the September 2019 visit.  Of the 174 RN positions, 163 were filled by civil servants and three positions were filled by contract staff.  The functional vacancy rate increased from two percent to nearly five percent.

Certified Nursing Assistant (CNA):  CHCF-PIP used 67 CNA contractors, a 100 percent increase from the 31 utilized in September 2019.

Licensed Vocational Nurse (LVN):  An additional 18 LVN contractors were also used. The CNAs and LVNs conducted 1:1 supervision of patients and other appropriate duties when needed.

Senior Psych Techs:  The functional vacancy rate for senior psych techs increased from three percent to eight percent with 34 of 37 positions filled.

Psych Tech:  Since the September 2019 visit, psych tech position allocations decreased by five percent from 395 to 376 allocated positions.   Of those positions, 336 were filled by civil servants and three were filled by contractors for a functional vacancy rate of nine percent.

Pre-Licensed Psych Tech:  Of the 18 pre-licensed psych tech positions, 11 were filled for a 39 percent functional vacancy rate.

Correctional Staff:  Custody staff positions increased from 99 to 140 since the September 2019 visit.  All custody positions were filled.

Other Staff:  Since the September 2019 visit, CHCF-PIP hired one personnel supervisor, one personnel specialist and one analyst.

There were no psychiatric nurse practitioner positions at CHCF-PIP.

## 2.  Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

While CHCF-PIP's management reported adequate staff-to-patient ratios, functional vacancies of 39 percent in psychiatry, 20 percent in psychology, and 32 percent in social worker staffing raised questions regarding the reliability of the report.  CHCF-PIP executive staff reported that position allocations remained consistent with DSH staffing levels after "Lift and Shift" and those exceeded CDCR levels.  CHCF-PIP reported that they exceeded the number of psychiatry positions needed to meet ratios by three positions after consideration of vacation, sick

leave, and training.  Although requested, these described calculations were not provided to the monitor in written format.

## IV.    TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

Consistent with findings from the September 2019 site visit, the organizational structure for clinical decision making within each unit at CHCF-PIP was nebulous.  While each unit had a program director position filled by a psych tech, clinical accountability was shared by all clinicians resulting in no clear leader.  Headquarters staff and local management recognized this as an issue and were working towards short-term and long-term remedies.

### 1.    Interdisciplinary Treatment Teams (IDTTs)

Required disciplines were present in most observed IDTTs.  In intermediate care, telepsychiatrists attended IDTTs due to on-site psychiatric staffing vacancies.  Telepsychiatrists were integral members of the treatment teams; however, poor audio and visual transmission issues impacted the quality of their attendance.  Also, during two observed IDTTs for intermediate care patients, the nurse and psych tech left the meetings at different times, resulting in disruption of the IDTT meeting.

The quality of the IDTTs varied.  At times, team members inappropriately engaged in patient assessments during the IDTTs.  Psychiatrists reviewed medications but did not address or discuss how the medications benefitted treatment.  In one case, the primary clinician discussed the patient's case while the patient stood outside the door looking in.

Treatment goals and treatment groups were minimally addressed, other than by rehabilitation therapists who discussed treatment participation most consistently.  LRH was not discussed until prompted by the monitor's expert.  For patients housed out of LRH, observed

276

treatment teams did not discuss the behaviors keeping the patient from their LRH or interventions to move patients toward their LRH.

Treatment teams generally focused on documented treatment objectives such as "to improve ADLs." One patient was scheduled for discharge despite continued psychiatric decompensation as evidenced by disorganized speech, non-compliance with treatment, and possible delusions.

Treatment interventions were often inadequate in light of patient acuity, and many reviewed treatment plans lacked interventions.

Clinical staff appeared uninformed regarding behavioral treatment, specifically brief behavior interventions. In numerous cases, the STEP system was not utilized appropriately, nor did treatment teams use other behavioral interventions that were readily available and indicated in multiple cases. One primary clinician indicated that the patient did not care about rewards, demonstrating a fundamental failure to understand the core premise of behavior treatment.

Primary clinicians and rehabilitation therapists completed clinical assessments, including suicide risk assessments during the IDTTs, often resulting in clinicians interrogating and questioning patients in a non-therapeutic manner. Primary clinicians asked patients their goals and what they wanted to work on, as opposed to collaboratively working with patients to develop clinically appropriate treatment and safety plans. Discharge planning was not consistently discussed, and staff reported that they were instructed not to assist patients in discharge planning due to concerns of overfamiliarity.

Many acute care patients observed during IDTT had significant histories of self-harming behaviors and/or serious mental illnesses. One observed patient arrived at the unit from a maximum custody unit during the weekend without direct clinician-to-clinician contact, resulting

in the patient remaining ineligible to participate in group therapies for days. Another observed patient was admitted on February 3, 2020 and refused to attend IDTTs or talk with his primary clinician. He did not regularly shower or leave his cell except during the week prior to the monitor's visit. A referral to the Positive Behavioral Support Team (PBST) was not considered, and the IDTTs did not formulate an adequate treatment plan to address this patient's behaviors.

During IDTTs, clinical staff reported information obtained from custody housing unit officer staff during the huddle process and throughout the day. The start of IDTTs for acute care patients on one unit was delayed due to inmate workers on the unit; custody staff did not escort patients during their presence.

### 2.    **Group Therapy**

Acute Care Program

In acute care, observed groups were attended by five to eight patients. Groups were well run, and patients were engaged in therapy. Interviewed patients reported a range of two to five hours of offered structured therapeutic activity per week depending on the housing unit and described the groups as helpful. Patients reported approximately 20 hours per week of non-clinical activities provided in the multipurpose room or outdoor recreational area.

Intermediate Care Program

For non-maximum custody intermediate care patients, the provision of group therapy was variable. Interviewed patients reported a range of two hours to eight hours per week of scheduled group therapy. A newly implemented pilot program on unit B8A allowed dayroom for specified patients, and a third custody officer position was allocated to allow increased out-of-cell time for patients on the unit. Interviewed patients reported that they were offered almost unlimited out-of-cell time in the dayroom and yard since implementation. Patients were also

allowed to eat meals in the dayroom, dining room or in their cells. Due to its recent implementation, supervisory staff continued to refine criteria for patients to participate in the pilot program.

Maximum Custody Status

Since the September 2019 visit, maximum custody treatment was provided by one primary clinician rather than the previous team of one psychiatrist, one psychologist, and one social worker. Staff and patients complained about the new staffing arrangement and noted increased patient refusals. Group therapy was not provided in maximum custody, and patients were removed from their cells only for individual contacts. Further, the data that CHCF-PIP provided related to structured therapeutic activity for maximum custody patients was invalid. For example, an activity involving placing a radio outside patients' cells while the patients completed a "feeling" worksheet was inappropriately counted and documented as "group therapy." Including yard time, maximum custody patients received less than ten hours per week out-of-cell time, and it appeared that intermediate care maximum custody patients routinely received less than acute care patients in maximum custody. CHCF-PIP staff provided no reasons for the lack of hours offered or received, and the monitor's expert observed large empty group rooms in maximum custody during each day of the site visit which could be used for structured therapeutic activities.

Group therapy was not scheduled for patients on solo programming.

3. **Individual Treatment**

Patients in acute care reported weekly confidential individual primary clinician contacts; however, they complained that they were very brief and not helpful.

In intermediate care, patients reported improvement in the provision of out-of-cell weekly primary clinician contacts.

**4.     Psychiatric Services**

In acute care, patients reported weekly appointments with their psychiatrists in confidential settings, and continuity of medications issues were absent.

In intermediate care, telepsychiatry was commonly utilized due to on-site psychiatric staffing vacancies.  Telepsychiatrists were assigned to specific units, unlike on-site psychiatrists who covered several units.  Staffing vacancies, access to patients, and substantial workload issues significantly impacted psychiatry continuity of care.

**5.     Other Treatment Issues**

**A.     Behavioral Management**

There was no progress with the PBST since the September 2019 visit.  The PBST continued to focus on "positive" symptoms such as acting out (aggressive) and self-harm behaviors and did not generate referrals or track "negative" behaviors.  Additionally, CHCF-PIP continued to refer to PBST documentation as "unit behavioral guidelines" that were not shown to the patient.  Primary clinicians were expected to review behavior plans with patients; however, this was not demonstrated through reviewed documentation.  CHCF-PIP reported that with current staffing, PBST was at maximum efficiency and could not produce more without another clinician, preferably a psychologist.

**B.     Morning and End of Shift Meetings**

The one observed morning huddle in acute care provided the staff a useful and brief overview of patients on the unit.

280

In intermediate care, the one observed afternoon huddle was troublesome. Only nursing staff attended, and the huddle consisted of a nursing staff member reading the names of patients housed on the unit. The only information conveyed was whether there were "issues reported" and no other clinical information was provided regarding medication adherence, current functioning or other important issues.

C.     "Tortilla Status"

During the September 2019 visit, the monitor's expert identified patients who received their meals via "tortilla status" pursuant to psychiatrist orders. Meals were delivered in mini-tostada shells through the cell door food port, and no paper tray or napkins were provided. Reviewed patient health records did not provide clinical justification for those orders, and the process appeared punitive in nature. During that visit, CHCF-PIP management staff ensured the monitor's expert and CDCR headquarters staff that they would self-report the "tortilla status" incident to licensing. However, during the March 2020 visit, while no patients were on "tortilla status," documentation indicated only one report was made to the Joint Commission, with no report to state licensing. A review of the report to the Joint Commission indicated that full details of the incident were not adequately included. Specifically, CHCF-PIP reported that staff members utilized paper trays when they did not, and that those paper trays were exposed in an unsanitary environment before they were placed in a general, open area of the unit exposing them to the environment with the tostadas placed on top. CHCF-PIP failed to report that each tostada shell was handed through the cell door and patients then had to place them down on non-hygienic surfaces in their cells. CHCF-PIP never informed the Joint Commission that "tortilla status" was done pursuant to the order of a psychiatrist. Consequently, the Joint Commission did not require any corrective action plan or training plan for psychiatrists.

In acute care, all patients complained about the quality of the food served.

## V.    PATIENT ACCESS TO CARE

### Patient, Orientation, Discretionary Program Status (DPS), and System to Encourage Progress (STEPs): Standards and Procedures

There were no changes in the System to Encourage Progress (STEP) program since the September 2019 monitoring tour, although the provided STEP tracking log was not consistent with prior logs.  Prior logs provided STEP data throughout the patient's admission whereas the current log only indicated the patient's current STEP level from the date he began at that level.  As a result, it was unclear if the log or other factors contributed to patients' placements at inappropriate STEP levels.

#### Maximum Security Review Project

Since the September 2019 visit, correctional staff reviewed CHCF-PIP maximum custody patients to determine the appropriateness of their custody level.  As part of this review, CHCF-PIP mental health staff reviewed the same patients.

Of 51 patients reviewed, discharge to a lower level of care was recommended for 24 or 47 percent.  Of those, 16 or 67 percent of patients were discharged to an EOP.   In four cases, the treatment team disagreed, and the patients were retained with updated treatment plans.

## VI.    REFERRALS AND TRANSFERS

CHCF-PIP reported on March 10, 2020 that 18 acute care patients and 15 intermediate care patients were on the admission waitlist for CHCF-PIP.  None exceeded transfer timeframes.

## VII.    ADMISSIONS AND DISCHARGES

### 1.    Admissions

There were 514 acute care admissions and 275 intermediate care admissions during the review period.  Six acute care patient referrals were rescinded and there were no rejections.

The average length of stay for acute care patients was 69.8 days, with a range of one to 220 days. For intermediate care patients, the average length of stay was 171.5 days with a range of seven to 667 days.

Two patients with complex medical needs were admitted to CHCF-PIP during the review period: one acute care and one intermediate care. Cells were retrofitted to accommodate their medical needs.

### 2. Discharges

During the review period, 535 acute care patients and 235 intermediate care patients discharged from CHCF-PIP. The average delay from clinical discharge to physical discharge was 15.2 days with a range of one to 43 days. Delays in transfers were largely due to incomplete documentation and unavailability of beds.

## VIII. LEAST RESTRICTIVE HOUSING

On March 10, 2020, 188 intermediate care patients were housed out of their LRH level.

## IX. PATIENT DISCIPLINARY PROCESS

CHCF-PIP did not provide training data relative to the patient disciplinary process.

A sample of 11 adjudicated RVRs indicated that mental health assessments were requested timely in seven cases or 64 percent of the time, and ten or 91 percent were completed and timely returned to custody staff. One mental health assessment was completed by a psych tech which was inappropriate. In nine, or 82 percent of reviewed RVRs, the mental health assessments indicated that mental health symptoms did not contribute to the patient's behavior, and none recommended that the RVR be documented in an alternate manner. Senior hearing officers documented consideration of the mental health assessment in ten cases or 91 percent of

the time, although two did not document how the assessment was considered and simply cut and pasted the clinician's documentation.

Patients did not participate in 64 percent of the hearings.

## X.    USE OF FORCE

On February 27, 2020, excluding staff on extended leave, 30 percent of CHCF-PIP staff had not attended the use of force training.

CHCF-PIP reported five instances of controlled use of force that involved one acute care patient and four intermediate care patients. Of those, two were due to medication refusals and three involved patients who disobeyed orders. A chemical agent was used in all five cases and decontamination was offered in all instances; two patients refused. Batons were utilized in two of the five cases, and emergency medication was utilized in three of the five cases. Mental health referrals were made after all five controlled instances. Institutional reviews deemed all five cases non-compliant with use of force policy due to inadequate filming, errors and missing details in reports, and medical evaluations either not completed timely or not at all.

There were 66 instances of immediate use of force and 148 instances of non-use of force. CHCF-PIP did not provide patient level of care for this data. In one reviewed attempted hanging incident, documentation indicated that the patient had a noose around his neck that he tightened until he turned blue, and staff utilized oleoresin capsicum spray to gain compliance to cut the noose. There was no mental health referral or clinical follow-up noted or documentation of suicide watch in the incident packet. The patient was rehoused in his cell.

## XI. UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SETINEL EVENTS

There were 546 serious incident reports completed during the review period for aggressive acts to self and aggressive acts to staff including self-cutting, swallowing objects, and property damage.

Five incidents involving a noose were labeled aggressive act to self. One reviewed incident packet was documented in the serious incident report log as cutting self, although the report indicated the patient tied a noose above the sink and placed it around his neck. Staff intervened with oleoresin capsicum spray. A mental health referral was not in the reviewed packet; however, it was noted that on the 128-C form, the clinician stated self-injurious behavior without the intent to die. The patient was rehoused in his cell.

## XII. SUICIDE PREVENTION

The week prior to the site visit, CHCF-PIP hired a senior psychologist for the SPRFIT position. CHCF-PIP also hired 67 registry CNAs and 18 registry LVNs to complete suicide watch in intermediate care, allowing psych techs to perform other important duties.

Nursing supervisory staff developed a laminated "cheat sheet" of duties for placement on clipboards of suicide watch observers.

## XIII. QUALITY MANAGEMENT AND UTILIZATION REVIEW

On March 10, 2020, CHCF-PIP had its quality management organization structure in place. During the reporting period, the Quality Performance Program was tasked with providing data to the executive management team deemed the "Top Four Priorities" including primary clinician individual weekly confidential contacts for every patient; ten hours minimum offered structured treatment for all patients; ten hours minimum yard for all patients; and, individual

weekly contact with psychiatry (every three days) for patients whose length of stay was less than 30 days or until the patient was stable, then once per week.

For structured treatment, Quality Performance Program audits indicated that schedules were not followed, groups were not replenished with new admissions, and staff shortages deeply impacted group cancellations.

At the time of the site visit, the non-clinical activity tracking program which captured all out-of-cell unstructured activities remained under development. However, the CHCF-PIP Quality Performance Program reported that during the review period, the total number of patients offered a minimum of ten hours of yard weekly doubled since the preceding site visit. Additionally, during the six months preceding the site visit, in acute care, patients were offered two to 15 hours of non-clinical activities per week. Patients utilized an average of two to six hours per week. For structured therapeutic activities, CHCF-PIP offered four to six hours per week on average per patient, and the average number of hours utilized per patient ranged from four to six hours per week.

For weekly psychiatry contacts, CHCF-PIP QPP did not provide viable data due to a lack of direction from the psychiatric department.

The CHCF-PIP QPP also monitored the acute and intermediate care performance report and developed corrective action plans for all indicators below required minimums. Additional activity for the QPP included participation in the PIP Integration Plan with headquarters; various solution center ticket requests for changes to the mental health huddle; and a request for development of an algorithm that required a mental health issue order to appear in conjunction with the initiation of a mental health observation order.

286

The Utilization Management Committee met on a monthly basis and agenda items included new continued stay review and continued stay review 30-day updates.  Meeting minutes were comprehensive.

The Program Review Committee met at least weekly to review incident reports.

The Psychology Specialist Services Committee met on an as needed basis as determined by referrals from the Program Review Committee.

## XIV.  **PATIENT COMPLAINTS/PATIENT SATISFACTION**

During the review period, patients filed 339 grievances and 57 staff complaints.

Since the September 2019 visit, the patient grievance process was folded into the CCHCS system as planned.  The transition produced a backlog of over 100 cases; however, as of March 13, 2020, the CHCF CEO assigned one PIP employee and two nursing staff to help clear the backlog.

CHCF-PIP patients completed satisfaction surveys quarterly; 13 acute care patients and one intermediate care patient completed a total of 14 surveys during the review period.  Most comments were left blank; however, common themes included insufficient yard time and treatment.

## XV.  **CUSTODY AND MENTAL HEALTH RELATIONS**

The new CHCF leadership and CHCF-PIP management reported a recently initiated collaborative process at the executive and custody levels.

While not required, CHCF-PIP staff attended the Custody Mental Health Partnership Plan training for EOP clinicians throughout its implementation over the past two years.

## XVI.  *COLEMAN* **POSTINGS**

*Coleman* posters were not posted in areas accessible by patients.

## XVII.  **LAUNDRY AND SUPPLY ISSUES**

Since the September 2019 visit, CHCF focused on the identified laundry issues and reported several remedial actions.  Meetings were held with stakeholders, Prison Industry Authority, and business services.  Vacancies were filled in the material service center; however, two employees had already vacated the positions.  Unit staff prepared a list of patients scheduled to shower the next day to prepare an individualized full issue; however, although the issue was placed on a cart that was rolled out at shower time and staff logged showers taken or refused, they did not log when clothing or linen was issued or returned.

Despite these actions, patients continued to complain they did not receive clothes and shoes, and CHCF-PIP staff reported that supplies dwindled at the end of the week.  The supply of bottled water also dwindled toward the end of the week as well.

Staff requested laundry and supply deliveries twice a week as well as an increase in the average levels of clothing and linen provided to patients.  Patients and staff reported that canvas shoes were the hardest item to receive.

## XVIII. **VISITATION/PRIVILEGES/TELEPHONE ACCESS**

The visiting center had opened since the September 2019 visit and there were no changes to visitation policies.

Patients reported adequate access to telephones once approved by the IDTT.

Longstanding issues with patient access to property remained.  Since the previous visit, CHCF-PIP assigned five additional custody staff to the Patient Management Unit.  Additionally, a second property day for the PIP was added in November 2019 when the policy changed to allow acute care patients access to their property.

Patients reported difficulty receiving legal paperwork as well as their durable medical equipment and radios occasionally.  The acute care program did not have a radio policy.

## XIX.  LAW LIBRARY ACCESS

The law library policy was unchanged since the September 2019 visit; however, the library was understaffed due to the loss of one librarian position and two allocated librarian technical assistant positions.  No issues with patient access to law library were reported.

APPENDIX A9
CIW-PIP

**CIW-PIP**
December 17, 2019 – December 19, 2019

## I.    SUMMARY OF THE FINDINGS

- During the site visit, CIW-PIP's census represented 71 percent of its capacity.

- Most positions were filled except for psychiatrist and social workers, which had a 25 percent vacancy rate.

- CIW-PIP met the acute and intermediate care staff-to-patient ratios for psychiatry.

- Custody officer participation in IDTTs varied.

- IDTT's discussion of patients' symptoms and current functioning varied.

- LRH was not routinely discussed at IDTTs.

- Patients had, at least, weekly contact with their psychiatrist or primary clinician.

- Utilization of behavior support plans was limited.

- DPS documentation lacked an individualized approach and required additional clarity regarding initiation, continuation, and discontinuation.

- CIW-PIP met timeframes for HCPOP endorsement and acceptance or rejection.

- CIW-PIP followed proper procedures during the three immediate use of force incidents.

- The quality improvement system lacked improvement reports.

- Patients raised issues with the laundry supply.

- Patients and staff reported that property did not timely transfer from CCWF.

## II.    CENSUS

The CIW-PIP was a 45-bed unit used for acute and intermediate care.  On December 17, 2019, the CIW-PIP census was 32 patients, including one acute care patient, and 31 intermediate care patients.  CIW-PIP attributed the decrease in census to increased movement to DSH-Patton.

291

At the time of the site visit, three patients were housed out of their LRH: one acute, and two intermediate care.

III.    **STAFFING**

1.    **Administrative, Clinical, and Correctional Staffing**

The executive director, hospital administrator, program director, and program assistant positions were filled.

Senior Supervising Psychiatrists:  The established senior psychiatrist supervisor position was filled.  The senior psychiatrist did not carry a caseload.

Psychiatrists:  Three of the four established psychiatrist positions were filed, resulting in a 25 percent vacancy rate.  The institution reported that the vacant psychiatry position had been posted.

Senior Psychologist Specialist:  The 0.5 FTE senior psychologist specialist position was filled.

Psychologists:  All three established psychologist positions were filled.  There were two psychology interns.  On December 17, 2019, CIW was pursuing American Psychological Association (APA) accreditation for the intern program.

Social Workers:  Three of the four established social worker positions were filled, resulting in a 25 percent vacancy rate.  The institution reported that they were in the process of hiring a candidate for the vacant position.

Recreational Therapists:  The four established recreational therapist positions were filled.

Registered Nurses (RNs):  All ten of the established registered nurse positions were filled.

Senior Psych Techs:  The six established senior psych tech positions were filled.

Psych Techs:  The 32 established psych tech positions were filled.

Correctional Staff:  All 15 custody officer positions were filled.  The one lieutenant position was filled, as was the one sergeant position.

### 2.    Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

CIW-PIP met the required staffing ratios in its acute and intermediate care programs for psychiatry, psychology, and recreational therapy.

### 3.    Staff Training

The institution reported that over 90 percent of the mental health staff attended annual Correctional Treatment Center (CTC) training and use of force training.

## IV.    TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### 1.    Interdisciplinary Treatment Teams (IDTTs)

All necessary disciplines were in attendance at observed IDTTs.  All members discussed treatment, strategy, progress toward goals and next steps; however, custodial officer participation varied from minimal to active.  Training could improve custodial officer participation.  Staff interactions with patients were empathic and they knew the patients well.  Patients actively participated and collaborated with the team during IDTT.

Appropriate discussion of patients' symptoms and current functioning varied.  For example, one IDTT utilized a series of mental status questions that were better served for an initial IDTT, and another IDTT did not address specific symptoms for a long-term patient.  Specific problems were discussed in light of nonpharmacological and pharmacological interventions.  In some instances, the psychiatrist adjusted medications, which was better suited for an individual session.  While IDTTs discussed group therapy attendance, group participation in relationship to treatment goals was absent.

293

Treatment goals were measurable, and interventions were proper given the patient's level of functioning; however, behavior plans were rarely used even when indicated for targeted behavioral problems (i.e., self-injurious behavior).

Decisions to discontinue Discretionary Program Status (DPS) required more collaboration and rationale. Staff reported, and the monitor observed, that it was the institution's practice to discontinue DPS at the ten-day IDTT.

LRH was not routinely discussed or documented during the IDTT. Staff explained that LRH was not reviewed until the 30-day IDTT. A review of patient records indicated that rationale for placement out of LRH was brief and lacked a comprehensive narrative of behaviors or symptoms that contributed to the decision, and/or progress, or lack thereof towards treatment goals. It also revealed that one patient had a recommended LRH move without an explanation for the change.

**2. Group Therapy**

CIW-PIP provided 12-week group therapy cycles, and group topics changed according to the needs of the population at the start of each new cycle. During the final week of the cycle, clinicians assessed overall progress, and worked with patients to identify groups for the next cycle.

During the review period, CIW-PIP reportedly offered an average of 12.9 hours of treatment per week and patients received an average of 8.7 hours. However, this average was high given the escorting process (i.e., "pitch and catch") for groups. The process requires a minimum of two staff members. A staff member releases the patient from the current setting (housing or treatment), signals the next staff along the route, directs the patient to walk towards that staff member, and both watch the patient as he or she walks toward the second staff member.

This is repeated as necessary until the patient reaches his or her destination.  This process was used in lieu of staff physically escorting the patient from one location to another within a housing unit or treatment area.  On December 19, 2019, the observed escort process for the 9:00 a.m. group started at 9:00 a.m. and took 18 minutes to complete.  Recreational therapy groups accounted for 37.5 percent of core group offerings during the review period, and 45 percent of group offerings during the site visit.

Clinicians documented daily group attendance via EHRS, addressed group attendance at each scheduled 30-day IDTT, and reportedly assessed attendance during weekly contacts.  Low attendance was attributed to treatment cancellations followed by patient refusal.  Although the institution provided cancellation data, it was obscure because it appeared to include both scheduled and offered treatment data.  The refusal data provided for review was difficult to understand and is thus not reported.

When group attendance was low, clinicians implemented a plan to promote improvement. Patients reported receiving one to three groups per week, which appeared to be a function of their stage placement with the most groups offered to STAGE III patients.  IDTTs considered patient group attendance when making decisions for stage advancement.

All groups were facilitated by two therapists and patient attendance ranged from two to seven patients.  Group therapists were well prepared; however, the nature of the group interactions depended on the size of the group.  Two person groups resembled more of an individual treatment approach in contrast to a group process.

Patient and staff interview responses regarding unstructured therapeutic time differed. Regarding out-of-cell unstructured therapeutic time, staff reported that patients were offered two hours per day, while patients reported they had one hour per day except for weekends, when they

had increased access to the yard.  Patients reported an average of five to eight hours per day out-of-cell, while staff indicated that patients averaged seven to nine hours out-of-cell.  Staff included 1.5 hours for meals and education, although patients reported having only 15 minutes per meal, and the institution supplied limited education classes.

### 3.  Individual Treatment

Patients reported having confidential individual contact with their psychiatrist and primary clinician at least once per week.  All interviewed patients said that they knew their primary clinicians' names and described them as helpful.  Additionally, they said that they were able to meet with their psychiatrist or their primary clinician upon request.

### 4.  Psychiatric Services

The institution met both the acute care and intermediate care patient ratios for psychiatry. CIW-PIP did not utilize telepsychiatry.

### 5.  Other Treatment Issues

Patients and staff agreed that there was a preference for patients to remain in their cells during dining.  CIW-PIP did not allow patients to bring commissary items, including condiments, to the dining room thus encouraging patients to remain in their cells during meals. CIW-PIP staff was unable to articulate a rationale for this rule.

### A.  Involuntary Medications (PC 2602)

Sixteen to 21 patients per month received PC 2602 medications during the review period. At the time of the site visit, 17 patients had PC 2602 processes in place: nine emergent and eight non-emergent.  Six of the requests were initiated at CCWF with the remainder starting at CIW. Three of the 17 patients were in acute care, and the remaining 14 patients were in intermediate care.  All requests were approved via the court process.

### B. Behavioral Management

CIW-PIP completed two behavioral support plans for one patient, and partially completed a plan for another patient. Of the two completed plans, the institution failed to provide the initial plans; thus, the monitor's expert reviewed the updated plans. The partially completed plan was not titled or dated.

The monitor's expert found that the development and implementation of behavioral support plans had begun at CIW-PIP, with early plans successfully reducing maladaptive behavior and increasing adaptive behavior on two seriously and persistently mentally ill patients. CIW-PIP's need for behavioral support plans far outweighed the use of behavioral support plans, and when they were used, it was not clear that they were reviewed monthly.

### C. Morning and End of Shift Meetings

Morning and end of shift meetings were not observed during the site visit.

## V. PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures

CIW-PIP needed clearer documentation for the initiation, continuation, and discontinuation of DPS, and an individualized approach that considered current risk of violence. At CIW-PIP, all new patients were placed on DPS during orientation, while staff completed assessments. Staff supported DPS status even though detailed clinical information about the patients' histories, symptoms, and functioning in CDCR was readily available. After orientation, CIW-PIP continued DPS for patients that were on maximum custody upon admission or engaged in aggressive behavior after admission.

Staff reported that patients on DPS were permitted to attend groups; however, only two DPS patients were permitted to attend groups at a time. Consequently, there were not enough

297

offered groups to accommodate daily attendance by all DPS patients—a criterion to discontinue DPS. Staff reported the number of groups offered daily was sufficient, as approximately half of patients typically refused groups.

During the reporting period, CIW-PIP had a monthly average of 14 patients on DPS, excluding patients on orientation status. For these patients, DPS lasted an average of 13.52 days a month during the reporting period. The range was one to 87 days, with an outlier of 2,039 days. At the time of the site visit, there were eight patients on DPS.

The Stage Program remained in place at the CIW-PIP for both the acute and intermediate care programs. Stage progression was contingent on program activity and proactive behavior. Stage reductions occurred after problematic behavior or failure to consistently meet Stage expectations. An area of concern was that access to group treatment was contingent on a patient's Stage level. Thus, psychiatrically unstable patients on Stage I were offered less treatment than patients on Stage II. Further, patients were required to remain at each Stage level for a minimum of 30 days before progressing to the next Stage, and the program lacked incentives to motivate positive behavior change.

## VI.    REFERRALS AND TRANSFERS

During the review period, 43 patients were referred the CIW-PIP. Ten referrals to acute care were rejected. Seven of those rejections were overturned by CCAT and admitted, one was re-referred to intermediate care, and EOP level of care was recommended for the two remaining rejections. Also, six referrals to intermediate level of care were rejected; four were rejected due to housing/secondary gain, and two were rejected because intermediate care was not the appropriate level of care for the patients. Timeframes were met for HCPOP endorsement and acceptance or rejection by CIW-PIP during the review period. There was one rescission.

Transfers between acute and intermediate care were initiated through a level of care change only. Patients were not physically moved, and for continuity of care purposes, their treatment team remained the same.

## VII. ADMISSIONS AND DISCHARGES

### 1. Admissions

During the review period, 35 patients were admitted to CIW-PIP: 18 acute care admissions and 17 intermediate care admissions. There was no waitlist during the review period or at the time of the site visit. No patients admitted during the review period, or currently housed in the CIW-PIP had complex medical needs.

No patients at CIW-PIP were designated maximum custody status. On arrival to CIW-PIP, DPS and Stages replaced maximum custody status until discharge.

During the review period, 12 patients were 90 days or less from parole. Pre-release CCATs were initiated for those patients.

At the time of the site visit, there were seven WIC 7301 patients in CIW-PIP with an average length of stay of 633 days.

### 2. Discharges

CIW-PIP discharged 57 patients during the review period. Patients in both acute and intermediate care waited an average of 1.5 days after clinical discharge before leaving for CCWF and CIW. For discharges to DSH-Patton, patients waited an average of 14 days after clinical discharge with a range of eight to 20 days.

Of the 18 patients admitted to acute care during the review period, 15 had their level of care changed to intermediate care within ten days, on average. Three patients remained at the

299

acute level of care and discharged in three days, 17 days, and 90 days, respectively. The average length of stay for intermediate care patients was 145 days.

Reviewed documentation revealed CIW and CCWF completed clinician-to-clinician contact within one to two days of discharge. Contacts with DSH-Patton took three to five days due to delays in response from DSH-Patton clinicians.

## VIII.    LEAST RESTRICTIVE HOUSING

During the review period, 17 patients were housed out of their LRH, seven acute care and ten intermediate care. The average length of time out of LRH was 47 days with a range of 11 to 177 days. At the time of the site visit, three patients were housed out of their LRH: one acute care and two intermediate care.

The admission and discharge unit coordinator reported that some women transferred from reception center prior to endorsement and the default was to house single cell as they did not have an LRH.

## IX.    PATIENT DISCIPLINARY PROCESS

One psychologist completed all mental health assessments in the CIW-PIP, with a second psychologist as backup coverage. Both psychologists received the mental health assessment training. During the reporting period, 19 RVRs were issued to CIW-PIP patients. A review of all 19 RVRs and mental health assessments revealed that the clinician did not recommend alternative discipline for any of the RVRs, even those where the clinician found that the patient's mental illness contributed to the behavior that led to the RVR. Further, the clinician routinely used generic language that was not individualized to the patient, specifically, recommending access to privileges that may ease incarceration anxiety. Management staff reported that they were aware of this issue, though remedial action had not yet been taken.

Custody staff failed to send requests for mental health assessments to mental health within two days as required by policy. The average length of time for a request was 11 days, with a range of four to 30 days. Mental health staff completed and returned all assessments within one day.

At the time of the review, only seven of the RVRs had completed the adjudication process. All adjudicated RVRs reviewed included documentation of consideration of the mental health assessment and mitigation factors by the senior hearing officer. Additionally, the senior hearing officer mitigated all RVRs, including reductions to administrative counseling chrono, reductions in loss of privileges, and reductions in loss of credit based on the mental health assessment.

## X. USE OF FORCE

All three of the use of force incidents were immediate. The monitor reviewed the use of force incident packets and found they were compliant with the use of force policy. Two of the incidents yielded four RVRs

## XI. UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

CIW-PIP documented SIRs and incidents of self-harm in the unusual occurrence log. There were 45 incidents documented in the unusual occurrence log. Serious incidents included a suicide attempt, and cases of aggression to self, peers, and custody staff. There were 14 incidents of self-harm during the review period.

## XII. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

No patients were placed in seclusion during the review period. One patient was placed in restraints for less than one hour.

## XIII.  **EMERGENCY RESPONSE**

The EMRRC met monthly during the review period and documented their meetings in detailed minutes.  Standing agenda items were transport reviews (emergent, urgent, and nonurgent); performance improvement work plans (PIWP); emergency response (reviewing the status of current responses and identifying trends); and required drills.  The EMRRC documented the required occurrence of quarterly emergency drills and issues discussed.

## XV.  **QUALITY MANAGEMENT AND UTILIZATION REVIEW**

The infrastructure for the quality program was in place, but the absence of quality improvement reports was indicative of a relatively inactive quality improvement system.  During the reporting period, CIW-PIP held monthly clinical meetings, quality and performance improvement program (QPIP) committee meetings, and utilization management meetings. Monthly clinical meeting minutes from the review period documented various clinical and administrative issues that were discussed among the staff.

QPIP meetings had quorums and routinely discussed systems surveillance (e.g., training, treatment hours, IDTT review, positive behavioral support plan, DPS, staff suggestions, patient and employee surveys, unusual occurrences, bed utilization management, etc.), and surveys/audits/compliance (e.g., on-demand performance reports, food services, health records audits, primary clinician contacts, etc.).

Monthly utilization management meeting minutes from the review period showed items for further discussion, an open forum, and discussions on data which included, but were not limited to, length of stay, transfer from acute care to intermediate care, LRH, and admissions and discharges.

Although these meetings were held, there were no performance improvement work projects or other formal process improvements, or audits and reports generated by any mortality and incident review committee conducted within the CIW-PIP during the review period.

## XVI.  PATIENT COMPLAINTS/PATIENT SATISFACTION

CIW-PIP patients filed eight appeals during the review period, none were against staff. Patient surveys were issued twice during the reporting period and the institution received a total of 14 responses.  CIW-PIP reported that due to low participation, they planned to start distributing surveys at patient discharge.

Weekly community meetings and monthly council meetings were held to discuss and resolve grievances and concerns.  Although community meetings were attended by half of the patient population, some patients described the community meetings as boring and ineffective because problems were never solved.

## XVII.  CUSTODY/MENTAL HEALTH PARTNERSHIP PLAN

At the time of the site visit, headquarters had not approved the revised LOP for the Custody Mental Health Partnership Plan; thus, the CIW-PIP was not mandated to implement the partnership plan.  However, CIW-PIP implemented executive leadership rounds, huddles, and quarterly roundtable training—a positive finding.

In July 2019, executive leadership rounds were conducted in the CIW-PIP. Documentation showed that leadership had discussions with staff, but it did not show that patient interviews took place.  Notwithstanding the lack of documentation, the institution stated that patient interviews did take place.  Multidisciplinary huddles occurred Monday through Friday during Second and Third Watch.

Documentation showed that mental health and custody staff had attended seven quarterly roundtable training modules, but it could not be determined if required staff were in attendance.

## XVIII. *COLEMAN* POSTINGS

*Coleman* posters in English and in Spanish were present in each of the units.

## XIX.   LAUNDRY AND SUPPLY ISSUES

Laundry issues persisted during the review period.  Patients complained of lack of access to new underwear after showers, inappropriate sized clothing returned when they sent their clothes to laundry, and a continuing problem with lack of socks.

## XX.   VISITATION/PRIVILEGES/TELEPHONE ACCESS

According to institution policy, the ability to have visitation and the type of visitation was determined by the IDTT.  Patients reported that visitation took place each Saturday and Sunday, and that there was no restriction on the length of visitation.

Telephone access was determined by the IDTT and patient's Stage level.  At Stage I patients were allowed one call per week and could be granted more calls, if clinically indicated.  At Stages II and III, patients were allowed three calls per week, and could be granted more calls, if clinically indicated.

Property issuance was not tied to Stage level and could only be restricted by the IDTT for a documented and justified safety reason.  However, patients reported difficulties obtaining their property when transferred from CCWF, which was confirmed by staff.  Regional staff indicated that this was an issue which would be monitored.

## XXI.   LAW LIBRARY ACCESS

CIW-PIP patients utilized a computer kiosk in the housing unit to access the law library.  Access to the law library was limited at CIW-PIP.  Inmates were unaware of the policy allowing

access only during Third Watch.  Staff and patients reported that legal forms were not available in the PIP and that patients needed to complete a Form 22 to request legal forms.  Further limiting law library access, was the lack of staff available to aid patients' navigation of the computer kiosk.

## XXII.  EDUCATION

Access to education was limited.  CIW-PIP's sole teacher had been out for a month at the time of the site visit.

## XXIII. RELIGIOUS SERVICES

At CIW-PIP, patients had weekly access to a Catholic minister.  Patients were required to request all other religious services.

<u>APPENDIX A10</u>
SQ-PIP

## SQ-PIP
February 18, 2020 – February 20, 2020

## I.    SUMMARY OF THE FINDINGS

- Thirty of the 40 SQ-PIP beds were dedicated to acute and intermediate care condemned patients; the remaining ten flex-beds were used for the care of condemned intermediate care, acute, or MHCB patients, or non-condemned MHCB patients.

- On February 17, 2020, the SQ-PIP was at 72 percent of capacity with two acute care non-condemned patients and 27 intermediate care condemned patients.

- The senior psychologist position was vacant; all other psychiatrist and psychologist positions were filled.

- Psychiatry, psychology, and recreation therapy caseloads were within mandated ratios; however, the social worker caseloads were in excess of the established ratio.

- Programming was impacted by changes which allowed the use of flex beds for the admission of non-condemned patients; SQ-PIP was not adequately prepared through training or policy review for admission of non-condemned patients.

- Therapeutic treatment modules were used for all out-of-cell treatment contacts and IDTTs at SQ-PIP.

- Automated tracking data for timeliness of psychiatric, primary clinician, and IDTTs was not available during the review period.

- The quality of treatment plans varied across treatment teams for both acute and intermediate programs with identified problem areas including patient participation, identification of specific discharge criteria, clinical interventions not individualized, and lack of measurable treatment goals.

- SRASHE safety plans were generally inadequate and not useful as a suicide prevention tool.

- Notwithstanding custody level of non-condemned patients, all were placed in mechanical restraints for all movement.

- The amount of structured therapeutic activity in the acute care program decreased since the preceding site visit, largely due to the different populations competing for treatment space.

- SQ-PIP offered an average of 4.2 hours of structured therapeutic activity per week to acute care patients, and patients received an average of 2.8 hours.  There was a 33 percent

307

refusal rate.

- SQ-PIP offered an average of 22.4 hours of structured therapeutic activity to intermediate care patients and they received an average of 7.8 hours. There was a 65 percent refusal rate.

- The small size of the groups compromised the therapeutic benefits realized in larger treatment groups, however patients in observed groups were engaged and shared personal experiences related to the material presented.

- Group treatment progress notes remained unimproved and lacked specific information relative to the patient's progress or lack thereof.

- Behavior plans were underutilized in treatment despite clinical indications of the need for a plan and existing plans were outdated. Training on behavior plans was indicated for SQ-PIP staff.

- The Steps Toward Accomplishment, Growth, and Education (STAGE) level system remained unchanged since November 2016.

- Five patients discharged from acute care during the review period with an average length of stay of 58 days; eight intermediate care patients discharged with an average length of stay of 109 days.

- SQ-PIP's quality management process notably declined since the preceding review period.

- A performance improvement work plan audit indicated compliance for items on the IDTT monitoring tool; however, the monitor's expert found the quality of IDTTs inadequate.

- A completed master treatment plan audit revealed several compliance issues.

- SQ-PIP conducted patient surveys twice a year and the most recent completed survey indicated that of the 15 areas surveyed, 13 achieved a score of less than 85 percent.

- The SQ-PIP visitation policy was revised during August 2019 to allow the treatment team to determine patient stability for visitation during the IDTT.

- The relationships between SQ-PIP clinical and custody supervisors were strained due to issues surrounding the placement of non-condemned patients on the unit.

- Temperatures varied widely across the wings of the SQ-PIP with some rooms significantly colder than others during the site visit. Plant management indicated that due to staffing shortages and other priorities, the institution was unable to provide a timeline

for when or whether improvements would be completed.

## II.    CENSUS

The SQ-PIP had 40 flexible beds, of which 30 were interchangeable and could be used for acute care, intermediate care, and as crisis beds for condemned patients.  The remaining ten beds were prioritized for use as follows: acute care, intermediate care condemned and acute care non-condemned, along with MHCB for condemned and non-condemned MHCB patients.

On February 17, 2020, the census in the SQ-PIP was 29 or 73 percent of capacity.  Of this number, two were acute care and 27 were intermediate care condemned patients.  The lengths of stay for the two acute care patients were nine and 123 days.  For intermediate care patients, the average length of stay was 667 days with a range from three to 1,965 days.  Eight patients or 31 percent had lengths of stay longer than 1,000 days.

## III.    STAFFING

### 1.    Administrative and Clinical Staffing

The hospital administrator, chief psychologist, senior psychiatrist supervisor, program director, program assistant, and nurse coordinator positions were filled.  A FTE psychologist served in an acting capacity as clinical director.

Psychiatrists:  Two of the 2.7 established psychiatry positions were filled, and the registry provided one additional FTE psychiatrist.

Senior Psychologist Supervisors:  The 0.4 FTE established senior psychologist supervisor position was vacant.

Senior Psychologist Specialist:  The senior psychologist specialist position was vacant. A psychologist served in the position in an acting capacity, leaving a functional vacancy rate of zero percent.

309

Psychologists:  Three FTE psychologists and one registry psychologist filled the 2.7 established psychologist positions.  As noted above, one psychologist served in an acting capacity as clinical director and senior psychologist specialist.

Social Workers:  Two of the 3.6 established social worker positions were filled; however, one social worker was on extended leave resulting in a 72 percent functional vacancy rate.

Recreation Therapists:  Three of the 3.6 established recreation therapist positions were filled for a 17 percent vacancy rate.

Supervising Registered Nurses (SRNs):  All three SRN positions were filled.

Registered Nurses (RNs):  All 11 RN positions were filled.

Senior Psych Techs:  Of the six established senior psych tech positions, five were filled for a vacancy rate of 17 percent.

Psych Techs:  Of the 31.5 psych tech positions, 26.5 were filled for a 16-percent vacancy rate.

Certified Nursing Assistants (CNA):  Six of the eight CNA positions were filled for a vacancy rate of 25 percent.

**2.  Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

Psychiatry, psychology, and recreation therapy caseloads were within mandated ratios; however, the social worker caseload was in excess of the established ratio.

**3.  Staff Training**

SQ-PIP conducted PIP, CTC, and TSI trainings during August 2019.  Trainings were not completed during July 2019 due to a scheduling conflict, and November and December 2019 training logs were unavailable.

Mental health staff would benefit from training and education regarding their role in communicating the need for custody to remove mechanical restraints from patients who do not require them.  It was observed that training, policies, procedures, and treatment guidelines prior to a significant population change would improve the transition process and reduce the impact on patient care.

## IV.    TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

During the review period, programming at SQ-PIP was impacted by changes to the use of flex beds.  Historically, flex beds were designated for condemned inmate mental health crisis bed usage.  However, during October 2019, SQ-PIP was directed to accept non-condemned acute and MHCB patients of all custody levels.  This change significantly impacted unit operations, as pursuant to CDCR operational procedures, maximum custody patients were not allowed to mix with non-maximum custody patients.  As a result, custody staff justified the regular use of mechanical restraints for non-maximum custody patients in settings where they would not otherwise have been permitted.  Despite the issues presented by the admission of non-condemned acute patients, SQ-PIP staff appeared to quickly adjust and appropriately respond to the patients.

Therapeutic treatment modules (TTMs) were used for all out-of-cell treatment contacts and IDTTs at SQ-PIP.  Restart chairs were available in one group treatment room; however, patients consistently preferred therapeutic treatment modules to restart chairs.

### 1.    Interdisciplinary Treatment Teams (IDTTs)

Timeliness of IDTT data was combined for acute and intermediate care, and staff indicated that automated tracking data for IDTTs was not available during the review period.  A limited review of EHRS indicated that SQ-PIP was compliant with IDTT timeframes for acute

care patients.  The IDTT room offered adequate space and contained a single TTM.  All patients reviewed in IDTT were placed in the TTM with subsequent removal of their handcuffs.  Patients' assigned treatment providers attended IDTTs.

For intermediate care, all required members were present for the observed IDTTs, and there was a sufficient number of computers for staff to access electronic records; however, the quality of IDTTs was poor.  Medications were not reviewed without prompting from the regional specialist in attendance.  Diagnoses, treatment plans, expectations for discharge, and suicide risk and safety planning were not addressed.  The treatment team reviewed one patient in absentia due to refusal and there was no plan for cell-front follow-up with the patient.

Clinical staff engaged in behaviors that were disruptive to the IDTT process, including standing in front of the TTM to casually converse with the patient, thus compromising the interactive discussion.  In another observed IDTT, the treatment meeting was disrupted by a clinician administering a multiple-choice assessment that went on for several minutes.

The quality of treatment plans varied across treatment teams for both acute and intermediate care programs.  Institutional audits indicated that patient participation and identification of specific discharge criteria needed improvement.  In acute care, while some treatment teams adequately summarized treatment goals and appropriate clinical interventions, others simply repeated policy and were not individualized to the patient's need.

For intermediate care, reviewed treatment plans lacked measurable treatment goals, specific treatment interventions and adequate case conceptualization.  SRASHE safety plans were clinically insufficient and non-specific and were limited in their usefulness as a suicide prevention tool.

## 2. **Group Therapy**

Daily treatment groups occurred in large, confidential treatment rooms with therapeutic modules placed in a semi-circle.  SQ-PIP staff confirmed that all patients were confined to TTMs during treatment groups.

Notwithstanding custody level, all patients were handcuffed during escort to groups. Custody staff expressed concern about patient safety during escorts through the narrow hallways which were often filled with staff, inmate cleaning crew, medication carts, and other items.  Staff reported that controlled movements were not an option because patients would not make their appointments/ducats in a timely manner.

The amount of structured therapeutic activity in the acute care program decreased since the preceding site visit, largely due to the different populations competing for treatment space. During the review period, SQ-PIP offered an average of 4.2 hours of structured therapeutic activity per week, and patients received an average of 2.8 hours.  There was a 33 percent refusal rate.  For acute care patients, SQ-PIP conducted two treatment groups each weekday: one 45 minutes in length and the other 75 minutes in length.  Provided schedules reflected that administrative segregation patients were always assigned to the 45-minute group, and non-administrative segregation patients were assigned to the 75-minute treatment group; no explanation was provided for the assignments.

Over half or 56 percent of treatment groups in the acute care program were canceled for unspecified reasons.  Unspecified cancellations should be a small portion of cancellations and indicated a need for mental health staff training.

In the intermediate care program, SQ-PIP offered an average of 22.4 hours of structured therapeutic activity and patients received an average of 7.8 hours.  There was a 65 percent refusal

rate. Reasons for group treatment refusals remained unclear and despite similar concerns noted during the preceding monitoring period, staff reported no significant progress toward understanding or remedying the issue. SQ-PIP developed a quality improvement team (QIT) for group treatment refusals; however, it was prematurely discontinued. Additionally, staff identified group ducating issues as a contributing factor to low group attendance, but this also was not addressed by leadership.

Intermediate care patients reported positive experiences in group treatment, although the small size of the groups compromised the therapeutic benefits often seen in larger treatment groups. Groups were both psychoeducational and process oriented, and core group topics were covered in each of the groups offered. Patients in observed groups were engaged and shared personal experiences related to the material presented.

### 3. **Individual Treatment**

The amount of individual treatment hours provided to acute and intermediate patients could not be determined from the data provided by SQ-PIP. In the acute care program, most treatment was provided through individual contacts rather than group therapy. Staff reported that acute and intermediate care patients met at least weekly with the psychiatrist, psychologist, and social worker.

### 4. **Psychiatric Services**

In addition to the three psychiatrists assigned to the SQ-PIP, two additional psychiatrists from San Quentin State Prison provided treatment to patients who were on their caseload prior to their admission to the PIP to enhance continuity of care. Similar to the issues noted in the preceding individual treatment section above, the data reported by SQ-PIP was not separated in a

314

manner that allowed for adequate determination of the amount of psychiatric treatment provided for acute and intermediate care patients during the review period.

5. **Other Treatment Issues**

A. **Involuntary Medications (PC 2602)**

Involuntary medications were managed appropriately during the review period. Two PC 2602 petitions were initiated, four were renewed, and one was withdrawn (a planned non-renewal). No PC 2602 petitions were denied, and there were no occurrences of planned use of force for involuntary medications.

B. **Behavioral Management**

Behavior plans remained problematic at the SQ-PIP despite improvements noted during the preceding monitoring visit. No single staff member was dedicated to the development and oversight of behavior plans, and unit staff did not understand the purpose or relevance of behavioral treatment. Behavior plans were underutilized in treatment despite clinical indications of the need for a plan.

SQ-PIP initiated only three individual behavior plans since the preceding monitoring visit. A review of the EHRS noted other patients for whom behavior plans were indicated; however, there was no documentation of consideration.

The three existing behavior plans were outdated and not fully functional, and staff did not consistently document target behaviors. All three plans were initiated prior to August 2018, and no plans were updated during the two years since implementation.

Behavior plans are living documents that require the behavioral specialist to monitor implementation, observe patient behavior, and modify the plan as needed. The role of a behavioral specialist requires education and supervised experience in the methodologies of

315

behavioral assessment and treatment. Training on behavior plans was indicated as several SQ-PIP staff did not understand the purpose of the plans and viewed them as unnecessary burdens.

### C. Morning and End of Shift Meetings

The monitor's expert attended one afternoon shift meeting during the site visit. A nursing staff member led the meeting, read aloud a list of patient names and commented on patients' medication compliance for the day. The meeting was not collaborative or interactive. Only representatives from the nursing department spoke. Most concerning was the absence of a psychiatrist or mental health clinicians during the meeting.

### D. Clinical Progress Notes

A review of patient health records revealed no improvement with group treatment progress notes, an area identified for improvement during the preceding monitoring period. Progress notes contained generic statements regarding patient attendance and no specific information relative to the patient's progress or lack thereof.

### E. Unit Temperatures

Temperatures varied widely across the wings of the PIP with some rooms significantly colder than others during the site visit. As a result of physical plant issues, outside air constantly circulated solely on the PIP floor of the building. In response to different temperatures, patients in cold cells were given additional blankets. Several patients attributed some treatment refusals to cold temperatures on one side of the building. Plant management staff indicated that due to staffing shortages and other priorities, the institution would not make immediate additional improvements. The institution was unable to provide a timeline for additional improvements or whether additional improvements would be completed.

## V.   PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures

SQ-PIP did not have an updated acute care program policy that included admission and treatment of non-condemned patients.  The lack of an update contributed to the confusion regarding treatment and operational expectations including mechanical restraints, escorts, and pre-release planning as the existing policy applied to condemned patients only.

SQ-PIP's use of the Steps Toward Accomplishment, Growth, and Education (STAGE) level system remained unchanged since November 2016 while awaiting implementation of a statewide policy.  SQ-PIP staff reported that they no longer utilized DPS; however, a review of current restrictive cuffing practices was indicated.

Patients at STAGE 1 were expected to participate in zero to 35 percent of treatment, STAGE 2 patients were required to participate in 36 to 66 percent of treatment, and STAGE 3 required participation at 67 percent and above.  Pursuant to policy, participation without prompts was required.

## VI.   REFERRALS AND TRANSFERS

SQ-PIP timely transferred two condemned patients to CMF-PIP for intermediate care during the review period.

## VII.   ADMISSIONS AND DISCHARGES

### 1.   Admissions

During the review period, 16 patients were referred and accepted to the SQ-PIP for acute care.  Of those, 12 were non-condemned patients.  Ten of the 12 non-condemned patients were admitted during a two-day period on October 17-18, 2019.  There were no rejections or rescissions, and transfer timeframes were met for all admissions.

317

Non-condemned patients were not allowed admission to the intermediate care program at SQ-PIP.  During the review period, 22 condemned patients were admitted to the SQ-PIP for intermediate care and there were no rejections or rescissions.  Transfer timeframes were met during the review period.

### 2.  Discharges

Five patients were discharged from acute care during the review period.  The average length of stay for those patients was 58 days with a range from 18.58 days to 153 days.  Eight intermediate care patients discharged from the SQ-PIP during that same time period.  The average length of stay for those patients was 109 days with a range from 39.96 days to 183 days.  No patients remained in the SQ-PIP longer than 72 hours after clinical discharge.

One acute, non-condemned patient paroled from SQ-PIP during the review period.  He was unexpectedly admitted within thirty days of parole.  SQ-PIP assigned a discharge clinical social worker and participated in a CCAT regarding his pending release.  Two additional patients were admitted within 90 days of parole during the review period.  SQ-PIP staff conducted pre-release planning assessments for both, contacted parole services associates and referred the patients to TCMP.

## VIII.  PATIENT DISCIPLINARY PROCESS

Three of five of required SQ-PIP custody staff completed training on the disciplinary process.  One hundred percent of required clinical staff were trained.

SQ-PIP issued five RVRs during the reporting period.  The monitor's review of all five revealed that policy was followed throughout the adjudication process.

## IX.  USE OF FORCE

There were no immediate or controlled use of force incidents during the reporting period.

## X.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

SQ-PIP did not separate serious incident reports (SIRs) generated in the PIP from SIRs generated in the CTC; therefore, the number of SIRs that occurred in the PIP could not be determined.

## XI.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

There were no incidences of seclusion, restraint, or use of observation rooms during the review period.

## XII.    SUICIDE PREVENTION

No suicides occurred in the SQ-PIP during the review period; five acts of self-harm were reported.

## XIII.    EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1.    Emergency Response

The Emergency Medical Response Review Committee (EMRRC) was institution-wide and not specific to the PIP.  The EMRRC met four of the six months during the review period, and minutes were maintained.  There was one incident involving a PIP patient from July 2019 through October 2019.

### 2.    Death Review Process

There were no deaths at the SQ-PIP during the review period.

## XIV.    QUALITY MANAGEMENT AND UTILIZATION REVIEW

SQ-PIP's quality management process had notably declined since the preceding monitoring period.  The monitor's expert observed problems with efficiency, methodology,

accountability, and communication between leadership and line staff as primary contributors to the decline of the quality management process discovered during the site visit.

Quality management was monitored through the SQ-PIP subcommittee meetings, which convened monthly during the review period. A review of SQ-PIP subcommittee meeting minutes indicated a quorum was achieved only once during the review period and required mental health and nursing staff failed to consistently attend. SQ-PIP proposed two Quality Improvement Teams (QITs) during the review period; one was rejected and the other addressed high treatment refusals. The high refusal QIT transitioned into a workgroup of one staff member and was ultimately discontinued without progress toward understanding or resolving attendance issues. Additionally, there was no proof of practice nor documentation regarding the outcomes of the workgroup. There were no other plans proposed to address treatment attendance issues.

SQ-PIP quality management focused on improving the quality of IDTTs during the review period. SQ-PIP initiated a Performance Improvement Work Plan (PIWP) for IDTT quality in April 2019, and in January 2020, institutional audits indicated 96.6 percent compliance with items on the IDTT monitoring tool. However, in contrast, the monitor's expert's review found the quality of SQ-PIP IDTTs to remain very poor. The CDCR regional specialist present during the site visit reported similar deficiencies found in IDTTs at a SQ-PIP visit two weeks prior. Leadership staff was unable to verify whether SQ-PIP clinicians had been informed of the items on the monitoring tool or whether IDTT staff had been provided feedback regarding observed deficits during the ten-month PIWP.

SQ-PIP also completed a master treatment plan audit during the reporting period that revealed several compliance issues. Although a corrective action plan was created that included staff training, SQ-PIP did not provide proof of practice for the training. Leadership staff

acknowledged that the training was informal and often in the form of reminders during monthly staff meetings.

The local governing body reportedly met three times during the review period, however, despite multiple requests, minutes for the local governing body and quality management committee meetings were not provided for review. SQ-PIP leadership reported problems with developing and revising policies and procedures in a timely manner, in part due to the infrequency of the local governing body meetings. SQ-PIP leadership was not confident in their ability to improve compliance with timely approval of policies and procedures due to a recent change in the approval process that resulted in delays of up to three months.

SQ-PIP's peer review process was active during the review period. All licensed, eligible staff were reviewed annually. There were no performance concerns documented regarding these reviews.

## XV.   **PATIENT COMPLAINTS/PATIENT SATISFACTION**

Two patients filed grievances during the reporting period; one was withdrawn, and no action was taken on the other. Grievances addressed access to therapy and the receipt of ducats.

SQ-PIP conducted patient surveys twice a year. The most recent survey was completed in December 2019 and included the time period of July 2019 to December 2019. Twenty patients completed the survey; of the 15 areas surveyed, 13 achieved a score of less than 85 percent. SQ-PIP management staff reported that it was in the process of reviewing trends to address during coordination meetings and the PIP subcommittee meeting.

The SQ-PIP patient advocate also met with patients regarding any complaints of abuse, and/or the unreasonable denial or withholding of a guaranteed right. The advocate met with six patients during the review period.

321

## XVI.  CUSTODY/MENTAL HEALTH RELATIONS

The relationship between SQ-PIP clinical and custody supervisors was strained due to an unresolved disagreement over the placement of non-condemned patients in the unit.  While custody and clinical management staff reported an excellent working relationship between disciplines at their level, clinical and custody supervisors reported poor working relations between the disciplines.  Additionally, while on site, the monitor observed a staff meeting where no supervisors attended, and line staff were very apprehensive and/or unwilling to discuss the relationship between the disciplines.

## XVII.  *COLEMAN* POSTINGS

At the time of the site visit, only one *Coleman* poster was observed in the SQ-PIP; however, posters in both English and Spanish were affixed in appropriate locations by the last day of the visit.

## XVIII. LAUNDRY AND SUPPLY ISSUES

There were no laundry or supply issues reported during the review period.

## XIX.  VISITATION/PRIVILEGES/TELEPHONE ACCESS

The SQ-PIP visitation policy was revised in August 2019 to allow the treatment team to determine patient stability for visitation during the IDTT.  SQ-PIP visitation times and dates were consistent with San Quentin State Prison.  Patients did not report any problems with visitation, access to telephones, or access to personal property.

## XX.  LAW LIBRARY ACCESS

Access to the law library computer kiosk was available upon patient request.  Interviewed patients confirmed adequate access to the law library.

## XXI.  __EDUCATION__

SQ-PIP reported that the institution's education staff was available to assist SQ-PIP patients; however, this service was not utilized during the review period.  It was unclear whether patients were aware that educational services were available to them.

<u>APPENDIX B-1</u>
DSH-Patton
February 4, 2020 – February 5, 2020

**Patient A**

This 30-year-old female was admitted to DSH-Patton on August 6, 2019.  The reason for admission was "to manage symptoms of grave disability and suicidal ideation." Treatment outcome expectations included a reduction of self-injurious behavior (cutting, headbanging, and strangulation), an improvement in medication adherence, a reduction of psychotic symptoms, improvement in both social skills and insight, and an increase in both impulse control and affect regulation.  She was diagnosed with Schizophrenia, an Amphetamine Substance Use Disorder, and a Borderline Personality Disorder.  She had an active PC 2602 involuntary medication order and was being treated with Haldol, Benadryl and Vistaril.

While at DSH-Patton, she had a history of punching the wall and becoming aggressive with unit staff, who noted that her behavior was difficult to redirect.  Her chart revealed major behavioral incidents in September, October, and December.  She was relatively stable in January 2020.  Her group attendance steadily increased from 58.4 percent in November 2019 to 70 percent in January 2020.

During the site visit, she remained on one-to-one continuous observation because of the severity of her impulsive behavior (15 SIRS, two for suicide attempts and 13 for aggressive acts).  The focus of the comprehensive multidisciplinary treatment team was to reduce her psychotic symptoms and stabilize her mood.  There was also documentation of psychiatric evaluations and weekly, if not daily psychiatric progress notes, especially for the past couple months.

There was no documentation of ongoing individual psychotherapy.  There was documentation of regular multidisciplinary treatment team meetings with the patient.

Findings

This patient's care was adequate.  Team members collaboratively worked to reduce her psychotic symptoms and impulsive self-destructive and aggressive behavior.  Her treatment plan was a comprehensive living document that addressed her psychotic symptoms and unstable emotions and behaviors.  Involuntary medication, one-to-one observation, and almost daily medication follow-up sessions with psychiatry were the primary interventions.  There was no evidence of a behavior support plan which could have helped manage her impulsive behavior.

**Patient B**

This 53-year-old female was committed to DSH-Patton on September 18, 2019.  She was diagnosed with a Bipolar Disorder in partial remission, with the most recent episode being mania.  Her medical record revealed an extensive history of mental illness and substance use disorders.

Her hospital course showed variable improvement.  She attended 92 percent of her group sessions in January.  She reported using her coping skills to control her emotions and behavior. In fact, she reported that she was "getting a lot from the cognitive behavior therapy group." Her rehab therapist and social worker met with her almost weekly.  She was seen by a psychologist once for an evaluation and by a psychiatrist multiple times a week.

She will be considered for parole in March 2020, after receiving a CDCR psychological evaluation to determine if she would parole to the community or to a state hospital as a "mentally disordered offender" (MDO).  There was no evidence in her treatment plan or progress notes that any interventions or plans were made to help her prepare for an upcoming transition from prison.

Findings

This patient's care was adequate.  She had a complicated history of mental health problems and substance use disorders.  The multidisciplinary team collaboratively worked with her, trying to stabilize her mental status and help her achieve at least two of her discharge goals, (medication adherence and participation in 90 percent of her treatment groups).  Her future was unclear given the possibility of being classified as MDO.  Regardless of the outcome, treatment planning needed to work on transitioning from prison to another environment.  Integrated substance use disorder treatment was also indicated, but it was not considered in her treatment plan.

**Patient C**

This is the third admission to DSH-Patton for this 51-year-old patient, admitted in August 2019. She was diagnosed with a Major Depressive Disorder and with an Unspecified Psychotic Disorder.  Psychiatric medications included Zyprexa and BuSpar.

Admission psychiatric, psychosocial and psychological evaluations were comprehensive and complemented each other.  They revealed that she was psychiatrically hospitalized because of suicidal thoughts due to feelings of guilt which occurred when she thought of her children.   She became hopeless and "catatonic."  A review of her record revealed a history of helplessness, hopelessness, auditory hallucinations, and social withdrawal.

The psychosocial assessment recommended that she receive individual psychotherapy and dialectical behavior therapy.  Weekly psychiatry progress notes were present.  Monthly psychology progress notes were also present.  Progress notes from social work and rehab therapists were not found.

The January 9, 2020 treatment plan was current.  Treatment goals included: medication compliance for at least six weeks; a reduction in suicidal ideation from ten out of ten to six out of ten; an identification of at least one reason to live; the articulation of one short-term and one long-term goal that she can accomplish while in prison; and a reduction in her reported sadness.

Her response to treatment during the past month was good. She attended and actively participating in treatment groups, reporting that she found them helpful. She denied any recent major symptomatology; however, her record revealed that she reported feeling depressed without suicidal ideation on a regular basis.

Findings

This patient's care was mixed. Evaluations were comprehensive and treatment plans were current. Based on a review of the record, she appeared engaged with the treatment team, collaboratively setting measurable goals and working to achieve those goals. Documentation tended to be timely and reflected continuity of care; however, progress notes from social work and rehabilitation therapists were not found. Since some documentation was missing, it was also unclear if the patient was receiving individual psychotherapy and/or dialectical behavior therapy, both of which were recommended per the psychosocial assessment.

**Patient D**

This 29-year-old woman was admitted to DSH-Patton on May 16, 2019 due to increasing psychotic behaviors. Symptoms included talking to herself, yelling and screaming at people who were not in her cell and yelling and screaming in session with word salad speech and psychotic thought processes. Treatment outcome expectations included stabilization of mood lability and increase opportunities for socialization in a less restrictive environment. Her estimated release/parole date (EPRD) was June 7, 2020.

Upon admission to DHS-Patton, she endorsed racing thoughts and the perception that others could read her mind. A remote history of amphetamine, alcohol and heroin use was reported. It was clear from admission summary that the referral package from CIW-PIP had been reviewed by the DSH-Patton clinicians.

The initial psychiatric evaluation, completed on the day of admission, was comprehensive and included a suicide risk assessment. Medications included olanzapine, buspirone, bromocriptine and hydroxyzine.

A November 19, 2019 treatment plan was reviewed, which indicated that her current diagnoses were Unspecified Schizophrenia Spectrum and Other Psychotic Disorder, Cannabis Use Disorder, severe and Amphetamine Type Substance Use Disorder, severe. Monthly progress notes in the context of her treatment plan were documented. Treatment objectives and interventions were individualized in her treatment plan. Monthly psychiatrist's progress notes were present in her health care record.

This patient's treatment team meeting was observed by the monitor's experts. Some discussion during the meeting focused on her likely need for participation in a substance abuse rehabilitation program upon her release, which was thought to be scheduled for June 2020.

Findings

This patient's care was adequate. She appeared to be receiving benefit from her current DSH-Patton hospitalization, although concern regarding the number of structured treatment hours being offered to her was present.

**Patient E**

This 59-year-old woman received her admission psychological assessment during September 3, 2019. The reason for admission was "manage symptoms of grave disability." Her history included command auditory hallucinations as well as bizarre behavior such as "defecating on the floor, intermittent disrobing and washing her muumuu in her toilet." She had DSH-Patton admissions prior to her CDCR incarceration, which included the diagnosis of Schizophrenia.

Her admission psychiatric evaluation was completed on the day of admission, August 29, 2019. The assessment was comprehensive in nature. Her presentation was consistent with the diagnosis of Schizophrenia, although her differential diagnosis included Schizoaffective Disorder and Major Depressive Disorder. Medications included Haldol, hydroxyzine, trazodone, paroxetine risperidone and benztropine.

The most recent treatment plan was dated January 9, 2020. Monthly treatment planning notes were documented in her health care record. Her group attendance was close to 80 percent during the past two months, which was an improvement over prior months. Objectives and interventions were individualized in her treatment plan.

Monthly notes by a psychologist were present from October to December 2019. Progress notes by the psychiatrist were generally present on a weekly basis, at least for the past three months. The psychologist's notes were filed under the physician's progress notes. One social worker monthly note was present in the chart.

Findings

This patient appeared to be benefiting from her current hospitalization, although the amount of structured therapeutic activities offered to her was very limited. She would also benefit from participation in increased numbers of structured therapeutic activities being offered to her.

**Patient F**

This 25-year-old patient, diagnosed with Schizoaffective Disorder, depressed type and Alcohol Use Disorder, was admitted from the CIW-PIP ICF on December 17, 2019. She was prescribed Clozaril, Prozac and BuSpar.

The admission psychiatric assessment was timely and comprehensive in nature. The initial nursing assessment and admission psychological assessment were also completed in a timely manner. The DSH-Patton rehabilitation therapy assessment, completed January 2, 2020, was comprehensive in nature.

The monitor's experts observed this patient's treatment team meeting. Her speech was somewhat slurred during the interview. The psychiatrist indicated that she had demonstrated marked clinical improvement during the past four weeks. Her medications were being adjusted. She expressed fear about returning to CDCR due to an incident that occurred at the CIW-PIP ICF in which another patient threw hot water on her, which required outside treatment.

She was seen regularly by the psychiatrist, social worker and rehabilitation therapists. A reasonable treatment plan with updates was also present.

Findings

Care was adequate for this patient who was clearly appropriate for an ICF level of care. Documentation by her clinicians was timely and appropriate. The major treatment issue was limited access to therapeutic groups.

**Patient G**

This 26-year-old female was admitted to DSH-Patton on September 6, 2019. Comprehensive multidisciplinary assessments were done in a timely manner. This patient had had an active PC 2602 involuntary medication order that expired on November 29, 2019. She had a past history of two PC 2684 prisoner commitments to DSH-Patton. A long history of self-injurious behaviors was noted. Medications included Remeron, Seroquel, propranolol, Buspar and Zyprexa. Diagnoses were Borderline Personality Disorder, severe, Unspecified Schizophrenia Spectrum or Other Psychotic Disorder, Disruptive Mood Regulation Disorder and Stimulant Use Disorder.

Her health care record was reviewed with a specific focus on her PC 2602 status which was not addressed. There were several incidents between mid-September and early December 2019 that indicated the need for continued PC 2602 including an incident of cheeking medications, two incidents of five-point restraints and two incidents of 1:1 observation.

Findings

This patient's care was inadequate. This patient had a long history of self-injurious behaviors and medication non-compliance, which resulted in a PC 2602 process that was allowed to expire on November 29, 2019.

<u>APPENDIX B-2</u>
SVSP-PIP
December 3, 2019 – December 6, 2019

**Patient A**

This health care record was reviewed following onsite patient interviews conducted on December 3, 2019 during which the patient expressed intense frustration with the mental health services and the length of his stay in the PIP.  He was referred for intermediate care in June 2019 due to decreased participation in EOP programming and self-injurious behavior.  His diagnosis was Post Traumatic Stress Disorder (PTSD) with comorbid depression.  He was prescribed mood stabilizing medication on September 24, 2019.  The patient's history was significant for 15 to 20 reported suicide attempts and numerous MHCB admissions.

A SRASHE was completed during the admission process.  However, the clinician left the individual acute risk factors section blank and, despite the patient stating during intake that he would not disclose his suicidal thoughts to staff, the primary clinician based the assessment of his acute suicide risk solely on the patient's self-report; the primary clinician wrote that his acute suicide risk was low.

The June 2019 treatment plan included the following goals: "working on pedophilic interest," "continue to work on past history of being sexually abused and pedophilic tendencies," "continue to help him with keeping an intact identity," and "working with him on accepting his condition, forgiving himself, and move on with his life while at SVSP-PIP."  Treatment interventions were not included in the plan.  The primary clinician also noted in the June 2019 treatment plan that the patient could be "helped at the EOP or CCCMS level of care."

The December 4, 2019 clinical summary described the patient as doing well, exhibiting minimal functional impairments, and engaging in and responding well to treatment.  The primary clinician also wrote that there were no barriers to treatment.  However, during the December 4, 2019 IDTT, the patient stated, "I'm not happy.  I'm done with this program.  I'm constantly mad and pissed off, but you guys won't see it." When asked about suicidal ideation during this IDTT, the patient replied, "Yes, and I have three plans.  Everywhere I go I figure out a plan for how I could do it." It appeared the patient left the IDTT after these suicidal statements, and there was no plan for follow up documented.  The December 4, 2019 clinical note was copied and pasted from a note written on November 5, 2019 and was inconsistent with his presentation during IDTT.

<u>Findings</u>

The care provided to this patient was inadequate.  Treatment plans, level of care justifications, and suicide risk management practices were not consistent with the record.  Despite the patient stating that he would not disclose suicidal thoughts to staff, the primary clinician based the judgement of suicide risk on the patient's self-report the following day.  While the record suggested that most of the acute risk factors were present, the primary clinician left this section of the assessment form blank and inaccurately wrote that his acute suicide risk was low.  In response to the patient's suicidal statements during IDTT, the treatment team should have

ordered immediate safety observation until a suicide risk evaluation and safety plan could be completed; however, the record suggested this did not occur. Suicide prevention training, proctoring, and supervision are highly recommended for the primary clinician.

Consistent with the patient's complaints during patient interviews, the IDTT did not sufficiently justify their level of care decisions. The primary clinician noted in June 2019 that the patient "can be helped at the EOP or CCCMS level of care"; however, he was retained in the PIP through December 2019 without justification or clear discharge objectives.

**Patient B**

This patient was reviewed at the request of plaintiff's counsel. Specifically, they asked whether the patient was appropriately placed on maximum custody and whether the behaviors resulting in maximum custody were addressed in treatment. The patient transferred to SVSP-PIP on April 29, 2019. Treatment concerns included depressive episodes, self-injurious behaviors, auditory hallucinations, and recent suicide watch. The patient had an active PC 2602 order and was prescribed antipsychotic and mood stabilizing medications. His acute and chronic risk for suicide were assessed as high.

He received two RVRs for indecent exposure in August and October 2019. The RVR mental health assessments noted that mental illness was not a contributing factor to the behaviors. Only one of the assessments offered recommendations for the hearing officer, and they were minimal. Treatment goals included reducing depressed mood, verbalizing hope for the future, identifying ways to improve decision making, reducing suicidal ideation, and participating in unit programming.

Findings

The quality of the RVR mental health assessments and treatment plans was inadequate. The treatment plan was vague and did not address the behaviors resulting in maximum custody placement. This also raised continuity of care concerns as the referring institution had incorporated "reducing impulsive acts (IEX behaviors)" into their treatment plan prior to his arrival at the PIP.

Although the clinician opined that mental health factors did not contribute to the RVR behaviors, on or around October 28, 2019, the ICC noted that the patient would be released from maximum custody and that his level of care was considered in their decision.

**Patient C**

This patient was reviewed at the request of plaintiffs' counsel to assess whether the patient was appropriately placed on maximum custody and whether the behaviors resulting in maximum custody were addressed in treatment. The patient transferred from CSP-Sac to SVSP-PIP due to

grave disability concerns on or around August 26, 2019. CSP-Sac noted that he had been "living in filth and refusing showers" around the time of referral.

The patient was placed in maximum custody following an alleged staff assault at CSP-Sac on June 27, 2019. The RVR mental health assessment indicated the patient's behaviors were not linked to his mental health symptoms. The clinician did not offer recommendations for the hearing officer to consider.

In October of 2019, the patient received an RVR for indecent exposure (IEX) at SVSP-PIP. The accompanying RVR mental health assessment noted that mental illness contributed to his behavior, that he was experiencing psychotic symptoms and was not on psychiatric medication at the time of the incident, and that he likely would not have engaged in the behavior if not for his symptoms. The clinician recommended continued family contacts, canteen, and housing at SVSP-PIP in place of a security housing unit (SHU).

The patient's "compulsive exhibition" was listed as a treatment target. His treatment goal involved displaying "behavior appropriate for level of care."

Findings

While the treatment plan was inadequate, the RVR mental health assessment and outcome were appropriate. "Compulsive exhibition" was identified as a treatment target, but there were no interventions offered in the SVSP-PIP treatment plan. In general, the treatment plan was vague and did not include measurable objectives. SVSP-PIP's October 2019 RVR mental health assessment was appropriate, and it appeared the hearing officer followed the clinician's recommendations.

**Patient D**

This patient's health care record was reviewed following onsite IDTT observation on December 4, 2019. The patient transferred to SVSP-PIP for intermediate care on March 5, 2019. He was referred for depression, chronic suicidal ideation, and lack of treatment progress.

According to the health care record, the patient was diagnosed with Major Depressive Disorder and Antisocial, Borderline, and Narcissistic Personality Disorders. However, when asked about the patient's diagnoses during IDTT observation, the treatment team responded that he was diagnosed with Bipolar Disorder and Post Traumatic Stress Disorder (PTSD).

The patient's medication administration record (MAR) indicated that he had active prescriptions for Fluphenazine, Vistaril, Keppra, Lithium, Remeron, Prazosin and Zoloft. The MAR also revealed that he refused Zoloft from December 1, 2019 through December 3, 2019. During IDTT observation, the psychiatrist stated that the patient was prescribed only Zoloft, Remeron, Vistaril, and Fluphenazine. The patient's recent medication non-compliance was not discussed during IDTT.

The patient was discharged from the PIP during the IDTT observation.

Findings

The care provided to this patient was inadequate. The IDTT was disorganized, and the treatment team did not operate cohesively. The clinicians were uncertain about the patient's diagnosis but did not attempt to resolve it. The treatment and discharge plans were vague. The IDTT discharged the patient without discussing critical clinical information in the record, including his progress toward treatment goals and recent medication non-compliance. Discharge recommendations also were not discussed or shared with the patient during IDTT.

**Patient E**

This patient was selected for review following onsite patient interviews wherein he endorsed continued suicidal thoughts and expressed concern regarding a planned discharge to EOP level of care within 30 days. The patient was housed in the TC1 unit during the monitoring visit. He was diagnosed with Major Depressive Disorder and Antisocial Personality Disorder. Medications included Lexapro and Depakote. The patient was referred to the PIP from the Richard J. Donovan Correctional Facility (RJD) after cutting his neck with a razor.

During the course of his current PIP admission the patient engaged in at least two self-injurious behavior incidents, with the most recent occurring in mid-November. The patient attributed the recent incident of self-harm to feelings of anxiety that were triggered by the planned discharge and other stressors. A SRASHE dated November 18, 2019 assessed his acute suicide risk as moderate and his chronic suicide risk as high.

The most recent psychiatry contact occurred on August 19, 2019. He was offered six individual contacts with the psychiatrist between October 3, 2019 and December 4, 2019, two of which were completed at cell front.

The patient's treatment goals were not aligned with the referring institution's treatment outcome expectations for anger management and distress tolerance, and this was not justified in the record. Treatment goals involved decreasing depression to a rating of six or less, and this goal remained the same since August 19, 2019. There were no documented goals for anxiety, suicidal ideation, or self-injury.

The patient's discharge from the PIP was discussed in clinical notes on October 23, 2019 and November 7, 2019. Documentation of discharge planning during the two most recent IDTTs was limited to referencing treatment outcome expectations and requesting a CCAT prior to discharge.

<u>Findings</u>

The patient's care was inadequate.  Psychiatry contacts were insufficient.  A safety plan was clinically indicated, but not completed.  The treatment plan did not fully address the patient's treatment needs or the referring institution's clinical concerns.  However, the plan to hold a CCAT prior to discharge was appropriate.

<u>APPENDIX B-3</u>
CMF-PIP
December 3, 2019 – December 6, 2019

**Patient A**

This health care record was reviewed at the request of plaintiff's counsel because the patient was identified as a possible rejection from ASH. During the site visit, CMF-PIP management and various CDCR headquarters staff explained that there were possibly errors in communication regarding this patient's rejection from ASH for least restrictive housing (LRH). All involved staff indicated that they would work together to remedy the situation and if he required referral to ASH, that referral would occur.

Regarding care, this patient had a history of suicidal ideation and "suicidal behaviors." He was diagnosed with Major Depressive Disorder and there was consideration for Borderline Personality Disorder. The patient was prescribed vortioxetine, duloxetine and hydroxyzine.

The patient requested a transfer to ASH and based on record review, it was unclear if his frustration regarding the lack of transfer to ASH was appropriately addressed. He requested a new primary clinician and had recently begun refusing to meet with his assigned primary clinician. Additionally, he had increasingly refused treatment groups and medications. Despite poor treatment compliance, the treatment plan was not modified to address contributing factors.

The patient's 60-day IDTT, which was held late, was observed during the site visit. All required participants were in attendance. He was high functioning, articulate, did not express or appear to experience psychotic symptoms, or have issues with socialization. For reasons that were unclear, these factors were used as a clinical justification to continue inpatient care at his current housing instead of consideration of a less restrictive housing environment. The patient was noted as high chronic risk of suicide. The two treatment goals identified in this treatment plan were to reduce depression to a self-report of four on a scale of one to ten and to display behavior appropriate for a lower level of care.

Findings

This patient's treatment was minimally adequate. This patient would benefit from DBT-informed treatment focused on his inability to manage limits and cope with disappointments. In addition, the patient's treatment plan should be updated based on poor treatment compliance and include safety planning.

As a result of the information learned regarding LRH, the patient should be re-referred to ASH so that his case could be reviewed and referred to ASH if appropriate.

**Patient B**

The patient was referred to intermediate care on September 7, 2019 from the MHCB due to an inability to function at his prior level of care due to danger to self. This patient's health care record was selected for review after the patient reported during patient interviews that he had not been seen by psychiatry for an extended period of time.

337

Record review indicated that an IDTT occurred almost three months prior to the site visit. Documentation was incomplete and the timeframe was not clear. Following discussion with CMF-PIP management, the patient was also "checked in and out" as being seen for two subsequent IDTTs. However, there was no supporting documentation beyond the patient level outcome which included a few short questions, e.g. How do you feel treatment is working for you? While the patient level outcome is typically completed at an IDTT, it is not sufficient documentation to support occurrence of an IDTT.

The patient was to be seen weekly by the psychiatrist and by his primary clinician. However, documentation of the last individual psychiatric contact was from two months prior to the site visit. At that time, his medication was changed from Zyprexa to Invega with a plan to "observe closely." The primary clinician did not meet with the patient weekly.

The lack of timely contacts was discussed with CMF-PIP management staff, and an urgent referral was submitted to psychiatry, IDTT was scheduled for the next business day, and it was expected that individual primary clinician clinical contacts would occur weekly in alignment with the treatment plan.

Findings

This patient did not receive adequate treatment. Comprehensive, individualized treatment plans were not developed and updated as required by Program Guide and clinical need. The patient was not regularly evaluated and provided treatment by his primary clinician or psychiatrist. A safety plan was not developed, and treatment did not address individual risk factors. Lastly, the lack of IDTT documentation was problematic.

**Patient C**

This patient's health care record was selected for review after the patient was observed in a treatment group and attended patient interviews. The patient disclosed his belief that staff were discriminating against him because he had transferred from DSH-Patton where he was committed under PC 1370 as incompetent to stand trial and was transferred from there due to aggression toward staff under the WIC 7301. It appeared he felt that he was being retained in inpatient treatment as a result of this "discrimination."

During the initial psychiatric assessment on August 28, 2019, the patient was seen as experiencing acute decompensation following acute intoxication. He had ingested heroin and crystal methamphetamine following a four-year period of abstinence. As a result, the patient was experiencing paranoia and command hallucinations causing him to feel suicidal. He had a history of feeling suspicious toward all staff, including mental health staff, for a variety of reasons though the behavior that had reportedly occurred at DSH-Patton was not mentioned in the intake assessment. The patient was diagnosed with Schizoaffective Disorder and prescribed olanzapine, venlafaxine and diphenhydramine.

There were multiple treatment plans in the health care record including August 27, 2019, August 29, 2019, September 19, 2019, October 28, 2019 and November 22, 2019 that indicated he was

not seen by consistent treatment teams. IDTTs were not always timely nor were required attendees always present. The quality of reviewed treatment plans was generally poor due to generic treatment goals, e.g. "patient will ID 5 benefits of an increased self-esteem" that, at times, lacked documentation of frequency or timeframe.

This patient was also not seen weekly by the psychiatrist and primary clinician in a confidential setting as indicated in the treatment plan.

Findings

Given the patient's acuity, this patient's treatment was inadequate. There was a lack of continuity of treatment team members, increasing the probability of treatment non-compliance, paranoia, and therapeutic rapport, particularly in light of the patient's acute psychotic symptoms. The treatment plans were too vague to allow for implementation of adequate treatment beyond medication management, and weekly contacts did not occur. Consideration of a referral to acute inpatient care for stabilization was warranted.

**Patient D**

This case was selected for review to determine if the patient had been seen weekly by the psychiatrist and psychologist as indicated in the treatment plan. Documentation indicated that he was not seen weekly by either as indicated in treatment plans dated October 30, 2019 and November 13, 2019. However, when he was seen, those contacts were meaningful.

The most recent treatment plan dated November 13, 2019 was reviewed. Objective goals, e.g. patient will participate in unit programming daily, were inadequate. Objective goals should have identified a specific level so that measurement could occur. For example, "the patient will participate in two unit activities per day" would have been a specific, measurable treatment goal. Treatment interventions included DBT skills which appeared appropriate for the patient. Additional treatment interventions were generic, making them less evidence based. The patient was also not seen timely for his ten day IDTT.

Findings

This patient did not receive adequate care. Contacts with providers were not in accordance with Program Guide requirements. In addition, the patient would benefit from a revised treatment plan with greater specificity.

**Patient E**

This patient's case was selected for review after his IDTT was observed on December 3, 2019. The patient was diagnosed with Autism and Schizophrenia and prescribed clozapine.

During the patient's November 2019 IDTT, he was described as floridly psychotic with the following behaviors: writhing, screaming, trying to pick at his eyes, spitting, and vomiting while an MTA tried to calm him. He was much improved at the IDTT observed during the site visit

339

one month later.  During that IDTT, he requested "more groups" but staff responded that they wanted to increase groups to the "full program of 12 hours" slowly.  IDTT documentation indicated that he was scheduled for a total of seven hours of groups, with a plan to "work to attendance of more groups."  There was no clear clinical rationale to not meet his request for more groups.

A primary clinician progress note written two days after the IDTT indicated that she reviewed the record in depth and spoke with unit staff, noting the patient's improvement and stability. Consequently, the patient was going to be placed in "more" groups for the remainder of the group cycle which ran through December 2019.  With the start of the next group cycle in January 2020, he would be scheduled for the full 12 hours of group.

This patient was seen weekly by his assigned primary clinician, a psychology intern, but not by the telepsychiatrist.  However, when seen by the telepsychiatrist, previous on-site psychiatrist, and primary clinician, those contacts appeared to be meaningful.

<u>Findings</u>

This patient was provided minimally adequate treatment.  While he improved dramatically within the last month, he was not seen every seven days by the psychiatrist (as required by the treatment plan) and was not provided with all available group treatment once stabilized.  There was not sufficient clinical justification to withhold additional treatment from the patient.

**Patient F**

This patient's case was selected for review after the patient was observed in group treatment and interviewed.  He reported that he was not seen regularly by his psychiatrist and that his psychiatrist discontinued his medications because "some people" snorted the medication he was taking.  The patient was diagnosed with Bipolar I Disorder, mixed episode, moderate; Acute Anxiety; agitation and depression.  He was prescribed aripiprazole and Abilify.

In a psychiatry progress note dated December 5, 2019, it was noted that the patient was upset with how his Wellbutrin had been discontinued but that the patient ultimately understood the concerns with the medication.  Based on the patient's self-report during interviews, he did not actually understand the concerns and would benefit from further follow-up and discussion with psychiatry.  This recommendation was provided to CMF-PIP management staff.  While the patient was not seen every seven days by psychiatry as indicated in treatment planning and required by Program Guide, contacts did appear meaningful.

The patient was seen weekly by the psychologist, though not all of those clinical contacts appeared substantive and meaningful.  The most recent treatment plan dated November 22, 2019 included subjective goals and non-specific vague goals.

340

Findings

This patient was not adequately treated. He was not seen by the psychiatrist with the required frequency, and during at least one psychiatric contact the provider did not ensure that the patient fully understood what was occurring. primary clinician contacts were not always meaningful and substantial, sometimes appearing more as "check-ins" rather than true clinical contacts.

**Patient G**

This patient was referred to CMF from CSP/Sacramento CTC after setting a cell fire. He was noted to be psychotic as manifested by hallucinations, flat affect and apathy. Diagnoses were Major Depressive Disorder and a pulmonary nodule (the patient reported that he had lung cancer, which apparently was not accurate). Medications included Zyprexa and Benadryl. His health care record was selected for review after observing his IDTT.

During IDTT, he was observed as drowsy and very dysarthric. The dysarthria was not adequately addressed during the IDTT, but following consultation with his psychiatrist, Cogentin was prescribed. Documentation specific to the presence of dysarthria was not present in the chart prior to the IDTT. In fact, documentation from a week prior indicated that permanent speech was not impaired.

He was not on suicide precautions but was dressed in boxer shorts and a T-shirt with a smock covering his clothing. The supervising nurse indicated that he had clothing available to wear but due to the transition from MTAs to correctional officers, he was not provided with proper instructions by custody staff to appropriately dress prior to the IDTT. The monitor's expert went to his cell with the correctional officer and discovered that he did not have any clothing other than the boxer shorts and T-shirt. This was subsequently remedied after the Headquarters' psychiatrist informed the nurse of our findings.

Findings

This patient's care was inadequate. It was concerning that this patient's dysarthria was not adequately addressed until intervention by the monitor's expert. Equally concerning was the lack of IDTT intervention relevant to this inmate not having full issue clothing.

**Patient H**

This patient was admitted to the CMF-PIP for acute care on June 10, 2019 from the SVSP-PIP ICF. Approximately a month prior, he stuck a spoon in his eye due to command auditory hallucinations and has continued to poke his eye. He has remained on 1:1 observation since his admission. Attendance at ophthalmology appointments has been inconsistent because he saw no purpose for such appointments. He had a long history of Schizophrenia associated with command hallucinations. Medications included Clozaril.

341

A Positive Behavior Support Team consult was obtained, and a detailed behavioral management plan was developed and implemented. A psychopharmacological consultation recommended ECT augmentation of clozapine among other recommendations.

His December 4, 2019 IDTT was observed. During IDTT he reported that he continued to poke his eye on an intermittent basis. His psychiatrist reported that he has significantly damaged vision in his right eye. His response to appropriate medications, a behavioral management treatment plan and a host of other interventions had not been good. The recommendation for ECT was reported by the treatment team to continue to be in the legal department.

The monitor's expert subsequently discussed this case with CDCR psychiatric leadership who were familiar with this patient's circumstances for a variety of reasons. For reasons unclear to the monitor's expert, the referral for ECT never occurred. CDCR psychiatric leadership was in the process of arranging ECT to occur at DSH.

Findings

This patient's care was inadequate. It was very concerning that the treatment team was misinformed about the reported ECT referral. This patient's need for ECT is urgent.

**Patient I**

This 27-year-old man was admitted to CMF-PIP on September 10, 2019 after swallowing razors, paperclips and zippers as a reported suicide attempt. He reportedly had chronic suicidal thinking without a plan or intent. He reportedly was grieving his mother's death. Diagnoses included Antisocial Personality Disorder and Unspecified Schizophrenia Spectrum and Other Psychotic Disorder. He had been refusing Celexa since November and had been requesting discharge.

Progress notes by his psychiatrist and primary clinician were reviewed. His clinical presentation during the past several months was essentially unchanged and discharge issues continued to be discussed.

His last four treatment plans were reviewed. The October 17, 2019 IDTT described this patient as being emotionally stable without current behavioral problems. His treatment goals were "lowering my suicidal ideation." The plan was to develop a safety plan with his primary clinician.

During the November 4, 2019 IDTT, he presented as being emotionally and behaviorally stable. He endorsed suicidal thinking if discharged to an EOP. He was confronted about yelling down the tier related to his concerns about being discharged and not having a single cell. The plan was to continue to assess his suicide risk and discuss appropriate discharge plans once he was stable.

The November 20, 2019 IDTT indicated that this patient had recently swallowed three razor blades with the intent to die, which reportedly was related to the recent death of his stepfather. He talked about wanting to be discharged to intermediate care in order to take advantage of more groups and have more freedom.  Medication adjustments were made by the psychiatrist.

During December 3, 2019, which was observe during the site visit, the IDTT discussed discharge to EOP with this inmate, who stated "just send me to 3CMS …  you are the professional."  The treatment team assessed him to have reached maximum medical benefit from acute care. Immediately after the IDTT, this patient did something in his cell which resulted in an alarm being set off.

Findings

This patients care was adequate.  It was unclear how much benefit this patient received from his inpatient hospitalization, related in part, to both his diagnosis and significant treatment limitations identified during the site visit.  He was informed about his discharge and clearly was unhappy about it, although it appeared to be clinically appropriate.

**Patient J**

This patient's record was reviewed at the request of plaintiff's counsel who expressed concerns about his treatment and treatment plan.  He was discharged to an ICF open dorm on December 4, 2019.  He was requesting transfer to DSH-Patton in order to be closer to his family.

The discharge summary written by Stephen Greenberg, M.D. indicated that he was admitted to CMF-PIP acute care on August 13, 2019, when he was diagnosed with acute Schizophrenia.  He periodically became overwhelmed by auditory hallucinations that encouraged him to engage in bizarre behavior such as feces smearing.

His hospital course was characterized by being active in groups and responding well to medications that included Abilify, Zyprexa, Effexor and Thorazine.  His agitation markedly decreased, and he stopped smearing feces.

He was noted to have little insight into the nature of his psychiatric symptoms.  He continued to experience hallucinations, present as paranoid and perceived that staff was messing with his food and out to get him.  Discharge to intermediate care was clinically indicated due to his need for chronic inpatient care.

Findings

This patient was appropriate for transfer to an intermediate level of care as his acute psychosis had improved.

## APPENDIX B-4
CHCF-PIP
September 17, 2019 – September 19, 2019

**Patient A**

This health care record was reviewed to evaluate the quality of care in the CHCF-PIP.  The patient was in the intermediate care program from January 2016 through the date of this review.  He was diagnosed with Major Depressive Disorder and Unspecified Psychosis.  The patient's mental health history included episodes of mania and depression, self-injurious behaviors and suicide attempts, command auditory hallucinations and paranoia, and numerous inpatient admissions for danger to self and others.  The patient was compliant with his prescribed Abilify for paranoia, Effexor and Wellbutrin for depression, Zyprexa for mood stabilization, and Seroquel for mood and psychotic symptoms.  A SRASHE dated September 11, 2019 assessed the patient's suicide risk as high for chronic and moderate for acute risk.

The primary clinician noted in the case formulation section of the treatment plan that they would provide reality feedback and use cognitive behavioral therapy "for psychosis techniques."  Treatment goals included decreasing social anxiety, accurately identifying and interpreting social cues, managing environmental stressors, and learning from past experiences to prevent relapse.  A mental health IPOC for danger to self was initiated on October 4, 2019.  The goal for this IPOC involved the patient reporting a reduction in suicidal ideation by the next IDTT interval.

Between August and December 2019, the patient's psychiatric symptoms worsened, and his cognitive abilities declined.  He was described in progress notes as paranoid, delusional, confused, disorganized, withdrawn, unpredictable, resistant to treatment, and as a danger to himself and others.  Concerns regarding command auditory hallucinations and amnesia with confabulation also were documented during this timeframe.

A psychiatry note in the medication section of the treatment plans remained exactly the same between June of 2019 and January of 2020.  At least four treatment plans included a copied and pasted outdated quote from the patient that read, "Abilify is working better, I feel less paranoid."

Findings

The quality of care and discharge planning for this patient was inadequate.  With the exception of adding an IPOC for danger to self, the treatment plans were not modified in response to the patient's lack of treatment progress.  Interventions for the proposed treatment objectives were either unclear or non-existent.  The discharge plan section of the treatment plan also was vague and lacked measurable goals.  The suicide prevention safety plan was not useful.  The medication section of the treatment plans included copied and pasted statements that did not accurately describe the patient's worsening mental status.  Finally, diagnostic clarification and neuropsychological testing were clinically indicated, but not facilitated or discussed by the treatment team.

**Patient B**

This health care record was reviewed to evaluate the quality of mental health treatment provided at CHCF-PIP.  The patient was in the acute level of care for grave disability concerns between August 2019 and January 2020.  He was diagnosed with Schizophrenia-Paranoid Type and

Psychogenic Polydipsia.  Symptoms included paranoid delusions, disorganized thoughts and behaviors, auditory hallucinations, poor hygiene, isolation, and excessive fluid intake.  DSH-Atascadero referred the patient to the CHCF PIP due to the severity of his polydipsia, which they described as potentially life threatening.  The patient had an active PC 2602 order and was prescribed Zyprexa, Vistaril, and Depakote.  His history was significant for numerous inpatient psychiatric admissions and three suicide attempts.  The clinician's judgment of suicide risk on the most recent SRASHE was moderate for chronic and low for acute.

The IDTT created an IPOC for grave disability.  Treatment goals included reducing grave disability to a rating of six by the next IDTT interval, increasing showers, meals, medication compliance, and programming, and ensuring self-care problems were in remission for three months.  Fostering a therapeutic alliance "by empathizing with the patient's feelings of distress" was the only intervention proposed for this IPOC and its goals.

All primary clinician progress notes between October 2019 and January 2020 described the patient as "disheveled and dirty" and "internally preoccupied."  The January 2020 discharge note indicated that the patient refused all treatment, did not come of cell for programming, remained psychotic, and "responded to internal stimuli most of the day and night."  The psychiatrist wrote that the patient was functioning at baseline and was not expected to make further progress.  Discharge treatment recommendations included medication adjustments to reduce auditory hallucinations and paranoia, psychoeducation regarding the importance of individual and group treatment, and incentives to improve activities of daily living.

Clinical summaries were not updated between October 28, 2019 and January 7, 2020.  A total of nine treatment plans contained copied and pasted notes in the clinical summary section, instead of relevant clinical updates.

Findings

The overall quality of care provided to this patient at the CHCF-PIP was inadequate.  The IDTT did not develop a case conceptualization, and the patient's treatment goals were not modified in response to his lack of treatment progress or apparent inability to meet current treatment objectives.  The one proposed treatment intervention of fostering a therapeutic alliance was insufficient for addressing the patient's severe symptoms and functional impairments, and its ineffectiveness was apparent.  Further, the clinical summary was not updated between October 2019 and January 2020, and the absence of this important data was particularly problematic given the lack of detail in the primary clinician's progress notes.

**Patient C**

This patient's health care record was reviewed to evaluate the quality of treatment and safety planning at CHCF-PIP.  The patient was admitted for intermediate care in July 2019.  He was diagnosed with Schizoaffective Disorder, and his symptoms included delusions, mood lability, chronic suicidal ideation, and frequent auditory hallucinations with self-harm content.  He also had a history of seizures.  The patient was prescribed Zoloft for depression, Zyprexa for psychosis, and Lithium for mood stabilization.

He had a history of suicide attempts, including overdosing on illicit substances and tying a noose around his neck. He also attempted suicide during his CHCF-PIP admission in November of 2019. The clinician's judgment of suicide risk on the December 3, 2019 SRASHE was high for chronic and acute. The safety planning section of the SRASHE was sufficiently detailed.

The IDTT created one IPOC for suicidal ideation, and the intervention involved "fostering a therapeutic alliance by empathizing with the patient's feelings of distress." The discharge planning section of the treatment plan offered additional goals that were pulled forward from the referring MHCB.

Findings

The quality of care provided to this patient was inadequate. The primary clinician pulled forward a proposed treatment plan from the MHCB referral but did not modify or revise the plan based on the patient's lack of treatment progress and current treatment concerns. The proposed intervention of fostering a therapeutic alliance to address the patient's suicidal behavior was insufficient. The clinical case formulation was very poor and suggested minimal effort and/or limited understanding of the patient's symptoms and behaviors, including his suicide attempts. As such, the treatment team should facilitate a comprehensive behavioral assessment and develop a more appropriate plan of care based on their results.

**Patient D**

This patient's health care record was reviewed to evaluate the quality of treatment and safety planning at CHCF-PIP. The patient transferred from the acute program to intermediate care at CHCF-PIP in August 2019. His diagnosis was Major Depressive Disorder with psychotic features. He was prescribed Cymbalta and Zoloft for depression. The record revealed that he was intermittently non-compliant with medications. The treating psychiatrist described the patient as chronically suicidal. He had prior serious suicide attempts and more recently cut his own neck in July 2019 while housed at CSP/Corcoran. The primary clinician's judgment of chronic and acute suicide risk was moderate on the August 15, 2019 SRASHE.

The treatment goals included increasing coping skills for distress tolerance and reducing interpersonal anxiety. The patient expressed a desire to work on anger and PTSD. An IPOC for self-harm was initiated in August 2019, and the accompanying goals included reducing suicidal ideation to "4 or below by the next IDTT interval" and demonstrating "a continued decrease in self-harming behaviors across treatment team intervals."

The patient remained psychiatrically unstable through October 2019. From November 2019 through January 2020, the primary clinician described the patient as "stable and able to manage his symptoms," while also documenting that he was "concerned" and "ambivalent" regarding his upcoming discharge. During a telepsychiatry meeting on February 10, 2020, the patient reported that he was "really depressed, anxious, and nervous about discharge." On February 14, 2020, he was admitted to the MHCB after cutting his neck, refusing sutures, and reporting a desire to die.

Findings

The quality of care was inadequate.  The IDTT failed to create specific discharge objectives or criteria.  The treatment goal of reducing depression to a "4 or below" clearly was not met.  The primary clinician repeatedly documented that the patient was in distress regarding the upcoming discharge but failed to assess the nature of his fears and appropriately intervene to ensure a smoother transition.   Treatment goals were not consistently measurable, and interventions were vague.  Finally, a suicide prevention safety plan was clinically indicated given the serious nature of his suicide attempt prior to arrival, but this was not attempted during the eight month PIP admission.

**Patient E**

This health care record was reviewed to assess the quality of care in the CHCF-PIP.  The patient transitioned from the acute program to intermediate care in May 2019, and he was housed in the maximum custody overflow unit from April through December 2019.  He was referred to the PIP for grave disability, and his presenting problems included poor hygiene, auditory hallucinations, paranoia, delusions of reference, bizarre behavior, somatization, and suicidal ideation.  His diagnosis was Schizoaffective Disorder.  He had an active PC 2602 order and was prescribed Thorazine and Haldol for psychosis, and Cogentin for medication side effects.  He had three recorded suicide attempts in his lifetime, the most recent of which occurred ten years prior.  The clinician's judgment of suicide risk on the SRASHE was moderate for chronic and acute.

The patient received RVRs for indecent exposure and a staff assault during his acute program admission in April 2019.  The results of both RVR mental health assessments indicated that there was a nexus between his behavior and mental illness; a reviewing supervisor signed both evaluations in agreement.  The classification committee convened on August 1, 2019 and retained the patient in maximum custody with a plan to review his status on July 15, 2020 or sooner if he was able to program "without getting into trouble."

Beginning in May 2019, the patient repeatedly requested removal from maximum custody so that he could participate in group treatment.  Between July 2019 and November 2019, the patient received only one out-of-cell confidential treatment contact and was offered only two treatment "groups."  Although referred to as group treatment, the progress notes revealed that these activities were offered at cell front by a recreation therapist and involved listening to music and exercising within the cell.

The intermediate care treatment plan targeted the patient's delusions and dangerousness to others.  Goals included consistently engaging in unit programming, interacting with other group members, and remaining free from hostility.  Documented treatment interventions for delusions included "reality testing of suspicious thoughts; using thought records and behavioral experiments; letting go of suspicious thoughts; and making at least one non-delusional relevant comment in group [twice] per week for one month."  The IDTT's discharge goals included a plan to "further improve psychosis and thought disorder, gain insight into mental illness," achieve 100 percent medication compliance, and increase attendance in group and individual treatment to two to three times per week.

348

In November 2019, the patient's functioning reportedly started to improve. On November 5, 2019, the primary clinician wrote that the patient "recovered from grave disability symptoms, but in terms of dangerousness, this patient has a way to go. He denies problems but remains hyper-focused on issues such as being forced to take medication and staring at staff members strangely."

The patient was subsequently removed from maximum custody on December 9, 2019, and his mental status significantly improved during the months that followed.

Findings

The quality of care provided to this gravely disabled and psychotic patient in the PIP was inadequate. Mental health services between July and November 2019 were limited to cell-front check-ins, an offering of two cell front recreation therapy groups, and one out-of-cell treatment contact. Although mental health clinicians agreed that there was a nexus between his RVR behaviors and mental illness, he received more punishment than treatment in the maximum custody overflow unit. The treatment was not consistent with inpatient level of care or the treatment plan during his first eight months in the PIP.

**Patient F**

This patient's health care record was reviewed to evaluate the quality of care provided in the CHCF-PIP. He was admitted to the acute program on October 5, 2019 due to repeated acts of "severe" self-injurious behavior and unremitting suicidal ideation. Psychiatric diagnoses included Bipolar Disorder, Polysubstance Use Disorder, Borderline Personality Disorder, and Antisocial Personality Disorder. He also suffered from chronic pain, had a prosthetic leg, and required a wheelchair for mobility. The patient had an active PC 2602 order and was intermittently compliant with medications during the PIP admission. His CDCR history was significant for at least four suicide attempts, countless acts of self-injury, 60 inpatient psychiatric admissions, and several RVRs for violence and destruction of property.

The patient received five RVRs during the current PIP admission, including assaulting another patient, threatening staff, and destroying property. He also repeatedly engaged in self-injury resulting in wound care and transport to community hospitals. The patient attributed some of his recent self-harm incidents to chronic pain and dissatisfaction with medical care in the PIP. SRASHEs were updated on five occasions during the current admission, and all resulted in high chronic and high acute suicide risk.

The IDTT developed an IPOC for self-harm with a goal of abstaining from injury for 30 days. A more recent documented plan included withholding "items such as coffee and food from custody" until he no longer required suicide watch. While some progress notes referenced developing a behavior plan, one was not present in the health care record.

The November 26, 2019 discharge plan section indicated that the patient would be retained in the acute level of care "indefinitely until he paroles in 2021."

349

Findings

The quality of care and discharge planning was inadequate. The patient was not progressing in treatment and would have benefitted from a behavioral assessment and plan. The only documented behavioral intervention involved negative punishment through withholding food and coffee. Further, it did not appear the patient was rewarded for good behavior, as he complained that his successes in treatment were ignored by staff. Other treatment interventions were vague and not evidenced based. Treatment goals were too broad and did not set the patient up for success. The treatment plan did not appropriately target the patient's medication non-compliance, RVR behaviors, or pain management issues. This was especially concerning as the patient reported that his chronic pain often triggered his desire to self-harm. A suicide prevention safety plan was clinically indicated but not completed during admission.

Finally, the IDTT's decision to retain the patient "indefinitely" in the acute level of care until his 2021 parole date was inappropriate and not justified. The patient was clear that he desired the less restrictive environment in intermediate care, and he would have benefitted from clear and reasonable discharge objectives and incentives to guide him toward this goal.

**Patient G**

This patient's health care record was reviewed to evaluate the quality of care provided in the intermediate care at CHCF-PIP. The patient had several PIP admissions since July 2018. He transitioned from the acute program to intermediate care in March 2019 to address his repeated acts of self-injury and continued threats of self-harm and suicide. Psychiatric diagnoses included Bipolar Disorder and Borderline Personality Disorder. His acute and chronic suicide risk were assessed as high on the October 7, 2019 SRASHE.

The treatment plan targeted the patient's suicidal ideation, impulsivity, emotion dysregulation, and mood. Discharge goals included "self-harm in remission for three months; refrain from threatening peers and staff; and displaying appropriate behavior for lower level of care." Additionally, an IPOC was created for danger to self.

The patient continued to engage in threats, self-injury, and "disruptive behavior" throughout his admission. There were seven incidents of self-injury recorded between September 26 and October 3, 2019. However, the IDTT discharged the patient to the EOP level of care on October 9, 2019. At the time of discharge, he threatened to engage in self-harm upon arrival to the receiving institution, and the clinician noted that he would not "contract for self-harm."
A review of additional documentation revealed that this patient was readmitted to the MHCB and rereferred to the acute program in January of 2020.

Findings

The care provided to this high-risk patient was inadequate. The reason for the patient's abrupt discharge from the PIP was unclear and he was not adequately prepared for the transition. He had seven recent incidents of self-injury, reported a plan to self-harm at discharge, and had not

met the discharge objectives outlined in the treatment plan including goals for self-injurious behavior, threatening, and "displaying appropriate behavior for a lower level of care." Further, the treatment plan was not revised in response to the lack of treatment progress. A behavior assessment and plan should have been considered by the IDTT.

**Patient H**

This health care record was reviewed to evaluate the care provided in the CHCF-PIP. The patient was admitted to the acute program on November 18, 2019 due to medication non-compliance, mood fluctuations, and suicidal ideation. Other clinical concerns included angry outbursts, impulsivity, "high anxiety," and self-reported auditory hallucinations.

The patient was diagnosed with Unspecified Intellectual Disability and Adjustment Disorder with depressed and anxious mood. The record also revealed a history of Bipolar Disorder and Attention Deficit Hyperactivity Disorder (ADHD) diagnoses. The patient's primary clinician described him as childlike, vulnerable, and prone to victimization. The clinician's judgment of suicide risk on the most recent SRASHE was low for chronic and moderate for acute. The suicide prevention safety plan was completed, and the clinician noted that the patient received a copy.

The treatment plan targeted the patient's impulsivity, suicidal ideation, and medication compliance issues. IPOCs were developed for danger to self and impulsivity.

The patient received one RVR during his PIP admission; however, this was resolved with a counseling chrono.

The patient transitioned to intermediate care at SVSP-PIP on February 29, 2020.

Findings

The care provided to this patient was adequate. Clinical notes included updates on progress toward treatment and discharge goals. The patient's RVR was appropriately resolved with a counseling chrono as an alternative to the RVR hearing process. SRASHEs were completed upon admission and prior to discharge. The patient was appropriately discharged to intermediate care for further treatment.

**Patient I**

This health care record was reviewed to evaluate the quality of care provided in the CHCF-PIP. The patient was admitted to the acute program for grave disability on or around August 13, 2019. His symptoms included depressed mood, thoughts of harming himself and others, and auditory and visual hallucinations. He was diagnosed with Bipolar Disorder, Major Depressive Disorder, and Unspecified Psychosis.

The patient's suicide history included five attempts and two self-harm incidents during incarceration. The clinician's judgment of suicide risk on the August 15, 2019 SRASHE was

351

high for acute and chronic risk.  The accompanying suicide prevention safety plan included specific strategies for the patient to utilize in the event of a crisis.

The treatment plan targeted the patient's medication non-compliance, perceptual disturbances, suicidal ideation, and depressed mood.  An IPOC was initiated for danger to self.

This patient discharged to intermediate care at CHCF on February 6, 2020.

Findings

The care provided to this patient in the CHCF-PIP was adequate.  The treatment plan included evidenced-based interventions and measurable objectives.  The patient was appropriately transitioned to intermediate care with treatment recommendations for continuity.  While suicide risk evaluations were thorough, the safety plans were lacking in detail.

**Patient J**

This health care record was reviewed to evaluate the mental health care provided in the CHCF-PIP.  CMF referred the patient for grave disability and self-harm.  His symptoms included persecutory delusions, emotion dysregulation, impulsivity, agitation, and anxiety.  He received intermediate care treatment from August 22, 2019 through January 15, 2020.  His psychiatric diagnoses were Unspecified Schizophrenia Spectrum Disorder, Delusional Disorder, Anxiety Disorder, Depressive Disorder, and Antisocial Personality Disorder.  There were two suicide attempts noted in the health care record.

The treatment plan included goals for reducing agitation and irritable mood, decreasing paranoia and hostility toward staff, and increasing organized thinking, insight, medication adherence, and treatment participation.

The patient often refused individual treatment contacts with the primary clinician and psychiatrist.  The primary clinician noted that the patient was paranoid and distrusting of health care staff, that he interrupted others constantly, and that he was non-compliant with medications and treatment throughout his PIP admission.  The patient also reportedly believed that others could read his thoughts through telepathy.  On January 13, 2020, the patient was informed of the passing of his assigned primary clinician and of the IDTT's plans to discharge him on January 15, 2020.

During the discharge IDTT the patient accused members of the treatment team of "colluding" against him and not offering adequate treatment.  Staff were unable to redirect him during this meeting, and he was ultimately escorted out of the room by custody staff.  The discharge justification stated, "He has not cooperated with various attempts to engage him and meet his treatment needs.  He warrants discharge."  The psychiatrist attended the discharge IDTT via video conferencing and noted that the video and audio were substandard on this date.  The psychiatrist subsequently wrote that the patient's treatment in the PIP "has been a failure" and that he was actively paranoid and "very much in need of proper antipsychotic medications."

The tele-psychiatrist also noted on the date of discharge that they were uncertain about the patient's diagnosis, adding that the patient might have a delusional disorder, paranoid personality disorder, or feigned psychosis for secondary gain. The psychiatrist also wrote that a PC 2602 order could not be pursued at this time, as the patient was not a danger to himself or gravely disabled. However, within the same note, the psychiatrist wrote a lengthy and much stronger argument for pursuing a PC 2602 order:

> "…patient cannot program at any level of care for any length of time due to serious mental illness making him essentially fit criteria for grave disability. There is no 'good' place in CDCR for Mr. Meeks to thrive because he is too paranoid to benefit from any treatment until he is given adequate trials of robust antipsychotics."

Despite the unresolved clinical concerns, the IDTT proceeded with the planned discharge to EOP on January 15, 2020; however, the patient "refused to leave" the PIP. The psychiatrist wrote on January 16, 2020 that the patient endorsed suicidal ideation with plans to self-harm and was readmitted to the PIP.

Findings

The care provided to this patient in the PIP was inadequate. While some of the treatment goals were described in measurable terms, interventions were vague and not evidenced based. The discharge decision and rationale were inappropriate. The psychiatrist raised uncertainties about the patient's diagnosis at discharge, wrote an argument for pursuing a PC 2602, and noted audio and visual problems during IDTT, but still discharged the patient to a lower level of care. The patient was clearly unstable during the discharge IDTT and it was apparent that he had not demonstrated progress in treatment. Instead, the IDTT should have retained the patient in the PIP, revised the treatment plan, conducted a behavioral assessment, and pursued the PC 2602 order based on the psychiatrist's argument. A PC 2602 order was subsequently pursued and granted in February 2020.

**Patient K**

This health care record was reviewed to follow up on concerning reports from the patient during onsite monitoring. He claimed that he had not met with a psychiatrist since his arrival at the acute program at CHCF. His psychiatric diagnosis was Schizoaffective Disorder, and he was prescribed Clozaril, Risperdal, BuSpar, and Zoloft. The medication administration records indicated 100 percent adherence with Clozaril. He had a history of multiple suicide attempts. The patient discharged from DSH-Coalinga to San Quentin on June 24, 2019; however, he was admitted to the MHCB six days later for worsening auditory hallucinations and suicidal ideation with intent to self-harm. His mental status improved, and he returned to San Quentin on July 8, 2019. Subsequently, he was admitted to CMF's MHCB for suicidal ideation and auditory hallucinations, and he was transported to the acute program at CHCF on August 5, 2019 for more intensive treatment.

The treatment plan focused on decreasing the patient's depression, auditory hallucinations, and suicidal ideation. The patient was scheduled for at least four individual treatment contacts but attended only one. His most recent contact with psychiatry occurred on September 4, 2019, one week prior to the onsite monitoring visit. Although the patient reported auditory hallucinations, the psychiatrist noted that psychotic symptoms were not observed. According to the record, the psychiatrist increased the patient's Zoloft, discontinued his Effexor, and considered initiating Zyprexa while discontinuing Clozaril and Risperdal.

Findings

The care provided to this patient in the acute program at CHCF appeared adequate. Contrary to his claim that he had not met with a psychiatrist since admission, the health care record revealed that psychiatry contacts were offered timely. The record also indicated that the patient refused most primary clinician contacts that were offered.

**Patient L**

This patient was admitted to the intermediate care program at CHCF-PIP on March 25, 2019. He was referred for suicidal ideation and depressive symptoms, which were reportedly complicated by substance use. The patient had numerous inpatient hospitalizations, including several referrals to acute and intermediate levels of care. He was diagnosed with Chronic Bipolar Disorder, most recent episode depressed, and prescribed Lithium, Benadryl and Effexor.

The most recent treatment plan, dated September 18, 2019, indicated that the patient continued to endorse depressive symptoms, including self-rating his depression at four out of five. The clinician informed the patient on this date that he would be discharged to EOP level of care in one month and noted that the patient had no concerns about this plan.

Laboratory studies for the patient's Lithium prescription were conducted appropriately.

Findings

The care provided to this patient was inadequate. Despite the patient's lack of progress toward treatment goals and continued significant depression, the clinician informed the patient on September 18, 2019 that he would be discharged to outpatient care within one month. The September 2019 treatment plan indicated that the patient would benefit from cognitive behavioral therapy and dialectical behavioral therapy; however, there was no indication that either were implemented during the course of his admission.

Due to concerns regarding the planned discharge of this patient, his case was discussed with the mental health supervisor at CHCF-PIP for follow-up.

**Patient M**

This patient was admitted to the maximum custody acute care unit at CHCF-PIP on August 20, 2019 for grave disability. The health care record indicated that he exhibited psychotic

symptoms, primarily communicated non-verbally with staff, and refused to wear clothing. He refused psychiatric medication throughout his PIP admission, and he was uncooperative with physical examinations during August 2019.

Psychiatry met with the patient at cell-front on August 21, 2019 and noted that he was grossly psychotic, uncooperative with the assessment process, and would be monitored for a PC 2602 order. A social worker wrote a useful assessment summarizing his recent history on that date.

An August 23, 2019 psychiatry note indicated that the patient would not engage with staff, participate in a confidential interview, wear clothing, or communicate verbally. He was naked in his cell, communicating only with hand gestures, and exhibiting internal pre-occupation on this date. Concerns about his poor self-care were also documented. The psychiatrist indicated that the patient would not consent to medication and that a non-emergent PC 2602 had been initiated. The PC 2602 hearing was scheduled for September 12, 2019.

An August 27, 2019 psychiatry note indicated no clinical change. A clinical note on September 6, 2019 described the patient as psychotic, mute, and unwilling to engage with staff. He was also lying on the floor without clothing on this date. His one-to-one safety observation was continued.

The patient was admitted to San Joaquin General Hospital on September 3, 2019 for altered mental status, danger to self, blunt head injury, and Schizophrenia. The provider wrote, "Patient was noted to have jumped off the sink at CHCF and was very agitated when he first came to the hospital requiring endotracheal intubation for airway protection."

The September 12, 2019 PC 2602 hearing was postponed. As of September 17, 2019, the patient's clinical condition had not changed, and he was not receiving psychiatric medications.

Findings

This patient was clearly in need of involuntary medication on an emergency basis. The monitor's expert asked CHCF-PIP leadership to follow up on this issue during the monitoring visit.

**Patient N**

This patient was admitted to the acute care program at CHCF-PIP on August 30, 2019 for grave disability. He was diagnosed with Schizoaffective Disorder. The patient reported that he would spit constantly due to a medical issue that caused excessive salivation. However, the referring institution wrote that the patient was responding to internal stimuli, unable to attend to activities of daily living, noncompliant with medication, and repeatedly spitting on the floor due to a delusion involving bugs in his mouth. The patient also had problems communicating and was unable to appropriately share a cell with another patient.

The patient refused to participate in the 72-hour IDTT on September 3, 2019.  The social worker's September 4, 2019 initial assessment of the patient was consistent with the psychologist's description on September 5, 2019.  The patient's prior MHCB records were reviewed during IDDT on September 10, 2019.

The patient refused to attend the September 17, 2019 IDTT.  The psychiatrist wrote that the patient had flooded his cell and was agitated.  The plan involved encouraging compliance with psychiatric medication and initiating a PC 2602 if needed.

Findings

The care was inadequate.  It was unclear why the psychiatrist did not initiate the PC 2602 process, given the patient already met criteria.

**Patient O**

This patient was admitted to CHCF-PIP's acute care program in September 2019 for grave disability and suicidal ideation.  He was diagnosed with Schizophrenia with catatonia.  He required a wheelchair for mobility due to poor balance.  The patient had an active PC 2602 order and was prescribed Zyprexa, Ativan, and a long-acting Abilify injection.

An initial psychiatry note, dated September 4, 2019, indicated that the patient was eating meals and using the toilet fairly appropriately; although there was mention in a few notes that he had urinated on the floor.  The psychiatrist noted that the patient would remain on one-to-one safety observation and that the treatment team would pursue electroconvulsive therapy (ECT) treatment.

A September 6, 2019 psychiatry note indicated that the patient was only intermittently compliant with his psychiatric medications.  He was minimally cooperative with the rehabilitation therapist's assessment on September 9, 2019.

On September 11, 2019 an outside consult was obtained specific to the use of ECT.

The seven-day IDTT occurred on September 13, 2019.  The patient did not respond to staff's prompts to attend the IDTT on this date.  The treatment team noted that the patient continued to have difficulty completing basic activities of daily living and engaging with staff.  Although he was accepting most meals, he was not showering or taking his medications orally, and he remained primarily catatonic.  The IDTT also noted that the ECT consult results were pending.

Little clinical change was noted during September 15 and 17, 2019.  A case review teleconference occurred on September 17, 2019, and another ECT consult was scheduled for September 18, 2019.

Findings

The care was adequate.  The patient was an appropriate candidate for ECT, and CDCR appeared to be actively pursuing such treatment.

**Patient P**

This patient was admitted to the CHCF-PIP on September 7, 2019.  The record revealed that he had a recent suicide attempt and, although he was no longer endorsing suicidal ideation, he remained very depressed.  He reported a history of Bipolar Disorder with ongoing auditory hallucinations.  Diagnoses in the record included chronic obstructive pulmonary disease, Hepatitis C, Mood Disorder, and Schizoaffective Disorder.

The initial IDTT occurred on September 9, 2019.  The patient requested trauma focused treatment in the PIP on this date.

Although the patient was admitted to the PIP on September 7, 2019, his initial psychiatric assessment was not completed until September 11, 2019, and the initial primary clinician assessment did not occur until September 13, 2019.

The IDTT noted on September 17, 2019 that the patient was cleared for programming and was exhibiting a brighter affect, while still endorsing anxiety and transient suicidal ideation.  The IDTT set a goal of helping the patient better manage his suicidal ideation.  The patient again requested to work on his trauma history in treatment.

It did not appear that rehabilitation therapy services were offered to this patient, based on the absence of notes from this discipline in the health care record.

Findings

The care provided to this patient in the CHCF-PIP was inadequate.  The primary clinician and psychiatry initial assessments were not completed timely.  Rehabilitation therapy notes were not found in the record.  The patient was essentially locked down throughout the duration of his orientation phase.  Overall, the treatment provided was not consistent with inpatient level of care.

**Patient Q**

This patient's health care record was reviewed as the patient reported that he had not received all of his property, specifically legal papers and sunglasses.  The patient was receiving mental health services at the intermediate level of care.  When unit staff were queried, they reported that the patient was not allowed certain properties due to a psychiatric order.  The health care record was reviewed for documentation supporting limited property issue.

The inmate was seen on February 27, 2020 by a psychiatrist, who noted that the patient had no comprehension of English; however, no interpretive services were utilized.  The psychiatrist, instead, documented that effective communication was achieved by speaking slowly and loudly.

357

The psychiatrist did not document any limitations to property. Additional progress notes by psychiatry and the medical physician, as well as orders, were reviewed. The treatment plan of January 14, 2020 also noted no restrictions. No documentation was identified that supported property limitation based on psychiatry orders.

Findings

Unit staff did not provide this inmate with all of his allowable property, despite no clinical restrictions. Unit nursing staff and custody reported that the patient had property limited by "doctor's order", but no such documentation was located in the health care record. In addition to this confusion regarding allowable property, it did not appear that interpretive services were utilized for this patient for clinical encounters as was indicated.

**Patient R**

This patient was receiving mental health services at the acute level of care and was classified as maximum custody. His health care record was reviewed as he was identified by the IDTT as extremely ill and nonadherent with treatment. The interventions to address this issue by the IDTT appeared to be limited to a PC 2602 petition for involuntary medications.

The patient was admitted to the CHCF-PIP on November 29, 2020 due to suicidal ideation; he had been considered gravely disabled in the MHCB prior to referral as well. The patient was provided with diagnoses of Major Depressive Disorder with psychotic symptoms, Post Traumatic Stress Disorder and Bipolar Disorder. The symptom presentation described in the health care record, however, appeared more consistent with a diagnosis of Schizophrenia, paranoid type. The patient was described as exhibiting bizarre delusional thinking, ideas of reference and disorganized thinking. He reported having chips placed in him connected to YouTube, people watching him through cameras, medical staff putting sulfur in his medication and chips implanted in his scrotum, penis, rectum and other body areas. The patient also believed that he was going to be attacked by phones connected to the chips implanted in his ears.

During IDTT, the patient reported continuous chest pains; despite medical follow-up that had cleared him. He complained that his neighbor was raping him in his cell every night and appeared to reference some of the delusional thinking regarding staff. He was intermittently adherent with taking medications. The patient was prescribed bupropion, Seroquel and Benadryl.

The patient was generally seen weekly in IDTT; although at times, the timelines were not met. Several of the patient's most recent treatment plans were reviewed (February 24, 2020, March 2, 2020, March 11, 2020). The patient's treatment plan identified danger to self as a target of treatment on March 2, 2020, while delusions and medication nonadherence were added on March 11, 2020. However, the treatment plan contained interventions that were dependent on a therapeutic rapport and established clinical relationship which clearly did not exist. There was no treatment goal for establishing a therapeutic rapport or full treatment adherence; although the patient regularly refused individual contacts. The treatment team did not consider PBST during the observed IDTT. When queried, the IDTT response indicated a complete lack of

358

comprehension of basic behavioral treatment concepts.  PBST was encouraged with a rationale provided, but ultimately not incorporated into the treatment plan.

Findings

This patient did not receive adequate treatment.  He had been hospitalized in a severely decompensated state; however, a PC 2602 involuntary medication order was belatedly considered.  The interventions provided in the treatment plan were inadequate, considering the acuity of the patient's symptoms.  An individual behavior plan was indicated for this patient, but the treatment team did not consider such treatment independently or even after suggestion, despite clear indicators.

**Patient S**

This patient's health care record was reviewed as the patient was observed during his IDTT.  He was receiving mental health services at the acute level of care.  The inmate reported that he had an untreated seizure disorder, with recent seizures that he claimed had been misinterpreted as acts of aggression resulting in uses of force against him.  The patient admitted to attempting to spitting on an officer prior to one incident.  He was observed during the IDTT in a spit shield and safety smock, despite not being placed on any level of suicide watch.  The patient had no shoes, and he had an abrasion on his forehead and a swollen, blackened right eye.

The patient was admitted on February 17, 2020.  He had previously been housed in an acute non-maximum custody unit, but he was transferred to the identified maximum custody acute unit.  The initial evaluation was completed by the prior unit psychiatrist on February 7, 2020, and the patient was referred to acute care due to danger to others, a history of command hallucinations, bizarre and odd behavior, aggression and treatment nonadherence.  The patient refused to leave his cell for the assessment, and he was only minimally responsive to the psychiatrist while denying all symptoms.  The psychiatrist noted that the patient appeared odd and paranoid during the interaction.  The psychiatrist noted that the inmate was psychotic; however, no clear diagnosis was provided at the time of that assessment.

The patient received his psychotropic medications by PC 2602 involuntary medication order due to grave disability that was renewed on December 26, 2019.  The diagnoses provided for the patient later remained "Depression" He was prescribed Haldol Decanoate injection, Zydis and Cogentin with backup medications in the event of medication refusal.

The treatment team identified danger to others, effective coping, nutritional status (reach and maintain optimal body mass index by eating sufficient amount of food), ineffective coping, and treatment nonadherence as treatment targets.  Sufficient nutrition was only monitored by the nutritionist and presumably floor staff (e.g., nursing).  The interventions specified in the treatment plan were not empirically based and were inappropriate or inadequate for the level of acuity of the patient's symptoms.  The treatment team did not indicate that they had considered any behavioral interventions or consultation with the PBST.  In addition, the patient was reportedly at STEP 3, despite treatment nonadherence and behavior that was inconsistent with progress outlined in the STEP guidelines.  The STEP system was clearly not utilized

appropriately as an effective treatment intervention, nor was it mentioned in the treatment plan as an intervention.

Individual session progress notes by the social worker and psychiatrist were reviewed.  The psychiatric progress notes appeared to suggest that the psychiatrist was skeptical regarding the veracity of some of the patient's complaints regarding prior seizure history and lack of memory for particular events of aggression.  It was unclear if the psychiatrist had reviewed the patient's health care record for documentation, or lack thereof, regarding seizures or past seizure treatment.

Findings

This patient did not receive adequate treatment.  He required a diagnostic evaluation, and diagnostic clarification was indicated so that the treatment team could be focused on the patient's symptoms and functional impairment.  The existing treatment plan was inadequate to address the patient's significant symptomatology and functional needs.  This patient should also be referred to PBST for consultation, at minimum.

## APPENDIX B-5
CIW-PIP
December 17, 2019 – December 19, 2019

**Patient A**

This health care record was reviewed to evaluate the care provided in the CIW-PIP.  The inmate was diagnosed with Bipolar I Disorder, Major Depressive Disorder, and Post-Traumatic Stress Disorder.  She was prescribed Thorazine, Trileptal, Benadryl, and Zyprexa.  The patient also suffered from a chronic medical illness.  She was admitted to the acute program at CIW-PIP on September 26, 2019, due to suicidal ideation and a recent suicide attempt by overdose and strangulation; this was her second inpatient admission.  On September 27, 2019, the patient's acute suicide risk was assessed as high due to a recent suicide attempt, continued suicidal ideation, and recent medication hoarding.

On October 7, 2019, the IDTT noted that the patient was interested in DSH-Patton and that she was considered for unlocked dorm placement; however, the patient started swallowing foreign objects within a week of this meeting and was retained at CIW-PIP.  The clinical staff documented concerns about the patient's high risk for impulsive and reckless behavior, her low threshold for self-harm, and her tendency to minimize the severity of her suicidal behavior.

On November 5, 2019, the IDTT met to discuss the patient's treatment progress over the past month.  While the IDTT advanced the patient to step two and allowed additional items including hygiene and personal items, regular linen, and a radio.   The team noted a number of discharge obstacles as well, including poor skills related to dorm living, poor boundaries, poor impulse control, a history of suicide attempts, and variable compliance with mental health treatment.  The IDTT also indicated that the patient had a pending RVR for extortion.

On November 11, 2019, the patient was treated at an outside hospital after swallowing 12 broken colored pencils.  She was placed on suicide observation and DPS upon return.  During the December 2, 2019 IDTT, the patient was retained at step one due to recent behaviors.  The IDTT offered treatment goal incentives on this date.  The IDTT convened again on December 12, 2019 and agreed to approve the patient's request for a television, headphones, shrimp noodles, and clothing.

The patient attended group therapy on December 10, 11, and 12 of 2019.  She met with her primary clinician on December 10, 2019, and the session focused on her impulse control, healthy decision-making, safety, and self-care.  On December 13, 2019, the recreation therapist noted that the patient was motivated to discharge from the CIW-PIP and not engage in self-harm.

Findings

The patient received adequate care in the acute psychiatric program.  The IDTT met frequently to review the inmate's case and worked collaboratively with the patient to address her impulsive and self-harming behaviors, unstable affect, and tendency to minimize her suicidal behavior.  The treatment plan was appropriately revised in response to treatment progress and lapses.  Incentives were offered to motivate behavior change.  IDTTs and individual contacts with the psychiatrist and primary clinician were timely.

**Patient B**

This health care record was reviewed to evaluate the care provided in the CIW-PIP.  The 58-year-old female spent most of her life in CDCR facilities and state hospitals.  She was designated a Mentally Disordered Offender in 2017.  The record revealed a history of command auditory hallucinations; impulsive, aggressive, and assaultive behavior; and social isolation.  She was developmental delayed (DD2), with limited adaptive and daily living skills.  The patient transferred to CIW-PIP in September of 2012.  Throughout the course of her PIP admission she was prescribed Depakote ER, Lithium, Cogentin, and recently Clozapine.

The treatment team targeted the patient's problematic thoughts and impulsive, violent, and isolative behaviors.  The IDTT considered a behavior plan with incentives to improve compliance with Clozapine related "blood draws," and the traditional DPS program was modified to include a behavioral treatment modality.  The team worked collaboratively with the patient to develop a behavior plan that included incentives and increasingly difficult yet achievable objectives.  Additionally, the psychiatrist attempted to address the inmate's symptoms with medication changes.

Despite the treatment team's interventions, the patient remained on step one of the program with DPS precautions through the date of this review.

Findings

The care provided to this patient was adequate.  The patient appeared to suffer from serious chronic and acute mental health problems that were exacerbated by her cognitive deficits.  The IDTT worked collaboratively to address the patient's medical (diabetes), safety (violence), and behavioral issues (social isolation).  The treatment team utilized appropriate interventions to achieve gradual progress toward treatment objectives.  IDTTs and individual treatment contacts were timely.

**Patient C**

This health care record was reviewed to evaluate the care provided in the CIW-PIP.  The patient's developmental history was traumatic and characterized by illicit drug use and criminal activity.  She had several MHCB and PIP admissions over the years for ingesting foreign objects and engaging in other serious behaviors.  In March of 2019, the patient discharged from the PIP to EOP level of care.  Her level of care was changed to 3CMS on September 11, 2019, and she was subsequently hospitalized for swallowing foreign objects on September 12, October 20, and October 24 of 2019.  Prior to her current PIP admission, she ingested a foreign object resulting in an exploratory laparoscopy, removal of several objects, and 57 sutures.  She spent ten days on DPS orientation status in the acute program and then transferred to the intermediate care program for further treatment.

The patient was diagnosed with Bipolar II Disorder, Antisocial and Borderline Personality Disorder, and Opioid Use Disorder. The treatment team noted that her addiction to opioids perpetuated her self-injurious behaviors. They concluded that the most likely precursor to her behavior of swallowing foreign objects was her desire for hospital admission to obtain opioids and/or attempt to escape a stressful situation.

The IDTT met on December 18, 2019 to assess her level of functioning. She reported that she was "feeling some stress and anxiety," worrying about family, and depressed as a result of feeling "stuck" her room. She rated her depression at a six on a scale from one to ten. Her mental status was reportedly stable. She denied experiencing suicidal ideation or having any urges to self-injure by swallowing foreign objects. The IDTT reviewed her suicide prevention safety plan and acknowledged her improvements and program participation. An exploration of her personal goals revealed that she desired admission to DSH-Patton in order to be "stabilized." She was placed in stage one and allowed a brush, mail, therapeutic reading, one phone-call per week, and playing cards; however, numerous restrictions and limitations remained in place for her own safety.

Findings

The patient received adequate care in the acute program at CIW-PIP, considering her acuity level and the severity of her maladaptive behavior. The various disciplines worked collaboratively with the patient to ensure her safety. The IDTT met weekly and collaborated with the patient to gradually and cautiously move her forward in the program. They appropriately increased her privileges while providing her with insight and tools to address her substance abuse concerns. Her admission to PIP was essential for her stabilization. This patient would likely benefit from an integrated dual diagnosis treatment program following discharge.

**Patient D**

This health care record was reviewed to evaluate the care provided in the CIW-PIP. The patient was developmentally delayed (DD2) and had several DSH-Patton commitments for psychosis and competency to stand trial. CCWF referred the patient for intermediate care at CIW-PIP on February 21, 2014 due to social withdrawal, assaultive behavior, and a potentially life-threatening case of psychogenic polydipsia. Other psychiatric concerns included auditory hallucinations, paranoid delusions, and cognitive deficits.

The treatment team attempted to reduce the patient's water consumption with several unsuccessful interventions over the course of four years. However, in January of 2018, a behavior plan was developed and implemented in consultation with medical, dietary, custody, mental health, and the patient. The treatment team observed the patient, measured her baseline, and implemented behavior guidelines. They also set target objectives and offered progress

incentives. This behavior plan was successful in reducing the inmate's excessive fluid intake, and her sodium level remained in the normal range over the past year.

The IDTT also constructed a behavior plan to address the inmate's social isolation and DPS status. The patient remained an active participant in the development, modification, and implementation of this behavior plan. Goals included programming with peers and attending group treatment without handcuffs; store points were used as an incentive.

Psychiatry was actively involved in titrating the patient's Clozaril to a therapeutic dose. The patient recently began attending treatment groups and self-reporting improvements with psychotic symptoms. The treatment team planned to increase the patient's out-of-cell activities as a result.

Findings

This patient received adequate care. The treatment team worked collaboratively with the patient to develop effective behavior plans. Both the psychogenic polydipsia and social isolation behavior plans were routinely modified with input from the patient and other disciplines. After years of unsuccessful treatment outcomes, the patient's psychogenic polydipsia was resolved, and the treatment team was making progress with the patient's isolation behavior and her Discretionary Program Status (DPS).

**Patient E**

This health care record was reviewed to assess the care and Discretionary Program Status (DPS) management at CIW-PIP. The 34-year-old patient was admitted to CIW-PIP in February of 2018. She was diagnosed with Schizophrenia and prescribed Zyprexa, Clonidine and Haldol. The patient had a long history of violence, and her assaultive behavior often occurred in the context of delusions and hallucinations. A clinical note indicated that the patient would be discharged to EOP level of care after one year.

The patient had three DPS placements since May 20, 2019, for a total of 166 days. Her current DPS placement started on September 22, 2019, after she fractured the nose of a psych tech during escort. On October 8, 2019, she "dropped to the floor" during escort, and this act was perceived as violent by CIW-PIP leadership. The treatment team did not conduct a comprehensive behavior assessment or address the violent acts in the treatment plan. Although the patient had no further incidents of violence after October 8, 2019, she remained on DPS without supporting documentation.

Primary clinician and psychiatry contacts were offered weekly, and the patient's DPS was reviewed in IDTT every two weeks. However, the individual contacts and IDTTs were often completed at cell front during the review period. The treatment team documented that group attendance was one of the consideration criteria for discontinuing the patient's DPS status; however, this was unreasonable given her history of non-compliance.

Findings

This patient's care was inadequate. The treatment plan did not appropriately address her prior acts of violence. The criteria for discontinuing her DPS were not appropriately adjusted in response to her lack of progress. The clinical documentation did not support the prolonged use of DPS. Although historically the patient had engaged in violence in the context of psychosis, there was no indication that she acted out violently after October 8, 2019, or that she continued to exhibit psychotic symptoms. Lastly, documentation of a discharge to EOP for this Welfare and Institutions Code 7301 patient was concerning.

**Patient F**

This health care record was reviewed to assess the adequacy of care and discharge planning at CIW-PIP. The 26-year-old patient was admitted to the CIW-PIP on November 26, 2019. She was diagnosed with Schizoaffective Disorder. Her symptoms at the time of referral included paranoid delusions, expansive mood, auditory hallucinations, and risk of harm to others. She was prescribed valproic acid, Zyprexa, and Cogentin.

Documentation for the 72 hour and ten-day IDTTs was reviewed. The notes indicated that DPS was initiated due to safety concerns; however, there were no other details provided. Discontinuation of DPS was contingent upon the patient attending 50 percent of treatment groups and abstaining from assaultive behavior. Although her DPS was discontinued during the ten-day IDTT, the supporting documentation lacked sufficient detail.

Primary clinician and psychiatry contacts were offered in accordance with her treatment plan. However, the patient did not meet with her clinician until after the initial IDTT, and the initial assessment was not completed.

The treatment goals did not align with the patient's psychiatric symptoms or the expected treatment outcomes listed in the PIP referral. Despite documented suicidal ideation in November of 2019, this was not addressed in her plan of care.

The discharge plan indicated that the patient would parole to DSH-Patton as a mentally disordered offender.

Findings

The care provided to this patient was inadequate. The patient's DPS was not clearly justified in the documentation. The clinician did not meet with the patient prior to IDTT or complete the required initial assessment. The treatment plan did not address the patient's suicidal ideation or the referring institution's treatment recommendations. Although comprehensive discharge planning was unnecessary given the MDO commitment, the treatment team should have developed a transitional plan of care.

**Patient G**

This 23-year-old female was admitted to the CIW-PIP on July 18, 2019 for danger to others. She had two MHCB admissions and was in the EOP level of care prior to her PIP admission. Following her first MHCB discharge the patient became physically assaultive toward custody staff. Her diagnoses included Bipolar I Disorder, Borderline Personality Disorder, alcohol abuse, cannabis abuse, and amphetamine abuse. She was prescribed Latuda and Seroquel. The patient was 19 weeks pregnant at the time of admission.

On July 22, 2019, she was retained on Discretionary Program Status (DPS) due to aggressive and bizarre behaviors. Her initial IDTT occurred on July 24, 2019. Her July 24, 2019 RVR mental health assessment found mitigating circumstances related to her mental illness.

A July 25, 2019 master treatment plan included a case formulation that placed little emphasis on her pregnancy and its relationship to her current clinical presentation. On July 26, 2019, she met with psychiatry and denied any issues with her pregnancy. An August 5, 2019 psychiatry note indicated that the PC 2602 process was initiated. She continued to deny issues regarding her pregnancy on this date.

DPS was continued on August 8, 2019. Although she continued to experience auditory hallucinations, clinical improvement was noted by the psychiatrist on August 14, 2019. The patient subsequently participated in a scheduled meeting with family services and developed a care plan for her unborn child. She attended an OB/GYN appointment on August 16, 2019. She also started cooperating with laboratory testing around this time.

By September 3, 2019, she was no longer on DPS. She continued to be seen by her psychiatrist, primary clinician, and obstetrician on a regular basis. Participation in group treatment was also documented.

On November 21, 2019, she reported feeling sad in the context of being separated from her newborn after delivery. She transferred to the hospital on December 5, 2019 for induction and returned to the PIP on December 7, 2019. She reported feeling a little depressed during this time, and her child was taken by Child Protective Service (CPS). On December 17, 2019, she reported feeling happy that her newborn was in the care of her adoptive mother.

This patient was also interviewed during onsite monitoring on December 18, 2019. She was reportedly in stage three at the time and offered three treatment groups per day. She stated that her primary clinician contacts generally occurred at cell front, while psychiatry contacts were conducted in a confidential setting.

Findings

This patient received treatment consistent with Program Guide requirements.  However, the apparent lack of focus on her pregnancy and delivery was concerning from a treatment perspective.

**Patient H**

This 30-year-old woman transferred from the MHCB at CCWF to the CIW-PIP on September 12, 2019 for titration of Clozapine and further stabilization.  She was recently discharged from the PIP to EOP level of care on July 30, 2019.  Her symptoms included head banging and bizarre behaviors.  The patient's clinical presentation was consistent with Schizoaffective Disorder, bipolar type, and cannabis use disorder.  The patient had an active PC 2602 order and was prescribed Clozapine, Depakote, Prolixin, and Trazodone.

The case formulation section of the September 13, 2019 treatment plan included a brief historical summary instead of a clinical case formulation.  Documentation was present in the context of regular clinical contacts with her psychiatrist and primary clinician.  She reported that her primary clinician contacts were completed at cell front, which appeared to be at least partially confirmed by record; although some of the contacts occurred in the no contact room.  The psychiatry contact on September 18, 2019 was also completed at cell front.

In November of 2019, the patient was placed on suicide precautions and DPS.  She continued to experience psychotic symptoms and her medications were increased.  By December 16, 2019, she appeared to be clinically improving, although still symptomatic.

Findings

Although the patient's severe psychiatric symptoms were beginning to improve by December of 2019, the amount of therapeutic activities offered to her, as well as the limited out of cell time, were barriers to her continued clinical progress.

**Patient I**

This 44-year-old female was admitted to the PIP on October 30, 2019 due to increasing psychotic symptoms.  Her diagnoses included Schizoaffective Disorder, Alcohol Use Disorder, Cannabis Use Disorder and Opioid Use Disorder.  Medications included Seroquel and Lithium. A PC 2602 was considered, but not initiated.

Her initial treatment plan was completed on October 31, 2019.  She was uncooperative with the initial primary clinician assessment on November 1, 2019, and this was apparently related to her psychotic symptoms at the time.  She did, however, attend a DPS empowerment group on this date.

On November 4, 2019, the psychiatrist described the patient as psychotic and she was retained on DPS orientation status.  On November 5, 2019, the recreation therapist completed an initial assessment, and the patient cooperated with the primary clinician initial assessment on the following day.

The patient's DPS status was discontinued on November 21, 2019.  The treatment team approved of her participation in yard, dining hall, and an enrichment group that was offered once per day.  The patient was informed that she was on step one and would be considered for step two during the next IDTT meeting in 30 days.  By December 3, 2019, she was on step two and included in two additional clinical groups.

On December 12, 2019, she discussed her new release date with her primary clinician, as it was reportedly extended from December of 2019 to May of 2020.

Findings

The care was inadequate.  The patient was on DPS for a prolonged period of time.  Although she is clinically improving, her progress was hampered by her limited access to out-of-cell therapeutic activities.

<u>APPENDIX B-6</u>
SQ-PIP
February 18, 2020 – February 20, 2020

**Patient A**

This patient's health care record was reviewed to evaluate the quality of treatment, discharge, and safety planning at SQ-PIP.  The patient was hospitalized in SQ-PIP at the intermediate level of care between July 11, 2019 and December 04, 2019.  He was referred for risk of self-harm, increased isolation, paranoia, failure to participate in treatment, and inability to manage activities of daily living.  The inpatient diagnoses were Schizophrenia, unspecified, Depressive Disorder and Obsessive-Compulsive Disorder.

The treatment plan targeted depressed mood and anxiety with goals of learning and implementing calming skills, as well as recognizing and addressing depression.  One IPOC for depressed mood included a plan to improve functioning by using goal setting.

The patient attended his individual treatment contacts, but refused to participate in IDTTs, group treatment and yard time throughout his admission.  He self-reported improvements in anxiety, paranoia and suicidal thoughts prior to discharge.

The discharge SRASHE indicated that the patient had a history of suicide attempts and self-harm, however, he reportedly had not engaged in self-injury since 2007.  The patient was discharged to the EOP level of care on East Block.

Findings

The patient's symptoms improved during the admission and he was appropriately discharged to the EOP level of care.  The SQ-PIP documentation, however, was inadequate.  Most treatment goals and interventions were vague and not measurable.  The patient's lack of group and IDTT participation were not addressed in the treatment plan.  The SRASHE safety plan was non-specific and did not fulfill its intended purpose as a suicide prevention tool.

Safety plan training and monitoring was indicated for SQ-PIP clinicians, as deficiencies were noted across providers.

**Patient B**

The patient was hospitalized in the SQ-PIP at the acute level of care between July 25, 2019 and January 15, 2020.  The reason for his inpatient admission was suicidal ideation with a "plan and intent" to hang himself.  The patient's diagnoses were Bipolar II Disorder and Major Depressive Disorder, recurrent.

Treatment plans targeted suicidal ideation.  Interventions included safety planning for suicidal ideation and writing "a long-term plan to identify support when dealing with stressors."  An IPOC was created for danger to self.

371

The psychiatrist noted that the patient was adherent with medication; however, he refused to leave his cell for IDTTs, group treatment and primary clinician contacts throughout his inpatient admission. The primary clinician documented that the patient routinely engaged in in-cell activities, including letter writing, exercising and artwork.

The patient reported at the time of discharge that his depressive symptoms had resolved with medications. The primary clinician described him as "cheerful" and "stabilized," and noted the patient had not endorsed suicidal ideation for three months. The patient was discharged to the EOP level of care. Assessment of suicide risk on the discharge SRASHE was rated high for chronic and moderate for acute. The SRASHE safety plan was not updated at the time of discharge, as the patient reportedly refused to participate.

<u>Findings</u>

The patient was appropriately discharged from the acute level of care to the EOP. Clinical documentation suggested his acute symptoms had remitted with psychiatric medications and he no longer met inpatient criteria.

The patient's poor participation in group treatment and yard were not adequately addressed in the treatment plans, and there was no progress noted in these areas.

The lack of safety planning at the time of discharge was very concerning. Clinicians documented the "serious" risk of suicide the patient posed, and the primary clinician planned to address this risk by developing a safety plan. The patient, however, discharged without an adequate safety plan. The clinician noted on the discharge SRASHE that the patient refused to participate, and information was brought forward from a safety plan written in October 2019. The October 2019 safety plan was poorly written and presented additional safety concerns. For example, "nobody, I wouldn't bother them" was written in the people to ask for help section, and "drawing I guess" was the only documented reason for living. Additional training and supervision for SQ-PIP staff regarding the appropriate completion of SRASHEs was indicated.

**Patient C**

This patient was hospitalized in the SQ-PIP at the intermediate level of care between August 15, 2019 and December 11, 2019. The reason for his inpatient admission was "reckless use of illicit substances" and suicidal ideation resulting in "persistent risk of lethality." The patient reported at the time of admission, "Certain things don't stop coming into my mind, things from my past, and the only way to stop it is to use drugs or to be dead." The patient explained to PIP staff that he often considered ending his life by overdosing on opiates or methamphetamine. On August 21, 2019, the patient stated, "I just want this to be over, or I want to leave prison. I can't believe today is my birthday. I can't see myself being here until 30."

The patient's diagnoses were Substance Induced Mood Disorder, Major Depressive Disorder, Post Traumatic Stress Disorder and Polysubstance Abuse.

The treatment plan provided a short-term goal of decreasing depression by engaging in group and individual appointments with an intervention of encouraging the patient to participate in treatment. A mental health IPOC was developed for substance abuse. The patient was described as motivated and highly active in individual and group treatment. He continued to report "low lows" with regard to his mood, but he indicated to staff that he was "able to control them." Psychiatric medications were discontinued during the admission, at the request of the patient. At the time of discharge, the patient had not endorsed suicidal ideation in approximately 60 days. The discharge SRASHE noted one suicide attempt by overdose while under the influence of methamphetamine in 2017. The patient did not attend his discharge IDTT.

Documentation indicated the patient requested placement in the Adjustment Center "to avoid drug users and drug availability" on East Block. The patient was, however, discharged to the EOP level of care on East Block.

Findings

The treatment planning, discharge planning and suicide prevention efforts for this patient were inadequate. The treatment plan was void of evidenced-based interventions and measurable objectives. There was no documentation that the treatment team developed discharge goals during the course of the patient's admission. The patient was concerned about relapsing if discharged to East Block, yet there was no documentation indicating a discussion or plan to prevent relapse on this facility. The patient's reason for refusing the discharge IDTT and the efforts made by staff to encourage participation also were not documented.

The safety planning for this patient was very poor. The discharge SRASHE did not include an updated safety plan, reportedly due to patient refusal. The most recent safety plan in the health care record was poorly written and lacked specificity. For example, the clinician documented in the reason to live section, "Just giving my sobriety a chance." A revised safety plan should have been encouraged and efforts toward doing so should have been documented prior to discharging this patient. It is very concerning that this patient had a history of attempting suicide in the context of drug use, was noted to be at high risk for relapse on East Block, and yet giving sobriety a chance was the only documented reason for living.

A follow up review of the patient's health care record revealed the patient was readmitted to an inpatient unit on February 24, 2020 at the MHCB level of care. The patient informed the admitting clinician he had relapsed on drugs and was experiencing suicidal ideation, which he attributed to his desire to "escape" intolerable feelings of hopelessness and purposelessness.

**Patient D**

The patient was hospitalized in the SQ-PIP at the acute level of care on August 10, 2020.  He was subsequently transferred to the intermediate level of care in the SQ-PIP on or around August 29, 2019.  The reason for his inpatient admission was "drug induced psychosis."  The patient's diagnoses were Amphetamine Type Substance Use Disorder, Substance Induced Psychosis, Unspecified Neurocognitive Disorder and Anxiety Disorder.  Symptoms at the time of admission included hallucinations and disorganization.  The SRASHE noted the patient had two prior suicide attempts and a history of self-injurious behavior.

SQ-PIP progress notes indicated the patient was a "high participator" in treatment and that his psychotic symptoms remitted.  He was noted to be at risk for relapse on illicit substances.  The patient refused psychiatric medications during his admission, including medications for reducing relapse.  One IPOC was developed for self-harm during the admission.  The discharge plan indicated the patient was discharged to the EOP level of care on East Block during October 2019.  Discharge recommendations included "establishing a positive therapeutic program" and encouraging psychotropic medication.

Findings

The patient was appropriately discharged from the intermediate level of care at SQ-PIP.  The treatment plan appropriately addressed the patient's symptoms and substance abuse concerns.  The discharge documentation, however, was poor.  There was no indication the patient had met any of his treatment objectives prior to discharge.  The safety plan to address his suicide risk was not developed prior to discharge.  The primary clinician noted on August 29, 2019 that a safety plan would be developed during the inpatient admission; however, this did not occur.  The October 2, 2019 SRASHE safety plan was left blank.  SQ-PIP clinicians required additional training and supervision to ensure adequate discharge planning, as this was an issue noted in several health care record reviews and on-site observations.

A follow up review of the patient's functioning in the EOP level of care on East Block revealed ongoing problems with substance abuse and mood symptoms.  The patient was caught "several times" manufacturing "pruno" in his cell, had one documented date of acute intoxication, and was likely "using/selling drugs" on the yard during exercise.  The patient's psychiatric symptoms were positive for depressed mood, irritability and anhedonia.

**Patient E**

The patient was admitted to SQ-PIP's intermediate level of care on October 1, 2014.  He was diagnosed with chronic and treatment resistant Schizophrenia, and his symptoms were positive for depressed mood, delusions, auditory hallucinations and poor attention to self-care.  Problems with memory, concentration and general cognitive functioning were noted as well.  The patient had been treated with clozapine long-term.

The February 6, 2020 treatment plan noted minimal improvement over the course of the admission. Areas of improvement included attendance in IDTT and primary clinician contacts. The patient's delusions and hallucinations persisted, and he continued to require "constant" prompting for basic self-care. He had not attended yard or treatment groups in over 90 days, despite encouragement from staff. The treatment plan referenced a behavior plan; however, this was not located in the health care record.

The February 2020 SRASHE assessed the patient with low chronic and acute suicide risk. The primary clinician stated that the patient had no history of suicidal ideation or attempts. The psychiatrist, on the other hand, noted on the same date that the patient had attempted suicide in the past.

Findings

Several documentation issues were identified during this review. The primary clinician did not include a case conceptualization in the treatment plan, despite the patient receiving services in the PIP since 2014. Measurability of treatment goals was inconsistent. The primary clinician and psychiatrist documented conflicting information regarding the patient's suicide attempt history, and the data would likely increase the patient's level of risk on the SRASHE.

Progress notes suggested a behavior plan had been developed; however, it was not present in the health care record. SQ-PIP staff confirmed during the site visit that behavior plans are not scanned into the health care record and were not shared with the patient; these were not clinically appropriate practices.

Finally, the treatment and behavior plan should have been revised in response to the patient's lack of progress with treatment objectives.

**Patient F**

This patient's health care record was reviewed to assess the quality of his treatment plan in the SQ-PIP. The patient had been on condemned status since 2001. He was referred to SQ-PIP intermediate level of care on or around February 28, 2017 due to psychotic symptoms, isolating behaviors and inability to manage his activities of daily living. The patient's diagnoses included Schizophrenia, paranoid type and Cognitive Disorder. His symptoms included delusions, hallucinations and "abnormal behavior." Psychotic and mood symptoms were treated with psychotropic medications which were adjusted throughout the course of hospitalization.

Treatment goals included attending individual treatment contacts, attending four yards and two groups per week, and "discussing one unique non-symptom topic during each individual session." Progress notes indicated the patient's treatment attendance improved, and the primary clinician described him as future oriented, socializing with peers, active in treatment and

375

medication adherent. The severity of his delusions; however, had not improved, and his attention to self-care without prompting was inconsistent.

Findings

The patient's treatment plan was adequate, with the exception of the case formulation section. The primary clinician developed measurable treatment objectives and appropriately documented progress toward these goals. The psychiatrist clearly documented the indications and rationale for various medication adjustments throughout the admission. There was no case conceptualization in the designated section of the treatment plan, which was concerning given the patient was observed over the course of almost three years.

**Patient G**

The health care record for this patient was reviewed to evaluate the quality of suicide risk assessment and management. This condemned status patient was referred to the intermediate level of care at SQ-PIP on September 19, 2019. He was diagnosed with Major Depressive Disorder; additionally, he had Marfan Syndrome. The health care record indicated that his mood and behavior symptoms were exacerbated by his worsening medical condition. Physical symptoms included chronic pain and vision loss. The patient also was expected to undergo aortic repair surgery in the coming months.

The patient's suicide history was significant for two nearly lethal suicide attempts in 2014 and 2011. The patient stated during his initial assessment, "I don't do it for attention. If I want to do it, I'm just going to do it." He informed his primary clinician in December of 2019 that he had been hoarding pills in the event he decided to overdose. The patient reported conditional plans to end his life with "a lethal dose of fentanyl" upon learning that his medical condition would render him disabled. The primary clinician described the patient as "entrenched in his future plan to kill himself." The SRASHE documented the assessment of suicide risk as high for chronic and moderate for acute suicide risk.

The patient requested discharge to East Block during October 2019 due to complaints about the quality of care he was receiving in the SQ-PIP. He specifically complained of inadequate oversight by management, inconsistent rounding, small food portions and his perception that "custody is running the show."

Findings

The patient was appropriately retained in the intermediate level of care despite his requests for discharge. The treatment plan, however, required more specificity in targeting conditional suicidal ideation and living with disability concerns. Consultation and collaboration with the patient's primary care physician should have been included treatment planning, as new

376

information regarding his condition might result in increased risk for suicide. Finally, the treatment plan was not modified in response to the lack of progress toward treatment goals.

**Patient H**

The patient was admitted to the acute level of care at SQ-PIP on October 17, 2019. He was referred due to frequent acts of self-harm, elevated suicide risk and assaults on staff. The referring institution noted that the patient's violent behavior was potentially motivated by paranoid delusional thinking. The patient was provided with the following diagnoses: Schizophrenia, Persistent Depressive Disorder and Borderline Personality Disorder. The patient was prescribed antipsychotic and mood stabilizing medications during his hospitalization.

The SRASHE assessed the patient with high chronic and acute suicide risk. He endorsed almost daily suicidal ideation, and he was vague in response to questions about suicide plans. The SRASHE noted three suicide attempts in 2019, one of which involved a near lethal overdose. The patient engaged in 16 incidents of self-harm during his PIP admission. During January 2020, the patient swallowed buttons, cut his wrists and was transferred to an outside hospital to remove a manufactured weapon from his rectum.

The February 4, 2020 treatment targets included suicidal ideation, self-injurious behavior and "anger resulting from paranoid ideation." The patient's discharge plan included transferring to intermediate level of care following two weeks without self-injury.

The primary clinician described the patient as requiring a lot of attention and becoming easily frustrated when feeling ignored. The primary clinician added, "It appears likely that the increased attention the [patient] gained at [PIP], and staff's increased responsiveness to self-injurious behavior, reinforced his use of self-injurious behavior as a way to get his needs met, which contraindicates future [PIP] placements as a method of reducing self-injurious behavior."

Findings

Treatment planning for this patient was insufficient. Treatment interventions were not evidenced-based, and the treatment plan should have been modified in response to the patient's lack of progress toward goals.

The comment by the primary clinician regarding contraindications for future PIP referrals was inappropriate. The approach to treatment was the issue, not the setting. The patient would likely benefit from a behavior plan to clarify reinforcers for undesirable behaviors and to offer incentives for progress toward treatment goals; however, it did not appear that this was considered.

**Patient I**

This health care record was reviewed to evaluate the quality of treatment and discharge planning. This condemned status patient was admitted to the intermediate level of care at the SQ-PIP on January 16, 2020.  He was referred to the intermediate program due to concerns regarding grave disability, danger to others and psychosis.  His acute psychiatric symptoms were primarily attributed to methamphetamine abuse.

The discharge plan included releasing the patient to the EOP level of care upon stabilization of acute psychiatric symptoms.  A February 11, 2020 psychiatry note indicated progress with mood, anxiety, panic symptoms, sleep and chronic pain.  The patient was assigned to relapse prevention groups to address his substance abuse issues.

The January 23, 2020 SRASHE assessed the patient with low chronic and acute risk for suicide. The patient reportedly had not engaged in self-harm or suicide attempts during his lifetime.

Findings

The treatment and discharge plans for this patient were adequate.  SQ-PIP staff continued to monitor and treat the patient until his violent ideation and psychotic symptoms remitted.  Relapse prevention was incorporated into the treatment plan, and relapse prevention groups were provided to address the patient's substance abuse issues.  The treatment plan also included a well written case conceptualization.

**Patient J**

This patient's health care record was reviewed to evaluate the quality of his treatment plan.  He was admitted to the intermediate level of care at SQ-PIP on April 21, 2017 for grave disability. He was provided with a diagnosis of Schizophrenia, and he reportedly experienced brain trauma. A PC 2602 order for antipsychotic medication had been continuously renewed since 2006.

The patient further decompensated on or about January 2020.  He had isolating behavior and muteness.  He refused medications, food, and out of cell activities.  He also no longer attended to his hygiene, with smearing and consuming of his feces.  Concerns about weight loss also were noted during this time.

The treatment team documented a plan to refer the patient for neuropsychological testing to determine whether his functional decline resulted from mental illness or dementia; however, the plan was placed on hold due to the severity of his cognitive impairment and mutism.

Findings

Progress notes referenced an existing behavior plan, which was indicated for this patient; however, the behavior plan was not available in the health care record for review. The treatment plan should have been revised and included more realistic and achievable goals. Plans for placing the patient in a more appropriate long-term care setting should be considered, and documentation should indicate timeframes and thresholds for this referral.

**Patient K**

This inmate's health care record was reviewed to assess the intake, security assessment and initial treatment process for using mechanical restraints in the SQ-PIP. This patient was not classified as condemned status or maximum-security level. He was admitted to the SQ-PIP on October 18, 2019 at the acute level of care. The initial treatment plan of October 21, 2019 documented a long history of psychotic symptoms with a prior hospitalization at ASH. The patient received his psychotropic medications by PC 2602 order due to grave disability. He was prescribed quetiapine. The patient was provided with a diagnosis of Schizophrenia Spectrum Disorder. The treatment plan indicated that the inmate was housed in a single cell due to command hallucinations of a violent and disruptive nature that impacted his functioning; however, the initial treatment plan did not include this information. The patient was described as disorganized and irritable, as well as unlikely to negotiate the complexities of a less restrictive housing environment.

Mechanical restraint status was not addressed in the treatment plan. While looking for other documentation that may have indicated a review of cuffing status, it was determined that the patient had transferred to SQ-PIP from ASH. There was no completed referral to acute level of care located in the ASH documentation. ASH considered the patient to be potentially violent, but documentation indicated that he was verbally aggressive without physical violence. A discharge summary reported that the patient had lunged at staff from his wheelchair on September 29, 2019; subsequently, he was placed in restraints. The documentation lacked detail regarding the patient's ability to leave his wheelchair, if any staff or patients had been placed at risk, or precipitants of the incident. This event should have been documented in the SQ-PIP treatment plan and used to evaluate the need for mechanical restraints.

According to SQ-PIP custody supervisory staff and procedures, the mechanical restraint status for patients was to be reviewed at 72 hour and seven-day IDTTs. Neither of this patient's treatment plans (October 21, 2019 and October 28, 2019) included information regarding mechanical restraint status; although there was documentation regarding least restrictive housing and privilege restrictions (none).

Findings

There was a lack of documentation that mechanical restraints were properly reviewed by the treatment team. His treatment was inadequate, as the treatment team did not address custodial restraints or the behavior allegedly underlying the need for restraints.

379

**Patient L**

This health care record was reviewed to evaluate whether the IDTT had documented review of mechanical restraint status during the 72 hour and seven-day IDTTs.  The patient was non-condemned status and non-maximum custody.  He was admitted to the SQ-PIP for acute care on October 18, 2019 due to danger to self and grave disability.  The patient reportedly was seen by the IDTT on the day of arrival with all required staff present.  The patient had no history of assaultive behavior or sexual misconduct.  His recommended least restrictive housing as determined by the IDTT was single cell, based primarily on the patient's hallucinations that could lead to disruption and/or assault.  It should again be noted that the patient did not have a history of assaultive behavior.  There was no documentation of discussion regarding mechanical restraints.

The subsequent IDTT, conducted past timelines on October 28, 2019, also did not document review by the IDTT regarding the need for mechanical restraints from a clinical perspective.

Findings

Based on documentation, the treatment team did not properly review this patient to allow for programming without mechanical restraints.  This violated policy and the patient's ability to program in the least restrictive environment.

**Patient M**

This health care record was reviewed to evaluate the documentation regarding the use of mechanical restraints for this patient while housed in the SQ-PIP.  The non-condemned, non-maximum custody patient was admitted on February 8, 2020 to the SQ-PIP for acute level of care.  The treatment plan of February 10, 2020 did not indicate if the patient had any assaultive history, nor did it document review of mechanical restraints.  The plan did document that the patient was lower functioning, impressionable and vulnerable to victimization.  The plan suggested that the patient was not appropriate for mechanical restraints; however, clear documentation regarding the use of mechanical restraints was absent.

The subsequent IDTT was conducted on February 18, 2020, and the treatment team again did not document the presence of assaultive behavior or review regarding the use of mechanical restraints.  A Mechanical Restraint Review document produced by custody dated February 15, 2020, indicated that the patient was placed on mechanical restraints because he was unclassified and reportedly had a fight with another patient on December 19, 2019.  None of this information was documented in the treatment plan.

Findings

The treatment team did not appropriately document consideration of the use of mechanical restraints.  They did not appear to consider the use of custodial restraints on the patient and resulting impact on treatment.  The treatment violated policy and the patient's ability to program in the least restrictive environment.