# Attachment A



**ROSEN BIEN GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Amy Xu
Email: AXu@rbgg.com

November 23, 2020

<u>VIA ELECTRONIC MAIL ONLY</u>

Matthew A. Lopes, Jr.
Coleman Special Master
Pannone Lopes Devereaux & O'Gara LLC
1301 Atwood Ave., Suite 215 N
Johnston, RI 02919
mlopes@pldolaw.com

   Re: *Coleman v. Newsom*: Comments on the Special Master's
     Draft Monitoring Report on the Mental Health Inpatient Care Programs
     <u>Our File No. 489-03</u>

Dear Special Master Lopes:

   This letter is in response to the Special Master's Draft Monitoring Report on the Mental Health Inpatient Care Programs ("Draft Inpatient Report" or "Report"). We write to comment on one issue noted in the report and to provide input on recommendations.

## I. Use of Restraints and Treatment Modules in Inpatient Programs

   The Report states that practices used in the Psychiatric Intensive Care Unit ("PICU") at the Veterans Administration Medical Center in San Francisco are inapplicable to the inpatient population in the CDCR PIPs. This statement is incorrect. The Report is also incorrect when it says that it was "agreed" that the patients in the PICU are dissimilar to those in the PIPs. Plaintiffs' counsel did not so agree. Report at 17.

   As we stated in our July 15, 2019 letter, attached hereto as **Attachment A**, differences between the PICU and CDCR PIPs are due to opposing treatment strategies and dissimilar staffing levels, not differences between the patient populations. Patients in the PICU have the same clinical diagnoses and range of mental health acuity as patients in CDCR's PIPs. The Report's reference to commitment offenses is particularly misplaced. There is no valid clinical connection between a patient's commitment offense

[3652598.6]

Matthew A. Lopes, Jr.
November 23, 2020
Page 2

to their need for inpatient mental health care. Moreover, in addition to voluntary patients, the PICU also handled patients receiving care during criminal proceedings and patients on Section 5150 involuntary holds. And while the Report implies that the PICU has few incidence of violence because of a dissimilar patient population, the opposite is true: PICU staff report few incidents of violence because the unit is richly staffed with well-trained and well-managed clinicians and nursing staff– not because their patient population is somehow different than CDCR's.

Defendants can and should implement successful practices used at the PICU in their inpatient programs. Putting patients in cages is not the answer to Defendants' inpatient treatment challenges. As the parties learned during the November 2018 tour, the PICU employed a variety of strategies to successfully manage this potentially disruptive inpatient population without cages, including hiring enough on-site psychiatrists to appropriately manage and adjust patients' medication and ensure continuity of care; hiring sufficient numbers of nurses and training them (as well as other staff) in therapeutic containment management and de-escalation tactics; and ensuring buy-in for appropriate behavioral management philosophies and techniques from the top down. As a result of these efforts, PICU staff were able to deescalate assaultive behavior and rarely resorted to the use of isolation or restrictive management methods such as restraints, which were employed only on a case-by-case basis at the order of a doctor. This approach stands in stark contrast to CDCR's routinized use of therapeutic treatment modules, or cages, and cuffs to manage entire categories of patients, including the most acutely ill ones. Plaintiffs object to any implication in the Draft Inpatient Report that cages are necessary for treating *Coleman* class members in need of inpatient care, or to the implication that the staff- and training- intensive strategies employed by a well-managed inpatient unit like the PICU would not work within CDCR's PIPs.

We request that the Special Master revise this portion of the Report to reflect that PICU practices may appropriately be applied to CDCR and DSH inpatient programs due to similarities between the patient populations, or at least to acknowledge that this issue remains a point of contention and warrants further exploration.

## II. Draft Inpatient Report Recommendations

The Draft Inpatient Report sets out six recommendations at pages 99-100, which address:

> (1)   inadequate treatment provided in the inpatient programs,
>
> (2)   staffing plans for CDCR inpatient programs,

Matthew A. Lopes, Jr.
November 23, 2020
Page 3

> (3) referral, transfer, and admission policies to inpatient programs during the COVID-19 pandemic,
>
> (4) lack of appropriate treatment spaces in Facilities C5 and C6 at SVSP-PIP,
>
> (5) supplemental reporting of patients waiting for inpatient care who are out of their LRH, and
>
> (6) development of suicide prevention policies in all PIPs.

While all of the recommendations are necessary, we request that Recommendation (5) be revised to include a deadline for completion. Recommendation (5) would require a report "to identify the number of patients on the waitlist specifically out of LRH, their current designated housing.., and where they have been endorsed to." Draft Inpatient Report at 100. We request that this report be made due within 14 days. The problem of patients housed out of their LRH is longstanding and has not improved despite the Special Master's focus on this issue in the late summer and early fall of 2019 and the LRH-focused tours of 2017. Pandemic-related movement restrictions have aggravated the problem. The Special Master and Court have repeatedly determined that the LRH process is an essential part of the remedy in this case, and closely tied to the full utilization of the complement of beds available to class members at ASH – where Defendants reported 81 open beds last week, and a waitlist of over 300 patients needing inpatient care. *See e.g.*, Apr. 24, 2020 Order, ECF No. 6639, at 3 & n.2; Mar. 24, 2017 Order, ECF No. 5583, at 15.

The last two Special Master reports have concluded the LRH process is broken. Therefore, we now request, as we did in 2018, that the Special Master recommend that Defendants be required to meet specific timeframes for evaluating and moving class members into their LRH designations to ensure patients' timely access to adequate mental health care required by the Constitution.

/ / /

/ / /

/ / /

/ / /

/ / /

[3652598.6]

Matthew A. Lopes, Jr.
November 23, 2020
Page 4


      Thank you for the opportunity to comment on the comprehensive Draft Inpatient Report.


                               Sincerely,

                               ROSEN BIEN
                               GALVAN & GRUNFELD LLP

                               */s/ Amy Xu*

                   By:  Amy Xu

AX:aa
cc:     *Coleman* Special Master Team
       *Coleman* co-counsel
       Kyle Lewis
       Elise Thorn
       Tyler Heath
       Lucas Hennes
       Christine Ciccotti
       Nina Raddatz
       Antonina Raddatz
       Kristopher Kent

# Attachment A



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Marc J. Shinn-Krantz
Email:  MShinn-Krantz@rbgg.com

July 15, 2019

<u>VIA ELECTRONIC MAIL ONLY</u>

CDCR Office of Legal Affairs
Nick Weber
Melissa Bentz
Jerome Hessick
Dillon Hockerson
Kristen Moose

Re:    *Coleman v. Newsom*:  Plaintiffs' Questions and Comments Re: Defendants'
Proposal to Install Cages in the Inpatient Hospital at CHCF
<u>Our File No. 0489-3</u>

Dear All:

We write in response to two documents initially circulated by Melissa Bentz on January 25, 2019, Defendants' proposal for a six-month trial of installing cages, which Defendants refer to as therapeutic treatment modules or TTMs, at the California Health Care Facility (CHCF) Psychiatric Inpatient Program (PIP) (the Pilot), and a related draft cage policy (the Policy).  We will respond soon in a separate letter to Defendants' draft Discretionary Programming Status (DPS) pilot policy.

Our comments and questions below come within the context of Plaintiffs' longstanding objections to Defendants' practice of providing mental health treatment to patients in cages, which evidence in this case has shown is inhumane and counter-therapeutic.  As we have repeatedly stated, Defendants' concerns about managing potential violence can and should be addressed using the same methods employed every day by mental health professionals treating similar patient populations—by ensuring their mental health units have sufficient numbers of appropriately trained staff.

Nonetheless, Plaintiffs agreed to consider the relevant proposals in good faith and intend to do so.  Our comments and questions below are offered in that vein, with the expectation that Defendants will provide additional responsive information in advance of workgroup discussions on this topic to ensure they are as productive as possible.

[3409364.4]

CDCR Office of Legal Affairs
July 15, 2019
Page 2

I.      **Plaintiffs' General Comments on Defendants' Proposal to Install Cages at CHCF PIP**

        As Defendants well know, Plaintiffs fundamentally disagree with the foundational assumption that the solution for addressing clinical and/or custodial staff's fear of patients is through the use of cages or the regular use of any other sort of restraint. Security in a hospital should come from direct observation and adequate numbers of properly trained staff, not classification scores and cages that undermine and impede desperately needed mental health treatment.

        We are obviously dismayed that Defendants are seeking to formalize and expand their reliance on cages in the licensed inpatient context by installing 14 new cages in CHCF's PIP, given our longstanding objection to their use in any setting within CDCR for anything more than individualized, temporary and short-term situations to manage imminent risks of serious harm.  Cages, an extreme version of restraints, are a literal and psychological barrier to both the patient seeking treatment and the treatment provider. Like any visible restraint, cages negatively affect others' perceptions of the mentally ill patient, dehumanizing the patients in the eyes of both their clinicians and other patients. *See Claiborne v. Blauser*, No. 16-16077, 2019 WL 2676900, at *1, *10 (9th Cir. June 28, 2019) (noting, in trial context, that visible restraints prejudice others against the restrained individual, as the "sight of a shackled litigant is apt to make jurors think they're dealing with a mad dog" (quoting *Maus v. Baker*, 747 F.3d 926, 927 (7th Cir. 2014)); *see also* Expert Declaration of Craig Haney, ECF No. 4378, Mar. 14, 2013 ¶¶ 82-83, 179 (class members describing how being locked in cages for treatment makes them feel like animals and impedes their access to mental health care).  Cages are an affront to class members' basic human dignity, which the Supreme Court has noted is "inherent in all persons," including mentally ill prisoners, and which "animates the Eighth Amendment prohibition against cruel and unusual punishment."  *Brown v. Plata*, 563 U.S. 493, 510 (2011).  The Supreme Court was so offended by Defendants' practice of holding high-acuity patients "for prolonged periods in telephone-booth-sized cages without toilets," *id.* at 503-04, that it attached to its opinion in this case a photograph of some of the cages CDCR seeks now to newly install in its highest acuity licensed hospital, *see id.* at App'x C.  There is simply no question that cages are destructive to the therapeutic relationship and impede clinical care, as the evidence has shown in this case. *See* Expert Declaration of Edward Kaufman, ECF No. 4379, Mar. 14, 2013, ¶ 86 ("At a minimum, the treatment modules pose a challenge to meaningful therapeutic interactions. To use them for individuals in acute distress, who may be feeling deeply isolated, even when there is no documented need for the modules is counter-therapeutic and inhumane.").

[3409364.4]

CDCR Office of Legal Affairs
July 15, 2019
Page 3

There is no question that Defendants' purported need to install counter-therapeutic cages to "manage" their acutely mentally ill patients is a direct outgrowth of their serious staffing deficiencies. CDCR's PIPs are dangerously understaffed, with nowhere near the number of allocated staff. Although intensive medication management is key to stabilizing patients, CHCF PIP has only 14.90 psychiatry positions filled out of 36.50 allocated. *See* May 2019 Filing, ECF No. 6209 at 5. With coverage provided through 2.80 registry positions, and 2.00 telepsychiatry positions, CHCF PIP is still at an abysmal 19.70 filled positions (54% filled). CMF PIP is even worse off, with only 10.00 psychiatrist positions filled out of 32.00 allocated. With 4.23 positions of registry coverage, CMF PIP still has only 44% of its psychiatry positions filled. SVSP PIP has *zero* of its 10.00 psychiatry positions filled, although its heavy reliance on registry coverage results in a 75% filled rate. (CDCR does not break out CIW or SQ PIP staffing on this monthly filing.)

CHCF PIP's psychiatry staffing has plummeted since CDCR took over the hospital program in June 2017's Lift and Shift. As of Defendants' May 4, 2017 report showing data for March 2017, CHCF PIP had 27.00 civil service staff psychiatrists out of 33.00 authorized positions. *See* May 4, 2017 Ltr. from G. Maynard to Special Master Enclosing DSH Staffing Report at 5. But as of May 2019, even though the staffing allocation had increased by 3.5 positions, CHCF had only 14.90 civil service staff (a drop of 12.10, or 44.81%). ECF No. 6209 at 5. Combined, CHCF PIP, CMF PIP, and SVSP PIP had 57.00 civil service staff psychiatrists as of March 2017, before Lift and Shift, and have now lost a combined 32.10 (56.32%) of those civil service staff psychiatrists. *Compare* May 4, 2017 DSH Staffing Report at 4-6 *with* ECF No. 6209 at 5.

Sufficient numbers of nursing staff are also critical to providing safe levels of observation and security in psychiatric units. Yet CHCF PIP also has severe nursing shortages that it makes up only through heavy use of overtime, according to Defendants' Monthly Report Data, April 2019 Enclosure 1*l*, enclosed hereto as **Attachment A**. Out of 430.00 authorized psychiatric technician positions, which Plaintiffs understand to be currently filled with medical technical assistants (MTAs), CHCF PIP had only 337 civil service positions filled, and made use of 2.83 full-time equivalent (FTE) contract positions and 61.91 FTE overtime positions, to bring the functional vacancy rate to of 28.26 positions (6.57% vacant). *See* Attachment A at PDF page 7 (internal document numbering: "Page 1 of 3"). CHCF PIP apparently attempted to make up for the nursing coverage gap through heavy use of registered nurse overtime as well, with 174.00 allocated registered nurse positions, 165 filled, 0.61 FTE contract positions, and 47.68 FTE overtime positions (-29.27% vacant). *See id.* The very high use of overtime for direct care nursing staff—109.59 positions—shows that CHCF is struggling to meet its actual nursing needs. CHCF PIP also reported severe functional vacancy rates in other

[3409364.4]

CDCR Office of Legal Affairs
July 15, 2019
Page 4

positions including psychologists (24.14% vacant), clinical social workers (15.15% vacant), and rehabilitation therapists (21.88% vacant). *See id.*

Even if Defendants filled their currently allocated PIP positions, however, Plaintiffs have long contended that their existing ratios are insufficient to provide safe and appropriate mental health care to the acutely ill patients in these inpatient psychiatric hospitals. CDCR has represented that it carried over DSH's existing staffing ratios to the PIPs with Lift and Shift. DSH's ICF ratios at the time of Lift and Shift were 1 to 35, although those staffing ratios have never been accepted by Plaintiffs or approved by the Special Master or the Court given that DSH's staffing plan is still in progress.

Indeed, DSH's Acting Director Stephanie Clendenin recently agreed with Plaintiffs that DSH's existing staffing ratios are inadequate. At a March 4, 2019 hearing before Assembly Budget Subcommittee No. 1 on Health and Human Services, and in the agenda for that hearing, Director Clendenin acknowledged that DSH is woefully understaffed and requested additional funding. She admitted that DSH's official budgeted psychiatry ratio for intermediate care is 1 to 35, whereas the average psychiatrist-to-patient ratio for the Western Psychiatric State Hospital Association's member hospitals is 1 to 25. *See* Assembly Budget Subcommittee No. 1 on Health and Human Services, Monday March 4, 2019 Hearing Video, available at https://www.assembly.ca.gov/media/assembly-budget-subcommittee-1-health-human-services-20190304/video ("Hearing Video") at 2:04:11 to 2:04:36; March 4, 2019 Hearing Agenda ("Agenda") at 25 (ratio is "well above the average of other state hospitals"). The Agenda is enclosed hereto as **Attachment B**. Notably, DSH maintained the 1 to 25 ratio until late 2011 or early 2012 when, in the midst of California's financial crisis, DSH's CRIPA consent decree requiring the 1 to 25 ratio ended and DSH increased the ratio to the present 1 to 35 level. *See* July 25, 2019 Commitments Ltr from C. Trapani to Workgroup at 5; August 3, 2018 Ltr. from J. Mupanduki to Workgroup at 1 (confirming ratio change). Director Clendenin also testified that DSH currently is budgeted for the minimum ratios required for licensing compliance, but due to the need for additional staffing, DSH delivers more nursing hours. *See* Hearing Video at 1:32:25 to 1:33:00; Agenda at 21 (budgeted ratios "do not result in enough nurses to effectively deliver adequate care"). This need for additional staff results in DSH's heavy reliance on overtime (including mandatory overtime) and registry use that exacerbates the staffing problems. *See* Agenda at 27-28. A representative for the California Association of Psychiatric Technicians echoed Director Clendenin's concerns, testifying that DSH is dramatically understaffed for the patient population it serves, including requiring psychiatric technicians to work 1.4 million hours of overtime, including 600,000 of involuntary overtime in 2016 alone. *See* Hearing Video at 1:45:10 to 1:45:36.

[3409364.4]

CDCR Office of Legal Affairs
July 15, 2019
Page 5


Moreover, Defendants' persistent claim that they cannot treat Maximum Custody or other high-custody patients without locking them in cages is belied by the fact that other inpatient programs serving similar patient populations treat their patients without cages by employing sufficient numbers of staff with sufficient training and support. This is the case, for example, in the San Francisco Veteran's Administration (VA) Psychiatric Inpatient Unit (PICU), which Plaintiffs, Defendants, and the Special Master team jointly toured in November 2018. Patients in the PICU have the same clinical diagnoses and range of mental health acuity as patients in CDCR's PIPs. The PICU is a richly staffed, locked facility that regularly treats individuals sent by the courts for treatment during criminal proceedings and patients on Section 5150 involuntary holds. As we learned on the tour, the PICU employs a variety of strategies to successfully manage this potentially disruptive inpatient population without cages, including, inter alia, hiring enough on-site psychiatrists to appropriately manage and adjust patients' medication and ensure continuity of care; hiring sufficient numbers of nurses and training them (as well as other staff) in therapeutic containment management and de-escalation tactics; and ensuring buy-in for appropriate behavioral management philosophies and techniques from the top down. As a result of these efforts, the PICU rarely resorts to the use of isolation or restrictive management methods such as restraints, which are employed only on a case-by-case basis at the order of a doctor. This approach, of course, stands in stark contrast to CDCR's routinized use of cages and cuffs to manage entire categories of patients, including the most acutely ill ones.

As seen at the PICU, and as DSH Director Clendinin testified in March, nursing staff perform a critical role in inpatient settings. We were surprised to learn recently that Defendants are planning to end the use of MTAs in the PIPs within the next six months, which Defendants did not disclose to the workgroup. To Plaintiffs' knowledge, Defendants have not yet developed a proposal for replacement of the MTAs—or at least have not come forward with one to the *Coleman* workgroup participants, despite Plaintiffs' query on June 24, 2019. *See* C. Trapani to Defs. Email, June 24, 2019. Assuming Defendants intend to replace the MTAs with psychiatric technicians, we strongly encourage significantly increasing the ratio and total number of psychiatric technicians assigned to the PIPs, as they can play a key role in increasing the level of direct observation and security within these units. We look forward to Defendants' proposal on this.

Staff in the PICU also identified the robust training they receive on appropriate de-escalation and management of assaultive behavior techniques as critical to the success of their program. Are CDCR clinical staff working in the PIPs currently trained in these techniques? If so, please provide us with the training materials. If not, have Defendants considered developing such a training in lieu of expanding the use of cages?

CDCR Office of Legal Affairs
July 15, 2019
Page 6

## II.     Plaintiffs' Specific Comments about Defendants' Draft Policy and Proposed Pilot

In light of the above concerns, Plaintiffs have a number of specific comments and questions regarding the particulars of Defendants' draft Policy and proposed Pilot.

### A.     Consideration of Alternative Options

Initially, Plaintiffs need more information on Defendants' justification for proposing the installation of cages in their inpatient psychiatric hospitals. What is the problem that this proposal is designed to address? Are Defendants aware of any published and/or peer reviewed studies of the use of cages or treatment modules in a licensed inpatient psychiatric hospital or program or any study of the use of cages at all in any mental health program? What other options, if any, did CDCR consider using before proposing to instead install cages at CHCF's inpatient unit? Did Defendants study or evaluate whether increasing staffing (or filling existing staffing vacancies) and/or providing additional training similar to that employed at the PICU and other inpatients hospitals would provide an alternative to installing cages? If so, please provide us the results. Did Defendants consider developing a step-down program permitting patients to more quickly program without restraints such as the one CDCR briefly attempted in the SAC PSU before abandoning it in 2017? *See* Special Master 27th Round Report, ECF No. 5779, at 186-87.

Plaintiffs understand that Defendants—first DSH, and then CDCR after Lift and Shift—have used cages in the inpatient program at SVSP for several years (despite Plaintiffs' objection), as well as in EOP ASU Hubs and the PSU (again, despite Plaintiffs' objection). Have Defendants ever studied their use of cages in any of these settings from a clinical perspective, e.g., to determine whether the use of caged treatment for psychiatric patients improves or impedes care? In particular, SVSP's PIP is the same level of care and security as CHCF's PIP. In lieu of expanding cages to new licensed inpatient programs without evaluating their efficacy in existing, substantially similar programs, Plaintiffs request that Defendants study and report on the clinical effects of their use in treating inpatient psychiatric patients in the SVSP PIP.

### B.     Existing Treatment for Maximum Custody Class Members in PIPs

With regard to Defendants' Pilot proposal, Plaintiffs are in the first instance deeply disturbed by Defendants' report that Maximum Custody patients at CHCF

CDCR Office of Legal Affairs
July 15, 2019
Page 7

currently receive no groups and potentially some limited individual therapeutic contacts,[1] and that their Maximum Custody policy interferes with the treatment of non-Maximum Custody patients at CHCF, as CDCR shuts down all programming anytime a Maximum Custody patient is outside of his or her cell even though that patient is restrained and escorted by staff.  Pilot at 1-2.  While Defendants blame the absence of cages at CHCF for their failure to provide constitutionally adequate—or indeed any—treatment to patients whom CDCR itself has determined need inpatient psychiatric hospitalization, *see id.* at 1, that is a Hobson's choice for the reasons outlined above.  Furthermore, providing zero hours of therapy to patients at the inpatient level of care is a clear violation of the Eighth Amendment, particularly when Defendants' representatives have previously testified that the standard of care for ICF class members is between 35 and 40 hours per week of patient programming, and that failure to provide such care both threatens to violate ethical principles regarding patient care and causes acutely ill class members' mental health to further deteriorate.  *See* Decl. of Victor Brewer, SVPP Executive Director, Sept. 16, 2010, ECF No. 3913-3 at ¶ 5; Decl. of Richard Lipon, CMF-VPP Acting Medical Director, October 12, 2010, ECF No. 3932-2 at ¶¶ 3, 6-9; *see also* ECF No. 3932 at 2, 5-6, 11-12.

Please provide us with information regarding how much programming, including yard and other out of cell activities plus group and individual treatment, patients on Maximum Custody status receive at CHCF PIP, and where and how they receive that treatment.  Please also explain why Defendants are proposing to install 4 cages on the yard, including specifying the size of those cages and what Defendants propose to use them for.  If, in fact, Defendants are failing to provide adequate outdoor exercise or mental health treatment to Maximum Custody prisoners in CHCF or other PIPs due to the lack of cages, then Defendants are in clear violation of their Eighth Amendment obligations to provide inpatient psychiatric care to these most vulnerable human beings. Plaintiffs do not and will not accept that cages are the only way class members needing inpatient care can receive treatment, given Defendants' failure to properly staff their inpatient programs and the many other methods employed by other inpatient hospitals across the country.

### C.    Operation of Maximum Custody Status in PIPs

Nor is it clear from Defendants' proposed Pilot and draft Policy what the precise scope of their planned use of cages would be given ambiguities surrounding their current and planned use of Maximum Custody status.  Plaintiffs have a number of questions

---

[1] Although Defendants' policy does not clearly state whether and how Maximum Custody patients at CHCF receive individual clinical contacts, it appears that they may receive such treatment only if a walk-alone yard is available.

CDCR Office of Legal Affairs
July 15, 2019
Page 8

about Maximum Custody status generally, and about how and why it is utilized in CDCR's inpatient psychiatric hospitals. Below, Plaintiffs first summarize the relevant portions of the materials and then outline their questions.

Defendants' draft Policy would formalize the use of cages in licensed inpatient programs for the treatment of all patients designated as Maximum Custody status pursuant to Title 15, and whose status cannot be waived by committee. According to Defendants' proposed Policy, while the ICC (which contains no clinical staff and is chaired by the Warden) would ostensibly be required to consider clinical input regarding a patient's behavior, the ICC alone would decide whether a patient will be treated in a cage and/or subjected to mechanical restraints while in the inpatient program. Furthermore, the ICC would make that determination based on unspecified "custody factors," without further consideration of clinical factors.

Concurrently, Defendants' proposed six-month Pilot would install 14 new cages at CHCF PIP to be used for providing mental health treatment to Maximum Custody prisoners. Pilot at 1. The Pilot outlines the existing Maximum Custody review process apparently used in the PIPs, which makes clear that the ICC does not review the appropriateness of a patient's Maximum Custody status for the first two weeks the patient is in the licensed psychiatric hospital. *Id.* After that, the ICC does not reconsider a patient's placement on Maximum Custody status until their Pre-MERD and MERD reviews, or unless a patient's IDTT has referred the patient to the ICC after determining the patient complied with certain treatment goals. *Id.* The decision to suspend a patient's Maximum Custody status is left to the sole discretion of the ICC chair, i.e., the Warden. *Id.* Finally, Defendants' Pilot document does not identify any methodologies by which they would propose to evaluate the efficacy of the Pilot, including identification of any outcome measures, comparisons to other programs, or discussing what a successful pilot might look like.

Plaintiffs initially note that no policy or directive governing the use of Maximum Custody status in the PIPs, including outlining the specific procedures and requirements discussed in the Pilot document, has ever been provided to Plaintiffs or discussed in the workgroups. Does one exist? Plaintiffs are not aware of any requirement in Title 15 or the DOM that Defendants must confine patients to cages before giving them mental health treatment. Per Title 15, patients classified as Maximum Custody merely "shall be under the direct supervision and control of custody staff." 15 CCR § 3377.1(a)(1)(C). What is Defendants' authority for requiring all patients on Maximum Custody to be caged during mental health treatment? Do medical patients on Maximum Custody status, or any other category of patients, receive treatment in cages?

CDCR Office of Legal Affairs
July 15, 2019
Page 9

Similarly, Plaintiffs are concerned that the vague rules governing Defendants' placement and retention of class members on Maximum Custody status imposes an unconstitutional custodial barrier to needed mental health treatment. The fact that the Warden alone has the discretion to suspend or maintain Maximum Custody status for hospitalized patients in need of the system's most intensive mental health treatment is deeply problematic. *See Estelle v. Gamble*, 429 U.S. 97 at 104-05 (1976) (custodial interference with prescribed medical treatment constitutes deliberate indifference). It is not apparent why Defendants' Maximum Custody practices could not or should not be modified in order to permit these extremely sick patients to receive constitutionally adequate mental health care in a licensed inpatient setting like the PIP. Defendants should develop alternative custodial security measures that do not interfere with treatment rather than incorporating the existing Maximum Custody designation and restrictions wholesale in the psychiatric hospital setting reserved for the most acutely ill class members. CHCF's PIP is already the highest custody inpatient program Defendants offer, which Defendants intentionally built inside prison walls based on the SVPP model in order to ensure CDCR could control security with electric fences to eliminate the risk to public safety of escape, in contrast to the DSH programs. This high-custody hospital setting should require little, if any, use of restraints for treatment and programming, much less the use of cages.

Why are Defendants unable to conduct the initial ICC in a shorter period of time than ten business days, i.e., two weeks, for this relatively small group of prisoners? Under what circumstances can the ICC waive Maximum Custody status, and what proportion of patients are eligible for such consideration? Why can't the ICC waive or suspend every prisoner's Maximum Custody status for the duration of their inpatient hospitalization, or at least for those prisoners whose underlying RVRs do not involve violence and/or occurred well before their PIP admission? Why should custodial factors and decision-makers have total and unilateral control over the Maximum Custody determination in this licensed inpatient setting, with the discretion to totally disregard clinical input on the effect this highly restrictive status may be having on a patient's mental health and treatment progress? And why should Maximum Custody status only be reconsidered in the three narrow circumstances identified by Defendants in the Pilot, which could result in class members remaining on Maximum Custody status for their entire inpatient stays?

Plaintiffs have previously requested information about Defendants' use of Maximum Custody status in the PIPs in an effort to fully evaluate this proposal, but have not yet received responsive data that would allow for evaluation, for instance, of how long patients in the PIP remain on Maximum Custody status currently. *See* M. Shinn-Krantz to N. Weber June 18, 2019 Email Request and Related Thread, attached as **Attachment C**. There are no timeframes in Defendants' proposal, beyond the ten-day

CDCR Office of Legal Affairs
July 15, 2019
Page 10

timeframe for an initial ICC, for how long a Maximum Custody classification may last. Plaintiffs are concerned that the lack of timeframes will lead many patients to remain on Maximum Custody indefinitely. The Special Master has expressed serious concern about similar indefinite and prolonged custodial interference with patients' access to treatment in prior reports on Defendants' inpatient programs. *See, e.g.*, Special Master Inpatient Report, May 30, 2014, ECF No. 5156, at 25, 28. Plaintiffs reiterate their request for this information in advance of further discussions.

Information Defendants have provided, however, raises concerns because it shows that PIP patients are much more likely to be classified as Maximum Custody than the CDCR population as a whole. Enclosed as **Attachment D** is an Excel chart provided by Defendants on March 5, 2019, showing the point-in-time inpatient census as of that date. At that time, approximately 14% of the 391 patients at CHCF's PIP were Maximum Custody, slightly higher than the roughly 13% of patients across all of the PIPs. Each of these percentages is much higher than the system-wide average of 5% reported in a recent Legislative Analyst's Office report enclosed hereto as **Attachment E**. *See* LAO Report, Improving California's Prison Inmate Classification System, May 2019 at 9, Fig. 8 (reporting 2018 data). Without additional data or explanation from Defendants, it is unclear how long patients at CHCF PIP are classified at Maximum Custody, or how many other patients are classified as Maximum Custody at some point during their inpatient stays.

Plaintiffs look forward to further discussion and information sharing on this topic.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Marc J. Shinn-Krantz*

By:   Marc J. Shinn-Krantz

MSK:MSK
Enclosures
cc:    *Coleman* Special Master        *Coleman* Co-Counsel
       Adriano Hrvatin                Elise Thorn
       Tyler Heath                    Damon McClain
       Robert Henkels                 Christine Ciccotti
       Sean Rashkis                   Joanna Mupanduki

[3409364.4]

ATTACHMENT A

**DIVISION OF HEALTH CARE SERVICES**
**STATEWIDE MENTAL HEALTH PROGRAM**
**P.O. Box 588500**
**Elk Grove, California  95758**



June 18, 2019

Matthew A. Lopes, Jr. Esquire
Office of the Special Master
Pannone Lopes Devereaux & O'Gara LLC
Northwoods Office Park
1301 Atwood Avenue, Suite 215 N
Johnston, RI  02919

via:  Elise Owens Thorn, Esquire
Deputy Attorney General
Department of Justice
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA  94244-2550

## RE: *COLEMAN* MONTHLY REPORT OF INFORMATION REQUESTED AND RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES

Dear Mr. Lopes:

Enclosed is the *Coleman* Monthly Report reflective of April, 2019, data (or as otherwise noted).  The following is the list of enclosures:

1. California Department of Corrections and Rehabilitation (CDCR) Staffing Report.
    a. Mental Health Executive Summary.
    b. Mental Institution Vacancy by Classification.
    c. Mental Institution Vacancies Summary by Classification.
    d. Mental Health Month to Month Registry Usage.
    e. Mental Health Six-Month Vacancy Summary.
    f. Mental Health Program Institution Vacancies-Summary by Classification.
    g. Statewide Mental Health Program Compliance Summary Report.
    h. Enhanced Outpatient Administrative Segregation Unit (EOP ASU) Case Manager Positions and Vacancies.
    i. Mental Health Hiring Progress Report.
    j. Mental Health Statewide Hire Tracking Summary -- Clinical Positions Only.
    k. Mental Health Telepsych Allocated and Filled Positions Report.
    l. Psychiatric Inpatient Program (PIP) Staffing Data.
    m. Department of State Hospitals (DSH) Staffing Data.

2. Reception Center Monthly Reports.
    a. Reception Center Mental Health Screening Report.
    b. Reception Center Transfer Timelines Report.

3. Continuous Length of Stay Counts for Mental Health Services Delivery Systems (MHSDS) ASU, Secured Housing Unit (SHU), and Psychiatric Services Unit (PSU) report.

Matthew A. Lopes, Jr. Esquire
Page 2

4. EOP Inmates Waiting Transfers to PSU.

5. EOP ASU Hub Trends.

6. Population and Census Reports.
   a. Health Care Placement Oversight Program (HCPOP) Information Report, Summary of Mental Health Population by Institution and Level of Care (H-1).
   b. MHSDS Management Information Summary (MIS).
   c. Weekly EOP/Outpatient Psychiatric Program Report.

7. Mental Health Crisis Bed (MHCB) Reports.
   a. MHCB Referrals report.
   b. MHCB Stays report.
   c. MHCB Wait List.

8. DSH and Inpatient Program Referral Reports.
   a. Referrals for Transfer to Inpatient Programs Report.
   b. DSH Monthly Report of CDCR Patients in DSH Hospitals, Summary of PC 2684s Report.

9. Milestone Credits Report.

10. Work Assignments Report.

11. Out of Level Housing Report.

If you have any questions, please contact me at (916) 691-0296.

Sincerely,

KATHERINE TEBROCK, ESQUIRE
Deputy Director, Statewide Mental Health Program
California Department of Corrections and Rehabilitation

Enclosures

cc:   Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
      Kerry F. Walsh, Esq., *Coleman* Deputy Special Master
      Jeffrey L. Metzner, M.D., *Coleman* Expert
      Kerry C. Hughes, M.D., *Coleman* Expert

Matthew A. Lopes, Jr. Esquire
Page 3

Mary Perrien, Ph.D., *Coleman* Expert
Henry A. Dlugacz, Esq., *Coleman* Expert
Patricia Williams, Esq., *Coleman* Monitor
Patrick McKinney, Esq., Office of Legal Affairs, CDCR
Nicholas Weber, Esq, Office of Legal Affairs, CDCR
Michael Bien, Esq., Rosen, Bien and Galvan
Donald Specter, Esq., Prison Law Office
Steve Fama, Esq., Prison Law Office
Brittany Brizendine, Psy.D, Assistant Deputy Director, Statewide Mental Health Program, Division of Healthcare Services (DHCS)
Angela Ponciano, Associate Director, Statewide Mental Health Program, DHCS
Laura Ceballos, Ph.D., Mental Health Administrator, Inpatient Facilities and Quality Improvement, Statewide Mental Health Program, DHCS
John Rekart, Ph.D., Chief, Quality Management and Informatics, Statewide Mental Health Program, DHCS
Teresa Owens, Health Program Specialist I, Quality Management, Statewide Mental Health Program, DHCS

DIVISION OF HEALTH CARE SERVICES
Psychiatric Inpatient Program Staffing Report
April 2018

## California Institution for Women - Psychiatric Inpatient Program

| Class Code | Classifications | Governor's Budget Authorized Positions (1) | Allocated Blanket Positions (2) | Total Positions | Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| 9288 | Senior Psychologist, Supervisor | 0.00 | 1.50 | 1.50 | 1.00 | 0.00 | 0.00 | 1.00 | 0.50 | 33% |
| 8103 | Program Director | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 8102 | Program Assistant | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 9761 | Senior Psychiatrist, Supervisor | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100% |
| 9287 | Senior Psychologist, Specialist | 0.00 | 0.50 | 0.50 | 1.00 | 0.00 | 0.00 | 1.00 | -0.50 | -100% |
| 9283 | Psychologist, Clinical | 2.00 | 1.00 | 3.00 | 3.00 | 0.00 | 0.00 | 3.00 | 0.00 | 0% |
| 9758 | Staff Psychiatrist | 2.00 | 1.00 | 3.00 | 1.00 | 0.00 | 0.00 | 1.00 | 2.00 | 67% |
| 9872 | Clinical Social Worker | 4.00 | 0.00 | 4.00 | 4.00 | 0.00 | 0.00 | 4.00 | 0.00 | 0% |
| 9286 | Recreation Therapist | 4.00 | 0.00 | 4.00 | 4.00 | 0.00 | 0.00 | 4.00 | 0.00 | 0% |
| 8253 | Psychiatric Technician | 32.00 | 0.00 | 32.00 | 32.00 | 0.00 | 0.00 | 32.00 | 0.00 | 0% |
| 8252 | Senior Psychiatric Technician | 6.00 | 0.00 | 6.00 | 7.00 | 0.00 | 0.00 | 7.00 | -1.00 | -17% |
| 9004 | Unit Supervisor | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| | **GRAND TOTAL** | **54.00** | **4.00** | **58.00** | **56.00** | **0.00** | **0.00** | **56.00** | **2.00** | **3%** |

(1) Authorized positions are based on the number of positions in the Governor's 2017/18 budget.
(2) Positions allocated per memorandum dated 1/27/15.
(3) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.
(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

DIVISION OF HEALTH CARE SERVICES
Psychiatric Inpatient Program Staffing Report
April 2018

## California Medical Facility - Psychiatric Inpatient Program

| Class Code | Classifications | Governor's Budget Authorized Positions (1) | Allocated Blanket Positions (2) | Total Positions | Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| 9390 | Chief Psychologist | 0.00 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 9288 | Senior Psychologist, Supervisor | 0.30 | 0.00 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.30 | 100% |
| 8103 | Program Director | 0.00 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 8102 | Program Assistant | 0.00 | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 9281 | Senior Psychiatrist, Supervisor | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100% |
| 9287 | Senior Psychologist, Specialist | 0.40 | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 100% |
| 9283 | Psychologist, Clinical | 2.50 | 0.00 | 2.50 | 3.00 | 0.00 | 0.00 | 3.00 | -0.50 | -20% |
| 9758 | Staff Psychiatrist | 2.50 | 0.00 | 2.50 | 0.00 | 1.50 | 0.00 | 1.50 | 1.00 | 40% |
| 9872 | Clinical Social Worker | 2.50 | 0.00 | 2.50 | 2.00 | 0.00 | 0.00 | 2.00 | 0.50 | 20% |
| 9286 | Recreation Therapist | 2.50 | 0.00 | 2.50 | 2.00 | 1.00 | 0.00 | 3.00 | -0.50 | -20% |
| | **GRAND TOTAL** | **10.70** | **4.00** | **14.70** | **10.00** | **2.50** | **0.00** | **12.50** | **2.20** | **15%** |

(1) Authorized positions are based on the number of positions in the Governor's 2017/18 budget.
(2) Positions allocated per memorandum dated 5/15/17.
(3) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.
(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

## DIVISION OF HEALTH CARE SERVICES
### Psychiatric Inpatient Program Staffing Report
### April 2018

## San Quentin - Psychiatric Inpatient Program

| Class Code | Classifications | Governor's Budget Authorized Positions (1) | Total Positions | Filled Civil Service Positions (2) | Contracted FTE (3) | Overtime FTE (3) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|---|---|
| 9859 | Chief Psychologist | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 9288 | Senior Psychologist, Supervisor | 0.40 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 100% |
| 8103 | Program Director | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 8102 | Program Assistant | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 9761 | Senior Psychiatrist, Supervisor | 1.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0% |
| 9287 | Senior Psychologist, Specialist | 0.40 | 0.40 | 1.00 | 0.00 | 0.00 | 1.00 | -0.60 | -150% |
| 9283 | Psychologist, Clinical | 2.70 | 2.70 | 3.00 | 0.00 | 0.00 | 3.00 | -0.30 | -11% |
| 9758 | Staff Psychiatrist | 2.70 | 2.70 | 3.00 | 0.00 | 0.00 | 3.00 | -0.30 | -11% |
| 9872 | Clinical Social Worker | 3.60 | 3.60 | 3.00 | 0.00 | 0.00 | 3.00 | 0.60 | 17% |
| 9286 | Recreation Therapist | 3.60 | 3.60 | 3.00 | 0.00 | 0.00 | 3.00 | 0.60 | 17% |
| | **GRAND TOTAL** | **17.40** | **17.40** | **17.00** | **0.00** | **0.00** | **17.00** | **0.40** | **2%** |

(1) Authorized positions are based on the number of positions in the Governor's 2017/18 budget.

(2) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.

(3) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

**CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES**
**Psychiatric Inpatient Program Staff**
**April 2019**
**Report submitted May 2019**

| CHCF PIP | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Classifications | Governor's Budget Authorized Positions (1) | Governor's Budget/ Departmental Authorized (Blanket) Positions (2) | Total Authorized Positions | Total Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
| **Mental Health Staffing** | | | | | | | | | |
| Psychologist | 29.00 | 0.00 | 29.00 | 22.00 | 0.00 | 0.00 | 22.00 | 7.00 | 24.14% |
| Psychiatrist | 33.00 | 3.50 | 36.50 | 14.90 | 2.68 | 0.00 | 17.58 | 18.92 | 51.84% |
| Clinical Social Worker, Health/Correctional Facility (Safety) | 33.00 | 0.00 | 33.00 | 28.00 | 0.00 | 0.00 | 28.00 | 5.00 | 15.15% |
| Rehabilitation Therapist | 32.00 | 0.00 | 32.00 | 25.00 | 0.00 | 0.00 | 25.00 | 7.00 | 21.88% |
| **Total, Mental Health Staffing** | 127.00 | 3.50 | 130.50 | 89.90 | 2.68 | 0.00 | 92.58 | 37.92 | 29.06% |
| **Direct Care Nursing Staff** | | | | | | | | | |
| Psychiatric Technician | 430.00 | 0.00 | 430.00 | 337.00 | 2.83 | 61.91 | 401.74 | 28.26 | 6.57% |
| Medical Technical Assistant | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Registered Nurse | 174.00 | 0.00 | 174.00 | 165.00 | 0.61 | 47.68 | 213.29 | 0.00 | 0.00% |
| **Total, Direct Care Nursing Staff** | 604.00 | 0.00 | 604.00 | 502.00 | 3.44 | 109.59 | 615.03 | 0.00 | 0.00% |
| **Administrative Staff** | | | | | | | | | |
| Medical Director | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Supervising Psychiatric Social Worker | 2.00 | 0.00 | 2.00 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00% |
| Supervising Rehabilitation Therapist | 3.00 | 0.00 | 3.00 | 2.00 | 0.00 | 0.00 | 2.00 | 1.00 | 33.33% |
| Chief Psychologist | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Senior Psychologist, Supervisor | 3.00 | 0.00 | 3.00 | 3.00 | 0.00 | 0.00 | 3.00 | 0.00 | 0.00% |
| Senior Psychiatrist, Supervisor | 2.00 | 0.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.00 | 100.00% |
| Senior Medical Technical Assistant | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Supervising Registered Nurse | 23.00 | 0.00 | 23.00 | 22.00 | 0.00 | 0.00 | 22.00 | 1.00 | 4.35% |
| Unit Supervisor | 18.00 | 0.00 | 18.00 | 16.00 | 0.00 | 0.00 | 16.00 | 2.00 | 11.11% |
| **TOTAL** | 784.00 | 3.50 | 787.50 | 638.90 | 6.12 | 109.59 | 754.61 | 32.89 | 4.18% |

(1) Authorized positions are based on the number of positions in the Governor's 2018/19 budget.
(2) Governor's budget/departmental authorized blanket positions are authorized in the Governor's 2018/19 budget. They are established at a point in time based on need of the facilities.
(3) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.
(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

**CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES**
**Psychiatric Inpatient Program Staff**
**April 2019**
**Report submitted May 2019**

| CMF PIP | Classifications | Governor's Budget Authorized Positions (1) | Governor's Budget/ Departmental Authorized (Blanket) Positions (2) | Total Authorized Positions | Total Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| **Mental Health Staffing** | | | | | | | | | | |
| | Psychologist | 27.50 | 0.00 | 27.50 | 22.00 | 0.46 | 0.00 | 22.46 | 5.04 | 18.33% |
| | Psychiatrist | 28.50 | 0.00 | 28.50 | 10.00 | 4.64 | 0.00 | 14.64 | 13.86 | 48.63% |
| | Clinical Social Worker, Health/Correctional Facility (Safety) | 27.50 | 0.00 | 27.50 | 20.00 | 0.90 | 0.00 | 20.90 | 6.60 | 24.00% |
| | Rehabilitation Therapist | 27.50 | 0.00 | 27.50 | 25.00 | 0.00 | 0.00 | 25.00 | 2.50 | 9.09% |
| | **Total, Mental Health Staffing** | 111.00 | 0.00 | 111.00 | 77.00 | 6.00 | 0.00 | 83.00 | 28.00 | 25.23% |
| **Direct Care Nursing Staff** | | | | | | | | | | |
| | Psychiatric Technician | 33.00 | 0.00 | 33.00 | 26.00 | 1.10 | 4.17 | 31.27 | 1.73 | 5.24% |
| | Medical Technical Assistant | 218.00 | 0.00 | 218.00 | 148.00 | 0.00 | 37.57 | 185.57 | 32.43 | 14.88% |
| | Registered Nurse | 77.00 | 0.00 | 77.00 | 70.00 | 0.00 | 5.86 | 75.86 | 1.14 | 1.48% |
| | **Total, Direct Care Nursing Staff** | 328.00 | 0.00 | 328.00 | 244.00 | 1.10 | 47.60 | 292.70 | 35.30 | 10.76% |
| **Administrative Staff** | | | | | | | | | | |
| | Medical Director | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| | Supervising Psychiatric Social Worker | 2.00 | 0.00 | 2.00 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00% |
| | Supervising Rehabilitation Therapist | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| | Chief Psychologist | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| | Senior Psychologist, Supervisor | 2.00 | 0.00 | 2.00 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00% |
| | Senior Psychiatrist, Supervisor | 2.00 | 0.00 | 2.00 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00% |
| | Senior Medical Technical Assistant | 39.10 | 0.00 | 39.10 | 29.00 | 0.00 | 2.78 | 31.78 | 7.32 | 18.72% |
| | Supervising Registered Nurse | 25.60 | 0.00 | 25.60 | 24.00 | 0.00 | 0.00 | 24.00 | 1.60 | 6.25% |
| | Unit Supervisor | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| | **TOTAL** | 511.70 | 0.00 | 511.70 | 382.00 | 7.10 | 50.38 | 439.48 | 72.22 | 14.11% |

(1) Authorized positions are based on the number of positions in the Governor's 2018/19 budget.
(2) Governor's budget/departmental authorized blanket positions are authorized in the Governor's 2018/19 budget. They are established at a point in time based on need of the facilities.
(3) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.
(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

**CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES**
**Psychiatric Inpatient Program Staff**
**April 2019**
**Report submitted May 2019**

| SVSP PIP Classifications | Governor's Budget Authorized Positions (1) | Governor's Budget/ Departmental Authorized (Blanket) Positions (2) | Total Authorized Positions | Total Filled Civil Service Positions (3) | Contracted FTE (4) | Overtime FTE (4) | Total Filled FTE | Functional Vacancy FTE | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|---|---|
| **Mental Health Staffing** | | | | | | | | | |
| Psychologist | 10.00 | 0.00 | 10.00 | 9.00 | 2.02 | 0.00 | 11.02 | 0.00 | 0.00% |
| Psychiatrist | 10.00 | 0.00 | 10.00 | 0.00 | 5.48 | 0.00 | 5.48 | 4.52 | 45.20% |
| Clinical Social Worker, Health/Correctional Facility (Safety) | 10.00 | 0.00 | 10.00 | 10.00 | 0.91 | 0.00 | 10.91 | 0.00 | 0.00% |
| Rehabilitation Therapist | 9.00 | 0.00 | 9.00 | 8.00 | 0.00 | 0.14 | 8.14 | 0.86 | 9.56% |
| **Total, Mental Health Staffing** | 39.00 | 0.00 | 39.00 | 27.00 | 8.41 | 0.14 | 35.55 | 3.45 | 8.85% |
| **Direct Care Nursing Staff** | | | | | | | | | |
| Psychiatric Technician | 31.00 | 0.00 | 31.00 | 13.00 | 12.08 | 0.05 | 25.13 | 5.87 | 18.94% |
| Medical Technical Assistant | 165.00 | 0.00 | 165.00 | 114.00 | 0.00 | 13.68 | 127.68 | 37.32 | 22.62% |
| Registered Nurse | 50.00 | 0.00 | 50.00 | 42.00 | 3.06 | 1.54 | 46.60 | 3.40 | 6.80% |
| **Total, Direct Care Nursing Staff** | 246.00 | 0.00 | 246.00 | 169.00 | 15.14 | 15.27 | 199.41 | 46.59 | 18.94% |
| **Administrative Staff** | | | | | | | | | |
| Medical Director | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Supervising Psychiatric Social Worker | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Supervising Rehabilitation Therapist | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| Chief Psychologist | 2.00 | 0.00 | 2.00 | 1.00 | 0.00 | 0.00 | 1.00 | 1.00 | 50.00% |
| Senior Psychologist, Supervisor | 1.00 | 0.00 | 1.00 | 1.00 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00% |
| Senior Psychiatrist, Supervisor | 1.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 100.00% |
| Senior Medical Technical Assistant | 30.00 | 0.00 | 30.00 | 21.00 | 0.00 | 3.40 | 24.40 | 5.60 | 18.67% |
| Supervising Registered Nurse | 22.00 | 0.00 | 22.00 | 17.00 | 0.00 | 0.00 | 17.00 | 5.00 | 22.73% |
| Unit Supervisor | 5.00 | 0.00 | 5.00 | 5.00 | 0.00 | 0.00 | 5.00 | 0.00 | 0.00% |
| **TOTAL** | **347.00** | **0.00** | **347.00** | **242.00** | **23.55** | **18.81** | **284.36** | **62.64** | **18.05%** |

(1) Authorized positions are based on the number of positions in the Governor's 2018/19 budget.
(2) Governor's budget/departmental authorized blanket positions are authorized in the Governor's 2018/19 budget. They are established at a point in time based on need of the facilities.
(3) Total filled civil service positions includes employees working second positions, retired annuitants, limited term, permanent intermittent.
(4) Contract hours and overtime hours worked during the reporting period are converted to full-time equivalent positions.

ATTACHMENT B

# AGENDA

## ASSEMBLY BUDGET SUBCOMMITTEE NO. 1

### ON HEALTH AND HUMAN SERVICES

### ASSEMBLYMEMBER DR. JOAQUIN ARAMBULA, CHAIR

### MONDAY, MARCH 4, 2019

### UPON ADJOURNMENT OF FLOOR SESSION - STATE CAPITOL, ROOM 447

## ITEMS TO BE HEARD

| ITEM | DESCRIPTION | |
|------|-------------|---|
| **4440** | **DEPARTMENT OF STATE HOSPITALS** | **3** |
| ISSUE 1 | DEPARTMENT OF STATE HOSPITALS OVERVIEW AND BUDGET, INCLUDING:<br>• PATIENT DRIVEN OPERATING EXPENSES AND EQUIPMENT<br>• ENHANCED TREATMENT PROGRAM STAFFING<br>• LANTERMAN-PETRIS-SHORT POPULATION SERVICES ADJUSTMENT | 3 |
| ISSUE 2 | INCOMPETENT TO STAND TRIAL ISSUES AND PROPOSALS INCLUDING:<br>• JAIL BASED COMPETENCY TREATMENT PROGRAM COST INCREASE<br>• METROPOLITAN STATE HOSPITAL INCREASED SECURE TREATMENT AREA FUNDING<br>• PATIENTS' RIGHTS ADVOCATE FUNDING<br>BUDGET CHANGE PROPOSALS:<br>• INCREASED COURT APPEARANCES AND PUBLIC RECORDS ACTS<br>• CONTRACTED SERVICES AND PATIENT MANAGEMENT SUPPORT | 10 |
| ISSUE 3 | COURT EVALUATIONS AND REPORTS BUDGET CHANGE PROPOSAL | 14 |
| ISSUE 4 | DIRECT CARE NURSING BUDGET CHANGE PROPOSAL | 19 |
| ISSUE 5 | WORKFORCE DEVELOPMENT BUDGET CHANGE PROPOSAL | 24 |
| ISSUE 6 | VOCATIONAL SERVICES AND STATE MINIMUM WAGE BUDGET CHANGE PROPOSAL AND TRAILER BILL | 30 |
| ISSUE 7 | OFFICE OF PROTECTIVE SERVICES – HOSPITAL POLICE OFFICER ACADEMY | 33 |

## NON-DISCUSSION ITEMS

| ITEM | DESCRIPTION | |
|------|-------------|---|
| **4440** | **DEPARTMENT OF STATE HOSPITALS** | **36** |
| ISSUE 8 | PRIVACY PROTECTION PROGRAM BUDGET CHANGE PROPOSAL | 36 |
| ISSUE 9 | ATASCADERO: POTABLE WATER BOOSTER PUMP CAPITAL OUTLAY PROPOSAL | 39 |
| ISSUE 10 | DEFERRED MAINTENANCE ADJUSTMENT | 41 |

# LIST OF PANELISTS IN ORDER OF PRESENTATION

## 4440 DEPARTMENT OF STATE HOSPITALS

### ISSUE 1: DEPARTMENT OF STATE HOSPITALS OVERVIEW AND BUDGET

#### PANELISTS

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Ellen Bachman**, Deputy Director, Statewide Quality Improvement Program, Department of State Hospitals
- **George Maynard**, Deputy Director, Administrative Services Division, Department of State Hospitals
- **Han Wang**, Finance Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

*Public Comment*

### ISSUE 2: INCOMPETENT TO STAND TRIAL ISSUES AND PROPOSALS

#### PANELISTS

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Christina Edens**, Deputy Director, Forensic Services Division, Department of State Hospitals
- **Christine Ciccotti**, Deputy Director, Legal Division, Department of State Hospitals
- **Han Wang**, Finance Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

*Public Comment*

### ISSUE 3: COURT EVALUATIONS AND REPORTS BUDGET CHANGE PROPOSAL

#### PANELISTS

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Christine Ciccotti**, Deputy Director, Legal Division, Department of State Hospitals
- **Jaci Thomson**, Principal Program Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

*Public Comment*

| ISSUE 4: DIRECT CARE NURSING BUDGET CHANGE PROPOSAL |
|---|

| PANELISTS |
|---|

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Janna Lowder**, Chief, Fiscal and Program Research, Department of State Hospitals
- **Jaci Thomson**, Principal Program Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

*Public Comment*

| ISSUE 5: WORKFORCE DEVELOPMENT BUDGET CHANGE PROPOSAL |
|---|

| PANELISTS |
|---|

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Dr. Katherine Warburton**, Deputy Director, Clinical Operations Division, Department of State Hospitals
- **Jaci Thomson**, Principal Program Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

*Public Comment*

| ISSUE 6: VOCATIONAL SERVICES AND STATE MINIMUM WAGE BUDGET CHANGE PROPOSAL AND TRAILER BILL |
|---|

| PANELISTS |
|---|

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Christine Ciccotti**, Deputy Director, Legal Division, Department of State Hospitals
- **Marcelo Acob**, Chief Financial Officer, Department of State Hospitals
- **Han Wang**, Finance Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

*Public Comment*

| ISSUE 7: OFFICE OF PROTECTIVE SERVICES – HOSPITAL POLICE OFFICER ACADEMY |
|---|

| PANELISTS |
|---|

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Han Wang**, Finance Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office
*Public Comment*

# ITEMS TO BE HEARD

## 4440 DEPARTMENT OF STATE HOSPITALS

### ISSUE 1: DEPARTMENT OF STATE HOSPITALS OVERVIEW AND BUDGET

**PANELISTS**

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Ellen Bachman**, Deputy Director, Statewide Quality Improvement Program, Department of State Hospitals
- **George Maynard**, Deputy Director, Administrative Services Division, Department of State Hospitals
- **Han Wang**, Finance Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

*Public Comment*

**BACKGROUND**

The Department of State Hospitals (DSH) is the lead agency overseeing and managing the State's system of mental hospitals.

*State Hospitals*. California has five state hospitals that treat people with mental illness. Approximately 90 percent of the state hospitals' population is considered "forensic," in that they have been committed to a hospital by the criminal justice system. The state hospitals are as follows:

- *Atascadero (ASH).* ASH is located on the central coast. It is an all-male, maximum security, forensic facility (i.e., persons referred by the court related to criminal violations). Population estimate: 1,106.

- *Coalinga (CSH).* Located in the City of Coalinga, CSH is the newest state hospital, opened in 2005, and treats forensically committed and sexually violent predators. Population estimate: 1,403.

- *Metropolitan (MSH).* Located in Norwalk, MSH serves individuals placed for treatment pursuant to the Lanterman-Petris-Short Act (civil commitments), as well as court-ordered penal code commitments. Population estimate: 1,046.

- *Napa (NSH).* Located in the City of Napa, NSH is a low-to-moderate security state hospital. Population estimate: 1,278.

- ***Patton (PSH).*** PSH is located in San Bernardino and cares for judicially committed, mentally disordered individuals. Population estimate: 1,494.

***Prison-Based Psychiatric Programs.*** For many years, under court order, DSH provided psychiatric care to inmates in three prison-based psychiatric facilities: 1) Vacaville Psychiatric Program; 2) Salinas Valley Psychiatric Program; and 3) Stockton Psychiatric Program. The 2017 Budget transferred the authority and resources for psychiatric care in these facilities from DSH back to the California Department of Corrections and Rehabilitation.

## DEPARTMENT BUDGET

The Governor's proposed 2019-20 DSH budget includes total funds of $1.99 billion dollars, of which $1.8 billion is General Fund. The additional funding is primarily in the form of "reimbursements" from counties that pay the state hospitals for civil commitments. The proposed 2019-20 budget is approximately a 3 percent ($59 million) increase from current year funding, primarily reflecting the Governor's proposals on State Hospitals staffing and workforce, discussed in more detail throughout this agenda.

| DEPARTMENT OF STATE HOSPITALS *(Dollars in Thousands)* | | | | | |
|---|---|---|---|---|---|
| Fund Source | 2017-18 Actual | 2018-19 Estimate | 2019-20 Proposed | CY to BY $ Change | % Change |
| General Fund | $1,527,716 | $1,766,643 | $1,825,789 | $59,146 | 3.3% |
| CA State Lottery Education Fund | 37 | 23 | 23 | $0 | 0% |
| Reimbursements | $158,816 | $167,476 | $167,323 | -$153 | -0.1% |
| Total Expenditures | $1,686,569 | $1,934,142 | $1,993,135 | $58,993 | 3.1% |
| Positions | 9,190.2 | 10,088.7 | 11,006.4 | 917.7 | 9.1% |

## STATE HOSPITALS CASELOAD

The State Hospitals provide treatment to approximately 6,372 patients, who fall into one of two categories: 1) civil commitments (referrals from counties); or 2) forensic commitments (committed by the courts). Civil commitments comprise approximately 10 percent of the total population while forensic commitments approximately 90 percent. DSH also operates a Conditional Release Program in which patients reside in community settings as well as jail-based treatment programs.

The following are the primary Penal Code categories of patients who are either committed or referred to DSH for care and treatment by the courts:

### Committed Directly From Superior Courts:

- *Not Guilty by Reason of Insanity* – Determination by court that the defendant committed a crime and was insane at the time the crime was committed.

- *Incompetent to Stand Trial (IST)* – Determination by court that defendant cannot participate in trial because defendant is not able to understand the nature of the criminal proceedings or assist counsel in the conduct of a defense. This includes individuals whose incompetence is due to developmental disabilities.

### Referred From The California Department of Corrections and Rehabilitation (CDCR):

- *Sexually Violent Predators (SVP)* – Hold established on inmate by court when it is believed probable cause exists that the inmate may be a SVP. Includes 45-day hold on inmates by the Board of Prison Terms.

- *Mentally Disordered Offenders (MDO)* – Certain CDCR inmates for required treatment as a condition of parole, and beyond parole under specified circumstances.

- *Prisoner Regular/Urgent Inmate-Patients* – Inmates who are found to be mentally ill while in prison, including some in need of urgent treatment.

| 2019-20 Governor's Budget Estimated Caseload | |
| --- | --- |
| **Location** | **Estimated Census on June 30, 2020** |
| *Population by Commitment Type – Hospitals* | |
| IST—PC 1370 | 1,613 |
| NGI—PC 1026 | 1,399 |
| MDO | 1,427 |
| SVP | 953 |
| LPS/PC 2974 | 703 |
| PC 2684 (*Coleman*) | 230 |
| WIC 1756 (DJJ) | 2 |
| **Subtotal** | **6,327** |
| *Contracted Programs* | |
| Kern AES Center | 60 |
| Riverside JBCT | 22 |
| Sacramento JBCT | 31 |
| Sacramento JBCT - Female | 11 |
| San Bernardino JBCT | 143 |
| San Diego JBCT | 28 |
| Sonoma JBCT | 11 |
| Stanislaus JBCT | 11 |
| Monterey JBCT | 15 |
| San Joaquin JBCT | 10 |
| Solano JBCT | 12 |
| Mendocino Small County Model JBCT[1] | TBD |
| Mariposa Small County Model JBCT[1] | TBD |
| Butte JBCT | 5 |
| Southern CA County A JBCT | 5 |
| Central CA County B JBCT | 5 |
| Northern CA County C JBCT | 6 |
| Northern CA County D JBCT | 48 |
| Southern CA County E JBCT | 10 |
| **Subtotal** | **433** |
| *CONREP Programs* | |
| CONREP Non-SVP[2] | 692 |
| CONREP SVP | 21 |
| **Subtotal** | **713** |
| **GRAND TOTAL** | **7,473** |

1. Please note that Mendocino and Mariposa JBCT do not have a set number of beds and instead focus on the number of patients served. As such, the annual population change total does not include these additional beds.
2. The CONREP Non-SVP caseload number includes STRP beds.

**Key DSH Budget Adjustments**

***Patient Driven Operating Expenses and Equipment (-$2.2 million in FY 18-19 and $10.5 million GF in FY 19-20 and ongoing).*** DSH requests $10.5 million in FY 2019-20 and ongoing to support the operating cost per patient. This request is to fund the 547 state hospital beds activated since FY 2012-13, as well as the beds activated in FY 2018-19 that included a request for staffing in the 2018 Budget Act. This proposal also includes a current year savings of $2.2 million for the 140 DSH-Metropolitan beds that have been delayed and are now scheduled to activate in FY 2019-20.

***Office of Protective Services – Hospital Police Officer Academy ($5.8 million and 3.0 positions GF in FY 19-20 and ongoing).*** DSH requests to convert 3.0 limited-term positions to permanent full-time positions, and $5.8 million ongoing to continue the specialized expanded Hospital Police Officer (HPO) Academy. *Please also see Issue 7 of this agenda*.

***Enhanced Treatment Program Staffing (-$1.8 million and -12.7 positions in FY 19-20 one-time GF).*** The Enhanced Treatment Program (ETP) is a new enhanced level of care designed to treat patients who are at the highest risk of violence and who cannot be safely treated in a standard treatment environment. These units will provide improved treatment with a heightened secure setting to patients with a demonstrated and sustained risk of aggressive, violent behavior toward other patients and staff. Construction and activation of the ETP units was delayed due to the emergency fire situation and a contractor reviewing and revising plans in response to regulatory comments. Due to unavoidable delays, DSH anticipates a savings of $1.8 million in FY 2019-20 for resources for the fourth ETP unit.

***DSH-Metropolitan Increased Secured Bed Capacity ($18.6 million and 119.3 positions in FY 19-20 and $20.1 million and 130.0 positions in FY 20-21 and ongoing GF).*** To provide additional capacity to address the ongoing system-wide forensic waitlist with a particular focus on the continuing IST waitlist, this expansion at DSH-Metropolitan is the final phase of the project. *Please also see Issue 2 of this agenda*.

***Lanterman-Petris-Short Population Services Adjustment ($606,000 in FY 19-20 and ongoing).*** DSH admits Lanterman-Petris-Short (LPS) patients through civil commitment processes. LPS beds are funded through reimbursements from counties that use the DSH system. Due to the increasing LPS population, DSH's reimbursement authority is not sufficient for the services provided to counties. Based on LPS bed usage, DSH projects it will collect approximately $606,000 more in FY 2019-20 than its current reimbursement authority. DSH requests an additional $606,000 reimbursement authority for LPS patients in FY 2019-20.

***Deferred Maintenance ($35 million in FY 19-20 one-time GF).*** DSH requests $35 million to address deferred maintenance projects that represent critical infrastructure deficiencies. *Please also see Issue 10 of this agenda*.

**Conditional Release Program (CONREP) Estimate ($3.1 million in FY 19-20 and ongoing GF).**

- ***CONREP General/Non-Sexually Violent Predator (SVP) Program - Housing Cost Increase ($1.0 million GF).*** DSH requests $1.0 million in FY 2019-20 and ongoing to support its contracted caseload of 666 CONREP clients. Without an augmentation of the current CONREP budget, DSH will not be able to maintain its current census and over time, will continue to reduce admissions and capacity to accommodate increasing housing costs for clients currently in the program.

- ***CONREP SVP Program Update ($2.1 million GF).*** DSH requests $2.1 million in FY 2019-20 and ongoing to support an additional two SVPs assumed to be released, for a total CONREP-SVP caseload of 23 by June 30, 2020.

**Contracted Patient Services Estimate ($12.3 million in FY 19-20 and $13.4 million ongoing GF).** *Please also see Issue 2 of this agenda*.

- ***Jail-Based Competency Treatment (JBCT) Existing Program Cost Increase ($1.1 million in FY 19-20 and $1.7 million on-going GF).*** Several existing JBCT programs have identified increased costs in providing restoration of competency services for DSH.

- ***JBCT New Programs ($11 million in FY 19-20 and $11.4 million ongoing GF).*** DSH continues to build out its continuum of care to support IST patients by working with a number of counties to develop new JBCT programs in their local jails and secure contracts to activate these programs in the budget year.

- ***Patients' Rights Advocate ($259,000 in FY 19-20 and ongoing GF).*** To comply with statute and regulations governing JBCT and the Admission, Evaluation, and Stabilization Center, DSH is requesting $259,000 in the budget year and ongoing to fund 6.5 contracted Patients' Rights Advocates to support the JBCT programs.

| STAFF COMMENTS/QUESTIONS |
| --- |

The Subcommittee requests DSH to provide an overview of the department, the state hospitals system, and the Governor's proposed 2019-20 DSH budget.

Please also present any and all program updates and proposals not otherwise contained in another Issue in this agenda.

**Staff Recommendation:**  No action is recommended at this time to allow for additional discussion and debate.

---

**ISSUE 2: INCOMPETENT TO STAND TRIAL ISSUES AND PROPOSALS**

---

**PANELISTS**

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Christina Edens**, Deputy Director, Forensic Services Division, Department of State Hospitals
- **Christine Ciccotti**, Deputy Director, Legal Division, Department of State Hospitals
- **Han Wang**, Finance Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

*Public Comment*

---

**BACKGROUND**

When a judge deems a defendant to be incompetent to stand trial (IST), the defendant is referred to the state hospitals system to undergo treatment for the purpose of restoring competency. Competency is legally defined as being able to understand the court proceedings and being able to aid in one's own defense. Once an individual's competency has been restored, the county is required to take the individual back into the criminal justice system to stand trial, and counties are required to do this within ten days of competency being restored.

For a portion of this population, the state hospital system finds that restoring competency is not possible. For these individuals, the responsibility for their care returns to counties which are required to retrieve the patients from the state hospitals within ten days of the medical team deeming the individual's competency to be unlikely to be restored. AB 2625 (Achadjian, Chapter 742, Statutes of 2014) changed this deadline for counties from three years to ten days. Prior to this bill, many individuals in this category would linger in state hospitals for years.

Over the past several years, the state hospitals have seen a growing waiting list of forensic patients, with a ten percent annual increase in IST referrals from courts to DSH. DSH has undertaken several efforts to address the growing IST waitlist including: 1) increasing budgeted bed capacity by activating new units and converting other units; 2) establishing a statewide patient management unit; 3) promoting expansion of jail-based IST programs; 4) standardizing competency treatment programs; 5) seeking community placements; 6) improving referral tracking systems; 7) participating in an IST workgroup that includes county sheriffs, the Judicial Council, public defenders, district attorneys, patients' rights advocates, and the administration; and 8) most recently, establishing and funding a mental health diversion program through the 2018 budget. DSH acknowledges that, despite these efforts, IST referrals have continued to increase, outpacing the

increases in DSH capacity. When queried about the potential causes of the growing number of referrals from the courts, the administration describes a very complex puzzle of criminal, social, cultural, and health variables that together are leading to increasing criminal and violent behavior by individuals with mental illness, consistent with national trends.

Since the 2007-08 fiscal year, the backlog of IST referrals awaiting treatment in state hospitals has grown from between 200 and 300 to 840 in December 2017; currently there are 753 on the IST waiting list. In 1972, the United States Supreme Court found in Jackson v. Indiana that a person committed on account of his or her incapacity to proceed to trial cannot be held for longer than the reasonable period of time necessary to determine whether the individual is likely to attain capacity. California law requires state hospital or outpatient facility staff to report to the court within 90 days on the status of the defendant's restoration to competency. Based on this 90 day requirement, several court rulings have recommended that a "reasonable" time to transfer IST patients for treatment is no more than 30 to 35 days. Many IST patients remain in county custody for longer, which may violate these patients' due process rights. In addition, the housing of IST patients in county jails while they await availability of treatment beds in state hospitals places stress on county jail systems.

### 2018 Mental Health Diversion Proposal
The 2018 budget (AB 1810, health budget trailer bill) provides legal authority for courts to divert qualified individuals to mental health treatment, in place of legal proceedings. The 2018 budget also includes over $100 million to help interested counties to establish the mental health treatment services needed to be able to divert certain, qualified mentally ill defendants. Subcommittee staff has asked DSH to provide an update on the implementation of these funds for counties. Additionally, the Judicial Council provided the following data on a couple of counties where mental health diversion is being implemented (outside of last year's DSH funding):

| Mental Health Diversion Activity Since July 1, 2018 | | | | | |
|---|---|---|---|---|---|
| Contra Costa County | | | | | |
| | Requested | Granted | Pending | Denied | Withdrawn |
| Petitions | 62 | 5 | 57 | 0 | 0 |
| Defendants | 41 | 2 | 39 | 0 | 0 |
| | | | | | |
| San Bernardino County | | | | | |
| Cases | 43 | 8 | 18 | 16 | 1 |
| Defendants | 22 | 6 | 9 | 6 | 1 |

| PROPOSALS |
| --- |

Consistent with the past several years, the 2019-20 DSH budget includes several requests and proposals intended to help address the IST waiting list, or to manage the increased workload that has resulted from the growing IST waiting list. These proposals include the following:

***Increase of Court Hearings and Public Records Act Budget Change Proposal.*** DSH requests 5.5 two-year limited term positions and $767,000 to address the 153 percent increase in court hearings at which DSH attorneys are required to appear throughout the State and the 220 percent increase in Public Records Act requests to which DSH must respond.

***Contract Services and Patient Management Support Budget Change Proposal.*** DSH requests 8.0 permanent full-time positions and $1.1 million in FY 2019-20 and ongoing to manage the developing and ongoing support of the expansion of competency restoration programs and increasing IST caseload, and to provide essential data and analysis for effective and efficient management of DSH patient management programs.

***Jail-Based Competency Treatment (JBCT) Existing Program Cost Increase.*** Several existing JBCT programs have identified increased costs in providing restoration of competency services for DSH. To continue operating these programs, DSH proposes to support the counties' requests for increased funding for JBCT programs in Sacramento, San Diego, and Sonoma counties. DSH requests $1.1 million in FY 2019-20 and $1.7 million ongoing to support these JBCT program costs.

***JBCT New Programs.*** DSH continues to build out its continuum of care to support IST patients by working with a number of counties to develop new JBCT programs in their local jails and secure contracts to activate these programs in the budget year. Negotiations and contract development are at various stages. DSH requests funding for contracting with five counties, serving up to 74 JBCT beds, for which DSH is requesting $11 million in FY 2019-20 and $11.4 million ongoing.

***DSH-Metropolitan Increased Secured Bed Capacity.*** To provide additional capacity to address the ongoing system-wide forensic waitlist with a particular focus on the continuing IST waitlist, this expansion at DSH-Metropolitan is the final phase of the project. DSH has received approval via past Budget Acts for positions and funding for Units 404, 406, and 408, which are scheduled to activate in Spring 2019, after construction completion. Consistent with the previous units, DSH is requesting 130.0 positions and $20.1 million ongoing for Units 412 and 414 (119.3 partial year positions and $18.6 million in 2019-20). The net impact of the Continuing Treatment West (CTW) Building and 100s Building renovations will be the activation of 236 additional beds at DSH-Metropolitan.

***Patients' Rights Advocate.*** To comply with statute and regulations governing JBCT and the Admission, Evaluation, and Stabilization Center, DSH is requesting $259,000 in the budget year and ongoing to fund 6.5 contracted Patients' Rights Advocates to support the JBCT programs.

| STAFF COMMENTS/QUESTIONS |
|---|

The Subcommittee requests DSH to provide an overview of the IST waiting list, present the proposals related to the IST waiting list (contained in this agenda item), and provide an update on the implementation of the diversion program adopted through the 2018 budget.

**Staff Recommendation:**  No action is recommended at this time to allow for additional discussion and debate.

## ISSUE 3: COURT EVALUATIONS AND REPORTS BUDGET CHANGE PROPOSAL

### PANELISTS

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Christine Ciccotti**, Deputy Director, Legal Division, Department of State Hospitals
- **Jaci Thomson**, Principal Program Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

*Public Comment*

### PROPOSAL

DSH requests 43.0 permanent full-time positions and $8.1 million in FY 2019-20, an additional 34.5 permanent full-time positions and $5.9 million in FY 2020-21, an additional 17.1 permanent full-time positions and $4.2 million in FY 2021-22 and an ongoing augmentation of $18.1 million in FY 2022-23 to implement a staffing standard to support the forensic services workload associated with court directed patient treatment.

The specific components of the Governor's proposal include:

- ***Additional Staff for Court Evaluations, Reports, and Testimony Workload ($4.1 Million).*** The Administration proposes additional clinical staff that would be dedicated to the workload associated with court evaluations, reports, and testimony, primarily to eliminate the conflict of interest that exists when treating clinicians perform these tasks related to their patients. Based on a review of the amount of workload generated by each patient type, the Department proposes staffing standards that would establish the number of clinicians it needs. Based on these standards, the Administration is proposing a total of 53.1 new positions (largely senior psychologist specialist positions) that would be phased in over three years, with 18.5 positions proposed for 2019-20. Under the Administration's proposal, staffing levels would be regularly adjusted based on the proposed staffing standards to account for changes in the makeup of the population. DSH plans to refine the staffing standards in future years as it collects more data about the amount of resources this workload requires.

- ***Additional Forensic Case Management and Data Tracking (FCMDT) Staff ($986,000).*** In order to standardize staffing for FCMDT workload, the Administration proposes a department-wide standard of 250 patients per staff member and to use associate government program analysts and staff service analysts (rather than the varying classifications currently being used) for the workload. In addition, the Administration is proposing to hire five additional associate government program analysts to expand its data collection efforts to

further refine the staffing standards for the evaluations, reports, and testimony workload on an ongoing basis. The Governor's budget proposes 7.3 positions in 2019-20. Under the proposal, each hospital would have an average of roughly ten positions dedicated to the work. These staffing levels would be adjusted regularly to account for changes in the size of the patient population.

- ***Increased Use of Neuropsychological Evaluations ($2 Million).*** The Governor's budget proposes additional resources to use neuropsychological evaluations on a larger scale to identify more patients with cognitive deficits. According to the department, this would enable clinicians to identify patients who are at risk of violence and to better tailor existing treatments to meet the needs of patients with cognitive deficits. Based on research conducted at DSH-Patton, the Department estimates that roughly 25 percent of patients admitted would need an in-depth neuropsychological evaluation after receiving an initial screening from their unit psychologist. Accordingly, the Governor's budget proposes 10.2 positions (largely senior psychologist specialists). Under the proposal, these staffing levels would be adjusted regularly to account for changes in the number of patients admitted.

- ***Cognitive Remediation Therapy Pilot ($954,000).*** The Administration proposes to begin treating patients with cognitive remediation therapy on a pilot basis at DSH-Metropolitan and DSH-Napa. According to the Department, patients that receive this therapy would be less likely to engage in violence and may have better outcomes. To implement the pilot, the Governor's budget proposes seven positions (including senior psychologist specialists and psychiatric technicians) in 2019-20.

### BACKGROUND

The staffing standard was developed through research conducted within DSH's Staffing Study and in collaboration with the Department of Finance Research and Analysis Unit through a Mission-Based Review. The proposed standard establishes population driven methods for calculating staffing needs in the following forensic functions: Evaluations, Court Reports and Testimony, Forensic Case Management and Data Tracking, and Neuropsychological Assessments and Treatment. DSH is continuing to enhance data collection efforts and will provide annual updates on data findings impacting the presented standards within the annual DSH Caseload Estimate.

***DSH Clinicians Required to Provide Evaluations, Reports, and Testimony.*** Given that around 90 percent of the patient population is committed to DSH from the criminal justice system, the department's clinicians are frequently required to provide courts with evaluations, reports, and testimony regarding patients, including IST, MDO, Not Guilty by

Reason of Insanity, and Sexually Violent Predator patients. The department estimates that it is required to complete roughly 11,000 mandated court reports each year.

After completing evaluations and/or reports, clinicians are often required to attend court hearings and provide testimony regarding their patient reports and evaluations. When this happens, clinicians are frequently required to travel to the court that committed the patient to participate in hearings.

Currently, each state hospital has its own approach to handling the above workload. For example, DSH-Atascadero and DSH-Coalinga have specific clinical staff dedicated to completing this workload. In contrast, DSH-Metropolitan and DSH-Patton do not have such dedicated staff. At these particular hospitals, the clinician who treats the patient also completes the required evaluations and reports, and provides court testimony. DSH-Napa uses a hybrid approach. Specifically, the hospital generally requires the treating clinician complete this workload but maintains a team dedicated to this workload for IST patients.

The Department reports that there are several problems associated with having the clinician who treats the patient also complete evaluations and reports and provide testimony regarding that patient. Specifically, DSH is concerned that this practice:

- **Creates a Conflict of Interest.** The Department indicates that having the treating clinicians carry out this workload for their patients can represent a conflict of interest. For example, it might require the clinician to indicate to a court that he or she has been unable to effectively treat a patient. In addition, the Department reports that there have been incidents in which patients have attacked their clinicians due to the testimony provided about them. According to DSH, such factors undermine the ability of clinicians to complete this workload objectively.

- **Relies on Clinicians Who Lack Necessary Expertise.** DSH indicates that, to be effective in completing the required court evaluations and reports, clinicians must be familiar with the judicial system as well as the legal requirements related to the required documents. However, DSH reports that many clinicians currently lack the legal training to carry out these tasks effectively. The Department also indicates that courts have complained about the quality of the work carried out by some clinicians.

- **Reduces Quality of Care.** This workload takes away time clinicians could otherwise spend treating their patients. As such, the department is concerned that the required workload could reduce the quality of care that patients receive.

***Forensic Case Management and Data Tracking (FCMDT) Staff.*** While clinicians complete the reports, evaluations, and provide testimony, the Department employs FCMDT administrative staff to assist them with this workload. These FCMDT staff are responsible for the overall coordination and tracking of the required reports and the coordination and completion of all paperwork and responses to court questions. FCMDT staff are also responsible for data tracking and analytical efforts related to various aspects of state hospital operations, such as admissions and discharge data, as well as bed capacity. The Department does not currently have a standardized approach to staffing these positions at each state hospital, but it reports that each FCMDT staff member typically has a caseload of 200 to 300 patients, though at some hospitals the caseload can be higher. On average, each hospital currently has roughly seven positions dedicated to this work.

***Neuropsychological Evaluations and Treatment.*** Neuropsychological evaluations are used to determine patients' current abilities to pay attention, remember information, plan and organize, and use language. This allows clinicians to determine whether patients have cognitive deficits and could benefit from cognitive rehabilitation therapy, which is designed to improve patients' cognitive function.

The Department reports that it is important to identify and treat cognitive deficits for two primary reasons. First, identifying and treating patients with cognitive deficits can reduce violence. For example, research conducted at DSH in recent years has found that cognitive deficits were predictive of violence. Moreover, a 2011 study at DSH-Patton showed that providing cognitive rehabilitation therapy to patients with cognitive deficits reduced their violence by 38 percent. Second, identifying and treating patients with cognitive deficits could improve treatment outcomes. For example, in a study also carried out at DSH-Patton, the presence of cognitive deficits was associated with longer lengths of stay. According to the Department, this suggests that treating such deficits could result in shorter lengths of stay. Moreover, the Department reports that providing information about patients' clinical deficits to clinicians can help them better structure the treatment they provide, even if the patient does not receive cognitive rehabilitation therapy. Despite these benefits, the Department reports that three of the five state hospitals do not offer cognitive rehabilitation therapy. While DSH-Patton and DSH-Atascadero offer such therapy, the Department reports that these hospitals are currently only able to provide such treatment to less than 1 percent of the patients needing it.

### LAO Concerns and Recommendations

***Reject Staffing for Evaluations, Reports, and Testimony and Direct DSH to Develop Plan for a Peer-Review Pilot.*** The LAO recommends that the Legislature reject the proposed funding for dedicated staff for court evaluations, reports, and testimony workload, including the related staffing standards proposed by the Administration.

Instead, the LAO believes that it would be more effective for the Department to implement a peer-review approach on a pilot basis beginning in the budget year in which treating clinicians complete this workload for each other's patients. As such, the LAO recommends that the Legislature direct the Department to provide a plan for implementing such a pilot by April 1, 2019, including information on what resources, if any, it would need and how it would go about selecting participating clinicians.

**Reject Additional FCMDT Staff.** The LAO states that, given that the Department did not demonstrate that its existing FCMDT staff are unable to effectively complete their workload, they recommend the Legislature reject the proposed augmentation for these staff. The LAO does not have concerns with the Department standardizing the classifications used to complete this workload or establishing staffing standards for it, so long as it can be done within existing resources. Finally, because the primary justification for the five associate governmental program analysts is collecting data to refine the standards for staffing evaluation, reports, and testimony workload, which the LAO does not recommend approving, they also recommend rejecting those proposed positions.

**Approve Funding for Neuropsychological Evaluations.** In light of the potential benefits, the LAO recommends approving the funding that would allow the Department to expand testing of patients with neuropsychological evaluations. The LAO agrees with DSH that this could help the department better prevent patient violence and improve treatment for patients with cognitive deficits.

**Approve Funding for Cognitive Remediation Pilot on Limited-Term Basis, Require Evaluation.** The LAO recommends that the Legislature approve three-year limited-term funding for the proposed cognitive remediation pilot at two state hospitals, rather than ongoing funding as proposed by the Governor. The LAO also recommends that the Legislature direct the Department to report on the outcome of the pilot by January 10, 2022, as this would allow the Legislature to determine whether to approve ongoing and/or expanded funding for cognitive remediation therapy as part of the 2022-23 budget.

**Staff Comments/Questions**

The Subcommittee requests DSH present this request, requests the LAO explain their concerns and recommendations, and requests DSH to then provide reactions to the LAOs concerns and recommendations.

**Staff Recommendation:** No action is recommended at this time to allow for additional discussion and debate.

## ISSUE 4: DIRECT CARE NURSING BUDGET CHANGE PROPOSAL

### PANELISTS

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Janna Lowder**, Chief, Fiscal and Program Research, Department of State Hospitals
- **Jaci Thomson**, Principal Program Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

### *Public Comment*

### PROPOSAL

DSH requests 379.5 positions and $45 million, phased in across a three-year period, to support the workload of providing 24-hour care nursing services. DSH also requests position authority only for 254.0 temporary help positions and 50.0 administrative positions to implement a staffing standard consistent with the findings of the Clinical Staffing Study of 24-hour care nursing services.

The Administration proposes several changes related to the way nurses are staffed at the state hospitals. Specifically, the Administration proposes to:

1. Standardize nursing staffing ratios across the unit categories established by the Clinical Staffing Study;

2. Permanently create temporary help positions and a budget for overtime;

3. Shift certain duties currently carried out by nursing staff to administrative staff;

4. Create psychiatric technician positions dedicated to staffing medication rooms; and

5. Create registered nurse supervisor positions that would provide oversight during the evening and overnight shift.

In total, the Governor's budget includes $15 million from the General Fund and 421.3 positions in 2019-20 to implement the above changes. (Under the proposal, the level would grow each year until reaching $46 million and 683.5 positions by 2021-22 and annually thereafter.)

The staffing standard was developed through research conducted within DSH's Clinical Staffing Study and in collaboration with the Department of Finance Research and Analysis Unit. This proposal examined nurse-to-patient ratios for providing nursing care and the components available to achieve these ratios including internal registries, overtime, and position movements among facilities. The proposal additionally presents

staffing methodologies for the administration of medication and the afterhours nursing supervisory structure. All methodologies can be re-assessed annually with updates provided within the annual DSH Caseload Estimate.

BACKGROUND

***DSH Clinical Staffing Study.*** In 2013, DSH began evaluating staffing practices at its five hospitals in a review known as the Clinical Staffing Study. The Department initiated the study in an effort to assess whether past practices and staffing methodologies— which often differed between each hospital—are in need of revision, particularly in light of a patient population that has grown in terms of size, age, and the number who have been referred by the criminal justice system. The study is in the process of reviewing the hospitals' nursing services, forensic departments, protective services, and the way each hospital plans and delivers treatment.

As part of its review of nursing staffing, the study collected data on the actual amount of staff that was being used on each unit throughout the state hospitals. The study also classified all of the different units into ten categories and two-dozen subcategories based on the type of services delivered and/or type of patients treated on the unit. This allowed the study to compare the staffing levels in place across the state hospitals at units that were delivering similar types of treatment to similar types of patients.

***DSH Subject to Minimum Staffing Standards for Nurses.*** Patients admitted to DSH are housed in different units throughout the hospitals based on various factors including their patient type (such as whether they are an MDO or a Sexually Violent Predator) and the level of care they require—also known as their acuity. The Department staffs these units with employees known as "level of care staff" who provide treatment services to the patients. Level of care staff include various types of nurses (such as registered nurses and psychiatric technicians) and other clinical staff including psychiatrists, psychologists, and social workers.

DSH is required to meet certain minimum staffing standards on its units. For example, DSH must comply with Title 22 of the California Code of Regulations, which sets the standards for operating many of the department's beds. In particular, it requires a certain minimum number of nursing staff based on patient acuity and associated treatment needs for each different eight-hour nursing shift (meaning morning, afternoon, or overnight). Title 22 nursing staff have many responsibilities, including patient observation, medication distribution, and patient escorting.

***Actual Nurse Staffing Generally Exceeds Minimums and Varies by Hospital.*** According to DSH, the minimum staffing standards do not result in enough nurses to effectively deliver adequate care. For example, the Department indicates that these ratios do not account for changes in the needs of the patient population since they were first established in the early 1980s. According to the Department, the patient population has become more difficult and violent since that time, which has increased the need for more intensive care. For example, patients experiencing a mental health crisis or feelings of suicidality require additional staff. To accommodate this workload, the Department typically staffs more nurses on its units than required by the minimum standards. DSH reports that these additional staff have resulted in it requiring more positions than it is currently approved for. Accordingly, the Department has relied on significant amounts of temporary help positions that have not been officially established in the budget. In addition, the Department has made significant use of overtime—including mandatory overtime—to maintain its current level of staffing. For example, a 2016 Little Hoover Commission study found that DSH nurses had worked about 194,000 hours of mandatory overtime in 2014-15.

Currently, DSH has no statewide standards established for the number of additional nurses that are necessary on its units to provide adequate care. This has resulted in each hospital using its own methods for establishing the number of nurses it views as adequate. For example, DSH-Atascadero uses the Patient Classification Rating System, which evaluates patients' stability in various behavioral areas to establish patients' clinical needs and corresponding staffing levels. In contrast, DSH-Napa utilizes fixed staffing levels for each unit that have been determined by management, such as the clinical administrator and nursing administrator.

***Staffing Not Regularly Readjusted in Budget Process.*** While DSH requests additional nursing staff when activating new units, it does not typically adjust its staffing when the makeup of its units changes over time. Accordingly, if the population changes in a way that requires more nurses—such as more acute patients being admitted—the Department must redirect the resources for the additional staff it needs from elsewhere in its budget and rely more on temporary help and overtime. Conversely, if its patient population shifts in a way that requires less staffing, the resulting savings are not normally recognized in the budget.

***Medication Room Staffing.*** Nurses who are assigned to medication pass duties are required to prepare, administer, document, and manage the medication administration process within each unit. Medication pass occurs four times a day, typically in the morning, noon, afternoon, and evening and can take up to two hours per pass. Medications are stored, managed, and administered from a medication room on each unit or brought patient to patient using a medication cart. According to the Department, each hospital staffs its medication rooms with a dedicated psychiatric technician on both the

morning and afternoon shifts. The Department reports that while these psychiatric technicians are counted toward the nurse to patient staffing ratios, they are generally preoccupied with their medication-related duties and are unavailable to deliver other types of care or to respond to incidence of violence on the units.

***On-Call Supervisor Used During the Evening and Overnight Shift.*** The first-line management and oversight of nurses on units in DSH is performed by either a unit supervisor or a supervising registered nurse, depending on various factors, such as the medical acuity of the unit. These supervisors work five days per week during the day shift. To ensure that a supervisory position is available during times when these individuals are not present, DSH uses a "program officer of the day" to fill the role. This role is assigned to unit supervisors and other managerial staff on a rotating basis. Individuals who are assigned to the program officer of the day role are not present at the hospital. Instead, they are on call and can be contacted by staff to address issues that arise on the unit. According to the Department, this can occur several times throughout the night.

### LAO Recommendations:

***Approve Nursing Adjustments, but Require Evaluation.*** The LAO recommends that the Legislature approve the proposed (1) standardization of nursing staffing ratios, (2) 254 temporary help positions and dedicated budget for overtime, and (3) 50 administrative staff to reduce the administrative workload currently carried out by nurses. The LAO states that these proposals would collectively help ensure that the Department's budget better reflects changes in the makeup of its patient population, increase transparency, and make better use of nursing staff.

However, the LAO also states that the proposed staffing standards are reflective of current practice that has not been subject to independent evaluation. Accordingly, the LAO recommends that the Legislature require DSH to contract with an independent consultant for a comprehensive clinical staffing analysis. Such an analysis should include: (1) an evaluation of the Department's clinical staffing—including both nursing and other clinical staffing; (2) an assessment of the appropriate number and type of clinical staff necessary to provide treatment for patients assigned to each category of unit established in the Clinical Staffing Study; (3) an assessment of whether staff are assigned appropriate responsibilities, or whether more tasks could be assigned to nonclinical staff or less costly clinical staff; and (4) recommendations to ensure the Department is utilizing its staff as efficiently and effectively as possible. The LAO estimates that such an analysis would likely cost in the low hundreds of thousands of dollars.

***Pilot Medication Room Staffing.*** The LAO believes that it is possible that the proposed additional nursing staff for medication rooms would free up other nurses on units to help better deliver care and reduce violence. However, the LAO states that, given the lack of data demonstrating that this is likely to occur and the magnitude of the proposed

resources, they recommend that the Legislature approve only a portion of the positions on a pilot basis. Specifically, they recommend that the Legislature approve $7.1 million (General Fund) and 63 psychiatric technician positions in 2019-20 on a three-year limited-term basis. The LAO states that this would provide the Department with sufficient staff to place dedicated nurses in 24 medication rooms, and argues that this should provide the Department with enough staff to test the new staffing package on a wide range of unit types. The LAO also recommends that the Legislature require the Department to report by January 10, 2022 on the effect that the additional staffing has on patient length of stay and violence rates, and notes that this analysis could be carried out by the independent consultant conducting the comprehensive clinical staffing analysis that they also recommend.

*Approve Evening/Overnight Supervisors.* The LAO recommends that the Legislature approve the proposed registered nurse supervisor positions as these positions would ensure that supervisory staff are physically present to address issues that arise on the units. It would also bring DSH staffing more in line with the staffing used by CDCR on similar mental health units.

STAFF COMMENTS/QUESTIONS

The Subcommittee requests DSH present this request, requests the LAO explain their concerns and recommendations, and requests DSH to then provide reactions to the LAOs concerns and recommendations.

**Staff Recommendation:**  No action is recommended at this time to allow for additional discussion and debate.

## ISSUE 5: WORKFORCE DEVELOPMENT BUDGET CHANGE PROPOSAL

### PANELISTS

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Dr. Katherine Warburton**, Deputy Director, Clinical Operations Division, Department of State Hospitals
- **Jaci Thomson**, Principal Program Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

### *Public Comment*

### PROPOSAL

DSH requests 8.0 permanent full-time positions and $1,755,000 General Fund in fiscal year (FY) 2019-20, $2,154,000 in FY 2020-21, $2,404,000 in FY 2021-22 and 2022-23 and $2,604,000 in FY 2023-24 on-going to support the development and implementation of a Psychiatric Residency Program and expand resources for Nursing Recruitment to meet the mission of providing mental health services to patients and reduce vacancy rates for mental health providers.

### BACKGROUND

The provision of mental health care requires attracting and retaining a sufficient workforce of trained medical professionals, psychologists, social workers, rehabilitative therapists and nursing staff. This BCP focuses on psychiatrists and nursing level of care staff due to the high vacancy rates in these classifications. In California, a medical doctor specializing in the diagnosis, treatment, and prevention of mental health illness must complete a four-year residency program in psychiatry in addition to specialized fellowship training to become a licensed psychiatrist. While DSH employs a large number of psychiatrists, many positions remain vacant. DSH and other state employers of psychiatrists, such as CDCR are experiencing difficulties in filling these positions largely due to the nationwide shortage of psychiatrists. In addition, successful recruitment is also challenged by the high-risk work environment. While nursing level of care classifications vary at DSH, this request will focus primarily on recruitment for registered nurses (RNs) and psychiatric technicians (PTs). These two nursing classifications reflect most of the authorized nursing positions at DSH. Below are various factors that affect DSH's ability to recruit and retain psychiatrists and level of care nursing staff.

### Psychiatry Recruitment and Retention Challenges

#### Staffing Requirements

DSH operates a 24 hour a day, 7 days per week hospital system that requires minimum staffing levels to meet legally prescribed licensing and certification requirements and safety standards. This requires shifts to be covered, even if positions are vacant. Nine out of ten DSH patients are forensic commitments - sent to DSH through the criminal court system because they have committed or have been accused of committing a crime linked to their mental illness. DSH cannot admit or discharge forensic patients without a court's consent order nor refuse to treat patients. As such, DSH must be staffed appropriately, at all levels and at all times.

An association of 15 state mental health hospital systems in the western region of the US, known as the Western Psychiatric State Hospital Association (WPSHA), found that the average ratio of psychiatrists to patients was 1:25 amongst its member hospitals. DSH's official budgeted psychiatry ratio is 1:35, well above the average of other state hospitals.

#### Vacancies

DSH has 259.3 authorized psychiatrist positions and a current statewide psychiatrist vacancy rate of 40.6 percent. As the primary care physician, unit activations are delayed without an adequate number of psychiatrists. DSH patients are extremely psychiatrically ill, requiring complex psychopharmacological interventions, which psychiatrists are uniquely qualified to prescribe. Absent an adequate number of psychiatrists, DSH may be unable to provide care to the growing forensic state hospital population, resulting in increased patient length of stay, further exacerbating the admission waitlists and litigation liabilities.

#### High Risk Environment

DSH's work environment is high-risk due to the high acuity of patients, rate of assaults, and mentally and physically demanding requirements. There were 3,639 patient-on-patient aggressive incidents and 2,855 patient-on-staff aggressive incidents recorded in 2016. Unlike the prison custodial environment, state hospitals cannot lock patients in their rooms and have very few options for the physical control of assaultive patients. The California Department of Public Health licensing requirements mandate that DSH patients are free to move about their unit and to off-unit treatment locations. As such, the potential to be assaulted is a daily threat for clinicians.

To further exacerbate DSH's challenges with psychiatrist recruitment and retention, DSH has higher caseloads than other state hospital systems. DSH as a system, is operating at nearly maximum functional capacity, which is not consistent with industry best practices. According to existing research, occupancy levels above 80 percent leads to

stressful work environments and further studies have shown that operating above 85 percent occupancy will have detrimental impacts to hospital performance such as staff dissatisfaction, burn-out, medication errors, aggressive behavior by patients among others. For large hospitals (above 1,000 beds), optimum occupancy is considered 83 percent.

*National Shortage and Problem with Residency Slots*
The National Institute of Mental Health attributes the national psychiatry shortage to several factors including an aging workforce and limited residency slots. Psychiatrists are aging out of the workforce - 70 percent of all active psychiatrists are age 50 or older and 39 percent of psychiatrists are 61 or older. This compares to only 55 percent of all physicians being age 50 or older. Thousands of psychiatrists could retire at any time.

Merritt Hawkins, a national medical recruitment firm, notes that psychiatrist searches are the third most requested specialty. In their 2015 Review of Physician and Advanced Practitioner Recruiting Incentives, Merritt Hawkins states, "the shortage of psychiatrists is an escalating crisis of more severity than shortages faced in virtually any other specialty. With many psychiatrists aging out of the profession, and with a preference among psychiatrists for outpatient practice settings, it is becoming increasingly difficult to recruit to inpatient settings." Graduates' preference for community outpatient services is in stark contrast to DSH's work environment, which is inpatient and serves a predominantly forensic population.

*Existing Psychiatry Residency Programs*
Per the National Resident Matching Programs Results and Data Report from April 2018, there are a total of 4,523 accredited Year 1 (PGY-1) residency programs in the United States (US). In all fields of Psychiatry, there are a total of 256 accredited PGY-1 residency programs with 1,556 resident slots. Of those, 22 programs are in California with 152 slots in California, in the field of Psychiatry."

Meanwhile, the current residency pipeline is insufficient to replace potential retirees from the field. The table on the next page highlights the total number of psychiatry residents in 2013-14. Program length is typically four years with approximately 1,000 residents graduating each year. It is notable that there are only 66 forensic psychiatry resident slots in the US with only about 16 finishing a residency program each year. DSH could absorb every forensic psychiatry resident in the US and still face significant staffing shortages.

**Nursing Level of Care Recruitment and Retention Challenges**

Many of the factors impacting psychiatry recruitment and retention similarly apply to nursing care positions, specifically as it relates to the high-risk environment and the remote geographic locations. The following information further outlines specific detail of nursing recruitment and retention barriers.

*Staffing Requirements*

DSH hospitals are licensed and regulated under CCR Title 22: Social Security, Division 5: Licensing and Certification of Health Facilities, Home Health Agencies, Clinics, and Referral Agencies. DSH hospitals contain beds licensed under Chapter 2 - Acute Psychiatric Hospital, Chapter 3 - Skilled Nursing Facilities and Chapter 4 - Intermediate Care Facilities. DSH must adhere to staffing minimums required by Title 22. Nursing staff shall be employed in the number and with the qualifications determined to provide the necessary services for those patients admitted for care. At a minimum, each nursing unit should have a registered nurse, licensed vocational nurse or psychiatric technician on duty at all times; however, licensed vocational nurses and psychiatric technicians may be utilized as needed to assist registered nurses in ratios appropriate to patient needs. In accordance with licensing requirements, DSH's budgeted staffing ratio for nurses are as follows in the majority of treatment units:

**Table 2: DSH Nursing to Patient Ratios by Shift and Level-of-Care Setting**

| Level-of-Care Setting | AM | PM | NOC |
|---|---|---|---|
| Acute | 1:6 | 1:6 | 1:12 |
| Intermediate Care Facility (ICF) | 1:8 | 1:8 | 1:16 |

While these are the budgeted nursing ratios in most of the DSH units, for safety (patient and staff) reasons, the actual nurse to patient ratio is much richer (see the 2019-20 Nursing Staffing Study BCP). DSH achieves these higher staffing ratios on the units largely through the use of overtime. Vacancies in the nursing classifications increases the amount of overtime necessary in order to cover all the posts in a unit for all shifts. In addition, the 2019-20 budget includes proposals for an additional 335 PTs and 44.5 Supervising Registered Nurses (SRN), the latter of which is expected to be largely filled through the promotion of current RNs.

*Vacancies*

DSH has 1,609.5 authorized positions for RN's and 3,120 authorized positions for PT's. Over the past year, the statewide vacancy rate for RNs has ranged from 13 to 18 percent, while the statewide vacancy rate for PTs has ranged from 10 percent to 21 percent. The rates at DSH-Atascadero and DSH-Coalinga are generally higher due to their geographic location.

To ensure that DSH facilities maintain a sufficient nurse to patient ratio, DSH's short term solution is to proactively use a combination of overtime, internal registries, temp help and external registries to fill these posts when vacant. Unfortunately, despite these efforts to meet mandated ratios, mandatory overtime is commonly required at DSH hospitals. In the first quarter of the current Fiscal Year (July- September 2018), RNs and PTs at the five hospitals had to work a total of 459,577.47 hours of overtime. The Little Hoover Commission issued a report dated April 1, 2016 regarding the excessive amount of overtime utilized at DSH.

Staffing shortages and mandatory overtime negatively affect staff as current RNs and PTs are subject to burn out and will leave for less stressful opportunities, resulting in DSH having an even higher vacancy rate. An important part of reducing high vacancy rates includes the development of a recruitment plan that is able to keep pace with attrition and growth.

### *LAO Concerns and Recommendations:*

***Permanent Funding Proposed for Promising, but Unproven Residency Program.*** The LAO believes that, given the high vacancies among psychiatrists and the need for additional forensic psychiatric residency programs, the Administration's proposal to create a forensic psychiatric residency program involving DSH-Napa merits legislative consideration. However, this approach is relatively expensive given that it would cost $1.6 million to produce four potential psychiatrists per year once it is fully operational. In addition, it is unclear how effective the program would actually be at filling psychiatrist positions at DSH as residents in the program could accept positions outside of DSH. Despite these uncertainties about the cost-effectiveness of the proposal, the Administration is proposing to fund the program on an ongoing basis. The LAO notes that this is inconsistent with a separate proposal the administration has to establish a nurse practitioner residency program within CDCR. In that case, the Administration is proposing limited-term funding to allow the residency program to be evaluated before funding it on an ongoing basis.

***Expansion of Nursing Training Partnerships Appears Reasonable . . .*** The LAO believes that the Administration's proposal to expand existing nursing training partnerships appears reasonable. This is because the current programs have a proven ability to help recruit additional nurses. Moreover, according to the Department, demand for the programs currently exceeds capacity at each of the participating colleges. For example, the Department reports that there are typically 150 applicants for the 30 slots in Cuesta Community College's program for psychiatric technicians.

***. . . But It Is Unclear Why Community College Instructional Funding Cannot Offset Costs.*** Given that the nursing instructors DSH would provide to the community colleges would allow them to enroll additional students, the community colleges should be receiving instructional funding associated with these students, according to the LAO. However, the Administration's current proposal would not offset the cost of the nursing instructors to account for this. While the Department informs us that it will submit a spring Finance Letter to offset $370,000 of the $507,000 cost for the three nurse instructors proposed for DSH-Atascadero, it is not currently planning to do so for the nurse instructors proposed for DSH-Coalinga or DSH-Napa.

***Approve Forensic Psychiatric Residency Program on Limited-Term Basis, Require Evaluation.*** The LAO recommends that the Legislature approve the resources requested to establish a forensic psychiatric residency program. However, given that the program is relatively costly and it is unclear whether it will effectively reduce psychiatric vacancies, the LAO recommends that the funding only be approved on a six-year limited-term basis. This would allow one cohort of students to complete the program and determine whether they ultimately accept positions at DSH. The LAO also recommends that the Legislature pass budget trailer legislation requiring the Department to report by January 10, 2025 on the extent to which the program has reduced psychiatric vacancies. This would allow the Legislature to review the outcomes of the program when considering whether to approve funding on an ongoing basis for the program as part of its deliberations on the 2025-26 budget.

***Direct Department to Report on Funding for Expansion of Nursing Training Partnerships.*** While the LAO has no concerns with the proposal to expand the existing nursing training partnerships at three state hospitals, they recommend that the Legislature withhold action on the proposal and direct the Department to report at spring budget hearings on why it cannot offset the costs of all five proposed nurse instructors with community college instructional funding.

---

**STAFF COMMENTS/QUESTIONS**

The Subcommittee requests DSH present this request, requests the LAO explain their concerns and recommendations, and requests DSH to then provide reactions to the LAOs concerns and recommendations.

---

**Staff Recommendation:**  No action is recommended at this time to allow for additional discussion and debate.

### ISSUE 6: VOCATIONAL SERVICES AND STATE MINIMUM WAGE BUDGET CHANGE PROPOSAL AND TRAILER BILL

#### PANELISTS

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Christine Ciccotti**, Deputy Director, Legal Division, Department of State Hospitals
- **Marcelo Acob**, Chief Financial Officer, Department of State Hospitals
- **Han Wang**, Finance Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

*Public Comment*

#### PROPOSAL

*Budget Change Proposal:*
DSH requests authority for 1.0 permanent, full-time position and a General Fund augmentation of $3.34 million beginning in fiscal year (FY) 2019-20 and on-going to implement a new and uniform wage structure for DSH's Vocational Rehabilitation Program.

*Trailer Bill:*
DSH is proposing trailer bill to clarify the employee-employer relationship between DSH and its patient workers, and specifically to clarify that patients are not subject to state minimum wage requirements. Finally, the trailer bill clarifies the applicability of workers' compensation benefits for DSH patients and establishes how workers' compensation benefits are to be dispensed to patient workers.

#### BACKGROUND

As part of the patient treatment plan and rehabilitation process, DSH offers its patients access to the Vocational Rehabilitation Program, which serves as a therapeutic program to provide a range of vocational skills and therapeutic interventions for patients. DSH clinicians work closely with DSH Vocational Rehabilitation Program managers to incorporate a treatment plan to assist patients in developing social skills, occupational skills, life skills, career skills, and confidence, as well as preparing for discharge and/or transition to next level of care, successful community integration when released, future employment and reducing criminal recidivism.

The program consists of clinicians evaluating the patient's current health to determine if the patient meets the preliminary criteria to participate in the program, which includes medical clearance and approval, determining that the patient is not a danger to self or others and the program will be beneficial for the patient's treatment and care. The

program allows patients to be paid an hourly wage for the work performed which varies by commitment type and work performed at each of the hospitals. Patients' work consists of the following type of jobs: custodial, kitchen worker, product assembler, laundry attendant, landscapes painter, plumbing, barber, horticulture, multimedia production, peer mentor, office clerk, and repair technician.

DSH's Vocational Rehabilitation Program provides an hourly wage to its patients who voluntarily participate in the program to continue their therapeutic treatment and care. The program is offered at each of the hospitals; however, the pay scale and processes vary. The program is considered critical for the care, evaluation, and treatment of DSH patients and the Department is now focused on standardizing the various patient wage structures between the state hospitals.

DSH evaluated the patient wages paid to patient-workers across the DSH system that are either associated with its Vocational Rehabilitation Programs or DSH-Napa's sheltered workshop in response to a December 11, 2016 letter from Disability Rights California (DRC). DRC requested that DSH pay minimum wages and asked that DSH standardize wages across all hospitals. DRC is an advocacy group that educates, investigates, and litigates to advance the rights, dignity, equal opportunities, and choices of all people with disabilities. Specifically, DRC raised equal protection arguments noting the types of work performed and the wages received differs by commitment type and hospital. DSH does not have a system-wide pay structure and most hospitals do not pay state minimum wage. Patients earn different wages depending on commitment type and/or in which hospital they reside.

The federal Fair Labor Standards Act (FLSA) requires employers to pay employees a minimum hourly wage and overtime pay (29 U.S.C.S. §§ 201-2190). Its essential purpose is to provide for workers a minimum standard of living necessary for health, efficiency, and general well-being of workers (29 U.S.C.S. § 202). With respect to DSH's patients participating in Vocational Rehabilitation Program, there is ambiguity in the implementing regulations and procedures. The FLSA's implementing regulations specifically provide that patient workers are employees under the statute, if their work confers an economic benefit to the hospital. (29 C.F.R. §§ 525.5, 525.3(e) (1989).) Although the FLSA's implementing regulations specifically provide that patient workers are employees under the statute, neither the statute nor the regulations specifically address forensically committed mental health patients whose minimum standard of living is provided by the hospital. Moreover, despite the federal regulations, the Department of Labor (DOL) Field Operations Handbook states that "generally, a prisoner/patient who performs work for the hospital or institution is not considered an employee for FLSA purposes" (U.S. DOL Field Operations Handbook section 64c03).

**STAFF COMMENTS/QUESTIONS**

The Subcommittee requests DSH to present this Budget Change Proposal and trailer bill, and respond to the following:

1. For what reasons does DSH not want to pay patient workers minimum wage?

2. Please detail the cost recovery statutes and policies for patients leaving the state hospitals.

3. Please explain the workers compensation provisions included in the proposed trailer bill.

**Staff Recommendation:**  No action is recommended at this time to allow for additional discussion and debate.

## ISSUE 7: OFFICE OF PROTECTIVE SERVICES – HOSPITAL POLICE OFFICER ACADEMY

### PANELISTS

- **Stephanie Clendenin**, Director (A), Department of State Hospitals
- **Han Wang**, Finance Budget Analyst, Department of Finance
- **Drew Soderborg**, Managing Principal Analyst, Legislative Analyst's Office

### *Public Comment*

### PROPOSAL

The Governor's budget proposes $5.8 million (General Fund) and three permanent positions for DSH to operate the DSH Police Academy at its current, expanded capacity on an ongoing basis—meaning three sessions annually.

### BACKGROUND

***Office of Protective Services (OPS).*** OPS is a law enforcement agency within DSH that provides security, enforces laws, and provides investigatory services at the five state hospitals. Currently, OPS is approved for 657 hospital police officer positions to carry out these responsibilities. The 2018-19 budget includes $9.6 million for the operation of OPS.

***DSH Police Academy.*** After being hired by DSH, hospital police cadets are required to attend a 14-week DSH Police Academy. At the academy, cadets must complete 548 hours of training in multiple disciplines. Some of the courses offered include leadership, professionalism, and ethics; laws of arrest; search and seizure; and cultural diversity/discrimination. Prior to 2017-18, the DSH Police Academy was located at DSH-Atascadero and ran two sessions annually with each session graduating 32 cadets each, in order to address the typical officer attrition rate. (As discussed below, the academy was later moved to accommodate a larger number of cadets.) After graduating from the academy, individuals are assigned to one of the state hospitals. The Department has historically had some difficulty recruiting and retaining hospital police officers. For example, its officer vacancy rate has exceeded 20 percent in prior years. This is likely due to a variety of factors, such as the higher salary similar agencies (such as CDCR) pay officers.

***Academy Temporarily Expanded in 2017-18.*** Due to the planned activation of 236 beds at DSH-Metropolitan that required the hiring of over 70 additional hospital police officers and the desire to reduce the officer vacancy rate, the Legislature provided additional General Fund resources over a two-year period beginning in 2017-18 for DSH to temporarily expand its academy. Specifically, DSH received $7.8 million in 2017-18 and

$12.4 million in 2018-19, as well as three, two-year limited-term positions. The additional funding allowed the academy to run three sessions annually, with each session consisting of 50 cadets. Given that not all cadets successfully complete the academy, DSH estimates that this is enough to result in 138 additional hospital police officers each year. The funds were also used to move the academy from DSH-Atascadero to a location in San Luis Obispo that is shared with the California Military Department, in order to provide more space for the larger number of cadets. According to the Department, the academy needs to continue operating at its expanded capacity due to the following reasons:

- **Increased Officer Attrition Rates.** According to the Department, the current attrition rate is 5.1 officers per month, an increase over the 2017-18 monthly attrition rate of 4.2, and the 2016-17 rate of 2.7. DSH projects that the rate will continue to increase to 7.1 officer per month by 2019-20 and by an additional officer per month in each subsequent year due to a projected increase in the number of officer retirements.

- **High Officer Vacancy Rates.** The Department reports that the 2018 vacancy rate for officers was 15 percent—about three times the rate typically assumed for most classifications. DSH expects to have a total of 132.1 vacancies by the beginning of 2019-20.

### LAO Concerns and Recommendations

Under the Governor's proposal to provide $5.8 million on an ongoing basis, the academy could be producing more graduates than necessary beginning in 2022-23, according to the LAO. This is because at the end of 2022-23 DSH would have roughly seven more officers than needed. The LAO notes that this assumes the attrition rate continues to increase over the next four years. To the extent the actual attrition rate is less than assumed, the academy could be producing excess graduates at an even earlier date. For example, if the attrition rate remained at 5.1 officers per month, the academy could begin producing excess graduates in 2020-21. Therefore, the LAO recommends:

1. **Approve Funding for Three Years.** Given the uncertainty regarding the number of academy graduates that will be needed in the long run to account for officer turnover and vacancies, the LAO recommends that the Legislature approve the resources requested to maintain the expanded DSH Police Academy for three years, rather than on an ongoing basis as proposed by the Governor. This would allow the academy to continue to produce additional officers to address the projected increase in the attrition rate and lower the vacancy rate without resulting in an excess number of officers in the future. After the three-year period, the Legislature could reevaluate as part of its deliberations on the 2022-23 budget the number of academy graduates needed to meet the security needs of the state's hospitals.

2. ***Require Report on Officer Recruitment and Retention.*** In order to ensure that the Legislature has sufficient information to provide oversight of hospital police officer recruitment and retention and assess future academy graduate needs, the LAO recommends that the Legislature approve trailer bill language requiring the Department to report annually on (1) the officer vacancy rate, (2) the officer attrition rate, (3) the number of cadets entering the academy, (4) the number of cadets who successfully graduate the academy, and (5) retention rates for successful graduates. This information would also allow the Legislature to determine whether adjustments to the level of funding for the DSH Police Academy are needed prior 2022-23.

| STAFF COMMENTS/QUESTIONS |
| --- |

The Subcommittee requests DSH present this request, requests the LAO explain their concerns and recommendations, and requests DSH to then provide reactions to the LAOs concerns and recommendations.

**Staff Recommendation:** No action is recommended at this time to allow for additional discussion and debate.

# NON-DISCUSSION ITEMS

The Subcommittee does not plan to have a presentation of the items in this section of the agenda, unless a Member of the Subcommittee requests that an item be heard. Nevertheless, the Subcommittee will ask for public comment on these items.

## 4440 DEPARTMENT OF STATE HOSPITALS

### ISSUE 8: PRIVACY PROTECTION PROGRAM BUDGET CHANGE PROPOSAL

#### PROPOSAL

DSH Legal Division (LD) requests 9.0 permanent full-time positions and $1,263 million in General Fund augmentation to establish a system-wide Privacy Office that will establish the DSH privacy program and provide oversight over system-wide and hospital-specific privacy compliance.

DSH states that it does not currently have the resources to address deficiencies in compliance with state and federal requirements regarding health information privacy. Moreover, LD does not have sufficient resources to timely and thoroughly respond to corrective action required by a recent audit or the increase in privacy and security incidents since 2017.

#### BACKGROUND

In May 2018, the California Office of Health Information Integrity (CalOHII) performed an audit of DSH's health information privacy and security activities from both system-wide and hospital-specific perspectives. CalOHII audited four compliance categories related to privacy, security, administrative (policies and procedures), and patient rights. CalOHII's methodology, as stated in their compliance review report, is limited to an evaluation of areas of potential high risk and their review does not cover all HIPAA-impacted program areas or requirements. CalOHII's review covered two hospitals and six system-wide programs. Nevertheless, CalOHII's audit contained 61 findings, of which 34 were high risk, 24 were medium risk, and three were low risk. Figure 1 below shows DSH's level of compliance for the four categories of the review. Importantly, this public audit report indicates that DSH's headquarters and individual hospitals scored less than 50 percent compliant in most categories and almost zero percent compliant in the category of Patient Rights

The most significant finding was that DSH lacks a system-wide privacy program responsible for policies and procedures, training, monitoring and oversight over compliance, incident and breach response, and risk mitigation. CalOHII requires DSH to

complete all corrective action and adequately address all deficiencies within 18 months of the date of the final report - November 2019. Necessary corrective action includes establishing missing privacy processes at all five hospitals and standardizing and updating existing ones. Each hospital will need additional staff to perform HIPAA-required tasks which are in addition to existing workload. To accomplish the corrective action, and to be fully compliant with federal and state laws, DSH will need additional resources.

Further, in 2018, the California Information Security Office (CISO) implemented a new requirement that state departments perform an intensive self-assessment of all mission critical systems. CISO is now in review of DSH's assessment via the California Compliance and Security Incident Reporting System Risk Module. The assessment confirmed findings from CalOHII that DSH lacks an adequate privacy program. CISO will likely require corrective action to address deficiencies designed to ensure adequate compliance with the State Administrative Manual Chapter 5300.

DSH currently has only one position dedicated to privacy compliance work, an Attorney IV, who is also the DSH Privacy Officer. With a staff of over 10,000 and approximately 12,000 patients served annually at five hospitals and multiple jail-based facilities, additional positions are needed to timely and thoroughly address incidents.

CalOHII's May 2018 audit findings and the CISO self-assessment demonstrate DSH's need for a system-wide privacy compliance and oversight function to: develop, manage, and improve DSH policies and procedures in compliance with state and federal requirements; standardize implementation of policies and procedures; monitor and oversee compliance with policies and procedures; and ensure corrective action occurs for any deficiencies.

DSH operates five hospitals and one headquarters facility. Each facility has its own fiscal, personnel, contracts, purchasing, and facilities staff. Historically, the hospitals functioned as relatively autonomous entities with broad oversight by DSH-Sacramento. Currently, each hospital has its own individual privacy policies and procedures with varying levels of sophistication and compliance. DSH lacks uniformity in its privacy policies and procedures because of differing interpretations and applications of federal and state laws and policies.

The requested staffing will allow DSH to develop and maintain a system-wide privacy program for headquarters and five forensic psychiatric hospitals that provide direct patient care. DSH is requesting 9.0 permanent full-time positions, including one Associate Governmental Program Analyst (AGPA) at each hospital, to adequately staff privacy program workload as follows:

- 1.0 Attorney III
- 1.0 Attorney I

- 6.0 Associate Governmental Program Analyst (AGPA) (5.0 at hospitals)
- 1.0 Staff Services Manager I (SSM I) Specialist

**STAFF COMMENTS/QUESTIONS**

The Subcommittee staff has no concerns with this proposal at this time.

**Staff Recommendation:**  No action is recommended at this time to allow for additional discussion and debate.

## ISSUE 9: ATASCADERO: POTABLE WATER BOOSTER PUMP CAPITAL OUTLAY PROPOSAL

### PROPOSAL

The Administration requests $113,000 for preliminary plans to install a potable water booster pump system at DSH-Atascadero. The project includes installing a potable water booster pump system to serve the DSH-Atascadero. Total project costs are estimated at $2,100,000, including preliminary plans ($113,000), working drawings ($229,000), and construction ($1,758,000). The construction amount includes $1,462,000 for the construction contract, $102,000 for contingency, $134,000 for architectural and engineering services, $60,000 for other project costs. Construction is scheduled to begin in December 2021 and will be completed in September 2022.

### BACKGROUND

This project will ensure the successful and uninterrupted operation of DSH-Atascadero's main fire sprinkler system. DSH-Atascadero's water supply is generated from five underground wells located at the northeast part of the campus. Each well station has a pump that sends water from the wells to an adjacent underground reservoir. Water is then pumped nightly from the reservoir to a one-million gallon storage tank located on top of a hill at the northern part of the campus. The storage tank then supplies water by gravity feed to the facility. The hospital's fire sprinkler system is fed from this main gravity line with the tank serving as the water reservoir for the sprinklers.

Since this is a gravity-based system, as the hospital increases its water usage, the water pressure decreases across the hospital. When multiple users draw water, such as for patient showers, dishwashing, bathroom usage, etc., the water pressure drops considerably. This drop in pressure puts the main fire sprinkler system at risk, as consistent water pressure is needed for the system to function effectively. DSH-Atascadero water pressure during normal operations averages between 40 to 50 psi, which is deficient by approximately 20 psi. Should the pressure be insufficient during a fire, the risk for property damage and patient/staff injury or death is increased greatly.

Additionally, the drop in water pressure also impacts to domestic water operations, such as water flow in patient showers and sinks, staff and patient toilets and urinals, and plant operations systems such as the water softening system and cooling towers.

To address this issue, and in accordance with recommendations made in a study prepared by the Department of General Services on September 28, 2017, this project will include the installation of a booster pump station parallel to the existing main line. The pump station will consist of five pumps that will turn on when the inlet water pressure drops. When the pressure rises to an acceptable level, the booster pump station will shut

off and the gravity system will provide the required pressure to the buildings. A second in-line booster pump will also be installed parallel to the distribution line at the central plant feeding the water system to handle the peak demand needs.

STAFF COMMENTS/QUESTIONS

The Subcommittee staff has no concerns with this proposal at this time.

**Staff Recommendation:**  No action is recommended at this time to allow for additional discussion and debate.

## ISSUE 10: DEFERRED MAINTENANCE ADJUSTMENT

### PROPOSAL

DSH requests $35 million one-time General Fund in 2019-20 to address deferred maintenance projects that represent critical infrastructure deficiencies. State Hospital facilities require routine maintenance and repair to keep them in acceptable condition and to preserve and extend their useful lives. This funding was determined by criticality of project by hospital and will be made available for encumbrance or expenditure until June 30, 2022.

### BACKGROUND

DSH reports that it has a total of roughly $400 million in deferred maintenance projects. Outside of resources from periodic statewide deferred maintenance proposals—such as the one proposed by the Governor in this year's budget—it is only able to dedicate around $1.9 million annually for these projects. Accordingly, the Department does not currently have a plan for how it will address this backlog.

*LAO Concerns and Recommendations:*
The LAO recommends that the Legislature seek additional information at budget hearings on DSH's plan for addressing the accumulation of deferred maintenance on an ongoing basis. For example, this could include an estimate of the ongoing level of maintenance funding that would be needed to prevent the future accumulation of deferred maintenance. The LAO states that this would provide the Legislature with additional information on the status of the Department's ongoing efforts to maintain their facilities.

Additionally, the LAO recommends that the Legislature adopt supplemental reporting language (SRL) that requires that, no later than January 1, 2023, DSH identify how its deferred maintenance backlog has changed since 2019. They further recommend that the SRL require that, to the extent that its backlog has grown in the intervening years, the Department to identify the reasons for the increase and the specific steps it plans to take to improve its maintenance practices on an ongoing basis. The LAO explains that, if a department experienced a large increase in its backlog, it might suggest that its routine maintenance activities are insufficient to keep up with its annual needs and that it should improve its maintenance program to prevent the further accumulation of deferred maintenance. In such cases, it would be important for the Legislature to understand this, so it can direct DSH to take actions to improve its maintenance programs. The LAO recommends adoption of the following SRL:

*Item 4440-001-0001.*

*No later than January 1, 2023, the Department of State Hospitals shall submit to the fiscal committees of the Legislature and the Legislative Analyst's Office a report identifying the total size of its deferred maintenance backlog as of the 2018-19 fiscal year and September 2022. To the extent that the total size of the deferred maintenance backlog has increased over that period, the department's report shall also identify the reasons for the increase in the size of the backlog and the specific steps the department plans to take to improve its maintenance practices on an ongoing basis.*

STAFF COMMENTS/QUESTIONS

The Subcommittee staff has no concerns with this proposal at this time, and recommends that the Subcommittee seriously consider the LAO's recommended SRL requiring DSH to produce a report on the Department's total deferred maintenance.

**Staff Recommendation:**  No action is recommended at this time to allow for additional discussion and debate.

ATTACHMENT C

**Marcus Levy**

| | |
|---|---|
| **From:** | Marc Shinn-Krantz |
| **Sent:** | Wednesday, July 3, 2019 4:36 PM |
| **To:** | Mitchell, Kelly@CDCR; Nick Weber |
| **Subject:** | RE: Coleman: PIP Roster & 28th Round SVSP Data [IWOV-DMS.FID6429] |

Nick,

What is the status of pulling this data?

Thanks,
Marc

**Marc J. Shinn-Krantz**
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
MShinn-Krantz@rbgg.com

CONFIDENTIALITY NOTICE: The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com

IRS CIRCULAR 230 NOTICE: As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

---

**From:** Marc Shinn-Krantz
**Sent:** Wednesday, June 19, 2019 7:29 AM
**To:** Mitchell, Kelly@CDCR <Kelly.Mitchell@cdcr.ca.gov>
**Cc:** Nick Weber <Nicholas.Weber@cdcr.ca.gov>
**Subject:** Re: Coleman: PIP Roster & 28th Round SVSP Data [IWOV-DMS.FID6429]

Thanks!

Sent from my iPhone

On Jun 18, 2019, at 10:52 PM, Mitchell, Kelly@CDCR <Kelly.Mitchell@cdcr.ca.gov> wrote:

> Trying to see what it would take and how long create report.  Will advise as soon as I hear.

> ---
> **From:** Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>
> **Sent:** Tuesday, June 18, 2019 12:11 PM
> **To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
> **Subject:** FW: Coleman: PIP Roster & 28th Round SVSP Data [IWOV-DMS.FID6429]
>
> Hi Nick,

1

Could you send us a version of this PIP census that (1) shows everyone who was in the PIPs for a recent month rather than point-in-time—preferably May, (2) indicating everyone who was on maximum custody at any time during that month, (3) the date, if any, that each person on that list was most recently classified as maximum custody, and (4) the date, if any, that each person was most recently removed from maximum custody?

I am happy to talk this through if there are logistical hurdles to producing a roster with that information.  (I left you a voicemail about that earlier this month).

Thanks,
Marc

**Marc J. Shinn-Krantz**
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
MShinn-Krantz@rbgg.com

CONFIDENTIALITY NOTICE: The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com

IRS CIRCULAR 230 NOTICE: As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Tuesday, March 5, 2019 11:36 AM
**To:** Cara Trapani <CTrapani@rbgg.com>
**Subject:** RE: Coleman: PIP Roster & 28th Round SVSP Data [IWOV-DMS.FID6429]

Hi Cara,

Attached are the rosters from March 5.  With respect to your second request I am not sure what document you are seeking.  I spoke to Tyler Heath and he was also unsure.  Do you know who provided the document to whom?  Otherwise, I can ask HCPOP to see if they have similar data for SVSP's STRH population.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243
(916) 323-3202

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Cara Trapani [mailto:CTrapani@rbgg.com]
**Sent:** Monday, March 04, 2019 1:03 PM
**To:** Weber, Nicholas@CDCR
**Subject:** RE: Coleman: PIP Roster & 28th Round SVSP Data [IWOV-DMS.FID6429]

Hi Nick,

Following up on the below, can you send the PIP roster and the updated Hub transfer data from the SVSP tour?

Thanks,
Cara

---

**From:** Cara Trapani
**Sent:** Thursday, February 21, 2019 9:14 AM
**To:** Nick Weber <Nicholas.Weber@cdcr.ca.gov>
**Subject:** Coleman: PIP Roster & 28th Round SVSP Data [IWOV-DMS.FID6429]

Hi Nick,

Is it possible for you to send me the current roster of patients in the PIPs, organized by program (i.e., SQ, CIW, SVSP, CMF, CMF L-1, and CHCF)?  We have some of that data, but it is not up to date.

Secondly, during the SVSP tour, there were some revisions to the data provided under Tab F that I don't think we got a copy of.  Specifically, I am thinking of the updated Hub transfer data that SVSP provided after discussions with the special master team.  It was just a few pages showing which EOP patients were in the STRH beyond 30 days during the review period.  If you can send us a copy of that, I'd appreciate it.

Many thanks,

Cara Trapani
<image001.jpg>
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
ctrapani@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.


IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

ATTACHMENT D

CHCF-PIP

| ACU(M) | | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cell | CHCF | B 304A1101001L | | | MHCB | ACUTE | 2/07/19 15 14 00 | 0 | 0 | | 25 | Maximum | III | | | 4/23/2020 |
| | | CHCF | B 304A1108001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Medium (A) | III | | | 10/26/2019 |
| | | CHCF | A 302A1115001L | | | MHCB | ACUTE | 2/13/19 12 25 00 | 0 | 0 | | 19 | Medium (A) | IV | | | 11/06/2051 |
| | | CHCF | B 302B1131001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 1/14/2049 |
| | | CHCF | B 302A1115001L | | | MHCB | ACUTE | 1/28/19 17 05 00 | 0 | 0 | | 35 | Close | IV | | | 12/29/2020 |
| | | CHCF | A 302A1109001L | | | MHCB | ACUTE | 12/16/18 10 22 00 | 0 | 0 | | 78 | Medium (A) | II | | | 1/24/2029 |
| | | CHCF | B 302A1116001L | | | MHCB | ACUTE | 1/29/19 12 42 00 | 0 | 0 | | 34 | Medium (A) | II | | | 2/29/2028 |
| | | CHCF | B 304A1116001L | | | MHCB | ACUTE | 2/26/19 14 26 00 | 0 | 0 | | 6 | Maximum | II | | | 6/27/2019 |
| | | CHCF | A 302A1131001L | | | MHCB | ACUTE | 2/01/19 10 43 00 | 0 | 0 | | 31 | Medium (A) | III | | | 1/03/2021 |
| | | CHCF | B 302B1122001L | | | MHCB | ACUTE | 2/21/19 13 13 00 | 0 | 0 | | 11 | Close | III | | | 7/29/2218 |
| | | CHCF | A 302A1134001L | | | MHCB | ACUTE | 2/25/19 16 20 00 | 0 | 0 | | 7 | Medium (A) | IV | | | 12/26/2033 |
| | | CHCF | B 302A1226001L | | | MHCB | ACUTE | 2/12/19 12 48 00 | 0 | 0 | | 20 | Medium (A) | III | | | 4/05/2020 |
| | | CHCF | B 302A1109001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 2/23/2026 |
| | | CHCF | A 302A1123001L | | | MHCB | ICF | 2/22/19 15 04 00 | 0 | 243 | | 10 | Medium (A) | IV | | | 3/14/2026 |
| | | CHCF | B 308B1110001L | | | MHCB | ACUTE | 2/26/19 10 34 00 | 0 | 0 | | 6 | Medium (A) | IV | | | 11/18/2020 |
| | | CHCF | B 308B1109001L | | | MHCB | ACUTE | 2/01/19 22 15 00 | 0 | 0 | | 31 | Medium (A) | III | | | 3/26/2020 |
| | | CHCF | B 304A1112001L | | | ICF | ACUTE | | 0 | 490 | | 0 | Maximum | III | | | 10/17/2056 |
| | | CHCF | A 302A1122001L | | | ACUTE | EOP | | 0 | 0 | | 0 | Medium (A) | III | | | 9/18/2031 |
| | | CHCF | B 302A1128001L | | | MHCB | ACUTE | 1/14/19 16 10 00 | 0 | 0 | | 49 | Medium (A) | IV | | | 6/15/2033 |
| | | CHCF | B 304A1119001L | | | MHCB | ACUTE | 2/07/19 10 01 00 | 0 | 0 | | 25 | Maximum | IV | | | 8/02/2027 |
| | | CHCF | B 304A1108001L | | | MHCB | ACUTE | 2/07/19 15 02 00 | 0 | 0 | | 25 | Maximum | IV | | | 12/21/2045 |
| | | CHCF | B 302B1113001L | | | MHCB | ACUTE | 11/27/18 15 18 00 | 0 | 0 | | 97 | Medium (A) | I | | | 2/07/2020 |
| | | CHCF | A 302A1135001L | | | MHCB | ACUTE | 1/31/19 12 23 00 | 0 | 0 | | 32 | Close | IV | | | 1/25/2020 |
| | | CHCF | B 301A1115001L | | | MHCB | ACUTE | 2/07/19 16 57 00 | 0 | 0 | | 25 | Unclassified | | | | 8/12/2019 |
| | | CHCF | B 302B1112001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 9/29/2030 |
| | | CHCF | B 302A1126001L | | | MHCB | ACUTE | 1/23/19 16 41 00 | 0 | 0 | | 40 | Medium (A) | IV | | | 3/17/2022 |
| | | CHCF | B 302B1108001L | | | MHCB | ACUTE | 1/10/19 11 13 00 | 0 | 0 | | 53 | Maximum | IV | | | 3/11/2028 |
| | | CHCF | B 302A1119001L | | | MHCB | ACUTE | 1/30/19 13 28 00 | 0 | 0 | | 33 | Close | III | | | 3/11/2061 |
| | | CHCF | B 308B1130001L | | | MHCB | ACUTE | 1/31/19 16 51 00 | 0 | 0 | | 32 | Medium (A) | II | | | 8/29/2019 |
| | | CHCF | B 302A1101001L | | | MHCB | ACUTE | 2/21/19 12 31 00 | 0 | 0 | | 11 | Medium (A) | IV | | | 9/21/2038 |
| | | CHCF | B 308B1132001L | | | MHCB | ACUTE | 2/22/19 12 43 00 | 0 | 0 | | 10 | Close | IV | | | 7/29/2021 |
| | | CHCF | B 308B1113001L | | | ICF | ACUTE | | 27 | 0 | Out to Natividad Medical Center from Jan 21 2019 4 00PM to Jan 22 2019 7 00PM. | 0 | Medium (A) | III | | | 1/25/9999 |
| | | CHCF | B 304A1106001L | | | MHCB | ACUTE | 2/22/19 15 42 00 | 0 | 0 | | 10 | Maximum | IV | | | 2/01/2024 |
| | | CHCF | B 302B1109001L | | | MHCB | ACUTE | 1/25/19 15 54 00 | 0 | 0 | | 38 | Medium (A) | IV | | | 12/02/2020 |
| | | CHCF | B 301A1123001L | | | ICF | ACUTE | 2/07/19 17 37 00 | 0 | 0 | | 25 | Close | IV | | | 5/04/2028 |
| | | CHCF | B 302A1121001L | | | MHCB | ACUTE | 2/28/19 15 50 00 | 0 | 0 | | 4 | Medium (A) | IV | | | 9/03/2023 |
| | | CHCF | B 302A1108001L | | | MHCB | ACUTE | 2/19/19 16 43 00 | 0 | 0 | | 13 | Medium (A) | II | | | 7/12/2025 |
| | | CHCF | B 302B1110001L | | | MHCB | ACUTE | 12/27/18 13 32 00 | 0 | 0 | | 67 | Close | IV | | | 9/19/2024 |
| | | CHCF | B 308B1127001L | | | MHCB | ACUTE | 2/11/19 11 28 00 | 0 | 0 | | 21 | Medium (A) | II | | | 10/30/2019 |
| | | CHCF | B 304A1123001L | | | MHCB | ACUTE | 3/01/19 12 10 00 | 0 | 0 | | 3 | Maximum | IV | | | 5/20/2028 |
| | | CHCF | B 301A1108001L | | | MHCB | ACUTE | 2/12/19 13 33 00 | 0 | 0 | | 20 | Medium (A) | IV | | | 5/04/2020 |
| | | CHCF | A 302A1110001L | | | MHCB | ACUTE | 2/12/19 13 31 00 | 0 | 0 | | 20 | Close | IV | | | 9/30/2028 |
| | | CHCF | A 302A1114001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 9/17/2019 |
| | | CHCF | B 308B1112001L | | | MHCB | ACUTE | 12/27/18 13 22 00 | 0 | 0 | | 67 | Medium (A) | II | | | 2/05/2022 |
| | | CHCF | B 304A1117001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | II | | | 2/18/2029 |
| | | CHCF | B 302B1124001L | | | MHCB | ACUTE | 2/11/19 11 22 00 | 0 | 0 | | 21 | Medium (A) | II | | | 1/19/1988 |
| | | CHCF | B 304A1111001L | | | MHCB | ACUTE | 1/07/19 12 51 00 | 0 | 0 | | 56 | Maximum | IV | | | 4/16/2030 |
| | | CHCF | B 304A1126001L | | | MHCB | ACUTE | 2/15/19 13 44 00 | 0 | 0 | | 17 | Maximum | | | | 6/26/2019 |
| | | CHCF | B 301A1117001L | | | MHCB | ACUTE | 2/15/19 17 46 00 | 0 | 0 | | 17 | Medium (A) | III | | | 1/07/2049 |
| | | CHCF | B 304A1109001L | | | MHCB | ACUTE | 3/01/19 17 18 00 | 0 | 0 | | 3 | Maximum | II | | | 10/22/2021 |
| | | CHCF | B 302B1118001L | | | MHCB | ACUTE | 1/24/19 14 57 00 | 0 | 0 | | 39 | Unclassified | I | | | 5/25/2020 |
| | | CHCF | B 301A1104001L | | | MHCB | ACUTE | 2/21/19 11 49 00 | 0 | 0 | | 11 | Minimum (B) | I | | | 10/30/2021 |
| | | CHCF | B 301A1119001L | | | MHCB | ACUTE | 2/16/19 11 21 00 | 0 | 0 | | 16 | Maximum | IV | | | 7/15/2020 |
| | | CHCF | B 302B1106001L | | | MHCB | ACUTE | 2/15/19 11 20 00 | 0 | 0 | | 17 | Close | IV | | | 9/08/2100 |
| | | CHCF | B 302A1118001L | | | MHCB | ACUTE | 2/14/19 13 08 00 | 0 | 0 | | 18 | Medium (A) | IV | | | 9/16/2020 |
| | | CHCF | B 301A1110001L | | | MHCB | ACUTE | 2/08/19 11 24 00 | 0 | 0 | | 24 | Medium (A) | III | | | 10/24/2028 |
| | | CHCF | A 302A1133001L | | | MHCB | ACUTE | 1/26/19 14 50 00 | 0 | 0 | | 37 | Medium (A) | III | | | 12/18/2033 |
| | | CHCF | B 308B1122001L | | | MHCB | ACUTE | 2/06/19 15 57 00 | 0 | 0 | | 26 | Medium (A) | II | | | 4/19/2021 |
| | | CHCF | B 302B1126001L | | | MHCB | ACUTE | 2/07/19 15 04 00 | 0 | 0 | | 25 | Medium (A) | IV | | | 6/18/2025 |
| | | CHCF | B 302B1129001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Medium (A) | II | | | 8/02/2019 |
| | | CHCF | B 302A1113001L | | | MHCB | ACUTE | 1/31/19 12 19 00 | 0 | 0 | | 32 | Close | III | | | 10/23/2054 |
| | | CHCF | B 302B1105001L | | | MHCB | ACUTE | 2/01/19 12 02 00 | 0 | 0 | | 31 | Medium (A) | III | | | 2/11/2033 |
| | | CHCF | B 301A1114001L | | | MHCB | ACUTE | 1/28/19 13 45 00 | 0 | 0 | | 35 | Medium (A) | I | | | 12/21/2020 |

CHCF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CHCF | B 302A1129001L | | | EOP | ACUTE | | 0 | 0 | | 0 | Medium (A) | II | | | 3/27/2019 |
| | CHCF | B 308B1117001L | | | EOP | ACUTE | 1/04/19 13:41:00 | 0 | 0 | | 59 | Medium (A) | II | | | 3/25/2019 |
| | CHCF | B 302A1125001L | | | MHCB | ACUTE | 2/07/19 13:09:00 | 0 | 0 | | 25 | Medium (A) | II | | | 3/10/2019 |
| | CHCF | A 302A1108001L | | | MHCB | ACUTE | 1/31/19 13:35:00 | 0 | 0 | | 32 | Close | III | | | 2/17/2027 |
| | CHCF | B 302B1120001L | | | MHCB | ACUTE | 1/25/19 16:36:00 | 0 | 0 | | 38 | Medium (A) | III | | | 10/29/2019 |
| | CHCF | B 301A1107001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 1/23/2165 |
| | CHCF | B 304A1110001L | | | MHCB | ACUTE | 2/07/19 10:02:00 | 0 | 0 | | 25 | Maximum | | | | 3/10/2019 |
| | CHCF | B 302A1107001L | | | MHCB | ACUTE | 2/14/19 14:27:00 | 0 | 0 | | 18 | Unclassified | | | | 2/08/2020 |
| | CHCF | A 302A1112001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Minimum (A) | II | | | 9/13/2019 |
| | CHCF | B 302B1121001L | | | ACUTE | ICF | | 0 | 1612 | | 0 | Medium (A) | II | | | 12/07/2022 |
| | CHCF | B 302B1130001L | | | MHCB | ACUTE | 1/02/19 13:48:00 | 0 | 0 | | 61 | Medium (A) | I | | | 7/11/2019 |
| | CHCF | B 304A1126001L | | | MHCB | ACUTE | 3/01/19 12:10:00 | 0 | 0 | | 3 | Maximum | III | | | 10/24/2019 |
| | CHCF | B 302A1120001L | | | MHCB | ACUTE | 2/26/19 11:30:00 | 0 | 0 | | 6 | Medium (A) | I | | | 4/06/2021 |
| | CHCF | B 301A1124001L | | | MHCB | ACUTE | 2/15/19 11:26:00 | 0 | 0 | | 17 | Medium (A) | III | | | 1/06/2027 |
| | CHCF | A 302A1119001L | | | MHCB | ACUTE | 1/24/19 14:59:00 | 0 | 0 | | 39 | Unclassified | II | | | 11/18/2024 |
| | CHCF | B 308B1133001L | | | MHCB | ACUTE | 2/12/19 11:03:00 | 0 | 0 | | 20 | Medium (A) | II | | | 3/18/2021 |
| | CHCF | B 308B1111001L | | | MHCB | ACUTE | 1/10/19 12:36:00 | 0 | 0 | | 53 | Unclassified | II | | | 2/10/2021 |
| | CHCF | A 302A1126001L | | | MHCB | ACUTE | 2/15/19 20:16:00 | 0 | 0 | | 17 | Unclassified | III | | | 8/20/2024 |
| | CHCF | A 302A1121001L | | | MHCB | ACUTE | 2/15/19 17:48:00 | 0 | 0 | | 17 | Medium (A) | IV | | | 12/03/2021 |
| | CHCF | B 308B1108001L | | | MHCB | ACUTE | 1/23/19 15:21:00 | 0 | 0 | | 40 | Unclassified | | | | 12/13/2020 |
| | CHCF | A 302A1124001L | | | MHCB | ACUTE | 2/15/19 17:42:00 | 0 | 0 | | 17 | Unclassified | I | | | 7/13/2021 |
| | CHCF | B 302A1122001L | | | MHCB | ACUTE | 2/21/19 16:30:00 | 0 | 0 | | 11 | Unclassified | | | | 8/30/2019 |
| | CHCF | B 302B1116001L | | | MHCB | ACUTE | 2/14/19 13:07:00 | 0 | 0 | | 18 | Unclassified | | | | 10/31/2020 |
| | CHCF | B 308B1131001L | | | MHCB | ACUTE | 11/27/18 12:51:00 | 0 | 0 | | 97 | Medium (A) | III | | | 8/16/1994 |
| | CHCF | B 308B1106001L | | | MHCB | ACUTE | 2/16/19 11:24:00 | 0 | 0 | | 16 | Close | IV | | | 4/09/20 6 |
| | CHCF | B 304A1115001L | | | MHCB | ACUTE | 1/07/19 16:39:00 | 0 | 0 | | 56 | Maximum | IV | | | 4/08/2025 |
| | CHCF | A 302A1105001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 11/18/2027 |
| | CHCF | B 302B1125001L | | | MHCB | ACUTE | 2/25/19 14:39:00 | 0 | 269 | | 7 | Maximum | IV | | | 12/19/2010 |
| | CHCF | A 302A1125001L | | | MHCB | ACUTE | 2/07/19 15:12:00 | 0 | 0 | | 25 | Medium (A) | IV | | | 12/31/2022 |
| | CHCF | A 302A1111001L | | | MHCB | ACUTE | 2/01/19 10:40:00 | 0 | 166 | | 31 | Medium (A) | III | | | 9/25/2064 |
| | CHCF | B 308B1128001L | | | MHCB | ACUTE | 1/22/19 16:31:00 | 0 | 100 | | 41 | Close | IV | | | 8/27/2035 |
| | CHCF | B 302A1104001L | | | MHCB | ACUTE | 12/28/18 09:40:00 | 4 | 0 | Out to Twin Cities Communit from Dec 20 2018  2:30PM to Dec 20 2018  6:33PM. | 66 | Unclassified | | | | 3/20/2019 |
| | CHCF | B 308B1105001L | | | MHCB | ACUTE | 2/22/19 10:16:00 | 0 | 0 | | 10 | Maximum | IV | | | 12/03/2019 |
| | CHCF | B 302A1102001L | | | MHCB | ACUTE | 2/15/19 13:31:00 | 0 | 0 | | 17 | Close | IV | | | 2/18/20 6 |
| | CHCF | B 301A1116001L | | | MHCB | ACUTE | 2/09/19 12:04:00 | 0 | 0 | | 23 | Close | IV | | | 9/13/2194 |
| | CHCF | B 304A1121001L | | | MHCB | ACUTE | 2/25/19 18:17:00 | 0 | 0 | | 7 | Maximum | IV | | | 12/27/2052 |
| | CHCF | A 302A1128001L | | | MHCB | ACUTE | 2/25/19 16:26:00 | 0 | 0 | | 7 | Medium (A) | IV | | | 3/09/2025 |
| | CHCF | B 302B1127001L | | | MHCB | ACUTE | 2/26/19 11:11:00 | 0 | 0 | | 6 | Medium (A) | IV | | | 12/16/2019 |
| | CHCF | A 302A1116001L | | | MHCB | ACUTE | 1/01/19 14:31:00 | 0 | 0 | | 62 | Medium (A) | IV | | | 3/31/2070 |
| | CHCF | B 301A1115001L | | | MHCB | ACUTE | 2/11/19 11:24:00 | 0 | 98 | | 21 | Medium (A) | IV | | | 8/25/2023 |
| | CHCF | B 308B1110001L | | | MHCB | ACUTE | 2/09/19 16:04:00 | 0 | 0 | | 23 | Medium (A) | II | | | 8/06/2011 |
| | CHCF | B 308B1129001L | | | MHCB | ACUTE | 2/13/19 15:59:00 | 0 | 0 | | 19 | Medium (A) | II | | | 1/25/9999 |
| | CHCF | B 308B1119001L | | | MHCB | ACUTE | 2/07/19 15:11:00 | 0 | 168 | | 25 | Maximum | IV | | | 9/22/2030 |
| | CHCF | B 302B1115001L | | | MHCB | ACUTE | 1/23/19 10:06:00 | 0 | 0 | | 40 | Medium (A) | IV | | | 9/08/2020 |
| | CHCF | B 302B1128001L | | | EOP | ACUTE | 2/01/19 19:03:00 | 0 | 0 | | 31 | Medium (A) | IV | | | 7/11/2009 |
| | CHCF | A 302A1110001L | | | MHCB | ACUTE | 1/18/19 16:40:00 | 0 | 0 | | 45 | Medium (A) | IV | | | 3/22/20 0 |
| | CHCF | B 304A1104001L | | | MHCB | ACUTE | 2/21/19 13:09:00 | 0 | 167 | | 11 | Maximum | IV | | | 3/09/2022 |
| | CHCF | B 308B1105001L | Isolation CC | | | | | | 0 | 0 | | 0 | | | | |
| | CHCF | B 302B1106001L | Isolation CC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304A1128001L | Isolation CC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 308B1106001L | Isolation CP | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | A 302A1133001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301A1127001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304A1128001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1106001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 302A1128001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304A1127001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 308B1105001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 302A1114001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 12/29/2020 |
| | CHCF | B 308B1126001L | | | MHCB | ACUTE | 2/05/19 16:21:00 | 0 | 0 | | 27 | Close | IV | | | 1/07/2035 |
| | CHCF | B 301A1108001L | | | MHCB | ACUTE | 2/11/19 11:27:00 | 0 | 0 | | 21 | Medium (A) | II | | | 11/16/2049 |
| | CHCF | B 308B1123001L | | | MHCB | ACUTE | 2/28/19 14:22:00 | 0 | 0 | | 4 | Medium (A) | IV | | | 12/01/2077 |

CHCF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CHCF | B 302B1123001L | | | MHCB | ACUTE | 1/11/19 11 59 00 | 0 | 0 | | 52 | Medium (A) | IV | | | 3/23/2022 |
| | CHCF | B 304A1114001L | | | MHCB | ACUTE | 2/22/19 16 48 00 | 0 | 0 | | 10 | Maximum | IV | | | 9/19/2034 |
| | CHCF | B 301A1113001L | | | ICF | ACUTE | 2/27/19 12 08 00 | 0 | 0 | | 5 | Close | IV | | | 10/23/2088 |
| | CHCF | B 302A1124001L | | | MHCB | ACUTE | 2/27/19 15 06 00 | 0 | 124 | | 5 | Medium (A) | II | | | 12/14/2021 |
| | CHCF | B 304A1128001L | | | MHCB | ACUTE | 2/03/19 15 13 00 | 0 | 0 | | 29 | Maximum | IV | | | 2/25/2070 |
| | CHCF | A 302A1138001L | | | MHCB | ACUTE | 12/28/18 16 19 00 | 0 | 0 | | 66 | Medium (A) | II | | | 7/29/2030 |
| | CHCF | B 304A1125001L | | | MHCB | ACUTE | 1/14/19 16 11 00 | 0 | 0 | | 49 | Maximum | IV | | | 5/14/2062 |
| | CHCF | B 302A1111001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Close | IV | | | 1/10/2022 |
| | CHCF | A 302A1120001L | | | ICF | ACUTE | | 64 | 339 | Out to San Joaquin General Hospital from Feb 5 2019 12 54PM to Feb 6 2019 5 31PM. Out to San Joaquin General Hospital from Feb 13 2019 3 14PM to Feb 14 2019 5 53PM. Out to UC Davis Medical Cen from Feb 16 2019 3 43PM to Feb 17 2019 3 52PM. | 0 | Medium (A) | IV | | | 10/23/2014 |
| | CHCF | B 304A1118001L | | | MHCB | ACUTE | 2/01/19 12 03 00 | 0 | 0 | | 31 | Maximum | IV | | | 11/07/2034 |
| | CHCF | A 302A1129001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | A 302A1137001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301A1102001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301A1120001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301A1121001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301A1126001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1107001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1110001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1111001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1125001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 302B1107001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 302B1108001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304A1112001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304A1130001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 308B1107001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304A1107001L | | | MHCB | ACUTE | 1/23/19 10 01 00 | 0 | 0 | | 40 | Maximum | IV | | | 9/02/2072 |
| | CHCF | A 302A1126001L | | | MHCB | ACUTE | 2/21/19 13 11 00 | 0 | 0 | | 6 | Close | IV | | | 8/24/2030 |
| | CHCF | B 304A1129001L | | | MHCB | ACUTE | 2/04/19 12 45 00 | 0 | 0 | | 28 | Maximum | IV | | | 11/29/2026 |
| | CHCF | B 308B1111001L | | | ICF | ACUTE | | 0 | 483 | | 0 | Medium (A) | IV | | | 8/08/2024 |
| | CHCF | A 302A1130001L | | | ICF | ACUTE | | 0 | 624 | | 0 | Medium (A) | IV | | | 7/29/2023 |
| | CHCF | B 308B1125001L | | | MHCB | ACUTE | 2/12/19 12 49 00 | 0 | 0 | | 20 | Maximum | III | | | 1/25/9999 |
| | CHCF | B 302A1117001L | | | MHCB | ACUTE | 2/27/19 13 23 00 | 0 | 0 | | 5 | Medium (A) | IV | | | 7/27/2022 |
| | CHCF | B 308B1115001L | | | MHCB | ACUTE | 12/04/18 14 20 00 | 0 | 0 | | 90 | Medium (A) | IV | | | 12/22/2021 |
| | CHCF | A 302A1317001L | | | MHCB | ICF | 2/26/19 16 28 00 | 0 | 0 | | 6 | Medium (A) | II | | | 11/21/2036 |
| | CHCF | B 302A1103001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 7/26/2022 |
| | CHCF | B 308B1114001L | | | MHCB | ACUTE | 1/31/19 09 48 00 | 0 | 0 | | 32 | Medium (A) | II | | | 8/29/2030 |
| | CHCF | B 308B1116001L | | | MHCB | ACUTE | 2/22/19 16 49 00 | 0 | 0 | | 10 | Close | IV | | | 10/29/2039 |
| | CHCF | A 302A1138001L | | | MHCB | ACUTE | 11/29/18 16 35 00 | 0 | 0 | | 95 | Medium (A) | IV | | | 10/13/2046 |
| | CHCF | A 302A1127001L | | | ICF | ACUTE | 2/04/19 13 35 00 | 0 | 0 | | 28 | Close | III | | | 7/28/2028 |
| | CHCF | B 304A1134001L | | | MHCB | ACUTE | 2/26/19 15 34 00 | 0 | 0 | | 6 | Maximum | IV | | | 4/27/2045 |
| | CHCF | B 308B1121001L | | | MHCB | ACUTE | 2/26/19 12 41 00 | 0 | 0 | | 6 | Medium (A) | III | | | 3/12/2055 |
| | CHCF | B 302A1130001L | | | MHCB | ACUTE | 1/14/19 13 28 00 | 0 | 0 | | 49 | Medium (A) | IV | | | 7/01/2035 |
| | CHCF | B 304A1105001L | | | MHCB | ACUTE | 1/15/19 16 31 00 | 0 | 0 | | 48 | Maximum | IV | | | 7/20/2020 |
| | CHCF | B 301A1106001L | | | MHCB | ACUTE | 2/15/19 15 37 00 | 0 | 0 | | 17 | Medium (A) | II | | | 8/26/2020 |
| | CHCF | B 304A1103001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301A1105001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301A1109001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301A1112001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301A1122001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301A1125001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301A1133001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1108001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1109001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1112001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1113001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1114001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1115001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 301B1116001L | vacant | | | | | 0 | 0 | | 0 | | | | | |

CHCF-PIP

| ACU(M) | | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CHCF | B 301B1117001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1121001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1122001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1123001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1124001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1126001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1127001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1128001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1129001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1130001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1131001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1132001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301B1133001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 302A1105001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 302A1106001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 302A1122001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 302B1117001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 302B1119001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 302B1132001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 302B1133001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 304A1102001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 304A1103001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 304A1122001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | A 302A1101001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | A 302A1102001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | A 302A1103001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | A 302A1104001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | A 302A1106001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | A 302A1136001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | A 302A1139001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 301A1101001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 308B1104001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 308B1116001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CHCF | B 308B1120001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| ICF(M) | Cell | CHCF | B 307B1104001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/26/2022 |
| | | CHCF | B 303B1128001L | | | MHCB | ICF | 12/10/18 14:58:00 | 0 | 0 | | 84 | Close | II | | | 10/12/2047 |
| | | CHCF | B 304B1123001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 4/09/2044 |
| | | CHCF | B 307A1120001L | | | MHCB | ICF | 12/17/18 18:38:00 | 0 | 0 | | 77 | Medium (A) | III | | | 4/09/2020 |
| | | CHCF | B 305B1129001L | | | MHCB | ICF | 1/25/19 09:17:00 | 0 | 0 | | 38 | Medium (A) | II | | | 8/15/2023 |
| | | CHCF | B 305A1120001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 7/23/2030 |
| | | CHCF | B 308B1114001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 6/09/2031 |
| | | CHCF | B 303A1128001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 2/13/2021 |
| | | CHCF | B 306B1120001L | | | EOP | ICF | 12/03/18 16:34:00 | 0 | 0 | | 91 | Medium (A) | IV | | | 8/20/2019 |
| | | CHCF | B 306A1119001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | II | | | 12/10/2021 |
| | | CHCF | B 303A1115001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 4/03/2022 |
| | | CHCF | B 307B1121001L | | | ACUTE | ICF | | 6 | 0 | Out to Marin General Hospital from Sep 17 2018 10:02AM to Sep 17 2018 4:57PM | 0 | Medium (A) | IV | | | 10/16/2020 |
| | | CHCF | B 306A1111001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 6/13/2024 |
| | | CHCF | B 308A1108001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 8/12/2021 |
| | | CHCF | B 303A1113001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 10/20/2022 |
| | | CHCF | B 306B1125001L | | | EOP | ICF | 12/11/18 14:34:00 | 0 | 0 | | 83 | Medium (A) | IV | | | 1/14/2038 |
| | | CHCF | B 305A1103001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 4/25/2190 |
| | | CHCF | B 307A1114001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/14/2024 |
| | | CHCF | B 307A1102001L | | | EOP | ICF | 8/10/18 12:09:00 | 0 | 0 | | 206 | Medium (A) | I | | | 3/05/2021 |
| | | CHCF | B 303A1126001L | | | EOPMod | ICF | 10/29/18 14:44:00 | 0 | 0 | | 126 | Medium (A) | IV | | | 12/04/2026 |
| | | CHCF | B 307B1123001L | | | ACUTE | ICF | 12/07/18 19:18:00 | 0 | 0 | | 87 | Close | IV | | | 2/13/2023 |
| | | CHCF | B 307B1125001L | | | EOPMod | ICF | 12/14/18 16:45:00 | 0 | 0 | | 80 | Close | IV | | | 1/25/9999 |
| | | CHCF | B 305A1126001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 11/09/2020 |
| | | CHCF | B 307A1115001L | | | ACUTE | ICF | | 0 | 149 | | 0 | Medium (A) | IV | | | 8/27/2071 |
| | | CHCF | B 303A1102001L | | | MHCB | ICF | 8/27/18 14:30:00 | 0 | 0 | | 189 | Medium (A) | IV | | | 12/27/2025 |
| | | CHCF | B 307B1131001L | | | ACUTE | ICF | | 2 | 0 | Out to Marin General Hospital from Dec 5 2018 5:15PM to Dec 5 2018 7:6PM | 0 | Medium (A) | IV | | | 10/12/2023 |
| | | CHCF | B 308A1124001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/21/2021 |
| | | CHCF | B 307B1106001L | | | MHCB | ICF | 6/17/18 16:01:00 | 0 | 0 | | 260 | Medium (A) | III | | | 1/31/2020 |

CHCF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CHCF | B 305A1108001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 3/09/2043 |
| | CHCF | B 307B1118001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 2/14/2020 |
| | CHCF | B 306A1102001L | | | EOP | ICF | 12/19/18 14 53 00 | 0 | 0 | | 75 | Medium (A) | III | | | 7/06/2024 |
| | CHCF | B 307B1120001L | | | ACUTE | ICF | | 22 | 2726 | Out to San Joaquin General Hospital from Jan 21 2019 7 37PM to Jan 22 2019 5 48PM | 0 | Medium (A) | IV | | | 6/16/2025 |
| | CHCF | B 306B1129001L | | | MHCB | ICF | 10/15/18 15 04 00 | 0 | 0 | | 140 | Close | II | | | 2/19/2023 |
| | CHCF | B 307B1115001L | | | EOPMod | ICF | 2/22/19 15 19 00 | 0 | 0 | | 10 | Medium (A) | I | | | 11/29/2021 |
| | CHCF | B 303B1115001L | | | ICF | EOP | | 0 | 0 | | 0 | Close | II | | | 5/23/2037 |
| | CHCF | B 304B1115001L | | | ACUTE | ICF | 2/15/19 10 35 00 | 1344 | 0 | Out to San Bernardino Count from Dec 20 2018 12 29PM to Feb 14 2019 12 5 PM | 17 | Maximum | IV | | | 6/09/2020 |
| | CHCF | B 303A1122001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 11/09/2021 |
| | CHCF | B 308A1119001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | I | | | 2/02/2020 |
| | CHCF | B 306A1105001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 12/20/2020 |
| | CHCF | B 308A1110001L | | | MHCB | ICF | 12/13/18 09 13 00 | 0 | 0 | | 81 | Medium (A) | II | | | 7/19/2019 |
| | CHCF | B 307A1119001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 5/05/2032 |
| | CHCF | B 306B1116001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 2/04/2029 |
| | CHCF | B 308A1124001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/03/2026 |
| | CHCF | B 304B1121001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 5/10/2020 |
| | CHCF | B 304B1117001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | II | | | 3/13/2028 |
| | CHCF | B 308A1118001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/23/2025 |
| | CHCF | B 307B1116001L | | | EOP | ICF | 8/30/18 16 03 00 | 0 | 0 | | 186 | Medium (A) | II | | | 9/13/2019 |
| | CHCF | B 303A1118001L | | | ACUTE | ICF | | 5 | 1107 | Out to San Joaquin General Hospital from Feb 2 2019 8 05PM to Feb 3 2019 1 45AM. | 0 | Unclassified | III | | | 3/03/2022 |
| | CHCF | B 306A1103001L | | | MHCB | ICF | 12/19/18 16 52 00 | 0 | 124 | | 75 | Medium (A) | III | | | 1/27/2022 |
| | CHCF | B 303B1124001L | | | EOP | ICF | 11/06/18 20 17 00 | 0 | 0 | | 118 | Close | IV | | | 8/14/2026 |
| | CHCF | B 303A1107001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 8/01/2019 |
| | CHCF | B 305A1114001L | | | ACUTE | ICF | | 0 | 772 | | 0 | Close | IV | | | 11/28/2023 |
| | CHCF | B 307A1124001L | | | ACUTE | ICF | 11/19/18 15 24 00 | 0 | 0 | | 105 | Medium (A) | IV | | | 10/20/2025 |
| | CHCF | B 303B1116001L | | | MHCB | ICF | 2/19/19 11 45 00 | 0 | 0 | | 13 | Medium (A) | III | | | 3/01/2021 |
| | CHCF | B 307A1112001L | | | MHCB | ICF | 12/06/18 18 00 00 | 0 | 0 | | 88 | Medium (A) | II | | | 3/27/2022 |
| | CHCF | B 305A1108001L | | | ACUTE | ICF | | 126 | 0 | Out to San Joaquin General Hospital from Jan 23 2019 2 06PM to Jan 28 2019 8 31PM | 0 | Medium (A) | IV | | | 10/21/2026 |
| | CHCF | B 306A1104001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 2/26/2038 |
| | CHCF | B 307B1129001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 10/10/2020 |
| | CHCF | B 307A1125001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | II | | | 3/21/20 6 |
| | CHCF | B 306A1118001L | | | EOP | ICF | 12/18/18 13 12 00 | 0 | 0 | | 76 | Unclassified | | | | 7/04/2019 |
| | CHCF | B 306B1131001L | | | MHCB | ICF | 12/19/18 10 54 00 | 0 | 0 | | 75 | Medium (A) | III | | | 10/17/2037 |
| | CHCF | B 306B1122001L | | | MHCB | ICF | 7/25/18 16 03 00 | 0 | 0 | | 222 | Medium (A) | III | | | 8/03/2023 |
| | CHCF | B 304B1119001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | I | | | 2/13/2020 |
| | CHCF | B 303B1112001L | | | EOP | ICF | 1/11/19 11 50 00 | 0 | 0 | | 52 | Medium (A) | III | | | 10/13/2024 |
| | CHCF | B 305A1101001L | | | EOP | ICF | 10/11/18 12 05 00 | 0 | 0 | | 144 | Medium (A) | II | | | 3/29/2019 |
| | CHCF | B 306A1128001L | | | ACUTE | ICF | | 281 | 1035 | Out to San Joaquin General Hospital from Dec 31 2018 11 15AM to Jan 11 2019 8 09PM. Out to San Joaquin General Hospital from Feb 9 2019 4 07AM to Feb 9 2019 2 20PM | 0 | Medium (A) | IV | | | 8/24/2020 |
| | CHCF | B 303B1119001L | | | EOP | ICF | 11/05/18 14 51 00 | 0 | 0 | | 119 | Medium (A) | III | | | 10/19/2020 |
| | CHCF | B 308A1110001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 4/13/2019 |
| | CHCF | B 303B1120001L | | | MHCB | ICF | 10/16/18 16 14 00 | 0 | 0 | | 139 | Medium (A) | IV | | | 10/04/2020 |
| | CHCF | B 305A1122001L | | | ACUTE | ICF | | 0 | 3199 | | 0 | Close | | | | 5/01/2020 |
| | CHCF | B 303A1111001L | | | EOPMod | ICF | 7/12/18 13 22 00 | 0 | 0 | | 235 | Close | IV | | | 4/25/2020 |
| | CHCF | B 306A1109001L | | | EOP | ICF | 6/04/18 13 44 00 | 0 | 0 | | 273 | Medium (A) | II | | | 3/31/2019 |
| | CHCF | B 303B1108001L | | | ACUTE | ICF | | 8 | 1980 | Out to San Joaquin General Hospital from Feb 12 2019 3 17PM to Feb 12 2019 11 26PM. | 0 | Maximum | IV | | | 5/06/2024 |
| | CHCF | B 307A1122001L | | | MHCB | ICF | 11/26/18 11 31 00 | 0 | 0 | | 98 | Medium (A) | II | | | 8/03/2023 |
| | CHCF | B 307B1108001L | | | EOP | ICF | 2/07/19 15 19 00 | 0 | 0 | | 25 | Medium (A) | II | | | 10/23/2022 |
| | CHCF | B 304B1104001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 5/18/2019 |
| | CHCF | B 305B1133001L | | | ACUTE | ICF | | 0 | 2335 | | 0 | Maximum | | | | 6/20/2019 |

CHCF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CHCF | B 305B1132001L | | | MHCB | ICF | 12/07/18 16:28:00 | 0 | 0 | | 87 | Medium (A) | I | | | 3/13/2024 |
| | CHCF | B 306A1124001L | | | EOP | ICF | 9/10/18 16:23:00 | 0 | 0 | | 175 | Medium (A) | IV | | | 12/14/2028 |
| | CHCF | B 305B1118001L | | | EOPMod | ICF | 9/12/18 13:49:00 | 0 | 0 | | 173 | Medium (A) | IV | | | 12/23/2031 |
| | CHCF | B 305A1106001L | | | EOP | ICF | | 0 | 0 | | 0 | Close | III | | | 1/06/2034 |
| | CHCF | B 305B1126001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 11/01/2021 |
| | CHCF | B 304B1108001L | | | EOP | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 10/04/2025 |
| | CHCF | B 306B1111001L | | | MHCB | ICF | 5/05/16 19:00:00 | 0 | 0 | | 1033 | Medium (A) | II | | | 2/10/2027 |
| | CHCF | B 303A1120001L | | | ACUTE | ICF | | 4 | 0 | Out to Modesto Eye Surgery Center from Feb 25 2019 1:21PM to Feb 25 2019 5:57PM. | 0 | Medium (A) | III | | | 4/12/2022 |
| | CHCF | B 304B1132001L | | | ACUTE | ICF | | 0 | 1950 | | 0 | Maximum | IV | | | 10/09/2058 |
| | CHCF | B 306B1110001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 2/04/2022 |
| | CHCF | B 304B1118001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | III | | | 3/15/2019 |
| | CHCF | B 305B1115001L | | | EOP | ICF | 10/18/18 16:52:00 | 0 | 0 | | 137 | Medium (A) | III | | | 8/17/2019 |
| | CHCF | B 308A1126001L | | | MHCB | ICF | 7/23/18 15:39:00 | 0 | 0 | | 224 | Medium (A) | IV | | | 10/12/1983 |
| | CHCF | B 304B1113001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 6/24/2019 |
| | CHCF | B 308A1112001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 1/04/2034 |
| | CHCF | B 307A1111001L | | | EOP | ICF | 1/07/19 16:25:00 | 0 | 340 | | 56 | Medium (A) | III | | | 4/30/2020 |
| | CHCF | B 303B1110001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/23/2020 |
| | CHCF | B 304B1131001L | | | ACUTE | ICF | | 82 | 0 | Out to San Joaquin General Hospital from Aug 8 2018 9:53AM to Aug 11 2018 7:12PM. | 0 | Maximum | III | | | 9/14/2019 |
| | CHCF | B 307A1121001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 10/12/2020 |
| | CHCF | B 308A1128001L | | | ACUTE | ICF | | 0 | 2790 | | 0 | Close | IV | | | 3/29/2022 |
| | CHCF | B 307B1126001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 1/14/2023 |
| | CHCF | B 307A1109001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/30/2021 |
| | CHCF | B 305A1102001L | | | ACUTE | ICF | 11/02/18 14:11:00 | 528 | 37 | Out to San Bernardino Count from Oct 10 2018 11:49AM to Nov 1 2018 11:11AM. | 122 | Medium (A) | IV | | | 12/29/2019 |
| | CHCF | B 306B1127001L | | | EOP | ICF | 12/21/18 16:51:00 | 0 | 0 | | 73 | Medium (A) | II | | | 12/25/2019 |
| | CHCF | B 307A1108001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 12/02/2019 |
| | CHCF | B 307B1119001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 2/03/2021 |
| | CHCF | B 305A1111001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 7/04/2021 |
| | CHCF | B 304A1118001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 10/01/2043 |
| | CHCF | B 308A1125001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | I | | | 11/28/2020 |
| | CHCF | B 303B1114001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 4/30/2020 |
| | CHCF | B 305A1115001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | III | | | 12/06/2024 |
| | CHCF | B 306A1110001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 7/15/2029 |
| | CHCF | B 305B1117001L | | | EOP | ICF | 12/18/18 12:13:00 | 0 | 0 | | 76 | Medium (A) | II | | | 6/30/2024 |
| | CHCF | B 306A1116001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 12/16/2021 |
| | CHCF | B 307B1114001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 2/20/2020 |
| | CHCF | B 308B1121001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 3/24/2022 |
| | CHCF | B 307A1103001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 4/25/2034 |
| | CHCF | B 305A1125001L | | | EOP | ICF | 12/05/18 15:51:00 | 0 | 0 | | 89 | Close | IV | | | 9/09/2056 |
| | CHCF | B 304A1109001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 11/04/2025 |
| | CHCF | B 307A1108001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 4/11/2019 |
| | CHCF | B 308B1114001L | | | MHCB | ICF | 1/22/19 12:13:00 | 0 | 0 | | 41 | Medium (A) | I | | | 4/13/2019 |
| | CHCF | B 307A1133001L | | | EOP | ICF | 12/21/18 13:42:00 | 0 | 0 | | 73 | Medium (A) | III | | | 6/25/2030 |
| | CHCF | B 306B1133001L | | | MHCB | ICF | 12/27/18 13:33:00 | 0 | 0 | | 67 | Medium (A) | III | | | 2/20/2032 |
| | CHCF | B 306A1115001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 9/20/2019 |
| | CHCF | B 305B1108001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 1/25/9999 |
| | CHCF | B 306A1121001L | | | MHCB | ICF | 12/05/18 16:26:00 | 0 | 0 | | 89 | Medium (A) | II | | | 8/29/2020 |
| | CHCF | B 307A1126001L | | | ACUTE | ICF | | 0 | 111 | | 0 | Unclassified | II | | | 4/06/2020 |
| | CHCF | B 304A1124001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Unclassified | III | | | 8/30/2033 |
| | CHCF | B 308A1123001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 4/16/2019 |
| | CHCF | B 308A1106001L | | | EOP | ICF | 12/17/18 13:20:00 | 0 | 0 | | 77 | Medium (A) | IV | | | 4/28/2022 |
| | CHCF | B 305A1121001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 4/08/2021 |
| | CHCF | B 308A1120001L | | | MHCB | ICF | 12/10/18 12:44:00 | 0 | 0 | | 84 | Medium (A) | III | | | 4/11/2026 |
| | CHCF | B 308B1106001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 11/16/2036 |
| | CHCF | B 303B1125001L | | | EOP | ICF | 2/17/19 15:27:00 | 0 | 0 | | 15 | Medium (A) | I | | | 9/27/2020 |
| | CHCF | B 305B1124001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 6/19/2019 |
| | CHCF | B 305B1127001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 8/12/2019 |
| | CHCF | B 305B1124001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | III | | | 1/16/2044 |
| | CHCF | B 303B1132001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Unclassified | | | | 1/25/9999 |

CHCF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CHCF | B 305A1107001L | | | MHCB | ICF | 7/18/18 15 02 00 | 0 | 0 | | 229 | Unclassified | | | | 12/22/2026 |
| | CHCF | B 306A1122001L | | | EOP | ICF | 10/01/18 12 13 00 | 0 | 0 | | 154 | Medium (A) | I | | | 5/04/2019 |
| | CHCF | B 305B1111001L | | | MHCB | ICF | 2/05/19 16 41 00 | 0 | 0 | | 27 | Medium (A) | I | | | 8/07/2021 |
| | CHCF | B 303B1109001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Unclassified | | | | 5/06/2024 |
| | CHCF | B 303A1124001L | | | MHCB | ICF | 12/03/18 18 36 00 | 0 | 0 | | 91 | Medium (A) | III | | | 12/31/2020 |
| | CHCF | B 303A1106001L | | | ICF | EOP | | 0 | 0 | | 0 | Unclassified | II | | | 9/02/2020 |
| | CHCF | B 306A1129001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Unclassified | II | | | 4/23/2019 |
| | CHCF | B 303B1133001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | II | | | 1/10/2022 |
| | CHCF | B 303B1126001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 6/14/2023 |
| | CHCF | B 303A1114001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Unclassified | III | | | 2/07/2021 |
| | CHCF | B 307B1112001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Unclassified | | | | 7/20/2019 |
| | CHCF | B 305B1120001L | | | MHCB | ICF | 1/07/19 17 45 00 | 0 | 0 | | 56 | Close | IV | | | 1/25/9999 |
| | CHCF | B 306B1123001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/23/2024 |
| | CHCF | B 303A1103001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Unclassified | IV | | | 3/15/2019 |
| | CHCF | B 304B1112001L | | | EOP | ICF | 1/11/19 10 22 00 | 0 | 0 | | 52 | Close | IV | | | 6/30/1985 |
| | CHCF | B 307B1170001L | | | EOPMod | ICF | 11/06/18 12 58 00 | 0 | 0 | | 118 | Medium (A) | IV | | | 5/07/1988 |
| | CHCF | B 307A1101001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/02/1991 |
| | CHCF | B 308B1132001L | | | EOP | ICF | 11/06/18 12 58 00 | 0 | 0 | | 118 | Close | IV | | | 1/02/2079 |
| | CHCF | B 306B1130001L | | | MHCB | ICF | 11/28/18 14 21 00 | 0 | 0 | | 96 | Medium (A) | II | | | 5/10/1995 |
| | CHCF | B 307B1132001L | | | ACUTE | ICF | | 14 | 1998 | Out to San Joaquin General Hospital from Dec 23 2018  6 23PM to Dec 23 2018 11 56PM. Out to San Joaquin General Hospital from Feb 15 2019 12 49AM to Feb 15 2019 | 0 | Medium (A) | IV | | | 8/20/2023 |
| | CHCF | B 306B1126001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Unclassified | IV | | | 1/08/2020 |
| | CHCF | B 308A1114001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/19/1998 |
| | CHCF | B 306A1104001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 8/19/2066 |
| | CHCF | B 306B1129001L | | | MHCB | ICF | 12/20/18 14 09 00 | 8 | 0 | Out to Adventist Health Bakersfield from Dec 19 2018  4 30PM to Dec 20 2018 12 05AM. | 74 | Maximum | IV | | | 4/03/2005 |
| | CHCF | B 303B1117001L | | | ACUTE | ICF | | 80 | 0 | Out to San Joaquin General Hospital from Feb 8 2019 11 24AM to Feb 11 2019  7 53PM. | 0 | Medium (A) | IV | | | 7/07/1997 |
| | CHCF | B 304A1113000L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 9/17/1997 |
| | CHCF | B 306B1128001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 9/10/2032 |
| | CHCF | B 306A1103001L | | | EOP | ICF | 12/13/18 17 02 00 | 0 | 0 | | 81 | Medium (A) | IV | | | 10/09/2063 |
| | CHCF | B 306B1115001L | | | EOP | ICF | 3/01/19 10 23 00 | 0 | 0 | | 3 | Medium (A) | IV | | | 5/27/1999 |
| | CHCF | B 303B1127001L | | | MHCB | ICF | 12/06/18 11 59 00 | 0 | 0 | | 88 | Medium (A) | II | | | 11/10/1998 |
| | CHCF | B 306A1101001L | | | ACUTE | ICF | | 244 | 0 | Out to San Joaquin General Hospital from Apr 7 2018  4 32PM to Apr 12 2018  7 54PM. Out to San Joaquin General Hospital from Jul 26 2018  8 30PM to Jul 31 2018  9 06PM. | 0 | Medium (A) | III | | | 4/04/2021 |
| | CHCF | B 308A1111001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 3/09/2022 |
| | CHCF | B 308B1108001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 10/27/2020 |
| | CHCF | B 308A1113001L | | | EOP | ICF | 12/07/18 16 54 00 | 0 | 0 | | 87 | Medium (A) | IV | | | 4/07/2020 |
| | CHCF | B 305B1110001L | | | MHCB | ICF | 9/26/18 09 49 00 | 0 | 0 | | 159 | Medium (A) | III | | | 12/12/2028 |
| | CHCF | B 306B1106001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/26/2030 |
| | CHCF | B 303A1112001L | | | EOP | ICF | 1/16/19 14 36 00 | 0 | 0 | | 47 | Close | III | | | 9/12/2019 |
| | CHCF | B 305A1126001L | | | MHCB | ICF | 12/10/18 14 56 00 | 0 | 0 | | 84 | Medium (A) | IV | | | 3/12/2032 |
| | CHCF | B 303B1105001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 7/04/2022 |
| | CHCF | B 304B1111001L | | | MHCB | ICF | 8/13/18 10 14 00 | 0 | 0 | | 203 | Maximum | IV | | | 6/18/2055 |
| | CHCF | B 307B1105001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 3/11/2047 |
| | CHCF | B 304B1125001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 12/15/2024 |
| | CHCF | B 306A1126001L | | | EOP | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 8/18/2019 |
| | CHCF | B 303A1129001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 3/16/20 6 |
| | CHCF | B 304A1114001L | | | ACUTE | ICF | | 0 | 322 | | 0 | Medium (A) | II | | | 12/20/2119 |
| | CHCF | B 306A1113001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 10/26/2060 |
| | CHCF | B 308A1105001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/03/2023 |

CHCF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CHCF | B 303A1117001L | | | ACUTE | ICF | | 6 | 0 | Out to San Joaquin General Hospital from Jan 19 2019 3:26PM to Jan 19 2019 9:33PM. | 0 | Medium (A) | IV | | | 9/08/2023 |
| | CHCF | B 303A1110001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 12/24/2019 |
| | CHCF | B 305A1130001L | | | MHCB | ICF | 12/19/18 11:10:00 | 0 | 0 | | 75 | Medium (A) | IV | | | 1/26/2034 |
| | CHCF | B 308A1102001L | | | EOPMod | ICF | 4/17/18 16:05:00 | 0 | 0 | | 321 | Close | IV | | | 7/07/2047 |
| | CHCF | B 305B1109001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/10/2030 |
| | CHCF | B 308A1133001L | | | EOP | ICF | 11/07/18 11:34:00 | 0 | 0 | | 117 | Medium (A) | II | | | 8/14/2061 |
| | CHCF | B 306A1115001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 2/08/2052 |
| | CHCF | B 308A1117001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 1/16/2022 |
| | CHCF | B 304B1123001L | | | ACUTE | ICF | | 0 | 1236 | | 0 | Medium (A) | IV | | | 5/28/2025 |
| | CHCF | B 303A1105001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 1/15/2053 |
| | CHCF | B 305B1104001L | | | EOP | ICF | | 0 | 0 | | 0 | Close | IV | | | 1/25/9999 |
| | CHCF | B 304B1112001L | | | ACUTE | ICF | | 381 | 0 | Out to Riverside County Sheriff from Jan 30 2019 11:33AM to Feb 15 2019 8:32AM. | 0 | Maximum | IV | | | 9/06/2048 |
| | CHCF | B 305B1125001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 11/19/2029 |
| | CHCF | B 306A1107001L | | | EOP | ICF | 11/15/18 16:13:00 | 0 | 0 | | 109 | Medium (A) | II | | | 11/25/2029 |
| | CHCF | B 306A1120001L | | | ACUTE | ICF | | 0 | 3606 | | 0 | Close | III | | | 1/25/9999 |
| | CHCF | B 307B1111001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 5/09/2007 |
| | CHCF | B 304B1106001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 6/03/2006 |
| | CHCF | B 307B1127001L | | | ACUTE | ICF | | 8 | 0 | Out to San Joaquin General Hospital from Dec 25 2018 5:15AM to Dec 25 2018 1:38PM. | 0 | Medium (A) | IV | | | 1/25/9999 |
| | CHCF | B 308A1122001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/19/2031 |
| | CHCF | B 304B1133001L | | | ACUTE | ICF | | 35 | 0 | Out to San Joaquin General Hospital from Feb 3 2019 9:42AM to Feb 4 2019 8:40PM. | 0 | Maximum | III | | | 8/23/2010 |
| | CHCF | B 305B1123001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 7/27/2029 |
| | CHCF | B 305B1124001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 1/20/20  0 |
| | CHCF | B 304B1116001L | | | EOPMod | ICF | 3/01/19 12:38:00 | 0 | 0 | | 3 | Maximum | IV | | | 6/08/2008 |
| | CHCF | B 305A1128001L | Isolation CC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 303B1106001L | Isolation CC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304B1106001L | Isolation CC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305A1128001L | Isolation CC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305B1106001L | Isolation CC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306A1106001L | Isolation CC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306B1106001L | Isolation CC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307A1128001L | Isolation CC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307B1106001L | Isolation CC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 308A1128001L | Isolation CP | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 303A1127001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 303B1105001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304B1105001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305A1127001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305B1105001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306A1127001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306B1105001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307A1127001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307B1105001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 308A1127001L | Isolation NC | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306A1113001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/21/2029 |
| | CHCF | B 303B1104001L | | | EOPMod | ICF | 8/29/18 10:21:00 | 0 | 0 | | 187 | Medium (A) | IV | | | 3/03/2018 |
| | CHCF | B 307B1110001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 1/25/9999 |
| | CHCF | B 308B1122001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 1/02/2023 |
| | CHCF | B 307A1113001L | | | ACUTE | ICF | | 0 | 3006 | | 0 | Close | IV | | | 1/29/2080 |
| | CHCF | B 305A1128001L | | | EOPMod | ICF | 2/20/19 11:30:00 | 0 | 0 | | 12 | Medium (A) | IV | | | 1/13/2032 |
| | CHCF | B 305A1112001L | | | EOP | ICF | 6/11/18 16:26:00 | 0 | 485 | | 266 | Medium (A) | IV | | | 11/19/2019 |
| | CHCF | B 305A1123001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/02/2007 |
| | CHCF | B 308B1133001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 1/23/2020 |
| | CHCF | B 305B1131001L | | | ACUTE | ICF | | 0 | 1950 | | 0 | Medium (A) | IV | | | 10/02/2030 |
| | CHCF | B 306B1117001L | | | EOP | ICF | 12/19/18 15:28:00 | 0 | 0 | | 75 | Medium (A) | III | | | 1/17/2036 |

CHCF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CHCF | B 303B1118001L | | | EOP | ICF | | 8 | 0 | Out to San Joaquin General Hospital from Jan 28 2019 10 41AM to Jan 28 2019 2 25PM. Out to San Joaquin General Hospital from Feb 13 2019 10 58PM to Feb 14 2019 | 0 | Medium (A) | III | | | 6/04/2028 |
| | CHCF | B 304B1124001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 3/06/2025 |
| | CHCF | B 306B1118001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 3/24/2019 |
| | CHCF | B 303A1104001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 9/27/20  0 |
| | CHCF | B 307A1110001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 3/10/2019 |
| | CHCF | B 305A1128001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 9/27/2020 |
| | CHCF | B 306A1106001L | | | MHCB | ICF | 11/06/18 18 10 00 | 0 | 151 | | 118 | Close | IV | | | 7/08/2031 |
| | CHCF | B 306B1109001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/28/2022 |
| | CHCF | B 303A1109001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 303A1116001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 303B1107001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304B1107001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304B1110001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304B1119001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304B1122001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305B1107001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305B1113001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305B1126001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306B1107001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306B1112001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307B1107001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306B1119001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/17/2031 |
| | CHCF | B 305B1119001L | | | ACUTE | ICF | | 0 | 2151 | | 0 | Close | I | | | 6/25/2019 |
| | CHCF | B 305B1130001L | | | EOPMod | ICF | 11/19/18 13 29 00 | 0 | 0 | | 105 | Medium (A) | IV | | | 5/12/2033 |
| | CHCF | B 307B1122001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 8/23/2030 |
| | CHCF | B 307B1129001L | | | EOP | ICF | | 0 | 0 | | 0 | Close | IV | | | 1/22/2051 |
| | CHCF | B 308A1129001L | | | MHCB | ICF | 11/09/18 17 38 00 | 0 | 0 | | 115 | Medium (A) | III | | | 8/01/2020 |
| | CHCF | B 303B1111001L | | | ICF | MHCB | 2/22/19 14 36 00 | 2 | 0 | Out to Kings County Sheriff from Feb 21 2019 8 12AM to Feb 22 2019 10 49AM | 10 | Medium (A) | IV | | | 7/26/2072 |
| | CHCF | B 305A1125001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 1/25/9999 |
| | CHCF | B 304B1128001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 12/31/2034 |
| | CHCF | B 307B1130001L | | | EOPMod | ICF | 8/20/18 12 08 00 | 0 | 0 | | 196 | Medium (A) | IV | | | 12/21/2025 |
| | CHCF | B 305B1105001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 3/12/2058 |
| | CHCF | B 306B1113001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 10/05/2055 |
| | CHCF | B 306A1108001L | | | EOP | ICF | 12/19/18 17 00 00 | 0 | 0 | | 75 | Medium (A) | IV | | | 11/08/2022 |
| | CHCF | B 305A1110001L | | | MHCB | ICF | 9/25/18 12 00 00 | 0 | 0 | | 160 | Close | IV | | | 8/05/2030 |
| | CHCF | B 304B1126001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 9/19/2030 |
| | CHCF | B 307B1113001L | | | EOP | ICF | 11/07/18 13 33 00 | 0 | 0 | | 117 | Close | II | | | 3/30/2032 |
| | CHCF | B 303A1119001L | | | EOP | ICF | 11/27/18 13 32 00 | 0 | 265 | | 97 | Medium (A) | III | | | 12/21/2044 |
| | CHCF | B 307B1124001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 3/03/2023 |
| | CHCF | B 305A1117001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/23/2043 |
| | CHCF | B 307A1105001L | | | ACUTE | ICF | | 19 | 250 | Out to San Joaquin General Hospital from Nov 22 2018 10 58PM to Nov 23 2018  3 38AM. Out to San Joaquin General Hospital from Nov 26 2018  7 13PM to Nov 27 2018  1 11AM. Out to San Joaquin General Hospital from Nov 27 2018 10 43PM to Nov 28 2018 | 0 | Medium (A) | IV | | | 4/23/2023 |
| | CHCF | B 303B1130001L | | | ACUTE | ICF | | 0 | 2679 | | 0 | Medium (A) | IV | | | 12/21/2022 |
| | CHCF | B 306A1112001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 12/06/2030 |
| | CHCF | B 306A1109001L | | | EOPMod | ICF | 12/07/18 14 50 00 | 0 | 0 | | 87 | Medium (A) | II | | | 10/01/2023 |
| | CHCF | B 303A1101001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 303A1103001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 303B1112001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304B1109001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304B1120001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 304B1133001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305A1104001L | vacant | | | | | 0 | 0 | | 0 | | | | | |

CHCF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CHCF | B 305A1105001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305A1119001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305A1129001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305B1116001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305B1122001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 305B1128001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306A1117001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306A1125001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306A1130001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 306B1104001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307A1104001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307A1106001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307A1107001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307A1116001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307A1117001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307A1118001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307A1129001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307B1109001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307B1128001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307B1133001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 308A1107001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 308A1114001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 308A1121001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CHCF | B 307A1123001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/28/2019 |

CMF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cell | CMF | A S 1105001L | | | MHCB | ACUTE | 12/22/18 19 35 00 | 0 | 58 | | 72 | Maximum | IV | | | 2/13/2023 |
| | CMF | A S 2227001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Medium (A) | IV | | | 10/03/2051 |
| | CMF | A S 1106001L | | | MHCB | ACUTE | 3/01/19 17 33 00 | 0 | 0 | | 3 | Medium (A) | IV | | | 7/04/2021 |
| | CMF | A S 1128001L | | | MHCB | ACUTE | 1/24/19 22 51 00 | 0 | 229 | | 39 | Maximum | III | | | 4/17/2020 |
| | CMF | A S 1126001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 3/24/2091 |
| | CMF | A P 1123001L | | | MHCB | ACUTE | 3/01/19 17 31 00 | 0 | 0 | | 3 | Close | IV | | | 2/14/2031 |
| | CMF | A Q 2222001L | | | MHCB | ACUTE | 1/07/19 10 16 00 | 0 | 0 | | 56 | Medium (A) | III | | | 7/16/2021 |
| | CMF | A S 1112001L | | | ICF | ACUTE | 2/21/19 15 27 00 | 0 | 0 | | 11 | Maximum | IV | | | 6/29/2020 |
| | CMF | A P 1119001L | | | MHCB | ACUTE | 2/11/19 12 46 00 | 0 | 0 | | 21 | Medium (A) | III | | | 3/17/2019 |
| | CMF | A S 2202001L | | | MHCB | ACUTE | 1/18/19 12 37 00 | 0 | 0 | | 45 | Medium (A) | III | | | 1/12/2023 |
| | CMF | A P 1101001L | | | MHCB | ACUTE | 1/17/19 11 27 00 | 0 | 0 | | 46 | Medium (A) | II | | | 1/25/9999 |
| | CMF | A S 1107001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 7/02/2019 |
| | CMF | A S 1108001L | | | MHCB | ACUTE | 3/01/19 11 06 00 | 0 | 0 | | 3 | Close | IV | | | 3/28/2044 |
| | CMF | A S 1121001L | | | MHCB | ACUTE | 2/22/19 13 32 00 | 0 | 0 | | 10 | Medium (A) | III | | | 9/30/2088 |
| | CMF | A Q 2203001L | | | ICF | ACUTE | 1/28/19 17 51 00 | 0 | 0 | | 35 | Medium (A) | II | | | 1/12/2025 |
| | CMF | A S 2203001L | | | MHCB | ACUTE | 2/28/19 17 59 00 | 0 | 0 | | 4 | Medium (A) | III | | | 4/15/2039 |
| | CMF | A Q 2213001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Close | IV | | | 8/26/2093 |
| | CMF | A Q 2221001L | | | MHCB | ACUTE | 1/14/19 11 10 00 | 0 | 0 | | 49 | Maximum | III | | | 11/25/2031 |
| | CMF | A Q 2212001L | | | MHCB | ACUTE | 11/09/18 11 34 00 | 0 | 0 | | 115 | Medium (A) | III | | | 5/24/2020 |
| | CMF | A S 1115001L | | | ACUTE | EOP | | 0 | 0 | | 0 | Close | IV | | | 7/15/2033 |
| | CMF | A S 1127001L | | | EOP | ACUTE | 2/13/19 15 18 00 | 0 | 0 | | 19 | Minimum (A) | I | | | 10/06/2019 |
| | CMF | A S 2208001L | | | MHCB | ACUTE | 2/22/19 13 12 00 | 0 | 0 | | 10 | Close | IV | | | 6/01/2043 |
| | CMF | A S 1122001L | | | EOP | ACUTE | 2/28/19 16 17 00 | 0 | 0 | | 4 | Medium (A) | II | | | 5/11/2019 |
| | CMF | A Q 2208001L | | | MHCB | ACUTE | 2/28/19 11 10 00 | 0 | 0 | | 4 | Medium (A) | III | | | 2/10/2020 |
| | CMF | A P 1125001L | | | MHCB | ACUTE | 1/28/19 11 28 00 | 0 | 0 | | 35 | Close | IV | | | 3/27/2117 |
| | CMF | A S 2222001L | | | MHCB | ACUTE | 2/28/19 12 02 00 | 0 | 0 | | 4 | Medium (A) | IV | | | 8/19/2023 |
| | CMF | A Q 2229001L | | | MHCB | ACUTE | 1/29/19 17 49 00 | 0 | 0 | | 34 | Maximum | IV | | | 3/16/2020 |
| | CMF | A S 1102001L | | | MHCB | ACUTE | 2/05/19 09 32 00 | 0 | 0 | | 27 | Medium (A) | II | | | 10/06/2022 |
| | CMF | A S 2230001L | | | EOP | ACUTE | 3/01/19 11 52 00 | 0 | 0 | | 3 | Medium (A) | II | | | 7/08/2020 |
| | CMF | A Q 2224001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 4/04/2023 |
| | CMF | A S 1114001L | | | MHCB | ACUTE | 12/15/18 15 52 00 | 0 | 0 | | 79 | Medium (A) | II | | | 3/14/2019 |
| | CMF | A P 1120001L | | | EOP | ACUTE | 11/15/18 16 25 00 | 0 | 103 | | 109 | Medium (A) | II | | | 3/19/2019 |
| | CMF | A Q 2207001L | | | ICF | ACUTE | 2/22/19 17 12 00 | 0 | 0 | | 10 | Close | II | | | 11/26/2020 |
| | CMF | A S 1113001L | | | EOP | ACUTE | | 0 | 0 | | 0 | Close | III | | | 6/14/2068 |
| | CMF | A Q 2226001L | | | MHCB | ACUTE | 2/25/19 18 35 00 | 0 | 0 | | 7 | Medium (A) | IV | | | 1/18/2029 |
| | CMF | A Q 3322001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Maximum | IV | | | 6/11/2063 |
| | CMF | A P 1108001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/30/2019 |
| | CMF | A P 1127001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Minimum (A) | II | | | 10/22/2021 |
| | CMF | A S 2224001L | | | MHCB | ACUTE | 2/08/19 14 47 00 | 0 | 0 | | 24 | Close | II | | | 11/30/2019 |
| | CMF | A S 2228001L | | | MHCB | ACUTE | 1/23/19 15 01 00 | 0 | 0 | | 40 | Medium (A) | II | | | 12/07/2019 |
| | CMF | A P 1126001L | | | MHCB | ACUTE | 2/12/19 16 23 00 | 0 | 0 | | 20 | Medium (A) | II | | | 12/09/2019 |
| | CMF | A S 2205001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Close | III | | | 9/21/2020 |
| | CMF | A Q 2209001L | | | MHCB | ACUTE | 2/28/19 10 06 00 | 0 | 0 | | 4 | Medium (A) | II | | | 4/29/2019 |
| | CMF | A S 2207001L | | | MHCB | ACUTE | 1/28/19 16 11 00 | 0 | 0 | | 35 | Minimum (A) | I | | | 4/22/2019 |
| | CMF | A S 1103001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Close | III | | | 10/13/2034 |
| | CMF | A S 1123001L | | | MHCB | ACUTE | 2/28/19 12 01 00 | 0 | 0 | | 4 | Close | IV | | | 6/19/2021 |
| | CMF | A P 1118001L | | | ICF | ACUTE | 11/30/18 14 11 00 | 0 | 0 | | 94 | Medium (A) | III | | | 1/14/2020 |
| | CMF | A P 1114001L | | | MHCB | ACUTE | 2/01/19 18 40 00 | 0 | 0 | | 31 | Minimum (A) | II | | | 5/12/2021 |
| | CMF | A Q 3317001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Maximum | II | | | 12/16/2019 |
| | CMF | A P 1111001L | | | MHCB | ACUTE | 11/26/18 11 23 00 | 0 | 0 | | 98 | Medium (A) | IV | | | 10/02/2021 |
| | CMF | A Q 2230001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | I | | | 6/02/2019 |
| | CMF | A S 1110001L | | | MHCB | ACUTE | 1/28/19 10 52 00 | 0 | 0 | | 35 | Medium (A) | II | | | 5/09/2019 |
| | CMF | A P 1122001L | | | MHCB | ACUTE | 2/07/19 09 51 00 | 0 | 0 | | 25 | Medium (A) | II | | | 5/06/2023 |
| | CMF | A Q 2219001L | | | MHCB | ACUTE | 2/13/19 10 56 00 | 0 | 0 | | 19 | Medium (A) | I | | | 4/13/2019 |
| | CMF | A Q 2210001L | | | MHCB | ACUTE | 2/27/19 14 46 00 | 0 | 0 | | 5 | Maximum | III | | | 5/10/2007 |
| | CMF | A P 1107001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Medium (A) | IV | | | 9/07/1998 |
| | CMF | A P 1130001L | | | ACUTE | EOP | | 0 | 0 | | 0 | Medium (A) | IV | | | 7/16/2008 |
| | CMF | A S 1124001L | | | MHCB | ACUTE | 12/27/18 10 41 00 | 0 | 0 | | 67 | Medium (A) | IV | | | 2/23/2017 |
| | CMF | A P 1124001L | | | MHCB | ACUTE | 2/20/19 14 50 00 | 0 | 0 | | 12 | Medium (A) | IV | | | 3/27/2013 |
| | CMF | A P 1102001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Medium (A) | IV | | | 2/27/2024 |
| | CMF | A Q 3301001L | | | MHCB | ACUTE | 1/18/19 18 17 00 | 0 | 0 | | 45 | Maximum | II | | | 4/29/2019 |
| | CMF | A S 1111001L | | | MHCB | ACUTE | 1/07/19 09 54 00 | 0 | 0 | | 56 | Medium (A) | IV | | | 3/03/2020 |
| | CMF | A Q 3305001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 6/21/2023 |

CMF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CMF | A Q 2215001L | | | MHCB | ACUTE | 11/28/18 15 47 00 | 0 | 0 | | 96 | Medium (A) | I | | | 6/26/2020 |
| | CMF | A Q 2205001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Medium (A) | II | | | 3/07/2021 |
| | CMF | A S 2223001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/26/2114 |
| | CMF | A P 1104001L | | | MHCB | ACUTE | 2/21/19 12 52 00 | 0 | 0 | | 11 | Medium (A) | III | | | 8/06/2020 |
| | CMF | A P 1116001L | | | MHCB | ACUTE | 2/28/19 12 17 00 | 0 | 0 | | 4 | Close | IV | | | 12/12/2030 |
| | CMF | A P 1132001L | | | MHCB | ACUTE | 2/25/19 15 14 00 | 6 | 148 | Out to Adventist Health Bakersfield from Feb 21 2019 5 35PM to Feb 21 2019 11 29PM. | 7 | Medium (A) | IV | | | 6/06/2026 |
| | CMF | A S 1119001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 12/10/2005 |
| | CMF | A P 1128001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 3/22/2021 |
| | CMF | A S 1125001L | | | MHCB | ACUTE | 1/02/19 10 29 00 | 0 | 0 | | 61 | Medium (A) | II | | | 7/17/2019 |
| | CMF | A Q 2223001L | | | MHCB | ACUTE | 2/21/19 09 43 00 | 0 | 0 | | 11 | Close | IV | | | 11/26/2076 |
| | CMF | A S 1129001L | | | MHCB | ACUTE | 2/01/19 09 53 00 | 0 | 0 | | 31 | Medium (A) | II | | | 11/11/2019 |
| | CMF | A S 1104001L | | | MHCB | ACUTE | 12/19/18 11 28 00 | 0 | 169 | | 75 | Medium (A) | II | | | 12/06/2032 |
| | CMF | A S 1120001L | | | MHCB | ACUTE | 11/09/18 16 06 00 | 0 | 0 | | 115 | Medium (A) | IV | | | 1/25/9999 |
| | CMF | A P 1113001L | | | MHCB | ACUTE | 2/21/19 12 49 00 | 0 | 0 | | 11 | Medium (A) | IV | | | 6/08/2020 |
| | CMF | A Q 2228001L | | | MHCB | ACUTE | 2/28/19 15 28 00 | 0 | 0 | | 4 | Medium (A) | IV | | | 11/19/2014 |
| | CMF | A Q 3326001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2210001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2212001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2213001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2218001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3306001L | | | MHCB | ACUTE | 2/15/19 14 52 00 | 0 | 0 | | 17 | Maximum | | | | 1/01/1000 |
| | CMF | A S 2209001L | | | MHCB | ACUTE | 2/12/19 14 33 00 | 0 | 0 | | 20 | Medium (A) | III | | | 5/20/2044 |
| | CMF | A S 2225001L | | | EOP | ACUTE | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/30/2021 |
| | CMF | A Q 3316001L | | | MHCB | ACUTE | 2/22/19 16 06 00 | 0 | 0 | | 10 | Maximum | IV | | | 5/06/2048 |
| | CMF | A P 1129001L | | | MHCB | ACUTE | 12/22/18 11 57 00 | 0 | 0 | | 72 | Medium (A) | II | | | 12/05/2019 |
| | CMF | A Q 2227001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Medium (A) | III | | | 6/08/2019 |
| | CMF | A Q 3308001L | | | MHCB | ACUTE | 2/07/19 10 46 00 | 0 | 0 | | 25 | Maximum | IV | | | 7/03/2027 |
| | CMF | A P 1103001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 1105001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 1106001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 1109001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 1110001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 1112001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 1115001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 1117001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 1123001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 1131001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1101001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1102001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1103001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1104001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1105001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1106001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1107001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1108001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1109001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1110001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1111001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1112001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1113001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1114001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1115001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1116001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1117001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1118001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1119001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1120001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1121001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1122001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1123001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1124001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1125001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1126001L | vacant | | | | | 0 | 0 | | 0 | | | | | |

CMF-PIP

| | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACU(M) | CMF | A Q 1127001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1128001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 1129001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2201001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2202001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2204001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2206001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2211001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2216001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2217001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2218001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2220001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2223001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2225001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2229001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 2231001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3302001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3303001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3304001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3307001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3309001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3310001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3311001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3312001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3314001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3315001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3318001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3319001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3320001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3321001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3323001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3324001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3325001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3327001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3328001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3329001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A Q 3330001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 1101001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 1109001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 1116001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 1117001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 1118001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 1130001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2201001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2204001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2206001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2211001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2214001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2215001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2216001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2217001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2219001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2220001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2221001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2226001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A S 2229001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | | Isolation NC | | | | | | | | | | | | | |
| Single | CMF | MIS100000001095 | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| Bunk | CMF | MIS2000000022 6S | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | | | Redlined | | | | | | | | | | | | | |
| ICF(M) | Cell | CMF | A P 2204001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 1/20/2025 |
| | | CMF | C HTCA101000 1L | | | EOPMod | ICF | 2/25/19 16 10:00 | 0 | 0 | | 7 | Medium (A) | IV | | | 6/08/2019 |
| | | CMF | A P 2201001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 11/04/2023 |
| | | CMF | C HTCB100300 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 1/25/9999 |
| | | CMF | A P 3326001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 11/11/2021 |
| | | CMF | A P 2205001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 5/03/2027 |

CMF-PIP

ACU(M)

| Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CMF | A P 3309001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 4/08/2053 |
| CMF | A P 3323001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 4/23/2020 |
| CMF | A P 3305001L | | | MHCB | ICF | 1/22/19 11 50 00 | 0 | 0 | | 41 | Medium (A) | IV | | | 9/18/2030 |
| CMF | C HTCD101500 1L | | | EOP | ICF | | 0 | 1825 | | 0 | Medium (A) | IV | | | 2/05/2024 |
| CMF | C HTCA101300 1L | | | EOP/Mod | ICF | 1/31/19 19 28 00 | 0 | 0 | | 32 | Close | III | | | 7/22/2030 |
| CMF | C HTCB100700 01L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 12/05/2024 |
| CMF | C HTCA100700 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 7/02/2021 |
| CMF | C HTCB100800 01L | | | MHCB | ICF | 2/25/19 14 13 00 | 0 | 480 | | 7 | Maximum | III | | | 9/01/2029 |
| CMF | C HTCB101300 01L | | | MHCB | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 3/07/2021 |
| CMF | A P 2207001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 4/06/2031 |
| CMF | C HTCA101200 1L | | | ACUTE | ICF | | 23 | 0 | Out to San Joaquin General Hospital from Jan 26 2019 7 26PM to Jan 27 2019 6 45PM. | 0 | Medium (A) | IV | | | 12/02/2034 |
| CMF | C HTCC100300 1L | | | EOP | ICF | 1/16/19 14 12 00 | 0 | 0 | | 47 | Close | IV | | | 4/01/2022 |
| CMF | C HTCA100400 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 10/10/2020 |
| CMF | A P 3302001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Close | IV | | | 1/15/2027 |
| CMF | C HTCB101100 1L | | | EOP | ICF | | 0 | 264 | | 0 | Close | IV | | | 6/16/2209 |
| CMF | A P 3313001L | | | ICF | EOP | | 0 | 0 | | 0 | Maximum | II | | | 6/08/2022 |
| CMF | A P 3321001L | | | EOP | ICF | 2/01/19 12 27 00 | 0 | 0 | | 31 | Maximum | III | | | 5/25/2020 |
| CMF | A P 3328001L | | | ACUTE | ICF | | 0 | 1108 | | 0 | Maximum | IV | | | 8/07/2021 |
| CMF | C HTCC101500 1L | | | EOP | ICF | 8/06/18 16 23 00 | 0 | 0 | | 210 | Medium (A) | IV | | | 11/14/2027 |
| CMF | C HTCC101600 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 6/03/2020 |
| CMF | A P 3327001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | II | | | 9/14/2019 |
| CMF | C HTCC101200 1L | | | EOP | ICF | 1/24/19 16 01 00 | 0 | 0 | | 39 | Medium (A) | II | | | 1/25/2020 |
| CMF | C HTCD100400 1L | | | MHCB | ICF | 9/28/18 10 10 00 | 0 | 0 | | 157 | Medium (A) | III | | | 1/30/2024 |
| CMF | A P 3316001L | | | EOP | ICF | 12/31/18 14 21 00 | 0 | 0 | | 63 | Medium (A) | III | | | 1/22/2034 |
| CMF | C HTCA100100 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 4/02/2021 |
| CMF | A P 3330001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 4/13/2027 |
| CMF | A P 3324001L | | | EOP | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 2/27/2028 |
| CMF | A P 2202001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 5/17/2038 |
| CMF | C HTCA101100 1L | | | ACUTE | ICF | | 0 | 5080 | | 0 | Medium (A) | II | | | 3/18/2021 |
| CMF | C HTCB101000 1L | | | MHCB | ICF | | 0 | 0 | | 0 | Medium (A) | I | | | 5/15/2019 |
| CMF | C HTCA101600 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 4/07/2025 |
| CMF | C HTCB101200 1L | | | ACUTE | ICF | | 0 | 3100 | | 0 | Medium (A) | III | | | 7/09/2025 |
| CMF | A P 3317001L | | | EOP | ICF | 12/27/18 12 29 00 | 0 | 0 | | 67 | Close | III | | | 4/15/2019 |
| CMF | C HTCB100400 1L | | | MHCB | ICF | 12/13/18 10 18 00 | 0 | 0 | | 81 | Medium (A) | II | | | 6/23/2019 |
| CMF | A P 3320001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/28/2019 |
| CMF | C HTCA101500 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 10/31/2023 |
| CMF | A P 2218001L | | | ICF | ACUTE | 2/26/19 10 17 00 | 0 | 0 | | 6 | Medium (A) | III | | | 5/02/2024 |
| CMF | C HTCC100700 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 3/31/2024 |
| CMF | C HTCC101300 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 12/07/2022 |
| CMF | C HTCC100800 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | I | | | 4/30/2019 |
| CMF | C HTCC101000 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 10/13/2021 |
| CMF | C HTCC100500 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 10/01/2019 |
| CMF | C HTCD101000 1L | | | ACUTE | ICF | | 0 | 2150 | | 0 | Medium (A) | I | | | 2/22/2020 |
| CMF | A P 2217001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 9/17/2022 |
| CMF | A P 3315001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 9/01/2022 |
| CMF | A P 3314001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 3/19/2019 |
| CMF | C HTCA100500 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 12/18/2026 |
| CMF | A P 3308001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 1/20/2022 |
| CMF | C HTCD101200 1L | | | MHCB | ICF | 12/06/18 09 48 00 | 0 | 0 | | 88 | Medium (A) | II | | | 12/30/2025 |
| CMF | C HTCD101400 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 12/25/2042 |
| CMF | C HTCD100600 1L | | | MHCB | ICF | 1/02/19 09 55 00 | 0 | 0 | | 61 | Medium (A) | II | | | 3/19/2022 |
| CMF | C HTCA100200 1L | | | MHCB | ICF | 11/20/18 09 31 00 | 0 | 0 | | 104 | Medium (A) | IV | | | 7/09/2019 |
| CMF | C HTCB100100 1L | | | ACUTE | ICF | | 0 | 747 | | 0 | Medium (A) | III | | | 6/01/2019 |
| CMF | A P 2206001L | | | MHCB | ICF | 2/28/19 10 27 00 | 0 | 0 | | 4 | Medium (B) | II | | | 11/03/2023 |
| CMF | C HTCB100900 1L | | | EOP | ICF | 2/25/19 14 13 00 | 0 | 1104 | | 7 | Medium (A) | IV | | | 3/11/2020 |
| CMF | A P 3319001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 8/13/2028 |
| CMF | C HTCD100700 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 9/17/2023 |
| CMF | A P 3318001L | | | EOP | ICF | 1/24/19 15 04 00 | 0 | 0 | | 39 | Minimum (A) | I | | | 2/04/2021 |
| CMF | C HTCC100200 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/10/2019 |
| CMF | A P 2215001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 6/28/2029 |
| CMF | A P 2214001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 4/03/2048 |
| CMF | A P 2219001L | | | ACUTE | ICF | 11/30/18 14 05 00 | 0 | 0 | | 94 | Maximum | | | | 10/08/2034 |
| CMF | A M 3313001L | | | EOP | ICF | | 0 | 0 | | 0 | Maximum | | | | 6/24/2020 |

CMF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CMF | C HTCC1006001L | | | EOP | ICF | 12/06/18 16:04:00 | 0 | 0 | | 88 | Medium (A) | II | | | 5/27/2019 |
| | CMF | A P 2203001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 7/19/2019 |
| | CMF | A P 3312001L | | | MHCB | ICF | 2/13/19 10:28:00 | 0 | 0 | | 19 | Medium (A) | ICF | | | 6/24/2019 |
| | CMF | A P 3329001L | | | | UN | | 0 | 0 | | 0 | Maximum | | | | 5/08/2019 |
| | CMF | C HTCA1008001L | | | EOP | ICF | 1/08/19 18:10:00 | 0 | 0 | | 55 | Medium (A) | IV | | | 1/03/1994 |
| | CMF | C HTCB1002001L | | | CCCMS | ICF | 1/25/19 16:12:00 | 0 | 0 | | 38 | Close | IV | | | 3/17/2004 |
| | CMF | C HTCC1009001L | | | EOP | ICF | 1/30/19 11:24:00 | 0 | 0 | | 33 | Medium (A) | IV | | | 3/08/2033 |
| | CMF | C HTCC1014001L | | | ACUTE | ICF | 34 | 0 | | Out to San Joaquin General Hospital from Dec 13 2018  9:50PM to Dec 14 2018  6:44AM. Out to San Joaquin General Hospital from Feb  6 2019  7:35PM to Feb  7 2019  8:44PM. | 0 | Medium (A) | IV | | | 9/06/2044 |
| | CMF | C HTCD1011001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 11/18/2000 |
| | CMF | C HTCD1008001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 1/02/2001 |
| | CMF | A P 2210001L | | | ICF | ACUTE | 12/31/18 15:27:00 | 0 | 0 | | 63 | Medium (A) | IV | | | 10/03/2013 |
| | CMF | A P 2213001L | | | EOP | ICF | 2/22/19 12:52:00 | 0 | 0 | | 10 | Medium (A) | IV | | | 12/15/2002 |
| | CMF | A P 3311001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 10/22/2020 |
| | CMF | C HCB1014001L | | | ACUTE | ICF | | 0 | 1635 | | 0 | Medium (A) | II | | | 3/26/2047 |
| | CMF | C HTCD1002001L | | | MHCB | ICF | 1/09/19 12:57:00 | 0 | 0 | | 54 | Close | III | | | 3/26/2028 |
| | CMF | A P 3307001L | | | ACUTE | ICF | 8 | 0 | | Out to San Joaquin General Hospital from Nov 28 2018 11:26PM to Nov 29 2018  7:41AM. | 0 | Maximum | IV | | | 12/09/2058 |
| | CMF | C HTCD1013001L | | | ACUTE | ICF | | 0 | 541 | | 0 | Medium (A) | IV | | | 9/02/2029 |
| | CMF | C HTCA1009001L | | | EOPMod | ICF | 12/28/18 17:58:00 | 0 | 0 | | 66 | Medium (A) | IV | | | 7/21/2022 |
| | CMF | C HTCC1004001L | | | EOP | ICF | 2/08/19 15:31:00 | 9 | 0 | | Out to Adventist Health Bakersfield from Jan 28 2019  5:26PM to Jan 29 2019  2:05AM. | 24 | Medium (A) | II | | | 1/25/9999 |
| | CMF | C HTCD1001001L | | | EOPMod | ICF | 10/18/18 15:18:00 | 0 | 0 | | 137 | Maximum | IV | | | 5/08/2025 |
| | CMF | A P 3322001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 12/26/2035 |
| | CMF | C HTCD1003001L | | | MHCB | ICF | 12/28/18 09:12:00 | 0 | 0 | | 66 | Medium (A) | II | | | 11/26/2058 |
| | CMF | C HTCA1014001L | | | MHCB | ICF | 10/16/18 19:41:00 | 0 | 367 | | 139 | Medium (A) | II | | | 5/08/2025 |
| | CMF | C HTCC1011001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 3/04/2027 |
| | CMF | C HTCD1005001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/06/2048 |
| | CMF | A P 3303001L | | | MHCB | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 12/02/2027 |
| | CMF | A P 2221001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 3306001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 3310001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 3301001L | | | MHCB | ICF | 1/11/19 12:56:00 | 0 | 0 | | 52 | Maximum | IV | | | 3/20/2032 |
| | CMF | C HTCA1003001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 1/25/9999 |
| | CMF | C HTCD1009001L | | | ACUTE | ICF | | 0 | 745 | | 0 | Medium (A) | IV | | | 7/02/2026 |
| | CMF | C HTCB1006001L | | | EOP | ICF | 2/08/19 15:52:00 | 0 | 0 | | 24 | Medium (A) | IV | | | 4/17/2026 |
| | CMF | A P 3304001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 3/31/2033 |
| | CMF | A P 3306001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 7/29/2023 |
| | CMF | C HTCA1006001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/08/2019 |
| | CMF | C HTCD1016001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/25/2037 |
| | CMF | C HTCB1015001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 3/07/2022 |
| | CMF | A P 2208001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2209001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2211001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2212001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2216001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2220001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2222001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2223001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2224001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2225001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2226001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2227001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2228001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2229001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2230001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2231001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2232001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A P 2233001L | vacant | | | | | 0 | 0 | | 0 | | | | | |

CMF-PIP

| ACU(M) | | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CMF | A P 2234001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CMF | A P 2236001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CMF | C HTCA1005001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CMF | C HTCB1016001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CMF | C HTCC1001001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| ICF(M) | Dorm | CMF | A A 3000330L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 8/17/2034 |
| | | CMF | A A 3000323L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/06/2019 |
| | | CMF | A A 3000304L | | | EOPMod | ICF | 1/25/19 15 10 00 | 0 | 0 | | 38 | Medium (A) | II | | | 8/23/2022 |
| | | CMF | A A 2000203L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 6/11/2019 |
| | | CMF | A A 2000227L | | | ACUTE | ICF | | 0 | 0 | | 0 | Minimum (A) | II | | | 4/22/2019 |
| | | CMF | A A 2000205L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 9/14/2032 |
| | | CMF | A A 3000310L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 9/07/2022 |
| | | CMF | A A 2000237L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 6/01/2027 |
| | | CMF | A A 2000228L | | | MHCB | ICF | 10/15/18 10 22 00 | 0 | 0 | | 140 | Medium (A) | II | | | 12/21/2020 |
| | | CMF | A A 3000333L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 2/05/2020 |
| | | CMF | A A 2000239L | | | ACUTE | ICF | | 0 | 1635 | | 0 | Medium (A) | III | | | 8/18/2021 |
| | | CMF | A A 3000324L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 12/26/2026 |
| | | CMF | A A 2000206L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 4/23/2019 |
| | | CMF | A A 2000232L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/24/2024 |
| | | CMF | A A 3000301L | | | EOP | ICF | 12/31/18 15 56 00 | 0 | 0 | | 63 | Medium (A) | III | | | 8/16/2019 |
| | | CMF | A A 3000337L | | | MHCB | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 8/08/2025 |
| | | CMF | A A 3000315L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/12/2030 |
| | | CMF | A A 2000223L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 7/25/2024 |
| | | CMF | A A 3000318L | | | MHCB | ICF | 8/23/18 13 43 00 | 0 | 0 | | 193 | Medium (A) | IV | | | 5/05/2026 |
| | | CMF | A A 3000335L | | | EOP | ICF | 6/26/18 14 36 00 | 0 | 0 | | 251 | Medium (A) | IV | | | 10/15/2026 |
| | | CMF | A A 3000327L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 5/13/2023 |
| | | CMF | A A 3000317L | | | MHCB | ICF | 1/22/19 09 20 00 | 0 | 0 | | 41 | Medium (A) | I | | | 9/10/2020 |
| | | CMF | A A 3000329L | | | EOP | ICF | 2/06/19 12 03 00 | 0 | 0 | | 26 | Medium (A) | III | | | 9/24/2031 |
| | | CMF | A A 2000219L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 3/19/2020 |
| | | CMF | A A 2000201L | | | EOP | ICF | 9/26/18 15 35 00 | 0 | 0 | | 159 | Medium (A) | II | | | 4/26/2048 |
| | | CMF | A A 2000209L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 2/04/2021 |
| | | CMF | A A 2000208L | | | ICF | EOP | | 0 | 0 | | 0 | Medium (A) | III | | | 5/25/2033 |
| | | CMF | A A 3000309L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 11/29/2020 |
| | | CMF | A A 2000238L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 3/21/2029 |
| | | CMF | A A 3000331L | | | MHCB | ICF | 2/11/19 10 12 00 | 0 | 0 | | 21 | Medium (A) | II | | | 10/28/2019 |
| | | CMF | A A 2000223L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 10/07/2024 |
| | | CMF | A A 2000221L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 8/19/2022 |
| | | CMF | A A 2000216L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 5/03/2036 |
| | | CMF | A A 3000319L | | | MHCB | ICF | 11/06/18 10 03 00 | 0 | 0 | | 118 | Medium (A) | II | | | 7/08/2019 |
| | | CMF | A A 3000316L | | | MHCB | ICF | 8/07/18 10 43 00 | 0 | 0 | | 209 | Minimum (A) | II | | | 5/05/2021 |
| | | CMF | A A 2000234L | | | ACUTE | ICF | | 0 | 4163 | | 0 | Medium (A) | II | | | 7/28/2019 |
| | | CMF | A A 2000210L | | | ACUTE | ICF | | 0 | 3030 | | 0 | Medium (A) | II | | | 5/14/2019 |
| | | CMF | A A 2000204L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 5/28/2019 |
| | | CMF | A A 2000207L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | I | | | 4/18/2019 |
| | | CMF | A A 3000322L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 6/16/2022 |
| | | CMF | A A 2000215L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 8/23/2025 |
| | | CMF | A A 2000211L | | | MHCB | ICF | 11/19/18 10 36 00 | 0 | 0 | | 105 | Medium (A) | II | | | 9/17/2024 |
| | | CMF | A A 3000339L | | | MHCB | ICF | 12/11/18 09 06 00 | 0 | 0 | | 83 | Medium (A) | III | | | 5/18/2020 |
| | | CMF | A A 3000311L | | | ACUTE | ICF | 1/18/19 10 25 00 | 0 | 0 | | 0 | Medium (A) | II | | | 9/15/2019 |
| | | CMF | A A 2000229L | | | MHCB | ICF | | 0 | 0 | | 45 | Minimum (A) | II | | | 5/15/2019 |
| | | CMF | A S 1101001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 11/02/2007 |
| | | CMF | A A 3000338L | | | EOP | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/04/2074 |
| | | CMF | A A 3000307L | | | EOP | ICF | 11/05/18 18 29 00 | 0 | 0 | | 119 | Medium (A) | IV | | | 7/05/2019 |
| | | CMF | A A 2000240L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 1/25/1712 |
| | | CMF | A A 2000235L | | | ACUTE | ICF | | 0 | 578 | | 0 | Medium (A) | III | | | 7/31/2022 |
| | | CMF | A A 3000320L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 5/13/2019 |
| | | CMF | A A 3000332L | | | ACUTE | ICF | | 0 | 1155 | | 0 | Medium (A) | II | | | 2/07/2036 |
| | | CMF | A A 3000306L | | | EOP | ICF | 10/04/17 14 05 00 | 0 | 0 | | 516 | Medium (A) | II | | | 4/01/2042 |
| | | CMF | A A 2000230L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 9/14/2017 |
| | | CMF | A A 2000212L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/08/2028 |
| | | CMF | A A 3000340L | | | ACUTE | ICF | | 47 | 0 | Out to San Joaquin General Hospital from Feb 13 2018 9 54AM to Feb 15 2018 8 38AM. | 0 | Medium (A) | II | | | 5/12/2022 |
| | | CMF | A A 3000336L | | | EOP | ICF | 9/26/18 18 49 00 | 0 | 0 | | 159 | Medium (A) | II | | | 11/12/2044 |
| | | CMF | A A 3000325L | | | MHCB | ICF | 5/03/18 17 45 00 | 0 | 0 | | 305 | Medium (A) | IV | | | 9/20/2019 |

CMF-PIP

| ACU(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CMF | A A 3000328L | | | ACUTE | ICF | | 0 | 1238 | | 0 | Medium (A) | III | | | 1/25/9999 |
| | CMF | A A 2000202L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 10/26/2041 |
| | CMF | A A 3000303L | | | ACUTE | ICF | | 0 | 4381 | | 0 | Medium (A) | II | | | 10/17/2011 |
| | CMF | A A 2000226L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 9/03/2019 |
| | CMF | A A 2000222L | | | MHCB | ICF | 6/06/18 20:40:00 | 0 | 0 | | 271 | Medium (A) | IV | | | 5/29/2022 |
| | CMF | A A 3000313L | | | MHCB | ICF | 8/24/18 11:53:00 | 0 | 0 | | 192 | Medium (A) | II | | | 6/09/2047 |
| | CMF | A A 2000220L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 12/11/2025 |
| | CMF | A A 3000305L | | | ACUTE | ICF | | 0 | 78 | | 0 | Medium (A) | IV | | | 5/01/2036 |
| | CMF | A A 3000314L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 10/14/2022 |
| | CMF | A A 2000214L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 1/04/2021 |
| | CMF | A A 2000213L | | | MHCB | ICF | 10/25/18 10:47:00 | 0 | 0 | | 130 | Medium (A) | II | | | 3/13/2027 |
| | CMF | A A 2000217L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 12/27/2020 |
| | CMF | A A 2000243L | | | MHCB | ICF | 11/08/18 10:56:00 | 0 | 0 | | 116 | Medium (A) | IV | | | 3/28/2036 |
| | CMF | A A 3000308L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 12/19/2023 |
| | CMF | A A 2000244L | | | MHCB | ICF | 7/20/18 19:26:00 | 0 | 0 | | 227 | Medium (A) | II | | | 3/25/2019 |
| | CMF | A A 3000326L | | | EOP | ICF | 1/18/19 10:16:00 | 0 | 0 | | 45 | Medium (A) | III | | | 7/23/2049 |
| | CMF | A A 3000302L | | | EOP | ICF | 9/28/18 19:14:00 | 0 | 0 | | 157 | Medium (A) | II | | | 5/25/2024 |
| | CMF | A A 3000334L | | | MHCB | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 8/31/2033 |
| | CMF | A A 3000312L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 9/07/2059 |
| | CMF | A A 2000224L | | | EOP | ICF | 1/08/19 12:16:00 | 0 | 0 | | 55 | Medium (A) | II | | | 8/27/2294 |
| | CMF | A A 2000218L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A A 2000225L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A A 2000231L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A A 2000236L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A A 2000241L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | CMF | A A 2000242L | vacant | | | | | 0 | 0 | | 0 | | | | | |

CMF-L1

| | | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ICF(M) | Cell | CMF | A  L  1115001L | | | ACUTE | ICF | 8/03/18 16 00 00 | 6 | 0 | Out to Vaca Valley Hospital from Jul 17 2018  4 48PM to Jul 17 2018 10 04PM. | 213 | Medium (A) | II |
| | | CMF | A  L  1101001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV |
| | | CMF | A  L  1103001U | | | EOP | ICF | 1/30/19 11 19 00 | 0 | 0 | | 33 | Close | IV |
| | | CMF | A  L  1125001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV |
| | | CMF | A  L  1118001L | | | ICF | EOP | | 0 | 0 | | 0 | Close | IV |
| | | CMF | A  L  1127001L | | | EOP | ICF | | 0 | 0 | | 0 | Medium (A) | IV |
| | | CMF | A  L  1113001L | | | MHCB | ICF | 12/14/18 18 29 00 | 53 | 0 | Out to Riverside County Regional Medical Center (RCRMC) from Dec  6 2018 3 03PM to Dec  8 2018 8 05PM. | 80 | Close | IV |
| | | CMF | A  L  1106001L | | | ACUTE | ICF | | 6 | 0 | Out to San Joaquin General Hospital from Feb  5 2019 4 20PM to Feb  5 2019 10 17PM | 0 | Medium (A) | III |
| | | CMF | A  L  1102001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV |
| | | CMF | A  L  1113001L | | | ICF | EOP | | 0 | 0 | | 0 | Medium (A) | II |
| | | CMF | A  L  1124001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV |
| | | CMF | A  L  1104001L | | | ACUTE | ICF | 12/12/18 16 08 00 | 309 | 0 | Out to Fresno County Sherif from Nov 28 2018 12 55PM to Dec 11 2018 9 12AM. | 82 | Medium (A) | II |
| | | CMF | A  L  1104001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II |
| | | CMF | A  L  1133001L | | | MHCB | ICF | 1/23/19 10 43 00 | 0 | 0 | | 40 | Medium (A) | II |
| | | CMF | A  L  1108001L | | | MHCB | ICF | 12/14/18 18 29 00 | 0 | 0 | | 80 | Medium (A) | II |
| | | CMF | A  L  1126001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV |
| | | CMF | A  L  1112001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV |
| | | CMF | A  L  1122001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III |
| | | CMF | A  L  1131001U | | | EOP | ICF | 12/19/18 12 55 00 | 0 | 0 | | 75 | Medium (A) | II |
| | | CMF | A  L  1101001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Minimum (A) | II |
| | | CMF | A  L  1121001U | | | ACUTE | ICF | | 0 | 2020 | | 0 | Close | II |
| | | CMF | A  L  1108001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III |
| | | CMF | A  L  1110001U | | | MHCB | ICF | 1/15/19 13 01 00 | 0 | 0 | | 48 | Medium (A) | II |
| | | CMF | A  L  1103001U | | | MHCB | ICF | 11/20/18 10 24 00 | 0 | 0 | | 104 | Medium (A) | II |
| | | CMF | A  L  1121001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II |
| | | CMF | A  L  1133001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | I |
| | | CMF | A  L  1129001U | | | MHCB | ICF | 11/14/18 10 04 00 | 0 | 0 | | 110 | Medium (A) | III |
| | | CMF | A  L  1120001L | | | EOP | ICF | 1/28/19 18 10 00 | 0 | 0 | | 35 | Close | III |
| | | CMF | A  L  1118001U | | | MHCB | ICF | 12/06/18 09 48 00 | 0 | 0 | | 88 | Close | IV |
| | | CMF | A  L  1111001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | III |
| | | CMF | A  L  1110001L | | | MHCB | ICF | 2/27/19 09 52 00 | 0 | 0 | | 5 | Medium (A) | II |
| | | CMF | A  L  1114001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | |
| | | CMF | A  L  1128001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV |
| | | CMF | A  L  1126001L | | | EOP | ICF | 12/14/18 12 15 00 | 0 | 0 | | 80 | Medium (A) | IV |
| | | CMF | A  L  1114001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II |
| | | CMF | A  L  1112001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV |
| | | CMF | A  L  1132001L | | | MHCB | ICF | 1/09/19 18 43 00 | 6 | 0 | Out to Kings County Superior Court from Jan  9 2019  8 06AM to Jan  9 2019  2 23PM | 54 | Close | IV |
| | | CMF | A  L  1109001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV |
| | | CMF | A  L  1127001U | | | ACUTE | ICF | | 0 | 460 | | 0 | Close | IV |
| | | CMF | A  L  1107001U | | | ACUTE | ICF | | 0 | 316 | | 0 | Medium (A) | IV |

CMF-L1

| Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CMF | A L 1124001L | | | MHCB | ICF | 2/21/19 10 11 00 | 0 | 407 | | 11 | Medium (A) | III |
| CMF | A L 1122001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III |
| CMF | A L 1111001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV |
| CMF | A L 1125001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV |
| CMF | A L 1132001U | | | MHCB | ICF | 12/28/18 09 54 00 | 0 | 0 | | 66 | Medium (A) | II |
| CMF | A L 1116001U | | | MHCB | ACUTE | 8/04/17 11 01 00 | 0 | 0 | | 577 | Medium (A) | II |
| CMF | A L 1127001U | | | MHCB | ICF | 1/14/19 16 15 00 | 0 | 0 | | 49 | Medium (A) | III |
| CMF | A L 1113001U | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV |
| CMF | A L 1116001L | | | MHCB | ICF | 9/01/18 18 58 00 | 0 | 0 | | 184 | Medium (A) | III |
| CMF | A L 1119001U | | | ACUTE | ICF | | 0 | 1155 | | 0 | Close | IV |
| CMF | A L 1109001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV |
| CMF | A L 1105001L | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1105001U | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1106001L | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1106001U | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1107001L | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1115001L | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1115001U | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1117001L | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1117001U | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1120001U | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1123001L | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1123001U | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1124001L | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1128001U | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1133001U | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1134001L | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1134001U | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1135001L | vacant | | | | | 0 | 0 | | 0 | | |
| CMF | A L 1135001U | vacant | | | | | 0 | 0 | | 0 | | |

CIW-PIP

| PIP(F) | | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cell | CIW | S PIPB1128001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CIW | S PIPB1138001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CIW | S PIPB1143001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | CIW | S PIPB1135001L | | | ACUTE | ICF | 1/12/18 13:04:00 | 0 | 0 | | 416 | Medium (A) | IV | | | 4/04/1997 |
| | | CIW | S PIPA1116001L | | | ACUTE | ICF | 5/15/18 20:06:00 | 7 | 0 | Out to Riverside County Regional Medical Center (RCRMC) from May 11 2018 6:00PM to May 12 2018 1:00AM. | 293 | Close | IV | | | 12/20/2005 |
| | | CIW | S PIPA1108001L | | | MHCB | ICF | 2/21/14 15:07:00 | 0 | 0 | | 1837 | Medium (A) | IV | | | 3/02/2022 |
| | | CIW | S PIPB1145001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 11/05/2020 |
| | | CIW | S PIPB1141001L | | | ACUTE | ICF | 12/27/18 13:21:00 | 0 | 0 | | 67 | Medium (A) | IV | | | 11/26/2020 |
| | | CIW | S PIPA1106001L | | | ACUTE | ICF | 11/09/18 15:16:00 | 0 | 0 | | 115 | Medium (A) | | | | 3/11/2022 |
| | | CIW | S PIPB1125001L | | | EOP | ICF | 9/19/12 12:00:00 | 0 | 0 | | 2357 | Medium (A) | IV | | | 8/08/2019 |
| | | CIW | S PIPA1113001L | | | MHCB | ICF | 3/10/16 10:32:00 | 0 | 0 | | 1089 | Medium (A) | IV | | | 5/20/2019 |
| | | CIW | S PIPA1104001L | | | EOP | ICF | 9/17/18 12:41:00 | 0 | 0 | | 168 | Medium (A) | IV | | | 10/18/2019 |
| | | CIW | S PIPB1124001L | | | MHCB | ICF | 2/07/19 14:11:00 | 0 | 0 | | 25 | Medium (A) | IV | | | 5/09/2019 |
| | | CIW | S PIPA1101001L | | | ICF | ACUTE | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/11/2019 |
| | | CIW | S PIPA1102001L | | | MHCB | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/09/2019 |
| | | CIW | S PIPB1129001L | | | ACUTE | ICF | | 2519 | 0 | Out to San Bernardino Count from Sep 20 2017 10:37AM to Sep 21 2017 12:01PM. Out to San Bernardino Count from Sep 21 2017 12:01PM to | 0 | Medium (A) | IV | | | 1/22/2023 |
| | | CIW | S PIPA1101001L | | | MHCB | ICF | 2/26/19 11:55:00 | 0 | 0 | | 6 | Maximum | IV | | | 3/13/2021 |
| | | CIW | S PIPB1122001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | III | | | 5/12/2034 |
| | | CIW | S PIPA1118001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 6/26/2023 |
| | | CIW | S PIPA1109001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 8/15/2019 |
| | | CIW | S PIPA1121001L | | | ACUTE | ICF | | 0 | 2355 | | 0 | Medium (A) | II | | | 7/16/2020 |
| | | CIW | S PIPB1140001L | | | ACUTE | ICF | 9/20/18 13:30:00 | 0 | 0 | | 165 | Medium (A) | II | | | 5/07/2025 |
| | | CIW | S PIPB1131001L | | | ACUTE | ICF | | 2711 | 0 | Out to San Bernardino Count from Jul 12 2017 10:23AM to Jul 12 2017 1:17PM. Out to San Bernardino Count from Jul 12 2017 1:17PM to Oct 26 2017 9:31AM. Out to San Bernardino Count from May 16 2018 9:45AM to May 23 2018 9:54AM | 0 | Medium (A) | | | | 7/01/2019 |
| | | CIW | S PIPB1142001L | | | ICF | EOP | 1/23/19 12:42:00 | 0 | 0 | | 40 | Medium (A) | II | | | 5/18/2019 |
| | | CIW | S PIPA1115001L | | | ICF | MHCB | | 0 | 0 | | 0 | Close | IV | | | 1/17/2020 |
| | | CIW | S PIPB1123001L | | | MHCB | ICF | 1/17/19 12:26:00 | 0 | 0 | | 46 | Medium (A) | I | | | 2/08/2021 |
| | | CIW | S PIPA1114001L | | | MHCB | ICF | 6/28/18 10:17:00 | 0 | 0 | | 249 | Medium (A) | | | | 6/30/2019 |
| | | CIW | S PIPB1138001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | III | | | 5/14/2027 |
| | | CIW | S PIPB1130001L | | | EOP | ICF | 2/14/19 11:14:00 | 0 | 0 | | 18 | Medium (A) | I | | | 12/21/2021 |
| | | CIW | S PIPB1144001L | | | ACUTE | ICF | 2/16/18 12:36:00 | 0 | 0 | | 381 | Medium (A) | | | | 9/11/2019 |
| | | CIW | S PIPA1112001L | | | MHCB | ICF | 7/11/18 13:29:00 | 0 | 0 | | 236 | Medium (A) | II | | | 4/20/2019 |
| | | CIW | S PIPA1120001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 5/07/2019 |
| | | CIW | S PIPA1119001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 7/25/2022 |
| | | CIW | S PIPA1117001L | | | MHCB | ICF | 1/08/19 14:28:00 | 0 | 0 | | 55 | Medium (A) | IV | | | 3/15/2019 |
| | | CIW | S PIPB1127001L | | | MHCB | ICF | 10/09/18 11:44:00 | 0 | 0 | | 146 | Medium (A) | | | | 4/01/2019 |
| | | CIW | S PIPA1115001L | | | ICF | ACUTE | 1/11/19 15:37:00 | 0 | 10 | | 52 | Medium (A) | I | | | 4/23/2019 |
| | | CIW | S PIPA1103001L | | | ACUTE | ICF | | 0 | 2000 | | 0 | Medium (A) | I | | | 8/06/2019 |
| | | CIW | S PIPB1132001L | | | MHCB | ICF | 2/12/19 14:15:00 | 0 | 0 | | 20 | Medium (A) | I | | | 5/05/2019 |
| | | CIW | S PIPB1133001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 11/19/2019 |
| | | CIW | S PIPB1139001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 1/25/9999 |
| | | CIW | S PIPA1105001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | | | | 5/25/2019 |
| | | CIW | S PIPB1136001L | | | ACUTE | ICF | 12/29/17 13:31:00 | 0 | 0 | | 430 | Medium (A) | IV | | | 9/20/2056 |
| | | CIW | S PIPB1137001L | | | MHCB | ICF | 7/31/17 10:56:00 | 0 | 0 | | 581 | Medium (A) | IV | | | 8/28/2019 |
| | | CIW | S PIPA1110001L | | | MHCB | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 2/08/2020 |
| | | CIW | S PIPA1107001L | | | ACUTE | ICF | | 0 | 4403 | | 0 | Medium (A) | II | | | 8/29/2024 |

SQ-PIP

| PIPCnd(M) | | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cell | SQ | S INF 1020001L | | | MHCB | ICF | 11/01/18 13 31 00 | 0 | 0 | | 123 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1012001L | | | MHCB | ICF | 12/28/18 13 05 00 | 0 | 0 | | 66 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1022001L | | | MHCB | ICF | 10/05/18 14 46 00 | 0 | 0 | | 150 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1047001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1015001L | | | CCCMS | ICF | 10/05/18 14 52 00 | 0 | 0 | | 150 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1014001L | | | ACUTE | ICF | | 0 | 1752 | | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1035001L | | | EOP | ICF | 4/21/16 13 20 00 | 0 | 0 | | 1047 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1038001L | | | MHCB | ICF | 12/12/18 12 12 00 | 0 | 0 | | 82 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1001001L | | | MHCB | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1044001L | | | EOPMod | ICF | 6/14/17 16 23 00 | 0 | 0 | | 628 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1043001L | | | EOP | ICF | 6/04/18 13 18 00 | 111 | 4328 | Out to Marin General Hospital from May 18 2018 11 54PM to May 23 2018 2 11PM. | 273 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1052001L | | | EOP | ICF | | 19 | 0 | Out to Marin General Hospital from Dec 12 2017 4 53PM to Dec 13 2017 11 20AM. | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1041001L | | | EOP | ICF | | 615 | 0 | Out to Marin General Hospital from Jul 2 2015 9 07AM to Jul 4 2015 11 12AM. Out to Marin General Hospital from Jan 22 2016 2 49PM to Feb 6 2016 3 37PM. Out to Marin General Hospital from Aug 2 2017 1 58PM to Aug 8 2017 5 32PM. Out to Marin General Hospital from Sep 6 2017 1 02PM to Sep 8 2017 | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1040001L | | | EOP | ICF | | 254 | 0 | Out to Marin General Hospital from May 13 2015 11 49AM to May 13 2015 7 18PM. Out to Marin General Hospital from Sep 3 2015 2 31AM to Sep 3 2015 7 41AM. Out to Marin General Hospital from Sep 6 2015 7 40PM to Sep 16 2015 5 21PM. Out to Marin General Hospital from Oct 7 2018 12 27PM to Oct 7 | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1011001L | | | MHCB | ICF | 2/08/19 11 32 00 | 0 | 0 | | 24 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1010001L | | | MHCB | ICF | 1/14/19 12 33 00 | 0 | 4376 | | 49 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1042001L | | | EOP | ICF | | 0 | 4376 | | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1018001L | | | MHCB | ICF | 12/10/18 07 30 00 | 0 | 0 | | 84 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1008001L | Isolation | | | | | 0 | 0 | | 0 | | | | | |
| | | SQ | S INF 1009001L | Isolation | | | | | 0 | 0 | | 0 | | | | | |
| | | SQ | S INF 1048001L | | | EOP | ICF | 6/14/18 15 18 00 | 0 | 0 | | 263 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1024001L | | | MHCB | ICF | 10/17/18 13 12 00 | 0 | 0 | | 138 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1039001L | | | EOP | ICF | | 95 | 0 | Out to Marin General Hospital from Apr 29 2018 12 42PM to May 3 2018 11 51AM | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1051001L | | | MHCB | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1037001L | | | MHCB | ICF | | 0 | 4376 | | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1036001L | | | EOP | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1019001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1016001L | | | MHCB | ICF | 1/17/19 17 30 00 | 0 | 0 | | 46 | Maximum | IV | | | 1/30/9999 |
| | | SQ | S INF 1013001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | SQ | S INF 1017001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | SQ | S INF 1021001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | SQ | S INF 1023001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | SQ | S INF 1045001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | SQ | S INF 1046001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | SQ | S INF 1049001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | SQ | S INF 1050001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | | | | Isolation | | | | | | | | | | | | | |

SVSP-PIP

ICF(M)

| | Institution | Bed Status | Details | Name | prev MHII | Current MHII | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 180 Cell | SVSP | C 006 112300 1L | | | ICF | ACUTE | | 23 | 0 | Out to Natividad Medical Center from Mar 1 2019 8:48PM to Mar 2 2019 7:04PM. | 0 | Medium (A) | IV | | | 10/12/2036 |
| | SVSP | C 006 110400 1L | | | ICF | EOP | 2/22/19 13:18:00 | 0 | 0 | | 10 | Medium (A) | II | | | 1/22/2023 |
| | SVSP | C 006 222700 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 8/03/2029 |
| | SVSP | C 005 222000 1L | | | ACUTE | ICF | | 0 | 704 | | 0 | Medium (A) | IV | | | 5/25/2022 |
| | SVSP | C 006 221500 1L | | | EOP | ACUTE | 2/27/19 13:33:00 | 0 | 0 | | 5 | Close | IV | | | 9/02/2019 |
| | SVSP | C 006 112800 1L | | | ICF | EOP | | 0 | 79 | | 0 | Close | IV | | | 4/22/2019 |
| | SVSP | C 006 111800 1L | | | EOPMod | EOP | 2/20/19 18:12:00 | 0 | 3496 | | 12 | Close | IV | | | 1/29/2036 |
| | SVSP | C 006 113000 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 3/30/2020 |
| | SVSP | C 006 110100 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/21/2019 |
| | SVSP | C 005 220200 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 7/22/2024 |
| | SVSP | C 005 110700 1L | | | MHCB | ICF | 3/01/19 11:56:00 | 0 | 0 | | 3 | Maximum | IV | | | 2/08/2023 |
| | SVSP | C 005 221300 1L | | | EOP | ICF | 10/30/18 19:58:00 | 0 | 0 | | 125 | Medium (A) | III | | | 6/18/2027 |
| | SVSP | C 006 112200 1L | | | EOP | ICF | 1/26/19 15:31:00 | 0 | 267 | | 34 | Medium (A) | I | | | 1/01/2021 |
| | SVSP | C 006 111700 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 6/03/2020 |
| | SVSP | C 005 221600 1L | | | MHCB | ICF | 12/28/18 15:30:00 | 0 | 0 | | 66 | Close | III | | | 11/19/2026 |
| | SVSP | C 005 113100 1L | | | MHCB | ICF | 11/16/18 12:17:00 | 0 | 0 | | 108 | Medium (A) | IV | | | 2/20/2021 |
| | SVSP | C 006 220800 1L | | | ACUTE | ICF | | 33 | 0 | Out to Natividad Medical Center from Jan 11 2019 1:45PM to Jan 11 2019 8:05PM. Out to Natividad Medical Center from Jan 13 2019 9:34PM to Jan 14 2019 12:31AM. Out to Natividad Medical Center from Jan 21 2019 2:45AM to Jan 21 2019 7:02AM. Out to Natividad Medical Center from Jan 21 2019 7:25PM to Jan 22 2019 12:55AM. Out to Natividad Medical Center from Jan 27 2019 7:45PM to Jan 28 2019 4:12AM. Out to Natividad Medical Center from Feb 2 2019 4:12AM to Feb 2 2019 8:05AM. | 0 | Close | IV | | | 10/04/2022 |
| | SVSP | C 006 110200 1L | | | EOP | MHCB | 11/15/18 15:35:00 | 0 | 198 | | 109 | Close | IV | | | 9/30/2080 |
| | SVSP | C 005 112600 1L | | | MHCB | ICF | 3/01/19 11:56:00 | 0 | 0 | | 3 | Medium (A) | III | | | 11/19/2031 |
| | SVSP | C 005 221000 1L | | | MHCB | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 5/24/2020 |
| | SVSP | C 005 223000 1L | | | ACUTE | ICF | 11/30/18 15:35:00 | 0 | 0 | | 94 | Medium (A) | IV | | | 3/23/2087 |
| | SVSP | C 005 110400 1L | | | MHCB | ICF | 10/26/18 15:38:00 | 0 | 0 | | 129 | Medium (A) | III | | | 4/19/2019 |
| | SVSP | C 006 220200 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 6/12/2029 |
| | SVSP | C 006 112000 1L | | | EOPMod | EOP | 12/14/18 13:21:00 | 0 | 0 | | 80 | Medium (A) | IV | | | 6/11/2024 |
| | SVSP | C 006 220400 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | II | | | 4/04/2047 |
| | SVSP | C 006 223000 1L | | | EOPMod | ICF | 1/31/19 15:17:00 | 0 | 0 | | 32 | Medium (A) | III | | | 7/18/2023 |
| | SVSP | C 006 111500 1L | | | EOP | ICF | 8/31/18 13:42:00 | 0 | 0 | | 185 | Medium (A) | III | | | 5/25/2024 |
| | SVSP | C 006 220100 1L | | | MHCB | ICF | 2/15/19 14:32:00 | 0 | 0 | | 17 | Medium (A) | IV | | | 11/01/2037 |
| | SVSP | C 006 112400 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 8/19/2021 |
| | SVSP | C 006 221900 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | III | | | 10/03/2035 |
| | SVSP | C 006 110800 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 7/09/2108 |
| | SVSP | C 006 222500 1L | | | EOP | ICF | 8/03/18 15:17:00 | 0 | 0 | | 213 | Medium (A) | II | | | 3/25/2047 |
| | SVSP | C 005 110300 1L | | | ACUTE | ICF | 8/01/18 15:55:00 | 0 | 0 | | 215 | Close | III | | | 12/21/2021 |
| | SVSP | C 006 112600 1L | | | ICF | EOP | | 0 | 0 | | 0 | Medium (A) | II | | | 7/01/2023 |
| | SVSP | C 005 111000 1L | | | EOP | ICF | 1/26/19 20:39:00 | 0 | 0 | | 34 | Medium (A) | III | | | 10/28/2029 |
| | SVSP | C 006 111600 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | I | | | 3/26/2019 |
| | SVSP | C 006 221100 1L | | | EOP | ICF | 11/07/18 14:25:00 | 0 | 0 | | 117 | Close | II | | | 6/08/2020 |
| | SVSP | C 006 111900 1L | | | EOPMod | ICF | 2/28/19 15:31:00 | 0 | 0 | | 4 | Close | II | | | 2/09/2021 |
| | SVSP | C 006 112700 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 2/07/2043 |
| | SVSP | C 006 220500 1L | | | MHCB | ICF | 2/22/19 13:18:00 | 0 | 0 | | 10 | Close | III | | | 4/15/2025 |
| | SVSP | C 005 221700 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 7/10/2022 |
| | SVSP | C 005 112000 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | II | | | 6/25/2036 |
| | SVSP | C 005 220400 1L | | | MHCB | ICF | 11/15/18 15:50:00 | 0 | 0 | | 111 | Maximum | III | | | 5/02/2029 |
| | SVSP | C 005 112700 1L | | | MHCB | ICF | 10/11/18 11:45:00 | 6 | 0 | Out to San Joaquin General Hospital from Oct 10 2018 6:12PM to Oct 11 2018 12:06AM. | 144 | Medium (A) | I | | | 3/07/2019 |
| | SVSP | C 006 222100 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | III | | | 1/25/9999 |
| | SVSP | C 006 220300 1L | | | EOP | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 11/19/2022 |
| | SVSP | C 006 221300 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 1/28/2020 |
| | SVSP | C 005 222300 1L | | | MHCB | ICF | 8/27/18 15:49:00 | 0 | 0 | | 189 | Medium (A) | II | | | 9/23/2021 |
| | SVSP | C 006 111300 1L | | | EOP | ICF | 1/07/19 13:20:00 | 0 | 0 | | 56 | Medium (A) | I | | | 9/06/2019 |
| | SVSP | C 005 111200 1L | | | EOPMod | ICF | 2/25/19 15:49:00 | 0 | 0 | | 7 | Medium (A) | II | | | 6/26/2019 |
| | SVSP | C 006 222400 1L | | | EOP | ICF | 11/27/18 12:05:00 | 0 | 0 | | 97 | Medium (A) | III | | | 6/07/2019 |
| | SVSP | C 005 223000 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 1/25/9999 |
| | SVSP | C 005 222400 1L | | | EOP | ICF | 10/11/18 13:40:00 | 0 | 0 | | 144 | Medium (A) | III | | | 12/28/2019 |
| | SVSP | C 005 110600 1L | | | ACUTE | ICF | | 9 | 0 | Out to Natividad Medical Center from Oct 8 2018 11:55AM to Oct 8 2018 8:10PM. | 0 | Medium (A) | III | | | 2/17/1989 |
| | SVSP | C 005 110800 1L | | | MHCB | ICF | 2/15/19 17:34:00 | 0 | 0 | | 17 | Medium (A) | IV | | | 7/29/2034 |
| | SVSP | C 005 111800 1L | | | GP | CCCMS | 2/28/19 15:22:00 | 0 | 0 | | 4 | Maximum | IV | | | 8/24/2006 |
| | SVSP | C 005 220900 1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/03/2062 |
| | SVSP | C 005 113200 1L | | | EOP | ICF | 4/12/18 13:08:00 | 0 | 0 | | 326 | Medium (A) | II | | | 1/25/9999 |
| | SVSP | C 006 110300 1L | | | EOPMod | ICF | 2/22/18 14:26:00 | 0 | 0 | | 375 | Medium (A) | IV | | | 11/13/2012 |
| | SVSP | C 006 221000 1L | | | EOPMod | ICF | 11/27/18 15:30:00 | 0 | 0 | | 97 | Medium (A) | II | | | 6/28/2086 |
| | SVSP | C 006 223100 1L | | | EOP | ICF | 3/09/17 16:13:00 | 0 | 0 | | 725 | Medium (A) | IV | | | 4/30/2013 |
| | SVSP | C 006 220600 1L | | | EOP | ICF | 10/10/18 15:43:00 | 0 | 0 | | 145 | Medium (A) | IV | | | 12/14/2026 |
| | SVSP | C 005 111100 1L | | | ACUTE | ICF | | 40 | 0 | Out to Natividad Medical Center from Sep 24 2018 12:57PM to Sep 25 2018 9:10PM. Out to Natividad Medical Center from Feb 23 2019 7:55PM to Feb 24 2019 2:06AM. | 0 | Medium (A) | III | | | 7/25/2027 |
| | SVSP | C 006 112500 1L | | | EOPMod | ICF | 10/16/18 15:14:00 | 0 | 0 | | 139 | Medium (A) | IV | | | 3/14/2025 |
| | SVSP | C 005 110000 1L | | | MHCB | ICF | 1/23/19 17:52:00 | 0 | 0 | | 40 | Maximum | IV | | | 8/10/2032 |
| | SVSP | C 006 220500 1L | | | EOPMod | ICF | 2/20/19 18:12:00 | 0 | 0 | | 12 | Medium (A) | IV | | | 8/06/2020 |

SVSP-PIP

| | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ICF(M) | | | | | | | | | | | | | | | | |
| | SVSP | C 005 111300 L | | | MHCB | ICF | 2/27/19 19:04:00 | 0 | 0 | | 5 | Medium (A) | II | | | 3/13/2006 |
| | SVSP | C 006 110600 L | | | EOPMod | ICF | 12/04/18 16:30 | 0 | 0 | | 90 | Medium (A) | II | | | 1/25/9999 |
| | SVSP | C 006 111400 L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 1/25/9999 |
| | SVSP | C 005 220500 L | | | GP | ICF | 2/25/19 21:09:00 | 0 | 0 | | 7 | Close | IV | | | 10/07/2019 |
| | SVSP | C 005 111400 L | | | ACUTE | ICF | | 0 | 1070 | | 0 | Medium (A) | IV | | | 1/06/2021 |
| | SVSP | C 005 112500 L | | | MHCB | ICF | 2/21/19 13:41:00 | 0 | 0 | | 11 | Medium (A) | II | | | 1/23/2018 |
| | SVSP | C 005 222900 L | | | EOP | ICF | 11/29/18 15:47:00 | 0 | 0 | | 95 | Medium (A) | IV | | | 1/30/2019 |
| | SVSP | C 006 220700 L | | | CCEMS | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 3/16/2032 |
| | SVSP | C 005 221400 L | | | ICF | EOP | 2/11/19 15:25:00 | 0 | 0 | | 21 | Medium (A) | IV | | | 11/14/2041 |
| | SVSP | C 005 221500 L | | | MHCB | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 2/06/2021 |
| | SVSP | C 006 110500 L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/07/2046 |
| | SVSP | C 006 221700 L | | | MHCB | ICF | 1/14/19 13:15:00 | 0 | 0 | | 49 | Medium (A) | IV | | | 2/14/2020 |
| | SVSP | C 006 112000 L | | | ACUTE | ICF | | 11 | 0 | Out to Natividad Medical Center from Oct 23 2019 7:55PM to Oct 23 2018 11:56PM | 0 | Medium (A) | IV | | | 6/25/2024 |
| | | | | | | | | | | Out to Natividad Medical Center from Dec 5 2018 7:30PM to Dec 6 2018 2:08AM | | | | | | |
| | SVSP | C 005 222800 L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 6/07/2020 |
| | SVSP | C 008 220000 L | | | ICF | EOP | | 94 | 0 | Out to Adventist Health Bakersfield from Jan 25 2019 10:42PM to Jan 28 2019 6:06PM. | 0 | Close | IV | | | 11/04/2021 |
| | | | | | | | | | | Out to Fresno Commun ty Hos from Feb 15 2019 7:30PM to Feb 16 2019 5:38PM. Out | | | | | | |
| | | | | | | | | | | to Adventist Health Bakersfield from Mar 4 2019 11:48AM to Mar 4 2019 3:50PM. | | | | | | |
| | SVSP | C 005 222700 L | | | EOPMod | ICF | 4/21/17 17:46:00 | 0 | 0 | | 682 | Medium (A) | IV | | | 8/27/2024 |
| | SVSP | C 005 110700 L | | | ACUTE | ICF | | 6 | 278 | Out to Natividad Medical Center from Feb 20 2019 7:35PM to Feb 21 2019 1:46AM | 0 | Medium (A) | IV | | | 12/30/2031 |
| | SVSP | C 006 222700 L | | | EOP | ICF | 10/10/18 15:43:00 | 0 | 0 | | 145 | Close | IV | | | 4/24/2026 |
| | SVSP | C 005 220800 L | | | EOPMod | ICF | 7/18/18 15:31:00 | 0 | 0 | | 229 | Close | IV | | | 9/04/2079 |
| | SVSP | C 006 112100 L | | | EOP | ICF | 11/19/18 15:05:00 | 0 | 0 | | 105 | Medium (A) | IV | | | 7/30/2022 |
| | SVSP | C 005 110300 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 110500 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 111500 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 111600 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 111900 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 112800 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 112900 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 220400 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 220500 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 220700 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 221100 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 221200 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 221900 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 222200 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 222500 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 005 223100 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 006 110200 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 006 220900 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 006 221200 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 006 221400 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 006 221600 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 006 221800 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 006 222000 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 006 222100 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 006 222600 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 006 222800 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | C 006 223200 L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| Cell | | | | | EOP | ICF | 11/22/18 02:07:00 | 135 | 0 | Out to San Diego County She from Nov 15 2018 2:33PM to Nov 21 2018 5:52AM. | 102 | Close | IV | | | 11/30/2023 |
| | SVSP | I 001810150 0 L | | | EOP | ICF | 3/01/19 14:49:00 | 0 | 0 | | 3 | Close | IV | | | 8/07/2042 |
| | SVSP | I 001810080 0 L | | | ACUTE | ICF | | 0 | 4406 | | 0 | Medium (A) | IV | | | 6/27/2034 |

SVSP-PIP

ICF(M)

| Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SVSP | I 001C10240D1L | | | MHCB | ICF | | 408 | 0 | Out to Twin C les Commun t from Nov 22 2012 5 52PM to Nov 21 2012 2 28AM. Out to Natividad Medical Center from Nov 22 2015 12:01AM to Jul 17 2015 3 23AM. Out to Other Hosp tal/Medical Location from Mar 30 2016 4:04AM to Mar 30 2016 1:45PM. Out to Other Hosp tal/Medical Location from Apr 1 2016 4:46AM to Apr 1 2016 2 39PM. Out to Other Hospital/Medical Location from Apr 4 2016 4 11AM to Apr 4 2016 1 20PM. Out to Other Hospital/Medical Location from Apr 6 2016 4 00AM to Apr 6 2016 2 06PM. Out to Other Hospital/Medical Location from Apr 13 2016 4 18AM to Apr 13 2016 1 35PM. Out to Other Hosp tal/Medical Location from Apr 18 2016 4 30AM to Apr 18 2016 1 54PM. Out to Other Hospital/Medical Location from Apr 20 2016 3 59AM to Apr 20 2016 1 55PM. Out to Other Hosp tal/Medical Location from May 2 2016 4:00AM to May 2 2016 1 55PM. Out to Other Hospital/Medical Location from May 4 2016 4:40AM to May 4 2016 2 32PM. Out to Other Hosp tal/Medical Location from May 6 2016 4 14AM to May 6 2016 2 25PM. Out to Other Hospital/Medical Location from May 9 2016 3 57AM to May 9 2016 2 24PM. Out to Other Hosp tal/Medical Location from Jul 6 2016 4 05AM to Jul 6 2016 2 19PM. Out to Other Hosp tal/Medical Location from Jul 20 2016 4 16AM to Jul 20 2016 2 33PM. Out to Other Hosp tal/Medical Location from Jul 27 2016 4 13AM to Jul 27 2016 3 10PM. Out to Other Hospital/Medical Location from Aug 3 2016 3 54AM to Aug 3 2016 2 29PM. Out to Other Hospital/Medical Location from Aug 30 2016 4 00AM to Aug 30 2016 2 58PM. Out to Other Hospital/Medical Location from Sep 6 2016 4 10AM to Sep 6 2016 1 35PM. Out to Other Hospital/Medical Location from Nov 1 2016 4 15AM to Nov 1 2016 1 45PM. Out to Other Hospital/Medical Location from Dec 13 2016 3 45AM to Dec 13 2016 1 07PM. Out to Other Hospital/Medical Location from Dec 27 2016 4 12AM to Dec 27 2016 2 00PM. Out to Other Hospital/Medical Location from Mar 7 2017 4 01AM to Mar 7 2017 1 20PM. Out to Other Hospital/Medical Location from Mar 14 2017 3 35AM to Mar 14 2017 1 24PM. Out to Other Hosp tal/Medical Location from Mar 21 2017 4 05AM to Mar 21 2017 12 47PM. Out to Other Hospital/Medical Location from Mar 28 2017 3 54AM to Mar 28 2017 1 50PM. Out to Other Hospital/Medical Location from Apr 11 2017 3 54AM to Apr 11 2017 1 23PM. Out to Other Hospital/Medical Location from Jul 3 2017 3 07AM to Jul 3 2017 1 13PM. Out to Other Hospital/Medical Location from Jul 11 2017 3 54AM to Jul 11 2017 1 20PM. Out to Other Hospital/Medical Location from Jul 18 2017 3 52AM | 0 | Maximum | IV | | | 4/01/2011 |
| SVSP | I 001B10130D1L | | | ICF | ACUTE | 2/08/19 21:03:00 | 0 | 9 | | 24 | Close | IV | | | 12/11/2023 |
| SVSP | C 006 22200D1L | | | EOP | ICF | 8/09/18 21:01:00 | 0 | 0 | | 207 | Close | IV | | | 8/06/2021 |
| SVSP | I 001C10250D1L | | | EOP | ICF | 8/07/18 18:23:00 | 0 | 0 | | 209 | Medium (A) | IV | | | 12/25/2030 |
| SVSP | I 001A10110D1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 4/09/2022 |
| SVSP | I 001A10060D1L | | | MHCB | ICF | 12/06/18 14:49:00 | 0 | 0 | | 88 | Medium (A) | II | | | 1/02/2022 |
| SVSP | I 001C10270D1L | | | ICF | EOP | | 0 | 0 | | 0 | Medium (A) | IV | | | 8/03/2036 |
| SVSP | I 001A10030D1L | | | ACUTE | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 1/25/9999 |
| SVSP | I 001C10290D1L | | | UN | ICF | | 645 | 0 | Out to Napa County Sheriff from Mar 13 2018 11 59AM to Apr 9 2018 8 15AM. | 0 | Unclassified | | | | 1/01/1000 |
| SVSP | I 001A10020D1L | | | EOP | ICF | | 0 | 0 | | 0 | Maximum (A) | II | | | 5/22/2023 |
| SVSP | I 001A10090D1L | | | EOP | ICF | | 0 | 0 | | 0 | Unclassified | | | | 12/19/2016 |
| SVSP | I 001C10300D1L | | | UN | ICF | | 0 | 0 | | 0 | Maximum | | | | 4/26/2020 |
| SVSP | I 001A10050D1L | | | UN | ICF | | 0 | 0 | | 0 | Maximum | | | | 6/08/2021 |
| SVSP | I 001B10210D1L | | | UN | ICF | | 0 | 0 | | 0 | Maximum | | | | 2/28/2021 |
| SVSP | I 001A10070D1L | | | UN | ICF | | 0 | 0 | | 0 | Maximum | | | | 4/19/2019 |
| SVSP | I 001A10120D1L | | | ACUTE | ICF | | 0 | 685 | | 0 | Close | IV | | | 1/25/9999 |
| SVSP | I 001B10170D1L | | | EOPMod | ICF | 10/25/18 19:22:00 | 0 | 0 | | 130 | Medium (A) | IV | | | 11/27/2060 |
| SVSP | I 001A10010D1L | | | EOPMod | EOP | 12/13/18 15:52:00 | 0 | 3226 | | 81 | Close | IV | | | 3/21/2067 |
| SVSP | I 001C10130D1L | | | MHCB | ICF | 2/23/18 10:11:00 | 0 | 0 | | 374 | Maximum | IV | | | 6/16/2020 |
| SVSP | I 001C10250D1L | | | EOP | ICF | 5/25/17 18:58:00 | 0 | 0 | | 648 | Unclassified | IV | | | 9/30/2078 |
| SVSP | I 001C10260D1L | | | EOP | ICF | | 0 | 0 | | 0 | Maximum | IV | | | 8/07/2019 |
| SVSP | I 001B10200D1L | | | EOP | ICF | | 0 | 0 | | 0 | Medium (A) | III | | | 3/13/2028 |
| SVSP | I 001B10140D1L | | | EOPMod | ICF | 6/08/18 12:27:00 | 0 | 0 | | 269 | Medium | III | | | 12/27/2004 |
| SVSP | I 001A10040D1L | | | EOP | ICF | | 14 | 0 | Out to Salinas Valley Memor from Dec 5 2018 11:46AM to Dec 5 2018 9:00PM. Out to Natividad Medical Center from Feb 23 2019 12:26PM to Feb 23 2019 4:19PM. | 0 | Medium (A) | IV | | | 11/24/2021 |
| SVSP | I 002A10010D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10020D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10030D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10040D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10050D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10060D2L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10050D2L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10070D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10060D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10080D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10090D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10100D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10110D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10110D2L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10130D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10120D2L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| SVSP | I 002A10120D1L | Redlined | | | | | 0 | 0 | | 0 | | | | | |

SVSP-PIP

| | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ICF(M) | SVSP | I 002A1013002L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002A1014001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002A1014002L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002A1015001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002A1016001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1017001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1018001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1019001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1020001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1021001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1022001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1023001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1025001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1026001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1027001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1028001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1029001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1030001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1031001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002B1032001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1033001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1034001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1035001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1036001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1037001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1038001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1039001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1040001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1041001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1042001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1043001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1044001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1045001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1046001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1047001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002C1048001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1049001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1050001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1051001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1052001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1054001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1055001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1056001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1057001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1059001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1060001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1061001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1063001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 002D1064001L | Redlined | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 001B1022001L | | | ICF | EOP | | 0 | 0 | | 0 | Close | IV | | | 1/25/9999 |
| | SVSP | I 001B1019001L | | | EOP | ICF | | 0 | 0 | | 0 | Close | IV | | | 6/05/2024 |
| | SVSP | I 001A1008001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 001B1016001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 001C1028001L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| Dorm | SVSP | I 001D1007003L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 4/23/2025 |
| | SVSP | I 001D1006001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Close | IV | | | 8/05/2025 |
| | SVSP | I 001D1003002L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 5/06/2030 |
| | SVSP | I 001D1004002L | | | ACUTE | ICF | | 7 | 0 | Out to Natividad Medical Center from Feb. 9 2019 3:00PM to Feb. 9 2019 7:39PM. Out to Natividad Medical Center from Feb 19 2019 10:55AM to Feb 19 2019 1:55PM. | 0 | Medium (A) | IV | | | 5/31/2033 |
| | SVSP | I 001D1005002L | | | MHCB | ICF | 11/20/18 13:04:00 | 0 | 0 | | 106 | Medium (A) | IV | | | 2/11/2023 |
| | SVSP | I 001D1004001L | | | EOP | ICF | | 0 | 0 | | 0 | Close | IV | | | 1/25/9999 |
| | SVSP | I 001D1005003L | | | EOP | ICF | | 0 | 0 | | 0 | Close | III | | | 1/07/2032 |
| | SVSP | I 001D1002002L | | | EOP | ICF | 7/20/18 15:58:00 | 0 | 244 | | 227 | Medium (A) | IV | | | 1/10/2045 |
| | SVSP | I 001D1003001L | | | EOP | ICF | 5/11/18 18:17:00 | 0 | 339 | | 297 | Medium (A) | IV | | | 2/04/2020 |
| | SVSP | I 001D1007004L | | | ACUTE | ICF | | 0 | 914 | | 0 | Medium (A) | IV | | | 6/22/2059 |
| | SVSP | I 001D1004004L | | | ACUTE | ICF | | 0 | 4405 | | 0 | Medium (A) | IV | | | 7/24/2027 |
| | SVSP | I 001D1004003L | | | MHCB | ICF | 9/11/18 14:48:00 | 0 | 0 | | 174 | Medium (A) | II | | | 12/19/2026 |
| | SVSP | I 001D1002006L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | II | | | 9/22/2011 |
| | SVSP | I 001D1003001L | | | ACUTE | ICF | | 0 | 0 | | 0 | Medium (A) | IV | | | 11/06/2032 |
| | SVSP | I 001D1002001L | vacant | | | | | 0 | 0 | | 0 | | | | | |

SVSP-PIP

| ICF(M) | Institution | Bed Status | Details | Name | prev MHI | Current MHI | Admission Date | Out to Court/Hospital Hours | Out to Medical Hold Hours | Summary | Days in Bed | Custody Classification | Security Level | Housing Determination | Housing Determination Date | Estimated Release Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SVSP | I 0010100200(3)L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 0010100300(3)L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 0010100400(3)L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 0010100400(4)L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 0010100500(1)L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 0010100600(2)L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 0010100600(3)L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 0010100600(4)L | vacant | | | | | 0 | 0 | | 0 | | | | | |
| | SVSP | I 0010100700(1)L | vacant | | | | | 0 | 0 | | 0 | | | | | |

ATTACHMENT E



# Improving California's Prison Inmate Classification System

GABRIEL PETEK
LEGISLATIVE ANALYST
MAY 2019

LAO

Case 2:90-cv-00520-KJM-SCR    Document 7039-1    Filed 01/28/21    Page 104 of 126

Cover photo provided courtesy of the California Department of Corrections and Rehabilitation.

# Executive Summary

*Overview of California's Inmate Classification System.* The California Department of Corrections and Rehabilitation (CDCR) uses an inmate classification system to assign inmates to different housing security levels and varying degrees of supervision during their daily activities. Assignment to a housing security level is generally based on inmates' assessed risk of misconduct—referred to as their "housing score." The performance of the inmate classification system has implications for the safety of staff, inmates, and the public; prison operations and cost; the size of the inmate population; and inmates' daily experiences in prison, including their access to rehabilitation opportunities.

*Assessment of Inmate Classification System.* In reviewing CDCR's inmate classification system, we identified several issues that merit legislative consideration. Specifically we found the following:

- *Housing Score Not Sufficiently Aligned With Departmental Goals.* We find that CDCR may be assigning unnecessary security to inmates who are prone to engage in minor misconduct, but not in serious misconduct. This approach is inconsistent with the department's goal to avoid placing inmates in more secure or restrictive settings than necessary.

- *Accuracy of Housing Score Could Be Limited.* We identified several factors that call into question the accuracy of CDCR's housing score methodology. Specifically, we found that: (1) CDCR has modified the methodology without reassessing its accuracy, (2) several changes—such as to the demographics of the inmate population—could have caused its accuracy to deteriorate since it was first established, and (3) there is some evidence that the methodology underweights age. We also found that the methodology for recalculating inmates' housing scores annually has never been evaluated.

- *Need for Some Overrides of Housing Score Is Unclear.* Under certain circumstances, CDCR staff can override an inmate's housing score and house the inmate at a security level different than otherwise called for under the department's methodology. However, given that three of the factors for which staff can override a housing score—inmates' age, time to serve, and behavior—are already included in the housing score methodology, it is unclear what additional benefits, if any, these particular overrides provide.

- *Access to Lowest Security Settings May Be Overly Restricted.* CDCR currently maintains policies that exclude certain inmates from the lowest security housing and supervision placements. To the extent that these policies cause certain inmates to be placed in unnecessarily restrictive environments, they unnecessarily create state costs and operational challenges.

*LAO Recommendations.* In order to address the above concerns, we recommend the Legislature take the following steps to improve the inmate classification process:

- *Direct CDCR to Develop New Method for Assignment to Housing Security Level.* We recommend CDCR contract with independent researchers to develop a new methodology

for assigning inmates to a housing level when they arrive in prison and annually thereafter. We find that a more effective methodology could reduce prison violence and other misconduct while minimizing placement of inmates in unnecessarily restrictive environments that can make them more prone to crime in the long run.

- *Consider Options to Expand Access to Lowest Security Settings.* We recommend that the Legislature consider directing CDCR to create processes for allowing low-risk sex offenders, inmates with more than five years left to serve, and inmates wanted by another law enforcement agency on minor charges into the lowest security settings. Such changes could alleviate existing operational challenges and reduce state costs—potentially in the tens of millions of dollars annually—without jeopardizing prison security or public safety.

# INTRODUCTION

Maintaining a safe environment for inmates and staff, as well as preventing inmate escapes, are fundamental aspects of the public safety mission of the California Department of Corrections and Rehabilitation (CDCR). The department uses an inmate classification system as a key tool to pursue this mission. The inmate classification system essentially assigns inmates to housing and varying degrees of security based on their assessed risk of misconduct and other factors, such as escape risk. Accordingly, the classification system significantly influences how CDCR deploys scarce housing space and custody staffing and has important implications for state costs. Moreover, because the system determines where and how inmates are housed and supervised, it significantly affects the daily experiences of individual inmates. In addition, because housing and supervision placements can affect inmates' abilities to earn credits that reduce their prison terms, the classification system can affect how long some inmates ultimately spend in prison. In this report, we (1) provide background information on CDCR's inmate classification system, (2) assess the current system, and (3) recommend steps to improve it.

# BACKGROUND

## PURPOSE OF INMATE CLASSIFICATION

***Prevent Inmate Escape and Misconduct.*** One of the primary challenges facing prison systems is preventing escape and misconduct, which can range from crimes (such as murder, assault, and drug trafficking) to more minor violations of prison rules (such as misuse of food or unexcused absence from a work assignment). Inmate classification systems are commonly employed prison management tools that allow prison officials to allocate security resources according to inmates' likelihood of escape or misconduct. These systems typically involve procedures to identify inmates with a high incentive for escape or risk factors that make them statistically more likely to engage in misconduct. This allows prison officials to place such inmates in more secure environments.

It is important to place inmates in the appropriate security setting for several reasons. On the one hand, placing inmates in a setting with insufficient security could jeopardize the safety of staff, other inmates, and the public. On the other hand, placing inmates in an overly restrictive setting can create other significant problems. For example, it can create a long-term public safety risk by making inmates more prone to crime through the influence of more criminally active peers. We also note that inmates placed in more restrictive settings may have less access to rehabilitative programming than other inmates. In addition, research has found that placing inmates in overly restrictive settings can exacerbate mental illness. Moreover, providing a higher level of security than is warranted results in an inefficient use of limited resources.

***California's Current Classification System Established Nearly 20 Years Ago.*** California was the first state in the nation to use a standardized inmate classification system based on objective criteria. This system was first evaluated in the 1980s. It subsequently underwent a significant overhaul and evaluation in the early 2000s, which formed the basis of the system that is still in place today. The stated goals of CDCR's system include (1) uniformly placing inmates in the lowest security level necessary to ensure the safety of staff, inmates, and the public; and (2) generally basing placements on objective information and criteria. In establishing the inmate classification system, the department also sought to maintain a database for research and evaluation of the system.

# HOW ARE INMATES CLASSIFIED?

CDCR's inmate classification system differentiates inmates in two primary ways. Specifically, the system assigns each inmate a (1) housing security level and (2) custody designation.

*Housing Security Level.* Housing security level generally determines the type of facility where inmates are housed. Inmates that the system determines have a higher risk of misconduct or escape are generally housed in higher security level facilities that have more security features, such as armed guard coverage or an electric fence.

*Custody Designation.* Custody designation determines where in the prison inmates may go during the day and the level of supervision they must be under when they are there. For example, inmates assigned to the lowest custody designation may work off prison grounds with minimal supervision by CDCR correctional officers. In contrast, inmates with the highest custody designation can only work within the building where they are housed and must be under the direct physical control of correctional officers at all times. Custody designation also affects inmates' eligibility to be housed in certain facilities. For example, based on the combination of their housing level, custody designation, and other criteria, some inmates are eligible for placement in specialized housing, such as conservation camps (one of the lowest security placements).

Below, we provide greater detail on how the inmate classification system is used to assign inmates to a housing security level, a custody designation, and specialized housing.

## Assignment to a Housing Security Level

*CDCR Operates Four Security Levels of Inmate Housing.* CDCR categorizes its facilities that house male inmates into security levels ranging from Level I (lowest security) to Level IV (highest security). (Facilities that house female inmates are not classified into different security levels as female facilities generally have similar levels of security.) Figure 1 summarizes the security requirements for each of the four security levels. As shown in the figure, inmates housed in Level I facilities are subject to the least amount of security and are generally housed in open dormitories (rather than cells) that are not required to have perimeter security—meaning some may be only surrounded by a razor wire fence or have no fence at all.

Inmates housed in Level II facilities generally also live in dormitories, though unlike Level I facilities, Level II facilities are located within the main security perimeter of the prison—meaning behind an electric fence or wall with guard towers. Inmates housed in Level III and IV facilities live in cells within the main security perimeter of the prison. Level IV facilities also often contain additional security features, such as a higher level of armed guard coverage and layouts that provide officers greater visibility of all cells.

We note that, CDCR maintains other housing units that are not part of its four-level security ranking. For example, restricted housing units—units which can be used to temporarily house inmates as punishment for a serious rule violation or who constitute a particular threat to prison security—and reception centers—which house inmates when they first arrive in CDCR custody and have not been fully classified—are not designated as one of the four security levels.

---

**Figure 1**

### Higher Security Level Housing Facilities Have More Security Requirements[a]

| Level | Minimum Required Bed Type | Minimum Required Perimeter Security | Armed Coverage |
|---|---|---|---|
| I (lowest security) | Dormitories | None | None required |
| II | Dormitories | Electric fence or wall with guard towers | None required |
| III | Cells | Electric fence or wall with guard towers | External |
| IV (highest security) | Cells | Electric fence or wall with guard towers | External and internal |

[a] There may be some exceptions to these requirements.

*Inmates Assigned Housing Score Based on Their Risk of Misconduct.* When inmates arrive at a reception center, they receive a risk assessment in which they are assigned points totaling from 0 to 999 based on six factors that are statistically associated with in-prison misconduct. These factors are (1) age at first arrest, (2) age at time of assessment, (3) term length, (4) gang membership, (5) number of prior incarcerations, and (6) behavior during prior incarcerations. The points assigned to each factor are summed to calculate a total housing score. Inmates with higher scores are considered to be more likely to engage in misconduct. Figure 2 illustrates how the housing score is calculated for two different inmates.

Inmates' housing scores are generally recalculated annually. Points are subtracted if inmates avoid serious rule violations, perform well in work or school, or achieve placement in the lowest custody designation since their housing score was last calculated. For example, if an inmate remains free of serious disciplinary issues for six months, two points are subtracted from his or her score. Conversely, points are added to inmates' housing scores if they have engaged in certain rule violations since their housing score was last calculated. For example, if an inmate commits a battery on an inmate, four points are added to his or her score.

*Current Housing Score Methodology Established Nearly 20 Years Ago.* The underlying basis of the department's current methodology for calculating inmates' housing scores when they first arrive in prison was established in the early

**Figure 2**

### Housing Score Is Calculated Based on Factors in Inmates' Backgrounds

| | Number of Points Assigned | Inmate A | Inmate B |
|---|---|---|---|
| **Age at First Arrest** | | | |
| Under 18 | 12 | 12 | — |
| 18 to 21 | 10 | — | 10 |
| 22 to 29 | 8 | — | — |
| 30 to 35 | 4 | — | — |
| 36 and Older | — | — | — |
| **Age at Time of Assessment** | | | |
| 16 to 20 | 8 | — | — |
| 21 to 26 | 6 | — | — |
| 27 to 35 | 4 | — | 4 |
| 36 and Older | — | — | — |
| **Term Length** | Years x 2 (Up to 50 Points) | 5 x 2 = 10 | 25 X 2 = 50 |
| **Gang Member** | 6 | — | 6 |
| **Number of Prior Incarcerations** | | | |
| Prior Jail or County Juvenile Sentence of 31 Days or More | 1 | — | — |
| Prior State or Federal Juvenile Incarceration | 1 | 1 | — |
| Prior State or Federal Adult Incarceration | 1 | — | 1 |
| **Behavior During Last 12 Months of Prior Incarceration** | | | |
| No Serious Rule Violations | -4 | -4 | — |
| Serious Rules Violations | Violations x 4 | — | 3 x 4 = 12 |
| **Specific Serious Rule Violations During Prior Incarceration** | | | |
| Battery or Attempted Battery on a Non-Inmate | Violations x 8 | — | 2 x 8 = 16 |
| Battery or Attempted Battery on an Inmate | Violations x 4 | — | — |
| Distribution of Drugs | Violations x 4 | — | 2 x 4 = 8 |
| Possession of a Deadly Weapon | Violations x 4 (Doubled if in Last 5 Years) | — | — |
| Inciting a Disturbance | Violations x 4 | — | — |
| Battery Causing Serious Bodily Injury | Violations x 16 | — | 1 x 16 = 16 |
| **Scores** | | **19** | **123** |

2000s by researchers at the University of California, Los Angeles (UCLA). Specifically, the researchers removed certain factors from the previous methodology that were not found to be statistically associated with misconduct (such as marital status and military service) and added certain factors that were associated with misconduct (such as gang affiliation and mental illness). They then randomly assigned inmates to be housed based on either the revised or previous methodology. After completing an evaluation of the revised methodology, the UCLA researchers found it to be more effective in predicting misconduct than the previous methodology and it was subsequently implemented for all inmates beginning in 2003. (We note that CDCR later removed mental illness from the methodology in response to a lawsuit.)

*Housing Security Level Is Generally Determined by Score, Unless Score Is Overridden.* As shown in Figure 3, CDCR has established certain scores—or "cut points"—that divide the range of inmate housing scores into four groups, each corresponding with a different housing security level. For example, an inmate with a housing score of 19 through 35 is typically housed in a Level II facility. We note that the current cut points were established based on research conducted by University of California researchers in 2010 and 2011.

However, CDCR can override an inmate's housing security level and house the inmate at a security level that is different than otherwise called for under the department's methodology. An override can happen through one of two ways:

- *Mandatory Overrides.* These overrides require staff to place inmates at a *higher* housing level than their score indicates. Currently, there are six mandatory overrides, as shown in Figure 4. Five of the six mandatory overrides result in inmates being housed at Level II rather than Level I. These overrides are intended to prevent inmates with a relatively high risk of escaping or victimizing the public if they escape from being placed in Level I facilities. This is because Level I facilities are generally not surrounded by electric fences or walls with guard towers, which are effective in preventing inmate escapes. Inmates who are not allowed in Level I facilities include those inmates who have attempted escape in the past, have certain histories of violence, or have committed a registerable sex offense.

- *Discretionary Overrides.* These overrides give CDCR staff the discretion to place inmates at a *higher or lower* housing level than their score indicates. There are 25 discretionary overrides. For example, staff can house inmates at a lower level due to a

**Figure 3**

### Housing Security Level Cut Points

| Housing Score | Housing Security Level |
|---|---|
| Under 19 | I |
| 19-35 | II |
| 36-59 | III |
| 60 and Over | IV |

**Figure 4**

### Six Mandatory Overrides of Housing Score

| Reason for Override | Mandatory Minimum Housing Level |
|---|---|
| Sentenced to life without the possibility of parole | II |
| History of escape | II |
| History of sex offense | II |
| History of violence and does not meet certain criteria[a] | II |
| Sentenced to life with the possibility of parole and does not meet certain criteria[b] | II |
| Sentenced to death | IV |

[a] Criteria include being within five years of release and having a minimum of seven years since last violent offense
[b] Criteria include having been evaluated by a psychologist to represent a low or moderate risk of violence and not having a high level of notoriety

record of good behavior or their youthfulness, immaturity, or advanced age. Alternatively, staff can place inmates at a higher security level if their disciplinary records indicate (1) a history of serious problems or (2) that they could threaten the security of the facility. Staff can also override an inmate's housing score if the inmate requires medical or psychological treatment that is only available at certain housing levels.

As of June 30, 2018, there were nearly 40,000 inmates in state prison whose housing score was overridden by CDCR staff as a result of either a mandatory or discretionary override. As shown in Figure 5, the majority of these overrides—about 25,700—occur from Level I to Level II. Of these particular cases, the vast majority (about 20,000) were moved from Level I to Level II as a result of two mandatory overrides—history of violence or sexual offending. This is likely one of the primary reasons why Level I facilities are populated at less than their design capacity when compared to other housing levels. (Design capacity generally

refers to the number of beds that CDCR would operate if it housed only one inmate per cell and did not "double-bunk" inmates in dormitories.) As shown in Figure 6 (see next page), CDCR's Level I facilities are only at 85 percent capacity, while Level II and III facilities are over 120 percent of capacity. (Given that CDCR often houses two inmates per cell or double-bunks inmates in dormitories, it is not uncommon for the population of a facility to exceed its design capacity to some degree.)

## Assignment to a Custody Designation

*CDCR Classifies Inmates Into Six Custody Designations.* Once inmates arrive at the prison to which they were assigned at the reception center, they are assigned a custody designation. CDCR uses six custody designations: (1) Maximum, (2) Close, (3) Medium A, (4) Medium B, (5) Minimum A, and (6) Minimum B, which are summarized in Figure 7 (see next page). As shown in the figure, custody designations affect the level of supervision inmates receive during daily activities, with Maximum requiring the highest level of supervision.

---

**Figure 5**

### Most Overrides of Housing Score Occur From Level I to Level II[a]

*Comparison of Level Based on Housing Score to Actual Housing Level Placement*



[a] Excludes inmates who (1) have not yet been assigned a housing score and (2) are housed in a specialized bed that does not have a designated housing level.

LAO

**Figure 6**

## Level I Facilities Are Under Capacity[a]

*As of June 30, 2018*

| Housing Level | Number of Inmates | Design Capacity | Percent of Capacity |
|---|---|---|---|
| I | 10,596 | 12,505 | 85% |
| II | 40,689 | 33,377 | 122 |
| III | 22,938 | 18,420 | 125 |
| IV | 23,759 | 14,936 | 159 |
| **Totals** | **97,982** | **79,238** | **124%** |

[a] Excludes inmates who (1) have not yet been assigned a housing score and (2) are housed in a specialized bed that does not have a designated housing level

We note that CDCR has the flexibility to apply different custody designations to inmates within the same housing security level. For example, an inmate placed on Close Custody receives constant supervision during his work activities, so that staff can sufficiently account for the inmate's specific location at all times. In contrast, an inmate placed on Medium A Custody in the same housing level would only receive frequent supervision, so that staff can sufficiently ensure that the inmate is present within a permitted work area.

***Custody Designation Can Limit Access Outside of Main Perimeter and Credit Earning Rates.*** CDCR also uses custody designation to limit access to areas beyond the main security perimeter of the prison to inmates who pose a low escape risk. For example, as shown in Figure 7, inmates with a Minimum B, Minimum A, or Medium B Custody designation are allowed varying amounts of access to areas outside the main security perimeter. In contrast, inmates with a Maximum, Close, or Medium A designation must live and attend programs and work assignments within the main security perimeter of the prison.

In addition, custody designation affects the amount of sentencing credits that some inmates earn. Specifically, inmates who are placed on Minimum Custody (either Minimum A or Minimum B) and are not serving certain sentences (such as a sentence for a violent crime) can earn two days off their sentence for every day served with good behavior. If these inmates were at a higher custody designation they would instead be earning one day off their sentence for every day served with good behavior.

***Custody Designation Determined by Various Criteria.*** Custody designation is assigned based on the presence or absence of certain factors as follows:

**Figure 7**

## Custody Designation Determines Level of Supervision Provided to Inmate

| Custody Designation | Required Level of Supervision During Daily Activities | Required to Live in Cells? | May Work Outside Main Security Perimeter? | May Be Housed and Work Off Prison Grounds? |
|---|---|---|---|---|
| Minimum B (least supervision) | Sufficient supervision to ensure the inmate is present. | No | Yes | Yes |
| Minimum A | Observed at least hourly if assigned outside the main security perimeter and sufficient supervision to ensure the inmate is present if inside the main security perimeter. | No | Yes | No |
| Medium B | Frequent and direct supervision while inside the main security perimeter and direct and constant supervision while outside the main security perimeter. | No | Yes | No |
| Medium A | Frequent and direct supervision. | No | No | No |
| Close | Direct and constant supervision. | Yes[a] | No | No |
| Maximum (most supervision) | Direct physical control of inmate by custody staff at all times. | Yes | No | No |

[a] Female inmates placed on Close Custody may be housed in certain dormitories.

- **Maximum Custody.** Inmates who are temporarily living in a restricted housing unit often as punishment for committing particularly severe rule violations, such as assault or possession of a weapon.

- **Close Custody.** Inmates who meet certain criteria, such as those who (1) are in the first 5 years of a sentence of 25 years or more to life, (2) have a history of escape, or (3) have committed a severe rule violation.

- **Medium A and B Custody.** Inmates who are not required to be on Maximum or Close Custody and do not meet the criteria for Minimum Custody. The default designation is generally Medium A. However, inmates are assigned Medium B Custody in certain cases, such as if there is a need for them to work outside the main security perimeter of the prison.

- **Minimum A and B Custody.** Inmates who meet various criteria including having a housing score of 35 or lower with no mandatory overrides applied (such as having committed a registerable sex offense). Inmates must also not be wanted by law enforcement for a felony and must be within five years of release. Inmates are generally only assigned Minimum B Custody if they are placed in a program that requires them to live outside the main security perimeter of a prison, such as a conservation camp.

Figure 8 shows the breakdown of the inmate population by custody designation. The majority of inmates are placed on Medium A Custody.

## Assignment to Specialized Housing

**Based on Both Housing Level and Custody Designation.** In most cases, inmates' housing placements are not affected by their custody designation.

However, some specialized housing placements—which tend to be the most and least restrictive housing in CDCR—do depend on inmates' custody designation. For example, to be eligible for a Minimum Support Facility (MSF) or conservation camp—both types of Level I facilities that are outside the main security perimeter of prisons—inmates must not only be eligible for Level I placement, but they must have a Minimum B Custody designation, as this allows them to live and work outside of a secure perimeter. (Please see the box on the next page for more information about MSFs and conservation camps.)

**Specialized Housing Can Affect Inmates' Credit Earning Status.** In some cases, inmates housed in conservation camps can earn time off of their prison sentence faster than they would if housed elsewhere at Minimum Custody, such as in an MSF. For example, offenders serving terms for violent felonies can earn one day off of their prison sentence for every day they serve with good behavior in a conservation camp rather than only one day off for every four days they serve if housed elsewhere.



**Figure 8**

**Most Inmates Placed on Medium A Custody[a]**
*2018*

- Maximum (Most Supervision) 5%
- Minimum B (Least Supervision) 10%
- Minimum A 2%
- Medium B 5%
- Close 10%
- Medium A 68%

Total: 109,379

[a] Excludes inmates who have not been assigned a custody designation.

LAO

### Minimum Support Facilities (MSFs) and Conservation Camps

MSFs are located on prison grounds but are outside of the main security perimeter of the prison. Inmates in MSFs provide important forms of operational support to prisons, such as grounds keeping and fire protection. In addition, when certain areas of the prison are "locked down"—meaning that inmates are confined to their dormitories or cells and cannot go to their regularly scheduled work assignments within the prison due to security concerns—MSF inmates temporarily fill these inmates' jobs so that key aspects of prison operations that depend on inmate labor (such as the kitchen and laundry) can continue to function.

Conservation camps are located off prison grounds, often in remote areas of the state. Inmates in conservation camps contribute to state wildfire fighting efforts by serving on hand crews. (Hand crews are usually made up of 17 workers that cut "fire lines"—gaps where all fire fuel and vegetation is removed—with chain saws and hand tools.) There are about 3,500 inmates housed in 42 conservation camps throughout the state that are generally jointly operated by the California Department of Corrections and Rehabilitation and the California Department of Forestry and Fire Protection. When not responding to fires, these inmates are available to support fire prevention and other resource conservation projects.

## ASSESSMENT OF CDCR'S INMATE CLASSIFICATION SYSTEM

In reviewing CDCR's inmate classification system, we identified several issues that merit legislative consideration. As summarized in Figure 9, we found that (1) the housing score methodology is not sufficiently aligned with the goals of the department's inmate classification system, (2) the accuracy of the housing score methodology could be limited, (3) the need for some discretionary overrides of the housing score is unclear, and (4) access to Level I housing and Minimum Custody designations may be overly restricted. We discuss each of our findings in more detail below.

### Housing Score Not Sufficiently Aligned With Departmental Goals

*Higher Points Given for Any Misconduct.* As previously indicated, one of the stated goals of CDCR's inmate classification system is to uniformly place inmates in the lowest security level consistent with the safety of staff, inmates, and the public. To put it another way, CDCR's goal is to ensure that inmates are not placed in a higher housing security level (more restrictive) than necessary. However, the department's housing score methodology is designed to assign higher points to inmates likely

---

**Figure 9**

#### Review of Inmate Classification System—Summary of Major Findings

✔ Housing score not sufficiently aligned with departmental goals.

✔ Accuracy of housing score could be limited.

✔ Need for some discretionary overrides of housing score is unclear.

✔ Access to Level I and Minimum Custody may be overly restricted.

to engage in *any* misconduct—meaning both serious and nonserious misconduct. For example, the system allocates the same amount of points to an inmate likely to engage in serious misconduct (such as assault) as an inmate likely to engage in minor misconduct (such as use of vulgar language) and may not require additional security resources. Accordingly, CDCR may be assigning unnecessary security to inmates who are prone to engage in minor misconduct, but not in serious misconduct. This approach is inconsistent with CDCR's goals because it may result in inmates who do not represent a serious safety concern being placed in more restrictive settings than necessary. Moreover, it also results in an inefficient use of limited security resources.

## Accuracy of Housing Score Could Be Limited

As discussed above, the accuracy of CDCR's housing score methodology has important implications for prison security, costs, and inmates' experiences while incarcerated. If the system incorrectly assesses certain inmates as having relatively high risks of misconduct, these inmates could be placed in more restrictive housing than necessary. Such a placement potentially threatens public safety as it could make inmates more prone to crime. In contrast, if the system incorrectly assesses certain inmates as having relatively low risks of misconduct, these inmates could jeopardize public safety through escape or misconduct.

In our review of CDCR's housing score methodology, we identified several factors that call into question the accuracy of the methodology in predicting misconduct. Specifically, we find that (1) CDCR has modified the methodology without reassessing its accuracy, (2) several changes—such as to the demographics of the inmate population—could have caused its accuracy to deteriorate over time, and (3) researchers have found some evidence suggesting that age is underweighted in the methodology. Furthermore, we find that the methodology for recalculating inmates' housing scores annually has never been evaluated in terms of accurately reflecting changes in inmates' likelihood of committing misconduct.

*Impact of Modification Made to Scoring Methodology Has Not Been Assessed.* As discussed above, the underlying basis of the department's current methodology for calculating inmates' housing scores when they first arrive in prison was established in the early 2000s by researchers at UCLA. In 2008, in response to a lawsuit, CDCR removed mental illness from the set of factors that increased inmates' scores. The department or external researchers, however, have not assessed the impact of this modification on the accuracy of the score in predicting inmate misconduct—making it unclear whether the scoring methodology is more or less accurate.

*Several Changes Could Have Impacted Accuracy of Methodology.* The researchers who established CDCR's current housing score methodology in the early 2000s used data on the conduct and characteristics of inmates from the late 1990s. Accordingly, the current system effectively assigns risk scores to current inmates based on how similar they are to inmates that engaged in misconduct in the 1990s. For example, because the researchers found that inmates in the late 1990's who were first arrested at a young age were more likely to engage in misconduct, the system assigns higher risk scores to current inmates who share this characteristic. However, any changes in the underlying relationships between these characteristics and misconduct may have caused the accuracy of the assessment to deteriorate over time. For example, if inmates who were first arrested at a young age no longer engage in misconduct at higher rates than other inmates, this would cause the accuracy of the assessment to decrease. Experts who study risk assessments designed to predict outcomes for a certain population generally recommend reassessing the accuracy of such tools whenever there are significant changes in the population for which the tool is used.

We find that several key changes could have caused the relationships between inmate characteristics and misconduct to change over time. These include changes in the following areas:

- *Inmate Demographics.* The demographics of the state's inmate population have

changed significantly since the housing score methodology was developed using inmate data from the late 1990s. This is largely due to changes in sentencing law such as the 2011 realignment, which shifted responsibility for housing lower-level felons from the state to the counties. (Please see the nearby box for an overview of recent changes in sentencing law.) As shown in Figure 10, inmates are, on average, older and more likely to be serving a term for a crime against persons now than they were when the housing score methodology was developed. Accordingly, it is possible that shifting demographics have changed the relationships between inmate characteristics used to calculate the housing



**Figure 10**

**Inmate Demographics Have Changed Since 1999**

**Inmate Population by Type of Offense**

1999 / 2017

- Crimes Against Persons
- Drug Crimes
- Property Crimes
- Other Crimes

**Inmate Population by Age**

1999 / 2017

- 18-29
- 30-39
- 40-49
- 50 and Older

score and actual inmate misconduct, likely reducing the accuracy of the tool.

- *How Inmates Are Housed.* Since 2000, there have been two substantial changes in inmate housing conditions. First, the state has significantly reduced the level of overcrowding in its prisons. As of January 31, 2000 state prisons were at about 195 percent of their design capacity. However, by July 25, 2018, state prisons were populated at 136 percent of their design capacity. Some research has found that this reduction in prison overcrowding significantly reduced the amount of assaults and batteries committed by inmates in California. Second, in recent years, CDCR has shifted many prison gang leaders from restricted housing—where they have little communication with other inmates—to general population environments as a result of a federal court order limiting the use of restricted housing. It is plausible that these changes may have altered the relationships between inmates' characteristics and their tendencies to engage in misconduct. For

example, the average inmate today may be less likely to engage in misconduct due to reduced overcrowding but gang affiliated inmates may be more likely to engage in misconduct today due to the greater presence of gang leaders in general population environments.

- *Inmate Incentives.* The incentives for inmates to avoid misconduct have increased. First, CDCR has increased the number of inmates who are eligible to earn time off of their sentences for maintaining good behavior. For example, since 2017 CDCR began allowing certain offenders to reduce their prison sentences by as much as a third through avoiding misconduct. Second, the number of inmates considered for release by the Board of Parole Hearings (BPH) before serving their entire sentence has increased. For example, Proposition 57 (2016) made nonviolent offenders eligible for parole consideration. Because BPH weighs avoiding misconduct favorably, inmates who are eligible for release

## Recent Policy Changes Impacting the Inmate Population

In recent years, the Legislature and voters have enacted various constitutional and statutory changes that significantly impacted the composition of the state's inmate population. Some of the major changes include:

- *2011 Realignment.* In 2011, the Legislature adopted legislation that limited who could be sent to state prison. Specifically, it required that certain lower-level offenders serve their incarceration terms in county jail. Additionally, the legislation required that counties, rather than the state, supervise certain lower-level offenders released from state prison.

- *Proposition 36 (2012).* Proposition 36 reduced prison sentences for certain offenders subject to the state's existing three-strikes law whose most recent offenses were nonserious, nonviolent felonies. It also allowed certain offenders serving life sentences to apply for reduced sentences.

- *Proposition 47 (2014).* Proposition 47 reduced penalties for certain offenders convicted of nonserious and nonviolent property and drug crimes from felonies to misdemeanors. It also allowed certain offenders who had been previously convicted of such crimes to apply for reduced sentences.

- *Proposition 57 (2016).* Proposition 57 expanded inmate eligibility for parole consideration, increased the state's authority to reduce inmates' sentences due to good behavior and/or the completion of rehabilitation programs, and mandated that judges determine whether youth be subject to adult sentences in criminal court.

by BPH have a strong incentive to avoid misconduct.

- *Access to Rehabilitation Programs.* CDCR has significantly increased the number of rehabilitation programs offered and the amount of time that inmates can earn off of their sentences from completing such programs. To the extent these programs are effective in reducing misconduct, greater participation in these programs may make some inmates less likely to engage in misconduct.

- *Data Quality.* The quality of CDCR data on inmate characteristics and behavior has also likely improved. This is because CDCR has expanded and updated its data systems significantly over the last two decades, allowing the department to capture more detailed and likely more accurate information about inmate characteristics and conduct. Moreover, the quality of data on inmate gang involvement has likely improved since the late 1990s because CDCR did not use inmate gang affiliation data for the purposes of inmate classification at that time. Accordingly, the researchers who developed the housing score methodology have informed us that inmates currently labeled as gang affiliated are probably more likely to be actually gang affiliated than inmates labeled as such in the data they used to develop the methodology nearly two decades ago.

*Researchers Have Raised Concerns About Score Accuracy.* As mentioned earlier in this report, CDCR commissioned University of California researchers in 2010 to assess whether there are any natural "tipping points" that correspond with clear increases in misconduct along the continuum of inmate housing scores. While this study was not an evaluation of the accuracy of the housing score in assessing inmates' risk of misconduct, the researchers did inadvertently uncover some evidence suggesting that inmate age appeared to be underweighted in the housing score methodology. Specifically, the researchers found that they were able to better predict inmate misconduct using inmates' housing scores and

age than by using their housing score alone. This suggests that, even though housing score methodology is intended to include the effect of age on the likelihood of misconduct, it does not give a strong enough weight to age relative to the other factors. Accordingly, the researchers recommended that CDCR commission a study to investigate whether a new housing score system might perform better. However, such a study has not been done at this time.

*Accuracy of Method for Annual Recalculation of Housing Score Never Assessed.* The UCLA researchers that developed CDCR's housing score system in the early 2000s only assessed the accuracy of the methodology they developed to calculate inmates' initial housing scores at reception centers. They did not assess the accuracy of CDCR's methodology for adding or subtracting points from inmates' housing scores annually thereafter. As such, it is unclear whether the factors that CDCR uses to move inmates' score up and down after their initial placement accurately reflect changes in inmates' risk of misconduct. Moreover, even if the factors used to adjust the score are appropriate, it is unclear if the amount that the score is adjusted is consistent with inmates' change in risk. This could mean that CDCR is housing inmates in either overly or insufficiently restrictive settings as a result of the annual recalculation.

## Need for Some Discretionary Overrides of Housing Score Is Unclear

As discussed above, there are several reasons why inmate classification staff can choose to place inmates in a housing level that is inconsistent with their score. Three of these reasons—inmates' age, time to serve, and behavior—are factors that are currently included in the housing score methodology. Thus, it is unclear what additional benefit, if any, these overrides would provide if inmates' scores already reflect the statistical impact of their age, time to serve, and behavior on their likelihoods of misconduct. Research suggests that risk assessments, such as the housing score, generally more accurately predict risk than humans can by applying their judgement. Accordingly, the use of judgement to override a risk assessment

in these cases raises concerns that it may be causing inmates to be assigned to either overly or insufficiently restrictive housing. Moreover, to the extent that staff overrides are necessary because of the inaccuracy of the housing score, it could be indicative that age, time to serve, or behavior are not appropriately weighted in the housing score methodology. Such inaccuracy could be due to the factors discussed above that have likely caused the accuracy of the score to decline since it was first developed.

## Access to Level I and Minimum Custody May Be Overly Restricted

CDCR's policies for limiting inmates' access to Level I housing and Minimum Custody designation appear to be overly restrictive in a few ways. Specifically, it is unclear why low-risk sex offenders are excluded from Level I housing and Minimum Custody and why inmates with more than five years left to serve or minor felony detainers are excluded from Minimum Custody. To the extent that these policies cause certain inmates to be placed in unnecessarily restrictive environments, they unnecessarily create state costs and operational challenges. We discuss these concerns in further detail below.

***Unclear Why Low-Risk Sex Offenders Are Excluded From Level I and Minimum Custody.*** Currently, CDCR excludes all inmates who have committed a registerable sex offense—including those who are not currently serving a term for that offense—from Level I facilities and from Minimum A and B Custody designations. This is based on the assumption that these particular offenders pose a greater threat to public safety if they were to escape when compared to other offenders. However, research suggests that the risk of sexual reoffending decreases markedly with time that offenders remain sex offense free in the community. Specifically, some individuals who have committed a sex offense in the past but are not committing new sex offenses eventually become less likely to commit a sex offense than an offender with no history of sexual offending. Moreover, research shows that the risk of an offender sexually reoffending can be reliably predicted with widely accepted risk assessments, such as the

Static-99 assessment that CDCR currently uses to identify low-risk sex offenders. This suggests that the department may not need to exclude *all* sex registrants from Level I facilities and Minimum Custody given that it can identify the subset of sex offenders who pose a minimal risk to public safety. Accordingly, the current policy has the potential to unnecessarily exclude some low-risk sex offenders from Level I facilities (including conservation camps and MSFs) and Minimum Custody.

***Unclear Why Inmates With Longer Time Left to Serve Are Excluded From Minimum Custody.*** As previously indicated, inmates with more than five years left to serve are currently excluded from Minimum A and B Custody designations. The underlying rationale is that such inmates have a greater incentive to escape to avoid serving the remainder of their sentences relative to those inmates within less than five years of release. Given this policy, those inmates with more than five years to serve are therefore ineligible from being housed in conservation camps and MSFs. While it appears reasonable to assume that inmates above a certain number of years left to serve have relatively more to gain from escaping prison, it is unclear why or how CDCR concluded that five years was an appropriate cutoff point.

***Unclear Why Inmates With Minor Felony Detainers Are Excluded From Minimum Custody.*** District attorneys, courts, and law enforcement agencies may notify CDCR that an inmate is wanted by that agency for a felony and in some cases request that the inmate be released into the agency's custody after completing his or her prison term. This is referred to as a detainer. For example, after an inmate is committed to prison for a certain crime, a law enforcement agency may discover evidence implicating that inmate in a separate crime that occurred before the inmate was incarcerated. The agency could then issue a detainer to CDCR for that inmate. As discussed earlier, inmates with outstanding felony detainers are excluded from Minimum Custody, and therefore ineligible for placement in conservation camps and MSFs. The rationale is that such inmates have an incentive to escape from prison to avoid facing felony charges. However, inmates facing minor felony charges have a relatively similar incentive

to escape compared to inmates with no felony charges. For example, an inmate with one year left to serve on his or her current sentence and an outstanding detainer for an offense that carries a two year prison term would have a similar incentive to escape as an inmate with three years left to serve but with no felony detainer. However, only the inmate with no felony detainer would be eligible for Minimum Custody. Accordingly, the current policy has the potential to unnecessarily exclude some inmates with detainers from Minimum Custody.

**State Prison Costs and Operational Challenges.** The unnecessary exclusions of certain inmates from Level I facilities and Minimum Custody likely increase state prison costs in two ways. First, because inmates assigned to Minimum Custody or housed in a conservation camp can earn credits at higher rates than they otherwise would, placing them in higher-level facilities results in them serving longer sentences than otherwise. This, in turn, increases the inmate population and associated state costs.

Second, it results in the state spending more than necessary on contract beds due to a lack of bed space in state prisons that could have otherwise been freed up to the extent CDCR moved additional inmates to conservation camps. This is because the state currently can only house a limited number of inmates in state owned and operated prisons—not including conservation camps—due to a court-ordered cap on the number of inmates that can be housed in such facilities and utilizes contract beds to help meet this population cap. (See the nearby text box for more information on the court-ordered prison population cap.) We note that it currently costs about $18,000 more annually to house an inmate in a contract bed than in a state prison bed or a conservation camp. As of February 27, 2019 the state housed nearly 3,500 inmates in conservation camps, though camps have a total design capacity of nearly 4,700. Accordingly, CDCRs overly expansive exclusions on camp eligibly—which have contributed to the roughly 1,000 vacant camp beds—could be costing the state tens of millions of dollars annually in unnecessary expenditures on contract beds.

In addition to increasing state prison costs, these exclusions can exacerbate operational challenges

### Federal Court Ordered California to Limit Prison Population

In November 2006, plaintiffs in two ongoing class action lawsuits—now called *Plata v. Newsom* (involving inmate medical care) and *Coleman v. Newsom* (involving inmate mental health care)—filed motions for the courts to convene a three-judge panel pursuant to the U.S. Prison Litigation Reform Act. On August 4, 2009, the three-judge panel declared that overcrowding in the state's prison system was the primary reason that the California Department of Corrections and Rehabilitation (CDCR) was unable to provide inmates with constitutionally adequate health care. Specifically, the court ruled that in order for CDCR to provide such care, overcrowding would have to be reduced to no more than 137.5 percent of the design capacity of the prison system. (Design capacity generally refers to the number of beds that CDCR would operate if it housed only one inmate per cell.) The court ruling applies to the number of inmates in prisons operated by CDCR, and does not preclude the state from holding additional offenders in other public facilities (such as conservation camps) or private facilities.

To comply with the prison population cap, the state took a number of actions, including (1) housing inmates in contracted facilities, (2) constructing additional prison capacity, and (3) reducing the inmate population through several policy changes. For example, in 2011, the state shifted the responsibility for housing and supervising certain lower-level felons to counties. In addition, Proposition 57 (2016) led to a reduction in the prison population by expanding inmate eligibility for parole consideration and increasing the state's authority to reduce inmates' sentences due to good behavior and/or the completion of rehabilitation programs.

faced by CDCR. Specifically, CDCR currently has challenges filling inmate jobs in MSFs due to a lack of inmates who qualify for both Level I and Minimum Custody placements. Allowing more inmates to receive these placements, and thus qualify to live in an MSF, would likely help CDCR to fill these inmate jobs. This in turn, could help support prison operations, such as grounds keeping or facility fire protection, and help support facilities that need additional inmate workers due to lockdowns.

Moreover, by excluding low-risk sex offenders from all Level I facilities, these policies unnecessarily increase the number of inmates who must be housed in Level II facilities. However, currently, Level I facilities are populated at less than 100 percent of their design capacity, while Level II facilities are populated at over 100 percent of their design capacity. To the extent that CDCR could increase the population of Level I facilities, it could potentially create more flexibility for housing Level II

inmates. This is important because CDCR can face challenges in placing inmates in facilities that simultaneously meet their rehabilitative, medical, mental health, and security needs.

***State Firefighting Costs and Operational Challenges.*** Finally, by contributing to the roughly 1,000 vacant conservation camp beds, these exclusions reduce the number of inmates who would otherwise be available to support state wildfire fighting and prevention efforts. When insufficient inmate hand crews are available, the state must use other hand crews—such as those formed by employees of federal agencies or private companies—which can increase costs. Furthermore, to the extent CDCR could increase the population of conservation camps, the California Department of Forestry and Fire Protection could accomplish more fire prevention work—such as fuel reduction—when inmates are not actively engaged in fighting fires.

# LAO RECOMMENDATIONS

Based on our assessment of CDCR's policies and practices for assigning inmates to varying levels of housing security and supervision by staff, we recommend the Legislature take certain steps to improve the inmate classification process. Specifically, we recommend that the Legislature (1) direct CDCR to contract with independent researchers to develop a new methodology for assigning inmates to housing levels and (2) consider various options to expand access to Level I facilities and Minimum Custody. We discuss each of these recommendations in greater detail below.

## Develop New Housing Score Methodology

We recommend that the Legislature direct CDCR to contract with independent researchers to develop a new methodology for assigning inmates to a housing level when they arrive at a reception center and annually thereafter. In our view, the researchers should develop the methodology by (1) using recent data and outcome variables that capture only misconduct that justifies additional

security resources and/or (2) using a methodology that gives weight to different types of misconduct based on severity. We also recommend that the new scoring methodology be periodically assessed to ensure it remains effective in accurately predicting inmate misconduct.

By developing a new methodology, CDCR and the researchers will be able to (1) consider what forms of misconduct require additional security resources; (2) utilize recent data, which is likely more accurate, detailed, and reflective of current realities than past data; and (3) potentially eliminate the need for some manual overrides of the score. Together, these factors would likely allow CDCR to more accurately predict inmate misconduct and improve its ability to assign inmates to appropriate levels of security. This in turn, could help CDCR reduce prison violence and other misconduct while minimizing placement of inmates in unnecessarily restrictive environments that can make them more prone to crime in the long run. In addition, a more accurate methodology could eliminate the need to override housing score based on age, behavior, and sentence length using human judgement.

We estimate that the cost of developing a new methodology would not likely exceed $1 million and could take a couple years. Until a new methodology is implemented statewide, we think it makes sense for CDCR to continue using its existing system for assigning inmates to a housing level.

## Consider Options to Expand Access to Level I and Minimum Custody

As discussed above, access to Level I and Minimum A and B Custody designations may be overly restricted for certain inmates (such as inmates who have committed a sex offense but nevertheless have a low risk of recidivism). Accordingly, there are likely certain low-risk inmates that could be placed in Level I housing or on Minimum Custody without jeopardizing safety. Depending on the number of such inmates, this change could reduce state costs—potentially in the tens of millions of dollars annually. Placing additional inmates in Level I and Minimum Custody could also mitigate existing operational challenges, such as a shortage of inmate labor in conservation camps and MSFs. Below, we discuss three options that the Legislature could consider for expanding access to Level I and Minimum Custody based on additional information from CDCR.

*Allowing Low-Risk Sex Offenders Into Level I and Minimum Custody.* We recommend that the Legislature consider directing CDCR to allow low-risk sex offenders into Level I facilities and Minimum Custody. To help the Legislature determine whether such a change should be made, we recommend it direct CDCR to report on how it would identify sex offenders who are of low risk to escape and re-offend for placement into Level I facilities and Minimum Custody. For example, CDCR could establish a set of criteria that include the inmate's assessed risk of sexual re-offense but also other factors, such as whether the inmate has participated in a sex offender treatment program and the amount of time elapsed since the inmate's last offense. We note that in 2017 CDCR made a similar change for inmates with histories of violence. Specifically, the department narrowed the circumstances that require a mandatory override for an inmate's history of violence. For example, if inmates meet certain criteria—such

as having not committed a violent offense for at least seven years—staff have the discretion to remove the override. Similarly, CDCR also conducts case-by-case reviews for inmates with life terms, and gang member status who are seeking entrance to Level I facilities or Minimum Custody status. In addition, we recommend that the Legislature direct the department to report on the number of inmates that would likely be affected if a review process were implemented for low-risk sex offenders.

*Reducing Time-to-Serve Restrictions for Minimum Custody.* We recommend that the Legislature consider directing CDCR to allow inmates with more than five years left to serve (up to some new, higher cut-off point) to gain Minimum Custody status. To help the Legislature determine whether to make such a change, it may want to direct CDCR to contract with researchers to conduct a randomized trial to assess whether the time-to-serve cut off for placement on Minimum Custody status could be increased without causing an increase in escapes.

*Allowing Inmates With Minor Felony Detainers Into Minimum Custody.* We recommend that the Legislature consider directing CDCR to allow inmates with minor felony detainers into Minimum Custody. To help the Legislature determine whether to make this change, we suggest directing CDCR to report on how it would identify inmates with minor felony detainers who would have a relatively low risk of escaping compared to inmates with more time at stake. For example, CDCR allows inmates with U.S. Immigration and Customs Enforcement holds on Minimum Custody if they meet certain criteria (such as if he or she has family ties in California). Similarly, CDCR could create a set of criteria for allowing certain inmates with felony detainers on Minimum Custody. These new criteria could be linked to time-to-serve criteria already in place or any changes made to the time-to-serve criteria (discussed above). For example, if CDCR allows inmates with six years left to serve into Minimum Custody, it could also admit any otherwise eligible inmate whose current sentence in addition to potential sentence tied to a felony detainer is six years or less. The department should also report on the number of inmates that would likely be affected if the new process was implemented.

# CONCLUSION

CDCR's inmate classification system is a key tool for assigning inmates to appropriate amounts of housing security and staff supervision. The performance of the system has implications for the safety of staff, inmates, and the public; prison operations and cost; the size of the inmate population; and inmates' daily experiences in prison, including their access to rehabilitation opportunities. We identified several concerns, which suggest that inmate housing placements may be based on inaccurate assessments of inmates' risks of misconduct and that the system may be assigning too much security and supervision in certain cases. Accordingly, we recommend the Legislature take various steps to improve CDCR's inmate classification system to ensure that maximum benefit is achieved from the allocation of scarce security resources.

Case 2:90-cv-00520-KJM-SCR     Document 7039-1     Filed 01/28/21     Page 126 of 126

## LAO PUBLICATIONS

This report was prepared by Caitlin O'Neil and reviewed by Drew Soderborg. The Legislative Analyst's Office (LAO) is a nonpartisan office that provides fiscal and policy information and advice to the Legislature.

To request publications call (916) 445-4656. This report and others, as well as an e-mail subscription service, are available on the LAO's website at www.lao.ca.gov. The LAO is located at 925 L Street, Suite 1000, Sacramento, CA 95814.