1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF CALIFORNIA
2


3
   RALPH COLEMAN, et al.,
4          Plaintiffs,
                                    Sacramento, California
5   vs.                             No. 2:90-CV-00520
                                    Friday, January 29, 2021
6   GAVIN NEWSOM, et al.,           10:08 a.m.
           Defendants.
7   _____/

8

9

10                          ---o0o---

11                  TRANSCRIPT OF PROCEEDINGS

12                    STATUS CONFERENCE

13      BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE

14          *(Proceedings held via videoconference.)*

15                          ---o0o---

16

17

18

19

20

21   Official Court Reporter:        Thresha Spencer,
                                      CSR, RPR
22                                    501 I Street
                                      Sacramento, CA 95814
23

24
   *Proceedings recorded by mechanical stenography, transcript*
25   *produced by computer-aided transcription*

```
1    APPEARANCES:

2      For the Plaintiffs:         ROSEN BIEN GALVAN & GRUNFELD
                                   LLP
3                                  101 Mission Street, 6th Floor
                                   San Francisco, CA  94105
4                                  By:  MICHAEL BIEN
                                        LISA ELLS
5                                        JENNY YELIN
                                        CARA TRAPANI
6                                  Attorneys at Law

7

       For the Defendants:        DEPARTMENT OF JUSTICE
8                                  1676 N. California Blvd.,
                                   Suite 620
9                                  Walnut Creek, CA  94596
                                   By: PAUL MELLO
10                                 Attorney at Law

11                                 DEPARTMENT OF JUSTICE
                                   OFFICE OF THE ATTORNEY GENERAL
12                                 1300 I Street
                                   Sacramento, CA  95814
13                                 By:  ELISE THORN
                                        LUCAS HENNES
14                                 Attorneys at Law

15                                 HANSON BRIDGETT LLP
                                   425 Market Street, 26th Floor
16                                 San Francisco, CA  94105
                                   By:  SAMANTHA D. WOLFF
17                                 Attorney at Law

18
       Special Master:            MATTHEW LOPES
19

20

21

22

23

24

25     (Appearances continued on following page)
```

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

```
 1    APPEARANCES (Continued):

 2    Also Present:                 Kathleen Allison
                                    Dr. Travis Williams
 3                                  Dawn Lorey
                                    Dean Borg
 4                                  Lucinda "Cindy" McGill
                                    Christine Ciccotti
 5                                  Antonina Raddatz
                                    Kristopher Kent
 6                                  Diana Toche
                                    Dr. Joseph Bick
 7                                  Jennifer Neill
                                    Nick Weber
 8                                  Melissa Bentz
                                    Lucas Hennes
 9                                  Namrata Kotwani
                                    James Spurling
10                                  Gregg Adam
                                    David Sanders
11

12
                              --o0o--
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        SACRAMENTO, CALIFORNIA, FRIDAY, JANUARY 29, 2021, 10:08 AM

 2                              --o0o--

 3   (Admonition given.)

 4              THE CLERK:  The United States District Court, Eastern

 5   District of California is now in session.  Chief Judge Kimberly

 6   J. Mueller now presiding.

 7        Calling civil case 90-520, Coleman, et al., versus Newsom,

 8   et al.  This is on for a status conference.

 9              THE COURT:  All right.  Good morning.  I'd like to

10   acknowledge lead counsel for each side, have them introduce

11   themselves, and they may introduce their teams for the record.

12        So for the plaintiffs.

13              MR. BIEN:  Good morning, your Honor.  Michael Bien of

14   Rosen Bien Galvan & Grunfeld, and appearing with me today for

15   the plaintiffs are Lisa Ells, Cara Trapani, Jenny Yelin, and I

16   think that's it.  Thank you.  Mr. Fama offers his apologies, he

17   was not able to be here today.

18              THE COURT:  All right.  I understood as much.  Thank

19   you.

20        For the defense, who's taking the lead today?

21              MR. MELLO:  Good morning, your Honor.  This is Paul

22   Mello.  Also appearing is Samantha Wolff, Elise Thorn, and

23   Lucas Hennes.

24        Secretary Allison is present and our PMKs:  Dr. Travis

25   Williams, Mr. Dean Borg, Ms. Dawn Lorey, and Ms. Cindy McGill
```

 1    are also present.  Thank you.

 2              THE COURT:  All right.  Good morning to all of you.

 3    Here's how I would like to proceed.  I have brief general

 4    comments I'd like to make at the beginning of the hearing,

 5    provide the Special Master a chance to make brief opening

 6    comments, provide the secretary a chance to make any brief

 7    opening comments, if she would like to, and then I'd like to

 8    drill down on suicide prevention, hearing from the persons most

 9    knowledgeable who are present, and Mr. Mello has just

10    identified them.

11        And then we'll talk about quarantine and isolation, I

12    believe, briefly, given the stipulation and the proposed order

13    I now have, and then I'd like to talk about next steps,

14    generally.

15        So in terms of overview, very briefly.  I understand from

16    the Special Master that the task force is still meeting, been a

17    little less often, which makes some sense to the Court,

18    allowing other work to happen in between.

19        The Special Master is working on, if not quite immanently,

20    wrapping up data remediation, making data remediation a very

21    high priority because it is so essential to the case moving

22    forward, but we may hear a bit from him on that.  Working to

23    finalize CQIT, we'll talk about that.  In next steps at the

24    end, and then also working to clear the deck about standing

25    reports that the Court has requested from him.

1    In terms of the way the Court is thinking about next steps,

2    just to flag thinking about it, I'm looking to set a next

3    hearing after this one that is, as I've signaled at our past

4    session, not just quarterly for sake of quarterly but more

5    organic; that is, tied to what's happening in the case.

6    And so there's a CQIT deadline out there that I'm looking

7    at.  That's an example of how I'm thinking about how we set our

8    next session.  But I'll ask for input on that, particularly

9    from the secretary, whether or not she has other thoughts.

10    So with that, Special Master Lopes, did you have a brief

11    report you would like to make at this time before we turn to

12    suicide prevention?

13    SPECIAL MASTER:  Yes, your Honor.  Thank you very

14    much.  As you stated, we are having task force meetings.

15    They're held every other Tuesday now, and on alternate weeks we

16    are having data meetings.  And in those data meetings we're

17    having reports made by CDCR and our data expert, Dr. Dan

18    Potter, and we're walking through the elements of the rollout

19    that need to be achieved prior to having us test everything in

20    the summer on tours.

21    We have been talking with the defendants about their

22    vaccination program, and it's my understanding that the vaccine

23    rollout has been going fairly well, that a substantial number

24    of inmates have been -- inmate patients have been vaccinated,

25    and a substantial number of staff have as well.  I think the

1    defendants can give you up-to-date numbers; those numbers are

2    changing daily.

3        In terms of quarantine and isolation space, we have worked

4    with -- the parties have worked together over the last few

5    months to put together an agreement on quarantine and isolation

6    space.  Then at the time of the last status conference there

7    was a pause requested because it seemed that the churning was

8    causing more positive cases to occur, and we've rebooted that

9    effort and continue to have discussions and stipulations before

10   the Court at this time for your review.

11       Suicide prevention, activation schedules, you'll hear more

12   about who is responsible for making sure that all of the

13   elements are achieved, but my team, led by Mr. Lindsay Hayes,

14   worked closely with the defendants on the activation schedules,

15   we feel that they're appropriate, and we're looking forward to

16   working with the parties going forward to make sure that full

17   implementation is achieved sometime next fall.

18       The PIP suicide prevention policy was filed with the Court

19   on December 30th.  There is one concern in that policy that I

20   think we all share, and that is it's unclear how much

21   out-of-cell activity will take place and whether telephone

22   privilege is a bit -- visiting privileges are addressed

23   adequately in the policy, but we are going to put that matter

24   on our agenda for our upcoming task force meeting, which will

25   occur next Tuesday.

1    That policy, your Honor, has been sent to the field.  In

2  terms of intake, we've had -- we've been invited to meetings on

3  an almost weekly basis to look at intake that would be coming

4  into the three reception centers.

5    It is my understanding at this point there are some 10,000

6  people in county jails awaiting transfer to CDCR.  It's

7  unclear, I believe at this time, although the secretary may

8  have up-to-date information as to what the plan will be to

9  bring people into the facilities -- back into the facilities

10  and reduce that number once everyone receives vaccines.

11    In terms of DSH transfers, you have a filing in front of

12  you.  DSH staffing, we are working with the DSH defendants and

13  the plaintiffs to put together a staffing plan -- or DSH has

14  proposed a staffing plan, we're all reviewing it.  The next

15  meeting is scheduled for February 11th.

16    We're also working with DSH on their continuous quality

17  improvement plan, and we will be convening meetings soon with

18  the plaintiffs and defendants.

19    In terms of data issues, again, we're working with the data

20  experts every other week, and we hope to have an update for

21  you that -- a meaningful update for you at the next status

22  conference.

23    As you stated, your Honor, we are working diligently to

24  reduce the backlog of reports that are waiting to be filed

25  yesterday -- or last night, excuse me.  I filed the Inpatient

 1   Care Report, I also filed the analysis of 2015 suicides and

 2   2016 suicides, and this morning -- or just prior to this

 3   hearing -- we sent in draft to the parties an analysis of the

 4   suicides committed in 2017.

 5        It is my hope that we will have a report on those suicides

 6   committed in 2018 before the next status conference, and we

 7   will clear up the backlog no later than the end of August of

 8   this year.

 9        That is my report, your Honor.

10           THE COURT:  All right.  Thank you, Special Master

11   Lopes.

12        Let me ask Secretary Allison.  I think my primary question

13   now would be:  Is there anything you want the Court to know

14   now, or is there any topic you want to be certain we touch on

15   before the end of today's session, recognizing that in talking

16   about next steps I'll provide a chance for more discussion of

17   intake -- a number of issues that Mr. Lopes mentioned, DSH

18   transfer.

19        Is there any issue you want us to at least raise at this

20   session that you haven't heard so far, Secretary Allison?

21           MS. ALLISON:  No, ma'am.  I think what's been said,

22   and also all of the issues we're going to cover today, are

23   pretty inclusive of the high-level issues that are going on, so

24   I don't have anything to add.

25           THE COURT:  All right.

1        MS. ALLISON:  I'll respond to questions.

2        THE COURT:  All right.  Let's turn then to suicide

3   prevention.  And, Secretary Allison, here I do have a few

4   questions for you at the beginning.

5     Are you satisfied -- I understand the policy that the Court

6   ordered is now in the field, perhaps belatedly, but I

7   understand it's in the field being implemented with some

8   fine-tuning required.  But the impression that there's good

9   meet and confer and that the outstanding issues that Special

10  Master Lopes mentioned, the need to focus on out-of-cell

11  activities go under visiting privileges.  Melissa Bentz's

12  letter that those issues are on the table, and there's a good

13  chance of those being worked out.

14     Is that your impression as well?

15        MS. ALLISON:  Yes, ma'am.

16        THE COURT:  And are you satisfied that the policy is

17  actually being implemented?

18        MS. ALLISON:  Yes, ma'am.

19        THE COURT:  All right.

20        MS. ALLISON:  It is being implemented.  And I know we

21  still have some work to do, and we're working through that.

22        THE COURT:  All right.  And that includes the

23  clinical judgment piece.  Is there anything you'd like to say

24  briefly about ensuring good clinical judgment?

25        MS. ALLISON:  Well, I'm not a clinician, and so I

 1    would need to defer to Dr. Travis Williams who can address that

 2    issue.

 3            THE COURT:  All right.  I know he's going to provide

 4    information in a bit, so I'll -- if Dr. Williams can be

 5    prepared to talk about clinical judgment, even if he has not

 6    already planned to, that would be helpful.

 7        Anything else you want me to know before we turn to the

 8    persons most knowledgeable, Secretary Allison?

 9            MS. ALLISON:  No, ma'am.

10            THE COURT:  All right.  Thank you.

11        Let's hear from the persons most knowledgeable; I

12    appreciate the defendants identifying them.  I'm prepared to

13    take them in the order provided in the notice, and so that

14    would be Director Borg, Associate Warden Lorey, Nurse

15    Consultant McGill, and then Dr. Williams.

16        Does that make the most sense to you, Mr. Mello?  Is that

17    why they're proposed in that order?

18            MR. MELLO:  I actually think that we might want to

19    start with Dr. Williams since he is the overall person most

20    knowledgeable on this project in the activation schedules and

21    has the global view of the project.

22        The others have a smaller piece, but of course we will

23    defer to the Court.  I don't think there was any intention to

24    put them in order for the presentation, your Honor.

25            THE COURT:  All right.  Secretary Allison, does it

```
 1    make sense to you to have Dr. Williams go first?

 2              MS. ALLISON:  Absolutely.

 3              THE COURT:  All right.  In terms of the amount of

 4    time the Court has budgeted, while this is a very high

 5    priority, but my thought would be to initially provide each

 6    person up to 15 minutes.

 7        The Special Master has indicated his initial thoughts that

 8    that probably is sufficient.

 9        Does that sound right to you, Secretary Allison?

10              MS. ALLISON:  Yes, ma'am.

11              THE COURT:  All right.  All right.  It's not to give

12    anything here a short trip, but recognizing we are today

13    operating at a high level while trying to keep the focus where

14    the focus is needed, that's how the Court will proceed.

15        So, Dr. Williams, you are there?

16              DR. WILLIAMS:  Yes, I am.

17              THE COURT:  All right.  And you're going to share

18    information about improving treatment planning as recommended

19    by the Special Master's expert, Mr. Hayes, specific

20    recommendation number 17 which loops in recommendations 9 and

21    10.  And I realize you also are able to talk about other

22    recommendations as enumerated on the notice.

23        So please proceed to share what you have to share with the

24    Court.  If I have questions, I'll let you know.

25              DR. WILLIAMS:  Okay.  So specific to safety planning,
```

1   we recognize that we need to create a process for a safety

2   plan, which is really a plan that the treatment team and the

3   patients work collaboratively on to ensure that during risky

4   times that the patient may become at a higher risk for suicide,

5   that there's a plan in place to help mitigate those factors

6   that make them a higher risk.  So that's the overall concept of

7   what the safety plan is that we're talking about in this

8   recommendation.

9       We've had many iterations of this, and we continue to seek

10  to refine our process and make it both individualized for our

11  patients but also easy for our clinicians to be able to create

12  with collaboration with the patient.

13      So we have been working in collaboration with Mr. Hayes

14  since late last year on creating a new form for this, and we

15  have drawn up drafts of this -- of this form.  We have gone

16  back and forth with Mr. Hayes and other members of the Special

17  Master's team.

18      We are very close to submitting our next draft based upon

19  feedback that we have had.  Simultaneous to that, we are

20  creating a policy and procedure that will clearly outline for

21  the clinicians when a safety plan is required.  That's

22  something that we -- we hadn't had in the past, and I think

23  that will actually help the clinicians better understand what

24  they need to do with these patients when they're creating these

25  safety plans based upon the environment in which they are in.

1    So that's the process that we are undergoing right now.

2       Our goal is to have a finalized draft that we can get over

3    to our quality management unit to start building into the

4    electronic health record in the next two months so that we can

5    then begin training our field on what they need to do in order

6    to enhance these safety plans.

7       So overall that is the broad strokes of what we are doing

8    with the safety plan.  Now, as you mentioned, there are some

9    other recommendations that tie in to this, specifically

10   recommendation 10 is related to when a patient has raised his

11   or her hands to say "I am suicidal" or "I feel like I am a

12   danger to myself," there should be an emergent order for a

13   mental health clinician to meet with that patient and assess

14   the level of suicidality.

15      We're working on refining that process.  We identified an

16   area of improvement in our electronic health record for when a

17   request for a referral is made.  One of the issues that

18   Lindsay -- Mr. Hayes had identified historically is that

19   sometimes these were misclassified, and so a patient wasn't

20   seen as quickly as needed to be.

21      So we have rectified that in the electronic health record

22   to require the referral to be seen within four hours of that

23   emergent time frame that's outlined in the program guide, so

24   we've made a fix to that order.

25      It is currently ready to go.  We have notified the field.

1   We're just waiting on one clarifying piece of information from

2   nursing about after-hours calls, but that is ready to be rolled

3   out to the field.

4       Secondary to that is that we now have regional specialists

5   that oversee suicide prevention in each of our four regions,

6   and they are auditing on a weekly basis all of the emergent

7   referrals that are associated with danger to self or suicidal

8   ideation to make sure that a suicide risk evaluation is

9   completed with the safety plan.

10      So those are the steps that we're taking.  Those audits

11  will continue into perpetuity.  We recognize that we need to

12  constantly have a handle on this, that even each one patient

13  that does not seem timely could result in a negative outcome

14  that we want to avoid.  So this is a measure to be preventative

15  to ensure that we are reducing the suicides that are

16  potentially preventative.

17          THE COURT:  In terms of the action steps you've

18  mentioned, do those show up on the actuation schedules?

19          DR. WILLIAMS:  Yes.  Yes.

20          THE COURT:  I've looked at those; I didn't look to

21  see if they are tied to specific recommendations.  And tell me

22  about training of the folks in the field --

23          DR. WILLIAMS:  Uh-huh.

24          THE COURT:  -- and including with respect to this

25  clinical judgment piece.  I assume there's basic training, but

 1   is there role modeling, is there role playing to try to alert

 2   folks who need to respond quickly so that they do, in fact?

 3            DR. WILLIAMS:  Of course.  So with this -- with this

 4   new rollout, we will have a broad training component, and in

 5   that we will be -- we've tested in different areas in our

 6   training unit ways to engage the participants in the training.

 7   So role playing and vignettes are absolutely a part of those

 8   training components.

 9       The second piece is the suicide risk evaluation mentoring,

10   which I believe is recommendation number 9.  We are seeking to

11   enhance that as well so that we can have some of those layers

12   that you're mentioning about clinical judgment.  We're going to

13   enhance what we're mentoring, but also making sure that those

14   people that are mentors are certified, that we have hands to

15   make sure that they are doing what they're supposed to do, that

16   they have the clinical judgment to be able to teach the other

17   clinicians how to assess appropriately and use their clinical

18   judgment appropriately in cases in which they're conducting the

19   suicide risk evaluations and safety plans.

20       So we are seeking to bolster that process to make sure that

21   the people that are doing the mentoring understand what we

22   expect from them, understand what is clinically prudent when

23   working with patients, and making sure that the clinicians are

24   then ready to be able to conduct the suicide risk evaluations

25   appropriately.

1      So, yes, we are using all-hands-on-deck with our training

2   as well as our mentoring piece to provide more -- more

3   structure.  But we also have, as I mentioned, those regional

4   specialists devoted to suicide prevention that will also be an

5   additional layer of oversight and to help with the clinicians

6   being able to conduct these evaluations appropriately.

7           THE COURT:  All right.  Thank you, Doctor.  What can

8   you tell me about how this all relates to correctional

9   officers --

10          DR. WILLIAMS:  So --

11          THE COURT:  -- for clinical in terms of how are

12  they -- what steps are being taken to ensure they can read

13  indicators correctly, they report if they're the persons that

14  need to report, and is there any incentivisation of their

15  handling this kind of situation according to best practices?

16          DR. WILLIAMS:  So we have the recommendation, one, is

17  the pre-service training at the academy.  We have enhanced

18  that, we have worked with Mr. Hayes on enhancing the curriculum

19  for that training so that from the beginning officers learn

20  about the risk factors associated with suicide, how to identify

21  a patient that may be at a higher risk for suicide.

22      In our safety plan, in recommendation 17, we're working on

23  a component where the safety plan that's been developed is in

24  some way communicated to the custody officers so that they are

25  aware of what they need to do.  That was one of the items that

1    we identified in the historical renditions of safety planning

2    that we could improve upon, which is that communication with

3    the officers that are there on the housing units, working with

4    these patients on a daily basis.

5        We want to be able to give them something so that they know

6    Inmate X has this safety plan in place.  These are the steps

7    that you should take as an officer to help reduce or help

8    identify when this patient may become higher risk for suicide.

9        I think that there is an inherit incentivisation that

10   keeping their inmates safe is part of their job, that it's

11   something that they are actively involved in, and I think that

12   may be something that we haven't always been able to do a very

13   good job at that we're seeking to enhance at this point, is

14   making sure that they feel a part of a team that is able to

15   help these patients.  And not just in the housing unit doing

16   their job, but that they're an active participant in all of

17   this.

18              THE COURT:  All right, thank you.

19              DR. WILLIAMS:  Uh-huh.

20              THE COURT:  Let me just ask if there are follow-up

21   questions either party would like the Court to ask, and I'll

22   then decide if I'm going to ask the question.  This is not, you

23   know, cross-examination or examination.  But any questions that

24   would elicit important information from Dr. Williams, Mr. Bien,

25   or a member of your team?

1          MR. BIEN:  Lisa Ells will be taking the lead, but she

2     does not -- we don't have questions of this witness.  Thank

3     you, your Honor.

4          THE COURT:  All right.  Mr. Mello?

5          MR. MELLO:  No, your Honor.

6          THE COURT:  All right.  All right.  Anything else you

7     would like the Court to know about any of the recommendations

8     that you're identified as being the person most knowledgeable,

9     Dr. Williams?

10          DR. WILLIAMS:  There are certainly many.  And since I

11     am the overall project manager for this rollout, I think that

12     in the activation schedule we have spelled out all of the steps

13     that we're taking.

14        I think one thing that I would like to mention related to

15     all of the suicide prevention efforts is that since I have

16     taken over this position in the past two years, I have really

17     sought to develop sustainable processes to ensure that we have

18     governance and oversight and we're providing the support that

19     we need to give to the institutional staff to be able to treat

20     our patients and ensure that they are safe when they are at

21     high risk.

22        So that -- that has been my overarching goal in all of

23     this, is making sure that while we identify areas that we can

24     improve on, that we have a handle on how we can monitor that at

25     a statewide level with such a large system in place.  And I am

1  personally committed to working on our Statewide Suicide

2  Prevention Committee that holds oversight over all of this, and

3  enhancing that to make sure that it is doing its level best to

4  make sure that all of these items are consistently on our

5  forefront.

6      But I'm also advocating, and my leadership can tell you,

7  I'm constantly fighting for as many resources as we possibly

8  can get to be able to devote to this, and I have been able to

9  get a tremendous amount of support.  We have nearly doubled the

10  size of our Suicide Prevention Unit here at headquarters,

11  including the four specialists that oversee the regions,

12  because I'm committed to making sure that we have as many eyes

13  on this as possible to make sure that we can change the tide

14  and improve the safety of our institutions.

15          THE COURT:  All right.  Thank you again,

16  Dr. Williams.

17      Let me just ask Special Master Lopes.  Anything you would

18  like me to consider asking Dr. Williams?

19          SPECIAL MASTER:  No, your Honor.

20          THE COURT:  All right.  All right.  Thank you,

21  Dr. Williams.  That all sounds very good.  You know, I know,

22  that the -- you know the devil is in the details and the

23  implementation, but in terms of goals and structures, that

24  sounds very encouraging to the Court.

25      The assumption has been that if all of the Special Master's

 1   experts' recommendations are followed, that California will end

 2   up with a very robust, probably state-of-the-art system, and

 3   that it will actually curtail suicides -- reduce them whenever

 4   they can be eliminated.  Of course, we need to get there, and I

 5   appreciate what I read as a sincere commitment to that goal.

 6       I do continue to be interested in this, the cultural

 7   collaboration piece, because I do see this as acknowledging

 8   that.  I may ask Secretary Allison before the hearing is over,

 9   you know, are there opportunities for incentivising and

10   following through on, again, the good planning in that area,

11   but that goes beyond your report, Dr. Williams.

12       So at this point, Mr. Mello, I would, in a matter of

13   course, turn to Director Borg, unless you suggest I take

14   someone else next.

15             MR. MELLO:  No, I defer to you with just one caveat,

16   which is we put them in alphabetical order, apparently, so

17   Mr. Borg is fine, your Honor.  Thank you.

18             THE COURT:  All right.  There's alphabetical and

19   there's order of number of recommendation.  So let's turn to

20   Director Borg then.

21       Director Borg, you are there?

22             DIRECTOR BORG:  Yes.  Good morning.

23             THE COURT:  Good morning.  You're going to talk about

24   sufficient number of suicide-resistant retrofitted cells,

25   correct?

1            DIRECTOR BORG:  That is correct, recommendation

2      number 12.  So I'm the Director of the Facility Planning

3      Construction and Management Division for the Department of

4      Corrections and Rehabilitation.  And, as part of this

5      recommendation we're tasked with modifying 65 new cells at 14

6      prisons to provide additional intake cell capacity.

7            We've broken this task into two phases.  The first phase

8      will cover 51 of those 65 new cells at 8 of the 14 prisons.

9      We've commenced the design process, and actually all of those

10     designs have been submitted to the Office of the State Fire

11     Marshal for their review of fire life safety requirements.

12           We have been having very good success with small projects

13     like this moving through the fire marshal's office

14     expeditiously over the last several months, so we track on a

15     monthly basis whether we receive comments.  And I also have a

16     monthly meeting with the Chief of the Fire Life Safety Division

17     of the Office of the State Fire Marshal where this is an agenda

18     item, and we're tracking the progress of these designs to make

19     sure that there's no delays in getting the design done.

20           While the design is underway, we are also working on

21     pre-construction activities which involve surveys of the cells.

22     It involves procurement of the construction items.  Some of

23     those construction items are what are referred to as long lead

24     items in that they're not manufactured until the orders are

25     placed.  And so sometimes there could be a 16-week lead time to

1    get those items, so we're beginning to order those long lead

2    items now.

3         We're also looking at our current construction schedules at

4    the prisons where we need to do this construction to make sure

5    that we're not delayed in starting this because there's another

6    project going on.  We're clearing the decks to make sure that

7    we can start construction on these as soon as the design and

8    the pre-construction activities are completed.

9         The second phase covers 6 prisons and 14 cells.  Those are

10   also in the design phase right now, and we project submitting

11   those to the fire marshal's office by the end of February, and

12   we'll also be conducting the same pre-construction activities

13   and procurement activities on those in order to expedite the

14   schedules.

15        So we're doing things with this project that -- where we're

16   taking items that are normally done on a consecutive basis, and

17   we're doing many things concurrently in order to get to the

18   point that we can get the construction underway.  The

19   construction will be completing on a phased basis.  Some

20   prisons will complete as early as November 1st of this year,

21   others are the scale -- the schedule takes them until

22   March 30th of next year.  But, on those, those are locations

23   where we have multiple phases, so we're doing work in two

24   separate buildings.

25        One building will be done before the end of the project, so

1   these will be -- all 65 cells will be coming active on a phased

2   basis as they become completed rather than having to wait for

3   the end of the construction of all cells.

4      That is a high-level explanation of what we're doing in

5   order to implement this recommendation, and I can answer any

6   questions there might be.

7            THE COURT:  I gather from your report and everything

8   else I've heard that you don't anticipate any waivers are

9   needed?

10           DIRECTOR BORG:  That is correct.  These are very

11   straightforward projects, so we have not identified anything

12   from law or regulations that is causing a delay or elongation

13   of the schedule.

14           THE COURT:  All right.  Well, parallel tracking

15   sounds good to the Court.  Let me ask Mr. Bien here.  Any

16   questions the plaintiffs would like the Court to consider

17   asking?

18           MS. ELLS:  Your Honor, this is Lisa Ells.  I will

19   address this.  Mr. Borg hopefully answered a number of my

20   questions.  The one that I have remaining, which I think is

21   assumed, is that funding is secure for these projects, and

22   there's no question that they will be fully funded through

23   completion?

24           THE COURT:  All right.  Fair question.  I'll allow

25   Director Borg to answer that question.

1          DIRECTOR BORG:  Yes.  Funding for these projects was

2    received in the Budget Act that went into effect July 1st,

3    2020.  So we already have the full funding for these projects,

4    that's what's allowing us to begin the procurement of the

5    construction material at this time.

6          THE COURT:  All right.  That sounds like that answers

7    your question, Ms. Ells?

8          MS. ELLS:  Yes.  The only other question I had was

9    whether there was any particular prioritization in terms of

10   which projects are put into phase one versus phase two, if

11   there was an assessment of a particular need at different

12   facilities or how those phases were selected?

13         THE COURT:  All right.  Director Borg, it's also fine

14   with the Court if you answer that question.

15         DIRECTOR BORG:  Certainly.  We did consult with the

16   Division of Adult Institutions to have them identify

17   priorities, so that identified several of them.  We expanded

18   that to look at the four prisons that have the largest number

19   of cells being converted.  So Tehachapi, CCWF, High Desert, and

20   Corcoran have between 8 and 12 cells each, so we made sure that

21   those went into phase one.

22     And then the remaining prisons in phase one were basically

23   targets for opportunities where we had planned visits by

24   architects and engineers already lined up.  So once these

25   projects were identified, it was a place they were already

 1   planning to be at within the next month, so those prisons ended

 2   up in phase one also.

 3           THE COURT:  Can you provide that prioritization list

 4   to the Special Master, please, with a copy to plaintiffs,

 5   Director Borg?

 6           DIRECTOR BORG:  Certainly.

 7           THE COURT:  All right.

 8           MR. MELLO:  If I may, your Honor, I believe that's in

 9   the activation schedules as well.  They are prioritized in

10   terms of which ones come first.

11           THE COURT:  But with the specific institutions

12   mentioned?

13           MR. MELLO:  Yes, it says which institutions are in

14   phase one and phase two, and it's listed in the filing, I

15   believe.  But if the Special Master would like additional

16   information, we will work with him to get it from Mr. Borg.

17   And we'll provide it, of course.  Thank you.

18           THE COURT:  Well, let me ask this.  I don't require

19   duplicative filings or submissions.

20      Ms. Ells, have you had a chance to scrutinize the

21   activation schedule?  Do you see the information Mr. Mello is

22   referencing?

23           MS. ELLS:  Yes.  I believe Mr. Mello is referencing

24   the final page which shows which institutions are in which

25   phase.  My question had been what the rationale behind that

 1    was.  So I do understand what the different phases are; it was

 2    more a question of why the department prioritized things the

 3    way they did.

 4         THE COURT:  And you have some information now in

 5    response to that question?

 6         MS. ELLS:  Yes.

 7         THE COURT:  So is that sufficient?

 8         MS. ELLS:  Yes.  I did have one more question that I

 9    was hoping to get some clarity on.  There were two prisons

10    identified in Mr. Hayes' report as requiring remediation that I

11    did not see on this list, and those were, I believe, Wasco and

12    DDI.  I am guessing the reason that DDI is not on the list is

13    because it's still being planned for closure, but I wanted to

14    confirm that because there was a significant amount of

15    discussion in Mr. Hayes' report about the deficiencies there.

16      And then I believe that the report also asks about two

17    unsafe intake cells that had been in routine use at Wasco that

18    didn't appear to be slated for remediation.

19         THE COURT:  Director Borg on that, Wasco and DDI, if

20    you could clarify, please.

21         MR. MELLO:  If you know, Director Borg.

22         DIRECTOR BORG:  Unfortunately, I'm unable to answer

23    that question; I would need to go back into the report in

24    detail.  In preparing for this, I had been focusing on the

25    locations where we were performing new construction of intake

1   cells.

2           THE COURT:  All right.  Then just so it's clear,

3   you're relieved of any -- actually, to provide the Special

4   Master with the list that you've identified where you are

5   moving forward, the total 65, but if you could follow up and

6   provide information responding to Ms. Ells' questions about

7   Wasco and DDI to the Special Master.  Mr. Mello could do that

8   if you provide him with the information.  So could you do that

9   within the next 14 days?

10          DIRECTOR BORG:  Yes, I can.

11          THE COURT:  All right.  Anything else you would like

12   to request that the Court elicit from Director Borg, Mr. Mello?

13          MR. MELLO:  No, your Honor.

14          THE COURT:  Special Master Lopes, anything you

15   believe should be asked of Director Borg?

16          SPECIAL MASTER:  Your Honor, I think Director Borg's

17   presentation was straightforward.  In the past I believe that

18   there have been orders around construction projects which

19   require the state to at least provide, if not the Court, me

20   with information if projects come offline for 30 or more days,

21   and I would urge the Court to consider doing the same here.

22      While the funding may exist for these projects and good

23   faith efforts are going to be made to construct them, if

24   something comes offline either because of an act of God or some

25   other unforeseen circumstance, fire code issues, et cetera, et

1   cetera, it would be helpful to me and to Mr. Hayes to know

2   about the rollout problems that exist and the solutions and

3   timeline changes that may go along with those problems.

4            THE COURT:  So all parties know and the Special

5   Master's suggestion, the Court's current thinking, and I can

6   return to this once we get through all of our persons most

7   knowledgeable, would be to simply approve the activation

8   schedules that have been provided by bench order rather than

9   issue a formal order and further clutter the docket, but

10  approve them and then ask, as the Special Master requests, for

11  anything on the activation schedule, including with respect to

12  this construction that Director Borg has covered.

13      If anything goes beyond 30 days delayed, then to let the

14  Special Master know.  The Court -- at this point the Court's

15  view is that it is made clear how it's going to approach

16  suicide prevention and the fifth re-audit that the Special

17  Master's expert will be performing, hopefully starting soon,

18  that is going to form the line in the sand for the Court.

19      But so it's clear, I'm prepared to approve the activation

20  schedule unless I hear something before we return to this

21  question and direct that notification of any delay past 30 days

22  of any due date on that schedule.  I'll come back and ask if

23  there's any concern about that.

24      All right.  So thank you, Director Borg.  I believe that

25  concludes the subject area you have appeared for.  You may

1    remain, of course, to observe.

2         Let's move on to Associate Warden Lorey.

3         Warden Lorey, are you there?

4              ASSOCIATE WARDEN LOREY:  Good morning, your Honor.

5              THE COURT:  Good morning.  Are you actually in front

6    of a river?

7              ASSOCIATE WARDEN LOREY:  Not this morning, although

8    that is the view this morning.  We're very thankful for our

9    water here.

10             THE COURT:  There you go; that is a nice view.

11        So I have you down to talk about recommendation 13,

12   enforcement of the policy, housing only new admits and

13   retrofitted cells with rehousing beyond 72 hours, and you may

14   also have something to say about recommendations 3 and 28 to

15   29.  So whatever you have to share with the Court at this

16   point, you may proceed.

17             ASSOCIATE WARDEN LOREY:  Thank you, your Honor.  I'm

18   prepared to start with recommendation 13.  It regards to the

19   recommendation that our department reinforce our housing policy

20   for our newly-admitted inmates into restricted housing.

21        Back in 2015 this was implemented.  Since then we've been

22   monitoring it via the CQIT process and through our quarterly

23   reviews conducted by our wonderful radial teams out there.  We

24   also monitor them through our suicide prevention reviews.

25        It's a manual process, and within our 33 institutions where

1   these various restricted housing units are located, each

2   institution has a little special manual process; however, our

3   regional teams are aware of those and keep track of those, and

4   those of us who have been out there have all seen these.

5        Now we plan to improve on that manual process.  We're

6   prepared, in accordance with the activation schedule you have

7   in front of you, we're prepared to work towards reiterating the

8   department's policies on the correct way to house our new

9   intakes.

10       In addition, we're going to institute a monthly managerial

11  compliance review at the local level.  So, in essence, although

12  our housing sergeants, who this is their main duty, they're

13  very, very good at it.  We're going to ask them to put together

14  a monthly report and pass that up for review to their

15  managerial chain.

16       In addition with the reboot of our Suicide Prevention

17  Response Committee there at the local institutions, or superfit

18  committees as we refer to them, that associate warden of

19  healthcare is now a standing member.  So that monthly

20  compliance report would actually be reviewed in that committee,

21  the Suicide Prevention Committee.  It fits right underneath

22  that, and that's where it will be reviewed.

23       The institution then, if they identify deficiencies,

24  they'll have an opportunity to discuss those institutes of

25  local corrective action plans, and, in addition, will ask the

1   institution to set up their monthly compliance reports up to

2   headquarters for review as well.

3       That's our short-term fix.  Eventually our goal is, later

4   this fall, hopefully, bearing any unforeseen concerns, we are

5   working with our Strategic Offender Management Systems team,

6   our SOMS team, to actually have this become an automated

7   process where these special intake cells -- these beds within

8   SOMS can actually be identified when our inmates move in and

9   out of them and can generate a noncompliance report that, one,

10  that local housing unit sergeant can look at on a daily basis,

11  just as a double-check to ensure that no one was missed.

12      Again, with this automated report, it is going to save our

13  staff time and energy.  It can be generated automated.  We

14  still want to keep that process where it is reviewed monthly

15  through those managers responsible for that as well as the

16  superfit committee and still sent up for headquarters.

17      That's the high-level presentation for that recommendation,

18  and I'm open to take any questions.

19           THE COURT:  All right.  And I asked Dr. Williams

20  about training rollout, and you've alluded to that.  But can

21  you just explain exactly how the training occurs to ensure this

22  all takes hold?

23           ASSOCIATE WARDEN LOREY:  Yes.  Initially, we will

24  start with a department memorandum providing this direction

25  that I discussed, and our supervisors and managers can go

 1  through that.  Basically, we call it on-the-job training, have

 2  the discussion.  In addition, the institutions will add this

 3  directive to their local operating procedures which all staff

 4  have access to.  Those are also reviewed at a headquarters

 5  level through our associate director here at DAI.

 6      As we get closer to the end goal with that automated

 7  report, we've got some different training strategies.  We have

 8  the wonderful regional teams who actually go on site and can

 9  provide some in-person training.  We've talked about doing a

10  regional overview training with slides, and so we definitely

11  will have that training piece covered.

12          THE COURT:  How many housing sergeants per

13  institution?

14          ASSOCIATE WARDEN LOREY:  In each of your housing

15  units, we do have one sergeant on each of those watches.

16          THE COURT:  All right.  And regardless of size of

17  unit, that's a reasonable ratio of sergeant to units?

18          ASSOCIATE WARDEN LOREY:  Correct.

19          THE COURT:  All right.  So I understand that you may

20  be changing roles and no longer sitting in your current seat

21  soon.  So who is your successor, and how are you ensuring that

22  your successor knows everything you do today that you've shared

23  with the Court and all the information on which you've relied

24  boiling it down to this high-level overview?

25          ASSOCIATE WARDEN LOREY:  As our Special Master's team

 1    can contest to, we don't operate alone.  So I have another

 2    manager -- I have a captain, actually, in our unit who is not

 3    changing jobs, and I also have wonderful support through our DA

 4    leadership who we keep informed after all of our meetings.

 5    They, too, are familiar with the activation schedule, your

 6    Honor, and I will only be three hallways down and accessible to

 7    anybody at any time.  But we do have a strategic plan to do the

 8    handoff for these plans.

 9             THE COURT:  All right.  Do you know -- is there

10    someone in particular who will move in to your position, do you

11    know at this time?

12             ASSOCIATE WARDEN LOREY:  I don't.  However, that

13    should be decided within the next several weeks.

14             THE COURT:  All right.  All right.  Thank you very

15    much.

16       Ms. Ells, any questions you'd like to ask the Court to

17    relay to Associate Warden Lorey?

18             MS. ELLS:  So the question we have arises really from

19    your questioning of Dr. Williams about the training of custody

20    staff to understand their role in suicide prevention.  We have

21    noticed a number of suicide reports in 2019 -- or, sorry, in

22    2020 and prior years in which there were significant lags in

23    custody officer timing of calling 911 after discovery of a

24    person who was in the midst of attempting to kill themselves.

25       And we also, in the suicide report that we discussed at

1  length at the December status conference, noted a number of

2  times in which custody officers didn't appear to understand or

3  take seriously high-risk behaviors indicative of the potential

4  for suicide and did not provide referrals for mental health

5  clinicians to come speak with that patient.  That's a theme

6  that we hear a lot from our class members, that custody

7  officers don't take seriously their expressions of suicidal

8  ideation or feelings of suicidality.  And we have a

9  longstanding concern that the training is simply not working.

10      And along the same lines for the people, the custody

11  officers who failed to call 911 promptly.  For instance, in

12  this suicide report that we discussed in December, there was a

13  lag of eight full minutes.

14      Nobody was investigated or considered for discipline even

15  though that violates court orders, and we have concerns about

16  what exactly is being done to ensure that the training takes

17  hold and works because we don't see it happening.

18          THE COURT:  Associate Warden Lorey?

19          MR. MELLO:  Your Honor, may I be heard?

20          THE COURT:  All right.  What --

21          MR. MELLO:  I believe this is outside the scope of

22  what she was here to speak about today, number one.  Number

23  two, are we really going to talk about particular suicides and

24  purported statements as to the status of training and

25  information they've heard from their clients at this hearing

 1  and then ask my clients about it in real time?

 2          THE COURT:  All right.  My -- you interjected before

 3  I could ask Associate Warden Lorey if she is prepared to answer

 4  that question.  I do see it as somewhat outside the scope of

 5  what she was identified for here.  But that said, anything you

 6  would like to share in response to that question, Associate

 7  Warden Lorey?  I see him shaking his head, but I'm giving you

 8  the chance.  If you want to go into a breakout room and consult

 9  with Mr. Mello, I'll give you that opportunity, Associate

10  Warden Lorey.

11      Do you wish to do that?

12          ASSOCIATE WARDEN LOREY:  No, your Honor.  Again,

13  that's not what I had prepared to address with the Court today.

14          THE COURT:  All right.  I think that's fair,

15  Ms. Ells.  I don't know that anyone is identified to -- we

16  could go back to Dr. Williams on that question, perhaps, in

17  case the overarching --

18          MS. ELLS:  It was.  I wasn't sure who to frame that

19  question to because it is custody staff noncompliance with the

20  clinical training that they are already receiving.

21      So it was -- you know, it's a fair point that perhaps

22  that's a problem in the training, perhaps it's a problem in the

23  follow through with custody in terms of enforcing their own

24  policies and training.

25      It is a longstanding issue in the case.  This is not

 1    specific to one particular suicide, as is very clear from

 2    Lindsay Hayes' report and from other suicide reports that are

 3    out there.

 4        So it's not a -- it's not unique and it's not new.  It is a

 5    longstanding issue.

 6            THE COURT:  Let's do this.  Dr. Williams is hearing

 7    the question.  Hold the thought.  If Dr. Williams has anything

 8    more to say about this issue which the Court has raised, I'll

 9    give him that chance at the end.

10        Anything else for Associate Warden Lorey, Ms. Ells?

11            MS. ELLS:  No, thank you.

12            THE COURT:  All right.  Mr. Mello, anything you would

13    like the Court to consider eliciting from Associate Warden

14    Lorey?

15            MR. MELLO:  No.  Just one question.  A couple of my

16    witnesses have -- or persons have meetings.  Are they allowed

17    to leave after they're done speaking, like Mr. Borg and

18    Ms. Lorey, or the secretary I know who does have a deadline

19    coming up and to head to a different board meeting?  That's

20    my -- just a process question, your Honor.

21            THE COURT:  In terms of Director Borg and Associate

22    Warden Lorey, I'm prepared to excuse them.  What is the

23    secretary's time?

24            MR. MELLO:  I believe that she has a meeting at noon,

25    your Honor, so I think we're fine with her at this point.

```
 1              THE COURT:  All right.  Mr. Bien, Ms. Ells, any
 2    reason not to excuse Director Borg and Associate Warden Lorey?
 3              MS. ELLS:  That's fine with us.  Thank you.
 4              THE COURT:  All right.  So Director Borg and
 5    Associate Warden Lorey, you are both excused.  I would ask the
 6    secretary to stay.  I previously said that I anticipated --
 7    maybe I didn't say it to this group, but I anticipate being
 8    done by noon.
 9         All right.  Next we have Nurse Consultant McGill.
10              MS. McGILL:  Good morning, your Honor.
11              THE COURT:  All right.  Hello.  And you're going to
12    cover levels of operation for suicidal inmates, staggering and
13    continuous operation of two levels that would be -- that
14    observation would never fall below those levels.  That's
15    recommendation 21.
16         So if you could share what you have with the Court, I would
17    appreciate it.
18              MS. McGILL:  Number 21, what is currently putting
19    together --
20              THE COURT:  Hold on.  There's quite a bit of static.
21    I think I'm not the only one; I saw the court reporter raise
22    her hand.  So I'm wondering if it is something with your
23    microphone.
24         Can you just say a couple of words for us to see if --
25              MS. McGILL:  Testing, 1, 2, 3.
```

 1                THE COURT:  There's definitely static.

 2                MS. ALLISON:  Do you have both your phone as well as

 3     your computer on, Cindy?

 4                MS. McGILL:  No, I just have my computer.

 5                MS. ALLISON:  So, Cindy, you might need to do it

 6     through your phone.  You might have to switch your phone audio.

 7     So if you go over and switch to phone, you can dial in and then

 8     use your phone as opposed to your computer.

 9         If you go down to where -- Judge Mueller, do you mind if I

10     talk her through how to switch the call?

11                THE COURT:  Not at all.  In fact, let's just do this.

12     Let's take a five-minute recess, and it sounds like Secretary

13     Allison is on it in terms of understanding the issue.  We'll

14     take a five-minute recess.  I'll just turn my camera off.

15     Anyone else need a five-minute break, take it.  We'll start

16     again at 11:08.

17         Thank you, Secretary Allison.

18         (Recess.)

19                THE CLERK:  Court is back in session.

20                THE COURT:  All right.  Apologies for the delay.

21         All right.  Nurse McGill, you're there?

22                MS. McGILL:  Yes, I am.  Sorry for the inconvenience,

23     your Honor.

24                THE COURT:  No problem.  That sounds much better, so

25     you may now proceed.

1          MS. McGILL:  Okay.  In regards to the suicide watch,

2   suicide precaution, what we are currently doing is creating a

3   standardized audit tool that the institutions will use to audit

4   suicide watch and suicide precaution rounding.  What they'll do

5   is monitor the 24 hours before, and then they will go ahead and

6   calculate the information, and they're going to complete a

7   summary sheet.  And that summary sheet will say if there's any

8   process improvement needed.

9       This will be sent then to the CNEs for signature.  It will

10  then go -- as Dawn Lorey has already mentioned -- it will also

11  go to the superfit committee, the local superfit committee for

12  any process improvement and action plans needed, and then it

13  will also go to the regional CNEs, and then it will be rolled

14  up for the headquarter's superfit also.

15      And so this information will be monitored for process

16  improvement and continue follow-up.

17      Then the other piece -- that's the short-term.  The

18  long-term is we're working with quality management, that they

19  have an automated tool that will create the audit data that

20  will actually go to a dashboard that all of the institutions

21  can use to monitor compliance, and this will also be discussed

22  at the regional superfits in the headquarters.

23      Any additional questions on the suicide watch or suicide

24  precaution realm?

25          THE COURT:  Let me -- I'll ask the parties if they

1    would like to propose questions.  Does that cover everything

2    you'd like to say?

3              MS. McGILL:  Unless there's any questions.

4              THE COURT:  One just general question.  I understand

5    that you have a dual assignment, you're CDCR and you're CCHDS,

6    correct?

7              MS. McGILL:  Right now I'm CCHDS, your Honor.

8              THE COURT:  All right.  So you're, as person most

9    knowledgeable, you are tasked with overseeing this piece for

10   the Coleman class?

11             MS. McGILL:  I work, and I'm a nurse consultant under

12   Marcy Flores, and she's the CNE who works with the mental

13   health component.  She works really closely, and I do also,

14   with the mental health side of the house.

15             THE COURT:  All right.  Is there anyone else who, as

16   far as you know and recognizing your role as consultant, who

17   has responsibility for implementing what you've described for

18   the Coleman class?

19             MS. McGILL:  I'm not quite sure I understand, your

20   Honor.  I apologize.

21             THE COURT:  All right.

22             MR. MELLO:  Your Honor, may I jump in?

23             THE COURT:  If you can answer that question.  Can you

24   answer the question?

25             MR. MELLO:  So Ms. Flores is Ms. McGill's supervisor,

 1   and she's unavailable today, so she is the one who would be

 2   speaking to this issue.  That's the only additional information

 3   I have, your Honor.

 4        THE COURT:  So you don't know the answer to the --

 5   the substantive answer to the question?

 6        MR. MELLO:  I think the answer to the question is

 7   that they're working collaboratively on these issues and

 8   addressing these issues, and it flows up through CDCR and

 9   CCHDS, and so I think that's the answer.

10        THE COURT:  All right.  Let me ask Special Master

11   Lopes.  You may understand how this works.  Do you have some

12   clarification to the Court's question?  Am I making a

13   distinction without a difference here?  Mr. Lopes?

14        SPECIAL MASTER:  I'm sorry, your Honor, I have

15   nothing to offer.

16        THE COURT:  All right.  I may follow up with the

17   Special Master on that.

18      Let me ask Ms. Ells, any questions for Consultant McGill

19   that you'd like me to ask?

20        MS. ELLS:  No, your Honor.  Thank you.

21        THE COURT:  All right.  Mr. Miller, anything else

22   you'd like the Court to pose?

23        MR. MELLO:  No, thank you.

24        THE COURT:  All right.  Special Master Lopes?

25        SPECIAL MASTER:  No.  Thank you, your Honor.

1            THE COURT:  All right.  Thank you.  Ms. McGill, you

2     are now excused, if you would like to sign off.

3            MS. McGILL:  Thank you, your Honor.

4            THE COURT:  All right.  In terms of next steps on

5     suicide prevention, I mentioned previously my intent to, by

6     bench order, approve the activation schedules and direct the

7     parties to notify the Special Master if there's a delay of

8     30 days or more with respect to meeting any due date.

9         Any objection or comment to that bench order, Mr. Bien?

10           MS. ELLS:  Your Honor, I will address this.  This is

11    Lisa Ells.  We don't have any concerns about that order.  I did

12    want to mention there were a couple of things about the

13    activation schedule that I just want to note for the record,

14    which the first of which is that plaintiffs' involvement is not

15    included essentially anywhere in this activation schedule in

16    terms of reviewing new policies or trainings that are being

17    revamped.

18        Typically we, at the appropriate time, have some

19    involvement and opportunity to comment on these types of

20    issues.  They are obviously at great importance to us, and we

21    would request that we be included in that process obviously

22    without any intent to delay anything.

23        The second thing I would note is --

24           THE COURT:  So let me just ask.  So that's not a

25    comment about any due date.  It's about the process of

1    developing anything on the schedule that's policy or procedure?

2            MS. ELLS:  Correct, yes, and training.

3            THE COURT:  All right.

4            MS. ELLS:  And then one other point.  We noted

5    there's one very important recommendation in Mr. Hayes' most

6    recent report, and we recognize this is not one of the original

7    32.  But there is a very, very important trend that is

8    occurring that has been identified in Mr. Hayes' report that

9    doesn't appear anywhere on the attack plan in this activation

10   schedule.

11       And that is the -- the recommendation that defendants

12   develop a path for the inadequate clinical positions resulting

13   in failures to place suicidal inmates in higher levels of care.

14   That is a persistent problem in 2020.  It was very bad as well

15   of the 20 -- I believe we have 24 reports out of the 31

16   suicides.  We noted that there were at least five suicides that

17   had occurred within eight days of just discharge, including

18   four within eight days of an MHCB discharge.  It's a very

19   critical problem, and we believe there should be a cap added to

20   this activation schedule to address that concern.

21           THE COURT:  I'm sorry.  I'm recalling that portion of

22   Mr. Hayes' report.  Can you tell me how exactly the cap would

23   be articulated?

24           MS. ELLS:  Well, I defer to defendants in working

25   with Lindsay Hayes to develop what the appropriate cap should

1    be, but there should be some plan of attack for remediating

2    that, and we don't see it -- unless I'm missing something, we

3    don't see it attended to in this activation schedule.

4            THE COURT:  Let me ask the Special Master on both

5    points, plaintiffs' involvement when it comes to development or

6    refinement of procedures, policies, training modules, and also

7    this issue of the cap for Special Master Lopes.  Is the process

8    that you contemplate going forward, does it take account of

9    what Ms. Ells is calling out?

10           SPECIAL MASTER:  Your Honor, we only have really one

11   process, and that is my team works with the defendants, and we,

12   at the appropriate time, get input from the plaintiffs, and it

13   is a rare, rare occurrence for us to just agree and implement

14   something without input from the plaintiffs.

15       So I -- while I understand Ms. Ells' concerns, I can't

16   imagine that we wouldn't have discussed all the policies and

17   the training with the plaintiffs.  So I don't know what more to

18   say.  I don't know why any more needs to be done than what is

19   already in place.

20           THE COURT:  All right.  I'm prepared to rely on the

21   Special Master to follow up the process.  There has been quite

22   a collaborative process overall, and there are many

23   opportunities for discussion, so I'm satisfied with that

24   assurance.

25       What about the cap issue, Special Master Lopes?

1          SPECIAL MASTER:  Well, I don't believe that there's a

2    reason to modify the activation schedules.  Again, Mr. Hayes

3    was involved in the crafting of them, and caps are any cap that

4    the plaintiffs want to discuss will be addressed with the other

5    caps that have already been put into place.

6      I believe that you should order the activation schedules to

7    be implemented and we move on.  There are ample opportunities

8    for us to discuss how they take shape in the future.

9          THE COURT:  All right.  On that, Ms. Ells, I would

10   say if you have a specific -- I heard what you said, defendants

11   develop, but if you want to press that issue, perhaps put a

12   little bit more in writing, provide it to the Special Master

13   and to the defendants, and I believe it will be considered.

14     All right.  Let me just -- in terms of next steps on

15   suicide prevention, I'll issue, you'll see it in the minutes,

16   that the bench order I've described I've already said I've set

17   in motion a process whereby the fifth re-audit coming up is

18   going to be very important.  I have it on good information

19   based on what everyone currently knows, that that fifth

20   re-audit should begin by this summer at the latest.

21     My only final question is for Secretary Allison.  I guess I

22   should ask first Dr. Williams.  There was an issue on training

23   for correctional officer staff from Ms. Ells.  Anything more

24   you want to say about that issue before I ask Secretary Allison

25   if she has any final comments?  And also whether or not she has

 1  full authority to execute everything showing on the activation

 2  schedule?

 3      Dr. Williams, any final word?

 4          DR. WILLIAMS:  Of course.  Just briefly regarding

 5  training with custody officers.  We work with Mr. Hayes to

 6  update all of our trainings that are suicide prevention

 7  related.  We work to enhance the information that we're

 8  providing to custody officers to be able to educate them more

 9  about the risk factors that they should be considering with

10  patients, the things that they should be doing with patients

11  that are elevated risk for suicide, and we continue to do that,

12  and we will continue moving forward as we update any trainings.

13      Training is never a one-and-done process.  It is an ongoing

14  issue, and we continue to identify concerns that we will put

15  into our trainings in collaboration with Mr. Hayes.  And that's

16  all I have for that.

17          THE COURT:  All right.  And the Court will continue

18  to pay close attention.  Training is essential, cultural

19  collaboration is critical, as this Court has called out.  The

20  question is, is that actually happening on the ground and is

21  there a way to incentivize beyond what's already happening?

22      All right.  Secretary Allison, any final word on suicide

23  prevention?  I know you've previously said this is a very high

24  priority for you.  The Court accepts that representation at

25  face value, but anything that you would like to say, I'm happy

1    to listen.

2       And I would like to know, do you believe you have full

3    authority to execute everything showing on the activation

4    schedules?

5            MS. ALLISON:  Yes, ma'am, I absolutely do.  I will

6    say that we worked very collaboratively with Lindsay Hayes on

7    developing that training.  I know he went out to our academy

8    facility to witness it live, to ensure that it was not just

9    what was written on paper but the actual implementation of the

10   training itself was thorough in his opinion.  And I know that

11   part of his tours he always goes out to the local institutions

12   for the annual suicide prevention training.  So I feel very

13   comfortable with where we're at with this going forward.

14           THE COURT:  All right.  Thank you.  Let's talk about

15   quarantine and isolation.  My only question is I see this step

16   and I see the refined stips with order.

17      Can I take, I believe it's the plaintiff's filing that

18   includes the order provision, and that answers the question the

19   Court had.  I wasn't clear if there was a request that I

20   approve that as an order.

21      Can I take the plaintiff's version and sign that?  Is there

22   any difference in that version?  And perhaps Ms. Thorn is the

23   person to answer that question if she's present.

24           MS. THORN:  Yes, your Honor, that's correct, the

25   versions are the same.  We just added the proposed order

1    language to the first version of the stipulation that was

2    filed.

3              THE COURT:  All right.  Mr. Bien or Ms. Ells agreed,

4    I can sign -- I believe someone else from plaintiff's team --

5              MR. BIEN:  Yes.  I'll be addressing that, your Honor.

6    We do request that you sign the stipulation, and we apologize

7    for not including that signature line with our initial filing.

8              THE COURT:  All right.  Well, that is at least fixed.

9    I understand there's some outstanding issues to be worked out

10   with regard to San Quentin, RJB, Mule Creek, but the

11   discussions are ongoing to work those out, so I don't feel the

12   need to talk more about those today.  Do you, Mr. Bien?

13             MR. BIEN:  No, your Honor.  I think we need to

14   continue.  There's some difficult issues still that remain, but

15   there's good communication on them, and we look forward to

16   resolving the remaining issues.

17             THE COURT:  Right.  Anything from the defendants on

18   this?

19             MR. MELLO:  No, your Honor.

20             THE COURT:  All right.  Special Master Lopes,

21   anything you'd like to say on quarantine?

22             SPECIAL MASTER:  No, your Honor.

23             THE COURT:  All right.  All right.  In terms of next

24   steps then, moving the case forward.  At this point the Court

25   will remain alert to any issues that arise with respect to

1    activation and then look for the fifth re-audit.

2        And if any party believes I need to know more on suicide

3    prevention, of course you know how to let me know by requesting

4    the chance to file a motion.

5        Looking forward, the next key dates have to do with CQIT,

6    but I believe there's a March 17th or 18th, 2021, date by which

7    CQIT should be refined/updated.  There are just a couple of

8    outstanding compliance percentage issues.

9        So my suggestion is that we plan a next session, end of

10   March, where CQIT is a high-priority agenda item, and the Court

11   would be focused on that.  Also, by then I'm thinking, unless

12   someone tells me differently, that the defendants may be in a

13   position to forecast what the horizon is looking like for

14   return to program guide compliance given the good progress

15   being made with vaccines and taking account of what the public

16   health folks are saying about immunity.

17       And, relatedly, that is if folks are able to start

18   returning to the facilities -- that would include the Special

19   Master's team, by the way.  I would hope to hear from the

20   Special Master what the -- his forecast is on when his folks

21   can return to on-the-ground monitoring.  And if it can occur

22   before March, that's fine with the Court, but March at least

23   we're going to really talk in depth about this.  Because there

24   is the unmet bed needs study out there.  I already said I'm

25   going to order it, but its completion is tied to the ability to

1   get into the facilities while keeping everyone healthy and

2   safe.

3       So for something at the end of March, CQIT's ability to

4   reenter the facilities for monitoring for unmet bed needs, and

5   what is the timeline to return to program guide compliance.

6   And I may ask Secretary Allison then what the thoughts are

7   about public health benchmarks.  Is CDCR developing public

8   health benchmarks that will guide that return to program guide

9   compliance?

10      I also would like to put on the agenda for March staffing

11  which has been long deferred on staffing.  I do -- I'd like to

12  just make certain the parties understand that I have heard from

13  the Special Master that DSH has made very good process and is

14  closing in on a staffing plan.  I anticipate directing DSH to

15  provide their plan by 14 days before a March date that will set

16  before we close out here today.

17      I understand there's some -- I don't know if the right word

18  is tumult, but something is going on with CDCR's plan, and so

19  it's not clear to the Court if something constructive is on

20  track there.  Perhaps the Special Master can correct me or tell

21  me what the better words are used, but I would still be

22  directing CDCR to provide a staffing plan, at least shortly

23  before any March hearing, because there's some serious issues

24  there we cannot let lag.

25      Other issues, MHCBs, the unmet bed needs study will address

 1   the clerk's outstanding concern about MHCBs.  I understand the

 2   DSH transfer issue is out there, it's pending, I'm going to

 3   resolve that; I believe I have what I need for that.

 4       I mentioned previously data is critical, and so we'll also

 5   include at a future status, hopefully, a report that data

 6   remediation has concluded.  I would ask the Special Master to

 7   be ready for a status report in March, but to really have June

 8   be a target date by which we can say data remediation is

 9   fulfilled or on the verge of being fulfilled.  And I may want

10   to return to cultural collaboration in June depending on what

11   else I'm hearing.

12       That is how I'm thinking about the next six months, but I

13   do want to -- that's my tentative, at least.  Let me ask

14   Secretary Allison if she -- you may not be prepared today, and,

15   if so, I'd ask you again in March.  But if you look at the

16   Court's orders, if you look at the program guide, if you look

17   at the Court's order clarifying benchmarks and calling out the

18   key areas where work still needs to be done, is there any other

19   area or any other order of priority that you would like the

20   Court to consider in terms of setting its agenda for the next

21   six months?

22           MS. ALLISON:  No, ma'am.  No, we'll be prepared for

23   the items that you've identified.

24           THE COURT:  And does that order of things make sense

25   to you?

1          MS. ALLISON:  Yes.

2          THE COURT:  All right.  Thank you.

3      All right.  Well, then that's the plan.  Well, I'll

4  issue -- you'll see the minutes, you'll see bench orders.  I'll

5  issue an order setting the agenda for March, and let me just

6  propose a date for March.  I know we tended to do Fridays.

7  Ms. Schultz, you can assist me here.  And I'm reluctant to go

8  to April 2nd because that gets into a holiday weekend for quite

9  a few people.

10         THE CLERK:  Potentially we could do March 25th at

11 10 a.m.

12         THE COURT:  All right.  We could do March 25th,

13 that's fair, at 10 a.m., or March 26th in the afternoon, that's

14 a Friday afternoon.  Let me ask, March 26th at 10 a.m. work for

15 the parties?  Mr. Bien?

16         MR. BIEN:  We're doing some quick surveying.  I think

17 the 25th is okay.

18         THE COURT:  All right.  And your dog agrees.

19         MR. BIEN:  Yes, sorry.

20         THE COURT:  Secretary Allison, would that date work

21 for you?

22         MS. ALLISON:  Yes, ma'am.

23         THE COURT:  Mr. Mello, you and the rest of your team?

24         MR. MELLO:  Again, information is passing around.

25 That works for me.  So yes, your Honor.

1              THE COURT:  All right.  Special Master Lopes?

2              SPECIAL MASTER:  Yes.  Thank you, your Honor.

3              THE COURT:  All right.  Then we'll reconvene on March

4   25th at 10 a.m.  Thank you, Ms. Schultz, you can put that down.

5       And let me just ask.  Anything else anyone wants the Court

6   to know?  Mr. Bien?

7              MR. BIEN:  No, your Honor.

8              THE COURT:  Secretary Allison?

9              MS. ALLISON:  No, your Honor.

10              THE COURT:  Mr. Mello?

11              MR. MELLO:  Just as the Special Master indicated,

12   provided final reports that's relative, draft report -- for two

13   final reports yesterday and then a draft report today.  I

14   believe our deadlines to evaluate and determine whether or not

15   we're going to object or file anything in response to those two

16   reports is due on February 8th.

17       We will meet and confer, but we will be likely requesting a

18   little additional time because those two reports that will

19   possibly be responding to on the 8th, that's over 1,220 pages,

20   so we may be asking for additional time.  I don't believe we

21   started meeting and conferring and getting plaintiffs' position

22   on that yet, but I just wanted to give you a heads-up, your

23   Honor.

24              THE COURT:  All right.  Thank you for the heads-up.

25   I'll let the Special Master let me know how that's going.

1      Anything further, Special Master Lopes?

2          SPECIAL MASTER:  Yes, your Honor.  I just wanted to

3   make clear that the plan -- the staffing plan that we will be

4   working on with CDCR will be for the PIPs, for the inpatient

5   care, and the other staffing plan for care in the prisons has

6   already been provided.

7          THE COURT:  Yes.  Thank you for that clarification.

8   I knew that.  I didn't say it out loud.

9      All right.  Thank you very much then.  You may sign off.

10  I'll see you in March, if not before.

11          THE CLERK:  Court is in recess.

12      (Proceedings adjourned:  11:38 a.m.)

13                      ---oOo---

14      I certify that the foregoing is a correct transcript from

15  the record of proceedings in the above-entitled matter.

16

17                      /s/ Thresha Spencer
                        THRESHA SPENCER
18                      CSR No. 11788, RPR

19

20

21

22

23

24

25

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC