XAVIER BECERRA, State Bar No. 118517
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
LAUREL E. O'CONNOR, SBN 305478
DAVID C. CASARRUBIAS, SBN 321994
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE: 925-746-8460
FACSIMILE: 925-746-8490
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE AND OBJECTIONS TO THE JANUARY 28, 2021 SPECIAL MASTER'S MONITORING REPORT ON THE MENTAL HEALTH INPATIENT CARE PROGRAMS FOR INMATES OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**<br><br>Judge: Hon. Kimberly J. Mueller |

1

**INTRODUCTION**

On November 23, 2020, Defendants submitted written objections to the Special Master's October 22, 2020 draft Monitoring Report on the Mental Health Inpatient Care Program for Inmates in the State of California Department of Corrections and Rehabilitation.[1]  Defendants' objections raised several concerns and requested the Special Master address those concerns in the final monitoring report.  The final report filed on January 28, 2021 (ECF No. 7039), addressed some, but not all, of Defendants' concerns.  Defendants restate their remaining concerns here for the record, and propose an alternative finding and recommendation on Defendants' use of therapeutic treatment modules to provide mental health treatment in the inpatient programs.[2]

**I.    THE SPECIAL MASTER'S REPORT FAILS TO DISTINGUISH SYSTEMIC ISSUES WITH ACCESS TO CARE FROM TEMPORARY ISSUES DIRECTLY ATTRIBUTABLE TO THE PANDEMIC.**

Without regard to the current weekly court-ordered monitoring and reporting on the impact of COVID-19 on inpatient programs, the Special Master retroactively expanded the report's scope and monitoring period beyond the original six-month monitoring period, which was supposed to end in December 2019.  (ECF No. 7039, Report at 20.)[3]  This expansion improperly comingled data from 2019 through February 2020 with data from the inpatient programs during the COVID-19 period where programs were admittedly limited to safeguard the lives of the *Coleman* class. (*Id.*)  Defendants raise this issue because the report only explains that COVID-19 exacerbated compliance issues but does not provide any analysis of COVID-19's impacts or distinguish data uniquely impacted by COVID-19 conditions. (*Id.* at 14, fn. 4.)

---

[1] Thorn Decl., Exhibit A.

[2] The Court's current schedule, which provides only 10 calendar days to respond to the Special Master's reports that are more than 500 pages, is insufficient to afford Defendants and their attorneys adequate time to fully vet what, if any, changes were made to the final reports from the Special Master's draft reports, and whether any of those changes fully, partially, or adequately address Defendants' concerns.  Defendants submit these objections in light of this schedule, which strains the limits of due process.  Although Defendants raised the subject of an extention of time at the January 29, 2021 hearing, Plaintiffs agreed to Defendants' request for additional time, this Court nonetheless rejected the parties joint request.  *See* ECF Nos. 7048, 7050.

[3] All citations to the filed report are to the ECF page numbering.

2

The report dismisses Defendants' objection in this regard, and attributes compliance rates and issues, which were clearly impacted by the COVID-19 conditions, to long-standing issues with the inpatient programs.  (Report at 14.)  However, this objection addresses the comingling of data resulting in the report's conflation of long-standing problems with issues that were compliant before the pandemic.

For example, the report states:  "[c]ombined with the uneven care being provided in the PIPs, the shortage of inpatient beds exacerbates an issue defendants have been grappling with for years.  At the time of this writing, the list of Coleman class members waiting for inpatient care beds remains high, at approximately 300 or more."  (Report at 21.)  But there is no mention that the "current" waitlist is a direct result of public health policies designed to safeguard patients and staff from infection by COVID-19 and to prevent the virus's spread both in institutions and in the community.  Even though the report acknowledges that all transfers to inpatient programs were timely for the reporting period (Report at 42.), the report fails to include a description of what the data showed for the months preceding the change in programming attributed to COVID-19:

- As of December 30, 2019, there was no waitlist for admission to the DSH programs, and the waitlist for patients referred to the PIPs was at 128 with no patients waiting over 30 days (ECF No. 6446);

- As of January 27, 2020, there were 25 patients waiting for admission to a DSH program, none over 30 days, and there were 155 patients waiting for admission to a PIP, with one waiting over thirty days (ECF No. 6470); and

- As of February 24, 2020, there were 17 patients waiting admission to a DSH program, none over thirty days, and 129 patients waiting for admission to a PIP, with two waiting more than thirty days. (ECF No. 6505.)

By failing to discuss the fact that the current waitlist for inpatient care is substantially, if not largely, the result of COVID-19 restrictions, the report gives the false impression of backsliding on Defendants' successful compliance with inpatient transfer requirements over the past several years.

3

1     Another example of an objection based on the report conflating issues of compliance with

2     data from COVID-19 conditions are comments in the report that class members encounter

3     difficulties in trying to gain admission to DSH programs.  (*See* Report at 116 and Thorn Decl.,

4     Exhibit A.)  DSH was asked to provide data for this round of monitoring from the period of June

5     –November 2019.  (*Id.*)  The monitoring period was expanded without any discussion with DSH,

6     well in to 2020.  (*Id.*)  DSH also objects to the conflation of past perceived admission issues with

7     the current COVID-19 crisis.  This is highlighted by the report's comparison of the admission of

8     *Coleman* class members and Offenders with Mental Disorders (OMHDs).  (Report at 26-28.)  As

9     pointed out in DSH's objections to the draft report (Thorn Decl., Exhibit A), the report's analysis

10    does not take into account the impact of the COVID-19 pandemic and necessary measures taken

11    by DSH and CDCR to prevent the spread of COVID-19 at their respective facilities.  This

12    analysis also ignores the legal necessity for DSH to admit OMHDs, as well as the historical

13    relative rates of referrals and admissions between Coleman class members and OMHDs, which

14    have always been at a higher amount than Coleman class members.  It is expected the number of

15    OMHD admissions will be much higher than Coleman class members because the referral rates

16    are dramatically different. For example, on average, DSH admits 41 OMHDs to its hospital units

17    each month and on average treats 1,244 OMHDs in its hospitals. (Thorn Decl., Exhibit A.)

18    Whereas Coleman capacity in DSH is limited to 336 patients and prior to COVID-19, the highest

19    census for 2018 and 2019 was 325. Nonetheless, DSH admitted 97% of all Coleman referrals

20    received, rejecting only 13 patients during the monitoring period.  (*Id.*)

21        In discussing inpatient census and waitlists data, the report includes only a portion of the

22    inpatient data, which paints an inaccurate and misleading picture.  For example, the charts that

23    summarize the inpatient census and capacity for the reporting period and the inpatient waitlist

24    (Report at 22-26) fail to show the referral rates under COVID-19 conditions, leaving the

25    impression that referred patients are not being admitted to inpatient beds when, in fact, reduced

26    admissions occurred because patients could not be transferred in the first instance.  The report

27    shows that pre-COVID DSH inpatient beds were filled above 90 percent with the census at DSH–

28    Atascadero at 97 percent as of February 20, 2020.  (Report at 52.)  The census is down post-

4

1   COVID because referrals post-COVID are down and pending referrals are delayed due to

2   movement restrictions imposed by the April 10 and April 17 policies.

3       Another example of skewed reporting is the description of the draft report as a "multi-

4   faceted report" based on "monitoring that was performed on-site [that] revealed what the Special

5   Master has continued to find during the COVID-19 pandemic." (Report at 20.) But COVID-19

6   conditions significantly altered how care was provided in the PIPs during the monitoring round

7   and the reporting period, and this should have been discussed in the report. Defendants requested

8   that the final inpatient report explain the impacts of COVID-19 to the parties and Court to better

9   inform and guide further action.

10  **II.    THE REPORT WRONGLY ASSUMES THAT ALL PRIOR STAFFING ORDERS APPLY TO ASSESS DEFENDANTS' STAFFING OF INPATIENT PROGRAMS.**

11

12      The report criticizes CDCR and DSH for failure to maintain no greater than ten percent

13  vacancy among psychiatrists, psychologist, and licensed clinical social workers under the 2002

14  order, but recognizes that whether the order applies to DSH may be an open question. (Report at

15  15, 16, and 40.) Defendants maintain that the 10% maximum vacancy rate applies to CDCR's

16  system-wide psychiatry staffing levels and disagree that the 2002 order applies to the PIPs, to

17  individual institutions or their subprograms, or to individual DSH hospitals, and object to the

18  report's contrary assumption.

19      In response to Defendants' objection, the report claims it is "unambiguous" that the Special

20  Master applied the 2002 order and the 2009 staffing plan ratios to the staffing at CDCR's PIPs in

21  past monitoring reports. But the actual language cited from the 2018 inpatient report does not

22  clearly articulate that the work on staffing in 2017, including the findings in the October 2017

23  order, apply equally to CDCR's PIPs, which had just been created. (ECF No. 5894 at 17-18.) In

24  fact, there is nothing in the 2018 inpatient report or the October 2017 staffing order that

25  unambiguously establishes that the 2002 staffing order applies to the then non-existent inpatient

26  staffing plan.

27

28

1    Defendants agree that they need to continue to work on the inpatient staffing plans to

2    provide adequate staffing.  But there is no standing order that applies the 2002 order on PIP

3    staffing

4    **III.    THE SPECIAL MASTER HAS MONITORED THE USE OF THERAPEUTIC TREATMENT**
     **MODULES IN CDCR'S PSYCHIATRIC INPATIENT PROGRAMS AND HAS NOT FOUND**

5    **DEFICIENCIES IN CARE.**

6    For the past several years, Defendants have proposed the use of Therapeutic Treatment

7    Modules (TTMs) to facilitate the treatment of appropriate MAX custody patients in a safe and

8    therapeutic manner.  TTMs or alternatives, such as restart chairs or other devices that restrain

9    MAX custody patients, are necessary to protect both patients and staff.  Plaintiffs have refused to

10   consider any use of TTMs and instead advocate for the treatment of such class members without

11   the protections afforded by TTMs.  Plaintiffs' position is not supported by any evidence that the

12   use of TTMs diminishes the value of the treatment provided or harms the patient.  The Special

13   Master has monitored the use of TTMs during his inpatient monitoring period and has not

14   reported on any adverse outcomes.  Indeed, the use of TTMs in general has been monitored and

15   reported for over a decade in this action.  In fact, the monitors reported that the PIP patients liked

16   the use of TTMs during therapy.  (Report at 73.)  Past monitoring reports also lack any evidence

17   that suggest the use of TTMs are inappropriate for an inpatient setting.  (*See* Special Master's

18   2016 report on inpatient programs at ECF No. 5448 at 103 and the 2018 report, ECF No. 5894.)

19   In the report, the Special Master finds that "the parties have bargained to an impasse.  Any

20   resolution regarding the use of TTMs in inpatient programs will have to be reached through

21   litigation."  (Report at 36.)  Litigation is unnecessary.  Given the absence of any negative

22   outcomes attributable to the use of TTMs to provide treatment in the PIPs, Defendants propose an

23   alternative finding as follows: the Special Master monitored use of TTMs in the PIPs during the

24   monitoring period with no reports that their use is contraindicated for providing mental health

25   treatment in inpatient programs.

26

27

28

**IV.    IMPROVEMENTS TO THE INPATIENT REFERRAL AND HOUSING POLICIES CONCERNING THE PLACEMENT OF PATIENTS AT THEIR LEAST RESTRICTIVE HOUSING.**

Three years after the change in provision of inpatient care from DSH to CDCR, issues regarding the application of the LRH policy continue to surface.  The report restates some of the concerns from the 2018 inpatient report and concludes that CDCR is not transferring patients who are eligible for housing in their LRH.  (Report at 42.)

Several issues need to be resolved in order to fully assess compliance with the LRH process.  First, CDCR does not track clinicians' clinical determinations regarding patients' ability to be housed at their LRH.  This information requires a manual chart review.  Second, CDCR is operating in a COVID-19 environment, which has impacted all inmate movement, including patient transfers to LRH subjected to COVID-19 safeguards restricting patient movement.  As the report indicates, the Special Master will monitor the LRH policy and movements to an LRH after the COVID-19 restrictions are lifted.  (Report at 44.)

The monitoring clearly covered and reported on LRH determinations.  (Report at 91-92.) Although the report indicates that CDCR followed the LRH process and policy of referring and transferring patients to their LRH based on both custodial qualifications and clinical approval, the third recommendation questions the clinical judgment exercised in determining whether a patient is qualified to be housed at his LRH.  What the report fails to note, is the audit that CDCR implemented at the PIPs to determine whether the LRH clinical reviews are being performed and is monitoring the LRH referrals through the statewide Quality Management process, including implementation of corrective action.

Finally, the report draws a direct correlation between a growing waitlist for inpatient care and the failure to properly place patients at their LRH.  (Report at 117.)  But the Special Master cites no evidence to show that the current waitlist has developed because qualified patients are not being transferred to their LRH.  The logical explanation is that patient transfers are limited due to restrictions approved by the Special Master and Plaintiffs and reported to the Court, and applied to prevent the spread of COVID-19.

Defs.' Resp. & Obj. to Special Master's Monitoring Rprt. on Inpatient Programs  (2:90-cv-00520 KJM-DB (PC))

1   Contrary to the report's Recommendation No. 3, clinical LRH issues should not be handled

2   in the weekly COVID-19 Task Force meetings because they require in-depth clinical discussions

3   that require more time than can be dedicated to such reviews during the weekly Task Force

4   meetings.  What the report fails to note is that LRH transfers are addressed by the weekly clinical

5   small workgroups, a process CDCR submits should continue.  The Special Master team should

6   review the LRH audit system that is in place and part of the Quality Management process so that

7   any improvements are addressed through the system designed for that purpose.

8   **V.    THE REPORT INCLUDES INCORRECT DATA ON INDIVIDUAL PROGRAMS.**

9   Defendants reviewed the Special Master's draft report and provided feedback on discreet

10  factual statements that were incorrectly reported.  Only some of the inaccuracies were corrected

11  in the final report.  The following is a list of the factual inaccuracies that remain part of the

12  January 28 inpatient report.

13  CDCR objected to several issues reported in error in the inpatient report related to

14  conditions at the CIW PIP and at the SVSP PIP.

15  With respect to reports of issues at the CIW PIP, the Special Master corrected his

16  statements at page 84 regarding RVR's and at pages 105 and 302 regarding the lack of an

17  education class.  No changes were made to correct the reporting at page 100 of unsubstantiated

18  reports of missing laundry or to correct statements at pages 100 and 301-302 concerning the lack

19  of library access that were not substantiated by the law library's access logs.

20  For corrections to inaccurate reporting of issues at the SVSP PIP, the Special Master

21  corrected statements at page 152 regarding the use of seclusion cells.  The report was not revised

22  to add the reason CDCR provided for the lack of loaner crank radios during the review period.

23  **VI.   ANY ORDER APPROVING THE SPECIAL MASTER'S RECOMMENDATIONS SHOULD
        ADDRESS DEFENDANTS' REQUESTS FOR CLARITY AND MISSING INFORMATION.**

24  The Report concludes with the Special Master's recommendation that the Court enter an

25  order directing Defendants CDCR and DSH to respond to five recommended courses of action.

26  As stated below, Defendants object to the recommendations on the basis that they call for action

27  on issues that are already being addressed and are therefore redundant, and on the basis of their

28

8

vagueness and ambiguity.  Defendants explained this position in their response to the draft report (*See* Exhibit A to the Thorn Decl.), which the Special Master appears to have largely ignored, for the most part, in making his final recommendations.  Defendants restate those objections below, and ask that any order on the inpatient report take into account Defendants' very reasonable requests.

###    A.    Recommendation No. 1.

This recommendation requires that CDCR and DSH develop plans, within 90 days, to provide patients with structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment, including for maximum custody patients consistent with a psychiatric inpatient level of care, as well as implement a system for tracking and reporting adherence to the standards developed.

In general, the recommendation is too vague and not tied to specific, identified issues in the report.  The recommendation does not indicate whether it calls for a specific plan to address every criticism in the report and only with respect to those programs that fall short, or whether it is a more general recommendation for systemic improvements at all of the inpatient programs.  Defendants are committed to working with the Special Master to clarify the required components of the plans requested in this recommendation.  Any order issued on this recommendation should recognize the need for greater clarity.

The report criticizes DSH for failing to provide individualized treatment or adequate individualized treatment.  (Report at 117.)  These criticisms resulted in this recommendation.  DSH objected to the criticism and any requirement that DSH develop a plan to provide individual treatment to *Coleman* class members.  DSH provides treatment to *Coleman* class members in its hospitals using group therapy as the primary treatment modality.  As DSH indicated in its objections to the draft inpatient report, DSH provides individual therapy when clinically indicated, but that group therapy is the primary treatment modality.  There are many times throughout the course of treatment that patients at DSH are not clinically indicated to require individual therapy.  (Thorn Decl., Exhibit A.)  The report does not include any basis to support a plan for expanding individual treatment when not clinically recommended.

1    Subject to the foregoing objections and requests for clarification, CDCR and DSH expect to

2    develop and submit plans to the Special Master within the requested timeframe.

3    **B.    Recommendation No. 2.**

4    This recommendation requires that CDCR **continue** to work with the Special Master to

5    complete staffing plans for the inpatient programs covering all required disciplines.  As stated

6    above, CDCR is already working with the Special Master to complete the PIP staffing plans and

7    will continue that work in the current workgroup.

8    **C.    Recommendation No. 3.**

9    This recommendation requires CDCR and DSH to refer, transfer, and admit Coleman class

10    members to appropriate inpatient programs under the Program Guide and consistent with public

11    health best practices given the COVID-19 pandemic.

12    This recommendation reflects what is already required under the April 24 and May 7

13    orders.  (ECF No. 6639, 6660.)  The recommendation is redundant and unnecessary given the

14    prior orders.  The recommendation is also misleading because it fails to discuss the obvious

15    pending public health concerns, and because it suggests that decisions made by weighing public

16    health concerns against access to specific inpatient mental health care have been improper

17    without citing any evidence to support that contention.

18    Defendants are already complying with this recommendation and it is consistent with their

19    practice to look at individual patient needs and case factors in referring, transferring, and

20    admitting patients to appropriate inpatient programs as required by the Program Guide and

21    consistent with public health best practices during the pandemic.  As previously noted, DSH

22    accepted and admitted 97% of patients referred during the monitoring period.  Defendants do not

23    need a court order to continue pre-COVID conduct and practices.  Post-COVID, Defendants are

24    entitled to the deference owed to prison and hospital administrators to protect the life and safety

25    of their patients and take steps needed to do so, including in emergency situations.

26

27

28

**D.    Recommendation No. 4.**

This recommendation requires CDCR to develop and file a plan within 180 days for providing appropriate treatment space for clinical services and activities in C5 and C6 at SVSP-PIP, or implement alternatives to the use of Facilities C5 and C6 at SVSP-PIP for inpatient care.

As Defendants readily agreed in their response to the draft report, the CDCR Defendants will work to develop the recommended plans.  However, Defendants question whether the 180-day timeline is reasonable in light of the other work both the parties and the Special Master's team must complete in 2021.  Defendants ask that any order leave room for a reasonable extension of the deadline as necessary.

**E.    Recommendation No. 5.**

This recommendation requires that Defendants develop a monthly report to be provided to the Special Master and Plaintiffs, but not filed with the court, identifying all patients in an inpatient level of care who are not housed in their LRH.  The Special Master revised this objection based on Defendants' requests for clarification and ability to report on the requested data.  Defendants appreciate the revisions.  However, given the limited time Defendants were given to prepare objections to this report, Defendants were unable to determine whether CDCR will be able to provide all of the information listed in the Special Master's revised recommendation as part of the monthly LRH report.  Defendants will work closely with the Special Master to determine what information is available on a monthly basis to create a report that will assist the Special Master in tracking patients at an inpatient level of care who are not housed in their LRH.

**CONCLUSION**

The key issues Defendants raise in objecting to the inpatient report are the lack of recognition in the report of the impact of the coronavirus pandemic on the access to inpatient care, the need for the Special Master's monitoring and input on the use of therapeutic treatment modules to provide inpatient mental health care, and the application of the 2002 staffing order to the PIP staffing plan that is currently under development.  Defendants request that the Court's order on the inpatient report recognize the Defendants' objections.

11

1

2    Dated: February 8, 2021

3                                                          Respectfully submitted,

4                                                          XAVIER BECERRA
                                                          Attorney General of California
5                                                          DAMON MCCLAIN
                                                          Supervising Deputy Attorney General
6
                                                          /S/ ELISE OWENS THORN
7                                                          Elise Owens Thorn
                                                          Deputy Attorney General
8                                                          Attorneys for Defendants

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Resp. & Obj. to Special Master's Monitoring Rprt. on Inpatient Programs  (2:90-cv-00520 KJM-DB (PC))