1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   MONICA N. ANDERSON, State Bar No. 182970
    Senior Assistant Attorney General
3   ADRIANO HRVATIN, State Bar No. 220909
    Supervising Deputy Attorney General
4   ELISE OWENS THORN, State Bar No. 145931
    KYLE A. LEWIS, State Bar No. 201041
5   LUCAS HENNES, State Bar No. 278361
    NAMRATA KOTWANI, State Bar No. 308741
6   Deputy Attorneys General
      1300 I Street, Suite 125
7     P.O. Box 944255
      Sacramento, CA 94244-2550
8     Telephone:  (916) 210-7318
      Fax:  (916) 324-5205
9     E-mail:  Elise.Thorn@doj.ca.gov
    Attorneys for Defendants
10
    HANSON BRIDGETT LLP
11  PAUL B. MELLO, SBN 179755
    SAMANTHA D. WOLFF, SBN 240280
12  LAUREL E. O'CONNOR, SBN 305478
    DAVID C. CASARRUBIAS, SBN 321994
13  1676 N. CALIFORNIA BLVD., SUITE 620
    WALNUT CREEK, CALIFORNIA 94596
14  TELEPHONE:  925-746-8460
    FACSIMILE:   925-746-8490
15  Attorneys for Defendants

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone:  (310) 552-0130
  Fax:  (310) 229-5800
  E-mail:  RSilberfeld@RobinsKaplan.com
Special Counsel for Defendants

16

17                 IN THE UNITED STATES DISTRICT COURT

18             FOR THE EASTERN DISTRICT OF CALIFORNIA

19                         SACRAMENTO DIVISION

20  **RALPH COLEMAN, et al.,**                Case No. 2:90-cv-00520 KJM-DB (PC)

21                              Plaintiffs,   **DECLARATION OF ELISE OWENS**
                                              **THORN SUPPORTING DEFENDANTS'**
22           v.                               **RESPONSE AND OBJECTIONS TO THE**
                                              **JANUARY 28, 2021 SPECIAL MASTER'S**
23                                            **MONITORING REPORT ON THE**
    **GAVIN NEWSOM, et al.,**                 **MENTAL HEALTH INPATIENT CARE**
24                                            **PROGRAMS FOR INMATES OF THE**
                              Defendants.     **CALIFORNIA DEPARTMENT OF**
25                                            **CORRECTIONS AND**
                                              **REHABILITATION**
26
                                              Judge:      Hon. Kimberly J. Mueller
27

28
                                        1

I, Elise Owens Thorn, declare:

1.     I am a Deputy Attorney General in the California Office of the Attorney General, representing Defendants in this matter.  I submit this declaration in support of Defendants' objections to the Special Master's January 28, 2021 report.  I have personal knowledge of the contents of this declaration and could testify to them if called to do so.

2.     Attached as Exhibit A is a true and correct copy of my letter to the Special Master dated November 23, 2020, with two attachments, letters from Defendants the California Department of Corrections and Rehabilitation and the Department of State Hospitals.

I declare under penalty of perjury that the information in this declaration is true and correct to the best of my knowledge.  Executed on February 8, 2021, at Sacramento, California.

*/s/ Elise Owens Thorn*

2

# Exhibit A

**XAVIER BECERRA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public:  (916) 445-9555
Telephone:  (916) 210-7318
Facsimile:  (916) 324-5205
E-Mail:  Elise.Thorn@doj.ca.gov

November 23, 2020

*Via Electronic Mail*

Matthew A. Lopes, Jr.
Special Master
Pannone Lopes Devereaux & O'Gara, LLC
Northwoods Office Park
1301 Atwood Avenue, Suite 215 N
Johnston, RI 02919

RE:    *Coleman*, *et. al. v. Newsom*, *et al.*,
          U.S. District Court, Eastern District of California, Case No. 2:90-cv-00520 KJM-DB

Dear Special Master Lopes:

　　　　This responds to your October 22, 2020 Draft Monitoring Report on the Mental Health
Inpatient Care Program for Inmates in the State of California Department of Corrections and
Rehabilitation.  Defendants' response includes comments, objections, and requests for both
clarification and corrections to several misstatements set forth in the draft report.  Defendants
also address the report's six recommendations, and request that you fully address Defendants'
concerns while finalizing your report.  As always, Defendants are available to meet with you and
your team to discuss these issues.

## I.    General Response and Comments.

　　　　Without notice to Defendants, you expanded the report's scope and monitoring period
beyond the original six-month monitoring period, which was supposed to end in December 2019.
Defendants raise this issue because findings based on the impacts of COVID-19 are comingled
with findings from pre-COVID-19 monitoring, without any explanation concerning data
uniquely impacted by COVID-19 conditions.  For example, the draft report states:  "[c]ombined
with the uneven care being provided in the PIPs, the shortage of inpatient beds exacerbates an
issue defendants have been grappling with for years.  At the time of this writing, the list of
Coleman class members waiting for inpatient care beds remains high, at approximately 300 or
more."  (Draft Report at 5.)  But there is no mention that the current waitlist is a direct result of
public health policies designed to safeguard patients and staff from infection by COVID-19 and
to prevent the virus's spread both in institutions and in the community.  Also, you describe the
draft report as a "multi-faceted report" with "monitoring that was performed on-site, [that]
revealed what the Special Master has continued to find during the COVID-19 pandemic."  (Draft

Matthew A. Lopes, Jr.
November 23, 2020
Page 2

Report at 4.)  But COVID-19 conditions significantly altered how care was provided in the PIPs during the monitoring round and the reporting period.  This report should explain the impacts of COVID-19 to the parties and Court to inform and guide further action.

In discussing inpatient census and waitlists data, the draft report includes only a portion of the inpatient data, resulting in misleading findings.  For example, the charts that summarize the inpatient census and capacity for the reporting period and the inpatient waitlist (Draft Report at 6-10), fail to also show the referral rates under COVID-19 conditions, leaving the impression that referred patients are not being admitted to inpatient beds when in fact reduced admissions occurred because patients could not be transferred in the first instance.  The census is down post-COVID because referrals post-COVID are down and pending referrals are delayed due to movement restrictions from the April 10 and April 17 policies.

Finally, on November 20, Defendants met with you and your team to discuss Defendants' questions on recommendations 1 and 5.  Defendants appreciate the opportunity to discuss those recommendations, but as detailed in Section IV below, still have some concerns regarding the scope of the recommendations.  Defendants also believe that recommendations 2, 3, and 6 are currently being addressed through the small workgroups or are the subject of policies that the Special Master team knows need additional time to take hold.  Defendants request that, at a minimum, the report be updated to include the status of such small workgroup discussions and the status of any pending policies.  And part of recommendation 1, as it pertains to individual treatment at DSH, lacks foundation and is not tethered to actual findings in the report. Defendants are prepared to further discuss with you and your team these important concerns before you file the final report.

II.     **Response and Objections to the Update on Access to Mental Health Inpatient Care.**

A.     **Staffing Issues.**

Staffing issues should be reported and followed as part of the ongoing staffing workgroups and development of staffing plans under the 2017, 2019 and 2020 Court orders.  The draft report (at pages 20-21) comments on the PIPs and DSH compliance with the ninety-percent fill rate, but fails to acknowledge that the staffing plan for the PIPs and the DSH programs are still under development with your workgroups.  As a result, any findings on compliance with staffing should be identified as pending and subject to the ongoing consideration of the staffing plans.  Defendants request that the report include a description of the workgroups, the progress made to date in the workgroups, and the status of CDCR and DSH staffing plans.  Defendants question the value of the staffing workgroups if the Special Master is inclined to take issue in a draft report such as this one without recognizing the parties' progress and ongoing commitment to the workgroup process.

The report also criticizes CDCR and DSH for failure to maintain no greater than ten percent vacancy among psychiatrists, psychologist, and licensed clinical social workers under the 2002 order. The order has always been applied to system-wide staffing levels and Defendants

Matthew A. Lopes, Jr.
November 23, 2020
Page 3

have never conceded that it applies to an institution, much less programs within an institution (i.e., PIPs). Defendants disagree that the 2002 order (90% rate) applies to the PIPs, to any subprogram or individual institution, and to individual DSH hospitals, and object to the report's contrary assumption.

### 1. Status of the PIP Staffing Plan.

On August 25, 2020, CDCR submitted staffing plans for the CHCF, CIW, CMF, and SVSP PIPs to the Special Master. On September 9, CDCR submitted a staffing plan for the SQSP PIP and an updated plan for the CHCF PIP. The plans have been the subject of three workgroups in September and October 2020. (Draft Report at 4.) Work remains to be done, including by your team, and reporting a lack of compliance, as you do in the draft report, is misleading. At a minimum, any report of non-compliance should make clear that your draft report concerns PIP staffing levels based on an order and plan for mental health outpatient programs, not the inpatient programs. (*See* prior staffing orders addressing the 2009 staffing plan and not PIP staffing plans, ECF Nos. 5171, 5307, 5711, and 9228.)

As you know, there are multiple pending proposals and policies currently under development and review that may impact PIP staffing. Defendants requests that the draft report be revised to include the current status of the Defendants' work in this regard.

### 2. Status of the DSH Staffing Plan.

DSH has spent the better part of the last four years submitting staffing plans for your approval. DSH provided its initial staffing plan in July 2016, to which the Special Master expressed concerns over the plan's level of detail. On October 10, 2017, the Court ordered DSH to fully implement its staffing plan within one year of the order. Since that time, DSH has provided regular status updates and further refined its staffing plan to address the Special Master's recommendations, including updates in May, August, and September 2018, March 2019, and March and July 2020. The July 2020 update focused on how DSH maintains compliance with staffing orders and ratios, addresses natural staff attrition, and discusses the steps it has taken when staffing levels fluctuate. Defendants request that the draft report include details concerning the work DSH has done since 2016 to put forward staffing plans that have not yet been reported on or approved by the Special Master or the Court.

Since July 2020, and during recent workgroup discussions regarding updates to the DSH staffing plan, the Special Master and Plaintiffs have asked a number of questions regarding DSH's psychiatry pay and contract rates. On November 20, DSH responded to those questions. Defendants are prepared to discuss with the Special Master and Plaintiffs those issues and any other concerns so that DSH can finalize its staffing plan.

Matthew A. Lopes, Jr.
November 23, 2020
Page 4

### B. Focused workgroups for CDCR PIPs need to address issues raised in the report.

Two important issues that have gone unresolved over the past several years are CDCR's proposal to use Therapeutic Treatment Modules (TTMs) to treat MAX custody patients and CDCR's transfer of class members to their least restrictive housing (LRH) under the 2015 LRH policy. Defendants requests that the draft report provide additional details concerning both issues, including the Special Master's position on each.

1.      The Use of Therapeutic Treatment Modules for MAX Custody Patients.

The parties have spent countless hours and meetings negotiating the use of TTMs to enable CDCR to treat MAX patients, without limits, in a safe and therapeutic manner. TTMs or alternatives, such as restart chairs or other devices that restrain MAX custody inmates, are necessary to protect both patients and staff. Plaintiffs appear to advocate for the treatment of such class members without the protections afforded by TTMs, but there is no evidence that the use of TTMs somehow diminishes the value of the treatment provided or harms the patient. Defendants request the Special Master approve the use of TTMs so that Defendants can take further action to open up this safe and useful mode of offering the mental health services to their MAX custody patients.

2.      Transfers to Least Restrictive Housing.

Three years after the change in provision of inpatient care from DSH to CDCR, issues regarding the application of the LRH policy continue to surface. The draft report restates some of the concerns from the 2018 inpatient report and concludes that the LRH issue is relegated to the COVID-19 Task Force. (Draft Report at 24-25.) The Special Master reports that CDCR is not transferring patients who are eligible for housing in their LRH. As Defendants have discussed with you and your team, CDCR does not track clinicians' clinical determinations regarding patients' ability to be housed at their LRH. This information requires a manual chart review. But CDCR is operating in a COVID-19 environment, which has impacted all inmate movement, including patient transfers to LRH subjected to COVID-19 safeguards restricting patient movement.

The draft report fails to note that under the LRH policy, the proper referral and transfer of patients to their LRH is based on both custodial qualifications and clinical approval, a process that is in place. The clinical review is a critical step in determining whether a patient is qualified to be housed at his LRH. The draft report's third recommendation, in particular, questions this clinical judgment. The draft report also fails to note that CDCR implemented an audit at the PIPs to check whether the LRH clinical reviews are being done and is monitoring the LRH referrals through the statewide Quality Management process, including implementation of corrective action. And the LRH transfers are addressed by the weekly small workgroups, a process CDCR submits should continue.

Matthew A. Lopes, Jr.
November 23, 2020
Page 5

Finally, the draft report draws a direct correlation between a growing waitlist for inpatient care and the failure to properly place patients at their LRH. (Draft Report at 98.) The Special Master cites no evidence to show that the current waitlist has developed because qualified patients are not being transferred to their LRH, as opposed to because of restrictions approved and applied to prevent the spread of COVID-19. Contrary to the draft report's recommendation, clinical LRH issues should not be handled in the weekly COVID-19 Task Force meetings because they require in-depth clinical discussions that require more time than can be dedicated to such reviews during the weekly Task Force meetings. Instead, the Special Master team should review the LRH audit system that is in place and part of the Quality Management process so that any improvements are addressed through the system designed for that purpose.

### C. The Draft Report Contains Misleading Findings.

Defendants object to a number of misleading findings in the draft report based on missing or incomplete data.

1. The draft report includes data on filled beds without also reporting the referral rates. Not including the number of referrals along with fill rates is an empty metric because the reader might infer that there are patients referred who are not getting transferred and admitted to inpatient beds. (Draft Report at 25-26.) You criticize DSH for low fill rates, but your draft report, including in the tables presenting data at pages 27 through 29, fails to provide information on the rate of referrals. There is a direct correlation between referral rates and fill rates, as there is for rejection rates for referrals. DSH's rejection rate is less than five percent, but this data is not included in the report. Ignoring the fill rate data or the number of rejections presents a misleading picture of what is happening with class members' access to inpatient beds. If DSH received more referrals, there would be more admissions and the fill rate would increase.

Despite pages of charts criticizing DSH for the low *Coleman* census in its programs, the draft report at page 68 notes the actual facts—that that there were 346 patients referred and admitted to DSH during the six month monitoring period and only thirteen referrals rejected. That is a 97% acceptance and admission rate. Only three percent of patients referred to DSH care were not accepted or transferred for admission. DSH cannot "fill beds" without the referrals to do so, nor is "filling beds" an appropriate way to assess access to inpatient care. The focus should be on patients who are clinically in need of care, and ensuring they are referred and admitted, and not on an arbitrary number of beds to be filled.

Defendants maintain that the impacts of COVID-19 should be reported separately and not comingled with data reporting pre-COVID-19 access to care. The draft report acknowledges COVID-19's impact, but maintains that the COVID-19 pandemic does not in any way modify inpatient program transfer obligations. (*Id*. at 29.) That position is illogical and inconsistent with Defendants' policies based on public health protections and the *Coleman* Court's orders allowing those protocols. (*See* ECF Nos. 6622, 6639, 6616 at 237 and 239, and 6761 at 60.)

Matthew A. Lopes, Jr.
November 23, 2020
Page 6

    2.  Defendants object to the statement on page 24 that "the waitlist for patients referred but not yet placed in inpatient care settings is significant and continues to grow."  While this statement appears to be the result of the small workgroup process addressing COVID-19 issues, the report does not acknowledge that any growing waitlist is due to COVID-19 and the limits placed on patient movement to keep patients and staff safe.

    3.  The draft report presents inpatient referrals and admissions data in a series of charts the Special Master created based in part on Defendants' monthly inpatient reports.  (*See* Draft Report at 5-12 and 26-29.)  The report's charts, as described further below, are misleading because they exclude relevant data and compare populations that have differing underlying mental health issues and require different treatment programs.

    First, a group of charts provides census and capacity numbers but leaves out overall referrals.  (Draft Report at 6-8.)  As stated above, presenting low census numbers does not provide any information about inpatient transfers or access without reporting on the referrals for the same time period.  Also, the census charts provide data for the period October 2019 through October 2020, but the factual support—namely, Defendants' monthly inpatient reports—are limited to reports filed for the periods October 2019 through April 2020.  (*Id.* at 5, n.4.)  The charts therefore fail to provide a complete picture of the referral, transfer and admission of class members to inpatient care.

    Second, the draft report presents two charts showing waitlists for admission to DSH-Atascadero and DSH-Patton.  (*Id.* at 9-10.)  These waitlist comparisons are misleading because they do not include data that shows how long a patient has been on the waitlist or whether and to what extent any of the patients for a given month waited over thirty days.  There will always be a waitlist of patients for DSH—due to the time it takes for any given patient to move through the referral and admission process, including when CDCR sends DSH the referral, the time for DSH to review the referral, accept the patient for admission, schedule the patient for transport, and the patient's admission to a bed.  The waitlist will never be zero due to the time needed to complete these steps.  As such, the relevant metric is how many patients waited over thirty days for those steps to be completed—and there was only *one* during the entire monitoring period of July to December 2019.  Comingling data on the total number of patients referred to inpatient care with patients who have been waiting beyond Program Guide timelines due to delays creates the misperception that the transfer of all patients on the waitlist are delayed, and that is simply not the case.  Also, the draft report does not identify the data's source to allow Defendants, the Court, or anyone else to assess the data underlying the comparison.

    Third, the draft report presents charts to compare the movement of Offenders with Mental Health Disorders (OMDs) and *Coleman* class members after DSH lifted the temporary suspension of admission of *Coleman* class members.  As with the waitlist charts, the comparison lacks foundation because it fails to identify the source of the data.  Separately, the comparison is based on a faulty premise—that the total number of beds and the number of referrals for each group is the same or was the same prior to the suspension period.  But that is misleading.  For example, on average, DSH admits 41 OMDs to its hospital units each month, and based on the

Matthew A. Lopes, Jr.
November 23, 2020
Page 7

average daily census treats 1,244 OMDs (both those committed pursuant to Penal Code Sections 2962 and 2972) in its hospitals. Whereas *Coleman* capacity in DSH is limited to 336 patients and prior to COVID-19, the highest census for 2018 and 2019 was 325. It is logical that the OMD census would be higher than the *Coleman* census because DSH receives significantly more referrals for OMDs—comparing the OMD admissions and census to the *Coleman* admissions and census is an apples to oranges comparison.

4. The draft report improperly includes the L-1 PIP in its critique of other PIPs, and specifically the CMF PIP. (Draft Report at 4, 18.) This is misleading because the L-1 program is substantially different and more robust than other PIP programs—the L-1 program has physical plant limitations and must support a waiver of state laws required to use the facility for inpatient care. For example, L-1 offers more therapeutic activity and out-of-cell time than any other PIP program. Yet the draft report states "[t]he CMF-PIP workgroup, which also encompassed CMF L1, focused on remediating the significantly limited treatment programming available to CMF-PIP patients." (*Id.*) Those statements in the draft report are misleading.

5. The draft report states that "lack of a sufficient number of inpatient beds" remains a serious problem. (Draft Report at 4.) To bolster this assertion, the report references SVSP PIP's C5 and C6 "temporary" status, although both units are licensed CTCs. Further attempting to bolster this assertion, the report states "[a]t the time of this writing, the list of *Coleman* class members waiting for inpatient care beds remains high, at approximately 300 or more." (Draft Report at 5.) But, according to the inpatient reports filed on October 15, 2020, there were 280 patients on the PIP waitlist, but also 245 empty beds, as well as another 115 empty beds at DSH programs. (ECF N0. 6912 at 6 and 13.) The bed vacancies and the waitlist are both direct results of COVID-19, yet the draft report attributes both to long-standing problems. Also, the size of the waitlist is not related to a lack of available beds. Even if Defendants had an additional 300 beds at the time of the writing of the report, it would in no way reduce the waitlist. The waitlist, at the time of the writing, was directly impacted by COVID-19 movement restrictions put in place in March and April 2020—restrictions which were fully vetted with the Plaintiffs and Special Master in the small workgroup and Task Force. No mention is made of this fact.

At a minimum, Defendants suggests that the report should provide the additional data showing that, although there is a waitlist, there are available beds for those patients that are not filled due to COVID-19 transfer restrictions.

## III.    Response from Individual PIPs and DSH Programs

Attached as Exhibits A and B are letters from CDCR and DSH setting forth corrections to statements in the draft report. Please consider and address this input in your final report so we have a complete record for review and any further action.

Matthew A. Lopes, Jr.
November 23, 2020
Page 8

IV.    **Defendants' Response to the Special Master's Six Recommendations.**

The draft report's six recommendations, like the report, conflate pre-COVID-19 conditions with pending and anticipated future COVID-19 conditions. The recommendations are generally consistent with much of the work Defendants are already doing to improve their inpatient care programs. But any final report needs to clarify several statements to provide an adequate record for review.

A.    **Recommendation No. 1.**

This recommendation requires CDCR and DSH within 90 days to develop plans to provide patients with structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment, including for maximum custody patients consistent with a psychiatric inpatient level of care, as well as implement a system for tracking and reporting adherence to the standards developed.

In general, the recommendation is too vague and not tied to specific, identified issues in the draft report. For example, does the recommendation seek a specific plan to address every criticism in the report and only with respect to those programs that fall short, or is this a more general recommendation for systemic improvements at all of the inpatient programs? Defendants appreciate the Special Master's willingness to clarify part of this recommendation that calls for the development and implementation of a system for tracking and reporting adherence to the standards developed—meaning the standards to be developed in the plans that are responsive to the recommendation. Defendants are confident that they can work with your team to clarify each of the components of the plans and requests that opportunity.

With respect to the recommendation for a plan to provide individual treatment, DSH assumes that the recommendation is not suggesting an expansion of the treatment it provides to *Coleman* class members in its hospitals, which as the Special Master knows, is limited to group therapy as the primary treatment modality. Defendants have not seen any evidence, and are not aware of any basis, to support a plan for expanding individual treatment when not clinically recommended.

The recommendation is likewise not specific as to the nature of the system for tracking and reporting adherence to the standards developed. Defendants are willing to work with the Special Master's team to better define the standards referenced in the recommendation and what is expected for tracking and reporting on adherence to the standards. It does appear that this recommendation may be tied to Defendants' ongoing work on plans to resume Program Guide care.

Subject to these requests for clarification, CDCR and DSH expect to develop and submit plans to the Special Master within 90 days. Defendants believe that implementation of a system for tracking and reporting adherence to the standards developed will require additional time and

Matthew A. Lopes, Jr.
November 23, 2020
Page 9

requests this recommendation be revised to allow additional time to implement a tracking and
reporting system after the plans are developed.

### B.  Recommendation No. 2.

This recommendation requires the Special Master to continue to work with CDCR to
complete staffing plans for their inpatient programs covering all required disciplines.  As stated
above, CDCR is already working with the Special Master to complete the PIP staffing plans will
continue that work in the current workgroup.

### C.  Recommendation No. 3.

This recommendation requires CDCR and DSH to refer, transfer, and admit *Coleman*
class members to appropriate inpatient programs under the Program Guide and consistent with
public health best practices given the COVID-19 pandemic.

This recommendation reflects what is already required under the April 24 and May 7
orders.  (ECF No. 6639, 6660.)  The recommendation is redundant and unnecessary given the
prior orders.  Your draft report does not discuss the obvious pending public health concerns or
suggest that informed agency decisions made by weighing public health concerns against access
to specific inpatient mental health care are improper (nor could you).

Defendants are already complying with this recommendation and it is consistent with
their practice to look at individual patient needs and case factors in referring, transferring, and
admitting patients to appropriate inpatient programs as required by the Program Guide and
consistent with public health best practices given COVID-19.

### D.  Recommendation No. 4.

This recommendation requires CDCR to develop and file plans with the Court within 180
days for providing appropriate treatment space for clinical services and activities (e.g., suicide
prevention, IDTTs, structured therapeutic activities, unstructured out-of-cell activities, and
individual treatment) in Facilities C5 and C6 at SVSP-PIP or implement alternatives to the use of
Facilities C5 and C6 at SVSP-PIP for inpatient care.

CDCR will work to develop and file a plan within 180 days for providing appropriate
treatment space for clinical services and activities in C5 and C6 at SVSP-PIP.  However, whether
Defendants can meet the 180-day timeline depends in part on whether the Special Master's team
and Plaintiffs provide timely feedback.

### E.  Recommendation No. 5.

This recommendation requires that Defendants develop a report to supplement the data in
their monthly census, waitlist, and transfer timeline compliance reports to identify the number of

Matthew A. Lopes, Jr.
November 23, 2020
Page 10

patients on the waitlist specifically out of LRH, their current designated housing (e.g., locked dorms, multi-person cell or single cell), and to where the patients have been endorsed.

Defendants appreciate the time you and your team took to meet with us on November 20, 2020, to discuss this recommendation. You and your team clarified the nature of the information to be reported and the timelines for reporting such information. Specifically, we understand that you are looking for patient-level details on each patient out of LRH, regardless of whether they have been placed on the waitlist to transfer to their LRH. Additionally, you may be seeking information for each inmate answering why the patient has not been referred or transferred to his or her LRH. But CDCR takes exception with the idea that they must report each month on any patient who has not been clinically approved to be housed in his LRH. That decision is not recorded so that it may be automated. CDCR clinicians do not record the reasons for not approving a patient's transfer to his LRH in a manner that can be reported automatically. Any monthly report will require a manual pull and recording of data.

In addition, the recommendation should be revised to broaden the definition of the term "waitlist" so that it captures the data the Special Master needs to monitor the LRH process. As currently drafted, the recommendation would only capture patients out of LRH who are already referred to their LRH—a subset of all patients out of LRH who may not be clinically appropriate to be referred to their LRH.

Defendants also suggest that any LRH report not be filed with the Court as part of the mid-month inpatient reports, but instead be submitted to the Special Master and Plaintiffs via e-mail or as part of the monthly *Coleman* report submitted via the secure File Transfer Protocol (FTP) site. The reports contemplated by the recommendation will contain confidential patient-level data that must be redacted or filed under seal. With the clarifications on this recommendation, CDCR will work with its Inpatient Referral Unit to determine the extent to which it can report monthly the information the Special Master needs for monitoring this population under the LRH policy.

**F.  Recommendation No. 6.**

This recommendation requires CDCR, within 90 days, to develop and implement appropriate suicide prevention policies in all PIPs.

CDCR anticipates it will submit draft suicide prevention policies to the Special Master and Plaintiffs within 90 days. The policies' full implementation is subject to the time it takes the Special Master and Plaintiffs to review and provide input. A reasonable adjustment to the 90-day timeline may be needed.

\*       \*       \*

Matthew A. Lopes, Jr.
November 23, 2020
Page 11


      Please revise the draft report to address Defendants' concerns or set forth clearly why you oppose Defendants' position, in order to create a record for further action.

                       Sincerely,

                       */s/ Elise Owens Thorn*

                       ELISE OWENS THORN
                       Deputy Attorney General

                For     XAVIER BECERRA
                       Attorney General

EOT:

Attachments

# Exhibit A

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



November 23, 2020

Elise Thorn, Esq.
California Department of Justice
Office of the Attorney General
1300 I Street
Sacramento, CA 95814

VIA EMAIL

Dear Elise,

I write regarding the draft Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation (CDCR).  Below are a few places in the report which CDCR believes may warrant correction or clarification.

<u>California Institution for Women (CIW) Psychiatric Inpatient Program (PIP)</u>

At page 84, the report states that "CIW-PIP patients received 19 RVRs during the review period. A review of mental health assessments showed that clinicians routinely utilized generic language that was not individualized to the patient and did not recommend alternative discipline for any of the RVRs, even those where the clinician found that mental health contributed to the behavior which caused the RVR. *Custody staff failed to timely request mental health assessments*." (Emphasis added.)  This finding cannot be reconciled with existing processes.  When a Rules Violation Report (RVR) is classified by a Captain or above via the Strategic Offender Management System, a request for mental health assessment automatically populates which is then forwarded to the assigned mental health clinician.  It is unclear from the report how custody staff failed to timely request mental health assessments given the nature of the SOMS RVR module.

At page 100, the report states that "at the CIW-PIP, patients reported a lack of socks and new underwear after a shower. Patients also reported that after sending clothes to laundry, clothing in incorrect sizes was returned to them."  CIW has a robust laundry and exchange of clothing program in the PIP. CDCR heard reports of patients complaining about lack of undergarments or socks during the *Coleman* tour. A laundry and cleaning schedule was provided to the team.  Based on this report, is unclear whether patient reports were substantiated.

At page 104, the report states that "at CIW-PIP, patients accessed the law library through a computer kiosk available in the housing unit. However, there were several problems with law library access. Staffing limitations hindered patients' ability to navigate the computer kiosk system and legal forms were only made available if a patient filled out a Form 22 request. Further, patients were not aware of a policy providing access to the law library resources only during Third Watch."

Elise Thorn
Page 2

(See also pages 301-302.)  CIW's law library access logs show that patients were provided consistent access to the law library.

Finally, at pages 105 and 302 the report states that "the only teacher had been out of work for a month at the time of the site visit, resulting in no classes being provided during her absence."  CIW reports no documentation identifying that education classes were not provided to pateints in the CIW PIP.

<u>Salinas Valley State Prison (SVSP) Psychiatric Inpatient Program (PIP)</u>

At page 152, the report states that seclusion cells "continued to be inappropriately used for one-to-one suicide monitoring."  Seclusion rooms are not used for one to one suicide watch at SVSP PIP.  Patients are kept in their assigned cells during one to one watch.  Seclusion rooms are used only in emergencies under orders by a physician every four hours.

At page 188, the report states that "SVSP-PIP reported difficulty with access to loaner crank radios during the review period and at the time of the site visit. No reason was provided for the lack of access."  Radio access issues were due to patients breaking the radios and misusing the parts for self-harm.  This reduces access to radios for all patients.


Sincerely,


Nick Weber

*/s/ Nick Weber*

Attorney
CDCR
Office of Legal Affairs

# Exhibit B

State of California – Department of State Hospitals                                 Gavin Newsom, Governor

Legal Division
1600 9th Street, Room 430
Sacramento, California 95814
www.dsh.ca.gov

DSH

November 23, 2020

**VIA ELECTRONIC MAIL**

Matthew A. Lopes, Jr.
Special Master
Pannone Lopes Devereaux & O'Gara, LLC
Northwoods Office Park
1301 Atwood Avenue, Suite 215 N
Johnston, RI 02919

RE: *Coleman*, *et. al. v. Newsom*, *et al.*,
       U.S. District Court, Eastern District of California, Case No. 2:90-cv-00520
       KJM-DB

Dear Special Master Lopes,

We write regarding the draft Monitoring Report on the Mental Health Inpatient
Care Programs for Inmates of the California Department of Corrections and
Rehabilitation (CDCR). Below are a few places in the report which the
Department of State Hospitals (DSH) believes may warrant correction or
clarification. The statements from the report are italicized with DSH's response
beneath.

*Two of the DSH hospitals—DSH-Atascadero and DSH-Coalinga—remain
constant performers for the Coleman class, despite the difficulties class members
encounter in trying to gain admission to their programs. (p. 4. Similar comments
are made on page 5)*

DSH Response: DSH would like clarification on the scope of this report, as DSH
was asked to provide data for this round of monitoring from the period of June –
November 2019. This report however, expands the monitoring period, with no
discussion with DSH, well in to 2020. DSH also objects to the conflation of past
perceived admission issues with the current COVID-19 crisis.

*Considering the size of the waitlist, the number of empty beds is cause for great
concern. Further, it should be noted that historically, empty beds usually reflect a
larger issue of class members not being referred for inpatient care. Also worth
noting, is that at the same time that DSH had closed its doors to Coleman class
members, it continued to accept Offenders with Mental Health Disorders
(OMHDs) into its hospitals. Although DSH lifted their suspension of admissions of
Coleman class members 30 days after it was enacted, the contrast between the*

*number of OMHD patients being admitted to DSH hospitals versus that of Coleman class member patients is remarkable. The two charts below show the movement of OHMD and Coleman class patients into DSH hospitals between May 2, 2020 and October 16, 2020. (p. 10)*

DSH Response: This analysis does not take into account the impact of the COVID-19 pandemic and necessary measures taken by DSH and CDCR to prevent the spread of COVID-19 at their respective facilities.  This analysis also ignores the legal necessity for DSH to admit OMHDs, as well as the historical relative rates of referrals and admissions between *Coleman* class members and OMHDs, which have always been at a higher amount than *Coleman* class members.  It is expected the number of OMD admissions will be much higher than *Coleman* class members because the referral rates are dramatically different.  For example, on average, DSH admits 41 OMDs to its hospital units each month and on average treats 1,244 OMDs in its hospitals. Whereas Coleman capacity in DSH is limited to 336 patients and prior to COVID-19, the highest census for 2018 and 2019 was 325.  Nonetheless, DSH admitted 97% of all *Coleman* referrals received, rejecting only 13 patients during the monitoring period.

*For DSH hospitals, DSH-Atascadero did not provide an average number of hours offered weekly to patients. At DSH-Coalinga, the average number of group treatment hours offered per week was slightly below the number of hours required to be offered in EOP. At DSH-Patton, patients were offered significantly fewer hours than EOP inmates. (p. 31)*

DSH Response: This statement would be accurate if the statement was for core groups only, as DSH-C was at 9.63 hours of core group offerings. DSH-C group offerings continue to be an average of 49.24 of structured hours weekly. DSH-A did provide a summary of treatment hours in the documents shared with the Special Master's team.

*Individual treatment continued to be rarely offered, provided, or tracked in the inpatient programs at CDCR and DSH and continues to need the focused attention of CDCR and DSH as indicated in the 2018 Inpatient Care Report. (p. 32)*

*The information provided by DSH-Atascadero lacked important information about the nature of individual treatment provided. The data from DSH-Coalinga indicated that individual treatment provided to Coleman class members during the review period was negligible. Patients at DSH-Patton received weekly individual treatment early in admission and were able to access content with individual providers as needed. The need to develop and implement meaningful individual treatment guidelines and tracking systems, as well as train staff*

*regarding providing adequate individual treatment in the inpatient programs, continued to need addressing by CDCR and DSH.* (p. 33)

Similar concerns are raised on p. 99: *In the DSH hospitals, access to structured therapeutic activities need to be expanded, and in the case of DSH-Atascadero and DSH-Coalinga, patients did not have access to sufficient individual treatment. Appropriate and complete tracking and reporting of the various forms of treatment were lacking in both the PIPs and DSH hospitals.*

DSH Response:   DSH would like to note that individual therapy is provided when clinically indicated, but that group therapy is the primary treatment modality. There are many times throughout the course of treatment that patients at DSH are not clinically indicated to require individual therapy. DSH asserts that patients do have access to sufficient individual treatment when clinically indicated.

At pages 69-70 the report discusses a variety of admission and discharge data for which DSH offers the following corrections:

- DSH-Atascadero discharged 162 patients during the review period. The average length of stay was 129 days, with a range of ~~103 to 179~~ 8 to 392 days (Note: It appears that the ranges in this report are the high and low monthly averages. This edit updates it to reflectthe highs and lows of all patients' length of stay. Also, the number 129 is the average of the monthly averages that was provide to the monitoring data 5.2 from DSH.  The true average LOS is 127 which is calculated by weighting each patient's LOS equally during the reporting period.)

- At DSH-Coalinga, there were 50 patients admitted during the review period; the number of referrals was not provided. Based on the data provided, the time from referral to admission ranged from ~~0 to 50~~ 1 to 29 days, with an average of ~~18~~ 9 days. The average time from acceptance to admission was ~~8~~ 6 days, with a range of zero to ~~26~~ 22 days. DSH-Coalinga discharged 56 patients during the review period. The average length of stay was ~~166~~ 160 days, with a range of ~~135 to 183~~ 23 to 291 days. Data for clinician-to-clinician contact was not reported. (Note: The report appears to be using date of referral by the IDTT to calculate the "time from referral to admission" and not the date DSH received the referral. DSH updated the number above using the referral received date – as that is the Program Guide's transfer timeframe.)

- During the review period, DSH-Patton admitted all 15 patients who were referred. The timeframe from acceptance to admission ranged from ~~4~~ 2 to 14 days, with an average of six days

*In DSH hospitals, more structured therapeutic activities and individual treatment would benefit the Coleman class members.* (p. 97)

DSH Response: Individual therapy is provided when clinically indicated. There are many times throughout the course of treatment that patients at DSH are not clinically indicated to require individual therapy.

*Within the timeframe of 7/1/19-12/31/19, only 3 class members at ASH had positive behavior support plans developed and implemented during this period.* (p. 102) Similar concerns are raised at page108.

DSH Response: Behavior plans are mostly reserved for patients who are willing to cooperate with staff on the implementation of the plan and have problematic behaviors related to severe and persistent mental illness.  Behavior plans are rarely used with patients engaging in willful criminal behavior or behaviors related to substance addiction.

*Within the timeframe of 7/1/19-12/31/19, patients in units 31 and 34 at ASH had extended lengths of stay at HAS Level 1.* (p. 102)

DSH Response: The length of time on HAS level 1 on Units 31 and 34 at DSH-A was most likely due to new admits on the unit, who are required to complete certain groups to move to HAS level 2 and are more likely to be in the process of psychiatric stabilization compared to *Coleman* patients on other units. Movement between levels is fluid and the length does not indicate one duration, it could encompass a patient spending several days at Level 1, then progressing, and behaviorally going back to Level 1 again.  With direct admits, DSH-A saw an increase in RVRs and contraband which would result in a reduction to Level 1.

*Within the timeframe of 7/1/19-12/31/19, ASH issued 33 RVRs to Coleman class member patients, a 45% increase from the preceding site visit.* (p. 103, 111)

DSH Response: DSH would like to clarify that DSH-Atascadero (DSH-A) does not issue RVR's, DSH-A only assists CDCR in determining if a RVR is pursued based on DSH-A completion of the Mental Health Assessment. There were 33 worksheets completed and submitted to CDCR for further action.

Similarly, at page 103 and 111, the report states: *Within the timeframe of 7/1/19-12/31/19, ASH did not conduct RVR hearings.*

DSH Response: RVR determinations and hearings are conducted by CDCR staff and not DSH staff.

*Within the timeframe of 7/1/19-12/31/19, there was a 50% increase in incident reports since the preceding visit.* (p. 103)

DSH Response:  DSH notes that the previous reporting period was only 5 months, where as this one is 6 months. Thus, the comparisons may not be equivalent, including differences in census and type of SIRs.

*Within the timeframe of 7/1/19-12/31/19, the rate of physical restraint usage at ASH hospital-wide was above the national average.* (p. 103)

DSH Response: DSH would object to this comparison of only 256 *Coleman* patients at a hospital that contains over 1,000 patients being compared to a national average, as well as requests information about what national average is being used.

*Within the timeframe of 7/1/19-12/31/19, ASH's one allocated clinical administrator position was vacant.*"

DSH Response: The position was technically vacant while the Clinical Administrator was serving as the acting Executive Director.  However, the Clinical Administrator duties were being performed by an individual working an Out of Class Assignment at the Clinical Administrator level.

*Within the timeframe of 7/1/19-12/31/19, on Jan 27, 2020 at ASH, 19 Coleman patients were at HAS Level 1, 20 on level 2, 114 on level 3, 83 on level and none on level 5.* (p. 109)

DSH Response: DSH notes that the date referenced is the date the data was produced, not the date for the report.

*Within the timeframe of 7/1/19-12/31/19, the total average time from CDCR's referral to admission to ASH was 21 days, with the longest delays in ASH's receipt of referrals. ASH did not provide reasons for these delays.* (p. 75)

DSH Response: This report is using the time from CDCR date of referral by the IDTT to admission to calculate wait times, which is not accurate. Using the raw data provided in response to question 5.4 CSH/ASH, the average time from the date the referral was received from CDCR to admission to DSH is 13 days, not 21 days. This is for patients admitted to ASH from 7/1/19-12/31/19.

*Within the timeframe of 7/1/19 0 12/31/19, ASH had 319 SIRs, a 50% increase since the preceding period. Of those, 79 or 25% were for aggression, 78 or 24% were for medical reasons, 70 or 22% were for suicide/self-harm and 92 or 29% were classified as other.* (p. 112)

DSH Response: DSH notes that the previous reporting period was only 5 months, where as this one is 6 months. Thus, the comparisons may not be equivalent.

*ASH updated AD 610.6 Bed Linen and Patient Clothing Policy on January 22, 2020. Laundry Logs were not provided for review. (p. 118)*

DSH Response:  The 2020 date should be 2019.

*Within the timeframe of 6/1/19-12/31/19, CSH reported that the census averaged 44 patients per month with a range of 36-39 patients.* (p. 121)

DSH Response: This is not accurate. Using document 5.4 the CSH Snapshot (with ASH data) the census range is 36-49, not 36-39 patients.