# Attachment

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                              GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



January 11, 2021

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write in response to your December 11, 2020 draft suicides reports including:

- The Special Master's Report on His Expert's Analysis of the California Department of Corrections and Rehabilitation's Annual Suicide Report January 1, 2015 - December 31, 2015 and his Expert's Review of Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2016 – December 31, 2016; (The Special Master's Report)
- Special Master's Expert's Analysis of the California Department of Corrections and Rehabilitation's Annual Suicide Report January 1, 2015 - December 31, 2015; (The Special Master's Expert's Analysis, Appendix B) and,
- Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2016 –December 31, 2016. (The Special Master's 2016 Annual Suicide Report, Appendix C.)

CDCR's 2015 and 2016 Annual Suicide Reports provide further evidence of CDCR ability to self-monitor suicides within its inmate population. CDCR's 2015 and 2016 Annual Suicide Reports demonstrate that CDCR honestly and critically assessed every suicide that occurred in 2015 and 2016 and show that CDCR is able to assess policy violations and implement corrective action. CDCR's 2015 and 2016 Annual Suicide Reports go beyond the analysis done by the Special Master's experts in their own annual suicide reports by providing comprehensive trend and statistical analysis conducted by CDCR's experts in correctional suicides prevention and analysis. Importantly, the reports are objective, impartial, and provide *all* available data for comparison to other populations.

CDCR has published its 2015 and 2016 Annual Suicide Reports on its public website to advance its robust self-monitoring efforts and allow mental health clinicians, nurses, and custody staff who work directly with the inmate population to have access to this valuable information. Thanks to these reports, as well as CDCR's comprehensive annual suicide prevention report to the

Special Master Lopes
Page 2

Legislature pursuant to Penal Code section 2064.1, CDCR will be better able to prevent and reduce the number of completed suicides within its institutions. It is therefore disappointing that you have decided to block CDCR from assuming the role of reporting on suicides to the *Coleman* court.

I. The Special Master's Report on His Expert's Analysis of the California Department of Corrections and Rehabilitation's Annual Suicide Report January 1, 2015 – December 31, 2015, and His Expert's Review of Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2016 – December 31, 2016.

    A. Background of the 2015 Annual Suicide Report.

In accordance with the Program Guide,[1] CDCR conducts comprehensive suicide case reviews following each completed suicide that culminate in a written report that is shared with the Special Master and *Coleman* Plaintiffs' counsel. In 2015, the Special Master approached CDCR about drafting an annual suicide report for suicides completed during 2015. CDCR welcomed the opportunity to demonstrate that it is capable of conducting critical self-monitoring of its suicide prevention and suicide review practices. As part of the process of drafting an annual suicide report, the Special Master recommended that CDCR begin to make determinations of foreseeability and preventability at each suicide case review teleconference. CDCR understood that conducting a foreseeability and preventability determination concurrent with the individual suicide case review process would reduce the workload in preparing the annual suicide report.[2]

On July 9, 2015, CDCR met with the Special Master's experts, Drs. Jeffrey Metzner and Kerry Hughes, to discuss adding foreseeability and preventability determinations to the suicide case review process. CDCR discussed several concerns with the proposed process, including the form of the definitions, disagreements between the Special Master's experts and CDCR, and whether to qualify the definitions as "possibly" or "likely" preventable or foreseeable. To be clear, at no point has CDCR objected to conducting robust analyses of suicides; CDCR has been committed to carefully and comprehensively reviewing every suicide to determine what may have contributed to it and what measures can be taken to address any deficiencies and achieve better outcomes. CDCR proposed slightly modifying the Special Master's definitions as follows in order to make them easier to apply by the multi-disciplinary group present at the suicide case review:[3]

> Foreseeable: A "foreseeable" suicide is one which, based upon available information reasonably known, is reasonably anticipated based upon the presence of a substantial or high risk for a suicide attempt which would require reasonable clinical, custodial, or administrative intervention. Foreseeability is assessed by

---

[1] See MHSDS Program Guide at 12-10-23 et seq.
[2] In reality, these efficiencies were mooted four years later when CDCR reanalyzed many of the cases at the request of the Special Master and Plaintiffs.
[3] During Suicide Case Reviews, the headquarters team would immediately convene a call following the main case conference to discuss specifically whether the case was foreseeable or preventable. That headquarters voting group consisted of mental health clinicians, nursing, and custody officials.

> determining the adequacy and accuracy of how suicide risk was evaluated. Assessment of the degree of risk may be high, moderate, or low to none. In contrast to a high and immediately detectable risk, a "moderate risk" of suicide, indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as a timely assessment, to determine the level of risk in the most appropriate manner and relevant interventions to prevent suicide.
>
> Preventable: A "preventable" suicide is one in which it is probable that, had some additional information been gathered or some additional interventions undertaken, as required by existing policy, the suicide would not have occurred. Preventability is assessed by determining whether risk management and/or suicide prevention policies and procedures, local operating procedures and the requirements set forth in the Program Guide were followed adequately. Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff.

CDCR understood that the Special Master's experts did not object to using those definitions during CDCR's Suicide Case Reviews. Beginning with the next Suicide Case Review, CDCR began using the above definitions in each of its individual suicide reports.[4] The case conferences, including the discussion on foreseeability and preventability, were also attended by the Special Master's experts. These same definitions and the committee's determinations were printed in each report. To ensure all 2015 suicides were analyzed for foreseeability and preventability, CDCR conducted a retroactive review of eleven individual suicide reports that had already been finalized prior to July 2015. That review was provided to the Special Master on August 11, 2016.

CDCR began drafting its 2015 Annual Suicide Report in 2016 shortly after it developed an outline of the annual report. The parties discussed the Suicide Case Review process and the outline at policy meetings held on August 17, 2016, September 28, 2016, and October 26, 2016. Initial drafting was also discussed during the December 7, 2016 policy meeting. As part of the process to ensure all were comfortable with CDCR's Suicide Case Reviews, Plaintiffs were invited to participate in several suicide case review calls, including the foreseeable and preventable determination, in late 2016 and early 2017.

On December 15, 2016, CDCR provided a forty-page excerpt of the draft 2015 Annual Suicide Report to the Special Master's experts. That draft 2015 Annual Suicide Report included the same definitions of foreseeable and preventable that were previously agreed to during the July 9, 2015, meeting and used in subsequent individual suicide reports. CDCR then provided a complete draft of the 2015 Annual Suicide Report to the Special Master in June of 2017 and, following further

---

[4] CDCR stopped conducting these reviews in mid-2017 for reasons set forth in section I(B) as well as Defendants' Statement in the December 11, 2020, Joint Report in Response to December 3, 2020 Order. (ECF No. 6980 at 2, et seq.)

Special Master Lopes
Page 4

meetings with the Special Master, provided a complete draft to the Plaintiffs on February 7, 2018. Plaintiffs provided feedback via letter on April 23, 2018. CDCR responded on June 13, 2018 and provided a revised draft of the 2015 Annual Suicide Report as well as an appendix containing individual case reviews. CDCR circulated another revised draft of the 2015 Annual Suicide Report on May 14, 2019 and circulated a reordered case review appendix to the Plaintiffs and Special Master on May 15, 2019.

Inexplicably, in a June 17, 2019 letter, Plaintiffs stated that they were "troubled to find that Defendants have revised" the definitions of foreseeable and preventable from those contained in the Special Master's expert's own reports. Despite having been aware of the revised definitions for years, and having participated in countless policy meetings on CDCR's suicide reporting processes, not to mention participating in actual suicide case reviews in 2016 and 2017, Plaintiffs contended that CDCR "unilaterally narrowed" the definition of preventable and made changes to the definition of foreseeable. Their letter denied any knowledge of the longstanding and agreed-upon deviation. ("Defendants do not acknowledge, much less explain, why they have deviated from the Special Master's definitions of the critical terms.")[5]

CDCR responded by letter on August 28, 2019. CDCR acknowledged at that time that it had mistakenly equated CDCR's definitions with those used by the Special Master and the court and that the statement would be removed from future drafts. CDCR maintained that the definitions, although slightly different, were not meaningfully different than those used by the Special Master and the court and declined at that time to engage in the same type of retroactive review CDCR had sought to avoid when agreeing to the process in July 2015.

Nonetheless, following an August 29, 2019 policy meeting, Defendants, in yet another effort to come to agreement on its 2015 Annual Suicide Report, agreed to reanalyze any suicide that had not already been determined to be both foreseeable and preventable using the prior definitions of the terms. That analysis took place in late 2019 and on January 13, 2020 a redlined copy of the revised 2015 Annual Suicide Report was provided to the Special Master team. A copy was provided to the Plaintiffs on January 14, 2020. The parties then participated in a policy meeting on January 16, 2020. During that meeting, CDCR understood that the Special Master had further recommendations regarding the draft, specifically:

- To include a table or chart showing which suicides were foreseeable or preventable;
- To confirm that CDCR would use the prior definitions going forward and, to that end, continue making foreseeable and preventable determinations at the end of each suicide case review, a process which had stopped in mid-2017; and
- To attach case reviews to the final report.

---

[5] Defendants object to the Special Master's finding that "defendants unilaterally changed" the definitions of foreseeable and preventable. (i.e., Report at 18) In fact, the history demonstrates that the change in definitions was negotiated and transparent.

Special Master Lopes
Page 5

Ultimately, the decision was made to finalize the 2015 Annual Suicide Report to avoid further delays caused by repeatedly changing goalposts.

> B. Determinations of Foreseeability and Preventability in the Manner Requested by the Special Master May Be Counterproductive in a Mortality Review Context and Frustrate Quality Improvement Efforts.

Many experts question the utility of foreseeability and preventability determinations in a mortality review context.[6] Among other things, foreseeability[7] and preventability determinations in the manner requested by the Special Master do not adequately acknowledge that deaths occur in a complex system and that causative factors beyond proximate cause of death are potentially important for identifying opportunities for improvement.[8] Ultimately, such determinations frequently divert attention away from opportunities for improvement that will lead to system-wide quality improvement and patient safety.

That is why the field of mortality reviews itself has largely shifted away from narrow foreseeability and preventability determinations to a more holistic approach that focuses on opportunities for improvement.[9] Under the modern view, a well-performing mortality review system will identify "opportunities for improvement" leading to "quality improvement, patient safety, and/or clinical education responses (immediate change) or initiatives (longer term) that are then evaluated to determine whether they yielded improvements along relevant clinical benchmarks."[10] This system requires the buy-in and participation of multiple actors who may be less willing to participate if the focus of the review is on foreseeability and preventability determinations whose purpose is to identify the person (or people) to blame for allegedly causing death.[11] Accordingly, for the mortality review system to work properly—and to increase motivation for practice modifications and constantly promote organizational learning—there must be a shift away from terms like foreseeable and preventable and towards assessments that focus on opportunities for improvement.[12] At the same time, such assessments should include staff level remediation, including training and accountability measures where appropriate.

There is an added risk of using foreseeability and preventability concepts that are not only vague, but in many instances, subjective: such measures are susceptible to bad faith manipulations

---

[6] Williams, B., Ahalt, S., Witt, L. (Final Report, Sept. 27, 2018). Assessing Medical Systems for the California Prison Health Care Receivership Corporation: Mortality Review Policy and Practice. The Criminal Justice & Health Program at UCSF, 3-4. https://cchcs.ca.gov/wp-content/uploads/sites/60/UCSF/Mortality-Review-Report.pdf

[7] The specific term "foreseeability" is not addressed in Dr. Brie Williams's Final Report. However, the term is as problematic as the term "preventability" because it focuses on identifying past proximate causation rather than future opportunities for improvement.

[8] *Id.* at 4.

[9] *Id.* at 14-15 (recommending that performance be tracked without relying on subjective and often variable assessments of "preventability" to emphasize quality improvement via identification of opportunities for improvement).

[10] *Id.* at 5.

[11] *Id.* at 4.

[12] *Id.*

Special Master Lopes
Page 6

that can expose CDCR to an array of unwarranted civil and criminal liability.[13] For example, the measures might be incorrectly treated as admissions that certain deaths were conclusively foreseeable and preventable in a legal sense. (E.g. Fed. R. Evid. 803(8) [hearsay exception for public records]; 804(b)(3) [hearsay exception for statement against interest]). Thus, in addition to frequently frustrating the identification of specific opportunities for improvement, foreseeability and preventability determinations raise a plethora of avoidable and unnecessary liability concerns.

### C. Suicide Rate Comparisons to Large State Systems Are Arbitrary and Do Not Control for Demographics or Population.

The Special Master's report finds that a "significant deficiency" in CDCR's 2015 Annual Suicide Report is that it does not "include specific comparisons to large state prison systems or otherwise control for differences in inmate population size and demographics." (Report at 19.)[14] CDCR disagrees. In fact, CDCR's report compares its 2015 suicide rate to *all* individual state prisons system suicide rates for 2015, including large systems. (2015 Annual Suicide Report at 33, Table 20.) This comparison provides complete and accurate context when comparing CDCR's suicide rate to other systems.

Furthermore, there is no way to "control for…size and demographics" with the data available from other states, so a comparison to just "large" prison systems is arbitrary, and no more meaningful than comparing CDCR to all United States prison systems. CDCR's 2015 Annual Suicide Report cautioned readers against "making comparisons of suicide rates between California and national or state estimates published by the Bureau of Justice Statistics," the source of suicide rates for other state prison systems, because "these rates are not adjusted for demographic factors." (2015 Annual Suicide Report at 23, fn. 11.)

The Special Master's report states that "although CDCR might like to rank itself with an inmate suicide rate of '20th among state prisons,' it would be far more accurate to state that CDCR had the 2nd highest suicide rate of the ten largest prison systems from 2001-2016." (Report at 20.)[15] Neither statement is more accurate than the other. What is not clear from the Special Master's report is the meaningfulness of comparing CDCR only to "large" prison systems without controlling for demographics of those particular systems. The ten largest systems, for instance, have far different ethnic/racial, age, and other demographics, including gang affiliation and membership, within their respective prison systems and the community. As this comparison between California, Texas, Illinois, Florida, and New York demonstrates, despite being considered "large" systems, distribution based on race, for instance, differs significantly between systems.

---

[13] See *id.* at 13.
[14] Comparing CDCR to other large systems appears to be a more recent statistic included in the Special Master's experts' reports on completed suicide. No state by state comparisons were made prior to the 2011 Annual Suicide Report, published in 2013. (ECF No. 4308 at 1, 9.) The Special Master's 2016 Annual Suicide Report, Appendix C, continues this trend and goes one step further by comparing CDCR to the *five* largest US prison systems.
[15] It is clear from the context that CDCR's statement that "[i]n 2015, California's rate of prison suicides ranked as 20th among state prisons" means that it's rate is the 20th highest, as the sentence is followed by Table 20 which ranks state prison suicide rates from "highest to lowest rate." (2015 Annual Suicide Report at 33.)

Special Master Lopes
Page 7



*Data gathered from each system's public website.[16]

Yet, the Special Master asserts that comparing these systems based on nothing more than size provides the basis for some meaningful conclusion. CDCR is unaware of any annual suicide report drafted by the Special Master's experts that controls its comparison of large prison systems to each systems' relative age, gender, or racial/ethnic differences. Simply put, there is nothing about a system's size that proves it has similar demographics to the California prison system.

> D. Comparisons between CDCR's Suicide Rate and the Suicide Rate of the United States, Among Other Populations, Are Valid and Meaningful.

The Special Master's report asserts that, by comparing CDCR's suicide rate to, among other populations, the rate of the general population of the United States, it "implies that overarching suicidal trends – rather than CDCR's actions or omissions – are responsible for CDCR's ongoing and worsening suicide crisis." (Report at 20.) In fact, the rise in suicides in the general population of the United States is cause for concern within CDCR – a serious factor that must be taken into account by CDCR staff when addressing suicide risk. And the use of these statistics and how they

---

[16] https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2019/08/DataPoints_062018.pdf
https://www.tdcj.texas.gov/documents/Statistical_Report_FY2018.pdf
https://www2.illinois.gov/idoc/reportsandstatistics/Documents/FY18%20Annual%20Report%20FINAL.pdf
http://www.dc.state.fl.us/pub/annual/1718/FDC_AR2017-18.pdf
https://doccs.ny.gov/system/files/documents/2019/09/Under%20Custody%20Report%202018.pdf

Special Master Lopes
Page 8

are presented is comparable to previous CDCR internal reports and the Special Master's own experts' reports which also provide unstandardized comparisons to other systems. (See Section I(B), *infra*.)

The Special Master also asserts without basis that the "presentation of such data indicates that the defendants do not believe they have a serious suicide prevention problem." (*Id*. at 21.) As its self-critical analysis of suicides within its institutions demonstrates, CDCR takes suicide prevention seriously and is transparent about problems it identifies and its plans for remediation. The 2015 Annual Suicide Report further acknowledges that "work remains to be done and efforts are ongoing" to prevent suicides. (2015 Annual Suicide Report at 59.) And the report identified implications of its findings and identified future steps aimed at addressing numerous problems, including ensuring patients with documented suicide attempt histories are properly treated, suicides in segregation, and the prevalence of suicides among the mentally ill. (*Id*. at 61, et seq.)

E.  CDCR's 2015 Annual Suicide Report Provides Meaningful Trend Data.

The Special Master recommends that "if the defendants insist upon continuing to publish reports that display comparisons between itself and other prison systems, such reporting should be meaningful. As stated in previous reports by the Special Master's suicide prevention expert, caution should always be exercised when viewing data on inmate suicide rates. Suicide rates are most meaningful when viewed over a sustained period of time." (Report at 21.)

But that is precisely what CDCR's 2015 Annual Suicide Report does, often by displaying CDCR suicide and population data for the last twenty years. And even the data criticized by the Special Master – Table 20, comparing CDCR's rate to that of other states, and Figure 6, comparing CDCR to the rate of the general population of the United States – are temporal trend charts, looking back fourteen and ten years respectively. In addition to these figures, CDCR's 2015 Annual Suicide Report displays temporal trend data on:

- The "Annual Frequency and Rate of Suicide in the CDCR for 20 years, by Gender and Overall," (2015 Annual Suicide Report, at 23, Table 15),
- "CDCR Suicide Rate and Frequency…2006 – 2015," (*Id*. at 24, Figure 1),
- "Frequency of Suicide by CDCR Institution, 2015 and by prior 15-year total and average (1999-2014)," (*Id*. at 25, Table 16),
- "CDCR Frequency by Month, 2015 and 10-Year Average," (*Id*. at 27, Figure 22),
- "Frequency of Suicide by Race, 2005-2015," (*Id*. at 28, Figure 3),
- "Number of Suicides by Age Group, 2010-2015," (*Id*. at 29, Figure 4)
- "Frequency of Suicide within Segregated Housing, 2010-2015," (*Id*. at 30, Table 17),
- "Length of Time in ASU before suicide, 2009-2015," (*Id*. at 31, Figure 5),
- "Frequency of Suicide within MHSDS Levels of Care, 2010-2015" (*Id*. at 32, Table 18), and
- "Frequency of Suicide in mental health versus non-mental health, average total populations, 2006-2015." (*Id*., Table 19.)

CDCR reports its suicide rates using best practices of reporting mortality rates. CDCR has not found any other prison system that comes anywhere close to CDCR in reporting inmate suicides in as much depth and with as much precision and analytical rigor.

II. The Special Master's Expert's Analysis of the California Department of Corrections and Rehabilitation's Annual Suicide Report January 1, 2015 – December 31, 2015. (Appendix B)

CDCR appreciates the Special Master's Expert's findings that the 2015 Annual Suicide Report provides a comprehensive and thoughtful analysis of suicides that occurred in 2015. CDCR has several comments and objections to the criticisms included in Appendix B to the Special Master's report.

A. Comparisons between CDCR and the United States are not Flawed or any less Relevant than those to other State Prison Systems.

The Special Master's Expert's Analysis states that comparing the CDCR suicide rate to that of the United States overall is "flawed" because it "does not control for differences in the demographic composition of these populations." (Appendix B at 3.) The analysis further opines that comparisons made to other state prison systems were relevant. As stated above, comparison of CDCR rates to the United States rate is not a flaw and is meant to illustrate the growing trend of suicides within the community – a factor which CDCR must address within its institutions. It is unclear how this comparison is flawed, while comparisons between CDCR and other state prison systems are not. Neither comparison is controlled for demographic compositions of these populations.

B. The Suicide Rate Denominator Must include all CDCR Inmates and Excluding Out-of-State Inmates from the Denominator Misleadingly Inflates the Suicide Rate.

The Special Master's Expert's Analysis also criticizes the calculation of CDCR's suicide rate. CDCR's determines its suicide rate per 100,000 by including all completed suicides in the numerator and its total inmate population in the denominator. (Appendix B at 3.) The total inmate population includes all inmates, whether they are in- or out-of-state, in contract beds, or in the Department of State Hospitals. Some prior Special Master expert reports exclude out-of-state inmates from the denominator, inflating CDCR's suicide rate despite the fact that those inmates are subject to CDCR's suicide prevention policies and Title 15. The analysis recommends that "for the sake of consistency," CDCR calculate the rate by using the number of in-state and out-of-state suicides in the numerator yet only using the in-state population in the denominator. To do as the analysis recommends would be highly misleading.

CDCR is expected to, and does, conduct suicide case reviews on *all* inmates, regardless of whether they are housed in-state, out-of-state, in a contract bed, or the Department of State Hospitals. Since 2010, CDCR has conducted suicide case reviews of at least five suicides occurring in contract beds. Excluding out-of-state inmates provides incomplete and misleading

data to the reader of the report. It provides erroneous data by counting an inmate in the numerator but not in the denominator. It also inflates the suicide rate by out counting thousands of CDCR inmates. In fact, on December 24, 2015, there were 5,791 inmates housed out-of-state, who made up 4.5% of CDCR's population.

The Special Master's Expert's Analysis also states that "[h]istorically, annual suicide reports to the court have used the population of inmates incarcerated within the state of California's CDCR facilities as of June 30th of a given year." (Appendix B at 3.) This is false. For instance, Dr. Patterson's report on suicides completed in 2011 used mid-year total population (both in- and out-of-state) when providing the 2012 suicide rate. (ECF No. 4308 at 1, asserting that the 2012 suicide rate was 23.72 per 100,000 based on a CDCR *total* population of 134,901.) In Dr. Hughes's report on suicides completed in 2014, the total population was also used to determine the 2014 suicide rate. (ECF No. 5428 at 2, asserting that CDCR's 2014 suicide rate was 16.97 per 100,000 based on a mid-year *total* population of 135,481.) And Mr. Hayes's initial audit and first re-audit report used rates based on the total population and only the in-state population interchangeably throughout the reports. (ECF No. 5259 at 4, using the *total* population for 2012 and 2013 suicide rates (134,901 and 132,827), but the in-state population for the 2014 suicide rate (126,619), and ECF No. 5396 at 31, using the mid-year *total* population to calculate the 2013 suicide rate while also using only the in-state population to calculate the 2014 and 2015 rates.)

Denominators in mortality rate calculations should include the whole population at risk. It is puzzling why one would remove the out-of-state inmates from determining CDCR's suicide rate, unless the goal was to artificially inflate the suicide rate. Moreover, there is no evidence that the demographic makeup of the out-of-state inmates is significantly different from the in-state population. That patients in the Mental Health Services Delivery System (MHSDS) were not permitted to be housed out-of-state is also not sufficient to justify excluding this population from the suicide rate calculation. Between 2010 and 2015, 36 percent of all completed suicides were by inmate not in the MHSDS at the time of death. Both populations are also subject to the same general mental health and Title 15 policies. The suicide case review and corrective action processes are the same for both systems.

In sum, this section of the Special Master's Expert's report and the recommendation found on page 8 are objectionable and must be stricken. Indeed, even the Special Master's Expert's draft 2016 Annual Report (Appendix C) acknowledges that using "the combined in- and out- of-state populations" is a method for reaching a "more accurate rate when accounting for all inmates for whom CDCR is responsible (in- and out-of-state)." (Appendix C at 4.) A past practice of using an inaccurate rate cannot justify continuing that practice. Relatedly, the use of only the in-state population to determine the suicide rate must also be stricken from the 2016 report (Appendix C) authored by the Special Master's expert as it is inaccurate and misleading.

    C. In 2015, CDCR had the 20th Highest Suicide Rate among State Prisons.

The Special Master's Expert's report states that "[o]n page 33, the 2015 CDCR Annual Suicide Report indicates, 'California's rate of prison suicides ranked as 20th among state prisons.' This

Special Master Lopes
Page 11

statement is misleading." (Appendix B at 4.) The Special Master's Expert's report goes on to find that CDCR does not have the 20th best rate, but rather the 30th. (*Id.*)

CDCR's 2015 Annual Suicide Report states that "[i]n 2015, California's rate of prison suicide ranked as 20th among state prisons." However, read in context, this statement is not misleading. Immediately following that sentence is Table 20, which ranks state prison suicide rates from "highest to lowest rate." (2015 Annual Suicide Report at 33.) California is 20th (highest) on that list. This section should be stricken from Appendix B.

> D. Findings Regarding Caucasian and Hispanic Suicides Are Correct When Not Taken Out of Context.

The Special Master's Expert's report states that:

> "On page 7, the 2015 CDCR Annual Suicide Report states that one of the factors contributing to the decline in the suicide rate from 2014 to 2015 was 'lower rates of suicides in Caucasian and Hispanic/Latino inmates.' Conversely, on page 10, the 2015 CDCR Annual Suicide Report indicates that 'Caucasians represented over half of all suicides despite comprising only 22 percent of the population within CDCR. This finding has been typical of the racial breakdown of suicides within CDCR for many years.' In 2014, Caucasian suicides made up 30.4 percent of suicides; 2015 did not reveal a lower rate of suicide for Caucasian inmates as asserted on page 7. However, there was a decline in the rate of suicides by Hispanic/Latino inmates in 2015 when compared to 2014."

(Appendix B at 4.) This is a misreading of CDCR's 2015 Annual Suicide Report and again takes statements out of context. The reference to "lower rates of suicides in Caucasian and Hispanic/Latino inmates" on page 7 of the 2015 Annual Suicide Report's Executive Summary was to the previous decade, not 2014.

> The decline in suicide rate in the CDCR in 2015 *compared to the prior 10 years* can be attributed to fewer suicides within segregated housing units, lower rates of suicides in Caucasian and Hispanic/Latino inmates, and fewer suicides in inmates aged age 35-54.

(2015 Annual Suicide Report at 7, emphasis added.) The full context of the statements would show that the declines and comparisons were, in fact, accurate for the time periods in the report. Figure 3 on page 28 of the 2015 Annual Suicide Report shows a decline in Caucasian and Hispanic/Latino suicides over the ten years prior to 2015. This section of Appendix B is objectionable and should be stricken.

> E. Special Housing Units and Sensitive Needs Yards Are Not the Same Thing.

The Special Master's Expert's report states that "the 2015 CDCR Annual Suicide Report, fails to recognize the safety concerns with the sample of inmates who died by suicide in 2015" while housed in a "special housing unit" or "special process unit" because it does not group these inmates

in with those inmates who died by suicide in Sensitive Needs Yards. (Appendix B at 4.) CDCR's 2015 Annual Suicide Report lists one inmate suicide in a Sensitive Needs Yard. (2015 Annual Suicide Report at 12.) These concerns are echoed in a recommendation at pages 8-9 of Special Master's Expert's report.

Sensitive Needs Yards and the special units that exist in reception centers are not the same thing. Sensitive Needs Yards program inmates like regular general population yards. They do not provide a special program as Reception Centers do. Sensitive Needs Yards are not closed yards with special rules. They simply program separately from general population yards. Suicides are appropriately sorted in CDCR's 2015 Annual Suicide Report by housing program.

      F.  Reporting of Suicides in Segregation over Time.

The Special Master's Expert's report states that there are "errors in reporting of suicides that occurred in segregation over time … First, the period between 2004 and 2014 is eleven years. Second, the period between 2010 and 2014 is five years, not ten as indicated in the text. Finally, while the second percentage (45 percent) is noted to be an average across years, it is unclear if the reader is to assume that the 47 percent noted in the first part of the sentence is the actual rate of suicides in segregated housing across those years, rather than an average of the rates during those years." (Appendix B at 5.)

These appear to be typos. To clarify, from 2005 through 2014 (ten years), there were 153 suicides in segregated housing (out of 329, total), or 47%, the same percentage reflected in the 2015 Annual Suicide Report. From 2010 through 2014 (five years), there were 74 suicides in segregated housing (out of 154, total), or 48%.

      G.  Case Review Omission.

The Special Master's Expert's report notes that CDCR's 2015 Annual Suicide Report did not include case reviews (i.e. detailed discussion of individual suicides). (Appendix B at 5.) Case reviews were prepared and finalized for the 2015 Annual Suicide Report and have already been provided to the Plaintiffs and Special Master, most recently on May 15, 2019. While CDCR is willing to provide case reviews to the Special Master and Plaintiffs subject to the *Coleman* protective order, CDCR cannot publish the reviews on its public website due to privacy concerns. CDCR has determined that de-identifying the inmates in the case reviews is insufficient, given the detail contained within, to protect against identifying the inmates discussed in each review.

It is worth noting that CDCR's case reviews are based on their more comprehensive individual suicide case review reports which can span upwards of forty pages. CDCR's case reviews are mere summaries of the existing and robust reports and production of them are not essential to the quality improvement portion of CDCR's Annual Suicide Reports.

      H.  Rigor Mortis.

The Special Master's Expert's report recommends that CDCR adopt a rigor mortis definition of two to four hours after death, referencing past Special Master reports citations to the "*Collins*

Special Master Lopes
Page 13

*English Dictionary* (2003 ed.)." (Appendix B at 6, 8.) CDCR's 2015 Annual Suicide Report, on the other hand, used a calculation of four hours after death citing to Wikipedia[17]. Neither the Collins English Dictionary nor Wikipedia are medical text. CDCR objects to the recommendation to utilize the Special Master's expert's definition. The decision on how to define rigor mortis in suicide case reviews is best left to CDCR in consultation with its medical partners at the California Correctional Health Care Services.

        I.   Foreseeable and Preventable Determination Disagreements.

Objections to the Special Master's findings on foreseeability and preventability need not be repeated in this section. To the extent that findings in his expert's report mirror those found in the Special Master's reports, CDCR maintains the same objections to both reports.

The Special Master's Expert's report states that "[f]urther, the [Suicide Case Reviews] included determinations of foreseeability and preventability in 13 cases. Eleven of the 24 SCRs, or 45.8 percent, did not include a conclusion about the foreseeability and preventability of the suicide. Information regarding the determinations of foreseeability and preventability for those 11 SCRs was obtained from CDCR to support analyses by the Special Master's experts." (Appendix B at 6.) The report should be modified to note that CDCR began making foreseeability and preventability determinations in August 2015 and thus had to retroactively make the determinations for reports that had already been published. Although the determinations did not appear in the published reports, determinations were made for each report in 2015 and they were provided to the Special Master on August 11, 2016.

The Special Master's expert disagrees with CDCR's determinations for cases H and S. (Appendix B at 6-8.) This is not evidence of a flaw in CDCR's analyses or use of slightly modified definitions. The Special Master's expert made the foreseeability and preventability determination found in Appendix B *four to five years* after the determinations made by CDCR's own clinicians. In apply the definitions for foreseeability and preventability reasonable minds may disagree about the ultimate outcome. Indeed, not every determination of foreseeability and preventability made by CDCR's own committee was unanimous. CDCR's committee consisted of several clinicians, nursing staff, and custody personnel as opposed to a single decision maker making after-the-fact conclusions. To the extent that differences in opinion, rendered years later while utilizing subjective criteria, are being relied upon as evidence that CDCR's revised definitions were meaningfully different than those employed by the court, CDCR objects.

Finally, the Special Master's Expert's Report opines that "[a]nonymity can be maintained by removing names and identifying information." (Appendix B at 8.) Thus, the report argues, CDCR should have included individual case determinations of foreseeability and preventability. (*Id.*) CDCR disagrees. Removing names and identifying information may not be sufficient when the

---

[17] Wikipedia appears to cite to a medical text, Anatomy Physiology, Sixth Edition, by Kenneth Saladin, to support its article.

facts of each case are unique and may often be found in media reports. Simply put, de-identification is not a perfect solution to maintaining anonymity.

   III.   Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2016 – December 31, 2016. (Appendix C)

        A. The Suicide Rate Must Be Calculated Using Total Inmate Population (In- and Out-of-State).

As already stated in section II(B), *supra*, the suicide rate must be calculated by including all inmates in the denominator – not just those housed in-state. Use of the in-state only calculation in the Special Master's 2016 Annual Suicide Report is objectionable and must be stricken. It is unacceptable to use the in-state population solely because it has been used in some past expert reports. The table at page 5 of Special Master's 2016 Annual Suicide Report compares the in-state and in- and out-of-state population based suicide rates over the prior ten years. Use of the in-state based calculation inflates the CDCR suicide rate by nearly half a point over that period (20.06 to 20.55).

The Special Master's 2016 Annual Suicide Report also provides more than one 2016 suicide rate. At the table on top of page 5, it notes that CDCR had a suicide rate of 21.8 per 100,000 using an in-state population-based rate calculation. And that same table also reports that CDCR had a rate of 21.0 per 100,000 using a rate based on total population (in- and out-of-state). Yet in the next table also on page 5, the report states that CDCR's 2016 suicide rate was 20.7 per 100,000. This discrepancy must be corrected and the proper rate based on the total CDCR population should be used. CDCR's 2016 Annual Suicide Report provides a rate of 21.0 per 100,000. (https://cchcs.ca.gov/wp-content/uploads/sites/60/SR/2016-Annual-Suicide-Report.pdf at 5.)

CDCR objects to suicide rates that exclude significant portions of the population from the denominator such as those used in the Special Master's 2016 Annual Suicide Report in Section III, pages 4-5.

        B. Suicides by Watch.

The Special Master's 2016 Annual Suicide Report states that "[w]ith regard to time, suicides were least likely to occur during first watch (22:01 to 06:00) with six deaths (22%) and most likely to occur during second watch (06:01 to 14:00) with 11 deaths (41%). Ten deaths by suicide, or 37%, occurred on third watch. This pattern differed slightly from 2015 when 30% of deaths during first watch, 30% during second watch and 40% during third watch." (Appendix C at 9.) CDCR has different numbers and requests that the Special Master's team check theirs again. CDCR shows six deaths *discovered* on first watch, twelve on second watch, and nine on third watch. Regardless, there is no statistical evidence that suicides are more *likely* during first watch. CDCR requests that the word "likely" be stricken.

There is no statistical difference between the three watches based on the results of a Chi Square "Goodness of Fit" test that looks at the observed distribution of suicides in the three watches

(categories) versus what would be expected by chance alone. The ratio of observed to expected has to be large for there to be a statistical difference. In this case, the test showed a p value of > .05 which is the cutoff for significance. CDCR is not aware of any year where the distribution of suicides over watch was different than random.

      C.  Mental Health Clinician Work Hours.

The Special Master's 2016 Annual Suicide Report states that "it was determined that 18 of the 27 suicides (67%) occurred outside of routine mental health clinician working hours, or when mental health staff were unlikely to be onsite." (Appendix C at 9.) The Special Master's 2016 Annual Suicide Report also admits that "specific work hours for mental health clinicians could not be determined for each facility on specific dates." (*Id*.) The conclusion that suicides occurred mostly outside of routine work hours, thus, should be amended or stricken given this admission. Many institutions, including those with large mental health populations, have clinicians who work on weekends and into the evenings. The conclusion that suicides occurred when mental health staff were away from the institution lacks sufficient basis and must be stricken.

      D.  Marital Status.

The Special Master's 2016 Annual Suicide Report states that "[c]omparisons reveal that marriage appeared less protective against suicide in 2016 than in 2015." (Appendix C at 12.) However, marriage is not a protective factor but is actually a suicide risk factor among inmates. Researchers in England found, in a large international sample of prison inmates, that married inmates were 1.5 times more likely to die by suicide than unmarried inmates.[18]

      E.  Security Level.

The Special Master's 2016 Annual Suicide Report states that "[f]ourteen inmates, or 52%, who died by suicide in 2016 were classified as Level IV. Seven inmates, or 26%, were classified as Level III, five (19%) were classified as Level II and one inmate (4%) was unclassified at the time of his death." (Appendix C at 14.) CDCR shows different numbers – seventeen inmates in Level IV, five in Level III, four in Level II, and one unclassified.

      F.  Involuntary Medication.

The Special Master's 2016 Annual Suicide Report states that seven of the inmates who died by suicide were under an involuntary medication order pursuant to Penal Code section 2602. (Appendix C at 22.) CDCR notes only five inmates were under such an order at the time of their death in 2016.

      G.  Foreseeability and Preventability.

The Special Master's 2016 Annual Suicide Report notes disagreement with CDCR on several determinations regarding foreseeability and preventability. (Appendix C at 27-28.) As stated

---

[18] Fazel, S., Cartwright, J., Norman-Nott, A., Hawton, K. (2008). Suicide in prisoners: a systematic review of risk factors. *Journal of Clinical Psychiatry* 69(11), 172).

above, regarding similar disagreements over 2015 suicides, this discrepancy is not evidence of a flaw in CDCR's analyses or use of slightly modified definitions. In applying the definitions for foreseeability and preventability reasonable minds may disagree about the ultimate outcome. Indeed, not every determination of foreseeability and preventability made by CDCR's own committee was unanimous. CDCR's committee consisted of several clinicians, nursing, and custody personnel as opposed to a single decision maker making after the fact conclusions. To the extent that differences in opinion, rendered years later while utilizing subjective criteria, are being relied upon as evidence that CDCR's revised definitions were meaningfully different than those employed by the court, CDCR objects.

### H. Recommendations.

CDCR objects to several recommendations set forth in the Special Master's 2016 Annual Suicide Report, as described in more detail below. One overarching comment is that several recommendations appear to overlap with Mr. Hayes's suicide prevention monitoring. CDCR recommends that the Special Master's 2016 Annual Suicide Report clarify how and whether the recommendations overlap, exceed, or contradict Mr. Hayes's own recommendations. Finally, CDCR objects to this recommendation to the extent that the Special Maser suggests that the recommendations are necessary to avoid a violation of the Eighth Amendment.

#### i. Division of Recommendations within CDCR's Individual Suicide Reports.

The Special Master's 2016 Annual Suicide Report recommends "that SCR reports divide recommendations and requirements for [Quality Improvement Plans (QIPs)] into two sections, one that addresses issues that have a potential impact on reducing suicides and one that addresses failures in procedures or deviations from policy that do not appear to have a direct impact on suicide risks within CDCR. Placing all recommendations together has the potential to assign equal weight to the importance of the issues as they relate to suicide risk and may serve to decrease staff's understanding of suicide prevention." (Appendix C at 29.)

CDCR attempted to do just this in 2013 and 2014 by differentiating policy violations that contributed to a suicide and those that did not, but were discovered during the case review process. This practice was criticized by Plaintiffs and in Lindsay Hayes's initial Suicide Prevention audit. (ECF No. 5259 at 33.) Mr. Hayes recommended that the practice end, a recommendation now enshrined in the court's February 3, 2015 order. (ECF No. 5271.) In response, CDCR issued a November 21, 2014 memorandum ending the process of "distinguish[ing] between contributory and non-contributory concerns in Suicide Reports." The memo further states that if concerns warrant additional action, "these concerns will be specifically addressed in the Recommendations section of the Suicide Report and will be made formal Quality Improvement Plans."

This recommendation should be stricken or clarified regarding how it differs from the practice employed by CDCR in 2013 and 2014, which both the Plaintiffs and Special Master strongly objected to.

       ii. The Recommendation to Provide Training on the Evaluation of Suicide Risk and the Data Used to Determine Such Risk is Vague.

 The Special Master's 2016 Annual Suicide Report states that "[t]here appears to continue to be the need for training on the evaluation of suicide risk and the data used to determine such risk. Focus on historical and objective information, such as behavior and mental status, should be considered in addition to inmate self-report." (Appendix C at 30.) CDCR objects to the vagueness of this recommendation. CDCR routinely updates its seven-hour Suicide Risk Assessment and Self Harm Evaluation training to include concerns discovered in suicide case reviews and from other audits. Risk justification and evaluation is always targeted through these trainings. To the extent that the Special Master has specific recommendations regarding the seven-hour training, the recommendation should be revised.

 Notably, the seven-hour training is also subject to recommendations and orders associated with Mr. Hayes's monitoring. (See for instance ECF No. 5259 at 13-14.) Mr. Hayes audits compliance with the Suicide Risk Assessment and Self Harm Evaluation training and is involved in the review of the curriculum. To the extent that this recommendation exceeds or conflicts with recommendations made by Mr. Hayes's, the report should so state.

       iii. Treatment Planning Training.

 The Special Master's 2016 Annual Suicide Report recommends increased training for treatment planning in light of suicides in which poor treatment planning was discovered. (Appendix C at 30.) Treatment planning and associated training is a complex process which extends far beyond suicide prevention. Any modification to CDCR's treatment planning processes, including training, must be done holistically.

       iv. Increased Use of Positive Behavior Support Teams (PBST) and Specific Cognitive and Behavioral Treatments.

 Although CDCR agrees with the Special Master's 2016 Annual Suicide Report recommendation to "[i]ncrease[] [the] use of PBSTs and specific cognitive and behavioral treatments designed to target" "self-harming behavior with or without suicidal intent," CDCR requests that the recommendation be clarified to ensure consistency with Mr. Hayes's own monitoring. (*Id*.) The suicide risk management program is part of CDCR's 2018 revision to the Suicide Prevention and Response Focused Improvement Team. Mr. Hayes audits CDCR for compliance with the 2018 policy during his monitoring rounds. To the extent that this recommendation exceeds or conflicts with recommendations made by Mr. Hayes's, the report should so state.

     v. Supervisor Review of MHCB Rescissions, Inmates who engage in Self-Harm after a Change to Lower Level of Care, and Inmates not referred to a Higher Level of Care.

 The Special Master's 2016 Annual Suicide Report recommends "that clinical supervisors routinely review treatment with inmates who have an MHCB referral rescinded, inmates who engage in self-injury or a suicide attempt following a change to a lower level of care and inmates who are not referred to a higher level of care despite indications for such a referral." (*Id.*) This recommendation is overly broad, vague, and touches on existing court-ordered processes. It is unclear whether the report recommends that a supervisor review *every* patient who has a rescission from a crisis bed, or quality management process utilizing a chart audit tool. Similarly, it intrudes upon the court-ordered sustainable process in that it recommends supervisory review of every patient not referred to a higher level of care.

     vi. Trauma Informed Treatment.

 The Special Master's 2016 Annual Suicide Report recommends that "[t]here may be a need to expand services to inmates with histories of trauma to include diagnostic assessments and formal treatment services." (*Id.*) Trauma-informed treatment may be appropriate in some cases, but CDCR objects to this recommendation to the extent that the Special Maser suggests that trauma-informed treatment is necessary to avoid a violation of the Eighth Amendment.

     vii. Involuntary Medication Petitions.

 While it is not clear from the Special Master's 2016 Annual Suicide Report how clinicians rely on involuntary medication orders,[19] it recommends that CDCR include "danger to self" in their involuntary medication petitions "whenever serious risk for self-injury has been documented during previous episodes of medication nonadherence." (*Id.* at 31.) While CDCR strives to provide a complete and accurate description of a patient's history during involuntary medication proceedings, it is not always legally possible to include the *basis* "danger to self" in every petition, even when a patient has a history.

 Petitions for involuntary medication orders pursuant to Penal Code section 2602 must be pled on the facts known at the time. If a patient is not presently a danger to self, it is unlikely that a court will grant a petition for involuntary medication. The Administrative Law Judges demand a recent showing of self-injurious behavior or suicidal ideation before they sustain a petition by clear and convincing evidence. Merely having a history of self-injurious behavior is insufficient in involuntary medication hearings. That history must be tied to events proximate to the involuntary medication petition in order for an Administrative Law Judge to consider granting a petition for danger to self. (See for instance, Title 15, section 3999.35(a)(3), stating that a "[d]emonstrated danger to self may be based on an assessment of the patient's present mental condition, including

---

[19] Psychiatrists are involved in involuntary medication hearings, while primary clinicians are not.

consideration of the patient's historical course of a serious mental disorder, to determine if the patient currently presents an elevated chronic risk or an imminent risk to his or her own safety.")

When bringing a petition for involuntary medication, CDCR's Office of Legal Affairs pleads any basis (danger to self, danger to others, or grave disability) that can be supported by available evidence. However, attorneys have an ethical duty of candor toward the court and cannot file pleadings or offer evidence known to be false or wholly unsupported by evidence. Thus, CDCR objects to any recommendation that requires its counsel to seek involuntary medication petitions for bases not supported by evidence at the time of filing.

Thank you for your consideration of these objections and comments prior to finalizing these reports.

Sincerely,

*/s/ Nick Weber*

NICK WEBER
Attorney
Office of Legal Affairs