DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE AND OBJECTIONS TO THE JANUARY 28, 2021 SPECIAL MASTER'S MONITORING REPORT ON THE MENTAL HEALTH INPATIENT CARE PROGRAMS**<br><br>Judge: Hon. Kimberly J. Mueller |

[3692309.5]

**INTRODUCTION**

The Special Master filed his Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of CDCR ("Report") on January 28, 2021, which highlighted several deficient areas in Defendants' inpatient programs and five well-reasoned recommendations for the Court's consideration. ECF No. 7039. On February 18, 2021, Defendants filed their response and objections to the Report after the Court found their request for an extension to be unsupported. *See* ECF No. 7051 ("Objections"); *see also* Feb. 8, 2021 Order, ECF No. 7050 (denying request for extension).[1] In their Objections, Defendants deny the existence of significant and longstanding deficiencies in their inpatient programs and instead argue that any present issues are due to limitations stemming from the COVID-19 pandemic. But as the Special Master has concluded in this Report and prior ones, Defendants have struggled with these same issues—limiting and delaying *Coleman* class members' access to inpatient hospitalization at the Department of State Hospitals ("DSH"), failing to provide adequate treatment in the PIPs, failing to maintain adequate clinical staffing, and failing to move patients to their least restrictive housing—since well before the pandemic. And though Defendants dispute various factual findings made by the Special Master, they fail to present evidence even hinting at clear error. Plaintiffs urge the Court to adopt the Special Master's Report, including all five of its recommendations.

**ARGUMENT**

**I. THE REPORT ACCURATELY IDENTIFIES LONGSTANDING DEFICIENCIES WITH DEFENDANTS' INPATIENT PROGRAMS THAT HAVE BEEN FURTHER EXACERBATED DURING THE PANDEMIC**

Defendants' objections rely on their contention that the identified deficiencies in

---

[1] For the first time in the 26 years it has been in place, Defendants assert that the Order of Reference's 10-day deadline to submit objections "strains the limits of due process." ECF No. 7051 at 2, n.2. Defendants took full advantage of the opportunity to submit extensive objections to the draft report, and are limited to that scope here. Nor were Defendants forced to comb through the final report to discern what had changed from the draft version, as the Special Master provided the parties with the necessary documents to create a redline comparison showing changes. Indeed, Plaintiffs offered the redline they generated based on those materials to Defendants in case they had difficulty, but received no response to the offer. *See* Declaration of Lisa Ells, filed herewith, ¶ 2, Ex. A.

[3692309.5]

inpatient care are a direct result of the COVID-19 pandemic. *See* ECF No. 7051 at 3.[2] This position is misguided and was soundly rejected by the Special Master. All of the issues that Defendants attribute to COVID-19 limitations are deeply rooted within the history of this case and therefore cannot be expected to improve without an order from this Court requiring targeted action from Defendants. *See* Report, ECF No. 7039 at 14 ("While the COVID-19 pandemic may have further highlighted, or, in some instances exacerbated, the problems faced by defendants, it most certainly did not create them.").

Defendants' objection that the Special Master improperly expanded the monitoring period and "comingled" data from the past year into the findings is meritless. *See* ECF No. 7051 at 2. The Report is a "full review" of Defendants' inpatient mental health programs, and therefore necessarily incorporates the "paper review" monitoring that occurred after in-person visits were suspended, as well as the Special Master's work with the COVID-19 Task Force and small workgroups. *See* ECF No. 7039 at 9, 20; ECF No. 6512 at 3-4 (Special Master report on monitoring in view of the coronavirus pandemic).

Defendants challenge the Special Master's finding that the 300-person deep inpatient waitlist at the time of his report signals a bed shortage, arguing the waitlist is solely an outgrowth of their pandemic response. *See* ECF No. 7051 at 3. But even at the start of the pandemic, the Special Master found Defendants were "within reach of running out of beds," with more patients awaiting inpatient admission than there were available beds—and Defendants did not object. Special Master's Corrected Report on the Status of Access to DSH ("2020 Inpatient Report"), ECF No. 6579 at 12-14. Defendants' own most recent bed projections confirm the severe shortage. *See* Ells Decl. ISO Pls' Brief re Staffing and Population, ECF No. 6856 at ¶ 72 & Ex. H at 185 (projecting significant increased inpatient bed need). And Defendants' argument ignores the larger context of the Special Master's point—that the compliance achievements Defendants tout in their three

---

[2] All page citations are to the ECF page number.

[3692309.5]

2

PLS.' REPLY TO DEFS.' RESPONSE AND OBJECTIONS TO JAN. 28, 2021 SPECIAL MASTER'S MONITORING REPORT ON MENTAL HEALTH INPATIENT CARE PROGRAMS

months of cherry-picked data[3] rely on their continued use of inappropriate "temporary" beds that have now been in use for a decade, with no plan in sight to replace them. *See* Report, ECF No. 7039 at 21.

Defendants next take issue with "the conflation of past perceived [DSH] admission issues with the current COVID-19 crisis." ECF No. 7051 at 4. Defendants' attempt to pass off this long-standing problem as nothing more than a perception problem is astounding. The Special Master has extensively documented the entrenched barriers Defendants have erected throughout the history of this case to prevent *Coleman* class members from accessing inpatient care at DSH. *See* Special Master's Monitoring Report on the Mental Health Inpatient Programs for Inmates of CDCR, May 25, 2016 ("2016 Inpatient Report"), ECF No. 5448 at 24-40 (detailing long history of Defendants' failure to transfer patients to low custody DSH beds except when ordered to do so by the Court); Special Master's Monitoring Report on the Mental Health Inpatient Programs for Inmates of CDCR, Aug. 30, 2018 ("2018 Inpatient Report"), ECF No. 5894 at 21-22 (referencing earlier findings and noting DSH access problems "persisted through the writing of this report."); 2020 Inpatient Report, ECF No. 6579 at 9-10 (referencing 2016 and 2018 Inpatient Reports and stating that timely access to DSH beds "is essential to the remedial process"). Indeed, at the start of the pandemic and while the Special Master's monitoring for this report was ongoing, DSH promptly slammed its doors on *Coleman* class members in defiance of existing Court orders, even while continuing to admit other patient classes, such as former class members civilly committed under the Offenders with a Mental Health Disorder ("OMHD") statute.[4] *See also* April 3, 2020 Order, ECF No. 6572 (ordering

---

[3] While Defendants' utilization of DSH inpatient programs showed some improvement starting in the late summer of 2019, those gains, like always, can be directly linked to the Special Master's focused attention and handholding. *See* Yelin Decl. ISO Pls' Opening Brief re MHCB Construction and Unmet Bed Need Study, ECF No. 6401-1 ¶ 22.

[4] Defendants continue to argue that the Special Master "ignores the legal necessity for DSH to admit OMHDs," ECF No. 7051 at 4, even though the Court has said there is no "legal authority that permits the rights of OMHDs, constitutional or otherwise, to be prioritized over the constitutional rights of *Coleman* class members." April 3, 2020 Order, (footnote continued)

[3692309.5]

3

PLS.' REPLY TO DEFS.' RESPONSE AND OBJECTIONS TO JAN. 28, 2021 SPECIAL MASTER'S MONITORING REPORT ON MENTAL HEALTH INPATIENT CARE PROGRAMS

Defendants to show cause why they should not be ordered to promptly admit *Coleman* class members consistent with protocols for admitting OMHDs).

Defendants next assert that the Court should disregard the Special Master's reporting regarding high rates of DSH admissions of OMHDs at closed institutions relative to class members at the same institutions because OMHD "referral rates are dramatically" higher historically, although they cite no admissible evidence substantiating this claim. ECF No. 7051 at 4. But the point is not referral rates but admission rates: Regardless of their relative referral rates, it is uncontested that DSH admitted OMHDs for treatment without interruption during the pandemic while refusing and delaying admission for swaths of class members being referred from the exact same institutions. Indeed, DSH has displaced class members in favor of OMHD admissions. *See* Pls' Brief re Oct. 23, 2020 Trial ("DSH Trial Brief"), ECF No. 6948 at 20 (citing trial exhibits P-095, P-6-14). Given this history, the comparisons in the Report between *Coleman* class members and OMHDs are appropriate and serve to contextualize the extent to which other patient classes receive preferential treatment from Defendants at the expense of class members. *See* Report, ECF No. 7039 at 26-28.

Defendants also object that the Report is misleading because the Special Master failed to highlight their referral and acceptance rates during the pandemic. ECF No. 7051 at 4-5. The Report described this activity less positively and stated that "[i]nformation and data provided to the COVID-19 Task Force show that there has been a substantial decline in referrals to acute and intermediate care programs, and the waitlist for patients referred but not yet placed in inpatient care settings is significant and continues to grow." Report, ECF No. 7039 at 42. If anything, Defendants' reliance on the argument that transfers are

---

ECF No. 6572 at 2. Therefore, Defendants' asserted interests in carrying out the statutory scheme that requires them to admit OMHDs has minimal relevance and does not excuse them from complying with this Court's prior orders. *See Hook v. Arizona Dep't of Corrections*, 107 F.3d 1397, 1402-3 (9th Cir. 1997) (federal court's remedial order in prison conditions litigation preempted conflicting state statute, where the court expressly found that the relevant remedial provision "was necessary to vindicate the prisoners' constitutional rights"); *see also* DSH Trial Brief at 20-22.

down just highlights the uncontested evidence of dramatically under-identified need for inpatient care, which has only grown more extreme during COVID-19 when referrals have dropped to mere fractions of their already problematic pre-pandemic levels. *See* Feb. 16, 2021 Joint Program Guide Departures Report, ECF No. 7059 at 93 (showing 2020 inpatient referral rates compared to 2019).

Additionally, Defendants argue that the Report is "skewed" because it does not describe the way that COVID-19 limited how mental health treatment was provided in the PIPs. ECF No. 7051 at 5. But the PIP deficiencies were well documented before the pandemic, including in the Special Master's report at the start of the pandemic, to which Defendants did not object. *See* 2020 Inpatient Report, ECF No. 6579 at 19-30 (noting that inadequate PIP treatment and staffing documented in 2016 and 2018 reports remained persistent problems). Asking the Special Master to delineate the bad care that existed before the pandemic from the bad care that exists now is a pointless exercise, and a waste of everyone's time. Instead of fighting with the Special Master about exactly how inadequate the PIP care is, Defendants should work on fixing it.

## II. THE COURT'S PRIOR STAFFING ORDERS ON VACANCY RATES AND STAFFING RATIOS APPLY TO THE PIPS, INDIVIDUAL INSTITUTIONS, AND DSH

Defendants object to the Special Master's findings that they continue to struggle with staffing vacancy rates, arguing that the ten-percent maximum vacancy rate applies only to CDCR's system-wide psychiatry staffing levels and does not apply to the PIPs or any individual institutions. *See* ECF No. 7051 at 5. As recounted by the Special Master, it was "unambiguous" that the 2018 Inpatient Report assessed staffing compliance using the "ten percent vacancy rate in addition to staffing ratios." ECF No. 7039 at 15-16. The 2018 Inpatient Report, issued after Lift and Shift, concluded that staffing vacancies were a primary area of focus for Defendants after monitoring tours of the former DSH inpatient programs (i.e., PIPs) and two state hospitals. ECF No. 5894 at 17-18. That report noted "notable staffing vacancies" at SVSP-PIP, with none of the four SVSP-PIP units meeting "required clinical staffing ratios for psychiatry, psychology, social work, or rehabilitation

1 therapy." *Id.* at 137.  As the Special Master recounts, he made specific mention in the
2 2018 report of monitoring the application of the ten-percent maximum vacancy rate and
3 October 10, 2017 order to the PIPs, with no objection from Defendants.  ECF No. 7039 at
4 15-16 (quoting ECF No. 5894 at 17-18).  Having failed to make this objection to the 2018
5 Inpatient Monitoring Report, which clearly applied the staffing ratios and ten-percent
6 vacancy rate to the PIPs after Lift and Shift, Defendants cannot be permitted to make it
7 now.  *See* Report, ECF No. 7039 at 15 ("Defendants have never lodged a prior objection to
8 the inclusion of this approach to monitoring or reporting.").  For this reason alone, the
9 Court should overrule Defendants' objection.

10 Even if the Court does not find that Defendants have waived their right to make
11 such an argument, Defendants provide no reasoning to support why the PIPs should not be
12 subject to the same staffing vacancy rates as CDCR's outpatient units.  The Court's 2002
13 order establishing a maximum vacancy rate of ten percent states that Defendants'
14 "constitutional obligations" to maintain adequate staffing levels extend to the "class
15 members in their custody at any given time," which does not support a carve-out for the
16 PIPs.  June 13, 2002 Order, ECF No. 1383 at 3-4.  On its face, the 2002 order applies to
17 the PIPs.  If anything, adequate staffing at this most intensive level of care, reserved for the
18 most acutely ill of patients, is more critical to the system's proper functioning than
19 anywhere else.  The PIPs must be monitored pursuant to the ten percent vacancy rate
20 established by the 2002 Order and enforced by the October 10, 2017 Order, ECF No. 5711.

21 Similarly, *Coleman* patients at DSH are also under Defendants' care and are equally
22 entitled to sufficient staffing if they are to be provided constitutionally adequate mental
23 health care.  The Special Master has tied inadequate staffing at DSH hospitals to
24 inadequate care.  *E.g.*, 2016 Inpatient Report, ECF No. 5448 at 45 (describing ASH units
25 that exceeded designated clinician-to-patient ratios when operating at capacity and
26 concluding that "[w]hen ratios are exceeded, treatment is impacted and patients suffer.");
27 *see also* Report, ECF No. 7039 at 52-53 (noting ASH staffing would exceed ratios if beds
28 allocated for class members were full).  While the Court did not formally add DSH as a

1  party until 2006, when DSH's long-standing intransigence left no other option, this has
2  always been a systemwide case, and DSH has always provided necessary inpatient care to
3  class members as part of Defendants' remedial scheme.  The primary defendant in this
4  case – Defendant Newsom and his predecessors – has always overseen and been ultimately
5  responsible for the acts of the subsidiary executive entities providing unconstitutional
6  levels of mental health care to the *Coleman* class – including both DSH and CDCR.  And
7  there is no question Defendant Newsom and his predecessors are and have always been
8  bound by the 2002 order to ensure adequate clinical staffing – measured at a vacancy rate
9  of no greater than ten percent – to provide constitutionally adequate care to the "class
10  members in [State] custody at any given time."  June 13, 2002 Order, ECF No. 1383 at 3-
11  4.  Nor is there any logical reason why DSH should be held to a different clinical staffing
12  level than CDCR, and Defendants make no attempt in either their objections lodged with
13  the Court or their informal objections to the Special Master's draft report to articulate any
14  such reason.  *See* Objections, ECF No. 7051 at 5-6; *see also* Thorn Decl. Ex. A, ECF No.
15  7051-1 at 5-6.

**III.   THE COURT SHOULD NOT ADOPT DEFENDANTS' PROPOSED ALTERNATIVE FINDING ABOUT THE APPROPRIATENESS OF USING CAGES IN THE PIPS**

18       Even though the Special Master expressly declined to conclude that cages are
19  appropriate for use in the PIPs, Defendants nevertheless request that the Court put such
20  words in his mouth.  *See* Objections, ECF No. 7051 at 6.  The very fact that the Special
21  Master declined to reach such a conclusion, after Defendants urged him to do so in their
22  response to the draft report, makes clear that he has not so concluded.  *See also* Thorn
23  Decl. Ex. A, ECF No. 7051-1 at 7.  Nor have the CDCR Defendants ever provided
24  evidence supporting their abhorrent assertion that inpatient psychiatric hospitals can and
25  should provide care to the most acutely ill patients through the bars of cages the Supreme
26  Court itself deplored – particularly when Defendant DSH employs no such barbaric
27  measures and provides dramatically better care.  *See Brown v. Plata*, 563 U.S. 493,
28  503-04 & Appx. C (2011).  Such a conclusion is, in any event, unsupported by the Report,

which notes problems with the use of cages in PIPs. At SVSP-PIP, staff members reported that cages are a barrier to *Coleman* patients accepting individual treatment—a serious concern that Plaintiffs also share based on reports from class members. ECF No. 7039 at 65; *see also id.* at 63 (finding CMF-PIP failed to produce data on use of cages, used inappropriate models, and situated cages in a way that undermined patient participation in group treatment). The Special Master has made no statement that cages are appropriate to be used in the PIPs, and the Court should reject Defendants' unsubstantiated request that he be forced to do so when it is clear he has never reached such an outrageous conclusion.

### IV. PROBLEMS WITH THE LEAST RESTRICTIVE HOUSING ("LRH") PROCESS HAVE PERSISTED FOR MANY YEARS AND CANNOT BE ATTRIBUTED TO THE PANDEMIC

The Special Master's instant Report, like his prior report, finds that "defendants continued to struggle with placing those patients for whom the setting is not contraindicated for clinical and/or custodial reasons in their LRH." ECF No. 7039 at 42-43. While Defendants claim that the Special Master's findings improperly question their clinicians' clinical judgment, and assert, as a strange defense, their own inability to track clinical LRH determinations, the Special Master properly rejected Defendants' arguments. *See id.* at 17 (noting that Defendants put forth a "strawman" argument); *see also* ECF No. 7051 at 7-8. In fact, Defendants' excuses demonstrate why this issue continues to be an area requiring attention. Through the course of monitoring, the Special Master found that patients were housed outside of their LRH because it was not "routinely discussed or documented during IDTTs" and "intervention plans to … assist patients in reaching their LRH were also not adequately documented." Report, ECF No. 7039 at 43. These are fundamental, necessary components of the LRH system, and Defendants do not contest they are broken. By adopting the Special Master's Recommendation #5, Defendants will be required to discuss these topics and subsequently, be able to track LRH determinations.

Nor should the Court accept Defendants' explanation that their failures to comply with the LRH process are due to COVID-19 safeguards restricting patient movement. *See* Objections, ECF No. 7051 at 7. Though the pandemic has certainly intensified this issue,

1  the Special Master has long reported that Defendants need to prioritize placing patients
2  within their LRH, including implementing an institutionalized process for reviewing LRH
3  placements and consistently documenting why patients are housed outside of their LRH.
4  *See* 2018 Inpatient Report, ECF No. 5894 at 21 (identifying LRH placements as an area of
5  improvement that should be prioritized); 2016 Inpatient Report, ECF No. 5448 at 9
6  (discussing why Defendants' failures to transfer patients to their LRH create a "resounding
7  ripple effect" throughout the inpatient units contributing to waitlists).  Furthermore,
8  Defendants' failure to move patients to their LRH contributes to waitlists and a
9  suppression of actual need for inpatient care, because clinicians are less likely to refer
10 patients who need a higher level of care if their referrals are unlikely to lead to prompt
11 inpatient admissions.  *See id.* at 35-36; *see also* Decl. of Pablo Stewart, M.D., ISO Pls.' Br.
12 on Evid. Hr'g Re: OSC re DMH Access, ECF No. 4055, ¶¶ 52-115; *see also, e.g.*, *id.*
13 ¶¶ 42-51.
14      It is clear the Special Master's past attempts to assist Defendants in fixing this
15 broken system – including literally sitting with CDCR clinicians to help them review LRH
16 determinations and ensure compliance with their own processes in the summer of 2019 –
17 failed to take hold.  Yelin Decl. ISO Unmet Bed Need Study, Nov. 27, 2019, ECF No.
18 6401-1, ¶ 22.  At the start of the pandemic, the Special Master – without objection from
19 Defendants – found high levels of class members held outside their LRH and noted that
20 "[a]ppropriate treatment at their LRH was elusive for many *Coleman* patients before the
21 onset of the COVID-19 pandemic."  2020 Inpatient Report, ECF No. 6579 at 15-19 (also
22 concluding that LRH issues were "further exacerbated by DSH's decision to close
23 admissions").  Defendants protest that there is no correlation between the growing
24 inpatient waitlist and their failure to properly place patients in their LRH, but their
25 arguments ring hollow against the repeating history of this case.
26      Similarly, the Court should not be distracted by Defendants' argument that the LRH
27 issue is unsuitable for the COVID-19 Task Force setting.  *See* ECF No. 7051 at 8.  Other
28 topics involving clinical discussions and case reviews are regularly discussed in a small

workgroup setting and subsequently presented for discussion before the larger Task Force. The Court should adopt the Special Master's findings regarding needed improvements to the critical LRH process, including Recommendation #5, which provides information necessary for appropriate oversight and monitoring of this process. *See* Report, ECF No. 7039 at 118-19.

## V. DEFENDANTS CANNOT ESTABLISH CLEAR ERROR

Defendants claim the Report includes "factual inaccuracies" but fail to provide any proof substantiating their objections, much less to establish clear error. *See* ECF No. 7051 at 8; *see also* Dec. 11, 1995 Order, ECF No. 640 at 8 (requiring adopting of Special Master findings of fact "unless they are clearly erroneous"); *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("To be clearly erroneous, a decision must strike the court as more than just maybe or probably wrong; it must … strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish.") (quoting *Alaimalo v. United States*, 645 F.3d 1042, 1060 (9th Cir. 2011)).

Defendants object to the Special Master's findings of missing laundry at CIW, *see* Report, ECF No. 7039 at 111, arguing that these reports are "unsubstantiated." ECF No. 7051 at 8. But the Special Master relied on statements from *Coleman* class members, and Defendants provided no evidence to contradict such reports. *See* Report, ECF No. 7039 at 111. Similarly, Defendants object to findings that patients had difficulty accessing the library and argued that CIW's library logs contradicted these findings, yet failed to provide any such evidence either to the Special Master or to this Court. Objections, ECF No. 7051 at 8; *see also* Thorn Decl. Ex. A, ECF No. 7051-1 at 16-17. Finally, Defendants apparently believe this Court should conclude the Special Master clearly erred in finding that class members were not provided with radios in the SVSP-PIP – even though they do not contest the accuracy of that finding – because the Special Master failed to include their wholly unsubstantiated excuse. *See* Objections, ECF No. 7051 at 8; *see also* Thorn Decl. Ex. A, ECF No. 7051-1 at 17. That is not clear error. The fact remains the radio were withheld, regardless of whether Defendants believe they had a good reason for doing so.

Defendants have presented no evidence of any sort to substantiate their factual objections, much less enough for this Court to disturb these findings as clearly erroneous.

## VI. THE RECOMMENDATIONS IN THE SPECIAL MASTER'S 2021 INPATIENT MONITORING REPORT ARE APPROPRIATE AND SHOULD BE ADOPTED

### A. Recommendation #1

Defendants' objections to Recommendation #1 are not really objections, as Defendants make clear they are proceeding to comply regardless. ECF No. 7051 at 10. Nor is their complaint that this recommendation is "too vague" and "not tied to specific, identified issues" valid. *Id.* at 9. The Report – like prior reports – is replete with extensive discussions of the identified deficiencies giving rise to this recommendation. *See, e.g.*, Report, ECF No. 7039 at 34 (concluding that difficulty scheduling clinical and structured therapeutic activities at CMF-PIP was a "serious problem primarily due to a shortage of scheduling staff"); *id.* at 49 (finding that group treatment space in SVSP-PIP's C5 and C6 was inadequate); *id.* at 50 ("Both CDCR and DSH continue to need to accurately track and report 'all structured and unstructured out-of-cell activities offered and received,'"); *id.* at 63 (discussing high rate of refusal rate for out-of-cell activities at CMF L1-PIP). In any event, Defendants ignore the fact that the recommendation calls for developing a remedial plan for these shortcomings "under the guidance and supervision of the Special Master." *Id*. at 118. Any further clarity Defendants purport to need will necessarily arise out of that process, as Defendants apparently concede.

The DSH Defendants comment that they should not be required to develop "a plan for expanding individual treatment when not clinically recommended." Objections, ECF No. 7051 at 9-10. The notion that the Special Master or this Court would require the provision of unnecessary individual treatment is absurd. The recommendation simply requires Defendants to develop a plan to address identified deficiencies, which include, as specific to DSH, inadequate tracking and data regarding "the nature of individual treatment provided" at ASH and "negligible" individual therapy at CSH. Report, ECF No. 7039 at 51. Defendants have not lodged factual objections to these findings, nor have they

1 objected to the Special Master's findings to the same effect in earlier reports. *See, e.g.*,
2 2018 Inpatient Report, ECF No. 5894 at 27 ("Developing and implementing meaningful
3 guidelines and training staff regarding the provision of adequate individual treatment must
4 be addressed by CDCR and DSH."). And in any event, Defendants have signaled their
5 intent to comply. These "objections" (to the extent that they even are objections) should
6 be overruled.

### B. Recommendation #2

Defendants' objections to Recommendation #2 have been effectively mooted by this Court's order requiring them to file a PIP staffing plan by March 22. *See* Feb. 18, 2021 Order, ECF No. 7064 at 2-3. That order, like the Special Master's related recommendation, is appropriate. CDCR has operated the PIPs—licensed, inpatient psychiatric hospitals treating the most seriously ill members of the *Coleman* class—for 3.5 years with no plan in place to address their chronic understaffing, which impedes the provision of constitutionally adequate inpatient care. *See, e.g.*, Report, ECF No. 7039 at 40; 2020 Inpatient Report, ECF No. 6579 at 19-20; 2018 Inpatient Report, ECF No. 5894 at 24, 28-29. And Defendants' most recent efforts to come up with a plan stalled out. *See* ECF No. 7039 at 30, n.14. The Court's intervention at this point is more than warranted.

### C. Recommendation #3

Recommendation #3, which requires that Defendants "continue to refer, transfer and admit *Coleman* class members to appropriate inpatient programs in compliance with the requirements of the Program Guide and consistent with public health best practices," is necessary in light of Defendants' continued recalcitrance and refusal to accept and treat *Coleman* class members. *See* Report, ECF No. 7039 at 118.

Despite Defendants' unsupported assertion that they are already complying with this recommendation, *see* ECF No. 7051 at 10, the Court is likely not surprised by the Special Master's finding that *Coleman* class members continue to face significant barriers for accessing appropriate inpatient programs and, specifically, DSH hospitals. *See* ECF No. 7039 at 21-29. Right now, although the average accepted patient has waited longer

than Program Guide timelines, more than a third of the 256 ASH beds designated for class members are empty, as are just under half of the 50 beds at CSH and almost two-thirds of the beds at PSH. *See* 11th Joint Update on the Work of the COVID-19 Task Force, Feb. 19, 2021, ECF No. 7065 at 5. Meanwhile, 334 patients await admission to the PIPs – far more than the number of available PIP beds. *Id.* at 6. This issue has been and continues to be under the purview of the COVID-19 Task Force, was the subject of an evidentiary hearing before the Court on October 23, 2021, and remains urgent.

And prior to the pandemic, the effort to ensure that patients are moved to appropriate inpatient beds in a timely manner consumed the time and resources of the Court, the Special Master, and the parties for decades. The 2016 Inpatient Monitoring Report vividly recounts this history. *See* ECF No. 5448 at 22–40. Among the extensive efforts the Special Master articulated were the fourteen prior orders this Court had then issued specifically aimed at filling the dedicated beds at ASH reserved for class members, all of which had failed to ensure full access. *See id.* at 36-39; *see also* Joint Status Report re DSH Inpatient Access, ECF No. 5335 at 11-17 (recounting history). The Special Master described the "frustration and futility" that the *Coleman* court has expressed about DSH's intransigent refusal to make their critically needed inpatient beds available to *Coleman* class members, noting that the "barriers which defendants claim prevent admission of *Coleman* class members into designated beds at DSH-Atascadero are not new; they are merely recycled under a different terminology every few years." 2016 Inpatient Monitoring Report, ECF No. 5448 at 39-40. Without constant and diligent monitoring, Defendants will again continue this entrenched historical cycle, all while *Coleman* class members who desperately need access to DSH's psychiatric hospital beds are shut out, and beds this Court has repeatedly ordered be made available to them sit empty. *Cf.* August 15, 2011 Order, ECF No. 4069; January 27, 2010 Order, ECF No. 3787; June 18, 2009 Order, ECF No. 3613. Based on both current circumstances and the extensive history of this issue in the *Coleman* case, the Court must adopt Recommendation #3.

[3692309.5]

13

PLS.' REPLY TO DEFS.' RESPONSE AND OBJECTIONS TO JAN. 28, 2021 SPECIAL MASTER'S MONITORING REPORT ON MENTAL HEALTH INPATIENT CARE PROGRAMS

### D. Recommendation #4

The Court should adopt Recommendation #4, which requires Defendants to develop and file a plan within 180 days for providing appropriate treatment space for clinical services and activities in housing units C5 and C6 at SVSP-PIP, or implement alternatives to the use of C5 and C6 for inpatient care. *See* Report, ECF No. 7039 at 118. In 2011, C5 and C6 were "established for temporary use as intermediate care units due to severe shortages of inpatient beds" and still remain in use today. *Id.* at 21. Defendants do not deny that a plan for replacing or fixing the allegedly "temporary" unlicensed beds in C5 and C6 is necessary, but request that the Court "leave room for a reasonable extension of the deadline as necessary." Objections, ECF No. 7051 at 11. The timeline recommended by the Special Master is appropriate and should be adopted. These unlicensed units, which were supposed to be temporary, have now been in place for approximately a decade and, as the Special Master found, continue to be inappropriate for long-term use. Defendants must be held to a concrete timeline for creating a plan, and 180-days is a reasonable timeline in which to do so.

### E. Recommendation #5

Defendants do not formally object to the Special Master's recommendation that Defendants develop a monthly report identifying all patients housed out of their LRH, including relevant information such as whether the determination not to transfer to the patient's LRH was based on clinical reasons, and whether the treatment team assessed if the patient was eligible for their LRH. Instead, they assert that they have had inadequate time to determine if CDCR can provide the information requested. Objections, ECF No. 7051 at 11. The Court should adopt the recommendation as written by the Special Master. If the information identified by the Special Master is not currently available to Defendants, they must implement a uniform system to collect it. Without access to the information identified by the Special Master, Defendants cannot meaningful improve their broken LRH process.

## CONCLUSION

Accordingly, the Court should reject Defendants' objections and adopt the Special Master's 2021 Inpatient Monitoring Report, including all five recommendations.

DATED: February 22, 2021

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: /s/ Amy Xu
    Amy Xu

Attorneys for Plaintiffs

[3692309.5]

15

PLS.' REPLY TO DEFS.' RESPONSE AND OBJECTIONS TO JAN. 28, 2021 SPECIAL MASTER'S MONITORING REPORT ON MENTAL HEALTH INPATIENT CARE PROGRAMS