1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   MONICA N. ANDERSON, State Bar No. 182970
    Senior Assistant Attorney General
3   ADRIANO HRVATIN, State Bar No. 220909
    Supervising Deputy Attorney General
4   ELISE OWENS THORN, State Bar No. 145931
    KYLE A. LEWIS, State Bar No. 201041
5   LUCAS HENNES, State Bar No. 278361
    NAMRATA KOTWANI, State Bar No. 308741
6   Deputy Attorneys General
      1300 I Street, Suite 125
7     P.O. Box 944255
      Sacramento, CA 94244-2550
8     Telephone:  (916) 210-7318
      Fax:  (916) 324-5205
9     E-mail:  Elise.Thorn@doj.ca.gov
    Attorneys for Defendants

    ROMAN M. SILBERFELD, State Bar No. 62783
    GLENN A. DANAS, State Bar No. 270317
    ROBINS KAPLAN LLP
      2049 Century Park East, Suite 3400
      Los Angeles, CA 90067-3208
      Telephone:  (310) 552-0130
      Fax:  (310) 229-5800
      E-mail:  RSilberfeld@RobinsKaplan.com
    Special Counsel for Defendants

10
11  HANSON BRIDGETT LLP
    PAUL B. MELLO, SBN 179755
    SAMANTHA D. WOLFF, SBN 240280
12  LAUREL E. O'CONNOR, SBN 305478
    DAVID C. CASARRUBIAS, SBN 321994
13  1676 N. CALIFORNIA BLVD., SUITE 620
    WALNUT CREEK, CALIFORNIA 94596
14  TELEPHONE:   925-746-8460
    FACSIMILE:   925-746-8490
15  Attorneys for Defendants

16

17              IN THE UNITED STATES DISTRICT COURT

18          FOR THE EASTERN DISTRICT OF CALIFORNIA

19                   SACRAMENTO DIVISION

20

21  **RALPH COLEMAN, et al.,**                  Case No. 2:90-cv-00520 KJM-DB (PC)

22                              Plaintiffs,      **DECLARATION OF DEAN L. BORG
                                                SUPPORTING DEFENDANTS'
23          v.                                  TWENTY-SECOND STATUS REPORT
                                                ON THE FUNDING PROCESS FOR THE
24                                              CONSTRUCTION OF MENTAL
    **GAVIN NEWSOM, et al.,**                    HEALTH CRISIS BEDS**
25
                              Defendants.
26
                                                Judge:    Hon. Kimberly J. Mueller
27

28

                                    1
─────────────────────────────────────────────────────────

1    I, Dean L. Borg, declare:

2    1.    I am the Director of the Facility Planning, Construction and Management Division for

3    the California Department of Corrections and Rehabilitation (CDCR).  I have personal knowledge

4    of the facts stated in this declaration and if called to testify to those facts I could and would do so

5    competently.  I make this declaration to support Defendants' twenty-second status report on the

6    funding process for the design and construction of licensed mental health crisis beds in Southern

7    California.

8    2.    The work on CDCR's plan to construct 50 new licensed mental health crisis beds at

9    the California Institution for Men is proceeding, consistent with reports previously provided to

10    the Court, with a potential delay described in paragraphs 4 and 5 below.

11    3.    The architect of record, Hellmuth, Obata and Kassabaum, continues to address

12    comments received from the Office of the State Fire Marshal (OSFM) and the licensing omission

13    identified by CDCR's peer review consultant as reported to the Court on January 27, 2021.

14    CDCR is still on track to submit revised working drawings to the OSFM by mid-March and

15    estimates receipt of the final working drawings from the OSFM by May 21, 2021.

16    4.    On February 24, 2021, CDCR received a decision from the California Superior Court,

17    County of San Bernardino, granting a petition for writ of mandamus filed in 2019 by the City of

18    Chino, the City of Chino Hills, San Bernardino County, and the Chino Valley Independent Fire

19    District, seeking an order directing CDCR to vacate approval of the CIM project on the basis that

20    CDCR's Environmental Impact Report on the construction project was inadequate.  A copy of the

21    decision is attached as Exhibit A.  The decision will potentially cause a delay in CDCR

22    proceeding to seek bids from the construction market.   Although CDCR successfully defended

23    seven of ten claims raised in the petition, it will need to address three issues with the

24    Environmental Impact Report the court found inadequate:  1) the description of baseline

25    conditions; 2) the analysis of project alternatives; and 3) the analysis of traffic impacts.

26    5.    My previous estimates of the dates for the commencement and completion of

27    construction will potentially be impacted by the work needed to address the Superior Court's

28    decision and, if necessary, correct the Environmental Impact Report.  I cannot provide a revised

2

timeline until the Superior Court issues the finalized writ and judgment, CDCR determines whether it will appeal the judgment and writ, and CDCR determines the feasibility of negotiating a resolution of the three claims with the petitioners.   I will report on the status of the entry of judgment, the decision to appeal the judgment, and an anticipated timeline for the other work needed to complete revisions to the Environmental Impact Report, if available, in my declaration in support of the 23rd status report to the Court in March.

6.    CDCR's response plan to COVID-19 has not led to any delays to the California Institution for Men construction project as of the date of this report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Sacramento, California on February 26, 2021.

/s/ *DEAN L. BORG*
DEAN L. BORG
Director
Facility Planning, Construction and Management
*(original signature retained by attorney)*

# Exhibit A

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT
FEB 2 4 2021
JESSICA MORALES, DEPUTY

**City of Chino et al. v. California Department of Corrections and Rehabilitation**

**San Bernardino Superior Court Case No. CIVDS 1917019**

**Department S-26, Judge David Cohn**

**February 24, 2021**

**Ruling on Submitted Matter: Petition for Writ of Mandate**

---

# I
# Background

The California Department of Corrections and Rehabilitation ("CDCR") proposes
to build a fifty-bed "Mental Health Crisis Facility" at the Chino Institute for Men ("CIM").
The project is one of several mental health facilities CDCR plans to build in response to
an order from the United States District Court for the Eastern District of California, which
found that CDCR lacked sufficient beds to meet the needs of prisoners with serious
mental health disorders.[1]

On July 9, 2018, CDCR, the lead agency for the project, issued a Notice of
Preparation ("NOP") for an environmental impact report pursuant to the California
Environmental Quality Act, Public Resources Code section 21000 *et seq.* ("CEQA").[2]
(AR 3150-3155.) The public comment period for the NOP ran through August 13, 2018.
The City of Chino ("Chino"), the City of Chino Hills ("Chino Hills"), and the Chino Valley
Independent Fire District ("the District") submitted oral and written comments.   (AR
3108-3109; 3114-3120; 3135; 5238-5243; 5249-5253.)

---

[1] *Coleman v. Brown*, Case No. 2:90-cv-0520-KJM-DB-P.  (AR 130, 2826-2861.)
[2] *See* CEQA Guidelines, Cal. Code Regs., Title 14 ("Guidelines") §§ 15082 and 15375, governing the requirements
for the NOP.

On December 6, 2018, CDCR released a draft environmental impact report ("Draft EIR").[3]  (AR 1289-1853.)  The comment period for the Draft EIR ran through January 28, 2019.  (AR 1282.) Chino, Chino Hills, and the District again submitted written comments.[4]  (AR 140; 146-148; 154-165.)

CDCR held a public hearing on January 10, 2019.[5]  Representatives from Chino, the District, and San Bernardino County attended and spoke.  (AR 1160-1224.)

CDCR responded to the written and oral comments in an April 2019 Final Environmental Impact Report ("Final EIR").[6]  (AR 124-1002.)  On May 8, 2019, CDCR certified[7] the Final EIR and filed a Notice of Determination ("NOD"),[8] stating that the project would not result in any unmitigated, significant, or unavoidable effects on the environment. (AR 9-14; 67.)

On June 7, 2019, petitioners filed a petition for a writ of mandate in this Court, seeking an order directing CDCR to vacate approval of the project.

## II

## Standard of Review

The standard of judicial review under CEQA is abuse of discretion.  (Pub. Resources Code, §§ 21168.5, 21005, subd. (a); *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512.)  Abuse of discretion can arise in two ways—by the agency lead failing to follow the procedures required by CEQA or by reaching factual conclusions unsupported by substantial evidence.  (*Ibid*.)  Whether the agency followed correct

---

[3] Guidelines, §§ 15084-15088.5 address the requirements regarding the Draft EIR.
[4] *Id.*, § 15087.
[5] *Id.*, § 15087, subd. (i).
[6] *Id.*, §§ 15088-15089.
[7] *Id.*, § 15090.
[8] *Id.*, § 15094.

procedures is reviewed *de novo*, but substantive factual conclusions are entitled to greater deference. (*Ibid.*) The Court " 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable.' [Citation.]" (*Ibid.*) "The decisions of the agency are given substantial deference and are presumed correct. The parties seeking mandamus bear the burden of proving otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination. [Citation.]" (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497.)

"The ultimate inquiry . . . is whether the EIR includes enough detail to 'enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.]" (*Sierra Club v. County of Fresno, supra*, 6 Cal.5th at p. 516.)  The EIR should provide decision makers with sufficient analysis for intelligent consideration of the environmental consequences of a project. (Guidelines, § 15151.)  Perfection is not required, but only a good faith effort at full disclosure. (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 331.)

III

## Petitioners' Claimed Deficiencies

### A. Analysis of Baseline Conditions (First Cause of Action)

The CEQA Guidelines, section 15125, subdivision (a), provide:

An EIR must include a description of the physical environmental conditions in the vicinity of the project. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. . . .

(1) Generally, the lead agency should describe physical environmental conditions as they exist at the time the notice of preparation is published . . . from both a local and regional perspective. Where existing conditions change or fluctuate over time, and where necessary to provide the most accurate picture practically possible of the project's impacts, a lead agency may define existing conditions by referencing historic conditions, or conditions expected when the project becomes operational, or both, that are supported by substantial evidence. In addition, a lead agency may also use baselines consisting of both existing conditions and projected future conditions that are supported by reliable projections based on substantial evidence in the record.

Due to the importance of the baseline for the EIR's environmental impact analysis, it must be plainly identified and not obscured. (*San Joaquin Raptor Rescue Ctr. v. County of Merced* (2007) 149 Cal.App.4th 645, 659.) Nevertheless, agencies have considerable flexibility in determining the baseline. The Supreme Court explained in *Communities for a Better Environment v. South Coast Air Quality Management District* (2010) 48 Cal.4th 310, 328:

> Neither CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline. Rather, an agency enjoys the discretion to decide . . . exactly how the existing physical conditions without the project can most realistically be measured . . . .

Petitioners contend that the Draft EIR failed to provide adequate disclosure and analysis of the baseline conditions, and that CDCR failed to remedy the deficiencies in the Final EIR. Specifically, petitioners contend CDCR should have addressed the conditions described in a 2008 Inspector General report entitled "California Institution for Men, Quadrennial and Warden Audit" (the "2008 Audit"), which found that CIM was in "an unacceptable state of repair due to years of neglect," with failing infrastructure and unfunded improvement projects. (AR 691, 696-698.)

CDCR, however, contends the 2008 Audit is irrelevant because it addressed

conditions a decade earlier. Even so, the Draft EIR recognized that CDCR was

making ongoing improvements and repairs:

> Substantial investment has been made during the past five years for
> projects that improve health care facilities including new and renovated
> medical clinics, pharmacies, dental clinics, and related infrastructure
> including utility systems, roofs and walkways. Within approximately the
> last 5 years, the value of these investments has exceeded $35 million . . .
> Finally, while CDCR acknowledges these public comments, maintenance
> of existing facilities is unrelated to the proposed project. The proposed
> project would remove disused facilities within CIM (i.e., the chapel and
> swimming pool), which would eliminate the need to maintain them and
> avoid continued deterioration. (AR 1322.)

The Draft EIR provided a site map showing the *placement* of the proposed facility

and existing buildings (AR 1319, 1329), but omitted any description of the *condition* of

the buildings and infrastructure that are critical to the project, or a description of *specific*

repairs either underway or contemplated. The Final EIR suffers from the same

deficiencies. In "Master Response 1: Conditions and Maintenance of Existing

Infrastructure," the Final EIR provides:

> As it relates to CEQA, the condition of existing facilities at CIM is part of
> the baseline environmental conditions. . . . The [2008] Audit pertains only
> to the condition of the existing infrastructure at CIM at the time the Audit
> was completed. Some of the infrastructure or the conditions (such as
> inmate population totals) affecting the infrastructure has been improved,
> *some not.* These are the baseline conditions against which the impacts of
> the proposed project are considered, where relevant (such as water and
> wastewater infrastructure). . . .

> [W]hile CDCR acknowledges that CIM requires on-going main-
> tenance/repairs, and CDRC must work within the funds allocated by the
> annual State Budget, this is an issue that is separate and apart from the
> proposed project (unless the project results in an adverse environmental
> effect on these facilities). . . .

Staff at CIM have reported other improvements to the prison's operation in response to the 2008 Audit, including . . . *on-going repairs/renovations of facilities and infrastructure.* . . .

Regarding the condition of CIM facilities and infrastructure, CDCR has made *substantial investment* in the past five years in projects that improve health care facilities including new and renovated medical clinics, pharmacies, dental clinics, and *related infrastructure including utility systems, roofs and walkways.* Within approximately the last 5 years, the value of these investments has exceeded $35 million. (AR 142-143, italics added.)

This Response is vague on the precise nature and extent of the improvements and investment. The Response is *particularly* vague whether the unspecified repairs are undergoing or planned for the future: "A majority of the concerns identified in the Audit have *either* been addressed *and/or* are issues the institution continues to work on . . . ." (AR 142, italics added.) Read literally, this language says the repairs *have already been* addressed, *or* they are underway, *or* (inexplicably) they have been both addressed *and* somehow are still underway. Obviously, the confusing "and/or" usage is merely an example of poor writing, but it highlights the underlying vagueness in the Final EIR.

Due to the vague and undefined references to "on-going repairs and improvements," it is unclear whether the baseline describes *existing* conditions, *future* conditions, or some *combination*. The EIR's failure to state clearly and definitely what repairs and improvements have already been made and what still needs to be done renders the baseline analysis uncertain. If the findings in the 2008 Audit are no longer accurate, an adequate description of the current conditions will demonstrate that. Insofar as the 2008 Audit may still describe some existing conditions at CIM, a discussion of the intended corrective measures is required. As written, the EIR

prevents an informed comparison of pre-project and post-project conditions. The Draft

and Final EIRs therefore fail as informational documents. (See, e.g., *County of Amador*

*v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 955.) Therefore, the

petition is granted as the first cause of action.

## B. Description of the Project (Second Cause of Action)

Petitioners contend the Draft and Final EIRs are inadequate because the

*description* of the project is inadequate. Specifically, petitioners contend the Draft and

Final EIRs present varying descriptions of the gross square footage of the facility.

Additionally, petitioners contend that vague statements in the description raise a

question whether the EIRs analyzed the *entire* project.

A legally sufficient EIR must include an accurate, stable, and finite project

description. (See, e.g., *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d

185.)

> The project description must contain: (1) the precise location and
> boundaries of the proposed project; (2) a statement of the objectives
> sought by the proposed project, including the underlying purpose; (3) a
> general description of the project's technical, economic, and
> environmental characteristics; and (4) a statement briefly describing the
> intended uses of the EIR. (Guidelines, § 15124.) The description should
> not, however, "supply extensive detail beyond that needed for evaluation
> and review of the environmental impact." [Citation.]
>
> "[A]n accurate, stable and finite project description is the *sine qua non* of
> an informative and legally sufficient EIR." [Citation.] "Only through an
> accurate view of the project may affected outsiders and public decision-
> makers balance the proposal's benefit against its environmental cost,
> consider mitigation measures, assess the advantage of terminating the
> proposal … and weigh other alternatives in the balance." [Citation.]

(*South of Market Community Action Network, supra,* 33 Cal.App.5th at p. 332.)

The description, however, need contain only a *general* description of the project's technical, economic, and environmental characteristics, including sufficient specific information about the project to allow an evaluation and review of its environmental impacts.  The EIR need not contain a *design-level* description of the project. (*Citizens for a Sustainable Treasure Island v. City & County of San Francisco* (2014) 227 Cal.App.4th 1036, 1054-1055.)  A description of the project should simply identify the project's main features and other information necessary for an assessment of the project's environmental impacts. As long as these requirements are met, the description may allow for flexibility to respond to unforeseeable events or changes in conditions that may affect the final design of the project. (*Id.* at p. 1053-1054.)

Nevertheless, a project description must describe "the whole of an action"—the entire project and not some smaller portion of it. (Guidelines § 15378; *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1297.)  The description must include all relevant parts of a project, including any future expansion or later phases that will foreseeably result from the project approval. (See, *Laurel Heights Improvement Ass'n v. Regents of Univ. of Cal.* (1988) 47 Cal.3d 376 ("*Laurel Heights I*".)

A project description must remain consistent throughout the EIR, but this does not mean the project cannot change as it proceeds through CEQA review and other stages of the approval process. (See, e.g., *East Sacramento Partnership for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 292.) Changes to projections of project impacts do not necessarily indicate that the project description is inadequate. (*City of Irvine v. County of Orange* (2015) 238 Cal.App.4th 526, 541.)  A description

identifying variations in design is permissible if the variations are fully described and separately evaluated, and the maximum possible scope of the project is clearly disclosed. (Kostka & Zischke, Practice Under the California Environmental Quality Act (2d ed. Cal. CEB), §12.7.1.); *South of Market Community Action Network, supra,* 33 Cal.App.5th at pp. 332-34.)

> [W]hen assessing the legal sufficiency of an EIR, we do not look for perfection, but "adequacy, completeness, and a good faith effort at full disclosure." [Citations.] . . .
>
> "The CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal." [Citation.] The whole point of requiring evaluation of alternatives in the Draft EIR is to allow thoughtful consideration and public participation regarding other options that may be less harmful to the environment. [Citation.] … We do not conclude the project description is inadequate because the ultimate approval adopted characteristics of one of the proposed alternatives; that in fact, is one of the key purposes of the CEQA process.

(*Id.* at pp. 334-336.)

*Increased Size of the Project*

Petitioners claim the Draft EIR was deficient because it failed to provide final detailed site plans showing the footprint of the building and adjacent structures.[9] (AR 138-139, 1329.) CDCR's responses to comments in the Final EIR state that a more detailed description of the project was unnecessary because the Draft EIR "evaluated

---

[9] Regarding the lack of a site plan or preliminary plan in the Draft EIR, petitioners state, "Final, detailed plans apparently did not exist when the [Draft] EIR was released." (Opening Brief, 12:25-26.) CDCR, however, notes that under Guidelines § 15004, an EIR should be prepared as early as possible in the planning process "to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment." (Guidelines, § 15004(b).) According to CDCR, at the time of the Draft EIR, the Project was sufficiently defined to allow for an adequate assessment of the environmental impacts, and CDCR properly applied the balancing test in section 15004 by issuing the Draft EIR before finalizing detailed plans. (Opp. Brief, 10:20-23.) CDCR is correct.

impacts based on reasonable maximum assumptions for any variables related to the site plan," and that further development of the plans fell within those "maximum assumptions." (AR 166.) According to petitioners, however, the Final EIR contains an entirely new project description, and accompanying graphics, changing the size of the project from 61,000 square feet to 69,000 square feet—a thirteen percent increase from the description in the Draft EIR. Petitioners argue there was nothing in the Draft EIR demonstrating that a thirteen percent increase in square footage falls within the "maximum assumptions" the environmental analysis was based on. Petitioners contend that due to the absence of a site plan in the Draft EIR, the footprint, height, and mass of the facility was unknown, and therefore, an accurate assessment of the environmental impacts of the size increase was impossible. (AR 130-131, 134-139, 166, 218, 283-284, 1170.)

Petitioners also contend that due to the failure of the EIRs to provide specific information about the improvements to an existing pedestrian pathway and parking lot, they cannot determine how much additional hardscape will be constructed. Therefore, petitioners argue, the actual impacts of the project—including impacts to groundwater and storm water runoff—cannot be fully evaluated.[10]

Contrary to these assertions, the project description meets the CEQA requirements set forth in the Guidelines, section 15124. The Draft and Final EIRs properly provide CIM's physical address and identify where within CIM's boundaries the facility will be located. Both EIRs properly include: (a) regional and detailed maps of the proposed site plan; (b) an adequate statement of the project objectives; (c) a description

---

[10] See discussion *infra* at § III-G.

of the project's technical, economic, and environmental characteristics; and (d) a brief

statement of the EIR's intended uses. (AR 134, 137-138, 1298, 1327-34.)

Regarding the square footage, Section 3.4 of the Draft EIR, entitled "Description

of the Proposed Project," provided:

> The new . . . building would be configured as *either* a single-story building
> with up to approximately 61,000-gross square feet (sf) of overall building
> footprint *or* a two-story building with up to a 35,000-sf first-floor footprint,
> including enclosed recreation yards.   The . . . building would provide
> space for 50 single-occupancy cells (50 beds) dedicated to inmates in
> mental health crisis, along with mental health care treatment space,
> clinical support space, housing, recreation, custody, support, and
> administrative services. . . .
>
> Other proposed project components include a new cyclone fence that
> would separately encircle the [facility], . . . improvements to the existing
> pedestrian pathway between the administration building and the [facility] . .
> . resurfacing and restriping portions of the existing administration building
> parking lot  . . . and installation of a new 360-space parking lot, at one of
> two optional locations, adjacent to Facility D.  Exhibit 3-1 shows the
> proposed site plan.  (AR 1328.)

The proposed site plan shows the facility will be located on the site of the current

unused chapel and swimming pool. (AR 1329.) The site plan also points generally to the

proposed "pedestrian Improvements," the two options for placement of the parking lot,

and the area for the improvements to the existing parking lot. (AR 1329.)

In many respects, the description of the project in the Final EIR tracks the

description in the Draft EIR.  Additionally, the "Description of Proposed Project" in the

Final EIR also states:

> The new . . . building would be configured as two-story building with up to
> approximately 69,000-gross square feet (gsf) of overall building footprint. .
> . . *This is a refinement in project design but does not alter the capacity of
> the facility.* The . . . building would provide space for a total of 50 beds
> (comprised of 46 single cells and 2 double occupancy cells) dedicated to
> inmates in mental health crisis, along with mental health care treatment
> space, clinical support space, housing, recreation, custody, support, and

administrative services. . . The slightly larger facility does not require additional staffing. (AR 134, italics added.)

The Draft EIR provided four options for the project, two design options for the building and two options for placement of the parking lot.  An EIR's project description may present alternative development schemes for a single proposed project, and a project description that identifies variations in design is permissible if the possible variations are fully described and separately analyzed, and the maximum possible scope of the project is disclosed. (*South of Market Community Action Network, supra*, 33 Cal.App.5th at p. 332-334.)  The Draft EIR contemplated that the facility *could* be a two-story building with a total square footage of up to 70,000 square feet (the 35,000-square foot first-floor footprint times two), and the Final EIR explains that this two-story option was ultimately selected. (AR 134.) Both the Draft and Final EIRs note the two design options contemplate a total of fifty patient beds, and that staffing requirements remained the same.

Although the Final EIR does not confirm which parking lot option will ultimately be selected, it does confirm that parking demands remained the same as analyzed in the Draft EIR. Moreover, contrary to Petitioners' assertion, the EIRs describe the total amount of new hardscape, and analyze the impact of the groundwater and storm water runoff for each of the parking lot options. (AR 166.)

CDCR also conducted a review to determine if the Final EIR needed to revise the analysis of air quality, greenhouse gas emissions, and energy impacts because of the increased square footage. Only one metric would be affected by the increase in the square footage—the amount of respirable particulate matter—and as to that metric, new

mitigation measures were included to reduce the impact below the significance threshold. (AR 131, 344-440.)

### Future Expansion of Project

Section 1.2.3 of the Draft EIR, entitled "Characteristics of the Project," provides that the facility "will also be designed to allow the provision of other levels of mental health care in addition to crisis." (AR 1299; *see also*, AR 1326.) Petitioners argue that this statement indicates the facility will provide services not only for inmates in acute mental health crisis, but also for inmates with chronic, non-acute conditions. Petitioners contend this additional level of care is not included in the Draft EIR's analysis of the environmental impacts, so there is a question whether the project is actually part of a larger project being analyzed in piecemeal fashion.

The Final EIR, however, states that "the project would allow flexibility such that if bed space at the [facility] is not needed for inmates in mental health crisis, other mental health treatment can be provided." (AR 167.) This flexibility does not indicate there is a different or larger project than the one analyzed in the EIRs, or that the CDCR did not include the "whole of the action" in its analysis. (AR 167.) Instead, it simply acknowledges a reasonably foreseeable use of patient beds not needed for inmates in crisis. Petitioners do not explain how the possible lower-level use of the patient beds is crucial to a review of the environmental effects of the project, or how this possible use impacted public participation in evaluating the analysis in the Draft or Final EIR.

As in *South of Market Community Action Network*, the project description in this case may not be perfect, but it is adequate. (AR 165-167, 1290, 1299, 1326-1334.) Therefore, the petition is denied as to the second cause of action.

## C. Analysis of Project Alternatives (Third Cause of Action)

Petitioners contend the selection and analysis of project alternatives is inadequate and was improperly influenced by a pre-determination that the mental health facility would be located at CIM, rather than at a prison complex elsewhere.

The Guidelines provide that an EIR must describe a reasonable range of alternatives to the proposed project, or the project location, that would feasibly attain most of the project's basic objectives while reducing or eliminating any of its significant environmental effects. (Guidelines, § 15126.6; *Habitat and Watershed Caretakers, supra,* 213 Cal.App.4th at pp. 1302-1303.) There are four threshold tests for determining whether an alternative is suitable: (1) can it substantially reduce significant environmental impacts; (2) can it attain most of the basic project objectives; (3) is it potentially feasible; and (4) is it reasonable and realistic. Although these criteria are not exclusive, alternatives that do not satisfy all four criteria may be excluded from consideration. (Guidelines, § 15126.6(c).) Other appropriate factors may be considered as well. (*Ibid.*)  In determining the nature and scope of alternatives, lead agencies must be guided by the doctrine of "feasibility." (*Citizens of Goleta Valley v. Board of Supervisors of the Cty. of Santa Barbara* (1990) 52 Cal.3d 553, 564-565.) "Feasible" is defined as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (*Pub. Res. C.*, § 21061.1; Guidelines, § 15126.6, subd. (f)(1).)

"'CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose. . . . [Citation.]'" (*Habitat and*

*Watershed Caretakers, supra,* 213 Cal.App.4th at pp. 1302-1303, quoting *Citizens of*

*Goleta, supra,* 52 Cal.3d at p. 566.) The EIR "is required to make an in-depth discussion

of those alternatives identified as at least potentially feasible." (*Sierra Club v. County of*

*Napa, supra,* 121 Cal.App.4th at p. 1504, fn. 5, italics omitted.)

> "An EIR's discussion of alternatives must contain analysis sufficient to
> allow informed decision making. [Citation.] … "To facilitate CEQA's
> informational role, the EIR must contain facts and analysis, not just the
> agency's bare conclusions or opinions." [Citations.] An EIR must include
> detail sufficient to enable those who did not participate in its preparation to
> understand and to consider meaningfully the issues raised by the
> proposed project. [Citation.]"

(*Habitat and Watershed Caretakers, supra,* 213 Cal.App.4th at p. 1303, quoting *Laurel*

*Heights I, supra,* 47 Cal.3d at pp. 404-405.)

If an EIR concludes that no environmentally superior alternatives are available, it must

provide sufficient facts and analysis to allow the decision-maker to determine whether

that conclusion is correct. (*Id.* at p. 1305.)

> "[I]t is the policy of the state that public agencies should not approve
> projects as proposed if there are feasible alternatives or feasible
> mitigation measures available which would substantially lessen the
> significant environmental effects of such projects.… [I]n the event specific
> economic, social, or other conditions make infeasible such project
> alternatives or such mitigation measures, individual projects may be
> approved in spite of one or more significant effects thereof."

(*Id.* at p. 1302, quoting*Citizens of Goleta Valley, supra,* 52 Cal.3d at pp. 564-565.)

Therefore, "an EIR should not exclude an alternative from detailed consideration

merely because it 'would impede to some degree the attainment of the project

objectives.' [Citation.] But an EIR need not study in detail an alternative that is infeasible

or that the lead agency has reasonably determined cannot achieve the project's

underlying fundamental purpose. [Citation.]" (*In re Bay-Delta Programmatic Environmental Impact Report Coordinated Proceedings* (2008) 43 Cal.4th 1143, 1165.)

The Draft EIR included a discussion of alternatives to the project—a "no project" alternative, alternative locations within CIM, a reduced-size alternative, and alternative locations at the California Rehabilitation Center at Norco and the California State Prison at Lancaster. CDCR evaluated each alternative using three screening criteria: (a) does the alternative accomplish all or most of the project's objectives, (b) is the alternative potentially feasible from economic, legal, regulatory, and technological standpoints; and (c) does the alternative avoid or substantially lessen any significant environmental impacts of the proposed project, including whether the alternative could create significant effects that are potentially greater. (AR 1495.) In considering the alternatives, the Draft EIR noted:

> Locating a [mental health facility] in the greater southern California region is driven by two primary factors: 1) Mental health crisis facilities require specialized staffing by mental health and medical professionals. . . . 2) Currently, there are a limited number of [facilities] in southern California. (AR 1495.)[11]

There is nothing in the record, however, explaining how or why *CIM* was selected, instead of a different prison complex in Southern California. While the *Coleman* court orders may have served as the impetus for deciding that a facility had to be built in Southern California, the orders do not state that the facility had to be built at CIM to the exclusion of other Southern California locations. (AR 2826-2861.) The State Budget Act allocated funds for CDCR to prepare working drawings for a facility at CIM

---

[11] The Draft EIR noted that *Coleman* required inmates experiencing a mental health crisis to be placed in a mental health crisis facility as quickly as possible, within 24 hours of diagnosis. Compliance with the *Coleman* court orders also required distribution of mental health crisis beds throughout California, as well as the recruitment of sufficient qualified staff to avoid delays in treatment. (AR 1298, *see also*, AR 2826-2861.)

(AR 3174, 4415-4416, 4418), and CDCR seems to interpret this as a mandate to *build* the facility at CIM, such that any other location would necessarily be deemed an inferior alternative simply because the facility "would not be at CIM," and therefore would not meet the project objective. (AR 1502-1503.) Of course, both the preparation of working drawings, and ultimately the building of a facility, depend on an allocation of funding, but that does not mean, necessarily, that a different location should not be considered as an alternative.

### The San Diego Alternative

Petitioners contend the Draft EIR should have considered the feasibility of a larger facility at R.J. Donovan Correctional Facility in San Diego. The Draft EIR, however, states, "The proposed 50-bed [mental health facility in San Diego] is not an alternative to, and *is needed in addition to*, the proposed [facility] at CIM." (AR 1495, italics added.) CDCR is already committed to building a mental health facility at the San Diego prison as part of its compliance with the *Coleman* court order.[12] (AR 156, 1495-1496.) Funding for the San Diego facility is appropriated through the 2017-2018 State Budget Act. (*Ibid.*) Therefore, the EIR adequately explains why the San Diego location is not an *alternative* location for the project. (AR 156, 1318, 1320, 1326-1327, 1495.)

### The Lancaster Alternative

The Draft EIR provides that the alternative location at the California State Prison at Lancaster "would also not meet the project objective to comply with the provisions of the [State Budget] Act to prepare preliminary construction plans for a 50-bed [facility] at

---

[12] See fn. 1, *supra*.

CIM *because it would not be at CIM*." (AR 1503, italics added.)  Such circular reasoning is nonsense.

The substantive analysis of Lancaster as an alternative is deficient, however, because it concludes, without citation to any supporting evidence, that the location would make it difficult to recruit qualified medical professionals and it could result in new impacts to biological resources "because different or additional special-status species could be affected." (AR 1502-1503.)  The Draft EIR does not show that any research was done on the question of recruitment of medical professionals to the Lancaster location, nor does it provide any references to environmental studies analyzing the flora and fauna in the region. (AR 1068, 1502-1503.)

CDCR's responses to comments in the Final EIR do not remedy this deficiency. In response to Petitioners' concerns regarding analysis of the Lancaster alternative, CDCR stated:

> The alternative location at [Lancaster] could result in biological effects that are additional to what would occur (and be mitigated) at CIM; for instance, while the burrowing owl is common to both CIM and [Lancaster], [Lancaster] is located in the Antelope Valley, an area with sensitive habitat that could support sensitive species including alkali mariposa lily, Le Conte's thrasher, tricolored blackbird, and others. While the [Lancaster] site was not surveyed for potential presence of these or other sensitive species, [Lancaster] would not avoid any project impacts and may increase them. Although not discussed in the Draft EIR, it is also noted that the [Lancaster] site is already spatially constrained by existing facilities including recently constructed medical treatment buildings. (AR 168.)

Therefore, although CDCR surmised that certain plant and bird species could be present in and near the Lancaster location, no environmental survey or analysis was performed. (AR 168.)

*The Norco Alternative*

The analysis of the alternative location at the California Rehabilitation Center at Norco is similarly inadequate. The Draft EIR rejected the location based on an incomplete analysis of Norco's status as an historic place and whether the State Historic Preservation Office might consider the demolition of some of the structures.[13] (AR 1502.) Although CDCR's responses to comments in the Final EIR stated that Norco was "environmentally inferior" because construction of a mental health facility would result in the demolition of structures that are eligible for listing on the National Register of Historic Places (AR 167-168, 6721-6082), this conclusion fails to take into account that under the Guidelines, a project that alters an historical resource but follows guidelines in the federal "Secretary of the Interior's Standards for the Treatment of Historic Properties" could mitigate impacts to less than significant, even if alterations to the historic resource are substantial. (Guidelines § 15064.6(b)(3).) CDCR also ignores its own acknowledgement that building a facility at the Norco location was possible through coordination with the State Historic Preservation Office. (AR 1502.)

While an EIR's discussion and analysis of alternatives need not be exhaustive, it nevertheless must be specific enough to allow informed decision making and public participation. A conclusory discussion of alternatives is not adequate. (*Laurel Heights I, supra,* 47 Cal.3d 376, 406.)  Instead, the Guidelines require an EIR to evaluate the comparative merits of the alternatives in a manner that allows a meaningful evaluation and comparison with the proposed project. (Guidelines § 15126.6(a), (d).) The CDCR rejected the Lancaster and Norco alternative locations as infeasible, though neither the

---

[13]  Petitioners do not challenge CDCR's analysis of the "no project" alternative, the "reduced size" alternative, or the "alternate location on CIM property" alternative. (AR 1497-1502.)

EIRs nor the rest of the administrative record contained sufficient information to support the findings. (See, e.g., *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1355.)

For these reasons, CDCR failed to proceed in the manner required by law resulting in a prejudicial abuse of discretion.  Therefore, the petition is granted as to the third cause of action.

## D. Analysis of Public Security and Emergency and Fire Protection Issues (Fourth and Ninth Causes of Action)

Petitioners contend the Draft and Final EIRs do not adequately analyze security issues at CIM, and fail to address an increased need in the surrounding community for fire protection and emergency services that would arise from the presence of a mental health facility at CIM.  Neither contention is subject to CEQA review. (AR 1321.)

Public Resources Code sections 21100 and 21151 require an EIR for any project that "may have a significant effect on the environment...." (*Pub. Res. C.* §§ 21100, 21151.) The phrase "significant effect on the environment" is limited to substantial, or potentially substantial, adverse changes in *physical* conditions in the environment. (Guidelines, § 15358(b).) Only changes to the *physical* environment trigger the need for an EIR; social or economic impacts alone are insufficient because they are not physical changes to the environment.  (Guidelines, §§ 15064(e), 15382.) Moreover, evidence of social or economic impacts that do not contribute to, or are not caused by, physical

impacts on the environment is not substantial evidence of a significant effect on the environment. (*Pub. Res. C.*, §§ 21080(e), 21082.2(c); Guidelines §15064(f)(6).[14]

Nevertheless, a lead agency may consider economic or social changes when evaluating whether a project's changes to the *physical* environment should be considered significant.  Section 15064, subdivision (e) of the Guidelines provides:

> . . . Where a *physical* change is caused by economic or social effects of a project, the physical change may be regarded as a significant effect in the same manner as any other physical change resulting from the project. Alternatively, economic and social effects of a physical change may be used to determine that the physical change is a significant effect on the environment. If the physical change causes adverse economic or social effects on people, those adverse effects may be used as a factor in determining whether the physical change is significant.[15]

### Security Issues

The facility will be built within a "Level II" security area of the CIM.  Nevertheless, the facility will accept inmates from all security levels.  Petitioners contend, therefore, that the facility should built to the maximum Level IV security standards. (AR 1196, 1321-1322, 1330.) Petitioners imply that cyclone fencing topped with razor wire will be insufficient, and that an electric fence should be installed. (AR 144-145, 168.)

---

[14] See also *City of Hayward v. Trustees of Cal. State Univ.* (2015) 242 Cal.App.4th 833, 843 (Increased demand for fire protection and emergency medical services is a socioeconomic impact, not an environmental impact); *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 576 (social and psychological effects of a project's change to community character are not environmental impacts subject to CEQA); *Baird v. County of Contra Costa* (1995) 32 Cal.App.4th 1464, 1469, n.2 (claim that expansion of residential addiction treatment facility will increase crime is not subject to CEQA review).

[15] See also, *Taxpayers for Accountable Sch. Bond Spending v. San Diego Unified Sch. Dist.* (2013) 215 Cal.App.4th 1013, 1052 (social impact of parking related to environmental impacts); *Christward Ministry v. Superior Court* (1986) 184 Cal.App.3d 180, 197 (evidence that new solid waste management facilities at landfill would disturb activities at nearby religious retreat showed secondary social impact, demonstrating that project's impacts were potentially significant.)

But Petitioners do not establish how these security issues would impact the *physical* environment, requiring CEQA review. Even so, the Draft and Final EIR still address these concerns. The building will be built pursuant to CDCR security and design standards traditionally used for securing and housing Level IV (maximum security) inmates—including an enhanced design of all entrances, windows, ventilation and fire control systems, observation posts, and security access to the roof of the building. (AR 143-145, 1321-1322, 1330.) In addition, although CIM recently improved security measures around Facility D—the area of CIM where the facility will be located—additional security fencing will encircle the new facility, providing an additional measure. (*Ibid.*)

Petitioners also raise security concerns arising from the transportation of additional inmates to and from the facility. Approximately 1,800 inmates will be transported annually. Addressing the increase, the Draft EIR stated that the project contemplates the construction of a perimeter road and an "additional vehicular secure entrance." (AR 1330.) The Final EIR explains that CDCR's transportation division has the responsibility for transporting inmates, and uses specially-outfitted secure vans for transporting mentally ill inmates. In addition, the Final EIR notes that only specially-trained, armed officers operate and provide security support in these vehicles, that inmates are fully secured in the special security enclosures in the vans for the duration of their transportation to and from the facility, and that a second vehicle will escort the van when inmates pose a higher security risk. Moreover, the current 34-bed mental health program located in CIM's infirmary already deals with inmates transported from other facilities. (AR 144.) Therefore, Petitioners have not met their burden to show that

these security issues constitute a matter for CEQA review. (See, *Saltonstall v. City of Sacramento* (2015) 234 Cal.App.4th 549, 586-587.)

*Fire Protection and Emergency Services*

Petitioners similarly fail to meet their burden to establish that additional inmates at CIM will increase the demand on fire protection and emergency services in the community, subject to CEQA review. CIM's on-site fire department does not provide emergency medical care for resident inmates. The District handles these calls. (AR 149, 1444). The Draft EIR, however, explains that there are seven District fire stations, eight medic engines, and one ladder truck, all within approximately three miles of CIM. In 2016, the District responded to 196 incidents at CIM; in 2017, it responded to 174. (AR 1444.) Due to the security issues arising from non-CDCR personnel responding to CIM, the District deploys a disproportionately large contingent of personnel to the facility when responding to emergency calls. (*Ibid.*) Nevertheless, the District's calls to CIM represented only 1.4 percent of the fire department's overall responses in 2017, with a rate of 0.05 calls per inmate at CIM. The Final EIR notes that fifty additional inmates are projected to result in only 2.5 additional calls to the District annually. (AR 149.) Therefore, substantial evidence establishes that the facility will not result in a meaningful impact to the provision of fire and emergency services in the surrounding community. (See, *City of Hayward v. Trustees of Cal. State Univ.* (2015) 242 Cal.App.4th 833, 842-843.)

Therefore, the petition is denied as to the fourth and ninth causes of action.

**E. Analysis of Traffic Impacts (Fifth Cause of Action)**

Petitioners contend CDCR's analysis of traffic impacts arising from the Project is based on incorrect and incomplete assumptions and, therefore, the findings are not supported by substantial evidence. According to petitioners, the traffic analysis in the Draft EIR does not evaluate traffic at all the surrounding intersections, and only considers traffic generated by CIM staff, but not trips generated by deliveries, visitors, or the annual transport of up to 1,800 inmates to and from the facility. (AR 162-163, 169-170.) In addition, petitioners claim the additional traffic analysis provided in the Final EIR is flawed because the Transportation Impact Analysis was not revised and made available for public comment, and is not based on the actual transport of inmates to and from other mental health facilities.

The Draft EIR sets forth the trip generation assumptions of the project and states that these estimates include daily deliveries and service trips. It also provides that the Transportation Impact Analysis assumed visitors to the facility would not result in new trips during weekday morning or evening peak hour study periods—the periods the transportation analysis and conclusions are based on—because visitor hours at CIM are limited to weekends and holidays. (AR 169, 1450-1457, 1639.) CDCR concedes the transportation of inmates to and from the facility was inadvertently excluded from the trip generation estimates in the Draft EIR, but the Final EIR states the facility could accommodate up to 1,800 inmate-patients per year, and this estimate is based on the occupancy and re-occupancy of every bed in the facility every ten days—a worst-case scenario. (AR 169-170.)

Therefore, the Final EIR estimates that since inmate transfers can occur every day and that the average number of trips would be approximately five per day, then transport of inmate-patients to and from the facility could result in up to twenty trips per day, with the gap between each arrival averaging almost five hours.[16] (AR 169-170.)

The Draft and Final EIRs note that under the Chino's General Plan guidelines, a traffic study is required for a project if it would generate more than fifty two-way peak hour trips at one intersection. (AR 170, 1449.)  Sixteen intersections were analyzed in the Draft EIR, and the analysis distributed project-generated traffic "to the external roadway network and study intersections based on recent employee zip code data provided by CDCR and traffic counts at the driveway of the existing facility." (AR 1455.) In addition, the analysis added project-generated traffic to the existing traffic volumes to estimate "Existing Plus Project" traffic volumes, and estimated the percentage of project-generated traffic that would enter through each gate, based on counts collected at the two project driveways. (AR 1457.) Although the Project would generate an estimated seventy-two trips during the weekday morning and weekday evening "peak hour of adjacent street traffic," none of the study intersections would experience an increase of fifty or more peak-hour trip, and, therefore, did not warrant further study. (AR 1450, 1455.)

This analysis, however, did not include trips generated by inmate-patient transportation to and from the facility.  Therefore, the analysis is incomplete because it is unclear whether the stated threshold would be exceeded with the inclusion of this information.  Although the Final EIR does discuss the number of estimated trips for

---

[16] Five inmates per day, two vans per inmate, two trips per van (one trip in, one trip out) equals twenty trips per day. (AR 169.)

inmate-patient transport, it assumes, without support, that these trips "would generally

be distributed to the external roadway network and study intersections consistent with

the trip distribution patterns detailed … [in] the Draft EIR." (AR 169-170.) The Final EIR

also states, without support, that these inmate-patient trips will not be scheduled for

specific times, and therefore, will not necessarily follow a regular traffic pattern like that

generated by CIM staff. (AR 170.) While inmates are required to be delivered to the

facility within twenty-four hours of their diagnosis, this does not necessarily equate to a

lack of scheduled trips or that inmate-patient transport would occur at all hours of the

day and night. (*See*, AR 169-170.)

      In short, the Final EIR makes various unsubstantiated assumptions, glossing

over the omission in the Transportation Impact Analysis of the trips generated by

inmate-patient transportation—the very traffic that is the subject of the project. Absent a

proper analysis that includes these inmate-patient trips—as well as an accurate

assessment of how, when, and where these trips would occur—it is unclear whether the

trip threshold for conducting an intersection analysis would be exceeded. Therefore, the

assertion that the Project "would not result in a substantial increase in overall

intersection delay, and this issue does not warrant further study" (AR 170) is

unsupported by the record, resulting in a failure of the Final EIR as an informational

document.  Therefore, the petition is granted as to the fifth cause of action.

    **F.  Opportunity for Comment on Air Quality Analysis (Sixth Cause of Action)**

      Petitioners contend the Draft EIR should have been recirculated because the

public did not have an opportunity to comment on a new analysis of air quality issues

included in the Final EIR. (AR 285-291.) According to petitioners, CDCR's analysis

results in two newly identified significant impacts and a new mitigation measure. (AR 287-290, 1360-1361.)

If significant new information is added to an EIR after notice of public review has been given, but before final certification of the EIR, the lead agency must issue a new notice and recirculate the EIR for review and comments. (*Pub. Res. C.* § 21092.1; Guidelines § 15088.5; *Vineyard Area Citizens for Responsible Growth v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 447.) New information is considered "significant" if it would change an EIR "in a way that deprives the public of meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." (Guidelines § 15088.5(a).) Nevertheless, "[r]ecirculation is not required where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications in an adequate EIR." (Guidelines § 15088.5(b).)

Examples of "significant new information" requiring recirculation include disclosures showing: (1) a new significant environmental impact would result from the project or from a new proposed mitigation measure; (2) a substantial increase in the severity of an impact would result unless mitigation measures are adopted to reduce the impact to a level of insignificance; (3) a feasible project alternative or mitigation measure that is considerably different from those previously analyzed would clearly lessen the significant impacts of the project, but the project proponents decline to adopt it; or (4) the draft EIR was so fundamentally inadequate that it precluded meaningful public review and comment. (Guidelines § 15088.5(a); see also *Laurel Heights*

*Improvement Ass'n v. Regents of Univ. of Cal.* (1993) 6 Cal.4th 1112, 1130 ("*Laurel Heights II*").)

"A decision not to recirculate an EIR must be supported by substantial evidence in the administrative record." (Guidelines § 15088.5(e).) Therefore, in deciding whether the CDCR properly determined recirculation of the Final EIR was unnecessary, the Court must determine whether the record as a whole contains substantial evidence to support CDCR's conclusion that "significant new information" was not added to the document. Substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384(a).) Under this standard, CDCR's decision is presumed to be correct, and petitioners bear the burden of demonstrating that the determination is not supported by substantial evidence. (*Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 903.)

CDCR was not required to recirculate the EIR.  The Final EIR included updated modeling for air quality and other analyses based on the project's increased square footage to determine whether revisions to the impact determinations were warranted. (AR 131, 344-440.)  In applying the updated modeling, CDCR found that site preparation for the project will generate 6.1 pounds per day of respiratory particulate matter emissions, slightly exceeding the 6 pounds per day localized threshold of significance. (AR 131, 152.)  As a result, the revised air quality analysis also contains a new mitigation measure suggested by the Southern California Air Quality Management District (SCAQMD). This mitigation measure would reduce the new impact below the

level of significance to 4.7 pounds per day of emissions. (AR 150-153, 280-295, 1302.) The Final EIR states that CDCR will implement the mitigation measure. (AR 153.)

Although the Final EIR includes a new impact in the air quality analysis, the Guidelines state that recirculation is required "*unless mitigation measures are adopted that reduce the impact to a level of significance.*" (Guidelines § 15088.5(a)(2).) Recirculation is required only if the mitigation measure meets all of the following criteria: (1) it is feasible, (2) it is considerably different from the mitigation measures already evaluated in the draft EIR, (3) it would clearly lessen the project's significant environmental impacts, and (4) it is not adopted. (See, *South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 330.) Petitioners have failed to meet their burden to show that recirculation was required.

Therefore, the petition is denied as to the sixth cause of action.

## G. Analysis of Water and Wastewater Issues[17]

### *Waste Water*

Petitioners claim the inadequate baseline description makes it impossible to determine if the facility will be connected to CIM's on-site septic system or to the public sewer system operated by Chino and the Inland Empire Utilities Authority. There are only limited connections to the sewer system, and CDCR did not evaluate additional service options. Petitioners also claim CDCR did not address existing deficiencies in CIM's septic system.

The arguments are unsupported. The Draft EIR states, "CIM, including the proposed [facility] site, is currently served by potable water, wastewater conveyance

---

[17]    The Opening Brief does not address the Eighth Cause of Action (inadequate analysis of stormwater impacts). The issue is apparently abandoned.

and treatment ... and solid waste services." (AR 1328.) Wastewater treatment is handled by CIM's on-site wastewater treatment plant, which is operated in accordance with the applicable waste discharge requirements adopted by the Santa Ana Regional Water Quality Control Board. (AR 1466.) Treated wastewater is discharged to percolation ponds, where water is reclaimed for irrigation of on-site agricultural fields. (AR 1466.)

The Final EIR's response to comments states that there is adequate capacity in CIM's existing wastewater treatment plant, CIM is in compliance with all applicable waste discharge requirements, and therefore, "[t]here would be no need to connect [the facility] to the [sewer system] ...." (AR 172.)

While the Draft EIR acknowledges that construction of the facility would result in "increased generation of wastewater flows associated with 50 inmate-patients and associated staff" (AR 1428), the proposed facility "would have separate service lines connecting to existing domestic water and sanitary sewer lines, each located within Facility D ...." (AR 1330.) The Summary of Impacts and Mitigation Measures states that based on wastewater generation rates at other CDCR facilities, CDCR concluded the CIM facility would generate approximately 6,500 gallons per day, resulting in a total wastewater treatment demand of 0.8365 million gallons per day. (AR 1312 (Impact 4.11-2).) Since the maximum capacity of CIM's wastewater treatment plant is 1.69 million gallons per day and currently has an average flow rate that is approximately half the permitted capacity, the summary concludes that the project "would not cause exceedance of the [Waste Water Treatment Plant] treatment capacity." (AR 1312; *see also,* AR 1328, 1466.)

The Draft EIR also determines that continued compliance with the applicable waste discharge requirements "would ensure that water from the proposed [facility] would not enter surface waters and any entering the groundwater basin would not contaminate aquifers," and therefore, no mitigation was required. (AR 1428.) The Draft EIR also concludes that "no construction of new wastewater treatment facilities or expansion of existing facilities would be needed."[18] (AR 1469.)

Based on this discussion in the record, there is substantial evidence showing that the analysis of the current wastewater capacity and the project's wastewater impacts is adequate.

*Water Needs and Impacts to Groundwater*

Petitioners claim the analysis of additional water needs due to the project is insufficient, and that the analysis of potential groundwater impacts had too short a time-horizon.

CDCR, however, explains that CIM overlays the adjudicated Chino Groundwater Basin. The State and petitioners are parties to that judgment. As a member of the Overlying Agricultural Pool, CDCR shares rights to the Basin's annual "Safe Yield" of 82,800 acre-feet, and any additional water needs generated by the facility would be met through groundwater produced pursuant to these rights. (AR 1424-1425, 14405-14407, 14454.) CDCR explains that the Basin's governance documents, including the judgment parties' "Peace Agreement," the "Optimum Basin Management Plan," and the "State of the Basin Reports" dictated the EIR's Year 2035 time-horizon. (AR 1429-

---

[18] To the extent petitioners contend the inadequate baseline description influences the adequacy of the wastewater treatment analysis, the determination that "no expansion of existing facilities is needed" suggests that the current condition of the septic system is sufficient and does not require any updates or repairs.

1430, 5911-5989, 11419, 11498-11571.100.)  Because the facility would not adversely affect the Basin's annual Safe Yield, the project would not cause substantial depletion of groundwater resources through 2035. (AR 1429-1430, 5911-5989, 11419, 11498-11571.100.)

CDCR concluded that projection *beyond* 2035 would be too speculative. (AR 172, 1429-1430.)  When no accepted methodology exists to assess an environmental impact, the lead agency may properly conclude that that the impact is too speculative to reliably evaluate it. (See, e.g., *Laurel Heights II, supra,* 6 Cal.4th 1112, 1137.)  Courts should uphold EIRs if the failure to analyze future long-term impacts is due to unknown or unknowable factors. (See, e.g., *Alliance of Small Emitters/Metals Industry v. South Coast Air Quality Mgmt. Dist.* (1997) 60 Cal.App.4th 55, 67.)

Petitioners have failed to demonstrate that it was improper for CDCR to rely on the detailed findings in the Basin's governance documents by refusing to speculate beyond the 2035 time-horizon. The analysis of the water and wastewater issues in the EIRs is adequate.  Therefore, the petition is denied as to the seventh cause of action.

## H. Decision to Locate the Project at the CIM (Tenth Cause of Action)

Petitioners contend CDCR's decision to locate the project at CIM was "arbitrary and capricious" because it "disregards public safety and peace of mind" due to the changed character of the surrounding community and continuing infrastructure and security issues.  (Opening Brief, 27:10-14.)  Petitioners cite no authority and provide no substantive argument in support of this assertion. A point merely asserted without authority for the proposition is deemed without foundation and requires no

discussion.  (See *Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1281.)[19]  Therefore, the petition is denied as to the tenth cause of action.


## IV

## Conclusion

For the reasons explained above, the petition is granted on three grounds: (a) The description of baseline conditions is inadequate; (2) The analysis of alternatives is inadequate; and (3) The analysis of impacts on traffic conditions is inadequate.  All other grounds for the petition are denied.  Counsel for the City of Chino is ordered to prepare and circulate a proposed writ and judgment to all counsel, and then submit it to the Court along with any objections to the wording.

Dated: February 24, 2021

David Cohn
Judge of the Superior Court

---

[19]         Despite being the subject of a separate cause of action, it may be that the issue is subsumed in the analysis of alternatives, discussed *supra* at § III-C.