1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

10  Attorneys for Plaintiffs

12              UNITED STATES DISTRICT COURT

13            EASTERN DISTRICT OF CALIFORNIA

15  RALPH COLEMAN, et al.,

16              Plaintiffs,

17      v.

18  GAVIN NEWSOM, et al.,

19              Defendants.

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF ALEXANDER GOURSE IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE MOTION TO CLARIFY ORDER OF JUNE 13, 2002**

Judge:  Hon. Kimberly J. Mueller

[3700479.1]

I, Alexander Gourse, declare:

1. I am an attorney duly admitted to practice before this Court. I am an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this declaration in support of Plaintiffs' Motion for Leave to File Motion to Clarify Order of June 13, 2002.

2. Plaintiffs maintain a document management system that preserves incoming and outgoing correspondence related to this case in their original form. The documents reproduced in each of the attachments to this Declaration are preserved in this document management system.

3. Attached as **Exhibit A** is a true and correct copy of a letter from Plaintiffs' counsel to Defendants' counsel and Special Master Matthew A. Lopes, Jr., with the subject heading "Staffing of Chief Psychiatrists, Senior Psychiatrist Supervisors, psychologists, and social workers," dated December 21, 2018.

4. Attached as **Exhibit B** is a true and correct copy of a letter from Plaintiffs' counsel to Defendants' counsel and Special Master Matthew A. Lopes, Jr., with the subject heading "Staffing of Chief Psychiatrists and Supervising Psychiatrists," dated May 27, 2020.

5. Attached as **Exhibit C** is a true and correct copy of a letter from Plaintiffs' counsel to Defendants' counsel and Special Master Matthew A. Lopes, Jr., with the subject heading "Defendants' September 8, 2020 Staffing Proposal and Court's November 4, 2020 Order," dated November 16, 2020.

6. On February 24, 2021, my colleagues Lisa Ells, Michael Bien, and I participated in a meet and confer call with Defendants' counsel Melissa Bentz, Nick Weber, Jennifer Neill, and Samantha Wolff. Special Master Matthew A. Lopes, Jr. also participated in this call, along with several members of his monitoring team. During the call I reiterated Plaintiffs' position that the 90-percent fill requirement in the Court's June 13, 2002 Order applies to all CDCR psychiatrists, including but not limited to Chief

Psychiatrists and Senior Psychiatrist Supervisors.  Melissa Bentz responded by restating Defendants' position that the June 13, 2002 Order does not apply to Chief Psychiatrists and Senior Psychiatrist Supervisors.  I and my colleague Michael Bien both told Special Master Lopes during this call that we believe the parties' attempts to resolve their disagreement over this issue have reached an impasse and that the issue needs to be decided by the Court.  Special Master Lopes agreed that the issue would need to be decided by the Court.

7.    During the same February 24, 2021 call with Defendants' counsel and the Special Master, the parties agreed to continue negotiating over several other issues raised in Plaintiffs' objections to Defendants' revisions to their 2009 Staffing Plan, ECF No. 6994, including whether Defendants' allocations of supervisory psychiatrist positions are consistent with the requirements of the 2009 Staffing Plan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Berkeley, California this 5th day of March, 2021.


_/s/ Alexander Gourse_
Alexander Gourse

[3700479.1]

2

DECLARATION OF ALEXANDER GOURSE IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE MOTION TO CLARIFY ORDER OF JUNE 13, 2002

# Exhibit A



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Michael S. Nunez
Email:  mnunez@rbgg.com

December 21, 2018

<u>VIA ELECTRONIC MAIL</u>

Nicholas Weber
Melissa Bentz
Jerome Hessick
Dillon Hockerson
CDCR Office of Legal Affairs
P.O. Box 94283
Sacramento, CA 94283-0001
Nicholas.Weber@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov
Jerome.Hessick@cdcr.ca.gov
Dillon.Hockerson@cdcr.ca.gov

Christine Ciccotti
Sean Rashkis
Elaine Ekpo
Joanna Mupanduki
DSH Legal Team
Christine.Ciccotti@dsh.ca.gov
Sean.Rashkis@dsh.ca.gov
Elaine.Ekpo@dsh.ca.gov
Joanna.Mupanduki@dsh.ca.gov

Matthew A. Lopes
Coleman Special Master
Pannone Lopes Deveraux & O'Gara LLC
Northwoods Office Park, Suite 215N 1301
Atwood Avenue Johnston, RI 02919-4946
MLopes@pldolaw.com

    Re:   *Coleman*:  Staffing of Chief Psychiatrists, Senior Psychiatrist Supervisors,
         psychologists, and social workers
         <u>Our File No. 489-3</u>

Dear CDCR Legal Team:

      I write regarding three matters concerning CDCR's mental health staffing.  First, I
write to urge that CDCR increase the allocation of chief psychiatrists and senior
psychiatrist supervisors ("supervising psychiatrists") to the levels provided for in the
2009 Staffing Plan, ECF No. 3619 ("Staffing Plan" or "Plan").  Second, I write in

CDCR OLA team
December 21, 2018
Page 2

response to Melissa Bentz's email dated November 29, 2018 ("CDCR's 11/29/18 Email") arguing that chief psychiatrists and supervising psychiatrists are not subject to the 90% staffing rate required by the June 13, 2002 Order, ECF No. 1383 ("6/13/02 Order"). Third, I write to repeat our request that Defendants provide further explanation regarding reductions earlier this year in the number of established psychologist and social worker positions and for additional information regarding the "blanket."

## I.    Allocating Additional Chief and Supervising Psychiatrists to CDCR Institutions

### A.    CDCR Has Failed to Allocate Chief Psychiatrists and Supervising Psychiatrists to Institutions in Accordance with the 2009 Staffing Plan

Defendants' court-ordered 2009 Staffing Plan provides parameters for the allocation of chief psychiatrists.  The Plan states that "Chief Psychiatrist positions will be allocated to prisons with MHCB units and prisons with complex and multiple mental health programs."  Staffing Plan at 31.  The Plan is consistent with the Program Guide, which, for instance, contemplates provision of treatment to MHCB patients by chief and supervising psychiatrists and involvement of chief psychiatrists in approving patients' stays in MHCB units beyond ten days.  MHSDS Program Guide at 12-5-1, 12-5-33 (2009).

The Plan also establishes ratios and other parameters for allocation of supervising psychiatrists.  The Plan states that a staff-to-patient ratio of 1:50 for supervising psychiatrists is "[n]eeded at all MHCB facilities" with six or more crisis beds.  Staffing Plan at 22, Exhibit 20.  In addition, the Plan provides that supervising psychiatrists "will be allocated to prisons that do not have a Chief Psychiatrist but have a significant number of staff psychiatrists providing services to a largely stable inmate-patient population" and also "to several prisons that have a Chief Psychiatrist and that have large and complex mental health services."  *Id.* at 32.

Defendants are not currently in compliance with any of these court-ordered obligations, and must take steps to remedy the violations immediately.  Indeed, the admissions in Dr. Golding's report that existing supervisory psychiatrists routinely are pulled away from their administrative duties to provide front-line patient care makes ensuring adequate allocations for supervisors all the more necessary.  *See* CDCR Mental Health System Report at 5-6, 56, 57, 136 (Oct. 31, 2018), ECF No. 5988-1 ("Golding Report").

[3329258.6]

CDCR OLA team
December 21, 2018
Page 3

**B.    CDCR Has Failed to Comply with Its Obligation to Provide Chief and Supervising Psychiatrists at Prisons with MHCBs**

Defendants have failed to allocate enough chief psychiatrists and supervising psychiatrists to meet the staffing levels required by the court-ordered 2009 Staffing Plan. First, Defendants have failed to allocate chief psychiatrists to three institutions with MHCB units, in contravention of the Plan's requirements:  CCWF, HDSP, and NKSP. *See* Coleman Monthly Report of Information Requested and Response to January 19, 1999 Court Order Regarding Staff Vacancies ("Coleman Monthly Staffing Vacancy Report") at Enclosure 1c Mental Institution Vacancy Summary by Classification (Nov. 14, 2018).

In addition, the governing ratios for supervising psychiatrists apply to all institutions with MHCBs, as all of CDCR's MHCBs have six or more crisis beds:  CIM (34 beds), CIW (10 beds, soon to increase to 29), COR (24 beds), HDSP (10 beds), KVSP (12 beds), LAC (12 beds), MCSP (8 beds), PBSP (10 beds), PVSP (6 beds), SATF (20 beds), SOL (9 beds), SVSP (10 beds), and WSP (6 beds).  Staffing Plan at 22, Exhibit 20; *see also* email from Nicholas Weber (Dec. 30, 2016) (Providing MHCB clustering data) ("12/30/16 Weber Email"); Order re Unlicensed CIW MHCB Beds (Sept. 24, 2018), ECF No. 5931.  However, as of September 2018, Defendants report that they have not allocated a single supervising psychiatrist to any of these thirteen institutions.  *See* Coleman Monthly Staffing Vacancy Report Enclosure 1c (Nov. 14, 2018).  In fact, as of that same date, Defendants had failed to allocate either a chief psychiatrist *or* a supervising psychiatrist to HDSP, even though HDSP has an MHCB and thus both positions are required under Defendants' staffing plan.[1]  Defs.' Monthly Psychiatry Vacancy Report at 4 (Nov. 30, 2018), ECF No. 6019; Coleman Monthly Staffing Vacancy Report Enclosure 6(a) (Nov. 14, 2018).

Court orders require Defendants to allocate enough chief psychiatrist and supervising psychiatrist positions to staff CDCR institutions in accordance with the 2009 Staffing Plan.  Defendants must take steps to immediately prepare and submit a budget change proposal in the upcoming budget cycle to request the funding necessary to allocate chief psychiatrist positions at CCWF, HDSP, and NKSP.  Additionally,

---

[1] HDSP also qualifies under the separate Plan requirement necessitating a supervising psychiatrist at prisons that do not have a chief psychiatrist but that have significant numbers of staff psychiatrists who treat a large group of stable class members.  Staffing Plan at 32.  CDCR has allocated 6.5 psychiatrists (2.50 on-site and 4 telepsychiatrists) to HDSP, which serves over 1,000 CCCMS patients.  Defs.' Monthly Psychiatry Vacancy Report at 4 (Nov. 30, 2018), ECF No. 6019; Coleman Monthly Staffing Vacancy Report Enclosure 6(a) (Nov. 14, 2018).

CDCR OLA team
December 21, 2018
Page 4

Defendants must promptly allocate supervising psychiatrists sufficient to meet the required 1:50 staff-to-patient ratio at CIM, CIW, COR, HDSP, KVSP, LAC, PBSP, PVSP, SATF, SOL, SVSP, and WSP, including if necessary, submitting a budget change proposal in the upcoming budget cycle to request funding necessary to create additional supervising psychiatrist positions needed to meet the ratio.

### C.    Allocating Additional Supervising Psychiatrists to Institutions with Large and Complex Mental Health Programs

Defendants have allocated supervising psychiatrists to only six institutions that have chief psychiatrists and large and complex mental health programs:  CHCF, CMC, CMF, RJD, SAC, and SQSP.  However, Defendants have not allocated supervising psychiatrists to many other institutions that have chief psychiatrists and mental health programs that are similarly large and complex.  *See* Coleman Monthly Staffing Vacancy Report Enclosure 1c (Nov. 14, 2018).  The institutions falling in this category, none of which have allocated supervising psychiatrists, include[2]:

1.    MCSP, which has a CCCMS program, the second largest EOP program with over 660 patients, and an EOP ASU hub;

2.    SATF, which has 2,600 identified *Coleman* class members (the largest number of identified *Coleman* class members of any institution), including over 600 EOP patients, an EOP ASU hub, a CCCMS program, and an STRH;

3.    CIW, which has a CCCMS program, an EOP unit, a SHU that routinely houses dozens of class members, a PSU, and a PIP;

4.    COR, which has a CCCMS program, an EOP ASU Hub, over 400 EOP patients, an IEX Unit, and a LTRH;

5.    KVSP, which has a CCCMS program, an EOP unit, and an STRH that often houses EOP patients;

6.    LAC, which has a CCCMS program, an EOP ASU hub, over 500 EOP patients, and an STRH;

---

[2] All of the institutions in this list also have MHCBs, and thus meet the separate requirement in the Plan necessitating allocation of supervising psychiatrists at all prisons with MHCBs at a 1:50 ratio.  *See* Staffing Plan at 22, Exhibit 20.

[3329258.6]

CDCR OLA team
December 21, 2018
Page 5

7.    SVSP, which has a CCCMS program, over 400 EOP patients, and a large PIP
      program with 244 beds;

8.    WSP, which has the largest reception center, a CCCMS program, and an STRH.

*See id.* Enclosure 6a; 12/30/16 weber Email.

These institutions have large and complex mental health programs.  *See* Staffing
Plan at 17, 20 (explaining that "increased services" are needed to treat "severity of mental
illness and impairment" of EOP population and that EOP ASU hub population "presents
the greatest challenge and workload for psychiatrists in outpatient settings").  Consistent
with the Plan's articulation of the role of supervising psychiatrists, these institutions need
supervising psychiatrists to oversee the administration of mental health services and
assure quality of care.  *Id.* at 32 (supervising psychiatrists "provide clinical supervision,"
perform "administrative tasks related to formulary, medication management, and
continuity of psychiatric medications," and are responsible for generating and reviewing
LOPs applicable to psychiatry and "for quality improvement activities including
peer/professional review processes").

While the Plan does not require every prison with a chief psychiatrist and a
complex mission to have an allocated supervising psychiatrist, an insufficient number of
prisons falling in this category have such positions, particularly given the massive growth
of the Plaintiff class in recent years that has stressed the system.  It is not apparent why
Defendants have allocated supervising psychiatrists at some institutions but not others.
What criteria did Defendants use when deciding to allocate supervising psychiatrists to
CHCF, CMC, CMF, RJD, SAC, and SQSP, but not to the other institutions listed above?
We urge Defendants to allocate at least one full-time supervising psychiatrist each to
CIW, COR, KVSP, LAC, MCSP, SATF, SVSP, and WSP beyond the allocations
provided for by the MHCB staff-to-patient ratios.  In the alternative, Plaintiffs request
that Defendants provide a justification for why supervising psychiatrists are not needed at
those institutions.

## II.    The 90% Court-Ordered Staffing Rate Applies to Chief Psychiatrists and
##        Supervising Psychiatrists

CDCR has incorrectly asserted that the text of the Court's June 13, 2002 Order
demonstrates that chief psychiatrists and supervising psychiatrists are not subject to the
required 90% fill rate.  CDCR's 11/29/30 Email.  The reference to both psychiatrists and
case managers in the Court's order does not demonstrate that chief psychiatrists and
senior psychiatrists are exempt from the court-ordered staffing rate.  6/13/02 Order at 4.
Use of the phrase "psychiatrists and case managers" in the Court's order demonstrates

[3329258.6]

CDCR OLA team
December 21, 2018
Page 6

that the Court intended to subject two groups of employees to the required staffing rate:
(1) psychiatrists, and (2) case managers. *See id.* The structure of this sentence places the
terms "psychiatrists" and "case managers" on equal footing. Thus, it is illogical to
conclude that the definition of case managers in any way limits the scope of psychiatrists
covered by the order, especially given that the definition of case managers that
Defendants cite does not even address psychiatrists and was adopted years after the
Court's order requiring the 90% staffing rate. *See* Program Guide Appendix A at 1
(defining "case manager"). If the Court wanted to limit the applicability of the required
staffing rate to only line staff psychiatrists, it could have done so by explicitly stating as
much, or by explicitly exempting chief psychiatrists and supervising psychiatrists. The
Court did neither, and a common sense read of the text is that the order covers all
psychiatrists.

This interpretation of the Court's order, which does not define "psychiatrist," *see*
6/13/02 Order, is consistent with the governing definition of "psychiatrist" under
California law in effect at the time. Since long before the Court ordered the 90% staffing
rate, applicable California regulations have defined "psychiatrist" as "a person who is a
licensed physician and surgeon in the State of California except as allowed under Section
2072 of the Business and Professions Code and who is certified by the American Board
of Psychiatry and Neurology or the American Osteopathic Board of Neurology and
Psychiatry or has completed a residency program in psychiatry approved by the
American Medical Association or the American Osteopathic Association."[3] 22 C.C.R.
§ 79567 (1996). This definition would not exclude CDCR's chief psychiatrists or senior
psychiatrists in particular, or individuals with administrative or supervisory duties more
generally.

In addition, the absence of a staff-to-patient ratio for chief psychiatrists does not
exclude them from the court-ordered staffing rate. First, the Order does not limit the
required staffing rate's applicability to psychiatrist classifications for which CDCR has
adopted staff-to-patient ratios. *See* 6/13/02 Order at 4. Second, the Court's 2002 order
predates the 2009 Staffing Plan by several years. Consequently, the scope of the court-
ordered fill rate in the 2002 Order could not have been limited to only psychiatrist
classifications for which the 2009 Staffing Plan provides staff-to-patient ratios, and more
recent court orders regarding staffing have not so limited the scope of the 2002 court-
ordered staffing requirement. *See, e.g.*, Order (Jul. 3, 2018), ECF No. 5850; Order (Feb.
15, 2018), ECF No. 5786; Order (Oct. 10, 2017), ECF No. 5711; Order (Aug. 7, 2016),
ECF No. 5477; Order (Jun. 13, 2014), ECF No. 5171; Order (Apr. 5, 2013), ECF No.

---

[3] Section 2072 of the California Business and Professions Code pertains to temporary
appointment of medical professionals licensed in other states and is not relevant to this
discussion.

[3329258.6]

CDCR OLA team
December 21, 2018
Page 7

4539 ("4/5/13 Order"). Moreover, certain allocations, such as the clinical staffing at desert institutions, are not ratio-driven. *See* 2009 Plan at 24 (allocating, e.g., 3.0 primary clinicians "per institution"). Neither the parties nor the Special master have ever contemplated that staffing rates at desert institutions are somehow beyond the Court-ordered 90% fill rate simply due to the lack of staff-to-patient ratios for the clinical staffing allocations there. Indeed, Defendants report their psychiatry staffing rates at these institutions in their monthly Court-ordered Psychiatry Vacancy Reports. *See, e.g.*, ECF No. 6019 (Nov. 30, 2018).

None of Defendants' other arguments demonstrate that chief psychiatrists and supervising psychiatrists are exempt from the court-ordered staffing rate. That the Court ordered and expressed interest in receiving monthly reporting regarding line psychiatrists at a hearing did not demonstrate or establish any purported limit to the scope of the court-ordered staffing rate, and at no time at the hearing that precipitated that reporting did the Court state that CDCR need not meet the 90% court-ordered staffing rate with respect to chief and supervising psychiatrists. *See* Feb. 14, 2018 Hearing Tr., ECF No. 5793. In fact, the Court has expressed concern regarding vacancies of chief psychiatrists and senior psychiatrists as well. 4/5/13 Order at 58. Similarly, that Defendants' recently proposed staffing plans and the parties' recent discussions have focused on line staff psychiatrists has no bearing on the scope of the court-ordered staffing rate.

Furthermore, the conclusion that chief and supervising psychiatrists are subject to the court-ordered staffing rate is consistent with the Court's goal in imposing the staffing rate: to ensure that the *Coleman* class receives constitutionally adequate care. *See* 6/13/18 Order at 2 (ordering required staffing rate in part because "adequate staffing" plays a "central role in meeting defendants' constitutional obligations to class members"). As Defendants' Plan—which Defendants have represented identifies appropriate staffing levels to meet constitutional standards, 10/10/17 Order at 15-16—makes clear, chief psychiatrists and supervising psychiatrists are necessary to provide constitutionally adequate care. First, the organization and supervision of psychiatric care is necessary to ensure that constitutionally adequate care is provided. The 2009 Staffing Plan mandates that supervising psychiatrists provide many essential functions including "clinical supervision of staff psychiatrists, … various administrative tasks related to formulary, medication management, and continuity of psychiatric medications, …. generation and periodic reviews of LOPs, [and] …. quality improvement activities including peer/professional review processes." Staffing Plan at 32. Second, the reality is that Defendants routinely rely on supervising psychiatrists to provide direct "front line" care to patients in addition to their supervisory duties to compensate for their chronic failure to take adequate measures to hire and retain sufficient numbers of staff psychiatrists. The recent report of Dr. Michael Golding, CDCR's Chief Psychiatrist, admits that "[s]ixty percent of psychiatric supervisors were seeing patients like line staff at least part time,

[3329258.6]

CDCR OLA team
December 21, 2018
Page 8

and in some cases full time." Golding Report at 5. To the extent that supervising psychiatrists provide direct care to reduce the impact of severe and longstanding staff psychiatrist vacancies, ensuring adequate staffing of supervising psychiatrists is central to ensuring provision of constitutionally adequate mental healthcare because Defendants' current system relies on them as an inappropriate crutch to bolster deficient staff psychiatrist numbers.

Third, chief and senior psychiatrists are part of the quality assurance plan that Defendants have adopted to satisfy their constitutional obligation to provide a process for ensuring the adequacy of the mental healthcare that they provide. *Coleman v. Wilson*, 912 F. Supp. 1282, 1308 (E.D. Cal. 1995). For example, the Mental Health Program Subcommittees ("MHPS") "monitor and direct quality improvement activities," and CDCR policy provides for the participation of chief psychiatrists on MHPS committees. 12.01.100 Mental Health Program Subcommittee at 1, 3 (Jul. 23, 2013). In addition, SPR FIT committees are a key and substantial component of CDCR's quality assurance plan, and the Program Guide provides that chief psychiatrists or senior psychiatrists serve on local SPR FIT committees. Program Guide 12-10-3 - 12-10-5, 12-10-20; Enhancements to the Suicide Prevention and Response Focused Improvement Teams (Feb. 2, 2018) (outlining current duties of SPR FIT committees).

In sum, ensuring adequate leadership and supervision of psychiatrists by filling chief and supervisory psychiatrist positions is a critical and necessary component of Defendants' mental health system. The Court's orders requiring psychiatrist positions to be filled at a rate of 90% or greater do not exclude those positions, nor have Defendants provided any basis to assume the Court has made such an illogical holding. Defendants must take all necessary steps to promptly fill both the existing chief and supervisory positions in conformity with the Court's orders, but also to hire for the newly allocated positions Defendants are required to maintain consistent with their 2009 Staffing Plan, as articulated above.

## III.    Lingering, Unanswered Questions Regarding the Reduction of Established Psychologist and Social Worker Positions Earlier This Year

Defendants cut 53 established psychologist positions and 31.6 established social worker positions between February 2018 and June 2018. *Compare* Coleman Monthly Staffing Vacancy Report Enclosure 1b (Apr. 4, 2018), *with* Coleman Monthly Staffing Vacancy Report Enclosure 1b (Aug. 9, 2018). At the July 23, 2018 work group meeting, Defendants represented that the reduction of established positions through April 2018 was due to a technical budgeting issue that has since been resolved. However, Defendants have not explained why there was a reduction of an additional five established psychologist positions in June 2018. In addition, the positions that were cut

CDCR OLA team
December 21, 2018
Page 9

as of June 2018 had not been restored as of Defendants' monthly data report for
September 2018, which reflects the same number of established psychologist and social
worker positions as the June 2018 report. *Compare* Coleman Monthly Staffing Vacancy
Report Enclosure 1b (Nov. 14, 2018), *with* Coleman Monthly Staffing Vacancy Report
Enclosure 1b (Aug. 9, 2018).

We have repeatedly requested additional detail regarding the decrease between
February and June in the number of established psychologist and social worker positions.
*See* Emails from Cara Trapani dated Sept. 19, 2018, Aug. 9, 2018, and July 27, 2018.
However, Defendants have failed to respond to these requests. The troubling lack of
transparency in Defendants' staffing numbers does not inspire trust.

We repeat our earlier request that Defendants explain in writing the reason for this
drop in the number of established psychologist and social worker positions. At the July
23 work group meeting, Defendants stated that some of these social worker and
psychologist positions moved from being established positions to be "in the blanket" for
budgeting purposes. We again ask that Defendants provide additional details regarding
how many and which positions are in the blanket versus established positions, and the
reasoning for each.

Please also explain where and how positions in the blanket are reported in the
monthly data reports, and whether and how Defendants plan to alert the Special Master or
Plaintiffs to similar off-cycle changes in the number of reported established positions
going forward. Without a transparent reporting mechanism, it is impossible to assess and
track Defendants' staffing levels and Defendants' compliance with the Court's staffing
orders. In addition, we request an explanation of how often Defendants move established
positions to the blanket. Finally, we ask that Defendants confirm that no allocated
positions are ever cut except during the bi-annual budgeting allocation process.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[3329258.6]

CDCR OLA team
December 21, 2018
Page 10

## IV.    Closing

      We request that Defendants respond to the questions and issues set forth in this letter by January 11, 2019.

                            Sincerely,

                            ROSEN BIEN
                            GALVAN & GRUNFELD LLP

                            */s/ Michael S. Nunez*

                    By:  Michael S. Nunez

MSN:fgl

[3329258.6]

# Exhibit B



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Michael S. Nunez
Email:  mnunez@rbgg.com

May 27, 2020

VIA ELECTRONIC MAIL ONLY

Elise Owens Thorn
Deputy Attorney General
Office of the Attorney General
1300 I Street, Suite 125
Sacramento, CA 95814
Elise.Thorn@doj.ca.gov

Matthew A. Lopes, Jr.
Coleman Special Master
Pannone Lopes & Devereaux LLC
317 Iron Horse Way, Suite 301
Providence, RI  02908
mlopes@pldolaw.com

Nicholas Weber
Melissa Bentz
Carrie Stafford
Dillon Hockerson
CDCR Office of Legal Affairs
PO Box 942883
Sacramento, CA  94283-0001
Nicholas.Weber@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov
Carrie.Stafford@cdcr.ca.gov
Dillon.Hockerson@cdcr.ca.gov

Re:     *Coleman v. Newsom*: Staffing of Chief Psychiatrists and
Supervising Psychiatrists
Our File No. 0489-03

Dear Counsel and Special Master Lopes:

I write regarding Defendants' ongoing inadequate staffing of chief psychiatrists and supervising psychiatrists at CDCR institutions.  First, we have yet to receive a response from Defendants to our December 21, 2018 letter ("Pls' December 21, 2018 Letter"), attached hereto as **Exhibit A**, wherein we urged Defendants to allocate additional chief psychiatrists and senior psychiatrist, supervisors ("supervising psychiatrists") sufficient to meet the staffing levels required by the court-ordered 2009 Staffing Plan ("Staffing Plan" or "Plan").  Recent staffing data makes clear Defendants have made no effort to correct this deficiency.  Accordingly, we reiterate our request that Defendants promptly take all steps necessary to meet the court-ordered staffing fill rates for supervising psychiatrists.

Elise Owens Thorn
CDCR Office of Legal Affairs
Matthew A. Lopes, Jr.
May 27, 2020
Page 2

Defendants must also take action to implement the measures recommended by the Special Master's Labor Economist and take whatever other steps are necessary to achieve the required staffing rates for these positions. As the Court has recognized, and as the 2009 Staffing Plan reflects, supervising psychiatrists play a critical role in Defendants' mental health system and sufficient numbers of them are necessary to ensure constitutionally adequate care. Yet in Defendants' chronically under-resourced system, "supervisors have clinical responsibilities far in excess of those contemplated in the 2009 Staffing Plan," which detract from their ability to perform their core supervisory functions. 12/17/19 Order at 39, ECF No. 6427. As such, not only must Defendants ensure that all required supervisory positions are allocated and filled, they should also develop a method to transparently track and report on the extent to which supervisory psychiatrists are performing line staff duties.

Finally, Plaintiffs request additional information on how Defendants plan to allocate staffing positions under the 2009 Staffing Plan for the upcoming July allocation cycle given the effect of current emergency COVID-19 policies on existing program censuses.

I.    **CDCR Must Remedy Its Ongoing Failure to Allocate Chief Psychiatrists and Supervising Psychiatrists to Institutions in Accordance with the 2009 Staffing Plan**

Defendants' court-ordered 2009 Staffing Plan provides parameters for the allocation of chief psychiatrists. *See* 12/17/19 Order at 34-35, ECF No. 6427. The Plan states that "Chief Psychiatrist positions will be allocated to prisons with MHCB units and prisons with complex and multiple mental health programs." Staffing Plan at 31.[1] The Plan is consistent with the Program Guide, which, for instance, contemplates provision of treatment to MHCB patients by chief and supervising psychiatrists and involvement of chief psychiatrists in approving patients' stays in MHCB units beyond ten days. MHSDS Program Guide at 12-5-1, 12-5-33 (2009).

The Plan also establishes mandatory ratios and other clear parameters for allocation of supervising psychiatrists. The Plan states that a staff-to-patient ratio of 1:50 for supervising psychiatrists is "[n]eeded at all MHCB facilities" with six or more crisis beds. Staffing Plan at 22, Exhibit 20. In addition, the Plan provides that supervising psychiatrists "will be allocated to prisons that do not have a Chief Psychiatrist but have a significant number of staff psychiatrists providing services to a largely stable inmate-

---

[1] Page numbers listed in pin cites are based on PDF pagination.

Elise Owens Thorn
CDCR Office of Legal Affairs
Matthew A. Lopes, Jr.
May 27, 2020
Page 3

patient population" and also "to several prisons that have a Chief Psychiatrist and that have large and complex mental health services." *Id.* at 32.

Defendants are not currently in compliance with any of these court-ordered obligations, and must take steps to remedy the violations immediately. If Defendants do not promptly commit to allocate the additional required chief psychiatrist and supervising psychiatrist positions, we will request that the Court order Defendants to allocate them.

### A.    CDCR Has Failed to Comply with Its Obligation to Provide Chief and Supervising Psychiatrists at Prisons with MHCBs

Defendants have yet to allocate chief psychiatrists to three institutions with MHCB units, CCWF, HDSP, and NKSP, in contravention of their own Plan's longstanding requirements. Coleman Monthly Report of Information Requested and Response to January 19, 1999 Court Order Regarding Staff Vacancies ("Coleman Monthly Reports") at Enclosure 1(C) Summary by Institution by Classification (May 15, 2020).

In addition, the governing ratios for supervising psychiatrists apply to all institutions with MHCBs, as all of CDCR's MHCBs have six or more crisis beds. *See* Staffing Plan at 22, Exhibit 20; Coleman Monthly Reports Enclosure 6a Summary of Mental Health Population by Institution and Level of Care (May 15, 2020). As of March 2020, Defendants report that they have not allocated *any* supervising psychiatrist to eleven of these institutions: CIM, HDSP, KVSP, LAC, MCSP, PBSP, PVSP, SATF, SOL, SVSP, and WSP. Coleman Monthly Report Enclosure 1(C) (May 15, 2020). We are dismayed that, despite the fact that we raised these clear staffing allocation violations at these institutions over seventeen months ago, Defendants have not yet allocated the additional necessary supervising psychiatrist positions at any of them.

Court orders require Defendants to allocate these key positions. Defendants must promptly secure funding for chief psychiatrist positions at CCWF, HDSP, and NKSP, and for supervising psychiatrists sufficient to meet the required 1:50 staff-to-patient ratio at CIM, HDSP, KVSP, LAC, MCSP, PBSP, PVSP, SATF, SOL, SVSP, and WSP.

### B.    Allocating Additional Supervising Psychiatrists to Institutions with Large and Complex Mental Health Programs

When we previously raised concerns in December 2018 regarding Defendants' allocation of supervising psychiatrists to institutions with large and complex mental health programs as required by the 2009 Staffing Plan, Defendants had allocated these

[3518354.12]

Elise Owens Thorn
CDCR Office of Legal Affairs
Matthew A. Lopes, Jr.
May 27, 2020
Page 4

positions to only a handful of institutions, including CHCF, CIW, CMC, CMF, RJD, SAC, and SQSP.  We are somewhat encouraged that, since then, Defendants have taken small steps towards compliance by allocating an additional 0.5 supervising psychiatrist to COR and slightly increasing their allocation of supervising psychiatrists to CIW, which also both have large and complex mental health programs.  *see* Coleman Monthly Report Enclosures 1(C) and 6(A) (May 15, 2020); Coleman Monthly Report Enclosure 1(c) (Sep. 12, 2019) (July 2019 data); Coleman Monthly Report Enclosure 1(C) (Mar. 20, 2019) (January 2019 data).

However, Defendants have yet to allocate any supervising psychiatrists to many other institutions that have similarly large and complex mental health programs, including the following:

1.    MCSP, which has the third largest population of patients in the MHSDS program with over 2,100 patients, including the third largest EOP program statewide with over seven hundred patients, an EOP ASU Hub, and a large CCCMS program;

2.    SATF, which has the largest number of identified *Coleman* class members of any institution, including large EOP and CCCMS programs, and an STRH;

3.    KVSP, which has a CCCMS program, an EOP unit, and an STRH that often houses several EOP patients;

4.    LAC, which has a CCCMS program, an EOP ASU hub, nearly 600 EOP patients, and an STRH;

5.    SVSP, which has a CCCMS program at over 100% capacity, an EOP program, and a large PIP program with 246 inpatient beds; and

6.    WSP, which has the largest reception center and a CCCMS program.

Coleman Monthly Report Enclosures 1(C) and 6(A) (May 15, 2020).  In fact, the need for supervising psychiatrists has increased at MCSP, where the EOP patient population has grown by over 5% since we previously raised concerns about this deficiency in late 2018.  *Compare* Coleman Monthly Report Enclosure 6(A) (May 15, 2020) (March 2020 data), *with* Coleman Monthly Data Enclosure 6(A) (Nov. 14, 2018) (September 2018 data).

Moreover, the allocation of only a half-time supervising psychiatrist to COR is inadequate given the size of COR's mental health program and the high number of suicides there.  COR has a twenty-four bed MHCB, and the half-time supervising

Elise Owens Thorn
CDCR Office of Legal Affairs
Matthew A. Lopes, Jr.
May 27, 2020
Page 5

psychiatrist allocated to COR is sufficient only to staff the MHCB at the 1:50 staffing ratio required by the Staffing Plan.  Coleman Monthly Report Enclosure 1(C) (May 15, 2020).  However, aside from the MHCB, COR also has a large and complex mental health program with nearly 1,200 patients that also necessitates the clinical oversight and support of a supervising psychiatrist, including an EOP program, an EOP ASU Hub, a CCCMS program operating at over 90% capacity, an STRH, and an LTRH.  *See id.*  The fact that there were four suicides at COR in 2019 and that Defendants' own suicide reports identified deficiencies in psychiatric care leading up to at least one of these suicides further underscores the need for additional supervisory psychiatric oversight. *See, e.g.*, Suicide Report for Carl Jones V26447 at 10, 12, 18,20 (Apr. 8, 2019) (lack of continuity of psychiatric care in MHCB, concerning discharge from MHCB to CCCMS supported by psychiatrist, and minimal discharge plan prepared by psychiatrist).

The institutions discussed above all have large and complex mental health programs.  *See* Staffing Plan at 17, 20 (explaining that "increased services" are needed to treat "severity of mental illness and impairment" of EOP population and that EOP ASU hub population "presents the greatest challenge and workload for psychiatrists in outpatient settings").  Consistent with the Plan's articulation of the role of supervising psychiatrists, these institutions need supervising psychiatrists to oversee the administration of mental health services and assure quality of care.  *Id.* at 32 (supervising psychiatrists "provide clinical supervision," perform "administrative tasks related to formulary, medication management, and continuity of psychiatric medications," and are responsible for generating and reviewing LOPs applicable to psychiatry and "for quality improvement activities including peer/professional review processes").

Although the 2009 Plan does not require every prison with a chief psychiatrist and a complex mission to have an allocated supervising psychiatrist, an insufficient number of prisons falling in this category now have such positions.  Defendants have yet to explain what criteria they used to allocate supervising psychiatrists to some institutions with chief psychiatrists and large and complex mental health programs but not others, despite our request for this information nearly eighteen months ago.  *See* Pls' December 21, 2018 Letter at 5.  We again urge Defendants to allocate at least one full-time supervising psychiatrist each to COR, KVSP, LAC, MCSP, SATF, SVSP, and WSP beyond the allocations provided for by the MHCB staff-to-patient ratios.  If Defendants do not promptly commit to allocate these positions, we will request that the Court order Defendants to do so.

Elise Owens Thorn
CDCR Office of Legal Affairs
Matthew A. Lopes, Jr.
May 27, 2020
Page 6

###### C. Defendants Have Failed to Allocate Supervising Psychiatrists to Two Institutions that Have a Significant Number of Staff Psychiatrists Serving a Largely Stable Population

The 2009 Staffing Plan also requires Defendants to allocate supervising psychiatrists to institutions that do not have chief psychiatrists but that have a significant number of staff psychiatrists serving a relatively stable patient population. While a number of institutions fitting this description do have allocated supervising psychiatrists, two do not.

ASP has five on-site staff psychiatrists allocated to serve, and has 5.48 psychiatrists actually providing care to, a patient population of over 1,000 at the CCCMS level of care. Coleman Monthly Reports Enclosures 1(c), 6(a) (May 15, 2020). In fact, ASP has a larger patient population than four other institutions to which Defendants have allocated supervising psychiatrists: DVI, FOL, NKSP, and SCC. *Id.* Enclosure 6(a). ASP also has more staff psychiatrists allocated to and actually serving patients than three other institutions to which Defendants have allocated supervising psychiatrists: DVI, FOL, and SCC. *Id. Enclosure 1(c).* Defendants must therefore promptly take all steps necessary to allocate a supervising psychiatrist to ASP, including funding the position.

Furthermore, in addition to requiring Defendants to allocate a supervising psychiatrist to HDSP because it has an MHCB, the Staffing Plan also requires Defendants to allocate a supervising psychiatrist to HDSP because Defendants have allocated for 2.5 on-site staff psychiatrists and 4 telepsychiatrists to serve a population there of over 1,000 patients at the CCCMS level of care. *Id.*

###### II. Sufficient Numbers of Supervising Psychiatrists Are Necessary for Constitutionally Adequate Care, and Defendants Must Track The Extent to Which They Are Being Diverted from Supervising Duties To Treat Patients

Supervising psychiatrists play a critical role in providing constitutionally adequate mental healthcare. As the Court has noted, supervising psychiatrists perform many essential functions including "clinical supervision of staff psychiatrists, . . . various administrative tasks related to formulary, medication management, and continuity of psychiatric medications, . . . generation and periodic reviews of LOPs, [and] …. quality improvement activities including peer/professional review processes." 12/17/19 Order at 35, ECF No. 6406 (quoting Staffing Plan at 32). Multiple witnesses at the Golding trial testified to the critical role played by supervisory psychiatrists in the system. *See* Kuich Deposition Testimony at 34-36, ECF No. 6406; 10/15/19 RT at 49, ECF No. 6345

Elise Owens Thorn
CDCR Office of Legal Affairs
Matthew A. Lopes, Jr.
May 27, 2020
Page 7

(Golding testimony); 10/16/19 RT at 328, ECF No. 6350 (Brizendine testimony).  The reality is, however, that Defendants routinely rely on supervising psychiatrists to provide direct "front line" care to patients in addition to their supervisory duties, but neither transparently report nor track the true extent of this reliance.  *See* 12/17/19 Order at 35-40, ECF. No. 6427 (finding "supervisors have clinical responsibilities far in excess of those contemplated in the 2009 Staffing Plan and defendants have misleadingly withheld this information in an effort to make compliance numbers look better and to support significant reductions in psychiatrist staffing levels"); *see also* Kuich Deposition Testimony at 30, ECF No. 6406 (estimating supervisors spend more than 30% but less than 50% of their time performing line-staff duties); 10/15/19 RT at 51, ECF No. 6345 (Golding testimony estimating psychiatrist supervisors spend about 50% of their time conducting direct patient care).  These informal duties take away from supervising psychiatrists' ability to perform their core function – to adequately supervise line psychiatrists.  Given the ongoing expectation that supervisors provide patient care to supplement the chronic line-staff psychiatrist vacancies, it is all the more critical that Defendants adequately allocate and fill all of their supervisory positions as contemplated in the 2009 Staffing Plan.  It is also critical that Defendants develop a system to transparently and accurately track and report on the extent to which supervisors are performing patient care duties that the 2009 Staffing Plan anticipates will be performed by line psychiatrists.

## III.   Defendants Must Reduce the High Vacancy Rate for Supervising Psychiatrists and Fill Longstanding Chief Psychiatrist Vacancies

As explained in our December 21, 2018 Letter, the longstanding 90% court-ordered psychiatrist staffing fill rates apply to both chief psychiatrists and supervising psychiatrists in addition to staff psychiatrists.  *Id.* at 5-8.  Defendants have consistently failed to meet the 90% staffing rate for these positions.

As of March 2020, Defendants have filled only fourteen of 20.5 supervising psychiatrist positions for a staffing rate of 68.3%, and this rate does not even account for the required supervising psychiatrist positions that have yet to even be allocated.  *See* Coleman Monthly Reports Enclosure 1(b) (May 15, 2020).  Defendants' supervising psychiatrist staffing fill rate has been consistently well below the required 90% threshold for years, and indeed the rate has actually declined since the beginning of 2019 from 75% to 68.3%.

We are also concerned about the longstanding vacancies in the chief psychiatrist positions at WSP and PBSP.  The chief psychiatrist position at WSP has been vacant

Elise Owens Thorn
CDCR Office of Legal Affairs
Matthew A. Lopes, Jr.
May 27, 2020
Page 8

since August 2019, and the chief psychiatrist position at PBSP has been vacant even longer.

Defendants must promptly take all steps necessary to comply with the court-ordered 90% staffing rate for chief psychiatrists and supervising psychiatrists, including implementing all of the measures that the Special Master's Labor Economist recommends. *See* An Analysis of Psychiatrist Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation and the Department of State Hospitals at 6-7 (Aug. 14, 2019) (draft version of report).

## IV.   Questions Regarding July Staffing Allocation Process

Finally, Plaintiffs request additional information on how Defendants plan to allocate staffing positions under the 2009 Staffing Plan for the upcoming July allocation cycle. Plaintiffs understand that, in their normal biannual staffing process, Defendants base the institutions' clinical allocations on current census numbers from the various mental health programs. The current mental health program census numbers, however, are not reflective of true need or Program Guide standards given that Defendants have seriously restricted mental health transfers under their emergency COVID-19 policies for the last two months. Given this issue, what census numbers or other process do Defendants plan to use to set the mental health allocations that will go into effect in July?

## V.   Closing

We request that Defendants promptly respond to the questions and issues set forth in this letter.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Michael S. Nunez*

By:   Michael S. Nunez

MSN:cg

cc: Adriano Hrvatin        Tyler Heath
    Damon McClain       Roman Silberfeld
    Kyle Lewis             Glenn Danas
    Lucas Hennes

[3518354.12]

# Exhibit A



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Michael S. Nunez
Email:  mnunez@rbgg.com

December 21, 2018

VIA ELECTRONIC MAIL

Nicholas Weber
Melissa Bentz
Jerome Hessick
Dillon Hockerson
CDCR Office of Legal Affairs
P.O. Box 94283
Sacramento, CA 94283-0001
Nicholas.Weber@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov
Jerome.Hessick@cdcr.ca.gov
Dillon.Hockerson@cdcr.ca.gov

Christine Ciccotti
Sean Rashkis
Elaine Ekpo
Joanna Mupanduki
DSH Legal Team
Christine.Ciccotti@dsh.ca.gov
Sean.Rashkis@dsh.ca.gov
Elaine.Ekpo@dsh.ca.gov
Joanna.Mupanduki@dsh.ca.gov

Matthew A. Lopes
Coleman Special Master
Pannone Lopes Deveraux & O'Gara LLC
Northwoods Office Park, Suite 215N 1301
Atwood Avenue Johnston, RI 02919-4946
MLopes@pldolaw.com

Re:    *Coleman*:  Staffing of Chief Psychiatrists, Senior Psychiatrist Supervisors,
       psychologists, and social workers
       Our File No. 489-3

Dear CDCR Legal Team:

I write regarding three matters concerning CDCR's mental health staffing.  First, I
write to urge that CDCR increase the allocation of chief psychiatrists and senior
psychiatrist supervisors ("supervising psychiatrists") to the levels provided for in the
2009 Staffing Plan, ECF No. 3619 ("Staffing Plan" or "Plan").  Second, I write in

[3329258.6]

CDCR OLA team
December 21, 2018
Page 2

response to Melissa Bentz's email dated November 29, 2018 ("CDCR's 11/29/18 Email")
arguing that chief psychiatrists and supervising psychiatrists are not subject to the 90%
staffing rate required by the June 13, 2002 Order, ECF No. 1383 ("6/13/02 Order").
Third, I write to repeat our request that Defendants provide further explanation regarding
reductions earlier this year in the number of established psychologist and social worker
positions and for additional information regarding the "blanket."

## I.    Allocating Additional Chief and Supervising Psychiatrists to CDCR Institutions

### A.    CDCR Has Failed to Allocate Chief Psychiatrists and Supervising Psychiatrists to Institutions in Accordance with the 2009 Staffing Plan

Defendants' court-ordered 2009 Staffing Plan provides parameters for the
allocation of chief psychiatrists.  The Plan states that "Chief Psychiatrist positions will be
allocated to prisons with MHCB units and prisons with complex and multiple mental
health programs."  Staffing Plan at 31.  The Plan is consistent with the Program Guide,
which, for instance, contemplates provision of treatment to MHCB patients by chief and
supervising psychiatrists and involvement of chief psychiatrists in approving patients'
stays in MHCB units beyond ten days.  MHSDS Program Guide at 12-5-1, 12-5-33
(2009).

The Plan also establishes ratios and other parameters for allocation of supervising
psychiatrists.  The Plan states that a staff-to-patient ratio of 1:50 for supervising
psychiatrists is "[n]eeded at all MHCB facilities" with six or more crisis beds.  Staffing
Plan at 22, Exhibit 20.  In addition, the Plan provides that supervising psychiatrists "will
be allocated to prisons that do not have a Chief Psychiatrist but have a significant number
of staff psychiatrists providing services to a largely stable inmate-patient population" and
also "to several prisons that have a Chief Psychiatrist and that have large and complex
mental health services."  *Id.* at 32.

Defendants are not currently in compliance with any of these court-ordered
obligations, and must take steps to remedy the violations immediately.  Indeed, the
admissions in Dr. Golding's report that existing supervisory psychiatrists routinely are
pulled away from their administrative duties to provide front-line patient care makes
ensuring adequate allocations for supervisors all the more necessary.  *See* CDCR Mental
Health System Report at 5-6, 56, 57, 136 (Oct. 31, 2018), ECF No. 5988-1 ("Golding
Report").

[3329258.6]

CDCR OLA team
December 21, 2018
Page 3

**B.    CDCR Has Failed to Comply with Its Obligation to Provide Chief and Supervising Psychiatrists at Prisons with MHCBs**

Defendants have failed to allocate enough chief psychiatrists and supervising psychiatrists to meet the staffing levels required by the court-ordered 2009 Staffing Plan. First, Defendants have failed to allocate chief psychiatrists to three institutions with MHCB units, in contravention of the Plan's requirements:  CCWF, HDSP, and NKSP. *See* Coleman Monthly Report of Information Requested and Response to January 19, 1999 Court Order Regarding Staff Vacancies ("Coleman Monthly Staffing Vacancy Report") at Enclosure 1c Mental Institution Vacancy Summary by Classification (Nov. 14, 2018).

In addition, the governing ratios for supervising psychiatrists apply to all institutions with MHCBs, as all of CDCR's MHCBs have six or more crisis beds:  CIM (34 beds), CIW (10 beds, soon to increase to 29), COR (24 beds), HDSP (10 beds), KVSP (12 beds), LAC (12 beds), MCSP (8 beds), PBSP (10 beds), PVSP (6 beds), SATF (20 beds), SOL (9 beds), SVSP (10 beds), and WSP (6 beds).  Staffing Plan at 22, Exhibit 20; *see also* email from Nicholas Weber (Dec. 30, 2016) (Providing MHCB clustering data) ("12/30/16 Weber Email"); Order re Unlicensed CIW MHCB Beds (Sept. 24, 2018), ECF No. 5931.  However, as of September 2018, Defendants report that they have not allocated a single supervising psychiatrist to any of these thirteen institutions.  *See* Coleman Monthly Staffing Vacancy Report Enclosure 1c (Nov. 14, 2018).  In fact, as of that same date, Defendants had failed to allocate either a chief psychiatrist *or* a supervising psychiatrist to HDSP, even though HDSP has an MHCB and thus both positions are required under Defendants' staffing plan.[1]  Defs.' Monthly Psychiatry Vacancy Report at 4 (Nov. 30, 2018), ECF No. 6019; Coleman Monthly Staffing Vacancy Report Enclosure 6(a) (Nov. 14, 2018).

Court orders require Defendants to allocate enough chief psychiatrist and supervising psychiatrist positions to staff CDCR institutions in accordance with the 2009 Staffing Plan.  Defendants must take steps to immediately prepare and submit a budget change proposal in the upcoming budget cycle to request the funding necessary to allocate chief psychiatrist positions at CCWF, HDSP, and NKSP.  Additionally,

---

[1] HDSP also qualifies under the separate Plan requirement necessitating a supervising psychiatrist at prisons that do not have a chief psychiatrist but that have significant numbers of staff psychiatrists who treat a large group of stable class members.  Staffing Plan at 32.  CDCR has allocated 6.5 psychiatrists (2.50 on-site and 4 telepsychiatrists) to HDSP, which serves over 1,000 CCCMS patients.  Defs.' Monthly Psychiatry Vacancy Report at 4 (Nov. 30, 2018), ECF No. 6019; Coleman Monthly Staffing Vacancy Report Enclosure 6(a) (Nov. 14, 2018).

[3329258.6]

CDCR OLA team
December 21, 2018
Page 4

Defendants must promptly allocate supervising psychiatrists sufficient to meet the required 1:50 staff-to-patient ratio at CIM, CIW, COR, HDSP, KVSP, LAC, PBSP, PVSP, SATF, SOL, SVSP, and WSP, including if necessary, submitting a budget change proposal in the upcoming budget cycle to request funding necessary to create additional supervising psychiatrist positions needed to meet the ratio.

### C.    Allocating Additional Supervising Psychiatrists to Institutions with Large and Complex Mental Health Programs

Defendants have allocated supervising psychiatrists to only six institutions that have chief psychiatrists and large and complex mental health programs:  CHCF, CMC, CMF, RJD, SAC, and SQSP.  However, Defendants have not allocated supervising psychiatrists to many other institutions that have chief psychiatrists and mental health programs that are similarly large and complex.  *See* Coleman Monthly Staffing Vacancy Report Enclosure 1c (Nov. 14, 2018).  The institutions falling in this category, none of which have allocated supervising psychiatrists, include[2]:

1.    MCSP, which has a CCCMS program, the second largest EOP program with over 660 patients, and an EOP ASU hub;

2.    SATF, which has 2,600 identified *Coleman* class members (the largest number of identified *Coleman* class members of any institution), including over 600 EOP patients, an EOP ASU hub, a CCCMS program, and an STRH;

3.    CIW, which has a CCCMS program, an EOP unit, a SHU that routinely houses dozens of class members, a PSU, and a PIP;

4.    COR, which has a CCCMS program, an EOP ASU Hub, over 400 EOP patients, an IEX Unit, and a LTRH;

5.    KVSP, which has a CCCMS program, an EOP unit, and an STRH that often houses EOP patients;

6.    LAC, which has a CCCMS program, an EOP ASU hub, over 500 EOP patients, and an STRH;

---

[2] All of the institutions in this list also have MHCBs, and thus meet the separate requirement in the Plan necessitating allocation of supervising psychiatrists at all prisons with MHCBs at a 1:50 ratio.  *See* Staffing Plan at 22, Exhibit 20.

CDCR OLA team
December 21, 2018
Page 5

7.      SVSP, which has a CCCMS program, over 400 EOP patients, and a large PIP program with 244 beds;

8.      WSP, which has the largest reception center, a CCCMS program, and an STRH.

*See id.* Enclosure 6a; 12/30/16 weber Email.

These institutions have large and complex mental health programs. *See* Staffing Plan at 17, 20 (explaining that "increased services" are needed to treat "severity of mental illness and impairment" of EOP population and that EOP ASU hub population "presents the greatest challenge and workload for psychiatrists in outpatient settings"). Consistent with the Plan's articulation of the role of supervising psychiatrists, these institutions need supervising psychiatrists to oversee the administration of mental health services and assure quality of care. *Id.* at 32 (supervising psychiatrists "provide clinical supervision," perform "administrative tasks related to formulary, medication management, and continuity of psychiatric medications," and are responsible for generating and reviewing LOPs applicable to psychiatry and "for quality improvement activities including peer/professional review processes").

While the Plan does not require every prison with a chief psychiatrist and a complex mission to have an allocated supervising psychiatrist, an insufficient number of prisons falling in this category have such positions, particularly given the massive growth of the Plaintiff class in recent years that has stressed the system. It is not apparent why Defendants have allocated supervising psychiatrists at some institutions but not others. What criteria did Defendants use when deciding to allocate supervising psychiatrists to CHCF, CMC, CMF, RJD, SAC, and SQSP, but not to the other institutions listed above? We urge Defendants to allocate at least one full-time supervising psychiatrist each to CIW, COR, KVSP, LAC, MCSP, SATF, SVSP, and WSP beyond the allocations provided for by the MHCB staff-to-patient ratios. In the alternative, Plaintiffs request that Defendants provide a justification for why supervising psychiatrists are not needed at those institutions.

## II.     The 90% Court-Ordered Staffing Rate Applies to Chief Psychiatrists and Supervising Psychiatrists

CDCR has incorrectly asserted that the text of the Court's June 13, 2002 Order demonstrates that chief psychiatrists and supervising psychiatrists are not subject to the required 90% fill rate. CDCR's 11/29/30 Email. The reference to both psychiatrists and case managers in the Court's order does not demonstrate that chief psychiatrists and senior psychiatrists are exempt from the court-ordered staffing rate. 6/13/02 Order at 4. Use of the phrase "psychiatrists and case managers" in the Court's order demonstrates

CDCR OLA team
December 21, 2018
Page 6

that the Court intended to subject two groups of employees to the required staffing rate: (1) psychiatrists, and (2) case managers. *See id.* The structure of this sentence places the terms "psychiatrists" and "case managers" on equal footing. Thus, it is illogical to conclude that the definition of case managers in any way limits the scope of psychiatrists covered by the order, especially given that the definition of case managers that Defendants cite does not even address psychiatrists and was adopted years after the Court's order requiring the 90% staffing rate. *See* Program Guide Appendix A at 1 (defining "case manager"). If the Court wanted to limit the applicability of the required staffing rate to only line staff psychiatrists, it could have done so by explicitly stating as much, or by explicitly exempting chief psychiatrists and supervising psychiatrists. The Court did neither, and a common sense read of the text is that the order covers all psychiatrists.

This interpretation of the Court's order, which does not define "psychiatrist," *see* 6/13/02 Order, is consistent with the governing definition of "psychiatrist" under California law in effect at the time. Since long before the Court ordered the 90% staffing rate, applicable California regulations have defined "psychiatrist" as "a person who is a licensed physician and surgeon in the State of California except as allowed under Section 2072 of the Business and Professions Code and who is certified by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry or has completed a residency program in psychiatry approved by the American Medical Association or the American Osteopathic Association."[3] 22 C.C.R. § 79567 (1996). This definition would not exclude CDCR's chief psychiatrists or senior psychiatrists in particular, or individuals with administrative or supervisory duties more generally.

In addition, the absence of a staff-to-patient ratio for chief psychiatrists does not exclude them from the court-ordered staffing rate. First, the Order does not limit the required staffing rate's applicability to psychiatrist classifications for which CDCR has adopted staff-to-patient ratios. *See* 6/13/02 Order at 4. Second, the Court's 2002 order predates the 2009 Staffing Plan by several years. Consequently, the scope of the court-ordered fill rate in the 2002 Order could not have been limited to only psychiatrist classifications for which the 2009 Staffing Plan provides staff-to-patient ratios, and more recent court orders regarding staffing have not so limited the scope of the 2002 court-ordered staffing requirement. *See, e.g.*, Order (Jul. 3, 2018), ECF No. 5850; Order (Feb. 15, 2018), ECF No. 5786; Order (Oct. 10, 2017), ECF No. 5711; Order (Aug. 7, 2016), ECF No. 5477; Order (Jun. 13, 2014), ECF No. 5171; Order (Apr. 5, 2013), ECF No.

---

[3] Section 2072 of the California Business and Professions Code pertains to temporary appointment of medical professionals licensed in other states and is not relevant to this discussion.

CDCR OLA team
December 21, 2018
Page 7

4539 ("4/5/13 Order").  Moreover, certain allocations, such as the clinical staffing at desert institutions, are not ratio-driven.  *See* 2009 Plan at 24 (allocating, e.g., 3.0 primary clinicians "per institution").  Neither the parties nor the Special master have ever contemplated that staffing rates at desert institutions are somehow beyond the Court-ordered 90% fill rate simply due to the lack of staff-to-patient ratios for the clinical staffing allocations there.  Indeed, Defendants report their psychiatry staffing rates at these institutions in their monthly Court-ordered Psychiatry Vacancy Reports.  *See, e.g.*, ECF No. 6019 (Nov. 30, 2018).

None of Defendants' other arguments demonstrate that chief psychiatrists and supervising psychiatrists are exempt from the court-ordered staffing rate.  That the Court ordered and expressed interest in receiving monthly reporting regarding line psychiatrists at a hearing did not demonstrate or establish any purported limit to the scope of the court-ordered staffing rate, and at no time at the hearing that precipitated the order did the Court state that CDCR need not meet the 90% court-ordered staffing rate with respect to chief and supervising psychiatrists.  *See* Feb. 14, 2018 Hearing Tr., ECF No. 5793.  In fact, the Court has expressed concern regarding vacancies of chief psychiatrists and senior psychiatrists as well.  4/5/13 Order at 58.  Similarly, that Defendants' recently proposed staffing plans and the parties' recent discussions have focused on line staff psychiatrists has no bearing on the scope of the court-ordered staffing rate.

Furthermore, the conclusion that chief and supervising psychiatrists are subject to the court-ordered staffing rate is consistent with the Court's goal in imposing the staffing rate:  to ensure that the *Coleman* class receives constitutionally adequate care.  *See* 6/13/18 Order at 2 (ordering required staffing rate in part because "adequate staffing" plays a "central role in meeting defendants' constitutional obligations to class members").  As Defendants' Plan—which Defendants have represented identifies appropriate staffing levels to meet constitutional standards, 10/10/17 Order at 15-16—makes clear, chief psychiatrists and supervising psychiatrists are necessary to provide constitutionally adequate care.  First, the organization and supervision of psychiatric care is necessary to ensure that constitutionally adequate care is provided.  The 2009 Staffing Plan mandates that supervising psychiatrists provide many essential functions including "clinical supervision of staff psychiatrists, … various administrative tasks related to formulary, medication management, and continuity of psychiatric medications, …. generation and periodic reviews of LOPs, [and] …. quality improvement activities including peer/professional review processes."  Staffing Plan at 32.  Second, the reality is that Defendants routinely rely on supervising psychiatrists to provide direct "front line" care to patients in addition to their supervisory duties to compensate for their chronic failure to take adequate measures to hire and retain sufficient numbers of staff psychiatrists.  The recent report of Dr. Michael Golding, CDCR's Chief Psychiatrist, admits that "[s]ixty percent of psychiatric supervisors were seeing patients like line staff at least part time,

[3329258.6]

CDCR OLA team
December 21, 2018
Page 8

and in some cases full time." Golding Report at 5. To the extent that supervising psychiatrists provide direct care to reduce the impact of severe and longstanding staff psychiatrist vacancies, ensuring adequate staffing of supervising psychiatrists is central to ensuring provision of constitutionally adequate mental healthcare because Defendants' current system relies on them as an inappropriate crutch to bolster deficient staff psychiatrist numbers.

Third, chief and senior psychiatrists are part of the quality assurance plan that Defendants have adopted to satisfy their constitutional obligation to provide a process for ensuring the adequacy of the mental healthcare that they provide. *Coleman v. Wilson*, 912 F. Supp. 1282, 1308 (E.D. Cal. 1995). For example, the Mental Health Program Subcommittees ("MHPS") "monitor and direct quality improvement activities," and CDCR policy provides for the participation of chief psychiatrists on MHPS committees. 12.01.100 Mental Health Program Subcommittee at 1, 3 (Jul. 23, 2013). In addition, SPR FIT committees are a key and substantial component of CDCR's quality assurance plan, and the Program Guide provides that chief psychiatrists or senior psychiatrists serve on local SPR FIT committees. Program Guide 12-10-3 - 12-10-5, 12-10-20; Enhancements to the Suicide Prevention and Response Focused Improvement Teams (Feb. 2, 2018) (outlining current duties of SPR FIT committees).

In sum, ensuring adequate leadership and supervision of psychiatrists by filling chief and supervisory psychiatrist positions is a critical and necessary component of Defendants' mental health system. The Court's orders requiring psychiatrist positions to be filled at a rate of 90% or greater do not exclude those positions, nor have Defendants provided any basis to assume the Court has made such an illogical holding. Defendants must take all necessary steps to promptly fill both the existing chief and supervisory positions in conformity with the Court's orders, but also to hire for the newly allocated positions Defendants are required to maintain consistent with their 2009 Staffing Plan, as articulated above.

## III.    Lingering, Unanswered Questions Regarding the Reduction of Established Psychologist and Social Worker Positions Earlier This Year

Defendants cut 53 established psychologist positions and 31.6 established social worker positions between February 2018 and June 2018. *Compare* Coleman Monthly Staffing Vacancy Report Enclosure 1b (Apr. 4, 2018), *with* Coleman Monthly Staffing Vacancy Report Enclosure 1b (Aug. 9, 2018). At the July 23, 2018 work group meeting, Defendants represented that the reduction of established positions through April 2018 was due to a technical budgeting issue that has since been resolved. However, Defendants have not explained why there was a reduction of an additional five established psychologist positions in June 2018. In addition, the positions that were cut

CDCR OLA team
December 21, 2018
Page 9

as of June 2018 had not been restored as of Defendants' monthly data report for September 2018, which reflects the same number of established psychologist and social worker positions as the June 2018 report. *Compare* Coleman Monthly Staffing Vacancy Report Enclosure 1b (Nov. 14, 2018), *with* Coleman Monthly Staffing Vacancy Report Enclosure 1b (Aug. 9, 2018).

We have repeatedly requested additional detail regarding the decrease between February and June in the number of established psychologist and social worker positions. *See* Emails from Cara Trapani dated Sept. 19, 2018, Aug. 9, 2018, and July 27, 2018. However, Defendants have failed to respond to these requests. The troubling lack of transparency in Defendants' staffing numbers does not inspire trust.

We repeat our earlier request that Defendants explain in writing the reason for this drop in the number of established psychologist and social worker positions. At the July 23 work group meeting, Defendants stated that some of these social worker and psychologist positions moved from being established positions to be "in the blanket" for budgeting purposes. We again ask that Defendants provide additional details regarding how many and which positions are in the blanket versus established positions, and the reasoning for each.

Please also explain where and how positions in the blanket are reported in the monthly data reports, and whether and how Defendants plan to alert the Special Master or Plaintiffs to similar off-cycle changes in the number of reported established positions going forward. Without a transparent reporting mechanism, it is impossible to assess and track Defendants' staffing levels and Defendants' compliance with the Court's staffing orders. In addition, we request an explanation of how often Defendants move established positions to the blanket. Finally, we ask that Defendants confirm that no allocated positions are ever cut except during the bi-annual budgeting allocation process.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

CDCR OLA team
December 21, 2018
Page 10

## IV.    Closing

      We request that Defendants respond to the questions and issues set forth in this letter by January 11, 2019.

                        Sincerely,

                        ROSEN BIEN
                        GALVAN & GRUNFELD LLP

                        */s/ Michael S. Nunez*

                  By:  Michael S. Nunez

MSN:fgl

# Exhibit C



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Lisa Ells
Email: lells@rbgg.com

November 16, 2020

<u>VIA ELECTRONIC MAIL ONLY</u>

Melissa Bentz                                    Matthew A. Lopes Jr.
Nick Weber                                       Coleman Special Master
Jerome Hessick                                   mlopes@pldlaw.com
CDCR Office of Legal Affairs
Melissa.Bentz@cdcr.ca.gov
Nicholas.Weber@cdcr.ca.gov
Jerome.Hessick@cdcr.ca.gov


Dr. Amar Mehta
Deputy Director
CDCR Statewide Mental Health
amar.mehta@cdcr.ca.gov

      Re:    *Coleman v. Newsom*: Defendants' September 8, 2020 Staffing Proposal and
              Court's November 4, 2020 Order
              <u>Our File No. 0489-3</u>

Dear Melissa:

      We write regarding the Court's November 4, 2020 order, ECF No. 6938, requiring
the parties to determine, with the guidance of the Special Master, whether they can agree
on any of the proposals stated in Defendants' September 8, 2020 letter ("the Letter") to
modify the 2009 Staffing Plan. We look forward to discussing this issue more at the
forthcoming meeting scheduled for November 17.

      As an initial matter, the Letter details various initiatives implemented over the last
five or so years to increase psychiatrist recruitment and retention, and discusses the
mid-cycle allocation adjustment Defendants unilaterally made in September 2020 for the
first time since the 2009 staffing plan was approved. As to the former, we appreciate the
recruiting and retention efforts, but they do not appear to have paid off given that
psychiatry staffing rates have not substantially improved. As to the latter, Plaintiffs
object strongly to the mid-cycle allocation change. Defendants never made any similar

[3650602.6]

Melissa Bentz
Matthew A. Lopes Jr.
Dr. Amar Mehta
November 16, 2020
Page 2

reallocation when the population of class members increased in the time between allocations.  There is every reason to think that the MHSDS population will increase back to pre-pandemic levels once intake from the jails resumes at full rates.  What is the policy that calls for mid-cycle adjustments?  How large and sudden does the population change (up or down) have to be for the "special" mid-cycle adjustment to occur?  Please confirm that the Department of Finance, the Governor's Office, and the Legislature have approved of this new system and that the adjustment will be applied for population increases, not only decreases.

Restoring cut positions takes significant time and effort, which will delay hiring when the class member population inevitably returns to pre-COVID levels.  We are also deeply concerned that reducing the allocations in the meantime could lead to curtailing hiring efforts or could even lead some psychiatrists to change jobs or prisons, which will undermine the ongoing recruitment and retention efforts Defendants have undertaken over the years.  For instance, we note that CRC's allocation of 7 staff psychiatrists, all of which are filled, was reduced to 4.5 in Defendants' mid-cycle adjustment:  What steps are being taken to retain the 2.5 staff psychiatrists whose positions have apparently been cut?  We have the same question for the .5 filled staff psychiatry position at WSP, which was cut with the September allocation.

In their Letter, Defendants also present a number of proposals for addressing the shortage of psychiatrists but fail to address many of the recommendations of the neutral Labor Economist Report, including the findings that Defendants' psychiatrists salaries do not remain competitive over time, that targeted compensation increases can be expected to improve recruitment and retention in difficult to hire locations such as the Central Valley, and that poor working conditions negatively affect psychiatrists' ability to perform their jobs and their overall job satisfaction.  *See* ECF No. 6695 at 18-19.  We agree in concept with two of Defendants' proposals, subject to negotiating appropriate standards and limitations:  (1) accounting for the use of psychiatric nurse practitioners (PNPs) in the psychiatric staffing allocations, and (2) permitting some telepsychiatrists to work from home instead of in hubs during the pandemic.

**PNPs**:  We agree that PNPs have an appropriate role to play in the provision of psychiatric care.  Although there are approximately 20 PNPs treating patients in the system right now, CDCR has no policy governing their role.  Although the parties began negotiating such a policy years ago, Defendants never finalized it after Plaintiffs and the Special Master commented on the initial draft.  We understand Defendants have prepared another draft policy and provided it to the Special Master for comment.  We look forward to reviewing it.

[3650602.6]

Melissa Bentz
Matthew A. Lopes Jr.
Dr. Amar Mehta
November 16, 2020
Page 3

In the meantime, we note that Defendants' 2017 staffing plan, which was adopted by the Court in relevant part with the support of Plaintiffs and the Special Master, expressly limits the use of PNPs to treatment of CCCMS class members. *See* ECF No. 5564 at 42. It also requires that the PNPs will be supervised by chief psychiatrists or senior psychiatrist supervisors. *Id.* We understand that such supervision is also required by licensing. Please provide us with information about what programs the PNPs currently employed by CDCR are assigned to.

We are concerned that the PNPs in the system right now are treating class members at higher levels of care, and without appropriate supervision. As you know, we have deep-seated concerns that Defendants have not complied with the supervisory allocations required by the 2009 plan. If anything, adding supervision of PNPs to the duties of supervisory psychiatrists, which did not exist at the time of the 2009 plan, could warrant increased allocations of supervisors given that Defendants have 20 PNPs in the system right now and apparently seek to expand that number.

We note that, as of the most recent Psychiatry Vacancy Report filed with the Court, ECF No. 6929, which includes Defendants' mid-cycle allocation cuts, PNPs are currently working at institutions that are required under the 2009 staffing plan to have Chief Psychiatrists allocated because they operate MHCBs, but do not according to Defendants' most recent monthly data. *See, e.g.,* ECF No. 6929 (CCWF (4.23 PNPs), NKSP (2.48 PNPs)); *Coleman* monthly data provided Oct. 15, 2020, Enclosure 1(c) (no chief allocated for either CCWF or NKSP). We are also concerned that PNPs at other institutions may not be properly supervised in their provision of care given that those institutions have a single supervisory psychiatrist and/or unfilled supervisory positions coupled with high percentages of vacant line staff psychiatry positions. *See id.* (e.g., CCWF (4.23 PNPs, 1 senior supervising psychiatrist, and 47% vacancy rate for line psychiatrists); SATF (4.58 PNPs, 1 chief psychiatrist, 42% vacancy rate for line psychiatrists); CHCF (1 PNP, 1 chief psychiatrist (plus 2 vacant senior supervising psychiatrist positions), and 59% vacancy rate for line psychiatrists). It is extremely likely that, given the high line-staff vacancies, the lone supervisor at each of these institutions is also providing direct patient care, further eroding the amount of time they have to supervise the PNPs working for them. Exacerbating the issue is that all of these institutions have MHCBs, where supervising psychiatrists are also required to play a direct role in patient care per the Program Guide and 2009 staffing plan. Finally, at some of the institutions with large numbers of PNPs, there are almost no on-site civil servant psychiatrists at all, meaning registry or telepsychiatry psychiatrists may be supervising the PNPs if such supervision is indeed happening in any robust manner. *See id.* (e.g., KVSP (3.91 PNPs, only 1 on-site psychiatrist out of 5.5 total allocated, including chief

Melissa Bentz
Matthew A. Lopes Jr.
Dr. Amar Mehta
November 16, 2020
Page 4

psychiatrist), SATF (4.58 PNPs, only 2 on-site psychiatrists out of total of 8 allocated,
including chief psychiatrist).

   In short, we are concerned about CDCR's ability to appropriately supervise and
allocate PNPs given the data we have reviewed to date. With these concerns in mind, we
welcome the opportunity to review Defendants' proposed PNP policy with a goal of
reaching a mutually agreeable approach to the appropriate use of PNPs in providing
*Coleman* patient care.

   **Non-Hub Telepsychiatry**: We also agree that it may be possible for
telepsychiatrists to provide care during the pandemic from non-hub locations such as
their homes, with appropriate limitations. We understand Defendants are also preparing a
proposal on this issue, which we look forward to reviewing. Our expectation is that all of
the other limitations of the Court-ordered telepsychiatry policy would apply to these
telepsychiatrists, including requirements for on-site visits, confidential space with
adequate bandwidth and equipment, access to EHRS, etc.

   We note, however, that Defendants' letter touts increases in telepsychiatry hiring
and retention since the start of the pandemic, but does not acknowledge that those
increases have come with significant losses of on-site staff psychiatrists and increased
reliance not only on registry psychiatry, but on registry telepsychiatry. A comparison of
the data from the Psychiatry Vacancy Reports for February and September 2020 (ECF
No. 6563 and 6929, respectively) shows the following:

|  | February 2020 | September 2020 | Net Change |
|---|---|---|---|
| On Site Psychiatrists | 143.30 | 135.40 | - 7.9 |
| Registry Psychiatrists | 61.18 | 80.01 | + 18.83 |
| Registry Telepsychiatrists | 4.56 | 16.23 | + 11.67 |

   To ensure that the proposed, temporary policy permitting telepsychiatry from
home does not further erode Defendants' ability to provide on-site care consistent with
the Program Guide and the telepsychiatry policy, Defendants should establish a
differential pay scale to encourage on-site care. The scale should pay most for on-site
care, less for telepsychiatry care from a hub, and the least for telepsychiatry from home.
And Defendants must continue to place the highest priority on ensuring on-site psychiatry
care at that PIPs and MHCBs, and availability of on-site psychiatry at EOP programs,
consistent with the telepsychiatry policy.

[3650602.6]

Melissa Bentz
Matthew A. Lopes Jr.
Dr. Amar Mehta
November 16, 2020
Page 5

**Inpatient Bed Allocations**:  In the Letter, Defendants propose to change the allocation for all inpatient programs—including the PIPs and MHCBs—to be census-based, rather than capacity-based, as it currently is.  Plaintiffs strongly disagree with the proposal.  There is simply no evidence whatsoever that there are too many psychiatrists in these programs or that psychiatrists are providing too much psychiatric care to the critically ill patients in these licensed beds.  The evidence that Plaintiffs' counsel has reviewed shows that these programs are dramatically understaffed for all disciplines, resulting in minimal or no out of cell time and inadequate psychiatric treatment.

Nor is it appropriate for Defendants—given the record in this litigation—to have additional financial incentives to reduce referrals and acceptances to inpatient psychiatric settings.

Staffing ratios for the inpatient programs are based on Defendants' own projections of need, and indeed Defendants continue to operate hundreds of unlicensed inpatient beds because their anticipated need is so great.  That need is projected to get even higher as to PIP beds under Defendants' Spring 2020 Bed Projections.  As we all know, the pandemic has dramatically impeded clinically necessary transfers to inpatient settings.  Defendants reported just last week that all of the PIPs are closed to admissions, despite the fact that over 300 patients have pending referrals.  Moreover, the Court and Special Master have now many times noted in the last year that there is significant evidence of unmet need that preexisted the pandemic, and COVID-19 has made the problem much worse.  The history of this case teaches that clinicians will not bother to refer patients when, as now, they will not actually transfer in a timely fashion. Defendants' data shows this pattern is unquestionably happening again, as COVID-19 has dramatically depressed referrals to the MHCB, ICF and acute levels of care (and likely EOP and CCCMS referrals as well).  As we have discussed at multiple task force meetings, Defendants' COVID-19 dashboard shows that referrals to higher levels of care were, in the early months of 2020 before the pandemic, higher than the same months in 2019.  Starting in April, however, referrals for all three inpatient levels of care fell to fractions of where they were in the same months last year and have persisted for the duration of the pandemic.  Meanwhile, the COVID-19 dashboard reports that rates of self-injurious behavior, including with intent to die, have either remained roughly the same as they were last year, or have increased.  And numbers of completed SRASHEs— even when supplemented with the use of Columbia Screeners—have plummeted by upwards of 40% when compared to 2019 despite these troubling trends.  In sum, Defendants' under-identification of class members in need of inpatient care is a persistent trend in this case that is playing out in dramatic fashion right now.  Moving to allocate

Melissa Bentz
Matthew A. Lopes Jr.
Dr. Amar Mehta
November 16, 2020
Page 6

psychiatrists based on the artificially low census rates in Defendants' inpatient programs is dangerous and wholly unacceptable. Care must be available to the likely thousands of patients currently in need of inpatient care who will only be fully identified after the Court's long-promised unmet need study is completed, and that can only happen if Defendants continue to allocate inpatient psychiatrists based on bed numbers.

**Proposals Based on Allegedly "Flawed" Provisions of the 2009 Staffing Plan**: Finally, Plaintiffs continue to object to the notion that positions duly allocated under the 2009 staffing plan should be cut due to purported "flaws" in the plan's methodology or assumptions. This includes Defendants' proposals for reducing the psychiatry allocations for routine psychiatry contacts for EOP and CCCMS class members, for a portion of CCCMS class members, and for crisis intervention. Defendants' letter does not even attempt to meet the "heavy burden" this Court ruled would be necessary to justify modifications to the 2009 plan—even before Dr. Golding's allegations and the subsequent trial showed that these same cuts, floated first in 2018, were predicated on intentionally manipulated data. *See, e.g.*, Dec. 17, 2019 Order, ECF No. 6247; *see also* Oct. 10, 2017 Order, ECF No. 5711.

It is alarming that Defendants, once again, did not fully vet these proposals with their headquarters psychiatry team, much less, we presume, with psychiatry leadership in the field, to ensure they were justified before presenting them to Plaintiffs. Defendants' September 21, 2020 letter makes clear that some proposals were not even presented to Dr. Golding and the other headquarters psychiatrists for their views. *See* M. Bentz Sept. 21, 2020 Letter at 3-4 (noting that "*[m]any* of the proposals" were discussed with headquarters psychiatry). The fact that massive cuts to psychiatry allocations are once again being presented against the professional judgment of the headquarters psychiatry team, whose sole mission is to ensure the psychiatrists treating patients in the field have sufficient resources and support to properly provide care, demonstrates that Defendants' purported identification of "flaws" in the allocations is hollow.

Plaintiffs came close to agreeing to the same proposals presented in the Letter in 2018. That tentative agreement was predicated on data the appeared to show that care in the field was much better than Plaintiffs understood it to be. We now know that data was false and presented an inflated picture of compliance. Yet Defendants continue to propose cuts that would effectively reduce Defendants' total number of needed psychiatrists to the levels that currently exist. But the existing number of psychiatrists have been unable to provide care consistent with the Program Guide, even as Defendants' data remains under the Special Master's expert's review to ensure that it is no longer false and misleading. And Defendants still have no reliable method to track the amount

Melissa Bentz
Matthew A. Lopes Jr.
Dr. Amar Mehta
November 16, 2020
Page 7

of direct patient care its under-allocated psychiatry supervisors are providing while also attempting to perform the supervisory tasks that are critically necessary to ensuring minimum levels of quality.  They still have not fixed the massive inefficiencies caused by the poor design of EHRS that impede psychiatry care, as detailed at length during the 2019 trial and particularly in Dr. Kuich's deposition, none of which are accounted for in the 2009 plan.  They also have not fixed the physical plant and other workplace condition deficiencies identified by Dr. Golding and others at the trial, which were confirmed by the Special Master's labor economist to be an issue of significant concern for psychiatrists in the field.  (As a side note, the fact that Defendants did not seek the views of headquarters psychiatry regarding the Special Master's labor economist report on psychiatry recruitment and retention—or even provide it to them—shows continued dysfunction in the department.)

Nor have Defendants apparently made any effort to account for other changes in the role or tasks of psychiatrists since 2009 that have increased psychiatry's workload, such as tasks related to providing care in segregation units established after that plan's approval.  Similarly, Defendants do not account for tasks psychiatry should be participating in, but are not.  This includes participation in Defendants' crisis intervention teams, which continue to operate without psychiatry membership or even a defined policy even as the suicide and self-injurious-behavior rates remain sky-high, and SRASHEs and referrals to all levels of inpatient care plummet.

This is not about math.  Even if Defendants have identified assumptions in the 2009 plan that appear outdated, the number of psychiatrists ultimately provided to each institution are not in practice tethered to the specific task, patient class, or provision in the plan that generated the allocation.  Instead, each institutions receives a sum total of psychiatry positions after each biannual allocation to provide care for the patients at their prison in whatever way they see fit.  As such, individual allocations from the 2009 plan cannot be separated out or severed from the whole picture of treatment class members receive.  There is no evidence that there are too many psychiatrists in CCCMS or EOP programs or that psychiatrists are spending too much time with their patients.  In fact, all indicators that we are aware of point in the opposite direction.

/ / /

/ / /

[3650602.6]

Melissa Bentz
Matthew A. Lopes Jr.
Dr. Amar Mehta
November 16, 2020
Page 8

      Until Defendants can demonstrate to us that psychiatric care is constitutionally adequate, or the Special Master confirms it to be true, we will not agree to cut psychiatry positions that Defendants themselves confirmed to be necessary to provide adequate care.

              Sincerely,

              ROSEN BIEN
              GALVAN & GRUNFELD LLP

              */s/ Lisa Ells*

        By:   Lisa Ells

LAE:LAE
cc:    *Coleman* Special Master Team
       *Coleman* co-counsel
       Kyle Lewis
       Elise Thorn
       Tyler Heath
       Lucas Hennes

[3650602.6]