# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,
**Plaintiffs**

v.    No. CIV S-90-0520 KJM DB P

GAVIN NEWSOM, et al.,
**Defendants**

## TWENTY-EIGHTH ROUND MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
March 5, 2021

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Management System |
| ADHD: | Attention Deficit Hyperactivity Disorder |
| ADLs: | Activities of Daily Living |
| AGPA: | Associate Governmental Program Analyst |
| AIMS: | Abnormal Involuntary Movement Scale |
| APP: | Acute Psychiatric Program |
| ASH: | Atascadero State Hospital |
| ASP: | Avenal State Prison |
| ASU: | Administrative Segregation Unit |
| BIP: | Behavioral Incentive Program |
| BLS: | Basic Life Support |
| C-file: | Case File |
| C&PR: | Classification and Parole Representative |
| Calipatria: | Calipatria State Prison |
| CAP: | Corrective Action Plan |
| CBT: | Cognitive Behavioral Therapy |
| CC I: | Correctional Counselor I |
| CC II: | Correctional Counselor II |
| CCAT: | Correctional Clinical Assessment Team |
| CCC: | California Correctional Center |

i

| | |
|---|---|
| CCHCS | California Correctional Health Care Services |
| CCI: | California Correctional Institution |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| Centinela: | Centinela State Prison |
| CEO: | Chief Executive Officer |
| CHCF: | California Health Care Facility |
| CHSA: | Correctional Health Services Administrator |
| CIM: | California Institution for Men |
| CIW: | California Institution for Women |
| CMC: | California Men's Colony |
| CME: | Chief Medical Executive |
| CMF: | California Medical Facility |
| CNA: | Certified Nursing Assistant |
| CO: | Correctional Officer |
| CPR: | Cardiopulmonary Resuscitation |
| CQI: | Continuous Quality Improvement |
| CQIT: | Continuous Quality Improvement Tool |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |

CSP/LAC:            California State Prison/Los Angeles County

CSP/Sac:           California State Prison/Sacramento

CSP/Solano:        California State Prison/Solano

CSR:               Classification Staff Representative

CTC:               Correctional Treatment Center

CTF:               Correctional Training Facility

CVSP:              Chuckawalla Valley State Prison

DCHCS:             Division of Correctional Health Care Services

DDP:               Developmental Disability Program

DSH:               Department of State Hospitals

DOT:               Direct Observation Therapy

DVI:               Deuel Vocational Institution

EHRS:              Electronic Health Records System

EKG:               Electrocardiogram

EOP:               Enhanced Outpatient Program

EPRD:              Estimated Parole/Release Date

ERRC:              Emergency Response Review Committee

EMRRC:             Emergency Medical Response Review Committee

EMS:               Emergency Medical System

eUHR:              Electronic Unit Health Record

| | |
|---|---|
| FIT: | Focused Improvement Team |
| Folsom: | Folsom State Prison |
| FWF: | Folsom Women's Facility |
| FTE: | Full-Time Equivalent |
| GACH: | General Acute Care Hospital |
| GP: | General Population |
| HCFIP: | Health Care Facilities Improvement Program |
| HCPOP: | Health Care Placement Oversight Program |
| HDSP: | High Desert State Prison |
| HPS I: | Health Program Specialist I |
| HR: | High Refuser |
| HS: | *Hora Somni*/Hour of Sleep |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| IPOC | Interdisciplinary Plan of Care |
| IDTT: | Interdisciplinary Treatment Team |
| IERC: | Institution Executive Review Committee |
| IEX: | Indecent Exposure |
| IP: | Inmate Patient |
| ISP: | Ironwood State Prison |

KVSP:                    Kern Valley State Prison

LOP:                     Local Operating Procedure

LOC:                     Level of Care

LRH:                     Least Restrictive Housing

LTRH:                    Long-Term Restricted Housing

LVN:                     Licensed Vocational Nurse

MAPIP:                   Medication Administration Process Improvement Program

MCSP:                    Mule Creek State Prison

MDO:                     Mentally Disordered Offender

MHCB:                    Mental Health Crisis Bed

MHCBU:                   Mental Health Crisis Bed Unit

MHOHU:                   Mental Health Outpatient Housing Unit

MHSDS:                   Mental Health Services Delivery System

MHTS.net:                Mental Health Tracking System

MERD:                    Minimum Eligible Release Date

MRSA:                    Methicillin Resistant Staphylococcus Aureus

MSF:                     Minimum Support Facility

NA:                      Nurse-Administered

NDS:                     Non-Disciplinary Segregation

NKSP:                    North Kern State Prison

NOS:                    Not Otherwise Specified

OHU:                    Outpatient Housing Unit

OP:                     Operational Procedure

OSS:                    Office Services Supervisor

PIWP:                   Performance Improvement Work Plan

PBSP:                   Pelican Bay State Prison

PC:                     California Penal Code

PIA:                    Prison Industries Authority

PIP:                    Psychiatric Inpatient Program

PREA:                   Prison Rape Elimination Act

PSH:                    Patton State Hospital

PSU:                    Psychiatric Services Unit

PTSD:                   Post-Traumatic Stress Disorder

PVSP:                   Pleasant Valley State Prison

QIP:                    Quality Improvement Plan

QIT:                    Quality Improvement Team

QMC:                    Quality Management Committee

R&R:                    Receiving and Release

RAP:                    Reasonable Accommodation Panel

REMS:                   Risk Evaluation and Mitigation Strategies

RJD:                    Richard J. Donovan Correctional Facility

RVR:                    Rules Violation Report

SCC:                    Sierra Conservation Center

SCU:                    Supportive Care Unit

SHU:                    Security Housing Unit

SI:                     Suicidal Ideation

SIB:                    Self-Injurious Behavior

SNF:                    Skilled Nursing Facility

SNY:                    Sensitive Needs Yard

SOMS:                   Strategic Offender Management System

SPHU:                   Special Program Housing Unit

SPMW:                   Suicide Prevention Management Workgroup

SPRFIT:                 Suicide Prevention and Response Focused Improvement Team

SSRI:                   Selective Serotonin Reuptake Inhibitor

SQ:                     San Quentin State Prison

SRASHE:                 Suicide Risk and Self-Harm Evaluation

SRE:                    Suicide Risk Evaluation

SSI:                    Supplemental Security Income

STEP:                   System to Encourage Progress

STRH:                   Short-Term Restricted Housing

SVPP:                   Salinas Valley Psychiatric Program

SVSP:               Salinas Valley State Prison

TMHU:               Temporary Mental Health Housing Units

TABE:               Test of Adult Basic Education

TCMP:               Transitional Case Management Program

TTA:                Triage and Treatment Area

VAC:                Vacuum-Assisted Closure

VSP:                Valley State Prison

WIC:                California Welfare and Institutions Code

WSP:                Wasco State Prison

## TABLE OF CONTENTS

ACRONYMS and ABBREVIATIONS ................................................................................. i

THE COLEMAN SPECIAL MASTER'S  TWENTY-EIGHTH ROUND MONITORING
REPORT ................................................................................................................. 1

I.        INTRODUCTION ................................................................................... 1

  A.  Significant Program Guide Developments: The 2018 Program Guide Update and
      the Revision Process ...................................................................... 22

  B.  The Golding Report .............................................................................. 26

      1.  The Receipt of the Golding Report, the Appointment of the Neutral
          Investigator, and the Evidentiary Hearing that Followed ........................... 26

      2.  The Appointment of the Special Master's Data Expert and His Activities to
          Date ........................................................................................ 33

  C.  Inpatient Care Monitoring.......................................................................... 38

  D.  The COVID-19 Pandemic and its Impact on the Twenty-Eighth Round of
      Monitoring .......................................................................................... 39

      1.  The Special Master's Status Updates to the Court Regarding Onsite
          Monitoring ................................................................................. 39

      2.  The COVID-19 Response .................................................................... 43

      3.  Coleman Class Members' Access to Inpatient Care.................................... 45

      4.  COVID-19 Related Program Guide Departures ......................................... 46

      5.  COVID-19 and its Impact on Population Reduction Measures, including
          Proposition 57 ............................................................................. 49

  E.  CDCR's Mental Health Headquarters Monitoring ........................................ 50

      1.  Mental Health Meetings.................................................................... 53

      2.  CDCR/CCHCS Meetings.................................................................... 55

  F.  The Special Master's Labor Economist's Report ........................................ 59

  G.  Major Policy Successes During the Twenty-Eighth Round ............................. 62

      1.  Telepsychiatry Policy....................................................................... 62

2.  Desert Transfers Policy ................................................................ 68

H.  Suicide Prevention ......................................................................... 70

1.  The Special Master's Expert's Fourth Re-Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation ................................................... 70

2.  2015 and 2016 Suicide Report ................................................... 71

II.   MENTAL HEALTH VACANCY RATES OVERALL AND BY DISCIPLINE DURING THE TWENTY-EIGHTH MONITORING ROUND ..................................... 73

Mental Health Vacancy Rates Overall and by Discipline During the Twenty-Eighth Monitoring Round ................................................................................... 73

III.  SUMMARY OF THE SPECIAL MASTER'S FINDINGS – ONSITE AND PAPER MONITORING ................................................................................. 80

A.  Quality Management ......................................................................... 80

B.  Quality of Care in CDCR's Mental Health Programs ....................... 84

1.  The Quality of Care Delivered during the Twenty-Eighth Monitoring Round Continues to Substantiate the Need for Focused Attention to the Interdisciplinary Treatment Team (IDTT) Through an Adequate and Sustained Quality Improvement Process in CDCR's Mental Health Program ......................... 84

a.  The Interdisciplinary Treatment Team Process .................. 85

b.  Treatment Planning Concerns ............................................ 93

i.   Documentation Issues ................................................ 93

ii.  Inadequacies in Treatment Planning ......................... 95

iii. Needed Modifications and Updates to Treatment Plans to Respond to Inmates' Current Health Issues Did Not Occur ................................. 97

iv.  Care Was Not Sufficiently Individualized to Address Inmates' Clinical Needs  98

(1) Treatment Was Not Individualized ................................... 99

(2) Records reflected Deficient Case Conceptualization and/or Formulation ........................................................................ 100

(3) Diagnoses in Inmates' Records Required Clarification/ Conflicting or Multiple Diagnoses Required Resolution .................. 100

x

(4) Treatment Plans' Goals were Inadequate ......................................... 102

    c.  Issues with the Consideration for Referral to a Higher Level of Care
Process ........................................................................................................ 103

C.  Medication Management ......................................................................................... 108

    1.  Psychiatry Measures ......................................................................................... 110

    2.  Clozaril/Clozapine Institutions ...................................................................... 113

    3.  Continuity, Compliance, Observation, and Administration Measures .................... 114

        a.  Continuity of Medication Upon Arrival at Reception Center............................. 115

        b.  Continuity of Medication for Inter-Institutional Transfers ................................. 115

        c.  Continuity of Medications with Intra-Institutional Transfers ............................ 115

        d.  Continuity of Medication following MHCB, Community Hospital or DSH
Transfer, Parole or Transfer to Community........................................................ 116

        e.  Observation of Preparation and Administration of Medications ....................... 117

        f.  *Hora Somni*/Hour of Sleep (HS) Medications ................................................... 117

        g.  AM/PM Medications ........................................................................................ 117

    4.  Medication Compliance Measures........................................................................ 117

        a.  Medication Compliance for PC 2602 Involuntary Medication........................... 117

    5.  Medication Administration Measures .................................................................. 119

        a.  Psychiatrist Prescribed Chronic Care Medications............................................ 119

        b.  Psychiatrist-Prescribed Outpatient Provider New Medication orders ............... 119

    6.  PC 2602 Petitions........................................................................................... 119

    7.  Pill Lines ............................................................................................................ 120

    8.  *Hora Somni*/ Hour of Sleep (HS) Medications ....................................................... 121

D.  Access to Higher Levels of Care ................................................................................ 121

    1.  Consideration of Referrals to Higher Levels of Care (Formerly Form 7388-B
Process ................................................................................................................ 123

        a.  Interdisciplinary Treatment Teams and Higher Level of Care Consideration Process ............................................................ 125

        b.  The Quality of Higher Level of Care Consideration Process Varied Across Institutions .............................................................. 126

    2.  Transfers to Inpatient Care.............................................................. 129

        a.  Adequacy of Referral/Non-Referral Logs ........................ 129

        b.  Transfers to Acute Inpatient Care ..................................... 130

        c.  Transfers to Intermediate Inpatient Care ......................... 131

        d.  Transfers Following Inpatient Bed Assignment ............... 131

    3.  MHCBs ........................................................................................... 132

        a.  Transfers to MHCBs and Bed Availability....................... 132

        b.  MHCB Lengths of Stay ...................................................... 132

    4.  Alternative Housing Lengths of Stay.............................................. 132

    5.  Transfers to Psychiatric Services Unit (PSU) ............................... 133

    6.  Transfers to Administrative Segregation EOP Hubs ..................... 133

    7.  Transfers to EOP ............................................................................ 133

    8.  Transfers to Short-Term Restricted Housing ................................ 133

    9.  Transfers to Long-Term Restricted Housing ................................ 134

E.  Mental Health/Custody Relations ............................................................ 135

    1.  Twenty-Eighth Monitoring Round Findings on Mental Health/Custody Relations ...................................................................................... 135

F.  Review of the RVR Process..................................................................... 139

G.  Use of Force ............................................................................................ 143

H.  Program Access ...................................................................................... 148

I.  Construction and Renovation of Mental Health Treatment Space at Various Levels of Care .......................................................................................... 158

J.  MHSDS Inmates in Segregated Housing................................................. 167

1.  Psychiatric Services Unit ............................................................................ 167

2.  Administrative Segregation EOP Hubs ..................................................... 168

3.  Short-Term Restricted Housing (STRH) ................................................... 169

4.  Long-Term Restricted Housing (LTRH) ................................................... 170

5.  3CMS Inmates in Administrative Segregation ......................................... 170

6.  Non-Disciplinary Segregation .................................................................. 170

7.  Privilege Group C and/or Work Group ("C" Status) ................................ 171

IV.    SUMMARY OF SPECIAL MASTER'S FINDINGS – HYBRID REVIEW ............... 172

A.  Access to Higher Levels of Care ..................................................................... 172

B.  Reception Center ............................................................................................. 176

C.  Temporary Mental Health Housing Units (TMHUs) ...................................... 178

D.  Administrative Segregation EOP Hubs .......................................................... 183

E.  MHCB ............................................................................................................. 185

F.  STRH ............................................................................................................... 188

G.  EOP ................................................................................................................. 190

H.  3CMS .............................................................................................................. 193

I.  Condemned 3CMS .......................................................................................... 195

J.  Review of the RVR Process ............................................................................. 196

V.    CONCLUSION ......................................................................................................... 198

APPENDIX A SPECIAL MASTER'S DATA EXPERT REPORT ........................................... 200

APPENDIX B CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN ..................... 226

APPENDIX C ACTIVITIES OF THE *COLEMAN* SPECIAL MASTER DURING
CALENDAR YEAR 2020 ...................................................................................... 237

APPENDIX D INSTITUTIONAL SUMMARIES ................................................................... 259

California State Prison/Sacramento (CSP/Sac) ..................................................... 260

Folsom State Prison (Folsom)/Folsom Women's Facility (FWF) ........................... 286

Pelican Bay State Prison (PBSP) ........................................................................ 300

High Desert State Prison (HDSP) ...................................................................... 306

Mule Creek State Prison (MCSP) ...................................................................... 325

Sierra Conservation Center (SCC) ..................................................................... 352

California Medical Facility (CMF) ..................................................................... 357

California State Prison (CSP/Solano) ................................................................ 391

San Quentin State Prison (SQ) ........................................................................... 414

Deuel Vocational Institution (DVI) ................................................................... 423

California State Prison/Corcoran (CSP/Corcoran) ........................................ 430

California Substance Abuse Treatment Facility (CSATF) ........................... 482

Pleasant Valley State Prison (PVSP) ................................................................. 509

Avenal State Prison (ASP) .................................................................................. 516

Salinas Valley State Prison (SVSP) ................................................................... 520

California Treatment Facility (CTF) ................................................................. 570

California Men's Colony (CMC) ......................................................................... 575

Wasco State Prison (WSP) ................................................................................... 605

Kern Valley State Prison (KVSP) ...................................................................... 629

California State Prison/Los Angeles County (CSP/LAC) ............................. 654

North Kern State Prison (NKSP) ....................................................................... 681

California Correctional Institution (CCI) ....................................................... 709

California Institution for Men (CIM) ............................................................... 725

California Rehabilitation Center (CRC) ........................................................... 751

California Institution for Women (CIW) .......................................................... 762

Richard J. Donovan Correctional Facility (RJD) .......................................... 790

Central California Women's Facility (CCWF) ................................................ 833

Valley State Prison (VSP)...................................................................................... 844

California Health Care Facility (CHCF) ........................................................... 850

APPENDIX E CLINICAL CASE REVIEWS ................................................... 858

California State Prison/Sacramento (CSP/Sac) .............................................. 859

Folsom State Prison (Folsom).......................................................................... 875

Pelican Bay State Prison (PBSP)..................................................................... 877

High Desert State Prison (HDSP)..................................................................... 904

Mule Creek State Prison (MCSP) .................................................................... 908

Sierra Conservation Center (SCC)................................................................... 917

California Medical Facility (CMF).................................................................... 930

California State Prison/Solano (CSP/Solano) ................................................. 935

San Quentin State Prison (SQ)......................................................................... 940

Deuel Vocational Institution (DVI) ................................................................. 960

California State Prison/Corcoran (CSP/Corcoran) ....................................... 994

California Substance Abuse Treatment Facility (CSATF) ......................... 1004

Pleasant Valley State Prison (PVSP).............................................................. 1006

Avenal State Prison (ASP)............................................................................... 1025

Salinas Valley State Prison (SVSP)................................................................ 1032

California Treatment Facility (CTF)............................................................... 1050

Wasco State Prison (Wasco)........................................................................... 1061

Kern Valley State Prison (KVSP).................................................................... 1066

California State Prison/Los Angeles County (CSP/LAC) ........................... 1075

North Kern State Prison (NKSP)..................................................................... 1080

California Correctional Institution (CCI)....................................................... 1092

California Institution for Men (CIM)............................................................. 1095

California Institution for Women (CIW) ................................................................. 1100

Richard J Donovan Correctional Facility (RJD) .................................................. 1101

Central California Women's Facility (CCWF) .................................................... 1108

Valley State Prison (VSP) ................................................................................... 1135

California Health Care Facility (CHCF) .............................................................. 1160

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs,

    vs.                                  No. 2:90-cv-0520 KJM DB

GAVIN NEWSOM, et al.,

    Defendants.

## THE COLEMAN SPECIAL MASTER'S
## TWENTY-EIGHTH ROUND MONITORING REPORT

## I.    INTRODUCTION

There are many words that can be used to describe the Twenty-Eighth Monitoring Round. Bombshell, complex, harrowing, onerous, and unbelievable are all appropriate and fitting to say the least. But in some respects, even they do not quite do justice. No matter what you call it, one thing is for sure: the Twenty-Eighth Round was anything but routine. To be sure, in the 25 years since the inception of the special mastership and the 27 prior monitoring rounds, this round has been like none other. Without question, the sheer number of interruptions during the round was unprecedented.

By the time the round started, California Department of Corrections and Rehabilitation's (CDCR) Chief Psychiatrist had authored and filed a whistleblower report (the Golding Report) accusing the department of presenting fraudulent and misleading data to the Court and Special Master. That revelation had an undeniable domino-effect on the trajectory of the case, let alone the monitoring round. The fallout from the Golding Report not only led to the appointment of a neutral expert, which was followed by a limited, evidentiary hearing, but it also led to the birth of

1

CDCR Mental Health Headquarters monitoring. Moreover, given the findings of the neutral investigator and the Court regarding defendants' data, the Special Master was in no position to rely on defendants' data for his monitoring reviews as he had in the past. This resulted in the Special Master having to conduct his own data analysis. And, as if all of that was not enough to upset the status quo, no one was prepared for what came next.

Inarguably, the grand finale of what has been the most unpredictable monitoring round in the history of this case was the onset of the novel coronavirus (COVID-19) pandemic in March 2020. As a result, the COVID-19 Task Force was formed, numerous status conferences were held and orders issued, population reduction measures were introduced, onsite monitoring was suspended and monitoring was conducted in alternative ways. And yet, despite all of this, the amount of ground covered, and progress made, has been remarkable.[1] In fact, much of the activity and progress regarding *Coleman* remedial efforts remains ongoing at the time of this writing.

The Twenty-Eighth Round began on February 12, 2019 with onsite visits that continued through the end of 2019. With the onset of the COVID-19 pandemic, the remaining institutions were monitored by paper reviews and hybrid Electronic Health Records System (EHRS)/paper reviews that were completed in September 2020. The Special Master's Twenty-Eighth Monitoring Round review covers the defendants' compliance with the plans, policies, and protocols provisionally approved by this Court in mid-1997 that were subsequently revised and re-approved by this Court on March 3, 2006, (ECF No. 1773), as well as the 2009 Program

---

[1] To the extent possible, activities and events that occurred during the Twenty-Eighth Monitoring Round are discussed in chronological order.

Guide Revision,[2] known as the Mental Health Services Delivery System (MHSDS) Program

Guide. On December 15, 2017, the Court ordered the parties to file "a current consolidated

Program Guide incorporating all modifications required by court orders since March 2006."

ECF No. 5750 at 4. The Special Master filed the 2018 Program Guide Revision in July 2018.[3]

ECF 5864. The MHSDS Program Guide, 2018 Revision, is the operative remedial plan in this

matter.[4]

      As previously stated, the Special Master's monitor's[5] and expert's institutional site visits

for the Twenty-Eighth Monitoring Round began on February 12, 2019 and ended in September

2020 with the completion of the last hybrid EHRS/paper reviews. As with prior rounds,

headquarters and institutional mental health staff and administrators of the California

Department of Corrections and Rehabilitation (CDCR) were generally cooperative with the

Special Master's monitoring staff during the institutional site visits. With the onset of the

COVID-19 pandemic, an unquestionable challenge for the defendants, this cooperation was

extended to the Special Master's monitoring staff during the course of paper and hybrid reviews.

The monitor conducted full onsite visits at 17 CDCR adult institutions - CCI, CIM, CIW, CMF,

---

[2] *See* April 19, 2017 Order, ECF No. 5610 at 1, n. 1 (stating that the 2009 Program Guide Revision "is the operative remedial plan in this action); *see also* April 15, 2013 Order at 30-32.

[3] The Special Master filed the 2018 Program Guide Revision and his report on June 29, 2018 which included three proposed appendices and a report containing four recommendations. ECF No. 5844. However, the court, by minute order, requested that the Special Master file the complete 2018 Program Guide Revision, which he did on July 30, 2018. ECF No. 5860. According to the court, the complete Program Guide included the 2009 Revised Program Guide, proposed appendices A and B, and the index to Appendix A. *Id*.

[4] Recognizing that parts of the remedy were not in the Program Guide, the court ordered the parties to provide a list of negotiated or court ordered remedial measures related to custody issues not currently in the Program Guide. ECF No. 6214. The court approved the parties' list on February 11, 2020. ECF No. 6460. On August 8, 2020, the court issued a one-year provisional approval of proposed processes for updating the Program Guide and the Compendium of Custody Related Measures. ECF No. 6806.

[5] Although the collected data and findings discussed in this Report are the product of members of different monitoring teams, the various monitors are referred to collectively as "the monitor." Members of the Special Master's staff who are mental health experts are referred to collectively as "the Special Master's expert."

CSATF, CSP/Sac, CSP/Corcoran, CSP/LAC, CSP/Solano, Folsom/FWF, HDSP, KVSP, MCSP, NKSP, RJD, SVSP, and WSP. Paper reviews were completed at CMC and CRC in March 2020. The remaining ten institutions - ASP, CCWF, CHCF, CTF, DVI, PBSP, PVSP, SCC, SQ, and VSP, were monitored through the hybrid EHRS/paper review process. A detailed discussion on the various ways by which monitoring was conducted during the Twenty-Eighth Monitoring Round is provided below. *See* discussion *infra* 39-43.

Given the different manner in which monitoring was conducted during this round, this report is divided up into two parts. The first part pertains to the 17 institutions where monitoring was conducted onsite and the two institutions where monitoring was conducted by paper review. The Twenty-Eighth Round core areas of monitoring included, but were not limited to, institutional mental health staffing levels, quality management, medication management, and transfers to higher levels of care. The summaries of the focus areas appear below as Sections A through J.

The Hybrid Review of the Special Master's Twenty-Eighth Round Monitoring Report covers the ten institutions that were monitored using the hybrid EHRS/paper review approach - ASP, CCWF, CHCF, CTF, DVI, PBSP, PVSP, SCC, SQ, VSP, and addresses access to higher levels of care, MHCB, Temporary Mental Health Units (TMHUs), administrative segregation EOP Hub, Short Term Restrictive Housing (STRH), EOP, Reception Center, 3CMS, and Rules Violation Reports. For each mental health program, the report focuses on compliance with Program Guide required clinical contacts, assessment of the quality of IDTTs, the quality of mental health care provided in the MHSDS programs at each institution, including in TMHUs, evaluates nonreferral decisions, and the intervention developed for inmates indicated for

consideration of referral to inpatient care but were not referred. The summaries of the focus areas for these institutions appear below in as Sections K through T.

Similar to the Twenty-Seventh Round, the Special Master's expert, Lindsay Hayes, was simultaneously conducting his fourth reaudit of suicide prevention policies, practices, and procedures in 20 selected CDCR prisons. A separate discussion on suicide prevention, including Mr. Hayes' report, is provided later in this report. *See* discussion *infra* Section H.

This report also discusses the four issues that the court ordered the Special Master to include in his Twenty-Eighth Monitoring Round Report: (1) specific benchmarks necessary for constitutional compliance, (2) implementation of the Custody and Mental Health Partnership Plan (CMHPP), (3) effects of Proposition 57, and (4) compliance with Form 7388-B and referrals to higher levels of care. ECF No. 5852 at 3 and 5-7. Issue one, benchmarks for compliance, was addressed by the Court in its September 3, 2020 order. ECF No. 6846. The Court noted that it had previously "directed the Special Master to begin recommending 'specific benchmarks that, when met, signal constitutional compliance'" and further, to "'include, as appropriate, specific recommended compliance percentage requirements for each benchmark,' starting with the Twenty-Eighth Round Monitoring Report." *Id*. at 1. The Court went on to say that it had since "contemplat[ed] setting its own process for establishing benchmarks." *Id*. The September 3, 2020 order "confirm[ed] the framework developed over the past twenty-five years for the requirements defendants must satisfy to achieve compliance with the Constitution and against which their progress toward constitutional compliance is being measured." *Id*. at 2. In addition, the Court "clarifie[d] the proper role of 'benchmarks' going forward." *Id*. Accordingly, this task is no longer delegated to the Special Master. Issues two, three, and four are discussed separately.

Given their length and degree of specificity, discussion of two topics have been appended. Appendix A is the Special Master's Data Expert's report on data issues and Appendix B is a report on the Custody and Mental Health Partnership Plan (CMHPP).[6] Appendix C is a list of activities of the *Coleman* Special Master During Calendar Year 2020. Appendix D is comprised of institution-by-institution summaries of the monitor's findings during the Twenty-Eighth Round. And finally, the Special Master's expert's clinical reviews of individual inmate cases appear in Appendix E.

On December 17, 2020, the Special Master provided the *Coleman* parties with the draft version of this report. Consistent with the regular practice for the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the draft report. On December 24, 2020, defendants requested a two-week extension of time to submit their responses to the report. The Special Master granted extensions to both parties. On February 2, 2021, pursuant to the extensions, the parties submitted their comments and objections to the draft report along with supporting documents.[7]

As discussed below, where the Special Master deemed revisions or amendments to the draft report were appropriate based upon the parties' comments, they have been addressed below or within relevant sections of this report.

**<u>Plaintiffs' Response to the Draft Report</u>**

In the response to the draft report, plaintiffs observed that the draft report emphasized defendants' persistent noncompliance regarding mental health staffing and access to higher levels of care, noting that the draft report recognized that neither the COVID-19 pandemic

---

[6] This report provides an update to the Court regarding the status of the implementation of the CMHPP by CDCR.

[7] *See* Attachment A, Letter February 2, 2021 from plaintiffs' counsel Sundeep Thind to Special Master Lopes. *See* Attachment B, Letter February 2, 2021 from defendants' counsel Alexander Gourse to Special Master Lopes.

challenges faced by defendants, "nor the temporary reduction in the CDCR population during the pandemic," were sufficient to justify their noncompliance with core benchmarks related to providing adequate mental health care to the *Coleman* class.

Plaintiffs raised four specific areas of concerns in the draft report: (1) segregation, (2) RVR process, (3) use of force, and (4) program access and credit earning. Plaintiffs asserted that the Special Master devoted "limited attention" to these issues and did not submit "recommendations for further action" notwithstanding that the report had demonstrated that there had been "little to no improvement, or back-sliding, since prior monitoring rounds."

Regarding plaintiffs' requests for specific recommendations in their letter, for reasons stated in the report, *see infra* at 198, the Special Master will not be submitting recommendations to the Court at this time.

Plaintiffs' response, organized by topic, is discussed in further detail below.

**<u>Segregation</u>**

Plaintiffs requested the Special Master to provide more details regarding defendants' compliance with STRH and LTRH requirements or clearly state whether appropriate evaluation of compliance had been prevented because of "insufficient documentation." Plaintiffs highlighted the requirements of the various segregation units and specifically requested the Special Master to amend the draft report with any supplemental additional information regarding compliance measures available to the Special Master's team. Plaintiffs further indicated that to the extent that defendants either failed or were unable to provide data and information necessary for monitoring, this should be clearly stated to "reflect a fundamental deficiency in Defendants' system that must be documented and remedied." After consideration of plaintiffs' comments,

the Special Master has determined that the report contains all the information available to the Special Master regarding segregation units.

Plaintiffs also observed that the report did not offer any recommendations "relating to the deplorable conditions at the SAC PSU," noting that many of the deficiencies were previously reported in the Twenty-Seventh Round Monitoring Report. The Special Master will continue to monitor the PSU at CSP/Sac, and work with the parties to remediate specific deficiencies identified.

Plaintiffs also raised concerns regarding the Special Master's report that insufficient information had been provided by the majority of institutions related to the timely transfer of *Coleman* class members housed in non-disciplinary segregation within the required timeframe and whether they had received their property and been granted privileges as required by policy. Plaintiffs requested the Special Master to "conduct a more in-depth review of the NDS system to determine whether there has been any significant improvement since the Twenty-Seventh Round and what steps are necessary for Defendants to become fully compliant." This and several other issues also raised by plaintiffs aid the Special Master's future review of CDCR's segregation programs and are more appropriate for action during the next and future monitoring rounds.

**RVR Process**

While plaintiffs indicated their overall concurrence regarding the Special Master's findings that there was a systemwide lack of compliance with the basic requirements of the RVR process, they expressed concern that the Special Master did not offer any recommendations. In addition, plaintiffs requested the Special Master to "prioritize the interrelated problems of improper RVRs and staff misconduct in the months ahead." The Special Master will continue to focus on the RVR process as a core function of his monitoring responsibilities, continue to

engage with CDCR regarding staff misconduct including his ongoing assessment of the viability of the CMHPP, and collaborate with the *Armstrong* court expert regarding staff misconduct as a function of the court coordination process.

**Use of Force**

Regarding use of force, while plaintiffs note that the draft report identified specific areas of noncompliance, they also observed that the Special Master did not provide any recommendations. The Special Master previously addressed the matter of recommendations above. Plaintiffs also commented that the draft report offered "little explanation of the use of force data provided by defendants' institutions," indicating that the data raised a number of questions and provided a number of examples, specifically referencing a finding of the *Armstrong* court regarding use of force data. Plaintiffs specifically asked whether the Special Master's team or defendants have "assessed whether there is any evidence of incidents being misclassified as immediate rather than controlled uses of force." Plaintiffs conclude by highlighting their concern that "defendants may be evading court-ordered safeguards for controlled uses of force by similarly manufacturing 'emergency' incidents to justify immediate uses of force instead," referencing the *Armstrong* staff misconduct litigation. In reviewing use of force incident packages, the Special Master's staff examined all information provided in the use of force packets, which informed the report and his findings.

**Program Access and Credit Earning**

Plaintiffs addressed the Special Master's findings regarding disparities in program access and credit earnings reported in the draft report. Plaintiffs expressed concern that unlike the Twenty-Seventh Monitoring Round Report, the draft report did not propose that these issues be addressed through the work group process and requested that disparities in program access and

out-of-level housing should be "placed on the workgroup agenda in the coming months." After consideration of plaintiffs' request, in addition to his ongoing monitoring, the Special Master will utilize the all-parties' policy meetings to address issues of program access and out-of-level housing.

**Defendants Response to the Draft Report**

Defendants' response to the draft report was divided into several parts: (1) general response and comments, (2) introduction, (3) mental health vacancy rates overall and by discipline, (4) summary of the Special Master's findings - onsite and paper monitoring, (5) summary of the Special Master's findings - hybrid review, (6) Appendix A - Special Master's data expert report, and (7) Appendix D - institutional summaries.

Defendants' response, organized by topic, is discussed in further detail below.

**General Response and Comments**

In their general comments, defendants do not take issue with the findings of the Special Master that mental health care provided to the *Coleman* class is inadequate; however, defendants take the position that because the findings were made for specified points in time, the report should indicate that important changes have occurred since the findings were made and that the report should be read in the context.

Regarding this comment, the Special Master points out that this draft monitoring round report, like all prior monitoring round reports previously shared in draft form with the parties and subsequently filed with the Court, expressly indicated the applicable review periods that were covered during the monitoring round. Moreover, the draft report also presented current information regarding various activities in which the parties have been involved and continue to be involved. Defendants themselves point to the numerous places in the report where the Special

Master discussed the myriad of activities involving the parties, several of which are ongoing, some from as far back as since the filing of the Twenty-Seventh Round Monitoring Report on February 13, 2018.  ECF No. 5779.  To the extent that reporting regarding ongoing activities of the parties and the Special Master require updating, the report has been amended. *See infra* at 37, 43, 73, 217, 236 and 258.

### Responses and Objections to the Introduction

This section of defendants' responses concerned the description of two specific mental health meetings that the Special Master's team attended as part of their CDCR's mental health headquarters monitoring activities.  Defendants requested that the Special Master revise his descriptions of the "Inpatient Referral Unit (IRU) Clinic Daily Check In" (Draft Report at 36) and "PIP Leadership Meeting" (*Id.*) to more accurately reflect their functions.  The Special Master has revised the descriptions of these two meetings in the draft report.  *See infra* at 54.

### Responses and Objections to Mental Health Vacancy Rates Overall and By Discipline

In this section, defendants contended that the Special Master inferred that the ten percent vacancy rate ordered by the court applied to all staffing positions.  The Special Master observes that the report specified that the ten percent vacancy rate applied only to psychiatrists, psychologists, and social workers.  *See infra* at 73.

Defendants also indicated that the report failed to include telepsychiatry as part of the overall psychiatry vacancy rate and thereby did not apply the vacancy rate to all psychiatry positions.  Defendants requested that the report regarding psychiatrist staffing and their compliance with the psychiatry vacancy threshold of ten percent must be considered by combining psychiatry as a whole.  While the Special Master retained information regarding the fill rate for onsite psychiatry and telepsychiatry separately in the report to keep the Court

11

apprised of defendants' utilization of the two psychiatry classifications, the Special Master has revised the report to also reflect overall psychiatry vacancy by combining onsite psychiatry and telepsychiatry vacancies and reported a single psychiatry vacancy rate of 36 percent. *Id.*

The Special Master concurs with defendants that the ten percent staffing vacancy rate does not apply to office tech positions and has added a clarifying footnote to the report. *Id.*

**Responses and Objections to Summary of the Special Master's Findings – Onsite and Paper Monitoring**

This section of defendants' response was divided into two parts: (1) quality management and (2) access to higher levels of care.

**Quality Management**

With regard to quality management, the Special Master concurs with defendants that the while the peer review process was on hold for outpatient programs during the site visits, peer review was occurring in MHCBs, and has accordingly amended the report to reflect this. *See infra* at 83.

**Access to Higher Levels of Care**

Regarding access to higher levels of care reported for the onsite institutions, defendants acknowledge that while "some of the criticisms are well-founded," they object to the report's summary of compliance with transfer timelines, asserting that it "mispresents" adherence to Program Guide requirements. Defendants contend that the table and underlying report "fail to identify or acknowledge the Program Guide addenda setting forth exceptions to the transfer timelines." Defendants further assert that untimely transfers to higher levels of care may be "excused by various transfer timeframe exceptions" as evidenced by their inpatient and MHCB compliance reports "which show near perfect compliance for reporting periods from September 2017 through February 2020." Defendants also make the same request regarding institutions

12

covered in the Hybrid Review section of the report and refer the Special Master to relevant Court orders adopting inpatient and MHCB timeframe exceptions.

As defendants are well aware, all transfers to higher levels of care information were provided by the CDCR defendants responsive to the Special Master's "Document Request" that was provided to defendants with copies to plaintiff prior to the site visits. "Tab F: Access/Transfers to Higher Levels of Care" of the Document Request expressly stated: "Please indicate transfers subject to exceptions to the transfer timelines." It is perplexing that after providing the very data reported to the Special Master, knowing the purpose for which the data was being provided, and not identifying exceptions to the transfer timelines which was specifically requested in the Special Master's Document Request, defendants now contend that the data CDCR provided "misrepresents [d]efendants' adherence to Program Guide requirements."

Defendants were the sole source of the information and knew the purpose of the request, and not only provided the information without the exceptions that had been expressly requested, but both headquarters' Mental Program and institutional staff assisted members of the Special Master's team regarding what the information represented. Only the defendants had the information to identify exceptions to Program Guide transfer timeframes and did not provide information regarding transfer exceptions responsive to the document request or during the site visits.

It was and remains the responsibility of the CDCR defendants to "identify" the exceptions to the transfer timelines in their responses to "Tab F: Access/Transfers to Higher Levels of Care" of the Document Request, and only after providing the required information, would any responsibility to "acknowledge" the exceptions then shift to the Special Master. On

the consideration of defendants' comments, and a further review of defendants' responses to the Twenty-Eighth Round Document Request, while the Special Master did not revise this part of this report, prior to the next monitoring round, he will again review his Document Request with the CDCR defendants as he has done before monitoring rounds.

Defendants requested that the Special Master should revise his report "to remove findings of compliance or noncompliance with transfer timelines from individual institutions" on the grounds that transfers to higher levels of care to crisis beds, intermediate and acute beds are "controlled centrally – not by individual institutions" and has been for years. Defendants described findings regarding compliance to individual institutions as "not meaningful." The Special Master disagrees with any notion that transfer information from individual institutions is not meaningful because they help inform how access to higher levels of care is happening in the system, notwithstanding that physical transfers are centrally controlled. Institutions initiate referrals for transfers and manage documentation until they are uploaded which is the starting point for central control. After considering defendants' comments, while the Special Master did not revise this part of this report, he will review with the parties his plans to monitor and report on the roles of individual institutions regarding access to higher levels of care to inpatient and MHCB beds, which he must continue to monitor.

### Responses and Objections to Summary of the Special Master's Findings – Hybrid Review

This section of defendants' response was divided into two parts: (1) access to higher levels of care and (2) review of the RVR process.

### Access to Higher Levels of Care

Regarding access to higher levels of care for institutions monitored using the hybrid review process, defendants assert that the Special Master's reporting regarding the

underutilization of intermediate care was not supported. On the consideration of defendants' comments, the Special Master removed this finding from the report. *See infra* at 172.

### **Review of the RVR Process**

Defendants objected to the Special Master's findings regarding the timeliness of requests for mental health assessments in the RVRs process, asserting that it did not appear to be factually correct because "[o]nce a Rule Violation Report is classified in SOMS, SOMS automatically requests that mental health conduct the [mental health assessment]." Defendants also restated this objection in several individual institutional summaries of the report.[8] Defendants requested that the report provide information regarding how the compliance rates were determined.

It should be said at the outset that the Special Master disagrees with defendants' position that his findings regarding the timeliness of requests for mental health assessments for RVRs was factually incorrect. CDCR policy mandates that all RVRs that require mental health assessments be submitted to mental health within two calendar days of the date of the RVR. Accordingly, mental health assessment requests were deemed noncompliant by the Special Master's team if they occurred more than two calendar days after the date of the violation as documented in the RVR packets.

That said, defendants are correct that SOMS autogenerates referrals to mental health for completion of mental health assessments and that requests for mental health assessments are not autogenerated until an RVR is appropriately classified by a custody supervisor. However, if a custody supervisor takes more than two calendar days to classify the RVR and a mental health

---

[8] The institutions were ASP, CCI, NKSP, PVSP, SATF, SVSP, and WSP. Noting that the response discussed above also applies to defendants' comments regarding RVRs for each of these institutions, the Special Master will not re-address this issue in the institutional summaries of the institutions.

15

assessment is required, then the mental health assessment request will not be completed timely as required by CDCR policy.

Special Master's RVR review utilized a process whereby CDCR provided a list of all *Coleman* class members issued RVRs by institution during the preview period. Using this list, the Special Master's team designated a minimum of ten specific RVRs and requested those packets from CDCR, all of which were provided.[9] Each packet indicated the date the RVR occurred and the date the RVR was referred to mental health. Each RVR packet contained a document captioned "Disciplinary Hearing Results" that, among other matters, lists the actions taken, by which staff, and the number of days that elapsed from the date of the violation until the listed action occurred. In determining compliance with timely requests for mental health assessments, the Special Master's team noted the number of days that CDCR reported had elapsed between the date of the RVR and "MH Assessment Requested," and then used a calendar to verify the accuracy of the report. Timeliness regarding requests for an mental health assessment was deemed noncompliant if the number of days from the date of RVR to the date of the auto-generated request to mental health for completion of an mental health assessment exceeded two days.

**Responses and Objections to Appendix A – Special Master's Date Expert Report**

This section of defendants' response was divided into two parts: (1) initial activities of the data expert, (2) general deliverables of the data expert, (3) subsequent activities of the data expert, (4) task force meetings with work groups, and (5) system documentation.

---

[9] In their comments and objections regarding the RVR process, defendants asked, "specifically whether SOMS was consulted," and requested that the Special Master "provide any examples of late request to CDCR for review." As indicated above, all the RVR packets containing the documentation used to determine compliance with mental health assessment requests timelines were specifically identified to CDCR as part of the request for the packets, which defendants can review.

### Initial Activities of The Data Expert

In the section of the data expert's report describing his initial activities, defendants requested that, in addition to the statement regarding the development of defendants' information technology system, the report also acknowledge that the system was developed over a period exceeding ten years, and that this development occurred prior to the existence of EHRS and SOMS, "and in the absence of a number of software tools and standard practices that have since been adopted by CDCR."  After consideration of defendants' comments, the Special Master's data expert added a clarifying footnote to Appendix A.  *See infra* at 207.

### General Deliverables of the Data Expert

In this section, defendants agreed with the Special Master's data expert's findings that the measurements of a Quality Assurance system "should be accurate, transparent, and sustainable." However, defendants requested that the findings in this report be limited to transparency and sustainability, and the matter of accuracy should be covered in a later report, because the Special Master's data expert had not yet addressed the issue of accuracy.  Defendants assert that any assessment of accuracy could only be accomplished after he "has had the opportunity to validate and report on the QA measurements and their accuracy."  After consideration of defendants' comments, the Special Master's data expert added a clarifying footnote to Appendix A.  *See id.* at n. 59.

### Subsequent Activities of the Data Expert

Defendants objected to the use of the term "deprecated" to describe CDCR's CQIT Tool Application.  After consideration of defendants' objections, the Special Master's data expert revised Appendix A.  *Id.* At 211.

**Task Force Meetings with Work Groups**

In this section, defendants discussed the documentation platform that the Special

Master's data expert had developed and demonstrated for the Mental Health program staff and

pointed out that this platform is not currently used by California Correctional Health Care

Services (CCHCS), which "has tools that are used for documentation and are standardized for

use for all systems at CCHCS."  After consideration of defendants' comments, the Special

Master's data expert added clarifying footnotes to Appendix A.  *Id.* at 221.

**System Documentation**

Defendants requested in their comments that the Special Master's data expert's

"recommendations that do not pertain to the certification and/or validation processes should be

removed from Appendix A" because his purview did not include assisting "CDCR with cleaning

up old and unused tables from the system."  After consideration of defendants' comments, the

Special Master's data expert amended Appendix A and added clarifying footnotes.  *Id.* at 221.

Defendants also objected to the use of the word "impossible" by the Special Master's

data expert concerning the design of the QA documentation system to maintain certification.

After consideration of defendants' comments, the Special Master's data expert revised Appendix

A.  *Id.* at 219.

In responding to the Special Master's data expert's comments regarding the use of testing

documentation as a function of their system development cycle (SDCL), defendants requested

that the report should be reworded to indicate that it was appropriate for CCHCS to continue to

use the tools it is currently using as part of the SDLC.  The Special Master's data expert observes

that he recommended to CDCR's Mental Health Program the adoption of a transparent and

sustainable documentation platform and change management process that could be used to

produce documentation sufficient for software validation against business requirements and software verification via automatic software testing but did not prescribe the tools that should be used to achieve these objectives. After consideration of defendants' comments, the Special Master's data expert amended Appendix A and added clarifying footnotes. *Id*. at 222.

Defendants assert that it is presently CCHCS's responsibility to test the actual database rather than CDCR and requested that the report be revised to reflect this. After consideration of defendants' comments, the Special Master's data expert added a clarifying footnote in the report. *Id*. at 221.

Regarding the Special Master's data expert report that CDCR IT had taken complete control of the of the production system, defendants requested that the statement be revised to indicate the CCHCS, not CDCR IT, had assumed oversight of the production system and offered the reasons for the change. Additionally, defendants asserted that it was incorrect to conclude that "'CDCR Mental Health Programmers' lacked the ability to inspect the production system," emphasizing that promoting code for the development database to production was restricted to CCHCS IT. After consideration of defendants' comments, the Special Master's data expert amended Appendix A and added a clarifying footnote. *Id*. at 222.

**Responses and Objections to Appendix D – Institutional Summaries**

Defendants reiterated in the form of a global objection, the previously stated objections discussed above to the findings of the Special Master regarding the timeliness of requests for mental health assessments following the issuance of an RVR, restating that the request is automatically generated. Defendants also restated the request that the Special Master explain how compliance was measured, and "specifically whether SOMS was consulted." In addition, defendants requested that the Special Master provide any examples of late mental health

assessment requests to CDCR for review.[10]  As the Special Master has already explained regarding how compliance with requests for mental health assessments following the issuance of RVR was determined, he will not repeat it in the various institutional summaries. *See discussion supra* at 15-16.

Defendants also raised concerns in the various institutional summaries, where the Special Master reported issues with receipt of inmate property.  Defendants stated the Special Master did not "specify which documents or modes of communication were used in obtaining this information."  Defendants requested that the institutional reports regarding property should be revised to describe which forms and documents were used to determine the timely receipt of property and granting of privileges as was the case with SATF's institutional summary. Additionally, defendants requested that the Special Master "specify whether the information was solely obtained through verbal conversation with the inmates, and if so, specify whether that information was verified by reviewing documentation maintained by CDCR staff."

To the extent that defendants are introducing a standard that requires that otherwise credible information obtained from members of the *Coleman* class and/or institutional staff must first be "verified by reviewing documentation maintained by CDCR staff" as a condition precedent for reporting the results of inmates and staff interviews by the Special Master, he finds this unacceptable and must reject it.  The Special Master may report credible information obtained from members of the *Coleman* class and CDCR staff members as has occurred in all prior reports submitted by the Special Master, without first using defendants' documents to verify such information.  The Special Master believes that each institutional report states the source regarding his findings related to property and privileges, and after consideration of

---

[10] *See* n. 9, *supra*.

defendants' comments, and a further review of his findings, the Special Master did not revise the report in this regard. The Special Master observes that he will not review his report applying the standard proposed by defendants regarding whether any information contained therein "was verified by reviewing documentation maintained by CDCR staff."

Defendants also raised concerns regarding what was captioned as "Request for historical data from SOMS," which was described as "multiple instances where the Special Master's team requested that various institutions provide historical informational or census data that they believed could be generated from SOMS." This is a mischaracterization. The Document Request for the Twenty-Eighth Monitoring Round, as with previous monitoring rounds, which was submitted to and discussed with headquarters Mental Health program staff, did not designate SOMS, or any other specific source of information and data. Each request indicated that it was for a designated review period that was specifically agreed to by the Special Master's team and headquarters Mental Health program staff, i.e., for site visits, the full six months prior to the month of the onsite visit and, in the case of the Hybrid reviews, the three months that the review period would cover. References in the report indicating that the data could not be generated from SOMS documented how institutional staff explained CDCR's failure to provide the information for the review period rather than because the Special Master's team "believed [historical informational or census data] could be generated from SOMS."

Defendants requested that the Special Master revise references in the report regarding the inability of institutions to provide historical data to include information "that CDCR is in the process of updating SOMS to automate this type of data request." It is not, nor has it ever been, the practice of the Special Master to revise his findings from his monitoring because of developments that defendants advised him of post monitoring in the response to his draft report.

As in the past, the Special Master is hereby noting the updated information but will not revise his findings regarding the responses provided by institutions indicating their inability to provide historical data due to limitations of SOMS.

The Special Master is very encouraged that CDCR has decided to automate the generation of historical custody data in SOMS, observing its positive implications for his monitoring as well as for internal use by the CDCR defendants to ensure compliance with the requisite Program Guide and policy requirements.

**Responses and Objections Regarding Specific Institutional Summaries**

Defendants included in their response specific requests suggesting certain corrections or clarifications to the draft report regarding designated institutions.  After careful review and consideration, the Special Master has addressed them as appropriate, which, in some cases, remained unchanged.  Specifically, the Special Master amended or revised, or updated the following institutional summaries in Appendix D, *infra*: CIM (at pp. 736, 745 and 746); CIW (at p. 774); CMF (at p. 376); COR (at pp. 456-457 and 480); Folsom/FWF (at p. 295); CSP/Lac (at p. 668); NKSP (at p. 706); SATF (at p. 494); SVSP (at pp. 532, 539, and 566); and WSP (at p. 626).

A.  **Significant Program Guide Developments: The 2018 Program Guide Update and the Revision Process**

At this late point in the case, it goes without saying that the Program Guide is the operative remedial plan.  *See* ECF No. 5610 n. 1.  To be sure, the court has previously emphasized that the Program Guide has long "established the framework for delivering constitutionally adequate mental health care."  ECF No. 6214 at 14 *quoting* ECF No. 5710 at 17-

18.  After 30 years, 27 monitoring rounds, and two revisions,[11] the Court's adoption of the 2018

Program Guide Revision "clarifie[d] for the record that remedial planning for this action [wa]s

substantially complete," and that "the time to materially alter its provisions ha[d] passed."  *See*

ECF No. 6214 at 4 and 14.  Moreover, the Court made clear its view that, "at this juncture, [] the

stakeholders are in a position to turn their primary attention to the tasks remaining to ensure

complete and durable implementation of the identified remedy, without further delay."  *Id*. at 18.

As required by the Court's December 15, 2017 order, the Special Master filed the

complete 2018 Program Guide Revision on July 30, 2018.[12]  ECF Nos. 5750, 5860, and 5864.

The 2018 Program Guide Revision was comprised of four agreed upon appendices[13] and one

section that required additional review by the Special Master and the parties.  ECF Nos. 5864 at

1-2 and 5864-1.  Within his cover report, the Special Master requested that the court adopt the

following four recommendations:

> 1. That, the Court formally adopt the policies attached to th[e] report as Appendix A and the clarification memo attached as Appendix B, as addenda to the MHSDS Program Guide 2009 Revision.

> 2. That, the Court enter an order directing the parties, under the guidance and supervision of the Special Master, to work on the development of an improved method for modifying the Program Guide utilizing the workgroup process already in place.

---

[11] For a discussion from the Court on Program Guide revisions, *See* ECF No. 6214 at 11.

[12] The court originally ordered the parties to file the updated Program Guide on December 15, 2017.  ECF No. 5750. After the parties requested a continuance, the court delegated the task to the Special Master who ultimately filed the 2018 Program Guide on June 29, 2018.  ECF No. 5844.  On July 20, 2018, the court ordered the Special Master to file the complete Program Guide which he filed on July 30, 2018.  ECF No. 5860; *see* n. 1, *supra* at 1, discussing the components of the complete Program Guide.

[13] Appendices B and C to the 2018 Program Guide Revision were originally identified as Appendix A to the Special Master's June 29, 2018 Program Guide Update Report.  Compare ECF No. 5864-1 at 203-597 with ECF No. 5844 at 11-387.  Appendix D to the 2018 Program Guide Revision was originally identified as Appendix B to the Special Master's June 29, 2018 Program Guide Update Report.  Compare ECF No. 5864-1 at 598-600 with ECF No. 5844 at 388-390.  Appendix E to the 2018 Program Guide Revision was originally identified as Appendix C to the Special Master's June 29, 2018 Program Guide Update Report.  Compare ECF No. 5864-1 at 601-603 with ECF No. 5844 at 391-393.

3.      That, the Court enter an order directing the Special Master to report back to the Court on the new proposed Program Guide modification process within 60 days of entry of the order.

4.      That, any proposed Program Guide-related regulations be provided to plaintiffs and the Special Master 90 days in advance of the public comment period, and/or any Program Guide-related policies currently incorporated into regulations that substantively change in the future.

ECF No. 5844 at 10.  Both parties filed a response to the Special Master's report in which they agreed to recommendations one through three.  ECF Nos. 5862 and 5875.

On July 9, 2019, the court issued an order addressing the Special Master's recommendations and other discreet issues related to the Program Guide.[14]  ECF No. 6214.[15] The court adopted the first recommendation to approve the 2018 Program Guide Revision which included Appendices A through D.  ECF No. 6214 at 19.

The Special Master's second and third recommendations were adopted with clarification that "[a]ny method for regular, if not annual, modifications to the Program Guide must focus on this fact: going forward, modifications should not work substantive changes to the approved remedy in this case."  *Id*. at 14-15, and 19.

The court deferred resolution of the fourth recommendation stating that:

> its eye [was] firmly focused on the twin needs to protect the approved remedy and preclude disagreement about all of the remedy's contours as the case moves through the final stages of remediation -- compliance, enforcement as necessary, and durability… .

*Id*. at 16.  Instead, the court referred the matter to the workgroup and ordered the Special Master to issue a report within 60 days of the order.  *Id*.

---

[14] The court identified the following as discreet remaining issues: the final proposed use of telepsychiatry, the final proposed addendum covering exceptions to the 24-hour timeline for MHCB care, a date certain for taking all temporary MHCBs offline, TTMs in inpatient settings, "policies that are currently in flux", and clarification of program guide provisions suggested by neutral investigator.  ECF No. 6214 at 17-18.

[15] This order amends the order filed on July 3, 2019.  ECF No. 6211.

Additionally, the July 9, 2019 order acknowledged that the remedy in the case included "some measures to address violations of law in the custodial management of class members." *Id.* at 16. Accordingly, the court ordered that within 30 days of the order, the parties file a list of all negotiated or court ordered remedial measures adopted in the case which were not included in the 2018 Program Guide Revision. *Id.* Furthermore, the court directed the parties to confirm that the Special Master reviewed and agreed that the list was comprehensive. *Id.*

On December 19, 2019,[16] the defendants filed the list entitled, "Negotiated or Court-Ordered Remedial Measures Related to Custodial Issues Not Included in the 2018 Program Guide Revision" and the Special Master filed his report recommending that the court adopt the list. ECF Nos. 6431 and 6432. The court adopted the list on February 11, 2020. ECF No. 6460.

In response to the court's July 9, 2019 order on the deferred resolution of his fourth recommendation, the Special Master filed his report on the proposed process for updating the 2018 Program Guide Revision on February 20, 2020.[17] ECF No. 6476. In his report, he provided a detailed history of the parties' negotiations. *Id.* On August 8, 2020, the court provisionally adopted the Special Master's proposed process for updating the Program Guide and the Compendium of Custody Related Measures with modifications for one year. ECF No. 6806 at 15-18. Pursuant to the court's order, the parties, with the Special Master's approval, must file the next update to the Program Guide and the Compendium of Custody Related Measures on September 1, 2021 and a statement on the efficacy of the update process and proposed amendments. *Id.*

---

[16] The parties requested and were granted several extensions. ECF Nos. 6234, 6240, and 6265.

[17] The Special Master requested and was provided an enlargement of time up to and including February 14, 2020. *See* ECF Nos. 6390, 6396, and 6441. The Special Master submitted an amended report on February 20, 2020. ECF No. 6476.

B.  **The Golding Report**

1.  **The Receipt of the Golding Report, the Appointment of the Neutral Investigator, and the Evidentiary Hearing that Followed**

On October 4, 2018, the Special Master received a whistleblower report from the *Plata* Receiver (hereinafter, Golding Report) authored by Dr. Michael Golding, CDCR's Chief Psychiatrist, which set off a chain of events that led to the appointment of a neutral expert[18] and an evidentiary hearing to determine whether the defendants intentionally provided misleading information to the Court and the Special Master.  ECF No. 6064 at 2.  The impact of the release of the Golding Report was immediate.  These events put a halt to an almost concluded year-long negotiation to address the defendants' October 10, 2018 deadline to come into compliance with the Court's prior orders to fill at least 90 percent of clinical staffing vacancies.  ECF Nos. 5711 and 5928; *see also* ECF No. 6695 at 8.

As a result of the Golding Report, on October 5, 2018, just days before the scheduled hearing, the Court received requests from both parties: plaintiffs requested a status conference and defendants requested a stay of proceedings.  ECF Nos. 5936 and 5938.  On the same day, plaintiffs informed the defendants that they were no longer willing to enter into a stipulation regarding the defendants' staffing plan.  During a special status conference on October 22, 2018, the Court vacated the original status conference set to consider enforcement of the October 22, 2017 order, ECF No. 5711 at 28, and the evidentiary hearing on the use of telepsychiatry.  ECF No. 5980.  After hearing from the parties, the Court appointed its own neutral investigator to investigate the allegations contained in the Golding Report.  ECF No. 6033.

The neutral expert conducted a four-month investigation, and on April 22, 2019, submitted a report to the Court.  ECF No. 6135 at 1.  The Court held a status conference on April

---

[18] The report uses the terms "neutral expert" or "neutral investigator" interchangeably.

26, 2019 and gave the parties and Dr. Golding 30 days to respond to the substance of the report, which would be discussed at a special status conference scheduled for June 10, 2019.  ECF No. 6135 at 1-2.  During the special status conference held on June 10, 2019, the Court announced that it anticipated holding a focused evidentiary hearing in September 2019 and directed the parties to meet and confer to determine whether they could stipulate to any underlying facts that were reported by the neutral expert.  Reporter's Transcript of Proceedings, June 10, 2019, ECF No. 6185 at 24:20-25:2.

On June 14, 2019, the Court issued an order accepting the neutral expert's report, while specifically noting it "did not, and does not, delegate any fact finding to the neutral expert."  ECF No. 6187 at 2.  The Court set an evidentiary hearing for September 13, 2019 and outlined areas that could establish that misleading data had been provided to the Court.  *Id.*   The parties were ordered to meet and confer and to evaluate plaintiffs' proposal to require that the defendants self-certify data within 30 days of the order.  *Id*.

On July 23, 2019, the parties filed their joint report, which addressed what the parties would, and would not, stipulate to concerning the neutral expert's report, and requested a prehearing conference.  ECF No. 6226.  In preparation for the evidentiary hearing, the Court held a telephonic prehearing conference on August 8, 2019.  ECF No. 6242 at 1.  Following the prehearing conference, the Court issued an order on August 14, 2019.  *Id*.  The order reviewed the areas to be discussed at the hearing, *Id.* at 4-13, and identified the issues from the neutral expert's report that were being referred to the Special Master for negotiation through the All-Parties workgroup.  *Id*. at 11.  The order specifically discussed defendants' performance reports that were affected by their business rule change which lengthened the amount of time for EOP

psychiatry appointments from 30 to 45 days and questioned the data accuracy issues with defendants' hub certifications. *Id*. at 5-6.

Regarding the increase in the length of time between EOP psychiatry appointments, the Court made reference to the neutral expert's report and his finding that, "CDCR's decision to redefine 'monthly' from 30 to 45 days to lengthen the intervals between EOP appointments 'would have likely resulted in the reporting of misleading data, and that data was reported to the [C]ourt in two filings.'" *Id*. at 5 (*citing* ECF No. 6185). The Court observed that in their joint status report, the parties agreed that the decision to redefine "monthly" in CDCR's business rules resulted in the reporting of misleading data to the Court, which was reported in two filings. *Id*. (*citing* ECF No. 6226 at 3-4). Accordingly, defendants represented that they would re-run the reports affected by the business rule change and file amended documents. *Id*.

Related to the ASU EOP Hub certifications, the Court noted that even though defendants admitted that five certification letters were sent to the Special Master and the plaintiffs based on data using an incorrect business rule, defendants nonetheless took the position in July 2019 that they "should not have to re-run the[] reports because the time for certification of the hubs ha[d] passed, and the timely psychiatry contact indicator was not one of the five mandatory compliance indicators." *Id*. at 5-6. The Court was unpersuaded by defendants' argument and stated that defendants were not relieved "of the obligation to correct the record, which must satisfy the highest levels of integrity," and that defendants would be "required to correct the[] five monthly certification letters…." *Id*. at 6. Lastly, the August 14, 2019 order directed the Special Master "to share information concerning his plans for, and progress on obtaining, independent data auditing with the parties…." *Id*. at 13.

On September 17, 2019, and following the filing of the parties' individual responses to the Court's August 14, 2019 order, the Court issued an order requiring defendants "to file and serve evidence in support of the assertion in their response to the [C]ourt's August 14, 2019 order that they 'did not modify the business rule [for] timely psychiatry contacts conducted for inmates in the ASU EOP Hub program' and their corresponding assertion that they 'no longer need[ ] to resubmit the five ASU EOP Hub certification letters' they previously represented contained misleading data." ECF No. 6288 at 4 (*citing* ECF No. 6257 at 27). The same order gave plaintiffs 14 days to file a response to defendants' proposal for correcting the misleading information contained in defendants' timely psychiatry performance reports. *Id*.

On October 10, 2019, defendants submitted their response to the Court's September 17, 2019 order. ECF No. 6330. Within their response, defendants admitted that, "[c]ontrary to its representation that the business rule had not been modified for ASU EOP Hubs, CDCR learned that the business rule for ASU EOP Hubs was changed from every 30 days to 'once every calendar month, never to exceed 45 days between appointments.'" *Id*. at 2. Defendants went on to state that, "CDCR erred when it reported that it 'did not modify the business rule [for] timely psychiatry contacts conducted for inmates in the ASU EOP Hub program' and that it 'no longer needed to resubmit the five ASU EOP Hub certification letters.'" *Id*. Defendants apologized for their error and stated that they were "taking remedial steps" and "welcome[ed] the opportunity to further clarify the record regarding this issue through declaration or through testimony at the upcoming evidentiary hearing." *Id*. Defendants asserted that they had corrected the timely psychiatry contact data submitted to the Special Master for the ASU EOP Hub certifications for the five months in question and attached a copy of CDCR's letter to the Special Master confirming the corrections as an exhibit. *Id.* at 3-9. Additionally, defendants stated that they

29

would file a declaration from Dr. David Leidner, Senior Psychologist Specialist for CDCR at the

California Men's Colony (CMC), regarding CDCR's modification to the business rule for the

ASU EOP timely psychiatry contacts indicator.  *Id.* at 2.

Plaintiffs filed their response to the Court's September 17, 2019 order on October 21,

2019.  ECF No. 6360.  Plaintiffs argued that the defendants failed to correct the timely

psychiatry data for every ASU EOP Hub institution for all five months at issue, and further failed

to acknowledge both the seriousness of their "erroneous business rule change" and the

"limitations of their methodology for providing the corrected data."  *Id*. at 2.  Consequently,

plaintiffs objected to the defendants' corrected filing, stating that it was "insufficient to fully and

transparently correct the record consistent with this Court's dictates."  *Id*.

The evidentiary hearing began on October 15, 2019 and lasted four days, concluding on

October 23, 2019.  ECF No. 6345; *see also* ECF Nos. 6350, 6364, and 6365.  During the hearing,

the extent of the data issues became clearer.  *See, generally* ECF No. 6427 at 13-19 (discussing

testimony provided at the evidentiary hearing).  To be sure, on the final day of the hearing the

Court offered its thoughts from the bench and noted that the defendants had acknowledged that

misleading data had been offered to the Court in at least two court filings.  Reporter's Transcript

of Proceedings, October 23, 2019, ECF No. 6380 at 7:7-12.  Additionally, the Court discussed

the defendants' admission that ASU EOP Hub certification letters provided to the Court were

based on data generated from faulty business rules.  *Id.* at 7:12-15.

Furthermore, during the Court's summation, it addressed the neutral investigator's report

and stated that, "while it is possible to find some parts of the neutral expert's report that could be

read as exonerating defendants, I think it has to be said [that] the neutral expert himself did not

let defendants off the hook."  *Id.* at 8:14-17.  The Court went on to say that to the contrary, the

neutral investigator "pointed to serious examples of misleading information being presented [to the court]… ." *Id.* at 8:17-19.

While opining on its initial thoughts and observations, the Court made reference to the need for a "new plan for improved data collection, analysis, and reporting," and noted its request to the Special Master "to work on that issue." *Id.* at 35:8-10. Additionally, the Court discussed its concerns with the *Plata* Receiver acting as the data warehouse for *Coleman* class members. *Id*. at 35:15-20. It cautioned that if that were to occur, the Receiver would act as a service provider and "it ha[d] to be understood [that] this Court and its Special Master are the client[s], and the client is going to negotiate and make certain that the *Coleman* class and its interests are served." *Id*. at 35:17-20.

The Court concluded its summation by addressing how critical it was for defendants to correct their data. It stated that, "the data must be fixed with the key stakeholders at the table." *Id*. at 40:14-15. Furthermore, the Court directed that:

> The data must be pulled together, gathered and collected in a form that allows the defendants ultimately, when they truly can, accurately to demonstrate to the Court that the Constitution is finally satisfied.

*Id.* at 40:16-20.

The Court memorialized its October 23, 2019 summation in an order that issued on December 17, 2019. ECF No. 6427. The Court found that "it [wa]s clear defendants ha[d] presented misleading information to the court." *Id*. at 20. Moreover, the Court determined that:

> the weight of the evidence and the reasonable inferences to be drawn from the totality of the record before the court fully supports the finding that as to [two of the three] issues covered at hearing, defendants have engaged in knowing presentation of misleading information to the court and to the Special Master.

*Id.* at 22.  The Court added that, "[t]aken together with defendants' admissions prior to hearing, defendants have knowingly presented misleading information to the court in numerous areas critical to the remedy in this case and measuring compliance with that remedy."  *Id.* at 41.

The impact of the Golding Report, and the evidentiary hearing that followed, on the Twenty-Eighth Monitoring Round cannot be understated.  Unsurprisingly, the allegations in the Golding Report led to feelings of mistrust and created tension not only between the parties, but between CDCR mental health staff as well.  Consequently, by agreement with CDCR's Mental Health Program, the Special Master assigned a team of experts and monitors to conduct in-person monitoring of CDCR's Mental Health Headquarters ("Central Office") operations that began on July 8, 2019.[19]  In a subsequent filing, the Special Master informed the Court that he was "currently engaged in monitoring CDCR mental health headquarters."  ECF No. 6308 at 2. He further reported that,

> This task, which has been underway for the past few months, requires a substantial time commitment from the Special Master's mental health experts. It includes attending meetings both in-person and via teleconference and collaborating with CDCR mental health staff in developing substantive policies and addressing outstanding issues resulting from court orders and workgroup meetings.

*Id.*

Additionally, given the allegations of fraud and the Court's ultimate finding of defendants' knowing presentation of misleading information, the Special Master and his team were required to perform their own data analysis, through a random sampling of information located in the EHRS.  This was a time-consuming undertaking for a team with limited staffing resources.  Thankfully, the Court realized the impact of this colossal task, along with the other numerous responsibilities of the Special Master, and during the course of the round, approved

---

[19] Central Office monitoring is discussed in further detail below.  *See infra* at 32-41.

three requests for additional resources.  ECF Nos. 6307, 6496, and 6646.  The Court's approval

of two of these requests followed its January 7, 2020 order wherein the Court outlined the

vastness and significance of the Special Master's current duties and responsibilities, as well as

his potential need for additional staff, stating in pertinent part:

> The work of the Special Master is divided into several areas: he and
> his team are monitoring at CDCR Headquarters, they are monitoring
> delivery of mental healthcare at institutions in the field, they are
> supervising ongoing work in the All-Parties Workgroup, they are
> preparing for and participating in settlement discussions supervised
> by Judge Drozd, and they are staying abreast of ongoing litigation
> activity before this court.  At this critical juncture, none of those
> critical tasks can give way in favor of others.  As the court informed
> the parties, the Special Master has advised the court this may require
> the addition of additional staff to his team.  The court is prepared to
> receive and consider such a request in due course.

ECF No. 6441 at 7.

In the same order, the Court noted that:

> [A]ll parties agreed the Special Master should be authorized to hire
> his own data expert as part of the ongoing remedial process that
> follows the court's proceedings on the Golding Report and the
> proposed coordination of data management with the *Plata* Receiver.
> The court agrees, and will authorize the Special Master to submit a
> request to approve this hiring when he has identified an appropriate
> expert."

*Id.* at 4.  Following the Court's order, the Special Master submitted his request for a data expert

on April 13, 2020.  ECF No. 6604.

## 2.  <u>The Appointment of the Special Master's Data Expert and His Activities to Date</u>

On April 29, 2020, the Court granted the Special Master's request to appoint Daniel F.

Potter, Ph.D. as a data expert (the Special Master's data expert).  ECF No. 6646.  On June 8,

2020, the Special Master filed his initial report on data issues within CDCR, which provided an

exhaustive history of the events that led to the appointment of Dr. Potter and his actions since the date of his appointment.  ECF No. 6705.

Since the initial data report, the Special Master's data expert has held regular meetings with CDCR regarding the EOP ASU Hub and PSU certifications.  ECF Nos. 6722 at 15, 6765 at 10, 6792 at 12-13, 6811 at 2, 6813 at 11-12, and 6841 at 6.  He has also held meetings to discuss plaintiffs' concerns with the EOP ASU Hub and PSU certifications.  ECF Nos. 6753 at 8 and 6811 at 2.  Additionally, the Special Master's data expert has met with the parties to discuss updates to the COVID-19 tracking charts, which included the submission of trend data to charts and maps filed with the Court.  ECF No. 6765 at 8.

The Special Master's data expert was still becoming familiar with the defendants' data systems during meetings held with the parties on July 30, 2020 and August 3, 2020.  ECF No. 6811 at 2.  Over the course of those meetings, he confirmed that he would conduct a "substantive review of and work on three components of Defendants' data: those related to CQIT, COVID-19, and the EOP ASU hub certification process."  *Id.*

On August 25, 2020, the EOP ASU Hub certification workgroup discussed areas of agreement and disagreement amongst the members.  ECF No. 6841 at 6-7.  The workgroup agreed that "the indicators from CDCR's Continuous Quality Improvement Tool (CQIT) were the proper indicators to use, and that the workgroup was discussing how many of those indicators should be considered core items requiring 90% compliance, and there were some concerns about the process for non-core items and how those affect compliance."  *Id.* at 6.  Two outstanding issues were first "not all indicators [were] automated, making it difficult to look at trends, and second [] the Special Master [did] not yet know whether the indicator measures themselves [were] valid."  *Id.*  At the time of the meeting, the Special Master's data expert was "still

evaluating whether those indicators [we]re being measured in a valid manner and determining whether CDCR c[ould] automate its data where appropriate." *Id.* He approximated that he would need three months, until November 2020, to complete his evaluation. *Id.*

As a result of the almost weekly meetings held since August 25, 2020, the Special Master's data expert has become familiar with the approximately 35 online and offline indicators utilized to certify the EOP ASU Hubs. He also learned that there was insufficient documentation to explain the precise definitions of the performance indicators which would be required for validation.

In September 2020, the Special Master's data expert began assessing the EOP ASU Hub's performance indicators as the initial process of data validation. During this process, he learned that the SharePoint database used by Mental Health to document standards and display definitions of performance indicators and other components needed for data validation had constraints. Some limitations included the inability to track changes and access the database via the web, as well as character and file size limitations.

Considering the extensive restrictions of the SharePoint database, the Special Master's data expert and the data liaison[20] presented a more robust and efficient master template. The master template contained proposed documentation standards and definitions of performance indicators to the Mental Health Program to consider using in place of SharePoint. As of November 2020, the Special Master's data expert and the data liaison were almost done completing 150 pages of definitions and materials for the template. The CDCR defendants indicated that they would review the proposed master template and determine if it could be utilized.

---

[20] The data liaison is a psychologist and programmer who was assigned by CDCR's Undersecretary for Health Services to work with the Special Master's data expert.

In addition to the limitations of the SharePoint database discussed above, CDCR's Mental Health Program IT staffing limitations have impacted the data validation process. For example, the Mental Health Program has explained that they need an entire week to prepare for each meeting, they do not have a person dedicated to this project, and their programming department is understaffed.

On December 14 and 15, 2020, the Special Master convened a teleconference with the parties regarding data remediation, and to specifically discuss the development of a roadmap for completion for the data certification process. During the December 14, 2020 meeting, the Deputy Director of the Statewide Mental Health Program informed the Special Master and plaintiffs' counsel that after review, CDCR had determined that the master template did not meet CDCR's information technology security requirements, but that they were exploring whether SharePoint or other platforms already hosted by CDCR could be used as the template for data certification. Mental Health Program leadership demonstrated a SharePoint documentation system to the Special Master's data expert and other members of the Special Master's staff (the Special Master's data team) during February 2021, which was agreed on for use as the documentation platform. The SharePoint documentation system was presented to stakeholders on March 4, 2021 and offered an opportunity for input by plaintiffs.

As previously discussed, the Special Master's data team is diligently working within CDCR's staffing and programming limitations. Beginning on October 21, 2020, the Special Master's data team, Mental Health Program leadership, quality management staff and subject matter experts convened two-hour weekly Business Rules and Methodology Review meetings, which were tasked with reviewing information that would be required for data validation. The focus of the meetings was directed to ensuring that mental health program indicators, business

rules and data elements were measuring Program Guide requirement and departmental policies as accurately as possible.

Beginning on December 17, 2020, Mental Health Program quality management staff and the Special Master's data team, and other members of the Special Master's staff started meeting weekly in one-hour Quality Assurance Certification Workgroup with the goal of developing a plan to implement a transparent, accurate and sustainable system for review by stakeholders.

In addition, starting on January 15, 2021, Mental Health Program quality management staff and the Special Master's data team meet weekly in one-hour Business Rule Template and Categorization meetings for the purpose of creating appropriate system documentation and a glossary of terms, and as of February 19, 2021, had produced templates that will be used for reports, indicators, business rules and form data elements for the Electronic Health Records System.

Starting on January 12, 2021, and occurring every two weeks since, the Special Master holds a Data and Continuous Quality Improvement (CQI) meeting with the parties.[21]  The Data and CQI meetings are the central forum for the Special Master and the parties to address the CQI indicators and EOP ASU Hub / PSU certification process.  In addition, during the Data and CQI meetings, the Mental Health Program quality management staff and the Special Master's data team report on their activities and plaintiffs are afforded opportunities to request information and provide input to the Special Master's data expert and CDCR Mental Health Program leadership and quality management staff.  During the Data and CQI meetings, Mental Health Program quality management staff also provides information regarding the state of the information technology system as it relates to the work of the Special Master's data expert.

---

[21] Data and CQI meetings were held on January 12 and 26, 2021 and February 9 and 23, 2021.

As result of the progress being made, the Special Master will not be requesting the Court to adopt a formal recommendation at this time and observes that the Mental Health Program quality management staff and the Special Master's data team are working on drafting a data project work plan for consideration by the parties under the guidance and supervision of the Special Master.  The data project plan will define its ultimate goals, determine a process for achieving the goals, ascertain required personnel, and a lay out a proposed schedule and method for keeping the Court apprised of progress as well as of any unexpected obstacles they encountered.

### C.  Inpatient Care Monitoring

From August 2019 to February 2020, the Special Master completed his monitoring of the three DSH hospitals: DSH-Atascadero, DSH-Coalinga, and DSH-Patton.  DSH-Atascadero and DSH-Coalinga were monitored by paper reviews.[22]  DSH-Patton was monitored onsite.  During the same time, onsite tours were also conducted at all CDCR PIPs: CHCF-PIP, CIW-PIP, CMF-PIP, CMF-L1, SQ-PIP, and SVSP-PIP.  There were two onsite visits at CHCF-PIP.

On October 22, 2020, the Special Master provided the parties with his draft 2020 inpatient care report.  He requested the parties submit comments or objections within 30 days - by November 23, 2020.  Both parties submitted their response on November 23, 2020.

The Special Master evaluated the parties' responses, and the 2020 inpatient care report was filed on January 28, 2021.  ECF No. 7039.  On February 8, 2021, after the court denied defendants' request for an extension of time, ECF No. 7050, the defendants filed their response and objections to the finalized report.  ECF No. 7052.

---

[22] DSH-Atascadero and DSH-Coalinga were monitored by paper review because both institutions were affected by the flu and quarantining during the monitoring period.

### D. **The COVID-19 Pandemic and its Impact on the Twenty-Eighth Round of Monitoring**

#### 1. **The Special Master's Status Updates to the Court Regarding Onsite Monitoring**

On March 20, 2020 the Special Master filed a report regarding the status of the Twenty-Eighth Round as well as central office monitoring given the COVID-19 pandemic.  ECF No. 6512.  Within his report, the Special Master noted the following significant events: (1) as part of the state's initial response to the global COVID-19 outbreak, California Governor Gavin Newsom declared a State of Emergency on March 4, 2020; (2) on March 11, 2020, CDCR began to limit outside access into the prisons by canceling regular prison visiting statewide with family visitation to go on as scheduled; (3) by March 14, 2020, CDCR announced that family visitation would also be suspended, effective March 16, 2020; (4) on March 16, 2020, the *Plata* Receiver notified the Special Master of his decision to suspend all *Plata* site visits and onsite audit activities until the end of April, at which time he would reassess and determine whether to lift the suspension; (5) additionally on March 16, the director of DSH issued a directive suspending all admissions of *Coleman* class members to DSH hospitals and most discharges for 30 days; (6) on March 17, 2020, CDCR stopped all transfers of out-of-state parolees or inmates to California for 30 days and directed that no volunteers or rehabilitative program providers would be allowed to enter prisons; and (7) on March 18, 2020, CDCR directed that all CDCR and California Correctional Health Care Services staff would be given a verbal screening before entering any work locations.  *Id.* at 1-2.  Additionally, on March 19, 2020, Governor Newsom issued an Executive Order directing all Californians to stay at home.[23]

---

[23] At the time of this writing, the state of California is back to both a limited and regional stay at home order, approximately nine months after its first statewide stay at home order, as the pandemic continues to surge. https://covid19.ca.gov/stay-home-except-for-essential-needs.

Based upon the Special Master's ongoing discussions with high-level officials and the *Coleman* parties, and given the dramatic and unpredictable spread of COVID-19 witnessed since the onset of the pandemic, the Special Master informed the Court that he had determined that it would be prudent and in the best interest of *Coleman* class members, CDCR and DSH staff, and his team of experts and monitors to develop alternative plans for monitoring that would substantially reduce in-person contacts for the immediate future. *Id*. at 2-3. Consequently, the Special Master suspended his regular in-person monitoring tours of CDCR institutions and DSH hospitals for three weeks, until April 6, 2020. *Id*. at 3. The Special Master stated that he would reassess the situation at that time to determine whether in-person monitoring could safely resume. *Id*. In place of onsite monitoring, the Special Master determined that a "paper review" of the institutions that were scheduled for site visits during those three weeks would be conducted.[24] *Id*.

The Special Master also suspended central office in-person monitoring for three weeks, until April 6, 2020, with monitoring occurring by means of teleconferencing instead of onsite. *Id*. at 4.

Soon after the Special Master filed his report, it became apparent that he would have to change his approach to offsite prison monitoring. The Special Master recognized the incredible challenges defendants were facing daily during the current crisis. As he stated in his report on *Coleman* class member access to inpatient care, "[s]taff are putting themselves in harm's way on a daily basis to provide treatment for their patients, and leadership is working diligently to

---

[24] A "paper review" is a form of monitoring consisting of a comprehensive review of an institution's compliance with Program Guide requirements via documentation requested by the Special Master and provided by the institution under review. These reviews include elements of a regular on-site monitoring visit, with an entrance meeting conducted by teleconference and additional meetings with institution staff as necessary, also by teleconference.

40

manage an evolving challenge." ECF No. 6565 at 32. In order to lessen the burden on defendants and allow for institution staff to participate in meetings, the Special Master revised his plan for offsite prison monitoring.

On April 16, 2020, the Special Master filed an update on the status of the Twenty-Eighth Round and central office monitoring. ECF No. 6615. The Special Master reported that given the ongoing crisis caused by COVID-19, including the many challenges facing defendants in working to combat the virus, all remaining institutions would be monitored by using the EHRS and institution documentation through a "hybrid EHRS/paper review" approach. *Id*. at 2-3.

The hybrid EHRS/paper review method of monitoring was determined to be the best alternative because it would not require a large volume of document production from the institutions, nor would it include entrance meetings, or any additional meetings with institution staff. *Id*. at 3. Instead, it was based primarily on the review of class members' electronic health records to assess both the mental health care provided to them at the various levels of care in the mental health programs at an institution and the timeliness of Program Guide required clinical contacts. *Id*. Institutions were required to provide a minimum amount of documentation in order to identify *Coleman* class members and to facilitate review of timeliness of transfers to inpatient care and the examination of the mental health assessments as a function of the Rules Violation Report process. *Id*. at 3-4. The document request was developed in agreement with the CDCR defendants and covered the prior three months immediately preceding the document request date. The following documents were requested from each institution:

1.  MHCB referrals from the institution;

2.  For institutions with an MHCB, a list of all inmates admitted into the MHCB with their lengths of stay;

3.  Referral/non-referral logs to acute and intermediate inpatient care; and

4.  List of MHSDS inmates who received RVRs.

The mental health program delivered all of the documents requested for the ten institutions timely and in the agreed format.

Although it was decided that the hybrid EHRS/paper review was the best approach given the circumstances, it goes without saying that it had significant limitations and was by no means as comprehensive or informative as onsite monitoring.  The greatest drawback was that the Special Master was unable to observe the actual living conditions of confinement and treatment. For example, there was no participation in, or observation of, IDTTs and structured therapeutic activities.  Similarly, there was no observation of pill lines or inmate movement generally.  In addition, no staff or inmate interviews were conducted.  So, while the hybrid review served its purpose given the COVID-19 pandemic, it is by no means an adequate replacement for onsite monitoring.

Regarding central office monitoring, the Special Master informed the Court that monitoring would continue as previously reported, by means of teleconferencing.  *Id*. at 4.  The Special Master further reported that he would continue to reassess the situation and keep the Court and the parties informed on whether he would lift the suspension of in-person monitoring. *Id*.

Given the seriousness of COVID-19 and the various state and federal public health guidelines surrounding it, the Special Master ultimately determined that in-person monitoring, both within the institutions and central office, was unsafe and therefore, the remainder of the

Twenty-Eighth Round was conducted offsite.[25]  As stated previously, 17 institutions were monitored onsite, two by paper reviews, and ten by hybrid EHRS/paper reviews.

## 2.  **The COVID-19 Response**

Since the onset of the COVID-19 pandemic, there have been several COVID-19 outbreaks throughout CDCR, including at ASP, CIM, CRC, CVSP, and SQ.  As of February 16, 2021, over 44,767 inmates have contracted the disease.  ECF No. 7065 at 3.  At the time of this filing, that number has grown to over 49,140.  Sadly, 212 inmates have died – 80 were *Coleman* class members.[26]  ECF No. 7065 at 3.

It goes without saying that the COVID-19 pandemic and the defendants' response to it became the top priority for the parties, Court, and Special Master.  ECF No. 6509.  In addition to COVID-19's impact on in-person monitoring, there was also an immediate need for the parties, Special Master, and the Court to increase their interaction and communication.  As a result, status conferences were held weekly, beginning March 20, 2020, through April 17, 2020.  ECF Nos. 6513, 6546, 6600, and 6622.  Beginning May 1, 2020, they were to be held every three weeks.  ECF No. 6643.

During the first quarterly telephonic status conference held on March 20, 2020, the Court directed the Special Master to convene a COVID-19 Pandemic Task Force ("COVID-19 Task Force") to work on issues affecting class members' access to mental health care.  ECF No. 6513. In addition to the Special Master and members of his team, COVID-19 Task Force meeting participants include counsel for the parties and representatives from CDCR, DSH, and the

---

[25] Despite not being able to conduct a full in-person tour, a few of the Special Master's experts were able to participate in a limited tour of CMF, CSP/Sac, and CHCF on May 27 and May 28, 2020.  The results from these tours were presented at the 20th Task Force meeting on June 2, 2020.

[26] *See* https://www.cdcr.ca.gov/covid19/population-status-tracking.

Governor's office.  A representative from the *Plata* Receiver's office and the *Armstrong* Court Expert have also been in attendance.  Since its formation on March 20, 2020, the COVID-19 Task Force has held a total of 47 large group meetings.  There have also been over 90 smaller workgroup meetings with both CDCR and DSH.

At a status conference held on June 26, 2020, the Court ordered the parties to file a joint report with Task Force updates by July 15, 2020 and continuing bi-weekly thereafter.  ECF No. 6741.  On August 26, 2020, the Court modified the schedule, ordering the parties to file Task Force updates every other Friday by 12:00 p.m., starting on August 28, 2020.  ECF No. 6837.  On September 25, 2020, the Court modified the schedule again, requiring updates every four weeks.  ECF No. 6886.  The most recent joint report, the parties' eleventh submission, was filed on February 19, 2021.  ECF No. 7065.

Aside from involvement with the COVID-19 Task Force and small workgroup meetings, since September 24, 2020, the Special Master's team has attended CDCR's weekly reception center intake discussion.  The meeting is facilitated by the Division of Adult Institutions (DAI) Director and CCHCS Medical Director with the three reception center wardens and Chief Executive Officers to discuss and plan intake from county jails.  The Special Master's participation in these meetings is in addition to his earlier inclusion in planning meetings with the Secretary of CDCR and the *Plata* Receiver regarding reopening the reception centers to intake from county jails.

The Special Master's team is also attending the CDCR's weekly Transferring COVID-19 High Risk Patients to Safer Housing meetings.  The meeting is facilitated by CCHCS Custody Director attended by CCHCS Medical Director, Statewide Chief Nurse Executive, Deputy Director, DAI, and others to plan and implement the transfer of medical high-risk patients

(including *Coleman* class members) from dorm and open celled housing to celled housing. The Special Master's staff have attended two meetings: November 24, 2020 and December 1, 2020.

### 3. *Coleman* Class Members' Access to Inpatient Care

During the first supplemental quarterly status conference on March 27, 2020, and as a result of DSH's closure to admission for *Coleman* class members, the Court directed the Special Master to file a status update on the transfer of *Coleman* class members into *Coleman* beds in DSH facilities and directed that the COVID-19 Task Force continue to meet. ECF No. 6546. In response to the Court's order, the Special Master filed the "Special Master's Report on the Current Status of *Coleman* Class Members' Access to Inpatient Care in the Department of State Hospitals" on April 2, 2020. ECF No. 6565.

Within his report, the Special Master discussed COVID-19 task force efforts regarding efforts on access to inpatient care in DSH facilities for *Coleman* class members. *Id.* at 6-7. The Special Master further stated that when making decisions about *Coleman* hospital beds, consideration should be given to the affect any continued closure has on CDCR's ability to provide inpatient treatment in the already struggling PIPs. *Id*. at 30. Additionally, the Special Master applauded CDCR for its successes, including suspending intake of all incarcerated persons into state facilities and creating and releasing the COVID-19 tracker. *Id.* at 31. The Special Master vowed to continue to address issues regarding access to the provision and adequate treatment to *Coleman* class members. *Id*. at 33.

On April 10, 2020, the Court issued an order setting an evidentiary hearing on Tuesday, April 21, 2020 regarding *Coleman* class members' access to inpatient care at DSH. ECF No. 6600. In an ordered issued on April 17, 2020, the Court continued the hearing to May 19, 2020 following the submission of a stipulation by the parties agreeing to continue the hearing for 30

45

days.  ECF No. 6622 at 3.  The parties stipulated to continuing the hearing two additional times.

ECF Nos. 6676 and 6734.  After a final motion to continue from the plaintiffs, which the Court

granted, the hearing was set for October 23, 2020.  ECF No. 6807 at 2.

The hearing was held as scheduled on October 23, 2020.  ECF No. 6923.  Following the

hearing, the parties met and conferred and agreed on a closing briefing schedule as

instructed/directed by the Court.  *Id.* at 4.  Both plaintiffs and defendants filed their closing briefs

on November 13, 2020.  ECF Nos. 6948 and 6949.  Defendants filed their rebuttal on

November 18, 2020.  ECF No. 6960.

On November 19, 2020, the Court ordered the parties to file a supplemental brief

addressing the question whether the Court can or should "presume cognizable harm to class

members whose transfer to necessary inpatient car is delayed beyond Program Guide timelines

and for reasons outside the court-approved exceptions to those timelines."  ECF No. 6961.  The

parties had seven days to respond.  *Id.*  The parties filed a stipulation asking for more time to file

the supplemental brief based on other intermittent deadlines.  ECF No. 6965.  The Court granted

the stipulation and ordered the parties to file their supplemental briefs by December 7, 2020 and

they did.  ECF Nos. 6966, 6975, and 6976.  On January 21, 2021, the Court directed the parties

to file a joint status report on the current state of admission at DSH.  ECF No. 7029.  Defendants

filed their status update on January 28, 2021.  ECF No. 7041. Defendants reported on *Coleman*

admissions and transfers to DSH.  *Id.*  Defendants included that due to COVID-19, transfers

were again suspended on January 12, 2021 for 30 days, but that they would continue to work in

the small workgroup and report in the COVID-19 task force meetings.  *Id.* at 2-3.

### 4.  <u>COVID-19 Related Program Guide Departures</u>

On April 24, 2020, the Court approved a temporary modification of the Program Guide in

order to provide for COVID-19 screening for inmates who were transferring to DSH.  ECF No.

6639 at 11.  The order was in response to DSH's March 16, 2020 notification to the Special

Master that it would stop allowing the admission of *Coleman* class members to DSH hospitals

because of the ongoing pandemic.  ECF No. 6579 at 5.  The Court noted that DSH "relied

exclusively on discretionary authority granted [] under state law and gubernatorial executive

orders to close DSH hospitals to *Coleman* class members."  ECF No. 6639 at 7.  The court went

on to say that DSH "may not rely solely on state law to take unilateral action that undermines

[the Program Guide]."  *Id.*  Further, the Court made clear that DSH was still required to follow

the Court's orders "which are an essential component of the Eighth Amendment remedy in this

case."  *Id*. at 7-8.  *See also* ECF No. 6661 at 9.  It also reinforced that the Program Guide

requirements for transfers to DSH inpatient care were still in force.  *Id*. at 10.

On June 2, 2020, the Court asked the parties to submit briefs discussing "the extent to

which, if at all, the [C]ourt can or should approve any measure that falls below Eighth

Amendment requirements as those are memorialized in the Program Guide and whether there is

any temporary period of time for such measures to remain in place that survives scrutiny under

applicable legal standards."  ECF No. 6700.

The parties filed their briefs on June 16, 2020.  ECF Nos. 6724 and 6729.  In response to

the parties' briefs and in an order filed on July 28, 2020, the Court ordered that "defendants shall

continue to comply with the requirements of the Program Guide to the full extent possible

consistent with public health best practices for members of the *Coleman* class in the

circumstances of the COVID-19 pandemic."  ECF No. 6791 at 4-5.  The Court reiterated that

"the Program Guide is based in Eighth Amendment requirements for the delivery of mental

health care to California's seriously mentally ill prisoners."  *Id*. at 3.  Additionally, the Court

remarked that departures from the Program Guide that provide less access to mental health care

than required likely fall below constitutional requirements. *Id*. On August 14, 2020, the Court ordered the parties to file a joint report addressing COVID-19 Program Guide departures and how to resume the provision of Program Guide required mental health care within four days. ECF No. 6814.

The parties filed their joint report on August 21, 2020. ECF No. 6831. Within it, the plaintiffs acknowledged that the pandemic was on-going, but stated that interim polices must be revisited because the parties were "[w]ell past the emergency phase of the pandemic." *Id.* at 9. Plaintiffs reiterated that defendants were "obligated to continue providing minimally adequate mental health treatment to class members" and that continuing the status quo was unacceptable. *Id*. at 8. Plaintiffs stated that they had offered suggestions to the defendants, including creating a comprehensive plan for providing long-term mental health care and creating a risk stratification plan that defines treatment criteria, among other suggestions. *Id.* at 15 (citing ECF No. 6751 at 14-20). Plaintiffs pledged to continue to work with the defendants and the Special Master to create solutions and alternatives. *Id*. at 9.

For their part, defendants discussed CDCR's COVID-19 Strategic Response plan and stated that they "continue taking steps to resume Program Guide-level care, including resuming structured therapeutic activities, providing structured and unstructured out-of-cell- time, and resuming transfers to appropriate levels of care." *Id*. at 17. Defendants referenced their roadmap to reopening and asked for flexibility to address mental health care. *Id*. at 19. The roadmap set benchmarks and included criteria for phasing open institutions, such as "testing capabilities, staffing coverage, and the length of time since each institution has experienced new positive cases of COVID-19." *Id*. at 18. Defendants closed by stating that they would continue to

48

collaborate with the plaintiffs and the Special Master regarding their continuing effort to provide Program Guide care to class members.  *Id*. at 20.

### 5.  COVID-19 and its Impact on Population Reduction Measures, including Proposition 57

On July 12, 2018, the Court adopted the Special Master's Twenty-Seventh Round Monitoring report and inquired whether it would be "prudent to study" the rise of the mentally ill inmate population and how "defendants [would] continue to meet program and staffing needs for the population if it continue[d] to rise."  ECF No. 5852 at 6.  Additionally, the Court directed the Special Master to recommend in his Twenty-Eighth Round Monitoring Report "whether the study [ ] should be required and if so, how it should be conducted."  *Id.* at 7.

In response to the onset of COVID-19, on March 24, Governor Newson issued an executive order with directives to CDCR to suspend intake from counties and in-person parole hearings for 90 days.[27]  Transfers into other programs were suspended as well.  ECF No. 6552 at 13.  These measures, paired with others, helped reduce the prison population to 106,965 inmates as of June 10, 2020.  ECF No. 6715.

On March 25, 2020, plaintiffs filed an emergency motion before the three-judge court to modify the population reduction order.  ECF No. 6522.  In their motion, plaintiffs argued that social distancing could not occur in CDCR prisons due to existing crowding and space constraints.  *Id*. at 14.  Defendants filed their response on March 31, 2020.  ECF No. 6552. Defendants relayed that they had already suspended county intake and were planning to transition approximately 3,500 non-violent male and female inmates to parole within the next few weeks.  *Id*. at 6.  Defendants further argued that they were already below the 137.5% design

---

[27] https://www.gov.ca.gov/2020/03/24/governor-newsom-issues-executive-order-on-state-prisons-and-juvenile-facilities-in-response-to-the-covid-19-outbreak

capacity and that the number would continue to drop.  *Id.* at 10.  CDCR also detailed their criteria to accelerate inmates to parole.  *Id.* at 18 (listing three criteria for accelerated release). On April 4, 2020, the three-judge court denied the plaintiffs' motion, concluding that the motion was not properly before the court and that the request "[fell] outside the scope of [its] equitable modification authority."  ECF No. 6574 at 12.

As required by the February 10, 2014 order, defendants continue to report on the status of the prison population in its monthly filings.  ECF No. 5060 at 3 (requiring monthly status reports and the current adult prison population).  According to these submissions, on March 11, 2020, at the beginning of the pandemic, there were 114,318 inmates housed in 34 adult institutions.  ECF No. 6502.  As of December 9, 2020, that number has gone down to 91,582.  ECF No. 6987.

In the defendants' November 16, 2020 filing they reported that the prison population was at 108.8% capacity.  ECF No. 6950-1 at 5.  With regard to Proposition 57, defendants asserted that 1,147 inmates that were released in October 2020 earned credit authorized by Proposition 57.  *Id.* at 6.

As a result of COVID-19, Proposition 57 efforts were effectively subsumed within a larger-scale movement aimed at reducing the overall prison population within CDCR. Consequently, it is difficult to discuss the impact of Proposition 57 independently of other population reduction measures that were introduced subsequently and acted on by the State in response to the pandemic.

### E.  CDCR's Mental Health Headquarters Monitoring

Since its commencement, central office monitoring has proven itself invaluable.  There simply is no substitute for the real-time information sharing, communication, and conversation that comes with the Special Master having a dedicated monitoring team onsite, working

collaboratively with CDCR's decisionmakers. With central office monitoring, the Special Master literally has a seat at the table.

As previously mentioned, the Special Master began monitoring central office on July 8, 2019. *See* discussion *supra* at 15. Within that same month, and with the assistance of the *Plata* Receiver, the Special Master's central office monitoring team was provided office and conference room space, office equipment, and online access by the California Correctional Health Care Services (CCHCS).

As part of central office monitoring, the Special Master's team and the Deputy Director, Statewide Mental Health Program set up regular weekly meetings to serve as the forum to attend to substantive mental health policy and outstanding program issues as they arise in various meetings at central office. Relatedly, regular weekly meetings were also established with CDCR's in-house counsel assigned to the Mental Health Program regarding court orders and *Coleman* workgroup topics within their domain. The two meetings subsequently became joint weekly meetings that addressed these issues together.

Also, early in the central office monitoring process, the Special Master's team began regular weekly meetings with the deputy *Plata* Receiver, as the initial point of contact to attend to *Coleman* and *Plata* coordination matters that arise out of or are related to central office monitoring, and to other matters as instructed by the *Coleman* Special Master and/or the *Plata* Receiver. The meetings served as a focal point for addressing coordination topics that did not require the direct action or intervention of the *Coleman* Special Master and the *Plata* Receiver. Subsequently, CDCR's Under Secretary for Health Services became a regular attendee at these meetings.

From the start of central office monitoring, members of the Special Master's team also began participating in ongoing CDCR/CCHCS meetings that CDCR's Mental Health Program's staff regularly attended or were invited to attend.  In monitoring central office, members of the Special Master's team have standing meeting invitations to Mental Health Program meetings as well as to the designated CDCR/CCHCS meetings described above.  For certain meetings, along with the assigned members of the central office monitoring team of experts and monitors, additional *Coleman* experts are designated to attend depending on the focus or subject matter of the meeting.  Members of the team participate fully in meetings, engage in discussions and deliberations, and receive meeting documents.  As a result of the continuing COVID-19 pandemic, central office monitoring has continued to occur by teleconferencing and other electronic communications means.

Coupled with the COVID-19 pandemic, there were unexpected leadership transitions that impacted central office staff and the continuity of communication between leadership and the Special Master's central office monitoring team.  For example, three Deputy Directors and one Director transitioned in the past eighteen months.  The transitional plans of each Deputy Director were transmitted to central office staff and to the Special Master's central office monitoring team only by means of verbal communication.  Other significant leadership changes in the last year and a half include the Assistant Deputy Director, the Chief of Quality Management, the Chief of the Suicide Prevention Unit, the Chief of Training, the Mental Health Administrator for Clinical Support and Suicide Prevention, and the Associate Director, Statewide Mental Health Program, position.

Depending on its charter or practice, Mental Health Program and CDCR/CCHCS meetings are held daily, weekly, bi-weekly, monthly, or quarterly.  In general, the Special

Master's central office monitoring team participates in four to six Mental Health Program and CDCR/CCHCS meetings on a typical workday. On average they attend 24 to 26 meetings each week and could participate in over 100 meetings in a month.

A non-exhaustive list of some of the meetings attended by the Special Master's central office monitoring team is provided below. For purposes of this report, central office meetings have been divided into two broad classifications: (1) meetings led by Mental Health Program staff ("Mental Health Meetings") and (2) meetings led by CDCR/CCHCS staff ("CDCR/CCHCS Meetings"). In addition, the meetings are sub-divided by categories as appropriate including leadership, program, information technology, or ad hoc. Details including the name of the meeting, meeting frequency, and a description of the purpose of the meeting are provided.

### 1. **Mental Health Meetings**

The Special Master's central office monitoring team attended the following mental health leadership meetings:

- *Coleman* Special Master's Team/ Deputy Director, Statewide Mental Health Program /Office of Legal Affairs Meeting (weekly) – attend to substantive mental health policy, program matters, court orders and *Coleman* workgroup topics.

- Deputy Director's "Flash" Meeting (three times a week until October 2020 and was changed to twice a week) – communication between mental health leadership staff.

The following list includes some of the many Mental Health Program meetings attended by the Special Master's central office monitoring team:

- Case Review conference (weekly) – to review and plan electroconvulsive treatment and Clozapine initiation in a non- Clozapine initiation institution.

- *Coleman* Tracking Workgroup (weekly) – review Mental Health Program deliverables, tracking whether timeframes for deliverables were met or not.

- Continuing Medical Education (CME) Lecture (weekly) – psychiatrist from different programs present continuing medical education lectures.

- Headquarters Psychiatry Team Daily Meeting (daily except for Tuesdays) – daily meeting of the Mental Health Program headquarters psychiatry team meeting.

- Headquarters Suicide Prevention and Response Focused Improvement Team (SPRFIT) (monthly) – attends to staff training and guidance for suicide prevention, response, reporting, and review with the goal of reducing suicide risk in CDCR.

- Inpatient Coordinator Teleconference *(monthly)* – update institutional inpatient coordinator on directives from headquarters dashboard updates, deficiencies, and successes.

- Inpatient Referral Unit Clinician (IRU) Daily Check-In (daily) – The IRU team reviews acute and intermediate care transfer approvals to CDCR inpatient programs, closed and open inpatient programs, inmate transfers to DSH and confers on inmate or institutional concerns.

- PIP Leadership Meeting (monthly) – IRU chief meets with PIP CEOs and PIP mental health leadership to discuss Least Restrictive Housing LOPS and audits, staffing, policy, program successes and deficits.

- Suicide Prevention Mental Health/Nursing/Custody Suicide Case Review (weekly) – the Suicide Prevention Team conducts cross-discipline suicide case reviews timelines for psychiatry/nursing/custody and institutional staff.

- Suicide Prevention Team Meeting (weekly) - administers statewide suicide prevention mission, manages suicide prevention policies and regulations, and manages all Suicide Case Review oversight, including Quality Improvement Plan (QIP) tracking.

- Suicide Prevention Updates (monthly) – attends to suicide prevention policies, programs updates, and changes.

- Weekly Psychiatry Team meeting (weekly) – telepsychiatry program chief provides and receives updates from field psychiatrists regarding impacts of policy, court orders, and directives related to the Mental Health Program.

- Weekly Telepsychiatry meeting (weekly) – attend to hiring, training, institutional and individual requests along with policy and other health care and administrative matters.

The following list includes some of the many mental health IT meetings attended by the

Special Master's central office monitoring team:

- Chart Audit Tool (CAT) audit reviews (monthly, semi -annually and annually) – review charts audit results with institutions, and policies and procedures that related to audits.

- EHRS and Reporting Request Approval Committee (weekly) – committee pre-screens requests for changes to EHRS and data reporting prior to submission to the Change Advisory Prioritization Committee (CAPC) for action.

- Headquarters (HQ) Scheduling Train the Trainer (TTT) (weekly - there was a hiatus after August 2020) – trains institutional schedulers to appropriately schedule mental health patients for mental health services.

- Keeping Up with Kanban (weekly) – utilizes an informatics framework used to implement agile software development to evaluate workflow needs for the Mental Health Program quality management staff.

- Mental Health Workflow Workgroup (weekly) – meetings to develop sequences through which mental health processes pass from initiation to completion for build in EHRS.

- Weekly Telepsychiatry Technology meeting (weekly) – attend to telepsychiatry information technology (hardware and software).

The Special Master's central office monitoring team also attended the following ad hoc

meetings:

- EHRS - Psychiatry Train the Trainer – psychiatrist provided CERNER and EHRS training.

- PIP Admission/Discharge Unit – attend to changes regarding admissions to and discharges from PIPs due to COVID-19.

## 2. **CDCR/CCHCS Meetings**

The Special Master's central office monitoring team attended the following

CDCR/CCHCS leadership meetings:

- CCHCS Suicide Prevention and Response Focus Improvement Team (SPRFIT) Data Analytics Tools Partnership (monthly) - develop automated performance reports, operation tools, and special analyses for the Mental Health SPRFIT.

- CHCF-PIP Transition Plan Subcommittee (quarterly) – supervises CHCF-PIP transition away from the DSH-PIP model to a CDCR-PIP model.

- CHCF-PIP/CMF-PIP Workgroup (monthly) – evaluation of programs successes and deficiencies in staffing, out of cell time, therapeutic hours, and other patient care activities.

- Clinical Operations Team (COT) (monthly as needed) – Multidisciplinary team reviews proposed changes to polices and moves the items forward to the Joint Clinical Executive Team for final approving.

- *Coleman/Plata*/CCHCS Meetings (weekly) - attend to *Coleman* and *Plata* coordination matters that arise out of or related to central office monitoring, or to other matters as instructed by the *Coleman* Special Master and/or the *Plata Re*ceiver.

- Complete Care Operations Team (CCOT) (monthly, but hiatus due to COVID-19) – Interdisciplinary team meeting to discuss compete care model metrics and programs outcomes.

- Executive Quality Management Meeting (monthly) - CCHCS executive team, Mental Health Leadership, Regional Health Administrators, Human Resources, Budgets, and other department heads review and determent Quality Management metrics, initiatives and other QM needs for the departments.

- Integrated Substance Use Disorder Treatment (ISUDT) Executive Briefing (monthly) – meeting jointly chaired by CDCR Secretary and *Plata* Receiver that makes policy level decisions regarding ISUDT.

- ISUDT Planning and Implementation (weekly) – oversee the planning and implementation of ISUDT in CDCR.

- Joint Clinical Executive Team (JCET) (every other Monday) – cross discipline forum (mental health, dental, medical, nursing, and quality management) to review proposed changes to the clinical operations/policies of a program, ensure that patient care is not affected or have any adverse effects on other discipline operations either clinical or non-clinical.

- Joint Statewide Patient Safety Committee (monthly) – CCHCS and other disciplines identify and improve health care concerns through root cause analysis and other means, to avoid further adverse events.

The following list includes some of the CDCR/CCHCS program meetings attended by

the Special Master's central office monitoring team:

- Bad News Notification LOP (monthly)– CDCR's Division of Adult Institutions (DAI) led meeting to review and develop a policies and procedures for health care, mental health, nursing, and DAI to notify inmate's family when sentinel events occurred.

- Electroconvulsive Therapy (ECT) Regulatory Workshop (bi-monthly) – flow mapping of the ECT process to improve efficiencies and to determine roles of institutional psychiatrists, medication court administrator (MCA), headquarters psychiatrists, CDCR's office of legal affairs and other necessary stakeholders.

- Gender Affirming Surgery Review Committee (at least weekly) – responsible for evaluating each request for Gender Affirming Surgery for medical necessity and make a recommendation to the Statewide Medical Authorization Review Team for final decision.

- Nursing Led Therapeutic Group (NLTG) Programs (weekly) – CCHCS nursing provide structured therapeutic activities to inmates and the patients inmates receive rehabilitation accredited credits (RAC) for attendance.  Over 30 of the programs provided are structured therapeutic activities.

The Special Master's central office monitoring team attended the following

CDCR/CCHCS IT meetings:

- Change Advisory Board (as needed) – final approval by CCHCS IT of all IT program impacting the entire department.

- Clinical Leadership Advisory Committee (weekly) – reviews all policy revisions, workflows, and other initiatives that impact the Electronic Health Record System.

- Data Governance committee (quarterly or as needed) – CCHCS IT led multidisciplinary committee reviewing impacts and changes to severs and data warehouses.

- Data Warehouse (weekly) - manages the availability, usability, integrity, and security of data used within the organization.

- Integrated Call (weekly) – responsible for developing concepts, ideas, and suggestions prior to presentation in the Clinical Leadership Advisory Committee (CLAC).

Finally, the following CDCR/CCHCS ad hoc meeting was attended by the Special

Master's central office monitoring team:

- Complete Care Model PIP leadership Presentation – CCHCS Deputy Director for Quality Management presented the concept discussed in the Executive Quality Management Meetings of psychiatrist lead inpatient teams.

In addition to their attendance at various meetings, since the beginning of central office

monitoring, the Special Master and his team, along with input from the plaintiffs, have worked

with the defendants to develop and institute a number of mental health policy memorandums.

These include:

1. September 24, 2019 - Master Treatment Plan Review Process in the Electronic Health Records System - clarified the review and documentation process for the Master Treatment Plan in the EHRS.

2. November 19, 2019 - Mental Health Crisis Bed: Rescinding a Referral – established the policy for rescinding a Mental Health Crisis Bed (MHCB) referral for inmates previously determined to require MHCB level of care.

3. February 7, 2020 - Clinical Contacts and Documentation - provides direction to mental health clinicians (psychiatrists, psychologists, social workers, psychiatric nurse practitioners) regarding clinical contacts and documentation regarding confidential and nonconfidential settings.

4. February 24, 2020 - Reporting Data Issues for Mental Health Quality Management Reports - provided direction to Mental Health Program staff for reporting data or EHRS issues and addressing any issues or requests related to quality management (QM) reports.

5. March 10, 2020 - Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans - required MHCB supervisors or designees to review all Suicide Risk Assessment and Self-Harm Evaluations (SRASHE) of discharging inmates from MHCBs to ensure that each SRASHE contains an adequate safety plan for reducing future suicide risk.

6. March 16, 2020 - Requirement for Initial Contacts to be Completed Prior to the Interdisciplinary Treatment Team - directed the primary clinicians (PC) and psychiatrists (PSY), to complete their initial PC and PSY contacts prior to the initial IDTT for all new intakes and all inmate transfers.

7. March 16, 2020 - Headquarters Mental Health Electronic Record and Data Change Management Policy – established a standardized approval and completion process for all Mental Health Program changes that occur in the EHRS, data reporting, and ad hoc data requests.

8. March 16, 2020 - Headquarters Mental Health Electronic Record and Data Change Management Procedures – established the Change Advisory Prioritization Committee (CAPC) to review and vote on approval for EHRS requests and reporting requests.

In its January 7, 2020 order, the Court recognized central office monitoring as one of the Special Master's "critical tasks" that could not "give way in favor of others." ECF No. 6441 at 7. Approximately 18 months in, central office monitoring remains a "critical task" of the Special Master and has continued to serve its purpose of "collaborating with CDCR mental health staff in developing substantive policies and addressing outstanding issues resulting from court orders and workgroup meetings" via teleconferences and other communication forms. ECF No. 6308 at 2. The Special Master plans to resume in-person monitoring at CDCR's Mental Health Headquarters once it is safe to do so.

### F. **The Special Master's Labor Economist's Report**

The Special Master's need to hire a labor economist was preceded by the CDCR defendants' years of significant challenges in the hiring and retention of psychiatrists.[28] Since 2002, CDCR has been under a court order to limit psychiatry vacancy rates to ten percent - including contracted services. ECF No. 1383 at 4. Yet, in a recent order dated November 4, 2020, the Court announced that CDCR continues to be noncompliant with the ten percent vacancy rate.[29] ECF No. 6938 at 2.

---

[28] This history is well documented in numerous prior filings with the court and need not be reiterated in its entirety here. *See*, *e.g.,* ECF Nos. 5171, 5269, 5439, 5564, and 5711.

[29] As outlined in the court's order, the parties, under the supervision of the Special Master, continue their work toward reaching an agreement on modifications to the Staffing Plan and policies around the use of psychiatric nurse practitioners in the delivery of mental health care to *Coleman* class members. ECF No. 6938.

In addition to CDCR's ongoing failure to achieve compliance with staffing levels, the retention of an independent labor economist was necessary given defendants' repeated refusal to provide information to the Special Master regarding efforts to negotiate salary increases to recruit and retain psychiatrists during the collective bargaining process. ECF No. 5564 at 24. Instead of providing the requested information, defendants preferred to cite to, and rely on, the confidential nature of the collective bargaining process, leaving the Special Master unable to determine if the reported salary increases were sufficient to improve longstanding vacancy rates. *Id*. Defendants' actions seemed to imply "that the mere act of engaging in the collective bargaining process satisfied [defendants'] Court-ordered directive to consider salary increases as a measure to recruit and retain psychiatry staff." *Id*.

In advance of making a request to the Court, the Special Master informed the parties of his intention to hire an independent labor economist. ECF No. 5850 at 3. Neither party objected. Thereafter, at a status conference on August 28, 2018, the Court confirmed the Special Master's intention to request the appointment of an independent labor economist to the parties. ECF No. 5905 at 35.

On September 4, 2018, the Special Master filed a request for the appointment of additional staff. ECF No. 5903. Within his request, he outlined his need for expert assistance to conduct labor market and salary analyses designed to aid him in his evaluation of the efficacy of defendants' recently negotiated salary and compensation increases. *Id*. On September 11, 2018, the Court approved the Special Master's request to hire economist and statistician Dwight Steward, Ph.D., and the EmployStats research firm. ECF No. 5919.

Consistent with prior court orders, ECF Nos. 5573 and 5711, and with keen awareness that both the CDCR and the DSH defendants shared the same labor market and

were known to compete for psychiatrists, the Special Master directed EmployStats to include DSH in its market and salary analyses. ECF No. 6695 at 11. EmployStats performed separate analyses of the employment conditions and compensation of both CDCR and DSH psychiatrists. *Id*. For the analysis of psychiatrists' employment conditions, EmployStats developed and conducted a survey of CDCR and DSH psychiatrists' perceptions of their working conditions and compensation. *Id*. at 11-12. The analysis of psychiatrists' compensation consisted of a comparison of the salary and total compensation of CDCR and DSH psychiatrists to psychiatrists employed by other public and private California employers. *Id*. at 12.

The data collection process required a coordinated effort between EmployStats, the parties, and the Special Master. *Id.* A substantial amount of data in various forms was collected from both CDCR and DSH over a period of several months. *Id.* There were also a series of meetings related to the development and administration of the surveys and other data collection efforts. *Id*. In all, the survey was distributed to 344 CDCR psychiatrists and 62.2 percent of the psychiatrists completed the survey. *Id.* at 199. Regarding DSH, the survey was distributed to 138 psychiatrists and 50.7 percent completed the survey. *Id.* at 253.

On May 29, 2020, the Special Master submitted the report of Dr. Steward and EmployStats entitled, "An Analysis of Psychiatrist Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation and the Department of State Hospitals," to the Court. *Id*. at 187. Dr. Steward made a number of findings in his report and five recommendations. *Id*. at 191-193. The five recommendations included: (1) the provision of a system of consistent and larger salary increase opportunities for psychiatrists throughout their employment tenure at CDCR and DSH; (2) the provision of a system of compensation differentials to incentivize psychiatrist to fill [CDCR] Central Valley positions and to retain

61

incumbents in those positions; (3) increased and improved office space and facilities provided for [CDCR and DSH] psychiatrists to perform their job functions; (4) an improved working environment for CDCR and DSH psychiatrists; and (5) to better inform CDCR and DSH psychiatrists of the value of their compensation and compensation relative to their peers. *Id*.

Despite the objections raised by the defendants to EmployStats' methodology and recommendations, *id*. at 16, the Special Master informed the Court that he supported the processes used by EmployStats and accordingly, recommended that the Court adopt the findings and recommendations. *Id*. at 20. As of this writing, the Court has yet to issue an order regarding the labor economist's report.

### G. **Major Policy Successes During the Twenty-Eighth Round**

#### 1. **Telepsychiatry Policy**

In defendants' February 2015 staffing plan, it was proposed that the statewide telepsychiatry program continue. ECF No. 5269 at 10. At that time, CDCR was using telepsychiatry at just nine institutions and had 28 staff psychiatrists working out of three satellite offices; 26 were full-time and two were part-time. ECF No. 5711 at 20 (citing ECF No. 5269 at 9 and n.2). Moreover, approximately 18 of the 28 staff psychiatrists had been hired in the nine months preceding the staffing plan. *Id*.

By January 2017, CDCR was using telepsychiatry at 18 institutions and its staff had grown to 48. ECF No. 5872 at 2. On February 6, 2017, the Special Master filed his Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan. ECF No. 5564. Within his report, the Special Master stated that "telepsychiatry is a viable method for the delivery of mental health services" and accordingly, recommended the "continued expansion of the telepsychiatry program" with a few notable caveats. *Id*. at 15-17.

Specifically, the Special Master found that: (1) telepsychiatry should serve as a supplement for onsite psychiatry and should only be utilized when institutions were unable to recruit psychiatrists to work onsite, (2) defendants should be required to continue their efforts of recruiting full-time psychiatrists to work onsite at the facilities, (3) onsite psychiatrists should not be allowed to migrate to remote offsite offices for the sake of convenience, (4) telepsychiatry was not clinically desirable as a frontline approach to providing psychiatric services for inmates with the most intensive or emergent needs, (5) telepsychiatry was an appropriate option for 3CMS inmates with the requirement that the telepsychiatrist work onsite at least twice per year at the designated institutions and more frequently if feasible, (6) the efficacy of telepsychiatry for EOP inmates was not clear or recommended as a permanent solution; however, where used it was recommended that a psychiatrist be onsite at least quarterly to treat EOP inmates, given the frequency of psychiatric contacts required by the Program Guide, and (7) telepsychiatry was not an appropriate method of treatment to be used regularly for inmates at the MHCB level of care and should only be used as a last resort or in emergency situations when an onsite psychiatrist was not available. *Id*. at 15-17.

The defendants objected to the Special Master's recommendations limiting the use of telepsychiatry for inmates at the EOP and higher levels of care. ECF No. 5711 at 21 (citing ECF No. 5591 at 5-9). Unpersuaded, the Court held that "the evidence tendered by defendants is insufficient to demonstrate that use of telepsychiatry is appropriate for all *Coleman* class members at every level of care in the MHSDS." *Id*. at 22. In addition, the Court stated that "the time ha[d] come for the adoption of an addendum to the Revised Program Guide that will govern the use of telepsychiatry and the extent to which telepsychiatrists may provide mental health

services in place of on-site psychiatrists going forward." *Id.* at 23.  With one clarification,[30] the Court adopted the Special Master's recommendations, required that they form the basis of the addendum to the Revised Program Guide, and set a deadline of one year from the date of the order for completion and implementation.  *Id.*

Following a February 14, 2018 status conference related to staffing, the Court issued an order on February 15, 2018 directing the parties to provide an answer as to the role telepsychiatry plays, consistent with the Eighth Amendment, to aid in resolving the psychiatrist staffing shortage.  ECF No. 5786 at 3-4.  The parties were ordered to file a joint status report by June 21, 2018 informing the Court of their progress in addressing its question.  *Id.* at 4.  A further status conference was set for June 28, 2018.  *Id.*

In March 2018, in response to the Court's order, defendants provided plaintiffs and the Special Master with a copy of the existing telepsychiatry policy which would inform discussions held during a series of upcoming All-Parties Workgroup meetings.  ECF No. 5872 at 4.  Through the All-Parties Workgroup discussions, numerous policy revisions were made, leading to a May 10, 2018 revised draft.  *Id.*

As ordered by the Court in its February 15, 2018 order, the parties filed a joint status report on June 21, 2018.  ECF No. 5841.  Within the joint report, the parties informed the Court of the following four issues of disagreement: (1) whether the policy required specific language stating that telepsychiatry was not appropriate at the MHCB and PIP levels of care, (2) whether the policy required specific language stating that telepsychiatry should serve as a supplement for on-site psychiatry and should only be utilized when institutions were unable to recruit on-site

---

[30] The clarification was to the first recommendation and confirmed that telepsychiatry should serve as a supplement, and not a substitute, for on-site psychiatry.  ECF No. 5711 at 23.  Moreover, telepsychiatry should only be used when institutions are unable to recruit psychiatrists or have short-term vacancies that cannot be filled otherwise.  *Id.*

psychiatrists, (3) whether cell-front telepsychiatry should be used, and (4) whether psychiatric nurse practitioners should be able to provide telepsychiatry services. ECF No. 5872 at 4-5 (citing ECF No. 5841 at 7-8).

As previously ordered, a status conference was held on June 28, 2018. ECF No. 5786. Subsequent to the status conference, the Court issued an order on July 3, 2018 directing the Special Master to "finalize a proposed telepsychiatry policy that is in his view consistent with the provisions of the October 10, 2017 order and the recommendations of his experts." ECF No. 5850 at 6. In so doing, the Court stated that the Special Master "shall propose in the final draft policy resolutions to the third and fourth disputes raised by the parties, concerning cell-front telepsychiatry and whether psychiatric nurse practitioners should be permitted to provide telepsychiatry services." *Id*. The Court ordered that the Special Master complete a final proposed telepsychiatry policy, circulate it to the parties, and file together the proposed policy and any responses received by the parties within 30 days from the date of the order.[31] *Id*. at 8.

As required by the Court's July 3, 2018 order, the Special Master filed his report on the proposed telepsychiatry policy addendum, along with the final proposed telepsychiatry policy addendum, and the parties' responses on August 2, 2018. ECF No. 5872.

On September 7, 2018, the Court issued a minute order directing the parties to meet and confer regarding disputed language related to the use of telepsychiatry at the EOP level of care, and to present proposed alternative language by close of business on September 12, 2018. ECF No. 5909. As directed by the Court, the parties met and conferred in workgroups on September 11 and 12, 2018, but were unable to reach an agreement regarding the disputed language. As a

---

[31] The defendants appealed the court's July 3, 2018 order to the Ninth Circuit Court of Appeal. ECF No. 5867. The Ninth Circuit dismissed the appeal. ECF No. 6450.

result, the parties filed separate statements with the court on September 12, 2018. ECF No. 5920, 5921.

On September 20, 2018, the Court issued an order continuing the matter for an evidentiary hearing regarding defendants' proposed use of telepsychiatry to October 15, 2018. ECF No. 5928. Subsequent to the revelation of the existence of the Golding Report, on October 12, 2018, the Court issued an order continuing the October 15, 2018 hearing to October 22, 2018. ECF No. 5949. On October 22, 2018, the Court vacated the telepsychiatry evidentiary hearing to be reset as soon as reasonably practical. ECF No. 5980.

On December 18, 2018 and in an effort to resolve outstanding issues, such as staffing, that were negatively impacting compliance, the Court ordered the parties to participate in a settlement conference.[32] ECF No. 6050. The settlement conference was scheduled for February 21, 2019 and was the first of several that occurred throughout 2019 and early 2020. ECF Nos. 6097, 6109, 6132, 6148, 6150, 6293, and 6429.

During the January 17, 2020 settlement conference, the parties were able to reach an agreement in principle to defendants' latest revised draft of the telepsychiatry policy. ECF No. 6449. Over the next several weeks, this agreement was finalized, and a stipulation was filed on March 25, 2020. ECF No. 6517. As part of the stipulation, the parties agreed that the revised telepsychiatry policy would be a provisional policy and that the provisional period would last 18 months from the date of the policy's full implementation. *Id*. at 2. Implementation was to occur within 120 days of the Court's approval of the stipulation. *Id*. The parties agreed that the revised policy would replace all previous policies regarding CDCR's use of telepsychiatry and that during the provisional period, the Special Master would monitor the use of telepsychiatry in

---

[32] The settlement conference was held before Judge Drozd.

accordance with the provisional policy. *Id*. The Court approved the stipulation on March 27, 2020. ECF No. 6539.

The parties' March 25, 2020 stipulation provided for the possibility of an extension of the 120-day period for full implementation due to COVID-19. *Id*. at 2. On July 24, 2020, the parties stipulated to a 30-day extension and the Court approved it on July 25, 2020. ECF No. 6789. On August 21, 2020, before the expiration of the 30-day extension, defendants filed a second motion for an extension of time. ECF No. 6833.

The basis of defendants' motion was that there were six substantive provisions of the telepsychiatry policy they could not implement given COVID-19 and accompanying public health measures. *Id*. at 2. Those provisions included: (1) periodic site visits by all line telepsychiatry staff, (2) telepsychiatrists working from CDCR-operated hubs, (3) only approved classifications as telepresenters, (4) preclusion of cell-front contacts as a clinical contact, (5) preclusion of telepsychiatry to treat inmates in the PIPs, MHCBs, and TMHUs, and (6) inmate concerns about COVID-19 exposure and treatment refusals. *Id*. at 5-7.

On September 21, 2020, the Court issued an order denying defendants' motion for an extension of time to implement six of the substantive provisions of the telepsychiatry policy. ECF No. 6874. In ruling on the defendants' motion, the Court determined that full implementation of the telepsychiatry policy was not a prerequisite to the start of the provisional 18-month period. *Id*. at 4. Additionally, and "[m]ost importantly," the Court found that "defendants' motion arises from the impact of COVID-19 on their ability to fully implement the policy, not COVID-19's impact on development and implementation of the internal monitoring mechanisms necessary to provision of the notice the policy requires." *Id*. at 5. Because the defendants had represented to the plaintiffs that they had already developed and implemented the

internal monitoring processes, and made no showing to the contrary, the "material condition" for the initial stipulation deferring the implementation period had been satisfied. *Id*. Accordingly, the Court held that the 18-month period for monitoring the defendants' provisional telepsychiatry policy would begin on October 1, 2020. *Id*. at 6.

### 2. Desert Transfers Policy

Reducing the Special Master's monitoring of the desert institutions and delegating those institutions back to the State has been a topic of discussion since 2016. Overtime, those discussions unfortunately stalled, but were ultimately renewed under the current administration.

At a status conference on December 14, 2018, the Court, having been briefed by the Special Master on clustering, ordered the parties to participate in a settlement conference. ECF No. 6054 at 42:4-9. As stated by the Court, the purpose of the settlement conference was to focus on,

> whether mentally ill inmates can be located in fewer total institutions to address persistent impediments to Program Guide compliance in the areas of staffing, bed transfers and cultural compliance training.

ECF No. 6050.

The settlement conference was held on February 21, 2019. ECF No. 6103. One of the agreements reached was that there would be "expedited transfers for inmates out of desert institutions within fourteen days." *Id*. at 2. In return for the defendants expediting transfers, plaintiffs agreed there would be a reduction in staffing at those institutions. *Id.* Plaintiffs also agreed that they would have no opposition to the Special Master ending on-site monitoring at those institutions. *Id*.

In March of 2019, defendants proposed a policy that would shorten the transfer timeframes outlined in the MHSDS Program Guide. ECF No. 6279. The purpose of the policy was to speed up the transfer of inmates out of desert institutions who needed to be included in the

MHSDS, as well as *Coleman* class members who were transferred to a desert institution but did not belong there. *Id.* The parties met and conferred almost every month between March and September of 2019 and, with the help of the Special Master, came to an agreement on the terms of a policy. *Id.* On September 12, 2019, the parties filed their stipulation. *Id.* As part of the policy, CDCR agreed to file monthly reports on *Coleman* transfers out of desert institutions, and the Special Master, in lieu of touring the institutions, would monitor by reading the filed reports. *Id.* at 2.

On September 26, 2019 the Court approved the policy and a subsequent addendum.[33]  In so doing, the Court noted that "the stipulation does not remove these institutions or class members who may be housed there from the jurisdiction of this court."  ECF No. 6296 at 3.  The Court also ordered the defendants to file monthly reports on the transfers of *Coleman* class members out of desert institutions.  ECF No. 6678.

In accordance with the stipulation and with the help of the Special Master, the parties then met and conferred to determine what the monthly reports would look like.  After two months, the parties filed a stipulation and proposed order on February 14, 2020.  ECF No. 6465. Attached to the order were templates for the reports as well as the discussed business rules that were to be used. *Id.* at 2.  The first report was filed on February 18, 2020.  ECF No. 6471.  To date, defendants have filed regular compliance reports regarding transfers of *Coleman* class members out of desert institutions.  ECF Nos. 6471, 6608, 6716, 6758, and 6818.

The Special Master continues to monitor the provision of care at the desert institutions. A retrospective review was conducted in September 2020 and showed both deficiencies and

---

[33] The parties were required by the court to define the terms "calendar day," "working day," and "business day," and agree upon the definitions.  ECF No. 6296. The definitions were included in the final stipulation.  ECF No. 6290 at 4.

successes regarding transfers in and out of the desert institutions. This review prompted clinical discussions and plans to improve timely transfers and communication.

### H. **Suicide Prevention**

1. **The Special Master's Expert's Fourth Re-Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation**

On September 23, 2020, and as part of the Special Master's continuing review of defendants' compliance with court ordered remediation, the Special Master submitted the fifth report from his expert, Lindsay M. Hayes, entitled, "The Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation." ECF No. 6879-1.

The fourth re-audit began on November 13, 2018 and ended on December 18, 2019. ECF No. 6879 at 6. Mr. Hayes selected 20 prisons based on four criteria. *Id.* at 5-6. (discussing the four criteria). Those prisons were: CCI, CCWF, CHCF, CIM, CIW, CMC, CMF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, DVI, KVSP, MCSP, NKSP, PBSP, PVSP, SQ, and WSP. ECF No. 6879-1 at 2. Institutional site visits, as well as review of inmate suicide case files, were conducted. *Id.*

On May 14, 2020, the fourth re-audit report was distributed in draft form to the *Coleman* parties and the parties were given 30 days to respond. ECF No. 6879 at 5-6. On June 15, 2020, both plaintiffs and defendants submitted letters in response to the draft report. *Id.* Mr. Hayes' responses to the parties' comments and objections were included in the final report. *Id.* at 13.

Mr. Hayes first report was filed January 14, 2015. ECF Nos. 5258 and 5259. In his first report, Mr. Hayes provided 32 recommendations to help improve suicide prevention policies and practices. ECF No. 5259. In his subsequent report filed on September 7, 2017, Mr. Hayes determined that three recommendations were no longer warranted. ECF No. 5671. That left 29

recommendations to be implemented.  In its September 3, 2020 order, the Court wrote that,

"[t]he twenty-nine recommendations must be completely and durably implemented to allow

comprehensive assessment of their efficacy in reducing the ongoing number of foreseeable

and/or preventable inmate suicides in California's prison system."  ECF No. 6846 at 22.

According to Mr. Hayes, defendants have succeeded in fully implementing 11 of the

recommendations.  ECF No. 6879 at 14.  Defendants have also had success with the partial

implementation of one additional recommendation.  *Id.*  There are 17 recommendations that

remain to be fully implemented, and one that requires further partial implementation to achieve

full compliance.  *Id.*  Accordingly, in his cover report, the Special Master requested that the

Court find the defendants in compliance with 11 of the recommendations, including part of a

twelfth, and asked the Court to order the complete implementation of the remaining

recommendations.  *Id.* at 27.

On December 2, 2020, the Court ordered the Special Master's report adopted in full.

ECF No. 6973 at 12.  Additionally, the Court ordered the defendants to

> file a list of the person or persons most knowledgeable of the steps
> required to complete implementation of all twenty-nine
> recommendations previously adopted by the court and to ensure that
> implementation is durable; defendants shall take all steps necessary to
> ensure the attendance of the person or persons at the status conference
> set for December 18, 2020.

*Id.*

## 2.  2015 and 2016 Suicide Report

In its December 2, 2020 order, the Court remarked on the current state of the annual

suicide reports.  *Id.* at 11.  In so doing, the Court stated that every year, as part of his duties, the

Special Master had filed reports on completed inmate suicides within CDCR.  *Id.*  The Court

noted that during the 2015 report writing process, and in an attempt to shift the responsibility for

the reports away from the Special Master and to the defendants, there was a dispute over the

meaning of foreseeable and preventable. *Id.* The dispute was caused when CDCR altered the long-standing, court-approved definitions of these terms as used in the Special Master's prior suicide reports and moreover, would not commit to using the court-approved terms in future reports.

Consequently, the Special Master formed a Suicide Report Workgroup to direct and guide the development of the review of the 2015 CDCR Report and the Special Master's analysis of suicides completed from 2016 through 2019. The Workgroup was comprised of a group of the Special Master's experts who also authored the last Special Master's suicide report in 2014.

The Special Master's analysis of the 2015 CDCR Report was completed by two of the Special Master's experts who are nationally recognized experts on mental health care and suicide prevention in correctional settings. One of these experts also authored the 2016 Special Master's Report.

The Special Master submitted a draft of both reports, his analysis of defendants' 2015 suicide report and his expert's authored 2016 Suicide Report, to the parties on December 12, 2020 and requested their response within 30 days. On January 11, 2021, plaintiffs and defendants submitted their comments and objections to the draft report. Both reports were finalized and filed on January 28, 2021[34]. ECF Nos. 7038-2, 7038-3.

On February 8, 2021, after the court denied defendants' request for an extension of time, ECF No. 7050, the defendants filed their response and objections to the final report. ECF No. 7052.

---

[34] The Special Master submitted a draft of his expert's authored 2017 Suicide Report to the parties on January 29, 2021. He requested their responses within 30 days. On March 1, 2021, defendants submitted their responses and objections to the report. After review, the Special Master anticipates finalizing and filing the report in March of 2021.

In its December 2, 2020 order, the Court ordered the parties to complete a joint summary status report addressing the difference in the definitions and how the difference would affect the Court's ability to review the current status of remediation by December 11, 2020.  ECF No. 6973 at 11.  On December 11, 2020, the parties filed their joint status report.  ECF No. 6980.

## II.    MENTAL HEALTH VACANCY RATES OVERALL AND BY DISCIPLINE DURING THE TWENTY-EIGHTH MONITORING ROUND

### Mental Health Vacancy Rates Overall and by Discipline During the Twenty-Eighth Monitoring Round[35]

As discussed below, throughout the Twenty-Eighth Monitoring Round, vacancy rates in CDCR's mental health program remained above the ten percent required by the Court for psychiatrists and psychologists.  The vacancy rate for social workers was ten percent.  ECF No. 1383.  Vacancy rate reduction from two to seven percent was realized for senior psychiatrist, chief psychologist, social worker, psych tech, and recreation therapist positions; however, these reductions were not adequate to balance the dearth of staff in other critical provider positions. The vacancy rate for chief psychiatrist positions remained unchanged at 22 percent and, while the functional vacancy rate for staff psychiatrists improved through the use of registry staff, the permanent staff psychiatry vacancy rate increased from 44 percent to 51 percent since the Twenty-Seventh Monitoring Report.  Telepsychiatry positions that afforded vital additional services had a vacancy rate of 18 percent, even with the use of registry staff.  The combined vacancy rate for psychiatrists (onsite and telepsychiatrists) was 36 percent.  Psychologist vacancies swelled to 20 percent, a six-percent increase from the Twenty-Seventh Monitoring

---

[35] Sources: (excluding staff psychiatrists, telepsychiatrists and psych techs): CDCR Secure Website for Monthly Reports, posted October 2020, covering the period of August 2020.  Because staffing data for psych techs was not included in the monthly posting, the data reported herein on psych tech staffing was obtained from the individual institutional reports for the Twenty-Eighth Monitoring Period.  Data for staff psychiatry and telepsychiatry was taken from Defendants' Monthly Psychiatry Vacancy Report (ECF 6892 at page 5).

Report.  Finally, the vacancy rate for essential office tech positions increased from six percent to 15 percent.[36]

As of August 2020, the total number of all established mental health positions for chief, senior, and staff onsite and telepsychiatrists; chief, senior and staff psychologists; social workers; senior psych techs and psych techs; and recreation therapists was 2,605.9.  Of these established positions, 2,242.6 were filled with full time employees and registry.  The collective vacancy rate among all these positions was 14 percent which represented a slight decrease from 17 percent reported in the preceding monitoring report.



---

[36] Office tech positions are not subject to the court-ordered minimum ten percent vacancy rate.

74

| Position | Allocated | Filled | 28th Round Vacancy Rate | 27th Round Vacancy Rate | Change |
|---|---|---|---|---|---|
| Chief Psychiatrist | 18 | 14 | 22 | 22 | - |
| Sr Psychiatrists | 17.5 | 14 | 20 | 22 | -2 |
| Staff Psychiatrists | 225.5 | 109.5 | 51 | 47 | +4 |
| Staff Psychiatrists with Registry | 225.5 | 163.72 | 27 | 40 | -13 |
| Telepsychiatrists | 78 | 52.67 | 33 | NA | NA |
| Telepsychiatrists with Registry | 78 | 63.92 | 18.1 | NA | NA |
| Chief Psychologists | 59 | 40 | 32 | 37 | -5 |
| Sr. Psychologists | 199 | 180 | 9.5 | 6 | +3.5 |
| Staff Psychologists | 748.5 | 555 | 26 | 18 | +8 |
| Staff Psychologists with Registry | 748.5 | 600.23 | 20 | 14 | +6 |
| Social Workers | 371 | 334 | 10 | 18 | -8 |

<u>Chief Psychiatrists</u>

The vacancy rate among the 18 allocated chief psychiatrists saw no increase or decrease from the preceding monitoring report and remained unchanged at 22 percent. No vacant positions were covered by registry and of those institutions with established chief psychiatrist positions, four remained unfilled – CSP/Corcoran, MCSP, PBSP and WSP.

<u>Senior Psychiatrists</u>

The vacancy rate for senior psychiatrists continued its decline over the last two monitoring rounds and decreased from 22 percent to 20 percent. Fourteen of the 17.5 established senior psychiatrist positions were filled. Of the 17 institutions with allocated positions, 14 filled all of them. The three institutions with 100 percent vacancy rates were CHCF, CMF and CSP/Corcoran. No registry staff were used to fill any vacancies.

Staff Psychiatrists

The vacancy rate for FTE staff psychiatrists saw a four percent increase from the preceding monitoring period, with a rise from 47 percent to 51 percent. However, through the use of registry, the functional vacancy rate saw a marked decrease from 40 percent to 27 percent during the same period.

Of the 225.5 established positions, 109.5 were filled resulting in a vacancy rate of 51 percent. The use of 54.22 registry staff reduced the functional vacancy rate 27 percent. The eight institutions with vacancy rates of ten percent or less were ASP, CCI, CRC, CSP/Sac, DVI, PBSP, SQ and SVSP. Fifteen institutions – CIM, CIW, CMC, CMF, CSP/Corcoran, CSP/LAC, CSP/Solano, CTF, Folsom, MCSP, NKSP, PVSP, RJD, SCC and WSP – had vacancy rates ranging from 11 percent to 50 percent. Five institutions – CCWF, CHCF, CSATF, KVSP and VSP – had vacancy rates ranging from 51 percent to 88 percent. HDSP, with 2.5 established positions, had a 100 percent vacancy rate.

Telepsychiatrists

Of the 78 telepsychiatrist positions allocated at the 22 institutions monitored during the Twenty-Eighth round, 52.67 were filled with civil service employees resulting in a vacancy rate of 33 percent. Registry covered an additional 11.25 positions which reduced the functional vacancy rate to 18.1 percent. The twelve institutions with vacancy rates of ten percent or less were CHCF, CIM, CMF, CSP/Corcoran, CSP/Solano, HDSP, KVSP, MCSP, NKSP, PVSP, RJD and WSP. Six institutions - CCI, CSATF, CTF, PBSP, SVSP and VSP - had vacancy rates ranging from 14 percent and 50 percent. CSP/Sac with its one allocation had a vacancy rate of 83 percent. The four institutions with 100 percent vacancy rates were CCWF, CIW, CMC and SCC.

76

<u>Chief Psychologists</u>

Of the 59 chief psychologist positions, 40 were filled, resulting in a vacancy rate of 32 percent. No registry coverage was used. Of the 29 institutions with allocated positions, 11 had zero vacancies – ASP, CHCF, CIW, CMC, CMF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, RJD and SVSP. Seventeen institutions had a 50 percent vacancy rate – CCI, CCWF, CIM, CRC, CSP/Solano, CTF, DVI, Folsom, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, SCC, VSP and WSP. One of the three positions at SQ was filled for a vacancy rate of 67 percent.

<u>Senior Psychologists</u>

The vacancy rate among senior psychologists increased slightly since the preceding monitoring round from six percent to 9.5 percent. Of the 199 allocated positions, 180 were filled with 14 institutions having a zero percent vacancy rate – ASP, CCI, CIM, CIW, CSP/Corcoran, CSP/Solano, CTF, DVI, HDSP, PBSP, SCC, SVSP, VSP and WSP. Four institutions – CHCF, CSP/LAC, MCSP and RJD had vacancy rates under ten percent. Of the remaining ten institutions that had allocated senior psychologist positions, the vacancy rates ranged from 11 percent to 44 percent.

<u>Staff Psychologists</u>

The overall vacancy rate for staff psychologists increased from 18 percent in the preceding monitoring round to 26 percent. Of the 748.5 total allocated positions, 555 were filled with full-time psychologists for a vacancy rate of 26 percent. The use of 45.23 registry staff reduced the functional vacancy rate to 20 percent representing an increase from the 14 percent functional vacancy rate reported in the preceding monitoring round. CIM, CTF and VSP filled all their staff psychology positions and another five institutions – CCI, CCWF, CIW, CMC and RJD had vacancy rates of ten percent or less. There were 12 institutions with vacancy rates

77

ranging from 11 percent to 25 percent – ASP, CMF, CRC, CSATF, CSP/LAC, CSP/Solano, Folsom, HDSP, MCSP, NKSP, PBSP and SQ. The remaining eight institutions, CSP/Corcoran, CSP/Sac, DVI, KVSP, PVSP, SCC, SVSP and WSP had vacancy rates ranging from 26 percent to 49 percent.

<u>Social Workers</u>

The overall vacancy rate for social workers decreased from 18 percent to ten percent since the preceding monitoring round with 334 of the 371 allocated positions filled by full-time employees. Registry staff further reduced the vacancy rate to seven percent, representing a decrease from 14 percent reported in the preceding monitoring round.

Twelve institutions filled all of the allocated positions – CRC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, HDSP, NKSP, PBSP, PVSP, SCC, VSP and WSP. Another nine institutions had vacancy rates less than ten percent – CCI, CCWF, CHCF, CIM, CIW, CMF, CTF, KVSP and RJD. The remaining eight institutions – ASP, CMC, CSATF, DVI, Folsom, MCSP, SQ and SVSP had vacancy rates ranging from 12 percent to 23 percent.

<u>Psych Techs</u>

Of the 14 institutions where data was provided for psych techs positions, there were 555.6 allocated psych tech positions of which 494.7 were filled with full-time employees for a vacancy rate of 11 percent. Another six positions were filled by registry staff and reduced the functional vacancy rate to 9.9 percent. This was a decrease from the 14 percent functional vacancy rate reported in the preceding monitoring round.

Three institutions – CSATF, Folsom and KVSP filled all of their allocated positions and four other institutions – CIM, CIW, CSP/LAC and MCSP had vacancy rates of less than ten

percent.  Six institutions – ASP, CMF, CSP/Sac, CSP/Solano, HDSP and NKSP had vacancy rates ranging from eleven percent to 17 percent.  WSP had a vacancy rate of 35 percent.

### Recreation Therapists

There were 275 allocated recreation therapist positions across 24 institutions. Of those 275 positions, 255 were filled with full-time employees.  Another 8.61 positions were covered by registry staff, which reduced the functional vacancy rate to four percent.

Eleven institutions – CCI, CCWF, CIM, CSP/Corcoran, HDSP, KVSP, MCSP, PBSP, PVSP, SVSP and VSP reported zero vacancies.  Another eight institutions – CHCF, CIW, CMF, CSATF, CSP/LAC, CSP/Sac, RJD and SQ had vacancy rates of ten percent or less.  CMC had a vacancy rate of 18 percent while both NKSP and WSP each had vacancy rates of 20 percent. Two institutions, CSP/Solano and DVI which each have one allocation, did not fill the positions.

### Office Techs

Of the 405 allocated office tech positions, 340 were filled, for a vacancy rate of 16 percent.  The use of 3.75 registry staff reduced the functional vacancy rate by one percentage point to 15 percent.  Seven institutions – ASP, CSP/Corcoran, HDSP, NKSP, PVSP, VSP and WSP filled all of their positions.  There were nine institutions with vacancy rates of ten percent or less – CCI, CCWF, CIM, CMF, CSATF, CSP/LAC, CSP/Solano, CTF and MCSP.  Eleven institutions – CHCF, CIW, CMC, CRC, CSP/Sac, DVI, Folsom, KVSP, RJD, SQ and SVSP, had vacancy rates ranging from 11 to 21 percent.  PBSP and SCC each had a vacancy rate of 33 percent.

## **Summary – Staffing**

Resolving its staffing vacancies to reach compliance with the ten percent vacancy rate required by the Court continued to elude the CDCR defendants in the Twenty-Eighth Monitoring

Round.   As discussed in detail above, pursuant to the Court's November 4, 2020 order regarding

staffing, the parties are continuing their work under the supervision of the Special Master toward

reaching an agreement on modifications to the 2009 Staffing Plan.

III.   **SUMMARY OF THE SPECIAL MASTER'S FINDINGS – ONSITE AND PAPER MONITORING**

A.  **Quality Management**

In his Twenty-Seventh Monitoring Round, the Special Master found that,

> None of the institutions reviewed had a quality management structure
> in place in the nature of a system that monitored mental health
> activities, analyzed the results, identified areas that needed
> improvement, and developed and implemented remedies with the
> objective of preventing future adverse outcomes.

ECF No. 5779 at 55.

The challenges faced by the CDCR defendants outlined above continued during the

Twenty-Eighth Monitoring Round.  These are the issues that a continuous quality improvement

(CQI) system are designed to address.  *Id.*  A rebooted CQI offers the solution to these

challenges.

The Special Master's findings regarding quality management in CDCR are presented

below.

Across institutions, quality management bodies met regularly and addressed relevant

MHSDS matters.  Most institutions held multiple local governing body and quality management

committee meetings during the review period and reported attaining quorums at most or all

meetings.  Likewise, most institutions' mental health subcommittees met and achieved quorums

regularly.  Eight institutions had active Quality Improvement Teams (QITs) during the review

period, and four had active Focused Improvement Teams (FITs).  Six institutions conducted

mental health related audits during the review period.  Notably, peer reviews generally did not occur outside of MHCBs per CDCR directive.

Fifteen of 19 institutions, including CIW, CMC, CMF, CSATF, CSP/Sac, CSP/Corcoran, CSP/LAC, CSP/Solano, HDSP, KVSP, MCSP, NKSP, RJD, SVSP, and WSP, had active local governing bodies during the review period.  Local governing bodies met monthly at CIW, CMC, CSATF, SVSP, and WSP (except for the month of December), and quarterly at CSP/Corcoran and RJD.  At CMF, CSP/Sac, CSP/Solano, KVSP, MCSP, NKSP, the local governing body met twice during the review period, while CSP/LAC's local governing body met once.  Local governing bodies were reportedly not required at CCI and CIM during the review period; local governing body activity was not reported at FSP/FWF or CRC.

Quorums were attained and documented for each local governing body meeting at CIW, CMC, CMF, CSATF, CSP/LAC, MCSP, NKSP, and WSP.  KVSP attained a quorum at one of its two meetings and SVSP reported a quorum for all but one of its monthly meetings.  There was not a quorum present at either of CSP/Solano's local governing body meetings.  At CSP/Sac, CSP/Corcoran, FSP/FWF, HDSP, and RJD, reviewed documents did not indicate whether a quorum was present at the local governing body meetings.

Quality management committees regularly met and reported attaining quorums during the monitoring round.  Monthly quality management committee meetings were held at CCI, CIW, CMC, CRC, CSP/Corcoran, CSP/LAC, CSP/Solano, FSP/FWF, KVSP, MCSP, NKSP, RJD, SVSP, and WSP.  At CIM, the committee appeared to meet monthly except for the month of June.  The CSATF quality management committee met regularly and, the committees at CMF and HDSP reportedly met as required.  CSP/Sac's quality management committee met twice during the review period.

Quorums were reported at all quality management committees at 14 institutions: CCI, CIM, CIW, CMC, CMF, CSATF, CSP/LAC, CSP/Solano, FSP/FWF, KVSP, MCSP, NKSP, SVSP, and WSP.  CRC attained a quorum at all but one of its monthly quality management committee meetings.  HDSP's quality management committee did not document whether a quorum was present, and quorums were not reported at CSP/Sac, CSP/Corcoran or RJD.

Most institutions' mental health subcommittees regularly met and achieved quorums during the review period.  The mental health subcommittees at CCI, CIW, CRC, CMF, CSP/Sac, CSP/Corcoran, CSP/LAC, CSP/Solano, FSP/FWF, HDSP, KVSP, MCSP, NKSP, RJD, SVSP, and WSP met monthly during the review period.  At CMC and CSATF, the mental health subcommittees met regularly.

The following institutions reported quorums at each mental health subcommittee held during the review period: CMF, CSP/Sac, CSP/LAC, FSP/FWF, HDSP, KVSP, MCSP, NKSP, SVSP, and WSP.  Mental health subcommittee quorums were not reported at CSATF, CSP/Corcoran, and RJD.

Some institutions utilized QITs during the monitoring round.  CIM, CMC, CSATF, CSP/Sac, CSP/Corcoran, CSP/LAC, MCSP, and WSP had active QITs as part of their quality management process.  FITs were active at CMC, CMF, CSP/Sac, and CSP/Corcoran during the monitoring round.  Among the audit topics reported during the review period or at the time of the site visit were: EOP treatment hours and refusals; EOP structured therapeutic activities; death reviews; EOP Hub certification; administrative segregation treatment; data entry; high-risk local operating procedure (LOP); mental health transfer timelines; alternative housing mental health log; and MHCB 30-day readmissions.  Regarding FITs, topics included administrative segregation, death review, and suicide prevention.

CIW, CMC, CSATF, CSP/Corcoran, CSP/Sac and RJD reported conducting audits for mental health-related matters during the monitoring round. Specifically, CSP/Sac conducted audits related to EOP programming, MHCBs, and indecent exposure RVRs, while CIW's mental health related audits addressed MHCB readmissions, quality of care, data entry, and suicide prevention.

Two institutions chartered projects designed to use data-driven methodologies to improve systems and quality of services, during the review period. The project at CSP/Corcoran related to wellness checks after crisis bed discharge, while the projects at RJD covered a variety of mental health topics, including hospital discharge completion times, medication adherence, parole processes, and time spent in alternative housing, among others.

Most institutions reported that CDCR placed the peer review process on hold during the monitoring round and, accordingly, did not conduct systemwide peer reviews except for MHCBs. CSP/Sac reported that it had mistakenly suspended the MHCB peer review process and planned to develop and implement peer review by June 2019. CIM, CMC, and HDSP conducted peer review for their MHCBs, while RJD conducted peer review for psychiatrists, but not for psychologists or social workers. At CIW, quarterly peer reviews were conducted for social workers and annual peer reviews were conducted for psychiatrists and psychologists.

### Summary – Quality Management

During the Twenty-Eighth Monitoring Round, CDCR's quality management system remained in place with required institutional bodies functioning at most institutions. With a few exceptions, local governing bodies, quality management committees, and mental health subcommittees met and achieved quorums regularly during the review period. About half of the

reviewed institutions had active QITs or FITs during the review period.  Significantly, the peer review system was on hold at most institutions per CDCR directive.

B.  **Quality of Care in CDCR's Mental Health Programs**

1.  **The Quality of Care Delivered during the Twenty-Eighth Monitoring Round Continues to Substantiate the Need for Focused Attention to the Interdisciplinary Treatment Team (IDTT) Through an Adequate and Sustained Quality Improvement Process in CDCR's Mental Health Program**

In both his Twenty-Sixth Monitoring Round Report and Twenty-Seventh Monitoring Round Report, the Special Master found that the quality of Interdisciplinary Team Meetings (IDTTs) meetings varied across and within institutions, which continued during the Twenty-Eighth Monitoring Round.  The results of observations of the IDTT process during this monitoring round were similar to the findings during the prior two rounds.  Some institutions and programs lacked meaningful team discussions during IDTTs while others conducted appropriate interdisciplinary treatment team meetings.  There were still IDTTs that did not appropriately attend to them including case conceptualization and formulation, and treatment plans that take into account inmates' diagnoses, symptomology, and case factors, with measurable goals and consideration of referral to higher level of care.  In contrast, there were other institutions and programs that adequately addressed these areas.  At several institutions, the role of supervisory guidance during the IDTTs was found to be beneficial.  Ensuring inmate participation in the IDTT process was still not occurring at all institutions.  There were two institutions with IDTT space problems as described below.

The Special Master's findings regarding the quality of the interdisciplinary team meeting process are presented below.

### a.    <u>The Interdisciplinary Treatment Team Process</u>

Collaboration and cohesion among team members, which were required for an interdisciplinary team to function appropriately varied across institutions and programs within institutions. CSP/Sac's EOP hub treatment team members were observed to appropriately interact with each other. In contrast, IDTTs observed in the administrative segregation and 3CMS programs at CCI were not collaborative. In contrast, while treatment teams at CSATF during observed IDTTs were found to lack clinical focus and psychiatry participation in IDTTs was minimal, there were appropriate interdisciplinary discussions observed in MHCB IDTTs at CIW, and the quality of the IDTT in its 3CMS program was reasonable. Staff attending EOP IDTTs at CSATF were observed to minimally communicate with each other, and the psychiatrist in IDTTs observed in CSP/Sac's PSU minimally participated. Similarly, the correctional counselor in CSP/Solano's 3CMS program rarely spoke.

Collaborative treatment planning was not evident during IDTTs observed on Facility C at MCSP; the psychiatrist's input was typically limited to a review of the inmate's medications. In the STRH IDTTs at CSP/Sac, cases were adequately presented; however, the correctional counselor generally did not provide relevant information. In the 3CMS program at CSP/Sac, the treatment team functioned appropriately during IDTT meetings. At CSP/Corcoran, the 3CMS program IDTTs observed were collaborative, with the telepsychiatrist being well prepared and actively engaged in interaction with other treatment team members. IDTTs observed in CSP/Corcoran's EOP hub were also adequate and functioned appropriately.

All IDTT members in the MHCB IDTTs observed at CSP/Corcoran offered appropriate input. IDTTs observed in the EOP program at CSP/LAC demonstrated appropriate interdisciplinary discussion, and team members in IDTTs observed in administrative segregation at CSP/Solano interacted appropriately. During IDTTs observed at Folsom and FWF, there was

interdisciplinary participation by all attendees. Like other members of the treatment team, the telepsychiatrist attending IDTTs in the STRH at HDSP was appropriately engaged during IDTT meetings. This was also the case with the assigned telepsychiatrist in the 3CMS program IDTTs observed at NKSP who was engaged with other members in the IDTTs.

Interdisciplinary discussions during IDTTs in HDSP's MHCB were appropriate. Treatment team members were observed to engage in reasonable interactions during meetings in the MHCB and STRH at KVSP. Discussions during IDTTs observed on Facility A at MCSP were particularly appropriate. Participants in IDTTs observed in the EOP hub at RJD provided clinically meaningful input. IDTTs in the 3CMS program at RJD were well facilitated. IDTT meetings observed in the EOP program on Facility A at SVSP were collaborative. On Facility D EOP at SVSP, treatment team meetings were well conducted, and appropriate interdisciplinary discussion occurred among the participants. IDTTs observed in administrative segregation at WSP were well-organized and collaborative, however, IDTT members observed in the 3CMS program at WSP were generally not fully engaged with each other.

Notably, in the EOP program at KVSP, it was observed that several clinicians who were scheduled for IDTTs were not present which resulted in presentations by substitute clinicians who were clearly unfamiliar with the inmates whose cases they were presenting which affected the functionality of the treatment team.

Meaningful attention to diagnoses and symptoms during IDTTs was one of the important functions of the interdisciplinary treatment team. There was appropriate discussion and diagnoses agreement between psychiatrists and PCs during IDTTs observed in administrative segregation at CSP/Solano and the STRH at CSP/Sac. The 3CMS program IDTTs observed at

NKSP also appropriately discussed inmates' diagnosis. Diagnostic agreement between the PC and the psychiatrists occurred during IDTTs observed on Facility A EOP at SVSP.

In contrast to the IDTTs discussed above, in observed IDTTs in the administrative segregation unit at CCI there was insufficient attention paid to specificity of symptoms and rationale for diagnoses. At an observed IDTT in the reception center EOP at CIM, the team did not address whether medication adjustments were necessary for an inmate whose presentation during the IDTT was manic, agitated, and paranoid. Diagnoses were not always clear from discussions during team meetings observed in the EOP program at KVSP. Treatment teams observed during IDTTs in the 3CMS program at WSP did not discuss symptoms underlying diagnoses for inmates presented during IDTTs.

Treatment planning was the core function of the interdisciplinary treatment team and central to providing care to MHSDS inmates. Adequate treatment planning is the *sine qua non* for providing adequate mental health care. Like other functions of the interdisciplinary treatment process, the quality of treatment planning observed during IDTTs varied across institutions and programs. There was an absence of clear and specific treatment goals and intervention indicated in IDTTs in the administration segregation unit at CCI. In the 3CMS program at CCI, IDTTs lacked discussion of pertinent clinical issues. While there was adequate discussion in the EOP IDTT observed at CIW regarding the inmate's progress; the IDTT did not discuss her history or treatment goals. In the EOP hub at CIW, the treatment plan developed for the inmate in the observed IDTT was not clinically reasonable.

In CIM's 3CMS program, psychosocial histories presented were incomplete, and treatment plans were vague and lacked conceptualizations. Treatment plans in the MHCB IDTTs at CIW were properly updated, and proposed treatment interventions and treatment goals

developed by IDTTs in administrative segregation at CIM were appropriate, realistic, and measurable. In the EOP program at CSATF, the comprehensiveness of case presentations varied significantly from clinician to clinician. However, in IDTTs observed in CSATF's 3CMS program; case formulations were adequate, and inmates' levels of care were appropriately addressed. The IDTTs observed in the EOP hub at CSP/Sac were generally adequate including their attention to treatment planning. Cases in the STRH IDTTs at CSP/Sac were generally adequately formulated; however, there was a dearth of measurable goals offered. In the PSU at CSP/Sac, observed IDTTs attended to general treatment goals but did not address specific treatment interventions.

Treatment plans in IDTTs observed in the EOP and MHCB at CSP/Corcoran were clinically useful and adequately discussed during the meetings. During initial IDTTs in the EOP hub at CSP/LAC, several teams failed to discuss measurable goals, and when goals were discussed they were rarely associated with functional impairments. IDTTs observed in the EOP program at CSP/LAC had discussions that were relevant to inmates' treatment, and treatment teams observed in administrative segregation at CSP/Solano offered treatment plans that included realistic and measurable goals. Treatment planning varied during IDTT meetings observed in the 3CMS program at CSP/Solano where one clinician presented appropriate psychosocial history and case conceptualization, and another presented treatment goals that were not measurable, and did not discuss suicide risk, safety planning or treatment progress. Adequate case formulations were presented during treatment team meetings observed in the 3CMS program at CSP/Sac.

Treatment goals were adequately discussed during IDTTs observed in the MHCB at HDSP; however, safety planning was one area needing improvement. Treatment planning

including goals presented during IDTTs observed at Folsom and FWF were not consistently adequate. The quality of IDTTs observed in the 3CMS program at HDSP including the adequacy of their treatment planning varied. In Facility C 3CMS at HDSP, IDTTs were well conducted and in Facility B 3CMS, adequate treatment planning and safety planning were lacking. Transitional treatment planning for MHCB discharges back out to prison or release to the community were appropriately developed in IDTTs observed at KVSP. Adequate safety planning was also developed during those IDTT meetings observed in KVSP's MHCB. In contrast, in IDTTs observed in the EOP program at KVSP, team members insufficiently focused on pertinent clinical history and case formulations, while centering their discussions on inmates' criminal histories.

IDTTs observed on Facility A at MCSP were well conducted with good case presentations, and clinicians in IDTTs observed on Facility B offered clinically sound case formulations during treatment planning. In contrast, in IDTTs observed on Facility C at MCSP, clinicians' presentations generally did not provide sufficient relevant clinical information to assess whether treatment goals and interventions were appropriate.

Adequate treatment planning, case formulations and clinical histories were found lacking during NKSP's IDTTs observed on Facilities B and D reception center EOP programs. IDTTs observed in the STRH at NKSP were well conducted with measurable goals and interventions that incorporated the diagnostic criteria and functional impairments were established for the inmates. In the 3CMS program IDTTs observed at NKSP, the team appropriately discussed treatment goals for inmates following the PC's presentation of assessments and reviews of inmates' functional impairments. Treatment plans presented during IDTTs observed in the EOP hub at RJD were appropriately discussed. For the 3CMS program at RJD, treatment plans were

89

generally lacking appropriate goals and interventions.  Treatment plans in the RJD 3CMS program included structured therapeutic activities for interested inmates.

Treatment plans, participation in structured therapeutic activities, and medication management were addressed during IDTTs observed on Facility A EOP at SVSP.  Treatment plans and goals, as well as safety plans, when clinically relevant, were similarly addressed during IDTTs observed on Facility D EOP at SVSP.  Relevant historical, current inmate custodial factors, and safety plans for suicide prevention, as appropriate, were considered during IDTTs observed in administrative segregation at WSP.  Treatment teams observed in the 3CMS program at WSP generally did not address specific symptoms and planned interventions, and treatment plans lacked clear goals.

The Program Guide identifies each inmate as a functional member of his or her IDTT.  Like other components of the interdisciplinary treatment process, efforts of IDTTs to ensure inmates' participation in IDTTs also varied across programs and institutions.  Some clinicians in observed 3CMS IDTTs at CCI used language that inmates were unlikely to understand.  In the EOP hub IDTT observed at CIW, the treatment plan presentation did not consider the DDP status of the EOP inmate.  For reasons that were not ascertainable, a PC in the 3CMS program at CIM provided information about inmates to the IDTTs prior to inviting them into the meeting.  In contrast, observed IDTTs at CSATF exhibited appropriate interactions with inmates.  In the 3CMS program at CSATF, treatment team members engaged the inmates who were permitted to ask questions and explain their understanding of the IDTT process.  During an IDTT at CSP/Solano, a PC asked the inmate whether it was true that he was a "crack baby."  This had an immediate chilling effect, and the inmate's further participation in his IDTT was minimal.  It was apparent that the PC's clinically inappropriate approach had the potential to negatively impact

the therapeutic alliance, and also adversely the inmate's attitude towards mental health care going forward.

The psychiatrists in the STRH IDTTs at CSP/Sac actively engaged inmates regarding knowledge of their medications, their benefits and side effects. Members of the treatment team in the PSU at CSP/Sac were generally knowledgeable about the inmates appearing in the IDTTs. Some clinicians did not explain the purpose of the IDTT, the role of the treatment team or provide other useful information to inmates during initial IDTTs observed in the EOP hub at CSP/LAC. One psychiatrist was very engaged with inmates during the initial IDTTs at CSP/LAC, while another psychiatrist focused on medication side effects, but did not discuss the benefits of medication adherence. During treatment team meetings in administrative segregation at CSP/Solano, the psychiatrist reviewed medications with inmates; however, in the case of one inmate, the treatment team did not appropriately include the inmate in the treatment discussion, and the IDTT eventually adjourned without adequately addressing the inmate's concern regarding his uncertain medical prognosis.

There were contrasting interactions with inmates in treatment team meetings in the 3CMS program at CSP/Solano, where one psychiatrist was observed to appropriately include inmates in treatment discussions and responded to their questions, while in another treatment team meeting, the psychiatrist, who was not the assigned psychiatrist, minimally engaged with inmates. The psychiatrist in the 3CMS program at CSP/Sac was appropriately engaged with inmates regarding their medications including discussing side effects. The telepsychiatrist attending IDTTs in the STRH at HDSP also appropriately engaged with the inmates during meetings, and the PC included inmates in the discussion and made every effort to assist inmates in understanding the process.

91

Clinicians appropriately engaged with inmates during IDTTs observed in the STRH at KVSP and in the EOP program team at the institution, members were generally observed to have appropriately engaged with inmates during the meetings. During IDTT meetings observed in EOP Facility B and Facility D at MCSP, staff exhibited proper rapport with inmates. In both Facilities B and D reception center EOP programs at NKSP, staff were observed during IDTTs to engage inmates. Treatment plans, clinical interventions, safety plans as appropriate, diagnoses and symptoms were discussed with inmates during IDTTs observed on Facility A EOP at SVSP, and inmates were involved in their treatment planning during IDTTs observed on Facility D EOP at SVSP. The participation of inmates in their treatment planning was encouraged in IDTTs observed in administrative segregation at WSP.

During the site visit, it was observed that in some programs, supervisors attended IDTTs and provided guidance and directions to the interdisciplinary treatment teams. The 3CMS program supervisor attended IDTTs and provided appropriate guidance to members of the team. IDTTs across programs at CSATF would have benefited from supervisory leadership regarding case presentations, goal setting, and safety planning. The supervisor in IDTTs in CSP/Sac's STRH was appropriately involved in inmates' treatment planning. Interventions by the supervisor during IDTTs observed on Facility A at MCSP were greatly beneficial.

Under the Program Guide, the assigned psychiatrist, PC, and correctional counselor were required to attend each interdisciplinary treatment team meeting. Required disciplines attended nearly all IDTTs observed during site visits, but it was unclear that this was the norm. Required staff attended IDTTs observed in administrative segregation and 3CMS IDTTs observed at CCI and the 3CMS, EOP and MHCB IDTTs at CIW. Necessary staff were also present for IDTTs in administrative segregation and MHCB at CIM and across programs at CSATF. Required staff

were observed to be in attendance at IDTTs in the MHCB and EOP program at CSP/Corcoran,

the EOP program at CSP/LAC, and the administrative segregation and 3CMS program at

CSP/Solano.  All required disciplines were represented at IDTTs that were observed at Folsom

and FWF.  During IDTTs observed in the EOP hub, PSU and STRH at CSP/Sac, all required

staff attended, as was the case with the MHCB at HDSP.  Required staff were present for

observed IDTTs in EOP, MHCB and STRH at KVSP and in EOP Facility B and Facility C at

MCSP.  Psychiatrists attending some IDTTs that were observed on Facility A at MCSP were not

the inmates' treating psychiatrists.  For IDTTs observed on Facilities B and D reception center

EOP programs at NKSP, all required disciplines were in attendance.  All required staff were also

in attendance at IDTTs observed in EOP, 3CMS and STRH at NKSP.  Required disciplines were

also present for IDTTs observed in the EOP hub at RJD and on Facility A and Facility B EOP at

SVSP.  In administrative segregation IDTTs observed at WSP, all required disciplines were

present.

Appropriate IDTT meeting space was no longer a predominant issue in CDCR's mental

health program; however, there were three institutions where treatment space for holding team

meetings were observed to be inadequate.  IDTTs in CSATF's EOP program was conducted in

inadequately ventilated rooms that were also overheated.  The space used for IDTTs in

administrative segregation at CSP/Solano was not confidential.  IDTT and other treatment space

at Folsom and FWF were limited and lacked confidentiality.

### b. <u>Treatment Planning Concerns</u>

#### i. <u>Documentation Issues</u>

Appropriate clinical documentation within in treatment plans across institutions and

programs remained an area of concern, as was reported in both the Twenty-Sixth and Twenty-

Seventh Monitoring Rounds Reports.  Reviews of inmates' health records found documentation to be insufficient, lacking, and inadequate at several institutions.

Clinician's treating [CCWF Inmate A] were heavily reliant on duplicated texts from prior records.  Documentation of clinical rationale for not referring [CCWF Inmate W] was incomplete.  Documentation in the treatment plan of [CHCF Inmate Y] was inadequate.  At CSP/Corcoran, documentation deficiencies were noted in multiple cases, e.g. [CSP/Corcoran Inmate A] (treatment interventions were not appropriately documented in progress notes); [CSP/Corcoran Inmate C] (symptoms were not sufficiently documented to support the antipsychotic medication prescribed); [CSP/Corcoran Inmate E] (clinical documentation was markedly insufficient); and [CSP/Corcoran Inmate H] (there were no rationales for nonreferral to higher level of care documented in their records).  For [CMF Inmate C], there was also no rationale for nonreferral documented in his record.  Documentation regarding [DVI Inmate B]'s current mental status was inconsistent in the record.

Clinical documentation inconsistencies were identified throughout the record of [DVI Inmate I].  For [HDSP Inmate D], clinical documentation was insufficient regarding his current symptomology, and appropriate treatment interventions were also not documented.  The health records of [KVSP Inmate I] contained contradictory information.  Psychiatric documentation in the health record of [PVSP Inmate N] was insufficient.  Documentation for the rationale of nonreferral to a higher level of care for [MCSP Inmate B] was insufficient.  Documentation in the treatment plan of [CSP/Sac Inmate H] was unclear, and in the case of [SVSP Inmate M], documentation in his treatment plan was deficient.  For [SVSP Inmate K], documentation in his records was also deficient, and contained inaccurate information.  Clinical documentation in the mental health record of [SQ Inmate B] was generally inadequate.

### ii.    Inadequacies in Treatment Planning

Record reviews revealed that consistent with findings reported in the two most recent Monitoring Round Reports, inadequate treatment planning persisted across institutions. Treatment plans commonly lacked measurable objectives, were poorly developed, contained vague interventions, failed to address psychotic symptoms, or otherwise did not address the specific impairments of the inmates or were not modified to address the lack of treatment progress. The treatment plans of [CIM Inmate D] were not sufficient to address his impairments, and for [CMC Inmate F] and [SVSP Inmate M], their treatment plans lacked effective interventions to meet their mental health needs. In the case of [CSATF Inmate A], his treatment needs were not adequately addressed in his treatment plan.

[CCWF Inmate X]'s treatment team failed to develop treatment plans to address her lack of treatment adherence, the underlying reason for multiple MHCB admissions, and behavior that resulted in Rules Violation Reports (RVRs). Treatment plans and interventions developed for [CCWF Inmate Y] did not address the inmate's significant psychiatric symptoms. In the case of [CCWF Inmate AA], her treatment plan did not sufficiently address her presenting problems. [CHCF Inmate B]'s treatment plan did not address the inmate's medication nonadherence. Treatment plans for [CHCF Inmate D] did not include measures to address treatment nonadherence. Apparent lack of consensus and collaboration among providers of care to [CHCF Inmate Z] remained unresolved during treatment team meetings, and his treatment plan did not address the inmate's depressive symptoms. The treatment plan of [CCWF Inmate A] was not very useful because it lacked interventions. Treatment interventions were also not provided for [DVI Inmate S].

There were several instances of treatment planning deficiencies identified at CSP/Corcoran: [CSP/Corcoran Inmate A] (treatment interventions were not implemented);

95

[CSP/Corcoran Inmate B] (treatment failed to address his treatment nonadherence) and [CSP/Corcoran Inmate I] (treatment plans did not have measurable objectives and failed to address his psychotic symptoms).  Likewise, several treatment plans at DVI were found to be inadequate: [DVI Inmate A] (treatment plan did not include either appropriate interventions or baseline measures to track treatment progress); [DVI Inmate G] (treatment plans were not aligned with the inmate's current treatment needs);  [DVI Inmate I] (treatment team failed to document his presenting symptoms to support his provided diagnoses and guide treatment planning and treatment interventions were not provided in his plan of care).  During his stay in the MHCB, the treatment plan of [PBSP Inmate D] failed to appropriately address the inmate's non-adherence with his treatment including medication nonadherence and lack of programming. Care was not adequately coordinated among providers for [CIM Inmate C] and [KVSP Inmate A].

Record reviews at KVSP also revealed multiple cases of treatment planning deficiencies, e.g. [KVSP Inmate F] (treatment formulations did not address impairments); [KVSP Inmate J] (treatment plan failed to address treatment nonadherence); and [KVSP Inmate K] (treatment plans did not appropriately address treatment needs).  The transition treatment plan of [CSATF Inmate B] related to his level of care reduction was inadequate, and in the case of [MCSP Inmate C] his symptoms and behavior issues were not adequately addressed in treatment prior to reduction in level of care.  For [SVSP Inmate R], little evidence of transition planning existed to adequately prepare the inmate for level of care change.  Insufficient transition planning was provided to [SVSP Inmate V] prior to his level of care change.

The current treatment needs of [DVI Inmate B] were not clearly documented resulting in the treatment plan that was insufficient.  [DVI Inmate D]'s treatment team failed to document the

inmate's symptoms to support the psychiatric diagnosis resulting in an inadequate treatment plan. [NKSP Inmate I]'s treatment plan was poorly developed.  Psychotic symptoms exhibited by [PBSP Inmate M], including paranoid or grandiose delusional thinking were not addressed in his treatment plan.  In the case of [PVSP Inmate K], his treatment plan did not clearly identify what triggered or precipitated his decompensation.  The treatment plan of [RJD Inmate E] failed to appropriately address his significant dysfunction.  For [RJD Inmate G], there was a lack of continuity of care; discharge recommendations following inpatient care were not incorporated into his treatment nor considered in the IDTT's level of care decision.

The treatment plans of [CSP/Corcoran Inmate B], [CSP/Sac Inmate H], [SVSP Inmate M], [SVSP Inmate U], and [WSP Inmate F] were vague.  [CSP/Sac Inmate J]'s treatment planning was inadequate and the treatment plan of [CMF Inmate D] was deficient because it did not take his recent inpatient care records into account.  [CSP/Solano Inmate D]'s treatment planning lacked appropriate interventions; and for [WSP Inmate F], his EOP interdisciplinary plan of care (IPOC) treatment interventions were inadequate, and his MHCB treatment plans did not connect planned interventions to treatment targets.  No treatment interventions were documented for [KVSP Inmate I] and [VSP Inmate V].

### iii. Needed Modifications and Updates to Treatment Plans to Respond to Inmates' Current Health Issues Did Not Occur

The interdisciplinary treatment team is required to appropriately modify treatment plans to attend to changes in symptomatology, mental health conditions, the absence of treatment progress or where the existing treatment plan failed to meet current treatment needs.  As with preceding monitoring rounds, the Special Master's expert found that at multiple institutions needed modification and updates to treatment plans did not occur.  In the case of [CIM Inmate C], indications of decompensation were not addressed in his treatment plan, and for

[CSP/Corcoran Inmate H], staff witnessed and documented his decompensation without implementing appropriate intervention.  [CHCF Inmate Z]'s treatment team failed to modify his treatment plan despite the lack of treatment progress noted in the healthcare record.  The record of [CHCF Inmate BB] showed that his treatment plan was not modified to address his current symptoms and treatment concerns.  The treatment team did not modify [DVI Inmate W]'s treatment plan to address his lack of treatment progress and treatment nonadherence.  In the case of [DVI Inmate X], the treatment plan did not appropriately address the inmate's presenting concerns, they remained unchanged for months.  Treatment plans for [CHCF Inmate D] were developed based on outdated information from other providers and failed to include sufficient updates regarding the inmate's current status.

Although their existing treatment plans were not achieving the desired outcomes, [KVSP Inmate G] and [SVSP Inmate K]'s treatment plans were not modified to respond to the lack of treatment progress, and for [MCSP Inmate E], his treatment plan was not modified even though no specific treatment interventions in the existing plan addressed his treatment nonadherence. The treatment plan of [KVSP Inmate G] was not modified even though he had multiple MHCB admissions, continuously refused treatment, and was not experiencing any progress in his treatment.  Treatment modifications adopted following the treatment team's decision not to refer [SQ Inmate M] to a higher level of care were insufficient for the inmate's treatment needs. [SVSP Inmate N]'s treatment plans were not modified to address the lack of treatment progress.

### iv.    Care Was Not Sufficiently Individualized to Address Inmates' Clinical Needs

Health records reveal that there were issues with case conceptualization, formulation, diagnoses, and treatment individualization.  Diagnostic issues were found in records at various

institutions.  There were records with inappropriate treatment goals and others lacked treatment goals in treatment plans.

### (1)   Treatment Was Not Individualized

In the case of [CCI Inmate C], his care was not individualized, and his records lacked symptom specificity.  [CHCF Inmate U]'s treatment plan was not sufficiently individualized to target his specific symptoms, and [CHCF Inmate V]'s treatment plan failed to appropriately address his anxiety and depression symptoms.  For [CIM Inmate A], critical information regarding MHCB admissions history, past suicide attempts, and recent hospitalizations were not considered in his treatment planning.  Both the PC and the psychiatry progress notes for [DVI Inmate Q] were primarily copied and pasted information from previous encounters and did not reference the inmate's plan of care or useful clinical interventions.  The treatment team failed to work collaboratively to develop an individualized treatment plan to address [DVI Inmate U]'s behavior issues.  His treatment plan was vague and did not target his presenting problems or include treatment interventions.

Review of the records suggested that [DVI Inmate Z]'s providers did not address the inmate's symptoms even as they worsened nor was his treatment plan modified during IDTT. For [KVSP Inmate A] a behavioral assessment was clinically indicated but not completed. [HDSP Inmate A]'s MHCB discharge plan was generic and not individualized.  The treatment plan of [KVSP Inmate L] was not individualized and did not include sufficient detail.  [DVI Inmate Y]'s treatment plan was vague and did not target the inmate's depressive symptoms. Clinical progress notes in a record of [PBSP Inmate A] were copied and pasted, including only slightly modified generic and lengthy paragraphs similar to what were found in other inmates' records, resulting in multiple inconsistencies and inaccuracies that indicated the notes were not inmate-specific.  The mental health plan of care for [PBSP Inmate F] lacked individualization

and specificity. Treatment plans in the interdisciplinary plan of care of [PBSP Inmate W] were minimal and not individualized; they were identical to those of at least two other inmates whose records were reviewed. [PVSP Inmate K]'s treatment team failed to address his individualized treatment and risk needs. There was a lack of treatment intervention to address risk of harm for [PVSP Inmate S]. Treatment plans developed for [SQ Inmate C] did not address his treatment nonadherence and precipitants that led to his recent admission to intermediate care.

### (2)    Records reflected Deficient Case Conceptualization and/or Formulation

As also observed during IDTTs, case conceptualization was lacking in the health records of [CSP/Solano Inmate E] and the case formulation for [SVSP Inmate B] was inadequate. Treatment formulations for [KVSP Inmate F] did not address his impairments. [CHCF Inmate FF]'s frequent MHCB admissions and RVRs were not adequately conceptualized in his treatment plans. Although [KVSP Inmate F] had suffered traumatic brain injury, his possible personality disorder and trauma history were not sufficiently clarified in the records or addressed in treatment formulations. The treatment team's case conceptualization for [SQ Inmate G] was inadequate. Even after three years of observation and treatment, the treatment team of [SQ Inmate U] had not developed a case formulation to guide their treatment decisions.

### (3)    Diagnoses in Inmates' Records Required Clarification/ Conflicting or Multiple Diagnoses Required Resolution

There were several records where diagnostic clarification or reconciliation was indicated but did not occur or where diagnoses provided inmates were not supported in the record.

For [CCI Inmate C], the rationale for his diagnosis was not provided (his care was not individualized). There were inconsistent diagnoses noted throughout the record of [CCWF Inmate R]; however, diagnostic clarification evaluation which did not occur (the inmate

decompensated). [CCWF Inmate S]'s psychiatric diagnosis was unclear; documentation of her symptoms was limited to "anxiety" (treatment plan was insufficient to meet treatment needs). The PC and psychiatrist of [CHCF Inmate Y] failed to justify their diagnoses with supporting criteria (treatment plan failed to address self-harm risk or depression symptoms). [CHCF Inmate BB] required diagnostic clarification did not occur (treatment plan was insufficient). For [CIM Inmate D], there was not sufficient evidence of symptoms to support the rationale for his diagnosis (treatment plan was insufficient). Required diagnostic clarification did not occur for [CSP/Corcoran Inmate A] (treatment interventions were not implemented); [KVSP Inmate A] (coordination of care across providers was inadequate); [KVSP Inmate F], (brain injury and trauma were not addressed in treatment formulation); and [SVSP Inmate R] (clinical needs were not properly addressed).

The diagnosis and underlying reasons for frequent MHCB admissions of [CMF Inmate B] remained unclarified (referral to inpatient care was not appropriately considered). [DVI Inmate B]'s diagnosis was unclear in the records (treatment plan was insufficient), and in the case of [DVI Inmate G], there were differing psychiatric diagnoses that were not justified with documented symptoms, and no attempts were made to resolve the diagnostic discrepancies during IDTTs (treatment plan did not align with current treatment needs). Although diagnostic uncertainties were documented in the record of [DVI Inmate L], it did not appear that they were reconciled (treatment plan was not individualized). There were inconsistent diagnoses found in the health records of [DVI Inmate R] (inmate would benefit from individualized treatment plan with Cognitive Behavioral Therapy (CBT) interventions). [KVSP Inmate K] required a comprehensive diagnostic evaluation that did not occur (treatment plan did not contain effective interventions to address frequent MHCB admissions or self-injurious behaviors). For [KVSP

Inmate I], diagnostic uncertainties in his health records also remained unresolved (no effective treatment interventions and treatment plan to target delusional beliefs, poor hygiene, and other behavior concerns). Evidence of symptoms to support diagnosis provided [MCSP Inmate A] was lacking (required adjustments to treatment goals/interventions did not occur). The diagnostic assessment of [SQ Inmate G] was inadequate (treatment goals were not inmate specific). The IDTT did not address inconsistent information regarding the diagnoses provided to [SQ Inmate I] (coordination of care among providers was lacking). There were discrepant diagnoses noted by different mental health providers of [SVSP Inmate T] (clinical needs were not appropriately addressed). [SVSP Inmate W] required diagnostic clarification; however, assessment of his symptoms did not occur prior to reduction in level of care (clinical assessments completed prior to his transfer were insufficient).

### (4)    Treatment Plans' Goals were Inadequate

The treatment plan of [CCWF Inmate A] was not very useful because it lacked objectives. The treatment goals provided for [CHCF Inmate B] did not address the inmate's medication nonadherence but was limited to reducing hallucinations and depressed mood. In the case of inmate [MCSP Inmate A], his treatment goals were not modified to address his lack of improvement, and [CSP/Solano Inmate D]'s treatment planning lacked appropriate treatment goals. [CSP/Solano Inmate E]'s treatment goals were deficient, and the treatment goals of [WSP Inmate F] were not individualized. The treatment targets and goals developed for [CCI Inmate A] were poor. Treatment goals outlined in treatment plan of [SQ Inmate G] were inadequate. The lack of treatment engagement by [SVSP Inmate K] should have been targeted in treatment with specified goals.

### c.    Issues with the Consideration for Referral to a Higher Level of Care Process

The Program Guide designates the IDTT as the clinical setting for consideration and decisions regarding referrals to higher levels of care.  MHSDS policies and procedures specify the process through which the IDTT is required to consider an inmate for referral to higher levels of care.  The reason is to ensure that inmates are treated at the level of care best equipped to address the severity and intensity of their mental health needs.  There are specific objective and subjective indicators that trigger consideration for referrals to higher levels of care.  In the event the IDTT decides not to refer to a higher level of care, it must provide sufficient clinical rationale to support the decision and must also develop and implement a modified treatment plan to address the criteria that prompted consideration.[37]  Records revealed cases where inmates were indicated for consideration but were not considered.  Others were considered but not referred, but the supporting clinical rationale for nonreferral was inadequate.  Of equal concern were those cases where treatment interventions and goals for inmates not referred were found to be inadequate.

In the case of [CCWF Inmate K], the clinical rationale provided for not referring her to a higher level of care was not specific and did not address the inmate's inability to function outside the structured setting of the MHCB.  After a lengthy stay in MHCB (16 days), [CCWF Inmate L] was not considered for referral to inpatient care notwithstanding the length of stay in MHCB and insufficient treatment progress in MHCB.  The treatment team of [CCWF Inmate R] failed to consider a higher level of care referral despite the inmate's decompensated state.  In the case of

---

[37] The section addresses quality of care regarding referrals to higher levels of care by assessing individual inmate cases. For a related discussion of the higher-level care consideration from the vantage point of the IDTT process, see also Part D, "Access to Higher Levels of Care" below.

[CMF Inmate B], referral to inpatient care was not appropriately considered, and the subsequent rationales provided for not referring him were insufficient.

Clinical rationales provided for not referring [CCWF Inmate W] were incomplete. Clinical staff witnessed and documented the decompensation of [CSP/Corcoran Inmate H], including a psychiatrist who indicated that he might require referral to inpatient care. No action was taken by his treatment team, and he was left in his cell, leaving custody to assume responsibility for attending to him. [CSP/Corcoran Inmate I] required placement in a highly structured inpatient psychiatric facility with 24-hour nursing care due to his major mental disorder; however, the IDTT failed to refer him to inpatient care. The rationale provided for not referring [DVI Inmate EE] to a higher level of care was that transfers were being "limited to essential business only." The rationales provided for not referring [KVSP Inmate G] with a history of multiple MHCB admissions, continuous treatment refusal, and lack of treatment progress were insufficient. [NKSP Inmate E] was not referred to a higher level of care although there was a lack of improvement in his acute symptoms, and the treatment modifications following the nonreferral decision were inappropriate and inadequate. Clinical rationales offered for not referring [NKSP Inmate I] were insufficient and treatment modifications following the decision not to refer him were inappropriate. The rationales offered for not referring [CCWF Inmate X], [CCWF Inmate Y], [CCWF Inmate AA], and [CSP/Sac Inmate K] were inadequate. Treatment modifications implemented for [CSP/Sac Inmate K] after the decision not to refer him to a higher level of care failed to specifically address the positive indicators that gave rise to his consideration with appropriate interventions. In the case of [KVSP Inmate A] higher level of care consideration decision was not sufficiently documented.

Regarding [CHCF Inmate S], treatment modifications implemented following the IDTT's decision not to refer him to a higher level of care were inappropriate given the inmate's clinical presentation at the time of the consideration.  Clinical rationales provided for not referring [CHCF Inmate T] to a higher level of care were inadequate as were treatment modifications developed following the nonreferral decision.  The rationales provided for not referring [PBSP Inmate A] to a higher level of care were insufficient.  While he was in the MHCB, although [PBSP Inmate D] continued to endorse suicidal ideation, remained treatment nonadherent, and continued to exhibit ongoing functional impairments; it did not appear that the IDTT considered referral to higher level of care prior to his discharge from the MHCB.  Similarly, although [PBSP Inmate I] refused nearly all his treatment contacts and was described as psychiatrically unstable and had not demonstrated progress toward his treatment goals; it did not appear that the IDTT had considered referral to a higher level of care.

[PVSP Inmate C] was appropriately considered for referral to inpatient higher level of care based on his clinical presentation; however, clinical justification for not referring him was insufficient.  In the case of [PVSP Inmate D], documentation of his mental status at the time of consideration indicated a need for referral to inpatient care; his referral to EOP instead was inappropriate and not supported in the record.  The rationale supporting the decision of the treatment team not to refer [SQ Inmate M] was inadequate.

Referral and transfer of certain inmates were inordinately delayed.  Despite multiple severe suicide attempts [CIM Inmate G] was inappropriately not considered for inpatient level of care during his initial MHCB admission.  His subsequent referral to acute inpatient care during his second admission into MHCB after a serious suicide attempt was inappropriately delayed. The clinical rationales for not referring [CSP/Sac Inmate J] failed to properly address his clinical

presentation, and modified treatment plans were inappropriate for him. He continued to deteriorate, was subsequently admitted to MHCB, and then required admission to acute inpatient care. During his third admission to MHCB in one month, [CMC Inmate B] psychiatrically decompensated in the MHCB while awaiting transfer to inpatient care. [CMC Inmate F] met criteria for consideration for referral to higher level of care; the treatment team chose not to refer him repeatedly. Rationales provided by the IDTT for not referring him were inadequate, and the modified treatment plan was insufficient to address his behavior (continued isolation), symptoms (depressive) and ongoing treatment nonadherence.

### Summary – Quality of Care Delivered During the Twenty-Eighth Monitoring Round

The findings reported above underscore that resolving the deficiencies affecting IDTTs and its core functions are necessary elements for providing adequate care to the *Coleman* class, and the CDCR defendants must bring immediate attention to remediating their IDTT process at those institutions and programs where they are not fully functioning.

Like the Twenty-Sixth Monitoring Round and Twenty-Seventh Round, the quality of interdisciplinary treatment team meetings in the Twenty-Eighth Monitoring Round continued to vary across institutions and across programs within institutions. There were well-organized, cohesive and collaborative IDTTs observed in some cases and in others, the IDTTs failed to function as a team. In some instances, interdisciplinary discussions were appropriate and treatment team members across disciplines, and the inmate, offered input. However, there were also multiple IDTTs where some treatment team members failed to participate, and in some IDTTs, the inmate, who is a functional member of the IDTT, had little or no voice. As reported, during the site visits, in general all IDTT members were in attendance; however, it was unclear whether this was a normal occurrence.

The core function of the IDTT is treatment planning, whether it is an initial treatment plan or a modified treatment plan to address current treatment needs, appropriate treatment planning is a necessary precondition to providing adequate care. It follows then, that for the CDCR Defendants to be able to provide adequate care consistently across institutions and programs, IDTTs must function as indicated in the Program Guide. During the Twenty-Eighth Monitoring Round, there were multiple IDTTs that functioned appropriately and still others that continued to require improvement that the CDCR defendants must address.

Record reviews continued to find deficiencies regarding the adequacy of documentation in treatment plans, case conceptualization and formulation, inadequacies in treatment planning, and treatment plans requiring modification and/or update to respond to inmates' current mental health issues. Records revealed that in certain instances treatment was not individualized, and conflicting multiple diagnoses remained unresolved. Clear treatment goals were not established and compliance with the requirements regarding a higher level of care process remained challenging for many IDTTs.

A fully functional CQI process is necessary to remediating deficiencies identified in IDTTs. Once rebooted, as reported in the Twenty-Seventh Monitoring Round Report, "the Special Master, with input from plaintiffs, will continue to work with defendants to develop their CQI process into an effective mechanism for identifying and resolving quality of care issues - such as those summarized above - which continue to plague CDCR's MHSDS, as well as any others that should arise over time." ECF No. 5779 at 77.

C.    __Medication Management__

In its original decision, the *Coleman* court found that medication management in

CDCR violated the Eighth Amendment.[38]  In order to meet the medication management needs

of the Mental Health Program, the Medication Administration Process Improvement Program

(MAPIP), an audit and reporting tool was developed through the coordinated efforts of the

*Coleman* Special Master and the *Plata* Receiver.  MAPIP had been implemented at all CDCR

institutions by the time of the Twenty-Seventh Monitoring Round and was in use at all

institutions during the Twenty-Eighth Monitoring Round.

The medication management functions of MAPIP in the Mental Health Program

> focuses on specific medication compliance measures that report
> performance in each area, and identifies problematic medication
> management administration issues requiring attention by an institution.
> For the psychiatric measures, MAPIP covers diagnostic monitoring for
> antipsychotic, mood stabilizing and antidepressant medications, and
> for nursing audits, MAPIP measures continuity of care, medication
> compliance, and medication administration of psychotropic
> medications.

ECF No. 5779 at 78.

MAPIP was used to monitor CDCR's compliance with medication management during

the Twenty-Eighth Monitoring Round.  As discussed in detail below, CDCR institutions

continued to have varying degrees of success with compliance with medication management in

its Mental Health Program.  The findings from the Twenty-Eighth Round Monitoring tours

presented in this report indicated that the various psychiatric measures required systemwide

focused attention.  The Special Master will work with defendants through the Mental Health

Program regarding remediation of the deficiencies identified regarding psychiatric measures in

this report. Because MAPIP overall, and specifically, the continuity, adherence, observation

---

[38]  *Coleman v. Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal 1995).

and medication administration methods (the nursing measures) are functions of the court coordination process, and is managed by the *Plata R*eceiver, the Special Master will continue to address the necessary remediation regarding nursing measures outlined above in that forum.

The institutions covered in this report regarding compliance with the various medication management measures are CCI, CIW, CMF, CMC, CRC, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, Folsom, HDSP, KVSP, MCSP, NKSP, RJD, SVSP, and WSP.

Seven institutions - CIM, CSP/Sac, CSP/Solano, Folsom, KVSP, RJD, and SVSP, identified ongoing failures regarding medication management in the review period. Folsom reported noncompliance for all psychiatric diagnostic measures during the review period. CIM documented that psychiatrists did not regularly obtain laboratory testing for all psychotropic medications. CSP/Sac reported that it was noncompliant for one or more months for the psychotropic measures for each designated medication. CSP/Solano reported that the institution regularly failed to obtain baseline laboratories when psychotropic medications were initiated, which contravened policy, and that there was widespread lack of cooperation by inmates regarding laboratory blood draws.

KVSP reported that it performed blood draws once a year only on inmates prescribed psychotropic medications, even for medications where it was clinically recommended to conduct more frequent laboratory tests. RJD reported ongoing challenges to obtaining laboratory testing for various psychotropic medications. In addition, RJD reported that there were methodological issues regarding their medication management that resulted in many false-positive laboratory reports. SVSP reported general noncompliance regarding medication management. It was apparent from staff interviews at SVSP that psychiatrists did not regularly review MAPIP data. For the reasons stated above, findings regarding psychiatric diagnostic

measures are not discussed below for CIM, CSP/Sac, CSP/Solano, Folsom, KVSP, RJD, and SVSP.

Regarding nursing medication management measures, CSP/Sac, CSP/Solano, Folsom, KVSP, and SVSP reported overall ongoing noncompliance across the several nursing measures (medication continuity, compliance, observation, and administration) during the review period. CIM reported compliance with all nursing measures except one, but details were not available. For these reasons, nursing measures at these institutions are also not discussed in this report.

Findings from the institutional site visits during the Twenty-Eighth Monitoring Round are reported below.

### 1. **Psychiatry Measures**

Psychiatry measures evaluated compliance with laboratory tests and other tasks related to inmates on psychotropic medications. Institutions reported monthly data regarding compliance for diagnostic monitoring of the following psychotropic medications: antidepressants, atypical antipsychotics, carbamazepine, Depakote, lamotrigine, and lithium as presented below. Diagnostic monitoring for clozapine was limited to institutions authorized to initiate or maintain clozapine, which is also discussed in more detail below. Compliance was achieved where MAPIP indicated 90 percent or above for a psychiatry measure.

The institutions covered in this report regarding compliance with psychiatry measures are CCI, CIW, CMF, CMC, CRC, CSATF, CSP/Corcoran, CSP/LAC, HDSP, MCSP, NKSP, and WSP.

No institution reported compliance with all applicable psychiatric measures throughout the review period. Staff indicated that where no data was provided for a measure during a month in the review period, no inmate required that measure.

110

Regarding the four diagnostic measures for antidepressants, CMF, CRC and NKSP were compliant with all applicable psychiatric measures during the review period. CCI, CIW, CMC, CSATF, CSP/LAC, MCSP, and WSP reported compliance with between one and three measures during any month of the review period. CSP/Corcoran and HDSP were not compliant with any diagnostic measures for antidepressants during each month of the review period.

There were 11 diagnostic measures for atypical antipsychotics; CRC was compliant with all applicable psychiatric medication measures for the review period. CCI, CIW, CMF, CMC, CRC, CSATF, CSP/Corcoran, CSP/LAC, HDSP, MCSP, NKSP and WSP reported compliance and noncompliance for different measures during the course of the review period, with none achieving compliance with more than four of the 11 measures during all six months of the review period.

CRC reported compliance for all applicable diagnostic measures for inmates prescribed carbamazepine. WSP did not report data for any of the four carbamazepine psychiatric measures. Ten institutions - CCI, CIW, CMF, CMC, CSATF, CSP/Corcoran, CSP/LAC, HDSP, MCSP, and NKSP, reported compliance or noncompliance with different measures during various months of the review period.

For psychiatric measures for inmates prescribed Depakote, no institution reported compliance with all four measures during each month of the review period. Multiple institutions - CCI, CMC, CRC, CSP/Corcoran, HDSP, MCSP, NKSP and WSP, reported compliance with between one and three measures during each month of the review period. CSP/LAC, CSATF, CIW, and CMF did not achieve compliance for any measure during any month of the review period.

Eight institutions - CIW, CMF, CMC, CSATF, CSP/Corcoran, MCSP, NKSP, and

WSP, provided medication management information regarding clozapine. CSATF and WSP reported data for one month and indicated they were compliant with the applicable measures for that month. NKSP reported quarterly data and also indicated compliance for the applicable measures. The remaining five institutions - CIW, CMF, CMC, CSP/Corcoran, and MCSP, provided monthly data and reported compliance or noncompliance during various months of the review period.

CMC, CRC, CSATF, CSP/Corcoran, CSP/LAC, NKSP and WSP were compliant with medication consent for lamotrigine for the review period. CIW was compliant for five months and CCI, CMF, and MCSP were compliant for four months during the review period. HDSP was noncompliant for two months during the review period of this measure.

For the five psychiatric measures for inmates prescribed lithium, CRC was compliant for all applicable measures for each month during the review period. All other institutions reported noncompliance during several months of the review period. CCI was compliant with two measures in each month of the review period and six institutions - CMF, CMC, CSATF, MCSP, NKSP, and WSP, were compliant with one measure each during each month of the review period. HDSP was not compliant with any measure during the review period. CSP/Corcoran was not compliant with any measure for inmates prescribed lithium during any month of the review period.

No institution provided a comprehensive performance improvement plan (PIP), or corrective action plan (CAP) designed to remediate deficient psychiatric measures. CSP/Solano reported that areas of noncompliance for psychiatric measures were addressed through in-service training held on October 23, 2019 but did not provide post-training data. KVSP reported that it had ongoing CAPs for two nursing measures.

### 2. __Clozaril/Clozapine Institutions__

On August 8, 2020, CDCR's Statewide Mental Health Program issued a policy memorandum to the field stating that clozapine can be initiated only in a mental health inpatient bed and instructed staff that all inmates requiring clozapine were to be referred to a psychiatric inpatient program (PIP) at CHCF, CIW, CMF, SVSP or SQ at the intermediate or acute level of care. The memorandum also empowered the Statewide Chief Psychiatrist to authorize clozapine initiation when clinically indicated in an MHCB at CCWF, CIW, CMF, or CSP/Sac. This represented a change from the Twenty-Seventh Monitoring Round when clozapine could be initiated in outpatient settings at CCWF, CIW, CMF, CSP/Sac and SQ.

The memorandum also identified CCWF, CIW, CMF, CSP/Corcoran, CSP/Sac, MCSP, NKSP, SQ and VSP as approved clozapine maintenance facilities where inmates who were stable enough could be discharged to from mental health inpatient beds. A clozapine inmate discharged to a maintenance institution was required to remain at the EOP level of care for at least six months after discharge to the institution.

As discussed above, CIW, CMF, CMC, CSATF, CSP/Corcoran, MCSP, NKSP, and WSP reported MAPIP data regarding inmates prescribed clozapine. Notably, WSP and CSATF were not indicated as approved clozapine initiation or maintenance institutions during the review period. None of the institutions reporting MAPIP data regarding clozapine, except for CSP/Sac which had 23, indicated the number of clozapine inmates in the institution at the time of the site visit. CMF reported that it had received a number of clozapine inmates during the site visit that were maintained on the medication. At the time of the site visit, NKSP was not a designated clozapine maintenance facility and reported transferring clozapine inmates to appropriate institutions.

### 3.  Continuity, Compliance, Observation, and Administration Measures

In MAPIP, continuity of medications was measured within the following categories: upon arrival at Reception Centers (RCs), inter-institutional transfer at Receiving and Release (R&R); Nurse-Administered (NA)/Direct Observation Therapy (DOT) medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; discharge/transfer from a community hospital and/or DSH (and CDCR's PIPs); and parole or transfer to the community.  Other measures included medication compliance with PC 2602 involuntary medications and observation of preparation and administration of *hora somni*/hour of sleep (HS) and AM/PM medications.  Medication administration compliance was measured for psychiatrist-prescribed chronic care medications and for psychiatrist-prescribed outpatient provider new medication orders.  As with the psychiatry measures, compliance was achieved when an institution attained 90 percent or above for a measure.

The institutions covered in this report regarding compliance with medication continuity, compliance, observation, and administration measures are CCI, CIW, CMF, CMC, CRC, CSATF, CSP/Corcoran, CSP/LAC, HDSP, MCSP, NKSP, RJD, and WSP.

CRC reported compliance for continuity with all applicable measures during the review period.  Institutions reported compliance or noncompliance with different nursing measures during the review period.  CSP/Sac reported that it had developed CAPs for all continuity, compliance, and administration measures that were below 90 percent; however, the CAPs were not measurable.  CSP/Solano reported that staff routinely discussed medication management issues during health care huddles.

CCI and CIW reported compliance with several measures throughout the review period.  CMF, CMC, CSATF, CSP/Corcoran, CSP/LAC, MCSP, NKSP, and WSP reported that they were not compliant with multiple measures during all six

114

months of the review period.

### a. Continuity of Medication Upon Arrival at Reception Center

CRC reported compliance with continuity of medication upon arrival at its R&R center during the audited period. NKSP reported compliance for five of the six audited months and CIM reported noncompliance for the period. No other institution provided information regarding this measure.

### b. Continuity of Medication for Inter-Institutional Transfers

CCI, CRC, and RJD, all reported compliance with continuity of medications for inter-institutional transfers at R&R during each month of the review period. Five institutions, CIW, CSATF, NKSP, SVSP, and WSP, presented varied rates of noncompliance. The remaining institutions – CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, Folsom, HDSP, KVSP, and MCSP, all reported they did not achieve compliance in any audited month.

### c. Continuity of Medications with Intra-Institutional Transfers

Compliance with continuity of NA DOT medications with intra-institutional transfers excluding ASU/SHU/PSU was reported by CIM, CRC, and NKSP. Compliance for two to four months was reported by CCI, CSATF, HDSP, and WSP. Noncompliance for all but one month was reported by CIW and CMF. Noncompliance throughout the monitoring period was reported by CMC, CSP/Corcoran, CSP/LAC, and RJD.

Compliance with continuity of medications upon intra-institutional transfer to ASU/SHU/PSU was achieved by NKSP. Compliance for all but one month was reported by CCI. Compliance for two to four months was reported by CMC, HDSP, and WSP. Noncompliance for all but one month was reported by CIW, CMF, and CRC. Noncompliance throughout the monitoring period was reported by CSP/Corcoran, CSP/LAC, MCSP and RJD. CSATF did not report any data for this measure for the reporting period.

### d.    Continuity of Medication following MHCB, Community Hospital or DSH Transfer, Parole or Transfer to Community

Three institutions – CRC, NKSP, and RJD, reported compliance with continuity of medications following transfer from the MHCB in all months of the review period.  CCI, CIW, CSATF, and WSP were compliant for three of six months.  Three institutions – CMF, HDSP, and MCSP, were compliant for one of six months.  CSP/Corcoran and CSP/LAC did not achieve compliance at any point during the monitoring period.

Compliance with continuity of medication upon discharge/transfer from a community hospital and/or DSH or a CDCR PIP for the review period was recorded at CRC.  One institution - CCI, reported compliance for all but one month.  CSATF and NKSP were compliant for four out of six months.  CIW and HDSP were compliant for three months. Two institutions - CMC and CMF, were compliant for two out of six months.  WSP was compliant for one of six months.  CSP/Corcoran and CSP/LAC did not achieve compliance at any point during the monitoring period.  No data was reported by RJD regarding continuity of medications upon parole or transfer to the community.

Compliance with continuity of medications upon parole or transfer to the community was reported by CRC, CSATF, and RJD.  One institution - CCI, reported compliance for all but one month.  Three institutions - CSP/LAC, MCSP, and WSP, were compliant for four out of six months.  Three institutions - CIW, CMF, and NKSP, were compliant for three out of six months.  CSP/Corcoran did not achieve compliance at any point during the monitoring period.  CMC reported compliance for one month and no data was reported for the remaining months of the review period.  No data was reported by HDSP regarding continuity of medications upon parole or transfer to the community.

116

### e.    Observation of Preparation and Administration of Medications

Observation of the preparation and administration of *hora somni*/hour of sleep (HS) and AM/PM medications was measured.  The results follow.

### f.    *Hora Somni*/Hour of Sleep (HS) Medications

Observation of the preparation and administration of HS was reported compliant for each month of the review period by CCI, CIW, CRC, CSATF, NKSP, and WSP.  One institution - CMC, reported compliance for all but one month.  HDSP was compliant for three out of six months.  Five institutions - CMC, CMF, CSP/Corcoran, CSP/LAC, and MCSP, did not achieve compliance at any point during the monitoring period.

### g.    AM/PM Medications

Compliance with observation of the preparation and administration of AM/PM medications was reported by CCI, CIW, CMC, and CRC.  Eight institutions – CMF, CSATF, CSP/Corcoran, CSP/LAC, HDSP, MCSP, NKSP, and WSP, did not achieve compliance at any point during the monitoring period for this measure.  No data was reported by RJD regarding preparation and administration of AM/PM medications.

### 4.    Medication Compliance Measures

Medication compliance was measured for PC 2602 involuntary medications.  The results follow.

### a.    Medication Compliance for PC 2602 Involuntary Medication

No institution reported compliance with PC 2602 requirements during all six months of the review period.  CMF and CSATF reported compliance for four of the six months reviewed.  CSP/LAC and RJD reported compliance for three of six months and CIW and CSP/Corcoran reported compliance for two of six months.  CCI and CMC each reported compliance for one of six months.  HDSP did not achieve compliance at any point during the

monitoring period.  MCSP reported noncompliance for four of six months and no data was provided for two months.

WSP reported noncompliance for three of six months and no data was provided for three months.  No data was reported by CRC and NKSP regarding compliance for PC 2602 involuntary medications during the review period.

CCI reported that all inmates with PC 2602 were medication compliant.  CIM and CMC each reported one emergency use of force regarding PC 2602 medication administration during the review period.  CRC reported that no inmates at the institution had active PC 2602 involuntary medication orders during the review period.  HDSP reported that a total of five controlled or emergent uses of force occurred regarding PC 2602 medication administration occurred during the review period.

CMF indicated that there were 138 PC 2602 involuntary medication orders in place at the time of the site visit.  However, CMF was not consistently compliant with PC 2602 medications during the review period.  CSP/LAC did not provide information regarding PC 2602 involuntary medication orders.  CSP/Sac reported that there was one controlled use of force incident during the review period regarding PC 2602 medication administration.  All PC 2602 inmates at SVSP were reported to be compliant with their medications; however, audit data was not provided. There was one inmate with a PC 2602 order at Folsom during the review period; medication compliance data was not provided.

At MCSP, 55 inmates had PC 2602 orders in place at the time of the site visit; the institution was not consistently compliant with PC 2602 medication orders.  RJD indicated at the time of the site visit that there were 87 inmates with PC 2602 involuntary medication orders; audits showed that it was not regularly compliant with PC 2602 medication orders during the

review period.

### 5.  Medication Administration Measures

Medication administration compliance was measured for chronic care psychiatrist prescribed medications and for psychiatrist-prescribed outpatient provider new medication orders.  The results follow.

### a.  Psychiatrist Prescribed Chronic Care Medications

CCI, CIW, CMF, CMC, CRC, CSATF, NKSP, and WSP were compliant with psychiatrist prescribed chronic care medication orders during the review period.  HDSP reported compliance for three months, and MCSP indicated it was compliant for two months. CSP/Corcoran and CSP/LAC were noncompliant throughout the review period.

### b.  Psychiatrist-Prescribed Outpatient Provider New Medication orders

CCI, CIW, CMF, CRC, CSATF, MCSP, NKSP, and WSP were compliant with psychiatrist-prescribed outpatient provider new medication orders during the review period. HDSP reported compliance for three months out of six months.  CMC, CSP/Corcoran, CSP/LAC, HDSP and RJD reported noncompliance for the audited measures.

### 6.  PC 2602 Petitions

CCI reported at the time of the site visit that no PC 2602 involuntary medication petitions were initiated during the review period.  Of nine existing orders, six orders were renewed and three were denied.  At CIM, eight PC 2602 involuntary medication petitions were initiated and granted; one petition was renewed.  CIW provided information regarding 40 PC 2602 involuntary medication orders covering an 11-month period.  There were 23 emergent petitions and 17 nonemergent petitions.  During the review period, 13 petitions from CIW were denied, not renewed, expired, or rescinded.  CMC reported that during the review period, 35 PC 2602 involuntary medication petitions had been granted, one had been denied, and six were not

renewed. The petitions granted included seven new orders, of which five had been emergency orders.

CSATF reported that all of its 36 petitions were granted. During the review period, CSP/Corcoran petitioned for renewal of 44 PC 2602 involuntary medication orders and initiated four new petitions. Of the renewal petitions, 43 were granted and one was denied. Regarding the four new petitions, two were granted, one was denied, and one was continued for an inmate who subsequently was transferred to another institution.

CSP/Sac reported at the time of the site visit that there was a total of 124 PC 2602 involuntary medication orders, which included 110 renewals, 11 emergent orders, and three nonemergent orders. CSP/Solano reported that no PC 2602 involuntary medication petition was initiated during the review period. HDSP did not provide usable information regarding its PC 2602 involuntary medication petitions at the time of the site visit.

Thirty-three of 34 PC 2602 involuntary medication petitions were granted at KVSP; one was denied. At MCSP, of the 46 PC 2602 involuntary medications petition submitted during the review period, 44 were granted and two were denied. NKSP initiated three PC 2602 orders and reported that these inmates were medication compliant. At RJD, no petitions were initiated, denied, or withdrawn during the review period. SVSP initiated ten emergency petitions for PC 2602 involuntary medications; eight were granted, one was denied, and one was withdrawn. During the reporting period, 14 PC 2602 petitions from SVSP were renewed and nine were not renewed. Regarding PC 2602 involuntary medication orders, WSP reported that it had initiated seven nonemergency petitions; six were granted, and one was withdrawn. One nonemergency PC 2602 petition was also granted at WSP.

### 7. Pill Lines

Eleven of the 18 CDCR institutions covered in this report indicated no problems with

lengthy pill lines, indicating that inmates generally moved through the lines in 30 minutes or less. CMC reported that while there were no problems regarding the length of time inmates took to move through the pill lines, the location remained an ongoing concern. Awnings were installed at CMC in November 2019; however, inmates reported that they were still subject to environmental elements, because the cover was insufficient.

### 8. *Hora Somni*/ Hour of Sleep (HS) Medications

CCI, CMF, CMC, CSP/Corcoran, CSP/Solano, MCSP, RJD, and WSP reported compliance for HS medications, including distribution no earlier than 8 p.m. The remaining institutions - CIM, CIW, CRC, CSATF, CSP/LAC, CSP/Sac, Folsom, HDSP, KVSP, NKSP, and SVSP, did not report time of distribution of HS medications. CSATF, CRC, CSP/Sac, NKSP, and SVSP reported the number of inmates prescribed HS medications. KVSP and Folsom provided no useful data regarding the distribution of HS medications.

### Summary – Medication Management

CDCR has continued to use MAPIP as its medication management audit tool, which was fully implemented during the Twenty-Seventh Round Monitoring tours. For the most part, institutions routinely performed psychiatry and nursing audits as required and within the timeframe mandated by policy, which was an improvement from the previous round; however, levels of success with medical management varied markedly across institutions. Notably, instituting systemic performance improvement plans or corrective action plans across institutions when deficiencies were identified was inconsistent if they were addressed at all.

### D. Access to Higher Levels of Care

Appropriately identifying, referring, and transferring inmates to receive higher levels of inpatient mental health care is necessary to end court supervision. The higher level of care consideration process is the necessary starting point. Regrettably, IDTTs across institutions and

programs failed to consistently utilize the higher level of care consideration process required by policy.

Dating from his Twenty-Second Monitoring Round Report [ECF No. 3990], and restated in his Twenty-Third Monitoring Round, the Special Master identified "[e]nsuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive higher levels of mental health care" as one of "seven general goals for the defendants." ECF No. 4124 at 85. The Court has said in the clearest terms that this goal is one of the necessary components of the "road map to the end of federal court oversight." ECF No. 5477 at 2. As recently as when adopting the Special Master's Twenty-Seventh Round Report, the Court indicated in its order dated July 12, 2018, that the higher level of care consideration process is "an essential component" for providing access to "inmates in need of inpatient mental health care." ECF No. 5852 at 7.

Consideration of referrals to higher levels of care in the Twenty-Eighth Monitoring Round continued to be a challenge for the CDCR defendants as was reported during the Twenty-Sixth Monitoring Round [ECF No. 5439] and in the Twenty-Seventh Monitoring Round. ECF No. 5779. IDTTs were required to review whether an inmate met certain enumerated criteria which may indicate the need for a higher level of care, and if so, jointly assess the need for referral to inpatient treatment. Based on that review and assessment they were to either make the referral or document the clinical rationale for not doing so. Where the IDTT decided not to refer an inmate who met criteria for consideration, the IDTT was also required to consider, and if indicated implement, clinically sound responsive interventions. Defendants continued to struggle with full implementation across all steps of this critical process.

In the Twenty-Eighth Monitoring Round, IDTTs at reviewed institutions failed to consistently consider higher levels of care as a fundamental function of the IDTT process as required. In those instances when IDTTs did consider referrals to higher level of care, the quality of the process varied with multiple IDTTs not considering all positive factors that mandate consideration of referral to higher levels of care under MHSDS policies. Several IDTTs focused on the objective indicators but did not address the subjective indicators at all. For those inmates who were considered but were not referred, IDTTs were required to develop and document clinically sound treatment plans to address all positive indicators regarding consideration of referral to higher levels of care; multiple IDTTs did not. As ordered by the Court, and discussed in detail below, this report presents an update regarding the consideration of referrals to higher levels of care (formerly Form 7388-B) process. Relatedly, multiple institutions were also deficient regarding appropriate referral/non-referral documentation, notably the adequacy of clinical rationales supporting non-referral decisions.

While the majority of the institutions reviewed during the monitoring round were compliant with transfer timelines to acute care, the number of noncompliant institutions was significant. Regarding intermediate care, compliance was very high, only two of the reviewed institutions were noncompliant. Compliance with transfers to MHCBs within 24 hours of referral was consistent across the reviewed institutions.

The details of the Special Master's findings regarding access to higher levels of care during the Twenty-Eighth Monitoring Round are presented below.

1. **Consideration of Referrals to Higher Levels of Care (Formerly Form 7388-B Process**

As referenced above, in adopting the Special Master's Twenty-Seventh Round Monitoring Report, the Court emphasized that "[c]ompliance with the [higher level of care]

referral process is an essential component of ensuring that all inmates in need of inpatient mental health care are timely identified and referred for such care." ECF No. 5852 at 7. The Court directed the Special Master to "provide an updated report on the status of compliance with IDTT policy related to Form 7388-B in his Twenty-Eighth Round Monitoring Report." *Id.*

At the time of the Twenty-Seventh Round Monitoring, CDCR's Mental Health Program used a paper form, CDCR Form 7388-B, as the format for documenting consideration and decisions regarding referrals to higher levels of care during IDTTs. In his Twenty-Seventh Round Monitoring Report, the Special Master reported that compliance was inconsistent with requirements regarding higher level of care consideration during interdisciplinary treatment teams (IDTTs) utilizing Form 7388-B. He found that "[a]lthough some institutions and programs have integrated the Form 7388-B into their IDTTs, full compliance continued to be a major problem at multiple institutions." ECF No. 5779 at 88.

During the Twenty-Eighth Monitoring Round, with the advent of the Electronic Health Record System (EHRS), the paper Form 7388-B was no longer used; however, consideration and discussion of referrals to higher level of care by the IDTT were still required, and the decision to refer or not to refer was still required to be documented in the appropriate section of the EHRS. Modified clinical interventions to address the positive indicator(s) that triggered the consideration for referral for those not referred was also required to be properly documented in the EHRS. In short, the only thing that changed from the Twenty-Seventh Monitoring Round to the Twenty-Eighth Monitoring Round regarding the higher levels of care consideration and referral process was that a paper form was replaced with electronic documentation. Consideration, discussion, and decisions regarding higher levels of care referrals as well as

providing clinical rationales for not referring and developing appropriate modified and clinically adequate treatment interventions for those not referred continued to be required of IDTTs.

The update regarding higher level of care consideration and documentation ordered by the Court is presented below.

> a. **Interdisciplinary Treatment Teams and Higher Level of Care Consideration Process**

As with the findings reported in the Twenty-Seventh Monitoring Round Report, during the Twenty-Eighth Monitoring Round, "full compliance [with the higher level of care consideration process] continued to be a major problem at multiple institutions." ECF No. 5779 at 88. IDTTs were observed in programs during onsite visits at CSP/LAC, CSP/Solano, CIM, CIW, CMF, CSATF, Folsom/FWF, HDSP, NKSP, RJD, SVSP and WSP.[39] IDTTs across these institutions did not consistently consider higher levels of care as required by policy. In multiple institutions, while some programs routinely and appropriately considered referrals to higher levels of care, others did not.

IDTTs observed in CIW's EOP Walker unit appropriately considered referrals to higher levels of care. Discussion and consideration of referral to higher levels of care occurred consistently during IDTTs observed at Folsom/FWF. In MHCBs at HDSP and WSP, observed IDTTs appropriately considered and discussed referrals to higher levels of care. Similarly, in the EOP reception center at WSP, observed IDTTs also appropriately considered and discussed referrals to higher levels of care. IDTTs in several programs at CIM consistently discussed consideration of referrals to higher levels of care, while others did not. During IDTTs observed at RJD, discussions regarding consideration to higher levels of care were observed to be minimal. Regional Mental Health Program administrators conducted multiple less formal site

---

[39] This discussion of "Access to Higher Levels of Care" include only those institutions reviewed by on-site visits.

visits at RJD separate from their sustainability major and minor site visits to help remediate inadequacies in the higher levels of care consideration and referral processes at the institution.

IDTTs at CSP/LAC and CMF did not consistently integrate higher level of care consideration and discussion into treatment team meetings in all programs. CSATF reported during the site visit that deficiencies regarding its higher level of care consideration process persisted. Generally, IDTTs in CSP/Solano's administrative segregation and 3CMS programs did not consistently consider referral to higher levels of care. This was also the case with IDTTs observed in STRH at KVSP.

In observed IDTTs in an EOP program at SVSP, there was discussion of referral to higher levels of care. However, generally, across programs at SVSP, IDTTs did not routinely address all positive indicator(s) as a function of their consideration for referral to higher levels of care process. Prior to the site visit, the Mental Health Program Regional staff had determined that the higher level of care referral process at SVSP was broken; this finding was confirmed by the monitor's expert during the onsite visit.

### b. The Quality of Higher Level of Care Consideration Process Varied Across Institutions

Across institutions, variable quality regarding higher level of care considerations and referral was observed during IDTTs and in high level of care consideration documentations reviewed in EHRS related to site visits. The second and third quarter sustainability process reviews at CIW revealed that the quality of higher level of care considerations was noncompliant; however, the percentage was noted to have improved during each subsequent quarter. CIW provided training to clinicians to remedy these deficiencies. CDCR's sustainability evaluation at CSP/Corcoran during the review period found that multiple IDTTs did not take into account all appropriate clinical information when considering inmates for

126

referral to acute and intermediate care.  IDTTs observed in the PSU at CSP/Sac did not appropriately address the consideration for referrals to higher levels of care.

At CMC, CSP/LAC, CMF, KVSP and MCSP, when IDTTs considered referral to higher levels of care, they tended to focus more on the objective indicators and did not sufficiently also consider the subjective factors as required by the higher level of care consideration process.  The sustainability process review at CMC found that EOP IDTTs did not thoroughly discuss all criteria indicated during their higher level of care consideration processes.  In some observed IDTTs at MCSP, staff also did not adequately review all criteria for consideration of referral to higher level of care, and in some instances appeared to have limited understanding of the benefits of inpatient treatment for their inmates.  Regional sustainability process reviews at MCSP raised concerns about the significantly higher referrals to acute care as compared to referrals to intermediate care, because of the potential implications regarding the level of decompensation required to trigger inpatient referrals from the institution.  IDTTs observed in the EOP programs at NKSP required direct supervisory interventions to prompt higher level of care consideration, which then centered on objective indicators with minimal attention to subjective indicators even with the supervisor's oversight.

As a function of the higher level of care consideration process, for those inmates considered and not referred, the IDTTs were required to document a clinical rationale,[40] and develop appropriate treatment interventions to address the positive inpatient care referral indicators.  There was variability across institutions regarding compliance with this requirement.

A regional sustainability process review at CSP/Sac found that modified clinical interventions for those inmates who were considered but not referred to high levels of care were

---

[40] The Special Master's findings regarding documentation of clinical rationales supporting decisions not to refer inmates with positive indicators are discussed in Section B 1 b iv. (4) c.

found to be generally acceptable. CSP/LAC was noncompliant regarding appropriate clinical interventions for those inmates considered but not referred to higher levels of care. Sustainability process reviews at CMF, during the monitoring period highlighted that treatment modifications following non-referrals were generally inadequate. CMF provided training to staff to help remedy the deficiencies found by Mental Health Program Regional Administrators.

Clinical interventions to address the needs of inmates not referred to higher level of care varied at KVSP. Some modified treatment plans at KVSP were clinically sound and designed to address the positive indicator(s) that gave rise to the inmate being considered for higher levels of care, while others were clinically inadequate. Treatment modifications for inmates at NKSP who were not referred to higher levels of care were deemed unacceptable by institutional audits, and at RJD, treatment modifications following non-referrals were typically found to be adequate. In observed IDTTs in an EOP program at SVSP, there was development of appropriate treatment interventions for those inmates not referred; however, for multiple inmates not referred at SVSP, treatment interventions were typically copied and pasted, which directly contradicted stated instructions in the higher level of care section of EHRS.

As discussed above, the Twenty-Eighth Round Monitoring discovered many deficiencies at institutions and programs regarding their higher levels of care consideration processes. Many of them are ongoing and notably have also been identified by the Mental Health Program through its sustainability review process, yet they continued. The Twenty-Eighth Round Monitoring updates regarding the higher level of care consideration progress may be summarized as follows:

1. across institutions and MHSDS programs, IDTTs did not consistently consider higher levels of care as required by policy;

2.  when IDTTs did consider higher levels of care, there was notable variability in adherence to the approved process regarding higher levels of care consideration; and

3.  for those inmates who were considered and not referred, IDTTs did not consistently develop clinically sound treatment interventions to address the positive indicator(s) that triggered their consideration.

### 2. **Transfers to Inpatient Care**

#### a. **Adequacy of Referral/Non-Referral Logs**

Documentation of referrals and non-referrals to higher levels of care, including providing clinical rationales for non-referrals, are integral to the higher levels of care processes of the Mental Health Services Delivery System (MHSDS). Using a log or other form of appropriate documentation, each institution is required to document all inmates who meet the designated criteria for consideration of referral to higher levels of care, state whether they were referred or not referred, and for those not referred provide appropriate clinical rationales in support of decisions not to refer. In his Twenty-Seventh Round Monitoring Report, the Special Master found that several institutions "had difficulties with appropriately documenting their referral/non-referral logs." ECF No. 5779 at 92. These "difficulties" remained during the Twenty-Eighth Monitoring Round. Moreover, also as reported during the Twenty-Seventh Round Monitoring Round, multiple institutions were still not supplying adequate clinical rationales supporting decisions not to refer inmates who met positive indicators (objective and subjective) for consideration of referrals to higher levels of inpatient care.

Findings regarding documentation and the adequacy of the rationale for inmates who met consideration for referral to acute or intermediate care but were not referred are presented below.

DVI, SCC, and VSP appropriately and properly documented adequate rationales for non-referrals to inpatient care during the review period. Records reviewed at CTF generally

indicated adequate documentation supporting decisions not to refer, and the clinical rationales documented at SQ were reasonable.

Clinical rationales to support non-referrals at MCSP, PBSP and SVSP were inadequate. There was variability in the adequacy of clinical rationales for non-referrals provided at ASP, CHCF, CIM and RJD. At CCWF and KVSP clinical staff did not adequately document clinical rationale supporting decisions not to refer. CMC sometimes utilized inappropriate rationale for not referring to inpatient care (e.g., inmate was not currently housed in an MHCB). Audit results at NKSP during the period under review indicated that some rationale provided for not referring to inpatient care were not acceptable (e.g., inmate required additional time for further assessment, or the inmate had not met with psychiatry).

The sustainable process found high interrater reliability agreement (95 percent) between the Mental Health Program headquarters' reviews and CIW's inpatient coordinator's referral/non-referral documentation including for adequacy of clinical rationales for not referring to inpatient care. In contrast, the sustainability process at CMF found low interrater reliability agreement between the Mental Health Program headquarters' reviews and its inpatient coordinators' findings regarding rationales for nonreferrals to inpatient care. At CSP/Corcoran, the sustainability process found that clinical rationales provided for not referring to inpatient care were insufficient.

### b.    Transfers to Acute Inpatient Care

CIM, CIW, CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, KVSP, MCSP, NKSP, RJD, and SVSP were compliant with timely inmate transfers to acute care within ten days of referral as required by the Program Guide. Five other institutions that reported transfers to acute care – CMC, CMF, CSP/LAC, HDSP, and WSP, were non-compliant with the ten-day timeframe. The

average compliance rate among these noncompliant institutions was 40 percent.  CMC had an abysmal compliance rate of just nine percent.

CCI, CRC, and Folsom did not refer any inmates to acute care during the review period.

### c.    Transfers to Intermediate Inpatient Care

CIM, CIW, CMF, CSP/Corcoran, CSP/Sac, CSATF, KVSP, MCSP, NKSP, RJD, SVSP, and WSP were compliant with the Program Guide requirement for transfer of inmates to intermediate inpatient care within 30 days of referral.

Just two institutions, CSP/LAC, and CMC, were noncompliant with the 30-day timeframe for intermediate transfers.  CSP/LAC had a compliance rate of 70 percent.  CMC had a compliance rate of 12 percent.

CCI, CRC, Folsom and HDSP did not refer any inmates to intermediate care during the review period.

### d.    Transfers Following Inpatient Bed Assignment

CIM, CIW, CSP/Sac, CSP/Solano, SVSP, and WSP were in compliance with the Program Guide requirement for transfers to acute inpatient beds within three days of bed assignment.  HDSP and KVSP were noncompliant; HDSP had a compliance rate of zero percent and KVSP had a compliance rate of 75 percent.

CIW and WSP were compliant with transfers to intermediate inpatient beds within three days of bed assignment.  CIM, KVSP, and SVSP were noncompliant with the requirement of transferring inmates to intermediate inpatient beds within three days of bed assignment.  The average compliance rate was 73 percent.

### 3. **MHCBs**

#### a. **Transfers to MHCBs and Bed Availability**

The Program Guide requires transfers to MHCBs within 24 hours of referral. CCI, CIM, CMC, CMF, CRC, CSP/Sac, CSP/Solano, Folsom, KVSP, MCSP, RJD, SVSP, and WSP were compliant. CSP/LAC was noncompliant, but its compliance rate was 89 percent.

HDSP indicated that it was compliant with transfers to MHCBs within 24 hours of referral but did not provide any supporting data.

#### b. **MHCB Lengths of Stay**

The Program Guide provides for MHCB stays for up to ten days. The following institutions had average lengths of stay in the MHCB that were less than ten days: CSP/Sac, CSP/LAC, CSP/Solano, CSATF, HDSP, KVSP, MCSP, and SVSP. Although the average length of stay at CSP/Solano was less than ten days, 42 percent of admissions stayed longer than ten days. The average length of stay at RJD was 10.6 days. The institutions with average lengths of stay over ten days were CIM, CIW, CMC, CMF, RJD, and WSP.

Reasons provided for lengths of stay exceeding ten days included delays in DSH and PIP referral processes and medical issues.

### 4. **Alternative Housing Lengths of Stay**

CCI, CIM, CIW, CMC, CMF, CRC, CSP/Sac, CSP/Corcoran, CSP/LAC, HDSP, KVSP, MCSP, NKSP, SVSP, and WSP were all compliant with the Program Guide's 24-hour time limitation on stays in alternative housing. Folsom and RJD were noncompliant with the 24-hour time limitation with an average compliance rate of 88 percent.

### 5.   **Transfers to Psychiatric Services Unit (PSU)**

The following institutions were compliant with the Program Guide 60-day timeframe after endorsement for transfer to a PSU: CSP/LAC, KVSP, MCSP, NKSP, RJD, and SVSP. CCI, CIM, CMF, CSP/Solano, Folsom, HDSP, and WSP did not endorse any inmates to PSU.

CIW, CSP/Corcoran, and CSP/Sac were PSU institutions and were not required to transfer inmates to other PSU institutions.

### 6.   **Transfers to Administrative Segregation EOP Hubs**

CRC, CSP/Solano, CSATF, KVSP, and MCSP were compliant with the 30-day timeframe for transfer to an EOP hub after placement in an administrative segregation unit. CCI, CIM, Folsom, SVSP, and WSP were noncompliant with the 30-day timeframe. The average rate of compliance was 82 percent. SVSP had a compliance rate of 69 percent.

CIW, CMC, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, and RJD were EOP hub institutions and were not required to transfer inmates to other EOP hub institutions.

### 7.   **Transfers to EOP**

CCI, CIM, CRC, CSP/Solano, and Folsom were compliant with EOP transfer timelines of 21 days following an inappropriate transfer, 60 days following referral to the EOP level of care, or 30 days after referral to the EOP level of care if clinically indicated. HDSP and NKSP were noncompliant with these transfer timelines. The average compliance rate at these institutions was 83 percent. HDSP reported that its noncompliance was largely due to court appearances.

### 8.   **Transfers to Short-Term Restricted Housing**

Transfers to STRH were required within 30 days of endorsement. CIM, CSP/Solano, and CRC were compliant with timely transfers to STRH. CMC did not differentiate between transfer timeliness for STRH and LTRH but reported that combined totals for both STRH and LTRH showed 96 percent compliance.

CCI, CMF, Folsom, MCSP, NKSP, and WSP were noncompliant. The average compliance rate of these institutions was 74 percent. NKSP had 53 percent compliance.

CSP/Corcoran and CSP/Sac were not required to track the timeliness of transfers into their STRH.

RJD reported that it unable to provide information regarding the timeliness of transfers to STRH due to the reporting limitations of SOMS.

### 9. <u>Transfers to Long-Term Restricted Housing</u>

Transfers to LTRH were required within 30 days of endorsement. The following institutions were compliant: CRC, CSATF, and KVSP. As noted previously, CMC did not differentiate between transfer timeliness for STRH and LTRH but reported that combined totals for both STRH and LTRH showed 96 percent compliance. CSP/LAC and NKSP were noncompliant; CSP/LAC had zero compliance, and NKSP had 25 percent.

CCI, CIM, CMF, Folsom, HDSP, RJD, SVSP, and WSP did not have any transfers to LTRH during the review period.

CSP/Corcoran was not required to track the timeliness of transfers into its LTRH.



| | Acute Inpatient Care | Intermediate Inpatient Care | MHCB | PSU | ASU EOP Hub | EOP | STRH | LTRH |
|---|---|---|---|---|---|---|---|---|
| NA* | 3 | 4 | 1 | 10 | 7 | | 3 | 9 |
| Not Timely | 5 | 2 | 1 | 0 | 5 | 2 | 6 | 2 |
| Timely | 11 | 12 | 13 | 6 | 5 | 5 | 4 | 4 |

*NA refers to institutions that did not transfer inmates to that level of care of MHSDS custody housing during the reporting period, were not required to track timeliness into that level of care or MHSDS custody housing at the institution or the data was not provided or available.

### Summary – Access to Higher Levels of Care

The defendants must remedy the specific deficiencies identified above regarding their higher levels of care consideration process in order to properly identify, refer, and transfer *Coleman* class members to appropriate inpatient programs and consistent with public health best practices in the circumstances of the COVID-19 pandemic at this time and with the capacity to accomplish these goals post-COVID-19 pandemic. Moreover, any remedy must also attend to ensuring that *Coleman* class members not referred received appropriate treatment interventions to address those positive indicator(s) that gave rise to their consideration for referral to higher levels of care. Once referred, inmates must be timely transferred, but institutions continued to fail to meet transfer timelines to acute, while they were generally compliant with timely transfers to intermediate care, as they were with MHCB transfers.

### E.  Mental Health/Custody Relations

#### 1.  Twenty-Eighth Monitoring Round Findings on Mental Health/Custody Relations

During the Twenty-Eighth Monitoring Round, as with previous rounds, the Special Master evaluated the state of the relationships between custody and mental health staff at the various institutions and its impact on access to mental health care and the treatment environment. The need for collaborative efforts between mental health and custody staff remained but had not been fully achieved in CDCR during the Twenty-Eighth Monitoring Round. Details of the findings of the Special Master are presented below.

At CIM, CIW, CMF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP-Solano, Folsom, HDSP, KVSP, MCSP, NKSP, RJD, SVSP, and WSP, the Special Master's experts and

monitors interviewed mental health, medical, custody staff, and inmates during the monitoring visit. CMC was reviewed by paper. Some of the information about the current state of the relationship between mental health and custody staff gathered from interviews substantiated the overall message contained in the Custody Mental Health Partnership Plan (CMHPP) regarding how the relationship between custody and mental health staff affected access to mental health care and treatment. In others, it was conflicting. Generally, however, document reviews supported the principal premise expressed in interviews about the relationship's current state at the different institutions. During the Twenty-Eighth Monitoring Round, the custody and mental health relationship and the issues associated therein mostly repeated concerns or lack thereof identified in the Twenty-Seventh Monitoring Round.

Complaints of timely issuance of personal property, not being released for mental health ducats, poor treatment of class members by custody staff, including disrespect, negative comments, name-calling, intimidation, threats, retaliation, and assaults were some of the grievances voiced during the monitoring round. Similar concerns were repeated in various iterations at CMF, CSP/Corcoran, CSP/LAC, Folsom, HDSP, NKSP, RJD, and SVSP. CCI, CIM, CIW, CSATF, CSP/Sac, CSP-Solano, CMC, CRC, KVSP, MCSP, and WSP did not provide information regarding inmate or staff interviews about mental health and custody relations.

Some institutions reported good relationships between the custody and mental health staff. For instance, at NKSP, the institution confirmed the implementation of the quarterly roundtables, which reflected a diverse attendance of disciplines in its sessions. At KVSP, custody, mental health, and nursing staff reported working collaboratively to establish the Crisis Intervention Team (CIT), which gave custody staff a more significant role when addressing crisis

136

referrals. Collaborative relations were reported at CSP/Sac, Folsom, KVSP, and NKSP. However, at RJD, it was observed that custody and mental health relationships needed improvement on all levels.

In some instances, staff reported good relationships, yet inmates indicated differently. At NKSP, for example, staff suggested that relationships were good, but statements from inmate interviews indicated feelings of the absence of respect from custody staff.

At RJD, mental health staff had a process in place to document statements or complaints made to them by inmates. Still, they acknowledged it had the potential to impact relationships between inmates and mental health staff and between custody and mental health staff. Monitors observed that the relationship between custody and mental health needed to improve overall. Additionally, inmates reported several incidents where officers used excessive force with EOP and inmates with physical disabilities. Further, inmates shared reports of being taunted over the intercom and retaliated against for voicing their concerns.

At CMF, there were concerns from inmates regarding personal property that was not being issued timely. In addition, there were concerns of efforts to reduce inmates' level of care by staff.

Mental health staff at CSP/Corcoran described the relationship between custody staff and inmates as bad and had concerns about the relationship between them. At CSP/LAC, inmates reported that mental health usually conceded if there was a disagreement between custody and mental health. They reported that custody also did not listen to inmates.

At CMF, inmates were concerned about staff efforts to lower their level of care in addition to personal property not being issued timely.

There were some positive comments at HDSP. In Facility A, inmates had good things to

say regarding the warden; however, in Facility B, mental health services and treatment by custody staff were displeasing to inmates. Of concern, inmates also noted that custody staff ignored their reports of suicidal ideation. There were also reports of retaliation.

Inmates voiced concerns in two separate facilities at SVSP. In A Facility, EOP inmates had problems with officers making rude comments and having too much input in whether they stayed in the EOP. Of concern, officers did not respond when inmates asked to speak with clinicians. Officers also handcuffed inmates and put them in the shower if they expressed suicidal ideation. In D Facility, officers refused inmates' entry to the EOP building. There was also an incident where an inmate alleged that an officer antagonized and assaulted a mentally ill inmate.

The Special Master will continue to monitor the status of mental health and custody relations, the culture of the institution, further data on the custody and mental health partnership, and their effect on access and adequacy of mental healthcare in CDCR during the Twenty-Ninth Monitoring Round.

### Summary – Mental Health/Custody Relations

Relations between mental health and custody staff in CDCR and how they impact access to care and the treatment provided to the *Coleman* class members is essential to the remediation process in the case. During the Twenty-Eighth Monitoring Round, while collaboration between mental health and custody staff was occurring at some institutions, it has not been fully achieved in CDCR, and the need to continue to develop this interdisciplinary partnership remained. The Special Master will monitor the relationship between custody and mental health staff during the 29th Monitoring Round.

An update regarding the Custody Mental Health Partnership Plan (CMHPP) is

provided in Appendix B.

###### F.     Review of the RVR Process

As reported in detail below, multiple institutions were noncompliant with basic requirements of the RVR process such as training mental health and custody staff, timely requesting and returning mental health assessments, and documenting consideration of the mental health assessment and mitigation by senior hearing officers.  Utilization of alternative disciplinary measures in mental health assessments was used sparingly.  Most concerning was that clinicians apparently believed that senior hearing officers could order that the inmate not participate in mental health programming as punishment for RVRs.

Seven institutions - CMC, CMF, CRC, CSATF, CSP/Sac, KVSP, and SVSP, were in compliance with the training of custody staff for the RVR mental health assessment process. Two institutions - CIW and MCSP, reported that between 80 and 89 percent of custody staff received training, while another two institutions - CSP/LAC and NKSP, indicated between 70 to 79 percent of custody staff were trained.  CIM and CSP/Solano demonstrated between 60 to 69 percent compliance with training requirements for custody staff.  Further, four institutions - CSP/Corcoran, Folsom/FWF, HDSP, and RJD, indicated compliance rates of 49 percent or less for training of custody staff.  CCI and WSP did not provide reliable training data.

Only five institutions – CIW, CRC, Folsom/FWF, KVSP, and RJD, indicated compliance with mental health clinician training of the RVR mental health assessment process.  Two institutions - CIM and CSP/Corcoran, reported between 80 to 89 percent of mental health staff received required training, and only 50 percent of SVSP mental health clinicians attended the training.  At CSP/Solano and CSATF, only 11 percent and nine percent of mental health staff attended training, and only one single clinician completed the training at NKSP.  Two institutions - CSP/LAC and MCSP, did not provide training to mental health clinicians in over 12

139

months prior to the review. Seven institutions - CCI, CMC, CMF, CSP/Sac, CSP/LAC, HDSP, and WSP, did not supply information regarding training for mental health clinicians.

There were 42,129 RVRs issued at the 19 reviewed non-desert institutions during the review period. Of those, 21,018 or 50 percent were issued to MHSDS inmates. There were 15,749 RVRs issued to 3CMS inmates, 4,760 RVRs issued to EOP inmates, 492 RVRs issued to MHCB inmates, five RVRs issued to intermediate level of care inmates, and 12 RVRs issued to acute level of care inmates. Fifty percent, or 21,044 RVRs were issued to non-MHSDS inmates. The mental health status of 67 inmates who received RVRs was unknown by CDCR.

Two institutions - Folsom/FWF and WSP, demonstrated compliance with timely requests for mental health assessments. CMC reported 83-percent compliance, and CSP/Corcoran indicated 75-percent compliance with timely referral to mental health. Two institutions - CSATF and CSP/Sac, revealed compliance between 60 and 69 percent of the time. CIW reported 50-percent compliance with timely requests for assessments, and two other institutions - CCI and CMF, requested assessments in a timely fashion between 40 to 49 percent of the time. CSP/LAC noted a 33-percent compliance rate, and three institutions - CSP/Solano, RJD, and SVSP, reported compliance between 20 to 29 percent of the time. MCSP indicated 12-percent compliance with timely referral to mental health. At CIM, mental health assessments were not requested timely and sometimes not requested when required.

Mental health clinicians at seven institutions - CIW, CMF, CSP/Sac, CSP/Solano, Folsom/FWF, MCSP, and RJD, completed and returned mental health assessments to custody staff within required timeframes. Four institutions - CMC, CSATF, CSP/Corcoran and WSP, reported compliance from 80 to 89 percent, and three institutions - CCI, CSP/LAC, and SVSP, indicated compliance 70 to 79 percent of the time. CSP/Sac timely completed and returned

mental health assessments only 60 percent of the time, and data revealed that HDSP did not complete and return mental health assessments timely.

Document review indicated ten institutions - CCI, CIM, CIW, CMF, CSP/Sac, CSP/LAC, Folsom/FWF, HDSP, NKSP, and WSP, were compliant with documentation of consideration of the mental health assessment by the senior hearing officers. CSP/Solano reported compliance; however, documentation consisted of cut and pasted information from the mental health assessment without articulation of the senior hearing officer's consideration. RJD and CSP/Corcoran indicated compliance 80 and 79 percent of the time, and two institutions - CSATF and KVSP, noted between 60 and 69 percent compliance. SVSP was 33 percent compliant, and MCSP reported compliance only 12 percent of the time. The monitor was not able to review any adjudicated RVRs at CMC and CRC due to the offsite paper review.

A reviewed sample of adjudicated RVRs revealed that six institutions - CIW, CSP/Sac, CSP/Solano, KVSP, NKSP, and WSP, were compliant from 90 to 100 percent of the time with documentation of mitigation by the senior hearing officers. CSP/Corcoran reported 83 percent compliance, while three institutions - CCI, CSATF, and RJD, indicated compliance rates between 70 and 79 percent. CMF, SVSP, and MCSP failed to reach even 50 percent compliance with documentation of mitigation. Clinicians at Folsom/FWF did not recommend mitigation in any of the RVRs reviewed. The monitor was not able to review any adjudicated RVRs at CMC and CRC due to the offsite paper review.

In the reviewed sample, there were only seven cases at two institutions - CMC and RJD, where the mental health assessment recommended alternative disciplinary measures as the inmates' behavior was strongly influenced by their mental illness. Four of the five cases at RJD resulted in reduction to counseling chronos by the captain, and one case proceeded to the senior

hearing officer for adjudication.  The monitor was not able to review the RVRs at CMC due to the offsite paper review.

Only three of ten, or 30 percent of reviewed classification committee actions included consideration of mental health factors when assessing SHU terms.

Across institutions, clinicians continued to exhibit confusion regarding recommendations of factors for senior hearing officer consideration when assessing penalties for RVRs.  Clinicians continued to inappropriately recommend that the senior hearing officer permit the inmate to continue their mental health programming, even though discontinuation of mental health services is not a permissible penalty.  Many clinicians used canned language which was often not responsive to the question asked on the mental health assessment.

## Summary – RVR Process

Although, MHSDS inmates comprised approximately one-third of CDCR's census, 50 percent of all RVRs issued were to MHSDS inmates, indicating a disproportionate number of RVRs were issued to *Coleman* class members when compared to the total CDCR inmate population.

Training both mental health and custody staff regarding the RVR process, which is fundamental for the RVR process to operate as intended, continued to be noncompliant across institutions during the Twenty-Eighth Round Monitoring Round.  Institutions across the system struggled with compliance with timely requests for mental health assessments following the issuance of RVRs.  Generally, more institutions were compliant with timely returning mental health assessments to custody within time frames than were not.  Although the majority of institutions reviewed were compliant with documenting consideration of the mental health

assessment by the senior hearing officers, it was concerning that many institutions remained noncompliant with this requirement of the process.

Multiple institutions continued to struggle with documentation of mitigation by the senior hearing officers in the RVR process.  Recommendation of alternative disciplinary measures in mental health assessments occurred sparsely.  Significantly, clinicians across institutions continued to recommend that senior hearing officers permit inmates to continue their participation in their mental health programs, even though senior hearing officers could not order that the inmate not participate in mental health programming as a punitive measure.

### G.    Use of Force

Institutions across the system were not compliant with training mental staff regarding CDCR's use of force policy.  Compliance with controlled and immediate use of force policies were not uniformed during the Monitoring Round.

As reported in the Twenty-Seventh Monitoring Round Report, subsequent to the Court's April 10, 2014 order directing defendants to revise their use of force policies and procedures under the guidance of the Special Master, ECF No. 5131 at 72, defendants filed their revised use of force plans, policies and procedures on August 1, 2014. ECF No. 5190.  The defendants' revised plan was approved by the Court on August 11, 2014.  ECF No. 5196.

During the Twenty-Eighth Monitoring Round, CDCR continued to train mental health and custody staff regarding the revised use of force policy.  This report presents the second comprehensive review of use of force since the implementation of the revised policy and training of staff.  The findings assessing the implementation and application of the use of force policy, which occurred during onsite visits at 19 institutions, are reported below.

143

Training

Under the use of force policy, training on the controlled and general use of force polices and regulations for managerial, supervisory, executive custody staff, mental health and nursing staff was required to be completed by all identified staff. CDCR provided reports regarding use of force training provided to custody and clinical staff within the preceding 12 months to determine compliance with this training requirement.

Of the 19 reviewed institutions, 18 or 95 percent were compliant in training custody staff regarding use of force policies and regulations. CSP/LAC and KVSP both reported training 100 percent of custody staff, and CSP/Sac and WSP reported 99-percent compliance. Three institutions – CMF, CSATF, and SVSP, reported 98 percent compliance. NKSP, CCI, and CRC reported 97 percent compliance, while CIW, FSP/FWF, and HDSP were 96 percent compliant. MCSP was 95 percent compliant, and CIM was 93 percent compliant. While HDSP reported an overall compliance rate of 96 percent, the warden, chief deputy warden, four correctional administrators, and five captains had not been trained. CSP/Solano was the only institution failing to achieve a 90-percent compliance rate, training 73 percent of their correctional staff.

While CMC, CSP/Corcoran, and RJD did not report aggregate use of force training data for correctional staff, they were in apparent compliance with the training requirement. CMC reported that the warden, chief deputy warden, correctional administrators had all received use of force training, in addition to 94 percent of captains and lieutenants, 97 percent of sergeants, and 98 percent of correctional officers. CSP/Corcoran reported 100-percent compliance for correctional administrators, 83 percent for captains, 91 percent for lieutenants, 92 percent for sergeants, and 93 percent for correctional officers. Finally, RJD reported that 100 percent of correctional administrators, 83 percent of captains, 90 percent of lieutenants, 92 percent of

sergeants, and 93 percent of correctional officers had been trained on use of force during the monitoring round.

As was the case in the preceding monitoring round, compared to custody staff, institutions were less successful in achieving compliance regarding mental health staff training in use of force policies. Ten institutions, or 58 percent, were compliant with use of force training for mental health staff. Compliant institutions included CIM (100 percent), CIW (98 percent), CRC (100 percent), CSATF (98 percent), CSP/Corcoran (100 percent), CSP/Solano (96 percent), KVSP (95 percent), RJD (100 percent), SVSP (91 percent), and WSP (97 percent). CMF, CSP/LAC, FSP/FWF, HDSP reported respective compliance rates of 87 percent, 85 percent, 88 percent, and 87 percent. CCI was non-compliant, with 78 percent of mental health staff receiving use of force training. While 82 percent of mental health staff at CSP/Sac had been trained in use of force policies, the institution reported that no psychiatrists had received training. MCSP was substantially non-compliant, reporting only 46 percent of mental health staff had been trained in use of force policies.

CMC and NKSP did not report overall compliance rates for mental health staff training. At CMC, the chief of mental health, chief of psychology and 100 percent of supervising psychiatrists, supervising psychologists, supervising social workers, and psychiatrists received use of force training; 95 percent of psychologists, 94 percent of social workers, and 91 percent of nursing staff were trained. NKSP indicated that 80 percent of psychiatrists, 80 percent of psychologists, 93 percent of social workers, and the chief psychologist had received use of force training.

145

Controlled Use of Force

Of the 18 institutions that reported controlled use of force data, CCI, CIW, CMC, FSP/FWF, NKSP, and WSP reported that no controlled use of force incidents occurred during the review period.  CIM did not provide data regarding the number of use of force incidents during the review period.  CRC reported aggregate use of force data that did not distinguish between controlled and immediate use of force incidents.  There were 39 controlled use of force incidents at the remaining 11 institutions, as follows: CMF (one); CSATF (three); CSP/Corcoran (six); CSP/LAC (three); CSP/Sac (11); CSP/Solano (one); HDSP (four); KVSP (three); MCSP (two); RJD (two); and SVSP (three).  Eight of the 11 institutions – CMF, CSATF, CSP/Sac, CSP/Corcoran, CSP/LAC, CSP/Solano, HDSP, and SVSP, achieved compliance with policies and regulations regarding controlled use of force incidents.  Two incidents at KVSP were found to be compliant, while the third incident was under review by the internal affairs at the time of the monitor's site visit.  While SVSP was compliant, problems with documentation were observed, including the use of the wrong inmate's name in the incident report.  All use of force incident records at FSP/FWF had been forwarded to the Investigative Services Unit and were not available for compliance review during the site visit.

Incidents at MCSP and RJD involving the extraction of an inmate from a cell in the administrative segregation unit were not compliant.  Regarding the incident at MCSP, documentation was lacking as to the justification for the use of force.  At RJD, the incident in question was deemed non-compliant because the inmate was issued an RVR for obstruction of a peace officer in the performance of their duty in violation of CDCR policy.

<u>Immediate Use of Force</u>

Of the 18 institutions that provided immediate use of force incident data, there were a total of 2,961 immediate use of force incidents, as follows: CCI (227); CIW (128); CMC (63); CMF (93); CRC (43); CSATF (114); CSP/Sac (268); CSP/Corcoran (298); CSP/LAC (231); CSP/Solano (98); FSP/FWF (71); HDSP (191); KVSP (362); MCSP (148); NKSP (87); RJD (78); SVSP (287); WSP (174).

A selection of intermediate use of force incidents was reviewed for compliance with policies and regulations. Record reviews indicated CMF, CSATF, CSP/Sac, CSP/Corcoran, CSP/LAC, HDSP, MCSP, NKSP, RJD, and WSP were compliant with immediate use of force policies and regulations. As noted above, records for all use of force incidents at FSP/FWF had been forwarded to the Investigative Services Unit and were not available for review at the time of the site visit. Further, CIM did not provide data regarding the number of incidents during the review period, and CRC reported aggregate data that did not distinguish between controlled and immediate use of force incidents.

Several violations of Program Guide requirements or CDCR policy occurred at SVSP. For example, there were three immediate use of force incidents at SVSP involving attempts to stop inmates from committing suicide or otherwise harming themselves. In one of these cases, an inmate was improperly issued an RVR following the incident. In another incident where an inmate was attempting to harm himself, the inmate was transferred to an administrative segregation unit in violation of policy requiring transfer to an MHCB following a suicide attempt. In two other immediate use of force incidents at SVSP, both involving cell extractions to effectuate transfer to an MHCB, the inmates were issued RVRs for obstructing a peace officer in the performance of their duties in violation of CDCR policy. Notably, staff at CCI reported

daily use of oleoresin capsicum spray on both A and B yards, and records indicated that pepper spray was used in 68 percent of immediate use of force incidents.

## Summary – Use of Force

Eighteen of the 19 institutions were compliant with the custody training requirements for the revised use of force policy.  Training of mental health staff improved compared to the Twenty-Seventh Round Monitoring Report but remained a problem, with 11 of 19 achieving compliance.

Incidents of controlled of force did not occur during the review period at six institutions. Of the 11 institutions where controlled used of force incidents occurred, eight were found to be compliant with controlled use of force policies and procedures.  Of the 18 institutions where immediate use of force incidents occurred, ten of 18 were compliant with relevant policies and procedures.  The Special Master will continue to assess compliance with training requirements and policy as part of his regular monitoring responsibilities.

H.    **Program Access**[41]

Job Assignments

Although improved since the Twenty-Seventh Round Monitoring Report, CDCR had not yet met all of the requirements for program access by MHSDS inmates.

Since the Twenty-Seventh Monitoring Round, non-caseload inmates continued to hold more job assignments than inmates in the mental health services delivery system and 3CMS inmates were more likely to than EOP inmates to have positions.

---

[41] Sources: Job Assignments, Academic, Education, and Milestone Credit data was obtained from the CDCR Secure Website for Monthly Reports, posted October 2020, covering the period of April 1, 2020 through September 30, 2020.  Out-of-Level Housing, ADA Reasonable Accommodation and Grievance Procedures, and Periodic Classification Score Reductions: EOP Inmates data reported herein was obtained from the individual institutional reports for the Twenty-Eighth Monitoring Period.

As to employment positions for EOP inmates, CMC reported that 47 percent of inmates held such positions; at MCSP, the percentage was 18 percent. At four institutions – CIW, CSP/LAC, RJD, and SVSP, 30 to 39 percent of EOP inmates held positions. Five institutions - CMF, CSP/Corcoran, KVSP, CSP/Sac, and CSATF, indicated that from ten to 19 percent of EOP inmates were employed.

The percentage of 3CMS inmates that held job assignments was higher than during the preceding monitoring round. CIM and CRC reported that 60 to 69 percent of 3CMS inmates held positions, and CMC and RJD indicated that 50 to 59 percent of 3CMS inmates were employed. Seven institutions - CIW, CMF, CSP/LAC, MCSP, CSATF, CSP/Solano, and SVSP, reported that between 40 to 49 percent of 3CMS inmates held positions. Four other institutions - CSP/Corcoran, Folsom, HDSP, and KVSP, revealed that between 30 to 39 percent of 3CMS inmates were employed. CCI and CSP/Sac reported that 20 to 29 percent of 3CMS inmates held positions, and at NKSP and WSP, ten to 19 percent of 3CMS inmates held job assignments.

For non-mental health inmates during the Twenty-Eighth round, three institutions - CIM, CRC, and RJD, revealed that 60 to 69 percent of non-mental health inmates held job assignments. Four other institutions - CMC, CSP/LAC, CSATF, and MCSP, reported that 50 to 59 percent of non-mental health inmates were employed. At eight institutions - CCI, CIW, CSP/Corcoran, Folsom, HDSP, KVSP, CSP/Solano, and SVSP, 40 to 49 percent of non-mental health inmates held job positions. Three more institutions - CMF, CSP/Sac, and WSP, indicated that 30 to 39 percent of non-mental health inmates were employed; at NKSP 24 percent of non-mental health inmates held such positions.

Academics

149

Academic assignments include, but are not limited to, English as a second language, adult basic education, and adult high school and equivalence programs. Inmates with a grade level test score of 6.0 or below are assigned to an education position.

Non-mental health inmates held academic assignments at slightly higher percentage rates than 3CMS inmates during the review period. EOP inmates held academic assignments least often.

For EOP inmates, CIW and RJD reported that 30 to 39 percent held academic assignments, and CMC indicated that 20 to 29 percent of EOP inmates held such assignments. Seven institutions - CSP/Corcoran, CSP/LAC, KVSP, MCSP, CSP/Sac, CSATF, and SVSP, revealed that ten to 19 percent of EOP inmates held academic assignments. CMF reported six percent of EOP inmates held assignments.

As for 3CMS inmates, CRC reported that 60 percent of 3CMS inmates had academic assignments, while 40 to 49 percent of 3CMS inmates at RJD and CSP/Sac held such assignments. Five institutions - CIW, CMC, CSP/Corcoran, CSATF, and Folsom, reported that between 30 to 39 percent of 3CMS inmates held academic assignments. Four more institutions - CCI, CIM, CSP/Solano, and SVSP, revealed that from 20 to 29 percent of 3CMS inmates held such assignments. Another five institutions - CMF, CSP/LAC, HDSP, KVSP, and MCSP, reported that between ten to 19 percent of 3CMS inmates had academic assignments. NKSP and WSP indicated that less than nine percent of 3CMS inmates held such assignments.

For non-mental health inmates, CRC reported that 60 percent held academic assignments. RJD and CSP/Sac indicated that between 40 and 49 percent of non-mental health inmates held academic assignments, and three institutions - CIW, CSP/Corcoran, and CSATF, revealed that 30 to 39 percent of non-mental health inmates held assignments. Seven institutions - CCI, CMC,

150

CSP/LAC, CSP/Solano, Folsom, KVSP, and SVSP, indicated that between 20 to 29 percent of non-mental health inmates held academic assignments. Three more institutions - CIM, HDSP, and MCSP, reported ten to 19 percent of non-mental health inmates held such assignments, and three other institutions - CMF, NKSP, and WSP, noted less than nine percent of non-mental health inmates held these assignments.

Education:

A. Vocational

Vocational education assignments provide inmates opportunities to learn a skill and potentially achieve industry certification or apprenticeship. Vocational positions include, but are not limited to welding, carpentry, plumbing, electrical, heating and air conditioning, painting, and computer repair.

More 3CMS inmates were enrolled in vocational education than EOP inmates and non-mental health inmates during the review period. EOP inmates accounted for the least percentage of inmates enrolled in vocational education.

For EOP inmates, seven institutions - CMC, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, and MCSP, reported between one and ten percent of EOP inmates were enrolled in vocational education. At four other institutions - CIW, KVSP, RJD, and SVSP, zero EOP inmates were enrolled in vocational education.

B. Voluntary

Inmates who requested and were approved to participate in college courses via correspondence or at the institution held voluntary education assignments.

EOP inmates represented the least percentage of inmates that attended voluntary education during the review period, and a larger percentage of non-mental health inmates than 3CMS inmates were enrolled in voluntary education.

CMC reported that 19 percent of EOP inmates were enrolled in voluntary education. Six institutions -CIW, CMF, CSP/Corcoran, MCSP, RJD and SVSP, revealed that between one and nine percent of EOP inmates attended voluntary education. No EOP inmates were enrolled in voluntary education at CSP/LAC, CSP/Sac, CSATF, and KVSP.

For 3CMS inmates, four institutions -CMC, CSP/Corcoran, HDSP, and MCSP, reported that between 20 to 29 percent of 3CMS inmates were enrolled in voluntary education. Another four institutions -CCI, CIW, Folsom, and SVSP, indicated that ten to 19 percent of 3CMS inmates attended voluntary education. Seven institutions - CIM, CMF, CRC, CSP/LAC, KVSP, NKSP, and WSP, revealed that one to nine percent of 3CMS inmates were enrolled in voluntary education. No 3CMS inmates were enrolled in voluntary education at CSP/Sac, CSP/Solano, CSATF, and RJD.

Thirty to 39 percent of non-mental health inmates at CMC and KVSP attended voluntary education. Three institutions -CCI, CSP/Corcoran, and HDSP, reported that 20 to 29 percent of non-mental health inmates were enrolled in voluntary education. Four more institutions - CIW, CRC, CSP/LAC, and Folsom, revealed that ten to 19 percent of non-mental health inmates were enrolled. Five institutions - CIM, CMF, MCSP, NKSP, and WSP, reported that one to nine percent of non-mental health inmates were in voluntary education. There were zero non-mental health inmates enrolled in voluntary education at CSP/Sac, CSP/Solano, CSATF, and RJD.

Milestone Credits

Inmates who actively participate in and complete in-prison rehabilitation programs including academic, vocational education and substance abuse programs may qualify for a reduction in their length of incarceration. An inmate earns "milestones" as the inmate completes components of the program and is awarded "credits" upon completion of specific milestones.

CDCR revealed that during the period reported, nearly 50 percent of eligible EOP inmates earned milestone credits across all institutions. During that same period, 11 percent of eligible 3CMS inmates and 14 percent of non-mental health inmates received credits.

At CIW, 89 percent of eligible EOP inmates received milestone credits. At CSP/Corcoran and MCSP, between 70 to 79 percent of eligible EOP inmates earned these credits. Another two institutions, KVSP and RJD reported that 60 to 69 percent of eligible EOP inmates earned milestone credits, and CMC and CSATF revealed that between 50 to 59 percent of eligible EOP inmates received them. Two institutions - CIM and SVSP, reported that 30 to 39 percent of eligible EOP inmates earned milestone credits and another two institutions - CMF and CSP/LAC, indicated that 20 to 29 percent of eligible EOP inmates at those institutions received the credits. Two more institutions - CSP/Sac and NKSP, reported ten to 19 percent of eligible EOP inmates earned credits; nine percent of eligible EOP inmates at WSP received the credits. Five institutions - CCI, CRC, CSP/Solano, Folsom, and HDSP, reported that zero eligible EOP inmates earned credit during the period reported.

For 3CMS inmates, MCSP reported that 22 percent of eligible 3CMS inmates earned milestone credits. Seven institutions - CCI, CIM, CIW, CMC, Folsom, HDSP, and RJD, reported that between ten and 19 percent of eligible 3CMS inmates received milestone credits. The remaining 11 institutions - CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CRC,

CSATF, KVSP, NKSP, SVSP, and WSP, reported that between one and nine percent of eligible 3CMS inmates earned milestone credits.

As for non-mental health inmates, four institutions - CCI, CIW, CMC, and MCSP, revealed that 20 to 29 percent of eligible non-mental health caseload inmates received milestone credits. Eight institutions - CIM, CMF, CRC, CSP/LAC, Folsom, HDSP, RJD, and SVSP, reported that ten to 19 percent of eligible non-mental health inmates earned credits. Another seven institutions - CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, KVSP, NKSP, and WSP, indicated that one to nine percent of eligible non-mental health inmates received milestone credits during the period reported.[42]

<u>Out-of-Level Housing</u>

While there was improvement in the percentage of inmates who were housed out-of-level since the preceding monitoring period, inmates remain housed out-of-level across institutions.

---

[42] On December 3, 2020, CDCR issued a Guidance For Mental Health Milestone Completion Credits During COVID-19 memorandum that included a 30-day timeframe for implementation. The stated purpose stated of the memorandum is "to ensure mental health patients continue to have access to Milestone Completion Credits (MCC) during the COVID-19 epidemic … [with] the goal to allow patients to earn credit and reduce their sentences through Proposition 57 while institutions implement modifications to treatment."









For EOP inmates, RJD and SVSP reported between 20 to 29 percent of inmates were housed out-of-level. Four institutions - CMF, CSP/Corcoran, CSATF, and MCSP, reported that from ten to 19 percent of EOP inmates were housed out-of-level. At CMC, CSP/LAC, and CSP/Sac,

between one to nine percent of inmates were housed out-of-level. CRC and NKSP did not report the number of EOP inmates housed out-of-level during the review. CIW does not house inmates according to levels. There were no EOP inmates housed out-of-level at the remaining seven institutions - CCI, CIM, CSP/Solano, Folsom, HDSP, KVSP, and WSP. It is important to note that 27 percent of EOP inmates were housed in lower levels than their classification.

As for 3CMS inmates, three institutions - CMF, MCSP, and RJD, reported that between 20 to 29 percent of 3CMS inmates were housed out-of-level. Seven institutions - CIM, CSP/Corcoran, CSP/LAC, CSATF, HDSP, NKSP, and SVSP, indicated that ten to 19 percent of 3CMS inmates were housed out-of-level. Another seven institutions - CCI, CMC, CSP/Sac, CSP/Solano, Folsom, KVSP, and WSP, reported that between one and nine percent of inmates were housed out-of-level. CIW does not house inmates according to levels and CRC did not report the number of 3CMS inmates housed out-of-level during the review.

ADA Reasonable Accommodation and Grievance Procedures

Fourteen institutions - CCI, CIM, CIW, CMC, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CSATF, HDSP, MCSP, RJD, and WSP, confirmed full implementation of the ADA reasonable accommodation and grievance procedures. SVSP reported that 48 percent of required mental health staff were trained on the functional evaluation of EOP inmates for program assignment. CRC, Folsom, KVSP and NKSP did not provide documentation to sufficiently confirm implementation.

Periodic Classification Score Reductions: EOP Inmates

The Special Master's team reviewed CDCR 840s from eight institutions - CSP/Corcoran, CSP/LAC, CMF, CSATF, KVSP, MCSP, RJD, and WSP, indicated that EOP inmates were granted classification score reductions for successful programming. Three institutions -

157

CSP/Sac, CMC, and SVSP, did not provide information regarding periodic classification score reductions. The remaining eight institutions - CCI, CIM, CIW, CRC, CSP/Solano, Folsom, HDSP, and NKSP, reported not having an EOP program or regularly housing EOP inmates.

## Summary – Program Access

While access to jobs improved for 3CMS inmates, overall inmate access to job percentages continued to favor non-mental health inmates. EOP inmates continued to linger well behind; over 55 percent of EOP programs reported less than 20 percent of EOP inmates held jobs. Access to academic assignments also lagged for MHSDS inmates, particularly EOP inmates. Access to vocational education improved for 3CMS inmates, although MHSDS inmates held less voluntary education assignments than non-mental health inmates. EOP inmates represented the least percentage of inmates with vocational education assignments. The longstanding issue of eligible MHSDS inmates not receiving milestone credits persisted, though eligible EOP inmates earned more than both non-mental health inmates and 3CMS inmates during the review period. Further, many MHSDS inmates were housed out-of-level with 73 percent of EOP inmates, and 63 percent of 3CMS inmates housed at higher levels than their classification. Most institutions had fully implemented the ADA reasonable accommodation and grievance procedures. Most reporting EOP programs indicated that EOP inmates were granted classification score reductions for successful programming.

I.  **Construction and Renovation of Mental Health Treatment Space at Various Levels of Care**

The Special Master's Twenty-Seventh Round Report explained how mental health treatment space shortages impacted CDCR's ability to provide adequate care. ECF No. 5779 at 126. These challenges continued through the Twenty-Eighth Round.

Onsite Monitoring

During onsite monitoring visits at CCI, CMC, CMF, CSATF, CSP/Corcoran, CSP/Sac, CSP/LAC, CSP/Solano, CRC, Folsom, KVSP, MCSP, NKSP, RJD, and SVSP no anticipated construction or renovation of mental health treatment space was reported.

Although construction resolved space concerns at some institutions, the lack of mental health treatment space still existed in CDCR. At CCI, there was a lack of safe confidential treatment space. Specifically, on A yard and B yard, treatment occurred in the non-contact visiting area which lacked a door separating the clinician from the open area and the assigned officer thereby compromising confidentiality. Clinicians reported difficulty hearing inmates which was exacerbated by telepsychiatry appointments conducted in the same area. On B yard, custody often appeared and asked questions limiting the confidentiality of clinician appointments. On C yard, structured therapeutic activities were not provided due to lack of space.

CIW reported adequate treatment space to conduct individual treatment and 3CMS IDTTs as well as structured therapeutic activities for the 3CMS and EOP populations. STRH and LTRH did not have confidential treatment space which resulted in structured therapeutic activities and individual treatment being conducted on the dayroom floor behind partitions.

Each yard at CMC had dedicated group treatment space except for the 3CMS East and West Yards. CMC did not report on the availability on individual treatment space.

CMF reported that 3CMS individual treatment rooms were problematic due to their extreme heat in the summer months. The institution was seeking to remedy this problem by ordering blackout curtains for the hottest offices and ordering portable coolers. Monitors

observed that the rooms in R-Wing, which were utilized for both EOP and 3CMS structured therapeutic activities, were also hot.

MHCB and EOP programs at CSATF reported inadequate clinician office space, group treatment rooms, and confidential treatment space. In Facilities F and G, staff reported that at times structured therapeutic activities were held in the dayroom due to heat. The lack of space in Facility F led to some 3CMS inmates receiving individual treatment in the medical building while some structured therapeutic activities were held in the dayroom due to its size. Clinical contacts in Facility E were held in the gym in close proximity to custody officers.

CSP/Corcoran lacked sufficient space for structured therapeutic activities in the EOP program. For the IEX pilot program, some treatment structured therapeutic activities were held on the dayroom floor which offered virtually no confidentiality.

CSP/LAC reported inadequate treatment space in Facilities B, C, and D. In Facility B, psychiatrists and clinicians shared treatment space. On Facility C, the gym was utilized for PC contacts and structured therapeutic activities, and the visiting room was often used to conduct multiple structured therapeutic activities at the same time. The gymnasium in Facility D was utilized for structured therapeutic activities.

At CSP/Solano, mental health treatment space was particularly problematic in administrative segregation as there was no confidential treatment space for individual clinical contacts or structured therapeutic activities.

Treatment space was limited at Folsom and FWF. Folsom had only one group treatment room, which was also utilized for 3CMS IDTTs. If fully staffed, FWF would not have sufficient space for confidential offices for psychiatrists and PCs. FWF used the visiting room for IDTTs, and the library two hours per week for structured therapeutic activities.

At KVSP, treatment space was an ongoing concern. Staff often sought out underutilized space and also combined offices to create four treatment spaces and seven individual treatment rooms.

WSP experienced limited treatment space during the reporting period due to construction but did not report when construction would be complete.

MHCB Construction at RJD and CIM

In an effort to address the issue of timely access to crisis beds and eliminate the waitlist, "Defendants have proposed through the Governor's January 2017 budget to construct an additional 100 flexible use crisis beds in Southern California." ECF No. 5595 at 8. The plans called for the construction of 50 crisis beds at RJD and 50 crisis beds at CIM.

Insufficient numbers of MHCB beds to meet the treatment needs of the *Coleman* class and the resulting activation of temporary MHCB beds that do not meet the Program Guide requirements are not novel problems to CDCR. In a 2019 Order addressing the Special Master's third re-audit and update on suicide prevention practices in CDCR prisons prepared by the Special Master's expert Lindsay Hayes, the Court stated:

> Court-approved use of temporary MHCB programs in locations that do not meet Program Guide requirements dates back more than a decade, as do court orders requiring defendants to activate sufficient numbers of permanent MHCBs to meet the needs of the plaintiff class. ECF No. 6212 at 7.

The Court's order further illustrated the troubled history of CDCR's attempts, through various iterations of bed plans, to enact a long-range bed plan for the provision of a sufficient number of MHCBs to treat the *Coleman* class members in need of crisis bed level of care. *Id.* at 7-9. Given the Court's labored history of this long-term problem incorporated into that order, it is unnecessary to reiterate the entire route that has led to the present situation.

The inability of defendants to transfer inmates to crisis beds within 24 hours of referral pursuant to Program Guide requirements prompted the Court to schedule a status conference, and if necessary, an evidentiary hearing to address obstacles to full compliance with the 24-hour transfer timeline. ECF No. 5610 at 14. In their brief filed with the Court on September 13, 2017 prior to the status conference and evidentiary hearing, defendants reported they had acquired legislative approval to build 100 new crisis beds in southern California within four years. ECF No. 5680-10, Tebrock Decl. ¶ 7. To help reduce the growing waitlist for crisis beds in southern California pending the construction of permanent crisis beds, CDCR proposed to activate a 20-bed unlicensed MHCB-unit at RJD. This concept had been fully vetted with all parties. In the Special Master's report on his experts' third re-audit of suicide prevention practices in CDCR prisons, it was concluded that "activation of the unit would result in deplorable conditions unacceptable for class members needing an MHCB level of care." ECF No. 5993 at 8. The Court adopted the recommendation of the Special Master not to allow the activation of an unlicensed temporary MHCB unit at RJD and overruled defendants' objection to the recommendation. ECF 6212 at ¶¶ 3 and 4.

On April 29, 2019, the Court ordered Defendants to file status reports every month on the funding process and status of the construction of 100 mental health beds. ECF No. 6135 at ¶ 5. It was not long before the project met with criticism by the California Legislature. In their second status report on the funding for the projects, defendants reported that.

> On June 12, 2019, the Joint Legislative Budget Committee notified the Department of Finance that, due to CDCR's declining population, CDCR's projections for crisis bed needs in the future, and changes to the project's scope and costs, the MHCB Construction Project may not be justified.

ECF No. 6208 at 3.

In response to the request by the Joint Legislative Budget Committee for an analysis for the continuing need for an additional 100 licensed crisis beds, the analysis, completed by CDCR and the Department of Finance, resulted in the deferment of the 50-bed RJD project but confirmed the need for the additional 50 beds at CIM.  ECF No. 6256 at 3.  Defendants' plan anticipated that 17 beds of the 50-bed CIM crisis bed project would be available for use as female crisis beds which would potentially reduce the total number of newly constructed crisis beds for use by male inmates to 33.  ECF No. 6401 at 8.  The Court has previously ordered that "[n]o currently operating temporary mental health program will be decommissioned unless there is adequate alternative capacity to accommodate future need in that level of care."  ECF No. 4199 at 5.  CDCR presently operates 73 unlicensed MHCBs in its system: 20 beds at CSP/Sac, 34 beds at CIM and 19 beds at CIW.  ECF No. 6235 at 3.  The math illustrates that there would be an overall net loss of 23 beds once the new beds at CIM have been completed and all unlicensed crisis beds are decommissioned.  However, as recently as August 26, 2019, CDCR experienced a 38 percent increase in the male crisis bed population.  ECF No. 6256-1 letter from Department of Finance attached as Exhibit 1 to Decl. of Dean Borg.

The demand for crisis beds is driven mainly by the EOP population.  In the last 11 years since the Three-Judge Court was convened and issued its opinion on August 4, 2009 ordering a population reduction, the EOP population increased from 4,664[43] to 6,033[44] despite an overall reduction in the CDCR inmate population of more than 60,000 during the same time period.[45]

---

[43] Joint Statement of Undisputed Facts filed on November 17, 2008 (*Plata* ECF No. 1815 at 3).

[44] Email dated December 7, 2020 from Nicholas Weber, CDCR Office of Legal Affairs, regarding MHSDS population.

[45] The overall inmate population in 2008 was 156,352 based on data reported in the Joint Statement of Undisputed Facts filed on November 17, 2008 (*Plata* ECF No. 1815 at 3).  The overall inmate population in CDCR institutions on December 2, 2020 was 92,259 based on data from the CDCR Weekly Report of Population.

There have been no reasons offered for the increase in the EOP population but it is clear that this population has defied all efforts to lower its numbers. The treatment and number of beds for this vulnerable population cannot be compromised, which would include maintaining a sufficient number of crisis beds.

Unmet Bed Needs Study

Since 2006, the determination of how many beds within the MHSDS are necessary to provide Program Guide required treatment to the various levels of care within the mental health population, is based on projections calculated by an outside contractor remains the current practice today. ECF No. 1998 at 2.[46] These calculations are affected by numerous factors including natural increases and decreases in population, increases or decreases in population as a result of policy changes, and increases or decreases in population based on state-wide voter enacted propositions.

In the most recent turn of events, the population was reduced as a result of the COVID-19 pandemic and the efforts by CDCR to increase physical distancing through a reduction in the overall inmate population using various emergency measures.[47]

However, it cannot be ignored that the present population reduction was partly the result of CDCR's decision to initially cease all intake from county jails leading to a reduction by attrition. CDCR recently began to increase admissions again from the county jails and it is expected that the increase in the overall population will also increase the MHSDS population from its current level which during the pandemic experienced a reduction in excess of 6,000

---

[46] Navigant Consulting was the original entity hired by CDCR to complete the projections, but that entity has since changed to McManis Consulting. However, the lead forecaster, John Misener, has not changed.

[47] On March 30, 2020 CDCR announced a plan to expedite parole for certain inmates with 60 days or less to serve on their sentences. On June 30, 2020 CDCR published a plan to release certain inmates with 365 days or less to serve on their sentence and awarded a one-time credit of 12 weeks of Positive Programming Credit to all eligible inmates which would move up release dates. https://www.cdcr.ca.gov/covid19/updates/.

inmates.[48]  Recently CDCR has reported that there are approximately 11,000 inmates in county

jails waiting to be transferred to CDCR institutions.  *Coleman* class members make up roughly

one-third of the population in CDCR[49] so it can be expected that one-third of those inmates, or

3,666 soon to be admitted to CDCR, will be added to the MHSDS population thereby

diminishing some of the mental health population reductions achieved during the pandemic.

Further complicating the calculation of appropriate mental health level of care beds

during this time, is the decision by CDCR to dramatically reduce the transfer of caseload inmates

between various levels of care to slow the spread of the coronavirus.  With respect to an inmate

who is referred to a crisis bed, if transfer is not possible due to coronavirus then the inmate will

be placed in alternative housing or a Temporary Mental Health Unit which is a separate unit

within an institution for inmates referred to inpatient care but unable to transfer to an appropriate

bed thereby leaving crisis beds unfilled.

However, one factor that cannot be quantified in any population projection report is the

unmet need for specific level of care beds.  History has shown that when the need for inpatient

beds has declined, even thought there was no decrease in the mental health population, an unmet

bed needs study was justified to produce a more accurate projection of the inpatient population.

This process has been endorsed in the past by the very consultant hired by CDCR to perform

such projections.  ECF No. 4020 n. 1.

The precedent for an unmet bed needs study dates back to 2004 when CDCR was first

ordered to commence an assessment of any unmet need for DSH inpatient beds.  ECF No. 1607

at ¶ 2.  A mere five years later, the Court again ordered defendants to conduct an assessment to

---

[48] CDCR Secure Website for Monthly Reports Exhibit 6(b), posted for January 2020 and September 2020.

[49] Data taken from CDCR Secure Website attachment 6(b) dated October 27, 2020.

determine if there were unmet needs for inpatient care among *Coleman* class members. ECF No.

3556 at ¶ 7. Both studies resulted in the identification for referral to higher levels of care of

*Coleman* class members who were previously unidentified,

> The first Unidentified Needs Assessment (UNA) was conducted
> pursuant to an order of this court filed October 5, 2004. The UNA
> was completed in March 2005, and defendants then "reported to the
> special master that 400 inmates were identified through UNA who
> otherwise would not have been referred to higher levels of care."
> Special Master's Report on Defendants' Plan Re: Intermediate Care
> Facility and Acute Inpatient Wait Lists, filed June 13, 2001 (hereafter
> report), at 5. The second assessment, identified as the Mental Health
> Assessment and Referral Project (MHARP), was conducted pursuant
> to an order of this court filed March 31, 2009 and completed in
> December 2009. That assessment resulted in the referral of nearly
> 1,000 inmates to a higher level of care who otherwise would not have
> been. See Defendants' Request for Temporary Relief, filed
> December 31, 2009, at 7.

ECF No. 4045, n. 1.

In an order dated October 8, 2019, the Court stated its concern with construction of the

reduced 50-bed crisis bed project at CIM and the ability of defendants to provide a sufficient

number of MHCBs to treat the *Coleman* class,

> The court's September 9, 2019 order, ECF No. 6275, directed the
> parties to be prepared to address two specific issues with respect to
> the 100 bed MHCB Project, which defendants apparently have
> now reduced to a 50 bed project at California Institute for Men,
> putting plans for another 50 MHCBs at Richard J. Donovan
> Correctional Facility (RJD) on hold. Although defendants
> represented at hearing that the project as currently approved in its
> reduced scope is sufficient to permit defendants to take all
> unlicensed MHCBs offline and replace them with licensed MHCBs
> as required by the Program Guide, the court has significant
> questions and concerns regarding defendants' current plan.

ECF No. 6312 at 4.

The Special Master has also indicated that the issues he has identified suggest that an

unmet bed needs study for the MHCB population may be necessary. *Id*. at 5-6. The sometimes

166

inexplicable fluctuation in the MHCB population, the probable short-term effects of the pandemic inspired population reductions, the anticipated admissions of mental health inmates from the counties, the reported decrease in the need for crisis beds but accompanied by a steady increase of EOP population since 2009, pose questions as to the reliability or predictability of the current need for crisis beds in these times when normal seems to be non-existent.

Although the Special Master is not requesting the Court to adopt a formal recommendation at this time, he strongly recommends that defendants take all necessary actions to fund and construct the 50 additional MHCBs at RJD.

### J.   **MHSDS Inmates in Segregated Housing**

In order to end federal court oversite, the defendants must achieve compliance with the requirements for the treatment of MHSDS inmates in administrative segregation.  ECF No. 5779 at 133.  Adequate clinical staffing in CDCR's segregated housing was a challenge to providing care to members of the *Coleman* class.  The inability of CDCR to provide MHSDS inmates in Segregated Housing with their allowable property and privileges in a timely manner was problematic.  The Special Master's findings regarding defendants' compliance with the policies and procedures for MHSDS inmates in segregated housing and with providing care in the psychiatric services units (PSU) is reported below.

#### 1.  **Psychiatric Services Unit**

Three psychiatrists at CSP/Sac met psychiatry staffing ratios in the PSU; however, one psychiatrist marginally exceeded ratios.  CSP/Sac did not meet staffing ratios for PCs.  CIW[50] was within staffing ratios for psychiatrists and PCs.

---

[50] CIW moved their EOP administrative segregation hub to the PSU in November 2017.  Due to low numbers in the EOP hub and PSU, the institution combined programming for both programs.  As a result, the electronic records review for the EOP hub and PSU were combined.

CSP/Sac and CIW were not compliant with initial psychiatry and initial PC contacts. CIW was compliant with routine psychiatry and PC contacts; however, CSP/Sac was not compliant.

Regarding initial IDTTs and routine IDTTs, CSP/Sac was not compliant. CIW was not compliant with timely initial IDTTs but was compliant with timely routine IDTTs.

All required staff attended IDTTs at CIW and CSP/Sac.

CIW and CSP/Sac were compliant for providing the required amount of structured therapeutic hours to inmates assigned to normal and modified programming.

## 2. **Administrative Segregation EOP Hubs**

Both psychiatry and PC caseloads were within staffing ratios at CSP/LAC and MCSP. CMF, CSP/Corcoran, CSP/Sac, and RJD indicated the psychiatry caseloads exceeded ratios and were noncompliant. PCs exceeded caseloads at CSP/Corcoran and CSP/Sac; CMF marginally exceeded ratios. RJD PCs were within caseload ratios.

CSP/Sac and RJD reported compliance for timely initial and routine psychiatry contacts. CSP/Corcoran and CMF were not compliant with initial psychiatry contacts but were compliant with routine psychiatry contacts. MCSP was noncompliant with initial psychiatric contacts. CSP/LAC was compliant for routine psychiatry contacts.

CSP/Corcoran was compliant with timely PC contacts. CMF was compliant for timely initial PC contacts but was noncompliant for routine contacts. CSP/Sac was not compliant with timely initial primary contacts, but compliant with routine contacts. MCSP was noncompliant with initial and routine PC contacts. CSP/LAC was noncompliant for routine PC contacts.

Required IDTT members were in attendance at CMC, CSP/Corcoran, and RJD.

Inmates at CIW, CSP/Corcoran, CSP/LAC, and RJD were offered a weekly average of more than ten hours of structured therapeutic time. For high refusers, CMC offered more than ten hours of structured therapeutic time.

### 3. <u>Short-Term Restricted Housing (STRH)</u>

At CIM, CSATF, CSP/Sac, HDSP, and KVSP, the psychiatry and PCs were within staffing ratios. CSP/LAC had a psychiatric nurse practitioner, supervised by the chief psychiatrist, who was within the staffing ratios for psychiatry. CSP/Corcoran did not assign a psychiatrist to STRH due to staffing vacancies. CSP/LAC and NKSP were within staffing ratios for PCs; CSP/Corcoran was within staffing ratios for two of the five PCs assigned to STRH. CIW and SVSP did not provide adequate information to determine compliance with psychiatry and PC staffing ratios.

CSP/Sac was noncompliant for initial psychiatric contacts and compliant for routine psychiatric contacts. NKSP was noncompliant for initial and routine psychiatric contacts. CSATF was compliant for initial psychiatric contacts. CSP/Corcoran and CSP/LAC were noncompliant for initial psychiatric contacts. KVSP was compliant for routine psychiatry contacts.

CSATF, HDSP, and NKSP were compliant for initial PC contacts, but noncompliant for routine PC contacts. CSP/LAC and CSP/Sac were noncompliant for both initial and routine PC contacts. KVSP was noncompliant for routine PC contacts.

CSP/Sac was noncompliant for initial IDTTs; none of the inmates were in the STRH long enough to have a routine IDTT. CSP/LAC was compliant for initial IDTTs. CSATF, HDSP, and KVSP were noncompliant for initial IDTTs.

Required members were present at CSP/Corcoran, CSP/Sac, HDSP, and KVSP for routine and initial IDTTs; they were present for initial IDTTs at CSATF.

CSP/Sac and NKSP were compliant for out of cell activities including yard; CSATF was noncompliant.

At CSP/Corcoran, 3CMS STRH inmates were offered an average of at least 1.8 hours per week of structured therapeutic activity.

### 4.  Long-Term Restricted Housing (LTRH)

At CSP/Corcoran, the institution was not able to provide caseload data for the psychiatrist in LTRH.  Seven of the nine PCs exceeded staffing ratios.  The institution was noncompliant for initial psychiatric contacts.

Initial and routine IDTTs were compliant at CSP/Corcoran.

### 5.  3CMS Inmates in Administrative Segregation

CCI and WSP were within staffing ratios for psychiatry and PCs.  RJD PCs were within staffing ratios.  There was not sufficient information to determine whether psychiatrists were within staffing ratios.

RJD was compliant for PC initial contacts.

Initial IDTTs were not compliant at RJD; none of the inmates in the sample were due for a routine IDTT.

### 6.  Non-Disciplinary Segregation

At CIW and Folsom, there were no inmates placed on non-disciplinary segregation status during the review period.  CSATF reported compliance for timely transfers; MCSP reported 89 percent compliance for timely transfers.  CSP/Solano, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, HDSP, KVSP, RJD, and SVSP did not provide sufficient information to determine whether transfers were timely.

Institution Classification Committees (ICCs) were timely at CIM.

CCI staff and inmates reported delays in receipt of inmate property after ICC clearance. CIM, SATF, and RJD inmates were provided appropriate property and privileges. CSP/Solano, CMF, CSP/Corcoran, CSP/LAC, HDSP, KVSP, MCSP, and SVSP did not provide sufficient information to determine whether inmates received property and privileges.

### 7.   Privilege Group C and/or Work Group ("C" Status)

At the time of the site visit, more than half of the inmates on "C" Status were MHSDS inmates at CIW, CMC, CMF, CSATF, CSP/LAC, CSP/Sac, and MCSP. Less than 50 percent of inmates on "C" Status at CSP/Corcoran, HDSP, and KVSP, were in the MHSDS. CIM, Folsom, CSP/Solano, and WSP did not have any MHSDS inmates on "C" Status during the site visit; CCI could not provide any information on "C" Status.

A review of inmate cases at CIW, CMF, CSP/Corcoran, NKSP and CSP/Sac indicated "C" Status was due to program failures. The following institutions did not provide an explanation regarding inmates on "C" Status: CMC, CSATF, CSP/Sac, CSP/LAC, HDSP, KVSP, MCSP, and CSP/Solano.

### Summary – MHSDS Inmates in Segregated Housing

Compliance with the requirements of MHSDS inmates in segregated housing was harmed by the inability of CDCR to obtain sufficient staff to meet staffing ratios. This apparently ultimately led to the inability to obtain timely clinical contacts and IDTTs.

Property delays continued to be a challenge across institutions. Although some institutions were compliant with property and privileges, others were delayed or did not provide sufficient information to evaluate compliance.

IV.    **SUMMARY OF SPECIAL MASTER'S FINDINGS – HYBRID REVIEW**

A.  **Access to Higher Levels of Care**

While there were multiple institutions covered in this part of the report that did not offer appropriate clinical rationales for not referring inmates who had indicators for consideration to higher levels of care, there were other institutions that appropriately provided clinical rationales that justified IDTTs' nonreferral decisions.

Records reviewed across the ten programs covered in this part of the report – ASP, CCWF, CHCF, CTF, DVI, PBSP, PVSP, SCC, SQ, and VSP, revealed variability with the adequacy for clinical justifications for nonreferrals to acute or intermediate care and the development of treatment plans to provide appropriate treatment and interventions for those inmates who were considered for referral but were not referred.  At CHCF and CCWF, clinical staff did not adequately document the rationale supporting their decisions not to refer inmates meeting multiple criteria for consideration.  At CHCF and PVSP, higher level of care forms were not properly completed.  Disagreement within treatment teams regarding referrals at CHCF and PVSP remained unresolved.

Criteria for consideration regarding referrals to higher levels of care were not noted in all IDTTs at CHCF.  CTF's treatment teams often referenced COVID-19 restrictions as the main reason for not referring even when the clinical rationale was justified.  For reasons that were not discernable in the records reviewed, PBSP appeared to only consider referrals to acute care and the rationale provided for nonreferrals were found to be generally clinically insufficient.  Clinical justification for not referring at PVSP in the cases reviewed were inadequate, notably the absence of sufficient psychiatry documentation.

In the EHRS records reviewed, the clinical rationales for not referring inmates to acute or intermediate care at DVI, SCC and VSP were found to be appropriate and properly documented.

At SQ and VSP, the clinical rationale for nonreferral to inpatient care was generally found to be reasonable and adequate. Documentation regarding nonreferral decisions at VSP were individualized.

### 1. Referrals to Acute Care

CCWF referred four inmates to acute care and rescinded two of the referrals. CHCF referred 78 inmates, PBSP referred three inmates, and VSP referred two inmates to acute care. CTF referred one inmate to acute care but subsequently rescinded the referral. ASP, DVI, SCC, and PVSP did not refer any inmates to acute care during the review period.

### 2. Referrals to Intermediate Care

During the review period, CCWF referred 16 inmates to intermediate care, of which 11 or 69 percent were rescinded, and the remaining five were accepted. CHCF referred three inmates to intermediate care during the review period but rescinded one. SQ referred 13 inmates to intermediate care. ASP, CTF, DVI, PBSP, PVSP, SCC and VSP did not refer any inmates to intermediate care during the review period.

### 3. Referrals to MHCB

There were 16 referrals from ASP to MHCB in the review period, of which nine were rescinded. CCWF referred 204 inmates to MHCB and rescinded 76 of the referrals. CHCF made 124 referrals to MHCB. CTF referred 33 inmates to crisis bed, of these, 12 referrals were rescinded. DVI referred 27 inmates, rescinded17 referrals. PBSP made 60 referrals to MHCB and rescinded one. PVSP referred 25 inmates to MHCB but rescinded ten of the referrals. SCC made ten referrals to MHCB, of which five were rescinded. SQ referred 134 inmates to MHCB and subsequently rescinded 13 of the referrals. VSP made 59 referrals to MHCB, but subsequently rescinded 30 of those referrals.

### 4.  Transfers to Acute Care

CCWF was compliant with inmate transfers to acute care within ten days as required by the Program Guide, although neither inmate transferred within 72 hours of bed referral.  CHCF, PBSP, and VSP were noncompliant with the ten-day transfer timeframe to acute beds.  There were no transfers from ASP, DVI, SCC, and PVSP, which did not refer any inmates to acute care during the review period.

### 5.  Transfers to Intermediate Care

CCWF, CHCF, and SQ were noncompliant with the 30-day timeframe for transfers to this level of care.  There were no transfers from ASP, CTF, DVI, PBSP, PVSP, SCC and VSP, which did not make any referrals to intermediate care during the review period.

### 6.  Transfers to MHCB

CHCF, CCWF, DVI, SCC, and SQ were compliant with transfer timelines to crisis beds. ASP, CTF, PBSP, and PVSP were noncompliant with transfer timelines to MHCB.



The hybrid EHRS/paper review process data request regarding transfers to higher levels of care was limited to transfers to acute care, intermediate care and MHCB.

## Summary – Access to Higher Levels of Care

Providing appropriate clinical rationale for not referring inmates to higher levels of care challenged multiple institution reviewed through the hybrid process. At some institutions, disagreement among treatment team members regarding referral decisions went unresolved. Many referrals to MHCBs from the institutions reviewed through the hybrid process were subsequently rescinded. Only one of the five institutions that transferred inmates to acute care met the required transfer timeline; none of the three institutions transferring to intermediate care was compliant with transfer timeframes. Of the ten institutions that transferred inmates to MHCBs, six completed the transfers timely.

### B.    Reception Center

Findings regarding mental health screening, clinical evaluations and treatment plans, varied within the reception centers reviewed through the hybrid EHRS/paper review process.

Three of the ten institutions covered in this part of the report - CCWF, DVI and SQ, had reception centers.[51]  Record reviews revealed documentation problems at CCWF, including important clinical information being omitted from health records.  Functional impairments related to symptomology, specific manifestation of symptoms, and duration of symptoms were often not documented or discussed in sufficient clinical detail in the EHRS records.

There were problems with treatment plans at both CCWF and DVI.  Multiple treatment plans at CCWF were not individualized and tended to be generic.  At DVI, reviewed treatment plans for inmates in the reception center STRH were deficient; they did not discuss mental health services that could be provided in the STRH or alternative services that would be available due to COVID-19 restrictions.

### 1.    EOP

One of the three institutions – SQ, housed EOP inmates in the reception center during the review period.  Reviewed records at SQ indicated that ten inmates received referrals for psychiatric assessments and psychological evaluations following screens at the time of arrival. With a compliance rate of 80 percent, initial psychiatric assessments at SQ were not timely. However, 90 percent of initial PC evaluations were timely completed.  Seventy percent of required IDTTs were compliant.  Weekly PC contacts for EOP inmates at SQ's reception center

---

[51] During the review period, California Central Women's Facility (CCWF) Deuel Vocation Institution (DVI) and San Quentin State Prison (SQ) were designated Reception Center institutions. On September 29, 2020, CDCR issued a memorandum stating that effective September 6, 2020, all reception center housing at California Institution for Men (CIM), DVI, and SQ were converted to general population (GP) housing, which effectively closed the reception center programs at the three institutions.

were significantly out of compliance, with only 63 percent of contacts completed in accordance with Program Guide timeframes.  CCWF and DVI reported that they did not have any EOP inmates in their reception centers during the review period.

### 2. **3CMS**

Mental health screenings and initial PC assessments were timely completed at CCWF and DVI.  Further, psychotropic medications were appropriately continued on arrival at CCWF, but at DVI, psychiatrists did not see inmates who arrived with psychotropic medications timely.  PC contacts at DVI did not occur within the first 30 days.  In addition, 3CMS inmates in CCWF's reception centers were not transferred timely.

### 3. **STRH**

DVI was the sole reception center covered in this part of the report with a reception center STRH program.  Psychiatrists failed to meet with inmates prior to their IDTTs in the reviewed cases.  Initial psychiatric assessments were noncompliant, and psychiatry contacts primarily occurred via telepsychiatry.  While PC contacts occurred each calendar week, they were noncompliant because they were offered eight to ten days apart.  Documentation indicated that PC contacts in the STRH occurred in confidential settings.  IDTTs in DVI's STRH reception center program were timely completed and required team members were present for 80 percent of IDTTs during the review period.  Psychiatrists were the most frequently absent members.  Notably, structured therapeutic activities were not offered in the STRH after July 2020.  Psychiatric technicians conducted daily rounds, and in-cell activities were apparently offered to inmates.

**Summary – Reception Center**

Treatment plans at CCWF and DVI were inadequate and mental health records of inmates reviewed at CCWF did not contain information related to symptomology or any resulting functional impairments.  With the exception of initial PC evaluations, SQ was generally noncompliant with Program Guide requirements for EOP inmates housed in reception centers.  While mental health screenings and initial PC evaluations for 3CMS inmates were compliant at CCWF and DVI, PC contacts at DVI were not timely and transfers out of CCWF's reception center were not compliant with Program Guide timeframes.  At DVI 3CMS psychiatrists did not see newly arriving inmates on psychiatric medications in a timely manner and in the STRH they did not see inmates prior to their IDTT and in the STRH psychiatrists were the most frequently absent member at IDTTs.  Finally, DVI was generally not compliant with policies for STRH programs in reception centers.

C.    **Temporary Mental Health Housing Units (TMHUs)**

Starting in March 2020, when the scope, nature and duration of the pandemic were unknown, defendants, working closely with the Special Master and his staff with robust input from the plaintiffs, developed plans to implement Temporary Mental Health Units (TMHUs). The TMHUs, which were an emergency, temporary response to the emerging crisis, designated a hierarchy of locations based upon specific criteria, where inmates awaiting transfer to an MHCB, PIP or DSH could, for public health reasons, receive clinical monitoring and a minimum amount of structured and unstructured treatment, and receive time out of their cells.

The primary goals of TMHUs were to provide short-term mitigation of the ill-effects of isolation and reduced treatment as imposed by public health measures requiring social distancing, where inmates could be monitored so that those meeting emergency clinical criteria could be safely transferred to their designated level of care despite general restrictions on inmate

178

movement.  TMHUs were aimed at reducing the spread of the virus among prisons and keeping

inmates and staff as safe as possible until a more comprehensive and sustainable approach could

be devised.  The approach was to be based on better information about the nature of the risks

presented by COVID-19 and how to reduce them in the correctional environment.

This early planning also provided for circumstances under which inmates could be treated

in their cells while awaiting transfer to their appropriate mental health treatment locations.

Arrangements were also made in the case of MAX inmates to expedite the decision for their

possible removal from this restrictive status as well as limitations on their placement in TMHUs.

As part of its response to the COVID-19 pandemic, CDCR developed TMHUs at

multiple institutions.  As noted, the plan for these units, which was developed in consultation

with the Special Master through the *Coleman* COVID-19 Task Force's small workgroup process,

was subsequently presented to the Task Force for input by plaintiffs' counsel.  Upon achieving

consensus among the parties, the TMHUs were approved for implementation.  Predicated on this,

CDCR issued a memorandum on April 10, 2020 instituting the TMHUs.  Attached to the

memorandum CDCR's "COVID Emergency Mental Health Treatment Guidance" and "COVID

Temporary Transfer Guidelines and Workflow."  The April 10, 2020 memorandum described the

TMHU as "a consolidation of high acuity inmates in adjacent cells where treatment can be

provided to a group of individuals who required similar inpatient treatment."[52]  Institutions were

directed to identify "clusters of cells for a TMHU per the COVID Emergency Mental Health

Treatment Guidance."[53]  Institutions were further directed to determine the location of the

---

[52] CDCR's Memorandum, "COVID Emergency Mental Health Treatment Guidance and COVID Temporary Transfer Guidelines and Workflow," April 10, 2020.

[53] *Id*.

TMHU "based upon space availability" and specific considerations outlined in the memorandum.[54]

Another memorandum was subsequently issued on April 17, 2020 covering MAX custody inmates and provided "additional information and clarification on the requirements for identifying and tracking of Temporary Mental Health Unit (TMHU) cells."[55]  On May 22, 2020, the Statewide Mental Health Program issued another memorandum "to allow psychologists and social workers the ability to provide tele-health in accordance" with specific guidelines outlined in the memorandum.[56]  At the time of the drafting of this report, the *Coleman* COVID-19 Task Force's small workgroup is discussing a further update to the COVID-19 transfer guidelines and workflow for subsequent presentation to the Task Force.  Issues under consideration include resolution of ambiguities in the interpretation of some the memos' provisions by combining them into one comprehensive document and revisiting the criteria permitting emergency transfer to inpatient treatment.

Among the institutions covered in this report, ASP, CTF, DVI, PVSP, SCC, and VSP each had active TMHUs at the time of the review.

The implementation of the TMHU policies showed the need for improved tracking of their requirements, as well as some ambiguities in their provisions.  Working with the Special Master's team in the small workgroup setting with ongoing input from plaintiffs during, among other forum, the weekly COVID-19 Task Force meetings, defendants developed various tracking

---

[54] *Id*.

[55] CDRC's Memorandum, "COVID Emergency Mental Health Treatment Guidance for Max Custody Patients and COVID Enhanced Outpatient Program Temporary Transfer Guidelines and Workflows," April 17, 2020.

[56] CDRC's Memorandum, "Update to COVID-19 Mental Health Delivery of Care Guidance and COVID-19 Emergency Plan Chart," May 22, 2020.

and reporting mechanisms to track adherence to requirements such as out-of-cell time, shower and yards. They also developed and deployed the TMHU registry and dashboard.

On July 28, 2020 the Court ordered that "Defendants shall continue to comply with the requirements of the Program Guide to the full extent possible consistent with public health best practices for members of the *Coleman* class in the circumstances of the COVID-19 pandemic." ECF No. 6791 at 4-5. In its Order of September 3, 2020, the Court raised the issue of adherence to court-ordered transfer timelines to inpatient care, noting that while it had "…not yet issued an enforcement order for compliance with the MHCB timeline [it would] revisit the question of the timing of such an order at the first quarterly status conference in 2021…." ECF No. 6846 at 21.

While both orders addressed issues well-beyond those raised by the TMHUs, they served to focus attention on deviations from Program Guide required treatment as well as transfer timelines for inmates housed in those areas in lieu of transfer to inpatient settings. Work within the workgroup and Task Force settings remains ongoing with respect to revisions to the April 10 and April 17 memos, defendants' consideration of ways to resume transfers to higher levels of care across institutions, and mechanisms for defendants to more effectively mitigate the ill-effects on inmates who are not transferred to inpatient settings within Program Guide required timelines.

Quality of care and documentation in the TMHUs were mixed. EHRS records reviewed for CTF did not indicate evidence of daily rounds, in-cell, or out-of-cell activities being offered to TMHU inmates. DVI generally delivered required TMHU approved care to TMHU inmates with less serious needs but did not provide adequate care to inmates with more acute presentations. Moreover, documentation at DVI often did not adequately reflect interventions that were targeted to reduce inmates' risks and attend to their presenting symptoms. Treatment

at SCC focused on psychotropic medication interventions with minimal supporting therapies.  At VSP, some orders entered in the EHRS records were inconsistent with clinical documentation.

Suicide risk assessments and safety planning were problematic across institutions.  The EHRS records showed that SRASHE documentation at ASP was inadequate.  However, post-TMHU five-day follow-ups at ASP were adequately completed and documented.  Suicide risk assessments at DVI were not consistently conducted prior to inmates' discharge and were overly reliant on inmates' self-reports.  Safety plans at SCC were not discussed with inmates prior to their discharge in all cases.  At VSP's TMHU, SRASHEs needed to be improved and safety plans were not consistently completed prior to inmates' discharge, including for those inmates placed in the TMHU due to suicidal ideation.  Some suicide risk assessments at VSP were improperly completed, documenting changes to suicide risk assessments of chronic risk over a period of days.

Emergency transfers were appropriately considered and initiated at ASP, but not at PVSP.

ASP, CTF, and DVI were compliant with daily clinical contacts in the TMHU, but psychiatrists at CTF did not appear engaged in the care of TMHU inmates.  Further, records at ASP indicated that daily PC clinical contacts occurred in confidential settings.  TMHU care at SCC consisted primarily of cell-front rounds with occasional confidential clinical encounters.  Daily PC contacts were provided at PVSP via telepsychiatry in confidential settings, and reasons for cell-front clinical contacts were documented.

The records reviewed indicated that ASP was compliant with completion of IDTTs within 72 hours of inmates' placement and weekly thereafter in its TMHU.  At SCC, IDTT

meetings were not consistently held as required. At DVI, there appeared to be coordination among treatment team members as documented in the records.

### Summary - TMHU

TMHU cells, which were developed as an alternative to higher levels of care, lack a therapeutic milieu and offer limited programming, treatment services and multi-disciplinary collaboration in comparison to established higher levels of care.

Compliance with CDCR's "COVID-19 Emergency Mental Health Treatment Guidance" varied across institutions. Daily clinical contacts generally occurred, but in some cases were conducted in non-confidential settings. Quality of care and documentation problems were noted at several institutions. Further, SRASHEs and safety plans were not appropriately completed in multiple TMHUs.

Although work continues, and public health considerations remain, defendants should approach the tasks of revising their guidance to staff, easing transfer to higher levels of care to the greatest extent possible while maintaining public health required precautions and improving efforts to mitigate the detrimental effects for those inmates remaining in TMHUs or treated in place in lieu of transfer to inpatient treatment, with a renewed sense of urgency.

D. **Administrative Segregation EOP Hubs**

COVID-19 restrictions limited treatment in the two EOP hubs reviewed, particularly structured therapeutic activities. Overall, care provided in the CHCF EOP hub was inadequate, whereas the care provided at CCWF was mixed.

Two of the ten institutions reviewed – CHCF and CCWF, had administrative segregation EOP hub programs.

EHRS reviews revealed that mental health care in the CHCF administrative segregation EOP hub was inadequate and that the significant psychiatrist vacancies meaningfully affected

care. Some inmates were not seen by psychiatry for months during their stays, and as reported below, psychiatrists did not attend IDTTs in the EOP hub. In addition, inmates in the EOP hub at CHCF were generally seen at cell-front for a variety of reasons including statewide mandatory or COVID-19 related lockdowns.

In the CCWF EOP hub, the lack of clear and consistent documentation in the EHRS records regarding the nature of the structured therapeutic activities offered inmates and the reasons for non-confidential contacts was persistent. EHRS documentation indicated that COVID-19 restrictions severely impacted the ability of clinicians to provide appropriate care with structured treatment goals in the program. Overall, the CCWF EOP hub program appropriately stabilized some inmates with complex mental health problems and/or referred them to inpatient care.

The randomly selected EHRS records reviewed regarding compliance with Program Guide requirements in the two EOP hub programs indicated that both CHCF and CCWF were compliant for initial PC contacts. For routine PC contacts, CCWF was compliant, while CHCF was not. Regarding initial psychiatric evaluations, CHCF was not compliant in any cases reviewed, while CCWF was 100-percent compliant for required initial psychiatric evaluations. Assessment of EHRS records requiring routine psychiatric contacts, showed that CHCF was noncompliant in all reviewed cases, while CCWF was 91 percent compliant.

CHCF was compliant with initial and routine IDTTs in the EHRS records reviewed. CCWF was also compliant with initial IDTTs and no routine IDTT was required during the review period for any inmate in the sample. CHCF was noncompliant for IDTT attendance for all disciplines; and notably, no psychiatrist attended any IDTTs during the review period. At CCWF, all attendees were present for required initial and routine IDTTs.

**Summary – EOP Hub**

In general, CCWF EOP did stabilize inmates in the EOP hub for complex mental health issues and/or appropriately referred them to inpatient care.

In the reviewed records, CCWF was consistently compliant with all Program Guide requirements for administrative segregation EOP hub programs, and CHCF was not. There were significant vacancies in psychiatry at CHCF which affected the quality of care provided. Psychiatrists did not attend IDTTs at CHCF, and some inmates were not seen by psychiatrists for months during their stay in the CHCF program. Cell-front contacts or the failure to document whether the contact was confidential or not was prevalent at both institutions.

**E.  MHCB**

Three institutions – CHCF, CCWF, and PBSP, of the ten reviewed had MHCB programs. The quality of care provided inmates in the MHCBs at these three institutions varied.

During the review period, CHCF admitted 339 inmates to its MHCB. Admissions to the MHCB at CCWF and PBSP were not determined for the review period. The average clinical length of stay in the MHCB at CHCF was 9.4 days and 6.8 days at PBSP. At CCWF, 86 percent of MHCB discharges occurred under ten days on average. Regarding physical discharges after clinical discharge, 11 percent of discharges at CCWF took longer than 72 hours to transfer. The average length of stay following clinical discharge was 3.2 days for CHCF and 1.4 days for PBSP.

During the review period, no inmates at CCWF and PBSP had three or more admissions, and three inmates at CHCF had three or more admissions. Six inmates at CCWF had two admissions in the review period.

Reviewed EHRS records indicated that MHCB treatment at CHCF was variable. For some reviewed cases at CHCF, there were deficiencies found regarding higher level of care

185

decisions, treatment planning, and documentation in the records. Care in the MHCB was found to be generally inadequate at CCWF and PBSP. Continuity of care at CCWF was deficient; the same PC saw an inmate only twice in one week, with other PCs covering the other days of the week; and significantly, other providers' progress notes, and documentation were apparently not considered in care decisions. Notably, at CCWF, clinicians routinely failed to follow-up on safety concerns or suicidal statements expressed by inmates, or to document treatment interventions during contacts in the MHCB.

Treatment noncompliance in the MHCB at PBSP was often unaddressed in treatment plans; deficiencies in treatment planning were identified in reviewed cases at CHCF. The quality of treatment plans at CCWF varied. Clinicians at CCWF and PBSP relied on the drop-down menus available in the interdisciplinary plan of care (IPOC) in EHRS for treatment planning. At PBSP, when clinicians employed the IPOC to generate treatment planning, the reviewed records indicated that they typically used one IPOC to develop treatment plans even for inmates presenting with multiple mental health issues during admission. In addition, the rationale offered for level of care decisions were often copied and pasted from one inmate's record to another.

However, when clinicians at both CCWF and PBSP developed treatment plans outside of the IPOC format, utilizing the treatment planning form in the EHRS, treatment planning tended to be individualized and documentation regarding higher level of care indicators, rationales for decisions, and revised treatment planning as a result of the decisions were found to be generally adequate in the reviewed records.

At CHCF, suicide risk evaluations and safety plans were completed prior to MHCB discharge in the EHRS records reviewed. CCWF discharged inmates from its MHCB regardless of whether the treatment goals had been met, or the inmate's risk of suicide remained elevated.

In some cases, referral to higher level of care was not considered during MHCB placement at CCWF. The rationale for level of care decisions at discharge from the MHCB at CCWF and PBSP was found to be deficient in the records reviewed.

Random samples of EHRS records reviewed regarding compliance with Program Guide requirements indicated that CHCF and CCWF were compliant with initial psychiatry evaluations in the MHCB; PBSP was not. Regarding PC evaluations within 24 hours of admission, CCWF and PBSP were compliant, while CHCF was noncompliant.

For initial IDTTs within 72 hours of admission, CHCF, CCWF, and PBSP were compliant in the EHRS records reviewed. None of the institutions were compliant for routine IDTTs: CHCF was 78 percent compliant, CCWF was 80 percent compliant and PBSP was 44 percent compliant. At CCWF, all inmates were discharged through appropriate discharge IDTTs. CHCF and PBSP were noncompliant for discharge IDTTs in the reviewed EHRS records.

CCWF was compliant for required attendees at IDTTs in the MHCB and CHCF was noncompliant. No information related to compliance with MHCB IDTT attendance was gathered for PBSP. PBSP utilized telepsychiatry for some IDTTs during the review period.

The reviewed EHRS records indicated that for daily clinical contact, CHCF was 97 percent compliant; PBSP was compliant at 90 percent or more. Daily clinical contact at CCWF was not determined in the reviewed records. CHCF and PBSP were noncompliant with twice-weekly psychiatry contacts in their MHCBs. Assessment of twice-weekly contacts in the MHCB at CCWF was not completed during the EHRS review.

Multiple psychiatrist and PC contacts occurred in nonconfidential settings, without documenting the reason, or the confidentiality of the setting was not documented in the EHRS.

Overall, in the MHCBs at all three institutions, non-confidential contacts for psychiatrists and PCs were the norm. At CCWF, a significant number of PC contacts occurred cell-front without documentation of inmate refusal. At CHCF, only ten percent of daily PC contacts were confidential. Also, at CCWF, nearly half of the twice-weekly psychiatry contacts occurred cell-front, while at PBSP, confidential twice-weekly psychiatry contacts occurred in only ten percent of reviewed cases. In many instances in the reviewed records, MHCB clinicians at these institutions failed to document whether contacts were confidential or not.

### Summary – MHCB

In general, inmates were admitted to MHCB for ten days or less, and a very small number of inmates had three or more MHCB admissions during the review period. The quality of care provided inmates in the MHCB at CCWF and PBSP were found to be generally inadequate and at CHCF to be variable. Compliance with Program Guide requirements regarding clinical contacts and IDTTs was variable, as was attendance of required staff. Compliance with daily clinical contacts occurred at CHCF and PBSP, whereas the same institutions were not compliant with required psychiatric contacts. Treatment at CCWF demonstrated insufficient continuity of care and treatment planning did not adequately address safety planning. Treatment planning at all three programs demonstrated inadequate consideration for referral to ICF or APP. Contacts in nonconfidential settings were prevalent in each MHCB reviewed.

### F.  STRH

Treatment provided in STRH was found to be generally adequate.

CCWF had a non-reception center STRH program for females, and PBSP and PVSP had non-reception center STRH programs for male inmates. The EHRS record reviewed from CCWF indicated inconsistent documentation between PCs and psychiatrists, signifying an absence of appropriate care coordination between the two disciplines. Treatment planning for

the inmates also reflected this absence of coordination. Treatment provided in the STRH at PBSP was generally adequate in the EHRS records reviewed. However, there was a need for improvement regarding treatment goals and their relationships to diagnoses and presenting symptoms and complaints. PVSP also provided generally adequate care, although some PCs copied and pasted notes from contact to contact and at times across inmates. Treatment plans were sometimes not updated to include a rating of current symptoms and problem descriptions. The records reviewed indicated minimal impact to COVID-19 on the services provided in the STRH at PVSP.

EHRS reviewed cases showed compliance for Program Guide requirements for timeliness of psychiatry and PC contacts, and IDTT meetings at CCWF. Compliance at PBSP, and PVSP was mixed.

Regarding initial psychiatric evaluations, CCWF was 78 percent compliant, PBSP was 36 percent compliant, and PVSP was 29 percent compliant. CCWF was 100 percent compliant for routine psychiatric contacts, PBSP was 93 percent compliant, and PVSP was 93 percent compliant. For initial PC assessments, CCWF was noncompliant at 78 percent, and both PBSP and PVSP were compliant at 93 percent. EHRS reviews for routine PC contacts showed that CCWF was noncompliant at 61 percent, PBSP was noncompliant at 62 percent, and PVSP was noncompliant at 75 percent. Clinical contacts across cases reviewed at CCWF were conducted at cell-front; justification for the use of nonconfidential settings was not consistently documented at CCWF. There was a pattern of cell-front contacts occurring at PBSP. PVSP continued confidential contacts during the review period.

The STRH program at CCWF was close to compliance regarding the timeliness of initial IDTTs at 89 percent compliance, PBSP was compliant at 93 percent, and PVSP was

noncompliant at 80 percent. No inmates at CCWF required quarterly IDTTs among the records reviewed. PBSP and PVSP were compliant for quarterly IDTTs at 100 percent. Required team members attended 100 percent of initial IDTTs at CCWF, and 90 percent attended initial IDTTs at PVSP. PBSP was compliant regarding attendance at both initial and routine IDTTs.

### Summary – STRH

Treatment provided in the STRH at PBSP and PVSP was generally adequate; however, compliance with Program Guide requirements for timeliness of psychiatry and PC contacts and IDTT meetings was not consistent throughout the review period. EHRS record reviews indicated that at CCWF, which was also noncompliant with multiple Program Guide requirements, there was an absence of coordination between the treating clinical disciplines, which was reflected in treatment planning. There was a need to improve treatment goals in relationship to diagnoses and presenting symptoms and to continuously update treatment plans to include current symptoms and current problem description.

### G.   EOP

Four of the ten institutions reviewed in the Hybrid EHRS/Paper Review - CCWF, CHCF, SQ, and VSP, had EOP programs, which included the condemned EOP program at SQ. Reviewed EOP programs were not consistently compliant with Program Guide requirements.

Overall, quality of care provided at the reviewed institutions varied. Record reviews indicated that quality of care provided in the EOP program at CHCF was generally inadequate. Several PC progress notes at CHCF remained unchanged from contact to contact. Treatment planning was deficient, with some treatment plans containing conflicting diagnoses and not documenting specific symptoms to support the diagnoses. Multiple reviewed cases indicated that treatment goals were generic and lacked baseline data. While EHRS records contained documentation of modified programming or quarantine related to COVID-19, it was clear that

190

programming and access to treatment were connected to the mental health tier system developed by CDCR in response to the COVID-19 pandemic.

The EHRS records reviewed revealed that in the main, adequate care was provided to inmates in CCWF's EOP program.  In those cases where COVID-19 restrictions impacted the care provided, modifications were appropriately documented.  Also, clinicians completed clinically useful progress notes, and IDTTs developed adequate treatment plans.

Mental health care provided to EOP inmates at VSP was marginally adequate.  Overall, there was an absence of active treatment being provided to inmates in the program.  There was insufficient documentation why some inmates were offered substantially more programming than others.  Where departure from requirements appeared to be related to COVID-19 restrictions, documentation was not always clear.  Although overall psychiatric care appeared adequate, it was unclear whether psychiatrists actually attended IDTTs at VSP.

For the condemned EOP program at SQ, COVID-19 restrictions impacted programming meaningfully, resulting in inadequate care being provided to inmates.  Of note, the reviewed EHRS records showed that multiple treatment plans were inadequate and had not been modified to take into account COVID-19 restrictions.  It was not uncommon for treatment plans and progress notes to simply indicate that inmates will be seen at cell-front due to COVID-19 precautions.  Although structured and unstructured therapeutic activities had been suspended, there was no documentation that in-cell mental health treatment materials were offered to inmates to help compensate for the absence of out-of-cell activities.

CCWF, CHCF, and VSP were compliant with initial PC contacts.  None of the condemned inmate records reviewed at SQ required an initial PC contact.  None of the

institutions were compliant with routine PC contacts: CHCF was 74 percent compliant, CCWF was 82 percent compliant, SQ was 88 percent compliant, and VSP was 81 percent compliant.

Regarding initial psychiatric assessments, CCWF and VSP were 100 percent compliant, but CHCF was not compliant at the rate of 67 percent. No condemned EOP inmates at SQ required an initial psychiatric evaluation. The condemned EOP program at SQ was compliant with routine psychiatric contacts, with 94 percent of contacts occurring within Program Guide timeframes; however, 83 percent of these contacts occurred cell-front. The other three institutions were not compliant: CHCF was 55 percent compliant, CCWF was 81 percent compliant, and VSP was 53 percent compliant. Forty-five percent of reviewed psychiatry contacts at CHCF occurred via telepsychiatry. Further, PC and psychiatry contacts at CHCF were generally held cell-front; in some cases, documentation indicated that cell-front contacts were due to modified programming.

CHCF and CCWF were compliant with initial and routine IDTTs during the review period. VSP was not compliant with initial IDTTs at 73 percent and routine IDTT at 81 percent. No reviewed inmates in the condemned EOP program at SQ required initial IDTTs; the program was 90 percent compliant for routine IDTTs. Staff attendance at initial IDTTs at CHCF was not compliant, and the institution was 89 percent compliant for attendance at routine IDTTs. CCWF was 100 percent compliant for initial and routine IDTT attendance in the reviewed records. VSP achieved 100 percent compliance for initial IDTTs and 85 percent for routine IDTTs. No inmates in the records reviewed required an initial IDTT in SQ's condemned EOP program. The program was not compliant for attendance at routine IDTTs, and absent attendees included most disciplines. It was not discernible from the documentation that the attendees at all institutions were the clinicians assigned to the inmates. Multiple IDTTs at CHCF were held in absentia.

**Summary – EOP Program**

The quality of care provided varied across the four programs. The EHRS records reviewed showed that EOP treatment provided to inmates at CHCF was generally inadequate, while EOP care provided at CCWF was found to be adequate. At VSP, while clinicians' progress notes were appropriate and treatment plans were adequate, EOP treatment was marginally adequate. Some inmates received sufficient programming while others did not, without explanation documented in records. While psychiatric care at VSP appeared adequate, it was unclear from some of the records reviewed that psychiatrists attended IDTTs. In general, adequate care was not provided in the condemned EOP population at SQ. Specifically, EOP care was meaningfully hampered by COVID-19 restrictions, and there was no documentation that inmates were provided mental health treatment materials to use in their cells.

### H.    3CMS

All ten institutions covered in this report- ASP, CCWF, CHCF, CTF, DVI, PBSP, PVSP, SCC, SQ, and VSP, had 3CMS programs. Adequacy of care provided to 3CMS inmates varied across institutions.

The EHRS records reviewed that, in general, ASP, PVSP, SCC, SQ, and VSP provided adequate care to inmates in their 3CMS programs. The care provided at CHCF in the 3CMS program was variable; however, most inmates in the 3CMS level of care at CHCF received inadequate care. Psychiatry vacancies impacted care provided to 3CMS inmates at CHCF. At CCWF, review of EHRS records indicated that 3CMS care was inadequate. While psychiatric services in the 3CMS program at CCWF appeared clinically appropriate, multiple treatment plans reviewed at CCWF were deficient; documentation in some cases appeared to be copied from one assessment or treatment plan to another. PC contacts in the 3CMS program at CTF were generally individualized. DVI did not provide adequate care in its 3CMS programs in the

reviewed records; however, psychiatry and PC treatment were supportive of inmates.  Treatment planning in the records reviewed was insufficient, notably around treatment interventions and discharge planning.  Care provided at PBSP in its 3CMS program was variable.

EHRS records reviewed regarding initial psychiatric evaluations indicated that ASP, CCWF, and PBSP were compliant; each completed all required initial psychiatric contacts in the review period.  CTF, DVI, PVSP, SCC, and VSP were noncompliant with initial psychiatric contacts.  No inmates in the reviewed records at CHCF and SQ required initial psychiatric evaluations.  ASP, CTF, SQ, and VSP, were compliant for initial PC contacts, completing all required initial PC contacts timely.  CCWF, DVI, PBSP, PVSP and SCC were noncompliant for initial PC contacts at a rate of 20 percent to 83 percent.  CHCF's records reviewed did not include any inmates requiring initial PC contacts.

The reviewed records indicated that ASP, PBSP, PVSP, and SCC completed all required routine psychiatric contacts in the review period.  CHCF, CCWF, CTF, DVI, SQ and VSP were noncompliant with routine psychiatric contacts attaining 15 percent to 80 percent compliance.  Regarding routine PC contacts - ASP, DVI, PBSP, PVSP, and SCC were compliant with routine PC contacts at the rate of 93 percent to 100 percent compliance.  CHCF, CCWF, CTF, SQ, and VSP were noncompliant with routine PC contacts at the rate of 60 percent to 83 percent.

ASP, CTF, PVSP, SQ and VSP completed all required initial IDTTs timely as documented in the EHRS records reviewed.  DVI, PBSP, and SCC were noncompliant with initial IDTTs with compliance levels of 17 percent to 77 percent.  No inmate in the records reviewed for CHCF required an initial IDTT.  For routine IDTTs, ASP and PBSP timely completed all required routine IDTTs in the reviewed records.  CTF was 91 percent compliant

and PBSP was 96 percent compliant for routine IDTTs. DVI was near compliance at 89 percent. CCWF, CHCF, SCC, SQ, and VSP were noncompliant in the range of 40 percent to 67 percent.

All required disciplines attended initial IDTTs at ASP, CCWF, DVI, PBSP, PVSP, SCC, SQ, and VSP. CTF was noncompliant at 67 percent for attendance at initial IDTTs. Regarding routine IDTTs, required disciplines were present at ASP, CCWF, DVI, PBSP, PVSP, SCC, and SQ. CHCF, CTF, and VSP, were noncompliant in the range of 43 percent to 82 percent for attendance at routine IDTTs. It was not documented that the attending IDTT staff were the assigned clinicians for each inmate.

### I.    Condemned 3CMS

The EHRS records review indicated that CCWF did not consistently provide adequate care to inmates in its condemned 3CMS program. Clinically appropriate care consistent with treatment plans that corresponded to inmates' needs was not provided to all inmates in CCWF's condemned 3CMS program. The quality of care provided in SQ's condemned 3CMS was inadequate. Treatment plans developed for the condemned 3CMS inmates at SQ were insufficient, and many were outdated, containing generic goals and vague interventions. Generally, consideration of referral to higher levels of care for condemned 3CMS inmates did not occur in IDTTs.

In the condemned 3CMS programs at CCWF and SQ, no inmates in the EHRS records reviewed required initial psychiatric evaluations, PC assessments or initial IDTTs. The condemned 3CMS program at CCWF was compliant for routine psychiatric contacts, PC contacts, and IDTTs in the EHRS records review. Staff attendance at IDTTs was 50 percent compliance. The EHRS records reviewed indicated that the SQ condemned 3CMS program was 85 percent compliant for routine psychiatry contacts, 26 percent compliant for routine PC

contacts and 80 percent compliant for routine IDTTs.  Staff attendance at IDTTs were 83 percent compliant.

**Summary – 3CMS**

Half of the ten reviewed non-condemned 3CMS programs provided adequate care to the inmates.  The quality of care provided by the remaining five 3CMS programs were either variable or inadequate.

The condemned 3CMS programs at CCWF and SQ did not provide adequate care to inmates.

While no institution was compliant with all Program Guide requirements regarding clinical contacts, a number of institutions consistently achieved compliance with multiple requirements.

**J.   Review of the RVR Process**

Samples of RVRs were reviewed at all ten Hybrid EHRS/Paper Review institutions - ASP, CCWF, CHCF, CTF, DVI, PBSP, PVSP, SCC, SQ, and VSP.  Multiple institutions continued to fail to meet basic requirements of the RVR process.

No institution demonstrated compliance with timely requests for mental health assessments in the reviewed records.  ASP, CHCF, SCC, SQ, and VSP documented greater than 50 percent compliance, and the remaining five institutions - CCWF, CTF, DVI, PBSP, and PVSP, achieved 50 percent compliance or less.

Mental health clinicians at five institutions - CCWF, CHCF, DVI, PVSP, and SCC, completed and returned mental health assessments to custody staff within required timeframes. Four of the remaining institutions - ASP, CTF, SQ, and VSP, were noncompliant with timely completion and return of mental health assessments in the reviewed records, in the range of 55

percent to 86 percent compliance.  PBSP's compliance with this measure was not documented during the review.

Multiple clinicians at PBSP recommended in the mental health assessments that senior hearing officers not limit access to mental health treatment as punishment, as well as used canned language in completing the RVR mental health assessment form.  At SQ, some senior hearing officers inappropriately employed developmental/cognitive functioning deficit language regarding decisions related to whether the inmate's mental health had played a role in the inmate's behavior that led to the issuance of the RVR.  Some clinicians' responses to questions on the RVR mental health assessment form revealed that they did not understand the range of penalties available to the senior hearing officer when assessing punishment for an RVR.

Two of the institutions in RVR review - ASP and CHCF, were compliant with documentation of consideration of the mental health assessment by senior hearing officers. CCWF, CTF, DVI, PBSP, SQ, and VSP were noncompliant in the range of 13 percent to 75 percent of the reviewed RVR records.  Compliance by PVSP and SCC was not documented in this review.

In the sample of adjudicated RVRs reviewed, clinicians at CHCF recommended mitigation in all reviewed cases, all of which were mitigated by senior hearing officers. Clinicians at ASP, CCWF, CTF, SCC, SQ, and VSP recommended mitigation in a range of 50 percent to 73 percent of the reviewed cases.  Out of six cases reviewed at PVSP, mitigation was recommended in one case.  DVI and PBSP's clinicians did not recommend mitigation in any of the cases reviewed.  Where clinicians recommended mitigation, senior hearing officers mitigated penalties in all cases at ASP, SCC, and VSP.  Mitigation occurred in 92 percent of cases recommended at CCWF, 75 percent at SQ, 60 percent at CTF, and 50 percent at DVI in the

reviewed cases.  At CTF and DVI, senior hearing officers mitigated penalties even when clinicians had not recommended mitigation.  At ASP, CCWF, and DVI, clinicians also recommended alternative discipline in some cases.  Policy at CCWF and DVI may not have been followed regarding clinicians' alternative discipline recommendations; no documentation was found in the RVR packages indicating a captain's review had occurred, nor did the senior hearing officer address a captain's review and decision in the RVR records provided.

### Summary - RVR Process

Institutions failed to timely request mental health assessments and timely complete and return them.  Documentation of consideration of the mental health assessment by a senior hearing officer remained noncompliant at several institutions.  At a number of institutions, clinicians continued to exhibit confusion regarding recommendations of the factors that a senior hearing officer must consider when assessing penalties for RVRs, including inappropriately recommending continuation of mental health programming; discontinuation of mental health services is not an allowable penalty.

## V.    CONCLUSION

After all the impediments, surprises, uncertainty, and loss that has occurred during this monitoring round, one might expect, and reasonably so, that any advancement of the case had ceased. But instead, the opposite is true.  As detailed in this report, progress is still being made and the case is moving forward.  This is so irrespective of the voluminous number of pleadings that have been filed in this case which somewhat deceivingly give the impression that the parties have dug in their heels and are rarely, if ever, in agreement.

To the contrary, the parties continue to work collaboratively, particularly through the COVID-19 Task Force and with the assistance of the CDCR and DSH small workgroups, to address improvements, policy issues, and other pressing matters as they surface.  The COVID-19

Task Force is beneficial to the parties, the Court, and the *Coleman* class members and should continue.

For the reasons stated herein, the Special Master believes that COVID-19 has been, and continues to be, enough of a challenge and therefore offers no formal recommendations and makes no request for any additional orders.

Respectfully submitted,

/s/ *Matthew A. Lopes, Jr., Esq.*
Matthew A. Lopes, Jr., Esq.
Special Master

March 5, 2021

# APPENDIX A

# SPECIAL MASTER'S DATA EXPERT REPORT

**<u>Special Master's Data Expert Report</u>**

**<u>Background</u>**

Data that accurately measures defendants' compliance with Program Guide and other court-ordered requirements for a constitutionally adequate mental health service system is an indispensable element of assessing whether defendants are meeting those requirements. An acceptable quality management system ("QA system") that relies on such data is a primary mechanism for defendants to attain compliance and demonstrate their ability to self-diagnose and self-correct any backsliding which may occur over time, thus eventually eliminating the need for federal court oversight. ECF No. 5092 at 4-5.

A benchmark indicator ("indicator") measures the rate at which a business requirement is satisfied. By necessity, the design of an indicator depends on both the business requirement and the available data produced in the context of that business requirement. When a design is possible, the design must be operationalized in such a manner that the actual operation ("actual operation") of the indicator matches its intended operation ("intended operation"). Implicit in this is that there is appropriate data available to correctly measure the business requirement.

In CDCR, indicators designed to measure Program Guide compliance rely on a series of business rules to describe and implement their operation. To be considered accurate, the business rules must be designed with fidelity to the dictates of the Program Guide and rely on data that is appropriate to achieve the intended purpose. The actual operation of the indicator must then match its intended operation.

In order to determine whether an indicator is accurate requires both careful review of its design to determine if it will indeed correctly measure its business requirement, and comparison

201

of its intended operation with its actual operation[57]  In other words, the system must not only give a technically precise correct answer to a query, but it must also ask the right question and have access to information appropriate to answer that question.

The watchwords for an acceptable data system are accuracy, transparency, and sustainability.  Unfortunately, defendants' mental health data systems are not currently sufficient on any of these fronts.[58]  Remediation is required so that trust in defendants' data can be established.  This can only be accomplished through meticulous assessment of what the system currently does, what it needs to do in order to be sufficient to the task at hand, and what it needs to maintain sufficiency over time.

The defendants can demonstrate their management of an acceptable QA system by verifying its accuracy using the approach outlined above and by having appropriate processes in place to ensure that the system remains accurate over time as the MHSDS evolves, and as the Court orders, and defendants' personnel change.  Providing sufficient transparency to all primary stakeholders as this process occurs and in an ongoing manner, would then allow the conclusion that the system is accurate, and the management is appropriate.

Because of the centrality of data to the monitoring and ultimate resolution of this case, the Special Master had long planned to conduct a systematic review of defendants' mental health data collection, calculation, and reporting systems.  Assessing a complex data and reporting

---

[57] The language of software validation and verification express these steps as asking, "did we build the right product?" and "is the product built correctly?"

[58] Detailed design specifications validated against business requirements are required to determine whether or not a particular indicator is designed correctly and operating correctly (i.e., accurate).  CDCR's production of detailed indicator and business rule specifications in the Business Rules and Methodology Review meeting which began on October 21, 2020, have already unearthed mismatches between current indicator designs, and compliance rates they are intended to measure. As these issues are discovered CDCR is taking steps to remediate them. However, many indicators and business rules have yet to be examined.

system used by a sprawling organization such as CDCR is an arduous task even under optimal or usual circumstances.

Here, the circumstances are neither optimal nor usual. Instead, the issue of data accuracy was suddenly thrust to the fore when, on October 4, 2018, the *Plata* Receiver provided the Special Master with a whistleblower report written by CDCR's Chief Psychiatrist, Dr. Michael Golding (Golding Report), which alleged systemic inaccuracies in some of the data defendants had provided to the Court, the Special Master, and/or plaintiffs suggesting the possibility that these data were materially misleading. The shadow of doubt cast by these allegations came to extend well-beyond the specific areas described in the Golding Report to the entire range of automated data defendants produced. This had far-reaching effects. Two of the most immediate and consequential sequelae were the halt of the expanded roll-out of the Continuous Quality Improvement Tool (CQIT) and the scuttling of an almost consummated agreement between the parties to reduce psychiatric staffing allocations. ECF No. 6705. *See* Special Master's Initial Report on Data Issues Within the California Department of Corrections and Rehabilitation June 8, 2020 for a more complete summary of these issues.

Among the cascade of events flowing from the Golding Report was the Court's appointment on December 14, 2018 of a neutral expert [ECF No. 6064 at 2] whose report [ECF No. 6147] was followed by a hearing to ascertain whether defendants had intentionally provided misleading information to the Court and the Special Master. A primary focus of the neutral expert's investigation was "…to determine whether defendants [had] committed any fraud on the court or the Special Master, [or if they had] intentionally provided false or misleading information to the court or the Special Master." ECF No. 6064 at 1-2. The neutral expert issued his filed report on May 3, 2019. ECF No. 6147.

Subsequent to the filing of the neutral expert's report, the Special Master and his team worked with defendants to examine some specific data-related deficiencies to which the Golding Report and the neutral expert's investigation brought focused attention. Still unaddressed, however, were global concerns as to the accuracy of defendants' data and the systems and methods by which it was produced and overseen. Stalled progress on important initiatives such as CQIT could not be jumpstarted until the data issues were resolved. Equally important to resolving technical concerns about the data was the need to create a framework to restore the trust which had significantly eroded over the course of the Golding Report, the ensuing investigations, and broader data issues arising from those events as well as during the Special Master's central office monitoring.

It was in that context and in response to the Court's order of January 7, 2020 [ECF No. 6441] that the Special Master filed his proposal for additional staff [ECF No. 6461] on February 12, 2020 where he included a discussion of a need for a team focused on data-related issues. *Id.* at 3-4. That request broadly outlined the proposed scope of work for the Special Master's data expert noting that he was "…. seeking to hire an expert in data quality management who would be responsible for advising him on all mental health data-related issues and also working with both CDCR and the *Plata* Receiver's Quality Management departments on the same." *Id.* The Special Maser repeated this proposed scope of work for the data expert when he requested on April 13, 2020 that the Court approve the retention of Daniel F. Potter, PhD, CAIA as his data expert [ECF No. 6604], a request granted by the Court on April 29, 2020. ECF No. 6646. On May 8, 2020, the Court ordered the Special Master to report on the progress made by his data expert in analyzing defendants' reports which underlay the Enhanced Outpatient Program (EOP) Administrative Segregation Unit (ASU) hub certification process. ECF No. 6661 at 20. On

June 8, 2020 the Special Master filed this Initial Report on Data Issues Within the California

Department of Corrections and Rehabilitation.  ECF No. 6705.  In that report, the Special Master

recommended that the Court order a subsequent report within 90 days so that his "…data expert

[would] have had the opportunity to conduct a more thorough analysis of the defendants' data

systems."  *Id*. at 21.

On September 3, 2020, the Court issued an order providing that it "…anticipates

discussing the schedule for completion of [data and quality assurance] remediation at the final

quarterly status conference of this year."  ECF No. 6846 at 27.  That status conference was set

for December 18, 2020.  In a minute order of September 8, 2020, the Court "decline[d] to adopt

the Special Master's recommendation that he be required to file a further report on data issues."

ECF No. 6847.  The Court noted its expectations that "…all stakeholders … be fully prepared at

the time of the 12/18/2020 Status Conference to set a firm schedule for completion of necessary

data and quality assurance remediation."  *Id*.  The Special Master was authorized to appoint Dr.

Potter (data expert) to his team on April 29, 2020.  ECF No. 6646.  It was against this backdrop

that Dr. Potter began his work in the midst of the COVID-19 crisis, which precluded his travel to

California for face-to-face meetings or demonstrations.  That work has continued to date.  The

Special Master convened teleconferences with the parties on December 14 and 15, 2020

concerning remediation efforts in general and specifically to discuss the development of a

roadmap for completion.

### Initial Activities of the Data Expert

On June 8, 2020, the Special Master submitted his initial report to the Court on data

issues within the CDCR.  ECF No. 6705.  His report discussed Dr. Potter's activities since his

appointment, which included meeting with staff from the Receiver's office regarding CDCR's

information technology systems and infrastructure, completing initial reviews of mental health business intelligence, and creating on-demand reports and change policies around mental health quality management.  He also worked to understand the data and policies regarding *Coleman* class members, the CDCR population generally, and COVID-19 within CDCR.  Further, Dr. Potter required orientation to a myriad of factors unique to the *Coleman* context.  Before work could begin on analyzing the accuracy of any specific performance indicator, Dr. Potter first had to become familiar with the history and context described above.  In order to operate effectively, he also needed to understand the unique organizational structure within CDCR, where different aspects of the systems he was required to assess were overseen by different entities and responded to different Federal Courts.  It was necessary, too, that he review and understand the key aspects of the Program Guides, the allegations contained in the Golding Report, the neutral expert's investigation, and the resolution of those by the Court.

Moving beyond these contextual complexities, Dr. Potter set out to gain a sufficiently detailed understanding of defendants' sprawling system for data entry, storage, retrieval, analysis, and reporting, as well as some of the conditions and criteria (i.e., workflows) that generate data, and some of the ways the analyzed data are used.  Only then could work begin in earnest to see how any given measure was defined, calculated, and reported, and whether that was concordant with the requirements of the Program Guide and orders of the Court.

To make detailed recommendations as to how defendants could create an adequate data management system which produced certifiably accurate compliance data, Dr. Potter had to analyze:

1. Defendants' requirements outlined in the Program Guide, parameters of measure, and data reporting,

2. How accurately defendants' business rules reflected and measured the requirements of the Program Guide.  There are two key questions: Does the <u>intended operation</u> of a business rule agree with Program Guide requirements?  Does the <u>actual operation</u> of each business rule match its intended operation?,

3. The nature of the current systems to collect, calculate, and produce data, as well as where and how data were stored and retrieved within the system (The answer to the two questions above consider not only the output of a business rule, but also whether inputs are correct.  The data being analyzed must be appropriate for the business rule at hand.  It must be collected free from unintended (or intentional) bias, with neither errors of omission nor of commission), and

4. Defendants' current change management process and system for controlling and documenting revisions to the business rules or data calculation methods once a particular measure was accurately defined and operationalized.

These are complex and time-consuming tasks under the best of circumstances, made more so by the disordered state of what Dr. Potter found.  Defendants' system was developed predominately by highly capable and dedicated laypeople (Mental Health QA Staff).  As a result, it lacks many of the documentation and other requirements standard for systems developed by data and computer science experts[59].  Consequently, understanding how the data system currently operates was considerably more time-consuming to unravel than would have been the case had the system been built by professionals in the field.

Dr. Potter first needed to know what was being done before he could assess what he could recommend should be done.  Unfortunately, much of the system had been developed on an ad hoc basis, with little to no documentation.  In many instances, working with the defendants to review its actual operation program code line by program code line, was the most efficient

---

[59] Development of the system has occurred incrementally over a period of more than ten years and the system was adapted to operate with additional CDCR/CCHCS data systems, including SOMS and EHRS.  It is Dr. Potter's understanding that in 2020, CCHCS IT professional programmers began to manage the deployment of MH software releases using a versioned software approach  and that on February 4, 2021, CCHCS IT reviewed software unit testing frameworks with  Mental Health Program QA Staff.  Both of these efforts are steps in the right direction.

manner for him to gain an understanding of important details on its current architecture and operation.

To put in context the length of time Dr. Potter has devoted to his assessment, it is noteworthy that the Receiver in June 2018 commissioned a study to assess whether 16 performance measures reported on the public dashboard accurately reflected Electronic Health Records System (EHRS) data.  Report on Health Care Services Dashboard, August 27, 2019. The report on the findings of that study was issued some 14 months later, on August 27, 2019. Although highly technical and undoubtedly time-consuming, the focus of that study was more limited in scope than the review undertaken by Dr. Potter.  The study essentially analyzed fidelity between the CCHCS-drafted "Dashboard 5.0 Glossary" which provided operational requirements (i.e., the intended operation) for 16 measures and the data output (i.e., actual operation) presented on the dashboard for those 16 measures.  The glossary defines these measures in terms of business rules, and the study assessed whether the intended operation of the relevant business rules as defined in the glossary matched their actual operation.  This was done by checking whether each measure's outputs, as reported on the dashboard, were accurately computed, and by feeding different sets of synthetic data into the rules and again comparing the actual results with the intended results.

In contrast, Dr. Potter is required to assess whether the business rules which make up the indicators accurately reflect Program Guide requirements, and whether or not they seem reasonable given both the workflows being used and the data available to them.  This work necessarily requires a precise enough description to determine whether or not the intended operation of the rule is in concordance with the Program Guide.  Where the Program Guide language requirements needed elucidation as to their clinical or operational significance, Dr.

Potter had to consult with the Special Master's clinical experts.  And as a matter of practical importance, while many software systems have requirements and specifications that describe the intended operation of many, if not all of their components and subcomponents, the CDCR Mental Health Program Data System, for the most part, does not.  This lack of documentation extends to their current indicators and business rules.

Therefore, Dr. Potter has requested CDCR Mental Health to produce this information, and as matter of expediency, the Special Master data team, Dr. Potter, and CDCR have been working together in order to produce sufficiently precise information for the current system. This group effort is also engaged to identify business rule deficiencies and remediations as they relate to concordance with the Program Guide.  Only then can he move on to questions of whether, given the correct definition of the inquiry, the calculations and presentation of some of the data are accurate.

Dr. Potter set out to review the processes being utilized to produce QA measurements, and worked with CDCR to develop recommendations that, when implemented, will help ensure that they are accurate, transparent, sustainable, and consistent with the Program Guide.

### **General Deliverables of the Data Expert**

At present, the general deliverables for Dr. Potter are as follows:

1.  Review the processes being utilized to produce QA measurements and work with CDCR to develop recommendations that, when implemented, will help ensure that they are accurate, transparent, and sustainable.  These recommendations must include steps that CDCR can take to help ensure that once an acceptable QA system is developed, structures are in place to ensure that it continues to be maintained and operated in an acceptable manner.

2.  Review the QA Change Management Process and work with CDCR to develop recommendations that, when implemented, will ensure that this process and its results are readily understandable to all relevant parties.  These recommendations must include steps that CDCR can take to help ensure the QA system is maintained

and operated in an accurate and transparent manner in the future.  In other words, that they are sustainable.

3.    As possible, certify sections of the QA system that are being maintained and operated in an accurate, transparent, and sustainable fashion.

**Subsequent Activities of the Data Expert**

To assess and begin to address these, Dr. Potter has, to date, reviewed over 350 documents relevant to his work, and conducted approximately 60 interviews of relevant staff. Dr. Potter engaged with CDCR to gain sufficient access to the QA system as an end user.  He reviewed various components of the On-Demand reporting system developed by CDCR MH, including the On-Demand Performance Report documentation that is available to end-users as they use the system.  Dr. Potter and CDCR IT worked together to create a live snap-shot MH QA data system ("Validation Sandbox").  This has allowed Dr. Potter to run tests, analyses, and experiments without the risk of impacting other users.

At Dr. Potter's request, CDCR IT granted him with read-only access to some parts of the CDCR software control system.  CDCR IT has also shared documentation on their software management process.  He has used this access to review software development information related to the On-Demand system.

Working with Dr. David Leidner ("System Architect"), Dr. Potter has utilized a top-down approach to trace the operation of several key statistics included in the On-Demand Performance Reports down to the Datawarehouse layer of the system, and a bottom-up approach to understand how operational data from sources such as the CDCR EHRS, the Department of State Hospitals (DSH), and the Strategic Offender Management System (SOMS) are collected in order to be fed into the Datawarehouse.

With CDCR IT and CDCR MH assistance, Dr. Potter was given the ability to run a deprecated version of the CQIT template report. Dr. Potter was told development on this functionality had been discontinued and removed from use in the aftermath of the Golding Report, so no current version is available. Dr. Potter was also provided access to the software CQIT Tool application that had previously been used to gather CQIT data during onsite audits. This application is currently referred to as the CQIT Legacy Tool application since it is in the process of being replaced. Dr. Potter requested details on the replacement CQIT Tool, and CDCR briefed him and a Deputy Special Master on the status of that project. During this briefing, CDCR Mental Health Program reported that if needed, the original CQIT template report could be brought back online, and that Legacy CQIT tool still remains available for Mental Health onsite audit use.

In order to further expedite this work, Dr. Potter worked with the System Architect to develop an example of the detailed and specific information ("precise information") that is being requested in order to check the intended operation of the system with its actual operation. The manner in which it is deployed also satisfies many transparency requirements for QA system certification.

### Task Force Meetings, Data and CQI Meetings and Work Groups

During the May 26, 2020 Task Force meeting, the defendants presented a revised proposal on how to modify the EOP ASU Hub Certification process during the COVID-19 pandemic. Additionally, the Special Master reported that Dr. Potter would be working with Dr. Leidner of CDCR in starting the project to examine and validate the data related to the EOP ASU Hub certification process. At the following Task Force meeting on June 2, 2020, plaintiffs raised their concerns that the revised proposal was concerning, as was the entire certification process.

At the next Task Force meeting on June 9, 2020, the Special Master reported that he planned to set up a separate small work group to address the issues of the EOP ASU Hub certification process. He said that he would bring in Dr. Potter so that everything was transparent, and everyone could be comfortable in what was being reported monthly. At the June 16, 2020 Task Force meeting, it was reported that the small work group had begun their work, and they determined that their first step would be to invite the plaintiffs to a future meeting to express their concerns about the process. On June 23, 2020, plaintiffs attended the EOP ASU Hub small work group and expressed their concerns about the process. They also submitted those concerns in writing to defendants and the Special Master on June 19, 2020.

At the July 7, 2020 Task Force meeting, defendants reported that the plan was to focus on the issue of certification during the COVID-19 pandemic until Dr. Potter got a better handle on CDCR's data systems. Beginning on August 4, 2020, Dr. Potter began regularly attending the Task Force meetings. At that meeting, plaintiffs were invited to comment on the revised certification process due to COVID-19. Dr. Potter reported that he was working on the EOP ASU Hub certification process and looking at the indicators, the overall scoring, and how the process was done.

On August 11, 2020, it was reported to the Task Force that defendants had requested the small work group slow down the current process so they could reevaluate it. At the Task Force meeting on August 18, 2020, it was reported that the plan was to continue to go over the process with the Special Master's experts and provide them with the reports so they could determine if the process was transparent.

The small work group then reported at the 32nd Task Force meeting, held August 25, 2020, that they had come to an agreement that the CQIT indicators were the proper indicators. It

was reported that the Special Master's experts had concerns that a significant number of indicators were not automated. He reported that the plan going forward was for Dr. Potter to validate the data and that the meeting of the regular small work group was suspended; however, they would meet if issues arose that required their expertise.

On October 6, 2020, defendants reported to the Task Force that they had come up with a new plan for addressing the issue. They reported that they had updated the EOP ASU Hub certification guidebook and they wanted to revive the small work group to review and provide comments on the new guidebook. Defendants reported that this would be happening in parallel with the project that Dr. Potter was working on looking at the indicators.

At the 40th Task Force meeting, on November 17, 2020, Dr. Potter provided an update to the Task Force on his work. He provided a summary of his activities and his next steps. He highlighted the issue of the lack of documentation for the system, and that Dr. Leidner, with consultation from Dr. Potter, had developed a documentation platform for the system that they hoped CDCR would adopt and he felt would allow them to quickly document enough of the system in order for him to begin to validate indicators and business rules. He reported that the documentation platform was ready to be demonstrated to defendants at the next business rules and methodology meeting.[60]

On December 1, 2020, Dr. Potter again presented to the Task Force on his progress and findings. He reported that defendants had received a demonstration of the documentation tool and they had reported concerns about CDCR allowing them to utilize the program since it was not already approved. He noted that no CDCR staff had created accounts and explored the tool

---

[60] Dr. Leidner worked with Dr. Potter to create this demonstration documentation platform in response to CDCR Mental Health Program request for an example of a documentation approach and system that would be sufficient for the data certification task including indicator and business rule validation and verification.

following the demonstration. He reiterated the fact that in order for him to validate components of the QA data system, there needed to be very clear documentation regarding all relevant aspects of the system and how it was supposed to work – which currently did not exist. He explained that they were going through that process now, that it was painstaking, and, due to the amount of detail required, it was slow. The Special Master's team reported to the Task Force that the plan was to start with the 11 automated indicators in the EOP ASU Hub certification process and use those as a jumping off point to then work on the entire CQIT tool.[61]

At the 42nd Task Force meeting, held December 8, 2020, defendants reported that they intended to propose a new process and timeline for completing the project, and that it was their intent to now include plaintiffs in the process. Plaintiffs were then provided an opportunity to ask Dr. Potter questions about his progress and findings. They asked him a series of questions about who he was working with from CDCR, and if he felt that the staffing of the project was sufficient. He reported that he was working most closely with Dr. Leidner on that data aspects and, while he felt people were working in good faith, there appeared to be a disconnect between Dr. Leidner and the CDCR mental health staff assigned to the project. Plaintiffs asked him what needed to happen for him to validate the data. Dr. Potter explained that in order for any of that to even begin, there needed to be precise descriptions of the indicators and their components. He stated that CDCR did not have that documentation, and they were currently focused on developing that so he could, in fact, start validating the system. Plaintiffs asked about other recommendations Dr. Potter had regarding the data system. Dr. Potter said that while the documentation portion was essential and the priority, he had further recommendations around

---

[61] Both the Mental Health Program and CCHCS IT have subsequently evaluated the demonstration platform and on January 28, 2021 demonstrated a SharePoint based Wiki platform to the Special Master data team that captures much of the functionality of the demonstration platform. Work to bring this into production is ongoing. SharePoint is the documentation platform in standardized for use for all systems at CCHCS.

cleaning up old and unused tables from the system, requiring that CDCR use source control going forward and utilize unit testing. He thought the implementation of those recommendations would allow for a more transparent and reliable system that people could trust. The parties agreed to schedule a meeting to discuss the defendants' new proposal for completing the data project.

There were a series of small work groups which met over the course of the past seven months. The first work group was made up of the experts, including Dr. Potter and CDCR staff. It met approximately 23 times on June 16, 2020, June 23, 2020 (with plaintiffs), June 30, 2020, July 14, 2020, July 21, 2020, July 28, 2020, August 4, 2020, August 11, 2020, August 18, 2020, August 25, 2020, September 3, 2020, September 8, 2020, September 15, 2020, September 22, 2020, October 6, 2020, October 21, 2020, October 27, 2020, October 28, 2020, November 4, 2020, November 18, 2020, November 25, 2020, December 2, 2020, and December 9, 2020.

On May 8, 2020, the Court ordered Dr. Potter to report on the data reports underlying the EOP/ASU Hub Certification letters. ECF No. 6661 at 20.

As a member of the ASU EOP Hub Certification Small Work Group, Dr. Potter requested detailed and specific information on the Quality Assurance statistics (called "indicators" or "benchmarks") used for ASU EOP Hub Certification. He has reviewed the information provided to him to date. He also requested access to the data collected during the onsite audits and has reviewed some of that data that CDCR provided.

In mid-October, a smaller work group split off from the main EOP ASU Hub Certification process work group to focus on the revised guidebook. It consisted of the Special Master's clinician, custody and nursing experts, and did not include Dr. Potter. That group met

approximately seven times on October 26, 2020, November 12, 2020, November 19, 2020, November 24, 2020, December 1, 2020, December 3, 2020, and December 8, 2020.

On October 15, 2020, CDCR Mental Health and Dr. Potter initiated a series of Business Rule and Methodology Review meetings to develop the detailed and specific information that specifies both the current intended operation (i.e. how the system is supposed to be currently working), and when needed, required future intended operation (i.e., how the system needs to work to be in concordance with the Program Guide) for the On-Demand indicator values required with ASU EOP Hub Certification.  Since then, there have been weekly meetings of this group.

CDCR's Mental Health Program quality management staff, Dr. Potter, and other members of the Special Master's staff have been meeting weekly since December 17, 2021 in a one-hour Quality Assurance Certification Workgroup that is developing the plans to implement a transparent, accurate and sustainable system that will be submitted for review by stakeholders.

On January 15, 2021, CDCR Mental Health also initiated a series of Business Rule Template and Categorization meetings.  These meetings have been focused creation of a set of Mental Health QA system documentation templates and a glossary of terms to help ensure a consistent and adequate set of documentation is for each business rule, indicator and report is developed.  This group has been meeting weekly since then, and as of February 19, 2021 templates for reports, indicators, business rules, and EHRS form data elements had been produced.

An agreed upon SharePoint system will be used as the documentation platform for the validation process.  The SharePoint system was demonstrated to plaintiffs and members of the Special Master's team on March 4, 2021.

Since January 12, 2021, the Special Master has convened a Data and Continuous Quality Improvement (CQI) meeting with the parties every two weeks. These meeting, which Dr. Potter participates in afford the parties opportunities to address the CQI indicators and AD Seg Hub/ PSU certification process, receive updates and other information from the Mental Health Program quality management staff and Dr. Potter on their activities, and provide input regarding Dr. Potter's work.

Dr. Potter and the Special Master data team have been active participants in these processes. Dr. Potter's work with defendants in the business rules work group examining the indicators used in the EOP ASU Hub certification process was informative as to the state of defendants' data systems overall, as well as the work which lays ahead in rebooting CQIT. The indicators and sub-indicators (referred to by CDCR as business rules) used in the certification process are a subset of the hundreds utilized in the overall CQIT process. As such, work done in this context should serve well to accelerate the rebooting of CQIT at the appropriate time.

Many preliminary definitions of items which are relevant to most subsequent measures were established, and a general approach to reviewing indicators and business rules has been established. These structures should serve to speed progress when later indicators are reviewed. More expeditious progress has been hampered by the painstaking nature of the tasks, exacerbated by the lack of basic documentation which must be, in essence, reconstructed de novo.

By way of example, accurate outputs require accurate inputs, and precise rules of operation, e.g., a consistent way to describe time frames, were required and have been developed. Without agreement on this, given the way the system operates, it is ambiguous if an event that must happen within one hour after 11:15 means the event must occur before 12:15 or before 13:00. Similarly, it is important to understand the concept of cell bed. If cell beds are

217

used to track prisoner housing, knowing why, when, how, and who updates the data for this item matters in terms of how data associated with this item should be interpreted. As another example, since voided orders are not included in any On-Demand reporting at this time, understanding the logic behind why, when, how, and who can void EHRS orders is critical.

Findings: Mental Health Data System

Overall, there were problems with system documentation, system design, and system change management.

**System Documentation**

The MH data system documentation is insufficient to determine if indicators are accurate. The reason for this is that there is little to no precise information on the intended operation of most indicators. Without knowing what the system should be doing, it is impossible to know if what the system is doing is correct.

Dr. Potter's findings include:

- The QA system documentation is insufficient to verify its operation.
    - Software verification is the process of confirming that a system or program meets its requirements specification.
    - Software verification requires a sufficiently precise description of a computer program's inputs and expected outputs. This information allows comparison of the computer program's actual operation with its intended operation. Without this information, such a comparison is not possible.
    - The current system documentation does not provide a precise description of many of its components and subcomponents, including indicators.
    - In order to perform software verification, a precise description of each indicator, what it measures (i.e., inputs), and how it should perform its measurement (i.e., its expected outputs) are required.
- The QA system documentation is insufficient to validate it against Program Guide requirements.
    - Without a precise description of an indicator's intended operation, there is no way to determine if its intended operation will accurately measure MHSDS compliance with Program Guide requirements.

218

- o The specific data sources upon which an indicator is supposed to rely (intended operation) need to be reviewed in the context of Program Guide requirements, e.g., which specific EHRS forms, form fields, and workflows are supposed to measured.

- o Without review and a comparison with the actual inputs, uses, errors of commission, and omission may be undetected.

- o All relevant forms and workflows must be designed to provide accurate data.

- o Without review, it is possible the design of some forms may be providing imprecise and or biased data.

- o Without review, some workflows options may be distorting the data.

- The QA system documentation system is not designed to maintain certification.

- o It is difficult to know how critical QA system details have changed over time.

- o There is no way to review the QA system or QA data system specifications as of a certain date.

- o There is no way to review all documentation changes that have occurred to the QA system or QA data system over a specific period of time.

- o The On-Demand reporting system is designed to handle business rule changes as follows: when a business rule is changed, the current rule is supposed to be retired (by setting its effective end date). However, there does not seem to be a process to track significant changes to the inputs.

As the parties, working under the guidance of the Special Master, work to develop a process to develop and implement a plan concerning data remediation, the following tasks should be considered:

➢ It is essential that CDCR develop comprehensive documentation as called for by the above findings. Careful review will be needed as it is developed.

➢ Deploy documentation in a way that allows future changes to the system to be reviewed within the context that they apply.

➢ This documentation should be accessible to all relevant parties in order to eliminate misunderstandings with regard to the systems' operation.

➢ Software verification is also an essential component of an adequate data system. CDCR should develop a software framework appropriate for verifying all court-reported indicators and business rules. *See* discussion *infra* at 222 regarding Unit Testing and Continuous Integration.

  o The QA data system's end-user documentation that does exist is, in some cases, poorly organized or inconsistent.

  o For example, the On-Demand system allows users to look up descriptions of indicators and in some cases, indicators are implemented via a collection of sub-indicators ("business rules"). Additional documentation for business rules exists in the On-Demand "Compliance Rules Report." However, it is oftentimes unclear what business rules belong to what indicators and vice-versa.

  o The amount of descriptive detail also varies between indicators.

➢ The documentation available to end-users should be detailed enough for them to verify if the system is producing valid results. One strategy for keeping the On-Demand system documentation current would be to provide appropriate links to the documentation system recommended above.

  • Software Development Practices

  o Key aspects of the QA data system live outside of source control.

  o Source control, also known as version control, is used by programmers to retain a copy of each version of a file used during the creation of new software the maintenance of old software. It provides an easy way to compare different versions of files, and lets one know who edits, what is edited, and when.

  o Certain database tables ("configuration tables"), e.g., the Codes table, define many aspects of the system's operation. For example, the calculation of indicators depends upon stored procedures, whose operation may, in turn, depend on parameters extracted from one or more of these tables.

  o The information in these configuration tables is not under source control.

o It is Dr. Potter's understanding that the development practices used by CDCR MH mean that source control is not automatically applied to stored procedures.

o It is Dr. Potter's understanding that most development work is done via the SQL Server Management Studio (SSMS) application interface.

o The current SSMS setup used at CDCR does not provide support for source control.

o Dr. Potter's understanding is that it is not currently easy to keep the current system consistently under source control.

o Some On-Demand report parameters ("web report parameters") are set via manual configuration applied to the web server that delivers these reports.

o These web report parameters live outside of source control.

The plan developed will need to address the following issue concerning its data systems.

➢ Appropriate software tools should be used to automatically ensure all live code and meta data (i.e., such as configuration tables and web report parameters) are under source control.

o QA databases contain extraneous and confusing information.

o The Production System contains many tables and stored procedures that are no longer in use or may never have been in use. (MI)[62]

o Some tables that are currently in use contain extraneous columns of information. For example, the patients' table has many extra columns. (MI)

o Tables with the same names exist on both the replication server and the reporting database server. (MI)

o Keeping track of which information is current in what context makes the system difficult to understand, which in turn, increases the likelihood of programmer error. (MI)

➢ As resources allow, CDCR should conduct a code and database clean-up.[63]

---

[62] The items marked with MI denote aspects of the system that do not directly impact the validity of the data but make the system more difficult to understand, maintain, and extend. This ultimately impacts sustainability but is not a short-term concern.

[63] On February 9, 2021 CCHCS IT shared that they have been helping Mental Health remove unused tables from their production systems, and they will also address the extraneous stored procedures, and that over time they anticipate this work will also address similar issues on the staging and development systems.

o   Some modern software development practices are absent.

o   The current SSMS setup used at CDCR does not allow for the use of the SSMS debugger.  (MI)

o   Unit testing is a standard approach for checking whether or not a program's actual operation matches its intended operation.  Its operation relies on the use of software tests (small programs) that can be run to compare the intended operation with actual operation of a program.  Typically, it is performed module by module, and subcomponent by subcomponent.  This process gives great confidence in the validity of the overall system.  Unit tests are typically rerun as the system is changed in order to quickly detect issues stemming from a change to a software component that other software components rely upon.

o   CDCR MH developers do not employ unit testing as part of their development process.

➢   CDCR Mental Health should adopt unit testing as part of their development process.[64]

o   Continuous Integration testing applies unit testing after every software update, or on a regular schedule.  It is considered a software engineering best practice for ensuring a system continues to work correctly.

o   Continuous Integration testing is not used to help verify ongoing correct operation of the system or system subcomponents.

➢   CDCR Mental Health should adopt continuous integration testing as part of their software QA process.[65]

o   It is Dr. Potter's understanding that moving new versions of QA data system from the development system to the stage system, and from the stage system to production system, is done manually.  There are policies that require the use of source control during this process, but these policies are not automatically enforced.

➢   The system should use appropriate tools to allow for this requirement to be enforced automatically.

o   It is Dr. Potter's understanding that due to prior issues caused by CDCR Mental Health QA Staff causing problems with the production system, CCHCS IT has taken oversight of the production system since CCHCS IT is responsible for keeping it up and running, and available

---

[64] The Data Expert has been told that CCHS IT recently demonstrated a Unit Testing and Continuous Integration framework to MH on February 4, 2021 and review and identification of steps to adopt this practice are underway.
[65] *See* n. 63, *supra*.

for end user access.  Because of this, Mental Health QA Staff, as of June 2020, lacked the ability to inspect important aspects of the production system.[66]

➢ At a minimum, the plan developed should consider how the CDCR source control system needs to contain a copy of the code and meta data that is running in production.

  ○ The operation of many stored procedures depends on raw numeric codes.  (MI)

  ○ The current architecture stores a large amount of unrelated system and parameter information in a common table ("Codes table"), and each row represents a different set of system or parameters values.  These raw numeric codes are often used to select parameter values from this table.

  ○ There is no explicit documentation on what columns are relevant and what columns are irrelevant for each row in the Codes table. Similarly, no explicit documentation exists on meaning, constraints, or relationships that should be maintained between the relevant columns. (MI)

➢ It is essential that the plan developed should consider how meta tables be put under source control.

  ○ Documentation and diagrams describing the computational and data relationships between system components are not maintained. Therefore, for example, it is unclear what stored procedures depend on what other stored procedures.  Automatic means for discovering these relationships are not available.  (MI)

➢ The plan developed should consider how CDCR could add links from source code to QA data system documentation that is relevant to its operation and encourage Mental Health QA Staff and CCHCS programmers to update this documentation as needed.

  ○ Most, if not all, stored procedures lack precise descriptions, and in fact, many contain very few comments that describe their operation. Without a precise description to verify if they are functioning as intended, and whether there are updates or modifications to them, will break components that depend on them.  (MI)

➢ It would be helpful if the plan developed consider how CDCR Mental Health can adopt a software development process that included unit testing.

---

[66] Since June 2020 Mental Health QA staff have had additional access rights granted to the Production Servers, including the ability to view SQL job history.  On February 24, 2021, Dr. Potter requested Mental Health QA staff to provide additional information regarding their access rights to Production Servers and will provide updated information regarding this matter in a subsequent report.

However, unit testing requires precise descriptions, so an incremental adoption as new software is developed might be one good adoption approach.

## Summary – Special Master's Data Expert Report

The current QA data system, including its lack of documentation, testing framework support, and change management processes, is insufficient for the task at hand. Work must also continue on validating the indicators and their individual business rules which are used in the ASU EOP Hub certification and CQIT processes and software testing must occur to verify that the indicator's actual operations are correct. At present, these processes are not sufficiently transparent. CDCR could address these issues more quickly and more effectively if they had additional personnel devoted to these tasks.

The time has come to move the system to the next level and for the parties, working under the guidance of the Special Master to devise a plan for CDCR to develop a data system to address the deficiencies described in this report. CDCR would then have a data system capable of producing data in which the parties, the Special Master and the Court could have confidence accurately reflected defendants' compliance for the indicators reported and which had the controls in place to maintain the integrity of the data over time. That system would also be sufficiently transparent which would help to restore trust in the data defendants produce and rely upon.

Although the Special Master is not requesting the Court to adopt a formal recommendation at this time, he strongly recommends that defendants, at minimum, take all necessary actions to document the system in accordance with accepted professional standards and further develop and maintain it in accordance with professional practices so that the system is accurate, transparent, and sustainable.

To that end, the Special Master recommends that the parties, working under his guidance and supervision, develop a written plan to accomplish this.  The plan should clearly define the ultimate goals of the project, a process for achieving those goals, and the personnel success will require, as well as a proposed schedule and method for keeping the Court apprised of progress and any unexpected obstacles encountered.  This same process should develop plans to accelerate the review of the ASU EOP Hub indicators and ultimately all CQIT indicators.

# APPENDIX B

# CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

**Custody and Mental Health Partnership Plan**

In the Twenty-Seventh Round Monitoring Report, the Special Master informed the Court that under his supervision the parties were able to complete the Custody and Mental Health Partnership Plan (CMHPP) through the All-Parties Workgroup.  ECF No. 5779 at 87.  In his report, the Special Master indicated that although completion of the plan was in progress, it was tempered by the fact that the goal to pilot the plan at six institutions was reduced to three and included no institution with a complex mental health mission.  *Id*. at 90-91.  This was of great concern to the Special Master who continued to work through the All-Parties Workgroup process to solidify implementation.  Additionally, the Special Master was troubled by the institutional culture - allegations of mistreatment, abuse, and micro-aggressions - toward inmates and the sustainability of the custody and mental health partnership.  The Special Master indicated that all would be closely monitored in the Twenty-Eighth Round.  *See* ECF No. 5779 at 104-105.

CDCR finalized the initial Partnership Plan and filed it with the Court on September 10, 2018.  ECF No. 5916.  On February 20, 2019 the Court approved the CMHPP, in addition to ordering an update and the development of a plan to incorporate the correctional clinical case management system (3CMS) treatment programs.  ECF No. 6095.  The initial CMHPP focused on Enhanced Outpatient Programs (EOP), MHCBs and 3CMS segregation units.

On September 12, 2019, pursuant to the Court's orders for expansion of the plan to the 3CMS treatment programs, CDCR filed an *Update to the Custody and Mental Health Program Plan,* (hereinafter, "Update"), which was an amendment to the September 10, 2018 filing.  ECF No. 6278.  The Update included plans for implementation of the Partnership Plan in 3CMS treatment programs, as well as timelines for completion.  *Id*.  Additionally, in acknowledgment of the Court's direction that the goal should be one of "effecting long term and sustainable

culture change…," *see* ECF No. 6194 (citing ECF No. 5477 at 7), the Update included all levels of the MHSDS.  *Id.*

On October 8, 2019, following receipt of the filing, the Court approved the updated plan submitted and ordered that it be implemented within the timelines set forth in CDCR's submission.  *See* ECF No. 6314 at 1.  The Court further directed CDCR to "certify to the Special Master that all deadlines specified in the [u]pdate have been met or that the tasks described as ongoing are in fact ongoing."  *See* ECF No. 6314 at 2.  If deadlines or tasks were not met and the plan remained incomplete, CDCR was directed to provide a detailed explanation as to why implementation of the plan was not completed.  *Id.*  CDCR was to provide certification regarding the status of the CMHPP to the Special Master by April 30, 2020.  *Id.* at 2.

Update to CMHPP for 3CMS

The updated plan for the 3CMS population is comprised of five primary components: (1) Joint Rounding; (2) Safe Reporting; (3) Training for 3CMS staff; (4) Support Activities in the 3CMS programs, such as Weekly Supervisory Meetings, Monthly Inmate Advisory Council Meetings, and Monthly Joint Supervisory Program Area Tours; and (5) Orientation for New 3CMS Patients.  *See* ECF No. 6278 at 8-14.

The staff required for involvement in joint rounding include the Warden, Chief Deputy Warden, Associate Wardens, Chief Executive Officer, Chief of Mental Health, Executive Director of the PIP, Chief Psychiatrist or Senior Psychiatrist, Chief Psychologist, and the Chief Nurse Executive.  *Id.* at 8.  The updated plan provided for rounding to occur monthly in at least one mental health program; however, all general population and reception center 3CMS populations should be rounded at least annually.  *Id.*  Additionally, the updated plan stated that a summary of the topics identified during rounding should be reported at executive staff meetings,

such as the Warden's Meeting, the quality management committee meeting, and the mental health program subcommittee meeting. *Id.* at 9.

The training curriculum included a wide variety of objectives that addressed topics such as confidentiality, ethics and professionalism, zero tolerance, and reporting misconduct. *Id.*

The various support activities included weekly meetings between the mental health supervisor and the custody sergeant who are required to document germane information regarding inmates discussed during the meetings. *Id.* at 12. The monthly inmate advisory council is attended by a facility captain and the mental health program supervisor as a collaborative effort where staff can provide information on programming to the inmate population and inmates have greater access to clinical and custody staff. *Id.* at 13. The monthly joint supervisory program area tours also promote the collaboration between clinical and custody staff, through tours that occur in all locations utilized by 3CMS inmates, including yard, work, housing and programming areas. *Id.* The tours are required to be conducted by the mental health program supervisor and sergeant and provide inmates with a direct contact with supervisors that allows issues to be heard and resolved quickly. *Id.*

The last component of the Update is 3CMS Orientation. In an effort to effectuate a smooth transition for new inmates in the 3CMS programs, an orientation brochure was created. *Id.* at 15. The intent was for the brochure to be given to new 3CMS inmates during the initial session with their primary clinician, providing them with the opportunity for discussion of programming during the meeting. *Id.* The brochure was expected to be made available by CDCR for dissemination at all 29 institutions that housed the 3CMS population.

EOP Orientation Groups

The EOP Orientation Groups (EOP groups) remained an outstanding element of the

initial CMHPP and were included in the monthly certification letters pursuant to court order.  *See*

ECF No. 6314 at 2.  The EOP groups were developed for two purposes: 1) to assist new inmates

with a better adjustment to the EOP program, and 2) to educate new EOP inmates regarding

coping skills that would be helpful to address issues commonly experienced in an EOP program.

EOP Orientation groups were to be led by a custody sergeant, mental health clinician, and an

inmate.

Certification of the CMHPP

CDCR's initial certification on April 30, 2020 reported that the following deadlines in the

update to the CMHPP were met: (1) non-3CMS huddle reports were implemented, (2) lesson

plans were updated for quarterly roundtables in non-3CMS programs, (3) executive joint

rounding for non-3CMS programs were implemented, (4) annual off-post training modules for

all staff were developed and implemented, and (5) mental health and custody supervisors were

trained on the inclusion of CMHPP elements when attending 3CMS Inmate Advisory Council

meetings, weekly 3CMS supervisory meetings, monthly 3CMS program area tours, and in the

distribution of 3CMS orientation brochures.

In the April 30th certification, CDCR also reported four modifications to the CMHPP

filed with the Court on June 12, 2019.  ECF No. 6278.  The modifications included (1) the

addition of the Chief Psychologist to the list of executive attendees for joint rounding; (2) the

expansion of joint rounding to locations outside the 3CMS housing units noting that general

population 3CMS inmates were regularly involved in programs outside their housing units; (3)

the required training for trainers for the off-post training was removed as staff with the required

instructor qualifications were already available at the institutions; and (4) CDCR made the decision that IT would not pursue automation of the huddle reports because the staff found value in manually building the report for each huddle.

Regarding implementation of the remaining tasks, the April 30, 2020 certification provided the following information: (1) EOP groups had begun at three of 19 institutions, or 16 percent, while the assignment and training of inmate-peer co-facilitators was completed at eight of 19 institutions, or 24 percent, (2) joint rounding in 3CMS programs had occurred in 20 of 29 institutions, or 69 percent, and it was reported that the remaining nine institutions would likely not begin until the coronavirus pandemic was controlled, (3) weekly 3CMS supervisory meetings were implemented in 19 of 29 institutions, or 66 percent, (4) monthly inmate advisory council meetings were occurring in 13 of 29 institutions, or 45 percent, although due to the pandemic some institutions had suspended formal inmate advisory council meetings, (4) monthly joint supervisory program tours were implemented at 13 of 29 institutions, or 45 percent, however, due to the pandemic some institutions had suspended the tours, and (5) CDCR reported all 3CMS orientation brochures were delivered to all appropriate institutions in February 2020 and that the orientation brochure had been disseminated to new 3CMS inmates at 19 of 29 institutions, for a compliance rate of 66 percent.

CDCR has provided seven supplemental monthly certification reports on implementation of the Update to the CMHPP in its institutions (May 2020 – November 2020). Each report addressed the tasks that remained to be completed, which included EOP groups, and the assignment and training of the inmate-peer co-facilitators. The monthly data from CDCR's certification reports is reflected below in Table A and Chart A.

Table A - Implementation of EOP Groups for CMHPP by Institution

|  | 4/2020 | 5/2020 | 6/2020 | 7/2020 | 8/2020 | 9/2020 | 10/2020 | 11/2020 |
|---|---|---|---|---|---|---|---|---|
| Assignment of Inmate-Peer Co-Facilitator | 8 | 8 | 8 | 9 | 9 | 9 | 10 | 8 |
| Training of Inmate-Peer Co-Facilitator | 8 | 6 | 5 | 4 | 5 | 6 | 7 | 10 |
| EOP Groups | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 5 |



Regarding the assignment of inmate-peer co-facilitators, CDCR reported the following data from the institutions; the assignment of inmate-peer co-facilitators occurred at eight of 19 institutions, or 42 percent, in May and June of 2020; at nine of 19 institutions, or 47 percent, in July, August and September of 2020; at ten of 17 institutions, or 59 percent, in October 2020; and at eight of 17 institutions, or 47 percent, in November 2020. In October 2020, the number of

EOP institutions was reduced from 19 to 17, due to the deactivation of receptions centers at SQ, DVI, and CIM.

For the task of training inmate-peer coordinators, CDCR reported implementation at six of 19 institutions, or 32 percent, in May 2020; at five of 19 institutions, or 26 percent, in June 2020; at four of 19 institutions, or 21 percent, in July 2020; at five of 19 institutions, or 26 percent, in August 2020; at six of 19 institutions, or 32 percent, in September 2020, at seven of 17 institutions, or 41 percent, in October 2020; and at ten of 17 institutions, or 60 percent, in November 2020.

Regarding EOP groups, implementation for the months of May through August 2020, occurred at three of 19 institutions, or 16 percent; at four of 19 institutions, or 21 percent, in September 2020; at four of 17 institutions, or 24 percent, in October 2020; and at five of 17 institutions, or 30 percent, in November 2020. CDCR stated that some institutions reported that groups were suspended at times due to COVID-19.

CDCR provided similar data regarding the remaining tasks to be implemented in the 3CMS programs for full compliance with the CMHPP for the months of May through November 2020. The tasks reported to be completed included joint rounding, monthly inmate advisory council meetings, monthly joint program area tours, weekly 3CMS supervisory meetings, as well as 3CMS orientation and on-the-job training of staff at the institutions. Data on joint rounding, inmate advisory council, program area tours, and weekly supervisory meetings is provided in Table B and Chart B below.

Table B - Implementation of CMHPP in 3CMS
by Number of Institutions

|  | 4/2020 | 5/2020 | 6/2020 | 7/2020 | 8/2020 | 9/2020 | 10/2020 | 11/2020 |
|---|---|---|---|---|---|---|---|---|
| Joint Rounding in 3CMS | 20 | 24 | 26 | 27 | 27 | 27 | 27 | 27 |
| Monthly Inmate Advisory Council | 13 | 20 | 22 | 25 | 25 | 26 | 27 | 27 |
| Monthly Joint Supervisory Program Tours | 13 | 18 | 19 | 23 | 24 | 24 | 25 | 25 |
| Weekly 3CMS Supervisory Meetings | 19 | 24 | 26 | 28 | 29 | * | * | * |

*Data for this section no longer provided in the CDCR monthly report.



CDCR reported implementation of joint rounding at 24 of 29 institutions, or 83 percent, in May 2020; at 26 of 29 institutions, or 93 percent, in June 2020; and from July through November 2020, at 27 of 29 institutions, or 93 percent.

Reported implementation of the monthly inmate advisory council meetings occurred at 20 of 29 institutions, or 69 percent, in May 2020; and at 22 of 29 institution, or 75 percent, in June 2020; at 25 of 29 institutions, or 86 percent, for the months of July and August 2020; at 26 of 29 institutions, or 90 percent, in September 2020; and at 27 of 29 institutions, or 93 percent, in October and November 2020.

As to Monthly Joint Supervisory Program Area tours, CDCR reported implementation at 18 of 29 institutions, or 62 percent, in May 2020; at 19 of 29 institutions, or 66 percent, in June 2020; at 23 of 29 institutions, or 79 percent, in July 2020; at 24 of 29 institutions, or 83 percent, in August and September 2020; and at 25 of 29 institutions, or 86 percent, in October and November 2020.

CDCR reported implementation of weekly supervisory meetings at 24 of 29 institutions, or 83 percent, in May 2020; at 26 of 29 institutions, or 89 percent, in June 2020; at 28 of 29 institutions, or 97 percent, in July 2020; and at 29 of 29 institutions, or 100 percent, in August 2020. CDCR discontinued reporting on this task once 100 percent compliance was achieved.

CDCR also reported on the distribution of 3CMS orientation brochures to its 29 institutions, which was reported to have been completed in February 2020. In addition, CDCR reported 100 percent compliance at all 29 institutions required to disseminate these brochures to new 3CMS inmates during initial primary clinician contacts. After reporting completion of this task in August 2020, CDCR did not address it again in subsequent certifications.

In addition, CDCR indicated that the off-post partnership training course was suspended on March 25, 2020 due to COVID-19 restrictions.  However, it was reinstated upon conversion to on-the-job training, which CDCR reported resulted in 100 percent compliance at all 29 institutions.  Despite the conversion, CDCR reported that the partnership training would continue to be a mandated and tracked.  Subsequently, CDCR discontinued reporting training in the certification.  CDCR's monthly certification of progress toward compliance with the plan will remain in place going forward.  Likewise, because of the significance of the collaboration between custody and mental health staff members toward completion of the remedial plan and improved conditions for class members, the Special Master will continue to monitor and report on implementation of the CMHPP at all institutions throughout the Twenty-Ninth Round.

In its September 3, 2020 order, the Court addressed the CMHPP and noted that at its request, the Special Master had provided the Court with a copy of the defendants' April 30, 2020 certification letter.  *See* ECF No. 6846 at 23.  The Court stated that the certification showed defendants had met some deadlines, while others had to be reset due to COVID-19.  *Id*.  The Court further acknowledged defendants' commitment to provide monthly reports to the Special Master until the CMHPP was fully implemented.  *Id*.  In so doing, the Court stated that "[i]n light of defendants' specific commitment to monthly updates and their apparent commitment to resetting specific deadlines as necessary, the court finds no need for additional orders to further progress toward this goal at this time."  *Id*.

# APPENDIX C

# ACTIVITIES OF THE *COLEMAN*

# SPECIAL MASTER DURING CALENDAR YEAR 2020

**Activities of the *Coleman* Special Master During Calendar Year 2020**

Twenty-Eighth Monitoring Round

We completed the Twenty-Eighth round of monitoring and I will be sending a draft copy of the Twenty-Eighth Round Monitoring Report to the parties this week. The completion of the Twenty-Eighth round of monitoring and the drafting of the report took the combined efforts of all the experts and monitors on my team.

Mental Health Headquarters Monitoring

Simultaneous with the Twenty-Eighth round of monitoring was the daily monitoring of mental health headquarters by a dedicated team of *Coleman* monitors and experts. Numerous policies and memoranda were developed and implemented due to the collaborative efforts of my team and CDCR mental health headquarters staff which reduced the possibility of litigation surrounding a variety of issues. The full-time headquarters monitoring team consisted of a Deputy Special Master, two experts, a monitor and a paralegal. Other *Coleman* team members attended meetings as necessary. CDCR legal counsel were involved in many of these meetings but not plaintiffs' counsel.

Task Force

The Task Force convened 41 times since the end of March. These meetings were attended by CDCR representatives, DSH representatives, the Department of the Attorney General, *Coleman* monitors and experts, a representative from the Receiver's office as well as an *Armstrong* representative.

CDCR Small Workgroups

CDCR small workgroups were established to discuss issues prior to presenting those issues to the Task Force. These workgroups were attended by CDCR clinicians as well as *Coleman* experts and monitors. Attorneys were specifically excluded from these meetings in order to promote more clinical discussions without the scrutiny of attorneys. Subsets of these workgroups included EOP ASU Hub Certification workgroup and the Behavioral Treatment Workgroup. These workgroups met weekly and more often when required.

DSH Small Workgroups

DSH workgroups were also established for the same reasons as the CDCR workgroups. These workgroups discussed issues specific to DSH and were attended by DSH clinicians as well as *Coleman* experts and monitors. These workgroups met weekly and more often when required. No attorneys were involved in these workgroups.

Plaintiff Weekly Meetings

Each week plaintiffs met with my experts and monitors to discuss the matters being worked on in the small workgroups in order to foster transparency and keep the plaintiffs informed of the progress being made in the small workgroups.  No defendants or their representatives attended these meetings.

## Special Master's Activities During Calendar Year 2020[67]

### Task Force Meetings:

- ECF No. 6513 filed 3/20/20 - After a status conference the court directed the Special Master to convene a COVID-19 Task Force as soon as possible and report back to the court as needed.

- Task Force meetings include the Special Master and representatives from the Special Master's team, representatives from CDCR, DSH, Plaintiffs, the Attorney General's Office, the *Plata* Receiver's Office, and a representative from the *Armstrong* case.

- There have been 42 task force meetings in 2020, with each meeting scheduled for one and a half hours. The meetings were held more frequently the first two months of the pandemic; small workgroups also meet at additional times throughout the week to address more specific concerns.

- Subsequent to the initial meeting on March 20, 2020, the Task Force meetings have occurred as follows;

  1. March 2020, on the 20th, 23rd, 24th, 26th, 28th, 30th, and 31st.
  2. April 2020, on the 3rd, 7th, 9th, 15th, 16th, 26th and 27th.
  3. May 2020, on the 5th, 12th, 19th, and 26th.
  4. June 2020, on the 2nd, 9th, 16th, 23rd, and 30th.
  5. July 2020, on the 7th, 14th, 21st, and 28th.
  6. August 2020, on the 4th, 11th, 18th, and 25th.
  7. September 2020, on the 1st, 8th, 15th, and 29th.
  8. October 2020, on the 6th and 13th.
  9. November 2020, on the 10th and 17th.
  10. December 2020, on the 1st and 8th.

- The following topics have been discussed at the Task Force meetings:

  1. Availability of PPE, masks, and hand sanitizer

---

[67] This list of meetings is not exhaustive.

2. Behavior treatment program
3. Census and waitlists and treatment in place
4. *Coleman* tours of California State Prison/Sacramento, CMF-PIP and CHCF-PIP to observe pandemic protocols
5. COVID-19 updates from CDCR and DSH on staff illnesses impacting coverage
6. COVID-19 updates from CDCR and DSH, including the number of patients tested, patients positive and patients resolved, and the number of patient deaths due to COVID-19
7. COVID-19 updates on specific institutions, movement, and coverage
8. Custody Plans
9. Data Project Updates
10. Decline in referrals to higher levels of care
11. Discharge medication for early release
12. Emergency mental health treatment guidance
13. EOP ASU Hub certification process
14. EOP transfer process
15. Guidance from the California Department of Public Health
16. Increased access to phone calls for contact with family
17. Milestone credits during COVID-19
18. Mission changes
19. Movement matrix, closed institutions, and tiers
20. Non-EOP ADA workers in EOP housing units
21. Physical distancing
22. PIP admission units
23. Program Guide Departures, resumption of Program Guide required, and defendants' plans to mitigate the impact of these departures.
24. Programming during wildfires
25. Provision of televisions, radios, and other entertainment devices for those in locked units
26. Quarantine and isolation
27. Roadmap to re-opening
28. Staffing at the PIPs and DSH
29. Staff serial testing
30. Suspension of transfers to DSH
31. Telepsychiatry policy
32. Telepsychiatry from home proposal
33. Tele-Work
34. Temporary Mental Health Units (TMHUs)
35. Transfers to and from desert institutions
36. Transfers to higher levels of care (MHCB, PIPs and DSH) during the pandemic

37. Treatment being provided during the pandemic including in locked units
38. Use of crisis beds for medical purposes

**California Department of Corrections and Rehabilitation – Small Workgroup Meetings**:

- There were approximately 53 small workgroup meetings between members of the Special Master's team and representatives of CDCR (*attorneys did not attend*).

- The small workgroup meetings occurred on the following dates:

    1. April 2020 on the 3rd, 4th, 5th, 6th, 8th, 13th, twice on the 14th, 15th, 16th, 26th and 27th, on the 26th the Richard J. Donovan TMHU proposal was discussed.
    2. May 2020 on the 1st, 6th, 7th, 8th, 11th, 13th, 15th, 20th, 22nd, 25th, 27th, and 28th.
    3. June 2020 on the 3rd, 10th, 17th, and 30th.
    4. July 2020 on the 1st, 8th, 15th, 22nd and 29th.
    5. August 2020 on the 3rd, 5th, 19th, 20th, and 26th.
    6. September 2020 on the 2nd, 9th, 16th, 23rd, and 30th.
    7. October 2020 on the 7th, 14th and 29th.
    8. November 2020 on the 4th, 12th, 18th, and 25th.
    9. December 2020 on the 2nd, 9th, and 30th.

- The topics discussed included:

    1. ADA workers at Valley State Prison
    2. CDCR/COVID-19 Dashboard
    3. CDCR's plans for implementing the Judge's order in the context of compliance with the Program Guide during the pandemic
    4. Class Members at desert institutions
    5. Crisis Intervention Team Policy
    6. EOP ASU ICF referrals
    7. EOPs in the ISUDT program and related coordination
    8. Flex beds and Least Restrictive Housing (LRH)
    9. Individual class members at CSP/LAC, Calipatria, Centinella, Chuckawalla Valley State Prison, Kern Valley State Prison
    10. MHCB transfers
    11. Movement/DSH transfers
    12. PIP admissions units
    13. Psychiatric Nurse Practitioner Policy
    14. Resumption of ICF and Acute bed transfers
    15. Space issues
    16. Staffing Plans

17. Telepsychiatry Policy
18. Telepsychiatry from home proposal.
19. Tele-Work
20. Temporary Mental Health Units (TMHUs)
21. Therapeutic intervention and group progress notes
22. Timeframes for IDTTs
23. TSI training
24. Updated treatment procedures (combined 4/10 and 4/17 memorandums)

**Department of State Hospitals – Small Workgroup Meetings**:

- The Special Master assigned members of his team to meet with representatives of DSH to discuss transfers to inpatient care at the state hospital during coronavirus pandemic. At times, the group included certain members of CDCR. No attorneys were present during these meetings.

- There were approximately 32 meetings held on the following dates:

    1. May 2020 on the 4th, 11th, 18th and 26th.
    2. June 2020 on the 1st, 8th, 11th, 15th, 16th, 22nd and 29th.
    3. July 2020 on the 6th, 13th, 20th and 27th.
    4. August 2020 on the 3rd, 10th, 24th and 31st.
    5. September 2020 on the 14th, 21st and 28th.
    6. October 2020 on the 5th, 12th, 19th and 26th.
    7. November 2020 on the 2nd, 9th, 16th, 23rd, and 30th.
    8. December 7th.

- The topics discussed during DSH meetings included the following:

    1. Behavioral Treatment Program
    2. Closed units vs. closed institutions in considering transfers
    3. Collaboration between CDCR and DSH regarding transfers
    4. COVID-19 updates on specific institutions
    5. Department of Public Health concerns
    6. Discharges back to CDCR
    7. Endorsement, quarantine, and testing
    8. Establishing COVID-19 units within each DSH facility
    9. Individual case reviews
    10. Least restrictive housing (LRH) transfers to DSH from the PIPs
    11. Long-term DSH patients
    12. Movement matrix

13. Personality disordered patients
14. Procedures for transfer of patients to DSH from closed institutions
15. Quarantine space
16. Temporary guidelines for transfer to DSH
17. Testing of patients and staff
18. Transfers of OMDs versus *Coleman* Patients to DSH

## EOP ASU Hub Certification Process – Small Workgroup Meetings:

- There were 34 meetings between members of the Special Master's team and representatives from CDCR.

- The meetings were held on the following dates:

  1. June 2020 on the 16th, 23rd and 30th
  2. July 2020 on the 7th, 14th, 21st and 28th
  3. August 2020 on the 4th, 11th, 18th and 25th
  4. September 2020 on the 3rd, 8th, 15th and 22nd
  5. October 2020 on the 6th, 13th, 21st, 26th, 27th and 28th
  6. November 2020 on the 4th, twice on the 12th, 18th, 19th, 24th, and 25th
  7. December 2020 on the 1st, 2nd, 3rd, 8th, 9th and 16th.

- The topics discussed during the meetings included the following:

  1. EOP ASU Hub Certification process
  2. EOP ASU Hub Certification process core indicators
  3. EOP ASU Hub Certification guidebook revisions
  4. EOP ASU Hub Certification Audits
  5. EOP ASU Hub Certification data processes

## Behavior Treatment Program – Small Workgroup Meetings:

The Behavior Treatment Program small workgroup was convened to address the lack of treatment for select CDCR patients in need of additional treatment options and modalities not currently available in CDCR or DSH.

- Meetings were held between members of the Special Master's team and representatives from CDCR.

- The meetings were held on the following dates:

  1. There were at least four workgroup meetings between June 2020 and July 2020

243

    2. August 2020 on the 3rd, 12th, and 26th

    3. September 2020 on the 2nd, 9th, and 16th

- The topics discussed during the meetings included:

    1. Clozaril programs

    2. Discussion regarding what other departments do both nationally and internationally

    3. Ideas for programing with CDCR

    4. Prior Programs explored

- This workgroup no longer meets and CDCR has put a hold on the program due to financial constraints, lack of headquarter staff to work on the project and that it was not feasible to run the program at the PIPs.  The last meeting occurred on September 16, 2020.

## **Weekly Debrief Meetings with Plaintiffs**:

- The Special Master and members of his team had weekly meetings with Plaintiffs commencing in June 2020 to provide information on the discussions that were occurring in the small workgroup meetings to maintain transparency in the workgroup process. There have been 23 meetings that have occurred since the beginning of June 2020:

1.    June 2020, on the 1st, 8th, 15th, 22nd and 29th.
2.    July 2020, on the 13th, 20th, and 27th.
3.    August 2020, on the 3rd, 10th, 17th, 24th and 31st.
4.    September 2020, on the 14th, 21st and 28th.
5.    October 2020, on the 13th.
6.    November 2020, on the 2nd, 9th, 16th, 23rd and 30th.
7.    November 2020 on 30th.

## **Court Coordination Meetings**:

- There have been 7 formal court coordination meetings between the Special Master and representatives of his team, the *Plata* Receiver and members of the Receiver's office, and the court-appointed representative in the *Armstrong* case in 2020.  Those meetings occurred on:

1.    1/15/2020
2.    2/26/2020
3.    4/29/2020
4.    6/4/2020
5.    7/22/2020
6.    9/15/2020

    7.     11/12/2020
    8.     12/16/2020

- Topics discussed at those meetings included:

    1.     Updates on the *Armstrong, Coleman* and *Plata* cases

    2.     *Armstrong* (in addition to updates)

        ■    Americans with Disabilities Act Worker Issues
        ■    *Coleman* Restrictive Housing and *Armstrong* Class Members
        ■    Order Regarding Housing of *Armstrong* Class Members During Pandemic
        ■    Staff Misconduct Motion
        ■    Status of Isolation/Quarantine Motion

    3.     *Coleman* (in addition to updates)

        ■    CMF-PIP Update
        ■    Construction of Tents at CIM
        ■    COVID-19 Testing for Inmate Transfers
        ■    EOP/ISUDT
        ■    Max Custody Program Update
        ■    Root Cause Analysis Presentation Update

    4.     *Plata* (in addition to updates)

        ■    CCHCS Quality Management Involvement in Mental Health Data Analytics – Request for Support with Development of SPRFIT Metrics
        ■    Committee Review
        ■    COVID-19 Testing Issues
        ■    CQIT Update
        ■    Dorm to Cell Movement
        ■    EHRS
        ■    EOP Group and Ducating
        ■    Housing Issues Associated with COVID-19
        ■    Inpatient Access to Care – Rounding
        ■    Intake Update
        ■    Mental Health Movement
        ■    Mortality Review and Reporting
        ■    Status of 2019-2020 Performance Improvement Plan
        ■    Structure for Health Care Regulations

**Special Master's Twenty-Eighth Monitoring Round**:

- The Twenty-Eighth Monitoring Round work is completed and in the writing process. The round was interrupted by the Coronavirus pandemic, which required it to be completed through several modalities. Included in the round were:

    I.    Seventeen institutions were monitored onsite:

    1. CCI – March 10, 2020 to March 12, 2020
    2. CIM – November 5, 2019 to November 7, 2019
    3. CIW – November 12, 2020 to November 15, 2020
    4. CMF – June 24, 2019 to June 27, 2019
    5. CSP/LAC – April 2, 2019 to April 4, 2019
    6. CSP/Sac – April 16, 2019 to April 19, 2019
    7. CSP/Solano – May 14, 2019 to May 10, 2019
    8. FSP & FWF – November 18, 2019 to November 20, 2019
    9. HDSP – March 5, 2019 to March 7, 2019
    10. KVSP – March 12, 2019 to March 14, 2019
    11. MCSP – May 29, 2019 to June 1, 2019
    12. NKSP – April 23, 2019 to April 25, 2019
    13. RJD – March 19, 2019 to March 22, 2019
    14. SATF June 10, 2019 to June 14, 2019
    15. SQ-EOP – February 26, 2019 to February 27, 2019
    16. SVSP – February 12, 2019 to February 15, 2019
    17. WSP – March 3, 2020 to March 5, 2020

    II.   Ten institutions were monitored through a Hybrid Electronic Health Record System (EHRS)/Paper Review. Through this process *Coleman* experts accessed the electronic medical records of patients and together with documentation provided by the institutions, compliance could be measured regarding timeliness of clinician contacts, IDTTs and transfers to higher levels of care. Access to the EHRS also allowed the *Coleman* experts to appraise the quality of care provided to inmates/patients at the CCCMS and EOP level of care as well as patients in the TMHUs and the condemned population. Documentation from the institutions allowed for a review of adjudicated RVRs. The ten institutions that were included in this hybrid review included:

    1. Avenal – May 18, 2020 to May 19, 2020
    2. CHCF – May 27, 2020 to May 29, 2020
    3. CCWF – May 5, 2020 to May 7, 2020
    4. CTF – April 7, 2020 to April 9, 2020

5.   DVI – April 21, 2020 to April 23, 2020
6.   PBSP – May 12, 2020 to May 14, 2020
7.   PVSP – May 12, 2020 to May 14, 2020
8.   SCC – April 21, 2020, to April 22, 2020
9.   SQ – April 1, 2020 to April 3, 2020
10.  VSP – April 7, 2020 to April 9, 2020

III.   Two institutions were monitored through full paper review:

1. CMF-L1 – March 17, 2020 to March 19, 2020
2. CMC – March 17, 2020 to March 17, 2020

IV.   DSH institutions monitored:

1.   Patton State Hospital – February 4-5, 2020 (onsite)
2.   Atascadero State Hospital – March 24, 2020 (paper review)
3.   Coalinga State Hospital - March 24, 2020 (paper review)

V.   CDCR PIP institutions monitored onsite:

1.   SVSP-PIP – December 3-6, 2019
2.   CMF-PIP – December 3-6, 2019
3.   CHCF-PIP – September 17-19, 2019 and March 10-12, 2019
4.   CIW-PIP – December 17-19, 2019
5.   SQ-PIP – February 18-20, 2019

**Data Remediation Following Golding proceedings**:

- On 10/8/19 (ECF No. 6312) the court acknowledged allowing the Special Master to consider the potential for sharing resources with the *Plata* Receiver to avoid duplication across the *Coleman* and *Plata* case; or to allow the Special Master to proceed with the hiring of his own data expert.

- The Special Master hired his own data expert, Dr. Dan Potter on April 29, 2020 who has been working with representatives from CDCR and CCHCS since his appointment and whose work is ongoing.  An initial report on the progress of the data expert was submitted to the court on 6/8/20 (ECF No. 6705).

- The Special Master also assigned Dr. Potter to the ASU EOP Hub Certification Workgroup, where he has been requested to examine the current data certification process.

- In addition, Dr. Potter will confirm whether CDCR's data collection and specifications are in alignment with the Program Guide and other requirements.

- Dr. Potter is also monitoring the impact of COVID-19, CDCR public health response and monitoring registries for statistically significant indications of disparate impact on *Coleman* class members.

- Dr. Potter attended more than 90 meetings from May 2020 through November 2020 on the following dates with representatives from CDCR, CCHCS, the Special Master's team and/or Plaintiffs:

    1. May 2020, on the 11th, 12th, 13th, 14th, 15th, 18th, 19th, 22nd, 26th, 28th and 29th

    2. June 2020, on the 3rd, 4th, 10th, 16th, 17th, 18th, 23rd, 24th, 25th, 26th, 29th, and 30th

    3. July 2020, on the 1st, 2nd, 7th, 9th, 13th, 14th, 15th, 16th, 17th, 20th, 21st, 22nd, 23rd, 24th, 27th, 28th, and 29th

    4. August 2020, on the 4th, 5th, 6th, 10th, 11th, 12th, 13th, 14th, 17th, 18th, 25th, and 27th

    5. September 2020 on the 1st, 2nd, 3rd, 8th, 10th, 14th, 15th, 16th, 18th, 21st, 22nd, 28th, and 29th

    6. October 2020 on the 1st, 5th, 6th, 7th, 8th, 9th, 12th, 13th, 15th, 19th, 20th, 21st, 22nd, 23rd, 27th, 28th, 29th, and 30th

    7. November 2020 on the 2nd, 3rd, 4th, 9th, 11th, 13th, 16th, 18th, 23rd, and 25th

## **Special Master's Reports**:

- There have been eight reports filed with the Court by the Special Master in 2020 which include the following:

    1. 2/14/20 (ECF No. 6466) – Special Master's Report on the Proposed Processes for Updating the 2018 Program Guide Revision, Related State Regulations, and Related Additions or Changes to the California Department of Corrections and Rehabilitation's Department Operations Manual

    2. 2/20/2020 (ECF No. 6476) - Special Master's Amended Report on the Proposed Processes for Updating the 2018 Program Guide Revision, Related State Regulations, and Related Additions or Changes to the California Department of Corrections and Rehabilitation's Department Operations Manual

248

3. 3/20/20 (ECF No. 6512) – Special Master's Report on the Status of the Twenty-Eighth Round Monitoring Report in View of the Coronavirus Pandemic

4. 4/2/2020 (ECF No. 6565) – Special Master's Report on the Current Status of *Coleman* Class Members' Access to Inpatient Care and Department of State Hospitals

5. 4/16/20 (ECF No. 6615) – Update to the Special Master's Report on the Status of the Twenty-Eighth Round of Monitoring and Mental Health Headquarters' Monitoring in View of the Coronavirus Pandemic.

6. 5/29/20 (ECF No. 6695) – Special Master's Report on his Expert's Analysis of Psychiatrists Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation.

7. 6/8/20 (ECF No. 6705) – Special Master's Initial Report on Data Issues Within the California Department of Corrections and Rehabilitation.

8. 9/23/20 (ECF No. 6879) – Special Master's Report on his Expert's Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation.

9. 12/11/2020 - Special Master's Analysis of the California Department of Corrections and Rehabilitation's Annual Suicide Report; January 1 through December 31, 2015 (Sent to the parties in draft on December 11, 2020).

10. 12/11/2020 - Special Master's Report on Suicides Committed in the California Department of Corrections and Rehabilitation for the calendar year 2016. (Sent to the parties in draft on December 11, 2020)

11. 12/17/2020 - Special Master's Twenty-Eight Round Monitoring Report was sent in draft form to the parties.

**Mental Health Headquarters Monitoring:**

- In general, the Special Master's central office monitoring team participates in four to six Mental Health Program and CDCR/CCHCS meetings on a typical workday. On average they attend 24 to 26 meetings each week and could participate in over 100 meetings in a month. Descriptions of meetings attended by the Special Master's central office monitoring team are provided below. For purposes of this report, central office meetings have been divided into two broad classifications: (A) meetings led by Mental Health Program staff ("Mental Health Meetings") and (B) meetings led by CDCR/CCHCS staff ("CDCR/CCHCS Meetings"). In addition, the meetings are sub-divided by categories as

249

appropriate including leadership, program, information technology, or ad hoc. The name of each meeting, meeting frequency and a description of the purpose of the meeting are provided.

A.  <u>Mental Health Meetings</u>

<u>Leadership Meetings</u>

- *Coleman* Special Master's Team/ Deputy Director, Statewide Mental Health Program /Office of Legal Affairs Meeting (weekly) – *attend to substantive mental health policy, program matters, court orders and Coleman workgroup topics.*

- Deputy Director's "Flash" Meeting (three times a week until October 2020 and was changed to twice a week) – *communication between mental health leadership staff.*

<u>Program Meetings</u>

- Case Review conference (weekly) – *to review and plan electroconvulsive treatment and Clozapine initiation in a non- Clozapine initiation institution.*

- *Coleman* Tracking Workgroup (weekly) – *review Mental Health Program deliverables, tracking whether timeframes for deliverables were met or not.*

- Continuing Medical Education (CME) Lecture (weekly*) – psychiatrist from different programs present continuing medical education lectures.*

- Headquarters Psychiatry Team Daily Meeting (daily except for Tuesdays) – *daily meeting of the Mental Health Program headquarters psychiatry team meeting.*

- Headquarters Suicide Prevention and Response Focused Improvement Team (SPRFIT) (monthly) – *attends to staff training and guidance for suicide prevention, response, reporting, and review with the goal of reducing suicide risk in CDCR.*

- Inpatient Coordinator Teleconference *(monthly) – update institutional inpatient coordinator on directives from headquarters dashboard updates, deficiencies, and successes.*

- Inpatient Referral Unit Clinician (IRU) Daily Check-In (daily) – The IRU team reviews transfer approvals, closed and open programs, patient transfers to DSH and confers on patient or institutional concerns.

- Inpatient Referral Unit Coordinated Clinical Assessment Team (IRU CCAT) (as needed) - *clinically discuss patients' treatment plans and level of care and seek to reach consensus about appropriate clinical care across agencies, facilities, and disciplines.*

- Inpatient Referral Unit (IRU) Staff Meeting (weekly) – IRU Chief discuss workload, met, or missed timeframes and other administrative and clinician topics involving inpatient movement.

- Inpatient Referral Unit (IRU) Suicide Prevention Workgroups (every two weeks) – *green belt project to evaluate the cause and establish interventions to prevent suicides after level of care changes from the PIPs.*

- Inpatient Referral Unit (IRU) Utilization Review (weekly) - *reviews with HCPOP, psychiatry and IRU clinicians' specific patients for appropriate level of care and housing.*

- Mental Health Peer Review Subcommittee Meeting (every two weeks) – *review clinicians' clinical and ethical behavior and make recommendations to institutional leadership.*

- Mental Health Quality Management Subcommittee (monthly) – *attends to quality mental health services to ensure they are consistent with all applicable laws, regulations, policies, and procedures.*

- Psychiatric Inpatient Program (PIP) Leadership Meeting (monthly) – *IRU chief meets with PIP CEOs and PIP mental health leadership to discuss Least Restrictive Housing LOPS and audits, staffing, program successes and deficits.*

- Suicide Prevention Mental Health/Nursing/Custody Suicide Case Review (weekly) – *the Suicide Prevention Team conducts cross-discipline suicide case reviews timelines for psychiatry/nursing/custody and institutional staff.*

- Suicide Prevention Team Meeting (weekly) - *administers statewide suicide prevention mission, manages suicide prevention policies and regulations, and manages all Suicide Case Review oversight, including Quality Improvement Plan (QIP) tracking*

- Suicide Prevention Updates (monthly) – *attends to suicide prevention policies, programs updates, and changes.*

- Weekly Psychiatry Team meeting (weekly) – *telepsychiatry program chief provides and receives updates from field psychiatrists regarding impacts of policy, court orders and directives related to the Mental Health Program.*

- Weekly Telepsychiatry meeting (weekly) – *attend to hiring, training, institutional and individual request along with policy and other health care and administrative matters.*

Information Technology Meetings

- Change Advisory Prioritization Committee (CAPC) – (weekly) *standardized approval and completion process for all Mental Health Program changes that occur in the Electronic Health Records System (EHRS) and data reporting.*

- Chart Audit Tool (CAT) audit reviews (monthly, semi -annually and annually) – *review charts audit results with institutions, and policies and procedures that related to audits.*

- Electronic Health Records System (EHRS) and Reporting Request Approval Committee (weekly) – *committee pre-screens requests for changes to EHRS and data reporting prior to submission to the Change Advisory Prioritization Committee (CAPC) for action.*

- Headquarters (HQ) Scheduling Train the Trainer (TTT) (weekly - there was a hiatus after August 2020 which continues at present) – *train institutional schedulers to appropriately schedule mental health patients for mental health services.*

- Keeping Up with Kanban (weekly) – *utilizes an informatics framework used to implement agile software development to evaluate workflow needs for the Mental Health Program quality management staff.*

- Mental Health Primary Clinician Assessment Reason Workgroup – *(*monthly*) workgroup that examines proposed changes to primary clinician's assessment PowerForms in EHRS.*

- Mental Health Reporting Service Ticket Now (twice a week*)* *–addresses specific service tickets submitted by institutional mental health staff regarding EHRS and on-demand reports.*

- Mental Health Sprint (monthly*) – report informatics activities completed or in progress.*

- Mental Health Workflow Workgroup (weekly) – *meetings to develop sequences through which mental health processes pass from initiation to completion for build in EHRS.*

- Weekly Telepsychiatry Technology meeting (weekly) – *attend to telepsychiatry information technology (hardware and software).*

  Ad Hoc Meetings (held at least once)

- Electronic Health Records System (EHRS) - Psychiatry Train the Trainer – *psychiatrist provided CERNER and EHRS training.*

- Psychiatric Inpatient Program (PIP) Admission/Discharge Unit – *attend to changes regarding admissions to and discharges from PIPs due to COVID 19.*

B.    CDCR/CCHCS Meetings

Leadership Meetings

- California Correctional Health Care Services (CCHCS) Suicide Prevention and Response Focus Improvement Team (SPRFIT) Data Analytics Tools Partnership (monthly) - *develop automated performance reports, operation tools, and special analyses for the Mental Health SPRFIT.*

- California Health Care Facility Psychiatric Inpatient Program (CHCF-PIP) Transition Plan Subcommittee (quarterly) – *supervises CHCF PIP transition away from the Department of State Hospital Psychiatric Inpatient Program (DSH-PIP) model to a California Department of Corrections and Rehabilitation-PIP model.*

- California Health Care Facility Psychiatric Inpatient Program (CHCF-PIP)/ California Medical Facility Psychiatric Inpatient Program (CMF-PIP) Workgroup (monthly) – *evaluation of programs successes and deficiencies in staffing, out of cell time, therapeutic hours, and other patient care activities.*

- Clinical Operations Team (COT) (monthly as needed) – *Multidisciplinary team reviews proposed changes to polices and moves the items forward to the Joint Clinical Executive Team for final approving.*

- *Coleman/Plata/CCHCS Meetings (weekly) - attend to Coleman and Plata coordination matters that arise out of or related to central office monitoring, or to other matters as instructed by the Coleman Special Master and/or the Plata receiver.*

253

- Complete Care Operations Team (CCOT) (monthly) – *Interdisciplinary team meeting to discuss compete care model metrics and programs outcomes. Hiatus due to COVID 19.*

- Executive Quality Management Meeting (monthly) - *CCHCS executive team, Mental Health Leadership, Regional Health Administrators, Human Resources, Budgets, and other department heads review and determent Quality Management metrics, initiatives and other QM needs for the departments.*

- Integrated Substance Use Disorder Treatment (ISUDT) Executive Briefing (monthly) – *meeting jointly chaired by CDCR Secretary and Plata receiver that makes policy level decisions regarding ISUDT.*

- Integrated Substance Use Disorder Treatment (ISUDT) Planning and Implementation (weekly) – *oversee the planning and implementation of ISUDT in CDCR.*

- Joint Clinical Executive Team (JCET) (every other Monday) – *cross discipline forum (mental health, dental, medical, nursing, and quality management) to review proposed changes to the clinical operations/policies of a program, ensure that patient care is not affected or have any adverse effects on other discipline operations either clinical or non-clinical.*

- Joint Statewide Patient Safety Committee (monthly) – *CCHCS and other disciplines identify and improve health care concerns through root cause analysis and other means, to avoid further adverse events.*

Program Meetings

- Bad News Notification LOP (monthly)– *CDCR's Division of Adult Institutions (DAI) led meeting to review and develop a policies and procedures for health care, mental health, nursing, and DAI to notify inmate's family when sentinel events occurred.*

- Electroconvulsive Therapy (ECT) Regulatory Workshop (bi-monthly) – *flow mapping of the ECT process to improve efficiencies and to determine roles of institutional psychiatrists, medication court administrator (MCA), headquarters psychiatrists, CDCR's office of legal affairs and other necessary stakeholders.*

- Gender Affirming Surgery Review Committee (at least weekly) – *responsible for evaluating each request for Gender Affirming Surgery for medical necessity and make a recommendation to the Statewide Medical Authorization Review Team for final decision.*

- Nursing Led Therapeutic Group (NLTG) Programs (weekly) – *CCHCS nursing provide therapeutic groups to patients and the patients receive rehabilitation accredited credits (RAC) for attendance. Over 30 of the programs provided are mental health groups.*

- Scheduling Initiative Prioritization Sub-Group (every two weeks) – *takes a holistic review of all scheduling done at CDCR by examining most significant schedule elements in terms of total scheduled hours, and how a proposed new schedule element has the potential to drive conflicts with other scheduled events. To avoid conflicts, a broad assessment of all scheduled events was conducted to identify areas of concern and opportunity.*

- Tele-Health Recruitment, Registry Efforts and (weekly) – *CCHCS Business Services reviews space and registry issues with telehealth and telepsychiatry and determines allocations and other needs.*

  Information Technology Meetings

- Change Advisory Board (as needed) – *Final approval by CCHCS IT of all IT program impacting the entire department.*

- Clinical Leadership Advisory Committee (weekly) – *reviews all policy revisions, workflows, and other initiatives that impact the Electronic Health Record System.*

- Data Governance committee (quarterly or as needed) – *CCHCS IT led multidisciplinary committee reviewing impacts and changes to severs and data warehouses.*

- Data Warehouse (weekly) - *manages the availability, usability, integrity, and security of data used within the organization.*

- Integrated Call (weekly) – *responsible for developing concepts, ideas, and suggestions prior to presentation in the Clinical Leadership Advisory Committee (CLAC).*

  Ad Hoc Meeting (held at least once)

- Complete Care Model PIP leadership Presentation – *CCHCS Deputy Director for Quality Management presented the concept discussed in the Executive Quality Management Meetings of psychiatrist lead inpatient teams.*

255

Since the start of central office monitoring, the Special Master and his team, with input from plaintiffs, worked with defendants to develop and institute several Mental Health Program policy memorandums:

1. September 24, 2019 - Master Treatment Plan Review Process in the Electronic Health Records System - *clarified the review and documentation process for the Master Treatment Plan in the Electronic Health Records System (EHRS).*

2. November 19, 2019 - Mental Health Crisis Bed: Rescinding a Referral – *established the policy for rescinding a Mental Health Crisis Bed (MHCB) referral for patients previously determined to require MHCB level of care.*

3. February 24, 2020 - Reporting Data Issues for Mental Health Quality Management Reports - *provided direction to Mental Health Program staff for reporting data or Electronic Health Records System (EHRS) issues and addressing any issues or requests related to quality management (QM) reports.*

4. March 10, 2020 - Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans - required *Mental Health Crisis Bed (MHCB) supervisors or designees to review all Suicide Risk Assessment and Self-Harm Evaluations (SRASHE) of discharging patients from MHCBs to ensure that each SRASHE contains an adequate safety plan for reducing future suicide risk.*

5. March 16, 2020 - Requirement for Initial Contacts to be Completed Prior to the Interdisciplinary Treatment Team - directed *the primary clinicians (PC) and psychiatrists (PSY), to complete their initial PC and PSY contacts prior to the initial IDTT for all new intakes and all patient transfers.*

6. March 16, 2020 - Headquarters Mental Health Electronic Record And Data Change Management Policy – *established a standardized approval and completion process for all Mental Health Program changes that occur in the Electronic Health Records System (EHRS), data reporting, and Ad Hoc data requests.*

7. March 16, 2020 - Headquarters Mental Health Electronic Record and Data Change Management Procedures – *established the Change Advisory Prioritization Committee (CAPC) to review and vote on approval for Electronic Health Records System (EHRS) requests and reporting requests.*

8. Clinical Contacts and Documentation - *provides direction to mental health clinicians (psychiatrists, psychologists, social workers, psychiatric nurse practitioners) regarding clinical contacts and documentation regarding confidential and nonconfidential settings.*

**Reception Center Intake**

The Special Master and select members of his team met with representatives from CDCR and the Receiver's office to participate in the planning of re-opening the reception centers to admissions from the county jails.  These meetings occurred on the following dates:

1. May 2020 on the 20th
2. September 2020 on the 4th and 16th
3. October 2020 on the 7th, 14th, 21st and 28th
4. November 2020 on the 4th, 10th and 18th
5. December 2020 on the 2nd and 28th

**Transferring COVID-19 High Risk Patients to Safer Housing**

The Special Master's team attends   CDCR's weekly Transferring COVID-19 High Risk Patients to Safer Housing meetings.  The meeting is facilitated by CCHCS Custody Director attended by CCHCS Medical Director, Statewide Chief Nurse Executive, Deputy Director, Division of Adult Institutions (DAI), and others to plan and implement the transfer of medical high-risk patients (including *Coleman* class members) from dorm and open celled housing to celled housing.

These meetings occurred on the following dates:

1. November 24, 2020
2. December 1, 2020.

**Major Accomplishments**

1. Adoption of Telepsychiatry Policy – ECF No. 6539 dated 3/27/20

2. Stipulation and Order Approving Plan to Report on Class Members Transferred Out of Desert Institutions – ECF No. 6678 dated 5/19/2020 (Adoption of Desert Transfer Policy – ECF No. 6296 dated 9/27/19)

3. CDCR Staffing – the parties have been negotiating the court-ordered staffing plan and have substantially agreed upon a plan. This issue is currently before the court.

4. Policies – through the headquarters monitoring process six policies were implemented in 2020 as more fully described above:

    i. Reporting Data Issues for Mental Health Quality Management Reports

    ii.      Supervisory Review of Mental Health Crisis Bed Discharge Safety Plans

    iii.     Requirement for Initial Contacts to be Completed Prior to Interdisciplinary Treatment Team

    iv.     Headquarters Mental Health Electronic Record and Data Change Management Policy

    v.      Headquarters Mental Health Electronic Record and Data Change Management Procedures

    vi.     Clinical Contacts and Documentation

5. Quarantine and Isolation Space – under my supervision, the parties have been negotiating a settlement to set aside sufficient quarantine space for EOP inmates at many of the institutions with EOP programs as well as quarantine space for the PIP at CMF.

# APPENDIX D

# INSTITUTIONAL SUMMARIES

**California State Prison/Sacramento (CSP/Sac)**
May 14, 2019 – May 17, 2019

Census:

On May 13, 2019, the total inmate population at CSP/Sac was 2,116. The mental health caseload population of 1,213 comprised 57 percent of the total inmate population.

The MHCB unit housed 21 inmates.

There were 60 inmates in the administrative segregation EOP hub and 499 mainline EOP inmates.

The 3CMS population included 305 mainline inmates and 111 inmates housed in STRH. There were 317 inmates in the PSU.

Staffing:

The chief psychiatrist position was filled. CSP/Sac did not have an established senior psychiatrist position.

Both chief psychologist positions were filled; one served as the chief of mental health. Eight of 8.5 senior psychologist supervisor positions were filled. Six of 7.5 senior psychologist specialist positions were filled, for a 20-percent vacancy rate.

There were 19.5 psychiatry positions, of which 13.2 were filled, for a vacancy rate of 32 percent. Registry provided an additional 3.75 psychiatry staff, decreasing the functional vacancy rate to 13 percent.

Of 57 staff psychologist positions, 0.5 position was allocated to the Developmentally Disabled Program (DDP). Fifty of 56.5 of the remaining positions were filled. Registry provided 1.5 psychology staff, reducing the functional vacancy rate to eight percent.

The supervising social worker position was filled, as were all 19 social worker positions. For social workers, 18.5 of the positions provided MHSDS clinical services and a 0.5 position was assigned to pre-release planning.

All four senior psych tech positions were filled. Of 106.2 psych tech positions, 85 were filled. Registry filled three more positions, for a functional vacancy rate of 17 percent. Of 76.1 mental health registered nurse positions, 72 were filled. Registry supplied four additional positions for a functional vacancy rate of 0.1 percent.

For recreation therapists, 26 of 28 positions were filled, leaving a seven-percent vacancy rate. Positions for the OSS II, HPS II, both HPS I and AGPA were all filled. Of 24 MHSDS clerical positions, 19 were filled, for a 21-percent vacancy rate.

Telepsychiatry:

CSP/Sac reported that telepsychiatry services that were shared with other institutions provided on-call services after hours. Telepsychiatry was not used in the MHCB.

Quality Management:

CSP/Sac had a robust quality management program, which continued to improve in comparison with the preceding review period.

Reviewed minutes from local governing body meetings in October 2018 and January 2019 were comprehensive and noted numerous agenda items. Those matters included review of CTC policies and procedures, mental health services, laboratory reports, licensing and certification, and custody operations, including access to care.

Reviewed quality management committee meeting minutes from October 2018 and March 2019 were also comprehensive. Addressed items included mental health and health care

safety dashboards, program updates, Performance Improvement Work Plans (PIWP), Prison Industry Authority, and QITs.

A review of monthly mental health subcommittee minutes covering December 2018 through March 2019 reflected a structured and comprehensive agenda and presence of a quorum. Addressed items included population and dashboard trends; custody, mental health, and nursing reports; PIWP updates; specialty services; and audits.

The institution also conducted several audits during the review period.  An audit of EOP programming and the MHCB resulted in the implementation of several CAPs.  An audit that tracked inmates who received RVRs for indecent exposure was used to revise inmate treatment plans.

CSP/Sac conducted PIWPs that met monthly and included appropriate staff.  PIWPs addressed level of care changes, diagnostic monitoring, EOP structured treatment, and EOP treatment refusal rates; the PIWP on treatment refusals was unsuccessful and terminated in March 2019.  The institution also implemented headquarters-required ongoing FITs and QITs that were specific to death reviews.

CSP/Sac reported that it had mistakenly not resumed MHCB peer reviews during the review period.  After consulting with headquarters for clarification of the suspension of peer review, and learning of their oversight, CSP/Sac developed a plan to complete peer reviews during June 2019.

Medication Management:

A review of the mental health headquarters MAPIP medication management dashboard from October 2018 through May 2019 indicated that psychiatric diagnostic monitoring MAPIP measures for inmates' prescribed antidepressants, antipsychotics, and Clozapine were deficient

for one or more months during the review period for laboratory monitoring, medical consents, and other mental health medication matters.

Non-compliant MAPIP nursing mental health measures included continuity of medications upon inter-institutional transfer at receiving and release (R&R), continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), continuity of medications for MHCB transfers, continuity of medications following discharge/transfer from a community hospital and/or DSH, and observation of medication preparation and administration for HS and AM/PM medications. CAPs were developed for the MAPIP nursing measures that scored below 90 percent, but the CAPs were not measurable.

There were 124 PC 2602 involuntary medications orders including 110 renewals, 11 emergent orders, and three non-emergent orders. The PC 2602 involuntary medications tracking process was clearly delineated. One controlled use of force extraction was due to PC 2602 involuntary medications non-compliance.

The non-automated MAPIP measure for pill line lengths and wait times for inmates who were prescribed medications reflected greater than 90-percent compliance.
There was a 180-day order limit for psychotropic medications. Bridge orders were prescribed for a maximum of 30 days for inmates transferring from CSP/Sac and for 60 days for inmates transferring to the institution. Nursing conducted verbal and telephone orders.

All non-formulary psychotropic medication requests were sent to the chief psychiatrist for approval.

The pharmacist reviewed the polypharmacy reports and forwarded concerns to the prescriber or mental health medical director.

One inmate was prescribed sertraline KOP and another fluoxetine KOP. Otherwise, all antidepressant and antipsychotic medications were prescribed DOT.

CSP/Sac was not a Clozaril initiating institution but provided Clozaril maintenance. Nursing staff received annual Clozaril training. Twenty-three inmates were prescribed Clozaril.

There were 343 inmates who were prescribed HS psychotropic medications.

Transfers:

CSP/Sac had two inpatient care coordinators who managed transfers to acute and intermediate care programs.

There was a major sustainability review in December 2018. The review included headquarters' sustainability audit of a sample of higher level of care (HLOC) consideration forms to determine whether they were thoroughly completed and provided adequate clinical justification for inmate non-referral when there were positive referral indicators; the review also assessed any modified clinical interventions in lieu of higher level of care referral. Additionally, the review analyzed the interrater reliability between the headquarters' reviewer and the judgment of CSP/Sac's inpatient coordinator as to the acceptability of HLOC thoroughness and treatment modification. Audit findings indicated that both headquarters and the CSP/Sac inpatient coordinator found that 97 percent of the reviews were acceptable.

The major sustainability review also involved attendance by regional mental health teams at IDTT meetings to evaluate the HLOC process. It found that some programs, such as the MHCB, thoroughly discussed HLOC referral and treatment plans; others, such as administrative segregation and mainline EOP, did not routinely discuss HLOC as part of the IDTT process. The major sustainability review found 100-percent compliance for PIP referral submission timeliness for 45 acute and three intermediate care referrals. It also found sustained quality

during most observed IDTTs; however, significant deficits as to psychiatry's contribution were noted in STRH.  Housing unit reviews/inmate follow-ups that were conducted in all PSU, EOP, administrative segregation, STRH, and MHCB units found 30 inmates who required further institutional follow-up.

There was a minor sustainability review in January 2019; the findings were very similar to the major sustainability review.  Recommendations included IDTT retraining for STRH clinicians, IDTT observation by supervisors and primary clinicians, and increased oversight.

During the review period, 632 inmates met criteria for higher level of care consideration. Of those, 106 inmates or 17 percent were referred. Ninety-one inmates were referred to acute care.  Two acute care referrals were rejected; the remaining 89 inmates all timely transferred within ten days of headquarters' referral.  One inmate transferred more than 72 hours after a bed assignment.

Fifteen inmates were referred to intermediate care.  Three referrals were rescinded, with two being referred to acute care.  All inmates transferred to intermediate care within 30 days of referral from headquarters.

Both inpatient care coordinators were familiar with protocols to expedite inpatient referrals when necessary, but no referrals were expedited during the review period. Records review and observed IDTTs found that inmates who were appropriate for referral to inpatient care were not referred, while non-referral rationales were inadequate.  Moreover, inpatient care referrals were overwhelmingly initiated by the MHCB.  The low number of intermediate care referrals and lack of referrals from the mainline EOP, PSU, and administrative segregation EOP hub indicated deficiencies in identifying inmates requiring inpatient care, and particularly intermediate care.

There were 12 CCAT reviews, but CSP/Sac did not provide documentation of the decisions.

No inpatient care transfers were cancelled or delayed due to impending paroles, disciplinary proceedings, classification factors or pending PC 2602 involuntary medications hearings.

There were no inmates on the Acute Bed Utilization Management Report awaiting a bed during the review period or at the time of the site visit.

*Vitek* hearings were held for 37 of the referrals; two inmates prevailed.

One inmate with complex medical needs transferred to CHCF.

During the reporting period, 114 inmates returned to CSP/Sac following discharge from inpatient care. CSP/Sac reported typically receiving only one day's notice of their return. Clinician-to-clinician follow-up was not tracked.

There were 419 inmates who were referred to the MHCB; 182 or 43 percent of referrals were rescinded. All but one inmate transferred within 24 hours of referral. Clinical and physical lengths of stay averaged 7.8 and ten days, respectively. Eighty-eight inmates' stays exceeded ten days, with a range from 11 to 80 days. Seventy-four inmates had three or more MHCB admissions.

CSP/Sac did not track the timeliness of LTRH transfers during the review period. At the time of the site visit, six inmates were pending LTRH transfer; all had been waiting for more than 30 days, with a range of 55 to 99 days.

Programming:

Administrative Segregation EOP:

The 1.5 FTE psychiatrist assigned to the administrative segregation EOP hub carried a caseload of 103 inmates, which exceeded the established ratio of 1:64. Four primary clinicians had

caseloads that ranged from 11 to 16 inmates; three of the four exceeded the established staffing ratio.

Observed IDTTs were adequate, with required staff in attendance. One of two presenting clinicians provided good case formulations and was engaged and sensitive to inmates' verbal and non-verbal cues. The psychiatrist was also engaged, asked individualized questions and appropriately interacted with other team members. The CC II was knowledgeable and answered relevant questions.

Interviewed inmates reported knowing their primary clinician and psychiatrist and receiving timely confidential contacts. However, they also reported insensitivity and inappropriate comments by housing unit officers.

Document review indicated that approximately one-third of administrative segregation EOP hub inmates had frequent housing moves, which significantly disrupted continuity of care.

Ten inmates were randomly selected to have their records reviewed for their administrative segregation EOP stays. However, certain factors led to the removal of some cases from the assessment.

Primary clinicians timely completed initial evaluations within ten days of inmate arrival in five of six required cases, but one initial contact occurred after the IDTT. Although all six required cases indicated an initial psychiatric contact before the initial IDTT meeting, it was not consistent with a comprehensive mental health assessment; instead, it was indicative of a routine contact, which was not consistent with Program Guide requirements and thus problematic.

All four cases that were required to have an initial IDTT had one within 14 calendar days of inmate arrival and on the same day as the ICC. Required staff attended all initial IDTTs. No inmates were required to have routine IDTTs.

As for routine primary clinician contacts, compliance was 93 percent for required weekly contacts. All eight required 30-day routine psychiatry contacts occurred timely.

MHCB:

CSP/Sac had two CTCs. CTC-1 had 13 MHCBs, one bed each for restraint and seclusion and two designated medical beds. One of the beds was an ADA cell. CTC-2 had 11 MHCBs and one bed that was used for either restraint or seclusion; the one ADA bed in CTC-2 was redlined. There were appropriate beds in each MHCB cell.

Three FTE psychiatrists provided services in the MHCBs. Psychiatry staffing was within the established staffing ratio given the MHCB census during the review period and at the time of the site visit. The 8.5 FTE primary clinicians who provided services in the MHCB seven days a week had caseloads within the established staffing ratio.

MHCB assessment and treatment processes were consistent with the Program Guide. Newly-admitted inmates were given a history and physical within 24 hours of arrival, a new or updated mental health assessment that was conducted in a confidential setting, an SRASHE if the inmate was admitted for suicidal behavior, and an initial IDTT within 72 hours. However, there was only 59-percent compliance for SRASHEs that met all audit criteria.

Inmates were seen daily in a confidential setting by a psychiatrist or psychologist, or at least twice weekly by a psychiatrist. CTC-1 had two available rooms for individual contacts. Individual contacts in CTC-2 took place in a room where the inmate and the clinician were separated by a Lexan window. There were also confidential settings in therapeutic modules in the dining room.

MHCB inmates did not have access to a dayroom but had access to the MHCB yard with a recreation therapist one to two times weekly. The recreation therapist also offered in-cell activities.

The supervising psychologist reported that her regular review of discharge summaries indicated timely completion by psychiatry, as well as SRASHE completion for all inmates following MHCB discharge. Regular review by the supervising psychologist also indicated compliance for suicide watch and precaution practices.

Staff reported that the huddle process was generally helpful. The crisis triage process was also described as a useful mechanism to facilitate timely crisis assessments. There were five inmates who were randomly selected to have their health care records reviewed for their MHCB stays. Three of five indicated a timely initial primary clinician evaluation within 24 hours of admission. Three of five also received a timely initial psychiatry evaluation, but one was conducted in a non-confidential setting.

All five reviewed cases indicated timely initial IDTTs. Seven of eight required ongoing or discharge IDTTs were timely. Chart review did not indicate any inappropriate discharges. MHCB chart review indicated compliance for 30 of 32 required daily contacts. Nineteen of 20 psychiatrist contacts were also compliant, but two were non-confidential; however, progress notes did not indicate whether this was due to inmate refusal.

Seclusion and Restraint:

Clinical restraints were not used during the reporting period. Seclusion was used on one occasion from January 25 through January 27, 2019 after an inmate banged his head.

<u>Alternative Housing</u>:

Two senior psychologist supervisors, seven psychologists, and two social workers were assigned to alternative housing.

Alternative housing was located on Facility B-7. Although mental health leadership reported that CSP/Sac had 20 alternative housing cells, Facility B-7 custody officers reported using only ten Facility B-7 cells for alternative housing. Each facility also had two ZZ cells that were used for ADA inmates.

There were 174 alternative housing placements during the review period, of which all but one was for 24 hours or less. Thirty-five or 20 percent of alternative housing placements were transferred to the MHCB.

Alternative housing cells were wet cells. They were not suicide resistant; inmates were provided with a non-tear smock, blanket, and mattress. Inmates in alternative housing were on suicide watch and, pending MHCB placement or rescission, were monitored by nursing or custody staff.

<u>Short-Term Restricted Housing</u>:

The one psychiatrist and five primary clinicians assigned to the STRH all had caseloads within the established ratio.

CSP/Sac was unable to report STRH 3CMS inmate lengths of stay for the review period.

Observed IDTTs indicated attendance by required staff, in addition to the 3CMS supervisor and a clinical lead. Staff were able to access EHRS and SOMS. Clinicians presented their cases well, with adequate case formulations. The onsite psychiatrist asked all inmates if they knew the medications they were prescribed, and their benefits and side effects. There was also sufficient medical record review with the psychiatrist and clinician in agreement as to the

diagnosis. The clinical supervisor interjected appropriately. However, the CC I did not provide relevant information. Improvement was also needed as to having specific measurable goals and discussion about inmates' prior higher level of care admissions.

STRH offered multiple 90-minute groups; the majority were taught by a recreation therapist. An observed 90-minute, clinician-led group addressed managing conflicts that were specific to segregation. All inmates were engaged and actively participated.
Interviewed inmates reported knowing their primary clinicians and psychiatrist, confidentially meeting weekly with primary clinicians, and being able to meet more often with either. Some reported that clinicians and custody staff did not take them seriously when they reported suicidal ideation. They further reported level of care changes from EOP to 3CMS in instances where symptoms had not improved.

Interviewed inmates and review of CDCR Form 114A for STRH inmates revealed the consistent offering of 18.5 weekly hours or more of yard and three weekly showers. Interviewed inmates also reported being offered 90 minutes of weekly group.

Ten inmates were randomly selected to have their health care records reviewed for their STRH stays. However, certain factors resulted in the removal of some cases from the assessment.

Six cases required an initial psychiatry evaluation, but there was no documentation of a comprehensive evaluation; documentation was only consistent with a routine contact, which was problematic. Furthermore, only one of six cases reflected documentation of a psychiatric contact before the IDTT. Chart review indicated that eight of nine cases had timely initial primary clinician evaluations.

There were timely initial IDTT meetings for four of eight cases that required them. Required staff attended all initial IDTT meetings. No cases required routine IDTTs.

All routine primary clinician contacts occurred weekly; however, compliance was sixty-eight percent for routine primary clinician contacts within seven days. All seven reviewed cases that required ongoing 90-day psychiatry contacts received them.

PSU:

CSP/Sac had four PSU units; two were on Facility A (PSU A) and two were on Facility B (PSU B). PSU A included DDP and Durable Permanent Mobility (DPM) inmates. PSU A and B had 128 and 104 single cells, respectively.

Three PSU psychiatrists had caseloads within the established ratio. A 0.75 PSU psychiatrist had a caseload that marginally exceeded the established ratio. Eleven primary clinicians assigned to the PSU had caseloads between 11 and 21 inmates; ten of 11 exceeded the established staffing ratio. Two additional primary clinicians with other duties had caseloads between two and three inmates.

The PSU had a four-step Behavioral Incentive Program (BIP) system to incentivize inmates to make positive changes by improving daily living and coping skills, and stress management, while decreasing negative and self-defeating behavior. The BIP provided additional privileges, such as expanded canteen, additional property and appliances to inmates who exhibited positive behavior and treatment participation; negative behaviors led to the loss of privileges.

Observed IDTTs revealed all required staff in attendance. Treatment team members were generally knowledgeable about inmates. However, the psychiatrist, who minimally participated, was covering for many cases and did not appear to have reviewed inmates' records prior to the

IDTT meetings. The IDTTs discussed general treatment goals but did not address specific treatment interventions or groups. There was also a lack of quality discussion of higher level of care referral consideration.

Recreation therapists and nursing facilitated most PSU groups; primary clinicians provided less than ten percent of groups. Provided aggregate data for all PSU inmates, including those on a modified program, indicated that they were offered a weekly average of 12 hours of groups. An observed recreation therapist-led group revealed a facilitator with excellent rapport with inmates who comprehensively presented concepts while eliciting feedback and participation; however, the basic tenets of Cognitive Behavioral Therapy (CBT) were not always accurately presented.

In October 2018, CSP/Sac conducted a chart review audit for inmates with indecent exposure behaviors. The audit analyzed whether the individual plan of care (IPOC) contained measurable goals and specific interventions that addressed indecent exposure behaviors, and whether or not these behaviors were addressed by the treatment plan's clinical summary or case formulation. The audit thus sought to focus staff on the need to directly address indecent exposure behaviors during treatment planning.

Six inmates were randomly selected to have their records reviewed for their PSU stays. Five of six required initial evaluations by the psychiatrist and primary clinician. Psychiatrists timely completed three of five initial psychiatry evaluations. Primary clinicians timely completed initial evaluations in two of five cases.

Five of six cases required initial IDTTs, but only three of five occurred timely with the IDTT seeing the inmate prior to the ICC. There were timely ongoing IDTTs for eight of nine cases that required them.

Sixteen of 18 psychiatry contacts that were required to occur at intervals no greater than 30 days were completed timely.  Eighteen of 22 required weekly primary clinician contacts occurred timely.

EOP:

CSP/Sac had two Level IV general population EOP programs, namely, EOP A and EOP B.  The average census of both units during the review period was 575 inmates.

The six psychiatrists assigned to EOP all had caseloads within the established staffing ratio.  Another Facility B 1.0 FTE psychiatrist had a caseload of between 20 and 25 inmates, among other duties.  Twenty-three primary clinicians assigned to the EOP had caseloads that ranged between 20 and 28 inmates; four caseloads exceeded the established staffing ratio.

Staff and inmates reported that primary clinicians saw inmates at least weekly or every other week if seen by their primary clinician in a group setting; psychiatry saw them monthly.  Inmates confirmed the frequency of such sessions but complained that primary clinician contacts were brief.  Facility A inmates further reported that sessions were not confidential.

Supervising psychologists reported completing initial IDTT meetings within 14 days.  Observed IDTTs were attended by required disciplines with access to EHRS and C-files; the IDTTs were clinically meaningful.  However, more discussion of groups that were relevant to the treatment plan and inmate group participation was recommended.

Only two-thirds of EOP inmates were offered at least ten weekly hours of out-of-cell structured therapeutic activities.  Their refusal rate was approximately 40 percent.  Inmates further reported that refusals were due to an insufficient number of core groups and too many recreational groups.  Observed groups indicated adequately prepared group facilitators and the active participation of between six and eight participants.

Inmates interviewed in several group settings complained about the frequent cancellation of treatment. Some also reported that some correctional officers had inadequate training to properly deal with EOP inmates. Others complained that staff encouraged them to change their level of care from EOP to 3CMS.

Inmates did not report any significant issues regarding medication management during interviews.

The inmates reported that there were good working relationships between custody and mental health staff in EOP.

EOP inmates reported that they did not recreate with non-EOP inmates.

Some mental health line staff expressed their belief that most EOP inmates did not require the EOP level of care and that the systemwide EOP review was faulty. Many also believed that the Program Guide only permitted inmates to be at the EOP level of care for one year.

Ten inmates were randomly selected to have their health care records reviewed for their EOP stays. Certain factors led to the removal of several cases from the assessment.

Two of three inmates who required an initial psychiatric contact had one; documentation reflected that this contact occurred after the IDTT, but within 14 days of inmate arrival; however, it reflected a routine contact, and not a comprehensive evaluation, as required by the Program Guide. Chart reviews indicated that both inmates who required initial primary clinician evaluations had them timely.

Two of three cases had timely initial IDTT meetings. All required quarterly IDTT meetings were timely. Required staff attended all initial and routine IDTTs; however, although attendance by the assigned psychiatrist was required, this was not clearly documented.

There was 74-percent compliance for required weekly primary clinician contacts, and seventy four percent compliance for required 30-day ongoing psychiatry appointments.

3CMS:

3CMS inmates were housed on Facilities A, B, and C.  Two full-time 3CMS clinicians had caseloads of 127 and 119, which exceeded the established staffing ratio; a part-time clinician had a caseload of 49.  Clinicians reported that clinical contacts occurred according to Program Guide requirements.  Both psychiatrists assigned to the 3CMS program had caseloads that were within the established staffing ratio.

Observed IDTT meetings were attended by the psychiatrist, primary clinician, and CC I. Staff accessed inmates' records by way of EHRS and SOMS.  The clinician presented adequate case formulations.  The psychiatrist was engaged and asked inmates whether they had questions about their medications and any side effects.  The CC I performed adequately.

At the time of the site visit, there were no groups on Facilities A or B, and minimal group activity on Facility C.  An observed clinician-led group on Facility C started 40 minutes late; the delay was reportedly due to custody staff not allowing inmates to attend even though they had ducats.  However, the group was well-conducted, and inmates exhibited skills that they had learned from attending this group; inmates further reported stressful housing unit situations but reported using mindfulness techniques to avoid receiving RVRs.

Interviewed Facility C inmates reported knowing their primary clinician and psychiatrist. They indicated receiving ducats for mental health services, but also reported instances when they were improperly not released for mental health groups or appointments.

During the fourth quarter of 2018, CSP/Sac data indicated that headquarters requested the assessment of 95 cases on the continued need for 3CMS level of care.  Of 81 completed reviews,

22 or 27 percent were removed from the 3CMS level of care.  During the first quarter of 2019, headquarters reviewed another 108 cases; of 88 completed reviews, 15 or 17 percent were removed from 3CMS level of care.

Nine randomly selected 3CMS inmate cases were selected for chart review.  Certain factors resulted in some cases being removed from the assessment.

All three inmates who were required to have an initial psychiatric evaluation had one within 14 days of arrival; however, two had them on the same day as the IDTT and it could not be determined whether the contact occurred during the IDTT or was a separate contact.  These initial psychiatric evaluations were also not consistent with a comprehensive mental health assessment, but were indicative of a routine contact, which was problematic. Three of five cases had initial primary clinician contacts, but only one of those contacts occurred within 14 days of inmate arrival and was timely.

Three of four cases had required timely initial IDTTs; required staff attended three of four initial IDTT meetings.  However, documentation did not indicate whether the attending psychiatrist was the assigned psychiatrist.  No inmates were required to have an annual IDTT.

Required 90-day psychiatry contacts were timely completed, as were required quarterly primary clinician contacts.

Other Issues:

Pre-Release Planning:

CSP/Sac offered pre-release groups to EOP inmates.  It was reported that assigned primary clinicians individually worked with inmates to help provide appropriate resources and planning for impending release.  The institution further reported that during IDTT, the treatment

team reviewed inmates' progress with their impending release plans. CSP/Sac did not track information on the number of inmates seen by the TCMP.

Program Access:

a.  Job and Program Assignments:

On May 2, 2019, CSP/Sac reported that of 706 jobs, 146 EOP inmates, or 21 percent of the EOP population, held job assignments. For 3CMS inmates, 133 or 27 percent of the 3CMS population held job assignments. For non-MHSDS inmates, 427 or 46 percent of the population held assignments.

For the 919 academic assignments, the institution reported that 239 EOP inmates, or 34 percent of the EOP population, held assignments. For 3CMS inmates, 207 or 42 percent of the 3CMS population held them, as did 473 or 51 percent of non-MHSDS inmates.

Of the 160 vocational education assignments, 25 or four percent of EOP inmates held them, as well as 34 or seven percent of 3CMS inmates and 101 or 11 percent of non-MHSDS inmates.

CSP/Sac did not have any voluntary education assignments.

Of 242 substance abuse treatment assignments, it was reported that 17 or two percent of EOP inmates held them, as did 37 or seven percent of 3CMS inmates and 188 or 20 percent of non-caseload inmates.

The institution provided a copy of the PowerPoint presentation entitled "Program Assignment for EOP Patients: An Interdisciplinary Treatment Team (IDTT)," which it used to train staff toward the goal of increasing EOP inmate program assignments. The presentation also included guidelines for performing functional evaluations for EOP inmates.

b.    Milestone Credits:

A report for the time period of November 1, 2018 to April 30, 2019 indicated that of 698 EOP inmates, 654 or 94 percent were eligible to earn milestone credits and 75 percent earned the credit.  For 3CMS inmates, 462 of 496 or 93 percent were eligible to earn milestone credits, with 32 percent earning the credit.  The data further indicated that of 926 non-caseload inmates, 848 or 92 percent were eligible to earn the credits, with 21 percent earning the credit.

CSP/Sac reported that 11 staff members had been trained on the milestone credit completion process.  The institution provided training materials.

c.    Out-of-Level Housing:

For the out-of-level housing of caseload inmates, provided data indicated that as of April 30, 2019, six EOP Level I inmates were placed in Level IV housing; five 3CMS Level II inmates were placed in Level IV housing and four EOP and two 3CMS Level III inmates were placed in Level IV housing.

d.    ADA Reasonable Accommodation and Grievance Procedures:

The institution confirmed implementation of the revised ADA accommodation and grievance procedures.  CSP/Sac also provided a copy of the CDCR Form 1824 Desk Reference Manual, which had been updated in October 2017 and delineated the ADA reasonable accommodation process.

e.    Periodic Classification Score Reductions: EOP inmates:

CSP/Sac reported that because SOMS lacked the capability to run historical reports, it was unable to access completed CDC 840s that reflected periodic classification score reductions for EOP inmates during the review period.

Case-by-Case Reviews:

CSP/Sac reported that 49 cases met the requirement for a 150-day review. A review of a sample of case notes for inmates who were retained in administrative segregation beyond 150 days indicated adherence with CDCR policy.

CSP/Sac only provided information on inmates eligible for 120-day pre-MERD reviews for the months of January, February, and March 2019. Reviewed information indicated that 100 percent of cases seen by the ICC were retained in LTRH; all had Classification Staff Representative (CSR) endorsements pursuant to CDCR policy.

Non-Disciplinary Segregation:

On May 16, 2019, there were three EOP and 16 3CMS inmates on NDS status, but it was not reported whether this status was related to property or privileges. The institution was unable to provide data on the number of caseload inmates on NDS status and their lengths of stay during the review period as SOMS was unable to produce such historical data.

"C" Status:

CSP/Sac inmates who received two or more RVRs during a six-month period were placed on "C" Status, resulting in a reduction of privileges. "C" Status was typically for 90 days and could not exceed 180 days.

The institution was unable to report the number of EOP, 3CMS, and non-MHSDS inmates on "C" Status and their "C" Status lengths of stay during the review period due to the inability of SOMS to report certain historical data.

On May 15, 2019, 35 CSP/Sac inmates were on "C" Status; nine were EOP, 12 were 3CMS and 14 were general population inmates. CSP/Sac was unable to report their lengths of stay.

<u>Mental Health Referrals</u>:

For psychiatry referrals, CSP/Sac reported timely responses to routine referrals but non-compliance for two of four emergent and three of four urgent referrals.  There was compliance for eight of nine psychiatry medication noncompliance referrals.

The institution reported compliance for emergent and routine referrals to primary clinicians, but 89-percent compliance for urgent primary clinician referrals.

<u>Construction/Space</u>:

The institution reported and observation confirmed adequate treatment space for individual and group treatment in the administrative segregation EOP, PSU, EOP, and 3CMS programs.  The STRH had only one group treatment space and a large conference room, but five individual treatment rooms.

<u>Mental Health/Custody Relations</u>:

As reported above, interviewed inmates reported good working relationships between custody and mental health staff in EOP.

CSP/Sac's local operating procedure dated February 2019 was generally in alignment with CDCR's custody and mental health partnership plan.

The institution had implemented monthly executive rounding prior to the required implementation date.  A review of executive rounding documentation from January through December 2019 indicated monthly completion by custodial and health care staff.  However, only two rounds complied with CDCR's partnership plan; the remaining were non-compliant as they were performed by the associate warden instead of the warden.

CDCR's partnership plan and CSP/Sac's local operating procedure required that a summary of executive leadership rounding be included in quality management committee and

mental health subcommittee minutes.  However, a review did not indicate the presence of this documentation in the quality management committee minutes.  Relatedly, reviewed mental health subcommittee documentation was not in accordance with the policy requirement of reporting rounded programs, identified critical topics, and the identities of staff who conducted the rounds.

A review of housing unit logs and huddle binders indicated inconsistent documentation of huddle meetings.  Among them, whole sections on the mental health unit huddle report were left blank.

CSP/Sac provided confirmation of the implementation of the quarterly partnership roundtables, which indicated attendance by 166 staff members from the MHCB, EOP, administrative segregation EOP hub, PSU, and STRH.  However, reviewed documentation did not indicate who was required to attend the training.

CSP/Sac only provided information related to medical complaints and did not provide information on institutional action reports.

Heat Plan:

The heat season was not in effect during the review period.

Some interviewed officers were aware of the various stages of the heat plan, the protocols required at each stage and when the heat season was in effect; others had difficulty identifying heat alert requirements and which months the heat season was in effect.  Most heat logs in the control booth reflected the reporting of the temperature every three hours, but some were incomplete.  Observed thermometers were appropriately placed in the housing units.

RVRs:

Of 120 custody staff who were required to receive the required RVR training, 113 or 94 percent received the training.  There were 82 of 89 or 92 percent of mental health staff who completed the training.

During the review period CSP/Sac issued 1,910 RVRs, of which 1,309 or 69 percent were issued to MHSDS inmates.  Specifically, 716 or 37 percent were issued to EOP inmates, 573 or 30 percent were issued to 3CMS inmates, and 20 or one percent were issued to inmates in the MHCB.

Mental health clinicians completed 777 mental health assessments.  Only 41 of 573 RVRs issued to 3CMS inmates were deemed by custody staff to meet the requirements for completion of a mental health assessment.

A sample of RVRs were analyzed for compliance with applicable CDCR policy; reviewed RVRs included five issued to MHCB inmates, five issued to EOP, and three RVRs issued to 3CMS inmates.  This review found that custody staff timely referred the RVR for a mental health assessment in only 60 percent of cases; mental health staff timely completed the assessment and returned it to custody in all cases.  Only one clinician determined that mental health symptoms had strongly influenced the inmate's behavior, but the clinician did not recommend alternate documentation and noted "N/A."  Individual clinicians repeatedly used the same phrase in suggesting the mental health factors and/or developmental/cognitive disability or adaptive functioning deficits the hearing officer should consider when assessing the penalty. All senior hearing officers documented consideration of mental health assessments; two noted penalty mitigation due to the assessments.

<u>Use of Force</u>:

CSP/Sac reported that more than 99 percent of custody staff received the mandatory use of force training, as did 82 percent of required mental health staff.  No psychiatrists attended this training as CSP/Sac reported that they were not required to attend; however, this was not in compliance with CDCR policy.

CSP/Sac reported 11 controlled use of force incidents during the review period.  There were also 268 immediate use of force incidents involving 246 MHSDS and 372 non-MHSDS inmates; some incidents involved more than one inmate.

A review of all controlled use of force incidents and six randomly selected immediate use of force incidents indicated compliance with CDCR policy.

<u>Lockdowns/Modified Programming</u>:

CSP/Sac reported four instances when it implemented modified programming.  One occurred from November 2 through November 19, 2018 on Facility B, in housing units 1 – 6.  A review of the daily Program Status Reports from November 2 through November 5, 2018 indicated a contradiction; they reported there would be no mental health groups or one-on-ones during this period, but also indicated that mental health care access would not be affected by the modified program.  The monitor was unable to obtain clarification of this discrepancy during the site visit.  There was also no recreational or dayroom activities during this modified programming.

Modified programming was also implemented during three other time periods during the review period; from November 27 through December 4, 2018 on Facility C, in housing units 1 – 8, from February 6 through February 13, 2019 on Facility B, in Buildings 3 and 4, and from March 22 through April 4, 2019.  As a result, there was no dayroom and typically no recreational

activities; however, priority ducats remained in place for mental health programming, which was reportedly not otherwise affected.

Access to Care:

A review of monthly Health Care Access Quality Reports from October 2018 through March 2019 revealed that less than one percent (0.89 percent) of issued mental health ducats and add-on appointments were not completed due to custody factors, while 12 percent were not completed for non-custodial reasons, excluding inmate refusals.

Non-Designated EOP:

CSP/Sac did not provide information regarding the non-designated EOP as activation had occurred outside of the reporting period.

Placement of 3CMS Inmates into Minimum Support Facilities:

The institution reported that no 3CMS inmates were placed in Minimum Support Facilities during the review period.

*Coleman* Postings:

Housing units on each yard were visited. All contained updated *Coleman* posters in English and Spanish posted in areas that were accessible to inmates.

Document Production Issues:

CSP/Sac reported that SOMS was unable to produce certain historical data. This resulted in the institution's inability to provide data for the reporting period on the number of STRH 3CMS inmates or on inmates housed in administrative segregation, and their lengths of stay. The institution was also unable to report the number of EOP and 3CMS inmates on NDS or "C" Status, and their respective lengths of stay, during the review period.

**Folsom State Prison (Folsom)/Folsom Women's Facility (FWF)**
May 7, 2019 – May 9, 2019

Census:

On May 7, 2019, Folsom State Prison housed 3,461 inmates, which included 2,986 male inmates and 475 female inmates in the Folsom Women's Facility (FWF).  The mental health caseload population of 681 included 508 male and 173 female inmates for 20 percent of the total inmate population.

There were three male inmates and three female inmates at the EOP level of care and 500 male inmates and 170 female inmates at the 3CMS level of care.

The five 3CMS male inmates in administrative segregation were awaiting transfer to STRH.

Staffing:

Folsom/FWF did not have an established chief psychiatrist position.

The senior psychiatrist supervisor position was filled.

One of the two chief psychologist positions was filled and served as the chief of mental health; the other remained vacant as a salary savings measure.

The senior psychologist supervisor position and the two senior psychologist specialist positions were filled.

Of the four established psychiatrist positions, 3.5 were filled, yielding a 12-percent functional vacancy rate.

Five of the seven psychologist positions were filled for a 29-percent functional vacancy rate.

Folsom/FWF did not have an established supervising social worker position.  Two of the six social worker positions were filled, yielding a 67-percent functional vacancy rate.  Combined

286

with the psychology vacancies, the functional vacancy rate for primary clinicians at Folsom/FWF was 46 percent.

Folsom/FWF did not have an allocated senior psych tech position. All of the 4.5 psych tech positions were filled.

The one HPS position and the one CHSA II position were filled. All of the 4.5 MHSDS clerical positions were filled.

During the site visit, CDCR mental health headquarters staff reported that based on the current census, Folsom/FWF's MHSDS staffing allocation would be decreased by 1.5 psychologist positions and 1.0 social worker position.

Telepsychiatry was not used at Folsom/FWF.

Quality Management:

Folsom/FWF had a robust quality management process. The quality management committee met monthly and the presence of a quorum was documented in the minutes. Agenda items included actions and recommendations of the mental health subcommittee, performance improvement work plans, local operating procedures, Joint Commission accreditation issues, and the role of custody staff in mental health care.

The mental health subcommittee met monthly and documented the presence of a quorum. The mental health subcommittee utilized CDCR's health care dashboard to monitor compliance with required mental health services at the EOP and 3CMS level of care. A myriad of regular agenda items included non-formulary medications; data entry issues; timely transfers; diagnostic monitoring; discharge follow-ups; timely completion of mental health assessments related to RVRs; and timely placement of inmates in administrative segregation, STRH, and LTRH. Regional mental health administration's reviews, local operating procedures and mental health

training requirements were also addressed.

Information from the quality management process was disseminated to Folsom/FWF mental health staff through emails, morning huddles, and mental health program staff meetings.

There were no mental health QITs chartered during the review period or ongoing at the time of the site visit.

Pursuant to instructions from mental health headquarters, external peer review did not occur during the reporting period. Folsom/FWF completed an internal peer review of 15 percent of 3CMS inmate charts, and feedback was provided to clinicians. Summaries of those findings were provided to the mental health subcommittee.

Medication Management:

The mental health headquarters medication management dashboard for the period of October 2018 through March 2019 was reviewed. Staff reported the dashboard was useful, although Folsom/FWF also utilized other databases for medication management.

Identified areas of noncompliance included the following nursing performance measures: continuity of medications upon inter-institutional transfer at receiving and release (R&R), continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), and continuity of medications for MHCB transfers. Staff was unable to explain the methodology for measuring compliance with administration for HS and AM/PM medications.

Psychiatric performance measures below 90 percent during the review period included Lamotrigine consent, abnormal involuntary movement scores (AIMS), lipid, blood sugar, complete metabolic panel (CMP), and complete blood count (CBC) with platelets. Depakote and Lithium measures also scored below 90 percent for the small sample of charts reviewed.

Corrective action plans to address deficiencies included meetings with nursing and psychiatry staff and retraining nursing staff regarding proper documentation.

There was a 120-day order limit for psychotropic medications. There was not a maximum length of time that bridge orders could be prescribed by policy. Nursing staff recorded verbal and telephone orders in EHRS and forwarded to pharmacy. A message was sent to the prescriber's message center to complete the order.

Non-formulary psychotropic medications were denied or approved by the senior psychiatrist. However, staff reported if unavailable, any psychiatrist could approve an order by signing as a senior psychiatrist.

Folsom/FWF's polypharmacy committee consistently reviewed inmates prescribed ten or more medications. At the time of the review, Folsom/FWF was developing a psychiatric polypharmacy committee.

Folsom/FWF was not an institution designated to initiate or maintain Clozaril.

At the time of the site visit, there were no inmates prescribed DOT/KOP or SSRI medication.

During the reporting period, there was one inmate on PC 2602 involuntary medications with an expiration date in August 2019.

There were 180 inmates receiving psychotropic medications on a HS basis. Information regarding compliance with time of administration of HS medications was not provided in a useful format.

Transfers:

There were 26 inmates who met criteria for higher level of care consideration during the review period for both acute and intermediate care. None were referred.

No inmates returned from acute or intermediate care programs during the review period.

Folsom referred 25 inmates to MHCBs. One referral was rescinded. Admissions occurred within 24 hours of referral.

FWF referred 11 inmates to MHCBs during the review period. Seven referrals or 64 percent were rescinded.

No inmates from Folsom/FWF transferred to a PSU or LTRH during the review period.

During the review period, 47 inmates transferred to STRH. Of those, 39 transfers or 83 percent were timely. Delays were largely due to court hearings and bus seat availability. At the time of the site visit, five 3CMS inmates in administrative segregation were awaiting transfer to STRH.

Five inmates transferred to EOP hubs during the review period. Of those, four inmates or 80 percent transferred timely. No inmates were awaiting transfer to an EOP hub at the time of the site visit.

There were 26 inmates transferred to EOP programs during the review period. All inmates transferred within 60 days. During the site visit, two male inmates and three female inmates were awaiting transfer to EOPs; none were beyond the 60-day transfer timeframe.

Programming:

MHSDS Inmates in Administrative Segregation:

Folsom transferred all caseload inmates requiring administrative segregation placement to appropriate EOP hub and STRH facilities. FWF immediately transferred all inmates requiring administrative segregation placement to CCWF.

Psychiatrists and primary clinicians with other assignments also provided services to the administrative segregation inmates pending transfer.

290

Treatment space in administrative segregation was limited and lacked confidentiality.

Eight retrofitted intake cells were located on the first tier. Additionally, there were "quiet cells," also known as maintenance cells, located at the back of the unit, behind a wall with decreased visibility. During the review period, 3CMS inmates were housed in those cells. Due to their isolated nature, the monitor's expert indicated it was not appropriate to house class members in the quiet cells.

Observed daily psych tech rounds were appropriate and the psych tech had good rapport with the inmates. Custody staff remained an appropriate distance away during rounds to afford confidentiality.

Alternative Housing:

Folsom used eight intake cells in administrative segregation for alternative housing. FWF used two cells in Receiving and Release (R&R).

There were 31 alternative housing placements during the review period. All transferred to MHCBs; four stays or 13 percent exceeded 24 hours.

Suicide smocks and clothing was issued as appropriate in alternative housing. Observed cells were clean, and cleaning logs were maintained at Folsom. FWF did not maintain cleaning logs. All cells had operating sinks and toilets, and appropriate bedding was provided.

3CMS:

Caseloads for three of five primary clinicians at Folsom exceeded the mainline 3CMS mandated ratio of 1:97 with caseloads ranging from 108 to 119 inmates. The remaining two primary clinicians had caseloads of 90 and 97 inmates. Two psychiatrists assigned to Folsom's 3CMS program had caseloads within the staffing ratio of 1:280, with caseloads of 181 and 192

inmates.  A third psychiatrist assigned to both Folsom and FWF had a caseload of 149 3CMS inmates.

Caseloads for the two primary clinicians in the 3CMS program at FWF were within mandated ratios with 70 and 96 inmates.  One of the two FWF psychiatrists had a caseload of 126 inmates and the second psychiatrist who provided services one day a week at FWF carried a caseload of 42 inmates.

At Folsom, four of the ten randomly selected 3CMS health care records reviewed required initial psychiatric contacts; three or 75 percent occurred before the IDTT.  All of the 3CMS inmates in the sample who required a routine psychiatric contact were seen within 90 days.

Six inmates in the 3CMS sample of ten inmates that required initial primary clinician contacts were seen timely.  All routine primary clinician contacts occurred within 90 days.

Inmates reported confidentiality of clinical contacts at Folsom.

Six inmates in the sample required initial IDTTs.  Folsom timely completed required initial IDTTs for all six inmates.  All required routine IDTTs in the sample were completed timely as well.

Required staff was present for all initial and routine IDTTs in the sample of Folsom inmates.

At FWF, six of the eight randomly selected 3CMS health care records reviewed required initial psychiatric contacts; four or 66 percent occurred before the IDTT.  All of the 3CMS inmates in the sample who required a routine psychiatric contact were seen within 90 days.

Six or 60 percent of the 3CMS sample of ten inmates that required initial primary clinician contacts were seen timely. All routine primary clinician contacts in the sample occurred within 90 days.

Inmates reported confidentiality of clinical contacts at FWF.

FWF timely completed required initial IDTTs for the inmates in the sample. Routine IDTTs were not required for any inmates in the sample.

Required staff was present for all initial IDTTs of the FWF sample inmates.

Observed IDTTs at Folsom and FWF were attended by all necessary participants and there was good interdisciplinary participation by all attendees. At Folsom, all participants had and used laptops; however, at FWF, only the psychiatrist and CC I used laptops. Discussion regarding treatment goals and treatment planning was inconsistent at both institutions. There was consistent discussion of consideration of referral to higher levels of care at both Folsom and FWF.

During the review period, the location of IDTTs at FWF was problematic. IDTTs were conducted in the visiting area with visual access by passing inmates and staff. Further, vending machines created loud ambient noise making it difficult to hear the IDTT participants.

At the time of the site visit, Folsom offered nine groups for 3CMS inmates. All groups were facilitated by clinicians. Inmates complained of long waitlists lasting for months during the review period. Inmates were generally satisfied with the quality of groups but expressed a need for more. The one observed group was well run and clinically beneficial.

FWF offered a total of two 60-minute groups for 3CMS inmates.

Other Issues:

Pre-Release Planning:

There were no pre-release planning groups at Folsom/FWF.   Limited pre-release planning was provided by primary clinicians and the Transitional Case Management Program (TCMP).   On May 7, 2019, the hiring of an institutional mental health pre-release coordinator (IMHPC) was in process.

During the review period, the institution did not track TCMP contacts.

Program Access:

a.   Job and Program Assignments:

The program access report for Folsom and FWF was combined.

On April 2, 2019, Folsom/FWF reported that of 1,374 available jobs, one EOP inmate, or 50 percent of the EOP population held a job assignment.

For 3CMS inmates, 239 or 33 percent of the 3CMS population held job assignments, and for non-MHSDS inmates, 1,134 or 41 percent of the non-MHSDS population held job assignments.

For the 623 academic assignments, Folsom/FWF reported that 177 or 25 percent of the 3CMS population held academic assignments and for non-MHSDS inmates, 446 or 16 percent held assignments.

Regarding the 269 vocational education assignments, 47 or seven percent of 3CMS inmates held vocational education assignments, as did 222 or eight percent of non-MHSDS inmates.

Of 949 voluntary education assignments, 174 or 24 percent of 3CMS inmates and 775 or 28 percent of non-MHSDS inmates held assignments.

Of 316 substance abuse treatment assignments, 106 or 15 percent of 3CMS inmates and 210 or eight percent of non-MHSDS inmates held substance abuse treatment assignments.

   b.   Milestone Credits:

During the review period, Folsom/FWF reported all 717 3CMS inmates were eligible to earn milestone credits.  Of those, 22 percent earned credits.  The two EOP inmates were eligible for milestone credits and one or 50 percent earned the credits.

Of the 2,744 non-MHSDS inmates, 2,738 or 99 percent were eligible for milestone credits; 28 percent earned the credits.

   c.   Out-of-Level Housing:

Female inmates at FWF were housed in dorms that included Level I, II and III inmates.

At Folsom, on April 23, 2019, there were 17 Level II 3CMS inmates in Level I housing and three Level II 3CMS inmates in Level III housing.  There were seven Level III 3CMS inmates in Level IV housing.

   d.   ADA Reasonable Accommodation and Grievance Procedures:

Folsom/FWF did not provide supporting documentation to confirm its implementation of ADA Reasonable Accommodation and Grievance Procedures.

Case-by-Case Reviews:

There were no MHSDS inmates in administrative segregation who required a 150-day case review.

Non-Disciplinary Segregation:

There were no inmates designated as NDS during the review period or at the time of the site visit at Folsom.

<u>"C" Status</u>:

At the time of the site visit, none of the 53 inmates on "C" Status were in the MHSDS.

<u>Mental Health Referrals</u>:

During the reporting period, Folsom/FWF reported a total of 1,321 mental health referrals; 60 emergent, 283 urgent, 855 routine, and 123 medication non-compliance referrals. Folsom/FWF reported compliance at 90 percent or above with primary clinician responses to all referrals and psychiatry responses to routine referrals. Psychiatry responses to urgent and emergent referrals were 88 percent and 82 percent respectively. Delays were reportedly due to the lack of data entry during evening or weekends. Folsom/FWF was 98-percent compliant with response to medication non-compliance referrals.

<u>Construction/Space</u>:

Treatment space at Folsom was limited. One group therapy room was also used for 3CMS IDTTs which limited the ability to hold additional groups. Folsom reported a request for utilization of the former health care space for pre-release planning upon completion of the new health care facility.

Treatment space was also limited at FWF. During the review period, inmates were seen in confidential offices for psychiatry and primary clinician contacts; however, if fully staffed, there was not sufficient office space. IDTTs were conducted in the visiting room. Groups were conducted in the library, which was only available two hours per week.

<u>Mental Health/Custody Relations</u>:

Folsom/FWF did not have EOP programs and thus were not included in CDCR's initial roll-out of the partnership plan. Staff from Folsom and FWF reported good working relations

with custody staff.  Inmates reported that some custody officers did not release them for mental health ducats.

Heat Plan:

The heat plan was not in operation during the review period.  Thermometers were appropriately located and operational.  Heat logs were adequately maintained; however, one officer at FWF pre-signed the logbook while leaving the temperature blank.  Custody staff was familiar with the heat plan.

RVRs:

On May 7, 2019, all designated clinical staff received required RVR training; however, only 49 of 99 or 49.5 percent of lieutenants and sergeants at Folsom and FWF attended the training.

Folsom/FWF's Inmate Disciplinary and Due Process Procedure (Operational Procedure #43) effective as of May 2018 required an annual review.  The Rules Violation Report Mental Health Assessment (Operational Procedure # 187) revised in November 2018 was current.

During the review period, Folsom/FWF issued 1,458 RVRs.  Of those, 394 or 27 percent were issued to MHSDS inmates; 130 or 33 percent of those required mental health assessments. For the reviewed sample of nine RVR packets, mental health assessments were requested and completed timely.  Clinicians generally did not recommend mitigation or factors to consider for assessment of penalties.  Additionally, clinicians determined in each case that mental health symptoms had not strongly influenced behavior and did not recommend alternate documentation. Senior hearing officers documented consideration of the mental health assessments in the reviewed sample.

Use of Force:

Folsom/FWF reported 96 percent of required custody staff were trained regarding use of force in 2018. Eighty-eight percent of required mental health staff were trained.

During the review period, 25 of 71 or 35 percent of the immediate use of force incidents involved MHSDS inmates. There were no controlled uses of force during that same period. There were 188 non-use of force incidents; however, all records had been forwarded to the Investigative Services Unit and were not available for review.

Lockdowns/Modified Programming:

There were no lockdowns at Folsom/FWF during the reporting period; however, Folsom documented five days of modified program for unit searches in Facility A. Mental health services were not interrupted.

Access to Care:

A review of Folsom/FWF monthly Health Care Access Quality Reports from October 2018 through March 2019 indicated that none of the issued mental health ducats and add-on appointments were not completed due to custody factors, while eight percent were not completed due to non-custodial reasons, excluding inmates' refusals.

*Coleman* Postings:

*Coleman* posters in both English and Spanish were accessible to inmates in the toured housing units.

Document Production Issues:

Folsom's MHCB referral log and alternative housing log had inconsistent data regarding length of stay in alternative housing for some inmates.

Folsom did not provide census data as requested by facility with date of arrival included.

Folsom/FWF did not provide information regarding compliance with time of administration of HS medications in a manner that was useful.

Folsom did not provide sufficient documentation regarding custody officer training on the heat plan.

**Pelican Bay State Prison (PBSP)**
Review Date - May 15, 2020

Census:

On May 14, 2020, PBSP's total inmate population was 2,603 inmates, a 22-percent increase since the preceding site visit. There were 284 inmates or 11 percent of the census on the mental health caseload, an increase of nine percent.

Three inmates were in the MHCB.

There were two EOP mainline inmates and 213 3CMS inmates, including 17 general population restrictive close custody 3CMS inmates.

There were 66 inmates in the STRH, of which 19 inmates were assigned NDS status.

Staffing:

As of May 2020, the chief psychiatrist position was vacant. One of the 1.5 staff psychiatry positions were vacant for a 33-percent vacancy rate. Of the two allocated telepsychiatry positions, 1.17 were filled, resulting in a 42-percent vacancy rate.

Both chief psychologist positions were filled. Since the preceding monitoring period, the senior psychologist supervisor position was decreased from four positions to one position which was filled. Both staff psychologist specialist positions were filled. Of the ten staff psychologist positions, eight were filled for a 20-percent vacancy rate.

All three social worker positions were filled.

Both recreational therapist positions were filled.

The one CHSA II position was vacant and the 0.5 HPSP I was filled. Three of the 4.5 office tech positions were filled for a 33-percent vacancy rate.

Transfers/Referrals:

300

During the review period, 30 inmates were considered for inpatient care. Of those, three inmates or ten percent were referred to acute care. Only one inmate transferred within ten days of referral. Two inmates transferred to CMF-PIP and one transferred to CHCF-PIP.

During the review period, there were 27 inmates who were considered for inpatient care but were not referred following IDTT review. A review of inmate health records indicated that rationales for non-referral were generally insufficient. For reasons not explained, it appeared that PBSP only considered referrals to acute psychiatric programs.

PBSP made 16 referrals to the MHCB during the review period, of which one was rescinded. Only one inmate transferred within 24 hours of referral.

Programming:

MHCB:

For the 29 inmates who discharged from the MHCB during the review period, the average length of stay was 8.2 days, with an average of 6.8 clinical days. Four inmates had stays longer than ten days with a range of 15 to 23 days. Two inmates or seven percent discharged to acute care, 12 inmates or 41 percent discharged to EOP, 14 inmates or 48 percent discharged to 3CMS, and one inmate or three percent discharged to general population.

No inmates had three or more MHCB admissions during the review period.

Record reviews revealed that PBSP did not provide adequate care for MHCB inmates during the review period. Numerous MHCB admissions were motivated by safety concerns at PBSP related to reported fear of retaliation by custody officers and of other inmates.

The quality of treatment plans was generally inadequate, especially when clinicians relied on pull down menus in the interdisciplinary plan of care (IPOC) in the EHRS. When clinicians were required to document their own treatment plan in the higher level of care section, they were

more patient specific and more likely to include appropriate interventions. MHCB clinicians typically initiated only one IPOC, despite inmates presenting with multiple issues during admission. Treatment non-compliance issues were often ignored in MHCB treatment plans. Discharge plans were often copied and pasted generic and lengthy paragraphs instead of plans developed specifically for each patient. Level of care rationales at discharge were generally insufficient and were routinely also copied and pasted from other records.

PBSP utilized telepsychiatry in the MHCB at least twice per week during the review period, including on weekdays. Several IDTTs were conducted using telepsychiatrists and the chief of mental health often was also present in the IDTTs.

PBSP offered recreation therapy twice per week.

Evaluators conducting RVR mental health assessments in the MHCB did not consult with MHCB staff, even when inmates refused the interviews.

Ten MHCB inmates' records were randomly selected for review. Seven inmates required initial psychiatry evaluations and 70 percent were completed timely. Confidentiality was not documented. All ten inmates received a PC evaluation within 24 hours of admission, although it was unclear whether the contacts were confidential.

Of the ten records reviewed, all initial IDTTs occurred within 72 hours of admission. One IDTT did not include all Program Guide required disciplines as nursing staff was not present. In the nine cases where weekly or discharge IDTTs were required, four or 44 percent were compliant. In one case, the admission IDTT also served as the discharge IDTT as the inmate remained in the MHCB for only one day.

PBSP was 84-percent compliant with completion of twice weekly psychiatry contacts; however, only ten percent were identified as confidential.

PBSP was compliant with completion of daily contacts in the MHCB; however, only 34 percent were noted as confidential and three were conducted via telemedicine.

STRH:

Overall, PBSP provided adequate mental health care to inmates housed in STRH.  Areas of needed improvement included IDTT treatment goals that failed to address all significant inmate diagnoses or presenting complaints and offered no explanation for their absence; failure to update the diagnosis, problem list, or IDTT when new diagnoses were made; and inconsistent documentation of confidentiality of contacts.   Medication issues included use of multiple antipsychotics of the same class without clinical justification; failure to appropriately advance the dose of medication when the inmate clinical response was inadequate; failure to inquire why an inmate was discontinuing his medication; and failure to continue to offer medication management to a psychotic inmate whose paranoid delusions were impairing him from attending treatment groups.

Records reviews were completed on 14 randomly selected inmates to assess compliance with timely psychiatric contacts in STRH.  All reviewed inmates required initial psychiatric evaluations and five or 36 percent were completed timely.  The review revealed four inmates that did not receive the required initial evaluations.  In addition, one inmate arrived in STRH on December 19, 2019 but did not have an initial evaluation until March 4, 2020, more than two months after the initial IDTT which occurred on January 2, 2020.

For routine psychiatry contacts, 81 percent occurred within 90 days and were compliant; 81 percent were conducted via telepsychiatry.

Fifteen inmate records were reviewed to assess compliance with PC contacts. Of the 15 inmates that required initial PC contacts, 93 percent were compliant. One inmate refused to attend the initial PC evaluation and the evaluation did not occur thereafter.

For the 15 inmates required to be seen for routine PC contacts, 62 percent occurred within seven days and were compliant. In five cases, there were patterns of cell front contacts due to inmate refusals. In three of those cases, every routine contact reviewed occurred cell front; in two cases, three of four routine contacts reviewed occurred cell front. Of concern, and in one of the cases with a pattern of cell front contacts, the records included limited information regarding the PC's assessment of the inmate's mental status. Notably, in the cases with patterns of cell front contacts, PCs often included notes regarding collateral information in the records, including medication adherence and observations from custody staff.

Fifteen reviewed inmates required initial IDTTs and 93 percent were compliant. For the 11 inmates who required quarterly IDTTs, each occurred within 90 days and were timely.

Required staff attended all initial and routine IDTTs. However, while a PC and psychiatrist were in attendance, it was not documented whether they were the inmates' treatment providers as required by the Program Guide.

<u>3CMS</u>:

The quality of care provided to 3CMS inmates at PBSP varied during the review period. While some charts indicated that care was adequate, others showed a lack of continuity and inadequate care. In some charts, one PC completed the initial evaluation, another attended the IDTT, and yet another saw the inmate at each clinical contact. Other charts showed discharge plans which were inaccurately pulled from prior documentation, and a lack of urgency when patients refused or missed appointments, particularly during COVID-19.

Records reviews were completed on 12 randomly selected cases to assess compliance with timely psychiatry contacts.   Of the five inmates who required initial psychiatry evaluations, all evaluations were compliant.

Regarding the 11 inmates required to be seen for routine psychiatric contacts, all contacts occurred within 90 days and were compliant; 22 percent were completed by telepsychiatrists.

Seven inmates required initial PC contacts.  Of those, four or 57 percent were compliant. PBSP completed 96 percent of routine PC contacts within 90 days and were compliant.

Six reviewed inmates required initial IDTTs and four of six or 67 percent were compliant.  For routine IDTTs, 11 of 12 records reviewed or 92 percent were completed timely.

Required staff attended all initial and routine IDTTs reviewed.  However, while a PC and psychiatrist were in attendance, it was not documented if the assigned treatment providers were in attendance as required by the Program Guide.

RVRs:

Eight RVRs were reviewed to assess compliance.   Custody staff referred the mental health assessment to mental health staff in a timely manner in four or 50 percent of the cases reviewed.  Multiple clinicians used canned language on the mental health assessment which highlighted their lack of understanding that a senior hearing officer cannot limit access to mental health treatment in the assessment of penalties.

Senior hearing officers documented their consideration of the mental health assessment in one case or 13 percent of the cases reviewed.  If, and when they mitigated penalties as a result of the mental health assessment, it was not consistently documented.

**High Desert State Prison (HDSP)**
March 5, 2019 – March 7, 2019

Census:

On March 4, 2019, HDSP housed 3,173 inmates.  There were 966 inmates on the mental health caseload or 30 percent of the total inmate population.

The MHCB unit housed eight inmates and no inmates were in alternative housing.

There were six EOP inmates in the general population and one EOP inmate pending transfer to an administrative segregation EOP hub.

There were 891 mainline 3CMS inmates and 60 3CMS inmates in STRH, including seven inmates assigned NDS status.

Staffing:

HDSP did not have an allocated chief psychiatrist position.

The senior psychiatrist position was vacant.

One of the two chief psychologist positions was filled and served as the chief of mental health; the other remained vacant as a salary savings measure.

Both senior psychologist positions were filled.

One of the 2.5 onsite psychiatry positions was filled by registry staff and three of the four telepsychiatry positions were filled yielding a 38 percent functional vacancy rate.

Of the thirteen allocated psychologist positions, ten positions were filled although three were on long-term sick leave for a 47 percent functional vacancy rate.

The one supervising social worker position was filled, as were the eight social worker positions.  One social worker was out on long-term sick leave for a functional vacancy rate of 13 percent.

The senior psych tech position was filled.  Nine of the 10.6 psych tech positions were

filled for a functional vacancy rate of 16 percent.

All four MHSDS registered nurse positions were filled.

The 1.5 recreation therapist position was filled.

The two HPS positions and the one office services position were filled.  The CHSA II position was vacant.  Six of the 8.5 MHSDS clerical positions were vacant for a functional vacancy rate of 30 percent.

Additional hires at the time of the site visit included one licensed clinical social worker in January 2019, one registry psychiatrist in February 2019, and one unlicensed clinical social worker in February 2019.  HDSP further reported anticipated additional hires of one onsite registry psychiatrist in April 2019, one psychologist pending documentation verification, and one senior psychologist supervisor in May 2019.  The hiring of the registry psychiatrist in April 2019 would reduce the functional vacancy in psychiatry from 38 to 23 percent.

Telepsychiatry:

Three telepsychiatrists each provided 40 hours of service per week for HDSP.  All had provided services to HDSP for more than five years.  The telepsychiatrist assigned to Facility B also provided services in STRH.  A second telepsychiatrist assigned to Facilities A and B also provided services in STRH, and one day a week in the MHCB.  The third telepsychiatrist assigned to Facilities C and D, provided services in STRH and one day a week in the MHCB.

The caseloads for the three telepsychiatrists at HDSP ranged from 202 to 251 inmates.

In observed IDTTs in STRH, the telepsychiatrist appropriately engaged with the other IDTT members and the inmates.

Quality Management:

The local governing body did not meet each month during the review period and did not

clearly document the presence of a quorum.  Agenda items included review and approval of previous meeting minutes, as well as operational procedures for medical, mental health, and dental.  Appropriate documentation was maintained with a plan for follow-up when indicated.

The quality management committee met as required but did not document the presence of a quorum.  The quality management committee addressed various matters related to the quality of all health care at the institution.  Compliance metrics were not consistently reviewed.  Minutes revealed elimination of correctional officer positions that assisted with medical appointments potentially creating issues with custody supervision.

The mental health subcommittee met monthly and documented the presence of a quorum.  Generally, the mental health subcommittee identified and took remedial action to address issues discovered through the quality management/quality improvement process.  However, during the review period, the mental health subcommittee did not appropriately address psychiatric diagnostic monitoring.  In addition, the mental health subcommittee did not consistently document what remedial actions were taken or the outcomes of remedial actions developed to address problems discovered through audits.

The mental health subcommittee documented several performance improvement work plans (PIWPs) attending to mental health care issues.

There were no mental health QITs during the review period or at the time of the site visit.

Pursuant to instructions from mental health headquarters, peer review for outpatient programs did not occur during the review period.  Peer review occurred in the MHCB but was impacted by staffing issues.  Telepsychiatry peer reviews were not conducted at HDSP.

Medication Management:

HDSP provided the MAPIP policy and procedure dated effective October 28, 2019 that included definitions, training and orientation, monitoring, and other documentation.

At the time of the site visit, headquarters documented all psychiatric diagnostic measures, compliance and continuity of medications via the MAPIP dashboard. HDSP nursing and mental health staff reported a need for an expanded glossary, a better understanding of the business rules, and the current role of the institution regarding this area.

HDSP reported compliance with applicable psychiatry medication measures for diagnostic monitoring of antidepressants. Medication consent was compliant for two months and non-compliant for four months. Thyroid monitoring was compliant for three months and no data was provided for three months. For venlafaxine blood pressure monitoring, HDSP was compliant for four months; no data was provided for two months. No data was reported during the review period regarding electrocardiograms (EKG).

Regarding the antipsychotic diagnostic measures, HDSP was not compliant for one or more months with several measures. Abnormal involuntary movement scale (AIMS) tests were compliant for five months and non-compliant for one month. Blood pressure monitoring was compliant for four months and no data was reported for two months. Blood sugar, complete blood count (CBC) with platelets, and comprehensive metabolic panel (CMP) were each compliant for two months and non-compliant for four months. EKG measures were compliant for two months, non-compliant for two months and no data was reported for two months. Height measures were compliant for four months and non-compliant for two months, while weight measures were compliant for two months, non-compliant for two months and no data was reported for two months. Lipid monitoring was compliant for one month and non-compliant for

309

five months; medication consent was compliant for four months and non-compliant for two months. Thyroid monitoring was compliant for two months and no data was reported for the other five months.

For psychiatric diagnostic monitoring of inmates prescribed carbamazepine, HDSP was compliant with CBC with platelets and CMP measures each month during the review period. Carbamazepine levels was compliant for five months and no data was reported for one month, while medication consent was compliant for four months and no data was reported for two months.

MAPIP data indicated that for Depakote, HDSP was compliant for measures of CMC with platelets and CMP for two months and non-compliant for four months. Compliance with Depakote levels was achieved for four months and HDSP was non-compliant for the remaining two months. Medication consent was compliant for four months and non-compliant for two months.

Medication consent for Lamotrigine was compliant for two months, non-compliant for one month and no data was provided for three months.

Psychiatric measures for liver function tests for inmates prescribed lithium were compliant for four months and non-compliant for two months. For EKGs, HDSP reported compliance for two months levels, noncompliance for three months and no data was reported for one month. Lithium levels were compliant for three months and non-compliant for three months. Medication consent was compliant for four months, non-compliant for one month, and no data was reported for one month. For thyroid monitoring, HDSP was compliant for three months, non-compliant for two months, and no data was reported for one month.

MAPIP medication management data indicated that HDSP was not compliant regarding medication continuity after inter-institutional transfers at R&R, court ordered involuntary medications, new psychiatric medication orders and observation of preparation and administration of AM/PM medications during any month of the six months-review period. Compliance was demonstrated for two of six months for medication continuity on the receiving yard following intra-institutional transfers from nonlocked units and for one of six months following discharge from crisis beds.

HDSP reported compliance during three of six months for medication continuity following inmate discharge from a community hospital or acute or intermediate care, psychiatric prescribed chronic care medications and observation of preparation of HS medications.

There was no data provided for five of six months regarding medication continuity with intra-interinstitutional transfers to locked units and for all six months regarding medication continuity at parole or release to the community at R&R.

All psychiatric and nursing MAPIP performance measures scoring below 90 percent had adequate CAPs.

HDSP was unable to provide documentation regarding psychotropic medication refusals.

Length of pill lines were reported as less than three minutes. HDSP was compliant with medication pass and LVN competency.

During the reporting period, 4.2 to 5.2 percent of prescriptions were non-formulary. HDSP's polypharmacy committee consistently reviewed inmates prescribed ten or more medications.

HDSP did not provide documentation regarding psychiatrist prescribing practices, the maximum length of medications ordered by psychiatrists, the maximum length of bridge ordered

311

medications, or how telephone orders and verbal orders were tracked.  HDSP also did not provide the headquarters policy regarding telepsychiatry prescribing practices.

HDSP's reports on PC 2602 involuntary medications orders during the review period were not presented in a format useful for monitoring.

There were five instances of controlled and emergent use of force related to medication compliance at HDSP.

Transfers:

The inpatient care coordinator had been in place for four years.  HDSP maintained comprehensive local transfer logs; however, there were multiple inconsistencies between local and headquarters' data.

During the review period, 31 inmates met criteria for higher level of care consideration for both acute and intermediate care.  Two inmates or less than one percent, were referred to acute care after IDTT consideration; no inmates were referred to intermediate care.

There were no rescissions or rejections of referrals to acute or intermediate inpatient care during the review period.

Transfers to acute care during the review period were not timely.  Neither of the two transfers to acute care occurred within 72-hours of bed assignment, or within ten days of referral from headquarters.  The delays were not due to impending paroles, disciplinary proceedings, classification factors, or pending PC 2602 involuntary medications hearings.

There were no inmates on the Acute Bed Utilization Management Report awaiting a bed during the review period or during the site visit.

No referrals were expedited due to clinical needs.

There were no *Vitek* hearings during the review period.

No inmate referred to acute care presented with complex medical conditions.

No inmates returned from acute or intermediate care programs during the review period. It was rare for inmates to return to HDSP because they did not have an EOP.

No inmates transferred to a PSU from HDSP during the review period.

HDSP had a ten-bed MHCB; the unit was closed from August 20, 2018 through October 22, 2018. During the reporting period, there were 118 referrals, including 17 to outside MHCBs. Referrals to MHCBs dropped precipitously during the closure period. Staff reported the decrease was largely due to inmate resistance to transfer to CSP/Sac, as well as staff training regarding appropriate referrals and admissions to MHCB.

HDSP rescinded 21 or 18 percent of the 118 MHCB referrals. Admissions to MHCBs generally occurred within 24 hours of referral. During the review period, less than ten percent of the 87 discharged inmates had lengths of stay longer than ten days, with a range of 11 to 15 days. Four inmates had three or more MHCB admissions in six months, with a range of three to 11 admissions. Approximately 20 percent of inmates discharged from MHCB to EOP level of care.

No inmates from HDSP were transferred to LTRH during the review period.

Twenty-four inmates transferred to EOP programs during the review period. Five inmates or 21 percent did not transfer within 60 days, largely due to court appearances. During the site visit, seven inmates were waiting transfer to EOPs; one was beyond the 60-day transfer timeframe guideline.

Programming:

MHCB:

A registry psychiatrist hired in February 2019 was assigned to the MHCB and Facility A during the site visit.  Psychiatrists, including telepsychiatrists, and primary clinicians assigned to the MHCB carried caseloads within established ratios.

A review of the health records of the randomly selected sample of ten MHCB inmates revealed that 70 percent of the sample were seen timely for their initial psychiatric contacts.  Six of seven or 86 percent of sample inmates were seen twice weekly for psychiatric contacts.

All inmates in the MHCB sample of ten inmates were seen timely for initial and daily primary clinician contacts.

Confidentiality of clinical contacts in the MHCB was not routinely documented by psychiatrists and primary clinicians in the health records of the sample of ten inmates.

Seven of ten, or 70 percent of initial IDTTs for the ten inmates in the MHCB sample occurred within 72 hours, and 100 percent of routine IDTTs were timely.

Required staff were present for all initial IDTTs in the sample of ten MHCB inmates and for seven of nine or 78 percent of weekly IDTTs.

All admission and discharge SRASHEs for the sample of ten MHCB inmates were found compliant.  Of concern, two of the discharge SRASHEs were completed a few hours in advance of the IDTT where the discharge decision was made.

HDSP was not compliant with five-day follow-up upon physical discharge from the MHCB.  Only six of seven, or 86 percent of the reviewed sample were seen for five consecutive days and documentation was not consistently completed.

There was good interdisciplinary discussion, and the necessary participants were present in observed IDTTs in the MHCB.  There was appropriate discussion of consideration of referral

to higher levels of care and treatment goals.  Safety planning remained an area of needed improvement in MHCB IDTTs.

Alternative Housing:

There were 104 alternative housing placements during the review period.  No stays during the review period exceeded 24 hours.  There were no inmates in alternative housing at the time of the site visit.

Short-Term Restricted Housing:

STRH was in a standalone building referred to as Building Z.

The psychiatrists and primary clinicians assigned to STRH carried caseloads within the established ratio.

All initial primary clinician contacts were timely for the eight randomly selected inmates in the sample of health records reviewed. However, routine primary clinician contacts for the sample were not timely.  Confidentiality of clinical contacts in STRH was not routinely documented.  Of the routine contacts in the sample where confidentiality was documented, several were indicated to occur cell-front due to inmate refusal.

All initial IDTTs in the STRH sample of eight inmates occurred after ICC; they were not conducted timely.  At the time of the site visit, two inmates were housed in STRH long enough to be seen for a routine IDTT.  Both IDTTs were conducted timely.

Required staff were present for all initial and routine IDTTs in the STRH for the eight inmates in the sample.

An observed IDTT in STRH was well conducted with full participation by staff and inmates.  The primary clinician adeptly discussed diagnostic rule-outs with the team, continued to include the inmate in the discussion, and ensured the inmate's understanding of the process.

315

As reported above, the telepsychiatrist appropriately engaged with the other IDTT members including inmates during the meetings.

HDSP reported ten groups of 60 or 90 minutes offered in STRH.  Groups in STRH were facilitated by recreation therapists.

An observed STRH morning huddle was comprehensive and all staff participated. Discussions covered transfers and admissions, medication issues, bizarre or unusual changes in inmate behavior, verbal referrals, the list of inmates requiring one-to-one observations, and any inmates referred.

Observed daily psych tech rounds were appropriate and the psych tech had good rapport with the inmates.

Communication between mental health staff and custody in STRH appeared good. Observed interaction of staff demonstrated teamwork when dealing with an inmate in crisis during the site visit.

3CMS:

All three Facility A primary clinicians' caseloads exceeded the 3CMS mandated ratio of 1:97, with caseloads of 107, 119, and 122 inmates respectively.  Caseloads for the two primary clinicians in Facility B also exceeded the established ratio with caseloads of 100 and 117 inmates, while clinicians assigned to Facilities C and D met the staffing ratios.  During the site visit, the chief of mental health temporarily carried a caseload of 50 3CMS inmates.  A social worker was expected to be assigned this caseload before the end of March 2019.

Two of the 12 randomly selected 3CMS health care records reviewed required initial psychiatric contacts; none occurred before the IDTT.  Of the 12 inmates in the 3CMS sample that required a routine psychiatric contact four of six occurred within 90 days.

All inmates in the 3CMS sample of 12 inmates that required initial primary clinician contacts were seen timely. The majority (82 percent) of routine primary clinician contacts in the sample occurred well within 90 days.

Confidentiality of clinical contacts was not routinely documented.

Initial IDTTs for 83 percent of the sample of 12 inmates were completed timely, as was the one required routine IDTT in the sample.

Required staff was present for all initial IDTTs of the 12 inmates in the 3CMS sample. The psychiatrist was not present for the one required routine IDTT in the sample.

The quality of observed IDTTs in 3CMS varied by yard. IDTTs on Facility C were well conducted with good interdisciplinary discussion, including involvement by the telepsychiatrist. However, IDTTs on Facility B were poor with a lack of adequate treatment planning and no safety planning when indicated. Of concern was an inmate who presented with recent suicidal ideation and a request for increased frequency of clinical contacts. The primary clinician indicated that the patient would be seen in three weeks, and there was no consideration of referral to a higher level of care or for immediate clinical assessment.

Due to staffing limitations, group therapy for 3CMS inmates was limited to six groups only on Facility A. The length of the waitlists for groups varied from weeks to months.

Facility B housed Level IV SNY inmates, including former EOP inmates, and some inmates who had been discharged from the MHCB. Many of these inmates were concerned that they needed more services than were provided in the 3CMS program currently, including group therapy and increased clinical contacts.

317

Other Issues:

Pre-Release Planning:

HDSP did not provide any pre-release treatment groups and pre-release activities performed by mental health staff were limited.  Coordination and cooperation between TCMP and HDSP mental health staff was poor during the review period.

Program Access:

e.   Job and Program Assignments:

The program access lieutenant at HDSP reported that there was a waitlist for all assignments.

On February 1, 2019, HDSP reported that of 1,348 available jobs, one EOP inmate, or 20 percent of the EOP population held a job assignment.

For 3CMS inmates, 328 or 33 percent of the 3CMS population held job assignments, and for non-MHSDS inmates, 1,019 or 45 percent of the non-MHSDS population held job assignments.

For the 280 part-time academic assignments, HDSP reported that no EOP inmates held assignments.  For 3CMS inmates, 89 or nine percent of the 3CMS population held part-time academic assignments and for non-MHSDS inmates, 191 or eight percent held assignments.

Regarding the 238 vocational education assignments, no EOP inmates held assignments. For 3CMS inmates, 81 or eight percent held vocational education assignments, as did 157 or seven percent of non-MHSDS inmates.

Of 723 voluntary education assignments, 176 or 18 percent of 3CMS inmates and 547 or 24 percent of non-MHSDS inmates held assignments.  No EOP inmate had a voluntary education assignment.

Of 259 substance abuse treatment assignments, no EOP inmates held assignments.  For 3CMS inmates, a total of 122 inmates or 12 percent of 3CMS inmates and 157 or seven percent of non-MHSDS inmates held substance abuse treatment assignments.

    f.   <u>Milestone Credits</u>:

On February 1, 2019, HDSP reported 939 of 983 or 96 percent of 3CMS inmates were eligible to earn milestone credits.  Of the 939 eligible 3CMS inmates, 22 percent earned milestone credits.  All five EOP inmates were eligible for milestone credits; two or 40 percent earned the credits.

Of the 2,263 non-MHSDS inmates, 2,133 or 94 percent were eligible for milestone credits; 22 percent earned the credits.

    g.   <u>Out-of-Level Housing</u>:

On March 6, 2019, there were no 3CMS or EOP inmates in Level I housing.  HDSP did not have Level II housing.  Two Level II EOP inmates and 69 Level II 3CMS inmates were in Level III housing.  Thirteen Level III 3CMS inmates were in Level IV housing.  There were 28 Level IV 3CMS inmates in Level III housing.

    h.   <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

The ADA Reasonable Accommodation and Grievance Procedures were implemented at HDSP.

    <u>Case-by-Case Reviews</u>:

Nine 3CMS inmates and one EOP inmate were housed in STRH beyond 150 days.  All long-term case conferences with the deputy warden were timely.

Non-Disciplinary Segregation:

HDSP was unable to provide information regarding NDS inmates for the reporting

period.

ICCs were observed for the seven inmates on NDS status in STRH.  The ICC approved

the NDS status, property, and privileges for the seven inmates.

"C" Status:

At the time of the site visit, 17 inmates or 27 percent of the 64 inmates on "C" Status

were in the MHSDS.  Inmates remained eligible for participation in mental health programming

while on "C" Status.  Further, inmates could use ongoing participation in programming to

support a request to reduce the duration of "C" Status.  Duration of "C" Status could also be

mitigated due to mental health assessments during the disciplinary process.

Mental Health Referrals:

HDSP was compliant with responses at a rate of 90 percent or higher to emergent, urgent,

and routine referrals for mental health during the review period.

Construction/Space:

Construction to add office space was planned on all yards.  Construction was scheduled

for April 2019 through June 2019.

Conference rooms on each yard were used for mental health treatment on Monday,

Tuesday, Thursday, and Fridays.  Staff reported the space was sufficient for group treatment.

Mental Health/Custody Relations:

There were mixed reports regarding custody behavior toward mentally ill inmates.

Inmates had very favorable comments regarding the warden and his efforts to address custody

issues from inmates on Facility A, while inmates on Facility B expressed displeasure with the

mental health services provided and their treatment by custody staff.  Facility B inmates, former EOP inmates and some inmates who had been discharged from the MHCB reported significant issues with inappropriate behavior by custody officers including demeaning comments, retaliatory cell searches, and discouraging inmates from attending treatment sessions.  Inmates expressed concern that their reports of suicidal ideation were ignored by some custody staff.

There were noted differences related to the designation of staff for executive joint rounding between the custody and mental health partnership local operating procedure and the custody and mental health partnership plan submitted by CDCR to the court.  HDSP began executive joint rounding in February 2019 and developed a schedule to continue rounds through December 2019.  HDSP utilized the huddle watch report for the STRH; however, they were not used for the MHCB.  HDSP planned to incorporate the MHCB huddle into the already existing huddle structure.

HDSP's schedule of quarterly round table trainings was consistent with policy.  All required MHCB staff attended training and STRH staff training was scheduled for March 2019.  Additional collaborative efforts included post-MHCB discharge custody check training; Multiple Interactive Learning Objective (MILO) simulator on communication and de-escalation techniques and signs and symptoms of mental illness and/or developmental disability/cognitive deficit; and, From Corrections Fatigue to Fulfillment (CFTF) training addressing psychological challenges experienced by correctional staff.

During the review period, six HDSP staff were referred to the Office of Internal Affairs (OIA) for inappropriate behavior towards inmates.  At the time of the site visit, five staff were pending action/decision by OIA while one was cleared.

Heat Plan:

HDSP ran heat plan protocols year-round; there were 18 reported Stage 1 heat alerts between September 1 and November 1, 2018. Heat logs were appropriately maintained in housing units and custody staff was familiar with the heat plan. Thermometers were not operational in all visited units and thermometers were not placed in appropriate areas in some units.

RVRs:

Designated clinical staff received required RVR training; however, most lieutenants and sergeants at HDSP had not received the training at the time of the site visit.

During the review period, HDSP issued 1,387 RVRs. Of those, 531 RVRs or 38 percent were issued to MHSDS inmates; 56 or 10.5 percent of those required mental health assessments. For a reviewed sample of RVR packets, mental health assessments were generally not requested and completed timely. Further, clinicians determined in each case that mental health symptoms had not strongly influenced behavior and did not recommend alternate documentation. Senior hearing officers documented consideration of the mental health assessments in the reviewed sample.

Use of Force:

HDSP reported that 87 percent of required mental health staff were trained regarding use of force at the time of the site visit. While 96 percent of line correctional staff received use of force training, the warden, chief deputy warden, four correctional administrators, and five captains had not been trained.

More than half of the 195 use of force incidents – 120 incidents or 62 percent involved MHSDS inmates. A total of 75 use of force incidents or 38 percent involved non-MHSDS

inmates.  Pepper spray was not utilized during the four controlled uses of force that occurred during the review period.  Subsequent supervisory reviews of the four controlled use of force packets at the various levels found compliance with CDCR's policies.

Lockdowns/Modified Programming:

During the review period, HDSP documented one program modification on Facility A from November 5 through November19, 2019 due to missing metal.

Access to Care:

A review of HDSP's monthly Health Care Access Quality Reports from August 2018 through January 2019 indicated that less than one percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 25 percent were not completed for non-custodial reasons, excluding inmate refusals.

Placement of 3CMS Inmates into Minimum Support Facilities:

HDSP staff reported HDSP was not one of the institutions designated to house 3CMS inmates in its Minimum Support Facility.

*Coleman* Postings:

*Coleman* posters were accessible to inmates in the visited housing units, although some were not updated.

Document Production Issues:

HDSP was unable to provide clear compliance data for completion of pre-placement screens as well as 72-hour mental health screens for inmates placed in administrative segregation units.

HDSP was unable to provide documentation regarding psychotropic medications refusals.

HDSP did not provide documentation regarding psychiatrists' prescribing practices, the maximum length of medications ordered by psychiatrists, the maximum length of bridge ordered medications or how telephone orders and verbal orders were tracked.

HDSP did not provide the headquarters' policy regarding telepsychiatry prescribing practices.

HDSP reports of PC 2602 involuntary medications orders during the review period was not presented in a format useful for monitoring.

**Mule Creek State Prison (MCSP)**
May 29, 2019 – May 31, 2019

Census:

On May 27, 2019 MCSPs total inmate population was 3,934. The mental health caseload was 2,098, or 53 percent of the population.

The MHCB had a population of eight and there were two inmates in alternative housing.

There were 620 mainline EOP inmates, and 43 inmates housed in the administrative segregation EOP hub. Two EOP inmates were pending transfer to the PSU.

The 3CMS mainline population was 1,404, and there were 21 3CMS inmates housed in administrative segregation.

Staffing:

The chief psychiatrist position was filled. MCSP did not have an established senior psychiatrist position.

Both chief psychologist positions were filled; one served as chief of mental health. Seven senior psychologist supervisors filled 6.5 established positions.

There were 18 established staff psychiatrist positions. Of those, 9.25 onsite positions, two telepsychiatrist positions, and two registry positions were filled, resulting in a functional vacancy rate of 26 percent.

Of the 42.5 established staff psychologist positions, 41.5 onsite positions were filled; registry staff filled an additional 1.5 positions. Seventeen of the psychologists employed at the time of the site visit were unlicensed and required supervision.

The supervising social worker position was filled. Of the 21 social worker positions, 19.5 positions were filled for a functional vacancy rate of seven percent. Six of the social workers were unlicensed and required supervision.

325

There were two established senior psych tech positions; one was filled, leaving a 50-percent vacancy rate.  Fifty-five of 56.5 psych tech positions were filled, resulting in a three-percent vacancy rate.

Twenty-two recreation therapists filled 21 positions.

There were four limited-term staff and one registry medical assistant positions filled.

The CHSA II and AGPA positions were both filled.  Two OSS II positions filled 1.5 established positions; and four HPS I positions filled 3.5 established positions.  All 24 established clerical positions were filled.

Telepsychiatry:

There were two telepsychiatrists at MCSP.  Telepsychiatry provided treatment in two EOP programs on Facilities B and D.  MCSP reported that telepsychiatry also provided on-call services after-hours for emergency and for crisis intervention.  Staff reported that telepsychiatry services were not used in the MHCB, other than during off-hours.  In the EOP administrative segregation hub, telepsychiatry was utilized only on an emergency basis.

Quality Management:

The local governing body met twice during the reporting period, achieving a quorum on both occasions.  The chief psychiatrist and chief psychologist attended one of the two meetings. Topics specifically relevant to mental health included staffing, referrals to higher levels of care, and collaboration huddles.

The quality management committee met monthly and achieved a quorum.  Meetings included a review of key issues from the mental health subcommittee.  Issues discussed included mental health staffing levels, difficulties with medication management, primary clinician continuity of care, and daily contacts with primary clinicians in the MHCB.  A topic which had

significant ramifications during the reporting period was related to the change in group scheduling and content, which started in December 2018.

The mental health subcommittee met monthly during the reporting period, achieving a quorum at each meeting. The chief psychiatrist was among the attendees. Issues addressed included the lack of attendance by psychiatrists at IDTTs, missed administrative segregation screenings, education of staff about the efforts to standardize group scheduling, efforts to improve continuity of care for inmates during level of care changes, and peer reviews which were "on hold." QIPs related to two suicides were also discussed.

The mental health subcommittee reviewed regular data reports on key EOP and 3CMS indicators, including timeliness of IDTTs, mental health referrals, psychiatry, and primary clinician contacts; IDTT staffing; and EOP treatment hours. Focus on inmate engagement in treatment was lacking. MCSP appropriately utilized the QIT process during the reporting period. One QIT related to the restructuring of group treatment across EOP programs and one related to treatment in administrative segregation.

<u>Medication Management</u>:

MCSP performed all required MAPIP audits during the reporting period. Medication refusals data was not automated and not reported.

The MAPIP audit showed MCSP was non-compliant with multiple nursing medication management measures, psychiatric medication measures, and diagnostic monitoring measures during the reporting period. The MAPIP audit process specific to psychiatry medication management practices included review of various indicators for diagnostic monitoring.

MCSP's MAPIP results for November 2018 through April 2019 reported compliance for psychiatric diagnostic monitoring and medication management. Review of the medication

management dashboard for the period showed that for inmates prescribed antidepressants at MCSP, EKG data for three months was non-compliant; no data was reported for the other three months. Venlafaxine blood pressure monitoring was compliant for all six months of the review period. Medication consent was compliant for three months. Compliance was shown for four months for thyroid monitoring.

For inmates prescribed antipsychotics, abnormal involuntary movement scale (AIMS) tests complete blood count (CBC) with platelets, and comprehensive metabolic panel (CMP), and lipid monitoring were non-compliant for all six months. Diagnostic monitoring of blood pressure, height and weight measurements, and thyroid monitoring were compliant during each of the six months of the review period and medical consent was compliant for five months. Blood sugar and EKG measurements were compliant for four months during the review period.

Regarding monitoring inmates prescribed carbamazepine, level monitoring was compliant for two months, non-compliant for two months, and no data was reported for the other two months. CMP and CBC diagnostic monitoring were compliant for four months each; no data was reported for the other two months. Medication consent was compliant for five months; no data was reported for one month.

Data for Clozapine diagnostic measures indicated that blood pressure, blood sugar, CBC, height, and weight, were compliant for all six months of the review period. CMP was compliant for four months; lipid monitoring and EKG were compliant for two months. Medication consent was compliant for four months. Thyroid monitoring was compliant for five months; no data was reported for two months.

MCSP was compliant with medical consent for Lamotrigine for four months.

Psychiatric diagnostic measures for inmates prescribed Depakote were compliant for medication consent for all six months of the review period.  For CBC with platelets, Depakote levels, and CMP, MCSP did not achieve compliance for any month of the review period.

For inmates prescribed Lithium, medication consent was compliant for five months. EKG was compliant for three months.  Psychiatric measures for Lithium levels was compliant for two months.  Kidney function monitoring was compliant for two months.  Thyroid monitoring was non-compliant for all six months.

Multiple MAPIP mental health measures scored below 90 percent for one or more months during the review period.  Medication continuity upon inter-institutional transfer at receiving and release (R&R), continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), following discharge from community hospital or acute or intermediate care, and observation of medication preparation and administration for HS and AM/PM were non-compliant for all six months of the review period. Medication continuity for court ordered involuntary medications was not compliant for four months; no data was provided for two months.  Medication continuity with parole or release to the community was compliant for four months; intra-institutional transfers to ASU/SHU/PSU and psychiatric-prescribed chronic care medications were compliant for two months; and medication continuity for MHCB transfers and new psychiatric medications were compliant for one month.

Medication management problems not resulting from these issues were addressed locally by the institution through training and quality improvement measures.

Pill lines were not an issue at MCSP.  Medication dispensing windows were in the mainline EOP housing buildings.

Medication orders were written for no longer than 180 days, and bridge orders were typically written for 30 days. Keep on person SSRIs were ordered for a maximum of 90 days and dispensed in quantities not exceeding a 30-day supply.

Non-formulary prescriptions for psychiatry medications were minimal.

MCSP was not a Clozaril initiation institution, but maintained inmates when prescribed Clozaril if transferred to MCSP.

During the review period, MCSP initiated 46 PC 2602 involuntary medication orders, for one MHCB, 39 EOP and six 3CMS inmates; 44 were granted and two were denied. PC 2602 involuntary medication orders previously issued for two inmates were not renewed. During the site visit, 55 EOP and 11 3CMS inmates had PC 2602 involuntary medication orders. The use of force was not reported for administration of PC 2602 involuntary medication during the review period.

Psychotropic medications prescribed HS were administered after 8:00 p.m.

The medication management operational procedure was updated in October 2018.

No medication management or access problems were reported during inmate interviews in the MHSDS programs.

Transfers:

MCSP had an inpatient care coordinator who monitored HLOC forms and referrals to inpatient care. During the review period, MCSP underwent a major and a minor sustainability review. The major sustainability review occurred on November 28 and 29, 2018, while the minor review occurred on January 15 and 16, 2019. A sustainable process data review occurred between the MCSP inpatient care coordinator and the headquarters senior psychologist during the fourth quarter of 2018 and demonstrated high interrater reliability regarding the quality of the

HLOC forms completed.  Staff audits of HLOC forms completed November 1, 2018 to March 31, 2019 were reported to demonstrate compliance at 98 percent.

Both the major and minor sustainability reviews noted that there were more referrals to acute care than to intermediate care.  This raised a concern regarding whether inmates were allowed to decompensate to the point of needing a higher level of care given the size of the EOP population and the small number of beds available in the MHCB.

The regional review process appeared to be a comprehensive audit and provided some useful suggestions and recommendations.  For example, it was suggested that the institution re-examine the viability of a pilot project whereby EOP inmates were assigned two primary clinicians, which, instead of increasing continuity of care, diffused responsibility.  Regional staff members conducted a sustainable process review simultaneous with the site visit.

There were 660 inmates considered, but not referred to acute or intermediate care during the reporting period.  Of the 660 inmates considered, 164, or 25 percent, had a level of care change to either EOP or 3CMS.  Some of the reasons inmates were considered for level of care changes included multiple MHCB referrals, three or more mental health evaluations, or failure to participate in the minimum weekly treatment hours required.

The monitor's expert reviewed inmates on the non-referral log.  In the sample reviewed, treatment teams generally referred those who were appropriate.  There were challenges with determining appropriateness due to unavailable documentation, inadequate clinical rationales, and treatment modifications.

The inpatient coordinator reported headquarters' performance data on higher level of care referrals was inaccurate and provided the monitor with MCSP's internal logs.  Review of the logs and data verified this information.

There were 63 referrals to a higher level of care during the review period, of which 40 were to acute and 20 were to intermediate care; two referrals were rescinded and one was rejected. The remaining 60 referrals transferred timely.

All but three inmates were reported to have met criteria for complex medical or mental health treatment needs, however, the inmates' needs did not interfere with the timeliness of the transfer.

*Vitek* hearings were held for 13 inmates; the outcome for all was to continue with the referral. There were two inmates pending referral to the acute level of care during the site visit. One patient had a *Vitek* hearing scheduled during the visit; he did not prevail and was awaiting placement through HCPOP. Both inmates awaiting placement at the time of the visit remained within transfer timelines. There were no inmates on a waitlist for transfer to acute or intermediate level of care.

There were no referrals to the PIP during the review period.

MCSP referred 251 inmates to MHCBs during the review period; 194 or 77.3 percent were admitted. All referrals transferred timely.

Ten inmates timely transferred to the PSU. During the site visit, one inmate was pending transfer to a PSU; the transfer remained within Program Guide timelines.

MCSP inmates were transferred internally to the EOP Hub; there were no reported delays.

Of the 65 3CMS inmates transferred to STRH, 53, or 82 percent were transferred timely. The range of days inmates were held beyond transfer timeframes was one to 34 days. Challenges responsible for delaying inmate transfers included lower bunk chronos, inmate mobility limitations, and nursing requirements.

Programming:

    Administrative Segregation EOP:

There was one psychiatrist assigned in administrative segregation for EOP and 3CMS inmates.  The psychiatrist's caseloads for both were within established staffing ratios.

Five primary clinicians provided services to the EOP and 3CMS administrative segregation inmates, all caseloads were within established ratios.

During the review period, 19 EOP inmates were held in administrative segregation beyond 90 days.  At the time of the site visit, three EOP inmates remained in administrative segregation beyond transfer timelines.

A total of five EOP inmates in the administrative segregation hub during the site visit were randomly selected to assess compliance with timely mental health contacts.  All five required initial psychiatric contacts and 80 percent of the psychiatric contacts occurred before IDTT.  None of the inmates reviewed were in administrative segregation long enough to be seen for a routine psychiatric contact.

All five cases required initial primary clinician contacts; all occurred before IDTT and 80 percent occurred timely.  Four of the five inmates required routine primary clinician contacts, one inmate was seen timely.

With regard to assessing compliance with timely IDTTs; one inmate was removed due to placement in the MHCB and 75 percent of the remaining inmates' IDTTs were timely.  No inmates reviewed were in administrative segregation long enough for a routine IDTT.

Administrative segregation staff reported inmate appointments and ducats flowed smoothly as the mental health treatment center was located directly across from the unit.  No concerns with treatment space were reported.

The monitor's expert observed two psych techs perform rounds. The rounds were reasonably conducted; the psych techs stopped at each cell and spoke briefly with inmates. Both had a good rapport with the inmates and asked appropriate questions. Chart notes were entered in "real time" following each cell visit. Both psych techs were proactive in addressing concerns brought to their attention. There was some confusion regarding which staff were responsible for distributing in-cell activities to the inmates. Mental health leadership clarified and ensured inmates would receive activities regularly.

The institution reported administrative segregation inmates had access to ten hours of yard for the review period. Of 25 reported weeks, 22, or 88 percent were compliant. The monitor's expert reviewed randomly selected inmate files over a ten-week period for inmate access to showers and found 100-percent compliance.

Recent initiatives for the EOP hub included the formal introduction of the CIT and clinician visits to inmate cells for encouragement to attend group or individual therapy. However, despite MCSP's efforts, attendance at group had not improved. Post-refusal contacts were also made to assess an inmate's mental status and the need for intervention. Staff did not appear to recognize the connection between inmate refusal to participate in treatment and the strip-search protocols for those who participated.

MHCB:

The MHCB was staffed with one full-time psychiatrist whose caseload was within established staffing ratios. There were seven primary clinicians assigned to the MHCB, of which five also provided crisis triage services. All primary clinicians in the MHCB met the established staffing ratios.

The primary treating psychiatrist was present Monday through Thursday and there was no consistent back-up plan for Fridays. As a result, the chief psychiatrist would occasionally cover IDTTs, though more frequently there would be no psychiatrist present, which was problematic.

MCSP maintained eight MHCBs. The crisis beds were redlined for updates from February 14 to March 1, 2019. All MHCB rooms were suicide resistant and ADA compliant. There was treatment space in the unit available for the recreation therapist, who worked Monday through Thursday.

During the review period, there were 126 admissions to the MHCB. Clinical and physical lengths of stay averaged 6.5 and 7.7 days, respectively, with a range of one to 23 days.

There were 41 inmates who had three or more MHCB admissions during the review period.

There were six inmates randomly selected for a compliance review during their MCSP MHCB admission.

Psychiatry initial evaluations were problematic. Of the six cases reviewed, 50 percent received a timely psychiatric initial evaluation. In part, this was the result of the assigned psychiatrist only working four days a week. In addition, one inmate who was housed in the MHCB for five days was never seen by psychiatry, as the assigned psychiatrist was on vacation. The primary clinicians completed timely initial evaluations 100 percent of the time.

There were 35 necessary daily contacts; MCSP was 100-percent compliant with those timeframes. At least 18 of those clinical contacts should have been with a psychiatrist, though psychiatry saw some inmates more than twice per week. Consequently, there were 23 psychiatric contacts during the timeframes reviewed and 19 of 23, or 82 percent, were compliant.

One problem with analyzing compliance with individual contacts was that the space used for meetings typically included the presence of other mental health staff so that the treatment contact was never truly confidential.  This meant that these clinical contacts did not meet the formal definition of daily clinical confidential contacts.  Without having an appropriate treatment space, no appropriate clinical contact could occur unless all other MHCB mental health staff left their work area.  Therefore, while daily contacts did occur in the MCSP MHCB, those contacts were not appropriately confidential and did not occur in an appropriate clinical treatment space.

Of the inmates reviewed, 100 percent received timely initial IDTTs.  There were six timeframes when an ongoing or discharge IDTT should have occurred, and in all instances the inmates were seen timely.  No inmates were discharged without appropriate IDTTs.

A room - located outside of the IDTT room, had to be shared by all mental health staff for individual treatment, assessment, and small group contacts.  This space was rarely confidential as it opened to the IDTT area, which also served as office space.  Therefore, any evaluations or clinical contacts that occurred typically had other MHCB staff present.  In addition, the space used was filled with treatment modules that were used with inmates who were not maximum custody.  Staff reported that they would leave the modules open and inmates un-cuffed, but inmates complained about the use of these modules.

There were room separators or dividers installed in the IDTT room reportedly to try to increase treatment space.  The institution recognized that this was not as successful as expected, but the dividers were not removed.  The IDTT members would set up around a table in one room and the inmate would sit outside of the dividers, effectively in the other room and unable to see, or be seen, by some of the team members.  The unit correctional officer also could not be seen by

all team members, and was rarely asked for input. There was sufficient room in the primary IDTT room to include the inmate in that area.

All required team members were present during observed IDTTs and most staff either sat at a desktop or utilized a laptop. The psychiatrist brought documents relevant to each inmate, but did not bring a laptop or utilize a computer during the IDTT. The recreation therapist presented thorough individualized assessments for each inmate.

Generally, privileges, property, and cuff status were addressed during the IDTT. The sergeant was able to provide paperwork for each inmate and explain the process followed. However, one inmate came to IDTT with no shoes. When questioned, that inmate explained that he had not been provided with shoes at all since he had arrived in the MHCB. Upon review of the MHCB cells and other inmates, it appeared that there was some confusion regarding property, safety restrictions, and the need to provide for basic needs such as foot protection to move about the unit. If there was a safety concern, shower slides could be provided and kept outside of the cell. Apparently, shower slides were being provided to inmates at shower time but no other time, resulting in inmates being forced to choose between going to the courtyard or other areas without shoes or refusing clinical activities. This concern was presented to the unit sergeant who followed up with the unit supervisor and the issue was resolved with all custody staff trained prior to the end of the site visit. Inmates would be provided foot coverings (e.g., shower slides) whenever out of their cells.

The senior psychologist supervisor provided structure to the IDTTs; overall the team functioned well. Team members knew inmates' histories and focused on the inmates' clinical needs.

337

When assessing for higher level of care, the IDTT focused more on objective than subjective factors. During observed IDTTs, a discussion took place about the reduction in the level of care for an inmate upon discharge from the MHCB. The team agreed to discharge the EOP inmate to 3CMS. While potentially problematic, the team articulated the reasons for the decision, as well as follow-up plans.

Inmates previously housed in the administrative segregation unit due to safety concerns or other non-disciplinary matters were handcuffed and treated as maximum custody inmates while in the MHCB. Staff seemed to attribute the practice to interpretation of the local operating procedure, which they believed provided no discretion.

Seclusion and Restraint:

There was one incident of restraint and one incident of seclusion during the review period. Each involved the same inmate and was the result of an incident of danger to self. The restraint and seclusion log was not properly maintained.

Crisis Intervention Team:

MCSP underwent headquarters' training in March 2019 to implement the approved CIT process. The approved process was activated on May 20, 2019. The approved team included a psychologist, SRN II, and lieutenant. The CIT was supervised by a senior psychologist supervisor who was also responsible for the supervision of the MHCB and alternative housing. Mental health had allocated two psychologists, with complimentary schedules for the team, to cover the scheduled weekly hours.

MCSP had previously implemented a CIT for a few months, though informally. In the informal version, the team would send out a "scout," or one team member who would make a preliminary assessment of the crisis and bring it back to the other members, as appropriate. It

was reported by staff that after learning the approved CIT approach, there were some residual challenges with some members of the staff's understanding that the "scout model" was no longer acceptable and it was rectified. As the CIT's formal activation was recent, no statistics regarding outcomes were available.

Alternative Housing:

The senior psychologist supervisor reported that two clinicians were assigned to alternative housing for triage and evaluation, though they spent much of their time consulting with yard clinicians. Similar to the CIT, the clinicians worked complimentary days to allow coverage for a seven-day week. The senior psychologist supervisor also reported mental health and custody staff worked collaboratively to timely move inmates from alternative housing to the MHCB.

MCSP had eight alternative housing cells, in Facility C-12, cells 147-150, and in Facility C-13, cells 118-121. All were wet cells. Four of the eight had up-to-date cleaning logs, but there were no logs for the remaining four. Five of the eight observed cells had suicide resistant mattresses. Of the remaining three, two were occupied by inmates from administrative segregation and one contained a torn non-suicide resistant mattress, which staff reported was replaced at the end of the site visit.

The institution reported that there were 251 inmates sent to alternative housing during the reporting period. Of the 251, 194 inmates, or 77 percent, were admitted to the MHCB and 57 inmates, or 23 percent, were rescinded. None of alternative housing placements lasted longer than 24 hours. The institution reported that interviews were conducted in the treatment space in Facility C-12, which was confidential, and on the dayroom floor using treatment modules in Facilities C-12 and C-13, which were not confidential.

The monitor observed one inmate in alternative housing who was on 1:1 watch and was in a suicide resistant smock.  However, the inmate did not have a suicide resistant mattress, which was brought to the attention of institutional staff.  The inmate had a non-confidential cell-side contact, although staff represented that he also had a prior confidential appointment.  At the conclusion of the site visit, the institution reported that the non-suicide resistant mattress had been replaced.

EOP:

The EOP programs housed Level II, III, and IV inmates in A-5, B-6, B-7, and D-18.

Both EOP psychiatrists assigned to Facility A and the Minimum Support Facility (MSF) carried caseloads within established ratios.  On Facility B, both EOP psychiatrists carried caseloads marginally outside of staffing ratios and on Facility D, the EOP psychiatrists carried caseloads within the established staffing ratios.

MCSP had 11 primary clinicians in Facility A, who provided services to both EOP and 3CMS inmates.  Caseloads for EOP primary clinicians were within established staffing ratios. All primary clinicians in Facilities B and D had caseloads within established staffing ratios.  The Facility B EOP senior psychologist supervisor carried a caseload of three inmates.

A total of eight mainline EOP inmates were randomly selected to assess compliance with timely mental health contacts as documented in the EHRS.  Of those, five required initial psychiatric contacts; none were timely.  There were sixteen timeframes required between routine psychiatric contacts; 63 percent occurred timely.  "Timeframe" as applied to compliance was the number of days between contacts.

Of the eight inmates, five required initial primary clinician contacts and all occurred timely. There were thirty total timeframes between primary clinician contacts, and 33 percent exceeded Program Guide timelines.

Five of the eight inmates required initial IDTTs; all occurred timely. There were 12 total timeframes between all IDTTs (initial and routine); all were timely. Presence of the assigned psychiatrist at IDTTs, as required by the Program Guide, was not clearly documented.

During the review period, the institution offered the required treatment hours 90 percent of the time for two months, but failed to offer required treatment hours to EOP inmates for four of the remaining six months.

Despite some improvement in treatment hours offered, refusal rates remained static during the review period ranging from 24 percent to 29 percent. As a result, the rate of attendance also did not improve significantly, ranging from a low of 41 percent in November 2018, to a high of 55 percent in March 2019.

MCSP implemented a significant change in the way groups were assigned and scheduled in all EOP yards. Mental health leadership reported that the change was the result of a QIT which was chartered because previous efforts to improve treatment hours offered to EOP inmates were unsuccessful. The changes created considerable confusion and dissatisfaction among many inmates and some staff. Mental health leadership acknowledged the validity of inmate complaints that groups with nominally clinically-oriented titles were in actuality run as leisure groups. All clinician-led EOP groups observed during the site visit appeared to be clinically relevant and participants appeared to benefit from group therapy participation.

In November 2018 the institution began a pilot program on its Level IV yard on Facility A. The mental health leadership combined the primary clinician caseloads from the EOP and

3CMS programs.  They relocated the team to the Facility A treatment center and combined their caseloads, so each clinician carried a caseload of both EOP and 3CMS inmates.  If an inmate's level of care changed between EOP and 3CMS, they retained the same primary clinician, although their housing unit and psychiatrist would change.  Staff believed this improved continuity of care.

The monitor's expert attended EOP IDTT meetings on Facilities A and B.  The space utilized for both IDTTs was adequate and staff had access to computers.  All required staff were in attendance.  On Facility B, a telepsychiatrist was utilized without technical difficulty.  The IDTTs featured excellent rapport with inmates and good case formulations.  However, staff did not adequately review criteria for consideration of a higher level of care and demonstrated limited understanding as to what benefits inpatient treatment could offer an inmate.

IDTTs on Facility A were particularly well-conducted, featuring excellent discussion, good presentations, good rapport with inmates, and well-timed supervisory interventions.  One concern was that in some instances inmates' treating psychiatrists was not present in the IDTT, which was problematic.

An observed EOP huddle took place in the medical office and was attended by nursing, mental health, and custody.  All staff participated and exchanged useful information.  Staff reported that huddles took place daily on second and third watch.

During interviews, mental health staff reported that they were feeling pressured to reduce inmates' level of care.  Staff connected this to a headquarters' training they attended, after which lists were provided to them on a quarterly basis for level of care reviews.

<u>3CMS</u>:

The staffing caseload for psychiatrists assigned to the 3CMS program was 1:280. A psychiatrist assigned to 3CMS inmates on Facility A carried a caseload of 1:290, which marginally exceeded the established staffing ratio. A 0.25 FTE registry psychiatrist carried a caseload of 1:47, which was within the established staffing ratio. Registry psychiatrists also carried caseloads that met the established staffing ratios in Facility B and E. A dual appointment 0.25 FTE psychiatrist with a 3CMS caseload in another CDCR institution carried a 3CMS caseload in Facility B of 1:154 inmates, which exceeded the established staffing ratio.

One Facility C psychiatrist carried a caseload of 1:285 inmates. The two 0.5 FTE psychiatrists assigned to 3CMS inmates on Facility D carried caseloads of 1:121 and 1:124; both were within the established staffing ratios.

The established clinical ratio for primary clinicians assigned to the 3CMS program was 1:97. On Facility A, primary clinicians with combined EOP and 3CMS caseloads met staffing ratios. On Facilities B and C, all primary clinicians had caseloads that met staffing ratios. One additional 0.5 FTE primary clinician on Facility C had a caseload of 55 inmates. All primary clinicians assigned to 3CMS inmates in Facility D and E had caseloads that met staffing ratios and a primary clinician assigned to the MSF had a caseload of 13, which fell within staffing ratios.

A total of ten 3CMS inmates were randomly selected to assess compliance with timely mental health contacts. With regard to assessing psychiatric contacts, three cases were removed as the inmates were not on psychiatric medication. Two inmates required initial psychiatric evaluations. Neither was assessed as timely. There were six timeframes between routine

psychiatric contacts, all were timely.  As stated above, "timeframe" as applied to compliance was the number of days between contacts.

Only two inmates required initial primary clinician contacts, both were timely.  For the 17 total timeframes between primary clinician contacts, 94 percent occurred timely.

With regard to assessing compliance with timely IDTTs, one inmate was excluded from the sample as he was referred to the MHCB during the review period.  Of the two inmates who required initial IDTTs, one was timely.  Five inmates required annual IDTTs; all were timely.

Five IDTTs were observed on Facility C.  The inmates and all required staff participants were in attendance.  While each IDTT member participated, input was regimented, and needed improvement to demonstrate collaborative treatment planning.  Additionally, the psychiatrist was typically the last to participate and input was limited to a review of psychiatric medication.

Case presentations were led by two primary clinicians; while one demonstrated strong therapeutic alliances with assigned inmates, both presentations needed improvement.  The lack of relevant clinical information made it difficult to determine if treatment goals, interventions, and the level of care were appropriate.  Furthermore, attention to clinical termination was needed.

MCSP had a robust group program for 3CMS inmates.  A review of group titles indicated that the majority of groups were recreational; while some core topics such as anger management, mental health education, and substance abuse were also available.

Other Issues:

Pre-Release Planning:

MCSP had two staff members assigned to pre-release planning, a clinical pre-release coordinator and a pre-release coordinator.  The clinical pre-release coordinator trained EOP and

3CMS clinicians on completing the pre-release assessment tool for inmates. This tool identified specific services inmates needed post-release.

In addition, both staff members facilitated group sessions offered to inmates on each yard at least six months prior to release. The groups covered a wide range of topics including employment, resume writing, housing, building community support, developing an identity and finding a purpose. The pre-release coordinators also met individually with inmates upon request.

In addition to the services of the pre-release coordinators, the inmates received the services of the TCMP staff member. The TCMP staff assisted inmates in obtaining personal identification or licenses, as well as applying for necessary services upon release, for example, social security or medical insurance.

Program Access:

a.  Job and Program Assignments:

On May 2, 2019, MCSP reported that of 1,923 job assignments, 132 EOP inmates, or 20 percent of the EOP population, held job assignments. For 3CMS inmates, 682, or 47 percent of the population, held job assignments. Non-caseload inmates held 1,109, or 56 percent of the job assignments.

For the 935 academic assignments, the institution reported that 155, or 23 percent of the EOP population, held these assignments; 335, or 23 percent of the 3CMS population, held the assignments, and 445, or 23 percent of the non-MHSDS inmates, held academic assignments.

There were 168 vocational education positions, of which four, or one percent, were held by EOP inmates, 75, or five percent, were held by 3CMS inmates and 89, or five percent, were held by non-MHSDS inmates.

Regarding the 751 inmates enrolled in voluntary education assignments, 49, or seven percent, of the EOP inmates held assignments. There were 299, or 20 percent of 3CMS inmates with assignments and 403, or 20 percent, were held by non-MHSDS inmates.

Of the 159 substance abuse treatment assignments, it was reported that 16, or two percent, of EOP inmates held this assignment as did 71, or five percent of the 3CMS population and 72, or four percent, of the non-MHSDS inmates.

MCSP provided documentation of the policies and procedures regarding the functional evaluation of EOP inmates for program assignments. The institution provided a copy of the functional evaluation procedure, a power point on the procedure, and training logs.

b. <u>Milestone Credits</u>:

As of May 2, 2019, MCSP indicated that of 663 EOP inmates, 631, or 95 percent, were eligible for milestone credits and 87 percent earned them. For 3CMS inmates, 1,345 of 1,464, or 92 percent, were eligible to earn milestone credits with 30 percent earning the credits. The data further indicated that of the 1,976 non-MHSDS inmates eligible to earn milestone credits, 1,779, or 90 percent, were eligible and 35 percent earned milestone credits.

MCSP provided the updated local operating procedure which was dated February 2019.

c. <u>Out-of-Level Housing</u>:

Data provided by MCSP as of May 30, 2019 showed that two Level I 3CMS inmates were in Level II housing; three EOP and two Level II 3CMS inmates were in Level III housing; and 34 EOP and 68 3CMS Level III inmates were in Level IV housing. There were 22 EOP and 28 Level II 3CMS and three Level III 3CMS inmates in Level I housing; 27 EOP and 169 Level III 3CMS inmates in Level II housing, and one Level IV 3CMS inmate in Level II housing. There were seven EOP and 14 Level IV 3CMS inmates in Level III housing.

d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

MCSP confirmed implementation of the revised ADA accommodation and grievance

procedures.

e.  <u>Periodic Classification Score Reductions: EOP Inmates</u>:

For the reporting period, MCSP produced completed CDCR 840s that indicated the institution

was providing classification score reductions for EOP inmates.

<u>Case-by-Case Reviews</u>:

MCSP reported one case that met the requirement for a 150-day review, but further

details were not provided.

<u>Non-Disciplinary Segregation</u>:

The institution reported a total of 19 NDS inmates were approved for expedited transfer

during the review period; 89 percent were transferred within 72 hours.  MCSP was not able to

provide verification that property and privileges were provided to NDS inmates in a timely

manner because they did not document this information.

<u>"C" Status</u>:

The institution reported a total of 63 inmates on "C" Status as of May 31, 2019.  There

were eight at the EOP level of care, 27 at the 3CMS level of care, and 29 non-MHSDS inmates.

The institution did not report the start or end dates for inmates on "C" Status.

<u>Mental Health Referrals</u>:

The institution was unable to provide adequate documentation regarding emergent,

urgent, and routine referrals.

<u>Construction/Space</u>:

MCSP had dedicated treatment space on each yard, with the exception of the MHCB unit.

Additionally, in D-18, which housed EOP inmates, there was a dedicated office for telepsychiatry appointments, but there was no other dedicated office for telepsychiatry in any of the other buildings on D and E Yards.

Mental Health/Custody Relations:

The Custody and Mental Health Partnership LOP, dated August 2018, was generally in alignment with headquarters' Partnership Plan. The main areas that differed were the addition of the associate wardens as designated personnel for executive rounding, and the exclusion of the "References" section.

All partnership activities had been implemented at the institution except for EOP orientation groups, which were under development at the headquarters level. Executive rounding began in March 2019; the delay in implementation was attributed to a custody leadership vacancy. Documentation of executive leadership joint rounding for the purposes of dissemination of information needed improvement.

During individual and group inmate interviews on Facility E, some custody staff were identified as treating caseload inmates with disrespect; influencing mental health staff regarding medications; and having threatened inmates, specifically with institutional transfers.

While huddles occurred in the administrative segregation EOP hub, they were not properly documented or documented at all. None of the huddle forms reviewed had all sections completed.

MCSP provided copies of in-service training participant sign-in sheets for the quarterly partnership trainings, however, without a comprehensive list of custody and mental health staff required to attend, the monitor was not able to determine compliance. The institution reported

1,500 Multiple Interactive Learning Objective (MILO) training sessions were held for staff as additional collaborative efforts.

The institution reported that a total of 212 MHSDS inmate appeals were filed as staff complaints. All were partially granted, and six appeals were referred for additional investigation. Two staff were referred for investigation not initiated through the appeal process. One staff member had been redirected to another post as a result of a complaint.

Heat Plan:

The institution reported no Stage I, II or III heat alerts, during the reporting period, which fell outside of the heat season.

A total of eight housing units were reviewed for compliance with CDCR policy and procedures regarding heat plan. Six of eight housing units had a working thermometer, but in two housing units, the temperature in the control booth was being recorded and not the temperature in the housing unit. Housing unit staff's knowledge of heat plan requirements varied, but was generally lacking.

RVRs:

Of the custody staff who were required to receive the RVR training, 84 percent attended. MCSP reported three mental health clinicians attended the mandatory training more than a year ago and they were the only clinicians used to complete all mental health assessments related to RVRs.

During the review period, MCSP issued a total of 1,271 RVRs, of which 793, or 62 percent, were MHSDS inmates. Specifically, one was issued to an acute care inmate, six to MHCB inmates, 281 to EOP inmates, and 506 to 3CMS inmates. There were 478 RVRs issued to non-MHSDS inmates.

For a reviewed sample of 17 RVRs, custody staff referred the RVR to mental health staff in a timely manner on two occasions, or 12 percent of the time. The clinical staff completed the mental health assessment and timely returned it to custody staff 95 percent of the time. The senior hearing officer documented consideration of the mental health assessment 12 percent of the time. The mental health assessment recommended mitigation of penalties in 47 percent of the RVRs reviewed and the senior hearing officer documented mitigation of the penalties 25 percent of the time.

In three, or 18 percent, of the mental health assessments reviewed, the clinician's recommendation for mitigation was for continued programming to which the inmate was already entitled. Of the two inmates reviewed who were being considered by the ICC for the SHU, the committee documented consideration of the mental health information for mitigation of the SHU term half the time.

Use of Force:

MCSP reported that 95 percent of custody staff attended the mandatory use of force training, but despite the high rate of compliance, no custody officer above the rank of sergeant had attended the training. Of the mental health staff required to attend use of force training, 46 percent attended; 85 percent of the nursing staff attended the mandatory training.

The institution reported two controlled use of force incidents during the review period. Both occurred in administrative segregation. MCSP reported 148 immediate use of force incidents involving 114 MHSDS inmates and 34 non-MHSDS inmates.

The monitor reviewed the controlled use of force incidents and one did not contain adequate details of why the use of force was necessary. The incident involved the controlled use of force to extract an inmate out of a holding cell on the dayroom floor in the administrative

segregation unit. There was no explanation regarding the need for the extraction and limited details were provided on the interventions attempted during the cool-down period.

The monitor reviewed four immediate use of force incidents and all were found to be compliant with CDCR policy and procedures.

Access to Care:

A review of MCSP's monthly Health Care Access Quality Reports from October 2018 to March 2019 indicated that one percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while five percent were not completed due to non-custodial reasons, excluding inmate refusals.

Placement of 3CMS Inmates into Minimum Support Facilities:

As of May 30, 2019, there were nine 3CMS inmates at the MSF. The institution was unable to provide a list of inmates who were in the MSF during the review period.

*Coleman* Postings:

*Coleman* posters were current in English and Spanish and visible to the inmates in all visited housing units and program areas.

Document Production Issues:

As part of the document request, the institution reported there were six cells used for alternative housing; however, the local operating procedure indicated and onsite inspections confirmed, there were eight alternative housing cells. Another document production issue concerned MCSP's provision of a version of the performance report to demonstrate compliance with mental health referrals. An examination of the data showed redundant information and the institution was unable to provide updated information during the site visit.

**Sierra Conservation Center (SCC)**
Review Date – June 5, 2020

Census:

On June 4, 2020, SCC housed 4,027 inmates; a seven percent decrease from the census reported during the preceding monitoring period. The mental health caseload population of 537 inmates increased by 12 percent since the preceding review period and represented 13 percent of the total inmate population.

There were no inmates in alternative housing.

There were two EOP inmates in administrative segregation.  There were 535 mainline 3CMS inmates; 12 3CMS inmates were in administrative segregation.

There were no inmates in TMHUs.

There was one MHSDS inmate in administrative segregation designated NDS.

Staffing:

One of the two chief psychologist positions was filled for a 50-percent vacancy rate.

There was one senior psychiatrist supervisor position which was filled.

The two senior psychologist specialist positions were filled.  SCC employed 1.0 senior psychologist supervisor, 0.5 more than the 0.5 allocated position.

One of the 3.5 staff psychiatrist positions was filled for a 71-percent vacancy rate.

Four of 6.6 staff psychologist positions were filled resulting in a 39-percent vacancy rate.

Four of 4.5 clinical social worker positions were filled for an 11-percent vacancy rate.

SCC did not have allocated recreation therapist positions.

The one HPSI position was filled; however, there was a 12-percent functional vacancy rate due to long term sick leave.   Three of the 4.5 office tech positions were filled for a 33-percent vacancy rate.

352

<u>Transfers/Referrals</u>:

There were no referrals to acute or intermediate care during the review period.

Three inmates met criteria for intermediate or acute care consideration but were not referred. The three cases were reviewed and the clinical rationale used to support decisions not to refer patients to higher levels of care was appropriate. In two of the cases, plans to treat the patients were not delivered as documented and the patients were moved to lower levels of care after IDTT, and prior to achievement of identified treatment goals.

<u>Programming</u>:

<u>MHCB</u>:

Between March 1, 2020 and May 31, 2020, SCC made ten referrals to MHCBs, of which five or 50 percent were transferred. There were three admissions to CHCF's MHCB, one to CMF MHCB, and one to CSP/Solano MHCB. All five transfers were completed within 24 hours. Four referrals were rescinded and one transfer was pending at the time of review. The pending inmate was significantly outside the transfer timeframe and had been placed in alternative housing for 8.2 days as of June 1, 2020.

<u>TMHU</u>:

TMHU cells, which were developed as an alternative to higher levels of care, lack a therapeutic milieu and offer limited programming, treatment services and multi-disciplinary collaboration in comparison to established higher levels of care. Record review of inmates housed in TMHU at the time of review indicated inadequate care, in part, due to lack of therapeutic milieu.

Randomly selected records were reviewed from the lists of inmates reported to have been placed in the TMHU through June 26, 2020.

The cases review revealed that SCC did not meet the expectations set forth in the *COVID-19 Emergency Mental Health Treatment Guidance* document. Treatment primarily consisted of cell-front rounds and occasional confidential encounters. IDTTs were not consistently conducted as required, and rationale for changes to patient privileges were not documented and appeared to be based on decisions by a single clinician. Aftercare and safety plans were not discussed with patients prior to discharge. Treatment appeared primarily focused on psychotropic medication interventions with little, if any, supporting therapies provided. In contrast, monitoring by nursing staff was consistently documented and indicated collaboration with the mental health staff.

3CMS:

Generally, the mental health care provided to mainline 3CMS inmates was adequate and met the clinical needs of the inmates. However, some areas requiring attention included missing and/or varying documentation of PC interventions; inconsistently updated inmate treatment goals; concerns about medications, including how they were prescribed, initiated and /or discontinued by psychiatrists; differing diagnoses between psychiatrists and PCs; and appropriately diagnosing other issues (e.g., an inmate with tremors and cognitive decline who possibly had dementia). Review of one inmate's record indicated he was not referred for a follow up psychiatric appointment after he decompensated during the lockdown in response to the COVID-19 pandemic. The lockdown negatively affected the quality of care received by some inmates as mental health programming was impacted.

Program Guide timeliness of IDTT, primary clinician and psychiatric contacts, and attendance at IDTT was assessed by reviewing a random selection of healthcare records for

mainline 3CMS inmates.  Seven mainline 3CMS inmates were randomly selected and reviewed to assess compliance with timely psychiatric contacts.

Five inmates required initial psychiatric evaluations and two or 40 percent were compliant.  For the six inmates that required routine psychiatric contacts, SCC was 100 percent compliant for timely completion within 90 days.

Records reviews of ten randomly selected 3CMS inmates were completed to assess compliance with timely PC contacts for the reporting period.

Five inmates required initial PC contacts.  Of those, three or 60 percent were compliant.

For the ten inmates expected to be seen for routine PC contacts, 100 percent occurred within ninety days and were compliant.

Ten cases were reviewed to assess compliance with timely IDTTs.   For the five inmates who required initial IDTTs, three or 60 percent were compliant.  There were three inmates that required annual IDTTs during the review period; two or 67 percent occurred timely.

Required staff were in attendance for 100 percent of initial and routine IDTTs.   While a PC and psychiatrist were in attendance at IDTTs, it was not documented if the assigned treatment providers were in attendance as required by the Program Guide.

RVRs:

SCC reported that four RVRs issued to 3CMS inmates required mental health assessments during the review period.  All were reviewed.  Of those, custody timely requested a mental health assessment in three or 75 percent of the cases; the one untimely referral was submitted five days late.  Mental health staff completed and returned all of the assessments timely.

A review of mental health assessments revealed that mitigation was recommended by clinicians 50 percent of the time.  In those cases, the senior hearing officer documented mitigation of penalties.  In one instance, the disciplinary hearing report contained conflicting dates on when the mental health assessment was received, as well as the level of care of the inmate at the time of the assessment.

**California Medical Facility (CMF)**
June 24, 2019 – June 27, 2019

Census:

On June 21, 2019, CMF housed 2,529 inmates. There were 1,052 inmates on the mental health caseload or 42 percent of the total inmate population.

The MHCB unit housed 40 inmates and no inmates were in alternative housing.

There were 429 mainline EOP inmates and 32 EOP inmates in the administrative segregation EOP hub.

There were 542 mainline 3CMS inmates and nine 3CMS inmates in administrative segregation waiting transfer to STRH. There were no inmates assigned NDS status.

Staffing:

The chief of mental health position was filled by an out-of-class assigned senior psychologist supervisor.

The established chief psychiatrist position was filled by an out-of-class assigned senior psychiatrist.

The senior psychiatrist position was filled but acted as the chief psychiatrist. An out-of-class assigned staff psychiatrist filled the senior psychiatrist position.

One of the two chief psychologist positions was filled for a 50 percent vacancy rate.

Four of the five senior psychologist supervisor positions were filled; the fifth position was filled by an out-of-class assigned staff psychologist. Four of the six senior psychologist specialist positions were filled, for a functional vacancy rate of 33 percent.

Nine of the 18.5 staff psychiatrist positions were filled with eight onsite psychiatrists and one telepsychiatrist. One of the eight onsite psychiatrists filled the senior psychiatrist position, resulting in a functional vacancy of 10.5 positions or 57 percent. CMF utilized 3.65 FTE registry

357

staff reducing the functional vacancy rate to 6.85 positions or 37 percent.

Of the 40 allocated staff psychologist positions, 34.5 positions were filled for a 14 percent functional vacancy rate.

The one supervising social worker position was filled. Of the 16 social worker positions, 12.5 were filled. Registry staff supplied an additional 0.5 position for a functional vacancy of 3.0 positions or 19 percent.

Six of the 6.3 senior psych tech positions were filled for a five percent vacancy rate. Sixty-seven of the 77.9 psych tech positions were filled resulting in a vacancy rate of 10.9 positions or 14 percent.

Of the 23 recreation therapist positions, 20.5 were filled for a vacancy rate of 2.5 positions or 11 percent.

Five of the seven medical assistant positions were filled for a 29 percent vacancy rate. All were limited term positions expiring in February 2020.

The two HPS I positions, the one office supervisor position and the one mental health training officer position were filled. Two of the three CHSA II positions were filled for a 34 percent vacancy rate. One CHSA II position was reclassified as an HPS I position and was filled at the time of the site visit. Four AGPAs filled the 3.5 established positions. Seventeen of the 21.5 MHSDS clerical positions were filled for a functional vacancy of 4.5 positions or 21 percent.

<u>Telepsychiatry</u>:

One telepsychiatrist provided services in the 3CMS program at CMF. Telepsychiatry was not used in the MHCB unit. The telepsychiatrist carried a caseload of 334 inmates, which

was more than the mandated ratio.  The quality of IDTTs with the telepsychiatrist that were observed in the 3CMS program was generally good.

Quality Management:

The local governing body met twice during the review period and a quorum was present for both meetings.  Minutes reflected agenda items covered relevant health care issues including implementation of the CIT, custody-mental health partnership executive rounding, and EOP level of care reviews.  Several health care operating procedures were reviewed, as well as significant health care staffing losses at CMF.

The quality management committee met as required and the presence of a quorum was documented for each meeting.  Mental health staff was present at all meetings except during December 2018.  The quality management committee addressed various matters related to the quality of mental health care at CMF, and mental health related corrective action plans were addressed.  Additionally, the quality management committee reviewed issues regarding EOP structured therapeutic treatment, medication management related to diagnostic monitoring, IDTT staffing, and mental health performance compliance metrics.

The mental health subcommittee met monthly and documented the presence of a quorum. The mental health subcommittee regularly identified issues for submission to the quality management committee.  Issues regularly reviewed included mental health performance reports, suicide prevention, and EOP hub certification.  The subcommittee also addressed issues related to seclusion and restraint, lengths of stay, and documentation in MHCBs.  Audit reviews included monthly quality monitoring audits, referrals to MHCBs, acute and intermediate care audits, and activities of the CIT.  Medication management issues were addressed regularly.

At the time of the site visit, CMF's SPRFIT and an administrative segregation FIT were

359

active.  There were no mental health QITs during the review period or at the time of the site visit.

During 2018, CMF initiated an EOP treatment improvement workgroup to improve scheduling and offering of group therapy.  At the time of the site visit, CMF included a pilot of the use of a new scheduling process to decrease conflicts with treatment and other activities such as work and education.

Quality management information was disseminated to line staff during monthly MHSDS program meetings.  Additionally, performance reports were discussed during weekly supervisors' meetings and then relayed to line staff.  Staff also received quality management information via email.

Pursuant to current CDCR policy, CMF did not conduct systemwide peer reviews during the review period or at the time of the site visit.

Medication Management:

CMF closely monitored medication management.  CMF aggregated MAPIP data with the onsite inpatient psychiatric programs which reportedly decreased their compliance rates.  Additionally, inmate refusals negatively impacted compliance rates.  MAPIP results for CMF were presented for December 2018 through May 2019.

MAPIP data showed that CMF was compliant for all six months for inmates prescribed antidepressants for the following psychiatric diagnostic monitoring: medication consent, thyroid monitoring, and venlafaxine blood pressure monitoring.  Data for EKG was reported compliant for one of the six months.

For inmates prescribed antipsychotics, CMF was compliant during each of the six months of the review period for thyroid monitoring, blood pressure, and height and weight measurements.  For other psychiatric measures related to antipsychotics, CMF was compliant for

five of the six months for medication consent and blood sugar. Psychiatric measures for abnormal involuntary movement scale (AIMS) tests was compliant for four of the six months, and measures of complete blood count (CBC) with platelets and comprehensive metabolic panel (CMP) were compliant for three of six months. Lipid monitoring was compliant for one month; EKG measurement was not compliant for any month during the review period.

Regarding psychiatric diagnostic monitoring of inmates prescribed carbamazepine, CMF did not report data for each month of the review period for medication consent, carbamazepine levels, CBC and CMP. MAPIP data showed compliance for three months for CBC, two months for CMP and medication consent, and one month for levels.

For Clozapine, compliance was achieved for each of the following measures during the review period: blood pressure, blood sugar, CBC, height and weight. Lipid and thyroid monitoring were compliant for five months, medication consent was compliant for four months, AIMS tests were compliant for three months, CMP measures for two months and EKGs were compliant for one month.

CMF was compliant with medical consent for Lamotrigine for four months, non-compliant for one month and did not report data for another month.

Psychiatric measures for inmates prescribed Depakote were compliant for medication consent for four months during the review period. Compliance for CBC and CMP were achieved for three months and for levels, CMF was compliant for one month.

For inmates prescribed Lithium, medication consent was compliant for all six months. Psychiatric measures for levels was compliant for three months, kidney function and EKG were compliant for two months, and thyroid monitoring for one month.

361

MAPIP results for CMF from December 2018 through May 2019 indicated that it was compliant for all six months for medication continuity for psychiatry prescribed chronic medications and for new psychiatric medications.  It was not compliant regarding medication continuity after inter-institutional transfers at R&R, medication continuity with intra-institutional transfers to nonlocked units, and observation of preparation and administration of HS and AM/PM medications during any month of the review period.

CMF reported compliance for four months for medication continuity for court ordered involuntary medications, three months for medication continuity at parole or release to the community at R&R, two months for medication continuity following inmate discharge from a community hospital or acute or intermediate care, and for one month with intra-institutional transfers to locked units.

All CMF nurses who delivered medication were evaluated annually.  The CDCR headquarters developed MAPIP Clinic Observation Checklist was used for all medication pass and environmental audits.  During December 2018 through May 2019, 66 staff members were observed performing a medication pass; all but one staff passed the audit without deficiency. The one exception during April failed related to hand hygiene issues and inmate identification with administration.  A corrective action plan (CAP) was completed which included on the job training.

A repeat assessment one month later demonstrated improvement, but problems with Direct Observation Therapy (DOT) medication administration were observed, which led to further on-the-job training and planned re-assessment during June.  The audits were supplemented by random monitoring by SRN IIs without notice.  A quality management nursing

subcommittee also met at least monthly to address relevant medication management issues. Corrective action plans were developed and implemented as needed.

Performance improvement plans were not developed by psychiatrists during the review period.

Psychiatrists at CMF were assigned an HPS I and an SSA who worked directly with the chief psychiatrist, senior psychiatrist supervisor, and medical assistants to develop and implement a process to effectively monitor the required diagnostic monitoring measures. The medical assistants utilized the mental health registry, on-demand report and other care team tools to monitor required measures. The medical assistants met regularly with their assigned psychiatrist to review the week's scheduled appointments, as well as review all labs, EKGs, and consents that required completion. Medical assistants interfaced with nursing and custody staff to facilitate appointments, completion of lab studies, and completion of required patient consent forms. Additionally, a weekly report was provided to the chief psychiatrist for review and follow-up. Results were shared with the psychiatry quarterly management team and other department supervisors to create corrective action plans when needed.

Prescribing practices at CMF included continuation of psychotropic medication prescriptions under the previous mental health provider's name when transferred from another CDCR facility. Upon arrival from non-CDCR facilities, medications were renewed for 14 days by the on-call psychiatrist. Once evaluated, medications were renewed for up to 180 days.

Upon admission to the MHCB, the MHCB psychiatrist or after hours on-call psychiatrist renewed psychotropic medications for 14 days. After initial psychiatric evaluation, within 24 hours of arrival, psychotropic medications were renewed, or new medication was ordered for 30

days.  Upon discharge, MHCB psychiatrists ordered medications for 14 days.  All
telephone/verbal orders were reviewed and signed electronically within 24 hours.

During May 2019, 4.3 percent of CMF psychiatry-prescribed medications were non-
formulary.  All non-formulary requests were sent through the electronic health record to the chief
psychiatrist or a designee who reviewed and granted or denied the request.

At CMF, polypharmacy was defined as being prescribed ten or more different
medications in contrast to the psychiatric standard of being prescribed two or more psychotropic
medications from the same category of medications.  Where there was an occurrence of
polypharmacy, CMF's pharmacy notified prescribing psychiatrists who reviewed those
prescriptions.  A review of the medications was not required to be conducted by supervisors nor
was the prescriber required to be peer reviewed.

The chief psychiatrist authorized initiation of Clozapine in the MHCB, if clinically
indicated.  Initiation of Clozaril occurred only in a MHCB for seven to ten days, with daily
monitoring by a registered nurse.  Upon stabilization, the patient was discharged to the EOP
level of care for outpatient Clozapine maintenance treatment and weekly monitoring by an
outpatient registered nurse continued.

Inmates prescribed Clozapine were entered in the Clozapine Risk Evaluation and
Mitigation Strategies (REMS) system.  A designated pharmacist monitored the Absolute
Neutrophil Count (ANC) results for each patient and reported it to REMS.  The pharmacist also
followed a protocol for ordering labs and coordinated with assigned psychiatrists.

During the review period, CMF accepted EOP inmates from other CDCR institutions
who were stable on Clozapine.  The inmates were monitored once a week by an outpatient

364

registered nurse and the assigned EOP psychiatrist who evaluated and adjusted dosages as needed. The inmates remained in EOP level of care for a minimum of six months.

All psychotropic medications and controlled substances were prescribed as DOT in the MHCB. In individual cases, psychiatrists could order psychotropic medications Nurse Administered (NA).

Psychotropic medications were prescribed NA for outpatient services unless adherence issues were present. CMF was unable to report the number of outpatient inmates who received psychotropic medications on a DOT basis.

In outpatient services, after evaluation for safety, psychiatrists were able to prescribe SSRIs (Fluoxetine, Sertraline and Escitalopram) as Keep On Person (KOP) for a duration of up to 90 days. CMF could not dispense more than a 30-day supply of KOP medication. As of May 21, 2019, there were six inmates prescribed KOP SSRIs and 770 inmates prescribed either NA or DOT medications.

CDCR headquarters and Office of Legal Affairs tracked and maintained the statewide PC 2602 involuntary medication inmate list. At the time of the site visit, 138 inmates at CMF received psychotropic medications via a PC 2602 involuntary medication order.

During the reporting period, 16 initial petitions for PC 2602 involuntary medications were initiated: four non-emergency petitions and 12 emergency petitions. No petitions were withdrawn for non-clinical reasons. Three of the four non-emergency petitions were granted. Ten of the emergency petitions were granted; one was denied and one was withdrawn.

There were no inmates who had been non-adherent with the PC 2602 involuntary medications process. One inmate on a PC 2602 involuntary medication order had two instances of use of force; however, neither incident was specific to medication nonadherence.

During the reporting period, 248 inmates received psychotropic medications at HS.  The HS medication pass always occurred after 8:00 p.m.

<u>Transfers</u>:

CMF's inpatient coordinators raised concerns during the review period regarding the length of time to transfer inmates to Atascadero State Hospital (ASH) and Coalinga due to LRH issues and the premature return of inmates from acute care.

Both the major and minor sustainable process reviews completed during the review period highlighted CMF's longstanding problems with establishing appropriate clinical rationales for inmates not referred to higher levels of care which had been ongoing since 2013. Review of treatment modifications following non-referrals were found to be generally inadequate.  Moreover, there was low interrater reliability agreement regarding non-referral decisions, rationale for non-referrals, and treatment plan between headquarters' reviews and CMF's inpatient coordinators.

Multiple remedial action plans addressing the issues identified developed over time and implemented to varying degrees were ultimately unsuccessful.  The sustainable process reviews found that CMF overestimated its compliance in multiple areas, such as timeliness in submission of completed referral packets.  Some of these errors were attributed to a change in personnel in the inpatient coordinator position; however, one continuing challenge highlighted in the sustainable process reviews was appropriate documentation in the electronic health record system, including progress notes and treatment plans.

CMF provided multiple trainings to staff at all levels regarding deficiencies.  There were improvements noted during the site visit in some observed IDTTs, though they were inconsistent

and varied with program and/or provider.  The presence of a program supervisor in IDTTs appeared to have a positive impact.

The monitor's expert's findings were consistent with the sustainable process review findings.  Clinical rationales were inadequate to justify non-referral, did not address the positive criterion/criteria, or were otherwise inadequate.  Treatment modifications were typically not sufficient as they often restated Program Guide standards, did not include clinically indicated empirically based interventions for the positive indicator(s), or were simply inappropriate, i.e. recommending more group therapy for an inmate refusing group treatment.  These failings were reflected in the low number of EOP inmates, 13 percent, referred to a higher level of care during the review period.  EOP inmates were frequently required to decompensate to the point of crisis requiring MHCB admission prior to receiving a referral to a higher level of care.

During the review period, 532 inmates met criteria for higher level of care consideration. Of those, 169 inmates or 31 percent, were referred to inpatient care after IDTT consideration.

CMF made 80 referrals to acute care during the review period.  There were no rejections and nine referrals were rescinded.  Of the 80 referrals, 46 or 55 percent were transferred timely and 34 or 45 percent were not transferred within timelines.  CMF reported that no inmates were placed on the Acute Bed Utilization Management Report awaiting a bed during the review period or during the site visit.

During the review period, CMF made 89 referrals to intermediate care.  There were no rejections and 19 referrals were rescinded.  All accepted inmates transferred within 30 days of referral.

CMF did not track returns from inpatient care.  While CMF provided reports for certain elements of care such as the five-day follow-up, there was no comprehensive log to ensure that

367

the reports were accurate and comprehensive. The reports also did not address all aspects of required follow-up care, such as the clinician-to-clinician contact. Without tracking inpatient returns, CMF could not provide a comprehensive list of inmates who had returned to the facility or moved internally from inpatient care. It was unclear how clinicians were notified of pending returns.

Review of records indicated that the overall quality of documentation of inmates identified as inpatient returns during the review period was inadequate. These records revealed insufficient documentation that any member of the treatment team reviewed the discharge documentation, and one reviewed inmate was not seen daily for five days as required. Inadequate safety planning also occurred when required. There was no standard process for the inpatient discharge summary to be downloaded and scanned into the EHRS. Consequently, it was apparently not readily available to all treatment team members.

Thirty *Vitek* hearings were completed at CMF during the review period; four inmates prevailed.

CMF did not track inmates with complex medical needs referred to PIPs or DSH. The institution reported that a retrospective review of the CMF referral log identified three inmates with complex medical needs that were referred to inpatient care during the review period. Two inmates transferred to CMF-PIP intermediate care and the third to CHCF-PIP intermediate care.

There were no acute or intermediate care transfers delayed or cancelled due to impending paroles, disciplinary proceedings, classification factors, or pending PC 2602 involuntary medication hearings.

There were no expedited transfers during the review period.

Institutional data indicated that seven inmates transferred to a PSU during the review period. None took longer than 60 days to transfer. No inmates were pending transfer at the time of the site visit.

CMF operated a 50-bed MHCB. CMF did not track when MHCBs were redlined for repairs.

During the review period, the average daily census ranged from 15 to 33 inmates. From December 1, 2018 through May 31, 2019, CMF referred 193 inmates to the MHCB. Ninety two percent or 177 referrals resulted in admission and 16 referrals or eight percent were rescinded. Two inmates transferred to outside MHCBs. One inmate, or less than one percent, was not admitted to the MHCB within 24 hours.

During the same period, 386 inmates were admitted to CMF's MHCB. The average clinical length of stay was 8.3 days with a range of two to 70 days. Eight percent or 32 inmates had clinical stays longer than ten days. The average physical length of stay was 12 days with a range of 11 to 73 days. Forty nine percent or 190 admissions took longer than ten days to physically discharge. No reasons for delays were documented; however, CMF staff reported physical lengths of stay longer than ten days were largely due to inmates waiting transfer to PIPs, specifically intermediate care. The inpatient coordinators reported that due to the regular availability of beds in their MHCB, they retained inmates until transfer to the PIP to reduce clinical destabilization.

Two inmates had three or more admissions during the review period.

All inmates were admitted directly into MHCBs unless after CIT and HCPOP hours. Beginning on December 3, 2019, CIT clinicians were staffed Monday through Friday from 8:00 a.m. to 11:00 p.m.; Saturday and Sunday 8:00 a.m. to 6:00 p.m. and holidays 8:00 a.m. to 4:00

p.m.  HCPOP operated from 8:00 a.m. to 10:00 p.m. 365 days per year.  If admission was required after hours, inmates were placed in alternative housing.

There were no EOP inmates pending transfer to a PSU at the time of the site visit.

No 3CMS inmates transferred from CMF to LTRH during the review period.

CMF transferred 66 3CMS inmates to STRH during the review period.  While 35 percent or 23 inmates transferred beyond the 30-day timeframe, appropriate reasons for delays were documented.

Programming:

Administrative Segregation EOP:

The administrative segregation EOP hub was located in unit M3.  At the time of the site visit there were 32 EOP inmates in administrative segregation.

The one psychiatrist assigned to the EOP hub carried a caseload of 1:40 inmates, which was within the staffing ratio.  The three primary clinicians assigned to the EOP hub carried caseloads of 1:12 to 1:13 inmates which marginally exceeded established ratios of 1:11 inmates.

For the six EOP inmates in the randomly selected ten inmate sample who required initial psychiatry contacts, 83 percent were timely and occurred prior to their initial IDTT.  All subsequent routine psychiatry contacts were timely for the three inmates of the sample who required contacts.

Nine of the ten inmates in the sample who required initial primary clinician contacts were seen timely.  Seven of those inmates required subsequent routine primary clinician contacts. Two inmates were seen every seven days for each subsequent contact as required.

All initial IDTTs in the EOP hub sample of six inmates occurred within 14 days; however, only one occurred before ICC.  Three occurred after ICC, and two were not applicable.

All required staff were present for the initial IDTTs in the sample. No inmates were housed in the EOP hub long enough to be seen for a routine IDTT.

An observed IDTT in the EOP hub was very problematic. The presenting primary clinician was covering for the inmate's primary clinician and was not familiar with the inmate, who was also a participant in the *Clark* Developmentally Disabled Program (DDP). The inmate was housed in administrative segregation due to gassing a custody officer and was referred to the district attorney's office for prosecution. His DDP status was minimized as evidenced by the clinician's suggestion that he use reading as a coping mechanism to decrease his stress; although it appeared the inmate was illiterate. The subsequent treatment plan was not understood by the inmate, nor was it a clinically reasonable plan.

Observed mental health and custody relations appeared good in the EOP hub.

MHCB:

CMF operated a 50-bed MHCB with two safety cells, four restraint rooms, and two ADA cells. Mattresses were provided on a steel bed-like frame.

Psychiatry coverage was provided seven days a week including after hours. CMF marginally exceeded the established staffing ratio for its maximum capacity of 2.5:25 inmates. Primary clinician coverage was also provided seven days per week; however, coverage was provided by eight primary clinicians as opposed to the required l0.5 primary clinicians required in a 50-bed MHCB. Caseloads were 1:10 to 1:12 inmates, which exceeded mandated staffing ratios.

Staff reported that a history and physical examination was completed for each inmate within 24-hours of admission during the review period. Five randomly selected MHCB charts were reviewed by the monitor's expert. Initial psychiatry evaluations for the five sample inmates

were completed timely.  However, none of the five cases received initial evaluations by their psychologist within 24 hours of admission.  While at times the inmate was seen by a psychologist, an evaluation was not completed.  Assessments were conducted in a confidential setting unless refused by the inmate.  Admission SRASHEs were completed as required.

During the review period, CMF was 77 percent compliant with completion of daily clinical contacts in the MHCB.  In addition to no contact occurring, reasons for noncompliance included the inmate not seen by the appropriate clinician and completion of cell-front contacts without the inmate refusing a confidential setting.

Only 69 percent of psychiatric contacts for the reviewed sample were compliant.  Further, there was inadequate psychiatric documentation.  Psychiatrists frequently utilized prior notes from other clinicians making it difficult to determine where the old, imported notes ended and current documentation began.  At times, psychiatrists added little to no documentation to the other clinician's progress note.  There were occasions when psychiatric documentation was insufficient to determine if an actual contact had occurred.

Due to current psychiatry and psychology vacancies, continuity of care was problematic as clinical contacts were often provided by different psychologists and psychiatrists daily.

CMF conducted IDTTs seven days per week; due to allocation issues, correctional counselors did not attend during weekends.  Custody officers did not attend IDTTs; relevant information was shared during the twice per day huddles.

For the five sample cases reviewed, all initial IDTTs were timely.  All required staff was present for three or 60 percent of the sample initial IDTTs; the correctional counselor and program supervisor were not present in the two deficient cases.

All subsequent weekly IDTTs were timely.  One inmate remained at the CMF MHCB for approximately four weeks post-clinical discharge pending transfer to intermediate inpatient treatment.  Weekly IDTTs were held consistently for that inmate.

No inmates were discharged without appropriate discharge IDTTs with all required staff present.

There was appropriate interdisciplinary discussion, and the required participants were present in observed IDTTs.  Treatment plans were updated and access to higher level of care was discussed and appropriately documented in these IDTTs.

Maximum custody and inmates not yet classified were escorted in mechanical restraints, placed in a treatment module, then uncuffed for the IDTT process.  All other inmates were uncuffed and sat in an open treatment module.  The treatment modules utilized in CMF's CTC were not *Coleman* approved modules, nor were they part of the grandfathering clause.

MHCB inmates at CMF were offered two hours of outdoor individual recreation yard five days per week, one hour per week out-of-cell recreation therapy with two other inmates in individual treatment modules, and in-cell recreation therapy activities.  Outdoor recreation yards offered some shaded areas; misters were not present.

Medical records staff tracked completion of discharge summaries.  The completion of discharge summaries at CMF was poor.  The monitor's expert review of discharge summaries revealed problems including the reason for referral section was often vague and lacked relevant timeframes, and precipitating factors leading to admission were omitted.

Most of the reviewed summaries included an inadequate "discharge plan" section usually only stating to where the inmate was discharged as the sole narrative which was not useful to the receiving institution.  Quality improvement regarding both intake and discharge summaries that

involve MHCB psychiatrists and primary clinicians would be beneficial to appropriate clinical care.

Discharge SRASHEs were not completed timely during March, April and May 2019 of the review period.

CMF did not perform audits relative to suicide watch and precaution practices in the MHCB.

Property, bedding, mechanical restraints and movement restrictions were reviewed timely by clinical staff and adjusted appropriately as clinically indicated.

<u>Seclusion and Restraint</u>:

Clinical restraints were not used during the review period.

<u>Crisis Intervention Team</u>:

During December 2018, CMF implemented the Crisis Intervention Team (CIT) using the statewide CIT policy and procedure. Since its inception, CMF reported an overall reduction in unnecessary MHCB referrals related, in part, to a more integrated approach to resolving inmate issues.

The CIT members reported their current staffing allocation was inadequate, specifically, it did not include an allocation for a psychiatrist. Psychiatrists were frequently consulted by the CIT members indicating a psychiatrist needed to be a regular member of the team.

CIT clinicians attended EOP and MHCB huddles and shared information regarding inmates they saw, as well as continually consulted with other providers regarding inmates that might activate CIT. This process allowed for implementation of behavioral plans to be carried out across shifts. Additionally, there was a bi-weekly multidisciplinary CIT quality management meeting designed to problem solve, ensure that all of the disciplines were communicating

effectively with each other, and continually identify and develop creative solutions for any issues that arose. Quarterly CIT trainings were conducted with all CIT disciplines to review and improve local processes.

The CIT had 232 CIT clinical interventions since its inception. Of those, 45.7 percent were admitted to the MHCB. The other 54.3 percent were provided alternate solutions to resolve the immediate crisis. A total of 74 percent of all CIT activations were for EOP inmates. The CIT program statistics at CMF revealed that ten inmates were admitted to the MHCB 24 times in the three months prior to the CIT activation. Post CIT activation, those same ten inmates were admitted to the MHCB a total of eight times.

Other notable statistics included the following: 74.1 percent of all CIT MHCB admissions were for suicidality or psychosis of major mental illness; 56.8 percent of all CIT activations occurred due to initial reports of suicidality, although only 19.4 percent of all CIT activations were for validated suicidality; 81 percent of all CIT activations were due to psychosis/drugs and were admitted to MHCB; and, 89 percent of inmates seen by the CIT were attempting to avoid transfer to administrative segregation or SHU, court, or to another prison.

The CIT referral process required improvement. During the review period, only the CMF CIT psychologist, as opposed to entire team, triaged all referrals, which was not consistent with policy and procedure. Additionally, CIT referrals were made by leaving a voicemail. At times, the voicemail box was full and timeliness of response to the voicemails was unclear.

Interviewed inmates expressed concerns that their reported feelings of self-harm were taken less seriously by custody staff and the CIT since its activation.

The CIT process at CMF was working fairly well, although staffing allocation for the CIT at CMF appeared in need of reassessment including adding psychiatry as a regular member.

375

Further, CIT policy and procedure and referral practices would likely benefit from a re-examination based on data and experience since implementation.

Alternative Housing:

CMF's policy and procedure prioritized alternative housing cells as follows: MHCB cells A19, A20, B19, and B20; two intake cells at the MHCB entrance; CTC medical beds on G1, G2, or G3 and the B-1 clinic TTA. The monitor's expert observed that the two intake cells in the MHCB did not have beds and were not appropriate for alternative housing use.

There were 62 alternative housing placements during the review period. Of those, 39 inmates were admitted to CMF's MHCB, 21 inmates were evaluated and sent back to their housing units, and two inmates transferred to an outside MHCB. No stays during the review period exceeded 24 hours. Documentation reviewed showed that alternative housing placements significantly decreased at CMF since implementation of the CIT.

Inmates placed in alternative housing were placed on 1:1 supervision by nursing or custody staff. Inmates received initial nursing assessments, daily medication monitoring, and daily clinical contact with a psychologist or psychiatrist. Clinical contacts occurred in a confidential setting.

EOP:

All of the four FTE psychiatrists assigned to CMF's EOP had caseloads between 1:94 and 1:101 inmates, within the mandated staffing ratio of 1:120 inmates. Of the 27 primary clinicians assigned to EOP, 14 or 52 percent had caseloads within the required 1:26 inmate ratio. Twelve or 44 percent of EOP primary clinicians had caseloads exceeding the ratio. One primary clinician carried a caseload of only ten inmates. Interviewed staff reported significant workload concerns impacting the completion of their duties.

376

One of nine randomly selected EOP health care records reviewed that required initial psychiatric contact was compliant. Seventy-nine percent of contacts were compliant for the eight inmates in the EOP sample who required routine psychiatric contact within 30 days. Inmates reported they were seen by psychiatry at least monthly.

There was no documentation for the one EOP inmate of the sample who required an initial primary clinician contact during the review period. Seventy three percent of routine contacts in the sample were completed weekly. Two inmates had no documentation of routine contacts in their charts.

Problems with continuity of care persisted due to high turnover of primary clinicians.

Inmates reported all clinical contacts occurred in a confidential setting in the O-Wing treatment center.

The initial IDTT for the one inmate in the sample for whom it was required was timely.

Ninety-four percent of required routine IDTTs were timely for the eight inmates in the EOP sample. Required attendees were present for 89 percent of IDTTs; however, it was unclear if it was the inmates' assigned psychiatrist and primary clinician in attendance. Interviewed inmates reported discussion of treatment planning during IDTTs; however, they also reported pressure during IDTT meetings to downgrade to 3CMS level of care.

Interviewed staff also reported pressure to reduce the EOP and 3CMS program numbers. Data provided during the site visit indicated 33 inmates had their level of care reduced from EOP to 3CMS during the review period. Eleven or 33 percent of those inmates already returned to a higher level of care by the time of the site visit, and one was admitted to inpatient treatment. CDCR regional staff and local mental health management staff disagreed with interviewed staff regarding this issue.

During the review period, CMF ran a 3CMS transition program to assist in transition from EOP to 3CMS level of care. During this six-week program, recently downgraded inmates continued to attend EOP groups and were seen by their EOP primary clinician in tandem with the 3CMS clinician. The 3CMS staff attended the IDTT for those inmates. Provision of services was individualized.

CMF had adequate treatment space for the provision of group therapy, although groups were limited due to the lack of group facilitators.

Interviewed EOP inmates generally reported positive experiences with mental health services at CMF. Issues of concern included delayed release from the unit that negatively impacted the start of group therapy, limited availability of showers in housing unit M1, and access to treatment issues for ADA inmates due to a malfunctioning elevator and occasional lack of ADA porters.

3CMS:

The one onsite psychiatrist in 3CMS had a caseload of 1:195, which was within the mandated ratio of 1:280. However, the telepsychiatrist caseload of 1:334 inmates exceeded the ratio.

Three of the six or 50 percent of 3CMS primary clinicians carried caseloads within the required staffing ratio of 1:96 inmates. The remaining three or 50 percent exceeded the ratios with caseloads up to 1:114 inmates.

None of the ten randomly selected 3CMS health care records reviewed required initial psychiatric contacts. Seventy-five percent of routine psychiatric contacts were completed timely for the four inmates in the 3CMS sample who required routine contacts.

None of the ten randomly selected 3CMS health care records reviewed required initial primary clinician contacts.  All routine primary clinician contacts in the seven relevant charts in the sample were timely.

No reviewed inmates in the random sample required an initial IDTT.  Three inmates in the sample required annual IDTTs and all were completed timely.  While all required disciplines were present in the IDTTs, it was unclear if the psychiatrist and primary clinician were the inmates' treating clinicians.

Six IDTTs were observed during the site visit.  All required members were present including a medical assistant for the telepsychiatrist.  The quality of the IDTTs was generally good as a result of the program supervisor's guidance, though quality did vary across primary clinicians.  Group therapy as an option was reviewed at each IDTT with inmates assigned to treatment groups/waitlists unless they refused.  Higher level of care considerations were not consistently reviewed.  Treatment was individualized.

There were ten 3CMS treatment groups offered at the time of the site visit.  Four of those groups were also open to EOP and non-caseload inmates.  Those groups included pain management and support groups for LGBTQ inmates.  Separate 3CMS treatment groups included anger management and EOP to 3CMS transition.

CMF maintained waitlists for 3CMS treatment groups which were managed by each group facilitator. At the time of the site visit, there were less than 20 inmates on any of the waitlists.

Other Issues:

Pre-Release Planning:

During the reporting period, only EOP inmates were offered pre-release groups at CMF. CMF reported there were sufficient pre-release groups and no waitlists.

At the time of the site visit, CMF identified five 3CMS inmates who were eligible for pre-release groups; however, groups were not yet started at the time of the site visit as only three 3CMS inmates could attend due to scheduling conflicts.

CMF reported all MHSDS inmates were referred to the pre-release coordinator for re-entry planning, and the plan was entered into the inmate's health record. CMF did not track whether the plan was incorporated into the inmates' treatment plans.

CMF documented Transitional Case Management Program (TCMP) contacts with inmates within 90-120 days of release.

Program Access:

e.     Job and Program Assignments:

On June 3, 2019, CMF reported that of 799 job assignments, 103 EOP inmates or 21 percent of the EOP population held job assignments. For 3CMS inmates, 228 or 40 percent of the 3CMS population held job assignments. For non-MHSDS inmates, 468 or 31 percent of the population held job assignments.

The program assignment officer reported that mental health caseload inmates had access to all job assignments. ICC determined an inmate's job placement based on the inmate's interests, skills, experience and other factors. Based on the ICC's recommendations, inmates were placed on waitlists for certain jobs. There was often availability for positions as porters and kitchen workers; it was more difficult to obtain more requested/higher skilled positions such as welders, electricians and plumbers, as well as the PIA positions of housekeeping and cleaning of medical cells.

For the 201 academic assignments, the institution reported that 18 EOP inmates or four percent of the EOP population, held assignments. For 3CMS inmates, 67 or 12 percent of the 3CMS population held assignments, and for non-MHSDS inmates, 116 or eight percent held such assignments.

Of the 164 vocational education assignments, 24 or five percent of EOP inmates held assignments, as well 54 or nine percent of 3CMS inmates and 86 or six percent of non-caseload inmates.

Of 358 voluntary education assignments, 84 or 17 percent of EOP inmates held this assignment, as did 104 or 18 percent of 3CMS inmates and 170 or 11 percent of non-caseload inmates.

Of 123 substance abuse treatment assignments, it was reported that nine or two percent of EOP inmates held assignments, as did 47 or eight percent of 3CMS inmates, and 67 or four percent of non-caseload inmates.

CMF provided sign-in sheets for attendance at two trainings that were entitled "Functional Evaluation Procedure for EOP Inmate Patients" and "Program Assignment for EOP Patients: An IDTT Review Process." These sign-in sheets reflected attendance by mental health staff during 2016 and 2018. CMF reported that attendance at both of the trainings was required for mental health staff to have received sufficient training on the functional evaluation of EOP inmates for program assignments. Of 53 mental health staff who were required to receive this training, only 18 or 34 percent received both trainings. Five other newly hired mental health staff employees had not received the training as it had not been offered since they had been hired.

CMF also provided copies of completed CDCR 128-C chronos reflecting the evaluation of EOP inmates' ability to participate in program assignments.

f.    Milestone Credits:

CMF implemented the milestone completion credit program, which it outlined in Operational Plan 76, dated September 2018.

From December 1, 2018 through May 31, 2019, of 494 EOP inmates, 477 or 97 percent were eligible to earn milestone credits and 85 percent earned the credit.  For 3CMS inmates, 548 of 574 or 95 percent were eligible to earn milestone credits, with 17 percent earning the credit. Of 1,507 non-caseload inmates, 1,438 or 95 percent were eligible to earn milestone credits, with 33 percent earning the credit.

c.    Out-of-Level Housing:

For the out-of-level housing of caseload inmates, provided data indicated that as of June 7, 2019, 42 EOP and 11 3CMS Level I inmates were placed in Level II housing and one 3CMS Level I inmate was in Level III housing; 71 3CMS Level II inmates were in Level III housing; 17 EOP and one 3CMS Level III inmates were in Level II housing; three EOP Level IV inmates were in Level II housing; and 46 3CMS Level IV inmates were in Level III housing.

d.    ADA Reasonable Accommodation and Grievance Procedures:

CMF confirmed that it had implemented the revised ADA accommodation and grievance procedures to include appeals regarding accommodations for psychiatric disabilities.  The institution also provided a copy of the updated CDCR Form 1824 Desk Reference Manual, which was updated on October 2, 2017 and delineated the ADA reasonable accommodation process.

e.    Periodic Classification Score Reductions: EOP inmates

For the review period, CMF provided completed CDC 840s reflecting that the institution was providing classification score reductions for EOP inmates.

Case-by-Case Reviews:

During the review period, 18 EOP inmates were housed in administrative segregation longer than 90 days.  Documentation of ICC 30-day reviews was completed.

During the same period, three MHSDS inmates were eligible for long term segregated case conferences.  All required staff attended the long term segregated case conferences, except the treating psychiatrist.  All decisions were documented with appropriate rationales.

As of June 5, 2019, three inmates were within 120-days of their projected MERD; two of the three cases were timely reviewed by ICC and the CSR.  CMF did not provide a list of all inmates placed in administrative segregation during the reporting period.

Non-Disciplinary Segregation:

During the reporting period, 23 NDS inmates were approved for expedited transfer; however, CMF did not provide transfer dates.

CMF did not provide documentation of provision of property, privileges and telephone calls for NDS inmates.

"C" Status:

At the time of the site visit, nine inmates or 64 percent of the 14 inmates on "C" Status were in the MHSDS.  In five of the MHSDS cases reviewed, all inmates were on "C" status as a result of multiple RVRs within 180 days.

Mental Health Referrals:

CMF did not provide reliable mental health referral documentation.

Construction/Space:

Fifteen rooms on the first and second floors of O-Wing were used to conduct group treatment for mainline EOP inmates. These large rooms could each accommodate 14 inmates. The rooms were clean, air-conditioned, had adequate lighting, and provided for sound confidentiality. The first and second floors of O-Wing also contained numerous confidential clinical offices that were used for individual treatment for EOP inmates.

There was one room on the second floor of O-Wing that was used to provide group treatment for 3CMS inmates. Similar to the EOP group treatment rooms, the 3CMS group treatment room was large and designed to seat 14 inmates; it was clean and air-conditioned, with adequate lighting and sound confidentiality.

Individual treatment space for 3CMS inmates was located on the second floor of R-Wing. Pre-site information provided by CMF noted the lack of air-conditioning for the individual treatment offices, and that the offices "can become extremely hot in the summer months." The pre-site information elaborated "(w)e are waiting for blackout curtains for the hottest offices and portable coolers have been ordered by Plant Ops to be placed in the R2 corridors for cooling the offices during the summer months." R-Wing was also used to provide groups for EOP and 3CMS inmates; these group treatment rooms were hot.

Treatment for administrative segregation EOP inmates was provided on the third floor of O-Wing. There were four group treatment rooms; each room contained eight treatment modules. This space was air-conditioned, clean, and provided for sound confidentiality. One-to-one clinical contacts were provided for administrative segregation EOP inmates in specially designed interview rooms; these were two adjacent rooms with a window between them that permitted communication. The rooms were clean and air-conditioned.

<u>Mental Health/Custody Relations</u>:

The Custody and Mental Health Partnership Local Operating Procedure dated July 2018 was generally in alignment with the CDCR headquarters' Custody and Mental Health Partnership Plan.  The main area that differed was the addition of associate wardens as designated personnel for executive rounding, as well as PIP leadership personnel including the PIP executive director, PIP clinical administrator, program director of acute care, program director of intermediate care, and chief of psychiatry.  PIP leadership was included in the section that addressed approval and review of the LOP.  Additionally, although CMF did not have an LTRH, their LOP referenced LTRH in several sections.

All developed partnership activities were implemented at CMF; however, they were not compliant with staff attendance and frequency of executive rounding.  In January 2019, rounds were conducted on three units, but only two (MHCB and L3 EOP) were compliant.  In February, rounds were conducted on ten units but only the MHCB was compliant.  None of the five rounds conducted in March 2019 were compliant.  Rounds were not conducted in April or May.  The institution reported a plan to resume rounds on June 17, 2019.

Documentation of executive leadership joint rounding for the purpose of dissemination of information was also not compliant.  Rounds were not documented in the Warden's meeting minutes, quality management committee, or mental health subcommittee minutes as required by policy.

When interviewed, staff was confused about the huddles and appeared to confuse the partnership plan huddles with the nurse-facilitated complete care model huddles.

The monitor conducted a review of 30 EOP mental health/custody huddle reports for units housing EOP inmates.  CMF utilized the approved huddle report form for general

385

population EOP staff huddles; however, the approved form was not used in administrative segregation. Custody staff attended only four of 18 mainline EOP huddles or 22 percent largely due to the location of the huddle outside of the housing units. Further, it was unclear if the officers attending the huddles were from all EOP housing units or staff assigned to the location of the huddle. Fourteen of the 18 reviewed huddle forms or 78 percent were complete.

The institution provided copies of In-Service Training participant sign-in sheets for the quarterly partnership trainings; however, the monitor was unable to confirm all EOP staff attended as CMF did not provide a list of all staff required to participate.

CMF reported 681 staff sessions of Multiple Interactive Learning Objective (MILO) training during the review period as additional collaborative efforts between custody and mental health staff.

All of the 146 appeals regarding staff complaints filed by MHSDS inmates were partially granted during the review period. Five appeals were referred for investigation. No staff member was redirected to another post as a result of a complaint.

Interviewed inmates raised concerns regarding timely issuance of personal property upon arrival to CMF, as well as staff efforts to reduce their level of care.

Heat Plan:

The heat plan was in effect at CMF during one month of the review period. During that time, CMF reported one Stage I heat alert but no Stage II or Stage III heat alerts. Pursuant to the local operating procedure, CMF prepared a monthly heat report that was submitted to CDCR headquarters. Other than meeting those requirements, the monitor's tour and interview of custody staff revealed CMF was grossly out of compliance with CDCR's statewide heat plan as discussed below.

During the site visit, there were no thermometers in the R1 education area, and the unit officer reported that temperatures were not monitored.  Caseload inmates attended education in that unit.  Further, in the R2 group treatment space, the officer was unfamiliar with the heat plan, did not have a thermometer in the unit, did not monitor or log the temperature as required during heat months, and stated if he was called about heat, he would call another unit for a hand-held thermometer.  Groups with caseload inmates were occurring in R2 at the time of the tour.

In all toured units except M3, the officers were unfamiliar with the stages of the heat plan.  Officers utilized hand-held thermometers to monitor the temperature; however, no one gave a cogent response to how a reading location was chosen or whether the thermometers were ever calibrated.  One officer reported she would check temperatures in the unit if she "felt hot and especially if she started to sweat."  Officers pointed to outdated heat risk lists, and one noted he would "know if someone was supposed to be on there but wasn't."  Some officers were unclear with the process of retrieving inmates on heat risk medications from the yard during Stage I alerts.

CMF's local heat plan did not require housing unit officers to record temperatures in the units.  Instead, the grill gate officers called the housing units and maintained the temperature logs at their stations.  While the Third Watch unit two grill gate officer was very knowledgeable, organized, and clear about the heat plan, another officer on the third floor produced an outdated log sheet when asked for the current temperature log.

In addition to the cumbersome temperature logging system, the LOP was confusing. While page two, number three of the LOP noted the Heat Related Pathologies Plan (HRP) will be implemented May 1 through October 31st with appropriate logging instructions, the next page, number 5 noted that the heat plan will be implemented whenever excessive heat conditions exist

(excessive heat defined as above 90 degrees).  Many interviewed officers stated temperature logs were used when it reached over 90 degrees outside, a clear misunderstanding of the heat plan possibly caused by the LOP.

Staff training and LOP revision would benefit CMF.

RVRs:

CMF reported 100 percent of the correctional administrators, captains and sergeants attended the mandatory mental health input into the RVR process training.  The institution reported 29 of 30 or 97 percent of lieutenants attended the mandatory training.

During the review period, CMF issued 768 RVRs.  Of those, 385 or 50 percent were issued to MHSDS inmates; 16 RVRs were issued to inmates at the MHCB level of care, 103 RVRs or 13 percent were issued to inmates at the EOP level of care, and 266 RVRs or 35 percent were issued to inmates at the 3CMS level of care.

Of the 15 reviewed RVRs, six or 40 percent of referrals for mental health assessments were timely.  Mental health staff timely completed and returned the mental health assessments to custody staff in 14 or 93 percent of the reviewed cases.  Clinicians recommended mitigation of penalties in 12 or 80 percent of the cases, and the senior hearing officer documented consideration of the assessment and recommendations in 11 or 92 percent of those cases.  The senior hearing officer mitigated penalties in eight or 66 percent of the 12 cases.

The mental health clinicians' documentation on the mental health assessments was responsive, written without clinical language and useful to the senior hearing officers.

During the review period, 52 MHSDS inmates appeared before ICC for SHU term consideration.  The two reviewed cases were compliant with documentation of consideration of mental health input.

<u>Use of Force</u>:

CMF reported that 781 of 795 or 98 percent of custody staff received the required use of force training.  Specifically, the training was received by the warden, chief deputy warden, all five correctional administrators, all six captains, all 30 lieutenants, all 83 sergeants, and 655 of 669 correctional officers; 14 correctional officers who did not receive training were out on long-term leave.

CMF further reported that 52 of 60 or 87 percent of mental health staff received the required use of force training.  Specifically, the chief of psychology, eight of ten supervising senior psychologists, 31 of 34 psychologists, and 11 of 14 social workers received the training.

During the review period, CMF reported one controlled use of force incident involved one 3CMS inmate and 60 of 93 immediate use of force incidents or 64.5 percent involved MHSDS inmates.  There were 259 non-use of force incidents of which 152 or 59 percent involved caseload inmates.

Review of the controlled use of force incident revealed compliance with CDCR policy.

Five immediate use of force incidents were also reviewed.  The review indicated that CMF staff's actions prior to, during and following the use of force complied with CDCR's use of force policy, procedure, and training.

<u>Lockdowns/Modified Programming</u>:

CMF reported there were no program lockdowns during the review period.

<u>Access to Care</u>:

A review of CMF's monthly Health Care Access Quality Reports from December 2018 to May 2019, indicated that 31 percent of issued mental health ducats and add-on appointments were not completed due to non-custodial reasons, excluding inmate refusals.  Custody factors

were not a reason for not completing any of issued mental health ducats and add-on appointments.

Non-Designated EOP:

CMF was a non-designated programming facility.  During the review period there were a total of 374 incidents involving 57 EOP inmates and 317 non-MHSDS inmates.  The institution reported nine incidents involving EOP inmates assaulting non-EOP inmates and two incidents of non-EOP inmates assaulting EOP inmates.  During the site visit, custody staff and inmate interviews revealed no concerns with the implementation and operation of CMF as a non-designated programming facility.

Placement of 3CMS Inmates into Minimum Support Facilities:

CMF did not place any MHSDS inmates into minimum support facilities during the review period.

*Coleman* Postings:

*Coleman* posters in English and Spanish were accessible to inmates in the visited housing units; however, posters bearing the incorrect address for the plaintiffs' attorneys were hanging in several MHCB treatment rooms.

Document Production Issues:

The mental health referral documentation was not presented in a useful format.

**California State Prison (CSP/Solano)**
November 18, 2019 – November 20, 2019

Census:

On November 18, 2019, the total inmate population at CSP/Solano was 4,539. The mental health caseload population was 743 or 16 percent of the population. The MHCB had a population of four inmates. There was one EOP mainline inmate awaiting transfer to an EOP program. The mainline 3CMS population was 732 inmates. There were six 3CMS inmates and 126 non-MHSDS inmates in administrative segregation. The six 3CMS inmates were pending transfer to the STRH.

Staffing:

The chief psychiatrist position was filled. CSP/Solano had no senior psychiatrist position established.

One of the two chief psychologist positions was filled.

All three senior psychologist positions were filled.

CSP/Solano had 5.2 staff psychiatrists, which was .2 positions more than allocated.

Nine of the 9.5 staff psychologist positions were filled for a vacancy rate of five percent.

The .5 established supervising social worker position was vacant. CSP/Solano had eight social workers on staff, which was 1.5 positions more than the 6.5 established social worker positions.

The one established senior psych tech position was filled. Six of the 7.1 psych tech positions were filled for a vacancy rate of 14 percent.

For recreation therapist positions, one of the 1.5 allocated positions was filled for a vacancy rate of 33 percent.

For clerical positions, 5.5 of the seven established positions were filled for a vacancy rate of 21 percent.

CSP/Solano had one OSS on staff, which was .5 more than the 1.0 established position.

<u>Telepsychiatry</u>:

During the review period, on-call telepsychiatry was utilized only in the MHCB for overnight shifts on Mondays, Tuesdays, and Wednesdays.

<u>Quality Management</u>:

The quality management system at the institution continued to function well. However, it did not fully explore or address some ongoing concerns. These issues included high MHCB readmission rates, the need for increased access to yard and recreation therapy for MHCB patients, the continued use of administrative segregation for alternative housing, and widespread problems with inadequate confidential treatment space. No QITs or FITs were chartered during the reporting period, although this would have been a constructive way to address some of the deficiencies.

Discussion with staff indicated that staff had limited knowledge of the activities of the quality management committee or the mental health subcommittee. Though perhaps a result of poor communication, some staff impressions were that overall quality management activities had diminished in the past year.

Minutes were provided for the August and May 2019 meetings of the local governing body, which indicated that a quorum was not attained for either meeting. The minutes appeared to be more of an agenda than a description of the topics discussed. The May 2019 meeting was primarily a discussion of the complete care model. The August 2019 meeting noted upcoming

*Coleman* and suicide prevention audits.  Other topics discussed included the approval of policies, procedures, and training schedules.

The quality management committee met monthly from April 2019 to September 2019. The minutes were reviewed, and a quorum was achieved at each meeting.  Again, the minutes were in an agenda format, making it difficult to discern what was discussed regarding specific issues.  Topics included staffing, training, quality of suicide risk assessments, telepsychiatry, and utilization rates in the MHCB.  The minutes for September 2019 included consideration of construction options for four new clinics, one-per-yard, a topic never mentioned by leadership during *Coleman* experts' discussions of the institution's challenges with confidential treatment space.

The mental health subcommittee met monthly from April 2019 to September 2019, attaining a quorum each meeting.  The chief of mental health and the chief psychiatrist both regularly attended, though their attendance was not required to achieve a quorum.  Matters discussed during the reporting period included MHCB readmissions and data entry problems, specifically the lack of dashboard data for MHCB treatment plans, suicide watch discharge plans, and the quality of suicide risk assessments.  The minutes also reflected the use of the CQI instruments to conduct self-audits of the institution's performance.

Medication Management:

The MAPIP audit revealed medication management issues in several areas monitored by nursing and psychiatry.  Performance measures from the medication management dashboard revealed less than 90 percent compliance in the following areas: continuity of nurse-administered direct observation therapy (DOT) medications with intra-institutional transfers; continuity of medications upon inter-institutional transfer at R&R; continuity of medication for MHCB

transfers; continuity of medication for discharge/transfer from a community hospital and/or DSH; blood sugar levels, complete blood count (CBC) with platelets, lipid monitoring, and comprehensive metabolic panel (CMP) for antipsychotics.  For Depakote, CBC with platelets, CMP, and Depakote compliance levels were deficient.

In discussions with the chief psychiatrist, it was reported most measures showing non-compliance resulted from small sample sizes, no-shows, and inmate refusals.  Non-compliance with diagnostic monitoring was attributed to the failure to obtain baseline labs when medications were initiated and to a lack of inmate cooperation.

Additionally, staffing deficiencies were noted as a contributing factor to non-compliance with medication monitoring, as well as unspecified systemic delays.  In July of 2019, a 0.5 psychiatry position was eliminated; an additional staff psychiatrist was on extended leave throughout the review period.  CSP/Solano also had no medical assistants to aid psychiatrists with MAPIP monitoring protocols.

The chief psychiatrist reported he addressed most areas of non-compliance for psychiatrists through an in-service training held on October 23, 2019; however, no post-training data was available for review.  Nursing implemented several performance improvement plans over the review period to address deficiencies, and progress was made in some areas based on a review of audit materials.

CSP/Solano utilized the complete care model, which included daily multi-disciplinary morning huddles.  Medication management was routinely discussed during these huddles and included a review of critical medications, expiring medications, and medication compliance issues.  Staff psychiatrists and the chief psychiatrist reportedly review the dashboard weekly for missing labs, EKGs, and consents to address compliance measures as well.

MAPIP measures of pill line lengths and wait times for inmates prescribed medications reflected greater than 90 percent compliance.

Non-formulary prescriptions for psychiatry medications were minimal and required approval by the chief psychiatrist.

CSP/Solano was not a Clozaril institution.

There were no PC 2602 involuntary medications petitions initiated during the reporting period.

HS medications were administered timely.

Transfers:

Due to inaccuracies with the on-demand report, local data was used for transfer information.  The inpatient care coordinator had been in place at CSP/Solano for one year.

During the review period, 43 inmates met criteria for higher level of care consideration. Of those, 15 inmates, or 35 percent, were ultimately referred to inpatient care after IDTT consideration.  All referrals resulted in inmate transfers to MHCBs.

There were 28 inmates considered but not referred to a higher level of care during the reporting period.

CSP/Solano made 15 referrals to acute care during the review period.  All acute referrals were sent to the Inpatient Referral Unit (IRU) within two days of IDTT.  One hundred percent of referred inmates transferred within ten days of IRU referral.  There were no rejections or rescissions during the review period.  All transfers were completed within 72 hours of bed assignment.   There were no inmates on the Acute Bed Utilization Management Report as awaiting a bed during the review period or during the site visit.

CSP/Solano reported that none of the inmates transferred to inpatient care had complex medical needs.

CSP/Solano referred 34 inmates to MHCBs during the review period. All but one inmate was admitted within 24 hours; no reason was given for the five-hour delay.

CSP/Solano did not transfer any inmates to a PSU during the review period.

Two inmates transferred to EOP hubs; both transfers met timeframe guidelines. On November 19, 2019, no inmates were awaiting transfer to an EOP hub.

CSP/Solano transferred 72 inmates to STRH. Six, or eight percent, did not meet transfer timelines; three were due to inmate refusal to accept housing, and three had no information. At the time of the site visit, six inmates were awaiting transfer to STRH. One inmate was beyond Program Guide transfer timelines due to a medical hold.

Sixteen inmates timely transferred to mainline EOPs during the review period.

Other Issues:

Administrative Segregation:

Administrative segregation was staffed with one psychiatrist who also covered the MHCB. Three primary clinicians were also assigned to administrative segregation during the review period.

IDTTs were observed for two inmates in administrative segregation. All required members were present and all accessed available computers. The IDTT space was non-confidential. Custody input was adequate and addressed pending RVRs, expected release dates, and transfer information. Treatment plans included realistic and measurable goals. There was appropriate discussion and diagnostic agreement between the primary clinician and psychiatrist. The psychiatrist reviewed medications and side effects with inmates. Primary clinicians

provided relevant historical information but consistently failed to include case conceptualizations.

The IDTT did not justify inmates' current levels of care and made no mention of considerations for higher levels of care. The IDTT did not appropriately include the inmate in the treatment discussion, and at times the meeting appeared to be rushed. One visibly distressed inmate expressed concern regarding a life-threatening medical diagnosis, stating, "I want to know from my doctor if this means I am going to die." His primary clinician appeared distracted and responded with, "Well I can see that you are still receiving your Ensure." The psych tech eventually commented, "Well not everyone dies from that," but the IDTT adjourned without adequately addressing the inmate's concern or assessing the psychological impact of his uncertain prognosis.

The morning meeting in administrative segregation was observed. It was attended by medical, mental health, and custody staff. Topics included high-risk inmates, new arrivals, property, and other inmate concerns.

Psych tech rounds were observed in administrative segregation. Rounds were completed appropriately and included distribution of relevant resources for in-cell activities.

MHCB:

During the review period, CSP/Solano operated a nine-bed MHCB. There were 93 admissions to the MHCB during the reporting period.

The average clinical length of stay was 7.9 days. Nine inmates or ten percent had clinical lengths of stay greater than ten days. The average physical length of stay was 9.9 days. For physical length of stay, 42 percent or 39 admissions stayed longer than ten days.

Zero inmates were reported to have had three or more MHCB admissions during the review period.

At CSP/Solano, one psychiatrist had primary responsibility for treatment in the nine-bed MHCB. An additional psychiatrist also shared responsibilities in the MHCB. All were within established staffing ratios. Primary clinician coverage was provided by four psychologists during the review period, all of whom were within established caseload ratios. One recreation therapist provided treatment in the MHCB.

At the time of the site visit, there were four inmates in the MHCB, two of whom were awaiting transfer to an acute inpatient treatment setting. Both were within transfer timelines.

The monitor's expert's review of the current location of inmates who were not referred to a higher level of care indicated that eight, or 27 percent of the 30 non-referred patients were housed in inpatient settings per the pre-site visit documentation. One inmate was being treated in an MHCB and seven were in either acute or intermediate care. For three of those eight patients, the reason for non-referral was that the patient had already been referred to a PIP and was awaiting transfer. Review of the facility's mental health program subcommittee meeting minutes revealed ongoing non-compliance with expectations for 30-day readmission rates following discharge from the institution's MHCB. However, many of these inmates were transferred to other facilities following a crisis bed discharge from CSP/Solano.

Telepsychiatry was utilized in the MHCB for on-call coverage for periods of time on Mondays, Tuesdays, and Wednesdays. Mental health leadership reported that CSP/Solano had utilized telepsychiatry for approximately two years. The current telepsychiatrist had never visited the facility, which made crisis bed staff members reluctant to utilize him for the on-call or emergency psychiatrist.

Confidential treatment space remained an ongoing concern in the MHCB. A room, which had multiple workspaces and a therapeutic treatment module, served as the primary space available for individual treatment and IDTTs. The staff who shared the workspace were observed to walk in and out during treatment or IDTT sessions. There was no confidential treatment space available for groups. There was a non-confidential individual treatment module in the common area outside the nursing station, which was used by the recreation therapist for individual sessions.

Staff interviewed identified the lack of confidential space as their single most significant obstacle to providing treatment. One clinician interviewed described a troubling situation in where an inmate who had recently been the victim of sexual assault was inhibited in discussing the incident with other staff present in the room.

An outside yard was available for recreation therapy activities, but activities appeared limited by a variety of factors. These included patient refusal, unsanitary and noisy conditions in the yard, specifically pigeon excrement and noise from a generator, use of the yards by inmate help cleaning mats and other equipment, and at times inclement weather conditions.

Two IDTTs were conducted during the site visit, one of which was observed. All required staff were present and had access to computers. There was generally good discussion amongst staff, and in one instance, an appropriate decision was made to transfer the patient to an acute level of care. The inmate was placed in a TTM although he was not an administrative segregation or maximum custody inmate. Staff indicated that an exception was made to place him in the TTM because of an unknown safety issue concerning the inmate.

Discussion with staff and observation of the IDTT indicated that property, bedding, and mechanical restraint decisions were reviewed regularly and relaxed as appropriate.

Team meetings, referred to as huddles, were attended by clinical, nursing, and custody staff and took place twice daily, with the second huddle added the week prior to the site visit. Patient behaviors, medication adherence, and a variety of concerns were discussed during the huddle.

Chart Review Analysis of MHCB

In accordance with Program Guide timeframes, initial evaluations were considered compliant if the assessment occurred within 24 hours of admission. There were five inmates randomly selected to have their electronic health records reviewed for compliance during their CSP/Solano admission to the MHCB. All five inmate cases reviewed were found to be 100 percent compliant for initial psychiatric and primary clinician evaluations. However, notations were not made as to whether the contacts were confidential; and in one instance, the evaluation was done without a necessary interpreter.

Of the five inmate patients reviewed, all were compliant for initial IDTTs within 72 hours of admission. There was 80 percent compliance with IDTTs that occurred within seven days of their initial IDTT while in the MHCB. Additionally, all five inmate patients had a timely second or discharge IDTT that was compliant.

Of the 15 required twice-weekly psychiatry contacts, CSP/Solano was compliant 87 percent of the time. However, confidential contacts were not regularly noted. Contacts were considered non-compliant when they were completed during an IDTT or it was completed without an interpreter.

There were 37 necessary daily primary clinician contacts required in the MHCB for the admissions reviewed. CSP/Solano clinicians attended 26, or 70.2 percent of the primary clinician contacts required. In only one instance was the contact noted to be confidential.

CIT:

The facility reported it did not consider the creation of a CIT to be an appropriate expenditure of resources. A review of after-hours MHCB referrals during the reporting period indicated there were 11 and all were admitted to the MCHB.

Seclusion and Restraint:

A review of pre-site visit data was confirmed by staff interview and indicated that neither seclusion nor restraint were utilized for any patient during the reporting period.

Alternative Housing:

The seven primary clinicians assigned primarily to the MHCB are also assigned to work with inmates in alternative housing.

While the CTC is the preferred location for alternative housing at CSP/Solano, due to the limited availability of those cells, all patients who required alternative housing during the reporting period were housed in the administrative segregation unit. CSP/Solano reported the use of cell numbers 123 – 128 in administrative segregation which had been retrofitted, and when those cells were occupied, the use of cell numbers 129 – 131 which had not been retrofitted. The institution reported cells 129 – 131 were not utilized during the reporting period.

There were ten alternative housing placements during the reporting period, with nine of the inmates having been timely moved to a crisis bed, for a 90 percent compliance rate. The average length of stay in alternative housing was 7.79 hours, with a range of 0.1 to 29.67 hours. The cells were clean and vacant during the monitoring visit. Correctional officers reported maintaining cleaning logs.

Since 2016, the monitor and the monitor's suicide prevention expert have consistently expressed concerns about the use of the cells in the administrative segregation unit as alternative

housing at CSP/Solano.  Additionally, inmate interviews in the administrative segregation unit were not confidential and took place in TTMs on the dayroom floor.  There was confidential treatment interview space in the CTC.  A FIT was recommended to examine viable solutions for the longstanding concern to identify appropriate alternative housing cells.

3CMS:

At the time of the site visit, four psychiatrists provided treatment to 732 3CMS inmates; all were within staffing ratios.  Additionally, 13 primary clinicians provided treatment to the 3CMS population and were within staffing ratios.  One recreation therapist provided treatment in the 3CMS program.

A 3CMS treatment group was observed on Facility D.  The group was comprised of 16 participants, including both MHSDS and non-MHSDS inmates.  A social worker led the 1.5-hour long group, which focused on cycles of behavior and stages of change.  The group was psychoeducational and process-oriented.  All inmates were actively engaged in the group discussion and appeared to be learning and implementing the subject matter, as evidenced by their ability to apply core concepts to their personal experiences.  Overall, this was a well-structured and meaningful group.  One concern was the participants' physical discomfort due to the extremely hot temperature in the room.  The heat became a distraction for the group members, and they considered opening the doors, but decided confidentiality was of greater importance.

Another 3CMS group observed had four participants and was jointly conducted by a licensed social worker and an occupational therapist.  The space in the room was adequate, but the room was not clean.  The group was focused on inmates recently discharged from EOP to 3CMS.  The group started late with the last participant arriving after the group had started.  The

leaders began with a "check-in" and then utilized various activities to engage the inmates in discussion and ended with a guided meditation. Overall, the group was adequately conducted.

Group treatment was not offered for 3CMS inmates in administrative segregation.

IDTTs were observed in a confidential space on Facility D. All required members were present for the three IDTTs observed, and all had access to inmate information on available computers. One psychiatrist was observed to appropriately include the inmates in the treatment discussion, ensure all questions were answered in understandable terms, and encourage inmates to access specific resources that would meet their needs. In contrast, another psychiatrist observed during an IDTT stated he was not the assigned psychiatrist for the inmate, and his contributions were minimal. The IDTTs adequately addressed diagnostic discrepancies; however, only one of the two psychiatrists reviewed symptoms. Of the primary clinicians observed, one used clinical jargon the inmates clearly could not understand, the treatment goals were not measurable, suicide risk was not discussed, nor was safety planning or treatment progress. Other primary clinician observations included adequate psychosocial history and case conceptualization.

It was extremely concerning that in one instance, during an IDTT a primary clinician stated, "I read, and tell me if this is true, that you were a 'crack baby'." The inmate was noticeably embarrassed and participated minimally afterward. This clinically inappropriate approach could negatively influence the inmate's mental health treatment by impeding the formation of a clinical alliance, adversely impacting the inmate's attitude towards mental health care in general, and, as a result, exacerbating his existing mental health issues. This incident indicated an immediate need for enhanced supervision and training to address the issue.

None of the IDTTs observed discussed level of care considerations or justified retaining the inmates at their current levels of care.  A correctional counselor was present in IDTT, but rarely spoke and sat facing away from the inmates and other treatment team members.

IDTTs for 3CMS inmates were not addressing criteria for consideration of referrals to higher levels of care.  IDTT training, supervision, and monitoring is needed at CSP/Solano, as the IDTTs have little utility in their current state, including ensuring inmates are at the appropriate level of care.

Inmates Discharged from 3CMS to General Population - Utilization Review

Despite the increase in the overall population at CSP/Solano, the reduced 3CMS population was discussed with both mental health and regional leadership during the visit.  In part, the reduction was linked to the 3CMS review process, which commenced in 2017.  The review process consisted of headquarters' request for the institution to review a list of 3CMS inmates who were not prescribed psychotropic medications to consider for removal from the 3CMS caseload.  The initial review resulted in 39 percent of the inmates on the headquarters' list being removed from the caseload.  One aspect of the review required assigned staff to provide justification for the inmate's continued need for 3CMS level of care.

The Regional Mental Health Supervisor provided the utilization review list from headquarters for the third and fourth quarter of 2019.  There was a total of 156 inmates on the third quarter list; fifteen or ten percent of which had been removed from 3CMS level of care and placed in general population.  During the fourth quarter, a review of 166 cases was requested; 32 or 19 percent were removed from the 3CMS level of care.

404

<u>Interviews with Leadership and Supervisory Staff</u>

The reasons for the reduced 3CMS census at the facility in contrast to an increased overall census was discussed with mental health and regional leadership during the site visit.  Staff indicated that the reduction in the 3CMS population at the institution appeared to be the result of multiple factors.  Influences identified included the reduction in the 3CMS administrative segregation population because of transfers to STRH and LTRH programs, the general discharge of 3CMS inmates to the community, and the reduction of the 3CMS population resulting from the initiation of the department's 3CMS review process.

<u>Inmate Interviews</u>

A group of inmates who agreed to remain behind after the conclusion of a group treatment session were interviewed.  Overall, they expressed satisfaction with their interactions with custody and their access to mental health staff, including psychiatry.  They reported no problems with their medications.  Their transition from EOP to 3CMS was discussed in-depth, and they reported concurrence with their change in level of care and their satisfaction with their access to treatment since transfer to the institution.

Five additional inmates were interviewed in a confidential setting on Facility D.  Inmates reported timely contacts with their primary clinicians and psychiatrists.  They reported satisfaction with the quality of existing groups, but requested more groups; specifically, a "family relations group" and a pet program.  All participants expressed frustration with accessing medications on Facility D.  They explained that in order to receive medication they must stand in lines on the yard for about one hour, even in extreme heat, high winds, and rainy weather.  In order to avoid the long lines, inmates must either discontinue their medications or receive a RVR.  This report appeared inconsistent with the 90 percent compliance rate reported in MAPIP

data regarding the pill line lengths and wait times.  Finally, these inmates identified provocative and bullying behaviors by custody staff as a significant source of stress.

<u>Chart Review Analysis 3CMS</u>

Ten randomly selected cases from the institution's current census were utilized for the 3CMS EHRS review.  The length of stay for these inmates ranged from June 3, 2004, to November 2019.

The inmate cases selected were reviewed for timely psychiatric evaluations, which must occur within 14 days of arrival and take place prior to the IDTT.  Initial psychiatric evaluations were expected in four of the ten cases reviewed.  Of these four inmates, three, or 75 percent, were seen timely.

Initial primary clinician contacts were considered compliant if they occurred within ten working days of arrival.  An initial contact was expected in four of the ten cases reviewed, and all four were found to be timely.

The individualized treatment plan must be completed within 14 working days of referral/arrival.  Treatment plans are also updated at least annually, whenever a change in level of care occurs, or when clinical judgment indicates the need for an update.

Three of the ten inmate cases reviewed required and received a timely initial IDTT.  In all three instances, the IDTTs occurred during the period under review.  Of the remaining seven cases reviewed, six were not due for their annual IDTT, and one was overdue for a combined compliance rate of 90 percent.

Other Issues:

Program Access:

a.  Jobs and Program Assignments:

On October 1, 2019, CSP/Solano reported that of 1,735 job assignments, 260 3CMS inmates or 34 percent of the 3CMS population, held job assignments.  Non-caseload inmates held 1,475 or 39 percent of the job assignments.

For the 969 academic assignments, CSP/Solano reported that 172 or 22 percent of the 3CMS population held these assignments, and 797 or 21 percent of the non-MHSDS population held these assignments.

The institution reported that of the 208 available vocational education assignments, 30 or four percent, were held by 3CMS inmates, and 178 or five percent, were held by non-MHSDS inmates.

CSP/Solano reported that of the 77 voluntary education assignments available, 11 or one percent, were held by 3CMS inmates, and 66 or two percent, were held by non-MHSDS inmates.

Of the 166 substance abuse treatment assignments available, 17 or two percent were held by 3CMS inmates, and 149 or four percent, were held by non-MHSDS inmates.

Regional staff reported that 15 percent of the MHSDS population held paid assignments, while 21 percent of the paid assignments were held by the non-MHSDS population.

b.  Milestone Credits:

On October 1, 2019, the institution reported one EOP inmate was eligible for milestone credits but did not earn them.  For the 3CMS population, 734 or 95 percent of 776 inmates were eligible for milestone credits and 20.6 percent earned them.  Of the 3,811 Non-MHSDS inmates, 3,462 or 91 percent were eligible for milestone credits and 24.3 percent earned them.

c.  Out-of-Level Housing:

As of October 25, 2019, there were eleven Level II 3CMS and 93 Level II Non-MHSDS inmates in Level III housing.  The institution reported 44 Level III 3CMS inmates and 221 Non-MHSDS Level III inmates in Level IV housing.

d.  ADA Reasonable Accommodation and Grievance Procedures:

The 1824 Desk Reference Manual and the CDCR-1824 Reasonable Accommodation Request form were up to date.

e.  Periodic Classification Score Reductions: EOP Inmates:

This was not applicable to CSP/Solano as there was no EOP program.

f.  Placement of 3CMS Inmates into Minimum Support Facilities (MSF):

CSP/Solano had no minimum support facility, and they did not track movement of 3CMS inmates to other minimum support facilities.

Case-by-Case Reviews:

The institution reported no applicable cases during the reporting period.

Non-Disciplinary Segregation:

There were no MHSDS inmates reported to be NDS at the time of the monitoring visit. Pre-site materials indicated there were four MHSDS inmates with NDS status during the review period.  The documentation provided by the institution did not identify the necessary information to determine timely transfers and distribution of property to the NDS inmates.

As there was no confidential space available for interviews in the administrative segregation unit, two non-MHSDS inmates were interviewed in a non-confidential area.  Each inmate indicated that they had received radios within one day of their arrival in administrative segregation and both acknowledged being offered showers several times a week.  A review of a

sample of ten non-MHSDS CDCR MH-114's supported discussions with inmates and staff that three showers and 10.5 hours of yard were offered weekly to inmates.

"C" Status:

Staff reported there were 34 patients on "C" status, of which seven or 21 percent were 3CMS patients.

Referrals:

CSP/Solano responded to 58 percent of the emergent psychiatry referrals in a timely manner.  Response to urgent and routine psychiatry referrals were over 90 percent compliant.

CSP/Solano was compliant with timely responses to emergent, urgent and routine primary clinician referrals.

Space:

Treatment space, along with the inability to identify appropriate alternative housing cells for inmates, remained an ongoing deficiency at CSP/Solano, despite these problems being highlighted in prior monitoring rounds.  There remains limited confidential and appropriate treatment space for individual clinical contacts or group contacts.  It was particularly problematic in administrative segregation, where there was no available individual or group confidential treatment space.  Instead, the institution crafted a make-shift area in which to hold IDTTs, ICCs, and UCCs, or any other group activity, utilizing six-foot tall file cabinets in the common area of the housing unit.

Appropriate treatment space remained a severe limitation for providing mental health treatment services to the MHSDS population at CSP/Solano.

<u>Mental Health/Custody Relations</u>:

The Custody and Mental Health Partnership Local Operating Procedure (dated February 2019) was generally in alignment with headquarters' Partnership Plan.  The main area that differed was the inclusion of the associate wardens as designated personnel for executive rounding; however, the updated CMHPP submitted to the court in September 2019 allowed for the inclusion of associate wardens during joint rounding.

Implementation of all required CMHPP activities at the institution were non-compliant. Review of documents onsite indicated that executive rounding as required was not regularly conducted at the institution, reflecting poor collaboration between the disciplines.  The institution did not document the single meeting reported from February 2019 in the warden's meeting minutes, the minutes from the quality management committee, or the mental health subcommittee minutes.  The chief of mental health reported a plan to conduct executive rounds during the fourth quarter of 2019.  Additionally, it was acknowledged that huddles were not implemented in accordance with the CMHPP.

The MHCB supervisor confirmed that the quarterly roundtables, the multi-disciplinary training required by the CMHPP, occurred during only one of four required quarters in 2019.  A review of attendance sheets confirmed attendees, but the institution was not able to provide information on who was required to be in attendance.  The institution reported that 768 custody, medical and mental health staff members had attended Multiple Interactive Learning Objective (MILO) training, as additional collaborative training efforts between custody and mental health staff.

There were one hundred complaints filed for staff misconduct, 32 of which involved MHSDS inmates. Ninety-eight complaints were partially granted, and two were referred for investigation.

Heat Plan:

CSP/Solano reported 50 Stage I, 40 Stage II, zero Stage III heat alerts, and zero heat-related incidents during the review period. Interviewed custody officers understood heat plan protocols and were able to explain the procedures required at each heat stage. Thermometers were appropriately located and operational. Heat logs were adequately maintained. The MHCB had air-conditioning and had a back-up generator available for loss of power. The generator was tested monthly and testing was logged and maintained by plant operations. Heat-related training was completed by 657 or 91 percent of custody staff and 27 or 100 percent of the mental health staff.

RVRs:

Of the custody staff who were required to receive RVR training, 66 percent attended. For mental health staff, 11 percent of required staff attended the training.

During the review period, CSP/Solano issued a total of 1,395 RVRs, of which 300 or 22 percent were issued to caseload inmates. Specifically, 294 RVRs were issued to 3CMS inmates, five were issued to EOP inmates, and one was issued to an inmate in the MHCB.

A sample of RVRs were reviewed and it was found that custody staff referred the RVR to mental health staff in a timely manner 25 percent of the time. The clinical staff completed the mental health assessment and timely returned it to custody staff 100 percent of the time. The senior hearing officer documented consideration of the mental health assessment 100 percent of the time. The quality of the mental health assessments varied. Further, although the senior

411

hearing officers noted consideration by copying exactly what the clinicians wrote, they did not provide reasoning for the decisions that was consistent with the information provided. During interviews, clinical staff indicated that they often did not list recommendations for mitigation, as when they did, they were not considered. Senior hearing officers generally mitigated privilege losses when recommended by clinicians; however, they regularly assessed maximum credit loss.

Use of Force:

CSP/Solano indicated that 73 percent of the custody staff and 96 percent of the mental health staff had completed use of force training. Of the 219, or 27 percent of the custody officers not trained, 20 officers were on long term leave.

The institution reported one controlled use of force incident for the reporting period. A review of the documentation demonstrated the institution complied with the controlled use of force policy, and five different staff members, including both custody and mental health, talked to the patient to encourage him to comply during a cool-down period.

Institutional data reflected a total of 98 use of force incidents, which involved 40 MHSDS inmates and 57 Non-MHSDS inmates. There were 135 total non-use of force incidents during the review period, involving 37 MHSDS inmates and 98 Non-MHSDS inmates.

Lockdowns:

There was one lockdown during the review period requiring program modification for a 24 hours for staff battery and threat assessment.

Pre-Release Planning:

CSP/Solano had assigned one full-time social worker as the institutional mental health pre-release coordinator (IMHPC). Headquarters sent out a list to the institution every two weeks that identified pre-release inmates. The names on the list were communicated by the coordinator

412

to the inmate's primary clinician so pre-release planning began sixty days prior to the inmate's release.  Pre-release planning groups were not offered at CSP/Solano.  They reported they were awaiting release of the curriculum from headquarters.  Staff reported they coordinated inmate releases with TCMP.

Access to Care:

A review of the institution's monthly Health Care Access Quality Reports from April 2019 through September 2019 indicated that of 9,580 mental health ducats were scheduled, with seven ducats not completed due to custody factors, and 1,409 or fifteen percent, not completed due to non-custodial reasons, excluding inmate refusals.

*Coleman* Posters:

Updated *Coleman* postings in both English and Spanish were found in all housing units toured by the Special Master's experts and monitors.   All postings were placed in common areas visible to *Coleman* class members.

**San Quentin State Prison (SQ)**
Review Date – June 15, 2020

Census:

On May 15, 2020, SQ housed 3,716 inmates, for a seven-percent decrease from the preceding site visit.  The mental health caseload population of 1,200 represented 32 percent of the total inmate population and had increased by nine percent since the preceding review period.

There were 238 mainline EOP and 716 mainline 3CMS inmates, including 60 condemned EOP and 140 condemned 3CMS inmates.

Six inmates were in the MHCB and one inmate was in alternative housing.

Twenty-three MHSDS inmates were housed in administrative segregation including 11 EOP inmates and 12 3CMS inmates.  Of those, four EOP inmates and four 3CMS inmates were placed in administrative segregation for isolation or quarantine precaution.

The reception center population totaled 216 inmates and included 25 EOP inmates, 185 3CMS inmates, and six inmates in STRH.

Staffing:

As of May 2020, the chief psychiatrist position was filled.  Two of three chief psychologist positions were filled for a 33-percent vacancy rate.

Allocated positions for senior psychiatrists decreased by two positions since the preceding monitoring report and the one position was filled.  Twelve of the 13.5 psychiatrist positions were filled for an 11-percent vacancy rate; a .30 position was filled by registry staff for a nine-percent functional vacancy rate.  While SQ utilized telepsychiatry, the institution did not provide information regarding allocated and filled positions for telepsychiatrists.

Since the preceding monitoring round, allocated positions for senior psychologist supervisors increased by two and all five positions were filled.  Allocated senior psychologist

414

specialist positions decreased by four, and three of the four positions were filled for a 25-percent vacancy rate. Allocated staff psychologist positions increased by nine positions since the preceding monitoring report. Of the 36.5 staff psychologist positions, 28 were filled for a 23-percent vacancy rate. Registry psychologists provided coverage for an additional 2.86 positions, resulting in a 14-percent functional vacancy rate.

The supervising social worker position was filled. Regarding social workers, 17 of the 19.5 allocated positions were filled leaving a 13-percent vacancy rate. Registry staff provided coverage for an additional 1.6 positions, resulting in a functional vacancy rate of five percent.

Allocated positions for recreation therapists increased from seven positions to 14.5 positions. Of those, 11 were filled, for a 24-percent vacancy rate.

One of the 1.5 AGPA positions was filled, for a 33-percent vacancy rate. The two CHSA II positions and 2.5 HPSI positions were filled.

SQ employed two office services supervisors, 0.5 more than the established 1.5 positions. Mental health clerical allocated positions increased by two since the preceding monitoring round, and 12 of the 19 positions were filled, for a 37-percent vacancy rate.

The staff services manager I and training officer I positions were vacant.

Transfers/Referrals:

During the review period, 105 inmates met criteria for inpatient level of care consideration. Of those, 16 or 15 percent were referred to inpatient care after IDTT consideration.

Three inmates or 19 percent were referred to acute care. There were no rejections or rescissions. None of the transfers occurred within ten days of referral and all three transfers were to the SQ-PIP.

Thirteen inmates or 81 percent were referred to intermediate care programs. There were no rejections or rescissions. Of the 13 referrals, only one transfer occurred within 30 days of referral. All but two inmates transferred to SQ-PIP; one inmate transferred to CMF-PIP and the other transferred to ASH.

There was one *Vitek* hearing during the review period.

SQ made 134 referrals to MHCBs during the review period. Of those, 13 or ten percent were rescinded. All inmates transferred within 24 hours of referral.

No inmates had three or more MHCB admissions during the review period. [B. Main: I believe I found one error. The SQ report (page 3) indicates no inmates had three or more MHCB referrals during the review period; however, Maria's HLOC reviews suggest otherwise.]

During the review period, there were 89 inmates who SQ considered for inpatient level of care that did not get referred. Inmate chart reviews indicated that rationales for non-referral to a higher level of care were generally adequate.

A limited review of healthcare records indicated that justifications for non-referrals were reasonable. However, in one reviewed case, documentation regarding non-referral rationale and treatment modifications was problematic and did not convey that the clinician was aware of the inmate's unique treatment needs. The record lacked IDTT documentation of current symptoms and functioning to allow a determination of whether continued care at the EOP level of care was appropriate.

Programming:

Reception Center:

Ten randomly selected EOP reception center inmate healthcare records were reviewed for compliance with Program Guide timeframes. All ten inmates received timely mental health

416

screens on arrival, and all resulted in referrals for psychiatric and psychological evaluations. Regarding initial psychiatric assessments, eight or 80 percent were completed timely. For PC evaluations, nine or 90 percent were completed within 18 calendar days.

All ten of the reviewed inmates required IDTTs during the review period. Of those, seven or 70 percent of the IDTTs were completed timely.

For weekly PC contacts, 63 percent occurred within seven days.

MHCB:

Reviewed healthcare records indicated that the adequacy of mental health treatment provided to inmates in the SQ MHCB varied. Identified areas in need of improvement included case conceptualization; diagnostic assessment and treatment planning; quality of PC assessments; and lack of coordination of care and continuity of care.

Ten inmates' healthcare records were reviewed for compliance with Program Guide MHCB requirements. Ninety percent of initial psychiatry evaluations were completed timely. For initial PC contacts, three or 30 percent were completed timely within 24 hours. Confidentiality of contacts was not documented in the reviewed records.

SQ was 100 percent compliant with completion of initial IDTTs within 72 hours. Required staff were present for eight or 80 percent of those IDTTs. IDTTs were completed within seven days of the initial IDTT in 100 percent of the cases. None of the reviewed inmates discharged from the MHCB without a discharge IDTT.

SQ was 100 percent compliant with completion of twice weekly psychiatry contacts. Confidentiality was documented for 17.5 percent of those contacts.

Ninety-five percent of daily contacts were completed for the reviewed sample. Confidentiality was noted for 12 percent of those contacts.

Condemned Care:

EOP:

COVID-19 restrictions significantly impacted programming for condemned EOP inmates during the review period and healthcare record reviews revealed that treatment plans were inadequate and not modified to address these restrictions.  There was no documentation that mental health treatment materials were offered to inmates in lieu of suspended out of cell psychotherapy and group treatment hours.  Treatment plans and progress note plan sections routinely indicated that inmates would continue to be seen cell-front due to COVID-19 precautions. Most indicated that inmates were offered out of cell contact for urgent and emergent issues only.

None of the condemned EOP inmates reviewed attended their IDTT meetings during the review period, although reasons varied.

Group treatment offered between mid-April and June 2020 consisted of one weekly 60-minute mental health treatment group with up to five inmates.

Recreation therapy groups were suspended during mid-April 2020.  There was one instance when an inmate was provided colored pencils based on his request during an IDTT, but this took more than two weeks and required collaboration from numerous disciplines.

Ten randomly selected condemned EOP inmate healthcare records were reviewed for compliance with psychiatry contacts.  None of the sample inmates required initial contacts.  For routine psychiatric contacts, 94 percent occurred timely within 30 days; however, 83 percent of contacts occurred cell-front.

Ten randomly selected condemned EOP inmate healthcare records were reviewed for compliance with PC contacts.  None of the sample inmates required initial contacts.  For routine

PC contacts, 88 percent occurred timely.  Of those, 39 percent occurred cell-front due to COVID-19 restrictions.

None of the sample condemned EOP inmates required initial IDTTs.  For required routine IDTTs, 90 percent were completed timely.  Required attendees were present for 52 percent of those meetings.  Missing attendees included the assigned psychiatrist or PC and the correctional counselor was absent in six cases.

3CMS:

Healthcare record reviews indicated that SQ did not provide adequate mental health treatment to condemned 3CMS inmates during the review period.  Treatment plans were not sufficient and failed to meet inmates' treatment needs.  Most treatment plans were outdated and not modified despite their poor quality.  Additionally, goals were generic, interventions were vague and not evidenced based, and inmates were not included in the treatment planning and goal setting.

In all reviewed cases, IDTTs failed to consider higher levels of care and did not adequately justify current levels of care.  Proposed treatment interventions were not implemented during treatment contacts.

Notwithstanding, the quality of psychiatry documentation, interventions, and planning was adequate in most cases.

PCs failed to follow through with their own documented plans to meet more frequently with inmates based on clinical need.

IDTTs did not document efforts to encourage inmate attendance upon refusal.

Due to COVID-19 restrictions, recreation therapy groups were not offered after April 14, 2020.  SQ completed weekly recreation therapist rounds.

419

The quality of the SRASHEs was generally adequate when they were available in the record. One high risk inmate with a suicide attempt history and a terminal illness did not have a suicide risk evaluation or safety plan in the record.

Six inmate healthcare records were reviewed for compliance with psychiatry contacts. Of those, none required an initial psychiatric evaluation during the review period. For routine contacts, 85 percent occurred within 90 days and were compliant. Twenty-one percent of psychiatry contacts were conducted cell-front due with the documented reason of COVID-19 restrictions.

Ten randomly selected condemned 3CMS healthcare records were reviewed for compliance with PC contacts. No inmates required initial PC contacts. For routine PC contacts, 26 percent occurred within ninety days and were compliant; 86 percent were conducted cell-front. In one reviewed case, there was an extensive progress note describing the PC's rationale for not seeing the inmate for a routine contact due to COVID-19. However, the PC did not complete cell-front rounds to check the inmate's mental status.

No reviewed inmates required an initial IDTT during the review period. For the five inmates who required annual IDTTs during the review period, four or 80 percent occurred timely. Required staff attended 83 percent of the reviewed annual IDTTs.

Mainline 3CMS:

Overall, SQ provided adequate mental health care to mainline 3CMS inmates during the review period. The care met the clinical needs of the inmates with a few exceptions. One concern was an inmate who experienced medication side effects due to being placed on a clinically appropriate medication at a much higher starting dose than recommended. Also of concern was that several inmates' charts contained documentation that was almost entirely the

same from one visit to the next.  Also, there were several cases where the diagnosis differed between the PC and the psychiatrist and one inmate had two diagnoses that had overlapping symptom groups, but treatment only focused on one of the two.

Ten randomly selected mainline 3CMS inmate healthcare records were reviewed to assess compliance with psychiatric contacts.  Of those, none required an initial psychiatric evaluation during the review period.  Regarding the ten inmates required to be seen for routine contacts, 31 percent occurred within 90 days and were compliant.  Of concern, one inmate had not had a psychiatric contact since January 2020.

Fourteen randomly selected mainline 3CMS inmate healthcare records were reviewed for compliance with PC contacts.  One inmate required an initial PC contact which occurred within ten working days of arrival and was compliant.  For the 13 inmates required to be seen for routine contacts, 74 percent occurred within 90 days and were compliant.  Of concern, one inmate was not seen by a PC since December 2019.  This inmate was due for a PC contact in March 2019, and at that time, the PC informed the inmate that "only high priority ducats will be seen due to the [COVID-19] quarantine, [and] unless [the inmate-patient] was in distress or needed to speak about a specific MH issue that was concerning to the [inmate-patient]", he would not be seen. Another inmate had not been seen by his PC since January 2020.

Of the 14 reviewed inmates, one required an initial IDTT which occurred within 14 working days of arrival and was compliant.  Seven reviewed inmates required annual IDTTs during the review and 57 percent occurred timely.  Required staff were in attendance for the initial and annual IDTTs reviewed.

RVRs

Eleven adjudicated RVRs were reviewed for compliance with policy timeframes. In seven or 64 percent of the cases, a mental health assessment was not requested timely with a range of one to 19 days late. Mental health clinicians timely completed and returned the assessments to custody in six or 55 percent of the reviewed cases with a range of one to 13 days late.

Clinicians recommended mitigation in eight or 73 percent of cases reviewed and the senior hearing officer documented consideration of the clinicians' recommendations in 75 percent of those cases.

In five or 45 percent of reviewed cases, disciplinary hearing results contained errors such as stating information was timely yet timeframe requirements were not met; no mental health factors for consideration when the senior hearing officer assessed penalties, yet the mental health assessment provided mitigation recommendations; and the senior hearing officer utilized developmental/cognitive functioning deficits instead of mental health deficits. Of particular concern was one RVR where the mental health clinician noted that there was not a diagnosis because the inmate refused to cooperate with assessment and the history of antisocial behaviors should be taken into consideration, and there were "no mental health factors that would impact penalties imposed." This inmate was ultimately admitted to the MHCB with a referral to acute care, and the RVR was placed on hold pending discharge from MHCB.

**Deuel Vocational Institution (DVI)**
Review Date - June 5, 2020

Census:

On June 4, 2020, DVI housed 1,848 inmates; a 19 percent decrease since the preceding monitoring period. The mental health caseload population was 370, a decrease of 21 percent since the preceding monitoring round, and represented 20 percent of the total inmate population.

There was one inmate in a TMHU.

One inmate was in alternative housing.

There was one mainline EOP inmate and 194 mainline 3CMS inmates.

The total administrative segregation population was 102 inmates, including ten 3CMS inmates and 12 inmates on NDS status.

There were 146 3CMS inmates in the reception center, of which 17 inmates were in the reception center's STRH.

Staffing:

DVI did not have an allocated chief psychiatrist position.  The senior psychiatrist supervisor position was filled.  Two of the four staff psychiatrist positions were filled for a 50-percent vacancy rate. Registry psychiatrists covered 1.04 positions, leaving a functional vacancy rate of 24 percent.  DVI did not utilize telepsychiatry.

One of the two chief psychologist positions was filled for a 50-percent vacancy rate. The one senior psychologist supervisor and two senior psychologist specialist positions were filled.  There were 13 staff psychologist positions, one more than the 12 established positions.

The five social worker positions were filled.

The recreational therapist position was filled.

423

Four of the 4.5 office tech positions were filled, leaving a 11-percent vacancy rate. The HPSI position was filled. The CHSA II and OSS II positions were vacant.

<u>Transfers/Referrals</u>:

There were no referrals to acute or intermediate care during the review period. Two inmates met criteria for inpatient care consideration but were not referred. Record reviews revealed that clinical rationale for non-referral was appropriate and properly documented.

<u>MHCB</u>:

Between March 1, 2020 and May 31, 2020, DVI referred 27 inmates to MHCBs, of which ten or 37 percent transferred. Of those transfers, eight were admitted to CHCF's MHCB, one to CMF, and one to PBSP. All ten transfers were completed within 24 hours. Seventeen referrals were rescinded. Of those, five of the 17 were placed in alternative housing for longer than 24 hours. Four of these inmates were placed in TMHUs and one was retained in alternative housing prior to the formalization of the TMHU process. The average length of stay for inmates in TMHUs was 4.3 days, with a maximum of 9.7 days. The one inmate placed in alternative housing prior to the formalized TMHU process had a length of stay of 7.6 days.

<u>Programming</u>:

<u>Reception Center</u>:

<u>EOP</u>:

There were no EOP inmates in the reception center at the time of reporting.

<u>3CMS</u>:

Healthcare record reviews indicated that during the review period, DVI did not provide adequate mental health care to reception center 3CMS inmates.

While initial mental health screenings and assessments were completed timely, there were several problems with psychiatric assessments. Psychiatrists did not see inmates who arrived on medications timely and there were often no progress notes for bridge orders. Initial psychiatric evaluations were often not completed, and in some cases, psychiatrists did not see an inmate for months after arrival to the reception center. Once seen, continuity of care was adequate as psychiatrists often followed the inmates throughout their stay in the reception center.

PC contacts did not occur within the first 30 days of arrival at the reception center as required by the Program Guide. PC contacts were often completed by a different clinician at each contact, affecting continuity of care for reception center 3CMS inmates. Further, PC contacts were unfocused and appeared to be mere check-ins with the inmate.

Documentation in the EHRS in several cases was inadequate and progress notes often consisted of cut and pasted historical information about the inmate's case with sparse relevant information about the inmate's current condition. Safety planning was inadequate.

Record reviews indicated significant diagnostic problems in reception center 3CMS inmate records; 100 percent of the ten inmates reviewed were diagnosed with an adjustment disorder even when clear symptoms of serious mental illness were present.

Reception Center STRH:

A total of ten records of the fourteen inmates in the reception center STRH were randomly selected for review by the monitor's expert. Record reviews indicated that DVI did not provide adequate mental health care to reception center STRH inmates during the review period.

Regarding initial psychiatric contacts, psychiatrists failed to meet with inmates prior to IDTT in 90 percent of the ten reviewed cases. In a significant number of cases reviewed, initial

psychiatric assessments did not occur until between seven to 14 days after IDTT. Nearly all psychiatric contacts were conducted via telepsychiatry.

PC contacts occurred each week, but in 90 percent of the cases reviewed PC contacts were offered eight to ten days apart. PC contacts were offered in confidential, out of cell settings.

IDTTs were completed timely; however, required treatment team members were present in 80 percent of IDTTs in the ten records reviewed; this was due to the absence of the psychiatrist. Also, 90 percent of reviewed treatment plans were deficient and did not include a discussion of services that would be offered to the inmate while housed in STRH.   There was no discussion of alternative services that could be provided when the availability of services was limited due to COVID-19.

Regarding group treatment, record reviews indicated that one hour of group treatment was offered until approximately July 10, 2020.  From the absence of group notes in EHRS, it appeared that group treatment was not offered after that date.

Psych techs conducted rounds at least once per day during the review period.

In-cell activities were routinely mentioned in healthcare records.

DVI did not meet the 30-day transfer timeline to STRH in any of the ten cases reviewed. The failure to meet the transfer timeline was noted both before and after the onset of the COVID-19 pandemic.

TMHU:

TMHU cells, which were developed as an alternative to higher levels of care, lack a therapeutic milieu and offer limited programming, treatment services and multi-disciplinary collaboration in comparison to established higher levels of care.  Record review of inmates

housed in TMHU at the time of review indicated inadequate care, in part, due to lack of therapeutic milieu.

Five inmates' EHRS records were reviewed to assess the adequacy of treatment provided in TMHUs and compliance with the *COVID-19 Emergency Mental Health Treatment Guidance* document. Reviewed cases included all inmates who had been placed in the TMHU for more than 24 hours through June 8, 2020. Mental health care provided within the TMHU at DVI was variable in meeting the expectations set forth in the *COVID-19 Emergency Mental Health Treatment Guidance* document and addressing the needs of patients in crisis.

DVI delivered adequate services to patients with less serious needs but did not adequately meet the needs of patients with more acute presentations. Clinical assessments were generally comprehensive and included thorough record reviews. While the documentation revealed coordination among team members and attempts to deliver the services required by the guidelines, it often failed to adequately reflect interventions targeted to reduce the patients' risks and address their presenting symptoms. Discharge decisions appeared overly reliant on patient self-reports. Diagnostic hypotheses were inconsistent, and suicide risks were not consistently assessed to have decreased prior to discharge decisions. Other than medication changes and occasional therapeutic sessions with PCs, little active treatment was documented. There was no evidence that out-of-cell programming was offered to inmates in the TMHU.

3CMS:

DVI did not provide adequate mental health care to 3CMS inmates during the review period. Both psychiatric and PC treatment was supportive in nature. However, PCs rarely noted clinical interventions in the progress notes and clear documentation of clinical interventions was lacking. Diagnoses were not easily located in the EHRS, indicating a need for additional staff

training regarding recordkeeping. Moreover, criteria to support particular diagnoses was not sufficient.

Treatment planning was insufficient. Specifically, treatment goals for anxiety and depression were documented with little specificity.  Staff training in treatment interventions and discharge planning would be beneficial.

Fourteen randomly selected inmate records were reviewed to assess compliance with Program Guide requirements regarding timeliness of IDTT, psychiatric, and PC contacts. Seven of those inmates required initial psychiatric evaluations.  Of those, five or 71 percent were timely.

Eleven inmates required routine psychiatric contacts and 79 percent occurred within ninety days and were compliant.  One inmate's first psychiatric contact occurred during his initial IDTT and the initial psychiatric assessment occurred after the IDTT.  Five of 20, or 25 percent of psychiatric appointments were conducted via telepsychiatry.

Six inmates required initial PC assessments.  Of those, five or 83 percent were compliant. The one case that exceeded timeframes was late by one day.

One hundred percent of the expected routine PC contacts during the review period occurred within ninety days and were compliant.  PCs did not consistently document whether contacts occurred in confidential settings.

Five inmates required initial IDTTs.  Of those, one or 20 percent were compliant.  Nine inmates required annual IDTTs during the review period; eight or 89 percent occurred within 365 days and were timely.

All required staff attended 100 percent of initial and routine IDTTs during the review period.  While a PC and psychiatrist attended, it was not documented whether it was the assigned treatment providers as required by the Program Guide.

RVRs:

Six RVRs were reviewed for compliance with Program Guide requirements. Custody staff timely requested mental health assessments in three of six cases, or 50 percent of the time. Mental health staff completed and returned the mental health assessments within policy timelines in all six cases, or 100 percent of the time. The senior hearing officer documented their consideration of the mental health assessment in two of the six cases, or 33 percent of the time.

In four or 67 percent of reviewed cases, the mental health clinician recommended mitigation of penalties.  Of those, the senior hearing officer documented mitigation of penalties in two or 50 percent of those cases. In one case, the senior hearing officer documented mitigation of penalties based on the mental health assessment; however, no mitigation recommendations were made.

In one case, the mental health assessment recommended alternative discipline because the inmate's mental illness strongly influenced the behavior documented in the RVR. Policy was not adhered to as the captain did not review the RVR thereafter, nor did the senior hearing officer address the mental health assessment recommendation.

The monitor also noted that clinicians completing the mental health assessment did not provide adequate responses to questions and failed to understand penalties that the senior hearing officer could assess.

**California State Prison/Corcoran (CSP/Corcoran)**
April 2, 2019 – April 4, 2019

Census:

On April 2, 2019, CSP/Corcoran housed 3,352 inmates.  There were 1,665 inmates on the mental health caseload, which constituted 50 percent of the total inmate population.

The MHCB housed 16 inmates; five inmates were in alternative housing.

There were 315 mainline EOP inmates.  There were 957 mainline 3CMS inmates.

CSP/Corcoran was an EOP hub; it housed 84 inmates.  There were 165 inmates in LTRH and 115 inmates in STRH.

Eight inmates were assigned non-disciplinary segregation (NDS) status including three MHSDS inmates.

Staffing:

The position for the chief psychiatrist was filled; there was no senior psychiatrist position established.

Both chief psychologist positions were filled.  All 6.5 senior psychologist positions, and 6.0 senior psychologist specialist positions were filled, for no vacancies in either discipline.

Considering staff psychiatrists, telepsychiatry, and contract psychiatrists, the functional vacancy rate in psychiatry was 35 percent.

Regarding psychologist positions, considering staff and contract psychologists, the functional vacancy rate in psychology was 22 percent.

The supervising social worker position was filled.  The total number of staff and contract social workers exceeded the 17.5 established positions.

Considering staff and contract recreation therapists, the functional vacancy rate was 50 percent.

<u>Telepsychiatry</u>:

At the time of the site visit, there were 2.5 FTE telepsychiatrists providing services at CSP/Corcoran including 1.0 FTE telepsychiatry services to the EOP and 1.5 FTE services to the 3CMS program.  Telepsychiatry was not used in the MHCB.

CSP/Corcoran reported that it planned to utilize telepsychiatry services that it shared with other institutions as its after hours on-call service provider following the site visit.  Additionally, the institution planned to use telepsychiatry as part of its crisis intervention team (CIT).

In IDTTs observed in the mainline 3CMS program, the telepsychiatrist was well prepared and actively engaged during each IDTT, was collaborative and effectively interacted with the rest of the treatment team.

<u>Quality Management</u>:

CSP/Corcoran's institutional quality management process included a functioning local governing body, quality management committee, and mental health subcommittee.

The local governing body met quarterly and addressed substantive health care matters including pertinent Correctional Treatment Center (CTC) matters and approved local operating policies and procedures.

The quality management committee met monthly; the minutes were comprehensive.  The deliberations and action items of the quality management committee included issues related to suicide watch discharge plans, EOP and MHCB treatment plans, internal compliance audits, timely admissions to MHCBs, wait times in the Treatment and Triage Area (TTA), and medication continuity.  Other areas covered during quality management committee meetings included completed and uncompleted mental health ducats, the Crisis Intervention Team (CIT) plan to decrease MHCB referrals, and timely crisis bed transfers within 24 hours of referral. The

quality management committee addressed the mental health program subcommittee's actions. Local operating procedures governing various healthcare areas were also considered and approved.

The mental health subcommittee met monthly and maintained useful meeting minutes. CSP/Corcoran's mental health subcommittee was actively engaged in implementing and monitoring corrective actions related to a variety of quality management/quality improvement processes at the institution including staffing, access to care, and program compliance.

Action items and meeting agendas showed that the mental health subcommittee attended to issues regarding post-discharge follow-up for custody and mental health, SPRFIT, and treatment attendance. The mental health subcommittee also addressed issues of treatment space, structured therapeutic activities, IDTT staffing, the indecent exposure program and the Transitional Housing Unit (THU). In addition, the mental health subcommittee considered timely psychiatry contacts, issues connected to the administrative segregation EOP hub and inpatient discharges and re-admissions within 30 days. EOP treatment attendance, issues related to documentation regarding returns from Department of State Hospitals (DSH) and IDTT staffing in LTRH and STRH were also discussed in the mental health subcommittee, which set up action plans with specific remedial performance goals. The mental health subcommittee regularly considered audits of the various MHSDS programs at CSP/Corcoran.

CSP/Corcoran's reported that its Hub Certification QIT and the mandated Suicide Prevention Response Focus Improvement Team (SPRFIT) were ongoing.

The institution undertook a Lean Six Sigma project, which utilized data-driven methodologies focused on improving systems by improving quality of services provided to

clients.  The Lean Six Sigma project addressed wellness checks following discharges from crisis beds with the goal of accurately completing documentation greater than 95 percent of the time.

No peer review occurred at CSP/Corcoran during the review period because the peer review process was placed on hold by mental health headquarters.

Medication Management:

CSP/Corcoran's MAPIP results for September 2018 through February 2019 reported compliance for medication continuity.  Review of the medication management dashboard for the period showed that for inmates prescribed antidepressants, CSP/Corcoran reported data for EKG for one month as non-compliant; no data was reported for the other five months.  Venlafaxine blood pressure monitoring was compliant for five months of the review period.  Medication consent was compliant for three months.  Compliance was shown for three months for thyroid monitoring; no data was reported for the other three months.

For inmates prescribed antipsychotics, blood pressure and height and weight measurements were compliant during each of the six months of the review period; medication consent was compliant for five of six months; and psychiatric measures for abnormal involuntary movement scale (AIMS) tests were compliant for three months. Electrocardiogram (EKG) measurements were compliant for one month during the review period.  Blood sugar, complete blood count (CBC) with platelets, comprehensive metabolic panel (CMP), and lipid monitoring were not compliant during any month in the review period.  Thyroid monitoring was compliant for two of six months; no data was reported for the other four months.

Regarding monitoring inmates prescribed carbamazepine, CMP and CBC diagnostic monitoring were compliant for two months each; no data was reported for the other four months. Medication consent was compliant for one month; no data was reported for the other five

433

months.  Carbamazepine level monitoring was compliant for one month, non-compliant for two months, and no data was reported for the other three months.

Data for Clozapine diagnostic measures indicated that blood pressure, blood sugar, CBC, height, weight, and medication consent were compliant for all six months of the review period. CMP and lipid monitoring were compliant for four months and EKG was compliant for two months.

CSP/Corcoran was compliant with medical consent for Lamotrigine for all six months.

Psychiatric diagnostic measures for inmates prescribed Depakote were compliant for medication consent for all six months of the review period.  For CBC with platelets, Depakote levels, and CMP, CSP/Corcoran did not achieve compliance for any month of the review period.

For inmates prescribed Lithium, medication consent was compliant for three months; no data was provided for one month.  Psychiatric measures for Lithium levels was compliant for one month.  Kidney function was compliant for one month; no data was provided for the other five months.  Thyroid monitoring was compliant for months.  EKG was compliant for two months, non-compliant for two months and no data was provided for the other two months.

Multiple MAPIP mental health measures scored below 90 percent for one or more months during the review period.  Medication continuity upon inter-institutional transfer at receiving and release (R&R), continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), medication continuity for MHCB transfers, with parole or release to the community, psychiatric-prescribed chronic care medications, new psychiatric medications and observation of medication preparation and administration for HS and AM/PM medications were non-compliant for all six months of the review period.

Medication continuity with intra-institutional transfers to ASU/SHU/PSU was compliant for three months. Medication continuity for court ordered involuntary medications CSP/Corcoran was compliant for two months and medication continuity following discharge from community hospital or acute or intermediate care was compliant for one month.

CSP/Corcoran reported that it did not consistently conduct MAPIP audits of the various psychiatric measures for psychotropic medications. Documentation provided by CSP/Corcoran demonstrated that relevant laboratory testing for certain prescribed psychotropic medications were not regularly obtained by psychiatrists. The failure appeared primarily to be related to high psychiatrists' vacancies. Staff reported that the use of medical assistants had helped to decrease the problem.

Medication orders at CSP/Corcoran were written for no longer than 180 days, and bridge orders were written for a maximum of 30 days.

All psychotropic medications were ordered DOT, except for Selective Serotonin Reuptake Inhibitors (SSRI), which were ordered KOP.

There were 52 inmates receiving nonformulary psychotropic medications. Non-formulary medications from other facilities were continued at CSP/Corcoran.

CSP/Corcoran was a Clozaril maintenance institution.

Overall, the PC 2602 involuntary medications process worked appropriately at CSP/Corcoran. For the reporting period, CSP/Corcoran petitioned for the renewal of 44 PC 2602 involuntary medications petitions and four new PC 2602 involuntary medications petitions were initiated. Thirty-eight of the renewal petitions were granted, one was denied due to failure to show good cause. Two petitions for inmates who remained at CSP/Corcoran were continued; petitions for three other inmates were also continued but they were subsequently transferred to

another prison.  Of the new PC 2602 involuntary medications petitions initiated, two were granted, one was denied due to failure to show good cause, and one was continued and the inmate was transferred to another prison.

HS medications were administered after 8:00 p.m.

Transfers:

During the review period, 39 inmates were referred to acute care and seven inmates were referred to intermediate care.

CDCR's regional sustainability evaluation at CSP/Corcoran during the review period found that insufficiency of clinical rationale and failure to consider all clinical information available for inmates under consideration for referral to acute and intermediate care remained areas of concern at CSP/Corcoran.  There were documented cases in the regional sustainability sample where treatment teams did not provide clinically adequate justification for non-referral to acute and intermediate care.

No DSH referrals were rescinded; no inmates with complex medical needs transferred during the reporting period.

All acute and intermediate care referrals transferred timely.

CSP/Corcoran was generally not notified of pending discharges from acute and intermediate care.

There were 621 admissions of CSP/Corcoran inmates to the MHCB at CSP/Corcoran and other crisis beds.  A total of 242 inmates referred for placement in the MHCB were rescinded.

CSP/Corcoran had an EOP hub, a STRH and an LTRH onsite, and reported that it did not track the timeliness of transfer of its inmates into these units.

Programming:

Administrative Segregation EOP:

CSP/Corcoran was an administrative segregation EOP hub institution; the EOP hub was located in A Facility (3-A) and had a maximum capacity of 200 inmates. During the reporting period, the census ranged between 75 to 95 inmates.

As with other MHSDS programs at CSP/Corcoran, the precise caseloads of psychiatrists assigned to the EOP hub could not be determined; however, the institution indicated that the number of inmates assigned to psychiatrists in the EOP hub significantly exceeded established staffing ratios.

Five of the six primary clinicians assigned to EOP hub carried caseloads of 1:19 to 1:20 inmates, a psychologist with other duties was also assigned one patient in the EOP hub.

Documentation indicated that the EOP hub was not certified each month during the review period. It was not certified in September 2018, it was certified in October 2018, and was certified conditionally with explanation in November 2018. Certification for December 2018 and January 2019 was still pending action by the mental health headquarters at the time of the site visit. The administrative segregation EOP hub was certified during February and March 2019.

The number of administrative segregation EOP hub inmates with stays exceeding 90 days during September 2018 to February 2019 ranged from two to five inmates for the reporting period. On March 20, 2019, during the site visit, the administrative segregation EOP hub housed 46 EOP inmates; three inmates had stays exceeding 90 days.

Ten inmates in the administrative segregation EOP hub during the site visit were randomly selected from the list provided by CSP/Corcoran to assess compliance with timely

mental health contacts as documented in the EHRS. Reviewed inmates were admitted in January 2019 and were assessed for contacts in February and March 2019 when the administrative segregation EOP hub was certified.

CSP/Corcoran reported that it was not compliant with initial psychiatric contacts in its various MHSDS programs during February 1, 2019 to March 25, 2019.

Five inmates in the sample were in the EOP hub long enough to be seen for routine psychiatry contacts; all timeframes occurred within thirty days or less. CSP/Corcoran was compliant with routine psychiatric contacts for the inmates in the sample.

For the four inmates in the sample that were reviewed for initial primary clinician contacts for the period of March 1, 2019 to March 28, 2019, there was 100-percent compliance. Of the five inmates in the sample who were in the administrative segregation EOP hub long enough to require routine primary clinician contacts, CSP/Corcoran was 93-percent compliant for routine primary clinician contacts in the sampled charts. Administrative segregation EOP hub inmates confirmed during interviews that they met their primary clinicians weekly.

A total of ten inmates were selected to assess compliance with timely IDTTs; no inmate in the sample met criteria for review for compliance with initial or routine IDTTs.

During observed IDTTs in the administrative segregation EOP hub, each inmate's participation in their out-of-cell structured therapeutic activities were reviewed as was their treatment plans. The observed IDTTs functioned appropriately and were adequate.

During the reporting period, CSP/Corcoran's documentation indicated that it was compliant with attendance at IDTTs in the EOP. The appropriate clinical and custody staff attended observed IDTTs.

As to the provision of ten hours of weekly group therapy for administrative segregation EOP inmates, an average of 11.4 weekly hours of group therapy were offered and 7.4 weekly hours were attended. Structured therapeutic activities data for inmates receiving modified programming was not analyzed during the site visit.

CSP/Corcoran was not compliant with offering at least ten hours of yard and three showers per week. A review of a sample of eight randomly selected weeks indicated that compliance with ten hours of yard per week ranged between 60 and 87 percent. For the same timeframe, compliance with offering three showers per week ranged between 68 percent and 87 percent.

During interviews, administrative segregation EOP hub staff reported higher caseloads which prevented them from adequately providing care, including holding individual primary clinician contacts in confidential settings in all cases. Staff indicated that the higher caseloads had a deleterious effect on the program.

Staff also reported that inmates often did not have appliances and did not have access to books or in-cell activities.

MHCB:

CSP/Corcoran had 24 beds designated as MHCBs; all were approved beds. Four of the MHCBs were redlined and three had repair work in progress at the time of the site visit.

During the second day of the site visit, April 3, 2019, the MHCB count was 18 inmates.

The MHCB at CSP/Corcoran admitted 299 inmates during the reporting period. The average clinical length of stay in MHCB was 7.88 days and the average physical length of stay was 8.55 days. There were 61 inmates with three or more MHCB admissions during the review period.

The review indicated that there was inadequate psychiatric coverage in the MHCB due to the significant psychiatrist vacancies at the institution.  The one full-time assigned psychiatrist in the MHCB was unable to and did not provide psychiatric treatment to MHCB inmates in a manner that was consistent with Program Guide requirements.

A total of 7.5 primary clinicians were assigned to the MHCB.

Five inmates were randomly selected from the CSP/Corcoran MHCB admission spreadsheet provided for the site visit as a sample for review of their health records to determine compliance with initial evaluations, daily contacts by primary clinician or psychiatrist, and initial, routine, and discharge IDTTs.  The dates of each counted was noted and the number of days between contacts were counted.

In accordance with Program Guide requirements, initial evaluations in the MHCB were considered compliant if the assessment occurred within 24 hours of admission.  Chart reviews showed that four of the five inmates in the sample or 80 percent of the randomly selected cases received initial evaluations by their primary clinician prior to the initial IDTT.

Regarding initial evaluation by the assigned psychiatrist, three of the five inmates in the sample or 60 percent were seen prior to the initial IDTT.

MHCB daily contacts were considered compliant if an inmate was seen daily beginning the day after admission for an out-of-cell clinical contact (unless the inmate refused) by a psychiatrist or psychologist.  On weekends, an MHCB inmate could be appropriately seen by a mental health clinician or the medical officer of the day.

Analysis of the lengths of stay for the five MHCB inmates in the sample showed that there were 30 necessary daily contacts during the length of time of their admissions. CSP/Corcoran was compliant with 28 of 30 of those contacts at 93-percent compliance.  At least

12 of those clinical contacts should have been with a psychiatrist. Ten of 12 or 83 percent of required psychiatric contacts for the sample were with a psychiatrist.

Under Program Guide requirements, the initial MHCB IDTT must occur within 72 hours of admission and subsequent IDTTs in the MHCB must occur at least weekly thereafter. An initial MHCB IDTT was determined to be compliant if it occurred within three days of admission to the crisis beds and ongoing IDTTs were determined to be compliant if they occurred within seven days thereafter. In addition, compliance with an IDTT at the time of MHCB discharge was also reviewed and assessed. An IDTT was considered compliant as a "discharge" IDTT if it occurred within 24 hours prior to discharge, or in the case of briefer stays (e.g., two days) the initial IDTT clearly established discharge criteria and developed a discharge plan.

Of the five randomly selected MHCB cases reviewed, all five or 100 percent were compliant for initial IDTTs within 72 hours. The EHRS review indicated that the five inmates in the sample required at least one or more ongoing IDTTs for a total of 17 total expected IDTTs during their admissions. Based on the EHRS reviews, all 17 or 100 percent of those ongoing IDTTs were completed timely.

Regarding discharge IDTTs, all five inmates in the sample received proper discharge IDTTs for a compliance rate of 100 percent.

MHCB IDTT meetings were observed during the site visit. All of the appropriate disciplines were in attendance with input provided by each. One inmate had not been seen by the psychiatrist prior to the IDTT. Consistent with Program Guide requirements, treatment plans were adequately discussed. The IDTT process observed was noted to be clinically useful.

CSP/Corcoran reported that MHCB inmates were allowed access to yard beginning on October 24, 2018.

Seclusion and Restraint:

CSP/Corcoran reported that no inmates were secluded or restrained during the review period.

Crisis Intervention Team:

CSP/Corcoran implemented its Crisis Intervention Team (CIT) in October 2018.  At the time of the site visit, seven clinicians (psychologists and social workers) were assigned to its CITs.  Each CIT included a mental health clinician, a registered nurse (RN) and a custody supervisor and provided support for crisis services in all CSP/Corcoran facilities.

Initially, the CIT provided coverage 24 hours a day, seven days a week.  However, at the time of the site visit, while coverage continued to be seven days a week, it ran from 7:00 a.m. until midnight daily.  Staff reported that the change was necessitated because of both staffing issues and access to HCPOP, which closed at approximately 10:00 p.m.  Staff indicated that very few CIT referrals had occurred past midnight.

The institution reported that in December 2018, the CIT was involved in 202 crisis intervention assessments with 112 of those assessments or 55 percent resulting in the inmate being returned to custody.  Ninety of the 202 crisis intervention assessments or 45 percent resulted in referral to a MHCB.  In February 2019, documentation indicated that CITs performed 96 crisis intervention assessments with 79 of them or 82 percent of the crisis intervention assessments resulting in referrals to MHCB.  A review of CIT data also indicated that there were many "multi-utilizers" frequently seen by the CIT, whose "crises" were addressed without referrals to MHCB, suggesting a decrease in unnecessary admissions to a MHCB.

Mental health staff at CSP/Corcoran reported during staff interviews that the CIT process was helpful and a very useful addition to the MHSDS services available.

Alternative Housing:

CSP/Corcoran used alternative housing for inmates awaiting MHCB placement when necessary. There were designated alternative housing cells across the institution, where inmates awaiting MHCB placement could be housed for up to 24 hours. Although, CDCR's regional mental health compliance team had recommended during the sustainable process audit that Facility 4A3L, cells 45 - 46 should not be used as alternative housing due to safety concerns, the cells remained designated as approved alternative housing at the time of the site visit.

Documentation regarding the cleaning of alternative cells had been recently initiated prior to the site visit. However, the institution's local operating procedure for alternative housing placement for inmates awaiting MHCB placement had not been updated at the time of the site visit.

There were 630 admissions to alternative housing at CSP/Corcoran during the reporting period. The compliance rate for timely transfer or discharge within 24 hours was 93 percent.

There were no inmates in alternative housing at the time of the site visit.

Long-Term Restricted Housing:

CSP/Corcoran was not able to provide the caseload data for the psychiatrist providing services in LTRH. One primary clinician in LTRH had a caseload of 1:50 inmates, six primary clinicians carried caseloads of 1:25 to 1:30 inmates, and two primary clinicians had caseloads of 1:12 and 1:14 inmates. The supervising psychiatric social worker had a caseload of five inmates and one psychologist with other duties had one inmate assigned to LTRH.

CSP/Corcoran reported that 208 inmates were placed in LTRH during the reporting period.  The average length of stay was 273 days, with the shortest stay being 17 days and the longest being 1,235 days.  The institution reported that it was unable to track timely transfers (within 30 days) into LTRH for inmates coming from other institutions, and it did not provide information regarding the timeliness of its internal transfers into LTRH.

CSP/Corcoran reported that it was non-compliant with initial psychiatric contacts in LTRH as was the case for all other MHSDS programs at the institution.

Routine LTRH psychiatric contacts were considered compliant if they occurred within ninety days of the initial psychiatric contact (or the last routine IDTT as applicable) and each subsequent routine contact thereafter.  Five LTRH inmates were randomly selected for a health care records review to assess compliance with timeliness of routine psychiatric contacts during the selected period of September 1, 2018 to March 27, 2019, of which only one inmate in the sample met criteria for assessing routine psychiatric contacts.  Psychiatric contacts for this inmate exceeded 90 days.

Of five LTRH inmates randomly selected for a health care records review to assess compliance with timeliness of initial and routine primary clinician contacts for the selected period of February 1, 2019 to April 3, 2019, three met the criteria for review.  Two of the three inmates were admitted during the review period and were seen timely for initial primary clinician contacts.

Compliance with weekly primary clinician contacts was assessed by verification of documentation in EHRS for the days between the initial contact (or first routine contact) and the next three subsequent routine contacts.  Routine weekly contacts were deemed compliant if there

were no more than seven calendar days between contacts.  For all three inmates reviewed, CSP/Corcoran was 89-percent compliant with timely routine primary clinician contacts.

It was not consistently ascertainable from record reviews whether psychiatry and primary clinician contacts in LTRH had occurred in a confidential or non-confidential setting.

Regarding IDTT compliance, the two inmates in the sample admitted during the review period were seen for their initial IDTT prior to the ICC.  The one inmate in the sample who was in LTRH long enough to require routine IDTTs was seen timely.

IDTTs were observed during the site visit on April 3, 2019.  Two of eight scheduled IDTTs occurred.  All disciplines were present for one of the two observed IDTTs; a psychiatrist was not present for the other.  Team members interacted spontaneously with the inmate and with each other, indicating a collaborative process.  Although the presenting clinician stated the diagnoses of the inmates, symptomatology and impact on functioning were not discussed, which made it difficult to ascertain the adequacy of treatment goals.  While treatment goals were stated, interventions and progress toward treatment goals was not adequately discussed by the treatment team.  Both IDTTs considered levels of care and one inmate was appropriately placed at the EOP level of care.

It was noteworthy that for those inmates with the highest incidents of violent behavior in LTRH, there was no indication or documentation that CSP/Corcoran routinely considered implementing behavior management plans within IDTTs.

The monitor attended ICC in LTRH during the site visit; a mental health clinician was present.  The participation of the clinician was noted to be perfunctory, consisting of asking the inmate if he was feeling "suicidal" and if he was "ok."  There was not any meaningful dialogue between the clinician and the committee chairman or other custody staff during the ICC.

According to documents provided by CSP/Corcoran, LTRH inmates were offered nine 90-minute recreational therapy groups for a total of 13.5 hours per week.  In addition, clinical groups offered in LTRH included two 90-minute dialectical behavior therapy groups and seven 70-minute rational behavior and decision-making groups.

The monitor reviewed ten randomly selected CDCR Form 114As in the LTRH covering four weeks during the review period and found that six or 60 percent of the inmates in the sample had not been offered at least ten hours of yard as required.  The review also revealed that LTRH offered a dayroom program during Third Watch six days a week for two hours on a rotational basis from 2:30 p.m. to 4:30 p.m. or 6:00 p.m. to 10:00 p.m., except on Wednesday, which was scheduled for laundry exchange.  Analysis of the CDCR Form 114As revealed that LTRH inmates were consistently offered access to dayroom on the Third Watch.

A group led by a social worker called "Rational Behavior and Decision-Making" was observed.  The group leader checked in with inmates at the onset; distributed a handout to group members to facilitate discussion; and appropriately engaged most of the eight attendees, demonstrating competence when redirecting group members and facilitating interactions between group members.  Group members were attentive, and most were actively engaged throughout the group.

In interviews of LTRH inmates several reported that generally psychiatry contacts exceeded the required timeframe, while others reported that their psychiatry contacts were timely.  Inmates reported that they were not offered confidential psychiatric contacts and that contacts with the psychiatrist always occurred cell-front, even when they had not refused.

As with timely psychiatric contacts, when interviewed regarding weekly primary clinician contacts, some inmates reported that there were delays in meeting the weekly contact

requirement in LTRH, while others reported that their primary clinician contacts were timely. Inmates reported that they always occurred in confidential settings.

A group interview was conducted with eight inmates from one side of the LTRH unit who had attended the "Rational Behavior and Decision-Making" group. Inmates reported that six of the eight had electrical appliances; the two inmates without appliances reported that they were admitted to the LTRH more than a month prior to the site visit. Overall, inmates viewed mental health staff to be helpful. Inmates reported that they liked their groups but wanted an art group. Of concern, the inmates reported that they had to escalate their behavior (e.g., kick their doors, yell "man down," and make a scene) to access emergency mental health.

These inmates expressed frustration that problems on the unit interfered with programming and believed that documentation of their out-of-cell-time was incorrect. They reported that the current group (10:00 a.m. to 11:30 a.m. on Wednesday, April 3, 2019) was their first time out of their cells all week. More than half reported that they had only four hours of out-of-cell time last week, even though the institution reported offering more time than that.

Ten inmates from a different side of the LTRH unit were randomly selected for another group interview. Five of the ten attended and confirmed that they had been asked to attend an interview with *Coleman* staff. These inmates reported that the lack of access to radios was due to a supply problem. These inmates reported that after a two-week period without yard, one inmate started a fire in his cell and shortly thereafter inmates were offered yard. These inmates believed that the yard access was instituted because of the cell fire.

These LTRH inmates also reported problems accessing emergency mental health, stating they were not taken seriously, that they had been told "kill yourself," or had to escalate their behavior to access mental health. One inmate reported that he was threatened with pepper spray

447

when he reported suicidal ideation.  Another inmate reported that he waited two months for his property following admission to the LTRH and only received his property after he flooded his cell.

Inmates in LTRH reported that both custody and mental health staff asked inmates if they wanted to attend treatment appointments or yard.  These reports were not consistent with staff reports regarding this issue as described below.

Mental health staff reported that the assigned mental health and custody staff were not enough to provide adequate care to inmates in LTRH.

LTRH staff characterized the CSP/Corcoran LTRH unit as "dangerous" with daily "gassing" of staff, high numbers of assaults, and numerous inmate-initiated cell fires.  A homicide had occurred in LTRH, which staff indicated had been "traumatizing."  LTRH custody staff indicated that they were compelled to use metal triangles attached to inmates' handcuffs to prevent inmates from retaining their handcuffs after placement in treatment modules in the group treatment area.

Mental health staff also reported that some inmates had inmate manufactured handcuff keys that were used to remove their handcuffs.  Staff further indicated during interviews that custody staff assigned to provide LTRH services, including escort officers, were insufficient. Moreover, mental health staff expressed concern about the relationship between custody staff and inmates, with some describing it as "bad."

It was also reported that mental health staff was resistant to conducting clinical contacts with inmates out-of-cell because of the risk of inmate assaults (e.g., kicking, head-butting).

Regarding IDTTs held in absentia, staff reported that level of care changes did not occur unless the inmate attended the treatment team meeting.

During staff interviews, the LTRH supervisor reported that treatment groups were scheduled so they did not conflict with yard time, which was not consistent with inmate reports as discussed above.

Regarding the significant number of cell-front contacts in LTRH, staff attributed the issue to limited confidential space.  However, this contradicted reports that mental health staff was resistant to conducting clinical contacts with inmates out-of-cell because of the perceived risk of inmate assaults.  Staff also reported that inmates did not want to leave their cells to attend treatment when they did not "like" the escorting officer.

Staff indicated that they were exploring the possibility of using attorney visiting rooms for clinical contacts to reduce non-confidential clinical contacts.

Staff reported a systemic issue regarding repeated level of care changes that resulted in inmates "bouncing" between LTRH at CSP/Corcoran and the PSU at CSP/Sac.  In this regard, inmates were changed from EOP to 3CMS level of care at CSP/Sac and then transferred to LTRH at CSP/Corcoran.  In multiple cases where inmates were returned to EOP level of care at CSP/Corcoran's LTRH and transferred back to the PSU at CSP/Sac, they were reportedly unjustifiably returned to LTRH at the 3CMS level of care.  Staff indicated that headquarters' staff was working with CSP/Corcoran LTRH staff and CSP/Sac PSU staff to determine appropriate remedial action to address this issue.

Facility staff also reported a concerning practice of maintaining inmates who were close to their Minimum Estimated Release Date (MERD) but needed EOP level of care at the 3CMS level of care in LTRH until that date.  At the time of their MERD, the inmate's level of care would be changed to EOP which meant they did not have to be returned to the PSU at CSP/Sac.

CDCR's regional staff confirmed that this practice occurred but reported they had directed the LTRH staff to discontinue the practice during their recent tour prior to the site visit.

Short-Term Restricted Housing:

The STRH unit was designated to house 3CMS and non-MHSDS inmates in administrative segregation and had a maximum population capacity of 198 at the time of the site visit.

Staff reported that no psychiatrist was assigned exclusively to STRH due to staffing vacancies.  A psychiatrist with other duties was also assigned to provide psychiatry coverage to STRH inmates; however, staff reported that it was often not timely.

One primary clinician was assigned a caseload of 1:25 inmates, three primary clinicians had caseloads of 1:27 to 1:30 inmates, and one primary clinician had a caseload of 1:12 inmates assigned.

CSP/Corcoran reported that it was non-compliant with initial psychiatric contacts in STRH.

Routine psychiatric contacts were considered compliant if they occurred within 90 days of the initial psychiatric contact and each subsequent routine contact thereafter.  Five STRH inmates were randomly selected for review of EHRS medical records for the period of January 13, 2019 through March 30, 2019 to assess compliance with timely routine psychiatric contacts. Two inmates in the sample met criteria for review regarding routine psychiatric contacts; both occurred timely.

Five STRH inmates were randomly selected for review of EHRS medical records for the period January 3, 2019 to February 8, 2019 to assess compliance with timeliness of initial and routine primary clinician contacts.  Four inmates in the sample met criteria for review.

Initial primary clinician contact was deemed compliant if it occurred within ten working days of arrival date in STRH.  To determine timeliness of the initial primary clinician contacts, days between the date of admission and the initial primary clinician contact were counted.  All four inmates in the sample were seen timely for initial contacts.

Subsequent routine primary clinician contacts were required to occur weekly. Compliance with weekly contacts was assessed by verification of documentation in EHRS for the days between the three subsequent primary clinician contacts after the initial primary clinician contact.  CSP/Corcoran was 78-percent compliant regarding routine primary clinician contacts for the sample reviewed.

Initial IDTTs in STRH must occur before ICC.  A review of SOMS for mental health inmates housed in STRH indicated that their initial ICCs occurred within ten days in 93 percent of the cases.

Five STRH inmates were randomly selected to assess compliance with timely IDTTs in EHRS medical records for the review period; two inmates met criteria for review.  The initial IDTTs for both inmates occurred after ICC and were deemed untimely.  The full complement of IDTT staff was present for these initial IDTTs.

Regarding routine IDTTs, none of the inmates in the sample had been in STRH long enough to require routine IDTTs.

Documentation provided indicated that 3CMS STRH inmates were offered an average of at least 1.8 hours per week of structured therapeutic activity, of which an average of 1.1 hours of structured treatment were attended by inmates due to refusals.

Six STRH inmates were interviewed in a group setting during the site visit.  Most of the inmates had been in STRH for less than two months by their report.  Inmates reported that they

451

had not met with either a psychiatrist or primary clinician since their admission to STRH even after making requests.  A subsequent review of health care records for STRH was not consistent with the information provided by the inmates regarding their primary clinician and/or psychiatrist contacts or IDTTs.  However, review of the EHRS health care records of the inmates in the group did indicate that the frequency of their clinical contacts was not consistent with Program Guide requirements.

During the interviews, inmates confirmed being offered access to outdoor recreation seven days per week for two to three hours per day.  They also confirmed being offered access to one group therapy session of 1.5 to two hours per week.  Most of the inmates in the interview group indicated that they had not found the group therapy to be helpful because it lacked structure and supplies.

Interviewed inmates asserted that psych techs did not address their self-referrals during rounds.  The inmates also made multiple complaints regarding their property, lack of access to paper books and writing supplies, and issues with the tablets that had been provided them by CDCR.  Complaints about the tablets included not being able to connect with radio stations and the five-hour duration of full charges, which then needed to be recharged by correctional officers.

During interviews with mental health staff, they stated that psychiatrist coverage in STRH was insufficient.  It was estimated that the psychiatrist assigned to cover IDTTs in STRH attended about 80 percent of them, and that psychiatrist was generally not the inmate's treating psychiatrist.

In addition, staff reported high staff caseloads in STRH; backed-up appointments; and conflicts between treatment activities and yards/showers, which forced inmates to have to choose

which to attend. Generally, according to staff, mental health treatment had to "work around" medical, dental, and other appointments.

Staff reported that the Dialectical Behavior Therapy (DBT) program in STRH was effective. Staff also indicated that there was an appreciable number of inmates in STRH who had chronic issues with suicidality. In addition, staff underscored that some inmates arriving from other institutions had experienced a difficult transition into CSP/Corcoran's STRH.

According to staff, the available custody escort staff was insufficient to meet the needs in STRH for all scheduled daily activities.

Staff expressed concern that STRH inmates did not have access to books and in-cell activities.

EOP:

CSP/Corcoran reported that it did not assign specific caseloads to psychiatrists in the mainline EOP program.

Nine primary clinicians assigned to the EOP program were assigned caseloads of 15 to 22 inmates which were within the staffing ratio of 1:26; two primary clinicians had caseloads of 30 inmates each, which exceeded the established ratio.

Program Guide timelines of initial and ongoing IDTT meetings, initial and ongoing primary clinician and psychiatric contacts, and attendance at IDTTs was verified via a random sampling of health care records for mainline EOP inmates.

CSP/Corcoran reported noncompliance with initial psychiatric contacts in its various MHSDS programs. Subsequently, verification of timely initial psychiatric contacts was not assessed.

A total of nine inmates (three from each program) were initially selected from a current list of mainline EOP inmates provided by the institution using a random number sampling website to assess compliance with Program Guide requirements for routine psychiatric contacts during the period of August 1, 2018 to March 15, 2019. One inmate was subsequently removed from the sample because his arrival date was after the selected review period of August 1, 2018 to March 15, 2019.

Counting the number of days between psychiatric contacts, there were ten total timeframes between psychiatric contacts for the eight inmates in the sample. Routine psychiatric contacts for 50 percent of the ten timeframes occurred within 30 days or less. The remaining five or 50 percent, occurred 31 days and later. For the sampled inmates, CSP/Corcoran was not compliant regarding routine psychiatric contacts occurring within 30 days or less.

Weekly clinical contact with the primary clinician was required to occur either individually or in group psychotherapy with individual clinical contact occurring at least every other week. Weekly primary clinician contacts were considered compliant if they occurred weekly in an individual confidential setting (unless the inmate refused the confidential contact), or the inmate was seen every other week in a primary clinician-specific group. Those groups had to be with the assigned primary clinician and labeled as a "primary clinician group" as designated by CDCR to be considered compliant.

Compliance was assessed for the four weeks prior to the start of the site visit (February 18, 2019 to March 25, 2019). A total of nine EOP inmates (three from each yard) were selected for a review of EHRS health care records to assess compliance with timely primary clinician contacts. Two of the nine inmates in the sample were admitted during the dates reviewed. For both inmates, initial primary clinician contacts occurred within 14 calendar days of arrival.

Regarding routine primary clinician contacts, there were 32 total timeframes between primary clinician contacts for inmates in the sample. Twenty-five or 78 percent occurred weekly and seven or 22 percent did not occur weekly. For the sampled inmates, CSP/Corcoran was non-compliant regarding routine primary clinician contacts.

Under the Program Guide, at the conclusion of the evaluation process and within 14 calendar days of arrival in the EOP, the IDTT was required to develop a treatment plan in an initial IDTT. Ongoing IDTTs were considered compliant if they occurred within 90 days of the previous IDTT.

The time between IDTTs was defined as a timeframe and included the time between the initial IDTT and the first routine IDTT and each subsequent routine IDTT during the selected period. The records of eight inmates of the nine in the mainline EOP sample were reviewed for IDTT compliance, one having been removed due to admission on March 27, 2019.

Six of seven or 86 percent of initial IDTTs of the sampled inmates were compliant with required Program Guide timelines.

There were four total timeframes between all IDTTs (initial and routine and each subsequent routine) for the eight inmates in the sample. All occurred in less than ninety days, making CSP/Corcoran compliant regarding routine IDTTs for the sample.

CSP/Corcoran reported that the institution was non-compliant regarding staffing for both initial and routine IDTTs in mainline EOP.

On April 3, 2019, the IDTTs of three mainline EOP inmates were observed. The appropriate staff were in attendance; the inmates' treatment plans were discussed. Discussion regarding inmates' participation in out-of-cell structured therapeutic activities ranged from none to adequate.

455

Information provided by CSP/Corcoran regarding the provision of structured therapeutic activities showed that for the review period, mainline EOP inmates not on modified program were on average offered 12.7 hours per week of out-of-cell structured therapeutic activities; 7.2 hours were attended; 5.7 hours were refused; and 4.4 hours were cancelled.

A group of about 25 mainline EOP inmates from Facility 3B01 were interviewed in a community meeting-like setting on April 2, 2019.  The housing unit was a non-designated EOP housing unit; inmates did not report any safety concerns or access to care issues regarding the designation.  The EOP inmates reported that they recreated with non-EOP inmates in an outdoor recreational yard but reported no issues regarding this.

These inmates confirmed that they were seen at least weekly by their primary clinicians in a confidential setting and by the psychiatrist at least every 30 days in a confidential setting. These meetings were described by them to generally be helpful.  Continuity of care with clinicians in mainline EOP, in general, was not an issue of concern for the inmates.  The inmates also confirmed that they met with their IDTT at least every 90 days.  Many of the inmates indicated during the interviews that they could summarize their current treatment plan.

Inmates indicated that they did not have difficulty obtaining medications that were prescribed to them; medication continuity problems were not reported in these interviews.

All the inmates indicated that they were offered at least ten hours per week of out-of-cell structured therapeutic activity, although a minority of these hours involved core groups in contrast to recreational type groups.  In general, the inmates reported that the core groups were useful.  The major complaint regarding groups in mainline EOP was that the inmates wanted more core groups in contrast to recreational groups. Interviewed staff reported that the primary

issues in providing EOP care at CSP/Corcoran included inadequate psychiatric coverage, increasingly larger caseloads for primary clinicians and psychiatrists and limited group rooms.

Mental health line staff indicated that the reason for the small percentage of structured therapeutic activities that focused on core groups being offered in EOP was directly related to lack of adequate numbers of group rooms in contrast to staffing issues.

3CMS:

As reported regarding other MHSDS programs at CSP/Corcoran, psychiatrists in the mainline 3CMS program were not assigned caseloads.  Two primary clinicians with caseloads of 1:79 and 1:87 inmates each were within the established ratio of 1:97. The other five 3CMS primary clinicians carried a caseload range of 1:115-1:174, which significantly exceeded the mandated staffing ratio.

Program Guide timelines of initial and ongoing IDTT meetings, initial and ongoing primary clinician and psychiatric contacts, and attendance at IDTTs was verified via a random sampling of health care records for mainline 3CMS inmates.  A total of eight inmates (two from each program) were selected from a current list of 3CMS inmates provided by the institution using a random number sampling website to assess compliance with Program Guide requirements as documented in EHRS medical records during the selected period of September 1, 2018 to February 28, 2019.

CSP/Corcoran reported that it was non-compliant for initial psychiatry contacts in the mainline 3CMS program.

Routine psychiatry contacts were considered compliant if they occurred at intervals no greater than 90 days following the last contact and were in a confidential setting, unless the inmate refused the confidential contact.  The contacts needed to be of a substantive nature, which

meant that the contact was more than just a "check in." To be more substantive, there needed to be discussion regarding matters such as medication effectiveness or side effects, overall inmate well-being, and/or discussion of similar matters.

Four of the eight inmates in the sample required routine psychiatric contacts. For those four inmates, there were four timeframes between psychiatric contacts, three of the four or seventy-five percent occurred within ninety days. CSP/Corcoran was not compliant with ongoing psychiatrist contacts for the inmates in the sample.

Initial primary clinician evaluations were considered compliant if they occurred within ten working days of arrival. Initial primary clinician contacts were not assessed for timeliness because of discrepancies between arrival dates for the 3CMS inmates in the sample that was provided during the site visit and arrival documentation in the EHRS.

Ongoing or routine primary clinician clinical contacts were considered compliant if they occurred at least every 90 days in an individual confidential setting, unless the inmate refused the confidential contact. There were seven timeframes between primary clinician contacts for the inmates in the sample. Six of the seven contacts or 86 percent occurred within ninety days, making CSP/Corcoran non-compliant for routine mainline 3CMS primary clinician contacts for the sample.

Individualized treatment plans had to be completed within 14 working days of referral/arrival into 3CMS. The initial treatment plan was considered compliant if it had occurred and was documented within 14 working days following arrival.

Treatment plans had to be updated at least annually, whenever a change in level of care occurred, or when clinical judgment indicated the need for an update. Ongoing or updated

treatment plans were determined to be compliant if the IDTT occurred within 365 days from the prior IDTT.

IDTTs in the mainline 3CMS program were not assessed for timeliness because of discrepancies between arrival dates for the inmates in the sample that was provided during the site visit and arrival documentation in the EHRS.

During the site visit, five IDTTs were observed on Facility 3A. These IDTTs were delayed. Staff in attendance were a covering psychiatrist, assigned primary clinicians, a covering correctional counselor, and a mental health supervisor. Cases were presented by three primary clinicians. A strength of each presentation was the rapport and empathy clinicians had with inmates, which were necessary ingredients for effective treatment. However, case presentations lacked important clinical information including current diagnosis, symptoms to support diagnosis, functional impairments, treatment goals, progress toward treatment goals, and treatment interventions. Rationale regarding level of care was not routinely discussed.

Four IDTTs including one in absentia, were observed on Facility B yard. Of fifteen scheduled IDTTs, ten were initial IDTTs. Staff in attendance were a telepsychiatrist, the medical assistant, two primary clinicians, the correctional counselor, and the mental health program supervisor. As reported above, the telepsychiatrist was well-prepared and actively engaged during each IDTT. Team interactions were collaborative. Diagnosis was not routinely stated and when it was, there was a need for diagnostic clarification that did not routinely occur. Symptoms to support diagnosis, functional impairment, treatment goals, treatment interventions, and rationale for level of care action or inaction were not fully discussed during these IDTTs.

During IDTTs, inmates who requested or warranted a contact sooner than 90 days were told to submit a slip instead of the provider scheduling the appointment for them at the time the request was made.

During interviews, mental health staff reported having significantly high caseloads, which affected their capacity to keep up with workload demands and provide adequate care. According to staff, along with not being able to meet the minimum requirements for individual contact with 3CMS inmates at least every 90 days, they were also not meeting requirements regarding CDCR Form 115 mental health assessments and post-inpatient discharge five-day follow-ups. Moreover, CSP/Corcoran required some primary clinicians assigned to 3CMS programs to continue to provide services to inmates on their caseloads who had been elevated to the EOP level of care.

Other Issues:

Pre-Release Planning:

CSP/Corcoran's pre-release planning coordinator provided services to all inmates released to probation, parole, and post-release community supervision from the institution. At the time of the site visit, CSP/Corcoran had a temporary pre-release planning coordinator with other duties providing pre-release planning. The institution reported that it was in the beginning stages of hiring a full-time pre-release coordinator, who was anticipated to commence work within six to eight weeks following the site visit.

For those inmates scheduled for release, services provided as part of pre-release planning included completion of a pre-release planning assessment and obtaining consent for release of information. The list of inmates scheduled for release was distributed by headquarters.

According to documentation provided by CSP/Corcoran, for the period under review, there were 51 inmates scheduled for release. Primary clinicians successfully completed 40 of 41 required pre-release planning assessments. Consents to release information were obtained for 49 of the 51 inmates. Regarding the remaining two inmates, one inmate's meeting was cancelled due to an error and never rescheduled, while the other refused to sign the consent to release information.

No pre-release groups were available during the period under review.

Program Access:

a.   Job and Program Assignments:

On March 1, 2019, CSP/Corcoran reported that of 1,336 available jobs, 97 EOP inmates, or 25 percent of the EOP population, held job assignments. For 3CMS inmates, 475 or 38 percent of the 3CMS population held job assignments, and for non-MHSDS inmates, 747 or 44 percent of the non-MHSDS population held job assignments.

For the 1,358 academic assignments, CSP/Corcoran reported that 135 EOP inmates, or 35 percent of the EOP population, held assignments. For 3CMS inmates, 510 or 40 percent of the 3CMS population held assignments, and for non-MHSDS, 713 or 41 percent of the non-MHSDS population held assignments.

Of 161 vocational education assignments, 25 or six percent of EOP inmates held assignments, as did 67 or five percent of 3CMS inmates and 69 or four percent of non-MHSDS inmates.

There were 111 voluntary education assignments, and four or one percent of EOP inmates held assignments, as did 48 or four percent of 3CMS inmates and 59 or three percent of non-MHSDS inmates.

Regarding 223 substance abuse treatment assignments, it was reported that five or one percent of EOP inmates held assignments, as did 112 or nine percent of 3CMS inmates and 106 or six percent of non-MHSDS inmates.

b.  Milestone Credits:

A report dated March 4, 2019 for September 1, 2018 to February 28, 2019 indicated that of 392 EOP inmates, 371 or 95 percent were eligible to earn milestone credits and 81 percent earned the credits.  For 3CMS inmates, 1,167 of 1,270 or 92 percent were eligible to earn milestone credits, with 16 percent earning the credits.  The data further reflected that of 1,739 non-MHSDS inmates, 1,635 or 94 percent were eligible to earn milestone credits, with 15 percent earning the credits.

c.  Out-of-Level Housing:

Regarding out-of-level housing of MHSDS inmates, data provided by CSP/Corcoran reported that on March 25, 2019, one EOP Level I inmate and one 3CMS Level I inmate were placed in Level III housing, and one 3CMS Level I inmate was placed in Level IV housing; 24 EOP Level II inmates and 63 3CMS Level II inmates were placed in Level III housing, and one 3CMS Level II inmate was placed in Level IV housing; seven EOP Level III inmates and 19 3CMS Level III were placed in Level IV housing;  and 15 EOP Level IV inmates and 32 3CMS Level IV inmates were placed in Level III housing.

d.  ADA Reasonable Accommodations and Grievance Procedure

CSP/Corcoran provided its local operating procedure dated January 2018 and updated in December 2018 that documented it had instituted the revised ADA accommodation and grievance procedures, which included a grievance process to accommodate psychiatric disabilities.

e.  Periodic Classification Score Reduction: EOP Inmates:

Staff reported that EOP inmates at CSP/Corcoran were granted classification score reductions for successful programming.

Case-by-Case Reviews:

CSP/Corcoran reported that four inmates were eligible for the 150-day case review.  Two of the four or 50 percent were released and the other two were retained.  In the two cases that were retained the subsequent reviews were conducted in compliance with the 150-day standard.

The institution reported 31 inmates eligible for 180-day reviews, and all or 100 percent of the cases were retained in LTRH and had endorsements from the classification staff representative.  All cases had determinate Minimum Eligible Release Dates (MERD) and were approved for continued retention or endorsed for transfer upon completion of the MERD.

The information provided by the institution did not identify the composition of the Long-Term Case-by-Case Review Committee, nor did the information provide any insight into the rationale for the decisions made to retain an inmate, other than retention was based on an established MERD or pending transfer.

Non-Disciplinary Segregation (NDS):

CSP/Corcoran had one NDS inmate at the time of the site visit.  Property and privileges were provided to the inmate who was within transfer timelines.

CSP/Corcoran was unable to produce a report regarding all NDS inmates during the review period.  Documentation of expedited transfer of NDS inmates during the monitoring period could not be verified.  Property and privileges provided to NDS inmates were not tracked.

"C" Status:

There were 69 inmates on "C" Status at CSP/Corcoran at the time of the site visit, of which four inmates or six percent were EOP, 31 inmates or 45 percent were 3CMS, and 34 inmates or 49 percent were non-MHSDS inmates.

A review of a randomly selected sample of seven cases documented the inmates were placed on "C" Status following classification as program failures.

Mental Health Referrals:

During the reporting period, CSP/Corcoran reported a total of 1,492 emergent referrals, 994 urgent referrals, and 2,986 routine referrals.

Primary clinician responses in each category of referrals were over 90-percent compliant. Psychiatrists' responses were 100-percent compliant for emergent referrals, 42-percent compliant for urgent referrals, and 64-percent compliant for routine referrals.

Construction/Space:

The mainline EOP program lacked enough space for structured therapeutic activities.

The LTRH group room (Facility 4A1R) which held ten therapeutic treatment models was dimly lit but adequately ventilated.

While there was appropriate space available in the IEX pilot program for IDTTs, individual treatment, and exhibitionism group treatment, all other treatment groups occurred on the dayroom floor, which was not private and confidential.

Mental Health/Custody Relations:

CSP/Corcoran's Custody and Mental Health Partnership Local Operating Procedure (LOP), was generally in alignment with the Custody and Mental Health Partnership Plan submitted by CDCR headquarters to the court.

In-service training sign-in sheets for February and March 2019 were reviewed. The sign-in sheets did not include all Watches; some sign-in sheets had only custody staff in attendance.

Requested documentation regarding custody and mental health staff training for the custody mental health partnership that would allow for verification of training was not provided.

CSP/Corcoran provided additional trainings, Multiple Interactive Learning Objective (MILO) simulator training to its staff. Documentation provided indicated that custody, mental health, and medical staff attended the training. The MILO training was for all staff to teach communication skills and de-escalation techniques and signs and symptoms of mental illness and/or developmental disability/cognitive deficit using an interactive simulator. Via scenarios, the simulator aimed to gain an inmate's compliance with staffs' verbal orders using verbal techniques as opposed to use of force.

Executive rounding at CSP/Corcoran were conducted by the warden and CEO in the LTRH during the week of March 11 through March 15, 2019 and in the EOP hub during the week of March 18 through March 22, 2019. Documentation of the rounds indicated that staff were queried on barriers to programming; however, there was no indication of discussions with inmates as required by the LOP.

Regarding dissemination of rounding information to staff, documentation that rounds had occurred as required by the mental health custody partnership was not provided for review by CSP/Corcoran.

According to the partnership plan, huddles were required during Second and Third Watch in the MHCB, EOP, LTRH and STRH programs, with attendance by custody and mental health staff. Pre-site documentation indicated that daily huddles on Second and Third Watch were implemented at CSP/Corcoran by March 2019.

Instead of the approved Mental Health Huddle Reports, CSP/Corcoran provided logs documenting attendance at huddles.  As a function of the mental health-custody partnership, the institution reported a total of 151 staff complaints were filed during the review period.  Of those 151 appeals, 107 or 71 percent were filed by MHSDS inmates.  Of the 107 appeals filed by MHSDS inmates, 48 or 45 percent were partially granted, zero were granted, and zero were denied.  Nine appeals were cancelled, two appeals were withdrawn by the inmate, 36 were resolved classified as "other," and 12 were still pending response.

Zero staff was redirected from their assignment as a result of an inmate appeal.  There were no adverse actions taken regarding staff as the result of an appeal filed by an inmate during the review period.

As reported above, mental health staff expressed concern about the relationship between custody staff and inmates, with some describing it as "bad."

Heat Plan:

For the review period, CSP/Corcoran reported Stage I heat alerts that lasted 21 days and a one-day Stage II alert during the month of September 2018 but reported no heat-related illnesses during those times.  In October 2018, there was a one-day Stage I alert, no Stage II alerts, and no heat-related illnesses.

A review of the institution's heat plan operational procedure revealed its procedure directly conflicted with departmental policy that required the Heat Risk List of inmates to be updated daily while CSP/Corcoran's operational procedure required the list to be updated weekly.

A tour of ten housing units revealed that thermometers were in areas that would capture accurate temperatures, and that temperatures were appropriately documented. Ten of 16, or 62 percent of staff interviewed were aware of their responsibilities during heat alerts.

RVRs:

Regarding RVR training, the institution reported a total of 147 custody staff were required to receive the mandated training. Of the 147, 65 or 44 percent received the training. The institution reported a total of 54 mental health staff were required to attend the training. Of the 54 staff, 44 or 81 percent received the training. CSP/Corcoran was non-compliant with staff training required for RVRs.

CSP/Corcoran reported a total of 3,737 RVRs were issued during the review period of September 2018 through February 2019. Of this total, 2,074 or 55 percent were issued to MHSDS inmates. Of the 2,074 RVRs issued to MHSDS inmates, 1,472 were issued to 3CMS inmates, 510 to EOP inmates, and 83 to MHCB inmates. The data also included two inmates at the intermediate level of care, and seven at the acute level of care that had been transferred from CSP/Corcoran.

A total of 28 randomly selected RVRs were reviewed for compliance with CDCR policy and procedure. Custody staff timely referred RVRs for a mental health assessment in 21 or 75 percent of the 28 reviewed cases. The range of overdue days in which custody staff referred the RVR for a mental health assessment was four to ten days.

Mental health staff completed the mental health assessment and timely returned the form to custody staff in 25 of the 28 cases reviewed or 89 percent of the time. The range of overdue days in which mental health staff returned the mental health assessment was nine to 21 days.

The senior hearing officer documented consideration of mental health information in 22 of the 28 cases reviewed or 79 percent of the cases. The senior hearing officer documented mitigation of penalties as recommended on the mental health assessment in 15 of the 18 cases or 83 percent where mitigation was recommended by the clinician. In five cases, the senior hearing officer cut and pasted what the mental health assessment stated regarding the inmate's mental illness contributing to the behavior documented in the RVR and what mental health factors to consider in assessing any penalties. It was observed that repetition of what was documented on the mental health assessment by the clinician was not appropriate documentation of the senior hearing officer's consideration or mitigation of penalties, because CDCR's policy required the senior hearing officer to articulate their consideration and mitigation of penalties.

Documents in a number of reviewed cases indicated that there was a need for additional training to improve senior hearing officers' documentation of consideration and/or mitigation of penalties based on mental health assessments. In these cases, the mental health assessment language was not useful to the senior hearing officer nor was it relevant to the question asked and did not assist the senior hearing officer regarding assessment of penalties in several cases.

A total of six ICC chronos were reviewed regarding the consideration of mental health assessment recommendations in the assessment of a SHU term. In all six cases, ICC failed to document consideration of mental health assessment information when assessing a SHU term.

Use of Force:

The institution reported that the warden and chief deputy warden had not attended mandatory use of force training within the past year. Five of five correctional administrators or 100 percent, five of six captains or 83 percent, 29 of 32 lieutenants or 91 percent, 77 of 84

sergeants or 92 percent, and 810 of 872 correctional officers or 93 percent attended mandatory use of force training.

For mental health staff, 100 percent of chief psychologists, psychologists, psychiatrists, and social workers attended the mandatory use of force training.

CSP/Corcoran reported a total of six controlled use of force incidents during the review period. There were 298 immediate use of force incidents involving a total of 230 MHSDS inmates and 74 non-MHSDS inmates during the review period. There was a total of 372 non-use of force incidents involving 289 MHSDS inmates and 64 non-MHSDS inmates.

The monitor reviewed the six controlled use of force incidents and found all followed use of force policy. A review of 15 immediate use of force incidents found no violations of policy.

Lockdowns/Modified Programming:

CSP/Corcoran reported three lockdowns during the review period which were documented in the institution's program status reports. The program status reports documented that the lockdowns were the result of a riot on the yard, an institution-wide search, and a two-on-two fight between security threat groups (STG). The institution-wide lockdown lasted 16 days; Facility 3C's lockdowns were still in effect at the time of the site visit.

A review of the program status reports discussed above indicated that health care services and priority ducats, which included mental health ducats, would be honored. Medication would be issued at the cell front or in the housing units.

Access to Care:

A review of CSP/Corcoran's monthly Health Care Access Quality Reports from September 2018 to February 2019, indicated that less than one percent of issued mental health

ducats and add-on appointments were not completed due to custody factors, while 31 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Non-Designated EOP:

CSP/Corcoran had two non-designated housing units, one on Facility 3A3, which housed Level III inmates, and Facility 3B1, which housed Level IV inmates. Interviews with facility staff and inmates revealed no current issues regarding the non-designated facilities.

Transitional Housing Unit:

The Transitional Housing Unit (THU) at CSP/Corcoran was part of CDCRs policy to manage STGs through a debriefing process for validated STG inmates who elected to disassociate from their STG. At a time of the site visit, the THU had a census of 57 inmates. There were no EOP inmates in the THU.

Phase one of the debriefing process required the inmate to provide enough verifiable information about their STG and their involvement in the STG to aid staff in concluding that the inmate had dropped out of the STG.

Phase two was the placement of the inmate into the THU to allow staff a six-month period of observation and for the inmate to adjust to programing with inmates of all races and ethnic groups. The debriefing process was expected to take at least a year but could be longer as the Office of Correctional Safety (OCS) validated the information provided by the inmate. After being cleared by OCS, an ICC would endorse the inmate for transfer to a SNY consistent with their case factors.

The THU functioned as a general population unit with access to the small concrete yard, and canteen. Job assignments and access to education programs were provided within the unit.

Indecent Exposure (IEX) Pilot Program:

470

CDCR issued an instructional memorandum regarding an IEX Pilot Program at CSP/Corcoran on November 30, 2017, and the pilot program was approved by California's Office of Administrative Law on February 7, 2018. Its goal was to determine if modification of some of the sanctions for IEX offenses would lead to a reduction in IEX behavior in a non-segregated environment. Under regulations in place at the time of the implementation of the pilot, inmates found guilty of indecent exposure or two or more Sexual Disorderly Conduct offenses in a 12-month period were subject to sanctions under California Code of Regulations (CCR), Title 15, Section 3315(f)(5)(K), and were required to be assessed a Security Housing Unit (SHU) term per CCR, Title 15, Section 3341.9(e)(12)(A).

Inmates in the pilot program, while still subject to CCR Title 15 sanctions discussed above, would not be subject to a SHU term solely based on an IEX offense, however, any D" IEX offense credit loss would become non-restorable.

The pilot applied to EOP, 3CMS, and general population (GP) inmates and accepted inmates from all classification levels. It was considered a non-designated programming facility for housing purposes.

While it was encouraging that the IEX pilot program sought to provide treatment to inmates exhibiting inappropriate sexual behaviors, it was observed that the current conceptualization of the IEX pilot was as a housing unit for inmates with problematic sexual behaviors in contrast to a sex offender specific treatment program.

The discharge criterion from the pilot was 90 continuous days without indecent exposure behavior. This expressed outcome, which was for an inmate to go 90 consecutive days without demonstrating any inappropriate sexual behavior did not address the underlying condition nor

was it indicative that the condition had been resolved or treated.  Ninety consecutive days without inappropriate sexual behavior was not a useful outcome indicator relevant to successful treatment.

The lack of discharge planning in the IEX pilot when clinically indicated was of serious concern.

### December 11, 2018 Site Visit

Census:

The Special Master conducted a site visit to assess CSP/Corcoran's IEX pilot on December 11, 2018.  At that time, there were 83 inmate participants in the IEX pilot program at CSP/Corcoran.  There were 37 EOP, 35 3CMS, and 11 non-MHSDS inmates.  Staff reported that EOP inmates were housed with non-EOP inmates, indicating that this was permissible because of the non-designated status of the IEX pilot program housing unit.  Housing EOP inmates in the program with non-EOP inmates was not consistent with the Program Guide and CDCR's instructional memorandum dated November 17, 2017 announcing the IEX pilot.

An additional 27 participants assigned to the IEX pilot program were not physically present at CSP/Corcoran at the time of the site visit; these inmates were at higher levels of in-patient care (MHCB, intermediate, or acute), or out-to-court.

Staffing:

Staff reported that there were no mental health positions established for the IEX pilot program.  However, three psychologists and one social worker from existing CSP/Corcoran staff were assigned to the IEX pilot program as primary clinicians.  A psychiatrist with other duties provided services to inmates in the pilot program.  The MHSDS caseloads per clinician was 1:24.

Information regarding custody staff assigned to the IEX program was not provided by CSP/Corcoran.

Staff reported that clinical staff assigned to the IEX program had received training on post-discharge five-day follow-ups, safety and treatment planning, and RVRs, including the associated mental health assessment. It was observed during the site visit that the treatment planning training had apparently not covered treatment plan implementation and treatment team facilitation.

No information regarding custody training was provided.

IDTTs:

During the site visit, ten IDTTs were observed. Eight of the inmates were EOP inmates; two were 3CMS inmates. Nine of the IDTTs were labeled initial IDTTs although the inmates were not new to the program but had returned to the IEX housing unit following a transfer from either a MHCB or an OHU.

No psychiatrist was physically present for the IDTTs. The psychiatrist assigned to the IEX program was not available for the IDTTs, which were covered by another psychiatrist via telephone. One of CSP/Corcoran's chief psychologists, the senior psychologist supervisor for the IEX program, each inmate's primary clinician, the IEX program's CC II, and the inmate were present for all IDTTs. It was observed that no input was obtained from the housing unit's custody officers during any of the IDTTs attended.

Two of the ten inmates reviewed during IDTTs appeared to have histories consistent with exhibitionism. It was observed that compared to prior site visits, there was more emphasis during the treatment team meeting on addressing inappropriate sexual behaviors. Two of the

inmates had approaching parole dates during the next six months; however, there was minimal discussion during the IDTT regarding discharge planning.

Although there was a very high refusal rate for EOP treatment groups, there was no discussion during IDTT with any of the inmates specific to either their participation in various groups or lack thereof.

It was observed that some of the specific stressors raised by inmates during IDTTs were not discussed during their IDTTs even when it was apparent that the inmate was exhibiting distress and indicated that this was contributing to his treatment refusals.

One inmate appeared to have an akathisia that was manifested by continuous rocking behavior and a self-perception of restlessness even when he did not rock. Although his rocking behavior was mentioned during the IDTT, it was perceived to be secondary to anxiety and was not brought to the attention of the psychiatrist attending the IDTT by telephone until the monitor's expert intervened.

During their IDTTs two inmates expressed current suicidal thinking; both inmates were assessed for suicidality immediately following the IDTTs.

Structured Therapeutic Activities:

Data reviewed regarding out-of-cell structured therapeutic activities offered to EOP inmates in the IEX pilot appeared to indicate that at least ten hours per week were being offered to these EOP inmates although there was a significantly high refusal rate. Staff reported that one treatment group per week was provided for inmates with a confirmed diagnosis of exhibitionism. One treatment group was also offered to 3CMS inmates.

One treatment group per week lasting 60 minutes to treat exhibitionism was significantly infrequent for this diagnosis. Treatment for first-time offenders in the IEX pilot program was no

different than the treatment provided to chronic offenders with IEX and/or sexual misconduct behaviors.  The high refusal rate of EOP inmates generally was not appropriately assessed and addressed by treating staff.

Developmental Disability Program (DDP) inmates were provided treatment in groups with non-DDP inmates, which was very likely disadvantageous to the DDP inmates due to their cognitive/intellectual deficits.

Daily Activity Schedule:

The IEX pilot program daily activity schedule, established yard, dayroom, shower, telephone, clothing exchange, meal schedules, and access to the law library.  Inmates in the IEX pilot program were offered yard or dayroom for a total of six hours on odd number days and for eight- and one-half hours on even numbered days as scheduled in the daily activity schedule. Compliance data was not available.

Staff Interviews:

Interviews with staff revealed that there had been meaningful improvement regarding inmates' property, laundry, and canteen as compared to prior site visits.  Staff reported that the unit sergeant had implemented a one-for-one laundry exchange that had reportedly improved the process internally.

Staff also reported that inmates had been transferred to the IEX housing unit prior to their RVR hearing and were later found not guilty of the RVR.  According to staff, there was at least one inmate with no history of IEX behavior who had been found not guilty of the RVR but subsequently had multiple RVR's related to IEX behavior following placement in the IEX pilot housing unit.

Inmate Interviews:

During the site visit, seven inmates who were reported by staff to have completed the IEX pilot were interviewed in a group setting.  Only one of those inmates reported that their stay in the IEX housing unit had been helpful to them regarding problematic sexual behaviors.  Most of the inmates demonstrated a significant lack of understanding regarding the nature of their sexually inappropriate behaviors and/or minimized such behaviors.  Several of the inmates' thinking indicated that they wanted help with their problematic sexual behaviors, which were not a focus of their treatment.

Inmates concurred with staff reports during interviews that canteen services had improved but reported that problems regarding receiving their personal properties following transfer to the IEX pilot were ongoing.

<u>Inmate Appeals</u>:

CSP/Corcoran did not provide documentation regarding inmates' appeals from the IEX pilot program.

<u>April 2, 2019 – April 4, 2019 Site Visit</u>

<u>Census</u>:

On March 21, 2019, there were 86 inmate participants in the IEX pilot program at CSP/Corcoran.  There were 50 EOP, 31 3CMS, and five non-MHSDS inmates.

Since the last monitoring visit on December 11, 2018, there were 24 inmates discharged and 53 inmates admitted to the IEX pilot program.

Of the 24 discharges from the IEX pilot, five or 24 percent completed the program. Additionally, of the inmates discharged, 15 or 63 percent were transferred to administrative segregation.  Of the 15 inmates transferred to administrative segregation, two were for an IEX SHU term, six were due to new non-IEX RVRs, and seven were due to safety/enemy concerns.

Of the remaining discharged inmates, one inmate was discharged to out-to-court, one inmate was admitted to MHCB, and one inmate was subsequently found not guilty of the IEX RVR.  No information was provided regarding one of the discharged inmates.

<u>Staffing</u>:

As reported regarding the preceding site visit, there were no mental health positions established for the IEX pilot program; staff was assigned from already established CSP/Corcoran programs.  Assigned staff in the IEX pilot program was reduced from three psychologists to two psychologists and one social worker since the December 2018 site visit.  Based on the census on March 21, 2019, the clinical staff ratio to MHSDS inmates was 1:29.

CSP/Corcoran reported that a custody supervisor was assigned to each Watch as was a control booth officer.  A search and escort officer were assigned to First Watch, two floor officers were assigned to Second Watch, and a yard officer was assigned to both Second and Third Watch.  Although daily activity schedules indicated dayroom activities were scheduled during Third Watch hours, no floor officers were assigned to Third Watch.

The institution reported that morning meetings/huddles between custody and mental health staff occurred daily in the unit.

The institution reported that assigned custody staff were trained regarding the instructional memorandum dated November 30, 2017 establishing the IEX pilot program, the local operating procedure (OP No. 30) governing the pilot program, and the required daily activity schedule for inmates in the pilot program.

<u>IDTTs</u>:

No IDTTs were attended during the site visit.  The monitor's expert and the program supervisor discussed issues regarding treatment plans in the IEX pilot program.  Treatment plans

did not consistently include IEX behavior as a target of treatment, did not include objective, behaviorally based treatment goals, and did not have clear, evidence-based appropriate treatment interventions.  They also discussed that consideration for referrals to higher levels of care from the IEX pilot program was not consistent in IDTTs.

Structured Therapeutic Activities:

Inmates with an Exhibitionistic Disorder diagnosis were offered a two-hour treatment group two times each week for a total of four hours of IEX-specific treatment weekly.  Staff reported that 3CMS and EOP inmates could be in this group together because group inclusion was based on diagnosis, not level of care.  For MHSDS inmates who did not carry a diagnosis of Exhibitionistic Disorder, EOP inmates received two hours of IEX group treatment weekly and 3CMS inmates received one hour of IEX treatment group per week.

A review of offered, attended, and refused EOP treatment hours for one week each month during October 2018 and March 2019 revealed that the IEX pilot program offered EOP inmates an average of 9.34 hours of structured therapeutic activities per week, of which 5.02 hours or 54 percent were attended and 46 percent were refused.  Other than groups offered to inmates with Exhibitionistic Disorder diagnosis, EOP treatment groups were provided by a psych tech.

An IEX treatment group was observed during the site visit; it was appropriately facilitated.  The group participants included lower and higher functioning inmates, which raised concerns regarding group efficacy considering their different abilities.  The facilitators were skilled, though one was stronger and better at utilizing the participants' strengths to move the group process along.  The treatment group addressed behavioral concepts as well as target behavior directly and appeared to be making progress in focusing treatment in a positive and meaningful way for IEX inmates.

478

Daily Activity Schedule:

As reported above, the daily activity schedule established schedules for yard, dayroom, shower, telephone, clothing exchange, meal schedule, and access to the law library. According to the daily activity schedule, inmates in the IEX pilot program were offered yard or dayroom for a total of six hours on odd number days and for eight and a half hours on even numbered days. Compliance data was not provided.

Staff Interviews:

During interviews, mental health staff indicated that a loss of a full-time psychologists from the IEX pilot had resulted in increased caseloads, noting that the number of EOP inmates in a program had also increased. Staff reported that generally inmates was seen based on their needs, which indicated that some inmates would be seen weekly while others were seen monthly or quarterly.

Staff also expressed concern that some inmates were transferred into the IEX pilot program prior to a hearing regarding an IEX RVR, observing that inmates were subsequently found not guilty had to be transferred out of the program which impacted continuity of care. Inadequate treatment for structured therapeutic groups was raised as one of the major issues confronting the IEX pilot program.

The monitor's expert discussed holding inmate community meetings with the clinical supervisor as part of the IEX pilot program where inmates can directly raise such issues with staff who was receptive.

Inmate Interviews:

479

Approximately fifteen inmates in the IEX program were interviewed.  During interviews several EOP inmates reported that one of the reasons they refused to attend group treatment was because it was held in the dayroom.

Inmates' complaints regarding laundry and canteen were much lower than in prior visits, particularly as systemic issues, although there were instances of failures in the case of individual, inmates.  Inmates did not offer any complaints regarding yard, dayroom, shower, telephone, clothing exchange, meal schedule, or access to the law library during interviews.

However, there were persistent complaints regarding property not being delivered timely after arrival into the unit, and loss and broken property.  The Special Master's monitor also reviewed appeals statistics.  Of the 67 inmates' appeals since the prior monitoring tour, 64 percent concerned property complaints.

Losing privileges and yard at the same time for the same infraction was a major complaint offered by inmates.  Supervisory custody staff indicated that this was a violation of policy and the practice would end.

<u>Inmate Appeals</u>:

A review of documents provided by CSP/Corcoran showed that since the preceding monitoring visit, there were 67 inmate appeals filed by IEX program inmates.  The appeals covered property (64 percent), custody/classification (nine percent), and discipline (eight percent).  The remaining 19 percent involved staff complaints, living conditions, mail, transfer, re-entry/parole, an amended appeal, and work incentive.

Of the 67 appeals filed, seven or ten percent were granted, 16 or 24 percent were partially granted, 13 or 19 percent were denied, 26 or 39 percent were withdrawn and five were pending a response at the time of the site visit.

<u>Placement of 3CMS Inmates into Minimum Support Facilities</u>:

CSP/Corcoran was not approved to house 3CMS inmates in its Minimum Support Facility (MSF). During the review period CSP/Corcoran had identified 14 3CMS inmates who met MSF criteria and were transferred to approved MSFs at other institutions.

<u>*Coleman* Postings</u>:

While *Coleman* postings were present in all toured housing units, many were not the current version. Regional staff indicated that the new posters had been distributed to institutions and would be posted in the housing units.

<u>Document Production Issues</u>:

As reported above, instead of providing the approved Mental Health Huddle Reports, CSP/Corcoran offered logs documenting attendees at morning huddles.

Other documentation that was not provided as requested included, custody/mental health training for the custody/mental health partnership, proof of distribution of rounding information to staff and documentation that rounds occurred as a function of the mental health/custody partnership, compliance data regarding offered yard or dayroom access in the indent exposure pilot program, and inmate appeals from the indecent exposure pilot program.

481

## California Substance Abuse Treatment Facility (CSATF)
June 11, 2019 – June 13, 2019

Census:

On June 11, 2019, CSATF's inmate population was 5,498. The mental health caseload population of 2,579 was 47 percent of the total inmate population.

The MHCB unit housed 15 inmates.

There were 589 mainline EOP and 1,883 mainline 3CMS inmates.

The STRH unit housed 84 3CMS inmates, nine of whom were assigned to non-disciplinary segregation, and eight EOP inmates pending transfer to an administrative segregation EOP hub.

Staffing:

The chief psychiatrist position was filled.

CSATF did not have an established senior psychiatrist position.

Both chief psychologist positions were filled; one served as the chief of mental health.

Two of 6.5 senior psychologist supervisor positions were filled, for a vacancy rate of 69 percent. Of 6.5 senior psychologist specialist positions, 5.5 were filled, resulting in a 15-percent vacancy rate.

CSATF had 19.5 staff psychiatrist positions. There were no onsite civil service psychiatrists. Psychiatry services were provided by five telepsychiatrists, four registry psychiatrists, 2.5 limited-term psychiatric nurse practitioners, and two registry psychiatric nurse practitioners, for a functional vacancy rate of 31 percent.

Of 48.5 staff psychologist positions, 42 were filled. Registry provided one additional position, resulting in a functional vacancy rate of 11 percent. There were 17 unlicensed psychologists.

Two supervising social workers filled 1.5 positions. Twenty-eight social workers filled 27.5 established positions. Of the 28 social workers, 11 were unlicensed.

All three senior psych tech positions and the 50 psych tech positions were filled.

Ten of 22 recreation therapist positions were filled, for a vacancy rate of 55 percent. Registry staff filled five positions, reducing the functional vacancy rate to 32 percent.

CSATF had four limited-term and one registry medical assistant.

The CHSA II position was filled by a limited-term HPS II. The HPS I position was filled. One of two OSS positions was filled. Of 29 mental health clerical positions, 27 were filled, leaving a seven-percent vacancy rate.

Telepsychiatry:

Five telepsychiatrists provided services to the EOP and 3CMS programs.

Quality Management:

CSATF's local governing body met monthly and attained a quorum. The chief of mental health attended some, but not all, meetings. The local governing body addressed issues related to mental health that included suicide prevention, the EOP program, and involuntary medications.

The quality management committee regularly met, achieved a quorum, and addressed mental health care-related issues. The mental health subcommittee reported monthly to the quality management committee on matters including high readmission rates for inpatient care and MHCB discharges, non-compliance for daily MHCB contacts, and EOP inmates' low level of treatment attendance and high level of treatment cancellations.

The mental health subcommittee regularly met. It reported on numerous matters such as self-harm incidents, CIT referrals, polypharmacy rates, treatment hours and compliance, IDTT meeting timeliness, and clinical staffing. There was no indication, however, of how the findings

of the mental health subcommittee were reported to staff; some staff reported being unaware of the subcommittee's activities. Supervisors reported incorporating mental health subcommittee concerns into supervisory activities and IDTT meeting interventions.

A QIT chartered in May 2018 addressed EOP inmate treatment hours and high refusal rates, and the scheduling of EOP groups. It was closed later in 2018 after reporting compliance above 85 percent for three consecutive months.

Multiple CSATF audits typically indicated use of CQI criteria, but generally did not identify areas needing improvement.

There was no active peer review at CSATF during the review period.

Medication Management:

Review of the mental health headquarters MAPIP medication management dashboard from October 2018 through March 2019 showed that for inmates prescribed antidepressants, CSATF was compliant for all six months of the review period for venlafaxine blood pressure monitoring, four months for medication consent, and three months for thyroid monitoring. No data for EKG was reported for any month.

For inmates prescribed antipsychotics, CSATF was compliant during each of the six months of the review period for blood pressure, and height and weight measurements. For other psychiatric diagnostic monitoring related to antipsychotics, CSATF was compliant for five of six months for medication consent. Psychiatric measures for abnormal involuntary movement scale (AIMS) tests and thyroid monitoring were compliant for one of six months each. Blood sugar, complete blood count (CBC) with platelets, comprehensive metabolic panel (CMP), and EKG measurements were not compliant for any month during the review period.

Regarding monitoring inmates prescribed carbamazepine, CMP measurements were compliant for four months and CBC for three months. Medication consent and levels were reported compliant for one month each. No data was provided for multiple months for each diagnostic measure.

For Clozapine, AIMS, EKG, and medication consent was 100-percent compliance in October 2018. No other data was provided for any other Clozapine diagnostic measure or month during the review period.

Psychiatric measures for inmates prescribed Depakote were compliant for medication consent for five months during the review period. Compliance for CBC with platelets, Depakote levels, and CMP were achieved for three months. CSATF was 100-percent compliant with medical consent for Lamotrigine for all six months.

For inmates prescribed Lithium, medication consent was compliant for all six months. Psychiatric measures for Lithium levels and EKG were compliant for two months; kidney function was compliant for one month. Thyroid monitoring was non-compliant all six months.

Multiple MAPIP mental health measures scored below 90 percent for one or more months during the review period. Medication continuity upon inter-institutional transfer at receiving and release (R&R) was compliant for three months; continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU) was compliant for four months, and medication continuity for MHCB transfers was compliant for three months. No data regarding medication continuity with intra-institutional transfers to ASU/SHU/PSU was provided.

Compliance with medication continuity following discharge from community hospital or acute or intermediate care and for court ordered involuntary medications was compliant for four

months.  CSATF was compliant with observation of medication preparation and administration for HS medications, psychiatric-prescribed chronic care medications, and new psychiatric medications for all six months of the review period and was non-compliant for all six months of the review period for observation of medication preparation and administration for AM/PM medications.

Corrective action plans were not provided for deficient psychiatric diagnostic monitoring measures and medication management efficiencies.

The non-automated MAPIP measure for pill line lengths and wait times for inmates who received medications indicated greater than 90-percent compliance.  However, providing shelter during inclement weather had remained problematic for more than ten years.

Staff reported that prescribing practices were based on formulary and non-formulary medication processes.  Timeframes were not provided for medication prescriptions or bridge orders.  Nursing conducted verbal and telephone orders, which were inputted into EHRS for prescriber sign off, but no timeframe was given for the prescriber to sign off.  It was unclear whether verbal and telephone orders were tracked.

The polypharmacy dashboard identified 4,090 inmates who were prescribed ten or more medications.

During the review period, all 36 PC 2602 involuntary medication orders were granted, including two emergent orders.

There were 960 inmates who were prescribed HS psychotropic medications; reported prescribed medications excluded Cogentin, Prazosin, and Vistaril.

Transfers:

CSATF had one inpatient care coordinator and a senior psychologist supervisor who provided sporadic backup.  The inpatient care coordinator's duties included completing monthly internal audits of higher level of care non-referrals.

There were regional sustainable process reviews in November 2018 and February 2019. They included tier walks and observation of IDTTs and other operational activities from the MHCB, STRH, EOP program, and alternative housing.

The sustainable process reviews also included a headquarters audit that evaluated the accuracy and quality of a random sample of higher level of care (HLOC) consideration forms.  It was designed to ensure that HLOC forms were thoroughly completed and provided adequate non-referral rationales when there were positive referral indicators, as well as determine whether clinical interventions in lieu of referral were sound.  The audit also examined the interrater reliability between headquarters and CSATF's inpatient care coordinator as to HLOC form thoroughness and treatment modification.

The November 2018 review analyzed the third quarter of 2018 and found 90-percent compliance for the quality of HLOC consideration forms.  Moreover, only one of 51 reviewed HLOC forms indicated a difference in the quality ratings of the headquarters' specialist and CSATF's inpatient care coordinator.

The sustainable process review also included quarterly review of eight randomly selected HLOC forms; 16 were reviewed for the two quarters.  Its purpose was to determine whether clinical documentation prior to the IDTTs was consistent with non-referral rationales and to analyze post-IDTT clinical documentation to assess whether it addressed additional clinical interventions that were implemented in lieu of referral.  This review indicated that eight of 16 had inadequate clinical justifications.

During the site visit, the monitor's expert also reviewed several medical records to evaluate non-referral clinical rationales and treatment interventions. Significant problems were found in both areas. Among them, the MHCB consistently used the same rationale at initial IDTTs, namely, that the inmate had recently been admitted and required further stabilization. For some of these inmates, however, there was sufficient documentation from prior treatment to decide whether a referral was appropriate. It was also problematic that listed interventions were frequently not appropriate or specific to the positive criteria and/or could not be implemented.

There was also concern that the MHCB initiated the majority of higher level of care referrals and that the EOP initiated few; this was problematic because it allowed an inmate to decompensate before the initiation of an inpatient care referral. There was no clinical rationale for the lack of referrals of EOP inmates to inpatient care for inmates who met one or more criteria for consideration for higher level of care.

During the review period, 746 inmates met criteria for higher level of care referral, of which 81 or 11 percent were referred.

There were 60 inmates referred to acute care. Four referrals were rescinded, and one was rejected. All but one timely transferred.

There were 21 inmates referred to intermediate care. One referral was rescinded and four were rejected. All remaining inmates were timely transferred.

Timely *Vitek* hearings were held for 15 of the referrals; two inmates prevailed, and two hearings were pending at the time of the site visit.

One inmate met criteria for complex medical needs; his inpatient care transfer was delayed, and he was transferred to CHCF's CTC for stabilization.

The inpatient care coordinator maintained an internal log of inmates who returned to CSATF from inpatient care and sent out daily emails that notified treatment teams of inmates' return. The log did not track primary clinician to primary clinician contacts but addressed other matters. In this regard, CSATF was typically compliant with timely mental health evaluations, five-day follow-up contacts, and completion of SRASHEs. However, the monitor's expert's review of the records of several inmates who returned from inpatient care revealed insufficient review of inpatient care discharge summaries by treatment team members.

There were 331 referrals to CSATF's MHCB, of which 66, or 20 percent, were rescinded.

Of the 51 inmates referred to administrative segregation EOP hubs, all but two transferred timely.

Six 3CMS inmates timely transferred to LTRH.

Programming:

MHCB:

CSATF maintained a 20-bed MHCB. Several beds were redlined at various times during the review period.

The registry psychiatrist and a psychiatric nurse practitioner assigned to the MHCB both had caseloads within the established staffing ratio. Telepsychiatry was not used in the MHCB. All seven psychologists and five social workers assigned to the MHCB and alternative housing met the established ratios. Since February 2019, a recreation therapist assigned full-time to the MHCB provided inmates with 30-minute sessions once or twice weekly.

MHCB clinical and physical lengths of stay averaged 7.8 and 9.6 days, respectively. Seventy-seven or 29 percent of inmates who were in the MHCB were there for more than ten days. Twenty-three inmates had three or more MHCB admissions.

The institution acknowledged that the MHCB had significant problems meeting the daily contact requirement.  This was primarily attributed to no longer being able to count social worker contacts toward it.  Reviewed psychiatry documentation typically did not permit a determination of whether a clinical contact had occurred.  Primary clinician documentation revealed that inmates were regularly seen at cell-front without further noting whether they had refused a confidential contact.  Chart review further indicated that continuity of care between contacts was poor, while treatment plans were frequently not prepared by the same clinician who had been seeing the inmate.

There were five inmates who were randomly selected to have their health care records reviewed for their MHCB stays.  Two of five indicated a timely initial evaluation by the psychologist within 24 hours of admission.  The social worker completed another initial evaluation within 24 hours; if considered compliant, compliance would increase to three of five cases.  There was a timely initial psychiatry evaluation for four of five cases.

MHCB chart review indicated compliance for seven of 30 required daily contacts. However, these clinical contacts typically occurred in a group setting when multiple clinicians met with one inmate; this was problematic because it was not conducive to confidential, individual clinical contacts.  Eight of 19 psychiatric contacts were compliant; however, some occurred during IDTT and did not qualify as individual clinical contacts.  If these contacts were considered non-compliant and were eliminated from calculations, there would be close to zero compliance for daily and psychiatry contacts.

Three of five cases reported timely initial IDTT meetings.  All eight required ongoing or discharge IDTTs were timely.  Required staff attended seven of eight ongoing or discharge

IDTTs.  Although a CAP developed after the sustainable process reviews required the presence of a program supervisor during IDTT meetings, this was not reflected in documentation.

Observed IDTTs revealed required staff in attendance with access to records, but no supervisor.  The treatment team demonstrated good inmate rapport, but at times lacked clinical focus.  The IDTTs would have benefited from supervisory input and more psychiatry participation as to case presentations, goal setting, and safety planning.

During the site visit, the air conditioning was not working for approximately 15 hours in a section of the CTC that housed the MHCB.  Six MHSDS inmates on the unit were offered ice water and showers, and fans were placed in the unit.  However, CTC staff further reported that the air conditioning routinely failed for various lengths of time.

Seclusion and Restraint:

Review of the seclusion and restraint log revealed seven episodes of restraint during the review period.  However, it was not always possible to calculate the length of restraint as times were not consistently recorded in the log.  The MHCB psychiatrist reported that four restraint incidents were related to one inmate who had a complex presentation over a five-day period.

Crisis Intervention Team:

Mental health staff reported that the CIT included psychology, nursing, and a custody lieutenant.  The CIT had been in existence since October 2018 and operated from 9 a.m. to 10 p.m., Monday through Friday.  Typically, a clinician initially conducted a preliminary assessment with the inmate.  A decision was then made to seek out the CIT's other members to participate as needed.

<u>Alternative Housing</u>:

CSATF primarily housed alternative housing inmates in the CTC; if necessary, other designated cells in Facilities D and E and the STRH unit, were used.  However, the alternative housing supervisor reported that during the review period all alternative housing needs were exclusively met by use of the CTC.

CTC alternative housing cells each had a toilet, sink, and mattress.  The CTC area where the alternative housing cells were located contained office space that mental health and medical staff shared, and two rooms with treatment modules that were used for confidential contacts. There were also two treatment rooms; one had a module.

The institution did not provide requested information on alternative housing placements and lengths of stay during the review period.

<u>Short-Term Restricted Housing</u>:

The one telepsychiatrist and six primary clinicians assigned to STRH all had caseloads within the established ratios.

STRH stays averaged 104 days.  No EOP inmates were housed in STRH for more than 90 days.  Extended STRH stays were typically due to pending RVRs and outstanding district attorney referrals.

Ten inmates were randomly selected to have their health care records reviewed for their STRH stays.  However, certain factors resulted in the removal of some cases from the assessment.

Eight cases required an initial psychiatry evaluation.  In five of them, the initial contact occurred within ten calendar days of STRH placement.  In four of the five cases, the initial contact also occurred before the IDTT.  In the fifth case, it occurred on the same day as the

IDTT, but it could not be determined if this contact occurred before, during, or after the IDTT meeting. All eight cases had timely initial primary clinician evaluations.

Four of eight routine primary clinician contacts timely occurred weekly. Two of three required ongoing 90-day psychiatry contacts were timely.

None of the eight cases that required an initial IDTT had a timely initial IDTT meeting, but required staff were present for all initial IDTTs. The one case that required a routine IDTT timely had one within ninety days.

Observed initial IDTTs began timely. Required staff, and the clinical supervisor and nursing staff, attended and could access SOMS and EHRS. The psychiatrist discussed medications, side effects, and psychiatry appointments with each inmate. However, clinicians did not present case formulations or measurable goals, and the IDTTs did not discuss groups. The primary clinician solely made decisions as to inmates' level of care, without including other treatment team members and the inmate. The nurse and CC I only participated when asked.

Observed ICCs for four 3CMS and one EOP inmate revealed required staff in attendance. The ICC chairperson considered mental health input in deciding whether to retain the inmate in STRH or release him to the general population.

CSATF offered 90-minute groups six days weekly but reported a high group refusal rate. An observed coping skills group on how anger and poor impulse control impacted inmates' lives was well-conducted and interactive.

Observed psych tech rounds were well-conducted. The psych tech respectfully asked inmates appropriate questions, offered in-cell activities, and encouraged inmates to attend groups and otherwise take advantage of opportunities to leave their cell.

Interviewed mental health, custody, and nursing staff indicated having a collaborative relationship. They further reported supportive morning huddles, crisis interventions, and admissions and discharges.

An interviewed group of EOP and 3CMS inmates typically being seen timely and in a confidential setting and did not indicate concerns with custody. The 3CMS inmates also did not report problems with medications.

Review of CDCR Form 114A for STRH 3CMS inmates indicated compliance for offering three weekly showers. Reviewed cases indicated that the ICC was conducted within ten days of STRH placement.

EOP:

CSATF's EOP program was housed on Facilities F and G. This program had a capacity of 660 Level II, non-disciplinary beds. There were 25 beds reserved for the substance abuse program.

A combination of onsite psychiatry, telepsychiatry, and psychiatric nurse practitioners provided psychiatry services. Both psychiatric nurse practitioners, the telepsychiatrist, and one of two onsite psychiatrists, had caseloads within the established ratio. All primary clinicians had caseloads within the established ratio.

Mental health leadership, staff, and inmates reported that the EOP program had recently emerged from a very difficult period when it struggled to provide basic mental health services, such as IDTTs and timely individual psychiatry and primary clinician contacts. Supervisors acknowledged that during much of the review period, EOP inmates were not routinely offered, and did not receive, the required number of hours of out-of-cell structured therapeutic activities. This period was also characterized by a lack of continuity of care, significant turnover in clinical

staff, and frequent changes in supervisory oversight; one EOP unit had eight supervisors during a one-year period. There were also high temperatures in EOP program treatment areas during the summer.

During the site visit, CSATF reported that staffing levels had stabilized, IDTTs occurred timely and with required staff, and since February 2019, EOP inmates were offered the required number of treatment hours. Nonetheless, difficulties with the quality and continuity of care, and sufficient attention to higher level of care considerations persisted.

CSATF reported a recent increase in EOP referrals to intermediate care, which it attributed to increased supervisory review. Supervisors and staff also reported that IDTTs had improved during the past six months; they attributed this to improved staffing and supervisors' regular presence at IDTTs, which began in October 2018. Sustainable process reviews had also recommended supervisors' regular attendance at IDTTs as a means of addressing quality concerns.

Nine inmates were randomly selected to have their health care records reviewed for their EOP stays. However, certain factors led to the removal of certain cases from the assessment.

Two of five inmates had required timely initial psychiatry contacts before the IDTT and within 14 days of inmate arrival. Three of five cases that required initial primary clinician evaluations had them within fourteen calendar days of inmate arrival.

Two of five cases that required initial IDTTs had them within 14 calendar days of inmate arrival. Nine of ten required quarterly IDTTs timely occurred within 90 days.

Nineteen of 35 required weekly routine primary clinician contacts occurred timely. Thirteen of 23 required 30-day ongoing psychiatry appointments were timely.

Required staff attended observed IDTTs.  However, the IDTTs were conducted in overheated, inadequately ventilated rooms.  The comprehensiveness of case presentations varied significantly, while treatment team members minimally communicated with one another as to pertinent information.  The IDTTs noted objective criteria for higher level of care referral consideration; however, inpatient assessments were limited and there was minimal acknowledgment of the subjective factors that could trigger transfer to inpatient care.

CSATF reported that from November 5, 2018 to May 5, 2019, the EOP program offered inmates an average of 13.2 weekly hours of structured out-of-cell activity; inmates refused an average of 4.8 weekly hours and attended a weekly average of 8.4 hours.  It was further reported that EOP inmates were offered a weekly average of 11 hours of core groups and three to four hours of specialty groups that addressed specific clinical symptoms.  However, staff admitted that the distinction between core and specialty groups was "informal."  Recreation therapists and some inmates reported that space limitations led to some groups' change in focus from a therapeutic one to an activity group; other yard groups were reported to be unmanageably large.

Observed clinician-led groups had many similarities.  Both were conducted by substitute clinicians due to the regular facilitator's unavailability.  Both were also conducted in an inadequate space that was hot; fans used to attempt to cool the rooms interfered with the ability of group members and the facilitator to hear one another.  Custody loudspeaker announcements and alarms provided additional interruptions.  Despite such conditions, one of the two groups was clinically meaningful.

Interviewed inmates reported appreciating groups and an interest in having more clinical groups, as opposed to leisure groups.  Some also expressed concern that staff was too quick to lower inmates' level of care and were not sufficiently aware of some EOP inmates' need for

inpatient treatment.  Inmates noted a lack of continuity of care with clinical contacts, which supervisors confirmed.

Some inmates expressed concerns with telepsychiatry; they reported difficulty expressing themselves during telepsychiatry and that its use made their psychiatry sessions impersonal. Some also noted problems with telepsychiatry's sound quality that at times made it difficult to hear and understand the telepsychiatrist.

Inmates also expressed concern with excessive heat in the housing units, and group and IDTT rooms.  They reported a lack of reasonable accommodation when they had to return to their housing units when a heat alert was triggered.

It was reported that in November 2018, the regional mental health administrator sent out an enhancement plan to assist with the transitioning of inmates from the EOP to 3CMS levels of care.  In November 2018, CSATF also initiated nine transitional groups.  The institution reported that 123 inmates were transferred from the EOP to 3CMS level of care during the reporting period.

3CMS:

Three 3CMS telepsychiatrists had caseloads of 414, 372, and 340, all significantly exceeding the established ratio of 1:280.  One of two psychiatric nurse practitioners assigned to the 3CMS program had a caseload within the established ratio; the other's caseload of 423 inmates also exceeded the established ratio.  A psychiatric nurse practitioner who was assigned one day weekly to the 3CMS program had a caseload within the established ratio.  Twelve of 13 3CMS primary clinicians had caseloads ranging from 1:115 to 1:140, far exceeding the established ratio of 1:97.

There were no reported problems with psychiatry contacts.  However, primary clinician contacts were reported not to be timely, while their length and quality were reported to be fair to poor.

Fourteen randomly selected 3CMS inmate cases were selected for chart review. However, certain factors resulted in some cases being removed from the assessment.

The initial psychiatry evaluation was timely for only one of four inmates.  There were timely initial primary clinician contacts within ten days of admission for the three inmates who required them.

All 29 required quarterly primary clinician contacts were completed timely, as were eight of nine required quarterly psychiatry contacts.

None of four cases had required timely initial IDTTs within 14 days of admission, but required staff attended three of four initial IDTTs.  There were timely annual IDTTs for all nine cases that required them; required staff attended all annual IDTTs.

Required staff were present at observed initial IDTTs.  Clinicians appropriately explained the IDTT's purpose, provided good case formulations, and engaged inmates; the IDTTs also addressed inmates' levels of care.  The psychiatric nurse practitioner presented adequately. Inmates were allowed to ask questions and were asked their understanding of the IDTT process.

An observed group was well-conducted; however, although eight inmates were scheduled for the group, only three attended.  The facilitator distributed materials on mindfulness and there was discussion of its relevance to prison life.  The facilitator fully engaged the group participants.

Interviewed inmates reported knowing their primary clinician and psychiatrist and typically being seen every 90 days.  Interviewed Facility D inmates reported seeing psychiatry in

a confidential setting, but reported that primary clinician contacts were not confidential. Interviewed Facility E inmates reported that contacts were typically not confidential. Whereas Facility E inmates reported that clinical contacts generally lasted between 20 and 45 minutes, depending on inmate need, Facility D inmates reported that sessions only lasted approximately five minutes. Facility E inmates expressed an interest in more groups.

Although Facility E inmates did not report any notable custody concerns, inmates on Facility D stated that custody staff lacked respect for mentally ill inmates and needed sensitivity training. They reported that when inmates made a written request for mental health assistance, custody officers often read the information aloud and made jokes. They further reported not being seen for between three and four weeks after putting in a sick call slip. Inmates also suggested that more clinical staff were needed so contacts would be timely.

Data from CDCR's utilization review initiated at headquarters indicated that, as of January 18, 2019, of 453 reviews, 69 or 15 percent of inmates had been removed from the 3CMS level of care. As of April 19, 2019, of 454 requested reviews, 66 or 16 percent were removed or pending removal from 3CMS level of care.

Other Issues:

Pre-Release Planning:

Mental health staff began providing pre-release services to EOP and 3CMS inmates within six months of release. Most of these services were provided through routine primary clinician contacts, but were not tracked as pre-release contacts. Mental health staff further reported that there were pre-release groups on the three EOP yards. CSATF also provided TCMP services to inmates approaching release.

Program Access:

499

g.     <u>Job and Program Assignments</u>:

On May 8, 2019, CSATF reported that of 2,307 job assignments, 91 EOP inmates, or 15 percent of the EOP population, held jobs. For 3CMS inmates, 752, or 37 percent, of the 3CMS population held job assignments. For non-MHSDS inmates, 1,464, or 49 percent, of the population held job assignments.

For the 845 academic assignments, the institution reported that 79 EOP inmates, or 13 percent, held assignments. For 3CMS inmates, 347 or 17 percent, held assignments and for non-MHSDS inmates, 419 or 14 percent, held assignments.

Of the 430 vocational education assignments, 19 or three percent of EOP inmates held assignments, as well as 140 or seven percent of 3CMS inmates, and 271 or nine percent of non-MHSDS inmates.

For the 1,229 voluntary education assignments, CSATF reported that 38 or six percent of the EOP population held assignments, 400 or 20 percent of the 3CMS population held them, and 791 or 27 percent of non-MHSDS inmates held assignments.

Of the 550 substance abuse treatment assignments, 61 or ten percent of EOP inmates held assignments, as did 239 or 12 percent of 3CMS inmates, and 250 or eight percent of non-MHSDS inmates.

The institution provided a copy of the PowerPoint "Enhanced Outpatient Program (EOP) IDTT Review of Suitability for Program Assignments and Functional Evaluation Procedure," which it used for staff training to increase the number of program assignments for EOP inmates; this also included guidelines for performing functional evaluations for EOP inmates.

h.     <u>Milestone Credits</u>:

A report for the time period of November 1, 2018 to April 30, 2019 indicated that of 609 EOP inmates, 596, or 98 percent, were eligible to earn milestone credits and 81 percent earned the credit.  For 3CMS inmates, 1,914 of 2,031, or 94 percent, were eligible to earn milestone credits, with 22 percent earning the credit.  The data further indicated that of 2,979 non-MHSDS inmates, 2,697, or 91 percent, were eligible to earn the credit, with 22 percent earning the credit.

CSATF reported that no formal training was provided to staff on the milestone credit program.

i.    Out-of-Level Housing:

Data provided by the institution indicated that as of May 8, 2019, 88 EOP and 43 3CMS Level I inmates were placed in Level II housing; 52 3CMS Level II inmates were placed in Level III housing; ten EOP and 27 3CMS Level III inmates were placed in Level II housing; 18 3CMS Level III inmates were placed in Level IV housing, and 65 3CMS Level IV inmates were placed in Level III housing.

j.    ADA Reasonable Accommodation and Grievance Procedures:

CSATF confirmed that it had an ADA coordinator and reported that the chief of mental health's secretary tracked all appeals.  The institution provided for review copies of CDCR Form 1824, the Reasonable Accommodation Panel (RAP) responses to inmates' requests for reasonable accommodation, and the CDCR Form 1824, Reasonable Accommodation Request Process Desk Reference Manual, which outlined the ADA reasonable accommodation process.

e.    Periodic Classification Score Reductions: EOP inmates

CSATF provided copies of Reclassification Scoresheets, CDCR Form 840, that indicated periodic classification score reductions for EOP inmates.

Case-by-Case Reviews:

501

CSATF was unable to identify all inmates who required a case-by-case review during the review period. During the site visit, eight inmates required such a review. Of those eight inmates, six were retained in STRH pending RVR completion and/or a decision by the district attorney. Regarding the two other retentions, in one case, the inmate was retained pending completion of an investigation into his safety concerns. The inmate had been in STRH for 164 days at the time of the ICC. In the other case, the inmate was retained in STRH pending establishment of a mental health treatment plan to work with him to be released from STRH. The inmate had been in STRH for 154 days at the time of the ICC.

Non-Disciplinary Segregation:

During the review period, 41 NDS inmates were approved for expedited transfer, of whom 40, or 98 percent, transferred within 72 hours. Ten inmates were on NDS status during the site visit. Review of CDCR Forms 114A and the isolation log indicated that property and privileges were timely provided to NDS inmates.

"C" Status:

CSATF was unable to report the number of EOP, 3CMS, and non-MHSDS inmates who were on "C" Status and their "C" Status lengths of stay during the reporting period due to the inability of SOMS to report historical data. During the site visit, on June 11, 2019, CSATF reported there were 62 inmates on "C" Status; four were EOP, 42 were 3CMS and 16 were non-MHSDS.

Mental Health Referrals:

CSATF reported mental health referral data for the review period that was broken down by month and was separated by whether the referrals were to psychiatry or primary clinicians.

Timely responses to emergent referrals to psychiatry were compliant for one month and non-compliant for three months; there were no emergent referrals for two months. CSATF reported compliance with timely responses to urgent psychiatry referrals for two of six months and compliance with timely responses to routine psychiatry referrals for three of six months.

There was compliance with timely responses for emergent referrals to primary clinicians for all six months of the review period. CSATF reported compliance with timely responses to urgent and routine primary clinician referrals for four of six months.

Construction/Space:

Many staff reported inadequate treatment space. Interviewed staff from the MHCB and EOP programs expressed concern with the lack of office, group, and confidential treatment space. Facility G staff reported sometimes holding groups in the dayroom, instead of group treatment rooms, due to the heat or the size of the group. On Facility F, some 3CMS inmates had to go to the medical building for clinical contacts due to insufficient treatment space.

During the site visit, excessive heat resulted in an observed Facility F group being held in the dayroom instead of a confidential group room. Relatedly, observed clinical contacts on Facility E were conducted in the gym, with custody officers nearby. The Facility E space did not have a fan, and it lacked heat during the winter.

Mental Health/Custody Relations:

CSATF's LOP dated July 2018 was generally in alignment with CDCR's custody and mental health partnership plan. One difference was CSATF's recognition that associate wardens could be designated personnel for executive rounding. An October 2018 amendment eliminated language from the original LOP that announced the timing of executive rounds.

Except for EOP orientation groups, which headquarters was developing, CSATF had implemented all partnership activities.

Review of documentation of executive leadership joint rounding indicated the need for improvement in the dissemination of this information.  Executive rounding was only reported in the warden's meeting minutes and not also in the minutes of the quality management committee or the mental health subcommittee, as required by CSATF's LOP and CDCR's partnership plan.

CSATF reported that from November 2018 through April 2019, the institution conducted monthly joint rounding.  However, the associate warden, and not the warden or chief deputy warden, conducted the rounds for four of six months.  All required health care staff appropriately conducted the rounding according to the LOP and the CDCR partnership plan for five of six months.  Reviewed rounding documentation reflected discussions with staff and inmates identifying significant program issues and resolutions.

Review of mental health/custody huddle reports for EOP inmate housing areas indicated numerous discrepancies, including lack of required signatures and sections of the reports not being completed.

Review of sign-in sheets for the quarterly partnership round tables and on-the-job trainings indicated presentation of partnership modules one and two to EOP staff on various occasions during 2018 and 2019.  However, because provided information only identified custody and mental health staff who attended the trainings, and did not further identify who was required to attend, compliance could not be ascertained.

CSATF reported that 1,005 staff had received on-the-job training on the LOP on the custody and mental health partnership plan.  There were also 1,290 staff sessions on the

"Multiple Interactive Learning Objectives" (MILO) training collaborative effort between custody and mental health staff.

MHSDS inmates filed 207 complaints as appeals against staff. Of these complaints, 172 were partially granted, zero were granted, and zero were denied; at the time of the site visit, the remaining 35 complaints were pending. Three appeals were referred for investigation. CSATF also reported the initiation of four staff complaints outside of the inmate appeals process, none of which were referred for investigation. No staff member was redirected to another post as a result of these complaints.

<u>Heat Plan</u>:

CSATF reported that between May and October 2018, it issued 29 Stage I heat alerts, one Stage II heat alert, and two Stage III heat alerts. Three inmates were treated for heat-related illnesses.

Interviewed custody staff were knowledgeable of the heat plan's various stages. Heat risk lists that identified inmates who were prescribed heat sensitive medications were sent weekly to the housing units; many custody officers were also able to access these inmates on the computer. Observed thermostats were appropriately placed in housing units.

Correctional staff reported that inmates were not permitted to stay out of their cells and in the dayroom during a heat alert; this was a result of an agreement with institutional leadership to address staff vacancies. Heat alert activations were reflected on the Daily Activity Report, but there was no documentation of alternative activities offered to inmates who returned to the housing unit.

<u>RVRs</u>:

CSATF reported 100-percent compliance for required custody staff receiving RVR training.  However, only nine percent of required mental health staff received this training.

CSATF issued 3,260 RVRs during the review period, of which 1,855, or 57 percent, were issued to caseload inmates.  Specifically, one RVR was issued to an intermediate care inmate, 48 were issued to inmates in the MHCB, 306 were issued to EOP inmates, and 1,500 were issued to 3CMS inmates.  The remaining 1,405 RVRs were issued to non-MHSDS inmates.

A sample of 17 RVRs were reviewed for compliance with applicable CDCR policy and procedures.  The review revealed that custody staff timely referred RVRs for a mental health assessment in approximately 65 percent of cases.  Mental health staff timely returned the completed assessment to custody approximately 80 percent of the time.  The senior hearing officer documented consideration of the mental health assessment in approximately two-thirds of the reviewed sample.

Of the reviewed sample, the mental health assessment recommended penalty mitigation in approximately 40 percent of cases.  The senior hearing officer actually mitigated penalties approximately 70 percent of the time when mitigation was recommended; however, in slightly more than 50 percent of the cases that recommended mitigation, clinicians' recommended mitigations were not responsive and/or appropriate and thus not helpful to the senior hearing officer in assessing penalties.

A trained mental health clinician did not complete any of the reviewed 17 mental health assessments.

Use of Force:

CSATF reported that 98 percent of required mental health and custody staff had received the required mandatory use of force training.

During the review period, CSATF reported three controlled use of force incidents; two occurred in STRH and one on Facility C.  There were also 114 immediate use of force incidents involving 91 MHSDS and 23 non-MHSDS inmates.

Review of the three controlled use of force incidents and five randomly selected immediate use of force incidents indicated compliance with CDCR policy and procedures.

Lockdowns/Modified Programming:

There were no lockdowns during the review period, but program status reports reflected 11 instances of modified programming.  These 11 periods ranged from one to 13 days; the longest impacted the entire institution for 13 days.  The incidents of modified programming were the result of missing metal, an attempted officer homicide, a mass institutional search, an active threat on inmates and staff, a security breach, and the finding of suspected escape paraphernalia.

All program status reports reported that health care services and priority ducats, including mental health ducats, would not be affected and that medications would be issued at cell-front or in the housing unit podium.

Access to Care:

Review of CSATF's monthly Health Care Access Quality Reports from November 2018 to April 2019 indicated that less than one percent of issued mental health ducats and add-on appointments were not completed due to custody factors; 11 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Placement of 3CMS Inmates into Minimum Support Facilities:

No 3CMS inmates transferred to a MSF during the review period.

*Coleman* Postings:

There were *Coleman* posters in 12 of 15 toured housing units; none were the most updated version.

<u>Document Production Issues</u>:

There was an inconsistency between the internal logs kept by the inpatient care coordinator and headquarters' provided information in the provided pre-site materials on higher level of care referrals. After a review of both, the internal logs were used for data purposes, as the information appeared to be more reliable.

CSATF was unable to identify all inmates who required a case-by-case review during the reporting period. The institution also could not report the number of EOP, 3CMS, and non-MHSDS inmates on "C" Status and their "C" Status lengths of stay during the review period.

**Pleasant Valley State Prison (PVSP)**
Review Date - May 15, 2020

Census:

On May 14, 2020, the total population at PVSP was 3,050; a five percent decrease from the previous monitoring period.  The mental health caseload population was 478 inmates, a decrease of 459 inmates or 49 percent, from the preceding monitoring period.  The mental health caseload represented 16 percent of the total inmate population.

There were six mainline EOP inmates, 446 mainline 3CMS inmates, and 21 3CMS inmates in STRH.

The MHCB was closed during the review period.

Five inmates were housed in the TMHU, including three inmates at the MHCB level of care and two inmates who required an acute level of care.

No inmates were housed in alternative housing.

Staffing:

The chief psychiatrist position and one of two chief psychologist positions were filled.

PVSP employed one senior psychologist supervisor, .5 more than its allocated position. The two senior psychologist specialist positions were filled.

One of the three psychiatrist positions was filled, for a 67-percent vacancy rate.  Another .25 position was filled by registry staff for a 58-percent functional vacancy rate.  PVSP did not use telepsychiatry.

Six of the 7.5 psychologist positions were filled resulting in a 20-percent vacancy rate. Registry staff covered an additional .48 positions, for a functional vacancy rate of 14 percent.

PVSP employed one supervising social worker,.5 more than its allocated position. Similarly, PVSP employed four social workers,.5 more than its allocated 3.5 positions.

The one recreation therapist position was vacant.

PVSP employed one OSS II,.5 more than its allocated position. The HPS I position was filled. Three of the four office tech positions were filled resulting in a 25-percent vacancy rate.

Transfers/Referrals:

During the review period, one inmate was referred to inpatient care after IDTT consideration. As of May 15, 2020, the inmate was pending transfer to acute care.

There were no referrals to intermediate care during the review period.

During the review period, 13 inmates met criteria for inpatient care consideration but were not referred after IDTT consideration. Review of nine of those cases revealed inadequate justification for non-referrals, including problems with insufficient psychiatric documentation, lack of collaborative treatment decisions, and incorrect form completion. Training on higher level of care form completion is strongly recommended.

PVSP referred 25 inmates to MHCBs. Of those, ten, or 40 percent were rescinded. Five inmates or 33 percent did not transfer to MHCBs within 24 hours of referral. Of those, transfers took an average of 7.8 days and ranged from 2.3 days to 14.9 days. There were no reasons provided for the delays.

No inmates had three or more MHCB admissions during the review period.

The MHCB was closed due to construction during the review period.

Programming:

TMHU:

TMHU cells, which were developed as an alternative to higher levels of care, lack a therapeutic milieu and offer limited programming, treatment services and multi-disciplinary collaboration in comparison to established higher levels of care.

510

Record review of the inmates housed in the THMU at the time of the review indicated inadequate care, in part, due to the lack of a therapeutic milieu. Emergency transfers were not considered in two cases where it was appropriate given the severity of symptoms and the inmates' lack of progress in the TMHU.

IDTT documentation included reasons for meeting in absentia, e.g. due to COVID-19 or inmate's refusal. Daily PC contacts were provided via telepsychiatry in confidential settings. Reasons for cell-front contacts were documented.

STRH:

During the review period, PVSP did not provide adequate care to inmates housed in STRH. Inmate records revealed insufficient psychiatric documentation and initial psychiatric contacts were inadequate for the level of comprehensive evaluation warranted. Documentation of routine contacts did not convey a meaningful contact.

IDTT documentation of treatment planning was adequate, but needed improvement with inclusion of specificity of symptoms, treatment goals to address identified symptoms, and clear interventions. Structured therapeutic activity was not included in assessment of care. However, beginning in April 2020, documentation of duration changed from the required 90-minute group to 60 minutes.

Six of ten reviewed inmates self-referred to the MHSDS after placement in STRH. Once referred, those inmates frequently refused contacts. A quality improvement project to better understand this issue would be beneficial.

Seventeen randomly selected mainline STRH inmate cases were reviewed for timely psychiatric contacts. All 17 cases required initial psychiatric evaluations and five or 29 percent were compliant. Of concern, many of the initial evaluations were not completed using the

correct EHRS form and the psychiatrists did not document if the evaluations were completed in a confidential setting. Additionally, four of the initial evaluations were documented as having occurred within minutes of the initial IDTT.

For the 15 inmates who required routine psychiatry contacts, 93 percent of the contacts occurred within 90 days and were compliant. Confidentiality of the contacts was not documented.

Twenty STRH inmates were randomly selected to assess compliance with timely PC contacts during the reporting period. All 20 inmates required initial PC contacts and 17 or 85 percent were compliant. One PC contact was completed without the inmate present due to COVID-19.

For routine PC contacts, 75 percent of the contacts occurred within seven days and were therefore compliant. Many routine contacts were brief and cell-front; the PC did not regularly document if contacts were conducted in confidential settings and there were many instances of inmate refusals.

Twenty STRH inmates were randomly selected to assess PVSP's compliance with completion of IDTTs. All 20 reviewed inmates required initial IDTTs and 16 or 80 percent were compliant. Four initial IDTTs were held in absentia due to the patients' refusal to attend and four initial IDTTs were held in absentia due to COVID-19.

For the 12 inmates that required quarterly IDTTs, PVSP was compliant with timely completion. Four routine IDTTs were held in absentia due to the patients' refusal to attend and six routine IDTTs were held in absentia due to COVID-19.

Required staff were in attendance at 18 or 90 percent of initial IDTTs and all routine IDTTs. It was not documented whether the PC and psychiatrist in attendance were the assigned treatment providers as required by the Program Guide.

3CMS:

PVSP provided generally adequate care to inmates at the 3CMS level of care, although documentation needed improvement. Some PCs copied text from contact to contact and at times, across patients. Many PC progress notes included descriptive and thorough plans for future contacts, but were rarely followed in terms of timeframes and interventions in subsequent clinical sessions.

Treatment plans were not regularly updated and also contained copied text from previous documents, including patients' current ratings of symptoms and description of problems. Copied text occasionally resulted in conflicting and/or misleading information. Formal interventions were often not planned nor implemented, and several treatment plans included "fostering therapeutic alliance" by "empathizing" with patient, or similar language without specifying the nature of the intervention.

Record reviews revealed minimal impact of COVID-19 on the services provided at PVSP. Confidential contacts continued, with only IDTT meetings and the length of clinical sessions affected.

Eight 3CMS inmates were reviewed to assess compliance with timely psychiatric contacts. Of those, five inmates required initial evaluations and four or 80 percent were compliant. None of the initial evaluations were completed using the correct EHRS form.

All eight inmates required routine contacts and 100 percent were completed timely.

Eighteen 3CMS inmates were reviewed to assess compliance with timely PC contacts. For the five inmates that required initial PC contacts, four or 80 percent were completed timely. For the 18 inmates expected to be seen for routine contacts, 93 percent were completed timely within 90 days.

A total of 18 3CMS inmates were randomly selected to assess compliance with timely IDTTs. Five reviewed inmates required initial IDTTs and they were completed timely. There were 12 inmates that required annual IDTTs during the review period; all twelve or 100 percent were timely.

Regarding staffing attendance, required staff were in attendance at 100 percent of initial and routine IDTTs. One routine IDTT was held in absentia due to the patient's refusal to attend and seven routine IDTTs were held in absentia due to COVID-19. It was not documented whether the PC and psychiatrist in attendance were the assigned treatment providers as required by the Program Guide.

RVRs:

Six RVRs were reviewed to assess compliance. Of those, custody staff submitted referrals to mental health within required timeframes in two or 33 percent of the cases. Mental health staff completed and returned all six or 100 percent of the mental health assessments timely. None of the reviewed mental health assessments indicated the RVR was related to the inmate's mental health symptoms.

The senior hearing officer included language to allow continued participation in mental health and rehabilitation services in five or 83 percent of the RVRs reviewed, demonstrating a lack of understanding that participation in mental health services cannot be impacted by an RVR.

One mental health assessment included a recommendation for mitigation by the mental health clinician.

**Avenal State Prison (ASP)**
Review Date – May 15, 2020

Census:

On June 4, 2020, ASP housed 4,143 inmates; an increase of 28 percent from the preceding monitoring round. There were 1,021 inmates on the mental health caseload, which constituted 25 percent of the total inmate population, and a five percent increase from the preceding monitoring round.

One MHCB inmate was housed in a TMHU. ASP reported there were no inmates in alternative housing.

There were four mainline EOP inmates and 1,016 mainline 3CMS inmates. There were 43 3CMS inmates housed in administrative segregation.

ASP reported no inmates on NDS status.

Staffing:

As of May 2020, there was no chief psychiatrist position. Registry filled all 5.17 staff psychiatry positions, which was .17 more than the allocated positions. ASP did not utilize telepsychiatry.

The two chief psychologist, two senior psychologist specialist and one senior psychologist supervisor positions were filled. Of the eight staff psychology positions, six were filled for a 25 percent vacancy rate. An additional .91 registry staff reduced the functional vacancy rate to 14 percent.

The supervising social worker position was filled. Allocated social worker positions decreased by one since the preceding monitoring visit. Seven of the 8.5 positions were filled, for a functional vacancy rate of 18 percent.

The CHSA II and two HSP I positions were filled.  ASP employed one OSS II, which was .5 more than the .5 allocated positions.  Of the seven office tech positions, six were filled for a 14 percent functional vacancy rate.

Transfers/Referrals:

ASP identified one inmate for referral to intermediate level of care during the review period.  There was no indication ASP made the referral to intermediate care.  EHRS review revealed that the inmate ultimately transferred to an MHCB at CHCF 22 days after TMHU placement.

ASP made 16 referrals to MHCBs during the review period.  Of those, nine or 56 percent were rescinded.  Five referrals or 31 percent took longer than 24 hours to transfer or rescind with a range of four to 14 days.  All but one of the seven inmates who transferred met timeframe guidelines; one transfer took 14 days.  Inmates remained in alternative housing prior to MHCB referral for an average of 12.4 days.

During the review period, there were four inmates who were considered for inpatient care but ASP did not refer.  A limited record review revealed variability with adequate clinical justifications for non-referral including lack of interventions in light of acuity and functional level; stabilized symptoms due to medications; and comprehensive evaluations coupled with appropriate interventions.

Programming:

TMHU:

TMHU cells, which were developed as an alternative to higher levels of care, lacked a therapeutic milieu and offered limited programming, treatment services and multi-disciplinary collaboration in comparison to established higher levels of care.

Health records of four inmates placed in TMHUs were reviewed which indicated that the mental health treatment provided in the TMHU was inadequate. Problems included the lack of therapeutic milieu; questionable level of care decisions; poor SRASHE documentation; and lack of appropriate strategic interventions at lower levels of care, resulting in an inefficient utilization of resources.

Chart reviews indicated that daily PC contacts were completed in confidential settings. Further, IDTTs were completed within 72 hours of placement and weekly thereafter, and interdisciplinary dissemination of information was documented. Post TMHU five-day follow-ups were adequately completed and documented. Emergency transfers were appropriately considered and initiated.

<u>Mainline 3CMS:</u>

ASP provided adequate mental health care to mainline 3CMS inmates during the review period. Most of the care met the clinical needs of the inmates with some exceptions. COVID-19 related issues may have impacted care for three inmates. Areas in need of improvement included cut and pasted documentation; instances where the diagnosis differed between the PC and the psychiatrist, and what was included in the EHRS Diagnosis & Problems tab; treatment goals not addressed by the interventions provided; and cases where one of the PCs failed to adequately assess inmates for other diagnoses (e.g., PTSD) or causes of their reported symptoms (e.g., anxiety vs. ADHD).

Ten randomly selected mainline 3CMS inmate cases were reviewed for compliance with PC and psychiatric contacts.

For the four inmates who required initial psychiatry evaluations, 100 percent were completed timely. All routine psychiatry contacts were completed within 90 days and were

compliant.  There were three inmates who were not prescribed medication who were seen by the psychiatrist for regular routine contacts.

For the four inmates who required initial PC contacts, 100 percent were compliant.  For routine PC contacts, 96 percent were completed timely during the review period.

Four inmates required initial IDTTs and all were completed timely.  There were nine inmates that required annual IDTTs during the review period and 100 percent occurred within 365 days and were timely.  Required staff were in attendance at 100 percent of initial and annual IDTTs.  While a PC and psychiatrist were in attendance, it was not documented whether it was the assigned treatment providers as required by the Program Guide.

RVRs:

A total of three RVRs were reviewed for compliance with CDCR policy and procedure. ASP mental health clinicians recommended alternative discipline for two of the three RVRs reviewed.

Custody staff timely requested a mental health assessment in two of three cases or 67 percent of the time.  Mental health staff completed and returned the mental health assessment to custody staff timely in two of three cases or 67 percent of the time.  Senior hearing officers documented their consideration of the mental health assessment in all of the reviewed cases.  The clinician recommended mitigation of penalties in two of the RVRs reviewed and the senior hearing officer mitigated the penalty in all of those cases.

**Salinas Valley State Prison (SVSP)**
February 12, 2019 – February l5, 2019

Census:

On February 12, 2019, SVSP's total inmate population was 3,226.  The mental health caseload population was 1,494.

The MHCB housed one inmate.

There were 343 mainline EOP inmates.

The mainline 3CMS program housed 1,045 inmates.

The administrative segregation population totaled 176 inmates.  There were ten EOP inmates housed in STRH pending transfer to a hub.  There were 95 3CMS inmates in STRH.  Twelve 3CMS inmates were assigned non-disciplinary segregation (NDS) status.

Staffing:

SVSP reported that the "primary challenges to providing outpatient mental health care in compliance with the Mental Health Services Delivery System (MHSDS) Program Guide ("Program Guide") have been related to staffing vacancies, staff turnover, staff absences and interruptions to patient access."  The institution indicated that 57 state and registry staff separated from the institution in 2018, while 36 state and registry staff were hired in the same time period, representing a net loss of 21 staff.  This has had a negative impact on continuity of care, as well as both quantitative and qualitative metrics related to Program Guide compliance at SVSP.

SVSP also reported that several registry primary clinician staff were not licensed at the time of the site visit, requiring supervision by staff.

The chief psychiatrist position was vacant.  There was no senior psychiatrist position established at SVSP.

There were two chief psychologist positions, both of which were filled; however, one chief psychologist was reassigned to the SVSP psychiatric inpatient program (PIP) effective July 1, 2017, creating one functional vacancy in this position at the prison. At the time of the site visit, SVSP had five filled senior psychologist positions, which was one position more than the established four. Similarly, there were six senior psychology specialists on staff at the time of the site visit, which was 0.5 FTE position more than the established 5.5 positions.

The institution had 11 established staff psychiatrist positions comprised of six onsite positions and five telepsychiatry positions. Of the six onsite positions, one was filled; 2.20 of the five telepsychiatry positions were filled for a vacancy of 7.8 positions. Registry supplied 5.76 psychiatry staff, lowering the vacancy to 2.04 positions and a functional vacancy rate of 18.5 percent.

Fourteen of 31 established staff psychologist positions were filled; there were 17 positions vacant or 55 percent. Registry filled 12.6 of the 17 vacant positions, leaving 1.4 positions or five percent functionally vacant.

The one established supervising social worker position was vacant and had been for over a year prior to the site visit. Of the 14.5 established social worker positions, 10.5 positions were filled, leaving four or 28 percent vacant. Registry staff filled three positions, resulting in a vacancy of one position or seven percent.

SVSP had 15 recreation therapists on staff, which was one position more than the 14 established recreation therapist positions.

Sixteen of the 16.5 clerical positions were filled, resulting in a 0.5 or three percent vacancy rate. The one established Office Services Supervisor (OSS) II position was filled. One FTE staff filled the 0.5 established Associated Governmental Program Analyst (AGPA) position.

There were 2.5 established Health Program Specialist (HPS) positions, of which two positions were filled, resulting in a vacancy of 0.5 position or 20 percent vacancy rate. The one established Correctional Health Services Administrator (CHSA) II position was not filled. SVSP did not have any state hired medical assistants on staff at the time of the site visit. There were two registry medical assistants providing services.

Telepsychiatry:

SVSP provided two FTE (40-hour per week) telepsychiatrists in EOP A Yard, Buildings 4 and 5, and 3CMS A Yard, Buildings 1, 2, and 3. Telepsychiatry services were reported to be available through the chief regional psychiatrist during First Watch in the MHCB; however, SVSP documented that no telepsychiatry was provided in the MHCB during the review period through the date of the closure of the CTC.

Quality Management:

Overall, the quality management program at SVSP met regularly in all required forums with required membership. Large amounts of data were collected, and relevant topics were discussed. Efforts focused primarily on meeting timeline and attendance requirements, rather than the quality of care provided. This was consistent with discussions with mental health leadership who portrayed efforts at attaining timeline and attendance requirements as continually undermined by myriad and chronic staffing problems faced by the facility; this focus reduced their ability to address issues of quality of care. It also inhibited the creation and implementation of systems to improve performance overall. Noteworthy were the frequent references throughout meeting minutes that a compliance threshold of 85 percent was the stated goal, when the court-approved threshold remains at 90 percent.

The local governing body met monthly with appropriate attendance from the required membership for all months in the reporting period, with the exception of September 2018 when reported scheduling conflicts prevented a meeting.  The minutes reflected agenda items relevant to mental health.

The quality management committee met monthly during the reporting period with suitable attendance from all required disciplines.  It covered a comprehensive range of topics from each discipline.  The most pertinent topics from the perspective of mental health included staffing; surveillance of key indicators; staffing of IDTTs where psychiatry and CC I attendance were continually problematic; the quality and timing of suicide risk assessments; frequent cancellation of treatment services, especially connected with unavailable providers and modified programming; insufficient performance by some registry clinicians and psychiatrists; and low treatment hours in the EOP and PIPs.

Considerable data was collected and presented.  Some improvements were realized, but some proved to be short-lived with improvements in one month followed by a reduction in performance in the following.  The meetings appeared to cover issues in more depth than did the mental health subcommittee; this was consistent with the report of the chief of mental health.

The mental health subcommittee met monthly with attendance by required members. Issues covered on a regular basis included clinical discharge follow-ups, delayed MHCB transports, referrals to higher levels of care, transfer timelines, continuity of care documentation, and access to care for inmates with developmental disabilities.

Many items recurred repeatedly across months without signs of improvement, suggesting that the corrective actions required modification or that their effectiveness was significantly

reduced by chronic staffing difficulties. Audits and meetings focused on the timeliness of contacts or the completeness of documentation to the exclusion of quality of care.

No QITs or FITs were chartered during the reporting period. The monitor's expert interviewed the mental health subcommittee chair, who indicated that the reason for this was that the weekly executive meeting had become focused on quality management and corrective actions to problems, effectively replacing the QIT function.

According to the chief of mental health, the three primary foci on quality management had been IDTT staffing, particularly attendance of psychiatrists, diagnostic monitoring related to psychotropic medications, and the amount of treatment offered.

The concern with IDTT staffing related primarily to psychiatric vacancies. Mental health leadership indicated that the improved psychiatry fill rate was achieved through a combination of registry, overtime, and telepsychiatry, in addition to the three onsite psychiatrists. It was noted that registry psychiatrists working overtime did not achieve the same level of productivity or flexibility of scheduling as that achieved by having additional full-time state employees. This limited the facility's ability to cover all IDTTs with psychiatrists and also had an adverse effect on continuity of care.

Quality management efforts had not previously focused on the high rate of rescissions of MHCB referrals, which was brought to the institution's attention during the site visit. A supervisor had been given the assignment to investigate this phenomenon.

With respect to supervision and peer mentoring, the mental health leadership noted that the facility's allocation for supervisors had been reduced from seven to five under the most recent staffing plan received from headquarters. SVSP had been unable to fill the supervising social work position for over a year. In addition to staffing problems, these factors were noted to

be the primary drivers of what was described as a focus on quantity and timing of mental health services to the exclusion of improving the quality of the care provided.

There was no peer review policy in effect during the review period. The institution reported that the peer review policy was under review.

Overall, the quality improvement efforts at SVSP collected a large amount of data. The usefulness of the data collected was significantly limited by a lack of sustained remediation efforts, staffing difficulties which undermined efforts to improve services, and a general lack of focus on the quality of services provided.

Medication Management:

The mental health headquarters medication management dashboard was reviewed for the period of July 2018 through December 2018. Identified areas with months of noncompliance included but were not limited to the following performance measures: continuity of medications upon inter-institutional transfer at receiving and release (R&R); continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU); continuity of medications upon inter-institutional transfer at R&R; continuity of medications for MHCB transfers; observation of medication preparation and administration for HS and AM/PM medications; medical consent for antidepressants; and medical consent, blood sugar, Complete Blood Count (CBC) with platelets, Comprehensive Metabolic Panel (CMP), and EKG for antipsychotics.

The monitor's expert discussed the MAPIP process with nursing staff, the chief of psychiatry, the chief of mental health, and the CEO. The nursing staff and CEO indicated that the Receiver's dashboard included many relevant aspects of the MAPIP process, which was

525

regularly reviewed by health care staff during the morning huddles and during other relevant review processes.

The newly appointed acting chief psychiatrist indicated that as a staff psychiatrist the MAPIP results were rarely reviewed by him. It was strongly suggested that MAPIP data should be reviewed by him on a regular basis in his role as chief psychiatrist.

The dashboard included percent of compliance with many of the MAPIP measures. The monitor's expert did not find on the dashboard data relevant to compliance with medication (i.e., refusal rates).

Performance improvement plans were present for MAPIP measures that were assessed via observation by nursing staff. The most recent performance improvement plans were dated December 2018 and covered: (1) administering medication using appropriate technique (now resolved), (2) no sufficient protection for inmate waiting in line for medication (ongoing), (3) not adhering to the entire DOT/NA process, and (4) medication room key shared with RNs & LVNs (pending final approval).

Other performance improvement plans that were resolved during the monitoring period included: (1) administering liquid medication after preparation; (2) oral liquids not poured on a solid/flat surface, therefore risk of inadequate dosage amount; and (3) encourages sufficient fluids during medication administration.

However, performance improvement plans were not present for MAPIP measures automated via EHRS. A comparative analysis of areas of improvement and deficits during the reporting period were also absent for such measures.

There was a 180-day order limit for psychotropic medications. Bridge orders were reportedly prescribed for the amount of time clinically indicated in each individual case, with 30

days duration for such orders being common.  There was not a maximum length of time that bridge orders could be prescribed by policy.  Verbal and telephone orders were recorded and reportedly trackable in the EHRS although it was unclear whether anyone tracked such orders.

The percentage of non-formulary psychotropic medications being prescribed on an outpatient basis from July 2018 through December 2018 ranged from 2.8 percent to 3.6 percent, with the total number of monthly psychotropic medication prescribed averaging more than 2,100. These percentages appear to be similar to prescriptions for non-psychiatric purposes ordered by non-psychiatric physicians at SVSP.

Non-formulary psychotropic medications were not prescribed in the CTC from October through December 2018.

The psychiatrists did not currently review polypharmacy reports although there was a process in place with medical staff for such a process to occur.

There were no patients on Clozaril during the reporting period.

There was not specified institutional criteria for ordering DOT medication by a psychiatrist.

During the reporting period, there were ten initial emergency petitions for PC 2602 involuntary medications initiated, with one of the petitions being withdrawn and one petition being denied.  Fourteen PC 2602 involuntary medications petitions were renewed during the reporting period and nine petitions were not renewed.  All inmates were compliant with the PC 2602 involuntary medications process.

There were 665 inmates receiving HS psychotropic medications.

527

<u>Transfers</u>:

Two inpatient care coordinators had been in place at SVSP since January 2017 and October 2018. SVSP inpatient care transfer data was unclear, as headquarters and local data conflicted. Institutional staff noted that headquarters data inaccurately included 35 inmates whose referrals were not generated by SVSP. SVSP staff advised that the local tracking log was accurate, and was reflected in the mental health subcommittee minutes, as well as the major sustainable process review report.

The fourth quarter major sustainable process review completed on December 5 and 6, 2018 resulted in several corrective actions, including delays in clinician documentation upon return from DSH/PIP, inadequate documentation specifying from where inmates returned, untimely submission of inpatient care referrals to headquarters, and incomplete tracking logs of inpatient care referrals. At the time of the site visit, the corrective actions had been implemented.

During the review period, 273 inmates met criteria for higher level of care consideration (both acute and intermediate care). Of those, only 37 inmates or 13.5 percent, were ultimately referred to inpatient care after IDTT consideration.

The non-referral log indicated that during the review period 236 inmates were identified who were not referred in 399 different IDTTs. The rationales for non-referral were generally inadequate.

Based on the monitor's experts' review of the various program IDTTs, the staff were not routinely addressing criteria for consideration to refer the inmate to a higher level of care. There was also often just one criterion marked as positive when numerous criteria clearly had been met. The sustainable process identified multiple areas that required work and follow-up with specific

clinicians. Yet some primary clinicians were resistant to turning in their documents for review. In addition, not all primary clinicians would access the sustainability report prior to their IDTTs, though it was readily available.  Consequently, the positive criteria were not always properly marked as "positive."

There was typically no targeted treatment to address those causes for underlying the positive indicators.  As a result, justification for non-referral was generally not appropriate.  The treatment interventions were often copied and pasted, in direct contradiction to the instruction for these items on the higher level of care section.  The referral to higher level of care process had already been identified by regional staff as broken at SVSP and that was confirmed during the site visit.  There needs to be significant remedial training regarding the process immediately so that inmates appropriate for a higher level of care can access that care.

Fifteen inmates were referred to acute care; nine to CHCF-PIP and five to CMF-PIP. One inmate was transferred to an outside hospital and died prior to completion of the referral packet.  There were no rescissions or rejections.  All inmates transferred within ten days of referral from headquarters, and within 72 hours of bed assignment.  However, nine of the 15 referrals or 60 percent, were not sent to headquarters within two days of IDTT referral as required by policy, with a range of three to eight days overdue.

There were no inmates on the Acute Bed Utilization Management Report as awaiting a bed during the review period or during the site visit.

During the review period, 22 inmates were referred to intermediate care.  Thirteen transferred to the SVSP-PIP, three to Atascadero State Hospital (ASH), two to the CMF-PIP, and one to the CHCF-PIP.  All transfers occurred within 30 days of referral from headquarters; however, four of 22 referrals or 19 percent, did not transfer within 72 hours of a bed assignment.

Further, 13 of 22 referrals or 59 percent, were not sent to headquarters within five days as required by policy. The late referrals averaged 7.3 days to refer to headquarters, with a range of six to 12 days. There was one rejection that was subsequently referred and transferred to acute care, and one referral was rescinded. Additionally, one inmate prevailed in his *Vitek* hearing. Seventeen *Vitek* hearings were completed at SVSP during the review period.

SVSP inpatient care coordinators were unaware of a process for direct admissions to ASH. While they did not refer directly to ASH, HCPOP sent inmates if they met criteria. For the three transfers to ASH during the reporting period, bed assignments took seven days for one inmate, and 14 days for the others.

SVSP referred four inmates with complex medical needs to inpatient care. Three inmates transferred with no delay, and the fourth died at an outside hospital prior to completion of the referral.

There were no acute or intermediate care transfers delayed or cancelled due to impending paroles, disciplinary proceedings, classification factors or pending PC 2602 involuntary medications hearings. There were no expedited transfers during the review period.

SVSP did not receive timely notification of pending discharges and returns from inpatient care programs. SVSP learned of discharges and returns only from the transportation list distributed by the C&PR between zero to two days prior to return. From July through November[68] of the review period, 92 inmates returned to SVSP from DSH/PIPs. Mental health subcommittee minutes revealed continued problems with timely clinician assignment, timely contacts, and timely completion of continuity of care documentation. While action plans were in place to address the delays, the subcommittee minutes noted continued deficiencies despite

---

[68] December data was not available in the provided materials as the subcommittee minutes were not yet finalized.

"multiple reminders to complete the documentation." These items were all identified during the major sustainability tour.

Institutional data indicated that two inmates transferred to a PSU during the review period. One inmate took 38 days to endorsement and an additional ten days to transfer; the other inmate was endorsed on the day of the SHU assessment and transferred 11 days later. There were no inmates pending transfer to PSU during the site visit.

The CTC closed on January 25, 2019 and remained closed during the site visit. During the review period, SVSP operated a ten-bed MHCB. Between one to five cells were redlined for two days during each month of the review period due to floor repairs. According to provided data, from July 1, 2018, through December 31, 2018, there were 455 referrals to the MHCB at SVSP. Seventy-three percent of referrals were rescinded, and only 123 of 455 referrals resulted in admission to the MHCB. One hundred and forty-two inmates discharged from the MHCB during that same period. The average daily census was 5.2 patients. One inmate, or less than one percent, was not admitted to the MHCB within 24 hours; the inmate transferred to the MHCB at California Men's Colony (CMC).

Lengths of stay in the MHCB ranged from one to 30 days, including 19 stays or 13 percent that lasted longer than ten days. The average length of stay was 5.7 days. Four inmates, or 2.75 percent, were not clinically discharged within ten days. Documentation reflected 50 percent of administrative delays were due to DSH/PIP referrals, and an additional 28 percent were the result of medical issues.

SVSP was unable to produce a report of inmates with multiple admissions during the review period. However, a list of inmates that were currently housed at SVSP with multiple

admissions to MHCBs during the past six months, contained 29 inmates with a range of three to 15 admissions.

All placements into MHCBs were completed by HCPOP.  SVSP did not report daily census data to HCPOP, as all beds were controlled electronically.

SVSP did not track access to dayroom/yard in the MHCB.  These activities were documented on the inmates' 114 logs while in the MHCB and upon discharge, the 114s were scanned into EHRS.

During the review period, 45 EOP inmates transferred to EOP hubs from SVSP. Fourteen or 31 percent did not transfer within 30 days, with a range of 31 to 175 days.  The average length of stay was 32.5 days.  Staff reported a new statewide policy allowing non-committee endorsements in an effort to expedite transfer to EOP hubs.  This policy allowed C&PRs to complete transfers without committee action or CSR endorsement.  A written policy was not provided for review.

SVSP was unable to provide a list of EOP inmates housed in D-2, administrative overflow during the review period.  The institution did not keep a list of inmates housed there and SOMS did not produce retrospective reports.[69]

No inmates transferred from SVSP to LTRH during the review period.

Programming:

MHCB:

Related to patient care issues involving two MHCB patients, the CTC was closed by the *Plata* Receiver on January 25, 2019.  Staff reported that with the closure of the MHCB, MHCB

---

[69] In their response, defendants state that "[t]he original document production did not request that Defendants provide a list of SVSP EOP inmates housed in D-2, administrative overflow during the review period." This is not correct. *See Document* Request, Tab H: Administrative Segregation Unit (ASU), which expressly states in pertinent part, "Provide a list in a spreadsheet of all inmates in ASU and ASU overflow during the review period."

staff were providing services in alternative housing and making referrals to outside MHCB.  One MHCB staff member provided outpatient services.

Telepsychiatry services were reported to be available through the chief regional psychiatrist during First Watch in the MHCB; however, SVSP documented that no telepsychiatry was provided in the MHCB during the review period through January 25, 2019 - the date of the *Plata* Receiver's closure of the Correctional Treatment Center (CTC).

The MHCB was open throughout the review period.  A spreadsheet was provided for review which was used to analyze compliance.  In addition, randomly selected chart reviews were utilized to analyze compliance.  Results for each are discussed separately.

<u>Spreadsheet Analysis of MHCB</u>

The appointments spreadsheet had to be cross-referenced with the admissions spreadsheet, as the appointments spreadsheet did not include arrival date to the MHCB.  From the indicated arrival date, all other expectations could be established.  The appointments spreadsheet was then sorted by institution (to ensure that only SVSP was represented), inmate CDCR number, then by appointment date (oldest to most recent).  From this list, ten cases were randomly selected.

All ten cases were non-compliant in at least one aspect of MHCB care.  The measures that were analyzed were: holding IDTTs within 72 hours of admission and then every seven days; initial evaluations by primary clinician and psychiatrist; suicide risk evaluation upon admission and upon discharge for inmates admitted due to suicide-related reasons; and daily contact with clinicians with at least two of those in the week occurring with the psychiatrist.  It should be noted that many of the cases reviewed were discharged prior to requiring a seven-day

IDTT, but two or 20 percent did not receive a discharge IDTT to determine appropriateness of discharge.

Only two inmates received SRASHEs at admission and discharge. Two other inmates received SRASHEs at admission but not at discharge. The remaining six cases did not receive a SRASHE at admission or discharge based on the spreadsheet data provided despite having been admitted for reasons related to suicidality. Only SRASHEs that were clearly indicated as such in the spreadsheet were counted for compliance.

Only two inmates or 20 percent did not receive an initial evaluation from the primary clinician or psychiatrist. However, there were three inmates who did not receive an initial evaluation from the PC and six who did not receive an initial evaluation from the psychiatrist. It should be noted that in three cases non-compliance was due to the initial contact occurring after the IDTT. It would be very difficult to develop a treatment plan for someone that the clinician has not met or evaluated.

IDTTs were compliant in general with just two cases or 20 percent not receiving discharge IDTTs. A second spreadsheet was utilized to identify compliance with required members of the IDTT. This spreadsheet was labeled "IDTT staffing" and was not located in the MHCB section. A spreadsheet from another area was utilized by "enable editing" and then filtering the spreadsheet to only include MHCB. The spreadsheet was then sorted by compliance and the "counting" function was used to count compliant and non-compliant cases. According to the data provided in this spreadsheet, there were 218 IDTTs held and 191 or 88 percent had all required participants present. The correctional counselor was the most frequently missing member.

Finally, daily contacts were achieved in seven cases or 70 percent. In nine of those cases at least two of those contacts within the week were conducted by psychiatrists. In the one case where it did not occur, the length of stay was brief, making the second psychiatric contact not applicable.

Chart Review Analysis

There were 15 inmates who were randomly selected to have their health records reviewed for their MHCB stays. The same data points were analyzed as had been done for the spreadsheets (e.g., initial evaluations, IDTTs, SRASHEs) with the addition of five-day follow-ups. The admission spreadsheet was utilized for the random selection of inmates and for the admission and discharge dates.

Based on chart reviews, 11 cases or 73 percent were compliant for admission and discharge SRASHE completion. Psychiatry completed initial evaluations timely in seven or 47 percent of cases, yet two of these occurred after the IDTT, negating their timeliness. Initial evaluations by the primary clinician demonstrated higher compliance rates with 13 or 87 percent of the reviewed charts having timely initial primary clinician evaluations completed.

IDTTs were held and initial treatment plans were completed timely in 14 of 15 or 93.3 percent of cases. Daily contact by a psychiatrist or psychologist occurred in 13 cases. The staff did not routinely report where they saw the inmate, making it impossible to analyze confidentiality. There were seven cases where the inmate's admission was long enough that it would require psychiatrists to have seen the inmates at least twice per week. Of those seven cases, five were compliant. Finally, 14 of 15 were placed on five-day follow-up; one was referred to a higher level of care. SVSP was compliant in meeting those follow-up expectations in most but not all incidents, with 91.4-percent compliance achieved.

535

Seclusion and Restraint:

There was no use of clinical restraints and seclusion during the review period.

Crisis Intervention Team:

The monitor's expert met with the CIT.  Staff reported that the CIT was in transition, and the program was currently in the process of reorganization.  At the time of the visit, the CIT was not fully implemented.  Training was planned for custody, SRN IIs, and mental health staff, and the new CIT was scheduled to "go-live" on May 1, 2019.  A schedule of CIT clinicians was provided for review.

Alternative Housing:

As stated above, the CTC/MHCB at SVSP was closed on January 25, 2019.  Since that time, patients in need of MHCB treatment were placed into alternative housing and subsequently transferred to an outside MHCB.  Alternative housing was located in the D-2 housing unit, with the TTA as a secondary location.

One patient was housed in D-2 for alternative housing during the site visit.  This patient was housed in a cell on the lower level of the unit.  He was dressed in underwear, and he was wearing a seizure protective headgear.  He did not have footwear, and there was water on the floor of the cell.  The patient was observed shivering uncontrollably.  He was unable to tell the interviewer how long he had been placed into the cell, and he did not have a safety blanket.  He was monitored by a CNA who reported that she had recently arrived for observation of the patient.  The CNA did not have a laptop or any means of documentation of the patient.  When questioned regarding this, she reported that she had just arrived for observation, and she was unable to provide any information regarding the status or monitoring of this patient.  The monitor's expert was accompanied by the regional mental health administrator and lieutenant;

they contacted the floor staff to obtain a blanket for the patient. After a period of time, the patient was provided with a blanket, and it was observed that the CNA was provided with a laptop. Upon leaving the unit, the transport van arrived to transfer the patient to an MHCB.

The care provided this patient was alarming and unacceptable. The patient was not provided with a safety blanket, and the observer could not adequately monitor and document observations regarding the patient without a laptop or means of documentation. Those items were only provided after concern was noted by the monitor's expert. This was also very concerning as this was the primary location of alternative housing and suicide monitoring for SVSP as the MHCB was closed.

No patients were housed in the TTA for alternative housing at the time of the site visit.

SVSP's local operating procedure required inmates housed in alternative housing to be placed on suicide watch because the alternative housing cells were not designed as suicide or ligature resistant.

During the review period, there were 399 alternative housing placements, of which 68 transferred to the MHCB at SVSP and seven transferred to an MHCB at another institution. The remaining 324 alternative housing placements were not transferred to an MHCB. Only three, or less than one percent, of the 399 alternative housing placements exceeded 24 hours.

SVSP was unable to report the daily average alternative housing census for the review period.

From January 25 through February 13, 2019, following closure of the SVSP MHCB, there were 45 alternative housing placements, of which 44 were for less than 24 hours and one exceeded 24 hours; this placement was for 38.5 hours.

STRH:

SOMS could not provide aggregate data for SVSP during the reporting period. Staff reported that SOMS was not designed to do so. The information reported in this section is a snapshot of information from a SOMS report dated February 11, 2019. The list provided by CDCR was entitled, "Appointments List." On the date reported, the census for STRH was 98 inmates, of which nine were EOP inmates and 89 were 3CMS. Of the nine EOP inmates, two had been housed in STRH beyond 30 days. One of the EOP inmates had been there for 59 days awaiting transfer and the other had been there for 45 days awaiting resolution of an RVR.

Staff and inmates confirmed that inmates were offered three hours per day of outdoor recreational activity. Access to radios was limited due to the institution running out of earbuds.

Clinical staff reported that at least 50 percent of clinical contacts did not occur in a confidential setting due to lack of adequate space for the psychiatrist and psychologists. The psychiatrist had access to an office in D Facility but reported a high refusal rate and often escort issues, which resulted in this option being only minimally helpful.

The monitor's expert observed the daily morning meeting, which was attended by medical, mental health, and custody staff. Topics included high-risk inmates, new arrivals, and other inmate issues of concern.

Data reported by SVSP indicated that there was 76-percent compliance with required members attending the IDTT meetings. The monitor's expert attended an IDTT. One of the inmates refused to attend the IDTT. Two of the IDTTs were attended by all the required IDTT members. The IDTTs did address levels of care primarily because the inmates raised issues related to their level of care. These level of care change requests did not appear to have been anticipated by any of the treatment team members, but were addressed during the IDTT.

The IDTTs reviewed relevant clinical and psycho-social history and medications. The case conceptualizations were weak. The diagnoses were clearly stated. There was diagnostic agreement between the primary clinician and psychiatrist. Treatment goals were often vague, as were treatment interventions. The IDTTs did not address issues related to either out-of-cell time or participation in group therapies. Custody staff were present but with minimal participation.

Staff reported that EOP inmates were not eligible to participate in group therapies for reasons which were unclear. Staff reported that recently 3CMS inmates were also not receiving weekly group therapy. A recreational therapist was assigned to the STRH. In-cell activities were reported to be provided as clinically appropriate in conjunction with consultation of the IDTT. However, the recreational therapist was not present in the IDTT observed by the monitor's expert. Formal logs were not kept for these activities.

The monitor's expert observed psych tech rounds in the intake unit, which were done in an appropriate manner.

Inmate interviews and review of CDCR Form 114As for 3CMS inmates housed in STRH revealed that inmates were typically offered 18.5 hours or more of yard and three showers on a weekly basis. Interviewed inmates further reported typically being offered 90 minutes per week of group.

Interviewed inmates further reported receiving weekly primary clinician contacts and daily psych tech rounds, while several who had been housed in the STRH for more than three months reported being seen by psychiatry every 90 days. Inmates also possessed electrical appliances. Further, most reported knowing how to access mental health staff when necessary, but also reported that custody officers were slow to respond to their mental health requests.

A review of SOMS for mental health inmates housed in STRH indicated that their initial ICCs occurred within ten days of STRH placement.

EOP:

SVSP provided two FTE (40-hour per week) telepsychiatrists in EOP A Facility, Buildings 4 and 5, and 3CMS A Facility, Buildings 1, 2, and 3. According to SVSP, the two psychiatrists assigned to the EOP A Facility had caseloads of 109 and 91 inmates each. In the EOP D Facility programs, the two assigned psychiatrists had caseloads of 79 and 61 inmates each. All four psychiatrists had caseloads within the established ratio of 1:120.

Documentation provided by SVSP indicated that six primary clinicians assigned to EOP A Facility had caseloads within the established ratio of 1:26. The caseloads of the 2.75 FTE registry primary clinicians ranged from 23 to 25 inmates, which similarly was within the mandated ratio.

In the EOP D Facility programs, the two primary clinicians were assigned to 21 and 20 inmates respectively and were within established caseload requirements. SVSP had six registry staff primary clinicians representing 4.65 FTE staff assigned to the EOP D Facility programs. Four registry staff provided less than 1.0 FTE services each: the 0.5, 0.75, and 0.8 FTE registry staff had caseloads of seven, 18 and 19 inmates, which were within the caseload limits. The 0.6 FTE registry staff with a caseload of 18 inmates exceeded the caseload requirement of 1:26.

Program Guide timeliness of IDTT, primary clinician and psychiatric contacts and attendance at IDTT was reviewed via a random sampling of healthcare records for EOP inmates during the review period July – December 2018. Ten records were selected from EOP A Yard and fifteen records were selected from EOP D Yard. Five more records were selected from D Yard due to the higher census. "Timeframe" was the number of days between contacts.

A psychiatrist was required to evaluate each EOP inmate at least monthly to address psychiatric medication issues. Psychiatry contacts were considered compliant if they occurred at intervals no greater than 30 days since the last contact.

Weekly clinical contact with the primary clinician was required to occur either individually or in group psychotherapy with individual clinical contact occurring at least every other week. Weekly primary clinician clinical contacts were considered compliant if they occurred every seven days in an individual confidential setting (unless the inmate refused the confidential contact), or the inmate was seen every other week in a primary clinician-specific group. Those groups had to be with the assigned primary clinician and labeled as a "primary clinician group" as designated by CDCR to be considered compliant.

At the conclusion of the evaluation process and within 14 calendar days of arrival in the EOP, the IDTT was required to develop a treatment plan. Ongoing IDTTs were considered compliant if they occurred within 90 days of the previous IDTT.

Facility A EOP

There was a range between psychiatric contacts in Facility A EOP of 11 to 57 days found in the sample. There was a total of 24 timeframes between psychiatric contacts with ten or 42 percent at thirty days or below and fourteen or 58 percent exceeding 30 days.

The reviewed sample demonstrated a range of one to 22 days between primary clinician contacts. Analysis of the 81 timeframes between routine contacts showed that 62 or 77 percent were seen weekly and 19 or 23 percent were not seen weekly.

The sampled charts for IDTTs showed the range between routine IDTTs was between 84 and 112 days. Analysis of the charts of the sample indicated that there were seven timeframes between routine IDTTs; two were 90 days; five exceeded 90 days.

541

Facility D EOP

Review of the sample of inmates in Facility D EOP indicated that excluding one inmate who was not seen at all by a psychiatrist during the period reviewed, there was a range of two to 104 days between psychiatric contacts. There was a total of 53 timeframes between contacts with 31 timeframes or 58 percent seen within 30 days and 22 timeframes or 41 percent exceeding 30 days.

The sample of inmates revealed a range for primary clinician contacts of between one and 28 days. There was a total of 126 timeframes; 86 or 68 percent of which occurred weekly and 40 or 32 percent exceeded weekly Program Guide requirements.

Analysis of the sampled charts regarding timely IDTTs in Facility D EOP showed the range of days for routine IDTT contacts was between 28 and 161 days. There was a total of sixteen timeframes between routine IDTTs with twelve or 75 percent within Facility D EOP the 90-day Program Guide requirements and four or 25 percent exceeding the 90 days Program Guide requirements.

EOP Inmate Interviews

Eleven EOP inmates housed in A4 and eleven EOP inmates housed in A5 were interviewed in two separate groups in a confidential setting in the A Facility EOP treatment building. Some general themes were noted during the group interviews. Inmates consistently expressed anxiety and fear that they would be downgraded prematurely to 3CMS. They reported that this information was conveyed consistently by mental health clinicians and that there was a time limit of several months until they would be downgraded to 3CMS. Additionally, patients reported the belief that they would be removed from the EOP if they complained about any

aspect of their treatment.  They reported undue pressure from custody staff to remove some patients from EOP.

Inmates reported significant problems with ducating for groups and appointments.  These issues included not being allowed out of the housing unit or back into the building after group or individual clinical sessions.  Some inmates reported that even when they had a ducat for a group or individual session, there were instances when their names were not on the officer's list and they would not be allowed to attend the clinical appointment.  Other inmates reported that in some cases they did not receive ducats for groups and appointments that they knew they were scheduled to attend and therefore could not attend.

There were varying reports regarding the quality of groups.  Some inmates complained that there were no pre-release groups.  They also indicated that the groups primarily consisted of movies and recreation-based groups.  Patients unanimously complained that only two of the six recreation therapists worked with patients during yard groups with organized activities.  The remaining recreation therapists reportedly stood apart from the inmates, only checking them in and out for the yard session.  Their concern was that the recreation therapy-based yard groups were essentially open yard and not structured therapeutic activities which affected the quality of the offered group therapy.

Inmates reported that they were seen every other week in individual confidential sessions, with some exceptions in which they were seen at cell-front.  They were seen in alternative weeks in primary clinician groups.  They reported that they were seen monthly by the psychiatrist, and some of the inmates were seen by a telepsychiatrist.  Some inmates expressed concern that the nurses present in the telepsychiatry session breached confidentiality, as they overheard officers discussing confidential information discussed during the sessions.

The monitor's expert interviewed EOP inmates housed in the D Facility in a group setting. Eleven EOP inmates housed in D-3 and eleven EOP inmates housed in D-4 were ducated; ten inmates were interviewed in two separate groups in a confidential setting in the chapel on the D Facility. Inmates interviewed reported that they were seen by their primary clinicians in a confidential setting; however, they complained that there was significant turnover of primary clinicians, resulting in poor continuity of care. They also reported that they were seen by their psychiatrist monthly in a private setting.

Of concern were reports, that were consistent with those heard on A Facility, in which inmates reported that they were informed that there were time limits to their placement in the EOP and that they would be moved to the 3CMS program within several months. This resulted in significant anxiety among EOP inmates. They cited examples of inmates who were severely ill with limited functioning who were moved to the 3CMS program prematurely.

Another issue reported by D Facility EOP inmates, was a problem with timely release for group therapy. They reported that they were frequently not timely released for the 8:30 a.m. group, and frequently arrived near the end of the group. This also occurred at the 12:30 p.m. group with very late arrival. They also complained of frequent group cancellations.

As was reported on the A Facility EOP, D Facility EOP inmates also reported that only some of the recreation therapists provided organized yard recreation, with other recreation therapists standing apart from the inmates and not providing structured therapeutic activities.

Inmates reported that cells in their housing units frequently flooded, with water flowing down the walls and from the light fixture. They also denied that *Coleman* posters were present in their housing units.

The monitor's expert toured the D-4 B pod and the D-3 B pod housing units. Cells 215 to 220 in D-4 B pod had been redlined due to water leaking into the cells. Observed cells had water dripping from the light fixtures and ceilings. Inmates interviewed in cells on the lower levels also reported that their cells had flooded during the rain that occurred the prior week. Cells in D-3, C, and B pod also flooded with recent rains.

A Facility EOP IDTT

The monitor's expert observed an A Facility Level III EOP IDTT. The treatment team planning meeting for five EOP inmates was observed. All of the required treatment team members were present. The observed IDTT process was collaborative.

Relevant clinical and psycho-social history was discussed as was medication management. Treatment plans, participation in groups, clinical interventions and safety plans were reviewed with the inmate. Diagnoses and symptoms were also discussed with the inmate.

Diagnostic agreement between the primary clinician and psychiatrist was present. Consideration for a change in the inmate's level of care also occurred as did such changes when clinically appropriate.

D Facility EOP IDTT

The monitor's expert attended the IDTT that occurred for the Level IV D Facility EOP. Eight IDTTs were observed. The meetings occurred in a confidential setting in the D Facility EOP treatment building. The necessary participants were present at the meeting. All of the inmates attended their IDTTs. Overall, the meetings were well conducted with good interdisciplinary discussion from all participants; the psychiatrist and the CC I provided very active and beneficial participation. Although the IDTTs were scheduled for 15 minutes per patient, the meetings were not limited to this duration, and they were appropriate in duration.

There was good discussion of treatment interventions and goals. Inmates were involved in the discussions of treatment planning. Safety planning was discussed for those for which it was clinically relevant. There was also discussion of consideration of referral to higher levels of care and of the EOP review topics.

One issue of concern was noted during the IDTT meetings. One inmate was presented, and a decision was conveyed, that he would be prepared for transfer to the 3CMS at the next quarterly IDTT meeting. The inmate had diagnoses of PTSD and an eating disorder. This decrease in level of care was inappropriate for this inmate; as he had a history of treatment at the 3CMS, EOP, and inpatient levels of care, and he had previously not fared well at the 3CMS level of care. Additionally, the patient remained symptomatic with current symptoms of bulimia and excessive exercising; his history was significant for very aggressive behavior when decompensated. After questioning and input from the monitor's expert, the treatment team stated that they would continue the patient at the EOP level of care. The issue of premature downgrade of EOP inmates to 3CMS appeared to be problematic at SVSP in both the A and D Facility EOP programs. This issue and concern regarding this practice was discussed in detail with the mental health leadership and the regional mental health administrator.

<u>IDTT Composition</u>

There were 934 IDTTs held, 695 or 74 percent with all required participants. Psychiatry was the most frequently absent discipline.

<u>Structured Therapeutic Activities</u>

The provision of structured therapeutic activities was calculated from information provided by the facility of weekly therapeutic hours provided. For the period of June 25, 2018 to

December 30, 2018, 7.19 hours were attended; 5.12 hours were refused; 12.23 were offered; 5.27 hours were cancelled; and 17.32 hours were scheduled.

3CMS:

In the several 3CMS programs at SVSP, the 1.0 FTE state staff psychiatrist had a caseload of 123 inmates in one yard which was within the established ratio of 1:280, and another 355 inmates in another yard, which significantly exceeded the established ratio. The telepsychiatrist in the 3CMS program had a caseload of 276, which was within the established ratio, and a registry psychiatrist in a different 3CMS program yard carried a caseload of 290 inmates, exceeding the ratio of 1:280. The registry psychiatrist in the administrative segregation/STRH which temporarily housed EOP inmates pending transfer to an EOP hub and 3CMS inmates placed in the STRH, carried a caseload of 104 inmates and was within the caseload for both levels of care at the time of the site visit.

SVSP documentation showed that all primary clinicians in the 3CMS program, state and registry, carried caseloads significantly above 1:97. In the 3CMS A Facility program, the one state staff primary clinician had a caseload of 138 inmates; the caseload of the other state staff primary clinician was 129 inmates. For the 3CMS B Facility program, the caseload of one state staff primary clinician was 182 inmates, and that of the other 1.0 FTE registry primary clinician was 181 inmates. In the 3CMS C Facility program, one state staff primary clinician had a caseload of 128 inmates. The ratio for a state staff primary clinician in the 3CMS D Facility program was 1:150 inmates and that of another 1.0 FTE registry primary clinician was 140 inmates. The two state staff primary clinicians assigned to administrative segregation/STRH had caseloads of 18 and 22 inmates respectively. The three 1.0 FTE registry primary clinicians

assigned to administrative segregation/STRH carried caseloads of 22 to 23 inmates, which met required ratios.

Program Guide timeliness of IDTT, primary clinician and psychiatric contacts and attendance at IDTT was reviewed via a random sampling of healthcare records for 3CMS inmates during the review period.

MM: Same comment as above- methodology is not discussed in other institutional summaries Random sampling was accomplished by requesting a list of inmates by level of care and Facility. Upon receipt of the rosters, a random sample was selected using a random number sampling website. Using this method, 20 records from the 3CMS roster that encompassed all yards were randomly selected of which 13 of 20 planned records were reviewed from 3CMS on account of time. As stated above, "timeframe" was the number of days between contacts.

Psychiatry contacts were considered compliant if they occurred at intervals no greater than 90 days following the last contact and were in a confidential setting, unless the inmate refused the confidential contact. The contacts needed to be of a substantive nature, which meant that the contact was more than just a "check in." To be more substantive, there needed to be discussion regarding matters such as medications effectiveness or side effects, overall inmate well-being and/or discussion of similar matters.

The sample of charts reviewed in the 3CMS program revealed that psychiatric contacts occurred within a range of 43 and 270 days. There were six timeframes between psychiatric contacts within the sample; four or 67 percent exceeded 90 days; two or 33 percent occurred in 90 days or less.

Ongoing primary clinician clinical contacts were considered compliant if they occurred at least every 90 days in an individual confidential setting, unless the inmate refused the confidential contact.

For primary clinician contacts in the sample for the 3CMS program, the range for routine contacts was between 56 and 99 days. Analysis of the timeframes between routine contacts showed there were twelve routine contacts. Ten or 83 percent occurred in 90 days or less and two or 17 percent exceeded 90 days.

Staff and inmates reported that on occasion 3CMS inmates were seen more frequently than every 90 days by primary clinicians for clinical reasons, but staff's ability to do so was limited by staffing shortages and turnover. Some inmates reported that their clinicians informed them that they were unable to see them more frequently for this reason. This was supported by interviews with staff and leadership, as well as pre-site visit material which all emphasized difficulties with compliance related to staffing vacancies, staff turnover, and staff absences, as well as problems with patient access to care related to violence on the yards.

Interviewed inmates consistently reported that clinical contacts with both primary clinicians and psychiatrists usually occurred in a private setting and that exceptions were generally associated with lockdowns. Many reported that although confidential, contacts tended to be brief and that they did not reliably see the same primary clinician or psychiatrist across contacts.

Both supervisory staff and inmates reported that no groups run by clinicians were provided to 3CMS mainline inmates during the reporting period or at the time of the site visit. Supervisory staff noted that previously provided groups, which focused on facilitating the transition to 3CMS for inmates recently transferred from EOP, were curtailed because of lack of

staffing.  Inmates interviewed consistently requested access to group treatment.  This was especially prominent among inmates who had recently discharged from EOP.

Individualized treatment plans had to be completed within 14 working days of referral/arrival into 3CMS and had to be updated at least annually, whenever a change in level of care occurred, or when clinical judgment indicated the need for an update.  The initial treatment plan was considered compliant if it had occurred and was documented within 14 working days following arrival.  Ongoing or updated treatment plans were determined to be compliant if the IDTT occurred within 365 days from the prior IDTT.

Routine IDTTs in the sample occurred within a range of 127 and 385 days.  Within the sample of charts from 3CMS inmates, six inmates were seen for routine contacts; two or 33 percent exceeded 365 days; four or 67 percent occurred within 365 days.

There were 858 IDTTs held.  All required participants were in attendance at 642 or 75 percent of all meetings.  Psychiatry was the most frequently absent discipline.

The monitor's expert attended IDTT meetings in all of the facilities where 3CMS mainline inmates were treated.  All IDTTs observed were attended by the required disciplines. While the EHRS and C-File were available, in some instances the EHRS was not reviewed during the course of the IDTT where doing so would have been useful in addressing an issue presented.  The space was confidential and adequate in all facilities.

With few exceptions, the psychiatrist in attendance was either not the treating psychiatrist for ongoing IDTTs, or for initial IDTTs, and had not evaluated the inmate prior to the team meeting.  Some of the IDTTs utilized telepsychiatry with adequate results.  For two IDTT sessions, the acting chief psychiatrist attended the IDTT as the participating psychiatrist.  All IDTTs showed participation by the various participants, but in many instances the psychiatrist's

and CCI's ability to participate meaningfully was hindered by their lack of familiarity with the inmate.  In most instances where the psychiatrist had not seen the inmate prior to the IDTT, he or she had conducted a prior chart review, but this was not always the case.  An interview with mental health leadership revealed that the psychiatrists' attendance at IDTT had been one of the primary concerns during the review period, estimated at 65 to 70 percent.

Case formulations were variable in their degree of completeness, but generally required considerable improvement and in some instances were non-existent.  Across IDTTs, the supervisor repeatedly and assertively intervened to guide the treatment team.  This occurred around a variety of areas, but frequently focused on the creation of clinically appropriate treatment goals, further assessment of suicide risk, and to elicit relevant clinical history which had not been addressed.  Presentations were often lacking relevant historical information or diagnostic considerations.  Goals were typically not measurable.  Risk factors for suicide and safety planning were not regularly addressed in a sufficiently comprehensive manner until the supervisor intervened.  Even at the termination of the IDTT in some instances it was unclear what diagnosis the inmate had received.

The supervisor indicated that he attended as many IDTTs as possible, but his ability to do so was limited by his additional duties in assisting to oversee EOP programing.

Discussion in several IDTTs underscored the level of inmate-on-inmate violence prevalent in the facilities.

<u>Inmates Discharged from EOP to 3CMS</u>

During the review period, 71 inmates were discharged from EOP to 3CMS.  The monitor's expert interviewed a sample of those inmates.  With few exceptions, the inmates reported ongoing distress about the lowering of their level of care.  Most reported little or no

transition planning, describing the change as sudden.  One inmate reported that he learned of the change in his level of care from custody staff, who learned of this decision before he did.  Clinical groups focused on easing this transition between levels of care were discontinued because of staffing shortages.  One of the monitor's experts observed IDTTs on A Facility where an inmate was queried about his poor adherence to prescribed medications.  He described his difficulty in making the transition from EOP to 3CMS particularly related to the difference in how psychotropic medication was distributed.

Mental health leadership reported an increase in the number of inmates referred to the MHCB from 3CMS, something they attributed predominantly to inmates' perceived need to be removed from 3CMS yards and returned to EOP.  Discussion with a psychologist on B Facility revealed her assessment that the recent change to non-designated yards has led to an increase in safety concerns among inmates.  This, it was reported, has resulted in some EOP inmates minimizing the severity of their symptoms leading to discharge from EOP to 3CMS where they subsequently decompensate.

Pre-site visit material contained a listing of inmates who met criteria for consideration for referral to a higher level of care during the review period.  A review indicated that 81 of those inmates were located at 3CMS at the time of their IDTTs.  The current location for those inmates was listed as intermediate or acute care for 42 of those inmates and ten were located in a crisis bed, suggesting ongoing problems in functioning at the 3CMS level of care.

<u>Interviews with Leadership and Supervisory Staff</u>

Mental health leadership and the supervisor responsible for the 3CMS program were interviewed.  Institution supervisory staff reported that regional staff provided the facility with a list each quarter of inmates treated at the 3CMS level of care to review for consideration for

possible discharge from 3CMS.  Facility staff then decided whether to schedule an IDTT to further consider discharge.  Although they did not have precise data, local leadership estimated that approximately 20 to 25 percent of the inmates on those lists were discharged following review.  This was attributed to low staffing levels which made it more difficult for the facility to be more diligent about assessing inmates for discharge.

Mental health leadership considered the recruitment and retention of qualified clinical staff to be their most pressing challenge in providing required treatment to 3CMS inmates.  They reported considerable difficulty in maintaining regular staffing, which resulted in the discontinuation of 3CMS groups, reduced continuity of care, and the need to regularly orient and supervise new clinicians.  Specific struggles to retain permanent staff on A Facility were reported, which resulted in an unacceptably high caseload for the sole remaining clinician.  B Facility was reported to have a particularly high rate of new admissions, which further strained staff resources.  B Facility was reported to receive as many as 18 new admissions on a given day.  Custody-related issues on B Facility were noted to a particular concern with increased requests by inmates to transfer off the yard or for single-cell status.  The 3CMS supervisor noted that some inmates complained that they were ducated but not called for appointments or that they had submitted multiple self-referrals which they did not receive responses to.

Inmate Interviews

Inmates were interviewed individually, and in group settings, in each of the facilities where 3CMS inmates were housed.  Inmates on facilities A and D were chosen from among those whose level of care had been lowered from EOP to 3CMS during the reporting period.  Inmates for interview on facilities B and C were randomly selected.  There were a variety of logistical difficulties associated with these interviews which appeared evocative of

communication problems between mental health and custody staff. These included interviews scheduled for two of the monitor's experts interviewing two separate groups of inmates at the same place and same time, and staggered production of inmates, so that what was planned as one group interview became multiple interviews of smaller groups of inmates. Consistent with ongoing issues related to safety concerns described by staff on facilities B and C, group interviews on those facilities were characterized by high rates of refusals.

The inmates described contacts with a primary clinician and a psychiatrist generally consistent with required timelines and that the contacts generally occurred in a confidential setting. Exceptions to confidentiality were reported as associated mostly with lockdowns. Many of the inmates interviewed described clinical contacts which were rushed and lacking in continuity in that they may be seen by different primary clinicians or psychiatrists from visit to visit. One noted that his primary clinician appeared concerned about his well-being but was rushed by custody staff who said that the time allocated for their session had expired. Others noted that their primary clinician would have seen them more frequently but told them that they were "overloaded." Some inmates described IDTTs as adequate, while others found them to be perfunctory, leaving them without a clear understanding of their treatment plans.

Problems with ducats and getting appointments scheduled were noted by a number of inmates. These issues included not being called for appointments or having to put in several requests to be seen before their requests were responded to. Both inmates and supervisory staff indicated that there was a lack of consistency with respect to the scheduling of appointments.

The desire for a reinstatement of clinician-led group treatment was voiced by many interviewed inmates. Access to other activities was described as limited with waitlists prevalent. Inmates who had recently transferred from EOP noted a lack of transition planning around the

move and ongoing distress around the drop-off in intensity of services and the change in medication procedures between the levels of care. Connected to this issue, during one inmate's IDTT on A Facility, the issue of medication adherence arose. The inmate attributed his poor adherence to custody not allowing him to go to medication because he did not have an ID card. Upon questioning by the monitor's expert, the telepsychiatrists stated that other inmates had reported the same concern. Another inmate on A Facility attributed his poor medication compliance to the difference in medication procedure between EOP, where medication was brought to him, and 3CMS where he has to be released to pick up the medication himself.

Some inmates with approaching release dates described custody staff who provoked them in what they perceived as an effort to induce the inmate to receive an additional RVR, which in turn, could lengthen their prison term.

Inmates in C Facility noted consistently leaking roofs in all of the buildings on the yard with resulting mildew forming in the units. They noted that the same problem occurred last year but apparently had not been remedied as planned.

Other Issues:

Pre-Release Planning:

There were no groups for pre-release activities during the reporting period.

Re-entry plans were not confirmed via EHRS, review of IDTT observation, or staff discussion.

It was reported that Transitional Case Management Program (TCMP) appointments were scheduled with inmates within 90 to 120 days of release to provide assistance with Medi-Cal, Social Security Administration and Veterans Administration applications. A spreadsheet indicated that TCMP scheduled 32 inmates for 44 appointments during the review period.

There was no statewide local operating procedure for discharge planning.  It was reported that the statewide pre-release coordinator was working to improve consistency of discharge planning across CDCR, including training for institutional coordinators.  SVSP had a psychologist assigned as its pre-release coordinator who had been in the role since October 2018.  In addition to this role, the pre-release coordinator also provided coverage for the SPRFIT, DDP evaluations and RVR mental health assessments.  Staff reported that discharge planning responsibilities could fulfill a full-time position.

The institution reported that awareness of planned release dates in the upcoming six months were provided to the SVSP pre-release coordinator every other week via notification from the statewide pre-release coordinator and a SVSP correctional counselor.  It was reported that EOP inmates were seen within 30 to 90 days of their release to assess the inmate's ability to navigate public transportation; the result of the assessment was then communicated to the correctional counselor to arrange courtesy transports to the inmate's county of release as needed.

A barrier to the provision of services was a lack of awareness where the inmate would reside when released.  This was contingent on improved communication with PRCS.  It was reported that the primary clinician provided clinical preparation for discharge and was likely to make a mental health appointment in the community.

Program Access:

i.    Job and Program Assignments:

On January 3, 2019, SVSP reported that of 1,416 available jobs, 188 EOP inmates, or 46 percent of the EOP population held job assignments.  Although SVSP reported that 17 EOP inmates held full-time employment positions, the program access lieutenant was skeptical of this

information; he indicated that due to EOP inmates' group attendance, these inmates could only work part-time.

For 3CMS inmates, 403 or 35 percent of the 3CMS population held job assignments, and for non-MHSDS inmates, 825 or 44 percent of the non-MHSDS population held job assignments.

For the 392 part-time academic assignments, SVSP reported that four EOP inmates, or one percent of the EOP population, held assignments. Significantly, it was also reported that there was another educational program that was not reflected in this academic data that exclusively educated EOP inmates with skill levels below the seventh grade. The program's director reported typically scheduling classes several times weekly and of arranging inmates in small group classes that specifically focused on their academic needs in reading, writing, and mathematics. During the site visit, 19 EOP inmates were enrolled in this program.

For 3CMS inmates, 187 or 16 percent of the 3CMS population held part-time academic assignments and for non-MHSDS inmates, 201 or 11 percent held assignments.

Of 140 vocational education assignments, six or one percent of EOP inmates held assignments, as did 57 or five percent of 3CMS inmates and 77 or four percent of non-MHSDS inmates. It was reported that the vocational education programs were typically conducted on B Facility, which did not house EOP inmates; this resulted in an extremely low percentage of EOP inmates receiving vocational education assignments.

Of 720 voluntary education assignments, 88 or 22 percent of EOP inmates held assignments, as did 225 or 20 percent of 3CMS inmates and 407 or 22 percent of non-MHSDS inmates.

Of 156 substance abuse treatment assignments, it was reported that two or zero percent of EOP inmates held assignments, as did 27 or two percent of 3CMS inmates and 127 or seven percent of non-MHSDS inmates.  However, the CC III who scheduled substance abuse treatment programs stated his belief that more than two EOP inmates were enrolled in such programming during the review period.

      j.   <u>Milestone Credits</u>:

A report dated January 3, 2019 indicated that for the reporting period, of 408 EOP inmates, 389 or 95 percent were eligible to earn milestone credits and 91.5 percent earned credits.  For 3CMS inmates, 1,045 of 1,136 or 92 percent were eligible to earn milestone credits, with 13.4 percent earning the credit.  The data further reported that of 1,873 non-MHSDS inmates, 1,741 or 93 percent were eligible to earn milestone credits; 16.4 percent earned the credits.

      k.   <u>Out-of-Level Housing</u>:

For out-of-level housing of caseload inmates, provided data indicated that as of February 15, 2019, one EOP Level I inmate was placed in Level III housing; 49 EOP and 81 3CMS Level II inmates were placed in Level III housing, five EOP and 29 3CMS Level III inmates were placed in Level IV housing and 13 EOP and 28 3CMS Level IV inmates were placed in Level III housing.

      l.   <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

SVSP provided training module materials and local operating procedures for the disability placement program but did not provide appeals regarding accommodations for psychiatric disabilities.  The institution reported that 31 of 65, or 48 percent of required mental

health staff, received the required training on the functional evaluation of EOP inmates for program assignment.

    m.  <u>Periodic Classification Score Reductions: EOP Inmates</u>:

SVSP did not produce completed CDC 840s for the reporting period. As such, the monitor was unable to confirm whether the institution was providing periodic classification score reductions for EOP inmates.

<u>Case-by-Case Reviews</u>:

SVSP reported a total of six cases meeting the requirement of a 150-day review, which had not been resolved. In all six cases, SVSP reported the date of the most recent ICC, however, they did not report when the next scheduled ICC would be held, as requested. All six cases had classification staff representative (CSR) approval for retention in administrative segregation for 60 or 90 additional days; however, the case notes did not provide any information regarding the discussion and/or decision of the Associate Director. No ICC chronos or MH-10s were provided for review.

<u>Non-Disciplinary Segregation</u>:

ICCs for three NDS inmates were observed in STRH. All three inmates were 3CMS level of care. All required staff were present. All three inmates were approved for expedited transfer, issuance of allowable property, and phone privileges consistent with their privilege group. One inmate had been in STRH for 13 days but had not been issued a radio. The STRH did not have earbuds for the radios. The facility could not recall when they last had earbuds available, and the radios were not usable without them. The chief deputy warden reported that they would now put earbuds on a regular order rotation, so they would not run into this issue again.

SVSP reported a total of 104 inmates were designated as NDS for expedited transfer during the review period. All 104 cases were reported as "will transfer on" a specific date, however the information did not indicate the actual transfer date.

SVSP did not provide a total list of NDS inmates during the review period to include inmates not approved for expedited transfer. SVSP did not track NDS privileges and property during the review period.

"C" Status:

SVSP was unable to report the number of EOP, 3CMS, and non-mental health inmates who were placed on "C" Status and their "C" Status lengths of stay during the reporting period. During the site visit, there were four EOP and 16 3CMS inmates on "C" Status. The institution did not report these inmates' "C" Status lengths of stay.

Mental Health Referrals:

During the reporting period, SVSP reported a total of 165 emergent referrals, 79 urgent referrals, and 747 routine referrals, but did not provide information as to whether the institution was compliant with program timelines for responding to the different levels of referrals.

Mental Health/Custody Relations:

The Custody and Mental Health Partnership Plan was implemented at SVSP, however, two components of the plan (executive leadership joint rounding, mental health huddles) did not meet the expectations of the institutional local operating procedure (LOP) signed during May 2018. The LOP is in alignment with the Custody and Mental Health Partnership Plan submitted by CDCR headquarters to the court.

Documentation of required monthly executive leadership joint rounding was provided for August through December 2018. SVSP was not in compliance with its institutional LOP, which

required that dissemination of information be shared via a summary at the executive staff meeting, the quality management committee, and mental health subcommittee, and be included as a monthly topic on the executive staff meeting agenda. Instead, a memo submitted to the regional team that documented the occurrence of rounds was the sole document provided as proof of practice. This memo was not timely as it was submitted to the regional staff in a single memo dated October 31, 2018. Documentation indicated that "no critical issue[s] were identified" however it was unclear if this applied to each month or only October 2018. Subsequent monthly memos were submitted to the regional staff as proof of practice for November 2018 and December 2018 executive rounds. No issues were identified on A Facility EOP during the November rounds. Regarding inclusion during quality management committee meetings, the only documentation was found on meeting minutes from November 29, 2018 and was comparable to the memo submitted to the regional staff on October 31, 2018 (described above).

In addition to the lack of dissemination of information, the lack of recognition of issues at SVSP was problematic. In terms of process, SVSP leadership reported familiarity with the sample questions provided as part of their LOP to provide guidance to staff when conducting executive rounds but acknowledged that they themselves did not utilize the questions when conducting executive rounds. The lack of identification of issues was particularly concerning given that the institution reported that 577 inmate complaints were submitted during the past twelve months. There were no investigations initiated for these complaints.

Per the partnership plan, huddles are required during Second and Third Watch in the MHCB, EOP, and STRH programs, with attendance by custody and mental health staff. Huddles should be documented on the Mental Health Huddle Report. The regional lieutenant confirmed

that the mental health huddles had not occurred as specified by the LOP.  A spot-check of the provided MHCB Mental Health Huddle Reports verified attendance of a mental health and custody representative, but documentation of daily huddles on both shifts was not consistent. Documentation of huddles in STRH was not provided.

In-Service Training sign-in sheets were reviewed onsite for verification of quarterly partnership round tables and on-the-job training.  While there was reasonable representation of custody, mental health, and health care staff, compliance of staff required to attend was unable to be determined.  Documentation requested that would allow for verification of this was not provided.

CDCR implemented additional trainings, Multiple Interactive Learning Objective (MILO) simulator and From Corrections Fatigue to Fulfilment (CFTF) for custody and mental health staff.  Documentation provided by the institution indicated that staff from various disciplines attended both trainings.  MILO trained all staff on communication and de-escalation techniques and signs and symptoms of mental illness and/or developmental disability/cognitive deficit using an interactive simulator.

There were numerous complaints and reports about custody staff from EOP inmates housed on A Facility.  EOP patients reported that custody had undue input in their continuation in the EOP.  They also reported that some officers made disparaging comments about EOP inmates.  They reported that some officers laughed at them and made fun of them regarding their treatment with psychotropic medications.  They indicated that some officers were unresponsive when they reported the need to speak with a mental health clinician, and if they reported suicidal ideation, were cuffed behind their backs and placed into the shower in the treatment building. Some inmates expressed reluctance to inform custody staff of self-harm acts for fear of ridicule.

There were also significant complaints regarding the behavior of custody officers on the D Facility.  Inmates reported that they were frequently turned away from the EOP building by the gate officer, even when they needed to see their clinicians.  They were concerned that custody officers were not sensitive to working with EOP inmates.  An incident was reported in which inmates alleged that an officer (who was not a regular officer on the yard) antagonized and ultimately assaulted a severely mentally ill inmate housed on the yard.

Heat Plan:

During the review period, SVSP reported five Stage I heat alerts but no Stage II or Stage III heat alerts.  During the heat season, the institution prepared a monthly heat report that was submitted to CDCR headquarters.  Reviewed heat logs reflected the recording of outside temperatures on an hourly basis and of inside temperatures for the various housing units every three hours.

Except for one correctional officer for building A-5, many interviewed officers had limited knowledge of and some difficulty explaining the various heat plan protocols.

Many officers were similarly unaware of how frequently the inmate heat risk list was updated and of the need to offer accommodations for lost yard time when there was a heat alert.

Many housing units' thermometers also were not working.  Custody staff reported that maintenance staff would replace these thermometers' batteries before May 1, 2019.

In at least one unit with a 180-degree layout and three housing pods, only the center pod, and not the two side pods, contained a thermometer that recorded the housing units' temperatures; this recorded temperature thus did not reflect the temperatures in either of the two other housing units.

RVRs:

563

SVSP reported a total of 4,590 RVRs were issued during the review period. Of this total, 2,566 or 56 percent were issued to MHSDS inmates. Of the 2,566 RVRs issued to MHSDS inmates, 1,761 were issued to 3CMS inmates, 746 to EOP inmates and 59 were issued to inmates at the MHCB level of care. RVRs issued to inmates at the inpatient level of care were excluded from the above totals.

The institution reported a total of 118 custody staff were required to receive the mandated RVR training. Of the 118, 115 or 98 percent received the training. The institution reported a total of 34 mental health staff were required to attend the training. Of the 34 staff, 18 or 53 percent received the training.

A total of 21 randomly selected RVRs were reviewed for compliance with CDCR policy and procedure. Custody staff timely referred the RVR for a mental health assessment in six or 29 percent of the 21 reviewed cases. Mental health staff completed the mental health assessment and timely returned the form to custody staff for 15 of the 21 RVRs reviewed or 71 percent of the time.

The senior hearing officer documented their consideration of mental health information in seven of the 21 cases reviewed or 33 percent of the time. The senior hearing officer documented mitigation of penalties as recommended on the mental health assessment in eight of 21 cases or 38 percent of the time. In 12 of the cases the senior hearing officer simply repeated what the mental health assessment stated. The duplication of what was documented on the mental health assessment is not adequate documentation of the senior hearing officer's consideration or mitigation of penalties, as policy requires the senior hearing officer to articulate their consideration and mitigation of penalties.

In four cases, the senior hearing officer assessed penalties which conflicted with the recommendations noted on the mental health assessment, without any statement justifying the disagreement with the mental health assessment recommendation.

In two cases, the senior hearing officer noted the mental health assessment recommendations and mitigated the penalties consistent with those recommendations.

In two additional cases the senior hearing officer noted mitigation of penalties as a result of the mental health assessment recommendations, however the mental health assessments did not recommend any of the mitigations made by the senior hearing officer.

<u>Use of Force</u>:

During the review period, the institution reported a total of three controlled use of force incidents and 287 immediate use of force incidents involving 205 MHSDS inmates and 82 non-MHSDS inmates.  Additionally, there were 282 non-use of force incidents involving 141 MHSDS inmates and 141 non-MHSDS inmates.  All use of force incidents involving inpatient inmates were excluded from the above information.

Of the 287 immediate use of force incidents, 92 incidents or 32 percent occurred on Facility D.  Facility B had 67 incidents or 23 percent, Facility C had 43 incidents or 15 percent, and Facility A had 34 incidents or 12 percent.  The remaining use of force incidents occurred in restricted housing, receiving and release, board of parole hearing area, visiting, or medical.

Custody staff were 98 percent complaint with receiving their mandatory use of force training.  Of the 905 custody staff at SVSP, 886 attended the use of force training.  Mental health staff were 91 percent compliant with receiving the mandatory use of force training.  Of the 222 mental health staff at SVSP, 201 attended the use of force training.

A total of six use of force incidents, (one controlled and five immediate) were reviewed for compliance with CDCR policy and procedure. The type of force used in the six reviewed incidents included three uses of pepper spray (OC), four uses of physical force, and one use of a 40 mm impact round.

In the controlled use of force incident, CDCR policy was adhered to including a cool-down period and attempts by mental health staff to get the inmate to comply. However, there were several clerical errors in the incident reports. In one section the wrong inmate's name was used and there was a reference to the inmate exiting a vehicle.

In the two immediate use of force incidents to effect transfer of the inmate to a MHCB and CMF, both inmates were issued RVRs for the specific act of obstructing a peace officer in the performance of their duties, which appeared to be in violation of CDCR policy memorandum dated September 11, 2015. The policy memorandum states in part, that an RVR "shall not be issued in connection with a cell extraction for transfer of the inmate to a mental health inpatient unit or between mental health inpatient units."

Lockdowns/Modified Programming:

The institution reported a total of 13 lockdowns as documented on the institution program status reports. The program status reports were the result of homicide, riots, battery on staff, battery on inmate, searches for missing metal, and institutional maintenance. Two program status reports impacted the entire institution over a total of twenty days.

All program status reports indicated health care services and priority ducats, which included mental health ducats, would be honored. Medication would be issued at the cell front or at the housing unit podium.

The review of institution program status reports provided some information, but not all regarding facility specific lockdowns, which may affect mental health inmates' access to care.  A review of three weeks of Facility D daily activity reports for Second Watch during the weeks of August 20 through August 26, 2018, October 8 through October 14, 2018, and December 24 through December 30, 2018 was completed.  The daily activity reports included specific yard closures such as, "staff shortages," which would not be included in the institution program status reports.

For the week of August 20 through August 26, 2018, Facility D reported normal program with zero program closures noted.

During the week of October 8 through October 14, 2018, the Facility D daily activity reports indicated no yard or dayroom on D-1 yard on October 8, 9, and 14 due to staff shortages and a power outage.  On the D-2 yard, the daily activity reports indicated no yard or dayroom on October 8 and 9 due to staff shortages, and a delayed yard release on October 10, 2018 due to a riot.

During the week of December 24 through December 30, 2018, the Facility D daily activity reports indicated no program, no yard, or dayroom due to staff shortages on D-1 or D-2 on all days reviewed.  The daily activity reports did not indicate if mental health ducats were completed or cancelled while the facility experienced staff shortages.

Access to Care:

A review of SVSP's monthly Health Care Access Quality Reports from July through December 2018 indicated that two percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 14 percent were not completed for non-custodial reasons, excluding inmate refusals.  During the site visit, the senior

psychologist specialist for quality management further assessed the access to care quality reports in the context of cancelled appointments. Her findings indicated that most of the cancellations were related in some respect to the shortage of recreation therapists.

Non-Designated EOP:

The monitor discussed with the Chief Deputy Warden, Facility Captain, and CC II the impact of CDCRs decision to no longer acknowledge SNY status in EOPs. Staff indicated there had not been a significant impact on the program at SVSP, however when an EOP inmate had their level of care changed to 3CMS, the inmate would face retaliation from other inmates when they returned to a general population 3CMS yard, as they were considered "no good" because they were housed on a yard with prior SNY inmates. The staff did not have any recommendations to solve this dilemma.

Staff also discussed the issue of inmates pressuring other inmates for their "paperwork." The staff indicated that if they lock up the inmate who asked other inmates for their paperwork, another inmate would then confront the inmate for their paperwork. The SVSP staff did not believe CDCR could function by placing each inmate who pressured another inmate for their paper work into administrative segregation and issue them an RVR.

Placement of 3CMS Inmates into Minimum Support Facilities:

The institution reported that no 3CMS inmates were placed into Minimum Support Facilities during the review period.

Compliance with In-Cell/Private Unclothed Body Search Policy:

Interviewed inmates housed in STRH reported that unclothed body searches occurred in-cell.

568

_Coleman_ Postings:

Inspection of numerous housing units that housed class members revealed that most, but not all, contained _Coleman_ postings.  At least six housing units contained updated postings, but many others did not have the most recent version of the _Coleman_ posting.  In many units, _Coleman_ postings were only located in the unit's main entrance and were not located in other areas, such as dayrooms, that were easily accessible to inmates.  Many housing units also did not contain the posting in both English and Spanish.

Document Production Issues:

The site visit revealed numerous difficulties with the ability of SVSP to produce requested documentation.  Among them, as previously reported, SVSP was unable to report the number of EOP, 3CMS and non-mental health inmates who were placed on "C" Status during the reporting period, and the respective "C" Status lengths of stay.  As to job assignments, the institution could not provide information indicating the specific jobs performed by the respective EOP, 3CMS and non-MHSDS inmates.  The institution also could not produce completed CDC 840s for the reporting period to ascertain whether SVSP was providing periodic classification score reductions for EOP inmates.

Information was not presented as requested.  For example, document sub-tabs were not properly labeled, and some had been deleted due to duplication, making it difficult to find data. In addition, a memorandum contained within a document sub-tab would make reference to another that actually had multiple same identified sub-tabs.

Also, as reported above, SVSP was unable to report the daily average alternative housing census for the reporting period or provide aggregate data for the STRH census during the reporting period.

**California Treatment Facility (CTF)**
Review Date -- June 5, 2020

<u>Census:</u>

On June 4, 2020, CTF housed 4,794 inmates; a decrease of seven percent since the preceding monitoring period.  There were 1,328 inmates on the mental health caseload, a decrease of 14 percent, which constituted 28 percent of the total inmate population.

There were four mainline EOP inmates and 1,311 mainline 3CMS inmates.

Three inmates were in the temporary mental health unit (TMHU).

There were 68 inmates in administrative segregation, of which ten were 3CMS inmates.

<u>Staffing:</u>

CTF did not have a chief psychiatrist position during the review period.  As of May 2020, the one senior psychiatrist supervision position was filled.  Two of the six staff psychiatrist positions were filled for a 67-percent vacancy rate, .87 registry staff reduced the functional vacancy rate to 52 percent.  The one telepsychiatry position was filled.

One of two chief psychologist positions was filled, for a 50-percent vacancy rate.  Both psychologist specialist position and the one psychologist supervisor position were filled.  CTF employed 12 psychologists, one more than the allocated 11 positions.

The one supervising social worker position was filled.  CTF employed 15 social workers, one more than the allocated 14 social worker positions.

The CHSA II position was vacant and the OSS II position was filled.  CTF employed three HPSIs, 0.5 more than the allocated 2.5 positions.  Eight of the ten office tech positions were filled, resulting in a 20-percent vacancy rate.

Transfers/Referrals:

CTF referred one patient to an acute level of care during the review period.   The referral was later rescinded.   No inmates were referred to intermediate level of care during the review period.

CTF referred 33 inmates to MHCBs during the review period.  Of those, 12 or 36 percent were rescinded.  Average length of stay from referral to rescission ranged from ten hours to 12.4 days.   Of the 21 inmates transferred to MHCBs, 17 or 81 percent transferred timely.  The four transfers beyond 24 hours averaged 39.2 hours, and there was one outlier who waited 13.7 days to transfer.

All inmates referred to the MHCB were placed in alternative housing at CTF.  Of those, nine or 27 percent remained in excess of 24-hours.

Record reviews revealed that clinical rationales used to support decisions not to refer inmates to higher levels of care were appropriate.  However, treatment teams often referenced the COVID-19 transfer restrictions as the primary reasons for failing to refer inmates, even when included clinical rationale was adequate.

During the review period, seven or 88 percent of the eight inmates that met criteria for inpatient consideration were not referred.  A review of EHRS records of four non-referred inmates indicated adequate justifications for the level of care decisions.

Programming:

TMHU:

TMHU cells, which were developed as an alternative to higher levels of care, lack a therapeutic milieu and offer limited programming, treatment services and multi-disciplinary collaboration in comparison to established higher levels of care.  Record review of inmates

housed in the TMHU at the time of the review indicated inadequate care, in part, due to the lack of therapeutic milieu.  CTF did not meet the expectations set forth in the *COVID-19 Emergency Mental Health Treatment Guidance* document for inmates housed in the TMHU during the review period.  Of serious concern was the lack of psychiatric engagement in the care of TMHU patients and inappropriate use of PC 2602 processes.

Other than daily PC contacts, many of which were cell-front, there was no evidence that daily rounds, in-cell treatment, out-of-cell activities or recreational services were offered.  A few patients were offered books in their cells.

Treatment plans did not routinely include goals to address the patient's needs while in crisis.  There were delays in consideration or initiation of transfers to a higher level of care and in more than one reviewed record, clinical acuity and/or negative COVID-19 test results warranted urgent transfer of a patient, but transfers were not initiated timely.  Additionally, some patients were suspected to be actively intoxicated and urine drug screens were ordered.  None of those records indicated review or further inquiry into the drug test results.  In at least one case, the patient's drug test was positive for opiates.

3CMS

Overall, PC contacts in mainline 3CMS were individualized.  However, in some cases PCs cut and pasted documentation from previous contacts.  Supervisory oversight was needed for inmates not seen during the COVID-19 lockdown or modified programs.

A total of 15 randomly selected records were reviewed to assess compliance with timely psychiatric contacts.  For the three inmates who required initial psychiatric evaluations, none of the required evaluations were compliant.  Two of the three required assessments were not

documented in the health records, and the third psychiatric assessment did not occur prior to the initial IDTT.

For routine psychiatric contacts, 80 percent of the contacts occurred within 90 days and were compliant.

A total of 14 inmates were reviewed for compliance with timely PC contacts. Three inmates required initial PC contacts, and all were completed timely.

For routine PC contacts, 81 percent occurred within 90 days and were compliant.

Three inmates required initial IDTTs and 100 percent were completed timely. Eleven inmates required annual IDTTs during the review period and ten or 91 percent were timely.

Required staff were in attendance at two of three or 67 percent of the required initial IDTTs. For annual IDTTs, required staff were in attendance at nine of eleven or 82 percent of the cases that required annual IDTTs. While a PC and psychiatrist were in attendance at all IDTTs reviewed, it was not documented whether it was the assigned treatment providers as required by the Program Guide.

RVRs:

The monitor's expert reviewed seven adjudicated RVRs to assess compliance. Custody staff requested mental health assessments timely in three of seven or 43 percent of the cases. Mental health staff timely completed and returned the mental health assessment to custody staff in six of seven or 86 percent of the cases.

Senior hearing officers documented their consideration of the mental health assessment information in four of seven cases or 57 percent of the time. The senior hearing officer documented mitigation of penalties in three of five or 60 percent of the cases reviewed. In some

cases, the senior hearing officer noted mitigation of penalties based on mental health assessment recommendations even though no mitigation was recommended.

Clinicians recommended mitigation of penalties in five of seven or 71 percent of cases. However, they did not provide adequate responses to the questions on the mental health assessment and failed to understand appropriate penalties that could be assessed by the senior hearing officer.

**California Men's Colony (CMC)**
March 2020 – Paper Review

Census:

On March 18, 2020, the total inmate population was 3,792 inmates. The mental health population was 1,332 inmates or 35 percent of the population.

The MHCB had a population of 48 inmates and there were no inmates in alternative housing during the review.

There were 522 mainline EOP inmates and 45 inmates housed in the administrative segregation EOP hub.

The 3CMS mainline population was 698, and there were eight 3CMS inmates housed in the administrative segregation unit.

Four MHSDS inmates were in non-disciplinary segregation. Seven inmates were pending transfer to STRH.

Staffing:

The chief psychiatrist and senior psychiatrist positions were filled.

Of the two chief psychologist positions, one was filled for a 50 percent vacancy rate. Of the six psychologist supervisor positions, five were filled for a 16 percent vacancy rate. Six senior psychologist specialists filled 6.5 established positions for a seven percent vacancy rate.

There were 17 established staff psychiatry positions. Of those, nine positions were filled, one psychiatrist was on long-term leave. However, with the addition of 2.25 registry psychiatrists the functional vacancy rate was reduced to 39 percent. There were no telepsychiatrists.

Of the 41.5 staff psychologist positions, 37.5 positions were filled for a ten percent vacancy rate.

575

The supervising social worker position was vacant.  Sixteen of the 14 social worker positions were filled, resulting in a 12 percent vacancy rate.

Of the 23 recreation therapist positions, 20.25 established positions and one registry position was filled for a functional vacancy rate of seven percent.

CMC provided no staff information on psych tech positions.

There were 23.5 MHSDS clerical positions, 19 were filled resulting in a 19 percent vacancy rate.

There were six of 7.5 office technician positions filled, including CHSA II, HPS I, HPS II, AGPA and OSS II, resulting in a 20 percent vacancy rate.

Quality Management:

Overall, the quality management committees and processes at CMC were comprehensive and relevant to problems identified.  The local governing board and quality management committee met monthly with the appropriate members in attendance.  Minutes of the meetings provided by CMC showed appropriate documentation as to the issues addressed and the actions taken in response.

Issues in the local governing board meetings included the following: periodic review and/or approval of policies and procedures, reports from various subcommittees, including mental health, medical, dental, patient safety, infection control, pharmacy and therapeutics, and resource management, as well as appointments and clinical privileges.  Issues of particular relevance to mental health included review and reports on higher level of care audits, review of a downward trend in EOP group treatment hours related to what was described as a headquarters' mandate, and attendance at mental health partnership huddles.

The quality management committee also received regular reports from various subcommittees such as medical, mental health, dental, pharmacy, utilization management review, patient safety, infection control, pharmacy and therapeutics, and resource management. Additional topics covered included; the status of various Performance Improvement Work Plans (PIWPs) in areas such as medical supply tracking, decreasing central line infections, and referrals to higher levels of care, policies, operating procedures, the tracking of lean six sigma projects, and the status of work orders.

The mental health subcommittee met regularly throughout the reporting period with appropriate attendance. Agenda topics for the monthly mental health subcommittee meetings, included: dashboard reviews, programmatic updates from MHCB, EOP and 3CMS, higher levels of care audits, treatment plans, group treatment attendance, readmissions to MHCBs within 30 days of discharge, reports from the administrative segregation unit QIT, suicide prevention, EOP staffing levels, DDP patients in ASU, psych tech rounding, audits, administrative segregation pre-screening, confidential clinical interviews and mental health referrals.

Audits were conducted and results were regularly reviewed. Corrective actions were planned in accordance with audit findings. These included a root cause analysis regarding a specific patient where CMC found it to be an opportunity for improvement of interdisciplinary communication; a plan to address findings of the sustainable process tours; and a plan related to diagnostic monitoring following the prescription of anti-psychotic medication.

A long-standing administrative segregation unit EOP hub QIT, originally chartered by headquarters, continued to be active during the reporting period. A FIT related to suicide prevention was also active. No new QITs or FITs were chartered during the reporting period.

577

Referrals to higher levels of care were problematic throughout the reporting period across multiple areas of the sustainability process. One area involved headquarters' audit of the higher level of care forms also reviewed by CMC's inpatient coordinators. There was poor interrater reliability between the headquarters' auditor and CMC's inpatient coordinators' review of the quality of documentation in the treatment plan, with the inpatient coordinator typically finding in favor of CMC. Multiple CAPs resulted from the sustainability process.

CMC had two inpatient coordinators throughout the review period; this was seen by CDCR headquarters and regional mental health as a contributing factor toward poor interrater reliability. In fact, one CAP item recommended that only one inpatient coordinator be responsible for review of the higher level of care form to try to maximize the interrater reliability. However, this and other CAP items did not appear to have been implemented between sustainability process site visits or by the time of the monitor's current review.

There were two sustainability reviews during the review period; a minor review was conducted in August 2019 (third quarter review), and a major review was conducted in November 2019 (fourth quarter review). Following the third quarter review, 30 cases were reviewed by headquarters and it was determined that 38 percent met criteria for "good" documentation. This was a significant drop from the prior period when 67 percent had been identified as "good" by headquarters. In addition, CMC identified 47 percent of the cases as meeting acceptable criteria for higher level of care resulting in poor interrater reliability. There were nine discrepant cases that had been pre-reviewed prior to submission for headquarters' review. The discrepancies or errors included mismarking positive criteria in consideration for higher level of care, failure to provide an adequate clinical rationale for non-referral, and failure

to address treatment targets in the intervention section that had been identified in the clinical rationale.

While the fourth quarter review did not provide a sample number, it did indicate that there were 12 cases where the CMC reviews differed from the headquarters' review. CMC identified 48 percent of cases as "good" or acceptable while headquarters identified just 38 percent as acceptable. Headquarters went further and noted that there was inconsistency between the two inpatient coordinators at CMC with one reaching higher interrater reliability with headquarters reviews than the other. Because of that, the concept that only one of the inpatient coordinators conduct the higher level of care (previously referred to as 7388B) review was re-emphasized as a possible solution to poor interrater reliability. However, both inpatient coordinators were encouraged to sit in on IDTTs to provide guidance and training, it would be beneficial to have both inpatient coordinators well trained in acceptable documentation.

During the third quarter review, problems were also found when reviewing the mental health subcommittee minutes. The errors included clarifying the number necessary for a quorum (eight instead of nine), missing information, and a lack of corrective action plans when compliance was less than CDCR's guideline of 85 percent. In addition, the embedded inpatient coordinator's higher level of care section reported that all referrals were completed timely despite multiple incidents where the on-demand report indicated timelines were not met. Many of the errors noted appeared to have been corrected by the June 2019 mental health program subcommittee minutes. However, some data errors that were thought to result from on-demand reports incorrectly noting referrals as over timelines continued to occur and there was no information regarding whether those errors had been corrected nor if a plan had been implemented to prevent future errors. Only as a result of the sustainability review were several

possible barriers identified regarding referrals and a CAP with a deadline date was implemented by CMC with the assistance of regional audit staff.

The fourth quarter major sustainability review generally confirmed the overall progress in documenting higher level of care matters in the mental health subcommittee minutes, though progress was erratic.  Improvement would be maintained during one month of minutes, but then have significant deterioration the next month only to improve again the following month.  There did not appear to be a cohesive plan to identify the cause for the lack of sustained improvement so that it could be remedied.  One area of continued difficulty involved timely *Vitek* hearings and the data entry of those hearings.  Information on *Vitek* hearings was inconsistent and unreliable in the performance report.  Again, no remedial plan was articulated through the mental health subcommittee minutes.  This had been identified as an area that needed to be addressed through the mental health subcommittee during the minor sustainability audit.  The findings from the regional sustainability process reviews were substantiated by record reviews.

Another significant deficit that was repeatedly reported throughout the third and fourth quarter reviews was the lack of sufficiency in the CMC follow-up action plan in response to the regional mental health team's recommendations.  For example, in the fourth quarter review, the regional mental health team recommended that if a treatment team did not agree on a referral to inpatient care, the matter would be elevated up the leadership chain, in accordance with existing policy.  The institutional response was a mere cut-and-paste of the regional recommendation. This was troubling because it suggested that this critical area of access to care was not properly addressed by CMC.

The regional mental health team reviewed IDTTs in the MHCB, administrative segregation unit, and mainline EOP during both the minor and major sustainable reviews.  The

IDTTs held in the MHCB, while there were occasionally areas for improvement, they were generally well-facilitated. One non-higher level of care issue that required further follow-up involved a MHCB patient who was brought to IDTT in mechanical restraints despite no longer being on administrative segregation status.

Findings in administrative segregation unit were like the MHCB regarding the quality of the IDTTs generally. In reference to higher levels of care, administrative segregation unit IDTTs addressed objective considerations, but did not consistently address subjective factors across both sustainable process reviews. Administrative segregation had more areas where improvement was needed across the minor and major sustainability reviews.

Finally, the regional mental health team reviewed mainline EOP IDTTs as part of their minor and major sustainability reviews. While there were many positive aspects reported as part of the sustainability reviews of the mainline EOP, a repeated concern involved the lack of thorough discussion of all higher level of care considerations and a failure to fully discuss RVRs. This was concerning because CMC did not appear to have implemented effective action plans so that regional mental health could identify improvement during observed IDTTs despite at least nine months of opportunity. This is an area ripe for quality or focused improvement teams so that there is buy-in by the IDTTs participants themselves.

Peer review meetings took place for psychiatrists and psychologists in the MHCB. Overall, there were four psychiatrists and 12 psychologists assessed by peer review during the reporting period. CMC reported that feedback was communicated to individual clinicians verbally and using a form developed for this purpose. The peer review process identified no significant concerns and no systemic issues.

Medication Management:

CMC's MAPIP results for April 2019 through September 2019 reported compliance for psychiatric diagnostic monitoring and medication management.  The medication management dashboard for the period showed that for inmates prescribed antidepressants thyroid monitoring, CMC was compliant for all six months of the review period.  Electrocardiograms (EKG) and medication consent were compliant for three months and non-compliant for three months. Venlafaxine blood pressure was compliant for four months; no data was provided for two months.

Data for inmates prescribed antipsychotics showed that abnormal involuntary movement scale (AIMS) tests and thyroid monitoring were compliant for all six months, and measurements for blood pressure was compliant for four months; no data was provided for two months. Blood sugar tests were compliant for three months and non-compliant for three months.  Diagnostic monitoring of blood sugar complete blood count (CBC) with platelets and comprehensive metabolic panel (CMP) were compliant for two months and non-compliant for four months during the review period.  Measurements for height was compliant for three months, non-compliant for one month and no data was provided for two months.  Weight measurements were compliant for four months and no data was provided for two months.  Lipid monitoring was compliant for two months and non-compliant for four months and electrocardiogram (EKG) measurements were compliant for three months and non-compliant for three months.  Medication consent was compliant for four months and non-compliant for two months.

Psychiatric measures for inmates at CMC prescribed carbamazepine indicated that level monitoring was non-compliant for three months; no data was reported for the other three months. CBC and CMP diagnostic monitoring was compliant for two months and non-compliant for two

months; no data was presented for two months. Medication consent was compliant for one month, not compliant for one month and no data was provided for four months.

Data for Clozapine diagnostic measures indicated that blood sugar, CBC, and EKG were compliant for all six months of the review period, and AIMS measures were compliant for four months and non-compliant for two months. Blood pressure was compliant for four months and no data was provided for one month. CMP was compliant for three months and non-compliant for three months. Weight measures were compliant for four months, no data was provided for two months. Height measures were compliant for two months, non-compliant for two months and no data was provided for two months. Lipid monitoring was compliant for two months and non-compliant for four months. Medication consent was compliant for five months and non-compliant for one month. Thyroid monitoring was compliant for five months; no data was reported for one month.

CMC's psychiatric diagnostic measures for inmates prescribed Depakote were compliant for medication consent for all six months of the review period and CBC with platelets and CMP were compliant for two of the six months and non-compliant for four months. Measuring for Depakote levels were compliant for two of the six months of the review period and non-compliant for four months.

CMC was compliant with medication consent for Lamotrigine for four months and no data was reported for two months.

Data for diagnostic measures for inmates prescribed Lithium indicated that medication consent was compliant for all six months of the review period. Thyroid monitoring, lithium levels, Creatine, and BUN (kidney function tests) and EKG measurements were compliant for two of the six months and non-compliant for the other four months of the review period.

Multiple MAPIP mental health medication measures scored below 90 percent for one or more months during the review period.  Observation of medication preparation and administration for AM/PM and psychiatric-prescribed chronic care medications were compliant for all six months of the review period.  Medication continuity upon inter-institutional transfer at receiving and release (R&R), continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), and medication continuity for MHCB transfers were non-compliant for all six months of the review period.

Intra-institutional transfers to ASU/SHU/PSU were compliant for four months and medication continuity following discharge from community hospital or acute or intermediate care was compliant for two months.  Medication continuity with parole or release to the community was compliant for one month and no data was reported for five months.  Medication continuity for court ordered involuntary medications was compliant one month and non-compliant for five months.  Observation of medication preparation and administration of HS medications was compliant for five months and non-compliant for one month.  New psychiatric medications were compliant for four months and non-compliant for two months in the review period.

Medication orders for MHCB level of care were written for 30 days and bridge orders were typically written for 15 days.  Medication orders were written for no more than 180-day supplies for EOP and 3CMS levels of care.  KOP SSRIs were ordered for a maximum of 90 days; however, these were dispensed in quantities that did not exceed 30-day supplies.

Telephone and verbal orders were tracked through EHRS.  Nursing staff were required to document medication orders electronically and to send electronic messages to the prescribers for review and signatures.

The process for ordering non-formulary medications changed following a memorandum issued in September of 2019 which allowed prescribers to order non-formulary medications without approval from a secondary reviewer.  Non-formulary medication data was not provided by CMC for review.

CMC was not a designated Clozaril institution.  The institution did not initiate or receive inmates on Clozaril medication during the review period.

A total of 35 PC 2602 petitions were granted and one was denied during the review period.  CMC initiated seven PC 2602 orders, of which five were emergent during the period under review.  PC 2602 orders previously issued to six inmates were not renewed.  One emergency use of force incident occurred for PC 2602 medication administration during the review period.

The length of the pill lines was not a concern based on nursing audit results.  However, the location of the pill lines was identified as a problem.  Nursing reported that the west clinic pill lines lacked protection from environmental conditions.  Awnings were installed in November 2019 to address the issue, however, CMC indicated that inmates found the coverage insufficient.

Psychotropic medications prescribed as HS were appropriately administered between 8:00 p.m. and 9:00 p.m.

Transfers:

CMC reported 1,267 cases that met the criteria for referral to an inpatient level of care but were not transferred.  The rational provided for not transferring these inmates to a higher level of care included reasons such as the inmate was not currently housed in a crisis bed, or the patient required additional time to respond to the current level of treatment.

All transfer data used was found in CDCRs EHRS on-demand performance reports which was provided for acute and intermediate care referrals. However, the spreadsheet provided did not include completed data for all referrals to acute and intermediate inpatient care at CMC, making it difficult to accurately determine all relevant time frames. The referral and transfer information that follows was based upon the data available.

CMC reported 234 referrals to inpatient care. Of this number 135 were referrals to acute and 99 were referrals to an intermediate level of care. The information provided indicated that 108 or 80 percent of acute referrals and 71, or 72 percent of the intermediate care referral packets were timely completed by the primary clinician. Subsequently of the 234 referrals, 46 were rescinded, including ten acute and 36 intermediate care referrals. CMC reported that timely acceptance by an inpatient hospital program occurred in just ten, or eight percent of the 125 acute referrals that remained, and in two, or three percent of the 63 intermediate care referrals that remained. The data provided also indicated that acute inpatient referrals timely transferred in 11 of 123 instances, or nine percent of the time, and in five of 43 cases, or 12 percent of the referrals to intermediate care.

CMC reported 358 timely referrals to the MHCB, of which 336 were admitted and 22 were rescinded during the period under review. There were 518 admissions to the MHCB at CMC, of which 358 patients were placed in alternative housing. Regarding the MHCB patients, 336 or 94 percent were timely admitted.

CMC reported they were unable to distinguish between transfers to LTRH or STRH and reported a combined total of 175 3CMS transfers to LTRH or STRH, of which 168 or 96 percent transferred timely.

CMC reported there were 43 3CMS inmates transferred to an EOP level of care and 15 EOP inmates' level of care was reduced to 3CMS, however no transfer times were provided.

Programming:

MHSDS Inmates in Administrative Segregation:

The administrative segregation EOP hub self-certified for August 2019 through December of 2019. The self-certification letter for January of 2020 was pending completion during document production. Each self-certification reported compliance at 90 percent or better for all required areas with no CAPs required.

Based on the data provided by CMC, of the 1,426 administrative segregation primary clinician contacts, 1,136 or 80 percent were held in a confidential setting. Data was not provided for psychiatry contacts held in a confidential setting. There data presented indicated 99 percent compliance with required attendees at IDTT; the most frequent absent staff member was the psych tech. The institution did not provide the average number of treatment hours per week for inmates in the administrative segregation unit for the review period.

There were 32 high refusers reported by CMC who had been housed in the EOP Hub, however, without knowing specific housing locations it was difficult to determine how many remained. The data provided suggested that at least ten of the 32 high refusers were still in the Hub. For high refusers, an average of 11.34 hours of structured therapeutic activity was offered to inmates per week, and an average of 1.80 hours were attended by inmates per week. On average 5.57 hours of structured therapeutic treatment was canceled per inmate per week, with a range of 0 to 18.75 hours. This resulted in an average refusal rate of 84 percent. A brief record review suggested that low participation by some inmates was due in part to poor treatment team interventions designed to increase participation for seriously mentally ill inmates. Of 32 high

refusers, only three or nine percent were inmates who were jointly evaluated by mental health and custody to identify custody practice impediments and alternative practices to facilitate treatment participation.

Based on provided data, 92 percent of administrative segregation 3CMS psychiatric contacts and 69 percent of administrative segregation 3CMS primary clinician contacts were held in a confidential setting. IDTT attendance was reported at 90 percent compliance with different individual disciplines absent each time.

MHCB:

CMC reported 518 admissions to the MHCB, an average clinical length of stay of 10.2 days, a physical length of stay of 14.1 days and a range of stay of 2 to 50 days. There were seven inmates with three or more admissions to the MHCB during the review period.

There were four psychiatrists and one senior psychologist assigned to the MHCB. There were ten psychologists who were assigned full time and one psychologist who provided services half time. In addition, the MHCB had one licensed clinical social worker and three recreation therapists.

CMC reported compliance with the completion of the SRASHE at MHCB referral and discharge. CMC also provided raw data on appointments with psychiatry, primary clinicians, and IDTTs. While compliance rates could not be calculated based on the appointment data provided by CMC, the data did reveal that some MHCB appointments considered completed had session times as brief as zero or one minute which was problematic. An IDTT documented as completed in zero time may have been held in absentia. Brief clinical contacts of one to five minutes would not be meaningful to MHCB patients, yet 1,300 of 9,482, or 14 percent of completed contacts and IDTTs were documented to have occurred in less than five minutes.

This is an area that lends itself to supervisory review, a FIT or QIT, to identify what is occurring in these brief contacts and how the contacts would best be documented (e.g., inmate "refusal" to stay for appointment rather than completed appointment).

The institution provided a schedule that included recreational therapy groups and recreational therapy yard groups, though it did not indicate how much daily out-of-cell time a patient would be offered, on average. There were daily morning and afternoon yard groups seven days per week. Each wing had access to the yard, alternating morning and afternoons, weather permitting. MHCB patients did not have access to the dayroom.

Ten inmates were randomly selected to have their EHRS charts reviewed for compliance during their CMC MHCB admissions. The following compliance areas were reviewed: initial evaluations for psychiatrists and primary clinicians, initial, and daily contacts with a psychiatrist or primary clinician of which two contacts must be with the psychiatrist and initial and ongoing IDTTs. The CMC MHCB admission spreadsheet was utilized for the random selection of inmates and for the admission and discharge dates of those inmates.

In accordance with Program Guide timeframes, initial evaluations were considered compliant if the assessment occurred within 24 hours of admission. Chart reviews showed that all ten or 100 percent of the randomly selected cases reviewed showed initial evaluations were completed by their psychiatrist and primary clinician within 24 hours of admission. Of the ten cases reviewed, nine of ten, or 90 percent had timely initial IDTTs. All required staff were present at initial IDTTs.

There were 13 expected ongoing IDTTs and all were held timely. All ongoing IDTTs had required team classifications in attendance, though the actual attendees changed, making it difficult to determine if the treating providers were present for their patients IDTT. Despite this

uncertainty, CMC did hold 22 of 23, or 96 percent of the expected IDTTs timely with all required disciplines present.

Regarding daily MHCB psychiatry and primary clinician contacts, there were 46 necessary daily contacts for the admissions reviewed. CMC was compliant with 42 or 91 percent of those contacts. At least 28 of those clinical contacts should have been with a psychiatrist though psychiatry saw some inmates more than twice per week. Of the 28 daily contacts that should have been completed by psychiatry, 26 or 93 percent, were compliant with Program Guide standards. Most psychiatrists and many psychologists did not clearly document whether MHCB patients were seen in a confidential setting in their progress notes. As a result, no conclusive data could be provided regarding the proportion of clinical contacts that were confidential.

Analysis showed that just under half, 20 of 46, or 43 percent of all daily contacts involved a clinician who had not seen the patient during the prior contact. While some patients were seen primarily by the same clinicians throughout their admissions, other patients experienced significant changes in providers based on documentation. A lack of continuity, while possibly less significant in a short-term admission, can still have a critical negative impact on therapeutic rapport and patient response to treatment and the treatment team.

Seclusion and Restraint:

CMC reported no incidents of seclusion or restraint during the review period.

Crisis Intervention Team:

The Crisis Intervention Team (CIT) was activated in April of 2019 at CMC.

Alternative Housing:

CMC's alternative housing consisted of twelve cells located on the first floor of Building 7, Facility D.  The cells were prioritized from one to 12.  Once the 12 cells were full, the institution had 38 additional cells available for usage.

EOP:

CMC reported that mainline EOP inmates were housed on Facility D in buildings 7 and 8.  While it previously housed inmates at higher custody levels, it was designated as a Level II facility for inmates in July 2019.  The EOP population had been increasing steadily coinciding with the change to Level II status.

Of the five psychiatrists assigned to EOP, two were within staffing ratios, while the remaining three exceeded ratios with caseloads of 1:129, 1:123 and 1:136, respectively.  Two primary clinicians assigned to EOP inmates had caseloads within staffing ratios, while the 16 remaining primary clinicians assigned to EOP inmates had caseloads that exceeded staffing ratios.  Additionally, there were 26 nurses and psych techs whose primary function was to provide groups, and one pre-release coordinator.

During the reporting period, CMC data indicated that EOP inmates were offered an average of 13.54 structured treatment hours per week, with 87 percent of the inmates being offered ten or more hours and an average of 7.94 hours were attended.  EOP inmates refused an average of 5.73 hours of structured treatment hours weekly.

CMC indicated that it continued to struggle in providing ten hour of structured treatment hours weekly for EOP inmates.  The primary obstacles reported included the increase in EOP population, a decrease in EOP clinical positions (although these were reported to have been restored), a 30 percent vacancy rate among recreational therapist assigned to the EOP, and

591

physical plant limitations with group rooms that only accommodated up to nine inmates at a time.  A system where patients were scheduled for thirty of more hours of work, education, and group sessions was noted to further strain CMC's ability to attain compliance.  The facility instituted a project aimed at analyzing and improving its scheduling protocols.  CMC also reported considerable effort in improving group programing with respect to curriculum and quality, which included staff training and a patient survey.

CMC reported 99 percent of primary clinician contacts took place in a confidential setting.  No equivalent data was provided for psychiatric contacts.

Data provided by CMC indicated that of 1,395 scheduled IDTTs, 1,322 or 95 percent were attended by the required participants.  Of the 73 IDTTs which did not have a full complement of staff, the disciplines most commonly not in attendance were the correctional counselor and psychiatry.

The Integrated Substance Use Disorder Treatment (ISUDT) Program began in January 2020.  CMC noted that many of the registered nurses and psych techs currently providing treatment to CMC's EOP population will begin to conduct groups for the ISUDT and the facility was working to determine how to manage the needs of both programs.

Program Guide timeliness of IDTT, psychiatric and primary clinician contacts and attendance at IDTT was assessed by reviewing a random selection of healthcare records for EOP inmates.  Contacts and IDTTs that occurred were assessed in accordance with Program Guide requirements.  The Program Guide requires that the initial psychiatric contact occur within 14 calendar days of arrival and for the initial psychiatric contact to occur prior to the initial IDTT.  For inmates on the yard, the days between the initial psychiatric contact and initial IDTT and days between the arrival date and initial psychiatric contact (as applicable) and days between up

to six subsequent routine contacts were counted.  The time between each contact was defined as a 'timeframe.'

A total of 12 inmates in the EOP program were selected to assess compliance with timely psychiatric contacts in EHRS medical records.  Of the six inmates that were admitted to the yard during the dates reviewed, two or 33 percent received a timely initial psychiatric contact, where the contact occurred before the IDTT and within 14 calendar days.  There were 44 expected timeframes between routine psychiatric contacts for 11 inmates.  Thirty-six or 82 percent occurred in 30 days or less and were compliant.

To assess timeliness of the initial contact by the primary clinician those inmates who transferred to the yard during the period under review, days between the initial contact and arrival were counted.  Regarding routine contacts, days between routine contacts were counted for six consecutive weeks.

A total of 12 cases were reviewed to assess compliance with the timely primary clinician contacts in the EHRS medical record.  Of the six inmates that transferred to EOP during the dates reviewed, six required initial contacts.  Three or 50 percent were completed in 14 calendar days and were compliant.  Of concern, in one case, the initial contact was not located for the duration of dates reviewed and was determined to be incomplete.  Regarding routine contacts, there were 54 expected timeframes and 41 or 76 percent were compliant.

For those inmates that transferred to the yard during the review period, days between their arrival date and initial IDTT; days between the initial IDTT and the next routine IDTT; and days between each subsequent routine IDTT were counted.  For inmates that were on the yard prior to the start of the round, days between each documented routine IDTT during dates reviewed were counted.

Again, twelve EOP inmate cases were reviewed to assess compliance with timely initial and routine IDTTs.  Of the twelve cases reviewed, six inmates required an initial IDTT and five of six, or 83 percent occurred within fourteen calendar days and were timely.  Nine inmates were expected to be seen for routine IDTTs during the dates reviewed.  There were 16 total timeframes between all routine IDTTs; 13 or 81 percent occurred in less than 90 days and were timely.  Required attendees were present for all initial and routine IDTTs.  Of note, the Program Guide requires attendance of the assigned psychiatrist and primary clinician, however assignment was not clearly discernable for all cases.

3CMS:

In the 3CMS level of care, one psychiatrist had caseloads within the ratio of 1:96, while two other psychiatrists had caseloads in excess of ratios with 1:326 and 1:375.  There were four primary clinicians assigned to 3CMS within staffing ratios, while the five remaining exceeded ratios with caseloads ranging from 1:103 to 1:124.

A total of 14 3CMS treatment groups were offered to inmates during the reporting period.  CMC reported that the frequency of individual treatment contacts for 3CMS inmates was based on clinical need, which resulted in numerous inmates being seen more frequently than every 90 days.  Psychiatry and primary clinician contacts reportedly occurred in confidential settings.

Inmates transitioning from EOP to 3CMS level of care were offered eight weeks of orientation group during the review period.  These inmates also received information pamphlets to ensure a smooth transition between the two levels of care.

CMC reported problems with psychiatry attendance in IDTT due to staffing shortages.  Primary clinicians were expected to consult with psychiatry regarding treatment planning and

recommendations outside of the IDTT in preparation. CMC did not indicate whether these consultations were tracked to ensure the IDTT received input from psychiatry.

Applying the EHRS case review methodology, a total of 12 cases were randomly selected to assess compliance with timely psychiatric, primary clinician and IDTT contacts. One of the twelve cases was removed from the review of psychiatric contacts as the inmate was not on any psychiatric medications. Regarding initial 3CMS psychiatric contacts, days between the initial contact and initial IDTT were counted. Regarding routine contacts, days between the initial contact (as applicable) and each subsequent routine contact during the review period were counted. Of the six inmates who required initial psychiatric evaluations, five or 80 percent were compliant. Regarding the 11 inmates expected to be seen for routine contacts, there were 20 expected timeframes, and 11 or 55 percent occurred within ninety days and were compliant. However, one inmate was of particular concern as he had not had a meaningful psychiatric contact since early October 2019.

For initial primary clinician contacts, days between arrival date and the initial primary clinician contact were counted to determine compliance of initial primary clinician contacts. Regarding routine contacts, days between the initial contact and each subsequent routine contact were counted. Reviews were completed on 12 cases.

Six inmates required initial primary clinician contacts. Of those that were required, four or 67 percent were compliant. For the 11 inmates expected to be seen for routine contacts, there were 29 expected timeframes and 27 or 93 percent occurred within 90 days and were compliant.

As to IDTTs, the days between arrival and the initial IDTTs were counted to assess compliance. To assess routine IDTT compliance, given the annual timeframe for IDTT, days

between an IDTT that occurred during the review period and the previous IDTT were counted. EHRS reviews were completed on 12 cases regarding compliance with IDTTs.

Of the six inmate cases who required initial IDTTs, five or eighty-three percent were compliant. The two inmates that required annual IDTTs during the review period occurred within 365 days and were timely. Regarding attendance at IDTTs, required staff were present at four of six or 67 percent of initial IDTTs. Required staff were present at one of two or 50 percent of routine IDTTs. Of note, while a primary clinician and psychiatrist were in attendance, often it was unclear if the assigned treatment providers were in attendance as required by the Program Guide.

Transgender Hub:

The staff at CMC had noted that they had become a transgender hub facility since the preceding site visit. Eleven clinicians including four supervisors had attended gender-affirming surgery mental health evaluation training on January 15, 2020, in accordance with implementation of the program. The chief of mental health supervised the program but was not listed as receiving the gender-affirming surgery mental health evaluation training, a potential concern. As of March 18, 2020, there were 27 inmates housed at CMC identified as part of that transgender hub designation: one at the MHCB level of care, seven at the EOP level of care, 15 at the 3CMS level of care, and four who were not on the mental health caseload.

Of the clinicians trained, two had provided services, including the evaluations for gender-affirming surgery and hormone readiness. There was not a current LOP, but one was in development per CMC management staff. No further information was provided, though staff did state on the entrance call that they did not feel that the transgender hub designation had negatively impacted the overall mental health mission in any way.

596

Other Issues:

Pre-Release Planning:

CMC reported that they had a pre-release coordinator who organized pre-release planning services and ensured that MHSDS inmates had programs set up prior to their release. The institution had one social worker designated for pre-release planning and two Transitional Case Management Program (TCMP) staff members. CMC reported having completed 154 pre-release inmate appointments and 68 pre-release packets. The pre-release coordinator indicated that 259 inmates had participated in pre-release groups, which were held twice a week during the period under review.

CMC's education department also operated the Transitions program, in which inmates met daily for six weeks prior to release to address post-release concerns.

Program Access:

a.  Jobs and Program Assignments:

On February 12, 2020, of the 1,853 job assignments, CMC reported that 250 or 44 percent of the EOP population held job assignments, 364 or 51 percent of the 3CMS population held job assignments; and for the non-MHSDS, 1,239 or 50 percent of the non-MHSDS population held job assignments.

For the 840 academic inmate assignments, CMC reported that 118 or 21 percent of the EOP population held academic assignments. For the 3CMS inmates, 204 or 29 percent of the population held academic assignments, and for the non-MHSDS inmates, 518 or 21 percent of the non-MHSDS population held academic assignments.

Regarding the 339 vocational educational assignments, CMC reported that 22 or four percent of the EOP population held assignments. For the 3CMS inmate population, the

institution reported that 94 or 13 percent of the 3CMS population held vocational assignments, and for the non-MHSDS inmate population, CMC reported that 223 or nine percent of the non-MHSDS population held vocational educational assignments.

For the 340 voluntary educational assignments, CMC reported that 35 or six percent of the EOP inmate population held voluntary educational assignments. For the 3CMS population, it was reported that 61 or nine percent of the population held voluntary educational assignments and for the non-MHSDS inmates, 244 or ten percent of the population held voluntary educational assignments.

There were zero substance abuse treatment assignments available to MHSDS inmates and eight substance abuse treatment assignments available to the non-MHSDS inmate population though zero of the substance abuse treatment assignments were filled.

Joint venture assignments were jobs that were available through the New Life K-9 program. Joint venture assignments were not available to EOP inmates, the single joint venture assignment available to the MHSDS population was held by a 3CMS inmate, or zero percent of the 3CMS population, and for the non-MHSDS population, 37 or 1 percent of the population held a joint venture assignment.

b. Milestone Credits:

A report dated August 1, 2019 to January 31, 2020 indicated that of 574 EOP inmates, 556, or 97 percent were eligible to earn milestone credits and 88 percent earned the credits. For 3CMS inmates, 696 of 711 or 98 percent were eligible to earn milestone credits and 26 percent earned the credits. The report further reflected that of 2,479 non-MHSDS inmates, 2,444 or 99 percent were eligible to earn milestone credits with 32 percent earning them.

c. Out-of-Level Housing:

On February 7, 2020, one Level I 3CMS inmate was placed in Level II housing, two Level II EOP and five Level II 3CMS inmates were placed in Level III housing. There were 44 Level III EOP and 57 Level III 3CMS inmates placed in Level IV housing.

d. ADA Reasonable Accommodation and Grievance Procedures:

The ADA Reasonable Accommodation Request Process was implemented on June 30, 2015. CIM provided a draft desk manual updated August 17, 2017. A training entitled, 'health care grievance office technician training' was documented as provided to a single staff member during the period under review.

e. Compliance with In-Cell/Private Unclothed Body Search Policy:

CMC provided documentation that a dozen correctional officers attended a training entitled, "Inmate Clothed/Unclothed Body Search" on January 28, 2020 in the administrative segregation unit, Facility B. In addition, the institution provided a policy document on unclothed body searches of inmates dated July 29, 2014.

Case-by-Case Reviews:

Monthly ICC Pre-MERD (Minimum Expected Release Date) reviews were documented for EOP inmates in the administrative segregation unit. Reported attendees at the hearings included the correctional counselor II and captain, however no mental health representative was reflected as present in the documents provided. Cases were presented timely, or within 60 days prior to the expiration of the MERD. Ongoing administrative segregation holds were documented, and lengthier stays were attributed to serious charges, such as murder, assault with a dangerous weapon or serious bodily injury resulting.

CMC reported the warden completed reviews of 65 EOP inmates in the administrative segregation unit who were there for more than 90 days during the reporting period. Of this number 55 were pending district attorney decision and RVR completion, one was pending an investigation into safety concerns and nine were pending transfers. However, the narrative provided on the warden's reviews was not the required documentation necessary to confirm completion of case-by-case reviews.

Non-Disciplinary Segregation:

CMC reported there was no current local operating procedure for NDS but provided the most recent version of NDS operating procedure for MHSDS inmates dated August 14, 2014.

On February 18, 2020, the institution reported there were eleven inmates on NDS status in the administrative segregation unit, of which three were MHSDS inmates at the EOP level of care. An additional three MHSDS inmates were reported to have transferred during the period under review.

"C" Status:

The institution reported that there were 45 inmates on "C" Status, as of March 26, 2020. There was one at the MHCB level of care, 15 at the EOP level of care, eight at the 3CMS level of care, and 21 non-MHSDS inmates. The institution did not indicate the reason for "C" Status.

Referrals:

CMC reported 2,301 emergent psychiatric mental health referrals, of which 53 were not timely for 98 percent compliance, 15 urgent psychiatric referrals with 100 percent compliance and 371 routine psychiatric referrals, of which 12 were not timely for 99 percent compliance. There were 99 emergent primary clinician mental health referrals that were 100 percent compliant, 187 urgent referrals, of which three were untimely for 98 percent compliance, and

909 routine primary clinician referrals, of which 12 were not timely for 99 percent compliance. The institution reported there were 286 medication non-compliance consults referrals, of which 12 were not timely for 96 percent compliance.

Treatment Space:

CMC had dedicated group treatment space on each yard, with the exception of 3CMS West Yard. Each location that housed MHSDS inmates had space for group treatment. The institution did not report on the availability of individual treatment space at 3CMS East and 3CMS West Yards.

Mental Health/Custody Relations:

During the review period, CMC was not required to conform to the 2019 custody and mental health partnership plan.

Over the last year, 1,057 complaints were filed for inappropriate conduct towards MHSDS inmates. Of the complaints, 499 were denied, 176 were granted, and 382 were partially granted. There were 310 health care grievances, of which 32 had interventions, and 278 did not. Three inmate appeals were referred for investigation.

Heat Plan:

Between August 2019 and October 2019, the institution reported 15 Stage I heat alerts, and five Stage II heat alerts. There were no Stage III heat alerts or heat related illnesses reported.

RVRs:

Of the custody staff who were required to attend RVR training, 98 percent attended. Regarding mental health clinicians, the monitor was unable to ascertain who attended training. The institution provided a list of clinicians but did not state whether all or a subset of clinicians attended the required training.

601

CMC issued 1,033 RVRs during the review period, of which, 502 or 48 percent were issued to MHSDS inmates. MHCB inmates received 39 RVRs, EOP inmates received 207 RVRs, and 3CMS inmates received 256 RVRs.

For the reviewed sample of 35 RVRs, custody timely referred the RVRs to mental health staff on 29 occasions or 83 percent of the time. Mental health assessments were completed and timely provided to custody on 28 occasions or 82 percent of the time. The mental health assessment recommended documenting the behavior in an alternative manner on two occasions, notably these were the only two occasions where supervising clinicians reviewed the mental health assessments. The mental health assessment recommended mitigation for 12 or 35 percent of RVRs. CMC did not supply the necessary adjudication documentation to determine whether the senior officer considered the mental health assessments in conducting the reviews.

<u>Use of Force</u>:

CMC reported the warden, chief deputy warden, and all five correctional administrators attended mandatory use of force training within the past year. Custody staff who attended the training, included six of seven captains or 94 percent, 34 of 36 lieutenants or 94 percent, 85 of 88 sergeants or 97 percent, and 715 of 732 correctional officers or 98 percent. For mental health staff, the chief of psychology and chief of mental health attended use of force training, as did all nine or 100 percent of supervising psychiatrists, supervising psychologists and supervising social workers, 13 or 100 percent of the psychiatrists, 56 of 59 or 95 percent of the psychologists, and 16 of 17 or 94 percent of the social workers. For nursing staff, 164 of 181 or 91 percent attended the use of force training.

The institution reported no controlled use of force incidents during the reporting period. CMC reported a total of 63 immediate use of force incidents involving 44 MHSDS inmates and

24 non-MHSDS inmates.  There was a total of 147 non-use of force incidents involving 90 MHSDS and 57 non-MHSDS inmates.

Lockdowns/Modified Programming:

CMC reported no program lockdowns during the reporting period and four incidents of modified programming that occurred on October 22, 2019, November 21, 2019, December 24, 2019, and January 31, 2020.  A modified program that occurred in December 2019 was limited to a few inmates who had were quarantined due to exposure to mumps at a previous institution, and in January 2020 a modified program was implemented in facilities E and F due to the rapid spread of norovirus among the residents in those facilities.  The modified programming in the dorms with norovirus was limited to those inmates with symptoms.   The remaining two modified programs were related to safety issues concerning contraband and missing equipment; however, the issues were rectified within the housing units and programming was returned to normal within two days.

Access to Care:

A review of CMC's monthly Health Care Access Quality Reports from August 2019 to January 2020, indicated that 1.6 percent of the issued mental health ducats and add-on appointments were not completed due to custody factors, while nine percent were not completed due to non-custodial reasons, excluding inmate refusals.

Non-Designated EOP:

CMC reported that Facility D became non-designated in January 2019.  During the review period, there were no reported incidents of violence between EOP and non-EOP inmates.

<u>Document Production Issues</u>:

CMC at times provided redundant data sources in the site documentation.  For example, CMC provided narrative responses to some document request items such as the number of primary clinician and psychiatry contacts that occurred cell front.  In addition, data was also provided via tables that appeared to have been exported from on-demand reports from EHRS. The multiple data sources were not always consistent.  Sometimes this was due to slight overlap due to differing periods of time.  For instance, audits of administrative segregation unit morning meetings covered July through December 2019, while narrative data was for August 2019 through January 2020.  At other times, the cause for the inconsistency could not be determined. Narrative data was not consistently sourced, and some tables and/or spreadsheets did not have dates.  In addition, CMC would provide narrative data that did not match the raw data provided. Attempts to reconcile were made as much as possible or what appeared to be the most reliable was used (e.g., data that appeared to have come directly from an identified source such as EHRS).  When calculations could be completed, they were, and those data were used instead of CMC's summary numbers.

The institution did not provide heat plan training documentation in a manner that was useful to the monitor.

**Wasco State Prison (WSP)**
March 3-5, 2020

Census:

On March 2, 2020, WSP housed 4,505 inmates.  The mental health caseload was 1,180 inmates or 26 percent of the population.

Six inmates were housed in the MHCB unit.

There were five EOP inmates, including four housed in administrative segregation pending transfer to an EOP hub.

There were 131 mainline 3CMS inmates.  Of those, six inmates were housed in the Minimum Support Facility (MSF) and two inmates were housed in administrative segregation.  The total administrative segregation unit population was 77 inmates.

The reception center population included 49 EOP inmates, of which 22 were parole violators, and 976 3CMS, of which 143 were parole violators.

Thirteen inmates were in reception center STRH.

Staffing:

The senior psychologists, supervising social worker, senior psychiatric technician and the MHSDS clerical positions were all filled.

The chief psychiatrist position was vacant.

There was no established senior psychiatrist position at WSP.

Of the two established chief psychologist positions, one was filled by the chief of mental health.  WSP was directed by headquarters not to fill the second position.

Three of the 6.5 staff psychiatrist positions were filled.  Registry staff filled an additional 1.5 positions for a functional vacancy rate of 31 percent.

605

The two FTE telepsychiatry positions were filled.  During the review period, telepsychiatry provided approximately 40 hours per week of services to the EOP population; however, as of November 1, 2019, telepsychiatry only serviced the 3CMS population.  WSP also shared a portion of an additional night shift telepsychiatrist that was not part of WSP's staffing package.  This telepsychiatrist provided crisis evaluations on Thursdays and Fridays from 4:00 p.m. to 7:00 a.m. and on Saturdays from 9:00 p.m. to 7:00 a.m.  Telepsychiatry was not utilized in the MHCB during the review period or at the time of the site visit.

Of the 30.5 staff psychologist positions, 20 were filled.  Registry staff filled an additional 1.5 positions for a functional vacancy rate of 30 percent.

WSP employed 14 social workers, one more than the established 13 positions.  An additional 1.05 registry staff covered staff on leave.

For psych techs, 15 of 24.8 positions were filled.  Registry staff filled an additional one position for a functional vacancy rate of 35 percent.

Two of the 2.5 recreation therapist positions were filled for a functional vacancy rate of 20 percent.  No registry staff was utilized.

There were no established medical assistant positions; however, WSP used three registry medical assistants during the review period.

WSP supervisory staff did not carry caseloads.  Also, recreation therapists were not assigned caseloads but provided groups throughout all MHSDS programs.  The chief of mental health led weekly meetings wherein all supervisors reviewed staff assignments and coverage.

Quality Management:

WSP maintained a robust quality management/quality improvement program.  The local governing body, quality management committee, and mental health subcommittees met monthly

and were well attended.  Meeting minutes indicated relevant issues were discussed; improvement projects were chartered, built and updated, and both audits and action items were reviewed. Leadership used the mental health dashboard to set priorities and project goals/outcomes. Additionally, the interconnections between the local governing body, quality management committee, and the mental health subcommittee were clearly reflected in monthly minutes. While quality management and quality improvement were incorporated into the fabric of mental health and the overall culture of the facility's leadership, interviewed mental health staff indicated that relevant information was not routinely disseminated from leadership.

The local governing body met monthly except during December, and a quorum was always met.  Agenda items included reviews and votes either approving or disapproving local operating procedures and policies and procedures for medical, dental, and/or mental health. Clinicians' credentials were also reviewed.  During the reporting period, the medical executive committee and the local governing body reviewed and approved credentials and privileges for 11 psychologists and two psychiatrists.  Mental health topics discussed by the local governing body included creation of a high priority list for high-risk mental health inmates in an effort to transfer them to a mainline program within 30 to 60 days, clarification of the definition of a "hunger strike," and recruitment of psychologists and social workers to fill vacancies created by recent non-punitive terminations.

The quality management committee met monthly during the reporting period and a quorum was present for all meetings.  Agenda topics included review of previous meeting action items, system surveillance and quality concerns, performance improvement work products, OIG Cycle 6 status updates, project reports, subcommittee reports, audits, and local operating procedure and policy and procedure reviews with approvals/denials.  A mental health quality

607

management committee action item included identification of reception center inmates discharged from MHCB/DSH and not readmitted within 30 days. Quality management committee mental health project reports included a Six Sigma Black Belt project focused on improving the process regarding psychiatry usage of nonformulary medications. Quality management committee minutes also included updates on mental health subcommittee projects, specifically delays in access to care due to staging and staffing availability, MHCB daily provider contacts, timely transfer to 3CMS and EOP, and response to mental health referrals and appointments.

The mental health subcommittee met monthly during the reporting period and always had a quorum present. Agenda items included system surveillance and quality concerns, improvement projects, local operating procedures, staffing issues, program management issues, audits, and a review of action items. Mental health projects identified in the quality management committee minutes were discussed in detail in the mental health subcommittee meeting minutes. Additional projects and audits included collaboration training for the partnership plan, mental health rule violation audits, indecent exposure audits, mental health dashboard results, and SPRFIT QIT minutes regarding "30-Minute Discharge Checks."

The EMRRC met monthly and maintained meeting minutes. Approximately 40 EMRRC cases were summarized, reviewed, and critiqued monthly. Response times and staff compliance were evaluated, and training issues and custody concerns were identified. Critical indicators were clearly presented in charts and tables that included trends and outliers. Additionally, WSP performed mock drills monthly throughout the institution. Administrative segregation unit drills and training rosters were summarized in stand-alone reports.

Approximately 15 to 20 percent of cases and drills involved mental health.  The number of mental health cases decreased significantly because of the CIT program.

<u>Medication Management</u>:

At WSP, MAPIP results for August 2018 through January 2019 reported compliance for psychiatric diagnostic monitoring and medication management. The medication management dashboard for the period showed that for inmates prescribed antidepressants, venlafaxine blood pressure and medication consent were compliant for all six months of the review period. Electrocardiograms (EKG) were non-compliant for one month and no data was reported for other months. Thyroid monitoring was compliant for two of the six months; no data was provided for the other four months.

Data for inmates prescribed antipsychotics showed that measurements for blood pressure, height and weight, and medication consent were compliant for all six months.  Thyroid monitoring was compliant for five months and no data was reported for one month. Electrocardiogram (EKG) measurements were compliant for two months during the review period.  Diagnostic monitoring of abnormal involuntary movement scale (AIMS), blood sugar, complete blood count (CBC) with platelets, lipid monitoring, and comprehensive metabolic panel (CMP) were non-compliant throughout the review period.

WSP did not provide data for carbamazepine for the review period.

Data for one month for weight measure related to Clozapine, which was compliant, was provided. No data was provided for any other diagnostic measures for Clozapine.

WSP's psychiatric diagnostic measures for inmates prescribed Depakote were compliant for medication consent for all six months of the review period.  CBC with platelets, CMP, and Depakote levels were compliant for one month during the six-months review period.

WSP was compliant with medication consent for Lamotrigine for three months; no data was provided for the other three months.

Data for diagnostic measures for inmates prescribed Lithium indicated that medication consent and thyroid monitoring were compliant the six months of the review period. Lithium levels and EKG were compliant for four months; Creatine and BUN (kidney function tests), were compliant for three of the six months.

Multiple MAPIP mental health medication measures scored below 90 percent for one or more months during the review period.  Observation of medication preparation and administration for HS medications, psychiatric-prescribed chronic care medications, and new psychiatric medications were compliant for all six months of the review period.  Medication continuity upon inter-institutional transfer at receiving and release (R&R), for MHCB transfers, and for intra-institutional transfers to ASU/SHU/PSU were compliant for three months. Medication continuity upon parole or release to the community was compliant for four of the six months of the review period.

Medication continuity upon arrival at the reception center and observation of medication preparation and administration for AM/PM were non-compliant for all six months. Continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU) was compliant for two months.  Medication continuity following discharge from community hospital or acute or intermediate care for one month was compliant. Medication continuity for court ordered involuntary medications was non-compliant for three months; no data was provided for three months.

Medications prescribed for mental health indications were not prescribed KOP with the exceptions of designated selective serotonin reuptake inhibitors.

On February 10, 2020, WSP had 554 inmates on psychotropic medication; 347 inmates were on antipsychotic medications and 18 inmates were on Lithium. All were prescribed as NA/DOT.

There were no issues with pill lines and timing of medication administration that interfered with mental health programs.

Nonformulary orders did not require approval by a secondary reviewer (facility medical authority); however, providers were required to follow HC DOM 3.5.5 prescription/order requirements limiting prescriptions/orders to medications listed in the CCHCS formulary, unless appropriately documented in EHRS.

Over 500 inmates were prescribed HS medications at WSP; all orders were administered after 8:00 p.m.

The PC 2602 coordinator tracked all initial and renewal PC 2602 cases. The coordinator also tracked existing PC 2602 inmates recently transferred to WSP from DSH/PIPs or MHCBs, inmates who transferred to mainline institutions prior to renewals, inmates who paroled prior to renewal, inmates discharged, and inmates who were assessed by psychiatrists and determined non-renewals. The tracking was updated weekly and as needed per new case.

Since August 2019, seven non-emergency PC 2602 petitions were initiated; one petition was withdrawn and six petitions were approved. One emergency PC 2602 petition was also approved.

Transfers:

A senior psychologist supervisor filled the inpatient coordinator position.

During the review period, there were 140 IDTTs for 87 inmates who met criteria for higher level of care consideration. Of those, WSP referred 25 inmates or 29 percent.

Reviewed electronic health records of non-referrals indicated inadequate rationales that did not address inmates' specific clinical indicators. Rationales from outpatient levels of care were often not provided, included boiler plate language, or failed to identify positive indicators when they were present. Further, the MHCB routinely considered EOP and acute level of care during admissions, however, ignored data that suggested intermediate level of care may have been more appropriate.

WSP referred 20 inmates to acute level of care; all referrals generated from MHCBs. Referrals were completed within timeframes; however, inmates were not transferred within ten days for six or 30 percent of inmates. Delays were attributed to lack of available acute beds. Two inmates did not transfer within 72 hours of receipt of a bed number; one was four days late due to a PC 2602 involuntary medication hearing and the other due to transportation issues. There were no rejections or rescissions.

WSP referred five inmates to intermediate care; two inmates were from MHCBs and three were reception center EOP inmates. One inmate was rejected and another referral was rescinded; both inmates were re-referred to acute care. All referral timeframes were met, and all inmates transferred within 72 hours of receipt of a bed number.

WSP completed six *Viteck* hearings during the review period; none of the inmates prevailed.

WSP reported no inmates returned from acute or intermediate care during the review period.

There were no inmates referred to acute or intermediate care that had complex medical needs during the review period.

No transfers were delayed or cancelled due to impending paroles, disciplinary proceedings or

612

classification factors.

During the review period, WSP referred 153 inmates to MHCBs; 128 were admitted and 25 inmates or 16 percent were rescinded. Of the 128 admissions, 54 inmates transferred to MHCBs outside of WSP. All referrals were admitted within 24 hours of referral.

No EOP inmates were endorsed for PSU transfer during the review period.

During the review period, 11 of 13 or 85 percent of EOP inmates transferred to EOP administrative segregation hubs within 30 days. Endorsement took an average of 17 days. At the time of the site visit, two of the four inmates waiting transfer to an EOP hub were beyond transfer timelines.

WSP reported that 18 mainline 3CMS inmates transferred to STRH during the reporting period. Four inmates or 22 percent took longer than 30 days to transfer.

WSP did not transfer any 3CMS inmates to LTRH during the review period. Excluding the months of December 2019 and January 2020 due to the impact of a mumps quarantine, WSP met transfer timeframes for reception center EOP transfers once during a four month period. Reasons for delays were not provided. On March 5, 2020, none of the 51 reception center EOP inmates had been waiting beyond the 60-day transfer timeline.

During each month of the review period, WSP was 50 percent compliant or below for reception center 3CMS transfers to mainline programs. On March 6, 2020, of the 939 reception center 3CMS inmates, 166 or 18 percent had lengths of stay over 90 days. For those inmates, the average length of stay was 190 days.

WSP did not provide data regarding transfers of mainline 3CMS inmates who required EOP level of care and transferred during the review period. On March 2, 2020, one mainline EOP inmate was waiting transfer and was not beyond timeframes.

Programming:

Reception Center:

WSP's reception center was staffed with 7.6 psychologists, two social workers, and two psychiatrists who completed screens and evaluations, as well as managed the reception center 3CMS population. WSP did not provide reception center caseload data for the review period; however, the institution reported that staff coverage was fluid, covered as needed, and did not exceed required ratios.

WSP met timeframe guidelines for completion of screens upon admission to the reception center. Of 5,627 inmates admitted to the reception center during the review period, 5,590 or 99 percent were screened within Program Guide timeframe requirements; 38 percent had positive results from a mental health perspective. Of those, 1,397 inmates or 25 percent were placed in the MHSDS; 1,340 inmates or 96 percent were placed in 3CMS, 21 inmates or 1.5 percent were placed in EOP, and 36 inmates or 2.5 percent required MHCB admission.

Interviewed inmates reported that they received an initial health care screen upon arrival, and with few exceptions, received previously prescribed psychotropic medications within 24 hours of admission.

Three primary clinicians and one psychiatrist were assigned to reception center EOP. At the time of review, primary clinician caseloads did not exceed the 1:18 required ratio. The psychiatrist caseload also did not exceed the 1:120 required ratio.

On March 5, 2020, there were 51 reception center inmates assessed to require an EOP level of care; 40 of those inmates were SNY EOP. None of the 51 inmates' lengths of stay exceeded the 60-day transfer timeframe requirement. While WSP attempted to cluster EOP

inmates in one housing unit, non-EOP inmates could be and were placed in the same housing unit. EOP inmates only double-celled with other EOP inmates.

Staff and interviewed inmates indicated that initial IDTTs were completed within 14 days of arrival unless their level of care was increased to EOP later in their reception center stay. Reception center EOP inmates confirmed that they were evaluated by the psychiatrist prior to their initial IDTT. All required staff and inmates were present in the observed reception center EOP IDTT. All IDTT members were actively engaged in the process, and consideration of referral to a higher level of care was discussed during the IDTT process. The individual and group treatments offered to reception center EOP inmates were consistent with Program Guide requirements.

Reviewed data and inmate interviews confirmed that reception center EOP inmates were seen weekly by their primary clinician and almost always in a confidential setting. Further, the inmates were seen on a monthly basis in a confidential setting by the psychiatrist. Inmates indicated there were no difficulties receiving their prescribed medications.

Reviewed local data and inmate interviews indicated that reception center EOP inmates were offered an average of 6.38 hours per week of out-of-cell structured therapeutic activity with an average of 5.04 hours per week received. The monitor's expert observed three reception center EOP group therapies wherein inmates were actively engaged. Inmates described the groups as helpful.

Minimal non-mental health activities were offered to reception center EOP inmates. Inmates received outdoor recreation therapy in a large yard twice per week, and dayroom time per tier every other day. The duration of activity ranged from one to two hours depending on the source of the information (custody staff versus inmate reports). However, staff reported during

the two weeks prior to the site visit, access to yard and dayroom time was very limited due to prison-wide cell searches that were taking place.

The major treatment issue for reception center 3CMS inmates was the lack of timely access to the psychiatrist. Other issues included the lack of access to yard and cleaning supplies.

Reception center 3CMS inmates were not required to receive IDTTs. WSP met Program Guide timeframes for initial primary clinician contact within 30 days of arrival and every 90 days thereafter for reception center 3CMS inmates. With rare exceptions, contacts with the primary clinicians and psychiatrists were confidential.

A review of electronic health records and inmate interviews revealed problems with access to psychiatry.

Inmates reported poor access to outdoor yard, issues with access to cleaning supplies, and plumbing issues.

Interviewed inmates were unclear of the reason for delay in their transfers to mainline 3CMS programs.

<u>MHSDS Inmates in Administrative Segregation:</u>

Two primary clinicians and one psychiatrist were assigned to administrative segregation. WSP did not exceed CDCR's mandated ratios of 1:16 for primary clinicians and 1:125 for psychiatrists during the review period. On March 2, 2020, two 3CMS inmates were housed in administrative segregation waiting transfer to STRH.

Observed IDTTs were well organized and collaborative, and all required disciplines were present with computers for accessing relevant inmate databases. Initial assessments were completed prior to the IDTTs. All relevant historical and current inmate factors were considered, including custodial indications. Safety plans for suicide prevention were reviewed with inmates during

IDTTs, and inmates were included in treatment discussions.  Inmate participation was encouraged.

IDTTs in administrative segregation did not, however, review case conceptualizations, considerations for higher levels of care, or rationales for retaining inmates in current levels of care.  Diagnostic disagreement between psychiatry and primary clinicians also was not discussed or resolved when clearly indicated.

Confidential group treatment space with therapeutic treatment modules (TTMs) and restart chairs was available for 3CMS and EOP inmates in administrative segregation.  Staff expressed concern that a moderate number of group treatment refusals occurred due to the escort process from the housing unit to the treatment space.

WSP offered 60- and 90-minute treatment groups to 3CMS and EOP inmates in administrative segregation.

Individual clinical contacts occurred in confidential space in the administrative segregation housing unit.  Inmates recently returned from inpatient care received two primary clinician contacts per week for the first 30 days in administrative segregation.  In addition to their scheduled primary clinician contacts, administrative segregation primary clinicians conducted monthly cell-front check-ins with inmates.

EOP inmates in administrative segregation were offered weekly primary clinician contacts and seven hours of weekly group treatment.  Additionally, three hours of recreation therapy was offered.

Psych tech rounds in administrative segregation were observed.  The psych tech assessed the immediate mental health needs for each inmate and offered reading materials and forms

through the uses of a mobile laptop station. EHRS were reviewed and updated during each cell-front contact.

WSP provided radios to all MHSDS inmates in administrative segregation.

MHCB:

WSP operated a six-bed MHCB in the CTC; the unit was filled on March 2, 2020. The MHCB was staffed with one psychiatrist, three psychologists, and two social workers. One psychologist and one social worker were on leave; however, adequate coverage was provided. Caseloads did not exceed mandated ratios for any discipline during the review period. Treatment provided to patients in the MHCB was consistent with Program Guide requirements.

The WSP supervising psychologist tracked MHCB admissions. During the review period, 79 inmates were admitted to the WSP MHCB. The average clinical length of stay was 8.2 days; however, 29 percent of patients had physical lengths of stay longer than ten days. Two inmates had three admissions each during the review period.

Referring clinicians completed suicide risk assessments prior to admission to the MHCB. Inmates received a history and physical examination within 24 hours of admission, and an updated or new mental health assessment was conducted in a confidential setting.

Initial IDTTs occurred within 72 hours of admission, and subsequent IDTTs were conducted at least weekly. Required staff regularly attended IDTTs during which they updated treatment plans and considered referral to higher levels of care. All IDTTs were held in an appropriate office-like setting. The IDTTs observed by the monitor's expert were clinically meaningful.

Supervising staff and patients indicated that clinical contacts with a psychiatrist or psychologist occurred daily.  Patients were also seen at least twice a week by a psychiatrist in a confidential office setting.

A recreation therapist provided out-of-cell activities to MHCB patients daily in a courtyard setting.  Patients had access to yard three times per week while in the MHCB.

Clinically meaningful discharge summaries were present in reviewed EHRS, and suicide risk assessments were completed upon discharge for patients admitted for suicidal thoughts/behavior.

Suicide watch and precaution practices were compliant with Program Guide requirements.

Property, bedding, mechanical restraint and movement restrictions were reviewed during IDTTs.

The MHCBs had appropriate, approved beds and mattresses.

There were two ADA-compliant cells within the CTC.

Seclusion and Restraint:

One inmate was restrained for approximately four hours during the review period. Seclusion was not used.

Alternative Housing:

WSP utilized the lower tier of administrative segregation for alternative housing. Additionally, other housing units were used when needed for special considerations such as ADA accessibility.

Clinical staff were assigned to the alternative housing areas as needed.  Clinical contacts in alternative housing were conducted in a confidential setting.

Two patients were in alternative housing during the site visit. Both were on suicide watch with 1:1 observation. Neither inmate remained in alternative housing beyond 24 hours.

During the review period, 160 inmates were placed in alternative housing. Of those, 134 inmates or 84 percent were referred to MHCBs. All but one patient transferred to an MHCB within 24 hours; WSP did not provide a reason for the one delay and the referral was rescinded.

Patients admitted for suicide watch were placed on 1:1 constant observation. There were no problems with issue of clothing or suicide smocks. The cells were wet cells and bedding was provided. Cells were cleaned by custody, and WSP maintained a cleaning log. Observed cells were clean.

Crisis Invention Team (CIT):

The CIT was implemented at WSP during December 2017 and included two psychologists, three social workers, one yard lieutenant and an SRN III. Psychiatric coverage was provided on an as-needed basis by either the on-call psychiatrist or the night shift telepsychiatrist.

The CIT provided coverage seven days a week, from 3:30 p.m. to 10:00 p.m. Monday through Friday and from 7:00 a.m. to 10:00 p.m. on Saturdays and Sundays. Referred inmates were evaluated by the full CIT. Implementation of the CIT resulted in significantly decreased MHCB admissions during evening hours.

WSP also had a crisis response team (CRT) that was implemented prior to the implementation of the CIT. The CRT was staffed by one psychologist and one social worker Monday through Friday from 7:00 a.m. to 5:00 p.m., and by the yard psychiatrist on an as needed basis. All crisis referrals during daytime hours were handled by the CRT, although suicide risk assessments were performed by the inmate's treating primary clinician.

During the month of August, reported as a typical month of data, there were 103 referrals to CRT, CIT, on-call psychiatry, and telepsychiatry night shift.  Of those, approximately 73 percent of inmates returned to custody; 24 percent transferred to MHCBs, and four referrals were rescinded.  Twenty nine percent of referrals were placed on suicide watch.

Reception Center Short-Term Restricted Housing:

Reception center STRH was located in the same housing unit as administrative segregation.  During the review period, WSP placed 60 reception center 3CMS inmates in reception center STRH.  For those inmates, the average length of stay was 34 days with a range from six to 132 days.  The longest stay was a Departmental Review Board (DRB) case.

On March 6, 2020, there were five inmates in reception center STRH.  The average length of stay for those inmates was 26 days with a range of 25 to 30 days.  WSP provided all reception center STRH services pursuant to policy, with the exception of exercise equipment; WSP was unaware of this requirement.

All interviewed inmates reported only positive experiences with custody and mental health staff in the reception center STRH.  Inmates confirmed that ICC was held within ten days of their arrival and that personal property was received within hours of their initial ICC review.  Out-of-cell activity logs were maintained and reviewed by the sergeant weekly in accordance with STRH policy.

3CMS:

One primary clinician was assigned to the mainline 3CMS and MSF.  An additional 0.5 psychologist and a telepsychiatrist also provided services as needed.  Staffing data indicated one primary clinician caseload was 1:120 which exceeded the mandated 1:97 primary clinician to inmate ratio.  Psychiatry caseloads did not exceed the required 1:280 ratio.

EHRS reviews and staff and inmate interviews indicated that psychiatry and primary clinician contacts occurred at least every 90 days in confidential settings. Medications were delivered timely and clinicians were responsive to mental health referrals. Interviewed inmates trusted their clinicians; however, they reported that mental health programming was limited to two recreation therapy groups due to staff shortages.

While critical treatment plan areas were addressed, observed IDTTs were rote and mechanical with no discussion of the symptoms underlying their diagnoses; the specific interventions used to address those symptoms; and the specific treatment plan objectives and goals. Inmates reported that treatment teams followed a question and answer protocol to assess inmates rather than collaboration with the inmate to assess and modify treatment strategies and goals. Additionally, patients were uncertain about their diagnoses and unable to identify the specific problems and symptoms that they were trying to change, the specific goals they were trying to attain, and the treatment strategies and interventions they were using to attain those goals.

Other Issues:

Pre-Release Planning:

One full-time social worker coordinated pre-release planning at WSP. A second part-time social worker was recently assigned to the program. For inmates within 120 days of release, WSP electronically tracked whether inmates were cleared for public transit and whether urgent mental health follow-up was indicated. Mainline 3CMS inmates were offered an average of two pre-release planning groups per week. Reception center 3CMS inmates were offered weekly, or as needed, individual pre-release planning contacts until their release. Beginning in October 2019, pre-release planning was entered into inmates' EHRS.

During the review period, 47 3CMS and 12 EOP inmates were scheduled for release.  All 59 inmates were seen by the TCMP case worker and two refused additional follow-up services.  Of those, 33 inmates were released to county probation, and 26 were released to state parole.  Telephone contacts with county probation and the parole outpatient clinic occurred prior to release and were documented on the pre-release planning log.  All inmates discharged to counties received a 30-day supply of medication.

Program Access:

    a.   Job and Program Assignments:

As of February 12, 2020, there were no program assignments for EOP inmates.  For 3CMS inmates, 62 or five percent of the population held job assignments.  Ten 3CMS inmates or one percent held academic assignments.  Five 3CMS inmates attended vocational education.  For non-MHSDS inmates, 522 or 16 percent of the population held jobs.  For academic assignments, 101 or three percent of non-MHSDS inmates held assignments.  Seventy-four or two percent of non-MHSDS inmates held vocational assignments.  The institution was unable to provide information regarding substance abuse due to the start of the ISDUT program.

    b.   Milestone Credits

As of February 12, 2020, WSP reported that 62 of 63 EOP inmates were eligible for milestone credits and 15 percent earned them.  Of the 1,195 3CMS inmates, 1,184 were eligible for milestone credits and three percent earned them.  Of the 3,368 non-MHSDS inmates, 3,331 inmates were eligible for milestone credits, and nine percent earned them.  The institution also provided its local operating procedure which was scheduled to expire in July 2020.

    c.  <u>Out-of-Level Housing</u>:

WSP provided information regarding out-of level-housing for mainline 3CMS inmates**.** As of February 7, 2020, three Level III non-MHSDS inmates were in Level I housing. Level II housing contained two Level I 3CMS inmates, 46 Level I non-MHSDS, one Level III 3CMS inmate, and 46 Level III non-MHSDS inmates. Two 3CMS inmates and 30 non-MHSDS Level III inmates were in Level IV housing.

    d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

WSP confirmed implementation of the revised ADA accommodation and grievance procedures.

    e.  <u>Periodic Classification Score Reductions, EOP Inmates</u>:

For the reporting period, WSP produced completed CDCR 840s that indicated the institution was providing classification score reductions for EOP inmates.

<u>Case-by-Case Reviews</u>:

One inmate met the criteria for a review during the reporting period. The inmate's stay in administrative segregation was initially extended due to a referral to the DRB. After DRB response, WSP ICC action was timely and the inmate transferred.

<u>"C" Status</u>:

On March 3, 2020, none of the 15 inmates on "C" status were in the MHSDS.

<u>Mental Health Referrals</u>:

All interviewed inmates were aware of the self-referral process at WSP. During the review period, WSP responded to 382 emergent referrals, 218 urgent referrals and 2,143 routine referrals. WSP responded to 86 percent of urgent psychiatry referrals and 89 percent of routine

psychiatry referrals in a timely manner.  Compliance with response to emergent psychiatry referrals was over 90 percent.

WSP was compliant with timely responses to emergent, urgent and routine primary clinician referrals.

Space/Construction:

Due to several construction and remodeling projects, treatment space was impacted during the review period.  Mental health diagnostics was relocated to space that allowed only one clinician to conduct screens at a time.  Additionally, because that same area was shared with CIT/CRT, during a crisis, diagnostics was either paused or stopped.  The opening of the TTA mental health space and new diagnostic space will alleviate these space concerns.  WSP did not provide expected dates of completion for these spaces.

Mental Health/Custody Relations:

WSP did not provide adequate data regarding staff completion of training on the Custody Mental Health Partnership Plan (CMHPP).  Staff reported improved relationships and access to care since the partnership training, and custody assisted with de-escalation of inmates.  During the review period, WSP was not required to conform to the 2019 CMHPP.

Nine inmates filed staff complaints for inappropriate staff conduct; six were filed by MHSDS inmates.  Of the staff complaints filed by MHSDS inmates, WSP made no interventions.

Heat Plan:

Interviewed housing unit officers effectively answered questions and demonstrated knowledge of local heat plan procedures.  Working thermometers were observed in all units

except for two where they were broken; a work order was submitted for only one of the broken thermometers.

There were 123 Stage I heat alerts, 32 Stage II heat alerts and five Stage III heat alerts during the reporting period.  WSP provided alternative yard accommodations for inmates on the heat risk list during Stage I heat alerts.

Interviewed inmates were aware of the heat alert process.

RVRs:

WSP did not provide data regarding the percentage of mental health and custody staff that was compliant with required RVR training during the review period.[70]  Interviewed custody and mental health staff were knowledgeable of the consideration of mental health input in the RVR process and penalty mitigation.  The local operating procedure for RVR mental health assessments was updated two months prior to the reporting period.

During the review period, WSP issued 3,303 RVRs.  Of those, 15 RVRs or less than one percent were issued to inmates housed in the MHCB, 33 RVRs or .09 percent were issued to EOP inmates, and 748 RVRs or 23 percent were issued to 3CMS inmates.

Mental health assessments were requested timely for 100 percent of the 11 reviewed RVRs; although nine assessments or 82 percent were timely completed and returned to custody.

Clinicians indicated that inmates' mental illness strongly influenced their behavior in three of the 11 RVRs and made recommendations relative to mitigation of loss of privileges in ten of the 11 RVRs.  No alternative discipline was recommended or approved for any reviewed RVR.

---

[70] In their response to the Twenty-Eighth Round Draft Monitoring Report, defendants provided lists of custody and mental health staff that had completed RVR training; however, compliance was not discernible from this information because there was no indication of the percentage of required staff that had completed the training.

Senior hearing officers documented consideration of inmate mental health factors in all of the cases reviewed and mitigated penalties based on mental health input in half of the cases.

Use of Force:

There were no controlled uses of force at WSP during the reporting period. There were 174 use of force incidents during the review period. Of those, 109 incidents or 63 percent involved MHSDS inmates, and 64 incidents or 37 percent involved non-mental health inmates. There were 49 non-use of force incidents. Of those, 29 incidents or 59 percent involved MHSDS inmates, and 20 incidents or 41 percent involved inmates not in the MHSDS.

Of 881 custody and management staff, 879 or 99 percent completed use of force training. Of the 74 mental staff, 72 or 97 percent completed use of force training.

All use of force incidences were reviewed in the weekly Institutional Executive Review Committee (IERC) that included the warden. All IERC reviewed cases were forwarded to the OIG.

Lockdowns/Modified Programming:

During the review period, there was one 47-day period of modified programing in the reception center impacting Yards C, H, and D-7, due to an outbreak of mumps. Mental health programming was not impacted.

Non-Designated EOP:

WSP's MSF was non-designated since May 31, 2018.

Placement of 3CMS Inmates into Minimum Support Facilities:

The MSF was located outside of the main institution and 3CMS staff covered the caseload in the unit.

On March 3, 2020, six inmates or four percent of 132 inmates in the MSF received 3CMS level of care. Policy review and staff interviews revealed that WSP was in compliance with the MSF policy, using the admission criteria, and performing required evaluations. WSP reported that very few 3CMS inmates were eligible for placement based on MSF admission criteria. WSP provided data identifying 3CMS inmates who were placed in the MSF during the reporting period; however, data was not provided on the total number of 3CMS inmates reviewed and referred to mental health for an evaluation, or the results of any completed evaluations.

_Coleman_ Postings:

Updated *Coleman* postings in both English and Spanish were observed in toured units.

**Kern Valley State Prison (KVSP)**
March 12, 2019 – March 14, 2019

Census:

On March 12, 2019, KVSP housed 3,711 inmates, a two-percent decrease since the preceding reporting period. The MHSDS population of 1,116 constituted 30 percent of the inmate population; it had decreased by 14 percent since the preceding review period.

The mental health caseload population included seven inmates in the MHCB, 103 mainline EOP inmates and seven EOP inmates in short-term restricted housing (STRH) pending transfer to an EOP hub. There were 895 mainline 3CMS inmates and 104 3CMS inmates housed in STRH.

Staffing:

KVSP reported that psychiatry staffing shortages and departures, and the hiring and training of new staff, resulted in the institution not consistently meeting and maintaining compliance with Program Guide psychiatry requirements for continuity of care and treatment compliance.

The chief psychiatrist position was filled, as was one of two chief psychologist positions; the chief psychologist served as the chief of mental health. KVSP was directed not to fill the second chief psychologist position as a salary savings measure.

Three senior psychologist supervisors filled 2.5 established positions; three senior psychologist specialists filled 2.5 established positions.

KVSP's 8.5 psychiatry positions were comprised of 5.5 onsite positions and three telepsychiatry positions. One of the onsite, and 1.25 of the telepsychiatry positions were filled, for a vacancy of 6.25 positions. Registry staff provided 4.28 FTE psychiatry positions, decreasing vacancies to 1.97 positions, for a functional vacancy rate of 23 percent.

Of 20.5 established staff psychologist positions, 15.5 were filled for a 24-percent vacancy rate. A psychologist from another institution provided services one day weekly at KVSP as an additional appointment.

The supervising social worker position was filled. During the site visit, KVSP had 13 social workers, which were three more than the ten allotted positions.

The senior psych tech position was filled. KVSP also had 31 psych techs, which exceeded the 26.7 established positions.

All five recreation therapist positions were filled.

The unit supervisor position was filled. KVSP had been directed not to fill the CHSA II position; a limited-term HPS II was provided instead. During the site visit, KVSP also had three HPS I employees.

Both limited-term medical assistant positions were filled.

Eleven of 11.5 established MHSDS clerical positions were filled, for a four-percent vacancy rate.

Telepsychiatry:

KVSP reported using telepsychiatry as its after-hours or on-call service provider, which it shared with five other institutions, and as part of its crisis intervention team (CIT). KVSP reported that it did not use telepsychiatry in the MHCB or EOP programs.

The B yard telepsychiatrist was physically present during the site visit, participated in IDTT meetings and completed individual sessions with inmates who she saw in IDTTs.

Quality Management:

A review of local governing body meeting minutes indicated that it met in September 2018, when a quorum was achieved, and various policies related to psychiatry and mental health

services were approved, among other matters. Minutes from the December 2018 local governing body meeting were not provided.

A review of minutes from the quality management committee revealed monthly meetings and attainment of a quorum, with the CEO and chief of mental health typically in attendance. The quality management committee tracked and addressed in detail various pertinent issues related to the provision of mental health services. Among them were the implementation of the CIT, difficulties with completion of appropriate justifications for the non-referral of inmates who met higher level of care referral criteria and with the provision of structured treatment for EOP inmates, and untimely responses to mental health referrals. Other addressed issues included problems adhering to MAPIP requirements and the untimely transfer of MHSDS inmates from the stand-alone administrative segregation unit.

Several issues that the quality management committee tracked showed signs of improvement during the review period. However, problems with staffing, and especially with psychiatry staffing, impinged on the sustainability of achieved gains. The utilization of the 85-percent threshold for many reviewed areas, instead of 90 percent, was also of concern.

A review of meeting minutes from the mental health subcommittee indicated the holding of monthly meetings and attainment of a quorum. Among other issues, the mental health subcommittee addressed the insufficient improvement in EOP inmates' treatment hours; a recurring, related remedial action was the lowering of the level of care of inmates who were not programming but remained clinically stable. The mental health subcommittee also addressed referral response non-compliance, which was primarily attributed to psychiatry staffing shortages.

The mental health subcommittee implemented Corrective Action Plans (CAPs) for several problem-prone areas, including suicide prevention-related matters such as five-day follow-up and deficient SRACHEs. The mental health subcommittee also noted but did not vigorously address problematic areas identified by regional staff during sustainable process visits, including difficulties with treatment goals, case formulations and IDTTs; attendance at IDTT meetings during the site visit indicated ongoing difficulties in these areas.

During the review period, KVSP did not develop any FITs or QITs.

Peer review did not regularly occur during the reporting period.

Medication Management:

As for automated MAPIP measures, KVSP reported on 27 applicable psychiatry measures and 13 applicable nursing measures, which were divided by medication type and diagnostic monitoring. CAPs for MAPIP measures five, six and seven, which represented medication continuity for medications that were delivered, offered and administered during inmate transfers, indicated less than 90-percent compliance due to medication unavailability, refusals and inappropriate nursing documentation. However, the institution reported more than 90-percent compliance for the additional nursing measures of nursing medication trainings, LVN competency evaluations, pill line lengths and medication storage practices. There were CAPs for all MAPIP measures with compliance rates below 90 percent.

It was reported that neither headquarters nor KVSP consistently tracked refusals for inmates who were prescribed psychotropic medications; the limited tracking indicated that these refusals were generally due to medication side effects which led to inmates missing the morning medication pass.

The chief psychiatrist reported that KVSP did not perform laboratory draws more than once annually for inmates who were prescribed psychotropic medications, which was inconsistent with MAPIP guidelines.  The rationale for the annual laboratory draws was that inmates who changed medications required multiple annual draws.  In the past such multiple blood draw requests had increased refusal rates; some inmates refused certain medications to avoid frequent blood draws.

Thirty-three of 34 petitions for PC 2602 involuntary medication orders were granted; the denied order was due to prescriber non-renewal.

KVSP did not indicate problems with long pill lines.  It was reported that medication administration did not interfere with inmates' access to individual and structured therapeutic activities.

During January 2019, 13,838 inmates were prescribed HS medications, which were administered at 8:00 p.m.  KVSP did not differentiate between HS medications that were prescribed for psychiatric, as opposed to medical reasons.  All psychotropic medication orders were prescribed DOT.

KVSP did not have a polypharmacy committee to evaluate inmates who were prescribed ten medications or more.

Non-formulary medications were submitted to KVSP's chief psychiatrist as a proposed medication order.

Transfers:

For the review period, KVSP considered but did not refer 415 inmates to a higher level of care.  The non-referral log identified non-referred inmates' IDTT date and level of care, the non-referral rationale, and any level of care change, among other matters.

During the review period, KVSP referred 17 inmates to acute care. Referral packets were timely sent to headquarters within two days of the IDTT referral as required for nine or 53 percent of inmates. One of the 17 acute care referrals was rescinded. Fifteen of 16 or 94 percent timely transferred within ten days of referral from headquarters. Twelve of 16 acute care referrals transferred within 72 hours of a bed assignment.

*Vitek* hearings were held for two of the acute care referrals; the outcome of the hearings was to continue with the referrals.

There were two referrals to intermediate care; the referral packet for one was timely sent to headquarters within five days as required. Both inmates who were referred to intermediate care transferred within 30 days of referral from headquarters, but only one transferred within 72 hours of a bed assignment. One of the inmates who was referred to  intermediate care had a *Vitek* hearing, which decided to continue with the referral.

One inmate with complex medical needs was referred twice to intermediate care. Both referrals were rescinded.

KVSP mental health staff and regional representatives reported that they were investigating the reasons for the extremely low number of intermediate care referrals and transfers during the review period. They further reported that HCPOP notified KVSP on the day when a patient was returning to the institution that the inmate was returning.

Sustainable process reviews at KVSP noted various weaknesses, including the lack of a permanent inpatient coordinator, the institution's program supervisors not playing an active role in the higher level of care/sustainable process review, and problematic continuity of care following inpatient care and inmate return to KVSP.

Case review further revealed that KVSP staff demonstrated difficulty documenting adequate clinical non-referral rationales, which at times were inconsistent with evidence provided in the treatment plan and/or in medical record documentation. Several reviewed cases appeared to have inappropriately not been referred to a higher level of care or any referral need could not be determined due to poor documentation.

The adequacy of interventions that KVSP mental health staff described in modified treatment interventions to address positive higher level of care referral criteria was also erratic. Some were clinically strong and appeared to fully address the indicators; others were inadequate and not evidence-based.

Reviewed records of inmates who returned from inpatient care revealed that clinician-to-clinician contacts were not documented; the inpatient discharge plan also was not referenced in the KVSP arrival treatment plan.

During the review period, 270 KVSP inmates were referred to MHCBs, 143 or 53 percent were admitted and 127 or 47 percent were rescinded. All 143 inmates who were referred to the MHCB reportedly transferred within 24 hours. MHCB transfer times averaged 7.2 hours.

KVSP transferred 110 inmates to EOP administrative segregation hubs, 101 or 92 percent transferred timely. Overdue lengths of stay for EOP inmates housed in administrative segregation averaged 16 days; no EOP inmates were housed in administrative segregation for more than 90 days.

All three EOP inmates who transferred to the PSU transferred timely.

Twenty-two of 23 or 96 percent of inmates timely transferred to long-term restricted housing; the untimely transfer was nine days overdue.

Programming:

MHCB:

KVSP maintained a 12-bed MHCB. During the site visit, seven beds were filled and two were redlined.

There were 188 admissions to KVSP's MHCB, including referrals from other institutions. Of these, 181 or 96 percent were for ten days or less. Overall, MHCB stays averaged 5.6 days. The seven MHCB stays exceeding ten days averaged 14 days and ranged from 11 to 20 days. One inmate had three stays in KVSP's MHCB.

Two psychiatrists and five primary clinicians assigned to the MHCB had caseloads that were within established staffing ratios. Although the MHCB was reported to be fully staffed, three of four assigned psychologists were unlicensed; many other staff were either new to KVSP or to the MHCB. The proportion of unlicensed staff created demands on supervisory staff which they reported limited their ability to sufficiently focus on quality of care or documentation concerns. The MHCB was reported to have regular and steady psychiatry coverage.

Supervisory staff noted a significant problem regarding the 30-day readmission rate for MHCB discharges; it ranged from a low of five percent in November 2018 to a high of 30 percent in December 2018. Reviewed quality management documentation indicated these readmission rates, but there was no clear plan for improvement.

Supervisory audits and inmate interviews reflected the conduct of daily MHCB contacts. It was also reported, however, that the MHCB continued to struggle with adequate documentation, including that related to SRACHEs. Staff reports and inmate interviews indicated that inmates were afforded regular access to outside yard. Chart reviews, staff reports,

and inmate interviews revealed that inmates were afforded full issue of clothing unless clinically contraindicated.

The CIT, which included a psychologist, nurse, and custody supervisor, was implemented in October 2018; at times telepsychiatry also participated. Supervisors reported that the telepsychiatrist did not see inmates in crisis at cell front. The CIT operated during some daylight hours and most nights until approximately 10:00 p.m. Mental health leadership believed that there was a possible relationship between the CIT, the reduced number of MHCB referrals, and the increased MHCB admission rate due to the addressing of custody issues as part of the crisis intervention process. Supervisors further reported that CIT-referred MHCB admissions were typically not rescinded. However, MHCB admissions by the on-call psychiatrist, who did not conduct face-to-face interviews, were the primary drivers of MHCB rescissions after an in-person clinical evaluation the following morning.

Observation of IDTTs conducted in the MHCB revealed adequate treatment space with required staff in attendance and with computer access. The IDTTs were reasonably interactive. Staff was knowledgeable about inmates and engaged in good transition planning as to MHCB discharges back to prison, and, as applicable, regarding inmates' release to the community. The observed IDTTs also addressed safety planning and did not use therapeutic modules.

During the site visit, five individually interviewed MHCB inmates generally reported regular contacts with the psychiatrist and clinicians, but reported both cell-front checks and the offer of private contacts. The inmates typically reported that their MHCB stays had been helpful and that staff had been responsive. Some also reported that custody staff had been of assistance.

There were ten inmates who were randomly selected to have their health records reviewed for their MHCB stays. Five of ten of the reviewed sample indicated that the initial

primary clinician evaluation occurred prior to the initial IDTT; six of ten received a timely initial psychiatry evaluation before the IDTT.  All ten reviewed MHCB charts indicated timely initial IDTTs, with all required treatment team members in attendance.  Nine of ten reviewed charts revealed that inmates received timely discharge IDTT meetings, with 100-percent compliance for required staff's attendance.

MHCB chart review indicated that 35 of 37 required daily MHCB contacts occurred; however, at least 21 of these clinical contacts should have been with a psychiatrist, but only 15 of 21 or 71 percent were, indicating noncompliance.

Seclusion and Restraint:

There was one instance of five-point restraint during the reporting period, which lasted for 55 minutes.  Seclusion was utilized four times; it ranged from eight minutes to over 14 hours.

Alternative Housing:

The institution had 12 alternative housing cells located on Facilities C-4, D-6, and in the STRH; each building had four cells.  A total of 270 inmates were placed in alternative housing during the review period.  The average daily alternative housing census was 1.43 inmates.

Five of 270 or two percent of inmates who were placed in alternative housing were housed there for over 24 hours.

All alternative housing cells were wet cells and were not suicide resistant.

On March 13, 2019, the monitor observed an inmate who was housed in alternative housing; a nurse was conducting a one-to-one suicide watch.  The inmate wore a suicide smock and had a suicide resistant mattress and blanket.  The monitor observed that the nurse's one-to-one suicide watch log was timely completed.

<u>Short-Term Restricted Housing</u>:

The STRH unit was located in a stand-alone building.  The STRH provided groups for 3CMS inmates; however, at the time of the site visit, additional groups or yard were not provided to satisfy required treatment hours for EOP inmates who were housed in the STRH.

KVSP reported that 170 mental health inmates placed in STRH were housed in administrative segregation between September 1, 2018 and February 28, 2019; 97 or 57 percent were housed there for more than 24 hours.  Mental health staff reported that housing mental health inmates in administrative segregation for more than 24 hours was due to an influx of caseload inmates requiring segregated housing and a corresponding limited amount of cell space in the STRH.

The caseloads of the one psychiatrist and six primary clinicians assigned to STRH were all within established staffing ratios.

Observed STRH IDTT meetings were well-conducted.  All appropriate staff, including the psychiatrist, were physically present; all clinicians had undertaken thorough medical record reviews and were productively engaged with team members and inmates.  However, higher level of care criteria were not always considered, while level of care decisions were not consistently discussed and made as a team.

The monitor's expert attended a coping skills group with six inmate participants that a recreation therapist conducted.  The group began on time.  The recreation therapist had a good rapport with inmates and was skillful at handling the group.

Interviewed STRH group participants reported seeing their primary clinician and psychiatrist, if needed, timely and in confidential settings, but expressed concerns with having to choose between day yard and group due to the cancellation of evening yard.  Inmates reported

that groups were beneficial and did not indicate problems with medications. However, they also reported certain systemic problems, including brown faucet water and clogged sinks that backed up dirty black debris, long waits for toilet paper, lack of soap, and inadequate clothing distribution.

Review of CDCR Form114A for caseload inmates typically reflected the offering of a minimum of 18.5 hours of weekly yard and three weekly showers, which interviewed inmates confirmed.

For the review period, KVSP was unable to provide length of stay data for mental health inmates who were housed in the STRH. However, the institution provided such information as of February 19, 2019, when 113 inmates were housed there. At that time, the unit housed nine EOP inmates with an average length of stay of 27 days and stays ranging from one to 64 days. On that date, the STRH also housed 103 3CMS inmates with an average length of stay of 80 days and one inmate with an MHCB level of care, who had been housed there for four days.

Five inmates were randomly selected to have their health records reviewed for their STRH stays. Three of the five cases were placed in STRH at KVSP and were selected for review regarding timely initial primary clinician evaluations. Chart review indicated that all three inmates had timely initial primary clinician evaluations, and two of three had timely initial psychiatric evaluations. Only one of three inmates had a timely initial IDTT, but all three had timely subsequent quarterly IDTT meetings.

Review of STRH charts indicated 73-percent compliance for ongoing primary clinician contacts within seven days and 100-percent compliance for psychiatry contacts at 90-day intervals.

EOP:

EOP inmates were congregated in Facility C-8; previously they had been housed in Facilities C-8 and C-7, but Facility C-7 was deactivated on October 1, 2018. In addition, KVSP also housed inmates housed EOP inmates in an overflow unit when the regular unit exceeded capacity.

Supervisors reported that there were typically one or two EOP inmates who were housed in an overflow unit, but at times this number increased to almost ten inmates. During the site visit, three EOP inmates housed in an overflow unit had stays that ranged from one to 23 days. These inmates were escorted to Facility C-8 for daily programming, which was described as an ongoing challenge.

The institution reported that one psychiatrist, six clinicians, and three recreation therapists were assigned to treat EOP inmates; the caseloads of the psychiatrist and primary clinicians were all within established staffing ratios. However, most primary clinicians assigned to the EOP were either unlicensed or newly licensed, which created a burden on supervisory staff. Mental health leadership described other ongoing challenges to include other staffing issues, including turnover, absences, and variable levels of clinical acumen.

A 3CMS psychiatrist covered EOP inmates one day weekly. Mental health leadership described the presence of a regularly scheduled, onsite psychiatrist as a significant benefit for treatment continuity and the management of inmates with paranoia; telepsychiatry was not used for the routine treatment of EOP inmates. KVSP appeared to make efficient use of clinical treatment space by combining staff offices and thereby increasing space for individual and group treatment rooms. The EOP supervisor nonetheless reported concerns with the sharing of offices and stated that increased group space would be useful.

641

There were continuing concerns with the inability to significantly improve EOP inmates' attendance at structured treatment in spite of ongoing quality management efforts. Although the number of offered groups had increased, the number of hours attended by inmates had essentially remained the same, while refused treatment hours had increased. The supervisor reported that inmates attributed this to various reasons, including a lack of satisfaction with group topics or the facilitator, or preferring to go to yard. Interviewed EOP inmates suggested multiple reasons, including some inmates' lack of motivation for treatment and the lack of officer training on how to work with inmates with mental disabilities. Review of quality management minutes suggested other possible causes for such low attendance; they included inmate fear of large groups, safety concerns, having to strip for yard, and paranoia and psychosis due to mental illness.

Interviewed EOP inmates reported significant appreciation for provided treatment but expressed concern of being threatened with the lowering of their level of care if they did not stop "causing trouble." Some inmates reported their belief that receipt of an RVR would lead to a reduction in their level of care; others stated this was KVSP's prior practice. Other inmates complained about custody staff's lack of understanding of mental disabilities; others believed that custody behaved reasonably. Relatedly, some inmates found clinical staff to be responsive, while others reported difficulty being seen as needed or at required intervals. Inmates further reported that mental health staff typically offered mental health contacts in an office setting. Inmates did not report problems with medications.

Observed IDTT meetings were generally problematic as several primary clinicians whose cases were scheduled were not in attendance, resulting in many presentations by staff who were unfamiliar with the inmates who they were presenting. Observed IDTTs also had a strong focus on criminal history and insufficient focus on pertinent clinical history; case formulations were

sparse, subjective factors for higher level of care consideration typically were not addressed and, at the end of IDTTs, the diagnosis was not always clear.  On a positive note, all required staff were in attendance.  Observed IDTTs also revealed clinical staff having good rapport with inmates, the notation of objective factors for higher level of care referral consideration and commendable attention to pre-release planning when indicated.

Two observed EOP inmate groups were found to be clinically beneficial.  Observed inmates were engaged in treatment and supportive of one another.

Interviewed EOP clinicians reported that structured services were only provided to EOP overflow inmates when requested by inmates.

Ten EOP inmates were randomly selected to have their health records reviewed.  Two inmates in the sample of ten were eliminated because of short lengths of stay in the EOP program.

Four inmates in the sample of eight who were placed in EOP during the site visit were selected for compliance with timely initial contacts. Chart review indicated that psychiatry timely saw two of four EOP inmates for an initial evaluation, while three of four were timely seen for initial primary clinician evaluations.  Three of four reviewed charts reported timely initial IDTTs, while timely ongoing IDTT meetings occurred in eight or 89 percent of the nine required IDTTs.

Chart review indicated that in 26 of 31 or 83 percent of cases there was compliance for primary clinician contacts weekly; 12 of 15 or 80 percent of ongoing psychiatry contacts occurred within 30 days.

3CMS:

The telepsychiatry position was assigned to the 3CMS program.  Three other psychiatrists assigned to the 3CMS program had caseloads that were within established staffing ratios.  Six primary clinicians assigned to the mainline 3CMS program had caseloads ranging from 111 to 132 inmates, which exceeded the mandated staffing ratio of 1:97; two other primary clinicians assigned to the mainline 3CMS had caseloads within established staffing ratios.

Observed one-on-one clinical sessions on Facility B were relevant; however, custody officers kept the door to the individual treatment office open, compromising confidentiality.

Interviewed 3CMS inmates on Facilities B and D rated the mental health program as fair. They reported timely seeing their clinicians and psychiatry. however, they indicated concerns with custody, who they reported typically either ignored or demeaned them.

It was reported that prior to approximately one month before the site visit, the clinical contacts of 3CMS inmates housed in Facility C-7 were being performed in therapeutic modules that were located in a non-confidential area.

The 3CMS supervisor reported that an enhanced 3CMS program had been initiated at KVSP on Facility C approximately nine months prior to the site visit; the reported purpose of the program was to transition inmates who had been discharged from the EOP to the 3CMS level of care and to assist 3CMS inmates who needed additional services.  The program's services included two weekly groups and, for the first 60 days, a one-on-one clinical contact every two weeks.  The program had a capacity of 30 inmates and provided transition services for 90 days.

Interviewed enhanced 3CMS program participants all reported being seen every two weeks; where applicable, they reported knowing their psychiatrist.  However, they also reported that the program was punitive and indicated sporadic group attendance due to the lack of group

structure; others reported custody's disregard for inmates' mental health needs. Concerns with the enhanced 3CMS program included that these services were comparable to a specialized program without clear policy guidelines.

Five randomly selected cases were selected for 3CMS chart review.

Chart review of the two inmates of the sample who required initial evaluations indicated compliance for initial primary clinician evaluations; one received an initial psychiatric evaluation. There was compliance for both inmates who were required to have an initial IDTT; one of the two inmates who required an updated IDTT had it timely.

Reviewed 3CMS charts indicated 100-percent compliance for timely ongoing primary clinician contacts at least every 90 days. One of two required ongoing psychiatry contacts were completed timely.

Other Issues:

Pre-Release Planning:

KVSP provided documentation reflecting some pre-release activities on all yards between September 2018 and February 2019; documentation indicated pre-release planning for one MHCB inmate and 26 EOP. KVSP did not report the number of 3CMS inmates pre-release planning.

Observed IDTT meetings for MHCB and EOP inmates demonstrated good attention to pre-release needs for inmates with approaching release dates.

Program Access:

a. Job and Program Assignments:

On February 1, 2019, KVSP reported that of 1,118 available jobs, 29 or 24 percent of EOP inmates held job assignments, as did 212 or 20 percent of 3CMS inmates and 877 or 34 percent of non-MHSDS inmates.

For the 458 academic assignments, four or three percent of EOP inmates held an academic assignment, as did 114 or 11 percent of 3CMS inmates, and 340 or 13 percent of non-caseload inmates.

Of 356 substance abuse treatment assignments, none were held by EOP inmates. Ninety-five or nine percent of 3CMS inmates and 261 or ten percent of non-MHSDS inmates held such assignments.

Of 254 vocational education assignments, one or less than one percent of EOP inmates held assignments, as did 58 or six percent of 3CMS inmates and 195 or eight percent of non-MHSDS inmates.

Of 970 voluntary education assignments, eight or seven percent of EOP inmates held assignments, as did 201 or 19 percent of 3CMS inmates and 761 or 30 percent of non-mental health inmates.

b. Milestone Credits:

A report dated February 1, 2019, for the time period of August 1, 2018 through January 31, 2019, indicated that 113 of 121 or 93 percent of EOP inmates were eligible to earn milestone credits, with 90 percent earning the credit. For the 1,039 3CMS inmates, 963 or 93 percent were eligible to earn milestone credits; 12 percent earned the credit. Of the 2,577 non-MHSDS inmates, 2,379 or 92 percent were eligible to earn milestone credits; 16 percent earned the credit.

c.  Out-of-Level Housing:

On February 22, 2019, no EOP inmates were identified as being housed out-of-level. There was one 3CMS Level I, one 3CMS Level II and 15 3CMS Level III inmates in Level IV housing.

d.  ADA Reasonable Accommodation and Grievance Procedures:

KVSP identified 147 ADA appeals with completion dates between August 2018 and February 2019.  Of these appeals, 145 had been completed and two were pending.  Of the 145 completed appeals, four were granted, 91 were granted in part, and 50 were denied.  KVSP did not produce training materials concerning ADA reasonable accommodation and grievance procedures, training rosters, or attendance sheets.

e.  Periodic Classification Score Reductions: EOP Inmates:

The institution produced completed CDC 840s for the review period, which indicated that KVSP was providing periodic class reductions for EOP inmates.

Case-by-Case Reviews:

Institutional spreadsheets reported that case-by-case reviews were conducted for inmates who were housed in segregation for more than 150 days.  The spreadsheets' delineated inmates' mental health status, the date and reason for their placement in segregation and their lengths of stay, with notes reflecting the ICC's latest action.  Most also indicated the date of the next scheduled IDTT.

Review of several cases in SOMS as to pre-MERD requirements indicated that inmates typically were not released in instances of a pending RVR or district attorney referral.  The review also revealed that ICCs were typically held timely.

Non-Disciplinary Segregation:

KVSP provided data that indicated the number of inmates who were assigned to non-disciplinary status (NDS) status on a weekly basis from August 2018 through January 2019.  The data did not report whether or not these inmates were on the mental health caseload, reasons for placement, average lengths of stay, or information regarding their property and privileges.  On average, during this time period, there were five KVSP inmates on NDS status.

"C" Status:

For the review period, KVSP reported that SOMS reported only point-in-time information and was unable to report the number of EOP, 3CMS and non-mental health inmates who were placed on "C" Status and their "C" Status lengths of stay.  During the site visit, there were four EOP, 59 3CMS and 86 non-MHSDS inmates on "C" Status.  The institution did not track their lengths of stay because of the reporting limitations of SOMS.

Mental Health Referrals:

The institution produced a performance report for mental health referrals which contained two data points each for emergent, urgent, and routine referrals for both psychiatry and primary clinician contacts.  The institution reported that maintenance of the performance report had led to the duplicated data points.

KVSP reported compliance for all emergent, urgent and routine referrals to primary clinicians.  For psychiatry referrals, the institution reported timely responses to urgent referrals and compliance for emergent psychiatry referral responses for all but one month.  For routine psychiatry referrals, there was non-compliance with timely responses for five of six months, which was due in part to the lack of psychiatrists and scheduling difficulties.

Construction/Space:

Confidential treatment space remained an ongoing concern at KVSP. Mental health staff reported that they were always seeking unused or underutilized space. They further reported attempting to make efficient use of space in the mental health program building on Facility C by combining staff offices. This resulted in the creation of four group treatment spaces and seven individual treatment rooms.

Mental Health/Custody Relations:

KVSP had approved LOP no. 1069 entitled "Custody and Mental Health Partnership Plan" in November 2018. It noted that implementation of the partnership plan would be effectuated through executive leadership joint rounding, mental health huddles, quarterly partnership round tables and on-the-job training and enhanced outpatient program orientation status.

The institution reported two instances of joint rounding during the review period, in December 2018 and January 2019. The joint rounding was to the STRH, where discussed issues included custody staffing, nursing concerns, the lack of treatment compliance and the CIT process and to the MHCB, where general concerns and required time frames for MHCB admissions and discharges were addressed.

KVSP provided sign-in sheets that reflected attendance by mental health and custody staff assigned to the EOP, MHCB and STRH at custody and mental health partnership training. The institution also provided a list of mental health staff who did not attend this training.

It was further reported that mental health, custody, and nursing staff had worked collaboratively to establish the CIT. This process reportedly gave custody staff a greater role when addressing crisis referrals.

649

During 2018, inmates filed 216 complaints against staff for inappropriate conduct, of which five were referred to the Office of Internal Affairs (OIA) for further investigation. Inmate allegations resulted in two additional requests for an OIA investigation. These investigations resulted in the restriction of one staff member from his post.

Heat Plan:

KVSP reported 59 Stage I heat alerts during August and September 2018, but none in October 2018. There were no Stage II or Stage III heat alerts.

Interviewed custody officers were typically knowledgeable of the heat plan and its requirements at the various stages. They also were generally aware of the requirement to offer accommodations for lost yard to inmates. However, some officers had difficulty identifying the heat plan stage when nursing/medical rounds were performed.

RVRs:

KVSP issued 4,041 RVRs, of which 1,842 or 46 percent were issued to caseload inmates.

The institution could not report whether all inmates who were required to have a mental health assessment received one. Mental health assessments were reportedly completed for all MHCB and EOP inmates who received RVRs, but verifying documentation was not provided. KVSP also did not provide information as to the completion of assessments for all 3CMS inmates who received Division A, B, C or SHUable offenses, or for 3CMS inmates whose behavior was deemed to be bizarre, unusual, or uncharacteristic. KVSP nonetheless reported referring 293 inmates for assessments in connection with RVRs; six were for inmates housed in the MHCB, 58 were for EOP inmates, 219 were for 3CMS inmates, and ten were for general population inmates.

Thirty-four inmates received RVRs that led to the imposition of a SHU term.

A sample of 15 RVR packets and mental health assessments were reviewed; five each were reviewed for MHCB, EOP, and 3CMS inmates.  Assessing clinicians concluded that mental health symptoms did not strongly influence behavior and thus did not recommend alternate documentation in any of the 15 reviewed cases.  However, clinicians determined that mental health factors contributed to inmates' behavior in two of 15 or 13 percent of the reviewed cases.

Mental health clinicians provided information for the senior hearing officer to consider when assessing penalties in 11 of 15 cases.  Information regarding penalties was not provided in three of 15 cases.  In two of 15, the clinicians remarked "N/A" as to what the hearing officer should consider during penalty assessment; no further explanation was offered.

The hearing officer documented consideration of mental health assessments in ten of 15 cases.  The inmate was found guilty of the RVR in 14 of 15 cases.  For the 14 inmates who were found guilty, in seven the  senior hearing officer documented penalty mitigation.  In another five of the 14 guilty dispositions, the senior hearing officer documented mitigation of some penalties, while others were not mitigated.  In another two cases, the senior hearing officer documented that none of the penalties were mitigated.

Review of the five RVRs issued to EOP inmates revealed two mental health assessments where the clinician recommended penalty mitigation, but provided language also referenced continuation of the EOP level of care; this was problematic, as maintaining or changing an inmate's mental health level of care was not an appropriate mitigating factor.

As for RVR training, KVSP reported 100-percent compliance for custody officers receiving required training as to the conduct of mental health assessments in the disciplinary process.  Additionally, 91 percent of mental health staff who had been designated to receive this training received it.

<u>Use of Force</u>:

During the review period, there were three controlled use of force incidents.  All involved caseload inmates; one was referred to the OIA.

There were 362 immediate use of force incidents, of which 243 or 67 percent involved MHSDS inmates.

KVSP reported that 100 percent of correctional staff who were required to be trained had completed mandatory use of force training, as had 95 percent of required mental health staff.

Review of the three controlled use of force incidents revealed supervisory level reviews indicating compliance with CDCR's use of force protocols in two of the incidents.  The third incident was referred to the OIA for further investigation, which had yet to be completed at the time of the site visit.

<u>Lockdowns/Modified Programming</u>:

There were no lockdowns at KVSP during the review period.  However, there were two periods of modified programming, from January 7 – 14, 2019 and February 7 – 12, 2019; however, it was reported that mental health programming was not interrupted.

<u>Access to Care</u>:

Review of data from August 2018 through January 2019 indicated that less than one percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 39 percent were not completed due to non-custodial reasons, excluding inmate refusals.

<u>Non-Designated EOP</u>:

KVSP had a single non-designated EOP yard, on Facility C-8, which became non-designated in January 2018.  Building 7 on Facility C was also a non-designated EOP yard until

it was deactivated on October 1, 2018. The EOP clinical supervisor acknowledged some initial, but insignificant, problems during the transition to a non-designated yard, but reported a mostly uneventful transition. One inmate-on-inmate assault was reported subsequent to the yard change. Interviewed inmate complaints did not focus on concerns with the non-designated yard.

Placement of 3CMS into Minimum Support Facilities:

KVSP did not house 3CMS inmates in the Minimum Support Facility.

*Coleman* Postings:

Toured units typically indicated the presence of updated *Coleman* posters in English and Spanish, which were posted in areas that were accessible to inmates.

Document Production Issues:

KVSP was unable to produce some documentation that the document request specifically requested, including review period documentation that reported overall lengths of stay for caseload inmates housed in STRH. The institution was also unable to report the number of mental health inmates who were placed on "C" Status during the reporting period.

As for mental health referrals, KVSP produced a performance report which contained two data points each for routine, emergent and urgent referrals for both psychiatry and primary clinician contacts. The institution reported that maintenance of the performance report had led to the duplicated data points.

**California State Prison/Los Angeles County (CSP/LAC)**
April 16, 2019 – April 19, 2019

Census:

On April 16, 2019, CSP/LAC's inmate population was 3,318. The mental health caseload population of 1,449 constituted 44 percent of the total inmate population.

The MHCB unit housed five caseload inmates.

There were 518 mainline EOP inmates.

The mainline 3CMS program housed 781 inmates.

The administrative segregation population totaled 166 inmates. There were 57 inmates in the administrative segregation EOP hub, including three EOP inmates pending transfer to the PSU. There were 88 3CMS inmates in STRH.

One EOP inmate was assigned to non-disciplinary segregation.

Staffing:

The chief psychiatrist position was filled.

CSP/LAC did not have an established senior psychiatrist position.

Both chief psychologist positions were filled; one served as the chief of mental health.

Six of eight senior psychologist supervisor positions were filled; two staff psychologists were assigned out-of-class to act as senior psychologist supervisors.

All seven senior psychologist specialist positions were filled.

The institution did not break down established staff psychiatry positions between onsite positions and telepsychiatry. Of 14.5 established psychiatry positions, seven were filled; there were six filled onsite telepsychiatrist positions and one filled telepsychiatry position, resulting in a vacancy of 7.5 positions or 52 percent. Registry provided 5.95 psychiatry staff, reducing the functional vacancy rate to 11 percent.

654

Forty-four of 46.5 allocated staff psychologist positions were filled.  Registry provided one additional position to reduce the functional vacancy rate to three percent.

The one supervising social worker position was vacant; however, a social worker was assigned out-of-class to act in the position at the time of the site visit.  Fourteen of 18.5 social worker positions were filled.  Registry staff provided 1.5 additional positions, reducing the functional vacancy rate to 16 percent.

Both senior psych tech positions were filled.  Of 57.5 psych tech positions, 51.5 were filled.  Registry supplied an additional two positions for a functional vacancy rate of seven percent.

All 12 MHSDS registered nurse positions were filled.

Eighteen of 21 recreation therapist positions were filled.  Registry staff provided an additional 0.5 position, reducing the functional vacancy rate to 12 percent.

During the site visit, CSP/LAC had two state medical assistants on staff; however, staff reported that the institution was not authorized to hire medical assistants.

The CHSA II position was vacant.  Both OSS II positions were filled.  All three HPS positions were filled, as was the AGPA position.  All 21 MHSDS clerical positions were filled.

Telepsychiatry:

During the site visit, 1.0 FTE telepsychiatrist provided services for the EOP program on Facility D.  Staff reported that telepsychiatry was not used in the MHCB.

Quality Management:

The local governing body met once during the review period, in October 2018, when it attained a quorum.  Review of meeting minutes indicated that relevant issues were covered.

The quality management committee held monthly meetings, kept meeting minutes and attained quorums. Mental health was represented at all but one meeting. The quality management committee addressed issues related to mental health, including access to care and the scheduling of treatment. Other addressed issues included the return of inmates from higher levels of care and the provision of structured therapeutic activities to EOP inmates.

Reviewed mental health subcommittee meeting minutes indicated a monthly quorum. The mental health subcommittee typically examined mental health performance reports, staffing, IEX incidents, higher level of care referrals, structured treatment for EOP inmates, treatment refusals, suicide prevention issues, and time frames for psychiatrist and primary clinician contacts and IDTT meetings.

No FITs or QITs were completed during the review period; however, at the time of the site visit, an active QIT for the administrative segregation EOP hub program met monthly.

CDCR did not conduct system-wide peer review during the review period or at the time of the site visit. However, in January 2019, CSP/LAC conducted psychology peer review in the MHCB; four MHCB psychologists met or exceeded standards.

Medication Management:

The mental health headquarters medication management dashboard provided data for both the psychiatric diagnostic and medication management measures.

Regarding diagnostic measures for antidepressants, CSP/LAC was compliant for venlafaxine blood pressure and thyroid monitoring throughout the review period and for medication consent, the institution was compliant for four of six months. No data was provided regarding electrocardiogram (EKG).

For antipsychotics, blood pressure, height wight measurements, and medication consent were compliant for the review period. Abnormal involuntary movement scale (AIMS) tests and was compliant for three months. EKG measurements were compliant for two months, non-compliant for two months and no data was provided for one month. Comprehensive metabolic panel (CMP) and blood sugar tests were compliant for one month each and non-compliant for five months. Complete blood count (CBC) with platelets and lipid monitoring were not compliant during the review period. Thyroid monitoring was compliant for one month and no data was provided for the other five months.

Regarding monitoring of inmates prescribed carbamazepine, CSP/LAC was compliant for two months, non-compliant for two months, and did not report data for two months for carbamazepine levels, CBC, and CMP. Medication consent was compliant for one month and no data was provided for the remaining months.

For inmates prescribed Depakote, CSP/LAC was compliant for four months with medical consent and non-compliant for two months. CSP/LAC was compliant for two months for CBC with platelets and non-compliant for four months, and for CMP, the institution was compliant for one month and non-compliant for five months. CSP/LAC was non-compliant during the review period for Depakote levels.

During the review period, CSP/LAC was compliant with medical consent for Lamotrigine.

Psychiatric measures for inmates prescribed Lithium were compliant for four months for medical consent and thyroid monitoring and non-compliant for two months. Diagnostic monitoring regarding EKG and Lithium levels were compliant for three of six months and for kidney function tests they were compliant for two of six months.

Mental health headquarters' medication management dashboard for the monitoring period indicated the following areas of non-compliance during each of six months: continuity of medications upon inter-institutional transfer at receiving and release (R&R); continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU); continuity of medications for MHCB transfers; continuity of medications following discharge/transfer from a community hospital and/or DSH; observation of medication preparation and administration for HS and AM/PM medications; continuity of medications for psychiatric-prescribed chronic care medications and new psychiatric medications. CSP/LAC was compliant with continuity of medications for intra-institution transfers to ASU/SHU/PSU for two of six months; for the remaining four months, the rate of compliance ranged from 81 to 88 percent. Compliance with medication continuity for court ordered involuntary medications occurred in three of six months, was non-compliant for two months and the compliance rate for one month was not reported.

CAPs for deficient psychiatry measures were developed and a workgroup that included psychiatry and nursing staff was established, in February 2019, to implement medication management CAPs to rectify deficiencies. However, CSP/LAC did not provide CAPs for the automated nursing MAPIP measures that scored below 90 percent.

The non-automated MAPIP measure for pill line lengths and wait times for inmates who received medications indicated greater than 90-percent compliance.

There was a 180-day order limit for psychotropic medications. Bridge orders were reportedly prescribed for a maximum of 14 days. Nursing conducted verbal and telephone orders.

All non-formulary psychotropic medication requests were sent to the chief psychiatrist for approval.

The pharmacist reviewed the polypharmacy reports; any concerns were sent to the prescriber or mental health medical director.

As for medication prescriptions, there were 276 inmates on antipsychotic medications, 435 on antidepressants, 64 on other psychotropic medications and 32 on KOP medications. Selective Serotonin Reuptake Inhibitors (SSRI) medications were not prescribed as KOP medications.

CSP/LAC was not a Clozaril initiating or maintenance institution.

The institution did not report the total number of inmates who were prescribed PC 2602 involuntary medications or the number of PC 2602 involuntary medication orders that were initiated, renewed or rescinded.

There were 377 HS psychotropic prescriptions, but the number of inmates who were prescribed HS psychotropic medications was not provided.  Reported HS psychotropic medications excluded Buspar, Cogentin, prazosin, Trileptal, and Vistaril.

<u>Transfers</u>:

CSP/LAC had two inpatient care coordinators who began in January 2019.

During the review period, there was one major and one minor sustainability review.  The major sustainability review covered July through September 2018.  One part of it was a headquarters review process that analyzed a random sample of higher level of care considerations to ensure there was adequate clinical justification for inmate non-referral when there were positive referral indicators and to ensure that the modified clinical interventions in lieu of referral were acceptable.  The audit reported 89-percent compliance.

659

Each quarter, Region III mental health specialists also randomly reviewed eight higher level of care/Form 7388-Bs that were positive for higher level of care referral consideration in cases where the inmate was not referred.  The review's purpose was to ensure that clinical documentation prior to the IDTTs was consistent with the non-referral rationales.  Several weeks of clinical documentation following the IDTT was also analyzed to determine whether it addressed additional clinical interventions that were implemented in lieu of the referral.  Five of eight non-referred cases were found to have had adequate clinical rationales.

The minor sustainability review in January 2019 similarly revealed three of eight cases of inmate non-referral that were not supported by documentation; two of the cases were extremely concerning as the IDTTs failed to note significant decompensation and symptoms that were impairing inmates that were documented as "safety concerns."

Regional staff's findings during the sustainability reviews were consistent with the findings of the monitor's expert.  A review of a sample of charts by the monitor's expert indicated that approximately one-third of clinical non-referral rationales were inadequate; these inmates likely should have been referred to a higher level of care.  Moreover, treatment modifications completed when not referring an inmate were typically cut-and-paste, did not adequately address positive criteria, and were not sufficiently empirically-based.

During the review period, 501 inmates met criteria for higher level of care consideration for both acute and intermediate care.  Sixty-two or 12 percent were referred.

Some observed IDTT meetings addressed objective higher level of care criteria to varying degrees, while others did not address objective or subjective criteria.  As a general matter, however, IDTTs did not consistently consider higher level of care considerations.

Thirty-one of 33 inmates who were referred to acute care transferred. Two referrals were rescinded, but there were no rejections. Twenty inmates or 65 percent transferred within ten days of referral from headquarters.

Thirty of 34 inmates who were referred to intermediate care transferred. Four referrals were rescinded, but there were no rejections. Twenty-one inmates or 30 percent did not transfer within 30 days of referral from headquarters.

There were no expedited inpatient care transfers during the review period. No inpatient care transfers were cancelled or delayed due to impending paroles, disciplinary proceedings, classification factors, or pending PC 2602 involuntary medication hearings.

Five inmates were on the Acute Bed Utilization Management Report awaiting a bed during the review period. Waits averaged 4.6 days and ranged from two to six days. No inmates were awaiting a bed at the time of the site visit.

*Vitek* hearings were held for 19 of the referrals; no inmates prevailed.

CSP/LAC referred one inmate with complex medical needs to inpatient care.

During the review period, 131 inmates returned to CSP/LAC from inpatient care; 37 returned from acute care and 94 from intermediate care. The institution reported receiving approximately three to four days' notice of pending discharges from inpatient programs. Inpatient coordinators reported problems with compliance for clinician-to-clinician contact within five days of an inmate's return to CSP/LAC.

A review of a sample of records of inmates who returned to CSP/LAC from inpatient care indicated that psychiatrists, primary clinicians, and IDTTs timely saw them for suicide risk assessments. However, the review also indicated an overall lack of continuity of care following inpatient care.

There were 321 referrals to the MHCB at CSP/LAC, of which 193 or 60 percent were rescinded and 128 or 40 percent were admitted.  Of the 128 admissions, 114 or 89 percent transferred timely.  Ten of the 14 non-compliant MHCB transfers were from RJD; many were only hours late.

Additionally, 37 CSP/LAC inmates transferred to outside crisis beds; 28 of these transfers occurred when CSP/LAC's MHCB was closed from January 23 through April 10, 2019.  Of the inmates who transferred to outside MHCBs, 34 or 92 percent transferred timely.

The average MHCB clinical length of stay during the review period was 4.5 days, with a range of one to 15 days; the average physical length of stay was 6.2 days.  Thirteen inmates or ten percent had stays exceeding ten days.

All 46 EOP inmates who transferred to a PSU transferred timely.

CSP/LAC transferred 23 inmates to LTRH.  None were timely transferred; from September 2018 through February 2019, transfers to LTRH averaged 95 days.

Programming:

Administrative Segregation EOP:

Two onsite psychiatrists and all primary clinicians who provided services in the EOP hub carried caseloads within the established ratios.

Pre-site reports as to weekly treatment hours combined treatment and modified treatment hours.  They indicated that from September 3, 2018 to March 3, 2019, CSP/LAC offered approximately 14.4 weekly hours of treatment; inmates attended a weekly average of 7.6 hours and refused a weekly average of 6.8 hours.

Observed IDTTs revealed that the psychiatrist and primary clinician saw all inmates prior to their IDTT.  Primary clinicians' record reviews were detailed and useful; however, their skills

varied significantly, and improvement was needed.  Specifically, during the initial IDTT some primary clinicians did not explain the IDTT's purpose, the treatment team's role, or the time frames for conducting IDTTs.  One observed psychiatrist soundly engaged inmates as to meaningful events in their lives; another focused on the negative side effects of medications without discussing benefits and the importance of medication adherence.  Observed IDTTs did not discuss measurable goals, while discussed goals were not associated with functional impairments.  Four of five observed IDTTs did not address the inmate's level of care.

An observed group was well-conducted, relevant, and well-received by inmates.  The clinician conducting it knew most of the participants and adeptly introduced new members, engaged inmates, and focused the group while permitting discussion and debate.

Interviewed inmates reported knowing their psychiatrist and primary clinician and receiving timely clinical contacts.  They indicated that clinical and recreation therapy groups were beneficial but needed more structure.  They further reported, however, that groups were combined when there was an insufficient number of participants, causing inconsistency in structured groups and having to adjust to inmates not in the original group.  The combining of groups was reported as an ongoing issue according to the inmates.

Many inmates reported that housing officers called them derogatory names, racial slurs, and otherwise engaged in inappropriate behavior.  They stated that after an evaluation for MHCB placement they often returned to a ransacked cell or their property was missing.  They further reported that custody influenced the CIT, which did not listen to inmates.

Review of CDCR Form 114As indicated that caseload inmates were consistently offered ten hours of weekly yard and three weekly showers; staff documented inmates' actual yard time, as well as refusals.

Five inmates were randomly selected to have their records reviewed for their administrative segregation EOP stays.  Four of the five required initial evaluations.  Primary clinicians timely completed initial evaluations in two of four cases; psychiatrists timely completed three of four initial psychiatry evaluations.

Four of the five cases were required to have initial IDTTs; however, only two of four initial IDTTs were timely.  There were timely IDTTs for both cases that required ongoing IDTTs.

As for seven-day time frames, 14 of 20 that required primary clinician contacts within seven days had them.  The six primary clinician contacts that occurred beyond seven days ranged from eight to 14 days.  All seven required 30-day time frames for psychiatry contacts occurred timely.

CSP/LAC was unable to report the number of inmates who were housed in administrative segregation, and their lengths of stay, during the review period.

MHCB:

CSP/LAC had a 12-bed MHCB unit.  One psychiatrist was assigned to the MHCB.  A 0.5 registry psychiatrist also provided services one day weekly.  Four primary clinicians provided coverage seven days weekly.  Psychiatry and primary clinician coverage was within the established staffing ratio for a maximum capacity of 12 beds.

The MHCB contained appropriate beds and mattresses.  There were two ADA-compliant cells.

The MHCB had a very competent and cohesive staff that provided treatment that was consistent with the Program Guide.  Staff interviews and records review reflected that newly-admitted inmates were typically provided with a history and physical within 24 hours of arrival,

a new or updated confidentially-conducted mental health assessment, a suicide risk assessment, and an initial IDTT within 72 hours.  It was further reported that either a psychiatrist or psychologist saw inmates daily, or a psychiatrist saw them at least twice weekly; contacts were confidential unless the inmate refused to come out of his cell.  Following the initial IDTT, subsequent IDTTs were conducted at least weekly.

Observed IDTTs were held in a room that permitted adequate confidentiality, with required staff in attendance.  Observed IDTTs revealed very good interdisciplinary discussion that was relevant to inmates' treatment.

MHCB inmates were offered one weekly hour of outdoor yard by the recreation therapist, which was considerably less than what was offered to inmates housed on the CTC's medical side.

MHCB discharge summaries were completed timely.  All inmates received a suicide risk assessment upon discharge.

There were five inmates who were randomly selected to have their health records reviewed for their MHCB stays.  Three of five cases indicated that the initial primary clinician evaluation occurred prior to the initial IDTT and within 24 hours; three of five also received a timely initial psychiatry evaluation.

All five reviewed charts documented timely initial IDTT meetings.  Four of five also indicated that inmates received timely discharge IDTTs, with 100-percent compliance for required staff's attendance.

MHCB chart review indicated that all 28 required daily contacts occurred.  A psychiatrist completed 20 of 28 of these contacts.  Of the 28 daily contacts, a psychiatrist was required to

complete 14 of them based on the inmate's admission date; psychiatry completed 13 of 14 of these contacts.

Seclusion and Restraint:

Clinical restraints were not used during the reporting period. Safety cells were used for four inmates for less than 4.75 hours per episode.

Crisis Intervention Team:

CSP/LAC's CIT was implemented in January 2019. The lack of specific staff allocations to the CIT was problematic. There was a decrease in CSP/LAC MHCB admissions during the reporting period, but it was unclear whether there was a relationship between implementation of the CIT and the decreased MHCB admissions.

Alternative Housing:

CSP/LAC assigned five psychologists and two clinical social workers, who primarily had other duties, to provide coverage in alternative housing; coverage was provided seven days a week.

There were 321 alternative housing placements during the review period, of which 312 or 97 percent were for 24 hours or less.

CSP/LAC LOP 534, which addressed alternative housing, was revised in July 2018. It did not designate or prioritize the cells that were used for alternative housing. Mental health leadership and custody staff nonetheless reported that there was a system for placing inmates in alternative housing that prioritized unoccupied first tier cells in certain housing units.

It was further reported that alternative housing cells housed one inmate at a time, with all inmates reportedly receiving one-to-one observation. Otherwise, treatment services were not

provided. A review of electronic logs for inmates in alternative housing during the site visit indicated notations of inmates' condition every 15 minutes.

All alternative housing cells were wet cells but were not suicide-resistant. Alternative housing inmates were reportedly provided with a safety smock, and with a suicide resistant bed, mattress and blanket.

Short-Term Restricted Housing:

A registry psychiatric nurse practitioner, who the chief psychiatrist supervised, carried a caseload of 85 STRH inmates. Six primary clinicians assigned to the STRH all had caseloads within the established ratio.

CSP/LAC was unable to report STRH 3CMS inmate lengths of stay for the review period. During the site visit, on April 18, 2019, the STRH housed 78 3CMS inmates. For these 78 3CMS inmates, their stays averaged 89 days and ranged from one to 631 days.

A review of SOMS for STRH caseload inmates indicated that initial ICCs occurred within ten days of STRH placement.

All interviewed STRH inmates knew their primary clinician and psychiatrist and reported being seen timely and more often if requested. They reported being offered groups as required and attending groups at least 80 percent of the time. They stated that groups were beneficial and did not indicate any problems with provided mental health care.

However, STRH inmates reported numerous custody concerns, including but not limited to frequent sexual innuendos, demeaning intercom announcements and intentional banging of Guard One wands on the door. They indicated that mental health and custody collaboration was fair but could improve. They further reported that in any disagreement between mental health and custody, mental health typically conceded.

667

An observed clinician-led group was relevant to managing conflicts specific to segregation. All inmates were engaged and actively participated.

Review of CDCR Form 114A for STRH 3CMS inmates revealed that inmates were typically offered 18.5 hours or more of weekly yard and three weekly showers; however, they did not report group attendance.

Five inmates were randomly selected to have their health care records reviewed for their STRH stays. Chart review indicated that two of five had timely initial primary clinician evaluations; in the three non-compliant cases, primary clinicians saw two inmates two days after the ICC, while the third inmate was seen four days after the ICC. Four of five inmates had timely initial psychiatry evaluations.

All five cases had timely initial IDTT meetings. The three cases that required timely quarterly IDTT meetings had them.

There were 18 timeframes that required primary clinician contacts every seven days. Of these, 14 of 18 had primary clinician contacts within seven days; of the four that occurred beyond seven days, inmates were seen on the eighth or ninth day. All three reviewed cases that required ongoing 90-day psychiatry contacts had them.

EOP:

The mainline EOP program was located in five buildings on Facilities C and D. Five psychiatrists and one telepsychiatrist assigned to this program all had caseloads within the established ratio. A registry psychiatrist who provided 1.2 FTE services had a 100-inmate caseload on Facility D-1, but also provided other psychiatric services. Twenty-three of 24 primary clinicians assigned EOP inmates had caseloads within the established ratio.

668

As of October 2018, CSP/LAC had implemented the EOP team concept with each building becoming its own treatment team.  A psychiatrist, senior psychologist supervisor, and primary clinician were assigned to each building, along with designated CC Is.  In February 2019, an RN care manager was also assigned to each building.

The frequency of mental health clinical contacts appeared to be consistent with Program Guide requirements.  Interviewed inmates reported usually being seen confidentially and on a weekly basis by their primary clinicians and at least every 30 days by psychiatry, which staff confirmed.  However, approximately 30 percent of primary clinician clinical contacts were non-confidential due to the lack of adequate offices for clinical contacts.  Some inmates also reported that it was common for them to meet with different psychiatrists.

Some inmates complained that their waiting time to be seen typically exceeded the 15-minute duration of their clinical contacts, which staff confirmed.  Others indicated feeling uncomfortable with the lack of confidentiality during telepsychiatry, which at times took place in the day room.

Inmates reported attending IDTTs at least quarterly, but some indicated not receiving copies of their treatment plan.  During IDTTs, ample time was taken with each inmate to convey and obtain relevant information.  Many observed IDTTs were well-organized and covered issues related to the inmates' treatment plan, clinical progress, and medication issues.  All required disciplines were typically in attendance; on Facility D, a registered nurse also attended.

CSP/LAC reported consistently offering more than ten hours of weekly out-of-cell structured therapeutic activities to EOP inmates, which inmates confirmed.  However, pre-site information noted low group attendance rates and the need to train group facilitators.

Most EOP inmates described group therapy as helpful. However, some reported that groups were not relevant to their issues. Inmates also typically reported having minimal input into their group assignment, while conflicts with inmates' work and education schedule often complicated the scheduling of groups.

Observation of a trauma-focused group revealed a very good psychologist-led group with commendable inmate participation. An observed recreational group in the gymnasium essentially involved three inmates and a recreation therapist shooting baskets. There were 17 inmates scheduled for the group; the recreation therapist did not know why so few scheduled inmates attended.

Staff and inmates reported that inmates had daily access to yard and, by way of recreation therapy, regular access to the gym.

Some inmates were very vocal regarding alleged custody staff misconduct, especially on Third Watch, that they reported involved the physical beating of inmates. Staff reports were consistent with some of these allegations. The allegations were conveyed to custody leadership at the time of the site visit.

There did not appear to be any medication management issues.

Mental health line staff indicated that approximately 20 to 30 percent of EOP inmates would require EOP treatment during most of their incarceration. Staff confirmed that EOP appointments were scheduled in 15-minute intervals and believed that this duration was reasonable, which was problematic. They also expressed differing perceptions as to whether or not supervisors were pressuring them to lower EOP inmates' level of care; many thought that many EOP inmates did not require their current EOP level of care.

Six inmates were randomly selected to have their health care records reviewed for their EOP stays.  Chart review indicated that all six received timely initial primary clinician and psychiatry evaluations.  All six also had timely initial IDTT meetings.  All three cases that required timely quarterly IDTT meetings had them.

A review of seven-day time frames indicated 30 that required primary clinician contacts every seven days.  Of these, 18 of 30 included primary clinician contacts within seven days.  The 12 primary clinician contacts that occurred beyond seven days had a range of eight to 15 days.  Fifteen of 16 required 30-day ongoing psychiatry appointments were seen as required.

3CMS:

Inmates requiring the 3CMS level of care were housed on Facilities A, B, C and D.  All five registry psychiatrists and a 0.5 onsite psychiatrist assigned to the 3CMS program had caseloads that were within the established staffing ratio; however, a 0.25 registry psychiatrist who provided services one day weekly had a 124-inmate caseload, which exceeded the staffing ratio.

Five primary clinicians assigned to the 3CMS program had caseloads of 117, 128, 130, 190 and 194 inmates, which all exceeded the established staffing ratio of 1:97; another clinician had a 30-inmate caseload.

Due to high primary clinician caseloads, clinical contacts were not reported to be timely, while their length and quality was reported as poor to fair.  There were no reported problems with psychiatry contacts.

The 3CMS supervisor reported that groups for inmates on Facilities A and B had existed for approximately six months; groups for inmates on Facilities C and D began the first week of April 2019.  Clinicians led the groups.

671

During the review period, 127 inmates were discharged from the EOP to 3CMS level of care.

Interviewed Facility B and D 3CMS inmates typically reported not knowing who their clinicians were.  Some reported feeling that their clinicians did not listen to them and that their level of care should not have been changed from EOP to 3CMS.  They also reported difficulties with access to care, including not being called for appointments, ducats not being honored, and missed appointments being recorded as refusals.  Interviewed inmates did not indicate concerns with receiving medications.

Interviewed Facility A inmates reported knowing their clinician and psychiatrist and being seen every 90 days, or more frequently, if needed.  They did not indicate concerns with the mental health program or with custody and were aware of groups.

Six randomly selected cases were selected for 3CMS chart review.  All four required initial primary clinician evaluations occurred, as did three of four required initial psychiatry evaluations.  The non-compliant initial psychiatric evaluation occurred within 14 days, but not prior to the IDTT.

Four of six cases were expected to have timely initial IDTTs; three of four had them.  The only inmate who was required to have an annual IDTT had a timely annual IDTT.

All seven required quarterly primary clinician contacts were completed timely, as were all seven required 90-day psychiatry contacts.

Other Issues:

Pre-Release Planning:

The pre-release coordinator reported that her position was part-time.  She had an assistant; both were clinical social workers.

The pre-release coordinator reported that the institution's pre-release program included assistance with employment skills such as resume preparation and interviewing techniques, and issues such as helping inmates to find purpose and address their fears.

CSP/LAC began assisting inmates with the transition from prison approximately 90 to 120 days prior to release. Such pre-release planning primarily occurred through inmate pre-release groups. During the review period, approximately 30 EOP inmates were enrolled in one of two weekly pre-release groups that were held on Facility D; the groups met for one hour for 12 weeks. Another pre-release group provided services on Facility C. Due to group slot limitations, only approximately 50 percent of released EOP inmates were able to participate in pre-release groups.

The pre-release coordinator indicated minimal interaction between CSP/LAC's pre-release program and the TCMP. Provided spreadsheets as to TCMP-related matters including applications for Medi-Cal, SSI, and veterans' assistance were incomplete.

The pre-release coordinator further reported that CSP/LAC's pre-release program was being revamped. Toward this objective, she reported conducting clinical trainings on all yards in the fall of 2018 to encourage clinicians to incorporate pre-release planning into their services.

Program Access:

a. Job and Program Assignments:

On March 1, 2019, CSP/LAC reported that of 1,413 jobs, 280 EOP inmates, or 44 percent of the EOP population, held job assignments. For 3CMS inmates, 292 or 33 percent of the 3CMS population held job assignments. Furthermore, 841 or 52 percent of the non-caseload population held them.

For the 295 academic assignments, the institution reported that 74 EOP inmates, or 12 percent of the EOP population, held assignments.  For 3CMS inmates, 104 or 12 percent of the 3CMS populations held assignments and for non-MHSDS inmates, 117 or seven percent held them.

Of the 229 vocational education assignments, 46 or seven percent of EOP inmates held assignments, as well 81 or nine percent of 3CMS inmates and 102 or six percent of non-caseload inmates.

Of 389 voluntary education assignments, one or less than one percent of EOP inmates held this assignment, as did 79 or nine percent of 3CMS inmates and 309 or 19 percent of non-caseload inmates.

Of 273 substance abuse treatment assignments, it was reported that ten or two percent of EOP inmates held these assignments, as did 110 or 12 percent of 3CMS inmates and 153 or nine percent of non-caseload inmates.

 CSP/LAC also provided a copy of a PowerPoint entitled "Program Assignment for EOP Patients: An Interdisciplinary Treatment Team (IDTT)," which it reported using as part of staff training to increase EOP inmates' program assignments; it included guidelines for conducting functional evaluations for EOP inmates.

b.   Milestone Credits:

 A report for the time period of September 1, 2018 to February 28, 2019 indicated that of 637 EOP inmates, 598 or 94 percent were eligible to earn milestone credits and 81 percent earned the credit.  For 3CMS inmates, 798 of 882 or 90 percent were eligible to earn milestone credits, with 17 percent earning the credit.  The data further indicated that of 1,629 non-caseload inmates, 1,408 or 86 percent were eligible to earn milestone credits, with 19 percent earning the

credit.  CSP/LAC also provided the lesson plans and training curriculum and materials that it used to implement the milestone credit program for EOP inmates.

    c.    <u>Out-of-Level Housing</u>:

For the out-of-level housing of caseload inmates, provided data indicated that as of March 25, 2019, one 3CMS Level I inmate was placed in Level III housing; 41 3CMS Level II inmates were placed in Level III housing and three EOP and five 3CMS Level II inmates were placed in Level IV housing; 17 EOP and 34 3CMS Level III inmates were placed in Level IV housing and 37 3CMS Level IV inmates were placed in Level III housing.

    d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CSP/LAC confirmed that it had instituted the revised ADA accommodation and grievance procedures.  The institution also provided a copy of the CDCR Form 1824 and the Desk Reference Manual, which delineated the ADA reasonable accommodation process.

    e.    <u>Periodic Classification Score Reductions: EOP inmates</u>:

For the reporting period, CSP/LAC produced completed CDC 840s that indicated that the institution was providing classification score reductions for EOP inmates.

    <u>Case-by-Case Reviews</u>:

CSP/LAC reported that 36 cases met the requirement for a 150-day review.  Reviews were completed as required.  Of the 15 inmates remaining in administrative segregation at the time of the site visit, 11 were pending referral to the District Attorney, two were awaiting further review, and two had medical holds.

    <u>Non-Disciplinary Segregation</u>:

On April 17, 2019, one EOP inmate was on NDS status, but it was not reported whether this status was related to property or privileges. CSP/LAC was unable to provide such data for the review period due to the limitations of SOMS tracking capabilities.

"C "Status:

CSP/LAC was unable to report the number of EOP, 3CMS, and non-mental health inmates who were placed on "C" Status and their "C" Status lengths of stay during the reporting period. On April 17, 2019, 60 inmates were on "C" Status. Of these inmates, one was at the acute level of care, two were EOP inmates, 28 were 3CMS and 29 were non-MHSDS inmates. These inmates' lengths of stay were not reported.

Mental Health Referrals:

CSP/LAC provided mental health referral data that was categorized by whether the referrals were to psychiatry or primary clinicians. There was compliance for timely responses to routine psychiatry referrals but non-compliance (67 percent) for responses to urgent psychiatry referrals. No emergent psychiatry referrals were reported. The institution reported compliance for timely responses to emergent, urgent, and routine primary clinician referrals, however it did not provide data regarding the rates of compliance.

Construction/Space:

CSP/LAC reported various problems with adequate treatment space. Among them, Facility B psychiatrists and primary clinicians shared treatment space. On Facility C, all primary clinician contacts occurred in non-confidential settings in the gym. Facility C recreational therapy groups were also held in the gym; at times, two groups were conducted simultaneously. The Facility C visiting room was also used for recreation therapy and psychoeducational groups; two groups were often assigned at the same time. On Facility D, the lack of treatment space

resulted in the conduct of groups in the gym, another non-confidential treatment space. However, individual, group and IDTT treatment space was not reported to be problematic in the administrative segregation EOP hub.

Mental Health/Custody Relations:

CSP/LAC's LOP 622 recognized that the custody and mental health partnership plan was composed of several facets, namely, executive leadership joint rounding, mental health huddles, quarterly partnership round tables and on-the-job training, and EOP orientation groups.

Provided documentation reflecting monthly executive joint rounding between January 2018 and February 2019 revealed that CSP/LAC maintained notes that reported both positive and negative rounding observations and the identities of various mental health, custody and medical staff, and inmates, who were interviewed and their comments.

Since 2018, two-hour custody and mental health joint partnership round tables and OJT had occurred quarterly on Second and Third Watch in the EOP, administrative segregation hub, MHCB, and STRH. However, provided sign-in sheets for February 2018 through March 2019 reflecting mental health and custody attendance did not report staff who was not in attendance and did not identify missed lesson plans and any plans to make up the training.

CSP/LAC also provided information on a course entitled "Multiple Interactive Learning Objectives," which was reported to be another collaborative effort between custody and mental health staff. The course sought to increase staff awareness of inmates' situations to improve communication toward an objective of decreasing the use of force. A total of 931 custody and mental health staff attended this ongoing course between March and December 2018.

During 2018, inmates filed 391 complaints against staff for inappropriate conduct toward them, of which 155 or 40 percent were filed by caseload inmates. Thirty-eight of these

677

complaints were referred for further investigation; however, no staff members were moved to another post as a result of these complaints.

As reported above, administrative segregation EOP inmates reported that custody influenced the CIT, which did not listen to inmates. Interviewed STRH inmates reported that in any disagreement between mental health and custody, mental health typically conceded.

Heat Plan:

During the review period, CSP/LAC reported 19 Stage I heat alerts but no Stage II or Stage III heat alerts. Interviewed custody officers typically had a good understanding of heat plan protocols and were able to explain the procedures at each heat stage. The officers also knew how to access the inmate heat risk list and of the requirement to offer inmates alternative programming inside the housing unit to compensate for lost yard time during a heat alert.

RVRs:

Of 108 custody staff who were required to receive the required RVR training, 76 or 70 percent received the training. CSP/LAC reported that it had not provided the required RVR training to mental health staff during the past 12 months.

During the review period, CSP/LAC issued 3,029 RVRs, of which 2,005 or 66 percent were issued to mental health caseload inmates. Specifically, 872 were issued to EOP inmates, 1,093 to 3CMS, and 40 to inmates at the MHCB level of care.

The institution reported that mental health assessments were completed for all EOP and MHCB inmates who were issued RVRs. They were also completed for all 3CMS inmates who received Division A, B, C or any SHU-able offense, and for 3CMS inmates who exhibited behavior that was deemed to be bizarre, unusual, or uncharacteristic.

A sample of 19 RVR packets were reviewed; four were issued to MHCB inmates, six to EOP inmates and nine to 3CMS inmates.  Custody staff timely referred the RVR for a mental health assessment in only approximately one-third of cases; mental health staff completed the assessment and timely returned it to custody in approximately three-quarters of the reviewed RVRs.  The senior hearing officer documented consideration of mental health information in all reviewed cases.

In none of the reviewed RVRs did the assessing clinician determine that the inmate's behavior was strongly influenced by mental health symptoms.  Relatedly, none of the assessments concluded that mental illness contributed to the behavior that led to the RVR.

Use of Force:

CSP/LAC reported that 85 percent of required mental health staff had received the mandatory use of force training, as had 100 percent of custody staff.

During the reporting period, there were three controlled use of force incidents and 231 immediate use of force incidents.  All three controlled use of force incidents involved MHSDS inmates.  The 231 immediate use of force incidents involved 323 MHSDS and 129 non-MHSDS inmates; some incidents involved more than one inmate.

A review of the three controlled use of force incidents and three randomly selected immediate use of force incidents indicated compliance with CDCR policy.

Lockdowns/Modified Programming:

There were no lockdowns during the review period.

Access to Care:

A review of CSP/LAC's monthly Health Care Access Quality Reports from September 2018 through February 2019 indicated that less than one percent (0.59) of issued mental health

ducats and add-on appointments were not completed due to custody factors, while 25 percent were not completed for non-custodial reasons, excluding inmate refusals. Inmates refused 74 percent of the ducats and add-on appointments that were not completed.

Placement of 3CMS Inmates into Minimum Support Facilities:

The institution reported that no 3CMS inmates were placed in Minimum Support Facilities during the reporting period.

*Coleman* Postings:

Toured housing units all contained updated *Coleman* posters in English and Spanish, which were posted in areas that were accessible to inmates.

Document Production Issues:

The institution reported that SOMS was unable to produce certain historical data. As a result, CSP/LAC could not provide data on the number of inmates housed in administrative segregation, STRH 3CMS inmates, or their lengths of stay. It was also unable to report the number and level of care of inmates who were placed on NDS or "C" Status, and their respective lengths of stay, during the review period.

**North Kern State Prison (NKSP)**
April 23, 2019 – April 25, 2019

Census:

On April 21, 2019 NKSP's total inmate population was 3,991. The mental health caseload population was 879 inmates, or 22 percent of the population.

The reception center population included 46 EOP inmates and 659 3CMS inmates. There were 160 mainline 3CMS inmates and seven 3CMS inmates housed in STRH.

Seven MHSDS inmates were not yet classified at the time of the site visit.

Staffing:

There was no chief psychiatrist position established at NKSP.

The one senior psychiatrist supervisor position was filled.

One of two established chief psychologist positions was filled and served as chief of mental health. The other position remained vacant as a salary savings.

The two senior psychologist supervisor positions and the two senior psychologist specialist positions were filled.

There were nine established staff psychiatrist positions. NKSP had one onsite psychiatrist and two telepsychiatrists on staff. The registry supplied an additional three psychiatrists for a functional vacancy rate of 33 percent.

Of the 26.5 staff psychologist positions, 20 were filled. Registry provided an additional 1.5 positions resulting in a functional vacancy rate of 19 percent.

The supervising social worker position was filled. There were ten established social worker positions; at the time of the site visit there were 15.75 social workers on staff.

All five mental health RN positions were filled.

There was no senior psych tech position established at NKSP.  There were 17.70 psych tech positions, of which 15.7 were filled, resulting in a 12-percent functional vacancy rate.

Of the three established recreation therapist positions, NKSP had filled 1.25 positions for a functional vacancy rate of 58 percent.

There were two medical assistants at the time of the site visit.  One additional medical assistant was scheduled to begin work at NKSP on May 6, 2019.

The established 0.5 OSS II position was filled with one staff member.  At the time of the site visit, NKSP had alternatively hired one HPS II to replace the position of CHSA.  For the 1.5 HPS I positions, two were filled.  Of the 9.5 mental health clerical positions, 10.5 positions were filled.

Telepsychiatry:

Of the two telepsychiatrists providing services at NKSP, one provided treatment to reception center EOP inmates and the other to mainline 3CMS inmates.  Each of the telepsychiatrists also provided services to reception center 3CMS inmates.  Staff reported that telepsychiatry services were not used in the MHCB.

All routine psychiatric services for reception center EOP inmates were performed by a telepsychiatrist.  The telepsychiatrist was a former supervising psychiatrist at the facility.  Both staff and inmates reported that the telepsychiatrist had visited the institution in the weeks prior to the site visit.  Though reportedly rare, the monitor's expert was informed that when an inmate was not suitable for telepsychiatry, an onsite psychiatrist was assigned.

Quality Management:

Minutes for the third and fourth quarter meetings of the local governing body held on October 4, 2018 and January 20, 2019 were reviewed; a quorum was present for both meetings.

The local governing body examined the activity report of the CTC during each quarter including admissions, readmissions, and unusual occurrences.  Summaries of minutes of the quality management committee meetings were also presented to the local governing body for review and action.

Minutes were provided for quality management committee meetings held from October 2018 to February 2019.  A quorum was present and mental health was represented at each meeting.  The quality management committee considered and acted on matters related to mental health services including monthly performance reports, timely mental health referrals, MHCB clinical stays, group treatment in a confidential setting, treatment refusals, and treatment attendance.  The quality management committee also reviewed the minutes and actions of other health care committees pertinent to mental health treatment including the mental health subcommittee, the institutional utilization management committee, the institution patient safety committee, the pharmacy and therapeutics committee, and the licensed inpatient services committee.

Minutes of the meetings of the mental health subcommittee were reviewed for the period of October 2018 through March 2019.  A quorum was present at each meeting.  The mental health subcommittee regularly attended to the minutes and actions of the SPRFIT meeting held during the prior month, matters involving responses to mental health referrals, daily clinical contacts in the MHCB, and treatment refused and attended.  Additional items addressed during the monthly mental health subcommittee meetings were staffing and vacancy concerns, compliance with timelines for higher levels of care, alternative housing, MHCB clinical lengths of stay, discharges, readmissions, and data entry.

No QITs/FITs were chartered or completed during the review period.

CDCR was not conducting system wide peer reviews during the review period or at the time of the site visit.

<u>Medication Management</u>:

The monitor's expert reviewed the mental health MAPIP medication management dashboard data with nursing staff at NKSP.

MAPIP data showed that for inmates prescribed antidepressants, NKSP was compliant for venlafaxine blood pressure monitoring and medication consent for the review period. No data was provided regarding thyroid monitoring and electrocardiogram (EKG) measures.

For inmates prescribed antipsychotics, NKSP was compliant during each of the six months of the review period for medication consent, lipid monitoring, and for blood pressure and height measurements. For other psychiatric measures related to antipsychotics, NKSP was compliant for five of six months for abnormal involuntary movement scale (AIMS) tests and weight measurements, and for one of six months for measuring blood sugar, complete blood count (CBC) with platelets; comprehensive metabolic panel (CMP), and lipid monitoring. No data was provided for thyroid monitoring.

Regarding psychiatric diagnostic monitoring of inmates prescribed carbamazepine, levels were compliant for four months, non-compliant for one month and no data was provided for one month. CBC and CMP were compliant for four months and no data was provided for two months. Medication consent was compliant for three months; no data was reported for the other three months.

NKSP reported quarterly data for Clozapine showing compliance with the following measures: AIMS, blood pressure, blood sugar, CBC, CMP, EKG and height. No data regarding thyroid monitoring was reported during the review period.

Psychiatric measures for inmates prescribed Depakote showed compliance with medication consent for all six months of the review period.  Diagnostic monitoring indicated compliance for three months for Depakote levels, CBC with platelets and CMP and noncompliance for three months.

Medication consent for Lamotrigine was compliant for four months; no data was reported for two months.

For inmates prescribed Lithium, NKSP was compliant with medication consent for all six months of the review period and with thyroid monitoring for five months.  Liver function tests, EKGs, and Lithium levels were compliant for three months and non-compliant for three months.

MAPIP nursing measures for continuity of nurse administered (N/A) direct observation therapy (DOT) medications with intra-institutional transfers to ASU/SHU/PSU, following discharge from MHCB transfers, observation of medication preparation and administration for HS medications, continuity of psychiatric-prescribed chronic care medications, and new psychiatric medications were all compliant during each month of the review period.

Multiple other MAPIP nursing measures consistently scored below 90-percent compliance during various months of the review period.  Compliance for medication continuity upon arrival to the reception center was non-compliant for five of six months, during inter-institutional transfer at R&R was non-compliant for three of six months, continuity following discharge/transfer from a community hospital or acute or intermediate care was not compliant for two of six months.  Regarding continuity at parole or release to the community at R&R, NKSP was not compliant for three of six months, and was not compliant during any month of the review period for observation of medication preparation and administration for AM/PM medications.  No data was provided for the rate of compliance with court ordered involuntary

medications.  Nursing staff was unable to describe how observation of medication preparation and administration of HS and AM/PM medications were observed or reported, though compliance percentages were supplied by headquarters.  Mental health and nursing staff members acknowledged little familiarity with the MAPIP dashboard and agreed that additional training on MAPIP would be useful.

Performance improvement plans for non-automated MAPIP measures assessed through nursing staff observation included, but were not limited to, length of pill lines, individual wait times in pill lines, security of medication, and medication temperature logs.  Compliance in these areas was reported to be above 90 percent.

There were no CAPs for psychiatric or nursing MAPIP measures scoring below 90 percent.  Staff reported CAPs were not developed because the low scores were often related to small sample sizes or inmate refusals.

There was a 180-day order limit for psychotropic medications.  Bridge orders had a maximum time of 30 days.

All non-formulary psychotropic medications were reported to the chief psychiatrist who approved or denied the request.

NKSP was not an initiating facility for Clozaril.  According to pre-site visit materials, inmates on Clozaril were identified in R&R and a psychiatrist was notified.  Once a patient was identified, a comprehensive psychiatric evaluation was completed within 72 hours and the patient's endorsement to a Clozaril maintenance institution initiated.

There were three PC 2602 involuntary medications orders initiated during the reporting period and all inmates were reported as compliant with their medications.

Institutional documents reported there were 278 inmates on psychotropic DOT medications and no inmates were ordered KOP psychotropic medications.  There were 653 inmates receiving psychotropic medications at HS.

Transfers:

NKSP was not designated to participate in sustainability audits as there was no mainline EOP.  However, NKSP's inpatient care coordinator conducted monthly audits of non-referred higher level of care (HLOC) forms (formerly Form 7388-B).  Audit findings for the period under review suggested challenges with documenting acceptable rationales and treatment modifications.  The problems occurred most frequently with a single provider in the MHCB and with few exceptions, the findings of the inpatient care coordinator were generally consistent with the monitor's expert.

The inpatient care coordinator provided information on inmate transfers to higher levels of care using an internal log kept by the institution.  Though the data provided on the internal log was inconsistent with the data from headquarters, additional information provided by the inpatient care coordinator supported the validity of the data kept internally by the institution.

There were 16 inmates referred for a higher level of care by NKSP.  Of this number, 13 inmates were referred and transferred to acute care.  All transfers were made within ten days of referral to headquarters.  Three inmates were referred to intermediate care.  All transfers were timely.  There were no rescissions or rejections.

Three inmates requested *Vitek* hearings.  All hearings were timely and no inmates prevailed.

The institution reported that all referrals for higher level of care met the criteria for inmates with complex medical needs, however their needs did not impact their timely transfers. There were no inmates pending referral to inpatient care at the time of the site visit.

The non-referral log showed that 155 inmates were identified but not referred to a higher level of care during the review period. Some reasons for non-referral included: requiring additional time for further assessment, reassessment after a change of medication, or the inmate had not met with psychiatry. No inmates returned to NKSP from an inpatient program during the period under review.

One EOP inmate transferred timely to the PSU.

Thirteen inmates were transferred to STRH, of which 53 percent transferred timely.

NKSP reported four transfers to LTRH, with 25 percent transferring timely.

There were eight inmates who transferred to mainline EOP during the reporting period, 87.5 percent transferred timely.

The headquarters performance report indicated that there were 609 EOP inmates in the reception center who transferred during the reporting period. Of this number, 516 or 84.7 percent transferred timely. The average timeframe for transfer was 53.1 days. The average length of stay for inmates transferring beyond Program Guide timelines was 189 days.

The headquarters performance report indicated 2,440 inmates transferred from the reception center to the 3CMS level of care. The average length of stay was 49.9 days. During the review period, there were 478 3CMS inmates who remained in the reception center beyond 90 days. The average total length of stay was 236.4 days. There were 146 3CMS inmates over 90 days in the reception center at NKSP at the time of the site visit.

Explanations provided for untimely transfers included: pending RVRs; transportation issues; endorsements made to an institution with no bed available; expiration of an endorsement, out to court; or an intervening DSH stay.

Programming:

Reception Center:

One telepsychiatrist and a registry psychiatrist were assigned to treat reception center EOP inmates.  Routine psychiatric services were provided by the telepsychiatrist.

A total of 22 primary clinicians provided services in the reception center, at least half of whom were licensed.  Primary clinicians providing reception center services were not assigned specific caseloads at NKSP.  There were three primary clinicians assigned to the reception center EOP including one who was not licensed and a fourth clinician who was on leave.  Assigned caseloads in the reception center EOP program were ten to 12 inmates each, which was within the prescribed staffing ratio.

At the time of the visit there were a total of 46 reception center EOP inmates, ten of whom were parole violators.  Reception center EOP inmates were housed on Facilities B and D, with Facility B housing primarily general population inmates and Facility D primarily housing SNY inmates.  Although they were clustered in areas within those yards, they were still mixed with 3CMS and general population inmates.

Treatment space was inadequate, and the available space was cramped, sometimes overheated, used for multiple purposes, and by various disciplines within the institution.  Groups were conducted in the chapel, which meant that group times had to be arranged around religious functions and seats were not appropriately arranged for group treatment.  This was noted as a fundamental factor limiting the institution's ability to provide a more robust group treatment

program.  Space limitations also were reported to sometimes result in the use of non-confidential

areas for didactic groups and occasionally for clinical contacts.

Interviews with mental health program leadership indicated their belief that the reception

center EOP was compliant with timeliness of all psychiatric and primary clinician contacts, as

well as the timing and composition of IDTTs.  It was difficult, however, for the institution to

provide continuity of care.  Inmates interviewed reported having regular contact with both

telepsychiatrists and primary clinicians in a confidential setting.

Inmates were scheduled for seven to eight hours of out-of-cell structured activities

weekly in an effort to ensure that program requirements were met.  Inmates noted having

adequate out-of-cell time and access to programing.

IDTT meetings for reception center EOP inmates were observed on Facilities B and D.

The IDTTs took place in a small room, accurately described by staff as "stuffy."  Staff had

computer access to required records.  All required disciplines were in attendance.

Staff had an adequate rapport with inmates.  Case presentations were conducted but

sometimes lacked relevant clinical detail.  The most striking example was of an inmate who had

recently returned from CHCF where he had been hospitalized in both acute and intermediate care

since October of 2018.  There was no discussion of the precipitants of his extended

hospitalization, nor of the discharge recommendations or course of treatment while at CHCF.

Presentations and discussions were somewhat more robust on Facility D as compared to

Facility B, but both required intervention by the supervisor to ensure all objective considerations

for a higher level of care were addressed.  Subjective criteria were less thoroughly covered, even

with supervisory oversight.  The IDTTs required attention to case formulations, treatment

planning, and focus on salient, clinical history.

The telepsychiatrist had only seen one of the three inmates prior to the IDTTs and his level of participation varied accordingly.  For the inmates he had not assessed prior to the IDTT his participation was limited mostly to questions about medications and whether the inmate was experiencing side-effects.  Where he had assessed the inmate prior to the IDTT, he was able to add useful information.

The visual and auditory quality of the telepsychiatrist's connection was adequate.  The medical assistant did not participate during the IDTT and did not appear to have communicated historical patient information to the psychiatrist.  In a follow up discussion, the medical assistant reported her role was to take the inmate's blood pressure and weight, obtain signed consent for information, and to forward this to the psychiatrist.

Reception center EOP inmates on both Facilities B and D were interviewed in group settings and individually.  Many, but not all had been there 30 days or more.  The inmates reported regular contact generally with the same primary clinician in a confidential setting.  Psychiatry was primarily available through the telepsychiatrist.  Inmates had mixed reactions to this modality.  The majority were neutral about its use, while some inmates expressed dissatisfaction, saying the lack of in-person contact connoted limited concern or caring.  These inmates found it difficult to communicate with the psychiatrist as a result.

The inmates on both yards but especially Facility D described a bifurcated experience with custody.  They described the EOP custody officers on Second Watch as dedicated professionals who treated them as human beings.  Alternatively, they had numerous complaints about the custody officers who worked the subsequent shift, reporting that they ignored inmates who felt suicidal.  Some inmates said, "you have to 'go suicidal' in order to get seen outside of your regular mental health appointment."  Contrary to positive staff reports regarding the Crisis

Intervention Team (CIT), the inmates reported that staff would not call the CIT on their behalf, or they expressed surprise that a CIT existed at all.

Inmates were generally appreciative of the groups provided, indicating that they wanted more or longer groups which they found helpful. No significant problems with the delivery of medications as ordered were described and most said they had good continuity of medications upon arrival from the county jail. Inmates had differing reports about how promptly they were seen by psychiatry upon arrival, with many saying that they were seen the same day and a smaller number saying that there was a considerable delay. This was consistent with the report of mental health leadership.

There were six randomly selected cases for the reception center EOP records review. No inmates were excluded from review, but as a result of regular transfers from the reception center, limited data was available for each case regarding treatment at NKSP. As this was deemed representative of reception center data, a decision was made to continue the review. The data points reviewed included the mental health screen, psychological evaluation, psychiatric evaluation, psychiatric contacts, primary clinician contacts, and IDTTs.

Initial psychiatric contacts were considered compliant if they occurred within 24 hours and prior to the initial IDTT. Of the cases reviewed, one inmate had not been timely seen, for a 50-percent compliance rate.

Substantive psychiatric follow-up was required every 30 days. Of the cases reviewed, only three intervals were appropriate for inclusion in the review, and two, or 67 percent were compliant with the timelines required.

Mental health screens were considered timely if completed within seven days and when the screen was positive, the inmate was referred for further psychological evaluation. All cases

692

reviewed received timely mental health screens and required subsequent psychological evaluation which was also timely.

When reviewing seven-day primary clinician contacts for the inmates included in this portion of the chart review, there were a total of 15 timeframes where weekly primary clinician contacts were expected.  A total of six, or 40 percent of the timeframes were in compliance, while six, or 40 percent of the timeframes included primary clinician contacts that occurred beyond seven days.  The remaining two inmates were due to be seen the week of the site visit.

The same six cases were reviewed for participation in IDTT; 50 percent had been seen in IDTT, while the remaining 50 percent were yet to be seen, despite one inmate's reported history of EOP level of care.

Facilities B, C, and D housed reception center 3CMS inmates.

There were four 3CMS inmates in the reception center who were there longer than 90 days.  The average length of stay in the reception center for 3CMS inmates was 105 days.  Some of the reasons given for the extended stays included: pending RVRs, archival reviews, lack of county jail documentation, and medical holds.  Of the four inmates discussed with staff, three had been endorsed and were awaiting transfer and one was pending RVR adjudication.

There were no groups provided for reception center 3CMS inmates on Facilities B, C and D.

During the site visit, there were no IDTTs held for reception center 3CMS inmates.

Interviews were held with reception center 3CMS inmates on Facility D.  All inmates reported having seen a clinician at least once since their arrival and confirmed they knew the process to obtain mental health services if needed.  Reception center 3CMS inmates reported they saw clinicians on a rotating basis and were not assigned to a particular clinician.  They

reported they were seen by a clinician within 30 and 90 days as required by the Program Guide. Five of the nine inmates interviewed had been in the reception center longer than 90 days.

Recommendations from the reception center 3CMS inmates included improved orientation regarding the availability of mental health services and more self-help workbooks.

MHCB:

The MHCB had capacity for ten inmates, however, the unit was closed at the time of the site visit for ADA retrofits and other repairs. The beds were taken offline on March 15, 2019. No firm date for reopening was set at the time of the site visit. At the time of its closure all inmates had been discharged from the MHCB level of care and no inmates required transfer to another MHCB.

NKSP made 114 HCPOP referrals for MHCBs during the review period. Of these, 46 inmates transferred to a MHCB and 68 referrals were rescinded. All transfers were timely.

The institution reported 97 admissions to its own MHCB unit during the reporting period. For inmates in the NKSP MHCB, the average clinical length of stay was 7.1 days and the average physical length of stay was 8.2 days. There were 19 inmates who remained in the MHCB for greater than ten days.

The area supervisor reported that when the MHCB was operational, staffing included two psychiatrists who covered during the week, with on-call psychiatry coverage on the weekends. There were three psychologists available during the week and an additional psychologist available for coverage on the weekend. The institution reported telepsychiatry was not used in the MHCB. The MHCB supervisor reported that the primary challenge in the MHCB unit was the occasional use of social workers to perform the required daily clinical contacts. The daily clinical contacts were supposed to be performed by a psychiatrist or psychologist. The senior psychiatrist

reported difficulty in having psychiatrists assess the inmate prior to his initial IDTT because the psychiatric coverage days and the days of IDTTs were coextensive with both being Monday, Wednesday, and Friday.

Mental health leadership reported recreation therapy coverage in the MHCB was seven days a week, which provided inmates daily out-of-cell time. It was further reported that a full issue of clothing was offered to inmates as quickly as possible after their MHCB admission. The supervisor indicated that some inmates resisted full issue because they interpreted it to mean staff was contemplating their discharge.

The percentage of inmates discharged from the MHCB who were not readmitted to an MHCB, acute, or intermediate care facility within 30 days of admission ranged from 85 percent in August 2018 to 64 percent in December 2018.

The supervisor reported that she found the treatment space in the MHCB adequate, with one confidential room utilized for both IDTTs and clinical interviews.

There were five inmates randomly selected to have their health records reviewed for compliance during their NKSP MHCB admissions.

Consistent with staff reports, psychiatry initial evaluations were concerning. Of the five cases reviewed, one or 20 percent received a timely psychiatric initial evaluation. In at least one case, no initial psychiatric evaluation was completed at all during the inmate's stay in the MHCB and the psychiatrist in a separate case completed the evaluation while in IDTT rather than an appropriate confidential setting prior to IDTT. The psychiatric evaluations in the remaining two cases were eventually completed, though delayed. In contrast, a further review of the records, demonstrated that 100 percent of the cases received initial evaluations by their primary clinician within 24 hours of admission.

Of the cases reviewed for timely IDTTs, there was 100-percent compliance for initial and discharge IDTTs.  No inmate was discharged without an appropriate IDTT.

As for clinical contacts with a psychiatrist or psychologist, there were 30 required daily contacts in the cases reviewed.  NKSP was compliant with all 30 of those contacts.  At least 15 of those clinical contacts should have been with a psychiatrist and 73 percent of the psychiatric contacts were completed as required.

Seclusion and Restraint:

There were five instances of clinical restraint during the review period.  One inmate accounted for multiple instances of restraint over a consecutive three-day period.  Provided logs were incomplete, therefore it was not always possible to calculate the lengths of the restraint.  All instances of restraint were noted to be related to danger to self or danger to others.  All restraints were by order of a doctor.

Seclusion was utilized on five occasions for three separate inmates during the review period.

Crisis Intervention Team:

Institutional documents indicated that the Crisis Intervention Team (CIT) was comprised of mental health, custody and nursing staff.  Mental health supervisors reported the CIT responded to crises throughout the day.  They reported that MHCB staff worked with on-call clinicians to improve continuity of care.

Chart reviews conducted by the monitor's expert did not reflect a CIT team response, instead documentation suggested only a single clinician responded to a crisis.

Alternative Housing:

NKSP assigned two primary clinicians who worked on weekdays and an additional three primary clinicians who worked during weekends to provide services.

While not available for verification through data, NKSPs alternative housing supervisor reported that the implementation of the CIT has significantly reduced use of alternative housing. The supervisor reported the CIT reduced the average placements in alternative housing from 120 to ten or 15 a month.

Of the 114 referrals to the MHCB, 79 inmates at NKSP were placed in alternative housing during the review period.  All inmates were timely transferred or their referrals rescinded.  There were no alternative housing placements during the site visit.

Observation of NKSPs ten alternative housing cells in building A4A indicated only seven were available for use.  The remaining three were being used for storage.  Documentation of cell cleaning was reportedly noted on the individual inmate's CDCR Form 114 after leaving the cell, making it a challenge to confirm the cleaning schedule.

NKSPs alternative housing local operating procedure was provided for review.  It was current and consistent with headquarters policy.

Short-Term Restricted Housing:

Two primary clinicians assigned to STRH and administrative segregation had caseloads of seven inmates each, which were within the established staffing ratios.

There were seven 3CMS inmates in STRH at the time of the site visit.  Each had been provided with a radio.  The institution did not report on the MHSDS inmates who were in the STRH during the review period.  Mental health headquarters reported that the institution did not keep this data.

There was a 90-minute group offered once a week. Staff reported poor attendance due to inmate turnover in the STRH.

IDTTs were observed in the STRH unit. Overall, the IDTTs were well-conducted by the primary clinicians. All required staff were in attendance, with the psychiatrist and RN physically present. With the exception of nursing, all in attendance at the IDTTs participated.

All inmates were seen by the psychiatrist and the primary clinician prior to the IDTTs. Historical information was discussed and information available was used to establish measurable goals and interventions, which incorporated the inmate's diagnostic criteria and functional impairments.

Interviewed STRH 3CMS inmates reported knowing they had a psychiatrist and a primary clinician, but were unsure how frequent contact would be, given their recent arrival in the STRH. They recalled discussions with their clinician about a team meeting and medications. All contacts referenced had occurred within the past week. The inmates did not report any problems with custody staff and reported feeling safe.

Psych tech rounds were observed and uneventful. The psych tech asked appropriate questions, gave out workbooks, and at the end of rounds referred one inmate to psychiatry and one to medical.

The monitor observed the morning huddle. It was attended by mental health, nursing, custody, and medical staff. Inmates currently housed in STRH were discussed along with new arrivals and discharges. A review of the morning huddle meeting log showed that most meetings were attended by custody and mental health staff.

A review of CDCR Form 114s showed that inmates were offered 18.5 hours of yard, three showers, and group therapy each week. Notably, most of the yards and group therapy

sessions were refused.  Staff reported that 3CMS inmates refused groups due to the stigma associated with mental health treatment or the desire not to interact with others during their time in STRH.

A review of Guard One reports for a single 24-hour period was 100-percent compliant.

Initial clinical assessments were expected in each of the five cases selected for review. Psychiatric evaluations were compliant in 60 percent of the cases.  Initial primary clinician evaluations were 100-percent compliant.

For the timeframes reviewed, 75 percent of psychiatric contacts for medication-related issues were compliant or occurred within 90 days.  The single non-compliant case involved an inmate who had not been seen by psychiatry since arrival to the STRH.

Of the five cases referenced above, three were expected to have timely initial IDTTs.  Of the number of cases eligible for review, 100 percent of the inmates were seen for their initial IDTTs within ten days and/or prior to ICC.

Ongoing primary clinician clinical contacts were compliant 50 percent of the time.

3CMS:

Inmates requiring mainline 3CMS level of care were housed in Facility A.

In the mainline 3CMS program, two primary clinicians were assigned caseloads of 109 and 116 respectively; both exceeded the established staffing ratios.  The third primary clinician in the mainline 3CMS program was a "rover" providing clinical services in various facilities as needed.

Staff reported that 3CMS inmates were seen more frequently than every 90 days by telepsychiatry and primary clinicians even though there was a shortage of psychiatrists.  Clinical contacts were reported as confidential.

For mainline 3CMS inmates, there were four groups facilitated by clinicians and available to both MHSDS and non-MHSDS inmates.  The inmates did not receive milestone credits for the groups and inmates in attendance were predominately non-MHSDS inmates.

 In the group observed during the site visit all 20 inmates enrolled were in attendance. The group was led by an inmate who wrote the curriculum and was co-facilitated by a mental health clinician.  The interactive group was 90 minutes long with a primary focus on ways to change behaviors or lifestyles.

NKSP reported it had expanded the groups offered.  Also, as the groups offered were not purely MHSDS groups, it had helped to encourage inmate participation, without the stigma often associated with mental illness.  One result of making the groups available to all was the creation of a waitlist.

Interviews were held with mental health leadership and supervisory staff where it was shared that the chief of mental health assisted in facilitating groups and helped supervisors and clinical staff with treatment for 3CMS inmates.

The monitor's expert attended five IDTT meetings on Facility A.  All but one inmate attended.  All IDTTs observed were attended by the required disciplines.  The primary clinician's diagnosis incorporated multiple assessments and a review of the inmate's functional impairments.  Discussions as to goals and diagnosis occurred with input from the team, including the telepsychiatrist.

The telepsychiatrist in attendance was the treating psychiatrist for the inmates in the IDTTs.  Medical record reviews and individual sessions were used by the telepsychiatrist to evaluate the inmate's medications and other needs.

The goals set with the inmates were measurable and appropriately challenging.  The team members had access to computers and were able to access the inmates' records during the IDTT.  The space where the IDTTs were held was adequate and confidential.

Mainline 3CMS inmates were interviewed.  The group members were randomly selected from each building on Facility A.  All inmates reported clinical contacts with a psychiatrist and primary clinician were consistent with required timelines and that the contacts occurred in a confidential setting.  Exceptions to confidentiality were inmate refusals.  Many of the inmates interviewed described clinical contacts as sterile, indicating they would like more individualized and focused contacts.  They sought more substantial discussion in the sessions and not just questioning as to whether or not they were suicidal.

A recommendation received during the 3CMS inmate interviews included having time set aside daily to see a counselor without an appointment on Third Watch, which would eliminate any issues with custody staff as an intermediary.

Five randomly selected cases were utilized for the 3CMS records review.  The inmates reviewed had a length of stay from February 2018 to April 2019.  The cases were selected from the NKSP-provided 3CMS current census so that each inmate was housed at NKSP at the time of the site visit.  However, one inmate who NKSP provided as housed on the 3CMS mainline ultimately appeared to have spent the entire time in the reception center.  Consequently, this inmate was excluded from subsequent analysis.

There was only one inmate in the sample who was expected to have a psychiatry or primary clinician evaluation, and while this case was not compliant with time frames, the inmate was not prescribed any psychiatric medications.

The initial treatment plan was considered compliant if it had occurred and was documented within 14 working days following arrival at NKSP and annually thereafter. Of the four cases reviewed, only one was expected to have a timely initial IDTT. However, this inmate was not seen for IDTT until 47 days following arrival. The remaining inmates were seen timely for their annual IDTTs.

For the timeframes reviewed, five psychiatry contact intervals were expected during the review period. All five, or 100 percent of the intervals were completed timely.

Ongoing 90-day psychiatry and primary clinician contacts were 100-percent compliant.

Other Issues:

Pre-Release Planning:

The pre-release supervisor reported that two primary clinicians were assigned the exclusive task of completing assessments in preparation for inmate releases. Additionally, the supervisor reported plans to begin pre-release groups in the reception center. Similarly, it was anticipated that the assigned primary clinicians would engage more with the inmates in order to develop individual release plans for their return to the community. At the time of the site visit, there was minimal coordination between the institutional pre-release staff and the TCMP contract staff.

Program Access:

f.   Job and Program Assignments:

On April 2, 2019 NKSP reported that of 525 available jobs, no job assignments were held by EOP inmates. For 3CMS inmates, 90 or ten percent of the population held job assignments and for non-MHSDS inmates 435, or 13 percent held job assignments.

For the 48 part-time academic assignments, NKSP reported that no EOP inmates held assignments.  For 3CMS inmates, three or .3 percent of the population held part-time academic assignments and for non-MHSDS inmates 45 or one percent held job assignments.

Regarding the 53 vocational education assignments, none were held by EOP inmates. For 3CMS inmates, ten or one percent of the population held assignments, as did 43, or one percent of non-MHSDS inmates.

Of 1,390 voluntary education assignments, three were held by .2 percent of EOP inmates and 263 were held by 30 percent of 3CMS inmates.  Of the non-MHSDS population, 1,124, or 34 percent held assignments.

Of the 138 inmates in substance abuse treatment, it was reported that 15 or two percent of the 3CMS population held assignments and 123 non-MHSDS inmates or four percent of the population held assignments.

To show compliance with implementation of the new policies regarding the functional evaluation of EOP inmates for program assignments, the institution provided copies of the headquarters memorandums, training material, and training attendance sheets from October 2017.  Of the 49 staff members listed on the attendance sheets, 31 or 63 percent attended the training.

g.   Milestone Credits:

As of April 3, 2019, NKSP reported that of 48 EOP inmates, all were eligible for milestone credits; 4.17 percent earned them.  For 3CMS inmates, 817 of 832 were eligible to earn milestone credits; 4.53 percent earned credits.

Of the 3,252 non-MHSDS inmates, 3,199 were eligible for milestone credits; 7.31 percent received the credit.

703

h.  Out-of-Level Housing:

NKSP did not provide information on out-of-level housing for inmates housed in the reception center, or for EOP inmates.  EOPs were immediately transferred upon classification to the higher level of care.  Staff represented that all EOPs were housed together regardless of classification until transferred.

As of March 31, 2019, the institution reported that there were six Level I 3CMS inmates in Level II housing.  There were 11 Level III 3CMS inmates in Level II housing and 11 Level III 3CMS inmates in Level IV housing.

i.  ADA Reasonable Accommodation and Grievance Procedures:

The institution reported that it had implemented the revised ADA accommodation and grievance procedures including the appeals process, but did not provide training materials, training rosters, or attendance sheets for review.

Case-by-Case Reviews:

NKSP reported no inmates eligible for a 150-day case-by-case review.

 "C" Status:

At the time of the site visit, there were six 3CMS inmates on "C" Status for failure to program, the result of multiple RVRs.

Mental Health Referrals:

NKSP reported compliance at 90 percent or higher with responses to psychiatry and primary clinician emergent, urgent, and routine referrals.  Contacts were reported to have occurred in non-confidential settings.  Provided documentation showed there were numerous cancellations, including, but not limited to "auto cancellations", "cancellation unspecified",

"custody cancellations" and "no shows."  Notably, only one cancellation was due to "refused in person."

Mental Health/Custody Relations:

NKSP staff reported good relations between mental health and custody staff.  On Facility A, inmates reported feeling a lack of respect from custody staff, but no other inmate concerns were noted.

The institution provided the local operating procedure for the Custody Mental Health Partnership.  Shortly after its release in March 2019, NKSP initiated executive rounding, huddles, and quarterly roundtables.  However, the institution continued to be challenged by the dissemination of information following executive rounding.  Any concerns following executive rounding should be addressed in the warden's executive board meeting and/or the quality management committee meeting and memorialized in the minutes.

The institution provided confirmation of the implementation of the quarterly roundtables, which reflected a diverse attendance of disciplines in sessions at the MHCB, EOP, and administrative segregation unit.

CDCR implemented additional trainings, entitled, Multiple Interactive Learning Objective (MILO) simulator and From Corrections Fatigue to Fulfilment (CFTF) for custody and mental health staff.  Documentation provided by the institution indicated that staff from various disciplines attended both trainings.

Heat Plan:

Only one month of the reporting period, October 2018, occurred during heat season. Documentation showed there were no heat alerts or heat-related incidents during the review period.  Custody staff were generally familiar with the heat plan.  They reported receiving a list

705

of inmates on heat medications daily.  Some custody officers believed that inmates returned to the housing unit from the yard during a heat alert were required to return to their cells.  Regional staff accompanying the monitor provided corrected information when necessary.  All toured housing units had a working thermometer appropriately located.

Institution staff received on-the-job training regarding the heat plan.  Of the correctional administrators and captains, 67 and 40 percent, respectively, were trained on the heat plan.  Lieutenants, sergeants and correctional officers were all over 90-percent compliant with completion of heat plan training.

RVRs:

Of the 730 custody officers who required RVR training, 521, or 71 percent received training.  Only one of the 45 mental health staff members received the mental health assessment training.

NKSP reported there were 2,494 RVRs issued from October 2018 through March 2019.  Of those, 675 or 27 percent of RVRs were issued to MHSDS inmates, one to an acute care inmate, 628 to 3CMS inmates, 38 to EOP inmates, and 18 to MHCB inmates.  There were 57 inmates whose MHSDS status was unknown since they had not been housed in the reception center long enough to be classified.

NKSP faced significant challenges in meeting requirements regarding mental health assessments related to RVRs because only one of its 45 mental health clinicians had received RVR mental health assessment training at the time of the site visit.

The senior hearing officer documented his consideration of the mental health assessment and mitigation in all cases reviewed.  Often the mitigation recommended that the inmate be allowed to maintain access to mental health programming, which was already required.

Use of Force:

The institution reported 97-percent or higher compliance for custody staff attendance at mandatory use of force training, including correctional administrators, captains, lieutenants, sergeants, and correctional officers.  For mental health staff; 80 percent of the psychiatrists, 100 percent of chief psychologists, 80 percent of psychologists, and 93 percent of social workers attended the mandatory use of force training.

The institution reported no controlled use of force incidents during the review period.  A total of 87 immediate use of force incidents involving 48 MHSDS inmates and 184 non-MHSDS inmates were reported during the review period.  Additionally, there were three incidents of immediate use of force in the MHCB unit.

There were a total of 74 non-use of force incidents involving 32 MHSDS inmates and 87 non-MHSDS inmates.

The monitor reviewed documentation on immediate use of force incidents that occurred in the MHCB during the review period and found no deviations from policy.

Lockdowns/Modified Programming:

There were no lockdowns during the reporting period, however, there were three periods of modified programming during October 2018 and January 2019, the impact of which for MHSDS inmates, was that no recreation activities were permitted.  Inmates required escorts to treatment areas and medication was distributed cell-front.

At the time of the site visit, Facility A was on modified programming.  As a result, inmates were required to have an escort to all treatment areas and no recreational activities were permitted.

Access to Care:

A review of NKSP's monthly Health Care Access Quality Reports from October 2018 to March 2019 indicated that zero ducats were reported as incomplete due to custody reasons, while 47 percent were not completed for non-custodial reasons, excluding inmate refusals.

Placement of 3CMS Inmates into Minimum Support Facilities:

There were 27 3CMS inmates housed in the MSF at the time of the site visit.

*Coleman* Postings:

Housing units had *Coleman* posters in English and Spanish that were placed in locations visible to class members.

Document Production Issues:

Mental health headquarters' staff confirmed that NKSP was not able to produce requested data related to STRH admissions during the reporting period. The institution provided internal logs on EOP transfers from the reception center, however, the internal report did not present reliable data. The reports provided by the institution for information on admissions to the STRH and transfers from the reception center was the mental health headquarters' performance report data. NKSP provided the performance report data on mental health referrals as well. Each performance report provided was without defined search terms.

## California Correctional Institution (CCI)
March 10, 2020 – March 11, 2020

Census:

On March 9, 2020, CCI housed 3,656 inmates, a nine percent increase since the preceding monitoring period. The mental health caseload of 1,499 had increased by ten percent and represented 41 percent of the population.

Two EOP inmates were waiting transfer to mainline EOP institutions.

There were 1,455 mainline 3CMS inmates evenly distributed among the five yards.

The total administrative segregation unit population was 89 inmates, including 42 3CMS inmates awaiting transfer to STRH.

Staffing:

There was no chief psychiatrist position at CCI. The senior psychiatrist position was filled and did not carry a caseload.

One of the two chief psychologist positions was filled and carried no caseload. Two senior psychologist supervisor positions were filled, which was 0.5 more than the established 1.5 positions at CCI.

CCI had four onsite psychiatry and four telepsychiatry positions, for a total of eight psychiatry positions. On March 11, 2020, three of the onsite psychiatrist positions were filled, one by registry staff, and two of the four telepsychiatry positions were filled, resulting in a functional vacancy rate of 38 percent for psychiatry. An additional .24 telepsychiatrist, not included in the staff psychiatry positions above, provided on-call services.

Of the 14.5 psychologist positions, one was vacant. With the use of a 0.5 contractor, the functional vacancy rate for psychologists was three percent. Notably, two psychologists were unlicensed.

709

CCI employed two supervising social workers, 0.5 more than the established 1.5 positions. Of 14 social worker positions, 12 were filled with an additional position filled by registry staff for a seven percent functional vacancy rate. Five social workers were unlicensed.

CCI employed one full-time recreation therapist, which was 0.5 more than allocated.

Ten of the 11 clerical positions were filled for a nine percent vacancy rate. The CHSA II position and OSS position were filled. Two of the three HPS I positions were filled for a 33 percent vacancy rate.

Quality Management:

CCI's quality management program declined since the preceding monitoring round, and many problems identified by staff were not included in quality management documentation.

Local governing body meetings were not required at CCI.

The quality management committee met monthly with a quorum, and meeting minutes provided succinct overviews of discussed topics. Agenda items consistently included a review of previous meeting minutes and action items, performance improvement work projects, program updates, local operating procedure updates, QIT project reports, and an overview by each subcommittee.

The mental health subcommittee met monthly with a quorum in attendance. While there was consistency in reviewed topics, it was unclear why topics remained as standing items or were suspended. Further, discussion of compliance or performance data was not documented, except during January 2020. Reviewed agenda items included sustaining quality reports, administrative segregation program metrics, OHU alternative housing, labs update, PC 2602 involuntary medicine report log, referrals to DSH and non-referrals to higher level of care, RVR mental health assessments, and mental health screens.

There were no QITs or FITs chartered during the review period.

Pursuant to a CDCR headquarters' directive, peer reviews were on hold.

Sustainability reviews were not required at CCI.

Medication Management:

Medication management compliance decreased during the review period.  Specifically, CCI was not compliant with multiple psychiatric medication diagnostic monitoring measures and nursing medication management measures.  Staff reported that performance improvement plans were implemented for those measures.  Interventions to address non-compliance included recruitment and retention efforts, supervision of medical assistants, collaborative efforts with the senior psychiatrist specialist and quality management health program specialist, and improved multi-disciplinary communication.

MAPIP results for CCI for August 2018 through January 2019 reported compliance for psychiatric diagnostic monitoring and medication management.  The medication management dashboard for the period showed that for inmates prescribed antidepressants, medication consent was compliant for three months.  Venlafaxine blood pressure monitoring was compliant for all six months of the review period.  Compliance was shown for five months for thyroid monitoring; no data was reported for one month.  CCI did not report data for EKG during the review period.

For inmates prescribed atypical antipsychotics, blood pressure, height and weight measurements, and medication consent were compliant for all six months.  Abnormal involuntary movement scale (AIMS) tests were compliant for two of the six months.  Diagnostic monitoring of blood sugar complete blood count (CBC) with platelets, lipid monitoring, and comprehensive metabolic panel (CMP) were non-compliant throughout the review period.

Electrocardiogram (EKG) measurements were compliant for one month, during the review period; no data for thyroid monitoring was reported for the review period.

Regarding monitoring inmates prescribed carbamazepine, level monitoring was compliant for two months, non-compliant for two months, and no data was reported for the other two months. CMP and CBC diagnostic monitoring were compliant for three months each, and non-compliant for one month; no data was reported for the other two months. Medication consent was compliant for one month; no data was reported for five months.

Psychiatric diagnostic measures for inmates prescribed Depakote were compliant for medication consent for all six months of the review period and CBC with platelets was compliant for one month. Depakote levels, and CMP was non-compliant for all six months of the review period.

CCI was compliant with medication consent for Lamotrigine for four months, non-compliant for one month; no data was reported for one month.

Data for diagnostic measures for inmates prescribed Lithium indicated that medication consent was compliant for six months and thyroid monitoring was compliant for one of the six months. Lithium levels and Creatine and BUN (kidney function test) were non-compliant for all six months. Electrocardiograms (EKG) were non-compliant for four months and no data was reported for two months.

At CCI, multiple MAPIP mental health medication measures scored above and below 90 percent for one or more months during the review period. Observation of medication preparation and administration for HS and AM/PM, psychiatric-prescribed chronic care medications, and new psychiatric medications were compliant for all six months of the review period. Medication continuity upon inter-institutional transfer at receiving and release (R&R), intra-institutional

712

transfers to ASU/SHU/PSU, following discharge from community hospital or acute or intermediate care, and medication continuity with parole or release to the community was compliant for five of the six months.

Continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU) was compliant for two months; medication continuity for MHCB transfers was compliant for three months, non-compliant for one, and no data was provided for two months. Medication continuity for court ordered involuntary medications was compliant for one month, not compliant for one month and no data was provided for four months.

CCI was not a Clozaril initiation or maintenance facility.

Use of non-formulary medication, which did not require approval from a secondary reviewer, was less than two percent, which staff attributed to significant misuse of medication and high rates of substance use at CCI. Misuse also impacted the limited use of PRN medications at CCI. DOT medication orders were completed on a case-by-case basis.

Medication orders were written for no longer than 90 days, and bridge orders were typically written for 14 days. Telephone orders were reported to be rare, although there was no formal tracking process. CCI did not prescribe KOP medications.

No PC 2602 involuntary medicine orders were initiated during the review period at CCI. However, during the review period, there were nine inmates on PC 2602 involuntary medicine orders, six of which were renewed and granted; the remaining three were not renewed. No patients on PC 2602 involuntary medicine orders refused medications during the review period. CCI did not report a process for tracking and reporting PC 2602 involuntary medicine cases to headquarters.

713

Data indicated that 440 inmates were prescribed HS psychotropic medications of which 296 were ordered after 8:00 p.m.

Transfers:

During the review period, 27 inmates met criteria for higher level of care consideration on 29 occasions. CCI did not refer any inmates to acute or intermediate level of care.

CCI referred 95 inmates to MHCB during the review period; 39 inmates were admitted, and 56 inmates or 59 percent were rescinded. The average length of stay in alternative housing prior to rescission was 14 hours with a range of 2.2 hours to 34.4 hours; one inmate remained in alternative housing beyond 24 hours. Transfers to MHCB occurred within 24 hours for all but one inmate when transportation was impeded by a highway closure.

CCI did not transfer any inmates to PSU.

During the review period, six of seven or 86 percent of EOP inmates transferred to EOP administrative segregation hubs within 30 days. One inmate transferred on day 34 due to a pending threat assessment. There were no EOP inmates waiting transfer to an EOP hub during the site visit.

CCI did not transfer any inmates to LTRH during the review period.

CCI transferred 270 3CMS inmates to STRH during the review period. Of those, 47 inmates or 17.5 percent transferred beyond the 30-day timeframe. Late transfers took an average of 33 days to transfer.

Thirty-seven inmates transferred to mainline EOPs during the review period. Of those, two transfers or 5.5 percent were beyond the 60-day timeframe. On March 10, 2020, at the start of the site visit, two inmates were waiting transfer to mainline EOPs, and neither were beyond 60 days.

Programming:

MHSDS Inmates in Administrative Segregation:

On March 11, 2020, there were 33 3CMS inmates in administrative segregation pending transfer to STRH. Of those, two inmates or six percent were beyond the 30-day transfer timeframe requirement.

CCI did not exceed primary clinician or psychiatrist mandated staff-to-inmate ratios in administrative segregation during the review period. Two primary clinicians were assigned to administrative segregation and a third contract primary clinician was available for coverage as needed. One onsite psychiatrist covered both administrative segregation and mainline 3CMS.

IDTT rooms for administrative segregation were confidential, spacious, and adequately ventilated. Observed IDTTs were attended by all required disciplines and were led by the primary clinician. While all staff except the psych tech participated in the IDTT, the process was not collaborative. Areas in need of improvement included discussion of relevant clinical history; specificity of symptoms; rationale for diagnosis; clear and specific treatment goals and interventions; and rationale for level of care decisions. Of concern, there was no discussion of salient clinical factors such as the elevated risk of suicide, management of symptoms, or upcoming transfer to STRH.

Inmates did not have adequate access to radios and televisions in administrative segregation due to internal communication issues related to supply requisitions. On March 10, 2020, management staff reported that those issues were resolved and going forward, supplies would be scheduled for order on a quarterly basis.

Morning meetings in administrative segregation did not occur as required during the review period.  Moreover, group therapy was not provided in administrative segregation due to the lack of treatment modules in the unit.

Alternative Housing:

Alternative housing for mainline inmates was located in Facility A, Housing unit 8, Section B, cells 101-105.  Administrative segregation inmates remained in administrative segregation cells 101-105.

During the review period, all 95 inmates referred to MHCBs were placed in alternative housing and one remained beyond 24 hours.

During weekdays, clinical contacts for inmates in alternative housing occurred in the no-contact visiting room located in another building.  Consequently, inmates wearing suicide smocks were escorted through the unit, and outside to the next building for clinical contacts.  During weekends, mental health contacts occurred cell-front as the non-contact room was not available.

3CMS:

For the 3CMS program, a majority of psychiatry caseloads exceeded the 1:280 mandated ratio with a range of 289 to 385 inmates.  Sixty-nine percent of primary clinicians had caseloads that exceeded the 1:97 ratio with caseloads ranging from 98 to 168 inmates.

Observed IDTTs in the 3CMS program were conducted in an adequately sized confidential room.  All required staff, including a telepsychiatrist, were present and had access to electronic documentation.  The process in these IDTTs was not collaborative, as psychiatric input was minimal and participation from other team members was negligible.  Treatment

planning lacked adequate discussion of relevant clinical issues and clinicians used language that exceeded inmates' average educational level.

Group therapy was minimal. On A and B yards, one group was offered one day per week for inmates returning from or rescinded from MHCB. The remainder of groups offered on A and B yards were recreational therapy. Two ethics and two drama groups offered on D yard were also opened to general population inmates. Group therapy was not offered on C yard.

Primary clinician and psychiatry contacts were not confidential. Moreover, continuity of care and access to care were not adequate. Inmates reported brief contacts with inattentive clinicians. On A and B yards, inmates reported only three hours a day for recreation and dayroom. Inmates reported that some inmates purposefully engaged in behavior to prompt a transfer to STRH where there was more programing. On B yard, inmates reported that refused appointments were not rescheduled for another 90 days and inmates were threatened with removal from MHSDS for refusal. Inmates on C yard reported a pattern of primary clinicians not showing up for appointments. On A yard, mental health appointments were completed cell-front during the frequent lockdowns, and on B yard, custody staff relayed to mental health staff that inmates refused appointments when they had not. Mental health staff on C yard reported that custody staff turned inmates away from scheduled groups stating that the group was "illegal, not necessary." Further, on D yard, priority ducats were not honored.

Inmates reported that informed consent was not always provided, renewals for expired medications were not timely, and access to prescribed PRN medication was difficult.

Across all yards there were reports of correctional officer misconduct and non-compliance with policy. Specifically, inmates who reported a psychiatric emergency at night were told to wait until the next morning, and some waited as long as several days. There were

reports of inmates being assaulted in response to requests for access to emergent care. Inmates reported that they either escalated their behavior to have their needs met or ultimately did not seek help. Staff from A, B, and C yards confirmed that they heard similar accounts from inmates. Inmates from all yards reported rude, disrespectful, and intimidating custody staff, including cursing and use of the term "green wall." The CDCR Ombudsman present during the site visit reported multiple complaints regarding custody staff on B yard.

Chart Review Analysis:

Ten randomly selected 3CMS inmate health records were reviewed to assess compliance with Program Guide requirements for timeliness of psychiatric contacts; 12 randomly selected inmate health records were reviewed to assess compliance with Program Guide requirements for timeliness of primary clinician contacts and IDTT.

There was 20 percent compliance for initial psychiatric evaluations and 46 percent compliance for routine psychiatric contacts. Of concern, two inmates in the sample had not been seen by psychiatry in eight months.

There was 50 percent compliance for initial primary clinician evaluations and 77 percent compliance for routine primary clinician contacts. Of concern, one reviewed inmate had not been seen by his primary clinician in over six months.

There was 50 percent compliance for initial IDTTs. Required staff were in attendance for three or 75 percent of initial IDTTs. One inmate required an annual IDTT which was completed timely with required staff in attendance. Documentation did not indicate whether the attending primary clinician and psychiatrist were the assigned clinicians.

Other Issues:

Pre-Release Planning:

During the review period, 353 inmates were eligible for pre-release planning.  Due to lack of space, staff, and custody coverage, no pre-release groups were held during the review period or at the time of the site visit.  Pre-release planning began approximately 60 days prior to parole.  Pre-release planning included completion of the preliminary information of the pre-release assessment, primary clinician contact no later than 30 days prior to release, notification of the psychiatrist of inmate's release date, completion of release of health information for inmates releasing to Post Release Community Supervision, assistance with housing placement with parole service agents and, collaboration with TCMP case managers.

Program Access:

a.  Job and Program Assignments:

As of February 12, 2020, there were no program assignments for EOP inmates.  For 3CMS inmates, 383 or 25 percent of the population held job assignments.  Additionally, 336 3CMS inmates or 22 percent held academic assignments, and 108 or seven percent of 3CMS inmates attended vocational education.  Twenty-two or one percent of 3CMS inmates held voluntary education assignments.  One 3CMS inmate attended substance abuse treatment.

For non-MHSDS inmates, 829 or 39 percent of the population held jobs.  For academic assignments, 392 or 18 percent of non-MHSDS inmates held assignments.  Nine percent or 189 non-MHSDS inmates held vocational assignments, and 37 non-MHSDS inmates or two percent held voluntary education assignments.  There were no non-MHSDS inmates enrolled in substance abuse treatment.

b. Milestone Credits:

No EOP inmates participated in milestone credit eligible programs during the review period.  As of February 12, 2020, CCI reported that of the 1,547 3CMS inmates, 1,487 were

eligible for milestone credits and 19 percent earned them.  Of the 3,693 non-MHSDS inmates, 2,074 inmates were eligible for milestone credits, and 27 percent earned them.

c. <u>Out-of-Level Housing</u>:

As of February 7, 2020, ten Level II 3CMS inmates, 17 non-MHSDS Level II inmates, one Level III 3CMS inmate, and one Level IV non-MHSDS inmate were in Level I housing. Level II housing contained 11 Level I 3CMS inmates, 12 Level I non-MHSDS, 31 Level III 3CMS inmate, 59 Level III non-MHSDS inmates, and one Level IV non-MHDS inmate.  The institution placed three 3CMS, six non-MHSDS Level II inmates, seven 3CMS, and nine non-MHSDS Level IV inmates in Level III housing.  Thirty-seven 3CMS inmates and 77 non-MHSDS Level III inmates were in Level IV housing.

d. <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CCI confirmed implementation of the revised ADA accommodation and grievance procedures.

<u>Placement of 3CMS Inmates into Minimum Support Facilities</u>:

CCI did not have a minimum support facility and did not track inmates placed in MSFs during the review period.

<u>Case -by-Case Reviews</u>:

There were no case-by-case reviews completed at CCI during the review period.

<u>Non-Disciplinary Segregation</u>:

On March 11, 2020, there were 13 3CMS inmates housed in administrative segregation on non-disciplinary status.  Staff and inmates reported delays in receipt of inmate property after ICC clearance.

<u>"C" Status</u>:

CCI did not provide information regarding inmates on "C" status.

Referrals:

CCI was compliant with timely response to primary clinician emergent, routine, and urgent referrals 90 percent of the time.  Responses to emergent and urgent psychiatry referrals were timely; however, response to routine referrals was only 76 percent compliant during the review period.

Space:

The lack of confidential, safe treatment space significantly limited CCI's ability to provide adequate care to inmates and retain mental health staff.  Both A and B yard inmates received mental health treatment in the non-contact visiting area.  Because this area did not have a door separating the clinician from the open visiting area and no officer was assigned to the area, inmate contacts were not confidential, and clinicians reported feeling unsafe.  Further, the monitor's expert observed, and one clinician confirmed, that it was difficult at best to hear inmates during clinical contacts.  The inability to hear was exacerbated for telepsychiatry appointments which were also occurring in this area.  On B yard, confidentiality was further hampered by the presence of custody staff appearing and asking questions during treatment sessions.  Inmates on C yard received treatment in a clinic; however, groups were not provided due to a lack of group treatment space.

During the review period, all treatment modules were removed from administrative segregation by order of the fire marshal which impacted CCI's ability to provide group therapy in the unit.

Mental Health/Custody Relations:

The CMHPP was not applicable to CCI during the review period. Inmates and clinical staff reported, and the monitor's expert observed, that CDCR 602s were not available on the housing units.

Heat Plan:

The local heat plan policy at CCI was updated during May 2019. Working thermometers were observed on all toured units. Interviewed staff members were familiar with stages of the heat plan and medication lists were distributed to the unit as required. There were five Stage I heat alerts during the review period.

RVRs:

The local operating procedure for the RVR mental health assessment process was revised during June 2019 and February 2020. While CCI reported that staff received training on the RVR mental health assessment process annually, no details regarding the training or staff attendance were provided.

CCI issued 1,755 RVRs. Of those, 920 or 52 percent of RVRs were issued to 3CMS inmates, ten were issued to EOP inmates and four were issued to MHCB inmates.

Nine adjudicated RVR packages were reviewed. Mental health assessments were requested timely for four or 44 percent of the reviewed RVRs, and seven assessments or 78 percent were timely completed and returned to custody.

Clinicians did not indicate that inmates' mental illness strongly influenced their behavior in any of the reviewed RVRs. Clinicians recommended mitigation of loss of privileges in all the reviewed RVRs but used generic language regarding mitigation. Alternative discipline was not recommended or approved for any reviewed RVR.

Senior hearing officers documented consideration of inmate mental health factors and clinician recommended mitigation factors in all cases reviewed.  Senior hearing officers mitigated penalties based on mental health input in 78 percent of the cases.

Use of Force:

Ninety-seven percent of required correctional staff received training on the use of force policy.  The warden, chief deputy warden, five of six correctional administrators and six of seven captains were trained on the policy.  Additionally, 31 of 34 lieutenants, 82 of 85 sergeants and 798 of 822 correctional officers received the training.  Twenty-eight of the 32 staff who did not receive training were on long-term sick leave.  CCI reported that 78 percent of mental health staff completed training on the use of force policy.

There was no controlled use of force incidents during the review period.   CCI reported 227 immediate uses of force, 76 percent of which involved 3CMS inmates and four percent involved EOP inmates.  Of the 227 immediate uses of force, oleoresin capsicum spray was utilized in 68 percent of incidents, the 44 mm was used in 33 percent of incidents, and physical force was used in 13 percent of incidents.

During the review period, staff reported daily use of oleoresin capsicum spray on both A and B yards due to inmate fighting.

Lockdowns/Modified Programming:

Lockdowns regularly occurred on A and B yards.  Reviewed program status reports indicated lockdowns typically involved entire yards as opposed to one specific security threat group.  The monitor's expert observed the same during the site visit.  Mental health ducats were completed during lockdowns; however, access was slower than normal, and many contacts were completed cell front.

<u>Access to Care</u>:

A review of documentation from August 2019 through January 2020 revealed that less than one percent (0.10 percent) of issued mental health ducats and add-on appointments were not completed due to custody factors, while 33 percent were not completed for non-custodial reasons, excluding inmate refusals.

<u>Non-Designated</u>:

Both D and E yards at CCI have been non-designated since 2018.  No other yards were non-designated at CCI.

On July 1, 2019, C yard began an incremental transition to a progressive programming facility (PPF).  Inmate selection criterion included no RVRs with documented good behavior override in the past year; not currently or in the past year in Work Group C; no division A-1, A-2, or B offenses in the past two years; and no SHU term in the past two years.  Prior to committee placement referral, inmates must complete the PPF application and sign a CDCR 128-B stating willingness to confirm to PPF program expectations.

<u>*Coleman* Postings</u>:

*Coleman* postings in both English and Spanish were posted in toured areas; although, inmates reported the posters were put up just prior to the site visit.  Posting locations were accessible to inmates.

**California Institution for Men (CIM)**
November 5, 2019 – November 7, 2019

Census:

On November 5, 2019, CIM's total inmate population was 3,651. The mental health caseload population was 1,151 inmates or 31.5 percent of the population.

The MHCB unit housed 32 inmates.

There was one mainline EOP inmate.

The mainline 3CMS program housed 979 inmates.

The administrative segregation population totaled 94 inmates, including 15 3CMS inmates who were pending transfer to STRH. Five inmates were assigned to non-disciplinary segregation.

The total reception center inmate population was 487 inmates, including 31 EOP inmates, of which eight were parole violators; and 93 3CMS inmates, of which 14 were parole violators. There were two reception center 3CMS inmates housed in reception center STRH.

Staffing:

On November 5, 2019, the chief psychiatrist position was filled. There was no senior psychiatrist position established at CIM.

One of the two chief psychologist positions was filled for a vacancy rate of 50 percent. The second position was not filled, and it was used to fund another position. The two senior psychologist specialist and two senior psychologist supervisor positions were filled.

Ten of the 12 staff psychiatrist positions were filled for a functional vacancy rate of 17 percent. All of the 23 staff psychologist positions were filled.

The one established supervising social worker position was filled.  CIM had 15.5 social workers on staff, which was two positions more than the 13.5 established social worker positions.

The seven established recreation therapist positions were filled.

One of the 14 established clerical worker positions was vacant for a functional vacancy rate of seven percent.  The one established Office Services Supervisor (OSS) II position and the one established Associated Governmental Program Analyst (AGPA) position were filled.  One Health Program Specialist II (HPS II) position (funded by the second chief psychologist position) was filled.  One of the two Health Program Specialist (HPS I) positions was filled, resulting in a 50 percent functional vacancy rate.  The one established Correctional Health Services Administrator (CHSA) II position was filled.

The two established senior psych tech positions were filled, and 33 of the 36.8 psych tech positions were filled for a functional vacancy rate of ten percent.

Seven contract medical assistants provided full-time services during the review period.

CIM utilized four psychology interns, six psychology practicum students, and five clinical social worker interns during the review period.

Telepsychiatry was not used at CIM during the review period or at the time of the site visit.

<u>Quality Management</u>:

CIM had an active quality management program.  CIM did not have a local governing body because the MHCB was not licensed.

Quality management committee and mental health subcommittee meetings were well attended, and documentation was clear and organized.  Documentation addressed problematic

issues and had appropriate tracking and follow-up or action plans, making it very useful.  It was unclear how documentation was disseminated to staff.

During the review period, a quorum was met for the quality management committee meetings except during June when no meeting was held.  Topics generally included: system surveillance; PIWP update; QITs; RCAs/sentinel events; lean six sigma projects; HCFIP; audits; inspections; EMRRC; resource management; mental health subcommittee; medical services/nursing subcommittee; patient safety subcommittee; dental subcommittee; pharmacy and therapeutics subcommittee and new business.

The mental health subcommittee reported to the quality management committee.  A quorum was met for all meetings held during the review period except for August 2019 when no meeting was held.  Issues that had a pattern of non-compliance were referred to QITs.  Topics generally included: old business; mental health measures; sustainable continuous quality improvement and quality improvement plan progress; mental health performance reports/trends; custody and mental health partnership plan; suicide prevention reduction focused improvement team; quality improvement team;  mental health training data; peer review; patient safety/nursing report; addiction service; pharmacy report; performance improvement work plan; mental health facility program reports; heat plan; status of critical work orders/plant issues; mental health departmental goals; department of state hospitals sustainable process; continuous quality improvement; chart audit tool; review of new and revised mental health policies and procedures; new/pending business.

QITs were charted as needed and included: data entry errors, high-risk LOP, transfer timeframe compliance for mental health patients, alternative housing mental health log, DDP, quality improvement of related mental health treatment plans, and CIM MHCB 30-day

readmissions.  Appropriate staff were included, and descriptions of QITs were adequate.  No other audits were conducted.

CIM maintained a master CAP List that was 32 pages long and overly comprehensive.  A review of the list indicated some items overlapped, and it also identified issues that would likely be better managed with staff supervision.  CAP areas included deficiencies from CDCR regional visits, *Coleman* suicide expert review, *Coleman* 2018 site review, CDCR CQI review, DDP audit, monthly institution report items covering six-month trends, and diagnostic measuring.

At the time of the site visit, with the exception of the MHCB, peer review did not occur. Three full-time psychiatrists, seven full-time psychologists, and three part-time psychologists were reviewed in September 2019.  Psychiatric documentation was adequate, and psychologists met or exceeded standards 95.5 percent of the time.  Staff notification of performance was conducted by email.  Of note, the peer review process did not address issues identified in CIM's regional review CAP regarding higher level of care consideration lacking rationale for non-referral.

CDCR did not conduct sustainability reviews at CIM as they did not have an EOP.

Medication Management:

Continuity of medications upon arrival in the reception center was the one nursing measure reported as non-compliant.

Documentation provided by CIM demonstrated significant problems with relevant laboratory testing being obtained by psychiatrists for certain prescribed psychotropic medications.

Medications refusals data was not reported.

The length of pill lines was not an issue at CIM.

Medication orders were written for no longer than 90 days, and bridge orders were written for a maximum of 14 days. Generally, verbal or telephone orders were not issued by psychiatrists at CIM during business hours. CIM did not order KOP medications for MHSDS inmates.

CIM did not provide information regarding inmates receiving nonformulary psychotropic medications.

CIM was neither a Clozaril initiating nor maintenance institution.

For the reporting period, eight new PC 2602 petitions were initiated and granted. CIM petitioned for the renewal of one PC 2602 petition. One patient was transferred to CIM after the initiation of a PC 2602 petition, which was still pending at the time of the site visit. One PC 2602 was reported non-compliant during the review period, which resulted in the use of force. HS medications were administered after 8:00 p.m.

Transfers:

The inpatient care coordinator had been in place at CIM since September 2015.

Sustainable process tours were not completed at CIM.

CIM provided on-demand reports and internal tracking data in response to the *Coleman* document request. CIM staff reported problems with the on-demand report including patients that were not housed at CIM.

During the review period, 550 inmates met criteria for higher level of care consideration. Of those, 92 or 16.7 percent, were ultimately referred to inpatient care after IDTT consideration. All referrals were for inmates in MHCBs.

The non-referral log indicated that during the review period, 303 inmates were identified but not referred in 459 different IDTTs.

CIM made 53 referrals to acute care during the review period.  All but one were sent to IRU within two days of IDTT referral.  There were no rejections, and one referral was rescinded and referred to intermediate care.  Nearly 100 percent transferred within ten days of IRU referral; one inmate transferred after ten days because CMF refused admission during the weekend.  Transfers were completed within 72 hours of bed assignment.  There were no inmates on the Acute Bed Utilization Management Report as awaiting a bed during the review period or during the site visit.

During the review period, CIM made 39 referrals to intermediate care.  All referrals were sent to IRU within five days.  There was one rejection, and the CCAT determined referral to acute care was more appropriate.  For the 13 rescinded referrals, reasons for rescissions were largely due to patient stabilization or IRU recommended referral to acute care.  Thirteen percent or five inmates were not transferred within 72 hours of bed number assignment; two were accepted on a Friday afternoon, and the PIPs would not admit during the weekend.  Four inmates took one day, and a fifth inmate took two extra days to transfer after receipt of a bed assignment.  One hundred percent of accepted inmates transferred within 30 days of referral.  There were no inmates requiring intermediate level of care on the Acute Bed Utilization Management Report as awaiting a bed during the review period or during the site visit.

There were concerns identified with the higher level of care referral process at CIM.  Inmates were not timely referred and were often discharged without their level of care properly assessed, resulting in readmission, sometimes repeatedly before referral.  Level of care was not consistently integrated into treatment team meetings, clinical rationales were not always adequate, and numerous treatment plans did not have any treatment modifications despite a positive indicator and no referral.

CIM's higher level of care monthly audits contained several errors. Every monthly audit indicated that each non-referred inmate met criterion seven, failure to participate in 50 percent of structured therapeutic activity over three months, yet the non-referral log listed only a small number of inmates who met the criterion. A review of a limited sample indicated that audits incorrectly identified inmates with positive criterion seven. The audit appeared prepopulated with positive ('yes') responses and not corrected when they did not apply, resulting in inflated compliance rates.

Additionally, each audit found compliance at 100 percent; however, the monitor's expert's review identified cases where the clinical rationale was not adequate, and treatment modifications were not entered. In one case, the inmate had several serious suicide attempts, at least one of which required 46 staples. The inmate was discharged from the MHCB to 3CMS level of care and was readmitted within three days. Several reviewed cases suggested level of care was not properly evaluated during MHCB IDTTs. Observed IDTTs in MHCB and other program areas also revealed the lack of level of care consideration.

CIM would benefit from training regarding level of care assessments and referrals to the proper level of care. The inpatient coordinator would also benefit from additional training around completion of audits and adherence to standardized methodology.

CIM completed 17 *Vitek* hearings during the review period; no inmates prevailed.

CIM reported that all of the inmates transferred to inpatient care had complex medical needs; however, it was unclear what definition CIM was using for inmates with complex medical needs. A review of random cases revealed medical issues in only one case where the inmate was awaiting medical appointments for the removal of swallowed pencils. In the remaining cases, common or no medical issues were identified, nursing did not note any medical issues, nor did

the psychiatrist, yet the inmate was listed as having complex medical needs and "high" medical risk.

There were no acute or intermediate care transfers delayed or canceled due to impending paroles, disciplinary proceedings, classification factors, or pending PC 2602 involuntary medications hearings.

There were no expedited transfers during the review period. CIM requested one expedited transfer; however, IRU informed them it was not available.

No inmates returned from inpatient care during the review period.

CIM did not transfer any inmates to a PSU during the review period.

During the review period, CMF operated a 34-bed MHCB.

There were 396 admissions to the MHCB during the reporting period. All but one of the referred inmates were admitted to the MHCB within 24 hours during the review period. During June, July, and the first two weeks of August, the average daily census in the MHCB was 28 inmates with a range of 24 to 31 inmates.

The average clinical length of stay was nine days. Thirty-two admissions, or eight percent, had lengths of stay greater than ten days. The average physical length of stay was 11 days. Forty five percent or 181 admissions had physical lengths of stay longer than ten days. Thirty-two inmates had three or more MHCB admissions.

During the review period, 17 inmates transferred to EOP hubs. Two transfers or 12 percent occurred beyond thirty days; one took 39 days due to endorsement issues, and another took 32 days due to transport issues.

There were no transfers to LTRH during the review period.

CIM transferred 172 inmates to STRH during the review period.  Of those, ten transfers or six percent took longer than 30 days.

 Four inmates transferred to mainline EOP during the review period.  All transferred within timeframes.

During the review period, CIM transferred 139 EOP reception center inmates.  Of those, 135 inmates or 97 percent transferred timely.

For 3CMS reception center inmates, 298 of 303 inmates or 98 percent transferred timely.

At the time of the visit, two reception center STRH inmates were beyond transfer timeframes due to the postponement of their RVR hearing by the inmates' pending DA referral.

Programming:

Reception Center:

The CIM reception center was staffed with 1.5 psychiatrists and six primary clinicians. Of the six primary clinicians, 3.25 covered intake and screening.  One primary clinician provided treatment to the 3CMS reception center population.  The psychologist carried a caseload of no more than 57 inmates during the review period, well within the mandated staffing ratio of 1:80 inmates.  Two primary clinicians provided treatment to the EOP reception center population. Caseloads for both primary clinicians ranged from nine to 17 inmates, within the mandated ratio of 1:18 inmates.

At the time of the visit, there were a total of 31 RC EOP inmates; eight were parole violators.  There were 93 reception center 3CMS inmates; 14 were parole violators.

Nearly 100 percent of the 1,032 mental health screens were completed timely during the review period.  Of those, 44 percent required mental health evaluations, of which nearly 100 percent were completed timely.

The reception center EOP IDTT room was confidential and had a sufficient number of computers available. All required members were present during an observed IDTT. The primary clinician provided a thorough clinical and psychosocial history but failed to provide an adequate case conceptualization and incorporate the inmate's mood lability and psychotic symptoms in the treatment plan. The IDTT did not discuss level of care considerations or whether medication adjustments were necessary, which was concerning given the inmate's manic, agitated, and paranoid presentation during IDTT. The EOP supervisor later informed the monitor's expert that staff had been trained only to mention higher level of care considerations when they were present.

Four randomly selected cases were utilized for the EOP reception center EHRS review. All four inmates reviewed received timely initial mental health screens. All psychological evaluations were timely completed.

CIM was not compliant with initial psychiatric evaluations as they did not occur within 24 hours. The institution reported a protocol different than was previously accepted procedure. CIM reported that all inmate medications were reviewed by the nurse upon intake, and the nurse's report was subsequently discussed with the psychiatrist on-call who continued the medication. While there were no medication interruptions for inmates upon arrival at CIM, the institution was not following the accepted medication review process.

All four inmates were seen by the psychiatrist within 21 days of arrival at the EOP reception center, and all were seen prior to their IDTT.

Of the cases reviewed, 100 percent had an IDTT within 21 days of arrival at the EOP reception center.

Of the four cases reviewed, there were a total of 13 timeframes in which weekly contacts were expected, and the data reflected 100 percent compliance with ongoing weekly primary clinician contacts.

All inmates were seen timely by the psychiatrist, and none were due for a second evaluation.  Confidentiality of contacts was not noted in the records.

<u>Administrative Segregation/Reception Center STRH</u>:

Reception center STRH was located in the administrative segregation unit.  One psychiatrist provided services to both populations, and caseload did not exceed ratio requirements.  Three primary clinicians also provided services to both populations and carried caseloads within staffing ratios.

Psychiatrists, medical assistants, and group treatment facilitators in administrative segregation utilized non-confidential treatment space.  Primary clinicians occupied two confidential treatment offices located in a different area of the administrative segregation unit.

The morning meeting was collaborative and meaningful.  Staff reviewed high-risk inmates, new arrivals, transfers, access to radios, and other updates.  The status of STRH inmates also was reviewed.

Observed IDTTs in administrative segregation were held in a confidential room with all required members in attendance.  Computers were available for IDTT members, and all team members provided relevant information.  Although the treating psychiatrist had not met with the inmate prior to IDTT, the psychiatrist accessed and referenced relevant information from the electronic health record.  Interventions were appropriate and treatment goals were realistic and measurable.  The psych tech provided valuable information regarding quality of group participation and in-cell activities and custody staff contributed meaningfully.  The IDTT

appropriately reviewed level of care considerations and provided a thorough justification for retaining the inmate at the current level of care.

Several of the six 3CMS patients interviewed in administrative segregation reported they were not familiar with the *Coleman* case. Yard and showers were offered as required; inmates were provided with institutional radios. Therapeutic activities were provided in non-confidential settings.

Eight inmates were placed in reception center STRH during the review period. A review of admission and discharge dates indicated brief admissions in the reception center STRH (11 days or less) except for the two inmates currently in the reception center STRH. Brief time periods and small sample sizes did not allow for a full evaluation of compliance with Program Guide timeliness for clinical contacts in the STRH.

MHCB:

At CIM, three psychiatrists provided treatment in the 34-bed MHCB, well within the 2.25:25 inmates established staffing ratio. Primary clinician coverage was provided by 7.3 psychologists during the review period with caseloads not exceeding six inmates, which was within the mandated ratio of 1.18 to 10 inmates. One additional psychologist began working in the MHCB at CIM the week prior to the site visit. Two social workers carried caseloads within the mandated ratio of 1:50 inmates.

During the review period, the MHCB was rarely at full capacity. MHCB cells contained approved beds.

A review of admissions during the review period revealed a large number of inmates diagnosed with adjustment disorders as the primary diagnosis, even when another serious mental illness was also listed. This caused concern regarding diagnostic practices in the MHCB.

Additionally, most daily contacts in the MHCB were conducted by pre-doctoral interns, despite the Title 22 requirement for a licensed psychologist. Further, interns conducted IDTTs during the review period, as well as conducted all 24-hour evaluations required by the Program Guide for patients admitted on Fridays. After discussion with management staff, the use of pre-doctoral interns for mandatory tasks was stopped by the end of the site visit.

Psychiatrists met with their patients as required during the review period.

Physical plant limitations negatively impacted individual contacts, as there were too few rooms appropriate for individual contacts. These rooms were also used as offices for the psychologists. Due to physical plant limitations, treatment teams were observed interviewing individual patients and documenting the contact as confidential. Inmate orderlies were observed on the units in areas where they were able to overhear provider-inmate conversations.

Despite the large number of psychologists allocated to the MHCB, staff complained about workload issues. However, the workload complaint was not verified through record review.

CIM did not adhere to their local operating procedure regarding cuffing in the MHCB. The mental health supervisor produced an out-of-date 2011 memorandum, not the active 2016 memo. Consequently, all inmates were cuffed regardless of custody status until after the IDTT. By the last day of the site visit, cuffing practices had been updated to comply with the 2016 memorandum.

Observed IDTTs included all required staff and the senior psychologist supervisor of the MHCB who regularly attended. However, her presence was not regularly indicated on the treatment plans. She also appeared to be minimally attentive during the IDTT process, even

when treatment teams would have benefitted from supervisory input, such as regarding referrals to higher levels of care.

Reviewed treatment plans indicated that psychiatry was sometimes absent from IDTT.

Safety plans and higher level of care (HLOC) considerations varied across treatment teams with some not addressing them at all while others addressed aspects of each. The quality of treatment plans also varied across teams, with some appearing thoughtful and well-constructed while others were minimal and not appropriate to the crisis setting. In many cases, it appeared that decisions regarding level of care had been made prior to the treatment team and did not consistently appear to be the result of a team process.

Recreational therapy groups occurred in the MHCB in a room filled with therapeutic treatment modules (TTMs). This requirement was attributed to custody and sensitive needs yard (SNY) inmates. However, the MHCB was a "non-designated" program and groups should be facilitated according to status. By the last day of the site visit, patients were not placed in TTMs unless required by their custody status.

Yard was provided to patients during Second Watch.

During the review period, medical assistants rounded on patients to verify that the level of observation and property was consistent with what was ordered.

There were five inmates randomly selected for a compliance review during their CIM MHCB admission.

Of the five cases reviewed, 100 percent received timely psychiatric initial evaluation.

All of the five inmates received a primary clinician evaluation within a 24-hour period; however, one was completed by an unlicensed clinician and therefore was non-compliant.

CIM was 100 percent compliant with completion of initial IDTTs within 72 hours of admission as well as subsequent IDTTs within seven days of their initial IDTT. All inmates received discharge IDTTs as required.

Psychiatry contacts occurred 100 percent of the time for the 21 twice-weekly required psychiatry contacts; however, in 62 percent of those appointments, the contact took place at cell front, or it was not noted whether the appointment was confidential.

For the reviewed cases, there were 35 required daily primary clinician contacts in the MHCB. CIM was not compliant with 16, or 46 percent of the primary clinician contacts due to unlicensed clinicians completing the contact.

Seclusion and Restraint:

There were no incidents of seclusion or restraint during the monitoring period.

CIT:

The Crisis Intervention Team (CIT) was not assigned to the MHCB as observed at other facilities. Instead, it was assigned to the SPRFIT. The single clinician assigned to that team worked four, ten-hour days, leaving three days uncovered. Staff reported that three different clinicians were assigned to those three days.

Alternative Housing:

CIM utilized four cells in administrative segregation, numbers 131-134, for alternative housing. They also used cell number 175 in the outpatient housing unit (OHU).

There were 63 alternative housing placements during the review period; all were moved out of alternative housing within 24 hours and all transferred to MHCBs.

All alternative housing cells were empty during the monitoring visit. Staff in administrative segregation alternative housing reported that cells were checked and cleaned

daily; however, they did not maintain a cleaning log. The alternative housing cells located in administrative segregation were not suicide resistant. OHU cell 175 was suicide resistant and there was a cleaning log maintained. Suicide smocks and clothing were issued as appropriate in alternative housing.

3CMS:

At the time of the site visit, six psychiatrists provided treatment to 979 3CMS inmates, which was within the staffing ratio of 1:280 inmates. One psychiatrist carried a caseload of 1:344 inmates, exceeding the ratio; however, this was a management issue, not an allocation issue.

CIM met ratios for primary clinicians providing treatment to 3CMS inmates as well with 12 primary clinicians providing treatment to 979 inmates. However, four primary clinicians had caseloads exceeding the 1:97 inmate ratio with caseloads ranging from 100 to 125 inmates. Again, this was a management issue as opposed to an allocation issue.

During the site visit, the 3CMS supervisor informed the monitor's expert some inmates scheduled for IDTT on Facility D would be reviewed in absentia due to a norovirus quarantine. Inconsistent information regarding quarantine status on this facility was discovered. At the request of the monitor's expert, the chief of mental health investigated for clarification, and, approximately two hours later, the chief discovered two of the inmates with planned in absentia IDTTs were, in fact, not on quarantine status. One of the 3CMS IDTTs occurred prior to this clarification, and the inmate was not permitted to attend. The breakdown in communication between departments nearly resulted in two inmates missing their IDTTs and other clinical contacts may have been impacted on this date.

The IDTT on Facility D occurred in a confidential space and all required members were present. The IDTT room had only two computers, one of which was utilized by the correctional counselor. The second computer, located on the desk in front of the primary clinician, was not utilized. Instead, the primary clinician and the psychiatrist referenced printed documents during the IDTT. The psychiatrist had not met with the inmates prior to IDTT but did reference printed documents at times. For no identifiable reason, the primary clinician introduced inmate information prior to inviting inmates into the room. The quality of the psychosocial histories for the inmates presented was poor and incomplete. Treatment plans were vague and there were no case conceptualizations offered. The primary clinician did not provide a justification for the diagnosis, and there was no discussion regarding diagnostic agreement between the primary clinician and psychiatrist. Suicide risk, safety planning, and level of care considerations also were not discussed during the IDTTs.

Neither the primary clinician nor the psychiatrist accessed the electronic record for clarification despite questions about medication and treatment histories raised during IDTT. One inmate corrected the primary clinician and psychiatrist about a recent medication change, and again there was no review of the record to confirm the change. The same inmate expressed concern about a noticeable hand tremor attributed to his psychiatric medication, and he was directed by psychiatry to submit a healthcare request form if he could not wait for his next scheduled appointment nearly 20 days later.

As the IDTT failed to follow up on one inmate's statement about a recent "crisis center" placement, the monitor's expert asked the inmate to elaborate for the team. The inmate reported suicidal intent less than three months ago which resulted in MHCB placement. The inmate also reported ongoing depressive symptoms, chronic pain, lack of access to his approved meals, and

feeling as though his disability issues were being ignored. The monitor's expert learned from the inmate's medical record review he returned from a community hospital where he was treated for "severe malnourishment" one week prior. This information was especially concerning as the IDTT responded to the inmate's pleas regarding lack of access to approved meals by encouraging him to submit a request for dietician review, an intervention previously attempted by a psych tech prior to his hospitalization. This inmate received inadequate care by his treatment team.

Five randomly selected 3CMS inmate charts were reviewed. Of those, three required initial psychiatric evaluations which were all completed timely.

For the three cases that required initial primary clinician evaluations, two were timely for 67 percent compliance.

Three of the five reviewed cases required and received timely initial IDTTs.

There were seven timeframes where quarterly primary clinician contacts were expected during the review. Of the seven contacts, six, or 85.7 percent of the contacts were timely, one was not due, and one did not occur within 90 days.

For the timeframes reviewed during the reporting period, ten psychiatric contacts occurred, and all were completed on a timely basis.

Other Issues:

Pre-Release Planning:

CIM assigned one FTE social worker as the institutional mental health pre-release coordinator and a .5 social worker to assist with pre-release groups. During the review period, 160 inmates were eligible for pre-release planning.

CIM maintained contact with the Transitional Case Management Program (TCMP) and pre-release planning groups were scheduled and attended as validated by logs. CIM established a relationship with Veterans Affairs to help patients obtain veterans services when eligible.

Program Access:

a.   Job and Program Assignments

CIM's assignment office followed the structured assignment process utilizing the priority waitlist and inmate skill set for specific jobs. Inmates were placed in job assignments regardless of mental health level of care unless the inmate was on heat risk medications and the job placed the inmate off grounds. In that circumstance, the inmate was placed in the next available onsite job. CIM reported they did not factor whether the job was paid or unpaid when making the assignment.

Of the 1,586 available job assignments at CIM, 70 percent or 1,121 were held by non-MHSDS inmates; 29 percent or 463 were held by 3CMS inmates; and two were held by EOP inmates.

Of 524 academic assignments available at CIM, 67.7 percent or 355 were held by non-MHSDS inmates; 31.9 percent or 167 were held by 3CMS inmates, and two or less than one percent were held by EOP inmates.

Of the 229 substance abuse treatment assignments available, 62 percent or 142 were held by non-MHSDS inmates and 38 percent or 87 were held by 3CMS inmates. No EOP inmates were assigned to substance abuse treatment.

CIM reported that of the 200 available vocational education assignments, 68, or 34 percent, were held by 3CMS inmates, and 132, or 66 percent, were held by non-MHSDS inmates.

Of the 419 voluntary education assignments available, non-MHSDS inmates held 283 or 67.5 percent of assignments; 3CMS inmates held 135 or 32 percent; and one EOP inmate held an assignment.

b.  Milestone Credits:

As of October 1, 2019, CIM reported 100 percent of the 34 EOP inmates were eligible for milestone credits and 11.8 percent earned them.  Of the 1,073 3CMS inmates 1,043 were eligible for milestone credits.; 23.6 percent of these inmates earned the credits.

Of the 2,649 non-MHSDS inmates, 2,603 were eligible to earn milestone credits; 24.63 percent earned the credits.

c.  Out-of-Level Housing:

At the time of reporting, there were eight 3CMS and 29 non-MHSDS Level I inmates housed in Level II.  Two 3CMS and three non-MHSDS Level II inmates were in Level III housing.

d.  ADA Reasonable Accommodations and Grievance Procedure:

The 1824 Desk Reference Manual was updated on October 2, 2017, and the CDCR-1824 Reasonable Accommodation Request for was updated in September 2017.  All outdated forms were replaced throughout the facility, including the libraries and housing units.

e.  Periodic Classification Scores: EOP Inmates:

CIM did not have an EOP.

Case-by-Case Reviews:

CIM reported one case that met the requirement for a 150-day review; however, the inmate paroled prior to the due date of the review.

Non-Disciplinary Segregation:

There were five non-disciplinary segregation general population inmates in administrative segregation during the monitoring visit. All five had their ICC within ten days. Yard and showers were offered as required for the inmates. A review of the property log revealed that property was assigned the day after arrival.

"C" Status:

On November 5, 2019, there were two non-MHSDS caseload patients on "C" status. One had three serious RVRs within 180 days and the other had multiple RVR's including two serious RVR's.

Referrals:

During the reporting period, CIM reported a total of 552 emergent referrals, 485 urgent referrals, and 3,103 routine referrals.

Psychiatry and primary clinician responses in each category of referrals were 100 percent compliant.

During the review period, 35 referrals were made to the CIT.

Construction/Space:

CIM was in the design phase of a planned 50-bed MHCB construction. Construction was scheduled for February 2021.

TTMs were located in staff offices and group rooms in Facility B. Facility D also had a TTM; however, staff reported it was not used. The treatment space in Facility B lacked confidentiality.[71]

Mental Health/Custody Relations:

---

[71] Defendants informed the Special Master in their objections and comments letter dated February 2, 2021 that the lack of confidentiality was remedied since the site visit, indicating that according to the CIM Office Space Management Team,"the clinician who occupied this treatment space in Facility B was relocated to a different office space. The new office space allows for clinician-patient confidentiality."

The Custody and Mental Health Partnership Local Operating Procedure dated February 2019, was generally in alignment with the CMHPP submitted to the court by CDCR headquarters during September 2018.

All CMHPP activities, with the exclusion of the EOP orientation groups which remained under development at the headquarters level, were implemented at the institution.

Documentation of Executive Leadership Joint Rounding was provided for the STRH April 2019 through August 2019 and MHCB April 2019 through July 2019. CIM was compliant with staffing for four of the six months during the reporting period. Custody attendance by the associate warden was compliant with the LOP but not the Court approved CMHPP. However, the updated CMHPP submitted to the court in September 2019 allowed for the inclusion of associate wardens during joint rounding.

Documentation of executive leadership joint rounding was comprehensive and provided a good description of the process executive leadership completed, which was compliant with the CMHPP. Problems were identified and addressed or referred to staff for resolution.

Documentation of executive leadership joint rounding for the purpose of dissemination of information was non-compliant. The chief of mental health acknowledged that rounds were not documented in the warden's meeting minutes or quality management committee as required by the local operating procedure and the CMHPP. Documentation in the mental health subcommittee minutes was sparse and needed improvement.

The institution provided copies of in-service-training participant sign-in sheets for the quarterly partnership trainings completed on the administrative segregation unit and MHCB. Documentation did not routinely indicate staff discipline or which partnership modules were presented. Further, a review of documentation of sign-in sheets only showed who was present,

but CDCR was unable to provide documentation that indicated who was required to attend the quarterly round table training, a system-wide issue that CDCR has acknowledged, which was resolved with implementation of the updated CMHPP.

Huddle reports for the MHCB and administrative segregation unit were reviewed onsite. A huddle report for Second and Third Watch for each month for each program was randomly selected to assess compliance with the CMHPP. Neither program used the full huddle report for documentation. Documentation from selected MHCB and administrative segregation unit huddle meetings indicated that staff used part of the approved huddle report. The MHCB was compliant with attendance and daily huddle meetings on both watches between April 2019 and September 2019; however, the administrative segregation unit did not have Third Watch meetings in August 2019 and September 2019. For selected MHCB documents, discussion regarding odd behavior, unusual or aggressive behavior was consistently documented as 'none' or "n/a" which was unlikely in the MHCB. An observed MHCB huddle did not cover all the required areas on the partnership form. While admissions, discharges and clothing issue was discussed, there were two patients on suicide watch that were not discussed and neither behaviors nor medications were addressed.

Additional collaboration training was provided through Multiple Interactive Learning Objective (MILO). Of the 1,283 multi-disciplinary (custody, medical and mental health) staff enrolled in the training, 861, or 67 percent, completed the training.

The institution reported that there were 48 complaints filed for staff misconduct, 21 or 44 percent were from MHSDS inmates. Data was not provided for the number that were granted, partially granted or denied. There were no disciplinary actions against staff and no staff were

moved to another post due to inmate complaints. The institution did not provide data on the number of complaints that were referred for investigation.

Heat Plan:

During the review period, CIM reported 59 Stage I, 49 Stage II, and 14 Stage III heat alerts and no heat-related incidents. Interviewed custody officers had a good understanding of heat plan protocols and were able to explain the procedures at each heat stage. Thermometers were appropriately located and operational.

RVRs:

Of the custody staff who were required to receive the RVR training, 68 percent attended the training. CIM reported 81 percent of mental health clinicians attended the training.

During the review period, CIM issued a total of 1,188 RVRs, of which 507 or 42.6 percent, were issued to caseload inmates. Specifically, two were issued to acute level of care inmates, and two were issued to intermediate level of care inmates, 30 were issued to inmates in the MHCB, three to EOP inmates, and 470 to 3CMS inmates. There were 681 RVRs issued to non-MHSDS inmates.

A review of RVRs revealed problems with the disciplinary process at CIM. Assessments were not requested timely and sometimes not requested when required. One case involved an inmate being removed from a shower in MHCB for forced PC 2602 medications who battered an officer. The mental health assessment described this inmate's behavior as strongly influenced by mental health symptoms of mood and psychotic disorders. The clinician noted he was not stable on meds and was strongly influenced by his mental health symptoms. While the senior hearing officer documented the mental health assessment was completed and copied the assessment language into the disposition, it was not addressed, and the inmate was found guilty. He was

assessed 150 days loss of credit, referred for a SHU review, assessed 60 days loss of phone and yard, and 90 days privilege group "C". There was no indication the mental health assessment impacted the disposition and there was no mitigation.

Another RVR for an inmate placed in MHCB after he was charged with a Division C offense revealed no consideration of a mental health assessment. The mental health assessment was requested then subsequently noted that it was not needed and was not mentioned in the disposition. The inmate was found guilty.

Use of Force:

As of October 1, 2019, 1316 or 93 percent of custody staff and 59 or 100 percent of mental health staff had received training on the use of force policy and procedure.

Lockdowns/Modified Programming:

From April 1, 2019, through May 2, 2019, repairs on high mast lighting required program status reports. No disruptions to the delivery of MHSDS treatment services resulted.

Access to Care:

A review of CIM's monthly Health Care Access Quality Reports from April 2019 to September 2019 indicated that less than one percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while five percent were not completed due to non-custodial reasons, excluding inmate refusals.

Non-Designated:

Facility D at CIM became a non-designated program facility in February 2018. Facility A and Facility C at CIM became non-designated program facilities in September 2018. Comparison of data for incidents for the year prior to conversion to non-designated and the year following conversion revealed a slight increase in overall incidents from 11 to 13 incidents;

however, the number of incidents that involved MHSDS inmates decreased from nine inmates to four inmates.

Placement of 3CMS Inmates into Minimum Support Facilities:

CIM did not have a Minimum Support Facility (MSF). There were three 3CMS inmates transferred out to an MSF during the review period.

*Coleman* Postings:

Current *Coleman* postings in both English and Spanish were found in all toured housing units. All postings were placed in common areas accessible to the *Coleman* class members.

Document Production Issues:

The inpatient coordinator reported that the on-demand report of transfers was inaccurate, as it often contained inmates not at CIM. The placement logs/spreadsheet for all alternative holding areas used for mental health monitoring during the review period was not provided as requested. The spreadsheets, logs, and other documentation of 3CMS STRH units also were not provided as requested. CIM did not maintain a log with this data.

**California Rehabilitation Center (CRC)**
March 2020 Paper Review
Review Period August 1, 2019 – January 31, 2020

Census:

On March 20, 2020, the total inmate population at CRC was 4,014 inmates, a 28 percent increase since the preceding monitoring period. The MHSDS population was 1,517 inmates, an increase of 281 inmates, or 23 percent. MHSDS inmates accounted for 38 percent of the population.

There were 1,515 mainline 3CMS inmates. Two mainline EOP inmates were pending transfer.

Staffing:

One of the two chief psychologist positions was filled. Headquarters directed CRC not to fill the second position.

The senior psychiatrist supervisor position was filled. CRC employed seven staff psychiatrists for the 6.5 allocated positions, and an additional 1.1 positions were provided by contract psychiatrists. CRC did not report the use of telepsychiatry.

Two supervising senior psychologists and two senior psychologist specialist positions were filled. Nine of the 9.5 psychologist positions were filled for a five-percent vacancy rate.

All nine of the social worker positions were filled.

CRC reported one recreation therapist position was filled.

The CHSA II position was vacant. The OSS II position and three HPS I positions were filled.

Of the nine office technician positions, 7.5 were filled for a 17 percent vacancy rate.

Quality Management:

The quality management committee met monthly, and required members were in attendance, with the exception of October 2019. The quality management committee examined relevant topics, although documentation indicated that discussions of issues were limited. The mental health subcommittee provided monthly reports of 45 standard benchmark metrics to the quality management committee, and at times reported on specific workgroup projects. Other mental health related topics addressed in the quality management committee included the approval of the Crisis Intervention Team (CIT) local operating procedure, inclusion of the senior psychologist specialist in quality management, and changes to staff reporting structures.

The mental health subcommittee met monthly with a quorum in attendance and addressed appropriate topics. A review of minutes indicated that discussions were limited. Agenda items included timely completion of custody welfare checks, presence of cut-down tools, timeliness of RVR mental health assessments, staffing, higher level of care considerations, OHU length of stay, medication and laboratory monitoring, and timely appointment completion.

A sustainable process review occurred during August 2019. The primary issues identified related to custody discharge checks and RVRs. No matters of urgent concern or needing significant improvement were noted. CRC provided one CAP addressing deficiencies in treatment plans; however, specific areas of concern were not documented.

There were no QITs or FITs chartered or active during the review period.

Peer review was pending during the reporting period.

Medication Management:

CRC's MAPIP results for March 2019 through August 2019 reported compliance for psychiatric diagnostic monitoring and medication management. The medication management

752

dashboard for the period showed that for inmates prescribed antidepressants, thyroid monitoring at CRC was compliant for two months and no data was provided for four months. Electrocardiograms (EKG) measures were complaint for one month, and no data was provided for five months. Medication consent and venlafaxine blood pressure were compliant for all six months of the review period.

Data for inmates prescribed antipsychotics showed that abnormal involuntary movement scale (AIMS) tests, measurements for blood pressure, blood sugar tests, complete blood count (CBC) with platelets, and comprehensive metabolic panel (CMP) were compliant for all six months during the review period. Measurements of height and weight, lipid monitoring, and medication consent were also compliant for all six months during the review period. Electrocardiogram (EKG) measurements were compliant for five months, and no data was provided for one month. No data was provided for thyroid monitoring during the review period.

Psychiatric measures for inmates at CRC prescribed carbamazepine indicated that level monitoring and medication consent were compliant for two months; no data was reported for the other four months. CBC and CMP diagnostic monitoring was compliant for three months; no data was presented for three months.

CRC's psychiatric diagnostic measures for inmates prescribed Depakote were compliant for medication consent for all six months of the review period, and CBC with platelets was compliant for four of the six months and non-compliant for two months. CMP and Depakote levels were compliant for five of the six months and non-compliant for one month.

CRC was compliant with medication consent for Lamotrigine for five months, and no data was reported for one month.

Data for diagnostic measures for inmates prescribed Lithium indicated that medication consent, lithium levels, Creatine, and BUN (kidney function tests), and thyroid monitoring were compliant for all six months of the review period.  EKG measurements were compliant for four of the six months, and no data was reported for two months.

Regarding MAPIP mental health medication measures, medication continuity upon inter-institutional transfer at receiving and release (R&R), continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), and medication continuity for MHCB transfers were all compliant for all six months of the review period.  Medication continuity following discharge from community hospital or acute or intermediate care, medication continuity with parole or release to the community, observation of medication preparation and administration for AM/PM and HS medications, medication continuity for psychiatric-prescribed chronic care medications, and new psychiatric medications were also compliant for all six months of the review period.

Continuity of medication upon arrival at the reception center and intra-institutional transfers to ASU/SHU/PSU were compliant for one month, and no data was reported for five months.  No information was reported regarding medication continuity for court-ordered involuntary medications for the six months in the review period.  CRC did not have a policy for non-formulary medication.  The use of non-formulary medication was reviewed by the senior supervising psychiatrist.  A dedicated committee reviewed all cases where ten or more medications were prescribed.  CRC reported no prescriptions for clozapine during the review period.

Psychotropic medications were prescribed for up to 180 days, and bridge orders were limited to 30 days.  Telephone orders were transcribed by nursing and countersigned by the psychiatrist.

The number of DOT orders for SSRI medications and KOP orders was not provided.

No PC 2602 petitions were initiated during the review period.

CRC reported no issues with pill lines.

Transfers:

There were no acute or intermediate care referrals during the review period.

CRC referred 105 inmates to MHCBs.  Of this number, six referrals were rescinded, and the remaining 99 inmates were timely transferred.  Over 70 percent were admitted to CIM, 12 percent were admitted to CSP/LAC, five inmates were admitted to NKSP, four inmates were admitted to KVSP, and one inmate was admitted to CSATF.   All inmates referred to the MHCB were placed in alternative housing, which was housed in the OHU at CRC.

All inmates placed in administrative segregation immediately transferred to CIM for housing.  CRC maintained custodial responsibility for those inmates, including completion of ICCs and transfers.

During the review period, five EOP inmates were transferred to administrative segregation hubs; all transfers were timely.  CRC timely transferred 28 inmates to mainline EOPs during the review period.

The two transfers to LTRH were timely, as were all 51 transfers to STRH.

Programming:

 Crisis Intervention Team:

 CRC initiated the CIT in January 2020.  Crisis intervention services were available from 5:00 p.m. to 10:00 p.m., seven days a week excluding holidays.  During January 2020, the CIT responded to seven referrals; four were admitted to a MHCB; one inmate's safety concerns were addressed by a housing change, and no housing changes were made for the additional two inmates.

 Alternative Housing:

 There were four primary clinicians providing coverage for alternative housing seven days a week, and the on-call psychiatrist provided coverage during off-hours from 10:00 p.m. to 7:00 a.m. and holidays.  Due to physical plant safety concerns, CRC made modifications to one OHU room for use as alternative housing to minimize unspecified risks.  CRC also created a separate overflow room in the OHU for alternative housing, which reportedly did not have the same safety concerns.

 During the review period, CRC placed 105 inmates in alternative housing pending transfer to MHCBs.  All inmates were timely transferred.

 3CMS:

 Six or 32 percent of primary clinicians had caseloads that were in excess of the mandated staffing ratios for 3CMS.  One psychiatrist had a caseload of 341 inmates, which exceeded the mandated ratio of 1:280 inmates.

 During the review period, CRC reassigned treatment teams dedicated to specific yards to improve continuity of care and coordination of treatment.  CRC reported five evaluation and

treatment spaces; however, they noted the aging physical plant continued to present significant challenges.

CRC reported a robust group treatment program for 3CMS inmates. The provided weekly group schedule indicated 28 groups run by primary clinicians and four groups facilitated by the recreation therapist. A variety of relevant topics were offered, including family issues, sleep hygiene, mood and stress management, as well as pre-release planning. One group was co-led with nursing and focused on diabetic management.

CRC reported an increase in transfers to their 3CMS program as a step down for EOP level of care inmates. During the review period, 16 inmates transferred to CRC from EOP for the 3CMS level of care programming. Inmates stepping down from EOP level of care were provided enhanced group and individual treatment hours by a crisis care clinician at CRC. Notably, despite the increased focus on this group of inmates, CRC reported that seven or 44 percent of those inmates transferred from EOP programs ultimately required referral and transfer back to a higher level of care, including six to an MHCB and one to EOP.

Fifteen randomly selected 3CMS inmate cases were selected for chart review of psychiatric contacts. Of the 15 inmates, 12 required initial psychiatric evaluations. Of those, seven or 58 percent were completed timely. One inmate required an initial psychiatric assessment and the psychiatrist attempted to see the patient prior to the IDTT, but the patient refused the contact. The psychiatrist documented the attempt to get the patient to stay for the evaluation. The documentation did not include any assessment of the patient's mental status or functioning beyond "did not appear to be in acute distress" and "did not report suicidal ideation." That encounter was not counted as compliant.

For nine inmates in the sample that required routine psychiatric contacts, all occurred within 90 days.

Twenty randomly selected 3CMS inmate cases were selected for chart review of primary clinician contacts. For the 16 inmates that required initial primary clinician contacts, all but one or 94 percent were completed timely. One hundred percent of routine primary clinician contacts occurred within 90 days and were timely completed.

There were 17 of the 20 cases that met criteria for IDTT review. Of the 16 cases that required initial IDTTs, 14 or 88 percent were completed. Required staff were in attendance for 14 or 88 percent of initial IDTTs. Of the two non-compliant for attendance, neither had a correctional counselor in attendance, and one was also missing the psychiatrist.

Two inmates required annual IDTTs during the review period, and both were timely completed.

Other Issues:

    Pre-Release Planning:

CRC reported they were in the initial stages of formalizing an approach to pre-release planning and did not provide any additional information.

    Program Access:

a.   Job and Program Assignments:

On February 12, 2020, of the 1,853 job assignments, one EOP inmate and 671 or 44 percent of 3CMS inmates held job assignments. For non-MHSDS inmates, 1,181 or 49 percent held them. Of the 643 academic assignments, 258 3CMS inmates, or 17 percent of the 3CMS population, held assignments; 385 non-MHSDS inmates or 16 percent of the population held assignments. No EOP inmates held academic assignments.

Of the 302 vocational education assignments, two EOP inmates held part-time assignments. For 3CMS inmates, 118 or eight percent held vocational education assignments; and 182 or eight percent of non-MHSDS inmates held them.

For the 170 voluntary education assignments, 53 inmates, or four percent of the 3CMS population, held assignments. For non-MHSDS inmates, 117 or five percent of the population held assignments.

b. Milestone Credits:

As of January 31, 2020, CRC reported that nine of nine EOP inmates were eligible for milestone credits, and 22 percent earned them. All 1,514 of the 3CMS inmates were eligible to earn milestone credits, and 14 percent earned them. CRC reported all 2,399 non-MHSDS inmates were eligible for milestone credits, and 23 percent earned them.

Referrals:

Data indicated, urgent and routine psychiatry referrals were responded to timely; compliance with psychiatry response to emergent referrals was 89 percent during the review period.

Primary clinicians' response to all mental health referrals, including emergent, urgent and routine referrals were timely.

Mental Health/Custody Relations:

CRC completed the first round of custody and mental health partnership training on March 3, 2020. The next round of training was scheduled to start in April 2020.

Heat Plan:

During the review period, there were 46 Stage I heat alerts, 37 Stage II heat alerts, and five Stage III heat alerts. Monthly heat reports were submitted pursuant to policy.

The Region IV mental health compliance team completed a review of CRC from August 27, 2019, to August 28, 2019.  The audit revealed that all toured housing units had working thermometers and all heat logs reflected appropriate temperature logging.  Further, it was reported that all interviewed staff was well informed of the various stages of the heat plan.  A review of daily activity reports indicated alternative recreation was provided to inmates during Stage I heat plan activation.

RVRs:

All mental health staff, with the exception of one psychologist, received the inmate disciplinary process mental health assessment training.  The three correctional administrators, five captains, and 25 lieutenants received the training.  Of the 58 sergeants, 56 received the training, and 584 of 604, or 97 percent of the correctional officers, received the training as well.  All mental health assessments were completed by the senior psychologist supervisor, with another psychologist as back up.  During the review period, 23 mental health assessments were requested and completed.  CRC did not provide information regarding timeliness.

CRC issued a total of 1,575 RVRs during the review period.  Of those, 772 or 49 percent were issued to the MHSDS population, which included six MHCB patients, three EOP, and 763 3CMS inmates.

The monitor was not able to review any adjudicated RVRs due to the offsite paper review.

Use of Force:

All mental health staff and 70 of 75 or 93 percent of nurses received training on the use of force policy.  For custody staff, 677 of 699 or 97 percent received the required use of force training.

During the review period, there were 43 use of force incidents; 14 or 33 percent involved MHSDS inmates.

Lockdowns/Modified Programming:

CRC reported there was no interruption to mental health services as a result of lockdowns or modified programming reported during the review period.

Access to Care:

Documentation indicated that less than one percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while an average of 12 percent per month were not completed for non-custodial reasons, excluding inmate refusals.

Non-Designated Yards:

CRC completed the transition to a non-designated programming facility in January 2019.

Placement of 3CMS Inmates into Minimum Support Facilities:

CRC did not have a MSF and reported that inmates appropriate for MSF placement were transferred.  CRC did not report any inmates transferred during the review period.

**California Institution for Women (CIW)**
November 11, 2019 – November 14, 2019

Census:

On November 12, 2019, CIW's inmate population was 1,513.  The mental health caseload population of 819 was 54 percent of the total inmate population.  The MHCB unit housed 18 inmates.  There were 60 EOP inmates, including 55 mainline, three in the PSU, one in the EOP administrative segregation hub and one pending transfer to the EOP administrative segregation hub.  The mainline 3CMS program housed 701 inmates.  There were eight 3CMS inmates in STRH and 32 3CMS inmates in LTRH.

Staffing:

The chief psychiatrist position was filled.  Of the 1.5 senior psychiatrist supervisor positions, 0.5 was filled resulting in a 66.6 percent functional vacancy rate.

Both chief psychologist positions were filled; one served as the chief of mental health.

All three senior psychologist positions were filled.

CIW had 10.5 staff psychiatrist positions.  Four positions were filled by permanent state employees and 4.2 were filled by registry staff for a functional vacancy rate of 22 percent.  Over 50 percent of treatment was provided by registry staff, resulting in continuity of care issues discussed below.

For staff psychologists, 22 of the 23 established positions were filled, for a functional vacancy rate of 4.55 percent.  Three psychologists were unlicensed.

The one supervising social worker position was filled.  CIW had 13 social workers on staff, which was 0.5 more than the established 12.5 positions.  Two social workers were unlicensed.

Ten of the 12 senior psych tech positions were filled for a functional vacancy rate of 17 percent. For psych techs, 72 of 79.4 positions were filled for a functional vacancy rate of nine percent.

All three mental health registered nurse positions were filled.

Six of the 7.5 established recreation therapist positions were filled, for a functional vacancy rate of 13 percent.

The four medical assistant positions were filled.

The two CHSA II positions were filled. One of the 1.5 HPS I positions was filled for a functional vacancy rate of 33 percent. One of 1.5 OSS II positions was filled for a functional vacancy rate of 33 percent.

Fourteen of the 16 mental health clerical positions were filled for a functional vacancy rate of 13 percent.

Four psychology interns rotated through the MHCB, PIP and some outpatient programs during the review period. CIW was in consortium with CIM to provide intern training and the program was submitted for American Psychological Association accreditation.

Telepsychiatry:

During the review period, one telepsychiatrist provided 40 hours per week to 3CMS inmates. CIW stopped using telepsychitrists during June 2019.

Quality Management:

CIW had an active quality management program including a local governing body, quality management committee, and mental health subcommittee.

The local governing body exceeded the quarterly meeting requirement and met monthly. A quorum was present at all meetings and agenda items included a review of policies in need of

further development - specifically policies related to suicide watch precautions, a review of credentialing packets, and approval or disapproval of requests for clinical privileges from psychologists, psychiatrists, and licensed clinical social workers.

The quality management committee met monthly; a quorum was always achieved. Issues reviewed and actions taken included the selection of Performance Improvement Work Projects (PIWP). During the review period, the committee focused on one mental health project regarding patient treatment attendance in both the EOP and in LTRH. The committee also monitored performance evaluations and improvement activities conducted by the mental health subcommittee.

The mental health subcommittee met monthly; a quorum was always present and the SPRFIT coordinator, chief psychiatrist, chief nurse executive, and inpatient coordinator were among the attendees. Issues addressed included a review of the MHCB readmission rate, timeliness of MHCB contacts, and EOP patient attendance to their treatment appointments. A review of PIWP projects included the management of psychiatric self-referrals, group effectiveness, group waiting lists, and weekend/holiday work schedules. Reviews of surveys and audits included a focus on effective communication and self-harm/suicide attempts. Quality improvement plans focused on MHCB discharges and patients who were not readmitted within 30 days. Dissemination of the subcommittee's activities was achieved by distributing the minutes from each meeting to departmental leadership, publishing information in the CIW newsletter (The Pulse) and discussing the minutes with mental health staff during their monthly meetings.

Audits were conducted monthly and quarterly and focused on critical performance indicators which included the readmission of patients to the MHCB within 30 days of discharge,

access to care, quality of care, data entry, and suicide prevention. Corrective actions were always initiated when performance did not meet expected standards. An example of corrective action was the development of programs/interventions to reduce the readmission rate to the MHCB unit.

Audit tools and the methodologies used in the studies were appropriate as they measured both quantitative and qualitative practices and outcomes. At times, sample sizes were small, making it difficult to interpret data and identify possible trends and underlying problems. Sample size deficiencies were the result of low patient counts in specific units/programs rather than a factor of the methodology. The fidelity of both the tools and the data were reviewed continually by the mental health subcommittee. Data was presented in self-explanatory tables and graphs.

QITs/FITs were not chartered at CIW during this reporting period and there were no central office-required ongoing QITs/FITs.

Psychology peer review consisted of ten psychologists and was conducted annually. Compliance for mental health progress notes and suicide risk evaluations were 99 percent and 98 percent respectively during the review period. Individual feedback to psychologists was provided via email.

Social worker peer review occurred once every three months. Four social workers were reviewed during the reporting period; 100 percent compliance was noted for IDTTs. Individual clinicians received feedback via the peer review committee meeting in June.

Psychiatry peer review occurred annually, and during the reporting period focused on the MHCB. All CIW psychiatrists were reviewed as they all worked in the MHCB, either on direct assignment or on weekend rounds. Progress note completion was in compliance; although one

765

psychiatrist had four deficiencies on documentation of laboratory results and another psychiatrist had one laboratory documentation deficiency. Individual psychiatrist feedback occurred via email from the peer review committee chairperson, or when deficiencies were found, face-to-face meeting to discuss steps for improvement.

The second and third quarter sustainability reviews revealed that quality of higher level of care considerations was below 90 percent; however, the percentage improved each quarter from 53 percent during quarter one. Corrective actions included follow-up on two specific cases and providing feedback to leadership about IDTT processes that needed improvement.

Medication Management:

At CIW, MAPIP results for April 2019 through September 2019 reported compliance for psychiatric diagnostic monitoring and medication management. The medication management dashboard for the period showed that for inmates prescribed antidepressants, venlafaxine blood pressure and thyroid monitoring were compliant for all six months of the review period. Electrocardiograms (EKG) were compliant for one month, non-compliant for one month, and no data was reported for one month. Medication consent was compliant for two of the six months.

Data for inmates prescribed atypical antipsychotics showed that measurements for blood pressure, height and weight, and thyroid monitoring were compliant for all six months. Electrocardiogram (EKG) measurements were compliant for four months during the review period. Medication consent was compliant for three months and abnormal involuntary movement scale (AIMS) tests were compliant for one of the six months. Diagnostic monitoring of blood sugar complete blood count (CBC) with platelets, lipid monitoring, and comprehensive metabolic panel (CMP) were non-compliant throughout the review period.

Psychiatric measures for inmates at CIW prescribed carbamazepine indicated that level monitoring was compliant for two months and non-compliant for three months; no data was reported for one month.  CBC diagnostic monitoring was compliant for two months, non-compliant for three months; no data was presented for one month.  CMP was compliant for four of the six months.  Medication consent was compliant for three months, not compliant for one month and no data was provided for one month.

Data for Clozapine diagnostic measures indicated that blood pressure, blood sugar, CBC, height, and weight were compliant for all six months of the review period.  CMP was compliant for four months, was non-compliant for one month, and no data was provided for one month. Lipid monitoring was compliant for four months, was non-compliant for one month, and no data was provided for one month.  EKGs were compliant for five months; no data was provided for one month.  Medication consent was compliant for two months and no data was provided for four months.  Thyroid monitoring was compliant for two months; no data was reported for two months.

CIW's psychiatric diagnostic measures for inmates prescribed Depakote were compliant for medication consent for five of six months of the review period, and CBC with platelets was compliant for two of the six months.  Depakote levels were non-compliant for all six months of the review period; CMP was compliant for one month.

CIW was compliant with medication consent for Lamotrigine for five months and non-compliant for one month.

Data for diagnostic measures for inmates prescribed Lithium indicated that medication consent was compliant for three months and thyroid monitoring was compliant for one of the six

months.  Lithium levels, Creatine and BUN (kidney function tests), and EKG were non-compliant for all six months.

Multiple MAPIP mental health medication measures scored below 90 percent for one or more months during the review period.  Observation of medication preparation and administration for HS and AM/PM and new psychiatric medications were compliant for all six months of the review period.  Medication continuity upon inter-institutional transfer at receiving and release (R&R) was compliant for two months and continuity of nurse administered (N/A)/direct observation therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU) was compliant for one month.

Medication continuity for MHCB transfers were compliant for three months.  Intra-institutional transfers to ASU/SHU/PSU and psychiatric-prescribed chronic care medications were compliant for all months.  Medication continuity following discharge from community hospital or acute or intermediate care and with parole or release to the community were compliant for three months.  Medication continuity for court ordered involuntary medications was compliant for two months, noncompliant for three months; no data was provided for one month.

CIW submitted a performance improvement plan (PIP) to improve medication management processes through improved EHRS notifications, training of staff and additional leadership efforts.  CIW did not provide either corrective action plan (CAPs) or PIPs for each measure scoring below 90 percent as requested.

There was a 30-day order limit for psychotropic medications in the MHCB and PIP.  In all other outpatient areas, psychotropic medications were for ordered 60 to 90 days.  Bridge orders were prescribed for a maximum of 30 days.  Nursing conducted telephone and verbal

orders only after regular business hours.  Psychiatry signature was required for telephone and verbal orders on the following business day.

Pursuant to a September 5, 2019 memo from headquarters, the chief and senior psychiatrists were no longer required to approve non-formulary psychotropic medication requests.  Nonformulary medications were reviewed during the monthly pharmacy and therapeutics (P&T) meetings.  From August 2018 to August 2019, non-formulary medication prescriptions dropped from 13.9 percent to 7.7 percent at CIW.

Of the 210 patients who required a polypharmacy review during the review period, 180 patients were *Coleman* class members.  Polypharmacy monthly meetings included the pharmacist and medical and psychiatric prescribers.

CIW's clozapine policy was comprehensive.  CIW did not provide the number of patients on clozapine.

Over 100 inmates at CIW were prescribed DOT SSRIs by psychiatrists.  Additionally, three patients were prescribed KOP SSRIs, and 46 patients were prescribed DOT SSRIs by medical providers.

From November 5, 2018 through October 22, 2019, there were 40 PC 2602 involuntary medication orders including 23 emergent and 17 non-emergent orders.  Thirteen petitions were denied, not renewed, expired, or rescinded during the review period.  The PC 2602 involuntary medication tracking was conducted weekly.

Pursuant to the memorandum for psychotropic medication nonadherence dated January 30, 2019, CIW nursing staff notified psychiatry when inmates missed three or more doses of medications or 50 percent of medications in one week.  An appointment with psychiatry was required within five business days of receipt of the missed medication notification.  CIW also

developed a contract for patients to sign to comply with medications. CIW did not track whether psychiatrists scheduled and met with all patients pursuant to the policy during the review period.

Additionally, under the sick call slip system at CIW, if the sick call request included symptoms of psychotropic medications side effects, those inmates were seen by nursing within 24 hours and routine psychiatric follow-up was required within five days. Requests for changes in the time of medication administration were made without patient contact and noted in a psychiatric note.

The change of location for administration of long-acting injectable medications from the medical clinic to a room at the pill window resulted in poor adherence as the inmates were not ducated for the pill line. In response, CIW authorized those inmates with passes for work, school, etc. to use the same passes to receive their injectable medications during pill lines.

Transfers:

The inpatient care coordinator had been in place at CIW for five years.

Due to regional and local CDCR staff reports of unreliability of the on-demand report, the monitor utilized local data.

During the review period, 170 inmates met criteria for higher level of care consideration. Of those, 20 or 12 percent, were ultimately referred to inpatient care after IDTT consideration; 18 referrals were from the MHCB, and two were from EOP.

The non-referral log indicated that during the review period 151 inmates were identified who were not referred in 393 different IDTTs.

CIW made ten referrals to acute care during the review period. All acute referrals were sent to the Inpatient Referral Unit (IRU) within two days of IDTT referral. One referral was rescinded and re-referred to intermediate care. One referral was rejected. CCATs were not

initiated for rejections; CIW staff conferenced locally with the onsite PIP staff.  All inmates transferred within ten days of IRU referral, and inmates moved within 72 hours of bed assignment.  There were no inmates on the Acute Bed Utilization Management Report as awaiting a bed during the review period or during the site visit.  `

CIW referred ten inmates to intermediate care during the review period.  All referrals were sent to IRU within five days.  There was one rescission and no rejections.  All inmates transferred within 72 hours of bed number assignment.  One hundred percent of accepted inmates transferred within 30 days of referral.  There were no inmates on the Acute Bed Utilization Management Report as awaiting a bed during the review period or during the site visit.

CIW completed seven *Vitek* hearings during the review period; no inmates prevailed.

CIW reported that 19 inmates who transferred to inpatient care had complex medical needs.

There were no acute or intermediate care transfers delayed or cancelled due to impending paroles, disciplinary proceedings, classification factors, or pending PC 2602 involuntary medication hearings.  There were no expedited transfers during the review period.

For inmates returning from inpatient treatment, the inpatient coordinator was notified directly by PIP staff during the discharge process.  During the review period, 11 inmates returned from the PIP.

During the monitoring round, CIW underwent a major and minor sustainability review.  For quality of higher level of care (HLOC) clinical rationales and treatment modifications, the interrater agreement between the headquarters' reviewer and the CIW inpatient coordinator was 95 percent during the minor review; it was not addressed during the major review.

While the overall rate of compliance increased from 53 percent to 81 percent, the cases deemed "good" by headquarters remained below 90 percent for the third consecutive quarter. This variability in the quality of the HLOC documentation was observed onsite during IDTTs and in HLOC forms in reviewed healthcare records. CIW provided training to clinicians whose documentation was judged to be substandard, although it was unclear if CIW was compliant with all regional mental health action items.

During the review period, CIW operated a 29-bed MHCB. No beds were redlined.

There were 198 admissions to the MHCB during the reporting period. CIW was not able to calculate the average daily census during the review period.

There were 367 physical discharges from the MHCB; 49 percent or 175 inmates discharged to EOP, 47 percent or 170 inmates discharged to 3CMS, and less than one percent or three inmates discharged to general population. Two inmates paroled directly from the MHCB. The remaining 17 inmates transferred to acute and intermediate care.

The average clinical length of stay in the MHCB was seven days. Two inmates had clinical lengths of stay greater than ten days. The average physical length of stay was eight days. Approximately 26 percent or 28 inmates had physical lengths of stay longer than ten days.

During the review period, 20 inmates had three or more MHCB admissions with a range from three to seven admissions.

During the review period, 13 inmates were housed in the PSU on 15 occasions. The average length of stay was 37 days.

Programming:

    Administrative Segregation EOP Hub and PSU:

One psychiatrist provided treatment to inmates housed in the PSU, EOP hub, STRH and LTRH. The PSU and EOP hub had capacity of ten inmates each. STRH had a capacity of 42 inmates, and LTRH had capacity for 60 inmates. At the time of the site visit, the census for these units totaled 44 inmates. Two primary clinicians carried caseloads of three and four inmates, which was within required ratios. Two medical assistants and two recreation therapists provided services in the units as well.

During November 2017, CIW moved the EOP administrative segregation hub to the PSU. Both programs were housed on the same unit and combined programming was provided as they had similar Program Guide requirements. Due to low numbers of both populations, combined programming allowed for better provision of group therapy and other services. Further, the PSU was less noisy and disruptive than the administrative segregation unit and provided better spaces for confidential contacts. All groups and individual contacts occurred in confidential settings in the PSU programming area. Therapeutic modules were utilized for individual and group contacts. Group assignment was based upon patient compatibility and treatment goals. Due to the low numbers of patients on the unit, some groups were very small with only two participants.

PSU patients were placed into a step incentive program; EOP hub inmates were not in the step program. All patients were afforded radios. Hub inmates were allowed property based upon administrative segregation policies. All patients were handcuffed during escort.

Regarding the provision of group therapy for PSU and EOP hub inmates, CIW offered 12.57 hours per week; 11.41 were attended, 1.16 hours were refused, and 1.94 hours were cancelled per week during the review period. Group therapy was provided in four modules, A,

B, C and D.  Only B module was provided during the week of the monitoring visit due to the

census of only four inmates on the unit.

Yard was offered every other day.  CIW staff reported extended yard times to

accommodate lost yard due to heat alerts.  Consistent with findings from a PREA site visit

conducted April 2019, the PSU/EOP hub yard lacked privacy screens around the toilet which

allowed officers to view inmates while toileting on the yard.[72]

The PSU/EOP hub afternoon huddle was attended by all disciplines and valuable

information on all inmates on the unit was discussed with all staff, including their current status

and issues of concern.  Level changes, new arrivals, property issues and five-day follow-up were

also addressed.

Interviewed PSU/EOP hub inmates who had arrived before the date of the interview

reported adequate access to primary clinicians, psych techs, recreation therapists, and the

psychiatrist.  Inmates knew how to access emergent and non-emergent mental health services in

the unit.  Interviewed inmates knew their mental health diagnoses and treatment goals, and

reported IDTTs occurred every 30 days.  Yard was offered daily from 9:00 a.m. to 12:00 p.m.

and inmates reported access to ten hours of group weekly.  Inmates requested evening groups

which were not being offered at the time of the monitor's visit.  Education was offered, with

three inmates attending GED classes and one enrolled in college classes.  Psych tech rounding

occurred daily.  Inmates reported weekly primary clinician contact with more available if needed

and psychiatry visits every 30 days; requests for psychiatry visits before 30 days also occurred.

There were no issues reported with psychiatry or primary clinician continuity of care and all

---

[72] In their objections and comments letter dated February 2, 2021 defendants reported that the issues had been remedied since the site visit. Defendants reported that there were now "privacy screens so that the officers are not able to view the inmates while they are on the toilet."

treatment was conducted in confidential settings. The one complaint from interviewed inmates was the lack of escort for restroom breaks during two-hour group blocks.

Chart Review Analysis

Due to the frequent movement between PSU and administrative segregation EOP hub status, discreet periods of separate stays were difficult to identify. As a result, PSU and administrative segregation EOP hub electronic health record document review was combined. Six inmates were randomly selected to have their records reviewed for their PSU and or administrative segregation EOP hub stays.

Of the six cases reviewed, three or 50 percent received timely initial primary clinician evaluations; the late evaluations were completed within two to 13 days of the due date. Four of the six cases or 67 percent received timely initial psychiatric evaluations; the two untimely cases were completed within one and five days of the due date.

All six cases were required to have an initial IDTT prior to ICC; five or 83 percent were completed timely. In the non-compliant case, IDTT was held four days after ICC.

IDTTs were required for PSU inmates at 60 days and 120 days, and every 90 days thereafter. For administrative segregation EOP hub inmates, IDTT was required every 90 days after initial IDTT. One hundred percent of ongoing IDTTs were timely for the five required cases. Required staff were present in 100 percent of the IDTTs.

CIW was 96 percent compliant with completion of both timely primary clinician contacts and psychiatry contacts for the six reviewed cases.

MHCB:

CIW had two MHCB units. There were ten MHCBs in the CTC and 19 MHCBs in the Walker unit. On November 12, 2019, the census was six in the CTC and 12 in the Walker unit.

The MHCB was staffed with four psychiatrists, eight psychologists, one recreation therapist and two psychology interns. All disciplines had caseloads within required ratios.

Four IDTTs were observed in the Walker unit during the monitor's visit. All required participants were present as well as with a captain, sergeant, clinical intern and additional nursing staff. Case presentations varied from thorough and empathic to rote and rigid. Mentoring and training would be beneficial. Higher level of care considerations were addressed. The patients' treating psychiatrist was present for all IDTTs; however, involvement was minimal. The correctional counselor and captain were engaged and intervened appropriately with all patients.

CIW reported that yard management groups were run by a recreation therapist during the day and psych techs in the evening and on the weekends. There were no clinician led groups at the time of the site visit; however, the MHCB supervisor reported a plan to implement them during 2020. Groups were not observed during the monitor's visit.

Three patients were interviewed regarding their stay in the MHCB. Two of the three patients were satisfied with the care provided and had no concerns with mental health or custody staff. One patient reported the MHCB experience was demoralizing and isolating.

There were no concerns with clothing issue or appliances or supplies in the MHCB. All chronos for property and bedding were discussed during daily huddles.

Yard access was documented daily in all reviewed 114As.

Chart Analysis:

There were five patients who were randomly selected to have their electronic health record reviewed for their MHCB stays. All of the five or 100 percent received timely initial

evaluations by their psychologist within 24 hours of admission. Confidentiality of the initial evaluation could not be confirmed.

Four of the five or 80 percent of initial psychiatry evaluations were completed timely. Confidentiality of the psychiatry initial evaluation was not documented.

Four of the five or 80 percent of reviewed cases indicated timely initial IDTTs; the single non-compliant case was one day late. All required staff was present in 100 percent of the initial IDTTs; however, it could not be determined from the record if the inmates' assigned correctional counselors and psychiatrists were present. All five or 100 percent of ongoing/discharge IDTTs occurred as required by Program Guide. Chart review did not indicate any inappropriate discharges. All required staff was present in 100 percent of reviewed IDTTs.

MHCB chart review indicated compliance for 31 of 38 required daily contacts. Reasons for non-compliance included cell-front contacts without the inmate having refused the contact, inadequate documentation to determine whether a contact occurred, or not seen at all.

Nine of 13 or 68 percent of psychiatrist contacts were compliant. Confidentiality was rarely documented and there were some significant problems with overall documentation in at least four reviewed cases. In four cases the documentation was insufficient to determine if a substantive psychiatric contact occurred or if any contact at all occurred. Psychiatrists frequently utilized primary clinician notes making it difficult to determine if the patient had been seen by the psychiatrist.

Clinical documentation in the MHCB was problematic and in need of focused supervisory attention based on the data review.

Seclusion and Restraint:

There were two instances of five point restraints use during the reporting period. All required checks and documentation were completed and coincided with documentation in the EHRS.

CIT:

The CIT responded to 17 incidents during the review period. Eight interventions resulted in admission to MHCBs, six inmates returned to their housing units, one inmate changed cell, one resulted in consult with the psychiatrist, and one was noted as other.

Alternative Housing:

Alternative housing at CIW was located in six cells in the CTC, 1307, 1308, 1309, 1311, 103, and 104. All cells were wet cells and not suicide resistant. Of the 211 inmates referred to alternative housing, 196 or 93 percent were timely admitted to an MHCB and 15 or seven percent of the referrals were rescinded. During the site visit, there were no inmates in alternative housing.

Long-Term Restricted Housing:

LTRH was located in the Special Programing Housing Unit (SPHU) which also housed STRH and non-MHSDS administrative segregation inmates. During the reporting period, 25 inmates were housed in LTRH; the average length of stay was 268.8 days, with a range from 41 to 917 days.

Review of 114As revealed that inmates received 15 hours of out-of-cell activity per week. In some instances, inmates were offered dayroom (in restart chairs) in lieu of yard. All interviewed inmates had access to a radio or tablet.

Short-Term Restricted Housing:

During the reporting period, there were 28 inmates in STRH.  The average length of stay was 40 days with a range from three to 206 days.  A review of 114As confirmed that inmates received at least 20 hours out-of-cell time per week.  All but one interviewed inmate, had access to a radio or tablet.  One inmate's radio was broken.

EOP:

The CIW mainline EOP had a program capacity of 94 inmates.  One psychiatrist provided services to the EOP inmates and six primary clinicians carried caseloads from nine to eleven inmates.  Caseloads were within required ratios of 1:120 for psychiatrists and 1:26 for primary clinicians.  During the review period, the average census was 73 EOP inmates, with an average length of stay of three months to over one year.  The program included inmates with security levels from I to IV.

The EOP Supportive Care Unit (SCU) was renovated during the review period to include two medication windows in the unit.  The renovations included five group therapy spaces and a separate adjacent office building for individual contacts and IDTTs.  EOP inmates ate in the main dining hall with general population inmates and were allowed to attend the main yard, as well as the segregated EOP yard.  EOP inmates participated in education programs with general population inmates.

Only one EOP IDTT occurred and was observed during the site visit.  All necessary participants were in attendance including the treating psychiatrist.  There was adequate discussion regarding the progress of the patient, and supportive therapy was provided.  However, there was no discussion of the patient's history, treatment goals or explicit discussion of

consideration of referral to higher levels of care; it was unclear whether this did not occur due to concerns for the patient due to the sensitive nature of her symptoms, or if it was an omission.

The monitor's expert attended a psychologist facilitated relaxation/mindfulness group. Seven inmates participated in the group and it appeared to be clinically beneficial. Interviewed EOP inmates reported that they were seen weekly by their primary clinician and at least monthly by the psychiatrist in a private office. They consistently reported that they were offered at least ten hours of structured therapeutic activities weekly; however, they requested that groups change after the ten-week cycles to prevent repetitive group provision. They also requested more clinician-based groups rather than recreation-based groups. Inmates reported that IDTTs occurred timely, and that treatment plans were routinely discussed with them. They reported nearly unrestricted yard time that included the mainline and EOP yards. Inmates did not report problems with returning indoors during heat alerts. The inmates did report that the SCU was very warm and staff reported the swamp coolers had been malfunctioning.

Tablets were provided to EOP inmates and there was a teacher on the unit; this was helpful for inmates who were not able or comfortable in attending general population education programs. Inmates requested more leisure and group activities on the weekends.

Interviewed EOP inmates expressed mixed opinions regarding attendance in mainline yard, education and meals. They were concerned for lower functioning inmates who had some difficulty in this mixing, and they indicated that it would be helpful to have the option of dining on the unit. They also requested more options for jobs/vocation other than laundry and porters.

During an observed community meeting in the SCU EOP, inmates requested pre-release groups, and the presence of a psych tech consistently on the unit for supportive therapy when indicated.

During the review period, CIW offered EOP inmates 12.65 hours of group therapy. Inmates attended an average of 10.12 hours per week, refused 2.53 hours per week, and 1.76 hours were cancelled.

Regarding the provision of group therapy provided, CIW indicated that for EOP inmates on modified programming, 3.7 hours were attended per week, 2.55 hours were refused, 6.26 hours were offered, and 0.87 hours were cancelled.

<u>Chart Analysis</u>:

Five EOP inmates were randomly selected to have their health care records reviewed.

One hundred percent of the four inmates requiring initial contacts had timely initial psychiatric and PC contacts.

Of the four required initial IDTTs; all or 100 percent were completed timely.

There were six expected ongoing IDTTs and all or 100 percent were also completed timely.  Required staff were present at all IDTTs reviewed.

For the 18 required weekly primary clinician contacts during the period reviewed, ten or 56 percent were compliant.  Reasons for non-compliance included the absence of any contact with the assigned primary clinician (group or individual), contact with "fill-in" or "covering" providers, and non-substantive contacts.  In one case, the inmate had not been seen by her primary clinician since discharging from the MHCB one week prior.

Fifteen of 17 or 88 percent of required 30-day ongoing psychiatry appointments were timely.  Documentation of confidentiality was not consistently present.

<u>3CMS</u>:

The 3CMS program had a capacity of 975 inmates and at the time of the site visit had 701 inmates.  The program was staffed with four psychiatrists with caseloads ranging from 164 to

195 inmates which was within the required ratio of 1:280 inmates.  All but one of the 12 primary clinicians had caseloads within the required ratio of 1:97 inmates; however, one primary clinician had a caseload of 1:108 which exceeded the ratio.  Two medical assistants were assigned to the 3CMS program at CIW.

The monitor's expert was not able to attend 3CMS IDTTs due to scheduling conflicts.

Multiple groups were offered to 3CMS inmates at CIW.  One observed group was facilitated by two interns who were empathetic, actively listened and exhibited positive role model behaviors.

Interviewed 3CMS inmates reported overall satisfaction with the mental health services at CIW.  One hundred percent of the inmates knew their primary clinician and reported being seen more often than every 90 days.  Inmates reported involvement in their treatment planning goals.  All interviewed inmates knew their psychiatrist's name and how to reach them if needed.  All were enrolled in two or more groups and reported consistent attendance.  Several inmates reported the inability to establish a trusting rapport with a clinician due to the constant switching of clinicians and lack of notification of the change.  Some custody officers were reported as disrespectful, not understanding inmates with mental illness, and making the inmates feel inferior.  One inmate reported that custody officers would not call mental health when requested and custody staff told an inmate to go ahead and kill herself when an inmate reported being suicidal.

Other Issues:

Pre-Release Planning:

CIW held a quarterly EOP pre-release group for up to 16 inmates who were six to nine months away from parole or whose level of care changed to EOP during the quarter of their parole; there was no waitlist.

CIW did not have pre-release groups for 3CMS inmates.  CIW submitted a pre-release group curriculum for 3CMS inmates to headquarters and was waiting for approval to begin.

Regarding re-entry planning, the institution reported that the TCMP started re-entry planning 120 days prior to release.  The institution indicated that pre-entry planning was incorporated into the inmate's treatment plan when the inmate or the pre-release coordinator informed the primary clinician that re-entry was a source of anxiety for the inmate.

Program Access:

e.    Jobs and Program Assignments:

As of October 1, 2019, CIW reported that of the 621 available employment positions, 17 or 24 percent of EOP inmates, 306 or 39 percent of 3CMS inmates, and 298 or 34 percent of non-MHSDS inmates held positions.

Of the 373 academic assignments, two inmates or three percent of EOP inmates held assignments, 218 or 28 percent of 3CMS inmates held assignments, and 153 or 18 percent of non-MHSDS inmates held assignments.

With regard to the 195 substance abuse treatment placements available, four inmates or six percent of the EOP inmates, 107 or 14 percent of 3CMS inmates, and 84 or ten percent of non-MHSDS inmates held placements.

Of the 390 voluntary education assignments, 27 or 38 percent were held by EOP inmates, 181 or 23 percent were held by 3CMS inmates, and 182 or 21 percent were held by non-MHSDS inmates.

For the 75 vocational education assignments, zero EOP inmates, 41 or five percent of 3CMS inmates, and 34 or four percent of non-MHSDS inmates held assignments.

f.  Milestone Credits:

On October 1, 2019, 71 of 72 EOP inmates were eligible for milestone credits and 80 percent earned them.  Of the 775 3CMS inmates, 763 were eligible for milestone credits and 30 percent earned them.  For the 866 non-MHSDS inmates, 843 were eligible to earn milestone credits; 37 percent earned them.

g.  Out-of-Level Housing:

CIW did not house inmates by level; all levels were mixed.

h.  ADA Reasonable Accommodation and Grievance Procedures:

The ADA Reasonable Accommodation and Grievance Procedures were implemented at CIW.

Placement of 3CMS Inmates into Minimum Support Facilities:

CDCR did not have an MSF for female inmates.

Case-By-Case Reviews:

During the review period, three inmates required long term segregated case conferences. Each of the three inmates were retained and had timely review dates.  All decisions were documented with appropriate rationales.

Non-Disciplinary Segregation:

There were no inmates placed on non-disciplinary segregation status during the review period.

"C" Status:

At the time of the site visit, the institution reported that there were 30 inmates on "C" status. Eight inmates were not members of the MHSDS, and the remaining 22 were 3CMS inmates. Of the 22 3CMS inmates, seven had a combination of one serious RVR and multiple administrative RVRs within 180 days. The remaining 15 had multiple serious RVRs within 180 days.

Referrals:

CIW responded to 57 percent of emergent psychiatry referrals in a timely manner. Timely response to urgent psychiatry referrals was at 67 percent compliance. CIW was compliant with response to routine psychiatry referrals. The institution reported compliance for timely responses to emergent, urgent, and routine primary clinician referrals.

Space:

For groups and individual treatment, the SPHU used restart chairs for STRH, and therapeutic treatment modules for LTRH in semi-circles on the dayroom floor. Partitions were utilized; however, they did not provide confidentiality.

All primary clinicians and psychiatrists had confidential offices for individual sessions. The 3CMS IDTT room was confidential. 3CMS groups were conducted in the main clinic. Regarding EOP treatment space, there were confidential group treatment rooms.

Mental Health/Custody Relations:

On September 12, 2019, CDCR filed an update to their September 2019 Custody Mental Health Partnership Plan (CMHPP). Because the review period concluded in September 2019,

the monitor's review focused on compliance with the September 2018 plan.  The Custody and Mental Health Partnership local operating procedure dated March 2019 was generally in alignment with the CDCR headquarters' CMHPP filed in September 2018.  CIW added the Associate Warden of Healthcare Operations to the executive rounding, and their PIP to the list of programs eligible for selection.  The LOP omitted safe reporting requirements, and details related to the EOP orientation group's participants and facilitators.

In addition, CIW produced memorandums indicating that the CMHPP's joint rounding was performed at the institution; however, they did not indicate that inmates were interviewed during rounding.  Additionally, the warden's meeting minutes did not include a discussion of the quarterly roundtables, the multi-disciplinary training required by the CMHPP.

The monitor could not confirm all required staff participated in partnership training from the documents provided.  CIW's custody and mental health staff also participated in MILO, PIP Collaboration, and Therapeutic Strategies and Intervention Trainings.

During the review period, all 119 of the inmates' appeals related to staff complaints were partially granted; 21 were referred for investigation.  Nine staff members were moved to another post as a result of the staff complaint; one was moved to medical records, four were moved to CIM, and four were placed on administrative time off.   There was one Institutional Disciplinary Action Report pending during the review period.

Heat Plan:

All interviewed officers, except one, were familiar with the heat plan.  Staff used handheld thermometers in all units, except the SPHU and EOP hub, which had wall mounted thermometers.  CIW did not provide monthly heat plan reports for two months within the review

period; thus, the monitor was unable to ascertain the number of days the institution had Stage I, II and III heat alerts.

RVRs:

CIW reported 80 percent compliance for required custody staff receiving RVR training. All captains and correctional administrators received the training, while 80 percent of lieutenants and 77 percent of sergeants were trained. All required mental health staff completed the required training.

CIW issued 1,441 RVRs during the review period, of which 976 or 67.7 percent were issued to class members. Specifically, 23 were issued to inmates in the MHCB, 56 were issued to EOP inmates, and 897 were issued to 3CMS inmates. Ten RVRs were reported as "unknown" for level of care and the remaining 455 RVRs were issued to non-MHSDS inmates.

A review of the institution's RVR log revealed that CIW did not recommend documentation in an alternative manner for any RVRs heard during the review period.

Five clinicians completed all RVR mental health assessments at CIW.

A sample of RVRs were reviewed for compliance with applicable CDCR policy and procedures. The review revealed that custody staff timely referred RVRs for a mental health assessment in 50 percent of cases. Mental health staff timely returned the completed assessment to custody approximately 90 percent of the time. The senior hearing officer documented consideration of the mental health assessment in 100 percent of the reviewed sample and whether mental health input led to mitigation of privilege restrictions and loss of credit.

The quality of mental health assessments was variable. Assessments were not specific to inmate symptoms and often used canned language.

<u>Use of Force</u>:

CIW reported that 96 percent of custody staff received required use of force training. Specifically, the training was received by the warden, chief deputy warden, all four correctional administrators, all four captains, 18 of the 20 lieutenants, 46 of the 47 sergeants, and 327 of 340 correctional officers.

CIW further reported that 98 percent of mental health staff received the required use of force training.

There were no controlled use of force incidents during the review period. For immediate use of force incidents, 122 of 128 or 95 percent involved *Coleman* class members. There were 172 non-use of force incidents of which 144 or 84 percent involved class members.

<u>Lockdowns/Modified Programming</u>:

There were no lockdowns during the review period, but program status reports reflected three instances of modified programming ranging from two to ten hours. Two incidents of modified programming were the result of mandatory quarterly reality-based alarm response training. The third incident was the result of installation of a switch gear for generator power. All program status reports indicated that health care services and priority ducats, including mental health ducats, as well as medication distribution were not affected.

<u>Access to Care</u>:

Review of CIW's monthly Health Care Access Quality Reports from May 2019 to October 2019 indicated that less than one percent of issued mental health ducats and add-on appointments were not completed due to custody factors; 13 percent were not completed due to non-custodial reasons, excluding inmate refusals.

_Coleman_ Postings:

_Coleman_ posters in English and Spanish were present in all observed units.

**Richard J. Donovan Correctional Facility (RJD)**
March 19, 2019 – March 22, 2019

Census:

On March 19, 2019, RJD housed 3,379 inmates.  There were 2,139 inmates on the mental health caseload, which constituted 57 percent of the total inmate population.

The MHCB housed 13 inmates; no inmates were in alternative housing.

There were 687 mainline EOP inmates.  There were 1,335 mainline 3CMS inmates.

RJD was an EOP hub; it housed 51 inmates.  There were 33 3CMS inmates in administrative segregation.

Seven inmates were assigned NDS status including one 3CMS inmate and one EOP inmate.

Staffing:

The position for the chief psychiatrist was filled; the 0.5 senior psychiatrist position was vacant.

Both chief psychologist positions were filled.  Eight of 7.5 senior psychologist positions, and eight of 7.5 senior psychologist specialist positions were filled.

Considering staff psychiatrists, tele-psychiatry, and contractual psychiatrists, the functional vacancy rate in psychiatry was 23 percent.

Forty-four of 48 staff psychologist positions were filled; contractual psychologists filled 1.5 positions for a three-percent functional vacancy rate.

The supervising social worker position was filled.  Twenty-three of 23.5 social worker positions were filled, for a three percent functional vacancy rate.

RJD filled 27 recreation therapist positions, which was two more positions than the 25 established positions.

Meeting with Psychiatrists:

The monitor's experts met with the onsite psychiatrists to discuss the provision of mental health services at the institution.  Various issues were discussed.  The psychiatrists reported that the loss of medical assistants had a detrimental effect on their provision of services.  Medical assistants had previously assisted psychiatrists in various tasks that allowed for greater psychiatric productivity and retention, including assisting in ensuring inmates made it to their appointments, assisting in laboratory studies, and assisting telepsychiatrists in their duties.  The use of medical assistants was included in the CDCR staffing plan for psychiatric retention and increased job satisfaction.

RJD's psychiatrists expressed concerns that psychiatric staffing vacancies resulted in poor continuity of care, and at times untimely clinical contacts.  They indicated that generally initial assessments prior to the initial IDTT had not been performed; however, recent changes had resulted in some initial assessments occurring prior to the initial IDTT, but most were untimely.

There were reports of inappropriate custody staff behavior, and the psychiatrists expressed some concern and reluctance regarding supervisory requests that they document inmate reports of such behavior, due to fear of retaliation.  They also reported that EOP SNY/non-designated yards for EOP inmates resulted in markedly increased workloads in the form of increased referrals, crisis interventions, and MHCB admissions.

There was also discussion regarding the current benefit of a telepsychiatrist who provided primary on-call duties on specified days; his on-call duties greatly decreased the workload of the

onsite psychiatrist on-call.  They noted that this telepsychiatrist performed a very beneficial

retention function for them, and they were concerned that his role would be discontinued.

Quality Management:

The quality management/quality improvement program at RJD was robust and very

useful.

RJD institutional quality management included a functioning local governing body,

quality management committee, and mental health subcommittee.

The local governing body met quarterly and addressed substantive health care matters

including pertinent correctional treatment center (CTC) matters and reviewed and approved local

operating policies and procedures.  The local governing body also attended to matters raised in

the minutes of the Health Care Quality Management Committee (HQMC) and the Health Care

Executive Committee (HCEC) as appropriate.

The quality management committee met monthly.  Minutes were comprehensive and the

mental health program subcommittee actions were standing agenda items for the quality

management committee.  A senior psychologist specialist was specifically assigned to the quality

management committee, which reported to RJD's CEO.

The deliberations and action items of the quality management committee included local

operating procedures, inmate medical services policies and procedures (IMSP&P), crisis

intervention teams (CITs), performance improvement work plans (PIWPs), Dashboard

Validation, track health care performance, patient safety, access to care, health facilities

management, health care incident reports (HCIRs) and health care audits.

The chief of mental health typically chaired the mental health program subcommittee,

which met monthly and maintained useful meeting minutes.  The mental health subcommittee

was actively engaged at RJD, implementing and monitoring corrective actions related to a variety of quality management/quality improvement processes at the institution.  CDCR's health care dashboard and other systemwide databases were regularly used by the mental health subcommittee, as were the monthly "spotlight" reports for supervisory and quality management/quality improvement purposes.

Action items and meeting agendas showed that the mental health subcommittee attended to issues regarding local operating procedures, referrals to higher levels of care, clinical peer review, medication management data, patient safety issues, health care incident reports, alternative housing issues, special projects, mental health grievances, pre-release planning, indecent exposure, sexual reassignment surgery, RVRs, MHSDS services, EHRS, mental health audits, program status reports, staffing, custody staffing matters, polypharmacy, Substance Abuse Treatment and Recovery program (S.T.A.R.), and CDCR's health care dashboard and patient registries.

During the review period, the regional mental health team conducted one major and one minor sustainability review and multiple less formal site visits at RJD to address the higher levels of care consideration and referral processes at the institution.

The EOP hub certification process successfully occurred at RJD on a monthly basis during the review period.  The process identified and corrected the finding that not all inmates received their mandated hours of yard based on staff's interpretation and implementation of the approved yard schedule.  In addition, issues were identified and corrected regarding the mental health screening process.

Additional quality management/quality improvement actions by RJD included implementing Lean Sigma Six projects, which utilized data driven methodologies focused on

improving systems by improving quality of services provided to clients.  Lean Six Sigma projects at RJD acted on during the review period that directly affected mental health care included improving hospital discharge completion times, psychiatric medication non-adherence counseling, improving compliance with urgent telemedicine recommendations, RJD's parole process, reducing MHCB/alternative housing admission times, assessing the accuracy of psychotropic medication reconciliations, and improving continuity of specialty services.

During the review period, PIWPs were used regularly at RJD to address pertinent issues regarding the adequacy of mental health care.  PIWPs at RJD covered chronic care, primary clinician five-day follow-up upon return from higher level of care, high priority specialty care in 14 days, and routine specialty care in 90 days, care management of high-risk patients in the MHSDS, and mental health follow-up upon discharge from MHCB/Acute/Intermediate care. Additional quality improvement activities at RJD covered its medication administration improvement program (MAPIP), improving psychiatric care for new arrivals, and improving psychiatric services for upcoming parolees.

RJD actively used audits within the MHSDS to evaluate its mental health services.

There were no QITs or FITs during the review period.

Peer review was conducted for psychiatrists during the review period.  RJD reported no significant concerns, trends, or patterns regarding psychiatric practice.  RJD's peer review appeared to be more of a quality assurance procedure in contrast to a quality improvement process.  The institution was paired with California State Prison/Corcoran for psychiatric peer review.

No peer review for psychologists and social workers occurred during the review period due to a peer review hold for these disciplines placed by mental health headquarters.

<u>Medication Management</u>:

RJD performed MAPIP audits during the review period.  System-wide MAPIP audit issues were being addressed through the court coordination process and locally by institutions.

MAPIP results for August 2018 through February 2019 were reviewed as RJD provided data for seven months.  RJD was compliant for medication continuity after inter-institutional transfers at R&R for all seven months of the review period.  Medication continuity on the receiving yard following intra-institutional moves from non-locked units and inmate discharge from a community hospital or acute or intermediate care, at the receiving institution following inmate discharge from crisis beds, for psychiatric-prescribed chronic care medications, and for new psychiatric medications were non-compliant for all seven months of the review period.  For intra-institutional moves to locked units, compliance occurred in five of the seven months.

MAPIP results for the review period indicated that medication continuity at parole or release to the community at R&R was compliant for six of the seven months; no data was provided for one month.  Medication continuity for court ordered involuntary medications was compliant for three of the seven months.

The MAPIP audit process specific to psychiatry medication management practices included monitoring of various indicators for psychotropic medications.  However, during the review period, psychiatry medication management resulted in many false positive reports due to what RJD characterized as methodological issues.  There were ongoing issues reported regarding obtaining laboratory testing for various psychotropic medications during part of the review period, although the institution reported recent improvement specific to relevant laboratory indicators.  During the review period and at the time of the site visit, the institution and headquarters were undertaking action to remediate MAPIP issues.

795

Medication refusals data was not automated and not reported.

RJD instituted performance improvement plans (PIPs) to improve psychiatric medication non-adherence counseling by psychiatrists and medication continuity following community hospital discharge.

Medication orders were written for no longer than 180 days, and bridge orders were typically written for 30 to 90 days.

Non-formulary prescriptions for psychiatry medications were minimal.

Medication management problems were not reported during inmate interviews in any MHSDS programs.

RJD was not a Clozaril initiation or maintenance institution.

Overall, the PC 2602 involuntary medications process worked well at RJD. For the reporting period, RJD did not have any petitions that were denied or withdrawn for non-clinical reasons and force was not used for PC 2602 involuntary medications. During part of the review period, RJD had 87 inmates with PC 2602 involuntary medications orders; 83 were EOP inmates and four were 3CMS level inmates.

RJD did not audit the length of pill lines.

Forty-one percent of all psychotropic medications were prescribed HS; HS medications were administered after 8:00 p.m.

Transfers:

Site visit observations revealed that EOP IDTT meetings were often problematic regarding consideration for higher levels of care. In observed IDTTs, there was little or no discussion regarding consideration of referral to higher levels of care; however, there was consistent discussion and focus regarding consideration of downgrade to the 3CMS level of care.

Only 12 percent of RJD inmates who met criteria for higher level of care consideration (both acute and intermediate) were ultimately referred to inpatient care after IDTT consideration. Review of documentation for non-referrals to acute and intermediate care showed that clinical rationales for not referring was not consistently adequate.  However, typically treatment modifications following non-referrals were found to be adequate.

During the review period, 61 of 65 or 94 percent of inmates who transferred to an acute care program transferred within Program Guide timelines.  All inmates who transferred to an intermediate care program transferred timely.  One patient was transferred to Atascadero State Hospital (ASH) from RJD.

RJD was generally not notified of pending discharges from acute and intermediate care.

There were 447 admissions of RJD inmates to the MHCB at RJD and other crisis beds. Ninety-three percent were admitted within 24 hours of MHCB referral.

There were 546 placements in alternative housing during the review period; 396 or 73 percent were admitted to the MHCB.  Fifty-eight or 11 percent of the inmates placed in alternative housing remained over 24 hours.

Ten inmates timely transferred to a PSU during the review period; all were timely.

RJD was unable to provide data regarding inmates that transferred to STRH within 30 days of placement during the review period due to the reporting limitations of SOMS.

There were no 3CMS inmates transferred to LTRH during the review period.

Programming:

Administrative Segregation EOP:

RJD was an EOP hub institution; the hub was located in B Facility (B-6).

The psychiatrist assigned to the EOP hub and 3CMS administrative segregation had a caseload of 1:51 in the EOP hub. Four primary clinicians each had caseloads of 1:11 and one primary clinician with additional duties had a caseload of five inmates.

Documentation indicated that the EOP hub was certified each month during the review period with two months being certified "with explanation." During September 2018, a plan was successfully implemented for the mental health screens measure that was below compliance during September 2018. During December 2018, a plan was also successfully implemented for the IDTT staffing measure that was below compliance because of CC I absences.

The number of EOP hub inmates with stays exceeding 90 days during September 2018 to February 2019 was two to five for the reporting period. On March 20, 2019, during the site visit, the administrative segregation EOP hub housed 46 EOP inmates; three inmates had stays exceeding 90 days.

Ten inmates in the EOP hub during the site visit were randomly selected from the EOP hub list provided by RJD to assess compliance with timely mental health contacts as documented in the health records. Dates of arrival were provided by CDCR's regional custody staff while dates of the ICC were provided by RJD.

The dates of the initial psychiatric and primary clinician contacts, subsequent psychiatric and primary clinician contacts, and the initial IDTT and subsequent IDTTs for the sampled inmates were noted. Days between initial IDTT and initial psychiatric contact were counted. Documentation was deemed timely if the initial psychiatric contact occurred before the initial IDTT. Compliance with routine contacts was assessed through verification of documentation in EHRS for the days between the three subsequent routine contacts after the initial contact. The number of days between contacts was calculated from the start date to the end date, but not

including the end date.  The time between the initial psychiatric contact and next routine contact and the next three subsequent routine contacts, as indicated, were counted.

To determine timeliness of initial primary clinician contacts, days between the date of admission and the initial primary clinician contact were counted and assessed as compliant if the initial contact occurred within ten working days of the arrival date to the EOP hub.  Compliance with weekly primary clinician contacts was assessed by verification of documentation in EHRS for the three consecutive weeks after the initial primary clinician contact.  The number of days between contacts was calculated from the start date to the end date, but not including the end date.  The time between contacts was counted, including the time between the initial contact and next routine contact and the next three subsequent routine contacts, as indicated.

Initial psychiatric contact was deemed timely if the psychiatric contact occurred before the initial IDTT.  Review of the sampled charts revealed 100 percent compliance for initial psychiatry contacts.  A subsequent ongoing or routine psychiatry contact was considered compliant if it occurred within 30 days of the last psychiatric contact.  RJD was compliant with routine psychiatric contacts for the sampled inmates.

During interviews regarding the frequency of psychiatry contacts, inmates indicated that they met their psychiatrists monthly but were unable to specify if it occurred at least every 30 days.

There was 100 percent compliance for initial primary clinician contacts and 67 percent compliance for routine primary clinician contacts in the sampled charts.

EOP hub inmates confirmed during interviews that they met their primary clinician weekly.

Validation of confidential contacts was not consistently ascertainable.  However, information obtained from both staff and EOP hub inmates indicated that individual clinical contacts by their primary clinicians and psychiatrists were conducted in an office setting with adequate confidentiality.

The Program Guide required that the initial IDTT must occur before the ICC or within 14 calendar days of arrival.  Five inmates in the sample of ten required initial IDTTs.  Initial IDTT meetings for four of the five sampled inmates or 80 percent occurred within 14 days, although none occurred before the ICC.

Two inmates in the sample were in the EOP hub long enough to require routine IDTTs, both of which occurred within ninety days.

All required disciplines attended the initial IDTT meetings reviewed in the charts.  The correctional counselor was present for one of the two routine IDTTs documented in the reviewed sample.

Observed IDTT meetings demonstrated the attendance of required participants; each provided appropriate input to the IDTT.  IDTTs were clinically meaningful; treatment plans were appropriately discussed, as were group attendance and participation.  Clinical staff and the correctional counselor used computers to access inmates' records during IDTTs.

During the review period, there were 16 inmates in the EOP hub prescribed modified treatment plans or enrolled in special programs as a result of refusing half or more of all offered treatment over an eight-week period.  Staff reported that most of the inmates who were prescribed modified treatment plans or enrolled in special programs designed to increase treatment participation graduated to full EOP hub programs during the review period.

An average of 15.4 weekly hours of group therapy were offered and 9.9 weekly hours were attended. Inmates interviewed during observed groups acknowledged being offered at least ten hours per week of out-of-cell structured therapeutic activities and reported that groups offered were generally very helpful. The modules in the EOP hub were the approved models and were clean and arranged appropriately.

Mental health rounds performed by a psych tech in the EOP hub were observed, and were found to be problematic, in part, because of the structured protocol developed by nursing staff that required asking every inmate whether they were suicidal or homicidal *each time* they were seen during daily rounds. As a result, the primary purposes of mental health rounds (a welfare check and providing reasonable access to health care) appeared to not be accomplished in a reasonable manner.

The monitor's expert interviewed eight EOP hub inmates in a group setting. They acknowledged being offered at least ten hours per week of out-of-cell structured therapeutic activities, which were described as helpful. The inmates reported that they generally had access to outdoor recreational yard about three days per week for a total of at least ten hours. However, they reported it was not uncommon for access to the yard to be limited related to having to share the recreational yards with non-mental health caseload inmates.

MHCB:

Four of the 14 MHCB cells were ADA-compliant.

One psychiatrist was assigned full-time to the MHCB. A second psychiatrist also provided services in the MHCB two days a week and a third psychiatrist was scheduled to begin providing weekend coverage following the site visit. Four primary clinicians were assigned full

time to the MHCB.  A fifth primary clinician provided services half time in the MHCB and a sixth provided coverage during one weekend day.

Eighteen percent of MHCB admissions were of inmates who had three or more admissions during the prior six months.  The average clinical length of stay during the review period was 8.8 days; the average physical length of stay was 10.6 days.

A sample of ten inmates were randomly selected from RJD's MHCB admission spreadsheet for a review of their health records for compliance with initial evaluations, daily contacts by primary clinician or psychiatrist, and initial, routine, and discharge IDTTs.  The dates of each counted was noted and the number of days between contacts were counted.

In accordance with Program Guide requirements, initial evaluations in MHCB were considered compliant if the assessment occurred within 24 hours of admission.  Chart reviews showed that nine of ten or 90 percent of the randomly selected cases received initial evaluations by their psychiatrist and primary clinician prior to the initial IDTT.

RJD was considered compliant with MHCB daily contacts if an inmate was seen daily beginning the day after admission for an out-of-cell clinical contact (unless the inmate refused) by a psychologist or psychiatrist.  On weekends an MHCB inmate could be appropriately seen by a mental health clinician or the medical officer of the day.

Analysis of the lengths of stay for the sample of ten MHCB inmates showed that there were 75 necessary daily contacts during the length of time of their admissions.  RJD was compliant with 73 of 75 of those contacts or 97 percent.  At least 42 of those clinical contacts should have been with a psychiatrist.  Forty of 42 or 95 percent of required psychiatric contacts were with a psychiatrist.

Under Program Guide requirements, the initial MHCB IDTT must occur within 72 hours of admission and subsequent IDTTs in the MHCB must occur at least weekly thereafter. An initial MHCB IDTT was determined to be compliant if it occurred within three days of admission to the crisis beds and ongoing IDTTs were determined to be compliant if they occurred within seven days thereafter. In addition, compliance with an IDTT at the time of MHCB discharge was also reviewed and assessed. An IDTT was considered compliant as a "discharge" IDTT if it occurred within 24 hours prior to discharge, or in the case of briefer stays (e.g., two days) the initial IDTT clearly established discharge criteria and developed a discharge plan.

Of the ten cases reviewed, 100 percent were compliant for initial IDTTs within 72 hours. The health records review indicated that the ten sampled inmates required at least one or more ongoing IDTTs, for a total of 18 total expected IDTTs during their admissions. The health records showed 17 or 94 percent of those ongoing IDTTs were completed timely. Regarding discharge IDTTs, only one of the ten inmates did not receive a proper discharge IDTT, for a compliance rate of 90 percent.

MHCB IDTT meetings were observed during the site visit. All of the appropriate disciplines were in attendance with input provided by each discipline. Treatment plans were appropriately discussed. The process was noted to be clinically useful. At these IDTTs, staff accessed the EHRS and C-file using computers.

Inmates, when clinically appropriate, had access to recreational therapy in the outdoor yard about three times per week for approximately one hour per session. This access was equivalent to medically admitted inmates in the Correctional Treatment Center (CTC).

<u>Seclusion and Restraint</u>:

RJD reported that seclusion and restraints were not used during the review period.

<u>Alternative Housing</u>:

RJD used alternative housing for inmates awaiting MHCB placement when necessary. There were 85 designated alternative housing cells across the institution where inmates awaiting MHCB placement could be housed for up to 24 hours. The institution had a current local operating procedure (LOP) for alternative housing placements for inmates awaiting MHCB placement; however, the LOP did not discuss the priority for alternative housing placements.

Of 546 inmates placed in alternative housing during the review period, 58 inmates or 11 percent of alternative housing placements lasted over 24 hours.

There were no inmates in alternative housing at the time of the site visit.

<u>EOP</u>:

RJD housed its mainline EOP programs in A Facility, C Facility, and E Facility.

In the mainline EOP programs, three psychiatrists had caseloads of 1:104-1:20, with two other psychiatrists providing services to caseloads of 1:21 and 1;125. A psychiatrist providing less than full-time services carried a caseload of 1:69 and a psychiatrist with additional duties had a caseload of 1:43.

Seven primary clinicians assigned to the mainline EOP programs on A Facility had caseloads of 1:21-1:25, and another four primary clinicians had caseloads of 1:11-1:17. In the SNY EOP programs on C Facility, seven primary clinicians carried caseloads of 1:20-1:22. Another four primary clinicians had caseloads of 1:15-1:16 and three additional primary clinicians had caseloads of 1:7-1:10. Seven primary clinicians providing services to EOP

mainline of E Facility had caseloads of 1:21-1:25; three primary clinicians had caseloads of 1:14-1:18, and one primary clinician had a 1:27 caseload.

EOP individual and group treatments and IDTT meetings were provided in the A Facility EOP treatment building.  Some group therapy sessions were subject to disruption because the group space also served as a passageway and other treatment areas afforded poor confidentiality and privacy.

Confidential spaces were available for individual, group and IDTT meetings in the C Facility EOP treatment building, the adjacent 3CMS treatment building.  On C Facility, clinicians shared offices.

On E Facility, there appeared to be adequate treatment space for group, individual and IDTT contacts in the mental health building.  Notably, one room in the building which was labeled "individual space" was also utilized by custody staff as a break room.  Alternative space for individual contacts and group therapy was also available in the housing unit. Psychiatric contacts occurred in a private setting in a separate medical building of E Facility.

Program Guide timelines of initial and ongoing psychiatric and primary clinician contacts, initial and ongoing IDTT meetings, and attendance at IDTT was verified via a random sampling of health care records for inmates in EOP.  A total of 15 inmates (three from each program) were selected from a current list of mainline EOP inmates provided by the institution using a random number sampling website to assess compliance with Program Guide requirements as documented in EHRS medical records.  Arrival dates were provided by regional custody staff using SOMS.

For inmates in the sample of mainline EOP program, the date of arrival was noted.  Days between arrival date and the initial contact for psychiatry and primary clinician and initial IDTT;

days between the initial contacts and the next routine psychiatry and primary clinician contacts were counted. For ongoing or routine psychiatry contacts, days between each subsequent routine psychiatry contact during the review period were counted. For ongoing primary clinician contacts, a six-week period immediately prior to the start of the site visit (February 4, 2019 through the week of March 11, 2019) was selected for review of their health records regarding documented ongoing primary clinician contact.

The number of days between routine contacts was calculated from the start date to the end date, but not including the end date, and were referred to as timeframes.

Initial psychiatric evaluations were considered compliant if they occurred prior to the initial IDTT and within 14 days of the inmate's arrival. Two of the 15 inmates in the random sample did not have any documented psychiatric contacts during the reporting period and were removed from the sample regarding compliance with psychiatric contacts. Another three were not yet due for initial contact at the time of the site visit and were not included in the EHRS review for compliance with initial psychiatry contact.

All ten sampled inmates were due and seen for initial psychiatry contacts. Six or 60 percent of initial psychiatric contacts in the sample occurred within 14 days of arrival and were compliant; four or 40 percent did not. Five of ten or 50 percent of the initial psychiatric contacts of the sample occurred before their IDTTs and five or 50 percent occurred after their IDTTs. For the sampled inmates, RJD was not compliant regarding initial psychiatric contacts.

Following the initial contact, a psychiatrist was required to evaluate each EOP inmate at least monthly to address psychiatric medication issues. Ongoing or routine psychiatry contacts were considered compliant if they occurred at intervals no greater than 30 days since the last contact.

Regarding compliance for routine psychiatric contacts, counting the number of days between psychiatric contacts after the initial contact (timeframes) for the sampled inmates, there were 47 timeframes between routine contacts. Twenty-seven of 47 timeframes, or 57 percent occurred in thirty days or less; twenty of 47 timeframes, or 43 percent, occurred 31 days and later. For the sampled inmates, RJD was not compliant regarding routine psychiatric contacts occurring within 30 days or less.

Regarding assessing for compliance with primary clinician contacts, the selected six-week period (February 4, 2019 through the week of March 11, 2019) was reviewed for documented ongoing primary clinician contacts. For inmates that were on in RJD's mainline EOP program for the duration of dates reviewed, days between each documented contact were counted. For inmates in the sample that transferred to the mainline EOP program after the onset of the selected six weeks, days between the initial contact and arrival were counted, then days between each subsequent routine primary clinician contact through the week of March 11, 2019 were counted.

Of the 15 inmates in the sample, two inmates transferred into RJD's mainline EOP program during the six weeks selected for review. In both cases, initial primary clinician contacts occurred within 14 calendar days. For the sampled inmates, RJD was compliant regarding initial primary clinician contacts.

Regarding routine primary clinician contacts, there were 60 total timeframes between primary clinician contacts. Fifty-six of 60 or 93 percent occurred weekly. Four of 60 or 7 percent did not occur weekly. For the sampled inmates, RJD was compliant regarding routine primary clinician contacts.

Under the Program Guide, at the conclusion of the evaluation process and within 14 calendar days of arrival in the EOP, the IDTT was required to develop a treatment plan in an initial IDTT. Ongoing IDTTs were considered compliant if they occurred within 90 days of the previous IDTT.

The time between IDTTs was defined as a timeframe and included the time between the initial IDTT and the first routine IDTT and each subsequent routine IDTT during the review period.

Fourteen of 15 or 93 percent of initial IDTTs of the sampled inmates were compliant with required Program Guide timelines. Of the 12 initial IDTTs, all required staff were present during nine of 12 or 75 percent.

There were 16 total timeframes between all IDTTs (initial and routine and each subsequent routine) for the 15 inmates in the sample; all occurred within less than 90 days. RJD was compliant regarding routine IDTTs for the sample.

RJD was non-compliant regarding IDTT staffing during routine IDTTs in mainline EOP; in all instances of non-compliance, the psychiatrist was not present.

Information provided by RJD regarding the provision of structured therapeutic activities showed that for the review period 16.21 hours were scheduled, 12.53 hours were offered, 7.17 hours were attended, 5.56 hours were refused, and 4.09 hours were cancelled.

The monitor's expert observed two group therapy sessions on A Facility. One group entitled "Explore Feelings" was facilitated by a psychologist and included six participants. The group occurred in an open, but partitioned area in the EOP treatment building on A Facility. This area was not optimal for groups as staff and inmates walked by frequently and confidentiality was poor. Group participants were actively involved in the group therapy

session, and the therapy appeared to be beneficial. Participants were interviewed after the group. They reported issues of concern, including inappropriate behavior by custody housing officers and poor consistency of CC Is. They also reported dissatisfaction with the poor quality of food, which they said was undercooked and insufficient in quantity.

The monitor's expert also attended an RN led group entitled "Cage the Rage." There were six group participants. Similar themes were expressed by group participants as issues of concern, including inappropriate custody behavior (excessive use of force, retaliation, and harassment), cold meals, malfunctioning showers, and having to choose between showers and group therapy. They reported satisfaction with the mental health services provided to them.

RJD implemented a locally developed "Level of Care Review Support" process to facilitate improved documentation and ensure appropriate level of care determinations. This process was developed to work in concert with the headquarters generated EOP review process. Review of provided documentation indicated that the process involved a detailed health care records review, documentation of collateral information from custody, nursing, and other staff, and discussion of aftercare for those inmates changed to 3CMS from the EOP level of care.

The monitor's expert met with the chief of mental health, the chief psychologist, and a psychology supervisor to discuss the process. Although the process allowed for more comprehensive review and evaluation of proposed level of care changes, concern was noted regarding wording in the documentation which indicated a clear focus on downgrade from EOP to 3CMS rather than evaluation of the inmate to determine the appropriate level of care, which could also result in an increase in the level of care. The mental health supervisory staff was receptive to changes in the documents to better communicate the need for referral to the appropriate level of care, whether that change was an increase or decrease in the level of care.

This was particularly important as observations of IDTTs at RJD indicated a focus on downgrading the level of care from EOP to 3CMS and little discussion of consideration of referral to higher levels of care.

The monitor's expert met with a group of A Facility EOP inmates to discuss the mental health treatment provided. Inmates reported that they were seen timely by their psychiatrists and primary clinicians for clinical contacts in a confidential setting. They reported timely IDTT meetings with appropriate team participation, including discussion of treatment goals.

These A Facility inmates reported that the EOP supervisor focused on removal of EOP inmates to the 3CMS program prematurely. They also expressed concern that custody officers had undue influence on mental health staff regarding removal from the program.

A major area of focus was complaints regarding inappropriate custody behavior. The inmates cited several incidents in which officers used excessive force with EOP and ADA inmates. They noted that the tower officer was extremely punitive, refusing to allow inmates in and out of the unit and their cells and closing the door on inmates. They also reported retaliation when incidents were reported. They cited loss of programming due to not being released from their cells. They reported that during December 2018, ten yards and 12 dayrooms were cancelled and during February 2019, 19 yards and 20 dayrooms were cancelled in building 2. They reported that the tower officer even announced over the intercom that one inmate had been transferred from C Facility; C Facility was SNY, and that information would likely result in the inmate being assaulted.

A Facility inmates also reported malfunctioning showers and officers taunting inmates over the intercom. Inmates reportedly were not provided with rain gear resulting in low group attendance.

Extremely troubling were reports of bad food that was at times spoiled and insufficient in quantity. As a result, they reported that some inmates even ate food from the garbage cans and that some inmates claimed ownership of specific garbage cans for this purpose. Custody officers reportedly laughed at inmates that were observed in these actions.

Due to concern regarding the very troubling reports regarding A Facility EOP inmates, the monitor's experts and the Deputy Special Master met with the warden. In response, the warden, Deputy Special Master and monitor's experts toured the A Facility EOP housing units where the inmates repeated their previous reports. The warden made specific commitments to remedy the several problems.

The monitor's expert and a monitor met with a group of C Facility EOP inmates to discuss the mental health treatment provided. Inmates reported that they were timely seen in a confidential setting by their psychiatrists and primary clinicians for clinical contacts. They reported timely IDTT meetings with appropriate team participation, including discussion of treatment goals. Some of the inmates reported that they received their psychiatric treatment by telepsychiatry, and there were mixed comments regarding this provision of services.

When questioned regarding the yard mixing of EOP and non-MHSDS and 3CMS inmates, the inmates reported that they intermingled with non-EOP inmates in work and in some sports activities. They reported that general population inmates had been transferred to C Facility where they subsequently assaulted EOP inmates to achieve removal from the yard.

The C Facility inmates made numerous reports and expressed concerns against custody officers whom the inmates reported provoked and cursed at EOP inmates, at times made false charges and assaulted EOP inmates. They reported incidents of retaliation from custody staff. One elderly EOP inmate in a wheelchair reported an incident in which the door was closed on

him by the tower officer.  The inmates also reported that officers frequently did not allow inmates to leave their cells for medication passes.

These C Facility EOP inmates expressed concerns that they were informed in their IDTT meeting that their time in the EOP was limited and that they would ultimately be transferred to the 3CMS program.  One inmate expressed anxiety regarding this issue as he reported that he was told that he would only be allowed to remain in the EOP for one year, despite his history of PC 2602 involuntary medications for grave disability and recent disorganized behaviors.

The monitor's expert met with a group of E Facility EOP inmates to discuss the mental health treatment provided.  Inmates reported that they were seen timely by their psychiatrists and primary clinicians for clinical contacts in a confidential setting.  They reported that they were released from their housing pods at 6:30 a.m. and the pods were locked at 8:45 p.m.  The inmates requested more core groups and reported that there were waitlists for some groups; this information was confirmed by EOP supervisory staff.  Inmates reported timely IDTT meetings with appropriate team participation.

When questioned regarding the yard mixing of EOP and non-MHSDS and 3CMS inmates, some E Facility inmates reported that there had been some non-MHSDS inmates who had been housed in the EOP housing unit; however, this practice had been discontinued.  The inmates also expressed concern regarding the behavior of some custody officers who did not respond to reports of suicidal ideation, made disparaging comments about EOP inmates, and openly discussed EOP clinical issues.

During the interviews, E Facility EOP inmates reported that canteen and groups occurred at the same time, resulting in inmates having to choose between the two.  They also expressed

concern that there was no assistance for EOP DDP/ADA inmates requiring additional care due to their disabilities.

Some inmates on E Facility expressed concern that they perceived that other inmates were privy to confidential information as they were occasionally informed of appointments by other EOP inmates in their housing units. The expert met with the chief of mental health to discuss this issue. RJD developed an inmate program which was monitored by custody staff known as "Humanity was Every One Person" (HEOP) to assist lower functioning EOP inmates in self-care, appointments and other duties. The participants were also EOP inmates. Although the program was run by custody staff, mental health supervisors met with the program frequently and reviewed procedures regarding confidentiality. Based upon the information provided, it did not appear that the program as described breached patient confidentiality.

The monitor's expert conducted tier walks with the CDCR regional administrator in the A Facility EOP housing units on March 19, 2019. Housing officers were initially interviewed to identify inmates of concern for whom additional scrutiny was provided. Some inmates were identified during the tier walks who needed mental health follow-up or follow-up by the regional administrator. Common themes were reported of inappropriate custody behavior, custody retaliation, turnover of CC Is, cold and malfunctioning showers, and reports of fear and assaults by inmates regarding SNY/non-designated yard issues.

During the tier walks, an incident occurred in which an inmate was released from his cell, and he immediately began pounding on the door of his neighbor and threatening harm to that inmate. This inmate was identified by a housing officer as an inmate of concern, and it was noted that there was water coming from his cell. He reportedly had been agitated on the prior night banging on his cell door, disturbing his neighbors. It was noted that there was no

813

immediate custody intervention observed regarding this incident, despite the inmate loudly threatening the other inmate. The regional administrator indicated that the inmate would be referred to the primary clinician and would be seen for follow-up.

After the tier walks, the monitor's expert met with the A Facility EOP supervisor. She reported that clinicians were instructed to document inmate reports of inappropriate custody behavior and to submit this documentation up their chain of command. This information was confirmed by the chief of mental health.

3CMS:

Two psychiatrists in the mainline 3CMS carried caseloads of 1:357 and 1:418 inmates; two other psychiatrist carried caseloads of 1:211 and 1:239 inmates. A half-time psychiatrist in the mainline 3CMS program had a caseload of 1:123 inmates.

In the 3CMS SNY program in C Facility two primary clinicians had caseloads of 1:124 and 1:126 inmates, while two other primary clinicians with other duties had caseloads of 1:49 and 1:59 inmates. Regarding the 3CMS SNY program in D Facility, three primary clinicians carried caseloads of 1:61-1:85 inmates; a fourth primary clinician had a caseload of 1:133. A part-time primary clinician had a caseload of 1:63 inmates and a primary clinician with additional duties had a caseload of 1:2 inmates.

Program Guide timelines of initial and ongoing IDTT meetings, initial and ongoing psychiatric and primary clinician contacts, and attendance at IDTTs was verified via a random sampling of health care records for inmates in mainline 3CMS. A total of 12 inmates (three from each program) were selected from a current list of mainline 3CMS inmates provided by the institution using a random number sampling website to assess compliance with Program Guide

requirements as documented in EHRS medical records.  Arrival dates and length of time in a facility were provided by RJD.

Three inmates in the sample of 12 were not on psychiatric medication and were removed from the sample for assessment of psychiatry contacts, leaving nine records for review.

Four inmates arrived in the mainline 3CMS program at RJD during the review period. For these inmates, three of four or 75 percent of initial psychiatrist contacts did not occur before IDTT, making RJD non-compliant regarding psychiatrist contacts for the sample.

Regarding ongoing or routine psychiatry contacts, there were 15 timeframes for routine contacts for 3CMS inmates.  Of those fifteen, nine or 60 percent occurred within ninety days and six of 40 percent did not.  RJD was not complaint with ongoing psychiatrist contacts for the sampled inmates.

Four inmates were transferred into RJD's mainline 3CMS program during the reporting period.  Three of four or 75 percent of the sample had initial primary clinician contacts within ten working days of admission, in compliance with the Program Guide.

All routine primary clinician contacts occurred within ninety days and often well within ninety days, making RJD compliant for routine mainline 3CMS primary clinician contacts for the sample.

Four inmates were transferred into RJD's mainline 3CMS program during the review period and three out of four or 75 percent were seen timely for initial IDTTs within 14 working days of arrival.  RJD was non-compliant regarding initial IDTTs for this sample.

Seven inmates in the sample of 12 were not due for an annual IDTT.  They were removed from the sample, leaving five inmates for review regarding ongoing IDTTs.  Of the five inmates

in the sample due for an annual IDTT, all occurred within 365 days making RJD compliant for mainline 3CMS inmate for the records reviewed.

Required staff were present for all initial IDTTs.  Regarding annual IDTTs, all staff were present for three of five or 60 percent of IDTTs in the sample.  In all cases where there was non-compliance it was due to the psychiatrist's absence.  RJD was not compliant with staff attendance at IDTT for 3CMS inmates in the sample.

Observed mainline 3CMS IDTTs were well facilitated; inmates were well-known to staff, and treatment plans included therapeutic groups for those inmates who were interested. Treatment plans needed improvement in use of objective, behaviorally based problems and goals as well as evidence-based interventions, which would guide individual sessions to focus on identified problem areas and interventions outlined in treatment plans.

Documentation showed that there were multiple treatment group offerings in the 3CMS facilities at RJD including several specialized groups for low functioning inmates and DDP 3CMS inmates.  An observed group was well-facilitated with participants clearly engaged, indicating the group was beneficial to them.

Interviewed inmates were generally pleased with the 3CMS program at RJD except for some complaints about custody staff being disrespectful and a lack of continuity of care with primary clinicians.

<u>3CMS Inmates in Administrative Segregation</u>:

The psychiatrist assigned to the EOP hub also provided services in the 3CMS administrative segregation unit.  Three primary clinicians had caseloads of 1:10-1:14 inmates.

RJD was unable to report overall lengths of stay during the review period for 3CMS inmates housed in administrative segregation.

On March 28, 2019, during the site visit, there were 28 3CMS inmates in the administrative segregation unit. For the 28 3CMS in the administrative segregation unit on March 28, 2019, their lengths of stay in administrative segregation averaged 12 days. Three of the 3CMS inmates in administrative segregation had medical holds and stays which exceeded 30 days. Two of the inmates were in administrative segregation for safety reasons after allegedly being assaulted by a group of EOP inmates in C Facility.

Five inmates in the 3CMS administrative segregation unit during the site visit were randomly selected from the inmate list provided by RJD to assess compliance with timely mental health contacts as documented in the health records. Dates of arrival and ICCs were provided by CDCR's regional custody staff.

The dates of the initial psychiatric and primary clinician contacts, subsequent psychiatric and primary clinician contacts, and the initial IDTT and subsequent IDTTs for the sampled inmates were noted. Days between contacts were counted from the start date to the end date, but not including the end date.

Three inmates in the sample were seen for an initial IDTT; there was no documentation of a psychiatric contact in the EHRS. Two of the sampled inmates had not been seen for IDTT as of the EHRS review during the site visit but were not overdue for initial psychiatric contacts. No inmate in the sample required a routine psychiatric contact at the time of the site visit.

All five inmates in the 3CMS administrative segregation sample were timely seen for initial contacts with a range of five to ten working days.

For the one inmate that was in 3CMS administrative segregation long enough to be seen for routine primary clinician contacts, there were three routine contacts with seven days between each contact.

According to the Program Guide, the initial 3CMS administrative segregation IDTT must occur before ICC. One inmate in 3CMS administrative segregation admitted on March 16, 2019 had not had an ICC and was removed from the sample leaving four records for review. Of the remaining four records, there was only one record where there was documentation of an initial IDTT before ICC. No inmate in the sample required a routine IDTT at the time of the site visit.

Five administrative segregation 3CMS inmates were interviewed in a group setting. They complained about EOP inmates receiving priority for both mental health services and correctional programming such as educational activities. They reported reasonable access to the psychiatrist, but also indicated that they were not seen at least every 90 days by a psychiatrist. They reported that they were not seen on a weekly basis by their primary clinician.

The inmates reported generally having access to ten hours per week of outdoor recreational activities.

Other Issues:

Pre-Release Planning:

RJD provided pre-release planning services to inmates to improve their preparation for successful re-entry into the community through increased emotional support, relationship skills, problem solving skills, knowledge of pre-release support services in the community, medication, transportation, housing and employment.

The institution reported a total of seven EOP pre-release groups per week and five 3CMS pre-release groups per week. The institution also reported a total of six recreation therapist pre-release groups per week. Each group had an identified mental health provider leading the group.

During the review period, a total of 191 MHSDS inmates were seen by Transitional Case Management Program (TCMP) staff regarding Supplemental Security Income (SSI), MediCal and Veteran benefits.

Program Access:

f.   Job and Program Assignments:

On March 1, 2019, RJD reported that of 1,738 available jobs, 237 EOP inmates, or 31 percent of the EOP population, held job assignments.  For 3CMS inmates, 653 or 47 percent of the 3CMS population held job assignments, and for non-MHSDS inmates, 848 or 51 percent of the non-MHSDS population held job assignments.

For the 876 academic assignments, RJD reported that 199 EOP inmates, or 26 percent of the EOP population, held assignments.  For 3CMS inmates, 368 or 26 percent of the 3CMS population held assignments, and for non-MHSDS, 309 or 18 percent of the non-MHSDS population held assignments.

Of 66 vocational education assignments, 11 or one percent of EOP inmates held assignments, as did 19 or one percent of 3CMS inmates, and 36 or two percent of non-MHSDS inmates.

There were 526 voluntary education assignments; 53 or seven percent of EOP inmates held assignments, as did 182 or 13 percent of 3CMS inmates, and 291 or 17 percent of non-MHSDS inmates.

Regarding 182 substance abuse treatment assignments, it was reported that 34 or four percent of EOP inmates held assignments, as did 69 or five percent of 3CMS inmates, and 79 or five percent of non-MHSDS inmates.

RJD conducted staff training regarding EOP inmate program assignments during February 2018. As a result, 94 percent of psychologists and social workers were trained. The institution provided training materials and curriculum and training attendance sheets.

The institution also provided a copy of the EOP functional evaluation that IDTTs reportedly performed for all EOP inmates and was used to document any functional impairment. This functional evaluation was the mechanism that was used to determine the programming activities in which EOP inmates could participate and that were documented on the CDCR 128-C. It was further reported that the UCC relied on the information reported on the CDCR 128-C and other case factors to program inmates.

g.  Milestone Credits:

A report for September 1, 2018 to February 28, 2019 indicated that of 762 EOP inmates, 712 or 93 percent were eligible to earn milestone credits and 88 percent earned the credit. For 3CMS inmates, 1,271 of 1,396 or 91 percent were eligible to earn milestone credits, with 22 percent earning the credit. The data further reflected that of 1,673 non-MHSDS inmates, 1,523 or 91 percent were eligible to earn milestone credits, with 23 percent earning the credit.

The institution also provided additional documentation related to milestone credits, including staff training classes and attendance rosters, curriculum, and related materials for some of the programs through which inmates earned milestone credits.

h.  Out-of-Level Housing:

Provided data indicated that on March 7, 2019, 25 EOP and nine 3CMS Level I inmates were placed in Level II housing, and one EOP and four 3CMS Level I inmates were placed in Level III housing; 61 EOP and 260 3CMS Level II inmates were placed in Level III housing, and three EOP and three 3CMS Level II inmates were placed in Level IV housing; 18 EOP and three

3CMS Level III inmates were placed in Level II housing, and 11 EOP and 16 3CMS Level III inmates were placed in Level IV housing; and 41 EOP and 102 3CMS Level IV inmates were placed in Level III housing.

i.    ADA Reasonable Accommodations and Grievance Procedure

RJD confirmed that it had instituted the revised ADA accommodation and grievance procedures, which included a grievance process to accommodate psychiatric disabilities.  RJD further reported that the institution's Reasonable Accommodation Panel ("RAP") met weekly to review grievances, which typically averaged between 30 and 40 weekly grievances.

j.    Periodic Classification Score Reduction: EOP Inmates:

For the reporting period, RJD produced completed Form CDC 840s that indicated that RJD was providing periodic classification score reductions for EOP inmates.

Case-by-Case Reviews:

RJD reported that there was one inmate who required a case-by-case review during the reporting period.  The inmate had two case conferences; the first occurred after the inmate was housed for 165 days in administrative segregation and the second occurred after 193 days.  All required participants, notably mental health representatives, did not attend the case conferences; however, there were identical mental health reports for both.  A non-administrative segregation placement was not recommended in either case conference; recommendations were directed to where the inmate could be transferred given his medical needs.

Non-Disciplinary Segregation:

RJD reported that during the review period 26 EOP and 22 3CMS inmates were on NDS status, but indicated it was not able to track and report NDS lengths of stay or transfer information.  At the time of the site visit, there were no caseload inmates on NDS status.

A review of logs in administrative segregation revealed that NDS inmates were issued property and phone privileges and were approved for expedited transfer.

"C" Status:

On March 20, 2019, during the site visit, there were three EOP inmates on "C" Status, with stays of 92, 84, and 77 days. There were also 15 3CMS inmates on "C" Status with stays that ranged from one day to 141 days. The institution was not able to report the number of EOP, 3CMS, and non-mental health inmates who were placed on "C" Status or their "C" Status lengths of stay during the reporting period.

Mental Health Referrals:

RJD reported the number of responses to emergent, urgent, and routine mental health referrals by discipline without indicating level of compliance. RJD did not report whether not these contacts occurred in confidential settings nor provide data regarding referrals to CIT.

Mental Health/Custody Relations:

Generally, it was observed during the site visit that RJD needed to improve its custody and mental health relationships at all levels. The warden and chief deputy warden were meeting with the CEO and other mental health managers; however, the process of mental health staff documenting statements/complaints of inmates made during confidential clinical contact was a concern.

The Custody and Mental Health Partnership Local Operating Procedure (LOP) was generally in alignment with the Custody and Mental Health Partnership Plan submitted by CDCR headquarters to the court. RJD's LOP expanded the executive rounding staff to include the chief psychologist. RJD also included associate wardens in their executive joint rounding in place of the warden in some instances, which was contrary to the plan approved by the court.

Regarding dissemination of information for joint rounding, RJD added that the information could be shared with line staff, a positive finding.

Executive leadership joint rounding was conducted monthly between June 2018 and January 2019 except for August 2018.  Identified issues typically were related to staffing needs and access to care issues derived mainly from staff concerns.  There was no documentation of concerns disclosed by inmates.

Per policy, a summary of executive leadership rounding was required to be included in the quality management committee and mental health subcommittee minutes.  There was no documentation of executive leadership rounding in the quality management committee minutes. Documentation in the mental health subcommittee was not in accordance with the policy requirement regarding programs that were rounded, critical topics identified, and which staff conducted rounds.  Of concern, there was documentation of when rounds would occur despite the need for the rounds to be unannounced per policy.  Mental health leadership was made aware of this during the site visit.

Documentation of huddles was reviewed.  The huddle report provided in the LOP was not used in the MHCB, EOP hub, or E Facility.  When the huddle report was used, each area was not consistently completed and thus it was not determinable if it was not filled because the area did not apply or because it was not discussed.  Documentation was incomplete and custody staff for Third Watch huddles was not fully represented during the review period.

RJD was unable to document that all required custody and mental health staff had received quarterly partnership training during the previous year.  It was apparent from the review that RJD needed to improve its documentation of partnership training and begin to track staff required to attend in order to demonstrate compliance with the partnership plan.

During the past year 345 inmate appeals had been filed by inmates as staff complaints. Of those 345 appeals, 252 were granted in part, 33 were withdrawn by the inmate, and three were cancelled. The remaining 60 appeals were denied or were pending a response. A total of eight appeals were referred to the institution investigative unit for an allegation inquiry and three were referred to the Office of Internal Affairs for investigation. Additionally, ten appeals were cancelled and assigned for investigation outside of the appeal process. One custody staff member had been redirected to the mail room as a result of a staff complaint appeal.

RJD staff advised the monitor of a process used by mental health staff to document statements/complaints made to them by inmates during mental health appointments or group treatment. The mental health staff were encouraged to write a memorandum to their supervisor documenting these statements/complaints which would then be forward to the chief deputy warden for action. A sergeant was assigned to conduct an inquiry into the statements/complaints made in the mental health staff's memorandum. It was observed and reported to RJD staff that this process had the potential to impact relationships between inmates and mental health staff and between custody and mental health staff.

As reported above, a major area of focus for interviewed EOP inmates was inappropriate custody behavior. The inmates cited several incidents in which officers used excessive force with EOP and ADA inmates and noted that the tower officer was extremely punitive, refusing to allow inmates in and out of the unit and their cells and closing the door on inmates, resulting in a loss of programming. Inmates also reported being taunted over the intercom by custody officers. Inmates further reported they would be retaliated against for voicing their complaints.

Heat Plan:

The institution prepared a monthly heat report that was submitted to CDCR headquarters. RJD also produced LOP No. 54 entitled "Heat Plan & Heat Risk Medications," which had been revised as of May 2018.

For the review period, RJD reported two Stage I heat alerts but no Stage II or Stage III heat alerts. Both Stage I heat alerts occurred in October 2018. No inmates experienced a heat-related illness due to these heat alerts. Reviewed heat logs indicated the recording of inside temperatures every three hours by the control booth officer for the various housing units. All thermometers in the housing units appeared to be operable and accurate; the thermometers' sensors hung from the second floors' ceilings, but not in a location that was in front of swamp coolers or fans.

The monitoring team interviewed custody officers from two buildings each from all five facilities regarding the heat plan protocols. Although most officers had general knowledge of the heat plan, many lacked specific knowledge of the procedures that were required to be performed at the various stages of the heat plan.

RVRs:

The institution reported two of six or 33 percent of the correctional administrators attended the mandatory mental health input into the RVR process training. Four of six captains or 66 percent attended the training, 11 out of 34 lieutenants or 32 percent and 12 of 84 or 14 percent of the sergeants attended the training.

For mental health staff, three of four chief psychologists or 75 percent attended the mandatory mental health input into the RVR process training, 17 of 18 senior psychologists or 94 percent attended the training, and 100 percent of RJD's psychologists, 40, attended the training.

RJD was not meeting its training requirements, timeliness of forwarding RVRs to mental health staff, senior hearing officer documentation of mitigation of penalties as a result of mental health assessment recommendations, errors in identifying mental health assessment recommendations, and some clinical staff used inappropriate canned language in mental health assessment responses.

For the review period there were a total of 2,537 RVRs issued to RJD inmates including inmates who were not physically at RJD when the violation occurred or when the hearing occurred. Of the 2,537 RVRs, 64 were issued to inmates at the MHCB level of care, 667 RVRs or 26 percent were issued to inmates at the EOP level of care, 1,063 RVRs or 42 percent were issued to inmates at the 3CMS level of care, and 732 RVRs or 29 percent were issued to non-MHSDS inmates.

The institution reported a total of five RVRs where the mental health assessment recommended alternative discipline due to the behavior being strongly influenced by the inmate's mental illness. Four out of the five RVRs were reduced to a counseling chrono by the captain and one RVR proceeded to the senior hearing officer for adjudication.

A total of 25 RVRs were reviewed for compliance with CDCR policy and procedure. Custody staff referred the RVR to mental health staff within policy timelines in seven out of 25 cases or 28 percent. Mental health staff completed the mental health assessment and timely returned the RVR to custody staff 100 percent of the time. The senior hearing officer documented their consideration of the mental health assessment information in 20 cases or 80 percent. The clinician recommended mitigation of penalties in eight or 32 percent of the RVRs reviewed. Of the eight cases where mitigation was recommended, the senior hearing officer mitigated the penalty in six or 75 percent of the RVRs. In seven RVRs or 28 percent, the senior

hearing officer indicated the mental health assessment recommended mitigation of penalties when in fact the mental health assessment did not recommend any mitigation of penalties.

In eight out of 25 mental health assessments or 32 percent the mental health clinician used canned responses when answering the question regarding mitigation of penalties. Additionally, the canned language was not responsive to the question.

Use of Force:

RJD reported that the warden and chief deputy warden had not attended mandatory use of force training within the past year. Five of five correctional administrators attended the training, five of six captains or 83 percent attended the training, 29 of 32 lieutenants or 90 percent attended the training, 77 of 84 sergeants or 92 percent attended the training and 810 of 872 correctional officers or 93 percent attended the training. For mental health staff, 100 percent of chief psychologists, psychologists, psychiatrists, and social workers attended the mandatory use of force training.

The institution reported a total of two controlled use of force incidents during the review period; both occurred in administrative segregation. RJD reported a total of 78 immediate use of force incidents involving 26 MHSDS inmates and 52 non-MHSDS inmates during the review period.

The monitor reviewed the two controlled use of force incidents; one was found to violate CDCR policy. One incident involved a cell extraction of the inmate from administrative segregation for placement into an MHCB due to decompensation. Following the cell extraction, the inmate was issued an RVR for obstruction of a peace officer in the performance of their duty. CDCR policy prohibited the issuance of an RVR in order to transfer an inmate to a higher level of mental health care. This error was not corrected during the use of force executive review.

The monitor reviewed four immediate use of force incidents; all incidents were determined to be in compliance with CDCR policy and procedure.

Lockdowns/Modified Programming:

There were no program lockdowns during the review period.  However, there were several periods of modified programming in A Facility, due to increased violence towards EOP inmates, which occurred during or near the review period.  The institution reported that no other facilities in the institution were placed on modified programming or lockdown during the reporting period.  RJD indicated that modified programming in A Facility was tailored to address identified issues.  During instances of modified programming, groups were not permitted, only individual appointments were allowed, and inmates required escorts to mental health appointments.

During one period of modified programming, certain identified inmates were precluded from participation in 3CMS groups but could participate in 1:1 meetings.  A modified program was instituted in one case due to a chickenpox outbreak, leading to certain identified inmates going to 1:1 meetings but not groups.  There was modified programming on A Facility due to a riot.  RJD indicated that modified programming following the riot was limited to inmates who were identified as members of gangs.  For these inmates, only priority ducats were permitted, and mental health meetings were conducted 1:1 as no groups were permitted.

Access to Care:

A review of RJD's monthly Health Care Access Quality Reports from August 2018 to January 2019, indicated that three percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while eight percent were not completed due to non-custodial reasons, excluding inmate refusals.

<u>Non-Designated EOP</u>:

Two EOP housing units on A Facility were identified as non-designated while the remaining three housing units on A Facility were general population.  During the review period, A Facility had two program lockdowns or program modifications that appeared to be related to its non-designated status.  Staff received confidential information that an EOP inmate would be murdered as a message to the administration that certain inmates will never program on a non-designated yard; confidential information was received identifying two inmates as targets of assault; 20 uncontrolled weapons were found on A Facility; and six batteries with a weapon on EOP inmates occurred over a two-week period of time.  Inmates identified as potential security threats were removed from A Facility and placed in administrative segregation.

The second modified program was initiated due to four assaults on EOP inmates by security threat group (STG) associates, information obtained during inmate interviews regarding inmates programming on a non-designated yard, and inmates being pressured to produce their "paperwork" regarding their conviction.  Inmates identified as pressuring other inmates for paperwork were placed in administrative segregation.  RJD reported that the warden, chief deputy warden, associate warden and captain toured Facility A multiple times during the modified program and spoke with staff and inmates.

At the time of the site visit, A Facility had been on normal program status since February 26, 2019.

A Facility was toured with the warden and chief deputy warden to speak with inmates during the site visit.  The issues and concerns raised by the inmates interviewed included, lack of hot water in the showers, limited shower times, (Tuesdays and Thursdays Second Watch only),

small food portions, yard releases delayed or cancelled for unknown reasons, allegations of disrespect by a correctional officer, and linen exchange delays.

The inmates further stated that the process used for mental health treatment group release and mental health ducats were good and no delays were noted.  Inmates interviewed stated the right inmates had been removed from Facility A to quell the threats, however, they were concerned about what type of inmates would be transferred to RJD to fill the now empty beds.

The monitor interviewed the chief deputy warden who stated that through investigations and interviews with inmates and staff, the Southern Hispanic inmates had been identified as the group instigating most of the program disruptions on A Facility.  The Southern Hispanic inmates had stated they would never program on a non-designated yard.  The institution had transferred approximately 150 Southern Hispanic inmates off A Facility since December 2018.  The chief deputy warden also advised the monitor he had requested approval to transition the entire Facility A to non-designated and not just limit it to certain housing units on A Facility.  The mixing of non-designated inmates with general population inmates had been identified as a concern by RJD executive staff.

At the time of the site visit. RJD had taken appropriate steps to reduce the threat of violence to EOP inmates on A Facility by non-MHSDS inmates.  More than 150 inmates identified as a threat to EOP inmates (i.e., Southern Hispanic inmates) had been transferred off A Facility.  This action was similar to the remedial action taken at San Quentin State Prison (SQ) when it transitioned to non-designated status, however, unlike SQ, where the entire institution converted to non-designated, at RJD, two out of the five housing units on A Facility were non-designated EOP housing.  The mixing of non-designated EOP inmates and general population inmates on A Facility remained a concern.  RJD executive staff reported that their request to

convert the entire A Facility to non-designated status was under consideration by CDCR headquarters at the time of the site visit.

*Coleman* Postings:

A tour of housing units of the facilities where MHSDS inmates were housed revealed that RJD had current *Coleman* posters in English and in Spanish.

Document Production Issues:

The site visit revealed multiple difficulties with the ability of RJD to produce requested documentation.  Among them, the MHCB referrals report and the institution's spreadsheet of alternative housing stays were not reconciled and provided conflicting data.

The institution did not produce information on the average daily mental health census of 1:1 watch when the request was made on site.  While onsite, the monitor noted that the electronically provided program status reports for the modified programing which ran from February 8 through February 27, 2019 and February 15 through February 27, 2019 appeared incomplete and was different from the printed material provided by RJD.  The updated institutional submission regarding this issue did not resolve the issue.

RJD did not report compliance with its responses to emergent, urgent, and routine mental health referrals during the review period.

The institution did not produce NDS lengths of stay for inmates no longer at RJD; during the site visit, it was further reported that SOMS was unable to track NDS "historical data" such as length of stay for inmates no longer at the institution.  The institution also did not provide all daily program status report documents, reporting that some were missing.

The total number of immediate use of force incidents reported by RJD staff were not consistent with the sum of the breakdown of incidents by location.  Staff was unable to provide

any useful explanation for the discrepancy. Data provided regarding the breakdown by facility of the non-use of force incidents involving MHSDS inmates and non-MHSDS inmates did not match the total number of reported non-use of force incidents.

The institution did not produce a sample of ICC chronos for inmates within 120 days of their MERDs.

**Central California Women's Facility (CCWF)**
February 1, 2020 – April 30, 2020

Census:

On May 15, 2020, CCWF housed 2,634 inmates: a nine percent decrease from the preceding site visit. The mental health caseload population was 1,366 inmates or 52 percent of the total inmate population for an increase of less than one percent since the preceding review period.

Five inmates were in the MHCB and there were no inmates in alternative housing.

There were 113 mainline EOP inmates and 1,018 mainline 3CMS inmates.

The total administrative segregation population was 107 inmates, including 12 inmates in the EOP hub.

The total reception center population of 368 inmates included 149 3CMS inmates and five inmates in reception center STRH.

There were 64 inmates in the mainline STRH.

There were three MHSDS inmates on NDS status.

Staffing:

As of May 2020, CCWF did not have an allocated chief psychiatrist position. The senior psychiatrist position was filled.

One of two chief psychologist positions was filled for a 50 percent vacancy rate.

All three senior psychologist supervisor positions were filled. CCWF employed four senior psychologist specialist positions which was .5 more than the allocated positions.

Five of 10.5 onsite staff psychiatrist positions were filled resulting in a 52 percent vacancy rate. The telepsychiatry position was not filled.

Twenty-five of 27.5 staff psychologist positions were filled for a vacancy rate of nine percent.

The supervising social worker position was filled. All 16 clinical social worker positions were filled.

CCWF employed seven recreational therapist positions which was .5 more than the allocated positions.

The CHSA II and OSS II positions were filled. Two of the 2.5 HPSI positions were filled for a 20 percent vacancy rate. Fourteen of the 14.5 office tech positions were filled for a three percent vacancy rate.

Transfers/Referrals:

CCWF referred four inmates to acute care during the review period; two inmates transferred, and two referrals were rescinded. Both inmates transferred within ten days of IDTT referral to headquarters, although neither inmate transferred within 72-hours of a bed assignment. There were no *Vitek* hearings for inmates referred to acute care.

CCWF referred 16 inmates to intermediate care; five referrals were accepted and 11 were rescinded. Four of the five accepted inmates transferred within 30 days; relevant dates were not provided for one inmate endorsed to DSH-Patton. Four of five or 80 percent of transfers to intermediate care did not occur within 72-hours of a bed assignment. Two inmates referred to intermediate care had *Vitek* hearings but did not prevail.

One of the inmates referred to intermediate care and rescinded was thereafter referred to acute care and transferred within 24 hours.

Between February 1 and April 30, 2020, CCWF referred 204 inmates to MHCBs, of which 128 transferred. There were 62 admissions to CCWF's MHCB and 66 to CIW. Of the 128 MHCB admissions, 98 percent transferred timely. The average time to transfer was 0.5 days.

There were 136 inmates who met criteria for intermediate or acute care but were not referred. Clinical staff did not adequately document rationales underlying their decisions not to refer to inpatient care.

Programming:

Reception Center:

EOP:

There were no EOP inmates in the reception center at the time of reporting.

3CMS:

Healthcare record reviews indicated CCWF did not provide adequate mental health care to reception center 3CMS inmates during the review period, except for medications.

Mental health screenings and PC initial assessments were completed timely and records indicated that CCWF ensured continuity of psychiatric medication upon arrival at the reception center.

There were several shortcomings with documentation. Diagnoses were not easily located in the EHRS system and criteria to support diagnoses, including functional impairments resulting from symptoms and duration of symptoms, were often not documented. While progress notes discussed symptoms in general terms, specific manifestations of symptoms were not discussed in detail.

Overall, initial treatment plans did not comply with Program Guide standards as they were found to be unclear and generic rather than individualized.

835

Finally, all inmates reviewed were in the reception center beyond the 90-day transfer timeline, including two inmates who had been in the reception center for approximately seven months, and another one for approximately five months. The impact of COVID-19 on the delayed transfers was not discernible from the record reviews.

Administrative Segregation EOP:

Record reviews indicated that CCWF did not consistently provide adequate mental health treatment to Administrative Segregation EOP Hub inmates during the review period. Although some of deficiencies may have been connected with COVID-related restrictions, there was not sufficient documentation provided in the records reviewed to assess if this was the case.

The lack of clear and consistent documentation was a concern across all health records reviewed for this institution. For instance, inmates were offered group treatment, but the nature of the groups was not always clear from the healthcare record. Psychologist-led groups were documented as recreational therapy groups rather than clinical or process groups. In addition, there was a pattern of cell-front clinical contacts and justification for the non-confidential appointments was not consistently documented.

COVID-19 related restrictions appeared to present challenges for clinicians and inmates, as records indicated that staff struggled to manage complex inmates. These programmatic restrictions appeared to negatively impact the development and implementation of structured treatment goals. Specifically, assisting inmates with the acquisition of skills necessary to control their behavior, including self-injurious behavior, was a challenge. Despite these challenges, some inmates were successfully stabilized while others required referral to higher levels of care.

Records of eight of the 12 inmates in the administrative segregation EOP hub were reviewed to assess compliance with Program Guide requirements regarding timeliness of IDTT, psychiatric and PC contacts.

There was 100 percent compliance for initial psychiatric evaluations.  Ninety-one percent of routine psychiatric contacts were compliant.

There was 100 percent compliance for initial PC evaluations and 60 percent of required PC contacts were timely.

One hundred percent of initial IDTTs occurred within 14 days and were compliant.  No inmates required routine IDTTs during the review period.  However, one inmate was seen earlier than 90 days to address the inmate's level of care.

Regarding staff attendance, required staff attended 100 percent of initial and routine IDTTs during the review period.

MHCB:

During the review period, 64 inmates discharged from the MHCB at CCWF.  Of those, ten inmates or 16 percent had clinical lengths of stay longer than ten days with a range of 11 to 34 days.  Seven inmates or 11 percent took longer than 72 hours to transfer after clinical discharge, although four transfers were delayed due to medical holds.  Six inmates had two MHCB admissions during the review period.

CCWF did not provide adequate mental health care to MHCB inmates during the review period.  Continuity of care was a significant problem in the MHCB, resulting in negative impacts to inmate care.  Clinicians conducted treatment and rounding on alternating days which led to clinical contacts with the same provider occurring only twice weekly.  Further, clinicians failed to consider other providers' progress notes and documentation when making inmate care

decisions. As a result, clinicians discharged inmates from the MHCB even though the health record indicated treatment goals had not been met, inmates' suicide risk had elevated, and higher levels of care should have been considered, but were not.

The quality of treatment plans varied. Generally, treatment plans were only adequate when the clinician did not rely on IPOC pull down menus in the EHRS. When inmates met acute or intermediate level of care indicators on the treatment plan form, rationales and revised treatment plans were generally adequate. Regardless of the treatment plan's adequacy, clinicians routinely failed to document the implementation of the treatment-planned interventions during clinical contacts.

Clinicians failed to appropriately follow up when inmates expressed safety concerns or made suicidal statements.

At discharge, intermediate level of care was not considered when clinically indicated and rationales for 3CMS level of care determinations were poor.

Randomly selected inmates' health records were reviewed to assess compliance with Program Guide requirements for timeliness of IDTT, psychiatric, and PC contacts.

There was 91 percent compliance for initial psychiatric evaluations. The majority of initial psychiatric evaluations were performed by psychiatric nurse practitioners.

One hundred percent of initial PC evaluations were compliant.

Compliance with daily clinical contacts requirements was not ascertainable from the records reviewed. Clinicians routinely failed to document whether daily contacts occurred in confidential settings. A significant number of daily contacts occurred either cell-front or in cell

and inmate refusals were not documented in the health record; thus, those contacts were not compliant.

Nearly half of the required twice weekly psychiatric contacts occurred cell-front or in cell and inmate refusals were not noted in the health record. Accordingly, these contacts were not compliant.

There was 100 percent compliance for required initial IDTTs and 80 percent compliance for routine IDTTs. Required staff attended 100 percent of initial IDTTs and 90 percent of routine IDTTs. No inmate was discharged without an appropriate discharge IDTT.

STRH:

Record reviews indicated that the adequacy of mental health care provided to STRH inmates varied during the review period.

Across cases, group therapeutic treatment was not documented as having occurred.

There was a pattern of cell-front contacts across cases and justification for non-confidential clinical contacts was inconsistently documented. In one case, a PC progress note indicated the inmate was seen cell-front due to COVID-19 while the record indicated the psychiatrist saw the same patient in a confidential treatment setting on the same day.

Coordination of care and treatment planning were not appropriately documented. There was inconsistent documentation between the PC and psychiatrist, indicating that either the PC or psychiatrist failed to thoroughly or routinely review the record prior to treating the inmate. In one case, the PC did not provide treatment consistent with the inmate's developed treatment plan.

Ten randomly selected inmates' health records were reviewed to assess compliance with Program Guide requirements for timeliness of IDTTs, psychiatric, and PC contacts.

There was 78 percent compliance for required initial psychiatric evaluations and 100 percent compliance for routine psychiatric contacts.

There was 78 percent compliance for required initial PC evaluations and 61 percent compliance for routine PC contacts.

Eighty-nine percent of required initial IDTTs were timely. No inmates required quarterly IDTTs during the review period.

Required staff members attended 100 percent of initial IDTTs during the review period.

EOP:

Record reviews indicated that CCWF provided adequate mental health care to EOP inmates during the review period.

Reviewed records indicated that inmates received overall care consistent with Program Guide requirements. Where the provision of care was impacted by COVID-19, modified programming was appropriately documented. Progress notes were useful and treatment plans were adequate. Treatment was generally consistent with Program Guide requirements,

Ten randomly selected inmates' health records were reviewed to assess compliance with Program Guide requirements for timeliness of IDTTs, psychiatric, and PC contacts.

There was 100 percent compliance for initial psychiatric evaluations and 81 percent compliance for routine psychiatric contacts.

There was 100 percent compliance for initial PC evaluations and 82 percent compliance for routine PC contacts. Notably, EOP caseload groups were appropriately used in lieu of an individual PC contacts 38 percent of the time.

One hundred percent of initial and routine IDTTs were compliant and required staff attended 100 percent of IDTTs.

<u>3CMS</u>:

Record reviews indicated that CCWF did not provide adequate mental health care to 3CMS inmates during the review period.

PC care, documentation, and treatment planning were inadequate in multiple cases. Clinically appropriate care, in line with developed treatment plans or as indicated by inmate needs, was not consistently provided. Documentation appeared to be copied from one assessment or treatment plan to the next without consideration of clinical or housing changes. Despite this, there were instances of thoughtful assessments and appropriate interventions for a few patients.

Psychiatric services appeared to be clinically appropriate overall. However, it appeared that clinicians were not consistently reviewing the patient record, especially documentation written by other disciplines.

<u>Non-Condemned 3CMS Contact Compliance:</u>

Thirteen randomly selected non-condemned 3CMS inmate health records were reviewed to assess compliance with Program Guide requirements regarding timeliness of IDTT, psychiatric, and PC contacts. For psychiatric contacts, nine of the thirteen prescribed psychiatric medication were reviewed for psychiatric contacts.

There was 100 percent compliance for the two inmates who required initial psychiatric evaluations, and 75 percent of required psychiatric routine contacts for the sample occurred timely.

For PC contacts, all 13 randomly selected inmate's healthcare records were reviewed. For the five inmates that required initial PC evaluations, one or 20 percent were completed

timely. Initial PC contacts did not generally appear to occur within the required timeframe of ten days. Routine PC contacts were compliant 83 percent of the time.

For initial IDTT's, six of 13 cases or 17 percent were completed within Program Guide timeframes for non-condemned 3CMS inmates. Five cases required annual IDTTs; two or 40 percent were completed timely. Required staff attended 100 percent of IDTTs for the non-condemned 3CMS population.

Condemned 3CMS Contact Compliance:

Ten randomly selected condemned 3CMS inmate health records were reviewed to assess compliance with Program Guide requirements regarding timeliness of IDTT, psychiatric, and PC contacts. No condemned inmates in the reviewed sample required initial psychiatric evaluations during the review period. Although 100 percent of routine psychiatric contacts were completed timely, 98 percent of those contacts occurred cell-front, either due to inmate refusals or COVID-19 program restrictions.

No condemned 3CMS inmates in the reviewed sample required initial PC contacts during the review period. Again, while 95 percent of routine PC contacts for the condemned 3CMS population were compliant, the majority of contacts occurred cell-front, either due to inmate refusal or COVID-19 program restrictions.

No condemned 3CMS inmates required initial IDTTs during the review period and 100 percent of annual IDTTs were compliant for the reviewed condemned population. Required staff attended 50 percent of IDTTs for the 3CMS condemned population during the review period.

RVRs:

Twenty-three RVRs were reviewed for compliance with Program Guide requirements.

Custody staff referrals to mental health staff were timely in ten or 43 percent of cases. Mental health staff completed the mental health assessment and timely returned it to custody staff 100 percent of the time.  Overall, the information provided by mental health staff was timely and useful.  Senior hearing officers documented their consideration of the mental health assessment information in 17 or 74 percent of cases.  The mental health assessment recommended mitigation of penalties in 13 or 57 percent of the RVRs reviewed and the senior hearing officer mitigated the penalty in twelve or 92 percent of cases where mitigation was recommended.  In 15 percent of cases, the senior hearing officer dismissed the charges based on the information provided in the mental health assessment.

In one case, mental health staff recommended alternative discipline due to the inmate's behavior being strongly influenced by mental illness.  In this case, policy was not followed as the required captain's review document was not provided, nor did the senior hearing officer address the captain's review and decision within the hearing section of the RVR.

**Valley State Prison (VSP)**
Review Date - June 5, 2020

Census:

On June 4, 2020, the total population was 3,062 inmates; a ten percent decrease since the preceding monitoring period. The mental health caseload population was 1,431 inmates, a decrease of 305 inmates, or 18 percent. The mental health caseload represented 47 percent of the total inmate population, including 341 mainline EOP inmates and 1,073 mainline 3CMS inmates. Forty-seven inmates were housed in administrative segregation, including five EOP and 11 3CMS inmates. On June 4, 2020, one inmate was housed at the MHCB level of care in the TMHU. VSP did not have an MHCB.

Staffing:

As of May 2020, there was no chief psychiatrist position, and the one senior psychiatrist position was filled. None of the 2.5 staff psychiatrist positions were filled. Registry psychiatry covered .76 positions, for a functional vacancy rate of 70 percent. VSP had six allocated positions for telepsychiatry, of which 4.7 positions were filled, for a functional vacancy rate of 22 percent.

There were two chief psychologist positions; one was filled, leaving a functional vacancy rate of 50 percent. Of the 3.5 allocated senior psychologist specialist positions, four were filled. All three senior psychologist supervisor positions were filled. The facility reported that one senior psychologist supervisor was out on an extended sick leave, thereby leaving a functional vacancy rate of 33 percent. Of the 19.5 staff psychologist positions, 19 were filled, leaving a three-percent vacancy rate.

The supervising social worker position was filled. All 14 clinical social worker positions were filled, as well as all nine recreation therapist positions.

The CHSA II position was vacant. VSP employed three HPSIs, which was .5 more than the 2.5 allocated positions. The one OSS II position was filled, as well as all 13 office tech positions.

Transfers/Referrals:

During the review period, 43 inmates met the criteria for referral to inpatient care. Of those, two inmates or five percent were referred to acute level of care; there were no referrals to intermediate level of care. One transfer or 50 percent met timeframe guidelines; the other took 12 days.

There were 41 inmates who were considered for inpatient care but were not referred following IDTT review. Record reviews indicated that clinical rationale for non-referral was appropriate. Decisions were individualized and not generic. Treatment planning was an area of weakness as they were not always comprehensive, and clinical summaries were not consistently updated.

During the review period, VSP referred 59 inmates to MHCBs. Of those, 30 inmates or 51 percent were rescinded; 18 or 60 percent of rescissions occurred beyond 24 hours with a range of 1.6 days to seven days. Of the 28 admissions, one inmate transferred after 24 hours. At the time of reporting, the pending transfer was in alternative housing for 1.6 days.

No inmates had three or more MHCB admissions during the review period.

Programming:

TMHU:

TMHU cells, which were developed as an alternative to higher levels of care during the COVID-19 pandemic, lack a therapeutic milieu and offer limited programming, treatment services and multi-disciplinary collaboration in comparison to established higher levels of care.

Reviewed cases revealed that care within the TMHU was inadequate. Treatment guidance was drafted to specify requirements for TMHU care. Those requirements were not met. Limited out of cell treatment was offered and rationale for failure to offer treatment was not documented. Interdisciplinary huddles were rarely noted. With the exception of one yoga class offered to one patient, there was no indication that recreational therapy or group therapy was offered to any patient. Orders entered in EHRS were not always consistent with clinical documentation, making the course of care difficult to follow at times. SRASHEs need improvement. Often, changes were noted in patients' chronic suicide risk over a period of days. Chronic risk represents a patient's long-term risk for suicide, given their history and static or slow-to-change risk factors. It is unlikely that a patient's chronic risk for suicide would change over the course of days, yet this was seen in a number of records reviewed. Additionally, safety plans were not reliably completed prior to the patient's discharge from the TMHU despite placement secondary to suicidal ideation.

EOP:

Reviewed cases revealed that care within the EOP at VSP during the review period was marginally adequate, with four cases demonstrating less than adequate care. Of primary concern was the lack of direct and active treatment being provided to patients to address their documented needs and assess their treatment progress. While this was likely due to clinicians covering for one another during the COVID-19 pandemic, review of the patients' treatment needs and assessment of patients' status over time was expected to ensure patient stability but was not found in the documentation. Overall, EOP programming hours were not provided in accordance with Program Guide requirements, but there was variability. Required programming offered to patients ranged from an average of 2.36 hours per week to 10.54 hours per week, with no indication as to why

some patients were offered programming while others were not. While the departure from requirements was likely due to COVID-19 restrictions, documentation did not provide clear rationale. The Program Guide also specifies that the patient's assigned PC is to document a monthly summary of the patient's treatment progress and degree of participation in treatment activities. This was only found in two of the ten records reviewed.

Overall, psychiatric care appeared adequate, although some documentation raised questions as to whether psychiatrists were actually present for IDTTs as indicated.

The health records of nineteen randomly selected mainline EOP inmates were reviewed to assess compliance with timely psychiatric and PC contacts. Seven inmates required initial psychiatric contacts and 100 percent were compliant as the contact occurred before IDTT and within fourteen calendar days. Eighteen inmates required routine psychiatric contacts, and 53 percent occurred in 30 days or less and were therefore compliant.

Ten inmates required initial PC contacts, and 100 percent were compliant as the contact occurred within fourteen calendar days. Seventeen inmates required routine PC contacts, and 81 percent were compliant. It was not clearly documented if the contacts were confidential.

Eleven inmates required an initial IDTT, of which eight or 73 percent occurred within fourteen calendar days and were timely.

Fourteen inmates were required to be seen for routine IDTTs; 81 percent occurred in less than ninety days and were timely.

Required attendees were present for all 11, or 100 percent of initial IDTTs. Required attendees were present for 23 of 27, or 85 percent of routine IDTTs. While the Program Guide requires attendance of the assigned psychiatrist and primary clinician, assignment was not clearly discernable for all cases.

3CMS:

The overall quality of the clinical contacts for mainline 3CMS inmates was adequate. However, there were no specific documented progress notes addressing COVID-19 concerns, and there was no documentation of in-cell activities or any other therapeutic supports during the COVID-19 months.

The health records of twelve mainline 3CMS inmates were randomly selected to assess compliance with timely psychiatric contacts. One inmate required an initial psychiatric evaluation which was not completed timely.

Regarding ten inmates required to be seen for routine psychiatric contacts, 72 percent occurred within 90 days and were compliant. Of concern, there were long delays between contacts for three inmates lasting between 111, 116, and 140 days.

The health records of 20 mainline 3CMS inmates were randomly selected to assess compliance with timely PC contacts. One inmate required an initial PC contact which was compliant.

For the 19 inmates required to be seen for routine PC contacts, 60 percent occurred within 90 days and were compliant. Of concern, one inmate went six months between routine contacts.

The health records of 20 mainline 3CMS inmates were randomly selected to assess compliance with timely IDTTs. One reviewed inmate required an initial IDTT which was timely.

There were eleven inmates that required annual IDTTs during the review period; 55 percent occurred within 365 days and were timely.

Required staff were in attendance at the one initial IDTT required. Required staff were also in attendance at nine of 12, or 75 percent of routine IDTTs. While a PC and psychiatrist were in attendance, it was not documented if the assigned treatment providers were in attendance as required by the Program Guide.

RVRs:

The monitor's review of a random selection of RVRs showed that custody referred the RVR to mental health staff within policy timelines in five out of nine cases, or 55 percent of the time. Additionally, mental health staff completed the mental health assessment and returned the form to custody within policy timelines in seven out of nine cases, or 78 percent of the time. The senior hearing officer documented his consideration of the mental health assessment information in three out of nine cases, or 33 percent of the time.

The mental health assessment clinician recommended mitigation of penalties in five out of nine cases, or 55 percent of the time. The senior hearing officer documented mitigation of penalties in 100 percent of the reviewed cases. The monitor's review of select RVRs also showed that the senior hearing officer cut and pasted mental health assessment responses into the RVR hearing process without documentation of consideration of the assessment. In one mental health assessment, the evaluation appeared to conflict with the information provided in the RVR. The RVR was issued for resisting staff during an evaluation for placement into a MHCB. During the evaluation, the patient began to act out, custody staff restrained the patient and medical staff injected the patient with 2mg of Ativan and 2mg of Haldol. In the mental health assessment, the clinician stated, "[i]t is likely that IP was not influenced by his mental health symptoms at the time of the RVR."

**California Health Care Facility (CHCF)**[73]
Review Date – May 15, 2020

Census:

On May 15, 2020, CHCF housed 2,732 inmates: a 21 percent increase since the preceding site visit.  The mental health caseload population was 1,235 inmates, an increase of 14 percent, and represented 45 percent of the total inmate population.

The MHCB housed 21 inmates.

There were 540 mainline EOP inmates and 627 mainline 3CMS inmates.

The administrative segregation EOP hub housed 47 inmates, including 39 EOP inmates, seven 3CMS inmates, and one inmate requiring intermediate level of care treatment.  Nineteen inmates were assigned NDS status.

Staffing:

As of May 2020, the chief psychiatrist position was filled.  The two senior psychiatrist positions were vacant.  Of the 18.5 staff psychiatrist positions, three were filled for an 84 percent vacancy rate.  Registry psychiatry staff covered 1.87 positions reducing the functional vacancy rate to 74 percent.  Of the seven telepsychiatry positions, 5.45 positions were filled for a 22 percent vacancy rate.

Both of the chief psychologist positions were filled.  Since the preceding monitoring round, allocated positions for senior psychologist supervisors and senior psychologist specialists increased by .5 positions each.  Five of the 6.5 senior psychologist supervisor positions were filled, for a 23 percent vacancy rate.  For senior psychologist specialists, four of the 6.5 positions

---

[73] This Institutional Summary covers the prison at the California Health Care Facility (CHCF).  Findings regarding the psychiatry inpatient program at CHCF (CHCF-PIP) was presented in the "Monitoring Report on the Mental Health Inpatient Care Program for Inmates in the State of California Department of Corrections and Rehabilitation."

were filled, reflecting a 38 percent vacancy rate. As of May 2020, allocated staff psychologist positions increased by 5.5 positions. Of the 51.5 positions, 19 were filled for a 63 percent vacancy rate. An additional 16.41 positions were covered by registry staff resulting in a 31 percent functional vacancy rate.

The supervising social worker position was filled. The 16.5 allocated social worker positions increased by 3.5 positions since the preceding monitoring visit. Of those, 14 positions were filled for a 15 percent vacancy rate. An additional 1.59 positions were covered by registry staff, leaving a functional vacancy rate of 5.5 percent.

Recreation therapist positions increased by 2.5 positions. Of the 28.5 positions, 23 were filled for a 19 percent vacancy rate. An additional 1.63 were covered by registry staff resulting in a 14 percent functional vacancy rate.

Two of the three AGPA positions were filled for a 33 percent vacancy rate. CHCF employed three HPSIs, which was .5 more than the 2.5 allocated positions.

The CHSA II position was vacant. The one OSS II position was filled. Of the 29.5 office tech positions, 25 were filled, for a 15 percent vacancy rate.

Transfers/Referrals:

During the review period, 540 inmates met the criteria for inpatient care consideration. Of those, 81 inmates or 15 percent were referred to inpatient care after IDTT consideration.

CHCF referred 78 inmates to acute care. Of those, 22 inmates or 28 percent transferred within ten days. Six inmates transferred to CMF-PIP, and 16 inmates transferred to CHCF-PIP. Six referrals were rescinded.

CHCF referred three inmates to intermediate care during the review period. One inmate transferred within 30 days, one referral was rescinded, and one transfer was pending at the time of reporting.

During the review period, there were 459 inmates who were considered for inpatient care but were not referred. A limited record review revealed variability with adequacy of clinical justifications for non-referral; lack of interventions in light of acuity and functional level; higher level of care forms not properly completed; failure to note criterion in prior IDTTs; and treatment team disagreement.

CHCF made 124 referrals to MHCBs during the review period. Of those, 32 or 26 percent were rescinded. All except one inmate transferred within 24 hours. A total of 339 inmates were discharged from CHCF's MHCB during the same time period.

Administrative Segregation EOP:

EHRS record reviews revealed that mental health treatment provided to inmates in the administrative segregation EOP hub was inadequate during the review period. Psychiatry vacancy rates impacted care; psychiatrists did not attend IDTTs, and some inmates were not seen by a psychiatrist for months into their stay in administrative segregation. Inmates were seen primarily at cell-front with documentation noting COVID-19 or statewide mandatory institutional lockdown as the justification. EHRS reviews also revealed mental health staff's consistent failure to utilize the diagnostic and problems section of the EHRS.

Thirteen randomly selected administrative segregation EOP hub inmate cases were selected for review of psychiatric and PC contacts.

Initial psychiatry contacts were not compliant in any cases reviewed. Of the 11 reviewed cases that required initial contacts, five or 45 percent did not receive initial contacts by psychiatrists.

For the seven inmates who required a routine psychiatric contact, none was compliant.

Initial PC contacts were completed timely; however, 74 percent of routine PC contacts were completed every seven days.

Initial IDTTs were completed timely, as was the one routine IDTT that was required during the review dates. All required attendees were not present for any initial IDTTs, and psychiatrists did not attend any reviewed IDTTs.

MHCB:

From February 1, 2020 through April 30, 2020, there were 339 admissions to CHCF's MHCB. The average length of stay was 12.6 days, with an average of 9.4 clinical days. For discharged inmates, 176 or 52 percent had stays longer than ten days with a range of 11 to 41 days. Seventy-three percent of inmates discharged to EOPs, 29 inmates or nine percent discharged to 3CMS, and two inmates paroled.

Three inmates had three or more MHCB admissions during the review period with a range of three to five admissions.

The quality of care provided in the MHCB at CHCF was variable. Of five reviewed cases, two revealed inadequate care. Deficiencies in the two cases pertained to higher level of care decisions, treatment and discharge planning, and generally poor documentation.

Five-day follow-ups and suicide risk evaluations were consistently completed in accordance with Program Guide requirements, and safety plans were completed prior to discharge.

Ten randomly selected MHCB inmate cases were reviewed for compliance with Program Guide requirements. All ten reviewed inmates received a PC evaluation within 24 hours of admission.

Eight of ten or 80 percent of initial psychiatry evaluations were completed timely; however, it was not documented whether the evaluations were completed in a confidential setting.

For initial IDTT within 72 hours of admission, all ten cases reviewed were compliant. Seven of nine required or 78 percent of routine IDTTs were completed within seven days of the initial IDTT. Of the 13 required routine and discharge IDTTs, 11 or 85 percent occurred timely.

CHCF was 97 percent compliant with completion of daily contacts in the MHCB, although only ten percent of those contacts were conducted in a confidential setting. Regarding twice-weekly psychiatry contacts, CHCF was 79 percent compliant during the review period.

Mainline EOP:

Reviewed records contained documentation of institutional modified programming or unit quarantine due to COVID-19 during the review period; however, it was unclear that programming and access to care were connected to the mental health tier system in place. Some mainline EOP inmates were seen for daily wellness checks, while others were not with no rationale provided.

Most IDTTs were held in absentia during the review period. Group documentation was unclear. While there was documentation in PC and psychiatry contacts that groups did not occur, other documentation indicated that groups occurred in the clinic. Consequently, it was unclear if a group occurred or if the contact was cell-front or in the dayroom.

PC and psychiatric contacts occurred mostly cell-front, although in some cases, it was documented that contacts occurred at cell-front due to modified programming.

PC contacts documentation remained unchanged between contacts.

Treatment plans were not individualized and often were not updated between IDTTs. Treatment plans also lacked specific symptoms to support diagnoses and, at times, had conflicting diagnoses.  Treatment goals were generic with unclear origin and lacked baseline data needed to assess progress.

Safety planning was missing when indicated.

Ten randomly selected mainline EOP inmate cases were selected for review of psychiatric and PC contacts.

Of the three inmates that required initial psychiatric assessments, two or 67 percent were completed before the IDTT and within 14 calendar days of admission and were therefore timely. For routine psychiatry contacts, 55 percent occurred within 30 days and were timely.  Forty-eight percent of psychiatric contacts were completed via telepsychiatry.

PC assessments were completed timely for all three mainline EOP inmates that required initial assessments.  For routine PC contacts, 74 percent were completed timely; however, 57 percent of PC contacts occurred at cell-front either due to COVID-19 or inmate refusal.

For the three mainline EOP inmates that required initial IDTTs, all three or 100 percent were completed timely.  Required staff was present in only one or 33 percent of those IDTTs. For routine IDTTs, 93 percent were completed within 90 days, and required attendees were present for 89 percent of those treatment teams.  It was unclear from the documentation if the attending psychiatrist and PC were the inmates' assigned clinicians.

Mainline 3CMS:

The overall care provided to mainline 3CMS inmates was variable, and CHCF provided inadequate mental health care to the majority of inmates reviewed.

Psychiatry vacancies impacted care for mainline 3CMS inmates. Medication management was appropriate; however, there was a lack of response to psychiatric referrals.

Treatment planning was variable and response to inmate safety concerns during IDTT was inadequate.

Nursing rounds were documented during the COVID-19 pandemic, and the provision of in-cell materials was generally documented.

Thirteen randomly selected mainline 3CMS inmate cases were selected for review of psychiatric contacts. None of the reviewed cases required initial psychiatric contacts. For routine psychiatric contacts, 15 percent were completed timely.

For PC contacts, 15 cases were reviewed for compliance with Program Guide timeframes. None required initial PC contacts during the review period. CHCF was 69 percent compliant for completion of routine PC contacts every 90 days.

No reviewed mainline 3CMS cases of the sample required initial IDTTs. Of the seven cases that required annual IDTTs, four or 57 percent occurred timely. Required staff were only in attendance at three of seven or 43 percent of IDTTs; psychiatrists were consistently absent. Documentation did not specify if the attending clinician was the assigned treatment provider as required by the Program Guide.

RVRs:

A total of 20 RVRs were reviewed for compliance with CDCR policies and procedures. CHCF mental health clinicians did not recommend alternative discipline for any of the RVRs reviewed.

Custody staff referred the RVR to mental health staff within policy timeframes in 16 of 20 cases or 80 percent of the time.  Mental health staff completed the mental health assessment and timely returned the RVR to custody staff 100 percent of the time.  Senior hearing officers documented their consideration of the mental health assessment in 19 cases, for 95 percent compliance.  The clinician recommended mitigation of penalties in all of the RVRs reviewed. Of those, the senior hearing officer mitigated the penalty in 19 or 95 percent of the RVRs.

# APPENDIX E

# CLINICAL CASE REVIEWS

**EXHIBIT A**
**California State Prison/Sacramento (CSP/Sac)**
**May 14, 2019 – May 17, 2019**

**Inmate A**

Plaintiffs' counsel requested a review of this inmate's healthcare record to assess the appropriateness of his current 3CMS level of care. The inmate's level of care was reduced from EOP to 3CMS in February of 2019 despite several MHCB admissions over the past few months. His psychiatric diagnoses included Bipolar II Disorder, with psychotic features; Antisocial Personality Disorder, Borderline Personality Disorder, Malingering, and Polysubstance Abuse. He was prescribed BuSpar, Cymbalta and Geodon; he was noted to be compliant with medications. The inmate was very unhappy with his mental health and medical care.

A December 9, 2018 MHCB admission note indicated that the inmate had 39 MHCB admissions since 2002. He also reported 11 psychiatric hospitalizations prior to his current prison term. A 2018 acute PIP discharge summary included the following information:

[Inmate] refused the majority of the offered individual therapy sessions, as well as all of his IDTTs, and consistently refused to adhere to his psychotropic medication regimen. It is noteworthy that throughout his acute PIP admission, [inmate] has continued to endorse his belief that there is a 'collusion' for him not to receive treatment when in actuality he has refused almost all of the treatment offered.

A December 2018 discharge note indicated that the inmate's endorsed symptoms appeared to be a manipulation tactic to affect housing. However, he was still considered at risk for engaging in self-injurious behavior or attempting suicide in response to a perceived threat in a less structured environment.

A January 8, 2019 IDTT note indicated that the inmate was overwhelmingly focused on changing his housing, being assigned a female clinician, and obtaining a cane or walker (a physician had determined he did not require a cane).

On January 15, 2019, the inmate requested a new PC. His request to receive increased contact with a female clinician was denied based on clinical contraindications. A February 7, 2019 PC note indicated that this inmate had a history of making false sexual allegations against staff members. Most recently he received an RVR for filing two PREA allegations against an officer; video evidence confirmed the PREA reports were false.

Throughout most of January and February of 2019 the inmate was unwilling to engage in treatment, and he refused to meet out of cell with mental health staff. His refusals typically resulted in cell front contacts. The inmate refused out of cell treatment on January 17, 2019 and was uncooperative with the RVR mental health assessment interview on January 22, 2019. On January 23, 2019, the inmate requested a meeting with his PC due to feeling anxious; however, upon follow up, he again refused a confidential contact and was uncooperative with the clinician. Similar interactions with the PC occurred on the following day and again on January 31, 2019.

A February 15, 2019 assessment note stated, "Inmate patient may not be suitable for this level of care since he is high functioning and unwilling to use one-to-one sessions. It would be at least beneficial to transfer the inmate to another therapist next week." On February 20, 2019, the PC saw the inmate for a wellness check. He again made it clear that he did not want another male clinician.

An April 22, 2019 psychiatry note indicated that the inmate was dissatisfied with his level of care. The psychiatrist recommended continued 3CMS level of care with a plan to see him on a monthly basis. The most recent PC note, dated May 6, 2019, indicated that the inmate was stable and high functioning, and the PC's plan was to continue seeing him in accordance with 3CMS requirements.

**Findings**

The level of care was appropriate. This inmate's presentation was consistent with Bipolar and personality disorder diagnoses. While his Bipolar Disorder appeared to be well controlled, his maladaptive behaviors were chronically problematic. The inmate will likely return to EOP level of care, and a very structured behavioral plan should be implemented as part of his treatment plan when this occurs.

**Inmate B**

Plaintiffs' counsel requested review of this inmate's record in order to assess the appropriateness of his current 3CMS level of care. The inmate reported to counsel that his level of care was reduced from EOP to 3CMS, despite a recent MHCB admission wherein he attempted suicide twice. His diagnoses included Adjustment Disorder, Antisocial Personality Disorder, and Major Depressive Disorder. The inmate was prescribed hydroxyzine and Remeron. The inmate had a long history of acting out in order to prevent transfer out of the Sacramento region, including setting a fire in a cell in order to avoid a 3CMS transfer while in the PSU. Although the inmate routinely claimed that he was transgender, staff perceived that he was doing so for secondary gain, as his behaviors and appearance did not reflect his claimed gender identity.

The March 15, 2019 psychiatric MHCB discharge summary indicated that the inmate was stable and that his level of care was EOP. The inmate's behavior and presentation were consistent with a personality disorder, which was described as being primary in contrast to symptoms of depression. His core psychological defense system was described as projective identification. The plan was to help him find ways to work around his personality disorder and to develop more mature coping mechanisms.

A March 19, 2019 progress note indicated that the inmate did not want the current PC as his assigned clinician. The note further stated that he "left to court at 3CMS LOC and came back as EOP LOC after going to crisis bed," that he was "likely feigning symptoms for secondary gain," and that "why he was made EOP with such documentation and clinical perceptions is unknown."

According to a December 28, 2018 progress note, the inmate's gender dysphoria claims were likely motivated by a desire to avoid transfer to CSP/Corcoran's SHU following the treatment team's planned level of care change. On April 9, 2019, the IDTT documented that the inmate had feigned symptoms for secondary gain in front of staff while "out to court" at another institution; this resulted in his most recent MHCB admission and subsequent level care change to EOP at discharge.

The treatment plan included cognitive therapy to help the inmate transition to 3CMS level of care.

A May 7, 2019 mental health assessment summarized this inmate's lengthy history of feigning symptoms for secondary gain.

**Findings**

The IDTT's level of care decision and rationale were appropriate. The inmate's requests for EOP level of care appeared to be motivated by reasons other than mental illness. Since December of 2018, the inmate was assessed by several clinicians who determined that he did not require EOP level of care. Mental health clinicians also consistently documented that the inmate did not meet criteria for gender dysphoria.

**Inmate C**

Plaintiffs' counsel requested review of this inmate's healthcare record in order to assess the appropriateness of his current 3CMS level of care. In January of 2019, the inmate's level of care was reduced from EOP to 3CMS shortly after he attempted suicide and complained about discrimination against inmates who receive mental health treatment. The inmate's diagnoses included Adjustment Disorder, Borderline Personality Disorder and Antisocial Personality Disorder. Medications included Abilify, fluoxetine, hydroxyzine and prazosin. He was noted to have over 20 MHCB admissions and six PIP admissions since 2003.

A January 3, 2019 IDTT note indicated that the inmate was referred on three occasions to MHCB level of care within a six-month period. All three MHCB level of care referrals occurred while he was in the 3CMS level of care. Documentation indicated that the behaviors leading to MHCB admissions were motivated by secondary gain to affect housing and to avoid safety concerns. The IDTT assessed that the inmate did not meet criteria for EOP level of care and did not exhibit psychotic symptoms during admission; he was described as attempting to present himself as depressed.

On February 6, 2019, the inmate received a mental health assessment related to an RVR for sexual disorderly conduct. He had an evaluation for suicide risk on that same date, and another similar evaluation one week later while housed in the STRH. The plan was to provide him with weekly mental health support.

The inmate met with his PC on March 8, 2019. He appeared to be stable and was continued at a 3CMS level of care. No change was noted the following week when he was again seen at cell

front in a non-confidential setting. The psychiatrist noted three days later that no issues were identified. The inmate participated in group therapy.

The inmate was transported to a hospital after reportedly swallowing 30 pills on March 22, 2019. He was subsequently admitted to the MHCB. He refused to attend his March 25, 2019 MHCB IDTT and was refusing medications during this time. The treatment team again noted that he frequently used MHCB admissions for non-mental health reasons. The psychiatrist documented on March 28, 2019 that the inmate reported doing better, felt ready for discharge, and denied suicidal or homicidal thinking. He was discharged to 3CMS level of care and returned to his housing unit.

The inmate continued to refuse one-to-one confidential sessions following MHCB discharge. On April 16, 2019, the IDTT documented that he would not be referred to a higher level of care, as his records strongly suggested that MHCB admissions were motivated by secondary gain. The three most recent RVR mental health assessments indicated that mental health was not a contributing factor. A cognitive behavioral approach to treatment continued to be implemented.

On May 1, 2019, the inmate reported no new issues or problems during his PC contact. He was regularly eating meals, and there appeared to be little clinical change based on a May 6, 2019 PC progress note.

**Findings**

The IDTT's level of care decision was appropriate. This inmate's presentation was consistent with a significant personality disorder. A mental disorder with psychotic symptoms was not present. The formulations described in his treatment plans and the decision to treat him at a 3CMS level of care were appropriate.

**Inmate D**

Plaintiffs' counsel requested review of this inmate's healthcare record to assess the appropriateness of his current 3CMS level of care. The inmate's level of care was reduced from EOP to 3CMS shortly after his psychiatric medications were changed. He was a 47-year-old man with a history of an Adjustment Disorder, with Mixed Disturbances of Emotion and Conduct, and Antisocial Personality Disorder. He had a history of receiving medications via a PC2602 order for grave disability. During his 20 years of incarceration his level of care was 3CMS for six years, EOP for five years; he had 16 MHCB referrals and one DSH admission.

On September 12, 2018, the treating psychiatrist prescribed BuSpar; other medications included Lamictal and Prozac. His medications were reviewed by another psychiatrist on September 21, 2018.

A September 27, 2018 PC progress note stated that the inmate again refused to attend his appointment; however, he was notified that 3CMS level of care would be recommended at his next IDTT. An October 2, 2018 PC progress note indicated that he refused his appointment and

was seen at cell front. The initial plan was to continue him at the EOP level of care, encourage compliance with his appointments, and educate him about 3CMS level of care.

An October 9, 2018 note indicated that the treating psychiatrist raised the possibility of retaining the inmate in EOP level care for an additional 30 days to monitor his response to a recent medication change. However, the covering psychiatrist noted that the inmate had refused a total of 16 doses of the recently prescribed BuSpar medication. The medication noncompliance rate was 61 percent over 26 days. The psychiatrist concluded that "given this lack of compliance with the medication, it appears that inmate has not been genuinely interested in determining whether the medication will be effective or not." The psychiatrist also noted that the inmate did not appear anxious during the IDTT.

The IDTT noted on October 9, 2018 that the inmate demonstrated competence and an ability to be self-sufficient, with minimal reliance on the custody and mental health staff. He largely worked on his legal issues rather than participating in the mental health treatment. The mental health master treatment plan indicated that his level of care would be reduced to 3CMS. The inmate was reportedly unhappy with the IDTT's level of care recommendation.

The inmate met with his new PC on October 22, 2018 and his psychiatrist on October 30, 2018. He was noted to be intermittently noncompliant with his prescribed medications. He refused a PC appointment on November 14, 2018 and was subsequently seen at the cell front by his clinician. He was described as uncooperative with the attempted interview. The psychiatrist met with the inmate at cell front on December 28, 2018 in response to a CDCR Form 602 appeal related to the discontinuation of his psychotropic medication. On January 17, 2019, the same psychiatrist met with the inmate and prescribed chlorpromazine, BuSpar, and Lamictal. The inmate declined to meet with his PC on February 5, 2019, and the meeting was conducted cell front as a result. On April 19, 2019, he met with the psychiatrist, and his medications were continued.

**Findings**

The IDTT's level of care decision was appropriate. The inmate did not appear to meet criteria for EOP level of care. It is noteworthy that he has been uncooperative with treatment ever since 3CMS level of care was mentioned to him.

**Inmate D**

This inmate's healthcare record was reviewed in response to the following documented concerns from plaintiffs' counsel:

Class members reported inadequate access to group treatment. Many class members complained that SAC has an insufficient number of core treatment groups on both A-Yard and B-Yard. Others reported that scheduling conflicts sometimes force class members to choose between group treatment and other activities such as yard or classes. For example, [inmate] on B-Yard reported that he only has access to group treatment two days a week and that his clinician said that she cannot schedule him for groups on other days because he has classes on those days.

The inmate's diagnoses included Bipolar I Disorder, Alcohol Use Disorder, Amphetamine Substance Use disorder, Antisocial Personality Disorder, and Acromioclavicular Joint Separation. He was prescribed Cymbalta.

A December 18, 2018 PC progress note indicated that the inmate would be retained in EOP level of care. Progress notes for the inmate's out of cell structured activities were dated December 18, 19, 20, and 26 of 2018.

A January 3, 2019 PC progress note indicated that two groups were added to the inmate's group schedule. Group treatment progress notes were dated January 3 (mood management/education), 10 (leisure activities and mood management/education), 14 (leisure activities, 17 (mood management/education), and 29 (leisure activities) of 2019.

A January 4, 2019 psychiatry note indicated that the inmate was seeking prescriptions for Wellbutrin and pain medication. His Trileptal was increased and Cymbalta continued on this date. A January 25, 2019 PC progress note reported that the inmate was attending some EOP groups and yard when he felt "good enough to go out." A January 30, 2019 PC progress note indicated that the inmate was encouraged to attend EOP offered services.

Structured therapeutic activities were documented on February 5 (recreational therapy), 12 (recreational therapy), 13 (recreational therapy), 14 (symptom management), 20 (recreational therapy), and 25 (leisure activities) of 2019.

**Findings**

The inmate's complaints regarding insufficient group treatment and core therapy groups appear valid. The planned hours for group treatment were neither documented in the February 26, 2019 treatment plan nor in the PC's progress notes. Therapeutic groups were offered even less between March and May of 2019; especially mental health treatment groups.

**Inmate F**

This 35-year-old patient was admitted to MHCB level of care for danger to self on March 21, 2019. He presented with depression, suicidal ideation, and safety concerns at the time of admission. The patient's symptoms were consistent with a diagnosis of Major Depressive Disorder, recurrent, severe. He received intermediate care treatment at DSH during the summer of 2018.

The patient refused to attend his initial MHCB IDTT. The initial psychiatric assessment was comprehensive. A SRASHE was completed. The IDTT clinical summary was useful. The initial treatment plan included medication management and a plan to discharge the patient to EOP level care. He received his physical examination on March 22, 2019. Psychiatry progress notes were dated March 24, 26, 28, 30, 31, and April 2 of 2019. PC progress notes were dated March 23, 28, 29, and April 1 of 2019.

864

His MHCB admission course was characterized by significant symptoms of depression, which included suicidal thinking, lack of motivation, and varying levels of treatment compliance. The MHCB IDTT determined on March 28, 2019 that he was not safe to return to his housing unit, and he was referred to intermediate care. The patient transferred to an intermediate care facility on April 3, 2019.

**Findings**

The mental health care provided to this patient was adequate. MHCB Program Guide requirements were met.

**Inmate G**

This 35-year-old patient's level of care was reduced from EOP to 3CMS on March 8, 2019. He was informed on March 15, 2019 that he would be transferred to another institution, which was too far for his family to visit. The PC subsequently referred the patient to the MHCB level of care for precautionary reasons.

The physical examination occurred on March 25, 2019. The March 26, 2019 initial psychiatry note was comprehensive in nature. Subsequent psychiatry notes were dated March 28 and 29 of 2019. The March 25, 2019 initial PC progress note contained relevant historical information. Subsequent PC progress notes were dated March 26 and 29 of 2019. The initial IDTT was held on March 26, 2019. The clinical summary formulations were useful. The treatment plan was vague and indicated, "Treatment team determined treatment goals would focus on improving his moods and reducing suicidal ideation."

The March 29, 2019 discharge summary included the following:

3/28/13, inmate reports better mood, concerns with safety on Soledad yards, and wanting to be discharged. Inmate is motivated for future with plans to parole, be with family and start business with sister. Discussed avoiding situations that would put him at risk to return prison. Inmate denied any suicidal or hallucinations. Inmate has tolerated changes in medicine and appears stable at this time. inmate discussed with the team and is clear for discharge today.

The discharge summary indicated that the psychiatrist did not believe the patient suffered from Bipolar Disorder, despite the patient's history. The IDTT discharged the patient to 3CMS level of care and noted that medications for Bipolar Disorder would not be continued as the psychiatrist did not "feel the benefit of this medication outweighs the risk of utilizing it psychiatry access is only once per three months."

**Findings**

MHCB treatment was consistent with MHSDS Program Guide requirements. Although the monitor's expert agrees that medication for Bipolar Disorder should not be prescribed when the disorder is not present, the MHCB psychiatrist's rationale for discontinuing the medication was

insufficient. Specifically, it appears that the psychiatrist assumes that, if a patient is designated 3CMS level of care, they can only be seen by a psychiatrist once every 90 days.

**Inmate H**

During onsite interviews with *Coleman* class members this 40-year-old EOP level of care inmate reported that he had not been offered an out of cell confidential PC contact in six weeks. His healthcare record was reviewed to determine whether MHSDS Program Guide requirements were met. The inmate's diagnosis was Major Depressive Disorder with psychotic features. He was prescribed Lexapro 10 mg p.o. every morning as well as Zyprexa p.o. nightly.

An April 5, 2019 MHCB history and physical examination note was completed in a timely manner and included the following:

Status post foreign body ingestion KUB on 4/3/19 shows 3 abdominal radiopaque foreign body in the mid abdominal and right pelvic measuring 1-2 cm. No acute medical issues since MHCB admission per nursing. Will monitor. Repeat KUB.

The April 5, 2019 MHCB PC admitting note included the following:

Patient reported that he was feeling that he was going to end up 'swallowing things' again, and he is afraid that it will lead to requiring surgery again to remove the objects. Recently he swallowed a pen filler (confirmed by x-rays) on 04/03/2019. On 03/31/2019 he swallowed about 3 inches of a tv cable and a round metal object (looked like a magnet) approx. 1.5 inches long.

The April 6, 2019 initial psychiatric examination was comprehensive. The only other psychiatry note was dated April 14, 2019. PC notes were date April 7, 8, 9, 10, 11, 12, and 14 of 2019. The inmate attended recreational therapy on April 8, 2019.

The April 7, 2019 treatment plan included the following:

While in MHCB, IP will learn distress tolerance such as DEAR MAN and GIVE FAST to learn new behaviors, communicate more effectively, recognize and regulate his emotions when faced with external stressors. Will use CBT (thought stopping, reframing) to recognize the thought patterns that contribute to his distress and to utilize coping tools earlier before he gets to a point where he feels he needs to self-harm or needs MHCB. Use psychoeducation to learn coping skills to replace self-harm behavior such as swallowing foreign objects.

The April 14, 2019 discharge note indicated that the inmate was discharged to EOP level of care.

The April 30, 2019 EOP level of care treatment plan was unclear. The clinical summary stated, "IP's SIB/FBI reviewed in IDTT, and IP was asked to refrain from such behavior. IP; severe sub. ab. Hx also reviewed with possible drug debts resulting in safety concerns."

The inmate received an initial psychiatric examination via telepsychiatry on April 16, 2019 at the CSP/Sac EOP. The five-day post MHCB discharge follow-ups were documented in the health

care record. He was seen at the cell front by mental health staff on April 25, 26, and 29 of 2019 due to his failures to appear for scheduled appointments. A May 10, 2019 PC note also stated "IP was seen by this clinician at cell-front for a wellness/status check."

**Findings**

The quality of care for this inmate was inadequate and Program Guide requirements were not met. The EOP treatment plan was vague and the EOP IDTT documentation was unclear. Psychiatry contacts in the MHCB were non-compliant. The most recent PC contact occurred at cell front for reasons that were not documented. However, the inmate's claim that he was only seen at cell front while in EOP was misleading, as documentation suggested he often refused confidential contacts in the treatment center prior to cell front contacts.

**Inmate I**

During onsite interviews with *Coleman* class members this 46-year-old inmate reported that he had not been offered EOP group treatment in approximately four weeks. His diagnoses included Antisocial Personality Disorder and Persistent Depressive Disorder. The inmate had a long history of depression with numerous MHCB admissions for suicidal ideation and self-harm. His suicidal statements were reportedly motivated by secondary gains, including to engage in indecent exposure and in response to custody concerns (i.e., property issues). He had four total PIP admissions, the most recent of which was in the acute program from November through December of 2015. His most recent PC2602 order expired in January of 2018. The inmate was referred to MHCB level of care on seven occasions during a six-month period.

In April of 2019 he was admitted to the MHCB for suicidal ideation, and his length of stay was approximately four days. He was subsequently discharged from MHCB to ASU on April 24, 2019.

An April 26, 2019 EOP PC progress note provided a useful summary of this inmate's history of mental illness. Progress notes also documented his five-day post MHCB discharge follow ups. A SRASHE was completed on April 30, 2019. A master treatment plan was completed on May 2, 2019. He was moved from ASU to mainline EOP on May 3, 2019. He participated in group treatment and IDTT on May 8, 2019, and he received his mainline EOP initial PC assessment on May 9, 2019.

The May 16, 2019 PC note indicated that he was scheduled to begin group treatment the week of May 20, 2019.

**Findings**

EOP treatment appeared to meet Program Guide requirements. The lack of group treatment offered to this EOP inmate in ASU may have been the result of his orientation status and short stay in the unit. Following his move to mainline EOP on May 3, 2019, he participated in one group treatment session on May 8, 2019 and he was scheduled for ongoing group treatment the week of May 20, 2019.

867

**Inmate J**

This inmate was selected from a list of inmates on CSP/Sac's higher level of care non-referral log. On October 24, 2018, the IDTT noted that the inmate had three or more MHCB referrals within the last six months and participated in less than 50 percent of treatment in the last three months. The October 24, 2018 higher level of care non-referral rationale stated that a higher level of care was not indicated due to the inmate's history of MHCB use for secondary gain. However, the healthcare record revealed that his MHCB admissions were for grave disability and psychotic related symptoms; the inmate also recently stabilized in an acute psychiatric program in response to treatment and medication changes. The two contradictory rationales appeared to describe two different inmates. The proposed treatment modifications as a result of the non-referral decision required consistent treatment participation for successful implementation; however, the inmate was not attending treatment. On December 13, 2018, the IDTT documented that the inmate had three or more MHCB referrals within the last six months and three or more RVR mental health evaluations completed within the last three months.

**Findings**

The treatment planning and higher level of care non-referral rationales were inadequate. The higher level of care form should stand alone, in that one should be able to read the form and identify clearly the appropriateness of non-referral and treatment modifications, without a more extensive review of the records.

Regarding the October 24, 2018 higher level of care non-referral documentation, upon further review of the record it became clear that the two contradictory rationales were in fact for two different inmates, and likely the result of a copy and paste error. Consequently, there were no rationale or treatment modifications offered for the second higher level of care indicator, and the first rationale was limited and lacked specificity.

The December 13, 2018 higher level of care non-referral rationale explained more fully the utilization of MHCB as well as the inmate's clinical presentation. However, the second rationale relied too heavily on the determination of the mental health assessments, rather than the broader clinical implications of repeated RVRs within a short period of time. Additionally, the treatment modifications were inadequate and unrealistic in light of the inmate's history and functional deficits. Finally, the treatment plan did not adequately address the inmate's ongoing stressors and coping skill deficits, nor did it adequately address his mental health symptoms.

**Inmate K**

This inmate was selected from a list of inmates on CSP/Sac's higher level of care non-referral log. The log indicated that higher level of care was considered on three occasions; March 7, 14, and 27 of 2019. During March 2019, the inmate's group treatment participation was less than 50 percent. In January of 2019, he was placed on a modified EOP treatment program due to psychotic symptoms rendering him unable to fully participate in treatment. A March 7, 2019 document also indicated that he refused to attend IDTT and treatment groups due to psychosis.

The March 7, 2020 clinical rationale appeared to place a great deal of weight on the alleged stability of the inmate based primarily on attending to activities of daily living. The treatment team did not consider the inmate's isolation a sign of poor functioning, though it was a key functional deficit and cause for modified program assignment. The treatment modifications for this inmate reinforced continued isolation with in-cell activities, which was clearly contrary to the goal of increasing out of cell activity, socialization, and treatment engagement. While there was discussion of increasing stress tolerance, the techniques to address this target were not directly related. The March 14, 2019 higher level of care non-referral rationale failed to consider the inmate's EOP modified treatment status or that his mental illness interfered with his ability to attend group treatment. The modified interventions were copied and pasted from the prior treatment plan, despite their inadequacy.

The March 27, 2019 clinical summary noted that the inmate was pending a mentally disordered offender evaluation. The inmate continued to meet the higher level of care indicator for mental health treatment non-participation. However, the March 27, 2019 non-referral rationale attributed the inmate's low treatment participation to volition, while ignoring the prior documentation that identified mental illness and functional deficits as contributing factors. The March 27, 2019 higher level of care non-referral rationale did not adequately address the inmate's full clinical presentation. The treatment modifications also were not adequate, as they did not appropriately address the specific clinical cause of his inability or reluctance to attend group.

**Findings**

The quality of care and the higher level of care non-referral rationales were inadequate for this inmate. The inmate appeared appropriate for a referral to a higher level of care; however, this did not occur. The clinical rationales for non-referral were insufficient and suggested that PCs had not fully reviewed the inmate's medical record prior to IDTT. The treatment modifications were also insufficient as they never specifically addressed the positive criterion with realistic and appropriate interventions. Additionally, there was a lack of care continuity that further compromised the quality of treatment.

**Inmate L**

This inmate was selected from a list of inmates on CSP/Sac's higher level of care non-referral log. The log suggested he was considered for a higher level of care referral on six occasions between November of 2018 and January of 2019. The inmate's level of care was appropriately increased from 3CMS to EOP on November 6, 2018, as the treatment team correctly identified that he was unable to function at his current level of care due to a major mental disorder.

On November 16, 2018, clinical documentation indicated that the inmate's group treatment participation was less than 50 percent. The December 5, 2018 IDTT documentation noted that the inmate continued to participate in less than 50 percent of treatment. His mood was described as unstable, his comments as inappropriate, and his speech as verbose. The treatment team also noted that the inmate was exhibiting symptoms of mania and had no insight into his mental illness. Conversely, the non-referral rationale indicated that the inmate was stable, that his

activities of daily living were adequate, and that his lack of treatment participation was volitional.

By December 5, 2018, the inmate had two months of EOP level of care treatment and observation, as well as medication changes. However, he had not demonstrated noteworthy improvements in symptoms or functioning. The inmate was described as difficult to redirect in sessions, and he frequently interrupted his providers making it difficult to provide therapeutic techniques beyond limit setting, rapport building, and behavior interventions. He reportedly exhibited highly provocative behavior in a setting that could result in harm to him as well.

On December 31, 2018, the IDTT again documented that the inmate's treatment participation was less than 50 percent. The inmate's level of functioning was described as poor and the non-referral rationale indicated a plan to adjust his medications once again instead of referring. The inmate continued to show signs of deterioration and he was admitted to the MHCB. The MHCB treatment team correctly noted on January 4, 2019 that the inmate was unable to function in the current level of care, that his treatment participation was less than 50 percent, and that his level of decompensation required referral to an acute psychiatric program.

**Findings**

The quality of care and the level of care decisions prior to inpatient admission were inadequate. The December 5, 2018 clinical rationale did not properly address the inmate's clinical presentation and placed too strong an emphasis on the inmate's intention, while not enough on the inmate's mental status. The treatment modifications were not patient specific and were inappropriate for this inmate. The inmate was not referred timely to a higher level of care in December of 2018 when, at a minimum, intermediate care was clinically indicated. Instead, the inmate continued to deteriorate, was admitted to MHCB, and required acute care by January of 2019.

**Inmate M**

This PSU inmate was identified for review during onsite group observations and inmate interviews. The inmate arrived at CSP/Sac on December 6, 2018, following an acute psychiatric program admission. According to the acute program discharge summary dated December 6, 2018, the inmate was admitted for self-injurious behaviors and suicidal ideation but received minimal treatment in the program due to his maximum custody status. He was only offered in-cell activities and individual out of cell activities. The discharge summary also indicated that the inmate engaged in superficial self-injurious behaviors during admission and that self-injury escalated when he learned about his planned discharge. The inmate feared being discharged to 3CMS and transferred to CSP/Corcoran. Additionally, he had a documented history of self-injurious behavior and harm toward others.

The initial psychiatric assessment was not completed upon arrival to CSP/Sac. The PC initial assessment was not completed timely and contained only minimal information that was primarily copied and pasted from DSH's documents. The inmate's diagnosis at CSP/Sac was unclear. The psychiatrist had indicated Mood Disorder, while other parts of the record and treatment plan

included Bipolar Disorder, unspecified; Bipolar II Disorder; and Antisocial Personality Disorder. The inmate was prescribed amlodipine 10mg daily, levothyroxine 50 mcg in the morning, Prozac 180mg daily, Seroquel 400 twice daily, and Seroquel 100 mg every eight hours as needed.

CSP/Sac's December 19, 2018 treatment plan failed to adequately address the inmate's symptom severity, particularly in light of the recent acute care admission. The inpatient discharge summary was not sufficiently incorporated into the treatment plan. The inmate's self-injurious behavior and depressed mood were identified as treatment targets, but treatment goals and interventions were vague and not evidence based. For example, the PC noted a goal of decreasing self-harm behaviors, as opposed to establishing baseline and target frequencies for self-harm incidents. Treatment interventions included "fostering a therapeutic alliance" and teaching the inmate to keep thought logs. Treatment groups were not discussed in the treatment plan.

The record indicated sporadic treatment compliance. The inmate consistently refused Seroquel in May of 2019; however, the psychiatrist did not address the non-compliance issue on May 14, 2019, despite writing that the record was reviewed prior to the contact. The psychiatry note had a generic copied and pasted format with only one section offering possible new or updated information. The inmate only intermittently attended scheduled PC and group treatment contacts.

Despite the inmate's lack of treatment compliance and progress, the primary treatment plan did not change. However, the treatment modifications outlined in the higher level of care form did offer more appropriate interventions. PC progress notes indicated that the inmate was consistently seen cell front following confidential contact refusals. The inmate often reported he was too tired to attend or that he had just woken up. However, the PC's progress notes did not suggest that the psychiatrist was consulted to ensure there were no underlying medical or medication causes. On May 3, 2019, the PC noted that EOP may be the most appropriate level of care for this inmate.

**Findings**

The quality of care provided to this inmate was inadequate. The inmate did not receive an initial psychiatry or PC assessment prior to IDTT, making the initial treatment plan difficult to construct with limited information on the inmate. The second treatment plan did not differ from the initial, despite additional time for observation and data collection. The inmate was rarely seen in a confidential setting and typically blamed being too tired or having just awoken. Despite this, there were no medication changes, and the PC did not refer the inmate to the psychiatrist for a medication consult to assess for possible side effects. The inmate's poor treatment compliance was only addressed through establishing therapeutic rapport, instead of utilizing evidence-based interventions.

**Inmate N**

This PSU inmate was identified for review during onsite group observations and inmate interviews. The inmate complained during interview that his level of care was rapidly reduced from EOP to 3CMS shortly after arrival to CSP/Sac from CSP/Corcoran. The healthcare record

confirmed that the inmate arrived at CSP/Sac on April 9, 2019. The inmate began receiving mental health services in 2012, was treated in an intermediate care facility for six months in 2014, and his reported command auditory hallucinations to harm himself resulted in several MHCB admissions. Stressors noted prior to his initial inpatient placement included discontinuing his gang affiliation and becoming SNY status. In October of 2018, the inmate received treatment in an acute psychiatric program following the death of his father, and he was discharged to EOP level of care after one month.

The PC initial assessment was not completed at CSP/Sac. Significant portions of the initial psychiatric assessment, dated April 9, 2019, were copied and pasted from other documents without indicating such. The inmate reported up to 15 suicide attempts to the psychiatrist but refused to provide further details. The inmate reportedly became extremely agitated and ended the session in response to the psychiatrist recommending discontinuation of Trileptal for Hepatitis C treatment. The psychiatrist concluded that the inmate had a history of Bipolar Disorder and maintained the inmate on clonidine .3mg in the evening, amlodipine 5mg at noon, Effexor XR 675mg daily, and Trileptal 2400 mg twice daily.

The April 17, 2019 initial treatment plan identified appropriate treatment targets; however, goals were not well-operationalized. There were only two generic interventions proposed, and they were interventions found in other treatment plans: "help patient develop more appropriate and adaptive methods of expressing anger" and "therapist will foster therapeutic alliance by empathizing with the patient's feelings of distress." Although anger, frustration tolerance, and depression were listed as treatment targets, the PC did not list specific treatment interventions for these identified concerns.

The treatment team rapidly reduced the inmate's level of care from EOP to 3CMS during the initial IDTT. The level of care justification section included recommendations for skill building and treatment services to be delivered to the inmate. While CSP/Sac mental health staff may have followed through with these recommendations while he awaited transfer, the inmate could not be guaranteed those services in the 3CMS level of care at CSP/Corcoran. Further, it was unclear whether the level of care change was based on the inmate receiving the additional services while in 3CMS.

**Findings**

The quality of care provided to this inmate was inadequate. The inmate was shuttled between facilities without being provided necessary mental health care (also colloquially known as "bus treatment"). The inmate had several functional deficits that were acknowledged in CSP/Sac's treatment plan. However, there were still other functional needs that were not appropriately addressed.

**Inmate O**

The purpose of this health record review was to assess the appropriateness of the inmate's level of care change. His level of care was reduced from EOP to 3CMS on November 19, 2019. The inmate's diagnoses were Generalized Anxiety Disorder and Antisocial Personality Disorder, and

his symptoms included depressed and anxious mood, anger, impulsivity, and intermittent suicidal ideation. Prescribed psychotropic medications targeted symptoms of anxiety and depression, and he was described as medication compliant. The inmate's history was positive for 14 inpatient psychiatric admissions during incarceration. His most recent MHCB admission, for danger to self, occurred on June 20, 2019. The SRASHE revealed a history of four to five reported suicide attempts by hanging and overdosing on pills. On November 15, 2019, the inmate reportedly "overdosed on 26 [over the counter pain relievers] at the same time his cellmate was found with a bedsheet around his neck."

The IDTT notes pertaining to the level of care change in November of 2019 indicated, "IP has claimed to be in need of more coping skills to become ready for parole, hoping to prolong stay in EOP, while not fully participating in it. It is unknown why he was admitted to EOP in the first place with this diagnosis, as it is not one of the *Coleman* 10 diagnoses eligible for EOP placement…at this point he has reached maximum benefit of what EOP has to offer. No additional progress is expected, as he plateaued in his condition." This IDTT was held in absentia.

The inmate was placed in ASU on the date his level of care was reduced to 3CMS. A PC noted, "per November 19, 2019 [administrative segregation] placement notice [inmate] is in administrative segregation due to confidential information received indicating he could no longer safely program within B facility EOP."

Following discharge from the EOP level of care at CSP/Sac, the inmate was placed in ASU three times, issued two RVRs, and provided three mental health consults for endorsing suicidal ideation. He continued to endorse depression, anxiety, and safety concerns. The inmate stated on February 19, 2020, "I feel like I am being torn apart. I have let a lot of stuff go and I am working on my patience, but nothing works. I sometimes want to give up but my mother will not take it well."

**Findings**

The inmate's treatment and suicide risk were not adequately addressed prior to the level of care change on November 19, 2019 at CSP/Sac. Throughout the healthcare record it was documented that the inmate endorsed symptoms of depression and anxiety, suicidal ideation, safety concerns, and fear of being removed from the EOP level of care. The clinician inappropriately attributed the lack of treatment progress to the inmate's participation, claiming he reached maximum benefit and was never appropriate for the EOP level of care. Collaborating with the treatment team and the inmate and modifying the treatment plan to address the inmate's symptoms and behavior concerns would have been the appropriate course.

Clinicians at CSP/Sac documented their doubts about the legitimacy of the inmate's reported suicide attempts while ignoring the inmate's distress surrounding the planned level of care change. On November 15, 2020, four days prior to the level of care change, the inmate was evaluated for endorsing suicidal ideation and reporting a medication overdose. The clinician determined that inpatient admission was not clinically indicated; however, she did not complete a SRASHE safety plan or reference an existing one. The EOP discharge IDTT was completed in

873

absentia, however, there was no documented reason for the inmate's absence. Additionally, the SRASHE safety plan was not updated on the date of his final EOP IDTT, despite clinicians linking suicide threats to level of care concerns and the inmate being placed in ASU on this date.

**EXHIBIT B**
**Folsom State Prison (Folsom)**
**May 7, 2019 – May 9, 2019**

**Inmate A**

This EOP inmate was housed at Folsom while awaiting transfer to an EOP. His healthcare record was reviewed to evaluate the care provided at Folsom.

The inmate arrived at Folsom on October 11, 2018 and was referred for EOP level of care on April 17, 2019. The inmate was provided with a diagnosis of Unspecified Psychosis not due to a substance or known physiological condition, Amphetamine-type Substance Use Disorder, and Unspecified Depressive Disorder.

The initial treatment plan dated October 24, 2018 noted the inmate's history of auditory hallucinations and depression. During previous incarcerations, the inmate was not a participant in the MHSDS.

Subsequent progress notes indicated worsening of auditory hallucinations, decrease in self-care and worsening depression with thought blocking. On April 8, 2019, the psychiatrist recommended to the PC that the inmate be considered for a higher level of care. A treatment plan dated April 17, 2019 indicated that the inmate had increased symptoms of psychosis which interfered with his ability to program. He reportedly had poor self-care, response to auditory hallucinations and disorganized thinking. At that time, he was referred for EOP level of care.

Treatment plans included goals of reduced hallucinations, self-injurious behavior and depressed mood, which were appropriate treatment goals. He was prescribed Zoloft, Remeron and Aripiprazole.

**Findings**

The care provided to this inmate appeared to be appropriate. This inmate was appropriately identified as needing a higher level of care due to worsening symptomatology. He was referred to the EOP level of care, and at the time of the visit he was awaiting transfer to an EOP. The transfer deadline had not yet occurred at the time of the visit. There was documentation of weekly PC contacts, as well as monthly psychiatric contacts after EOP referral.

Treatment plans included the appropriate treatment goals. Clinical contacts also included appropriate assessment of suicidality, including the use of the Columbia-Suicide Severity Rating Scale.

**Inmate B**

This EOP inmate was housed at Folsom while awaiting transfer to an EOP. His healthcare record was reviewed to evaluate the care provided at Folsom.

The inmate arrived at Folsom on April 15, 2019, and he was recommended for EOP level of care on April 24, 2019.  He was seen by a PC on April 22, 2019 for an initial assessment when it was noted that he had auditory hallucinations and difficulty managing in a general population setting. The clinician indicated that the inmate would be referred for the EOP level of care.

The inmate was prescribed Prozac, Zyprexa and Remeron.  He was provided with diagnoses of Unspecified Schizophrenia Spectrum and Other Psychotic Disorder and Unspecified Depressive Disorder.

A treatment plan dated April 24, 2019 included treatment goals of decreased hallucinations, anxiety, improved hygiene, social and coping skills. There was also discussion of worsening of auditory hallucinations.

**Findings**

This inmate appeared to receive appropriate mental health care.  He was appropriately identified as requiring EOP level of care, and he was referred by the IDTT.  Treatment planning was clinically appropriate and individualized. This inmate also had a history of suicidal ideation and behavior, and there was documentation of appropriate assessment of suicidality, including the use of the Columbia-Suicide Severity Rating Scale. There was documentation of weekly PC contacts, as well as monthly psychiatric contacts after EOP referral. Treatment plans included the appropriate treatment goals. At the time of the visit, the inmate was awaiting EOP transfer, and his transfer deadline had not yet occurred.

**EXHIBIT C**
**Pelican Bay State Prison (PBSP)**
**Review Date - May 15, 2020**

**Inmate A**

This patient was in the PBSP MHCB from March 26, 2020 to March 30, 2020 due to danger to self. The PC indicated that custody staff reportedly confiscated the patient's property; subsequently, the patient endorsed command auditory hallucinations and suicidal ideation, resulting in MHCB admission. The patient's psychiatric diagnoses were Bipolar I Disorder and Antisocial Personality Disorder. He was prescribed Depakote, Vistaril and Risperdal. The patient was intermittently adherent with taking his prescribed psychotropic medications. A March 30, 2020 SRASHE assessed the patient with high chronic and low acute suicide risk. The patient's history was significant for two suicide attempts by hanging; the most recent attempt occurred in 2009. Records indicated that the patient had not received an RVR since September 2019.

The March 27, 2020 treatment plan included only one mental health interdisciplinary plan of care (IPOC) for auditory hallucinations. The treatment goal was to learn three new coping skills, and the intervention was to encourage the patient to work on coping skills and his attitude toward auditory hallucinations. A different section of the treatment plan form indicated that the PC would utilize cognitive behavior therapy and motivational interviewing for the "examination of thoughts, feelings, and behaviors that result in auditory hallucinations and suicidal ideation." This document also indicated that the patient had not met any higher level of care referral indicators during admission and that he would be discharged to the 3CMS level of care when the discharge criteria were met. The PC wrote that 3CMS was the "most appropriate level of care given treatment course/response and formulation of case and following recommendations."

The IDTT, PC and psychiatry contacts occurred within Program Guide timeframes.

It appeared that all of the patient's MHCB psychiatry contacts were conducted via telepsychiatry, including during IDTT.

The patient discharged to the 3CMS level of care on March 30, 2020. The discharge note stated, "The IDTT decided Friday to send this inmate back to 3CMS level of care" and that the patient "reached maximum benefit." Despite discharging the patient to the 3CMS level of care, the PC wrote that the patient's protective factors would be "strengthened by his involvement in EOP level of care services."

After leaving the MHCB on March 30, 2020, the patient was involved in a physical altercation with another patient, and he was placed in ASU.

A review of the five-day follow-up revealed two medication errors during the first week of MHCB discharge. Nursing documentation indicated that the psychiatrist was notified on April 2, 2020 that all psychiatric medications had expired. The psychiatrist wrote a note on April 3, 2020 stating that medications were renewed. On April 7, 2020, a nurse notified the psychiatrist again that the patient had no active orders for medication. The psychiatrist renewed the medications

and followed up with a note on April 8, 2020 indicating that the order had expired "for unclear reasons."

**Findings**

The quality of care provided to this patient was inadequate. The MHCB treatment plan and other clinical documentation were poor. The rationales provided regarding consideration of referral to higher levels of care were insufficient. The patient's medications were discontinued twice during the week of his MHCB discharge. The patient was admitted to the MHCB due to danger to self, yet the PC did not create an IPOC to address this concern during admission. The IDTT noted that the patient would discharge once the discharge criteria were met; however, it was unclear whether this occurred, as the criteria were extremely vague and not specific to the reasons for admission. The IDTT and PC did not follow up on the patient's custody concerns, despite this contributing to his MHCB admission.

The documentation by the PC was difficult to follow, as information was copied and pasted; generic and lengthy paragraphs were only slightly modified. Similar paragraphs were observed in several other patient's MHCB healthcare records during this review, and they resulted in numerous inconsistencies and inaccuracies, as the information was not patient specific. The PC's treatment plan and discharge notes, for example, contained inconsistent information regarding RVRs and level of care at discharge. Finally, it appeared that all of the patient's MHCB psychiatry contacts, including the initial and discharge assessments occurred via telepsychiatry. Additionally, no psychiatric discharge summary was documented.

**Inmate B**

This patient was admitted to the PBSP MHCB from April 13, 2020 to April 15, 2020 due to danger to self. His reported symptoms at admission included auditory hallucinations, suicidal ideation with depressed and anxious mood. He informed MHCB staff that he had been targeted by custody staff in his housing unit due to filing custody staff complaints, and that this was contributing to his suicidal ideation. He also alleged that these officers were making false accusations against him.

The patient's psychiatric diagnosis was Adjustment Disorder, with mixed anxiety and depressed mood. He was prescribed Remeron during the MHCB admission. A SRASHE on April 15, 2020 assessed the patient with low chronic and acute suicide risk. There were no recorded suicide attempts or self-injurious behavior incidents in his history.

The patient received two RVRs prior to MHCB admission. He was charged with possession of a controlled substance on December 17, 2019 and with delaying a peace officer in the performance of duties on April 13, 2020. The RVR mental health assessments resulted in findings that the patient's mental health did not contribute to the RVR behaviors.

The MHCB treatment plan primarily focused on "stress management and sleep hygiene." Interventions included breathing exercises and psychoeducation. The PC indicated that the patient had not met any of the higher level of care referral indicators. The PC created one IPOC for danger to self, but they did not include treatment interventions for this primary treatment target.

The IDTT decided to discharge the patient during the initial MHCB IDTT on April 15, 2020, noting that the primary trigger for MHCB admission was "issues with custody." The rationale for discharge indicated that the patient no longer exhibited suicidal ideation, functional impairments, distress or disturbance. The IDTT recommended that the patient's 3CMS clinician increase the frequency of contacts to every 30 days.

Regarding the rationale for placement at the 3CMS level of care at discharge, the PC wrote, "At this present time there are no known barriers for [the patient] to program at a 3CMS level of care, should he choose to do so." The PC noted that the patient was angry and disagreed with the level of care decision. The patient informed the PC that he would refuse to program until his custody issues were resolved or until he moved to a different setting.

The healthcare record indicated that, at some point after leaving the MHCB on April 15, 2020, the patient was charged with battery on a peace officer and placed in ASU.

On April 16, 2020, the STRH clinician noted that the ASU pre-placement screen yielded positive results, but consultation with mental health staff did not occur.

**Findings**

The quality of care provided to this patient in the MHCB at PBSP was inadequate. One mental health IPOC was created for danger to self; however, the PC failed to include any treatment interventions. The progress notes suggested that the only interventions offered during PC contacts were diaphragmatic breathing and psychoeducation related to sleep hygiene. The treatment team documented that the patient's suicidal ideation and MHCB admission was "triggered" by issues with custody officers in his housing unit, yet there was no indication that the IDTT attempted to consult with custody staff or in any way tried to address these concerns. Further, it did not appear that the IDTT included the patient in his treatment or discharge plans, and there were no follow up discussions documented suggesting that they attempted to help the patient understand their level of care and discharge decisions. The IDTT instead planned to discharge the patient back to his housing unit where he reported that officers were targeting him, and he subsequently engaged in behavior that resulted in ASU placement. The IDTT did not provide a sufficient rationale for discharging the patient to the 3CMS level of care, nor did they sufficiently document the reason his request for a higher level of care was denied. Finally, despite the patient's recent MHCB admission and his five-day follow-up status, the staff member who conducted the ASU pre-screen evaluation inappropriately did not consult with mental health staff in response to the positive screening result.

At the time of this review, on July 3, 2020, the patient remained housed in the ASU at PBSP.

**Inmate C**

This patient had five referrals to the MHCB at PBSP between March 2020 and June 2020. His psychiatric diagnosis was Adjustment Disorder with mixed anxiety and depressed mood. Symptoms included impulsivity, agitated and anxious mood, disrupted sleep and intermittent suicidal ideation. He routinely reported safety concerns as a result of custody officers retaliating against him for filing complaints. The patient was prescribed Vistaril and Remeron. He was non-adherent with prescribed Remeron during his most recent MHCB admission during June 2020. A

SRASHE dated June 29, 2020 assessed the patient with low chronic and acute suicide risk. There was no documentation in the healthcare record that the patient attempted suicide or engaged in self-harm behaviors.

On March 6, 2020, the patient was referred to the MHCB twice for danger to self and safety concerns on Facility A. The first referral resulted in alternative housing placement, and the second referral on the same date resulted in MHCB admission. The chief of mental health and various representatives from custody staff attended the patient's MHCB IDTTs in an apparent attempt to address his safety concerns. The PC documented that there was "a high degree of likelihood" that the patient would act out violently toward himself or others if returned to his housing unit at PBSP. The patient requested placement in PBSP's ASU until custody could arrange for his transfer to another institution. The March 6, 2020 treatment plan included one IPOC for danger to self with a goal of being free from self-harm for one week. The treatment intervention involved teaching the patient Socratic questioning as a structured approach for testing reality. The patient was discharged to the 3CMS level of care, and the discharge note indicated that the patient was "symptom free." The PC's level of care rationale stated, "Discharge to 3CMS given his medication." Custody placed the patient in the STRH upon discharge.

The patient's third MHCB referral occurred on April 9, 2020. Prior to admission, custody staff attempted to move the patient from the STRH to Facility B. The patient received an emergency consultation with mental health staff and was subsequently returned to the STRH with a new lock up order. The ASU pre-placement screen yielded a positive result, and the follow up consultation with the on-call psychiatrist resulted in MHCB admission. The patient, however, denied endorsing suicidal ideation and was frustrated with the readmission. He was discharged to the STRH at the 3CMS level of care on April 10, 2020.

The patient's fourth MHCB referral occurred on May 13, 2020. Prior to admission, the patient was reviewed by the ICC, designated non-disciplinary status (NDS), and informed that he would transfer to another institution. He apparently reported suicidal ideation in response to being denied access to his property and canteen on this date, and he was re-admitted to the MHCB after normal business hours. The following day, the patient informed MHCB staff that he had not endorsed suicidal ideation, but he had instead requested to speak with the tele-psychiatrist. The treatment plan noted the patient's frequent MHCB admissions, and the PC documented a higher level of care non-referral rationale and an accompanying treatment plan to address the patient's concerns at PBSP. "Absence of symptoms" was included in the rationale for non-referral. During this admission, the PC added an IPOC for impulsivity. Custody staff encouraged the patient to consider SNY placement; however, the patient refused. The patient was discharged to the STRH at the 3CMS level of care on May 15, 2020.

The patient's fifth and most recent MHCB referral resulted in admission from June 24, 2020 to June 29, 2020. The PC noted that the patient was in distress, endorsed suicidal ideation; and he reported that he was "having a nervous breakdown" over transfer delays resulting from COVID-19 related facility closures. The treatment plan included an IPOC for danger to self with a goal of remaining free from self-harm. The PC noted that the custody sergeant encouraged the patient to give MHCB treatment his best effort and added that custody was there to support his success in treatment. He was discharged to the STRH at the 3CMS level of care on June 29, 2020.

## Findings

The overall quality of care provided to this patient was adequate; however, the documentation was deficient. The patient was appropriately discharged to the 3CMS level of care following each MHCB admission. All five-day follow-ups were completed in accordance with Program Guide requirements, and the SRASHEs and safety plans were adequate. The documentation suggested that custody staff and mental health staff worked collaboratively to address the patient's safety concerns in the MHCB. The most recent treatment plan offered an appropriate justification for non-referral to a higher level of care, including a detailed treatment plan to address the patient's concerns at the prison.

Documentation deficiency included the following observations. The MHCB treatment plans between March and May 2020 were inadequate. The IPOCs were vague and did not adequately address the patient's presenting concerns. The PC routinely documented that the patient was "absent" psychiatric symptoms, which was inconsistent with their own description of the patient and documentation from other members of the IDTT. The treatment and discharge plans contained very lengthy, copied and pasted paragraphs that were not relevant nor specific to this patient. The discharge level of care rationale contained verbatim statements found in several healthcare records reviewed during this review period. Finally, the level of care rationale was unclear and not specific to the patient, as the PC used a copied and pasted statement indicating that 3CMS was "most appropriate level of care given the treatment course/response and formulation of case and following recommendations."

## Inmate D

This patient was in the PBSP MHCB from March 26, 2020 to April 13, 2020 due to danger to self. A March 18, 2020 note indicated that he was psychiatrically decompensating, refusing to program, reporting increased auditory hallucinations, isolating in a malodorous cell and endorsing suicidal thoughts during the preceding three months. The patient had recently completed a six-month SHU term at CSP/Corcoran on March 23, 2020. On March 25, 2020, while on layover at DVI, the patient endorsed suicidal thoughts; he was referred for MHCB placement and transferred to the PBSP MHCB.

The patient had a history of traumatic brain injury with lasting cognitive impairment and related seizures. The patient participated in a series of psychological testing while hospitalized at DSH for intermediate care from June 2016 to January 2017, and the results indicated that he met diagnostic criteria for Borderline Intellectual Functioning and PTSD. His psychiatric diagnosis upon MHCB admission at PBSP was Major Depressive Disorder, recurrent and severe with psychotic features. However, at discharge, the diagnosis was replaced with Schizophrenia Spectrum Disorder, Other Psychotic Disorder and Unspecified Depression. The patient's psychiatric medications were modified twice during MHCB admission; on April 10, 2020, the patient was prescribed Abilify for psychosis and depression, and his Vistaril prescription was discontinued.

A SRASHE on April 13, 2020 assessed the patient with high chronic and moderate acute suicide risk. The PC noted three unverified suicide attempts in the patient's history, which included an overdose of over-the-counter medications and an alleged hanging attempt at PBSP in 2010.

881

At the time of MHCB admission on March 26, 2020, the patient endorsed auditory hallucinations, a desire to die, and a lack of future orientation. The March 27, 2020 MHCB treatment plan included one mental health IPOC for danger to self with a goal of reducing the patient's depression to a "four or below" by the next IDTT. Goal setting was listed as the intervention. Another section of the treatment plan indicated that the patient would "receive a series of behavioral observations to increase frustration tolerance." The PC also wrote in this document, "Once patient tolerates 30 minute behavior observation and full issue for another 48 hours, patient will be discharged as patient has met his treatment goal."

On April 10, 2020 the PC noted that the patient would be retained in the MHCB beyond ten days. The IDTT indicated that he would not be referred for a higher level of care, and the non-referral rationale stated, "Referral not made. Inmate to be discharged to EOP level of care on Monday after the weekend and a trial of antipsychotic medication." The accompanying revised treatment plan in this section stated, "Treatment will use behavioral shaping" and "examine behaviors that contribute to schema overreliance and with a view to broaden delusional metaphor once properly elicited toward prosocial vectors to limit harm to self."

Progress notes leading up to the date of discharge described the patient as disengaged, attending to hallucinations, depressed, withdrawn, hopeless, refusing to get out of bed, minimally caring for himself, endorsing suicidal ideation with no plan, and refusing vitals, medications and individual contacts. The patient also refused in-cell treatment materials when offered.

The April 13, 2020 discharge SRASHE indicated that the patient continued to report suicidal ideation during daily rounds, that passive suicidal ideation was his "baseline," and that the patient would not fully participate in safety planning. The PC wrote that the patient "did not know why he did not want to discuss plans for the future and manage his safety" and that he routinely stated, "I will go wherever they send me. I'm good." Additionally, the PC reported that the patient's speech often "trailed off" when they attempted to complete the safety plan.

The patient was discharged on April 13, 2020 to the EOP level of care. He was subsequently placed in 3CMS general population housing until transfer to another institution could be arranged. The PC's rationale for EOP level of care was, "Discharge to EOP as most appropriate level of care given treatment course/response and formulation of case and following recommendations."

Although IDTTs and individual contacts with the psychiatrist and PC were offered timely, the patient refused most of these contacts during admission. Telepsychiatry was utilized for the initial assessment, IDTT, and for a psychiatric contact on the day of discharge. The tele-psychiatrist noted at discharge that the patient was observed at cell-front due to refusal and that it was difficult to hear the patient.

The five-day follow-up was completed in accordance with Program Guide requirements.

**Findings**

The quality of care provided to this patient was inadequate. The MHCB treatment plan did not appropriately address the patient's non-adherence with treatment, medications, and programming. Clinical documentation did not provide rationale and support for this patient's

discharge from the MHCB without a referral to intermediate care. The patient continued to endorse suicidal ideation, remained non-adherent with treatment and programming, exhibited ongoing impairments in functioning, refused to complete the suicide prevention safety plan, and refused to meet with the telepsychiatrist at cell-front on the date of discharge. The documentation suggested that a referral to an intermediate care facility was indicated; however, it did not appear the IDTT considered this level of care prior to discharge. The PC's rationale for non-referral to a higher level of care only stated that the patient would be discharged to EOP; further, the rationale for EOP level of care included a copied and pasted statement observed in several other patient healthcare records during this review. The copied statement also did not match the description of the patient noted in other clinical documents, including daily progress notes prior to discharge.

As of July 10, 2020, the patient had not demonstrated improvements in symptoms or functioning, and he remained in PBSP's 3CMS general population housing while awaiting transfer to an EOP facility.

**Inmate E**

This patient was referred twice to the MHCB from the PBSP STRH due to danger to self during the review period. The first admission occurred from March 4, 2020 to March 13, 2020, and the second admission occurred from May 20, 2020 to May 26, 2020. The patient was provided with a diagnosis of Major Depressive Disorder, recurrent and severe. Although he declined psychotropic medication throughout his first MHCB admission, the psychiatrist prescribed Vistaril for anxiety at discharge. Remeron was prescribed during his second admission. A SRASHE on May 26, 2020 assessed the patient with moderate chronic and low acute suicide risk. The patient had no recorded suicide attempts, however, he reportedly crafted a noose and planned to hang himself prior to both MHCB admissions.

The patient received four RVRs between January 2020 and March 2020. All RVR mental health assessment results indicated that his mental health symptoms had not contributed to his RVR behaviors.

The March 6, 2020 treatment plan included one mental health IPOC for danger to self. The higher level of care section of the treatment plan noted that the patient met one of the referral indicators; however, the PC stated that a referral to acute care was not recommended. The non-referral rationale in the March 13, 2020 treatment plan also indicated that acute care was not recommended as the patient exhibited "stable functioning" in the MHCB setting. The accompanying revised treatment plan in the higher level of care section stated that cognitive behavior therapy would be utilized, that cognitive distortions would be challenged, and that a safety plan would be developed to address the patient's suicide risk. The treatment plan also indicated that recreation therapy would be offered twice per week. The patient was discharged to the STRH at the 3CMS level of care on March 13, 2020. Included in the rationale for discharge was, "patient reached maximum benefit of MHCB stay, no criteria present to warrant extended stay."

Mental health IPOCs were absent in the May 22, 2020 treatment plan. Documentation in the clinical summary section indicated that the patient would not engage in self-injury or suicide attempts, and that anxiety and depression would be reduced to a score of five or below. The

883

patient was discharged on May 26, 2020 at the 3CMS level of care and housed in STRH on non-disciplinary segregation (NDS) status. The discharge rationale indicated that he "reached maximum benefit of MHCB stay" and that he was "stable, symptom free, and ready for discharge."

IDTT and individual treatment contacts with the PC and psychiatrist were timely. The PC documented treatment interventions and patient progress in the daily progress notes. The safety plan was individualized, and the five-day follow-up protocol was completed in accordance with Program Guide requirements.

## Findings

The overall quality of care provided to this patient was adequate, although marginally, and numerous documentation concerns were noted during both MHCB admissions. The quality of IPOCs in the March 2020 treatment plan were poor; however, the treatment plan in the higher level of care section was adequate. The IDTT decision to discharge the patient to the 3CMS level of care upon discharge appeared appropriate, but the level of care rationales provided, and the higher level of care considerations were insufficient. The non-referral rationale contained only a brief sentence indicating that the patient would not be referred to an acute program. Intermediate care and EOP level of care were not considered. Although the patient's acute symptoms appeared to have stabilized prior to both discharges, the discharge rationales were inappropriate. The discharge note indicated that the patient was "symptom free" and that he "reached maximum benefit of MHCB stay," instead of appropriately recording the patient's progress toward treatment goals and any symptoms to be addressed by the outpatient provider.

## Inmate F

This patient received MHCB treatment at PBSP from February 23, 2020 to March 6, 2020; his physical discharge date was March 9, 2020. The patient was referred from the EOP level of care at CSP/Sac due to grave disability concerns. His symptoms at admission included paranoia, hallucinations, mood dysregulation, agitation, disorganized speech, refusal of food and showers and fecal smearing.

The patient was provided with a diagnosis of Schizoaffective Disorder. The MHCB psychiatrist prescribed Abilify, Haldol, Cogentin, Vistaril, Remeron, Lithium and Prazosin. The patient was medication adherent during his MHCB stay. A SRASHE dated March 6, 2020 assessed the patient with moderate chronic and low acute suicide risk. The PC documented that the patient had a history of self-injurious behavior and one suicide attempt by hanging in 2008. The patient's history was significant for six DSH and PIP admissions, with the most recent occurring at the CMF-PIP acute program where the patient was hospitalized from August 2019 to October 2019.

The patient received two RVRs during his first week in the MHCB. On February 25, 2020, he received an RVR for indecent exposure; and on March 1, 2020, he reportedly spit water at a psych tech resulting in an RVR for battery on a non-prisoner. The evaluator recommended an alternative to the RVR process in both reports, given the patient's level of psychiatric

decompensation at the time of the incidents. Additionally, the PC documented, "Inmate was decompensated and this led to the behavior."

On February 24, 2020, the PC noted that the psychiatrist had not met with the patient prior to the IDTT. The IDTT considered a referral to acute care on February 28, 2020; however, the PC's rationale for non-referral on this date was that "the IDTT decided against it, given slow reconstitution of inmate," and as a result of the inmate having been admitted for less than one week. The IDTT recommended that the patient remain on cuff status due to recent impulsive behaviors. The February 24, 2020 treatment plan included one mental health IPOC for grave disability, and the goal was to program and improve self-care "as measured by eating meals" by the next IDTT. The proposed intervention was to assist the patient in setting self-care goals. The February 28, 2020 clinical summary section of the treatment plan offered more individualized treatment goals to address self-care, showers, meals, treatment participation, cell maintenance and fecal smearing.

On March 6, 2020, the PC noted that the patient had been retained in the MHCB longer than ten days. On this date, the rationale for non-referral to a higher level of care stated only that the patient had been approved for an extended length of stay in MHCB for medication changes. The accompanying treatment modifications section noted that MHCB staff would make extra efforts to work on obtaining ordered laboratory studies with the patient who was a "hard stick and had some issues getting blood drawn."

The patient physically discharged from the MHCB to the EOP level of care on March 9, 2020. The IDTT noted at the time of discharge that the patient demonstrated improvements in medication adherence, hygiene, food intake, cell management and in "speaking coherently." The discharge plan stated that the patient would return to the CSP/Sac mainline EOP level of care; however, upon return, he was placed in the CSP/Sac ASU as a result of the RVR that occurred in the PBSP MHCB.

**Findings**

The quality of care provide to this patient was inadequate. The mental health IPOCs lacked specificity, individualization and evidenced based interventions. Although the PC's treatment plan in the clinical summary section offered more detail, measurable objectives and evidenced based interventions were lacking. The February 28, 2020 rationale for non-referral to a higher level of care was inappropriate. The IDTT indicated on this date that the patient was severely decompensated, that he received two RVRs in the MHCB due to behaviors attributed to his mental illness, that he should remain on cuff status, and that a referral to acute care was considered, but decided against. The IDTT should have referred the patient to a higher level of care with a plan to rescind the referral upon demonstrating sufficient progress, as this would prevent delayed access to needed acute care. Further, it did not appear that intermediate care was considered at any point during admission.

The IDTT appropriately reviewed the patient's cuff status during the February 28, 2020 IDTT, but it failed to document subsequent recommendations in the IDTT notes. The patient had only partially met his treatment goals by discharge, yet the PC wrote in the discharge summary that the patient had "met max benefit" in MHCB. Custody staff did not adopt the recommendations

885

of the RVR mental health evaluator, nor was their plan to place the patient in segregation upon discharge communicated with the mental health staff. The IDTT may have developed a different discharge plan had they been informed the patient would not be discharged to the mainline EOP.

The psychiatrist failed to meet with the patient prior to the initial IDTT. Telepsychiatry sessions were typically conducted on Fridays, and the patient was offered telepsychiatry contacts on at least three occasions during admission.

**Inmate G**

This patient was admitted to the PBSP MHCB from May 12, 2020 to May 20, 2020. He received mental health services at the 3CMS level of care, and he was housed in the STRH on non-disciplinary segregation (NDS) status due to safety concerns prior to admission. The PC noted that the patient was originally placed in the STRH during February 2020 and that he was endorsed to the CSATF level three SNY program; however, his transfer date was unknown as transfers were suspended due to COVID-19.

The patient was provided with diagnoses of Unspecified Depressive Disorder and Adjustment Disorder. Upon admission, he reported auditory hallucinations, depressed and anxious mood, hopelessness, loss of appetite and suicidal ideation. He was reportedly medication non-adherent. The psychiatrist prescribed Vistaril, Celexa, Haldol and Mirtazapine during admission. The patient's history was significant for two suicide attempts by hanging, with the most recent occurring prior to MHCB admission on May 12, 2020. The patient manufactured a noose in his cell, and he attempted to hang himself on this date; a neighboring patient alerted staff who intervened. A SRASHE on May 19, 2020 assessed the patient with high chronic and low acute suicide risk.

The MHCB treatment plan included one mental health IPOC for danger to self. The PC indicated that they would improve the patient's functioning with goal setting and by encouraging the patient to verbalize treatment concerns. The PC also indicated that a safety plan would be developed with the patient. A more detailed and individualized treatment plan was documented in the transfer and discharge section of the treatment plan. Treatment targets addressed the patient's eating, sleep, medication adherence and exercise. Goals included 100 percent adherence with medications, mental health appointments and recreation therapy. The discharge plan indicated that the patient would discharge after "maintaining 48 hours of no self-injurious behavior" with minimal observation and full patient issue. The PC noted that treatment progress would be measured by "attendance in all mental health appointments." The IDTT indicated that the patient had not met any of the higher level of care referral indicators during admission.

On May 20, 2020, the patient was discharged to the 3CMS level of care and returned to the STRH on NDS. The discharge note indicated that the patient met his treatment goals, fully participated in MHCB treatment, had no incidents of self-harm, adhered with taking prescribed medications, completed his safety plan intervention and demonstrated notable improvements in mood and functioning. The PC noted that the patient was in agreement with the discharge recommendations and that he reported feeling "back to normal." The discharge summary offered additional treatment recommendations for the STRH clinician.

A review of daily progress notes suggested that treatment interventions were occurring during individual treatment contacts, and the PC routinely noted medication adherence and progress toward treatment goals.

IDTT and individual treatment contacts with the PC and psychiatrist were timely. Recreation therapy was offered twice per week. The five-day follow-up was completed in accordance with Program Guide requirements.

As of July 9, 2020, the patient had not transferred from the STRH at PBSP.

**Findings**

The quality of care provided to this patient was adequate. Although IPOCs were lacking in specificity, the PC developed a detailed and individualized treatment plan with measurable goals and evidenced based interventions in the transfer and discharge section of the master treatment plan. The PC noted daily progress toward treatment goals, which supported the IDTT decision to discharge. The patient was included in the treatment and discharge planning, and the PC offered additional treatment recommendations for the receiving clinician in the STRH. Appointments and follow ups were in compliance with Program Guide requirements.

**Inmate H**

This patient was referred to the PBSP MHCB on at least five occasions between March 2020 and May 2020. MHCB staff documented during each admission that the patient's suicidal statements were motivated by safety concerns on the yard. The patient repeatedly informed MHCB staff that he was afraid for his life on Facility A. Mental health staff consulted with custody regarding the patient's safety concerns during each admission and noted that the patient's safety concerns were being investigated.

The patient was provided with diagnoses of Antisocial Personality Disorder and Unspecified Adjustment Disorder. The patient refused psychiatric medications during MHCB admissions, and he reportedly "rejected" treatment efforts from staff. A SRASHE on May 22, 2020 assessed the patient with moderate chronic and low acute suicide risk. The patient's history was significant for four incidents of self-harm without intent to die, the most recent occurred on May 18, 2020.

The initial MHCB admission on March 30, 2020 occurred after custody attempted to move the patient from the STRH to Facility A. The discharge note of the April 8, 2020 admission indicated that custody staff planned to place the patient in the STRH "pending investigation of safety concerns." On April 10, 2020, custody staff attempted to again move the patient to Facility A; however, the patient reported suicidality, and he was readmitted to the MHCB.

Between April 11, 2020 and May 13, 2020, the patient was housed in STRH and did not seek MHCB admission. However, on May 13, 2020, he was readmitted to the MHCB after resisting escort to Facility A and reporting suicidal ideation.

The May 14, 2020 clinical summary indicated that a confidential informant notified custody about weapons on the yard, and that the patient was in fact being targeted for "assault/stabbing."

887

The note also stated that "custody found the information to be credible." The patient reported to the PC that custodial staff were "malevolent in their insistence" that he should be able to program in the PBSP general population. On May 15, 2020, the custody captain informed the patient that he would be escorted to the STRH upon discharge; however, after normal business hours, officers attempted to return the patient to Facility A. Subsequently, the patient was readmitted to the MHCB by the on-call psychiatrist after threatening suicide.

The May 15, 2020 treatment plan did not include any mental health IPOCs. The May 18, 2020 MHCB treatment plan included one mental health IPOC for treatment non-adherence with a goal of daily attendance in treatment activities. The intervention involved educating the patient on the benefits of treatment adherence. The PC also noted that the IDTT would "focus on ameliorating the inmate's coping skills through specific targeting of his stress, given the fact that his current thwarting of custody placement is not working well for him." The higher level of care section included a statement that the patient would not be referred to an acute psychiatric program, as his crisis behavior had "resolved upon admission."

The May 22, 2020 discharge summary stated that the patient met diagnostic criteria for a diagnosis of Antisocial Personality Disorder. The PC's justification for providing this diagnosis was "given history of violence, volitional maneuvers to avoid responsibility taking and history of same." The PC also noted that the patient rejected treatment efforts, adding that the patient "wants to fight against CDCR for unknown gains, suspected as litigious," and that he "writes complaints against all staff with whom he develops an angle to assail."

The patient was discharged again to the STRH at the 3CMS level of care on May 22, 2020. The PC's rationale for discharging the patient to the 3CMS level of care stated, "most appropriate level of care given treatment course/response and formulation of case and following recommendations."

**Findings**

The quality of care provided to this patient was inadequate. The quality of treatment plans was poor, and mental health IPOCs were absent in the patient's May 15, 2020 treatment plan. Although the patient did not appear to require a higher level of care, the rationale for non-referral was insufficient, and only acute care was considered. The rationale for discharge to the 3CMS level of care was an unclear statement that was copied and pasted across numerous other patients' MHCB healthcare records. The discharge plan sections were filled with lengthy copied and pasted paragraphs that were also found in multiple patients' healthcare records. Despite the patient's valid safety concerns in general population, the PC's personal frustration toward this patient was apparent throughout the documentation and should have been addressed in consultation or supervision.

The MHCB staff attempted to work with custody in discharging the patient to safe housing in the STRH; however, poor coordination and communication resulted in custody staff attempting to move the patient to the facility where he feared for his life, and this resulted in unnecessary readmissions to the MHCB by the after-hours on-call psychiatrist. This patient would have benefitted from a structured and multidisciplinary behavior plan that included custody staff and the STRH clinical team. The patient should have been escorted from the MHCB to the STRH

during normal business hours and seen by the STRH clinician upon arrival. Discharging the patient during normal business hours would have minimized communication issues and unnecessary readmission by the on-call psychiatrist.

**Inmate I**

This patient had two MHCB admissions at PBSP during the review period. He was initially admitted due to danger to self from March 4, 2020 to March 12, 2020, and he was readmitted due to psychiatric decompensation and acute psychosis from March 30, 2020 to April 10, 2020. His psychiatric diagnoses included Unspecified Schizophrenia Spectrum Disorder and Other Psychotic Disorder. The MHCB psychiatrist prescribed Thorazine, Cogentin and Vistaril; however, the patient was medication non-adherent.

A SRASHE on April 9, 2020 assessed the patient with high chronic and low acute suicide risk. The patient reported two suicide attempts, with the most recent occurring on March 4, 2020 by tying a noose around his neck. A follow up note on March 5, 2020 indicated that the patient would have died if not discovered by staff.

On February 7, 2020, the patient received an RVR for "behavior which could lead to violence." The RVR mental health assessment interview was completed in the MHCB on March 8, 2020; however, the evaluator wrote that they did not consult with MHCB providers. The assessment results indicated that the RVR behavior was not attributable to symptoms of a mental illness.

The March 6, 2020 treatment plan included a mental health IPOC for danger to self with a goal of remaining free of suicidal thoughts and behaviors for one week. Another goal indicated that the patient would attend and actively participate in daily programming. The PC's treatment interventions involved developing a safety plan, goal setting and verbalizing treatment concerns. A more detailed and individualized treatment plan was included in the transfer and discharge section of this document. On March 11, 2020, the patient refused to attend the IDTT, and new IPOCs for medication non-adherence and hallucinations were added to the treatment plan. The patient was discharged to the STRH at the 3CMS level of care on March 12, 2020, with a recommendation of monitoring for the possibility of transfer to the EOP level of care over the next 90 days.

Prior to the second MHCB admission on March 30, 2020, the patient presented with persecutory delusions, hypervigilance and command auditory hallucinations. He indicated on this date that MHCB admission would not help him. On March 31, 2020, the patient reported that he did not want to take his antipsychotic medication, as he feared it would "make him worse." Throughout the course of his MHCB admission, he endorsed auditory hallucinations, routinely refused to speak with the psychiatrist and PC, refused recreation therapy and refused antipsychotic medication. On April 5, 2020, the PC wrote that the patient was possibly delusional and that he reported "feeling bad." On April 6, 2020, the patient reported that "the weekend was rough"; and on April 7, 2020, he stated that he was "doing bad." The patient refused to speak about his feelings during follow up questions, and he explained to the PC that talking about his feelings "only makes it worse."

On April 8, 2020, the psychiatrist conducted a cell-front contact prior to the IDTT. The psychiatrist noted that the patient would not offer input into his own treatment plan, that he did not plan to attend the IDTT, and that he deferred to the treatment team for future plans. The IDTT decided to discharge the patient to the EOP level of care on this date and indicated that he would be housed in the STRH. The discharge rationale indicated that he no longer met inpatient criteria; however, it did not suggest that he met his treatment or discharge goals. The PC acknowledged that the patient "had not sufficiently stabilized and had not established medication or treatment compliance." A referral to intermediate care was not considered. Instead, the IDTT recommended that the STRH clinician meet with the patient twice per week and offer in-cell activities.

Records indicated that the patient was not informed of the outcome of the April 8, 2020 IDTT. When custody staff attempted to escort the patient to the STRH, he endorsed suicidal and homicidal ideation; subsequently, nursing staff retained the patient in the MHCB on discharge status overnight. On April 9, 2020, the patient informed the PC that he did not know his discharge plan, that he had questions about being placed in EOP, and that he "felt kicked out." After the PC answered the patient's questions, he agreed with the IDTT discharge plan; and he was escorted to the STRH.

**Findings**

The quality of care provided to this patient was inadequate. The IDTT decision to discharge was not at all supported by the clinical documentation. The patient clearly had not demonstrated progress toward treatment goals; he refused nearly all of his treatment contacts, and he was described as psychiatrically unstable. He had refused four PC contacts consecutively in the days preceding his discharge, and the PC noted that they were unable to fully assess the patient's mental status on those dates. The patient's presentation suggested that the IDTT should have considered a referral to intermediate care; or minimally, the IDTT should have documented a rationale for non-referral and a plan to stabilize the patient. The IDTT's failure to inform the patient that he was discharged to the EOP level of care with housing in STRH resulted in unnecessary panic from the patient and avoidable burden on after-hours staff.

Finally, the RVR mental health assessment interview was conducted in the MHCB on March 8, 2020; however, the evaluator did not appropriately consult with the MHCB providers.

**Inmate J**

This patient received MHCB treatment at PBSP from March 18, 2020 to April 10, 2020. The healthcare record indicated that he was admitted to the MHCB at CSP/Solano from February 23, 2020 to March 2, 2020, and he was subsequently discharged to the EOP level of care.

The patient then transferred to the CSP/Sac ASU where his five-day follow-up was conducted. The patient was seen for emergency consultations at CSP/Sac on March 5, 2020 and March 17, 2020 in response to endorsement of suicidal ideation and distress surrounding his upcoming May 30, 2020 parole date. The March 17, 2020 emergency consultation resulted in referral to the MHCB, and the patient was placed in alternative housing until transport to the PBSP MHCB on the following day.

The patient was provided with a diagnosis of Major Depressive Disorder. His symptoms included depressed and anxious mood, suicidal ideation, and hopelessness. He informed the MHCB clinician that his upcoming parole date was exacerbating his symptoms, as he had no housing plan and would be required to register as a sex offender upon release. The MHCB psychiatrist prescribed Vistaril, Duloxetine and Remeron, and the patient was medication adherent.

A SRASHE on March 27, 2020 assessed the patient with high chronic and acute suicide risk. The patient's history was significant for four suicide attempts, and his most recent attempt by strangulation occurred in the PBSP MHCB on March 23, 2020. Documentation indicated that the patient tied a noose around his neck and the sink in his MHCB cell. On April 7, 2020, custody officers searched the patient's cell while he showered and discovered a "strong rope" made from safety smock material.

Two RVRs were issued to the patient for indecent exposure during March 2020. The first incident occurred on March 13, 2020, while the patient was in the EOP at CSP/Sac, and the second incident occurred on March 19, 2020 in the MHCB at PBSP. Clinical interviews for the RVR mental health assessments for both incidents were attempted while the patient was housed in the PBSP MHCB. The evaluator documented that the patient refused to participate in both interviews and that members of the MHCB treatment team were not consulted. The results of the assessments were that the patient's mental health symptoms had not contributed to the RVR behaviors.

The IDTT documented on March 27, 2020 that the patient met one higher level of care referral indicator, and an acute care program referral was submitted on this date. The PC wrote in the discharge summary that the patient had not established "any clear contingency parole plans."

MHCB IDTTs and individual treatment contacts with the PC and psychiatrist were timely. Recreation therapy was offered twice per week. The patient, however, refused most individual treatment, recreation therapy contacts, and laboratory studies ordered by the psychiatrist.

The patient was transported to CMF-PIP acute program on April 10, 2020 for further treatment.

**Findings**

The quality of care provided to this patient during his 22-day stay in the PBSP MHCB was inadequate; although, the IDTT decision to refer him to an acute psychiatric program was clinically appropriate. CSP/Solano and PBSP repeatedly documented that the patient's frequent MHCB admissions and acute psychiatric symptoms were triggered by fears surrounding parole and lack of pre-release planning; however, parole planning was seemingly ignored by MHCB providers. Treatment plans failed to address the patient's RVR behaviors and treatment non-adherence. The RVR mental health assessment evaluator did not appropriately consult with the MHCB treatment team, particularly in light of the patient's refusal to participate in the interviews.

**Inmate K**

This healthcare record was randomly selected for review from a list of STRH inmates to assess if the inmate received appropriate care in the 3CMS level of care. This inmate transferred from CSP/Solano to the STRH at PBSP on March 17, 2020.

The initial IDTT during the review period occurred on April 1, 2020, and all required staff were present. The inmate was provided with a diagnosis of Major Depressive Disorder, recurrent, moderate; he was also treated for anxiety related symptoms. No diagnoses were added under the Diagnosis and Problems list tab during the review period. In addition to reduction of depressive symptoms, treatment goals focused on improving the therapeutic alliance. The inmate was also diagnosed with multiple medical conditions included on the problem list in the treatment plan. He was prescribed Mirtazapine, Sertraline and Vistaril.

The therapeutic interventions (i.e., cognitive behavioral therapy and group therapy) provided were appropriate for his diagnosis and target symptoms. On April 10, 2020, concern was raised regarding possible COVID-19 exposure that occurred 14 days prior, but the inmate was cleared for normal housing after a negative screen. He reported several times that he was "stressed" due to being housed in the STRH, not having his property, and not being geographically near his family. A PC contact on April 19, 2020, occurred in response to these issues of concern. The inmate was ultimately able to manage his stress, and he eventually began to attend groups.

The initial psychiatric visit occurred on April 10, 2020; this contact was late as it occurred after the initial IDTT. There was a lack of documentation of subsequent psychiatry contact during the review. During his initial appointment, the inmate reported depressive symptoms, including insomnia and low mood. No adjustment was made to his prescribed medications, and his active symptoms were not mentioned in the assessment.

The confidentiality of the clinical contacts was not documented in the healthcare record.

**Findings**

The care provided to this inmate was inadequate due to issues around psychiatric treatment and lack of appropriate follow-up. The PC appropriately identified the inmate's ongoing depression and anxiety, and treatment goals were implemented to address these symptoms. There was a lack of documentation regarding the psychiatric rationale for not adjusting the inmate's medication when he reported active depressive symptoms. Although it is not uncommon for a psychiatrist to refrain from changing the medication of a patient at the initial assessment, it is expected that their clinical rationale would be documented in their assessment. Additionally, psychiatric follow-up was also indicated in light of the inmate's report of depressive symptoms; however, such follow-up was not documented.

**Inmate L**

This healthcare record was randomly selected for review from a list of STRH inmates to assess if the inmate received appropriate care.

This inmate transferred from the general population 3CMS program at NKSP to the STRH at PBSP on January 9, 2019. The inmate was provided with a diagnosis of Unspecified Depressive Disorder. He was also diagnosed with several medical conditions associated with pain.

During the review period, three IDTTs were conducted for this inmate. The first IDTT occurred on January 16, 2020, the second occurred on February 5, 2020, and the third occurred on April 29, 2020. The inmate attended one of the three IDTTs during which he agreed with the goals and treatments that were instituted. Appropriate goals and interventions were documented that were consistent with the inmate's diagnosis and symptoms; these goals and interventions were updated at subsequent IDTTs.

During a PC follow-up contact on April 24, 2020, the inmate provided documentation that in 2014 he was given a diagnosis of PTSD, and he requested a change in the focus of treatment to PTSD rather than depression. The inmate also voiced concern regarding his untreated PTSD during the April 29, 2020 IDTT. He was formally assessed by his PC for PTSD and anxiety on April 30, 2020, and she ascertained that he had both anxiety and PTSD symptoms. Although the diagnosis or problem list was not updated; the PC did update the treatment plan to include both anxiety and PTSD symptoms, which were appropriately addressed at subsequent PC follow-up visits. All PC contacts were timely.

The inmate was not prescribed psychotropic medication, and no psychiatry visits occurred during the review period.

**Findings**

The care provided to this inmate was appropriate. He received PC treatment that was targeted to his treatment goals and symptoms. While documentation of his diagnosis was not updated with PTSD or anxiety, it did not appear to impact the appropriateness of the provision of care.

**Inmate M**

This healthcare record was randomly selected for review from a list of STRH inmates to assess if the inmate received appropriate care.

This inmate was transferred from DVI to PBSP on August 26, 2019, where he was placed in the STRH. The inmate was provided with diagnoses of Delusional Disorder, grandiose type and Antisocial Personality Disorder. He was also diagnosed with gastric reflux disease. He was not prescribed psychotropic medication during the review period.

During the review period, three IDTTs were conducted for this inmate. The IDTTs occurred timely, and the required attendees were present at the IDTTs. The inmate repeatedly refused to attend the IDTTs; however, the treatment goals were updated and reviewed with the inmate. Treatment goals were primarily directed to address symptoms related to Antisocial Personality Disorder (e.g., reducing thoughts of harming others, reducing hostile behaviors towards others, etc.) and not addressing symptoms of delusional thinking. Although documentation repeatedly noted that the inmate was not taking psychotropic medications, it should be noted that there was a lack of documentation that medications were recommended to the inmate during the review period.

PC contacts occurred timely, and treatment goals were addressed during each visit. The inmate did not attend groups, and documentation indicated that he was likely refusing to attend groups due to paranoid delusional thinking. There was, however, no documentation that the PC addressed the possible presence of delusional thinking, or that psychiatric consultation was requested.

There were no documented psychiatry visits during the review period. The inmate was last seen by the psychiatrist individually on August 20, 2018.

The confidentiality of PC contacts was not noted in the documentation.

**Findings**

The care provided to the inmate was inadequate. The inmate exhibited psychotic symptoms, including paranoid or grandiose delusional thinking, which was not addressed during the IDTTs or during the PC clinical contacts. This inmate should have been referred for psychiatric assessment and possible treatment with antipsychotic medications. The inmate did receive PC contacts that were targeted to documented treatment goals and symptoms. The confidentiality of PC visits was not documented.

**Inmate N**

This healthcare record was randomly selected for review from a list of STRH inmates to assess if the inmate received appropriate care.

This 3CMS inmate was transferred to PBSP from DVI on February 1, 2018. The inmate was provided with diagnoses of Major Depressive Disorder, recurrent and Borderline Personality Disorder on the problem list, and Anxiety on the diagnosis list. He was prescribed Vistaril; Mirtazapine was also prescribed; however, it was discontinued during January 2020.

During the review period, two IDTTs were conducted for this inmate, on February 6, 2020 and March 18, 2020. The inmate attended the first but not the second IDTT. Documented treatment goals were clinically appropriate.

PC contacts occurred timely. There was documentation that evidence-based interventions (CBT) were utilized that appropriately addressed treatment goals and individualized concerns. There was documentation that the sessions occurred in a confidential setting.

Psychiatric contacts were not timely and occurred on December 3, 2019, January 13, 2020, March 23, 2020 and April 10, 2020. The care provided at each visit was appropriate. The inmate discontinued Mirtazapine during January 2020; and, during his psychiatric session, the psychiatrist provided education regarding the risks of medication non-adherence. There was, however, a lack of documentation that the psychiatrist explored the reasons for medication non-adherence. Medication side effects were appropriately discussed and addressed.

**Findings**

The care provided to this inmate was appropriate.  Clinical interventions were appropriate for the inmate's diagnosis, treatment goals and clinical presentation. The confidentiality of treatment was noted by the PC, but there was a lack of documentation that the psychiatrist sessions occurred in confidential settings.

**Inmate O**

This healthcare record was randomly selected for review from a list of STRH inmates to assess if the inmate received appropriate care. This 3CMS inmate was transferred from SQ to PBSP on April 10, 2019.

During the review period, two IDTTs were conducted for this inmate, on January 15, 2020 and April 8, 2020.  The diagnosis included on the IDTT problem list was Unspecified Anxiety Disorder; conversely, Borderline Personality Disorder was listed on the diagnosis list.  Treatment goals were to reduce anxiety and to build coping skills. Treatment goals were appropriately updated in the treatment plan.  The inmate was prescribed Mirtazapine and Sertraline.

The majority of PC contacts occurred timely on a weekly basis.  The treatment provided was a combination of supportive and cognitive behavioral therapy which was appropriate in the treatment of anxiety.  The treatment goals were addressed at each visit and were updated.  All but two of the PC contacts occurred in a confidential setting.

Psychiatry contacts occurred timely, on February 21, 2020 and April 24, 2020.  The confidentiality of the setting was not documented.  There was documentation that ongoing symptoms, medications and current stressors were addressed at each session.  The inmate was noted to be medication adherent.  Medications were appropriately titrated to address ongoing symptomology.

**Findings**

The care provided to this inmate was appropriate. The PC provided clinical interventions that were appropriate for the inmate's diagnosis, treatment goals and clinical presentation.  The confidentiality of treatment by the PC was not documented.

**Inmate P**

This healthcare record was randomly selected for review from a list of STRH inmates to assess if the inmate received appropriate care. This 3CMS inmate was transferred from MCSP to PBSP on November 14, 2019.

During the review period, three IDTTs were conducted for this inmate, on December 5, 2019, February 26, 2020 and May 6, 2020.  The inmate was provided with a diagnosis of Unspecified Depressive Disorder.  He was prescribed Citalopram.  Treatment goals were appropriately focused on reducing depressed mood by addressing the underlying causative factors, including dysfunctional thoughts and associated feelings of distress.

PC contacts occurred timely, and they occurred in a confidential setting; these contacts occurred weekly for most of the review period. Cognitive behavioral and supportive therapies were provided during each session, and treatment goals were updated. Acute stressors were appropriately addressed during clinical encounters.

The inmate was seen on four occasions by the psychiatrist, and those clinical contacts occurred timely. There was documentation that current stressors were discussed, symptoms were reviewed, and medication was adjusted, as indicated. Two of the four visits occurred at the cell-front, due to the inmate refusing to leave his cell for a confidential appointment. The inmate was reportedly medication adherent.

**Findings**

The care provided to this inmate was appropriate. Clinical contacts were therapeutic and confidential. The clinical interventions provided were appropriate for the inmate's diagnosis, treatment goals and clinical presentation.

**Inmate Q**

This healthcare record was randomly selected for review from a list of STRH inmates to assess if the inmate received appropriate care. This 3CMS inmate was transferred from KVSP to PBSP on November 7, 2019. A SRASHE was performed on December 5, 2019, after the following was documented, "flooded [the] tier, kicked door and sang (rapping all night long on 12/5/19. Covered cell front. Other inmates asked him to stop and he kept being extremely loud. A second referral…stated Hostile/assaultive/poor self-control; Poor attention span/difficulty following directions; Exhibits bizarre behavior (yelling, covering cell front & flooring)." He was deemed to be low risk for suicide. His inappropriate behavior was noted to be due to "…experiencing depression for the first time since being transferred to prison from county jail, following taking a plea deal to a grisly crime committed while in county. Pt. has regrets regarding this crime and is now labeled a sex offender because of the crime. Pt. is just beginning to grieve the deaths of his mother and brother…"

During the review period, three IDTTs were conducted for this inmate. The inmate was provided with diagnoses of Adjustment Disorder, unspecified and Antisocial Personality Disorder. He was prescribed Vistaril. Treatment goals were to reduce depressed mood and to challenge dysfunctional thoughts secondary to lack of insight or poor judgment. These treatment goals neither addressed the grief the inmate was experiencing due to the loss of his mother and brother, or the regret he was experiencing related to his crime and new sex offender status. Treatment goals were updated at each IDTT, and the inmate attended most of the IDTTs.

PC contacts occurred timely and weekly. The confidentiality of the setting was documented; most visits occurred at cell-front due to inmate refusal. Interventions were supportive and appropriately brief given the setting of most contacts.

The inmate was seen twice by the psychiatrist during the review period. The second appointment occurred approximately one month late, and the inmate refused to be seen. The focus of treatment was management of anxiety and related insomnia symptoms with medication. The inmate reported that the medication helped his symptoms, and he was reportedly medication

adherent. Despite the inmate's refusal to be seen by the psychiatrist; his medication was continued, and he was scheduled for psychiatric follow-up in 90 days or sooner.

**Findings**

The overall care provided to this inmate was appropriate. Clinical interventions were appropriate for the inmate's diagnosis, treatment goals and clinical presentation, although several of the inmate's presenting complaints were not addressed in treatment (new sex offender charge, regret, and grief). Clinical contacts occurred in a confidential setting, unless the inmate refused out of cell contact.

**Inmate R**

This healthcare record was randomly selected for review from a list of STRH inmates to assess if the inmate received appropriate care. This inmate that was transferred from DVI to PBSP on July 10, 2019.

During the review period, two IDTTs were conducted for this inmate; both IDTTs occurred timely. The appropriate attendees were present at the IDTTs. The problem list of the most recent IDTT provided diagnoses of Anxiety and Bereavement; however, documentation in the IDTT note indicated a diagnosis of Generalized Anxiety Disorder. The inmate was not prescribed psychotropic medications, and he had not seen a psychiatrist since 2016. Treatment goals focused on assisting and managing anxiety by developing coping skills and psychoeducation with a goal of having anxiety symptoms in remission for three months or more. Although treatment goals were updated at each IDTT, the treatment goals did not address grief and bereavement.

PC contacts occurred timely and weekly in a confidential setting during the review period. Treatment sessions included assessment of current stressors and anxiety symptoms, and supportive and occasionally insight-oriented therapy techniques were provided. Treatment sessions also documented interventions to address grief and bereavement; however, this was inconsistently documented. Treatment goals were updated at each visit. The inmate was adherent with group therapy attendance.

**Findings**

This inmate received adequate mental health care as treatment interventions were clinically appropriate. However, it should be noted that although the inmate's symptoms were adequately addressed in treatment, issues of grief and bereavement were inconsistently or not addressed at all. Treatment planning should be updated to address this very important issue of concern.

**Inmate S**

The healthcare record for this inmate was reviewed to evaluate the care provided at the 3CMS level of care at PBSP during March 2020 to June 2020. The inmate transferred to PBSP from SQ on October 17, 2019. An ASU pre-placement screen and initial health screening were completed on that date. No diagnosis was listed in the diagnosis and problems section of the EHRS. The

897

inmate was seen by the IDTT on October 31, 2019, following initial placement in the STRH. The inmate remained in the STRH until approximately March 2020.

An initial evaluation was completed on March 6, 2020, and it was noted that the inmate had been provided a diagnosis of Adjustment Disorder with depressed mood, in full remission by history. Although initially prescribed Remeron, the inmate reportedly only took the antidepressant medication for a brief period of time during October 2019.  He was not prescribed psychotropic medications throughout the period of review. The treatment plan dated March 6, 2020 clarified that the inmate was placed at the 3CMS level of care due to medical necessity with a focus on ultimately removing the inmate from the MHSDS. Unfortunately, the psychologist who completed the initial evaluation was not present at the initial treatment team meeting.

The March 19, 2020 initial 3CMS general population IDTT did not occur timely; however, the required members were in attendance. The diagnosis and problem list was not reviewed and updated as part of the IDTT process. The existing interdisciplinary plans of care (IPOCs) initiated during November and December 2019 were maintained, despite the move to less restrictive housing, recent remission of symptoms, and the treatment focus on removing the inmate from the MHSDS. The inmate was also not provided any pre-release goals, despite scheduled release in January 2021. The existing treatment goals were outdated, and they were not clearly focused on maintaining symptom remission and adjustment to not receiving mental health services.

The inmate was not seen by a psychiatrist prior to the IDTT; although, a psychiatrist was present at IDTT. The inmate was not seen again by his PC during the review period, so the review was extended to include June 2020. The inmate was next seen by his PC on June 17, 2020, which was more than 90 days after his last PC clinical encounter that occurred on March 6, 2020. The PC who saw him at this visit was different from the PC who completed the initial evaluation. This lack of continuity of care may have contributed to the lack of substantive clinical information in the PC contact documentation of June 17, 2020 and apparent lack of meaningful therapeutic intervention or plan. The PC noted providing "support about upcoming release date" without documentation of the provision of adequate pre-release planning despite the inmate's upcoming release date approximately six months away.

**Findings**

The care provided to this inmate in the 3CMS general population was not adequate. His diagnosis was unclear due to the lack of substantive documentation and associated treatment planning. The inmate's treatment plan was not updated to reflect his move from STRH to the mainline/general population. While upon arrival to the general population the inmate was evaluated to be in remission from his symptoms, the treatment plan was not updated to reflect the decrease in symptoms. Different clinicians completed this inmate's initial evaluation, attended his initial general population 3CMS IDTT, and saw him for individual contact which resulted in poor continuity of care and treatment, including the lack of planning for discharge from the MHSDS. There were no pre-release treatment goals or interventions documented in the treatment plan, despite the inmate's upcoming release. This inmate would benefit from a comprehensive treatment plan to identify and address what prompted his placement in the MHSDS, with goals to maintain symptom remission and pre-release planning, as well as to maintain stability once

discharged from the MHSDS. He would also benefit from consistency in providers. It is likely that he would not require extensive treatment given his diagnosis of Adjustment Disorder, assuming the validity of that diagnosis.

**Inmate T**

The healthcare record for this inmate was reviewed to evaluate the care provided at the 3CMS level of care at PBSP. The inmate arrived at the facility in 2015. He was admitted to the MHCB prior to the review period in November 2019 and was then returned to the 3CMS level of care. Based on a review of the diagnosis and problems section of the EHRS, the inmate was provided with diagnoses of Anxiety Disorder, unspecified and Major Depressive Disorder, single episode, unspecified. Although the treatment team discussed adding the diagnosis of Borderline Personality Disorder on March 26, 2020, it was never formally added to the diagnosis and problems section of the healthcare record. The inmate was prescribed Lexapro. The inmate was seen by a tele-psychiatrist, and documentation indicated that the tele-psychiatrist was at times unable to see the inmate due to connection difficulties at PBSP. Psychiatric contact did, however, occur more frequently than the Program Guide minimum. The inmate had erratic medication adherence.

The inmate was seen by the IDTT on March 26, 2020 and June 3, 2020. He had apparently been placed on "OTC" (presumably over-the-counter, later clarified as such in a March 3, 2020 progress note) restrictions. A February 13, 2020 progress note from the initial PC contact during the period reviewed indicated that the inmate had reported consuming over the counter medication in an inappropriate manner resulting in stomach distress. While the inmate did appear to experience anxiety, review of documentation from a mental health appeal interview of February 15, 2020 and a psychiatric contact on February 19, 2020 suggested that the inmate also exaggerated his mental health symptoms for secondary gain. Some examples included repeated attempts to convince mental health providers that his anxiety was so extreme that he should be allowed to be scheduled for and/or attend medical appointments only when the yard was empty of other inmates. Another example included an effort to have documents that he had written placed into his healthcare record to set the stage for "a lawsuit against CDCR" according to his own admission. The inmate reported to staff that mental health staff believed that he was manipulative and were not responsive to his needs including in a mental health appeal, however, documentation did not support this belief. The treatment team focused on the inmate's reported symptoms and did not identify any manipulation-related goals.

The treatment team was asked to review and update the inmate's treatment plan due to multiple urgent and emergent referrals. The March 2020 IPOC identified anxiety as an area of treatment focus. While other areas of the treatment plan identified Borderline Personality Disorder as an updated diagnosis, the treatment team did not update the diagnosis and problem section of the treatment plan where that was required. The treatment plan did include narrative regarding providing the inmate with DBT but no related IPOC was created. Progress notes during this time did not indicate enrollment in DBT group, nor was there other treatment documentation that the inmate was receiving DBT. The inmate was seen prior to his June 2020 IDTT, but individual contacts were not increased in an effort to provide DBT or DBT-informed therapy or other empirically based intervention. In light of the recent increased frequency of urgent/emergent referrals, the 3CMS treatment plan required modification to provide increased treatment intensity

899

(i.e., frequency and duration) to provide brief intervention to increase coping skills and to decrease reactive behavior to external stressors.

While the treatment teams during March and June 2020 included the required disciplines in attendance, these staff were not always the required participants. For example, on June 3, 2020, the assigned treating psychiatrist was not present; instead, the IDTT included the supervising psychiatrist. This may have contributed to the IDTT report of improvement in symptoms without clear justification or acknowledgement that the treatment plan had not been fully implemented. This clinical "improvement" appeared to have been based solely on the reported decreased number of referrals. The old treatment goals were not updated to reflect the lack of increased treatment or modified to address the lack of progress in self-reported symptoms of anxiety. The inmate was retained at the same level of care. Despite only being seen once by his PC between the March and June 2020 IDTTs, the inmate was described as improved by his IDTT on June 3, 2020 without sufficient clinical rationale. The OTC restrictions were "lifted" without any objective data presented (they were never described or explained); there was never any corresponding order for placement on or off any OTC restrictions located in the healthcare record. The inmate's number of referrals significantly increased immediately after this IDTT, suggesting that there had been no real sustainable behavioral change.

The inmate was subsequently placed on medication-assisted therapy (MAT) in mid-June 2020 for substance abuse, and contacts with providers in that program increased; however, there was no change in 3CMS treatment.

**Findings**

The care provided to this inmate was adequate, although minimally. The treatment team appeared uncertain regarding the inmate's primary diagnosis, documenting that they believed that the inmate had Borderline Personality Disorder, but not formally documenting that diagnosis or properly documenting (via IPOCs) clinical interventions or implementing the associated interventions. While the March 2020 IDTT acknowledged an increased need for treatment, only medication management was provided. Treatment was not increased in an effort to provide indicated treatment to the inmate. He was ultimately provided with MAT for substance abuse, but he received only medication management for his mental illness that required placement in the MHSDS.

**Inmate U**

The healthcare record for this inmate was reviewed to evaluate the care provided at the 3CMS level of care at PBSP. The inmate arrived at PBSP in December 2017 and was receiving mental health services at the 3CMS level of care at that time. The inmate had multiple medical diagnoses in the diagnosis and problem section of the healthcare record, but no mental health diagnosis. The inmate's last annual IDTT occurred prior to the review period in November 2019. The required attendees were present at the IDTT. The treatment plan described mood and anxiety symptoms with possible PTSD. The inmate was not prescribed psychotropic medication; although, the treatment plan included several psychosocial interventions for depressive and anxious mood.

The first clinical contact occurred on January 7, 2020, for supportive therapy. The inmate appeared to be functioning well and focused on positive behaviors to cope with situational stressors. The inmate was provided recreation therapy by the rehabilitation therapist; the primary purpose for this activity was not documented. This provision of services was a beneficial exception to the usual lack of access afforded general population 3CMS inmates. Group treatment documentation provided minimal clinical information. Although implied, the lack of documentation may have been intentional as the rehabilitation therapist appeared to be working with the inmate regarding sensitive issues of physical deformity, victimization, and improved socialization.

The inmate was seen at approximately 90-day intervals by his PC during the review period. While that was not consistent with his treatment plan which indicated more frequent clinical contact, it did appear sufficient for his level of functioning and mental health need. During mid-May 2020, the inmate was placed on quarantine due to COVID-19. No increased mental health care or evaluation was provided during that time in response to his quarantine status. No mental health referrals were generated during that time as well; however, it was unclear what the status of mental health assessment was during this period. Quarantine observation appeared to end after 19 days on May 28, 2020. The inmate was not seen by the PC following the April 2020 contact during the review period.

**Findings**

The care provided to this inmate was adequate, although minimally. His treatment plan contained vague, subjective, and difficult to measure treatment goals. The inmate would benefit from an updated treatment plan with revised clinically appropriate treatment goals and a clinically updated treatment plan. The adequacy of the treatment plan was limited somewhat by the EHRS treatment plan/IPOC format. However, the treatment team could use the narrative portions of the IPOCs to specify objective measurable treatment goals and empirically based interventions that would be more appropriate for the level of care provided, the inmate's symptoms, and functional level. The inmate did not receive increased mental health contact while quarantined; however, that was expected given the circumstances. Due to the lack of documentation, the inmate's mental status during quarantine could not be assessed.

**Inmate V**

The healthcare record for this inmate was reviewed to evaluate the care provided at the 3CMS level of care at PBSP. The inmate arrived at PBSP on November 7, 2019 from NKSP. He was initially seen by the PC on November 20, 2020. The inmate was not seen by a psychiatrist prior to the initial IDTT on November 21, 2020. This evaluation noted a prior diagnosis of Generalized Anxiety Disorder. The inmate was minimally cooperative during the evaluation, and he expressed significant reluctance to participate in mental health treatment. He reported that he had been "wronged" at PBSP in the past and strongly disliked custody, other inmates, medical and mental health staff. The inmate prematurely ended the evaluation, abruptly leaving. The inmate was not prescribed psychotropic medication.

The IDTT on November 21, 2019 did not develop an IPOC or actual treatment plan, so it was unclear what the treatment providers were to focus on as goals of treatment and/or what

interventions would be utilized. It appeared that there was no formal or actual treatment plan based upon available documentation. The inmate was seen for initial evaluation during the review period by his PC on January 10, 2020. During this individual contact, motivational interviewing was utilized with supportive therapy to assist the inmate in goal setting. Psychoeducation was also reportedly used to assist the inmate in developing strategies and behaviors to improve mood. The inmate reported depressive symptoms and anxiety with panic attacks. There was no documentation regarding the effectiveness of or the inmate's response to these interventions. Actual treatment interventions appeared to be limited to case management.

The inmate was seen every 90 days, on January 10, 2020 and April 9, 2020 by the PC for individual contacts; however, he was seen by two different providers, resulting in poor continuity of care. The inmate was not seen during the review period by a psychiatrist, nor was he required to be seen by a psychiatrist as no psychiatric referrals were generated, and the inmate was not prescribed psychotropic medication throughout the review period.

**Findings**

The care provided to this inmate was adequate, although minimally. The treatment provided to this inmate was episodic and disconnected, at best. While the treatment plan was constructed outside of the review period, its inadequacy (lack of any IPOCs or actual treatment goals and interventions) severely limited the subsequent team's treatment of the inmate. The inmate may have been at a functional level where only case management was necessary, but that should be clearly and explicitly documented in the treatment plan. Additionally, subsequent individual PC contacts appeared vaguely focused on unclear symptoms that may not have been viewed as credible by the treatment providers.

This inmate would benefit from a diagnostic evaluation and an updated treatment plan that included review of the appropriate level of care for this inmate.

**Inmate W**

The healthcare record for this inmate was reviewed to evaluate the care provided at the 3CMS level of care at PBSP. The inmate arrived at PBSP during February 2018. He was diagnosed with a seizure disorder, but no specific mental health diagnoses or problems were identified in the diagnosis and problems section of the healthcare record. The first contact with mental health during the review period occurred during an IDTT on February 11, 2020.  This IDTT included the required attendees; however, those attendees did not include the assigned treating providers at the time of review. The treatment plan appeared identical to the plans of several other inmates reviewed at this institution, including the same subjective and/or vague treatment goals and areas of focus for treatment. This was due at least in part to the Cerner treatment plan form; although, the treatment team could have utilized narrative sections of the IPOCs to develop a more appropriate individualized treatment plan. The lack of a cogent, evidence-based treatment plan appeared to be due in part to the lack of continuity in providers.

The inmate was not prescribed medication by a psychiatrist; however, he was prescribed carbamazepine by medical for a seizure disorder. The February 11, 2020 treatment plan documented a history of diagnosis of PTSD; however, the current treatment team lacked

documentation of diagnostic clarification. Available documentation did not indicate that the treatment team reviewed this prior diagnosis.  The only IPOCs initiated were related to depressive symptoms; anxiety was mentioned in the discharge narrative section.

The inmate was seen for PC contact on February 19, 2020. No evidence-based interventions were documented during that clinical contact, such as CBT techniques challenging underlying assumptions and cognitive distortions.  Additionally, the inmate should have been provided assignments to review how thoughts can impact feelings and can serve as triggers to anxiety; psychoeducational techniques were also not utilized. The inmate instead appeared to receive supportive therapy with minimal case management provided. Although this progress note documented the inmate's request to be seen every seven days and the PC plan to schedule the inmate to be seen within the next five working days, the inmate was not seen again by the PC until May 13, 2020, when he was seen by a different PC. Documentation from that provider suggested that the session was limited to building rapport rather than implementing meaningful interventions or case management.

Treatment team and individual provider progress notes repeatedly referred to the inmate's upcoming release and the inmate's anxiety related to that release; however, there was no information provided specific to a date of release, nor were pre-release services provided to the inmate by mental health. The treatment team did not initiate any IPOCs related to release planning, despite the importance of the pending release in the inmate's overall functioning and the inmate's increasing anxiety regarding his release.

**Findings**

This inmate did not receive adequate care. His treatment plan was minimal in content and not individualized, as it was identical to the treatment plans (IPOCs) provided to at least two other inmates reviewed. The treatment plan did not appear to address the inmate's primary symptoms or stressors, which during the review period included symptoms of anxiety related to his impending parole and lingering feelings of depression. Clinicians viewed the inmate as high functioning, but contacts with him were brief and documentation was sparse, leaving the reviewer with limited evidence to support the lack of interventions, or to conclude that the inmate did not have undisclosed symptoms or other impairment. The inmate had an imminent release date that was repeatedly referenced in documentation. While the precise time to release was never indicated, it appeared that release was soon enough that pre-release treatment should have been provided to this inmate. This inmate would benefit from diagnostic clarification, with the treatment team updating the inmate's diagnosis formally as required in the treatment plan form, and consistent with the standard of care. In addition, the inmate would benefit from an updated individualized treatment plan, including pre-release services.

Additionally, the lack of continuity of care due to different PCs resulted in disjointed and inadequate care.

**EXHIBIT D**
**High Desert State Prison (HDSP)**
**March 5, 2019 – March 7, 2019**

**Inmate A**

This patient was admitted to the MHCB on August 2, 2018 from A yard at HDSP. He initially presented with hypomanic symptoms and grandiose delusional thinking. He was provided with diagnoses of Schizoaffective Disorder, bipolar type, possible Substance-Induced Mood Disorder. He was admitted due to concerns regarding his safety due to his current symptomatology.

Current treatment goals included addressing his delusional thinking and ineffective coping. The healthcare record indicated that the patient was resistant to treatment interventions and medication recommendations. A SRASHE completed on August 8, 2018 assessed the patient with low acute and chronic suicide risk. The safety plan stated that upon realization of acute suicidal distress, he should immediately inform an officer or staff member "going man down if necessary" to be seen by mental health staff.

The psychiatric discharge plan indicated that the patient was discharged to the EOP level of care with five-day follow-up and the completion of a SRASHE within seven days and every 90 days for the next year to ensure short and long-term stability.

**Findings**

This patient was appropriately admitted to the MHCB due to manic symptoms that resulted in him being in a dangerous situation on the yard. The SRASHE appropriately determined low chronic and acute suicide risk. He was appropriately discharged to a higher level of care due to his treatment resistance and continued symptomatology. The MHCB discharge plan was generic and not individualized. The safety plan was inadequate.

**Inmate B**

This patient had multiple MHCB admissions at HDSP. His healthcare record was reviewed to evaluate his treatment and safety planning, as well as whether the patient was receiving treatment at the appropriate level of care.

The patient had MHCB admissions on the following dates during the review period: August 5, 2018 to August 6, 2018; August 10, 2018 to August 14, 2018 and August 16, 2018 to August 23, 2018. He had a history of multiple suicide attempts. He was provided with diagnoses of Bipolar I Disorder, Antisocial Personality Disorder, Exhibitionism and Alcohol/Marijuana and Opioid Abuse. He received his psychotropic medications by PC2602 order.

The healthcare record indicated that the patient was initially referred to the HDSP MHCB on July 27, 2018 from STRH. They documented that his current stressors included discharge to B yard from STRH, debt on the yard, upcoming parole and safety concerns in and outside of prison. He reportedly had a history of 32 MHCB placements/referrals; a MHCB referral was

rescinded on July 26, 2018. He had a history of three DSH admissions and treatment at the EOP level of care with most recent discharge during November 2017. The clinician stated that the patient had a history of using the MHSDS to control his housing.

Identified goals for treatment included danger to self, mood state, and ineffective coping. Although the SRASHE noted moderate chronic and acute risk, the narrative indicated that the patient had high chronic risk. A review of safety planning indicated that the plan was limited to informing the nearest staff member of any changes in levels of agitation and suicidal ideation. The MHCB discharge note indicated that the patient had incurred debts on the yard resulting in his safety concerns. It was determined that he did not require a higher level of care as his psychiatric symptomatology was stable on medications.

He was readmitted to the MHCB on August 10, 2018 due to reporting suicidal ideation with plan after taking an overdose of his KOP medications and treatment at an outside hospital.

The SRASHE completed at the time of the MHCB discharge assessed high chronic and low acute risk. No new safety plan was located.

The patient was re-admitted to the MHCB after placing a plastic bag over his head in a suicide attempt (but not his mouth) resulting in a cell extraction. During this admission, the psychiatrist changed his oral Zyprexa to Risperdal Consta due to low blood levels and admitted medication checking. Depakote was continued. The SRASHE at the time of this discharge noted high chronic and high acute suicide risk. The safety plan involved telling mental health staff if he experienced change in mood and in making decisions regarding other inmates, as well as taking his psychotropic medications. The inmate was discharged to the EOP level of care.

**Findings**

Although this patient repeatedly presented with safety concerns resulting in multiple MHCB placements, it did not appear that those issues were addressed in the treatment provided and in treatment planning. Treatment plans appropriately included focus on suicidal behavior and poor coping skills, but included repetitive statements noted in other healthcare records regarding discharge to 3CMS, five-day follow-up and SRASHE after discharge which was not individualized. Safety planning was poor. This patient was appropriately referred to the EOP level of care.

**Inmate C**

This healthcare record was reviewed to assess treatment and safety planning upon discharge from the MHCB. The patient was provided with diagnoses of Unspecified Depressive Disorder, Unspecified Psychotic Disorder and possible Major Depressive Disorder, severe with psychotic features.

This patient reported suicidal ideation related to recent transfer to HDSP and the recent death of his brother. He reported recent self-injurious behavior by cutting himself with a paper clip, and he was accused of PREA. The psychiatrist indicated that the patient had significant depressive

symptoms at the time of admission. He was prescribed Zyprexa and Zoloft. A review of the treatment plan noted that the reasons provided for non-referral to a higher level of care was that the patient was using the MHCB as a means to gain a higher level of care and to influence his housing. It further stated that the patient did not appear open to trying to program at the 3CMS level of care. Of concern was a statement in the treatment plan that the patient would be discharged to the 3CMS level of care at his next IDTT. "Given that (the patient) has reported that he is willing to do what it takes to get a higher level of care, he will remain in the MHCB a few more days to ensure that he does not act on his reported thoughts of suicidal ideation." There was also documentation in the treatment plan that the patient did not have a mental health diagnosis warranting MHCB admission. Goals for treatment included reducing suicidal ideation and discharge to a lower level of care.

The discharge SRASHE dated August 2018 assessed the patient with low chronic and moderate acute risk. The safety plan consisted of letting the nearest staff member know about any changes in his levels of agitation and suicidal ideation.

**Findings**

There were concerning discrepancies in the assessment of this patient by the psychiatrist and the psychologist, with the psychiatrist providing diagnoses indicative of a severe mental disorder and the psychologist stating that the patient did not present with a mental health diagnosis warranting placement in the MHCB. Treatment planning appropriately addressed suicidal ideation, but included repetitive statements noted in other healthcare records regarding discharge to 3CMS, five-day follow-up and SRASHE after discharge, which were not individualized. Safety planning was poor. Additionally, of concern were statements regarding the use of the MHCB for housing changes; however, treatment planning did not address this issue.

**Inmate D**

This healthcare record was reviewed with a focus on the discharge SRASHE, treatment planning and safety planning. This patient arrived at HDSP on December 27, 2018, and he had 11 MHCB admissions within six months of his arrival to HDSP. The inmate had no MHCB placements at HDSP. He was housed briefly in the STRH, and then he was transferred to the B yard.

Although the patient was not admitted to the MHCB or alternative housing at HDSP, he was seen for five-day follow-up upon his arrival, and from February 17, 2019 to February 22, 2019. Treatment plans and clinical contacts notes did not include current clinical information; instead, they brought forward prior clinical information that occurred at another institution.

A SRASHE was completed on February 17, 2019 due to suicidal ideation. The inmate was assessed with low chronic and acute risk. The note stated that the patient "initially claimed he was SI [suicidal] when he was told that he would be sent back to his cell on a five-day follow-up with custody checks". The assessment further described the patient as a "master manipulator" and directed his assigned clinician to conduct a full record review due to this statement. There were also statements that the patient was attempting to be moved from HDSP and that he wanted

the clinician to help him to achieve a PC2602 order for this purpose. There was no specific safety plan outlined.

A recent note from a social worker in February 2019 stated that the patient informed the nurse that he was having suicidal thoughts with plans and that he had swallowed assorted pills in the past several days. The on-call physician was contacted. The clinician indicated that the patient was not suicidal based upon their discussion and future oriented plans. No SRASHE was completed.

This patient was interviewed. He had no response when presented with suicidal ideation. He also stated that he needed to be seen more frequently than every 90 days by the PC, but this increased clinical contact was not provided.

**Findings**

The care provided to this patient was deficient. Clinical documentation was insufficient regarding current symptomatology and treatment interventions. A SRASHE was not completed when indicated. There were multiple statements in the healthcare record describing the patient as being manipulative and minimizing his suicidality. Of additional concern was the failure to refer to the MHCB, and instead ordering five-day follow-up.

**EXHIBIT E**
**Mule Creek State Prison (MCSP)**
**May 29, 2019 – June 1, 2019**

**Inmate A**

This healthcare record was reviewed at the request of the plaintiff's attorneys to assess quality of care provided.  This 47-year-old inmate was transferred from CSP/Corcoran to MCSP during October 2018.  At the time of the review, he was housed in A Yard at the EOP level of care.  He was provided with diagnoses of Antisocial Personality Disorder, Bipolar I Disorder and Post-Traumatic Stress Disorder.  At the time of the review, his psychiatric medication had been discontinued at his request.

The plaintiff's letter indicated that activities typically regarded as recreational had occurred in core groups.  Document review confirmed that this occurred in two anger management groups during the months of April and May 2019.  Recreational activities also occurred during stress management groups.  While exercise and social activities can assist with stress management, alternative methods to stress management were not covered in any groups.  Further, the rationale for chosen activities and impact on stress was not clearly documented.

Psychiatric assessment documentation was comprehensive, timely and completed before the initial IDTT.  It was documented that the inmate had an extensive history of mental illness with a childhood onset. Symptoms included mood lability and auditory hallucinations.  He had four suicide attempts with the most recent in May 2015.  He had been receiving mental health treatment at the EOP level of care for five years.  Psychiatric documentation for the review period provided adequate documentation of clinical contacts including review of PC documentation, and indication of a collaborative treatment approach.  Documentation indicated an appropriate clinical discussion with the inmate regarding the inmate's request to discontinue a long-standing prescription for Abilify.

The treatment goals for this inmate changed during the review period. During his initial IDTT, his goal was to address impulsive behavior. PC contacts did not address this goal.  For unknown reasons, this goal was not included in his treatment plan at his next IDTT on January 24, 2019. Instead, a goal to reduce depressed mood to a four or lower (scale one to ten, with ten as severe depression) was implemented and continued at his next quarterly IDTT on April 18, 2019. Accordingly, individual PC contacts addressed feelings of sadness.  Over the course of treatment since the depression goal was implemented, depression was mostly rated as an eight or nine (severe range) with one brief rating in the moderate range.   Use of therapeutic interventions identified in the treatment plan were not clearly or consistently documented.

During the month of May 2019, treatment groups included the following: caseload group, life skills, mood management, social skills communication, milestone aggression replacement, leisure activities and anger management.  It was unclear how these groups were individualized to address the inmate's specific treatment needs.

Of note, there was documentation that the PC discussed transition to 3CMS after which there was documentation of an increase in the inmate's distress.

**Findings**

Considering the totality of areas in need of improvement, this inmate's care was inadequate. Areas in need of improvement included documentation of symptoms to support diagnosis, documentation of baseline depression rating, individualized group interventions, utilization of substantive treatment in core treatment groups and documentation of interventions in primary clinician contacts. Lastly, considering the ongoing rating of depression in the severe range, a goal to decrease the depression to a four was unrealistic. Adjustment of the treatment goal/interventions was warranted given the absence of improvement.

**Inmate B**

This inmate's healthcare record was reviewed to assess the quality of care provided after he was observed during the monitoring tour in alternative housing in the administrative segregation unit (ASU). This 43-year-old inmate was placed in the ASU from A yard EOP on May 20, 2019. He was provided with diagnoses of Major Depressive Disorder, Opioid Use Disorder, Alcohol Use Disorder and Amphetamine-type Substance Use Disorder. He was prescribed Lexapro, Remeron and Trileptal.

The ASU admission was precipitated by an assault on an officer after the inmate learned that his sentence was extended. During the assault, the inmate sustained injuries to his groin area and eyes due to the use of pepper spray and beanbag rounds. While receiving treatment in the TTA for his injuries, he ingested the contents of an ice pack which was documented as an intentional overdose. During the completion of the SRASHE in alternative housing in ASU, he recanted suicidal ideation and indicated that he did know why he ingested the ice pack other than knowing that it would result in transfer to the hospital. It was documented that the inmate was offered admission to the MHCB twice, which he declined. He was discharged from alternative housing and was maintained at the EOP level of care with five-day follow-ups. This SRASHE was completed by a post-doctoral intern and there was no indication of consultation with another staff member. Of note, a different post-doctoral fellow completed five-day follow-up assessments.

Five-day follow-ups began timely, but sequential completion of subsequent assessments was disrupted by medical needs. He was transferred to an outside hospital between May 22, 2019 and May 25, 2019 due to seizures. The second five-day follow-up beginning on May 25, 2019 occurred the day he returned from the hospital. He was seen later on May 25, 2019 by the CIT as the inmate was kicking his cell door and yelling. The underlying issue was extreme leg pain in the area where he recently had an IV placed. He was escorted to the TTA. Sometime after the completion of his third five-day follow-up, he was sent to an outside hospital due to more seizure activity where he remained until May 27, 2019. It was documented that he had discontinued seizure medication three days before the seizure; this issue was not addressed in mental health documentation to assess any possible self-harm intent around this decision.

The fourth five-day follow-up occurred on May 28, 2019. Based upon the documentation, it was not possible to determine if the inmate returned timely on May 27, 2019 to be seen for the five-day follow-up or if the assessment was completed late. Documentation was lacking regarding why the follow-up was not completed on May 27, 2019.

Documentation indicated that the inmate's depression preceded his ASU admission. His initial PC consulted with his previous clinician who indicated that the inmate had low distress tolerance and "often fantasizes about killing himself every day." His PC contact occurred on May 28, 2019, and his initial IDTT occurred on May 29, 2019. IDTT documentation indicated that the inmate had been nonadherent with treatment group attendance in mainline EOP which was attributed to his depression. Additionally, it was documented that the inmate stated, "I'm just more depressed than usual since I've been in ASU…I messed up my future." Documentation for non-referral to a higher level of care was that the inmate indicated that he would begin group treatment and had adequate functioning due to attending to activities of daily living. There was no documentation of a safety plan. Instead, the treatment goal was to reduce his depression to a four or lower.

During his initial psychiatric assessment on May 30, 2019, the inmate was upset as he learned that he would remain in ASU for 40 additional months. He denied suicidal ideation, but shortly thereafter, he was seen by the CIT after he made superficial cuts to his arm that required cleaning and dressing in the TTA. Another post-doctoral intern completed a SRASHE at that time. The self-injurious behavior was triggered by extensive ASU time which he did not believe he could manage and the resulting implications for parole. He reported a plan to hang himself. He was referred to the MHCB, and he was housed in alternative housing in the ASU where he was observed during the monitoring tour.

**Findings**

This inmate's care was inadequate and particularly concerning given the level of risk involved. Notwithstanding placement in a high-risk environment, SRASHEs were primarily conducted by different post-doctoral interns without documentation of consultation. This lack of continuity of care by unlicensed clinicians likely contributed to missing important risk factors (e.g. discontinued medication, hopelessness, negative future orientation), consideration of ongoing suicidal ideation and poor distress tolerance. Documentation for the rationale of non-referral to a higher level of care was insufficient. Treatment planning was also inadequate and did not address pressing treatment needs such as a safety plan or poor distress tolerance.

**Inmate C**

This health record was reviewed  to assess the appropriateness of the inmate's level of care change. The inmate's level of care was reduced from EOP to 3CMS in September 2019.

The inmate's diagnoses included Delusional Disorder, Anxiety Disorder, Amphetamine Type Substance Use Disorder, and Antisocial Personality Disorder. Delusional content involved atypical religious beliefs, illness spread by alien spirits, and persecution. Prescribed psychotropic medications targeted anxiety, mood stabilization, and psychosis. He was compliant with these

medications. The psychiatrist noted a history of self-injurious behavior, suicide attempt, and 30 inpatient admissions. Judgment of suicide risk on the SRASHE was rated as low for acute and chronic risk.

The inmate received RVRs for staff assault in May 2019 and in August 2019 for overfamiliarity.

**Findings**

The inmate's symptoms and behavior concerns were not adequately addressed in treatment prior to reducing his level of care to 3CMS. The EOP discharge documentation on September 19, 2019 indicated the inmate had attended only 34 percent of treatment offered since his release from ASU in June 2019. There was no documentation regarding progress with delusions or whether delusional beliefs were influencing his treatment refusals. The inmate also received a RVR one month prior to his level of care change.

**Inmate D**

This EOP inmate's healthcare record was reviewed as the inmate was identified on the non-referral log on three occasions as meeting criteria for consideration of referral to a higher level of care; however, he was never referred. The inmate was noted to have met higher level of care criteria as follows: on January 10, 2019, he met the criterion regarding three or more MHCB referrals during the last six months; on March 13, 2019 and March 28, 2019, he met the criteria for three or more RVRs in the last three months and participating in less than 50 percent of treatment over the last three months. The inmate was provided with diagnoses of Schizoaffective Disorder, bipolar type and Antisocial Personality Disorder. He was prescribed Cogentin and risperidone. Although the inmate had erratic medication adherence, the pattern of adherence did not meet the criteria for medication non-adherence which would result in psychiatric referral.

The inmate was seen by his EOP IDTT on January 10, 2019, following discharge from the MHCB where he had been admitted due to suicidal ideation. At that time, documentation indicated that the treatment team viewed his suicidal ideation as resulting from his avoidance of dormitory placement. Review of the healthcare record indicated that the inmate was long perceived by mental health providers as having safety concerns due to multiple factors, including gang dropout status, and inappropriately utilizing his mental health treatment (e.g., level of care, single cell chronos) to avoid environmental stressors such as dormitory placement.

The inmate was considered an unreliable historian in light of conflicting self-reports and symptoms. Despite this, he was prescribed psychotropic medication for which he was reasonably adherent through April and May 2019. On January 10, 2019, his MCSP EOP treatment team did not consider him appropriate for a higher level of care based upon the documentation from VSP (where he had previously received treatment) and the inmate's presentation at MCSP where he presented as stable with no suicidal ideation, demonstrated ability to function, and appropriate mood. The documented treatment modifications were appropriate to the inmate's symptoms and treatment targets at that time.

The inmate was next seen on March 13 and March 28, 2019. At that time, he met two additional criteria for higher level of care consideration: three or more RVRs and participating in less than 50 percent of treatment. When seen on March 13, 2019, the inmate had been moved to administrative segregation due to his RVRs; consequently, his mental health treatment had been moved to another treatment team. The rationale for non-referral to a higher level of care again primarily centered on secondary gain as the basis for MHCB admissions; there was also documentation that the same motivation, impacting housing, was the cause of his RVRs; therefore, mental health was not determined to be a factor in his RVRs. However, when reviewing the RVR mental health assessment Findings for January 25, 2019 and January 31, 2019; the evaluating mental health clinician *did* find the inmate's mental health and DDP status to be factors in the offenses. Consequently, the clinical rationale for non-referral to a higher level of care was inadequate as it did not address the inmate's current status accurately or address what the inmate had been experiencing if he had improved. The treatment modifications to address multiple RVRs and admissions to MHCB and participating in less than 50 percent of treatment were minimally adequate. Adequate clinical rationale was not provided; as a result, the rationale for non-referral was inadequate.

On March 28,2019, the EOP treatment team determined that the inmate was not appropriate for referral to a higher level of care; although he met the same criteria described above. The clinical rationale for non-referral remained the same, with the same limitations due to inaccuracies and limited documentation. Based upon review of the healthcare record, the inmate appeared to be capable of functioning at the EOP level of care; although he required adequate treatment to address his anxiety and limited coping skills. Unfortunately, the treatment modifications were not modified to address these factors, but they remained unchanged from the prior treatment plan. As the inmate had not received any additional RVRs or MHCB placements since the last IDTT, those interventions may have resulted in improvement and not required modification. However, regarding the criterion indicating poor treatment attendance/adherence, not only did the rationale remain unchanged; but the interventions did as well, with no improvement noted. The clinical rationale for non-referral was cut and pasted from the prior IDTT. The rationale did not explain why the inmate continued to not attend treatment, if the treatment modifications were working, or why the modifications were not changed as the inmate was still not participating in treatment. The rationale for non-referral indicated that the inmate was not referred because he had historically avoided groups due to a desire to avoid inmates he might have conflict with, and that he had told mental health staff in the prior IDTT that he wanted to make better choices and receive treatment. Despite this, the inmate continued to not attend groups, and the treatment team maintained the same rationale for non-referral, relying on the inmate's statement that he would change his behavior which was insufficient. There was reference to the inmate's report of symptoms, but the healthcare record was replete with documentation regarding the inability to rely on the inmate's self-report. It was noted that clinicians ignored the inmate's statements regarding worsening of symptoms; however, they were attentive when he reported positive symptom improvement. Consequently, the rationale provided was inadequate, as were the treatment modifications. Treatment should have been modified to reflect that the inmate's behavior and treatment participation were unchanged.

**Findings**

It did not appear that referral to a higher level of care was indicated for this inmate; however, the documentation justifying non-referral was inadequate as were the treatment modifications to address the specific clinical indicators that were positive for consideration of referral to a higher level of care, specifically treatment participation.

**Inmate E**

This EOP inmate's healthcare record was reviewed as the inmate was listed twice in the non-referral log for the month of January 2019 as meeting criteria for consideration of referral to a higher level of care; however, he was not referred. The inmate was seen by the EOP IDTT on January 2, 2019; at that time the treatment team determined that the inmate met criteria six (three or more RVRs within last three months) and seven (participation in less than 50 percent of treatment in last three months). He was seen again on January 24, 2019, after he was placed on modified program and determined to meet criterion seven. The inmate was provided with a diagnosis of Mood Disorder, unspecified, Adult Attention Deficit Hyperactivity Disorder, and Post Traumatic Stress Disorder. He was prescribed Effexor, prazosin, Strattera and mirtazapine.

As noted above, the IDTT on January 2, 2019 noted that the inmate met criteria six and seven for higher level of care consideration. The rationale for non-referral regarding criterion six was adequate. The treatment modifications were generally adequate; although some modifications were non-evidence-based and unrealistic strategies (e.g., walking away from situation for custody interactions where inmate does not have the freedom to walk away) were also included. The rationale for non-referral for participation in less than 50 percent of treatment in last three months was adequate, but it should have focused on the fact that the inmate reported that his poor participation was time limited. This would have allowed for the IDTT to focus on the reliability of the inmate's self-report.

The inmate was moved to the EOP ASU Hub due to safety concerns. The treatment team saw the inmate again on January 24, 2019, when it was noted that he only met the criterion regarding participation in less than 50 percent of treatment in last three months for higher level of care consideration. The rationale for non-referral was similar to that provided in the prior IDTT and did not address the fact that the inmate had been using similar reasons for non-participation for an ongoing period of time. The rationale did address the inmate's functional ability and lack of symptoms other than anxiety regarding safety. The treatment modifications were the same as the prior IDTT and were not applicable. The modifications were inadequate, as the behavior had not improved.

**Findings**

The inmate did not require referral to a higher level of care at the time of the IDTT review. However, the treatment plan required modification of the treatment interventions which did not address the inmate's poor participation in treatment. The inmate had clear safety concerns that were never sufficiently addressed and that prevented the inmate from attending group treatment. The higher level of care documentation should have included treatment modifications that were

913

designed to specifically address this heightened level of vigilance and anxiety with a goal to increase the inmate's treatment engagement. The mental health care provided to this inmate was adequate, although only minimally.

**Inmate F**

This inmate's healthcare record was reviewed as the inmate appeared on the non-referral log on multiple occasions due to repeated MHCB referrals (criterion five). The inmate was seen by the MHCB IDTT on March 11, 2019 when it was noted that he met criterion five for higher level of care consideration (three or more MHCB referrals within the last six months). The EOP IDTT on March 18, 2019, March 19, 2019 and March 27, 2019, also determined that the inmate met meeting criterion five at each IDTT. The inmate was provided with diagnoses of Major Depressive Disorder, recurrent with psychotic features and Borderline Personality Disorder. He was prescribed lithium, risperidone and venlafaxine. There was documentation that the inmate had poor medication adherence during the review period.

The healthcare record review indicated that the inmate had a significant substance abuse history; he experienced safety concerns due to drug debts, resulting in ASU placement or significant anxiety resulting in MHCB placement. The inmate also was described as demonstrating poor functioning at times as evidenced by poor hygiene and poor medication adherence.

On March 11, 2019 the inmate was seen by the MCSP MHCB IDTT when he reportedly met criterion five for higher level of care consideration due to multiple MHCB referrals within the previous six months. Specifically, that admission was his third placement within three months. While it was noted that the inmate's previous admissions were focused on safety concerns and housing, and that the current admission appeared similar, the treatment team also noted that the inmate was not showering or taking his medications. This was an initial IDTT, so the treatment team indicated that they believed the inmate might stabilize with continued treatment at the MHCB level of care including resumption of psychotropic medications. The clinical rationale for non-referral was adequate, as were treatment modifications.

The inmate was next seen by the MHCB IDTT on March 18, 2019. The non-referral log incorrectly indicated that this IDTT was an EOP IDTT. The inmate was noted by his MHCB IDTT to meet criterion five due to his repeated MHCB admissions. The clinical rationale for non-referral was appropriate. No actual treatment modifications were listed; instead, there was a summary of what had been implemented in the MHCB to stabilize the inmate for discharge. This section was not properly completed. The MHCB IDTT saw the inmate again on March 19, 2019 for discharge (again, the non-referral log incorrectly indicated that this IDTT was an EOP IDTT). The inmate continued to meet criterion five for higher level of care consideration of referral. The clinical rationale for non-referral and treatment modifications were appropriate based upon documentation.

On March 27, 2019, the inmate was seen by the ASU EOP Hub IDTT, when documentation indicated that the inmate continued to meet criterion five for higher level of care consideration. The clinical rationale missed the complexity of the inmate's clinical presentation and focused on the inmate "feigning/exaggerating symptoms to achieve higher LOC", utilizing that as a basis for

non-referral. While the inmate did not appear to require a referral to higher level of care at that time, his clinical presentation and history were far more complex, and documentation from the MHCB did not suggest feigning. The rationale did note that the inmate had improved and was treatment adherent, no longer displaying acutely symptomatic behaviors. Because of the additional functional descriptors, the rationale was minimally adequate despite concern regarding the lack of acknowledgement of clinical complexity of the inmate. The treatment modifications were appropriate.

**Findings**

The overall care provided to this inmate was adequate. The inmate was appropriately not referred to a higher level of care. The MHCB treatment team did not always complete the higher level of care documentation appropriately, but generally provided appropriate clinical rationales for non-referral and treatment interventions. The ASU EOP treatment team mischaracterized the inmate as feigning/exaggerating symptoms, suggesting that the treatment team had not reviewed MHCB documentation. As a result, the treatment plan including the higher level of care documentation, were inadequate. The ASU EOP treatment team did include functional descriptors that made the clinical rationale minimally adequate; the treatment modifications were appropriate.

**Inmate G**

This inmate's healthcare record was reviewed as the inmate was admitted to the MHCB on December 30, 2018, after he returned to MCSP on December 17, 2018 from Coalinga State Hospital. He was provided with a diagnosis of Schizoaffective Disorder. The inmate was prescribed clozapine, buspirone and propranolol; he was also prescribed haloperidol on an as needed basis.

The inmate was timely assessed for suicide upon his arrival at MCSP, and he received all consecutive five-day follow-ups as required. The inmate was not functioning well, as documentation indicated that he repeatedly reported to staff that he was consistently experiencing auditory hallucinations. He initially refused medication; although, he eventually accepted medications. The inmate was seen by the psychiatrist on December 19, 2018, when haloperidol was discontinued due to concern that it might be the cause of the inmate's continued agitation that had been documented by several staff and observed by the psychiatrist. The psychiatrist added Vistaril; however, an associated entry in the medication administration record was not located until December 27, 2018. The psychiatrist also noted that the inmate had not been receiving prescribed as needed medications, and informed staff of the need to administer those medications when the inmate requested them.

The PC conducting the five-day follow-up contacts indicated suspicion regarding the veracity of the inmate's self-report of auditory hallucinations, despite such documentation in the healthcare record, as well as from Coalinga State Hospital. During cell-front contacts, the PC repeatedly documented that there was no indication of internal stimuli without noting the limitation of cell-side contacts. Fortunately, the inmate came out of cell for a confidential contact for the fourth day of follow-up, when the PC was able to observe behavior and to recognize that the inmate was experiencing hallucinations. The inmate repeatedly looked toward the door, and when asked,

indicated that he believed "they" were hitting him with the door and that it hurt. The PC did not pursue who "they" were and if there was any connection between this and the inmate's aggressive acts toward nursing staff. On December 24, 2018, a different PC, who had apparently more thoroughly reviewed the healthcare record, was able to better conceptualize the inmate's mental status and the role his psychotic symptoms played in his aggressive and suicidal behaviors, as well as his need for a higher level of care. Although this PC's assessment was more clinically adequate, this documentation occurred on a five-day follow-up form, which might not be viewed for such important information.

The inmate was referred by custody for an urgent referral on December 27, 2018, due to bizarre behavior and agitation. The correctional officer indicated that Spanish was preferred for the inmate, but mental health staff had not documented any attempt to converse with the inmate in Spanish, which may have been part of the challenge with some of the difficulties in discussing the inmate's symptoms. The inmate was then seen by the PC at cell-front on December 27, 2018 approximately seven hours after receipt of the referral. He was seen cell-front, reportedly because the contact occurred during 1600 count time; it was unclear why it took seven hours to complete the contact. The contact appeared to have been brief and was conducted in English. This was troubling as an urgent referral clearly should have occurred in a confidential setting in the inmate's primary language. Two days later, the inmate attempted to jump from the second tier. According to the SRASHE completed on that date, custody staff reported that inmate was halfway over the tier before they were able to restrain him. There was also a direct quote from the inmate cited that was in Spanish, suggesting again that the inmate should at least be offered an interpreter for each mental health contact. Interestingly, not only was the inmate's Spanish language preference never assessed or mentioned in mental health notes; documentation also noted that effective communication was achieved.

Once the inmate was admitted to the MCSP MHCB, the full extent of the inmate's symptomatology and decompensation was revealed and documented. The treatment team recognized the inmate's acute mental health need for a higher level of care, and the inmate was referred for acute inpatient care.

**Findings**

This inmate did not receive adequate treatment until he was placed in the MCSP MHCB. His presentation was considered disingenuous by those completing the five-day follow-up form, suggesting that they had not reviewed the inmate's healthcare record prior to clinical contact.

Although there was a custody report that the inmate was Spanish speaking and required interactions in Spanish, there was no documentation that he was ever offered an interpreter. This also suggested that EOP staff had not gathered collateral information by meeting with custody to learn their observations of the inmate.

The EOP psychiatrist did treat the inmate appropriately including advocating for the inmate to receive his "as needed" medications as indicated. It was unclear if this inmate was returned to MCSP in a decompensated state or quickly decompensated upon return. Regardless, the MHCB treatment team noted his acute need and made an appropriate referral for acute level of care.

**EXHIBIT F**
**Sierra Conservation Center (SCC)**
**Review Date – June 5, 2020**

**Inmate A**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care.

This inmate transferred from WSP to SCC on March 9, 2020 at the 3CMS level of care. The PC initial assessment and initial IDTT were timely and occurred in confidential settings. Diagnoses found in different places in the record included Schizoaffective Disorder, Bipolar Type and Opioid Use Disorder, Methamphetamine Use Disorder, Marijuana User. He was prescribed Effexor XR and Zyprexa during the review period to manage depression and auditory hallucinations. He noted he was interested in substance use treatment and that his auditory hallucinations were worse during withdrawal.

The PC initial assessment was thorough and identified past history and current symptoms. A preliminary plan of care was developed that focused on improving depression, medication adherence, appropriate institutional behaviors, and eventually moving him out of the 3CMS program after he was medication free for six to nine months. The last treatment goal was not consistent with the standard of care for Schizoaffective Disorder, Bipolar Type, which is a chronic mental illness that is not treatable without medication.

His IDTT was attended by all required staff and occurred in a confidential environment. During the IDTT, the inmate reported that he last experienced auditory hallucination prior to transfer to SCC but admitted to depressive symptoms. He participated in the development of his treatment goals which were to reduce his depressive symptoms over the next year with the intervention being CBT. Medication adherence, which should have been included given reports of medication non-adherence and improving institutional behaviors were not included.

He was seen timely for a PC follow-up on May 8, 2020 in a confidential setting. During the visit, the inmate noted he was not experiencing auditory hallucinations due to the medication. He stated he was upset he had been moved to a heat medication dorm where he was less comfortable. He requested to be taken off Zyprexa so that he could be moved back to his previous dorm. He rated his depression as seven out of ten due to his environmental discomfort. His interdisciplinary plan of care (IPOC) was updated during the visit. While the intervention was clinically appropriate during this contact, it was supportive in nature instead of CBT as noted in his treatment plan. The assessment to participate in Integrated Substance Use Disorder Treatment (ISUDT) Program was appropriate.

He did not receive a timely psychiatric initial evaluation and was not seen for a psychiatric contact until approximately three months after admission. Documentation from this contact was more consistent with a follow-up visit and not an initial evaluation. During this visit, he complained of sleep difficulty and depressed mood but denied suicidal ideation and auditory hallucinations, which the psychiatrist referred to as "alleged AH" suggesting that he questioned the veracity of the inmate's report of psychosis. The inmate asked to be taken off Zyprexa due to

917

being moved into a heat dorm. The psychiatrist discontinued the Zyprexa at the patient's request however, abrupt discontinuation of Zyprexa was clinically inappropriate. Zyprexa should have been gradually decreased over time and stopped at the lowest effective dose given it is the core treatment for Schizoaffective Disorder. There was no documentation that that education was provided. Diagnoses included in the text of the note were "Opioid Addiction" and "Pain due to dental cavities" Schizoaffective Disorder, Bipolar type was notably absent with no explanation for the lack of inclusion. Of note, prior to this contact, there were several brief psychiatric notes that documented medication changes in response to medication non-compliance.

**Findings**

This care provided to this inmate was inadequate. There were significant problems with diagnosis, treatment goals, timeliness of psychiatric care and the therapeutic and medication interventions provided.

**Inmate B**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care. There were discrepancies in diagnoses by provider which included Adjustment Disorder with anxiety and Unspecified Anxiety Disorder. During the review period he was prescribed Vistaril 25 mg by mouth in the evening as needed for anxiety.

PC contacts were timely but were provided by clinicians other than the assigned clinician. There was documentation of current stressors in addition to any ongoing symptoms, but varying documentation of interventions was provided. His treatment goal was to reduce anxiety below three of ten for six months prior to his next IDTT. However, his IPOC was not consistently updated.

Confidential psychiatric contacts were timely. His appointments consisted of a review of symptoms, review of current stressors, supportive therapy, medication impact on his symptoms, and the inmate's efforts to cope with his stressors. During his last appointment, the inmate reported he did not care for the "COVID lockdown" and that he was no longer working due to it.

**Findings**

This inmate received adequate mental health care in the 3CMS program. Psychiatric interventions were targeted towards diagnosis and symptoms. Documentation of PC interventions and updated treatment goals needed improvement. While there was differing documentation of his diagnoses, it did not appear to impact care as the symptoms overlapped.

**Inmate C**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care at SCC. He was provided with diagnoses of Adjustment Disorder with mixed anxiety and depressed mood, Antisocial Personality, and Polysubstance Dependence. His treatment goal was to improve his depression. He was not prescribed psychotropic medication during the review period.

918

His PC follow-ups were timely and confidential.  Assessment of current stressors, symptoms, and intervention provided were documented.  However, there was no diagnosis or other additional information (e.g., information on treatment goals) that is normally found in PC notes.  His IPOC was updated after each visit.  During the April follow-up visit the inmate "…vented frustrations about the restrictions and loss of program due to COVID 19 precautions…" which was described by the PC as "increased situational stress due to loss of yard and program."  There was no mention of in-cell activities or groups being offered as enhanced treatment during the loss of yard and program.  The inmate did not attend therapeutic groups from January 2020 to the end of April 2020.  He resumed therapeutic group attendance with moderate participation starting in May 2020.

**Findings**

Overall, the treatment provided was clinically appropriate.  However, the delivery of care appeared to be impacted by the onset of the COVID-19 pandemic.  Documentation noted restrictions and loss of programming due to COVID-19, including loss of yard.  Delivery of care addressed treatment goals.  Interventions were clinically appropriate, but there was no documentation in cell activities were offered during the review period.

**Inmate D**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care.  He was provided with diagnoses of Recurrent Major Depressive Disorder, PTSD, Dysthymia and Asperger Syndrome; however, these diagnoses were not included in the appropriate place of the EHRS.  He was prescribed fluoxetine, Effexor and oxcarbazepine during the review period.  His treatment goal was to reduce his depressed mood.

PC contacts were timely and confidential. Active symptoms and current stressors were identified and discussed; however, the intervention was not noted in the documentation of any of the visits.

He was seen by a PC on May 4, 2020 for an RVR mental health assessment evaluation and was cleared to proceed with the disciplinary hearing.  However, his report, in alignment with PC documentation, that he had difficulty reading social cues due to Asperger's appeared to play a role in the conflict and should have been considered.  As a result of the RVR, the inmate lost his job.

Psychiatric contacts were timely and confidential. During contacts, symptoms, current stressors, medications, labs, and medication adherence were reviewed.  Clinical decision making was consistent with his diagnoses and information provided, e.g., his Fluoxetine was changed from keep on person to nurse delivery after he reported forgetting to take it on his own.

**Findings**

The care provided to this inmate was clinically appropriate.  The inmate received clinically appropriate psychiatric interventions for his diagnoses and symptoms.  Although, documentation of interventions by the PC was an area in need of improvement.

**Inmate E**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care. He was diagnosed with Adjustment Disorder with Anxiety, Unspecified Anxiety Disorder and Unspecified Depressive Disorder per the PC, and additionally with PTSD and Bereavement per psychiatric documentation. He was prescribed Vistaril and fluoxetine which was discontinued due to side effects during the review period. His treatment goal was to reduce his depressive symptoms.

PC contacts were timely. Current stressors were discussed, symptoms were reviewed, and his IPOC which addressed treatment needs, was updated. However, interventions were not noted in the documentation. There was no mention of in-cell activities during the COVID lockdown.

Psychiatric contacts were timely and confidential. Current stressors were discussed, symptoms reviewed, education provided, and plan adjusted, as necessary. During his May 2020 follow-up, the inmate complained of not wanting to get used to "laying around all day" and that he "misses getting out of his cell more often" due to the COVID-19 lockdown.

**Findings**

The care provided to this inmate was clinically adequate. Medication changes were appropriate. There was diagnostic variation, and while it did not appear to impact the delivery of appropriate care, diagnostic clarification was warranted. Treatment goals were narrowly focused on depressive symptoms and did not address his other diagnoses and their associated symptoms. PC interventions were not noted in documentation.

**Inmate F**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess appropriateness of care. He was diagnosed with Adjustment Disorder with Anxiety, Severe Alcohol Use Disorder in early remission, although diagnoses were not included in the appropriate place within the EHRS. He was prescribed Remeron for anxiety and sleep.

He attended his IDTT which was timely and attended by all required clinical staff. His primary treatment goal was to reduce his anxiety below a four of ten over a six-month period before his next IDTT.

PC contacts were timely, but documentation was minimally adequate. Psychiatric contacts were timely and confidential. During each contact, current stressors were discussed, active symptoms reviewed (which the inmate denied during each visit), education provided (e.g., mindfulness), and plan adjusted, as necessary. Most of the appointment content surrounded his upcoming release in a few months, including where he would live and how he could continue his treatment.

**Findings**

Psychiatric care and treatment planning were adequate; however, documentation of PC care was sparse and insufficient. Sparse documentation is problematic because it is disruptive to continuity of care.

**Inmate G**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care. Psychiatric diagnoses, which were not documented in the appropriate place in the EHRS were Major Depressive Disorder, recurrent, severe (MDD); Obsessive Compulsive Disorder (OCD); and Alcohol Abuse. Pertinent medical diagnoses were Dyslipidemia and Benign Familial Tremor. His treatment goals were to reduce his depressive symptoms from three days a week to one day a week over a year with the intervention being CBT once every 90 days to identify and modify habitual negative thoughts. He was prescribed Zoloft and Zyprexa.

The two PC contacts during review dates were confidential, but not timely. There was no documentation of clinical interventions. He appeared to decompensate between visits, including worsened OCD symptoms (i.e., increased hand washing), possible auditory hallucinations, and cognitive impairment. Despite this decompensation, he was not referred to the psychiatrist to address psychiatric symptoms and cognitive concerns or the primary care physician for cognitive concerns.

There were three psychiatric appointments during the reviewed dates which were timely. Overall, documentation included assessment of current symptoms, a review of other symptoms and medication side effects, and a plan that included assessment of abnormal movements, lab testing and medication changes. During the first appointment, the Zyprexa was changed to PRN, but the reason for this change was not specified. At the next appointment, he complained of racing thoughts since changing to PRN Zyprexa, and he resorted to requesting it daily. During the following visit, he reported resolved racing thoughts due to taking Zyprexa daily, but also reported increased OCD symptoms and anxiety which he attributed to the "modified program." In response, his Zoloft was increased.

Of concern, there was no documentation that the PC notes had been reviewed by the psychiatrist which would have alerted the psychiatrist to cognitive concerns. Thus, consideration was not given to other possible diagnostic options that would explain his cognitive impairment and tremor (e.g., dementia or other neurological illness). Relatedly, an auto-populated PC entry from October 11, 2019 was included in his first psychiatric contact which noted that custody said the inmate was confused and disoriented and required prompts to go eat. This suggested difficulty managing ADLs.

During January and May 2020, the inmate attended bi-weekly recreation group therapy in the gym that covered various mental health topics. He was consistently noted to have moderate participation. These groups occurred despite the COVID-19 lockdown that was in effect in the facility.

**Findings**

The care provided to this inmate was inadequate. Provider communication and collaboration was a significant area of concern. PC follow-up visits were not timely, there were no documented clinical interventions in PC notes, and the PC failed to refer the inmate to psychiatry or his primary care physician when the inmate decompensated and continued to demonstrate

cognitive impairment. While the medication choices were adequate for the inmate, the psychiatrist failed to resume daily dosing of Zyprexa after the inmate reported taking it daily to keep his racing thoughts controlled. He increased the Zoloft dose in response to symptoms that appeared to be triggered by the inmate's concerns about COVID-19, which as an adjustment reaction, that would have been better addressed with psychotherapeutic interventions. The psychiatrist did not consider a cross taper with another antipsychotic that was less likely to worsen the inmate's tremor, dyslipidemia, and cause weight gain versus continuing Zyprexa PRN. Finally, the psychiatrist did not consider other diagnostic options that would his explain cognitive impairment and tremor (e.g., dementia or other neurological disorder).

**Inmate H**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care. He was diagnosed with Adjustment Disorder with mixed anxiety and depressed mood and Anxiety Disorder. The diagnoses were not noted in the appropriate section of the EHRS. Treatment goals were to reduce symptoms of anxiety below a two of ten, maintain his depressive symptoms at or below a three of ten, bring his anxiety symptoms into remission for one year, develop a relapse prevention plan, develop a therapeutic alliance with his PC, identify environmental factors that trigger problem behaviors, and challenge depressive thoughts. The timeframe for improvement was one year. He had not been prescribed psychiatric medication for two years and was not taking any during the review period.

PC follow-ups were timely and confidential. Documentation was brief but addressed relevant clinical points. There was documentation of scheduled but cancelled appointments which lacked clear documentation of rationale.

**Findings**

The inmate received appropriate treatment. Clinical interventions were appropriate for his diagnosis, treatment goal and clinical presentation, although diagnostic clarification was warranted. The reason for missed appointments should be clearly documented in EHRS.

**Inmate I**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care. He was diagnosed with Major Depressive Disorder, moderate, recurrent and Post Traumatic Stress Disorder although the diagnoses were not included in the appropriate place in the EHRS. His treatment goal was to reduce depressed mood before the next IDTT. He was not prescribed psychotropic medications during the review period.

The two PC contacts during the review dates were timely and confidential. During each of his visits, ongoing passive suicidal ideation was assessed. Protective factors were noted. He was also asked about his current stressors, and his coping mechanisms were identified and reinforced. The inmate denied active suicidal ideation at each visit. Therapeutic interventions were documented. His IPOC was not updated.

## Findings

The care provided to this inmate was appropriate. Although IPOCs were not updated, the assessment and treatment provided was clinically appropriate for his diagnoses and symptoms. While he reported ongoing passive suicidal ideation, it was addressed during PC contacts. There was no active suicidality or need for referral to higher level of care. His choice not to take psychiatric medication was appropriate given his mild symptoms.

## Inmate J

This inmate's healthcare record was selected from the non-referral roster to assess adequacy of care. The inmate was diagnosed with Alcohol Use Disorder, severe, in early remission, Amphetamine-Type Substance Use Disorder, severe, in sustained remission, Antisocial Personality Disorder, Unspecified Depressive Disorder, and borderline intellectual functioning. He was prescribed mirtazapine and hydroxyzine, as needed.

The inmate was placed in 3CMS level of care after being discharged from the MHCB on February 26, 2020 with recommendations for weekly clinical contacts with the inmate. He was seen in IDTT on March 4, 2020 after being placed in ASU for safety reasons.

He was identified on the referral to a higher level of care roster due to having multiple MHCB admissions over the previous six months. The IDTT noted that the patient required more intensive services than could be provided to him at 3CMS level of care and referred him to EOP. It was noted that the inmate's current level of functioning did not require inpatient or crisis services.

## Findings

This inmate's care was adequate. The rationale included as the reason for not referring the inmate to a higher level of care was clinically appropriate.

## Inmate K

This patient's healthcare record was selected from the non-referral roster to assess adequacy of care. The patient was suspected of having substance-induced psychosis and a diagnosis of psychotic disorder was under consideration. The patient had not been a participant in the MHSDS since being incarcerated in 2018.

The patient was placed in a TMHU after his level of care was changed to MHCB on May 4, 2020 after exhibiting agitation and rapid speech. He was sent to a community hospital where he received haloperidol, lorazepam and diphenhydramine. He was sedated upon return to SCC and returned to MHCB level of care.

The IDTT met with the patient on May 6, 2020 for an initial treatment plan. Goals to address the patient's delusions and danger to others were created. The patient denied mental health symptoms or needs and refused urine drug screening. The patient was identified as in need of a higher level of care secondary to his inability to function at his current level of care and his need

for inpatient level services. The team noted that the patient's current placement at MHCB level of care would meet his needs by engaging him in daily treatment and assessing his functioning.

**Findings**

This patient's care was inadequate. While the non-referral rationale was appropriate at the time, the IDTT discharged the patient from the MHCB level of care the following day and did not provide the services outlined in the treatment plan prior to discharge.

**Inmate L**

This patient's healthcare record was selected for review of the adequacy of care provided to patients receiving TMHU level of care. This patient was in the TMHU from June 21, 2020 through July 7, 2020. He was diagnosed with Major Depressive Disorder, single episode, severe with psychotic features and Antisocial Personality Disorder. He was prescribed fluoxetine and aripiprazole was added during his TMHU stay.

The patient was admitted to the TMHU at the MHCB level of care from 3CMS due to suicidal ideation with an active plan. The patient reported during a routine PC contact that he was thinking about killing himself, had packed his possessions, and had given away his canteen items. A comprehensive SRASHE completed on June 22, 2020 indicated that both chronic and acute risk for suicide were high.

He was seen in accordance with the treatment guidance for TMHU which included at least daily rounds, a daily individual contact with his PC or psychiatrist, nursing rounds and IDTT meetings as required with all necessary participants. Treatment included the provision of CBT and medication monitoring with adjustments, as needed. The documentation was comprehensive and consistent across team members. The patient was regularly assessed for safety and functioning. No groups or out-of-cell activities were provided throughout his stay. He was provided reading materials on June 22, 2020 and a radio with earbuds on June 23, 2020. The PC and psychiatrist documented that the patient was dysphoric and expressed ruminative suicidal ideation along with expressions of hopelessness and worthlessness. The patient expressed regret over reporting suicidal ideation, as he believed he could have killed himself had he not told his PC about his thoughts.

Initial IDTT goals were created to target danger to self and depression. The team decided that the patient continued to require MHCB placement and would likely need EOP or an inpatient placement following MHCB. The patient's COVID-19 test from June 22nd returned a negative result on June 25, 2020, but the psychiatrist documented that all transfers were cancelled due to COVID-19. Over the next week, during daily contacts, it was noted that he continued to have feelings of worthlessness but was looking forward to the possibility of going to an EOP. PC and psychiatry documentation noted that the patient was in need of more out of cell treatment and engagement in activities to distract himself from his chronic suicidal ideation. On June 28, 2020 the patient reported intrusive suicidal ideation and hopeless, noting that his suicide was likely "preordained," and he could not be cured. On June 29, 2020, the patient was seen by the psychiatrist who added aripiprazole to his medication regimen with the patient's agreement. On

924

June 30, 2020, the patient reported that he just needed to get out of the way so staff could treat someone who might benefit from treatment, as he was never going to get better.

A second IDTT was held on July 1, 2020 with all necessary members present. A SRASHE indicated continued high chronic and acute suicide risk. It was noted that the patient's protective factors were now viewed as irrelevant to him and was noted to be worsening. The IDTT determined that the patient could no longer function at MHCB level of care and required emergency placement within an inpatient setting. He was referred to an acute inpatient setting and, in accordance, his level of care was changed. It was noted that mental health headquarters had been contacted. The previous negative results of the COVID-19 test could no longer be used for a transfer, so the patient was retested on July 1, 2020.

The patient's mental status and functioning was noted to be unchanged over the next six days, with continued hopelessness, worthlessness and suicidal ideation. The patient asked if he could have access to "fresh air" on July 6, 2020 and was noted to refuse medications on that date out of frustration. On July 7, 2020, the patient was transferred to a PIP.

**Findings**

While the patient's care was in line with TMHU expectations, and documentation demonstrated a caring, collaborative and dedicated treatment team, patient care within the TMHU was inadequate. TMHU cells, which were developed as an alternative to higher levels of care, lack a therapeutic milieu, offered limited programming and out of cell activities, in comparison to higher levels of care. Of concern, was the staff misunderstanding regarding transfers, and the fact that the patient remained in a TMHU for 16 days with clear worsening of symptoms warranting an increase in his needed level of care.

**Inmate M**

This inmate's healthcare record was selected for review of the adequacy of care provided to patients receiving TMHU level of care. The patient was diagnosed with Bipolar I Disorder, current or most recent episode depressed with psychotic features, Alcohol Dependence in a controlled environment, Polysubstance Dependence in a controlled environment, and Antisocial Personality Disorder. He was prescribed oxcarbazepine and hydroxyzine PRN prior to placement in the TMHU, and had quetiapine added during TMHU stay.

The patient was placed in the TMHU at MHCB level of care from 3CMS on June 24, 2020, after reporting suicidal ideation and an intent to kill himself after a cell search. He was initially uncooperative with assessments, but eventually participated minimally. He was seen on June 25, 2020 for an initial SRASHE and psychiatric assessment. He was assessed to be at high chronic and high acute risk for suicide. No safety plan was discussed. The initial psychiatric assessment indicated that the patient was reporting auditory hallucinations and was feeling down and worthless. The patient requested quetiapine and bupropion, as he needed an "upper." The psychiatrist prescribed quetiapine.

The patient was seen during rounds on June 26, 2020. He reported at cell-front that he was no longer suicidal but still depressed. There was a verbal order entered into the record for partial

clothing, a radio, paper and writing materials on this date. There was no supporting documentation regarding the change in patient privileges nor evidence of IDTT concurrence.

On June 27, 2020, the patient was seen during rounds and for an initial PC assessment. The patient was noted to be depressed and reported feeling worthless and empty. The patient reported feeling bullied by other inmates and wanted to go to EOP. The PC noted that the patient should engage in treatment to target depression and improve his sense of purpose. There was reference in the assessment to the IDTT's decision to admit the patient to TMHU, but there was no IDTT documentation entered in EHRS.

The patient was seen during rounds and for a confidential session with the psychiatrist on June 28, 2020. The patient reported feeling empty and being bothered by childhood memories of neglect. The patient requested bupropion to help make those thoughts "go away." That evening, it was noted that the patient refused quetiapine because it was crushed.

On June 29, 2020, the patient was seen individually by the PC who noted that the patient reported no thoughts of suicide and asked about getting bupropion. The patient was noted to be in good spirits and joking. Later that day, the patient was seen by the IDTT with all required members present. The IDTT was noted to be the weekly MHCB update, but no initial MHCB treatment plan had been developed. The goals on the treatment plan targeted depression and behavioral symptoms. The patient asked to be discharged and returned to his previous housing and reported that he was no longer suicidal. The disposition from the IDTT was to discharge the patient to 3CMS level of care with a recommendation to have mental health treatment for "mild to moderate" mood disturbance. A discharge summary was entered by the psychiatrist noting the addition of quetiapine during the patient's stay in the TMHU. The psychiatrist recommended that the patient be seen for five-day follow-ups and evaluated for the need for continuing the quetiapine, and the possible addition of an antidepressant. No suicide risk assessment was completed, and no safety plan was developed prior to the patient's discharge.

**Findings**

The care provided to this patient was inadequate. The initial PC assessment was not timely and an the initial IDTT was not held nor was initial treatment plan developed within 72 hours as required by the TMHU treatment guidance document. Patient privileges appeared to have been increased after one full day in the TMHU, with no indication of how that decision was made. There was no safety plan developed at any time during his TMHU placement, and there was no SRASHE completed at the time of discharge, despite his initial risk assessment indicating high chronic and acute risk for suicide. Other than brief clinical evaluations and a change in the patient's medication, no active treatment interventions were documented, and no in-cell or out-of-cell services were provided to target his suicidality, safety, coping deficits, depression or worthlessness prior to discharge.

**Inmate N**

This inmate's healthcare record was selected for review of the adequacy of care provided to patients receiving TMHU level of care. The patient was diagnosed with chronic Schizophrenia

and anxiety.  He was prescribed buspirone, haloperidol, olanzapine, benztropine and hydroxyzine PRN.

The patient was placed in TMHU at MHCB level of care in the early morning hours of June 26, 2020 after punching the TV in his dorm, laughing inappropriately and providing irrelevant responses to questions.  The on-call psychiatrist who placed the inmate in the TMHU ordered a COVID-19 test and a stat dose of olanzapine.  The inmate was at the 3CMS level of care at the time of the incident.

The following morning, the patient was seen by a PC who attempted to complete a SRASHE with the patient but was unable due to the patient's compromised mental status including somnolence and disorientation.  Based on previous assessments and the patient's status, it was determined that the patient's risk for suicide was low to moderate with appropriate rationale for those ratings.  An inpatient consult note indicated that the patient was admitted to MHCB for grave disability and would need to display improved orientation to person, place, and time along with the ability to engage coherently in conversation for two days in order to be discharged. Based on a chart review, the psychiatrist noted that a medication the patient was taking for latent tuberculosis was likely affecting the efficacy of his psychotropic medications.  Dosages were adjusted and medications which had recently been discontinued due to patient non-compliance were restarted.  The nurse who was observing the patient noted that his behavior raised suspicion that he was under the influence of a substance as he was acting erratically, yelling, making paranoid statements, banging on the cell door, vomiting and demanding a COVID test.  It was noted that a urine drug screen was ordered by a physician who assessed the patient for complaints of headaches and a lump on his head.

On June 27, 2020 the patient was seen by the PC during rounds and for an initial assessment. The patient appeared sedated during rounds and exhibited no agitation.  During an individual session with the PC, the patient was noted to have an improved mental status but reported that he could read other people's minds and believed that one of his dormmates was "messing" with his mind.  He reported auditory command hallucinations to kill himself but had no intent.  The patient reported that he used "spice" on June 15, 2020 which triggered an anxiety attack on that date.  The patient reported that he did not want to return to the dorm and preferred to be sent to a psychiatric hospital.  The PC noted the patient likely had chronic Schizophrenia, documented a thorough history including extensive substance use and included goals to stabilize the patient in the initial assessment.

A psychiatrist completed rounds and an initial assessment with the patient on June 28, 2020.  The patient was sedated and provided inconsistent responses to questions about his behavior and his history. The patient was noted to be ambivalent and evidenced poor memory for events.  The patient admitted to having a mental illness and needing treatment with medications. Informed consent was provided for prescribed medications. The psychiatrist documented that the patient was showing objective improvement in both his level of anxiety and his psychotic presentation. The nurse who was monitoring the patient contacted the psychiatrist with concerns over the patient's level of disorientation and unclear speech later in the day.  The psychiatrist ordered neurological checks to be completed.

927

On June 29, 2020, the patient was seen on rounds, individually by the PC and psychiatrist, and in IDTT. The PC and psychiatrist both noted improvements in the patient's thought content and cognitive processes, as well as his level of alertness. The IDTT meeting included all required members and included identification of goals to address hallucinations, anxiety and behavioral symptoms. The plan noted that the patient's presentation was likely triggered by substance use but also an underlying psychotic disorder. The plan was in keeping with the initial goals of the MHCB placement to improve the patient's level of orientation and organization of thoughts for at least two days. The plan was to discharge the patient after meeting those goals, likely within the following two days.

A discharge IDTT was held the following day, on June 30, 2020, included all required members, and noted that the goals of the MHCB placement had been met. While there was previous documentation to "monitor for EOP need," he was discharged to 3CMS level of care. Both the psychiatrist and the PC entered discharge summary notes in the records indicating that the patient had returned to baseline. The psychiatrist indicated a guarded prognosis and noted that the urine drug screen results were not yet returned, but suspected substance use triggered the patient's psychosis. A SRASHE was completed as well, assessing the patient's chronic and acute suicide risk to be low to moderate with no imminent risks or warning signs. There was no safety plan.

**Findings**

This patient's care in the TMHU was inadequate. TMHU cells, which were developed as an alternative to higher levels of care, lack a therapeutic milieu, offered limited programming and out of cell activities, in comparison to higher levels of care. The initial psychiatric assessment was delayed and no out-of-cell or in-cell recreation treatment was offered to this patient. Interventions primarily consisted of psychotropic medications and monitoring of their effects. The patient appeared to narrowly meet the goals of the TMHU placement prior to his discharge to 3CMS level of care. Given the unknown urine drug screen results, the "guarded" prognosis, assessment of chronic Schizophrenia, and recent history of medication non-compliance, discharge to EOP level of care was warranted.

**Inmate O**

This patient's healthcare record was selected to review adequacy of care provided to patients in the TMHU. He was diagnosed with acute psychosis and was prescribed olanzapine and had lorazepam added while in the TMHU.

The patient was placed in the TMHU at MHCB level of care from 3CMS on June 10, 2020. He had been discharged from MHCB level of care eight days earlier after a ten-day stay secondary to acute psychosis. The patient presented with disorganized thinking, poor interpersonal boundaries and talking to himself and others who were not visible. Attempts to engage the patient in an intake interview and SRASHE were not successful on account of his psychotic process and agitation. The patient was assessed as being at moderate risk for suicide, both chronically and acutely, based on his history and current level of agitation and unpredictability. It was noted that substance use was also suspected, as his previous psychotic episode was believed to have been triggered by substance intoxication. The patient refused to take medications initially, but eventually complied. Preliminary goals for the TMHU stay were

documented in a progress note and included evidence of intact reality testing, an absence of agitation and bizarre behavior, medication compliance, no self-harm, violence or threats, and the ability to engage in interviews and treatment.

On June 11, 2020, the patient was seen during rounds by the PC on two occasions.  The patient appeared calmer and more organized initially, but then began flooding his cell and was belligerent and naked.  The on-call psychiatrist was contacted and increased the patient's olanzapine dose and added lorazepam to decrease his level of agitation.  The patient was seen again twice on rounds by the PC on June 12, 2020 and initially noted to be calmer and more oriented, but belligerent and demanding to be sent back to the yard when seen later in the day.

The initial psychiatric evaluation was not timely, and documentation was brief and erroneous.  Specifically, it was noted that the patient had been medication non-compliant prior to his admission which was inconsistent with other documentation in the EHRS which noted full medication compliance.  The psychiatrist noted impaired reality testing and possible hallucinatory experiences.  When seen later during rounds by the PC, the patient was noted to be more organized.  The PC documented that the patient would be transferred to an actual MHCB once his COVID-19 test results were received.  PC rounds were again conducted on two occasions on June 14, 2020.  One included a brief visit which noted the patient's report of doing "good" and denying hallucinations.  The patient was sleeping during the second visit to the cell.  The patient flooded his cell later that day after requesting "private time" to use the toilet.

The patient continued to demonstrate agitated and disorganized behavior on June 15, 2020 when seen on rounds by the PC. There was unclear documentation by a psychologist indicating an offer to custody staff to "observe the patient on the yard" instead of in TMHU housing.  This offer appeared to be interpreted as a plan to discharge the patient to 3CMS level of care, but the issue was resolved.  The patient was seen in a confidential setting by the PC and it was noted that he was given a phone call to his mother. Negative COVID-19 results were received, and the patient was transferred to a MHCB.  Documentation indicated that a psychologist to psychologist consultation was completed prior to the transfer.

**Findings**

The care provided to this patient was inadequate.  Over his five-day stay on the TMHU, the patient was seen during rounds daily by a PC and had two out-of-cell, confidential encounters; one with a PC and one with a psychiatrist.  The initial psychiatric contact was not timely, brief, and included inaccuracies about the patient's medication compliance.  No IDTT was held.  No treatment was documented beyond the addition of lorazepam and an increase in olanzapine.

**EXHIBIT G**
**California Medical Facility (CMF)**
**June 24, 2019 – June 28, 2019**

**Inmate A**

This healthcare record was reviewed at the request of plaintiffs' attorneys to assess the appropriateness of his level of care and adequacy of treatment and safety planning. The patient is a 33-year-old male committed to the CDCR on May 1, 2019. He was diagnosed with Major Depressive Disorder and had a recorded history of suicide attempts and self-harm behaviors.

The patient was evaluated for suicidal ideation with a plan to cut himself on May 2, 2019. His chronic and acute risk were assessed as high on this date, and he was subsequently placed in alternative housing, under constant observation, pending transfer to a MHCB.

The MHCB admission, initial psychiatric examination, and history and physical occurred on May 3, 2019. The treatment goals were to improve mental status, reduce suicidal ideation, and obtain additional information to clarify mental health diagnoses and suicide risk. The MHCB psychiatrist continued the inmate's medications, which included aripiprazole, mirtazapine, prazosin, and Prozac. Additionally, Borderline Personality Disorder and Post-Traumatic Stress Disorder were added to the list of diagnoses on this date.

The MHCB IDTT convened on May 5, 2019. A different psychiatrist met with the patient and discussed his treatment plan, which included medication adjustments and cognitive behavioral techniques to plan a safe response to stressors and symptoms. The patient's access to property was increased on this date.

On May 8, 2019, the patient informed the psychiatrist that he no longer experienced suicidal ideation and was ready for discharge; his depression was rated at a three out of ten on this date.

On May 9, 2019, the psychiatrist noted that the patient exhibited better adjustment to the prison environment and was motivated to engage in outpatient treatment at the EOP level of care. The psychiatrist further indicated that there were no high-risk behaviors at that time. The May 9, 2019 suicide risk assessment indicated that the patient learned to manage his suicidal ideation and was future oriented. Mitigating factors for suicide risk were detailed. The psychiatrist also noted, "In the EOP milieu he should be continually encouraged to share his thoughts, feelings, and urges with his therapist and/or housing officer."

The patient discharged to EOP level of care on May 9, 2019 with an order for five-day follow-up. However, it appeared he was seen on an emergency basis by a social worker in the TTA that same day. On May 12, 2019 he endorsed suicidal ideation and safety concerns related to alleged gang affiliation, and he was subsequently placed in alternative housing to await MHCB admission. On May 13, 2019 the patient was admitted to an available MHCB, where he informed the psychiatrist he was threatened by another patient on the EOP yard prior to admission.

**Findings**

The care provided to this patient was adequate. The initial treatment in the MHCB was appropriate, as was his discharge. Documentation also indicated that the patient was in agreement with the MHCB treatment and discharge plan. The patient subsequently endorsed suicidal ideation on May 12, 2019 in response to safety concerns, and this was appropriately addressed with MHCB readmission.

**Inmate B**

This healthcare record was reviewed as the patient had five MHCB referrals during the review period. This 29-year-old male arrived at CMF on October 29, 2018; he is serving a 75-year sentence. Prior psychiatric diagnoses included Bipolar I Disorder, Schizophrenia, Schizoaffective Disorder, and Adjustment Disorder with depressed mood. The inmate's medical history was significant for a seizure disorder. He also had a history of involuntary medication.

On January 21, 2019, the patient was admitted to the MHCB for suicidal ideation with a plan to jump from his bunk or hit his head against the sink. However, two days after admission, he claimed he threatened suicide to obtain a single cell in administrative segregation. The January 24, 2019 MHCB discharge summary indicated that the patient wanted to return to San Quentin's administrative segregation unit and that he denied feeling suicidal, homicidal, depressed and anxious. The summary further stated that no signs of psychosis or a mood disorder were present and that the patient reported compliance with psychiatric medication.

The patient was readmitted to the MHCB on January 26, 2019 for circumstances similar to his prior admission. However, he denied depression and thoughts or plans to harm himself upon MHCB placement, and his motives remained unclear to the treatment team. His treatment course was characterized by medication non-adherence and inappropriate affect. The February 5, 2019 IDTT documentation referenced the patient's multiple MHCB admissions; however, the rationale for non-referral to a higher level of care was unclear. The patient was thought to be clinically stable, although his appearance was described as disheveled. MHCB discharge recommendations included EOP level of care, continuation of Haldol Decanoate, and diagnostic clarification. The discharge summary further stated, "Patient has a history of being referred to the MHCB only to deny any and all symptoms, behaving incongruently to his endorsed [suicidal ideation]. He was admitted to our MHCB on 1/26/19 once again secondary to SI from [San Quentin]."

This patient was again admitted to the MHCB on February 19, 2019; however, he later reported, "my roommate told custody I was suicidal." The MHCB clinician documented that the patient presented with significant minimization of mental health issues. The IDTT indicated that MHCB treatment would focus on the patient's "Danger to Self," insight into his mental health condition, and ability to tolerate stress in the moment. The February 25, 2019 discharge summary stated, "He has consistently denied any thoughts of self-harm, states the primary issue was that his cellmate did not want him to stay there. He also denies hallucinations and does not display any psychotic behavior. No medication changes were made." The IDTT's higher level of care non-referral rationale on this date indicated that the patient "lacks sincere desire to decrease symptoms (which he denies), so he cannot be expected to utilize treatment opportunities at the

ICF LOC at this time. Likewise, Pt does not evince psychotic symptoms or [danger to self/danger to others], and therefore is not at this time appropriate for APP LOC either." He discharged to the EOP level of care on this date.

Subsequent MHCB readmissions occurred on March 11, 2019 and May 23, 2019.

**Findings**

The care provided to this patient was inadequate. The documentation suggested the patient likely required a referral for treatment in an inpatient setting. However, a referral to inpatient care was not appropriately considered, and the discharge summaries and higher level of care non-referral rationales were insufficient. Further, the diagnosis and underlying reasons for the frequent MHCB admissions were not clarified.

**Inmate C**

This inmate's healthcare record was reviewed at the request of plaintiffs' attorneys to assess the appropriateness of his recent level of care change from EOP to 3CMS. The inmate arrived at CMF in 2012, and he was initially included in the EOP level of care on July 13, 2009. He was primarily housed in CMF's N1 unit for EOP inmates with chronic and serious mental illness between 2015 and June 2019. His psychiatric diagnosis was Bipolar I Disorder, and he was prescribed Depakote, mirtazapine, and hydroxyzine. He also suffered from chronic pain that reportedly contributed to his increased suicide risk and depressed and agitated mood.

IDTT documentation referenced a lengthy history of acting out impulsively and engaging in suicidal behavior. The treatment team also noted that the inmate responded poorly to change, with increased anxiety, agitation, and depression. As such, distress tolerance was identified as a treatment target. A reduction in level of care was not discussed on this date.

PC progress notes suggested the inmate's symptoms were managed with psychotropic medication. A change in PCs occurred in April 2019, and the therapeutic value of clinical contacts with this provider was unclear. The assigned PC changed again in May 2019, and this provider referenced the inmate's attempt to cope with a serious matter related to a group treatment assignment. PC progress notes in May and June of 2019 contained copied and pasted clinical information. There was no indication that the inmate's level of care or recent PC changes were addressed during PC encounters, despite prior documented concerns regarding his response to change.

The inmate's level of care was reduced from EOP to 3CMS on June 13, 2019. The IDTT's level of care rationale indicated the inmate reached "maximum benefit" and no longer exhibited functional impairments, although the clinical documentation did not adequately support this claim.

**Findings**

The care provided to this inmate was inadequate. The inmate was not adequately prepared for the abrupt level of care change, and the IDTT's level of care rationale was insufficient and not supported elsewhere in the documentation. Additionally, changes to the assigned PCs were not

appropriately addressed with sessions focused on termination with providers, which was especially relevant considering the inmate's history of responding poorly to change. The concerns noted in this review were shared with CMF leadership during the site visit.

## Inmate D

This healthcare record was reviewed as the inmate returned to CMF from intermediate care at CHCF-PIP during the review period. He arrived at CMF on February 4, 2019 at the EOP level of care. The inmate was diagnosed with Schizophrenia, paranoid type, and he was prescribed mirtazapine, propranolol, and risperidone.

The five-day follow-up in February of 2019 did not meet Program Guide requirements, as the inmate was not seen on February 6, 2019. Although the SRASHE was conducted within 24 hours of the inmate's arrival at CMF, the safety plan was not completed on February 9, 2019.

The initial IDTT and PC assessment were completed timely. However, the psychiatrist did not meet with the inmate prior to the initial IDTT, and relevant information from the intermediate care discharge summaries was not included in the PC or psychiatrist's initial assessments. It should be noted that, while the CHCF psychologist and social worker completed discharge summaries, the psychiatrist did not. The initial IDTT occurred on February 7, 2019. The IDTT documentation appropriately referenced information from the inpatient discharge summaries, including evidence of cognitive decline based on neuropsychological testing. However, the information was not integrated in the EOP treatment plan.

The inmate's treatment plan was poorly constructed and did not include treatment interventions. For example, the provider documented that there were "no significant barriers to progress," however, the inmate's non-compliance with treatment and lack of insight into his mental illness were identified as treatment targets. Additionally, treatment goals were generic (e.g., patient will become treatment adherent by attending treatment activities daily for a week).

### Findings

The care provided to this inmate was inadequate. While adequate treatment and safety planning were critical components of ongoing care post inpatient discharge, the treatment plan was seriously deficient and the safety plan was not appropriately completed on February 9, 2019. Further, the recent inpatient care records were not reviewed and incorporated in the initial assessment or treatment plan for care continuity, the five-day follow-up failed to meet Program Guide requirements, and the psychiatric assessment was not completed prior to the initial IDTT.

### Inmate E

This inmate's healthcare record was reviewed as he was identified on CMF's higher level of care non-referral log twice during the review period. His diagnoses were Borderline Personality Disorder, Antisocial Personality Disorder, and Adjustment Disorder with mixed disturbance of emotions and conduct. A prior diagnosis of Bipolar Disorder was also noted in the healthcare record. The inmate was prescribed Vistaril for anxiety and lithium for mood stabilization.

The inmate was referred to the MHCB for suicidal ideation during December 2018; however, a SRASHE was not completed upon admission. On December 10, 2018, the IDTT noted that he met the higher level of care referral indicator for inability to function in the current level of care; however, he was not referred, and a rationale for non-referral was not provided. The accompanying treatment modifications were minimally adequate.

During a subsequent IDTT on December 12, 2018, the inmate met the higher level of care referral indicator for three or more MHCB referrals within a six-month period. The inmate reportedly stabilized by this date, and the clinical rationale for non-referral and accompanying treatment modifications were acceptable.

**Findings**

The care provided to this inmate during MHCB admission was adequate. While the initial clinical rationale for non-referral was inadequate, the inmate stabilized and the subsequent rationale for non-referral and treatment modifications were appropriate.

**Inmate F**

This inmate's healthcare record was reviewed as he was included on CMF's higher level of care non-referral log on March 18, 2019. The inmate was referred to the MHCB level of care from the ASU following a CIT evaluation. CIT documentation indicated the inmate was anxious and paranoid with reported command auditory hallucinations to harm himself and his cellmate; razors were subsequently found in his cell. The inmate also informed the CIT that his psychiatric medications were ineffective.

The initial IDTT occurred on March 18, 2019, at which time the inmate met three higher level of care referral indicators. However, the initial IDTT review was used as a rationale for non-referral, despite the inmate's extremely decompensated state and the treatment team's opinion that his symptoms were unlikely to improve. The IDTT note stated, "decision is deferred to next IDTT or adequate remission of symptoms, which is not expected given Pt's hx and presentation." The accompanying treatment modifications were inadequate, given the acute nature of the inmate's symptoms at the time.

The IDTT did not convene again until March 25, 2019, and, although this was timely by Program Guide standards, this delayed the clinically indicated higher level of care referral by seven days. The inmate was ultimately referred to a higher level of care during this IDTT, and he transferred to inpatient care.

**Findings**

The care provided to this inmate was inadequate. The documented non-referral rationale and accompanying treatment modifications were insufficient. The inmate was not referred to a higher level of care when clinically indicated, and the delay in access to care was inappropriate and unjustifiable.

**EXHIBIT H**
**California State Prison/Solano (CSP/Solano)**
**November 18, 2019 – November 20, 2019**

**Inmate A**

This 25-year-old male was transferred from RJD to CSP/Solano on September 12, 2019 after RJD changed his level of care from EOP to 3CMS in June of 2019. His primary diagnosis, Post Traumatic Stress Disorder (PTSD), was treated at CSP/Solano without medication. His healthcare record was reviewed to assess his treatment after the level of care change. His EOP "step-down" group at CSP/Solano was observed, and he was subsequently interviewed. Upon interview, the inmate's perception was that staff at RJD did not assist him with coping with the anxiety and uncertainty around his transfer and level of care change.

Relevant treatment history included the following psychiatric medications: Seroquel, Concerta, fluoxetine, Remeron and Thorazine. Previous diagnoses included Unspecified Schizophrenia spectrum and other psychotic disorder, and there were indications of possible Attention Deficit Disorder. He frequently reported PTSD-related symptoms and intermittently reported auditory and visual hallucinations in the context of fluctuating participation in treatment.

Upon arrival at CSP/Solano, an initial mental health assessment was conducted on September 24, 2019. It summarized pertinent mental health history and indicated that the inmate would remain on "C-status" until November because he could not manage attending anger management classes for three hours at a time. The inmate reported attention-related symptoms and that prior to a recent setback, he had been doing well without psychotropic medication. His initial IDTT at CSP/Solano, which was attended by all required disciplines, took place on September 26, 2019. His presentation with symptoms consistent with PTSD was noted, although they were assessed as not interfering with the inmate's daily functioning. Criteria for consideration for a higher level of care were reviewed and his 3CMS level of care was confirmed. A diagnosis of Unspecified Schizophrenic Disorder was added.

By October 3, 2019 he was offered the EOP "step down" group at SOL which he accepted after some initial hesitation. At a session with his PC of October 31, 2019, the inmate indicated that he was pleased to be back at CSP/Solano because he was close to home. His primary concern was that despite enrollment in the EOP step-down group, he would like more programming. He began group attendance shortly thereafter and was seen twice by a psychologist.

**Findings**

This inmate received adequate care while at CSP/Solano and at least initially was making an adequate adjustment to 3CMS services. He perceived the treatment at RJD related to his transition to 3CMS to be inadequate. Although he refused to participate in some offered treatment, better efforts to engage him during this time could have been useful.

**Inmate B**

This 37-year-old patient's chart was reviewed to assess the treatment he received in CSP/Solano's MHCB where he was housed at the time of the site visit. He was referred to the

935

MHCB from San Quentin EOP on November 12, 2019 because of suicidal ideation after having reported swallowing foreign objects. The patient was diagnosed with Bipolar Disorder and Borderline Personality Disorder, treated variously with Zyprexa, Valproic Acid, Remeron and Prozac.

After arrival at the CSP/Solano MHCB, the initial psychiatric and psychological assessments were conducted the day following admission. The patient initially refused confidential clinical contacts, for example refusing a psychiatric contact on November 15, 2019 and contacts with the psychologist on November 14, 2019, November 16, 2019 and November 17, 2019. In some of the notations it is clear that he refused in the presence of the clinician, while in others it was not clear whether the clinician had spoken with the patient. He was assessed by the psychiatrist on November 12, 2019, when he was experiencing symptoms of withdrawal and expressing the desire to die. An IDTT was conducted on November 13, 2019.  Treatment and safety plans included the use of Cognitive Behavior Therapy interventions.

During the night of November 17, 2019, the patient was found to be bleeding and, per the nurse on duty, looked pale and depressed. The on-call psychiatrist was contacted who monitored the patient's movement to an outside hospital for sutures. After his return, progress notes indicated that the patient had "cut threw [sic] a vein." The following morning, the treatment team began consideration of a referral to acute care noting his lack of progress since admission and continued suicidal ideation. Suicide Risk Evaluations (November 12, 2019 and November 18, 2019) assessed the patient as both high chronic and acute risk for suicide. The patient remained hopeless despite having a parole date in two years.

After referral to acute care while awaiting transfer, the patient showed some moderate signs of improved engagement with the treatment team but remained hopeless and potentially suicidal.

**Findings**

This patient's care was adequate.  He received required assessments and evaluations. An appropriate decision to refer to acute care was promptly made following the patient's suicide attempt.  Documentation of the context in which confidential contacts were offered warranted improvement.

**Inmate C**

This 45-year-old patient's chart was reviewed to assess MHCB evaluation and treatment where he was housed at the time of the site visit. His case was discussed during an observed morning huddle where it was reported that he made a noose during the overnight shift and tried to put it around the light fixture. The on-call psychiatrist was contacted, a PRN of Haldol was given and the patient went to sleep. He was on a15-minute observation schedule, but one-to-one observation was not ordered. The treatment team decided to refer him to acute care noting his lack of improvement over his seven-day MHCB stay.

The patient carried diagnoses of Major Depressive Disorder with psychotic features and Unspecified Psychosis.  He transferred from DVI on November 12, 2019 secondary to command hallucinations telling him to hang himself. At that time, he reported swallowing a razor blade, although an X-ray conducted in the hospital was negative. This incident prompted a suicide risk

evaluation which concluded that "impression management" was highly suspected. Subsequent X-rays ordered by the MHCB physician were positive. However, the razor blades were never recovered despite the patient having been on contraband watch for an extended period of time.

A psychiatry and psychology initial assessment, as well as a suicide risk assessment were conducted on November 12, 2019, although the patient was only minimally engaged. An IDTT took place on November 13, 2019 attended by the psychiatrist, psychologist, nurse and CC1.

**Findings**

This patient was appropriately referred to acute care following a suicide attempt at the MHCB. He was evaluated and seen appropriately during his admission, although initially he was only marginally engaged in treatment. It was not clear why the patient was not placed on one-to-one watch following the overnight incident where he made a noose, especially in the context of the unretrieved razor blades which he might still have had in his possession.

Of note, while at DVI, appropriate assessment of his risk for self-harm was likely hampered by initial negative X-ray reports which may have led to the assessment at DVI that he may have been engaged in "impression management."

**Inmate D**

This healthcare record was randomly selected to assess the provision of 3CMS services on A yard. This 42-year-old was diagnosed with Major Depressive Disorder and Post Traumatic Stress Disorder. He was not prescribed any psychiatric medication per his preference. He self-referred to 3CMS level of care on September 5, 2018 in part, due to "ongoing passive S/I [suicidal ideation]."

Mental health contacts occurred more frequently than every 90 days during the reporting period. He was a participant in the Personal Transformation group program. This program had an individual therapy component, in which the individual therapist differed from the PC, and there was not continuity of care between providers. Of concern, during a contact with the clinician from the Personal Transformation group program, there was documentation that he disclosed "recurring themes of 'not existing' and being locked in a box….as a coffin." Despite these references, there was no assessment of suicidal ideation; referral for further assessment; or communication with the assigned PC about potentially suicidal ideation.

Despite initiating treatment for suicidal ideation, treatment goals did not address suicidal ideation. There was no change to the current treatment goal (reduce depressed mood to two or less prior to the next IDTT) since his initial IDTT almost a year earlier. The only intervention to assist him in achieving the goal of reducing depression was to foster a therapeutic alliance.

**Findings**

This inmate's care was inadequate. Treatment planning, including development of treatment goals and appropriate interventions, was insufficient. Of major concern, the clinical staff failed to assess his potentially suicidal statement. Lastly, there was an indication of a lack of continuity of care between treatment providers.

**Inmate E**

This 30-year-old inmates' healthcare record was reviewed to assess the mental health response and appropriateness of level of care after he received an RVR on June 13, 2019 for Battery on a Peace Officer. At the time of the incident he was at the 3CMS level of care.

He was transferred to CSP/Solano from NKSP on May 8, 2019, where documentation indicated he was experiencing auditory hallucinations, depression, agitation and mood lability. While at CSP/Solano, he was diagnosed with Major Depressive Disorder recurrent episode with psychotic features and Unspecified Schizophrenia Spectrum and Other Psychotic Disorder. He was initially prescribed risperidone, Depakote and Celexa. Shortly after his arrival to CSP/Solano, the risperidone and Depakote were discontinued at his request.

For reasons that were unclear, the PC documented that a case formulation was not appropriate due to the intake assessment being the first encounter. His IDTT was timely, but there was no documentation of treatment goals on the treatment plan.

Less than a month after his admission to CSP/Solano, he was found unresponsive. He was sent to an outside hospital emergency room and admitted to the ICU. It was determined that he had a Depakote overdose. He was also positive for Meth/Amphetamine. Two days later, he was discharged and returned to his housing at CSP/Solano. For reasons that were unclear, there was documentation of an ASU pre-placement on June 4, 2019. Regional staff reviewed documentation and reported that he was not admitted to ASU.

Mental health providers opined that the Depakote ingestion was not an intentional suicide attempt after the inmate reported taking the Depakote to sleep after using meth. Mental health staff did not attempt to seek consultation with hospital staff. He was assessed as low acute and chronic risk, and there was no consideration for closer observation or five-day follow-ups.

Less than two weeks later, he was referred to the TTA for tachycardia and elevated blood pressure. He appeared mildly confused and was described as "searching the room aimlessly with his eyes." He was sent to an outside hospital but returned to CSP/Solano because he refused treatment. Following his return, he was sent back to his housing unit where he assaulted a sergeant (which resulted in the RVR that prompted this review). He was described as confused with an altered level of consciousness. He was brought back to TTA where he made threats to harm others, was shouting, spitting and refusing treatment. The on-call psychiatrist was contacted, and he was given IM Haldol and Ativan and transferred to the TTA at CMF that night.

His RVR Mental Health Assessment was completed at CMF. Documentation indicated that he was psychotic and paranoid and that a mental disorder contributed to his behavior. However, it was opined that because his "instability was partly due to using cannabis" documentation of the behavior in an alternative manner was not warranted. He transferred to the CSP/Corcoran LTRH on June 28, 2019 where he has remained at the 3CMS level of care.

**Findings**

This inmate's care at CSP/Solano was inadequate. The lack of a case conceptualization and treatment goals and subsequent clinical response to his Depakote overdose were deficient.

938

While the RVR assessment was conducted at CMF, staff failed to fully appreciate the impact his mental illness had on his behavior.  This case was referred to the Regional Supervisor for a review of his level of care.

**EXHIBIT I**
**San Quentin State Prison (SQ)**
**Review Date – June 15, 2020**

**Inmate A**

This inmate was randomly selected from SQ's condemned EOP roster to assess the adequacy of care provided during the review period. The inmate's level of care was increased from 3CMS to EOP in October 2019. He was diagnosed with Schizophrenia, paranoid type, and his symptoms included paranoid ideation, auditory hallucinations, agitation, and recurrent depressive episodes. The inmate was compliant with his Zyprexa and Mirtazapine prescriptions. The clinician's judgment of suicide risk on the most recent SRASHE, dated October 16, 2018, was moderate for chronic and low for acute risk. The inmate had one recorded suicide attempt via hanging while in county jail. His most recent suicide prevention safety plan occurred in 2018 and was incomplete.

The PC's initial assessment was not completed following the inmate's inclusion in EOP level of care. The most recent initial PC assessment was conducted in February 2017. PC and psychiatry contacts occurred cell front throughout the review period, with the exception of one confidential PC contact on May 21, 2020. The PC noted that cell front contacts occurred "due to COVID-19 precautions," while the psychiatrist documented non-confidential contacts "due to modified programming." Documentation suggested PC contacts were limited to brief wellness checks without clinical interventions throughout the review period.

IDTTs were not timely during the review period. Only one EOP IDTT, on May 5, 2020, occurred since the inmate's level of care change from 3CMS to EOP in October 2019; and this meeting was held in absentia for reasons that were not documented. The EOP level of care treatment plan also was not developed until seven months after his inclusion in the program. IDTT documentation described the inmate as isolative with auditory hallucinations and increasing anger and agitation. However, only depressed mood was addressed in the treatment plan with an interdisciplinary plan of care (IPOC) that was pulled forward from his October 17, 2018 3CMS plan of care. This outdated treatment plan was incomplete, as it failed to address the inmate's other presenting problems and was missing treatment interventions entirely. The treatment team's rationale for continued EOP level of care was inappropriate and not inmate specific. The rationale stated, "meets criteria for EOP level of care to maintain current stability and continue participating in 10 hours of weekly offered treatment." In contrast, the IDTT further noted he would "continue to be offered limited groups due to COVID-19 precautions."

The inmate was offered one 60-minute group per week from around April 8, 2020 through the end of the review period. He regularly attended group treatment when offered.

**Findings**

The care provided to this inmate was inadequate. The condemned inmate's EOP treatment during the review period was limited to cell front wellness checks, medication management, and one 60-minute treatment group per week. Providers did not document whether in-cell treatment materials were offered in lieu of suspended services. The EOP IDTT and initial treatment plan were not completed until seven months after the level of care change, and a rationale for the

940

inmate's absence from the initial IDTT was not provided. The EOP PC also failed to complete the initial assessment, which was last revised in February 2017. Treatment interventions were not implemented during PC encounters, and planned interventions were not included in the most recent treatment plan. Further, the inmate's 2018 3CMS treatment plan was pulled forward in May of 2020 without modifications to address his current treatment needs with planned interventions. This was especially concerning given the PC noted increased psychotic symptoms and agitation around this time. Finally, the rationales for non-confidential treatment contacts were insufficient.

**Inmate B**

This inmate was randomly selected from SQ's condemned EOP roster to assess the adequacy of care provided during the review period. His diagnosis was Major Depressive Disorder with Psychotic Features, although providers attributed his history of psychotic symptoms to substance use. The inmate experienced hypersomnia, feelings of guilt and shame, and episodes of depression throughout the review period. He was prescribed Hydroxyzine for anxiety and Olanzapine for mood stabilization. The most recent suicide risk evaluation, dated January 29, 2019, indicated moderate chronic and low acute suicide risk. There were no suicide attempts or incidents of self-injury noted in the healthcare record.

The March 10, 2020 IDTT was conducted in absentia due to the inmate reporting "anxiety and aversion to IDTT group size." All required disciplines were present for the IDTT. The treatment plan included one mental health IPOC for depressed mood that was pulled forward from January 2018. The goal was to "reduce depressed mood to 4 or below" by the next IDTT; however, there were no treatment interventions listed. The inmate's medication information had not been updated in the IDTT's medication intervention progress section since November 2019. The treatment team noted the inmate did not meet higher level of care referral indicators, and the rationale for continued EOP level of care was based on "medical necessity per [psychiatrist] advisory to keep in the EOP." It appeared the psychiatrist had concerns about the inmate's history of "rapidly decompensating in a lower level of care." There was no record of a subsequent IDTT by the date of this review on June 18, 2020.

All routine PC and psychiatry contacts occurred cell front for various reasons between March 2, 2020 and June 11, 2020. The current PC documented cell front contacts due to "COVID-19 health and safety precautions," although they offered a confidential session "for any urgent issues." The inmate's former PC documented cell front contacts due to refusals between March 2, 2020 and May 6, 2020. The psychiatrist consistently noted cell front contacts occurred "due to mental health modified programming."

Group progress notes indicated the inmate actively participated in groups when offered. However, a May 13, 2020 progress note stated, "With COVID restrictions patient has lost several opportunities for treatment, yard, and group." Recreation therapy groups were not offered between April 14, 2020 and June 18, 2020, mental health treatment groups were reduced to 60-minutes per week in mid-April, and groups were not offered at all due to COVID testing during the week of June 11, 2020. Progress notes during the month of June suggested yard was either limited or not occurring at all. For example, a June 2020 PC progress note indicated the inmate would "likely return to yard after COVID-19 program restrictions are lifted."

941

**Findings**

The quality of care and clinical documentation were inadequate. The inmate's EOP treatment was limited to medication management, cell front wellness checks, and one 60-minute treatment group per week. Clinical notes suggested the inmate's depression was worsening over the course of the review period; however, he was not encouraged to participate in out of cell treatment, and interventions were not offered at cell front. In-cell treatment activities also were not provided in lieu of suspended treatments. The IDTT failed to develop a sufficient treatment plan with interventions, and the treatment team's rationale for continued EOP level of care was vague and based solely on historical information, which suggested the inmate might never be considered for a less restrictive level of care. Instead, the treatment team should have set clear discharge objectives and focused their interventions on preparing the inmate for less restrictive care. Finally, the inmate's quarterly IDTT was more than one week late by the date of this review.

**Inmate C**

This inmate was randomly selected from SQ's condemned EOP roster to assess the adequacy of care provided during the review period. He discharged from intermediate care to the EOP level of care on March 13, 2020. Documentation related to this admission indicated he refused medications and participation in treatment upon learning of a planned discharge, and his medications were discontinued prior to his arrival at SQ. The inmate's psychiatric diagnoses were Unspecified Depressive Disorder and Amphetamine Type Substance Use Disorder. He also suffered from a traumatic brain injury and was noted to exhibit psychotic symptoms in the context of amphetamine use. The clinician's judgment of suicide risk on the March 18, 2020 SRASHE was moderate for chronic and low for acute. The inmate attempted suicide once in 1975 by wrist cutting. The inmate's suicide prevention safety plan was not modified after November 2019, primarily as a result of his refusals.

During the initial EOP IDTT on March 24, 2020 the inmate stated he would be "fine" without mental health services and he reported a plan to participate minimally in treatment. The IDTT noted the inmate did not meet the higher level of care indicators, and he was retained in EOP on this date. The treatment plan included a mental health IPOC for depressed mood with a goal of reducing depressed mood to four or below. However, the IDTT failed to document a necessary baseline rating for depression. The provider's planned intervention for depression was to "encourage him to work on improved functioning by using goal setting." The inmate's medications were not updated in the medication intervention progress section of the IDTT documentation.

Group treatment was offered minimally during the review period, and the inmate participated in none. Recreation therapy groups were not offered after March 26, 2020, and mental health groups were not offered after April 10, 2020. Progress notes did not indicate whether the inmate participated in yard or dayroom when offered.

PC and psychiatry contacts occurred weekly at cell front between March 13, 2020 and June 11, 2020. The psychiatrist attributed cell-front contacts to "mental health modified programming," while the PC documented non-confidential contacts due to inmate preference or "as a result of COVID precautions." Additionally, the PC wrote in all progress notes, "PC will meet with

942

patient cell front due to COVID-19 precautions," and that confidential sessions were offered for "urgent and emergent" needs.

The inmate did not attend the June 16, 2020 IDTT, and the documented reason was, "not present at IDTT due to COVID-19 situation." The inmate's level of care was reduced to 3CMS on this date, reportedly based on "having control of his mental health needs without additional support from the mental health program." The PC noted that he would be seen every 45 to 60 days in 3CMS level of care, although it was unclear whether this was communicated to the receiving 3CMS clinician.

**Findings**

The quality of care provided to this inmate was inadequate. Documented treatment plans were insufficient and failed to address the inmate's treatment non-compliance and precipitants to his recent intermediate care admission. The reduction in level of care was based on the inmate's unwillingness to engage with mental health staff instead of progress toward discharge objectives, which were not developed by the treatment team. Discharge objectives should have incorporated participation in treatment, utilization of healthy coping skills, and relapse prevention and safety planning. Finally, psychiatry did not complete an initial assessment of the inmate following his discharge from intermediate care.

**Inmate D**

This inmate was randomly selected from SQ's condemned EOP roster to assess the adequacy of care provided during the review period. The inmate received EOP level of care treatment at SQ since June 1, 2018. He was diagnosed with Schizophrenia, paranoid type, and prescribed Zyprexa for psychotic symptoms. The clinician's judgment of suicide risk on the most recent SRASHE, dated December 11, 2018, indicated moderate chronic and low acute risk. The SRASHE referenced one suicide attempt by "cutting" in late adolescence.

The IDTT convened on April 21, 2020 without the inmate in attendance. The provider suggested the inmate was forced to choose between IDTT and yard participation, and he chose yard. The inmate reportedly attended all recreation therapy groups offered; however, he "frequently declined confidential 1:1 sessions in order to attend custody yards" and he refused all mental health groups for reasons that were not documented. The treatment team did not consider scheduling individual contacts and IDTTs during different times to address the yard conflict. The inmate did not meet the higher level of care referral indicators on this date. He was retained in EOP level of care with a plan to consider 3CMS upon demonstrating ongoing medication compliance, symptom stability, and use of safe coping skills.

The April 2020 treatment plan addressed the inmate's hallucinations with a planned intervention to "work on coping strategies" in order to reduce "feelings of interference/dysfunction rated as a 4 or below by self-report at the next IDTT." However, a necessary baseline rating was not provided. The plan also indicated medication non-adherence would be addressed by "encouraging the patient to make connections between symptom amelioration and treatment adherence" to achieve the objective of verbalizing "understanding of therapeutic benefits of treatment adherence."

943

All PC and psychiatry contacts during the review period were conducted non-confidentially on the yard or at cell front, with the exception of two confidential PC contacts in March and May 2020. Weekly PC contacts were routinely scheduled during yard time between February 28, 2020 and June 19, 2020, and the inmate either refused or spoke very briefly with the PC on the yard. Psychiatry contacts were timely and completed cell front "due to modified programming."

The inmate's healthcare record confirmed refusals for all mental health groups offered during the review period. Recreation therapy groups were not offered after April 8, 2020; however, the inmate did not attend these groups after March 24, 2020.

**Findings**

The mental health care provided to this inmate was inadequate. The inmate was diagnosed with a serious mental disorder; however, his EOP treatment was limited to medication management, minimal recreation therapy groups, and brief wellness checks that were often refused due to yard conflicts. The IDTT seemingly ignored the scheduling conflict that resulted in the inmate's lack of participation in IDTT and individual treatment contacts. The inmate's reason for refusing treatment groups, while actively participating in recreation therapy groups, also was not explored. Further, the treatment plan was inadequate, did not address his lack of treatment participation, and was not implemented during PC contacts. Lastly, the inmate did not have a suicide prevention safety plan, despite the SRASHE referencing a prior suicide attempt.

**Inmate E**

This inmate was randomly selected from SQ's condemned EOP roster to assess the adequacy of care provided during the review period. The inmate arrived at SQ in June 2006. He was diagnosed with Schizoaffective Disorder, Bipolar Type, and prescribed Zyprexa for psychosis and mood stability and Cogentin to address medication side effects. The inmate was medication compliant throughout the review period. The most recent suicide risk evaluation indicated no prior suicide attempts and low chronic and acute suicide risk; however, the May 2020 treatment plan noted "past reported history of suicide attempt."

IDTTs met in February and March 2020. The EOP treatment plan only identified disorganized thinking and speech as a treatment target; however, there were no planned treatment interventions provided. The treatment team's level of care rationale was limited to, "…does not meet criteria for a higher level of care." The IDTT did not develop a plan to graduate the inmate to a less restrictive level of care. Case formulations were not documented in the treatment plans. Instead, the February 2020 case formulation section noted only, "child trauma," and the May 2020 case formulation section only included, "stable, sleeping well, and medication compliant." The IDTT documentation did, however, include a plan for the PC to "see the patient weekly at cell front due to the current COVID-19 precautions unless he has an increase in mental health symptoms."

More than 50 percent of scheduled mental health treatment groups were cancelled between March and June 2020, and the inmate routinely refused groups when offered. Recreation therapy group notes during this time frame indicated the inmate chose the "option of outdoor activities for fresh air" and "was cooperative in yard and socialized."

944

Psychiatry contacts were timely, while PC contacts were not. Nearly all psychiatry and PC contacts ranged from five to 15 minutes in duration, during the review period. The inmate was not offered a PC contact between March 5, 2020 and April 1, 2020. The March 9, 2020 contact was cancelled, and the March 19, 2020 encounter was limited to a cell-front interaction for introducing his newly assigned PC. Psychiatry contacts were completed sooner than every 30 days, with nearly all appointments conducted cell front for various reasons.

**Findings**

The care provided to this inmate was inadequate. The EOP treatment was limited to medication management and minimal recreation therapy groups. The PC did not appear to have a sufficient understanding of the inmate's treatment needs based on their inability to complete a case conceptualization or develop a meaningful plan of care. The inmate was retained in the EOP level of care without discharge objectives, planned treatment interventions, or a sufficient rationale. The inmate was not offered in-cell treatment activities in lieu of lost treatment hours.

**Inmate F**

This patient was randomly selected from SQ's MHCB roster to assess the adequacy of care during MHCB admission. The 59-year-old patient arrived at SQ's reception center for his fourth term on March 12, 2020. He was referred from 3CMS to MHCB level of care for psychosis and grave disability on April 24, 2020.

A non-emergent PC 2602 was initiated shortly after MHCB admission due to continued psychosis and medication non-adherence.

Initial assessments, daily contacts, and IDTTs were completed timely with comprehensive documentation. However, treatment goals and interventions needed improvement. For example, the IDTT included goals that relied on subjective ratings without providing baseline measures to assess progress.

On April 30, 2020, the patient was referred to intermediate care and he was subsequently admitted on May 5, 2020.

**Findings**

This patient's care was adequate.  Documentation conveyed his symptoms and impaired functioning to support the psychiatric diagnosis, treatment interventions, and higher level of care referral. The PC 2602 and intermediate care referral were timely and appropriate. However, treatment plans needed improvement.

**Inmate G**

This patient was randomly selected from SQ's MHCB roster to assess the adequacy of care during admission. He discharged from CMF's MHCB to 3CMS level of care in March 2020. The patient was admitted to the MHCB at SQ on April 11, 2020, at which time he exhibited acute distress related to an assault by a peer and a "take down" by custodial staff. He was not prescribed psychiatric medication during the review period.

945

Daily contacts were non-compliant in the MHCB, while initial assessments and IDTTs were timely. The patient reportedly refused to meet with the PC for the initial assessment, and the PC did not attempt to later engage him in the evaluation. The PC's initial assessment relied on documentation pulled forward from the psychiatric assessment, instead of a comprehensive independent record review. Further, the PC did not include sufficient information related to his recent MHCB admission at CMF or the precipitants to his current MHCB admission.

On April 14, 2020, the PC conducted a cell-front "wellness check," and on April 15, 2020 the psychiatrist documented a cell-front contact that was not due to patient refusal. Documentation related to daily MHCB contacts suggested treatment interventions were not offered during PC encounters.

The quality of treatment plans was generally lacking. Providers failed to include clear interventions and establish baseline measures for goals that relied on subjective ratings to demonstrate progress. For example, one treatment goal noted suicidal ideation would be reduced to a six or below by discharge, without indicating the patient's current rating or defining a six in terms of intensity and risk. Further, the goal for suicide did not take into account the patient's denial of suicidal ideation since MHCB admission, and the provider never revised the treatment plan to resolve the discrepancy.

Documentation suggested the patient's mental status improved over the course of his MHCB admission, and the patient attributed his progress to resolution of safety concerns. The higher level of care non-referral rationale and 3CMS level of care justification were reasonable. However, the PC inappropriately noted "suicidal ideation" as the discharge diagnosis.

The patient discharged to 3CMS level of care on April 16, 2020. He reportedly declined to participate in suicide prevention safety planning; however, and there were no further attempts to engage him.

**Findings**

The care provided to this patient was inadequate. Although his safety concerns were addressed and his mental status subsequently improved, several deficiencies were noted during this review. The treatment team's case conceptualization, diagnostic assessments, and treatment plans were insufficient. Inconsistent documentation regarding suicidal ideation was not resolved prior to discharge. Treatment goals were not patient specific and, while interventions were implemented to address immediate situational stressors, the patient's limited coping skills were not a focus of treatment. Further, the PC documented only one attempt to engage the patient in the initial assessment and safety plan prior to discharge.

**Inmate H**

This 36-year-old condemned patient was randomly selected from San Quentin's MHCB roster to assess the adequacy of care during MHCB admission. His MHCB admission was initiated after he assaulted an officer during an escort to the visiting area. CDCR staff suspected stimulant intoxication at the time, and he was cleared by TTA medical staff for MHCB admission. The patient was diagnosed with a rule out of Substance Induced Agitation. He was not prescribed psychiatric medication.

946

MHCB providers' initial assessments were comprehensive and timely. The patient's agitation and distress subsided over the course of his stay, which suggested substances may have contributed to his psychiatric decompensation prior to admission.

The patient discharged from the MHCB and MHSDS during the initial IDTT, and the documented clinical rationale was appropriate.

**Findings**

This patient's care was adequate.  The treatment team's documentation was comprehensive and provided sufficient justification for their clinical decisions.

**Inmate I**

This 50-year-old patient was randomly selected from SQ's MHCB roster to assess the adequacy of care during admission. He was referred for MHCB placement and MHSDS inclusion on April 21, 2020, after endorsing auditory hallucinations and suicidal ideation with intent to self-harm. The patient was described as visibly distressed with possible delusions. The psychiatric diagnosis was unclear in the healthcare record, although he was prescribed Zoloft during MHCB admission.

The initial assessments, daily contacts, and IDTTs were timely, and the clinical documentation was generally adequate. However, further review of MHCB providers' documentation revealed variations in mental status updates and significant discrepancies in diagnoses that warranted clarification. One psychiatrist noted a problem of Adjustment Disorder with Anxiety, while focusing their assessment on PTSD, and another psychiatrist documented diagnoses of Unspecified Depressive Disorder and rule-outs for Schizophrenia Spectrum Disorder; Major Depression, with Psychotic Features; Narcissistic and Antisocial Personality Disorders; and Bereavement Reaction. The PC's initial assessment and IDTT documentation indicated Adjustment Disorder, PTSD, and the need to rule out psychotic thought process. Further, providers failed to document sufficient justifications for their diagnoses and rule-outs.

The treatment goals included reducing anxiety and decreasing suicidal ideation to a rating of four or lower. However, goals were not updated prior to discharge, despite the patient's denial of suicidal ideation.

The April 2020 SRASHE indicated current suicidal ideation, while the MHCB PC noted the absence of suicidal ideation since mid-March 2020. However, the discrepancy was not appropriately addressed, despite the patient's MHCB admission resulting from reports of suicidal ideation with intent.

**Findings**

The care provided to this patient was inadequate. Documentation suggested a serious lack of care coordination. Mental health staff documented inconsistent information about diagnoses, mental status, and suicide risk without appropriately attempting to resolve the discrepancies through consultation, IDTT discussion, or diagnostic clarification evaluation. Providers also failed to document sufficient justifications for their diagnoses. Further, treatment plans were deficient.

**Inmate J**

This condemned patient was randomly selected from SQ's MHCB roster to assess the adequacy of care during admission. He had an extensive history of self-injurious behavior, suicide attempts, and inpatient admissions. His most recent inpatient admission was in an acute program from December 27, 2019 through January 15, 2020. On February 11, 2020, the patient was referred for the current MHCB admission at SQ for danger to self. He reportedly had a razor in his mouth during a treatment group earlier on this date, and, although he denied intent to self-harm, he indicated the inpatient setting would be a safer place for him. His distress at the time was attributed to chronic familial and housing unit stressors. The patient's psychiatric medications included Melatonin, Zyprexa, Wellbutrin, Propranolol, and guanfacine.

MHCB providers' initial assessments were comprehensive and timely, although inconsistent diagnoses were identified in the documentation. The psychiatrist's diagnoses included Unspecified Bipolar and Related Disorder, depressed; Borderline Personality Disorder; and PTSD, while the PC and IDTT documentation noted ADHD and Affective Disorder.

The patient was discharged from the MHCB during his initial IDTT on February 14, 2020. The rationale for discharge referenced two of three recent self-injurious behaviors incidents in the MHCB; risks associated with inpatient care for patients with suicidal behaviors; the patient's denial of suicidal ideation since admission; and a lack of symptoms suggestive of psychiatric decompensation. The IDTT did not provide a clear rationale for EOP level of care or suggest a plan for addressing his ongoing housing and familial stressors in the outpatient setting. The patient's report of feeling safer in an inpatient setting also was not explored.

The patient refused to participate in the discharge suicide risk evaluation and suicide prevention safety planning. His chronic suicide risk was assessed as high and his moderate risk was assessed as moderate on this date.

**Findings**

The patient's care was adequate, although marginally. The quality of providers' initial assessments was sufficient, and the IDTT's level of care decision at discharge was reasonable. However, the discharge rationale needed improvement and treatment modifications were indicated.

**Inmate K**

This inmate was randomly selected from SQ's higher level of care non-referral roster to assess adequacy of care provided during the review period. The 41-year-old inmate was in the EOP level of care and housed on facility-B. His psychiatric diagnoses included Psychotic Disorder Not Otherwise Specified, PTSD, and Major Depressive Disorder. He was prescribed Zoloft, Remeron and Zyprexa.

The inmate was flagged on the sustainability report during his March 2020 IDTT for participating in less than the minimum number of treatment hours. Higher level of care non-referral documentation addressed relevant clinical areas and the inmate's ability to function in the current level of care. The inmate attributed his lack of participation in programming to

feeling agitated and attempting to avoid conflicts with peers. However, the treatment plan was not modified to address the inmate's agitation and propensity for interpersonal conflict, which may have improved his participation in programming.

Providers' progress notes were individualized and comprehensive. The inmate was described as symptomatic and able to function in the current setting. Psychiatric diagnoses were consistent in PC and psychiatric documentation, while IDTT diagnoses differed.

**Findings**

The IDTT's decision to retain the inmate in EOP level of care was appropriate; however, treatment planning was insufficient for addressing the inmate's treatment participation.

**Inmate L**

This 47-year-old condemned patient was randomly selected from SQ's higher level of care non-referral roster to assess the adequacy of care provided during the review period. IDTT documentation included diagnoses of Bipolar Disorder,Major Depressive Disorder, Recurrent, Polysubstance Dependence, Borderline Personality Disorder, and PTSD. He was prescribed Invega, Naltrexone and Melatonin.

The patient was admitted to the MHCB from April 12, 2020 through April 15, 2020 for suicidal ideation with a plan to overdose. The patient's distress at the time was attributed to the deaths of his mother and sister. He also reported difficulties related to modified programming. The patient's suicidal ideation subsided by the time of his initial MHCB IDTT, at which time he requested discharge. However, he was unable or unwilling to articulate factors that contributed to the resolution of suicidal ideation. The patient discharged to EOP level of care and returned to his former housing, although his reported difficulties in the housing unit were not addressed during admission.

He was identified on the sustainability report due to four MHCB level of care referrals within a six-month period. The IDTT's higher level of care non-referral rationale provided a thoughtful conceptualization of his needs; however, improvements were needed. The provider failed to consider precipitants to the patient's multiple MHCB admissions in their non-referral rationale, and the accompanying treatment modifications were insufficient for addressing his current treatment needs, including the precipitants to his frequent inpatient referrals. Additionally, interventions were not documented to address his reported difficulties with modified programming, which was identified as a contributing factor to his current MHCB admission.

**Findings**

The care provided to this patient was inadequate. While the patient did not appear to require a higher level of care referral from the MHCB, his discharge was premature. Deficiencies were identified in non-referral rationales and treatment modifications, and diagnostic clarification was needed.

**Inmate M**

This 60-year-old inmate was randomly selected from SQ's higher level of care non-referral roster to assess the adequacy of care during the review period. The inmate was flagged on the sustainability report for three or more MHCB admissions within a six-month period. The inmate recently discharged from the MHCB to the EOP level of care.

The IDTT's higher level of care non-referral rationale on February 11, 2020 was insufficient. The treatment team failed to consider the precipitants for his prior MHCB admissions in their non-referral rationale, and the provider inappropriately noted he received EOP treatment for an Opioid Use Disorder. This statement was inconsistent with treatment plans that addressed more serious diagnoses of Acute Schizophrenia, Anxiety Disorder, and Panic Attack as a Reaction to Stress.

The insufficient non-referral rationales impacted the quality of the accompanying treatment modifications, which solely focused on substance abuse interventions.  The treatment needs identified during his recent MHCB admission were not addressed.

Diagnostic clarification was needed for effective treatment planning, as inconsistencies were noted throughout the documentation. In addition to the above diagnoses, the inmate's psychotic symptoms were also attributed to suspected meth intoxication during his recent PIP admission.

**Findings**

This inmate's care was inadequate. The higher level of care non-referral rationale was inappropriate, and the treatment modifications were insufficient for addressing the inmate's treatment needs. Further, the appropriateness of EOP level of care could not be determined as a result of conflicting clinical information observed throughout the inmate's healthcare record.

**Inmate N**

This 29-year-old patient was randomly selected from SQ's higher level of care non-referral roster to assess the adequacy of care during the review period. The patient discharged from intermediate care one month prior to his current MHCB admission. He was diagnosed with Bipolar Disorder and prescribed Zyprexa and Zoloft. The patient was flagged on the sustainability report for three RVR mental health assessments in a three-month period and low treatment participation.

The IDTT convened in April 2020, noted the higher level of care referral considerations, and documented a non-referral rationale. However, there was no indication RVR documentation was reviewed and considered in the rationale. The inmate's RVR behaviors also were not addressed in the treatment modifications. The patient attributed his low treatment participation to sleeping most of the day; however, the treatment team did not explore this further or develop a plan to address the issue.

## Findings

While EOP level of care was appropriate, the higher level of care non-referral rationale and treatment modifications were inadequate. The treatment team failed to sufficiently explore and address the patient's RVR behaviors and lack of treatment participation. The patient's claim that his low treatment participation resulted from sleeping most of the day required further exploration to assess potential underlying factors such as depression, anxiety, or poor sleep habits; treatment interventions should have been planned accordingly.

## Inmate O

This 61-year-old inmate was randomly selected from SQ's higher level of care non-referral roster to assess the adequacy of care during the review period. He arrived at SQ's reception center on March 5, 2020 and was included in the EOP level of care. The inmate recently returned from CSP/Solano's MHCB and was housed in ASU for COVID-19 quarantine. His psychiatric diagnoses included Major Depressive Disorder, Unspecified Psychosis, and Schizoaffective Disorder Bipolar Type. He was prescribed Depakote and Seroquel. The inmate was identified on the sustainability report due to his extended MHCB stay during the review period.

On April 15, 2020, the inmate was admitted to the MHCB at SQ for danger to self. He endorsed auditory hallucinations and racing thoughts prior to admission. The IDTT convened on April 27, 2020 and noted the extended length of stay in MHCB was needed for stabilization of manic symptoms. His manic symptoms reportedly improved with medication, although the medication was titrated due to side effects prior to discharge.

The IDTT's higher level of care non-referral rationale included appropriate PC and psychiatry interventions. The treatment modifications were reasonable, although timeframes for planned interventions suggested they were specific to the MHCB setting "over the next 7 days." In contrast, the IDTT noted the inmate was recommended for discharge and would connect with his outpatient providers within the next two weeks regarding treatment progress.

The discharge SRASHE noted current suicidal ideation and hopelessness, which was consistent with recent PC documentation; however, this was not discussed during the discharge IDTT. The inmate declined to participate in discharge safety planning, although he indicated the previous plan was sufficient. A review of the prior safety plan revealed that hopelessness was listed as a warning sign and church was included as a coping strategy.

The inmate ultimately discharged to the ASU from MHCB for reasons that were unclear. His most recent suicide prevention safety plan also was not appropriate for the ASU setting.

## Findings

The care provided to this inmate was inadequate. There was a disconnect between the IDTT's planned treatment modifications and planned discharge to EOP. It was especially concerning that the inmate was placed in a high-risk environment such as ASU, without a sufficient safety plan. There was also a need for diagnostic clarification, given the overlapping diagnoses listed in the healthcare record. However, reasonable rationales were provided for the extended length of stay

in MHCB and the higher level of care non-referral. MHCB clinical documentation was individualized and addressed pertinent areas.

## Inmate P

This inmate was randomly selected from a list of mainline 3CMS inmates to assess the adequacy of care provided during the review period. He was diagnosed with Schizoaffective Disorder, Depressive type, and multiple medical conditions.

The 3CMS annual IDTT occurred timely on December 17, 2019. The PC noted that, although the inmate did not attend the meeting, the treatment plan was reviewed with him during a PC contact on November 22, 2019. IDTT documentation suggested the inmate continued to experience delusions, bizarre behavior, and confusion (i.e., talking to walls). The inmate was also described as a "less reliable historian" due to confusion and a delusional belief that he was pardoned in the 1990s; he reportedly asked officers daily about his upcoming parole date. However, the treatment team perceived he was able to manage his activities of daily living and function in the 3CMS housing unit. The IDTT continued the inmate's unmet treatment goals on this date. Treatment objectives required he demonstrate the ability to challenge the reality of a delusion at least once, exhibit behavior appropriate for a lower level of care, and gain reality testing skills. The inmate was retained in 3CMS level of care without medication on this date.

The inmate did not meet with a psychiatrist or receive psychotropic medications during the review period. He reportedly refused medication reevaluation when offered.

PC contacts were timely, and the inmate generally denied symptomatic complaints during clinical encounters. He discussed interpersonal "tension" due to his cellmate's use of cleaning products on at least one occasion, and he planned to change his cell to address the issue.

## Findings

The care provided to this inmate was adequate. The PC identified his ongoing chronic delusions and set treatment goals to address them. Psychiatry offered to reevaluate for medication management during IDTT. The IDTT's rationale for retaining the inmate in 3CMS level of care was appropriate.

## Inmate Q

This inmate was randomly selected from a list of mainline 3CMS inmates to assess the adequacy of care provided during the review period. His psychiatric diagnoses included Depressive Disorder, Unspecified Anxiety Disorder, and multiple medical conditions. He was prescribed Nortriptyline (25 mg by mouth before bed) and Vistaril (75 mg by mouth before bed as needed) for sleep.

The inmate did not attend his annual 3CMS IDTT on November 26, 2019 or his ASU IDTT on March 25, 2020. Clinicians did note that treatment plans were reviewed with him prior to these meetings. The inmate was placed in ASU in March 2020 for medical quarantine, secondary to flu-like symptoms. His unmet treatment goals were continued during IDTTs. However, while the treatment plan targeted his symptoms of anxiety, depressive symptoms were not addressed.

The PC addressed the inmate's treatment goals and immediate complaints during routine PC contacts. The PC also processed an RVR incident in January 2020, which resulted in the inmate losing his job as a porter and phone privileges for 30 days. PC contacts occurred almost weekly in the ASU during the March 2020 quarantine period.

Psychiatry notes indicated the inmate was medication adherent and declined switching to a newer class of antidepressant medication. Psychiatric medications were not listed in the EHRS Medication Administration Record (MAR).

**Findings**

The overall care provided to this inmate was adequate. He was appropriately retained in the 3CMS level of care due to symptoms neither significantly worsening nor impacting his ability to function in general population. The PC set treatment goals to address his anxiety symptoms. The psychiatrist offered evidence-based alternatives and adjustments when clinically appropriate. However, the treatment team provided a diagnosis of Depressive Disorder without addressing his depressive symptoms in the plan of care.

**Inmate R**

This inmate was randomly selected from a list of mainline 3CMS inmates to assess the adequacy of care provided during the review period. His initial psychiatric diagnosis of Unspecified Anxiety Disorder was later changed to Adjustment Disorder with Anxiety. Vistaril was prescribed to treat his anxiety symptoms. He also suffered from multiple pain related medical problems.

The inmate was not due for IDTT during the review period. PC contacts were timely and entailed weekly individual psychotherapy in a confidential setting.

Routine psychiatry contacts were timely, and the inmate's medication was adjusted at his request on April 14, 2020. However, each psychiatry note contained outdated and inaccurate inmate information pulled forward from prior records. For example, the psychiatrist repeatedly pulled forward a prior diagnosis of Panic Disorder and a prescription for Vistaril 50 mg by mouth at bedtime. Further, the psychiatrist noted Adjustment Disorder with Anxiety and methamphetamine use in progress notes, while the diagnosis tab only included a diagnosis of Unspecified Anxiety Disorder.

**Findings**

The overall care provided to this inmate was adequate. He appeared appropriate for 3CMS level of care. The PC sufficiently addressed his treatment goals, psychiatric symptoms, and underlying issues, and the psychiatrist also provided care consistent with his diagnosis and symptoms. While documentation issues were identified, they did not appear to impact the inmate's care during the review period.

**Inmate S**

This inmate was randomly selected from a list of mainline 3CMS inmates to assess the adequacy of care provided during the review period. He transferred from Alameda County Jail to SQ's reception center in May 2019, and subsequently moved to SQ's mainline 3CMS program on September 25, 2019. He was diagnosed with Unspecified Anxiety Disorder, Adjustment Disorder, with Depressed Mood, and a seizure disorder. The psychiatrist prescribed BuSpar (20 mg by mouth twice a day) for anxiety and Benadryl (150 mg by mouth before bedtime).

The inmate was not due for an IDTT meeting during the review period. Treatment goals developed during the most recent IDTT indicated he would learn to express his anger in a socially appropriate manner; learn about the potential consequences of his negative thoughts and behaviors; reduce his depressed mood; and, build a therapeutic alliance with his PC through psychotherapy.

The PC offered monthly contacts between December 2019 and February 2020. Progress notes referenced interventions focused on improving effective communication, coping skills, understanding, and frustration tolerance.

The inmate received emergent mental health contacts with a PC and psychiatrist on April 21, 2020 in response to "bad news." He was informed his father was hospitalized and diagnosed with COVID-19, and that CDCR planned to transfer him to CSP\Corcoran for administrative reasons. He reportedly had a seizure on this date as well. His acute and chronic risk for suicide were assessed as low. The psychiatrist noted symptoms of anxiety and insomnia and started the inmate on Benadryl (150 mg by mouth at bedtime) and a high dose of BuSpar (20 mg by mouth twice daily).

The inmate met with a different psychiatrist via telepsychiatry on May 6, 2020. This provider completed a brief note "…related to coronavirus coverage," and indicated the inmate complained of BuSpar related side effects that involved feeling "drunk" and experiencing "electrical shocks." The provider reviewed the inmate's labs, noted he was sleeping better, and planned for follow up in three months. While the provider did not believe he was benefitting from BuSpar, the medication was continued at the inmate's request.

**Findings**

The psychiatric care provided to this inmate was inadequate. The psychiatrist started the inmate on a higher than recommended dose of BuSpar without a documented rationale. The inmate's BuSpar medication was started at 40 mg per day in divided doses, despite the recommended starting dose range of 10 to 15 mg per day in divided doses; with subsequent 5 mg per day increases at two to three-day intervals. This was the most likely reason for the inmate's significant side effects noted in May 2020. However, all other aspects of psychiatric treatment reviewed were clinically appropriate.

**Inmate T**

This inmate was randomly selected from a list of mainline 3CMS inmates to assess the adequacy of care provided during the review period. He arrived at SQ on October 11, 2012. Psychiatric

diagnoses were not provided in the IDTT problem list or EHRS diagnosis list; however, psychiatric progress notes referenced a diagnosis of "moderate depression in stable remission." He was not prescribed psychotropic medications during the review period.

The psychiatrist noted the inmate was stable without medication. Psychiatric care was largely supportive in nature and appropriately responsive to the inmate's concerns and requests.  For example, the inmate expressed a desire to participate in mental health groups, and the psychiatrist agreed to explore the matter with his PC.

The inmate's January 2020 PC contact focused on treatment goals and other real-time concerns. PC contacts were not timely during the review period, and appointments were cancelled without a documented reason on April 30, 2020 and May 7, 2020. In May 2020, the inmate reported increased irritability during a lockdown secondary to COVID-19 precautions, and the PC appropriately explored triggers and reviewed relevant coping skills. However, in reference to future appointments, the PC informed the inmate "…the usual scheduling procedure might not be followed due to state directive to allocate resources to priority program needs; but he could submit a mental health referral form at any time and that he would be seen within the program guidelines."

The inmate was not due for IDTT during the review period. His treatment goals were to reduce self-reported irritability, demonstrate objective improvement, decrease anxiety, build coping skills, and increase prosocial responses.

**Findings**

The care provided to this inmate appeared adequate, although marginally. Clinical interventions were appropriate for the inmate's clinical presentation and treatment goals. The decision to treat the inmate without psychiatric medication also appeared clinically sound. However, the inmate's psychiatric diagnosis was not clearly documented in the healthcare record and providers failed to document whether contacts occurred in confidential settings. Further, PC contacts were cancelled without recorded rationales on two occasions, and the PC declined to document a follow-up time frame after May 2020 reportedly due to a COVID-19 related statewide directive.

**Inmate U**

This inmate was randomly selected from a list of mainline 3CMS inmates to assess the adequacy of care provided during the review period. He arrived at SQ on April 2, 2013. His psychiatric diagnoses were recurrent Major Depressive Disorder and Paraphilia. Several medical illnesses were listed as well, including spinal stenosis. The psychiatrist prescribed Depakote as a KOP (500 mg by mouth in the evening) for impulse control, mood stability, and nightmares.

The inmate's annual IDTT occurred on March 10, 2020. Treatment goals involved reducing depressed mood, maintaining depression in remission for one year, and improving functioning through goal setting. The treatment goals were appropriately updated during the IDTT. However, the treatment team's case formulation was not completed, despite the inmate's inclusion in MHSDS for over three years. Providers, instead, repeatedly pulled forward a sentence that read, "Case formulation is in process - information will be added as it is presented."

PC contacts were timely and occurred on December 9, 2019 and March 4, 2020. The provider's interventions were mostly supportive and focused on current stressors. Treatment goals were addressed at each visit and updated based on the inmate's presentation.

Psychiatry contacts were timely and occurred in-person on January 29, 2020 and via telepsychiatry on April 28, 2020. The inmate's symptoms, medications, and stressors were consistently reviewed during these appointments. A serum Depakote level was appropriately ordered after laboratory results suggested subtherapeutic levels. However, psychiatric documentation between January and April 2020 was essentially the same, including the mental status examination section, which included a prior quote from the inmate. Only minor word changes related to social stressors and Depakote level were noted.

**Findings**

The care provided to this inmate was inadequate. The PC's treatment interventions were appropriate for his diagnosis, treatment goals, and clinical presentation; however, the psychiatrist's medication interventions were not. While Depakote is used for impulsivity, the medication is not indicated for treatment of Major Depressive Disorder or nightmares. IDTT and psychiatry documentation included notable issues with information pulled forward from other records. The IDTT also neglected to develop a case formulation after three years of observation and treatment. Finally, the psychiatrist did not provide sufficient updates on mental status in progress notes, which are essential for tracking changes in cognitive, physical, and emotional states, in addition to determining risk and guiding treatment decisions. The psychiatrist and PC failed to document whether treatment contacts occurred in confidential settings.

**Inmate V**

This inmate was randomly selected from a list of mainline 3CMS inmates to assess the adequacy of care provided during the review period. The inmate arrived at SQ on September 22, 2015. His psychiatric diagnoses were Mood Disorder, Major Depressive Disorder, recurrent, and Alcohol Abuse in remission. The healthcare record also revealed several medical illnesses, including stage four liver cancer. He was prescribed Depakote (ER 500 mg, by mouth, in the evening) for mood stability and Promethazine (100 mg by mouth at bedtime) for sleep.

Psychiatry contacts were timely and occurred on December 13, 2019 and March 6, 2020. The provider addressed current stressors and symptoms during contacts. The inmate exhibited worsening symptoms suggestive of a Mood Disorder during a March 2020 psychiatry contact, and these included irritable mood, decreased need for sleep, and rapid speech. The psychiatrist increased Depakote and changed Promethazine to as needed on this date. Laboratory results were reviewed at each appointment, and a Depakote level was ordered during the March 2020 visit.

PC contacts were also timely and occurred on December 18, 2019, February 18, 2020, and May 4, 2020. Psychotherapy addressed current stressors (i.e., liver cancer), symptoms, and treatment goals. The PC also provided supportive therapy during each session and documented status updates in progress notes. However, in May 2020, the PC informed the inmate 3CMS treatment would be "minimal due to COVID-19 precautionary health and safety measures."

The inmate was not due for an annual IDTT during the review period. His treatment goals involved reducing depressed mood and maintaining depression in remission for three months.

**Findings**

The care provided to this inmate was inadequate. Providers' diagnoses and treatment focus differed throughout the review period, and the discrepancies were never resolved through consultation or IDTT discussion. The PC diagnosed the inmate with Major Depressive Disorder, which suggested the absence of manic or hypomanic symptoms, while the psychiatrist diagnosed the inmate with a Mood Disorder, which indicated the presence of mania or hypomania at some point. It was necessary to clarify the diagnosis, as the PC's interventions were insufficient for a diagnosis of Mood Disorder and the psychiatrist's Depakote intervention was inappropriate for Major Depressive Disorder. However, it was appropriate for the psychiatrist to increase the inmate's Depakote dose in response to new onset hypomanic symptoms of irritability, decreased need for sleep, and rapid speech. Both providers also failed to document whether clinical contacts occurred in confidential settings.

**Inmate W**

This inmate was randomly selected from a list of mainline 3CMS inmates to assess the adequacy of care provided during the review period. He arrived at SQ on April 24, 2013. His psychiatric diagnoses were Schizoaffective Disorder and Polysubstance Dependence, although the PC also provided a diagnosis of Post-traumatic Stress Disorder (PTSD) in one progress note. He was prescribed Remeron (15 mg by mouth at bedtime), Prozac (80 mg by mouth in the morning), and Risperdal (5 mg by mouth at bedtime).

The annual IDTT occurred on February 25, 2020. The treatment goals were updated during IDTT and included reducing the inmate's auditory hallucinations and negative symptoms of psychosis and increasing his coping skills and ability to tolerate chronic psychotic symptoms. The provider also noted key coping skills of working in the kitchen and taking quiet walks on the yard.

Routine PC contacts were not timely during the review period. The PC met with the inmate on January 3, 2020 and May 7, 2020; however, his April 28, 2020 appointment was cancelled. The PC addressed the inmate's current stressors and the impact of PTSD symptoms on his group programming and upcoming Board of Parole Hearing (BPH) preparation. The PC also documented their efforts to assist the inmate with his BPH readiness and noted progress toward treatment goals.

Psychiatry contacts were timely and occurred in a confidential setting on November 15, 2019 and February 14, 2020. The inmate endorsed active symptoms of psychosis and discussed current stressors during each follow up. He denied medication side effects and was noted to be medication adherent. Laboratory results were up to date and follow-up appointments were set for three months. However, the provider's documentation was essentially the same for each visit, including quoted auditory hallucination content, with only minor changes in the subjective and appearance section of the mental status examination.

**Findings**

The care provided to this inmate was adequate, although marginally. The inmate was diagnosed with a psychotic disorder and endorsed active psychotic symptoms throughout the review period; however, the PC failed to follow up for four months between January and May 2020. The PC's documentation did not indicate whether clinical contacts occurred in a confidential setting. Additionally, psychiatric documentation was essentially the same for each contact, as this provider pulled forward text from prior notes without sufficiently updating the inmate's mental status. However, providers' interventions were appropriate for the inmate's diagnoses, treatment goals, and current stressors.

**Inmate X**

This inmate was randomly selected from a list of mainline 3CMS inmates to assess the adequacy of care provided during the review period. He arrived at SQ on August 15, 2012. The inmate's psychiatric diagnoses were Major Depressive Disorder, recurrent, in partial remission and Polysubstance Dependence, in a controlled environment. Psychotropic medications were not prescribed. His treatment goals were to reduce symptoms of worthlessness and guilt, improve decision making, increase functioning through goal setting, maintain improved mood for one year, and challenge negative thought patterns.

PC contacts were timely and occurred on January 29, 2020 and February 26, 2020. The PC addressed current symptoms and stressors with cognitive behavioral therapy (CBT) interventions during each encounter. The PC also encouraged his involvement in programming and noted progress toward treatment goals. The PC documented a plan to follow up 30 days after his February 2020 appointment; however, this scheduled contact was cancelled.

The inmate had no psychiatric medications or psychiatry contacts after 2019. He was not due for an annual IDTT during the review period.

**Findings**

The overall care provided to this inmate was adequate. The PC's clinical interventions were appropriate for his diagnosis, treatment goals, and clinical presentation. However, the PC did not document whether contacts were offered in confidential settings.

**Inmate Y**

This inmate was randomly selected from a list of mainline 3CMS inmates to assess the adequacy of care provided during the review period. He transferred from VSP to SQ on October 18, 2018. His psychiatric diagnosis was Depression. Psychotropic medications were not prescribed, and the inmate had not met with a psychiatrist since 2016.

The inmate was not due for an annual IDTT during the review period. Treatment goals were to reduce symptoms of depressed mood, maintain symptoms in remission for six months, learn cognitive behavioral therapy coping skills, and attend stress management group therapy.

958

PC contacts were timely and occurred on January 9, 2020, January 24, 2020, February 7, 2020, March 6, 2020, and April 16, 2020. The PC addressed current stressors and symptoms with cognitive behavioral and insight-oriented therapy techniques during each encounter. The PC also encouraged continued participation in group therapy and mainline programming. However, the PC informed the inmate on April 16, 2020 that, as a result of COVID-19, "…the usual scheduling procedure might not be followed due to state directive to allocate resources to priority program needs; but he could submit a mental health referral form at any time and that he would be seen within the program guidelines."

**Findings**

The care provided to this inmate was adequate. The PC's clinical interventions were appropriate for his diagnosis, treatment goals, and clinical presentation. However, the PC did not document whether contacts were confidential. The PC's reference to a statewide directive related to the COVID-19 pandemic suggested the inmate's care may have been impacted after April 2020, although this did not appear to compromise care during the current review period.

**EXHIBIT J**
**Deuel Vocational Institution (DVI)**
**Review Date - June 5, 2020**

**Inmate A**

This inmate was randomly selected from DVI's 3CMS program roster to evaluate the adequacy of care through healthcare record review. The 55-year-old inmate transferred from CSP/Solano to DVI on April 14, 2020 based on a court order to "rehouse mainline inmates to cell living" during the pandemic. The inmate began experiencing depressive symptoms and entered the MHSDS program at 3CMS level of care in 2011. His psychiatric diagnosis was Pervasive Depressive Disorder, and he was prescribed Remeron for sadness, anxiety, low energy, irritability, and insomnia. He had no recorded suicide attempts.

The initial IDTT at DVI occurred on June 4, 2020, at which time the inmate requested removal from MHSDS. While the treatment team appropriately retained him in the 3CMS level of care, the clinical rationale was insufficient. The June 2020 treatment plan targeted the inmate's depression; however, the origin of the treatment plan components was unclear, and the clinician did not include a baseline measure of depression to appropriately monitor progress. Treatment interventions were also lacking.

The initial psychiatry contact was not completed until nearly six weeks after the inmate's arrival at DVI. The inmate denied mental health symptoms and asked to discontinue his medications on May 29, 2020, and the psychiatrist documented a plan to lower the dosage and discontinue the medication in 14 days.

The initial PC assessment was timely and addressed pertinent clinical areas. While progress notes provided an appropriate overview of the inmate's functioning, they did not indicate whether treatment interventions were offered during clinical contacts.

**Findings**

This inmate's care was inadequate. There appeared to be a lack of coordination among providers, the level of care rationale was insufficient, and his initial psychiatric assessment did not occur until six weeks after his arrival at DVI. The treatment plan did not include evidenced based interventions or baseline measures for tracking treatment progress, and the PC's progress notes suggested treatment interventions were not offered during clinical contacts.

**Inmate B**

This inmate was randomly selected from DVI's 3CMS program roster to evaluate the adequacy of care through healthcare record review. The 37-year-old inmate transferred from Solano to DVI on April 14, 2020 due to a "COVID desegregation plan." The treating psychiatrist diagnosed the inmate with Unspecified Anxiety Spectrum Disorder and psychiatric medication was not prescribed. The record revealed a history of one or two suicide attempts, the most recent of which involved driving into a wall after a dispute with his wife in 2015.

960

The initial psychiatry and PC assessments included relevant historical information but did not provide sufficient detail regarding the inmate's current symptoms or presenting problems. The psychiatrist diagnosed the inmate with Unspecified Anxiety Spectrum Disorder, and, while this diagnosis was included in the "problem" section of the treatment plan, it was not in the designated place of record.

The treatment plan included a goal of reducing the inmate's anxiety, but there was no record of the inmate's baseline anxiety rating. The only treatment intervention involved establishing a therapeutic alliance, which by itself was insufficient for the treatment target.

The PC's documentation did not include the status of the inmate's symptoms or his response to treatment. The clinician noted that they provided the inmate with a module on anger management but did not include a rationale or indicate that this was an area of concern.

**Findings**

The care was inadequate.  The inmate's current treatment needs were not clearly documented in the initial assessments, the diagnosis was unclear, and the treatment plan was insufficient. Further, the PC's progress notes suggested that treatment interventions were not offered during clinical contacts.

**Inmate C**

This inmate was randomly selected from DVI's 3CMS program roster to evaluate the adequacy of care through healthcare record review. The 33-year-old inmate arrived at DVI on December 28, 2017. While a diagnosis was not documented in the designated place of record, Major Depressive Disorder and "depression with anxiety" were listed as problems in the IDTT documentation. He was not prescribed psychiatric medication.

The IDTT's plan of care for anxiety and depression remained the same from April 2019 through February 2020. The treatment plan targeted the inmate's anxiety and depression. Treatment goals involved reducing anxiety to a rating of four or lower through goal setting and education and reducing depression to a rating of six or lower by fostering a therapeutic alliance. However, the PC's progress notes suggested that treatment interventions were not implemented during six of eight PC contacts; interventions were only offered twice by a clinician providing coverage for the assigned PC.

A total of eight PC contacts occurred between February and July 2020, with three in February and five offered monthly thereafter.  The reason for the increased frequency of clinical contacts was not documented.

**Findings**

The care provided to this inmate was mixed. The higher frequency of clinical contacts was unexplained in the record and did not align with the inmate's treatment plan. The treatment plan included only supportive interventions and was not revised in response to the inmate's lack of treatment progress. The current diagnosis was not appropriately justified with supporting

symptoms or criteria, and the documented rationale for maintaining the inmate at 3CMS level of care was insufficient.

## Inmate D

This inmate was randomly selected from DVI's 3CMS program roster to evaluate the adequacy of care through healthcare record review. The 57-year-old inmate transferred from CSP/Solano to DVI on April 14, 2020; COVID-19 was noted as the reason for his transfer. The psychiatric diagnosis was not included in the designated place of record. While a diagnosis of Unspecific Depressive Disorder was found in the problem section of the IDTT documentation, specific symptoms were not included to support this diagnosis.

The June 2, 2020 initial IDTT was not completed until seven weeks after the inmate's arrival date. The treatment plan did not align with the clinician's case conceptualization, and the origin of the treatment outcomes for depression was unclear. The inmate had expressed a desire to "learn better coping skills and process losses" in treatment. The rationale for maintaining the inmate in 3CMS included that he "has a lot to work on and wants to continue as CCCMS…reported current frustration/stress, but has been taking it day by day…"

The June 23, 2020 initial psychiatric assessment was not completed until ten weeks after the inmate's arrival at DVI; he was not prescribed psychiatric medication.

The PC's progress notes included an overview of stressors that did not align with the inmate's treatment plan. On July 22, 2020, the PC provided the inmate with an anger management module to complete by his next appointment; however, the PC did not document a rationale or note that this was an area of concern. The PC wrote that the inmate's depression was at a seven out of ten, but also described him as stable and high functioning.

## Findings

This inmate's care was inadequate. The treatment plan did not adequately address the inmate's presenting problems, the level of care rationale was insufficient, and the treatment team failed to document symptoms or criteria to support the psychiatric diagnosis. Additionally, documentation regarding the inmate's current mental status was inconsistent in the record. This inmate would have benefitted from a diagnostic clarification evaluation and a more effective treatment plan.

## Inmate E

This inmate was randomly selected from DVI's 3CMS program roster to evaluate the adequacy of care through healthcare record review. The 26-year-old inmate arrived at DVI on September 5, 2018. He had an EPRD of January 7, 2031. Although the psychiatric diagnosis was not documented in the designated place of record, depression and dysthymia were listed as problems in the IDTT documentation. He was not prescribed psychiatric medication.

PC contacts were offered monthly during the review period, with the exception of June 2020. The PC's progress notes suggested that useful clinical interventions were implemented during clinical contacts, and that the inmate had stabilized and met his treatment goal of reducing depression to a six or lower.

**Findings**

This inmate's overall care was adequate. However, his symptoms and functional deficits should have been documented to support the psychiatric diagnosis. This inmate would likely benefit from relapse prevention and MHSDS discharge planning given his apparent stability.

**Inmate F**

This inmate was randomly selected from DVI's 3CMS program roster to evaluate the adequacy of care through healthcare record review. The 23-year-old inmate arrived at DVI on September 3, 2019. Although his psychiatric diagnosis was not documented in the designated place of record, Adjustment Disorder with Mixed Anxiety and Depressed Mood was recorded in the clinical notes. The psychiatrist prescribed Remeron.

The psychiatrist's progress notes were succinct and appropriate. PC progress notes provided an overview of the inmate's functioning and suggested that interventions were primarily supportive in nature.

The inmate presented as stable and without functional deficits. He denied depressive symptoms during clinical contacts on February 19, 2020 and April 20, 2020. Although there was a reference to the inmate's "fluctuating moods" being manageable on April 20, 2020, the PC did not provide an update on his anxiety.

**Findings**

This inmate's care was mixed. While he was reportedly stable, the IDTT's planned treatment interventions were not implemented during PC contacts and the psychiatric diagnosis was not appropriately justified in the documentation.

**Inmate G**

This inmate was randomly selected from DVI's 3CMS program roster to evaluate the adequacy of care through healthcare record review. The 35-year-old inmate arrived at DVI on June 7, 2018. Psychiatric diagnoses were not documented in the designated place of record. Paranoid Schizophrenia and Depressive Disorder were listed as problems in the IDTT notes; however, in stark contrast, Major Depression without psychosis and Unspecified Anxiety Disorder were recorded in the psychiatrist's documentation. Specific symptoms were not documented to support the providers' differing diagnoses. The inmate was prescribed BuSpar and Remeron for anxiety and depression.

The psychiatrist did not meet with the inmate for seven months between October 2019 and May 2020. However, the tele-psychiatrist's documentation on May 21, 2020 and July 2, 2020 included relevant and useful clinical information.

Although five PC contacts were offered between December 17, 2019 and July 30, 2020, the greater frequency of clinical contacts was unexplained and did not align with the inmate's clinical presentation at the time. On December 17, 2019 the PC wrote a plan to follow up with the inmate in 60 days after describing him as stable and denying depressive symptoms; however,

on April 29, 2020 the PC wrote a plan to follow up in 90 days after documenting that the inmate refused the contact and was irritable. On July 21, 2020 the PC wrote that they would follow up with the inmate in 90 days, but then met with the inmate less than two weeks later for reasons that were not documented. Further, the PC did not document whether treatment interventions were implemented during clinical contacts.

The inmate's treatment plan had not been revised since June 2018, and it contained outdated information about the inmate's current treatment concerns. For example, one component referenced "unremitting symptoms of a serious mental disorder - self-injurious," but this was not documented as a concern after December 2019. The IDTT's rationale for retaining the inmate in the 3CMS level of care stated only that he was "programming adequately."

**Findings**

This inmate's care was inadequate. The inmate's differing psychiatric diagnoses were not justified with documented symptoms. Providers did not justify their differing diagnoses with symptoms or attempt to resolve diagnostic discrepancies during IDTT or through a diagnostic clarification evaluation. The treatment plans and level of care rationale were insufficient and did not align with the inmate's current treatment needs, and the PC's progress notes suggested that treatment interventions were not implemented during clinical contacts.

**Inmate H**

This inmate was randomly selected from DVI's 3CMS program roster to evaluate the adequacy of care through healthcare record review. The 58-year-old inmate arrived at DVI on February 9, 2019. Although the psychiatric diagnosis was not included in the designated place of record, several diagnoses were found throughout the clinical documentation. Persistent Depressive Disorder was included in the problem section of the May 29, 2020 IDTT notes. In contrast, Major Depressive Disorder (MDD) - in remission and Unspecified Anxiety Disorder were recorded in the provider's January 22, 2020 notes. The psychiatrist replaced the MDD - in remission diagnosis with MDD - without psychotic features in subsequent notes authored between May 19, 2020 and June 18, 2020. Specific symptoms to support these diagnoses were not included in the clinical documentation. The inmate was prescribed Prozac.

Although PC contacts were offered timely, the inmate met with a different provider between May and July 2020 for reasons that were not documented. Fortunately, the covering clinician documented useful clinical interventions to address the inmate's anxiety.

The inmate's treatment plan remained the same since the initial IDTT in March 2019. Fostering a therapeutic alliance was the only documented treatment intervention for reducing the inmate's anxiety, depression, and grandiosity. While the inmate endorsed increased anxiety during the May 29, 2020 IDTT, there was no indication that depression and grandiosity were ongoing concerns. However, the treatment plan was not updated.

**Findings**

This inmate's care was mixed. The inmate reportedly responded well to psychiatric medication adjustments and the PC implemented treatment interventions during clinical contacts. However,

the treatment plan was outdated and did not align with the PC's interventions. The IDTT should have revised the treatment plan in response to the inmate's progress and changing treatment needs. Additionally, the clinical documentation should have included symptoms to support the psychiatric diagnosis.

**Inmate I**

This inmate was randomly selected from DVI's 3CMS program roster to evaluate the adequacy of care through healthcare record review. The 37-year-old inmate transferred from CSP/Solano to DVI on April 14,2020; COVID-19 was noted as the reason for transfer.  His psychiatric diagnosis was Adjustment Disorder with Anxiety. He was prescribed Vistaril, as needed, for insomnia.

Documentation was inconsistent regarding the inmate's primary treatment concerns. The psychiatrist wrote that insomnia was the primary issue; the treatment plan only targeted "anxiety"; and the IDTT's level of care rationale indicated that he would "benefit from 1:1 counseling as it relates to him managing his depressive symptoms." While the psychiatrist prescribed medication for insomnia, depressive symptoms were not addressed in the inmate's plan of care or problem list.

The treatment plan was not applicable to this inmate. The treatment goal involved reducing the inmate's anxiety to a rating of six or lower; however, the inmate had already rated his anxiety at two out of ten on this date, and the PC wrote that his baseline rating was a five or six during the initial assessment five weeks prior. Additionally, treatment interventions were absent in the plan of care.

The timeliness of initial contacts varied. The initial IDTT and initial psychiatric assessment were non-compliant with Program Guide timeframes. Although the PC contacts were timely, the PC's progress notes suggested treatment interventions were not offered during these contacts.

**Findings**

This inmate's care was inadequate. Inconsistencies were identified throughout the clinical documentation and suggested a lack of coordination among providers. The treatment team failed to document a list of presenting symptoms to support the diagnosis and guide the treatment plan. Treatment interventions were absent in the plan of care and not offered during PC contacts. Further, the treatment goals and the level of care rationale were inappropriate and not relevant.

**Inmate J**

This healthcare record was reviewed to evaluate the treatment team's higher level of care non-referral rationale. The inmate received 3CMS level of care treatment at DVI, and was housed in administrative segregation, secondary to battery on another prisoner. His psychiatric diagnoses included Borderline Personality Disorder, Intermittent Explosive Disorder, and Major Depressive Disorder. Psychotropic medications were not prescribed.

The IDTT convened on April 1, 2020, at which time the inmate met the higher level of care indicator for receiving three or more RVRs during a three-month period. The treatment team decided that referral to a higher level of care was not warranted, as the inmate was new to the administrative segregation unit and appeared to be functioning at his baseline. Instead, they documented a plan to monitor the inmate's adjustment and re-evaluate his need for a higher level of care at the next IDTT.

The April 1, 2020 treatment plan targeted the inmate's irritability and impulsivity with interventions that included fostering engagement, assisting with anger management, increasing coping skill development, and improving decision making skills.

**Findings**

The higher level of care non-referral rationale appeared adequate. However, likely due to his refusal to engage with mental health staff, the inmate's history was minimally updated since his prior incarceration in 2018.

**Inmate K**

This healthcare record was reviewed to evaluate the treatment team's higher level of care non-referral rationale. The inmate received 3CMS level of care treatment at DVI and was housed in administrative segregation. His psychiatric diagnoses included Disruptive Mood Dysregulation Disorder and Persistent Depressive Disorder. Psychotropic medication was not prescribed.

The IDTT convened in administrative segregation on May 13, 2020. The inmate met the higher level of care consideration indicator for receiving three or more RVRs during a three-month period; all for battery on a prisoner. The IDTT's higher level of care non-referral decision was based on the calculated nature of his most recent violent incident. The inmate had admitted to acting out violently in an attempt to teach another inmate a lesson, rather than impulsively reacting, and this was perceived as progress in the context of other behavioral improvements. He was also actively participating in group and individual treatment. As such, the IDTT planned to continue treating the inmate's anger and impulsivity in the 3CMS level of care.

**Findings**

The higher level of care non-referral rationale was adequate.

**Inmate L**

This healthcare record was reviewed to evaluate the adequacy of 3CMS care in the reception center at DVI. The inmate transferred from county jail to DVI on January 2, 2020. He endorsed depressive symptoms and prior suicidal thoughts during the initial health screening and was referred for a routine mental health contact. However, it was unclear whether this referral was generated, as a follow up contact did not occur within five calendar days. The inmate subsequently received a positive mental health screen and was referred for an initial PC assessment.

The PC noted in the January 16, 2020 initial assessment that the inmate's mild symptoms of depression and anxiety were likely secondary to complicated bereavement, although no formal diagnosis was entered into the electronic record. A self-reported history of Bipolar Disorder, fetal alcohol syndrome (FAS), and methamphetamine use was also documented.

Despite the inmate's request to receive psychiatric medication for mood stability, he was not seen for an initial psychiatric evaluation until March 30, 2020. The psychiatrist documented that the inmate's diagnosis was either Bipolar Disorder or a Mood Disorder that was secondary to substance abuse. However, neither a list of symptoms nor a clinical justification for one diagnosis over the other were included. Despite the inmate's previous request for medication, he declined medication on this date. He explained to the psychiatrist that he feared leaving his cell to collect the medication as a result of ongoing harassment from other inmates. The psychiatrist did not prescribe medication, suggest a plan to ensure the inmate could safely receive medication, or report the inmate's safety concerns.

The PC did not follow up with the inmate until 90 days after MHSDS placement, and the inmate was described as disheveled and malodorous during this contact. While the PC also wrote that the inmate "denied all safety concerns," this statement conflicted with other clinical notes that clearly identified "harassment by others" as a primary contributor to his anxiety, fear of leaving his cell, and reluctance to accept medication.

On May 26, 2020, the psychiatrist noted continued anxiety, harassment concerns, and resistance to medication. By June 19, 2020, the inmate submitted a self-referral for psychiatric medication; although psychiatry did not follow up until June 30, 2020.

A treatment plan was not developed for this inmate during the six-month period he was retained in the reception center at DVI.

**Findings**

This inmate's care was inadequate. The inmate's safety concerns clearly contributed to his declining mental status and treatment resistance; however, the PC and psychiatrist did not appropriately intervene. Despite the inmate remaining at the reception center for more than six months, a treatment plan was never developed, and treatment interventions were not offered during PC contacts. Instead, PC contacts consisted of brief check-ins without a treatment focus. Although diagnostic uncertainties were documented in the record, it did not appear the PC or psychiatrist were working toward clarifying the inmate's diagnosis. This inmate required closer monitoring, a comprehensive diagnostic assessment, and an individualized treatment plan to address treatment obstacles and enhance coping skills.

**Inmate M**

This healthcare record was reviewed to evaluate the adequacy of 3CMS care in the reception center at DVI. The inmate transferred from NKSP to DVI's reception center on January 29, 2020. NKSP had already completed the initial mental health screen and assessments, prescribed medication, and placed the inmate in the 3CMS level of care. His historical diagnoses included Adjustment Disorder, Amphetamine Use Disorder, and Opioid Use Disorder.

967

On February 4, 2020, a DVI PC met with the inmate in response to a routine referral. The progress note suggested that the contact was brief and limited to coordinating a psychiatry contact to address his medication concerns. On February 7, 2020, a psychiatrist followed up with the inmate and discontinued his medications in response to complaints about side effects.

Nursing completed a screening evaluation of the inmate and determined that he qualified for integrated substance use disorder treatment, though it was unclear if he had sufficient time to participate prior to his parole date. Unfortunately, the substance use treatment groups were not offered due to COVID-19 related program limitations. The inmate and his provider also decided that medication assisted treatment was not in his best interest, as he had a history of abusing methadone.

During a PC contact on March 3, 2020, the inmate was reportedly functioning well without psychotropic medication and exhibiting minimal psychiatric symptoms. A diagnosis of Adjustment Disorder with anxiety was recorded on this date; substance use diagnoses were not included. This PC contact appeared to consist of a brief "check-in," with some discussion of the inmate's parole plans. Subsequent PC contacts were completed every four to six weeks by different clinicians. During a PC contact on May 13, 2020, the inmate reported increased anxiety symptoms, which were identified as a trigger for his substance use. However, the PC did not offer clinical interventions to address these symptoms or the inmate's increased risk of relapse.

The healthcare record also indicated that the inmate was seen by a transitional case management program (TCMP) social worker and was in the process of applying for Medi-Cal benefits.

**Findings**

This inmate's care was adequate, yet marginally. He was seen frequently by mental health staff, and pre-release services were provided to a minimal degree. However, continuity of care was lacking, and PC contacts routinely consisted of brief "check-ins" without interventions or a treatment focus. The inmate's increased anxiety appeared to elevate his risk for relapse on substances, and he would have benefitted from substance abuse specific treatment.

**Inmate N**

This healthcare record was reviewed to evaluate the adequacy of 3CMS care in the reception center at DVI. The inmate transferred from San Quentin State Prison (SQ) to DVI for processing on December 2, 2019. He was recently recommitted to CDCR for a life sentence after his death sentence was overturned. The inmate did not report a history of mental health treatment or medication during the mental health screening at DVI. However, on March 5, 2020, a mental health clinician met with the inmate in response to a self-referral for adjustment issues. On March 18, 2020, he was included in the 3CMS level of care and diagnosed with Adjustment Disorder, with anxiety. The PC noted that the inmate experienced moderate to high levels of anxiety that were triggered by the new setting and his increased exposure to other inmates.

The inmate met with a different PC on April 7, 2020 and received basic cognitive behavioral therapy (CBT) techniques to develop coping strategies for anxiety. On April 21, 2020, the inmate met with a different PC after moving to the reception center's sensitive needs yard (SNY). An

individual plan of care (IPOC) for anxiety was created for the first time on this date, though it was not part of a comprehensive treatment plan.

In response to the inmate's request for more frequent PC contacts, he continued to meet with a clinician every three to four weeks. While CBT was implemented by one provider, others offered only brief "check-ins."

A DVI psychiatrist met with the inmate for the first time on May 29, 2020. Psychotropic medications were not prescribed, as the inmate was fearful, they might negatively interact with his other medications. Instead, the psychiatrist provided CBT techniques for anxiety management on this date.

**Findings**

This inmate's care was adequate. Although mental health staff did not develop a formalized treatment plan or consistently offer evidenced based interventions, they frequently met with the inmate to offer support as he adjusted to the new environment.

**Inmate O**

This healthcare record was reviewed to evaluate the adequacy of 3CMS care in the reception center at DVI. The 31-year old first-term inmate arrived at DVI on February 11, 2020. After endorsing a few symptoms during the mental health screening evaluation, he was referred for further assessment. The initial PC assessment was completed on February 19, 2020, during which the inmate endorsed multiple symptoms of anxiety and depression, including depressed mood, anhedonia, racing thoughts, withdrawal, hopelessness, passive suicidality, and discomfort in social situations. He was included in MHSDS at the 3CMS level of care on this date.

In March 2020, the inmate was placed in administrative segregation for safety concerns and he met with a STRH clinician on March 10, 2020. The inmate endorsed racing thoughts and requested psychotropic medication for symptoms of depression and anxiety during this contact. However, the psychiatrist did not follow up with the inmate until three months later. PC contacts in the STRH also were non-compliant, as they were not offered every seven days.

PC contacts generally consisted of check-ins without a treatment focus. The inmate was reportedly ambivalent about the value of mental health services and he vacillated between requesting psychotropic medication and removal from MHSDS to participate in fire camp. The PC suggested that the inmate be retained in 3CMS at DVI due to the correctional counselor's concern that transfer from the reception center would be delayed by re-endorsement. The PC recommended removal from MHSDS following transfer to a mainline facility.

**Findings**

This inmate received adequate care. Although problems were identified, the care was adequate given the inmate's high level of functioning and apparent lack of serious mental illness. The mental health staff at DVI cautiously included the inmate in MHSDS for mild symptoms related to first time incarceration adjustment.

**Inmate P**

This healthcare record was reviewed to evaluate the adequacy of 3CMS care in the reception center at DVI. The 22-year old first-term inmate transferred from county jail to DVI's reception center on February 18, 2020. County jail records indicated a history of suicide watch placement and diagnoses that included Schizophrenia, paranoid type, Bipolar Disorder, disruptive disorder, and anxiety. However, Major Depressive Disorder was the only diagnosis provided by CDCR staff. The inmate's DVI mental health screen resulted in referral for further assessment.

The initial PC assessment was completed on February 25, 2020; however, it did not appear the clinician reviewed the inmate's county jail records. During the assessment, the inmate reported a history of Schizophrenia, treatment with antipsychotic medication, and an onset of auditory hallucinations at age eight. He also reported that his current medications were ineffective for treating his auditory hallucinations. The PC diagnosed the inmate with Major Depressive Disorder, noting that he exhibited poor hygiene, blunted affect, limited eye contact, and "odd thought process." However, a rationale for excluding psychosis from the diagnosis was not provided, and the difference between "odd thought process" and a thought disorder was unclear. The inmate was included in MHSDS at the 3CMS level of care on this date.

The inmate arrived at DVI on psychotropic medication but was not seen by psychiatry within 24 hours. The initial psychiatry contact was completed on March 24, 2020, at which time the inmate was diagnosed with Major Depressive Disorder, with Psychotic Features. The psychiatrist noted evidence of a thought disorder, confabulatory speech, poverty of thought, psychomotor retardation, flat affect, and impaired judgment. This provider replaced the inmate's medication with Thorazine for auditory hallucinations and insomnia; Zoloft for neurovegetative symptoms, depression, and anxiety; and Benadryl for extra-pyramidal symptoms (EPS). The inmate was medication compliant.

The PC did not follow up with the inmate within 30 days of MHSDS inclusion.The inmate met with a different PC on April 6, 2020; however, clinical interventions were not offered during this contact. The inmate subsequently submitted a self-referral requesting EOP level of care consideration, and he was interviewed by another PC three days later on April 9, 2020. This clinician noted that they were not familiar with the inmate but did address his concern and determined that he would remain in 3CMS level of care.

The clinical documentation suggested that the inmate's symptoms were improving by April 2020, most likely in response to stable housing and psychotropic medication. On April 24, 2020 a psychiatrist educated the inmate on his medications and convinced him to remain on Zoloft, while discontinuing Thorazine and Benadryl.

On June 4, 2020, the inmate was seen by another PC who was not familiar with the inmate. This clinician discussed pre-release plans in a general manner, including explaining the role of the parole outpatient clinic and reporting to a parole officer.

This inmate did not have a comprehensive treatment plan in the record.

## Findings

The care this inmate received was adequate, yet marginally. He remained in the reception center's 3CMS program for four months without a coordinated plan of care, and treatment was limited to medication management. Continuity of care was problematic, as a different clinician met with the inmate during each PC contact. However, the inmate reportedly perceived staff as helpful, particularly the psychiatrist, who met with him consistently throughout his time at the reception center. The inmate stabilized with medication and functioned adequately with minimal support. He would have benefitted from formalized treatment and pre-release planning to address his current symptoms and longer-term goals.

## Inmate Q

This healthcare record was reviewed to evaluate the adequacy of 3CMS care in the reception center at DVI. He arrived at DVI's reception center on February 20, 2020, and reported a history of mental illness, psychotropic medication, and other treatment during the initial medical screening. He also had a history of 3CMS inclusion and was diagnosed with Antisocial Personality Disorder and Mood Disorder during a prior term. In contrast, he was diagnosed with Adjustment Disorder, with Depressed and Anxious Mood, following the initial PC assessment at DVI on March 4, 2020.

Although the inmate arrived on psychotropic medication, he did not meet with a psychiatrist within 24 hours of arrival. The first contact with psychiatry did not occur until April 1, 2020; he was maintained on Cymbalta and Remeron. Although the psychiatrist described the inmate's symptoms as mild, he exhibited blunted and restricted affect, hopelessness, and depression.

A PC contact was not offered within 30 days of MHSDS inclusion, and progress notes suggested that treatment interventions were not offered during PC contacts. Mental health contacts also were not provided while the inmate was confined to his cell due to shingles in mid-April 2020. On April 21, 2020, a different clinician met with the inmate and noted significant weight loss, without clarifying whether it was intentional or secondary to his depression. This clinician also wrote that the inmate endorsed hopelessness and helplessness, sleep difficulties resulting from environmental factors, chronic pain, and other medical concerns. However, a formal assessment of suicide risk was not completed in response to these documented risk factors. Further, this PC's documentation was insufficient as they referred to this contact as "administrative," wrote "no results" in several sections of the note and pulled forward other data from a prior encounter.

A subsequent PC contact was completed by a different clinician on May 19, 2020, and this encounter also appeared brief with minimal therapeutic value. The progress note on this date primarily included copied and pasted information from prior records. Although the inmate subsequently met with psychiatry on two other occasions, the clinical notes offered minimal updated information and were primarily duplicates of prior psychiatry notes.

## Findings

The care was inadequate. Continuity of care was problematic, PC contacts were completed as brief check-ins, and mental health treatment was limited to medication management. Additionally, PC and psychiatry progress notes primarily consisted of copied and pasted

information from previous encounters and did not reference a plan of care or interventions beyond medication to address the inmate's depressive symptoms. Further, the PC should have completed a thorough risk assessment in response to the suicide risk factors noted in April 2020.

**Inmate R**

This healthcare record was reviewed to evaluate the adequacy of 3CMS care in the reception center at DVI. The second-term inmate had active psychiatric medication prescriptions at the time of arrival on March 3, 2020. While the inmate was not seen by a psychiatrist within 24 hours of arrival on medication, nursing consulted with psychiatry and new medication orders were filed on March 4, 2020. However, a corresponding psychiatry note was not found in the record. The inmate was prescribed sertraline and olanzapine.

The mental health screen was completed on March 5, 2020, and the inmate was referred for further assessment. On March 9, 2020 the PC initial assessment was completed, and the clinician noted prior psychiatric diagnoses that included Schizophrenia, paranoid type; Major Depression; and Anxiety Disorder. The inmate also had an extensive substance use history, including methamphetamine use, which overlapped with his symptoms and complicated his diagnostic picture. The inmate also reported contradictory information during the assessment and appeared to be an unreliable historian; although this was not identified by the evaluating clinician. For example, the healthcare record revealed that the inmate provided conflicting reasons for his homelessness, including his mother dying and his mother moving out of state. Additionally, this initial assessment contained outdated information that was pulled forward from notes authored during a prior prison term, including a statement that the inmate was looking forward to parole in 2018.

The initial psychiatric assessment was not completed at DVI. The psychiatrist met with the inmate for the first time on March 19, 2020, at which time the inmate requested medication for schizophrenia. This provider noted that the inmate was unable to report specific symptoms that would warrant antipsychotic medication. The inmate subsequently became frustrated and requested discontinuation of all psychotropic medications. Diagnoses on this date included, Adjustment Disorder with Anxious Mood, Amphetamine and Opioid Use Disorders, and a rule-out of Antisocial Personality Disorder.

The inmate met with a different PC immediately after the March 19, 2020 psychiatry appointment. This clinician described him as agitated and preoccupied with the psychiatry contact. The inmate informed the PC that he requested to discontinue all medications during a moment of frustration and expressed regret. However, this was a missed treatment opportunity, as the PC did not utilize CBT techniques to review the behavior and explore alternatives.

On March 26, 2020, the inmate met with a different psychiatrist who recorded a diagnosis of Schizoaffective Disorder, although this was not explained or supported in the documentation. Instead, this provider's notes contained much of the same content as the prior psychiatrist's, with the exception of recent vitals and an order for buspirone, olanzapine, and mirtazapine. Medication indications also were not documented. On April 23, 2020, another psychiatrist diagnosed the inmate with Adjustment Disorder during a routine contact. This note did not

include updated clinical information beyond the inmate's medication regimen. Subsequent psychiatry notes also lacked sufficient detail.

On April 16, 2020, the inmate was seen by a different PC in response to a self-referral for sleep difficulties and anxiety related to reception center transfer delays. Evidenced based interventions were not offered during this clinical contact. During a PC contact on May 28, 2020, the inmate complained about his antipsychotic medication and reported that he had never experienced auditory hallucinations.

**Findings**

The care provided to this inmate was inadequate. The lack of provider collaboration and continuity resulted in inconsistent diagnoses and interventions. The inmate's symptoms and unhealthy coping strategies were not appropriately addressed in treatment. PC contacts most often consisted of brief check-ins without therapeutic value. The inmate would have benefitted from an individualized treatment plan with CBT interventions. Diagnostic uncertainties should have been resolved with a comprehensive diagnostic evaluation.

**Inmate S**

This healthcare record was reviewed to evaluate the adequacy of 3CMS care in the reception center at DVI. The first-term inmate arrived at the reception center and received his initial health screener on March 5, 2020. He arrived on psychotropic medication but was not seen by a psychiatrist within 24 hours. While nursing staff consulted with psychiatry and obtained an order for mirtazapine, a corresponding psychiatry note was not identified in the record.

The inmate's mental health screen was completed on March 10, 2020 and resulted in referral for further assessment. A clinician completed the initial assessment on March 16, 2020, and the inmate was included in the 3CMS level of care to address symptoms of depression. The initial psychiatric assessment was not completed until April 1, 2020. The psychiatrist determined that the most likely diagnosis was Adjustment Disorder, with depressed mood.

Subsequent PC and psychiatry contacts were offered every four to five weeks, with some triggered by self-referrals and others by routine appointments. While there was continuity in psychiatric care, the inmate met with different clinicians for his PC contacts. PC progress notes suggested that treatment interventions were not implemented during clinical contacts, despite the inmate's deteriorating mental status.

**Findings**

This inmate's care was inadequate. Although he initially responded well to psychotropic medication, his symptoms appeared to worsen in response to the prolonged reception center stay. Continuity of care among PCs was inadequate, and treatment interventions were not offered during the brief clinical encounters. Clinicians should have at least offered brief behavioral interventions in the absence of continuity, as they have proven to be particularly effective for anxiety. Further, in response to the inmate's worsening symptoms and extended length of stay, a formalized plan of care should have been developed and implemented by one assigned PC.

**Inmate T**

This healthcare record was reviewed to evaluate the adequacy of 3CMS care in the reception center at DVI. The inmate arrived at the reception center on March 10, 2020, and his initial health screen was completed the same day. The mental health screen was completed on March 23, 2020, and the PC initial assessment occurred on April 1, 2020; however, neither were timely.

The inmate had a history of depression and treatment with antidepressant medication. Although the PC did not document a formal diagnosis, numerous depressive symptoms were noted at the time of the initial assessment, including hypersomnia, anhedonia, anergia, isolation, shame, hopelessness, poor hygiene, and loss of support. The inmate was included in MHSDS at the 3CMS level of care on April 1, 2020.

The initial psychiatric assessment did not occur until six weeks after MHSDS inclusion on May 20, 2020. The psychiatrist prescribed Remeron and, despite the severity of the inmate's depressive symptoms, diagnosed the inmate with Adjustment Disorder, with Anxiety and Depression.

PC contacts were completed every four to six weeks by different clinicians. These contacts were conducted as brief check-ins, with minimal therapeutic value, and progress notes were limited to historical information and a brief mental status update.

**Findings**

The care provided to this inmate was adequate, yet marginally. The inmate was treated primarily through medication management, which was not offered until six weeks after his inclusion in MHSDS. Although he responded well to medication, continuity of care was problematic and resulted in clinicians focusing their attention on information gathering instead of offering treatment interventions.

**Inmate U**

This healthcare record was reviewed to evaluate the adequacy of 3CMS care in the reception center at DVI. The inmate had received treatment in the EOP and 3CMS levels of care during prior terms. He arrived at DVI's reception center on March 16, 2020, with a Bipolar Disorder diagnosis and psychotropic medication prescriptions. While he was not seen by psychiatry within 24 hours, nursing consulted with psychiatry and medication orders were entered electronically on March 20, 2020. However, a corresponding psychiatry progress note was not included in the record.

The mental health screen was completed on March 19, 2020 and resulted in referral for further assessment. The initial PC and psychiatry assessments were completed timely. The inmate endorsed numerous symptoms of anxiety and depression, including hopelessness, sadness, negative ruminations, restlessness, and tense and "wound up" feelings. He also reported command auditory hallucinations with self-harm content, current suicidal ideation, and a prior suicide or self-harm incident involving overdose on Benadryl. The inmate was included in the 3CMS level of care on this date.

974

Although the PC did not document a formal diagnosis, the psychiatrist documented moderate to severe Post Traumatic Stress Disorder (PTSD), "with secondary depression, anxiety, insomnia, and semi-psychotic symptoms." The inmate was prescribed Zyprexa, mirtazapine, and Paxil.

The inmate was seen frequently by various mental health clinicians, often in response to self-referrals. One PC documented a treatment goal that involved developing three coping skills to increase functioning; however, they did not specify the inmate's functional deficits or include any planned treatment interventions. Clinicians documented concerns about the inmate's behavior and substance abuse issues; however, these problems were not appropriately addressed in the treatment plan or during PC contacts.

On June 2, 2020, the inmate was placed in administrative segregation and subsequently endorsed suicidal ideation. Nursing staff documented that they were unable to reach the on-call psychiatrist after multiple attempts, and a consult with the chief psychologist resulted in a recommendation for alternative housing placement. However, the inmate was instead transported to a community hospital after reporting chest pain and diarrhea for several days. Upon returning to the institution, the inmate refused medication, would not disclose whether he planned to take his own life, and threatened to bang his head until his specific medication demands were met. The inmate was treated in the temporary mental health unit (TMHU) until he was discharged to 3CMS level of care with a diagnosis of Adjustment Disorder.

While in the outpatient setting, the inmate continued to experience difficulties with programming and treatment compliance. The five-day follow-up notes revealed that he intermittently refused medications and reported shortness of breath and medication concern, although these complaints did not result in referrals to the medical or psychiatry department.

The suicide prevention safety plan was not useful. The plan included walking the yard as a distraction technique, even though programming was limited during the pandemic and the inmate mostly remained in bed due to shortness of breath. The inmate's mother and brother were identified as people to ask for help in the plan; although, the inmate did not have reliable access to the phone system as a result of COVID-19.

## Findings

The care provided to this reception center inmate was inadequate. The treatment team did not work collaboratively or develop an individualized treatment plan to address the inmate's behavior issues. As a result, the inmate's threats of self-harm and attempts to divide staff in order to get his needs met were reinforced. The existing treatment plan was vague and did not target the inmate's presenting problems or include treatment interventions. PC contacts offered little clinical value in the absence of interventions. The safety plan was not useful as a suicide prevention tool, as it did not account for inmate specific or COVID-19 related limitations.

## Inmate V

This reception center inmate's healthcare record was reviewed to evaluate the care provided in the STRH unit at DVI. The inmate arrived at DVI in February 2020 and was housed in the STRH for gang related safety concerns on two occasions during the review period. His diagnosis was

975

Major Depressive Disorder, recurrent and severe, with psychotic features. Remeron, Venlafaxine, and Abilify were prescribed, and the inmate was medication compliant. The clinician's judgment of suicide risk on the June 5, 2020 SRASHE was high for chronic and moderate for acute. The inmate's history was significant for three suicide attempts, the most recent of which occurred in November 2019 by wrist cutting during a period of intoxication.

The inmate was released from restricted housing to the SNY in May 2020; however, gang pressures resulted in suicidal ideation and alternative housing placement on June 5, 2020. He was released within 24 hours to STRH on June 6, 2020, where he remained through the date of this review.

The treatment plan included mental health interdisciplinary plans of care (IPOCs) for anxiety and depression. The IDTT recommended cognitive behavior therapy (CBT) strategies and dialectical behavior treatment (DBT) to address the inmate's symptoms and thought distortions. The PC also noted that motivational interviewing would be utilized to address his substance use concerns. The inmate reported a desire to obtain his GED, and the PC provided GED materials within one week of his expressed interest. Psychiatric technicians documented that the inmate was offered in cell activities.

The PC's weekly progress notes included detailed updates on the inmate's presentation and symptoms. On May 14, 2020, the inmate endorsed suicidal ideation, and, while the PC determined that MHCB was not indicated, a suicide risk evaluation, safety plan, and five-day follow-up were completed.

Most psychiatry appointments were completed via tele-psychiatry. A nursing note indicated the inmate was not administered his Abilify due to being "out of medication"; however, this issue was resolved within 24 hours. On July 28, 2020, the inmate fell to the floor and hit his head while standing up to receive his morning medications. He was subsequently brought to the treatment and triage area on a gurney, and medical staff attributed the fall to dizziness related to his psychiatric medication. The inmate reported to nursing that he regularly experienced dizziness in the morning.

The absence of group treatment notes in the record suggested this inmate was not offered group treatment in the STRH.

**Findings**

The STRH PC and psychiatrist provided adequate care. Confidential treatment contacts and in-cell materials were routinely offered. Progress notes provided sufficient detail regarding the inmate's progress and intermittent periods of decline. The treatment plans included evidenced based interventions and some measurable goals. The PC's response to the inmate's increased risk for suicide in May 2020 was appropriate.

However, healthcare staff's response to the inmate's fall was concerning. Despite nursing attributing the inmate's dizziness and moderately serious fall to psychiatric medication, a consult

with the prescriber did not occur. Instead, the inmate was referred to his PC, who also did not consult with the psychiatrist.

## Inmate W

This reception center inmate's healthcare record was reviewed to evaluate the care provided in the STRH unit at DVI. The inmate was in the EOP level of care and diagnosed with Schizophrenia, paranoid type, during a prior term. He arrived at DVI on February 3, 2020 and was housed in the STRH from February 20, 2020 through June 15, 2020. The PC at DVI diagnosed the inmate with Mood Disorder, Post Traumatic Stress Disorder (PTSD), and Antisocial Personality Disorder. In contrast, the treating psychiatrist diagnosed the inmate with Unspecified Schizophrenia Spectrum Disorder, Unspecified Bipolar Disorder, and Substance Use Disorder. Zyprexa was prescribed within one week of STRH placement; he was medication compliant. A suicide risk evaluation and safety plan were not completed at DVI, although one note suggested he denied a history of suicide attempts.

During February 2020, the PC documented that the inmate did not leave his cell and spent his time pacing and writing. The February 26, 2020 initial IDTT occurred without the inmate or a psychiatrist in attendance; the inmate reportedly had a conflicting dental appointment. The February 2020 treatment plan included one mental health IPOC for anxiety. Appearing relaxed, learning new coping skills, and reporting reduced anxiety were listed as treatment goals. The planned interventions involved providing "reassurance and comfort" and managing "environmental factors" in STRH, "such as harsh lighting, high traffic flow, and excessive noise." The inmate had requested to work on his social skills in treatment.

The inmate remained in the restricted housing unit at the 3CMS level of care for approximately four months. He refused to leave his cell for all STRH group treatment and IDTT meetings, and nearly all of his PC and psychiatry contacts. On April 1, 2020, the inmate explained to his PC that he refused group treatment due to safety concerns. The inmate also requested EOP level of care on this date, and the PC responded that he "must come out for weekly sessions and group." However, the reason the inmate was requesting a higher level of care was not explored.

A May 7, 2020 PC progress note indicated that the inmate was scheduled for ICC and he reported being "done with turf wars" and would do whatever he needed to do to defend himself. The context for these statements was not provided, and there were no follow up inquiries or interventions documented. During a subsequent PC contact on June 10, 2020, the inmate reported that he was depressed due to three recent family member deaths. The PC noted that the inmate continued to refuse yard, individual contacts, and group treatment.

On June 15, 2020, the inmate transferred from DVI to HDSP; he was admitted to the MHCB approximately one week later.

**Findings**

The care provided to this inmate was inadequate. The PC did not address the inmate's safety concerns, which he identified as a reason for his group treatment refusals. The PC's response to the inmate's request for EOP level of care was not appropriate, and a sufficient rationale for non-consideration was not documented. The treatment plan was not revised in response to the inmate's lack of treatment progress and did not address treatment non-compliance and the inmate's self-identified goal for improved social skills. Planned treatment interventions were vague, and progress notes suggested interventions were not offered during weekly clinical contacts. The treatment team's diagnostic disagreements were not discussed or resolved, and providers did not justify their diagnoses with symptoms or criteria. Finally, the inmate's statements on May 7, 2020 suggested that he may have been at risk for harming others; however, the PC did not appropriately assess the inmate's risk or intervene in any useful manner.

**Inmate X**

This reception center inmate's healthcare record was reviewed to evaluate the care provided in the STRH unit at DVI. The inmate arrived at DVI on January 2, 2020 and was placed in the STRH upon arrival. He was included in MHSDS at the 3CMS level of care on January 16, 2020 and remained in restricted housing through the date of this review on July 30, 2020. The inmate was hearing impaired, relied on a wheelchair for mobility, and suffered from chronic back and shoulder pain. His physician prescribed Tramadol for pain. The inmate routinely complained of being denied a cane and receiving inadequate medical care. He attributed feelings of distress to poor medical care, chronic pain, and his upcoming parole. The inmate's history was significant for one inpatient commitment at DSH-Atascadero, treatment for Bipolar Disorder, and psychiatric medications that included mood stabilizers, antidepressants, and antipsychotics. The treatment team at DVI diagnosed the inmate with Adjustment Disorder, with mixed anxiety and depressed mood; however, symptoms were not listed in the treatment plan. A SRASHE and safety plan were not completed at DVI, and clinical notes indicated no prior suicide attempts or self-harm incidents.

The initial IDTT was held on January 29, 2020. The inmate's treatment plan included mental health IPOCs for impulsivity and depressed mood. The treatment goal was to sustain the inmate's impulsivity and depression in remission for six months by improving his decision making. This treatment plan was not modified during the six-month period of STRH placement.

Although the psychiatrist did not meet with the inmate prior to the January 29, 2020 IDTT, the inmate's antidepressant medications were discontinued on this date. This was concerning as the PC noted that the inmate had requested to continue receiving Remeron. The inmate's first individual contact with psychiatry did not occur until March 6, 2020.

The inmate participated in IDTT and group treatment, and he attended nearly all of his PC and psychiatry appointments. Group treatment was offered once per week in the STRH unit, with the exception of July 13 through July 31. Psychiatric technicians conducted daily rounds on the unit.

978

On April 23, 2020, the PC wrote that the inmate endorsed increased anxiety and worry; however, this was not explored further, and interventions were not offered. On June 17, 2020, the inmate reported that his mental health was affected "greatly" by parole concerns, medical issues, and being denied access to a cane; the PC again did not ask follow-up questions or offer interventions. On June 24, 2020, the inmate reported anxiety related to the impact of COVID-19 on transfers and being denied a cane, and on July 29, 2020, he reported increased anxiety due to medical concerns, his upcoming parole date, and uncertainty about the availability of care in the community; the PC once again did not intervene.

**Findings**

The quality of care provided to this inmate was inadequate. The treatment plan remained unchanged for seven months and did not appropriately address the inmate's presenting concerns, including chronic pain, parole planning, and increasing anxiety. Essential information was also missing from the treatment plan, including current symptoms, relevant history, and a clinical case conceptualization. The PC did not offer treatment interventions during contacts or respond in any useful manner to the inmate's stated concerns or worsening anxiety. Further, the PC did not complete a suicide risk evaluation or document current suicide risk factors in the record.

**Inmate Y**

This reception center inmate's healthcare record was reviewed to evaluate the care provided in the STRH unit at DVI. The inmate arrived at DVI on September 4, 2019 and was placed in the STRH from March 25, 2020 through June 20, 2020, and from July 9, 2020 through July 31, 2020. He was diagnosed with Unspecified Bipolar Disorder, Post Traumatic Stress Disorder (PTSD), Polysubstance Use Disorder, traumatic brain injury (TBI), and lymphatic cancer. The inmate reportedly experienced visual hallucinations and grand mal seizures following the brain injury. Effexor and Elavil were prescribed for depressed mood, and Phenytoin and Keppra for seizures. He was mostly compliant with prescribed medications. Despite two suicide attempts noted in the record, a SRASHE and safety plan were not completed during the ten months he was in the MHSDS program at DVI.

The inmate received two RVR mental health assessments during the review period. On March 25, 2020, an RVR was issued for Battery on a Prisoner. The results of his RVR mental health assessment indicated that mental health symptoms were not a contributing factor, and the clinician's vague recommendations to the hearing officer stated, "Any consequences that decrease his ability to utilize his coping skills could be detrimental to his mental health." Another RVR was issued on July 9, 2020 for Possession of a Deadly Weapon, and, while the clinician did not offer recommendations for the hearing officer to consider, they wrote, "All penalties for any like offender for a like offense should be appropriate."  The recommendations of these two RVR mental health assessments were inappropriate and should be addressed with training and supervision.

On April 1, 2020, the PC completed their initial assessment without interviewing the inmate and noted that he had a conflicting medical appointment. The initial IDTT also occurred on this date; however, the inmate and psychiatrist were not in attendance. The initial psychiatric evaluation was not completed until April 17, 2020.

Treatment plans, dated April 1, 2020 and July 12, 2020, included one mental health IPOC for anger that was pulled forward from the inmate's October 2019 treatment plan. The treatment goals included reducing violent acting out "rated as a 4 or below" by self-report and learning socially appropriate methods of expressing anger. The planned intervention involved cognitive behavior therapy (CBT) to increase acceptance and tolerance of stress.

Group treatment was offered once per week in the restricted housing unit, and the inmate routinely attended during the months of May, June, and July. Confidential out of cell PC contacts were offered. Psychiatry appointments were scheduled monthly and were routinely completed via tele-psychiatry. Psychiatric technician rounds were conducted at least once per day. An April 8, 2020 note indicated that the inmate had a radio and "plenty of books" in his cell.

The inmate reported bouts of anger and depression throughout his STRH stay. He attributed some of these episodes to concerns about his mother's health and verbal altercations with a neighboring inmate. He reportedly became frustrated with his neighbor and shattered the glass of his cell door on May 12, 2020.

**Findings**

The care provided to this inmate was inadequate. Despite the inmate's impulsivity and suicide attempt history, a SRASHE and safety plan were not completed at DVI. The inmate's psychiatric symptoms were specified to justify the diagnoses and guide the treatment plan. Treatment plans were vague and did not target the inmate's depressive symptoms. A psychiatrist did not attend the initial IDTT or complete the initial assessment prior to the meeting. The psychiatrist's documentation lacked sufficient detail. For example, only the word "good" was written in the presenting problem section on July 17, 2020, and this was automatically pulled forward into the problem section of nearly all subsequent progress notes completed by the PC and psychiatrist.

**Inmate Z**

This reception center inmate's healthcare record was reviewed to evaluate the care provided in the STRH unit at DVI. The inmate's history was significant for three suicide attempts, substance use issues, a PC2602 order in 2015, and numerous inpatient commitments. In November 2016, the inmate paroled from CMF-PIP's acute care program and was subsequently committed to DSH-Atascadero as a mentally disordered offender (MDO). The inmate arrived at DVI in October of 2020 and was included in MHSDS at the 3CMS level of care in November of 2019. He received mental health treatment in the STRH unit from February 11, 2020 through the date of this review on August 5, 2020. The psychiatrist diagnosed the inmate with Unspecified Schizophrenia Spectrum Disorder and Other Psychotic Disorder. The inmate's symptoms

included tangential speech, depressed mood, auditory hallucinations, and grandiose and paranoid delusions. A SRASHE was completed during a crisis intervention contact on November 21, 2019, and the clinician's judgment of suicide risk was high for chronic and low for acute. The inmate reported three suicide attempts, the most recent of which occurred in 2007 by overdose on antipsychotic medication.

All required disciplines were present for the initial IDTT on February 19, 2020; however, the psychiatrist did not meet with the inmate prior to the meeting. The PC noted that the inmate was delusional and believed he was in prison for filing a lawsuit against the police department for their involvement in "a kidnapping and prostitution ring." The treatment plan included only one mental health IPOC for aggression, and this was pulled forward from the inmate's November 2019 treatment plan. The initial psychiatric evaluation was not completed until February 28, 2020. The psychiatrist noted that the inmate declined antipsychotic medication on this date and that Effexor was prescribed for depression.

On March 27, 2020, a crisis intervention clinician met with the inmate in response to an urgent mental health referral. This clinician noted that the inmate was "very aggressive" toward staff and was claiming that his "spirit wife was messing with him." The clinician wrote that, although the inmate did not meet criteria for MHCB commitment, he should be returned to IDTT for consideration of EOP level of care due to psychiatric decompensation. The PC subsequently met with the inmate on March 30, 2020; however, they did not reference the March 27, 2020 crisis contact or schedule an IDTT for a level of care review.

Throughout March and April 2020, the inmate continued to exhibit psychotic symptoms, was intermittently non-compliant with medication, and often refused to participate in treatment and programming. The IDTT convened without the inmate for their routine quarterly review on April 29, 2020; however, they did not revise the treatment plan in response to the inmate's worsening symptoms and treatment non-compliance, and a higher level of care was not considered.

By May of 2020, the inmate's mental status had significantly deteriorated. The PC noted on May 6, 2020 that the inmate was urinating in cups and reporting that spirits were raping him in his cell. On May 14, 2020, the inmate reported, "I'm not alright, but there's nothing you can do about it." On June 4, 2020, the PC wrote that various staff were concerned the inmate was gravely disabled. On June 11, 2020, a different clinician conducted a cell-front contact and noted that the cell was malodorous and that the inmate remained in bed and was unwilling to engage.

The IDTT convened for their routine quarterly review on July 15, 2020. The PC noted that the inmate continued to present as delusional and was focused on law enforcement and a spiritual realm that "continues to attack, rape, and kidnap his soul." The IDTT did not revise the treatment plan or consider a higher level of care, and a rationale for retaining the inmate in 3CMS was not provided.

Group treatment was generally offered once per week in the STRH, although the inmate had not attended since early April 2020. Psych tech rounds occurred at least once per day. The inmate refused most of his PC contacts, and primarily received cell front check-ins as a result.

It appeared that all psychiatry contacts were completed via telepsychiatry. The psychiatrist conducted the initial psychiatric assessment on February 28, 2020 and completed a follow-up appointment on May 15, 2020. The inmate refused his most recent psychiatry appointment on July 3, 2020, and no other psychiatry appointments were offered as of August 5, 2020.

**Findings**

This inmate's care was inadequate. PC contacts were primarily completed as cell front check-ins without interventions, and clinical documentation lacked sufficient detail. The inmate required a higher level of care than 3CMS based on his deteriorating mental status in the STRH. However, despite STRH unit staff and unassigned clinicians expressing grave disability and level of care concerns, the assigned providers did not change the level of care or the treatment. Instead, the STRH treatment team retained a November 2019 treatment plan that only targeted aggression; the inmate's psychotic symptoms, grave disability criteria, and treatment non-compliance were not addressed. Further, IDTTs were not used for their intended purpose, as documentation suggested providers did not discuss the inmate's worsening symptoms, treatment plans, and level of care during treatment team meetings.

**Inmate AA**

This reception center inmate's healthcare record was reviewed to evaluate the care provided in the STRH unit at DVI. The inmate arrived at DVI on October 10, 2019 and was housed in the STRH from December 27, 2019 through January 30, 2020, and from May 14, 2020 through June 18, 2020. His psychiatric diagnoses were Uncomplicated Bereavement and Polysubstance Abuse. A review of the inmate's history revealed a Bipolar Disorder diagnosis, one suicide attempt, and substance abuse issues that resulted in three to four overdoses. The psychiatrist prescribed Remeron for depressed mood, and the inmate was mostly compliant with his medication. The inmate's chronic and acute risk for suicide were assessed as moderate on December 20, 2020; his most recent suicide attempt occurred in December of 2018 by intentional opioid overdose.

The initial IDTT occurred on January 8, 2020, without the inmate or a correctional counselor in attendance. The PC noted that the inmate "only wanted to talk to the psychiatrist" earlier on this date; however, the psychiatrist did not meet with the inmate until January 22, 2020. While the inmate was compliant with his prescribed Remeron in the STRH, he declined the medication shortly after his release from the unit on January 30, 2020.

On or around May 14, 2020, the inmate reportedly ended his gang affiliation and returned to the STRH for safety concerns. During the initial STRH PC contact, he reported increased symptoms of depression and grief over the loss of two family members. The IDTT convened for the initial

review with all required disciplines present on May 20, 2020. Although the psychiatrist had not met with the inmate prior to the meeting, the antidepressant medication was renewed on this date.

The STRH treatment plan remained the same since January of 2020. The plan included one mental health IPOC for depressed mood, with a goal of demonstrating continued improvement with mood symptoms and challenging one dysfunctional thought per individual contact. The planned intervention involved fostering a therapeutic alliance. Although the inmate requested to work on his grief in treatment, it was not addressed in the plan or during individual contacts.

Group treatment was offered once per week in the restricted housing unit; although the inmate attended only one group during the review period. PC contacts occurred weekly, with some offered more than seven days apart. IDTTs were timely, and psych tech rounds were completed daily.

**Findings**

The care provided to this inmate was adequate, yet marginally. Although he stabilized with psychiatric medication and his own self-imposed routine, the treatment plan was insufficient, and treatment was not offered during individual PC contacts. Further, the treatment plan was generic, lacked measurable goals and evidenced based interventions, and failed to address the inmate's self-identified treatment target.

**Inmate BB**

This reception center inmate's healthcare record was reviewed to evaluate the care provided in the STRH unit at DVI. The inmate arrived at DVI on August 16, 2019 and was housed in the STRH date of this review on August 3, 2020. A PC note suggested that the inmate was retained in restricted housing due to custody staff's concerns for his safety. His history was significant for a diagnosis of Schizophrenia, Paranoid Type, one DSH competency to stand trial commitment, auditory hallucinations, and treatment with a variety of antipsychotic and mood stabilizing medications. His psychiatric diagnoses at DVI were Paranoid Personality Disorder and Bipolar I Disorder, most recent episode hypomanic. Prominent symptoms included paranoid ideation, explosive outbursts, impulsivity, and mood lability. The inmate only consumed packaged food due to fears of tampering. He declined psychiatric medication at DVI due to concerns about negative side effects. A suicide risk evaluation and safety plan were not completed during the 11-month period at DVI.

The record revealed that the inmate had been removed from MHSDS in September of 2019. On February 6, 2020 the inmate was evaluated by a mental health clinician in response to a referral from custody staff. This clinician wrote that the inmate recently flooded his cell and the tier, and was currently exhibiting depression, paranoia, and emotional dysregulation. However, due to the inmate's fear that MHSDS inclusion might be used against him in court, the clinician did not include him in the mental health program.

On February 27, 2020, the inmate was again evaluated by mental health in response to a referral from medical staff. Healthcare staff reported that the inmate was "increasingly unstable and aggressive" and only eating packaged food items served during lunch. MHSDS inclusion was recommended on this date.

The inmate was included in the 3CMS level of care during the initial IDTT on March 4, 2020. However, despite several concerning symptoms and behaviors noted during recent contacts, the treatment plan only targeted "anger" with goals of reducing violent acting out, based on a self-rating of 4 or below, and reducing threatening behavior to one time per week for one month. The planned treatment interventions involved fostering a therapeutic alliance and teaching the inmate about thought records.

The inmate continued to deteriorate in the segregation unit, and on April 15, 2020, the IDTT convened to discuss EOP level of care. The tele-psychiatrist noted on this date that the inmate declined psychiatric medication and did not meet involuntary medication criteria. The PC noted that the inmate required weekly contacts "to regulate himself" and exhibited continued emotional instability and impulsivity. While the treatment team recommended EOP level of care on this date, they later decided to retain the inmate in 3CMS due to the inmate's conditional threats to harm EOP staff and protective custody inmates if referred. However, the IDTT did not modify the inmate's treatment plan or enhance mental health services despite agreeing that a higher level of care was clinically indicated. Within six days of the April 15, 2020 IDTT, the inmate informed his PC that he might benefit from EOP treatment, but the PC did not document a response or a non-referral rationale.

A May 14, 2020 progress note indicated that the inmate was paranoid and limiting his food intake to packaged items that were only served during lunch. On May 16, 2020, he was described as verbally aggressive toward staff, and he flooded his cell and the tier on this date. On May 19, 2020, the PC noted that the inmate requested a radio and that he previously returned his radio to custody "because it was playing disturbing messages." Custody staff informed the PC that he had returned the radio within one day of receipt on three separate occasions. While custody staff agreed to provide a radio on this date, the sergeant informed the PC that it would be the last time.

The inmate participated in only one psychiatry contact and three confidential PC contacts during the review period, and all others were completed as cell-front wellness checks due to refusal. Although group treatment was offered one hour per week in the STRH unit, the inmate refused to attend. In-cell activities were offered.

On July 1, 2020, the IDTT convened again, and the PC noted that he met all of his treatment goals. This statement was not justified because the inmate had not stabilized or acquired new coping skills; however, given that the PC only targeted anger in the plan, it is possible that he met his one goal by refraining from aggressive acts around this time. The PC further explained that the inmate did not respond well to thought records and that he preferred "action based behaviors such as attendance at yard" to manage his mood. The IDTT retained the inmate in

3CMS level of care due to continued mood lability and "angry outbursts secondary to Bipolar I Disorder and Paranoid Personality Disorder."

During a PC contact on July 9, 2020, the inmate stated, "I'm never going to change. I'm always going to get in trouble. I'm not taking medication." He subsequently flooded his tier and pushed an officer into a railing for touching his shoulder in mid-July. The inmate informed the PC that he was not concerned about a 90-day extension to his sentence, as he was facing homelessness upon release. A July 21, 2020 progress note indicated that he had not attended yard in a while due to the officers cuffing him too tightly during escort.

The inmate was endorsed to PBSP's step-down program in mid-July; although he was still awaiting transfer from DVI as of August 3, 2020.

**Findings**

The care provided to this inmate was inadequate. Instead of basing level of care decisions on clinical indications or using clinical strategies to encourage compliance, the treatment team allowed the inmate to decide his own level of care when he declined MHSDS inclusion in February of 2020, and when he refused EOP level of care in April 2020. It was very concerning that clinical services were not enhanced after the EOP referral was withdrawn in response to the inmate's threats. At a minimum, subsequent IDTTs should have occurred more frequently than every 90 days, and the inmate should have been monitored more closely. The treatment plan was ineffective and only targeted the inmate's anger, despite several other obvious symptoms and behaviors documented throughout his stay in the STRH. Treatment targets should have addressed the inmate's medication and treatment refusals, impulsivity, and paranoid thoughts and behaviors. STRH staff may have unintentionally rewarded this inmate's aggressive behaviors, as he was able to avoid outcomes that he feared or perceived as undesirable. As such, a comprehensive diagnostic and behavioral assessment was warranted to guide effective treatment planning and achieve meaningful outcomes and did not occur.

**Inmate CC**

This reception center inmate's healthcare record was reviewed to evaluate the care provided in the STRH unit at DVI. The inmate arrived at DVI on December 23, 2020 and was housed in the STRH from April 13, 2020 through June 9, 2020. The PC noted that "fighting" was the reason for restricted housing placement. The inmate was included in MHSDS at the 3CMS level of care on April 22, 2020. His diagnosis was Bipolar I Disorder, Most Recent Episode Depressed. A SRASHE and safety plan were not completed at DVI.

The initial IDTT meeting occurred on April 22, 2020 and included all required disciplines; although the psychiatrist did not meet with the inmate for an initial contact until April 27, 2020. The treatment plan targeted depressed mood with goals that included identifying three ways to improve decision making and demonstrating continued improvement in mood symptoms. The treatment intervention involved helping the inmate "look at his behavior history and build

985

insight." The PC also noted that the inmate's heroin use in prison was a potential barrier to treatment success.

A tele-psychiatrist prescribed Remeron for depression on April 27, 2020. However, on May 20, 2020, the inmate requested removal from MHSDS and discontinuation of the medication due to fear of being killed for receiving psychiatric medication upon transfer to a level IV facility. The medications were discontinued on this date, but the inmate was retained in the 3CMS level of care.

The inmate was removed from MHSDS during IDTT on June 10, 2020. The PC noted that the inmate regularly attended his individual PC contacts, appeared psychiatrically stable, and met his treatment goals.

**Findings**

The care provided to this inmate during his brief inclusion in MHSDS was adequate. However, psychiatry documentation lacked sufficient detail and treatment plans needed improvement.

**Inmate DD**

This reception center inmate's healthcare record was reviewed to evaluate the care provided in the STRH unit at DVI. The inmate arrived at DVI on or around July 24, 2019, and he was housed in the STRH from July 24, 2019 through June 11, 2020. The PC noted that the inmate was retained in restricted housing due to "prior gang validation." His psychiatric diagnosis was Depressive Disorder, secondary to a medical condition, and his medical concerns included chronic pain, Coccidioidomycosis (valley fever), hearing loss, lung cancer, and mobility issues. Remeron was prescribed for sleep and depression, and Cymbalta for depression and chronic pain. The inmate was intermittently medication non-compliant due to negative side effects. The clinician's judgment of suicide risk on July 24, 2019 was low for chronic and moderate for acute. The inmate had one recorded suicide attempt in June of 2019 by hanging while in county jail.

The initial IDTT occurred on April 8, 2020 with all required disciplines present. The treatment plan targeted the inmate's depressed mood with a goal of challenging one dysfunctional thought per therapy session for one week. The treatment interventions involved fostering a therapeutic alliance and goal setting. The STRH treatment plan remained exactly the same from October 23, 2019 through April 8, 2020.

Psych tech rounds occurred daily, and in-cell activities were provided in the STRH. While the inmate was compliant with his weekly PC contacts, he refused several tele-psychiatry appointments, and he did not participate in group treatment after May of 2020.

The inmate was endorsed to CHCF on May 15, 2020 and the PC started therapy termination sessions on May 22, 2020. He transferred to CHCF on or around June 11, 2020.

**Findings**

The care provided to this inmate was adequate, yet marginally. The inmate appeared to have a positive rapport with his PC and his compliance with individual treatment improved during the six-month period prior to transfer. The PC also appropriately documented progress over time and commenced therapy termination sessions one-month prior transfer. However, the treatment plan was outdated and did not target the inmate's current treatment needs, including chronic pain and non-compliance with IDTT, treatment groups, and psychiatry contacts. The reason for his treatment refusals also was not documented. The PC failed to include an appropriate case conceptualization.

**Inmate EE**

This reception center inmate's healthcare record was reviewed to evaluate the care provided in the STRH unit at DVI. The inmate arrived at DVI and was placed in the STRH on February 7, 2020, where he remained through the date of this review on August 3, 2020. His psychiatric diagnoses were Schizoaffective Disorder, Bipolar Type, Unspecified Anxiety Disorder, Unspecified Depressive Disorder, and Antisocial Personality Disorder. His reported medical concerns included a brain tumor, end stage liver disease, and vision and memory loss. The inmate was prescribed Prozac and Vistaril for depression and mood stabilization, although he had several periods of medication non-compliance. The clinician's judgment of suicide risk on the May 21, 2020 SRASHE was moderate for chronic and low for acute. The inmate's suicide attempt history included cutting his wrists in 2015 and 1998 and attempting to hang himself in 1996.

The inmate received an RVR for threatening great bodily injury or death on June 23, 2020. The July 1, 2020 RVR mental health assessment indicated that mental health symptoms did not contribute to the RVR behavior. The clinician's recommendations for the hearing officer stated that the inmate would "react negatively to any adverse action" and that his mental health should not be "significantly impacted if found guilty." No other recommendations were offered.

The initial IDTT occurred on February 19, 2020; however, the inmate did not attend, and a treatment plan was not created. A treatment plan was not developed until two months later on April 29, 2020. While the psychiatrist met with the inmate prior to IDTT, an initial psychiatric assessment was never completed at DVI.

Although group treatment was offered weekly in the STRH, the inmate stopped attending group treatment on March 18, 2020. His group facilitators previously described him as withdrawn, disruptive, and attention seeking.

On April 8, 2020, the STRH psychiatrist met with the inmate to discuss medication non-compliance, and medications were adjusted.

During a PC contact on April 23, 2020, the inmate reported that he was thinking about suicide "off and on." The PC's progress note stated that he consistently had a negative outlook on life, that he had been refusing PC and psychiatry contacts, and that he was "informed of temporary

crisis bed referral" on this date. However, the inmate was not referred to the MHCB and a suicide risk evaluation and safety plan were not completed on this date.

The IDTT convened again on April 29, 2020, and the inmate requested EOP level of care on this date. However, the IDTT documentation indicated that the inmate was retained in 3CMS due to transfers being "limited to essential business only," and this was the only level of care rationale provided. Although the IDTT recommended increased PC contacts in lieu of EOP level of care, subsequent PC contacts did not meet minimum STRH policy requirements.

The first treatment plan was developed on April 29, 2020. The inmate's depression and "unremitting symptoms of a mental disorder" and "self-injurious" behavior listed as treatment targets; however, interventions were generic and limited to fostering a therapeutic alliance and goal setting. The treatment goal involved reducing depression to a self-rating of four.

On May 21, 2020, the inmate met with a different clinician in response to an urgent referral for a suicidal statement during ICC. This clinician described inmate's protective factors as "thin" and referred to him as "needy with staff." A SRASHE and safety plan were completed, and the inmate was returned to his cell.

Clinical notes in May and June of 2020 indicated that the inmate continued to request EOP level of care and was not progressing in treatment. On July 1, 2020, the tele-psychiatrist noted that he "spends all of his time in his cell."

The inmate refused to attend his July 15, 2020 IDTT, and the PC wrote that they were "unable to ascertain the [inmate's] current treatment progress or address any new concerns." The IDTT did not revise the treatment plan, consider a higher level of care, or provide a rationale for the current level of care on this date.

In response to the inmate requesting a new PC on July 16, 2020, the PC stated that he "could do whatever he wished." However, the assigned PC remained the same and the inmate continued to refuse PC contacts.

On July 23, 2020, the inmate was seen by a different clinician in response to another urgent referral. The clinician noted that the inmate was experiencing hopelessness and increased anxiety about the possibility of early parole due to COVID-19. The inmate also disclosed a prior sexual assault in county jail on this date and explained that he felt more comfortable speaking to a male about the incident; a PREA report was filed.

In response to the inmate's question about being seen by a clinician on July 27, 2020, the PC wrote, "instructed the inmate that issues related to COVID currently take precedent until further notice."

**Findings**

The quality of care provided to this inmate was inadequate. The initial psychiatric assessment was never completed and, although the initial IDTT occurred in February of 2020, a treatment plan was not developed until April 29, 2020. The PC did not complete a suicide risk evaluation or safety plan in response to the inmate's increased suicide risk on April 23, 2020. The IDTT noted that EOP level of care was not considered due to transfers being "limited to essential business only," and a similar non-referral rationale was documented during a subsequent PC contact. Although the IDTT recommended more frequent PC contacts in lieu of EOP treatment, subsequent PC contacts instead failed to meet the minimum STRH policy requirements. The treatment plan was ineffective and treatment interventions were not offered during PC contacts.

**Inmate FF**

This healthcare record was reviewed to evaluate the adequacy of care provided in the temporary mental health unit (TMHU) at DVI. The patient was referred to the MHCB level of care and placed in a TMHU on the evening of June 3, 2020. Although he received 3CMS services until 2017, he was not a participant in the MHSDS program at the time of MHCB referral.

On June 3, 2020, the patient endorsed suicidal ideation with a vague plan for self-harm. The on-call psychiatrist was consulted, and the patient was subsequently placed in a TMHU with one-to-one suicide observation. The SRASHE was completed on June 4, 2020, and the clinician's judgment of chronic and acute suicide risk was moderate. The accompanying suicide prevention safety plan included a comprehensive history of the patient's mental health treatment during incarceration. The TMHU clinician also noted COVID-19 testing was ordered on this date, and transfer to an available MHCB was recommended.

The initial psychiatric and PC assessments were completed during a joint session on June 4, 2020. The patient was described as ambivalent about mental health treatment on this date, and, while the psychiatrist documented a description of the patient's presenting problem, a comprehensive history was not included. Psychiatric medications were not recommended or ordered on this date, although copied and pasted text indicated that medication consent was obtained, and education was provided. The PC's notes summarized the joint contact with psychiatry. No other clinical contacts or rounds were completed on this date.

A variety of psychiatric disorders were documented without appropriate justification during the patient's brief TMHU stay. The healthcare record listed Depressive Disorder and Schizotypal Personality Disorder upon TMHU placement; the PC diagnosed the patient with Adjustment Disorder at the time of TMHU release; and one psychiatrist's progress note listed "cluster B traits" and a rule-out for "schizotypal." Further, the treating psychiatrist used a multiaxial diagnostic format that was discontinued by the American Psychiatric Association (APA) in 2013.

The patient was released from the TMHU on June 5, 2020. Moderate acute and chronic suicide risk were noted in the discharge SRASHE. Discharge documentation suggested that the TMHU release was based on the patient self-reporting a desire to "do better," using "positive coping skills," and endorsing "passive" suicidal ideation. While the psychiatrist wrote that the patient's

"treatment plan and goals were discussed" on this date, only a plan to release the patient to 3CMS with follow ups during specific timeframes was identified in the record.

According to CDCR's OnDemand reporting system, the patient received 12.5 hours of treatment during his 36-hour TMHU placement. However, further review of the record suggested that the 12.5 hours were accounted for by three overlapping sessions; with two overlapping contacts receiving 2.5 credited hours each, one June 4, 2020 contact being counted twice, and one June 5, 2020 contact being counted three times. Additionally, a PC contact occurring on June 5, 2020 did not have a corresponding note in the healthcare record.

**Findings**

The care provided to this TMHU patient was inadequate. Although the initial assessments were thorough and clinically sound, the documentation did not support the treatment team's decision to release the patient from the TMHU on June 5, 2020. The TMHU discharge appeared to be based on the patient's self-report of wanting to do better, instead of objective evidence of progress and treatment goal attainment. It was also concerning that the treatment team did not attempt to resolve diagnostic discrepancies, which is necessary for developing an effective treatment plan. Finally, while the TMHU cells were developed to provide a temporary alternative to higher levels of care during the pandemic, the treatment, programming and milieu were not consistent with inpatient psychiatric care.

**Inmate GG**

This healthcare record was reviewed to evaluate the adequacy of care provided in the temporary mental health unit (TMHU) at DVI during the review period. The patient was diagnosed with Bipolar Disorder, PTSD, and Adjustment Disorder with mixed anxiety and depressed mood. He was prescribed buspirone, olanzapine, and hydroxyzine. On April 14, 2020, the patient was referred from 3CMS to MHCB level of care, and the afterhours on-call psychiatrist ordered one-to-one suicide observation in the TMHU.

A suicide risk evaluation was completed on April 15, 2020, and the patient's chronic and acute suicide risk were assessed as moderate. The patient reported extreme anxiety, suicidal thoughts, and memories of child sexual abuse that were triggered by sharing a housing unit with sex offenders. The psychiatrist noted on April 15, 2020 that the patient was seen during "informal IDTT and rounding." While the initial psychiatric assessment form was used for this contact, only the "Presenting Problems" section was completed. This provider documented a brief history and mental status examination and noted rule-out diagnoses for bipolar disorder with anxiety, schizophrenic spectrum with anxiety, PTSD, and substance use disorder. The psychiatrist's plan involved reducing suicide observation to 15-minute safety checks, increasing buspirone, and working toward "exploring childhood traumas and triggers" in group, individual, and recreation therapy. However, group treatment and recreation therapy were not offered during TMHU placement.

The patient participated in a psychiatric assessment, IDTT, and suicide risk evaluation on April 16, 2020. While the SRASHE indicated that the patient's chronic suicide risk was high and acute risk was moderate, the psychiatrist noted "low risk for suicide." The patient was also described as overwhelmed and hopeless on this date. The suicide prevention safety plan included contacting family and an individual in the community for support, while also noting the patient reported a lack of family support and no contact information for the identified person in the community. The plan further indicated that the patient was "encouraged to establish a relationship with someone he feels comfortable enough with to ask for help."

The April 16, 2020 treatment plan included only one treatment goal of decreasing anxiety, and this was pulled forward from the patient's February 2020 3CMS treatment plan. While behavior therapy was recommended to address childhood events, no further details were offered.

The patient was released from the TMHU on April 16, 2020; however, the discharge decision was based almost entirely on self-reported improvements.

CDCR's OnDemand reporting system indicated that the patient received two hours of services while in the TMHU.

**Findings**

The care provided to this patient was inadequate. It concerning that one-to-one suicide observation was reduced to 15-minute safety checks without indicating whether the TMHU cell was suicide resistant. With the exception of medication, there was no evidence of treatment interventions offered during clinical contacts. The patient did not have a treatment plan that addressed his current treatment needs or the reasons for TMHU placement. The patient's housing unit concerns were not addressed, despite the patient identifying this as a trigger for his abuse memories, suicidal ideation, and other symptoms. The suicide prevention safety plan was also insufficient, and the treatment team did not document a reduction in suicide risk prior to TMHU release. Additionally, the TMHU discharge rationale was based almost exclusively on the patient's self-report, with little objective information to support the discharge. Finally, while the TMHU cells were developed to provide a temporary alternative to higher levels of care during the pandemic, the treatment, programming, and milieu were not consistent with inpatient psychiatric care.

**Inmate HH**

This healthcare record was reviewed to evaluate the adequacy of care provided in the temporary mental health unit (TMHU) at DVI during the review period. Prior to TMHU placement the patient attempted suicide by cutting his neck. He received treatment with 18 sutures at a community hospital and was placed in the TMHU and MHSDS program when he returned on April 12, 2020. The PC diagnosed the patient with Major Depressive Disorder, single episode, severe; whereas the psychiatrist documented Depressive Disorder, Not Otherwise Specified, and

included rule-outs for major depressive episode versus adjustment disorder with mixed anxiety and depressed mood. Sertraline was prescribed during TMHU placement.

The Columbia SSRS was administered on April 13, 2020; however, this screening instrument was not appropriate for use given the patient's very recent suicide attempt. While the PC assessed the patient's acute and chronic suicide risk as moderate on the April 13, 2020 SRASHE, his acute suicide risk appeared high based on his recent serious suicide attempt, ineffective protective factors, recent paternal death, continued agitated state, recent incarceration, and feelings of failure.

The patient met with the TMHU psychiatrist twice on April 13, 2020. This provider wrote that the patient would benefit from the milieu of an MHCB and that the regional mental health administrator was consulted; however, it was decided that the patient would remain at DVI with MHCB level of care services provided in the TMHU. The treating psychiatrist did note significant risk for suicide on this date.

The IDTT convened on April 14, 2020. Although the treatment team did not indicate whether the patient was in a suicide resistant cell, the one-to-one suicide observation was reduced to 15-minutes safety checks on this date. The treatment plan targeted the patient's depressed mood, anxiety, and impulsive behavior. However, his grief, suicidal ideation, and suicidal behavior were not addressed in the plan.

The April 15, 2020 SRASHE indicated no change in suicide risk, and the clinician documented a plan to continue MHCB level of care. The psychiatrist also met with the patient on this date, noted low to moderate suicide risk, and described the patient as exhibiting an improved range of affect with less anxiety and self-reported mood improvement.

A PC progress note, dated April 18, 2020, suggested that the contact may have occurred at cell front without clinical interventions offered. However, appropriate clinical interventions were implemented during an April 19, 2020 PC contact.

IDTT and individual contacts with the PC and psychiatrist were completed on April 20, 2020. The documentation suggested continued improvements with a decrease in depression and anxiety. The treatment team indicated that EOP level of care may be indicated at the time of release. Although the formalized treatment plan was unchanged, a provider noted additional goals of addressing self-harm, negative thoughts, stress management, shame, impulse control, asking for help, frustration tolerance, and anxiety.

A joint PC and psychiatry contact occurred on April 21, 2020, at which time the patient reported concerns about returning to the yard and endorsed feelings of shame and remorse. The provider wrote that he was minimizing the seriousness of his suicidal behavior and lacking a solid safety plan. A safety plan was developed during a subsequent PC contact on this date and included a plan to shave with custody supervision.

The patient was released from the TMHU to EOP level of care on April 22, 2020. The discharge SRASHE indicated that the patient's chronic suicide risk was actually higher than previously assessed. The patient's chronic suicide risk was rated as high and acute risk as moderate. The safety plan was not modified on this date. Prior to release the patient expressed concern about pain medication withdrawal in light of his substance use history; however, the psychiatrist noted that he was ready for discharge without documenting a response or intervention related to his concern.

CDCR's OnDemand reporting system noted that the patient received 13.6 hours of services while in the TMHU.

**Findings**

The care provided to this patient during his ten-day length of stay in the TMHU was inadequate. He required treatment in an inpatient setting to address his high risk for suicide and symptom acuity upon return from the community hospital. TMHU treatment was limited to psychiatric medication and a few clinical contacts, with only two that included useful clinical interventions in a confidential setting. The TMHU care did not include active treatment interventions, treatment groups, out of cell structured activities, or a therapeutic milieu. The TMHU treatment plan did not include sufficient interventions to address his current treatment concerns or suicide risk. Further, clinical documentation suggested that the patient's discharge may have been premature given the recent increase in risk factors, such as shame, pain medication withdrawal, and potential for relapse.

**EXHIBIT K**
**California State Prison/Corcoran (CSP/Corcoran)**
**April 2, 2019 – April 4, 2019**

**Inmate A**

This record was reviewed to evaluate the mental health care provided in CSP/Corcoran's LTRH. During onsite group interviews, this inmate informed the monitor's expert that he experienced daily suicidal ideation. The inmate subsequently appeared distressed, endorsed current suicidal ideation, and was preoccupied with a belief that CDCR was somehow responsible for his mother's death. The crisis intervention team (CIT) responded to the emergent referral for suicidal ideation, and the CIT note stated, "CIT RN was called by Sgt Burns at 1250.  When CIT arrived Per SGT building [sic] inmate was not suicidal, he was pulled out from his cell per *Coleman* request. No CIT needed." The note did not clarify whether the nurse assessed the inmate in accordance with policy, or whether they determined the CIT was no longer needed on account of the sergeant's report. The following day, CSP/Corcoran leadership clarified that the sergeant cancelled the CIT after the inmate denied stating that he was suicidal.

The inmate's psychiatric diagnoses varied throughout the documentation. He was diagnosed with Antisocial Personality Disorder, Schizoaffective Disorder, and Adjustment Disorder on February 7, 2019; with Borderline Personality Disorder and Adjustment Disorder on March 14, 2019; and with Unspecified Bipolar Disorder on March 30, 2019. Psychiatric medications included Trileptal and Cymbalta.

The IDTT met without the inmate in attendance on February 7, 2019. The inmate's depressed mood was targeted in the plan of care; however, treatment interventions were not clearly documented during routine clinical contacts.

The inmate was seen by a variety of clinicians throughout March 2019. These providers described the inmate as emotionally labile and indicated that he was pre-occupied with the change in clinicians. Documentation from two clinical contacts noted that the inmate did not "report" suicidal ideation, and an assessment of his suicide risk was not conducted.

**Findings**

This inmate's mental healthcare was inadequate. Coordinated care was needed for diagnostic clarification purposes. Consistent clinical providers were needed to improve treatment engagement and outcomes. Treatment interventions were not implemented during clinical contacts or appropriately documented in progress notes. It was troubling that a sergeant cancelled the CIT despite the nature of the referral, including the inmate's suicidal statements. The CIT should proceed whether or not the inmate recants suicidal statements during a nursing assessment. It is recommended that the CIT policy address this concern as well.

**Inmate B**

This LTRH inmate's healthcare record was selected for review following an onsite group interview wherein he reported that psychiatry had not met with him since his arrival. The inmate was diagnosed with Adjustment Disorder and prescribed Trileptal.

The January 9, 2019 IDTT documentation indicated that he transferred to CSP/Corcoran from CSP/LAC after receiving a SHU term.  The treatment goal involved reducing the inmate's depressed mood to a rating of four or below by the next treatment team meeting. Encouraging goal setting to work on improved functioning was listed as an intervention. The inmate requested anger management treatment while in the program; however, this was not incorporated into the treatment plan.

Between January 17 and March 20, 2019, weekly 90-minute treatment groups were offered to the inmate in the LTRH. Although the inmate attended only eight of 14 treatment groups, his non-compliance was not addressed in treatment.

Contrary to the inmate's claim that he was not seen by a psychiatrist in LTRH, an initial psychiatric assessment, dated February 6, 2019, was reviewed. However, the psychiatric assessment was completed after the initial IDTT.  The record also revealed that PC contacts did not occur weekly. The PC contacts appeared to consist of only brief check-ins, as treatment interventions were not recorded in the accompanying progress notes. A change in PC was noted, but the rationale for the change was unclear.  Although the inmate was assessed by the CIT on March 1, 2019, this event was not discussed during the subsequent PC contact on March 6, 2019.

**Findings**

This inmate's care was inadequate.  While the inmate's claim that he had not met with a psychiatrist in the LTRH was not supported by the documentation, Program Guide requirements were not met, clinical documentation was generally insufficient, continuity of care was lacking, and treatment plans were deficient. The initial psychiatric assessment was not completed prior to the initial IDTT, and PC contacts were not offered weekly. The treatment plan included vague interventions, failed to address treatment non-compliance, and ignored the inmate's request to work on anger management. The IDTT included a treatment goal of reducing depression to a rating of four or below without appropriately collecting and documenting a baseline rating to track the inmate's progress or regression.

**Inmate C**

This 3CMS inmate's healthcare record was reviewed to evaluate the quality of mental health care at CSP/Corcoran. The inmate recently returned to CDCR in August 2018. On November 25, 2018, he submitted a request to restart his psychiatric medication, which included Thorazine, Abilify, Depakote, and Seroquel. He endorsed auditory hallucinations and anxiety. Prior psychiatric diagnoses included Bipolar II Disorder and Post-Traumatic Stress Disorder (PTSD). On December 3, 2018, a psychiatric nurse practitioner met with the inmate in response to his request for medication. This provider documented that the inmate was sleeping 2.5 hours per

night, rated his depression and anxiety as high, and reportedly vacillating between crying and feeling happy. He was diagnosed with Schizophrenia, paranoid type, and Bipolar II Disorder.

On December 24, 2018, the inmate submitted a request to discontinue his Thorazine medication. On January 23, 2019, the psychiatric nurse practitioner completed the initial psychiatric assessment with the inmate, noted reports of decreased anxiety and depression and increased sleep, and discontinued his psychiatric medications. The provider added PTSD to the list of diagnoses and recommended continued 3CMS level of care.

The inmate did not attend his initial PC contact on January 2, 2019. The PC completed the initial assessment without the inmate on January 25, 2019 and referenced recent documentation from the psychiatric nurse practitioner. The PC also recommended 3CMS level of care.

The February 7, 2019 initial IDTT was completed in absentia, and 3CMS level of care was continued. The inmate requested removal from MHSDS during a cell-front PC contact on March 5, 2019. There were no serious symptoms or functional deficits documented on this date. On April 11, 2019, the IDTT convened again without the inmate in attendance and he was removed from MHSDS.

**Findings**

This inmate's mental health care was inadequate. The initial IDTT, PC assessment, psychiatric assessment, and mental health referral failed to meet Program Guide timeframes. A face-to-face interview was not attempted on the date the initial PC assessment was completed. Symptoms were not sufficiently documented to support the serious diagnoses and antipsychotic medication. Further, the abrupt removal from MHSDS was alarming, considering his antipsychotic medication was discontinued less than three months prior, and the PC observed him only once at cell front during his brief inclusion in the program.

**Inmate D**

This patient's healthcare record was reviewed to evaluate the quality of care provided in the MHCB at CSP/Corcoran. His psychiatric diagnoses included Antisocial Personality Disorder and Unspecified Depressive Disorder. He had a substance abuse disorder as well. Prior medications included Geodon, Risperidone, and perphenazine. A significant history of foreign body ingestion was noted.

The patient was admitted to the MHCB on January 25, 2019, following an incident of self-injury. The PC completed their initial assessment on January 26, 2019 and noted that the patient's history included seven suicide attempts. On January 26, 2019, the patient told the psychiatrist, "I'm not feeling safe. I have staples in my stomach. I can pull it open and swallow them again. I cut my wrists too."

The patient continued to engage in self-injurious behavior through February 1, 2019. He reported on this date that his current crisis was precipitated by the death of his grandmother. The treatment team planned to retain the inmate in MHCB for further observation. On February 4,

2019, the patient informed the psychiatrist that he felt like cutting himself. A SRASHE was completed on February 5, 2019, and the patient's acute suicide risk was assessed as moderate. On February 5, 2019 the IDTT referred the patient for a higher level of care and updated the treatment plan.

A progress note dated February 19, 2019 indicated that the patient was frustrated due to "waiting for surgery and transfer to DSH." He was scheduled for a surgery related to foreign body ingestion on February 26, 2019. The psychiatrist noted on this date that the patient remained on discharge status since February 7, 2019 and was referred to intermediate care, pending medical clearance. The psychiatrist further stated, "Today he was supposed to be sent to OTM for a surgical appointment for removal of the inserted object, but the appointment was postponed to 3/5/20. Because of constant threat of harm himself, he has been placed on one-to-one suicide watch continuously, and he enjoyed it as he always stands at his cell door to chat with the watch staff."

By March 7, 2019, the patient was medically cleared for transfer to DSH. A March 13, 2019 nursing note indicated that he transferred to CHCF.

**Findings**

The mental health care provided to this patient was adequate. The patient was appropriately referred to a higher level of care. IDTTs and individual contacts with the PC and psychiatrist were timely. The treatment plan included an interdisciplinary plan of care (IPOC) that was sufficient for his clinical circumstances.

**Inmate E**

This patient's record was reviewed to evaluate the appropriateness of his level of care and treatment in the MHCB. He was diagnosed with Amphetamine Dependence, Antisocial Personality Disorder, Bipolar Disorder, Unspecified Depressive Disorder, and Psychotic Disorder. Symptoms included hallucinations and paranoid thinking. The psychiatrist prescribed lithium and fluoxetine. Antipsychotic medications were recommended, but the inmate declined. He had a history of EOP level care and several psychiatric hospitalizations, including one MDO commitment at ASH. His level of care was reduced from EOP to 3CMS three months prior to this review. The patient recently transferred to CSP/Corcoran from CHCF.

The patient's initial IDTT at CSP/Corcoran's MHCB was completed on November 15, 2018. Although CHCF clinicians determined that the patient did not require inpatient treatment, the patient requested DSH inpatient care during the initial assessment. The IDTT subsequently discharged the patient to 3CMS level of care on November 21, 2018.

On December 7, 2018, the patient was placed in administrative segregation due to an indecent exposure charge. On January 4, 2019, the PC noted that the patient was stable with continued auditory hallucinations. The PC planned to follow up with the patient every 90 days, at a minimum.

On February 19, 2019, the psychiatrist met with the patient and described him as stable. Lithium, Strattera, Prozac and Vistaril were continued on this date. The psychiatrist planned to follow up in 90 days. A March 14, 2019 PC progress note indicated that the patient was included in CSP/Corcoran's IEX program; however, the monitor's expert did not find documentation related to IEX treatment in the record.

A SRASHE was completed on March 14, 2019, and the patient's chronic and acute risk for suicide were assessed as low.

**Findings**

The mental health care provided to this patient was inadequate. Although the patient did not require inpatient care at the time of this review, it is highly unlikely he will remain stable with the current treatment plan and limited frequency of mental health contacts at every 90 days. At a minimum, his treatment plan should be revised to include more frequent contacts with mental health. Clinical documentation during his stay in administrative segregation was very insufficient. The screening evaluation was not completed, and the patient's inappropriate sexual behavior was not well documented or appropriately addressed in the treatment plan.

**Inmate F**

This healthcare record was reviewed to evaluate the appropriateness of the inmate's level of care. The record suggested that the inmate had a depressive disorder diagnosis.

The inmate requested removal from MHSDS during a PC contact on August 17, 2018. The plan was to schedule an IDTT to address the request. By November 2, 2018, the inmate was no longer in MHSDS; however, he requested to speak with a clinician in the STRH on this date. The clinician planned to meet with him several times before deciding whether to include him in the MHSDS program.

During a PC contact on November 6, 2018, the inmate reported rage and anger related to recent allegations of battery on another inmate. The PC wrote a plan to continue meeting with the inmate weekly, without including him in MHSDS. Subsequent PC contacts occurred on November 19, December 20, 2019, January 4, 18, 29, February 14, 21, 28, March 7, 14, and 21, 2020. At least two of the progress notes indicated that he was seen in a confidential setting.

The inmate remained symptomatic and continued to have difficulties adjusting to administrative segregation; he was included in MHSDS at the 3CMS level of care. A January 29, 2019 PC progress note included a problem list. A January 8, 2019 note referenced his plan of care. He was participating in group treatment in the STRH by February of 2019.

**Findings**

While the care provided to this inmate was adequate, the record did not include an IDTT note, treatment plan form, or PC initial assessment. However, it appeared he did have a treatment plan and had been assessed by an IDTT based on references in the PC's progress notes.

**Inmate G**

This inmate's healthcare record was reviewed to evaluate the mental health care at CSP/Corcoran. He was diagnosed with Adjustment Disorder and depression. The inmate attributed his depressive symptoms to being wrongfully convicted of his index crime. The treating psychiatrist prescribed mirtazapine. He had a number of medical problems, including asthma, leukopenia, and benign prostatic hypertrophy.

On January 18, 2019, the inmate endorsed auditory hallucinations and suicidal ideation. A CIT social worker evaluated the inmate and determined that he did not require inpatient care. However, he subsequently cut himself with his inhaler while still in the treatment and triage area and was again evaluated by a mental health clinician. The second mental health evaluation resulted in referral to MHCB level of care with one-to-one suicide observation.

The initial PC assessment in MHCB was completed in a confidential setting on January 19, 2019, and the inmate reported feeling very stressed. The initial psychiatric assessment occurred on January 19, 2019; however, the documentation was very sparse in content, with the exception of information that appeared to be copied and pasted. The inmate was seen in a non-confidential setting on January 20, 2019, at which time he requested discharge from MHCB. The PC met with the inmate the following day in a non-confidential setting and noted that scheduled safety checks were continued.

A January 21, 2019 psychiatry note stated that the inmate's presentation was unchanged from the previous day. The IDTT convened on January 22, 2019, with all required disciplines, and the treatment plan was formulated. Consideration for a higher-level care was documented. The plan was to assist the inmate with developing a minimum of three new coping skills and to improve his frustration tolerance.

The inmate participated in recreational therapy on January 23, 2019 and group therapy on January 25, 2019. IDTTs and individual contact with the PC and psychiatrist were timely in the MHCB.

The inmate discharged to 3CMS level of care on January 28, 2019 with an order for a five-day follow-up. Clinical improvement was noted.

**Findings**

The care provided to this inmate was adequate. Clinical contacts in the MHCB were consistent with Program Guide requirements. However, progress notes from the PC and psychiatrist were sparse in content.

**Inmate H**

This healthcare record was reviewed in response to concerns expressed by housing unit custody staff. The floor officer reported that the inmate had poor ADLs, only communicated in writing,

and refused yard, showers, dayroom, and mental health programming. The inmate was diagnosed with Selective Mutism, Brief Psychotic Disorder, Atypical Disorder, and Antisocial Personality Disorder. Psychotropic medications were not prescribed. The inmate was designated DD1 and had a TABE score of 1.3.

The inmate was described as stable and doing well on January 3, 2019. He was reportedly oriented and organized, with linear goal-directed thoughts. Although the inmate's level of care was EOP at this time, the PC wrote that he would be seen again in 90 days. The inmate no longer communicated verbally with mental health staff following this appointment. He refused confidential contacts with mental health staff and began communicating with idiosyncratic hand signals when interacting cell front. The inmate refused to meet out of cell with the developmental disability (DD) psychologist on January 11, 18, and 25 of 2019. Progress notes for these dates were copied and pasted from prior dates and provided little additional information.

On January 28, 2019, the PC noted that the inmate seemed fine; however, he was pulled from his cell for cleaning due to an odor emanating from it. On February 4, 2019, the inmate wrote a request for a sign language interpreter on a piece of paper and presented it to his PC at cell front. The PC wrote that an interpreter could not assist the inmate, as he did not utilize American Sign Language (ASL), and this interaction was perceived as evidence that the inmate was logical and coherent rather than delusional.

On February 12, 2019, the inmate was assigned a different PC. He interacted minimally at cell front with this new provider and was described as having limited insight, poor judgment, and strong body odor. On February 21, 2019, a covering clinician interacted with the inmate at cell front. The inmate held up a sign stating that he recognized this PC and that the PC had been involved in a fight on 3A yard. The clinician noted that, although the inmate was mistaken, he was somehow logical on this date. Non-verbal communications with mental health staff at cell front continued throughout February and March of 2019, with the PC writing a possible need to consult with medical regarding neuro-cognitive difficulties.

The March 5, 2019 treatment plan indicated none of the higher level of care indicators were met. However, the inmate had refused 50 percent or more of his mental health treatment. In February and March, he appeared to refuse all, or nearly all of his mental health appointments. Further record review revealed that the inmate had refused 64 to 96 percent of mental health services since December 2018.

The inmate refused to meet with the psychiatrist on March 9, 2019. He again requested a sign language interpreter using his handwritten sign when the psychiatrist approached cell front. The psychiatrist subsequently emailed the PC and expressed concern that the inmate was decompensating and may require inpatient care due to grave disability. On March 18, 2019, the PC responded, "Ok, will do when you return." However, on March 19, 2019, the PC interacted with the inmate at cell front and noted that he was not exhibiting signs of decompensation based on his ability to communicate in written English without difficulty. He was not referred to a higher level of care. A subsequent PC note on March 29, 2019 contained copied and pasted data without any new clinically relevant information; it appeared to be almost identical to prior progress notes.

1000

**Findings**

The care and clinical documentation for this inmate were inadequate. Several PCs met with the inmate at cell front and witnessed signs of decompensation without appropriate intervention. Although a psychiatrist noted that the inmate was decompensating and may require a referral to inpatient care, follow-up was insufficient, and the level of care concern was not discussed further. The treatment team should have convened to review the case, discuss the inmate's need for a higher level of care, document an appropriate level of care rationale, and modify the treatment plan. Instead, this inmate was left in his cell while custody staff assumed responsibility for tending to his physical and mental health needs to the best of their ability.

**Inmate I**

This healthcare record was reviewed to follow up on concerns expressed by housing unit custody staff and an inmate porter. The porter and floor officer informed the monitor's expert that the inmate required assistance with simple tasks, including cell cleaning. Custody staff reported that they recently submitted a referral to the mental health department due to concerns about the inmate's ADLs, including poor hygiene and yard, dayroom, and shower refusals. The inmate, however, attended mental health appointments.

The inmate arrived at CSP/Corcoran for the IEX pilot program in February 2019. His initial PC assessment was completed on February 15, 2019. The initial assessment and IDTT documentation suggested the clinician relied on collateral information from the record due to the inmate's limited communication during interview. The PC noted that the inmate was distracted, not fully oriented, and that his speech was both pressured and delayed. Although the inmate did not acknowledge any severe symptoms during the assessment, the PC determined that an interdisciplinary plan of care (IPOC) for grave disability was indicated at the time of the initial IDTT on February 19, 2019. The treating psychiatrist attended the initial IDTT; however, they had not met with the inmate prior to the meeting and they did not initiate a PC 2602 despite grave disability concerns.

On February 27, 2019, the PC noted that the inmate exhibited lethargy, incoherence, lack of orientation, thought blocking, and flat affect. Although custody staff reported that the inmate would attend mental health groups with prompting, his participation was consistently recorded as low.

The March 5, 2019 treatment plan indicated that the inmate's level of care was increased from 3CMS to EOP due to "self-neglect" and requiring prompts from staff to manage his ADLs. Although he was not prescribed medications, he agreed to start pharmacologic treatment during this IDTT. The clinical summary noted that the inmate experienced disturbing auditory hallucinations that prevented him from being able to focus. The inmate was diagnosed with Major Depressive Disorder, which was inconsistent with his symptoms.

The psychiatrist met with the inmate after the March 5, 2019 IDTT. The psychiatrist described him as disorganized and disheveled, with dirty clothes and long fingernails. The psychiatrist

continued the Major Depressive Disorder diagnosis and added "psychosis" as well. The inmate was prescribed a low dose of Zyprexa (7.5mg at bedtime) on this date.

On March 13, 2019, the PC noted that while the inmate reported improvements, custody staff had not observed any change. During another PC contact on March 19, 2019, which inexplicably took place in the dayroom, the PC suggested that the inmate had difficulty remembering to take medication and that he required significant assistance. On March 26, 2019, the PC met with the inmate in response to a referral from nursing. Documentation indicated that the DSH coordinator was consulted due to the inmate's extreme body odor, resulting from ongoing shower refusals; poor cell conditions, with food and napkins across the floor; continued disorientation; medication non-compliance; and reliance on custody staff for structured support. However, the inmate was not referred to inpatient care.

**Findings**

The care provided to this inmate was inadequate. Treatment plans lacked measurable objectives for grave disability concerns and did not address the inmate's psychotic symptoms. The IDTT failed to refer the inmate to a higher level of care when it was clear that the inmate could not function in his current level of care due to a major mental disorder and that he required highly structured inpatient psychiatric care with 24-hour nursing supervision. Given the severity of symptoms and functional deficits, the inmate should have been referred to acute care for initial stabilization. The inmate also required consideration of a PC 2602 order, as staff had verbally reported erratic medication compliance due to the inmate's level of disorientation.

**Inmate J**

This inmate's healthcare record was reviewed at the request of plaintiffs' attorneys. The inmate alleged that individual therapy had not been offered since his arrival at CSP/Corcoran's IEX pilot program on February 22, 2019. The PC completed the initial assessment on March 5, 2019 and noted a history of self-injurious behavior, psychiatric hospitalization, and a diagnosis of Unspecified Bipolar Disorder. The inmate was prescribed Vistaril (50mg as needed for anxiety every two hours), Prozac (60mg in the morning), Risperdal (3mg in the evening), and carbamazepine (200mg twice daily). The inmate was out to court on several occasions at the end of February and early March. He was briefly admitted to the MHCB and discharged on February 25, 2019.

Although all required members were present for the inmate's initial IDTT on March 12, 2019, the psychiatrist did not complete the initial assessment until March 19, 2019. The treatment plan targeted the inmate's self-injurious behavior, lack of insight, poor judgement, and depressed mood. The March 12, 2019 treatment plan included treatment goals that were subjective or vague. Treatment interventions were not empirically based or sufficient for the acuity of the problem. The inmate expressed a desire to transfer to "DSH for better treatment," possibly referring to treatment for sexual deviancy.

On March 13, 2019, the inmate complained about not receiving group treatment; though the documentation suggested he either attended, was a "no show," or was possibly out-to-court when groups were offered.

**Findings**

While the overall care was adequate, the treatment plan did not include objective and behaviorally based treatment goals or clinically appropriate interventions. The initial psychiatric assessment was not completed prior to the initial IDTT.

The record suggested that the inmate was offered individual and group treatment when available.

**Inmate K**

This case was selected for review as the inmate was in the EOP level of care and had received 20 RVRs. The inmate was diagnosed with Bipolar I Disorder, mixed type, and prescribed Effexor, valproic acid, benztropine, and haloperidol. The inmate recently returned to CSP/Corcoran from DSH on December 11, 2018.

The initial IDTT was held on December 19, 2018. The IDTT identified that the inmate had 14 MHCB referrals within a six-month period. He had not been issued an RVR since August of 2018. The inmate was described as willing to work on his impulsive and suicidal behavior, which was often triggered by agitation and boredom.

As the inmate was on a modified EOP treatment program, the IDTT convened again on January 16, 2019. He was retained on modified program due to his "highly disruptive behaviors while participating" in treatment, and the IDTT noted, "It is expected that these disruptive behaviors will decrease significantly within the next 30 days."

**Findings**

This inmate was adequately treated. The higher level of care non-referral rationales and treatment modifications were appropriate.

**EXHIBIT L**
**California Substance Abuse Treatment Facility (CSATF)**
**June 10, 2019 – June 14, 2019**

**Inmate A**

This inmate was selected for healthcare record review following concerns noted during onsite IDTT observation. His recent history was significant for a MHCB admission at CIM for grave disability on January 30, 2019, at which time his mental state was described as confused and his behavior as bizarre with poor self-control and inappropriate laughter. The inmate was subsequently placed in the EOP level of care and transferred to CSATF. His psychiatric diagnosis was Unspecified Psychosis and he was prescribed Zyprexa and Depakote.

The inmate's level of care was reduced from EOP to 3CMS at CSATF on May 28, 2019. On June 2, 2019, the CIT was activated in response to an interrupted suicide attempt. He reportedly tied a rope around his neck and attempted to jump from the upper tier prior to custody staff's intervention. The CIT clinician's documentation referenced two prior suicide attempts and described the inmate as confused with dysthymic mood and flat affect. He was assessed with moderate chronic and high acute suicide risk.

The MHCB initial psychiatry assessment was completed on June 3, 2019, and the psychiatrist noted that the inmate was 19-years-old when he attempted suicide for the first time and received a diagnosis of Schizophrenia. The MHCB psychiatrist continued the inmate's Depakote and adjusted his Zyprexa dosage on this date. The initial PC assessment was completed by a social worker on June 3, 2019, and the documentation referenced current auditory hallucinations and a prior suicide attempt via stabbing at the age 21.

On June 4, 2019, the IDTT convened and the psychologist noted a recent level of care change from EOP to 3CMS due to meeting all of his treatment goals. The inmate reported to the MHCB treatment team that he was "tired of life" on this date. A subsequent psychiatry note indicated that the inmate was vague about his symptoms and suicidal ideation, and his one-to-one suicide observation was continued. The inmate was non-compliant with psychiatric medication on June 7, 2019 and he refused PC contacts on June 8 and 9, 2019. The MHCB psychologist approached the patient at cell front on June 10, 2019 to inform him that a PC contact would occur later in the day; however, the provider did not document an update on his mental status. On June 10, 2019 the psychiatrist noted that the patient would not contract for safety.

The IDTT observed for this patient did not address safety planning consistent with his documented history.

**Findings**

The care provided to this inmate was inadequate. The inmate's rapid decompensation following the reduction in level of care from EOP to 3CMS suggested the change was premature and that the inmate was not sufficiently prepared for the transition. The inmate's treatment needs were

not adequately addressed with respect to safety planning and level of care considerations. Further, the frequency of PC contacts with the MHCB psychologist did not meet requirements.

**Inmate B**

This transgendered inmate's healthcare record was reviewed to assess the appropriateness of the level of care change from EOP to 3CMS. The inmate's history was significant for a traumatic brain injury in 2009 with subsequent cognitive deficits. Psychiatric diagnoses included Gender Dysphoria, PTSD, Major Depressive Disorder, and Neurocognitive Disorder due to traumatic brain injury. The inmate also endorsed auditory hallucinations and had a significant trauma history. Her most recent MHCB admission occurred on February 5, 2018 following a suicide attempt. She was prescribed Seroquel, and medication adherence was an area of concern during the review period.

Clinical documentation referenced intermittent suicidal ideation, food restriction behaviors, and poor compliance with psychiatric medication and group treatment. The inmate did not receive a transitional care plan to ensure a smooth transition from EOP to 3CMS level of care.

A May 30, 2019 telepsychiatry note indicated that the inmate continued to endorse auditory hallucinations and frustration with the reduction in level of care. The inmate was also reluctant to take psychiatric medication in the 3CMS program. There was a documented plan to continue discussing the need for EOP level of care.

**Findings**

The care provided to this inmate was inadequate. The inmate's level of care was reduced from EOP to 3CMS without adequate transition planning. Clinical notes suggested a return to EOP level of care should have been considered sooner, as a result of the inmate's poor functioning in the 3CMS program.

**EXHIBIT M**
**Pleasant Valley State Prison (PVSP)**
**Review Date - May 15, 2020**

**Inmate A**

This 47-year old's healthcare record was selected from the non-referral roster to assess adequacy of care. He was identified on the sustainability report as unable to function at his current level of care, 3CMS, due to a major mental disorder. He was diagnosed with Adjustment Disorder with Anxiety and was prescribed Remeron.

During his March 18, 2020 IDTT, he was at 3CMS level of care and was housed in the STRH. Documentation indicated that ongoing distress which included anxiety, agitation, negative thinking, frustration and passive suicidal ideation, was worsening. Psycho-social stressors and discontinuation of Tylenol with Codeine for chronic pain contributed to his distress.

The treatment team changed his level of care to EOP with the goal of assisting him in managing ongoing stressors. This change addressed the concern raised on the sustainability report. Documentation was comprehensive and discussed relevant clinical factors in detail.

**Findings**

The referral to EOP level of care was appropriate and his care was adequate.

**Inmate B**

This 25-year old's healthcare record was selected from the non-referral roster to assess adequacy of care. He was identified on the sustainability report as unable to function due to a major mental disorder. He was diagnosed with Major Depressive Disorder. He was not prescribed psychiatric medication.

While he was in 3CMS, PC progress notes indicated ongoing psychiatric distress and consideration of an increase in level of care months before the completion of an initial assessment on March 26, 2020 "to increase his level of care.'' Documentation indicated that depressive symptoms had increased and included ongoing passive suicidal ideation. There was also an increase in psychotic symptoms including delusions, bizarre thinking and perseverating on religious and sexual topics.

An IDTT was scheduled almost two weeks after completion of the initial assessment, and for reasons that were unclear, was marked as an initial IDTT. Despite psychiatric attendance at IDTT, there was no documentation that medication or refusal of a March 9, 2020 psychiatric appointment were discussed. His level of care was changed to EOP, although the rationale for EOP placement was not in alignment with the PC assessment. Instead, the referral to EOP addressed self-harm behavior, a previous issue for him. Further, there was no documentation of psychotic symptoms in the referral or treatment goals.

**Findings**

This inmate's care was inadequate.  The referral to a higher level of care was needed, but the referral was delayed. Documentation of this inmate's symptoms indicated consideration of inpatient level of care.  Other areas of insufficient treatment were lack of discussion of psychiatric medication and lack of documentation of all symptoms regarding rationale for placement and treatment planning which impedes continuity of care.

**Inmate C**

This 40-old inmate's healthcare record was selected from the non-referral roster to assess adequacy of care.  He was identified on the sustainability report as unable to adequately function at his current level of care due to a major mental disorder.  He had a long-standing diagnosis of Adjustment Disorder with Mixed Anxiety and Depressed Mood and was prescribed Remeron and BuSpar.

There were discrepancies in IDTT, psychiatric, and initial PC documentation regarding whether the level of care change from 3CMS to EOP occurred via a March 5, 2020 initial PC evaluation in advance of IDTT or during the March 10, 2020 IDTT.  Documentation indicated that the inmate's mental status had declined in the weeks prior to IDTT. Specifically, depressive symptoms included decreased energy, motivation and appetite. The week before IDTT, symptoms worsened and included isolating, auditory hallucinations and passive suicidal ideation with difficulty identifying reasons to live. Symptoms were exacerbated by chronic pain.

Despite decompensation, targeted interventions to address his specific symptoms, including relaxation for pain management, the underlying factor for his distress, were not included as treatment goals.  Rationale for EOP level of care despite an increase in symptoms in the week before IDTT (passive suicidal ideation, auditory hallucinations and isolation), was not clearly documented.

**Findings**

This inmate's care was inadequate.  Documentation of his clinical presentation indicated that consideration of inpatient level of care was warranted. Documentation of clinical justification for EOP was insufficient. The possibility that level of care was changed in advance of IDTT was of concern as it is an indication of poor coordination of care. Lastly, diagnostic review was warranted.

**Inmate D**

This 55-year old's healthcare record was randomly selected from the non-referral roster to assess adequacy of care.  He was identified by two indicators on the sustainability report, unable to function due to a major mental disorder and chronic psychiatric symptoms that had not responded to six months of treatment.  He was diagnosed with Schizophrenia and prescribed Remeron, BuSpar, Zyprexa and Propranolol.

This inmate was at the 3CMS level of care at the time of transfer from WSP to PVSP on March 18, 2020.  He was seen timely for his PC assessment and presented with disorganized thought

processes and active auditory and visual hallucinations. Documentation indicated that his level of care was changed to EOP. On April 1, 2020, he was seen for an initial psychiatric contact which also indicated that he was EOP level of care. The psychiatric contact did not have sufficient documentation necessary for an initial contact.

IDTT was held on April 2, 2020. Treatment planning was reasonable and goals to target auditory hallucinations were identified with appropriate interventions.

**Findings**

This inmate's care was inadequate. The decision to refer him to a higher level of care was appropriate. However, documentation of his mental status warranted a referral to inpatient level of care. The referral to EOP, which was made in advance of IDTT, was not compliant with the Program Guide and an indication of a need for collaboration with treatment providers.

**Inmate E**

This 33-year-old's healthcare record was randomly selected from the non-referral roster to assess adequacy of care. He was identified on the sustainability report for inability to function at his current level of care due to a major mental disorder. He was diagnosed with Adjustment Disorder with Anxiety and was prescribed Vistaril for anxiety and disturbed sleep.

On March 16, 2020, the inmate was placed in STRH; he was not in the MHSDS at that time. In response to a self-referral, he was seen for a mental health consult on March 20, 2020. Shortly thereafter, during the initial PC assessment, he was placed in 3CMS level of care. Initial contacts and IDTT were timely; however, the quality of the initial psychiatric assessment was insufficient.

Treatment goals targeted depression, were measurable with an established baseline, and interventions were reasonable. Treatment planning would have been improved with goals to target identified symptoms of depression and anxiety.

**Findings**

The care provided to this inmate was adequate. Although the change in level of care in advance of IDTT was problematic, the referral to 3CMS was appropriate.

**Inmate F**

This 42-year-old's healthcare record was randomly selected from the non-referral roster to assess adequacy of care. He was diagnosed with Schizoaffective Disorder and prescribed Zyprexa and BuSpar.

He was referred to the MHCB after a suicide attempt via superficial lacerations to his wrist, and admitted on April 18, 2020. At the time of referral, he was actively psychotic, including command auditory hallucinations and poor ADL's. Upon admission to the MHCB, he was given Haldol and Vistaril for acute psychosis. Treatment goals targeted auditory hallucinations and self-harm. Goals were measurable with identified interventions.

He was discharged from the MHCB to EOP during an April 27, 2020 IDTT. IDTT documentation indicated that he was identified on two indicators on the sustainability report, inability to function due to a major mental disorder and chronic psychiatric symptoms that have not responded to six months of treatment.

Documentation at the time of discharge did not support discharge to a lower level of care. IDTT documentation of ongoing suicidal ideation and disturbed sleep was inconsistent with recent PC documentation. Additionally, he was rated as high acute and high chronic risk on the SRASHE, with unclear rationale for this assessment. He was non-compliant with the completion of safety planning and there was no documentation of the clinician's attempts to engage him. Non-referral rationale, "LOC changed to EOP to further stabilize sx [symptoms] and receive more frequent mh [mental health] contact" was insufficient.

**Findings**

This care provided to this inmate was inadequate. Documentation of clinical presentation at the time of discharge suggested that he should have been considered for referral to a higher level of care at the intermediate level.

**Inmate G**

This 23-year-old's healthcare record was selected from the non-referral roster to assess adequacy of care. At the time of his January 23, 2020 transfer to PVSP for STRH placement, he was not in the MHSDS.

The inmate was seen on February 19, 2020 as a result of a February 17, 2020 self-referral for mental health. An initial PC assessment was completed on February 24, 2020, and 3CMS level of care was recommended due to anxiety and depression. Initial psychiatric documentation was timely but lacked sufficient clinical information. He was prescribed Vistaril for anxiety and insomnia.

During a February 26, 2020 IDTT, he was diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood. Treatment goals addressed anxiety, but not all identified symptoms (depression and sleep disturbance). Goals to reduce anxiety included baseline measurements, and interventions were reasonable.

While his level of care change was appropriate, documentation on the higher level of care form needed improvement.

**Findings**

This inmate's care was adequate. With the exception of the psychiatric assessment, documentation was clinically relevant.

**Inmate H**

This 50-year-old's healthcare record was selected from the non-referral roster to assess adequacy of care. He had a history of placements in MHCB, EOP and 3CMS level of care since 1997, and

had been at 3CMS level of care since 2017. He was diagnosed with Major Depressive Disorder and was not prescribed psychiatric medication.

The inmate was seen in response to a self-referral to mental health and staff described him as self-dialoguing. There was conflicting documentation on the SRASHE regarding auditory hallucinations; in one sentence he denied auditory hallucinations, but in the next sentence, he endorsed "whispers" that he "yells at." He endorsed passive suicidal ideation. His level of care was changed from 3CMS to EOP. Rationale for the EOP referral addressed anxiety and depression, but did not include symptoms that prompted the referral, particularly psychosis and passive suicidal ideation to assist with continuity of care.

Documentation for a psychiatric consult was not located nor was there documentation of psychiatric input during IDTT.

**Findings**

This inmate's care was inadequate. While the change in level of care was needed, consideration for an inpatient referral was warranted based on observations of psychosis by staff and lack of psychiatric medication.

**Inmate I**

This 36-year-old's healthcare record was selected from the non-referral roster to assess adequacy of care. He was diagnosed with Persistent Depressive Disorder, Early Onset, with Persistent Major Depressive Episode, Moderate with Mood Incongruent Psychotic Features. He was not prescribed psychiatric medication.

His level of care was changed from 3CMS to EOP after a PC contact on January 28, 2020, and documentation indicated that ongoing anxiety and depression had intensified at that time. He reported "panic attacks," recent auditory hallucinations and passive suicidal ideation. This was attributed to struggling with substance abuse while on "C" status. A SRASHE was completed and he was rated high on chronic and acute risk; although, it was not clear how the clinician reached that conclusion.

Treatment goals targeted depression. Panic attacks, auditory hallucinations, and risk of self-harm were excluded. Goals were measurable but there was no baseline to assess change. Interventions included utilizing goal-setting, but the connection between symptoms and intervention was unclear.

**Findings**

This inmate's care was inadequate. While it was not clear how the finding of high acute and high chronic risk was determined, this finding warranted consideration of a higher level of care at the inpatient level. The change in level of care to EOP occurred in advance of IDTT. Treatment planning needed improvement and diagnostic review was needed.

1010

**Inmate J**

This healthcare record was selected for review from a list of patients who were in PVSP's TMHU during the review period to assess adequacy of care. This patient was in the TMHU at the MHCB level of care between April 13, 2020 and April 16, 2020 due to delusional thinking and risk of self-harm. He was again placed in the TMHU at the MHCB level of care from April 19, 2020 to April 21, 2020 for suicide attempt, auditory hallucinations, and hopelessness. At that time, his level of care was changed to acute level of care, pending DSH placement which occurred on June 16, 2020.

During the acute level of care placement, clinical contacts occurred daily, either in a confidential space or at cell front. He reportedly went to the yard, day room, and shower on a regular basis. His mental status generally remained unchanged throughout his placement in the TMHU. He repeatedly asked about transfer to DSH, and he reported auditory hallucinations which did not create much distress. He was treated with Zyprexa, Cogentin, and Inderal.

The IDTT met seven times during his TMHU placement, three of which occurred in absentia. The IDTT documentation indicated that his medication compliance was good and medication response was partial.

**Findings**

This patient was seriously mentally ill and appropriately placed in an inpatient level of care. While provided treatment was in alignment with TMHU policy, this patient's care was inadequate. TMHU cells, which were developed as an alternative to higher levels of care, lack a therapeutic milieu and offered limited programming, treatment services and multi-disciplinary collaboration in comparison to a higher level of care.

**Inmate K**

This healthcare record was selected for review from a list of patients who were in PVSP's TMHU during the review period to assess adequacy of care. This patient was admitted in the TMHU between May 18, 2020 to May 27, 2020 at the MHCB level of care. The admission was precipitated by reports of command auditory hallucinations of demons, self-injurious behaviors (superficial cut his right arm and he had tied a shoelace around his neck) and tangential and confused thought processes. He was described as evasive, and his report of symptoms was in contrast to a two-year period of stability. He was diagnosed with an Unspecified Schizophrenic Spectrum Disorder, and Abilify was prescribed to ameliorate the psychotic symptoms.

The IDTT met at appropriate times and the clinicians met with the inmate daily. There were discrepancies in his reports to clinicians that were not addressed. For example, a May 19, 2020 PC progress note documented complaints about the side effects of his medication and stated it did not help him with the demons. In contrast, a May 21, 2020 psychiatry progress note revealed medication compliance and a denial of any medication side effects. He also denied any suicidal ideation. Throughout his stay, he was focused on not wanting to return to C yard, saying "there were a lot of demons on C yard" and "I cannot go back there." While he continued to insist the demons were real and he could not return to C yard, he denied auditory hallucinations and suicidal ideation shortly after his admission.

1011

During his stay, a developmental disability evaluation was conducted.  Results were consistent with a DD2 designation.  His discharge SRASHE evidenced no change from his admission SRASHE which indicated high chronic and acute suicide risk levels.  During the discharge IDTT, he denied auditory hallucinations and suicidal ideation. He reported taking his medication and said he felt better. He insisted he could not return to C yard because of enemies. The IDTT noted the most appropriate level of care was EOP until his release from prison in less than three weeks. He was moved to STRH on May 27, 2020.

**Findings**

This patient's care was inadequate.  There was a failure by the treatment team to address his individualized treatment and risk needs. This patient was relatively stable for almost two years in CDCR, until he was about to be released. The treatment plan did not clearly identify triggers or precipitants to his decompensation i.e., upcoming release and/or secondary gains.  It was unclear why members of the IDTT did not discuss contradictory reports regarding psychiatric medication raising concerns about collaboration.  Further, discharge to a segregation unit despite high risk of suicide and an approaching release carried potential risks.

**Inmate L**

This healthcare record was selected for review from a list of patients who were in PVSP's TMHU during the review period to assess adequacy of care.  This patient was treated at the MHCB level of care within the TMHU for suicidal ideation with intent between April 19, 2020 and May 4, 2020.  He was re-admitted three days later for suicidal ideation and auditory hallucinations until he was discharged to acute level of care at CHCF on June 16, 2020.  He was prescribed Effexor and Thorazine.

During both TMHU admissions, he was seen for IDTT and daily clinical contacts. Psychiatric medications were adjusted to address ongoing symptoms of depression, command auditory hallucinations and suicidal ideation.  During his readmission, the treatment team recommended that he be discharged from the TMHU and transferred to inpatient care. They documented that he would likely benefit from long-term treatment within a structured milieu at a psychiatric hospital level of care, given his readmission to MHCB level of care and his continued auditory hallucinations, suicidal ideation, and depression. They reported the TMHU setting was unable to stabilize him, as evidenced by his deterioration within a few days discharge from his first TMHU placement.  Just prior to his transfer, it was noted he was being stabilized on medication, one-to-one therapy and up to two hours of out of cell activity.

**Findings**

This patient was appropriately admitted to MHCB level of care in the TMHU and eventually referred to acute level of care. Of note, the IDTT documented that inpatient was better able to provide long-term treatment in a structured therapeutic milieu.

**Inmate M**

This 22-year-old inmate's healthcare record was randomly selected from the STRH roster to assess adequacy of care.  He was placed in the STRH on February 20, 2020.  He was diagnosed

with Adjustment Disorder with Mixed Anxiety and Depressed Mood.  He was not prescribed psychiatric medication.

The initial PC assessment was timely, and of good quality.  Relevant clinical areas were documented including symptoms and functional impairment. Initial and subsequent IDTTs were timely. Clinical interventions and goals were individualized and included baseline assessment to assess progress.  Assessment and treatment planning would have been improved with assessment of the relationship between substance use and anxiety or depression.

PC documentation was thorough and included an overview of interventions utilized but would have been improved with specificity to align with treatment plan interventions. Documentation of partial goal achievement was indicative in progress notes but not reflected in the updated treatment plan.

During March, and the first week of April 2020, 90-minute groups were offered weekly; however, for reasons that were unclear, subsequent weekly groups were scheduled for one hour.

**Findings**

This inmate's care was adequate.  Documentation was overall comprehensive and clinically sound.

**Inmate N**

This healthcare record was randomly selected from the STRH roster to assess adequacy of care. This 55-year-old inmate was placed in the STRH on February 4, 2020.  He was diagnosed with Major Depressive Disorder and Polysubstance Abuse and prescribed Vistaril.  He was not in the MHSDS at the time of his arrival; however, in April 2020, he requested to be seen by mental health and was subsequently admitted to 3CMS due to depression and anxiety. He had a history of anxiety and depression which were exacerbated by recent heroin withdrawal.

Documentation labeled as an initial psychiatric contact was insufficient, and routine psychiatric contacts also lacked sufficient detail.

The initial PC assessment addressed pertinent psycho-social history and identified current symptoms of depression and impact on functioning.  Case conceptualization needed improvement as it impacts treatment planning.

The initial IDTT was timely, but treatment planning was insufficient.  Origin of treatment goals was unclear.  Treatment goals did not address identified problems or functional impairments. Treatment goals were measurable but there was no baseline to determine if the goal was realistic or assess progress.

Clinical contacts were often cell-front due to refusals, which were not addressed.  Treatment interventions identified in the treatment plan were not documented in routine clinician contacts

Groups were offered weekly during dates reviewed and were scheduled for one hour.

1013

**Findings**

This inmate's care was inadequate due to insufficient psychiatric documentation and treatment planning.

**Inmate O**

This inmate's healthcare record was randomly selected from the STRH roster to assess adequacy of care. This 27-year-old inmate was placed in the STRH on April 16, 2020. Shortly after admission, he submitted a request for mental health services and was subsequently referred to 3CMS level of care. He was diagnosed with Adjustment Disorder with Mixed Anxiety and Depression and was prescribed Vistaril.

The initial psychiatric and PC assessments lacked sufficient clinical detail. Documentation of treatment planning was hampered by inadequate initial PC assessment. Treatment goals were measurable, but origin of goals and interventions was unclear.

Routine PC contacts provided a reasonable summary of his mental status, but there was no documentation of treatment provided.

A review of documentation indicated that groups were offered for three of four weeks in May, and weekly during June 2020. Groups were scheduled for one hour.

**Findings**

This inmate's care was inadequate. Quality of documentation was insufficient.

**Inmate P**

This inmate's healthcare record was randomly selected from the STRH roster to assess adequacy of care. This 48-year-old inmate was placed in the STRH on February 5, 2020. He was diagnosed with Major Depression and prescribed Prozac.

The inmate submitted a referral to mental health for anxiety and depression. PC documentation was comprehensive but would have been improved with more specificity of symptoms. In contrast, psychiatric documentation was insufficient for the level of comprehensive evaluation warranted. Neither provider's assessment documented symptoms to support diagnosis.

The initial IDTT was timely and treatment goals addressed anxiety and depression. Baseline functioning was assessed, and goals were measurable with appropriate interventions.

Routine PC contacts were conducted cell-front due to refusals. Identified treatment interventions were not consistently documented.

Following his initial PC assessment, groups were offered weekly for one hour.

**Findings**

This inmate's care was adequate, although marginally. Despite lack of follow-up on refusals, overall quality of treatment planning and PC documentation was sufficient. In contrast, psychiatric did not contain the kind of comprehensive evaluation warranted.

**Inmate Q**

This inmate's healthcare record was randomly selected from the STRH roster to assess adequacy of care. This 34-year-old inmate was placed in the STRH on February 23, 2020. He was diagnosed with Adjustment Disorder with Mixed Anxiety and Depression and was prescribed Vistaril for sleep.

He was referred for a psychiatric assessment by his PC. He refused the psychiatric contact, and there was no documentation of an attempt to see him until more than two months later. Documentation of the psychiatric contact was insufficient for the level of comprehensive evaluation warranted.

The initial PC assessment and IDTT were timely and of adequate quality. Treatment goals addressed reports of anxiety, with an established baseline to assess change that was realistic and measurable. Treatment interventions were not identified.

Quality of PC documentation conveyed meaningful content with clear documentation of the inmate's mental status, management of stressors, and clinical interventions.

During the month of May 2020, the inmate attended one of three offered groups; each was scheduled for one hour instead of the 90 minutes of structured therapeutic activity required in the STRH.

**Findings**

This inmate's care was adequate, although marginally. IDTT and PC documentation were adequate. However, psychiatric follow-up and quality of psychiatric documentation was insufficient.

**Inmate R**

This inmate's healthcare record was randomly selected from the STRH roster to assess adequacy of care. This 32-year-old inmate was placed in the STRH on February 22, 2020. He was diagnosed with Adjustment Disorder with Anxiety. He was not prescribed psychiatric medication.

The initial PC documentation addressed relevant clinical areas. Disclosure of trauma history warranted an assessment of Post-Traumatic Stress Disorder. Treatment planning appropriately identified anxiety and substance use as treatment goals which were measurable and appropriate.

Interventions identified in the treatment plan were not documented in routine PC contacts.

Each week during April and May 2020, the inmate was offered one hour-long group.

**Findings**

The inmate's care was adequate.

**Inmate S**

This inmate's healthcare record was randomly selected from the STRH roster to assess adequacy of care. This 34-year-old inmate was placed in the STRH on February 2, 2020.

During late March 2020, he self-referred to mental health for anxiety and depression including passive suicidal ideation. His initial PC contact and IDTT addressed pertinent clinical areas. He was diagnosed with Adjustment Disorder with Mixed Anxiety and Depression. He was referred to the psychiatrist for disturbed sleep but refused each contact and was not prescribed psychiatric medications. Documentation did not address the refusals.

Treatment planning needed improvement. Goals targeted "anxiety" but there were no goals that targeted manifestation of anxiety (ruminating, palpitations). Further, depression and sleep disturbance were not targeted, and ongoing passive suicidal ideation was not included on the treatment plan.

PC contacts were conducted cell-front through mid-May 2020 due to refusals. Documentation provided a summary of his mental status and psycho-social stressors, but treatment interventions were not documented.

During May 2020, the inmate was offered groups for three of four weeks, two of which lasted 90 minutes and met STRH program requirements.

**Findings**

This inmate's care was assessed as inadequate due to the lack treatment intervention to address risk of harm.

**Inmate T**

This inmate's healthcare record was randomly selected from the STRH roster to assess adequacy of care. This 25-year-old inmate was placed in the STRH between November 16, 2019 through May 28, 2020.

The initial PC assessment was timely and addressed pertinent clinical areas. He was diagnosed with "Anxiety" but other than the inmate's self-report of feeling anxious about pending charges, specific symptoms and impact on functioning to support diagnosis was lacking.

Psychiatric documentation indicated the inmate was referred to psychiatry for insomnia and was seen promptly. However, a full comprehensive psychiatric assessment was not completed, and routine psychiatric documentation was brief.

While the treatment goal to reduce anxiety was measurable, there was no baseline assessment to measure change, or if the goal was realistic. Treatment interventions identified in the treatment plan were not documented in a review of a random sample of routine contacts.

A sample of group programming during the month of April 2020 indicated that hour-long groups were offered weekly.

**Findings**

This inmate's care was inadequate. The was no initial psychiatric assessment and routine psychiatric documentation were very brief and insufficient. Diagnostic assessment and documentation of treatment interventions were needed.

**Inmate U**

This inmate's healthcare record was randomly selected from the STRH roster to assess adequacy of care. He self-referred to mental health after one month in the STRH. He was diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood.

Psychiatric documentation was problematic. Content in documentation labeled as initial psychiatric contact was insufficient for the level of comprehensive evaluation warranted and was nearly indistinguishable from routine contacts. While routine contacts occurred more frequently than quarterly, content was too brief to convey a meaningful contact. Vistaril was prescribed for anxiety and insomnia but depressive symptoms were not targeted.

The PC assessment was comprehensive. Treatment planning addressed depression, an identified symptom, but there were no goals to address anxiety or disturbed sleep, low energy, or isolating. Treatment interventions were included in routine progress notes but not clearly aligned with those identified in the treatment plan.

A review of a sample of groups during April and May 2020 indicated that groups were scheduled for one hour.

**Findings**

This inmate's care was adequate, although marginally. PC contacts and treatment planning were adequate, but psychiatric documentation failed to convey that clinically meaningful contacts had occurred.

**Inmate V**

This inmate's healthcare record was randomly selected from the STRH roster to assess adequacy of care. This 36-year-old inmate was placed in the STRH on March 28, 2020. He was diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood. He self-referred to mental health for anxiety, depression, disturbed sleep and passive suicidal ideation. Initial PC contacts and IDTT were timely, and a SRASHE was completed.

Content in documentation labeled as an initial psychiatric contact was insufficient. While routine psychiatric contacts occurred more frequently than quarterly, content was too brief to convey meaningful contacts. Vistaril was prescribed for anxiety and insomnia but depressive symptoms were not targeted.

Treatment goals targeted anxiety and disturbed sleep but there was no goal for depression. Interventions to meet goals were not identified and risk of harm was not addressed in treatment planning or subsequent routine contacts.

PC contact documentation conveyed a meaningful interaction but was lacking mental status data and alignment with treatment planning.

Hour-long groups were offered weekly during May and June 2020.

**Findings**

This inmate's care was inadequate. Psychiatric documentation was clinically insufficient, and despite placement in an environment that elevated risk of self-harm, his passive suicidal ideation was not addressed in treatment planning or routine contacts.

**Inmate W**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving 3CMS level of care. Diagnoses included generalized anxiety disorder and "Anxiety NOS" which is a diagnosis no longer used with the current DSM. He was not prescribed psychotropic medication at the time of the review as it had been discontinued secondary to the inmate refusal in December 2019.

The inmate refused two out of the three contacts scheduled with his PC during the review period. The PC noted the inmate's status and documented observable functioning during refused contacts. The inmate was noted to be functioning adequately without medications and was scheduled for removal from the 3CMS caseload in June 2020. The psychiatrist also noted stability of the inmate without medications during routine psychiatric visits.

**Findings**

The care provided to this inmate was adequate.

**Inmate X**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving 3CMS level of care. The inmate was diagnosed with generalized anxiety disorder and major depressive disorder, single episode in partial remission.

PC progress notes indicated that Cognitive Behavioral Therapy (CBT) was the planned intervention for the inmate's anxiety and depressive symptoms, but no evidence of interventions was provided in the documentation. Starting in January 2020, the PC noted that the inmate was

1018

to be seen every 30 days, but the inmate was seen every 60 days. PC progress notes contained copied text from contact to contact.

His annual IDTT completed January 14, 2020, noted that he had been stable without medications for over a year. The treatment plan was to continue to address depressive and anxiety symptoms with CBT.

**Findings**

This inmate's care was inadequate. Progress note content was copied from session to session, and follow-up sessions were not in keeping with the plans noted in progress notes.

**Inmate Y**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving 3CMS level of care. The inmate was transferred to PVSP on March 9, 2020. His diagnoses were panic disorder and unspecified depressive disorder, and he was prescribed fluoxetine. Medication was reviewed and continued at time of transfer.

The inmate was seen for his PC initial assessment and his treatment plan was completed in a timely manner. Of concern, an IDTT note and text within the treatment plan stated that the inmate was absent due to COVID-19 protocol, yet the treatment plan stated, "IP is presenting for his initial IDTT" and included inmate quotes. The inmate quote was taken from an initial assessment conducted at a previous facility several months earlier and carried over into the most recent PC initial assessment, as well as the treatment plan. The inmate was not seen by psychiatry prior to or during the IDTT meeting. The inmate was first seen by his psychiatrist after IDTT and noted to be stable on medications.

The inmate was seen within appropriate timeframes by his PC for a routine visit in a confidential setting, and an increase in depressed mood was noted. Interventions were documented to target these symptoms.

**Findings**: This inmate's care was adequate, although marginally. Copied text resulted in misleading documentation within the PC initial assessment and treatment plan, but subsequent treatment was appropriate to the inmate's needs. Lack of psychiatric input into treatment planning was an area of concern.

**Inmate Z**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving 3CMS level of care. He was diagnosed with major depressive disorder, recurrent, moderate and the psychiatrist included a diagnosis of PTSD as well. The inmate was prescribed sertraline and lamotrigine.

PC sessions were well-documented and included clear interventions and inmate's response to treatment.  The PC made referrals to the psychiatrist appropriately when needed.

The inmate was seen by the psychiatrist within appropriate timeframes including being rescheduled within one week of a refused appointment and being seen in response to a referral from the PC.  Medication effects and side effects were well-documented, along with considerations and plans.  Diagnoses continue to be listed in multi-axial format.

It was noted that the inmate was not present for his annual IDTT on April 14, 2020 due to COVID-19, but the treatment plan was completed and consistent with progress notes.

**Findings**

Although there were concerns with discrepancies in documented diagnoses between clinicians and the use of DSM-IV nomenclature and multi-axial format, the care provided to this inmate was adequate.

**Inmate AA**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving 3CMS level of care.  The inmate diagnoses were generalized anxiety disorder and major depressive disorder, recurrent, moderate.  He was not prescribed psychotropic medications.

The inmate returned to PVSP on January 2, 2020 from an extended stay at court.  A psychiatry note indicated no psychotropic medications at the time of transfer.  The PC initial assessment was completed on January 9, 2020, and the inmate was seen for IDTT and updated treatment plan on January 21, 2020.  Routine visits with his PC occurred as required by the Program Guide and included well-documented and appropriate interventions, as well as inmate response.  The inmate was also seen and assessed by the IDTT for inclusion in Male Community Reentry Program (MCRP) during the review period.

**Findings**

The care provided to this inmate was adequate.

**Inmate BB**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving 3CMS level of care.  The inmate was diagnosed with PTSD.  He was not prescribed psychotropic medications.

The inmate was transferred to PVSP on February 5, 2020 after placement in 3CMS level of care while at WSP reception center.  A psychiatrist note indicated that the inmate was not prescribed medications.  The inmate was seen for a PC initial assessment on February 13, 2020.  The entire

clinical summary and case formulation sections were copied without any changes from the previous initial assessment. His treatment plan was developed during IDTT on February 19, 2020 and included goals to target anxiety through graduated exposure and group participation. The clinical summary was updated, but remaining sections were copied from previous assessments.

The inmate was seen for a routine PC contact on May 12, 2020. There was no indication that interventions on the treatment plan were initiated or implemented.

**Findings**

The care provided to this inmate was inadequate. The initial assessment was not updated at the time of transfer, and while specific treatment interventions were noted on the treatment plan, those interventions were not provided.

**Inmate CC**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving 3CMS level of care. He was diagnosed with major depressive disorder, recurrent, moderate. He was not prescribed any psychotropic medications.

The inmate's treatment plan was updated just prior to the review period to target depressed mood.

The inmate was seen for routine PC contacts on three occasions throughout the review period. Documentation did not reflect interventions provided, only a plan to provide interventions, and documentation was copied from previous contacts. Of concern, in one PC note, an increase in the inmate's rating of depressive symptoms was documented but there was no indication that the PC recognized this as an increase.

**Findings**

The care provided to this inmate was inadequate. Progress note content was copied from session to session, and treatment interventions were not in keeping with the plans noted in progress notes.

**Inmate DD**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving 3CMS level of care. He was diagnosed with schizoaffective disorder, depressive type and was prescribed mirtazapine.

The inmate was seen for a routine PC visit on January 15, 2020 with adequate recent treatment history and response, along with inclusion of collateral information from medical and psychiatry.

1021

The inmate's annual treatment plan was reviewed without the inmate present, as he refused to attend for an unknown reason.

The inmate was seen within expected timeframes after submitting a healthcare request to speak to his PC during February 2020. He refused his next PC visit on March 8, 2020, and it was noted that the inmate refused to come out of his cell. He was not seen again by his PC during this review period which exceeded Program Guide requirements.

A psychiatrist saw the inmate on December 31, 2019 and noted that his mirtazapine had been discontinued due to noncompliance on December 23, 2019. The medication was restarted, and the inmate's treatment history was included in a progress note. There were no notable changes during subsequent psychiatric contacts.

**Findings**

The care provided to this inmate was adequate, though marginally. Psychiatric services appeared adequate; however, the PC did not appropriately follow up to determine the inmate's status or reason for contact refusals.

**Inmate EE**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving 3CMS level of care. He was diagnosed with antisocial personality disorder, Bipolar I disorder, depressed with psychotic features and substance abuse. The inmate was not prescribed psychotropic medications.

The inmate was seen by his PC on three occasions during the review period for routine contacts. The documentation from these contacts indicated that support was provided but no formal therapeutic interventions. The inmate was also seen for an IDTT, and the treatment plan was updated to address a request for transfer to a minimum support facility (MSF). No concerns were found with the inmate moving to MSF, and his primary treatment goal was to reduce irritability.

**Findings**

The care provided to this inmate was adequate, although the diagnosis of Bipolar I is questionable given the inmate's stability without medication.

**Inmate FF**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving 3CMS level of care. He was diagnosed with depressive disorder and was not prescribed psychotropic medications.

The inmate was seen for routine PC contacts in accordance with expectations, and progress notes included therapeutic interventions and the inmate's response to these interventions. A January 28, 2020 IDTT resulted in an updated treatment plan. The treatment plan was complete and updated appropriately.

The inmate attended weekly leisure skills groups throughout the review period, ending in April 2020. Notes indicated that the inmate participated actively in the 90- and 120-minute art groups.

**Findings**

The care provided to this inmate was adequate.

**Inmate GG**

This patient's healthcare record was selected for review to assess adequacy of TMHU care. His TMHU admission on May 20, 2020, was precipitated by odd behaviors, flight of ideas, and grandiose and delusional thinking. He was also disoriented to date. He was ultimately diagnosed with Schizophrenia.

Subsequent documentation indicated that he remained in the TMHU at the MHCB level of care due to potential danger to others exacerbated by psychotic symptoms (delusions of grandeur). The plan was to continue daily contact with a mental health clinician. He remained restricted to his cell due to the unpredictable nature of his behavior. Subsequent contacts with his PC indicated that he remained unengaged in treatment.

A May 28, 2020 psychiatric documentation indicated the following: "Done in absentia for IDTT with team. Case Discussed. He has been delusional, and talking to himself in the cell and gesturing, he remains a danger to others at this time." He was refusing medications. At least three consults to mental health were generated by custody due to odd/bizarre behavior. For reasons that were unclear, the psychiatrist indicated he was discharged to DSH via the IDTT.

A June 8, 2020 note indicated that he was awaiting transfer to an acute inpatient level of care. Subsequent progress notes indicated that he was waiting transfer to DSH. A June 16, 2020 note indicated that he would be transferred to DSH that day but was ultimately transferred to CHCF.

**Findings**

This patient, who did not leave his cell during his TMHU stay, was clearly psychotic and appropriately transferred to an inpatient level of care although not in a timely manner (which was likely due to COVID screening issues). This patient's care was inadequate. An emergency transfer should have been considered. TMHU cells, which were developed as an alternative to higher levels of care, lack a therapeutic milieu and offered limited programming, out of cell contacts and activities in comparison to a higher level of care.

**Inmate HH**

This patient's healthcare record was selected for review to assess adequacy of care in the TMHU while at the MHCB level of care due to psychosis with negative symptoms.  He was diagnosed with Unspecified Schizophrenia Spectrum and Other Psychotic Disorder.

Throughout his stay, he was non-compliant with prescribed psychiatric medication and refused daily out of cell clinical contacts and activities which included showers, despite encouragement. A PC 2602 was initiated on May 12, 20202 and upheld on May 19, 2020.

For reasons that were unclear, documentation from May 7, 2002 indicated that he was clinically discharged from the TMHU to DSH due to poor self-care and psychosis.  This was well in advance of his transfer date to CHCF on June 16, 2020.

**Findings**

This patient's care was inadequate.  This patient was clearly psychotic and was appropriately transferred to an inpatient level of mental health care, although not in a timely manner, which was likely due to COVID screening issues. TMHU cells, which were developed as an alternative to higher levels of care, lack a therapeutic milieu and offered limited programming, out of cell contacts, and activities in comparison to a higher level of care.  The initiation of a PC 2602 helped to mitigate the significant clinical limitations in the TMHU setting.

**EXHIBIT N**
**Avenal State Prison (ASP)**
**Review Date – May 15, 2020**

**Inmate A**

This healthcare record was selected for review from a list of patients who were in ASP's TMHU. On June 17, 2020, after exhibiting odd, bizarre and confused behavior, this 29-year-old 3CMS inmate was placed in the TMHU at the MHCB level of care.  There was a TMHU referral one-month prior for similar symptoms that was rescinded.

Initial psychiatric and PC evaluations were timely.  With the exception of one missed contact, the patient was seen daily either on site or via telehealth in a confidential setting.  Throughout his stay, he denied mental health problems, including suicidal ideation or attempts, but continued to exhibit maladaptive behavior and possible psychotic thought processes.

On June 23, 2020, the IDTT met with him and noted that neither the etiology nor the precipitants for his apparent symptoms of possible psychosis/cognitive impairment were presently understood. Additionally, they noted his behavior was the result of mental health challenges which were beyond his control. He was diagnosed with an Unspecified Psychotic Disorder and a rule out Unspecified Neurocognitive Disorder. To achieve his highest level of functioning and protection, the IDTT changed his level of care to EOP. Due to movement restrictions, the patient continued to be housed in the TMHU.

**Findings**

This inmate was at risk of being harmed by other inmates in his housing unit on 3CMS LOC due to mental illness and personality disorder traits with no insight. Clinicians and the IDTT made efforts to maintain him in the least restrictive environment while simultaneously keeping him safe.  Despite the opportunity for confidential onsite and telehealth sessions, treatment in the TMHU for both the MHCB and EOP levels of care was limited due to the lack of therapeutic milieu. TMHU cells, which were developed as an alternative to higher levels of care, lacked a therapeutic milieu and offer limited programming, treatment services and multi-disciplinary collaboration when compared to an appropriate location for treatment at a higher level of care.

**Inmate B**

This healthcare record was selected for review from a list of patients who were in ASP's TMHU. For over nine years, this 37-year-old male was effectively treated for depression and anxious distress with medication and supportive therapy at the 3CMS level of care.

Following a positive COVID-19 test, he had three contacts with mental health between June 3, 2020 and June 9, 2020 during which time he reported problems with anxiety, sleep and appetite. He also reported feeling anxious about his COVID-19 diagnosis.  Medications were adjusted but his anxiety continued.  Due to escalating anxiety, he was placed in the TMHU at the MHCB level of care on June 14, 2020 and was placed on one-to-one suicide watch until at least June 18, 2020.  A SRASHE rated his chronic and acute suicide risk levels as moderate, noting he denied a

history of suicide ideation, attempts or gestures. The SRASHE also noted he reported possible safety concerns in the yard.

Between his admission and June 24, 2020, medication adjustments were made with minor improvement in his level of distress. He continued to deny suicidal ideation. Documentation from June 18, 2020 indicated that he was waiting for a MHCB transfer, pending a negative COVID-19 test. If positive, he would continue to be treated in the TMHU until the crisis was resolved. Despite negative COVID-19 test results, he continued to receive MHCB LOC in the TMHU because of transfer restrictions. Documentation from June 24, 2020 stated his symptoms had not been resolved and distress had not been stabilized. The plan was to continue treatment in the TMHU until the crisis was resolved.

On June 25, 2020, a SRASHE was administered, the IDTT met with the patient, and a PC contact occurred via telehealth in a confidential session. The SRASHE revealed low chronic and acute suicide risk levels. The IDTT decided to discharge him to a 3CMS LOC. The rationale for reducing his level of care to 3CMS, was that his acute psychiatric crisis had passed. The PC also reported the acute crisis had been resolved; however, he continued to experience difficulties obtaining restorative sleep due to anxiety. To address these problems, his PC and psychiatrist would provide therapy and medication to increase his adaptive functioning. They also noted the inmate had tested COVID-19 positive; consequently, he would be quarantined after being discharged from the TMHU.

**Findings**

Consideration of the connection between his COVID-19 test results and his anxiety with sleep problems was not documented or adequately treated prior to TMHU placement. Given his mental health history, mental status during TMHU placement, discharge SRASHE, and IDTT, the escalation to MHCB appeared premature; however, it helped explain the team's decision to reduce his level of care from MHCB down to 3CMS.

TMHU cells, which were developed as an alternative to higher levels of care, lacked a therapeutic milieu and offer limited programming, treatment services and multi-disciplinary collaboration in comparison to a higher level of care.

**Inmate C**

This healthcare record was selected for review from a list of patients who were in ASP's TMHU. He was placed in the TMHU three times (April 29, 2020-May 13, 2020; May 22, 2020- June 1, 2020; and June 10, 2020-June 13, 2020) for manic/psychotic symptoms before he was transferred to the CHCF MHCB. He was diagnosed with Bipolar I Disorder, currently manic with psychotic features. While in the TMHU, medication adjustments were made, and there was a pattern of symptom improvement and medication compliance followed by medication noncompliance and decompensation when discharged from the TMHU.

During his first admission, he met daily with his PC and/or psychiatrist, often in a confidential setting. Medications were adjusted, and custody and nursing staff provided frequent updates on his condition to the PCs. The IDTT met on May 6, 2020 and recommended he remain in the TMHU at MHCB level of care due to persistent manic and psychotic symptoms, including

continued agitation and violent/threatening behaviors. On May 13, 2020, the IDTT met and noted that he exhibited observable progress since the initiation of psychiatric medications. Upon careful consideration, the team decided his continued progress might be improved by returning to a yard and resuming more regular housing and programming.  Consequently, he was discharged from the TMHU, and his level of care was changed from MHCB to EOP.

On May 22, 2020 he returned to the TMHU and was referred to intermediate level of care by the IDTT.  He was described as confused, disoriented, withdrawn, impulsive and he appeared to be hallucinating and bothering others.  While in the TMHU, he took his medication and his mental status improved.  On June 1, 2020, the IDTT released him from TMHU to a regular yard. He remained at intermediate level of care until/unless stability could be maintained on a yard after transition to general population.  Daily contacts were to continue.

On June 10, 2020, after recently disclosing medication non-compliance, the PC reported he was hypomanic with elevated delusional and manic symptoms, believing he was a CIA employee and a prophet talking with God. Later that day, in response to an urgent/emergent consult, the PC reported his thinking was disorganized and circumstantial. He also reported pressured speech, ideas of reference, and grandiose delusions. The PC noted he would be housed in the TMHU to await MHCB transfer. The PC also noted that he would consult with supervisory staff immediately to facilitate transfer.

**Findings**

The PC met with the patient in a timely manner, often in a confidential setting and consultation with custody and nursing occurred. It was unclear why an PC2602 involuntary medication order was not seriously considered. TMHU cells, which were developed as an alternative to higher levels of care, lacked a therapeutic milieu, offered limited programming and out of cell activities, in comparison to higher levels of care.

**Inmate D**

This healthcare record was selected for review from ASP's non-referral list.  This inmate was not in the MHSDS until April 22, 2020 when his level of care was changed to 3CMS.

Prior to the level of care change, between January 2, 2020 and April 2, 2020, he was seen three times by a mental health clinician at his request for mild anxiety.  After the third contact, due to increased anxiety (worrying, disturbed sleep and ruminating) a psychiatric referral was submitted.   The initial psychiatric assessment was timely.  He was diagnosed with Unspecified Anxiety Disorder and prescribed Zoloft.

The PC assessment was completed on April 17, 2020, and an IDTT was held on April 22, 2020. The treatment team reported he would be treated with medication and coping skills training. Subsequent psychiatric and PC contacts exceeded Program Guide requirements.  His symptoms improved with medication and copings skills.

**Findings**

The care provided to this inmate was appropriate. The PC provided support and elevated his LOC from general population to 3CMS when his symptoms began to interfere with his daily functioning. He was prescribed psychotropic medication and provided skills training and support. His symptoms have been stabilized since April 2020 at 3CMS LOC.

**Inmate E**

This healthcare record was selected for review from ASP's non-referral list. He had a history of receiving 3CMS level of care until 2011 when he was removed from the MHSDS.

Between February 28, 2020 and May 8, 2020, he met with a clinician three times for supportive counseling related to his upcoming parole hearing. During the May contact, he reported increased anxiety and requested a psychiatric referral. A psychiatric contact occurred on May 18, 2020, at which time he was diagnosed with Unspecified Anxiety Disorder, prescribed Vistaril, and included in the 3CMS level of care in advance of the IDTT which was held on May 26, 2020.

**Findings**

This inmate's care was adequate. His mental status remained relatively stable. His PC and psychiatrist provided the appropriate level of care in confidential settings.

**Inmate F**

This healthcare record was selected for review from the non-referral list at ASP. He was included in the 3CMS on March 25, 2020 during IDTT.

On February 20, 2020, a PC met with him for a routine consult, at which time, he reported concerns with concentration and memory and raised the possibility of having a personality disorder. He reported that during his December 2019 board hearing he was given a five-year denial, in part, for unresolved mental health issues. A planned follow-up contact a month later indicated ongoing difficulty with concentration which he attributed to racing thoughts, forgetfulness, frustration, anger and sleep problems. A psychiatric referral was submitted, and he was seen timely and prescribed Effexor.

He attended IDTT and contributed to his goals and treatment plan. His level of care was changed to 3CMS to address his Schizotypal personality traits and symptoms of depression and attention deficit hyperactivity.

**Findings**

This inmate's care was adequate. He was seen in confidential settings by a PC, psychiatry and IDTT. The evaluations were comprehensive, and the interventions (psychotropic medication and monitoring for psychotic symptoms) were appropriate, to include placement in to 3CMS level of care.

**Inmate G**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care. This inmate was transferred from WSP on January 23, 2020. Initial psychiatric and PC assessments and IDTT were timely. Diagnoses varied and were not included in the appropriate place of the EHRS. Diagnoses included Unspecified Depressive Disorder, Unspecified Anxiety Disorder, history of Attention Deficit and Hyperactivity Disorder, Rule-out Posttraumatic Stress Disorder (due to childhood abuse) and Dysthymia.

At the inmate's request, psychiatric medication (Remeron and BuSpar) for depression and anxiety were discontinued. While the psychiatrist did not fully explore the rationale for the request, mental capacity to decline treatment was assessed, he was offered alternative treatments, and was appropriately warned of the risk of recurrence of his symptoms. He was seen bi-monthly for three psychiatric contacts between February and June 2020 for confidential contacts. Over the three visits, he continued to deny active mood or anxiety symptoms and a need for medication management.

The PC assessment documented that he had limited coping skills during social interactions and attachment issues that have led to his symptoms of depression and anxiety. The focus of treatment was to identify his attachment patterns and identify strengths and vulnerabilities in relationships. However, at the inmate's request, his IPOC developed in IDTT was to target anger with several supporting interventions including an anger rating below an eight out of ten with ten being the worst, to have no violent or threatening behaviors over a 12-month period, and to build a therapeutic alliance with the inmate. Identifying his attachment patterns and strengths and vulnerabilities in relationships was not included in IDTT documentation.

The three PC routine contacts during reviewed dates were timely. During each visit, he rated his anger as three out of ten, discussed current topics (e.g., what he was reading, COVID-19, etc.), and coping mechanisms were discussed. PTSD was not ruled out and there was no documentation of efforts to identify his attachment patterns and the strengths and vulnerabilities in his relationships.

**Findings**

The inmate was appropriately placed and adequately treated in the 3CMS program. The PC adequately addressed his anger issues, a goal that was developed collaboratively. The inmate was appropriately taken off medication when he requested it. He was followed for 90-days by psychiatry after stopping his medication, per policy. There were differences in the diagnoses of the psychiatrist and the PC. It was unclear why one or the other chose not to update their diagnosis list to match the presumably agreed upon IDTT diagnoses.

**Inmate H**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care. Diagnoses varied including Major Depressive Disorder, Depression and Anxiety, Unspecified Anxiety Disorder, Rule-out Unspecified Bipolar Disorder and Cannabis, Alcohol, LSD, Ecstasy, Other Hallucinogen Use Disorder, in remission,

1029

in a controlled environment.  He was not prescribed psychiatric medication but was seen regularly by the psychiatrist.

His IPOC goals were to reduce depression and anxiety to a self-rated level of four out of ten or less on a scale of one to ten (ten being the worst), build a therapeutic alliance, and to display behavior appropriate for a lower level of care by his next annual IDTT. He rated himself a five out of ten for depression.

PC contacts occurred on January 23, 2020 and April 14, 2020. During the January follow-up visit he reported mild depression and anxiety symptoms but said that overall, he was doing "alright." During the April follow-up visit, he again reported mild depression and anxiety symptoms. The intervention provided was CBT and was appropriate for his symptoms.

Psychiatric contacts were timely and occurred on January 2, 2020, February 28, 2020, March 25, 2020, and May 20, 2020. His appointments primarily consisted of a review of symptoms, review of current stressors, supportive therapy, and ongoing discussion of the benefits versus risks of taking medication to treat his psychiatric symptoms.

**Findings**

The inmate was appropriately placed and treated in the 3CMS program. PC and psychiatry contacts were confidential and targeted towards his treatment goals and symptoms. While there was differing documentation of his diagnoses, it did not appear to impact care, as they all overlapped despite some lacking specificity of severity.  He received adequate mental health care in the 3CMS program.

**Inmate I**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care.  He was prescribed sertraline for a diagnosis of depression which was not listed in the appropriate place of the EHRS.

His annual IDTT was attended by all required staff.   He rated his depression as a five out of ten during the IDTT.  Treatment goals to reduce his depression below a six out of ten with an eventual plan to bring his depression into remission for at least three months and foster a therapeutic alliance with his PC were continued.

The time between the two PC contacts during the reviewed dates exceeded 90 days.  Contacts occurred with a different clinician, and documentation of therapeutic interventions and progress toward IPOCs varied.  Overall, he was described as stable.  The interdisciplinary plan of care (IPOC) for depression was a three out of ten which he attributed to taking psychiatric medication.

The four psychiatric contacts, one of which occurred via telepsychiatry, during reviewed dates exceeded Program Guide requirements.  During each visit, the psychiatrist asked him to rate his depression and anxiety, went through a review of symptoms, current stressors, and adjusted his medication, if needed.  During the review period, his diagnosis was updated when his psychiatrist changed.  Per the documentation, he was diagnosed with Unspecified Depressive

Disorder in January 2020, and Major Depressive Disorder, recurrent, moderate starting in March 2020.

A June psychiatric contact noted he was placed in quarantine due to testing positive for COVID-19 on May 23, 2020. He denied experiencing any symptoms of COVID. He reported being restricted to his cell starting May 23, 2020, and that other than increasing his sleep from eight hours a day to ten to 11 hours a day ("due to boredom"), he was doing well. There was no mention of in-cell therapeutic activities in the documentation, and he was not encouraged to follow-up with his PC.

**Findings**

This inmate's care was adequate. While PC documentation of clinical interventions needed improvement, psychiatric treatment appropriately targeted treatment goals and symptoms. It was unclear if mental health care was impacted by quarantine placement due to testing positive for COVID-19.

**Inmate J**

This healthcare record was randomly selected for review from a list of mainline 3CMS inmates to assess if the inmate received appropriate care. The diagnosis of Unspecified Anxiety Disorder was not documented in the appropriate place in the EHRS. He was not prescribed psychiatric medication during the review period.

Treatment goals were to reduce symptoms of anxiety below a two out of ten, bring his anxiety symptoms into remission for three months or more, develop three new coping skills, and to build a therapeutic alliance with his PC. The two routine PC contacts during the review period were timely. During the appointments, his current stressors and symptoms were assessed, and clinically appropriate interventions for anxiety were provided (e.g., mindfulness meditation). His IPOCs were updated at each visit. The confidentiality of the visits was not documented but visits occurred in the ASP B Complex Clinic.

**Findings**

The care provided to this inmate was adequate. Clinical interventions provided were appropriate for his diagnosis, treatment goals, and clinical presentation.

**EXHIBIT O**
**Salinas Valley State Prison (SVSP)**
**February 12, 2019 – February 15, 2019**

**Inmate A**

This EOP inmate arrived at SVSP on June 20, 2018.  His healthcare record was reviewed as he had not been referred to a higher level of care despite multiple MHCB admissions and suicide attempts. He was provided with a diagnosis of Major Depressive Disorder.  A diagnosis of Schizoaffective Disorder was also located in the healthcare record. He had a history of multiple MHCB admissions since August of 2018 with multiple suicide attempts and cutting behaviors. He also had a history of multiple PIP placements (acute and ICF), since the beginning of his prison term in January of 2014. The inmate received his psychotropic medications by PC 2602 due to danger to self. He was prescribed Prozac, venlafaxine, Geodon, and olanzapine injection for refusal of PC 2602 medications.

The inmate was hospitalized in the PIP for acute care from November to December of 2017. He was subsequently admitted to PIP-ICF. Following his PIP-ICF discharge on June 20, 2018 the inmate immediately admitted to the MHCB.  On August 16, 2018, during a post MHCB five-day follow-up, the inmate again returned to the MHCB due to auditory hallucinations and suicidal ideation with a desire to die. He reportedly stopped eating for three days around this time.  The MHCB treatment team indicated that he was not referred to DSH as they believed he would stabilize in the MHCB within ten days; they noted a referral would be considered if stabilization did not occur. The inmate had refused 55 percent of EOP treatment prior to MHCB admission. On August 22, 2018, at the time of discharge, the IDTT noted continued depressive symptoms, auditory hallucinations, and delusional thinking. Following this IDTT, the inmate started banging his head and he tied a noose tightly around his neck. A note documented two days later indicated that the inmate's "conditional" suicidal ideation was "based upon housing," as he had expressed fears of victimization by custody officers on the yard. He requested DSH and threatened to starve himself.

SRASHEs were completed on August 22 and August 24, 2018. The SRASHE completed on August 22 assessed the patient with high chronic and high acute risk. The SRASHE completed on August 24 (two days later) noted high chronic and low acute risk due to conditional suicidal ideation "based upon housing."  The reviewer indicated that the inmate's hunger strike plan was not a lethal plan. He was discharged from the MHCB at that time.

The patient was discharged to the D yard at EOP level of care.  He continued to endorse auditory hallucinations and psychosis.  Cell-front contacts were required on several occasions, as he refused to attend scheduled appointments.  On December 5, 2018, the inmate was seen by a psychologist after making a suicidal threat; the SRASHE completed on this date indicated moderate acute and high chronic risk.

On October 25, 2018, the inmate was admitted to the MHCB for reportedly swallowing 13 Geodon and making a superficial cut to his neck.

An RVR Mental Health Assessment on December 17, 2018 noted that the inmate's PC2602 order for danger to self would expire on February 6, 2019. The RVR assessment was completed at cell-front as the patient reportedly refused an out of cell confidential interview. The clinician noted that the patient was uncooperative, and that the assessment was abbreviated. The evaluator determined that mental health did not play a role in the patient's RVR.

A case consultation on January 9, 2018, which included mental health supervisory staff, convened to discuss MHCB discharge placement.  The note indicated that the patient was viewed as engaging in suicidal behavior to gain admission to the PIP. He recently threatened to jump off the second tier of his pod with a noose wrapped around his neck.  The team stated that this suicide attempt was also for secondary gain. It appeared that the decision was made to move the inmate to the Level 3 EOP upon MHCB discharge.  The inmate was released to A yard at the EOP level of care where he remained at the time of the monitoring visit.

**Findings**

The care was inadequate. It appeared that this inmate required a higher level of care due to his continued suicidal ideation and behaviors.  His SRASHE of August 22, 2018 appropriately assessed high chronic and high acute risk; however, the SRASHE on August 24, 2018 inappropriately determined low acute risk. Safety planning was very poor and did not provide the inmate with specific interventions to prevent self-harm.

The quality of the RVR Mental Health Assessment completed on December 17, 2018 was poor, and it is questionable how a determination was made that mental illness did not play a role in this inmate's RVR, in light of the inmate's uncooperativeness with interview and the brevity of the assessment.

Documentation indicated that the staff believed the inmate was threatening and attempting suicide repeatedly to gain admission to PIP.  Despite serious, repeated suicide attempts, as well as the inmate's long history of mental health treatment and inpatient hospitalizations, the staff did not refer him to a higher level of care which was indicated.  This resistance to refer appeared related to the belief that the inmate's behavior was due to secondary gain.  This should not be utilized as a criterion for non-referral.  The inmate's attempts were lethal, and possible secondary gain would not prevent him from completing suicide. Transfer from one EOP to another EOP yard was no substitute for longer-term inpatient treatment for stabilization.

**Inmate B**

This EOP level of care inmate was housed in SVSP's STRH unit for battery causing serious injury. He transferred from SQ to SVSP on November 7, 2018. Diagnosis was Schizoaffective Disorder. The inmate had a history of paranoid thinking, anxiety, depression, and negative Schizophrenia symptoms. While the inmate was not prescribed psychotropic medications at the time of this review, prior medications included mood stabilizers and antipsychotics.

The inmate had a pending serious RVR at the time of this review. The RVR mental health assessment was completed on February 5, 2019 and indicated that the inmate's mental disorder

may have contributed to the RVR behaviors. The inmate requested 3CMS level of care during this assessment.

On February 12, 2019, the inmate met with his PC cell front in ASU. He was provided with in-cell activities and a book. He agreed to attend the upcoming IDDT on February 13, 2019.

The monitor's expert attended the inmate's IDTT on February 13, 2019. His presentation was consistent with notes previously summarized above. He again requested 3CMS level of care. The IDTT's response to this request was less than straightforward. At the time of this review, the February 13, 2019 IDTT was not yet documented in the healthcare record. However, the February 8, 2019 treatment plan was reviewed and the treatment targets included negative symptoms, poor social skills, and lack of insight; treatment interventions focused on group therapy.

**Findings**

The care provided to this inmate was inadequate. The inmate's presentation was consistent with the differential diagnosis of a Schizoaffective Disorder versus Schizophrenia and he was in need of antipsychotic medication. However, he was unwilling to consent to medication and unlikely to meet involuntary medication criteria. As such, medication should have been targeted in the treatment plan and addressed during clinical encounters. The psychiatrist's February 8, 2019 assessment and plan were unclear. The social worker's case formulation was not useful.

The IDTT's response to the inmate's request for 3CMS level of care was misleading and provided the inmate with unrealistic hope that his level of care would change in the near future. Based on the inmate's presentation and history, 3CMS level of care was highly unlikely. Instead, the IDTT should have provided a clear and honest rationale for retaining the inmate in EOP level of care to preserve his trust in the treatment team and increase compliance.

**Inmate C**

This 3CMS inmate's record was reviewed following onsite IDTT observation in SVSP's STRH unit on February 13, 2019. An April 18, 2018 note indicated the inmate was prescribed Remeron and Zyprexa but had consistently refused the medication since April 5, 2018. He had a long history of substance abuse issues, which included methamphetamine use.

The inmate requested removal from MHSDS and the IDTT agreed to remove him. The IDTT documented that the inmate's prior psychiatric symptoms were attributed to illicit substance use. He was educated regarding the process of requesting mental health services as needed.

The inmate reported that he had been drug-free for about one year; it did not appear that he had received any form of substance abuse treatment or 12 step classes.

**Findings**

The decision to remove the inmate from MHSDS was appropriate. The inmate's healthcare records were consistent with the IDTT's assessment and supported the level of care decision. However, the inmate will require substance abuse treatment prior to parole, as he is at high risk for relapse.

**Inmate D**

This STRH inmate was selected for review following onsite IDTT observation. On January 19, 2019, the inmate was admitted to MHCB for danger to self after reporting a plan to overdose on heroin. Prior to admission the inmate received a letter informing him that his dad died from cancer. The inmate had a significant history of substance abuse issues. Prior diagnoses included mood disorder, anxiety disorder, and polysubstance dependence disorder. He was prescribed a variety of different psychotropic medications in the past.

The monitor's expert observed the inmate's STRH IDTT on February 13, 2019. The inmate requested an increase in level of care from 3CMS to EOP, in part, to facilitate a transfer closer to Folsom State Prison which was closer to his grandfather. He had presented with depressed mood and low energy since STRH placement. Following a relatively brief discussion, the treatment team recommended EOP level of care for six months in order to address grief and depression issues.

**Findings**

The level of care decision was appropriate. Although the decision to increase the inmate's level of care to EOP was questionable, it was within the parameters of reasonable clinical judgment when considering the conditions of STRH confinement.

**Inmate E**

This EOP inmate's record was selected for review following onsite IDTT observation. The 30-year-old inmate transferred to SVSP on February 4, 2019. The inmate had a history of auditory hallucinations, mood lability, ADHD, and substance abuse issues. His problem list included Schizoaffective Disorder, Unspecified Schizophrenia Spectrum, and Other Psychotic Disorder. Prior psychiatric medications included olanzapine and buspirone. The inmate's current symptoms included auditory hallucinations, mood swings, and delusional thoughts.

The initial psychiatric assessment was completed via telepsychiatry on February 13, 2019. The evaluation was consistent with the initial PC's report. Aripiprazole and buspirone were prescribed on this date.

Group progress notes indicated that the inmate attended therapeutic groups on February 12 and 13, 2019.  The monitor's expert attended the inmate's initial IDTT on February 14, 2019. The IDTT discussed the inmate's treatment plan and diagnosis. He met diagnostic criteria for an

Unspecified Schizophrenia Spectrum Disorder. All required disciplines attended the IDTT. The IDTT recommended EOP level care on this date.

**Findings**

The care provided to this inmate was adequate. The inmate was appropriately assessed to be in need of an EOP level of care. There was reasonable interdisciplinary discussion with the inmate during IDTT and an appropriate treatment plan was developed during IDTT.

**Inmate F**

This 37-year-old inmate's record was reviewed following onsite IDTT observation. The inmate reportedly began experiencing depressive symptoms at age ten and manic episodes at age 33. He also had a history of abusing methamphetamines. Psychiatric medications included Effexor, olanzapine, and Trileptal. His diagnosis was Schizoaffective Disorder. The inmate had a long history of self-harming behaviors, with the most recent incident occurring in October of 2017. His November 21, 2018 treatment plan identified depressed mood as a primary concern.

PC contacts were documented on November 29, December 3, and December 20 of 2018. Additional clinical contacts were documented on January 8, 14, 23, 29, and on February 8 and 12 of 2019. He was seen by three different PCs during the review period, and clinical contacts were conducted both at cell front and in confidential settings. Psychiatric contacts occurred on December 7, 2018, January 7 and 23, and February 14 of 2019. The inmate was seen by two different psychiatrists during the review period.

The monitor's expert attended the inmate's follow-up IDTT on February 14, 2019. The IDTT determined that the inmate met diagnostic criteria for Schizoaffective Disorder, bipolar type, and Anxiety Disorder Not Otherwise Specified. He was noted to be medication compliant, but still very depressed. A prolonged discussion occurred in the IDTT regarding whether or not to refer the inmate to intermediate care due to ongoing depressive symptoms and chronic suicidal ideation. The inmate's low group treatment participation also was discussed during IDTT.

**Findings**

The care provided to this inmate was adequate. The IDTT reviewed higher level of care considerations and diagnostic criteria. The tele-psychiatrist's interventions sufficiently addressed medication management. The IDTT appropriately scheduled the subsequent treatment team meeting within 30 days to discuss treatment progress and reassess the inmate's need for a higher level of care.

**Inmate G**

This 3CMS inmate's healthcare record was reviewed following onsite IDTT observation. The 78-year-old inmate had significant medical problems that resulted in his CHCF endorsement while he was at RJD. The CHCF transfer, however, did not occur due to lack of bed availability and the endorsement expired. He transferred from RJD to SVSP instead.

The inmate received an initial mental health screening at SVSP on January 31, 2019. The initial PC contact was completed at cell front on February 8, 2019. The February 12, 2019 initial PC assessment included a relevant psychiatric history and a summary of events leading to his recent transfer from RJD to SVSP.

The monitor's expert attended the inmate's initial IDTT on February 13, 2019. The psychiatrist had not met with the inmate prior to IDTT; he was not prescribed psychotropic medications. All required disciplines were present in IDTT. The IDTT spent 45 minutes discussing the inmate's case. A treatment plan was formulated, the single cell chrono was renewed, and the inmate was included in 3CMS level of care. The treatment team also coordinated with medical staff to transfer the inmate to CHCF.

**Findings**

The care provided to this inmate was adequate. Although the reason for the inmate's transfer to SVSP instead of CHCF was unclear, the IDTT formulated an appropriate treatment plan that would facilitate his transfer to CHCF in the near future.

**Inmate H**

This inmate's healthcare record was reviewed following onsite IDTT observation. The 39-year-old inmate transferred to SVSP on January 24, 2017. Diagnoses included Major Depressive Disorder, General Anxiety Disorder and a rule out for cluster B personality disorder.

Psychiatry contacts occurred monthly during the review period, with the exception of December 3, 2018 through January 29, 2019. The psychiatrist's documentation was generally helpful. PC contacts occurred on July 27, August 6, 16, 28, September 12, 21, 25, October 9, 23, November 6, 20, 27, December 7, 11, 21, 2018, January 4, 16, 17, 23, 29, February 12, 2019. The PC's documentation was generally adequate. Treatment plans were reviewed for the following dates: August 16, November 8, 2018 and January 31, and February 14, 2019.

The monitor's expert attended the inmate's February 14, 2019 IDTT. The IDTT reduced the inmate's level of care from EOP to 3CMS on this date, which had been a treatment goal during the past year. Both the patient and treatment staff were in agreement that he had met criteria for such a change in level of care.

**Findings**

The quality of care provided to this inmate was marginal. EOP PC and psychiatry contacts were non-compliant with Program Guide requirements during the review period. The inmate, however, appeared to benefit from his EOP treatment and was now ready to receive less restrictive care in 3CMS.

**Inmate I**

This 54-year-old EOP inmate's healthcare record was reviewed following onsite IDTT observation. He transferred to SVSP on November 1, 2018. Diagnoses included Schizoaffective Disorder, depressive type, multiple substance use disorder, and a rule out for Cluster B personality disorder. Medications included bupropion, lithium and olanzapine.

The initial PC assessment and IDTT were dated November 8, 2018. The need for a further DDP assessment was considered on this date. On December 7, 2018, the PC documented a plan to meet with the EOP inmate weekly. Subsequent PC notes were dated December 11, 18, 27 of 2018 and January 2, 14, 29 of 2019. At least three of these clinical contacts were completed at cell front.

Psychiatric progress notes were dated December 18, 2018 and January 29, 2019.

The monitor's expert attended the inmate's February 14, 2019 IDTT. All required disciplines were present. The inmate endorsed significant anxiety related to an apparent herpes zoster infection. The PC's interventions were appropriate and included a plan to consult with pertinent medical staff. An interdisciplinary plan of care (IPOC) for depressed mood was summarized.

**Findings**

The quality of care provided to this inmate was marginal. Program Guide requirements were not met due to the infrequency of PC contacts in February of 2019 and as a result of the inconsistent offering of confidential contacts during the review period. Although the IDTT verbalized appropriate interventions during onsite monitoring, the plans were not reflected in the documentation. For example, the plan to liaise with medical staff and to refer the inmate for psychological testing were not clearly noted in the record.

**Inmate J**

This 30-year-old inmate transferred to SVSP on October 3, 2019. He was diagnosed with Bipolar Disorder and prescribed Depakote and lithium. His history included at least three suicide attempts (2008, 2014 and 2016) and a self-injurious behavior incident that resulted in MHCB admission on November 6, 2018.

Initial PC assessments were completed on October 5, 2018 and November 16, 2018. Subsequent PC contacts were dated November 19, December 6, 20, 26, 27, 2018, and January 4, 10, 15, 22, and February 1, 5, 6, 12, 13, 2019. Several of these clinical contacts were completed cell front. Progress notes were informative in the context of describing treatment progress.

The October 18, 2018 initial psychiatric assessment noted that he was feeling paranoid about other inmates attacking him. Subsequent psychiatric progress notes were dated November 2, 6, 8, 9, December 18, 2018 and January 2, 8, February 4, 13, 2019. These notes provided a reasonable summary of this inmate's treatment and clinical progress.

1038

IDTTs occurred on October 11, November 21, 2018 and February 14, 2019. The inmate was referred to intermediate care during the most recent IDTT. The referral was based on continued mood cycles, repeated thoughts of self-harm, and heightened anxiety triggered by fear of manic episodes.

**Findings**

The care provided to this inmate was generally adequate. Documentation was reasonable. The decision to refer this inmate to intermediate care was clinically appropriate.

**Inmate K**

This case was selected from a list of EOP inmates on "modified program." The inmate was diagnosed with Bipolar Disorder, Mood Disorder, Major Depressive Disorder, Post-Traumatic Stress Disorder (PTSD), and Antisocial Personality Disorder. Abilify (5mg daily) was prescribed for mood stabilization. The inmate was placed on a modified treatment program during IDTT on June 28, 2018; however, the rationale for the treatment modification was not stated in the treatment plan. Further review of the record suggested the modified program was due to refusing 50 percent or more of his treatment. The inmate attributed his group treatment refusals to group facilitators' overreliance on movies in place of more structured treatment. Treatment contacts were frequently completed at cell front, however, the reason for non-confidential contacts was not consistently documented.

The August 2, 2018 treatment plan was not modified to address the inmate's lack of treatment participation and it failed to identify that the inmate met the higher level of care criterion for attending less than 50 percent of treatment within a six-month period. The inmate was removed from modified program during IDTT on August 2, 2018; however, a rationale for removal was not documented despite the inmate's ongoing treatment compliance issues.

**Findings**

The care provided to this inmate was inadequate. The treatment team failed to meet the 30-day IDTT requirement for inmates on modified program. The IDTT removed the inmate from modified program without providing a clinical rationale and without indicating whether the reason for inclusion had been appropriately addressed. Documentation was poor and contained inaccurate information. The inmate was not properly considered for a higher level of care. His lack of treatment engagement should have been targeted in treatment with its own goals and interventions. Finally, the treatment plan should have been modified in response to the inmate's lack of treatment progress.

**Inmate L**

This case was selected from a list of EOP inmates on "modified program." The inmate was diagnosed with Delusional Disorder; he was not prescribed psychotropic medications. He discharged from intermediate care approximately five months prior to this review. The record suggested that treatment non-compliance may have been the reason for modified program

1039

placement; however, he was not identified as meeting the higher level of care criterion for participating in less than 50 percent of treatment within a six-month period.

IDTTs failed to meet Program Guide timeframes and higher level of care considerations were not documented on December 13, 2018 and January 10, 2019. However, the inmate was appropriately identified and considered for higher level of care during IDTT on February 7, 2019. The February 2019 non-referral rationale was clinically sound, as were the accompanying treatment interventions. It should be noted that the inmate was subsequently referred and admitted to intermediate care.

**Findings**

The quality of care provided to this inmate was marginal. The quality of clinical documentation was deficient and the IDTTs failed to meet Program Guide requirements for inmates on modified program. The eventual referral to intermediate level of care was appropriate.

**Inmate M**

This case was selected from a list of EOP inmates on "modified program" at SVSP. The inmate was appropriately identified as meeting the higher level of care criterion for refusing 50 percent or more of treatment. His diagnosis was Schizophrenia, paranoid type, and his poor treatment attendance was largely due to paranoia. The psychiatrist prescribed perphenazine and divalproex.

The November 8, 2018 IDTT documentation did not include a clinically adequate rationale for non-referral. The proposed alternative treatments were not meaningfully modified over time, despite the inmate's lack of treatment progress. The proposed intervention only involved encouraging the inmate, as opposed to offering evidenced based interventions. Plans were vague. For example, one of the treatment goals was to attend treatment daily by "attending treatment activities daily."

Finally, while the inmate's lack of treatment engagement was identified as a focus of treatment, the fact that he was placed on a modified treatment program was not mentioned in the treatment plan. As this was a significant component of treatment, it should have been specifically addressed in the treatment plan, particularly so that future caregivers could clearly identify the reason for modified program.

**Findings**

The care provided to this inmate was inadequate. While the decision to place the inmate on modified program was appropriate, documentation was poor, treatment plans were unclear and lacked appropriate interventions; IDTTs did not meet Program Guide requirements. Higher level of care non-referral rationales were not clinically adequate. The treatment plan included confusing and circuitous language was not appropriately modified in response to the inmate's lack of treatment progress and was not tailored to the inmate's level of functioning with achievable and realistic objectives.

**Inmate N**

This healthcare record was selected for review as the inmate was identified on the "sustainability report." The inmate was diagnosed with Mood Disorder NOS and was prescribed phenytoin, dicyclomine, gabapentin, and Effexor XR. Medication non-adherence was a problem since early December 2018. The inmate had a history of PC2602 orders for danger to self. An initial psychological evaluation indicated that the inmate identified as female transgender, although hormones were not a part of treatment during the last two years. The inmate did, however, report extensive bullying by staff and other inmates. Despite this, mental health staff referred to the inmate as "he" throughout the documentation.

The 3CMS inmate had 16 MHCB admissions within a six-month period and appeared on the higher level of care non-referral log six times during the review period. The inmate's MHCB admissions were typically less than three days. Following MHCB discharges, the inmate would engage in self-harm behaviors in the housing unit and return to MHCB. On September 12, 2018 and December 5, 2018, the IDTT did not accurately document that the inmate met higher level of care indicators for three or more MHCB admissions and three or more RVRs (a total of nine). Higher level of care non-referral rationales noted that the inmate's behaviors were motivated by a desire to cause "disruption and increased paperwork for staff" and "not motivated by mental illness or distress." However, within the same treatment plan, the inmate's suicidal behaviors were attributed to poor problem solving, coping, and anger management skills.

Following a community hospital admission for intentional overdose, the inmate was referred to a higher level of care.

**Findings**

The care provided to this inmate was inadequate. The inmate was not referred timely to a higher level of care, despite clinical indications for EOP and higher levels of care throughout the review period. An acute program should have been considered sooner in an effort to stabilize the inmate and effectively address the suicidal behavior cycle that existed. Treatment plans were not modified to address the inmate's multiple RVRs, frequent MHCB admissions, and lack of treatment progress. The inmate required a transgender evaluation or further documentation to clarify questions regarding gender identity. Finally, the inmate required assistance with managing custodial conflicts as these were identified as a trigger.

**Inmate O**

This EOP inmate was identified on the higher level of care non-referral log and selected for record review. The non-referral log noted that the inmate was placed on modified program; however, this information was not documented in the treatment plan. The inmate was diagnosed with Borderline Personality Disorder and had several chronic medical issues. His psychotropic medications included hydroxyzine and mirtazapine.

The August 15, 2019 IDTT noted that the inmate met the higher level of care indicator for having three or more MHCB referrals within a six-month period (a total of nine MHCB

admissions). The higher level of care non-referral rationale was initially sufficient; however, it remained unchanged despite the inmate's continued MHCB admissions. The accompanying treatment interventions also were not modified over time, despite the inmate's lack of progress in treatment.

The IDTT eventually referred the inmate to intermediate care and he transferred to CMF's L-1 unit.

**Findings**

The care provided to this inmate was inadequate. His frequent readmissions to MHCB suggested that discharges were premature or that higher level of care was indicated. Treatment plans were ineffective and not modified in response to the inmate's lack of treatment progress. While the inmate was eventually referred to intermediate care, he should have been referred sooner based on his clinical presentation.

**Inmate P**

This inmate was identified on SVSP's higher level of care non-referral log and selected for record review. The inmate had conflicting psychiatric diagnoses from the psychiatrist and psychologist. The psychiatrist noted diagnoses of Schizoaffective Disorder, Polysubstance Dependence, and Antisocial Personality Disorder, while the psychologist diagnosed Schizophrenia. While both providers identified psychotic symptomatology, the psychiatrist also identified and was treating depressive symptoms that the psychologist had not recognized or believed to be present. His PC2602 order for danger to others was not due to expire until January 8, 2020. The psychiatrist prescribed paliperidone, Prozac, Remeron, and olanzapine.

SVSP classified the inmate as clinically "high 2" risk, as he had five recent MHCB admissions. The inmate was on a modified EOP treatment program in August of 2018. He met the higher level of care indicator for having three or more MHCB admissions within a six-month period. The IDTT's higher level of care non-referral rationale included an adequate conceptualization of underlying factors to his MHCB utilization.

The inmate was referred to a higher level of care.

**Findings**

The care provided to this inmate was adequate. He was appropriately referred to a higher level of care. The treatment team established appropriate treatment modifications for the behaviors resulting in MHCB admissions. Diagnostic discrepancies, however, needed to be reconciled through IDTT or a planned diagnostic clarification.

**Inmate Q**

This healthcare record was selected for review as the inmate was identified on SVSP's higher level of care non-referral log. The inmate was in the EOP level of care and diagnosed with

"Schizoaffective Disorder, bipolar type, possibly influenced by methamphetamine." The inmate was prescribed paliperidone (six mg at bedtime) for psychotic symptoms. The record noted at least one incident of self-injurious behavior that required stitches and resulted in significant blood loss.

Between September and December of 2018, the inmate met three higher level of care referral criteria for requiring structured 24-hour nursing supervision due to a mental disorder; having three or more MHCB referrals within a six month period; and participating in less than 50 percent of treatment within a three month period.

The IDTT's higher level of care non-referral rationale indicated that, instead of referral, they would focus on the inmate's medication regimen. The treatment plan primarily offered recommendations for the EOP clinician to implement following MHCB discharge; however, it did not appear that these interventions were introduced in the MHCB despite the inmate's motivation to engage in treatment.

The January 10, 2019 IDTT was held without a psychiatrist in attendance. The inmate was referred to a higher level of care during this treatment team meeting. However, clinical information on the "higher level of care" form was not consistent with SVSP's non-referral log.

**Findings**

The care provided to this inmate was inadequate. The inmate required diagnostic clarification in order to tailor the treatment to his specific needs. The treatment team suggested that the inmate's symptoms may be related to substance use; however, they should have attempted to resolve diagnostic uncertainties with a more comprehensive assessment, collaboration with other disciplines, and ongoing discussions in IDTT. Further, the record suggested that the inmate should have been referred for intermediate care sooner.

**Inmate R**

This inmate's record was reviewed in a targeted fashion focusing on the review period because he was seen in a group interview on A yard. He was identified by SVSP as having been discharged from EOP to 3CMS during the reporting period. He was variously diagnosed with Schizoaffective Disorder and Bipolar Disorder and treated over time with olanzapine and valproic acid. During the course of his incarceration, he was treated at the 3CMS, EOP, and MHCB levels of care. His EPRD was April 2, 2019.

A progress note of April 2018 from a prior facility noted that the inmate would be retained in EOP level of care and that he had neurobiological deficits and racing thoughts.

In August of 2018, while in EOP, the inmate reported increased depression. A psychiatry note indicated that the inmate was medication compliant and had not been symptomatic for five years. Notes in September of 2018 removed active psychiatric diagnoses but maintained treatment goals related to reducing hallucinations. In October of 2018, the inmate reported feeling that he did not require medication; however, he was medication adherent, nonetheless. The inmate was

noted to have self-advocacy skills and 3CMs was recommended. A suicide risk assessment reported that the inmate's active treatment participation mitigated his risk.

By November of 2018, the inmate transferred to 3CMS level of care; he was assessed as having adequate personal hygiene and wanted his Depakote discontinued. The inmate was seen for IDTT on October 24, 2018 and by a different PC than the one at his IDTT on November 29, 2018. A PC saw the inmate on January 29, 2019, at which point he was inquiring about his pre-release planning. He was told that someone would follow up with him within 90 days of his release date and he was encouraged to contact the PC if the follow up did not occur within two-weeks of that encounter. As of the time of the site visit, the pre-release planning follow-up had yet to occur, which was the subject of the inmate's concerns voiced during an interview with one of the monitor's experts.

**Findings**

The care provided to this inmate was inadequate. The inmate's diagnostic picture and clinical needs were not appropriately addressed over the recent course of his treatment in EOP and then 3CMS. Additionally, there was little evidence of transition planning to adequately prepare the inmate for the level of care change and his pending release to the community.

**Inmate S**

This 53-year-old inmate's record was reviewed in a targeted fashion following onsite IDTT observation. He was housed at SVSP since December of 2018, following treatment at an MHCB related to multiple stress issues involving his family. The record was unclear as to whether he had previously been treated in EOP during the course of his incarceration, although there were some indications that this had been the case. His diagnostic history included possible multiple sclerosis; pseudo-seizures; spinal disease; Conversion Disorder; Factitious Disorder; Unspecified Neurocognitive Disorder; Adjustment Disorder; and Anxiety Disorder, Not Otherwise Specified. He was treated with Remeron and various somatic medications until recently.

According to the record, two of the inmate's children recently died from leukemia and his other children also were diagnosed with the same illness. The record also noted efforts to properly diagnose the genesis of the inmate's neurological symptoms, which included recent reports of fainting. The inmate's test results reportedly raised doubts about the legitimacy of his multiple sclerosis diagnosis. The inmate stated the belief that he was faced with the decision of attempting to treat his somatic conditions with medications, which may not be successful, or undergoing surgery which could result in paralyses. He reported difficulties in receiving clearance for his family visits and indicated that he planned to discuss his medical treatment options with them. During IDTT, the inmate voiced concerns about follow-up for his somatic conditions, as well as his possible release and the need for prerelease planning.

**Findings**

The care provided to this inmate was inadequate. This inmate had complex and interconnected psychosocial, mental health and somatic issues which were not the subject of adequate inter-

disciplinary coordination or increased intensity of mental health contact during the review period.

**Inmate T**

This 24-year-old inmate's record was reviewed in a targeted fashion following interview by one of the monitor's experts. The inmate's level of care was reduced from EOP to 3CMS during the reporting period.

The inmate was variously diagnosed with Major Depressive Disorder and Adjustment Disorder with Depressed Mood. He was treated with citalopram, Remeron, Zyprexa, Depakote, and Lamictal.

His more remote significant history included reported auditory hallucinations and substance use, which began around age 14. More recently, the inmate was treated at the EOP level of care for issues that included emotion and mood dysregulation and self-reported auditory hallucinations in the context of increased depressive symptoms.

On July 12, 2018, the inmate reported decreased anxiety in response to his planned transfer being cancelled. At that time, the inmate stated a willingness to transfer to 3CMS. The PC note indicated that plans to cope with the new environment were discussed. By August 1, 2018, an IDTT approved his discharge to 3CMS. A November 20, 2018 suicide risk evaluation noted the inmate's mood dysregulation, current stressors, and his request to speak to a clinician regarding his level of care. The inmate requested EOP level of care at that time, as he did not feel he was receiving the assistance he required in 3CMS. While his acute and chronic risk of suicide were both rated as low, decreased access to mental health treatment was noted as a risk factor in the context of his recent move to 3CMS level of care.

He was seen by a PC on December 6, 2018, when he requested to restart his psychiatric medication. He also reported anxiety related to the recent death of his grandmother. The inmate was seen by his treating psychiatrist on December 10, 2018, and his diagnosis was changed to Major Depressive Disorder, in partial remission with anxious distress; Remeron was prescribed on this date. On December 19, 2018, the inmate met with a tele-psychiatrist in response to his medication non-adherence; the note indicated that the inmate became upset and left the room and that his Remeron was discontinued. His diagnosis on this date was Adjustment Disorder, with mixed anxiety and depressed mood.

**Findings**

The care provided to this inmate was inadequate. The inmate's diagnosis and clinical needs were not appropriately addressed or coordinated between disciplines or across different clinicians. Diagnostic clarification was indicated based on the discrepant diagnoses noted by his different mental health providers. While some transition planning did occur prior to the level of care change, the inmate's psychiatric symptoms worsened and warranted increased treatment contacts and closer monitoring.

**Inmate U**

This inmate's record was reviewed in a targeted fashion following interview by one of the monitor's experts. His level of care was reduced from EOP to 3CMS during the review period.

He was variously diagnosed with depression and bipolar disorder. Medications included Benadryl, Trileptal, and Zoloft. The death of his son in March of 2018 was identified as a stressor. He was placed in EOP on July 8, 2018, following MHCB discharge for suicidal ideation. Other pertinent history included a DSH hospitalization from August 5, 2016 to November 23, 2016; he was discharged with a diagnosis of bipolar disorder. Pertinent remote history included an incident of playing "Russian Roulette" without a stated desire to die.

The PC noted on July 13, 2018 that the inmate continued to endorse depression and expressed a desire to remain in EOP level of care. He was described as having a "manipulative quality" to his speech and he was thought to be "baiting a response." The clinician's plan was to reduce the level of care from EOP to 3CMS.

A July 18, 2018 note suggested the inmate's chronic suicide risk was moderate. The psychiatrist prescribed Trileptal for mood and pain on July 25, 2018. The same psychiatrist saw the inmate on August 13, 2018 and noted improved mood. The inmate was seen by his PC and a covering clinician on August 14, 2018 and August 29, 2018, with the latter note indicating a plan to retain the inmate in the EOP level of care. A September 14, 2018 psychiatry note indicated that the inmate was in "excruciating pain," but was otherwise doing well. The PC noted on October 1, 2018 that the inmate continued to complain about hand pain and the plan involved continuing EOP weekly contacts. The October 4, 2018 IDTT was attended by the same PC, but a different psychiatrist. The treatment plan targeted the inmate's depressed mood and included a goal of the inmate displaying "behavior appropriate for a lower level of care." After being informed about the possibility of transfer to 3CMS level of care, the inmate spoke of repressed anger and difficulty with acting out behavior. The IDTT concluded that the inmate had reached maximum benefit from EOP and would be "promoted" to 3CMS.

A suicide risk assessment was conducted on October 25, 2018 related to the lowering of his level of care. He presented with flat, depressed affect, but expressed a willingness to attempt 3CMS level of care. A December 4, 2018 psychiatric assessment noted depression at a six on a scale of one to ten; the psychiatrist prescribed Zoloft and planned to reassess the inmate in 90 days. The PC and psychiatry notes of early January 2019 suggested that the inmate's presentation was essentially unchanged.

**Findings**

The care provided to this inmate was inadequate. Treatment plans were vague and the inmate did not appear to receive transition planning following the seemingly abrupt level of care change from EOP to 3CMS. While the transfer may have been appropriate, the chart did not reveal sufficient justification or a plan for increased clinical contacts to ensure a smooth transition to 3CMS level of care.

**Inmate V**

This inmate's record was reviewed in a targeted fashion focusing on the reporting period. He was discharged from EOP to 3CMS during the reporting period. He was diagnosed with Schizoaffective Disorder. Symptoms included psychosis, anxiety, and depression. He was prescribed Lexapro, Lithium, Remeron and Zyprexa.

The inmate had a long history of depression and suicidal thoughts with multiple reported community psychiatric hospitalizations, a family history of schizophrenia, and numerous MHCB referrals.

A July 31, 2018 telepsychiatry assessment noted that the inmate was treated at the EOP level of care and that he was at moderate to high risk of suicide due to non-modifiable risk factors. The inmate reported to his PC on August 14, 2018 that he found it difficult to get out of bed and was confused about his medications. On August 28, 2018, he reported to his PC that his low attendance at group treatment was related to his depressive symptoms.

The September 20, 2018 IDTT recommended 3CMS level of care, noting that the inmate refused over 59 percent of his EOP treatment during the preceding year, that he continued to report depressive symptoms, and that "observed behaviors" indicated higher functioning. The note also indicated that drug use was suspected. The inmate refused at least two contacts with his primary clinician in October of 2018. On December 31, 2018, he was seen cell-front after refusing to come to an appointment with his PC.

**Findings**

The care provided to this inmate was inadequate. This inmate did not receive sufficient transition planning prior to his transfer to 3CMS or sufficient follow-up frequency after the level of care change. Additionally, the cause of his poor treatment adherence should have been more comprehensively explored and addressed prior to the level of care change.

**Inmate W**

This 26-year-old inmate's record was reviewed in a targeted fashion focusing on the reporting period. He was treated at the EOP level of care until September 27, 2018 and was housed in D yard of 3CMS at the time of review. This inmate was variously diagnosed with depression and psychosis and treated alternatively with Depakote, olanzapine and paroxetine.

Reported pertinent history included hearing voices since age 15, a gunshot wound to the head at age 14, and sexual abuse at age 11. However, the PC noted that there were no signs of surgery or scarring. The inmate also reported a history of three suicide attempts. His EPRD was November 4, 2018.

On August 16, 2018 while in EOP, the inmate reported daily auditory hallucinations, depression and paranoia; however, custody staff reported that the inmate was "high functioning." He was

thought to be "manipulative," and the diagnosis of psychosis was assessed as being inconsistent with his presentation. The possibility of secondary gain was raised as well.

The psychiatrist increased the inmate's paroxetine from 40 to 60 mgs on August 20, 2018, noting that the inmate continued to endorse auditory hallucinations while his mood had improved. On August 30, 2018, the inmate reported to his PC that he had difficulty making it to group appointments because of the use of military time on the ducats. He also expressed fear of not receiving the help he needed if his level of care was reduced to 3CMS. The clinician noted that he appeared to be "managing expectations" to avoid transfer.

It was also noted that, while the inmate had a diagnosis of depression from a previous clinician, it had yet to be verified due to "lack of time to interact" with the inmate. More time was needed to rule out the diagnosis of depression and psychosis. On September 10, 2018, the psychiatrist reported no significant changes and the inmate reported missing medication dosages as a result of his paranoia. On September 13, 2018, the PC noted that more time was needed to fully assess the inmate, but that it appeared likely he was "better suited" to a lower level of care. He refused mental health contact on September 20, 2018.

The inmate's subsequent IDTT took place on September 27, 2018, at which time he still receiving olanzapine and paroxetine. No indications for a higher level of care were documented. It was noted that he did not appear to have significant psychiatric symptoms, consistently violated personal boundaries, and was thought to be a "shot caller." The decision was made to change his level of care to 3CMS.

The inmate's first contact with mental health following the level of care change was for an initial PC assessment on October 8, 2018. He was described as "cognitively slow" and exhibiting inappropriate laughter and mood liability on this date. He was noted to be compliant with his Zyprexa, Vistaril, Paxil, and Depakote. He was given a rule out diagnosis of depressive disorder and his psychotic symptoms were considered likely secondary to drug use.

An October 18, 2018 IDTT found no indications for higher level of care. It did not appear that the psychiatrist conducted an initial assessment of the inmate prior to IDTT. However, the psychiatrist noted on this date, following IDTT observation, that the inmate felt depressed as a result of his recent level of care change and that his Depakote would be increased to target depression and other mood symptoms.

On October 31, 2018, the inmate reported grogginess. On November 9, 2018, he was reportedly feeling better and sleep had improved. On February 4, 2019, the psychiatrist noted that his auditory hallucinations were tolerable with medication and he was in good control.

**Findings**

The care provided to this inmate was inadequate. The clinical assessment prior to transfer was insufficient. While the EOP clinician documented that more time was needed to assess the inmate's symptoms and to clarify his diagnosis, this did not occur prior to the level of care change. The PC saw the inmate as symptom-free; however, there was no consultation with

psychiatry to discuss the possibility that his symptoms were attenuated by medication. The 3CMS clinician also appeared uncertain about the inmate's diagnosis and psychotic symptoms. Though substance abuse was suspected, there was no plan to verify or address substance abuse in treatment.

**EXHIBIT P**
**California Treatment Facility (CTF)**
**Review Date -- June 5, 2020**

**Inmate A**

This inmate's healthcare record was selected for review of the decision for non-referral to a higher level of care. The inmate was provided with diagnoses of Bipolar Disorder, most recent episode manic with psychotic features and Polysubstance Use Disorder; Other Specified Schizophrenia Disorder was also considered as a provisional diagnosis. He was prescribed olanzapine, mirtazapine and lithium.

At the time of his IDTT on April 16, 2020, the inmate was housed in the TMHU secondary to manic and psychotic behavior. Documentation indicated that he was considered for a higher level of care due to an inability to function at his current level of care, requirement for a highly structured environment with 24-hour nursing care to treat his psychiatric illness, and the presence of chronic symptoms that had not responded sufficiently to at least six months of treatment to a degree that facilitated adequate levels of functioning.

A healthcare record review could not validate the third indication, that the inmate had not been stable over the previous six months. In March 2020, the 3CMS IDTT noted that the inmate was stable and adequately functioning at that level of care, and the inmate had been retained at the 3CMS level of care without crisis intervention since November 2019. On March 25, 2020, upon transfer to CTF and during an initial assessment with a psychiatrist, his antipsychotic medication (olanzapine) was discontinued, and the inmate was started on mirtazapine.

The IDTT's rationale for not transferring the inmate to a higher level of care was COVID-19 movement restrictions. The treatment team indicated that they would be providing treatment similar to services in an MHCB, including weekly IDTT, daily individual sessions, rounding and observations, as well as enhanced care to support him in lieu of transfer. It was noted that a change in his medications since placement in the TMHU, as well as improved insight and awareness into his mental illness, had increased his stability since his placement in the TMHU on April 13, 2020.

**Findings**

While the decision not to transfer the inmate to a higher level of care appeared appropriate, documentation of the criteria for consideration of higher level of care referral and the rationale provided for that decision was not in keeping with the inmate's status and level of functioning. Specifically, it appeared that the IDTT documentation that the inmate had not been stable for over six months despite adequate treatment was inaccurate. Additionally, the team noted that he was not transferred due to COVID-19 restrictions, rather than the improvements in his clinical presentation secondary to a change in medication and increased insight.

**Inmate B**

This inmate's healthcare record was selected for review of the decision for non-referral to a higher level of care. The inmate was provided with a diagnosis of Bipolar I Disorder, currently

1050

mixed episode, severe with mild psychosis.  He was prescribed olanzapine, lithium and hydroxyzine.

During the review period, there were three IDTT meetings during which referral to a higher level of care was considered.  On April 22, 2020 and April 28, 2020, the inmate was housed in the TMHU awaiting transfer to an MHCB due to an acute manic episode accompanied by psychosis.  The consideration for a higher level of care referral on April 22nd noted that the inmate  was not able to function at his current level of care and he required a highly structured environment with 24-hour nursing care to treat his psychiatric illness.  The IDTT noted that he would remain at the TMHU due to COVID-19 transfer restrictions, but he would receive the enhanced treatment services provided at the TMHU, including weekly IDTT meetings, daily individual sessions with a PC, and treatment materials to work on in his cell.  It was noted that daily PC contacts and weekly IDTT meetings were documented; however, there was no documentation that the inmate was provided treatment material in his cell.  It was also documented on the inmate's treatment plan that he had begun to show signs of stabilization on his medications and would be considered for discharge the following week.

On April 28, 2020, the IDTT decided to discharge the inmate from the TMHU and to rescind the MHCB referral.  Due to his inability to function at the 3CMS level of care and the fact that he received three RVRs while in the TMHU, the IDTT was required to review him for higher level of care consideration.  The decision was to discharge the inmate from the TMHU to the EOP level of care with the rationale that his continued stability and medication adherence could be monitored more closely in that setting.

On May 21, 2020, the inmate remained at CTF and was awaiting transfer to the EOP at VSP.  He was reviewed for higher level of care based on having received at least three RVRs in the previous six months.  It was noted that the mental health assessments conducted for those RVRs determined that the inmate's rule violating behavior was driven by symptoms of his mental illness during a manic episode, and placement at the EOP level of care was still appropriate at that time

**Findings**

The rationale for not referring the inmate to a higher level of care was appropriate. Of concern was the fact that the enhanced services that were to be provided to the inmate while being maintained at CTF were not documented.

**Inmate C**

This inmate's healthcare record was selected for review of the decision for non-referral to a higher level of care.  The inmate was provided with a diagnosis of Bipolar I Disorder.  He was not prescribed psychotropic medications during the review period.

An IDTT was conducted on May 8, 2020 after the inmate was placed in the TMHU on May 6, 2020.  The treatment plan noted that consideration for referral to a higher level of care occurred secondary to MHCB placement for at least 10 days.  Although the inmate did not meet this criterion, this indicator was checked positively.  The rationale for not referring him to a higher

level of care was that the inmate was determined to be ready for discharge back to 3CMS level of care.

**Findings**

The decision for non-referral to a higher level of care appeared appropriate, yet unnecessary given that the inmate did not meet any of the criteria warranting referral consideration. Of concern was that the PC checked an inappropriate criterion and provided justification for a decision that was not relevant to the case.

**Inmate D**

This inmate's healthcare record was selected for review of the decision for non-referral to a higher level of care. The inmate was initially provided with a diagnosis of Borderline Personality Disorder; Unspecified Bipolar and Related Disorder was also added during the review period. He was not prescribed psychotropic medications.

The inmate was considered for referral to a higher level of care on three occasions during the review period. Upon examination of the healthcare record, it appeared that only two of those reviews were required and the third review was an error.

The inmate was placed in the TMHU on April 13, 2020. During his initial THMU IDTT meeting on April 16, 2020, it was noted that the inmate was unable to function at his current level of care. It was documented that he had attempted suicide via hunger strike. It was also noted that he was not being transferred to an MHCB due to COVID-19 restrictions, but he would receive enhanced treatment to support acquisition of coping skills to manage frustration tolerance during daily PC contacts.

TMHU IDTT documentation on April 23, 2020 indicated that the inmate required review for referral to a higher level of care due to his inability to function at his current level of care. The treatment team noted that the inmate had resumed eating all meals since April 16, 2020, and he was to discharged from the TMHU to the EOP level of care. The IDTT further noted that the inmate had met the goals of his TMHU placement and that a referral to higher level of care was no longer required.

A May 11, 2020 IDTT note indicated that the inmate met two higher level of care referral criteria; he was unable to function at his current level of care, and he had been referred to an MHCB three or more times in the previous six months. However, record review revealed that the inmate's only MHCB placement was the one on April 13, 2020. Records dating back to 1996 indicated no previous MHCB referrals. The rationale provided for not referring the inmate to a higher level of care was that the inmate had two prior EOP placements in response to mood instability and one referral to MHCB due to danger to self. He was noted to have "constant passive SI" and a history of depression and anxiety. It was noted that he was "being referred to a higher LOC at this time, not PIP but EOP" so that his needs could be met. It was noted that while he was awaiting transfer to the EOP, he would receive cognitive behavioral therapy to target his irritability, impulsivity and suicidal ideation. A number of skills were listed as being promoted in treatment.

1052

**Findings**

The rationale included as the reasons for not referring the inmate to a higher level of care was appropriate.  Of concern, however, was the fact that the inmate was noted as having multiple MHCB referrals when he had not.  Additionally, it was noted that the inmate was "being referred" to an EOP level of care when he was already placed at the EOP level of care and was awaiting transfer.

**EXHIBIT Q**
**California Men's Colony (CMC)**
**March 17, 2020 – March 19, 2020**

**Inmate A**

This EOP level of care inmate was referred to the MHCB from ASU on three occasions during the month of November 2019. The inmate's diagnosis was Schizoaffective Disorder - Bipolar type and Antisocial Personality Disorder.  Symptoms included suicidal ideation, disorganized behavior, and auditory hallucinations. The inmate had a history of suicide attempts, numerous RVRs, and medication non-compliance.

The initial MHCB treatment plan targeted mood, psychosis, and suicidal ideation.

Psychiatric medications were restarted on November 4, 2019.  The inmate began smearing feces and was described as hallucinating and agitated on November 8, 2019.  He refused his medications on November 11, 2019.  MHCB discharge documentation indicated the inmate's mood was anxious and depressed and he was described as "distracted and appearing to respond to internal stimuli."  The inmate was discharged to the EOP level of care and returned to ASU on November 13, 2019 with a five-day follow-up.

The EOP psychiatrist met with the inmate on November 19, 2019 and increased his antipsychotic medication. The inmate met with his EOP PC during the five-day follow-up and for an initial evaluation on November 21, 2019. The PC described him as paranoid, disorganized, responding to internal stimuli, distracted, and exhibiting pressured speech with loose associations.

The inmate was referred for MHCB placement on November 23, 2019 due to endorsing suicidal ideation with a plan to hang himself with a sheet.  He was placed in alternative housing overnight and released the next day without being admitted to an MHCB.  The inmate informed the clinician prior to release that he was being rejected and antagonized by inmates in neighboring cells, and this belief appeared delusional.  The inmate also informed the clinician that he had refused his psychiatric medication due to being "too depressed to get out of bed."

The inmate refused to meet with his PC on November 26, 2019.  The EOP clinician observed the inmate pacing in his cell on this date, and described him as paranoid, disorganized, responding to internal stimuli, and exhibiting pressured speech with loose associations.

The inmate met grave disability criteria on November 28, 2019, and he was transferred to the MHCB.  He was described as agitated, self-harming, disruptive to other inmates, and medication non-compliant on this date. The inmate was also described as delusional and reported a desire to hurt other inmates who were bullying him due to "not being a homosexual."

The inmate continued to psychiatrically decompensate during the November 28, 2019 MHCB admission, and he was eventually discharged to intermediate level of care on January 3, 2020.

**Findings**

The threshold for referring the inmate to a higher level of care was too high, and the timeframe for transferring him to the appropriate level of care was too long. The inmate demonstrated that a higher level of care was indicated while housed in ASU at the EOP level of care in November 2019. He received his third referral to MHCB within the same month on November 28, 2019, yet he remained in the MHCB without transfer to the intermediate level of care until 36 days later on January 3, 2020. He continued to psychiatrically decompensate in the MHCB while awaiting the transfer. Further, on November 3, 2019, medication non-compliance was noted to impact his ability to "adequately function in a prison setting," however, this was not appropriately incorporated into his treatment or safety plan.

**Inmate B**

This patient's healthcare record was reviewed due to his involvement in an emergency use of force during PC2602 medication administration in the MHCB at CMC. The inmate's PC2602 order, which was set to expire in February 2020, was granted for danger to others and grave disability. His primary diagnosis was Schizoaffective Disorder, Bipolar Type. He was admitted to the MHCB from the EOP level of care on November 29, 2019. The patient discharged to the acute level of care at CHCF-PIP on or around December 20, 2019. The patient's symptoms prior to admission included, disorientation, agitation, aggression, paranoid and grandiose delusions, and bizarre behavior.

The patient refused his antipsychotic medication on December 12, 2019. He was subsequently escorted to an interview room to receive his injectable PC2602 medication. The patient reportedly threatened to kill the psychiatric technician and spit on the shoulder and forearm of the psychiatric technician during administration. He was charged with battery on a peace officer, battery on a non-prisoner, and threatening to kill a public official as a result. Emergency use of force was used during this incident. Officers reportedly pushed the patient against the wall and covered his face with a spit mask, and the patient cooperated.

On the same date as the use of force incident, the MHCB psychiatrist noted that the patient complained his antipsychotic medications were "poison." The psychiatrist documented that the patient's cognition, judgment, and insight were impaired, and further described him as delusional and exhibiting signs of mania on this date.

The patient stated to his psychiatrist on December 14, 2019, "I'm Jesus Christ. I spit on a nurse. I was mad at her for giving me a shot. I'm a nurse. I'm a [certified nursing assistant]. I don't have to take meds. I'm off [involuntary medications]." The patient continued to psychiatrically decompensate in the MHCB and was referred to acute level of care on December 16, 2019. He subsequently transferred to the CHCF-PIP for further treatment.

The RVR mental health assessments for the December 12, 2019 incident were completed at CHCF-PIP on December 31, 2019. The PIP treatment team warned the clinician that the patient was "too unstable" to come out of his cell, and the evaluation was completed cell front as a result. The clinician concluded that the patient's mental health factors did not contribute to the

behaviors resulting in the three RVRs, that mental health factors were unlikely to have impeded his ability to appreciate the wrongfulness of his actions, and that mental health "need not be considered when assessing penalties," including a SHU term.

The patient received another RVR at CHCF-PIP on December 28, 2019. The charge was battery on a peace officer, and the incident involved the patient rushing the cell door, hitting a cup of water on his food port, and wetting an officer and a psychiatric technician. The RVR mental health assessment for this incident was completed on January 8, 2020 and indicated that mental health factors contributed "heavily" to the behavior described in the RVR, "strongly enough that the incident should be considered for documentation in another way." The clinician noted that the patient continued to report that his medications were "poison."

**Findings**

The patient's mental illness was not adequately considered during the RVR process following the incident on December 12, 2019. Moreover, the patient was issued three RVRs for one incident that occurred in the context of involuntary medication administration. The patient was admitted to the MHCB for danger to others as a result of a mental illness, and he was also known to refuse his psychiatric medications. The psychiatrist opined on the date of the incident that the patient was delusional, believing his medications were poison, and exhibiting signs of mania with impaired judgment, cognition, and insight. The IDTT noted that the patient had psychiatrically decompensated and warranted acute level of care placement around this time as well.

The CHCF clinician's judgment in the RVR mental health assessment was very concerning. The clinician referenced an abundance of information suggesting mental health factors contributed to the RVR behaviors, yet seemingly ignored all of the data in the recommendations for the hearing officer. The clinician's opinion that none of the potential penalties would result in further psychiatric decompensation could have resulted in harm to this patient. Training and supervision should be provided for this clinician.

The RVR mental health assessment, conducted one week later on January 8, 2020, was an excellent example of how the aforementioned clinician should utilize available data in making recommendations to ensure hearing officers are appropriately informed.

**Inmate C**

This patient's healthcare record was reviewed due to his involvement in an emergency use of force while in the MHCB on August 12, 2019. The patient was admitted to the MHCB at CMC on August 7, 2019 for danger to self. He was diagnosed with Chronic Paranoid Schizophrenia and Bipolar I Disorder with psychotic features. His symptoms at the time of MHCB admission included grandiose and paranoid delusions, depressed mood, and auditory hallucinations. The content of his delusions involved a belief that CMC staff had implanted a device underneath his eyelids which allowed others access to his thoughts and eyesight. An emergency PC2602 order was initiated at the time of his admission.

The patient received an RVR for battery on a peace officer on August 12, 2019. The incident report noted that the patient slipped out of one handcuff while his MHCB cell was being cleaned, and he allegedly lunged at two inmate porters. Emergency use of force involved pushing the patient to the ground. The patient reportedly resisted and kicked one officer in the knee before being overcome and secured in restraints.

The MHCB psychiatrist described the patient as irritable, agitated, and delusional following their contact on the date of the incident.

The patient's PC2602 hearing was held on August 14, 2019, and the petition was granted.

**Findings**

The emergency use of force, RVR proceedings, and the RVR mental health assessment appeared appropriate based on review of incident reports and healthcare record. The custody audit for the use of force sufficiently documented violations of policy during and after the incident. For example, the officer that failed to secure the handcuff appropriately received on the job training. The RVR mental health assessment considered the severity of the inmate's mental illness at the time of the incident and the clinician appropriately recommended an alternative to the RVR process. Finally, the patient was appropriately referred to the acute level of care at CHCF-PIP based on lack of treatment progress and risk of harm to himself and others.

**Inmate D**

This healthcare record was reviewed to evaluate the quality of treatment planning in the MHCB at CMC. The patient was admitted to the MHCB for danger to self, and he remained in the unit from September 24, 2019 to October 13, 2019. His diagnosis was Major Depressive Disorder and he had a history of traumatic brain injury. The patient's symptoms included dysphoria, hopelessness, and suicidal ideation. He was prescribed antidepressant and mood stabilizing medications during his admission, and he was described as mostly compliant. The patient's level of suicide risk on the SRASHE was high for chronic and acute.

The treatment plan targeted mood symptoms, suicidal ideation, and sleep. The IDTT referred the patient to the acute level of care on October 2, 2019 based on his level of risk and lack of progress toward treatment goals. The patient transferred to CHCF-PIP on or around October 13, 2019.

**Findings**

The patient's treatment plan in the MHCB at CMC was adequate. Goals were measurable and interventions were evidenced based. The IDTT appropriately referred the patient to the acute level of care in response to his high risk for suicide and his lack of treatment progress.

**Inmate E**

This inmate's healthcare record was reviewed to evaluate the appropriateness of his level of care at CMC.  The inmate was diagnosed with Major Depressive Disorder and he had a history of suicide attempts.  The inmate had three MHCB admissions at CMC between November 5, 2019 and January 31, 2020.  The inmate's level of care changed from 3CMS to EOP following his first MHCB admission on November 5, 2019.  MHCB staff indicated that his suicidal ideation was motivated by fears for his safety on the yard and in ASU.

The MHCB treatment plans targeted the inmate's depressed mood, anxiety, suicidal ideation, and safety concerns during each admission.

The inmate transferred to WSP on or around February 22, 2020.

**Findings**

The quality of care provided to this inmate was adequate. The MHCB treatment plans addressed the inmate's presenting problems with measurable goals and evidenced based interventions. The treatment team appropriately involved custody staff in addressing the inmate's safety concerns, which contributed to his suicidal ideation and MHCB admissions. The MHCB clinician sufficiently documented higher level of care considerations and provided an appropriate rationale for non-referral.

**Inmate F**

This ASU EOP inmate was identified on CMC's high treatment refusal list and higher level of care non-referral list. He was initially placed in CMC's ASU EOP hub on December 11, 2019.  His psychiatric diagnosis was Schizophrenia, although Schizoaffective Disorder was also considered.  Medications included Haldol, Prozac, benztropine, omeprazole, valproic acid, and chlorpromazine and he had a current PC2602 order.

At the time of the initial psychiatric evaluation, he presented as actively psychotic with auditory and visual hallucinations, impaired insight, and poor judgment.  During the PC evaluation, he presented as guarded, with restricted and dysphoric affect, and minimized his auditory hallucinations.  Historical information indicated that the inmate would become disorganized, tangential, aggressive, and violent during periods of medication non-adherence.

IDTTs were held on January 22, 2020, February 19, 2020, and March 18, 2020. IDTT notes indicated that the inmate met criteria for higher level of care consideration; however, the treatment team repeatedly did not refer him. Despite recent lab refusals, continued treatment refusals, and modified EOP program status, the treatment team felt that he was using coping skills and was not mentally decompensated. The higher level of care non-referral rationale indicated that he was recently discharged from inpatient care; however, no further details were provided.

The PC's interventions included scheduling the inmate for less treatment groups and allowing him to participate in groups upon request; however, the inmate had already demonstrated a lack of desire to participate, and there were no incentives offered.

**Findings**

This inmate's treatment was inadequate. While the inmate clearly met criteria for intermediate care, the treatment team repeatedly chose not to refer him. Higher level of care non-referral rationales and accompanying treatment modifications were insufficient as they did not address the inmate's continued isolation, increased depressive symptoms, and treatment non-compliance.

Additionally, the treatment plans did not include effective or evidenced based interventions to address the inmate's treatment non-compliance. The PC's interventions inappropriately placed the responsibility for increasing treatment participation on the inmate, despite his apparent functional deficits. This was clinically contraindicated given the inmate's mental illness was the primary contributing factor to his treatment non-compliance. Instead, the treatment team should have assessed the function of the inmate's behavior and developed a behavior plan based on their Findings.

**Inmate G**

This case was selected to review the treatment provided in CMC's MHCB. The patient was admitted to the MHCB on December 15, 2019 following a contact with the crisis intervention team (CIT). The CIT was initiated because he shattered his cell door window by striking it several times and yelling that he was going to kill himself and someone else.

The patient was engaging in unusual behaviors when first admitted, including urinating under his cell door and smearing feces while refusing to speak to staff, leading mental health staff to suspect that he may have been under the influence of a substance. The patient was described as paranoid and a poor historian with no insight into his mental illness.

The psychiatrist noted that the patient appeared to be responding to internal stimuli prior to admission despite denying auditory hallucinations. That psychiatrist provided diagnoses of Schizophrenia and Unspecified Psychotic Disorder not due to substance use or known physical disorder, a diagnosis that was discrepant with the mental health staffs' belief that he was under the influence. The patient was prescribed Zyprexa.

The patient's initial IDTT occurred timely on December 17, 2019 and all required members of the treatment team were present, including an additional psychiatrist. The patient was described as psychotic during IDTT and determined to require continued MHCB placement. He was found positive on higher level of care (HLOC) criterion five (multiple MHCB admissions in the past six months) as he had four MHCB admissions within the past six months, although it did not appear that he was referred. There was no clinical rationale provided for non-referral to a HLOC in that section of documentation. The treatment modifications were inadequate since the patient's acuity made it unlikely that Cognitive Behavior Therapy and Dialectical Behavior Therapy could

be implemented, particularly in a short-term setting, when he was uncooperative, acutely psychotic, and not engaged in treatment. Brief behavioral interventions and rapport-enhancing treatments would have been more appropriate.

The patient was seen by IDTT the following day, December 18, 2019, when it was determined that he required a referral to acute inpatient care.  The treatment modifications developed during this treatment team meeting were much more clinically appropriate and realistic considering the patient's level of acuity and functional impairments.

**Findings**

The patient ultimately received adequate treatment while in the CMC MHCB. While upon initial placement the patient's treatment plan was not properly completed and did not include adequate clinical interventions, the treatment team corrected during a subsequent IDTT. The treatment team identified the need to refer the patient to inpatient care and developed an appropriate treatment plan pending the patient's transfer to acute level of care.

**EXHIBIT R**
**Wasco State Prison (Wasco)**
**March 3, 2020 – March 5, 2020**

**Inmate A**

This inmate's healthcare record was reviewed as he reported not having seen a psychiatrist despite submitting four mental healthcare requests.

This inmate arrived at WSP on October 4, 2019. The first healthcare request was dated January 9, 2020 due to feeling "stressed out, anxiety due to the noise of being confined for the first time." He was seen by a PC the next day. Another healthcare request was submitted on January 30, 2020 and he was seen on February 4, 2020 by a PC.

During February 20, 2020 this inmate submitted two requests, which included a request to have his medications restarted. He was seen by a PC on February 24, 2020.

He was scheduled to see a psychiatrist during February 7, 14, 15, 21, 28, 2020, but each of these appointments were cancelled due to the office used by the psychiatrist being redlined.

This inmate was scheduled to be transferred to CCI during the evening of March 4, 2020. Due to the intervention of the reception center supervisor, he was scheduled for evaluation by the psychiatrist during the afternoon of March 4, 2020. Review of the psychiatrist's initial assessment indicated that he was started on psychotropic medication.

**Findings**

This inmate's access to a psychiatrist was clearly inadequate. It is very concerning that multiple appointments were cancelled without an appropriate clinical response.

**Inmate B**

This WSP reception center inmate's healthcare record was reviewed to evaluate the appropriateness of level of care and suicide prevention efforts. He arrived at WSP on September 30, 2019, and he was housed in protective custody due to safety concerns. The inmate was placed in the 3CMS level of care on October 9, 2019, admitted to the MHCB on January 22, 2020, and discharged to the EOP level of care on January 29, 2020. His provisional diagnosis was Unspecified Schizophrenia. The psychiatrist prescribed Vistaril, Remeron, and Zyprexa, and the inmate was described as medication compliant.

The inmate's MHCB admission followed a documented suicide attempt on January 22, 2020. The inmate attempted to jump over a fence that separated the protective custody and general population yards, expecting he would be attacked and killed. The inmate wrote a note indicating he planned to end his life prior to this incident. He reported a plan to end his life by "whatever means possible" at the time of MHCB admission.

The MHCB clinician rated the inmate's suicide risk as moderate for chronic and low for acute on the discharge SRASHE. The clinician offered the following justification, "He was rated at a high acute risk level with imminent warning signs. Over the course of seven inpatient treatment days, depression and suicidal thoughts have significantly decreased and he is functioning well on the unit. Current acute risk is low due to his improvement and symptoms being situational."

**Findings**

The inmate was not transferred out of the reception center within required timeframes for 3CMS level of care inmates, and he psychiatrically decompensated after 105 days. The inmate's level of care was increased to EOP on January 29, 2020, following discharge from the MHCB. He remained at the WSP's reception center until after March 2, 2020, approximately 145 days after he entered the MHSDS.

The inmate was appropriately admitted to the MHCB and discharged to the EOP level of care. Treatment objectives were met prior to discharge from MHCB. Treatment goals for MHCB and EOP were measurable and appropriately addressed the inmate's treatment needs. The five-day follow-up was completed in accordance with Program Guide requirements. Documentation indicated the inmate was functioning adequately in the EOP level of care and actively participating in treatment.

The MHCB discharge safety plan was adequate. The clinician's justification and judgment of suicide risk on the discharge SRASHE, however, suggested training on the tool was indicated. The inmate's suicide risk factors during the preceding three months were too significant for a low rating, and the clinician rated him as high acute risk for suicide just seven days prior.

**Inmate C**

This inmate's healthcare record was reviewed to assess the quality of mental health treatment and safety planning. The inmate was at WSP's reception center between December 13, 2019 and February 27, 2020. The inmate's diagnosis was Schizoaffective Disorder, depressed type. He was placed in EOP level of care on December 26, 2019, and the PC noted that he paroled while in the EOP level of care in 2016. The inmate was prescribed antidepressant and antipsychotic medications in county jail, and these were initially continued upon arrival to WSP.

The inmate's initial assessment with psychiatry occurred on December 24, 2019, and medications were discontinued at the request of the inmate. His initial IDTT was held on December 26, 2019. Documentation in January 2020 indicated the inmate presented with moderate symptoms of depression and anxiety. The inmate was reportedly functioning well and participating in the majority of his individual and group treatment contacts by February 2020. He continued to sign refusal forms for psychiatric medications during psychiatry visits.

The treatment plan targeted depressed and anxious mood with cognitive behavioral treatment. The clinician's judgment of suicide risk on the December 2019 SRASHE was high for chronic and low for acute. The safety plan was not completed.

## Findings

The inmate was appropriately monitored in the EOP level of care as a precaution, in light of his history and refusal to take prescribed antidepressant and antipsychotic medications while at WSP.

The inmate was not transferred within Program Guide timeframes, as he remained in the reception center for 63 days following placement in EOP level of care.

While not required, a safety plan was not completed while the inmate was at WSP, but given the clinician rating the inmate's chronic suicide risk as high and noting an "extensive" history of suicide attempts and self-injurious behavior it was clinically indicated.

## Inmate D

This WSP reception center inmate's record was reviewed in response to a written request by plaintiffs' counsel. The inmate's level of care was EOP. His length of stay in ASU was a concern expressed in the memorandum, as it appeared he was confined to the unit for more than five months.

The inmate was placed in ASU on July 16, 2019 for assaulting a peace officer. He was sent out to court on August 5, 2019, and he did not return to WSP's ASU until November 4, 2019. Custody staff indicated they planned to release the inmate to facility B at WSP; however, a "staff separation alert" prevented this outcome, and the inmate was not appropriate for placement on any other facility at WSP. The inmate's RVR was heard and he was endorsed to KVSP following ICC on December 3, 2019. KVSP did not accept the inmate, as their volume of EOP inmates was too high. A mumps quarantine reportedly delayed transfers out of WSP between December 13, 2019 and January 29, 2020; however, the inmate was endorsed and transferred to CSP/Sac by January 9, 2020.

Mental health progress notes described the inmate as functioning well in ASU. He was participating in treatment with "no signs of decompensation," and he was reportedly coping adequately in the environment.

## Findings

The inmate was not retained in ASU consistently between July 16, 2019 and January 9, 2020, despite appearances. He was held in the unit beyond the 30-day limit; however, WSP custody staff appropriately documented their efforts toward transferring the inmate out in a timely manner, and attributed unexpected delays to the rejection from KVSP and the mumps quarantine.

Documentation from mental health staff suggested the inmate was functioning adequately despite the delays in transfer. The mental health treatment provided was adequate, and the inmate's participation was consistent.

**Inmate E**

This WSP reception center inmate's record was reviewed in response to a written request by plaintiffs' counsel. The inmate's level of care was 3CMS. His length of stay in ASU was a concern expressed by plaintiffs' counsel, as he was confined to the unit well beyond Program Guide timeframes.

The inmate was placed in ASU on August 13, 2019. Documentation indicated the inmate was a validated gang member with numerous enemies, and he previously paroled from CSP/Corcoran during a SHU term. He was placed in WSP's ASU upon arrival as a result. Case-by-case reviews occurred on August 21, 2019, November 6, 2019, December 30, 2019, and January 3, 2020. Custody staff noted that resolving the inmate's safety concerns and a medical quarantine resulted in significant transfer delays. The inmate was endorsed to CIM and he transferred on January 13, 2020.

The inmate was placed in 3CMS level of care for "medical necessity," and he was diagnosed with an Adjustment Disorder. He received STRH services in ASU. Documentation indicated he was participating in mental health treatment and yard, functioning adequately, and presenting with "no signs of decompensation."

**Findings**

The inmate remained in ASU well beyond Program Guide and STRH policy timeframes. The staff in ASU followed STRH policy in terms of out of cell hours and services offered. The inmate participated in these services, and he appeared to function adequately despite the extended length of confinement. The quality of mental health services provided was adequate. WSP offered an additional 60-minute weekly treatment group for all STRH inmates, in addition to those required by policy.

**Inmate F**

This inmate's healthcare record was reviewed to evaluate the quality of treatment and safety planning at WSP. The inmate arrived at WSP's reception center on January 17, 2020. He was placed in the EOP level of care on or around January 24, 2020. His symptoms included sleeplessness and depressed and anxious mood. His diagnosis was Major Depressive Disorder. Prescribed psychiatric medications included BuSpar, Trazadone, Remeron, and Vistaril, and he was described as compliant. The EOP treatment plan included an IPOC for anxiety.

The inmate was admitted to the MHCB at WSP on February 20, 2020 due to suicidal ideation with a plan to hang himself with a sheet. He remained in the MHCB for eight days and was discharged on February 28, 2020 with a five-day follow-up.

The MHCB treatment plan included goals of developing a safety plan, identifying feelings of distress, improving overall mood, and demonstrating the ability to discharge to lower level of care. An IPOC for danger to self was created during admission as well.

The discharge SRASHE completed on February 28, 2020 assessed the inmate's suicide risk as moderate for chronic and low for acute.

**Findings**

The care provided to this inmate was inadequate. While the level of care decisions were appropriate, several concerns were identified during this review. The EOP clinician did not develop a formalized treatment plan. The EOP interdisciplinary plan of care (IPOC) that was created for anxiety did not include inmate specific goals, and the interventions were not evidenced based. The MHCB treatment plan was vague and did not connect interventions to the treatment targets. The suicide prevention safety plan completed at the time of MHCB discharge lacked specificity.

**EXHIBIT S**
**Kern Valley State Prison (KVSP)**
**March 12, 2019 – March 14, 2019**

**Inmate A**

This inmate's record was reviewed following onsite interview held in conjunction with a psychologist from CDCR's regional office. The inmate's primary concern was that his level of care would be lowered from EOP to 3CMS. The inmate appeared on the sustainable process list during the course of EOP treatment. He was treated at both the 3CMS and EOP level of care during the review period. The inmate's level of care was reduced from EOP to 3CMS at a prior institution on July 3, 2018. However, in December of 2018, his level of care was again increased to EOP, and he subsequently transferred from CCI to KVSP. The inmate was diagnosed alternatively with Schizoaffective Disorder, Mood Disorder NOS, Antisocial Personality Disorder, Adjustment Disorder, and Bipolar Disorder. Psychiatric medications included Trileptal, Effexor, olanzapine, chlorpromazine, mirtazapine, Depakote, and Ativan.

Remote pertinent history included reports of having been molested by his father and having set his bedroom on fire after barricading the door at age nine. His recent history was significant for a still-in-effect PC 2602 order for involuntary medication due to being a danger to self and others; various MHCB and DSH/PIP admissions; and numerous incidents of self-harm, including foreign object swallowing and superficial cutting. Although many of his self-harm behaviors required evaluation at outside hospitals, mental health staff viewed these behaviors as motivated by "secondary gain." His TABE score was 6.2, and he recently received an RVR for delaying a peace officer in the performance of duties.

The inmate expressed interest in Dialectical Behavior Therapy (DBT) treatment during his initial assessment at KVSP, as it was recommended by a previous clinician. However, DBT was not included in the treatment plans at KVSP. Records indicated that the inmate reported feeling empty and suicidal when not occupied, and that he attempted suicide when bored or angry.

The March 20, 2019 treatment plan noted several MHCB level of care referrals and recent crisis intervention team evaluations. The inmate reportedly swallowed a zipper on March 9, 2019. The IDTT determined that EOP level of care was appropriate and noted that he was an active participant in treatment. The IDTT also recommended PC contacts twice per week.

**Findings**

The care provided to this inmate was inadequate. The IDTT did not sufficiently document higher level of care considerations. The inmate would have benefited from a diagnostic clarification evaluation and behavioral assessment. The coordination of care across providers was poor. Despite the previous provider recommending DBT, and the inmate's similar request, KVSP's treatment plans did not incorporate this clinically indicated evidenced based treatment. DBT is recommended to address the inmate's emotion dysregulation, suicidal ideation, self-injuries, and other maladaptive behaviors.

**Inmate B**

This inmate's healthcare record was reviewed following IDTT observation during onsite monitoring. The inmate was in the EOP level of care at the time of this review. His primary diagnosis was PTSD and the record noted possible mild cognitive impairment. Symptoms included acute anxiety, paranoia, and nightmares. The inmate was prescribed olanzapine, prazosin, and sertraline. The inmate attempted suicide in 2017 while in HDSP's ASU and in 2016 while in an ICF.

The inmate was admitted to SVSP-PIP on May 9, 2018 due to his inability to function at the EOP level of care, irritability, assaultive behavior, auditory hallucinations and paranoia. In August of 2018, the inmate received neuropsychological testing at ASH, and his results indicated diminished ability in several domains, good adaptive functioning, and a recommended diagnosis of Unspecified Neurocognitive Disorder. He discharged to EOP level of care from ASH on February 28, 2019 with diagnoses of PTSD, Delusional Disorder, Unspecified Neurocognitive Disorder, Phencyclidine Use Disorder, and Cocaine Use Disorder.

KVSP attempted a clinician to clinician contact with ASH on March 7, 2019; however, it was unsuccessful. The KVSP clinician instead reviewed the discharge summary for relevant information. The initial mental health assessment was conducted in a confidential therapeutic module on March 8, 2019. The psychiatrist conducted an assessment on March 12, 2019 and followed up with the inmate again on March 15, 2019.

The initial IDTT was held on March 13, 2019. The treatment plan noted an anticipated EOP discharge date of June 13, 2019 without providing a rationale for the rapid change in level of care following his return from DSH. The inmate continued to endorse depression, paranoia, hypervigilance, and flashbacks through March 22, 2019.

**Findings**

The overall care provided to this inmate was adequate. However, the clinician-to-clinician contact with ASH did not occur. Also, the treatment team did not provide a rationale for their plan to discharge the inmate from EOP within a month of the initial IDTT.

**Inmate C**

This inmate's healthcare record was reviewed following onsite IDTT observation. The inmate was alternately diagnosed with mood disorder NOS, antisocial personality disorder, psychotic disorder, adjustment disorder, bereavement, polysubstance dependence, borderline personality disorder, major depressive disorder, bipolar disorder and PTSD. Prescribed psychotropic medications included Zyprexa, Zydis, Vistaril, Prazosin, Lithium, mirtazapine, Depakote, and BuSpar. His history was significant for three to four suicide attempts, with the most recent occurring in December 2019. The inmate recently discharged from intermediate care at SVSP-PIP, and his expected parole date was July 14, 2019.

The inmate transferred to KVSP around March 1, 2019. The five-day follow-up was completed as required, but the clinician-to-clinician contact was not documented. On March 7, 2019, the PC and psychiatrist conducted their initial assessments; however, a SRASHE was not completed during the initial assessment. The initial IDTT occurred on March 13, 2019.

On March 15, 2019, the inmate refused a confidential contact. On March 22, 2019, the PC met with the inmate in a confidential setting; group enrollment and parole planning were discussed during the meeting. The SRASHE was subsequently completed on March 29, 2019.

**Findings**

The care provided to this inmate was adequate. IDTT and individual contacts with psychiatry and the PC were timely. Attention to parole planning was sufficient. Although the SRASHE was not completed at the time of the initial assessment, the evaluation occurred three weeks later on March 29, 2019. The five-day follow-up occurred as required; however, there was no evidence of a clinician to clinician contact.

**Inmate D**

This inmate's healthcare record was reviewed following onsite IDTT observation. The inmate was diagnosed with Bipolar I Disorder and Schizophrenia. His symptoms included depression and persecutory delusions. His prescription for Geodon was discontinued in the fall of 2018 and replaced with Zoloft. His course of treatment included poor adherence to medications and a fluctuating clinical presentation with episodes of psychosis and periods of relative stability with minimal symptoms. Pertinent history included three admissions to DSH, a recent MHCB admission in April of 2017 for danger to self, an incident of self-injury in 2013, and a significant number of RVRs throughout incarceration.

The inmate was treated by a different telepsychiatrist for medication management in the fall of 2018, and his antipsychotic medications were discontinued by this provider. Clinical notes in December of 2018 described the inmate as psychotic, with auditory hallucinations and persecutory delusions. The PC noted around this time that the inmate believed he was being tormented by the government, that microphones were placed in his cell, and that holograms were connected to the Mafia. It was unclear whether the treating psychiatrist and the PC coordinated to address the inmate's psychotic symptoms, need for antipsychotic medications, and sub-optimal engagement in treatment around this time.

The March 19, 2019 IDTT attributed the inmate's poor attendance in group treatment and yard activity to fatigue. The higher level of care non-referral rationale indicated that the inmate would be retained in EOP based on his ability to care for himself, medication compliance, and lack of apparent difficulties with activities of daily living. The plan of care failed to address the inmate's treatment non-compliance. Progress notes authored in March of 2019 also did not address the lack of treatment participation or other indicators for higher level of care consideration.
A March 21, 2019 clinical note indicated that the inmate was not prescribed antipsychotic medication and was not exhibiting psychotic symptoms.

Completed confidential contacts fluctuated throughout the review period due to the inmate's refusal for illness and fatigue and the PC's schedule reportedly being impacted by modified program (October 23, 2018) and state holidays (November 20, 2018; December 21, 2018; January 26, 2019; February 5, 2019).

**Findings**

The care provided to this inmate was inadequate prior to March of 2019. Care coordination between the telepsychiatrists and the PC was poor. Interdisciplinary treatment plans did not adequately address the inmate's treatment noncompliance, psychotic symptoms, and higher level of care indicators. Higher level of care non-referral rationales were inadequate and confidential treatment contacts were not offered during state holiday work weeks. However, the inmate's care appeared to improve and he was described as stable by March of 2019.

**Inmate E**

This patient's healthcare record was reviewed to assess the care he received in KVSP's MHCB. The monitor's expert also interviewed the patient prior to his planned MHCB discharge. The patient was referred to KVSP's MHCB from WSP on March 11, 2019 due to an incident of self-injurious behavior, medication non-compliance, and other behavior concerns. The patient was variously diagnosed with bipolar disorder, schizoaffective disorder, depressive disorder, psychosis NOS, impulse control disorder NOS, substance induced psychosis, and attention deficit disorder. He was treated alternately with Abilify, BuSpar, Effexor, Vistaril and Trazadone.

The patient was provided a safety smock, safety blanket, and safety mattress upon MHCB admission. He initially refused to leave his cell, declined medications and meals, and banged on his cell door. However, by the second day of admission, the patient participated in confidential contacts and apologized for his behaviors. He received regular contacts with his PC and psychiatrist. The patient reported that his psychiatric medications were effectively treating his depression and hallucinations.

IDTTs were timely. The March 11, 2019 treatment plan suggested that the patient's MHCB admission resulted from auditory hallucinations, paranoia, maladaptive behaviors, and chronic substance abuse. By March 14, 2019, the patient was considered stable for discharge on Abilify, BuSpar, Effexor and Vistaril.

**Findings**

The care provided to this patient was adequate. The patient quickly stabilized in the MHCB. He was provided full issue when indicated. IDTTs and individual contacts with the PC and psychiatrist were timely. The discharge level of care was appropriate.

**Inmate F**

This healthcare record was reviewed to evaluate the care provided in KVSP's EOP and MHCB levels of care. The monitor's expert observed the inmate's initial EOP IDTT following MHCB discharge. The inmate is serving a life without parole sentence.

His history was significant for an active PC2602 order for forced medications, multiple somatic complaints, various inpatient referrals, and suicide attempts. His symptoms included depression, nightmares, traumatic flashbacks, suicidal ideation, and chronic auditory hallucinations with commands to end his own life. He was treated alternately with Abilify, Remeron, Zyprexa, Geodon, Risperdal, Proxilin, Haldol, Invega, Prazosin, and Vistaril.

In October 2018, the inmate discharged from an ICF to EOP level of care at SVSP. The ICF treatment team recommended continued CBT and group treatment in the outpatient setting.  On November 13, 2018, the inmate was referred to the MHCB at SVSP after endorsing suicidal ideation related to a safety concern.

The inmate transferred to KVSP in February of 2019. On March 4, 2019 he was seen in a therapeutic module for an initial PC assessment, although it was unclear why the contact took place in that setting. During interview, he acknowledged suicidal thoughts involving cutting or hanging himself one day prior. His chronic and acute risk for suicide were assessed as moderate. He was described as highly motivated to engage in treatment. The psychiatrist also met with the inmate on March 4, 2019 and noted depressive symptoms. The March 6, 2019 IDTT documents indicated that his involuntary medication order was renewed.

On March 9, 2019 the inmate's order for paliperidone (nine mg) had expired and he refused his back-up injection. The psychiatric technician reportedly emailed the psychiatrist to review the situation; however, it was apparently not resolved quickly based on subsequent notes that revealed nursing's ongoing efforts to resolve the matter. On March 12, 2019, the inmate met with a psychiatrist after endorsing racing thoughts, passive suicidal ideation, and reporting that his medications were "not working."

Around March 13, 2019, the inmate was admitted to the MHCB after engaging in self injurious behavior and reporting ongoing suicidal ideation. The psychiatrist noted during MHCB admission that the inmate had a history of traumatic brain injury and PTSD.

On March 14, 2019, the IDTT's diagnostic emphasis was on the inmate's personality disorder and higher level of care considerations were not documented. On March 16, 2019, the psychiatrist noted a working diagnosis of depressive disorder NOS, psychosis NOS, polysubstance use, r/o substance induced psychosis, adult ASPD, and cluster B personality traits. IDTTs and individual contacts with the PC and psychiatrist were timely.

**Findings**

The care provided to this inmate was inadequate. The treatment of this complex case was hindered by a lack of diagnostic clarity. The role of the inmate's traumatic brain injury, possible

personality disorder, and trauma history were not sufficiently clarified or addressed in formulations or treatment. The ICF treatment team offered outpatient treatment recommendations that included CBT; however, these were not clearly incorporated in the treatment plans at KVSP. The inmate would benefit from a comprehensive diagnostic evaluation with psychological testing and a behavior plan.

**Inmate G**

This inmate's healthcare record was selected to review the appropriateness of his level of care. The inmate had a prior diagnosis of Schizophrenia. Psychiatric medications had not been prescribed in months. The inmate met the higher level of care indicator for having three or more MHCB referrals within a six-month period. Despite noting a fourth MHCB admission on August 3, 2018 and repeated episodes of self-injury, with a possible intentional overdose, the treatment team elected not to refer the inmate to a higher level of care.

On August 6, 2018, the inmate was discharged from MHCB to 3CMS level of care. EOP level of care was not considered. Instead, the MHCB IDTT recommended more frequent contacts in the 3CMS program. The record suggested the inmate was not functioning well in the 3CMS level of care. Additionally, the 3CMS treatment plan was not modified despite the inmate's continued crisis contacts, refusals to engage with mental health staff, and medical scan confirming he swallowed a paperclip.

**Findings**

The mental health care provided to this inmate was inadequate. At a minimum, the inmate appeared appropriate for EOP level of care. The treatment plan should have been modified in response to his lack of treatment progress, behavior concerns, continued treatment refusals, and MHCB admissions. The inmate also would have benefitted from a functional behavior assessment. Clinical rationales for non-referral to higher levels of care were insufficient. Some treatment providers attempted to characterize the inmate as manipulative without documenting sufficient evidence; this could potentially bias subsequent providers.

**Inmate H**

This inmate's healthcare record was selected to review the appropriateness of his level of care. The inmate was diagnosed with Major Depressive Disorder, Antisocial Personality Disorder, and Polysubstance Dependence. Psychiatric medications were not prescribed. The inmate met the higher level of care indicators for having three or more MHCB admissions within six months and for receiving three or more RVRs within a three-month period. At the time of his September 6, 2018 MHCB admission, the inmate had five RVRs and 11 MHCB admissions.

The inmate transferred from WSP to KVSP's MHCB after reportedly inserting three razor blades into his rectal cavity. However, the razor blades were not found during the community hospital's medical assessment. His frequent MHCB admissions and RVRs appeared to be triggered by negative interactions with custody staff. The IDTT documented a lengthy description of the

inmate's MHCB placements and RVRs in the higher level of care non-referral justification section. The accompanying treatment modifications were appropriate.

During the most recent MHCB admission the inmate again reported to staff that he swallowed razor blades. He was transported to an outside hospital where he refused abdominal x-rays. Hospital staff were unable to confirm razor blade ingestion but noted that he otherwise appeared comfortable and unconcerned.

**Findings**

The care provided to this inmate was adequate. While the treatment team did not provide an adequate clinical rationale for non-referral to inpatient care, the level of care decisions and treatment modifications were appropriate. This inmate would likely benefit from a comprehensive diagnostic evaluation, including for diagnostic clarification purposes.

**Inmate I**

This EOP inmate was identified in plaintiffs' letter as an inmate potentially in need of a higher level of care. The inmate returned to KVSP from an ICF on January 10, 2019. His diagnosis varied throughout the record, ranging from no diagnosis to Schizophrenia. The current diagnosis was not clearly documented in recent KVSP records, although his current treatment team appeared to suggest that Antisocial Personality Disorder was present. Psychotropic medications were not prescribed at the time of this review, and it was unclear whether psychiatry had considered an involuntary medication order. The inmate's record indicated he was previously found incompetent to stand trial.

On January 23, 2019, the inmate was described as generally demonstrating no psychological symptomatology beyond poor hygiene. While he had been refusing showers and was described as malodorous, the current treatment team perceived that secondary gain was motivating these behaviors. The January 23, 2019 treatment plan targeted anxiety and delusions, though delusions were not discussed in the narrative. Poor hygiene, suspected symptom fabrication, and diagnostic uncertainties were not addressed in the plan of care, though the narrative portion of the treatment plan suggested these were primary concerns.

The inmate's mental illness appeared to be more easily recognized when seen for longer out of cell clinical contacts, as opposed to brief interactions or cell front check ins. Some progress notes described the inmate as highly or severely delusional and as exhibiting no insight into his mental illness. The inmate's writings on healthcare request forms also suggested delusional and disjointed thoughts.

Most of the clinical information in the record was based on the inmate's self-report, as mental health staff did not obtain records from community providers or the county jail. This was significant because the treatment team portrayed the inmate as having limited credibility; yet efforts to confirm or dispute his claims were minimal or non-existent. Collateral information was also necessary to corroborate the inmate's self-reported suicide attempts while in county jail in order to accurately assess his suicide risk.

**Findings**

The mental health care provided to this inmate was inadequate. The medical record was filled with contradictory information. While the IDTT conceptualized the inmate as malingering and attempting to feign grave disability, other providers described the inmate as psychotic with delusions and disorganized thinking. There were no effective treatment interventions documented in the treatment plan or implemented during clinical contacts. At a minimum, the inmate's treatment plan required revision to target his delusional beliefs, poor hygiene and ADLs, and other behavior concerns. A comprehensive diagnostic evaluation is recommended to resolve diagnostic uncertainties and appropriately guide the plan of care.

**Inmate J**

This 3CMS inmate was identified by plaintiffs' attorneys and reviewed to determine whether a higher level of care was indicated. The inmate was diagnosed with Major Depressive Disorder and Anxiety Disorder NOS. He was prescribed buspirone (15mg morning and bedtime) and Lexapro (20mg daily). Medication compliance was poor in March of 2019. Further review of the record indicated a history of erratic medication adherence. However, psychiatry contacts were not completed in accordance with the medication noncompliance policy and psychiatry notes only minimally addressed the issue. The inmate was also noncompliant with individual treatment contacts, and he was often seen at cell front following refusals. He often reported that he was fine and did not need to talk when approached by providers.

The inmate's treatment plan was updated since August 8, 2017. He was seen at least every 90 days by his psychiatrist and PC, though the content of those contacts suggested more active interventions were necessary.

**Findings**

The care provided to this inmate was inadequate. While the level of care appeared appropriate, the treatment plan failed to address the inmate's treatment noncompliance issues, which likely would have benefitted from brief behavioral interventions. Additionally, the psychiatry contacts did not adhere to the medication noncompliance policy.

**Inmate K**

This 3CMS inmate was identified by plaintiffs' counsel and reviewed to determine whether a higher level of care was indicated. He was diagnosed with Major Depressive Disorder, recurrent, chronic. Psychotropic medication included Abilify, clonidine, haloperidol, venlafaxine, Thorazine, and Vistaril. The inmate was admitted to the MHCB following an incident of self-injurious behavior, and he was discharged to 3CMS level of care on November 21, 2018. Around that time, he was described as extremely disruptive whenever his needs were not met, and he frequently banged on his cell door. The inmate's case was reviewed by the IDTT and mental health headquarters staff, and it was determined that 3CMS level of care was appropriate. However, on January 12, 2019, the inmate was transported to a community hospital after

swallowing a foreign object, which was confirmed with X-ray. He was admitted again to the MHCB upon return.

Following MHCB discharge, the inmate's subsequent 3CMS treatment plan did not address his repeated MHCB placements or self-injurious behavior. The plan of care also did not include effective objective treatment targets or adequate evidence-based treatment interventions.

On January 25, 2019, the PC noted that more frequent contacts were clinically indicated to address coping skills; however, this did not occur as planned.

**Findings**

The care provided to this inmate was inadequate. The inmate required a comprehensive diagnostic evaluation. The treatment plan did not appropriately address the inmate's frequent MHCB admissions or self-injurious behaviors. Reassessment of his level of care was warranted in light of recent events; however, this did not occur. While the PC noted that more frequent contacts would occur to address the inmate's poor coping skills, the PC failed to follow through with their own plan of care.

**Inmate L**

This 3CMS inmate was identified by plaintiffs' counsel and reviewed to determine whether a higher level of care was indicated. The inmate's level of care was reduced from EOP to 3CMS in June of 2018. On December 19, 2018, a psychiatrist diagnosed the inmate with Schizophrenia, Depressive Disorder NOS, and Adjustment Disorder, with mixed anxiety and depressed mood. However, more recently, a different psychiatrist diagnosed the inmate with Schizoaffective Disorder, bipolar type, and Antisocial Personality Disorder. The inmate was prescribed Abilify, clonidine, diphenhydramine, haloperidol, and venlafaxine.

The PC noted possible delusional content. The most recent psychiatry contact occurred on March 3, 2019; however, the progress note contained extensive generic information that was copied and pasted from other records, making it difficult to determine whether the note contained any new data. There was little meaningful information included in the progress notes since June of 2018.

**Findings**

The care provided to this inmate was inadequate. The inmate's records were not individualized and did not include sufficient detail. Consequently, the need for a higher level of care could not be determined based on healthcare record review. The treatment team should complete a comprehensive evaluation of the inmate, revise the treatment plan, and assess and appropriately document the inmate's level of care needs.

**EXHIBIT T**
**California State Prison/Los Angeles County (CSP/LAC)**
**April 16, 2019 – April 19, 2019**

**Inmate A**

This inmate's healthcare record was reviewed to evaluate the mental health treatment provided at CSP/LAC following discharge from inpatient care. The inmate was discharged to CSP/LAC on January 7, 2019 from intermediate care at DSH-Atascadero.

According to DSH-Atascadero documentation, the inmate was hospitalized for approximately three months for suicidal behavior, suicidal ideation and depression. He was non-adherent with significant portions of recommended treatment, and his report of symptoms was inconsistent with staff observations. DSH-Atascadero staff described the inmate as a high functioning, asymptomatic individual who was sophisticated and engaged in volitional behavior to achieve a higher level of care.  He also reportedly appeared to take advantage of lower functioning inmates (e.g., arranging for those lower functioning inmates to give and bring him food). Despite this, DSH-Atascadero clinical staff continued to attempt to provide treatment for the inmate's depression and suicidal ideation while meticulously documenting his high level of functioning and lack of motivation in addressing the reported depression and suicidal ideation. The DSH-Atascadero discharge summary included clinically relevant information.

Upon arrival at CSP/LAC, an initial psychiatric evaluation was completed on January 10, 2019; an initial PC evaluation was completed on January 8, 2019; and he was seen by the IDTT on January 16, 2019. All of these contacts were completed timely. The CSP/LAC PC noted that the inmate had recently discharged from DSH-Atascadero; however, there was no documentation that indicated the discharge summary was reviewed or incorporated into the inmate's assessment and treatment planning. The only reference to the DSH-Atascadero admission came from the inmate self-report that he had safety concerns on the undesignated yard at CSP/LAC, and he had cut his wrist to the tendon resulting in the original inpatient referral to DSH-Atascadero. The psychiatric initial evaluation included information from the DSH-Atascadero discharge summary; the psychiatrist noted that the inmate had been stable at discharge and demonstrated no functional impairments throughout his hospitalization.

The treatment plan dated January 15, 2019 also indicated that the information provided in the DSH-Atascadero discharge summary was not reviewed or considered.  The treatment plan did not acknowledge that DSH-Atascadero staff specifically noted that the inmate was appropriate for 3CMS level of care; although the treatment team did indicate that the inmate's level of care would be re-evaluated in 60 days rather than 90 days because the inmate was requesting transfer to the 3CMS level of care.

**Findings**

While this inmate's overall care was adequate, the transition from inpatient care to treatment at CSP/LAC was compromised by the treatment team's failure to review and utilize information contained in DSH discharge documentation, specifically the discharge summary. DSH-

Atascadero provided extensive and useful information that would have been critically important in the development of the inmate's treatment plan; however, there was no indication that the treatment team reviewed that information and incorporated it into his treatment plan. Consequently, there was little continuity between DSH-Atascadero inpatient treatment and outpatient treatment at CSP/LAC.

**Inmate B**

This inmate's healthcare record was reviewed to evaluate the treatment provided at CSP/LAC following discharge from inpatient care. The inmate arrived at CSP/LAC on February 1, 2019 following approximately one month of intermediate care at the CHCF-PIP. Inpatient documentation noted that the inmate was referred due to suicidal ideation and "increased decompensation" while at the EOP level of care, as evidenced by increased paranoia (e.g., nurses would poison him) and refusal of mental health and medical appointments. The inmate was provided with a diagnosis of Schizoaffective Disorder.  He was prescribed BuSpar.

The CHCF-PIP discharge summary indicated that the inmate failed to participate in most of his inpatient treatment, a primary reason for the inpatient referral. He was only prescribed one psychotropic medication, an antidepressant (Mirtazapine), despite documented psychotic symptoms; this medication would not address the inmate's psychotic symptoms. The inmate initially refused medication; however, he subsequently agreed to taking the medication, even increasing the dosage. The inmate was not described as "grossly psychotic" during the month of inpatient treatment; however, this assessment was questionable as the inmate's psychotic symptoms had previously interfered with his ability to participate in treatment. There was a lack of documentation that alternative efforts were made to communicate with the inmate regarding the reason for his treatment refusal or salient reinforcers. For example, there was no documentation that a functional analysis and behavioral plan had been attempted prior to discharge from intermediate care. The discharge summary from CHCF-PIP lacked the detail and amount of clinical information provided in DSH discharge summaries; however, the psychiatrist did note that the inmate would benefit from psychiatric follow-up at the EOP level of care upon return to CDCR.

Upon transfer to CSP/LAC, the inmate was seen for initial evaluation by the psychiatric nurse practitioner (PNP) on February 11, 2019. He was seen for initial PC evaluation just prior to his initial IDTT on February 12, 2019. The PNP only superficially referenced the inpatient hospitalization, and documentation did not include relevant clinical information provided in the CHCF-PIP discharge summary. The PC did note the inpatient hospitalization; however, CHCF-PIP IDTT notes were cut and pasted into the clinical summary of the initial assessment. Information from the CHCF-PIP discharge summary were not meaningfully incorporated into the intake assessment.

Similar observations were noted regarding the CSP/LAC IDTT.  The treatment plan of February 12, 2019 incorrectly documented the length of inpatient hospitalization as two months rather than one month.  The treatment team did note that the inmate continued to refuse treatment, and the inmate was placed on a modified program. However, interventions were sparse and not empirically based. With each subsequent IDTT during March and April 2019, treatment goals

were appropriate, although not always stated in objective behavioral terms; however, interventions remained inadequate and not empirically based.

**Findings**

The care provided to this inmate was adequate, although minimally. The CSP/LAC treatment team did not appropriately utilize the inpatient discharge summary or other information provided by the CHCF-PIP staff. It should be noted that the inmate was hospitalized for a relatively brief stay, and the information provided was of limited clinical utility; however, that information was not meaningfully incorporated into initial assessments or initial treatment planning. He was placed on modified program in an effort to address his lack of treatment engagement, but documented interventions were inadequate. It should also be noted that the treatment provided at CHCF-PIP was also inadequate based on healthcare record review.

**Inmate C**

This inmate's healthcare record was reviewed because the inmate was identified on the inpatient non-referral log multiple times. Only two of those entries occurred while the inmate was housed in the CSP/LAC MHCB. During the MHCB hospitalization from November 15, 2018 to November 20, 2019 at CSP/LAC, the inmate was noted to meet criterion two (requires highly structured inpatient care with 24-hour nursing supervision due to major mental illness), criterion three (demonstrates chronic symptoms that have not responded to at least six months of treatment) and criterion five (three or more MHCB referrals in six months). Later, was noted to only meet criterion five for higher level of care consideration. The inmate was not referred to a higher level of care. The inmate was provided with a primary diagnosis of Antisocial Personality Disorder. He was not prescribed psychotropic medications. He received treatment at the EOP level of care prior to MHCB placement.

During this admission to the CSP/LAC MHCB, he was seen on November 16, 2018 for an initial IDTT when it was noted that he met criteria two (inmate requires highly structured inpatient psychiatric care with 24-hour nursing), three (inmate demonstrates chronic psychiatric symptoms that have not responded sufficiently to six months of treatment) and five (three or more MHCB referrals). The clinical rationale for non-referral was well-documented and valid; treatment modifications were also appropriate. Based on the entire treatment plan and the clinical rationale, it was unclear that the inmate actually met criterion three.

On November 20, 2018, the inmate was seen for his discharge IDTT when it was noted that he only met criterion five (three or more MHCB referrals). The clinical rationale for non-referral and treatment modifications were appropriate.

**Findings**

The care provided to this inmate was appropriate and he was appropriately considered but not referred to a higher care. CSP/LAC MHCB staff provided sound clinical rationale for non-referral, and documentation indicated that the healthcare record had been reviewed with appropriate treatment modifications provided.

**Inmate D**

This inmate's healthcare record was reviewed because the inmate had been identified twice on the inpatient non-referral log as meeting criterion seven (not participating in 50 percent or more of treatment); he was not referred to a higher level of care. The inmate was identified as being assigned to a modified program. He was provided with a diagnosis of Schizoaffective Disorder. The inmate received his psychotropic medications by PC 2602 court order.  He was prescribed lithium, hydroxyzine, Abilify and Cogentin.

The treatment plan dated September 26, 2018 indicated that the inmate met criterion seven (refusing 50 percent or more of treatment) but included a poor rationale for non-referral to a higher level of care. The treatment team noted that the inmate had a history of refusing treatment and presumed that this was his level of optimal functioning and not a sign of decompensation. This conclusion was determined, despite the fact that the inmate refused to shower and to provide his clothing and bedding for laundry, only engaging in "bird baths" in his cell and washing clothes in his sink.  This determination was also made despite the inmate's long history of poor functioning as demonstrated by his PC 2602 court order for grave disability. The inmate exhibited active delusional thought content that prevented him from participating in regular institutional programming and mental health treatment. In light of the acuity of his impairment, the treatment modifications were also inadequate.

The next CSP/LAC IDTT occurred on October 25, 2018; this IDTT continued to accurately reflect that the inmate met criterion seven (less than 50 percent treatment attendance) for higher level of care consideration. The treatment team noted that the inmate's delusional thinking prevented him from going to the dining hall, as well as his treatment activities and other daily activities such as showers. The treatment team, however, continued to provide an inadequate rationale to justify non-referral, including citing the inmate's medication adherence as justification despite the PC 2602 court order in place, which was of concern. As in the prior treatment team meeting, the treatment modifications remained unchanged, and they were inadequate in light of this inmate's current functioning and symptomatology. No substantive clinical changes were made to address target behaviors or to assist the inmate in improved functioning.

**Findings**

The mental health care provided to this inmate was inadequate and he should have been referred to a higher level of care.  The inmate was eventually placed on modified programming; however, clinically adequate modified treatment interventions to address the underlying causes of his treatment refusal were never developed. Moreover, his mental illness resulted in multiple areas of grave disability. This was evidenced by the mental illness interfering with the inmate's ability to access food by preventing him from going to the dining hall and to maintain basic hygiene by preventing him from using the shower and laundry services. It should be noted that this inmate was ultimately referred to inpatient care.

**Inmate E**

This inmate's healthcare record was reviewed because the inmate had been identified multiple times on the inpatient non-referral log; at least one of the occurrences of non-referral to a higher level of care occurred at the CSP/LAC MHCB. The inmate was identified as meeting criterion five (three or more MHCB referrals within six months) on January 10, 2019. The inmate was provided with a diagnosis of Schizoaffective Disorder.  He was prescribed Haldol and Cogentin.

The treatment plan of January 10, 2019 indicated that the inmate met only criterion five for higher level of care referral consideration. The clinical rationale was adequate, but it would have benefitted from greater clinical specificity regarding the severity of the inmate's repeated problematic behaviors. The MHCB treatment modifications were clinically adequate.

**Findings**

The inmate was appropriately considered, but not referred to a higher level of care. However, the clinical rationale, while adequate, would have benefitted from greater specificity; the rationale was vague and not individualized. Despite this, the inmate received adequate treatment at the CSP/LAC MHCB.

**EXHIBIT U**
**North Kern State Prison (NKSP)**
**April 23, 2019 – April 25, 2019**

**Inmate A**

This 19-year-old reception center EOP inmate's healthcare record was reviewed after his interview and observation in a reception center EOP group on D yard during which he voiced concerns about custody's response to mental health crises. The inmate was provided with various diagnoses including Major Depressive Disorder, Unspecified Anxiety Disorder, Unspecified Depressive Disorder, psychosis and seizure disorder.  He was prescribed risperidone and Remeron; however, he was previously prescribed Zyprexa, Prozac and Depakote. His history was significant for a recent suicide attempt on January 1, 2019; the inmate had no history of inpatient psychiatric treatment.

Upon entry to the CDCR from the county jail, the inmate received an initial health screening which generated an urgent mental health referral. During a psychiatric contact that same day, the inmate reported symptoms of depression, sleep disturbance and auditory hallucinations, but he declined medication treatment.

He was seen on February 26, 2019 for a mental health screening; this screening noted two previous suicide attempts in the county jail which included biting his wrist in an attempt to open his vein and restricting his water intake with an intent to die. He reported passive suicidal ideation without a plan; additionally, he reported increasing command hallucinations to harm himself or others, and the belief that others could hear his thoughts. A psychology note later that day indicated that the inmate was seen earlier for a screening to evaluate whether he posed a danger to himself; however, the results were unavailable. This clinician informed custody to not allow the inmate to return to the building until the results of the SRASHSE were available. After consultation, the inmate was found suitable for EOP level of care, but not for MHCB admission. An intern conducted a SRASHE on February 26, 2019, during which the inmate endorsed suicidal ideation and stated that the previous week he deprived himself of water intake for two days. He reported a suicide attempt the month before when he requested a single cell. The SRASHE, which was not co-signed, noted that custody reported recent problems with this inmate's programming. He was assessed as presenting with suicidality for personal gain to obtain a housing change; his suicide risk was assessed as low for chronic and acute risk. A social worker saw the inmate the following day when he denied suicidal ideation.

On March 5, 2019, the inmate was seen by a different post-doctoral intern for an assessment which noted that this was the inmate's first incarceration. He reportedly was not in acute distress, but he continued to report command auditory hallucinations telling him to stop water intake. The assessment determined that the inmate was manipulating for secondary gains.

A SRASHE was conducted by a different social worker on March 8, 2019; this assessment indicated that the inmate appeared to be exaggerating his symptoms. By March 8, 2019, the inmate was seen by a reception center 3CMS social worker who noted that he refused his psychotropic medications on February 26, 27 and March 3, 2019, stating that the medications

caused sedation. The 3CMS level of care was assessed as the appropriate level of care, and the inmate was referred to the psychiatrist due to his medication refusal. A different psychologist conducted a SRASHE on March 20, 2019, apparently related to an MCHB referral for unclear reasons. This assessment indicated that the inmate may have attempted to request additional contact through secondary means; however, he would benefit from more intensive mental health contact.

The inmate was seen by the psychiatrist on March 25, 2019, when he requested a change in medication stating that the reason for his poor medication adherence was due to Zyprexa making him feel sick. The psychiatrist described the inmate as "slow" and suspected that the inmate had chronic auditory hallucinations. They agreed to a trial of Risperdal, with plans to consider EOP if the inmate continued to have difficulties. A SRASHE on March 28, 2019 noted that the inmate, while not requiring EOP, would benefit from additional contact. The following day the inmate was seen by a post-doctoral intern who planned to refer him to EOP due to severe auditory hallucinations, numerous SRASHEs and ten consults in the preceding five weeks.

On April 5, 2019 the inmate was assessed by an LVN in the D yard chapel holding cells due to redness on his neck. He was returned to custody in stable condition. The social worker conducted a SRASHE the same day; this assessment stated that custody reported that the inmate stated he did not wish to die and medical reported that he had redness around his neck but no bruising or abrasions. The clinician discussed this with CIT members, and it was determined that the inmate should be housed with other inmates for increased safety and the incident would be discussed with his PC upon their return. A psychiatric evaluation completed on April 9, 2019 noted continued auditory hallucinations and restlessness, but the inmate appeared fairly well managed on Risperdal. A treatment plan dated April 11, 2019 noted that he was stabilized at the EOP level of care and that he would decompensate without EOP treatment. Progress notes also documented the inmate's attendance at various groups.

**Findings**

The mental health care provided to this inmate was variable. Care provided while he was in the 3CMS program was poor; however, he ultimately was transferred to the appropriate level of care in the EOP.

This inmate was clinically seen on multiple occasions; however, there was poor continuity of care among providers. His poor adherence to medication and continued crises and hallucinations were not adequately managed in 3CMS program. The lack of continuity of care may have contributed to assessments that the inmate was "manipulating" and delayed his transfer back to EOP which appeared to be the appropriate level of care. While consultation with the CIT occurred, there was no clear documentation that the team responded to crises.

**Inmate B**

This 49-year-old inmate's healthcare record was reviewed to assess his treatment since his return to EOP, as well as the decision to maintain him at that level of care. He was provided with various diagnoses, including Agoraphobia, Bipolar 1 Disorder, Schizoaffective Disorder and

Antisocial Personality Disorder and was prescribed Latuda and lithium. The inmate arrived at NKSP from MCSP on March 5, 2019 where he had been out to court.  He was serving a life sentence.

This inmate's history was significant for previous treatment with Zyprexa, Wellbutrin, Depakote, Thorazine, Mellaril, Seroquel, trazodone, BuSpar and Abilify.  Additionally, he had two to three MHCB admissions, most recently during 2016; he also had an extended hospitalization at Vacaville at the ICF level of care, and he was discharged in January 2019. In one instance of self-harm, the inmate tied a string around his toes to induce pain, which lead to the amputation of two toes. His most recent manic episode occurred during late 2018. It was reported that the inmate benefited from dialectical behavioral therapy (DBT) while at DSH. His more remote history was significant for abuse by his mother from ages eight to thirteen from which he continued to experience flashbacks.

An initial psychiatric assessment was conducted on March 8, 2019 prior to his IDTT of March 13, 2019, when he denied suicidal ideation or auditory hallucinations; however, he reported a higher level of depression than usual. The IDTT treatment plan focused on the continued use of DBT to decrease his depression and efforts to support adherence with medications. His group attendance was poor, he was seen as stable, and he reportedly attended his individual sessions.

The decision was made to maintain the inmate in the EOP and not to refer him to a higher level of care at that time to allow time to adjust to his new schedule upon return to NKSP.

**Findings**

The mental health care provided to this inmate was adequate.  The inmate was appropriately assessed upon his return to NKSP, and a supportable decision was made to initially maintain him at the EOP level of care with DBT and medication treatment.

**Inmate C**

This 58-year-old inmate's healthcare record was reviewed to assess the facility's response to his recent discharge from inpatient treatment where he had been treated at both the ICF and acute levels of care.  The IDTT for this inmate was observed during the monitoring visit.

The inmate was provided with a diagnosis of Schizoaffective Disorder; he was prescribed Haldol Decanoate and Zyprexa. He was originally transferred from the MCSP MHCB to CHCF-PIP with maximum custody status on November 15, 2018, which status was removed on January 10, 2019.  He was treated for psychotic symptoms with increased aggression. Discharge summaries from CHCF-PIP, which were reviewed by the psychiatrist at NKSP, indicated increased insight regarding the need for medication and his various medical problems including congestive heart failure and hypothyroidism.

Upon arrival at NKSP on April 10, 2019, an initial health screen was completed by nursing, a SRASHE was performed, and five-day follow up was commenced. The initial psychiatric assessment was conducted on April 14, 2019, noting thought blocking and somewhat guarded

affect. The five-day follow up was completed as planned. Clinician-to-clinician contact with CHCF was documented on April 16, 2019, and the ICF discharge summary was reviewed; the inmate's agreement with discharge to EOP was noted. A mental health assessment by his PC was completed on April 17, 2019, where this pertinent history was reviewed. The inmate's attendance in a cognitive behavioral therapy (CBT) group was noted, and the inmate was observed participating in this group by this writer.

The IDTT of April 24, 2019 reasonably addressed the issues noted and maintained the inmate at the EOP level of care. The PC note of the same day noted his flat affect and his depression as five on a scale of one to ten.

**Findings**

The mental health care provided to this inmate was adequate.  This inmate's initial assessment upon arrival from CHCF-PIP and initial treatment planning were appropriately managed. Clinician-to-clinician contact was made, and PIP discharge summaries were reviewed and incorporated.

**Inmate D**

This 43-year-old reception center EOP inmate's healthcare record was reviewed to evaluate the treatment he received in the reception center EOP.  His IDTT was observed during the monitoring visit. The inmate had recently arrived at NKSP on April 15, 2019 with documentation from the Los Angeles County Jail dated April 12, 2019 indicating that he had no ongoing medical or mental treatment, and that he was suitable for general population housing.

Nursing screening conducted on April 15, 2019 noted no current medications or mental health issues. A post-doctoral intern saw the inmate on April 15, 2019 for a mental health screen. On April 17, 2019 a mental health assessment documented that the inmate reported a suicide attempt four to five years prior when he was admitted to a community hospital in Santa Monica, California. The inmate's history was also significant for a car accident 19 years prior during which he lost consciousness and after which he reported auditory hallucinations. A SRASHE of the same day indicated three prior suicide attempts including drinking bleach and cutting his wrists. A mental health assessment of the same day was congruent with the SRASHE and noted that the inmate, while not prescribed medications, was willing to see the psychiatrist.

Progress notes indicated that the inmate attended a recreation group several times during his first week in the reception center. A PC note on April 24, 2019 noted that the inmate endorsed auditory hallucinations and mild depression. The inmate attended a CBT group on April 24, 2019 which this writer observed.

The monitor's expert observed the inmate's initial IDTT on April 24, 2019. The need for a psychiatric assessment, which had not yet occurred, was discussed, as was the inmate's past treatment with Seroquel, risperidone and Abilify.

The IDTT indicated that the psychiatrist would see the inmate later that day; he was seen by the psychiatrist on that date when he endorsed continued auditory hallucinations and depression. The voices were derogatory in nature. A history of physical abuse by his father which eventually caused the inmate to run away from home was noted. At this assessment, the inmate reported multiple inpatient hospitalizations and three suicide attempts, as well as outpatient psychiatric treatment in Los Angeles. Zoloft and Abilify were started with plans for psychiatric follow up.

**Findings**

The overall mental health care provided to this inmate was adequate, with some exceptions noted. The information provided upon this inmate's transfer appeared incomplete, but staff obtained complete histories which allowed them to adequately assess the inmate. Treatment planning was hindered by the psychiatrist not having assessed the inmate prior to the initial IDTT, but initial assessments and planning were otherwise appropriate.

**Inmate E**

This healthcare record was reviewed to evaluate the mental health care provided at NKSP. This inmate was referred to NKSP MHCB from WSP where staff noted that he had been seen for medical concerns approximately six weeks earlier and was noted to have been losing weight since his arrival there; the inmate was only 86 percent of the appropriate weight for his height. The inmate was referred to the MHCB due to not leaving his cell for at least three days and not eating.  He presented with delusional thinking, poor ADLs, and poor insight and judgement. The inmate reported that he was not eating because he believed that his food had been contaminated; however, he did not understand that by refusing meals, he would starve. The inmate refused medical appointments as well, despite having told staff that whenever he had eaten contaminated food it caused his stomach to hurt and his body to produce extra "mucous."

A December 12, 2018 treatment plan did not adequately address the inmate's acute symptomatology in the rationale for non-referral in the higher level of care (HLOC) section of the electronic healthcare record. The treatment modifications did not address the inmate's behavior in light of his history. For example, the inmate had been refusing medications, but one treatment modification was "I/P…prescribed psychiatric medications" without any indication how the treatment team would ensure the inmate's adherence in light of his history of treatment non-adherence. The NKSP inpatient coordinator also noted that the treatment modifications were inadequate, and the program supervisor was notified. The team planned to monitor the inmate's intake and output; however, they only planned to "encourage" him to "at least try" to eat each of his meals.

Significant clinical improvement was not achieved by his discharge IDTT on December 17, 2018. The inmate continued to refuse meals, sporadically eating portions of his breakfast; additionally, he did not receive appropriate tracking of intake and output, and he refused needed medical and mental health interventions as a result of his mental illness.

The inmate continued to report potentially somatic complaints. Progress notes from psychiatry were internally inconsistent. For example, on December 15, 2018, the psychiatrist indicated that

a mental status examination could not be conducted because the inmate was uncooperative. However, in the next sentence the inmate was described as having normal thought processes and cooperative with the interview. The inmate was also described as having "mild" paranoia in this note while at the same time refusing most meals and liquid supplements due to paranoid delusional thinking. The inmate was discharged from the MHCB on December 17, 2018, with reference to having improved and having consumed 100 percent of meals the prior day based on the treatment team. However, supporting documentation did not verify these statements. The dietician's December 17, 2018 note indicated that only 52 percent of the last nine meals had been consumed and 33 percent of the last six meals had been consumed, and the inmate was described with worsening and not improving symptoms. No documentation of the inmate's intake and output was located in the healthcare record.

**Findings**

The mental health care provided to this inmate at NKSP was inadequate. Although the inmate was referred to the MHCB, he should have been considered for a referral to inpatient care upon discharge from the MHCB. The inmate met criteria for referral to an acute level of care that would have provided him with intensive treatment, structured 24-hour nursing, and close monitoring of his intake and output. This inmate was not referred to a higher level of care, despite the lack of improvement in acute symptoms. Additionally, the treatment modifications included in the higher level of care documentation were inappropriate and inadequate.

**Inmate F**

The healthcare record for this inmate was reviewed as he was included on the non-referral log to higher level of care on (October 26, 2018, October 31, 2018 and November 13, 2018) after meeting criterion 5 (three or more MHCB referrals during the last six months) during all three interdisciplinary treatment teams and criterion 2 (requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to major mental disorder) during an IDTT on October 26, 2018. This inmate was provided with a diagnosis of Borderline Personality Disorder.

The inmate was a recent arrival to NKSP prior to the October 26, 2018 MHCB admission for threats to self and staff. He admitted to his PC that he had been abusing heroin and methamphetamine at the county jail until four to five days prior to his transfer to prison. The inmate was seen on October 26, 2018 for crisis evaluation, when he presented with increasing agitation and hostility, including increasingly severe acts of self-injury. He initially waved a formed noose in front of staff, and he later scratched himself drawing blood. He was ultimately admitted and then discharged from the MHCB following a ten-day stay.

The treatment plan on October 26, 2018 noted that the inmate met criteria 2 and 5 (described above); however, the rationale for non-referral and treatment modifications were inadequate. The non-referral rationale was simply that the inmate's condition "appeared manageable at the NKSP MHCB" without any supporting information. The only clinical treatment modification documented was to implement behavior modification to decrease self-harm; however, this was not clarified and required greater specification. An extended admission in the MHCB would be

1085

necessary for behavior modification to have been a practical treatment modification for this inmate.

On October 31, 2018, the EOP treatment team met and noted that the inmate met criterion 5 (three or more MHCB referrals in the last six months); however, he was not referred to a higher level of care. The clinical rationale provided during this IDTT were more detailed and clinically sound. On November 13, 2018, the treatment team addressed the multiple MHCB stays and non-referral to higher level of care with appropriate clinical rationale that documented clinical consultation and justification. The treatment modifications were clinically adequate**.**

**Findings**

This inmate was appropriately not referred to a higher level of care. While the initial clinical rationale was inadequate, subsequent IDTTs documented appropriate clinical rationales for non-referral, and treatment modifications were also improved. The inmate received adequate treatment.

**Inmate G**

The healthcare record for this inmate was reviewed as he was included twice on the non-referral to higher level of care log while in the MHCB. The inmate was identified as meeting criterion 2 (requires highly structured inpatient care with 24-hour nursing supervision) on November 2, 2018, and criteria 1 (as a result of a major mental disorder, inmate is unable to function at current level of care). On November 14, 2018, the inmate was again identified as meeting criterion 2 (requires highly structured inpatient care with 24-hour nursing supervision). The inmate was provided with a diagnosis of Major Depressive Disorder. He was prescribed Cogentin, Haldol, Prazosin and sertraline.

The inmate was admitted to the MHCB because he was experiencing suicidal ideation and had two plans, one of which he would not share with clinical staff. The clinical rationale for non-referral was minimal, simply stating that the inmate's mental health "condition" could be managed at NKSP; however, documentation did not include how this would occur or the specific symptoms or behavioral aspects of his mental illness that could or would be addressed at NKSP. The rationale also lacked specific referral criteria, given the very limited programming available at NKSP MHCB. The treatment modifications only included identification of alternative thought processes and behaviors to replace self-harm and maladaptive patterns. This appeared to be more appropriate as a long-term goal rather than one appropriate for the short-term MHCB stay. The inpatient coordinator noted the same deficiencies on the non-referral log and reported the deficiencies to the program supervisor.

It was concerning to note that on November 9, 2018, the treatment team did not identify any subjective or objective criteria met by the inmate in the higher level of care referral consideration document. This may have partially been due to the lack of an appropriate Spanish-language interpreter available for this inmate at that IDTT. This appeared to be substantiated by the IDTT conducted on November 14, 2018, as the IDTT again believed that the inmate met criterion 2 (described above) in addition to criterion 1 (inmate is unable to adequately function at this level

of care as a result of a major mental disorder). Despite meeting two higher level of care criteria, the IDTT did not refer the inmate due to a medication change that the team thought might result in stabilization. The treatment modifications included that medication change and additional CBT skills that were appropriate to the inmate's mental status. It should be noted that on November 16, 2018, the inmate met criteria 1 (see above), 2 (see above), and 5 (3 or more MHCB referrals), and he was subsequently referred to acute inpatient care.

**Findings**

The care provided to this inmate was ultimately adequate. While he should have been identified as meeting at least one criterion at the November 9, 2018 IDTT, the clinical rationale for non-referral were acceptable, as were the treatment modifications. A Spanish language interpreter should have been utilized at the IDTTs and all clinical contacts.  As the inmate failed to improve over the course of admission, the treatment team ultimately appropriately referred the inmate to a higher level of care, for acute inpatient treatment.

**Inmate H**

The healthcare record for this inmate was reviewed as he was listed twice on the NKSP non-referral log. This inmate met criterion 7 (participating in 50 percent or less of treatment) on two separate occasions in February 2019 during an MHCB admission.

On February 4, 2019, the MHCB IDTT determined that the inmate also met criterion 7 (see above) and criterion 2 (requires highly structured inpatient psychiatric care with 24-hour nursing supervision). The IDTT rationale for non-referral was appropriate, as the team wanted to allow for some time to determine the efficacy of interventions implemented since admission which included a medication change. The treatment modifications were appropriate and included interventions that could be implemented within the MHCB and continued post-discharge. The NKSP inpatient coordinator's assessment was consistent with this monitor's expert's review of the quality of clinical rationale and treatment modifications.

The inmate was seen again by IDTT on February 11, 2019 when it was noted that he only met criterion 7 (participating in 50 percent or less of treatment) for higher level of care referral consideration. The rationale was appropriate, documenting that the inmate's decreased participation was due to safety concerns and that, regarding treatment modifications, mental health staff would facilitate communication with custody staff regarding those safety concerns. In addition, the inmate reported that his psychotropic medication change had been effective, and positive changes had already begun, resulting in decreased symptomatology. An additional treatment modification included the PC educating the inmate about the EOP level of care and the role of treatment adherence in maintaining stability.

**Findings**

This inmate was appropriately not referred to inpatient care during his February 2019 MHCB admission. The inpatient coordinator was consistent in the assessment of the adequacy of clinical rationale and treatment modifications with this writer. This inmate received adequate treatment,

which addressed his symptoms.  Additionally, mental health staff facilitated resolution of his non-mental health concerns.

**Inmate I**

The healthcare record for this inmate was reviewed as the inmate appeared on the higher level of care non-referral log on three different occasions (October 31, 2018, November 27, 2018, and February 13, 2019) as meeting criterion 7 (participating in 50 percent or less of treatment). This ASU EOP inmate was provided with a diagnosis of Schizotypal Personality Disorder; he was not prescribed psychotropic medications due to refusal. The psychiatrist most recently described the inmate as circumstantial and delayed in speech on December 28, 2019.

The inmate was placed into the 3CMS in October 2017, removed during January 2018 and then referred to EOP on September 20, 2018. His placement in the EOP followed evaluation resulting from referrals from custody due to bizarre behavior and concerns that included his lack of socialization with other inmates, poor interaction with custody staff, refusal to program (such as go to yard), and refusal to communicate with mental health staff. In addition, staff noted that he had multiple toothpaste caps aligned on his windowsill with an apple stem precisely placed atop each cap. There were also handwritten notes stacked on his top and bottom bunk in segregation and affixed to the walls in several locations. The notes were disorganized in content, containing delusional content with grandiose and "metaphysical" themes, as well as references to the power of the universe and the power of the inmate's bloodline.

On October 31, 2018, the treatment team indicated that the inmate met only criterion 7; although the inmate also appeared to meet criterion 1 (inmate is unable to adequately function at the current level of care as the result of a major mental disorder). The clinical rationale for non-referral was inadequate.  The rationale stated that the inmate was uninterested in mental health, which was consistent with his lack of insight and his mental illness; the rationale also indicated that his refusal may have been due to "inmate politics," something not mentioned previously or supported by any other documentation, behavior, or custody concerns. Despite the fact that repeated PC progress notes indicated that the inmate was refusing to attend appointments and would only interact briefly, primarily to complete signature of the refusal form; the treatment plan presented this information as the inmate having been "compliant with clinician…no decompensation observed." The inmate had refused to attend IDTT.

By November 27, 2018, the inmate had been moved to administrative segregation, and a new treatment team attributed the inmate's continued refusal of treatment to gang politics. It was unclear how they determined that gang politics were the cause of the inmate's refusal, as this was never explained in the documentation and the inmate only minimally communicated with mental health staff between treatment team meetings, primarily only to say he refused clinical contacts and/or to sign refusal forms. The mental health staff did not document cell observations as had been performed at initial placement into the EOP to document improvement or deterioration of the organization and cleanliness of the cell. The mental health staff also did not document utilization of collateral information; this would have been beneficial as the inmate would not interact with mental health staff.  In light of the valuable information obtained from custody staff in the referral and placement of this inmate into EOP, that collateral information would be

critical. The clinical rationale for not referring to a higher level of care was consequently inadequate, as were the treatment modifications which were dependent on the inmate's attendance. His treatment plan established unrealistic goals without objective, behaviorally based indicators. For example, one goal was to attend and actively participate in unit programming daily when that was clearly unachievable; a lesser goal of coming out of cell two of seven days would have been a more appropriate initial and achievable goal. A second goal was to demonstrate continued improvement in functioning across treatment intervals; this included no observable behavioral criteria. Clinically appropriate interventions were also not included in the treatment plan.

Finally, on February 13, 2019, the treatment team indicated that the inmate met criterion 7 (refusing 50 percent or more of treatment) but the clinical rationale was not justifiable. While in the clinical summary, the treatment team noted that there had been improvement with the inmate increasing attendance and participation in his individual clinical contacts, which was a positive improvement; the clinical rationale for non-referral continued to note that the treatment refusal was likely due to gang politics without appropriate verification to justify such a conclusion. In addition, gang politics are not a clinical rationale; the inmate was described as thought disordered, yet he was not referred to a higher level of care. The rationale did note that the inmate was not gravely disabled; however, this level of dysfunction was not required for referral to inpatient care. The treatment modifications were adequate during this treatment team.

It should be noted that the inmate was transferred to another facility for administrative segregation placement where clinical progress had occurred. He subsequently returned to NKSP from "out-to-court." The NKSP PC contacted the sending facility PC to discuss the care provided and to incorporate some of the strategies that appeared effective at the sending facility into the treatment modifications. The treatment plan was similar to what was described above: overly broad with vague treatment goals that did not include objective behaviorally based criteria and clinically appropriate interventions.

**Findings**

This inmate was not appropriately considered for a higher level of care. The treatment provided to this inmate was inadequate as evidenced by poorly developed treatment plans, inappropriate treatment modifications during several treatment team meetings, and insufficient clinical rationales for non-referral.

**Inmate J**

The healthcare record for this inmate was reviewed because the inmate had been identified as an inmate who had received services through the crisis intervention team (CIT). A SRASHE dated October 9, 2018 that corresponded to the CIT log was reviewed. No progress note of this encounter was located in the healthcare record as required by the NKSP local operating procedure (LOP). The SRASHE did not indicate that it was completed as a function of the CIT but did note that there had been an emergency referral indicating possible suicidal ideation. The clinician documented that the custody interview had occurred, and SOMS had been reviewed; however, the electronic healthcare record had not been reviewed.

The inmate was described as "minimally cooperative with vague or no answers to clinician's questions." There was no documentation that the other members of the CIT (nursing staff, facility supervisor) met with the inmate to discuss the case. Based upon the documentation, it appeared that this assessment actually involved only one clinician responding to a crisis call rather than a genuine CIT response involving the entire CIT. Nursing documentation in the EHRS was inconsistent with that described in the NKSP CIT LOP.

There was no documentation available regarding the original referral allowing for assessment of the adequacy of the crisis response.

**Findings**

This crisis response did not comply with the NKSP CIT LOP; instead the documentation was more consistent with a single provider responding to an emergency crisis call. While it appeared that the inmate was appropriately returned to his cell, based on available documentation, critical documents such as the reason for referral were not available to make necessary determinations regarding the adequacy of the crisis response. This was not an adequate CIT response for an emergency mental health evaluation.

**Inmate K**

The healthcare record for this inmate was reviewed because the inmate had been identified as receiving CIT services on November 6, 2018. The inmate arrived in the reception center on November 6, 2018, and he was quickly seen by CIT; although a progress note was not completed as required by the NKSP CIT LOP. A SRASHE was completed on that date that indicated that the inmate was reporting that the voices in his head were telling him to kill himself. The psychologist also documented that he had reviewed a staff/custody referral; he subsequently interviewed the inmate and reviewed the healthcare record.

There was no documentation that the CIT responded as a team or that each member had completed their necessary components of evaluation. The psychologist alone appeared to make the determination that the inmate could return to his cell based on available documentation in the SRASHE, and to increase the level of care to EOP. These determinations were inconsistent with the NKSP CIT LOP.

Based on available documentation, this intervention appeared to be a crisis response by an individual provider rather than a coordinated crisis team response. There was no nursing documentation that was consistent with the NKSP CIT LOP.

**Findings**

Despite this case appearing in the CIT log, the response was not consistent with the NKSP CIT LOP. The inmate appeared to have been appropriately not referred to the MHCB at that time, but the documentation of the process was inappropriate and was based on an individual clinician's

judgment and not the result of a crisis intervention team. This was not an appropriate CIT response.

**Inmate L**

The healthcare record for this inmate was reviewed because the inmate was listed on the CIT log as receiving services on March 12, 2019. There was a telephone call on March 12, 2019 at 1230 hours to psychiatry by the registered nurse for consultation as the inmate potentially posed a risk of self-harm. At 1408 hours, the inmate was seen by a psychologist for the completion of a SRASHE; the psychologist noted that the contact was for reasons related to suicidality. The psychologist reviewed SOMS and the EHRS, and the inmate was interviewed. The inmate denied multiple risk factors and suicidality. Because a progress note was not completed in accordance with NKSP LOP for CIT, there was no documentation to determine if the inmate had been asked why he reported suicidality upon arrival but denied it to the psychologist, and/or the reason for the change in mindset. The SRASHE included minimal information, and the inmate was determined to not require MHCB placement but did meet criteria for inclusion in the EOP, particularly given his high levels of anxiety.

Other than the documentation that the nurse had contacted psychiatry earlier in the day, there was no indication that the CIT had met with the inmate together or otherwise adhered to the CIT process. There was no nursing documentation that was consistent with the NKSP CIT LOP, nor was there any documentation by a custody supervisor.

**Findings**

This appeared to have been an individual provider responding to a crisis call, not a CIT response. There was no evidence that the required contacts occurred in accordance with the NKSP CIT LOP. No documentation was located in the EHRS that was consistent with the NKSP CIT LOP. This was not an adequate CIT response.

**EXHIBIT V**
**California Correctional Institution (CCI)**
**March 10, 2020 – March 12, 2020**

**Inmate A**

This 3CMS level of care inmate's healthcare record was reviewed to assess the quality of the SRASHE and safety plan. The inmate was housed in ASU during February 2020. His history was positive for suicide attempts and self-injurious behavior incidents. Although clinicians expressed doubts regarding the legitimacy of his reported suicide attempts, they noted the inmate consistently reported two past attempts by hanging. The PC at CCI noted that the inmate often endorsed suicidal ideation and engaged in self-harm to avoid court appointments or to achieve housing and level of care changes.

On March 6, 2020, the inmate reported that he ingested several over-the-counter pain relievers and endorsed suicidal ideation. Documentation in the SRASHE on this date indicated the inmate claimed he had ingested ten pills throughout the day to manage headache pain, and adamantly denied intent to harm himself. The evaluating clinician ultimately did not recommend inpatient admission on this date but documented that the inmate had been refusing mental health treatment for 90 days, had received three RVRs in three months, had been violent, and had frequent community hospital visits for ingesting potentially harmful objects or substances. The judgment of suicide risk on the SRASHE was high for chronic and low for acute. The inmate refused to participate in safety planning, as he was adamant he did not intend to harm himself.

**Findings**

The results of this healthcare record review were mixed. The SRASHE completed on March 6, 2020 in response to the inmate's self-injurious behavior was adequate. The justification for acute and chronic risk with mitigating factors was thorough and clear. The clinician's rationale for not recommending inpatient admission also was well documented. The evaluating clinician appropriately ordered a five-day follow-up and documented a plan to contact the primary clinician regarding the inmate's increased risk.

While the inmate refused to participate in the safety planning portion of the SRASHE following the self-injurious behavior incidents on February 13, 2020 and March 6, 2020, there should have been a documented follow up plan for completing the form in light of the inmate's risk for self-harm.

The CCI treatment targets, goals, and interventions were poor. The inmate's self-injurious behaviors were not addressed in the treatment plan or interdisciplinary plans of care (IPOCs), despite repeated acts. The inmate's ingestion of objects and pills may result in unintentional serious harm, and this should have been a primary focus of his treatment.

**Inmate B**

This inmate's healthcare record was reviewed to assess the quality of the treatment plan and the appropriateness of his current level of care.

The inmate was in the 3CMS level of care at the time of his arrival to CCI on July 8, 2019.  He was diagnosed with Major Depressive Disorder and Opiate Use Disorder, and he had one serious suicide attempt by overdose on heroin in January 2019.

Since arrival at CCI, the inmate was described as stable, "sober," and desiring removal from 3CMS.  He denied suicidal ideation and a desire to use drugs since July of 2019.

The inmate had one IPOC for depressed mood.

**Findings**

While this inmate was appropriately retained in 3CMS level of care at CCI, the care provided was inadequate.  Treatment planning for this inmate was very poor.  He had one mental health IPOC for depression, but interventions were vague and goals were generic.  Suicidal ideation should have been included in the treatment plan upon arrival, due to the inmate's documented suicide attempt by overdose six months prior.  Substance abuse was not addressed in the treatment plan or IPOCS.  There was a statement about monitoring the inmate for relapse and a reference to a relapse prevention plan in one note; however, this was not incorporated into the treatment plan and was not available in the healthcare record for review.  Finally, the one SRASHE completed at CCI did not include a safety plan and did not reference an existing one.

**Inmate C**

This 41-year-old inmate's healthcare record was reviewed to assess the provision of healthcare at the 3CMS level of care after he had three MHCB referrals within six months.

This inmate's initial IDTT was completed in absentia on January 14, 2020 and documentation indicated he was diagnosed with anxiety, a mood disorder, and Anti-Social and Borderline Personality Disorders.  Documentation was lacking to support diagnoses.  His treatment goal was to reduce depression to a four or below but there was no baseline to assess change.  Interventions were reasonable, but it was unable to be determined if they were individualized.  Psychiatric medications included Vistaril, Zyprexa and BuSpar.

He was discharged from the MCHB to 3CMS level of care where it was opined that his "behavioral presentation coupled with his verbal responses were inconsistent with…statements that he intends to kill himself…he has used impression management as an attempt to control custody and clinician behavior."  Consequently, IDTT determined that treatment would address communication skills, which was not added as a treatment goal.  Further, treatment goals did not address underlying factors for impression management or precipitating or maintaining factors for moderate chronic risk for self-harm, identified by the MHCB discharge SRASHE.

The initial PC assessment did not include any original documentation by the clinician, instead, content was pulled forward from other providers, including the clinical summary and case formulation. There was no current mental status assessment. While within Program Guide timelines, he was seen by his PC two weeks after IDTT due to an increase in stressors. However, there was no plan to increase treatment frequency but for him to access mental health if needed.

Despite recent discharge from a MHCB, his initial psychiatric assessment occurred after his initial IDTT, and almost a month after his admission to CCI. Of concern, his medications had expired five days prior. There was a documented plan for psychiatric follow-up within 14 days, but documentation was not located.

**Findings**

This inmate's care was inadequate. In addition to specific issues noted above, there was a lack of individualization of this inmate's care. Despite a recent discharge from the MHCB, PC treatment contacts did not occur as clinically indicated, and psychiatric contacts were non-compliant with Program Guide timelines. Symptom specificity and rationale for diagnoses was needed. Treatment planning needed improvement and was lacking full consideration for precipitating and maintaining factors for risk of self-harm and the treatment team's assessment that he engaged in impression management.

**EXHIBIT W**
**California Institution for Men (CIM)**
**November 5, 2019 – November 7, 2019**

**Inmate A**

This inmate's file was reviewed due to quality of care concerns observed during IDTT. During IDTT, the inmate endorsed high levels of depression and anxiety, sleep disturbance, feelings of helplessness, and fears of victimization due to his physical disability. The inmate attributed his level of distress to chronic pain, mobility impairment, a lack of visitation from family, and lack of access to approved meals. Additionally, the inmate expressed concern regarding a visible hand tremor attributed to his psychiatric medication.

According to the inmate's medical record, he is serving his first prison term with an expected release date in 2023. The inmate's history is positive for major depressive episodes, two recorded suicide attempts, and one MHCB placement for suicidal thoughts less than three months ago. One suicide attempt occurred while in the military and involved wrist cutting. His second suicide attempt involved overdosing on medications while in the community two years ago. Medical diagnoses for this inmate include degenerative spine disease, insulin dependent diabetes, and chronic pain.

During a five-day follow-up on August 31, 2019 a psych tech wrote that the inmate reported extreme weight loss due to dietary issues, and the psych tech responded by encouraging the inmate to submit a request for dietician review. In a note dated September 3, 2019 the inmate reported, "My mind is everywhere telling me that I am not working correctly." In October 2019, the inmate was "found to be severely malnourished," and was transferred to a community hospital due to weight loss and an inability to manage his activities of daily living (ADLs). He returned to CIM from the community hospital around November 1, 2019.

During IDTT on November 5, 2019, the IDTT failed to incorporate relevant information from the electronic health record, made no mention of level of care considerations or recent hospitalization, and did not address suicide risk or safety planning. The psychiatrist had not met with the inmate prior to IDTT, and he raised concerns about the inmate's medication order expiring since they had not been administered one day prior. When the inmate complained of a hand tremor attributed to his psychiatric medication, the psychiatrist encouraged him to submit a request for psychiatry "as needed." The inmate's next scheduled psychiatry visit was more than twenty days later. Finally, in response to the inmate's distress surrounding CDCR's failure to provide approved meals, the IDTT encouraged him to submit another request form for a dietician review.

**Findings**

This inmate's care was inadequate. The IDTT failed to incorporate critical inmate information in their decision making. Without discussing the inmate's history of MHCB placement, past suicide attempts, recent hospitalization, and level of care considerations, the IDTT ignored this inmate's treatment needs. By repeatedly encouraging this inmate to submit request forms, the IDTT

demonstrated a marked absence of a sense of urgency for this inmate who was observably distressed and at risk. This case was brought to the attention of the Chief of Mental Health for follow-up. If this inmate is to be retained at 3CMS level of care, the frequency of contacts should increase based on current clinical need.

**Inmate B**

This inmate was reviewed due to level of care concerns highlighted in plaintiffs' counsel pre-tour monitoring memorandum. The inmate was admitted to the MHCB at CIM three times between October 3, 2019 and October 18, 2019. During the first MHCB admission, psychiatric medications were started, exacerbation of symptoms was attributed to reception center placement, and the inmate was said to have stabilized prior to discharge at 3CMS level of care by the seventh day. The inmate was readmitted to the MHCB on October 11, 2019 and discharged at the EOP level of care on October 17, 2019. MHCB staff began working with custody to transfer the inmate out of the reception center around the time of his second MHCB discharge since this was identified as a significant source of stress. Upon the inmate's third admission on October 19, 2019, mental health and custody staff developed a plan to hold the inmate in the MHCB until his transfer to a mainline facility. According to the MHCB psychiatrist, there was a miscommunication with custody staff regarding whether or not to place the inmate on discharge status while awaiting transfer, and the number of days went well beyond the approved extension. At the time of this review, staff were expecting the inmate to transfer within 24 hours.

**Findings**

This inmate's care was appropriate.  It appears mental health and custody staff attempted to collaborate adequately to address the inmate's treatment needs. His level of care was appropriately changed to EOP at the time of his second MHCB admission. Although there was a breakdown in communication that resulted in a very long MHCB admission, it was clear the inmate's safety concerns were being addressed at this level of care while he awaited transfer to a mainline facility.

**Inmate C**

This RC EOP inmate was identified during IDTT observation where he exhibited paranoia, rapid mood fluctuations and erratic behavior. His healthcare record was reviewed to evaluate quality of care.

Although the medical record revealed a history of Bipolar and Schizoaffective diagnoses, the PC's treatment plan focused primarily on anxiety and substance abuse. The case conceptualization was very poor, and the PC failed to address functional deficits exhibited by the inmate. The psychiatrist appropriately addressed the inmate's symptoms with antipsychotic medication. Despite the discrepant approach to treatment, there was no discussion regarding modifications to the treatment plan during IDTT. Finally, the IDTT failed to discuss level of care considerations for this inmate who was showing signs of psychiatric decompensation in the IDTT.

## Findings

This inmate's care was inadequate.  Although steps were being taken to appropriately address the inmate's emotion dysregulation on the date of IDTT, care was not coordinated between providers, and indications of decompensation were not addressed during IDTT or in the treatment plan. The PC would benefit from additional training on level of care considerations and treatment planning.

## Inmate D

This 57-year-old 3CMS inmate's case was reviewed to address plaintiff counsel's concerns about level of care and treatment planning.  At the time of the review, he was on A facility serving life without parole.  He was diagnosed with Bipolar Disorder and prescribed Depakote and Vistaril. Throughout his incarceration, he had numerous MHCB admissions (most recent July 2019) and was EOP level of care for approximately 11 years until October 2018 when his level of care changed to 3CMS.  He had a history of suicide attempts with the most recent in 2016.  He had a long history of substance abuse and a chaotic childhood.  There was no documentation to indicate whether these experiences were considered for diagnosis or treatment planning.
His initial PC assessment and IDTT were completed timely on September 20, 2019.  Similar to his initial PC assessment, he presented as irritable during IDTT, however irritability was not included as a treatment goal. Treatment goals were to address anxiety (reduce to a rating of a 2 or lower) and mania (in remission by next IDTT), however, manifestation of these symptoms was not clearly documented, and it was unclear if treatment goals were realistic.  Rationale for treatment interventions was unclear.  Medication was not included as a treatment intervention. His initial psychiatric assessment was not timely.   Documentation from a routine psychiatric contact (October 25, 2019) was minimal and there were no significant mental health issues identified.  A review of the MAR indicated medication compliance with only three refusals since his admission.

## Findings

A combination of factors resulted in assessment of this inmate's care as inadequate.  His initial psychiatric assessment was overdue; symptoms to support and rationale for diagnosis were lacking, and treatment planning was insufficient.  Despite these shortcomings, regarding plaintiff counsel's concerns, there was no documentation of distress, decompensation or other symptoms/behaviors that would warrant a change in level of care.

## Inmate E

This 41-year-old inmate was diagnosed with Adjustment Disorder with Anxiety and Opioid Use Disorder Severe in Early Remission. His healthcare record was reviewed to assess his mental health care while in the RC STRH.

On September 23, 2019, he was admitted to the RC STRH after he received an RVR for Battery on a Prisoner.  Shortly thereafter, he was referred for a routine consult after a request to speak with mental health staff due to anxiety and insomnia.  During that contact, an initial assessment

1097

was completed and he was referred to 3CMS level of care. The initial evaluation was well written, covered pertinent clinical information and provided a rationale for level of care and diagnosis. He was referred for a psychiatric consult and seen on October 1, 2019, at which time Remeron was prescribed. His initial psychiatric contact occurred on October 29, 2019, after IDTT, and it was thorough and well written.

PC contacts between October 3, 2019 and November 4, 2019 occurred on a weekly basis but not every seven days as required. There was documentation of identified treatment interventions to address anxiety and sobriety.

**Findings**

Documentation of treatment provided was very good. However, due to multiple non-compliant contacts, this inmate's care was inadequate.

**Inmate F**

This 3CMS inmate's healthcare record was selected for review because plaintiffs' counsel were concerned regarding the adequacy of treatment and level of care. The inmate was DDP1 in addition to being on the mental health caseload and was being seen by the DDP officer and clinician. He was diagnosed with Major Depressive Disorder, recurrent, moderate, with a history of head injury with associated coma. He refused any psychiatric medications.

The treatment plan was adequate for the symptoms described in documentation. During a June 18, 2019 PC contact, the inmate reported problems with a staff member about whom he had filed a CDCR Form 602. The inmate stated that he had a desire to speak more to the clinician about his feelings and life and the PC indicated that she would reschedule him later in the week. During the June 20, 2019 contact, the inmate reported mild depression, but expressed symptoms of increased anhedonia and somnolence with observed lack of energy.

The inmate was next seen by the PC on September 19, 2019 and appeared to be functioning adequately, though he remained vulnerable due to his DDP1 status (e.g., presents in childlike manner). The inmate described several coping skills for his depression and anger that he used and was determined to be at the appropriate level of care. The inmate appeared to be actively engaged in utilizing his coping skills to minimize depressive symptoms. Symptoms that were noted during the June 20, 2019 contact were reported to have improved, though variable, based on external circumstances.

**Findings**

Based on available documentation, this inmate received adequate care and was at the appropriate level of care.

**Inmate G**

This MHCB patient's case was selected for review to assess treatment adequacy and level of care; concerns documented in Plaintiffs' counsel pre-tour monitoring letter.  He was re-admitted to the MHCB on October 20, 2019 after he was discharged on October 17, 2019 following a ten day stay.  At the time of the site visit, he was awaiting transfer to an acute inpatient program. The patient was identified by the psychiatrist as having a history of Major Depressive Disorder, substance-induced psychosis, anxiety, and "vague psychotic symptoms during times of sobriety." He was prescribed Zoloft, Remeron and Zyprexa.

Prior to the first MHCB placement, the patient cut his throat requiring 46 staples. Despite the severity of this attempt, the patient was discharged to 3CMS.  Documentation was poor. Specifically, the clinical summary was not updated to reflect the presence or absence of suicidality, while other documentation indicated that the inmate had remained suicidal but that he had no plan. The safety plan was limited and did not reflect the seriousness of the patient's suicide attempt despite repeated statements that he was fearful and did not want to go back to the yard.

The patient was re-admitted to the MHCB three days later after another suicide attempt.  He had lacerations on his neck and forearm requiring outside medical attention and received multiple staples on his wrists.  He was referred to acute inpatient level of care; however, the treatment team waited until his weekly IDTT to make the referral thereby delaying access to care.

**Findings:**

This patient did not receive adequate care.  The patient should have been considered for referral to inpatient level of care during his initial MHCB admission.  In addition, his safety plan from that admission was inadequate to meet the severity of suicidal intent.  Further, he was not discharged to the appropriate level of care in light of his acute suicidality.  Lastly, the delayed referral to acute inpatient care during his second admission was further indicated inadequacy of care.

**EXHIBIT X**
**California Institution for Women (CIW)**
**November 12, 2019 – November 15, 2019**

**Inmate A**

This patient transferred to CIW MHCB from CCWF on July 10, 2019 due to suicidal ideation with a plan to hang herself. She was previously housed in SHU, and expressed inability to cope in SHU, poor medication efficacy, recent heroin use, and a pending difficult anniversary. She was also reportedly medication nonadherent for the prior three months.

The patient was provided with a diagnosis of Bipolar Disorder without psychosis, Borderline Personality Disorder and Opioid Dependence. The patient had a history of three suicide attempts while in CDCR. She was changed from EOP to 3CMS level of care during December 2018.

A review of treatment plans indicated a treatment goal in the MHCB to decrease suicidal ideation. After five days in the MHCB, the patient was discharged to the PSU. She had two subsequent MHCB admissions that occurred from July 26, 2019 to August 5, 2019 (cutting arm), and August 27, 2019 to September 5, 2019, both for suicidal ideation or self-injurious behavior. It appeared that her MHCB admissions were precipitated by relationship issues with another inmate.

After her third MHCB admission, the patient was placed on the High Risk List for increased monitoring. The treatment team decided not to refer to a higher level of care as the patient was new to the PSU; further, she had resolution of suicidal ideation and intent, decrease in depression and anxiety, and improvement on medications adherence. Documentation after MHCB discharge indicated that the patient was stable.

A SRASHE completed on August 4, 2019 determined that the patient was a high acute and chronic suicide risk. A SRASHE completed on September 4, 2019 noted high chronic and moderate acute risk.

**Findings**

The care provided to this patient appeared adequate. There was documentation of appropriate safety planning for this patient with recurrent suicidal ideation and self-injurious behaviors. There was documentation of five-day follow-up after MHCB discharge. The decision not to refer to a higher level of care after three MHCB admissions was well documented and clinically appropriate.

**EXHIBIT Y**
**Richard J Donovan Correctional Facility (RJD)**
**March 19, 2019 – March 22, 2019**

**Inmate A**

This inmate was scheduled to participate in onsite group interviews with the monitor's expert; however, he was unable to attend as a result of his significant psychotic symptoms and level of agitation. The inmate was diagnosed with Schizoaffective Disorder, bipolar type, and he was prescribed Zyprexa, Lithium, and Cogentin with orders for involuntary intramuscular injections in the event of medication refusal. The current PC 2602 order was scheduled to expire on June 18, 2019. He had a history of multiple MHCB and DSH admissions. His level of care was EOP and he was housed on facility A at the time of this review.

The inmate was treated in the CTC for two months after a serious assault that resulted in a broken jaw. He continued to have victimization concerns following his return to facility A, and he would limit his out of cell activity to meals and showers. Recent progress notes indicated that the inmate presented with paranoid ideation that may have been reality based.

The most recent treatment plan dated February 27, 2019, included goals to address grandiosity and treatment non-adherence.

At the request of the monitor's expert the inmate was seen by his PC due to concerns noted at the time of group interviews. Consistent with previous contacts, the PC reported that the inmate was highly suspicious and paranoid of others. However, he was medication compliant.

**Findings**

The care provided to this inmate was adequate. Although the monitor's expert was concerned about the inmate's paranoia and uncooperative behavior during onsite interviews, the healthcare record suggested the inmate was likely functioning at baseline, was medication adherent, and did not require a higher level of care at the time. Further, treatment planning for this inmate was appropriate.

**Inmate B**

This 45-year-old 3CMS inmate transferred to RJD from SATF on January 2, 2019. Diagnoses included a closed head injury, a seizure disorder, depressive disorder and a substance use disorder. He presented with side effects of akathisia and a sleep disturbance. His depressed and anxious mood were attributed to lack of family connections and prison politics. He was prescribed Abilify, Vistaril, amitriptyline, Remeron, Dilantin, and propranolol. His estimated parole release date (EPRD) was April 8, 2020. The inmate was placed in administrative segregation for possession of an illegal substance.

The treatment plan appropriately addressed issues relevant to his substance abuse disorder and symptoms of depression.

On January 15, 2019, the inmate was seen in a non-confidential setting at his request. A February 14, 2019 PC progress note indicated that the inmate was seen cell side due to refusal. Documentation suggested that he was concerned about communicating with mental health due to his current gang affiliation.

The administrative segregation prescreening evaluation occurred on February 20, 2019. The February 25, 2019 initial PC assessment noted that the inmate had a history of Major Depressive Disorder with Psychotic Features and a Schizoaffective Disorder. Subsequent MHPC progress notes were dated February 25, March 4, 11, 18, of 2019. An ICC meeting occurred during March 1, 2019.

There were no psychiatry progress notes since his arrival at RJD.

**Findings**

The care provided to this inmate did not meet Program Guide requirements. The inmate had not been seen by a psychiatrist since his arrival at RJD, despite active psychotropic medication prescriptions.

**Inmate C**

This healthcare record was reviewed to evaluate the quality of 3CMS services at RJD. The inmate was transgendered and arrived at RJD in 2017. Psychiatric diagnoses included Dysthymic Disorder and Amphetamine Abuse. The inmate was prescribed oxcarbazepine (300mg at noon and bedtime) and Vistaril (50mg once at bedtime).

Records from December 2018 and January 2019 revealed that the inmate was exhibiting increased distress and reporting worsening sleep, racing thoughts, poor attention, isolation, decreased appetite, and other depressive symptoms. However, these symptoms were not specifically targeted in the January 16, 2019 treatment plan. The treatment intervention for depressed mood involved fostering a therapeutic alliance by empathizing with the inmate's feelings of distress, and goals relied on subjective ratings of depression instead of objective behavioral measures. All required disciplines were present for IDTT on this date.

Mental health contacts occurred about every three weeks. The PC's progress notes indicated supportive therapy was primarily utilized; more active interventions were minimal during individual treatment contacts. The record also suggested that supportive therapy had a positive impact on the inmate's ability to tolerate environmental stressors. The inmate participated in and appeared to benefit from a coping skills treatment group that met twice per week for one hour.

A March 12, 2019 telepsychiatry progress note repeatedly used male pronouns when referring to the transgendered inmate. The note also indicated that the inmate requested to reschedule the appointment and preferred an office visit.

## Findings

The care provided to this inmate was adequate, although minimally. The inmate appeared to benefit from medication management, supportive therapy, and group treatment. However, the treatment plan and progress notes were insufficient. With the exception of medication management, treatment interventions were neither meaningful nor evidence-based. Cognitive-behavioral therapy (CBT) was not utilized, despite its proven efficacy for depressive symptomatology. Treatment goals should include objective measures of progress instead of solely relying on subjective ratings of depression. Further, PC progress notes should be linked to the treatment plan and reflect active interventions.

## Inmate D

This healthcare record was reviewed to follow up on level of care concerns noted during onsite inmate interviews. During interviews, the inmate reported that he had been assaulted by another inmate after complaining about custody staff to internal affairs, and he believed custody officers were involved in organizing the assault. The inmate also reported that recent referral to an intermediate care facility was evidence of further retaliation. He was diagnosed with Major Depressive Disorder and Post-Traumatic Stress Disorder (PTSD). BuSpar (10 mg three times daily as needed) and Trileptal (300 mg twice daily as needed) were prescribed for anxiety.

Progress notes indicated that the inmate had high levels of depression and anxiety with chronic suicidal ideation. His group treatment compliance was sporadic, and he had been added to the institution's high-risk list for closer monitoring. PC contacts focused on teaching distress tolerance, monitoring for signs of decompensation, and reviewing and updating the inmate's suicide prevention safety plan.

The record suggested that the inmate began decompensating significantly around the time of the reported assault and allegations against custody staff. He was isolating more, refusing showers, and attending less treatment. On March 5, 2019, the inmate was referred to intermediate care, and the clinical documentation substantiated the referral. The treatment team added treatment modifications while the inmate awaited transfer, including considering medication adjustments to address his significant clinical needs.

## Findings

The care provided to this inmate was adequate. The treatment team appropriately identified and addressed safety concerns and referred the inmate to intermediate care.

## Inmate E

This healthcare record was selected for review as the inmate had three separate entries on RJD's higher level of care non-referral log. The inmate's level of care was EOP at the time of this review. He was diagnosed with Adjustment Disorder, Borderline Personality Disorder, and Antisocial Personality Disorder. The inmate had significant trauma, a negative view of himself, and frequently engaged in maladaptive behaviors. Psychiatric medications included olanzapine

(5mg once at night), prazosin (1mg at bedtime), and Risperdal (2mg at bedtime and 1mg at morning). The inmate reportedly had 19 MHCB level of care referrals in a three-month period. Although this could not be confirmed by the record, it was clear that the inmate had at least three MHCB admissions within the preceding six months.

Progress notes indicated that the inmate repeatedly swallowed objects necessitating trips to outside hospitals. It was noted that the inmate's mother expressed concern that he stopped communicating with her prior to September 19, 2018. On September 26, 2018, the inmate expressed significant concern and anxiety related to the court process. The PC noted that it was possible that the inmate may become psychotic when under extreme stress.

An October 15, 2018 higher level of care non-referral rationale stated that the inmate had a history of engaging in self-harm and reporting suicidal ideation for secondary gain, including to avoid court, achieve a higher level of care, or to access an outside hospital. The rationale was based on the inmate's history of malingering, instead of his current symptoms and functioning. The treatment modifications for the inmate's frequent inpatient admissions were equally superficial and predicated on the inmate's motivation to change his behavior, despite his apparent lack of intrinsic motivation. The December 5, 2018 MHCB discharge plan included the same higher level of care non-referral rationale and treatment modifications as the November 2018 and October 2018 treatment plans.

The inmate was eventually referred to a higher level of care during a recent MHCB admission.

**Findings**

The treatment provided to this EOP level of care inmate was inadequate. Treatment interventions were insufficient. There was evidence of significant dysfunction that the inmate expressed through self-injurious behavior; however, this was not appropriately addressed in the treatment plan. The IDTT should have assessed the underlying function of the inmate's behavior and offered effective behavioral interventions. Higher level of care non-referral rationales between October and December of 2018 were inappropriate and failed to properly consider the inmate's current symptoms, functional deficits, and level of care needs. Further, the treatment team mischaracterized the inmate's functional impairments as volitional.

**Inmate F**

This healthcare record was reviewed to evaluate the appropriateness of the inmate's recent level of care reduction and transition. The inmate was diagnosed with Schizophrenia, paranoid type, and Antisocial Personality Disorder. He was prescribed risperidone (2mg evening) and Vistaril (25mg four times daily).

The record indicated that a 3CMS transition plan was in place for several months, and that the inmate would develop the necessary skills to maintain stability in a less restrictive level of care. Multiple PC and psychiatry progress notes indicated that the inmate's focus was on not returning to the inpatient setting, working toward EOP level of care discharge, and demonstrating

readiness for 3CMS level of care. His level of care was reduced from EOP to 3CMS on November 6, 2018.

The 3CMS level of care treatment plan was well-developed and addressed the inmate's primary symptoms, including behaviors that previously resulted in higher level of care referrals. The inmate was included in a weekly treatment group that was process oriented and aimed at supporting him during his level of care transition.

PC and psychiatry contacts were timely following the level of care change to 3CMS. The IDTT, however, was not. Although he was scheduled to meet with his PC every 60 days, this did not occur. The inmate missed an appointment while out to court, and he was not rescheduled upon return to RJD.

**Findings**

The care provided to this inmate was adequate and the level of care decision was appropriate. With the exception of IDTT, mental health contacts were completed in accordance with Program Guide requirements at RJD.

**Inmate G**

This healthcare record was reviewed to evaluate the appropriateness of the inmate's recent level of care reduction and transition. Prior to arrival at RJD, the inmate was at DSH-Coalinga for mood lability, depression, and thinking errors. According to the DSH discharge summary, the inmate had numerous prior inpatient referrals to MHCB, intermediate care, and acute programs, as well as EOP placements. He was diagnosed with Major Depressive Disorder, Post-Traumatic Stress Disorder, Borderline Personality Disorder, Antisocial Personality Disorder, Alcohol Use Disorder, and Cannabis Use Disorder. Records suggested the inmate stabilized after approximately two months at DSH; although the summary was hand-written and difficult to read. The inmate discharged to the EOP level of care with prescriptions for Abilify, BuSpar, Sertraline, and Vistaril. He transferred from DSH to RJD on August 17, 2018. By September 19, 2018, his level of care was reduced to 3CMS, and by December 19, 2018, he was removed from MHSDS entirely.

The inmate discussed his goal of "getting off EOP" during the initial PC assessment at RJD. He subsequently refused the initial psychiatric evaluation. The psychiatrist followed up with the inmate in the dayroom and noted that the inmate reportedly stopped taking his psychotropic medication prior to leaving DSH. However, this information was not consistent with the DSH discharge summary and suggested that the RJD psychiatrist had not reviewed the record. The inmate also informed the psychiatrist of his desire to achieve 3CMS level of care in order to transfer to a northern institution that was closer to family.

Approximately two weeks after his arrival at RJD, the inmate was placed in administrative segregation for an alleged battery on his cellmate. The PC met with the inmate several times, but only for brief encounters at cell front. He did not meet with a psychiatrist in the segregation unit. On September 19, 2018, the IDTT convened, with all required members present, and the

inmate's level of care was reduced to 3CMS. The rationale for the reduction in level of care included that the inmate had been actively working "over the course of the last several months" to reduce his symptoms and reduce his level of care. This treatment plan noted an earlier intermediate care placement but did not reference the most recent August 2018 DSH placement or recommendations in the discharge summary.

The inmate subsequently transferred to several other facilities and was removed from MHSDS by December 19, 2018.

**Findings**

The care provided to this inmate was inadequate. Continuity of care was poor, as DSH records and discharge recommendations were not incorporated in treatment and level of care decisions at RJD. Consequently, the treatment team did not appropriately intervene upon learning that the inmate stopped taking his psychiatric medications upon arrival, and the level of care justification were incomplete.

**Inmate H**

This healthcare record was reviewed to evaluate the appropriateness of the inmate's level of care and higher level of care non-referral rationales. The inmate met the higher level of care referral indicator for participating in less than 50 percent of his treatment. He was included on RJD's higher level of care non-referral log three times following IDTTs in EOP and MHCB levels of care. The inmate was diagnosed with Major Depressive Disorder, recurrent, severe. He was prescribed Keppra (1500 mg twice daily) and Vistaril (100 mg at bedtime).

The MHCB's October 15, 2018 higher level of care non-referral rationale was only minimally adequate. The IDTT noted that this was the inmate's initial IDTT and that more time was needed to determine whether a higher level of care referral was indicated. However, they could have based their referral decision on collateral information in the healthcare record. The MHCB discharge non-referral rationale, dated October 22, 2018, was vague, did not address the positive referral indicator, and included copied and pasted treatment modifications.

The inmate's EOP level of care IDTT occurred in the administrative segregation unit on October 31, 2018. The treatment plan noted that the inmate recently discharged from MHCB for suicidality. The IDTT's non-referral documentation indicated that the inmate was relatively stable and that the treatment team was considering a reduction in level of care. Extensive behavioral descriptions were used to justify the non-referral rationale and the inmate was placed on modified EOP program on this date.

A November 5, 2018 note indicated that the inmate broke a window in his cell, reportedly swallowed glass, was transported to an outside hospital, and tested positive for amphetamines. He was admitted to the MHCB level of care upon return. On November 8, 2018, the IDTT determined that a referral to an acute psychiatric program was necessary due to the inmate's recent suicide attempt, continued suicidal ideation, and acute anxiety. The treatment modifications were clearly copied and pasted, as they were identical to those found in another

inmate's treatment plan. The plan did not address the primary behavioral impairments or presenting problems, including his acute substance intoxication, sustained anxiety, and inability to manage distress. The inmate transferred to a higher level of care.

**Findings**

The care provided to this inmate was adequate, although minimally. The inmate should have been referred to a higher level of care sooner. Higher level of care non-referral rationales and treatment modifications were not appropriate. Treatment plans were not inmate specific and failed to address the inmate's presenting problems.

**Inmate I**

This healthcare record was reviewed to evaluate the appropriateness of the inmate's current level of care and RJD's higher level of care non-referral rationales. The inmate had three entries on the higher level of care non-referral log during the review period. He met referral indicators for inability to adequately function at the current level of care; requiring highly structured inpatient care with 24-hour nursing supervision; demonstrating chronic psychiatric symptoms that have not responded to six months of treatment; and having three or more MHCB referrals within a six month period. The inmate was diagnosed with Unspecified Mood Disorder. He was prescribed BuSpar (10 mg three times daily), citalopram (20 mg daily), doxazosin (2 mg daily), gabapentin (600 mg three times daily), hydrochlorothiazide (25 mg daily), and olanzapine (20 mg at bedtime). He had a history of self-injurious behavior with a recent community hospitalization for overdose. While in the MHCB he continued to engage in minor self-injurious behaviors. The inmate was also transported to an outside hospital during MHCB admission for a possible stroke; left side weakness with facial drooping were noted.

The October 12, 2018 higher level of care non-referral rationale solely stated, "new admit for depression." The planned treatment modifications were appropriate. The inmate was unable to attend the IDTT on October 17, 2018 as he was being evaluated for a stroke at an outside hospital. Although the treatment team had sufficient information to determine whether the inmate required a higher level of care on this date, the non-referral rationale only stated that the inmate was administratively discharged and would be placed in MHCB upon return. The October 22, 2018 higher level of care non-referral rationale was vague and included only a description of the inmate's prior placements. However, the treatment modifications appropriately indicated that the IDTT would request a case consultation with the inpatient referral unit (IRU).

The inmate was referred to an acute psychiatric program during the October 26, 2018 IDTT, and the treatment modifications pending transfer were appropriate.

**Findings**

While a higher level of care referral should have occurred sooner, the care provided to this inmate was adequate. The referral was complicated by his cooccurring medical concerns, outside hospital admission, and continued self-injurious behaviors. Alternative treatment modifications were appropriate.

1107

**EXHIBIT Z**
**Central California Women's Facility (CCWF)**
**February 1, 2020 – April 30, 2020**

**Inmate A**

This inmate was randomly selected to review the adequacy of care provided in the 3CMS program at CCWF. Her psychiatric diagnoses included Unspecified Anxiety Disorder, Unspecified Depressive Disorder, and several substance use disorders.

The inmate discharged from MHCB to 3CMS level of care on December 4, 2019. The post discharge five-day follow-up was completed timely, although the clinical documentation for two contacts was duplicated.

The PC's initial assessment occurred on December 18, 2019, and the inmate requested psychiatric medications during the assessment. The document provided historical information about the inmate, without including a current assessment of the inmate's functioning or treatment needs. Further, the history of present illness section was limited to copied text from her recent MHCB admission.

The 3CMS treatment plan was only partially developed on December 19, 2019; the plan was missing treatment objectives and interventions. The document's level of care assessment section did not reference the inmate's recent MHCB admission, and the clinical summary was not updated.

The inmate's prescription for sertraline was initiated and stopped twice within a 20-day period in December 2019, although documentation was completed for only one of the changes on December 19, 2019. A psychiatrist prescribed atomoxetine and noted a rule-out diagnosis for ADHD on February 3, 2020. Nursing staff noted subsequent periods of medication non-adherence, and the inmate was scheduled to meet with psychiatry on March 3, 2020; however, the appointment was not completed. Psychiatry eventually followed up on April 16, 2020 and noted the inmate's reported anxiety and concern that medications were slowing her down; her dosage was increased on this date. Problems with medication non-adherence continued, and several medication refills were requested without a corresponding psychiatric encounter.

SRASHEs were completed on February 28, 2020 and May 14, 2020. The inmate's acute suicide risk was assessed as low in both evaluations, while her chronic risk was assessed as moderate in February, and high May 2020. The increase in chronic risk was not explained. Suicide prevention safety plans were not completed on these dates.

**Findings**

The care provided to this inmate was inadequate. The treatment plan was not useful as it lacked objectives and interventions. The PC did not provide updated information regarding the inmate's functioning or treatment needs in the initial assessment, and their documentation relied heavily on duplicated text from prior records. While psychiatric assessments were thorough, prescriptions were noted to expire between visits.

**Inmate B**

This inmate was randomly selected to review the adequacy of care provided in the 3CMS program at CCWF. The inmate's diagnoses were PTSD, Gender Dysphoria, Antisocial Personality Disorder, and Major Depression. Psychiatric medications were not prescribed. The SRASHE, dated December 11, 2019, indicated low chronic and acute risk for suicide and no historical incidents of self-harm.

The inmate was offered two routine PC contacts during the review period, and these occurred on December 12, 2019 and January 30, 2020. The PC's progress notes referenced discussions regarding current emotional and interpersonal issues, and the provider's interventions appeared appropriate. Other clinical contacts during the review period occurred in response to seven referrals submitted by the inmate and custody staff for interpersonal issues and housing concerns. A number of clinicians completed the referral contacts, and the inmate typically responded well to their interventions involving reinforcement of coping strategies and healthy emotional expression.

On April 29, 2020, nursing staff referred the inmate to psychiatry after noting she was angry and refusing medication. A psychiatric nurse practitioner completed the initial psychiatric assessment on May 11, 2020. The evaluation was comprehensive and indicated the inmate was unwilling to take psychiatric medication despite the potential benefits.

**Findings**

The overall care provided to this inmate was adequate, and interventions offered during clinical contacts appeared appropriate.

**Inmate C**

This inmate was randomly selected to review the adequacy of care provided in the 3CMS program at CCWF. Her psychiatric diagnoses were Depressive Disorder, Unspecified Anxiety Disorder, Unspecified Depressive Disorder, ADHD, Adult Antisocial Behavior, and Cluster B personality disorder. Hydroxyzine was prescribed as needed.

The inmate's first routine psychiatric contact during the review period occurred on January 14, 2020. She was reportedly experiencing "on and off" symptoms of anxiety and depression and was unwilling to start an additional antidepressant medication at that time. The psychiatrist subsequently met with the inmate on April 13, 2020, at which time consent forms were updated and hydroxyzine was continued.

Only two PC contacts occurred during the review period, and both were completed as "administrative encounters." The PC met with the inmate on February 18, 2020 and May 11, 2020 to complete her 90-day post MHCB discharge SRASHEs, and her chronic and acute risk for suicide were assessed as low on these dates.

**Findings**

The care provided to this inmate was inadequate. Mental health treatment was limited to medication management, as the PC failed to provide appropriate treatment interventions or document progress toward treatment objectives during the review period.

**Inmate D**

This inmate was randomly selected to review the adequacy of care provided in the 3CMS program at CCWF. Her psychiatric diagnoses were PTSD and Major Depressive Disorder, recurrent, moderate.

The initial psychiatric assessment was completed by a psychiatric nurse practitioner on December 16, 2019. Subsequent psychiatric contacts were completed by different providers in February, March, May, and June 2020, and there were two instances where practitioners failed to follow through with their own plan to meet with the inmate within 30 days. However, the psychiatric documentation was generally thorough and included assessments of medication side effects and efficacy.

The inmate met with the PC once during the review period. The corresponding progress note included treatment interventions offered, in addition to the inmate's response. The inmate requested an appointment with psychiatry during this contact, and a consult with psychiatry was documented.

The inmate participated in six recreation therapy groups between January and March 2020.

**Findings**

The care provided to this inmate was inadequate. Only one PC contact was offered during a six-month period. Psychiatric care continuity was lacking, as different providers completed contacts throughout the review period, and their planned follow-up timeframes for clinical indications were missed on two occasions.

**Inmate E**

This inmate was randomly selected to review the adequacy of care provided in the 3CMS program at CCWF's reception center. She arrived at CCWF on March 3, 2020 with prescribed risperidone and diphenhydramine. Psychiatry wrote an initial order to continue these medications three days after her arrival, and the prescriptions were renewed twice before her initial psychiatric contact. The inmate was diagnosed with Schizoaffective Disorder, Bipolar Type, and her history was significant for several suicide attempts, involuntary psychiatric hospitalizations, and substance use issues. The most recent suicide attempt occurred in 2017.

The initial mental health screen completed on March 5, 2020 suggested possible suicide risk, possible depressive disorder, possible mania, and a significant psychiatric history. However, she was noted to exhibit "good" adaptive functioning.

1110

The PC's initial assessment occurred on March 17, 2020. The provider documented a rule-out for cognitive deficits and recommended 3CMS level of care. The inmate's chronic and acute suicide risk were both assessed as high on this date; however, the accompanying suicide prevention safety plan was inappropriate for a correctional setting.

The psychiatrist's initial assessment was not completed until May 8, 2020, despite the inmate's active prescription for antipsychotic medication since the date of her arrival in March 2020. The provider's documentation included an assessment of abnormal involuntary movement scale (AIMS) and a review of medication efficacy and side effects.

The inmate transferred to a mainline facility on May 31, 2020 and was subsequently referred for MHCB level of care following a crisis evaluation on June 1, 2020. The corresponding clinical documentation indicated poor hygiene, suicidal ideation, and command auditory hallucinations. Her acute and chronic suicide risk were assessed as high on this date as well; however, a safety plan was not developed. The inmate discharged to EOP level of care by the date of this review.

**Findings**

The care provided to this inmate in the reception center at CCWF was inadequate. Her suicide risk was high, she did not have an adequate suicide prevention safety plan, treatment did not address her suicide risk, and she appeared to psychiatrically decompensate until her MHCB admission on June 1, 2020. The PC also noted possible cognitive deficits during the initial assessment but failed to address the concern or order further assessment. The reception center PC should have considered a higher level of care or increased the frequency of clinical contacts in 3CMS at a minimum. Further, the inmate arrived at CCWF on antipsychotic medication; however, her medications were not continued timely, and she did not receive her initial contact with psychiatry until 66 days after arrival.

**Inmate F**

This inmate was randomly selected to review the adequacy of care provided in the 3CMS program at CCWF's reception center. She arrived at CCWF on January 28, 2020 with prescribed psychiatric medications that were continued for 30 days by a psychiatrist. Her prescriptions included aripiprazole, diphenhydramine, and trazodone. The inmate was diagnosed with Alcohol Use Disorder and included in MHSDS at the 3CMS level of care for medical necessity. Her psychiatric history was significant for inpatient hospitalization, a suicide attempt by cutting at age 13, and inpatient alcohol treatment.

The inmate's February 5, 2020 mental health screen was not completed timely. Her results indicated possible depression, suicide risk, and significant psychiatric history, although "good" adaptive functioning was also noted.

The PC's initial assessment completed on February 13, 2020 indicated the inmate refused the psychiatric medications continued from county jail, as she reported they were prescribed for alcohol detox. The inmate was included in MHSDS at the 3CMS level of care for medical necessity on this date.

The psychiatrist conducted their initial assessment of the inmate on February 14, 2020. Her medications were discontinued after she denied mental health concerns and signed the treatment refusal form. The provider's mental status examination on this date was minimal, although they documented a plan for the PC to monitor the inmate for possible recurrence in symptoms.

The inmate requested removal from MHSDS during a PC contact on March 12, 2020, and the clinician noted, "remove from CCCMS, medical necessity no longer exists and MH TX has stopped." The psychiatrist subsequently followed up with the inmate on May 7, 2020 and documented a plan to consult with the PC "for possible removal from 3CMS." The inmate was removed from MHSDS following a PC contact on May 18, 2020.

**Findings**

The care provided to this inmate was adequate.

**Inmate G**

This inmate was randomly selected to review the adequacy of care provided in the STRH at CCWF. She was diagnosed with Gender Dysphoria, several substance use disorders, and Adjustment Disorder, with mixed anxiety and depressed mood. The inmate was medication adherent. She was placed in the STRH twice during the review period.

The initial STRH placement occurred from March 7 through March 12, 2020. She refused to participate in an RVR mental health assessment that was attempted in the STRH unit on March 11, 2020. Group treatment and individual contacts with a PC and psychiatrist were not offered during the five-day period, although psych tech rounds were documented daily in the unit.

The inmate returned to STRH on April 13, 2020, and she was retained in the unit through the date of this review. The PC's initial assessment contained inaccurate mental health information pulled forward from a prior 3CMS record, as it noted a lack of psychiatric history, medications, and symptoms.

The psychiatrist's April 27, 2020 documentation included current symptoms, medications, and psychiatric history.

The STRH treatment plan was created on April 28, 2020. This document also relied on information pulled forward from the inmate's prior records. The treatment goals and intervention from her general population treatment plan were not modified. The treatment plan also indicated she would be eligible for a lower level of care after 90 days of observation following medication titration; however, there was no indication that psychiatry planned to discontinue or titrate the medications elsewhere in the record.

The PC continued to document little to no distress, while the psychiatrist noted ongoing problems with adjustment and anxiety, throughout the review period.

The inmate was not offered group treatment in the STRH during the review period. Individual contacts with the psychiatrist and PC were timely. However, psychiatry contacts were consistently completed in a non-confidential setting, and PC contacts were variably completed at

cell-front due to COVID-19 concerns. Psych techs conducted daily rounds in accordance with STRH policy.

**Findings**

The care provided to this inmate was adequate, although minimally. The treatment plan was not modified following STRH placement. Group treatment was not offered, and individual contacts with the PC and psychiatrist were primarily completed in a non-confidential setting. The PC included inaccurate information about the inmate's history and current symptoms in their initial assessment, and their descriptions of the inmate's mental status were inconsistent with the psychiatric providers throughout the review period. Further, there was no indication the treatment team discussed their differing opinions regarding the inmate's current symptoms and treatment needs.

**Inmate H**

This inmate was randomly selected to review the adequacy of care provided in the STRH at CCWF. She arrived at CCWF with a prescription for mirtazapine on April 4, 2020 and was temporarily placed on quarantine status due to COVID-19. On April 24, 2020, the inmate was placed in the STRH after refusing assigned housing. Her psychiatric diagnosis was Adjustment Disorder with depressed mood and anxiety.

The inmate submitted mental health requests on April 17, 18, and 26, 2020. She informed a clinician on April 26, 2020 that her psychiatric medications were not continued upon arrival at CCWF. She subsequently met with her PC on April 29, 2020; however, this appointment was completed at cell-front "per COVID-19 safety measures." On May 2, 2020, a psychiatric technician noted the inmate complained of racing thoughts during daily rounds.

The PC's initial assessment occurred on May 6, 2020, and the psychiatrist's initial assessment was completed at cell-front on May 7, 2020 "to prevent possible exposure to COVID."

The inmate's STRH treatment plan dated May 12, 2020 focused on reducing anxiety through weekly provision of Dialectical Behavior Therapy (DBT) materials. The PC also met with the inmate for a routine contact on this date; however, it was unclear whether the encounter occurred at cell-front or in a confidential setting, as both were referenced in the record. Subsequent PC contacts were completed weekly at cell front. The PC's progress notes did not indicate whether the DBT materials were provided to the inmate in accordance with the treatment plan.

The inmate was referred to MHCB level of care on May 31, 2020 at 3:30 a.m. However, she remained in her STRH cell under suicide watch observation until her mental health evaluation later that morning. Nursing noted that the inmate denied suicidal ideation after she was removed from her cell, and she was quoted as saying she just wanted to get out of her room. The mental health clinician assessed the inmate, rescinded the referral to MHCB, completed a SRASHE and safety plan, and initiated the five-day follow-up plan. The inmate's chronic and acute risk for suicide were assessed as low.

Mental health contacts were not completed timely and group treatment was not offered in the STRH during the review period. Psych tech rounds were documented daily.

**Findings**

The care provided to this inmate was inadequate. Psychiatric medications were not continued upon arrival, and the inmate did not receive a mental health contact until three weeks after her arrival date. The PC also failed to implement planned treatment interventions during clinical encounters, and individual contacts with the PC and psychiatrist primarily occurred in a non-confidential setting. Lastly, the inmate was not offered STRH groups during the review period.

**Inmate I**

This inmate was randomly selected to review the adequacy of care provided in the STRH at CCWF. She was diagnosed with Major Depressive Disorder, Antisocial Personality Disorder, and Cannabis Abuse. Healthcare records suggested she sought MHCB placement and exposed herself in an attempt to secure a housing unit change in April of 2020, although her MHCB referral was rescinded and she was returned to 3CMS level of care on April 24, 2020.

The clinician's April 2020 crisis documentation included appropriate assessments and interventions. Daily follow-ups were completed in addition to an indecent exposure screening evaluation. The IDTT also met "informally" and determined the inmate did not meet diagnostic criteria or require treatment for Exhibitionism.

The inmate's first and only individual contact with psychiatry during the review period occurred on May 4, 2020, in response to a psych tech's consult request. A psychiatric nurse practitioner completed the initial assessment in a confidential setting on this date and ordered Mirtazapine and oxcarbazepine.

The inmate refused the PC's initial assessment on May 4, 2020; however, the assessment was completed the following day in a nonconfidential setting due to COVID-19. The assessment's content was mostly limited to copied and pasted information from prior records. The STRH treatment plan was appropriately updated to address her racing thoughts and recent RVRs.

PC contacts were offered weekly in the STRH, with the exception of the third week in May 2020. The PC documented interventions during clinical encounters, and only one PC contact occurred in a non-confidential setting secondary to COVID-19.

Treatment groups were not offered to the inmate in the STRH during the review period. Psych tech rounds were documented daily.

**Findings**

The care provided to this inmate was adequate. However, some contacts completed at cell-front "due to COVID" needed a more detailed explanation.

**Inmate J**

This inmate was randomly selected to review the adequacy of care provided in STRH at CCWF. She was diagnosed with Adjustment Disorder with mixed anxiety and depressed mood, Attention Deficit Hyperactivity Disorder (ADHD), Antisocial Personality Disorder, Other or Unspecified

Stimulant Use Disorder, and relationship distress with spouse or intimate partner. The inmate recently discharged from CIW's MHCB and returned to CCWF's STRH on March 13, 2020.

A clinician to clinician contact via email was noted on March 17, 2020, and the inmate received daily contacts in accordance with the five-day follow-up plan in the STRH unit.

The PC's initial assessment of the inmate occurred on March 18, 2020, and the initial psychiatric assessment was completed by a psychiatric nurse practitioner on April 1, 2020. Both assessments were thorough.

PC contacts were offered weekly, with the exception of the third week in May 2020. All routine PC contacts were completed at cell-front; although the PC noted a cell front contact due to COVID-19 a few hours after the psychiatric nurse practitioner completed a confidential contact with the inmate on April 1, 2020. The treatment plan included goals that reflected the inmate's ASU related needs, and treatment interventions were implemented during clinical encounters. The inmate also received in-cell activities in the STRH.

A 90-day post MHCB discharge SRASHE was completed on May 27, 2020, and the results indicated moderate chronic suicide risk and low acute suicide risk. The suicide prevention safety plan was updated on this date, and the plan was appropriate for the current setting. Clinical documentation indicated the SRASHE occurred in a confidential setting, while a PC contact completed on this date was offered at cell front.

Group treatment was not available to the inmate in the STRH during the review period. Psych tech rounds were completed daily.

**Findings**

The overall care provided to this inmate was adequate. However, some PC contacts completed at cell front due to COVID-19 needed a more detailed rationale, considering confidential contacts were also documented on these dates.

**Inmate K**

This patient was hospitalized in CCWF's MHCB twice for grave disability concerns during the review period. She was diagnosed with Major Depressive Disorder and Schizophrenia. Prescribed psychiatric medications included Depakote for mood stabilization, Zyprexa for psychosis, Paxil for depression, Prazosin for nightmares, Buspar and Vistaril for anxiety, and Cogentin for medication side effects. The patient did not have a history of suicide attempts or self-injurious behavior incidents.

The patient was initially admitted to the MHCB for grave disability from April 28, 2020 through May 7, 2020. Psychiatric symptoms at the time of intake included paranoid delusions, auditory hallucinations, and mood dysregulation. Interdisciplinary plans of care (IPOCs) targeted hallucinations, depressed mood, and anxiety. Treatment interventions involved providing empathy to foster a therapeutic alliance, encouraging verbalization of medication concerns for compliance, challenging dysfunctional thoughts for mood issues, and using "rational reasoning"

1115

to address psychosis. The May 7, 2020 discharge summary indicated that the patient exhibited a significant decrease in symptoms and was engaged in treatment and compliant with medication. The patient discharged to the 3CMS level of care on this date, and the five-day follow-up was completed in accordance with MHSDS Program Guide requirements.

The patient was subsequently readmitted to the MHCB on May 12, 2020 due to paranoid delusions, auditory hallucinations, anxiety, bizarre behavior, and inability to function in the outpatient setting. IPOCs from her April 28, 2020 MHCB admission were carried forward in the May 13, 2020 treatment plan. A new IPOC was developed for grave disability with a plan to utilize mindfulness to improve self-care behaviors.

The PC noted on May 14, 2020 that her depression and anxiety remained elevated, while her psychotic symptoms appeared to be at baseline. While the patient requested EOP level of care for continued structured treatment on this date, she was again discharged to 3CMS on May 18, 2020. The MHCB treatment team's rationales for 3CMS level of care were identified in three separate documents in May 2020. A May 11, 2020 consultation note stated that, although the patient was non-compliant with medication, mental health staff had not exhausted every resource at the 3CMS level of care to consider her for EOP. On May 18, 2020, the PC referenced a lack of "significant symptoms resulting in functional impairments while in the MHCB." Finally, the May 18, 2020 discharge SRASHE noted that the patient would not be discharged to EOP level of care "due to uncertainty of need."

On May 28, 2020, two housing unit officers informed the patient's 3CMS clinician that she continued to exhibit bizarre behavior including pacing, crying, yelling, and talking to herself. The custody officers also stated that they were "not sure what to do with her" and that she would be a "better fit" for EOP. The 3CMS clinician documented a plan to advocate for EOP placement on this date; however, as of June 18, 2020, the patient's level of care remained 3CMS.

**Findings**

The quality of care provided to this patient was inadequate. The patient was admitted twice within a two-week period for psychotic symptoms and grave disability concerns, and she clearly required a higher level of care than 3CMS. However, providers' rationales for 3CMS level of care were non-specific and inappropriate, as they did not address the patient's apparent inability to function outside the structured MHCB setting or clarify how her severe symptoms and functional deficits would be managed in the least restrictive level of care. Further, the 3CMS clinician's May 28, 2020 documentation confirmed the inmate could not be managed in 3CMS; however, the level of care was not appropriately reviewed and changed by the date of this review on June 18, 2020. Additionally, the MHCB treatment planning and implementation were insufficient for addressing the inmate's presenting problems. For example, mindfulness was not an appropriate intervention for self-care concerns in the context of grave disability.

**Inmate L**

This patient was hospitalized in the MHCB at CCWF for grave disability and danger to self from May 5, 2020 through May 21, 2020. The referring ASU EOP clinician noted poor cell conditions and refusals to shower and comply with treatment and medication since mid-April of 2020. Her psychiatric diagnosis was Bipolar I Disorder. The psychiatrist prescribed Zyprexa for psychosis and mood, Risperdal for psychosis, Vistaril for anxiety, Effexor for depression, and Cogentin for medication side effects. Problems with medication non-adherence persisted during MHCB admission, and a PC 2602 order was granted for grave disability and danger to self on May 11, 2020. She had one recorded suicide attempt in 2011 by overdose on unknown pills.

The MHCB treatment plan included IPOCs that targeted the patient's depressed mood, danger to self, and grave disability; although the higher level of care considerations section of the form offered a more detailed, evidenced based, and patient specific plan of care. The provider also noted a safety plan would be developed during the course of admission to address the inmate's suicide risk.

The patient met with the same MHCB provider only twice per week on average. PC contacts were completed by three different clinicians, with only one provider offering clinical interventions for the patient. Psychiatry contacts were also completed by three different providers, and psychiatric documentation was generally brief and insufficient.

On May 20, 2020, the patient stated to the psychiatric nurse practitioner, "I can go back to [administrative segregation] and try to commit suicide." However, there was no indication that this provider intervened or communicated the threat of suicide to other members of the treatment team prior to MHCB discharge on the following day.

On May 21, 2020, the patient discharged to administrative segregation, despite continued issues with depressive symptoms, lack of cooperation with MHCB staff, and a threat of suicide one day prior. The discharge SRASHE also described the patient as flat and depressed, with moderate acute and chronic suicide risk. Further, the psychiatric nurse practitioner documented that the patient would be released to 3CMS level of care, while the PC wrote that she would return to EOP level of care.

The patient was offered two recreation therapy visits during admission, although she refused both.

**Findings**

The quality of care provided to this patient was inadequate. At the time of her MHCB discharge, providers' recent clinical notes suggested her suicide risk was elevated and discharge goals were unmet. A referral for intermediate care was not appropriately considered, despite the extended length of stay in the MHCB and insufficient treatment progress. Continuity of care was also an area of concern, as the patient was seen by three different PCs and three different psychiatric providers during her 16-day length of stay in the MHCB; moreover, communication among these

1117

providers was insufficient. While the treatment plan was appropriate, only one of the three clinicians implemented interventions during clinical contacts. Further, the suicide threat one day prior to discharge appeared to have been ignored by the psychiatric nurse practitioner, as the provider did not document an intervention, opinion about the seriousness of the threat, or a consultation with other members of the treatment team. Additionally, there was no indication MHCB staff appropriately consulted with the receiving ASU EOP treatment team, which was especially concerning in light of the patient's recent mental status and suicidal statement one day prior to discharge.

## Inmate M

This patient received MHCB care at CCWF from May 14, 2020 through May 21, 2020. Her level of care was 3CMS and she was housed in an eight-person dorm prior to the MHCB referral. Psychiatric concerns noted around the time of admission included suicidal ideation, depressed mood, hopelessness, anxiety, and an incident of "superficial" cutting on her forearm. The patient attributed her elevated psychiatric symptoms to a COVID-19 "lockdown" in her housing unit. Her psychiatric diagnoses were Major Depressive Disorder, Generalized Anxiety Disorder, Attention Deficit Hyperactivity Disorder (ADHD), and Antisocial Personality Disorder. Prescribed psychotropic medications included Vistaril, Strattera, and Remeron. Effexor was added to her list of prescribed medications during her MHCB admission. The patient's history was significant for three suicide attempts, self-injurious behavior incidents, and substance abuse issues.

The May 14, 2020 MHCB treatment plan included IPOCs for depressed mood, anxiety, and self-injury. The provider noted that thought records would be utilized to reduce the patient's depression to a self-rating of "4 or below" by the next IDTT. CBT interventions were also included to address the patient's emotion dysregulation, cognitive distortions, medication non-compliance, and self-harm behaviors.

Between January and May 2020, the patient received three RVRs for disrespect, possession of alcohol, and disobeying orders. She was in the 3CMS level of care at the time, and only one of the offenses resulted in an RVR mental health assessment.

The patient met with the same MHCB provider only twice per week on average, as three primary clinicians and three psychiatric providers rotated throughout the week. PCs did not document whether treatment interventions were implemented during PC contacts.

Progress notes throughout the course of the MHCB admission described the patient as depressed, anxious, fearful, difficult to engage, "poorly cooperative," and as "lying in bed and not wanting to get up." On May 18, 2020, the patient expressed fear of placement on facility C and D due to the availability of "drugs and alcohol." The PC noted on May 19, 2020 that the patient was "subdued," "largely non-responsive," and not making eye contact. A suicidal statement was also documented in this progress note, although the PC's response was not included. The patient reportedly stated, "I'd rather go out to seg or cut myself. I'm not living on the yards."

On May 20, 2020 the IDTT discharged the patient to 3CMS level of care, despite the concerns noted above. The IDTT discharge documentation suggested the patient exhibited improvements with depressive symptoms, anxiety, and sleep, although this was not supported by the progress notes. The treatment team did not provide a sufficient justification for 3CMS level of care at the time of discharge. The clinician's judgment of suicide risk on the May 20, 2020 discharge SRASHE was moderate for chronic and low for acute risk. The five-day follow-up was ordered and completed in accordance with MHSDS Program Guide requirements.

Following MHCB discharge, the patient received urgent or emergent mental health contacts on May 23, June 12, June 18, and June 19. Custody staff requested the mental health contact on June 19, 2020 in response to the patient crafting a noose out of shoelaces; however, the evaluating mental health clinician cleared her, and she returned to her housing unit. She tied a sheet around her neck and a light fixture that evening and was subsequently referred to MHCB level of care and placed in alternative housing; nursing staff noted abrasions along her neck from an attempted hanging.

**Findings**

The care provided to this inmate and suicide prevention practices were inadequate. The MHCB discharge appeared premature, given the patient's symptom severity, increased suicide risk, and lack of engagement with providers prior to discharge. Continuity of care was a problem in the MHCB, and the various providers' clinical notes at times offered conflicting information about the patient's progress and readiness for discharge. Further, while the treatment plan was sufficient, progress notes suggested the plan was rarely implemented by the three PCs during clinical contacts.

**Inmate N**

This patient was admitted to the MHCB at CCWF for danger to self on three occasions during the review period. Psychiatric concerns documented around the time of admission included depressed mood, paranoia, command auditory hallucinations, suicidal ideation, and a plan to "slit her wrists." The patient was diagnosed with Schizoaffective Disorder and prescribed Haldol for psychosis, Trileptal for mood, Celexa for depressive symptoms, Cogentin for medication side effects, and BuSpar and Vistaril for anxiety. Her medications were adjusted during each of the three admissions, and she was generally medication compliant. The most recent SRASHE noted one suicide attempt at the age of 14 by overdose with sleeping pills.

In March 2020, the patient was retained in the MHCB for approximately ten days and discharged to 3CMS level of care. The corresponding five-day follow-up plan was not completed in accordance with MHSDS Program Guide requirements, as there was no mental health contact entered on March 20, 2020 and the plan was discontinued after only four follow ups. She was readmitted to the MHCB less than one month later on April 14, 2020; however, her level of care was changed to EOP at the time of discharge on April 24, 2020.

The patient's third and most recent MHCB admission during the review period occurred from May 11, 2020 through May 18, 2020. The May 12, 2020 treatment plan targeted the patient's limited insight and suicidal ideation with CBT strategies. The accompanying goals indicated she would identify undesirable cognitive and emotional responses, learn to consider future consequences, and replace ineffective responses with healthier behaviors and coping skills. The treatment team also noted that the patient would benefit from pre-release planning and completion of an in-cell CBT focused homework assignment prior to discharge.

The IDTT did not recommended a higher level of care at the time of discharge on May 18, 2020. Their non-referral rationale included that the patient had stabilized and no longer endorsed suicidal ideation or auditory hallucinations. The PC further noted that the patient completed her in-cell CBT homework assignment and that her MHCB treatment goals were met. Detailed treatment recommendations for the EOP clinician to follow were included in the discharge plan. The patient's suicide risk was assessed as moderate for chronic risk and low for acute risk. The accompanying safety plan was patient specific and useful as a suicide prevention tool.

The patient discharged to the EOP level of care on May 18, 2020.

**Findings**

The care provided to this patient was adequate, although minimally. The IDTT's level of care rationales were generally appropriate, and the modified treatment plan that accompanied the non-referral adequately addressed the patient's symptoms, risk, and behavior concerns. The patient also received in-cell treatment materials in accordance with her treatment plan. However, continuity of care was lacking in the MHCB, and implementation of treatment interventions during clinical contacts was inconsistent across providers. IPOCs were generally inadequate, and, while the treatment team indicated the patient would benefit from pre-release planning, it was unclear whether this was addressed during the MHCB admission or coordinated with providers in the EOP level of care following discharge. Finally, the five-day follow-up was not completed in accordance with Program Guide requirements. This document should have been reviewed for completeness on day five and extended as a result of the missed contact on March 20, 2020.

**Inmate O**

This healthcare record was reviewed to assess the care provided in the MHCB during the patient's two separate admissions within the review period. Her psychiatric diagnosis was Unspecified Schizophrenia Spectrum Disorder. The patient's initial MHCB admission occurred on March 26, 2020, at which time the admitting psychiatrist noted her psychiatric medications were discontinued at the reception center and she subsequently decompensated. Prior to admission, she engaged in self-harm and urinated and defecated in a holding cell.

The March 28, 2020 treatment plan included IPOCs for anxiety and self-injury. Treatment goals involved verbalizing two alternatives to self-injurious behavior prior to discharge and complying

with medication for one week. The patient's psychiatric medications were adjusted during this admission, and she was described as psychiatrically stable prior to her discharge on April 3, 2020. The discharge documentation also included treatment recommendations for the EOP clinician.

The patient was readmitted to the MHCB on May 13, 2020 after attempting to hang herself. Although the May 15, 2020 IPOCs were inadequate, the modified treatment plan in the higher level of care non-referral section included interventions that were more patient specific and evidenced based. On May 18, 2020, the patient endorsed thoughts of suicide by hanging and increased distress due to familial concerns. The PC did not document a sufficient intervention or follow-up plan in response to the patient's suicidal statement on this date.

On May 20, 2020, the IDTT discharged the patient to the EOP level of care. The accompanying suicide risk evaluation referenced four suicide attempts since January of 2019, the most recent of which occurred seven days prior to this admission when she attempted to hang herself. The PC's judgment of suicide risk was high for chronic and low for acute, although clinical documentation suggested her acute risk was higher. She was subsequently housed in ASU due to safety concerns.

The patient engaged in an incident of self-injurious behavior during the five-day follow-up period; however, this did not result in a MHCB referral, and the follow-up was discontinued after only four entries.

**Findings**

The care provided to this patient was inadequate. The May 20, 2020 discharge was premature based on recent clinical documentation, which suggested an increased risk for self-harm, poor ability to cope with current stressors, and unmet discharge goals. Continuity of care in the MHCB was a serious problem, as the patient met with the same provider only twice per week on average. The various PCs failed to document whether the treatment plan was implemented during clinical contacts. Further, the providers involved in the May 20, 2020 discharge did not have direct contact with the patient during the preceding three days, and they failed to reference relevant clinical information from other providers' notes during that timeframe. Finally, the five-day follow-up was not completed in accordance with Program Guide requirements and was not appropriately continued for additional days, despite an incident of harm during that timeframe.

**Inmate P**

This inmate was randomly selected from CCWF's 3CMS reception center roster to assess the adequacy of care provided during the review period. The inmate had one recorded suicide attempt via overdose in 1981. She was diagnosed with Schizophrenia at CCWF. Her prescription for Abilify was continued upon arrival at CCWF on March 3, 2020.

The inmate requested a psychiatry contact after her arrival and was informed of a scheduled appointment on March 19, 2020. However, the psychiatrist did not follow up until March 24,

2020, and this provider failed to complete clinical documentation for the encounter. The initial psychiatric assessment was not completed until two months later, despite her active prescription for antipsychotic medication. The psychiatric assessment addressed medication management, although the clinical content was succinct. Subsequent psychiatry contacts occurred on June 5, 2020 and July 2, 2020.

The mental health screen and initial PC assessment were completed timely, although the initial PC contact was not completed within 30 days of MHSDS inclusion. The content of the initial PC assessment was minimal, due in part to the inmate's request to prematurely terminate the interview, and the remaining sections of the assessment were completed based on record review. The PC recommended 3CMS level of care with monthly contacts for monitoring the inmate while she awaited transfer to a mainline facility. However, the PC did not follow up during the month of April 2020.

Subsequent PC progress notes described the inmate as relatively stable and without psychiatric distress.

**Findings**

This inmate's care was inadequate. The length of time between her arrival on antipsychotic medication and the initial psychiatric assessment, two months, was very concerning. Moreover, the psychiatrist failed to complete documentation for the March 24, 2020 encounter. Additionally, the initial PC contact was non-compliant with Program Guide requirements and did not align with the PC's plan to meet with the inmate monthly for closer monitoring. Lastly, the provider failed to justify the psychiatric diagnosis and develop a treatment plan that sufficiently addressed her adjustment issues.

**Inmate Q**

This inmate was randomly selected from CCWF's 3CMS reception center roster to assess the adequacy of care provided during the review period. The 27-year-old inmate arrived at CCWF on January 22, 2020. Seroquel was prescribed in county jail and continued upon arrival at CCWF. Her psychiatric diagnoses included Bipolar Disorder and Major Depressive Disorder. The healthcare record also referenced problems with cannabis and opioid use.

The mental health screen and initial PC assessment were completed timely, although the content of the PC's assessment was minimal. The PC recommended 3CMS level of care with monthly contacts for clinical monitoring until the inmate transferred to a mainline facility. Subsequent PC contacts occurred monthly and corresponding progress notes suggested the inmate was coping well in the reception center.

The initial psychiatric assessment was completed on February 6, 2020, and the provider's clinical documentation was minimal. The inmate's psychiatric medication was discontinued on this date as a result of her stability. She subsequently met with psychiatry once in April and twice in May 2020.

An individualized treatment plan that addressed the inmate's adjustment to incarceration was not available in the record.

**Findings**

The care provided to this inmate was adequate. However, the quality of the initial assessments and treatment plan was insufficient.

**Inmate R**

This inmate was randomly selected from CCWF's 3CMS reception center roster to assess the adequacy of care provided during the review period. The 48-year-old inmate arrived at CCWF on March 3, 2020, and her expected release date was in August 2021. Psychiatric diagnoses included Adjustment Disorder with Anxiety, Cannabis Use Disorder, Amphetamine Type Use Disorder, and Alcohol Use Disorder. A diagnosis of Psychotic Disorder was identified elsewhere in the diagnostic section of the healthcare record. BuSpar was prescribed for anxiety.

The mental health screener and initial PC assessment were completed timely. The initial psychiatric assessment occurred on March 13, 2020. Subsequent psychiatric contacts occurred at least monthly.

The PC recommended 3CMS level of care to address the inmate's mild anxiety, although a sufficient treatment plan was not developed for this inmate.

On May 12, 2020, the psychiatrist noted that the inmate was delusional and that her BuSpar medication was discontinued at her request. A June 19, 2020 psychiatry note also referenced current delusions, paranoia, and auditory hallucinations. Her psychiatric diagnosis was changed to Unspecified Delusional Disorder and Unspecified Psychotic Disorder on this date. The inmate also reportedly agreed to a prescription for Haldol; however, she was subsequently non-compliant with the medication.

The most recent PC progress note dated June 18, 2020 described the inmate as delusional and "decompensating." The inmate also reported daily auditory hallucinations on this date. However, despite the clinician's concerns regarding decompensation and continued psychotic symptoms, there were no additional PC contacts as of August 10, 2020.

**Findings**

This inmate's care was inadequate. The PC failed to follow up with the inmate based on clinical indications after documenting psychotic symptoms and apparent decompensation on June 18, 2020. The treatment team did not appropriately consider a higher level of care or a diagnostic clarification evaluation, despite the inmate's decompensated state and inconsistent diagnoses noted throughout the record. There was also a lack of collaboration among providers and a lack of effort to obtain relevant collateral information from other institutional staff. Lastly, the treatment plan was insufficient and not individualized.

**Inmate S**

This inmate was randomly selected from CCWF's 3CMS reception center roster to assess the adequacy of care provided during the review period. The 36-year-old inmate arrived at CCWF with prescribed psychiatric medication on January 24, 2020. She was diagnosed with an anxiety

1123

disorder and prescribed Prozac, BuSpar, and Vistaril at CCWF. The inmate also had significant substance abuse history.

The mental health screen was completed timely. PC and psychiatry initial assessments offered minimal clinical content, and there was no clear treatment plan to address the inmate's initial adjustment to incarceration. However, the psychiatrist appropriately addressed medication management, and the inmate's medications were changed on the date of the initial contact. She was included in MHSDS at the 3CMS level of care.

Subsequent PC and psychiatry contacts were non-compliant with Program Guide timeframes. For example, the psychiatrist did not follow up until five months after the initial psychiatric assessment.

**Findings**

This inmate's care was inadequate.  The psychiatric diagnosis was unclear and documented symptoms were limited to "anxiety." The treatment plan was insufficient and routine contacts with the PC and psychiatrist were non-compliant with Program Guide timeframes.

**Inmate T**

This inmate was randomly selected from CCWF's 3CMS reception center roster to assess the adequacy of care provided during the review period. The 30-year-old inmate arrived at CCWF on January 24, 2020. Her psychiatric history was significant for an inpatient hospitalization for danger to others, treatment with antipsychotic medication, and a commitment to Napa State Hospital for a competency evaluation. The inmate was initially prescribed Risperdal for auditory hallucinations during her Napa State Hospital commitment, and the record indicated her psychotic symptoms were well managed on this medication.

The mental health screen, initial PC assessment, and routine contacts with the PC and psychiatrist were completed timely. The initial psychiatric assessment occurred on February 12, 2020; at which time she was described as stable with low cognitive functioning. The psychiatrist discontinued the inmate's antipsychotic medication at her request during this initial contact.

The 3CMS treatment team failed to document a psychiatric diagnosis or develop a clear treatment plan for this inmate; however, clinical notes suggested she remained stable in the 3CMS level of care without antipsychotic medication.

**Findings**

This inmate's care was adequate, although minimally. PC contacts were timely, and the progress note content was appropriate. However, the treatment team failed to develop an initial treatment plan and document a psychiatric diagnosis.

**Inmate U**

This inmate's healthcare record was reviewed to assess the care provided in the ASU EOP hub at CCWF. Her psychiatric diagnoses included Bipolar Disorder, manic type, with psychosis;

1124

Borderline Personality Disorder; Antisocial Personality Disorder; and Amphetamine Induced Depressive Disorder. She had an active PC 2602 order and was treated alternately with Zyprexa, Lexapro, Remeron, Lamictal, Lithium, Vistaril, and Haldol decanoate during the review period. The inmate's psychiatric history was significant for at least two suicide attempts, incidents of self-injurious behavior, eight MHCB referrals, and seizures following a traumatic brain injury in 2017. Her most recent MHCB admission was at CIW from December 1, 2019 through December 10, 2019.

The inmate's post-MHCB five-day follow-up was completed at CCWF, and her level of care was subsequently increased from 3CMS to EOP on February 6, 2020.

A psychiatric nurse practitioner (PNP) assessed the inmate on March 3, 2020 and noted she required constant prompts to take her medication. She also occasionally refused court ordered medications or attempted to "cheek" and snort them.

The IDTT convened on March 3, 2020, although documentation related to staff attendance was unclear. Criteria for higher level of care referral consideration were negative on this date. The treatment indicated she participated in group treatment and individual contacts conducted at cell front. The inmate was routinely offered groups facilitated by a registered nurse; however, her attendance was sporadic. A psychologist also offered groups in the housing unit, although they were referred to as recreation therapy groups in the documentation and did not appear to be process oriented.

The PC offered in-cell entertainment on March 9, 2020. The inmate attended individual confidential contacts with this PC on March 12, April 14, April 17, April 23, and April 30, 2020. She also participated in the PC's caseload groups on April 2, April 17 and April 30, 2020. The PNP noted a refused individual contact on March 19, 2020 and a completed confidential contact on March 27, 2020. Some of her individual contact with the PC and PNP were completed at cell front with an insufficient documented rationale during the review period. For example, on May 16, 2020, the PNP noted a cell front contact to prevent possible exposure to COVID.

The PNP's April 30, 2020 progress note described the inmate as medication noncompliant and disheveled. Her partial adherence to medication and group treatment continued in May 2020. However, by June 2020, the inmate reportedly demonstrated treatment progress and appeared more stable.

**Findings**

The overall care provided to this inmate was adequate. Her adherence to medications was partial, although she appeared to stabilize somewhat later in the review period. However, rationales for non-confidential contacts were insufficient and psychologist led groups were used for recreation therapy instead of treatment.

**Inmate V**

This inmate's healthcare record was reviewed to assess the care provided in the ASU EOP hub at CCWF. The 33-year-old Caucasian female was diagnosed with Schizophrenia and Unspecified

Psychotic Disorder. Risperdal was prescribed for psychotic symptoms, although she demonstrated poor adherence.

The inmate received an RVR and was admitted to the MHCB for aggressive behavior in the context of paranoid delusions on April 1, 2020. The corresponding RVR mental health assessment indicated she was acutely psychotic at the time of the offense and that her behavior was likely related to paranoia. She discharged from the MHCB on April 7, 2020, and the five-day follow-up was completed in the ASU EOP hub.

The IDTT convened on April 21, 2020 with required staff in attendance; however, the treatment team documented that the inmate was not present due to COVID exposure.

The inmate was admitted to the MHCB on April 26, 2020 after reporting suicidal ideation and distressing psychotic symptoms. An additional antipsychotic medication was prescribed during this admission. The PNP noted a cell-front contact was completed in the MHCB on April 27, 2020 to prevent possible exposure to COVID, and subsequent PNP notes offered a similar rationale for non-confidential contacts.

A psychologist met with the inmate on May 4, 2020 due to her high treatment refusal rate. She attributed her low attendance to depression, a recent cancer diagnosis, fear of assault, and officers failing to inform her when groups commenced. The clinician noted her delusions and paranoia were obstacles to treatment participation.

The inmate's hallucinations appeared to subside, and her treatment attendance improved in late May 2020.

**Findings**

The overall care provided to this inmate was adequate. She exhibited improvements in symptoms and treatment participation toward the end of the review period. However, the psychologist led groups were documented as recreation therapy groups instead of treatment groups. Additionally, the rationales for non-confidential contacts were insufficient, especially with respect to the PNP notes.

**Inmate W**

This inmate's healthcare record was reviewed to assess the adequacy of care provided in the ASU EOP hub and the higher level of care non-referral rationales. The IDTT determined a referral to a higher level of care was not indicated on four occasions between February 25, 2020 and April 28, 2020, despite noting positive consideration criterion. The inmate was designated DD1 and alternately diagnosed with Schizophrenia, Major Depressive Disorder, and Schizoaffective Disorder. Her reported history was significant for four suicide attempts and treatment for Bipolar Disorder, PTSD, mood instability, anxiety, and depressive symptoms. She was prescribed Olanzapine, BuSpar and Prozac during the review period. A plan to initiate a PC 2602 order in the event of continued medication non-adherence was documented, but not pursued.

The inmate's course of treatment in the ASU EOP Hub was characterized by altercations with other inmates, high treatment and medication refusals, safety concerns, stressors related to housing and family, impulsivity, self-injurious behavior incidents, and four MHCB referrals within a six month period. Although some of her self-harm acts were described as superficial, recent assessments of suicide risk indicated high chronic and acute suicide risk.

On March 24, 2020, the IDTT's level of care rationale indicated she was appropriate for EOP level care to work on skills development. All required members attended this IDTT.

On April 16, 2020, the inmate wrapped a string around her neck during a group held in the dayroom. She also endorsed auditory hallucinations and attributed the behavior to a recent telephone call with her family. Her chronic and acute suicide risk were assessed as high on this date, and she was referred for MHCB level of care.

The April 24, 2020 IDTT documentation referenced the inmate's multiple MHCB admissions, low treatment participation, and chronic psychiatric symptoms that did not respond well to clinical interventions. The treatment noted a higher level of care was discussed; however, they determined she would remain in EOP level of care without documenting a sufficient non-referral rationale. IDTT meetings held on April 24, 2020 and May 19, 2020 were missing required members.

On May 11, 2020, the inmate reported in group that her mother moved and changed her telephone number, and she could no longer live with her mother following her release next year as a result. Subsequent clinical documentation in May and early June 2020 suggested improvements in group treatment participation, and the inmate was subsequently released to mainline EOP.

Providers' rationales for completing non-confidential individual contacts throughout the review period included, quarantine interference, prevention of possible COVID exposure, safety of the inmate and staff due to COVID, and inmate refusal. A number of IDTT meetings also occurred without the inmate in attendance, and, while rationales were not consistently documented, protecting the inmate and staff from COVID was noted intermittently.

**Findings**

The care provided to this inmate was inadequate and the higher level of care non-referral rationales were incomplete. Clinical contacts were completed in non-confidential settings and IDTTs occurred in absentia with insufficient justification. The inmate was identified as high risk for suicide and her suicide risk was elevated following the withdrawal of family support during the review period. However, family conflict and loss of support were not appropriately addressed in treatment, despite their apparent impact on her symptoms and self-harm behaviors.

**Inmate X**

This inmate's healthcare record was reviewed to assess the adequacy of care provided in the ASU EOP hub and the higher level of care non-referral rationale. The 38-year-old was diagnosed alternately with Other Specified Bipolar Disorder and Schizoaffective Disorder, Depressive

Type. She was prescribed variously with Zyprexa Xydis, Latuda, Trileptal, and Effexor. Her PC 2602 order expired during the review period.

The inmate's history was significant for a competency related DHS-Patton admission, chronic thoughts of suicide over 15 years, and four MHCB admissions since September of 2019. Her course of treatment during the review period was characterized by delusions and auditory hallucinations, two RVRs for aggressive behaviors linked to her psychiatric symptoms, MHCB admissions, and very low Zyprexa medication adherence that resulted in significant decompensation, bizarre behavior, and "fecal incidents."

The inmate was housed in the ASU EOP hub from March 24, 2020 through April 23, 2020, during which time her treatment attendance was at seven percent while her medication compliance was at 15 percent. She returned to the MHCB on May 4, 2020.

A number of individual clinical contacts were completed in a non-confidential setting without a clear rationale. Documented reasons for cell-front contacts included, pursuant to COVID-19 protocol, to prevent possible COVID exposure, due to health concerns regarding COVID-19 social distancing recommendations, and due to inmate refusal. Some progress did not indicate whether the contact occurred in a confidential setting.

IDTTs were conducted at least monthly in the ASU EOP hub. PC and psychiatric contacts generally occurred timely, although some gaps in expected frequency were observed. The treatment team did not sufficiently document their higher level of care non-referral rationales, despite the positive referral criteria.

**Findings**

The care provided to this inmate was inadequate. The treatment teams failed to adequately address the inmate's poor treatment adherence, underlying reasons for multiple MHCB admissions, and behaviors that resulted in two RVRs during the review period. The treatment team's higher level of care non-referral rationale was not adequately documented, and providers' justifications for non-confidential contacts were insufficient at times.

**Inmate Y**

This inmate's healthcare record was reviewed to assess the adequacy of care provided in the ASU EOP hub and the higher level of care non-referral rationale. She was diagnosed with Schizoaffective Disorder, Bipolar Type, and treated with Haldol, Abilify, BuSpar, Prozac and Remeron. The inmate's psychiatric history included an incident where she stabbed herself in the chest during a psychotic episode at age 16, three community inpatient hospitalizations, one Napa State Hospital admission, multiple psychiatric inpatient program admissions throughout her incarceration, and a clozapine trial. Her most recent PIP admission occurred from May 2016 through February 2017.

Her course of treatment in the ASU EOP hub was characterized by depressive symptoms, distressing auditory hallucinations, paranoia, two RVRs, two PREA reports, and MHCB admissions. During her March 2020 MHCB admission, she reportedly stabilized with Haldol

decanoate injections; however, staff noted concerns regarding potential for decompensation and recommended enhanced treatment following discharge.

Individual contacts with the PC and PNP were routinely offered. However, providers' rationales for completing non-confidential contacts throughout the review period were not documented in a clear or consistent manner. For example, the PNP notes tended to indicate the inmate was seen at cell front to prevent possible exposure to COVID, and one note included a comment that the inmate was coping adequately with the modified treatment due to COVID.

IDTT meetings were conducted on March 25, 2020 and May 5, 2020; however, the inmate's attendance and participation were not clearly documented. Her symptoms were generally described as manageable and her level of care was not elevated. Clinical notes suggested she was provided in-cell worksheets to help with symptom management during modified programing.

The inmate appeared to decompensate in May 2020. Her treatment refusal rate was high, and paranoia, confusion, and insomnia were noted as treatment barriers during high refuser contacts. In late May 2020, she reportedly consumed her cellmate's medication and endorsed homicidal ideation and command auditory hallucinations to commit suicide.

**Findings**

The care provided to this inmate was inadequate. Treatment plans and interventions failed to sufficiently address her significant psychiatric symptoms, and higher level of care non-referral rationales were not adequately documented. Further, the documentation was at times unclear regarding confidentiality of contacts and reasons for cell-front contacts.

**Inmate Z**

This inmate's healthcare record was reviewed to assess the care provided in the ASU EOP hub at CCWF. The inmate's psychiatric diagnosis was Major Depressive Disorder, with psychotic features, and she was treated with aripiprazole, olanzapine, Seroquel, and BuSpar. Her chronic and acute suicide risk were assessed as high.

Her recent history was significant for multiple MHCB admissions within a six-month period, several RVRs linked to worsening psychiatric symptoms, self-harm attempts, nightmares, claustrophobia, and safety concerns. The inmate also endorsed feelings of humiliation and resentment following an incident where officers pulled her out of the shower and punched her in the mouth.

The inmate appeared relatively stable when discharged from the MHCB on March 15, 2020, and her five-day follow-up was completed in the ASU EOP hub. However, she subsequently refused groups, kept her cell dark, and was described as agitated.

The inmate's symptoms and medication adherence improved by her April 7, 2020 IDTT. IDTTs were conducted with required members, although a clear rationale for the inmate's absence was not provided.

Some PC and PNP contacts were confidential, while others indicated she refused. The inmate received regular mental health contacts due to her high refusals, during which she attributed her low attendance to fear, lethargy, COVID-19, and depressive symptoms.

An April 24, 2020 PNP note indicated she was seen cell front to prevent possible exposure to COVID. The PC noted a treatment refusal on April 30, 2020, although the inmate was described as doing well despite racing thoughts. The PNP completed a cell-front contact on May 7, 2020 and documented a decrease in mood swings and general improvement in daily functioning.

The inmate's group attendance improved in May 2020, and she raised the possibility of decreasing her level of care to 3CMS in June 2020. A PC contact was completed at cell front on June 3, 2020, at which time the inmate was described as optimistic about release from ASU following her next ICC.

**Findings**

The care provided to this inmate was adequate.

**Inmate AA**

This inmate's healthcare record was reviewed to assess the adequacy of care provided in the ASU EOP hub and the higher level of care non-referral rationales. The 33-year-old inmate was diagnosed variably with Schizoaffective Disorder, Bipolar Disorder, Borderline Personality Disorder, and Amphetamine Use. She was alternately prescribed aripiprazole, ziprasidone, fluoxetine, benztropine, Haldol, and mirtazapine.

The inmate's recent psychiatric history was significant for multiple MHCB admissions, two incidents of foreign body ingestion, medication "cheeking," chronic suicidal ideation, at least eight suicide attempts, and one PIP admission from June through October 2019.

The inmate was admitted to the MHCB on February 27, 2020 for severe depression, distressing auditory hallucinations, and active suicidal ideation. She gradually improved and was discharged on March 2, 2020. However, her group treatment and medication adherence were sporadic following return to EOP level of care.

PC contacts were attempted frequently throughout the review period due to the inmate's high treatment refusal rate. The inmate reportedly attributed her low treatment attendance to sleepiness from medications and lack of interest. A March 7, 2020 PC progress note described the inmate as dysthymic with complaints of loneliness. On March 10, 2020, she reportedly threw water on a nurse and requested transfer to a PIP. On March 25, 2020, she met with the CIT after reporting suicidality. Her group treatment refusals continued through April 2020.

The PNP increased her Lamictal and Zyprexa dosages on May 12, 2020, after the inmate endorsed increased command auditory hallucinations telling her to do "bad things."

The inmate was transported to a community hospital twice for swallowing foreign objects during the review period. On April 28, 2020, she was transported to a community hospital after swallowing a pair of tweezers, and on May 15, 2020, she returned to the hospital due to ingesting

1130

a battery. She would not engage in treatment upon return from the hospital in May 2020, and on May 27, 2020 she reported a desire to kill herself.

The IDTT convened on June 2, 2020 with all required members present. The inmate reported being pleased with her medication on this date.

**Findings**

The care provided to this inmate was inadequate. The inmate required a more structured and collaborative treatment approach. Her treatment plans did not sufficiently address her presenting problems. Additionally, the IDTT failed to document an adequate rationale for non-referral to a higher level of care in the face of positive consideration indicators.

**Inmate BB**

This inmate's healthcare record was reviewed to assess the adequacy of care provided in the ASU EOP hub and the IDTT's higher level of care non-referral rationale. The inmate was predominately diagnosed with Schizoaffective Disorder, PTSD, and Methamphetamine Use Disorder. Clinical assessments noted a mix of psychotic features and personality disorder traits. She was variously prescribed Abilify, Zyprexa, and Trileptal. The healthcare record referenced two prolonged PIP admissions.

The inmate was placed in the ASU EOP hub on or around March 2, 2020, following MHCB discharge. The five-day follow-up was completed; however, the inmate was mostly described as nonresponsive or assaultive toward staff. An RVR mental health assessment, dated March 4, 2020, attributed her behavior to increased psychiatric symptoms at the time of the offense. On March 6, 2020, the inmate reported her medications were not administered and became agitated during a group, which resulted in a use of force incident. Another RVR mental health assessment, dated March 13, 2020, indicated her behavior was not associated with her psychiatric condition.

The PNP and PC completed their initial assessments of the inmate prior to the March 17, 2020 IDTT. The treatment team noted a higher level of care was not indicated due to improvements in mood and cooperation since MHCB discharge; however, this was inconsistent with other clinical documentation in March 2020.

The inmate was described as disruptive and threatening in group on March 18, 2020, and she subsequently refused numerous treatment contacts through early April 2020. On April 10, 2020, she was referred to the MHCB for mania, aggression, impulsivity, and inability to respond to redirection.

The IDTT submitted an intermediate care referral on April 14, 2020 for danger to others and significant impairment. The IDTT determined she did not meet emergency transfer criteria and planned to retain her in the MHCB. The inmate reportedly agreed to a discharge on April 20, 2020 and was housed in the ASU awaiting transfer to intermediate care. The subsequent ASU preplacement screen indicated a mental health consult was not required.

The inmate was readmitted to the MHCB on April 29, 2020 due to possible delusions, pressured speech, and lack of engagement in safety planning. The inmate attended her April 30, 2020 IDTT with all required staff. The PNP noted continued medication non-adherence, suicidal thoughts, and referenced the pending PIP transfer. The inmate discharged to the ASU EOP hub on March 11, 2020 after reportedly demonstrating significant improvement on medication.

On May 26, 2020, the IDTT convened and documented that a PIP referral would be considered and that a PC 2602 order was required. However, the IDTT also noted an intermediate care referral was in place since April 13, 2020. The inmate was positive for multiple higher level of care referral criteria, although the treatment team determined she could be safely treated in the ASU EOP hub.

A May 27, 2020 PC progress note described the inmate as suicidal, agitated, hyperverbal, paranoid, with diminished overall stability. The inmate was informed there were no MHCBs available on this date. The PNP also met with the inmate on May 27, 2020 and raised her medications to address elevated energy and frustration.

**Findings**

The care provided to this inmate was adequate, although minimally. She was appropriately referred to intermediate care in April 2020; however, assessments regarding emergency transfer criteria were not adequately documented. The inmate required a more structured and collaborative treatment approach while she awaited transfer to an intermediate care facility.

**Inmate CC**

This inmate's healthcare record was reviewed to assess the adequacy of care provided in the ASU EOP hub and the IDTT's higher level of care non-referral rationale. The 27-year-old inmate arrived from county jail with psychotropic medications that included Abilify, Effexor and Lithium. She was diagnosed with Schizoaffective Disorder.

The PC's initial assessment occurred on March 26, 2020, during which time the inmate endorsed paranoid ideation and sexual frustration. Other psychiatric symptoms included depressed mood, paranoia, and suicidal and homicidal ideation. The healthcare record also referenced one suicide attempt.

A May 6, 2020 PC progress note indicated the inmate appeared to be under the influence of an unknown substance, and she was referred to the CIT for evaluation later on this date. CIT documentation described the inmate as labile and screaming, and she was apparently refusing to flush her toilet. She was referred to MHCB level of care and placed in alternative housing, pending bed availability. On May 7, 2020, the inmate informed a clinician she used methamphetamine one day prior in an attempt to ward off negative auditory hallucinations. Her chronic and acute suicide risk were assessed as moderate on this date.

The inmate subsequently transferred to the MCHB where her Abilify was increased. She was reportedly unable to participate in out of cell activities due to quarantine status. The IDTT discharged the inmate to EOP level of care on May 14, 2020 with improved but persistent psychotic symptoms after what was thought to be a manic episode.

The inmate endorsed passive suicidal ideation during the five-day follow-up period. She met with her PC on May 20, 2020 and described her mood as "awesome," although the clinician did not indicate whether this was cause for closer monitoring considering her recent MHCB placement in connection with a manic episode.

The healthcare record referenced an incident where the inmate allegedly assaulted an ASU EOP supervisor on May 14, 2020.

**Findings**

The care provided to this inmate was adequate during her relatively brief ASU EOP Hub stay.

**Inmate DD**

This inmate's healthcare record was reviewed to assess the adequacy of care provided in the ASU EOP hub and the IDTT's higher level of care non-referral rationale. The inmate was diagnosed with PTSD, Major Depressive Disorder, and Borderline Personality Disorder. She was variously prescribed Cymbalta, Trileptal, Prozac, BuSpar and Zyprexa. Her psychiatric history was significant for at least six inpatient hospitalizations, multiple instances of self-harm, numerous MHCB admissions, and recent suicidal ideation.

The inmate was admitted to the MHCB in early March 2020 after swallowing a razor. The IDTT documentation referenced her three MHCB admissions within a six-month period and determined she did not require a higher level of care based on her positive response to inpatient treatment.

A clinician noted on March 11, 2020 that the majority of the inmate's self-harm behaviors were connected to relationship issues. The PNP's initial assessment of the inmate indicated she was anxious about a potential reduction in level of care.

The inmate refused to attend her March 17, 2020 IDTT. The treatment team again referenced her multiple MHCB admissions; however, they suggested she engaged in self-harm to affect level of care and housing changes. The IDTT determined that EOP level of care was appropriate, considering the lack of "genuine" mental health distress, although they acknowledged her high risk behaviors might result in "extreme consequences."

A psychologist completed a cell-front contact on March 17, 2020 to inform the inmate of her IDTT goals. She was offered more frequent PC contacts due to her high treatment refusal rate during this time, although most contacts were completed at cell front. The inmate was seen for a high refuser contact on April 6, 2020, and the clinician identified the lack of out of cell contacts due to COVID as a barrier to treatment. The limited group treatment available in the unit also obscured the meaning of her low attendance.

The PNP noted the inmate agreed to a cell-front contact on April 10, 2020 to reduce the risk of COVID. The inmate reported on this date that she did not want to attend dayroom groups due to the lack of confidentiality and complained another group room was not large enough for all participants.

1133

Her group treatment attendance remained sporadic through May 2020, and she was described as depressed in clinical notes. The PNP conducted another cell-front contact on May 4, 2020 to prevent possible exposure to COVID. She attributed her treatment refusals during this time to not feeling up to participating, headaches, and ASU fatigue.  The inmate reported worsening depressive symptoms during a confidential PNP contact on May 14, 2020, despite medication adherence.

The inmate was transported to an outside hospital on May 19, 2020 after reportedly ingesting a razor blade and tweezers. She was quarantined upon return and referred for MHCB admission. Documentation suggested she was retained in the MHCB through at least June 8, 2020, and the MHCB treatment team noted that her depressive symptoms worsened in the ASU setting.

**Findings**

The care provided to this inmate was inadequate. Clinical notes referenced COVID-19 related treatment restrictions that negatively impacted this inmate's mental health. Mental health staff were unable to provide necessary structured treatment to this inmate. She would have benefitted from inpatient care with treatment focused on skills acquisition. Further, the need for intermediate care was not sufficiently addressed by the treatment team, despite their failed efforts to manage her self-injurious behaviors in the ASU EOP hub.

**EXHIBIT AA**
**Valley State Prison (VSP)**
**Review Date - June 5, 2020**

**Inmate A**

This patient's healthcare record was randomly selected from the VSP TMHU roster dated May 22, 2020 to assess the adequacy of care provided. Upon further review, it was noted that the patient's referral to MHCB was rescinded in less than 24 hours. This was apparently not a TMHU admission, but an alternative housing placement pending assessment. As such, this case was reviewed for adequacy of care provided in alternative housing.

This patient was placed in alternative housing from EOP level of care. He was diagnosed with Schizophrenia; Major Depressive Disorder, recurrent, with psychotic features; Substance Use Disorder; and Antisocial Personality Disorder. The patient was prescribed haloperidol, mirtazapine, olanzapine, oxcarbazepine, venlafaxine and diphenhydramine, as well as haloperidol PRN, hydroxyzine PRN and benztropine PRN.

The patient was retained in the TMHU for one-to-one monitoring on May 21, 2020 after reporting racing thoughts and suicidal ideation. The CIT was contacted and responded. The patient was assessed and given PRN haloperidol and hydroxyzine after consulting with the on-call psychiatrist. The patient did not calm significantly. A medical assessment revealed tachycardia, and as a result, benztropine was given as a PRN after consultation with the on-call psychiatrist. The patient was placed on one-to-one watch.

A SRASHE was completed upon placement in the TMHU and noted the patient was a recent return from DSH. The patient was noted to be noncompliant with his antidepressant medication, had problems sleeping, and was noted to have paranoia. His chronic and acute risk for suicide were assessed as high. A referral was made to the MHCB, and the decision was made to retain the patient on one-to-one watch.

The patient was seen for a second SRASHE the next day when it was noted that the patient was denying suicidal ideation and reported wanting to return to his cell and receive his property. He was noted as laughing and joking with staff. He was assessed as continuing to have high chronic risk for suicide, but his acute risk was assessed to be low. No safety plan was developed. His MHCB referral was rescinded. A discharge note indicated that the patient should be seen in EOP, and treatment recommendations were provided.

The patient's stay in alternative housing was less than 24 hours.

**Findings**

The treatment provided to this patient was adequate, although the discharge SRASHE did not include a safety plan, despite the patient's report of suicidal ideation precipitating the alternative housing placement. PRN medications were provided as treatment while in alternative housing and appeared to be effective in resolving the patient's crisis.

1135

**Inmate B**

This EOP inmate's healthcare record was randomly selected to review for the adequacy of care provided. The inmate was placed in EOP level of care on December 18, 2019. He was diagnosed with Unspecified Depressive Disorder, Unspecified Schizophrenia Spectrum and other psychotic disorders. The inmate was prescribed mirtazapine and risperidone.

The inmate was seen for weekly individual sessions with his PC throughout the review period. Sessions focused on the inmate's hallucinations and delusions along with interpersonal concerns. More often than not, progress notes described the inmate's experiences and thoughts but did not clearly indicate what types of interventions were provided or how the inmate's current functioning indicated progress or lack thereof in treatment. PC progress notes indicated shortened sessions, or sessions occurring in the yard due to COVID-19 throughout March and April 2020. Of concern was a note dated April 30, 2020 when the PC documented a short visit with the inmate and noted no significant issues. The day prior, the inmate had been in a fight with another inmate and nursing documentation indicated bruising around the inmate's eye. There was no mention of any altercation or bruising in the PC's notes until a week later.

A psychiatrist saw the inmate monthly throughout the review period. Of concern, on June 3, 2020, the following note was entered by a psychiatrist, "IP [inmate- patient] was seen by provider. Note was missed. Provider is not available at this time, to complete note of this contact." No further information was provided.

Treatment plan goals and interventions appeared relevant to the inmate's diagnoses. Treatment plans were reviewed timely, and the two documented IDTT meetings included the necessary participants. Goals and interventions were reviewed, and one treatment plan update included a summary of the inmate's progress. The Clinical Summaries remained largely unchanged on both reviews.

The inmate was scheduled for 90 groups during the review period. Of these, 45 groups or 50 percent were documented as cancelled. All completed groups were recreation groups, except one social skills group. Progress notes were entered into EHRS on four occasions, all related to recreation groups. No other information about the inmate's participation or progress in groups was noted, despite a treatment goal to focus on his interactions in groups. The inmate was offered an average of 6.47 hours of programming weekly during the review period. Of those hours offered, he attended 3.5 hours or 54 percent on average, per week.

**Findings**

The care provided to this inmate was not adequate. Throughout the review period, the inmate was not offered, nor did he attend the required services for EOP level of care. While not offering groups is understandable within the context of COVID-19, attention to the inmate's needs should have been more proactive, especially given that his delusions may have resulted in a physical altercation that went unnoticed by his PC. Documentation related to active interventions, as well as inmate's response to treatment and progress toward treatment goals was not present in EHRS for reasons that were not discernible.

**Inmate C**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving EOP level of care. He was placed in the EOP level of care on December 20, 2019. Diagnoses included Borderline Personality Disorder, Post-Traumatic Stress Disorder, anxiety disorder, and mood disorder in conditions classified elsewhere. There was also reference to Bipolar I disorder in both PC and psychiatry progress notes, but it was not visible on the formal problem or diagnosis lists in EHRS. He was prescribed hydroxyzine, oxcarbazepine and prazosin.

The inmate was seen weekly by a clinician for individual sessions although the majority were not conducted with his assigned PC. Notes indicated that his assigned PC was not at the facility for an extended period. Most of the contacts appeared appropriate and focused on the issues noted in the treatment plan. Treatment interventions and the inmate's response to treatment were often documented. Of concern, one progress note included inconsistent content which appeared to be the result of content duplicated from another progress note.

Monthly contacts were held with a psychiatrist, mostly focused on the inmate's desire for more medications to assist with sleep and anxiety. The inmate's needs appeared to be addressed.

The inmate was scheduled for 131 group sessions over the review period, 39 or 30 percent of which were documented as cancelled. He attended all but four of his scheduled groups. All but five of the groups held during the review period were recreational groups. Of concern, only 30 or 33 percent of group sessions held included progress note documentation. The inmate was offered 8.28 hours of weekly programming and he attended 6.99 hours or 84 percent on average, over the review period.

The inmate was scheduled for one IDTT which was not completed timely. The required members of the IDTT were present, including the inmate. Goals and outcomes were reviewed but not changed from the initial plan done in January. This included two outcomes which conflicted with each other (one to have anxiety rated as two or below the other as four or below). His progress and functioning were reviewed.

**Findings**

The care provided to this inmate was adequate, although marginally. The team attempted to address his needs despite failing to meet required treatment hours, likely secondary to COVID-19 restrictions. Interventions and the inmate's response were documented and were in line with treatment goals, with the exception of group programming which was not adequately documented.

**Inmate D**

This inmate's healthcare record was randomly selected to review the adequacy of care provided to inmates receiving EOP level of care. He was transferred to EOP on November 8, 2019. The diagnoses on his treatment plan were Antisocial Personality Disorder, Generalized Anxiety Disorder, Major Depression and Post-Traumatic Stress Disorder. On occasion, psychiatrists questioned whether Bipolar II may be a better explanation for his symptoms than Major

Depressive Disorder, but no formal diagnostic change was made. The inmate was prescribed prazosin, buspirone, fluoxetine, mirtazapine, and hydroxyzine.

The inmate was seen for weekly PC contacts throughout the review period, although on two occasions exceeded seven days between contacts. Starting with the inmate's first contact in April and continuing through the review period, the inmate was seen by clinicians who were not his assigned PC, as that clinician was absent from the facility. Half of the PC contacts occurred in a confidential setting during the review period and documentation indicated that this was the inmate's choice as he did not feel comfortable seeing staff in the mental health offices because staff was not wearing facial coverings. The content of sessions focused on assessing risk of harm to self and others but not on providing treatment in accordance with the inmate's needs or treatment plan.

During the review period, a SRASHE was completed and indicated the inmate's chronic risk as high and acute risk as moderate. A safety plan was created 11 days later, due to "limited time," and the plan appeared adequate and relevant.

The inmate was seen for psychiatric contacts monthly, during which the inmate's symptoms were addressed through medication and included routine review of medication efficacy, side effects, laboratory results and the inmate's mental status. Two of the contacts were noted to have been conducted via telepsychiatry.

One IDTT and treatment plan review was scheduled during the review period. All necessary members were present, including the inmate. Treatment goals remained unchanged and focused on danger to self and suicidal ideation.

The inmate was scheduled for 121 groups during the review period according to EHRS. Of those scheduled, 73 or 60 percent were documented as cancelled. Of the 48 groups the inmate attended, there were only seven progress notes describing his participation. The inmate was offered 10.09 hours of programming on average and attended 7.62 hours or 76 percent on average during the review period.

**Findings**

The care provided to this inmate was adequate, although marginally. Of concern was the focus of PCs on assessing current risk rather than providing interventions to assist the inmate to develop resources to manage chronic risk, and the lack of documentation for group attendance.

**Inmate E**

This inmate's healthcare record was randomly selected for review of adequacy of care provided to inmates receiving EOP level of care. The inmate was transferred from CMF EOP to VSP EOP on March 10, 2020. Records indicate that he was primarily Spanish-speaking but understood English. He was diagnosed with Major Depressive Disorder, single episode, in partial remission. The inmate was prescribed fluoxetine.

The inmate had contact with five different clinicians over the course of three months. He was seen weekly, with the exception on one week during April, and the sessions were variably

1138

conducted in English and Spanish depending on the clinician's language ability; only one clinician engaged an interpreter. The inmate's symptoms of depression, anxiety and intermittent auditory hallucinations appeared to worsen over the review period, but progress notes did not reflect acknowledgement of symptom increase. All PCs carried over content from a psychiatric progress noted dated March 20, 2020, which noted that the inmate was "feeling better now" rather than subsequent psychiatric progress notes that documented increased symptoms. Additionally, the inmate's effective coping skills of activities and distraction were very limited due to COVID-19, increasing hopelessness, rumination and anxiety. Interventions were noted to be "rapport building" and encouraging the inmate to talk with his family and use coping skills.

A SRASHE conducted on April 17, 2020 noted the inmate's suicide risk to be low, for both chronic and acute risk. This appeared to be based primarily on the inmate's self-report without consideration of objective factors, recent negative health news, or his suicide attempt less than six months prior. The safety plan was inadequate in that it indicated that the inmate did not have people he could talk to about his suicidal ideation and that he should "remove thoughts" of suicide.

The inmate was seen by three different psychiatrists during the review period; one session occurred two-weeks later than required. Two of the three routine sessions were conducted in English, although a psychiatrist "pulled in" a Spanish-speaking therapist toward the end of the session. One psychiatrist appeared to note the inmate's increasing symptoms and referred the inmate to a Spanish-speaking psychiatrist who assessed the inmate as "stable." Of concern, the psychiatrist who participated in IDTT documented that the inmate was "improving" despite documentation to the contrary.

Treatment plans and IDTT meetings were timely. The goals to address depressed mood and decrease suicidal ideation appeared appropriate but the interventions were not well targeted to meet those goals. Both IDTTs were conducted in English.

Of the 58 groups scheduled for the inmate in EHRS, 14 or 24 percent were documented as cancelled. The inmate attended two clinician-led groups during the review period, and both included progress notes. The inmate was documented as having attended 42 recreational therapy groups, but no progress notes were entered into the record. The inmate was offered 3.94 hours of programming on average, per week and attended 3.88 hours or 98 percent on average over the review period.

**Findings**

The care provided to this inmate was not adequate. Over the review period, documentation clearly reflected increased anxiety, hopelessness, guilt, suicidal ideation and psychotic symptoms. However, clinicians did not appear to recognize the worsening over time and did not appear to be provide interventions to address symptom changes. A suicide risk assessment appeared to inadequately account for objective factors and the inmate's history, with an over-reliance on the inmate's self-report. Additionally, the inmate was seen or assessed by eight different clinicians over three months, most of whom did not speak the inmate's primary language.

1139

**Inmate F**

This inmate's healthcare record was randomly selected for review of the adequacy of care provided to inmates receiving EOP level of care. He was placed in the EOP level of care on July 19, 2019. The inmate was diagnosed with Schizoaffective Disorder, depressive type; Post-Traumatic Stress Disorder; Antisocial Personality Disorder by history; and Polysubstance Abuse versus dependence by history. He was prescribed fluoxetine and mirtazapine.

The inmate was seen weekly by a PC, but a session noted in the orders section of EHRS as "completed" on March 26, 2020 was not appropriately documented in a progress note. All sessions were noted to occur in a confidential setting and appeared to address problems listed on the treatment plan with appropriate interventions and documentation of the inmate's response. Of note, documentation of symptom assessments or plans for continuity of future sessions varied by provider.

Psychiatric contacts occurred monthly via telepsychiatry services and appeared to address inmate needs and assessed functioning, medication efficacy and side effects.

One IDTT meeting was held during the review period to update the treatment plan in accordance with the Program Guide. The meeting included necessary participants, including the inmate, and addressed inmate progress and ongoing needs.

The healthcare record indicated that the inmate was scheduled for 125 group sessions during the review period; 53 or 41 percent of which were documented as cancelled. The inmate was noted to "no show" for six group sessions. Of the 67 groups attended by the inmate, 16 or 24 percent were documented in progress notes. The inmate was offered 6.67 hours of programming, on average, over the review period and attended 5.67 hours or 85 percent on average, weekly.

**Findings**

The care provided to this inmate was adequate, although marginally. He was not offered the minimum number of required structured therapeutic hours of service required for EOP level of care, likely due to COVID-19, but not documented as such. Of concern, documentation by the assigned PC did not include formal tracking of symptom progress over time or clear plans for subsequent sessions, despite adequate treatment documented during the sessions. Group documentation was not adequate. All clinical contacts were conducted in confidential settings.

**Inmate G**

This inmate's healthcare record was randomly selected for review of adequacy of care provided to inmates receiving EOP level of care. He was discharged from DSH-Atascadero to VSP EOP on May 13, 2020. Diagnoses included Schizoaffective Disorder, depressive type; Schizophrenia; Antisocial Personality Disorder; and Substance Use Disorder. He was prescribed benztropine, haloperidol, haloperidol PRN, hydroxyzine, mirtazapine, olanzapine, oxcarbazepine and venlafaxine.

Documentation noted that on arrival to VSP, the inmate was placed in a single cell for COVID-19. Also, immediately upon arrival at VSP, an ASU pre-placement assessment was completed

without clearly documented rationale. The assessment incorrectly noted the inmate as a general population inmate. The inmate was seen for five-day follow ups in accordance with requirements. His safety plan was reviewed, and a SRASHE completed with inmate's chronic risk noted to be high and acute risk noted to be low.

A week after admission to VSP, the inmate reported being suicidal and the CIT was notified. The team's response time was adequate and a SRASHE was completed which increased the inmate's acute suicide risk to moderate. The resulting disposition was to refer the inmate to a higher level of care and "retain in TMHU for continued 1:1 monitoring." The inmate had an elevated heart rate and reported high anxiety, so he received PRN haloperidol, hydroxyzine and diphenhydramine. A SRASHE was completed the following day and noted the inmate's acute risk was reduced to low. The MHCB referral was rescinded, and the inmate returned to EOP. He was seen as required for five-day follow ups.

The initial IDTT was not timely, but all required individuals were present, including the inmate. The inmate's treatment goals targeted hallucinations by addressing distress and increasing coping skills and danger to self by reducing suicidal ideation and depression through goal setting.

The initial psychiatric assessment conducted via telepsychiatry was not timely and occurred nearly one full month after discharge from DSH-Atascadero, 19 days after his return to EOP from MHCB, and a week after his IDTT. While the assessment appeared thorough and addressed the need for diagnostic clarification, given this inmate's acute treatment needs, the delay was concerning.

There were also concerns regarding psychiatric documentation. The first was a note from a pharmacist to the psychiatrist regarding the inmate's high olanzapine dose. The psychiatrist responded that the inmate was discharged from DSH-Atascadero with all medications at high doses and noted, "I have yet to see him." This was concerning as the same psychiatrist was present at IDTT and completed a psychiatry review five days earlier. Also, of concern was the completion of AIMS testing shortly after admission to VSP with no other psychiatric documentation, thus the nature of the contact which resulted in an AIMS assessment was unclear.

The PC initial assessment was not timely and occurred, 16 days after arrival at VSP from DSH-Atascadero, and seven days after discharge from the TMHU. Weekly routine contacts with his PC occurred as required and appeared to be in line with the inmate's treatment plan from this date forward.

During the review period, the inmate was scheduled for ten recreation groups, seven or 70 percent of which were documented as cancelled. There was a single progress note for groups noting the inmate as "no show." The inmate was offered 2.36 hours of programming per week, on average and attended 1.03 hours or 44 percent per week, on average over the review period.

**Findings**

The care provided to this inmate was not adequate. The inmate returned from an inpatient psychiatric hospitalization with active prescriptions for seven psychotropic medications,

including two antipsychotics and two antidepressants, but was not assessed by a psychiatrist until 28 days after his arrival at VSP. During that period, the inmate required a MHCB referral for suicidal ideation and PRN medications for anxiety. Concerns were noted with psychiatric documentation and the inmate was not offered programming in accordance with EOP level of care requirements.

## Inmate H

This inmate's healthcare record was randomly selected for review of adequacy of care provided to inmates receiving EOP level of care. He was placed in the EOP level of care on December 24, 2019. The inmate was diagnosed with Bipolar I disorder, most recent episode hypomanic. He was not prescribed psychotropic medications.

Throughout the review period, documentation indicated that the inmate was stable without any medications. The intention was to reduce him to 3CMS level of care in March 2020, but due to COVID-19 movement restrictions, the inmate was to remain at EOP level of care through June 2020. Weekly PC contacts indicated overall stability but noted an increase in frustration and a decrease in treatment participation which were attributed to the inmate's desire to return to 3CMS level of care. Psychiatric contacts were primarily conducted through telepsychiatry and noted functioning consistent with PC documentation. An IDTT was conducted timely and goals were consistent with the plan described above.

The inmate was scheduled for 115 groups during the review period, 88 or 76 percent of which were documented as cancelled. For the remaining groups, 12 or 44 percent included documentation in the EHRS. The inmate was offered, on average, 7.36 hours of programming each week and attended 2.67 hours or 36 percent over the review period.

## Findings

The treatment provided to this inmate was adequate, except for the offering of required program hours, likely due to COVID-19 restrictions. Documentation of group participation was needed.

## Inmate I

This inmate's healthcare record was randomly selected for review of adequacy of care provided to inmates receiving EOP level of care. The inmate was placed in the EOP level of care on February 4, 2020. The inmate was diagnosed with Schizophrenia, unspecified and anxiety. He was prescribed mirtazapine, fluphenazine, and benztropine. The inmate was noted as a member of the Developmental Disability Program (DDP). During the review period, the inmate was admitted to the TMHU for MHCB level of care and returned to EOP.

The inmate was seen weekly by a PC throughout the review period. Of concern, the intervention and follow-up plan documentation by one of the PCs was copied from session to session, even when it did not fit with what had been documented elsewhere in the same progress note. The majority of the sessions focused on the inmate's thoughts, feelings and hallucinations, with occasional documentation of interventions provided. He was seen by the IDTT for an updated treatment plan, where it was noted that he had improved functioning, and had not been in the MHCB in three months. The plan noted that the inmate did not have any side effects from his

medication, despite having reported involuntary movement of his teeth to his PC the week prior who referred the inmate to the psychiatrist. The psychiatrist saw him several days later and his hydroxyzine was discontinued, as the inmate believed this was causing him to grind his teeth.

Eight days later, the inmate was admitted to the MHCB after reporting an intention to jump off the stairway and cut himself to kill himself. The inmate was noted to be disoriented and had poor memory following the event. The SRASHE noted high chronic and moderate acute risk for suicide. Documentation indicated that the inmate may have experienced an increase in anxiety since his hydroxyzine was discontinued but was not assessed further. The inmate was discharged back to EOP a few days later. An IDTT updated his treatment plan accordingly, and PC contacts were in alignment with the update. Prior to his discharge, a psychiatrist noted that the inmate may need an additional antipsychotic to help control his paranoia and hallucinations. However, psychiatric documentation over two weeks later noted that the inmate seemed to be functioning well on his current medications.

According to the healthcare record, the inmate was scheduled for 97 groups during the review period, 64 or 66 percent of which were documented as cancelled. The inmate was noted to be "no show" for four groups as well. Fifteen groups included documentation in the EHRS. On average, the inmate was offered 6.85 hours of programming weekly and attended 4.08 hours or 60 percent over the review period.

**Findings**

The care provided to this inmate was adequate, despite the need for improvement in documentation. The inmate was not offered required programming hours during the review period likely due to COVID-19. Also, the inmate was noted to have submitted multiple requests to medical staff for attention to painfully long toenails beginning in March which had not been addressed at the time of this review. This concern was elevated and addressed.

**Inmate J**

This inmate's healthcare record was randomly selected for review of adequacy of care provided to inmates receiving EOP level of care. He was placed in the EOP level of care on December 31, 2019. The inmate was diagnosed with Bipolar I Disorder, current or more recent episode manic, with psychotic features and Amphetamine-Type Substance Use Disorder, severe, in early remission. He was prescribed aripiprazole, hydroxyzine PRN and benztropine.

One IDTT meeting was held during the review period to update the treatment plan. All required participants were present, including the inmate. Goals and interventions remained the same and included participation in DBT group, which was cancelled, likely due to COVID-19 concerns; however, this was not documented.

The inmate was seen for monthly telepsychiatry visits and an additional visit to assess for medication side effects. Psychiatric documentation reflected adequate care. Of concern, was the addition of lamotrigine to the inmate's medication regimen, but the signed informed consent form noted that "Depakote" had been added. In all following progress notes written by the CNAs who were supporting the telepsychiatry sessions, "Depakote" was listed as one of the

medications prescribed for the inmate. The record indicated no history or current prescription for Depakote for this inmate.

The inmate's initial PC contact was not timely, but all routine PC contacts during the review period were timely. Of concern, the inmate was seen by four different clinicians for PC contacts throughout the review period due to the absence of his assigned PC, who only met with him for three contacts. Documentation of progress notes varied by provider; just over one half included an assessment of target symptoms and interventions, and the remainder were status checks. Confidentiality of PC contacts varied. A third of contacts occurred in the yard or in the day room with documentation that this was due to COVID-19. Only two of the non-confidential visits due to COVID-19 concerns were consecutive; all of the other visits had confidential sessions either the week prior, the week following, or both, raising questions about the rationale for the non-confidential visit.

Of the 86 groups scheduled in healthcare record during the review period, 41 or 47 percent were documented as cancelled. Of the 45 groups reportedly held, five were documented in progress notes. Over the review period, the inmate was offered 5.4 hours of programming per week and attended 3.15 hours or 58 percent, on average.

**Findings**

The care provided to this inmate was not adequate. Of concern, treatment was not in line with the inmate's treatment plan, in large part due to coverage provided by various clinicians that conducted status checks without clinical assessments or interventions. There were additional concerns regarding documentation of inaccurate medication. The inmate was not offered required programming hours during the review period.

**Inmate K**

This inmate's healthcare record was randomly selected for review from the non-referral log to assess adequacy of rationale for non-referral. He was diagnosed with Schizoaffective Disorder, bipolar type and Borderline Personality Disorder. He was also noted to be enrolled in DDP secondary to cognitive deficits and propensity toward victimization. The inmate was prescribed fluphenazine and benztropine. The inmate was on a PC 2602 involuntary medication order, with a fluphenazine injection ordered should he refuse oral medications.

During his initial IDTT at VSP on March 24, 2020, it was noted that the inmate had not attended at least 50 percent of programming, therefore a higher level of care needed to be considered. He was recently transferred from the EOP at RJD where he had attended only ten percent of programming. The inmate was assessed as demonstrating impulse control, effective symptom management, and an ability to maintain his activities of daily living with reminding and prompting. It was noted that he was socializing with his peers without conflict and was taking his medications as ordered. His treatment plan included provisions for prompting the inmate to attend programming, creating a calendar, and using motivational interviewing and problem solving in therapy to promote program attendance. For these reasons, the decision was made to retain the inmate at EOP level of care. Of concern was the fact that the EOP Functional Evaluation was not updated at the March 24, 2020 IDTT.

**Findings**

The decision for non-referral appeared appropriate given the recent transfer and the provisions in the inmate's treatment plan to support increased program attendance. Of concern was the fact that the EOP Functional Evaluation was not updated during the IDTT.

**Inmate L**

This inmate's healthcare record was randomly selected for review from the non-referral log to assess adequacy of rationale for nonreferral. He was diagnosed with Schizoaffective Disorder, bipolar type. He was prescribed lamotrigine, venlafaxine and hydroxyzine.

The inmate was seen by the IDTT for an EOP routine treatment plan review on April 30, 2020. His PC was not in attendance at the IDTT, but the psychiatrist, correctional counselor and senior psychologist supervisor were noted as present. The review indicated that the inmate refused 56 percent of his programming over the previous three months and had received two RVRs in recent weeks for failure to be present for count and disrespect with the potential for violence/disruption. The inmate noted that recent changes in his seizure medications were the cause of his increased depressive symptoms, anxiety, and frustration intolerance.

The rationale for retaining him at EOP level of care was that he recently started a new medication for seizures, and this resulted in an increase in symptoms. While there had been a change in his seizure medication, there was also noted to be medication non-adherence with both his seizure medication and his psychotropic medications. His psychotropic medications were changed a number of times over the review period, mostly in response to the inmate's refusal to take medications as prescribed.

The content of the treatment plan was largely unchanged from the previous document. The goals and interventions were unchanged and targeted hallucinations as the only problem, despite noted issues with program participation, frustration intolerance, depression and anxiety. The medication review section included text from the January 2020 review, much of which was no longer relevant. The EOP Functional Evaluation was not updated, despite changes in the inmate's behavior. The treatment modifications listed to support the inmate in his current location included the use of Rational Emotive Behavioral Therapy (REBT) combined with motivational interviewing to "explore and identify thoughts that lead to depressive mood" and "cognitive therapy to identify cognitive triggers of anxiety and to promote skill building." These were not included as goals or interventions on the treatment plan.

According to documentation, the inmate was seen two weeks earlier, on April 17, 2020, by a clinician other than his assigned PC to prepare for his IDTT and update his treatment plan. The content of the treatment plan update included inaccurate information about the inmate's medications, both psychotropic and seizure medications, as they had been changed over the period of time between that visit and the IDTT. This is significant because the rationale for maintaining the inmate at the EOP level of care despite his high program refusal rate was related to recent changes in his medications.

**Findings**

While the inmate's functioning did not appear to warrant a transfer to a higher level of care at the time of the IDTT, the rationale for retaining him at EOP was not adequate. There were inconsistencies in documentation, and additional treatment interventions and supports were not adequately identified to assist the inmate in succeeding at his current level of care. Treatment plan goals and interventions were not updated to address the inmate's treatment participation or medication compliance.

**Inmate M**

This inmate's healthcare record was randomly selected for review from the non-referral log to assess adequacy of rationale for nonreferral. He was diagnosed with Unspecified Schizophrenia Spectrum and Other Psychotic Disorder and Autism Spectrum Disorder.

The inmate was transferred to the EOP level of care from 3CMS in January 2020. He was scheduled for a routine, quarterly IDTT meeting on April 28, 2020. The inmate refused to participate in the IDTT; all required staff were present. The inmate was noted to have attended 12 percent of programming since his initial IDTT. His treatment goals were written to target delusions through challenging his thinking, and he was prescribed no medications as he refused evaluation by a psychiatrist.

Consideration for a referral to a higher level of care was required due to his refusal to participate in programming. The rationale for not referring him to a higher level of care was based on the inmate's claim that he was "illegally" placed in EOP and chose not to participate until his grievance was resolved. It was noted that he attended other appointments, showered regularly, and ate meals without any issues. The clinician documented no objective signs of auditory hallucinations or bizarre behavior, yet there was documentation that the inmate was rolling up his jacket at the base of his cell door to keep the bugs out despite a report from officers that there was no bug problem on the unit. Additionally, it was noted that on more than one occasion, the inmate banged on his cell door and yelled when he returned from an appointment and found himself unable to enter his cell because it was locked. This behavior was documented in the record as impatient and immature.

The plan to address his lack of participation was documented as continued weekly attempts to engage him and working with custody to reinforce participation in outdoor activities and recreation groups. One additional intervention that appeared unclear was, "MHPC will work with IP on the identifying and maintenance of coping skills that have allowed him to function adequately without the interference of previous symptoms related to Schizophrenia diagnosis." It was concluded that his lack of treatment had not resulted in negative effects such as placement in a crisis bed or mental health decompensation.

A review of the record indicated that his refusal to engage in assessments and treatment in EOP was similar to his behavior in 3CMS which prompted transfer to EOP with little change since his increased level of care three months prior.

## Findings

The rationale for not referring this inmate to a higher level of care seemed appropriate, but time limited. It appeared that additional time was necessary to further assess the inmate's mental health needs, but consideration for a level of care change appeared warranted at the next review, should the inmate's functioning remain unchanged.

## Inmate N

This inmate's healthcare record was randomly selected for review from the non-referral log to assess adequacy of rationale for nonreferral. He was diagnosed with Major Depressive Disorder, single episode, moderate; Amphetamine-Type Substance Use Disorder, severe in early remission and adult antisocial behavior. He was prescribed lithium.

The inmate was seen for an initial EOP IDTT and treatment plan on April 30, 2020. Of note, the plan was conducted later than required, as the inmate had transferred to VSP on April 9, 2020. The PC, psychiatrist, senior psychologist, correctional counselor and another psychologist were noted as present, yet documentation on the IDTT form indicated that the inmate had questions about his medications and "will ask the psychiatrist about this," implying that the psychiatrist was not present. The goal was to target the inmate's depressed mood by challenging his dysfunctional thoughts using motivational interviewing.

The inmate's rate of participation in treatment over the previous three months was less than 50 percent prompting the need to consider the inmate for a higher level of care. Since transfer to VSP the inmate engaged in treatment at 80 to 90 percent. This was validated through the record review.

## Findings

The rationale for not referring this inmate to a higher level of care was appropriate as the inmate's treatment participation had increased significantly since arrival at VSP. Of concern, the IDTT was conducted later than required and the attendance list indicated that the psychiatrist was present, yet the documentation indicated otherwise. One additional concern was that the EOP Functional Assessment section of the treatment plan included "N/A" for all entries.

## Inmate O

This inmate's healthcare record was randomly selected from the non-referral log to assess adequacy of rationale for nonreferral. He was diagnosed with Unspecified Schizophrenia Spectrum and Other Psychotic Disorder. The psychiatrist also indicated that Major Depressive Disorder with psychotic features was being considered, along with a substance use disorder diagnosis. He was prescribed buspirone and aripiprazole.

The inmate was seen for his initial IDTT and treatment plan on April 23, 2020, after returning to EOP from the MHCB. All required participants were in attendance at the IDTT. A goal to address the inmate's anxiety was initiated to include objectives and cognitive behavioral interventions. There was also a goal listed to target hallucinations, but no objectives or interventions were included. The inmate was required to be considered for a higher level of care

1147

because he had more than three MHCB referrals in the past six months and was attending less than 50 percent of his treatment activities.

Documentation within the IDTT noted that his three MHCB admissions over the previous three months had been precipitated by his auditory hallucinations and danger to others. The rationale for not referring him to a higher level of care included an absence of hallucinations and no noted interpersonal problems on the unit as evidenced by self-report and corroborated by correctional officers and other mental health staff. While this rationale was sound internally, a record review revealed that all three MHCB admissions were precipitated by the inmate's suicidal statements and danger to himself, not danger to others. The IDTT did not include supports or interventions to specifically target the inmate's suicidal ideation.

Also, the inmate was noted to be attending only 34 percent of his programming. Documentation within the treatment plan indicated that this was the inmate's way of coping with interpersonal stressors and reducing his auditory hallucinations. The rationale for not referring him to a higher level of care was that the lack of attendance was adaptive given his needs. A review of records, however, indicated that since returning to VSP on April 9, 2020 the inmate attended 87 percent of his programming.

### Findings

The rationale for not referring the inmate to a higher level of care was not appropriate given that it was not in keeping with the inmate's history or current level of functioning. The rationale was based on incorrect information. First, it was based on the assertion that the inmate's danger to others was the precipitant of his previous crises when it was danger to self that was the precipitant. Of note, the author of the treatment plan had seen the inmate for an initial assessment the week prior and had correctly documented his history of suicidal ideation and not his danger to others. Second, there was discussion that the inmate's failure to attend programming was adaptive given his danger to others. In fact, the inmate had been attending most of his programming and again, danger to others was not of primary concern. One additional concern is that the EOP Functional Assessment section of the treatment plan included "N/A" for all entries.

### Inmate P

This inmate's healthcare record was randomly selected from the non-referral log to assess adequacy of rationale for nonreferral. He was diagnosed with Unspecified Depressive Disorder and Major Depressive Disorder, recurrent episode moderate. He was prescribed venlafaxine, atomoxetine, oxcarbazepine and hydroxyzine PRN.

The inmate was seen for a routine EOP IDTT and treatment plan review on May 21, 2020. No psychiatrist attended the meeting, but a nurse's name was entered into that location on the attendance list without any reason for the substitution. All other required members were noted as present. The inmate's goals targeted substance use and depressed mood. Objectives were listed on the plan, but there were no interventions included to achieve these objectives. The inmate was noted to have attended 32 percent of his programming over the previous quarter. The inmate indicated that he was "lazy" and the clinician noted the inmate's lack of motivation and

preference to spend time with his friends on the unit as reasons for his failure to attend groups. The decision was made not to refer the inmate to a higher level of care because his lack of program participation was not due to mental illness and the inmate was participating in individual sessions and yard activities without issue. It was noted that the inmate agreed to make an effort to attend groups. Interventions, including cognitive behavioral techniques, psychoeducation, and motivational interviewing, were listed as means to support better attendance.

**Findings**

The rationale for not referring the inmate to a higher level of care was appropriate. Of concern was the fact that a nurse's name was listed in the IDTT attendance roster as the "psychiatrist" present at the IDTT meeting.

**Inmate Q**

This inmate's healthcare record was randomly selected from the non-referral log to assess adequacy of rationale for nonreferral. Progress notes and the problem list indicated that he was diagnosed with Adjustment Disorder with Anxiety, but Major Depressive Disorder and Schizophrenia were included on the diagnosis list within the EHRS. Additionally, the psychiatrist listed the diagnosis as other specified bipolar and related disorder on the treatment plan. The inmate was prescribed risperidone, lithium, mirtazapine, benztropine and hydroxyzine PRN.

The inmate was at 3CMS level of care and was seen for an initial IDTT after being discharged from EOP, and a recent discharge from the MHCB. The inmate was in ASU at the time of the IDTT on March 25, 2020, and all required participants were documented as present. The inmate's targets for treatment included danger to self, substance use, hallucinations and depressed mood. All targets had goals, objectives and interventions included. The inmate needed to be considered for a higher level of care secondary to receiving three RVRs in the past three months. These included possession of a controlled substance, possession of dangerous contraband, and absent from work. A mental health assessment for the latter revealed no mental health considerations and the former two were pending evaluation. The IDTT found the inmate to be stable and free from mental health concerns that would warrant a higher level of care. The inmate admitted having and using methamphetamine and reported that he had a razor while in EOP for shaving.

A review of the record revealed that the inmate was discharged from EOP with appropriate clinical rationale and then placed in MHCB secondary to verbalizing suicidal ideation in what appeared to be an attempt to influence housing. He was placed in ASU secondary to enemy concerns and reported feeling safe in ASU. Documentation appeared consistent regarding the inmate's mental status and functioning in 3CMS.

**Findings**

The rationale for not referring this inmate to a higher level of care appeared appropriate. Although, it appeared that the inmate's diagnoses required clarification.

**Inmate R**

This inmate's healthcare record was randomly selected from the non-referral log to assess adequacy of rationale for nonreferral.  He was diagnosed with Schizoaffective Disorder, bipolar type; Alcohol Use Disorder, severe; and Amphetamine-Type Substance Use Disorder, severe.  The inmate was prescribed haloperidol, buspirone, and benztropine.

The inmate was seen for a routine EOP IDTT and treatment plan review on April 21, 2020.  All required attendees were noted to be present.  The inmate had a single goal targeting hallucinations.  He was noted to be medication adherent with benefits and no reported side effects.  Due to the inmate's low attendance in groups, 34 percent, it was required that his level of care be reviewed.  The rationale for not referring him to a higher level of care was that he did not present with severe mental health symptoms or functional impairments.  He was noted to be eating, sleeping, socializing and attending individual appointments without a problem.  The inmate reported that he did not feel motivated to walk to another building for a group and sometimes felt anxiety in groups with other people.  Interventions to increase motivation and decrease anxiety were listed.  There was a discrepancy noted on the treatment plan.  In the section related to the inmate not being ready for discharge, it was documented that the inmate does not meet criteria for inpatient transfer because "he has been going to his groups."  Upon further review, it was noted that this statement had been copied from the previous treatment plan review.  It was also noted that the Clinical Summary had not been updated since July 2019.

**Findings**

The rationale for not referring this inmate to a higher level of care appeared appropriate, however, there were inconsistencies noted in the treatment plan due to copying text from a previous plan.

**Inmate S**

This inmate's healthcare record was randomly selected from the non-referral log to assess adequacy of rational for nonreferral.  He was diagnosed with Schizoaffective Disorder, bipolar type; ADHD, predominantly hyperactive/impulsive presentation; Alcohol Use Disorder, severe, in sustained remission; Amphetamine-Type Substance Use Disorder, severe, in sustained remission.  The inmate was prescribed aripiprazole, atomoxetine, escitalopram, mirtazapine, prazosin, benztropine and chlorpromazine PRN.

The inmate had an initial EOP IDTT and treatment plan completed on March 26, 2020 following his return to EOP from MHCB level of care.  All required attendees were documented as present.  The inmate had a single goal related to hallucinations with identified objectives and interventions.  The inmate reported experiencing abnormal movements and restlessness as medication side effects, and it was noted that his benztropine would be increased.

He was required to be reviewed for a higher level of care given that he had five MHCB admissions over the previous six months. Four of these admissions were prompted by suicidal ideation and one by homicidal ideation.  The inmate reported that these thoughts were often triggered by auditory command hallucinations and interpersonal difficulties with his roommates.  It was noted that the inmate was functioning well since his return from MHCB and was not

endorsing thoughts, plans, or intent of hurting himself or others. It was also noted that he had improved emotional regulation. These findings were consistent with discharge documentation from the MHCB. Of note, the EOP Functional Evaluation section had "N/A" entered for all responses and the Clinical Summary was not updated.

**Findings**

The rationale for not referring this inmate to a higher level of care was appropriate. The treatment plan, however, did not include a functional evaluation for EOP nor an updated clinical summary.

**Inmate T**

This inmate's healthcare record was randomly selected from the non-referral log to assess adequacy of rationale for nonreferral. He was diagnosed with PTSD and depression, major, recurrent, severe with psychosis. He was prescribed buspirone, prazosin, venlafaxine, perphenazine, and hydroxyzine.

The inmate was participating in modified EOP programming due to the severity of his symptoms and his difficulties attending full EOP programming. He was seen for a monthly IDTT and treatment plan review on May 26, 2020. Treatment goals continued to target his depression and anxiety through skill building and cognitive behavioral interventions. There were noted improvements over the previous month in symptom reduction and group participation. He was required to be considered for a higher level of care secondary to his level of program participation being below 50 percent. It was noted that his level was up to 49 percent from 38 percent the previous month. The rationale for not recommending a higher level of care was noted to be his current symptom stability and his progress in group attendance. He was also noted to be actively participating in individual treatment, completing his homework, and practicing his skills. He was noted to be functioning adequately on the unit.

**Findings**

The rationale for not referring this inmate to a higher level of care was appropriate.

**Inmate U**

This patient's healthcare record was selected for review of the adequacy of care provided to patients in the VSP TMHU. This patient was admitted to the TMHU at MHCB level of care from 3CMS. The patient was diagnosed with Schizoaffective Disorder, Bipolar Type; Schizophrenia; and Unspecified Depressive Disorder. Prior to the TMHU placement, the patient was not prescribed psychotropic medications. While in the TMHU, the patient was prescribed olanzapine orally with an injection as back-up should he refuse oral medications under an emergency PC 2602 order.

The patient's placement in the TMHU appeared appropriate given what appeared to be a psychotic episode evidenced by violence, agitation, disorganized speech and paranoia while being seen in the TTA for a medical follow-up secondary to unexplained weight loss. The patient was seen for an emergency evaluation by a psychiatrist at the time of the crisis on

May 13, 2020, and was prescribed an injection of haloperidol, lorazepam, and diphenhydramine. The patient was assessed to be a danger to self, a danger to others, and meeting criteria for grave disability. The psychiatrist placed the patient on "Emergent PC2602" and ordered olanzapine. A psychologist also responded to the crisis but noted that the situation had been assessed and addressed by the psychiatrist. The patient was placed on 1:1 watch and remained on that status throughout his stay in the TMHU. The 1:1 watch was noted as required for suicidality, but a SRASHE was not completed until the time of discharge.

The patient was seen during daily rounds by a clinician. He was also seen for daily clinical contacts by a PC, all but one of which were conducted cell front. The psychiatrist had cell-front contacts with the patient on two occasions over the seven-day period and attended both IDTTs. The patient was noted to be disorganized, aggressive and threatening, warranting cell-front contacts. Interdisciplinary huddles were documented on two occasions.

An initial IDTT was held on May 15, 2020 with the patient, a psychologist, psychiatrist, psych tech, CNA, sergeant and officers present. Treatment goals were updated to include recent symptoms and behaviors, with a focus on medication adherence to address symptoms. The patient was noted to have yard restriction because he was unpredictable, aggressive and hostile. It was noted that the team suspected methamphetamine use, but there was no indication that this was pursued further.

There was no documentation to indicate that the patient was offered or received any out of cell time beyond the IDTT and one PC session. It appeared that the patient was not offered a shower until May 18, 2020. The patient was noted to have received reading materials on May 19, 2020, as indicated by the PC who noted that the team would be consulted about this decision; there was no evidence that consultation occurred.

For reasons that are not clear, the patient was seen for a specialized ICC on May 18, 2020. At that meeting, he threatened the Warden and was placed in ASU. The patient was noted to be moved to the "Ad Seg side" and daily rounds by a psych tech commenced on that date. An ASU pre-placement assessment was completed and included an unremarkable mental status and no need for mental health consultation. Later that same day, a nurse met with the patient to discuss a medical grievance related to a desire for vitamin D supplements. There was nothing in the documentation for either of these contacts to indicate the patient was in TMHU or demonstrated compromised mental status.

Clinically, the patient appeared to begin stabilizing on May 19, 2020. An IDTT was held on May 20, 2020, and the decision was made to discharge the patient to EOP level of care. All required members were present, and a SRASHE was completed as well. Treatment recommendations were documented.

Records reflected that the patient was offered and attended 2.3 hours of services while in the TMHU; two of those hours of services were cancelled.

Of note, through the patient's time in the TMHU, a number of orders were entered into the healthcare record for "MH Patient Issue" for patient clothing and property allowances. These orders did not appear to be followed-up according to documentation in progress notes. For

example, the patient was initially ordered to have a safety smock, safety blanket, safety mattress, safety eating issue, and no further restrictions upon placement in the TMHU. Within 40 minutes, an order was written to reflect that restrictions were reduced and indicated that he was to be provided with full clothing, a regular mattress, treatment material and regular eating issue. There was no clinical documentation to provide rationale for this change in status and according to clinical documentation, the changes were not implemented as ordered. Later, the orders indicated that the patient was to be given partial clothing and a toothbrush, but clinical documentation continued to record that the patient was in a smock and was requesting a toothbrush.

**Findings**

The care provided to this patient was inadequate. Documentation was inconsistent. The TMHU placement was indicated to resolve a psychotic episode accompanied by agitation and violence. The primary interventions were psychotropic medication and the time required for medications to resolve the patient's symptoms. The concerns noted in this review were the inconsistency between the documentation and implementation of patient privileges, as well as the disciplinary issues encountered during the TMHU stay. One additional concern was that the patient was seen for an ASU preplacement evaluation and a grievance discussion with nursing on May 18, 2020, neither of which mentioned the patient's TMHU status or compromised mental status.

**Inmate V**

This patient's healthcare record was selected for review of the adequacy of care provided to patients in the VSP TMHU. The patient was placed on TMHU status from 3CMS level of care. The diagnoses on record were depression and anxiety. The psychiatrist who assessed the patient in the TMHU noted his impression as Adjustment Disorder with Mixed Anxiety, although it is not a DSM diagnosis and may have been a typographical error. The patient was prescribed hydroxyzine PRN.

The patient was placed at the MHCB level of care during the evening of May 17, 2020, following statements he made about wanting to cut his wrists and experiencing paranoia. For unclear reasons, two ASU pre-placement evaluations were completed proximate to the placement which noted suicidal ideation. While max custody cells were designated for some TMHU cells, the reason for this placement was not clearly documented.

The patient was seen by a PC the following morning, and a SRASHE was completed which noted that the patient was experiencing increased suicidal ideation and paranoia secondary to his upcoming parole scheduled for May 26, 2020. His risk was noted to be moderately high for both chronic and acute risk. He was continued on 1:1 watch and retained in the TMHU for further evaluation and treatment. Documentation noted that the patient would be expected to come out of his cell for activities when offered.

The patient was seen the following day, cell-front, by the PC and the psychiatrist together. This one contact on May 19, 2020 was documented three times as a PC contact, the initial psychiatric assessment and the initial PC assessment. The patient was noted to be angry and hostile. The

psychiatrist documented that the patient was "conditionally suicidal" noting that the patient wanted to remain in the TMHU until his release on parole.

An initial IDTT was conducted on May 20, 2020 in keeping with treatment guidelines for the TMHU. All required staff were present, but it was unclear whether the patient participated. The goals were updated to reflect danger to self, and the intervention was to assist the patient in challenging his dichotomous thinking. There was a note that the patient may need a California Welfare and Institutions Code 5150 evaluation at the time of parole in six days. Despite documentation that daily monitoring would occur, there was no follow up provided. He was, however, seen cell-front by a social worker on May 22, 2020 to discuss his upcoming release with no mention of a Code 5150 evaluation.

The patient was seen daily, at cell front, by a PC throughout the remainder of his stay. On May 21, 2020 there were two PC notes documented. One of those notes indicated that the patient may be able to be discharged from MHCB if he were to have a single cell. On May 22, 2020, the daily note consisted of one line noting, "Discussed discharge at IDTT this afternoon. IP was agreeable to the plan. No issues noted with nursing or custody staff."

An IDTT was held on May 22, 2020 with all required staff present. It was unclear if the patient was present, but it was noted that he was agreeable to discharge to a single cell. A SRASHE was completed and noted that both chronic and acute risk were low. A discharge note was documented on the same date and included recommendations for follow-up.

Records indicated that the patient was offered a total of 1.4 hours of services during his five-day stay in the TMHU.

**Findings**

The care provided to this patient was not inadequate. Provided treatment was not in alignment with TMHU guidelines. No treatment interventions were documented, despite the fact that the patient expressed serious concerns over his upcoming release, and the guidelines require safety planning development with patients who express suicidal ideation. There was no documentation that the patient was offered out-of-cell structured treatment.

**Inmate W**

This patient's healthcare record was selected for review of the adequacy of care provided to patients in the VSP TMHU. The patient was placed in the TMHU for MHCB admission from EOP on two occasions, first on May 18, 2020, and then again within one day of discharge on May 21, 2020. Both instances of TMHU placement were reviewed. The patient was diagnosed with Schizophrenia; Anxiety Disorder; Alcohol Use Disorder, severe, in early remission; and Amphetamine-Type Substance Use Disorder, severe, in sustained remission. While he was not prescribed any medications prior to his placement, he was prescribed buspirone and olanzapine during his initial TMHU stay. He refused one dose of buspirone daily, while on TMHU status.

The patient was initially admitted to TMHU on 1:1 watch for reporting that he was going to hurt someone and kill himself. Documentation indicated that two weeks prior to admission, the patient had asked to stop taking his psychotropic medication and it was discontinued without a

psychiatric contact.  He was seen by the PC and psychiatrist simultaneously on May 19, 2020.
This single, cell-front contact resulted in documentation of the initial PC assessment, a SRASHE,
a PC contact note, and the initial psychiatric assessment.  Documentation was thorough and both
chronic and acute risk were noted to be low despite the patient's identified risk factors, as the
patient was noted as "future-focused" and verbalizing conditional suicidality due to housing
issues, as well as willing to restart medications.

The patient was seen on rounds and during an IDTT the following day, and the decision was
made to discharge the patient back to EOP.  All necessary participants were present for the IDTT
which was noted to have occurred at a therapeutic module.  The patient reported feeling
depressed, scared, and nervous, but was no longer expressing suicidal ideation.
Recommendations for follow up were provided, and another SRASHE was completed with
essentially the same content; no safety plan was developed.  A safety plan is required following
admission to MHCB for suicidality and is clinically necessary to ensure that the patient is
equipped to cope with his suicidal ideation post-discharge.

The patient was returned to MHCB level of care on May 21, 2020 after reporting the same issues
including suicidal ideation and paranoia.  A SRASHE was completed, noting chronic and acute
risk at the moderate level.  The rationale for change in chronic risk from low to moderate was not
documented.  The patient was seen the following day for a PC initial assessment at cell-front and
a confidential initial psychiatric assessment.  He was also seen in IDTT in a therapeutic module
for development of a treatment plan.  Each of these documents was similar in content to those
created during the patient's previous stay, days earlier.

The patient was seen at least two times daily by the PC during the remainder of his stay in the
TMHU with all contacts except one occurring cell front.  One confidential contact included
treatment interventions and a thorough patient assessment of functioning.  One contact occurred
in the yard and included discussion about the patient's family and upcoming discharge.  All other
contacts were noted to be primarily status checks.  A SRASHE was completed on May 25, 2020
in preparation for discharge and included updated patient stressors and protective factors.
Chronic risk was reduced to low without clear rationale.  Acute risk was assessed as low.  There
was a relevant safety plan.

A discharge IDTT was held on May 27, 2020 with all necessary participants and included an
updated patient status and recommendations for returning to EOP.

Record review indicated the patient was offered and accepted a total of four hours of
programming; one hour during the first placement and three hours during the second.  Five hours
of programming were cancelled during the first stay and 9.5 hours were cancelled during the
second stay.  No groups or out-of-cell treatment was documented.

**Findings**

This patient's treatment while in the TMHU was inadequate. The provision of treatment
interventions included medications and two therapeutic sessions over the nine days the patient
was in the TMHU.  Additionally, no safety plan was developed when the patient was initially
discharged from TMHU, and there was no clear rationale for fluctuations in the patient's rated

1155

chronic risk level for suicide. Lastly, discontinuation of psychiatric medication without a face to face contact was an area of concern.

## Inmate X

This patient's healthcare record was selected for review of the adequacy of care provided to patients in the VSP TMHU. He was transferred to TMHU at MHCB level of care from 3CMS. He was diagnosed with Major Depressive Disorder, recurrent episode, mild and Unspecified Anxiety Disorder. The patient was prescribed olanzapine, mirtazapine, venlafaxine, buspirone and oxcarbazepine.

The patient initially reported suicidal ideation secondary to the recent death of his parents. An emergency consult was initiated by nursing staff. A psychiatrist completed a SRASHE via telepsychiatry on May 15, 2020 and admitted the patient to TMHU on 1:1 watch. The patient's chronic risk for suicide was noted to be low and acute risk was rated as moderate. An ASU pre-placement assessment was completed by nursing and noted that the patient had been placed in ASU earlier that evening. The reason for this placement was not clearly documented.

The patient was seen the following afternoon, on May 16, 2020, by the PC, twice within 13 minutes according to the times entered in the healthcare record. The first note indicated that the patient was hopeless, overwhelmed and suicidal, thinking about the death of his father. Coping skills and psychoeducation were provided to the patient. The second session noted that the patient reported sleeping better and asked about a transfer to MHCB or EOP. There was no rationale or documentation regarding the change in presentation or reported sleep patterns that occurred in less than 15 minutes. There was no documentation about whether these contacts occurred in an office or cell front.

The patient was seen twice the following day by a PC. The patient reported wanting to transfer to EOP in order to gain milestone credits, participate in more programming, and avoid a debt he incurred. He received partial clothing along with his glasses and reading/writing materials.

On May 18, 2020, a SRASHE was completed and noted that the patient was free of suicidal ideation and focused on transferring to EOP to avoid safety concerns related to a debt. His chronic risk level was raised to moderate and acute risk noted to be low. Discharge from TMHU was discussed and the patient seemed amenable to the plan and would address safety concerns with custody. The safety plan was updated. During an IDTT later that day, the plan was confirmed by the team and the patient was discharged. The IDTT meeting included all required attendees. The PC emailed 3CMS staff to inform them of the patient's pending discharge. Treatment recommendations for follow up were documented.

Records indicated that the patient was offered and received 1.2 hours of services while in the TMHU.

## Findings

The patient's treatment while in the TMHU was inadequate. There was limited access to out-of-cell services. Concerns included the completion of an ASU preplacement assessment for unknown reasons, and the documentation of PC contacts occurring within 13 minutes of each

other with inconsistent content and no discussion of the changes in patient presentation in such a short time. It is unclear if the patient's limited ability to access programming was consistent with limited weekend programming, but he was provided materials in his cell.

**Inmate Y**

This patient's healthcare record was selected for review of the adequacy of care provided to patients in the VSP TMHU. The patient was admitted to TMHU from 3CMS level of care. He was diagnosed with Schizoaffective Disorder, depressive type; other Substance Induced Psychotic Disorder with moderate or severe use disorder; and anxiety. He was prescribed olanzapine.

The patient was referred for evaluation on May 16, 2020 by a lieutenant secondary to auditory hallucinations, suicidal ideation, confusion and difficulty following directions. The nursing staff conducted an evaluation and the CIT initiated. A PC assessed the patient and found him to be suicidal with a plan and means. He was placed on MHCB status in the TMHU on 1:1 watch.

On May 17, 2020, an initial PC assessment was completed but no SRASHE was done. The patient's crisis appeared to have abated. He reported that he felt better and just needed some rest. He stated that he had been worried about his family and was feeling overwhelmed. He was seen later that same day for PC rounds and was noted to appear stable. The patient reported that he hoped to return to his previous cell as he liked his cellmates and felt supported by them. He was given partial clothing and writing/reading materials with plans to discuss discharge with IDTT. The materials he was provided included both treatment materials and leisure materials.

On May 18, 2020, a SRASHE was completed in preparation for discussion of his discharge with IDTT. The SRASHE was comprehensive and included an appropriate safety plan. The patient was noted to have high chronic risk for suicide but low acute risk with appropriate rationale documented.

He was seen later that day for an IDTT meeting and treatment plan review, with all necessary members present. His goals remained unchanged from those drafted for 3CMS and targeted depression and hallucinations. The patient reported wanting to discuss an additional medication and to get assistance contacting his family. He was referred to his assigned 3CMS team for assistance. The patient accepted this plan and was discharged. There was documentation that the 3CMS team was contacted via email. There were no specific treatment recommendations offered at the time of discharge other than to follow the patient's current treatment plan.

Documentation indicated that the patient was offered and received 0.7 hours of services while in the TMHU.

**Findings**

The patient's treatment while in the TMHU was inadequate. He did not have a SRASHE at the time of admission despite being admitted for suicidal ideation and a plan. He was not provided with adequate out-of-cell services. It is unclear if the patient's limited ability to access programming while in TMHU was consistent with limited weekend programming, but he was provided reading materials in his cell.

1157

One note of concern was that prior to his TMHU placement, the patient had transferred from EOP to CCCMS on March 3, 2020. He was seen by a PC for an initial assessment on March 12, 2020, and by the IDTT on March 17, 2020. On March 29, 2020 there was a non-contact note entered by a psychiatrist to discontinue the patient's haloperidol secondary to non-compliance. This was the last entry prior to the patient's crisis on May 16th. More frequent follow up was indicated for a patient with a history of psychosis and suicidal behavior, recently transferred from EOP who stopped taking his antipsychotic medications.

**Inmate Z**

This inmate's healthcare record was selected for review of the adequacy of care provided to patients in the VSP TMHU. This patient was in ASU 3CMS prior to transfer to the TMHU. The patient was diagnosed with Adjustment Disorder and Borderline Personality Disorder. He was prescribed hydroxyzine PRN which he took one to four times per day while in the TMHU.

The patient was admitted to the TMHU at MHCB level of care by the on-call psychiatrist on the night of May 19, 2020 following a referral from custody staff for suicidal ideation and crying. Nursing staff noted that the patient stated, "I can't do this anymore" and was tearful.

On May 20, 2020, a PC assessment and SRASHE were attempted, but the patient refused both attempts. The patient also refused breakfast but accepted a PRN for hydroxyzine. The PC noted that per custody, the patient was told that he was going to be charged with battery on a prisoner as a confidential investigation had been completed. Further, his cellmates, who the patient claimed had engaged in sexual acts against him, were being released from ASU. The PC evaluation included treatment recommendations, and the SRASHE was completed without patient participation. Chronic and acute risk were noted to be moderate based on history. The patient was also noted as refusing to attend the ICC held that day. The ICC team agreed that the patient's maximum security status would not impact his access to mental health treatment while in the TMHU.

The patient was seen twice by a PC on May 21, 2020, once for an initial assessment and once during rounds. During rounds, the patient reported that he had attended ICC previously that day. There was no documentation of this in the healthcare record, so it was not clear if mental health staff had been present. The patient reported that the ICC informed him that he would be transferred to another facility; he was pleased with that outcome.

The patient was seen for a PC contact, a psychiatric assessment, and IDTT meeting on May 22, 2020. All necessary members were present for the IDTT. The patient's transfer was discussed along with recommendations for placing the patient in EOP due to increased depression and anxiety since his placement in ASU two months prior. The initial psychiatric assessment discussed the patient's gender dysphoria and depression. The patient's dose of hydroxyzine was increased, and the psychiatrist recommended an evaluation for gender dysphoria.

An order was entered in healthcare record the morning of May 22, 2020 indicating that the patient was to have staggered 15-minute checks instead of 1:1 monitoring. Treatment guidance for TMHU states that 15-minute checks "are not authorized unless the cell has previously been

found to be suicide-resistant." There was no discussion of this decision in progress notes or IDTT documentation.

A discharge note by the PC on May 22, 2020 included recommendations for treatment targets and interventions. A SRASHE was completed and updated to reflect patient status and lack of suicidal ideation. Chronic risk remained moderate and acute risk was reduced to low with rationale and protective factors discussed. No safety plan was included, despite being required given the patient's admission for suicidal ideation.

Documentation indicated that the patient was offered and attended 1.8 hours of services while in the TMHU.

**Findings**

The treatment provided to this patient was inadequate. There were concerns about the failure of mental health staff to document participation in an ICC meeting, failure to create a safety plan with the patient prior to discharge and ordering staggered 15-minute checks for a patient who was admitted to the TMHU for suicidality on maximum security status.

**EXHIBIT BB**
**California Health Care Facility (CHCF)**
**Review Date – May 15, 2020**

**Inmate A**

This healthcare record was reviewed at the request of plaintiffs' attorneys to assess the mental health care provided at CHCF prior to his death by overdose on February 2, 2020. The inmate arrived at CHCF on September 24, 2017. Psychiatric diagnoses included Major Depressive Disorder, recurrent episode, and Bipolar Disorder, with ultra-rapid cycling, and without psychosis. His chronic and acute risk for suicide were assessed as low on January 14, 2019.

On March 27, 2019, the inmate met with a CHCF psychiatrist and agreed to treatment with Depakote for rapid mood cycling, poor sleep, and racing thoughts. The psychiatrist also noted on this date that Prozac was discontinued, Abilify was continued, and Remeron was increased.

The March 28, 2019 treatment plan noted anxiety, depression, rapid cycling moods, and sleep problems. The treatment team determined that he did not meet higher level of care referral criteria, and he was retained in 3CMS. His psychiatric medications were continued on this date.

A psychiatry note on May 31, 2019 indicated that the inmate was non-adherent with prescribed psychotropic medications due to reported lethargy and a desire to avoid heat-risk medications. The psychiatrist discontinued the inmate's Depakote and Abilify and changed his diagnosis to Major Depressive Disorder, severe without psychotic features. The psychiatrist subsequently prescribed Lexapro and continued Remeron on August 23, 2019. However, on October 25, 2019, the inmate reported that he was no longer taking Lexapro due to dizziness, and the psychiatrist discontinued Lexapro and prescribed Cymbalta. On January 17, 2020, the psychiatrist met with the inmate again and noted ongoing symptoms of depression and anxiety; Cymbalta and Remeron were continued.

PC progress notes indicated that the inmate consistently reported depressed mood without suicidal ideation, plan, or intent.

On February 2, 2020, unit custody staff found the inmate unresponsive and pulseless in his room. While the inmate had a Do Not Resuscitate order, CPR was initiated as his status was described as highly suspicious of unnatural cause. The inmate was pronounced dead by a hospital physician at 1844 hours.

**Findings**

The overall care provided to this inmate appeared adequate. There was no indication that the inmate's overdose and subsequent death were the result of a completed suicide attempt. Treatment planning appropriately addressed the inmate's target symptoms; although there was little reported change in symptoms during the review period. He met with the same psychiatrist throughout the review period. However, the inmate had a significant history of medication non-adherence, and medication management appeared to be driven by the inmate. It did not appear that an adequate trial of medications occurred prior to the multiple medication changes, and the

1160

psychiatrist did not document adequate medication education, including the need to take medications as prescribed prior to discontinuation.

## Inmate B

This inmate's healthcare record was reviewed at the request of plaintiffs' attorneys to assess the care provided in the 3CMS program at CHCF. While the CDCR name and number provided by plaintiffs' counsel did not match in the record, the CDCR number, date of birth, and institution matched for the above-named inmate.

The inmate was diagnosed with PTSD and Schizoaffective Disorder, bipolar type. He was prescribed Geodon, Cymbalta, and BuSpar. A significant history of suicide attempts was noted in the healthcare record, with some influenced by command auditory hallucinations. The inmate received treatment in EOP level of care until August 22, 2019, at which time his level of care was changed to 3CMS.

On August 16, 2019, the psychiatrist noted that the inmate attributed his recent medication non-adherence to losing his single cell status and being assigned to a double cell. The IDTT convened on August 22, 2019 and documented that the inmate requested 3CMS level of care and was minimally cooperative during the meeting. The IDTT determined that he did not meet higher level of care referral criteria on this date. The PC also noted that the inmate showed little motivation to engage in treatment and primarily focused on maintaining his single cell status.

The initial 3CMS PC assessment was completed on September 4, 2019. The September 2019 IDTT documentation essentially reiterated information from the EOP IDTT notes, making it difficult to determine the inmate's current level of functioning. A September 18, 2019 psychiatry note indicated that the inmate reported medication non-adherence, and his psychiatric medications were discontinued. This provider also noted that the inmate would benefit from treatment but was unwilling to engage.

The inmate was subsequently placed in dormitory housing, and he remained upset about the loss of single cell status. On November 26, 2019, he informed his PC that he had taken psychiatric medication in the past and was willing to meet with a psychiatrist to discuss medication again. However, on January 8, 2020, the inmate declined psychiatric medication, and the provider wrote that he appeared paranoid about people in his dorm and exhibited anxiety and "nervous speech."

During PC contacts on February 26, 2020 and April 22, 2020, the inmate reported doing well without psychiatric medication.

Clinical notes suggested the inmate was involved in group treatment after the onset of COVID-19, including a Coping Skills group and a Leisure Activities group provided by a recreation therapist. Nursing rounds were completed daily from April 30, 2020 through May 3, 2020, and the inmate was seen at least quarterly by the PC. However, there was a lapse in psychiatric contacts from September 18, 2019 through January 8, 2020, and this was particularly concerning given the inmate's medication non-adherence.

**Findings**

The care provided to this inmate was inadequate. The treatment plan did not address the inmate's medication non-adherence, and treatment goals were limited to reducing hallucinations and depressed mood. Additionally, clinical documentation included outdated information that appeared to be copied and pasted from previous records. For example, the inmate's September 2019 3CMS IDTT appeared identical to his August 2019 EOP IDTT documentation, and a sufficient update on his current mental status and functioning was not included as a result.

**Inmate C**

This inmate's healthcare record was reviewed at the request of plaintiffs' attorneys to assess the care provided in the 3CMS program at CHCF. The inmate was initially included in the 3CMS level of care on July 30, 2003. There were no recorded suicide attempts in his history. He transferred from SVSP to CHCF on October 15, 2013 due to complicated medical problems. His psychiatric diagnoses were Major Depressive Disorder and Dementia. Remeron and Zoloft were prescribed. The inmate was designated DD1 and housed in the OHU at the time of this review.

The September 26, 2019 treatment plan noted concerns regarding memory deficits and dementia. The inmate also continued to endorse symptoms of anxiety and depression, including ruminations and poor sleep. He did not meet higher level of care referral criteria on this date.

A November 13, 2019 psychiatry note indicated that the inmate exhibited worsening memory deficits and lack of orientation to the month, year, and location. The PC noted that the inmate was increasingly frustrated with his cognitive issues, and that mental exercises would be offered to address memory functioning. The inmate subsequently participated in psychological testing with a psychology intern, and the results suggested a diagnosis of Factitious Disorder with exaggeration and falsification of memory issues. A follow up test was recommended to determine whether continued placement in the Developmental Disabilities Program (DDP) was warranted.

On February 10, 2020, the PC noted that the inmate was giving away his meals and refusing psychotropic medication due to concerns about weight gain. The inmate informed his PC that he was consuming one meal per day due to weight gain and abdominal pain. The PC referred the inmate to psychiatry on this date and noted that medical staff were attending to his abdominal pain. In February of 2020, the inmate began a hunger strike due to concerns about his medical care.

A SRASHE was completed on March 18, 2020 as a result of the inmate's hunger strike. The inmate was assessed with moderate chronic and low acute risk for suicide. A safety plan was developed; however, it did not provide specific means to address the inmate's concerns or include safety measures to prevent self-harm. This document also clarified that a physician lowered the inmate's medical care and discontinued pain medications for chronic back and stomach pain.

PC contacts occurred more frequently than every 90 days, which was appropriate given his clinical presentation and symptoms. Documentation suggested the inmate was involved in group

1162

therapy, including anger management and recreation therapy, in January, March, April, and May of 2020.

**Findings**

The mental health care provided to this patient was lacking. The treatment plan and use of psychological testing was appropriate. However, suicide prevention safety planning was inadequate and PC and recreation therapy contacts were routinely completed at cell front, without appropriate justification noted in the record. Additionally, it did not appear that a psychiatrist met with the inmate in response to the PC's referral for a psychiatric assessment in February of 2020.

**Inmate D**

This healthcare record was reviewed at the request of plaintiffs' attorneys to assess the mental health care provided at CHCF. The inmate received services in the 3CMS and EOP levels of care since his initial incarceration in 1998. Psychiatry notes indicated that several diagnoses were considered, including Delusional Disorder, Schizophrenia, and Major Depressive Disorder with psychotic features. He adamantly refused psychotropic medications at CHCF.

On November 22, 2019, the inmate was placed in administrative segregation for fighting; his level of care was EOP at the time. Progress notes indicated that he refused out of cell contacts and was seen at cell front as a result. He was also on modified programming status due to group treatment refusals.

The IDTT convened on January 2, 2020 and determined that he did not meet higher level of care referral criteria. During a subsequent IDTT on January 30, 2020, the inmate's status was changed from modified programming to mainline EOP.

A telepsychiatrist met with the inmate in a confidential setting on February 24, 2020. This provider noted that, although the inmate continued to exhibit paranoia toward staff and other inmates, he continued to refuse medication and did not meet PC 2602 involuntary medication criteria. During a confidential telepsychiatry contact on March 23, 2020, the inmate reported doing well, although he continued to exhibit paranoia.

An April 15, 2020 SRASHE assessed the inmate with low acute and chronic risk for suicide. During an IDTT on April 16, 2020, the inmate's level of care was changed from EOP to 3CMS. The level of care rationale focused on the absence of inpatient referrals and psychiatric medication. The treatment team also noted that his delusional thinking was minimal and did not interfere with daily functioning. A 3CMS orientation group was recommended on this date.

PC progress notes indicated that most contacts occurred at cell-front. The content of these notes was minimal and provided little information regarding the inmate's current status or progress toward treatment goals.

A brief note on April 17, 2020 indicated that the inmate's level of care was changed to 3CMS, and the initial 3CMS IDTT occurred on April 30, 2020.

The inmate participated in recreation therapy from June 2, 2020 through June 11, 2020. PC and psychiatry contacts were timely.

**Findings**

The care provided to this inmate was inadequate. Treatment plans generally relied on outdated information that was pulled forward from other providers, and they did not include a sufficient update on the inmate's current status. Documented measures to address programming and treatment non-adherence also were lacking. Additionally, it did not appear the level of care change was based on EOP treatment goal attainment.

**Inmate E**

This 3CMS inmate's healthcare record was reviewed at the request of plaintiffs' attorneys to assess the mental health care provided at CHCF. The inmate's psychiatric diagnoses included Unspecified Schizophrenia Spectrum and Other Psychotic Disorder and Adjustment Disorder with depression and anxiety. Psychological testing performed in June 2019 suggested the presence of mild psychotic symptoms. He was also diagnosed with Elephantiasis, and the adverse impact on his physical appearance reportedly exacerbated his mental health symptoms. Although his history included suicide attempts, there were no MHCB admissions noted in the record. The inmate was housed in the OHU at the time of this review.

The 3CMS annual IDTT was conducted on July 25, 2019; however, depression was the only symptom noted at the time.

The healthcare record suggested that PC contacts were timely, and interventions were implemented during sessions.

Psychiatry completed the initial assessment and prescribed Risperdal in August 2019. The inmate had endorsed intermittent auditory hallucinations with accompanying sleep disturbance. His Risperdal dosage was subsequently increased on November 1, 2019, and again on January 15, 2020 to address ongoing psychotic symptoms. A May 23, 2020 psychiatry note indicated that the inmate's reported symptoms were essentially unchanged, and his Risperdal dosage was further increased. The psychiatrist additionally prescribed as needed Risperdal for ongoing symptoms one week later.

Clinical contacts with the PC and psychiatrist were timely. The inmate participated in group and recreation therapy until March 2020, at which time these activities were discontinued presumably due to COVID-19 related restrictions. Documentation suggested that in-cell materials were provided by the recreation therapist on May 20, May 28 and June 3, of 2020.

**Findings**

The care provided to this inmate was adequate. Treatment planning appropriately addressed the inmate's depression and psychotic symptoms. Clinical contacts occurred in a confidential setting. Group and recreation therapy were offered until March of 2020, and in cell materials were provided in May and June of 2020.

**Inmate F**

This 3CMS inmate arrived at CHCF on December 20, 2019. He was not provided a mental health diagnosis or prescribed psychotropic medication; although the healthcare record suggested he primarily presented with symptoms of depression.

The initial PC assessment was completed on January 3, 2020. The inmate had no history of mental health treatment in the community, no inpatient commitments during incarceration, and no recorded suicide attempts.

The January 8, 2020 IDTT documentation noted that the inmate's depressed mood would be addressed in treatment, and that he did not meet higher level of care referral criteria. The treatment plan included appropriate clinical interventions on this date.

A covering clinician met with the inmate for his routine PC contact on April 8, 2020. This clinician noted that the contact was completed on the yard based on the inmate's request, and that the inmate reported ongoing depressive symptoms and poor sleep. This clinician also documented that the inmate would be offered weekly PC contacts in EOP level of care, despite his 3CMS level of care status at the time. A referral to psychiatry was not submitted on this date.

Although this inmate arrived at CHCF in December of 2019, there was no indication that he met with a psychiatrist.

**Findings**

The mental health care provided to this inmate was inadequate. Despite his 3CMS status and continued endorsement of depressive symptoms through April of 2020, the inmate was not referred to or seen by a psychiatrist since his arrival at CHCF in December 2019. Although PCs noted depressive symptoms, a psychiatric diagnosis was not found in the healthcare record. Additionally, the clinician noted on April 8, 2020 that the inmate endorsed continued symptoms of depression and would receive weekly contacts with his PC in the EOP level of care; however, the inmate's level of care was 3CMS, and he was not offered subsequent contacts with a psychiatrist or PC by the date of this review.

**Inmate G**

This inmate initially transferred to CHCF for MHCB level of care on October 15, 2019. He was not included in the MHSDS or prescribed psychotropic medications prior to his arrival. Psychiatric diagnoses included Adjustment Disorder with depressed mood and Antisocial Personality Disorder. He was most recently prescribed Zoloft and Vistaril.

The October 18, 2019 MHCB treatment plan noted threats of self-harm and fear of transferring to a prison where he had safety concerns. The inmate discharged to 3CMS level of care and was subsequently housed in general population at CHCF. The five-day follow-up was completed after MHCB discharge.

The inmate was followed consistently by the PC, and his symptoms of depression and anxiety were addressed during clinical contacts. Overall, he appeared to adjust well to his new environment.

IDTTs and individual contacts with the PC and psychiatrist were timely.

**Findings**

The overall care provided to this inmate in the 3CMS program appeared adequate. However, PC progress notes contained essentially the same information for all contacts, including the plan and disposition sections.

A more significant concern was identified in the October 18, 2019 MHCB documentation, as the clinician wrote, "when informed that the mental health team is not able to comment on his custody factors or help to facilitate any change in that area he said 'Oh you will'." It was inappropriate for the clinician to suggest that the MHCB treatment team would not address his safety concern. This matter should have been addressed with the correctional counselor's involvement during IDTT. Leadership at CHCF should ensure their staff are aware that similar situations have resulted in completed suicides, and that a CDCR/DAI memo clearly outlines the responsibilities of mental health staff regarding MHCB inmates who report safety concerns upon discharge.

**Inmate H**

This 3CMS inmate transferred from RJD to CHCF on April 12, 2018. His psychiatric diagnosis was Depressive Disorder, Not Otherwise Specified. He was prescribed Remeron and was reportedly medication adherent.

The inmate was offered only one psychiatry contact during the review period, and this contact occurred on October 30, 2019.

The inmate's 3CMS annual IDTT was conducted on April 16, 2020. However, only a PC and correctional counselor attended this treatment team meeting. The PC noted that the meeting was held in absentia "due to the COVID-19 modified program," and that the inmate did not meet higher level of care referral criteria. The 3CMS treatment plan targeted the inmate's depression and anxiety with cognitive behavioral therapy tools. The healthcare record also indicated that the inmate was involved in AA and NA prior to the pandemic.

The inmate reportedly benefitted from treatment with Remeron for his depressive symptoms, and the most recent PC progress note indicated that he was doing well in the 3CMS program.

**Findings**

The care provided to this inmate was inadequate. Despite maintaining the inmate on antidepressant medication, psychiatry contacts were not offered for more than seven months and a psychiatrist did not attend IDTT. Further, the IDTT documentation did not indicate the level of involvement the inmate had in the treatment planning process, or whether the IDTT discussion and outcomes would be shared with the inmate and psychiatrist after the meeting.

**Inmate I**

This 3CMS inmate transferred from SATF to CHCF on April 7, 2017. He was variously diagnosed with Mood Disorder, Not Otherwise Specified; Adjustment Disorder, with mixed anxiety and depressed mood; and Depressive Disorder, Not Otherwise Specified. The psychiatrist prescribed Paxil and the inmate was reportedly medication adherent.

A November 1, 2019 psychiatry note indicated that the inmate was doing well and was involved in a computer literacy class. Paxil was continued on this date, and a plan to follow up in 90 days was documented. The psychiatrist again described the inmate as doing well on January 22, 2020, and the medication and follow up plan remained the same.

PC contacts were completed at least quarterly, and corresponding progress notes indicated that he was frustrated with ADA related issues.

The 3CMS annual IDTT was conducted on April 2, 2020 with all required disciplines present; although the inmate did not attend "due to modified programming." The treatment plan addressed the inmate's anxiety, depressed mood, and risk of injury. The IDTT determined that the inmate did not meet higher level of care referral criteria on this date.

Nursing rounds were documented during the COVID-19 modified programming in May and June of 2020.

Although IDTT and PC contacts were timely, psychiatry contacts were not. There was no indication that the inmate was involved in group therapy or offered in cell activities.

**Findings**

The care was inadequate. The inmate was not offered a psychiatry contact for six months, despite the prescriber noting on January 22, 2020 that follow up would occur within 90 days. Additionally, the inmate was not offered in cell activities or group therapy.

**Inmate J**

This 3CMS inmate arrived at CHCF on December 30, 2019. He was diagnosed with Major Depressive Disorder, recurrent episode, unspecified. The inmate utilized a wheelchair and relied on a colostomy bag, and this reportedly exacerbated his frustration and depressive symptoms. Cymbalta and Remeron were prescribed.

The initial psychiatric assessment was completed on January 15, 2019, and Remeron and Cymbalta were continued. However, there were no subsequent psychiatry contacts noted in the healthcare record.

The January 16, 2020 treatment plan focused on decreasing depression and assisting the inmate with his medical issues. The inmate did not meet higher level of care referral criteria on this date.

It appeared that an MHCB referral was submitted and rescinded on March 22, 2020. The SRASHE completed on this date indicated that the inmate reported a passive wish to die, and his

1167

acute and chronic risk for suicide were assessed as low. The inmate attributed his suicidal thoughts to his medical care and chronic pain.

The PC met with the inmate more frequently than every 90-days, and these contacts focused on symptom management.

Recreation therapists offered in-cell materials at least weekly in May and early June of 2020. Nursing rounds were also conducted during COVID-19 modified programming in May and June of 2020.

**Findings**

The care provided to this inmate was inadequate. The inmate did not meet with a psychiatrist for approximately five months after his initial psychiatric assessment on January 15, 2020.

**Inmate K**

This healthcare record was reviewed to assess the EOP care provided in the ASU at CHCF. A psychiatry note written on June 2, 2020 included a diagnosis of Unspecified Schizophrenia Spectrum and Other Psychotic Disorder; although this provider also suspected Schizophrenia or Schizoaffective Disorder. The inmate refused psychiatric medication during the review period.

The inmate was described as delusional, paranoid, and as a very poor historian with no insight into his mental illness. He believed that messages were delivered through ultraviolet light, that his daughter's "eye" tattoo allowed her to watch him at all times, and that his family members were affiliated with various federal organizations. Additionally, the inmate refused to leave his cell for mental health appointments, although he reportedly showered and attended yard when available. His IDTT records indicated that he was placed on a modified EOP program on April 7, 2020.

There were three IDTTs held during the review period; however, a psychiatrist was present for only one, and the inmate refused all three. The IDTT's treatment goals and interventions were generally appropriate. However, the inmate's treatment group refusals were conceptualized as volitional, rather than a result of his mental illness and lack of insight. The May 5, 2020 treatment plan was not modified to include additional interventions for treatment non-adherence, presumably due to the inaccurate conceptualization of the inmate's treatment non-compliance. The IDTT noted that the inmate met one higher level of care referral indicator. The accompanying non-referral rationale was generally adequate; however, the treatment team's opinion that the inmate was stable was less credible as time went on.

Subsequent clinical notes suggested the inmate was a candidate for a higher level of care, as he continued to exhibit serious symptoms and functional deficits, including delusional beliefs, poor boundaries with peers, and visual and auditory hallucinations. However, despite these concerns, the higher level of care documentation on May 26, 2020 was copied and pasted from the preceding IDTT without treatment modifications.

Daily contacts with various clinicians were offered in addition to routine contacts with his assigned PC. However, the inmate would have benefitted from continuous contacts with his

assigned provider given the nature of his symptoms, reluctance to engage in treatment, and modified program status. Daily contact progress notes often included content that appeared to have been copied and pasted from prior documentation, and these contacts were apparently brief to "…decrease exposure risk to COVID-19…" While treatment engagement was encouraged, interventions outlined in the treatment plan were not implemented during clinical contacts. However, the PC provided therapeutic handouts with homework assignments, and these were reviewed during subsequent appointments.

Psychiatry contacts occurred monthly during the review period. A clinical note referenced a previously assigned psychiatrist's opinion that the inmate did not meet involuntary medication criteria; however, it appeared this was not appropriately assessed by the current psychiatrist.

**Findings**

This care provided this inmate was adequate, although minimally. While the inmate was closely monitored by mental health and received in cell materials and homework assignments, interventions outlined in the treatment plan were not implemented during clinical encounters. The inmate was not seen daily by his assigned PC, despite clinical indications and his modified EOP program status. Further, the clinical documentation suggested he would have benefitted from a referral to inpatient care, an involuntary medication assessment, and behaviorally based treatment interventions.

**Inmate L**

This healthcare record was reviewed to assess the EOP care provided in the ASU at CHCF. Although a psychiatric diagnosis was not included in the diagnostic section of the electronic healthcare record or in the initial psychiatric assessment, the inmate received a diagnosis of Unspecified Anxiety Disorder prior to transfer from Deuel Vocational Institution (DVI) in March 2020. The initial PC assessment also referenced a history of "Dysthymia, Depressive Disorder, and Other Anxiety Disorder." Abilify, mirtazapine, and Vistaril were prescribed.

The initial PC assessment noted that the inmate was previously affiliated with a gang and that he refused to follow through with an order to stab another inmate. His status subsequently changed from active gang member to sensitive needs yard (SNY).

On March 26, 2020, the inmate was admitted to CHCF's MHCB for suicidality. The inmate was described as anxious, depressed, and concerned for his safety and the safety of his family members. The MHCB IDTT occurred on March 29, 2020 with all required disciplines in attendance. The treatment plan did not include a psychiatric diagnosis, although depression, anxiety, and suicidal ideation were identified as treatment concerns. The IDTT's interdisciplinary plans of care (IPOCs) focused on reducing suicidal ideation, as measured by the inmate's subjective rating, through goal setting, fostering a therapeutic alliance, and empathizing with the inmate. However, these planned interventions did not sufficiently address the safety concerns or the inmate's elevated anxiety. The inmate discharged from MHCB to EOP level of care on April 5, 2020, and he returned to the ASU.

The five-day follow-up was primarily completed at cell front, despite the inmate's documented safety issues and probable concern about sharing sensitive information in a non-confidential

setting. The accompanying suicide prevention safety plan included elements that were not adequately addressed.

The initial ASU EOP IDTT occurred on April 14, 2020; however, the psychiatrist and inmate did not attend. The IDTT developed an IPOC for anxiety without including planned treatment interventions.

The inmate's COVID-19 status was unclear in the record. Some providers met with the inmate for confidential contacts, while others noted that contacts were completed at cell front due to either quarantine status, droplet precaution, or as part of a statewide mandatory modified program. Additionally, some progress notes offered conflicting information regarding confidentiality. For example, one progress note indicated that during a confidential contact the inmate was eating in his cell when the PC approached.

PC progress notes suggested supportive counseling and some cognitive behavioral treatment techniques were implemented to address the inmate's anxiety, although this was not consistent. Brief daily wellness checks were offered from April 19, 2020 through May 11, 2020 due to COVID-19 program restrictions. However, mental health treatment was apparently suspended in lieu of the brief cell front contacts during this timeframe. The healthcare record also suggested that in-cell activities were offered on May 7, 2020, and that some treatment groups resumed during the third week of May 2020.

**Findings**

The EOP care provided was adequate, although minimally. The inmate was closely monitored by mental health staff and provided daily contacts during COVID-19 program restrictions. However, he would have benefitted from a comprehensive evaluation to resolve diagnostic uncertainties and guide treatment planning with specific interventions. Additionally, it appeared that confusion regarding his COVID-19 status resulted in fewer confidential treatment contacts offered, which was especially concerning given his level of distress, safety concerns, and probability of limited disclosures during cell front contacts.

**Inmate M**

This healthcare record was reviewed to assess the EOP care provided in the ASU at CHCF. The inmate was housed in ASU from March 25, 2020 through the date of this review. A psychiatric diagnosis was not provided in the diagnosis and problem section of the healthcare record. However, Major Depressive Disorder was noted in a March 27, 2020 RVR mental health assessment, and, in contrast, the psychiatrist documented that lamotrigine was prescribed for Bipolar Disorder.

The inmate's initial ASU EOP IDTT occurred on April 7, 2020; however, the psychiatrist and psychiatric technician did not attend, and the meeting did not occur until after the institutional classification committee (ICC). Further, although the IDTT documentation indicated that the meeting was held in absentia, interactions referenced in the notes suggested the inmate may have been present for the meeting. The treatment team described the inmate as entitled and angry, and perceived his symptoms of depression and anxiety as conditional. The inmate reportedly did not want to remain at CHCF and threatened to endorse suicidal ideation if returned to his previous

1170

institution. The IDTT noted three or more RVRs within a six month period, and the higher level of care non-referral rationale and treatment modifications were appropriate.

PC contacts were not timely during the first three weeks of ASU placement, and most of these contacts occurred at cell front due inmate refusals and COVID-19 program restrictions. The extent of his engagement with staff during cell front checks varied. On April 27, 2020, the PC indicated that the inmate would receive daily PC contacts due to treatment participation below 50 percent; however, the treatment plan was not modified accordingly. The daily PC contact documentation was formulaic, often included copied and pasted content, and did not consistently describe the level of engagement.

The inmate did not meet with a psychiatrist in ASU during the review period. A psychiatric contact was attempted on May 19, 2020; however, the inmate refused.

**Findings**

The care provided to this inmate was inadequate. The absence of the psychiatrist in IDTT limited the information exchange and the treatment team's ability to clarify the diagnosis and develop a collaborative and meaningful plan of care. While the higher level of care treatment modifications section included effective clinical interventions, progress notes suggested these were not implemented during PC contacts. This inmate would have benefitted from a comprehensive diagnostic evaluation, treatment that aligned with the enhanced plan of care, and a collaborative IDTT that met Program Guide requirements.

**Inmate N**

This healthcare record was reviewed to assess the EOP care provided in the ASU at CHCF. The inmate was monolingual and required a Spanish interpreter. His psychiatric diagnosis was Schizophrenia, Unspecified type, and he was prescribed Abilify. The inmate was admitted to the MHCB on December 2, 2019 for grave disability, disorientation, and delusions; he believed he was 17-years-old and that CDCR changed his face, height, weight, and identity. Problems with medication adherence were documented throughout the review period. However, despite these concerns, involuntary medication was not pursued during the MHCB admission, and the inmate subsequently discharged to the ASU EOP hub on December 12, 2019.

PC contacts in the ASU were completed at cell front with a correctional officer who served as the Spanish interpreter. The PC noted that the inmate denied psychiatric symptoms, had no insight into his mental illness, and refused all treatment. Further, the inmate's engagement during cell front contacts was limited. While the inmate claimed he was showering and participating in yard, the PC did not confirm the activities by reviewing the 114 log.

The ICC reviewed the inmate's case on February 6, 2020. A senior psychologist supervisor attended this meeting and reported non-compliance with mental health treatment and medication.

ASU EOP IDTTs occurred monthly; however, psychiatry did not attend these meetings during the review period. While the treatment plan included an IPOC for hallucinations, the inmate's medication non-adherence and lack of treatment participation were not addressed. The IDTT also did not address the inmate's continued treatment refusals in the higher level of care referral

section, and the treatment plan was not modified based on the positive indicator. A February 18, 2020 IDTT note indicated that the inmate would be retained in ASU for an additional 90-days to "investigate" the September 2019 RVR incident.

A psychiatrist did not meet with the inmate until May 9, 2020, at which time Abilify was prescribed for psychosis; the dosage was subsequently increased despite frequent medication refusals.

**Findings**

The care provided to this inmate was inadequate. The inmate was psychotic, lacked insight into his mental illness, was non-compliant with medication and treatment, and required a higher level of care; however, the psychiatrist's involvement in the inmate's care was minimal and EOP treatment was limited to non-confidential cell front check ins with a custody officer present for Spanish interpretation. Further, the treatment plan was inadequate and was not appropriately modified to address the inmate's current treatment needs, lack of treatment progress, or high treatment refusal rate. This inmate should have been reevaluated for involuntary medication, referred to a higher level of care, and provided enhanced treatment while awaiting inpatient placement.

**Inmate O**

This healthcare record was reviewed to assess the EOP care provided in the ASU at CHCF. The inmate was initially placed in CHCF's ASU EOP Hub on March 2, 2020. The PC diagnosed the inmate with Generalized Anxiety Disorder, Antisocial Personality Disorder, and severe Opioid Use Disorder with dependence; whereas a diagnosis of Unspecified Depressive Disorder was noted elsewhere in the healthcare record. The inmate was prescribed Remeron, Clonidine, Lexapro, and hydroxyzine.

The psychiatrist and PC did not attend the initial ASU EOP IDTT on March 10, 2020. A senior psychologist supervisor facilitated the IDTT and developed the initial treatment plan; however, treatment interventions were not included, and only anxiety was identified as a treatment target.

The ICC convened on March 12, 2020, and the PC reported that the inmate was compliant with treatment and medication. However, progress notes near this date revealed he was designated as a high treatment refuser, and that group treatment refusals were attributed to fear of contracting COVID-19 and a lack of medical supplies for his chronic interstitial cystitis.

The inmate did not meet with a psychiatrist in ASU until May 19, 2020, despite his arrival on psychiatric medication in March of 2020.

The inmate refused to attend his subsequent IDTT on May 26, 2020, although the required disciplines were present on this date. The IDTT did not review the problem list or document new symptoms, and the prior treatment plan was not revised despite its apparent deficiencies.

PC contacts occurred daily. Most contacts were non-confidential, reportedly due to COVID-19 related modified programming. Dialectical behavior therapy and other cognitive-behavioral techniques were provided during PC contacts, and the inmate appeared to respond well to

treatment. In-cell materials and homework assignments were also offered, and the PC reviewed completed homework during subsequent encounters.

Daily PC contacts were no longer provided after April 8, 2020, presumably due to the inmate's participation in treatment and removal of his high refuser designation. However, this change did not appear to involve the IDTT, and the treatment plan was not modified accordingly.

**Findings**

This care provided to this inmate was adequate, although minimally. The PC appropriately addressed the inmate's anxiety, depression, pain, stress, and anger management issues during PC contacts. The inmate received daily PC contacts while on modified program, and routine PC encounters appeared meaningful and beneficial. However, the psychiatrist's involvement in the inmate's care was minimal, the treatment plan was inadequate, and the March 10, 2020 IDTT did not meet Program Guide requirements.

**Inmate P**

This healthcare record was reviewed as the patient was identified on CHCF's higher level of care non-referral log. The patient met higher level of care referral indicators for his inability to function in the current level of care, for requiring a highly structured inpatient setting with 24-hour nursing care, and for chronic psychiatric symptoms that did not sufficiently respond to at least six months of treatment.

The patient was admitted to the MHCB for suicidal ideation on January 16, 2020. A diagnosis of Schizoaffective Disorder, Bipolar Type, was provided during IDTT on January 19, 2020. The MHCB psychiatrist also noted thought blocking, disorganized thinking, possible delusions, and a history of auditory hallucinations and Schizophrenia. The patient had an active involuntary medication order for grave disability and danger to others, and he was prescribed haloperidol, Zyprexa, lithium, BuSpar, risperidone, and Benadryl.

The IDTT convened on January 19, 2020, at which time the patient exhibited thought blocking, disorganized thoughts and speech, isolative behavior, apathy and avolition, and paranoia that precipitated aggressive outbursts and resulted in two RVRs. The IDTT noted that he met the higher level of care criterion for participating in less than 50 percent of treatment as a result of his mental illness. The patient also clearly demonstrated that his chronic psychiatric symptoms had not responded to treatment efforts for an extended period of time. However, the higher level of care non-referral rationale was inadequate on this date, as it only referenced the recency of his MHCB admission. Additionally, the accompanying treatment modifications were minimally adequate given the patient's symptom acuity and functional deficits.

Although CHCF's non-referral log indicated that the patient was not referred to a higher level of care as of February 6, 2020, the healthcare record suggested he was in fact referred to an acute psychiatric program during IDTT on January 23, 2020.

**Findings**

The care provided to this patient was adequate and he was appropriately referred to an acute psychiatric program. However, clinical documentation suggested the referral should have been submitted sooner, given the apparent need for longer term care upon admission. Additionally, the non-referral rationale and treatment modifications were insufficient.

**Inmate Q**

This healthcare record was reviewed as the patient was identified on CHCF's higher level of care non-referral log. The patient was admitted to the MHCB for danger to self on January 31, 2020, at which time he was experiencing suicidal ideation, anxiety, and paranoia in the context of "spice" intoxication. His psychiatric diagnosis during MHCB admission was Other Substance Induced Psychotic Disorder, and he was prescribed risperidone and Cogentin.

The initial psychiatric assessment was completed on February 1, 2020, at which time the patient declined recommended adjustments to his medications and refused to leave his cell due to paranoia.

The initial IDTT occurred on February 3, 2020 with all required disciplines in attendance. The IDTT noted that the patient met the higher level of care referral criterion for three or more MHCB referrals within a six-month period. The accompanying treatment modifications were comprehensive and appropriate, considering the patient's symptoms and functioning at the time. The treatment team's rationale for non-referral was adequate and primarily attributed the MHCB admissions to the patient's unintentional drug overdoses and accompanying side effects. The treatment team noted treatment progress, including increased positive behaviors and engagement with providers.

The IDTT convened again on February 10, 2020 with all required disciplines present. IDTT documentation highlighted the patient's treatment progress, including cessation of suicidal ideation. The higher level of care non-referral rationale on this date was adequate. The patient was appropriately discharged from the MHCB to EOP level of care on this date.

**Findings**

The treatment and level of care decisions were adequate. The MHCB provided effective interventions that were appropriate and resulted in psychiatric stabilization prior to discharge.

**Inmate R**

This healthcare record was reviewed as the patient was identified on CHCF's higher level of care non-referral log. The patient was admitted to the MHCB for danger to self and others on April 1, 2020. He was provisionally diagnosed with Schizoaffective Disorder, Bipolar type, and prescribed Abilify, Cogentin, risperidone, and Zyprexa.

Individual contacts with the psychiatrist and PC were consistently completed at cell front due to "institutional needs and in accordance with COVID…" Although the content of psychiatric documentation was often minimal, the provider noted the patient functioned reasonably well,

remained medication adherent, and reported benefits from psychotropic medication. An April 7, 2020 PC progress note also described the patient as relatively stable and as benefitting from treatment. However, the patient's refusal to participate in vital signs and showers were not addressed in treatment or explained in the documentation. PC and psychiatry progress notes also indicated that the patient was ready for discharge.

The IDTT convened on April 11, 2020 and discharged the patient to EOP level of care. The treatment team noted that the patient met the higher level of care referral indicator for three or more MHCB admissions within a six-month period, and the accompanying non-referral rationale was appropriate and consistent with the patient's clinical presentation at the time. However, the treatment modifications in this section were insufficient, as they only referenced services already provided to the patient.

**Findings**

The care provided and level of care decisions were adequate. The IDTT appropriately explained the precipitating factors to the patient's frequent MHCB admissions, and the higher level of care non-referral rationale was appropriate and supported by the clinical documentation. However, CHCF suspected the patient's MHCB admissions were related to safety concerns, and they did not sufficiently address this issue during his admission or in their recommendations at discharge.

**Inmate S**

This healthcare record was selected for review as the patient was identified on CHCF's higher level of care non-referral log in March of 2020. The patient recently discharged from the CMF-PIP. He was admitted to CHCF's MHCB for danger to self from March 9, 2020 through March 19, 2020 and was subsequently re-referred to the MHCB for suicidal ideation on March 23, 2020. His psychiatric diagnoses were Bipolar Disorder and Antisocial Personality Disorder. Psychiatric medication was not prescribed at the time of this review.

The patient was housed in the ASU EOP Hub when he was not in the MHCB, and his EOP clinician suspected he threatened suicide to avoid the segregation unit. However, documentation in the SRASHE did not support the referring clinician's belief. The SRASHE note indicated that the patient exhibited objective signs of depression in addition to his self-report, and that he recently lost his primary support system. Additionally, his chronic and acute suicide risk were assessed as high.

The IDTT convened on March 13, 2020 with all required disciplines in attendance. The treatment team noted that the patient met higher level of care referral indicators for three or more MHCB admissions in a six-month period and three or more RVR assessments within a three-month period. The non-referral rationale was adequate given the patient's apparent stability, willingness to engage in treatment, and additional time needed to determine the most appropriate level of care. The accompanying planned treatment modifications were comprehensive and appropriate.

The IDTT met again on March 19, 2020 with all required disciplines in attendance. However, the higher level of care non-referral rationale and accompanying treatment modifications on this date

were inadequate. The modified treatment plan was copied and pasted from the prior IDTT and was no longer appropriate given the planned discharge.

Following MHCB readmission, the IDTT reviewed the patient's case on March 26, 2020 with all required disciplines present. The patient continued to meet the two aforementioned higher level of care indicators; however, the non-referral rationale was inadequate and contradictory. The clinician documented that the MHCB admissions were for secondary gain, while also noting objective stressors and despair that manifested in social withdrawal, suicidal thoughts, and self-injurious headbanging. The IDTT further indicated that additional time was needed to assess the patient's level of care needs; however, this was insufficient given their familiarity with the patient and the volume of collateral information available (e.g., 11 RVRs in the last three months, objective stressors, prior MHCB documentation, etc.). The accompanying treatment modifications were copied and pasted from a prior IDTT.

This patient was ultimately referred to inpatient care on April 2, 2020.

**Findings**

The care provided to this patient was inadequate. The higher level of care referral was clinically indicated on March 26, 2020; however, the IDTT delayed the referral and their non-referral rationale and accompanying treatment modifications were inappropriate given the patient's recent history and clinical presentation at the time. Additionally, the higher level of care forms relied on copied and pasted information from prior notes, and, at times, included information that was inappropriate or no longer applicable.

**Inmate T**

This healthcare record was reviewed as the patient was identified on CHCF's higher level of care non-referral log on three occasions during the review period. The patient transferred from CSP/Sac to CHCF for MHCB placement on February 19, 2020. The inpatient admission was for danger to self, and the pre-admission screener noted psychosis, grandiose delusions, agitation, and recent self-injurious behavior by cutting. He was prescribed hydroxyzine pamoate and olanzapine during this admission. A diagnosis of Bipolar I Disorder, most recent episode manic, with psychotic features, was identified in the problems and diagnosis section of the healthcare record.

The initial IDTT was held in absentia due to patient refusal on February 22, 2020; all required disciplines attended. The treatment plan included an IPOC for improving nutrition and ceasing a hunger strike. Clinical notes indicated that he refused to cooperate with custody and healthcare staff when they attempted to complete hunger strike protocols. The IDTT noted that the patient met the higher level of care referral criterion for participating in less than 50 percent of treatment during the preceding three months. The rationale for non-referral to a higher level of care was adequate on this date, as the MHCB treatment team planned to establish a therapeutic relationship with the patient to facilitate his engagement in treatment. The accompanying treatment modifications were comprehensive and included motivational interviewing to increase participation, further treatment team discussion, psychiatry follow up, and consideration of involuntary medication pursuant to PC 2602.

On February 27, 2020, a psychologist documented that the patient's mental status was improving; however, in contrast, they also noted that his speech was tangential with loose associations, and that he continued to refuse treatment. The patient engaged with the psychiatrist at cell front on February 29, 2020, at which time he declined psychotropic medications, but agreed to eat his meals; however, there was no further documentation about the patient's food intake.

The IDTT convened again on March 1, 2020 with all required disciplines present; although the assigned psychiatrist and PC did not attend. IDTT documentation indicated that the patient exhibited grandiose delusions, auditory hallucinations, disorganization, and difficulties recognizing social cues. For example, the patient believed he was placed in ASU due to cutting on himself and lighting his blood "on fire." He reportedly continued to refuse most mental health contacts and nursing assessments in the unit. The psychiatrist recommended a referral to a higher level of care on this date; however, the PC did not agree, and the patient was ultimately retained in the MHCB for further assessment and to reconcile the disagreement. He met the higher level of care referral indicator for a MHCB length of stay greater than ten days. Although the provider noted that the patient's psychiatric medication was recently adjusted, there were no other treatment modifications noted. The MHCB supervisor was consulted on this date and reportedly agreed with the treatment team's plan of care and level of care decision.

The assigned PC noted that the patient remained resistant to mental health treatment and that it was difficult to assess his mental status based on his unwillingness to respond to assessment questions. In contrast, the psychologist who attended the patient's IDTT met with the patient at cell front on March 6, 2020 and described him as cooperative and responsive. On March 7, 2020, the psychiatrist noted that the patient refused to meet until the provider informed him he would need to cooperate in order to be discharged. The patient continued to refuse nursing interventions, including attempts to assess his vital signs.

The IDTT convened again on March 8, 2020 with all required disciplines present; however, the patient's assigned PC and psychiatrist did not attend. The patient was discharged to EOP level of care with a "strong recommendation" for an intermediate care referral. The IDTT did not document a higher level of care non-referral rationale in the higher level of care form on this date, despite their recommendation and positive referral indicators.

**Finding**

The care provided to this patient was inadequate. The treatment team's higher level of care documentation was generally insufficient, as they failed to document that the patient met criterion seven during the first two IDTTs. Higher level of care non-referral rationales and accompanying treatment modifications also were inadequate on March 1 and March 8 of 2020. Additionally, the PC and psychiatrist disagreed about the higher level of care referral during IDTT on March 1, 2020; however, it was unclear whether the disagreement was resolved in accordance with policy. The MHCB treatment team should have referred this patient to intermediate care as soon as it was clinically indicated to prevent delays in access to care, as opposed to "strongly recommending" that the receiving outpatient treatment team assume responsibility for the referral.

**Inmate U**

This healthcare record was randomly selected from CHCF's EOP roster to assess the adequacy of provided mental health care. The 58-year-old inmate was diagnosed with Major Depressive Disorder, with Psychotic Features, and prescribed Wellbutrin, Haldol, and Cogentin. The inmate's housing unit on E-yard was on quarantine status for a portion of the review period, although the timeframe was unclear.

IDTTs were timely; however, the IDTT documentation on March 4, 2020 and May 20, 2020 was virtually the same. A current description of the inmate's symptoms, functioning, and progress toward treatment goals was not provided. The treatment plan did not address the inmate's auditory hallucinations or specific symptoms of depression, despite ongoing symptoms documented elsewhere in the healthcare record. Further, the treatment goal for reducing depression remained unchanged, though clinical notes suggested this goal was completed in February 2020.

Psychiatry contacts were timely, and the provider included the status of the inmate's depression and auditory hallucinations in their documentation.

PC contacts were not timely, and the care provided during PC contacts did not align with the treatment plan. The PC's documentation was virtually the same in April and May of 2020, and the content was also very similar to notes observed in other inmates' healthcare records. Further, it was difficult to determine whether clinical contacts were confidential, as notes indicated both that the contact was confidential and conducted at cell front due to COVID-19 restrictions.

**Findings**

The care provided to this EOP level of care inmate was inadequate. The inmate did not have an individualized treatment plan that targeted his specific symptoms, and the treatment interventions were not implemented during PC contacts. Additionally, the quality of the IDTT and PC documentation was insufficient.

**Inmate V**

This healthcare record was randomly selected from CHCF's EOP roster to assess the adequacy of provided mental health care. The 28-year-old inmate was diagnosed with Schizoaffective Disorder, Bipolar Type, and prescribed Prozac, Vistaril, and Zyprexa. The inmate's history was significant for substance abuse issues, community inpatient treatment for psychosis, and one to three suicide attempts involving cutting, burning, and overdose. The inmate had a recent MHCB admission in April of 2020 for suicidal ideation and auditory hallucinations. His housing unit on E yard was on quarantine status for a portion of the review period, although the exact timeframe was unclear.

The inmate's five-day follow-up was completed after MHCB discharge, and the quality of safety planning by various clinicians ranged from cursory to individualized.

A tele-psychiatrist completed the initial psychiatric assessment; however, this contact was not completed timely.

The PC's initial assessment primarily relied on content pulled forward from prior evaluations, and an update on the inmate's current functioning was not provided. Daily wellness checks were completed in addition to routine PC contacts during the review period, presumably due to the COVID-19 quarantine. However, planned treatment interventions were not implemented during clinical contacts.

The treatment plan did not address the inmate's risk of self-harm or active symptoms of depression and anxiety. Instead, the plan targeted substance use with a goal of reducing substance cravings. However, the inmate reportedly remained sober for two years and there was no indication that he was experiencing cravings. Further, the treatment plan relied on subjective ratings without including baseline measures for tracking progress.

A sample of group treatment documents was reviewed, and the notes indicated that six recreational therapy groups were offered during the first week of June 2020. However, the notes did not clearly indicate whether the recreation therapy activities occurred in person, in cell, or in the dayroom setting.

**Findings**

The EOP care provided to this inmate was inadequate. The PC did not convey a sufficient understanding of the inmate's current symptoms or treatment needs in their initial assessment, case formulation, clinical summary, or IDTT documentation. Further, the treatment plan did not appropriately address the inmate's symptoms of anxiety and depression, and treatment interventions were not implemented during clinical contacts.

**Inmate W**

This healthcare record was randomly selected from CHCF's EOP roster to assess the adequacy of provided mental health care. The 28-year-old inmate was classified as DD1 and diagnosed with Adjustment Disorder with Anxiety. Vistaril was prescribed, as needed.

IDTTs were completed timely. However, IDTT documentation in March and June of 2020 did not include the current status of the inmate's symptoms, functioning, or progress toward treatment goals. Instead, these documents mostly relied on outdated information pulled forward from the inmate's December 2019 administrative segregation IDTT notes.

Psychiatry contacts were timely, and the provider's documentation included relevant updates following each contact.

PC contacts were timely. However, progress notes were virtually the same in April and May of 2020, and very similar content was observed in other inmates' healthcare records as well.

A sample of group treatment documents were reviewed, and the notes indicated that eight recreation therapy groups were offered during the first week of June 2020. However, the notes did not clearly indicate whether the recreation therapy activities occurred in person, in cell, or in the dayroom.

**Findings**

The care provided to this inmate was inadequate. The PC's documentation was generally repetitive, and treatment plans were not appropriately updated to address the inmate's current symptoms and functioning. Additionally, a list of diagnostic criteria was not provided to support the longstanding diagnosis of Adjustment Disorder.

**Inmate X**

This healthcare record was randomly selected from CHCF's EOP roster to assess the adequacy of provided mental health care. The 52-year-old inmate was diagnosed with Schizoaffective Disorder, Depressed Type; Post Traumatic Stress Disorder; and Borderline Personality Disorder. He was prescribed Vistaril for anxiety, Prozac for depression, Abilify for mood stabilization, and as needed Thorazine for agitation. The inmate was medication non-adherent as a form of protest to the COVID-19 quarantine in his housing unit.

The IDTT documentation remained virtually the same over a five-month period, and the current status of the inmate's symptoms, functioning, and progress toward treatment goals was not included. The PC noted that the inmate completed his treatment goal for anger and depression in January 2020; however, this was not reflected in subsequent treatment plans through the date of this review. Additionally, treatment goals relied on subjective ratings without a baseline measure to appropriately track progress.

Most PC contacts completed during the review period occurred at cell front due to inmate refusals and COVID-19 related modified programming, and at least three of these contacts were non-compliant with timeframes. Wellness checks were offered in addition to routine PC contacts in April and May of 2020. Additionally, progress notes suggested the inmate was seen by several different clinicians throughout the review period and that the care provided did not consistently align with the treatment plan.

Psychiatry contacts were non-compliant, and the inmate reportedly refused his most recent psychiatric appointment.

The provision of group treatment varied throughout the review period. There were at least ten hours of weekly groups offered during most of March 2020; approximately four treatment groups occurred in April 2020; and groups were not available in May or June of 2020.

Clinical notes indicated a clear pattern of psychiatric decline from mid-April

through early June of 2020, with two hunger strikes occurring in April and May of 2020. However, the treatment was not modified or enhanced, and the inmate was not referred to psychiatry until June 4, 2020.

**Findings**

The EOP care provided to this inmate was inadequate. The inmate's psychiatric decompensation was not addressed appropriately with a referral to the psychiatrist or a review and modification to the current treatment. Psychiatric care was lacking, despite the inmate's medication non-

1180

adherence and worsening symptoms. The lack of PC continuity and treatment interventions was also concerning given his declining mental status. Further, the inmate did not have access to treatment groups in May and June of 2020.

**Inmate Y**

This healthcare record was randomly selected from CHCF's EOP roster to assess the adequacy of mental health care provided. The 40-year old inmate had a recent MHCB admission for suicidal ideation secondary to safety concerns. He was discharged from MHCB to EOP level of care in April of 2020 and housed on A-yard. The five-day follow-up was completed timely.

An initial PC assessment was not completed after the level of care change, and neither the PC nor the psychiatrist met with the inmate prior to the initial IDTT. The IDTT documentation was completed by a post-doctoral intern who relied on prior healthcare records for clinical information; the intern was not involved in the inmate's care after this date. The inmate's anxiety, depression, and risk for self-harm were not addressed in the diagnosis or treatment plan. Instead, a diagnosis of psychosis was provided, and, although the inmate's auditory hallucinations were targeted in the treatment plan, baseline measures for tracking progress were not included.

PC contacts and daily wellness checks were completed by various clinicians; although progress notes suggested that both types of contacts were limited to brief check-ins without therapeutic interventions. Additionally, confidential PC contacts were not consistently offered every seven days.

The initial psychiatric assessment was not completed until two weeks after the initial IDTT. The psychiatrist provided a diagnosis of anxiety and psychosis, prescribed Zoloft, and continued the inmate's Remeron and Zyprexa. Additionally, the psychiatrist noted that the inmate did not know how to cope with thoughts of self-harm; however, there was no indication that the safety plan was reviewed or that the PC was consulted on this date.

A sample of group notes indicated that five groups were offered during the first week of June 2020; however, it was unclear whether group activities occurred in person, at cell front, or out of cell. In-cell programming was documented in two of the five corresponding notes.

**Findings**

The care and safety planning provided were inadequate. The quality of clinical documentation was inadequate in the five-day follow up, treatment plan, and progress notes. The PC and psychiatrist did not justify their diagnoses with supporting criteria. The PC failed to complete the initial assessment after the level of care change to EOP. PC contacts consisted of brief check-ins without treatment interventions. Finally, the treatment plan was developed without input from the inmate and did not address his self-harm risk or symptoms of depression and anxiety.

**Inmate Z**

This healthcare record was randomly selected from CHCF's EOP roster to assess the adequacy of provided mental health care. The 58-year-old inmate was diagnosed with Schizophrenia and prescribed Vistaril, Latuda, and an as needed intramuscular Risperdal injection.

IDTTs occurred timely; however, IDTT documents were virtually the same in April and May of 2020. The treatment goals and interventions for auditory hallucinations had not been updated since mid-2019, and the treatment plan failed to address the inmate's depressive symptoms. The inmate's current symptoms, functioning, and treatment progress also were not updated in the May 2020 IDTT notes. Additionally, the IDTT's treatment decisions were not appropriately justified in the documentation, including the decision to retain the inmate in the EOP level of care.

Psychiatric contacts were timely and occurred via tele-psychiatry; however, there were minimal changes observed in the provider's four progress notes authored between March and June of 2020.

PC contact compliance was an area of concern, as seven of fifteen were not completed timely. The PC's documentation changed minimally over time, included generic copied and pasted statements found in other inmates' records, and provided inconsistent information about the inmate. For example, on May 21, 2020, the PC noted both that the inmate denied auditory hallucinations and that the provider "addressed patient's concerns about hearing voices." The PC also wrote, "Pt was seen cell front due to COVID-19 program restrictions/Pt was seen in confidential setting."

The PC and psychiatrist appeared to have differing opinions regarding the inmate's mental status. The PC documented that there was no indication of perceptual disturbances and that the inmate did not display abnormalities in speech or thought processes. In contrast, the psychiatrist noted that the inmate was actively psychotic with daily auditory hallucinations, loose associations, delusions, and disorganization.

Although groups were not provided during the first two weeks of April 2020, the healthcare record indicated that five or six hours of group were offered later in the month. The group documentation lacked specificity and did not consistently clarify whether group was offered in person, at cell front, or in the dayroom.

**Findings**

This EOP care provided to this inmate was inadequate. There appeared to be a lack of collaboration and consensus among providers; however, this was not discussed or resolved during consultation or treatment team meetings. The treatment plan did not address the inmate's depressive symptoms, and the plan was not modified in response to the lack of treatment progress noted in the healthcare record. Further, the clinical documentation was generally inadequate, and justifications for treatment and diagnostic decisions were not provided.

**Inmate AA**

This healthcare record was randomly selected from CHCF's EOP roster to assess the adequacy of provided mental health care. The psychiatric disorder was not clearly noted in the healthcare record. The IDTT documentation included a diagnosis of Unspecified Mental Health Disorder, while the problem section of the healthcare record listed Major Depression and Major Depression with Psychotic Features. None of these diagnoses were justified with specific symptoms or criteria, and recent psychosis was not referenced elsewhere. The inmate was prescribed Remeron at the time of this review.

The most recent IDTT documentation indicated that the meeting was held in absentia due to modified programming during COVID-19, and the treatment plan was not modified on this date.

Psychiatric contacts were timely and occurred via telepsychiatry. This provider's documentation was individualized and covered relevant clinical areas. PC contacts were not timely on two occasions during the review period, and most contacts were completed by a covering clinician while the assigned PC was on leave. The covering clinician's documentation was individualized, and the care provided was partially aligned with the treatment plan.

A sample of group treatment notes suggested five treatment groups were offered during the first week of June 2020. However, it was unclear whether group activities occurred in person, at cell front, or out of cell. The corresponding notes only indicated that in-cell and dayroom activities were provided.

**Findings**

While the overall care provided to this inmate was adequate, a few concerns were noted during this review. The quality of treatment planning and implementation needed improvement, and the inmate's psychiatric diagnosis should have been clarified in the healthcare record with supporting symptoms/criteria.

**Inmate BB**

This healthcare record was randomly selected from CHCF's EOP roster to assess the adequacy of provided mental health care. The psychiatric diagnosis was unclear as differing diagnoses were recorded within the same IDTT note. Major Depression with Anxiety Distress was recorded in the diagnosis section, while Obsessive-Compulsive Disorder and Major Depression with Psychosis were documented in the clinical summary. Providers did not document specific criteria or symptoms to support these diagnoses.

IDTT documents, completed by two different clinicians on January 23, 2020 and April 20, 2020, were nearly identical. The treatment plan carried forward interventions from June of 2019, relied on subjective ratings without including baseline measures for tracking progress, and failed to address the inmate's depression.

The PC's progress notes indicated the inmate was struggling with COVID-19 related program restrictions, although the extent of the limitations was unclear. On May 4, 2020, the Crisis Intervention Team (CIT) was activated in response to suicidal ideation and PREA reports. The

inmate was described as dissatisfied with treatment provided by his PC, and he reportedly denied suicidal ideation during interview. Although a SRASHE was completed on this date, a suicide prevention safety plan was not. The inmate's subsequent contact with mental health staff occurred nine days later, and, while the PREA matter was addressed, his dissatisfaction with treatment was not.

PC contacts were non-compliant with Program Guide timeframes, did not include interventions outlined in the treatment plan, and were frequently conducted at cell front as a result of COVID-19 program restrictions.

Psychiatric contacts were timely, and the provider's clinical documentation was useful. The inmate was prescribed Prozac during the review period.

A sample of group notes indicated that six treatment groups were offered during the first week of May 2020. However, it was unclear whether group activities occurred in person, at cell front, or out of cell. The corresponding notes only indicated that in-cell and dayroom activities were provided.

COVID-19 was generally noted as the reason for cell front contacts, in absentia IDTTs, and limitations on programming; however, the tier of operations was not provided, and there was no indication that the inmate's housing unit was under quarantine.

**Findings**

The care provided to this inmate was inadequate. Diagnostic clarification was needed. Treatment plans were insufficient and not modified to address current symptoms and treatment concerns. The PC did not implement interventions outlined in the treatment plan during clinical contacts. Additionally, the CIT interventions were inadequate and should have included suicide prevention safety planning at a minimum.

**Inmate CC**

This healthcare record was reviewed at the request of plaintiffs' attorneys to assess the appropriateness of the inmate's level of care and the adequacy of provided treatment during the pandemic. The inmate was diagnosed with Schizoaffective Disorder; although differing specifiers were noted in the healthcare record, including Bipolar Type and Paranoid Type. Providers did not justify the diagnosis with specific symptoms or criteria. The psychiatrist prescribed Vistaril, BuSpar, and Zyprexa.

The IDTT documentation was virtually the same in February and May of 2020. The treatment plan also was not updated after June of 2019, despite the provider noting one goal was achieved.

Psychiatric contacts were timely, and this provider's documentation was individualized with relevant clinical information. However, PC contacts were not timely, and PC encounters between March and June of 2020 alternated between wellness checks at cell front and confidential out of cell contacts. The PC's progress notes suggested interventions outlined in the treatment plan were not implemented during clinical contacts.

A sample of group treatment notes indicated that groups were offered on eight occasions during the first full week of June 2020. However, it was unclear whether group activities occurred in person, at cell front, or out of cell. The corresponding notes only indicated that in-cell and dayroom activities were provided.

**Findings**

While the extent of COVID-19 related program restrictions was unclear in the record, the care was inadequate based on deficient treatment plans, lack of diagnostic clarity, and the PC's failure to implement treatment interventions during clinical contacts. However, the level of care appeared appropriate.

**Inmate DD**

This healthcare record was randomly selected from CHCF's EOP roster to assess the adequacy of provided mental health care. The review period for this inmate was February 15, 2020 through April 26, 2020, as the inmate was primarily treated in the MHCB twice between April 26, 2020 and the date of this review. The healthcare record indicated that inmate received EOP level of care services since 2014.

A PC progress note indicated that the inmate was informed of a plan to reduce his level of care to EOP by April 30, 2020, although there was no indication that this plan was discussed during prior IDTTs. The inmate reportedly responded with a suicidal statement and ran out of the building, and the PC noted that custody staff "refused to go after" him. While a SRASHE was completed on this date, a suicide prevention safety plan was not. Subsequent PC progress notes in mid-April of 2020 indicated that the inmate was seen at cell front and exhibited continued distress as the level of care change date approached; discharge planning was insufficient.

Psychiatry contacts were completed timely, and this provider's documentation was useful. However, PC contacts were not timely, and they reportedly occurred at cell front due to COVID-19 safety precautions in mid-April of 2020.

On April 26, 2020, the inmate was admitted to the MHCB after endorsing suicidal ideation with a plan to cut himself.

**Findings**

The care provided to this inmate was inadequate. The inmate received EOP level of care treatment since 2014, and he was described as increasingly distressed in response to the planned level of care change. However, the PC failed to adequately prepare the inmate for the transition to 3CMS, and the inmate's lack of preparedness, along with limited services during the pandemic, should have been considered in the level of care decision. Additionally, the PC did not complete a safety plan in response to the inmate's suicidal statements on April 30, 2020.

**Inmate EE**

This patient was randomly selected from CHCF's MHCB admission roster to assess the quality of mental health care provided. The patient had a total of two MHCB admissions at CHCF

during the review period. His psychiatric diagnosis was Schizoaffective Disorder, Bipolar Type, and Exhibitionistic Disorder. Symptoms included depressed mood, paranoid ideation, auditory hallucinations, and poor impulse control. He had an active PC 2602 order for danger to others and was prescribed Zyprexa 20 mg, Risperdal 4 mg, Depakote 2000 mg, and Vistaril 100 mg. However, medication compliance was not an area of concern during the MHCB admissions. The clinician's judgment of suicide risk on the March 22, 2020 SRASHE was low for chronic and acute. There were no suicide attempts documented in the healthcare record, although he frequently endorsed suicidal ideation with various plans for ending his life.

The February 2020 IDTT documentation indicated that the inmate's group treatment compliance was below 50 percent, with a weekly average refusal rate of 7.2 hours. During a PC contact on February 27, 2020, the patient requested placement in therapeutic groups with treatment modules instead of "dayroom groups," as he was afraid he would be assaulted by other inmates due to the nature of his crimes. The MHCB treatment team's higher level of care non-referral rationale on this date indicated that the patient's treatment non-compliance issues would be addressed in the MHCB; however, there was no significant change in his participation prior to discharge and return to CSP/Sac. The inmate returned to CHCF's MHCB approximately ten days later.

The MHCB treatment plans in February and March of 2020 did not include interdisciplinary plans of care (IPOCs) to address the inmate presenting mental health concerns. Nursing developed IPOCs related to Corona Virus and Legionnaire's Disease, and these included a plan to address risk of infection through education and ensuring the patient could verbalize strategies for reducing his own risk.

On March 16, 2020, the PC inappropriately wrote that the patient was not offered a confidential session due to "institutional needs, time constraints, and overload of paperwork." Additionally, the PC's clinical summary included only one sentence, and progress notes for March 17 and 18 were identical.

**Findings**

The care provided to this patient was inadequate. The patient's treatment compliance issues and underlying safety concerns were not appropriately addressed by MHCB providers, and this contributed to his readmission within ten days of discharge. IPOCs were not developed in February or March to address the inmate's presenting problems; other treatment plans were vague and lacked measurable outcomes. The initial MHCB discharge was premature and not based on discharge objectives, as the patient continued to refuse nearly all MHCB groups and several individual contacts with the PC and psychiatrist throughout his admission. Further, the MHCB clinician did not accurately document the presence of higher level of care indicators during the March 2020 admission, despite the patient's three MHCB admissions during a six-month period and treatment compliance below 50 percent. The PC also did not provide a higher level of care non-referral rationale or appropriately modify the plan of care to address the MHCB readmissions or treatment non-compliance. Finally, the PC's March 2020 documentation and non-confidential contact rationale were concerning and should be addressed by CHCF leadership.

**Inmate FF**

This patient was randomly selected from CHCF's MHCB admission roster to assess the mental health care provided. The patient was referred for MHCB level of care on ten occasions during the review period; however, this review primarily focused on the three most recent admissions, which occurred April 29, 2020 through May 3, 2020; May 19, 2020 through May 22, 2020; and May 31, 2020 through June 2, 2020. Documented reasons for the various MHCB admissions included "unknown," danger to self, danger to others, and command auditory hallucinations. The patient's psychiatric diagnosis was Other Specified Schizophrenia Spectrum and Other Psychotic Disorder. While the patient refused psychotropic medication during the April 29 and May 19 admissions, he agreed to be prescribed Vistaril during the May 31 admission. The inmate's history included two suicide attempts in 2014 and 2018. His June 2, 2020 discharge SRASHE indicated high chronic and low acute suicide risk.

In April 2020, the PC wrote, "Admitted from CHCF to crisis bed for unknown reasons. Gets nonsensical at times when discussing his possible presentation at time of admission. Refusing meds and asking to be sent back." The April 2020 treatment plan noted that the patient's protective factors were "religiosity intertwined with command auditory hallucinations" and wanting "the right medication." The April 2020 IDTT notes referenced the high frequency of MHCB admissions; however, the treatment team determined that a higher level of care was not indicated, and their rationale for non-referral stated, "Patient will not be referred to a higher level of care at this time as he does not meet the criteria for danger to self, danger to others, and extreme mental disability."

Mental health IPOCs were not provided during the April 2020 MHCB admission. However, IPOCs developed during the subsequent admission in May 2020 targeted the inmate's hallucinations and danger to others. Planned treatment interventions included cognitive restructuring, encouraging compliance with medication, identifying triggers for suicidal and homicidal ideation, and increasing coping skills for command auditory hallucinations.

A May 19, 2020 PC progress note indicated that the patient refused to leave his cell, masturbated at the cell door, urinated out of the cell door, banged on the cell door, and flooded the cell.

The patient was issued three RVRs in May of 2020. The RVR mental health assessment for a charge of obstructing a peace officer occurred on May 20, 2020, and the evaluating clinician determined there was a "nexus" between the RVR behavior and the patient's mental illness; a list of recommendations was included for the hearing officer to consider when assessing penalties. The mental health assessment for the indecent exposure (IEX) was completed on May 27, 2020, and this clinician noted that the inmate was without psychiatric medication at the time of the offense and that his mental illness was a contributing factor; recommendations for the hearing officer were appropriate on this date. Although a third RVR for "making pruno in his cell" was referenced in the record, there were no further details, and a corresponding RVR mental health assessment was not available in the record.

The medication intervention sections within the master treatment plans were not routinely filled out or updated by psychiatry. Additionally, the medication intervention section during April

2020 listed Zoloft and Vistaril, despite the lack of psychotropic medication prescribed at the time.

**Findings**

The overall care provided to this patient was inadequate. Although RVR mental health assessments were an area of strength, deficiencies were identified in treatment and discharge plans, higher level of care documentation, care continuity, and the quality of clinical documentation. The patient's frequent MHCB admissions and RVRs were not adequately conceptualized or addressed in treatment plans or higher level of care documentation. MHCB staff did not sufficiently coordinate care with outpatient treatment teams during admission or discharge, and this was particularly evident when the MHCB clinician wrote "unknown reasons" for the inmate's April 2020 admission. Further, PC progress notes contained inconsistent clinical information and IDTT notes routinely included copied and pasted patient information from prior records without providing a date of reference or timeframe.

**Inmate GG**

This patient was randomly selected from CHCF's MHCB admission roster to assess the mental health care provided. The patient was admitted twice to the MHCB for danger to self during the review period. His diagnoses were Bipolar I Disorder and Borderline Personality Disorder. Symptoms included depressed mood, anxiety, hopelessness, helplessness, and command auditory hallucinations. Prescribed psychotropic medications included Prozac for depressive symptoms, Zyprexa for agitation, Vistaril as needed for anxiety, Melatonin for sleep, and Haldol for mood. He also had an active PC 2602 order. The patient's history was significant for nine suicide attempts, as well as numerous incidents of self-harm without intent to die. The MHCB clinician's judgment of suicide risk on the May 28, 2020 SRASHE was high for chronic and high for acute.

The February 2020 IDTT notes primarily relied on documentation pulled forward from prior records, without indicating whether the collateral information was reviewed with the patient for accuracy. Further, the PC did not document a clinical summary or develop an individualized plan of care during the February 2020 admission.

The MHCB treatment team referred the patient to an acute psychiatric program three days after his February 18, 2020 admission, as the patient had engaged in three incidents of self-harm in the MHCB and was non-compliant with treatment. However, the treatment team rescinded the acute referral and discharged the patient to the EOP level of care following a coordinated clinical assessment team (CCAT) meeting on March 3, 2020. Discharge documentation indicated that significant progress was observed since February 29, 2020, and that the patient was in agreement with the level of care recommendation.

The patient's subsequent MHCB admission for danger to self-occurred on May 20, 2020. The patient was uncooperative with all healthcare staff and he engaged in self-harm during this admission. The IDTT coordinated another CCAT, which occurred on May 28, 2020, and the patient was subsequently referred to an acute psychiatric program for "high risk" of self-harm and suicide.

1188

The IDTT's revised treatment interventions included cognitive behavior therapy, cognitive restructuring, motivational interviewing, distress tolerance, and other interventions to address the patient's treatment non-compliance, emotion dysregulation, self-harming behaviors, and cognitive distortions. Additionally, a mental health IPOC was created for danger to self during the May 20, 2020 admission.

The patient discharged from the MHCB to the acute program at CHCF's PIP.

**Findings**

The treatment and level of care decisions were adequate. Although several documentation issues were observed in February and March of 2020, improvements were noted during the subsequent MHCB admission. Higher level of care referrals were timely and appropriate, and the MHCB staff appropriately utilized the CCAT process. The rationale for rescinding the inpatient referral in February of 2020 was appropriate. Additionally, continuity of care was an area of strength, as members of the inmate's EOP treatment team attended the March 6, 2020 MHCB discharge IDTT.

**Inmate HH**

This patient was randomly selected from CHCF's MHCB admission roster to assess the mental health care provided during the review period. The patient was admitted to the MHCB for danger to self and others from April 9, 2020 through April 12, 2020. His psychiatric diagnosis was Schizophrenia, and symptoms included command auditory hallucinations, thoughts of harming himself and others, explosive anger, selective mutism, and delusional beliefs with grandiose, paranoid, and sexual content. The patient was compliant with his prescribed Risperdal during MHCB admission. The PC's judgment of suicide risk on the April 9, 2020 MHCB discharge SRASHE was moderate for chronic and acute risk; although there were no suicide attempts or incidents of self-injury noted in the healthcare record.

The MHCB treatment plan included interventions for short and long term goals, including motivational interviewing, cognitive restructuring, and distress tolerance. However, there were no mental health IPOCs developed during the admission. The nursing department developed IPOCs related to Corona Virus and Legionnaire's Disease and included a plan for addressing risk of infection through education and ensuring the patient could verbalize strategies for reducing his own risk. Additionally, the IDTT documentation referenced the inmate's three MHCB admissions within a six-month period, and an appropriate higher level of care non-referral rationale was provided.

The IDTT discharged the patient to the EOP level of care on April 12, 2020.

**Findings**

The care provided to this patient was adequate. The treatment planning, level of care decisions, and clinical documentation were generally appropriate.

**Inmate II**

This patient was randomly selected from CHCF's MHCB admission roster to assess the mental health care provided during the review period. The patient was referred from EOP level of care to the MHCB on March 30, 2020. His psychiatric diagnosis was Bipolar I Disorder. Documented concerns at the time of admission included danger to others, auditory hallucinations, manic mood, unpredictable behavior, and non-compliance with keep on person (KOP) diabetes medication. Depakote was prescribed for mood stability. There were no suicide attempts or self-injurious behavior incidents noted in the healthcare record.

The MHCB treatment plan and PC progress notes addressed the patient's presenting problems with motivational interviewing and cognitive behavior therapy (CBT) interventions. Additionally, a mental health IPOC for danger to others was initiated on March 31, 2020 with a goal of reducing thoughts of harming others to a self-rating of two by the next IDTT.

The patient was compliant with treatment, medication, and programming during his admission. The PC noted that the treatment team and patient were in agreement regarding treatment progress and readiness for discharge to the EOP level of care. The discharge SRASHE, suicide prevention safety plan, and order for five-day follow-up were completed, and the discharge summary included detailed recommendations for outpatient providers. Additionally, the MHCB psychiatrist adjusted the patient's Depakote during admission, and the KOP medications were changed to directly observed treatment (DOT) at the time of discharge to address compliance issues in the outpatient setting.

**Findings**

The care provided to this patient was adequate. The IDTT appropriately addressed the issues resulting in his referral to the inpatient unit, including medication compliance issues and mood instability. IDTTs and individual contacts with the PC and psychiatrist were completed in accordance with MHSDS Program Guide requirements.