

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Alexander Gourse
Email:  AGourse@rbgg.com

February 2, 2021

VIA ELECTRONIC MAIL ONLY

Matthew A. Lopes, Jr.
Special Master
Pannone Lopes Deveraux & O'Gara LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnson, RI  02908
Mlopes@pldolaw.com

Re:   *Coleman v. Newsom*: Plaintiffs' Comments on Draft 28th Round
       Monitoring Report
       Our File No. 489-3

Dear Special Master Lopes:

The Draft Twenty-Eighth Round Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols (hereafter "Draft Report") provides a valuable overview Defendants' mental health system and reflects the hard, careful work of your team under extraordinarily difficult circumstances.  We greatly appreciate the Draft Report's emphasis on Defendants' persistent noncompliance in areas such as mental health staffing and access to higher levels of care.  We also appreciate the Draft Report's recognition that neither the challenges Defendants face related to COVID-19 nor the temporary reduction in the CDCR population during the pandemic can justify Defendants' noncompliance with core benchmarks relating to treatment space and the provision of quality care.  We look forward to continuing our work with your team and with Defendants to remedy CDCR's ongoing deficiencies in these and other areas.

While the Draft Report has many strengths, Plaintiffs are concerned about the limited attention devoted to several critical issues, as well as the lack of recommendations for further action in areas where Defendants have demonstrated little to no improvement,

[3684103.5]

February 2, 2021
Page 2

or back-sliding, since prior monitoring rounds. We address the most troubling issues below.

I.    Segregation

The Draft Report makes several important findings related to conditions in Defendants' segregation units and the housing of *Coleman* class members in those units. *See generally* Draft Report at 150-54.  We concur in the Draft Report's emphasis on the connections between inadequate clinical staffing in PSU, EOP ASU hub, STRH, and LTRH units (among others) and Defendants' inability to provide adequate care within required timeframes.  *Id.*  Similarly, we strongly agree with the Draft Report's conclusion that many institutions continue to fail in their obligation "to provide MHSDS inmates in Segregated Housing with their allowable property and privileges in a timely manner[.]" *Id.* at 150.

We would appreciate a more thorough discussion of Defendants' compliance with the requirements for STRH and LTRH units, or a clearer statement of when insufficient documentation prevented an appropriate evaluation of Defendants' compliance.  The STRH and LTRH units, like all segregation units, are extremely dangerous to class members, as the Court held in April 2014.  *See Coleman v. Brown*, 28 F. Supp. 3d 1068, 1093 (E.D. Cal. 2014) (holding segregation "presents significant risks for seriously mentally ill individuals," including dramatically increased risk of suicide).  The negotiated requirements for STRH units – such as 20 hours of out of cell activities for men[1] including ninety minutes of confidential structured therapeutic activity weekly, the provision of entertainments devices and in-cell therapeutic activities, and weekly PC contacts – are critical protections against the serious deprivations of these harsh units. *See* Defs' Remedial Plans re April 2014 Order, ECF No. 5211-1, at 5-6.  The same is true for the LTRH requirements – including 10 hours of yard, 3.5 hours of other recreational activity, and ninety minutes of confidential structured therapeutic activity weekly, as well as the provision of in-cell therapeutic activities and weekly PC contacts.  *Id.* at 7-8.  The high-level summary of the STRH units contains limited discussion of certain provisions at a few institutions, but no discussion of the aforementioned LTRH requirements.  *See* Draft Report at 151-53 (summarizing findings regarding in-person monitoring tours of STRH and LTRH programs); *see also id.* at 171-73 (summarizing hybrid review of STRH programs at PVSP, CCWF, PBSP).  While some institutional summaries assess compliance with the relevant measures, they are not uniformly discussed in others, such as, for example, PBSP (p. 286-87), HDSP (p. 298-99), DVI (p. 408-09), PVSP (p. 501-

---

[1] The out of cell requirements for female and RC STRHs are slightly different, requiring a minimum of 15 hours of out of cell time, to include at least ninety minutes of groups. Defs' Remedial Plans re April 2014 Order, ECF No. 5211-1 at 6.

[3684103.5]

February 2, 2021
Page 3

03); KVSP (p. 631-32); CIW (p. 771); RJD (p. 831-32). Information on access to entertainment devices is particularly limited, even in summaries that otherwise generally assess the other relevant requirements. *See, e.g.*, CSP-SAC (p. 252-54), SATF (p. 482-84). It is not clear whether the limited discussion of the LTRH and STRH requirements is due to a dearth of available compliance data. We ask that the Draft Report be amended to include any additional information on these critical compliance measures that is available to the Special Master's team. If Defendants failed or were unable to provide the necessary data to enable monitoring, that should be clearly stated, as it would reflect a fundamental deficiency in Defendants' system that must be documented and remedied.

The Draft Report's discussion of segregation is also notable for what it leaves out. Plaintiffs are particularly concerned about the lack of any recommendations relating to the deplorable conditions at the SAC PSU, where there were five suicides in 2019 alone and where the Draft Report identified multiple areas of noncompliance. *See* Draft Report at 254-55 (noting, among other things, that ten of the 11 primary clinicians in the PSU had caseloads exceeding the established staffing ratio; that there was minimal psychiatrist participation in IDTTs; that IDTTs did not address specific treatment interventions or groups or seriously consider referrals for higher levels of care; and that a significant percentage of psychiatry and clinician evaluations were not timely completed). Many of these deficiencies were noted in the 27th Round Monitoring Report, *see* ECF No. 5779 at 134-35, 173-74, and showed little improvement in the 28th Round.

Similarly troubling was the Draft Report's revelation that the vast majority of institutions that housed class members in non-disciplinary segregation "did not provide sufficient information" to determine either whether they were transferring class members within the required 72-hour timeframe or whether class members housed in non-disciplinary segregation received property and privileges. *See* Draft Report at 153. It is inexcusable that Defendants cannot furnish the necessary information to enable monitoring of these court-ordered requirements, particularly since the number of institutions failing to provide this information appears to have increased dramatically since the 27th Round, when it was reported that only three institutions failed to provide the necessary transfer information and only two institutions failed to provide the necessary property information. *See* ECF No. 5779 at 141. Defendants must fix this very serious problem promptly, particularly since accurate reporting is highly likely to reveal far-reaching non-compliance. For instance, when a greater number of prisons provided monitoring data in the 27th round, the Special Master found only three institutions were compliant with transfer timelines, *id.*, and that 22 percent of NDS transfers from SAC (one of the institutions that failed to provide the necessary information during the 28th Round) took longer than 30 days, or more than ten times the mandated 72-hour transfer timeline, *id.* at 190.

February 2, 2021
Page 4

The NDS policy is a cornerstone of the remediation required by the Court's April 2014 order, secured after a trial, upon finding that "placement of seriously mentally ill inmates in the harsh, restrictive and non-therapeutic conditions of California's administrative segregation units for non-disciplinary reasons for more than a minimal period necessary to effect transfer to protective housing or a housing assignment violates the Eighth Amendment." *Coleman*, 28 F. Supp. 3d at 1099. Plaintiffs request that the Special Master conduct a more in-depth review of the NDS system to determine whether there has been any significant improvement since the 27th Round and what steps are necessary for Defendants to become fully compliant.

## II.   RVR Process

While we concur with the Draft Report's conclusion that "[m]ultiple institutions were noncompliant with basic requirements of the RVR process," Draft Report at 121, we are concerned by the lack of recommendations in this area of the Report as well. Defendants have made little progress in addressing the unacceptably low number of cases in which mental health assessments recommended alternative forms of discipline. While the 27th Round Report identified five instances in which alternative discipline was recommended, *see* ECF No. 5779 at 113, the current Draft Report has identified only seven such instances, *see* Draft Report at 124. The Draft Report's finding that a significant number of clinicians "apparently believed that senior hearing officers could order that the inmate not participate in mental health programming as punishment for RVRs," *id.* at 121, is particularly alarming and illustrates how urgent it is for Defendants to improve their staff training on the RVR process.

The Draft Report also notes three instances at SVSP in which RVRs were improperly issued to class members for conduct that occurred during cell extractions or during transfers to inpatient care. Draft Report at 556-57. But, as we and the OIG have documented, the problems with RVRs are not limited to SVSP and are in fact endemic to CDCR. *See* Sept. 24, 2020 T. Nolan – N. Weber Letter re: Plaintiffs' Concerns about the Issuance of False and Retaliatory Rule Violation Reports Against Class Members (attached) ("Sept. 24 Nolan Letter"). As noted, we have identified numerous instances of similarly problematic RVRs being issued at other institutions, and the *Armstrong* plaintiffs have exhaustively documented the connection between RVRs that were improperly issued in circumstances like these and the impunity with which custody officers at RJD and other institutions engage in excessive force against *Coleman* class members, *see Armstrong* ECF No. 2922 at 20-21 (describing multiple instances of outright fabrication of RVRs at RJD); *see also Armstrong* ECF No. 2948 at 10 n.4, 12 (same at LAC). The 27th Round Monitoring Report indicated that the Special Master would devote time and resources to resolving the numerous deficiencies his team identified in Defendants' RVR process, ECF No. 5779 at 115, but the current Draft

[3684103.5]

February 2, 2021
Page 5

Report includes no such assurances. Plaintiffs request that the Special Master prioritize the interrelated problems of improper RVRs and staff misconduct in the months ahead.

### III.   Use of Force

The Draft Report identifies a number of problems relating to Defendants' noncompliance with their court-ordered use of force policies, including widespread noncompliance with policies governing immediate uses of force and the training of mental health staff on relevant use of force policies and procedures. *See* Draft Report at 125-30. But the Draft Report provides no recommendations related to Defendants' noncompliance in these areas, despite the fact that compliance with immediate use of force policies appears to have dropped considerably since the 27th Round. *See* ECF No. 5779 at 119 (noting an overall rate of compliance of 78 percent during the 27th Round). This backsliding is particularly disturbing in light of the *Armstrong* court's findings relating to staff violence at RJD (where a large number of the declarant victims were both *Armstrong* and *Coleman* class members) and the evidence the *Armstrong* plaintiffs have introduced of similar violence at other high-security institutions, including LAC, where many of the staff misconduct declarants were also members of both the *Coleman* and *Armstrong* classes.

The Draft Report also provides little explanation of the use of force data provided by Defendants' institutions. That data raises a number of questions about, for example, the implausibly low number of immediate use of force incidents at certain institutions such as RJD, *see* Draft Report at 129 (reporting a total of 78 immediate use of force incidents at RJD, or less than a quarter the number that occurred at KVSP). The unexplained disparity between RJD and otherwise similar institutions is consistent with the *Armstrong* court's findings that the data produced by Defendants "capture[s] only UOF or staff misconduct incidents that were reported," and that incarcerated people at certain institutions "are reluctant to report staff misconduct or the improper use of force for fear of retaliation or further abuse." *Armstrong v. Newsom*, No. 94-CV-02307 CW, 2020 WL 5511523, at *16 (N.D. Cal. Sept. 8, 2020). The upshot, as Judge Wilken explained, is that "Defendants' UOF and staff misconduct data likely are under-representative of the actual UOF or staff misconduct incidents that take place at RJD." *Id.* at *17. The current Draft Report's findings therefore belie the likelihood that Defendants may be significantly underreporting use of force incidents at RJD and elsewhere.

For similar reasons we are concerned about the fact that Defendants have reported a vanishingly small number of controlled use of force incidents, *see* Draft Report at 128 (reporting a total of 39 controlled use of force incidents statewide during the 28th Round). How are Defendants defining controlled uses of force? Has the Special Master team or

[3684103.5]

Defendants assessed whether there is any evidence of incidents being misclassified as immediate rather than controlled uses of force?  Evidence of custody-manufactured "emergency" incidents allowing immediate use of force was provided in the *Armstrong* staff misconduct litigation.  *See, e.g.*, *Armstrong* ECF No. 2922 at 20-21; *Armstrong* ECF No. 2948 at 12; *Armstrong v. Newsom*, 475 F. Supp. 3d 1038, 1048-49 (N.D. Cal. 2020); *see also* Sept. 24 Nolan Letter at 7-8.  In light of this evidence, we are concerned that Defendants may be evading court-ordered safeguards for controlled uses of force by similarly manufacturing "emergency" incidents to justify immediate uses of force instead.

### IV. Program Access and Credit Earning

The Draft Report finds that program access generally improved for CCCMS class members during the 28th Round, but that EOP class members continue to be underrepresented in areas such as job assignments, academic assignments, and vocational education assignments.  Draft Report at 131-41.  The Draft Report also finds that a very high percentage of *Coleman* class members are housed at higher security levels than their classification, including 63 percent of CCCMS class members and 73 percent of EOP class members.  *Id.* at 141.  Higher security level programs have far fewer opportunities for rehabilitative programs, less out of cell time, more violence, and more RVRs.

These disparities are not new.  *See* ECF No. 5779 at 120-25 (identifying broadly similar disparities during the 27th Round).  In the last monitoring report, the Special Master stated that the problems discovered relating to program access would be addressed through the workgroup process.  *Id.* at 125.  But the current Draft Report includes no similar pledge to address the persistent, ongoing inequalities identified during the 28th Round.  Improving Defendants' compliance in this area should be a high priority, given the direct link between program access, credit earning and the success of mental health treatment.  Plaintiffs request that disparities in program access (including the related issue of out-of-level housing) be placed on the workgroup agenda in the coming months.

    Sincerely,

    ROSEN BIEN
    GALVAN & GRUNFELD LLP

    By:  Alexander Gourse

cc:    *Coleman* Co-Counsel
       *Coleman* Defense Counsel
       *Coleman* Special Master Team

[3684103.5]