STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
JENNIFER NEILL
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



February 2, 2021

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Dear Special Master Lopes,

Defendants are in receipt of the draft Twenty-Eighth Round Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols. Defendants offer the following objections and comments concerning your Report and request the Report be revised accordingly. Defendants' response is organized to align with the organization (including headings) of the Twenty-Eighth Round Monitoring Report.

The Report's findings are based on site visits that took place mostly in 2019[1] and paper review of eleven other institutions that occurred between March and May 2020. While the findings are informative for the time they were made, the findings are already stale given the myriad of changes made during and since the end of the review period.[2] Indeed, just for calendar year 2020, the report details over twenty-pages of activities in which the parties have been involved. Those activities include, among other things:

- Expansive Mental Health Headquarters Monitoring, (Draft Report, pp. 219, 231-239.)
- Over forty COVID-19 Task Force Meetings, (*Id*. at 219, 220-222.)
- Over fifty small workgroups, covering topics from COVID, desert institutions, Crisis Intervention Teams, referrals to higher level of care, Integrated Substance Use Disorder Treatment, space issues, psychiatric nurse practitioners, segregation, staffing, training, and treatment of individual patients, (*Id*. at 219, 222-223.)
- Court coordination on many of the same topics, (*Id*. at 226-227.)
- More than ninety meetings on data remediation (*Id*. at 229-230.)

The data remediation category itself began in earnest in 2019 when CDCR began issuing policy revisions aimed at initial psychiatry contacts, reporting data errors, change management, medication non-adherence, and confidentiality of appointments. (*Id*. at 240.)

CDCR has also made substantial strides in ensuring adequate staffing levels. Since the monitoring period began, CDCR has seen a significant increase in the psychiatry fill rate – from

---

[1] At 227-228 of the report is a list of on-site tours. CCI, WSP, and CIW tours were noted to have occurred in 2020, the first two in March and the last in November. This does not appear to be accurate, at least for CIW.
[2] In this case, the review period relied on data as early as August 2018.

77% in August 2018 to 89% in December 2020. (ECF No. 5934 at 6, and ECF No. 7042 at 5.)[3] This fill rate increase is significant as the monitoring report seems to suggest that staffing vacancies negatively impact patient care in the past. Those findings are likely no longer true in many cases today given CDCR's population reduction and its increase in staffing fill rate over the last year.

Given the breadth of initiatives and revisions to critical areas of the case, including staffing, custody and mental health partnership, data systems, population reduction, and policy updates, the report must reflect that its findings may not reflect these important changes and should be read in that context.


I.   INTRODUCTION

    E. CDCR's Mental Health Headquarters Monitoring

        1. Mental Health Meetings

The Report describes the Inpatient Referral Unit (IRU) Clinician Daily Check In as follows: "The IRU team reviews transfer approvals, closed and open programs, inmate transfers to DSH and confers on inmate or institutional concerns." (Draft Report, p. 36.) This statement is not entirely accurate and should be revised to state that the IRU team reviews referrals to Acute and Intermediate Care within California Department of Corrections and Rehabilitation's (CDCR) Psychiatric Inpatient Program (PIP) and Department of State Hospitals (DSH), requests expedited or emergency transfers, and confers on inmate and institutional concerns.

Immediately following the IRU section, the Report describes the "PIP Leadership Meeting" as the "IRU chief meets with PIP CEOS and PIP mental health leadership to discuss Least Restrictive Housing LOPS and audits, staffing, program successes and deficits." (*Id.* at p. 36.) This statement should be revised to include that newly released policies and training/implementation plans are also discussed during the monthly PIP Leadership Meeting.


II.  MENTAL HEALTH VACANCY RATES OVERALL AND BY DISCIPLINE DURING THE TWENTY-EIGHTH MONITORING ROUND

The Special Master concludes that the CDCR Defendants failed to resolve staffing vacancies to reach compliance with the ten percent vacancy rate required by the Court in the Twenty-Eighth Monitoring Round. (Draft Report, at 61.) That conclusion is improper because it infers that the ten percent vacancy applies to all staffing positions. The conclusion also fails to include telepsychiatry vacancies as part of the overall psychiatry vacancy rate, improperly applying the ten percent threshold to a subset of psychiatry positions.

---

[3] CDCR continues to evaluate its staffing plan in determining whether changes in circumstances since the development of the 2009 Staffing Plan warrant further modifications to the plan.

2

The Report states "[t]elepsychiatry positions that afforded vital additional services had a vacancy rate of 18 percent, even with the use of registry staff." (Draft Report, p. 55.) Monitoring compliance with the 2002 staffing order by evaluating psychiatry and telepsychiatry separately is inconsistent with the 2002 staffing order and Defendants object to the report on that basis. (See ECF No. 1383 at 3, "Defendants shall maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including contracted services…")

Defendants' compliance with staffing must consider the vacancy rate as a whole – combining on-site psychiatry plus telepsychiatry. Further, it is unclear how a separate figure was generated for the psychiatry and telepsychiatry vacancy rates. There is no fixed number of telepsychiatry positions. Instead, the total number of allocated positions at an institution are moved between on-site and telepsychiatry as needed. Thus, Defendants request that this portion of the Report be revised to incorporate vacancy data for telepsychiatry positions within the overall vacancy rate for on-site psychiatry positions, consistent with Defendants' monthly psychiatry vacancy reports.

The Report further states "the vacancy rate for essential office tech positions increased from six percent to 15 percent." (Draft Report, p. 55.) As mentioned above, the Court's 2002 staffing order directed Defendants to maintain a ten percent vacancy rate for psychiatrist and case manager positions; there is no current requirement that Defendants maintain a minimum vacancy rate for office tech positions. (EFC No. 1383, p. 3.) Defendants request that the report acknowledge that the ten percent vacancy rate from the 2002 staffing order does not apply to office tech positions.

### III. SUMMARY OF THE SPECIAL MASTER'S FINDINGS – ON SITE AND PAPER MONITORING

#### A. Quality management

"Most institutions reported that CDCR placed the peer review process on hold during the monitoring round and, accordingly, did not conduct systemwide peer reviews." (Draft Report, p. 65.) Although the peer review process is still on hold the peer review process for inpatient settings is ongoing. With respect to outpatient peer review, Defendants have received feedback from the Special Master and are currently working on modifying the forms and providing guidance to the field.

#### D. Access to higher levels of care

The Special Master criticizes the CDCR Defendants' compliance with access to higher levels of care. While some of the criticisms are well-founded (*e.g.*, the need to improve the quality of IDTTs' consideration of the need for referrals and documentation of those discussions), the Special Master's summary of compliance with transfer timelines misrepresents Defendants' adherence to Program Guide requirements. Specifically, the draft report states:

> "Once referred, inmates must be timely transferred, but institutions continued to fail to meet transfer timelines to acute, while they

> were generally compliant with timely transfers to intermediate
> care, as they were with MHCB transfers."

(Draft Report at 117.) Both the table and the underlying reports on transfer timelines summarize timely and untimely transfers to higher levels of care, but fail to identify or acknowledge the Program Guide addenda setting forth exceptions to the transfer timelines. Failing to do so, the draft report incorrectly reports on the CDCR Defendants' compliance with transfer timelines to acute, intermediate care facility (ICF), and mental health crisis beds (MHCB). (*Id.*) Further, while transfers to acute, ICF, and MHCB may not have been timely for some referrals, the untimeliness is excused by various transfer timeframe exceptions, as evidenced by Defendants' monthly inpatient transfer timeframe compliance reports which show near perfect compliance for reporting periods from September 2017 through February 2020.

The report should also be revised to remove findings of compliance or non-compliance with transfer timeframes from individual institutions. For years, transfers to crisis beds, ICF, and acute beds have been controlled centrally – not by individual institutions. The ability to timely transfer patients to these programs is not within the primary control of any individual institution. Defendants' centralized management of the beds is reported monthly. Attributing compliance findings to individual institutions is not meaningful. Instead, the report should attribute compliance on a system-wide basis, using Defendants' monthly inpatient or MHCB transfer reports.

A similar table is included in the section of the Report on the hybrid Electronic Health Record System (EHRS) paper review institutions at page 158 of the Draft Report. Both tables should be revised to report compliance consistent with Program Guide and the addenda to the Program Guide setting forth court-approved transfer timeframe exceptions. (*See* ECF No. 5750 adopting Defendants' inpatient timeframe exceptions, ECF No. 5744, and ECF No. 6295 adopting Defendants' MHCB timeframe exceptions, ECF No. 6261-1.)

IV.   SUMMARY OF SPECIAL MASTER'S FINDINGS – HYBRID REVIEW

    K. Access to Higher Levels of Care

        Summary – Access to Higher Levels of Care

The Report states:

> "Intermediate care appeared to be significantly underutilized
> considering that seven of the ten institutions reviewed in this part
> of the report made no referrals to that inpatient level of care."

(Draft Report, p. 158.) This finding lacks basis. The hybrid review ostensibly appraised ten institutions but only *four* of those institutions (CCWF, CHCF, SQ, VSP) have Enhanced Outpatient Programs, which are the primary drivers of inpatient referrals. Furthermore, only three institutions, CCWF, CHCF, and PBSP, have Mental Health Crisis Beds. It is, therefore, not

4

surprising that only a few of these ten institutions made referrals to intermediate care during the limited review window. Accordingly, CDCR objects to the finding that the level of care was "significantly underutilized" by these ten institutions because this finding is unsupported.

      T.  Review of the RVR process

The Report states:

> "[n]o institution demonstrated compliance with timely requests for mental health assessments in the reviewed records. ASP, CHCF, SCC, SQ, and VSP documented greater than 50 percent compliance, and the remaining five institutions—CCWF, CTF, DVI, PBSP, and PVSP achieved 50 percent compliance or less."

(Draft Report, p. 179.) This does not appear to be factually correct. Defendants generated reports and determined that the compliance rate was higher than 50 percent for all institutions with respect to timely requests for mental health assessments (MHA). CDCR requests that the Report provide additional information as to how these compliance rates were determined. This objection is also restated in the individual institution review summaries below. It is unclear how the Special Master has reached conclusions about the timeliness of mental health assessment requests given that the process is an automated function of the Strategic Offender Monitoring System (SOMS). Once a Rule Violation Report is classified in SOMS, SOMS automatically requests that mental health conduct the MHA.

## APPENDIX A – SPECIAL MASTER'S DATA EXPERT REPORT

**Initial Activities of the Data Expert**

The Report states:

> "Defendants' system was developed predominately by highly capable and dedicated laypeople. As a result, it lacks many of the documentation and other requirements standard for systems developed by data and computer science experts. Consequently, understanding how the data system currently operates was considerably more time-consuming to unravel than would have been the case had the system been built by professionals in the field."

(Draft Report, p. 190.) The Report should also acknowledge that the system in question was developed over a period of more than ten years, prior to the existence of EHRS and SOMS, and in the absence of a number of software tools and standard practices that have since been adopted by CDCR.

5

**General Deliverables of the Data Expert**

The Report states:

> "At present, the general deliverables for Dr. Potter are as follows:
>
> 1. Review the processes being utilized to produce [Quality Assurance (QA)] measurements and work with CDCR to develop recommendations that, when implemented, will help ensure that they are accurate, transparent, and sustainable. These recommendations must include steps that CDCR can take to help ensure that once an acceptable QA system is developed, structures are in place to ensure that it continues to be maintained and operated in an acceptable manner.
>
> 2. Review the QA Change Management Process and work with CDCR to develop recommendations that, when implemented, will ensure that this process and its results are readily understandable to all relevant parties. These recommendations must include steps that CDCR can take to help ensure the QA system is maintained and operated in an accurate and transparent manner in the future. In other words, that they are sustainable.
>
> 3. As possible, certify sections of the QA system that are being maintained and operated in an accurate, transparent, and sustainable fashion."

(Draft Report, p. 192.) CDCR agrees that the Quality Assurance measurements should be accurate, transparent, and sustainable. CDCR, however, requests that the Report mention that, as of this time, Dr. Potter has not yet ensured that the QA measurements are accurate. The findings within this Report should only relate to the transparency and sustainability of the QA measurements, not their accuracy. The accuracy component of the QA measurements should be addressed in a later report, which should be issued after Dr. Potter has had the opportunity to validate and report on the QA measurements and their accuracy.

**Subsequent Activities of the Data Expert**

The Report states "Dr. Potter was also provided access to the software CQIT Tool application that had previously been used to gather CQIT data during onsite audits. This application has also been deprecated by CDCR." (Draft Report, p. 193.) The application was not deprecated, however, efforts to update CQIT were paused for a period of time. The current CQIT tool is still available and is used as validated by the Mental Health program. The tool has had limited use by headquarters staff because of pandemic travel restrictions but remains active.

**Task Force Meetings with Work Groups**

Dr. Potter provided an update to the Task Force on his work at the 40th Task Force meeting on November 17, 2020. (Draft Report, p. 195.) At this time, he "provided a summary of his activities and next steps." (*ibid.*) Dr. Potter also worked to develop a "documentation platform for the system that they hoped CDCR would adopt and he felt would allow them to quickly document enough of the system in order for him to begin to validate indicators and business rules." (*Id.at* pp. 195-6.) Dr. Potter then provided a demonstration of the documentation tool and he observed that Defendants "reported concerns about CDCR allowing them to utilize the program since it was not already approved." (*Id.*at p. 196.) It is apparent that Dr. Potter had developed a documentation platform that he demonstrated for the Mental Health program. The documentation platform is a "Wiki" site developed by Dr. Potter that is not currently used by California Correctional Health Care Services (CCHCS). CCHCS has tools that are used for documentation and are standardized for use for all systems at CCHCS.

**System Documentation**

The Report states "Dr. Potter said that while the documentation portion was essential and the priority, he had further recommendations around cleaning up old and unused tables from the system, requiring that CDCR use source control going forward and utilize unit testing." (Draft Report, p. 197.) Dr. Potter has been tasked to assist with the certification and validation of the software used by the mental health program, not to assist CDCR with cleaning up old and unused tables from the system. Thus, Dr. Potter's recommendations that do not pertain to the certification and/or validation processes should be removed from Appendix A.

The Report provides the following:

- "The [Quality Assurance (QA)] system documentation system is not designed to maintain certification.
    - It is difficult to impossible to know how critical QA system details have changed over time.
    - There is no way to review all documentation changes that have occurred to the QA system or QA data system over a specific period of time."

(Draft Report, p. 200.) CDCR agrees that it is difficult to know how critical QA systems have changed over time, but it is not impossible. Defendants request that the words "to impossible" be removed from the above sentence.

Dr. Potter makes references throughout Appendix A about CDCR's inability to use modernized system tools. At one point, the Report specifically states "[m]odern software development practices are absent." (Draft Report, p. 203.) The California Correctional Health Care Services (CCHCS) IT team uses both testing and documentation tools as part of the system development lifecycle (SDCL). SDCL is a standardized IT process that is used by the software industry to test, develop, and design software. These tools are used uniformly by those who implement SDLC. The "modernized system tools" Dr. Potter refers to are tools that Dr. Potter would like CCHCS

7

to use, but they are not the only tools that could be used to test and document the system. The Report should be reworded to explain that the modernized system tools that Dr. Potter recommends are not the only tools that can be used to test, develop, and design the database, rather, it is appropriate to continue using the tools CCHCS is currently using as a part of the SDLC.

The Report states:

> "Unit testing is a standard approach for checking whether or not a program's actual operation matches its intended operation. Typically, it is performed module by module, and subcomponent by subcomponent. This process gives great confidence in the validity of the overall system….
>
> CDCR Mental Health should adopt unit testing as part of their development process."

(Draft Report, p. 203.) CDCR currently does conduct some form of what Dr. Potter may be classifying here as unit testing; CDCR performs user acceptance testing, which tests whether the way the database has been coded is producing accurate results. However, the testing of the code itself has transitioned from CDCR to the California Correctional Health Care Services (CCHCS) IT team to test the actual database to ensure it works correctly. CCHCS's IT team promotes the actual changes into production database, so it is CCHCS's responsibility to test the database itself in order to ensure that the coding is correct and that the database works according to the way it was coded. CCHCS already has individual testers that have the expertise to perform the task. Thus, CDCR requests that the report be revised to reflect this change.

The Report notes:

> "It is Dr. Potter's understanding that due to prior issues caused by CDCR Mental Health programmers breaking the production system, CDCR IT has taken complete control of the production system. Because of this, CDCR Mental Health programmers, as of June 2020, lacked the ability to inspect the production system."

(Draft Report, pp. 203-4.). Defendants request this statement be revised to state that California Correctional Health Care Services (CCHCS) IT, not CDCR IT, has taken oversight of the production system; this change was made because CCHCS IT has the appropriate skill sets to code and produce the system. CCHCS's IT team worked with CDCR to incorporate the standard system development lifecycle (SDLC). As mentioned previously in this letter, SDLC is a standardized IT process that is used by the software industry to test, develop, and design software. Additionally, it is incorrect to conclude that the "CDCR Mental Health programmers" lacked the ability to inspect the production system. (*Id*. at p. 203.) Whereas CDCR programmers have the visibility to code the system, they cannot promote these coded changes to production. Only CCHCS IT can promote code for the development database to production. Prior to implementing the SDLC, the code was put directly into production without testing and documentation, but that has since changed. Since the incorporation of the SDLC process, the code is tested and documented before it is placed into production.

8

APPENDIX D INSTITUTIONAL SUMMARIES

**General Objections to Content in Institutional Summaries**

The following sections are incorporated in several institutional summaries found in Appendix D under the "Other Issues" heading. CDCR has global objections to the following sections of the Report:

1. Mental Health Assessment Referrals – In several sections of the Report, the Special Master finds that mental health assessments are not timely requested once a Rule Violation Report (RVR) is issued. This is a confusing finding given the fact that the process has completely been automated since October 31, 2017. Once an RVR is classified or reclassified, SOMS updates automatically and generates the RVR Mental Health Assessment request. CDCR notes several specific sections below containing this finding. CDCR requests that the Special Master review how compliance was measured, specifically whether SOMS was consulted, and provide any examples of late request to CDCR for review. (*See* attached California Department of Corrections and Rehabilitation Memorandum, Changes to the Rules Violation Report Mental Health Assessment Process for Strategic Offender Management System, from Kathleen Allison, Director, Division of Adult Institutions (October 9, 2017.)

2. Property concerns – In various institutional summaries, the Report finds that there were issues with the receipt of inmate property but fails to specify which documents or modes of communication were used in obtaining this information. For example, the Report states:

   > "CCI staff and inmates reported delays in receipt of inmate property after ICC clearance CIM, SATF, and RJD inmates were provided appropriate property and privileges. CSP/Solano, CMF, CSP/Corcoran, CSP/LAC, HDSP, KVSP, MCSP, and SVSP did not provide sufficient information to determine whether inmates received property and privileges."

   (Draft Report, p. 153.) CDCR requests that all references made to the timely or untimely allocation of property and privileges in this Report be made in the same fashion as it was done for SATF here: "[r]eview of CDCR Forms 114A and the isolation log indicated that property and privileges were timely provided to NDS inmates." (Draft Report, p. 492.) Here, the Report describes which documentation was used to conclude that non-disciplinary segregation (NDS) inmates at SATF timely received their property and privileges. CDCR requests that all references made within the Report to the timely or untimely receipt of an inmate's property and privileges describe which forms and documents were used to make that determination. If this information was obtained from staff, please identify whether the staff who provided the information were custody or mental health staff. Additionally, please specify whether the information was solely obtained though verbal conversation with the inmates, and if so, specify whether that information was verified by reviewing documentation maintained by CDCR staff. Several specific examples of where the Report should be revised are provided below, but these examples do not represent every instance where property and privileges are mentioned within the Report.

3.  Request for historical data from SOMS – The Report contains multiple instances where the Special Master's team requested that various institutions provide historical informational or census data that they believed could be generated from SOMS.[4] The historical data requests included, but were not limited to, the following: (i) a list of inmates in non-disciplinary segregation who had since transferred to another institution; (ii) inmates on "C" status and their "C" status length of stay for the entire reporting period; and (iii) the number of EOP, 3CMS, and non-mental health inmates who were placed on "C" Status and their "C" Status lengths of stay during the reporting period.

    SOMS is coded to provide point-in-time data, meaning that it can only provide relevant data for inmates that are currently housed within the institutions. SOMS was not designed to provide historical data on demand for document requests such as these. Although there is no requirement that SOMS provide information in this manner, CDCR is currently working to update SOMS and hopes to be able to capture all relevant historical inmate classification data in the future. Therefore, CDCR requests references to institutions' inability to provide historical data be revised to include that CDCR is in the process of updating SOMS to automate this type of data request.

Folsom State Prison (Folsom)/Folsom Women's Facility

The Report states "Folsom/FWF did not provide ADA Reasonable Accommodation and Grievance Procedures." (Draft Report, p. 277.) This does not appear to be an accurate statement. Folsom/FWF has been in compliance with all aspects of the ADA 1824 process since this policy was implemented several years ago. CDCR believes this finding should be removed from the Report unless information is provided to substantiate this allegation.

California Medical Facility

The Report states

> "The monitor's expert observed a non-*Coleman* approved treatment module in the TTA where inmates were placed until evaluated by a mental health clinician. The module was reportedly utilized daily and inmates frequently remained in the module for longer than four hours before assessment by a mental health clinician." (Draft Report, p. 359.)

---

[4] See, e.g., Draft Report, CSP-SAC Program Access (commencing with "CSP/Sac reported that because SOMS lacked capacity to run historical reports… during the review period."), Non-Disciplinary Segregation (commencing with "[t]he institution was…unable to produce such historical data."), Document Production Issues (commencing with "CSP/Sac reported that SOMS was unable to produce certain historical data… The institution was also unable to report…during the review period) pp. 261-262, 267; CSP-COR Non-Disciplinary Segregation (commencing with "CSP/Corcoran was unable to produce a report…during the review period."), pp. 453-454; KVSP C Status (commencing with "[f]or the review period… and their "C" Status lengths of stay."), p. 640; SVSP Short Term Restricted Housing (commencing with "SOMS could not provide aggregate data…SOMS was not designed to do so."), p. 527; CSP-LAC C Status (commencing with "CSP/LAC was unable to report…during the reporting period."), Document Production Issues (commencing with "[t]he institution reported that SOMS was unable to…during the review period."), pp. 669, 673; RJD Document Production Issues (commencing with "[t]he institution did not produce NDS… for inmates no longer at the institution."), p. 823.

Holding cells or therapeutic treatment modules (TTMs) adjacent to or inside the treatment triage area (TTA) are not the same as those in mental health treatment rooms or group rooms; therefore, they are not subject to the same design requirements. Furthermore, managerial approval is required and documented on a holding cell log for any inmate who is placed in this type of a holding cell for longer than four hours. It is not clear how the "monitor's expert observed" patients in the holding cell for greater than four hours given the nature of *Coleman* tours. Thus, Defendants request this excerpt either be removed from the Report or be revised to include the explanation provided by Defendants.

Mental/Health Custody Relations:

The Report states "[i]nterviewed inmates raised concerns regarding timely issuance of personal property upon arrival to CMF, as well as staff efforts to reduce their level of care." (Draft Report, p. 369.) CDCR requests that this section be revised to include whether any additional documentation pertaining to the receipt of these inmates' property was consulted to verify these inmate concerns.

California State Prison – Corcoran (CSP-COR)

### Short-Term Restricted Housing

The Report states "inmates also made multiple complaints regarding their property, lack of access to paper books and writing supplies, and issues with the tablets that had been provided them by CDCR." (Draft Report, p. 442.) The Report does not indicate whether these complaints were independently verified. CDCR requests that this portion of the Report be revised to reflect if any property documentation was used to verify these complaints.

### Enhanced Outpatient Program

The Report states "[m]ainline EOP inmates reported that it was not uncommon to miss groups due to a variety of reasons such as lockdowns or not being allowed out of the housing unit, etc. (Draft Report, p. 447.) The Report is misleading because it implies that missing groups resulted in a failure to offer ten hours of treatment, which is the threshold that should be used to measure compliance. Most EOP programs purposely overschedule EOP inmates for group treatment beyond the ten hours per week in case there are emergencies such as lockdowns or program modifications that would impact their ability to complete the ten hours. Thus, EOP mainline patients are still offered at least ten hours of treatment per week even if some groups are cancelled or rescheduled. CDCR requests that this sentence be reworded to state, "In spite of reports of lockdowns or not being allowed out of the housing unit, the mainline EOP inmates still were offered at least 10 hours of group treatment per week."

The Report suggests a violation of Prison Rape Elimination Act protocols when it states "[s]everal inmates reported that some custody officers were inappropriately provocative to them in the housing units." (Draft Report, p. 447.) CDCR requests that any PREA allegations be immediately reported to custody supervisors or headquarters staff.

### Mental Health/Custody Relations

The Report states:

> "[i]n-service training sign-in sheets for February and March 2019 were reviewed. The sign-in sheets did not include all Watches; some sign-in sheets had only custody staff in attendance.
>
> Requested documentation regarding custody and mental health staff training for the custody mental health partnership that would allow for verification of training was not provided."

(Draft Report, p. 455.) All training sign-in sheets and relevant training documentation was provided to the Special Master's team. The training sign in sheets (CDCR 844 forms) are given to the HPS I or designee to upload into the COR Custody and Mental Health Partnership Plan SharePoint. CDCR already provided these data to the Special Master's team, but they are also enclosed with this Letter for the Special Master's review. Additionally, these sign-in sheets were completed pursuant to CDCR policy. It is permissible for separate sign-in sheets to be utilized for different watches as well as a separate one for custody and mental health.

### Indecent Exposure (IEX) Pilot Program

The Report references the indecent exposure (IEX) pilot program at CSP-COR. (Draft Report, pp. 461-71). The Report notes:

> "it was observed that the current conceptualization of the IEX pilot was as a housing unit for inmates with problematic sexual behaviors in contrast to a sex offender specific treatment program… This expressed outcome, which was for an inmate to go 90 consecutive days without demonstrating any inappropriate sexual behavior did not address the underlying condition nor was it indicative that the condition had been resolved or treated."

(*Id.*at 461-462.). The Report does not mention that only a handful of the participants were diagnosed with exhibitionism. Further, in contrast to the Report's assumption, the IEX program is conceptualized not as a mental health treatment program, but a housing and classification program that diverts inmates from segregation terms.

### Inmate Interviews

The Report states "there were persistent complaints regarding property not being delivered timely after arrival into the unit, and loss and broken property." (Draft Report, p. 470) It is not clear whether these complaints were independently verified. CDCR requests that this portion of the Report be revised to reflect if any property documentation was used to confirm these complaints.

California Substance Abuse Treatment Facility (SATF)

### Short-Term Restricted Housing

The Report states:

> "Review of CDCR Form 114A for STRH 3CMS inmates indicated noncompliance for offering 18.5 hours of weekly yard, but compliance for offering three weekly showers. The additional 1.5 hours of structured therapeutic out-of-cell time was not documented in the CDCR 114A. Reviewed cases indicated that the ICC was conducted within ten days of STRH placement."

(Draft Report, p. 484.) It is not policy for mental health clinicians to document the 1.5 hours of structured out-of-cell treatment on paper form CDCR 114-A. Clinicians document this treatment in EHRS. Additionally, STRH inmates were offered 18.5 hours of yard time. Thus, SATF was in compliance with this item. The Report should be revised to state that SATF was in compliance for offering 18.5 hours of weekly yard. Findings regarding whether treatment groups were offered should be made based on an EHRS review.

### Non-Disciplinary Segregation

"Review of CDCR Forms 114A and the isolation log indicated that property and privileges were timely provided to NDS inmates." (Draft Report, p. 492.) Here, the Report describes which documentation was used to conclude that non-disciplinary segregation (NDS) inmates at SATF timely received their property and privileges, and thus, clarifies how the Special Master reached his determination. CDCR requests that *all* references made within the Report to the timely or untimely receipt of an inmate's property and privileges include a sentence describing which forms and documents were used to make that determination. If this information was obtained from staff, please identify the staff as custody or mental health personnel. Additionally, please specify whether the information was obtained solely through conversation with inmates, and if so, if the information was verified by reviewing CDCR documentation.

### Rules Violation Reports (RVR)

The Report states:

> "A sample of 17 RVRs were reviewed for compliance with applicable CDCR policy and procedures. The review revealed that custody staff timely referred RVRs for a mental health assessment in approximately 65 percent of cases. Mental health staff timely returned the completed assessment to custody approximately 80 percent of the time."

(Draft Report, p. 496) As previously stated, the mental health assessment referral process is automated in SOMS; there is no human element to this process. SOMS automatically sends/refers the mental health assessment to clinical staff once the RVR is classified. This

13

automation began when the RCR process was incorporated into SOMS, so it unclear how compliance was determined to be at 65 percent.

Pleasant Valley State Prison

### Rules Violation Reports (RVR)

The Report states:

> "Six RVRs were reviewed to assess compliance. Of those, custody staff submitted referrals to mental health within required timeframes in two or 33 percent of the cases. Mental health staff completed and returned all six or 100 percent of the mental health assessments timely. None of the reviewed mental health assessments indicated the RVR was related to the inmate's mental health symptoms.
>
> The senior hearing officer included language to allow continued participation in mental health and rehabilitation services in five or 83 percent of the RVRs reviewed, demonstrating a lack of understanding that participation in mental health services cannot be impacted by an RVR."

(Draft Report, p. 504.) As previously stated, SOMS automatically requests that a clinician perform a mental health assessment once the RVR is classified in SOMS, so it is unclear how the compliance rate was determined.

Avenal State Prison (ASP)

### Rules Violation Reports (RVR)

The Report states:

> "Custody staff timely requested a mental health assessment in two of three cases or 67 percent of the time. Mental health staff completed and returned the mental health assessment to custody staff timely in two of three cases or 67 percent of the time. Senior hearing officers documented their consideration of the mental health assessment in all of the reviewed cases. The clinician recommended mitigation of penalties in two of the RVRs reviewed and the senior hearing officer mitigated the penalty in all of those cases."

(Draft Report, p. 509.) As stated previously, SOMS automatically requests that a clinician perform a mental health assessment once the RVR is classified in SOMS, so it is unclear how the compliance rate was determined.

14

Salinas Valley State Prison (SVSP)

### Transfers

The Report states:

> "SVSP was unable to provide a list of EOP inmates housed in D-2, administrative overflow during the review period. The institution did not keep a list of inmates housed there and SOMS did not produce retrospective reports."

(Draft Report, p. 522.) The original document production did not request that Defendants provide a list of SVSP EOP inmates housed in D-2, administrative overflow during the review. Since CDCR was not notified that the Special Master's team required this information, Defendants request that this portion of the Report be reworded to state that SVSP was unable to provide this list during the tour of the institution, but would have provided this information if the institution been given sufficient.

### Short Term Restricted Housing (STRH)

The Report states:

> "Inmate interviews and review of CDCR Form 114As for 3CMS inmates housed in STRH revealed that inmates were typically offered 18.5 hours or more of yard and three showers on a weekly basis. Interviewed inmates further reported typically being offered 90 minutes per week of group; however, reviewed 114As frequently did not reflect inmates being offered 90 minutes of weekly group."

(Draft Report, p. 529.) Group therapy, including the ninety minutes per week discussed within the Report, are not logged in CDCR form 114-As. Thus, there is no deficiency as implied in the Report. Group hours are recorded in EHRS only.

### Rules Violation Reports (RVR)

The Report states:

> "A total of 21 randomly selected RVRs were reviewed for compliance with CDCR policy and procedure. Custody staff timely referred the RVR for a mental health assessment in six or 29 percent of the 21 reviewed cases. Mental health staff completed the mental health assessment and timely returned the form to custody staff for 15 of the 21 RVRs reviewed or 71 percent of the time."

(Draft Report, p. 554.) As stated previously, SOMS automatically requests that a clinician perform a mental health assessment once the RVR is classified in SOMS, so it is unclear how the compliance rate was determined.

**Use of Force**

The Report states:

> "In the three immediate use of force incidents to stop the inmate from committing suicide/self-harm, one inmate was issued an RVR for assault on a peace officer, which appeared to be in violation of CDCR policy. The incident involved the inmate hitting his head on the MHCB door window. Mental health staff ordered involuntary medication be administered, which resulted in custody staff performing an immediate extraction. During the extraction to provide the inmate with medical care for his head injury and to administer involuntary medication, the inmate lunged at custody staff when they entered the MHCB room. Additionally, this incident was referred to the local district attorney's office for possible prosecution."

(Draft Report, p. 556.) CDCR disagrees with this assessment because the RVR was written for assault on a peace officer during the cell extraction; issuance of this type of RVR is within policy. Title 15, section 3317.2, subdivision (a)(1), bars the issuance of RVRs during involuntary medication administration. However, subdivision (c) permits an RVR during this situation where the behavior is a violation of, *inter alia,* Title 15, section 3323, subdivision (d)(2), assault on a peace officer, as occurred here:

(a) Inmates shall not be issued a Rules Violation Report for behavior that constitutes a Rule Violation under the circumstances described in subsections (1)–(4) below.
   (1) The behavior occurred in connection with a cell extraction for the administration of involuntary medication, as defined in Penal Code Section 2602, or involuntary medical treatment, as defined in Probate Code section 3200, et seq. . . .
(c) If the inmate commits a Serious Rules Violation pursuant to Section 3315 while participating in the behavior noted above, which constitutes a Division A-1 offense as defined in Section 3323, subsection (b), an assault or battery as defined in Section 3323, subsections (d)(1), (d)(2), and (d)(3), or an assault on a peace officer or non-prisoner as defined in Section 3323, subsections (f)(11) and (f)(12), a Rules Violation Report shall be completed and processed in accordance in accordance with this Article.

(Title 15, section 3317.2. *See also* ECF No. 5305, Order adopting section 3317.2, and ECF No. 6431, compendium of custody remedies.) The finding cited above should be removed or revised to reflect that policy was not violated when this RVR was issued.

The Report states that:

> "[i]n another immediate use of force incident, the inmate exited his cell on the second tier of the housing unit, with a bed sheet tied into a noose. He began tying the bed sheet onto the railing and

16

> placed the noose around his neck. He was ordered to stop and
> failed to comply. The control booth officer fired one 40 mm impact
> round at the inmate. The floor officers responded to the area and
> physically restrained the inmate. Following this incident, the
> inmate was rehoused in D-2, an administrative segregation unit and
> not in a MHCB. Based on the suicide attempt, the inmate should
> have been rehoused in the MHCB for mental health evaluation and
> treatment."

(Draft Report, p. 556-557.) Only a clinician can determine the appropriate housing level for an inmate. A clinician assessed the inmate to determine whether a suicide attempt occurred and determined that no crisis bed referral was warranted. Therefore, absent a finding that the suicide attempt was not manipulative and that the clinician erred in his or her assessment, the paragraph cited above should be removed from the Report or it should be revised to reflect that patient was housed appropriately.

Wasco State Prison

**Rules Violation Reports (RVR)**

The Report states:

> "WSP did not provide reliable data regarding RVR training during
> the review period; although interviewed custody and mental health
> staff were knowledgeable of the consideration of mental health
> input in the RVR process and penalty mitigation. The local
> operating procedure for RVR mental health assessments was
> updated two months prior to the reporting period.

(Draft Report, p. 618.) Defendants provided all relevant RVR Mental Health Assessment (MHA) training data to demonstrate that WSP was in compliance with the RVR MHA training. The training was conducted online and the documentation affiliated with the training was provided to the Special Master's team as a part of the document production. It is also being included with this letter in case the Special Master's team would like to review it again.

California State Prison, Los Angeles County (CSP-LAC)

**Enhanced Outpatient Program**

The Report states:

> "Some inmates were very vocal regarding alleged custody staff
> misconduct, especially on Third Watch, that they reported involved
> the physical beating of inmates. Staff reports were consistent with
> some of these allegations."

17

(Draft Report, p. 663). These are serious allegations and must be reported for investigation. CDCR representatives present on this tour did not hear these allegations and monitors did not report them to the representatives. CDCR requests that either more information be provided in the Report to conduct investigations, or that the Special Master provide CDCR with this information separately.

North Kern State Prison

### Rules Violation Reports (RVR)

The Report states a "staff assistant was reportedly provided to all EOP and MHCB inmates during the RVR process, but staff provided no documentation as verification of this process." (Draft Report, p. 699.) Staff assistant data is embedded within the SOMS RVR module. Thus, anyone reviewing an RVR can determine whether a staff assistant was provided to EOP or MHCB patients. This finding should be stricken or revised to clarify whether SOMS was referenced to make this determination.

California Correctional Institution

### Non-disciplinary segregation

"The Report states "[s]taff and inmates reported delays in receipt of inmate property after ICC clearance." (Draft Report, p. 713.) CDCR requests that the Report specify whether any property documentation was used to reach this conclusion. Please also specify whether reporting staff are custody or mental health personnel.

### Mental Health/Custody Relations

The Report states: "[i]nmates and clinical staff reported and the monitor's expert observed that CDCR 602s were not available on the housing units." (Draft Report, p. 715.) This statement is unhelpful as it fails to identify the housing units at issue. CDCR requests a list of the specific housing units where the lack of CDCR 602 forms was observed so this conclusion may be verified and used to ensure that the housing units have all necessary forms.

### Rules Violation Reports (RVR)

The Report states: "[n]ine adjudicated RVR packages were reviewed. Mental health assessments were requested timely for four or 44 percent of the reviewed RVRs, and seven assessments or 78 percent were timely completed and returned to custody." (Draft Report, p. 715.) As stated previously, SOMS automatically requests that a clinician perform a mental health assessment once the RVR is classified in SOMS. Without additional information from the monitors as to how the compliance rate was determined, the statement cannot be verified and cannot be used to correct any compliance issues. Defendants request that the Report be revised to include the monitor's explanation on how they determined compliance rates.

California Institution for Men (CIM)

### Administrative Segregation/Reception Center Short Term Restrictive Housing (STRH)

The Report states: "[i]nmate property was reportedly not available; however, inmates were provided with institutional radios." (Draft Report, p. 729.) Several pages later, under "Non-disciplinary Segregation," the Report states: "[a] review of the property log revealed that property was assigned the day after arrival." (Draft Report, p. 738.) These appear to be contradictory statements, as the inmates being referred to within CIM's administrative segregation unit/reception center STRH are in the same unit as the inmates in non-disciplinary segregation. When reading both of these statements together, it is unclear whether inmates received their property the day after arrival, or whether inmates did not receive their personal property and were provided institutional radios as a substitute. CDCR requests these sentences be clarified to explain whether the Report is referring to the same group of inmates. CDCR also requests that the Report include any documentation or sources of information that were used to make both these findings.

### Construction/Space

The Report states: "[t]he treatment space in Facility B lacked confidentiality." (Draft Report, p. 739.) This has been remedied since the tour. The CIM Office Space Management Team reported that the clinician who occupied this treatment space in Facility B was relocated to a different office space. The new office space allows for clinician-patient confidentiality.

### Mental Health/Custody Relations

The Report states:

> "Documentation of Executive Leadership Joint Rounding was provided for the STRH April 2019 through August 2019 and MHCB April 2019 through July 2019. There was no documentation of executive rounding for required programs administrative segregation, reception center STRH or MHCB during September 2019."

(Draft Report, p. 739.) Executive rounding for these programs is only required twice a year and CIM has met this requirement. The second sentence of this paragraph should be removed because it is written as though executive rounds are required each month by the Custody and Mental Health Partnership Plan.

California Institution for Women (CIW)

### Administrative Segregation EOP Hub and PSU

The Report states:

19

> "Consistent with findings from a PREA site visit conducted April 2019, the PSU/EOP hub yard lacked privacy screens around the toilet which allowed officers to view inmates while toileting on the yard."

(Draft Report, p. 767.) CIW confirms this issue has been remedied since the April 2019 site visit. CIW's ASU EOP Hub/PSU (Psychiatric Services Unit) yard now has privacy screens so that the officers are not able to view the inmates while they are on the toilet.

The Report states:

> "Yard was offered daily from 9:00 a.m. to 12:00 p.m. and inmates reported access to ten hours of group weekly. Inmates requested evening groups which were not being offered at the time of the monitor's visit."

(Draft Report, p. 767.) Inmates who have been admitted into CIW's ASU EOP-HUB are offered evening dayroom out-of-cell activities. Furthermore, CIW's ASU EOP-HUB has Re-Start chairs on the dayroom floor.

### Enhanced Outpatient Program

The Report states:

> "[i]nmates did not report problems with returning indoors during heat alerts. The inmates did report that the SCU was very warm and staff reported the swamp coolers had been malfunctioning."

(Draft Report, p. 773.) During the review period, the Supportive Care Unit (SCU) never reached stage two heat alert, which occurs when the temperature in the housing unit rises to 90°F. Additionally, working fans were placed in each hallway within the SCU as an extra cool-down measure.

Thank you for consideration of these comments.

Sincerely,

*/s/ Sundeep Thind*

Sundeep Thind
Attorney
Office of Legal Affairs

20