**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.**

   **Plaintiffs,**

**v.**

              **No. 2:90-cv-0520 KJM DB P**

**GAVIN NEWSOM, et al.**

   **Defendants.**

**SPECIAL MASTER'S REPORT ON HIS EXPERT'S REPORT ON SUICIDES
COMPLETED IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND
REHABILITATION
JANUARY 1, 2017 – DECEMBER 31, 2017**

Attached is the *Coleman* Special Master's expert's Report on Completed Suicides in the

California Department of Corrections and Rehabilitation (CDCR) from January 1, 2017 through

December 31, 2017 ("Report").  This is the nineteenth report by the Special Master's expert[1] on

completed suicides by CDCR inmates.  It is submitted as part of the Special Master's overall

continuing review of defendants' compliance with court-ordered remediation in this matter.

   The Special Master created an internal Suicide Report Workgroup ("Workgroup") to

direct and guide the development of this Report and forthcoming analyses of suicides completed

in the CDCR.  *See* ECF No. 7038 at 2.[2]  The Workgroup is comprised of Lindsay M. Hayes,

M.S., Jeffrey L. Metzner, M.D., Sharen Barboza, Ph.D., Kahlil A. Johnson, M.D., and Kerry C.

---

[1] Members of the Special Master's staff who are mental health experts are referred to collectively as "the Special Master's expert."

[2] References to page numbers for documents filed in the court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system.

Hughes, M.D.  Sharen Barboza, Ph.D. authored the Report.  In preparing the Report, Dr. Barboza, with support from other *Coleman* experts, conducted in-depth clinical reviews and assessments of the health care records and CDCR death review reports for all CDCR inmate suicide deaths during calendar year 2017.

On January 28, 2021, the Special Master filed his Report on His Expert's Analysis of the California Department of Corrections and Rehabilitation's Annual Suicide Report, January 1, 2015 – December 31, 2015, and His Expert's Review of Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2016 – December 31, 2016.  ECF No. 7038.[3]  In that report, the Special Master provided a detailed overview of the history of the 2015 and 2016 suicide report development process.  *Id.* at 11-17.  As part of a broader effort to decrease the occurrence of inmate suicides in CDCR and support opportunities to reduce the scope of the Special Mastership, the Special Master permitted CDCR to write the 2015 annual suicide report "under his supervision and in coordination with his expert."  *Id.* at 3.  As the Special Master reported: "When faced with the opportunity to self-monitor and report, it became clear that defendants were only willing to take on the responsibility for suicide review and reporting on their terms."  *Id.* at 3-4.  In part because of defendants' refusal to utilize the court-ordered definitions of "foreseeable" and "preventable"[4] as part of their suicide analysis and reporting, the Special Master "re-assumed responsibility for drafting suicide reports beginning with the 2016 annual report."  *Id.* at 4.

---

[3] On February 8, 2021, defendants filed objections to the Special Master's Report on his Expert's Analysis of CDCR's Annual Suicide Report January 1, 2015 – December 31, 2015 and his Expert's Review of Suicides Completed in CDCR January 1, 2016 – December 31, 2016.  ECF No. 7052.

[4] Notably, CDCR ceased performing the foreseeability and preventability analyses altogether during 2017.  *See* Report at 26; *see also* ECF No. 7038 at 12 n.8 ("As defendants acknowledge in their response to the Special Master's draft [2015 and 2016] reports, the [Suicide Case Review Committee] stopped conducting foreseeability and preventability determinations in their suicide case reviews in 2017.").

**Special Master's Expert's Report on Suicides Completed in CDCR in 2017**

Among the Special Master's expert's findings in the Report were the following:  In 2017, 30 inmates died by suicide, resulting in the highest rate of suicide (22.9 deaths per 100,000) since 2012.  Report at 1.  Of these 30 deaths, 23, or 77 percent were determined to be either foreseeable, preventable, or both.  *Id.* at 27.  Sixty-seven percent of inmates who died by suicide in 2017 were Mental Health Services Delivery System (MHSDS) participants.  *Id.* at 3.  Hanging was the primary method used by CDCR inmates who died by suicide in 2017, an increase from 2016.  *Id.* at 2.  There was an increase of deaths by suicide among Hispanic/Latinx and African American inmates compared to the rates found in 2016.  *Id.*  Compared to prior years, inmates who died by suicide in 2017 were younger on average, with a plurality (39 percent) of deaths by suicide occurring by those aged 25-34 years.  *Id.*  Finally, five or 17 percent of cases "showed evidence of clinicians failing to identify or document known risk factors during suicide risk evaluations", an improvement over 2016.  *Id.* at 3.

On January 29, 2021, the Special Master provided the *Coleman* parties with a draft version of the Report.  In accordance with regular practice for the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the draft Report.  Plaintiffs' counsel did not submit comments or objections to the draft Report.  On March 1, 2021, defendants submitted their comments and objections to the draft Report.  *See* Letter from Dillon Hockerson, Esq., CDCR Office of Legal Affairs to Special Master Lopes (Mar. 1, 2021), attached hereto as Exhibit A.  After careful review and consideration, the Special Master's expert has revised and clarified relevant portions of the Report where warranted, as discussed in further detail below.

**Defendants' Response to the Draft Report**

Defendants made general and specific objections to the Special Master's expert's draft Report. Generally, defendants objected to the draft Report as duplicative of CDCR's own self-monitoring and reporting on completed suicides. Exhibit A at 1-2.[5] Moreover, defendants expressed their disappointment "in [the Special Master's] decision to resume reporting on suicides to the *Coleman* court, a function that is duplicative and unnecessary." *Id.* at 2.

The Special Master strongly disagrees with defendants' position that the Special Master's reporting on completed suicides in CDCR is "duplicative and unnecessary." Long-standing court orders in this matter require the Special Master to analyze suicides occurring in CDCR and report to the court regarding the same. The history of the Special Master's efforts to work toward delegating the suicide monitoring and reporting function is well-documented and need not be repeated in full here. *See* ECF No. 7038 at 3-4, 11-22. In short, defendants have refused to draft their suicide reports in a manner consistent with existing court orders with respect to foreseeability and preventability determinations. *Id.* at 11-22. Because of their intransigence on these issues and concerns over potentially admitting tort liability regarding inmate suicides, *see id.* at 20, defendants' have opted to write nonconforming, parallel suicide reports and post them on their website. *See id.* at 17. As the Special Master and the court have reminded defendants on numerous occasions, if and when defendants wish to seek relief from relevant court orders, they are free to file a motion with the court.[6] Until then, existing court orders require the Special

---

[5] As defendants note in their letter, CDCR drafted a compendium suicide report covering calendar years 2017-2019 and posted the report on their website. *See* Exhibit A at 1 n.1. The Special Master notes that his expert's Report, compared to CDCR's 2017-2019 compendium report, provides an opportunity to conduct in-depth analysis and identify disaggregated inmate suicide trend data by year. Moreover, as discussed, defendants' suicide reports are not fit for filing with the *Coleman* court due in part to the absence of court-ordered foreseeability and preventability analyses.

[6] The court addressed this issue during the December 18, 2020 status conference: "The Court does not anticipate continuing to churn any issues the parties may want to talk about. This is not a Coleman salon. … [I]n the future,

Master to file annual suicide reports—including foreseeability and preventability analyses—and the Special Master will continue to file his expert's reports with the court.

Defendants continued to object to the Special Master's calculation of the inmate suicide rate: "CDCR objects to calculating the suicide rate based only on the in-state population." Exhibit A at 2.  This objection is perplexing because the Special Master's expert did not calculate the suicide rate based *only* on the in-state population; rather, the Special Master's expert calculated the rate using the combined in-state and out-of-state inmate population.  The draft Report also included an "in-state only" suicide rate calculation to allow for comparison between the 2017 Report and prior annual suicide reports, which only included in-state inmate suicide rate.  Furthermore, in CDCR's own 2015 suicide report, they included an "in-state only" suicide rate to allow for comparison to the Special Master's prior reports.  *See* ECF No. 7038 at 230 (discussing Table 14 of CDCR's 2015 report, which presents "two … frequency and rate of suicide calculation" — one in-state only and one which includes CDCR's out-of-state population— "in order to ensure consistency with past reports prepared by members of [the Special Master's staff]").  Therefore, the Special Master's expert's inclusion of both rates in the Report is entirely reasonable and, consequently, the defendants' requested changes were not incorporated into the final Report.

Defendants also objected to the draft Report's comparison between CDCR's inmate suicide rate and that of other large prison systems.  Exhibit A at 2-3.  As the Special Master has

---

unless I have invited a brief, I'm not calling for briefing unless it appears in support of a motion. … To the extent there is other larding of the docket with legal positions, those are not allowed, and they will be stricken if they still appear."  Reporter's Transcript of Proceedings (RT), ECF No. 7002 at 6:21-7:15.  One of the four issues the court used to exemplify the parties "larding" the docket was defendants' argument regarding foreseeability and preventability:  "And talking about the suicide prevention issue, to the extent defendants' separate statement going on at some length about foreseeability and preventability, referring to those definitions as the Special Master's, there's a passing acknowledgement of the Court's adoption of those definitions.  The Court has adopted those definitions."  *Id.* at 8:10-15.

previously noted, other large prison systems are "likely to be more similar to California in their

dynamics and processes than smaller systems." ECF No. 7038 at 22. Accordingly, comparisons

to other large prison systems are appropriate and consistent with the Special Master's prior

reports. Defendants also requested that the Special Master's expert include the source of the data

from other large prison systems; the final Report includes this source information. *See* Report at

5 n.5.

In response to defendants' comments regarding the draft Report's discussion of suicides

by watch and potential confusion over the definition of "suicidal act," *see* Exhibit A at 3, the

Special Master's expert removed this section from the final Report.

Regarding inmate suicides by security level, defendants reported that "CDCR shows

different numbers for each security level" and requested the Special Master's expert to validate

data regarding suicides by security level.[7] Exhibit A at 3. The Special Master's expert updated

the Report, *see* Report at 13, and included additional information regarding the source of the

security level data. *See id.* at 13 n.19.

Defendants again took issue with the Special Master's expert's discussion of sensitive

needs yards (SNYs): "SNYs program inmates like regular [general population] yards. This false

distinction could result in a misinterpretation of trend data as the statement and analysis

incorrectly distinguishes a classification type from a housing type." Exhibit A at 3. In response

to this objection, the Special Master's expert made clarifying formatting changes to the Report

---

[7] Defendants also challenged the draft Report's statistics regarding the number of inmates on involuntary medication orders that committed suicide in 2016 and suggested the Special Master's expert validate the data. *See* Exhibit A at 4. As noted in the Special Master's Report on His Expert's Analysis of the California Department of Corrections and Rehabilitation's Annual Suicide Report, January 1, 2015 – December 31, 2015, and His Expert's Review of Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2016 – December 31, 2016, the numbers have been validated based on the information provided to the Special Master. *See* ECF No. 7038 at 6-7. However, because this data was only included in the 2017 report for comparison purposes, the sentence defendants objected to was removed from the final Report.

but did not change the substance of the analysis regarding SNYs and inmates with safety concerns who committed suicide in 2017.  *See* Report at 16-17.

In response to the defendants' concerns with the draft Report's discussion of Administrative Segregation Unit intake cell policy, *see* Exhibit A at 4, the Special Master's expert made clarifying edits to the Report.  *See* Report at 16-17.

As noted, defendants continue to take issue with the Special Master's expert's long-standing, court-ordered analysis of suicide preventability and foreseeability:  "The Special Master's assumption that the foreseeability and preventability analyses can 'reduce the likelihood of completed suicides' grossly ignores the evidence to the contrary of such a conclusory statement."  Exhibit A at 4-5.  Accordingly, defendants objected to the foreseeability and preventability discussion in its entirety and requested the section be removed from the draft Report.  *Id.* at 5.  The history of the Special Master's expert's foreseeability and preventability analyses—and defendants' historical opposition to this critical information being reported to the court—is well-established.  *See* ECF No. 7038 at 17-22.  The Special Master and his expert will continue to draft and file annual suicide reports in conformance with existing court orders, including foreseeability and preventability analyses.

**CONCLUSION**

The inmate suicide rate among CDCR's inmate population in 2017 — 22.9 deaths per 100,000 — was its highest since 2012.  Report at 1.  In 2017, a CDCR inmate committed suicide every 12.1 days.  *Id.*  The Special Master's expert's analysis of completed suicides in 2017 continues to show that a significant portion of inmate suicides were foreseeable (43 percent) or preventable (77 percent).

The Special Master agrees with the conclusions included in his expert's Report.  Because these conclusions track prior court orders and the general mission of the Suicide Prevention Management Workgroup, they need not be reiterated in additional court orders at this time. Accordingly, the Special Master requests that the court adopt in full the attached Report by Dr. Sharen Barboza, Ph.D. on Completed Suicides in the California Department of Corrections and Rehabilitation from January 1, 2017 through December 31, 2017.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr.
Special Master

March 11, 2021

# EXHIBIT A

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



March 1, 2020

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write in response to your January 29, 2020 draft Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017 (hereinafter referred to as "the Special Master's Expert's Report" or "Report"). CDCR remains concerned that the Special Master's Expert's Report mostly simply duplicates self-monitoring already conducted by CDCR and CDCR's own comprehensive report on suicides that occurred in 2017. As discussed in more detail below, CDCR believes it has established a means of self-monitoring by publishing its own review of suicides completed in 2017.[1] The report includes not only CDCR's findings but also identifies a range of measures to enhance suicide prevention and response efforts.

You have stated that your own experts must resume reporting on annual suicides because CDCR has stopped conducting a "foreseeability" and "preventability" analysis using the same definitions used in your expert's reports. (*See* Special Master's Report on his Expert's Analysis of the California Department of Corrections and Rehabilitation's Annual Suicide Report January 1, 2015 – December 31, 2015 and his Expert's Review of Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2016 – December 31, 2016, ECF No. 7038 at 4.) CDCR reiterates its position that current developments in community standards on death reviews question the utility of narrow "foreseeability" and "preventability" analyses of the type in dispute. The analysis of whether a death was foreseeable or preventable diverts attention away from opportunities for improvement and to enhance suicide prevention efforts. For these reasons, the field of mortality review has largely shifted away from the narrow foreseeability/preventability determinations to a more holistic approach focused on quality improvement. (Defendants' Objections to the Special Master's Report on his Expert's Analysis of CDCR's Annual Suicide Report January 1, 2015-December 31, 2015 and his Expert's Review of Suicides Completed in CDCR January 1, 2016-December 31, 2016, ECF No. 7052 at 4.) As stated above, CDCR objects to the Special Master's Expert's Report as substantively similar to CDCR's 2017-2019 Aggregate Suicide Report. The Special Master's addition of an outmoded

---

[1] On February 1, 2021, CDCR published its 2017-2019 Aggregate Suicide Report on its public website. CDCR's 2017-2019 Aggregate Suicide Report can be accessed on its public website at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf (last accessed on 2/26/2021.)

"foreseeability" and "preventability" analysis does not warrant the need for the Special Master to conduct a separate report.

The Special Master's report is duplicative as demonstrated by CDCR's transparent reporting. For example, CDCR's 2017-2019 Aggregate Suicide Report honestly and critically assessed every suicide that occurred in 2017, including assessing policy violations and implementing corrective actions to prevent further violations. As a direct result of CDCR's reports, as well as CDCR's comprehensive annual suicide prevention report to the Legislature pursuant to Penal Code section 2064.1, CDCR will be better able to prevent and reduce the number of completed suicides within its institutions.

CDCR remains disappointed in your decision to resume reporting on suicides to the *Coleman* court, a function that is duplicative and unnecessary. (ECF No. 7052 at 3.) Additional objections and comments to your expert's report are set forth below.

I.      **The Suicide Rate Denominator Must Include All CDCR Inmates; Excluding Out-of-State Inmates from the Denominator Misleadingly Inflates the Suicide Rate.**

The table on page 4 of the Special Master's Expert's Report provides two calculations of CDCR's suicide rates per 100,000 from 2007 to 2017. The second column in the table represents CDCR's suicide rate based solely on CDCR's in-state population, and the third column represents CDCR's suicide rate based on CDCR's total population (in- and out-of-state inmates). CDCR objects to calculating the suicide rate based only on the in-state population. Inmates housed out-of-state are subject to CDCR's suicide prevention policies and Title 15, including conducting a Suicide Case Review Report, as necessary. Excluding CDCR inmates housed out-of-state does not adequately capture the population for which CDCR is responsible for. Indeed, excluding out-of-state inmates[2] from the calculation artificially raises the suicide rate from 22.9 per 100,000 inmates to 23.7 per 100,000 inmates, which results in a total inflation of 0.8 per 100,000 inmates. The rates reported in the "CDCR Prisons In-State Only" column in the table on page 4 should be stricken.

II.     **Comparison to Other Large Prison Systems in the Country Is Arbitrary, Inconsistent with Prior Reports, and Lacks Foundation.**

The Special Master's Expert's Report at page 5 compared CDCR's population and suicide rate with four other "large prison systems," stating CDCR's "suicide rate is the 2nd highest rate out of the five largest correctional systems." First, CDCR objects to the comparison to the other four large prison systems because the analysis does not account for the different demographics, population, applicable laws, and other variables. Second, comparing CDCR with just four other prisons is inconsistent "with the Special Master's prior practice of including comparisons between CDCR and the ten largest prison systems. . . ." (ECF No. 7038 at 22-23.) Lastly, the Report fails to provide a citation or reference for the data provided in the table on page 5.

---

[2] A total population of 4,273 inmates as of December 31, 2017.

Special Master Lopes
Page 3

CDCR objects to the expert's comparison as it is arbitrary, is inconsistent with the previous reports by the Special Master's experts, and does not provide a source of reference for the data provided in the Report. Therefore, the analysis and conclusions must be stricken from the Report.

## III.    Unclear Definition and Analysis of Time of "Suicidal Act."

The Special Master's Expert's Report states "[s]uicides were relatively consistent across time of day with 33% of suicidal acts occurring during first watch (22:01 to 06:00), 37% during second watch (06:01 to 14:00), and 30% during third watch (14:01 to 22:00)." (Report at 8.) It is unclear whether *suicidal act* is defined as *time of discovery*. The data and analysis in the Report may be misleading depending on how the Special Master's experts define "suicidal acts." For example, a suicidal act of overdosing or laceration may result in a different time of discovery of a decedent's body. CDCR requests the Special Master clarify the experts' definition of "suicidal act" and modify the analysis accordingly.

## IV.    Security Level.

The Special Master's Expert's Report states "[f]ourteen inmates, or 47%, who died by suicide in 2017 were classified as Level IV. Five inmates, or 17%, were classified as Level II, four (13%) were classified as Level III, four (13%) were unclassified and one inmate (3%) was classified as Level I. For two inmates (7%) who died by suicide in 2017, classification levels were not available." (Report at 13.) CDCR shows different numbers for each security level: 16, or 53%, as Level IV; five, or 17%, as Level III; two, or 7%, for both Levels II and I; and five, or 17%, as unclassified. CDCR requests that the Special Master's team check their data again and update the Report accordingly.

The Report also states "in 2016, 78% of inmates were classified as high security." (*Id.*) CDCR reiterates its concern that the percentage does not accurately reflect the percentage of high security inmates that completed suicide in 2016.[3] CDCR requests the Special Master's experts review the percentage and update the Report as necessary.

## V.    "Sensitive Needs Yard" is a Classification, Not a Housing Type.

Under the Housing Type section on pages 16 and 17 of the Report, the Special Master's expert differentiates the housing type of General Population (GP) with the classification of Sensitive Needs Yard (SNY). SNYs program inmates like regular GP yards. This false distinction could result in a misinterpretation of trend data as the statement and analysis incorrectly distinguishes a classification type from a housing type. CDCR objects to this distinction and requests the Special Master's experts update the Housing Type section as well as the table on page 16 of the Report.

---

[3] "The Special Master's 2016 Annual Suicide Report states that "[f]ourteen inmates, or 52%, who died by suicide in 2016 were classified as Level IV. Seven inmates, or 26%, were classified as Level III, five (19%) were classified as Level II and one inmate (4%) was unclassified at the time of his death." (Appendix C at 14.) CDCR shows different numbers – seventeen inmates in Level IV, five in Level III, four in Level II, and one unclassified." (ECF No. 7052-1 at 15.)

Special Master Lopes

Page 4

## VI.     Misstatement of Administrative Segregation Unit Intake Cell Policy.

The Special Master's expert misstates CDCR's policy on the use of single-cell Administrative Segregation Unit (ASU) intake cells.  On page 17, the Report states that an "inmate was alone in his *ASU intake cell* after his cellmate had been relocated. Policy requires another cellmate to be placed in the cell within eight hours . . . ." (*Emphasis* added.)  According to CDCR policy:

> Inmates approved for double-cell housing who can be safely double-celled upon intake, and for whom an appropriate cell partner is available, shall be celled where the vacancy exists and will not require housing in a designated ASU intake cell. Under this revised policy, when inmates are in their initial 72 hours of ASU placement and their cell partner subsequently moves out of the cell, ASU staff shall immediately make every effort to identify another compatible cellmate. If the inmate cannot be double-celled with a compatible cellmate, ASU staff shall place the inmate into an available retrofitted intake cell as soon as possible, but no later than eight hours after the cell partner has been moved from the cell.

(CDCR Memorandum, dated October 30, 2015, "Revised Administrative Segregation Unit Intake Cell Procedure".)  CDCR's policy allows inmates to be single-celled in an ASU intake cell.  A new cellmate only needed to be found if the first inmate was *not* in an intake cell.  CDCR objects to the misapplication of policy and requests it be stricken from the Report.

## VII.    Incorrect 2016 Percentage Reported for Involuntary Medications.

The Special Master's Expert's Report claims that 26% of suicides from 2016 were under an involuntary medication order pursuant to Penal Code section 2602.  (Report at 21.)  Similar to the comment under section V, *supra*, CDCR noted only five inmates were under such an order in 2016[4] and requests the Special Master to check their numbers for 2016 and update the percentage accordingly.

## VIII.   Determinations of "Foreseeability" and "Preventability" in the Manner Presented in the Report May Be Counterproductive in a Mortality Review Context and Hinders Quality Improvement Effort.

The Special Master's Expert's Report states the "foreseeability" and "preventability" analyses can "describe the adequacy and implications of CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgement, and utilization of clinical and custodial alternatives to reduce the likelihood of completed suicides."  (Report at 25-26.)  The statement that the "foreseeable" and "preventable" analysis can reduce the likelihood of completed suicides is conclusory and not supported by evidence.  The Special Master's assumption that the

---

[4] *See* ECF No. 7052-1 at 16.

foreseeability and preventability analyses can "reduce the likelihood of completed suicides" grossly ignores the evidence to the contrary of such a conclusory statement.[5]

As previously stated, many experts question the utility of foreseeability and preventability determinations in a mortality review context.   Among other things, foreseeability[6] and preventability determinations in the manner requested by the Special Master do not adequately acknowledge that deaths occur in a complex system and that causative factors beyond proximate cause of death are potentially important for identifying opportunities for improvement.[7] Ultimately, such narrow foreseeability and preventability determinations frequently divert attention away from opportunities for improvement that will lead to system-wide quality improvement and patient safety.

That is why the field of mortality reviews itself has largely shifted away from narrow foreseeability and preventability determinations to a more holistic approach that focuses on opportunities for improvement.[8]   Under the modern view, a well-performing mortality review system will identify "opportunities for improvement" leading to "quality improvement, patient safety, and/or clinical education responses (immediate change) or initiatives (longer term) that are then evaluated to determine whether they yielded improvements along relevant clinical benchmarks."[9]  This system requires the buy-in and participation of multiple actors who may be less willing to participate if the focus of the review is on foreseeability and preventability determinations whose purpose is to identify the person (or people) to blame for allegedly causing death.[10]   Accordingly, for the mortality review system to work properly—and to increase motivation for practice modifications and constantly promote organizational learning—there must be a shift away from terms like "foreseeable" and "preventable" and towards assessments that focus on opportunities for improvement.[11]   At the same time, such assessments should include staff level remediation, including training and accountability measures where appropriate.

CDCR objects to section III, *I*. "Foreseeability and Preventability" (Report at 25-28), and requests that section be removed from the Report.

/ / /

/ / /

/ / /

---

[5] Williams, B., Ahalt, S., Witt, L. (Final Report, Sept. 27, 2018). Assessing Medical Systems for the California Prison Health Care Receivership Corporation: Mortality Review Policy and Practice. The Criminal Justice & Health Program at UCSF, 3-4. https://cchcs.ca.gov/wpcontent/ uploads/sites/60/UCSF/Mortality-Review-Report.pdf
[6]  The specific term "foreseeability" is not addressed in Dr. Brie Williams's Final Report. However, the term is as problematic as the term "preventability" because it focuses on identifying past proximate causation rather than future opportunities for improvement.
[7] *Id.* at 4.
[8] *Id.* at 14-15 (recommending that performance be tracked without relying on subjective and often variable assessments of "preventability" to emphasize quality improvement via identification of opportunities for improvement).
[9] *Id.* at 5.
[10] *Id.* at 4.
[11] *Id.*

Special Master Lopes
Page 6


      Thank you for your consideration of these objections and comments prior to finalizing this reports.


Sincerely,


/s/ **Dillon Hockerson**

DILLON HOCKERSON
Attorney
Office of Legal Affairs