**APPENDIX A**

**CASE SUMMARIES**

Case A

I.   <u>Summary of Case</u>

Case A was a 38-year-old female who was found by a peer who alerted correctional officers that the inmate was hanging in her single cell on a Level III, general population yard, on August 23, 2017.  She was not a participant in the Mental Health Services Delivery System (MHSDS) at the time of her death.

She was born in Hawaii and moved to California at the age of 16.  Other than documentation that her parents separated when she was young, and her father died when she was 25-years old; further family history was not documented.  She had a 13-year relationship with the father of her 10-year old daughter.  The relationship was reportedly abusive and both parties used substances.  Since the end of the relationship in 2010, the inmate had limited contact with her daughter, and in time her parental rights were restricted due to her substance abuse.  Records indicated she began using marijuana at age 16, which she used into her twenties.  During her mid-thirties, the inmate began using methamphetamine and quickly advanced from smoking to intravenous use.  A diagnosis of Alcohol Use Disorder was provided in her healthcare record, but specific details were not available.

The onset of this inmate's criminal history began in 2013, the same year she began using methamphetamine.  Over the course of four years, she had a history of multiple instances of probation non-compliance including failure to complete court ordered residential substance abuse treatment programs (twice) and ongoing substance abuse.  She was ultimately arrested on November 28, 2016 for violation of probation and admitted to her first California Department of Corrections and Rehabilitation (CDCR) term on January 18, 2017 for index charges of burglary and stalking (father of her daughter).

Her incarceration was unremarkable with no disciplinary actions or appeals.  Three months into her sentence, she was placed in fire camp program housing which resulted in an institution transfer.  A month after her transfer, she was recommended for placement into the fire camp program by an Institution Classification Committee (ICC) pending a second ICC review due to the stalking conviction.  During the second ICC review on July 12, 2017, she was approved for the program; however, the Warden did not grant her a gate pass due to the stalking conviction.  An August 10, 2017 calendar entry, "No Gate Pass" "Fuck it," found in her property corresponded with the day she learned of the Warden's decision to deny the gate pass.  Five days later, she was notified by ICC of the decision and plan to review her case in six months.

Case A had a childhood diagnosis of Attention Deficit/Hyperactivity Disorder (ADHD).  As an adolescent, she was provided with diagnoses of depression and Bipolar Disorder.  Her medication history included trazodone, fluoxetine and amphetamine/dextroamphetamine which were discontinued when she lost insurance in

2013, also the same year she began using methamphetamine. She engaged in counseling intermittently as an adolescent as a condition of probation. In 2014, she was evaluated at but not admitted to a local emergency room for "Multiple Personality Disorder traits" and a suicide threat. Throughout her second court-ordered admission to a residential substance abuse treatment program she engaged in cutting; specific details were not provided in available documentation. She was ultimately discharged from the program due to her mental health issues.

According to the Mental Health Primary Clinician Initial Assessment, the inmate denied current mental health issues. The Suicide Case Review (SCR) noted that pertinent clinical information from the Probation Officer's Report was not included in the assessment (prior mental health diagnoses, prior psychiatric medication since the age of 14, history of cutting and progression of mental health symptoms in the past four years prior to incarceration were not documented). A diagnosis of Mood Disorder, absent clinical rationale, was documented in the initial assessment. She was placed in the Correctional Clinical Case Management System (3CMS) level of care due to medical necessity, and she was prescribed trazodone. During the initial psychiatric evaluation, the inmate denied mental health symptoms and requested to discontinue psychotropic medication. Psychiatric documentation of the plan was: "1. Discussed about prison policy of prescribing Trazadone. I decreased and stopped. 2. Continue Therapy." Two weeks after the initial evaluation and one week after the medication was discontinued, she was removed from the MHSDS by the clinician who completed the initial assessment. The SCR noted that the rationale for removal from the MHSDS was lacking. A review of the healthcare record indicated that the process for removal was unclear. Documentation from a February 15, 2017 clinician's progress note indicated that the inmate was "recently placed at GP level of care and discharge from MH SDS" [sic], suggesting that she had been removed from the MHSDS in advance of this contact."

The day of her suicide, the inmate spoke to her mother, but an attempt to reach her brother (similar to most attempts) was unsuccessful. During the conversation with her mother, she stated "I'm really tired of being here," "I don't feel good, I never really feel good." Her mother told her not to "think about it", and the conversation shifted to the mother's daily activities. Case A interjected and again re-iterated the difficulty she was having and ended the call expressing her love for her family.

Documentation in the SCR of interviews with the fire camp program captain and three housing unit officers indicated that they were surprised by the inmate's death. The captain reported that she accepted the gate pass decision and expressed "motivation and determination to maintain a positive program." The inmate continued to attend alternative vocational training and enrolled in cosmetology training on August 5, 2017, the same day as the ICC meeting. A friend who had last spoken to her two days before her death described her as "more down."

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.   <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not preventable.

IV.   <u>Critique of Suicide Case Review Report</u>

The SCR was an adequate summary of this case and included available social, criminal, incarceration, substance use and mental health history.  It provided a reasonable assessment of the precipitants to this suicide but could have been improved with consideration of perceived lack of support from her family likely experienced by the inmate.  Provided recommendations followed from the content and findings of the report.

There was no recommendation to address the transfer of an inmate to fire camp program housing in advance of full ICC and warden approval.  The inmate had been housed with program participants for several months when the gate pass was denied.  The SCR indicated that she had been participating in daily physical regimens for fire camp until the gate pass was denied.  Addressing admission to fire camp program housing and participation in advance of full approval is needed given the emotional impact of beginning a positive program with expectations for full participation, only to have it denied.

V.   <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in two required Quality Improvement Plans (QIPs) which required RC staff training, completed during a staff meeting.  Meeting minutes and the two-separate staff training sign-in sheets were provided as proof of practice.  Meeting minutes indicated that the meeting in which two training sessions were completed lasted one hour; however, documentation of the sign-in sheet indicated that each training lasted an hour.  Completion of the QIPs occurred the day before (October 19, 2017) the final SCR was dated (October 20, 2017).  This QIP response was considered problematic as a result.

The first QIP addressed lack of inclusion of pertinent clinical information from the Probation Officer's Report and other collateral sources in the clinician's initial assessment.  An audit of ten RC intakes was to be conducted with the best course of action to include training to all RC clinical staff.  In accordance with the QIP, an audit of ten RC intakes was conducted, followed by staff training to include relevant collateral

4

information during a bi-weekly RC staff meeting.  While not required, the training was also provided to all mental health staff; although proof of practice was not provided outside a December 19, 2017 memo regarding implementation of the QIP.  Training met the minimal requirement of the QIP; however, training alone does not ensure sustainability and is therefore assessed as inadequate.  To ensure sustainability, continued audits of inclusion of collateral documentation should have been recommended until a reasonable threshold of compliance was met for a reasonable period of time.  Provision of examples of "best course of action" would have been useful for the institution.

The second QIP addressed the lack of documented rationale for removal of the inmate from the MHSDS.  In accordance with the QIP, training with RC staff regarding documentation of a thorough rationale for level of care changes was completed.  The QIP was insufficient for a number of reasons.  First and foremost, it did not address the psychiatrist's recommended plan to "continue therapy."  Second, the need for collaboration to discuss level of care changes between treatment providers was not included in the QIP.  The removal from the MHSDS a week after medication discontinuation is not consistent with the 2009 Program Guide which requires that, "Inmate-patients may be clinically discharged from 3CMS if they have been in continuous remission and are functioning adequately in the mainline without treatment (including medication) for six-month."  Lastly, the QIP did not address clinician's documentation that conveyed that the removal from the MHSDS occurred in advance of the clinician's contact.

There was no recommendation for a QIP to address psychiatric documentation, "Discussed about [sic] prison policy of prescribing Trazadone."  A statewide policy regarding this is unknown and clarification is necessary.

## Case B

I.  <u>Summary of Case</u>

This inmate was a single 28-year-old African American man who was found by correctional officers hanging in his single Mental Health Crisis Bed (MHCB) cell on August 29, 2017.  He was admitted to the ICU and maintained on life support until his death on September 21, 2017.

Born and raised in Sacramento, CA, the inmate was placed in foster care at age 13 due to neglect and physical abuse by his mother.  He had no contact with his father who had an extensive criminal history.  His brother and grandmother committed suicide.  Behavioral and emotional regulation problems with alcohol and drug use (cocaine, ecstasy, marijuana) began during childhood.  He had an extensive history of gang involvement beginning at age 10.  He had three children from three different relationships.

The inmate's criminal history began at age 11 and resulted in commitment to the Division of Juvenile Justice (DJJ) until age 21. Within a year of release from DJJ, he was arrested for possession of a firearm and inflicting corporal injury on a spouse or cohabitant and committed to CDCR for two years. He was committed to CDCR for his second term in April 2015 to serve life with parole for murder. Similar to his commitment to DJJ, while in CDCR, he had numerous disciplinary actions for violent offenses which resulted in extension of his initial parole eligibility date from 2069 to 2095.

Documentation indicated an extensive history of mental health issues beginning during childhood. During his second CDCR term, he was treated at the 3CMS level of care for the first three months and then elevated to the Enhanced Outpatient Program (EOP) level of care. According to the SCR, his level of care was changed as needed, and he alternated between EOP and inpatient levels of care. In the two and a half years he was in CDCR custody, he was housed in eight different institutions. Of note, six of his eight MHCB admissions were to different facilities. Treatment goals generally targeted mood stability, stress tolerance and decreasing/eliminating suicidal thoughts/behaviors. He had a long history of threatening and engaging in self-harm and suicide attempts. Suicide attempts were planned and impulsive, and he had a pattern of conditional suicidal statements and self-harm in the presence of staff. Although the SCR identified concerns with three suicide risk evaluations, it was documented that most treatment teams appropriately assessed his level of risk. He was intermittently adherent with treatment including clinical contacts and psychiatric medication.

Issues regarding the need for diagnostic clarification were persistently present regarding this inmate. Earlier diagnoses included ADHD, Bipolar Disorder and Depressive Disorder, Not Otherwise Specified (NOS). CDCR diagnoses ranged from Mood Disorder, Schizoaffective Disorder and Depressive Disorder. The SCR noted that several documents recommended psychological testing, which was completed on April 25, 2017 and provided diagnostic recommendations of Borderline Personality Disorder and Histrionic Personality Disorder. While the SCR noted diagnoses of Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, Mood Disorder NOS, and Antisocial Personality Disorder at the time of his death; treatment plan documentation noted Major Depression with psychotic features, Bipolar Disorder, Borderline Personality Disorder and Antisocial Personality Disorder. Trauma symptoms and consideration of Posttraumatic Stress Disorder (PTSD) were documented during the most recent MHCB admission.

After a period of five months of general stability at the EOP level of care, the inmate's mental status declined in May 2017. This began with a Rules Violation Report (RVR) for indecent exposure on May 2, 2017. That same day, he reportedly ingested a large dose of pills and was sent to an outside hospital. SCR documentation regarding the toxicology screen was conflicting; in one area, results were negative but later in the report, the lab results were reported as inconclusive. Upon return to the facility from the hospital, the inmate tied a shoelace around his neck. He was admitted to the MHCB on

6

May 3 and transferred to an Intermediate Care Facility (ICF) on June 9, 2017 shortly after he made another suicide attempt by overdose.  There were varying accounts of the dose, name and number of pills ingested.  Upon admission to the ICF, the inmate began cutting his arms.  A behavioral incentive treatment plan to address aggressive behavior was developed and was reportedly useful.  A review of a clinician contact indicated that construction on the tier resulted in all inmate's individual contacts and Interdisciplinary Treatment Teams (IDTTs) being conducted at cell-front.  Construction also prevented out of cell programming, including group treatment.  On August 8, 2017, the inmate boarded up his cell window and severely assaulted five Medical Technical Assistants (MTAs) upon entry to his cell.  He was discharged from ICF two days later.  According to the SCR, he was placed in the Administrative Segregation Unit (ASU); although documentation in the healthcare record indicated immediate referral and admission to the MHCB.  According to the SCR, ICF discharge documentation was in accordance with the 2009 MHSDS Program Guide inpatient discharge guidelines.

Shortly after admission to the MHCB, the inmate was referred to the ICF on August 15, 2017; however, admission was denied due to an assessment that his symptoms and functioning were driven by a personality disorder.  An IDTT was conducted on August 29, 2017, when the inmate was informed of the denial and a plan to discharge him to EOP ASU.

A review of documentation indicated varying accounts of whether the inmate made a suicidal statement or his behavior/statements implied suicidality at the IDTT.  Regardless, he was assessed as "high risk" with no impulse control and placed on one-to-one observation.  He refused to relinquish his property, which remained in his cell for the duration of the one-to-one observation period.  There were numerous discrepancies documented in the Crime/Incident reports and other documents surrounding this inmate's death by hanging in his MHCB cell under one-to-one observation.  The institution's Warden submitted a CDCR 989, Office of Internal Affairs (OIA) Investigation Request.  The pending investigation resulted in the minimal staff interviews.

Of note, outside hospital admission documentation indicated that a urine drug screen was positive for amphetamine and methamphetamine.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was foreseeable.  The inmate had a long history of self-harm threats and behavior with poor distress tolerance, both exacerbated by stressful events.  According to the SCR, his self-harm behaviors were assessed by most clinical teams as a "serious risk."  Further, the SCR included an Integrated Suicide Risk Assessment from the Department of State Hospitals (DSH) inpatient program from June 20, 2017 documented that "…it remains possible that he may one day lethally injure himself without intent to do so."

7

On the day of his suicide, he experienced two significant stressors (ICF rejection and premature discussion to discharge him to ASU, an environment he had not historically tolerated well).  He was placed on one-to-one observation; however, despite an order to remove property, he continued to have access to items in his cell to harm himself.  Throughout the next several hours the inmate exhibited multiple behaviors, including statements of intent to hang himself, covering the windows with poor visibility into the room and creating a noose; all indications of intention to engage in self-harm.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  Consistent with the California Correctional Health Care System (CCHCS) Death Review Summary, the Special Master's expert determined that this death was preventable.  There were multiple delays in the activation of the emergency response and 911.  Staff failures included the removal of property per provider orders, appropriate response to self-harm behaviors despite the inmate being on one-to-one observation and notification of mental health staff.

IV.   Critique of Suicide Case Review Report

The SCR was an adequate summary of this case and included relevant social, criminal, incarceration, substance use and mental health history while identifying limitations posed by the pending OIA investigation.  It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report.

There were several areas that warranted further discussion.  The first was the multiple institutional transfers which resulted in multiple treatment team changes.  Provider changes exacerbated an already existing challenge in the development of a collaborative therapeutic relationship for individuals with case factors like this inmate and made it nearly impossible to develop a strong therapeutic rapport, a necessary ingredient for successful treatment.  Another important factor that was overlooked was the lack of out of cell programming at the inpatient program that was documented in the healthcare record as a contributing factor to the events that led to his return to CDCR.  Additional areas the SCR did not discuss were the need to engage this non-compliant individual with treatment (a behavior management plan could have targeted this issue) and the possibility that staff concerns that he exceeded the maximum ten-day MHCB length of stay (there was documentation in the healthcare record that staff were cognizant of the extended stay) contributed to the premature discussion during IDTT of discharge to the EOP ASU.

Discrepancies in the SCR were noted regarding diagnosis at the time of death and the results of a May 2017 toxicology report after an ingestion of pills.  Also, on page 21, the last sentence in the first paragraph under mental health concerns was incomplete.

Specifically, "Although the SRE [suicide risk evaluation] appeared to correctly identify suicide risk factors, the risk formulation appears to underestimate his risk, particularly…" Similarly, items 1 and 2 in the 'problem' box under section IX "Recommendations" were unclear to the reader.

Allegations from an inmate interview of inappropriate staff statements and behavior, and that content from the Ambu Bag was missing, were documented in the SCR. The transcript of the interview was submitted to be added to the CDCR 989, OIA Investigation Request. Regardless of whether these areas of concern were included in the investigation, a statement of the status and need for a QIP pending the outcome was needed.

V.   Analysis of Quality Improvement Plan Process

This case resulted in 23 required QIPs; three were related to mental health concerns with a focus on suicide risk evaluations; nine were related to custody concerns and 11 were related to nursing concerns.

The first two mental health concerns were related to the quality of three suicide risk evaluations that were completed at two institutions. The QIP was for suicide risk evaluations in question and 15 additional suicide risk evaluations (completed by the clinician who completed the suicide risk evaluation of concern) to be reviewed with course of action to be determined by the facility. Both institutions completed the reviews but had different plans of action. During the completion of the reviews, it was determined that there was a pattern of deficiencies in suicide risk evaluations. The QIP response addressed training, an important first step; however, the QIPs were inadequate as sustainability was not ensured and underlying factors that contributed to the pattern of deficiencies in suicide risk evaluations were not identified and addressed. To ensure sustainability, continued audits of suicide risk evaluations should have been considered until a reasonable threshold of compliance was consistently met for a reasonable period of time.

The third mental health concern addressed the lack of suicide risk evaluation following MHCB discharge on May 25, 2017. The corresponding QIP was adequate, and proof of practice addressed the identified issue with a plan for continued review.

Additional QIPs related to mental health were needed. A statewide joint mental health and custodial QIP to address continuity of care to consider ways to minimize treatment team changes through frequent facility transfers was necessary. Relatedly, the inmate had multiple diagnoses that varied across institutions. A statewide QIP to address diagnostic clarification and utilization of psychological testing was needed. A QIP regarding the decision not to appeal the ICF rejection was lacking. Close coordination of care for this shared patient with the inpatient program was another needed QIP.

Elimination of self-injurious behavior as a treatment goal for this individual was an unrealistic goal. A QIP to address treatment planning (specifically the need to obtain baseline assessment to determine realistic goals) and behavior management plans was needed.

An investigation was pending for six of nine identified custody concerns related to emergency medical response and implementation of the Use of Force policy. A CDCR 989 was submitted to the OIA. The investigation was pending at the time of completion of the final QIP. Upon completion of the investigation, the institution was required to submit a memo describing actions take to address identified problems. As of this writing, the memo has not been received by the Special Master's team.

One of the remaining three custodial areas of concern addressed lack of full visibility into MHCB cells due to cell layout and corresponding documentation of this inmate while on one-to-one observation. This is partially addressed through the above referenced investigation. Regarding cell layout, it was determined that significant reconstruction of the unit would be needed to achieve full visibility in all but 12 cells. To mitigate risk, inmates who were assessed as higher suicide risk were to be placed in cells with full visibility. This response was insufficient and contingent on 1) correct identification of risk which was determined as an area of concern in this case, and 2) the level of risk remaining unchanged while the inmate is in the MHCB.

The last custodial issue was the inmate's access to a piece of a no-tear safety blanket that was used to fashion the noose utilized to hang himself. Staff training occurred, and a memo was distributed in response to the QIP to review responsibilities related to linen exchange. This was adequate and would have been strengthened with the addition of cell searches when inmates are not in the cells regardless of the results of the linen exchange assessment. Relatedly, there was no QIP regarding the documentation of a metal object tied to the blanket in the SCR.

Of note, proof of practice documentation from custody and mental trainings documented who attended; however, it could not be determined if all staff that were required to attend were in attendance as a list of staff assigned to these areas was not utilized.

There were 11 nursing concerns identified in the SCR, three systemic process issues, six issues pertaining to nursing lapses in care, and two lapses in emergency response. Per the QIP, the institution's Chief Nursing Executive was required to address identified issues and to determine actions needed. With the exception of the first nursing issue (absence of a missing Health & Physical) documentation was inadequate. Specifically, proof-of-practice documents were not sufficiently individualized to address specific areas of concern. Additionally, training dates and content were unable to be determined. An individualized response would have included role plays/drills and documentation of real time audits with supervision as appropriate.

Case C

I.   Summary of Case

This inmate was a single, 35-year-old Latino man who was found by correctional officers non-responsive in his PSU single cell on July 19, 2017.  He was found with ligature wrapped tightly around his neck, presumably attached to a light fixture before discovery. Early rigor mortis had set in.  He had been discharged from the MHCB to the EOP level of care within days of his death.

The inmate was raised by his paternal grandparents in California.  His relationship with his parents was described as "difficult" in the SCR.  After achieving his General Educational Development (GED), he attended some college.  He had various jobs which were negatively impacted by substance use.  He began using marijuana as an adolescent which expanded to alcohol, methamphetamine, ecstasy, cocaine and mushrooms at age 19.  He was gang involved at age 15 but ultimately separated from the gang.  He had a 15-year-old son who was also being raised by his grandparents.

His third CDCR term began in August 2015 following a conviction for first-degree murder with a life with parole sentence.  While in CDCR, he had 11 Rule Violation Reports, the majority of which were for aggressive behavior toward others.  His final RVR, occurred on April 21, 2017 for attempting to kick another inmate.  According to the SCR, his clinician found an "association between the behavior that triggered the RVR" and his mental health issues.  However, mental health factors were not identified in the consideration of consequences.

Mental health treatment was initiated while in custody during his second term at the 3CMS level of care.  During his third term after a brief period at 3CMS level of care, he alternated between EOP and MHCB levels of care for treatment of mania, hypomania, depression, psychotic symptoms and suicidal ideation.  His time in EOP did not exceed four months.  On August 14, 2016, he reported a suicide attempt via overdose and was admitted for his second of six MHCB admissions.  The overdose was viewed as an attempt to obtain an inpatient referral.  During MHCB admissions he responded well to psychiatric medication adjustments, and a PC 2602 was initiated during a four week stay in February 2017.  Following that discharge, he remained at the EOP level of care for two months before returning to the MHCB for five weeks where the focus was on medication adjustment.  He was discharged from his last MHCB admission after five weeks on June 12, 2017 and returned to the PSU on June 14, 2017.  There were no inpatient program referrals.

The day before his suicide, he had a visit (one of at least 14 visits since January 2017) from his paternal grandparents.  Upon notification of his death, they reported that during the visit he was apologetic for perceived problems, and "he no longer wanted to be a part of this world" and saw no future for himself.  Of note, family visits appeared to be a

11

precipitant to decompensation for him.  The SCR indicated that after family visits in April 2017, his mental status declined.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was preventable.  The SCR indicated that provider documentation indicated "early signs of rigor mortis with significant rigidity." While  security/welfare checks were documented as completed, per the SCR, "it appears that visual/physical observation of a living, breathing inmate, free from obvious injury as required did not occur."  A CDCR 989 addressing this issue was submitted to the Office of Internal Affairs.

IV.    Critique of Suicide Case Review Report

The SCR was an inadequate summary of the care provided.  The SCR included relevant social, criminal, incarceration and substance use history however, a detailed assessment of EOP treatment (appropriateness of treatment goals, group treatment attendance and participation, alignment with treatment goals) and attempts to address treatment non-compliance was needed.  Institutional stressors were documented as contributing to his psychiatric decompensation; however, several significant areas were not discussed.  The lack of discussion regarding the relationship between isolation due to segregation and mental health decline was a significant area of concern.  Relatedly, overall time spent in segregation was not provided.  Evaluation of the impact of his mental health and behavior that led to RVRs was not conducted, nor was there further discussion regarding the lack of mental health factors in the consideration of consequences following his most recent RVR.  Despite multiple MHCB admissions, justifications for not referring the patient to a higher level of care and the use of appropriate treatment modifications were not discussed.

During a healthcare record review, the Special Master's expert noted multiple areas that warranted further discussion in the SCR.  Disruptions in continuity of care due to multiple clinicians and attempts to minimize cell-front contacts was not discussed.  As an example, while in EOP between March 15, 2017 and May 4, 2017, there were eight clinician contacts, four of which occurred at cell-front provided by at least four different clinicians.  Group treatment was unable to be verified during this time.  Documentation that he was restricted from the treatment center due to disruptive behavior was not addressed.  Review of five-day follow-up documentation indicated that some notes were

12

virtually unchanged and lacked sufficient individualized detail, particularly when completed by nursing staff.  Refusal to engage during psychiatric technician rounds on two occasions in the days before his death was not raised as an area of concern.

There were additional areas that would have strengthened the SCR.  Reference was made to "chronic effects of an assault perpetuated in 2010 by members of the gang from which he has previously separated"; further detail to address potential safety concerns in CDCR would have been useful.  The possibility of a connection between family visits and mental status decline was also worth exploration.

V.    Analysis of Quality Improvement Plan Process

This case resulted in seven required QIPs.  Four QIPs were related to custody concerns, and three were related to nursing concerns.  There were no mental health recommendations, however QIPs for areas in the previous section that warranted further discussion were needed.

An OIA investigation was pending for two identified custody concerns related to security/welfare checks and emergency response procedures.  A CDCR 989 addressing this issue was submitted to the Office of Internal Affairs.  The investigation was pending at the time of completion of the final QIP.  Upon completion of the investigation the institution was required to submit a memo describing actions taken to address identified problems.  As of this writing the memo had not been received by the Special Master's team, and review by the Suicide Prevention and Response Focused Improvement Team was unknown.

Training was provided in response to two QIPs that addressed the Cardiopulmonary Resuscitation (CPR) response.  This was adequate but would have been strengthened with drills to ensure sustained skill application.

Of note, proof of practice documentation from custody and mental trainings documented who attended; however, it could not be determined if all staff that were required to attend were in attendance as a list of staff assigned to these areas was not utilized.

Photos of the inmate's cell door indicated that one of the two cell windows was covered.  This warranted a QIP regarding impact of full visibility into the cell and policy compliance, yet this issue was not included in the SCR.

The three nursing recommendations addressed missing nursing documentation.  The SCR and final QIP refer the writer to the CCHCS Death Review Summary for QIPs.  However, the specific QIP and proof of practice were unclear in the Death Review Summary to the reader.  In addition, the Death Review Summary identified two system/processes not included in the SCR or final QIP.

13

A joint custody and healthcare QIP at the headquarters level to ensure family members are educated via various forums (webpage, during visitation sign-in process, closed circuit television in waiting areas) on identifying areas of concern regarding inmate mental status and a clear user friendly process to share information with CDCR personnel is needed.

Case D

I.   Summary of Case

This inmate was a 36-year-old Caucasian male who was found by correctional officers hanging from a noose he had fashioned from his sheet while housed in a single cell in the ASU on October 21, 2017.  He was not a participant in the MHSDS at the time of his death.

Little information was available regarding the inmate's history prior to incarceration.  He was reportedly raised in California, had minimal contact with his father and sister and an "average" relationship with his mother.  He reportedly completed school through the eleventh grade and later obtained his GED.  He was unmarried but had two children.  He was generally employed as a lifeguard and a carpenter while in the community.  His reports of substance use were inconsistent; however, the reports appeared to reveal a history of using marijuana, methamphetamine and alcohol.  At one time he reported having received substance use treatment in the community.  He had no juvenile criminal record and no history of gang affiliation.

Prior to his recent incarceration, the inmate had been incarcerated in CDCR for driving under the influence with bodily injury, controlled substance use and possession, driving while license suspended, and possession of burglary tools.  He also had additional arrests for domestic violence, which did not result in charges.  During his previous incarcerations, he did not receive mental health services.

The inmate arrived at CDCR for RC screening in November 2016, just over three years from his last CDCR release in August 2013.  He was convicted of attempt to evade police while driving recklessly, vehicle theft with prior vehicle related convictions and grand theft property-conspiracy.  He was sentenced to four years.  During his incarceration he received two RVRs, both for possession of a cell phone while at a fire camp.  He had no visits while incarcerated.

The inmate was seen for a mental health screening.  No mental health needs were reported or documented during his time at county jail.  He reported one suicide attempt "as a teen" but did not elaborate and reported feeling less interest in pleasurable activities and endorsed feeling useless or guilty and experiencing racing thoughts at times.  A full mental health evaluation was completed on November 16, 2016, when the inmate denied

14

any history of mental health needs or any current symptoms or concerns.  He denied any history of suicide attempts, contradicting his earlier report.  A suicide risk evaluation completed at the time included no history of suicidal thoughts, behaviors, or attempts;  he was assessed with low chronic and acute risk for suicide.  Other than his history of substance use, poor impulse control and sleep disturbance; no other risk factors or mental health needs were reported.  The inmate did not appear to meet criteria for enrollment in the MHSDS, but he was scheduled for a five-week follow-up to assess his adjustment and functioning.  When seen again on December 21, 2016, he appeared irritated by the contact and denied any mental health needs or symptoms.  He was informed about how to contact mental health and was not scheduled for further contacts.

The inmate was moved to a fire camp on August 15, 2017.  While at the fire camp, he reported safety concerns and was placed in ASU on September 13, 2017 while his concerns were investigated.  While in ASU, he was found guilty of charges related to possession of cell phones.  During that hearing, he signed a statement saying he had no enemies.  He remained in ASU until September 21, 2017, when he was placed in the general population/mainline at the same facility rather than back at the fire camp.  On October 3, 2017, he was reportedly involved in an altercation which resulted in a second placement in ASU and expressed continued safety concerns.  He was seen for ASU pre-placement screenings and ASU screenings on these occasions when he denied any mental health concerns or suicidal ideation.

The inmate submitted two healthcare requests while in ASU, one requesting a mental health evaluation and one requesting that medical change him from vigorous to full duty status.  His request for mental health services was dated as received on October 20, 2017.  It was unclear if that request addressed to mental health was triaged by any of the licensed psychiatric technicians who may have known the inmate better than the triage nurse.  The form did not clearly indicate the time that the request was triaged.  While it requested dates and times, only the dates were completed.  It should have been triaged the following morning (the morning of October 21), but no one saw the inmate prior to his suicide on October 21, 2017 at 1548.

A progress note dated October 10, 2017 indicated the inmate would require pre-release planning by the Transitional Case Management Program (TCMP) for Medicaid and Social Security/Disability benefits for his projected release date of December 10, 2017.  There were different release dates included in the healthcare record, with at least two dates cited: December 2017 and June 2018.  While the correct date was unclear, prison release did appear imminent.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert found that based on the information available to staff at the time, this death was not foreseeable.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not preventable.

IV.   Critique of Suicide Case Review Report

The SCR included relevant social, criminal, incarceration, substance use and mental health history. It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report. While there were areas of concern in the report (e.g., referring to inmates who requiring emergency response because they are in the process of killing themselves by a noose as "hangers") that should be corrected, they were not the focus of the review so the lack of attention to those areas does not mean that they were not otherwise addressed.

V.   Analysis of Quality Improvement Plan Process

This case resulted in no required QIPs.

Case E

I.   Summary of Case

This inmate was a 24-year-old Latino male found by correctional officers hanging in his single cell at a Reception Center on June 20, 2017. He was receiving mental health services at the 3CMS level of care at the time of his death.

The inmate was noted to be an unreliable historian, frequently refusing to participate in interviews; when he did participate, the information was questionable and did not provide a coherent picture of his life. Information provided by his family noted a troubled childhood starting with guardianship of the inmate and his three older siblings which was transferred to an aunt when the inmate was six months old. He reportedly had a learning disability and quit school at the age of 18, after completing the tenth grade. His family reported that he had mental health problems and substance use issues during adolescence and adulthood, and he tried to kill himself resulting in hospitalization. The dates and details of that event were unknown. They also reported that the inmate heard voices and took medications; although they could not provide further information.

The inmate entered CDCR for the first time in March 2017 after being sentenced to nine years on four counts of carjacking, a violent offense. He remained unclassified with

regard to his security level as he was still in the reception process and awaiting completion of that process to be endorsed to a permanent facility to serve the remainder of his time.  He appeared to have adjusted relatively well to the RC.  The inmate did not receive any RVRs or other write-ups due to misbehavior.  Correctional officers noted that he was not a troublemaker.

While other inmates generally did not want to participate in discussing the inmate, no one appeared to disagree with the idea that he was generally quiet and kept to himself.  He had been cleared for a cellmate, but he remained single celled with no explanation why he was never given a cellmate.

He entered CDCR with a diagnosis of Schizoaffective Disorder from a county jail.  Upon arrival, nursing staff noted that he was prescribed two psychotropic medications at county jail.  A bridge order was obtained so that the inmate would continue to receive his medications; however, he refused psychotropic medications, saying that he did not want to take them and did not need them.  He ultimately stopped taking psychotropic medications on March 25, 2017.  He was seen for a mental health screening on April 3, 2017, and he was referred for a mental health evaluation which was scheduled for the following day.  He stated during the assessment that he wanted to sign a refusal and was going to "say no to everything."  He did sign the informed consent for mental health treatment.  The inmate was provided with a preliminary diagnosis of Mood Disorder, and he was placed at the 3CMS level of care.

When seen for a mental health evaluation on April 17, 2017, he denied symptoms, with the exception of auditory hallucinations which he denied hearing recently; and he implied that he was coping with his mental illness.  The clinician's noted his nonadherence with prescribed medications.  With the exception of the presence of blunted affect and slow speech, the clinician did not find any other signs or reported symptoms of mental illness beyond the history of auditory hallucinations.  The inmate was provided with a diagnosis of Unspecified Schizophrenia Spectrum and Other Psychotic Disorder, and the preliminary plan of care was to help the inmate to increase coping skills, to provide him with supportive therapy, to encourage medication compliance and to refer him to psychiatry.  He was seen by a primary clinician on May 9, 2017, with no change in reported symptoms and continued medication nonadherence.

There were nine medication nonadherence reports completed between March 2017 and May 16, 2017, when the inmate was finally seen by a psychiatrist.  At that psychiatric appointment, he told the psychiatrist that he had no mental illness or symptoms; therefore, he needed no medications.  The psychiatrist discontinued the psychotropic medication as requested.  It was unclear why psychiatry did not see the inmate timely upon arrival to maintain psychotropic medications as required by the Program Guide or see the inmate as required by the medication nonadherence policy.  Little effort was made to assist the inmate in understanding the value of medication therapy and to help him understand the need to remain on those medications or to find a more satisfactory medication regimen.

Because the inmate remained in the 3CMS program at the RC, IDTTs were not scheduled, and minimal services were provided.  Because most inmates transferred within 60 to 90 days, services were generally limited to quarterly individual sessions with a primary clinician and psychiatrist if needed.

II.     Determination of Foreseeability

There was no finding of foreseeability in the Suicide Case Review or by the Suicide Case Review Committee.  The Special Master's Expert found that while a suicide risk assessment should have been completed as part of the new arrival for the inmate, it may not have made a difference in the determination of clear foreseeability.  This inmate had little to no insight regarding his mental illness, and he would not have disclosed accurate information to mental health staff about his mental status at the time the suicide risk assessment would have been done.  The Special Master's determined that this death was not foreseeable.

III.    Determination of Preventability

There was no finding of preventability in the Suicide Case Review or the Suicide Case Review Committee.  The Special Master's expert determined that this case was not preventable.

IV.     Critique of Suicide Case Review Report

The SCR provided an adequate review of the limited treatment provided to inmates at the 3CMS level of care in a Reception Center (RC).  The SCR noted deviations from Program Guide and the likelihood that delays in care resulted from those deviations.  The SCR appeared reasonable and fair.  Those deviations from Program Guide, while delaying access to psychiatric care, would likely not have impacted outcome.

V.  Analysis of Quality Improvement Plan Process

There were two QIPs that were developed directly from two of the problem areas identified in the SCR. Specifically, emergency services (911) were not contacted timely, and medication nonadherence was not properly addressed by the psychiatrist, resulting in multiple notifications before the inmate was finally seen approximately seven weeks after refusing medications.

For both deficiencies, an inquiry was to occur to determine the cause for these deficiencies, and the local leadership was to develop an appropriate plan for remedy. This occurred. The plan also included training for their staff (e.g., emergency response, medication management) and required them to review and to sign off on the policy. The two QIPs were appropriate and should be monitored as part of the quality management process to ensure ongoing compliance.

The two QIPs with training proof of practice were submitted and were acceptable. No additional QIPs were needed.

Case F

I.  Summary of Case

This inmate was a 54-year old, Caucasian man who was found unresponsive and covered in blood by a correctional officer in his solely-occupied cell in a Sensitive Needs Yard (SNY) on June 28, 2017. His cellmate was not present during the incident. During a tier walk, custody staff noted the inmate's cell window covered with cardboard and when the inmate did not respond to an order to take it down, the control officer was ordered to unlock the door and the inmate was discovered. He was receiving mental health services at the EOP level of care at the time of his death.

The inmate reportedly experienced trauma during his childhood, involving physical and sexual abuse as well as neglect. He reported receiving medication (e.g., "Ritalin") between ages six and ten. He began using substances at age 12 and starting stealing car stereos as a minor. He attended public school and denied participation in special education but experienced multiple suspensions and expulsions secondary to behavior problems. He eventually dropped out of school in the tenth grade. He was variably employed at restaurants, as a meat cutter and at a retail chain. He was married at age 18 prior to his first adult arrest which occurred the same year. He and his wife were married for over 34 years but separated much of the time due to his history of incarceration and relationships with other women when not incarcerated. During his current incarceration, his wife served him with divorce papers. He had served four previous prison terms prior to his most recent incarceration. He reportedly had three sons, one daughter and five grandchildren. He had no visits during his current incarceration.

He reported drinking alcohol starting at age 12 and drinking heavily beginning at age 21. He reported that he was an alcoholic. He also used intravenous methamphetamine and heroin beginning at age 15, began smoking crack cocaine at age 30 and experimented

19

with a number of illegal and prescription drugs.  He reportedly attended substance use treatment at least four times.  He reported that he lived in Florida for a time, but was using crack cocaine and drinking, which led to a series of suicide attempts.  He reported that his longest period of sobriety was five years.

The inmate served time in the past for multiple crimes including assault with a deadly weapon on a peace officer, robbery, burglary, and use of controlled substance.  His current commitment was the result of a crime committed in December 2012 after attempting to rob an elderly woman with a knife in a parking lot.  When that failed, he fled and attempted to rob another woman in the parking lot but was arrested.  He reported being under the influence of methamphetamine at the time and was experiencing auditory hallucinations and paranoia.

He was incarcerated for the fifth and final time in CDCR in June 2013 to serve a 98-year to life sentence for two counts of attempted robbery and dissuading a witness.  He received only one RVR during his current term in March 2017 for possession of inmate-manufactured alcohol.  He had two ASU placements during his current term, one in 2013 for safety reasons and one in 2015 due to lack of bed availability.  He was reportedly a gang dropout (Skinhead) and participated in the Wiccan religion; he was considered an elder in the Wiccan community at the correctional facility.

The SCR noted that the inmate first received mental health services in CDCR in May 1996 when he was placed at the EOP level of care.  In October 1996, he was transferred to DSH where he remained beyond his release from CDCR as a Mentally Disordered Offender.  During his next period of incarceration in 1999, he was treated primarily at the 3CMS level of care where he was retained for subsequent periods of incarceration.  During these previous terms, he was provided with diagnoses of Depressive Disorder NOS, Major Depressive Disorder, recurrent and Bipolar I Disorder.

During his current term, the inmate was initially placed at the 3CMS level of care and treated for mood instability and paranoia.  He engaged in a serious suicide attempt in February 2014, was placed in the MHCB and was transferred to DSH for acute then ICF levels of care.  He was discharged at the EOP level of care in June 2015.  Treatment planning at that time targeted suicidal ideation/attempts and depression.  He attended group and individual treatment with a plan to reduce his level of care to 3CMS with sustained stability through the end of 2015.  In early 2016, his participation in EOP programming decreased, and his depressive symptoms increased.  Treatment goals to improve his participation in group treatment were added to his treatment plan.  He was not referred to a higher level of care at that time as he continued to maintain medication compliance and to attend to his activities of daily living.  He received no RVRs, and he attended individual sessions.  His group attendance remained low, but he was retained at the EOP level of care in September 2016 for the same reasons listed above.

In October 2016, some of his psychotropic medications had to be discontinued secondary to liver problems.  This contributed to an increase in anxiety, depression and paranoia.

The inmate asked to be removed from his educational program secondary to these symptoms. He also contracted methicillin-resistant staphylococcus aureus (MRSA) around this time and had to spend eight days in a community hospital. By January 2017, he was reporting depressive symptoms and fluctuating suicidal ideation. He was also experiencing chronic pain secondary to a neck injury for which pain medication had been discontinued. He attended just over half of his scheduled programming at that time.

In March 2017, the inmate received an RVR for possession of inmate-manufactured alcohol, and in April his wife served him with divorce papers. The inmate reported an increase in morbid thinking, stopped attending group programming and inconsistently attended individual treatment sessions. His treatment plan in April 2017 noted increased fears of abandonment and rejection along with increased depression, suicidal ideation and substance use. The IDTT documentation noted that his impulsivity and self-injurious behavior were "exacerbated" by his substance use. Despite this, the IDTT indicated that the inmate was able to maintain functioning without attending group treatment and that he would be considered for a decreased level of care to 3CMS at the next IDTT. The SCR noted that the primary clinician's progress notes for this case were not updated after each session and failed to include proper assessment of his current functioning and included no updates in the plan or education sections, making the course of his treatment and his progress difficult to follow.

The last mental health sessions occurred on June 22 and 23, 2017; these were routine session where the inmate clearly disclosed his struggles to his psychiatrist and primary clinician. He denied suicidal intent or a plan at that time. The inmate was described as impulsive repeatedly by the treatment team. No suicide risk assessment was completed by either provider, violating Program Guide requirements. Healthcare documentation noted that the inmate reported suicidal ideation that increased over the last months of his life and was intense at times; the inmate had difficulty coping with this increased frequency and intensity of ideation. His primary clinician documented that the inmate exhibited poor self-control over those thoughts. Transfer to a higher level of care never occurred, and the inmate died by suicide on June 28, 2017.

The inmate had six serious prior suicide attempts noted in the healthcare record with the most recent attempt in 2014 by placing a razor to his neck. There were also two attempts by overdose with heroin and one in 1994 by hanging, and at least one to two others by cutting. Five suicide risk evaluations were completed during the inmate's most recent incarceration. His chronic risk was typically rated as moderate; although the one suicide risk evaluation completed following his suicide attempt in 2014 noted his chronic risk as high. His acute risk was assessed as ranging from low to high. The final suicide risk evaluation completed in January 2017 was noted to be problematic in that it noted five previous suicide attempts but rated his chronic risk as moderate without adequate justification. The safety plan was also underdeveloped.

The inmate had numerous medical conditions including Hepatitis C and a seizure disorder. He had undergone cervical spine surgery with treatment of pain medication for

residual cervical pain as provided by the pain management committee; this medication had recently been discontinued, and the inmate lost a related appeal several months prior to his suicide.  The inmate also suffered from chronic anemia and had a history of repeated head trauma.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's Expert concludes that this suicide was foreseeable.  Information was clearly available that had it been appropriately acted upon would have likely resulted in a different outcome for this inmate.  Suicide risk was not accurately assessed by the treatment team.  The team underestimated acute and chronic risk and ignored multiple stressors.  They did not complete suicide risk evaluations when indicated and failed to refer the inmate to a higher level of care when indicated.  The inmate continued to inform his treatment providers of his struggles with suicidal thoughts and intent while they failed to intervene.  There were multiple clinical points of intervention that were ignored, ultimately leading to the suicide of this inmate.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert finds that this suicide was preventable.  Had the treatment team adhered to Program Guide requirements and referred the inmate to a higher level of care, completed suicide risk assessments when indicated, and provided adequate clinical care, the outcome of this case quite likely would have been different.  The treatment team clearly documented that the inmate was impulsive and did not have the resources to cope with psychic abandonment.  Additionally, they documented that the inmate endured an enormous and meaningful abandonment when served with divorce papers by his wife of 34 years.  However, despite guidelines that pointed to referral to a higher level of care and subjective indicators supporting that referral, the treatment team failed to do so.  The primary clinician failed to keep adequate treatment notes of their sessions.  No provider completed a suicide risk assessment as required by the Program Guide; despite the inmate continuing to report to his treatment team his psychic pain and suicidal thoughts that occurred with greater frequency and intensity.

IV.   Critique of Suicide Case Review Report

The SCR was an adequate summary of this case.  It provided a thorough summary of the inmate's available criminal, social and mental health history.  It outlined the treatment team's failures and the QIPs followed from the findings in the case.

V.   Analysis of Quality Improvement Plan Process

There were seven QIPs developed due to the SCR.  These QIPs were inadequate as they focused only on the primary clinician assessing suicide risk, ignoring that the psychiatrist also failed in that regard.  Since the psychiatrist had seen the inmate on June 23, 2017 and been told similar complaints about suicidal thoughts, the psychiatrist also should have been held responsible for assessing suicide risk and making appropriate referrals; however, no QIP for the psychiatrist specifically was provided.  That gave the impression that suicide assessment and managing risk fell solely on the primary clinician, a significant problem for treatment teams with shared risk in keeping their patients alive.

Further, it appeared that an assessment or increased supervision was indicated regarding the evaluation of competency for the treating primary clinician and psychiatrist.  However, all QIPs were training based and did not focus on individual clinician and psychiatry performance issues.  Similarly, training was provided to staff on completion of suicide risk evaluations and referrals to higher levels of care without reviews of individual performance or overall performance of the IDTT process.

Case G

I.  <u>Summary of Case</u>

This inmate was a 32-year-old Caucasian transgender man, biologically female but identifying as male and housed in a female facility, who was found by custody officers hanging in his solely occupied ASU cell on October 28, 2017.  He was discovered upon an emergency cell entry after he boarded up his room and stopped communicating with custody staff.  He was hanging with a sheet around his neck that was tied to a top locker, He was pronounced dead on October 29, 2017.  He was receiving mental health services at the EOP level of care at the time of his death.

The inmate's mother and stepfather were described as "unstable." Both parents had substance use disorders, and his paternal grandmother had a history of bipolar disorder.  He was rejected by his parents for his sexual orientation.  At one point he was raised by his maternal grandmother, and later he began living with a significant other in hotels.  He had a history of significant physical and sexual abuse.  He was physically abused by his stepfather.  He was molested by his mother's friend when he was five years old and by an uncle, who lived in the family home, from ages eight to fifteen.  He had trouble in school and dropped out in ninth grade, and later again in eleventh grade at an alternative school.  He received his GED during his first term at CDCR.  His intellectual abilities were noted in the high-average range during a psychological assessment at a pre-sentence evaluation in 2005.  The reports of his substance abuse history were inconsistent, but included marijuana, amphetamines, crack cocaine, Ecstasy, alcohol and heroin use.  He reported that he stopped using substances at age 31.   The inmate's employment history included discount store service, maintenance work, supervision of unloading stock from trucks and furniture restoration.  He did not marry.  He lost custody of his son when the son was 2

years old, and his son was 14 years old at the time of the inmate's suicide.  In the time preceding his death, his son had not visited in over a year, and letters had been returned unopened.

The inmate had a tumultuous relationship with a girlfriend who lived in a cell directly above him in the ASU, a housing arrangement which facilitated their communication.  The duration of the relationship was at least two years; although it appeared likely that they had known each other from the inmate's previous prison term.  A friend interviewed after the inmate's death expressed the belief that they were not "good for each other."  One letter from the girlfriend to the inmate found in his property said: "I'm ready for Sunday…it's up to YOU.  Once we do this there's not an option and no going back…we have to stay playing 'suicidal' long enough and do extra shit over & over til we got it DONE!" The SCR interpreted this as a possible attempt to gain control over their lives in prison.  An additional possible interpretation considered by the Special Master's expert was that this was evidence of a suicide pact.  On the night of the inmate's suicide, according to the girlfriend, he was particularly irritable after receiving his intramuscular medication; the two argued and the girlfriend fell asleep after taking a sleeping pill while they were talking.

The inmate was first incarcerated in CDCR at age 19 on March 23, 2005 and was paroled on January 14, 2009.  He was convicted of six counts of second-degree robbery.  He returned to CDCR on a parole violation, followed by periods of parole and violations, frequently related to substance abuse.  During this term he was placed in ASU twice for a total of approximately 11 months and in the Security Housing Unit (SHU) for four months.  He received numerous RVRs for aggressive and threatening behavior.

The inmate entered CDCR for his second and final term in June 2013.  During this term, he received disciplinary actions, including 60 RVRs and 21 ASU placements with four RVRs pending at the time of his death.  At the time of his death, he was serving a 13-year sentence for assault with a deadly weapon.  He was parole eligible with an expected release date in October 2024.

The inmate had a history of self-harm behaviors, including cutting and head banging, and suicide attempts that began in early childhood.  These behaviors were thought to be triggered by feelings of anxiety, depression, frustration, and a sense of hopelessness and abandonment.  He experienced psychotic symptoms that began in childhood around the same age as his substance abuse.  He first attempted suicide by overdose at age eight, and again at age 16.  At age 14 he cut himself, requiring 30 stiches.  He attempted suicide by hanging at age 18.  In the community, the inmate had at least three hospitalizations for suicidality and psychosis.

During his incarceration, he was provided with diagnoses of Adjustment Disorder with anxiety and depression, Bipolar II Disorder, Antisocial Personality Disorder, PTSD,

24

Gender Dysphoria and Borderline Personality Disorder.  He was most recently prescribed risperidone.  He attempted suicide by hanging while in CDCR at age 22.  He attempted again at age 27 due to feelings of dejection for having a long sentence.  His relationship with his girlfriend appeared to contribute to his emotional insecurity, RVRs and MHCB admissions.  He may have felt distress and abandonment due to an argument with his girlfriend on the night of the suicide and silence when his girlfriend fell asleep in the middle of their conversation.  They exchanged rings to be worn unless they planned to break up, and his ring was found next to him following his suicide.

Several weeks after the start of the instant term in June 2013, he began participation in the MHSDS at the 3CMS level of care until he was admitted to a MHCB on October 22, 2013.  After he was discharged from the MHCB, he continued in the 3CMS program, but he again entered the MHCB level of care within several months.  Overall, he had 11 crisis bed admissions and one admission to acute inpatient treatment (July 13, 2016 to September 1, 2016).  Following this inpatient stay, he was discharged to the EOP level of care; he remained at this level of care until December 2, 2016, when his level of care was lowered to 3CMS where he remained until September 22, 2017 when he was admitted to the MHCB.  .  Clinical notes over the summer and early fall of 2017 documented increased head banging, depressive symptoms, hopelessness, a tendency to isolate and a decrease in baseline functioning.  During this time, the inmate repeatedly requested transfer to a higher level of care, either EOP or an inpatient program, noting that he found the incentive program in the inpatient setting helpful in managing his depression.  He reported making a noose, having thoughts of hanging himself, using head banging as substitute for cutting which he found more satisfying, and being concerned about his relationship with his girlfriend and with rejection by family members.  During a primary clinician contact on September 11, 2017, he requested to be seen twice weekly, but his clinician documented the inability to accommodate this request due to increased caseloads and limited space.  The plan was to refer him to the IDTT to discuss his request for treatment at the EOP level of care.

During a primary clinician contact on September 20, 2017, the inmate described depressive symptoms such as sleeping 12 to 13 hours daily with low energy, as well as increased head banging.  After reports that he was non-responsive due to repeated head banging on September 21, 2017, the Crisis Intervention Team responded.  The inmate described racing thoughts and a plan to hang himself.  A full suicide risk evaluation was not conducted until the next day because of the late hour; he was referred to the MHCB and placed in alternative housing on suicide watch.  During the suicide risk evaluation on September 22, 2017, he reported that he was not suicidal, and he was not admitted to a crisis bed.  The clinician rated his acute risk for suicide as low, despite numerous signals indicating elevated risk in the context of increased depressive symptoms, decreased functioning and recent self-injurious behavior.  A total of 12 suicide risk evaluations were conducted during the course of the inmate's incarceration; all other suicide risk evaluations had assessed his acute risk as either moderate or high and his chronic risk as high.

Following his release from alternative housing, five-day follow up was conducted.  A primary clinician's note on October 3, 2017 indicated that the inmate wanted to go to the EOP to attend more groups.  He inquired about when he would receive a tablet noting that he did not have a radio and the television was broken.   During a primary clinician contact on October 9, 2017, he was described as hopeless.   He stated that he did not wish to go to the MHCB, but he was asking for help and not receiving it.   He reported feeling less angry than sad.

He was transferred to the EOP level of care on October 12, 2017.   After transfer to the EOP, he attended one of seven offered groups.   Group attendance and increased participation were documented goals.   During this time, mental health evaluations conducted for input into RVRs assessed that mental illness did not influence his behavior. Healthcare documentation suggested some stabilization.  Clinical notes on October 25 and 27, 2017 indicated that his medications were sedating, making him "groggy." He died by suicide on October 29, 2017.

The SCR reported that psychiatry, primary clinician and IDTT contacts in 2016 and 2017 were provided timely according to policy guidelines.   Suicide risk evaluations for MHCB admissions and discharges in 2016 and 2017 were provided according to policy timelines, except for the suicide risk evaluation for discharge from the MHCB on July 13, 2016 that was not located in documents.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.   The Special Master's expert determined that this death was foreseeable.   The available information indicated the presence of substantial risk for suicide, but that risk was underestimated during his last suicide risk evaluation, and he was not admitted to the MHCB on September 23, 2017; instead he was returned to the 3CMS level of care with five-day follow up until October 12, 2017 when he began EOP level of care.   This occurred in the context of repeated requests by the inmate for more intensive treatment and signs of deteriorating functioning.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.   The Special Master's expert determined that this death was preventable.  The custody officer conducting rounds noticed that the inmate's door window was covered, making the view obstructed to staff.   The officer ordered him to take down the window covering; the inmate responded "No," and the officer left to complete rounds, returning 20 minutes later when the inmate had completed suicide. The likelihood of the completed suicide might have been substantially reduced had the officer intervened at the time the inmate refused to remove the covering on his door window.

IV.     Critique of Suicide Case Review Report

The SCR was an adequate summary of this case.   It provided a summary of the inmate's available criminal, social, substance use, suicide and mental health history.  It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

V.     Analysis of Quality Improvement Plan Process

This case resulted in three QIPs.

The first was related to the September 22, 2017 suicide risk evaluation that was found to be deficient during the review, and an audit was conducted by the facility.   As a result, suicide risk evaluation mentoring was provided to the clinician who performed this suicide risk evaluation, and a Senior Psychologist, Supervisor conducted audits of suicide risk evaluations completed by the clinician, providing feedback that "more comprehensive/inclusive safety plans need to be in place."

The second related to the primary officer noticing that the inmate's cell door window was covered, obstructing the view for staff.   When ordered to take down the window covering, the inmate responded "No", and the officer left to complete custody rounds, returning 20 minutes later when the suicide was completed.   As a result, OIA was contacted for an investigation.   No further information was available.

The third related to the 23 pills that were found in the vaginal cavity during autopsy. These included 16 oxcarbazepine, 6 hydroxyzine and 2 atomoxetine.   The hydroxyzine was ordered as direct observation treatment, and the atomoxetine was not ordered for the inmate but was ordered for the inmate's girlfriend who lived in the cell above him.   As a result, a new procedure was implemented, and nursing staff was educated.   Licensed staff should provide an inmate's oral medication through an open cell door, food port or cell bars.  Inmates receiving medication through a food port will lift the cup to the cell window and show the staff member the cup to ensure all medications are available, ingest the medication orally, and then show the empty cup.   If an inmate's cell view is obstructed, the staff member will alert the inmate that the items obstructing the view should be removed, or else they will document the medication as refused and will report the incident to their immediate supervisor.

Although it was noted as a concern, no suicide risk evaluation was located in connection with the inmate's discharge from the MHCB on July 13, 2016 when he was referred to an inpatient program.   Because this occurred more than a year prior to his death, this likely did not contribute to the outcome; however, this should have been explored carefully to determine the nature of the lapse and whether a QIP was required.   Otherwise, the QIPs

27

were responsive to the primary concerns raised.   The second QIP had not been adequately addressed; because, although a referral for investigation was made, there was no indication that one was completed.

Case H

I.   <u>Summary of Case</u>

This inmate was a 22-year-old, never-married, Latino man found unresponsive and hanging from a noose attached to an upper bunk bedframe by psychiatric technicians conducing mental health rounds in an ASU cell at a RC on November 17, 2017.   Custody staff responded and removed the noose, but the SCR identified deficiencies in the response and a delay in calling 911.   An ambulance was requested, CPR was performed, and an automated external defibrillator was applied.   The inmate was pronounced dead the same day at a community hospital.   He was not a participant in the MHSDS, at the time or at any time during his incarceration.

The inmate was serving a sentence of 16 months for evading or attempting to evade a peace officer.   He was eligible for parole, and his release date was April 15, 2018.   He was provided with diagnoses of Intermittent Explosive Disorder and Antisocial Personality Disorder during his less than two-month incarceration.   He had been housed in an ASU intake cell since November 15, 2017 after requesting protective custody in connection with his desire to discontinue his gang affiliation.   He was double-cell eligible but did not have a cellmate at the time of his suicide, as his cellmate was removed three hours prior to his death.

The inmate was born in California.   He maintained connection with his mother and grandmother with whom he lived at the time of his arrest but described no contact with his father.   He had five siblings, and he shared custody of his four-year-old daughter to whom he addressed a suicide note.   The inmate reported completing high school at a private school after being removed from public school due to disciplinary problems.   The record indicated that he participated in unspecified special education classes.   He reported no employment history despite skills in construction.

The inmate reported a history of mental health treatment as a juvenile for ADHD and behavioral difficulties treated until age 17 with amphetamine/dextroamphetamine, aripiprazole, clonidine and melatonin.   Other pertinent history included substance use and abuse and a heroin overdose leading to a coma and two-day hospitalization.   The year of the overdose was reported as 2014 or 2016.   At various times, the inmate described the overdose as a suicide attempt; although on other occasions, he reported it to be accidental.

The inmate had an extensive juvenile criminal justice history beginning in 2008.   It included various juvenile justice detentions.   He had no prior prison terms.   He was

28

arrested in 2007 at age 12 and was convicted in 2008 of lewd or lascivious acts with a child under 14. During the instant incarceration, the inmate expressed concerns about the implications of this history.

Adult criminal justice involvement began in 2015, culminating in a 2016 conviction for entering a noncommercial dwelling, obstruction/resisting a public officer and probation violations for which he was sentenced to three years' probation and 90 days in jail.

The inmate had no RVRs and was classified as Level II with 27 points. On November 15, 2017, he expressed anxiety and fear of retaliation in connection with his discontinuance of gang affiliation. In an interview with a correctional counselor, he expressed concern that this history would be included in current paperwork. Upon being informed that he would be reviewed for an "R" suffix, he requested placement in the Specialized Processing Unit or SNY upon transfer. On November 17, 2017, the inmate was removed from his cell because of custody's uncertainty about his cellmate's desire to renounce his gang affiliation. He was moved to a cell adjoining this same inmate and died three hours later. One inmate who was housed with the inmate in general population later said that he knew the "trigger" to the inmate's suicide, but he had to clear the interview with other gang members; he later refused the interview.

On September 22, 2017, the inmate received a mental health screening interview when he reported the overdose as a suicide attempt due to high levels of stress and depression. Although he reported some protective factors and denied suicidal ideation, he also endorsed symptoms consistent with Major Depressive Disorder and suicide risk, such as feeling useless, sinful or guilty, decreased interest in sexual activity and loss of appetite. On September 27, 2017, a mental health assessment noted that the inmate tended to minimize his problems, and that he now characterized the overdoses as accidental.

A suicide risk evaluation of the same date documented multiple static risk factors for suicide as well as current causes for concern including agitation, loneliness, feelings of self-loathing and lack of future orientation. He was assessed with low acute and moderate chronic risk for suicide. The rationale supporting these determinations conflated chronic and acute risk in that some acute factors were assessed as chronic.

After arrival at the ASU, a preplacement screen found no indication for a mental health referral. The screen was initially thought to have been completed after his placement in ASU, but the subsequent investigation found that it was timely. The ASU screening questionnaire was likewise unremarkable. Upon interview by a mental health clinician on November 16, 2017, these screenings and assessments were noted and additional or significantly changed information was reported. The inmate endorsed treatment for drug abuse and multiple overdoses. During a second interview on the same day, he was incongruently described as anxious and euthymic with his anxiety animated by the possibility of gang retaliation.

Suicide risk and the need for inclusion in the MHSDS appeared to have been underestimated.   Upon arrival at the ASU, inconsistencies in his reported history were insufficiently assessed making safety planning inadequate.

II.   <u>Determination of Foreseeability</u>

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was foreseeable.  The available information indicated expressed fear of retaliation related to his desire to renounce his gang affiliation and his desire for protective custody housing in connection with this past convictions.  These required clinical interventions, such as inclusion in the MHSDS, and further assessment of his suicide history as well as custody intervention.

III.   <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was preventable.  Mental Health assessments did not adequately clarify inconsistencies in reports of past suicide attempts, reports of suicidal ideation, and his reports of symptoms consistent with depression and elevated risk.   Inclusion in the MHSDS appeared warranted and could have explored, assessed and attempted to reconcile these inconsistencies and to obtain additional information to assess and mitigate risk.   The suicide risk evaluation conflated acute and static risk factors which likely contributed to an underestimation of risk and insufficient safety planning.   Mental Health did not fully respond to the inmate's reported history and currently reported symptoms and risk factors.   Custody did not fully respond to his reported safety concerns.   Had more information been obtained and critically reviewed, additional mental health and custody interventions may have been implemented to prevent the suicide.

IV.   <u>Critique of Suicide Case Review Report</u>

The SCR was an adequate summary of this case.   It provided a summary of the inmate's available criminal, social, substance use, suicide, and mental health history.    It provided a reasonable assessment of the precipitants to his suicide and the recommendations provided followed from the content and findings of the report.   Although generally adequate, the analysis emphasized deficiencies in documentation of the suicide risk evaluation; the documentation may also be indicative of insufficient training with respect to distinguishing chronic and acute risk factors.  The SCR appropriately emphasized the need for the assessing clinician to explore and assess conflicting information related to suicide risk.  The results of the coroner's report, which found scars on the inmate's left forearm and wrist, further demonstrated the need for further assessment.

V.    Analysis of Quality Improvement Plan Process

This case resulted in six QIPs.

The first related to inconsistencies that were not documented about prior self-harm (whether the overdose was accidental or a suicide attempt) in the primary clinician's Mental Health Initial Assessment on September 27, 2017.  The rationale was not well documented.  One of the clinicians who recorded this had left the institution, and the other clinician was provided training.  The seven-hour suicide risk evaluation training and chart audit tool items that were used to evaluate suicide risk evaluations were reviewed.

The second related to documentation deficits in the suicide risk evaluation on September 27, 2017.  The rationale for estimation of acute and chronic suicide risk was not well documented.  Fifteen suicide risk evaluations performed by the clinician were reviewed and found with areas that required more thorough documentation, such as risk factors. The training from the first QIP addressed these issues.

The third related to an eight-minute delay in activating 911, which likely did not change the outcome.  As a result, psychiatric technicians received training on local operational procedure related to emergency response and local policy and procedure related to emergency medical response.

The fourth related to pre-placement screening before ASU placement.  The inmate was transferred to the ASU on November 15, 2017, but the ASU pre-placement screening was performed on November 16, 2017.  It was unclear if the inmate was brought to healthcare staff by custody for pre-placement screening before ASU placement.  Upon further review, the ASU pre-placement screening was found to be timely and completed on November 15, 2017.

The fifth related to how psychiatric technicians reported the hanging to custody officers. As a result, psychiatric technicians reviewed training on local operational procedure related to emergency response, local policy related to emergency medical response, which outlined the requirement that psychiatric technicians carry a whistle/personal alarm and remain at the scene.

The sixth related to ASU cell placement policy.  The inmate's movement followed policy and procedure, but current policy should be viewed and modified if needed.  Upon review, the institution was found to have appropriately followed policy and did not find the need to revise policy.

Case I

I.    Summary of Case

31

This inmate was a 21-year-old African American man who was found by a custody officer conducting Guard I Security checks hanging with a state-issued bed sheet attached to a vent and tied around his neck in his solely occupied cell in Short-Term Restricted Housing (STRH) on December 7, 2017.  CPR was performed, and an ambulance later arrived.  A paramedic shortly declared the inmate deceased.  He was a participant in the MHSDS at the 3CMS level of care at the time of his death.

The inmate was variously provided with diagnoses of Depressive Disorder, NOS, Adjustment Disorder with disturbance of conduct and Adjustment Disorder with depressed mood.  He was prescribed mirtazapine.  Except for a brief time when he was not in the MHSDS and a brief MHCB stay, he was treated primarily at the 3CMS level of care.

The inmate entered CDCR in August 2015 and was housed in three different facilities prior to the one where the completed suicide occurred.  His security level was Level IV, and he had 94 points.  He was parole eligible and had a release date in January 2019.

During adolescence, the inmate had substance use and behavioral problems.  He had two uncles with substance use problems.  He was raised by both parents.  He completed school through the tenth grade.  At the time of his arrest, he was unemployed and homeless, because his mother barred him from the home.

The inmate did not have prior juvenile or adult criminal history.  When he was fifteen, he was hospitalized for "depression, agitation, and anxiety" for five days and prescribed antidepressant medication.  He did not receive treatment for other periods of anxiety and insomnia during adolescence.

He entered his first and only term at CDCR in August 2015.  He was serving a three-year sentence for second degree robbery.  He was targeted and injured on November 17, 2015 in connection with a gang altercation.  Due to safety concerns considered by custody to be viable, he was placed in ASU on November 20, 2015 and transferred to another facility on November 25, 2015.  He remained in STRH through November 1, 2017.  On November 21, 2017, he requested placement in an SNY and stated he did not want to participate in gang activity.  On December 4, 2017, he reported rumors of being in bad standing with his gang, and the assessing officer recommended that he remain in ASU before assessment from the ICC.

The inmate received seven RVRs during his term.  He received two visits from his mother, and a physician wrote a hardship letter on September 25, 2017 requesting that the inmate be transferred closer to where his mother lived due to difficulties in his mother's terminal breast cancer diagnosis.  One of the inmate's former cellmates stated he was the "black sheep of his family."  He had some anger toward his father; although he

maintained contact with him during his incarceration, and he had a loving relationship with his mother who was terminally ill.

He reported a history of depression but did not identify other mental health problems or suicidal ideation at an initial health screening on August 27, 2015.  He participated in the MHSDS at the 3CMS level of care for most of his term, where he was treated for depression and substance use disorders and had a goal of managing coping skills with cognitive-behavioral therapeutic (CBT) techniques.  On October 20, 2015 he submitted a Health Care Services Request Form to be seen by a "psych" about medication and was seen by a mental health clinician who noted symptoms of depression, chronic anger, ruminating thoughts and sad mood.  On October 22, 2015 he saw a psychiatrist when he reported hearing his three-year-old daughter's voice since February 2015.  He was prescribed mirtazapine, and two days later reported feeling "a bit better", denying suicidal ideation but with continued report of sad mood, anxiety, anger outburst, insomnia and fatigue all day.  His mood and symptoms improved over the next several months.  He was transferred to another facility on August 31, 2016, and he saw a psychiatrist on September 8, 2016 when he reported no suicidal thoughts, major mental health concerns or behavioral problems; but his mood was sporadically depressed, and his affect was mildly dysphoric with irritability and constricted range.  He continued to receive CBT treatment and denied suicidal ideation.

On March 29, 2017 during an interview with a clinician, the inmate reported no depression or anxiety symptoms and a desire to be removed from the 3CMS level of care and the MHSDS.  The psychiatrist agreed with his request, finding him stable; mirtazapine was discontinued on May 16, 2017.  He was reportedly stable through the summer of 2017.  He was placed in the ASU on September 22, 2017 after an RVR for weapon possession for which he was eventually found not guilty, when he denied suicidal ideation and behaviors.  On September 26, 2017 during an RVR Mental Health Evaluation he reported no distress and expressed that he would like to be removed from the 3CMS program.  No suicidal thoughts or behaviors were noted during an IDTT meeting on October 4, 2017 when the team, noting continued recent depression and agitation related to his incarceration, found that the inmate could still benefit from continued treatment for depression utilizing CBT techniques.  As a result, he was maintained in the 3CMS with the plan to review his status in six months.  The mental health treatment plan had several areas left completely blank and was noted to have only a minimal case formulation and no meaningful, individual, measurable goals.  The inmate did not sign the form, and it was unclear whether he attended the IDTT.

On October 23, 2017, the inmate reported to a psychiatric technician that "I'm going to hurt myself", and the psychiatric technician submitted an emergent referral.  During the ensuing clinical contact, the inmate reported that he was not suicidal, but he did not feel safe pending transfer to a high security yard, a transfer which ultimately did not occur.  On October 25, 2017 he denied distress and suicidal ideation.  On November 1, 2017 he

returned to 3CMS general population from the STRH.  During the IDTT on November 21, 2017, he was found to be stable and was not exhibiting significant symptoms; he was discharged from the 3CMS and MHSDS due to symptom remission.  The rationale was inconsistent and not well documented in that the case formulation and clinical summary were found to be inadequate; and although the discharge was based on symptom remission, his treatment plan still contained an active focus on his depressed mood. Twenty minutes after discharge from the 3CMS and MHSDS, he requested placement in an SNY due to safety concerns.  On November 21, 2017, an ASU Pre-Placement Screening noted no mental health distress and no suicidal ideation.  He was moved to the STRH because of safety concerns.  The next day on November 22, 2017, the inmate was seen in response to an emergent referral due to reported suicidal ideation.  The interview occurred at cell-front.  The documentation focused on "secondary gain" to the exclusion of his emotional distress and fear.  He was, nonetheless, referred to the MHCB due to his "adamant" report of suicidal ideation.

During his initial psychiatric interview in the MHCB on November 22, 2017, the inmate noted that there were "many ways" he could hurt himself.  He also reported auditory hallucinations, significant depression as well as sadness and irritability; however, he denied current intent to self-harm.  The psychiatrist was doubtful as to the veracity of the reported hallucinations.  The following day, the inmate reported becoming suicidal when placed in ASU, saying that he needed EOP level of care, and that he felt paranoid and afraid that someone would harm him.  Although denying it at that time, he reported that he did have suicidal ideation the prior day.  The initial mental health assessment of November 23, 2017 cited an October 23, 2017 note indicating the inmate's supposed history of "feigning SI for secondary gain of avoiding a transfer," a statement not contained in that note.  Notes of the following day contained inconsistencies with prior documentation; the psychiatrist concluded that the inmate's reports of psychotic symptoms were likely feigned.  On November 25, 2017, a clinician saw the inmate at cell-front due to his refusal of a confidential contact, when he denied suicidal ideation or psychotic symptoms but reported continued depression of eight out of ten on a scale of one to ten.  By November 27, 2017, the inmate reported improvement with reduced suicidal ideation, but the clinician also noted his depression and anxiety were nine out of ten on a scale of one to ten.  On November 28, 2017, the inmate refused to get out of bed, exhibiting flat affect.  On November 29, 2017, he demonstrated depressed mood and flat affect but requested clothing and denied suicidal ideation.  Although he did not leave the MHCB until December 3, 2017, the treatment team discharged the inmate on December 1, 2017 for treatment at the 3CMS level of care.  The rationale for discharge included that he was dealing with his depression and was helped by medication.  The psychiatrist described his suicidal ideation as "passive." The discharge summary also noted his ongoing concerns for his safety.

The inmate received a suicide risk evaluation on September 14, 2015, when he was transferred to the 3CMS level of care; chronic risk was assessed as low, and later on

September 28, 2017 while he was in the 3CMS program, his chronic risk was assessed as moderate. Both suicide risk evaluations assessed low acute suicide risk. The September 28, 2017 Safety/Risk Reduction Plan was more detailed. During the November 22, 2017 suicide risk evaluation, the inmate expressed suicidal ideation. The clinician noted the inmate had a "high potential for feigning suicidal ideation for reasons of secondary gain" but did not provide adequate rationale for this statement. As noted above, he was admitted to the MHCB on November 22, 2017. The clinician omitted the Columbia Suicide Severity Risk Scale (C-SSRS) because she had not received training on this tool. The clinical note and accompanying suicide risk evaluation predominantly viewed the inmate's complaints through the lens of manipulation, deemphasizing the connection with his safety concerns, suicidal ideation and depression.

During the November 30, 2017 suicide risk evaluation, the inmate reported depression with daily auditory hallucinations. He reported no suicidal intent; chronic and acute risk for suicide were assessed as low. The SCR noted that the inmate's safety concerns, depression symptoms and suicidal ideation were likely connected. He was also fearful of not seeing his mother who had breast cancer and potential altercations with gang members.

It was noted on November 23, 24 and 25, 2017 that the inmate denied suicidal thoughts. On November 27, 2017, he said he "rarely" thought of committing suicide. He was prescribed mirtazapine on November 30, 2017, which continued until his death. On December 1, 2017, he was discharged from the MHCB to the 3CMS level of care, and on December 3, 2017 he was transferred to the STRH and received an ASU Pre-Placement Screening when he denied suicidal ideation. During the five-day follow-up assessments, the inmate continued to deny intent and plans to self-harm. He was found hanging approximately 14 hours after his fourth five-day follow-up. He did not leave a suicide note.

II.   <u>Determination of Foreseeability</u>

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death may have been foreseeable in that available information suggested the need for more complete assessment of suicide risk and more complete assessment of the need for more intensive and targeted clinical interventions. The inclusion of a statement that the inmate was feigning suicidal ideation for secondary gain, was erroneously attributed to a previous assessment. This assertion was repeated in subsequent notes and may have hindered clinicians' ability to adequately assess the inmate's suicide risk prior to his death.

III.   <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was preventable. The likelihood that the completed suicide might have been substantially reduced if the inmate's risk of suicide had been more completely assessed, and had his complaints of auditory hallucinations, intermittent suicidal ideation, depression and fear and his request for a higher level of care been more carefully considered. This may have led to more targeted treatment and safety planning which might have prevented the death.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. It provided a summary of the inmate's available criminal, social, substance use, suicide and mental health history. It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in nine required QIPs.

The first related to an interview with a primary clinician and the inmate on October 23, 2017, when the clinician did not perform a suicide risk evaluation; although a referral note stated that he had said "I'm going to hurt myself." The clinician did not document the referral reason, explore the statement or create a safety plan. The response detailed that the inmate recanted his statement and made it because he wanted to express his concerns about his transfer. The clinician who did not perform the suicide risk evaluation received a seven-hour suicide risk evaluation training on November 21, 2017. Additional training about suicide risk evaluations for emergent referrals was provided at a Mental Health All Staff meeting on May 9, 2018.

The second related to inadequate portions (transfer/discharge planning, case formulation, and clinical summary) documented on November 21, 2017 by the IDTT on the Mental Health Master Treatment Plan, which recommended removal from the MHSDS. The inmate reportedly had no symptoms, even though he said he had "somewhat often" thoughts of suicide. As a result, the clinician who completed this document received feedback about completing treatment plans. Training about completing treatment plans was also provided at a Mental Health All Staff meeting on May 9, 2018.

The third related to an interview on November 22, 2017 that was not conducted in a confidential setting, even though the inmate was discussing his safety concerns. The clinician who completed this interview worked at the facility but did not receive training on this topic. Training on conducting interviews in confidential settings was provided at a Mental Health All Staff meeting on May 9, 2018.

36

The fourth related to the lack of documentation regarding the inmate's safety concerns, depression and suicidal ideation, and the focus on manipulation and malingering instead of present risk factors during a suicide risk evaluation on November 22, 2017. The clinician also did not perform the C-SSRS, which would have included important information about the inmate's history with suicidal ideation. As a result, an audit revealed that the clinician completed a suicide risk evaluation for ten of the 16 emergency referrals. This clinician no longer worked on the facility and did not receive training on this topic. Seven of the ten completed suicide risk evaluations completed by the clinician had inadequate safety plans. All ten did not adequately justify risk according to audit criteria. All staff received training regarding suicide risk evaluations for QIP 1, and there was a plan for staff to complete the Safety Planning Webinar for QIP 5.

The fifth related to the clinician who performed the November 22, 2017 who did not complete the mandatory trainings "Safety Planning Webinar" and "Differential Diagnosis of Complex Cases in Corrections." The training compliance report revealed that overall training compliance increased from 84% in March 2017 to 88% in April 2017, and most trainings were offered quarterly. All staff were expected to complete the "Safety Planning Webinar at the next offered time; the compliance rate was 79% at the facility at the time of the QIP response.

The sixth related to the clinician who performed the November 22, 2017 evaluation who did not attend the C-SSRS training. At the time, this was not on the list of mandatory trainings. As a result, the C-SSRS training webinar is anticipated to be included on the mandatory training list, but no updated list was provided.

The seventh related to deficiencies in the documentation of the inmate's MHCB admission from November 22, 2017 through December 3, 2017. As a result, all staff received training at a Mental Health All Staff meeting on May 9, 2018 regarding completion of documentation. Other staff members were mentored, feedback on suicide risk evaluation documentation was provided, and ten MHCB suicide risk evaluations were randomly audited.

The eighth related to the lack of individualized treatment interventions for the inmate's triggers during the five-day follow-up evaluations after discharge from MHCB on December 3, 2017. As a result, ten MHCB discharge five-day follow-ups were reviewed, and individual feedback was provided.

The ninth related to a ten-minute delay for emergency medical services activation. As a result, the correctional officer who discovered the inmate was provided training, and all custody staff were provided training on activation of the Emergency Medical System. Custody peace officers also received training on responding to suicide attempts, and all custody staff were required to take a class on Health Care Access Training that included the protocol for calling 911.

The QIPs were generally appropriate and addressed the identified concerns. QIPs 3 and 4 indicated that the clinician requiring training or counseling no longer worked at the facility, so they were not provided. In the event that clinician continued to work within CDCR, there should have been some provision for the required intervention to take place at the currently assigned facility. With respect to QIP 5 regarding safety planning training, the response indicated that the current compliance rate was 79% at the facility and QIP 6 discussed training that was planned. These QIPs were partially adequate but required a provision for follow up to ensure complete compliance at the end of the scheduled training.

Case J

    I.   <u>Summary of Case</u>

This inmate was a 38-year-old Asian man who was found by custody officers during security checks hanging in his solely occupied ASU cell in a RC on October 29, 2017. He was hanging with a sheet around his neck that was tied to a ladder attached to the wall of his cell, and he was pronounced dead about one hour after being discovered. He was not a participant in the MHSDS at the time of his death.

The inmate's place of birth was unknown, but he immigrated to the United States at age 16. He lived with his mother and siblings. He attended school until completing the tenth grade and then stopped for unknown reasons. He indicated his primary language was English, in which he was fluent according to records, but not in his native language which was noted to be an Asian dialect. He reported living alone as an adult and, when employed, he worked as a truck driver and delivery man. He denied substance use until age 37 when he began regularly using methamphetamine. He never married and had no children. It appeared that his criminality led to schisms with members of his family.

He was associated with an Asian street gang before coming to prison but denied being a full member of the organization. He had no known juvenile criminal history. His criminal history began at age 19 and entailed crimes of violence towards others, theft of property and vehicles, drug possession and violation of parole. He was noted to be an undocumented immigrant, and as a result he had several Immigration and Customs Enforcement (ICE) detainers, including at the time of his death. His commitment offense occurred in November 2014 when during a traffic stop a concealed firearm and methamphetamine pipe with residue were found in his pocket, in addition to over $24,000 found hidden in his vehicle. He was ultimately sentenced to his third CDCR term of one year and four months.

The CDCR SCR did not include a summary of his first two terms in CDCR. He entered CDCR for his third term in September 2017 at the RC where he was placed in the general population. He had no RVRs or appeals during his 40-day incarceration. He was

notified of an ICE detainer in September 2017; however, according to custody, inmates, and family members, he was not worried due to several past detainers having not led to deportation.  In October 2017 he was placed in ASU because he feared for his life due to prison politics and that he believed he was a target of assault by "all" other Asian inmates.  His placement in ASU was meant to be temporary while awaiting placement in the Special Processing Unit.  Custody staff reported that the inmate felt afraid but that they neither noted any threatening interactions between him and other inmates nor a change in his outward mood that would raise concern.  Interviews with a former cellmate and a distant cousin at the same facility indicated that he was looking forward to parole in December 2017 and that he aspired to regain his family's approval by positively changing his way of life.

Other than a slightly elevated LDL cholesterol level he was reportedly healthy.

He reported no history of mental health treatment in the community or while previously incarcerated.  During his stay at CDCR he was screened during intake in September 2017 and found not to require mental health treatment.  In October 2017 he received two ASU pre-placement screenings and one ASU Screening Questionnaire in October 2017.  He denied concerns during the pre-placement screenings.  During the ASU Screening Questionnaire, however, he reported symptoms of anxiety and depression in the past 30-days.  He was referred for evaluation by a mental health clinician and later that day when interviewed by a mental health clinician he was deemed to not require mental health treatment.  The clinician did not mention the mental health symptoms he reported on the ASU Screening Questionnaire earlier that day, suggesting the document may not have been reviewed prior to his mental health evaluation.  Despite this negative screen, a CDCR 7362 Health Care Services Request form requesting to be seen by mental health for depression was found posthumously in his cell.

He denied suicidal thoughts or behaviors during all screenings.  There was no history of self-harm, suicidal thoughts, intent or plans while at CDCR.  There were no suicide risk evaluations performed while he was at CDCR.  He left four notes prior to his death: two pre-suicide notes and two suicide notes.  The pre-suicide notes both had a spiritual-religious theme.  In the first he expressed the belief that he was being punished by God and in the second that with good works he may be forgiven.  Of the two suicide notes, in the first he spoke of a wish to be somewhere else where there was no hatred and that he had nothing to live for; in the second note, he apologized to his family for his failure to meet their expectations.  There is no discussion of the events of his final three days of life in the report.

There was no analysis of the adequacy of custody security checks while the inmate was in the ASU intake cell.

II.    Determination of Foreseeability

39

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable based on the available information indicating that, other than his safety concerns, he was not at substantial risk for suicide.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not preventable.

IV.   Critique of Suicide Case Review Report

The SCR was a minimally adequate summary of this case.  The SCR should have included a summary of his prior two CDCR terms including any relevant mental health treatment data, including suicide risk evaluations.  The SCR should have also included a summary of his final three days of life, or a statement on why the information was not included (e.g., it was not available).  Finally, an analysis of the adequacy of custody security checks while the inmate was in the ASU intake cell should have been included.

V.   Analysis of Quality Improvement Plan Process

This case resulted in two QIPs.  The first was related to the October 2017 mental health clinician evaluation.  The mental health clinician evaluation was deficient due to its failure to include the findings of depression and anxiety symptoms from the ASU Screening Questionnaire completed earlier the same day.  The QIP required training on the importance of including relevant information from the healthcare record for the mental health clinician who performed the evaluation.  As a result, training was provided by a supervisor to the clinician who performed the evaluation.  Signed documentation of the training by both the mental health clinician and the supervisor as well as a memorandum were provided to the Suicide Prevention and Response Focused Improvement Team (SPRFIT) as proof of QIP completion.

The second QIP was related to the inmate not being placed into a retrofitted, suicide resistant, ASU intake cell for the first 72 hours after placement in ASU.  The QIP called for an inquiry into ASU housing procedures to determine what actions or training were needed.  The facility provided a memorandum indicating that at the time of the death the only unit with retrofitted ASU intake cells was closed.  Updated policies and procedures were implemented as a result to insure better protection of inmates in ASU for the first 72 hours.  Evidence of training for custody officers in ASU was provided as proof the QIP was completed.

The QIPs were adequate and addressed the identified concerns.

Case K

I.   Summary of Case

This inmate was a 27-year-old Latino man who was found by correctional officers hanging in his single ASU cell on March 23, 2017.  He was not a participant in the MHSDS at the time of his death.

He was born and raised in California by his parents along with his three siblings.  He was noted to be a good student in elementary school and in middle school until he got in trouble and was expelled for smoking, possibly marijuana.  He was home-schooled afterwards.  At the age of 14 years old, he became involved with a Latino street gang.  His juvenile arrest history began soon after and included theft, resisting arrest, possession of tobacco, assault with a deadly weapon and gang activity.  By age 16, the inmate had spent nine months at a juvenile offender facility for assault with a deadly weapon and gang activity.  He began to work helping his father at a welding yard.  The inmate never married and had no children.  According to his sister, he was doing well until he started using alcohol and methamphetamine which repeatedly resulted in paranoia.

The inmate entered the CDCR for his first term in March 2009 with a sentence of five years for resisting an officer with threat of violence and evading an officer while driving the wrong way.  He received six RVRs during that term for possession of alcohol (twice), participating in a riot with use of force, tattooing, possession of a weapon and misuse of personal property.  He was involved with his gang during this term.  There was no discussion in the SCR of whether he received mental health treatment at CDCR during this first term, this was noteworthy given his RVRs for possession of alcohol and the information that substance use could have led to paranoia.  The inmate paroled in August 2013.

In September 2014, he was arrested for carjacking and fleeing parole which led to a six-year sentence.  He entered CDCR for his second and final term in January 2015 with an initial parole date in December 2017.  He maintained close contact with his family and friends during his second term, including 25 visits, and he wrote to his family in December 2016 saying he was no longer involved with the gang, wanted drug and alcohol treatment, and was looking forward to releasing on parole.  In prison, his academic level was measured to be between tenth and eleventh grade.  The inmate worked several jobs while in CDCR including dining room worker and porter.  He was also involved in several programs including vocation computer literacy, vocation electronics, college coursework and substance abuse programming.  During his second term, he had no appeals but received one RVR in February 2017 for battery on an inmate who was in an enemy gang leading to a placement in ASU.  However, the fight was not approved by his gang's leadership which led to him writing his family to let them know

that he had to separate from the gang, that he was being sent to another prison, and that he was worried about what would happen.  He called and ended his relationship with his girlfriend that same month.

The inmate had no reported formal mental health history prior to incarceration.  While at CDCR, he screened negative for mental health symptoms both while at the RC and before placement in ASU.  He denied a history of suicide attempts, had no known suicide attempts while at CDCR, repeatedly denied suicidal ideation or plans, and had no suicide risk evaluations completed during this term.

The inmate was considered healthy, and he had no chronic medical conditions.  While at CDCR he received treatment for allergic rhinosinusitis and impacted cerumen (ear wax).

Significant SCR findings prior to his death that may have influenced his decision to commit suicide included that he was given a "second chance" with his gang at the start of his second term, but he was not allowed to know anything about gang operations according to a confidential custody report; that his life and/or his family's lives may have been threatened by his gang and/or the enemy gang; and that he died on the anniversary of his first term incarceration at CDCR which was approximately five weeks after initially reporting his safety concerns to custody.  He did not leave a suicide note or any other indication for his actual reasons for suicide.

During the emergency response the inmate was noted to be in rigor mortis.  Assistance was requested by custody using a whistle instead of the Personal Alarm Device (PAD) that officers were required to wear, and 911 was not called until 11 minutes after the inmate was found.  The fact that he was found in rigor mortis "cold to the touch" and an internal body temperature of 82 degrees Fahrenheit led to the conclusion that security checks were inadequate, across two shifts.  Security checks required custody to make a "visual/physical observation of a living, breathing inmate" according to policy.  Custody documentation indicated that security rounds had been completed.

II.   Determination of Foreseeability

The Suicide Case Review Committee found that this suicide was not foreseeable.  The Special Master's expert agrees with the SCRC that this death was not foreseeable.

III.   Determination of Preventability

The Suicide Case Review Committee found that this suicide was preventable due to the failure of custody to perform adequate security checks during the shift the inmate was found and during the prior shift.  Additional support of this finding from the Special Master's expert analysis indicated that the inmate may have been found 11 hours after he

died based on his internal body temperature of 82 degrees Fahrenheit when he was discovered.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case.  The SCR included relevant social, criminal, incarceration, substance use, and mental health history.  It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report.  It could have been enhanced with an inclusion of a brief overview of his involvement, if any, with MHSDS during his prior incarceration.

V.    Analysis of Quality Improvement Plan Process

This case resulted in six required QIPs, three to address custody concerns and three to address nursing concerns.

The first custody concern that required a QIP was the failure of custody to perform adequate security checks on the inmate according to policy, as he was found in rigor mortis.  All custody QIPs required the Warden or designee to perform an inquiry into the findings.  In this case, custody was asked to inquire into the way security checks were conducted and to decide on any actions or training that need to occur.  A memorandum of the findings and actions taken, or training provided was to be submitted upon completion of the QIP.  The custody QIP memorandum provided indicated that this issue was referred for an OIA investigation.  There was no information provided on the result(s) of the OIA investigation.  However, a subsequent memo indicated that training was provided to all three shifts on the expectation that custody performed appropriate security checks.  Evidence of training was provided.  This response was partially adequate.

The second custody concern required a QIP to address the inappropriate way the inmate was cut down by custody.  When the noose was cut, he fell to the floor because custody did not support his body to relieve tension prior to cutting the noose.  Custody made the finding that staff were unable to get into position to support the inmate before cutting him down and that the officer that cut him down made the best decision given the circumstances to avoid further delay in the emergency response.  Custody provided training to all three shifts of officers in the ASU on the expectation that custody staff should support a hanging inmate before cutting them down.  Evidence of training was provided.  This response was adequate.

The third custody concern required a QIP to address the officer's use of a whistle instead of a PAD to alert other officers that the inmate was found hanging.  Custody made the finding that staff on the ASU where the inmate was housed historically used whistles to alert officers when there is an emergency because the PADs activated for the entire

building instead of the ASU.  The policy and post orders were updated to reflect that officers can use either a whistle or a PAD in the ASU.  It was also noted that there were not enough PADs in the facility for every officer to carry one.  Custody provided training to all three shifts of officers in the ASU on the updated post orders.  Evidence of training was provided.  This response was adequate.

The nursing QIPs were to include an inquiry and steps taken to address the following three concerns: initiating cardiopulmonary resuscitation including attempting to insert an oropharyngeal airway on a person with signs of rigor mortis, failure to document the results of the automated external defibrillator device analysis and whether it advised a shock, and the 11-minute delay in activating 911.  It was noted that the CCHCS Death Review Committee would address the nursing QIPs and that the findings would be included in the Final Death Review Summary.  Evidence of these inquiries was provided in the CCHCS Final Death Review which agreed with the findings and referred the QIPs to the Nursing Professional Practice Committee (NPPC).  The report did not include the NPPC QIP response.  Therefore, this response was inadequate, because no evidence was provided on the response to the three QIPs that were related to nursing.

Case L

   I.   <u>Summary of Case</u>

This inmate was a 26-year-old Latino man who was found by correctional officers hanging in his double SNY cell from a ladder on April 19, 2017.  His cellmate was out of the cell when he committed suicide.  He was not a participant in the MHSDS at the time of his death.

There was very little socio-demographic information available about this inmate.  According to a Probation Officer Report (POR), he was born in California.  There was no information about his family or upbringing in the available documents, but he was noted to have written his mother letters while in prison.  He attended school until he dropped out after the ninth grade due to the birth of his first child.  He dropped out to get a job to provide for his child.  He worked as a seasonal laborer beginning at the age of 15.  He never married but had a total of four children.  He apparently only had contact with his youngest child with his girlfriend who was still a toddler at the time of his death.  He had no known gang affiliations.  The inmate began using marijuana, alcohol, and methamphetamine as an adolescent/early teen, and he escalated to daily use prior to the offense that led to his incarceration.  His juvenile criminal history included one misdemeanor and one infraction that were both informally handled and did not result in incarceration.  His adult criminal history included a conviction for unlawful sexual intercourse and two for domestic violence.  He had no prior state prison incarcerations but was a repeat probation violator leading to several periods in local jails ranging from 30 to 365 days in jail between 2008 and 2014.

His commitment offense occurred in June 2016 when he spent the night with his girlfriend and repeatedly physically assaulted her with his two-year-old child laying nearby. He fled when his girlfriend called the police. He later admitted to having used alcohol and methamphetamine that night. The inmate moved out of state after that and did not return until fall 2016 when he was arrested for probation violation and ultimately sentenced to three years in state prison for corporal injury of a spouse. His POR included a statement by the inmate that indicated he took responsibility for his actions that led to incarceration and that he wanted to change.

The inmate entered CDCR in March 2017 for his first term. He was placed in an SNY shortly after arrival due to reportedly being placed in protective custody while in the county jail. However, no explanation was provided regarding the reason for protective custody. While at CDCR, he received no RVRs and had no appeals. He was assessed for the Developmental Disability Program but found not to meet criteria. He had no visits and received no phone calls in the 40 days he was in CDCR prior to his death. The inmate was not in included in the MHSDS, and he screened negative for mental health services while at CDCR. There was no record of mental health treatment while in jail or in the community. No suicide risk evaluations were performed while the inmate was at CDCR.

Interviews with the inmate's cellmate and other inmates he knew provided additional information on his mental and emotional state prior to his death. His belongings included letters to his mother and girlfriend. The letters to his girlfriend and mother centered on repeated apologies and requests for their forgiveness and love. His belongings also contained writings about death and drawings of a stick figure hanging by a noose.

The inmate's cellmate reported speaking to him repeatedly about his relationship issues with his girlfriend and his regret over the commitment offense that led to them breaking up. His cellmate self-identified as a support for the inmate. His cellmate reported that the inmate tried to kill himself three times before he died by suicide.

The first suicide attempt for the inmate involved swallowing a bottle of keep-on-person medication paired with constructing a noose to hang himself. His cellmate was able to speak to him and get him to agree not to attempt to harm himself again. The cellmate did not report this incident. His cellmate attempted to throw the noose out the window, but it would not fit. The inmate then convinced him to keep the noose to work out with in the cell, and the inmate later used the noose to commit suicide.

The second suicide attempt occurred about two weeks before the inmate killed himself and entailed him cutting his wrists in the shower. The cellmate stated that he reported the incident to a custody officer in their housing unit; however, the inmate was never referred to mental health for further evaluation. The SCR indicated that an OIA investigation was initiated to examine whether custody was told about the second suicide attempt.

The third suicide attempt occurred about one week before the inmate killed himself.  It entailed the cellmate awakening to find his view of the inmate from the lower bunk obstructed by a jacket.  After engaging him in conversation, the cellmate found out he had interrupted him in the middle of constructing a new noose to commit suicide.  He reported he was upset over a letter from his girlfriend indicating there was no chance of reconciliation for them.  His cellmate believed he would not attempt suicide again due to their talk.

The inmate left two suicide notes on top of his Bible.  The first was in a Mother's Day card to his girlfriend and the other was to his mother and family.  Both notes entailed apologies for his choice to take his own life.  The SCR reviewer opined that the suicide appeared to have been fueled by his break-up with girlfriend and showed evidence of careful planning and rehearsal based on his three prior attempts.  The inmate's cellmate was out of the cell for medical reasons when he ended his life.

II.     Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.     Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was preventable.  Custody's failure to refer the inmate for mental health evaluation after his cellmate reported his second suicide attempt led to a missed opportunity to intervene and most likely prevent his suicide two weeks later.  He would have likely been placed in an MHCB and may have been referred to a higher level of care afterwards given his repeated suicide attempts at that point in time.

IV.     Critique of Suicide Case Review Report

The SCR was an adequate summary of this case.  The SCR included relevant social, criminal, incarceration, substance use, and mental health history.  It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report.

V.     Analysis of Quality Improvement Plan Process

This case resulted in two required QIPs, with a third pending due to an OIA investigation. There were no mental health or nursing concerns noted.

The first custody concern that required a QIP was the failure of custody to bring the cut down kit to the scene per policy.  All custody QIPs required the Warden or designee to perform an inquiry into the suicide and prevention response procedures and to decide on any actions or training that needed to occur.  A memorandum of the findings and actions taken, including training provided, was to be submitted upon completion of the QIP.  The custody QIP memorandum provided indicated that custody officers on the unit were unable to bring the cut down kit to the cell because the kits were attached to the wall.  The intervention included ordering Emergency Rescue bags for every housing unit and retraining staff on the updated policy.  Evidence of training was provided.  This response was adequate.

The second custody concern required a QIP because the inmate's body was not supported appropriately prior to being cut down.  Custody found that this was an issue and provided training to custody officers on the unit that instructed them to support a hanging inmate before cutting them down.  Evidence of training was provided.  This response was adequate.

There was no memorandum with an update on the results of the OIA investigation into whether custody was informed of the inmate's second suicide attempt and whether they failed to refer him to mental health for further evaluation.  This response was inadequate.

Case M

I.   Summary of Case

This inmate was a 29-year-old, single, African American male who, according to the SCR, was found hanging from a bed sheet tied to an "air vent" in his solely occupied double-cell in a general population yard on March 26, 2017.  In contrast, the Nursing Death Review Summary indicated he was "discovered non-responsive in his cell on the ground between the toilet and lower bunk" with a bedsheet tied to his "upper bunk." He was classified Level IV and was included in the MHSDS at the EOP level of care at the time of his death.

The SCR indicated that the inmate was born in Riverside, California, and he was raised in foster care and group homes.  Child Protective Services removed him from his parents' custody at the age of 13 as a result of abuse.  Although he left high school during the tenth grade, he received his GED in 2012.  The inmate struggled with substance abuse issues from adolescence until his death.  While the SCR noted abuse of various substances, he appeared to prefer methamphetamine and other stimulants since age 26.

He maintained communication with his parents via letters and had seven visits with his mother and son during his brief second term, the most recent of which occurred in February 2017.  The inmate learned that his son was in the process of adoption without

an opportunity for reunification around December 2016.  The SCR indicated no recent phone calls.  The SCR did not provide information about his marital status.

His criminal history was significant for a robbery in 2006 that resulted in juvenile probation, as well as a bank robbery in 2008 that resulted in his first CDCR prison term with a six year and eight month sentence.  Although he paroled in 2013, he returned for 120 days for a violation, and was subsequently released on May 23, 2015.  He was arrested for the commitment offense one day later on May 24, 2015.  He reportedly threatened a female with a screwdriver and appeared under the influence of an unknown substance on this date.  He entered CDCR for his second term in March 2016, and his release date would have been on July 31, 2017.  The SCR did not provide sentencing information.

The inmate was housed at eight different institutions in the 12 months prior to his suicide, with no more than three months at one facility.  The SCR referenced two RVRs during his recent term, both of which were issued within a month of his death.  On February 28, 2017 he received an RVR for fighting, and on March 15, 2017 he was issued an RVR for sexual disorderly conduct during group therapy.  The SCR also noted he had no prior record of exhibiting inappropriate sexual behavior and that he transferred to another facility one day later.  The SCR indicated his former cellmates reported the inmate was afraid of retaliation and of being killed as a result of the fight on February 28, 2017, which was consistent with his reports to mental health staff prior to his suicide.

The SCR noted outpatient mental health treatment for "ADHD, Bipolar Disorder, Mood Disorder, and depression" during adolescence.  He was also hospitalized for an attempted suicide by overdose on his mother's prescription medication in 2000.  Although the inmate did not access mental health treatment in the community as an adult, he was included in the MHSDS at the 3CMS level of care during his prior term between 2011 and 2013.  He also had one DSH admission in 2011 for depressive symptoms and suicidal ideation with a plan to stab himself.  The SCR also referenced progress notes from 2013 that stated, any thought of his parole date "triggers anxiety." The inmate attempted suicide a second time in 2015 at a county jail, prior to entering CDCR for his recent term. He reportedly tried to suffocate himself by placing tissue into his throat.

After returning to CDCR for his second term, the inmate was included in the MHSDS at the 3CMS level of care on March 22, 2016 "as a precaution" based on his mental health history.  He received diagnoses of Mood Disorder, NOS and Antisocial Personality Disorder.  The SCR referenced a July 6, 2016 progress note that indicated he did not sleep or eat for days during periods of stress and that his "family matters" were his greatest stressor.  The note further suggested that the inmate had insufficient coping skills.  According to the reviewer, he endorsed perceptual disturbances around this time which were suspected to be substance induced.

The inmate required more intensive mental health services throughout the last three months of his life.  It appeared the loss of his son to adoption initially triggered the decline in functioning; as subsequently, his psychiatric symptoms worsened, his suicide risk elevated, he received two RVRs and he was evaluated for MHCB level of care on five occasions.  However, he had only one MHCB admission on December 7, 2016 and one brief alternative housing placement on March 1, 2017.  During his 11-day MHCB admission for threatening to kill himself by hanging in December 2016, he was treated for depression where he was prescribed sertraline and discharged to the EOP level of care for further treatment of mood symptoms and substance use problems.  He admitted to recent heroin, cocaine and methamphetamine use during this admission.  However his psychiatric medication was discontinued upon transfer to another facility a short time later, reportedly due to his expressed concerns about being unable to enter a drug treatment program at the time of his release several months later.

The SCR noted a brief period of stability until February 28, 2017, when the inmate received an RVR for fighting.  On March 1, 2017 he was placed in alternative housing after endorsing suicidal ideation; however, his MHCB referral was rescinded with a progress note that stated "no evidence of acute distress" and that his presentation "likely indicates secondary gain motives."  The SCR noted he endorsed thoughts of suicide at least once during the subsequent five-day follow-up but reported no intention of engaging in self-harm.  Only one treatment plan was referenced in the SCR.  The reviewer noted that on March 9, 2017 the clinician wrote the inmate was unwilling to engage in out-of-cell contacts or participate in the treatment planning process.  Although the reviewer did not provide an opinion about the adequacy of this treatment plan, the description suggested it was insufficient, as it only targeted impulsivity and labile mood while ignoring suicidal thoughts and underlying stressors.

The inmate arrived at his most recent facility on March 16, 2017.  On March 17, 21 and 22, 2017, he was evaluated for MHCB admission based on suicide concerns; however, none of these evaluations resulted in a referral for inpatient care.  Although his EOP primary clinician suggested his acute suicide risk was high and that he required MHCB admission on March 17 and March 22, a second clinician with less knowledge of his case re-evaluated his risk as lower and cleared him to return to his cell just hours later.  The SCR noted that the second clinician did not sufficiently justify the decisions in the clinical documentation or consult with the primary clinician on these dates.

According to the SCR, the March 17, 2017 suicide risk evaluation included "a number of serious acute risk factors" including fear of retaliation for the February 28, 2017 fight, current suicidal ideation, anxiety related to parole, recent loss of his son through adoption and recent death of his grandmother.  The primary clinician also noted on March 17, 2017 that the inmate rated his suicidal ideation at a ten out of ten, that he could not stop the thoughts, was unable to identify protective factors, that his medication was not helping, and that he was going to kill himself.  However, he was not admitted to the

MHCB on this date.  On March 22, 2017 the primary clinician suspected substance intoxication, and wrote that he reported, "I did something that put me at risk.  They are going to kill me.  I am a piece of shit, I am not safe.  If I go back to my cell I am going to jump off the tier or hang myself" and that he said he was "going to die anyway." The primary clinician assessed his chronic suicide risk as moderate and his acute risk as high, and he was referred for another suicide risk evaluation instead of referral to the MHCB. The SCR indicated that the inmate spent five hours and 25 minutes in a shower stall with a custody suicide watch observer on this date, and that he cut himself with a metal drain cover while waiting for the second evaluator.  Custody officers then sprayed him with chemical agents in an attempt to stop him from further self-harm.  Despite these events and the primary clinician's documentation suggesting the need for MHCB admission, the second clinician assessed his acute suicide risk as low without consulting with the primary clinician or reviewing her evaluation, and the inmate was released back to his cell.  The SCR indicated that no individualized safety plan was developed on March 22, 2017 and that there was no documentation to support a psychiatric technician's report that he was medically cleared after inflicting self-harm on this date.

The primary clinician informed the suicide case reviewer she was concerned the inmate was not admitted to the MHCB on March 22, 2017.  However, the matter was not elevated, and the next and final primary clinician contact occurred at cell-front on March 24, 2017 due to refusal.  The primary clinician's progress note, and a note from the dental department described the inmate as behaving "erratically" on this date, but there was no attempt to intervene including through enhanced monitoring, more frequent contacts, or ensuring a thorough evaluation out-of-cell.  He was found hanging in his cell at 1407 on March 26, 2017.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not indicate whether the inmate's suicide was foreseeable.  The Special Master's expert determined this suicide was foreseeable based on available information.  The inmate was due to parole four months after his death. However, within 30 days of his suicide he received two RVRs, exhibiting worsening symptoms without sufficient coping, was evaluated for MHCB placement on four occasions for statements suggesting suicidal intent and intense fear for his safety, engaged in self-injurious behavior while waiting for an evaluation on suicide watch, and exhibited "erratic" and impulsive behavior with signs of substance intoxication.  It was clear he required a higher level of care and that his primary clinician recognized this; however, clinicians with less knowledge about his case, including one unlicensed clinician, conducted inadequate suicide risk assessments, and he was returned to his cell without appropriate interventions in lieu of inpatient care.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability in this case.  The Special Master's expert, however, determined this suicide was preventable based on available information.  CDCR staff failed to collaborate and appropriately intervene to address the inmate's high acute suicide risk and apparent psychiatric decompensation.  On two occasions, the EOP primary clinician's opinion regarding risk for suicide and need for inpatient care was seemingly disregarded by a second clinician with less knowledge of the inmate.  The inmate was denied MHCB admission without the two clinicians resolving their disagreements and without sufficient documented rationales or enhanced treatment and monitoring in lieu of inpatient care.  Further, the primary clinician informed the suicide case reviewer she was concerned the inmate was not admitted to the MHCB on March 22, 2017; however, this clinician did not elevate the matter to a supervisor or implement increased contacts or monitoring in lieu of inpatient care.  The primary clinician also did not conduct a thorough out of cell evaluation during their next and final contact on March 24, 2017, despite recent events and suggesting he was behaving erratically on this date.  The inmate was discovered hanging in his cell two days later on March 26, 2017.

It is also worth noting that; although the suicide case reviewer's comment was not well explained, page 18 of the report stated problems identified during the review "were considered contributory to the death."

IV.     Critique of Suicide Case Review Report

The SCR provided a summary of relevant social, criminal, incarceration, substance use, and mental health history.  The SCR was also thorough in its critique of suicide risk evaluations and clinical documentation during crisis encounters.  However, the SCR did not provide an adequate review of the inmate's mental health care over time.  The SCR did not include a critique of treatment plans, medication management, routine treatment encounter interventions, treatment compliance issues, higher level of care considerations and non-referral rationales.  As such, there was no indication whether the underlying precipitants to the inmate's suicide were sufficiently recognized and addressed by treatment teams at his various institutions or whether intermediate care should have been considered or initiated prior to his suicide.

The inmate was evaluated for MHCB placement without admission on four occasions during the month of his death; however, the SCR did not consistently assess the quality of or indicate whether safety plans were completed at each encounter despite the denial of inpatient care.  The SCR mentioned custody staff sprayed the inmate with a chemical agent after he cut himself with the shower drain cover while on suicide watch on March 22, 2017; however, there was no critique or further information about this event in the report.  Additionally, the SCR wrote both that the inmate was found hanging from a bedsheet to an air vent and that nursing indicated he was found on the ground near the

toilet with a noose tied to the upper bunk of his bed, but never commented on the discrepancy in their report.

The format of the SCR's QIPs was difficult to follow, and in the "problem" summary table on page 18, under the seven identified nursing department concerns, the SCR indicated, "The concerns are listed above and were considered contributory to the death." However, the SCR did not discuss this opinion elsewhere and it was unclear why this statement was only listed in the nursing section, considering serious problems were also identified for mental health.

V.      Analysis of Quality Improvement Plan Process

This case resulted in 10 identified problems, with six for nursing, one for custody, two for mental health, and one combined QIP for custody and mental health.

Custody staff received a QIP for failing to respond with the entire cut-down tool kit, and the SCR required the Warden to conduct an inquiry and determine required actions or training for staff.  The Warden submitted a memo and proof of training indicating the identified staff members were retrained regarding policy requirements related to this item.

Two institutions received mental health specific QIPs for suicide risk evaluation inadequacies, one of which focused on discrepancies between the two clinicians on March 22, 2017.  The reviewer recommended the Chief of Mental Health or designee to decide what actions needed to be taken regarding the suicide risk evaluation problems identified on March 22, 2017.  The SCR also recommended training for all staff regarding consultation between the primary clinicians and MHCB triage team.  A portion of this item was appropriately addressed with training on a local policy change that required the MHCB triage clinician to consult with the primary clinician, review records and communicate with a mental health supervisor.  The institution also noted that quarterly suicide risk evaluation and safety planning training would commence in June 2017.  However, the identified MHCB triage clinician's negligence on March 22, 2017 was not sufficiently addressed by the institution and required further intervention.

The Warden and CEO were required to review the local operating procedure related to use of holding cells with identified staff and to review the length of time it took for the inmate to be assessed by mental health on March 22, 2017.  The Warden submitted a memo with proof of training on related policy for involved custody staff; however, there was no indication this item was resolved by the CEO and mental health department. Further, the SCR suggested the inmate was also evaluated by two different clinicians over the course of five or more hours on March 17, 2017; however, the reviewer did not recommend a timeline review for this date or training of involved staff.

Lastly, the SCR did not provide QIPs for nursing deficiencies, but noted they would be addressed by the CCHCS Death Review Committee.  Documentation related to the nursing QIPs was not available for review.

Case N

I.   Summary of Case

This inmate was a 24-year-old single, Latino male who was discovered hanging from a vent in his solely occupied ASU cell at approximately 0707 hours on August 4, 2017.  He was serving a first prison term of life with parole for involvement in the murder of a rival gang member when he was 17.  The inmate was receiving mental health services at the EOP level of care at the time of his death.

The inmate was born and raised in Los Angeles, California.  He was the second oldest of five siblings, and his parents remained married until he was in his twenties.  The inmate denied a history of abuse and neglect; although, he endorsed significant shame and guilt related to "molesting" his sister.  He dropped out of school in junior high as a result of fights and gang involvement; however, he received his GED in 2010.  The inmate began abusing methamphetamine daily at age 12 or 13 and heroin at age 19.  He reportedly abused "any drugs that were available" to cope with his incarceration, and he continued to struggle with substance abuse issues until his death.

The inmate never married or fathered children.  He routinely reported confusion and safety concerns related to his sexual orientation.  He appeared to have a positive relationship with his most recent cellmate, was writing letters to a female who apparently expressed interest in continuing their relationship, and he remained in communication with his parents until his death; although, he reportedly felt responsible for his parents' divorce, and his cellmate believed he blamed himself for his sister's recent miscarriage.

The inmate had no prior arrests or convictions.  He was 17-years-old when he and his codefendants shot and killed a rival gang member, a crime for which he was sentenced to life with parole for first degree murder and intentional discharge of a firearm causing great bodily injury/death.  He entered CDCR in November 2012.

The SCR indicated he was initially gang involved in CDCR until April 2013, when he requested protective custody due to reported concerns that other inmates commented he was "homosexual and would be assaulted." He subsequently received SNY designation on May 16, 2013.  The SCR reported conflicting information about the inmate's disciplinary history.  In the narrative, the SCR noted that he received six disciplinary chronos and four RVRs, yet in a table of disciplinary actions, six incidents were listed next to the heading "CDCR RVRs."  The six incidents were related to possession of contraband and controlled substances, disobeying, violation of standards and failure to return a library book; however, there were no RVRs received after 2015.  At the time of

his death, he was in ASU for reported safety concerns and classified Level V maximum custody.

The inmate first accessed mental health services at age 12 or 13 for symptoms of depression.  He did not access mental health services in CDCR until August 26, 2015 when he was admitted to the MHCB for suicidal ideation, anxiety, paranoia, depression and recent methamphetamine use.  At that time, he was noted to be "despondent over his sentence" and ashamed about his SNY status and a sexual incident that was known by other inmates.  He was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depressed mood during this MHCB admission, and he was removed from the MHSDS upon discharge.

His next contact with CDCR mental health staff occurred at the time of his second MHCB admission for danger to self on October 3, 2015.  He submitted a health service request form on this date stating he was gay, ashamed, and felt like he wanted to "end it all." He also stated to a nurse that "suicide may be a better alternative than being in prison" and reportedly admitted to crafting a noose to hang himself.  During the course of his October 2015 MHCB admission he presented with paranoia, auditory hallucinations, hopelessness, anxiety and fears that other inmates wanted to kill him.  On October 8, 2015, he was placed in restraints after reportedly banging his head in response to auditory hallucinations, and a t-shirt was found hanging from the vent in his cell.  The MHCB psychiatrist initiated anti-anxiety and antipsychotic medication, documented a possible diagnosis of "malingering," and recommended a referral for neurological testing.  The inmate was discharged to the EOP level of care after approximately 20 days in the MHCB.  His discharge diagnoses were Adjustment Disorder, Methamphetamine-Induced Psychosis, Polysubstance Dependence and Antisocial Personality Disorder.  The SCR, however, did not comment on the MHCB treatment team's higher level of care considerations or non-referral rationales despite the extended length of stay and apparent difficulties managing him in the MHCB.  It was also silent on the completion of neurological testing following the referral.

The inmate had a third MHCB admission less than three weeks after his October 23, 2015 discharge.  On November 10, 2015 he was referred to the MHCB after reporting a hanging attempt and endorsing suicidal ideation with a plan to end his life.  Notes from this admission indicated he endorsed purposelessness as a result of his life sentence and believed he would likely commit suicide rather than serve out his sentence.  Although this was his third MHCB admission in a three month period, he was not referred to a higher level of care, and the SCR did not comment on the adequacy of the MHCB treatment team's higher level of care non-referral rationale.  The inmate reportedly improved significantly with medication and out of cell programming, and he was discharged to the EOP level of care on November 18, 2015 with diagnoses of Adjustment Disorder, Substance-Induced Mood Disorder and Antisocial Personality Disorder.

He continued to exhibit mood instability, suicidal ideation, anxiety, depression and paranoia throughout 2015 and 2016.  Treatment and medication adherence were also problematic during his time period.  His antidepressant medication was discontinued due to complaints about sedation in January 2016, and no other antidepressant medications were prescribed after this date.  Antipsychotic medication (haloperidol) was discontinued in February 2016 as auditory hallucinations were "thought to be related to drug use."

In January 2017, the inmate was treated for an infected laceration to his arm.  He informed nursing on January 30, 2017 that he cut his arm the previous week while using drugs.  The SCR noted that, although he met with his primary clinician on this date, a suicide risk evaluation and safety plan were not completed.  In February 2017, his anti-anxiety (hydroxyzine) and antipsychotic (haloperidol) medications were restarted; however, the inmate was nonadherent, and the haloperidol was discontinued again on April 2, 2017.

The inmate's most recent suicide risk evaluation was completed on May 3, 2017, when he endorsed suicidal ideation "within the past week and past three months."  He also reported hopelessness and stated that he needed to be more open with his clinician.  The SCR noted his chronic and acute suicide risk were assessed as moderate on this date; however, the clinician failed to complete an individualized suicide prevention safety plan.  The SCR also noted that, although he endorsed passive suicidal ideation on May 8, 2017, the primary clinician still did not develop a plan to monitor his suicidal ideation.  The inmate subsequently refused his next primary clinician contact on May 16, 2017.

He transferred to another facility on May 22, 2017.  The SCR noted that mental health staff did not complete a suicide risk evaluation in accordance with MHSDS Program Guide after his arrival.  The clinician attributed his history of suicidal ideation and behaviors to "an attempt to manipulate his environment and fulfill certain needs/desires;" however, this statement was not justified in the documentation, and the clinician did not consider that the inmate chose not to inform staff of the self-inflicted laceration to his arm until after it became infected on January 30, 2017.

The SCR noted that in early June 2017, the inmate requested antidepressant medication; however, only buspirone and hydroxyzine were prescribed for anxiety on June 16, 2017. Throughout June and July 2017, his treatment participation was described as sporadic. However, the SCR did not indicate whether his EOP treatment team appropriately considered a higher level of care.  On July 11, 2017 he reported guilt related to his victim and family, adding that he felt like a "piece of shit." He informed his clinician on July 25, 2017 that he was nonadherent with medication; additionally, he reported that he was "chasing drugs," but could not find any, that he would "honestly" use right now and that he thought about killing himself but did not want to do that to his family.  The primary clinician did not complete a suicide risk evaluation and safety plan or enhance his care and monitoring in any way on this date.  Approximately nine days later, during his EOP

IDTT on August 3, 2017, the inmate was tearful and stated, "It doesn't really matter [3CMS or EOP] …I don't think any of you care…even if I told you [everything] you wouldn't really care…I think with the things I've done I don't deserve to live." The SCR noted that the treatment team did not intervene or complete a suicide risk evaluation and safety plan in response to these statements.  Later that day, the inmate requested placement in administrative segregation for safety concerns, and he was placed in a non-retrofitted ASU cell where he covered his window and hung himself with a braided sheet.  According to the SCR, he was discovered the following morning at 0707 hours "cold to the touch" with a "rigid jaw and fingers" and with "purple/blue fingertips."

## II.   Determination of Foreseeability

Although the Suicide Case Review Committee did not indicate whether the inmate's suicide was foreseeable, the Special Master's expert determined that this suicide was foreseeable based on available information.  The SCR noted that the inmate had "contemplated suicide as a viable option" since 2015.  He also made statements suggesting he would likely take his own life to avoid serving a life sentence in prison.  He often talked about suicide and attributed his chronic suicidal ideation to his life sentence, feelings of guilt and shame related to his sexual identity and criminal acts, hopelessness, loneliness, and at times, concerns for his safety.  His substance abuse also appeared to be a contributing factor to his psychiatric symptoms, and his suicidal behaviors often occurred in the context of methamphetamine use.  The SCR noted that the primary clinician did not sufficiently monitor his suicide potential as indicated after May 3, 2017, and he subsequently transferred to another facility on May 22, 2017.  Staff at the receiving institution attributed his history of suicidal ideation and behaviors to "manipulation" and were not aware of his current suicide risk, as they never attempted an assessment of suicide risk despite MHSDS Program Guide requirements and clinical indications.  The SCR specifically noted that the receiving institution staff failed to complete suicide risk evaluations and safety plans following his arrival and in response to suicidal statements on July 25, 2017 and one day prior to the suicide discovery on August 3, 2017.  As such, the treatment team did not appear to have an accurate estimation of his suicide risk or a sufficient plan to minimize his suicide risk around the time of his death.

## III.   Determination of Preventability

The Suicide Case Review Committee did not indicate whether the inmate's suicide was preventable; however, the Special Master's expert determined the suicide was preventable based on available information.  An EOP clinician did not complete a suicide risk evaluation or develop a safety plan after learning the inmate cut his arm with a razor blade in an attempt to take his life in January 2017.  On May 3, 2017 the inmate endorsed anxiety, suicidal ideation, feelings of hopelessness and substance abuse over a three-month period; however, the clinician did not appropriately intervene, consider enhanced monitoring or develop a suicide prevention safety plan.  The SCR noted staff at a

receiving institution violated MHSDS Program Guide requirements by failing to administer a suicide risk evaluation following his arrival to their institution on May 22, 2017.  This departure was especially concerning given the inmate's suicidal statements prior to arrival, his history of suicidal statement and behaviors, the lack of safety planning prior to his arrival and his recorded suicide attempt in January 2017.  The EOP treatment team failed to complete suicide risk evaluations and safety plans on two occasions in response to suicidal statements during clinical encounters.  For example, on July 25, 2017 he informed his EOP clinician he thought about killing himself and on August 3, 2017; he was described as tearful during IDTT and stated, "It doesn't really matter [3CMS or EOP] …I don't think any of you care…even if I told you [everything], you wouldn't care...I think with the things I've done I don't deserve to live."

There were also two custody policy violations referenced in the SCR that suggested preventability.  On August 3, 2017 the inmate informed custody staff he had safety concerns and requested placement in ASU; however, he was placed in a non-retrofitted ASU cell where he hung himself from a vent with a braided sheet while his window was covered.  According to the SCR, there was a vacant retrofitted safety cell at the time of his placement.  The SCR also questioned the thoroughness of custody staff's security and welfare checks during first and second watch, as the inmate was "cold to the touch, had a rigid jaw and fingers, and purple/blue finger tips" upon discovery.  The SCR further noted that; although the Round Tracker Summary confirmed checks were completed in ASU, "…it appears the making of a visual/physical observation of a living, breathing inmate, free from obvious injury as required did not occur appropriately during either Watch."

IV.   Critique of Suicide Case Review Report

The SCR provided an inadequate summary of this case.  Relevant social, criminal, incarceration, substance use and mental health history were included, as was a reasonable assessment of the precipitants to this suicide and recommendations that directly corresponded to the content and findings within the report.  However, treatment plans, medications and higher level of care non-referral rationales were not sufficiently critiqued.  The suicide case reviewer also did not indicate whether the various disciplines involved in his EOP care adequately addressed substance abuse issues, treatment nonadherence, sexual identity issues, diagnostic uncertainties, psychiatric symptoms, functional deficits, and feelings of guilt, shame and hopelessness.  Although the SCR referenced interventions in progress notes on dates where the inmate endorsed suicidal thinking, it did not indicate whether progress notes included appropriate and ongoing treatment interventions to address suicide risk and other clinical needs.  Further, the SCR noted the decedent's recent cellmate believed he had "communication issues with his primary clinician" and that his mother reported that the facility was moving him to "gangville," "taking him out of EOP," and using him as a "test subject" to see how he would handle a "regular environment in level II"; however, there was no follow up to

these reports and they were not discussed elsewhere in the report.  This was especially concerning as the inmate's mother appeared to attribute his suicide, in part, to receiving this news.  Finally, while the SCR adequately focused on clinicians' failures to administer suicide risk evaluations and safety plans when required or indicated, it did not offer a sufficient critique of the quality or accuracy of completed suicide risk evaluations.

V.    Analysis of Quality Improvement Plan Process

This case resulted in a total of four required QIPs.  The two QIPs for mental health were related to suicide risk evaluation concerns.  At one facility, staff failed to complete a suicide risk evaluation and safety plan upon learning the inmate lacerated his arms from a suicide attempt on January 30, 2017 and failed to complete an individualized suicide prevention safety plan when he endorsed suicidal ideation on May 3, 2017.  The QIP for these problems required suicide risk evaluation retraining and an audit of ten suicide risk evaluations for identified staff.  The Special Master's expert determined this QIP was adequate and appropriately resolved through suicide risk evaluation mentoring and auditing, training and staff counseling.

A QIP was required for a second facility's failure to complete suicide risk evaluations after the inmate's arrival, in response to suicidal statements during a July 25, 2017 individual contact, and in response to suicidal statements during IDTT on August 3, 2017.  This QIP required "training to mental health staff about the importance of considering clinical needs of the patient when assessing suicide risk" and determining "if any additional education or training is needed." However, the Special Master's expert determined the reviewer's recommended QIP was too vague and should have included, at a minimum, a discussion regarding identification of risk and appropriate interventions in this particular case, as well as more in depth training on suicide prevention, safety planning and Program Guide requirements.  Fortunately, mental health staff addressed the QIP with appropriate training during their monthly suicide prevention meeting.  However, the facility's memo stated the case was reviewed with "the involved clinician," while failing to indicate whether other members of the August 3, 2017 IDTT participated in training or received counseling.

The QIPs for custody addressed the inmate's placement in a non-retrofitted intake cell despite the availability of a retrofitted cell at the time he entered ASU, and their failure to visually observe and assess the inmate's safety during ASU rounding.  The two QIPs required the Warden to address the apparent policy and procedure violations by submitting a memorandum indicating completion of the 989 process and a description of actions taken to address both matters.  While the Warden submitted a memo indicating the case was referred to OIA for further investigation to address the two QIPs for custody staff, OIA's response was not available at the time of this review.

Case O

I.  Summary of Case

This inmate was a 43-year-old Vietnamese male who was discovered hanging from the
metal cover of a smoke detector in his solely occupied MHCB cell on December 5, 2017.
The SCR indicated he cut his MHCB safety mattress with a state issued razor and used
the mattress material to craft a ligature.  He was transported to a community hospital
where he remained on life support equipment until brain inactivity was confirmed, and he
was pronounced dead on December 11, 2017.  His level of care was MHCB at the time of
suicide.

According to the SCR, the inmate immigrated to the United States at age 14.  He was
raised by his mother, as his father reportedly died by suicide in Vietnam.  The decedent
reportedly began abusing illicit substances around age 16, including cocaine,
methamphetamine and alcohol.  He left school in the eleventh grade but completed his
GED while incarcerated in 2010.  Although he never married, he reportedly had one
biological son with whom he had no contact.  The SCR indicated no visitors since June
2009 and no recent phone records.  The inmate believed he was a burden to his family,
and he ceased communication with them a few years prior to his death.

His criminal history was significant for juvenile arrests, gang involvement, theft,
unauthorized use of a motor vehicle, attempting to elude a police officer and the instant
offense of second-degree murder.  He also had an active ICE detainer.  He entered CDCR
in February 2000 to serve a life sentence for second degree murder.  The SCR indicated
he shot another male in the chest with a handgun following an argument and fistfight
outside a bar.  His minimum eligible parole date was in January 2037.

The inmate received multiple RVRs and had several administrative segregation
placements during his incarceration, most were related to violent behaviors, safety
concerns and substance use.  He dropped out of his gang and was designated SNY in
2012; however, he continuously voiced safety concerns related to his race, prior gang
involvement and drug debts since December 2016.  On November 26, 2017, he received
an RVR for fighting; however, the suicide reviewer was informed he was physically
attacked by a "known drug dealer" on this date.  The SCR noted that the inmate was
interviewed regarding his safety concerns, that he provided vague and non-specific
information, and that he only referred to individuals of concern by their gang monikers.

Although the inmate had not received mental health treatment prior to his most recent
incarceration, he informed MHSDS clinicians he experienced anxiety and depression
since age 14, and that he had one interrupted suicide attempt which involved holding a
gun to his head in 1987.  The SCR indicated he self-referred for mental health services to
address depressive symptoms and sleep difficulties in 2012; however, clinicians

determined he did not require MHSDS inclusion at that time.  The inmate did not access mental health services again until his MHCB referral on December 12, 2016.

The inmate had four MHCB admissions and one ICF placement for danger to self within a year of his suicide.  He was initially admitted to the MHCB in December 2016, when he endorsed auditory hallucinations, a plan to harm himself, "intense" depression and anxiety, methamphetamine use, drug debts and safety concerns.  Psychotropic medication was initiated during this admission, and he was subsequently discharged to the 3CMS level of care on January 6, 2017.  He returned to the MHCB three days later for suicidal ideation and auditory hallucinations, with voices commanding him to hang himself.  He also informed MHCB staff that he felt disconnected from family, had abused methamphetamine over the course of four months and was concerned about drug debts. His level of care was increased to EOP at the time of his January 17, 2017 discharge.

He received EOP treatment for depression, command auditory hallucinations and anxiety in the ASU.  The SCR indicated his symptoms remained mostly stable with psychiatric medication until May 2017; although, he continued to endorse suicidal ideation without plan or intent during this period.  The suicide case reviewer noted ASU EOP progress notes did not consistently provide information related to current mental status, treatment progress, plans or interventions.  On May 11, 2017 the inmate was informed in ICC that he would transfer to a Level IV prison, and he subsequently "destabilized."

On May 18, 2017 he was admitted to the MHCB after reporting plans to end his life.  He reported enemy concerns related to drug debts as his primary stressor during this admission.  The inmate was discharged from the MHCB to the ASU EOP with a referral to ICF on May 30, 2017.  The ICF referral noted that the inmate experienced hopelessness, despair and anxiety regarding his life sentence, and that his coping skills were limited to substance use.  The referral also indicated his minimization of psychiatric symptoms resulted in obstacles to diagnostic accuracy and treatment planning.  While awaiting ICF transfer, the inmate stated that he would rather take his own life than be killed by other inmates for drug debts.

The inmate remained in ICF care for five months until his discharge to the EOP level of care on November 16, 2017.  During the course of his PIP-ICF admission; despite documented medication adherence, he continued to endorse auditory hallucinations and depressive symptoms, and he was observed intoxicated twice in a three-month period, refused substance abuse treatment, received two RVRs and frequently declined treatment group attendance.  ICF clinicians noted he exhibited increased psychotic symptoms during intoxication, minimized his substance abuse issues, had poor insight into his mental illness, and that television was his only coping skill after five months in the PIP. In contrast, the ICF discharge documentation indicated that he somehow met "maximum benefit" from the program and had not shown outward signs or symptoms of psychosis or a mood disorder.

According to the SCR, the inmate was assaulted by a known "drug dealer" and received a RVR for fighting on November 26, 2017.  On November 28, 2017 he superficially lacerated his forearm resulting in "trickles of blood", and a psychiatrist subsequently evaluated and cleared him for transfer to his final facility without a suicide risk assessment or safety plan.  The evaluating psychiatrist described the inmate as depressed and anxious related to his transfer and safety concerns, and that he denied trying to end his life during the self-harm incident.  The SCR indicated the receiving institution was notified of the self-harm incident via clinician-to-clinician contact and Receiving and Release (R&R) sergeant notification.

On November 28, 2017, the inmate arrived at his final institution.  The SCR indicated a data entry error resulted in accidental and abrupt discontinuation of antipsychotic and antidepressant medications during transfer, and the inmate remained without medication for eight days.  On December 3, 2017 he was admitted to the MHCB after cutting himself for the second time in five days.  MHCB clinicians documented medication adherence during this admission; although he did not have medication orders.  At the time of admission the inmate reported suicidal ideation and safety concerns, and stated, "Wherever I go they want to get me.  It happened here already.  I'm tired of running away." On December 4, 2017, less than 24 hours after MHCB admission, one-to-one suicide observation was reduced to 30-minute checks without a sufficient documented rationale.  Later this date, a psychologist observed the inmate "braiding a towel" in his MHCB cell, and one-to-one suicide observation was reordered at 1716.  The psychologist did not write a progress note to explain the change in observation or document the towel incident until the following day, and one-to-one suicide observation was discontinued the next morning without a sufficient documented rationale.  The inmate subsequently attended IDTT on this date and claimed he was braiding the towel "to have something to do"; however, his level of safety observation was not increased, and he was discovered hanging in his MHCB cell later that evening at 2340.

The SCR indicated the inmate used a state issued razor to cut material from his safety mattress to create a ligature and that MHCB staff reported finding a towel and unauthorized reading material and clothing in his MHCB cell during the admission.

The inmate was treated with antipsychotic and antidepressant medications during his incarceration; however, only mirtazapine was ordered for depression at the time of his suicide.  His psychiatric diagnoses varied throughout his healthcare records between December 2016 and December 2017.  While the SCR indicated he was consistently provided with a diagnosis of Major Depressive Disorder, recurrent with psychotic features; during his five-month ICF admission, his most recent MHCB treatment team provided a less concerning and more situational diagnosis of Adjustment Disorder with mixed anxiety and depressed mood just two weeks after his ICF discharge.

The SCR highlighted several suicide risk evaluation issues that occurred three weeks prior to the inmate's suicide. The November 27, 2017 suicide risk evaluation omitted numerous acute risk factors that resulted in a "largely underestimated" rating of low risk. A psychiatrist failed to complete a suicide risk evaluation and safety plan on November 28, 2017 after the inmate lacerated his forearm. The most recent institution's safety plans were described as "underdeveloped", and their suicide risk evaluations failed to include information relevant to his recent hospitalization and self-harm behavior, which resulted in underestimation of suicide risk. Further, the most recent suicide risk evaluation completed on the date of his MHCB admission included serious inaccuracies regarding protective factors and failed to integrate recent self-harm and fighting behaviors in the justification of risk and safety plan.

II.   <u>Determination of Foreseeability</u>

The suicide case review committee did not provide a determination regarding foreseeability. The Special Master's expert's opinion is that this suicide was foreseeable. The inmate was released from intermediate care two weeks prior to his suicide without resolving the underlying reasons for his referral. Although the ICF treatment team claimed he achieved "maximum benefit," clinical notes did not support this claim. The intermediate care referral noted concerns about diagnostic accuracy, treatment planning, coping skills, substance use and symptoms of depression and psychosis. The referral also referenced the inmate's statement that he would rather take his own life than be killed for his drug debts. However, ICF documentation suggested he had not demonstrated progress, that his only coping skill was watching television, and that there continued to be a lack of clarity regarding his diagnosis.

On November 28, 2017, approximately two weeks after ICF discharge, the inmate lacerated his forearm and was cleared for transfer to another facility without completion of a suicide risk evaluation or safety plan. His antipsychotic and antidepressant medications were not continued or re-ordered upon arrival at the receiving facility, and on December 3, 2017, he was readmitted to the MHCB after cutting himself again. Still, his psychiatric medications were not ordered, although MHCB clinicians documented medication adherence during the admission. After one-to-one suicide watch observation was discontinued less than 24 hours after admission, he was observed crafting a noose out of a towel in his MHCB cell. Although one-to-one suicide observation was reordered, it was discontinued the following morning without a sufficient documented rationale. He subsequently participated in IDTT and stated that he was braiding a towel in his MHCB cell for something to do; however, his level of observation was not increased.

The SCR noted the final institution failed to incorporate recent ICF records and recent self-harm behaviors in their suicide risk evaluations, and that they underestimated his risk while inaccurately overstating his protective factors. Further, the inmate repeatedly

endorsed suicidal ideation and serious safety concerns since May 2017, and he informed staff he would rather take his own life than allow other inmates to kill him over gang debts.

## III.   Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability; however, the Special Master's expert's opinion is that his death was preventable based on the following:

The ICF discharged the inmate to the EOP level of care less than three weeks prior to his suicide without sufficiently addressing the reasons for his higher level of care referral. He did not exhibit significant improvements during the admission, and his only known coping skills at discharge were watching television and substance use.

The inmate lacerated his forearm and cut his foot within two days of his MHCB admission; however, his one-to-one suicide observation was discontinued in less than 24 hours without sufficient documentation.  A short time later on December 4, 2017, the inmate was observed "braiding a towel" in his MHCB cell; although towels were not permitted as allowable items for obvious reasons.  One-to-one suicide observation was reordered; however, the clinician did not document the towel incident or their rationale for increased observation until the following day.  His one-to-one suicide watch observation was discontinued the morning after the towel incident, and he was discovered in his cell hanging later that evening.  The inmate also had a state issued razor in his possession that he used to cut material from his mattress to craft a noose.

A data entry error resulted in the inmate no longer receiving his antipsychotic and antidepressant medication for eight days prior to his suicide, and this error was not resolved by MHCB psychiatry until the date of his suicide on December 5, 2017.

MHCB documentation was misleading regarding his medication adherence and risk for suicide.  The SCR indicated suicide risk evaluations were incomplete, provided an underestimation of suicide risk and overstated protective factors.  The SCR also noted orders related to suicide observation were unclear, and that this may have contributed to confusion regarding allowable items and suicide observation needs.

## IV.   Critique of Suicide Case Review Report

The SCR provided a thorough summary of this case, including relevant historical information, current incarceration course, suicide risk related information and recent relevant information from various disciplines involved in the inmate's care.  The SCR also offered a reasonable assessment of the precipitants to his suicide and recommendations that followed the content and findings of the report.

The SCR's suicide risk evaluation concerns at four different institutions included inaccurate identification of acute risk based on current situation, poor integration and discussion of individualized risk factors used in determining acute and chronic risk, difficulties constructing individualized safety plans, poor conceptualizations, failures to explain or justify changes in risk ratings, inaccurate and omitted risk information and inaccurate and misleading protective factors.

Although the SCR sufficiently critiqued care provided to the inmate in the prison facilities, there were several concerns discovered during his recent ICF admission that were not addressed in the reviewer's critique or recommended QIPs.

V.   <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in 12 required QIPs, with eight items for mental health, one for custody, one for nursing and two for mental health headquarters.  The suicide case reviewers recommended QIPs were appropriate and directly linked to problems identified in the report.  The SCR included four recommended QIPs to address suicide risk evaluation inadequacies at four CDCR institutions.  Each identified institution provided a memorandum and proof of training in response to their assigned QIP.  The QIP stemming from the psychiatrist's failure to follow Program Guide requirements and appropriately intervene after the inmate engaged in self harm prior to transfer was addressed through suicide risk evaluation training that reportedly was not previously required for staff at the institution.

QIPs also addressed poor documentation quality and errors, electronic health record medication orders for interfacility and intrafacility transfers, the inmate's possession of a razor blade in his MHCB cell and the serious suicide watch documentation errors prior to his suicide.

The various institutions' QIP responses and efforts were generally appropriate, and proof of practice for training and counseling was provided where indicated.  However, it was concerning that the response for QIP 2 indicated a provider received a nine percent passing rate on suicide risk evaluation mentoring and was allowed to continue administering suicide risk evaluations without direct supervision.  Additionally, QIP items 2 and 6 were unresolved based on the corresponding memorandum indicating the need for follow up audits after provided training.

The Special Master's expert determined additional QIPs were indicated to address other concerns referenced in the SCR.  First, the ICF discharged the inmate, indicating that he achieved "maximum benefit" from treatment despite minimal to no progress toward referral objectives.  Second, the inmate's most recent treatment team in the MHCB provided a diagnosis of Adjustment Disorder; despite his presentation and healthcare records suggesting a more significant diagnosis.  Third, although the suicide case

reviewer recommended a QIP to address the matter of the inmate's medications not following him to the receiving facility, it did not address the receiving facilities failure to review the record and to order medications at the time of MHCB admission on December 3, 2017.  Lastly, while the SCR focused on the documentation issues in the MHCB that led to serious errors and inadequate suicide prevention practices, it did not address the lack of verbal communication and collaboration among MHCB staff within and across disciplines.  For example, the errors may have been avoided had the case been discussed during morning meetings and/or shift change meetings.  Lastly, although the SCR addressed the inmate's possession of a razor in his cell, it should have also incorporated the issue of the inmate being in possession of a towel that he used to braid a noose in his MHCB cell.

Case P

1. <u>Summary of Case</u>

This inmate was a 21-year-old African American male, who was found hanging by correctional officers in his single cell on a general population yard on March 19, 2017.  At the time of his death, he was receiving mental health services at the 3CMS level of care.

The inmate was born at California Central Women's Facility on August 11, 1995.  His developmental history was unstable and chaotic.  His parents had a history of criminality and drug abuse.  His mother reportedly had a mental health history, with a diagnosis of Schizophrenia.  His father was deceased.  He reported using cannabis at nine years of age and cocaine at 11 years of age.  Additionally, he was sexually abused and attempted suicide at 11 years of age.  At 13, he became a ward of the state and was placed in a group home.  He did not graduate from high school.  When he was arrested, he was in a two-year relationship with a girlfriend who was pregnant.  He married her while in prison on January 7, 2017, six weeks prior to committing suicide.  He was unemployed when arrested.  He reportedly had a history of temporary work, manual labor and janitorial jobs.

The inmate had an extensive juvenile record involving multiple arrests for battery, commercial burglary and lewd acts on a child.  At 19 years of age, in November 2015, he entered CDCR.  His commitment offense was second-degree robbery with the use of a firearm.  He was also convicted of possession of a concealed firearm, carrying an unregistered loaded firearm, possession of a large capacity magazine and possession of a controlled substance.  Before sentencing, he expressed sorrow for the victims and requested a probated sentence to allow him to take care of his girlfriend and daughter.  Despite his plea, he was sentenced to seven years and eight months, with an early parole release date of December 9, 2021.

He was incarcerated in CDCR for a total of 16 months.  The first seven months were spent at the RC, and the remaining nine months at a mainline facility.  He was housed in general population, with a Level III custody classification.  He received one RVR for fighting in 2015, and another RVR for possession of a cellular phone in June 2016.  In August 2016, he received a RVR for excessive kissing and not paying attention to child during a visit with his girlfriend.  The "excessive kissing" RVR was heard in September 2016 and reduced to a counseling chrono.  He received another counseling chrono for being disrespectful in October 2016.  He was never placed in segregation or a restricted housing unit.  In his legal file, he received two 128-B General Chronos when he became impatient with his correctional counselor who was completing required paperwork to allow him to marry his girlfriend.  This chrono highlighted a sense of urgency regarding the completion of the required paperwork and to marry his girlfriend.  They were married on January 17, 2017.  She had an important role in his life, as demonstrated by daily phone calls and weekly visits.  Approximately two months after his wedding, he committed suicide.

Prior to incarceration, the inmate exhibited several mental health symptoms related to an unstable and traumatic developmental history, which involved sexual abuse, drug abuse and attempted suicide.  As a juvenile, he received counseling related to the sexual abuse and was diagnosed with an anxiety disorder while living in the group home.  He was also prescribed psychotropic medication for aggression and distractibility/inattention.  His probation officer reported he had participated in a 16-week treatment program offered by Youth and Family Services.

Mental health services were not initiated at the RC.  Shortly after arriving at the mainline institution, he submitted a self-referral to mental health in July 2016.  He stated, "I have a lot of time to do and I don't know what to do.  I can't sleep."  Ten days after submitting the self-referral, he was seen by a clinician who focused on sleep hygiene.  He did not receive a mental status examination or a mental health evaluation, which would have determined if he met criteria for a mental health diagnosis.  Dissatisfied with his session, he submitted another self-referral immediately after the session.  He was seen eight days later by the same clinician who once again did not perform a mental status examination or a mental health evaluation, and did not place him in MHSDS; however, she provided a diagnosis of Adjustment Disorder and referred him to psychiatry.

He was seen by psychiatry within seven days when a diagnosis of Adjustment Disorder with Depressed Mood was provided.  He was prescribed sertraline, placed in the MHSDS, and referred to a primary clinician for an intake evaluation.  He was evaluated by a primary clinician within seven days on August 3, 2016.  The evaluation revealed his chaotic childhood, a history of sexual abuse, one previous suicide attempt, a history of drug abuse and a family history of mental illness and criminality.  His specific symptoms, the duration of those symptoms, and the impact of those symptoms on his daily functioning were poorly documented.  Additionally, a suicide risk evaluation was not

administered; however, the primary clinician noted that a suicide risk evaluation would be completed. She also documented that he was at moderate chronic suicide risk due to a past suicide attempt. He was placed in at the 3CMS level of care; however, there was no paperwork completed in the Unit Health Record entering the inmate into 3CMS level of care; consequently, he was not formally placed in MHSDS until October 21, 2016, eleven weeks after meeting criteria for enrollment. An initial treatment plan was developed but was not individualized to address his needs. It noted that he would be referred to the treatment team for a treatment plan and that he should remain adherent with medications and continue with 90-day contacts with his primary clinician.

He was seen by the primary clinician on November 2, 2016 who noted that the inmate reported he had to force himself to be happy and reported depression, unstable mood, irritability, restless sleep and social withdrawal; yet, no assessment of suicidal ideation, suicidal intent or desire to live was documented. He was seen by the treatment team on November 10, 2016 when his master treatment plan was completed. This treatment plan noted that the inmate was bothered by depression "very much" which moderately interfered with his life. No information was provided related to his observed symptom severity. On December 13, 2016, a psychiatrist met with him to discuss his intermittent medication adherence, and sertraline was discontinued at his request. The inmate expressed a desire to be treated with individual and group therapy, not with medication. Following his suicide, his primary clinician indicated that he was not enrolled in groups secondary to problems with the electronic health record. He was seen one more time by his primary clinician on January 11, 2017. Documentation indicated he was functioning well without medication and participating in the Delancey Street Program. He was not seen again prior to his death on March 19, 2017.

His documented history of suicidality revealed a self-reported suicide attempt at 11 years of age, after being sexually molested by a relative. He was reportedly found hanging by his uncle who was able to save his life. Records revealed that during his course of treatment in CDCR, he never received a formal suicide risk evaluation. A significant pre-suicidal event included an incident during visitation with his wife on March 19, 2017. During that visit, he gave his wedding band to his wife who exited the facility with the ring. He contacted her by phone following their visit, asking her for the wedding band. A recording of their conversation revealed she did not plan to visit him the following week, but she would return the ring at her next visit. As the conversation continued, he angrily threatened to commit suicide if she did not return the ring the following weekend. The call ended at 1545 hours, and he was found unresponsive in his cell at 1628 hours.

II.  Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.  Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was preventable had he received adequate evaluations and treatment.  Despite a history of a self-reported suicide attempt and requests for increased services, the inmate never underwent a formal suicide risk assessment, nor was he provided with an adequate treatment plan to address his mental health needs.  He was denied access to group treatment due to issues with the electronic health record, rather than his mental health needs.

IV.  Critique of Suicide Case Review Report

The SCR was an adequate summary of this case.  It included relevant social, criminal, institutional, substance use and mental health histories.  It also provided a description of the inmate's treatment while incarcerated in a critical evaluation of his care.  The precipitants to the suicide were reasonably assessed and the recommendations provided followed from the content and findings in the report.

V.  Analysis of Quality Improvement Plan Processes

Five required QIPs followed from the findings in the report.  Four QIPs were related to the delivery of mental health services, primarily from the primary clinician, and one QIP was related to the emergency response.  The four mental health QIPs resulted from inadequate assessments of the inmate's suicide risk, procedural violations involving placement of the inmate in the MHSDS, ethical violations related to the absence of informed consent, and the inadequate acquisition of critical information necessary to clinically conceptualize the case, to formulate a diagnosis, and to develop an individualized treatment plan.  The one custody QIP resulted from an apparent delay in the emergency response system.  The QIP responses were appropriate and comprehensive.  A detailed description of each QIP is presented below.

The first mental health QIP resulted from the primary clinician not performing a formal suicide risk evaluation at the time of the initial intake evaluation and at the time of placement within the MHSDS.  The primary clinician's mention of a past suicide attempt and the inmate's denial of current ideation/intent did not constitute an evaluation of suicide risk.  Additionally, the suicide and self-harm section of the initial intake was incomplete.  The QIP required training regarding the MHSDS Program Guide requirements for completing an evaluation of suicide risk, as well as adequately documenting the clinical formulation of suicide risk.  The training was required for the treating primary clinician.  All clinicians at the facility also attended training.  The training participation sign-in sheets were provided.

The second mental health QIP resulted from the treating primary clinician not completing a CDCR-128 MH3 form (Mental Health Placement Chrono) causing a two-month delay in placement into the MHSDS.  The QIP required the facility to determine the reason for the absence of the mental health placement chrono and to provide appropriate training.  On local review, it was determined that timely placement was not a widespread issue, and it was limited to the treating clinician; consequently, training was only provided to this clinician.  Once again, a training participation sign-in sheet was provided.

The third mental health QIP resulted from the treating clinician not including a signed informed consent for mental health care in the healthcare record.  On May 2, 2017 clinicians were trained on the relevant section from the Program Guide.  Additionally, supervisors sent emails to their respective staff reminding them of the need for informed consent.  The treating clinician also received the same training.  Training participation sign-in sheets were provided.

The fourth mental health QIP resulted from inadequate clinical documentation by the treating clinician.  A complete healthcare audit was recommended to determine the extent of documentation problems.  These audits were performed.  They revealed patterns of documentation in which adequate clinical detail was inconsistently present, and canned statements were commonly used.  Based on these findings, the treating clinician's practice was restricted, with improved practice necessary before assigning any new or additional responsibilities.  Additionally, the clinician was not assigned suicide risk evaluations.  Clinical supervision was ongoing.  The ultimate outcome of this process was not available.

The fifth QIP resulted from a significant delay in appropriate medical response because emergency medical system activation did not occur until approximately fifteen minutes into the emergency.  The warden was requested to conduct an inquiry into the medical emergency response procedures determine what actions/trainings were required.  The warden's inquiry revealed a discrepancy in the audit timeline and the critical incident report.  After reviewing the policy and the report, he concluded the audit did not reflect the efforts of staff to provide appropriate care; consequently, he determined that QIP 5 had been fully addressed, and no further action was necessary.

Case Q

I.    Summary of Case

This inmate was a 31-year-old Latino male who was found by correctional officers in his single cell in a general population yard with deep lacerations to his neck, the inside of both elbows, and on both wrists on March 21, 2017 resulting in his death.  He had been receiving mental health services at the 3CMS level of care.

Events leading to his death began at approximately 0710, when an officer observed the inmate's cell window covered, obstructing the view into his cell. After receiving an order, the inmate partially removed the cover, providing a clear view into the cell. In approximately thirty minutes, the window was covered again. Since he refused orders to remove the cover, an officer opened the door and observed him sitting on the floor, bleeding from a laceration on the inside of his right elbow. Two broken and torn nooses were also observed hanging from a vent in the ceiling. The officer also observed barriers and barricades obstructing a path to the inmate; consequently, he activated his personal alarm device. Other officers arrived wearing personal protective equipment. The inmate actively resisted a cell extraction. He was placed in cuffs and ankle restraints, and he was strapped to a gurney. Medical staff provided oxygen and attempted to apply dressings to his wounds. He was transported to the Triage and Treatment Area (TTA). While in the TTA, he became unresponsive, stopped breathing, and no longer had a pulse. Medical called for an ambulance and initiated CPR. The AED paddles were applied and read, "no shock advised." Emergency medical services staff and fire department staff arrived at the TTA. Life-saving measures were applied until he was pronounced dead by a CMF physician.

The inmate was born in Mexico. He was raised by his mother until age 12, when he moved to the United States to live with his father. He described his father as overly critical, always putting him down. He reported starting to use methamphetamine, marijuana and alcohol as an adolescent. He dropped out of high school in the tenth or eleventh grade and went to work for the same construction company as his father. By age 18, he moved back to Mexico for approximately two years. He returned to the United States and once again worked in the construction field for approximately eight years.

His first known arrest occurred at age 17 for vandalism. There was no evidence of any other juvenile arrests. As an adult, he had several arrests for drug-related charges including drug possession and being under the influence of drugs. He also had two burglary charges, one in 2008 and the other in 2013. His commitment offense occurred in 2014 when he was 29 years old. He broke into a house and assaulted a 17-year-old girl and her parents with a hammer. When he left the house, he pointed a gun at a person in the area, demanded his car and fled in the vehicle. He drove recklessly and rammed the car into a police vehicle. He resisted arrest resulting in police officers firing their guns and employing tasers. He sustained gunshot wounds to the head and arm. He was convicted of carjacking, first-degree burglary, assault with a firearm (three counts), reckless driving and use of a firearm in the commission of an offense (five counts). He was sentenced to 28 years and eight months in prison.

He arrived at a CDCR Reception Center in January 2015. He was initially placed in administrative segregation because he had been housed with northern Hispanic inmates in the county jail; however, he was transferred to general population one week later after

being classified as a nonaffiliated Mexican.  The only formal suicide risk evaluation was completed on January 26, 2015 and included one previous suicide attempt.  His chronic risk level was assessed as moderate, and his acute risk was low.

He was transferred to a mainline facility on March 19, 2015 where he actively participated in several programs to include Alcoholics Anonymous, Narcotics Anonymous, a Catholic religious program, victim offender's insight group, and a self-help reentry program called Katargeo.  He also had a job assignment with healthcare facilities maintenance.  The maintenance supervisor reported that his work performance was satisfactory.  He had four RVRs between August 2015 and December 2016.  The RVRs resulted from battering another inmate, obstructing an officer, refusing to take a urine drug test and possession of morphine.  Because of these RVRs, he lost his job assignment, and his cumulative points rose, resulting in a need to be transferred to a Level IV facility.  He received regular telephone calls during his incarceration and had four visits, three by his sister and one by his mother.

There was minimal information available regarding his personal mental health history prior to incarceration or his family's mental health history.  Additionally, he appeared to be a poor historian, providing inconsistent details about his substance use, suicide attempts and mental status.  Despite this, his records revealed a history of substance use problems, suicide attempts and criminality which included violence.  He reportedly began using methamphetamine between ages 12 to 17, and he used daily for three weeks prior to his commitment offense.  He also reportedly started using marijuana at age 14 and alcohol at age 16.  Additionally, he reported being treated at inpatient drug treatment programs on six separate occasions while living in Mexico.

A pretrial psychological assessment revealed the inmate was able to discuss his offense and participate in the trial, with modest cognitive impairment.  The psychological report also listed two suicide attempts, one in 2011 and the other in 2013.  Upon arrival at the RC, he was administered a mental health screening which was positive because of prior treatment with antidepressant and antipsychotic medications, a history of suicide attempts and current mood symptoms.  He was seen by two psychiatrists on the day of his arrival.  He was provided with a diagnosis of mild Major Depressive Disorder and a history of an Amphetamine-Induced Psychotic Disorder.  Psychiatry treated him psycho-pharmacologically with antipsychotic and antidepressant medication.  He was placed in the MHSDS at the 3CMS level of care.  He was evaluated several times at the RC resulting in diagnoses of a Major Depressive Disorder and Polysubstance Dependence.  Evaluations also revealed a suicide attempt at 17 or 18 years of age and a history of methamphetamine-induced hallucinations.  Mental status difficulties included sadness/depression, anhedonia, anergia, avolition and poor concentration.

The inmate was transferred to a mainline facility on March 19, 2015.  He reported feeling depressed to his primary clinician on March 30, 2015.  The IDTT met on April 1, 2015

and maintained his Major Depressive Disorder diagnosis. The Polysubstance Dependence diagnosis was changed to a Drug-Induced Psychosis, in remission. In April 2015, psychiatry discontinued his antipsychotic medication and reduced his antidepressant medication. In June 2015, psychiatry discontinued his antidepressant medication at his request. During that time, he reported feeling mildly anxious about receiving an RVR for fighting. The anxiety was clearly situational, disappearing when the RVR was withdrawn.

In August 2015, he met with an on-call clinician prior to being transferred to the ASU following a fight. He appeared acutely distressed, concerned about his sentence being increased and about being classified as a Level IV inmate. He was seen by his primary clinician and psychiatrists over the next few months. He denied any significant mental health issues, until December 2015 when he began reporting nightmares related to his commitment offense. These nightmares continued for the next few months, resulting in a referral to a PTSD group and the initiation of antidepressant medication. He also increasingly complained of pain due to bullet fragments in his head. Psychiatry discontinued his antidepressant medication because of poor adherence; however, the treating psychiatrist met with his primary care physician who agreed to prescribe duloxetine for management of pain and depression/anxiety.

During September 2016 at an IDTT meeting, the inmate was invited to participate in a pain management group. As he declined the invitation, the treatment team focused on his depression, setting a goal of reducing his depression by 50%. A few weeks later, custody requested an evaluation after observing him trying to swallow a pill from a latex glove during shift change. The evaluator reported that he was tearful and concerned about gaining additional time and being classified as a Level IV inmate. On December 19, 2016, he complained of sleeping all day and night because he was concerned about a pending transfer to a Level IV facility due to an RVR for morphine possession. He rated his depression as an eight out of ten, and his anxiety as ten of ten. On January 17, 2017, he complained of continual pain due to bullet fragments in his head. He also complained of increasing depression due to inactivity, having lost his job and being confined to quarters. During January 2017, he received a medical hold in preparation for surgery to remove the bullet fragments from his head on February 1, 2017. On February 28, 2017 he declined an appointment with his primary clinician. The medical hold was removed on March 6, 2017, and he was informed on March 9, 2017 that his point total rose, resulting in the need to transfer him to a Level IV facility. When he met with his primary clinician on March 16, 2017, he complained about being transferred to a Level IV facility. He also reported significant depression and anxiety, describing both as ten out of ten (maximum rating). He denied suicidal ideation and requested to see psychiatry for an anti-anxiety medication. On March 20, 2017, he requested a medical appointment as soon as possible. On March 21, 2017 he committed suicide, dying of exsanguination.

A review of his property revealed the pretrial psychological evaluation which reported two suicide attempts, one in 2011 and the other in 2013. Both attempts apparently occurred in the context of acute methamphetamine intoxication. A community mental health record was also found, containing notes from a hospitalization related to his suicide attempt on October 5, 2013. He reportedly had a stab wound 1.5 cm long. The hospital noted his wound was self-inflicted. Additionally, interviews with inmates suggested he was in drug debt and concerned about being transferred to a Level IV facility. They noted his drug utilization increased over the past month. A suicide note was recovered. The note alleged that he overheard imminent threats to his life and was taking action to kill himself rather than being killed by others. He believed a correctional officer threatened him and was directing other inmates to kill the inmate and dispose of his body.

II.   Determination of Foreseeability

The suicide was determined not to be foreseeable by the suicide case review committee. The Special Master's expert agree with this determination.

III.   Determination of Preventability

The suicide was determined to be preventable by the suicide case review committee. The Special Master's expert agrees with this determination.

IV.   Critique of Suicide Case Review Report

The SCR was a marginally adequate summary of this case. The SCR contained the essential information regarding the incident, background information, institutional functioning, mental health history, medical history and significant pre-suicidal events. Additionally, timelines were used to clearly present the sequence of relevant events, especially of the incident, institutional functioning and mental health history. In the mental health section, facts were clearly presented, and appointments included dates (i.e., IDTTs, psychiatry appointments and primary clinician appointments). The information tended to be comprehensive. Commentaries, both positive and negative were present; however, critical analyses were minimal. The salient issues were explicitly identified including minimal documentation on treatment plan goals, treatment progress and appropriate level of care as well as implicitly identified by mentioning inconsistencies between what was being observed by the clinician and being reported by the inmate, clinicians not asking for clarification, and questionable evaluations. Relevant distal and proximate events were identified, resulting in two relevant, but vague and overlapping mental health concerns. One concern was not discussed and that was the absence of formal or informal assessment of suicide risk other than an initial suicide risk evaluation completed in 2015. This lack of assessment of suicide risk should have been discussed in the SCR.

73

V.   <u>Analysis of Quality Improvement Plan Processes</u>

The case resulted in eight concerns: three custody concerns, three nursing concerns, and two mental health concerns.  QIPs were developed and implemented by the appropriate disciplines.  The responses were reviewed and approved by the Suicide Case Review Focused Improvement Team on June 23, 2017.

The three custody concerns involved the elapsed time between observing the inmate bleeding and his arrival in the TTA, a delay in the activation of 911 and alleged staff misconduct.  Actions taken included requests for two investigations by the OIA for the first and third concerns, and a clarification memo for the second concern.  The memo was sent via email, and no verification of staff receipt or review was completed.  Additionally, evidence of training was provided, but only for training provided to Supervising Nurses rather than custody staff.  This response was inadequate.

The three nursing concerns involved a delay in the activation of 911 (a multi-system issue including custody and nursing), a delay in initiating bleeding control procedures and vague documentation.  The nursing QIP was noted to be addressed by the Death Review Committee; and the Death Review Committee noted that the issues were referred to other entities, but no outcomes of follow up were available.  This response was inadequate.

The two overlapping mental health concerns were combined by the institutional team in their development and implementation of a corrective action plan.  The first concern involved the primary clinician's lack of documentation of the consideration for a higher level of care referral between December 2016 and March 2017.  The second concern involved the treatment plan not adequately addressing depression and anxiety.  The chief psychologist and supervising psychiatric social worker focused on the inmate's increasing mental health symptoms and stressors (i.e., an RVR which elevated his custody level, level IV classification, a long sentence, chronic pain and his first incarceration), and the loss of protective factors (the inmate's job and family visits).  Given the increasing risk factors and decreasing protective factors, they focused on the treatment team and treatment plan which did not consider increasing his level of care and addressing safety concerns.  On June 14, 2017, the treating clinician was individually trained in these areas, which included the importance of considering an elevation in the level of care when reported symptom levels increased, and appropriately documenting level of care decisions with rationales and justifications.  An eight-slide training PowerPoint was used in the training.  An all-staff training occurred on May 24, 2017 outlining events (risk and protective factors) which led to the inmate's death.  Additionally, a 3CMS team training occurred on June 1, 2017 focusing on the difficulties in providing care to 3CMS inmates, and on methods of conducting more in-depth assessment.  The appropriate training participation sign-in sheets were provided.

Case R

I.   Summary of Case

This inmate was a 38-year-old Latino male who was found by another inmate hanging in his solely occupied cell on an SNY on December 9, 2017.  He was receiving mental health services at the EOP level of care at the time of his death.

The inmate was born in Mexico.  When he was five years of age, his parents divorced with his mother leaving the family, including his three sisters and their father.  His father eventually remarried, and the family emigrated to the United States when the inmate was approximately 20 years old.  There was no evidence that he was married or had children.  He began using alcohol and illicit drugs at age 13, with consistent use by late adolescence.  His substances of choice were alcohol and marijuana.  The inmate reported that he attended Alcoholics Anonymous and Narcotics Anonymous several times, and eventually relapsed.  His formal educational history was unclear, with conflicting reports indicating he dropped out of school in the second, seventh and tenth grades.  There was no evidence he attained a GED.  His employment history consisted largely of manual labor, working construction, painting, landscaping and selling tacos.  His longest period of employment was working two years as a welder.

The inmate's criminal history dated back to 2006 when he was arrested at age 27, being convicted of possessing burglary tools and receiving stolen property.  In 2008, he also had arrests for possession of marijuana, receipt of stolen property and failure to appear.  Additionally, between 2006 and 2008, he was connected to multiple sex offenses.  He pled guilty to raping and sexually assaulting three victims on February 6, 2009.  At that time, he was sentenced to 26 years in state prison.  In 2011, he was convicted of sexually assaulting another victim through deoxyribonucleic acid (DNA) testing.  His earliest possible release date was October 4, 2036.

The inmate entered CDCR in February 2009.  A review of his institutional adjustment revealed several issues, starting with a request for and placement in the SNY.  Throughout his eight years of incarceration, he received seven RVRs which included an assault on another inmate with a deadly weapon (his cellmate) in 2010.  In March 2011, his sentence was increased due to that assault.  Over his years of incarceration, he was placed in ASU several times and served terms in the SHU for violence.  Phone records were unavailable; however, inmates reported that he spoke with his family by phone regularly.  Per the visitation log, his father last visited him on October 21, 2017.  He received approximately two to three visits a year from his father and stepmother for the duration of his incarceration.

There was no evidence that the inmate received mental health services in the community.  He first reported auditory hallucinations when he was arrested at age 27.  Two years after arriving at the RC, he entered the MHSDS on March 9, 2011.  He was assessed to need 3CMS level of care for tangential thinking/confusion, dramatic outbursts, mood

75

instability and fights.  In January 2012 he reported auditory hallucinations of conversations, visual hallucinations of various images, and poor appetite with a weight loss of 30 pounds.  He was diagnosed with a seasonal affective disorder and pharmacologically treated with antipsychotic medication.  His medication adherence was variable, and he repeatedly manifested hypersexuality, hypomania, refractory psychotic disorganization and agitation.

Between 2012 and 2016, the inmate was essentially medication adherent and relatively stable, reporting auditory hallucinations when he did not take his medication.  In 2016, he discontinued his medication and began to experience active mood and psychotic symptoms.  His level of care was elevated to EOP in July 2016 as his hallucinations, delusions, paranoia and anxiety intensified.  In September 2016 after a facility transfer, his level of care was reduced to 3CMS for reasons which were unclear.  In March 2017 he stopped taking his medication, and on April 1, 2017 he cut himself.  He was admitted to the MHCB, and psychiatric medications were initiated.  Review of the medication administration record indicated that he was mostly adherent with taking his prescribed medication.  On April 12, 2017, he was discharged to the EOP level of care.

The inmate remained relatively stable until September/October 2017 when he discontinued medication again and began reporting an increase in auditory hallucinations. On November 26, 2017, he was admitted to the MHCB due to auditory hallucinations, depression (ten of ten), and suicidal ideation with urges to cut himself.  On November 29, 2017, the inmate rated his depression as nine out of ten.  His thinking remained disorganized, and he continued to report hallucinations and depression until he was discharged on December 7, 2017.  On December 8, 2017 he denied suicidal ideation, intent or plan saying he did not want to harm himself in the future because he wanted to remain calm and to take his medication.  On that day, clinicians noted he appeared mildly anxious and custody reported that he was talking to his cell wall.  Two attempts were made to assess him on the second day of his five-day follow-up on December 9, 2017. He told the first clinician that he could not speak English; consequently, she informed him that she would arrange to have him meet with a Spanish-speaking clinician.  When that clinician arrived, custody opened the door for the inmate to exit his cell; however, he did not leave the cell.  His former cellmate ran to the cell and found him hanging.

This inmate's first suicide risk evaluation, according to the Mental Health Tracking System was conducted on March 22, 2011; however, it was not located in the healthcare record.  A later suicide risk evaluation dated February 3, 2012 indicated that acute and chronic risks were both assessed as moderate.  During his incarceration, 19 suicide risk evaluations were conducted.  His acute and chronic risks were unspecified once, his acute risk was determined to be low twelve times, low-to-moderate once, and moderate three times.  His chronic risk was determined to be low six times and moderate 12 times.  Two suicide risk evaluations were problematic due to significant omissions and inadequate justifications of the risk and safety planning sections, resulting in a QIP.  Additionally,

one suicide risk evaluation underestimated his acute risk because several risk factors were omitted.

II. <u>Determination of Foreseeability</u>
There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined this death was not foreseeable.

III. <u>Determination of Preventability</u>
There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined this death was preventable. Had the clinicians treating the inmate completed a thorough review of his records, conducted adequate evaluations, and provided appropriate treatment, including specific interventions based on assessments and the treatment plan; his likelihood for suicide would have been decreased.

IV. <u>Critique of Suicide Case Review Report</u>
The SCR was an adequate summary of this case. The SCR was divided into nine major sections. Each section summarized highlights and salient information. Deficiencies in the delivery of care were clearly identified and explained, with a focus on assessments, treatment, and overall delivery of care proximate to the inmate's death. The information in the case review generated three general concerns which did not rise to the level of a QIP, and eight concerns requiring QIPs.

V. <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in eight required QIPs: four mental health QIPs, one joint mental health and nursing QIP, two nursing QIPs and one custody QIP. The four mental health QIPs involved:

(1) inadequate documentation because of insufficient detail on the assessment, plan and education sections, resulting in continuity of care difficulties;
(2) incomplete documentation involving the mental health clinician filling out the mental health crisis bed discharge custody check-sheet;
(3) two problematic suicide risk evaluations omitting significant information and inadequately justifying the inmate's acute risk level and safety plan; and
(4) an underestimation of the inmate's acute suicide risk, due to the omission of significant risk factors.

The one joint mental health and nursing QIP resulted from multiple concerns related to an MHCB inpatient stay. These concerns included: inadequately addressing medication adherence and alternatives to the specific medication; no treatment plan discussions involving an elevation in his level of care due to treatment refusal; not directly addressing

alternatives to medication nonadherence; omission of a mental status evaluation in a psychiatric note; and no clinical note for December 1, 2017 while the inmate was in the MHCB.

The two nursing QIPs involved inadequate assessments, and the one custody QIP involved untimely custodial checks during five-day follow-up.

Each QIP's corrective action proposal (training slides, policies, the C-SSRS and Quality of Care Review Tool) and supporting implementation documentation (training participation sign in sheets and a memorandum from the Division of Health Care Services, Statewide Mental Health Program (SMHP) dated April 9, 2018 addressing the custody QIP) were reviewed. They were complete, timely and adequate. A memorandum dated May 22, 2018 from the Deputy Director of the SMHP noted the Suicide Case Review Focused Improvement Team reviewed and approved the implementation of the quality improvement plans recommended in the SCR from December 9, 2017.

Case S

I.   Summary of Case

This inmate was a 28-year-old Latino man who was found by correctional officers hanging in his single cell in an SNY on April 26, 2017. He was receiving mental health services at the EOP level of care in an RC at the time of his death.

He was raised in Arizona by his mother and had little contact with biological father. His mother remarried and he had five half-siblings. There was some indication that the inmate's stepfather was abusive toward him during childhood and a report that he was physically assaulted by a stranger at age 16. He had no known juvenile arrest history, was reported to have completed high school, and was stably employed through age 21 or 22. Around age 23, the inmate became addicted to cocaine. He was married and had one daughter but became physically abusive toward his wife when he suspected she was cheating. A warrant was issued for his arrest for charges of kidnapping, aggravated assault and assault following an incident of domestic violence, including threatening his wife with a gun and assaulting her. As a result of this incident, his wife fled to California to stay with her family.

In November 2015, the inmate located his wife and her family in California and entered their home carrying an assault rifle and dressed in body armor. He held them at gunpoint but eventually surrendered to police. He made a serious suicide attempt by hanging while in county jail and was psychiatrically hospitalized as a result. He remained on a licensed mental health unit within the jail throughout his detention there. He accepted a plea deal and was incarcerated for the first and only time within CDCR in February 2017 for 15 years. He had charges in Arizona that were still pending at the time of his

78

incarceration.  During his incarceration, he did not receive any RVRs, did not make any phone calls, and did not have any visits.  However, there was evidence of written correspondence with family.  He had not been assigned to a job at the time of his death. During reception, he requested to be placed in an SNY based on safety concerns and the request was approved.

Documentation indicated that the inmate attempted to hang himself in county jail on September 13, 2016 by tying a noose around his neck and jumping off a tier.  The attempt was nearly lethal and resulted in hospitalization and a six-day coma.  A hand-written note was included on the top of the inmate's transfer documentation from the jail indicating that he was a "very high suicide risk" and would need one-to-one observation "upon arrival."  Upon his incarceration in CDCR during February 2017, staff were alerted to his suicide risk and he was seen by mental health staff.  He was evaluated, diagnosed with Major Depressive Disorder, placed in MHSDS, and prescribed medication on the day of his arrival.  During the evaluation, he reported a psychiatric hospitalization in Arizona due to substance use in 2015 as well as paranoia and anxiety since adolescence.  Later, he reported his attempted suicide was following his arrest for domestic violence.  The inmate discussed his suicide attempt in jail as "a mistake" and reported that he was no longer suicidal.  A suicide risk evaluation completed at the time noted depressive symptoms along with a number of protective factors.  His safety plan included interventions and consultation requests.  His chronic risk was assessed as moderate, and his acute risk was assessed as low.

The evaluator placed the inmate at the 3CMS level of care but simultaneously referred him to the EOP level of care.  A psychiatrist prescribed citalopram, quetiapine and a decreasing taper of clonazepam along with PRN (when needed) quetiapine and hydroxyzine at intake and scheduled the inmate for a priority consultation which occurred ten days later on March 9, 2017.  During that telepsychiatry visit, the inmate reported being free of suicidal ideation and reported the medications were helping him to feel better.  He was described with depressed mood.  He reported a history consistent with his earlier reports and added that he heard "whispers at night time [sic]."  No other psychotic symptoms were reported.  Of note, the psychiatrist noted the inmate's reliability as "poor" but then later reported he was a "credible historian."  Following this visit, the inmate refused medications on ten occasions between March 1 and 11 and refused treatment groups on March 14 and 15, 2017.

A suicide risk evaluation was completed on March 14, 2017.  It was similar in content to the initial risk evaluation but added an additional chronic risk factor, the perception of the loss of social support and two acute risk factors, anxiety and psychotic symptoms.  The SCR noted that the suicide risk evaluation incorrectly noted that the inmate was not a participant in the MHSDS and contained an inadequate safety plan.  The suicide risk evaluation failed to note the inmate's reported suicide attempt in 2015.  His risk levels remained unchanged from his initial suicide risk evaluation.  The SCR failed to note the

overreliance on the inmate's self-report during this evaluation. In addition to failing to identify a second previous suicide attempt documented in the healthcare record, the inmate minimized the seriousness of his suicide attempt and the seriousness of his index crime. Accurate information was contained within the inmate's healthcare record but was not incorporated into the risk evaluation.

The inmate was referred to psychiatry as a result of medication nonadherence, and his refusals were discussed during an IDTT meeting on March 16, 2017. He attended the meeting and discussed his crime and his suicide attempt. He was tearful when he spoke. He reported racing thoughts, sleeping difficulties and social withdrawal. He noted being mildly paranoid but denied safety concerns. He was provided with a provisional diagnosis of Major Depressive Disorder, severe, with psychotic features with a provisional diagnosis of Bipolar I Disorder, most recent episode depressed. The treatment plan that was developed focused on paranoia and delusional thinking with goals to increase insight into his mental illness, to improve his ability to report his symptoms to the team, and a focus on depression with a goal to lower his self-reported rating of depression. The IDTT agreed to placement at the EOP level of care.

During the remainder of March 2017, the inmate attended most of his scheduled EOP groups, missing two days, and attended his individual sessions with his primary therapist. He was described malodorous and preoccupied with internal stimuli during a session on March 29. During the session he reported mild paranoia; although, he denied thoughts of harming himself or others. In early April 2017, he reported doing "fine" to the psychiatrist and stated that he was no longer depressed. His grooming appeared improved in mid-April; yet he reported receiving divorce paperwork from his wife. He stated that he had been expecting the divorce papers and told his primary clinician that it was "probably for the best." He attended the majority of his treatment groups and was generally adherent with his prescribed medications during the month of April. His treatment plan was updated on April 18, 2017, and it noted his participation in EOP programming and medication adherence. The focus of treatment was depression management as his psychotic symptoms were said to have subsided. Bipolar Disorder was offered as a provisional diagnosis. He denied suicidal thoughts and stated that he would report recurrence of those thoughts to staff. Documentation indicated that he attended groups and individual sessions over the following week, reporting no distress; however, he died by suicide on April 26, 2017.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

80

III.   <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not preventable.

IV.   <u>Critique of Suicide Case Review Report</u>

The SCR was an adequate summary of this case.  The SCR included relevant social, criminal, incarceration, substance use and mental health history.  It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report.  The one concern noted by the Special Master's expert was the failure to identify the over-reliance on the inmate's self-report and failure to demonstrate evidence of healthcare record review.

V.   <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in three required Quality Improvement Plans, two to address mental health concerns, and one joint nursing/custody concern related to the delay in activating 911.

The first mental health concern that required a QIP was the placement of the inmate in the 3CMS level of care with a simultaneous referral to the EOP level of care, delaying the inmate's placement in a higher level of care.  The QIP was to provide steps taken to ensure that this would not recur.  The QIP response indicated that the delay was part of the intentional process instituted at the facility to ensure that the level of care was appropriate.  The process was changed to include a determination to be made the same day and immediate placement of the inmate in EOP groups.  Evidence of training was provided.  This response was adequate.

The second mental health concern required a QIP to address the error and the lack of an appropriate safety plan completed during the suicide risk evaluation conducted on March 14, 2017.  The QIP was to include a review of at least ten suicide risk evaluations completed by this clinician and associated mentoring.  A review of the clinician's documentation revealed deficiencies in safety plan development.  Mentoring was implemented but not completed at the time the response was provided.  The clinician was required to have all safety plans co-signed at that time.  Additionally, all staff were trained on the development of safety plans for all inmates in the MHSDS regardless of their level of suicide risk.  Evidence of training was provided; although, the curriculum content was not possible to read given the poor quality of the copy provided.  This response was adequate.

81

The joint custody/nursing concerns were to include an inquiry and steps taken to address the delay in activating 911. Evidence of the inquiry was provided as was the relevant policy. The response noted that training was provided, but no evidence of that training was submitted as part of the response. This response was only partially adequate, as the SCR required that evidence of training be provided.

Case T

I.  <u>Summary of Case</u>

This inmate was a 35-year-old African American man who was found by correctional officers hanging in a holding cell on a STRH on May 18, 2017. He was receiving 3CMS level of care services and was single-celled at the time of his death.

The inmate was born prematurely at six months gestation. He was the oldest of eight siblings and reported childhood sexual and physical abuse. He did not complete high school and reported that he left, or was expelled, in tenth or eleventh grade due to fighting with peers. His father, mother and sister were reported to have mental health issues. He never married and had no children according to available documentation. He reported daily use of marijuana and regular use of alcohol beginning in childhood/early adolescence. He also reported experimentation with cocaine, hallucinogens and methamphetamine. He was homeless at the time of his index offense.

The inmate was detained as a juvenile for possession of dangerous weapon and was placed on probation as a juvenile for marijuana possession, transportation/distribution of marijuana and possession of a weapon on school grounds. As an adult, he was placed on probation for battery and had arrests for assault, weapons charges, theft and drug-related offenses. He was incarcerated in the CDCR for the first time in May 2004 for the index offense when he was 22 years old. At the time of his death, he was serving a sentence of 40-years to life for second degree murder with multiple enhancements after shooting an acquaintance following an argument earlier in the day.

Records indicated that the inmate displayed disruptive and violent behavior in county jail including manufacturing weapons, fighting with other inmates, yelling, banging, covering his window, smearing himself with feces and engaging in sexual contact with another inmate. He continued to display disruptive and violent behavior in the CDCR. He received 19 RVRs while incarcerated for possession of dangerous items, possession of alcohol, threats towards staff and other inmates, fighting, refusing orders, conspiracy to introduce a controlled substance into the facility during a visit, possession of a cell phone, possession of drugs and throwing urine and feces. He was not known to have any gang affiliation and had no known enemies. He participated in work training programs and vocational classes in 2007 and 2008. He also worked while in EOP at times. He received visits and had regular phone calls.

Prior to his incarceration in CDCR, the inmate was referred to mental health services while in jail in June 2003 after banging his head, smearing feces and yelling that he was hearing voices. He exhibited similar behaviors in July, October and November of 2003. On at least one of those occasions, documentation from the jail noted that it was believed that his behavior was due to "playing a game" for the "attention of the other inmates."

The inmate received mental health services in 2005 and from 2009 to 2010, both for brief periods of time during which he reported mood and psychotic symptoms. In April 2014, after being placed in an ASU, he reported visual hallucinations and a return of auditory hallucinations urging him to kill himself. He also began refusing meals and was smearing feces. He was placed at the 3CMS level of care on April 22, 2014 and was seen for a suicide risk evaluation on April 28, 2014. The evaluation found no evidence of risk, no prior evaluation of suicide risk, and no need for further follow up. During psychiatric consultations in May 2014, he reported that he was smearing feces to keep "evil shadows" away and in response to hallucinations. On May 21, 2014, he was placed at the EOP level of care. On May 26, 2014, he reported that the voices were telling him that if he did not kill himself, "they will do it"; subsequently, the inmate was placed at the MHCB level of care through June 16, 2014. While in the MHCB, he initially refused to eat, smeared feces, stated that he did not want to talk about his plans for suicide because staff would prevent him; and he refused prescribed antipsychotic medications. No involuntary medication order was sought. The inmate later denied suicidal ideation and was discharged to the EOP level of care in the ASU. He was provided with a diagnosis of Psychotic Disorder, NOS.

Upon release from the ASU in July 2014, the inmate transferred to a mainline EOP yard where he remained until October 2014, when he was transferred to the 3CMS level of care. In response to his decrease in level of care, he stopped eating, smeared feces and reported suicidal ideation. He was placed at the MHCB level of care for eight days when he frequently refused to eat and was smearing feces. Staff believed he was feigning symptoms related to custody issues, and he was discharged to the 3CMS level of care. Records indicated that a suicide risk evaluation was attempted but not completed secondary to his refusal to participate on October 31, 2014. At that time, his chronic risk for suicide was assessed as low. A suicide risk evaluation was completed prior to discharge from the MHCB on November 6, 2014. The evaluation again rated both chronic and acute risk for suicide as low, noting that secondary gain was suspected with the motivation of returning to the EOP level of care rather than 3CMS.

Upon return to the 3CMS level of care on November 7, 2014, the inmate was placed in the ASU for allegations of possession of a dangerous weapon and attempting to hang himself in a holding cell in ASU. He reported suicidal ideation and an intent to die, but staff documented that the attempt was made in "clear full view of staff walking by", thus minimizing his intent. He was placed at the MHCB level of care. A suicide risk evaluation was completed that day. The SCR failed to include the risk level assessed that

day, but noted that the evaluation, and other evaluations completed in 2014, failed to include imminent risk factors and underestimated the inmate's overall risk level based on the assumption of secondary gain.  The inmate was referred to DSH inpatient treatment despite the inadequate risk evaluation.

While in DSH care for over six months, the inmate reported feeling depressed and endorsed constant thoughts of wanting to die, but he reported that he would wait until returning to his receiving institution.  He reported plans to jump from a high tier.  Upon discharge on July 2, 2015, his intentions were communicated in the inmate's discharge summary, and he was placed at the EOP level of care.  He was placed in ASU and reported suicidal thoughts when evaluated during his pre-placement screening on July 13, 2015.  The suicide risk evaluation completed in response to an emergent evaluation again rated his chronic and acute risk as low and inaccurately noted no history of suicide attempts.  A second suicide risk evaluation completed the next day noted that he was using suicidal gestures to get his needs met, and it noted his chronic risk as moderate but his acute risk was assessed as low.  He was again screened and emergently referred for evaluation on July 20, 2015.  His suicide risk assessment failed to note any imminent risk and rated both his chronic and acute risk as low.  On July 22, 2015, the inmate was attacked by three other inmates and was placed in ASU.  During the pre-placement screening, the inmate reported that he had been told by others that he would be harmed if he did not kill himself.  He was referred for a suicide risk evaluation which again assessed both his chronic and acute risk as low.  Most of the suicide risk evaluations completed in July 2015 failed to note the inmate's statements made during his pre-placement assessments and incorrectly documented that the inmate denied auditory hallucinations.

Upon release from ASU in August 2015, the inmate was seen for a suicide risk evaluation and reported two previous suicide attempts and a desire to die at the time.  His risk level was increased, and modifiable risks were appropriately targeted in the safety plan.  He was referred to and evaluated by a psychiatrist for reports of depression and insomnia.  He was prescribed hydroxyzine.  Over the following nine months, he was seen weekly for individual sessions with his primary therapist who provided treatment targeting his depression and suicidal ideation.

In May and June 2016, the inmate reported contemplating suicide over a number of mental health contacts.  On May 13, 2016, he was placed on suicide watch in alternative housing after reporting suicidal ideation to nursing staff.  He later reported that this was a misunderstanding, and he was removed from watch and placed on five-day follow-ups.  During the third day, he asked to extend his monitoring by custody due to continued thoughts of suicide.  The clinician recommended MHCB placement, but the referral was rescinded later that day after the inmate said he was not suicidal.

The inmate reported ingesting 40 pills on June 3, 2016, which prompted evaluation in an emergency room and placement on suicide watch.  Documentation written by a psychiatric technician indicated that the inmate "was observed ingesting a handful of pill (sic) in his cell during cell front medpass."  The SCR noted that this event occurred on June 4, 2016 and failed to note that the behavior was observed.  A subsequent note by a nurse indicated that he "allegedly" swallowed pills and subsequent documentation noted a lack of laboratory results from the hospital noting an overdose, minimizing his intent.  Upon evaluation, the inmate noted, "maybe I did want to die."  A suicide risk evaluation was completed which noted a number of imminent risk factors; yet chronic and acute risk for suicide were assessed as low.  The rationale provided was that the inmate had not engaged in "an actual overdose."  He later ingested paint chips in an alternative housing cell and was eventually transferred to the MHCB.  The inmate was discharged back to the EOP level of care on June 20, 2016 where he received required follow up and monitoring.

Over the following months, the inmate was provided with diagnoses of Anxiety Disorder and Borderline Personality Disorder.  Dialectical Behavioral Therapy (DBT) was implemented as treatment to assist him in moving to a lower level of care.  He attended his weekly appointments and appeared to be making use of the skills he was learning in treatment.  In January 2017, there was evidence of increased anxiety, depression and suspiciousness.  The primary clinician assessed the inmate for recurrence of psychotic symptoms which were not present, but a consultation request was submitted to psychiatry for anxiety on January 27, 2017.  In early February, the inmate reported that he was staying in his cell and declining showers because of cell searches.  He was again referred to psychiatry; he was ultimately seen on February 8, 2017 when he was prescribed paroxetine.  Over the next two months, the inmate was described as unshaven and wearing dark sunglasses during his appointments with clinicians.  He reported suicidal ideation to the psychiatrist in March, and later that month he reported feeling "emotionally drained" to his primary clinician and more irritable to the psychiatrist.  He also told the psychiatrist he was experiencing anxiety, poor sleep and poor appetite; paroxetine dose was increased.

On April 8, 2017, the inmate smeared feces on an officer's furniture and belongings, and he was placed on suicide watch in alternative housing in the ASU.  He was released the following day and placed in an ASU cell in STRH as "EOP overflow."  He denied suicidal ideation during his pre-placement screening as well as during five-day follow-ups.  He was able to discuss protective factors.  He was assigned a new primary clinician during his stay in ASU, and this clinician communicated with his prior mainline EOP clinician to discuss the inmate's low distress tolerance, distrust of authority and history of abuse.  The inmate was seen by a psychiatrist on April 13, 2017, who noted that his anxiety episode had resolved and upon request of the inmate; paroxetine was discontinued.

The SCR noted that a mental health assessment was completed on April 19, 2017, and the inmate was moved to the 3CMS level of care. Upon review of the healthcare record, the Special Master's expert found documentation that differed from this statement. On April 18, 2017, the inmate was seen for an initial mental health assessment. The mental health assessment concluded that the inmate "continues to demonstrate low distress tolerance and cognitive distortions which impairs his overall functioning and therefore EOP continues to be the appropriate LOC [Level of Care]." The assessment concluded by stating that "I/P will be retained at the EOP LOC at this time. Referral for a lower LOC will be assessed at next IDTT and weekly." However, the following day, the inmate was seen in IDTT, and it was determined that he did not meet criteria for continuation at the EOP level of care; the decision was made to lower the inmate to the 3CMS level of care. IDTT documentation was completed by the same clinician who had completed the mental health assessment the previous day. The treatment plan noted that the inmate was present at the IDTT, contributed to the goals and plan and was aware of the plan content. It noted that he did not refuse to participate or sign, yet the inmate did not sign the treatment plan. These inconsistencies were not mentioned in the SCR and not marked for corrective action.

The inmate was transferred to the 3CMS level of care, and on April 26, 2017 the inmate's previous mainline EOP clinician emailed to inform the 3CMS clinician about the inmate's previous successful DBT treatment, challenging behaviors, triggers, lack of skills and reluctance to build rapport. The 3CMS clinician met with the inmate on May 3, 2017, also the date the IDTT met. The IDTT documentation was similar to the previous IDTT in content, with only a noted change in the narrative about the inmate being appropriate for 3CMS level of care, rather than EOP level of care. Of note, the treatment plan included a checked box that the inmate would be EOP level of care after the IDTT, which appeared to have been an error. This was not mentioned in the SCR. The inmate was provided with a diagnosis of Generalized Anxiety Disorder, and he was prescribed hydroxyzine. There was no mention of the exclusion of his previous Borderline Personality Disorder diagnosis.

On May 9, 2017, the inmate was again sent to a community hospital after ingesting an unknown amount of acetaminophen. Upon return the following day, he reported to the crisis clinician that he wanted a higher level of care than 3CMS, arguing that he escalated quickly when triggered and wanted to be able to control his problems. He requested to speak with his previous clinician and be referred to DSH. The clinician opined that he was stable, and he was placed back in the STRH rather than admitted to the MHCB. No five-day follow up was scheduled or conducted. During the ASU pre-placement screening, he reported suicidal ideation but refused to speak with the ASU clinician. He reported distress about the transfer of his cousin (an inmate) to another institution.

On May 16, 2017, the inmate smeared feces on his body and in his cell and told the psychiatric technician that he needed to go to a higher level of care. During his

evaluation with a psychologist, the inmate stated that he smeared feces "as that's the way they listen to me"; he denied suicidal ideation.  He was returned to the STRH.  Two days later, on May 18, 2017, the IDTT convened a meeting to address his smearing of feces.  Documentation indicated that the team agreed that the behavior was not a result of mental illness but instead a result of poor behavioral coping skills.  The IDTT noted that the inmate would remain in the 3CMS program contingent upon his participation in programming and not retaliating against staff.  The IDTT documentation noted, "Should I/P begin to smear his feces in retaliation and as a way of manipulating staff, I/P will be removed from the 3CMS program and his level of care lowered to GP."  Later that day, the inmate told staff that he felt suicidal.  These statements were evaluated within the context of the inmate cleaning his cell and being harassed by other inmates for "caving in" to custody staff.  The STRH sergeant instructed custody staff that the inmate should be "stripped out" and placed in a holding cell with someone to "sit on him" until he could be evaluated by a crisis clinician.  Records indicated that the inmate refused to submit to an unclothed body search, so the officer left the inmate to report the refusal to the sergeant.  The sergeant directed the officer to have someone provide constant supervision to ensure the inmate did not hang himself with his jumpsuit.  The sergeant did not assign an officer for this task.  Direct observation did not occur, and the inmate was found hanging over an hour after the last documented observation.  Custody documentation noted that a mental health supervisor told the inmate, "you're not suicidal" and noted that this opinion would be communicated to the on-call psychologist approximately one hour and 22 minutes prior to his death.

There were a number of concerns noted during the emergency response following this inmate's suicide, including conflicting documentation about officer responses during the emergency intervention.  These were addressed through required QIPs discussed below.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was foreseeable based on a number of reasons.  The first and most obvious reason was that the inmate clearly stated his intent to kill himself prior to his suicide.  Additionally, the inmate had previously attempted to kill himself following transfers to lower levels of care or failures to increase his level of care, including ingesting potentially lethal pills nine days prior to his death.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was preventable based mainly on the fact that despite being actively suicidal, the inmate was

left unobserved and uncuffed in a holding cell with his clothing and access to means to kill himself.  Had staff observed the inmate as required, he likely would not have died.

IV.   Critique of Suicide Case Review Report

The SCR, overall, was an adequate summary of this lengthy and complex case.  There were two notable omissions within the SCR that should have resulted in additional corrective action recommendations.

The first was in regard to the inmate's ingestion of pills on June 3, 2016 which prompted evaluation in an emergency room and placement on suicide watch.  Documentation written by a psychiatric technician located in the healthcare record stated that the inmate "was observed ingesting a handful of pill (sic) in his cell during cell front medpass" but subsequent nursing documentation on that date and throughout the inmate's record either referred to the ingestion as "alleged" or ignored it altogether.  The SCR failed to note that the behavior was actually observed, so was not alleged, and should have been documented as a suicide attempt.  This should have resulted in a recommendation for the nurse who initially documented the ingestion as "alleged" on that day and the mental health clinician who completed the suicide risk assessment and noted that it was not an "actual overdose" to improve the accuracy of their documentation.

The second omission of concern within the SCR was the failure to document the discrepancies between a mental health assessment and IDTT treatment plan completed one day apart by the same clinician.  The mental health assessment noted that the inmate was to be retained at the EOP level of care as he continued to meet criteria based on low distress tolerance and cognitive distortions which impaired his overall functioning; yet the following day, the IDTT lowered his level of care to 3CMS without explanation as to what had changed from the previous day.  This inconsistency also should have been recommended for corrective action to determine if these discrepancies were a pattern for this particular clinician and to correct poor supporting documentation for level of care changes.

There were two additional minor errors noted within the report; the inmate's age was incorrectly documented in the executive summary, and his level of care was incorrectly listed in a table outlining MHSDS service levels and diagnoses.  Neither of these errors impacted the findings of the SCR.

The SCR included relevant social, criminal, incarceration, substance use and mental health history.  It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

V.   Analysis of Quality Improvement Plan Process

This case resulted in 25 required Quality Improvement Plans.  Seven QIPs were required to address concerns related to custody staff, five were required to address nursing concerns, and 13 were required to address mental health concerns.

The seven custody required QIPs were all related to the events that transpired on the day of the inmate's suicidal act.  They included the following:

- The officer left the inmate unobserved to report the inmate's refusal to submit to an unclothed body search.
- There was no documentation of monitoring of the inmate after 1706 hours.  He was discovered hanging at 1812 hours.  Further, the inmate was uncuffed in the holding cell.  Both of these were violations of operating procedure.
- The initial responder attempted to activate a PAD, but it failed.  The officer left the scene rather than blowing a whistle to alert others to the emergency, in violation of direction in the Program Guide.
- The inmate was placed on his side after being removed from the holding cell. There is conflicting documentation about when the inmate was rolled to his back, and CPR was initiated.  Custody reports indicated that it occurred prior to the arrival of medical staff, and medical staff reported seeing the inmate lying on his side when they arrived.  Failure to initiate CPR was a violation of policy.
- Custody staff failed to respond with a complete cut-down kit as required.
- There were numerous discrepancies in the emergency reports from staff on May 18, 2017.  Specifically, a number of events were all noted as occurring at 1812 hours with significant details omitted.
- The inmate was not provided with a loaner radio during his time in STRH as required.

The response from the facility noted that an investigation was requested by the OIA.  The results of that investigation were not available at the writing of this summary.

The five nursing concerns were as follows:

- No suicide observations were recorded for an ordered watch on April 8, 2017 to April 9, 2017.
- A psychiatric technician incorrectly documented medication adherence and no side effects for the inmate when the medications had been discontinued ten days prior in April 2017.  Further, prior to discontinuation, the psychiatric technician documented no side effects when the inmate had asked to have the medication discontinued secondary to side effects.
- On May 9, 2017 following an overdose, vital signs and nursing assessments were not completed as required, and there was a delay in contacting Poison Control.
- On the above date, a telephone order for activated charcoal was documented at 2347 hours, and documentation indicated that the order was from Poison Control;

yet documentation indicated that Poison Control was not contacted until 0015 hours, and the activated charcoal administered at 0020 hours.

- During the emergency response on May 18, 2017, a nurse turned the inmate's head rather than log rolling him to remove emesis, despite the presence of a possible neck injury.

These QIPs were reportedly addressed through the Death Review Committee (DRC). Documentation from the DRC noted its actions as, "Unrelated to preventing or delaying the death, the DRC identified opportunities for improvement. An action item will be sent to NPPC for multiple nursing care issues." The DRC summary then concluded with a list of six lapses in care. In addition to the five lapses noted above, a sixth indicated a delay in activation of 911. No further information was available. This response was inadequate, as there was no information regarding what actions were taken.

The thirteen mental health concerns included four from 2014 which likely influenced later assessments, and nine which occurred within the last 24 months of the inmate's life:

- Inadequate response to five mental health referrals submitted between April 21, 2014 to April 28, 2014, including two referrals that were "emergent." The emergent referrals were not responded to timely and then determined the inmate did not need further follow-up without adequate rationale. According to the Program Guide, the inmate should have been under constant observation until evaluated.

This QIP included a memo that described the process for responding to emergent referrals. The response noted that an updated local operating procedure would be drafted after October 31, 2017, and no further information was available. This response was only partially adequate.

- Despite the inmate reporting command auditory hallucinations and smearing feces to keep "foreign entities" and "evil shadows" away in April and May 2014, his IDTT on May 7, 2014 noted that he did not meet criteria for a higher level of care, and he was not referred for inpatient services until May 24, 2014. The clinical rationale for failure to refer was inadequate.

Record reviews and policy reviews were conducted, memos were drafted, and training was enacted to address the above. Of note, some of the training sessions reportedly occurred during 2015 through 2017, following the above events but prior to the suicide. Grands rounds were initiated to address complex cases. The QIP and response appeared adequate.

- Despite the inmate's behavior of smearing feces, evasive refusal to discuss suicide plans, and medication refusals, no consideration of involuntary medications was documented.

A review of the case revealed evidence that the inmate should have been considered for involuntary medications. The review revealed that the provider was unaware of the

criteria required for involuntary medications.  This was reportedly addressed through training in 2014, and the response demonstrated an increase in requests or renewals for involuntary medication orders in the following years.  This response appeared adequate.

- Poor safety planning and inadequate suicide risk assessments resulting in underestimation of the inmate's suicide risk were completed in 2014.

This recommendation was partially addressed through the QIP response.  The SRC recommended a QIP that included training of all staff in two content areas and mentorship as needed.  Only one training had been provided at the time of the response.  Mentoring was 60% compliant, and the additional training had not yet begun.  There was no follow up information provided, thus this response was inadequate.

- In his August 4, 2015 treatment plan, the IDTT failed to note that the inmate had reported an intent to jump from a tier to complete suicide upon discharge from DSH on July 13, 2015.

This was addressed through training with curriculum and evidence of participation included.  This response was adequate.

- Three suicide risk evaluations completed in July 2015 were conducted by the same clinician who used largely identical information in each, including inaccurate information about the inmate's history of auditory hallucinations and recent reports of suicidal ideation and intent.  Suicide risk was underestimated on each evaluation.

The QIP included a review of the clinician's suicide risk evaluations, feedback, mentoring and ongoing monitoring.  At the time the response was created, only review and feedback had been provided.  The other elements were planned but had not been completed.  No further information was provided as to the outcome of these efforts.  This response was partially adequate.

- The inmate was not seen by psychiatry in response to a referral on December 23, 2015 with the rationale that he had refused his psychiatric visit on December 16, 2015.

The QIP response stated that the failure was a scheduling error "coupled with some miscommunication between OT and psychiatry."  The plan did not elaborate on this miscommunication.  The QIP stated that the facility "no longer closes our new requests for psychiatry appointments for inmate who have had completed prior recent psychiatry contacts."  This was not the problem identified in the SCR.  A document outlining how to enter referrals into the Mental Health Tracking System (MHTS) was provided as "documentation of prior practice which lead [sic] to the error" yet that document did not include direction that included cancelling new referrals or requests based on prior appointments.  This response was inadequate.

- When the inmate reported taking 40 to 50 pills on June 4, 2016, and he was treated at an outside hospital and subsequently admitted to the MHCB. The suicide risk assessment determined that the inmate had low chronic and acute risk and noted that the action was not a suicide attempt.

The QIP included a discussion with the clinician, training of clinical staff and a plan to review future assessments and to engage in mentoring with the clinician in question. Only the initial discussion and training with staff had been completed at the time of the response, and no follow up evidence was provided regarding reviews, mentoring or the outcomes of these actions. This response was inadequate.

- Five days after the inmate smeared feces on officer's furniture and belongings, a psychiatrist discontinued his medication, noting that the inmate had an episode of nonspecific anxiety which had resolved. There was no recognition of his psychiatric history nor consideration of alternative medications.

The QIP response included a review of the psychiatrist's documentation for this case and other cases. No pattern of inadequacies nor deficiencies was identified. The psychiatrist was also trained on documentation. With respect to this specific case, the QIP response failed to address the psychiatrist's lack of review/documentation of the inmate's history, noting that only the instant assessment, coupled with the concurrent assessment of other team members, was considered. This response was only partially adequate.

- IDTT meetings on April 19, 2017 and May 18, 2017 did not document the inmate's prior suicidal acts following changes to lower levels of care or failures to increase his level of care.

The QIP response indicated that training was provided to staff as part of the monthly suicide prevention meeting. The training curriculum and evidence of attendance was provided. This response appeared adequate.

- Following an overdose on May 9, 2017, the evaluating clinician appeared to significantly underestimate the inmate's suicide risk despite the overdose and the inmate's refusal to discuss the event. On the same date, the inmate reported suicidal ideation during an ASU pre-placement screening and no higher level of care was considered.

The QIP involved a comprehensive review of documentation of the incident and resulted in the clinician being referred to the Professional Practice Executive Committee. No further information was available. This response was adequate.

- On the day of the suicide, an IDTT was conducted to discuss the inmate's fecal smearing, and the documentation indicated that the inmate's participation in the MHSDS was contingent upon his discontinuation of fecal smearing. This was not a valid reason to discontinue care, based upon Program Guide requirements.

The QIP response included discussion of the documentation surrounding the IDTT meeting in question, as well as documentation from 15 additional IDTTs. No pattern of problems was identified, and the concerns with the IDTT in question were explained as occurring due to the IDTT membership including staff "who do not typically participate in IDTT, but who were invited to participate in order to address the various stressors contributing to [inmate]'s presentation were present." There was further description that the documentation was "written in haste." There was no evidence that any action was taken to address these issues or to prevent them from occurring in the future. This response was inadequate.

- Custody documentation noted that a mental health supervisor told the inmate that he was not suicidal less than 90 minutes prior to his death and told the inmate this information would be relayed to the crisis clinician.

This QIP response noted that an investigation was requested by the OIA. The results of that investigation were not available at the writing of this summary.

As a general note, many of the QIPs and responses provided by the institution appeared to occur on the same date (September 27, 2017) likely related to the due date for submissions. This was likely the reason for the majority of responses being inadequate with regard to completeness and follow-up.

Case U

I.  <u>Summary of Case</u>

The inmate was a 61-year-old Caucasian man who was found by correctional officers hanging in his single cell on September 20, 2017. He was receiving EOP level of care at the time of his death.

The inmate was born and raised in Michigan by his parents, both of whom were deceased at the time of his death. He had one brother and one half-sister with whom he maintained contact during his incarceration. He graduated from high school in 1974 and then served in the United States military from 1974-1976 and was deployed to Vietnam. He was the sole survivor of a helicopter crash, from which he experienced extensive injuries, was in a coma for three days, and subsequently was medically discharged from military service. He moved to California at age 25 for employment purposes. He obtained a bachelor's degree and two master's degrees and was consistently employed prior to his incarceration. He was divorced three times. He had one daughter.

The inmate described himself as a "functional alcoholic", and he reported drinking daily since 1995. He had no history of drug use. He reported participating in substance use treatment on three occasions, the outcome of which was not reported. Prior to his most recent incarceration, he had been sentenced to three years for assault with a deadly weapon. He was paroled in April 2008.

He entered CDCR for the second time in October 2009 to serve a 92-years-to-life sentence for attempted murder, inflicting great bodily injury involving domestic violence, assault with a deadly weapon, terrorist threat, rape with force/violence/fear of bodily injury, and penetration with force against a victim's will.  The victim was his girlfriend.

Throughout his incarceration, the inmate received one RVR in 2011 for possession of inmate manufactured alcohol.  He received no visits and made no phone calls.  There was evidence of written correspondence with others.  He was a participant in the Disability Placement Program due to mobility impairment.  He used a walker and supplemental oxygen.  He was placed in a single cell in an EOP unit due to a recommendation from mental health related to his symptoms of PTSD.  His treatment plan included a goal to eventually enable him to double-cell.  He participated in a veterans' program to address combat-related PTSD.  On June 13, 2017, the Unit Classification Committee decided to transfer the inmate to a facility with a medically high risk mission.  Despite a recommendation for a single cell, he was determined to be eligible for dormitory housing following his transfer on July 28, 2017.  He appealed this decision, but the decision was denied.

The inmate briefly received mental health services in the community in 1991 for depression.  He was prescribed medication, which he did not find effective, so he discontinued treatment.  Upon entry into CDCR in 2009 he was placed at the 3CMS level of care, but no diagnosis was indicated.  In 2010, he braided a noose and was in the process of attempting to hang himself when his attempt was stopped by officers and another inmate.  He was admitted to the MHCB and eventually to DSH for inpatient treatment for three months.  Upon discharge to the EOP level of care, the treating psychiatrist noted continued concerns about the inmate's suicide risk.  He was immediately placed at the MHCB level of care upon his return due to suicidal ideation, and he was ultimately discharged to the EOP level of care after 16 days.

In 2015, the inmate reported sleep disturbance when having a cellmate and noted that he feared he would kill his cellmate secondary to PTSD symptoms and flashbacks.  He reported night terrors, dissociative episodes and overwhelming rage.  There was discussion among the IDTT about lowering his level of care to 3CMS, but this decision was postponed due to his symptom severity.  He reported in May 2015 that suicide was his only means of escape and that he often prayed at night to die and not wake up.  In December 2015, he began a course in Cognitive Processing Training offered by the Department of Veterans Affairs (VA).  A VA psychologist worked with his IDTT to provide treatment to the inmate.  After the 12-week program, the inmate continued working with the VA psychologist and reported in May 2016 that his work with the psychologist was the only thing "keeping me alive at this point."

94

The IDTT conducted timely treatment meetings through October 2016.  From that date through July 2017, IDTT meetings were missed or delayed, and psychiatric contacts did not meet policy timelines.  In early 2017, medical staff began to taper the inmate's morphine which he was taking for pain, in preparation for discontinuation in May 2017.  He appealed this decision in February and in March 2017.  These appeals were denied.  Upon transfer to another facility in July 2017, no suicide risk evaluation was completed, despite his history of a suicide attempt and suicidal ideation.  The inmate was cleared for dormitory housing and for a double-cell by the IDTT.  He appealed these decisions and asked that his previous treatment team be contacted about the severity of his symptoms.  His appeal was denied, and it did not appear that his prior treatment team was contacted.  His primary clinician noted the inmate's previous diagnoses and treatment, including the services provided through the VA, yet indicated a PTSD diagnosis as provisional and a diagnosis of Major Depressive Disorder was provided  There was no mention of the inmate's dissociative symptoms or fears of hurting others during a flashback.

In August 2017, the inmate was seen three times by a psychiatrist to address medication nonadherence.  The inmate reported that he was frustrated that his pain was not adequately managed and reported that he did not want to live with that amount of pain.  He also reported a resurgence of nightmares.  In August, the psychiatrist documented diagnoses of Bipolar Disorder and PTSD.  On August 28, 2017, the inmate was seen at cell-front by his primary clinician in response to a referral.  The inmate was told that he continued to be eligible for a double cell and dormitory.  He responded by saying that "this is the calm before the storm because I cannot live double celled."  He was seen again on September 1, 2017 at cell-front, and the contact was not well documented.  His next weekly contact did not occur.  The inmate was seen for the final time on September 12, 2017 at cell-front when he reported that he was not having any issues.  He submitted three healthcare requests, to address optometry, pain management and the need for a mobility vest on September 18, 2017.  Prior to his death, he organized, labeled and inventoried his belongings in a "Last Will and Testament."  He died on September 20, 2017.

Documentation indicated that during the emergency response to the suicide, the officers cut the noose without securing the inmate's body, causing him to hit his head on a stool in his cell and then on the floor.  This was inconsistent with emergency response procedure guidelines.

II.     Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was foreseeable.  This determination was based on the fact that the inmate clearly stated, on several occasions, that he saw death as a means to escape his situation and his ongoing chronic pain.  He stated that the decision to place him with a cellmate was unacceptable,

and yet that decision remained unchanged at the time of his death despite documentation of his need for a single cell secondary to the severity of his PTSD symptoms and his history.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was preventable in light of the fact that the inmate was not seen according to requirements by his primary clinician, and his primary clinician failed to adequately account for and address his reported PTSD symptoms.  Had there been proper acknowledgment of the inmate's needs, he likely would have received the treatment he needed to prevent his suicidal behavior.  Additionally, the inmate reported chronic pain, and his pain medication was discontinued four months prior to his death.

IV.   Critique of Suicide Case Review Report

The SCR was an adequate summary of this case.  It included relevant social, criminal, incarceration, substance use and mental health history.  It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.  There were two noted errors, however, related to required QIPs.  The SCR noted an absence of goals by the IDTT to address suicidal ideation, yet these goals were present on his most recent treatment plans.  Also the SCR noted that a primary clinician contact was missed, when it was actually not required as a group contact had been completed that week.

V.   Analysis of Quality Improvement Plan Process

This case resulted in seven required Quality Improvement Plans, six related to mental health (two were errors as noted above) and one custody concern.  The mental health concerns required four QIPs to address missed IDTT meetings, failure to complete a suicide risk evaluation upon transfer, cell-front primary clinician contacts and missed psychiatry appointments.  The first three QIPs addressed these issues through a review of the documentation in question and staff training.  There was no evidence of a review to determine if these issues extended beyond this case or if there was a larger pattern.  There was a review of the fact that cell-front primary clinician contacts were conducted because scheduled sessions had been missed due to conflicting medical appointments.  A memo was generated to address how to prioritize conflicting appointments.  The QIP to address the missed psychiatry appointments noted high vacancy rates and ongoing recruiting efforts.  These responses were partially adequate.

The custody QIP was required to address the fact that correctional officers did not support the inmate's body during cut-down.  All that was submitted for this QIP was a

training form, signed by two officers, which listed "Suicide Prevention" training for one hour. The content of that training was not provided. This response was inadequate.

Case V

I.  Summary of Case

The inmate was a 37-year-old African American man who was found by correctional officers hanging in his single cell in an ASU on January 27, 2017. He was receiving mental health services at the 3CMS level of care at the time of his death.

As his parents were addicted to drugs and frequently absent from his life, the inmate was raised primarily by his grandparents. When his mother was present in his life, she reportedly abused him both emotionally and physically. The inmate also reported being sexually assaulted at gunpoint at the age of 16. Records indicate that he did not complete high school, but later obtained his GED and completed some college courses. His history was positive for drug abuse including methamphetamine and heroin dependence. As an adult, he was court ordered to attend drug treatment on five occasions, completing two of the programs. He had no history of gang involvement. He was divorced twice and had three children, but only had contact with one of these children. During his current incarceration, he did not receive any visits, nor was there evidence of any phone calls.

The inmate's criminal history began in childhood, at age 12 when he was arrested for burglary and possession of stolen property, yet there was no evidence of other juvenile arrests. He was convicted of four felonies and fourteen misdemeanors as an adult, including charges of domestic violence, assault, drug-related crimes, parole violations and driving on a suspended license. He also had a history of being the subject of a number of restraining orders.

The inmate was incarcerated for the third time in CDCR during November 2016. He was sentenced to serve six years for assault with force likely to produce great bodily injury against a female victim who was a stranger. In January 2017, he was assaulted by three inmates and placed in the ASU; he did not want to be placed in an SNY at that time. He reportedly owed debts for drugs. He received no RVRs during his two-month incarceration.

Prior to his incarceration in CDCR, the inmate reportedly attempted suicide on three prior occasions, twice while housed in county jail in 2013 and once in county jail in 2014. Despite this, records indicated that he had not received mental health services in CDCR during previous periods of incarceration including from October 2014 through January 2015. Upon his most recent reception in 2016, he reported a significant mental health history including psychiatric hospitalizations and suicide attempts. He reported symptoms of paranoia, hallucination, racing thoughts, poor sleep and appetite. The

evaluator noted the absence of previous treatment during incarceration, questioned the veracity of his reports, and referred him for further evaluation.

When he was seen for a comprehensive evaluation on November 30, 2016, he was placed at the 3CMS level of care.  He reported experiencing trauma and behavioral problems as a child, substance use issues and the development of psychiatric symptoms beginning in 2008.  He reported several psychiatric hospitalizations in 2010 and treatment with a number of psychotropic medications including antipsychotics, antidepressants, mood stabilizers and a stimulant (i.e., Ritalin).  The inmate reported hitting his head to the point of losing consciousness and three previous suicide attempts, twice by hanging in 2013 and once by cutting in 2014.  The precipitants of these attempts were not documented.  A suicide risk evaluation was completed on that date but was never entered into the healthcare record.  It was located after the inmate's death and noted a number of risk factors as well as protective factors.  He was determined to have high chronic risk but low acute risk for suicide.  The safety plan addressed reducing his self-injurious behavior.

The inmate wrote several healthcare requests for mental health services, including an urgent request for medications to address his auditory hallucinations received on December 12, 2016.  He was seen on December 14, 2016, and he reported hitting his head daily in an attempt to stop the voices.  At that time, he reported that he had attempted suicide by hanging on five prior occasions.  The inmate was referred to a psychiatrist and seen on December 19, 2016.  He requested medications that would not be sedating; he also reported problems concentrating.  He asked to be placed on atomoxetine for attentional support, rather than an antipsychotic.  Two days later, he submitted a request for placement in treatment groups and more frequent contacts with his primary clinician.  His primary clinician met with him on December 29, 2016 and told him he had been referred to groups.  He also stated that the effect of his medications was decreased by the afternoon.  Documentation indicated that the primary clinician saw the inmate the following week, but no such contact was documented.  The inmate again submitted a request for more frequent contacts with his primary clinician on January 15, 2017.  He was not seen in response to this request.

The inmate was placed in the ASU after he was assaulted.  The pre-ASU screening completed on January 21, 2017 noted that the inmate denied suicidal ideation.  He submitted a request to see his primary clinician on January 24, 2017.  On that same date, he was provided within in-cell activities by a recreational therapist.

An IDTT was conducted without the inmate present, on January 25, 2017.  The IDTT determined that he would continue to receive services at the 3CMS level of care.  In the treatment plan, problems were listed as psychotic symptoms and head-banging; yet the treatment interventions were to address depressive symptoms.  That same day the inmate was scheduled to be seen by his psychiatrist.  The inmate refused to leave his cell to be seen by the psychiatrist, but he reported positive response from atomoxetine at cell-front.

He asked for medications for sleep disturbance, and the psychiatrist scheduled to see him the following week.  The healthcare record indicated that the inmate refused medications on at least eight days in January 2017.

Later that same day, the inmate was seen by his ASU primary clinician.  The inmate explained that his ASU placement was due to safety concerns and that he had no RVRs.  A mental health evaluation and suicide risk evaluation were completed with the inmate on that date.  He discussed his childhood trauma and drug addiction.  He noted concerns over the loss of his parental rights in 2016.  He recounted his psychiatric history including several hospitalizations.  He reported three previous suicide attempts, current auditory hallucinations and a high level of depression.  He disclosed the three previous suicide attempts discussed earlier and noted that they were precipitated by auditory hallucinations.  The clinician assessed the inmate with moderate chronic and acute risk for suicide.  Despite this assessment, the suicide risk evaluation appeared to support a determination of high chronic risk; protective factors related to his children were noted, despite the inmate reporting loss of contact with his children during the session.  The safety plan was noted to be adequate.  It is unclear why the IDTT was conducted and a treatment plan created prior to this initial evaluation by the primary therapist.

The inmate attended an Institutional Classification Committee (ICC) meeting on January 26, 2017.  The mental health clinician at the meeting noted in a very short note that the inmate's mood was "good," he was smiling and denied suicidal ideation.  The inmate was placed on a list to be transferred to another facility.  On the day of his death, January 27, 2017, the inmate was seen during rounds by a psychiatric technician who noted that the inmate reported no suicidal ideation.  The inmate was asked about his medication refusal; he reported that the medication was keeping him awake, but he did not want it to be discontinued.

Following his death, his primary clinician learned that the inmate was being taunted by other inmates who were encouraging him to harm himself.  The SCR author believed the inmate had reported this to the primary clinician who failed to enter this into the inmate's healthcare record and as such a QIP was required to address the issue.  The QIP was required in error.

II.   Determination of Foreseeability

The Suicide Case Review Committee determined this case to be foreseeable.  The Special Master's expert agreed with this determination.  The determination was based on the fact that an initial suicide risk evaluation, which determined that the inmate had a high chronic risk for suicide, was never entered into the healthcare record.  Further, a suicide risk evaluation completed two days prior to the inmate's death failed to account for risk factors, including imminent factors, that increased his suicide risk.  Had these factors been recognized, his high risk would have been identified.

III.   <u>Determination of Preventability</u>

The Suicide Case Review Committee determined this case to be preventable.  The Special Master's expert agreed with this determination based on the fact that the inmate's treatment plan was created prior to a comprehensive multidisciplinary assessment, was not internally consistent and failed to provide for interventions to address his suicide risk. Additionally, the inmate did not receive a radio while in ASU, which may have helped distract him from the auditory hallucinations and taunting of other inmates.  Had these issues been properly addressed, the likelihood of suicide would have been reduced.

IV.   <u>Critique of Suicide Case Review Report</u>

The SCR was an adequate summary of this case.  The SCR included relevant social, criminal, incarceration, substance use and mental health history.  It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report.

V.   <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in eleven required Quality Improvement Plans, six to address mental health concerns, four to address nursing concerns and one to address custody concerns.

The mental health concerns were related to the failure to enter the suicide risk evaluation into the healthcare record, the completion of the IDTT and treatment plan without the inmate present and prior to completion of a mental health assessment or psychiatric assessment, failure of the psychiatrist to note the inmate's depression or psychosis, failure to accurately assess suicide risk two days prior to his death, internal inconsistencies within the treatment plan, and poor documentation by a mental health clinician following the ICC.  QIPs included documentation audits, staff training and staff mentoring, as appropriate.  Evidence of training was submitted, but evidence or outcomes of individual audits or mentoring was not provided.  The response was adequate.

As noted above, there was also a QIP required to address the primary clinician's failure to document the inmate's report of being taunted by other inmates, but this was noted to have been a misunderstanding of the timing of the receipt of this information and did not require a QIP as a result.

The nursing QIPs were required to address the administration and documentation of the use of Narcan, inaccurate documentation of the inmate's medication adherence by the psychiatric technician and failure to complete a medication referral secondary to the inmate's refusal of psychotropic medications.  These issues were noted to have been referred to the NPPC, and the outcome was not provided.  This response was inadequate.

The custody QIP was required to address the fact that the inmate was not provided with a radio when he should have been according to policy.  This issue was addressed through training.

Case W

I.   Summary of Case

This inmate was a 35-year-old Latino man who was found by correctional officers hanging in his single cell in an EOP ASU unit on July 6, 2017.  He was receiving mental health services at the EOP level of care at the time of his death.

Records indicate that the inmate was born in California and raised by his mother as well as being placed in foster care and group homes.  The inmate received physical and emotional abuse perpetrated by his mother; she reportedly had substance use problems. He had little contact with his father who died in 1997.  His mother died in 2009.  He reportedly had good relationships with his remaining family members.  Records indicated that he had problems with anger throughout his childhood and was in special education classes from fifth through eleventh grade, when he dropped out of school.  He never married and had no children.  He had significant issues with substance use including alcohol, methamphetamine and cannabis.  He was gang-affiliated until 2004.

The inmate's history included a long criminal record, beginning in early adolescence for violent behaviors both inside and outside his home.  Records indicated that his criminal history began at age 11 and included battery on a peace officer and assault with a deadly weapon.  He was hospitalized at age 13 after fighting with his brother and attempting to hold his family hostage.  As a juvenile, he completed two separate programs for children with severe behavioral problems.  He was also incarcerated as a juvenile, and records indicated that he attempted suicide by overdose while in juvenile hall.  He was incarcerated in CDCR previously for the crime of terrorist threats and had been arrested for two previous charges of driving under the influence of alcohol.  For his index offense, he entered CDCR in September 2007 at age 25, with a life sentence for second degree murder after stabbing a friend to death under the influence of drugs.  During this incarceration, he received 12 RVRs, ten of which were for violent or assaultive behaviors, often directed toward correctional officers and related to his delusional belief that he was being poisoned by them.  His healthcare record indicated that mental health assessments conducted regarding his RVRs consistently noted the contributory factors of his mental illness and recommended alternative sanctions.

Records indicated that the inmate received visits from his family members through March 2016.

As a child, the inmate was hospitalized four times before age 11 for "mood swings", and as noted above completed two treatment programs designed to address severe behavioral problems. Records also indicated that he sustained a serious head injury at age seven when he was hit by a car. During his previous incarceration in CDCR, he was treated at the 3CMS level of care and provided with a diagnosis of Dysthymic Disorder. He was also provided with various other diagnoses during that period including Adjustment Disorder; Mood Disorder, NOS; Bipolar II Disorder; Intermittent Explosive Disorder; Delusional Disorder; Major Depressive Disorder, recurrent, severe with psychotic features; Schizoaffective Disorder, Bipolar Type and Antisocial Personality Disorder. Records indicated that while housed at a county jail at the age of 23, he cut himself four times on the same day; and in 2007, he cut his wrist secondary to depressed mood. These were documented as suicide attempts.

During his most recent incarceration, the inmate demonstrated delusional beliefs about his food being poisoned early on in his incarceration. This belief resulted in assaults and a refusal to eat. In 2008 he was placed at the EOP level of care after reporting the belief that his food was being poisoned by custody staff and subsequently refusing to eat. In late 2009, a conservatorship was sought to allow feeding against his will. Beginning in January 2010, he was force-fed under a court order multiple times through early 2013 and was noted to have lost a significant amount of weight during that time. Records indicated that he was treated at the EOP level of care, MHCB level of care and in inpatient settings for the first five years of his incarceration. In 2012 while housed in SHU, he cut his left wrist, right arm and attempted to hang himself. He stated that he did this to seek revenge on staff for poisoning him, believing that the poison would be found during his autopsy. He was placed in the MHCB and in an acute inpatient setting during 2012.

In July 2013 while receiving services at the 3CMS level of care, a PC 2602 was granted for danger to others and was renewed until the time of his death. He did not have food refusals after 2013, yet in 2014 he began to express delusional beliefs not only about his food but also a belief that officers had placed a chip in his spine and could hear his thoughts. He also engaged in violence toward officers at that time. In 2015 his symptoms worsened to include auditory hallucinations, expanded delusions and depressed mood. He returned to the EOP level of care in June 2015. It was noted, however, that his affect was often incongruent with the content of his speech, and he often expressed himself in a clear and calm voice even when discussing distressing topics.

The inmate began expressing vague suicidal ideation during 2015 but did not engage in any violent self-injurious behavior. A suicide risk evaluation completed in June 2015 noted that he expressed a desire to die on the anniversary of his crime (February 2) and that he could die by refusing to eat or drink and then cutting the feeding tube if one were initiated. A suicide risk evaluation completed in January 2016 failed to document his history accurately and included information from another inmate's records.

In April 2016, the inmate reported being suicidal and was placed at the MHCB level of care.  Two suicide risk evaluations completed in April 2016 carried over the inaccurate information noted in the January evaluation, but a third evaluation included accurate information.  He was transferred for acute inpatient care due to delusional ideation with suicidal and homicidal intent.  He was provided with a diagnosis of Schizoaffective Disorder.  He was prescribed a number of medications including an antidepressant (sertraline), two antipsychotics (ziprasidone oral and PRN injectable, paliperidone), a mood stabilizer (divalproex sodium), an anxiolytic (buspirone) and diphenhydramine (commonly used for medication side effects and sleep).  During his inpatient stay, he was again noted to have an incongruent affect and noted as "overly bright and cheery, given his circumstances."  He was discharged to the EOP level of care in August 2016 but began requesting to return to the 3CMS level of care in September of that year.  He refused to engage in EOP programming but maintained good self-care and hygiene and was noted to be medication adherent.  He reported that he feared he would hurt others if he left his cell and continued to report delusional ideation.  From April 26, 2016 through December 13, 2016, the inmate underwent four suicide risk evaluations, all noted high chronic suicide risk.  His acute risk was rated as high in April and May 2016 but low in August and December 2016.  In February 2017, his chronic risk was reduced to moderate and his acute risk was assessed as low, apparently moderated by a number of protective factors including his supportive family and motivation for treatment.

In March 2017, his primary clinician suggested that he may require a higher level of care given his paranoia and programming refusals.  The IDTT decided not to refer him to an inpatient setting based on his ability to maintain his activities of daily living, his lack of overt decompensation, his participation in individual sessions and his medication adherence.  He was maintained on a modified treatment plan.  He underwent suicide risk evaluations in April and May 2017, both noted low acute suicide risk.  The April evaluation rated chronic risk as high, but the May evaluation noted a number of protective factors and reduced his chronic risk to moderate.  This final risk assessment was noted to be comprehensive.  It should be noted that while he reported family support as a protective factor, he reported to clinicians that he believed CDCR was keeping his family away.

In the final months of his life, the healthcare record included conflicting documentation.  His primary clinician noted that the inmate would be maintained on a modified plan while awaiting DSH placement, yet no referral to DSH was located in the healthcare record.  Additionally, his treating psychiatrist stated that the inmate would be better served at the 3CMS level of care because he was not taking advantage of EOP programming.  The psychiatrist also noted the potential for staff assault should the inmate be placed in a DSH facility.  During this time, the inmate was assaultive toward staff, reported constant auditory hallucinations, demonstrated increased anxiety and anger, and began accusing his treatment providers of "abuse."

The inmate was seen by his primary clinician on the day before his death when he reported that he did not have a mental illness, but simply suffered from "anger problems." He was noted to be aggressive while making statements about inflicting violence on officers and his psychiatrist, but he denied suicidal ideation or intent. The following day, he covered his cell window with cardboard and left a suicide note which included a statement that his family had turned their backs on him.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was preventable. This determination was based on the fact that over the final months of his life, this inmate's symptoms and functioning were deteriorating to the point that his primary therapist noted a need for referral to an inpatient setting. In fact, in a progress note dated the day before his death, the primary clinician noted that he would be seen individually until acceptance to DSH, yet no referral was located in the healthcare record. Additionally, the inmate had not participated in any EOP programming for a number of months and remained confined to his cell, unwilling to leave. Had the inmate been assessed properly and his low level of functioning identified, he would have been referred for a higher level of care and treated appropriately, reducing the likelihood of his suicide.

IV.   Critique of Suicide Case Review Report

The SCR was not an adequate summary of this case. It should be noted that this case had a long and complicated history, yet the SCR included contradictory and confusing information regarding the inmate's mental health treatment history while incarcerated. The narrative of the report included timelines and dates of level of care changes that did not correspond with information provided in a table within the report. For example, the narrative report indicated that his level of care was reduced to 3CMS in February 2013, yet within the table that change was noted to have occurred in June 2012. Additionally, the SCR noted that the inmate was reportedly attending his individual treatment sessions prior to his death, yet the report also noted an ongoing refusal to leave his cell secondary to his statements that he would hurt others if he did. The SCR did not explicitly clarify whether the inmate was seen for individual sessions at cell-front or if he was willing to leave his cell for these contacts. Additionally, the organization of the SCR, which separated his treatment, suicide risk evaluations and disciplinary events resulted in a

104

disjointed timeline, making it difficult to follow the inmate's symptom progression over time.

The SCR included a summary of the inmate's known social, criminal, incarceration, substance use, and mental health history and provided a reasonable assessment of the precipitants to this suicide. The recommendations provided followed from the content and findings of the report, however there was no critical analysis of the inmate's psychiatric care.

V.     Analysis of Quality Improvement Plan Process

This case resulted in six required Quality Improvement Plans, three related to mental health services, one related to custody and two to address nursing care during the emergency response. The mental health QIPs were complex, and each was required to address a number of issues.

The first mental health QIP was required to address the inaccuracies noted in three separate suicide risk evaluations. The QIP response reported that the three clinicians responsible for completing these evaluations were no longer working for CDCR, and no further action was taken. This response was inadequate as it failed to attempt to assess what could have been a systematic issue. Based on the failure to follow up, it was not known if these problems continued with other clinicians. The other two mental health QIPs were required to address failures to properly refer the inmate to a higher level of care and failure to accurately document his decompensation. These were addressed through training, although the impact of that training was not provided. This response was adequate.

The custody QIP involved a delay in activating 911 and was addressed through training. The nursing concerns included a documentation error and the provision of a third dose of Narcan without a physician's order. The former was not addressed, and the latter was noted to have been referred to the Nursing Professional Practice Committee (NPPC) with no follow up provided. This response was partially adequate.

Case X

I.     Summary of Case

This inmate was a 33-year-old Latino man who was found by correctional officers hanging in his single cell in a SNY at an RC on March 12, 2017. He was not receiving mental health services within the MHSDS at the time of his death. He had been incarcerated for 53 days at the time of his death.

He was an undocumented immigrant to the United States from Mexico, having arrived in 2007 on his own. His family remained in Mexico. He was primarily Spanish-speaking,

but available documentation from multiple sources indicated that he communicated in English without the need for an interpreter.  He completed school through the sixth grade. Records indicated that his mother died in 2014, and he did not have contact with his father.  He was never married but had one daughter.  He had no prior criminal record and denied use of drugs or alcohol.  He was not affiliated with any gang.

The inmate was incarcerated in CDCR for the first time in January 2017 for crimes including false imprisonment, assault by means of force likely to produce great bodily injury and forcible rape.  He was sentenced to 24 years and eight months.  He did not receive any RVRs during his brief period of incarceration.  He was placed in Protective Custody (PC) upon reception, as he had been in PC in the county jail.  He did not require placement in the DDP.  He had no visits nor phone calls and was not assigned to any job or programming.  He did maintain written correspondence with his family.

One week after his arrival to CDCR, he was the victim of battery by another inmate. Following the incident, the inmate did not report any safety or enemy concerns related to this event.  Of note, the death review revealed information that indicated the inmate had been yelling that he was going to kill himself, and other inmates were yelling for him to do so the night of his suicide.  An investigation was initiated at the facility as a result.

There was no documented history of mental health treatment or suicide attempts prior to incarceration.  Healthcare documentation indicated that the inmate was screened for mental health symptoms during the four years he spent in the county jail.  He denied mental health history and never requested mental health services at the jail.  Upon his reception into CDCR, he was screened by nursing staff, and a referral was submitted based on his reported depressive symptoms, being a new commitment, and his lengthy sentence.  He was seen the next day for a scheduled mental health screening, not in response to the referral.  The screening resulted in negative findings other than the inmate being placed in PC, and the inmate was not referred for further evaluation.  When the referral was received, it was determined "completed" by an office technician who assumed it had been addressed during the routine mental health screening.  He was not seen again by mental health staff prior to his death and never underwent a suicide risk evaluation.

II.    Determination of Foreseeability

The Suicide Case Review Committee determined that this death was not foreseeable. The Special Master's expert agreed with this determination.

III.    Determination of Preventability

The Suicide Case Review Committee determined that this death was not preventable. The Special Master's expert does not agree with this determination.  It is likely that had a

mental health clinician been aware of the inmate's presentation during his initial medical screening, additional attention would have been given to his mental health needs. This would have at least resulted in further evaluation and another opportunity for contact with mental health staff. Given the timing of his assault one week after arriving in CDCR, he may have been willing to discuss his thoughts and feelings if asked providing an opportunity for intervention and likely prevention of his death by suicide. Additionally, the inmate was allegedly yelling out he was going to kill himself, and other inmates were encouraging him the night of his suicide. The information was credible enough that an investigation was warranted, and thus may be further indication that the suicide was preventable as officers could likely hear the yelling which was noted to have kept other inmates awake during the night.

IV.  Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. The SCR included known social, criminal, incarceration, substance use, and mental health history. It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

V.  Analysis of Quality Improvement Plan Process

This case resulted in one required Quality Improvement Plan to address the fact that the referral was not addressed appropriately. In response, the facility updated its procedure with improved tracking and oversight. Evidence of staff training was provided.

Additionally, an investigation was pending regarding whether or not correctional officers heard yelling among inmates, encouraging the inmate to kill himself on the night of his suicide. The results of that investigation should have been completed and findings incorporated into an additional QIP as indicated. The results were not available in the records related to this suicide for review by the Special Master's expert.

Case Y

I.  Summary of Case

This inmate was a 28-year-old Caucasian man who was found by a correctional officer hanging in his single cell on a general population yard on October 15, 2017. He was not receiving mental health services in the MHSDS at the time of his death. Records indicated that he was eligible for a double cell, but he did not have a cellmate.

There was little information available regarding the inmate's history within his records. An interview with his grandfather during his death review provided most of his background information. He was born and raised in California until age five, when he moved with his mother and step-father to Ohio. The inmate's father committed suicide

107

when the inmate was six years old.  The inmate returned to California at age 17 with his mother.  He was noted to have had a dysfunctional childhood which included physical abuse at the hands of his stepfather, as well as drug and alcohol use within the home. Child Protective Services were involved in the child's life both in California and Ohio. He reportedly completed school through the eleventh grade.  While he never married, records indicated that he had two children; although his grandfather was not aware he had children.  While he corresponded with his grandfather through letters, there were no visits or phone calls on record during his incarceration.

His substance use history included the use of cocaine, marijuana, heroin and methamphetamine.  He reportedly used drug intravenously and completed a drug rehabilitation program prior to his incarceration.  Interviews with staff and inmates following his suicide revealed that the inmate was actively using drugs prior to his death.

Despite an extensive criminal history as an adult, the inmate was serving his first incarceration in CDCR for assault with a deadly weapon (a machete) likely to cause great bodily injury and personally inflicted great bodily injury beginning in August 2016.  He was serving a six-year term after pleading to a lesser crime, as he had originally been charged with attempted murder.  Prior to his incarceration, he had been arrested for vandalism, receiving stolen property, driving without a license and a series of drug-related crimes.  He was offered a drug diversion program in lieu of incarceration in 2010 but was terminated from the program in 2012.  He was placed on probation and did not receive any new criminal charges until his index offense.

During his 14-month incarceration, the inmate received 15 RVRs, many of which were related to being late to or absent from work.  As a result, he was determined to be a "program failure" and was not enrolled in any programming at the time of his death. None of his RVRs resulted in segregation placement but involved loss of privileges.  At the time of his death, he was a "C-Status" inmate meaning that he had limited privileges including limited movement out of his cell.  He was initially classified at security Level III, but this was increased to Level IV secondary to his disciplinary record.  The inmate had requested a transfer to Calipatria State Prison for his Level IV placement, and this request was granted.  The transfer was scheduled to occur the day after his death.

There was no documented Test of Adult Basic Education (TABE) score located in the records, but he was not placed in the DDP as he passed the screening and was noted to have had an eleventh-grade education.

At the time of reception, records from the county jail indicated that the inmate was provided with a diagnosis of Adjustment Disorder with depressed mood and included a history of substance use and two suicide attempts during adolescence.  His initial health screening noted that he was referred for a routine evaluation by mental health staff. Evidence of this referral was not located in his healthcare records.  He was seen for an

initial mental health screening on the day of his reception, and that screening noted a history of psychiatric hospitalizations and a previous suicide attempt. The screening indicated that his adaptive functioning was fair/poor and documented that he had "continuing" mental health needs. Despite this, he was not referred for further evaluation and was subsequently not included in the MHSDS. Upon transfer from the RC, a screening noted no history of mental health treatment, no history of depression and no history of suicide attempts. The inmate never requested mental health services during his incarceration, and he was never seen for a suicide risk evaluation.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was preventable. This determination was based on the fact that there was information available from county records and later within CDCR records indicating a history of mental health treatment and suicide attempts. Two staff members failed to appropriately refer the inmate for follow up despite the indicated need for such. Additionally, the staff who screened the inmate upon transfer from the RC failed to review the previous screenings; and therefore, failed to recognize the need for further evaluation as well. Had the inmate been evaluated, underlying mental health needs would have likely been uncovered and addressed, decreasing the likelihood of suicide.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case although the lack of required QIPs was not acceptable. There were clear lapses in follow-up and failures to complete required tasks, yet no corrective action was ordered. In this respect, the SCR was unacceptable. The SCR included relevant social, criminal, incarceration, substance use, and mental health history. It provided a reasonable assessment of the precipitants to this suicide.

V.    Analysis of Quality Improvement Plan Process

This case resulted in no required QIPs, but there was one noted mental health concern and three custody concerns. The mental health concern was related to the failure of staff to refer the inmate for further mental health evaluation at the time of reception, despite evidence of a prior mental health history and suicide attempts. It also noted the failure on the part of the staff at the receiving facility, following his transfer from the RC, to review

the records and to accurately document his mental health history.  The Special Master's expert determined that these failures went beyond mere "concerns" and should have resulted in corrective action.  Further, as noted above, had the inmate undergone a more comprehensive evaluation, underlying needs may likely have been identified and his suicide prevented.

The custody concerns were related to a delay in sounding an alarm upon discovering the inmate hanging in his cell, failure on the part of custody staff to arrive on scene with the entire cut-down kit, and a finding that one of the officers who responded to the scene was delinquent with regard to updated CPR/First Aid training.  The first item was noted to have been identified by the facility prior to completion of the SCR and was addressed, the second was reportedly being addressed by headquarters at the state level, and there was no indication of action taken in response to the final concern.  It was unclear to the Special Master's expert why these "concerns" did not result in required corrective action.  In many other SCRs, these issues have resulted in corrective action.  It was positive to note that the facility and statewide leadership had identified these issues previously, but a failure to require formal corrective action appeared to be a deficiency within the SCR.

Case Z

I.   Summary of Case

This inmate was a 36-year-old Latino man who was found by a correctional officer unresponsive, laying on the floor of his single cell surrounded by blood in an SNY on December 26, 2017.  The inmate had cut his wrists and forearm and placed a towel along the inside of his cell door which delayed staff's ability to open the door.  He was not receiving mental health services in the MHSDS at the time of his death.

The inmate was born in Mexico and came to the United States as an undocumented immigrant at age 12.  He was the youngest sibling and had four brothers and three sisters.  His parents remained in Mexico but reportedly traveled back and forth to the United States.  He lived with his aunt at the time of his index offense.  He was 23 years old at the time.  He never married and had one daughter, who was born after his arrest.  He maintained written correspondence with his daughter and the mother of his daughter and well as members of his immediate and extended family.  He had several visits each year from his family and a friend while he resided in CDCR facilities.  He did not have visits when he resided out-of-state.  His last visit was with three of his nieces in early December 2017.  There was no record of any phone calls during his incarceration.

Records indicated that the inmate completed education through either the sixth grade or eighth grade and was primarily Spanish-speaking.  He did not have any steady employment prior to his arrest.  He had a history of substance use, including marijuana, cocaine, heroin and methamphetamine.  He had no juvenile criminal history but was

arrested once prior to his index offense.  It was reported that he was affiliated with a gang prior to incarceration, and he was shot at age 22.

When the inmate entered CDCR in January 2004, he was serving his first prison term for three separate incidents which resulted in charges for carjacking with the use of a firearm, attempted second degree robbery with the use of a firearm, second degree robbery with the use of a firearm and carjacking.  He was sentenced to 21 years and four months.  He had a detainer from ICE and was expected to be deported to Mexico upon his release from CDCR scheduled to occur in 2022.

He resided in 12 different facilities during his incarceration, including out-of-state facilities from January 2009 through May 2017.  While incarcerated, he was enrolled in courses in English as a Second Language and Adult Basic Education.  He also had work assignments at out-of-state facilities.  At the time of his death, he was on a waitlist for educational and reentry programming in CDCR.  He acquired eight RVRs during his incarceration, three involved violence, two involved tattoos, two were substance related and one was for misuse of state property.  Records indicated that the inmate had outstanding debts for drugs and gambling.  In 2013 he requested SNY placement related to these debts, and he expressed a desire to disaffiliate from a prison gang.

In October 2016, the inmate assaulted his cellmate with a pen and experienced an increase in his security level which made him ineligible to remain out-of-state.  When he returned to CDCR, he affirmed his renunciation of his gang affiliation and was maintained in SNY housing until his death.

The inmate had no documented history of mental health services prior to or during his incarceration.  The intake screening did not indicate the need for mental health services, and he was not referred for further evaluation.  The inmate had one contact with mental health staff while housed at an out-of-state facility in October 2016 following the assault of his cellmate.  He reported hearing voices that he attributed to his cellmate as the cause for his attack.  He was placed on observation and then suicide precaution status secondary to impulsivity, violence, as well as feelings of humiliation, shame and despair.  He endorsed suicidal ideation at the time.  He was removed for observation two days later after he reported being stable and no longer experiencing suicidal ideation.  He reported having some depression, nervousness, restlessness and feelings of worthlessness but was cleared for ASU placement on October 31, 2016 while awaiting transfer back to CDCR.  During all prior and subsequent routine evaluations, he denied any history of mental health symptoms, suicidal ideation or suicide attempts.

The inmate's medical history included migraine headaches and the use of pain medication.  However, he was not prescribed any medications upon his return to CDCR in 2017 and had no medical encounters upon his return.

During a review of the death, it was discovered that synthetic drugs were present in his housing unit, and another inmate reported that the inmate likely used these drugs, possibly resulting in psychotic-like symptoms. An inmate in a nearby cell reported hearing him yelling about having to remove a tracker from his arm. Toxicology results obtained during the autopsy noted the presence of caffeine, amphetamine and methamphetamine in the inmate's blood.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not preventable.

IV.   Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. The SCR included relevant social, criminal, incarceration, substance use, and mental health history. It provided a reasonable assessment of the precipitants to this suicide, and the concerns noted in the report were justified by the findings.

V.   Analysis of Quality Improvement Plan Process

This case resulted in no required Quality Improvement Plans, but there were two concerns noted, one related to mental health and one related to custody. The mental health concern was related to the lack of substance use programming available to the inmate upon his return to CDCR. The custody concern was related to a conflict between local operation procedure and statewide policy regarding the number of custody staff required to be present for an emergency cell entry. The conflict was resolved by updating the local operating procedure.

Case AA

I.   Summary of Case

This inmate was a 46-year-old Latino man who died after jumping from an upper tier on October 7, 2017. He was housed in a double-cell in general population at an RC and was receiving mental health services at the 3CMS level of care at the time of his death. He had been incarcerated for 80 days prior to his death. It should be noted that the

112

determination of this death as a suicide was not initially clear due to unusual behavior by other inmates at the time of the incident.  It was ultimately determined to have been a suicide by the coroner.

The inmate was born in Mexico where he was raised by his parents.  His father was reportedly a heavy alcohol user who beat the inmate with a belt.  Records indicated that he had no problems in school and eventually earned his GED while incarcerated in a county jail.  While his primary language was Spanish, he was noted to have been fluent in English.  He came to the United States during his adolescence and was usually employed as a laborer.  He married and had two children, a daughter and a son.  He maintained contact with his family during his incarceration.

The inmate did not have a juvenile criminal history and had no known gang affiliation.  He had a history of alcohol and cocaine use, but he obtained sobriety at age 41.  His criminal history included convictions for possession of controlled substance, carrying a loaded firearm, having a concealed weapon in a vehicle and intoxication.  His index offense occurred in 1993 and involved intentionally shooting an acquaintance following an argument.  He evaded arrest by fleeing to Mexico but was extradited and arrested in 2012.  He was convicted of first-degree murder in 2017 and sentenced to 25 years to life in prison.

While incarcerated in CDCR, he had no RVRs, and he engaged in activities such as exercising and attending religious services.  He had no known conflicts with other inmates but did express fears for the safety of himself and his family based on the content of reported auditory hallucinations.

The inmate reported that his psychiatric symptoms began at age 42, one year after obtaining sobriety.  Records from the county jail indicated that he had been receiving mental health treatment for depression and anxiety following several suicide attempts.  He reported that he had been prescribed psychotropic medications at the county jail, but transfer documentation did not include any listed medications.  During his intake screening on July 19, 2017, he described experiencing psychotic symptoms, auditory hallucinations, and depression and was positive for suicide risk.  He was seen for an urgent consult later than required (two days rather than within 24 hours) but was not found to need crisis services.  The urgent consult documentation indicated that "records reflect" three in-custody suicide attempts.

Documentation indicated that he was seen by a psychiatrist on the day of his arrival, but no evidence of this contact was located in the inmate's healthcare record.  In an email, the psychiatrist noted that he had seen the inmate who reported taking medications at the jail, and the psychiatrist had attempted to contact the jail but was told to call back as no providers were available.  The psychiatrist also documented three suicide attempts while the inmate was housed at the county jail.

During his full mental health assessment on July 24, 2017, the inmate was placed at the 3CMS level of care but was noted to have clear thinking, no delusions and no perceptual distortions.  Documentation indicated that he was optimistic and displayed future orientation.  He was given a suicide risk evaluation at the time, and he reported a single suicide attempt by cutting in 2016.  He noted that he was depressed at the time and could not handle his life anymore.  He reported feeling like he had no purpose.  The inmate reported a number of protective factors and presented no additional warning signs according to documentation.  He was assessed with moderate chronic but low acute risk for suicide.  His safety plan included inclusion in the MHSDS at the 3CMS level of care and routine contacts with his primary clinician and psychiatrist.  There was no evidence in the suicide risk evaluations or mental health assessment that the clinician reviewed documentation but instead appeared to rely solely on the inmate's self-report.

Records indicated that he was seen by a psychiatrist on August 7, 2017, but no documentation of this contact was located in the healthcare record.  After the inmate's death, the psychiatrist produced handwritten notes which included background information and discussion of the inmate's symptoms of depression, anxiety and sleep disturbance.  His initial contact with the primary clinician occurred on September 6, 2017 which was noted by the SCR to have been within the 30-day timeframe required by the Program Guide.  This contact occurred 44 days after the inmate was placed in 3CMS level of care, outside of Program Guide requirements.  During that contact, the inmate reported loneliness with difficulty sleeping and eating but denied thoughts of suicide.  A referral to psychiatry was generated from this contact.

The inmate was seen by psychiatry two days later, and an in-depth assessment was completed.  The psychiatrist noted that the inmate was depressed, anxious and experiencing psychotic symptoms including auditory hallucinations but noted that the report of psychosis was inconsistent with a primary thought disorder.  The psychiatrist documented that the inmate may have been exaggerating his symptoms in order to receive treatment.  Additionally, the psychiatrist noted that the inmate expressed getting relief from his previous medications, none of which were antipsychotic medications.  The psychiatrist prescribed the three medications previously prescribed for the inmate including buspirone, mirtazapine and sertraline.  During this contact, the inmate reported that he had attempted suicide three times on the same day in 2016 by cutting and choking himself.

The inmate was seen again by the psychiatrist on October 6, 2017, two days prior to his death.  The inmate reported being "very stressed" and experiencing constant auditory hallucinations telling him that his family had been killed and that he would be killed, but the psychiatrist noted no evidence of the inmate responding to internal stimuli.  The inmate reported fears about his thoughts being recorded but did not evidence any other

114

disturbances in thought and was noted to be linear and goal-directed.  The psychiatrist
increased his medications and added risperidone to address the psychotic symptoms.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review
Committee for this case.  The Special Master's expert determined that this death was
foreseeable.  The inmate had a history of serious suicide attempts while incarcerated in
the county jail and yet there was no evidence that attempts were made to obtain
information related to those attempts or the treatment of the inmate following those
attempts, despite the inmate's report that he was housed on a special unit for 60 days.
The inmate was clearly expressing concerns about his safety and an increase in symptoms
prior to his death.  Had these concerns been adequately noted, it would have been likely
that the heightened risk for suicide would have been identified.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review
Committee for this case.  The Special Master's expert determined that this death was
preventable.  The inmate was not seen in accordance with Program Guide requirements,
did not have a treatment plan, and when the inmate was seen, documentation was not
entered into the healthcare record.  Additionally, staff failed to adequately request and/or
review available documentation about the inmate's mental health and suicide history.
Had proper care been provided, the likelihood for suicide would have been reduced.

IV.    Critique of Suicide Case Review Report

The SCR was inadequate.  While it summarized the case, there was an error in
calculating the timeframe for the initial primary clinician contact following inclusion in
the 3CMS program.  Additionally, in the summary section of the SCR, it was noted "his
records indicate he continually felt optimistic about his future."  It was unclear how this
conclusion was made, as there were only eight mental health contacts with this inmate
during his incarceration.  Two of those contacts were never entered into the healthcare
record.  Of the remaining six, only one noted the inmate to have been "optimistic" and
that was his initial mental health assessment completed on July 24, 2017 which appeared
to rely solely on the inmate's self-report, despite indication that previous records had
been reviewed.  This was concerning, as the urgent consult noted that three suicide
attempts were included in the inmate's records, but only one was reported by the inmate
according to the initial mental health assessment.  This over-reliance on self-report was
not noted in the SCR.

The remaining contacts included reports of depression, anxiety, sleep disturbance,
appetite disturbance, auditory hallucinations, fears for his safety and the safety of his

family, and a belief that his thoughts were being recorded.  The only indication that the inmate was not suicidal appeared to be documentation that the inmate denied suicidal ideation.  The SCR made no mention of the fact that a treatment plan was never developed for the inmate.  The safety plan developed at the time of his initial mental health assessment indicated that the inmate would be seen by his primary clinician to develop a treatment plan.  This did not occur.  The sole contact with his primary clinician noted increased symptoms and prior suicidal ideation but made no mention of his previous suicide attempts.  The plan generated from that contact was "continue 3CMS LOC," "IP will continue daily exercise," and "Requested psychiatry appointment and he is now scheduled to be seen on 9/8."  There was no mention of any plans for follow up with the primary clinician or interventions to be provided to address the inmate's reported symptoms.  The SCR also failed to mention that during the psychiatry contact on September 8, 2017, an interpreter was used as the psychiatrist noted the inmate was primarily Spanish-speaking.

The SCR included descriptions of the inmate's social, criminal, incarceration, substance use and mental health history.  It concluded with a description of doubt that the inmate's death was a suicide; and therefore, did not draw conclusions about the precipitants.  The recommendations provided did not address all concerns noted in the report and failed to note serious lapses in documentation and treatment.

V.      Analysis of Quality Improvement Plan Process

This case resulted in four required Quality Improvement Plans, two for mental health, one related to nursing care, and one systemic concern.  The mental health concerns including the lack of documentation from two psychiatric contacts and the urgent consult occurring outside of Program Guide requirements.  The nursing concern was related to the lack of documentation indicating that steps were taking to decrease blood loss after the inmate was found on the ground floor and even after a pulse was detected.  The systemic concern had to do with a delay in the arrival of the ambulance onsite.  All QIPs were presented with adequate investigation in the root causes, and staff training as appropriate.  Evidence of training was provided.  There was also evidence that the ambulance company had been contacted to resolve the delays.

There were not QIPs required to address the lack of information about the inmate's medications at the jail and the failure of the psychiatrist to follow up on this issue, yet both issues were addressed through the corresponding QIPs.

There was no mention of the delay in the initial primary clinician contact with the inmate after placement in at the 3CMS level of care or the failure to develop a treatment plan with the inmate.

Case BB

I.   Summary of Case

This inmate was a 30-year-old Caucasian man who was found by his cellmate hanging in their double cell on a SNY on July 6, 2017.  He was receiving mental health services at the EOP level of care services at an RC at the time of his death.  He had been incarcerated for fewer than 100 days prior to his death.

Records indicated that the inmate was born and raised in Alaska.  He had one brother and was primarily raised by his mother.  Both his mother and brother were noted to have struggled with addiction, and there was a family history of mental illness.  While there was conflicting information about his marital status, it appeared that he was unmarried but possibly engaged to a woman with whom he had one son.

He reportedly graduated from high school and attended college at three different institutions.  He was reported to be a writer and bodybuilder and had worked as a dietician and a correctional officer.  Prior to his incarceration, he was noted to have issues with alcohol and methamphetamine use and had received treatment for his substance use issues.  While there was no evidence of arrests during adolescence, he had prior adult arrests for trespassing, drug-related crimes, battery, weapons possession, property damage, false imprisonment and child cruelty.

The inmate was incarcerated for the first time in CDCR in March 2017 to serve a sentence of two years for corporal injury on specific persons resulting in traumatic condition and resisting/deterring an officer with threat/violence following a domestic violence incident.  Upon reception, he appeared confused, was unable to respond to directions and had a hard time focusing.  He was immediately referred to the MHCB where he spent 13 days before returning to the RC.  He received one RVR for battery on a prisoner in May 2017 after which he requested SNY placement, which was granted.

Available documentation indicated that the inmate had received mental health services in the community, including at least three psychiatric hospitalizations for psychosis, and had attempted suicide on one prior occasion in 2012.  He received mental health services in the county jail for anxiety, mood swings and depression.  According to transfer documentation, he was prescribed trazodone, sertraline and clonazepam while at the county jail.

The inmate was placed at the MHCB level of care upon arrival to CDCR due to paranoid ideation, depression, anxiety and auditory hallucinations.  He was observed talking to himself and making bizarre statements.  Mental health staff were unable to complete a suicide risk evaluation upon admission but noted that he "may be at moderate risk" for danger to self in the future.  He was noted to be medication nonadherent, and initial treatment planning focused on medication adherence and stress management.  However, it was difficult to ascertain what medications he was prescribed or had been refusing as

he had only been incarcerated for one day and documentation in the healthcare record was unclear.

While he refused to communicate with treatment staff or to attend his initial IDTT, he was observed talking to himself, engaging in angry outbursts, hitting his head on his door, kicking the door, jumping off his bed while naked and trying to reach the sprinkler. On March 28, 2017, a progress note written by a psychologist described the inmate as naked and jumping off his bed, having "possible suicidal ideation", yet the plan was "will be discharged to EOP and his suicide precautions will be removed."  The only treatment goal noted was "rapport building" and referenced meeting with the psychiatrist and discussing "general" mental health concerns.

An initial psychiatric note written on March 28, 2017 indicated that while limited information was available, the inmate appeared to be responding to internal stimuli.  The inmate was provided with a provisional diagnosis of Psychotic Disorder, NOS and was continued on an antidepressant (sertraline).  The psychiatrist noted that the inmate required antipsychotic medication, but none were prescribed as the inmate had not provided consent; although, there was no documentation that informed consent was attempted.  The psychiatrist noted that the inmate may require a referral to DSH.

Psychiatric documentation on March 30, 2017 indicated that the inmate remained with disorganized thinking and was "not eligible for PC 2602 at this time so no psych meds."  On April 3, 2017, the psychiatrist noted that the inmate would likely be ready for discharge at his next IDTT; however, within the same note the psychiatrist documented that the inmate evidenced disorganized thinking with paranoia and guarded affect.  On April 4, 2017, the IDTT made the decision to discharge the inmate to the EOP level of care for reaching "maximum benefit" which was described as the ability to maintain his activities of daily living, not harming himself, ability to identify his location and following instructions properly.  A suicide risk evaluation and safety plan were created without any input from the inmate.  There was also no evidence of any out of cell treatment provided to the inmate while in the MHCB.

Upon return to the RC, the inmate was seen for five-day follow up.  He denied suicidal ideation but endorsed depression and auditory hallucinations.  The suicide risk evaluation completed on the final day of follow up was incomplete and contained contradictory information.  It was noted that the inmate did not participate in the evaluation.

During April 2017, he refused to attend his IDTT meeting, psychiatry appointments, his initial mental health evaluation and all groups.  Two individual sessions with his primary therapist were on the schedule, but no progress notes were entered into the healthcare record.  It was unknown whether the inmate participated.

In May 2017, the inmate refused his psychiatry appointments, his IDTT meeting and all but one group session. Notes indicated that he attended a group entitled, "SA" on May 9, 2017, but no further information was available. The May 2017 IDTT noted that the inmate stopped taking his medication but had been coming to his primary clinician contacts; however, there were no progress notes for these sessions located in the healthcare record. The treatment plan included conflicting and erroneous information and failed to discuss the inmate's MHCB admission or previous mental health treatment. He was placed on a modified program due to his refusals and was scheduled to be seen twice per week by his primary clinician. On May 13, 2017, the inmate received an RVR for battery on a prisoner and underwent a mental health assessment for that incident on May 23, 2017. During the assessment, he admitted to hearing voices and reported that his medications were not working. He was referred to psychiatry as a result. The assessment indicated that his mental illness was not a factor in his RVR.

There were eight scheduled sessions with the primary clinician during May 2017, but no progress notes were entered on any of the scheduled dates except a single entry on May 31, 2017. On that day, he was given a mental health screening and reported a history of psychiatric hospitalizations, treatment for alcohol use and a previous suicide attempt. A clinical progress note was also entered by his primary clinician on that same date but failed to mention any of the new information about his history gathered from the screening.

On June 5, 2017, the inmate was scheduled to see a psychiatrist to address the referral generated during the RVR assessment related to his medications not working. The inmate refused the session, and his medications were discontinued. On June 8, 2017, he was seen by a psychiatrist who noted that the inmate was paranoid, experiencing auditory hallucinations, low stress tolerance, anxiety and depression. The psychiatrist described the inmate as "floridly psychotic" and prescribed risperidone, sertraline, hydroxyzine and benztropine. The inmate also attended his IDTT on that date, but the plan remained largely unchanged, still including the erroneous and inconsistent information, and failing to include discussion of the inmate's psychiatric history, previous suicide attempt or course of treatment in the MHCB. The treatment plan made no mention of the inmate's symptoms, treatment refusals, or medications. The plan noted that he was refusing 84% of his programming but "not due to his mental health deteriorating in the clinical opinion of this PC." Documentation indicated that the inmate attended two of the 27 scheduled groups in June, one recreational group and one group for anxiety management. Clinical progress notes were written for individual contacts with his primary clinician on four occasions, all of which noted paranoia but documented an absence of suicidal ideation.

During his final psychiatric session on July 3, 2017, the inmate reported continuing anxiety and auditory hallucinations and was noted to be paranoid, anxious and depressed with low stress tolerance. His risperidone dose was increased. While he refused all four of his scheduled groups that week, he asked to speak to his correctional counselor as he

119

had heard through his air vent that his father had died.  On July 5, 2017, the inmate
reported to his primary clinician that he was going to stop taking his medications because
he heard through his air vents that staff was feeding him estrogen.  He refused to attend
his IDTT on the morning of July 6, 2017, and he was found hanging in his cell later that
same day.  It was noted that the treatment plan drafted at the IDTT included his
delusional ideation but failed to include any relevant psychiatric history of his previous
suicide attempt.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review
Committee for this case.  The Special Master's expert determined that this death was
foreseeable.  This determination was based upon the fact that information was available
related to the inmate's psychiatric history, treatment needs and a self-reported suicide
attempt which were never addressed nor included in any assessment or treatment
planning efforts.  Had the treatment providers recognized this available information and
documented his history accurately, the potential risk for suicide, or at least significant
decompensation, would have been recognized.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review
Committee for this case.  The Special Master's expert determined that this death was
preventable.  This determination was made based on the fact that the inmate was not
provided with adequate treatment planning, treatment interventions nor appropriate
consideration of his need for a higher level of care.  In many instances, documentation
and treatment planning appeared haphazard and careless, including omissions, errors and
inconsistencies that were carried over time and again.  Additionally, even when
additional information was discovered, it was not incorporated into the inmate's
treatment or treatment planning.  Had this inmate received the treatment he needed for his
psychiatric symptoms, the likelihood of death by suicide would have been reduced.

IV.   Critique of Suicide Case Review Report

The SCR was an adequate summary of this case; although, the description of care
provided within the MHCB was difficult to follow and required a direct review of the
electronic health record.  The review of the record revealed that the original
documentation was equally unclear.  The SCR included relevant social, criminal,
incarceration, substance use and mental health history.  It was sufficiently critical of the
course of treatment provided to the inmate.  It provided a reasonable assessment of the
precipitants to this suicide, and the recommendations provided followed from the content
and findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in nine required Quality Improvement Plans, eight of them related to mental health services at the facility level and one related to statewide concerns. The QIPs were required to address failures to complete necessary assessments, poor quality risk evaluations, incomplete or missing documentation, inadequate treatment planning, failure to consider appropriate level of care needs, medications discontinued without a psychiatric assessment, failure to consider the appropriateness of telepsychiatry for an inmate who refused treatment, and poor quality discharge summaries. The statewide QIP was required to address the failure of previous treatment information being available in a timely manner to staff at the MHCB. Responses from the facilities were mostly adequate and included evidence of training as well as training content. Individual clinician deficiencies were addressed as needed in most cases. Of concern was the fact that at one facility, mentoring and auditing was not completed timely, as a clinician was on extended vacation. Follow-up was planned but not available for review. Additionally, the statewide response was that a workgroup was planned, but the ultimate outcome was not provided.

Case CC

I.    Summary of Case

This inmate was a 34-year-old Latino man who was found by correctional officers hanging in his single cell on a general population yard on March 21, 2017. He was not receiving mental health services in the MHSDS at the time of his death.

The inmate was born and raised in California by his mother and his maternal grandparents. Records indicated that his father was incarcerated during his childhood. He had one sister. He graduated from high school, attended two years of college, and took courses to learn to be a mechanic. Records indicated that he was a city employee for three years as a trolley mechanic prior to his incarceration. While never married, he had one son. Records indicated that he had regular visitation from his family during incarceration and exchanged written correspondence routinely as well.

The inmate reported that he began experimenting with alcohol at age 14 or 15 and began using marijuana at age 20. Following a motorcycle accident when he was 21, he began taking both legal and illegal drugs for pain. By age 24, he was using cocaine, alcohol, and marijuana daily. He denied any treatment for his substance use issues prior to incarceration. There was no evidence of gang affiliation.

While there were records of previous arrests and probation beginning at age 17, the inmate's incarceration for the index offense was his first within CDCR. He was incarcerated for first degree murder and attempted murder after intentionally shooting the ex-boyfriend of a woman he was dating and attempting to shoot the man's friend outside

of a bar.  He was sentenced to 77 years to life in prison.  The inmate reported being intoxicated on alcohol, cocaine, marijuana, Vicodin and Xanax at the time of the shooting.  He was incarcerated in February 2010.  He received four RVRs during his incarceration.  One RVR, for possession of an inmate-manufactured deadly weapon, resulted in a SHU term and ASU placement.  After his death, evidence of gambling with other inmates and gambling debts were located in his property.  Prison records also indicated that the inmate had been granted a transfer closer to his family three weeks prior to his death and was pleased about this.

Medically, the inmate was treated for asthma, seborrheic dermatitis and chronic back pain.  His medications were all keep-on-person, and he responsibly requested refills in a timely manner.  In fact, he requested medication refills on the day of his death.

The inmate reported that he was diagnosed with ADHD as a child, but no documentation was available to confirm any treatment received.  He briefly received services in the MHSDS for less than six months in 2010 following his evaluation during the reception process.  He was placed at the 3CMS level of care after reporting mood swings, depression, insomnia, paranoia, and a history of Bipolar Disorder (not verified).  While he continued to verbalize paranoid ideation, a belief that he could foretell the future, and insomnia, he denied the need for medication.  He was removed from the 3CMS during July 2010 without ever having had an IDTT meeting, treatment plan or evidence that his symptoms were addressed.  Rationale for removal from the MHSDS was not documented.

Once discharged from mental health services, he did not seek assistance from mental health again during his incarceration.  He was evaluated by mental health staff on three occasions; he was seen following a facility transfer, upon placement in ASU, and in response to a request from custody staff.  All three evaluations concluded that he did not meet criteria for inclusion in the MHSDS.  The inmate had two suicide risk evaluations during his incarceration, one in 2010 and one in 2011.  Both resulted in the determination of moderate chronic risk for suicide based on his history of depression, chronic pain, substance abuse, violence, long prison term, poor impulse control and prior history of suicide attempts.  He had reported an attempt to kill himself by overdose in 2008 and one other attempt for which no details were provided.  His acute risk was determined to be low on both occasions, and he was noted to have a number of protective factors.  The risk evaluations appeared to be internally consistent; however, the justification of risk determinations, mental status examinations and safety planning were judged to be poorly completed on both.

No significant changes in behavior or mood were reported by inmates or staff who knew the inmate prior to his death.  He left a suicide note in the form of a card to his grandmother indicating that he was no longer able to cope.

II.   <u>Determination of Foreseeability</u>

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.   <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not preventable.

IV.   <u>Critique of Suicide Case Review Report</u>

The SCR was an adequate summary of this case.  It incorrectly indicated on the cover memo to the report that he was a participant in MHSDS at the 3CMS level of care.  He had been discontinued from services in 2010.  Otherwise, the SCR included relevant social, criminal, incarceration, substance use and mental health history.  It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

V.   <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in three required Quality Improvement Plans, one QIP addressed concerns regarding the quality of the suicide risk evaluations at the statewide level and the other two QIPs were related to the emergency response by custody staff at the facility level.  The response to the first QIP requirement indicated that the issue "will be discussed" at the SPRFIT meeting, but no follow up was provided or confirmed.  The two custody QIPs were appropriately addressed through policy review and training, and evidence of both were provided.

Case DD

I.   <u>Summary of Case</u>

This inmate was a 36-year-old Caucasian man who was found by correctional officers hanging in his double cell in an SNY on May 3, 2017.  He was receiving mental health services at the 3CMS level of care at the time of his death.

The inmate was raised in Maine by his parents until they divorced when he was two to three years of age.  He resided with his mother after, and he lost contact with his father at age six.  He witnessed domestic violence between his parents as well as their substance use.  Records indicated that his mother suffered from depression and had a history of attempted suicide.  The inmate completed school through the ninth grade and ran away

123

from home at age 15 or 16.  He later obtained his GED while incarcerated.  He reported drinking alcohol beginning at age 13 and started using marijuana around the same time but stopped a few years later.  He reported experimenting with other drugs as well. Records indicated that his mother sent him to a hospital for substance use treatment during early adolescence.  His substance use continued throughout his incarceration.  The inmate never married and had no children.  He received regular written correspondence and visits from his mother and his girlfriend.  For unknown reasons, he had no visits after November 2016.

It was documented that the inmate hitchhiked to California after running away from home.  He committed his instant offense at the age of 16 and was incarcerated for second degree murder after killing a homosexual male who made advances toward him while they were drinking together on a beach in California.  He and another man killed the victim by striking him in the head with a beer bottle and forcing sand into his mouth.  He was sentenced to serve 16 years to life with the possibility of parole and entered CDCR in 2001.

His incarceration was notable for substance use and violence.  He was placed in ASU at least five times for fighting and was eventually placed in an SNY in 2010 due to drug debts and remained in SNY until his death.  He received 13 RVRs during his incarceration, all related to substance use, violence or behavior that could lead to violence.  Documentation indicated that the inmate attended a number of self-help groups and completed associated workbooks while incarcerated.  Although he had been denied parole for three years in 2015, he continued to make plans for his release, including securing housing and employment opportunities.

Documentation indicated that the inmate was receiving mental health services in the community during his adolescence to address symptoms of anxiety, depression and panic attacks.  It was noted that he attempted to die by suicide during that time and was psychiatrically hospitalized on two occasions, once following an overdose.  Healthcare records indicated that while incarcerated in CDCR, the inmate had two mental health assessments, one in 2002 and one in 2003 which did not indicate the need for services.  In 2010, after being stabbed in the abdomen by another inmate, he was referred for a mental health evaluation after being placed in ASU.  While initially not enrolled in the MHSDS, a follow-up assessment by a psychiatrist resulted in the decision to include the inmate at the 3CMS level of care for depression, anxiety, passive suicidal ideation, sleep disturbance and poor appetite.  He was provided with a diagnosis of Dysthymia and suspected Social Anxiety Disorder.  During these early contacts with mental health staff in 2010, he disclosed his history of psychiatric hospitalizations and attempted overdose during adolescence but denied any history of suicide attempts in the following years. Initially the inmate was prescribed medications for symptoms of depression, anxiety and sleep disturbance which he often refused to take.  He reported that his social anxiety

made it difficult for him to go to the pill line.  Eventually, he discontinued taking any medications but continued to be followed at the 3CMS level of care.

In November 2015, he was denied parole for three years.  On January 20, 2016, he was sent to a community hospital for a drug overdose.  He reported to the hospital staff that he had taken ibuprofen and injected "something" into his arm.  His drug screen was positive for opiates and amphetamines, yet he denied drug use after returning to CDCR.  He reported suicidal ideation and a desire to die, so he was admitted to the MHCB.  He was described with disorganized thinking, paranoid ideation and severe depression at that time.  During his month-long stay in the MHCB, he presented variably to staff who were unsure if his odd presentation and delusional ideation were secondary to his drug use or the result of a primary psychiatric condition.  He was nonetheless prescribed an antipsychotic medication.  Collateral contact with his mother during that time indicated that while he had no history of psychosis, she believed that his denial of parole and recent split from his girlfriend had overwhelmed him.  His mother stated that he had reported suicidal ideation to her, and he was unsure of his ability to function post-incarceration.  He was discharged at the 3CMS level of care with diagnoses of Psychotic Disorder, NOS and Mood Disorder, NOS as well as Amphetamine and Opioid Abuse.

The inmate stopped taking his antipsychotic medication after two days following his discharge from the MHCB.  Over the next month, a number of referrals were received regarding his bizarre behavior, acting out, destruction of property in his cell and his refusal to engage in medical appointments or medical treatments.  He also reported having "seizures" during this time but denied the need for medical care.  During June through August 2016, he reported to his primary clinician that he believed there were computers on the grounds controlling his behavior, and he expressed the belief that the Federal Bureau of Investigation (FBI) was using surveillance on him.  He was not referred for a higher level of care because he was noted to be attending to his activities of daily living and was functioning adequately without medications.  In August 2016, a seven-page letter to the FBI was intercepted by CDCR staff and included content noting the computers on grounds that were being used on him.  He reported that the computers had sexually assaulted him by "inducing orgasms."  A Prison Rape Elimination Act (PREA) investigation was conducted, and a referral to mental health was generated.  Delusional ideation was added to his treatment plan, and his primary clinician noted that transfer to EOP would be considered at his next IDTT meeting.  A progress note following the IDTT meeting in September 2016 noted that the decision was to retain him at the 3CMS level of care because he was able to program on the yard without difficulty.  The IDTT documentation did not include any evidence of a discussion related to the level of care.  The plan was for his primary clinician to see him monthly.

Healthcare documentation indicated that the inmate was seen monthly through February 2017.  He was noted to be working on self-help packets, and he denied delusional ideation during that time; however, there was no evidence of a mental status examination

by his primary clinician.  During his final contact with his primary clinician in February 2017, documentation indicated that the inmate was being considered for removal from the 3CMS program.  It was noted that he was functioning well as evidenced by completion of his self-help packets.  There was no documentation that progress had been made regarding his delusional thinking nor appropriate documentation of interventions to address the same.  In fact, progress notes indicated that the primary clinician intentionally did not address his delusions, as doing so would be "counterproductive."

Healthcare records indicate that the inmate had ten suicide risk evaluations completed during his incarceration, six in 2016 and none in 2017.  Only one suicide risk evaluation, completed in 2010, noted his suicide attempt during adolescence.  Most of the suicide risk evaluations completed indicated that the inmate's chronic suicide risk was low.  Four suicide risk evaluations assessed chronic risk as moderate.  Similarly, acute risk was assessed as low during all suicide risk evaluations with the exception of the one completed after his overdose in January 2016, where his acute risk was assessed as moderate.  There were concerns noted with the suicide risk evaluations completed in conjunction with his month-long stay in MHCB during 2016.  While clinicians documented a number of risk factors, including acute concerns, they rated his risk level as lower than appeared warranted.  Additionally, safety planning did not adequately address his needs at the time of discharge from the MHCB including his suicidal ideation, drug overdose and delusional thinking.  It also failed to include the information provided by his mother, including his expressed suicidal ideation to her related to his upcoming release.  It should be noted that the inmate was scheduled to be seen for a parole hearing two days following his death, but he had planned to request a year-long postponement at the hearing.  The rationale for the postponement was not documented.  The night before his death, it was reported by his cellmate that the inmate was awake all night hitting himself in the head.  His cellmate reported his behavior to correctional officers the following day who went to check on the inmate and found him hanging in the cell.  There was no evidence of a suicide note.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was preventable.  This determination was made based on the lack of treatment provided to the inmate to address his delusional ideation and known suicide risk associated with anxiety related to his parole board hearing.  There was clear information available to his

126

clinicians that the inmate had decompensated over time and was experiencing significant psychiatric symptoms, including persecutory delusions. It was also clearly documented that he had extreme anxiety about his ability to cope with his upcoming parole board hearing. Additionally, there was evidence that he had overdosed following his previous board hearing. Rather than continuing with monthly contacts, his primary clinician stopped seeing him monthly in February 2017, when his hearing was scheduled for the first week of May 2017. Had additional interventions been provided and had his risk for suicide been properly evaluated, it was likely that actions could have been taken to prevent his suicide.

IV.     Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. It included relevant social, criminal, incarceration, substance use and mental health history. It was sufficiently critical of the care provided to the inmate and provided a reasonable assessment of the precipitants to this suicide. The recommendations provided followed from the content and findings of the report.

V.      Analysis of Quality Improvement Plan Process

This case resulted in seven required Quality Improvement Plans. All but one were related to mental health services. There was one joint custody/nursing concern regarding the delay in activating 911 emergency services. Mental health concerns focused on poor treatment planning, inadequate treatment to address the inmate's delusional thinking, inadequate suicide risk estimates, poor safety planning, the lack of updated mental status examinations, and failure to properly consider higher levels of care for this inmate. There were also two concerns required to be addressed by statewide headquarters which included the failure of a tracking system to notify clinicians that a suicide risk evaluation was due in February 2017, and the belief by the inmate that his parole status would be negatively impacted by his MHSDS level of care.

Six of the seven QIPs addressed the required elements and included evidence of training curricula and training rosters, as necessary. When clinical audits were required, they were completed. The only QIP not adequately completed was the one addressed to statewide headquarters to provide inmates with proper information regarding the relationship between mental health services and parole. The response from headquarters simply stated that they would work with the parole board to discuss how to address this concern with inmates, but no follow up was provided.