1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:   (510) 644-2555

   MICHAEL W. BIEN – 096891
   JEFFREY L. BORNSTEIN – 099358
   ERNEST GALVAN – 196065
   LISA ELLS – 243657
   THOMAS NOLAN – 169692
   JENNY S. YELIN – 273601
   MICHAEL S. NUNEZ – 280535
   JESSICA WINTER – 294237
   MARC J. SHINN-KRANTZ – 312968
   CARA E. TRAPANI – 313411
   ALEXANDER GOURSE – 321631
   AMY XU – 330707
   ROSEN BIEN
   GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
   Telephone:   (415) 433-6830

10  Attorneys for Plaintiffs

12  UNITED STATES DISTRICT COURT

13  EASTERN DISTRICT OF CALIFORNIA

15  RALPH COLEMAN, et al.,

16              Plaintiffs,

17        v.

18  GAVIN NEWSOM, et al.,

19              Defendants.

Case No. 2:90-CV-00520-KJM-DB

**MARCH 15, 2021 JOINT REPORT ADDRESSING CURRENT COVID-19 RELATED DEPARTURES FROM PROGRAM GUIDE REQUIREMENTS**

Judge:  Hon. Kimberly J. Mueller

On April 17, 2020, the Court ordered the parties to file a stipulation identifying "temporary departures from certain Program Guide requirements" for the provision of mental health care arising from Defendants' efforts to respond to the COVID-19 pandemic.  ECF No. 6622 at 2-3 (Apr. 17, 2020).  On May 20, 2020, the parties submitted a stipulation and proposed order as the Court directed.  *See* ECF No. 6679 (May 20, 2020). That stipulation set forth a process whereby the parties, on a monthly basis, would meet and confer, under the supervision of the Special Master, and report to the Court on updated changes to the stipulation and its attachment, Appendix A.  *See id.* at 4-5.  The parties filed updates to Appendix A, along with stipulations, on June 15, 2020, *see* ECF No. 6718, and July 15, 2020, *see* ECF No. 6761.

The Court disposed of the parties' May 20 stipulation without adopting it in the July 28, 2020 Order, ECF No. 6791 ("July 28 Order").  By minute order, the Court required the parties to continue to provide monthly updates regarding changes to Appendix A on the fifteenth of every month except for August 2020.  *See* Minute Order, ECF No. 6814 (Aug. 14, 2020).  On August 21, 2020, the parties submitted their August monthly update, along with "their positions on the path to full resumption of Program Guide level mental health care assuming the COVID-19 pandemic has not abated and will not abate for some time," July 28 Order at 3, and their agreement that the monthly update process should continue, *see* Jt. Report Addressing Current COVID-19-Related Departures from Program Guide Requirements & Resumption of Program Guide Mental Health Care, ECF No. 6831 (Aug. 21, 2020).

The parties hereby submit the attached updated version of Appendix A, which captures as of the date of this filing the status of COVID-19-related departures from requirements set forth in the Program Guide and/or policies listed in the "Compendium of Custody Related Measures," *see* ECF No. 6661 at 2, jointly filed by the parties on December 19, 2019, ECF No. 6431 ("Compendium policies").

/ / /

/ / /

1.      The chart attached hereto as **Appendix A** identifies three additional policies that clarify, update, or revise portions of existing policies already included in Appendix A. Appendix A includes policies that depart from the Program Guide and/or Compendium policies in Defendants' efforts to manage the delivery of mental health care during COVID-19.  True and correct copies of the three policies—the March 1, 2021 Updated Draft COVID Temporary Guidelines for Transfer to DSH Inpatient Care; March 3, 2021 Memo – Clarification – COVID-19 Pandemic and Guidance Regarding Field Operations; and February 19, 2021 Memo – COVID-19 Screening and Testing Matrix for Movement of Newly Resolved Reception Center Patients to Institutions—are attached hereto as part of Appendix A.

2.      One of the Appendix A policies added to the September 2020 update—the August 14, 2020 Institutional Roadmap to Reopening ("Roadmap")—addresses the quantity and modalities of mental health treatment provided within CDCR.  Defendants have agreed to report on institutions' movement between Roadmap "phases" prior to each COVID Taskforce Meeting, or every two weeks.  True and correct copies of two Roadmap phase reports, including point-in-time data as of March 2, 2021 and March 15 2021, are attached hereto as **Exhibit 6**.  These reports show the progress of each facility by phase, with phase one being the most restrictive and phase four being the least restrictive.  The parties will continue to meet and confer regarding the Roadmap phase report, including as to its content and format, as appropriate.

3.      The status of several of Defendants' pandemic policies is currently unclear. In September, Defendants indicated that the Roadmap and the August 19 version of the Movement Matrix resulted in the need to revise some existing pandemic policies and/or to recognize that some had been superseded.  On November 5, 2020, Defendants circulated a draft policy titled "Draft COVID Mental Health and Custody Guidance" ("Draft COVID Guidance"), which states its intent to supersede several additional pandemic policies.  On November 10, 2020 and December 9, 2020, Plaintiffs provided preliminary comments on the Draft COVID Guidance.  Plaintiffs provided written comments on the Draft COVID

Guidance on January 12, 2021.  Defendants are in the process of reviewing Plaintiffs' comments and are considering the necessity for the revision of the original April 10 and April 17, 2020 policies in light of the February 8 Directive from Dr. Mehta.  At this time, Defendants are focused on eliminating the remaining inpatient waitlist with the goal of significantly reducing or ending the use of TMHUs.  In addition, Defendants are in the process of reviewing the Roadmap and the March 25, 2020 COVID-19 Mental Health Delivery of Care Guidance & Tier Document to determine whether changes are necessary.

Also on January 12, Defendants circulated a revised January 8, 2021 version of the Movement Matrix.  The January 8 Movement Matrix incorporates some of Plaintiffs' comments and feedback, provided in a December 4, 2020 letter, and by email and teleconference on December 9, 2020.

After further discussion, the parties provisionally agree that the Roadmap, January 8 Movement Matrix, and Draft COVID Guidance, if and when implemented, will supersede in whole or part the following pandemic policies currently included in Appendix A:

(1)     COVID-19 Mental Health Delivery of Care Guidance & Tier Document (Mar. 25, 2020);

(2)     COVID Emergency Mental Health Treatment Guidance and COVID Temporary Transfer Guidelines and Workflow (Apr. 10, 2020);

(3)     COVID Emergency Mental Health Treatment Guidance for MAX Custody Patients and COVID EOP Temporary Transfer Guidelines and Workflow (Apr. 17, 2020); and

(4)     COVID-19 Patient Movement for Mental Health Treatment (May 11, 2020).

On February 11, 2021, Defendants provided Plaintiffs and the Special Master the February 8 Directive, which modifies in part both the April 10 and 17 policies listed above.  Specifically, while certain COVID-19 safety protocols for PIP and MHCB transfers remain in place, individual transfers to and from PIP and MHCB units will no longer be subject to review for emergent circumstances.  Instead, PIP and MHCB transfers will return to being governed by Program Guide requirements and processes, and

[3705141.1]

individual class members' vaccination status will not prevent them from transferring to inpatient levels of care. Due to the backlog of patients awaiting inpatient transfers, patients will be prioritized according to the following criteria: "emergency transfers in progress, requests for expedited transfers, patients waiting longest on the wait list, transfers to less restrictive housing, and other transfers to open up bed space in inpatient settings as necessary." February 8 Directive at 1; *see also* **Exhibit 5** (COVID-19 Dashboard showing patients awaiting inpatient transfers). As Defendants prioritize and work through the backlog, there will be residual delays in PIP transfers. Defendants represent that the MHCB backlog has been cleared. Plaintiffs have not had sufficient time to review and evaluate whether this is so. The parties will continue to discuss this issue within the COVID Taskforce.

The parties will continue to meet and confer, under the supervision of the Special Master, to clarify any other implications of the February 8 Directive and address any concerns with its operation and implementation, as appropriate.

4.      As of the September 15, 2020 update, Defendants indicated they were in the process of reviewing all policies in Appendix A to ensure they are up to date and consistent with each other. Defendants also stated that a memo to the field would be necessary to clarify the status of these policies, once the review is complete. The Draft COVID Guidance is one such memo. Defendants represent that notification to the field about the operative status of policies found in Appendix A will coincide with the eventual finalization of the Draft COVID Guidance.

Plaintiffs believe that any clarifying memo to the field should also address the status of the COVID-19 Surge Mitigation and Management Plan attached as Exhibit 7 to the September 15, 2020 Program Guide Departures Update.

The parties will continue to meet and confer regarding these policies to clarify terms and intent; work out implementation of the policies with regard to *Coleman* class members; and address Defendants' reporting on the impacts of the memos.

5.      In their May 20, 2020, stipulation, Defendants agreed to provide certain

1  reports to the Special Master and Plaintiffs.  *See* ECF No. 6679 at 3-5, ¶ 2.  Defendants

2  began producing reports the week of May 25, 2020.  Redacted copies of those reports are

3  appended hereto:

4             b.      Tier Reports, February 8-12, 2021; February 16-19, 2021; February

5  22-26, 2021; March 1-5, 2021, **Exhibit 1**;

6             c.      Shower and Yard in Segregation Compliance Report for February

7  2021, **Exhibit 2**;

8             d.      TMHU 114-A Tracking Log Report for February 2021, **Exhibit 3**.

9  This report also integrates the report on the custody reviews of Max Custody patients

10  referred to a TMHU.  *See* ECF No. 6679 at 3-4, ¶ 2(c); and

11             e.      On Demand Patient's Pending Inpatient Transfer Registry accessed

12  March 15, 2021, **Exhibit 4**.

13             f.      COVID-19 Mental Health Dashboard, accessed March 15, 2021,

14  **Exhibit 5.**

15        The parties have agreed on the form of the Tier Reports.[1]  *See* ECF No. 6679 at 3,

16  ¶ 2(a).  On October 9, 2020, Defendants finalized updating the TMHU Registry, *see id.*,

17  ¶ 2(b), and replaced it with the Patient's Pending Inpatient Transfer Registry.  The Patients

18  Pending Inpatient Transfer Registry includes data on (1) all patients housed in a TMHU,

19  (2) patients referred to an acute bed and not housed in a TMHU, crisis bed, or psychiatric

20  inpatient program, and (3) patients referred to intermediate care and not housed in a

21  TMHU, crisis bed, or psychiatric inpatient program.

22        Plaintiffs provided written comments on the Patients Pending Inpatient Transfer

23  Registry on November 24, 2020.  Defendants responded by letter December 11, 2020.  The

24  parties met and conferred regarding the Patients Pending Inpatient Transfer Registry on

25  January 8, 2021, resolving several outstanding issues.  Plaintiffs continue to have concerns

26  

27  

28  [1] In contrast to the Roadmap Phase Report, the first tier of the Tier Report is the least
restrictive, while the fourth tier is the most restrictive.

[3705141.1]

1  that Defendants' reporting mechanisms do not capture class members referred to an

2  MHCB but not housed in an MHCB or TMHU.  Defendants confirmed they are continuing

3  to work to make several updates to the Registry based on Plaintiffs' feedback.  The parties

4  will continue to meet and confer as necessary.

5       The parties have had ongoing discussions regarding the Shower and Yard in

6  Segregation Compliance Report, *id.* at 4, ¶ 2(d), and the TMHU 114-A Tracking Log

7  Report, *id.* at 3, 4 ¶¶ 2(c), (e).  *See* ECF No 6761 at 3 (July 15, 2020).  During a January 8,

8  2021 meet and confer, Plaintiffs exhausted their questions regarding the Shower and Yard

9  in Segregation Compliance Report ("Shower and Yard Report").  During the January 8

10 meet and confer, Defendants explained that pending revisions to the TMHU 114-A

11 Tracking Log Report, incorporating input from the Special Master's team, awaited

12 finalization of the Draft COVID Guidance.  As discussed above, Plaintiffs submitted

13 written comments on the Draft COVID Guidance on January 12, 2021.  On January 13,

14 2021, Defendants clarified the additional information that will be included in the revised

15 114-A Tracking Log Report.

16       At the March 2, 2021 Taskforce meeting, the Special Master raised additional

17 questions regarding the Shower and Yard Reports and the TMHU 114-A Tracking Logs.

18 Specifically, Defendants confirmed that the Shower and Yard Report does not report

19 whether class members in TMHUs located within existing segregation units are offered

20 shower and yard.  At the institution level, individuals in TMHUs located within existing

21 segregation units are administratively separated, for tracking purposes, from other

22 individuals in segregations units.  Plaintiffs have asked Defendants to add a footnote to

23 future Shower and Yard Reports to identify this exclusion from the reported data.

24 Defendants provided the Shower and Yard Report in response to Plaintiffs' request for

25 data on the property and privileges offered to segregated inmates with mental illness

26 during COVID, not in response to any data request associated with the TMHUs.

27 Nonetheless, Defendants agree to add such a footnote.

28       In addition, CDCR did not receive adequate documentation to confirm whether

certain individuals in TMHUs have been offered showers.  In the past, when CDCR did not receive adequate documentation for any field on the TMHU 114-A Tracking Logs, including showers, CDCR noted on the Log that the activity did not occur or was not offered.  CDCR is working with the institutions on fixing the documentation issue to improve the accuracy of reporting on the TMHU 114-A Tracking Logs going forward. Plaintiffs have asked Defendants to identify in the 114-A Tracking Logs where they are lacking documentation sufficient to accurately report on programs or services provided. Defendants are considering this request.

The parties will continue to meet and confer regarding the status of the TMHU 114-A Tracking Log Report and revisions, and the Shower and Yard Reports.

6.      On May 20, 2020, the parties reported that they were still negotiating the data Defendants can provide regarding the average number of hours of out-of-cell treatment, including yard and recreation time, offered per week, as well as the status of available entertainment devices and other in-cell activities for all class members in mental health segregation units.  In meet and confer discussions, Defendants reported that they do not have the capability to report on this information because none of this data is currently automated and they lack a single source of tracking information that could be used to provide a report on these issues.  Defendants reported that, in lieu of a headquarters-level automated tracking report, their typical practice is to regularly audit many of these items via on-site audits by Mental Health Regional Administrators.  While on-site audits were temporarily paused due to the COVID-19 pandemic, they resumed in mid-July 2020. Since that time, Defendants have inspected twenty-two institutions and collected data on the operation of mental health segregation units at those institutions.

During the January 8, 2021 meet and confer, the parties discussed the status of these segregation audits, the methodology for performing the audits, and the status of Defendants' reporting on them.  Defendants agreed to provide all mental health segregation unit data and information collected during the audit process to Plaintiffs, including data and information collected since the resumption of onsite monitoring in

July 2020.  Defendants provided some of this data and information and the parties filed it
with the January 15, 2021 Program Guide Departures update.  Attached hereto as
**Exhibit 7** are true and correct copies of five additional onsite audits, conducted at SAC,
PVSP, SATF, NKSP, and COR.

During the January 8, 2021 meet and confer, Defendants explained that the on-site
audits use a portion of the Continuous Quality Improvement Tool (CQIT).  The parties
agree that any questions about the process or methodology of these on-site custody audits
should be raised through the existing CQIT update process or ongoing discussions
regarding the process of certifying Administrative Segregation Unit Enhanced Outpatient
Program Hubs.

Plaintiffs remain concerned about Defendants' inability to effectively track and
report on these requirements at the headquarters level, and about Defendants' reliance on
on-site audits as a general matter given Plaintiffs' concerns about the PSU and EOP ASU
hub certification process.  The parties nonetheless agree to continue to meet and confer
about these issues as necessary under the supervision of the Special Master.

DATED:  March 15, 2021                    ROSEN BIEN GALVAN & GRUNFELD LLP


                                          By:  */s/ Jessica Winter*
                                               Jessica Winter

                                          Attorneys for Plaintiffs


DATED:  March 15, 2021                    XAVIER BECERRA
                                          Attorney General of California

                                          By:  */s/ Lucas Hennes*
                                               Lucas Hennes
                                               Deputy Attorney General

                                          Attorneys for Defendants

# APPENDIX A

**Appendix A**

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **\*COVID-19 Mental Health Delivery of Care Guidance & Tier Document (Mar. 25, 2020)** | Stipulation and Order Approving CDCR's Telepsychiatry Policy, ECF No. 6539 (Mar. 27, 2020)<br><br>Program Guide 12-1-12 & Attachment A (confidentiality) | • Permits telepsychiatry broadly, including in PIPs and MHCBs, without a finding of emergency<br><br>• Telepsychiatry not treated as a supplement, but rather a substitute, for in-person psychiatry at EOP and higher levels of care<br><br>• Permits use of tele-psychology<br><br>• Approval for use of telepsychiatry is made by the hiring authority, and may be preferred modality of providing psychiatry services<br><br>• Telepsychiatrists may provide telepsychiatry services from their homes during regular work hours, rather than from telepsychiatry hubs<br><br>• Each institution can decide which telepresenters can be used, including: MA or CNA, and any healthy staff unable to perform their assigned duties during the crisis (with training).<br><br>• Telepsychiatry providers not required to conduct site-visits at any particular frequency<br><br>• Registry telepsychiatrists may be used without limitation |

[3702972.2]

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | <ul><li>Patients may not have an option to refuse telepsychiatry as a treatment modality</li><li>On-site psychiatrists may not be available if a clinical emergency occurs during a telepsychiatry session</li><li>Confidential space for telepsychiatry contacts may not be available</li><li>Nurse practitioners may provide telepsychiatry services</li><li>Requires telepresenters for telepsychiatry, but clinical and other telepsychiatry support-staff may not be available</li></ul> |
| | Mental Health Services Delivery System Program Guide, 2020 Revision ("Program Guide") at 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-6 to 8, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-1, 12-5-3 to 10, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, | Decisions on admission and discharge subject to day-to-day analysis of staffing, individual patient needs, space availability, social distancing, restrictions on movement, quarantine and isolation status, and the degrees of risk when making these decisions. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) | |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21; 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities) | Groups may not be offered, depending on space, staffing, and quarantine or isolation status.  Groups that do continue may be reduced in size in order to adhere to social distancing requirements.<br><br>Larger classrooms or vocational space could be used to allow for smaller groups.<br><br>Patients in isolation and/or quarantine will not attend groups but shall be provided with activities and receive daily rounding. |
| | Program Guide 12-1-12 & Attachment A (confidentiality requirements) | Groups may not be confidential if placed in an alternative location (e.g. day room, classrooms) or due to social distancing purposes. |
| | Program Guide 12-1-12 & Attachment A (confidentiality requirements) | Contacts with IDTT may be cell front and non-confidential. |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21; 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, | Patients may be limited to in-cell activities only.<br><br>Patients housed in a MHCB awaiting transfer to a higher level of care and patients in alternative housing awaiting |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities) | transfer to a MHCB will be provided enhanced out-of-cell time and therapeutic activities as well as daily rounds, as operations allow. |
| | Program Guide at 12-5-7 to 8, 12-5-10, 12-5-31, 12-10-7 to 12 | Patients may not receive SRASHEs if suicidal, but may instead be screened using the Columbia screening tool. |
| | Program Guide at 12-1-6, 12-1-16, 12-3-1 to 2, 12-5-4<br><br>Order, ECF No. 5710 (Oct. 10, 2017)<br><br>CCHCS Policy 12.05.301: Housing of Patients Pending Mental Health Crisis Bed Transfers | Depending on the institution's Tier level, patients may be placed in alternative housing for longer than 24 hours.  Within 24 hours of placement or if patient remains longer than 24 hours, a full SRASHE must be completed. |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 13, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide Chapters 5, 6 | As patients wait for inpatient referrals to process, they may not receive treatment commensurate with their level of care. |
| | Program Guide 12-1-16 (timelines for level of care transfers) | Symptomatic patients shall be isolated from other patients in the general population and will not transfer absent showing of legal or medical necessity. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-3 to 10, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12, 12-8-1, 5 to 7, 9, 11 to 12, 12-9-2 to 3, 4 to 5, 6, 12 to 14, 12-10-12 to 13, 19 to 21 (access to higher levels of care)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 10, 12-8-4, 10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities) | |
| | Program Guide at 12-1-4, 12-3-3 to 4, 12-4-10 to 11, 12-4-13<br><br>Memo: Release Planning for Inmates Participating in the Institution's Mental Health Services Delivery System (Mar. 11, 2010), Program Guide, Appendix C, *see* ECF No. 5864-1 at 276-82. | Pre-release planning activities may be limited to varying degrees.<br><br>All required activities to occur when social distancing can be followed. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | 1:1 contacts with psychiatrists may not occur within timeframes. |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15,12-4-19, 20, 12-5-14, 12-5-33,12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, | 1:1 contacts with psychologists or social workers may not occur within timeframes. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 12-9-6 to 8 (primary clinician contacts) | |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-10-15 to 19 (availability of treatment modalities) | 1:1 suicide watch may not occur where clinically indicated. |
| | Program Guide 12-3-2 (psychiatrists as primary clinicians)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | Any physician, nurse practitioner, or physician assistant can serve as a psychiatrist. |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, | Psychiatrist duties may be triaged only to serve urgent or emergent needs. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
| --- | --- | --- |
| | 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | |
| **COVID-19 Pandemic – Guidance Regarding Field Operations (Mar. 18, 2019, revised Mar. 20, 2020)** | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-15, 12-5-33 to 34, 12-7-7, 10, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>February 14, 2017 memorandum titled Mental Health Crisis Bed Privileges Revision, Program Guide, Appendix C, *see* ECF No. 5864-1 at 349. | Not congregating in groups of 10 or more individuals and suspending group programs where participants are likely to be in close contact. |
| **Restricted housing, Reception Centers, PIP Phone Calls (Apr. 8, 2020)** | September 22, 2016 memorandum regarding Reception Center Privileges for EOPs, *see* ECF No. 6431 at 4. | Extends phone call privileges for those in segregated housing, reception centers, and PIPs beyond what is permitted by privilege group. |
| **\*COVID-19 Programming Opportunities for Inmates Participating in the MHSDS in Restricted Housing (Apr. 1, 2020)** | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability | Implementation of third watch programming opportunities within restricted housing. If mental health groups and 1:1 clinical contacts cannot occur in the restricted housing units, wardens will ensure PM yard is offered to those in the MHSDS. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | |
| **COVID-19 Electronic Appliance Loaner Program (Apr. 1, 2020)** | January 22, 2014 Memo – Multi-Powered Radio Loaner Program in Administrative Segregation Units; and March 12, 2007 Memo – Televisions in Segregation Units, *see* ECF No. 6431 at 4. | Increase patient access to loaner electronic appliances. |
| **\*COVID-19 Emergency Mental Health Treatment Guidance and COVID-19 Temporary Transfer Guidelines and Workflow (Apr. 10, 2020) (As modified by February 8, 2021 direction to resume Pre-COVID-19 PIP and** | Program Guide 12-1-8 to 9, 12-5-1, 12-5-32 to 34 (MHCB care provided in licensed settings)<br><br>Program Guide 12-1-12 & Attachment A (confidentiality) | Creation of TMHUs<br><br>• Until backlog of PIP and MHCB transfers is worked through, TMHUs will house and provide services to class members awaiting transfer<br><br>• Group therapy may be reduced to 3-4 people and may be eliminated.  If no groups can be run, then yard time in the evening should be considered |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **MHCB movement processes.)** | Program Guide 12-1-16 (timelines for level of care transfers)[1]<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-9-19 to 21 (access to higher levels of care)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21,12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide 12-3-9, 12-4-6, 12-5-11 to | • IDTTs may occur by teleconference<br><br>• IDTT staffing level varies based on availability of staff<br><br>• Content and delivery of treatment will be based on a daily evaluation of the proportion of staff available for patient care and direct activities<br><br>• Huddles may be telephonic, but only if in-person huddles cannot be conducted safely<br><br>• Daily out-of-cell individual treatment offerings with psychiatrist or primary clinician will occur whenever possible<br><br>• When possible, all PC and psychiatrist contacts shall be conducted in a confidential space.  Where necessary due to staffing, available treatment team members may engage in collaborative cell front tele-heath treatment sessions using portable equipment.  It is preferable for cell doors to be |

[1] While the February 8 Directive eliminates the emergent transfer review process for PIP and MHCB transfers, there will continue to be delays in these transfers while CDCR works through the backlog of waitlisted patients.  The parties will continue to meet and confer, under the supervision of the Special Master, and will update Appendix A when these timelines are no longer impacted.

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 12, 12-7-12 to 13, 13-8-8, 12-9-5 (required IDTT staffing)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | open when conducting this cell side treatment modality.<br><br>• Permits cell-front tele-mental health<br><br>• Each institution can decide which telepresenters can be used, including: MA or CNA, and any healthy staff unable to perform their assigned duties during the crisis (with training)<br><br>• Upon discharge from TMHU and if the IDTT determines the patient no longer requires inpatient mental health treatment, then referral to higher level of care shall be rescinded |
| | Program Guide 12-1-12 & Attachment A (confidentiality)<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to | Enhanced Treatment-in-Place<br><br>• When a patient is referred to an inpatient level of care and is unable to transfer to an inpatient bed, a TMHU, or is not already in an inpatient setting, treatment will be provided in the patient's housing unit until transfer can occur ("treatment-in-place")<br><br>• When possible, all treatment, including groups and clinical contacts, shall be provided in confidential setting, however that may not always be possible<br><br>• Primary clinical contacts may not occur on a daily basis |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15,12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts)<br><br>Orders, ECF Nos. 6095, 6314 (Feb. 20, 2019, Oct. 8, 2019) (requirement implementation of Custody and Mental Health Partnership Plan, including inter-disciplinary huddles) | • Group therapy may be reduced to 3-4 people and may be eliminated.  If no groups can be run, then yard time in the evening should be considered.<br><br>• If in-person huddles cannot be conducted safely, then huddles should but are not required to occur telephonically |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | Transfer Guidelines and Workflow<br><br>• Plaintiffs will not seek contempt sanctions for failures to transfer patients in a timely manner when the failure resulted from COVID-19<br><br>• Patients will be discharged to the same facility unless irreconcilable custodial considerations prevent doing so, in which case an additional screening step will occur |
| **Department of State Hospitals Directive on Suspension of Admissions from CDCR to DSH (Apr. 15, 2020)** | Program Guide 12-1-9<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care)<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – | *Coleman* admissions to DSH resumed after a 30-day suspension with additional guidelines and protocols required to effectuate transfers from CDCR to DSH. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Referrals and Admissions | |
| **\*COVID-19 Emergency Mental Health Treatment Guidance for MAX Custody Patients and COVID-19 EOP Temporary Transfer Guidelines and Workflow (Apr. 17, 2020) (As modified by February 8, 2021 direction to resume Pre-COVID-19 PIP and MHCB movement processes.)** | Program Guide 12-1-12 & Attachment A (confidentiality)<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities) | • When referred to an inpatient bed, MAX custody patients shall be placed in an inpatient bed, if one is available within the institution, by Health Care Placement Oversight Program (HCPOP). If no inpatient bed is available within the institution, then the patient is placed under observation as clinically appropriate until a MAX custody review is completed within the next 24 hours of referral.<br><br>• Patients referred to an inpatient bed for whom MAX custody status is lifted will proceed through the standard COVID-19 Emergency Mental Health Treatment Guidance and COVID-19 Temporary Transfer Guidelines and Workflow (Apr. 10, 2020)<br><br>• Patients referred to an inpatient bed who remain on MAX custody status following review can be sent to a MAX TMHU for a maximum of 10 days<br><br>• Permits the creation of TMHUs specific to MAX patients. MAX Custody TMHUs will be located in a segregation setting, according to the following |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts)<br><br>Memo: Creation of Correctional Clinical Case Management System Short Term and Long Term Restricted Housing (Jan. 15, 2015), Program Guide, Appendix C, *see* ECF No. 5864-1 at 420-24. | priority: EOP ASU Hub/PSU; STRH/LTRH; ASU.<br><br>• Patients offered 5 hours weekly of structured treatment and 15 hours weekly of unstructured out of cell time<br><br>• Group therapy occurs only where done safely<br><br>• IDTT held within 72 hours of placement in MAX TMHU and again at 7 days from date of placement<br><br>• At 7-day IDTT, if the patient is not stabilizing or improving, they are referred to MHCB and transferred to an inpatient setting, potentially at another institution, within 10 days from date of placement following procedures described in the COVID-19 Temporary Emergency Transfer Guidelines.<br><br>• Content and delivery of treatment will be based on a daily evaluation of the proportion of staff available for patient care and direct activities<br><br>• If the inpatient referral is based on acute suicidality, the patient will be placed on 1:1 watch until the Treatment Team determines what level of |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | observation is clinically necessary |
| | | • If in-person huddles cannot be accomplished safely then huddles shall occur telephonically |
| | | • Individual out-of-cell treatment by psychiatrist or primary clinician shall occur daily whenever possible |
| | | • Group therapy may be reduced to 3-4 people and should only be performed where it can safely be done.  It may be eliminated entirely, in which case only in-cell treatment would be provided.  If no groups can be run, then yard time in the evening should be considered. |
| | | • Psychiatrist and primary clinician contacts may not be confidential |
| | | • Permits tele-mental health treatment |
| | | • Permits the following staff members to act as tele-presenter: Medical Assistant; any staff unable to perform their assigned duties during the crisis, provided the staff member has been provided adequate training; any mental health provider; an LVN, RN, |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | CAN, Psych Tech; or any medical provider<br><br>• Upon discharge from a MAX TMHU, and the IDTT determines the patient no longer requires inpatient mental health treatment, then the referral to higher level of care shall be rescinded |
| | Program Guide 12-1-8, 12-4-1, 12-4-4 (EOP patients housed in designated units only)<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-9-7 to 9 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-14 to 15, 12-4-19, 12-4-20, 12-9-6 to 8 (primary clinician contacts)<br><br>Program Guide at 12-4-4 to 5 (access to EOP level of care) | COVID-19 EOP Temporary Transfer Guidelines and Workflow<br><br>• In an attempt to limit the transmission of COVID-19 all non-emergency transfers shall be immediately curtailed. All movement within a facility can continue while taking into consideration COVID-19 status<br><br>• Inter-facility transfers subject to review and approval by regional or headquarters staff<br><br>• Outpatient external transfers or releases from segregated housing to mainline mental health programs at other institutions, to include transfers from desert institutions, transfers from stand-alone ASUs to STRH, CCCMS to EOP, and EOP to CCCMS, will only occur if the treatment team determines, and the Regional Clinical Leadership agrees, that the transfer is necessitated by an imminent, life-threatening |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | emergency or serious mental health decompensation, and the life-threatening condition or serious decompensation cannot be reasonably treated at current institution |
| | | • EOP-level treatment provided when full staffing is available; otherwise subject to tier status |
| | | • Patients discharged from EOP ASU who cannot transfer internally to an EOP may be placed on a local CCCMS yard |
| **COVID-19 Temporary Transfer Restriction Psychiatric Inpatient Programs FLEX Guidance (May 14, 2020)** | Program Guide Chapter 6 | • The treatment team shall not be required to complete a new intake evaluation because the treatment team will be the same, as the patient continues to remain in the same licensed unit; however, an intake IDTT and updated treatment plan for the new level of care will be required. |
| | | • While patients receiving intermediate and acute inpatient care typically will have different treatment goals, there currently is not a significant difference in treatment modalities provided to patients at the intermediate and acute inpatient levels of care |
| **\*Tele-Mental Health** | Stipulation and Order Approving CDCR's Telepsychiatry Policy, | • Permits the provision of tele-mental health services beyond those permitted by the parties' |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **Memorandum (May 22, 2020)** | ECF No. 6539 (Mar. 27, 2020) | stipulated telepsychiatry policy, including by psychologists and social workers |
| **COVID-19 Guidance for Daily Program Regarding Social Distancing for Cell or Alternative/Dorm Style housing of Eight Persons (May 11, 2020) and COVID-19 Operational Guidelines Monitoring and Accountability (May 27, 2020)** | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-15, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>February 14, 2017 memorandum titled Mental Health Crisis Bed Privileges Revision, see Dkt. 5864-1 at 349. | • Goal of having patients maintain at least six feet apart from each other, and attendant impacts on programming:<br><br>• Requires social distancing in the workplace<br><br>• Reduced numbers to allow for increased social distancing may result in no dayroom activities<br><br>• Educational programs shall be provided in such a manner as to allow for social distancing, once group activities resume.  Until such time, education materials will be provided to housing unit/dorm/cells.<br><br>• The May 27 memo operationalizes and creates an accountability procedure to assure that the modifications to programming directed by the May 11 Social Distancing Guidance are being implemented; enforces departures directed by the May 11 Guidance |
| **\*COVID-19 Patient Movement for Mental Health** | Program Guide 12-1-16 (timelines for level of care transfers) | • Provides direction on transfers between DSH and CDCR that may impact timeframes |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| Treatment (May 11, 2020)[2] | CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions & Exceptions Addendum<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 7, 12-7-11, 12-7-12, 12-8-5 to 7, 12-8-11 to 12, 12-9-4 to 5, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) | • Prevents certain individuals who otherwise qualify for transfer from CDCR to DSH from doing so, where the patient tests positive for COVID-19 or screens positive for COVID-19 risk. |
| **Updated Draft COVID-19 Temporary Guidelines for Transfer to DSH Inpatient Care (March 1, 2021, superseding April 15, 2020, May 15, 2020, June 12, 2020, June 19,** | Program Guide 12-1-16 (timelines for level of care transfers)<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions & Exceptions Addendum | • Provides direction on transfers between DSH and CDCR that may impact timeframes<br><br>• Provides additional individualized clinical review and a COVID-19 screening process.<br><br>• Delays certain individuals who otherwise qualify for transfer |

---

[2] Defendants issued this policy without negotiating it with Plaintiffs, and the parties agreed in their May 18, 2020 stipulation that Defendants' current practices do not conform with these or any other existing written guidelines.  *See* ECF No. 6676 at 2. Plaintiffs maintain their objection to this policy, but have agreed to include it here because Defendants have confirmed that it was issued and has not been rescinded.

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **2020, July 16, 2020, October 20, 2020, and January 4, 2021 versions)[3]** | Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) | from CDCR to DSH from doing so, where the patient tests or screens positive for COVID-19. <br><br> • CDCR must order a PCR COVID-19 test no more than five days before the projected admission date for any patient accepted to DSH. <br><br> • For referrals to DSH from a CDCR institution closed due to a COVID-19 outbreak, patient transfers to DSH will occur where CDCR and DSH decide there is adequate public health data demonstrating an acceptably low risk of COVID-19 exposure. To make this decision, CDCR and DSH leadership will discuss relevant public health information on a patient by patient basis, including exposure risk, availability and use of PPE, testing and results, physical plant effects on exposure risks, and the extent of staff crossover between units with active cases and those without cases to evaluate the possibility of transfer. Patients considered for transfer pursuant to this process will be quarantined for 14 days, and tested for COVID-19, |

[3] Plaintiffs maintain their objection to the guidelines, as stated in the October 23, 2020 evidentiary hearing and in Plaintiffs' post-trial brief, ECF No. 6948 (Nov. 13, 2020).

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | followed by a further discussion between CDCR and DSH leadership regarding any interim exposure risks that occurred during the quarantine period. |
| | | • Provides direction as to the transfer of class members with presumed immunity to COVID-19 due to prior infection. |
| | | • Transfers to DSH will not be held based on a patient's vaccination status, unless the receiving DSH facility cannot complete the patient's vaccination series in accordance with public health guidance. |
| | | • DSH collaborates at least weekly with the Special Master's experts in small group meetings to discuss and refine the referral process, resolve conflicts and respond to COVID-19 related impacts on referrals and transfers due to the changing nature of the pandemic. |
| | | • The Special Master continues to closely monitor all referrals, rejections and completed transfers to and from the DSH inpatient programs, and to evaluate compliance with the |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | Court's April 24, 2020 Order. See ECF Nos. 6622 at 3; 6639. |
| **Memo re 90-Day Supply of Medications for Expedited Releases (July 7, 2020)** | Program Guide 12-3-14 (prescribed medication supply for CCCMS patients who parole)<br><br>Memorandum: Release Planning for Inmates Participating in the Institution's Mental Health Services Delivery System (Mar. 11, 2010) at 4-5, 6 | • Permits the provision of a 90-day supply of certain medications for individuals subject to expedited release due to COVID-19 population density reduction measures.<br><br>• Psychiatric providers are directed to write medication orders, as clinically appropriate and within legal confines, for a 90-day, rather than 30-day, duration for those subject to expedited release. |
| **Memo re Cell-Front Nursing Activities (June 26, 2020)** | Program Guide 12-5-32, 12-10-4, 12-10-15 to 19 (describing suicide watch and observation procedures)<br><br>Memorandum: Level of Observation and Property for Patients in Mental Health Crisis Beds (Mar. 15, 2016) at 2 (describing suicide watch as primarily observation) | • Permits IDTTs to recommend that nursing staff provide cell-front activities to patients<br><br>• Requires these activities to be performed while designated nursing staff are performing 1:1 observations of patients; in the past, nursing staff had only one primary task during 1:1 observation—observing the patient<br><br>• Provides a library of cell-front nursing activities for patients |
| **\*Institutional Roadmap to Reopening (August 14, 2020); Memo re Reintroduction of In-Person** | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-15, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-10, | Based on several factors, including the number of new COVID-19 cases, the availability of adequate testing, nursing and custody staff, and PPE, adequacy of physical distancing practices, and status of employee |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **Rehabilitative Programming (Sept. 25, 2020) (directing institutions to create plans to implement portions of Roadmap to Reopening); Memo – Clarification – COVID-19 Pandemic and Guidance Regarding Field Operations (Mar. 3, 2021)** | 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-2-8 to 10, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care)<br><br>Memorandum: Transfer of Correctional Clinical Case Management System Inmate-Patients to Male Short Term Restricted Housing Units (Mar. 3, 2016)<br><br>Memorandum: Creation of Correctional Clinical Case Management System Short Term | testing and contract tracing, each institution may be placed, at the discretion of its Warden and Chief Executive Officer, in one of four "phases."  The phases range from most to least restrictive on the institution's general operation, healthcare services, and inmate programs.  Depending on an institution's phase, restrictions may be placed on:<br><br>• Mental health treatment modalities and quantities that can be provided<br><br>• Movement between or within institutions or facilities, including movement to and from restricted housing, to and from desert institutions, and between levels of care, which may result in class members remaining in settings not designed to provide the level of treatment and programming contemplated by the Program Guide and other negotiated policies for their level of care.<br><br>• Out of cell and other yard time<br><br>• When a facility can safely resume in-person programming, incarcerated people can participate in assigned rehabilitative programs with incarcerated people from different housing units in the |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | and Long Term Restricted Housing (Jan. 15, 2015)<br><br>Memorandum: Short-Term Restricted Housing Mental Health Requirements (Feb. 8, 2016) (mandates movement of CCCMS class members with an ASU term to STRH)<br><br>Memorandum: Long Term Restricted Housing Mental Health Requirements (Feb. 8, 2016) (mandates movement of CCCMS class members with a SHU term to LTRH)<br><br>Memorandum: Short-Term and Long-Term Restricted Housing Policies (Feb. 4, 2016) (mandates movement of CCCMS class members with ASU and SHU terms to STRH and LTRH, respectively)<br><br>Stipulation & Order, ECF No. 6296 (Sept. 27, 2019) (approving and attaching policy for reducing transfer | same facility.  They may not participate in rehabilitative programming with individuals from different facilities within the same institution. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | timeframes from desert institutions) | |
| **\*Movement Matrix (revised Jan. 8, 2021), as modified by Memo – COVID-19 Screening & Testing Matrix for Movement of Newly Resolved Reception Center Patients to Institutions (Feb. 19, 2021)** | Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-2-8 to 10, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care).<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions<br><br>Memorandum: Transfer of Correctional Clinical Case Management System Inmate-Patients to Male Short Term Restricted Housing Units (Mar. 3, 2016) | For each type of movement between and within institutions, sets the COVID-19 testing strategy, required type of quarantine housing, and process for moving an inmate who refuses a COVID-19 test.  In certain circumstances, precludes transfer, at least temporarily.<br><br>•   Testing, quarantine, and transfer procedures in some cases may impact timeframes for transfers to higher levels of care, from desert institutions and reception centers, and to and from restricted housing units, which may result in class members remaining in settings not designed to provide the level of treatment and programming contemplated by the Program Guide and other negotiated policies for their level of care.<br><br>•   Limits COVID-19 related processes for transfer of recently resolved COVID-19 patients from the Wasco State Prison and North Kern State Prison Reception Centers to the patients' endorsed institutions.<br><br>•   In certain circumstances, including where a patient is currently housed in isolation or quarantine due to a COVID-19 exposure, or where the patient |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Memorandum: Creation of Correctional Clinical Case Management System Short Term and Long Term Restricted Housing (Jan. 15, 2015)<br><br>Stipulation & Order, ECF No. 6296 (Sept. 27, 2019) (approving and attaching policy for reducing transfer timeframes from desert institutions) | tests or screens positive for COVID-19, the patient will not transfer until their COVID-19 status is resolved.  These prohibitions on transfers apply to transfers into CDCR institutions from reception centers; to and from levels of care and mental health segregation units within the same institution; and external transfers other than transfers to an MHCB or PIP. |
| **COVID-19 Operations EOP Hub Certification Process & Addendum for Certifying Met with Explanation due to COVID-19 Restrictions (Sept. 11, 2020)** | Program Guide Chapters 7, 8, 9<br><br>Order, ECF No. 5131 (Apr. 10, 2014); Order, ECF No. 5196 (Aug. 11, 2014)<br><br>Defs' Plans & Policies Submitted in Resp. to Apr. 10, 2014 and May 13, 2014 Orders, ECF No. 5190 at 17-19 (Aug. 1, 2014) | • Permits audits of PSU and EOP ASU units to be conducted remotely, by video equipment or telephone, due to COVID-19-related staffing limitations<br><br>• If no institution staff are available to conduct remote audits, then those audits will be conducted by a regional staff member<br><br>• COVID-19-related limitations or changes to standard audit procedure or mental health treatment provisions—including whether audits are conducted remotely or by regional staff, groups or other treatment are not offered, and IDTTs or ICCs |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | are held in absentia—shall be documented on the audit form<br><br>• If an institution's failure to meet certification requirements is due purely to COVID-19-related restrictions, the institution may pass certification "with explanation," assuming certain criteria are met.  Documentation of the rationale for any such "with explanation" certification is required. |
| **COVID-19 Psychiatric Inpatient Program Admission Bed Policy and Procedure (Oct. 23, 2020)** | PIP Policy 12.11.2101(A) – Referrals and Admissions<br><br>PIP Policy 12.11.2111 – Housing Review/Least Restrictive Housing | • Creates a process by which patients newly admitted to a PIP will be housed in a single-cell admission bed in the PIP before they are placed in their endorsed program.  If local medical or public health staff deem it necessary, patients transferring within a PIP will also initially be placed in an admission bed.<br><br>• Patients typically will remain in a PIP admission bed for 14 to 21 days following their admission to a PIP.<br><br>• Creates Admission Units, or groupings of admission beds in PIPs.<br><br>• Creates and implements COVID-19 safety protocols applicable to each patient in an admission bed, including |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | quarantine, testing and screening.<br><br>• If identified admission beds are full but vacant patient beds exist in the PIPs, intake of new patients will not stop. In this circumstance, PIP leadership will identify additional admission beds for quarantining new admissions to ensure patient admissions can continue.<br><br>• Local PIP leadership will monitor admission unit bed numbers and identify overflow admission beds in advance to ensure the admission units do not reach capacity.<br><br>• While PIP patients are housed in an admission bed, their endorsed non-admission bed in the PIP will be reserved for them.<br><br>• While patients are in admission units, they will receive all available PIP mental health services, focusing on patient orientation, intake evaluation, and initial treatment planning. The treatment plan developed by the admission unit clinical team will be coordinated with the receiving treatment team to which the patient will transition. Patients in admission units will |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | also be offered property, phone calls, yard, and all other privileges consistent with current policy for all PIP patients. |
| **Guidance for Mental Health Milestone Completion Credits During COVID-19 (December 2, 2020)** | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-15, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Enhanced Outpatient Program Milestone Credit Group Therapy – Required Materials (Sept. 24, 2015)<br><br>15 C.C.R. § 3043.3(f)(2), as incorporated into Compendium of Custody-Related Remedies, 2020 Program Guide Revision, Appendix E at 1 | • Provides guidance to institutional mental health staff for allowing class members to continue to earn milestone completion credits during the pandemic and while receiving modified mental health treatment activities<br><br>• Describes pandemic-related modifications to group mental health treatment typically offered to class members and a means of measuring milestone credits earned pursuant to these modified offerings |
| **COVID-19 Risk Transfers – Revised (November 9, 2020)** | Program Guide 12-1-16 (timelines for level of care transfers) | • Precludes incarcerated people with a COVID-19 risk score of 3 or higher from transferring to six institutions (ASP, CIM (Facilities A and D), CRC, CVSP, FSP, and SQ) or |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | facilities within those institutions.<br><br>• Class members with a COVID-19 risk score of 3 or higher will not have access to the H Unit EOP dorms at SQ, which consist of two 100-person Level II dorms. |

[3702972.2]

# Policies and Procedures for March 15, 2021 Program Guide Departures Update

**Updated Draft COVID-19 Temporary Guidelines for Transfer to DSH Inpatient Care**

**March 1, 2021**

I.  Clinical referral Process

a)  CDCR will upload referral packets to SharePoint and notify DSH of the names of referrals. This action initiates Program Guide transfer timelines which will be reported as such beginning with the date these guidelines are implemented.

b)  Referrals will be shared with the Coleman Special Master Expert small workgroup team and may be discussed in small workgroup team meetings.

c)  If DSH has clinical questions or concerns regarding a referral, the DSH Medical Director designee and the CDCR clinical designee will consult regarding the case. CDCR may rescind referrals it determines to be not clinically appropriate after this discussion.

d)  If the two designees are not able to agree regarding the disposition of a case, the case will be forwarded to the DSH medical director and the CDCR Chief Psychiatrist for resolution. This consultation shall result in acceptance, rescission or lack of consensus of the referral.

e)  If there is no consensus reached, the referral will follow normal rejection procedures as per the MOU to include CCAT.

f)  All rejections shall also be reviewed by the Coleman Special Master Expert small workgroup.

g)  DSH will provide the list of accepted patients to the IRU, and issue a Decision Form of acceptance for each accepted patient.

h)  When notified of a projected admission date, CDCR will order a PCR COVID-19 test for each accepted patient no more than 5 days before the projected admission date.

i)  Once a negative COVID-19 test is obtained, CDCR shall promptly endorse the patient to DSH per the program guide and DSH will issue an Acceptance Transfer Chrono for accepted patients in accordance with section I.m and section IV of these guidelines, utilizing the admission protocol.

j)  Immediately prior to transfer the patient will undergo the current COVID-19 medical screening as outlined in Section III below.

k)  The COVID-19 test results, the date of the test, the date of the result, and screening results shall be promptly communicated to the receiving DSH institution's Medical Director prior to transfer.

l)  COVID-19 test results and COVID-19 screening shall be prominently and clearly communicated in the referral packet so that the receiving institution's Medical Director receives this information prior to transfer.

m) DSH shall follow the newly developed DSH COVID-19 Admission Protocol delineated in Section IV.

n)  For referrals from Closed Institutions the following process shall apply:
DSH will consider transfers from closed institutions where there is adequate public health data demonstrating an acceptably low risk of exposure to the patient. These cases will be discussed in the small workgroup and will require physician contact from the person most knowledgeable at the referring

institution to the accepting facility medical director. The discussion will include relevant public health information such as potential exposure to infected employees and/or inmate patients, effects of physical plant on exposure risk, availability and use of PPE, status of serial location-based testing, floating of staff to and from relevant units, etc. The discussion will also include a consideration of whether the patient is in a presumed immunity period. The presumed immunity period is defined as follows:

1. If the patient has been asymptomatic - 14 to 90 days after positive test, or
2. If the patient has been symptomatic - 14 to 90 days after first symptoms, AND one day without fever without fever reducing medication AND other COVID symptoms have improved, or
3. If the patient is immunocompromised and has been symptomatic - 20 - 90 days after first symptoms AND one day without fever without fever reducing medication AND other COVID symptoms have improved.

o) Transfers to DSH will not be held based on vaccination status, unless the receiving facility does not have the ability to complete a vaccination series in the manner recommended by current public health guidance.

II.   **DSH Discharges to CDCR**

a) DSH will send a weekly list of patients who are ready for discharge to CDCR's Inpatient Referral Unit (IRU) and put the COVID screen and discharge packet on SharePoint.

b) Immediately prior to transfer the patient will undergo the current COVID-19 medical screening as outlined in Section III below and shall be tested for COVID.

c) The COVID-19 test results, the date of the test, the date of the result, and screening results shall be promptly communicated to the receiving CDCR institution's Medical Director prior to transfer.

d) Prior to transport IRU will ensure that the Chief Medical Executive at the receiving facility is notified and prepared to accept the arrival of the patient.

e) Transport shall be held until the IRU notifies the Classification and Parole Representative that the CME has approved transport.

III.   **Information to be provided as a part of current COVID-19 pre-transfer medical evaluation**

a) Referring Institution
b) Receiving Institution
c) Does the patient have a new or worsening cough?  [Y/N]
d) Does the patient have a fever (>100 F)?  [Y/N]
e) Is the patient experiencing new or worsening shortness of breath?  [Y/N]
f) Is the patient currently on isolation?  [Y/N]

g) Is the patient currently on quarantine?  [Y/N]
h) Is the patient known to be a contact of a confirmed COVID -19 case?  [Y/N]
i) Include the patient's vitals for the last 14 days as available

IV.  <u>DSH COVID-19 Admission Protocol</u>

All new admissions to DSH will follow the following protocol:

**DSH ADMISSION AND TESTING FLOWCHART**

**PATIENT +/- COVID-19 RNA TESTED**   **1**

1. Patients arriving to DSH Hospitals from the Department of Corrections or County Jails could have been tested or not tested prior to transportation. **Patients that have stayed overnight in outside hospital.** Preferred transportation in groups to have cohort/group admissions

3. Patients are admitted in a cohort/group and are housed together in one unit during sequestration/observation period (one cohort = one admission unit). If patients are asymptomatic during the admission screening, they are housed in an observation unit preferably in a single room specially if there is any significant risk of exposure. At any time pt test results (+), they move to isolation. The patient is re-tested at Day 5 post admission (Test 2) and 14 days (Test 3). If test result at 5 (+) pt moves to Isolation Unit and if (-) stays until results of test at day 14.
Staff are assigned/dedicated to this units and tested as needed.

**DSH HOSPITAL TRIAGE SCREENING**   **2**

**COVID-19 RNA TEST 1 (DAY 1)**

2. Upon admission at a DSH Hospital all patients are tested on the day of admission (Test 1, Day 1).

4. If a patient has symptoms of COVID-19 disease at the time of admission, they are housed in a Patient Under Investigation (PUI) unit. Closely monitored. If test at day 5 (+) moves to Isolation Unit and if (-) stays as PUI until results of test at Day 14.

**4**

**SYMPTOMATIC**   NO

**PUI (SINGLE ROOM/ SEPARATE FROM COMFIRMED CASES)**   YES

**3**

**ADMISSION OBSERVATION UNIT (AOU) (SINGLE ROOM PREFERRED)**

**SYMPTOMATIC**

**COVID-19 RNA TEST 2 DAY 5**

**TEST 3 DAY 14**

**DAY 5 and 14 COVID-19 RNA TESTS RESULTS**

COVID-19 (+)      COVID-19 (-)

**5**

**TEST 1 COVID-19 (+)**   →   **ISOLATION UNIT**

**FOR PATIENT MANAGEMENT FOLLOW DSH MANAGEMENT OF COVID-19 PATIENTS AND PUI GUIDELINES**

**ASYMPTOMATIC AND TEST 1, 2, 3  NEGATIVE**   NO

5. At any time a patient test (+) for COVID-19 (confirmed by testing), they are housed in an isolation unit with only other (+) patients.

**6**

YES   **REGULAR UNIT**

6. If the patient test negative upon admission and when re-tested (Day 5 and 14), they can be housed in a regular unit

 **CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES 

# MEMORANDUM

**Date:**   March 3, 2021

**To:**   ASSOCIATE DIRECTORS, Division of Adult Institutions
CHIEF EXECUTIVE OFFICERS
WARDENS

**From:**

**CONNIE GIPSON**
Director
Division of Adult Institutions

DocuSigned by:
**Joseph Bick**
3471B7202A84404...
JOSEPH BICK, M.D.
Director
Division of Health Care Services

DocuSigned by:
*Brantley Choate*
EE00552E97454D3...
BRANT R. CHOATE, Ed.D.
Director
Division of Rehabilitative Programs

**Subject:**   **CLARIFICATION – COVID-19 PANDEMIC AND GUIDANCE REGARDING FIELD OPERATIONS**

The California Department of Corrections and Rehabilitation (CDCR) and California Correctional Health Care Services (CCHCS) continue to take necessary precautions to reduce the potential for staff and inmate exposure to COVID-19. The purpose of this memorandum is to provide clarification regarding social distancing expectations for rehabilitative program operations.

Wardens and Chief Executive Officers continue to collaboratively assess each facility's ability to re-introduce in-person programming per the September 25, 2020 memorandum titled, *Reintroduction of In-Person Rehabilitative Programming – Revised*, and the *Institutional Roadmap to Reopening*.

When it is determined that a facility can safely resume in-person programs, inmates shall be afforded the opportunity to participate in assigned rehabilitative programs together with other inmates from different housing areas within the same facility. Comingling participants from different facilities shall not be allowed.

Assigned rehabilitative programs may include, but not be limited to Integrated Substance Use Disorder Treatment, Cognitive Behavioral Interventions, Career Technical Education, Adult Education, Arts in Corrections, and Inmate Activity Group programs.

# MEMORANDUM

If you have any questions, please contact Mark Tillotson, Captain, Office of Policy Standardization, Division of Adult Institutions, at (916) 324-5487.

cc: Tammy Foss
Charles W. Callahan
Sarah Larson
Kimberly Seibel
CCHCS Deputy Directors
Renee Kanan, MD, MPH
Barbara Barney-Knox
Kevin Hoffman
Niki Dhillon
Lisa Heintz
Andre Gonzales
Ralph Jackson
Regional Health Care Executives
Regional Deputy Medical Executives
Regional Chief Nurse Executives
Shannon Swain
Associate Superintendents
Robert Fields
Douglas Snell
Mark Tillotson
Stephen Zanini
Hillary Iserman
Crystal LeSieur

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date: **September 25, 2020**

To: **Associate Directors, Division of Adult Institutions**
**Wardens**
**Correctional Counselors III, Division of Rehabilitative Programs**
**Community Resources Managers**
**Principals**
**Chaplains and Native American Spiritual Leaders**

Subject: **REINTRODUCTION OF IN-PERSON REHABILITATIVE PROGRAMMING - REVISED**

The purpose of this memorandum is to provide direction and guidance to the adult institutions in reintroducing in-person programming for Inmate Activity Groups (IAG); Integrated Substance Use Disorder Treatment (ISUDT) programming; Education classes; and religious services, while supporting the California Department of Corrections and Rehabilitation's (CDCR) continuing efforts to mitigate the impact of the Coronavirus (COVID-19) pandemic.

Effective immediately, Wardens shall collaborate with their Chief Executive Officers to determine which programming measures may be utilized in keeping with the document titled *Roadmap to Reopening,* dated August 14, 2020. Wardens shall send their agreed upon institutional reopening plans to their respective mission Associate Director for review prior to implementation.

Submitted plans shall identify the maximum number of program participants for each activity, taking into account physical distancing protocols. Where appropriate, in-person programming may be implemented utilizing institution staff; Self-Help Sponsors (SHS); Alcohol and other Drug (AOD) Counselors; Education staff; Chaplains; and Native American Spiritual Leaders (NASLs), in keeping with the guidance provided by the Centers for Disease Control and Prevention (CDC).

When the number of staff program facilitators, AOD Counselors, Education staff, Chaplains, NASLs, and inmate participants exceed the modified room capacity of the programming space, institutions shall implement a plan to accommodate all inmates assigned to the programs. For example, an IAG Alcoholics Anonymous (AA) program has 20 assigned participants and normally meets once per week. If the modified room capacity is six persons, the group would be separated into four cohorts of five inmates each, with one facilitator per session. Each cohort would attend AA on a rotating basis, ensuring all assigned participants were afforded equal access to the program. ISUDT programs operating beyond Phase One will not divide into rotating cohorts, and will continue with their assigned number of participants in the identified spaces and timeframes consistent with physical distancing and all other CDC protocols.

It is the expectation that all staff, program facilitators, and inmate participants wear face masks and maintain physical distancing at all times for the duration of programming sessions.

For religious services, staff are encouraged to cohort participants, ensuring all inmates are afforded equal access. In keeping with Department Operations Manual, Section 101060.8, chapel facilities are designated for daily religious uses and programs. Use of the chapels for other than religious activities shall require the approval of the Warden.

For facilities unable to resume in-person programming, institutions shall support alternative in-cell or cell-front programming through the distribution of printed religious literature, rehabilitative programming and independent study materials provided by Community Based Organizations (CBOs), AOD Counselors, Education staff, Chaplains, and NASLs.

Associate Directors, Division of Adult Institutions
Wardens
Correctional Counselors III, Division of Rehabilitative Programs
Community Resources Managers
Principals
Chaplains and Native American Spiritual Leaders
Page 2

All rehabilitative programming materials provided shall be in accordance with the memorandums titled, *Collection and Distribution of Printed Rehabilitative Programming Materials*, dated April 10, 2020, and *Approved Usage of Independent Study for Class Closures* dated, February 4, 2020, as provided by the Chaplains and NASLs, or as directed by the Division of Rehabilitative Programs (DRP). Identified ISUDT participants shall receive Program Engagement Packets directly from institutional AOD Counselors. AOD Counselors shall frequently make contact with participants within their housing units as needed to deliver and collect packet programming materials, or answer brief questions regarding curriculum (approximately 10 minutes per participant).

Institutions shall work with CBOs, colleges, and volunteers to identify individuals who may be interested in facilitating programs virtually by two-way video conference. To facilitate this type of programming, staff shall coordinate with their local Enterprise Information Systems team to identify viable program locations and equipment. Programs utilizing video conferencing require a staff or SHS program facilitator; existing video conferencing equipment; and a program location with available internet access. A staff member or SHS shall schedule and initiate video conferences as the host; remain on-site to provide supervision; and conduct program attendance. Cisco and Polycom equipment, and/or specialized conferencing through Education's Canvas Learning Management System assigned to the institution should be used for this purpose where available, and are currently the only departmental approved platforms for this activity. The following warning shall be included in the body of each video conference invitation:

*"Notice: Recording program sessions is not authorized. All participants are expressly restricted from conducting audio or video recording. Failure to comply with this restriction may result in termination of services and may result in the violator being held criminally or civilly liable."*

In preparing programming spaces for use, chairs shall be strategically placed and visual floor markings affixed in all programming areas to assist facilitators and participants in complying with physical distancing requirements. Programming areas shall be cleaned and disinfected before and after each session, as outlined by the guidance provided by the CDC. Inmate participants shall be utilized to clean these areas with staff program facilitator oversight. Program facilitators shall ensure the Cleaning Schedule Log is completed for each session. All cleaning and sanitization product instructions and best practices shall be followed, as outlined within the memorandum titled, *COVID-Related Cleaning Protocols for Institutions*, dated April 8, 2020.

Appropriate Personal Protective Equipment (PPE) shall be issued and worn by inmates and staff at all times as part of cleaning and sanitization. Each institution shall ensure sufficient PPE is available for this purpose. When required cleanings occur during scheduled programming hours, this time shall be counted as part of the inmates' program attendance and participation. In recognizing some inmates may not feel comfortable attending IAG held in a group setting, absences from voluntary program sessions shall not be counted for the purpose of removing participants until further notice. Inmates assigned to ISUDT and Education programs are expected to attend classes and complete independent study packets. Library services and Education assessments shall continue utilizing physical distancing practices.

All individuals entering the institutions shall be subject to the following screening protocols: touchless temperature screening, verbal screening questionnaires, and ensuring a facemask is worn at all

**Associate Directors, Division of Adult Institutions**
**Wardens**
**Correctional Counselors III, Division of Rehabilitative Programs**
**Community Resources Managers**
**Principals**
**Chaplains and Native American Spiritual Leaders**
**Page 3**

times. With the exception of CDCR staff, individuals shall provide their own facemasks which comply with institution dress standards (i.e., no obscene/offensive language, gang affiliation, etc.). Hand sanitizer shall be accessible to all facilitators and participants. At a minimum, one hand sanitizer station will be available at the institution entrance and within each programming area. In recognizing mitigation of COVID-19 is a fluid process, all programs may be subject to suspension without notice.

We applaud your ongoing efforts to assist the Department in maintaining a healthy, safe environment which is conducive to rehabilitative programming. Ensuring the availability of programming opportunities is an important aspect of rehabilitation, and serves to preserve the peace by giving inmates a positive focus for their energy and attention. Your dedication to sustained rehabilitative programming within the institutions is appreciated.

If you have any questions regarding IAG programs, please contact Crystal LeSieur, Community Partnerships Manager, Office of Policy Standardization, at Crystal.LeSieur@cdcr.ca.gov. For questions regarding ISUDT, please contact Andre Gonzales, Chief, Rehabilitative Programs, DRP, at Andre.Gonzales@cdcr.ca.gov. For questions regarding Education programs, please contact Hillary Iserman, Deputy Superintendent, Office of Correctional Education, at Hillary.Iserman@cdcr.ca.gov. For questions regarding religious services, please contact Charles Richey, Community Resources Manager, Religious Programs Oversight Unit, OPS, Division of Adult Institutions, at Charles.Richey@cdcr.ca.gov.

**CONNIE GIPSON**
**Director**
**Division of Adult Institutions**

*Khy Hoff* *for*

**BRANT R. CHOATE, Ed.D.**
**Director**
**Division of Rehabilitative Programs**

**Attachments**

cc:   **Charles W. Callahan**
      **Kimberly Seibel**
      **Kevin Hoffman**
      **Shannon Swain**
      **Hillary Iserman**
      **Andre Gonzales**
      **Ralph Jackson**
      **Dougless Snell**
      **Mark Tillotson**
      **Stephen Zanini**
      **Robert Fields**
      **Associate Superintendents**
      **Marco Barragan**
      **Charles Richey**
      **Crystal LeSieur**

## Institutional Roadmap to Reopening-August 14, 2020

### Introduction

This document outlines, at a high-level, the Roadmap to Reopening major programs within the California Department of Corrections Rehabilitation (CDCR) and California Correctional Health Care Services (CCHCS). In an effort to mitigate the spread of COVID-19, the Departmental Operations Center (DOC) was established to provide statewide oversight and direction for COVID-19 efforts. The following are examples of actions taken to decrease exposure and increase physical distancing in California's prisons:

- Expedited release of inmates.
- Suspended normal visiting.
- Suspended intake from county jails.
- Modified housing assignments in dorm settings to facilitate physical distancing.
- Screening to include both a verbal questionnaire and temperature checks for all individuals entering state prisons.
- Conducted Board of Parole Hearings via videoconference.
- Continued to reinforce the importance of hand-washing and frequent cleaning.
- Provided and mandated the use of reusable cloth barrier masks

- Provided hand sanitizer to staff/inmates.
- Provide face coverings to staff/inmates.
- Modified programming at all institutions to increase physical distancing and implemented enhanced cleaning.
- Implemented a screening process for all inmate workers.
- Provided daily updates on the CDCR website to ensure transparent communications with staff, families, stakeholders, and the public.
- Continued communication with local and state authorities to determine current mitigation levels in the community.

The CDCR-CCHCS Roadmap to Reopening incorporates a multi-phased approach to reopen statewide operations, relying on the recommended guidelines set forth by the Centers for Disease Control and Prevention (CDC), the California Department of Public Health (CDPH), and other stakeholders. It is important to note that multiple considerations may affect the speed at which institutions and various program areas reopen. Institutions will continuously evaluate and monitor positive COVID cases and will reinstate precautionary measures, as needed, to protect all of those who live and work in California's prisons. This document is not intended to replace other COVID-related policies, but to work in concert with companion policies. As such, and as an example, specific questions related to transferring of inmates between institutions would be detailed via the CDCR/CCHCS test-and-transfer policy.

### Phases Defined

Phase 1: Most restrictive modifications
Phase 2: Ease Phase 1 restrictions
Phase 3: Expand opportunities outside housing units
Phase 4: Return to "new" normal program for all staff and the population

Movement between the phases will be at the discretion of the Warden and Chief Executive Officer who shall report daily to the Department Operations Center (DOC) their current phase, and any plans to move to different phases in subsequent days. Depending on institutional design, movement between phases may apply to the entire institution or individual facilities within an institution, at the discretion of the Warden and CEO. This is to recognize significant differences related to design, dorm/cell housing, and intermixing of inmates and staff in various facilities. Throughout the phases, the Department is committed to ensuring the safety, security, and well-being of all staff and inmates by continuing to perform the precautionary measures listed above.

## Factors for Determining Movement from One Phase to the Next

When assessing an institution's readiness to move from one phase to the next, whether loosening or tightening restrictions, the following factors will be considered:

1. Is the institution experiencing a stabilizing or decreasing disease burden for the inmate population? Case Rate:
   - Phase I to II: No new cases on a rolling 14-day cumulative new case rate.
   - Phase II to III: No new cases on a rolling 60-day cumulative new case rate.
   - Phase III to IV: No positive or new cases for a 90-day period.
   - Phase IV: Reopening to new normal operations. Note that this may include continuing precautionary measures such as face coverings, more frequent cleanings, etc.
2. Is the institution able to sustain adequate testing levels to monitor the ongoing health of the institution? If inadequate, remain in Phase 1.
3. Is the institution able to sustain adequate staffing coverage for both custody and nursing posts? If inadequate, remain in Phase 1.
4. Does the institution have access to an adequate supply of personal protective equipment (PPE) and hand sanitizer should an outbreak occur? If inadequate, remain in Phase 1.
5. Has the institution instituted Physical Distancing with the ability to monitor, sustain, and enforce the measures successfully? If inadequate, remain in Phase 1.
6. Ongoing employee testing and contact tracing program in place.

## General Operation Provisions

*Phase 1*

- The institution has a current outbreak – three or more COVID-19 positive patients
- Movement and programming access severely restricted within the individual facility or institution

*Phase 2*

- The institution has outbreak contained
- Movement and program-area access within the facility or institution eased based on location and COVID status of the inmate population

*Phase 3*

- No current positive inmates
- Increased movement and program access

*Phase 4*

- Resumption of pre-COVID-19 programming. Note that this may include continuing precautionary measures such as face coverings, more frequent cleanings, etc.

## Health Care Operations

*Phase 1*

- Essential and critical health care appointments only.

*Phase 2*

- Careful resumption of routine clinical operations:
   - Episodic non-essential
   - High-risk and chronic care patients
   - Telemedicine (including ISUDT)
   - On-site specialty services

Institutional Roadmap to Reopening, 2

- Allow Mental Health services where physical distancing can be maintained
- Resume Dental

### Phase 3
— Resume all clinical operations

## Institutional Operations

### Phase 1
— The institution is closed to visitors, volunteers, and activities involving outside groups.
— No outside vendors, non-essential contractors, or non-employees permitted on institutional grounds, other than those who are essential for supplying the institution with needed goods.
  - ISUDT Program Providers, including Alcohol And Other Drug (AOD) Counselors; are essential contractors
— Inmate workforce limited to essential functions.
— Yard/feeding with the same population within the same housing unit.
— Limited dayroom access to the same rotating groups. Physical distancing to be maintained.
— No family visiting (overnight visits).
— Limited recreational dayroom access to allow physical distancing.

### Phase 2
— Visitation limited to one visitor for one hour, per inmate per month. Tables in visiting rooms must be six feet apart, staggered schedule, mandatory masks, and tables disinfected between visits.
— Outside vendors, non-essential contractors, or non-employees may be permitted.
— Inmate workforce limited to essential functions.
— Continue yard/feeding access with the same population groups cohort.
— Continue limited dayroom access to the same rotating groups. Physical distancing to be maintained.
— Family visiting still prohibited.

### Phase 3
— Expand visitation to allow two visitors to visit for one hour per inmate, twice per month. Tables set six feet apart, staggered schedule, mandatory masks, and tables disinfected between visits.
— Inmate workforce may be expanded beyond essential functions.
— Expand yard access to up to two housing units at a time or by isolated/quarantined, orientation status, or general population status cohorts.
— Expand dayroom access to allow for more inmates while ensuring they maintain physical distance.
— Re-open family visiting to allow for one family visit per week, per family visiting unit.

## Inmate Programs
Rather than prescribing a particular response to apply to all, individual institutions shall adapt to their local, changing needs. To that end, the roadmap conceptualizes many potential programming options as a "menu" from which institutions may select the program delivery methods which meet current operational and safety needs within the phased guidelines. These options include reduced group sizes, staggered schedules, outdoor, or programming in other non-traditional spaces to allow for physical distancing, tents, canopies, or modified hours. Best practices and solutions will be collected and shared with all institutions to add to the operations menu. The Division of Rehabilitative Programs (DRP) will

work with the In-Prison DRP CCIII to collect data on the conditions, and rationale leading to each institutional program decision and modification for historical and reporting purposes.

### Phase 1

- All students receive independent study packets and teachers telework 2-4 days per week.
- Active Integrated Substance Use Disorder Treatment (ISUDT) participants receive Program Engagement Packets from ISUDT AOD Counselors.
- Inmates with legal deadlines may go to the law library so long as physical distancing is maintained. All others may request books, forms, and paging for library and law library access.
- Students may be administered educational assessments with approval from the Warden.
- The following programs remain closed: Offender Mentor Certification Program and Innovative Grants Program/Arts in Corrections.

### Phase 2

- Law library limited to paging and where physical distancing can be achieved.
- Blended instruction: The number of students in class will be dependent on appropriate physical distancing. The remainder of students will receive independent study while not in class.
- Students shall be administered educational assessments if physical distancing permits.
- ISUDT Allow for Integrated/ Offender Mentor Certification Program services to resume in a group setting, but not to exceed a 1:6 ratio. Institutions may exceed these ratios if reasonable alternatives such as outdoor programming are available.
- Arts in Corrections/Innovative Grants Program/Inmate Self Help Groups where appropriate capacity exists to allow physical distancing.

### Phase 3

- Continue blended instruction: Number of students in class will depend on appropriate physical distancing. The remainder of students will receive independent study while not in class.
- Inmates may use the library and law library, physical distancing permitting.
- Inmates are administered educational assessments, physical distancing permitting.
- ISUDT continues as in Phase 2. Integrated/Interventions for Sexual Offenders Program/Offender Mentor Certification Program services in a group setting using program option 'menu'.
- Expand reopening of Arts in Corrections/Innovative Grants Program/Inmate Self Help Groups by allowing the institution discretion to allow volunteers to return. Continue physical distancing.

DocuSign Envelope ID: 1EABDFF2-B2D6-4612-9B0B-2CCA45754895

 **CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES** 

# MEMORANDUM

| | | |
|---|---|---|
| **Date** | : | **February 19, 2021** |

| | | |
|---|---|---|
| **To** | : | WARDENS |
| | | CHIEF EXECUTIVE OFFICERS |
| | | CHIEF MEDICAL EXECUTIVES |
| | | CHIEF NURSE EXECUTIVES |
| | | ASSOCIATE DIRECTORS |

**From** :

DocuSigned by:

Joseph Bick
347167202A8A404...

**JOSEPH BICK, M.D., Director**
**Health Care Services**
**California Correctional Health Care Services**

DocuSigned by:

*Connie Gipson*
60F75B6E86804F7...

**CONNIE GIPSON, Director**
**Division of Adult Institutions**
**California Department of Corrections and Rehabilitation**

**Subject** : **COVID-19 SCREENING AND TESTING MATRIX FOR MOVEMENT OF NEWLY RESOLVED RECEPTION CENTER PATIENTS TO INSTITUTIONS**

The purpose of this memorandum is to provide updated guidance regarding the transfer of recently COVID-19 resolved patients from Wasco and North Kern State Prison Reception Centers. Effective immediately, this update supersedes previous direction outlined in the "Institution Intake from Reception Center" section of the COVID-19 Screening and Testing Matrix for Patient Movement.

Patients meeting the following criteria are eligible for transfer:

- Diagnosed with COVID-19 by PCR test
- Currently resolved, and initially diagnosed no more than 80 days ago
- Are not currently in isolation
- Are asymptomatic on the day of transfer
- Have a negative rapid point of care test within 24 hours of their transfer from the reception center to the receiving institution

During transportation, all patients and staff shall wear an N95 mask. At the receiving institution, resolved patients who have a COVID risk score of 0, 1, or 2 can be housed in cells or dorms. Patients who have a COVID-19 Risk Score of three or more shall only be housed in cells with solid front doors, as outlined in the current COVID-19, Interim Guidance for Health Care and Public Health Care Providers.

DocuSign Envelope ID: 1EABDFF2-B2D6-4612-9B0B-2CCA45754895

# MEMORANDUM

**COVID Screening and Testing Strategy (from Reception Center to Institution):**

- Do not transfer patients who are currently isolated
- Screen for COVID-19 symptoms and obtain rapid test on day of scheduled transfer
- If screen and rapid test is negative, transfer within one day of rapid test collection
- Patients who are symptomatic and/or test positive during pre-transfer testing shall not be transferred and shall be isolated as per interim guidance
- All patients and transportation staff shall wear an N95 mask during transfer

**COVID Screening and Testing Strategy (Receiving Institution):**

- No need to test or quarantine inmates upon arrival
- No COVID related housing restrictions unless COVID risk score of 3 or greater, in which case the patient shall be housed in cells with solid front doors

If you have any questions or require additional information related to this memorandum, please contact Tammy Foss, Director, Corrections Services, California Correctional Health Care Facility at (916) 691-2887.

cc:   Clark Kelso          Kimberly Seibel       Robert Herrick
      Richard Kirkland     Charles Callahan      Christopher Podratz
      Diana Toche          Donald McElroy        Roscoe Barrow
      Dr. Joseph Bick      Jackie Clark          Rainbow Brockenborough
      Tammy Foss           Renee Kanan,          Barbara Barney-Knox