MATTHEW RODRIQUEZ, State Bar No. 95976
Acting Attorney General of California
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
LUCAS HENNES, State Bar No. 278361
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
DAVID C. CASARRUBIAS, SBN 321994
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE: 925-746-8460
FACSIMILE: 925-746-8490
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br>                Plaintiffs, <br><br>          v. <br><br> GAVIN NEWSOM, et al. <br><br>                Defendants. | Case No. 2:90-CV-00520- KJM-DB <br><br> **DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT ON HIS EXPERT'S REPORT ON SUICIDES COMPLETED IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION JANUARY 1, 2017- DECEMBER 31, 2017** <br><br> Judge:   Hon. Kimberly J. Mueller |

## INTRODUCTION

Defendants submit the following objections to the Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017 (hereafter the "Special Master's 2017 Suicide Report" or "Report"). (ECF No. 7077.) As Defendants explained in their previous objections to the Special

Master's and his expert's suicide reports, the Special Master's expert's report mostly duplicates self-monitoring already conducted by CDCR and CDCR's own comprehensive report on suicides that occurred in 2017. As discussed in more detail below, CDCR's own self-critical, independent review of suicides completed in 2017, published on February 1, 2021, is just one component of a robust suicide prevention system found in no other state correctional system.[1] That review includes not only CDCR's findings but also identifies a range of measures to enhance suicide prevention and response efforts. (ECF No. 7052 at 3.)[2] Duplicative and costly reports by the Special Master do nothing to further the goal of ending this case.

## OBJECTIONS TO THE SPECIAL MASTER'S REPORT

**A.    The Report is redundant, provides no better or additional information than CDCR's own Suicide Report, and largely confirms the findings and conclusions CDCR makes in its own annual report.**

Defendants object to the Special Master's 2017 Suicide Report in its entirety on the ground that it largely repeats CDCR's own suicide report. (*See* ECF No. 7077 at 10 (CDCR's response to Special Master's draft 2017 Suicide Report reflecting CDCR's objection on the ground that the Special Master's expert's report is "substantively similar to CDCR's 2017-2019 Aggregate Suicide Report"), 11 (CDCR's response to Special Master's draft 2017 Suicide Report reflecting CDCR's objection that the "Special Master's report is duplicative as demonstrated by CDCR's transparent reporting").) Defendants further object to the Special Master's 2017 Suicide Report in its entirety on the ground that it provides no better or additional information than CDCR's own suicide report and largely confirms the findings and conclusions CDCR makes in its own annual report making it unnecessary to inform the Court or CDCR's progress.[3] (*See* ECF No. 7077 at 10

---

[1] On February 1, 2021, CDCR published its 2017-2019 Aggregate Suicide Report on its public website.  CDCR's 2017-2019 Aggregate Suicide Report can be accessed on its public website at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf (last accessed on 03/22/2021.)

[2] References to page numbers for documents filed in the Court's Electronic Case Filing (ECF) system are to page numbers assigned by the ECF system.

[3] Notably, the primary difference between the Special Master's expert's Report and CDCR's own report, is that the former includes a problematic foreseeability/preventability analysis, and the latter does not. (*See* § C, *infra* (highlighting issues with the foreseeability/preventability analysis).)

(CDCR's response to Special Master's draft 2017 Suicide Report reflecting that "CDCR remains concerned that the Special Master's Expert's Report . . . simply duplicates self-monitoring already conducted by CDCR and CDCR's own review of suicides completed in 2017").)

CDCR published its 2017 suicide statistics in its 2017-2019 Aggregate Suicide Report, reflecting CDCR's commitment to advancing its robust self-monitoring efforts and to transparency by allowing mental health clinicians, nurses, and custody staff who work directly with the inmate population to have access to this valuable information. (*See* CDCR's 2017-2019 Aggregate Suicide Report available at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf (last accessed on 03/22/2021).) CDCR's own suicide report demonstrates that CDCR honestly and critically assessed every suicide that occurred in 2017, including assessing policy violations and implementing corrective actions to prevent future violations. (*Compare id. with* ECF No. 7077-1.) As a direct result of Defendants' reports, including CDCR's comprehensive annual suicide prevention report to the Legislature pursuant to California Penal Code section 2064.1, Defendants will be better able to prevent and reduce the number of completed suicides within its institutions.

Furthermore, and as Defendants noted in their previous objections to the Special Master's suicide reports, Defendants are unaware of any other prison system in the country that reviews each suicide as thoroughly and rigorously as CDCR, and then seeks to incorporate lessons from each suicide into its practice. (ECF No. 7052 at 3.) As such, Defendants request that the Court sustain Defendants' objections so that the Special Master can focus his time and energy not on matters that are the subject of multiple reports by CDCR but on issues that require additional work to fully achieve a sustainable remedy. (*See* ECF No. 6996 (order acknowledging a variety of interim steps that still need to be monitored and completed to attain a full and durable remedy).)

**B.    The Report provides arbitrary comparisons to other large prison systems in the country.**

The Special Master's expert's report compares CDCR's population and suicide rate with

---

Otherwise, CDCR and the Special Master's expert are crafting very similar reports.

other "large prison systems," and ultimately concludes that CDCR's "suicide rate is the 4th highest rate out of the ten largest correctional systems." (ECF No. 7077-1 at 5.) However, the report fails to include any analysis that accounts for the different demographics, population, applicable laws, and other variables that would make this a meaningful, rather than an arbitrary, comparison.

The revisions to the Special Master's draft report highlights this arbitrariness. In the Special Master's draft Report, his expert compared CDCR to only four other "large prison systems" in order to conclude that CDCR's "suicide rate [was] the 2nd highest rate out of the five largest correctional systems." (*See* ECF No. 7077 at 11.) Following Defendants' informal objections, the Special Master's expert changed the report and compared CDCR to nine other "large prison systems" and concluded that CDCR's "suicide rate [was] the 4th highest out of the ten largest correctional systems." (ECF No. 7077-1 at 5.)

Accordingly, CDCR objects to the Special Master's expert comparing CDCR to an arbitrary list of other "large prison systems" without the necessary methodology to make it a valid comparison. (*See* ECF No. 7077 at 11 (CDCR's response to Special Master's draft 2017 Suicide Report reflecting CDCR's objection to the Special Master's expert's report arbitrarily comparing CDCR to other large prisons).)[4]

**C.   The Report includes overly simplistic determinations of "foreseeability" and "preventability" that are counterproductive in a mortality review context and hinder quality improvement.**

---

[4] CDCR further objects to the Special Master's inclusion of a methodologically-problematic suicide rate that is based only on the in-state population. (*See* ECF No. 7077 at 11 (CDCR's response to Special Master's draft 2017 Suicide Report reflecting CDCR's objection to calculating the suicide rate based only on the in-state population).) There is no reason to continue calculating and publishing a suicide rate based solely on the in-state population when inmates housed out-of-state are subject to CDCR's suicide prevention policies and Title 15 of the California Code of Regulations, including conducting Suicide Case Review Reports as necessary. Indeed, excluding out-of-state inmates from the calculation artificially raises the suicide rate from 22.9 per 100,000 inmates to 23.7 per 100,000 inmates, which results in a total inflation of 0.8 per 100,000 inmates. The Special Master's justification for continuing this practice (*i.e.*, to allow for comparisons to prior reports that only included in-state inmate suicide rates, *see* ECF No. 7077 at 5) ignores the issues with this problematic data and only perpetuates and exacerbates the problem by continuing to publish misleading data for the sake of consistency in publishing misleading data.

The Report continues to include an overly simplistic analysis of foreseeability and preventability even though a chorus of experts question the utility of these determinations in a mortality review context.[5] The Special Master's insistence on including these determinations in suicide reports (ECF No. 7077 at 2, 4-5) not only sometimes results in arbitrary, methodologically unreliable labels, but also fails to acknowledge that deaths occur in a complex system and that causative factors beyond proximate cause of death are potentially important for identifying opportunities for improvement.[6]

Without identifying any specific court order, the Special Master says that "existing court orders *require* [him] to file annual suicide reports—including foreseeability and preventability analyses," describes his expert's report on this topic as a "long-standing, *court-ordered analysis* of suicide preventability and foreseeability," and criticizes Defendants' own suicide reports as "not fit for filing with the *Coleman* court due in part to the absence of *court-ordered foreseeability and preventability analyses*." (ECF No. 7077 at 4-5, 7 (emphasis added).) The Special Master's position is wrong and not supported by the record. The Court's prior orders merely reflect that if the Special Master's suicide report is going to include a foreseeability/preventability analysis, that analysis may use the Court-approved definitions for those terms. (*See*, *e.g.*, ECF No. 4693 (order affirming the Special Master's definitions of "foreseeable" and "preventable" without mandating that he include a foreseeability/preventability analysis in future suicide reports).) There is no court order or "orders" requiring the Special Master to include a foreseeability/preventability analysis in his suicide reports.

Indeed, the science no longer supports foreseeability and preventability analyses. As

---

[5] Williams, B., Ahalt, S., Witt, L. (Final Report, Sept. 27, 2018). Assessing Medical Systems for the California Prison Health Care Receivership Corporation: Mortality Review Policy and Practice. The Criminal Justice & Health Program at UCSF, 3-4. https://cchcs.ca.gov/wp-content/uploads/sites/60/UCSF/Mortality-Review-Report.pdf (last accessed on 03/22/2021) (hereafter "Williams"). While the specific term "foreseeability" is not addressed in Dr. Williams's Final Report, the term is as problematic as the term "preventability" because it focuses on identifying past proximate causation rather than future opportunities for improvement.

[6] *Id.* at 4.

Defendants have previously shown, narrow and methodologically problematic foreseeability and preventability determinations frequently divert attention away from opportunities for improvement that will lead to system-wide quality improvement *and patient safety*. Under the modern view, a well-performing mortality review system will identify "opportunities for improvement" leading to "quality improvement, patient safety, and/or clinical education responses (immediate change) or initiatives (longer term) that are then evaluated to determine whether they yielded improvements along relevant clinical benchmarks."[7] This system requires the buy-in and participation of multiple actors who may be less willing to participate if the focus of the review is on foreseeability and preventability determinations whose purpose is to identify the person (or people) to blame for allegedly causing death.[8] Accordingly, for the mortality review system to work properly—and to increase motivation for practice modifications and constantly promote organizational learning—there must be a shift away from terms like "foreseeable" and "preventable" and towards assessments that focus on opportunities for improvement.[9]

As such, Defendants object to the entirety of Section III, subsection I, "Foreseeability and Preventability" of the Special Master's expert's report.[10] (*See* ECF No. 7077 at 10, 13-14 (CDCR's response to Special Master's draft 2017 Suicide Report reflecting CDCR's objection to the entirety of the Special Master's expert's foreseeability/preventability analysis).)

## **CONCLUSION**

The Special Master's suicide report largely just duplicates CDCR's own suicide report. Defendants' Suicide Reports demonstrate that CDCR honestly and critically assessed every suicide that occurred in 2017 and show that CDCR has a sustainable process in place for assessing policy violations and implementing corrective action. The Court should sustain Defendants'

---

[7] Williams, *supra* note 2, at 5.

[8] *Id.* at 4.

[9] *Id.*

[10] To be clear, this objection is aimed at the entirety of the foreseeability/preventability *analysis* and not merely at how those terms are specifically defined. (*Cf.* ECF No. 7077 at 5 n. 6 (referencing prior filings with Defendants' criticism of the foreseeability/preventability definitions).)

1 objections.

2 DATED: March 22, 2021                HANSON BRIDGETT LLP

4                                  By:   *s/ Paul B. Mello*
5                                       PAUL B. MELLO
                                        SAMANTHA D. WOLFF
                                        DAVID C. CASARRUBIAS
6                                       Attorneys for Defendants

8 DATED: March 22, 2021                Respectfully Submitted,

9                                       Matthew Rodriquez
10                                      Acting Attorney General of California
                                        Damon McClain
11                                      Supervising Deputy Attorney General

12                                 By:   *s/ Elise Owens Thorn*
                                        ELISE OWENS THORN
13                                      Deputy Attorney General
14                                      Attorneys for Defendants