1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

10   Attorneys for Plaintiffs

12                 UNITED STATES DISTRICT COURT

13                 EASTERN DISTRICT OF CALIFORNIA

15  RALPH COLEMAN, et al.,                    Case No. 2:90-CV-00520-KJM-DB

16              Plaintiffs,                   **PLAINTIFFS' REQUEST FOR LEAVE
                                              TO FILE OBJECTIONS, AND**
17        v.
                                              **PLAINTIFFS' OBJECTIONS TO
18  GAVIN NEWSOM, et al.,                     DEFENDANTS' RESPONSE TO
                                              DECEMBER 17, 2020 ORDER RE
19              Defendants.                   CQIT INDICATORS**

20                                            Judge:  Hon. Kimberly J. Mueller

[3707891.2]

**PLAINTIFFS' REQUEST FOR LEAVE TO FILE OBJECTIONS TO DEFENDANTS' RESPONSE TO DECEMBER 17, 2020 ORDER RE CQIT INDICATORS**

Pursuant to this Court's Order of December 24, 2020, ECF No. 7003, Plaintiffs request leave to file the objections stated below to Defendants' March 17, 2021 filing captioned "Defendants' Response to December 17, 2020 Order Re CQIT Indicators," at ECF No. 7089.  Plaintiffs' counsel has previously provided the substance of the objections stated below in letters and emails to Defendants' counsel and the Special Master dated February 18, 2021, March 10, 12, and 15, 2021.  Party counsel and the Special Master met and conferred regarding these issues seven times--on January 12, 2021, January 26, 2021, February 9, 2021, February 23, 2021, March 9, 2021, March 11, 2021 and March 15, 2021.

In the objections stated below, Plaintiffs request that the Court reject the list of "key" indicators filed at Docket No. 7089 and direct Defendants to develop a comprehensive list in compliance with the Court's orders of September 3, 2020 and December 17, 2020.

DATED:  March 23, 2021          Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Ernest Galvan*
_____
Ernest Galvan

Attorneys for Plaintiffs

[3707891.2]

# TABLE OF CONTENTS

Page

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' RESPONSE TO DECEMBER
17, 2020 ORDER RE CQIT INDICATORS ................................................................ 1

A.    KEY INDICATORS ARE NOT LIMITED TO THOSE IN CQIT;
      THEY ALSO INCLUDE INDICATORS SEPARATELY
      REPORTED TO THE COURT AND THOSE USED IN THE ASU
      EOP HUB AND PSU CERTIFICATION PROCESS. .................................... 1

B.    DEFENDANTS' LIST OMITS MANY KEY INDICATORS THAT
      ARE ALREADY PART OF CQIT. ................................................................ 2

      1.    "Treatment Attended" .......................................................................... 3

      2.    "Programs with More Than One Type of Group Offered" ................. 4

      3.    "SREs [Suicide Risk Evaluations] that Met All Audit Criteria" .......... 4

      4.    "5-Day Follow-Ups With Documentation of Current
            Suicidality" ........................................................................................ 4

      5.    "Discharges from MHCB with Clinician Review of D/C
            [Discharge] Summary" ....................................................................... 5

      6.    "Percentage of Patients in Alt Housing with a Bed" .......................... 5

      7.    "IDTTs Meeting All Audit Criteria" .................................................... 6

      8.    "IDTTs Observed in Which Management of Patients Resistant
            to TX [Treatment] is Addressed Through an Individualized TX
            [Treatment] Intervention and Goals With Custody Input" ................. 6

      9.    IDTTs with Measurable Treatment Goals" .......................................... 6

      10.   "Patients Without Conflicting Diagnosis" ........................................... 6

      11.   "EOP and CCCMS with No Provisional or Rule Out DX
            [Diagnosis] Over 90 Calendar Days" ................................................. 7

      12.   "RVRs issued in violation of Title 15 section 3317.2 or for
            refusing to attend a ducated mental health appointment" ................... 7

      13.   "RVRs Recommended for Mitigation That Were Mitigated" ............. 7

      14.   "Percentage of RVRs that Were Mitigated" ........................................ 8

      15.   "RVRs Requiring MHAs Where Officer Agreed with MH
            Clinicians Recommendation for Alternative Documentation of
            Behavior" ............................................................................................ 8

      16.   "Compare Percent of Inmate Overall that Received RVRs with
            Percentage of MH Inmates that Received RVRs" ............................... 8

17. "RVR MH Assessments Conducted in Private Setting" ..................... 8

18. "Use of Force Involving MH Inmates" ................................................ 8

19. "Warden Review of [Segregation] Cases Over 90 Days" ................... 9

20. "EOP Hub CCII and Captain Review for LOS Over 90 Days" ........... 9

21. "Percentage of Inmates with LOS Over 150 Days in which ASU Case Reviews were Completed On Time" ................................. 9

22. "Percentage of Initial ICCs Reviewed and Held within 10 Calendar Days of Arrival" ................................................................... 10

23. "Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors" ......................................................... 10

24. "High Refusers Due to Custody Reasons with Documented Plan of Action" ...................................................................................... 10

25. "Percentage of Psych Tech Round Documentation That Meets All Audit Criteria" ............................................................................... 10

26. "Percentage of PT rounds Documented While at Cell Front" ........... 11

27. "Psych Tech Rounds Where EC [Effective Communication] and Interaction with Patient are Achieved/Attempted and Appropriate Referrals are Made as Indicated" ................................... 11

28. "Percentage of Psych Tech Rounds meeting General Process Requirements" ...................................................................................... 11

29. "Percentage of Nursing Staff Current with CPR Training" ............... 11

30. "Custody Officers with CPR Training" ............................................. 11

31. "Percentage of Peace Officers Observed to Carry their CPR Mouth Shield" ...................................................................................... 11

32. "Percentage of Eligible MHSDS Patients Receiving Milestone Credits" ................................................................................................. 11

33. "Adequate Group Treatment Space" .................................................. 12

34. "Adequate IDTT Space" .................................................................... 12

35. "Adequate Individual Treatment Space" ........................................... 12

36. "Percentage of Clinical Restraint Occurrences Meetings All of the Audit Criteria" ............................................................................... 12

37. "Seclusion Duration" and "Seclusion Rate" ...................................... 12

C.   REMEDIAL REQUIREMENTS FOR WHICH INDICATORS SHOULD BE DEVELOPED ......................................................... 13

1.   Keeping Patients in the EOP Minimum of 90 Days After Segregation Discharge ......................................................................... 13

2.   Mental Health Crisis Bed Intake Assessments .................................... 13

3.   Psychiatrist Services Unit (PSU) Behavioral Incentive Programs ........................................................................................... 14

4.   Documentation of Custody-Clinical Contacts ..................................... 14

5.   5-Day Follow Ups After Discharge from Intermediate and Acute Inpatient Care ........................................................................... 14

6.   CCCMS Class Members in Minimum Support Facilities (MSFs) ............................................................................................... 14

7.   Non-disciplinary Segregation (NDS) .................................................. 14

8.   Controlled Versus Immediate Uses of Force ...................................... 15

9.   Procedures for Mental Health Assessment of Inmate Indecent Exposure and Treatment for Exhibitionism ........................................ 15

10.  Least Restrictive Housing [LRH] in Inpatient Settings ...................... 15

CONCLUSION ................................................................................................. 16

ORDERS REVIEWED ..................................................................................... 16

ACRONYMS AND ABBREVIATIONS USED ............................................... 17

**PLAINTIFFS' OBJECTIONS TO DEFENDANTS' RESPONSE TO DECEMBER 17, 2020 ORDER RE CQIT INDICATORS**

Plaintiffs object to the list of "key" indicators filed by Defendants on March 17, 2021 at Docket No. 7089.  The Court directed Defendants to update the indicators in Defendants' Continuous Quality Improvement Tool ("CQIT") to account for requirements added to the Program Guides as memorialized by the filings at Docket No. 5864-1 (July 30, 2018), and the Compendium of custody-related requirements at Docket No. 6431 (December 19, 2019).  If done in compliance with the Court's orders, this was to be an additive process, capturing items agreed to after CQIT was developed during the period between 2012 and 2017.  Instead, Defendants have chosen to *subtract* requirements, to remove items from its list of "key" indicators even where the items measure functions that are absolutely necessary to protect class members from serious harm and death.

As required by the Court's orders, the Special Master has included Plaintiffs' counsel in discussions regarding Defendants' lists during the past several weeks. Plaintiffs' counsel has taken a practical approach.  Plaintiffs' counsel does not insist that every single indicator is "key" to measuring compliance.  Defendants, however, have gone much too far in trimming the list of indicators, as explained below.

A.     **KEY INDICATORS ARE NOT LIMITED TO THOSE IN CQIT; THEY ALSO INCLUDE INDICATORS SEPARATELY REPORTED TO THE COURT AND THOSE USED IN THE ASU EOP HUB AND PSU CERTIFICATION PROCESS.**

On September 3, 2020, this Court issued an order addressing benchmarks for compliance.  (ECF No. 6846.)  That Order identified several sources of benchmarks that currently lie outside CQIT.  Plaintiffs have asked that these areas be added to CQIT so that Defendants can work with one centralized set of key indicators.  Defendants have declined, and stated that they prefer to track and report compliance on these benchmarks separately. These non-CQIT indicators include:

1.     "Semi-annual mental health population projection plans"  (ECF No. 6846 at 5.)

2.     "[S]hort-term, intermediate and long-range bed plans" (*Id.*)

3.      Staffing (*Id.* at 5, 21.)

4.      "Custody and Mental Health Partnership Plan (CMHPP)" (*Id.* at 6, 23.)

5.      "Transfer Timelines to Inpatient Care"  (*Id.* at 20.)

6.      Transfer Timelines to Mental Health Crisis Bed Care  (*Id.* at 21.)

7.      Suicide Prevention Measures  (*Id.* at 21-22.)

8.      Transfers out of desert institutions  (*Id.* at 23.)

In addition to the list above from the September 3, 2020 benchmarks order, any set of "key" indicators must also include the indicators that Defendants use for periodic certification of Administrative Segregation Unit (ASU) EOP Hubs and Psychiatric Services Units (PSUs) under this Court's order of April 10, 2014, which prohibited housing of class members in certain restrictive units unless Defendants certify monthly that the units meet Program Guide requirements.  *Coleman v. Brown*, 28 F.Supp.3d 1068, 1109 (E.D. Cal. 2014).  By definition, the indicators used in this process signal whether class members can receive adequate care.  They must be included as "key" indicators in any set of benchmarks.

Whatever happens with the CQIT "key" indicators, any set of benchmarks for compliance will have to include indicators for the above-listed compliance areas that Defendants have chosen to exclude from CQIT.

### B.      DEFENDANTS' LIST OMITS MANY KEY INDICATORS THAT ARE ALREADY PART OF CQIT.

Defendants have chosen a very limited list of "key" indicators, over the objection of Plaintiffs' counsel during the meet and confer process in response to this Court's orders of September 3, 2020 (ECF No. 6846) and December 17, 2020 (ECF No. 6996).  The Court noted in the September 3, 2020 Order that "[t]he 'key indicators' in CQIT are likely equivalent to the material provisions of the Program Guide and the Compendium that may not be modified without court approval."  (ECF No. 6846 at 24 n.11.)  In the briefing leading up to the December 17, 2020 Order, Defendants argued for a small set of key indicators, contending that some CQIT indicators only serve to "inspire best practices" and

thus should not be included in any set of benchmarks for constitutional compliance.  (ECF No. 6996 at 5.)  The December 17, 2020 Order stated that the CQIT indicators serve a dual purpose.  First, they are part of the quality improvement program that is an essential component of the remedy.  Second, they include "key" indicators that serve "separate remedial functions by facilitating assessment of the degree to which full implementation of the remedial plans in this action remains to accomplished."  *Id.*  Both purposes require a comprehensive list that captures all functions necessary to prevent needless suffering and death among class members, and all parts of the remedy necessary to prevent such suffering and death.

Plaintiffs have taken a practical and flexible approach to the "key" indicators task, not insisting that every single CQIT indicator be included as "key," but at the same time pressing for indicators to be included as "key" if they directly measure whether class members are receiving minimally adequate care, and whether the remedies ordered by this Court are being implemented in an effective way.

Below, Plaintiffs identify the CQIT indicators that remain missing from Defendants' list.

### 1.    "Treatment Attended"

Defendants contend that this indicator is "informational" only.  They choose to track only the "treatment offered."  Such an approach encourages only formal compliance.  "Treatment attended" should also be treated as key in order to ensure that treatment obstacles such as scheduling, lock downs, and shortage of custody staff do not prevent the actual provision of  treatment.  "Defendants' ultimate constitutional obligation is to provide the tens of thousands of seriously mentally ill inmates in their custody with 'access to adequate mental health care.'" (Dec. 17, 2020 Order, ECF No. 6996 at 8 (quoting *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995)).)  Measuring whether patients are actually attending treatment is a critical indicator of whether Defendants are meeting this obligation.

### 2.      "Programs with More Than One Type of Group Offered"

This indicator is shown as neither "key" nor "informational" in Defendants' March 17, 2021 filing because they propose to decommission it entirely from CQIT.  This indicator should be kept in CQIT and treated as "key" to overall compliance.

Defendants contend that this indicator need not be "key" because it applies only to CCCMS programs.  CCCMS patients, however, are the vast majority of the class. Providing adequate programs to the CCCMS patients prevents decompensation that results in persons needing the higher levels of care.  The Program Guide requires that patients receive various scheduled structured therapeutic treatment activities.  (*See, e.g.*, Program Guide at 12-3-3, 12-3-11 (CCCMS); 12-4-9 to 12-4-11 (EOP), ECF No. 5864-1 at 35, 43, 58-59.)  If a program were to only provide one type of group (for example, only recreational therapy, but no other therapeutic groups), that would signal it is falling below the minimum treatment requirements mandated by the Program Guide.  The indicator also needs to be corrected to include EOP programs, which apparently are not currently measured at all.

### 3.      "SREs [Suicide Risk Evaluations] that Met All Audit Criteria"

As the Special Master stated in his fourth suicide prevention re-audit report, "[c]ompletion of suicide risk evaluations for inmates presenting as possible risks for suicide must be automatic … because failure to complete such evaluations can result in death by suicide within CDCR facilities."  (ECF No. 6879 at 19.)  Indeed, the suicide prevention report's Recommendation 10, adopted by the Court, requires that "[e]ach facility's SPRFIT [Suicide Prevention and Response Focused Improvement Team] should audit the quality of completed SREs on a monthly basis."  (*See* Dec. 24, 2020 Order, ECF No. 7004 at 5.)

### 4.      "5-Day Follow-Ups With Documentation of Current Suicidality"

Adequacy of "five-day clinical follow-ups for MHCB, Alternative Housing, DSH, and Psychiatric Inpatient Program (PIP) returns" is one of the Special Master's suicide prevention expert's 19 Suicide Prevention Audit Checklist measures.  (*See* Fourth Re-

Audit, ECF No. 6879-1 at 35 n.10.)  The requirement that "any CQI audit report of a facility's suicide prevention practices … contain data on all 19 suicide prevention measures," is part of the Fourth Re-Audit's Recommendation 32, which has been adopted by the Court.  (*See* Special Master Report on Fourth Re-Audit, ECF No. 6879 at 24; Dec. 24, 2020 Order, ECF No. 7004 at 6.)

### 5. "Discharges from MHCB with Clinician Review of D/C [Discharge] Summary"

The Program Guide requires that "[c]oncurrent with the implementation of the discharge plan or within 21 days of the inmate-patient's discharge from the MHCB, the Chief of Mental Health at the institution where the inmate-patient was transferred will audit the implementation of the discharge plan and follow-up care."  (Program Guide at 12-5-29, ECF No. 5864-1 at 99.)  The Special Master's suicide prevention expert highlighted the critical importance of discharge planning, including development of adequate safety plans, in his most recent audit.  (*See, e.g.*, Fourth Re-Audit, ECF No. 6879-1 at 23-24.)

### 6. "Percentage of Patients in Alt Housing with a Bed"

Policy 12.05.301 ("Housing of Patients Pending Mental Health Crisis Bed Transfer"), which is incorporated into the 2018 Program Guide at ECF No. 5864-1 at 342, requires that "[w]hile in alternative housing pending transfer, patients shall be provided at minimum, with a safety (no-tear) mattress …."  (*Id.* at 343.)  Compliance with this policy has been lacking.  As the Special Master's suicide prevention expert has found, "suicidal inmates placed in alternative housing were often placed in hazardous, unsafe cells …. [M]any suicidal inmates were housed in these locations for more than 24 hours and oftentimes not provided a bunk, instead having to sleep on a mattress on the floor thus increasing the possibility that an otherwise suicidal inmate would deny their SI to avoid continued perceived punitive conditions."  (Fourth Re-Audit, ECF No. 6879-1 at 12-13.) The most recent audit found that long stays in alternative housing persist at some institutions.  (*Id.*)

### 7.    "IDTTs Meeting All Audit Criteria"

IDTTs are central to patients' treatment at all levels of care and required under the Program Guide.  (*See, e.g.*, Program Guide at 12-4-1, ECF No. 5864-1 at 50 ("Critical components [of the EOP program] include: [a] comprehensive array of mental health services delivered within the framework of an [IDTT]."); 12-5-13, ECF No. 5864-1 at 83 (IDTTs must occur "at least weekly" for MHCB patients).  Several 2018 Program Guide pocket part policies highlight the numerous important functions of IDTTs.  (*See, e.g.*, 14-0128 Policy – Interdisciplinary Treatment Team (IDTT) Level of Care Decision 12.01.200, ECF No. 5864-1 at 235; 14-0303 Memo – Interdisciplinary Treatment Team (IDTT) Review of Inmate-Patients Ability to Participate in Program Assignments, ECF No. 5864-1 at 319.)  Ensuring that IDTTs meet all audit criteria is "key" to determining whether these material provisions of the Program Guide are met.  In addition, this indicator is part of Defendants' ASU-EOP Hub and Psychiatric Services Unit periodic certification process, another reason it should be included as "key" indicator.

### 8.    "IDTTs Observed in Which Management of Patients Resistant to TX [Treatment] is Addressed Through an Individualized TX [Treatment] Intervention and Goals With Custody Input"

See item number 7 above.

### 9.    IDTTs with Measurable Treatment Goals"

See item number 7 above.

### 10.    "Patients Without Conflicting Diagnosis"

The Program Guide requires that a patient's "mental health treatment plan must include a detailed description of the [patient's] diagnosis."  (Program Guide at 12-4-8, ECF No. 5864-1 at 57; *see also* Program Guide at 12-3-10, ECF No. 5864-1 at 42 ("The treatment plan includes … a diagnosis").)  The Special Master's most recent report found that care in Defendants' institutions was not sufficiently individualized to address patients' clinical needs in part because "diagnoses in inmates' records required clarification" and "conflicting or multiple diagnoses required resolution."  (Special Master's 28th Round Report, ECF No. 7074 at 117-19.)

**11.    "EOP and CCCMS with No Provisional or Rule Out DX [Diagnosis] Over 90 Calendar Days"**

See item number 10 above.

**12.    "RVRs issued in violation of Title 15 section 3317.2 or for refusing to attend a ducated mental health appointment"**

This indicator is shown as neither "key" nor "informational" in Defendants' March 17, 2021 filing because they propose to decommission it entirely from CQIT.  This indicator should be kept in CQIT and treated as "key" to overall compliance.

The prohibition on disciplining patients for refusing to attend treatment is a core part of the post-2013 remedy in use of force and inmate discipline.  (*See* Compendium, ECF No. 6431 at 5 (listing Title 15 section 3317.2 as a custody-related remedial measure); 2018 Program Guide, ECF No. 5864-1 at 241 (July 5, 2017 Memo – Mental Health Appointment Refusals) & 250 (July 2016 CCHCS Memo – Scheduling and Access to Care Procedure).)  A system that imposes disciplinary sanctions in response to mental health symptoms is not in compliance with the Eighth Amendment or this Court's prior orders.

**13.    "RVRs Recommended for Mitigation That Were Mitigated"**

This indicator is shown as neither "key" nor "informational" in Defendants' March 17, 2021 filing because they propose to decommission it entirely from CQIT.  This indicator should be kept in CQIT and treated as "key" to overall compliance.

The *Coleman* RVR remedy includes mandatory diversion from the RVR process in various instances set forth in Title 15 and the 2018 Program Guide, and discretionary diversion in other instances where mental health impacted the behavior.  (*See, e.g.*, Compendium, ECF No. 6431 at 5 (listing Title 15 and DOM provisions related to the RVR process); 2018 Program Guide, ECF No. 5864-1 at 241, 250; *see also, e.g.*, May 4, 2015 Order in Response to the Special Master's Report on CDCR's Implementation of Policies and Procedure on Rules Violation Reports, ECF No. 5305.)  The Special Master's most recent report identified "multiple institutions [that] were noncompliant with basic requirements of the RVR process."  (Special Master's 28th Round Report, ECF No. 7074 at 156.)  The requirement to provide and incorporate mental health input into the RVR

process is a dead letter if it is never or rarely acted upon.  This indicator is key.

### 14.   "Percentage of RVRs that Were Mitigated"

This indicator is shown as neither "key" nor "informational" in Defendants' March 17, 2021 filing because they propose to decommission it entirely from CQIT.  This indicator should be kept in CQIT and treated as "key" to overall compliance.

See numbers 12 and 13 above.

### 15.   "RVRs Requiring MHAs Where Officer Agreed with MH Clinicians Recommendation for Alternative Documentation of Behavior"

This indicator is shown as neither "key" nor "informational" in Defendants' March 17, 2021 filing because they propose to decommission it entirely from CQIT.  This indicator should be kept in CQIT and treated as "key" to overall compliance.

See numbers 12 and 13 above.

### 16.   "Compare Percent of Inmate Overall that Received RVRs with Percentage of MH Inmates that Received RVRs"

See numbers 12 and 13 above.

### 17.   "RVR MH Assessments Conducted in Private Setting"

See numbers 12 and 13 above.  CDCR's 2015 RVR policies, incorporated into the 2018 Program Guide, require that the mental health assessor "[i]nterview the patient who is the subject of the RVR in a private setting."  (Oct. 21, 2015 Policy Re: RVR MHA 12.07.601(P1), 2018 Program Guide, ECF No. 5864-1 at 262; *cf.* CCR Title 15, Section 3317 (requiring "clinical input" in RVR process) (incorporated into Compendium, ECF No. 6431 at 5).)

### 18.   "Use of Force Involving MH Inmates"

The post-2013 remedies in this case include limitations on the use of force against persons with mental illness, and in situations where a person's behavior is influence by symptoms of mental illness.  In the related *Armstrong* litigation, the court has received evidence that Defendants are tolerating a pattern of practice of custody officers targeting mentally ill prisoners for improper uses of force.  See *Armstrong v. Newsom,* 484 F. Supp.

8

1  3d 808 (N.D. Cal. 2020); *Armstrong v. Newsom,* 2021 WL 933106 (N.D. Cal. Mar. 11

2  2021).

3  **19.    "Warden Review of [Segregation] Cases Over 90 Days"**

4          The Court found that confinement in administrative segregation units creates

5  substantial risks of serious harm to the health and safety of all persons with serious mental

6  illness, including and particularly persons at the EOP level of care.  *Coleman v. Brown*, 28

7  F. Supp. 3d 1068, 1093-95, 1103 (E.D. Cal. 2014).  In recognition of these dangers, the

8  Program Guide requires that

9              [i]nmate-patients housed in ASU for more than 90 days shall
             be reviewed every 30 days outside of the ICC process, by the
10            Facility Captain and Correctional Counselor II.  The status of
             each case, with detailed information regarding reasons for
11            delays in the referral, disciplinary, classification, and/or
             transfer process, shall be compiled and reviewed by the
12            Warden or designee (Chief Deputy Warden, or Associate
             Warden for Health Care). The Warden shall ensure that
13            reviewers take action to resolve any issues that impact length
             of stay in ASU.
14
15  (Program Guide at 12-7-9, ECF No. 5864-1 at 133.)  Class members face substantial risks

16  of serious harm from prolonged administrative segregation conditions even if they receive

17  a review of their placement every 30 days.  The remedy uses timely reviews to mitigate the

    harms.  In addition, this indicator is part of Defendants' ASU-EOP Hub and Psychiatric
18
    Services Unit periodic certification process, another reason it should be included as "key"
19
    indicator.
20
21  **20.    "EOP Hub CCII and Captain Review for LOS Over 90 Days"**

            See number 19 above.
22
23  **21.    "Percentage of Inmates with LOS Over 150 Days in which ASU
            Case Reviews were Completed On Time"**

24          See number 19 above.  This indicator measures the September 15, 2014 memo

25  mandating priority case-by-case review of all patients housed in ASU over 150 days.  (See

26  2018 Program Guide at 5864-1 at 505.)  Defendants clarified that this indicator measures

27  review of patients in all segregation settings (including SHU and PSU, as required by the

28  2018 Program Guide, ECF No. 5684-1 at 505-509).

[3707891.2]

PLAINTIFFS' OBJECTIONS RE CQIT INDICATORS

**22.    "Percentage of Initial ICCs Reviewed and Held within 10 Calendar Days of Arrival"**

See number 19 above.  The August 14, 2014 memo mandating that the ICC occur within 10 days (incorporated into the 2018 Program Guide at ECF No. 5864-1 at 495) is another remedy from the 2014 segregation trial.  The 10 days plus 72 hours timeframe for moving NDS patients out of segregation was ordered by the Court in 2014.  (*See* Aug. 11, 2014 Order, ECF No. 5196 at 2 n.1.)  This indicator is "key" to evaluating Defendants' compliance with the August 2014 memo and 2014 Court orders.

**23.    "Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors"**

Welfare check compliance is one of the Special Master's suicide prevention expert's 19 Suicide Prevention Audit Checklist measures.  (*See* Fourth Re-Audit, ECF No. 6879-1 at 35 n.10.)  Welfare checks are "key" to mitigating the substantial risks of serious harm posed by administrative segregation environments.  *See Coleman v. Brown*, 28 F. Supp. 3d 1068, 1093-95, 1103 (E.D. Cal. 2014).

**24.    "High Refusers Due to Custody Reasons with Documented Plan of Action"**

This is required by the February 25, 2015 memo "Review of Refusal to Attend Mental Health Treatment By ASU EOP Hub and PSU Inmates," incorporated into the 2018 Program Guide at ECF No. 5864-1 at 437.

**25.    "Percentage of Psych Tech Round Documentation That Meets All Audit Criteria"**

This is one of 19 Suicide Prevention Audit Checklist measures.  (*See* Fourth Re-Audit, ECF No. 6879-1 at 35 n.10.)  The requirement that "any CQI audit report of a facility's suicide prevention practices … contain data on all 19 suicide prevention measures," is part of the Fourth Re-Audit's Recommendation 32, which has been adopted by the Court.  (*See* Special Master Report on Fourth Re-Audit, ECF No. 6879 at 24; Dec. 24, 2020 Order, ECF No. 7004 at 6.)

The suicide prevention expert's Recommendation 20 (adopted by this Court) also requires that "CDCR should develop a corrective action plan to ensure that supervising

nursing staff regularly audits psych tech practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs." (*See* Dec. 24, 2020 Order, ECF No. 7004 at 6.)  Like custody welfare checks, psych tech rounding in administrative segregation units is "key" to mitigating the substantial risks of serious harm posed by those environments.  *See Coleman v. Brown*, 28 F. Supp. 3d 1068, 1093-95, 1103 (E.D. Cal. 2014).

26.   **"Percentage of PT rounds Documented While at Cell Front"**

See item number 25 above.

27.   **"Psych Tech Rounds Where EC [Effective Communication] and Interaction with Patient are Achieved/Attempted and Appropriate Referrals are Made as Indicated"**

See item number 25 above.

28.   **"Percentage of Psych Tech Rounds meeting General Process Requirements"**

See item number 25 above.

29.   **"Percentage of Nursing Staff Current with CPR Training"**

See item number 25 above.

30.   **"Custody Officers with CPR Training"**

See item number 25 above.

31.   **"Percentage of Peace Officers Observed to Carry their CPR Mouth Shield"**

See item number 25 above.

32.   **"Percentage of Eligible MHSDS Patients Receiving Milestone Credits"**

This is a key measure of material provisions of the 2018 Program Guide and Compendium that arose from the *Hecker* litigation.  (*See, e.g.*, 2018 Program Guide, ECF No. 6864-1 at 574 (September 24, 2015 Memo Re: EOP Milestone Credit Group Therapy) & 602; Compendium, ECF No. 6431 at 4 ("CCR Title 15, Section 3043.3, subdivision (f)(2), regarding Credit Earning.  This regulation codifies provisions of the July 7, 2014, memo Milestone Completion Credits for Participants in the Mental Health Services

1  Delivery System at the Enhanced Outpatient Program Level of Care.").)

2  ### 33.  "Adequate Group Treatment Space"

3  As set forth in the Special Master's 27th Round Report, shortages in adequate

4  mental health treatment spaces negatively impact Defendants' ability to provide adequate

5  care.  (*See* ECF No. 5779 at 126.)  The Special Master recently found that "[t]hese

6  challenges continued through the Twenty-Eighth Round."  (ECF No. 7074 at 175.)

7  Defendants cannot meet their "ultimate constitutional obligation … to provide the tens of

8  thousands of seriously mentally ill inmates in their custody with 'access to adequate

9  mental health care'" without adequate treatment space.  (*See* Dec. 17, 2021 Order, ECF

10  No. 6996 at 8 (quoting *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995).)

11  ### 34.  "Adequate IDTT Space"

12  As noted above, lack of adequate IDTT space has historically hindered patients'

13  access to treatment required by the Program Guide.  Although the Special Master found

14  that this issue had improved in his most recent report, "there were three institutions where

15  treatment space for holding team meetings were observed to be inadequate."  (Special

16  Master's 28th Round Report, ECF No. 7074 at 110.)

17  ### 35.  "Adequate Individual Treatment Space"

18  See item number 34 above.

19  ### 36.  "Percentage of Clinical Restraint Occurrences Meetings All of the Audit Criteria"

20
21  The March 1, 2016 memo – Use of Mechanical Restraints in MHCB Unit, describes

21  when such restraints may be used.  (*See* 2018 Program Guide, ECF No. 5864-1 at 372.)

22  There are also numerous provisions in the Program Guide about restraint use, signaling the

23  materiality of these provisions.  (*See* Program Guide at 12-5-17 to 12-5-23, ECF No. 5864-

24  1 at 87-93.)

25  ### 37.  "Seclusion Duration" and "Seclusion Rate"

26  Defendants contend that these indicators are "informational" only.  (ECF No. 7089-

27  1 at 9.)  Because the Program Guide mandates numerous requirements for use of seclusion,

28

1    these indicators are key.  *See* Program Guide at 12-5-23, ECF No. 5864-1 at 93

2    ("Seclusion shall only be used on a written or verbal order by an authorized clinician;"

3    "The initial order for seclusion shall not exceed four hours;"), 12-5-24, ECF No. 5864-1 at

4    94 ("Subsequent orders for continuation of seclusion shall not exceed four hours."), 12-5-

5    25, ECF No. 5864-1 at 95 ("During the entire period of seclusion, the inmate-patient shall

6    remain on direct one on one nursing observation;" patients in seclusion must be checked

7    by a nurse within the first 15 minutes, by a physician or nurse practitioner in the first 4

8    hours, and after these initial checks, by a nurse every 4 hours and by an authorized

9    clinician every 24 hours; every 15 minutes, the nurse must offer fluids and nourishment

10   and every hour the nurse must evaluate the patient's need for "toileting, exercise, personal

11   hygiene products, temperature, room environment, and cleanliness.").  Indicators are

12   needed to ensure that these requirements are being met.

## C.   REMEDIAL REQUIREMENTS FOR WHICH INDICATORS SHOULD BE DEVELOPED

In addition to matters already reported to the Court (Section A, above), and matters

already tracked in CQIT (Section B, above), there are remedial requirements not yet

tracked in CQIT that should be covered by "key" indicators to assess compliance.  These

are listed below.

### 1.   Keeping Patients in the EOP Minimum of 90 Days After Segregation Discharge

Patients "referred from the ASU or PSU to a GP-EOP Unit shall be retained at the

EOP level of care for a minimum of 90 days" to support "adjustment to the GP

environment."  (Program Guide at 12-4-8, ECF 5864-1 at 57.)  This is an essential measure

of the system's ability to prevent harm to patients caused by segregation stays.

### 2.   Mental Health Crisis Bed Intake Assessments

This must occur within 24 hours of placement.  (Program Guide at 12-5-11, ECF

5864-1 at 81.)  The assessment is necessary "to meet the critical needs of the seriously

mentally disordered inmate-patient" and "to rule out medical conditions that may be a

cause of presenting symptoms."  (*Id.*)

### 3.    Psychiatrist Services Unit (PSU) Behavioral Incentive Programs

The Program Guide requires that "[e]ach PSU shall have a behavioral incentive program with criteria for achieving and retaining each level." Program Guide at 12-9-7, ECF 5864-1 at 159. The proper operation of these behavioral incentive programs is necessary to remove custody-based obstacles to mental health care.

### 4.    Documentation of Custody-Clinical Contacts.

The Program Guide pocket part memos include a requirement that when clinicians consult with custody staff about mental health needs, the clinicians include the name of the clinician in the patient's mental health records. (May 8, 2015 Memo – Consulting Staff Name Documentation in Healthcare Records, ECF No. 5864-1 at 270.) This requirement serves an essential purpose to address custody-based obstacles to care. It should be tracked with a "key" indicator.

### 5.    5-Day Follow Ups After Discharge from Intermediate and Acute Inpatient Care.

Patients returning to regular housing or EOP housing are to receive 5-day follow-up evaluations under the Program Guide pocket parts. (ECF No. 5864-1 at 367-370.) This is a suicide prevention measure and should be included as a "key" indicator. (*See* Fourth Re-Audit, ECF No. 6879-1 at 35 n.10.) The existing 5-day follow-up indicators in Defendants' March 17, 2021 filing at ECF No. 7089-1 at 3 may cover only MHCB discharge follow-ups, not inpatient discharge follow-ups.

### 6.    CCCMS Class Members in Minimum Support Facilities (MSFs)

Part of the *Hecker* access remedy removes mental health barriers to accessing Level I Minimum Support Facilities. The Program Guide pocket parts include a requirement of CCCMS access to MSFs. (ECF No. 5864-1 at 284-298.) The compliance benchmarks must include an indicator to determine whether CCCMS class members are receiving this access.

### 7.    Non-disciplinary Segregation (NDS)

After trial findings on the harms of administration segregation to class members, the

1   Court ordered removal of class members housed in segregation for non-disciplinary

2   reasons. *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1099-1100 (E.D. Cal. 2014).  These

3   findings resulted in several Program Guide pocket part policies that are missing from

4   Defendants' list of key indicators.  (*See* ECF No. 5864-1 at 495-498, 500-503.)

### 8.   Controlled Versus Immediate Uses of Force

6   The post-2013 remedial measures create a bright line between "controlled" uses of

7   force and "immediate" uses of force, as well as limits on uses of force in both situations

8   where staff have the opportunity to de-escalate the situation without force.

> The differences between these two categories are significant to
> the remedy in this case. "Immediate" uses of force are applied
> without the reflection and intervention that can avoid or
> prevent the serious harm suffered by members of the plaintiff
> class when force is used. See RT at 1967:6–12. Thus, the
> definition of immediate use of force must be adequate to
> exclude uses of force in circumstances where "time, distance
> and delay" can be taken before force is used.

*Coleman*, 28 F.Supp.3d at 1081–82; *see* ECF No. 5864-1 at 543-563, 568-573.

Defendants have not updated CQIT to track these requirements, much less included any

"key" indicators in their recent filing.

### 9.   Procedures for Mental Health Assessment of Inmate Indecent Exposure and Treatment for Exhibitionism

18   The Compendium includes the Court's March 12, 2007 order on assessment and

19   treatment of exhibitionism (ECF No. 2157), as well as the policy memos arising from the

20   March 12, 2007 order.  (*See* ECF No. 6431 at 5, 7 (Aug. 31, 2007 Amended Policy for

21   Adult Males Referred for Treatment of Exhibitionism.)  These remedial measures are

22   critical to prevent overuse of segregation and use of force.  Defendants have presented no

23   indicators that can be used as benchmarks for compliance.

### 10.   Least Restrictive Housing [LRH] in Inpatient Settings

25   Defendants have presented no indicators measuring the requirements of the June 30,

26   2017, Policy Housing Review/Least Restrictive Housing (12.11.2111), which is part of the

27   Compendium.  (ECF No. 6431 at 5.)  Defendants' inpatient programs are plagued with

28   custody-based obstacles to care, including holding patients in locked-down units that

severely limit individual and group treatment.  In order to address these problems, patients are to be moved out of locked down units to the "least restrictive housing" compatible with their case factors.  (*See* Special Master's Inpatient Monitoring Report, May 25, 2016, ECF No. 5448 at 9, 120-122, Order of March 8, 2017, ECF No. 5573 (requiring "creation of a consistent and uniform patient level system to be utilized across all of its [DSH's] inpatient programs that treatment *Coleman* class members.")  In the January 2021 inpatient report, the Special Master found that Defendants "struggle with placing those patients for whom the setting is not contraindicated for clinical and/or custodial reasons in their LRH."  (ECF No. 7039 at 42.)  Defendants' performance in getting inpatients to least restrictive housing in inpatient programs should be a "key" indicator.

## CONCLUSION

For the reasons stated above, Plaintiffs' request that the Court reject the list of "key" indicators filed at Docket No. 7089 and direct Defendants to develop a comprehensive list in compliance with the Court's orders of September 3, 2020 and December 17, 2020.

DATED:  March 23, 2021                       Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP


By:  */s/ Ernest Galvan*
        Ernest Galvan

Attorneys for Plaintiffs


## ORDERS REVIEWED

By my signature above, I certify that I have reviewed the following orders in preparing these objections:

| Date | Docket | Subject |
|---|---|---|
| **12/24/2020** | 7004 | Suicide Prevention |
| **12/24/2020** | 7003 | Pre-filing requirements |
| **12/17/2020** | 6996 | Benchmarks |
| **9/3/2020** | 6846 | Benchmarks |
| **2/20/2019** | 6095 | Custody and Mental Health Partnership Plan |
| **3/8/2017** | 5573 | Inpatient Care |
| **5/1/2015** | 5305 | Discipline and Use of Force |
| **8/11/2014** | 5196 | Order Approving Use of Force, Discipline, and Segregation Plans |
| **4/10/2014** | 5131/5133 | Discipline and Use of Force; 28 F. Supp. 3d 1068. |
| **3/12/2007** | 2157 | Assessment and Treatment of Exhibitionism |

## ACRONYMS AND ABBREVIATIONS USED

| ACRONYM | FULL TEXT |
|---|---|
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System |
| CCHCS | California Correctional Health Care Services |
| CCII | Correctional Counselor II |
| CCR | California Code of Regulations |
| CDCR | California Department of Corrections and Rehabilitation |
| CMHPP | Custody and Mental Health Partnership Plan |
| CPR | Cardiopulmonary Resuscitation |
| CQIT | Continuous Quality Improvement Tool |
| D/C | Discharge |
| DOM | Department Operations Manual |
| DSH | Department of State Hospitals |

[3707891.2]

PLAINTIFFS' OBJECTIONS RE CQIT INDICATORS

| ACRONYM | FULL TEXT |
|---------|-----------|
| DX | Diagnosis |
| EC | Effective Communication |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| ICC | Institution Classification Committee |
| IDTT | Interdisciplinary Treatment Team |
| LOS | Length of Stay |
| LRH | Least Restrictive Housing |
| MH | Mental Health |
| MHA | Mental Health Assessment |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| MSF | Minimum Support Facilities |
| NDS | Non-disciplinary Segregation |
| PIP | Psychiatric Inpatient Program |
| PSU | Psychiatric Services Unit |
| PT | Psychiatric Technician |
| RVR | Rules Violation Report |
| SHU | Security Housing Unit |
| SPRFIT | Suicide Prevention and Response Focused Improvement Team |
| SRE | Suicide Risk Evaluation |