1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF CALIFORNIA
2                     --oOo--

3   RALPH COLEMAN, ET AL,        ) Docket No. 90-CV-520
                                 ) Sacramento, California
4              Plaintiffs,       ) March 25, 2021
                                 ) 9:24 a.m.
5        v.                      )
                                 )
6   GAVIN NEWSOM, ET AL.,        ) Re: Status conference
                                 )
7              Defendants.       )

8          TRANSCRIPT OF PROCEEDINGS (Held via Zoom)
        BEFORE THE HONORABLE KIMBERLY J. MUELLER
9             UNITED STATES DISTRICT JUDGE

10  APPEARANCES (Via Zoom):

11  For the Plaintiffs:    ROSEN BIEN GALVAN & GRUNFELD, LLP by
                           MR. MICHAEL BIEN
12                         MS. LISA ADRIENNE ELLS
                           MS. CARA ELIZABETH TRAPANI
13                         MR. STEVE FAMA
                           MR. ERNEST GALVAN
14                         MR. ALEXANDER ROSS GOURSE
                           101 Mission Street, Sixth Floor
15                         San Francisco, CA 94105

16      (Appearances continued next page.)

17              JENNIFER COULTHARD, RMR, CRR
                   Official Court Reporter
18               501 I Street, Suite 4-200
                   Sacramento, CA 95814
19                jenrmrcrr2@gmail.com
                     (530)537-9312
20
        Mechanical Steno - Computer-Aided Transcription
21

22

23

24

25

```
 1    APPEARANCES (Via Zoom Cont'd)

 2    For the Defendant:        OFFICE OF THE ATTORNEY GENERAL by
                                MS. ELISE THORN
 3                              1300 I Street, Suite 125
                                Sacramento, CA 94244
 4
                                HANSON BRIDGETT, LLP by
 5                              MS. SAMANTHA DERIN WOLFF
                                425 Market Street, 26th Floor
 6                              San Francisco, CA 94105

 7                              MR. PAUL B. MELLO
                                1676 North California Blvd., Suite 620
 8                              Walnut Creek, CA 94596

 9    Also Present:            Special Master Matthew Lopes
                                Secretary Kathleen Allison,
10                              Director Stephanie Clendenin,
                                Dr. Joseph Bick
11                              Dr. Amar Mehta
                                Dr. Katherine Wharburton
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          SACRAMENTO, CALIFORNIA, THURSDAY, MARCH 26, 2021

2                              --oOo--

3          (In open court.)

4          THE CLERK:  Calling civil case 90-520, Coleman, et al.

5     v. Newsom, et al.  This is on for a status conference.

6          THE COURT:  All right.  Good morning.  I'll take

7     appearances.  First the Special Master, Special Master Lopes,

8     you're present?

9          SPECIAL MASTER LOPES:  I am, Your Honor.

10         THE COURT:  All right.  Good morning to you.

11         SPECIAL MASTER LOPES:  Good morning.

12         THE COURT:  For the plaintiffs, Mr. Bien?

13         MR. BIEN:  Good morning, Your Honor.  Michael Bien,

14    Ernie Galvan, Lisa Ells, Cara Trapani, Alexander Gourse and

15    Steve Fama on behalf of the plaintiff class.

16         THE COURT:  All right.  Good morning to you and your

17    team.

18         And for the defendants, let me acknowledge Ms. Thorn.

19    Is that fair, Ms. Thorn, to acknowledge you and have you

20    identify other members of your team present?

21         MS. THORN:  Yes.  Hello, Your Honor.  Good morning.

22         THE COURT:  Good morning.

23         MS. THORN:  I have with me appearing Mr. Paul Mello

24    and Samantha Wolff.  I'm sorry.

25         THE COURT:  I needed -- so as not to interfere, I was

1    asking you to identify members of your team.  I'm considering

2    you lead counsel with the Attorney General's Office; is that

3    fair?

4              MS. THORN:  That's correct, Your Honor.  Thank you.

5              THE COURT:  All right.

6              MS. THORN:  But Mr. Mello will be lead counsel for

7    defendants for today's status conference.

8              THE COURT:  Is he the one to acknowledge all of the

9    persons on the team, including the public sector attorneys

10   appearing here today?

11             MS. THORN:  Yes, Your Honor.

12             THE COURT:  I just want to make a record of who's

13   appearing.  I realize some people are monitoring, but if you'd

14   like to make a formal record of who's appearing, it would seem

15   to me you'd be the one that would identify the public sector

16   attorneys appearing.

17             MS. THORN:  Right.  Yes, Your Honor.  Thank you.

18             Just myself from the Office of the Attorney General

19   this morning, Your Honor.

20             THE COURT:  All right.  And Mr. Mello, you'd like to

21   state your appearance?

22             MR. MELLO:  Yes.  Paul Mello and Samantha Wolff also

23   for defendants.

24             In addition, our clients, Secretary Allison, Director

25   Clendenin, Drs. Bick, Mehta and Wharburton are present.  Thank

1   you, Your Honor.

2           THE COURT:  All right.  Good morning to all of you.

3           I note, as always, we have some observers, but is

4   anyone else appearing here today?  If so, please let me know

5   now.  All right.  I note we have some persons most

6   knowledgeable.

7           Here's the agenda for today.  It was set forth in my

8   February order, to make certain we're all on the same page.

9   We'll start by discussing CQIT.  There are some issues that

10  have now been raised.  I want to give you some sense of how the

11  Court perceives the filings so far and talk about a process to

12  finalize the CQIT tool.

13          Then we'll talk about return to program guide

14  compliance and here I'll give Ms. -- Secretary Allison a chance

15  to make some opening remarks.

16          And then I understand that Dr. Bick is the person most

17  knowledgeable for CDCR, and Director Clendenin and

18  Dr. Wharburton are the persons most knowledgeable for DSH.

19          Do I understand correctly that Dr. Mehta is here only

20  with respect to in-patient staffing?

21          MR. MELLO:  Your Honor, this is Paul Mello.  Dr. Mehta

22  will also speak to return to more normal operations.

23          THE COURT:  All right.  All right.  Thank you for that

24  clarification.

25          We'll ask the Special Master to provide an update for

1    his plans to return to on-site compliance monitoring, we'll

2    talk about in-patient staffing, some issues there.  I'd like to

3    get clarification from the parties on and also provide some

4    direction for moving forward.

5           At the end, I just want to check in briefly on what I

6    am seeing about desert institutions and clarify what is going

7    on there, given that summer is coming.  And I also want to talk

8    about the pending DSH transfer issue given, again, the

9    information I'm seeing on that.

10          Is there any other issue either party believes we need

11   to address today?  Mr. Bien?

12          MR. BIEN:  We have some -- nothing else that's a

13   motion.  We did want to give you a heads-up that we're going to

14   be filing -- I'll let Ms. Ells address the issue, please.

15          Lisa.

16          THE COURT:  Okay.  Just identify the issue for me,

17   Ms. Ells.  What's the issue?

18          MS. ELLS:  It regards compliance data for DSH staffing

19   that I intend to address during the DSH staffing portion of the

20   status conference.

21          THE COURT:  All right.  Anything else, Mr. Bien?

22   You're muted.

23          MR. BIEN:  Sorry, Your Honor.  No, Your Honor.

24          THE COURT:  All right.  So I gather, Mr. Mello, you're

25   covering everything.  So anything else you want to put on the

1    agenda for today?

2          MR. MELLO:  Just, Your Honor, in one of the prior

3    conferences you asked the secretary and the leaders if they had

4    any priority items in the next several months, and I think they

5    comport with what we're talking about.  But, of course, it's

6    returning to more normal operations; it's suicide prevention,

7    which is at the tip of their mind; it is working together and

8    completing data validation; and it, of course, probably

9    includes -- and, of course, Dr. Mehta can speak to this as

10   well -- it would include --

11         THE COURT:  What was the last thing you said, also

12   probably includes?

13         MR. MELLO:  Also probably includes lessons learned

14   from the last 13 months, but those are big picture items.  I

15   don't think they necessarily warrant a discussion, but those

16   are the items that they are focusing on going forward to the

17   extent they don't get sidetracked by emergencies or litigation.

18         Thank you, Your Honor.

19         THE COURT:  All right.  Thank you.  We'll add suicide

20   prevention to the other issues just to touch on at the end.

21   We've spent time on that issue, it's an important one.  The

22   Court remains very concerned about it, as I know Secretary

23   Allison is.  But if there's anything she would like to tell me

24   at the end just by way of a brief update, I'm happy to hear

25   that.

1          I've already indicated and as will become clear as we

2    proceed, at this point I'm scheduling statuses, for lack of a

3    better word "organically," so as the case demands.  And so if

4    there's a need for another status on suicide prevention, I'm

5    happy to talk about that.  I know I'm awaiting a report from

6    Mr. Hayes.

7          On lessons learned, if the persons most knowledgeable

8    or Secretary Allison wants to identify initial lessons learned

9    when we get to return to program guide compliance, that would

10   be an appropriate place to weave in any initial observations

11   that we might want to keep in mind as we talk about returning

12   to program guide compliance.

13         All right.  Let's start with CQIT then.  First of all,

14   I note the objections.  The defense requests to file objections

15   by -- or response to the objections by April 1st.  I'm going to

16   grant that request.  But here's my current thinking on CQIT, an

17   incredibly important tool in measuring quality, compliance

18   generally, I think we need to clarify.  The Court needs to

19   clarify for the parties, with more input from all of you, the

20   role of CQIT in terms of laying the foundation for durability

21   of compliance and whether or not everything gets rolled into

22   the CQIT or if there is some parallel reporting.  And I realize

23   there may be some lack of clarity on that point.  I'm going to

24   ask in just a moment for the Special Master to share any

25   thoughts he may have based on the direction in which things

1    were going before COVID, so that's one question.  Does

2    everything get rolled into CQIT?  Not every -- not every tiny

3    detail can be rolled into CQIT.  But what gets rolled into CQIT

4    and what other reports, if any, would continue and provide the

5    basis for the Court ultimately evaluating durability.  Those

6    are unanswered questions in the Court's mind right now.  But

7    one thing that is clear to the Court, I can't even tell you

8    it's just a tentative, but the CQIT indicators need to be

9    driven by the Constitution and the program guide, what the

10   program guide embodies.  And so I do not bless the suggestion

11   that the indicators are inextricably intertwined with the areas

12   where the defense believes it can achieve 90 percent

13   compliance.  First, the indicators get set.  And I understood

14   that the parties were well on pace with that before COVID.

15   Then we can talk about compliance and if there are exceptions

16   to 90 percent compliance for any indicator.

17           So that is -- that is the Court's understanding of how

18   we're proceeding.  And I believe that's consistent with, again,

19   the way the CQIT tool was on pace before COVID.  It doesn't

20   mean parties can't argue for exceptions to 90 percent

21   compliance, that's possible, but that comes afterwards.  It

22   should not prevent a constitutionally required indicator from

23   making it on to the CQIT tool list.

24           So that's what I have to say at this point.  Let me

25   ask the Special Master.  Is there a report you can share

1    regarding the direction you understood things were heading in

2    and any thoughts you have currently, Special Master Lopes?

3              SPECIAL MASTER LOPES:  Thank you, Your Honor.

4         When CQIT was built out some nine years ago, it was

5    with the intent of having a tool to measure quality

6    improvement, but it also was a monitoring tool that the

7    defendants could use to measure their compliance, and hopefully

8    in a sustainable way, so that they could ultimately exit the

9    case.

10        When the original CQIT was built, we could have taken

11   every single sentence from the program guide and made it an

12   indicator; and instead, what we did was, we looked at it as

13   significant benchmarks, if you will, that needed to be put into

14   CQIT.  So we didn't go through -- and I think there's been some

15   confusion maybe with both sides that we put together or that

16   the defendants built CQIT and add a line for every line in the

17   program guide.

18        CQIT was built on a number of indicators that were

19   significant, "key," if you will.  So as it was built out, we

20   then decided collectively to pick 10 institutions for review

21   using the tool.  And after those 10 institutions were subject

22   to a site inspection, the defendants put out 10 individual CQIT

23   reports.

24        We were going back and forth on those reports, and

25   everyone had concerns about them; but generally speaking, the

1    parties were in lock-step, in terms of the use of the tool, and

2    plaintiffs were invited to do the reviews with us.  They were

3    there.

4          We then had a subsequent round, based upon reviewing

5    the same 10 institutions, and we were waiting for the 10

6    individual reports to be distributed when the Golding report

7    was filed, so we never saw the 10 institutions, which was

8    concerning for my team.  And I believe the plaintiffs will

9    speak for themselves, but I believe it was concerning for them

10   as well because the reports were not timely and because there

11   were elements that were still under review and discussion that

12   may not have been captured in the monitoring process itself.

13   But all that said, things were moving in the right direction.

14         My discussions with the defendants got bogged down a

15   little bit over the use of a cover report, if you will, an

16   umbrella, to come over the top of the individual -- the 10

17   individual site inspections.  We were in active discussions

18   about how to do that so that the defendant's report, which used

19   the tool, would ultimately be filed with the Court.  It would

20   be sent to us in draft, "us" being my team and the plaintiffs,

21   and we would comment on the same similar to how my reports get

22   commented on by the parties.

23         So there was a -- there was a lot of activity and

24   discussion and agreement on the use of the tool, the indicators

25   that were measured, and we were making steady progress when

1   everything was interrupted and the neutral investigator came in

2   to work for the Court.

3         So when we started to look at key indicators, I

4   believed, and I believe my teammates did as well, that we had a

5   baseline to work from that was solid and that could be

6   implemented fairly quickly.

7         Our discussions got somewhat bogged down.  The

8   plaintiffs took the position that, well, the defendants gave us

9   a list of indicators, just indicators, and they then said these

10  are not the key indicators, they're just the indicators.  The

11  plaintiffs took the position originally that they thought that

12  every one of those indicators was a key indicator, but they

13  were willing to negotiate on a lesser number, if you will.

14        The defendants took the position that groupings of

15  that number were key indicators and that some of the indicators

16  that had been used in CQIT, that had been agreed to in CQIT,

17  for use in CQIT, some of those were informational, some were

18  aspirational, and others were key.  So they had a much smaller

19  number.

20        My team, more in line, I think, with where the

21  plaintiffs were positioned, believed that if an indicator -- if

22  you had to have a court order to remove or modify an indicator,

23  that then that made it a key indicator.  And we had -- my team

24  got together and we had roughly 153 key indicators that we felt

25  were appropriate for measurement.

1          There was also an undercurrent, Your Honor, where the

2     defendants believed that if all of the indicators that they had

3     identified and that we had examined, if all of those indicators

4     were measured at 90 percent, then they would never be able to

5     get out of the case, and that was -- it was a very difficult

6     concept to shake, and it formed the basis for, in my view, of

7     the back-and-forth exchange.

8          So I've said an awful lot and what I really want to

9     share most importantly is that when the CQIT indicators were

10    originally put into the tool, we had already narrowed the

11    process to make those indicators key, if you will.  We did not

12    put an indicator in for every single line in the program guide,

13    otherwise there would be 10,000 indicators.  So we worked to

14    get the material aspects of the program guide into the

15    indicators, and that's why this process was so challenging,

16    because two to three years ago we collectively were out

17    reviewing institutions using the tool; and while there were

18    some disputes, they were not widespread.  And the gap between

19    where my team and maybe the plaintiffs are and where the

20    defendants are today is yawning.

21          I think in the end, Your Honor, my recommendation

22    would be that the Court possibly ask me to write a report and

23    submit the same with our views of what the key indicators

24    really are.

25          THE COURT:  All right.  I was going to ask if, given

1    the prior history, we're seeing things appear to be on track,

2    but the gap, with some explanation from you as to how that has

3    opened up, if it would make sense once the defense filing is on

4    the docket April 1st to refer that to you.  So let's assume I

5    do that but then I set a status to hear a report on the CQIT

6    tool.  Based on what you currently know, what's a reasonable

7    but not-longer-than-necessary amount of time to come back with

8    something that reflected whatever the parties can agree to and

9    then, in addition, your independent recommendation?

10          SPECIAL MASTER LOPES:  Your Honor, you mean an oral

11   report?  I believe that three-week time frame would be

12   appropriate.  If you refer to a written report, four weeks.

13          THE COURT:  All right.  All right.  I'll hear from

14   each side now.  Any objection to my referring this to the

15   Special Master once the defendant's filing is on the docket and

16   then arranging for a further status?  I would probably ask the

17   Special Master to put something in writing given the importance

18   of the tool, so ask for a written report within four weeks of

19   submission, so by around May 1st and then set a status within a

20   reasonably short period of time to review where we are with

21   CQIT.

22          Mr. Bien, who will handle this issue for your team?

23          MR. BIEN:  Mr. Galvan is going to handle it, Your

24   Honor.

25          THE COURT:  All right.  Mr. Galvan?

1          MR. GALVAN:  Good morning, Your Honor.  No, plaintiffs

2    have no objection to that schedule.

3          THE COURT:  Anything else you want the Court to know

4    at this point?

5          MR. GALVAN:  There's just one thing, which is I think

6    the Special Master articulated a kind of a filter for what's a

7    key indicator built around whether the indicator measures

8    something that requires a court order to change.  Our filter is

9    a little bit different.  We look at whether the indicator

10   measures something that has an impact on whether our clients

11   face a risk of serious injury or death due to inadequacies in

12   the mental health system.  So that's -- when we ask to add

13   things to the list, that's our filter.  It's more based on the

14   risks that our clients face than anything procedural about the

15   status of an order requiring it.  That's all I have on that,

16   Your Honor.

17         THE COURT:  All right.  Mr. Mello, who on the defense

18   team is going to handle this?

19         MR. MELLO:  Me, Your Honor.

20         THE COURT:  All right.

21         MR. MELLO:  Can I ask a point of clarification?

22         So we would make our filing, it would be due the 1st.

23   The Special Master then would file a report approximately four

24   weeks thereafter.

25         Would the parties have the opportunity to respond to

1    the Special Master's report in writing so that we had --

2              THE COURT:  Well, the report would come only after

3    intensive sessions with the parties, and so -- but one question

4    is, can the Special Master, through further negotiation, close

5    the gap and, if so, how far, given how far this issue

6    progressed before COVID.  So the parties will have a chance to

7    respond one way or the other, but it might be that I first got

8    to nip excessive briefing in the bud.  I may have a status

9    before I direct briefing.

10             MR. MELLO:  Understood, Your Honor.  I'm sorry.  If

11   you were done.  Are you done, Your Honor?

12             THE COURT:  I am done.

13             MR. MELLO:  Okay.  Thank you.

14             Understood completely.  This is a very important issue

15   in the case, and we just want to make sure that there's a

16   fulsome record on the issue.

17             And with respect to specific arguments raised and

18   plaintiff's objections, we will be able to respond to that in

19   some of the statements made by Mr. Galvan right now.  I don't

20   see the need to respond to that right now, since we have the

21   opportunity, but that schedule sounds fine with us.

22             Of course defendants would like to have the

23   opportunity to respond in writing if there is a report and they

24   feel the need to.  But with that, I understand that schedule,

25   and that works for defendants.  Thank you, Your Honor.

1          THE COURT:  All right.  Then I will be referring this

2    matter to the Special Master once the defendant's filing is on

3    the docket on April 1st.  That would mean a written report by

4    April 29th with intensive sessions with the parties in the

5    interim.  So that would mean I'd be looking for another status

6    by mid-May on this.  So let's -- I'm penciling that in.  We'll

7    come back at the end with Ms. Schultz and identify specific

8    dates, taking account of whatever else comes out of our

9    discussions.

10          All right.  Let's move on to return to program

11   compliance.  And here I'd like first to acknowledge Secretary

12   Allison.  Thank you, Secretary Allison.  I know you have much

13   else to do, but your presence is important to keeping the

14   proper focus on this case in the Court's view, so I'd like to

15   acknowledge you to first make any initial comments you would

16   like to about benchmarks and guiding return to program guide

17   compliance, and then I'll hear from Drs. Bick and Mehta before

18   turning to the DSH persons most knowledgeable.

19          Secretary Allison?

20          SECRETARY ALLISON:  Thank you, Your Honor.

21          Certainly getting back to somewhat normal operations,

22   whatever our new normal will look like following COVID.

23   Currently today we're tracking 36 active cases within our

24   system, so it's the lowest we've had in a year and so, you

25   know, we are anxious to get started but also very cautious at

1    the same time.  And Dr. Bick, as our public health expert, can

2    go into those details.

3          We certainly -- each institution, and it's individual

4    based on the institution, will be reopening in phases, just

5    like we are in our communities when it is safe to do so.  For

6    example, very high level, obviously, for me, but, you know,

7    they have to be -- no active -- no positive cases within 14

8    days in order to move through the phases and then -- no staff

9    or inmate cases, that is.  And then on the far end of that 60

10   days in order to move into the next phase.

11         So you know, again, it begins very cautious.  We have

12   to be cautious.  We will continue to socially distance, per CDC

13   guidelines, in our spaces, our treatment spaces, our group

14   spaces, those type of things.

15         We are anxious to reopen some type of face-to-face

16   visiting.  We're looking at maybe a hybrid approach, depending

17   upon -- and each institution's inmate advisory committees get

18   to weigh in on this, so whether we do two face-to-face visiting

19   days or we do one face-to-face visiting day coupled with a

20   video visitation.  And so there's lots of nuances and, you

21   know, we're working through those plans.

22         We are hopeful to implement limited face-to-face

23   visiting come April 10th.  And with that comes testing of the

24   offender, testing of the family member.  If they don't have a

25   recent test, within 72 hours, we would do a point-of-care test

1    upon arrival to visiting.

2            So very excited that we've worked through a lot of

3    processes to be able to offer this.  But the number one thing

4    is, we have to do it safely.  And so, you know, I have to defer

5    to Dr. Bick and Dr. Mehta for any of this, the specific nuances

6    as relates to their individual programs.

7            THE COURT:  All right.  Thank you.

8            Dr. Bick?

9            DR. BICK:  Good morning, Your Honor.  I think it's

10   certainly an understatement to say that this has been an

11   incredibly challenging year for everyone who lives and works in

12   corrections.  We've had over 49,000 patient cases of COVID and

13   over 16,000 staff cases with 216 patient deaths and 26 staff

14   deaths related to COVID, so it's been incredibly challenging.

15           There are some reasons to be optimistic, cautiously

16   optimistic.  Since our December peak of over 10,000 active

17   cases, as Secretary Allison said, we're now down to 36 active

18   cases across the department among patients in the last 14 days.

19   We have 22 facilities who've had no new cases over the last 14

20   days.

21           We've had some tremendous successes with the rollout

22   of the vaccine.  We've been very fortunate that it's been

23   recognized as a broader public health imperative to vaccinate

24   those who live and work in our correctional settings.  Ten of

25   the largest outbreaks across the country of COVID have taken

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1    place in correctional settings, and we're very fortunate that

2    California's one of those states where leadership has decided

3    that we can move forward and vaccinate those who live and work

4    in prison.

5          As of yesterday, we've offered vaccine to 70,565

6    patients, and we have an acceptance rate across the state of 67

7    percent.  But I think if you asked us six months ago will we

8    have a vaccine and will two-thirds of our patients accept it,

9    we probably would not have answered yes on either one of those

10   cases, so that's positive.

11         We have 41 percent of our staff accepting vaccine at

12   this time.  Some of the things that temper my enthusiasm are

13   that vaccine acceptance varies across the state.  It's not

14   consistent from one classification to another.  This mirrors,

15   to a large extent, what we see happening in the larger outside

16   community, and so we have some work to do in making sure that

17   all of our patients and all of our staff, as many as possible,

18   accept the vaccine.

19         Another area that gives me pause is the ongoing number

20   of new cases that we're seeing among our staff.  This is not

21   surprising.  In most (inaudible) citizens are vaccinated and

22   this is, of course, where our employees are coming from.

23         We know from last year, from last fall and winter,

24   virtually every uptick in patient cases, inmate cases, was

25   preceded by increases among staff.  And so this is of a

1    concern.  We have (inaudible) staff cases at 30 different

2    facilities at this time, and we're consistently seeing new

3    cases among staff.

4           Other areas of concerns is the increasing frequency of

5    variants that we're seeing, COVID variants.  We now have a

6    significant number of both the UK variant and a different

7    California variant that are being reported across our state,

8    and there's some evidence that these are going to be more

9    easily transmitted, may cause more severe disease and it's not

10   clear yet whether or not our existing vaccines are going to be

11   effective against these new variants.

12          So again, we have some reason for optimism, and this

13   relates to what Secretary Allison is talking about in terms of

14   cautiously reopening visiting with significant safeguards in

15   place, cautiously moving on the roadmap to reopening in terms

16   of our programming, but we're going to have to be incredibly

17   vigilant going forward.

18          One other area of concern I have is the significant

19   backlog of patients who have come through jails to reception

20   centers.  They're a representation of our larger California.

21   The last thing we need to do is to bring in a large pool of

22   unvaccinated at-risk people, and so we're targeting that

23   specific population with vaccination and our hope is that we'll

24   be able to vaccinate the majority of them before they move from

25   reception to the institutions.

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1           I think the last things I would say are that, you

2      know, we have the concern for those.  We're going to have to

3      remain very vigilant in terms of testing of our patients as we

4      move on this roadmap.

5           And the last thing is, I think there's just some

6      interesting things that we can learn from this last year.  We

7      had a very unintentional experiment that happened in terms of

8      decreased movement and different types of access to care,

9      whether that was telehealth or other versions of care, and it's

10     been interesting.  Although there's certainly some

11     well-documented anecdotes of patients who appear to have had

12     bad outcomes related to reduced movement, there's also a

13     significant amount of information that appears to reflect that

14     patients did not worsen and, in some significant measures, did

15     better.  And this relates, I think, to some of the concerns

16     that we had earlier prior to COVID about the unintended

17     consequences of frequent movement, as driven by program guide

18     and how this results in disruption of care teams and can be

19     potentially detrimental to patients.

20          So I would just say I'm hoping that we're going to be

21     able to further review this.  I think it's incumbent upon us to

22     learn from this past year and incorporate what we've learned

23     into our plans going forward.

24          THE COURT:  Three follow-up questions for you,

25     Dr. Bick.  And I do -- I think the program you've overseen is,

1    overall, impressive in terms of the results it's achieved to

2    date.  Is it so far entirely voluntary?  I thought I had read a

3    press report suggesting that certain staff would be required to

4    be vaccinated to perform certain jobs.  Is there no requirement

5    in effect currently?

6             DR. BICK:  Your Honor, there is currently no

7    requirement, either within our department or anywhere else,

8    that I am aware of at this time outside of our department for

9    mandating COVID vaccine.

10            In fact, the military, which readily requires many

11   types of vaccinations, has not required mandated COVID vaccine

12   at this time.  It's certainly an area of conversation.  The

13   tack that we're taking right now is to try to identify

14   incentives that are not coercive that would lead them to make

15   that decision.

16            THE COURT:  All right.  Understood.  There is some

17   ways to go.  With respect to intake, can you -- or perhaps

18   Secretary Allison is the person to answer this question.  I

19   realize I'm not quite clear on where CDCR is with reopening all

20   of the reception centers.  What's the status of intake?  Is

21   that pipeline flowing completely subject to the vaccination

22   that Dr. Bick has described?  Secretary Allison, do you want to

23   start first with that?

24            SECRETARY ALLISON:  Certainly.  I would say even prior

25   to COVID we had reduced our reception centers down to two just

1    due to the decreasing population within our system, and so we

2    went to our two primary reception centers, North Kern State

3    Prison and Wasco State Prison.  That was well ahead of the

4    pandemic.  I will say that there -- and it varies from

5    day-to-day -- anywhere from 8 to 10,000 sitting in the county

6    jails waiting to come to CDCR.

7        We slowly increase our numbers based on -- we worked

8    collaboratively with healthcare as far as what's the safest

9    number to bring in that we can manage once they arrive to our

10   reception centers.  We are nowhere near our normal capacity.

11   We have ample room, but it's -- you know, we're just trying to

12   do it in a safe manner.  So we work very, very closely together

13   to make those decisions on a weekly basis, what's coming in the

14   following week, and we message that with the counties.

15       Any county that has a particular concern, whether they

16   have overcrowding issues or whatever their concerns are, if

17   they have somebody with higher needs then I know that we can

18   prioritize them, but we range anywhere from 200 to 350,

19   depending upon our ability to get them in and then obviously to

20   move them out on the back end.

21       I will say some of the precautions that we've put in

22   place, as far as quarantine and different things have slowed

23   our processes a little bit to actually move people along out of

24   the reception center.  But again, we're just trying to do it as

25   safe as possible.

1           THE COURT:  All right.  Anything more on that point,

2    Dr. Bick?  And then I have one more question for you.

3           DR. BICK:  Yes, Judge.  I would like to add one thing.

4    I'm very pleased with our progress thus far in vaccinations,

5    but I think it's important to remember that people who are

6    vaccinated can still get infected and can still transmit the

7    virus to others.  The vaccines are most important in preventing

8    serious illness and death.  It appears that they do decrease

9    the likelihood that someone gets infected and passes it to

10   others, but they're not perfect, and so it's important to keep

11   that in mind.

12          The other thing I would say is what I feel is the

13   constant tension between getting back to some type of normal

14   programming for our patients with critically important things

15   like visiting and our other programs.  And on the other side is

16   that reality that all we really need is one person to come in

17   with a COVID variant that we fail to identify.  And that would

18   be the same whether we're talking about all those dedicated

19   people who come in for arts in corrections or the people who

20   volunteer in education or a visitor or somebody in the dog

21   program or in the garden program.  All these things that are

22   really critical parts of rehabilitation, every time we open up

23   a little bit and allow people to come in from these counties

24   where the majority of people are not vaccinated, we're

25   introducing some degree of risk.

1          THE COURT:  All right.  Final question.  You mentioned

2     lessons learned and suggested there may be lessons learned with

3     respect to telehealth.  Is there a report that you, CDCR, can

4     share with the Court that compiles, in a principled way, not

5     just anecdotes but data on lessons learned with respect to

6     telehealth?

7          DR. BICK:  I would be glad to take the lead on a

8     report, Your Honor, and put some of that information in front

9     of you.

10         THE COURT:  All right.  What's a reasonable period of

11    time for you to provide that?

12         DR. BICK:  I'd like to discuss that with our counsel

13    and with Dr. Mehta.  Much of the work will be done by the

14    mental health department, so I'm assuming we're going to need

15    at least four weeks, but I'm not prepared to give you a

16    specific date.

17         THE COURT:  All right.  All right.  We'll perhaps come

18    back to that.

19         All right.  Dr. Mehta, do you have additional

20    information to share on return to program guide guidelines?

21         DR. MEHTA:  Yes, Your Honor.  Thank you.  And I'll

22    stick to the mental health aspects, but of course everything

23    that has been said has been hugely important.

24         So we were able to continue to meet many of the

25    requirements at the institutions throughout the pandemic,

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1    though, of course, we focused our attention on areas where we
2    needed to make changes.  So things that have been improving or
3    already improved, we're back to normal transfers for mental
4    health crisis bed.  Those patients are generally moving within
5    24 hours.  And almost all if not all of our acute placement,
6    acute psychiatric placement patients also transfer immediately
7    as we had before COVID.

8              Just this week we have been working on a notice to the
9    field that we are ready to close down the TMHUs, the temporary
10   mental health units, that have been such a big part of our
11   discussions.  There is -- we haven't been using them.  I think
12   there were two patients in them at the beginning of this week.
13   We haven't been using them very much since we've been able to
14   resume transfers.  And so many of the people that are waiting
15   to go to inpatient right now are in that enhanced level of care
16   treatment in the outpatient setting.  So the mental health
17   crisis beds and the acutes transfer very quickly.  The ICF
18   patients are -- we're working through the backlog there.  We've
19   made tremendous progress.  We currently have less than a
20   hundred people who have been waiting more than 30 days; there
21   are 96 of them.  And that's, you know, half as many as we had
22   in mid-February, just over a month ago.  So we have been
23   transferring at a furious rate and as quickly as we can while
24   also moving emergencies that come up in addition to the
25   backlog.

1          We've also been working very closely with DSH.

2     They've been excellent partners.  They've helped volunteer to

3     help review evals and things that have really helped us make

4     sure every patient is being treated at the appropriate level of

5     care and location.

6          I would say one of the aspects that is going to be the

7     next big push has to do with resuming group treatment,

8     out-of-cell hours, which is one of the major mitigation areas

9     that we've been focused on.  Two ways that we are working on

10    this have to do from the staffing perspective where vaccines

11    and everything that's already been set have been allowing us to

12    have more staff at the institution, staff returning to the

13    institutions able to engage with the patients in the way that

14    we all would like to see again.

15         The other side of that is the space perspective,

16    having enough room to maintain social distancing and

17    sanitization between groups and things like that.  That one is

18    being addressed through revisions to the roadmap to reopening,

19    which has a lot of very specific information about the size of

20    groups and how to set things up and what different phases the

21    institution has to be in order to accommodate different levels

22    of treatment.  So we're hoping that that one comes out soon as

23    well.  It has been a lot of work and I think is a good

24    document.

25         Your Honor, you mentioned progress on behavioral

1    report and suicide prevention.  We, of course, never stopped

2    that as well.  Dr. Williams and others who have spoken to the

3    Court have been really just hammering away at that at all

4    times.

5         We continue to work on data validation.  COVID or no

6    COVID, that is an important task that we all know is critical.

7    We use that data every day to guide our patient care, and we're

8    eager to make sure that everyone restores confidence in that

9    data as well.

10        And lastly, I would just add that -- well, so actually

11   two categories.  One is, we have also designated certain groups

12   of patients as priority transfers that were not part of the

13   waitlist for inpatient or anything like that.  So the desert

14   institutions, for example, we didn't transfer patients that

15   were already in mental health to the deserts, but when they

16   were identified at the deserts during the bulk of the year, we

17   weren't transferring those patients automatically.  We were

18   triaging them, making sure that they could get the treatment

19   that they need.  Now we are moving all of those patients out of

20   the desert as soon as they are identified back to the way that

21   we were doing it pre-COVID.

22        We've also done -- made similar rules surrounding

23   certain segregated status patients, making sure that they're in

24   the appropriate milieu, so they can be in an ad seg hub instead

25   of an ad seg that doesn't allow all of the hub programming to

1    occur.

2          In terms of lessons learned from the pandemic, I very

3    strongly echo Dr. Bick's statement about telehealth.  I think

4    there have been some really amazing things that we've been able

5    to do.  And I think when we prepare a report, Your Honor, I

6    will try to include as many articles and peer review -- as much

7    peer reviewed data as possible.  There is a tremendous amount

8    of it, and virtually all of it has been positive.

9          I've asked plaintiffs before if they have seen

10   anything negative, studies showing negative results, and I

11   still have not received a single one of those studies.  It's

12   been very positive for all of our patients.

13         I'm also very eager to look at patient movement.

14   Continuity of care within the same treatment team is such a big

15   part of mental health.  It's not something that the plaintiffs

16   have focused on.  We've been sort of following priorities and

17   letters as they come.  I would love to focus on that, focus on

18   the handoff of care and not retriggering the abandonment issues

19   and everything else that is the sort of the core of what we try

20   to do in mental health.  So all of those issues, Your Honor,

21   are things that we continue to focus on and are looking to

22   improve in the future.

23         THE COURT:  All right.  So any backlog in transferring

24   desert institution inmates was solely linked to COVID; is that

25   fair, in your view?

1          DR. MEHTA:  Yes, Your Honor.  Sorry.  Yes, Your Honor.

2     They were all identified after they had been transferred there;

3     not as members of the -- of the mental health department, and

4     then they were decompensated at that location, and then the

5     delays were due to COVID.

6          THE COURT:  All right.  Well, that touches on the

7     concern I added to our list of other issues to check on.  It

8     may, unless the plaintiffs or anyone here has other thoughts

9     for me --

10         MR. BIEN:  Yes, Your Honor.

11         THE COURT:  Hold on one second.  Anyway, so we can

12    wrap desert institutions into this section of our agenda.  But

13    before I call on the parties, let me follow up with Dr. Mehta

14    on one question.  You mentioned the modifications to the

15    roadmap to reopening.  What is the current date by which you

16    believe you'll be able to share an updated roadmap to reopening

17    with the Court and the parties?

18         DR. MEHTA:  Yes, Your Honor.  We had a work group that

19    has been meeting weekly with deputy directors from all the

20    different treatment areas and quality improvement areas.  Just

21    to be clear, though, this is not a mental health project.  This

22    is certainly larger than us.  And so I don't know exactly what

23    sort of deadline Dr. Bick and others will be able to meet

24    there, but I do believe we're close.  We're at the end of that

25    workgroup this week, Your Honor, I believe, and we're close to

1   releasing something.  I apologize; I don't have a specific

2   date.

3           THE COURT:  All right.  Dr. Bick, are you the person

4   to provide a target date, or is that something I should ask

5   Secretary Allison?

6           DR. BICK:  I can weigh in on the healthcare aspects of

7   this.  This certainly has a significant input from DAI and

8   healthcare.  We're hoping that we can get all of the mental

9   health, medical, nursing, public health, dental guidance

10  completed within the next two weeks.

11          And I know that Secretary Allison has a number of

12  people that are working on this quite extensively right now, so

13  I think the healthcare component will probably be completed

14  within the next two weeks.

15          THE COURT:  All right.  Secretary Allison, anything to

16  add to that?  When can the Court and the parties expect to see

17  an updated roadmap to reopening?

18          SECRETARY ALLISON:  Your Honor, I would have to get

19  back to you on that.  I do not sit in those workgroups, and I

20  know Dr. Bick does and he has staff -- I mean, obviously I have

21  staff in there, but it's several layers down, and so I couldn't

22  give you an exact date.  I could certainly communicate with our

23  attorneys as soon as we have more of a definitive date.

24          THE COURT:  The Court's question is, given what

25  Dr. Mehta and Dr. Bick have said is how much -- who else is

1   involved in the update other than health, mental health?

2        SECRETARY ALLISON:  Oh, I'm sorry.  So it's a

3   collaborative effort with our adult institutions as well as

4   mental health and healthcare.  It's kind of a collaborative

5   effort to make sure that we do a holistic approach to -- and

6   the safest approach to reopening.  But obviously we have to

7   defer to the guidance from our public health experts.

8        THE COURT:  Are they working on parallel tracks?

9        SECRETARY ALLISON:  They're working in tandem.

10  They're working together on this collaboratively.  So I will

11  say that, you know, there's -- you have to deal with the

12  visiting piece, which we've dealt with -- and I think we're

13  releasing today our visiting memo and all the protocols that go

14  along with that -- and then you have programs within the

15  institution.  And some institutions are in phase 3 where they

16  can already reopen to socially distanced programs.

17       Our biggest priority is testing of our population.  So

18  when the population was, you know, working on various things

19  that could get milestone credits, let's say, the priority was

20  to get them tested so they can award those credits as soon as

21  possible.  So that is the priority going forward.

22       And then, of course, you know, as programs -- so we

23  have our internal institutional programs and then we have

24  volunteer programs, so it breaks it all down at all these

25  different levels what those parameters are going to be to

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1    ensure that all of the health and safety protocols are applied.

2         THE COURT:  All right.  We'll come back to that when

3    we're talking about dates to put on the calendar going forward.

4    But let me first hear from DSH, and then we'll hear from the

5    parties.  So for DSH, Director Clendenin?

6         DR. CLENENDIN:  Thank you, Your Honor.

7         So our story is similar to our colleagues over at

8    CDCR.  After experiencing a pretty significant surge of COVID

9    cases throughout our hospitals throughout the winter months,

10   we, too, are seeing a very substantial decline in the number of

11   COVID positive cases across our patients and our staff.

12   Currently, in the last 14 days, we've had 5 patients who have

13   been positive with only 3 of those at our facilities treating

14   Coleman patients.  As a result, we have been able to really

15   focus on timely admissions to the department.

16        We have continued admissions all throughout the

17   pandemic since reopening back in March of -- March 16th, and we

18   have admitted 180 Coleman patients since that time with 23 just

19   since our last status conference that was held in February.

20   Currently we have 5 accepted referrals on our list for transfer

21   to the department and -- as of yesterday.  And those

22   individuals have -- the longest wait has been 7 days.  So all

23   of the individuals that we have waiting to transfer to the

24   department are going through their processing and are all under

25   30 days of wait time at this time.

1          I'd like to actually turn it over to Dr. Wharburton to

2     talk more about our work with the Department of Public Health

3     and, you know, the public health benchmarks as it relates to

4     our reopening.

5          THE COURT:  All right.  Dr. Wharburton?

6          DR. WHARBURTON:  Thank you, Your Honor.  We don't

7     really interpret public health benchmarks ourselves.  We rely

8     on the expert public health physicians that CDCH can help us to

9     understand them, and they change too.  You know, vaccination

10    rate is a new benchmark, for example.

11         So as Dr. Bick so eloquently described, we still have

12    a lot of unknown variables.  We don't know the scope of

13    protection afforded by the vaccines, we don't know the impact

14    of variants.  We're all very hopeful, but we are, as Dr. Bick

15    and Dr. Mehta both described, also trying to balance our

16    optimistic approach to resuming normal operations with a hard

17    learned reluctance to underestimate this virus.

18         So we're going to continue to work in the small

19    workgroups collaboratively as we've done.  We've been able to

20    really resume a lot of normal operations with our partners at

21    CDCR, and we're going to continue to collaborate with the

22    expert physicians at CDCH on a daily basis as the science

23    changes.  Thank you.

24         THE COURT:  All right.  We'll talk more about the

25    transfer issue at the end of the agenda.  I do have a question

1    about the pending matter.  But for plaintiffs who's going to

2    share any thoughts based on what we've heard about return to

3    program compliance, Mr. Bien?

4            MR. BIEN:  Yes, Your Honor.  I'm going to address

5    this.

6            THE COURT:  All right.

7            MR. BIEN:  First of all, we very much appreciate the

8    efforts led by Dr. Bick to manage COVID and especially to

9    obtain and manage the vaccination effort.  It's been certainly

10   a model and certainly much better penetration both into staff

11   and incarcerated people than almost any other system that I'm

12   aware of.  And that's to the credit of the defendants and the

13   State which, you know, authorized the vaccines and are allowing

14   it to go forward.  And I think that provides, you know, great

15   hope.

16           I do think that the balance is off in the department,

17   and I think you heard it again today.  And I understand why, if

18   you're an epidemiologist and you've just gone through this

19   nightmare that that's where you're balancing risk.  Mental

20   health care is simply not being provided at the level that's

21   safe for our clients.

22           We appreciate the fact that we now have access, thanks

23   to the Court's orders, to medical records and to ongoing

24   reports of performance from CDCR about mental health care

25   delivered, but these reports show that a very important

1    measure -- and we just looked at the EOP programs and we
2    followed the instructions about how to look at the EOP programs
3    and, you know, eight of -- and we looked at a two-week period
4    in March, ending on March 14th, and 8 of the 15 programs had
5    zero treatment hours, zero group treatment hours.  And the
6    other ones that had some group treatment hours had 1 percent or
7    less than what they had in a comparable period between February
8    3rd and February 16th before the pandemic hit.

9         The contacts that are happening in these EOP programs
10   are cell side mainly and/or, you know, just -- they're given
11   their meds but they're not doing much else yet.

12        Some of these programs, by the way, have had zero
13   incarcerated people cases and zero staff cases in the last 14
14   days.  I know things are changing, but we really think there
15   needs to be a clear order to the department to actually begin
16   implementing these programs.  They can be implemented safely
17   and appropriately.  And we also think a date certain for this
18   roadmap to be reissued -- there has never been a reissue of the
19   roadmap since it first came out.  It needs to be reissued to
20   the extent that's holding things up.

21        While we appreciate the fact that transfers with a lot
22   of help from -- urging from the Special Master team and from us
23   have started moving, we still see lots of people in the desert.
24   There were no moves out of the desert in February, zero, of
25   EOPs and CCC patients.  And there's still, I think, 45 or so

1    that are -- I forgot the exact number, but there's still over a

2    hundred sitting there.

3              There are also lots of Coleman patients in segregation

4    units that are in the wrong segregation units; for example,

5    they're not in Coleman segregation units or they're ready for

6    discharge from segregation and they haven't been discharged.

7              And again, you know, the balance -- yes, there's risk.

8    I'm not an epidemiologist, but I disagree with -- and Dr. Bick

9    and I talk about some things in meetings, you know, how you

10   interpret the studies.  I think that in the rest of society

11   people are starting to go back to see doctors live after

12   they're vaccinated.

13             In the rest of society the balance between delayed

14   medical care and mental health care is different.  And I'm not

15   saying that we should suddenly open up.  I agree completely

16   that we need to be cautious, but we need to start putting some

17   pressure on mental health to start delivering programs that are

18   not -- that are confidential and are meaningful treatment.

19             And to the extent that Dr. Bick and Dr. Mehta -- I

20   don't know what they were referring to, that they can learn

21   from experience through the pandemic about how good people are

22   doing not getting mental health care and not being transferred,

23   then we strongly disagree.  I don't think there's any evidence

24   here or anywhere else in society of that.

25             Yes, it's been a tremendous benefit that we have

1    tele-psych, and we've encouraged the department to allow other

2    clinicians to do more tele-med, and we think that's great and

3    maybe we should allow more tele-med over time and we're willing

4    to talk about that, but we also need to have more live care,

5    more people who are staffers vaccinated.  They should be back

6    working in the prisons and delivering care to patients.  Groups

7    could be -- you know, can be had in rooms with windows open and

8    social distancing.  You can even have some groups in tents

9    outside.  There needs to be more creativity and more direction

10   to actually providing care.

11          We've requested a meeting of public health experts,

12   our own experts and defendants' experts, the receiver's experts

13   to discuss how do you -- what's safe now.  What can people do.

14   How do we get back to normal.  It's not going to be normal for

15   a long time.  We agree with that.  But there's much more that

16   we can do, and there needs to be more pressure on providing

17   care.

18          The other point I'd like to make is it's not true, at

19   least I believe, that there are places in the United States

20   that are mandating staff to be vaccinated.  There are

21   hospitals, there are nursing homes, congregant settings,

22   especially where people are at risk.  And I think prisons fall

23   into that category and I think it's a -- I know it's a

24   controversial issue and there are lots of reasons and I agree

25   with it.  It's much better from a public health standpoint to

1    get people to accept the vaccine, but I -- if the balance is

2    we're not going to provide mental health care because there's a

3    risk that people are going to come in the door that are

4    unvaccinated, I don't agree with that balance.  I think that

5    you can say you're free to work somewhere else or get

6    vaccinated because we have people who are vulnerable inside

7    that need to get back to life, and I think that applies to a

8    lot of issues here.

9           And so, you know, our -- we think there is an urgency.

10   I think there will be another surge.  I think there will be

11   other challenges with this pandemic.  It's far, far from over.

12   But here we have an opportunity where the cases are way down

13   There's a lot of people vaccinated.  We need to go in there

14   while it's in a safe way and make sure people are okay.  And

15   that means getting them into a confidential setting, getting

16   them to groups, getting them back to treatment.

17          We need to get people out of segregation in the

18   desert.  And again, we appreciate that the transfers, you know,

19   are moving and beginning to go.  I think CDCR has big, big

20   challenges, and the Court correctly identified them.  You know,

21   we understand there are more than 10,000 people waiting in

22   county jails.  That's a challenge.

23          The CDCR has also announced that they want to close a

24   prison, and it's in the budget to close DVI.  If that happens,

25   there's an issue of space.  And we talked about space.  How are

1    we going to keep space if we're closing prisons?

2           So I think there are some important issues out there,

3    but I think the most important for us is a time to begin -- you

4    know, I'm glad the TMHUs are closing.  We don't think there's a

5    reason to be waiving program guide standards, Your Honor.  We

6    think that it's time that the department should be held to

7    program guide standards far more than what we've been allowing

8    and, you know, for example, zero groups for EOP is just not

9    acceptable.  Thank you, Your Honor.

10          THE COURT:  All right.  Plaintiffs have been agreeing

11   to some exceptions.  Are you signaling that you're going to

12   stop agreeing to adding to the list of program guide

13   exceptions?

14          MR. BIEN:  Again, we have not -- we're expressing --

15   we don't really want to have litigation over this.  Again, I

16   don't think that that's healthy.  There's been some very good

17   communication, but I do think what we do -- we have not seen

18   any evidence that the department is tracking what's going on at

19   each institution in these high levels of care, EOP and higher,

20   and really making sure the treatment is being offered and

21   discussing methods.

22          There is supposed to be a plan for each institution

23   about how they were going to address mental health care under

24   COVID.  We have not seen any of these.  They have not been

25   shared.  We're not spending time on that.  I think that's -- in

1    my mind, that's really a key priority.  I know there are a lot

2    of priorities going on, but to me, you know, delaying care this

3    long is quite dangerous.  And the danger of that risk has to be

4    balanced with the COVID risk, especially where people have been

5    vaccinated, the staff and the patients.

6              THE COURT:  All right.  Understood.

7              From the defendants, Mr. Mello?

8              MR. MELLO:  Yes.  So I would like to -- there's a lot

9    to unpack there.  There's a lot of generalities.  There's a lot

10   of conflicting statements.  There's a lack of science as to

11   much of that discussion.  There's a lack of tethering to

12   actually what's happening in terms of programming.

13             THE COURT:  Let me just -- let me get you out of

14   litigation mode, sir.  This is your opportunity to tell me

15   generally, without overreacting to what Mr. Bien just said,

16   what your position is on return to program guide compliance.

17             MR. MELLO:  Your Honor, respectfully, I will turn it

18   over to my clients to speak to some of the factual assertions,

19   but with respect to a deadline to provide the roadmap for

20   recovering when the pandemic remains a moving target so it can

21   be provided; and then Dr. Bick and his public health experts

22   and DSH and their public health experts are going to have to do

23   what we do, which is to evaluate and rely on actual public

24   health experts as opposed to attorneys to decide what is safe,

25   but -- so there's much to unpack there, and it's very difficult

1    when one side gets the opportunity to make these sort of bold

2    assertions and then counsel is told not to represent their

3    clients' interests.

4        So I will turn it over to Dr. Mehta and Dr. Bick if

5    they have any specific responses to those items.  But

6    defendants, both DSH and CDCR, will continue to rely upon

7    science to safely protect both those who live in their

8    institutions, are housed in their institutions and work in

9    their institutions.

10       And with that I'd love to turn it over to Dr. Mehta or

11   Dr. Bick on some specifics.  Thank you, Your Honor.

12       THE COURT:  Well, I've heard from Dr. Bick and

13   Dr. Mehta.  This is a status conference.  If, based on anything

14   that happens here the defense requests a chance to file a

15   motion, it may do that.  I'm just -- I'm trying to gather

16   information.

17       So I listened carefully.  I've heard from Dr. Bick and

18   Dr. Mehta.  I was just asking if you had anything more to

19   share, but I'm going to construe that as not at this time,

20   although you may let me know you want to file a motion or file

21   some kind of legal brief, Mr. Mello; is that fair?

22       MR. MELLO:  May I be heard, Your Honor?

23       THE COURT:  I just asked you if that was fair.

24       MR. MELLO:  Yeah.  So Dr. Bien -- Mr. Bien provided

25   generalizations regarding certain things like transfers out of

1    desert institutions and he said that there were no transfers

2    out of desert institutions in February.  There is a public

3    filing that demonstrates otherwise.

4         Mr. Bien indicated there's no programming at the EOP

5    level.  Dr. Mehta can provide the Court actual information on

6    that, if the Court would like to hear that information.

7         With respect to defendant's public health thinking on

8    these issues, Dr. -- I mean, Mr. Bien gave his thoughts on that

9    subject.  Dr. Bick can speak to those issues, if the Court

10   would like to hear those issues.  Because I don't believe when

11   Dr. Bick and Dr. Mehta spoke before Mr. Bien spoke that they

12   anticipated he would say some of those things.  But, again, if

13   you would not like to hear from Dr. Bick and Dr. Mehta

14   additionally, that is fine.  I just wanted to make sure that

15   they have the opportunity if the Court would like to hear to

16   set the record straight on some of those items.

17        Thank you, Your Honor.

18        THE COURT:  The general agenda item is where are we in

19   terms of returning to program guide compliance.  And I'm

20   gathering information as the Court thinks about that question.

21        I heard what Dr. Bick and Dr. Mehta said, and I noted

22   some apparent discrepancies or at least overall different

23   pictures, but I don't feel the need to dive into that.

24        My current thinking is that I would ask the defendants

25   to file within four weeks the updated roadmap to reopening,

1   recognizing it may be a milestone along the way to full

2   reopening, but I understand there's a document in progress, so

3   I would ask defense to file that within four weeks with any

4   cover memo the defense would like to attach explaining how this

5   affects program guide compliance and the return to full

6   compliance.  And then that would put us on the same track so we

7   can revisit program guide resumption and CQIT by mid-May.

8        On the telehealth issue, I would request defendants

9   file the report Dr. Bick has indicated he would take the lead

10  on, I would say, within six weeks, given what I heard from

11  Dr. Bick, if he's able, working with others that should provide

12  input to that report to file it earlier and it's before us in

13  time to consider in mid-May, I'm happy to fold that in as well.

14  But I really see that as not necessarily tied to talking more

15  in the near future about program guide compliance.

16        All right.  Let's move to the Special Master's role.

17  And I'd like to ask Special Master Lopes to weigh in here on

18  two issues:  Return to on-site compliance monitoring.  What is

19  your projection about a return to that role that is so

20  essential to this case; and also, what is your current view on

21  the timing of task force meetings?  Special Master Lopes.

22        SPECIAL MASTER LOPES:  Thank you.  There are members

23  of my team who have been fully vaccinated already and other

24  members who are waiting to be scheduled for vaccinations.  I

25  expect that by June there will be a sufficient number of my

1  team members who will be fully vaccinated and available to
2  resume on-site monitoring.

3      My present thought is to begin monitoring those
4  institutions that have psychiatric inpatient programs, the
5  so-called PIPs.  We've scheduled a site visit at each of those
6  institutions to allow my team to not only monitor the PIPs but
7  also other mental health programs within the institution during
8  one visit.  That way we can review the continuity of care.

9      In terms of task force -- do you have any questions,
10  Your Honor?  I'm sorry.

11      THE COURT:  Go ahead and finish your entire report
12  first and then I may.

13      SPECIAL MASTER LOPES:  Okay.  Thank you.  Excuse me.
14  So the -- in terms of the meeting schedule, we've had a robust
15  meeting schedule over the past year.  We've had task force
16  meetings almost every week, almost to the end of the year, and
17  now we're having task force meetings every other week and
18  alternate weeks we're having data meetings.  I would like to,
19  starting in April, slow that down a little bit, have one task
20  force meeting per month.  We'll leave the data meetings on
21  calendar for every other week because they are doing a lot of
22  good work, and we really need the data systems to be evaluated
23  at the appropriate time.

24      And it would be my hope, Your Honor, that once we
25  start touring, we would stop having the task force meetings,

1    which I should state right now the task force meetings are

2    bifurcated.  Part of the meeting is devoted to COVID-19 issues

3    and the other part is devoted to policies and working on policy

4    issues that exist.  But once we fully resume touring, I would

5    like your permission to discontinue those meetings and hold, as

6    we had in the past, quarterly policy meetings to discuss the

7    salient issues that need grappling with.

8         We also have ample opportunity, while we're touring,

9    to meet with both sides because some of these tours will be

10   group tours, meaning plaintiffs will be along with us, with the

11   defendants.  And it gives us an opportunity to have ad hoc

12   meetings, if you will.  That is the direction we're heading in

13   at this point, Your Honor.

14        THE COURT:  Does the plan for resuming on-site

15   monitoring, does that allow you to proceed with unmet bed

16   needs?

17        SPECIAL MASTER LOPES:  Our goal would be to start the

18   unmet bed needs study in the late fall, that way we could fully

19   examine all of the PIP programs and the institutions that are

20   running PIP programs.

21        THE COURT:  All right.  And final question before I

22   ask if the parties have any objection to the schedule of task

23   force meetings that Special Master Lopes has laid out:  Do you

24   plan to continue headquarters monitoring?

25        SPECIAL MASTER LOPES:  Yes.  Absolutely.

 1           THE COURT:  All right.  So that would continue apace?

 2           SPECIAL MASTER LOPES:  Yes.  That has been very

 3   helpful, Your Honor.  It allows us to work directly with the

 4   defendants on the development of policies.  And more than

 5   anything else, it allows us to be in lock-step with the

 6   defendants in terms of their cadence, what they're examining,

 7   why they're examining things.  And it allows us to give

 8   realtime -- get realtime information and provide better

 9   concentrated services to the State.

10           THE COURT:  All right.  Mr. Bien, any objection to

11   anything you've just heard?

12           MR. BIEN:  No, Your Honor.

13           THE COURT:  All right.  Anything else to say with

14   respect to the Special Master's plans?

15           MR. BIEN:  No, Your Honor.  We look forward to -- my

16   office -- and we want to acknowledge the assistance of the

17   receiver's office.  My office has been able to have

18   vaccinations to our attorneys and paralegals who work within

19   the prisons on cases, and we appreciate that and we are ready

20   to join the Special Master inside whenever tours begin.

21           THE COURT:  All right.  Mr. Mello, are you the person

22   to weigh in on this point?

23           MR. MELLO:  Yes.  We are supportive of cutting back on

24   those meetings.  And I think everybody is excited to begin to

25   tour.  And everybody is very thankful to the work of CCHCS and

1  CDCR to provide vaccinations to individuals so those actions

2  could occur.  So we are supportive, Your Honor.  Thank you.

3  THE COURT:  All right.  Very good.  Then that will be

4  the schedule going forward.  Task force meetings once a month.

5  Data continues every other week.  Once touring begins, meetings

6  move to quarterly.

7  And I am going to order the unmet bed needs to begin

8  as soon as possible.  I will go ahead and order that now with

9  the understanding that it's likely to begin in the fall once

10  touring begins.

11  All right.  Let's talk about inpatient staffing.  And

12  let's talk first about the DSH plan and then the CDCR plan.  My

13  question really, I need to hear from the parties.  It appears

14  that the DSH plan has come together overall well.  And so my

15  question is, are the plaintiffs -- do they agree that that plan

16  is appropriate?

17  And noting DSH's explanation of the occasional

18  exceptions to the 90 percent fulfillment rate, did the

19  plaintiffs agree that exceptions are warranted based on the

20  population size, or does the Court need to entertain some

21  focused briefing on this question?  If there's ever going to be

22  an exception to 90 percent, does that need to be resolved in a

23  very deliberate manner?

24  And I understand Ms. Ells had wanted to raise to the

25  Court's attention a possible motion.  So Ms. Ells, on the DSH

1    plan, staffing plan, plaintiffs' thoughts?

2          MS. ELLS:  Yes, Your Honor.  So we appreciate the

3    thoroughness of DSH's plan.  We appreciate that there was a

4    thorough analysis of the staffing needs across the commitment

5    categories.  We don't necessarily agree with everything in the

6    plan.  We have some reservations about aspects of it.

7          We certainly support the move to the treatment team

8    ratio lowering at the 1 to 30 rate.  We don't, for instance,

9    agree with DSH's proposed method of calculating compliance in

10   terms of moving to partial -- first of all, aggregating across

11   the various hospitals, which tends to mask deficiencies in

12   staffing at Ash, nor do we agree that it's appropriate to look

13   at the ratios without also looking at the number of allocated

14   positions.  We also don't agree with the intimation that

15   telepsychiatry may be increased at some point in the future in

16   DSH; however, we don't think that any of those disputes are

17   necessary to resolve today in order to approve this staffing

18   plan.

19         The motion that I was speaking about earlier relates

20   to our intent to file a request for leave to file a motion

21   pursuant to your December 24th order, which we intend to file

22   in the next day or so.  And it relates to a very narrow issue,

23   which is DSH's refusal to provide hospital-wide data.  In the

24   past we have received that data.  DSH stopped providing it a

25   few years back just prior to lift and shift and is now only

1   reporting on the number of positions for the treatment teams

2   treating Coleman class members instead of the entire hospital.

3   So we have no way of knowing, for instance, if the hospital has

4   a, you know, 50 percent vacancy rate for psychiatry while they

5   are reporting that the treatment team allocations for Coleman

6   are fully staffed.

7           In the past there have been problems with treatment

8   team members that are supposedly devoted to Coleman at the

9   appropriate ratio being pulled into other duties to cover

10  vacancies elsewhere in the hospital, and we feel like it's

11  appropriate and necessary to ensure compliance to receive a

12  picture of what the entire hospital staffing looks like.  So

13  we've met and conferred a number of times.  I believe the

14  Special Master will confirm that we're at an impasse.  DSH is

15  not willing to give this data.  So we intend to file a request

16  for leave to file a motion with regard to that narrow issue.

17          THE COURT:  But just so I'm clear, you would say the

18  Court can approve the DSH inpatient staffing plan now?

19          MS. ELLS:  Yes, with our reservations and subject to

20  monitoring as to -- you know, for instance, one question that

21  we do have is that 1 to 30 ratio has not been fully funded in

22  the long term.  We appreciate that the department has devoted

23  resources to implement it July 1st, but it's not clear to us,

24  at least, whether that will be fully funded in the future.  And

25  we think that's a very important aspect of this plan.  And so

1    that is one remaining question that we have that may be

2    appropriate to address to the department.

3          But we do agree that -- there has been greater success

4    at DSH in recent years of filling their positions, and so we

5    support moving forward with this plan subject to, you know,

6    further tweaks in the future if need be.

7          THE COURT:  So from your point of view I'll ask the

8    defense the same thing.  Can I direct the parties to file a

9    stipulation for the Court to consider approving adopting the

10   proposed DSH inpatient staffing plan, allowing the plaintiffs

11   to memorialize their reservations but noting that they don't

12   interfere with adoption at this time?  Does that make sense to

13   you, Ms. Ells?

14         MS. ELLS:  Yes, Your Honor.

15         THE COURT:  All right.  Let me just ask Special Master

16   Lopes before I hear from the defense.  Do you confirm there's

17   an impasse on the hospital-wide data and access to that data by

18   plaintiffs?

19         SPECIAL MASTER LOPES:  I do, Your Honor.

20         THE COURT:  All right.  All right.  So on the DSH

21   staffing plan, Mr. Mello agreed that the stipulation is the way

22   to proceed?

23         MR. MELLO:  I want to make sure I understand the

24   stipulation.  Defendants filed -- DSH filed their plan.  It

25   sets forth the plan.  It sets forth the process by which they

1    will go through the regular process.  And so, I mean, I think

2    we filed our plan.  I don't think a stipulation is necessary

3    for us to agree that the Court adopt it or not.  We have filed

4    our plan, number one; number two, the Court referenced 90

5    percent compliance.  I don't think DSH has ever been ordered to

6    comply with 90 percent compliance, but maybe that's neither

7    here nor there and -- but with respect to hospital-wide data,

8    this is about Coleman class members and, therefore, it should

9    be about Coleman units and so, therefore, that is defendant's

10   position.  But, again, with respect to the specifics of the

11   plan, the director can speak to that, Your Honor.

12          THE COURT:  Well, the plaintiffs have alerted me that

13   they're going to be filing a request to file a motion, and so

14   if I approve that request, I need to see it to fully understand

15   it; but if I approve the request, then the defense would have a

16   chance to fully set forth its position.  That would be

17   sufficient, would it not, Mr. Mello?

18          MR. MELLO:  Understood, Your Honor.

19          THE COURT:  All right.  On the plan -- I understand

20   it's a proposed plan, so --

21          MR. MELLO:  Your Honor, to be clear, that plan has

22   gone through the normal process of state government, and it

23   is -- DSH's plan is a well-thought-out plan.  And again, I can

24   defer to the director for specifics if the Court has questions

25   about the plan.  Thank you.

1            THE COURT:  Well, I anticipate ordering a stipulation,

2    if the parties can come to it, or I'll clarify my position with

3    respect to the plan.

4            With respect to the CDCR inpatient staffing plan,

5    there are outstanding issues that -- to the extent it's a

6    proposed plan, I don't think it's a final plan.

7            I understand there were some hiccups regarding whether

8    or not CCHCS data on nursing was readily available.  The

9    Special Master has clarified it is readily available.  The

10   receiver has confirmed information is available at the drop of

11   a hat to the Special Master and persons working on the Coleman

12   case.  So I'm not certain I'm hearing quite the full story

13   about what happened with some last minute inability to come

14   together as related to not having the nursing data, but just so

15   you all know, I've confirmed with the Special Master, as the

16   receiver has told him, that data is available.  No barriers.

17           Generally I've let the Special Master know, I've

18   reminded him -- you know, I don't babysit the Special Master,

19   but any time during any session he's having with the parties

20   there's a roadblock that appears it could be resolved by

21   alerting the Court, I've asked him to let me know.  I can't

22   promise I'm always going to be available within a few minutes,

23   but I'm prepared to Zoom in or phone in to any session and --

24   just as I would in a deposition to resolve an objection to try

25   to cut to the chase.  So I just want the parties to know that.

1    In any event, I understand, Special Master Lopes, that you have

2    received the nursing data?

3         SPECIAL MASTER LOPES:  Yes, Your Honor.  I've

4    received -- the receiver's office provided us with the

5    provisional data.  I believe that if I understand it correctly,

6    the nursing data that I've received is still being reviewed by

7    the Department of Finance, but it is the receiver's best effort

8    at identifying the nursing staffing needed for the PIPs.

9         The receiver and I spoke yesterday.  He told me that I

10   could share it with the parties and it was my understanding

11   that he was unaware of this being a sticking point in the

12   discussions that we were having on the PIP policy.  So we do

13   have sufficient information on nursing.

14        Now we're waiting for the custody information that

15   needs to be weighed as well, and we can move ahead and finalize

16   the plan for the discussions around the plan.

17        THE COURT:  While I have you, Special Master Lopes,

18   and before I hear from the parties -- and Dr. Mehta -- I

19   understand Dr. Mehta may want to say something on this issue --

20   remind me where we are with the labor economists' report and

21   how that dovetails with the --

22        SPECIAL MASTER LOPES:  The labor economists' report I

23   believe is still before -- pending before the Court and you

24   have not ruled on it yet.

25        THE COURT:  But is your view that I can now?  Should I

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1    do so now?

2           SPECIAL MASTER LOPES:  I believe you should.

3           THE COURT:  Okay.  All right.  Then I'm ordering

4    myself to do that.  I will do it as promptly as I can.

5           All right.  So on this issue, again, before I hear

6    from the parties, hear from Dr. Mehta, given the outstanding

7    issues and given that -- even though the requirement for a plan

8    has been out there for a significant amount of time now, I see

9    my job as just facilitating, finalizing the plan to the extent

10   possible.  And I think the way to do that, subject to hearing

11   from all of you, would be to refer this back to the Special

12   Master, ask him to come back in 30 days now that the nursing

13   data is available and we can also add that to a mid-May status

14   report.

15          Is that a realistic time frame, Special Master Lopes?

16          SPECIAL MASTER LOPES:  I believe so, Your Honor.

17          If I may add, my team has been having either informal

18   or formal discussions with the State around the PIP staffing

19   again since roughly August of 2020, and we had meetings with

20   the State, my team and the defendants, to look at the PIP

21   staffing plan.  We had meetings in September, we had meetings

22   in October.  We had scheduled more meetings at the beginning of

23   the year.  So this has dragged on quite a bit.  And that was

24   before the plaintiffs were brought in.  So it was after the

25   Judge's -- after your -- excuse me -- Your Honor's order I

1   believe in February stating that a plan needed to be -- I mean,

2   ordering a plan to be filed for this status conference.  It was

3   at that point that we got a second iteration of the plan, which

4   is just devoted to mental health.  And it may have been given

5   to all of us on or about the 13th of March.  So while it's a

6   new plan for the plaintiffs, the concepts are not new to me and

7   my team.  And, quite frankly, it was, I believe, a waste of our

8   resources to have gone through the efforts that we did in

9   September and meeting in October and have nothing come from it.

10  So another four weeks, I think, is ample time for us to dig in

11  and try to have productive negotiations.  But I do want to

12  state for the record that my team has been working on this in

13  full meetings since September of 2020.

14          THE COURT:  All right.  Let me ask first Dr. Mehta.

15  The person most knowledgeable notice indicated that had you

16  something to say on this point.  What would you like the Court

17  to know, if anything?

18          DR. MEHTA:  Your Honor, Special Master Lopes said a

19  lot of what I was going to say, to be honest.  I completely

20  agree, you know.  We've had hours of meetings and questions

21  about the plan.  It takes into account hundreds of variables.

22  And we've made several changes based on the Special Master's

23  feedback already.  I will take good ideas anywhere I can find

24  them, I promise.  And we've had many of them from the Special

25  Master.

1           If I may describe one of the difficulties we've faced,

2    Your Honor, we met with the plaintiffs about this on Thursday

3    of last week, I believe.  One of the -- I apologize.  One of

4    the first items that we heard from the plaintiffs was Mr. Bien

5    saying:  So you want to screw Coleman here to save a few

6    dollars.  It really just deflated me completely.  I felt that

7    this was not constructively working towards solutions.  And

8    I've seen this again and again.  I feel like the constant

9    demonization by plaintiffs of my team doesn't help anyone,

10   including their clients.

11          I'm trying to run a program here.  I want to attract

12   good people, people who want to feel like they can make a

13   difference, make things better.  It doesn't help the morale, it

14   doesn't help the people who are already working on this who are

15   working in healthcare.  They went into healthcare.  I, myself,

16   saw patients, thousands of patients for six years straight, and

17   I know how it feels to constantly be told that everything

18   you're doing is worthless.

19          And so just to that end, Your Honor, I just wanted to

20   mention that we are happy to work with the Special Master, and

21   we have been and we will continue to.

22          When Your Honor speaks about Mr. Coleman, I can

23   identify with that.  I can identify him with my patients.  This

24   is why I work here.  This is why I accepted this position,

25   which was not an easy decision to make, I will say very

1    clearly.  We want to make positive changes, and it just feels

2    like we're not getting any true attempts to work together, and

3    I'm tired of my staff being called greedy or evil or

4    incompetent.  We treat thousands of patients every day, and

5    that's why we're here, Your Honor.

6         THE COURT:  All right.  Well, the Court does not

7    witness name calling.  Name calling is out of order in any

8    session where an arm of the Court is presiding, just so that's

9    clear.  I can't -- you know, if there's a dispute to be teed

10   up, I'm here to resolve disputes that really need to be

11   resolved without encouraging unnecessary disputes at this late

12   stage of the case when we are in the remedial phase.  And the

13   Court needs to be mindful of its enforcement obligations.  So

14   I'll think about what your saying.

15        Of course plaintiffs now will have a chance to say

16   whatever they would like to say, but I would say just to be --

17   Special Master Lopes is an arm of the Court.  He does not act

18   as an effective administrative law judge, you know.  He is

19   facilitating discussions.  But it doesn't mean that he's not an

20   arm of the Court, and he should be treated as would be the

21   Court.  The sessions that occur under his facilitation should

22   be treated as sessions of court.

23        DR. MEHTA:  Thank you very much, Your Honor.  I

24   appreciate that.

25        THE COURT:  So Mr. Bien, anything to say with

1    recognition that I'm going to refer this back to the Special

2    Master and put it on our next status for mid-May?

3         MR. BIEN:  Yeah.  I mean, to the extent -- I do not

4    and did not intend -- I don't know what Dr. Mehta is referring

5    to, and I apologize if I did make a statement like that that

6    was offensive and uncalled for.

7         The plan that we saw we didn't receive until very very

8    late.  We were kept out of it and didn't get even one look at

9    the plan for the PIPs until very very -- just last week I

10   think, actually.  And it did not include any information from

11   the receiver's office about nursing, and so it's quite

12   obviously incomplete.  Nor did it have any custody information,

13   which is in CDCR's possession.  And it included cuts, so we

14   were concerned, especially since we know that the existing

15   PIPs, both before, during and after, you know, during the

16   pandemic and before the pandemic were not able to deliver care.

17        So again, I think if there was a statement like that,

18   it was uncalled for, and I apologize for it and I will restrain

19   myself.  Again, I believe that the staff is working very very

20   hard on behalf of the patients, and we appreciate the efforts

21   of the department and Dr. Mehta personally on the case.

22        I do think that giving something to us so late and

23   something complete made it very difficult for us to respond.

24        I also -- anyway, that's all I would say, Your Honor.

25   And we agree completely that these negotiations are part of the

1  court process, and we will conduct ourselves appropriately.

2         THE COURT:  All right.  Thank you.

3         Mr. Mello, anything more to say with the recognition

4  this will be referred back to the Special Master?

5         MR. MELLO:  And we are supportive of it being referred

6  back to the Special Master.

7         Just for purposes of clarity, we were ordered on

8  February 18th to present a plan on March 22nd.  We did that in

9  a timely fashion, but we are supportive and Dr. Mehta is

10  definitely supportive of working -- continuing to work -- and

11  that's what we said in our filing -- continuing to share

12  information with the Special Master team.

13         Thank you, Your Honor.

14         THE COURT:  All right.  Then that will be the plan.

15  Special Master will report back on this issue as well within 30

16  days, and then this will be on the agenda for mid-May status.

17  I'm looking at May 14th, by the way, if Ms. Schultz confirms

18  that that date is available.

19         And I thank Dr. Mehta for invoking the name of an

20  individual for whom the case has been brought.

21         DR. MEHTA:  Sure.

22         THE COURT:  The Court has in the past made a point of

23  reminding all of us of what this case is really about, and it

24  is appropriate to invoke the real persons who really are at the

25  heart of this case.

1          Ms. Schultz, does that date work, the May 14th date

2    before we do a little bit more here?

3          THE CLERK:  Yes, Your Honor.  Would you want the

4    hearing at 9:00 a.m. or 10:00 a.m.?

5          THE COURT:  I would say 10:00 a.m.

6          THE CLERK:  Yes, Your Honor.  That date and time are

7    available.

8          THE COURT:  All right.  So we'll put that down.  Then

9    just the final issues I wanted to touch base on -- and I would

10   add -- I'd like to ask Ms. Thorn if she has any thought about

11   when the new attorney general might be sworn in.  I understand

12   he has to go through confirmation proceedings.

13         But first, I think we've touched on desert

14   institutions for now.  When we revisit road-to-recovery program

15   guide resumption, we can drill down on desert institutions, if

16   that issue is still lagging.

17         MR. BIEN:  Your Honor, may I be heard?

18         THE COURT:  You may.

19         MR. BIEN:  I received information from my team that

20   there is an inconsistency in the joint filing about desert

21   institutions and that it at one point said zero people were

22   transferred in February, at another point it says 45 were

23   transferred, so we need to go back and figure that out, but to

24   that -- the extent that was a mischaracterization of

25   information, I wanted to correct it on the record today.

1        Thank you.

2        THE COURT:  All right.  Thank you on that.

3        In terms of the pending matter, the Court had an

4   evidentiary hearing on transfers into DSH.  The record is

5   complete.  There are some objections pending.

6        My question is at this point if, in fact, the pipeline

7   is moving, as best as can be expected and, in fact, moving

8   well, I'm inclined to issue an OSC letting you formalize your

9   response as to why I should not either find the matter moot for

10  now or defer consideration.  I can rule on the objections so

11  the record is clear because I know how I would rule on

12  outstanding objections, but I'm not seeing the need for me to

13  spend the time to resolve what appears to be a moot issue.

14       So who from the plaintiffs would tell me their initial

15  reactions to that thought?  I can issue an official order to

16  show cause, I'm inclined to do that, but I'm giving you a

17  heads-up and a chance to inform my current thinking.

18       MR. BIEN:  Mr. Galvan will address that, Your Honor.

19       THE COURT:  All right.  Mr. Galvan?

20       MR. GALVAN:  Yes.  Thank you, Your Honor.

21       The issue is not moot, in our opinion.  Dr. Bick said

22  earlier today that, you know, outbreaks could resume at any

23  point, that someone could come, it just takes one patient with

24  a variant that is resistant to the vaccine to restart the

25  outbreaks.  And we think that the evidence at the evidentiary

1    hearing in a briefing thereafter showed that our clients were

2    being harmed by a series of blanket policies of no transfers

3    without a test, no transfers from closed institutions and that

4    these policies were applied in a way that was across the board

5    without regard to the client's urgent need for life-saving

6    inpatient mental health care.  And we are concerned that at

7    this stage in the pandemic, with the risks that Dr. Bick talked

8    about today, that our clients still face that risk, so we think

9    a ruling is important.

10         I also consulted at docket 7085 the most recent

11   inpatient status report, and I consulted our closing brief at

12   docket 6948 regarding the issues that we'd asked for a remedy

13   on, and one of them was people who are late on their transfer

14   out of their least restrictive housing.  This is very important

15   to treatment because people who are held in the lockdown

16   max-type institutions get very little treatment.  And it's very

17   important that they get -- if they can go to least restrictive

18   housing that they do.

19         The most recent filing at 7085 I counted, the way I

20   interpret their data -- I hope I'm right -- 329 people who are

21   waiting, who are still out of least restrictive housing.  So I

22   think the pipeline is still somewhat clogged in essential

23   areas.

24         The other thing I noted in that filing is that there

25   are scores of people who are reported as exceptions, and they

1   came up with the exception COVID-19 for timely transfers.  And

2   some of those people were late more than a hundred days, some

3   of them 200 days past program guide requirements.  They're

4   reporting them under an exception that doesn't exist under this

5   Court's approved exceptions to timely transfers.  And that is

6   something that we had also asked for in our closing brief to be

7   corrected, that that -- the exception for medical care requires

8   a joint finding by the mental health and medical team that the

9   person's medical needs outweigh their need for mental health

10  care case-by-case, not simply COVID-19 across the board

11  applying to everyone.  And so all of those things are not moot.

12  Those are still live issues, Your Honor.

13          THE COURT:  All right.  What's the most recent ECF

14  number, 7085?

15          MR. GALVAN:  Yes, Your Honor.  7085 is the most recent

16  inpatient filing.

17          THE COURT:  All right.  Your thoughts on this issue?

18  I will issue the OSC and allow Mr. Galvan, on behalf of the

19  plaintiffs, to memorialize those responses, and I'll think

20  about them.  I will think about them.

21          Mr. Mello, are you the one to weigh in on this?

22          MR. MELLO:  Yes.  We believe that the matter is moot

23  and look forward to receiving that OSC.

24          I think that the Court, if it's going to look back at

25  those filings, should look closely at what the exceptions are.

1    And also, it's important to note that I believe it's -- either

2    it was the Director or Dr. Wharburton testified there are five

3    pending referrals right now, and so -- but with that I think

4    nothing more.  There's no reason to argue about a matter that

5    was done ages ago where we are in a different stage.  And we

6    are supportive of the Court taking the action that it indicated

7    in the introduction.  Thank you.

8          THE COURT:  All right.  Let me ask Secretary Allison

9    is there anything you'd like to bring to the Court's attention

10   at this point on suicide prevention?  I know an issue you're

11   working hard on.

12         SECRETARY ALLISON:  Yes, ma'am.  We've come a long way

13   fortunately.  And maybe Dr. Mehta could be our subject matter

14   expert here.  I know that he's been working very closely with

15   the Special Master and Dr. Williams, who is our suicide

16   prevention coordinator, to resolve any remaining issues as it

17   relates to suicide prevention.  And so I would definitely turn

18   it to Dr. Mehta to add anything.

19         DR. MEHTA:  Thank you.  Your Honor, I would just say

20   we've worked very closely with Nurse Barbara Barney Knox on

21   items 20 and 21, which are recent ones that we just looked at

22   recent -- looked at literally yesterday.  That's why it was on

23   my mind.

24         Dean Borg has also been extremely helpful from

25   facilities.  I think all of these names may have come up in

1    past discussions, so I only mention them here to say that we

2    have kept the pressure on this topic.  COVID has not interfered

3    with this one thing, I will say that.  We are -- we take this

4    very seriously.  In any list that I would create this is

5    probably the very first of any list of important things that we

6    work on.

7         And I will say we've had excellent support from

8    Secretary Allison and Dr. Toche and Dr. Bick.  Pretty much

9    anything that we ask for to help coordinate with other

10   departments is done immediately.  So I've been very heartened

11   to see that, Your Honor.

12        THE COURT:  All right.  We'll put this on just as

13   something to check in on at each status that we have.

14        Let me ask if plaintiffs have anything to say about

15   suicide prevention at this point.  Mr. Bien or a member of your

16   team?

17        MS. ELLS:  I'll address this, Your Honor.

18        THE COURT:  All right.  Ms. Ells.

19        MS. ELLS:  This is Lisa Ells.  We haven't received any

20   updates on this front since the last status conference, so we

21   are glad to hear from Dr. Mehta that --

22        COURT REPORTER:  I'm sorry.  I did not hear Ms. Ells

23   speak since she began speaking.  My internet cut out.  Could

24   you please begin again?

25        MS. ELLS:  Yes.  Can you hear me now?

1          COURT REPORTER:  Yes, I can.  Thank you.

2          MS. ELLS:  Okay.  Thank you.  I was just saying that

3     we have not received any updates from defendants on this topic

4     since the last status conference, so we appreciate hearing

5     Dr. Mehta's comments on this, and we look forward to further

6     updates.

7          We would request in advance of the next status

8     conference to discuss the progress defendants are making on

9     this front in advance of the status conference so we are

10    somewhat better informed before the status conference.

11         THE COURT:  Special Master Lopes, do you have a role

12    to play here in facilitating sharing of information --

13         SPECIAL MASTER LOPES:  Yes.

14         THE COURT:  -- before May 14th?

15         SPECIAL MASTER LOPES:  Yes.  I can put that on our

16    next task force meeting agenda, Your Honor.  And I can report

17    today that my suicide expert, Lindsay Hayes, is meeting every

18    week with CDCR, and he's been provided with updates on suicide

19    prevention matters.

20         He's informed me that CDCR is complying with the

21    timelines set forth in the activation schedules and that CDCR

22    is not more than 30 days behind on any project.

23         However, he has also reported to me that at our last

24    status conference there was discussion about out-of-cell

25    activities in the PIPs and further planning around that area

1    and maybe another amendment to the policy, and to this date one

2    hasn't been provided.  But all other areas are moving along.

3            THE COURT:  All right.  But I can look to you to

4    facilitate sharing of information before the next status, and

5    we can hear an update on the update --

6            SPECIAL MASTER LOPES:  Yes.

7            THE COURT:  -- that Mr. Hayes is looking for.

8            All right.  Finally, Ms. Thorn, do you have any

9    informed guess as to when the new attorney general would be on

10   the job?

11           MS. THORN:  I'm sorry, Your Honor, I don't.  I know

12   that Mr. Bonta has to go through the normal confirmation

13   process; and once that is completed and he's confirmed, then

14   he'll be sworn in.  So I don't have a timetable for that.

15           THE COURT:  All right.  Well, maybe we'll know more by

16   mid May.

17           I would contemplate a -- I don't know if

18   mid-litigation is the right term, but I would contemplate a

19   mid-litigation scheduling conference, anticipate one time, and

20   ask the attorney general to appear for that.  And I can think

21   about whether or not that would -- this Court has a strong

22   culture of putting things on the record, but scheduling

23   conferences can be held in camera.  And so just so you know,

24   Ms. Thorn, I'm contemplating that, but I won't ask for any

25   suggested schedule from your office, but I'll bring that up

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1    again on May 14th.  Understood?

2              MS. THORN:  Okay.  Understood.  Yes, Your Honor.

3              THE COURT:  All right.  All right.  I believe that

4    concludes our agenda for today.  Let me just ask Special Master

5    Lopes, anything we didn't cover that you want to say for the

6    record?

7              SPECIAL MASTER LOPES:  Thank you, Your Honor.  I

8    wanted to clarify one thing and make one statement.  The thing

9    I wanted to clarify was that you ordered the defendants to

10   submit two staffing policies.  One was on DSH and the other one

11   was for the PIPs through CDCR.  The DSH policy is largely --

12   we've all agreed to it in large measure, save the area of

13   concern outlined by Attorney Ells, and my team had some of the

14   same concerns.  But generally speaking, that plan, according to

15   my staff of experts, is satisfactory.

16             The second plan was the PIP plan, which we all

17   received on or about March 13th.  That has the nursing

18   component that wasn't brought into play.  So there are two

19   different.  One needs further work, the other Ms. Ells has an

20   objection that she'd like to pose.  That's one.  I just wanted

21   to make sure that I didn't conflate the two plans to the right

22   areas.

23             The last thing, I feel the need to say this on the

24   record, we have had in this case thousands of meetings with the

25   parties, and most of those meetings are run relatively

1    smoothly.  And tempers do flair.  And while I'm not taking

2    exception with what Dr. Mehta said, because his feelings are

3    personal to him, our meetings are not UFC fights.  But that

4    does not mean that when you have all parties concerned about

5    the same thing, which is to treat these patients in a

6    constitutionally adequate manner and treat them as human

7    beings, that doesn't mean that people don't push and pull

8    throughout the course of the meeting in some way, shape or

9    form.  But I would be remiss if I left this hearing with the

10   air that our -- any meeting that we have is akin to a wrestling

11   match.  They're not.  But occasionally we all say things that

12   we'd like to pull back or we all may express frustration that's

13   based upon our individual desires to see these inmate patients

14   or patients treated appropriately.  That's it, Your Honor.

15          THE COURT:  All right.  Thank you for that statement,

16   Special Master Lopes.

17          I realize they're off-the-record sessions, but -- I'll

18   assume that you don't have to put on your referee's outfit and

19   pull out whatever the UFC refs use to restore order.  And I

20   understand that there are important issues here on both sides

21   of the case.  I understand that.  But the goal is to keep the

22   case on track.  Given all the good time and energy spent, this

23   case cannot go off the rails.  And it should be getting closer

24   to the point where it can get back on the main line and headed

25   towards completion.

1          All right.  So just to review, we'll have a status on

2   May 14th at 10:00 a.m.  The agenda that day will be a CQIT

3   update with the Special Master's further report.  And at that

4   point in time I'll hear from the parties and decide whether or

5   not I'm going to authorize briefing of road to recovery as

6   related to the program guide resumption.  And in talking about

7   program guide resumption, we can touch on desert institutions.

8   And if the telehealth issue is teed up, we can touch on that.

9   Third, CDCR's inpatient staffing plan with a further update

10  from the Special Master beforehand.  And fourth, we'll check on

11  suicide prevention and we'll see if there are other issues

12  ready to discuss at that time.

13          I am -- just to make clear, I've issued a bench order

14  approving the defendant's filing a response to plaintiff's

15  objections on the CQIT question with those -- with that

16  response to be filed by April 1st.  The Special Master will

17  provide his report on CQIT by April 29th.  And as I discussed,

18  we will review whether or not anything further from the parties

19  is needed on May 14th.

20          On the telehealth report, I've directed defendants to

21  provide the report Dr. Bick has indicated he'll take the lead

22  on within six weeks at the outside.  That's my current

23  direction.  If more time is needed, the defendants can let me

24  know.  Once that report is filed, whenever it is, plaintiffs

25  could have two weeks to file a written response and then we

1    will calendar that as appropriate.  And again, if it's teed up

2    in time for May 14th, we can talk more about it; but if not, we

3    would not really drill down there.

4           On the roadmap to recovery, the defendants will file

5    within four weeks an updated roadmap to recovery to reopening,

6    noting their plans as of the time of filing.  And plaintiffs,

7    within one week, can file any written response.  That would tee

8    that issue up for the agenda item I've just noted on May 14th.

9           On the DSH inpatient staffing plan, I'm considering

10   that submitted before the Court.  And I'll let you know if I'm

11   looking for any stipulation or ex parte request with respect to

12   that report.  I'll look for the plaintiff's motion on the

13   hospital-wide data.  And if I approve the filing of the motion,

14   of course the defense will have a chance to respond.

15          And we have talked about a process whereby the Special

16   Master will come back to me in 30 days with a report on the

17   CDCR inpatient staffing plan.  We'll discuss that on May 14th.

18   And if I'm going to allow any further briefing or any filing of

19   any kind by a party, I'll let the parties know on May 14th.

20          I'm going to issue the OSC on the pending DSH transfer

21   issue, so you'll have a chance to respond to that,

22   memorializing and expanding on what you've said today.

23          I believe that is all I need to clarify.  The minutes

24   and the docket will reflect everything I've just said.  Let me

25   just ask, any need for clarification on anything at this point,

1    Mr. Bien?

2              MR. BIEN:  No, Your Honor.

3              THE COURT:  Mr. Mello?

4              MR. MELLO:  No, Your Honor.  Thank you.

5              THE COURT:  All right.  Very well.  Thank you very

6    much.  Thank you all for appearing, including Secretary Allison

7    and her staff and the DSH director and Dr. Wharburton.  Thank

8    you.  You may sign off.

9              THE CLERK:  Court is in recess.

10       (Concluded at 12:06 p.m.)

11

12                    C E R T I F I C A T E

13

14       I certify that the foregoing is a true and correct

15    transcript of the record of proceedings in the above-entitled

16    matter.

17
     /s/Jennifer Coulthard                March 27, 2021
18   JENNIFER L. COULTHARD, RMR, CRR           DATE
     Official Court Reporter
19

20

21

22

23

24

25

     JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312