DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CLARIFY ORDER OF JUNE 13, 2002**<br><br>Judge: Hon. Kimberly J. Mueller<br>Date: May 7, 2020<br>Time: 10:00 am<br>Crtrm.: Virtual |

[3704763.6]

# NOTICE OF MOTION

PLEASE TAKE NOTICE that on May 7, 2021 at 10:00 am, or as soon as the matter may be heard before the Honorable Kimberly J. Mueller, at the United States District Court at 501 I Street, Sacramento, California 95814, Plaintiffs will move for clarification of the Court's June 13, 2002 Order, ECF No. 1383, requiring that Defendants "maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including contracted services[.]"  Plaintiffs' motion is based on this notice, the following memorandum of points and authorities, the declaration and exhibits filed in support, and the pleadings and records on file with the Court in this action.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

**INTRODUCTION**

2      On June 13, 2002, this Court ordered Defendants to "maintain the vacancy rate

3 among psychiatrists and case managers at a maximum of ten percent, including contracted

4 services[.]"  Order, ECF No. 1383 at 4 (June 13, 2002) ("2002 Order").[1]  The Court did not

5 define the term "psychiatrists" in its 2002 Order, but for more than a decade the parties and

6 the Special Master agreed that it included not only Defendants' "staff" psychiatrists but

7 also the more experienced psychiatrists who both provide treatment and supervise those

8 staff psychiatrists.  In 2018, however, with enforcement proceedings looming, Defendants

9 argued for the first time that they are not required to fill the "chief" and "senior psychiatrist

10 supervisor" positions described in their 2009 Staffing Plan because the 2002 Order does

11 not expressly refer to supervisory positions.  *See* Pls' Request for Leave, ECF No. 7072 at

12 2 (March 5, 2021).  Because the parties' attempts to resolve this dispute have reached an

13 impasse, *see id.* at 3-4—and because Defendants continue to allow supervisory psychiatrist

14 positions to sit under-allocated and vacant[2]—Plaintiffs now seek an order clarifying that

15 the maximum vacancy rate in the 2002 Order applies to *all* Defendants' psychiatry

16 positions, including but not limited to chief psychiatrists and senior psychiatrist

17 supervisors.[3]

18

**LEGAL STANDARD**

19      "A court may clarify its order for any reason."  *In re Twitter, Inc. Sec. Litig.*,

20

_____

21 [1] Pin cites in docket filings refer to ECF pagination where available and to internal pagination where ECF pagination is not available.  Documents that were not filed using the ECF system or that are otherwise unavailable in digital form in that system are cited as

22 "Dkt. No." rather than "ECF No."

23 [2] *See* Declaration of Alexander Gourse in Support of Plaintiffs' Motion to Clarify Order of June 13, 2002 filed herewith ("Gourse Decl.") ¶¶ 2-3 and Exs. 1-2 (showing that as of

24 January 2021 Defendants had filled only 14 of 18 chief psychiatrist positions and only 15 of 20.5 senior psychiatrist supervisor positions at CDCR institutions, and only 2 of the 8

25 additional senior psychiatrist supervisor positions allocated to the PIPs); Pls' Objs & Comments re: Defs' Proposed Revisions to 2009 Staffing Plan, ECF No. 6994 at 2-7

26 (explaining that Defendants are under-allocating supervisory staffing positions in contravention of the requirements of their 2009 Staffing Plan, in addition to failing to fill

27 the positions they do allocate).

[3] The Court granted Plaintiffs' request for leave to file this motion.  *See* Minute Order,
28 ECF No. 7075 (March 9, 2021).

1    No. 16-cv-05314-JST, 2020 WL 2519890, at *1 (N.D. Cal. May 18, 2020) (quoting *Wahl*

2    *v. Am. Sec. Ins. Co.*, No. 08-cv-0555 RS, 2010 WL 2867130, at *3 (N.D. Cal. July 20,

3    2010)). Clarification of a prior order is "undoubtedly proper" as a precursor to enforce-

4    ment proceedings, such as those contemplated by this Court's October 10, 2017 Order,

5    ECF No. 5711, because clarification can "facilitate compliance with the order" and

6    "prevent 'unwitting contempt.'" *Paramount Pictures Corp. v. Carol Publishing Group*, 25

7    F. Supp. 2d 372, 374 (S.D.N.Y. 1998) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9,

8    15 (1945)); s*ee also Gautreaux v. Chicago Housing Authority*, 4 F. Supp. 2d 757 (N.D. Ill.

9    1998) (clarifying scope of order issued nearly thirty years earlier), *appeal dismissed for*

10   *lack of jurisdiction*, 178 F.3d 951 (7th Cir. 1999). "[A] court should construe the scope of

11   an injunction in light of its purpose and history, in other words, 'what the decree was really

12   designed to accomplish.'" *Salazar v. Buono*, 559 U.S. 700, 762 (2010) (Breyer, J.,

13   dissenting) (quoting *Mayor of Vicksburg v. Henson*, 231 U.S. 259, 273 (1913)).

**ARGUMENT**

15
16
   **A.**     **The Plain Text of the 2002 Order Extends the 90-Percent Fill Requirement to All CDCR Psychiatrists, Including Chief Psychiatrists and Senior Psychiatrist Supervisors.**

17      The relevant text of the 2002 Order is broad enough to apply to chief psychiatrists

18   and senior psychiatrist supervisors. That text states that "Defendants shall maintain the

19   vacancy rate among psychiatrists and case managers at a maximum of ten percent,

20   including contracted services." 2002 Order at 4. Although the 2002 Order does not define

21   the term "psychiatrists," there is little question that Defendants' chief psychiatrists and

22   senior psychiatrist supervisors are "psychiatrists" within the ordinary meaning of the term.

23   *See United States v. Ezeta*, 752 F.3d 1182, 1185 (9th Cir. 2014) (undefined terms generally

24   construed according to their ordinary or natural meaning). A psychiatrist is a "medical

25   doctor who diagnoses and treats mental, emotional, and behavioral disorders."

26   "Psychiatrist," *Merriam-Webster.com Dictionary*.[4] Defendants' 2009 Staffing Plan makes

27

28   [4] https://www.merriam-webster.com/dictionary/psychiatrist.

1    it clear that chief psychiatrists and senior psychiatrist supervisors diagnose and treat

2    mental, emotional, and behavioral disorders.  *See* Defs.' 2009 Staffing Plan, ECF No. 3693

3    at 31-32; *see also* ECF No. 6380, Oct. 23, 2019 Golding Bench Ruling Tr. at 455:9-16

4    (noting testimony from Defendants' Statewide Chief of Psychiatry that supervisory

5    psychiatry staff spend between a third and half of their time providing direct patient care).

6    Indeed, Defendants themselves classify the positions of "chief psychiatrist" and "senior

7    psychiatrist (supervisor)" as sub-categories of "psychiatrist" positions in the monthly

8    vacancy summaries they provide to Plaintiffs and the Special Master in connection with

9    this litigation.  *See, e.g.*, Gourse Decl. ¶ 4 & Ex. 3 at 2.  Because chief psychiatrists and

10   senior psychiatrist supervisors are psychiatrists, they are included in the 90-percent fill

11   requirement according to the plain text of the 2002 Order.

12        Defendants have argued in the past that the reference to "psychiatrists" in the 2002

13   Order actually means "staff psychiatrists" because it appears in the same sentence as the

14   term "case managers."  According to Defendants, this "shows that the application of the

15   ten percent vacancy rate is limited to line staff, not supervisors," because the Program

16   Guide supposedly excludes supervisory psychologists from the definition of "case

17   managers."  *See* Email from Melissa Bentz (Nov. 29, 2018), Ex. F to Special Master Labor

18   Economist Report, ECF No. 6695 at 56 (citing Program Guide Appendix A at A-1).  The

19   Court should reject this argument for multiple reasons.  For one thing, the Program Guide

20   does *not* exclude supervisory staff from its definition of "case manager."  Rather, the

21   provision cited by Defendants states that a "clinical case manager" is "a mental health

22   clinician, typically a psychologist or Psychiatric Social Worker, who provides functions

23   such as assessment, intervention, treatment planning, treatment, and case review."

24   MHSDS Program Guide (2018), ECF No. 5864-1 at 196 (July 30, 2018).  By defining

25   "case manager" primarily in functional terms, the Program Guide leaves open the

26   possibility that any mental health clinician (or at least any psychologist or psychiatric

27   social worker) who provides the listed functions is a "case manager," even if that person is

28   also a supervisor.  Defendants' 2009 Staffing Plan, in turn, makes it clear that supervisory

1    clinicians *do* provide the listed functions.  *See, e.g.*, Defs' 2009 Staffing Plan at 27-28

2    (tasking chief and senior psychologist supervisors with, among other things, "the

3    professional delivery of mental health services in a corrections environment," "the delivery

4    of all treatment and patient needs," and ensuring "timely and systematic responsiveness to

5    inmate-patient needs").  The term "case managers" therefore incudes supervisory staff as

6    well as line staff, and this Court's reference to "case managers" in the 2002 Order proves

7    the opposite of what Defendants' claim it does.

8         At most, the term "case managers" is ambiguous as to its applicability to

9    supervisory staff, making this case a poor fit for the *noscitur a sociis* and *ejusdem generis*

10   canons of interpretation Defendants have relied on to support their position.  *Cf. Graham*

11   *County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288-289

12   (2010) (rejecting claim that statutory reference to "administrative" sources of information

13   referred only to *federal* "administrative" sources, even though it appeared in the statute

14   alongside two other indisputably federal sources of information).[5]

15        Even if Defendants were correct that the term "case managers" excludes

16   supervisory staff, their argument would still be unpersuasive.  If the Court had intended to

17   limit the application of the 2002 Order to only a subset of psychiatrists, such as staff

18   psychiatrists, it would have done so by referring to "staff psychiatrists" or "line

19   psychiatrists"—just as, in Defendants' interpretation, it purportedly used the term "case

20   managers" (rather than the broader categories of "psychologists" and "social workers") to

21   refer to the subset of non-supervisory psychologists and social workers.  But the Court did

22   not do this.  Instead, it stated that Defendants must maintain a 90-percent fill rate among

23   "psychiatrists"—a category it did not define but whose plain meaning clearly includes staff

24   psychiatrists, Chief Psychiatrists, and Senior Psychiatrist Supervisors alike.  There is no

25

---

26   [5] While Defendants argue that "psychiatrists" should be construed narrowly to conform to the term "case managers," it would be just as plausible to interpret "case managers" in

27   light of the term "psychiatrists" and reach the opposite conclusion from the one advocated by Defendants:  i.e., that *both* terms should be interpreted as including supervisory staff

28   because the term "psychiatrists" includes supervisory psychiatrists as well as staff psychiatrists.

reason to believe that the Court intended to create a major exception to the 90-percent fill requirement but failed to do so explicitly.  *Cf. Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001) ("Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

Because the plain text of the 2002 Order requires Defendants to fill 90 percent of *all* psychiatrist positions, the Court should grant Plaintiffs' motion.

**B.      The Historical Context of the 2002 Order Makes Clear the 90 Percent Fill Requirement Applies to Chief and Senior Psychiatrist Supervisor Positions.**

At the time it issued the 2002 Order, the Court was well aware that supervisory psychiatry vacancies were causing problems in Defendants' mental health system.  The Special Master began monitoring Defendants' supervisory psychiatry staffing no later than 1998, and regularly reported to the Court on both the need for supervisory psychiatry positions at Defendants' institutions and Defendants' failure to fill those positions in the months and years immediately preceding and immediately following the 2002 Order.  *See* Second Round Monitoring Rpt., Dkt. No. 981 at 10, 17, 23, 31, 46 (Oct. 23, 1998); Third Round Monitoring Rpt., Dkt. No. 1036 at 41-42, 86, 121, 191, 205-06, 213 (May 26, 1999); Fourth Round Monitoring Rpt., Dkt. No. 1093 at 22-23, 37, 70-71, 100, 109-10, 188, 202, 304 (Dec. 7, 1999); Fifth Round Monitoring Rpt., Dkt. No. 1144 at 32, 34, 141, 150, 160 (April 14, 2000); Sixth Round Monitoring Rpt., Dkt. No. 1213 at 28-29 (Oct 10, 2000); Eighth Round Monitoring Rpt., Dkt. No. 1317 at 47, 64, 86, 106-07, 113, 170 (Nov. 27, 2001); Ninth Round Monitoring Rpt., Dkt. No. 1373 at 39, 45-46, 84, 88, 116 (April 25, 2002); Tenth Round Monitoring Rpt., Dkt. No. 1446 at 17, 26, 59, 103, 113, 151, 165, 232 (Oct. 23, 2002); Eleventh Round Monitoring Rpt., Dkt. No. 1519 at 27, 101-02, 155 (June 10, 2003); Twelfth Round Monitoring Rpt., Dkt. No. 1553 at 19, 219 (Dec. 9, 2003); Thirteenth Round Monitoring Rpt., Dkt. No. 1587 at 34, 152, 157-58, 218, 229, 263 (June 18, 2004).

1    The Special Master repeatedly emphasized the importance of supervisory

2  psychiatrists in these reports and warned that vacant supervisory psychiatrist positions

3  were negatively affecting the quality of care provided to *Coleman* class members.  In April

4  2002, for example, less than two months before the Court ordered Defendants to fill 90

5  percent of their "psychiatrist[]" positions, the Special Master reported that "[t]he loss of

6  the chief psychiatrist" at CSP–Solano "made it virtually impossible for the institution to

7  sustain any organized quality assurance efforts."  Ninth Round Monitoring Rpt., Dkt.

8  No. 1373 at 45-46 (April 25, 2002).  In the same report, the Special Master warned that the

9  absence of a chief psychiatrist at ASP had left the institution's mental health program

10  "adrift," while WSP had finally "hired a much-needed chief psychiatrist to fill a position

11  that had long been vacant."  *Id.* at 88, 116.  In October 2002, just four months after the

12  Court ordered Defendants to fill 90 percent of their "psychiatrist" positions, the Special

13  Master reported that the vacant chief psychiatrist position at HDSP "created serious

14  problems of service delivery and quality."  Tenth Round Monitoring Rpt., Dkt. No. 1446 at

15  17 (Oct. 23, 2002).   The Special Master also warned that the "absence of a chief

16  psychiatrist" at NKSP had resulted in inadequate supervision of both contract and

17  permanent staff psychiatrists at the institution, *id.* at 145, 151, and that "the lack of a chief

18  psychiatrist" at LAC "created serious leadership problems" there, *id.* at 165.  As a result of

19  these and similar reports from the Special Master, the problem of inadequate supervisory

20  psychiatry staffing was a prominent issue in this case at the time the Court issued the 2002

21  Order.

22    Indeed, the rationale for ordering Defendants to fill 90 percent of psychiatrist

23  positions was directly related to the problem of inadequate supervision in Defendants'

24  psychiatry program.  The Court issued the 2002 Order in response to a series of Special

25  Master reports specifically devoted to the problem of staffing vacancies.  The first of these

26  reports, issued in May 1999, found that Defendants' "extensive" use of temporary contract

27  psychiatrists resulted in "inadequate psychiatric care," in large part due to Defendants'

28  inadequate supervision of contract psychiatrists.  *See* Special Master's Rpt. on Staffing

1    Vacancies, ECF No. 1032 at 6, 9-10 (May 19, 1999).  The Special Master also suggested

2    that Defendants' failure to provide adequate psychiatric supervision was at least partly

3    caused by the uncompetitive compensation structure Defendants offered to supervisory

4    psychiatrists.  *See id.* at 12-13 (noting "a flurry of resignations among [psychiatrist]

5    supervisors in favor of staff positions with fewer responsibilities and higher pay").  To

6    remedy the problem of inadequate psychiatric care, the Special Master recommended—

7    and the Court subsequently ordered—that Defendants fill at least 75 percent of

8    "psychiatrist" positions while also reducing their reliance on "short-term contract

9    psychiatrists."  *Id.* at 14; Order, ECF No. 1055 at 4 (July 26, 1999).  But Defendants did

10   not comply with this Order.  Instead, they reduced their psychiatrist vacancy rate by

11   *expanding* their use of short-term contract psychiatrists.  *See* Special Master's Second

12   Quarterly Rpt. re Staffing Vacancies, ECF No. 1351 at 11-12 (Feb. 26, 2002).  By early

13   2002, the Special Master concluded that the underlying purpose of the July 1999 Order—

14   ensuring that Defendants provide constitutionally adequate psychiatric care to *Coleman*

15   class members—would be better served by requiring Defendants to improve their

16   management and oversight of contract psychiatrists, rather than firing them.  *Id.* at 5-6, 11-

17   12.  As a result, he recommended that the Court modify the July 1999 Order and require

18   Defendants "to maintain the vacancy rate among psychiatrists and case managers at a

19   maximum of ten percent, including contracted services."  *Id.* at 11.  This change would

20   "secure … compliance with the spirit of the July 26, 1999 mandate on vacancies," the

21   Special Master explained.  *Id.* at 12.  The Court's 2002 Order adopted the Special Master's

22   recommendation in full.  *See* ECF No. 1383 at 2, 4.

23         "[A] court should construe the scope of an injunction in light of its purpose and

24   history, in other words, 'what the decree was really designed to accomplish.'"  *Salazar*,

25   559 U.S. at 762 (Breyer, J., dissenting) (quoting *Mayor of Vicksburg v. Henson*, 231 U.S.

26   259, 273 (1913)).  In this case, the history of the 2002 Order shows (a) that it was issued at

27   a time when the problem of inadequate psychiatric supervision was a prominent issue in

28   this case, and (b) that it increased the required fill-rate for psychiatrists from 75 percent to

1    90 percent for the specific purpose of ensuring adequate supervision of Defendants'

2    contract psychiatrists.  Defendants' suggestion that the 2002 Order does not apply to Chief

3    Psychiatrists and Senior Psychiatrist Supervisors is implausible in light of this history, and

4    the Court should grant Plaintiffs' motion in full.

5

6    **C.    The Purpose of the 2002 Order Would be Advanced by Continuing to Apply its 90 Percent Fill Requirement to Supervisory Psychiatrist Positions.**

7         Adequate supervision of Defendants' psychiatry program is no less important today

8    than it was in 2002, and a 90-percent fill requirement for supervisory psychiatry positions

9    remains a necessary part of any remedy for the constitutional violations at issue in this

10   case.  Defendants continue to employ short-term contract psychiatrists in large numbers,

11   and close oversight of these contractors remains essential to the provision of adequate

12   psychiatric care.  Defendants also depend on supervisory psychiatry staff to formulate and

13   implement quality assurance programs and to provide direct patient care in MHCBs and

14   elsewhere.  Indeed, Defendants themselves have acknowledged the necessity of filling

15   their supervisory psychiatrist positions, both in their 2009 Staffing Plan and in recent

16   testimony to the Court.  This Court should clarify that its 2002 Order requires Defendants

17   to fill 90 percent of supervisory psychiatrist positions.

18        Defendants continue to rely on a veritable army of short-term contract psychiatrists

19   to provide psychiatric care to the *Coleman* class, just as they did in 2002.  *See, e.g.*, Gourse

20   Decl. ¶ 5 and Ex. 4 (showing that Defendants employed between approximately 51 and 65

21   registry psychiatrists each month from August 2020 through January 2021).  The need for

22   supervision of these contract psychiatrists has not diminished since 2002, and remains

23   essential to delivering constitutionally adequate care to class members.  *See, e.g.*, Eleventh

24   Round Monitoring Rpt., Dkt. No. 1519 at 155 (June 10, 2003) ("NKSP was in serious need

25   of a chief psychiatrist to provide supervisory stability and accountability for staff clinicians

26   and contractors."); Thirteenth Round Monitoring Rpt., Dkt. No. 1587 at 157-58 (June 18,

27   2004) (noting that NKSP "continued to experience problems with continuity of care,

28   particularly psychiatric care, due to the number of contract clinicians employed by the

facility and the lack of a chief psychiatrist"); *id.* at 218 ("Because VSPW lacked a chief or senior psychiatrist to manage and supervise mental health services, the reliance on so large a cadre of contractors resulted in substantial discontinuities in care[.]"); *id.* at 229 (noting that the "relatively large corps of contracted clinicians" at HDSP and NKSP "did not receive the close administrative and clinical supervision they needed" due to the lack of a chief psychiatrist at the institutions); Fourteenth Round Monitoring Rpt., ECF No. 1649 at 151 (Feb. 11, 2005) (noting that VSPW's "reliance on so many contract clinicians was exacerbated in the absence of a chief or senior psychiatrist to orient and supervise contractors"); Fifteenth Round Monitoring Rpt., ECF No. 1746 at 72, ECF No. 1746-2 at 85 (Jan. 23, 2006) (noting that the lack of chief or supervisory psychiatrists at SCC and CRC undermined efforts at coordination and "resulted in some increasing problems with continuity of care and frequent medication changes"); Twenty-Fifth Round Monitoring Rpt., ECF No. 4298 at 48 (Jan. 18, 2013) (finding that the filling of supervisory psychiatrist positions is "critical" to, among other things, "good management and utilization of line staff"); Twenty-Seventh Round Monitoring Rpt., ECF No. 5779 at 36 (Feb. 13, 2018) (noting that statewide staffing increases during the monitoring period "were not sufficient to counterbalance the positions that saw an increase in vacancy rates," including chief psychiatrist positions). Indeed, Defendants' recent revisions to their 2009 Staffing Plan show that the need for supervisory psychiatrists is even greater than it was at the time of the 2002 Order. *See* Defs' Adjustments to 2009 Staffing Plan, ECF No. 6978-1 at 3-27 (Dec. 11, 2020) (requiring additional oversight of psychiatric nurse practitioners by Defendants' supervisory psychiatrists and expanding Defendants' use of telepsychiatrists).

Defendants also depend on supervisory psychiatrists to carry out their quality assurance programs and ensure that *Coleman* class members receive constitutionally adequate care. "Chief and senior staff play a critical part in ensuring the delivery of good clinical care," the Special Master has explained, and "[t]his perhaps most directly manifested in the role of supervisory staff in the quality improvement activities—an area of great importance to the completion of the remedial effort in this case[.]" Twenty-Fifth

1    Round Monitoring Rpt., ECF No. 4298 at 48 (Jan. 18, 2013); *see Coleman v. Wilson*, 912

2    F. Supp. 1282, 1308 (E.D. Cal. 1995) (finding that Defendants cannot provide adequate

3    mental health care without quality assurance to ensure staff competence); *see also, e.g.*,

4    Ninth Round Monitoring Rpt., Dkt. No. 1373 at 39, 45-46 (April 25, 2002) (noting that the

5    lack of a chief psychiatrist at CSP–Solano undermined the institution's quality assurance

6    efforts); Tenth Round Monitoring Rpt., Dkt. No. 1446 at 17 (Oct. 23, 2002) (finding that a

7    vacant chief psychiatrist position at HDSP "created serious problems of service delivery

8    and quality"); Special Master's Suicide Prevention Expert's Re-Audit, ECF No. 5396 at

9    77, 120 (Jan. 13, 2016) (finding that psychiatrists at PBSP and CCI failed to participate in

10   mandatory suicide prevention meetings at PBSP and CCI while the institutions' chief

11   psychiatrist positions were vacant).  Accordingly, supervisory psychiatrists play key roles

12   on Defendants' Suicide Prevention and Response Focused Improvement Teams (SPRFIT)

13   and on their Mental Health Program Subcommittees.  *See* MHSDS Program Guide (2018),

14   ECF No. 5864-1 at 171, 581-82, 588 (July 30, 2018) (requiring the service of chief and

15   supervising psychiatrists on SPRFIT committees); *id.* at 265, 267 (July 23, 2013 Policy on

16   Mental Health Program Subcommittee 12.01.100, providing for the participation of chief

17   psychiatrists on MHPS committees).  Notably, supervisory psychiatrists are mandatory

18   members of Defendants' local SPRFITs whose attendance is required to establish a

19   quorum, and the Special Master's Suicide Prevention expert has repeatedly found the

20   majority of audited institutions' SPRFITs fail to meet the quorum requirement and remain

21   deeply problematic in multiple other ways that required recent Court intervention.  *See id.*

22   at 581-82, 588 (February 2, 2018 Policy on Enhancements to the Suicide Prevention and

23   Response Focused Improvement Teams, requiring attendance of supervising psychiatrists

24   at SPRFIT meetings to establish quorum); Special Master's Suicide Prevention Expert's

25   Fourth Re-Audit, ECF No. 6879-1 at 30-33 (Sept. 23, 2020); Minute Order, Jan. 29, 2021,

26   ECF No. 7043 (ordering Defendants to implement activation schedule to address

27   deficiencies in suicide prevention noted in Hayes Fourth Re-Audit).

28           Defendants have conceded the necessity of filling supervisory psychiatric positions

by including those positions in their 2009 Staffing Plan and subsequent modifications to it. *See* Order, ECF No. 5711 at 16 (Oct. 10, 2017) (noting that Defendants have represented to the California Legislature that "the staffing levels in the 2009 Staffing Plan were 'appropriate' and necessary to meet constitutional standards"). The 2009 Staffing Plan makes it clear that adequate supervision of psychiatrists is necessary to provide constitutionally adequate care. According to the Plan, Chief Psychiatrists have "primary responsibility for formulary oversight of psychiatric medications and for quality improvement related to psychiatric medication prescription, monitoring, adjustment and delivery." 2009 Staffing Plan, ECF No. 3693 at 31 (Sept. 30, 2009). They are also responsible for, among other things, "writing and updating Local Operating Procedures (LOPs) related to the practice of psychiatry" and "ensuring that practices are consistent with the most recent departmental policies." *Id.* Senior Psychiatrist Supervisors, meanwhile, provide many essential functions, including "clinical supervision of staff psychiatrists," "various administrative tasks related to formulary, medication management, and continuity of psychiatric medications," "generation and periodic reviews of LOPs," ensuring psychiatry practice at the institution conforms to department policy, and "quality improvement activities including peer/professional review[.]" *Id.* at 32. In MHCB units in particular, Senior Psychiatrist Supervisors not only supervise staff psychiatrists, they also "provide clinical care for difficult cases, review documentation initiating involuntary medication and restraints, and monitor use of restraints." *Id.* at 22.

On top of those supervisory duties, this Court has found that supervising psychiatrists in the MHSDS today "have clinical responsibilities far in excess of those contemplated by the 2009 staffing plan." ECF No. 6380, Oct. 23, 2019 Golding Bench Ruling Tr. at 455:9-16 (noting testimony from Statewide Chief of Psychiatry and former Statewide Chief of Telepsychiatry that supervisors provide direct patient care between a third and half the time); *see also* Order, ECF No. 6427 at 36 (Dec. 17, 2019) ("There is no dispute that CDCR supervising psychiatrists see inmate patients for clinical appoint-ments[.]"). Indeed, Defendants' own high-level headquarters staff have testified to this

1  Court about the importance of adequate supervisory psychiatry staffing on multiple

2  occasions in recent years.  According to Defendants' Statewide Chief of Psychiatry, "[w]e

3  need psychiatric supervisors to be helping to organize and manage care so that it's quality

4  care," and the absence of such supervision "decimates[s] the ability of [CDCR's]

5  psychiatrists to take care of our patients."  ECF No. 6377, Oct. 15, 2019 Tr. at 33:14-20;

6  *see also id.* at 33:9-13 (Statewide Chief of Psychiatry testifying that without adequate

7  numbers of supervisory psychiatrists, "each little bit of care that is done per patient is less

8  complete and less well done and, thus, fewer supervisors creates a need for greater

9  frequency of care"); *id.* at 73:11-74:1 (Statewide Chief of Psychiatry further testifying that

10  the absence of adequate numbers of supervisory psychiatrists "means you need far more

11  line staff psychiatrists" because the quality of care provided is lower); ECF No. 6406,

12  September 19, 2019 Kuich Deposition Tr. at 34:11-35:12 (former Statewide Chief of

13  Telepsychiatry describing importance of supervising psychiatrists in MHSDS).

14        The filling of supervisory psychiatrist positions remains a necessary part of the

15  remedy in this case, and this Court should grant Plaintiffs' motion to clarify that its 2002

16  Order requires Defendants to fill at least 90 percent of supervisory psychiatrist positions.

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

[3704763.6]

13

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CLARIFY ORDER OF JUNE 13, 2002

**CONCLUSION**

This Court should grant Plaintiffs' motion because the plain text, history, and purpose of the 2002 Order all demonstrate that it requires Defendants to fill at least 90 percent of supervisory psychiatrist positions.

**CERTIFICATION OF ORDERS REVIEWED**

Plaintiffs' counsel certifies that he reviewed the following orders relevant to this filing: ECF and Dkt. Nos. 1055, 1383, 5711, 6427, 6794, 6938, 7003, 7035, 7043, 7075.

DATED:  April 9, 2021                    Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Alexander Gourse*
        Alexander Gourse

Attorneys for Plaintiffs