DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

   Plaintiffs,

  v.

GAVIN NEWSOM, et al.,

   Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE REGARDING INPATIENT ADMISSIONS EVIDENTIARY HEARING**

Judge:   Hon. Kimberly J. Mueller

## INTRODUCTION

The barriers to life-saving inpatient care that Plaintiffs demonstrated in the October 23, 2020 hearing have not been removed. The Defendant officials in this case continue to employ across-the-board, one-size-fits all exclusions from inpatient care based on COVID-19 testing and overall institution closures. In addition, hundreds of *Coleman* class members are receiving limited inpatient care because they are being held outside of the least restrictive housing locations that would allow for greater out of cell time and access to group treatment. These practices continue to place class members at risk of serious harm and death. The Court noted in the March 26, 2021 Order to Show Cause that there was no wait list for Department of State Hospitals inpatient beds during the week of March 8, 2021. ECF No. 7107 at 2. As discussed below, Defendants reported to the Court that there was a waitlist just a few days before March 8, 2021. Defs' Census, Waitlist, and Transfer Timelines for Inpatient Care ("Inpatient Census and Waitlist Reports"), March 15, 2021, ECF No. 7085-1 at 2 (reporting 19 patients on COVID-19-related holds with wait times in excess of Program Guide limits as of February 28, 2021). Even if Defendants can achieve occasional point-in-time clearance of the waitlist, patients are still experiencing long delays before they arrive in DSH inpatient beds, as documented in the inpatient reports filed with the Court each month. Defendants report nearly all of the delays as being due to COVID-19. The issues tried on October 23, 2020 are not moot. Plaintiffs therefore respectfully request a ruling on the issues raised in the evidentiary hearing.

## LEGAL STANDARD

Mootness exists where the party seeking relief no longer suffers any harm for which the Court can fashion effective relief. *Nw. Envtl. Def. Ctr. v. Gordon,* 849 F.2d. 1241, 1244-45 (9th Cir. 1988). To the extent that Defendants contend that the issues tried in the evidentiary hearing are moot, the Defendants bear the burden to demonstrate mootness. "The party asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court to provide." *In re Pintlar Corp.*, 124 F.3d 1310, 1312 (9th Cir.

1    1997) (citation omitted); *accord Norman-Bloodsaw v. Lawrence Berkeley Lab.,* 135 F.3d

2    1260, 1274 (9th Cir. 1998).

3        In addition, a defendant's "voluntary cessation of a challenged practice does not

4    deprive a federal court of its power to determine the legality of the practice." *United*

5    *States v. Brandau*, 578 F.3d 1064, 1068 (9th Cir. 2009) (internal quotation marks and

6    citation omitted).  A defendant's voluntary cessation of offending conduct will only moot a

7    case when two strict conditions are met:  "(1) subsequent events have made it absolutely

8    clear that the allegedly wrongful behavior cannot reasonably be expected to recur, and

9    (2) interim relief or events have completely and irrevocably eradicated the effects of the

10   alleged violation." *Norman-Bloodsaw*, 135 F.3d at 1274 (internal quotation marks,

11   brackets, and citations omitted).

12       Even if a dispute is moot because the challenged conditions no longer exist, the

13   Court may still decide the question under the mootness doctrine exception for "situations

14   that are 'capable of repetition, yet evading review.'" *Brandau,* 578 F.3d at 1067 (quoting

15   *Gerstein v. Pugh,* 420 U.S. 103, 111 n.11 (1975)).  Under such circumstances, even if "the

16   particular situation precipitating a constitutional challenge to a government policy may

17   have become moot, the case does not become moot if the policy is ongoing." *Brandau,*

18   578 F.3d at 1067 (internal quotation marks omitted).  Even if a written policy has changed,

19   the question is not moot if the challenged practices continue.  *Id.*

20       Here, the harms caused by Defendants' COVID-19 inpatient transfer policies are

21   not moot.  The transfer delays due to COVID-19 policies remain substantial, with scores of

22   class members delayed far beyond Program Guide deadlines.  Defendants continue to

23   maintain lists of "closed institutions," and have admitted in their most recent inpatient

24   waitlist report that they continue to delay inpatient transfers due to COVID-19 closures.

25   Inpatient Census and Waitlist Reports, March 15, 2021, ECF No. 7085-1 at 2 (Director

26   Clendenin letter discussing "patients from facilities with active COVID-19-related holds

27   waiting beyond Program Guide transfer timelines.").  Defendants may point to the smaller

28   point-in-time numbers of patients on COVID-19 holds compared to over 50 patients at the

time of the evidentiary hearing.  Indeed on some days Defendants may clear the waitlist entirely, as appears to have happened just before the Court received the report referenced on page 2 of the Order to Show Cause at ECF No. 7107.  But patients are arriving at DSH only after long wait times, sometimes beyond 100 days, and far beyond what the Program Guide requires.  As discussed below, Defendants claim that these delays are all excused due to "Covid-19."  The continuing harms to any patients held beyond Program Guide timelines preclude any finding of mootness.  And even if the smaller number weighed in favor of mootness, the fact that Defendants are still applying across-the-board COVID-19 holds shows that the inpatient waitlists will grow again in the event of a surge in positive cases caused either by COVID-19 variants arriving in CDCR prisons, lack of staff acceptance of vaccines, or an influx of unvaccinated people from county jails.  *See* Transcript of Mar. 25, 2021 Status Conf., ECF No. 7111 at 20-21; 40 (Dr. Bick).

## DISCUSSION

The Court set three issues for the evidentiary hearing on October 23, 2020:

> (1) as required by the April 24, 2020 order, have DSH and CDCR been complying with the Program Guide requirements, as modified by the temporary addition of COVID-19 screening, for transfer of class members to inpatient hospital beds;

> (2) if they are not complying with those requirements, in what way or ways are they deviating from those requirements; and

> (3) what is the rationale for any deviation.

May 7, 2020 Order, ECF No. 6660 at 2.  The Court stated that Defendants have the burden of proving that any additional deviations from the Program Guide, other than COVID-19 screening, are justified.  *Id.*

After the hearing, the Court ordered briefing on a fourth question:  "Can or should the court presume cognizable harm to class members whose transfer to necessary inpatient care is delayed beyond Program Guide timelines and for reasons outside the court-approved exceptions to those timelines."  Nov. 19, 2020 Minute Order, ECF No. 6961.

Defendants did not meet their burden of proof to demonstrate that their acts and

1  omissions blocking transfers to Department of State Hospitals (DSH) inpatient beds are

2  based on a reasonable balancing of the risks of harm from delayed mental health treatment

3  and from COVID-19.  *See* Plaintiffs' Closing Brief, Nov. 13, 2020, ECF No. 6948.  They

4  pointed to no public health guidance, and presented no expert testimony that directs

5  hospitals of any kind to close their doors to otherwise eligible patients who have been

6  exposed to COVID-19.  *Id.* at 17.  A qualified infectious disease expert, Dr. Adam

7  Lauring, testified that there are many measures that hospitals can and have taken to

8  mitigate COVID-19 risks, but closing admissions is not one of them.  *Id.* at 17-18.

9  Dr. Lauring reviewed DSH's COVID-19 protocols in detail, and testified that they were

10 adequate to mitigate COVID-19 risk without closing admissions to *Coleman* patients.  *Id.*

11 at 18-20.

12        On the other side of the balance are the serious risks of injury and death posed by

13 delayed access to mental health care.  Here again, Defendants presented no evidence

14 regarding the fate of patients denied access to DSH beds, other than conclusory assertions

15 that care was adequate in the units where patients waited for admission.  *Id.* at 7:2-5 (Drs.

16 Warburton and Bick had not looked at patient records).  Plaintiffs presented evidence of

17 the harms suffered by individual patients while waiting to transfer to DSH.  *Id.* at 12-14.

18 The harms faced by these patients included severe catatonic episodes with loss of bladder

19 control, suicide attempts with massive blood loss, ingestion of objects, self-cutting,

20 headbanging, and pulling out of hair.  *Id.*  Even when patients suffer no physical injuries

21 from self-harming behavior, patients with untreated or inadequately treated psychosis

22 suffer potentially irreparable harms.  *See* 10/23/2020 RT 258:20-259:13 (Dr. Stewart

23 testimony that "if you allow the person to remain psychotic, it worsens the overall

24 prognosis throughout the lifetime of the patient in question.").

25        The inpatient waitlists filed with this Court each month show that even months after

26 the hearing, patients are still not being transferred promptly to DSH hospitals.  The last

27 inpatient waitlist before the evidentiary hearing, with data as of September 28, 2020,

28 showed a total of 54 patients waiting for DSH hospital transfers.  Inpatient Census and

1  Waitlist Reports, Oct. 15, 2020, ECF No. 6912 at 6. Of these 54 patients, 39 had been

2  waiting more than 30 days for transfer in violation of the Program Guide. *Id.*

3       As of March 15, 2021, the most recent inpatient waitlist, with data as of

4  February 22, 2021, showed a total of 19 patients waiting for DSH hospital transfers, with

5  14 patients waiting more than 30 days for transfer. Inpatient Census and Waitlist Reports,

6  March 15, 2021, ECF. No. 7085-1 at 4. Director Clendenin's cover letter filed with the

7  Court states that as of February 28, 2021, "there were 19 patients from facilities with

8  active COVID-19-related holds waiting beyond Program Guide timelines." *Id.* at 2.

9  Director Clendenin's letter references a "supplemental report on DSH's pending waitlist,

10  provided to the Special Master and Plaintiffs via email, [that] shows these patients' waitlist

11  status." *Id.* A copy of the supplemental report, redacted to remove patient identifying

12  information is attached to the Galvan Declaration as Exhibit 1. The first page of the

13  Supplemental Report shows columns for "Acceptance Date," "Active Endorsement Date,"

14  "Test Date, "Retest Date," "Test Result Date," and "Admission Date." In each case listed,

15  the sequence of the dates shows that DSH and CDCR are adding approximately a week to

16  already long transfer delays in order to secure COVID-19 test results before allowing the

17  patient – who has already been approved for transfer to DSH—to actually move. This is

18  the same unwarranted test-based source of delay that was at issue in the October 23, 2020

19  evidentiary hearing. In every case reported, the negative test requirement either directly

20  caused the patient's transfer to exceed Program Guide timelines or extended his or her

21  already past-due transfer even longer.

22       Such waitlists numbers are a snapshot of the list at the moment the data is pulled.

23  The inpatient filings also include details on wait times for patients recently admitted to

24  intermediate inpatient beds. These reports show the wait times remain dangerously long.

25  For the month of February 2021, DSH reported receiving seven *Coleman* patients with

26  delayed admissions, all on the grounds of "Exception Covid-19." The image below shows

27  this portion of the report filed at ECF No. 7085-2 at 19, showing "Days from Referral to

28  MH IRU to Admission" ranging from 31 to 118 days, and "Days Over Program Guide

1  Timeframes" ranging from 1 to 88 days.

DETAIL: OUT OF COMPLIANCE
FEBRUARY 2021

| HCPOP Endorsement Location | HCPOP Endorsement Date/Time | Accepting Inpatient Program | Date Placed on Accepted Referrals List | Inpatient Program Admitted | Inpatient Program Admit Date/Time | Comments for DELAY/EXCEPTION | Referral Status | Day from Referral to MH IRU and Admission | Within Program Guide Timeframes | Days over Program Guide Timeframes |
|---|---|---|---|---|---|---|---|---|---|---|
| Female ICF: CIW | 02/08/2021 16:10:00 | Female ICF: CIW | 02/11/2021 | Female ICF: CIW | 02/12/2021 15:49:00 EXCEPTION: COVID-19 | | Admitted | 63 | N | 55 |
| ICF-Dorms: CIH | 10/27/2020 14:48:00 | ICF-Dorms: ASH | 10/26/2020 | ICF-Dorms: ASH | 02/03/2021 15:03:00 EXCEPTION: COVID-19 | | Admitted | 118 | N | 88 |
| ICF-Dorms: ASH | 10/26/2020 11:58:00 | ICF-Dorms: CIH | 10/27/2020 | | | | | | | |

| Inpatient Program Admitted | Inpatient Program Admit Date/Time | Comments for DELAY/EXCEPTION | Day from Referral to MH IRU and Admission | Within Program Guide Timeframes | Days over Program Guide Timeframes |
|---|---|---|---|---|---|
| ICF-Dorms: ASH | 02/03/2021 15:03:00 | EXCEPTION: COVID-19 | 118 | N | 88 |
| ICF-Dorms: ASH | 02/03/2021 15:03:00 | EXCEPTION: COVID-19 | 105 | N | 75 |
| ICF-Dorms: ASH | 02/03/2021 15:03:00 | EXCEPTION: COVID-19 | 65 | N | 35 |
| ICF-Dorms: ASH | 02/03/2021 15:23:00 | EXCEPTION: COVID-19 | 63 | N | 33 |
| ICF-Dorms: ASH | 02/26/2021 17:48:00 | EXCEPTION: COVID-19 | 85 | N | 55 |
| ICF-Dorms: ASH | 02/26/2021 23:59:00 | EXCEPTION: COVID-19 | 81 | N | 51 |
| ICF-Dorms: ASH | 02/26/2021 17:48:00 | EXCEPTION: COVID-19 | 79 | N | 49 |
| ICF-Dorms: ASH | 02/19/2021 17:26:00 | EXCEPTION: COVID-19 | 31 | N | 1 |

Delays in transfers to DSH hospitals not only harm the patient, but also cause ripple effects throughout the inpatient care system. *See* Special Master's Corrected Report on the Status of Access to DSH, April 6, 2020, ECF No. 6579 at 9-10. The inpatient reports filed before the evidentiary hearing and last month show that *Coleman* patients are waiting dangerously long times to get into any inpatient bed, not just those operated by DSH. While some of these delays may be caused by problems just within CDCR, the failure to get patients into the DSH beds, many of which sit empty, puts unnecessary pressure on the system. In the report filed just before the evidentiary hearing for September 2020, there were 24 patients admitted to CDCR-operated intermediate inpatient beds outside Program Guide timelines, several with wait times exceeding 100 days, including one patient admitted to DSH's Atascadero State Hospital after waiting for 184 days. Inpatient Census and Waitlist Reports, Oct. 15, 2020, ECF 6912 at 25. In all but one case, the reason given for the delay was "COVID-19." (The remaining case was listed as "Medical Hold.") *Id*.

Wait times in the most recent report, filed on March 15, 2021, continue to be long and impact many patients. As shown in the image taken from ECF 7085-2 above, among

the seven patients admitted to DSH intermediate inpatient programs in February 2021 outside of Program Guide timelines, several waited more than 80 days to get to DSH beds. For CDCR-operated intermediate inpatient beds, the same report shows that 41 patients were admitted to inpatient care outside of Program Guide timelines, with wait times up to 346 days. Inpatient Census and Waitlist Reports, March 15, 2021, ECF No. 7085-2 at 19-20. Including both DSH and CDCR intermediate inpatient programs, 34 patients waited more than 100 days for admission. *Id.* The reason given for every single delayed transfer in February 2021 was "COVID-19." *Id.* at 15-16, 19-20. This recent data shows that Defendants are still using across-the-board one-size-fits all COVID-19 holds to delay access to inpatient care. The harms demonstrated in the October 23, 2020 evidentiary hearing are still occurring, and the issue is therefore not moot.

The ripple effects from delayed inpatient care also show up in the long waitlists for "Least Restrictive Housing" (LRH) placements. Many patients who are in the CDCR-operated PIPs are housed in restrictive units with limited out of cell time or programming even though they have been cleared by custody and clinical reviews for an LRH placement that is less punitive and more therapeutic. *See* Pls' Suppl. Brief on DSH Transfers, Dec. 7, 2020, ECF No. 6975 at 9-11; Special Master's Monitoring Report on the Mental Health Inpatient Programs for Inmates of CDCR, May 25, 2016, ECF No. 5448 at 9. The Special Master's latest inpatient monitoring report finds that "defendants continued to struggle with placing those patients for whom the setting is not contraindicated for clinical and/or custodial reasons in their LRH" and includes a recommendation specifically targeting LRH transfers. Special Master's Monitoring Report on Inpatient Programs, Jan. 28, 2021, ECF No. 7039 at 42-43, 118-119 (recommending that Defendants "develop a monthly report…identifying all patients in an inpatient level of care who are not housed in their LRH."). Patients continue to be housed outside of their LRH placement, almost as many in March 2021 (329) as in October 2020 (360). *Compare* Inpatient Census and Waitlist Reports, Oct. 15, 2020, ECF No. 6912 at 17-19 with Inpatient Census and Waitlist Reports, March 16, 2021, ECF No. 7085-2 at 8-10. The table below shows the

out-of-LRH totals from the reports filed at ECF No. 6912 on October 15, 2020 and at ECF

No. 7085 on March-15, 2021:

| ICF Patients Out of LRH | Sept. 28, 2020 (ECF No. 6912 at 17-19.) | Feb. 22, 2021 (ECF No. 7085-2- at 8-10.) |
|---|---|---|
| PIP Stockton | 214 | 194 |
| PIP Vacaville | 38 | 30 |
| PIP Vacaville Multi Person Cells | 11 | 3 |
| PIP Salinas Valley | 61 | 71 |
| PIP Salinas Valley Multi Person Cells | 13 | 14 |
| PIP Vacaville Dorms | 14 | 11 |
| PIP California Institution for Women | 9 | 6 |
| TOTAL | 360 | 329 |

While patients wait for months in CDCR for access to inpatient beds, this data

shows that Defendants have made only small progress on reducing the number of patients

being held outside their least restrictive housing, and that DSH continues to hold many of

its *Coleman* beds empty.  In fact, the *Coleman* DSH census dropped by 20 patients

between September 28, 2020 and February 22, 2021.  The table below shows the DSH

*Coleman* unit census before the evidentiary hearing, and as of February 22, 2021.  Empty

*Coleman* beds at DSH have increased from 115 before the evidentiary hearing to 134 in

February 2021.  Transferring PIP patients who are out of their LRH and currently eligible

for unlocked dorms into appropriate beds at DSH would open up lower custody PIP beds

for other *Coleman* class members.

| | Sept. 28, 2020 (ECF No. 6912 at 6.) | | Feb. 22, 2021 (ECF No. 7085-1 at 4.) | |
|---|---|---|---|---|
| Facility | *Coleman* Census | Available Beds | *Coleman* Census | Available Beds |
| Atascadero Unlocked Dorms | 177 | 79 | 160 | 96 |
| Coalinga Unlocked Dorms | 36 | 14 | 29 | 21 |
| Patton Unlocked Dorms | 8 | 22 | 12 | 17 |
| TOTAL | 221 | 115 | 201 | 134 |

1   The issues tried in the October 23, 2020 evidentiary hearing would be moot if the

2   facts regarding *Coleman* inpatient care were such that the Court could fashion no effective

3   relief to prevent the on-going harms caused by Defendants' across-the-board, one-size-fits

4   all COVID-19 barriers to transfer.  As the discussion above shows, the delays continue,

5   and the number of empty beds at DSH reserved for class members continues to increase.

6   The relief that Plaintiffs sought after the evidentiary hearing would be as effective today in

7   remedying the violations as they would have been last year.  The relief sought is in two

8   categories:

9       (1) No across-the-board holds for COVID-19 testing.  Transfers of *Coleman*

10  patients should not be delayed or held based on screening or testing for COVID-19.  If

11  Defendants require a negative COVID-19 test at the originating institution prior to

12  transferring to DSH, such testing must occur within Program Guide timelines and should

13  not qualify as an exception to transfer timelines.  Under no circumstances should Program

14  Guide timelines be put on hold while *Coleman* patients are screened or tested.  The test

15  delays are not moot because CDCR and DSH continue to add approximately a week to

16  already long transfer delays in order to wait for test results.  *See* Declaration of Ernest

17  Galvan, ¶ 2, Ex. 1.

18      (2) No across-the-board holds for COVID-19 institution closures.  As Director

19  Clendenin states in her March 15, 2021 letter to Court, Defendants still allow patients to

20  wait for DSH care based on "COVID-19 related holds."  Inpatient Census and Waitlist

21  Report, March 15, 2021, ECF No. 7085-1 at 2.  The long delays in transfers documented in

22  the most recent Inpatient Census and Waitlist Report discussed above show that this area is

23  still a problem, and is not moot.  *See* ECF No. 7085-2 at 19 (patients admitted to DSH

24  under the COVID-19 exception who waited up to 88 days over Program Guide timelines).

25  Defendants continue to designate entire institutions as closed to movement.  *See*

26  Declaration of Ernest Galvan, ¶ 3, Ex. 2 (CCHCS/CDCR Open Closed Institution

27  Movement Report, April 1, 2021).  Transfers of *Coleman* patients admitted to DSH should

28  not be delayed or put on hold because the patient originates from an institution that CDCR

1  has designated as closed to movement.  Instead, a *Coleman* patient who originates from a

2  closed CDCR institution should be treated as having a positive indicator for COVID-19

3  exposure for purposes of the Medical Director's decision regarding initial placement into

4  an isolation room or unit upon admission to DSH.

5       (3)    <u>No across-the-board timeline reporting exceptions for closed institutions, test</u>

6  <u>delays or COVID-19 positive patients</u>.  Exceptions to transfers timelines should be claimed

7  only if "an inmate has a medical issue that cannot be treated at a psychiatric inpatient

8  program and that is more urgent than his or her need for inpatient mental health treatment."

9  Stipulation Regarding Addendum To Program Guide Regarding Transfer Timeframes;

10  Order Thereon, June 8, 2017, ECF No. 5631 at 2.  The recent inpatient reports, including

11  the report at ECF No. 7085 cited throughout this response, claim a non-compliance rate of

12  zero, based on across-the-board assertions that scores of delays were due to "Covid-19."

13  This is not a proper use of the medical exception quoted above, without a case-by-case

14  determination as to whether the COVID-19 risk posed by a particular patient outweighs the

15  need for inpatient mental health treatment.  There is no evidence in the record that

16  Defendants' referral process considers at all the harm to the patient of delayed access to

17  inpatient psychiatric care at DSH.  Defendants' medical leaders in both CDCR and DSH

18  testified that they did not look at patient's medical records at all and could not speak to

19  their individual circumstances.  *See* RT 80:20-81:24, 89:3-21 (Dr. Warburton); RT 192:24-

20  193:22 (Dr. Bick).

21      The issues from the hearing are not mooted, and the requested relief is appropriate,

22  especially because it is not obvious that "interim relief or events have completely and

23  irrevocably eradicated the effects of the alleged violation" nor that "the allegedly wrongful

24  behavior cannot reasonably be expected to recur… ."  *Norman-Bloodsaw,* 135 F.3d

25  at 1274.  Despite increasing vaccinations, experts agree that the pandemic is far from over,

26  and that another surge, more restrictions to movement between institutions, and further

27  challenges are imminent.  *See* Transcript of Mar. 25, 2021 Status Conf., ECF No. 7111 at

28  20-21 (Dr. Bick).  The requested relief remains necessary to ensure that across-the-board

PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE REGARDING INPATIENT ADMISSIONS
EVIDENTIARY HEARING

1 restrictions do not create dangerous barriers to life-saving inpatient mental health care.

2 <u>**CONCLUSION**</u>

3     In light of the foregoing, Plaintiffs request that the Court proceed to rule on all three

4 issues addressed at the October 23, 2020 evidentiary hearing and grant appropriate relief.

5

6 DATED: April 9, 2021          Respectfully submitted,

7           ROSEN BIEN GALVAN & GRUNFELD LLP

8

9           By: */s/ Ernest Galvan*

10             Ernest Galvan

11           Attorneys for Plaintiffs

12

13     By signing this document I certified that I have reviewed the following orders:

| DATE | ECF No. | Topic |
|---|---|---|
| 3/26/2021 | 7107 | Order to Show Case Re Mootness |
| 12/24/2020 | 7003 | Case Procedure |
| 11/19/2020 | 6961 | Inpatient Access |
| 10/30/2020 | 6928 | Inpatient Access |
| 6/17/2020 | 6730 | Inpatient Access |
| 5/7/2020 | 6660 | Inpatient Access |
| 4/24/2020 | 6639 | Inpatient Access |
| 4/10/2020 | 6600 | Inpatient Access |
| 4/3/2020 | 6572 | Inpatient Access |
| 6/8/2017 | 5631 | Inpatient Access |
| 4/19/2017 | 5610 | Inpatient Access |

PLAINTIFFS' RESPONSE TO ORDER TO SHOW CAUSE REGARDING INPATIENT ADMISSIONS EVIDENTIARY HEARING