MATTHEW RODRIQUEZ, State Bar No. 95976
Acting Attorney General of California
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
LUCAS HENNES, State Bar No. 278361
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
DAVID C. CASARRUBIAS, SBN 321994
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE:   925-746-8460
FACSIMILE:   925-746-8490
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.<br><br>      Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CLARIFY ORDER OF JUNE 13, 2002 [ECF NO. 7118]**<br><br>Judge: Hon. Kimberly J. Mueller<br>Date: May 7, 2020<br>Time: 10:00 a.m. |

# INTRODUCTION

Nearly two decades after the Court's 2002 order, and following years of litigation and monitoring of Defendants' mental health staffing, Plaintiffs now seek to effectively expand that order by allegedly "clarifying" that the maximum ten percent vacancy rate for staff psychiatrists applies to all psychiatrists, including chief psychiatrists and supervisors. Taking the Court's directive that "Defendants shall maintain the vacancy rate among *psychiatrists* and case managers at a maximum of ten percent, including contracted services" (ECF No. 1383 at 4 (emphasis added)),[1] Plaintiffs read the word "psychiatrists" divorced from the context of the Court's order, including specifically the Special Master's recommendation underlying the order. However, when read appropriately with fidelity to the record leading up to the 2002 order, the word "psychiatrists" clearly refers to *staff* psychiatrists only. And none of Plaintiffs' arguments purportedly relying on the plain text of the order, its history, or its purpose do anything to change this result. Plaintiffs may not expand the scope of the remedy in this litigation by attempting to "clarify" an order that was clear when entered. Accordingly, the Court should deny Plaintiffs' motion for clarification.

# ARGUMENT

**A.    The Special Master's use of the term "psychiatrists" in his 2002 staffing recommendation did not relate to either chief psychiatrists or senior psychiatrist supervisors.**

The Court should reject Plaintiffs' request to expand the scope of its 2002 order to include both chief psychiatrists and senior psychiatrist supervisors in its mandate that *staff* psychiatrist vacancies be kept at a maximum of ten percent. (ECF No. 1383 at 4.)  Both the purpose and history of the 2002 order clearly demonstrate that the motivation behind the maximum ten percent vacancy threshold was to address vacancies among staff psychiatrists, not supervisors. Moreover, properly reading the word "psychiatrists" in context with the term "case managers" demonstrates that the application of the ten percent vacancy rate is limited to staff psychiatrists only. Plaintiffs may not re-write the record or move for entirely new relief in the guise of clarification.

---

[1] References to page numbers for documents filed in the Court's Electronic Case Filing (ECF) system are to page numbers assigned by the ECF system.

1. **The Court's interpretation of the word "psychiatrists" must be guided by the record leading up to its 2002 order, which reveals that the word did not relate to either chief psychiatrists or senior psychiatrist supervisors.**

Ordinarily, the construction given to an order by the *issuing judge* is entitled to great weight. *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 759 (1994). But, here, none of the parties have the benefit of having the same judge that issued the 2002 order actually construe it. (ECF No. 1383 at 4 (order entered by the Hon. Lawrence Karlton).) This unique procedural posture highlights the exceptional nature of Plaintiffs' request and should demand a heightened level of scrutiny of the record leading up to the issuance of the order to ensure that any interpretation is genuine. That record shows that the term "psychiatrists" did not relate to either chief psychiatrists or senior psychiatrist supervisors.

The fundamental staffing issue back in the early 2000s was vacancies among staff psychiatrists and case managers. As reflected in the 2002 order, the Special Master had been monitoring staffing vacancies among *staff* psychiatrists and case managers since at least July 26, 1999, when the Court first ordered the Defendants to maintain the vacancy rate among staff psychiatrists at a maximum of twenty-five percent. (ECF No. 1383 at 2:14-15 referencing ECF No. 1055 (July 26, 1999 Staffing Order); *accord*, ECF No. 1262 at 1:18-20 (confirming that the Court's July 26, 1999 directive "required defendants to reduce the vacancy rate among *staff* psychiatrists to 25 percent or less and among psychiatric social workers to ten percent or less, while keeping vacancy rates among other categories of mental health staff at present or comparable rates" (emphasis added).) To fill those vacancies, the Special Master reported that Defendants had engaged in aggressive contracting for staff psychiatry positions. (ECF No. 1383 at 2:14-17.) Through such contracting, Defendants effectively reduced the overall vacancy rate among staff psychiatrists and case managers throughout CDCR to approximately 5.6 percent by the end of 2001. (ECF No. 1351 at 5.)

It was with the intent of insulating the positive practice of hiring contractors from the realities of state budgetary reductions that the Special Master recommended that the Court order Defendants to maintain the vacancy rate among those psychiatrists and case managers at a maximum of ten percent. (*Id.* at 6.) In the Special Master's own words, it was "absolutely critical

that the defendants maintain their current patterns of *contracting for clinical services* and resist any temptation to reduce such services in response to calls for budget reductions." (*Id.* at 6 (emphasis added).) Those positions were necessarily staff psychiatrist positions only, in light of the general contracting process governed by the State Constitution and other California Government Code restrictions on contracting for personnel services—a process that by design is not fit for hiring chief or supervisor psychiatrists who must be accountable to CDCR and not a third-party staffing agency. (ECF No. 1227 at 39 ("state agencies are required to use Civil Service personnel for all services, unless the requirements of one of the narrowly drawn exceptions listed in [California] Government Code Section 19130 are met").) Defendants are not aware of any chief psychiatrist or senior psychiatrist supervisor that was ever retained through this complex contracting process, and Plaintiffs have not demonstrated that this was ever done in their affirmative motion. (ECF No. 7118 *passim*.)

The Special Master's reporting prior to the 1999 and 2002 staffing orders also is consistent with Defendants' contracting only for staff psychiatrists, not psychiatrist supervisors. For example, in 1999, the Special Master reported on Defendants' efforts to combat vacancies "among psychiatrists and case managers" through the use of contractors. (ECF No. 1032 ("Special Master's Report on Staffing Vacancies").) As the Special Master explained: "The defendants have sought to cover gaps in the ranks of their *psychiatrists and case managers* with contracted services. Exhibit B is the latest available monthly report on the defendants' use of contracted mental health services, documenting *those services* for the month of March 1999." (ECF No. 1032 at 4 (emphasis added).) Careful examination of Exhibit B shows that the Special Master's use of the term "psychiatrists" in the phrase "among psychiatrists and case managers" referred to staff psychiatrists only. (*Id.* at 19-20.) Specifically, when looking at column six titled "Vacancies Being Covered By Contract Staff," Exhibit B expressly notes that the three categories of vacancies being covered with contracted services were: *staff* psychiatrists, psychologists, and psych social workers.[2] Nowhere in that exhibit does one find a reference to either a chief psychiatrist or a

---

[2] As used in the Special Master's 1999 report, case managers include both psychologists and psych social workers. (*See* ECF No. 1032 at 5-6; *accord*, Dkt. No. 1230.)

senior psychiatrist supervisor, or any other indication that Defendants' use of contracted services were for anything other than staff psychiatrist and case manager positions. (*Id.* at 9, (reporting that Defendants had "managed nearly to fill the time missed through *staff* vacancies with contracted services").) The record is consistent with Defendants' understanding that CDCR has never hired any chief psychiatrist or senior psychiatrist supervisor through the State's complex contracting process for personnel services.

These facts confirm that the issue the Special Master was addressing in recommending that the Court adopt a maximum ten percent vacancy rate among staff psychiatrists and case managers was to guarantee that Defendants would continue "their aggressive contracting of temporary psychiatrists and case managers to fill vacant positions." (ECF No. 1351 at 3 ("Special Master's Second Quarterly Report on Defendants Efforts to Reduce Staffing Vacancies").) His recommendation did not concern vacancies in any supervisory positions. Those facts and the basis of the Special Master's recommendations are as clear today as they were over twenty years ago. Accordingly, the Court should deny Plaintiffs' request.

> 2. The Special Master's and the Court's use of the word "psychiatrists" when read in context with term "case managers" further shows why the term did not relate to either chief psychiatrists or senior psychiatrist supervisors.

Properly reading the word "psychiatrists" in context with the term "case managers" also demonstrates that application of the ten percent vacancy rate is limited to staff psychiatrists only. (ECF No. 1383 at 4.) "[A] word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008); *Probert v. Family Centered Services of Alaska, Inc.*, 651 F.3d 1007, 1011 (9th Cir. 2011). As used by the Special Master and Defendants prior to the 2002 order, the term "case managers" was understood to include both psychologists and psych social workers—*i.e.*, line staff positions. (ECF No. 1351 at 4-5 (Special Master referring to case managers as "psychologists" and "psychiatric social workers"); ECF No. 1032 at 5-6 (same); *id.* at 19-20 (listing in a column "Vacancies Being Covered by Contract Staff" and only including staff psychiatrists, psychologists, and psych social workers); *accord*, Dkt. No. 1230 at 1:27 (Defendants' report pursuant to the Court's 1999 staffing order reflecting that "case managers" was used as a term meaning "psychologist or psych social

worker").) Critically, Defendants are not aware of any reference in the record prior to the 2002 order that supports a contrary reading of this term that would include supervisory positions. Accordingly, because the term "case managers" is limited to line staff, it gives the word "psychiatrists" more precise content and shows that the word "psychiatrists" must also be limited to staff psychiatrists only.

The 2002 order only applies the maximum ten percent vacancy rate to line staff. Plaintiffs' after-the-fact rationalizations relying on how the term "case managers" has been used in reports and orders postdating the 2002 order lack fidelity to the record.[3] (*See* ECF No. 7118 at 5:12-6:14.) Ultimately, Plaintiffs' motion asks for clarification of the word "psychiatrists" in the 2002 order. To do this, that word must be read in the context of how the parties, the Special Master, and the Court were using terminology at the time—and not, as Plaintiffs suggest, how the word has been used in the decades that followed. Thus, Plaintiffs' reference to the 2009 staffing plan and other post-order proceedings should be disregarded, and only help underscore why Plaintiffs' motion is not to clarify the 2002 order but instead to modify it, based on subsequent events.[4]

**B.   Plaintiffs' purported attempt at clarification actually muddies the Court's 2002 order in an effort to secure affirmative relief which they never sought at the time and to which they are not entitled.**

As explained above, the use of the word "psychiatrists" in the Court's 2002 order is tied to Defendants' use of aggressive contracting of temporary *staff* psychiatrists and case managers to fill vacant positions at that time. (ECF No. 1351 at 3.) Ignoring the facts, Plaintiffs argue that the

---

[3] For this reason, Plaintiffs' point that senior psychiatrists sometimes perform clinical duties in addition to supervisory ones is unavailing. (*See* ECF No. 7118 at 3:4-8.) The focus must be on what the order was actually designed to accomplish in 2002 by looking at the basis for the Special Master's recommendation. (*See* § B.2. *post*.) Consequently, their related argument that some supervisors today carry a substantial caseload similarly has no merit because it is unsupported by any actual data that shows how many supervisors are engaged in providing clinical services that are otherwise ordinarily provided by staff. (*See* ECF No. 7118 at 13:17-14:2.) Even if some senior psychiatrist supervisors, on occasion, perform clinical duties or carry a caseload, neither that assertion nor any evidence showing how frequently that occurred was part of the record when the 2002 order issued.

[4] Notably, Plaintiffs' reliance on statements from the 2019 Golding proceedings is especially objectionable both because it far postdates the 2002 order and because the statements relied upon were not supported by any documentary evidence. (*See* ECF No. 7118 at 14:2-11.)

plain text, history, and purpose of the Court's 2002 order support their over-inclusive construction. All of their attempts to re-write the record fail.

1.  The plain text interpretation of the word "psychiatrists" as it was used in the early 2000s did not include supervisory positions.

Plaintiffs' first argument is that the plain text of the 2002 order "is broad enough to apply to chief psychiatrists and senior psychiatrist supervisors." (ECF No. 7118 at 4:17-18.) Taken out of context, as Plaintiffs do here, many words in an order can be read broadly enough to reach any party's desired end. Indeed, Plaintiffs could simply go trawling through the docket for decades-old orders to redefine their scope based on broad interpretations. Such a result must be avoided.

A court order must be read in context. (*See Edmo v. Corizon, Inc.*, 935 F.3d 757, 800 (9th Cir. 2019) (interpreting district court order and rejecting overbroad interpretation of a phrase read out of context). And here, the context shows that the Court's use of the word "psychiatrists" in 2002 was not inclusive of chief psychiatrist and senior psychiatrist supervisor positions, whose roles and responsibilities go far beyond those of ordinary staff psychiatrists. (ECF No. 3693 at 31 [chief psychiatrist duties]; *id.* at 32 [senior psychiatrist supervisor duties].) Rather, the word was used in a limited sense to refer to staff psychiatrists in the same way the term "case managers" was used to refer to line staff only. (*See* § A.2., *ante*.) As a result, the Court should reject Plaintiffs' overly-simplistic and overly-broad plain text interpretation.

2.  The purpose and history of the 2002 order shows that the word "psychiatrists" as it was used in the early 2000s did not include supervisory positions.

Plaintiffs next argue that the purpose and history of the 2002 order supports their over-broad construction of the term "psychiatrists." (ECF No. 7118 at 7:8-14:16.) To do so, Plaintiffs laboriously pore through a litany of monitoring reports from the Special Master, most of which were issued since the Court's 2002 order, and pluck out each and every instance in which the Special Master made any comment about chief psychiatrist and senior psychiatrist supervisor vacancies. (ECF No. 7118 at 7:8-10:4 (citing sixteen monitoring reports, a majority of which postdate the issuance of the Court's 2002 order).) But, as Plaintiffs' concede: "'[A] court should construe the scope of an injunction in light of its purpose and history, in other words "*what the*

*decree was really designed to accomplish.*"'" (ECF No. 7118 at 9:23-26 (*citing Salazar v. Buono*, 559 U.S. 700, 762 (2010).) Here, the only pertinent evidence of what the 2002 order was really designed to accomplish are the Special Master's related staffing reports, and more specifically, the staffing report and the parties' related papers that underlie and led to the 2002 order itself. The specific purpose underlying the order—which arose directly from the Special Master's recommendation—as well as the history directly preceding that recommendation must guide the Court's decision here, not an after-the-fact attempt to rewrite history.

Consequently, Plaintiffs' citations to post-2002 information are not only inappropriate, but also, ignore important facts such as the directive from the Court in 2018 that clearly shows that the vacancy issue the Court has sought to address since 2002 remains with *staff* psychiatrists. (Hearing Tr. 2/14/2018 at 19:15-20 ("And I'm looking specifically at the line for *staff* psychiatrists. And I'm going to direct that that information be filed with the Court monthly . . . That may keep us focused on the vacancy issue that most troubles the Court." (emphasis added).) Plaintiffs also fail to explain why, if supervisors were intended to be included in the 2002 order, they felt the need in 2019 to request to add supervisors to psychiatric vacancy reports. (ECF No. 6226 at 21:23-24 (July 23, 2019 Joint Report Following June 10, 2019 Status Conference) ("To the extent that psychiatric supervisors are 'working in a given position' as psychiatric line staff, Defendants should include them in this report on psychiatry line staff vacancies.").)

As Defendants already explained, the purpose of the 2002 order was to purportedly insulate Defendants' contracting to fill staff psychiatrist and case manager vacancies from the realities of state budgetary reductions. (*See* § A.1. *ante*.) That core purpose is confirmed when the Court considers Defendants' objection and Plaintiffs' reply to the Special Master's recommendation of a ten percent vacancy rate. (Dkt. Nos. 1357 & 1365.) Defendants' objection was as follows:

> Defendants object to recommendation 1, that they be directed to maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent. Defendants have already achieved this vacancy rate, and there is no evidence that they will reduce the use of contracted clinicians as a result of the State's fiscal difficulties.

(Dkt. 1357 at 1:22-26.) In response to that objection, Plaintiffs asked that the Court adopt the Special Master's recommendation because there was no evidence that "the fiscal resources necessary for [Defendants] to continue the current level of *contract mental health staffing* [would be] protected from reduction . . . ." (Dkt. No. 1365 at 3:3-5.) Certainly Plaintiffs' own reference to "contract mental health staffing" (which, as we know, was for line clinical staff only) must thwart Plaintiffs' attempt to now expand and reinvent the 2002 order to secure relief which they never sought at the time.

Plaintiffs' response to Defendants' objection also opined that the Special Master's recommendation was "*narrowly drawn*" to fortify Defendants' contracting of temporary psychiatrists and case managers to address mental health staffing deficiencies. (*Id.* at 3:7 (emphasis added).) As is apparent, Plaintiffs' current position—that the purpose of the Court's order was to set a maximum vacancy rate for *supervisory* positions as well as line staff—is inconsistent with the position they took back in 2002, when they argued that the Special Master's recommendation underlying the order was narrowly drawn to address the continuation of *contract mental health staffing* to meet the need for staff psychiatrists. Accordingly, what the Court's order decided, and thereby sought to accomplish in 2002, never included setting a maximum vacancy rate for chief psychiatrists and senior psychiatrist supervisor positions, and Plaintiffs' position at the time tacitly acknowledged this fact.

Plaintiffs finally argue that the purpose of the 2002 order, which was to remedy the constitutional violations in this case by protecting contracted staff psychiatrist positions from budgetary reductions, would be advanced by "clarifying" that it requires Defendants to fill 90 percent of supervisory psychiatrist positions. (ECF No. 7118 at 9:5-14:16). But as Defendants already explained, the only "narrowly drawn" purpose of the 2002 order was to purportedly insulate Defendants' practice of contracting to fill *staff* psychiatrist and case manager vacancies from the realities of state budgetary reductions. (*See* § A.1. *ante*.) That narrowly drawn purpose must continue to control today. Maintaining the integrity of Judge Karlton's 2002 order and its narrowly drawn purpose would be consistent with the Prison Litigation Reform Act's needs-narrowness-intrusiveness requirement, which mandates that injunctive relief be "narrowly drawn,

1  extend no further than necessary to correct the harm the court finds requires preliminary relief, and
2  be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2). Plaintiffs
3  understood that in 2002 and they should be held to that requirement now.[5]
4       Ultimately, if Plaintiffs seek to apply a ten percent vacancy rate to supervisory psychiatrist
5  positions they must make a record and file the appropriate motion; due process requires nothing
6  less.[6] They cannot short-circuit procedure under the guise of a "motion to clarify" to obtain more
7  relief today than was originally awarded nearly twenty years ago. Accordingly, the Court should
8  reject Plaintiffs' request and deny their motion.
9  / / /
10 / / /
11 / / /
12 / / /
13 / / /
14 / / /
15 / / /
16 / / /
17 / / /
18 / / /
19 / / /
20 / / /
21 / / /
22 / / /

---

[5] For that matter, Plaintiffs' unsupported assertion that for more than a decade the parties and the Special Master purportedly "agreed" with their overbroad construction of the 2002 order is irrelevant. (ECF No. 7118 at 3:4-8.) It's also false. Notwithstanding, the only relevant record for purposes of *clarifying* what the Court's true intentions were in its 2002 order is the underlying record of events that led to the order itself, and not whatever transpired in the decades thereafter.

[6] To the extent the Court elects to construe Plaintiffs' motion for clarification as a motion for new relief, despite their failure to prosecute such a motion, Defendants request that they be given the opportunity to brief that issue to mitigate the attedant prejudice that would result.

## CONCLUSION

The Court's 2002 order is clear. The Special Master's narrowly drawn recommendation of a ten percent staffing vacancy rate among psychiatrists and case managers that was subsequently adopted by this Court never contemplated the inclusion of chief psychiatrists or senior psychiatrist supervisors. As such, the Court should deny Plaintiffs' purported motion to "clarify."

DATED: April 23, 2021                      HANSON BRIDGETT LLP

By: *s/ Paul B. Mello*
PAUL B. MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS
Attorneys for Defendants

DATED: April 23, 2021                      Respectfully Submitted,

Matthew Rodriquez
Acting Attorney General of California
Damon McClain
Supervising Deputy Attorney General

By: *s/ Elise Owens Thorn*
ELISE OWENS THORN
Deputy Attorney General
Attorneys for Defendants