DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO CLARIFY ORDER OF JUNE 13, 2002** |
| v. | |
| GAVIN NEWSOM, et al., | Date:   May 14, 2021 |
| Defendants. | Time:   10:00 a.m. |
| | Crtrm.:  Virtual |
| | Judge:  Hon. Kimberly J. Mueller |

1    Defendants' proposed interpretation of this Court's June 13, 2002 Order, ECF No.

2    1383 (hereafter "2002 Order") is inconsistent with its plain text, history, and purpose.

3    Nothing in the 2002 Order's text suggests that its mandate that Defendants limit the

4    vacancy rate among "psychiatrists" to 10 percent or less is limited to "staff psychiatrists."

5    Nor does the 2002 Order's history or purpose show that the Court intended to so limit its

6    scope.  Instead of engaging with the text of the order or the evidence cited in Plaintiffs'

7    opening brief, Defendants now offer a series of red herrings and baseless objections.

8    Because Plaintiffs have demonstrated that the 2002 Order's mandate applies to *all*

9    "psychiatrist" positions, without exception, this Court should grant Plaintiffs' motion in

10    full.

11    **I.    The Text of the 2002 Order Unambiguously Requires Defendants to Fill 90
           Percent of *All* Psychiatrist Positions.**

12

13    The relevant text of the 2002 Order is clear and unambiguous: Defendants must

14    "maintain the vacancy rate among psychiatrists and case managers at a maximum of ten

15    percent, including contracted services."  2002 Order at 4.  Plaintiffs demonstrated in their

16    opening brief that Defendants' supervisory psychiatrists are "psychiatrists" within the

17    ordinary meaning of the term because they are "medical doctor[s] who diagnose[] and

18    treat[] mental, emotional, and behavioral disorders."  Pls' Mot. to Clarify (hereafter

19    "Mot."), ECF No. 7118 at 4-5 (April 9, 2021).  Indeed, Defendants and the Special Master

20    alike have long used the term "psychiatrists" to include chief psychiatrists and senior

21    psychiatrist supervisors.  *See* Mot. at 5; *see also* Vacancies Summarized by Classification,

22    Ex. 1 to Declaration of Eileen Baumgardner (hereafter "Baumgardner Decl.") at 1,

23    Dkt. No. 1117 (Jan. 21, 2000) (reporting an overall vacancy rate of 29.77 percent for

24    "psychiatrists" based on data that included both supervisory and staff psychiatrist

25    positions); Budget Change Proposal, Ex. 2 to Baumgardner Decl. at 7 ("As of August 11,

26    1999, the vacancy rate for psychiatrists (including chief, senior, and staff levels) was 27

27    percent[.]"); Special Master's Recommendations on Defs' Request for an Extension to

28    Comply with Staffing Order, ECF No. 1184 at 2, 31 (July 20, 2000) (reporting an overall

[3727879.7]                                          1                    Case No. 2:90-CV-00520-KJM-DB
PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO CLARIFY ORDER OF JUNE 13, 2002

1    vacancy rate of 30.57 percent for "psychiatrists" based on data that included both

2    supervisory and staff psychiatrist positions).

3           Defendants all but ignore the plain text of the 2002 Order in their opposition, ECF

4    No. 7137 (April 23, 2021) (hereafter "Opp."), offering instead a series of unsupported,

5    ahistorical assertions about its purported intent.  But it is well established that "[i]f '[a]

6    statute is clear and unambiguous, that is the end of [the court's interpretive inquiry].'"

7    *United States v. Chhun*, 744 F.3d 1110, 1116 (9th Cir. 2014) (quoting *United States v.*

8    *Bahe*, 201 F.3d 1124, 1128 (9th Cir. 2000)).  The same rule applies to the interpretation of

9    injunctions.  *See United States v. Armour & Co.*, 402 U.S. 673, 677-78 (1971) (declining to

10   find a violation of a consent decree whose "language, taken in its natural sense," did not

11   bar the defendants' conduct).  Because Defendants' supervisory psychiatrists are

12   "psychiatrists" within the ordinary and natural meaning of the term, they are subject to the

13   2002 Order's 90-percent fill requirement and the Court need not delve any deeper into the

14   record.  *See* Mot. at 4-7.

15          Defendants' arguments to the contrary are not persuasive.  Defendants continue to

16   argue, for example, that the term "psychiatrists" actually means "staff psychiatrists"

17   because it appears in the same sentence of the 2002 Order as the term "case managers."

18   *See* Opp. at 5-6.  But Defendants offer no evidence that supports their assertion that, at the

19   time of the 2002 Order (or anytime thereafter), the parties and the Special Master

20   understood the term case managers as being limited to "line staff positions."  *See id.* at 5.

21   Rather, the evidence they cite suggests only that the parties and the Special Master

22   understood the term "case manager" to mean "psychologist or psych[iatric] social worker."

23   *Id.* at 5-6 (citing ECF No. 1351 at 4-5; ECF No. 1032 at 5-6, 19-20; Dkt. No. 1230 at

24   1:27).  As Plaintiffs explained in their opening brief, this definition of "case manager" does

25   *not* exclude supervisory psychologists or supervisory psychiatric social workers, and

26   therefore does *not* provide a basis for rejecting the plain and ordinary meaning of the term

27   "psychiatrists" in favor of a narrow definition that excludes Defendants' supervisory

28   psychiatrists sub silencio.  *See* Mot. at 5-6.

1    Moreover, even if Defendants were correct that the term "case managers" excludes

2  supervisory psychologists and social workers, they offer no explanation whatsoever for

3  why the Court chose to use the term "psychiatrists" in the 2002 Order if it intended to

4  exclude supervisory psychiatrists from the 90-percent fill requirement.  The Court could

5  have—and presumably would have—referred to "staff psychiatrists" or "line psychiatrists"

6  if this were its intent, just as, according to Defendants' interpretation, it referred to "case

7  managers" rather than the broader categories of "psychologists" and "psychiatric social

8  workers" for the purpose of excluding supervisory clinicians.  The Court should reject

9  Defendants' dubious suggestion that the Court chose to create a major exception to the 90-

10  percent fill requirement for psychiatrists but failed to express this intent in the text of the

11  2002 Order.  *See id.* at 6-7 (citing *Graham County Soil & Water Conservation Dist. v. U.S.*

12  *ex rel. Wilson*, 559 U.S. 280, 288-89 (2010), and *Whitman v. Am. Trucking Ass'ns*, 531

13  U.S. 457, 468 (2001)).

14    As a fallback, Defendants invite the Court to simply ignore the unambiguous text of

15  the 2002 Order.  If the Court embraces a textualist approach, Defendants warn, Plaintiffs

16  will be empowered to "go trawling through the docket for decades-old orders to redefine

17  their scope based on broad interpretations."  Opp. at 7.  Defendants' fears are overblown.

18  For one thing, there is nothing wrong with interpreting an injunction broadly where its text

19  supports the interpretation.  In the analogous context of statutory interpretation, the

20  Supreme Court recently rejected the notion of a "'canon of donut holes,' in which

21  Congress's failure to speak to a specific case that falls within a more general statutory rule

22  creates a tacit exception.  Instead, when Congress chooses not to include any exceptions to

23  a broad rule, courts apply the broad rule." *Bostock v. Clayton County, Georgia*, 140 S. Ct.

24  1731, 1747 (2020) (concluding that Title VII's broadly worded prohibition on sex

25  discrimination applies to discrimination on the basis of sexual orientation); *see also Penn.*

26  *Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 209 (1998) (ADA's prohibition on disability

27  discrimination by public entities "unmistakably includes State prisons and prisoners within

28  its coverage," because the statute "plainly covers state institutions *without* any exception

1    that could cast the coverage of prisons into doubt"). Similar reasoning applies when a court

2    interprets the scope of an injunction.[1]  Where a court chooses not to include any exceptions

3    in a broadly worded order, it is entirely proper when interpreting that order to "apply the

4    broad rule" rather than inferring an exception merely because the order does not specify

5    that it applies to the particular circumstances at issue. *Bostock*, 140 S. Ct. at 1747.  In this

6    case, the fact that the 2002 Order refers to "psychiatrists" without specifically detailing any

7    subcategories subsumed in that word is not a basis for inferring an exception for

8    supervisory psychiatrists.  There is no "canon of donut holes" whereby the Court's failure

9    to specify that its 90-percent fill requirement also applies to supervisory psychiatrists must

10    be construed as "creat[ing] a tacit exception" excluding those supervisory positions. *Id.*

11        Defendants cite *Edmo v. Corizon, Inc.*, 935 F.3d 757, 800 (9th Cir. 2019), to

12    support their position, but the case is inapposite. *See* Opp. at 7.  In *Edmo*, the district court

13    ordered prison authorities to provide the plaintiff with "adequate medical care, including

14    gender confirmation surgery," and to "take all actions reasonably necessary to provide [the

15    plaintiff] gender confirmation surgery as promptly as possible." *Edmo v. Idaho Dep't of

16    Corrections*, 358 F. Supp. 3d 1103, 1129 (D. Idaho 2018).  On appeal, the defendants

17    challenged the portion of the order requiring "adequate medical care" as "overbroad."

18    *Edmo*, 935 F.3d at 800.  The Ninth Circuit rejected this overbreadth claim but construed

19    the order to require only "'adequate medical care' that is 'reasonably necessary' to

20    accomplish [the gender confirmation surgery]—not every conceivable form of adequate

21    medical care." *Id. Edmo* is not analogous to this case.  Here, Defendants do not argue that

22    the 2002 Order would be impermissibly vague or overbroad if it were construed according

23    to its plain text.  Nor could they, as even the broadest possible construction of the 2002

24    _____

25    [1] If anything, the danger of judicial overreach is greater in the sphere of statutory
      interpretation, which implicates legislative comity concerns, than in the sphere of
26    interpreting injunctions.  Rule 65(d) requires an injunction to "state its terms specifically"
      and "describe in reasonable detail … the act or acts restrained or required," thereby
27    protecting defendants against orders that are truly vague or overbroad. *See* Fed. R. Civ. P.
      65(d)(1).  Defendants have never asserted that the 2002 Order fails to comply with this
28    mandate.

1   Order would be *far* more specific than the order to provide "adequate medical care" in

2   *Edmo*.  The fact that the Ninth Circuit construed the *Edmo* injunction narrowly does not

3   mean that courts must always give every injunction its most narrow construction.  Where,

4   as here, the text of an injunction is clear and unambiguous and the defendants have not

5   raised a plausible challenge to the validity of the order, a court should interpret the order as

6   broadly or as narrowly as its text requires.

7        Because the text of the 2002 Order unambiguously requires Defendants to fill 90-

8   percent of their psychiatrist positions, without exception, the Court should grant Plaintiffs'

9   Motion in full.

10  **II.    Defendants Mischaracterize the History of the 2002 Order, Which Increased
         the Required Fill Rate for "Psychiatrists" from 75 to 90 Percent for the**

11  **Specific Purpose of Ensuring Adequate Supervision of Staff Psychiatrists.**

12       Both the 2002 Order and the Special Master's recommendations that led to it were

13  directly related to the problem of inadequate clinical supervision in Defendants' psychiatry

14  program.  As Plaintiffs demonstrated, the Special Master began monitoring Defendants'

15  supervisory psychiatry staffing no later than 1998 and repeatedly emphasized the critical

16  need for Defendants to fill supervisory psychiatry positions in the years and months

17  immediately leading up to the 2002 Order.  *See* Mot. at 7-8.  In late April 2002, for

18  example, less than two months before the Court issued the 2002 Order, the Special Master

19  reported that the vacant chief psychiatrist position at CSP-Solano "made it virtually

20  impossible for the institution to sustain any organized quality assurance efforts"; that the

21  absence of a chief psychiatrist at ASP left the institution's mental health program "adrift";

22  and that WSP "hired a much-needed chief psychiatrist to fill a position that had long been

23  vacant." *Id.* at 8 (quoting Ninth Round Monitoring Rpt., Dkt. No. 1373 at 45-46, 88, 116

24  (April 25, 2002)).  As a result of these and similar reports between 1998 and 2002, the

25  Court was well aware of the serious problems that vacant supervisory psychiatrist positions

26  were creating in Defendants' mental health program at the time it issued the 2002 Order.

27

28

1   *Id.* at 7-8.[2]

2         Contrary to Defendants' assertion that "Plaintiffs read the word 'psychiatrists'

3   divorced from the context of the Court's order, including specifically the Special Master's

4   recommendation underlying the Order," Opp. at 2, Plaintiffs' opening brief provides a

5   detailed analysis of the 2002 Order's context, including the Special Master's February

6   2002 report and recommendations related to staffing vacancies that the 2002 Order

7   adopted.  *See* Mot. at 8-9.  Defendants simply ignore the clear record demonstrating that

8   the Special Master's February 2002 recommendation that Defendants be directed "to

9   maintain the vacancy rate among psychiatrists and case managers at a maximum of ten

10   percent, including contracted services," was the result of a shift in the Special Master's

11   thinking about the role that short-term contract psychiatrists should play in Defendants'

12   psychiatry program.  *Id.*

13         In May 1999, the Special Master reported that Defendants' reliance on short-term

14   contract psychiatrists to fill staff psychiatrist vacancies was creating as many or more

15   problems as it solved.  *See* Special Master's Rpt. on Staffing Vacancies, ECF No. 1032 at

16   10 (May 19, 1999) ("The link between contract services by numerous, short-termed

17   psychiatrists and inadequate psychiatric care is clear."); Special Master's Recommendation

18   on Defs' Request for Extension of Time to Comply, ECF No. 1184 at 8 (July 20, 2000)

19   (noting that the May 1999 report "lamented the employment of too many contract

20   _____

21   [2] Defendants summarily dismiss the relevance of these reports in their opposition, asserting
that "the only pertinent evidence of what the 2002 order was really designed to accomplish

22   are the Special Master's related staffing reports" issued between 1999 and 2002.  Opp. at
8.  Defendants cite no authority for their exceedingly narrow understanding of the

23   historical context of 2002 Order,  In reality, courts regularly consider the broad historical
context of legal texts as a way of determining their meaning.  *See, e.g.*, *District of*

24   *Columbia v. Heller*, 554 U.S. 570, 600-01 (2008) (relying on evidence of "analogous arms-
bearing rights in state constitutions that preceded and immediately followed adoption of

25   the Second Amendment" to determine the scope of the right guaranteed by the Second
Amendment).  Moreover, the staffing reports Defendants describe as "the only pertinent

26   evidence" of the intent behind the 2002 Order *themselves* cite and quote from the broader
monitoring reports Plaintiffs cited as evidence that the problem of supervisory staffing

27   vacancies was a prominent issue in this case at the time of the 2002 Order.  *See, e.g.*,
Special Master's Recommendations on Parties' Requests Regarding Staff Vacancies, ECF

28   No. 1102 at 6-8 (Dec. 27, 1999).

1    psychiatrists … who often created more problems than they solved.").  A key source of the

2    problems with Defendants' use of contract psychiatrists, the Special Master explained, was

3    the inadequate supervision Defendants provided to these contractors.  *See* Rpt. on Staffing

4    Vacancies, ECF No. 1032 at 9-10 (May 19, 1999) ("A multiplicity of contract providers,

5    each serving only a few hours weekly, seems to preclude proper orientation, training, and

6    supervision by permanent staff, which lacks sufficient time or resources to guide the

7    efforts of contract psychiatrists.").  As a result of these problems, the Special Master

8    recommended not only that the Court order Defendants to reduce the overall vacancy rate

9    among "psychiatrists" to 25 percent or less, but also that the Court order Defendants to

10    substantially reduce the percentage of vacant psychiatrist positions that Defendants filled

11    with contractors.  *Id.* at 14.  The Court adopted these recommendations verbatim in an

12    order issued on July 26, 1999.  *See* Order, ECF No. 1055 at 4 (July 26, 1999).

13        Over the course of the next two years, however, as Defendants repeatedly failed to

14    fill psychiatrist vacancies with permanent employees instead of contractors, the Special

15    Master apparently came to view Defendants' use of contract psychiatrists as a necessary

16    evil.  *See, e.g.*, Special Master's Recommendation on Parties' Requests re Staffing

17    Vacancies, ECF No. 1102 at 7 (Dec. 27, 1999) (noting that despite the serious problems

18    associated with Defendants' use of contract psychiatrists, the use of contractors "has

19    prevented utter disaster.  Without these substitutes, the defendants' MHSDS would be in a

20    shambles.").  He therefore began recommending that the Court order Defendants to step up

21    their efforts to fill vacant chief psychiatrist and senior psychiatrist supervisor positions as

22    well as permanent staff psychiatrist positions, so as to mitigate the problems associated

23    with the use of contract psychiatrists by improving Defendants' ability to supervise them.

24    *See id.* at 10 (recommending that the Court order Defendants "to implement [pay]

25    increases *for all classes of psychiatrists* by no less than $20,000 annually" (emphasis

26    added)).  The Court adopted this recommendation in January 2000.  *See* Order, ECF No.

27    1111 at 3 (Jan. 13, 2000).

28

1    By early 2002, the Special Master had concluded that some combination of

2  "aggressive contracting of temporary psychiatrists" and improved supervision of these

3  contract psychiatrists represented one of the few plausible ways for Defendants to improve

4  the quality of the psychiatric care they provided to *Coleman* class members. *See* Special

5  Master's Second Quarterly Rpt. on Staffing Vacancies, ECF No. 1351 at 3 (Feb. 26, 2002).

6  As a result, he recommended that the Court modify its July 26, 1999 order to require

7  Defendants to fill 90 percent of "psychiatrist" positions, "including contracted services,"

8  rather than the previous 75 percent target that had been paired in the July 1999 order with a

9  requirement that Defendants reduce their use of contract psychiatrists. *Id.* at 11.  As the

10  Special Master explained, this change would "secure … [Defendants'] compliance with the

11  spirit of the July 26, 1999 mandate on vacancies." *Id.* at 12.  The 2002 Order adopted this

12  recommendation in full. *See* ECF No. 1383 at 2, 4.

13    In their opposition, Defendants note that, in April 2001, the Court described its July

14  26, 1999 order as "requir[ing] defendants to reduce the vacancy rate among *staff*

15  psychiatrists to 25 percent or less[.]"  Opp. at 3 (emphasis in Defendants' opposition)

16  (citing Order, ECF No. 1262 at 1:18-20 (April 4, 2001)).  They also note that the 2002

17  Order "referenc[es]" this July 26, 1999 order. *Id.* (citing ECF No. 1383 at 2:14-15).

18  Based on this limited historical evidence, Defendants argue that "[t]he fundamental

19  staffing issue back in the early 2000s was vacancies among staff psychiatrists and case

20  managers," Opp. at 3, and that the 2002 Order's mandate with regard to "psychiatrist"

21  vacancies must necessarily apply only to staff psychiatrists, *id.* at 5.  But this argument is

22  highly misleading.  Even if one assumes that the Court deliberately referred to "staff

23  psychiatrists" rather than "psychiatrists" in its April 2001 description of the July 1999

24  order,[3] its interpretation of the July 1999 order is entirely consistent with the view that the

25  ───────────────

26  [3] Notably, the Special Master's report and recommendation that formed the basis for the
   April 2001 order does *not* describe the July 1999 order as applying only to "staff
27  psychiatrists." *See* Special Master's Report and Recommendations  on Psychiatrist and
   Social Worker Vacancies, ECF No. 1227 at 1 (Dec. 20, 2000).  Indeed, this document
28  (footnote continued)

1    2002 Order applies to supervisory psychiatrists as well as staff psychiatrists.  As explained

2    above, the Special Master shifted his views between 1999 and 2002 and determined that

3    Defendants' use of short-term contract psychiatrists was tolerable so long as the

4    contractors were properly supervised, and the 2002 Order is predicated on that shift.

5          Defendants also note that both the Special Master and Plaintiffs expressed concern

6    during discussions of the Special Master's February 2002 recommendations that the state's

7    budgetary woes would lead Defendants to reduce the number of short-term contractors

8    they were using to fill vacant staff psychiatrist positions.  *See* Opp. at 3-4, 8-9.  The 2002

9    Order briefly mentions these discussions.  *See* ECF No 1383 at 2.  Citing these discussions,

10   Defendants argue (a) that the sole purpose of the 2002 Order's psychiatry staffing mandate

11   was to "insulat[e] the positive practice of hiring contractors from the realities of state

12   budgetary reductions," Opp. at 3, and (b) that because Defendants did not (and do not) use

13   contractors to fill supervisory mental health positions, the 2002 Order's 90-percent fill

14   requirement for "psychiatrists" is limited to "staff psychiatrists," *see id.* at 4-6, 9.

15         This argument suffers from at least two glaring logical flaws.  First, the fact that *one*

16   rationale for the 2002 Order was to prevent Defendants from cutting contractor positions

17   during a recession does not prove that preventing such cuts was the *only* rationale for the

18   2002 Order.  As demonstrated above, another rationale for the 2002 Order was to mitigate

19

20   reports overall "psychiatrist" vacancy rates using data that clearly represents the sum of
21   staff and supervisory psychiatrist vacancies.  The first reported vacancy rate for
     "psychiatrist positions" (30.57 percent) is premised on June 2000 data that shows 39.75
22   vacancies out of 112.1 allocated "staff psychiatrist" positions, three vacancies out of 24
     allocated "chief psychiatrist" positions, zero vacancies out of four allocated "senior
23   psychiatrist supervisor" positions, and one vacancy out of three allocated "senior
     psychiatrist specialist" positions.  *Id.* at 3, 26.  Adding these figures together yields a total
24   of 43.75 vacancies out of 143.1 total "psychiatrists," or 30.57 percent.  *Id.* at 26.  The
     second reported vacancy rate for "psychiatrist positions" (29.36 percent) is premised on
25   data from December 14, 2000 that does not break down the total numbers of vacancies and
     allocated positions into sub-classes of psychiatrists, *see id.* at 24, but the Special Master
26   clearly believed that this data included supervisory psychiatrist positions.  The Special
     Master states in his Report that Defendants were employing "37 more psychiatrists" in
27   December than they were in "mid-2000." *Id.* at 3.  The December data, in turn, shows that
     Defendants had filled 136.18 "psychiatrist[]" positions, or 37 more than the sum total of
28   staff, chief, and senior psychiatrist positions that were filled in June (99.35).  *Id.* at 24, 26.

1   the deleterious effects of Defendants' reliance on large numbers of short-term contract

2   psychiatrists by improving Defendants' supervision and oversight of those contractors.

3   This rationale is entirely consistent with Plaintiffs' and the Special Master's related

4   concerns that the state's budgetary woes would lead Defendants to cut contractor

5   positions.[4]  Defendants' claim that preventing cuts in contractor positions was the *only*

6   rationale for the 2002 Order's 90-percent fill requirement rests on precisely the type of

7   context-free analysis that Defendants (wrongly) attribute to Plaintiffs at various points in

8   their opposition brief.  *See, e.g.*, Opp. at 2, 5-8.

9          The second prong of Defendants' contractor argument is similarly flawed.  After

10   wrongly assuming that the sole purpose of the 2002 Order's 90-percent fill requirement

11   was to prevent cuts in contractor staffing, Defendants then reason—as best Plaintiffs

12   understand the argument—that, because Defendants do not use contractors to fill

13   supervisory positions, the 2002 Order's 90-percent fill requirement necessarily excludes

14   supervisory positions as well.  *See* Opp. at 4-5.  But this is a non-sequitur.  The fact that

15   the Defendants did not employ contractors in supervisory positions in 2002 does not mean

16   that the Special Master and the Court were not concerned about vacant supervisor

17   positions at the time of the 2002 Order.  As Plaintiffs have demonstrated, the fact that

18   Defendants *did* employ contractors in staff positions is precisely why the Special Master

19   and the Court *were* concerned about vacant supervisory positions.  For the same reason,

20   the fact that Defendants did not employ contractors in supervisory case-manager positions

21

22

23

24   [4] Defendants suggest that Plaintiffs' concern about reductions in contractor staffing in
2002 is incompatible with Plaintiffs' current argument that the 2002 Order's 90-percent fill
requirement applies to supervisory psychiatrists.  *See* Opp. at 8-9.  But these concerns are

25   easily reconciled.  Essentially all of the staffing gains Defendants made in response to the
1999 order were through increases in contract psychiatry staff (in contravention of that

26   order's requirement to reduce such reliance).  That Plaintiffs were also worried that budget
cuts would lead to reductions in the number of psychiatrists providing direct patient care

27   does not obviate the legitimacy of the concomitant concern that the huge influx in registry
staff would require enhanced supervision, which could only be appropriately provided by

28   filled supervisory psychiatrist positions.

1   either—*see* Opp. at 5-6—does not help Defendants.[5]

2          Defendants repeatedly assert that "Plaintiffs' citations to post-2002 information"

3   are "inappropriate" because "the only relevant record for purposes of *clarifying* what the

4   Court's true intentions were in its 2002 order is the underlying record of events that led to

5   the order itself, and not whatever transpired in the decades thereafter."  Opp. at 8, 10 n.5

6   (emphasis in original).  As such, Defendants assert that this Court should ignore how

7   Defendants themselves defined psychiatrists and case managers in their 2009 staffing plan,

8   as well as how the Court and Special Master used the terms in reports and orders

9   postdating 2002.  Opp. at 6 (referencing Mot. at 3-6).  But courts regularly rely on

10  evidence of how a legal text was understood in the years after its issuance or enactment as

11  a means of ascertaining the text's meaning.  *See, e.g.*, *District of Columbia v. Heller*, 554

12  U.S. 570, 600-01 (2008) (relying on evidence of "analogous arms-bearing rights in state

13  constitutions that preceded *and immediately followed* adoption of the Second Amendment"

14  to determine the scope of the right guaranteed by the Second Amendment (emphasis

15  added)); *Employees Reinsurance Co. v. Superior Ct.*, 161 Cal. App. 4th 906, 921 (2008),

16  *as modified* (April 22, 2008) (explaining that "when a contract is ambiguous, a

17  construction given to it by the acts and conduct of the parties with knowledge of its terms,

18  before any controversy has arisen as to its meaning, is entitled to great weight," and that

19  "[t]he conduct of the parties after the execution of the contract and before any controversy

20  has arisen as to its effect affords the most reliable evidence of the parties' intentions")

21  (internal alterations and quotation marks omitted).

22         Indeed, Defendants' cite to their 2009 staffing plan to explain the roles of

23  supervising psychiatrists a mere one page after complaining that Plaintiffs' reliance on the

24  same plan for the same purpose "should be disregarded."  Opp. at 6-7.  That plan and its

25  ────────────────

26  [5] Insofar as Defendants invoke this point to argue, yet again, that "psychiatrists" means
    "staff psychiatrists" because it appears in the same sentence as the term "case managers,"

27  their position is untenable for the reasons discussed in Plaintiffs' opening brief, *see* Mot. at
    5-7, and in Section I, *supra*.  Nothing in the new citations Defendants provide changes that

28  analysis.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO CLARIFY ORDER OF JUNE 13, 2002

1  descriptions of the roles of the clinicians in CDCR clearly supports Plaintiffs'

2  interpretation. *See* Mot. at 4-5, 12-13.  And Defendants' attempts to dismiss the evidence

3  of the critical role played by psychiatric supervisors in their system—including their

4  significant role in providing direct patient services as established during the Golding

5  proceedings—ignores the fact these are not merely Plaintiffs' unsupported suppositions,

6  but the Court's own findings based on the sworn testimony of Defendants' top

7  headquarters psychiatrists.  *See* Opp. at 6 nn.3-4 (discussing Mot. at 13-14).  Defendants

8  simply cannot explain why excluding supervisory psychiatrists, when the text of the 2002

9  Order does not exempt them, would be consistent with the Court's many orders (including

10 the 2002 Order) seeking to ensure Defendants' fulfill their constitutional obligation to

11 provide minimally adequate clinical staffing to treat the *Coleman* class.  *See Salazar v.*

12 *Buono*, 559 U.S. 700, 762 (2010) (Breyer, J., dissenting).

13        Finally, Defendants suggest that this Court's expression of concern about staff

14 psychiatrist vacancies during a February 2018 status conference "clearly shows that the

15 vacancy issue the Court has sought to address since 2002 remains with *staff* psychiatrists."

16 Opp. at 8 (emphasis in original).  The Court's statement shows no such thing.  At the

17 hearing in question, the Court ordered Defendants to file data relating to staff psychiatrist

18 vacancies on the fifteenth of each month, in addition to the monthly data they have

19 provided and continue to provide to the Special Master and Plaintiffs for at least a decade

20 showing supervisory psychiatrist vacancies, for the purpose of "keep[ing] us focused on

21 the vacancy issue that most troubles the Court."  Hrg. Tr., ECF No. 5793 at 19.  The fact

22 that vacancies in staff psychiatrist positions were "most" troubling to the Court in 2018

23 does not mean that widespread vacancies in other classes of positions have not been a

24 focus of remedial efforts in the past, or that such vacancies do not render Defendants non-

25 compliant with the 2002 Order or other orders of this Court.  Indeed, the Court's October

26 10, 2017 order, which gave rise to the Court's February 2018 comments and the

27 subsequent psychiatry vacancy report requirement, makes clear that the Court is enforcing

28 the entirety of the 2009 staffing plan, which indubitably includes psychiatric supervisors,

1   even if the longstanding line psychiatry vacancies are the most egregious deficiency. *See*

2   ECF No. 5711 at 30 (requiring Defendants to "come into complete compliance with the

3   staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate

4   required by the court's June 12, 2002 order").

5   **III.    Conclusion**

6       The plain text, history, and purpose of the 2002 Order all demonstrate that the

7   Court's mandate has always required Defendants to fill at least 90 percent of *all*

8   psychiatrist positions, including but not limited to chief psychiatrist and senior psychiatrist

9   supervisor positions. Therefore, this Court should grant Plaintiffs' Motion in full.

10                          **CERTIFICATION**

11      In preparing this filing, Plaintiffs' counsel certifies that he reviewed the following

12   orders: ECF and Dkt. Nos. 1055, 1111, 1262, 1383, 5711.

13

14   DATED: April 30, 2021          Respectfully submitted,

15                                  ROSEN BIEN GALVAN & GRUNFELD LLP

16

17                                  By: */s/ Alexander Gourse*

18                                      Alexander Gourse

19                                  Attorneys for Plaintiffs

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO CLARIFY ORDER OF JUNE 13, 2002