**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
    **Plaintiffs,**

    **v.**                                                            **No. 2:90-CV-0520 KJM DB**

**GAVIN NEWSOM, et al.,**
    **Defendants.**

## THE SPECIAL MASTER'S REPORT ON THE CONTINUOUS QUALITY IMPROVEMENT TOOL KEY INDICATORS

**I.**    **INTRODUCTION**

    During a status conference held on March 25, 2021, the Court referred the task of identifying the continuous quality improvement (CQI) key indicators to the Special Master and ordered him to present his recommendation regarding what they should be in a report filed with the Court by April 29, 2021.[1]  The Special Master was further ordered to continue negotiations with the parties to see how much, if any, of the gap between them could be closed.  ECF No. 7111 at 14-17.[2]

    This report is responsive to the Court's order.

---

[1] On April 29, 2021, the Court issued a minute order granting the Special Master's request for an extension of time and ordered the report to be filed on May 6, 2021.  ECF No. 7143.

[2] References to page numbers for documents filed in the court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system.

## II.   HISTORY: DEVELOPMENT OF THE CONTINUOUS QUALITY IMPROVEMENT (CQI) PROCESS

### A.   Background

The need for a quality management system was identified as early as June 1994 by the Magistrate Judge who recommended that defendants develop and implement a quality assurance and peer review process for their mental health services system.  ECF No. 547 at 80.  The Magistrate Judge's recommendation was adopted by the Court in *Coleman v. Wilson*, 912 F. Supp. 1282, 1323-1324 (E.D. Cal. 1995).

Regrettably, as described in detail below, defendants' progress stagnated at nearly every stage of development.

From the very beginning, the abiding focus of the *Coleman* case has been defendants' obligation to provide incarcerated persons with serious mental illness access to adequate mental health care and treatment.  To that end, the development and implementation of an effective CQI system has been a foundational building block of the remedy.  A dependable process to systematically identify barriers to accessing adequate mental health treatment for the *Coleman* class, developing potential solutions to those problems, and assessing the effectiveness of the remedies devised, are central to defendants' ability to remediate the Eighth Amendment violations in the provision of mental health care found by the Court.  Further, the durability of the remedy must be demonstrated once compliance is achieved.

Although the sufficiency of treatment was always the over-riding objective, for many years defendants did not reliably have even rudimentary quality assurance systems in place.  As a result, it was premature for them to attempt to develop programs aimed at systematically improving the quality of care they provided.  Defendants first had to ensure that clinical functions were routinely occurring as required and that they had a quality assurance structure in

place across institutions to track this.  Only then would defendants be in a position to focus seriously on the quality of the treatment they provided.

Full implementation of defendants' CQI program is both a free-standing element of the remedy in this matter as well as the primary mechanism for defendants to demonstrate not only that they have achieved compliance with the Court's remedial orders at a given point in time, but also that they have developed the internal structures needed to sustain that compliance.

In his monitoring and in his approach to promoting defendants' progress towards remediation, the Special Master was guided by a simple fact – a clinical encounter had to occur in the first place for it to occur in a clinically appropriate manner.  Similarly, regularly occurring quality assurance meetings in local prisons attended by the necessary personnel was a condition precedent for the development of a more robust quality management system to improve the quality of care.  This was the struggle over the first 17 years of monitoring.

However, by 2012, the local quality assurance committee structure was predominately in place, presenting a significant opportunity for progress.  In his Twenty-Sixth Round Monitoring Report, the Special Master determined that this structure "did not enable CDCR to diagnose and resolve problems with the quality of care it delivers" because it was not "a central office-driven quality improvement process."  ECF No. 5439 at 105.  The Special Master underscored that a central-office driven CQI process offered "great promise for continued evolution into the durable remedy via which CDCR can achieve compliance in *Coleman* remediation and, if utilized correctly, allow CDCR to eventually emerge from *Coleman* Court oversight."  *Id.* at 129.

In 2012, defendants, working under the guidance of the Special Master with input from the plaintiffs, began the process of identifying the Continuous Quality Improvement Tool (CQIT) indicators and developing a more robust, central-office-driven CQI system capable of

improving the quality of care delivered to the *Coleman* class.  In developing the CQIT indicators, defendants examined the myriad of requirements contained in their remedial plan—the Program Guide—and distilled its most salient elements to form the list of CQIT key indicators.

However, the path to implementing the use of the indicators has been tortuous, marked by much effort and achievement, but also by derailing events causing substantial delays in forward movement and loss of momentum.

Initially, CDCR's efforts to create a quality management system focused on the development of various committees and structures within each prison with a mental health mission.  These included a local governing body, a quality management committee, a mental health subcommittee, the formation of quality improvement teams, and peer review by clinicians. The Special Master monitored and reported on the functioning of these committees as part of his regular onsite monitoring and reporting to the Court.  As noted, incremental improvements were made so that by the time the Special Master completed his Twenty-Fourth Monitoring Round in January 2012, multiple institutions had this local quality management infrastructure reliably in place.  This permitted a shift in focus toward a more comprehensive and central office-driven quality *improvement* process to augment and build upon the existing local quality assurance structures.  *See* Special Master's Report on Defendants' Quality Improvement Process, ECF No. 4730 at 4.

The Court recently reiterated the multifaceted ways in which CQI is integral to the remedy in this matter:

> Defendants' expert previously has testified via declaration 'that defendants cannot provide adequate mental health care without some form of quality assurance.'  *Coleman v. Wilson*, 912 F. Supp. at 1308.  The Eighth Amendment requires access to 'adequate' mental health care; a quality assurance program is a necessary part of ensuring the adequacy of the mental health care delivered in a

> system the size of defendants' Mental Health Care Delivery
> System (MHSDS).

ECF No. 6996 at 2.  The Court expressly identified the quality improvement process as "an

integral remedial function in this action:  defendants' assumption of responsibility for self-

monitoring the adequacy of mental health care delivered to the plaintiff class." *Id.* at 7.  The

Court underscored that a functional quality improvement process is "as essential to the

constitutional remedy as are individual components measured by CQIT." *Id*.

The full implementation of the individual components of CQIT and the overall quality

improvement process serve twin critical components of the remedy—the improvement of the

mental health care provided to class members and the creation of an infrastructure for defendants

to monitor and improve the program they have in place to provide that care.  Defendants'

sluggish development of the basic quality assurance foundation, which took from 1995 until

2012 to put in place, and the on again off again nature of the deployment of CQIT since 2012,

mean that the performance of CQIT to address these dual functions has never been fully tested.

Its substantial potential to monitor and improve the quality of mental health care provided to

*Coleman* class members has yet to be realized and it remains only an eventuality waiting to

unleash its latent capability to lead the way to the end of federal court oversight.

B.    Development of a Central Office-Based Quality Improvement Process

Quality improvement goes beyond quantifying tasks and tallying the presence or absence

of forms or the timeliness of required activities, to examining the quality and adequacy of the

care provided.  It also moves remedial activities beyond the local level to examine solutions to

barriers to adequate treatment that can only be addressed on a systemwide basis.  The Special

Master was aware that a primary driver of the move from quality assurance to quality

improvement was imperative to improve the quality of mental health care provided so that it

could meet constitutional standards.  Table 1 below provides a summary of the attributes of quality assurance and quality improvement.

**Table 1**. **Quality Assurance and Quality Improvement Summary**

|  | **Quality Assurance** | **Quality Improvement** |
|---|---|---|
| **Level** | *Institutional* | *Central Office* |
| **Problems Addressed** | Local *problems and attempts local* solutions | Systemwide *problems and supports local remedial* actions through headquarters level oversight and systems solutions |
| **Focus** | *Quantification* of tasks | Q*uality* of treatment provided |
| **Goal** | Generally *reactive* to encapsulated problems identified at institutional level | Generally, *proactively* aims to improve system; more *standardized* system *roadmap for sustainable self-monitoring* |

Quality assurance processes are generally designed to measure the presence or absence of identified indicators [e.g. Is the required admission intake form present? Which elements of the intake form are completed?].  In contrast, quality improvement processes focus on quality issues [e.g. Is the documentation in the intake forms clinically appropriate?] and/or processes [e.g. Can the process of completing the intake forms be changed to make it more efficient and/or useful?]. Quality assurance generally precedes the implementation of a quality improvement process. Quality management often encompasses both quality assurance and quality improvement processes.

With this in mind, the Special Master in his Twenty-Fourth Monitoring Round report recommended that the Court order defendants to review and assess their quality management process and develop a central office-based quality improvement process as a function of their quality management system.  ECF No. 4205 at 75-76.  This recommendation was adopted by the Court in its August 30, 2012 order, which provided for a six-month period of time for development.  ECF No. 4232 at 5-6.

This signaled an inflection point in the advancement of CDCR's CQI processes as the goal turned toward forging the path for defendants' self-monitoring and the eventual removal of federal court oversight.  The Special Master's experts and CDCR staff set to work starting on September 14, 2012 through a series of meetings and teleconferences with the goal of meeting the Court's six-month deadline. They agreed to focus on creating a tool with specific indicators that CDCR could use to identify issues and address problems with the mental health care it provided.  This tool, which was significant, but not the only part of CDCR's overall CQI process, became known as the "CQIT."

As a result of this process, working under the guidance of the Special Master, and with input from plaintiffs, defendants developed a list of indicators for each area; these became known as "key indicators" because they were culled from the "material" requirements of the Program Guide, relevant Court orders, and the collaborative identification of additional indicators central to the provision of adequate mental health treatment and its monitoring.  While some elements related to the identification and timely transfer of patients to higher levels of care were already court ordered, those processes were deemed to be part of the foundation upon which CQI would be built making it unnecessary to include detailed measurement of each of those functions in the initial CQIT.  By early January 2013, this early stage of the work, which also included development of a protype for CQIT, was completed and the late February 2013 deadline appeared achievable.  ECF No. 4730 at 5-7.

C.    The First CQI "Derailing" Event

The first major derailing event in the development of the CQIT occurred on January 7, 2013 when defendants moved to terminate federal court oversight.  The Special Master's work

with defendants on the CQIT and plaintiffs' input came to a grinding halt.[3]  By the time the

Court denied defendants' motion to terminate on April 5, 2013, "the court-ordered six-month

timeframe for completion of the project had expired by approximately two months."  ECF No.

4730 at 8.  After the termination motion was denied and the extension was granted, forward

progress was hampered by the need to reestablish the mutual confidence that such a complex

joint undertaking required.  *Id*. at 7-8.

  D.  <u>Resumption of the CQI Development Process</u>

  As a result of the delay engendered by the termination motion, on April 22, 2013, the

Court granted an extension to defendants to July 1, 2013 to complete the development of CQIT

under the guidance and supervision of the Special Master with input from plaintiffs.  ECF No.

4561 at 1-2.  The delay and impending July 1, 2013 deadline resulted in a significant

compression of the timeline for the completion of the initial iteration of the tool and the

commencement of the planned testing at designated institutions.

  Prior to defendants filing their termination motion, and after the denial of the motion,

between September 20, 2012 and May 13, 2013, approximately 19 meetings between the Special

Master's experts and defendants took place to work on development of the CQIT, which

identified the initial overarching priority areas to be addressed by the CQIT.  ECF No. 4730 at 5.

During the process, the list of focus areas was refined and expanded to include, among other

things, examination of issues such as transfer timelines and appropriate referrals to higher levels

of care, group attendance, treatment in lockdown units, and various clinical outcome measures.

---

[3] The Special Master's staff and plaintiffs' counsel attended a pre-scheduled webinar on the development of the tool on February 8, 2013; however, no further collaborative meetings occurred until after the termination motion was denied.  ECF No. 4730 at 7.

In addition, the Special Master and the parties agreed to test the CQIT at eight institutions: Central California Women's Facility (CCWF), California Correctional Institution (CCI), California Institution for Men (CIM), California State Prison/Los Angeles County (CSP/LAC), California Men's Colony (CMC), California State Prison/Sacramento (CSP/Sac), California Substance Abuse Treatment Facility (CSATF), and Salinas Valley State Prison (SVSP). *Id.* at 8. CQIT tests at the eight institutions commenced on May 22, 2013 and were completed on June 26, 2013. Members of the Special Master's team of experts observed the CQIT testing at all eight institutions; plaintiffs' counsel was present for the visits at CSP/LAC, CMC, CSP/Sac, SVSP, and CCWF. These test visits covered a broad range of CQI topics. ECF No. 4730 at 14-15.

In his August 2013 report on defendants' quality improvement process, the Special Master noted overall that CQIT was "off to a good start." ECF No. 4730 at 16. He, however, made multiple recommendations for improvement of the process following the tests conducted at the eight institutions. *Id.* at 16-29.

At this point in the development of the CQIT, CDCR had planned to only report the results of the CQI visits on its electronic dashboard simply as compliance percentages color coded into three levels of performance. The Special Master strongly recommended that CDCR produce reports at regular intervals, in both narrative and summary formats, on both the institutional and systemwide levels.

Following the Special Master's August 2, 2013 report, the Court ordered that:

> Rather than set a new deadline, the court will reiterate that defendants' development and implementation of an improved quality improvement process is fundamental to ending federal court oversight in this action. It is grounded in this court's obligation to end its supervision of defendants' delivery of mental health care to members of the plaintiff class when defendants have

> implemented a durable remedy for the Eighth Amendment
> violations in the delivery of that care.  A key component of a
> *durable* remedy is the development and implementation of an
> adequate quality improvement process by which defendants will
> self-monitor and, as necessary, self-correct inadequacies in the
> delivery of mental health care to the thousands of seriously
> mentally ill inmates incarcerated in California's prisons.
> Defendants are required to work under the guidance of the Special
> Master, with input from plaintiffs' counsel, on this task until it is
> completed.

ECF No. 5092 at 4-5 (citation omitted).

CDCR provided a revised "Continuous Quality Improvement Site Audit Guidebook" to the Special Master for review on September 11, 2013.  From September 2013 through January 2014, the Special Master's experts and plaintiffs' counsel met with defendants and attended training that included presentations regarding the revised guidebook, the CQIT indicators and chart audit questions and provided feedback.

The next round of test runs of the CQIT process took place in July and August of 2014 when the Special Master's experts accompanied CDCR on CQIT visits at Deuel Vocational Institution (DVI), California State Prison/Solano (CSP/Solano), SVSP, California Institution for Women (CIW), CSP/LAC, CSP/Sac, CMC, California State Prison/Corcoran (CSP/Corcoran), and Richard J. Donovan Correctional Facility (RJD).  This was followed by revised versions of the CQI guidebook which included additional areas of review as agreed upon on September 26, 2014.  The Special Master's experts again provided feedback to defendants.

Following these test runs, the *Coleman* parties and the Special Master agreed that CQIT measures concerning administrative segregation would be utilized for the EOP ASU Hub

certification process.[4]  Site visits with this focus were conducted in September and October 2014 with plaintiffs' counsel in attendance.

The parties reached agreement in an all-parties' meeting on September 30, 2015 for defendants to move ahead with a trial implementation of CQIT in another test round at ten institutions with the Special Master's experts and plaintiffs in attendance.  These institutions were SVSP, RJD, North Kern State Prison (NKSP), CSP/LAC, Ironwood State Prison (ISP), Chuckawalla Valley State Prison (CVSP), California Correctional Center (CCC), High Desert State Prison (HDSP), Centinela State Prison (Centinela), and Calipatria State Prison (Calipatria). There was also an agreement that the CQI indicators would be revised as issues and findings might evolve.  The plan was for CDCR to conduct an initial CQIT review at a test site— identified as SVSP—and provide a draft report of the visit to both the Special Master and plaintiffs' counsel before continuing with the remaining nine planned site visits.  The initial test visit took place at SVSP from June 6, 2016 to June 9, 2016.  Observation of this visit at an institution with a complex mission showed the need for various improvements to the process.

---

[4] On April 10, 2014, the Court ordered defendants to develop a plan to report compliance with Program Guide requirements in their EOP ASU Hub units, and further ordered defendants not to admit *Coleman* class members to and EOP ASU Hub that "failed to meet or exceed Program Guide requirements for a period of more than two consecutive months."  ECF No. 5131 at 73. Responsive to this order, on August 10, 2014, defendants submitted a plan to institute a monthly EOP ASU Hub Performance Certification Process (ECF No. 5190), which was approved by the Court on August 11, 2014. ECF No. 5196.  The Special Master has long expressed ongoing concerns to the parties about the transparency and efficacy of the certification process. Plaintiffs' counsel most recently raised several issues regarding the certification processes of defendants' EOP ASU Hub and Psychiatric Services Unit (PSU) in a letter to the Special Master and defendants dated June 19, 2020, indicating that they believed that the self-certification process was "a failure." The Special Master referred the matter to the small workgroup to develop proposals to address its deficiencies for consideration by the parties.  Following further exchanges of correspondence between the parties, consideration of defendants' draft CQIT guidebook regarding the certification process, and multiple discussions in the workgroup and during COVID-19 Task Force Meetings no agreement was finalized. On April 12, 2021, defendants informed the Special Master and plaintiffs' counsel via email that "CDCR plans to immediately implement the revisions" and encouraged the Special Master "to monitor the revised process during his 29th Monitoring Round and report on it in his monitoring report."  In light of defendants' unilateral action, the Special Master is strongly considering writing a separate report regarding the EOP Hub and PSU certification processes.

The remaining nine visits were completed by November 16, 2016 with plaintiffs in attendance at all but one.

The trial implementation was characterized by significant delays between the site visits and the production of draft reports following review and comment by the Special Master's experts and plaintiffs' counsel. While there ultimately were improvements to these reports over time and across iterations, the staccato nature of defendants' report production disrupted the momentum for advancement of CQIT.

Between February 2017 and June 2017, the Special Master and the parties assessed defendants' draft reports from the test institutions. In June 2017, the Special Master's experts reviewed defendants' test CQI reports through the lens of assessing whether they were adequate to serve as eventual replacements of the Special Master's reports.

The review revealed the potential strength of the CQI process as well as a number of core improvements that needed to be made, which were provided to defendants. CDCR provided a draft outline for a systemwide report to the Special Master and plaintiffs in early June 2018.

    E.      The Second CQI "Derailing" Event

The second major derailing event in the development and deployment of CQIT occurred on October 4, 2018 when the Special Master received a whistleblower report from the *Plata* Receiver authored by Dr. Michael Golding, CDCR's Chief Psychiatrist (the Golding Report). As so much of the CQI process is dependent on transparently produced accurate data, the process once again ground to a halt pending data remediation, which is ongoing.

As outlined above, the history of the CQIT process demonstrates that over the course of time, three different pilots or trial implementations were conducted, and considerable work went into refinement of the process, and development of the CQIT indicators, as well as production of

CQIT reports.  This constructive and generally collaborative work was interrupted by derailing events such as defendants' termination motion and the filing of the Golding Report and was slowed by the unpredictable pace of defendants' production of draft reports for review and comment.[5]

## III.    THE BENCHMARKS ORDER AND THE PROCESS TO DETERMINE THE KEY INDICATORS IN THE CONTINUOUS QUALITY IMPROVEMENT TOOL (CQIT)

### A.    The Benchmark Order

By the time the Court issued its July 12, 2018 order instructing the Special Master to recommend "specific benchmarks that, when met, signal constitutional compliance," ECF No. 5852 at 3, the CQIT indicators had been developed and generally agreed upon, drawing strongly but not exclusively from the material requirements of the Program Guide and key court orders.[6] There had been agreement between the Special Master and defendants, with input from plaintiffs, on the indicators, and general although not complete agreement regarding the scope of CQIT assessments and reports for individual institutional CQIT site visits, and work had begun on the scope and content of a systemwide report.

In an order issued on March 17, 2020, the Court stated that considering the "intervening events" since its July 12, 2018 order issued to the Special Master regarding benchmarks, such as the Golding Report, it was "contemplating setting its own process for establishing benchmarks." ECF No. 6509 at 2.  On September 3, 2020, the Court issued an order that delineated and confirmed "the remedial framework for this action and the road map to the end of federal court

---

[5] To further assist the Court, illustrations of timelines related to significant CQIT court orders, key markers in the development of CQIT, and pilots, test runs and trial implementation of CQIT are presented in Appendix A.
[6] On June 29, 2018, the Special Master filed his "Report on the California Department of Corrections and Rehabilitation Mental Health Services Delivery System Program Guide Update."  ECF No. 5844.  On July 12, 2018, in addition to instructing the Special Master to recommend "specific benchmarks" starting with his Twenty-Eighth Round Monitoring Report, the Court specified that the recommended benchmarks "shall include, as appropriate, specific recommended compliance percentage requirements for each benchmark."  ECF No. 5852 at 3.

oversight." ECF No. 6846 at 28. The Court identified the "CQIT's 'key indicators' as the functional equivalent of 'benchmarks' that, as used in this order, signify the material provisions of the Program Guide and the Compendium that must be durably implemented at a degree of compliance the court will confirm in a subsequent order." *Id.* The Court invited the parties to file "narrow briefing on whether additional remedial measures are ripe for establishment of compliance standards or deadlines for completion." *Id*.

The Court returned to the CQIT indicators in its December 17, 2020 order. The order provided a review of the role of quality assurance and quality improvement in the *Coleman* action and stated that they "are required parts of the remedy" in the case. ECF No. 6996 at 2. The order discussed and responded to the parties' briefings regarding an updated CQIT's key indicators list, confirmed the role of an updated list of key indicators in the process, addressed the establishment of a percentage compliance rate for key indicators, indicated a process and timeframe for updating "the finalized CQIT," and the administrative segregation enhanced outpatient program (EOP) treatment improvement plan. *Id*. at 6-9.

The Court underscored that "it is settled in this action that full implementation of the quality improvement process, including CQIT, is essential to a durable remedy in this action. For that reason, implementation of all components of CQIT is essential to the proper function of this key remedial requirement." *Id*. at 5.

The Court ordered that,

1.      Within three months from the date of this order, defendants shall, under the supervision of the Special Master, who may seek input from the plaintiffs as appropriate, update the key indicators in the Continuous Quality Improvement Tool (CQIT) to reflect changes required by the 2018 Update to the Program Guide and Compendium of Custody Related Remedial Measures.

2.     Defendants shall file the updated list of key indicators within three months from the date of this order.

3.     The court defers confirmation of the compliance rate for each key indicator pending defendants' compliance with paragraph 2 of this order and consideration of findings and recommendations filed by the Special Master, if any, for a different compliance rate for one or more of the key indicators followed by resolution by this court of objections, if any, to such findings and recommendations.

4.     After the list of key CQIT indicators has been finalized, defendants will be required to seek leave of court before making any substantive change to any CQIT indicator.  They may do this by including a request for court approval of such changes with the annual updates to the Program Guide and the Compendium, or they may file individual requests for approval when they request court approval of any material provision of the remedy.  In either event, defendants shall include the annual updates to the Program Guide and the Compendium in their certification that the requirements of this order have been met together with a list identifying any material change to a key CQIT indicator or a statement that no such changes have been made in the preceding year.

*Id*. at 11-12.

B.     **The Special Master's Efforts to Negotiate Agreement Regarding the CQIT Key Indicators**

1.     Meetings

Pursuant to the Court's December 17, 2020 order, the Special Master convened multiple meetings attended by him and his experts, and the parties.  The meetings occurred on January 12 and 26, February 9 and 23, March 9, 11, 15, and 16, 2021.

2.     Proposed CQIT Key Indicators

The framework for identifying the CQIT key indicators included several exchanges of proposed CQIT key indicators by the parties and discussion of each proposal and counter proposal in granular detail during the meetings.  At the start of the process, defendants proffered a list of 169 indictors attached as Appendix B which formed the basis for the opening discussion. This list substantially reflected the universe of CQIT indicators that had been developed by

15

defendants under the guidance of the Special Master with input from plaintiffs. Subsequently, plaintiffs submitted a list of 2018 Program Guide Revision and Pocket Parts Policies related subject areas, that they maintained had not been included in defendants' list of 169 indicators, and also requested that defendants include other remedial measures in the case not included in the 2018 Program Guide Revision as CQIT indicators, which are attached as Appendix C. Defendants submitted general objections to plaintiffs' proposals, attached as Appendix D, and placed plaintiffs proposals in three categories:

a)      items already measured;

b)      items that CDCR agree to measure or were open to further discuss; and

c)      items that CDCR did not believe should be measured.

Based on the documents the parties had exchanged and discussions in the meetings, plaintiffs sought clarification regarding several of the proposed CQIT indicators and subject matters covered, which is attached as Appendix E.

Defendants presented what became their final offer, attached as Appendix F.  Defendants addressed the following areas in their submission:

a)      items that CDCR agreed to measure;

b)      items that CDCR did not agree should be measured;

c)      performance report omitted from their initial list of 169 indicators;

d)      other questions raised by plaintiffs; and

e)      CQIT indicators recommended for decommissioning.

Defendants also proposed that several individual indicators be combined into a single indicator. This would be achieved "by removing the various line items" in a "rolled up format"; but would permit users to drill down and examine the individual items in the roll-up.

In an effort to assist the parties in coming to agreement, the Special Master also offered draft CQIT key indicators to them for their consideration.  These draft key indicators were based on the indicators that had been used during the CQIT test period discussed above, which had been developed by defendants under his guidance, with input from plaintiffs.  These draft indicators aided the formulation of his recommendations presented below.

In the end, the parties could not reach agreement and defendants indicated that they would file their proposed list of CQIT indicators on March 17, 2021 pursuant to the Court's order.

C.       Defendants' Filing Pursuant to December 17, 2020 Order

Defendants filed their response to the Court's December 17, 2020 order on March 17, 2021, ECF No. 7089, and attached what was captioned as "CDCR's current list of 'key indicators' for its Continuous Quality Improvement Tool (CQIT)" as Exhibit A to their filing. ECF No. 7089-1.  They informed the Court that the list "reflects changes from the 2018 Update to the Program Guide and the Compendium of Custody Related Remedial Measures."  ECF No. 7089 at 1.  Defendants further informed the Court that to provide it with "additional information and context about CQIT," Exhibit A also "includes a list of non-key informational quality improvement indicators which do not measure material provisions of the Program Guide, Compendium, or court orders and may also continuously evolve."  *Id.* at 2.  Exhibit A was comprised of 76" key" indicators and "81 non-key" informational quality improvement indicators, for a total of 157 indicators.  ECF No. 7089-1.

D.       Plaintiffs 'Objections to Defendants' March 17, 2021 Filing

On March 23, 2021, plaintiffs filed objections to defendants' list of indicators filed on March 17, 2021.  ECF No. 7101.  Plaintiffs objected to defendants' decision not to add eight

specified indicators to CQIT that were not previously measured in CQIT, noting that defendants had indicated they preferred to track them separately. *Id.* At 1. Plaintiffs also objected to defendants' omission of 37 specific indicators presently in CQIT from their filed list of "key" indicators. *Id.* At 2-13. Finally, plaintiffs identified ten Program Guide or court-ordered requirements they indicated were not tracked in CQIT that they maintain should be tracked as "key indicators" in CQIT. *Id.* at 13-16.

E.    Meetings after the Filings Pursuant to the March 25, 2021 Order

During the March 25, 2021 status conference, the Court ordered the Special Master to submit his report recommending the CQIT key indicators "only after intensive sessions with the parties." ECF No. 7111 at 16. On April 6, 2021, plaintiffs declined the Special Master's offer to both parties to have additional discussion regarding the CQIT key indicators. Defendants agreed to meet with the Special Master. On April 13, 2021, the Special Master and his experts met with defendants regarding the indicators and were unable to reach agreement with them.

IV.    **INDENTIFYING THE CQIT KEY INDICATORS RECOMMENDED BY THE SPECIAL MASTER**

As reported above, the Special Master convened eight separate meetings with the parties regarding the CQIT key indicators before defendants filed their indicators list on March 17, 2021 and once with defendants after they filed their list; plaintiffs declined his invitation to meet. The parties did not reach agreement through negotiation regarding what should constitute the CQIT key indicators.

In the process of identifying the CQIT key indicators and presenting his recommendations regarding what they should be pursuant to the Court's March 25, 2021 order, the Special Master reviewed the documents offered by the parties during negotiations. In

18

addition, the Special Master drew on the discussions that had occurred during the several meetings.

Defendants' proposals were formulated around a near "red line" like partition of "key" indicators and "non-key" informational indicators, a distinction that had neither been contemplated nor applied in the development of the original indicators used during the CQIT test phases previously described. Defendants also introduced a new concept that called for a "rolled up format" whereby various existing indicators would be collapsed in a single indicator, which was also a concept that had not been considered in the development of the original CQIT indicators. Moreover, defendants also proposed decommissioning several existing CQIT indicators notwithstanding that the tool has never been fully tested. Plaintiffs' proposals generally sought to expand the list of indicators measurably beyond the original CQIT indicators that had been used during the test period to include additional items in the Program Guide as well as other remedial measures ordered in the case that did not form part of the 2018 Program Guide Revision and Pocket Parts.

In sum, the Special Master was presented with two competing groupings of proposed key indicators. Defendants' proposed key indicators presented a reasonably complete list of indicators but sought to subtract significantly from the originally identified indicators by considering many of them "informational" not "key" or in some fashion obsolete so that they should be "decommissioned." Plaintiffs' list of proposed indicators sought to gather under the CQIT rubric a wide range of remedial plans and orders. Faced with this and in the context of parties inability to reach compromise, the Special Master and his team examined the entire list of indicators proffered by defendants to determine which were required by the Program Guide or

Court order or were otherwise material to the provision of adequate mental health care and determined that it was reasonable to consider those as "key."

The Special Master was mindful that when defendants had developed the original list of CQIT indicators, under his guidance and supervision, with substantial input from plaintiffs in the earlier period discussed above, they had conducted a thorough review of the entire Program Guide and its myriad requirements, came to an agreement on which of those constituted its material provisions, and collaboratively developed the indicators using that standard.

The standard applied to developing the key indicators was that it must be required by the Program Guide and must also be required for appropriate quality of care, including suicide prevention.[7]  As previously discussed, the remedy in this case has two inescapably connected components – improving the mental health care provided to class members and putting in place an infrastructure to monitor and improve the programs that provide the care.  As the Court underscored in its December 17, 2020 order, the "full implementation of a quality improvement process, including CQIT, is essential to a durable remedy in this action," concluding that 'implementation of all components of CQIT is essential to the proper function of' a quality improvement process."  Identifying the "key" indicators is one of the components of the CQI process that the Court highlighted as essential.  ECF No. 6996 at 5.  Updating the CQIT key indicators is a necessary and major forward movement toward implementing a properly functioning quality improvement process.  Concomitantly, monitoring the usefulness of the indicators is also integral to the proper function of the defendants' quality improvement process and the assessment of the utility of the indicators.  The Twenty-Ninth Monitoring Round which is scheduled to commence on May 24, 2021 offers an opportunity to test the recommended CQIT

---

[7] Separately, the Court ordered the defendants on December 3, 2020, to implement the CQIT for suicide prevention that includes 19 indicators developed by the Special Master's suicide prevention expert. ECF No. 6973.

key indicators.  The Special Master will submit his findings to the Court in his Twenty-Ninth Monitoring Round Report if he is so ordered.

In developing his recommended list, the Special Master concluded that if an indicator was sufficiently salient to be included in the original CQIT pursuant to the exhaustive process he and his staff undertook with the defendants to develop the CQIT with input from plaintiffs, then it was presumptively a "key" indicator.  In addition, if an indicator measured a requirement that cannot be changed without leave of the Court, the Special Master also considered it presumptively material, and therefore a CQIT "key" indicator.

The Special Master believes that the indicators listed below meet the above standards and are necessary to measure the material requirements of the Program Guide, which constitutes the remedial plan in *Coleman,* and as a result should be considered to be "key" indicators.

## CONCLUSION

Pursuant to the Court's order of March 25, 2021, the Special Master hereby recommends that the following list of indicators be provisionally approved by the Court as the preliminary CQIT key indicators, and that the Special Master be furthered ordered to test and monitor the functionality and efficacy of these preliminary CQIT key indicators during the Twenty-Ninth Monitoring Round.  He further recommends that he should be ordered to report his findings to the Court in his Twenty-Ninth Monitoring Round Report.

### Access to Care

1. Timely MH Referrals
2. Timely PC Contacts
3. Timely Psychiatry Contacts
4. Timely IDTTs
5. Treatment Offered
6. Placement of ASU/SHU CCCMS in STRH/LTRH within Timeframes
7. Timely Transfers to CCCMS/EOP
8. Timely Admissions to Inpatient Care

9.    Inpatient Transfer Deadlines for PIPs and DSH
10.   Effective Communication Achieved
11.   IDTTs in a Confidential Setting
12.   Percentage of all IDTTs observed in which a health record and C-
      file are available
13.   Group Treatment in a Confidential Setting
14.   MHSDS Patients Transferred out of Desert Institutions
15.   Observed RC Screens Conducted in a Confidential Setting
16.   MH Screens
17.   Appointments Cancelled Due to Custody
18.   Appointments Seen as Scheduled
19.   Housing Units where 128 MH-5s are Accessible and Available to Housing Unit
      Staff
20.   Custody MH Referrals
21.   MHSDS inmates in ASUs transferred within policy requirements

## Suicide Prevention

1.    Timely Completion of 5/8 Day Follow Ups from MHCB, alternative housing, and
      DSH/PIPs. MHCB, Alternative Housing, DSH, and PIPs
2.    Emergent/urgent MH referrals that result in SRASHEs
3.    Safety planning to reduce suicide risk
4.    Suicide-resistant MHCBs
5.    APP/ICF Discharges with Clinician-to-Clinician Contact within 5 Days
6.    SRE Mentor Program
7.    Patients Referred to MHCB on Continuous Direct Visual Observation
8.    Patients in Alt Housing on continuous observation and provided suicide-resistant
      bed
9.    Percentage of timely Nursing Rounds in MHCB patients on suicide watch and
      suicide precaution recorded in EHRS Clearly Marked, On Time, and Documented
      on Correct Form
10.   Percentage of Observed R&R and Reception Center Screens in Confidential
      Setting and Correct Documentation Used
11.   Housing Unit/Inmate Living Areas with emergency response equipment and
      Inventoried Daily
12.   Custody Follow Ups for MHCB Discharges/7497 Forms
13.   Orders Reviewed with Properly Documented Observation Orders
14.   MHCB Records with Rationale for Limited Issues of Clothing and Bedding
15.   MHCB property and privileges
16.   ASU Intake Inmates Appropriately Housed
17.   Percentage of ASU Welfare Checks audited that were not completed on time and
      staggered
18.   Percentage of nursing staff current with CPR training
19.   Percentage of Health Care Staff with Suicide Prevention Training
20.   Percentage of Custody Officers with Suicide Prevention Training

21. Emergency Response Procedures for Self-Injurious behaviors and suicide attempts
22. MHCB Daily Provider Checks
23. SREs that Met All Audit Criteria
24. Discharges from MHCB with Clinician Review of D/C Summary (SRASHE)
25. Satisfactory SPR FIT Meeting

## Quality of Care

1. IDTT Staffing
2. Cases with Documentation of Appropriateness of LOC Discussed for Patients Identified by 7388B as Potentially Requiring Higher LOC
3. Treatment Plans with Satisfactory Documentation
4. Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers
5. Treatment Plans with Documented and Implemented Pre-Release Plans
6. IDTTs in which PC Intake Evaluations were Completed Prior to Initial IDTT
7. IDTTs in which Psychiatry Intake Evaluations were Completed Prior to Initial IDTT
8. Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers
9. EOP IDTT Discussion of Clinical Appropriateness for Work, Education Accommodation
10. Primary Clinician Continuity of Care
11. Psychiatrist Continuity of Care
12. IDTTs Meeting All Audit Criteria

## Specialized Custody

1. Percentage of RVR MHAs Where the Patient was Informed of the Limits of Confidentiality
2. RVRs Recommended for Mitigation with Documentation of Consideration of Mitigation
3. RVRs Where Hearing Officer Disagreed with MH Clinician's Recommendation to Document in an Alternative Manner and Documented Rationale for Disagreement on 128B
4. Percentage of Days Where Heat Plan was Activated, and Alternative Out of Cell Activities were Offered to Heat Alter Patients
5. Inmates Not Requiring Restraints for MH Treatment Attended Outside a TTM
6. Percentage of 128Bs Indicating the Requirement for Mechanical Restraints that are Present for MHCB Patients
7. Thermometer Checks Completed and Accurate
8. Timely MH RVR Assessments
9. RVRs Recommended for Mitigation That Were Mitigated
10. Use of Force involving MH Inmates
11. Additional Use of Force (Specificity to be determined)

**Medication Management**

1. Medication Admin: Chronic Care Medications Historical Administration (Psychiatrist)
2. Medication Admin: Outpatient Provider New Medication Orders (Psychiatrist)
3. Diagnostic Monitoring-Antipsychotics
4. Diagnostic Monitoring-Clozapine
5. Diagnostic Monitoring-Mood Stabilizers
6. Diagnostic Monitoring-Antidepressants
7. Diagnostic Monitoring-QT Prolongation EKG 12 Months
8. Continuity of Meds Upon Inter-Institutional Transfer at R&R
9. Continuity of NA/DOT Meds with Intra-Institutional Transfers (Excluding ASU/SHU/PSU)
10. Continuity of Meds: Mental Health Crisis Bed (MHCB) Transfers
11. Continuity of Meds with Intra-Institutional Transfers to ASU/SHU/PSU
12. Continuity of Meds: Discharge/Transfer from a Community Hospital and/or DSH
13. Medication Compliance with PC 2602, Involuntary Meds: Court Order
14. Medication Compliance with PC 2602, Involuntary Meds: Med Order
15. Additional MAPIP (Specific medication monitoring, other MAPIP measures related to psychiatric medication monitoring not included here)


**Restricted Housing**

1. Placement of ASU EOPs in Appropriate Housing Within Timeframes
2. NDS timely expedited transfers
3. Psych Tech Rounds Completed According to PG Requirements
4. ASU Pre-Screens
5. Percentage of Refused ASU MH Screenings that Resulted in a PC Contact within 5 Working Days
6. Percentage of ASU Screenings that Occurred Within 72 Hours of Placement of Arrival
7. ICCs with Mental Health Clinicians present, and relevant information provided
8. ASU Inmates on 21-Day Intake Status with Markers Posted for initial 72 hours
9. (LMH: in suicide prevention) Cells Reviewed Where Inmates Are Allowed Approved Entertainment Devices
10. Percentage of Unclothed Body Searches Conducted in a Private Area
11. ASU Screens that are Conducted in Confidential Settings
12. ASU Out of Cell Time Offered
13. Percentage of Weeks in which Yard was Offered According to STRH/LTRH Policy
14. Weeks in which Shower Access in ASU was Offered as Required
15. Units in which Staff can Identify NDS Patients and Have Tracking System for Phone Calls and Property
16. Warden Review of Cases Over 90 Days

17.     ASU LOS for MHSDS vs. Non-MHSDS Patients
18.     EOP Hub CCII and Captain Review for LOS Over 90 Days
19.     Percentage of Inmates with LOS Over 150 Days in which ASU Case Reviews were Completed on Time
20.     ASU, STRH, LTRH Morning Meetings meeting All Audit Criteria
21.     Percentage of Initial ICCs Reviewed and Held within 10 Calendar Days of Arrival
22.     Number of EOP and CCCMS Patients in ASU
23.     Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors
24.     High Refusers Due to Custody Reasons with Documented Plan of Action
25.     High Refusers in which 128B was Completed
26.     Percentage of High Refusers Due to Custody in Which a Meeting Between MH and Custody was Conducted within 7 Calendar Days
27.     Inmates Who Received ASU MH Guide
28.     Percentage of Psych Tech Round Documentation That Meets All Audit Criteria
29.     Psych Tech Rounds Where EC and Interaction with Patient are Achieved/Attempted and Appropriate Referrals are Made as Indicated
30.     Percentage of IDTTs Observed in which a Health Record and C-File were Available
31.     Percentage of Peace Officers Observed to Carry their CPR Mouth Shield
32.     Percentage of Eligible MHSDS Patients Receiving Milestone Credits
33.     RVR MH Assessments Where All Documentation Requirements Were Met
34.     RVR MH Assessments Conducted in Private Setting
35.     Use of Force MH Assessments Meeting Documentation Requirements
36.     Patients Discharged from DSH with Classification Casework Completed Prior to Transfer When Required
37.     Compare Percent of Inmate Overall that Received RVRs with Percentage of MH Inmates that Received RVRs
38.     Percentage of MH-7s required completed prior to ASU placement

## Patient Safety

1.     Number of Episodes of Heat Related Illnesses Occurring in MHSDS
2.     Percentage of Clinical Restraint Occurrences Meetings All of the Audit Criteria
3.     Seclusion, Frequency, and Duration

## Utilization and Resource Management

1.     MHCB Clinical Stays within Timeframes
2.     Percentage of mental health OHU stays 48 hours or less
3.     Timely admission to MHCB

## Facility/Environment of Care

1.     Adequate Group Treatment Space
2.     Adequate IDTT Space

3.      Adequate Individual Treatment Space

**Staffing/Personnel Training, and Staff Resources**

1.      Chief Psychiatrist
2.      Chief Psychologist, Correctional Facility
3.      Senior Psychologist, Correctional Facility (Supervisor)
4.      Senior Psychiatrist (Supervisor), Correctional and Rehabilitative Services (Safety)
5.      Supervising Psychiatric Social Worker I, Correctional Facility
6.      Senior Psychiatrist (Specialist), Correctional and Rehabilitative Services (Safety)
7.      Senior Psychologist, Correctional Facility (Specialist)
8.      Staff Psychiatrist, Correctional and Rehabilitative Services (Safety)
9.      Recreation Therapist, Correctional Facility
10.     Psychologist-Clinical, Correctional Facility
11.     Clinical Social Worker (Health/Correctional Facility) - Safety
12.     Staff that report having computers for all out of call clinical appointments
13.     Percentage of healthcare staff current with suicide prevention training
14.     Allocated and filled positions

**Additional Key Indicators**

1.      Sustainability Process
2.      ASU EOP Hub Certification
3.      PIP (To be developed)
4.      Custody and Mental Health Partnership Collaboration


Respectfully submitted,


/s/ *Matthew A. Lopes, Jr., Esq.*
Matthew A. Lopes, Jr., Esq.
Special Master

May 6, 2021

# **<u>APPENDIX A</u>**

# Orders

**1994**
June - Magistrate Judge recommends CDCR must develop a quality assurance system

**1998**
Aug - Court again ordered defendants to implement quality assurance system

**2012**
Aug - Order begins new phase from quality assurance to development of central office driven quality improvement monitoring to identify problems and eventual end of federal court oversight
Aug 30 - Ordered to review and assess existing QA process and develop improved quality improvement progress in six months

**2016**
Aug 16 - Order: "the successful implementation of CQIT is a key marker of success on the road to ultimate termination of this court's oversight."

**2020**
Sept 3 - Order "[i]dentifies CQIT's key indicators as the functional equivalent of "benchmarks" that... signify the material provisions of the Program Guide and the Compendium...."
Dec 16 - Orders defendants under supervision of special master to "update the key indicators in the ....CQIT to reflect any changes required by the 2018" update and compendium

| 1994 | 1995 | 1998 | 2002 | 2012 | 2014 | 2016 | 2018 | 2020 |
|------|------|------|------|------|------|------|------|------|

**1995**
1995 – Recommendation regarding quality assurance adopted by court

**2002**
June - Defendants ordered to develop a plan to speed the implementation of the quality assurance process

**2014**
Feb 27 - Order requires work on CQIT under the guidance of the special master with input from plaintiffs' counsel, on this task until it is completed

**2018**
Dec 14 - Order regarding data remediation and appointment of neutral

# Key Markers in Development of CQIT

**1994**
June - Magistrate Judge recommended development of quality assurance system

**1998**
June - Special master reported "Quality assurance is the critical key to an enduring remedy"
Aug - Court again ordered defendants to implement quality assurance system

**2012**
Aug - Order-- begin new phase from quality assurance to development of central office driven quality improvement monitoring to identify problems and end federal court oversight

**2014**
Feb 27 - Court Order required work under the guidance of special master, with input from plaintiffs' counsel, on this task until it is completed
July and Aug – Special master's expert accompanied CDCR mental staff test on runs of tool at 9 institutions

**2016**
June 6-9 - Test implementation began at SVSP
Oct-Nov - Continued trial implementation; plaintiffs attended all but one of the nine visits

| 1994 | 1995 | 1998 | 2002 | 2012 | 2013 | 2014 | 2015 | 2016 | 2018 |
|------|------|------|------|------|------|------|------|------|------|

**1995**
1995 - Recommendation adopted by court

**2002**
June 2002 - Defendants ordered to develop a plan to speed the implementation of the quality assurance process

**2013**
Jan 7 - *First derailing event*— defendants filed termination motion which suspended work until resolved
May 22 – June 26 - Fledgling CQIT tool piloted at 8 institutions, attended by members of special master's staff and plaintiffs' counsel
Aug 2 – Special master files report on the results of the pilot, citing a good start but with multiple suggestions

**2015**
Sept 30 - Parties and special master agreed at an all parties' meeting that defendants may proceed with a trial implementation of CQIT in the institutions, with the special master and plaintiffs' counsel present to observe

**2018**
Oct 5 – Plaintiffs notified the Court of the Golding report— *second derailing event* stopped all progress
Dec 14 - Order re data remediation and appointment of neutral

# Pilots, Test Runs and Trial Implementation of CQIT

**2012**
Late 2012 - Work with special master to develop key indicators and CQIT approach

**2014**
Jan 23 - CDCR presents to plaintiffs on CQIT indicators and chart audit questions, to which plaintiffs provide feedback
Feb 26-28 – Special Master's staff resume meeting on custodial areas, reviewing draft reports including custodial findings at all CQIT-piloted institutions
Feb 27 - Court Order requires CDCR to work under the guidance of the special master, with input from plaintiffs' counsel, on CQI until it is completed
July & Aug – Special Master's staff accompany CDCR on test runs of tool at 9 institutions
Aug 6 & Sept 26 - CDCR produced revisions of Guidebook for review
Sept & Oct – CDCR conducts audits of ASU EOP hubs for certification, using CQIT measures and being observed by special master's staff and plaintiffs' counsel

**2016**
June 6-9 - Test implementation began at SVSP
June 10 - Feedback was provided and defendants offered plans to revise at an all-parties workgroup
Sept 30 - Defendants submitted first draft of SVSP CQI report
Oct-Nov - Continued trial implementation; plaintiffs attended all but one of the nine visits
Nov 1 - Revised draft of SVSP report following special master's feedback
Dec 14 - Plaintiffs submitted comments

| 2012 | 2013 | 2014 | 2015 | 2016 | 2017-2018 |
|------|------|------|------|------|-----------|

**2013**
Early Jan - CQIT key indicators identified, and a prototype of the audit tool developed
Jan 7 - First derailing event—defendants filed termination motion which suspended work until resolved
Feb 8 - Plaintiffs attended webinar on the development of the tool
May 22 - June 26 - Fledgling CQIT tool piloted at 8 institutions, attended by members of special master's staff and plaintiffs
Aug 2 – Special Master files report on the results of the pilot, citing a good start but with multiple suggestions
Sept 11 - CDCR provided a revised "Continuous Quality Improvement on Site Audit Guidebook" (Guidebook) to special master for review

**2015**
July 1 - Defendants provide a revised version of the Guidebook
July 21 - Plaintiffs' counsel submit comments on the Guidebook
Sept 30 - Agreement at an all parties' meeting that defendants may proceed with a trial implementation of CQIT in ten institutions, with the special master and plaintiffs present
Dec 9 - CDCR provides updated CQI presentation to special master for review and comment
Dec 11 - Plaintiffs offered their recommendations at meeting

**2017**
Feb 16—Defendants provide update on SVSP report which is to be redrafted as example report
March 2 - Plaintiffs submit written comments on trial CQI tours
April 24 & 26 - Defendants revised drafts of SVSP report with mock data
June—Special Master convenes workgroup of his experts and monitors to review reports with defendants and provide feedback on scope and content
June 29 - Plaintiffs provide feedback on CCC, Calipatria, Centinela, CVSP, ISP, and SVSP reports
Aug 30 - Defendants submitted draft CQI reports on CSP/LAC, HDSP, NKSP, and RJD to special master and plaintiffs—included 85% threshold
Sept 12 - Plaintiffs submitted comments on draft CQI reports for CSP/LAC, HDSP, NKSP, and  RJD to defendants and special master
Sept 14—Special master's experts and monitors met with defendants and overall found improvement over time, despite concerns  around scope as compared to special master's reports
Oct 19 - Defendants and special master's team meet to develop process for selection and documentation of case reviews for CQI reports
Nov 6 - Special master's  workgroup and defendants to discuss updated draft CQI report
2018 - Work continues into 2018 concerning scope and content of systemwide report and refinement of site visit reports

# **APPENDIX B**

Jones Mohamedu

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov> |
| **Sent:** | Tuesday, January 26, 2021 4:16 PM |
| **To:** | Tavares, Zelia M; Neill, Jennifer@CDCR; Namrata Kotwani; Kyle Lewis; Adriano Hrvatin; Michael W. Bien; 'Lisa Ells (LElls@rbgg.com)'; Jessica Winter; Cara Trapani; Amy Xu; Marc Shinn-Krantz; 'dspecter@prisonlaw.com'; 'Steve Fama'; Toche, Diana@CDCR; Bick, Dr. Joseph@CDCR; Weber, Nicholas@CDCR; Mehta, Amar@CDCR; Elise Thorn; Lucas Hennes; Stafford, Carrie@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR; Ceballos, Laura@CDCR; Cartwright, Steven@CDCR; Leidner, David@CDCR; Cooper, Angelyne; Medlin, Braxton H.; Brian Main; cradavsky@gmail.com; James DeGroot; Metzner, Jeffrey; JP Sorah; Kahlil Johnson; Karen Rea; dockc99@aol.com; Walsh Kerry F.; Hector Kristina; L Hayes; McClendon-Hunt, LaTri-c-ea; Lopez, Lana L.; maria@drmariamasotta.com; Lopes Matthew; Ryan, Jr., Michael F.; Jones Mohamedu; mperrien@aol.com; harconwil@gmail.com; Gribbin Rachel; Costa Regina; Rod Hickman; Sharen Barboza; Millham, Sofia A.; trougeux@hotmail.com; Damon McClain; Trezvant, William J.; Paul B. Mello (Pmello@hansonbridgett.com); Samantha Wolff (SWolff@hansonbridgett.com); 'Silberfeld, Roman M.'; Raddatz, Antonina@DSH-S; Christine Ciccotti (Christine.Ciccotti@dsh.ca.gov); Kent, Kristopher@DSH-S; Ball, Laurie@CDCR; Dan Potter; hdlugacz@blhny.com; Golding, Michael@CDCR |
| **Subject:** | Coleman: List of Indicators in CQIT |
| **Attachments:** | CQIT Indicator Spreadsheet- 1.26.2021.xlsx |

All,

Attached is a chart listing the indicators in CQIT. It is not limited to the key indicators. The chart is being provided to you for discussion purposes in light of the March deadlines and does not represent Defendants' final work product. Defendants continue to review and analyze the indicators and may revise the attached chart for various reasons, including changes in EHRS, housing units, or policy. Also, CDCR is currently working on updated indicators for SPRFIT that may require further revisions to the chart. As indicated on the chart, the designations of whether an indicator is required by the Program Guide, Compendium, or prior Court Order are preliminary and do not represent Defendants' final positions. Defendants will continue to work through the indicators on the list to determine what, if any, changes may be necessary. In the meantime, we hope the chart will assist the parties' discussion on CQIT.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

| Indicator | Data Source | Policy/ Requirement[1] | Required by PG, Compendium, or Court Order?[1] |
|---|---|---|---|
| **Access/Availability of Confidential Care** | | | |
| Timely MH Referrals  (emergent, urgent, routine) | EHRS | MHPG p. 12-1-5: 24 hour response from receipt of referral | y |
| Treatment Offered (EOP, LTRH, STRH) | EHRS | MHPG Ch. 4 No research found to support number of hours alone as treatment indicator. However, access to care is important. | y |
| Appointments Cancelled Due to Custody | EHRS /SOMS | | n |
| Appointments seen as scheduled | EHRS | NCCHC MH-E-08 (important) "patients are transported safely and in a timely manner for mental health appointments both inside and outside the facility." | n |
| Timely PC Contacts | EHRS | MHPG, NCCHC MH-E-04, E-05 | y |
| Timely Psychiatry Contacts | EHRS/SOMS | MHPG | y |
| Timely IDTTs | EHRS/SOMS | | y |
| Treatment attended | EHRS | NCCHC MH-E-08 (important) "patients are transported safely and in a timely manner for mental health appointments both inside and outside the facility." | n |
| Patients reporting satisfactory access to care. | (CQIT) Inmate Perception of Access to Care in inmate interview tool: | CQAIMH - Notes time of appointments, ease of getting to appointments important (non correctional environment) | n |
| IDTTs in a confidential setting | EHRS Check tx space via on site observation. number IDTT encounters that were held in confidential setting/All group encounters observed | OSHA/MH Program guide 12-1-12 NCCHC MH-D-03 "Sufficient and suitable space, supplies, and equipment are available for mental health services. | y |
| Group treatment in a confidential setting | EHRS | MH Program guide 12-1-12 NCCHC MH-D-03 "Sufficient and suitable space, supplies, and equipment are available for mental health services. HIPAA | y |
| MHSDS patient transfers out of desert institutions | EHRS and SOMS Number of inmates at ASU Hub (Cal, Cen, Cor, HDSP, KVSP, LAC, PBSP, PVSP, SAC, SATF, SVSP) + number of inmates at desert institutions requiring higher LOC and transfer that transferred within transfer timelines/total number with change in LOC and transfer | MHPG p. 12-1-16 | y |
| Housing units where 128 MH-5s are accessible and available to housing unit staff | CQIT/Custody On site visit | MHPG 12-1-5 | n |
| Custody MH Referrals | CQIT/Custody On site visit | MHPG 12-1-5 | n |

Not Coded

| | | | |
|---|---|---|---|
| Placement of ASU/SHU CCCMS in STRH/LTRH within timeframes | EHRS/SOMS | 16-0303 Memo- Transfer of Correctional Clinical Case Management System (CCCMS) Inmate-Patients to Male Short Term Restricted Housing (STRH) Unit | y |
| MHSDS inmates in ASUs transferred within policy requirements | EHRS/SOMS | MHPG, August 2014 court order | Y |
| Timely transfers to CCCMS/EOP | EHRS/SOMS | MHPG | y |
| Programs with more than one type of group offered | Site Visit Audit tool 1. View wait list for all CCCMS groups. number of CCCMS groups offered | | n |
| Percentage of inmates screened negative on the mental health intake screening tool who were not placed in MHSDS loc within 6 months of initial screening | CQIT/HQ data collection | NCCHC MH-E-02 | n |
| Observed RC Screens Conducted in Confidential Setting | CQIT/Site Visit Audit tool | MHPG 12-1-12, 12-2-3 | y |
| **Suicide Prevention** | | | |
| SREs that met all audit criteria | Peer Review Audit Tool CAT | Content of suicide risk assessments: American Association for Suicidology; general textbooks of suicide risk assessment (e.g. Simon, Shea, Rudd); standard of care as determined by court cases | n |
| Percentage of SRASHEs completed on time. | EHRS/SOMS | | y |
| 5 day follow-ups with documentation of current suicidality | chart Audit Tool with Guidelines Methodology: Institution reviews 5-day follow up documentation through CAT  Responsible: Supervising Clinician or designee | Continuity of Care for Suicide Prevention and Research, Suicide Prevention Resource Center, 2011 | n |
| Housing Units/Inmate living areas with cut down kits and inventoried daily | CQIT/Custody On site visit | PG 12-10-23 | y |
| Custody follow ups for MHCB discharges | CQIT/Site Visit Observation: Sample: Inmates d/c'd from MHCB for suicidality within prior 24 hours. Review custody log of checks for compliance. **Note: Change for 30 min checks not yet programmed** | DAI Memorandum 2018 PG in memo 17-0901 (MHCB custody d/c checks) No research found that addresses outcomes for custody follow ups for inpatient discharges. | y |
| Timely Completion of 5/8 day follow ups | EHRS | No research found to address a five follow up particularly. Research stresses follow up post discharge is critical for prevention. HEDIS: percentage who receive follow up within 7 days post discharge. | y |
| SRE Mentor Program | CQIT/Number of clinicians who have completed one cycle of the SRE mentor program/total number of MH clinicians. | Training needs for clinicians: Schmitz et al., Preventing Suicide Through Improved Training in SRA…, Suicide and Life Threatening Behavior, 2012; McNeil et al., Effects of Training on Suicide Risk Assessment, Psychiatric Services, 2008. | y |
| Interventions for high utilizers tailored to  decrease risk | Chart Audit Tool | High Risk as reported on patient registries is defined by CCHCS "clinical risk definitions"  Attachment 1. | n |

| | | | |
|---|---|---|---|
| Satisfactory SPR FIT meeting | SPR FIT minutes submitted to HQ - entered into CQIT | 2-2-18 memo, PG 12-10-3 | y |
| Suicide Count | EHRS/Suicide Prevention SharePoint | | n |
| 837s for self harm incidents in which there was a delay of more than 4 minutes for cell entry | CQIT/Audit of 837's. Number of suicide attempts in which there was a delayed response/total number of attempts. Note: Requirements are in emergency response policy. **(7229-A, 7229-B might be better docs to refer to)** 837 only submitted in use of force situations" they specifically deal with suicides | HCDOM 3.7.1, BLS shall not exceed four minutes.  HC staff has eight minutes | n |
| Patients referred to MHCB on continuous direct visual observation | Site Visit Audit tool/CQIT | PG 2018 memo 10/15/15 re housing of patients pending MHCB transfer | y |
| Patients in alt housing with watch staff actively watching | Site Visit Audit tool/CQIT | PG 2018 memo 10/15/15 re housing of patients pending MHCB transfer | y |
| Percentage of patients in alt housing with a bed. | Site Visit Audit tool/CQIT | | y |
| Percentage of nursing rounds clearly marked, on time, and documented on correct form. | Site Visit Audit tool/observation | | n |
| Acute/ICF Discharges with Clinician to Clinician Contact within 5 days | Chart Audit Tool: Sample - DSH Discharges 1. Is clinician to clinician contact documented within 5 days of return to CDCR? Note: Use current DSH discharge clinician to clinician contact form to measure. | PG 2018 at memo 12.05.400, Jan 2014, ICF/APP MH hospital returns | y |
| Discharges from MHCB with clinician review of d/c summary | Chart Audit tool. Sampling: Inmates D/C'd from MHCB and OHU for suicide precaution/watch 30 days prior to audit. | | n |
| Percentage of observed R&R screens in confidential setting and correct documentation used | CQIT/Site Visit Audit tool | MHPG 12-1-12 | y |
| **Quality of Care/Patient Care and Treatment** | | | |
| Primary clinician continuity of care | EHRS/SOMS | | n |
| Psychiatrist continuity of care | EHRS/SOMS | | n |
| IDTT Staffing | EHRS | MHPG p. 12-3-9, 12-4-6, 12-5-11, 12-7-12, 12-8-8, 12-9-5 | y |

| | | | |
|---|---|---|---|
| Cases with documentation of appropriateness of LOC discussed for patients identified by 7388B as potentially requiring higher LOC | CQIT/ Sustainable Process number of cases that had adequate documentation/total number of cases reviewed. | MHPG p. 12-1-9, 12-1-15, 12-10-20. "The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care. Referrals to higher levels of care shall be considered when the inmate-patient's clinical condition has worsened or the inmate-patient is not benefiting from treatment services available at the current level of care." memo 14-0128 "Procedure- Interdisciplinary Treatment Team (IDTT)- Level of Care (LOC) Decision 12.01.200P1) | y |
| IDTTs meeting all audit criteria | CQIT/Site Visit Observation Tool | | n |
| IDTT's observed in which   management of patients resistant to tx is addressed through an individualized tx intervention and goals with custody input | Site Visit Observation Tool | | n |
| IDTTs with Measurable treatment goals | CQIT/Site Visit Observation Tool | | n |
| Treatment plans with satisfactory  documentation | Chart  Audit  Tool | MHPG 12-1-15 IDTT is responsible for consideration to higher and lower LOC MHPG 12-3-9 Tx plan is individualized, based on assessments from all disciplines. | y |
| I/Ps that reported at least satisfactory on  "perception of IDTT" | On Site Audit/CQIT | | n |
| Perception of Individual Treatment | On Site Audit/CQIT | | n |
| Perception of Group Benefits | CQIT/Screen out criteria, Oriented X3 patient interview audit tool | | n |
| IDTTS in which PC intake evals were completed prior to initial | CQIT/**Site visit observation:** **EOP and MHCB IDTT** 1. Did the primary clinician complete the 7386 intake evaluation during the IDTT meeting? Note: Presence of should be coded "0" - is NOT acceptable Note: New MHCB admits. Initial eval might be done after IDTT - check PG guide specific criteria. | MHPG 12-3-8, 12-4-7, 12-7-8 3/16/2020 memorandum: REQUIREMENT FOR INITIAL CONTACTS TO BE COMPETED PRIOR TO THE INTERDISCIPTINARY TREATMENT TEAM | y |
| IDTTS in which psychiatry intake evals were  completed prior to initial | CQIT/**Site visit observation:** **EOP and MHCB IDTT** 1. Did the psychiatrist complete the 7230-G intake evaluation during the IDTT meeting? Note: Presence of should be coded "0" - is NOT acceptable | 3/16/2020 memorandum: REQUIREMENT FOR INITIAL CONTACTS TO BE COMPTETED PRIOR TO THE IDTT | y |

| | | | |
|---|---|---|---|
| Treatment plans with reason for refusal and intervention documented for high refusers | **Chart Audit Tool:** Sample: EOP inmate-patients greater than or equal to 90 days with 50% or more group refusal rate | MHPG 12-7-10, 12-7-11 | y |
| Groups started on time and attempts made to engage all participants | Site Visit Observation Tool | | n |
| Groups where leader related content to treatment issues | Site Visit Observation Tool (Identify groups that have a purpose other than leisure) | MHPG p. 12-4-9, 12-4-11, 12-4-14 | y |
| Inmate-patients without conflicting diagnoses | chart audit tool (Review same set of charts being reviewed for other purpose) Review most recent treatment plan, psychiatry note, pc note. | Use best practices. No clear PG requirement MHPG 12-3-9 "Treatment plans are based on current assessments from all disciplines..." | n |
| Orders reviewed with properly documented observation orders | CQIT | memorandum 3/15/16 Level of Observation and Property for Patients in Mental Health Crisis Beds | y |
| MHCB records with rationale for limited issue of clothing and bedding | CQIT/Site Visit Observation: MHCB, OHU, Alt Housing | MHPG p.12-10-15 Suicide Watch must be renewed every 24 hours | y |
| EOP and CCCMS with no provisional or rule out Dx over 90 calendar days | CQIT/chart Audit Tool: Charts reviewed for some other purpose during the audit (treatment plan reviews). | Best Practices  DSM-IV Guidebook, American Psychiatric Association | n |
| Standardized statewide peer review | CQIT/Institution Audit and Entry | Best Practices. No PG req. to have peer review. | n |
| Treatment plans with documented and implemented pre-release plans | Chart Audit Tool: IDTT Sample - parole list. | MHPG. p. 12-3-10 | y |
| EOP IDTTs discussion of clinical appropriateness for work, educ, accommodation addressed | CQIT/On site audit | MHPG 12-4-21 memo 14-0303 "IDTT Review of Inmate/Patient's Ability to Participate in Program Assignments" | y |
| MH documentation of consultation from medical staff | Chart Audit Tool: Sample - Patients on the "master registry-chronic care conditions" with either diabetes A1C 7.7 or above or Chronic Pain and a MH diagnosis. | No PG requirement. | n |
| MHPS meeting audit criteria | CQIT/HQ review of minutes | | n |
| **Special Needs and Services - Healthcare** | | | |
| Eligible MHSDS patients receiving milestone credit | CQIT/Automated report | CCR Title 15 Section 3043 | y |
| Effective Communication Achieved | EHRS | HCDOM 2.1.2 | y |

| | | | |
|---|---|---|---|
| MH RVR assessments where all documentation requirements were met. | Chart Audit Tool | | n |
| 115 assessments conducted in private setting | CQIT | PG Pocket Part- 15-1021 | y |
| Percentage of RVR MH assessments where the patient was informed of the limits of confidentiality. | Chart Audit Tool | PG Pocket Part- 15-1021 | y |
| Use of force MH assessments meeting documentation requirements | Chart Audit Tool | | n |
| High refusers due to custody in which a meeting between MH & custody conducted within 7 days | CQIT/Site Visit Audit tool | 2018 MHPG revision p. 211. REVIEW OF REFUSAL TO ATTEND MENTAL HEALTH TREATMENT BY ADMINISTRATIVlt SEGREGATION UNIT ENHANCED OUTPATIENT PROGRAM lruD AND PSYCiilATIUC SERVICES UNIT INMATES | y |
| I/Ps discharged from DSH with classification casework completed prior to transfer when required. | C-File Audit: Sample: Inmates admitted to DSH from ASU, PSU, SHU, RC. | No PG requirement. | n |
| compare percent of inmates overall that receive RVRS with the percent of MH inmates that receive RVRs. | EHRS/SOMS | Psychiatric Services in Jails and Prisons (2nd Edition), American Psychiatric Association, 2000 | n |
| **Specialized Custody** | | | |
| RVRs recommended for mitigation with documentation of consideration of mitigation | | | Y |
| RVRs recommended for mitigation that were mitigated | | | n |
| The percentage of RVRs that were mitigated | | | n |
| Completed RVRs requiring MH assessment | | | n |
| RVRs req MH assessment officer agreed w/MH clin recommended alternate doc umentation of behavior | Custody On site visit/CQIT | Title 15 section 3317.1 (which is part of the Compendium) requires hearing officers to consider the MHA. | n |
| RVRs where hearing officer disagreed with MH clinician recommended alte rnate doc. behavior and documented rationale for disagreement on 128B | | | Y |
| Percentage of RVRs with an assessed SHU term in which the Institution Classification Committee noted mental health recommendations on the ICC chrono | | | N |
| Percentage of RVRs issued to non-MHSDS participants, CCCMS, EOP, and MHCB patients. **(QM MH Reporting Kanban)** | | | n |
| Percentage of days where heat plan was activated and alternative out of cell activities were offered to heat alert lps | Custody On site visit/CQIT | | y |
| Percentage of staff interviewed following unclothed body search policy. | CQIT | | Y |
| Inmates NOT requiring restraints for MH treatment attending outside a TTM | CQIT/Custody On site visit | Memo dated 3/15/11,titled "Mental Health Crisis Bed Unit-Use of Mechanical Restraints and Escort Policy". Revised memorandum 3/1/16 "Use of Mechanical Restraints in a Mental Health Crisis Bed Unit" | y |
| Percentage of 128B's, indicating the requirement for mechanical restraints, that are present for MHCB patients. | Custody On Site Audit/CQIT | 3-15-11 Policy "Mental Health Crisis Bed Unit- Use of Mechanical Restraints and Escort Policies." Revised memorandum 3/1/16 "Use of Mechanical Restraints in a Mental Health Crisis Bed Unit" | y |

| | | | |
|---|---|---|---|
| Use of Force involving MH inmate | Number of individual incidents from the denominator that involved a mental health inmate/All individual use of force incidents that occurred during the reporting period<br>Note: Look at percentages from each institution, establish baseline, identify outliers.<br>M Jones has tables that summarize current reports.(CDCR 837) | | n |

## Medication Management

| | | | |
|---|---|---|---|
| Diagnostic Monitoring-Antidepressants Antidepressants | CCHCS Dashboard | | Y |
| Diagnostic Monitoring-Antipsychotics Antipsychotics | CCHCS Dashboard | | Y |
| Diagnostic Monitoring-Clozapine Clozapine | CCHCS Dashboard | | Y |
| Diagnostic Monitoring-Mood Stabilizers Med Consent 12 Months | CCHCS Dashboard | | Y |
| Diagnostic Monitoring-Mood Stabilizers Lithium | CCHCS Dashboard | | Y |
| Diagnostic Monitoring-Mood Stabilizers Carbamazepine | CCHCS Dashboard | | Y |
| Percentage of inmate-patients prescribed Lamotrigine with appropriate laboratory monitoring. | QM staff/data | | Y |
| MAPIP Medication Continuity-Transfer | MAPIP / CCHCS Dashboard | | y |
| psychiatric medication compliance | MAPIP/CCHCS Dashboard | | y |
| Medication Compliance with PC 2602, Involuntary Meds: Court Order | MAPIP / CCHCS Dashboard | | y |
| MAPIP M20: Chronic Care Meds-Psychiatrist | MAPIP/ CCHCS Dashboard | | y |
| Perception of medication delivery | CQIT/Patient interview audit tool (note: Consider comparing similar programs to one another) | | n |

## Restricted Housing

| | | | |
|---|---|---|---|
| Warden review of cases over 90 days | CQIT - Custody HQ Audit Owner<br>Audit conducted by DAI HQ | (MHPG, Ch.7,Section (H)(5) | y |
| EOP HUB CCII and Captain Review for LOS over 90 days | CQIT/Custody HQ audit | (MHPG, Ch.7,Section (H)(5) | y |
| Percentage of inmates with Length of Stay over 150 days in which ASU case reviews were completed on time. | Custody/HQ audit | September 15, 2014 memo mandating priority case-by-case review of all MHSDS inmates housed in ASU over 150 days | y |
| ASU, STRH, LTRH Morning Meetings meeting all audit criteria | Site visit observation/CQIT | May 9, 2005 memorandum,  October 2, 2006 "Plan to Reduce Suicide Risk in ASU". NCCHC Standards, Appendix E: Mental Health Considerations for Segregated Inmates<br>"Psychiatric Services in Jails and Prisons." - Clinical staff should communicate to segregation staff to identify any inmate who may be showing signs of psychological problems. | y |

| | | | |
|---|---|---|---|
| ICCS with MH clinician presence and relevant information provided | Site visit observation/CQIT | MHPG 12-7-2 | y |
| Percentage of initial ICCs reviewed and held within 10 calendar days of arrival. | Custody/ HQ audit | August 14, 2014 memo mandating ICCs for NDS within 10 calendar days | y |
| EOP and CCCMS patients in ASU | HCPOP data. Number of CCCMS + number of EOP inmate patients in ASU/ total number of inmates in ASU number of EOP inmate patients/total number in ASU number of CCCMS inmates in ASU/total number of inmates in ASU | HEDIS - percent of patients receiving any service, outpatient, intensive outpatient, and inpatient treatment (not specific to incarcerated inmates - systemwide measure). | n |
| Psych tech rounds completed according to PG requirements | Psych Tech Rounds Audit Tool Conducted by Nursing Change process: Pull from EHRS | MHPG: 12-7-5; 12-8-7; Guidelines for clinical contact for inmates in lock up addressed. "...provide for regular rounds by a qualified MH practitioner..." Psychiatric Services in Jails and Prisons (2nd Edition), American Psychiatric Association, 2000; NCCHC Standards, Appendix E: Mental Health Considerations for Segregated Inmates | y |
| ASU LOS for MHSDS vs. non MHSDS inmate-patients. | SOMS | Poor substantive research to support increased LOS increases risk to patients. Anecdotal suggests there are ill effects from long term isolation. | n |
| Placement of ASU EOPs in appropriate housing within timeframes | EHRS/SOMS | MHPG p. 12-1-16 - Rules built into MHTS Poor substantive research to support increased LOS increases risk to patients. Anecdotal suggests there are ill effects from long term isolation. | y |
| Percentage of ASU Welfare Checks audited that were completed on time and staggered | Total number of custody wellness checks documented and occur at random within 30 minutes between checks/total number on inmates requiring wellness checks. **Sample:** Three shifts. One continuous 24 hour period. Audit two days prior to day of audit. **Note:** Use of Guard One data for reporting in progress: currently in CQIT | | y |
| welfare checks completed on time and staggered. "Percentage of days over the prior 30 days in which all ASU wellness welfare checks were completed on time and staggered." **(QM MH Reporting Kanban)** | | ASU: Not to exceed 30 minute intervals for the first 21 days in ASU. Dec. 12 2006 "Revised 30 Minute Welfare Check Process." Docket number 2061-3 Filed 12/01/06. "Defendant's August 12, 2010 Report on Activities Taken Following the Court's April 14, 2010 Order." ACA Standard 4-4257 - 30 minute irregular visual checks of inmates | Y |
| Percentage of ASU welfare check summaries reviewed and signed by custody supervisors | Custody On site visit/CQIT | ASU: Not to exceed 30 minute intervals for the first 21 days in ASU. Dec. 12 2006 "Revised 30 Minute Welfare Check Process." Docket number 2061-3 Filed 12/01/06. "Defendant's August 12, 2010 Report on Activities Taken Following the Court's April 14, 2010 Order." ACA Standard 4-4257 - 30 minute irregular visual checks of inmates | y |
| ASU inmates on 21 day intake status with markers posted | Custody On site visit/CQIT | Memorandum dated 10/6/06"Expectations Regarding Administrative Segregation and Suicide Prevention". | y |
| ASU Intake Inmates Appropriately Housed | | | y |
| Cells reviewed where inmates are allowed approved entertainment devices | Custody On site visit/CQIT | | y |

| | | | |
|---|---|---|---|
| High refusers due to custody reasons with documented plan of action | MH On Site Visit/CQIT | 2018 MHPG revision p. 211. REVIEW OF REFUSAL TO ATTEND MENTAL HEALTH TREATMENT BY ADMINISTRATIVIt SEGREGATION UNIT ENHANCED OUTPATIENT PROGRAM AND PSYCiiiATIUC SERVICES UNIT INMATES | Y |
| High refusers in which 128B was completed | MH On Site Visit/CQIT | 2018 MHPG revision p. 211. REVIEW OF REFUSAL TO ATTEND MENTAL HEALTH TREATMENT BY ADMINISTRATIVIt SEGREGATION UNIT ENHANCED OUTPATIENT PROGRAM AND PSYCiiiATIUC SERVICES UNIT INMATES | Y |
| Percentage of unclothed body searches conducted in private area(s) | Custody On site visit/CQIT | 2014 court order | Y |
| Percentage of high refusers due to custody in which a meeting between MH and custody was conducted within 7 calendar days | MH On Site Visit/CQIT | 2018 MHPG revision p. 211. REVIEW OF REFUSAL TO ATTEND MENTAL HEALTH TREATMENT BY ADMINISTRATIVIt SEGREGATION UNIT ENHANCED OUTPATIENT PROGRAM AND PSYCiiiATIUC SERVICES UNIT INMATES | y |
| Percentage of MH-7s required completed prior to ASU placement. | EHRS | MHPG 12-7-2, 12-7-3; NCCHC Standards, Appendix E: Mental Health Considerations for Segregated Inmates | y |
| Percentage of refused ASU MH screenings that resulted in a PC contact within 5 working days. | EHRS | | y |
| Inmates who received ASU MH Guide | MH Onsite Audit/CQIT Inmate Interview tool. Have you received the "ASU Inmate Orientation Mental Health Guide?" | MHPG p. 12-7-16 (attachment) | y |
| Percentage of ASU screenings that occurred within 72 hours of placement/arrival. | EHRS/SOMS | MHPG: 12-7-6; NCCHC Standards, Appendix E: Mental Health Considerations for Segregated Inmates | y |
| ASU screens that are conducted in confidential setting | CQIT | NCCHC Standards, Appendix E: Mental Health Considerations for Segregated Inmates MH Program guide 12-1-12 | y |
| Percentage of psychiatric technician round documentation audited that meets all audit criteria. | Nursing audit tool: (based upon nursing standard psych tech round form) 1. Is there documentation that the psych tech consulted with custody? 2. Does the weekly summary include observations of the inmates behavior and grooming? 3. Does the weekly summary include observations of the inmate's cell (cleanliness, etc.)? 4. Does the weekly summary include information regarding the inmate's medication compliance or side effects? | Psychiatric Services in Jails and Prisons (2nd Edition), American Psychiatric Association, 2000; NCCHC Standards, Appendix E: Mental Health Considerations for Segregated Inmates | n |

| | | | |
|---|---|---|---|
| Percentage of PT rounds documented while at cell front | Nursing Audit Tool. Data are now obtained. Not yet in report (CQIT per QM MH Reporting Kanban) | | n |
| PT rounds where EC and interaction with IP are achieved/attempted and appropriate referrals are made as indicated. | Nursing Audit Tool. Data are now obtained. Not yet in report | | n |
| Percentage of PT rounds meeting General Process requirements | Nursing Audit Tool. Data are now obtained. Not yet in report | | n |
| ASU out of cell time offered | Custody On Site audit/CQIT Source: CDCR 114A | Title 15, Section 3343 (h). "...Inmates assigned...will be permitted a minimum of one hour per day, five days a week of exercise outside their rooms or cells..." Research supports that isolation impacts mental stability but general statements that isolation is bad is not supported (needs to be case by case). | y |
| Percentage of weeks in which yard was offered according to policy for STRH and LTRH | Custody on site audit/CQIT | August 2014 court order | y |
| Weeks in which shower access in ASU was offered as required | Custody on site audit/CQIT | Title 15 Sections 3331 (3)(g), and 3343 (g) "..."showering and shaving will be permitted at least three times a week." Research supports that isolation impacts mental stability. Research supports that isolation impacts mental stability but general statements that isolation is bad is not supported (needs to be case by case). | y |
| Units in which staff can identify NDS IPs and have tracking system for phone calls & property | Custody on site audit/CQIT | 9/25/13 Memorandum " Non Disciplinary Segregation" , 12/3/13 "Non Disciplinary Segregation Enhanced Outpatient Program and Correctional Clinical Case Management Services Release or Transfer Timelines" | Y |
| **Personnel, Training, and Staff Resources** | | | |
| Staff that report having computers for all out of call clinical appointments. | Chief of MH and CEO one time survey. | | n |
| Percentage of healthcare staff current with suicide prevention training | MH HQ Training Unit | | y |
| Percentage of nursing staff current with CPR training. | Nursing HQ Training Unit | California Board of Registered Nurses | n |
| Custody Officers with CPR Training | Custody On Site audit/CQIT | | n |
| Custody Officers with suicide prevention training | Custody On Site audit/CQIT | Feb 2, 2018 memorandum: ENHANCEMENTS TO THE SUICIDE PREVENTION AND RESPONSE FOCUSED IMPROVEMENT TEAMS | y |
| Percentage of all IDTTs observed in which a health record and C-file are available | CQIT/Site Visit Observation | NCCHC MH-H-03 (important) "Access to Custody Information" | n |
| Percentage of Peace Officers observed to carry their CPR mouth shield. | CQIT/On site audit | MHPG 12-10-21 | y |

| Allocated and filled postions | Staffing Numbers and vacancy rate by institution (look at functional vacancies and program allocation)• Compare the number of positions assigned to each service area with the number of vacant positions | MHPG p. 12-1-10 NCCHC P-C-07, MH-C-07 (important) "A sufficient number of health staff of varying types provides inmates with adequate and timely evaluation and treatment." Citation should be to the 2009 Staffing Plan and 2002 Order requiring 10% maximum vacancy rate for case managers and psychiatrists. | y |
|---|---|---|---|

## Facility

| Adequate group treatment space | MH On Site audit/CQIT | | n |
|---|---|---|---|
| MHCB, Alternative Housing cells clean at time of visit | CQIT/Site visit observation/audit tool. 1. Cell/module is free of offensive odors. 2. Cell/module is free of debris. | OSHA and CA Title 22 Code 77151 and 77153 | n |
| Percentage of all MHCB and Alternative Housing cells observed that are clean and had an up to date cleaning schedule. | On site audit/CQIT | OSHA and CA Title 22 Code 77151 and 77153 | n |
| Alternative housing cells located in space consistent with policy specifications. | CQIT/Site Visit Observation | | y |
| Adequate IDTT space | MH On Site audit/CQIT | | n |
| Treatment Module / Security Desk Standards | MH On Site audit/CQIT | MH Program guide 12-1-12 NCCHC MH-D-03 "Sufficient and suitable space, supplies, and equipment are available for mental health services. Best practices. | y |
| Adequate Individual Treatment Space | MH On Site audit/CQIT | | n |

## Patient Safety

| Number of episodes of heat related illnesses occurring for MHSDS inmates receiving heat alert medications. | audit tool Total number of inmates with a heat illnesses as reported on heat incident log | | n |
|---|---|---|---|
| "Number of clinical restraint occurrences within the MHCB (five point restraint)" | MH On Site Visit/CQIT | NCCHC MH-A-06 "Continuous Quality Improvement Program" AHQR | n |
| Percentage of clinical restraint occurrences meeting all of the audit criteria. | MH On Site Visit/CQIT | Title 22. Section 77103. | n |
| Indicator: Number of safety cell placements (padded cells) | EHRS | | n |
| Thermometer Checks completed and accurate | Custody On site audit/CQIT | heat plan policy | y |
| Percentage of  Use of Force Mental Health assessments that met document requirements. | Chart Audit Tool | | n |

## Utilization and Resource Management

| Accepted Acute/ICF Referrals | EHRS | | n |
|---|---|---|---|
| MHCB and Acute/ICF discharges not  readmitted within 30 days | EHRS/SOMS | | n |

| | | | |
|---|---|---|---|
| MHCB physical discharges within timeframes | EHRS/SOMS | 2018 MHPG:<br>12/23/2014 memo "Transfer of Inmates To and From Mental Health Crisis Beds" | y |
| Percentage of mental health OHU stays 48 hours or less. | EHRS | MHPG | y- no longer applicable |
| MHCB clinical stays within timeframes | EHRS/SOMS | MHPG 12-5-1 | n |
| Timely admission to MHCB | EHRS/SOMS | MHPG 12-5-4<br>The inmate-patient shall be transferred within 24 hours of referral. | y |

1. The designations of whether an indicator is required by the Program Guide, Compendium, or prior Court Order are preliminary and do not represent Defendants' final legal position. Defendants continue to review these indicators and the requirements of the Program Guide, Compendium, and Court Orders and may revise the designations as the work on this project continues.

# **APPENDIX C**

| From: | Cara Trapani |
|---|---|
| To: | Nick Weber; Melissa Bentz; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR; Stafford, Carrie@CDCR |
| Cc: | Coleman Team - RBG Only; Coleman Special Master Team; Steve Fama; CDCR OLA Coleman CAT Mailbox; Elise Thorn; Samantha Wolff (swolff@hansonbridgett.com); Damon McClain (Damon.McClain@doj.ca.gov); Lucas Hennes; Paul B. Mello; Namrata Kotwani; Roman Siberfeld; Glen Danas; Christine Ciccotti (Christine.Ciccotti@dsh.ca.gov); Nina Raddatz; kristopher.kent@dsh.ca.gov; Adriano Hrvatin (Adriano.Hrvatin@doj.ca.gov); Rashkis, Sean@DSH-S |
| Subject: | Coleman: Letter Re: Updating CQIT Indicators in Compliance with 12/17/21 Order, ECF No. 6996 [IWOV-DMS.FID6429] |
| Date: | Friday, February 19, 2021 12:24:20 AM |
| Attachments: | CQIT Indicator Spreadsheet- 1.26.2021.xlsx<br>CET-OLA, Letter Re_ Updating CQIT Indicators Per 12_17_20 Order, 02-18-2021, 0489-03.PDF |

Dear all,

In preparation for next week's Data and CQI Meeting, attached is Plaintiff's letter responding to Defendants' list of CQIT indicators dated January 26, 2021 (reattached here for reference).

Thank you,

Cara Trapani



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
ctrapani@rbgg.com

**(Pronouns – she/her/hers)**

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Tuesday, January 26, 2021 1:16 PM
**To:** Zelia M. Tavares <ztavares@pldolaw.com>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Michael W. Bien <MBien@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Jessica Winter <JWinter@rbgg.com>; Cara Trapani <CTrapani@rbgg.com>; Amy

Xu <AXu@rbgg.com>; Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Donald Specter
<dspecter@prisonlaw.com>; Steve Fama <sfama@prisonlaw.com>; Toche, Diana@CDCR
<Diana.Toche@cdcr.ca.gov>; Bick, Dr. Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Nick Weber
<Nicholas.Weber@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Elise Thorn
<Elise.Thorn@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Stafford, Carrie@CDCR
<Carrie.Stafford@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind,
Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Laura Ceballos <laura.ceballos@cdcr.ca.gov>;
Steven Cartwright <Steven.Cartwright@cdcr.ca.gov>; Leidner, David@CDCR
<David.Leidner@cdcr.ca.gov>; Angie Cooper <acooper@pldolaw.com>; Braxton Medlin
<bmedlin@pldolaw.com>; Brian Main <psydocmain@gmail.com>; Cindy Radavsky
<cradavsky@gmail.com>; Jamas DeGroot <upcjdegroot@gmail.com>; Jeffrey Metzner
<jeffrey.metzner@cuanschutz.edu>; Joseph Sorah <jsorah@pldolaw.com>; Kahlil Johnson
<kjohnson@kahliljohnsonpsychiatry.com>; Karen Rea <karenrea01@gmail.com>; Kerry Courtney
Hughes, MD <dockc99@aol.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Kristina Hector
<khector@pldolaw.com>; Lindsay Hayes <lhayesta@msn.com>; Latricea McClendon-Hunt
<lmcclendonhunt@pldolaw.com>; Lana Lopez <llopez@pldolaw.com>; Maria Masotta
<maria@drmariamasotta.com>; Matt Lopes <mlopes@pldolaw.com>; Michael Ryan
<mryan@pldolaw.com>; Mohamedu Jones <mjones@pldolaw.com>; Mary Perrien
<mperrien@aol.com>; Patricia M. Williams <harconwil@gmail.com>; Rachel Gribbin
<rgribbin@pldolaw.com>; Regina Costa <rcosta@pldolaw.com>; Rod Hickman Gmail
<rqhickman@gmail.com>; Sharen Barboza <drsbarboza@gmail.com>; Sofia Millham
<smillham@pldolaw.com>; Tim Rougeux <trougeux@hotmail.com>; Damon McClain
<Damon.McClain@doj.ca.gov>; William Trezvant <wtrezvant@pldolaw.com>; Paul B. Mello
(Pmello@hansonbridgett.com) <Pmello@hansonbridgett.com>; Samantha Wolff
(SWolff@hansonbridgett.com) <SWolff@hansonbridgett.com>; 'Silberfeld, Roman M.'
<RSilberfeld@RobinsKaplan.com>; Nina Raddatz <Antonina.Raddatz@dsh.ca.gov>; Christine Ciccotti
(Christine.Ciccotti@dsh.ca.gov) <Christine.Ciccotti@dsh.ca.gov>; Kent, Kristopher@DSH-S
<Kristopher.Kent@dsh.ca.gov>; Ball, Laurie@CDCR <Laurie.Ball@cdcr.ca.gov>; Dan Potter
<dpotter@alumni.brown.edu>; Henry D. Dlugacz <hdlugacz@blhny.com>; Golding, Michael@CDCR
<Michael.Golding@cdcr.ca.gov>
**Subject:** Coleman: List of Indicators in CQIT

All,

Attached is a chart listing the indicators in CQIT. It is not limited to the key indicators. The chart is
being provided to you for discussion purposes in light of the March deadlines and does not represent
Defendants' final work product. Defendants continue to review and analyze the indicators and may
revise the attached chart for various reasons, including changes in EHRS, housing units, or policy.
Also, CDCR is currently working on updated indicators for SPRFIT that may require further
revisions to the chart. As indicated on the chart, the designations of whether an indicator is required
by the Program Guide, Compendium, or prior Court Order are preliminary and do not represent
Defendants' final positions. Defendants will continue to work through the indicators on the list to
determine what, if any, changes may be necessary. In the meantime, we hope the chart will assist the
parties' discussion on CQIT.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO
NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE
AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

February 18, 2021

<u>VIA ELECTRONIC MAIL ONLY</u>

Nicholas Weber                    Nicholas.Weber@cdcr.ca.gov
Melissa Bentz                     Melissa.Bentz@cdcr.ca.gov
Dillon Hockerson                  Dillon.Hockerson@cdcr.ca.gov
Sundeep Thind                     Sundeep.Thind@cdcr.ca.gov
Carrie Stafford                   Carrie.Stafford@cdcr.ca.gov
CDCR Office of Legal Affairs

  Re: *Coleman v. Newsom*:  Letter Re: Updating CQIT Indicators in Compliance
    with Order of December 17, 2021 ECF No. 6996
    <u>Our File No. 0489-03</u>

Dear Office of Legal Affairs:

  This letter responds to Defendants' January 26, 2021 CQIT indicators chart.
Plaintiffs reviewed the indicators and compared them to the requirements in the 2018
Program Guide, including its pocket parts (ECF No. 5864-1), and the Compendium of
Custody Related Remedial Measures (ECF No. 6431, hereafter "Compendium").  This
letter lists the requirements in the Program Guide and Compendium that are missing from
Defendants' chart.

  This letter is limited to missing areas we have identified in our initial review.
While we have additional questions about the scope of each indicator, those are best
addressed in the data certification process (specifically, during the "stakeholder review"
outlined in Defendants' high-level overview).[1]  We will raise questions about the
methodology and business rules for each indicator as they are made available by
Defendants (and under the guidance of Dr. Potter).

---

[1] For example, we will ask you to confirm that the business rules for the "Timely PC
Contact" indicator take into account the requirement that EOP patients in segregation
who refuse more than 50% of treatment must interact with their primary clinician daily
(instead of weekly).  *See* Program Guide at 12-7-10 to 12-7-11.

[3693656.7]

PRIVILEGED AND CONFIDENTIAL
Nicholas Weber, et al.
CDCR Office of Legal Affairs
February 18, 2021
Page 2

We reserve the right to raise additional areas on further review of the indicators, and as Defendants develop new policies and revise existing ones to address mental health and custody functions needed for the remedy in this action.

## I.   2018 Program Guide, Chapters 1-10

The requirements below from Chapters 1 through 10 of the Program Guide (*see* ECF No. 5864-1) are not reflected by the indicators listed in Defendants' January 26, 2021 chart.

1.   Reception Center Screening

New intakes must receive an Initial Health Screening by nursing within 24 hours, a Mental Health Screening within 7 calendar days, and, if deemed necessary, a standardized mental evaluation within 18 calendar days.  Program Guide at 12-2-2.

2.   Reception Center Transfer Timelines

Is it not clear whether the reference to "MHPG" in row 19 of the indicators captures the RC transfer timelines required by the Program Guide at 12-1-16.  This needs to clarified.

3.   Acute and ICF Transfer Timelines

Transfer to acute must occur within 10 days of referral and transfer to ICF must occur within 30 days of referral.  Program Guide at 12-1-16.  Referral paperwork for acute must be completed within 2 working days of identification, and within 5 working days of identification for ICF (or within 10 working days if due process hearing is required).  *Id.*  Transport for both acute and ICF must be completed within 72 hours of bed assignment.  *Id.*

4.   Discharge from Administrative Segregation

Patients "referred from the ASU or PSU to a GP-EOP Unit shall be retained at the EOP level of care for a minimum of 90 days" to support "adjustment to the GP environment."  Program Guide at 12-4-8.

5.   Inpatient Referral Process

The Program Guide requires that patients "with multiple admissions to MHCB (three or more within six-month period) shall be evaluated for referral to [DSH or a

[3693656.7]

PRIVILEGED AND CONFIDENTIAL
Nicholas Weber, et al.
CDCR Office of Legal Affairs
February 18, 2021
Page 3

PIP]."  Program Guide at 12-5-10.  This may be captured by reference to the 7388B form at line 43.  Its inclusion as an indicator should be made clear.

6.      MHCB Intake Assessment

This must occur within 24 hours of placement.  Program Guide at 12-5-11.

7.      Seclusion

There should be an indicator (or indicators) to address whether seclusion occurrences meet all requirements.  *See* Program Guide at 12-5-23 to 12-5-26.

8.      Quality Management for Implementation of Discharge Planning from MHCB

The Program Guide requires that "[c]oncurrent with the implementation of the discharge plan or within 21 days of the inmate-patient's discharge from the MHCB, the Chief of Mental Health at the institution where the inmate-patient was transferred will audit the implementation of the discharge plan and follow-up care."  Program Guide at 12-5-29.

9.      DSH Referral and Discharge Process

There should be an indicator (or indicators) to address whether the DSH referral and discharge processes, including the CCAT process, meet all requirements.  *See generally* Program Guide, Chapter 6.  The indicators that apply to inpatient referral and discharge need to take account of lift-and-shift.  Indicators that might previously have applied only to DSH now apply to the PIPs.

10.     Timely Transfer to ASU EOP Hub

EOP patients housed in administrative segregation must transfer to an EOP ASU Hub within 30 days.  Program Guide at 12-7-8.  This may be covered by row 18, but needs to be clarified.

11.     PSU Treatment

"Each PSU shall have a behavioral incentive program with criteria for achieving and retaining each level."  Program Guide at 12-9-7.

12.     PSU Staffing

PRIVILEGED AND CONFIDENTIAL
Nicholas Weber, et al.
CDCR Office of Legal Affairs
February 18, 2021
Page 4

"The PSU shall have mental health staff on duty during Second Watch."  Program Guide at 12-9-12.

13.    Suicide Prevention

There should be indicators to address whether suicide watch and precaution procedures meet all requirements.  *See* Program Guide at 12-10-15 to 12-10-19.  There should also be an indicator (or indicators) to address whether emergency response procedures were followed for responses to self-injurious behaviors and suicide attempts.  *See* Program Guide at 12-10-21 to 12-10-23.  Additionally, there should be indicators addressing whether suicide death reviews and QIP procedures meet all requirements.  *See* Program Guide at 12-10-24 to 12-10-28.

The recently-ordered suicide prevention measures needs to be incorporated in the indicators.  *See* Dec. 24, 2020 Order Regarding Suicide Prevention Efforts, ECF No. 7004 at 2:4-15; Jan. 29, 2021 Bench Order (approving activation schedules).

## II.    2018 Program Guide, Pocket Part Policies

The below pocket part policies from the 2018 Program Guide (ECF No. 5864-1) are not reflected by the indicators listed in Defendants' January 26, 2021 chart.  Some of these items from the pocket part policies cross-reference related requirements from the Compendium (which is further detailed in Section III, *infra*).

1.    Mental Health Referrals

There should be an indicator addressing mental health referrals from BPH, at least to show that such referrals are occurring.  *See* January 15, 2016 Memo – Mental Health Referrals from Board of Parole Hearings Staff.

There should be an indicator to ensure staff document any mental health referral they receive in person or by phone.  *See* July 7, 2015 Memo – New Procedure re Mental Health Referral Chrono Form.

There does not appear to be an indicator that ensures class members have access to 7362 forms for mental health self-referrals.  *See* July 2016 CCHCS Memo – Scheduling and Access to Care Procedure, ECF No. 5864-1 at 246-47.

2.    RVRs

PRIVILEGED AND CONFIDENTIAL
Nicholas Weber, et al.
CDCR Office of Legal Affairs
February 18, 2021
Page 5

There should be an indicator that ensures class members are not given RVRs for refusing ducated mental health appointments.  *See* July 5, 2017 Memo – Mental Health Appointment Refusals; July 2016 CCHCS Memo – Scheduling and Access to Care Procedure, ECF No. 5864-1 at 250.

There should be an indicator ensuring that class members are not issued RVRs for circumstances involving uses of force to administer Penal Code 2602 medications.  *See* June 5, 2014 Memo – RVRs Issued Relative to Involuntary Medication of Inmates; *see also* Compendium remedial measures: California Code of Regulations ("CCR"), Title 15, Section 3317.2(a); Department Operations Manual ("DOM") Section 52080.5.8.

Indicators should also be added to reflect that patients shall not be issued an RVR for behavior related to a cell extraction for the administration of involuntary medication or transfer to or between inpatient units, or when the behavior is in connection with being placed in restraints and/or seclusion, or is an act of self-mutilation or attempted suicide. *See* CCR, Title 15, Section 3317.2(a); DOM Section 52080.5.8 (these are listed in the Compendium).

Additionally, senior hearing officers and hearing officers must receive required training, including on mental health issues.  *See* CCR, Title 15, Section 3310(d) (this remedy is listed in the Compendium).

The *Coleman* RVR remedy includes mandatory diversion from the RVR process in the instances listed above, and discretionary diversion in other instances where mental health impacted the behavior.  *See, e.g.*, May 4, 2015 Order in Response to the Special Master's Report on CDCR's Implementation of Policies and Procedure on Rules Violation Reports (ECF No. 5305); CCR, Title 15, Sections 3317, 3317.1 & 3317.2; ("DOM") Section 52080.5.8.  Any CQIT audit should require the facility to report on the number of such diversions from the RVR process during the period under review. Plaintiffs are preparing to seek new relief to address rampant abuse of the RVR system, including retaliatory RVRs against class members for seeking mental health treatment, and false RVRs, as documented in the recent *Armstrong* motions.  Additional measures will be necessary to address such relief.

3.      Documentation

There should be an indicator ensuring that all staff members consulted regarding a patient's behavior, functioning, or status are named in the patient's records.  *See* May 8, 2015 Memo – Consulting Staff Name Documentation in Healthcare Records.  While

**PRIVILEGED AND CONFIDENTIAL**
Nicholas Weber, et al.
CDCR Office of Legal Affairs
February 18, 2021
Page 6

Defendants' list includes indicators requiring documentation of mental health consultation with medical staff and psych tech consultation with custody staff, there is no indicator measuring the general requirement.

       4.       Reception Centers

There should be an indicator ensuring minimum treatment requirements are met for EOP patients in Reception Center ASU programs.  *See* April 4, 2017 Memo – Treatment for Reception Center EOP Patients in the ASU.

The September 22, 2016, memo regarding Reception Center Privileges for EOPs (listed in the Compendium) does not appear to have an associated indicator.  There should be one.

There should be an indicator ensuring EOP class members are appropriately housed in Reception Centers.  *See* May 17, 2011 Memo – Housing of EOP Inmates in Reception Center Institutions.

       5.       MHCBs

The November 17, 2014 Memo – Documentation Required for Referral to MHCB does not appear to have an associated indicator.  There should be one.

There should be an indicator evaluating whether the requirements of the February 14, 2017 Memo – MHCB Privileges Revision are being followed.  There does not appear to be one.

There should be an indicator evaluating compliance with the March 1, 2016 memo – Use of Mechanical Restraints in MHCB Unit, which describes when such restraints may be used.  There does not appear to be one.

There should be an indicator evaluating whether class members' prior housing is retained for the 10 days of an MHCB stay, avoiding any disincentive to reporting they are in crisis.  *See* January 4, 2016 Memo – Reiteration of Expectations Relative to MHCBs and Return Cases.

Many of the requirements in the December 13, 2014 Memo – Transfer of Inmates to and from MHCBs, and the appended memos of the same date (addressing MHCB referrals, rescissions, and discharges) do not appear to have indicators.  These memos

**PRIVILEGED AND CONFIDENTIAL**
Nicholas Weber, et al.
CDCR Office of Legal Affairs
February 18, 2021
Page 7

require additional indicators, including, for example, that an MHCB referral be entered within one hour of the clinical decision to refer a patient to MHCB.

6.      Inpatient Care

There should be an indicator ensuring that patients discharged from acute and intermediate care programs receive five-day follow-up evaluations.  *See* May 9, 2012 Memo – Intermediate and Acute Discharge Follow Up.

There should be an indicator ensuring that patients discharged from acute or intermediate inpatient care receive a mental health evaluation within 24 hours of their discharge.  *See* April 19, 2013 Memo – Level of Care Changes for Patients Returning from DSH; January 17, 2014 Memo – Intermediate and Acute Mental Health Hospital Returns – Records Review.

7.      CCCMS Class Members in MSFs

The January 25, 2016 Memo – CCCMS Level of Care in MSFs allows class members at the CCCMS level of care to be housed in MSFs.  There should be an indicator to show the level of CCCMS access to MSFs to ensure that the policy is being implemented.

8.      Suicide Prevention

There should be an indicator measuring whether SPRFIT Coordinators attend Inmate Advisory Council and Inmate Family Council meetings, as required by the August 13, 2013 Memo – SPRFIT Coordinator Attendance at Inmate Advisory Councils and Inmate Family Councils.

9.      Non-Disciplinary Segregation

There do not appear to be indicators measuring compliance with NDS procedures, training, and other processes.  *See* August 14, 2014 Memo – NDS Processing Procedure for MHSDS Patients; September 2, 2014 Memo – Implementation of NDS for MHSDS Patients Processing, Procedures, and Required Trainings; *see also* related Compendium remedial measures: CCR, Title 15, Section 3335(a); August 11, 2014 Order Implementing Defendants Plans and Policies in Response ECF No. 5131 (ECF No. 5196 at n.1.).   There should be indicators to address these requirements.

PRIVILEGED AND CONFIDENTIAL
Nicholas Weber, et al.
CDCR Office of Legal Affairs
February 18, 2021
Page 8

While there is currently an indicator listed for NDS property—"Units in which staff can identify NDS IPs and have tracking system for phone calls & property"—it is unclear whether this indicator tracks compliance with the NDS personal property matrix. *See* CCR Title 15, Section 3190(c); DOM Appendix D (this is a Compendium remedy).

10.     Segregation Reviews

Although there is an indicator for reviews of class members in ASU over 150 days, there do not appear to be indicators to measure compliance with requirements for reviews of class members in SHU or PSU settings. *See* September 15, 2014 Memo – Priority Case-By-Case Review of MHSDS Long-Term Segregated Inmates. There should be indicators to evaluate compliance with required reviews for class members in PSUs and SHUs.

The indicator at row 121 does not appear to address whether there is a sufficient supply of entertainment devices, whether they are distributed or just sitting in a storage room, and whether they work. Checking for their presence in cells is not adequate. Section 3190(l)(3) of Title 15 (listed in the Compendium) requires that entertainment appliances are available to individuals in segregation.

11.     Uses of Force

There should be indicators to ensure clinical input is provided for controlled uses of force. *See* April 18, 2014 Memo – Requirement for the Presence of a Mental Health Clinician During All Controlled Use of Force Incidents. There are indicators measuring whether use of force documentation requirements are met, but not, apparently, ensuring that clinical input is provided.

While certain indicators address aspects of uses of force, there do not appear to be indicators that evaluate whether controlled, immediate, and deadly uses of force were used properly. *See* October 17, 2014 Memo – Use of Force Revisions; *see also* related Compendium remedial measures: DOM sections 510201 through 51020.24; April 10, 2014 Order Regarding Use of Force, Segregation, and Discipline (ECF No. 5131). There should be indicators to evaluate these requirements.

Controlled uses of forces have become extremely rare after the recent *Coleman* use of force remedy was put in place in 2014 and 2015. The recent *Armstrong* motions have shown examples of incidents that should have been handled by a controlled use of force (or no force at all) but were treated as immediate use of force situations. Any CQIT

PRIVILEGED AND CONFIDENTIAL

Nicholas Weber, et al.
CDCR Office of Legal Affairs
February 18, 2021
Page 9

measurement system should require the facility to show how many controlled and immediate uses of force were reported during the period under review.

Additionally, there should be an indicator addressing the prohibition on use of tasers for patients who received any psychotropic medication in the prior six weeks. *See* DOM Sections 91020.18 through 91020.18.2 (listed in the Compendium).

Plaintiffs are preparing to seek new relief to address improper use of force against class members. In the recent *Armstrong* motions, most of the improper uses of force occurred against people who were *Coleman* as well as *Armstrong* class members. And many of the improper uses of force appeared to be motived by animus against the mentally ill. Additional indicators will be necessary to address such relief.

12.     EOP Milestone Credit Earning

The September 24, 2015 Memo – EOP Milestone Credit Group Therapy – Requirement Materials ensures that certain materials are available to facilitators of certain groups where EOP patients can earn Milestone Credits. There should be an indicator to ensure these materials are available to group facilitators.

**III.     Compendium**

The below Title 15 provisions, Department Operations Manual ("DOM")[2] sections, Court orders, and policy memoranda contained in the Compendium (ECF No. 6431) are not reflected in Defendants' CQIT indicator list.

1.     Custody Designations, Credit-Earning, and Work Assignments

As noted above, Defendants' list of indicators does not address many requirements related to credit-earning, work assignments, and custody classification issues. There should be indicators to address whether the relevant Title 15 requirements are met. *See* CCR, Title 15 sections 3377.1(b)(6)-(b)(7) (Inmate Custody Designations), 3043.2(b)(5)(A) (Good Conduct Credit), and 3044(b)(8)(B) (Inmate Work Groups and Privilege Groups); *see also* February 16, 2017, memo regarding Work Group C and Privilege Group C Program. Although Defendants' list currently has an indicator for "eligible MHSDS patients receiving milestone credits," this only addresses Section 3043.3(f)(2) (Milestone Completion Credit) of Title 15.

---

[2] Available at https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2020/03/2020-DOM-02.27.20.pdf

**PRIVILEGED AND CONFIDENTIAL**
Nicholas Weber, et al.
CDCR Office of Legal Affairs
February 18, 2021
Page 10

There also do not appear to be indicators for the Compendium policy memos related to these issues.  *See* May 18, 2006, memo Instructions for Awarding Favorable Behavior Points to I/Ps assigned to EOP GP; January 7, 2015, memo Change in Credit Earning Status for Inmates Eligible for Day for Day Work Credit and Assigned Minimum A/B Custody; June 5, 2015, memo Minimum A Custody and Minimum B Custody Criteria and Application.

The Compendium also includes an "Administrative Determinants" memorandum (dated July 5, 2016) whose stated purpose is to "expand inmate access to all rehabilitative programs, for those who have demonstrated positive programming."  There should an indicator to show whether and how often the facility under review has made use of the discretionary determinants set out in the July 5, 2016 memorandum to get class members to lower security levels where they have greater access to programming.

2.      Segregation Case Review

A psychological assessment will be included in the case review and classification committee review of inmates assigned to segregated housing units.  *See* CCR, Title 15, Section 3342(b).  There is no indicator for this requirement.

3.      Serious Rule Violations

Incarcerated people who have a disability and are charged with a serious rule violation shall be assigned a staff assistant.  CCR, Title 15, Section 3315(d)(2)(A)(3).  Additionally, the incarcerated person may request witnesses attend the hearing.  CCR, Title 15, Section 3315(d)(2)(E)(1).  There are no indicators for these requirements.

4.      Assistance to Inmates for Administrative Segregation Classification
        Hearings

A staff assistant shall be assigned for MHSDS patients.  CCR, Title 15, Sections 3340(a)(4) and (a)(4)(A).  There is no indicator for this requirement.

5.      Indecent Exposure ("IEX")

Defendants' list does not address treatment of patients with Exhibitionism or who engage in IEX or related behaviors.  There should be an indicator (or indicators) to address whether the requirements set forth in DOM Sections 51200 through 52100.7 are followed.  *See also* August 31, 2007, memo Amended Policy for Adult Males Referred for Treatment of Exhibitionism.

[3693656.7]

**PRIVILEGED AND CONFIDENTIAL**
Nicholas Weber, et al.
CDCR Office of Legal Affairs
February 18, 2021
Page 11

6.      Single Cell Status Due to Mental Health Concerns

When clinical staff recommend single-cell status due to mental health concerns, "[t]he classification committee shall consider the clinical recommendations made by the evaluating clinician with assistance from the clinician who participates in the committee and review the inmate's case inmate's case factors when determining the housing assignment."  DOM Section 54046.10; *see also* January 19, 2016, memo Inmate Housing Assignment Consideration During the Screening and Housing Process.

In addition, Title 15 outlines various requirements for single- and double-celling, and housing of transgender incarcerated people.  *See* CCR, Title 15, Section 3269.

7.      Custody and Mental Health Collaboration

The Court has held that "[c]onstitutionally adequate mental health care requires …. a collaborative culture between custody and mental health staff in each prison institutions that houses mentally ill inmates."  August 9, 2016 Order Adopting the Special Master's Twenty-Sixth Round Monitoring Report (ECF No. 5477); *see also* February 20, 2019 Order Regarding Defendant's Custody and Mental Health Partnership Plan (ECF No. 6095).  There should be indicators related to the CMHPP on Defendants' list.

8.      Self-Harm Incident Reporting

The Court ordered that "Defendants shall develop a system in each institution for identifying and recording self-injurious episodes, including forms, logs and other documents necessary to support such a recording system."  July 26, 1999, Order Regarding Staff Obligation to Report Incidents (ECF No. 1055 at ¶ 10).  There is no indicator associated with this requirement.

9.      Least Restrictive Housing in Inpatient Settings

There are no indicators measuring the requirements of the June 30, 2017, Policy Housing Review/Least Restrictive Housing (12.11.2111).

10.      Heat Plan

The indicators currently listed do not address the requirements that "institutional staff must generate and distribute a daily list of all inmate-patients currently prescribed any of the designated Heat Alert Medications," whether "cooling and hydration measures" are offered as required, or whether reasonable accommodations are provided

PRIVILEGED AND CONFIDENTIAL
Nicholas Weber, et al.
CDCR Office of Legal Affairs
February 18, 2021
Page 12

to heat-risk patients to ensure they "are afforded equal access to programs, services, and activities during extreme weather conditions."  *See* May 1, 2019, 2019 Heat Plan and Updates.  Indicators should be added to measure these requirements.

## IV.     Other Remedial Requirements

Other than the 2018 Program Guide and the Compendium of Custody Related Remedies, have Defendants created indicators based on any of the other remedial measures in the case?  *See, e.g.*, July 3, 2019 Order, ECF No. 6211 at 6 (specifying that in addition to Program Guide and custody-related remedies, other remedial measures include "defendants' staffing plan," "regular mental health bed projections," "concomitant planning for and building of necessary mental health beds and clinical treatment space," and "targeted provisions to address inmate suicides").  One critical example is the suicide prevention activation plan ordered by the Court on December 24, 2020 (ECF No. 7004).

In addition, several remedial policies have been developed since the 2018 Program Guide update, including, for example, the Telepsychiatry Policy, Psychiatric Nurse Practitioner Policy, Desert Transfer Policy, Medication Adherence Policy, PIP Suicide Prevention Policy, Use of Force Healthcare Access Memo, and the policies that emerged from the evidentiary hearing following Dr. Golding's Report.  Have Defendants created any indicators for these policies?

Additionally, there are several remedial policies currently under review, including the PIP STEP policy and the CIT policy, that will require indicators.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:   Cara E. Trapani

CET:CET
cc: *Coleman* Special Master Team     Lucas Hennes         Antonina Raddatz
    *Coleman* Co-counsel              Namrata Kotwani       Kristopher Kent
    Elise Thorn                       Roman Silberfeld      Adriano Hrvatin
    Samantha Wolff                    Glenn Danas           Sean Rashkis
    Damon McClain                     Christine Ciccotti

# **APPENDIX D**

| From: | Bentz, Melissa@CDCR |
|-------|---------------------|
| To: | Cara Trapani; Coleman Team - RBG Only; Steve Fama; Cooper, Angelyne; Medlin, Braxton H.; Brian Main; cradavsky@gmail.com; hdlugacz@blhny.com; James DeGroot; Metzner, Jeffrey; JP Sorah; Kahlil Johnson; Karen Rea; dockc99@aol.com; Walsh Kerry F.; Hector Kristina; L Hayes; McClendon-Hunt, LaTri-c-ea; Lopez, Lana L.; maria@drmariamasotta.com; Lopes Matthew; Ryan, Jr., Michael F.; Jones Mohamedu; mperrien@aol.com; harconwil@gmail.com; Gribbin Rachel; Costa Regina; Millham, Sofia A.; trougeux@hotmail.com; Trezvant, William J.; Tavares, Zelia M; Sharen Barboza; Dan Potter |
| Cc: | Elise Thorn; Weber, Nicholas@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR; Stafford, Carrie@CDCR; Samantha Wolff (swolff@hansonbridgett.com); Damon McClain (Damon.McClain@doj.ca.gov); Lucas Hennes; Paul B. Mello; Namrata Kotwani; Christine Ciccotti (Christine.Ciccotti@dsh.ca.gov); Raddatz, Antonina@DSH-S; Kent, Kristopher@DSH-S; Mehta, Amar@CDCR; Cartwright, Steven@CDCR; Ceballos, Laura@CDCR; Golding, Michael@CDCR |
| Subject: | RE: Coleman: Letter Re: Updating CQIT Indicators in Compliance with 12/17/21 Order, ECF No. 6996 [IWOV-DMS.FID6429] |
| Date: | Tuesday, March 9, 2021 12:42:24 AM |
| Attachments: | MCB-CET Response to Ps Letter re Updating CQIT Indicators.pdf |

All,

Attached please find a partial response to Plaintiffs' February 18, 2021 letter. CDCR will provide a response to the remaining issues in the letter soon.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

---

**From:** Cara Trapani <CTrapani@rbgg.com>
**Sent:** Thursday, February 18, 2021 9:23 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Samantha Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Damon McClain (Damon.McClain@doj.ca.gov) <Damon.McClain@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Roman Siberfeld <RSilberfeld@RobinsKaplan.com>; Glen Danas <GDanas@RobinsKaplan.com>; Christine Ciccotti (Christine.Ciccotti@dsh.ca.gov) <Christine.Ciccotti@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Adriano Hrvatin (Adriano.Hrvatin@doj.ca.gov) <Adriano.Hrvatin@doj.ca.gov>; Rashkis, Sean@DSH-S <Sean.Rashkis@dsh.ca.gov>
**Subject:** Coleman: Letter Re: Updating CQIT Indicators in Compliance with 12/17/21 Order, ECF No.

6996 [IWOV-DMS.FID6429]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear all,

In preparation for next week's Data and CQI Meeting, attached is Plaintiff's letter responding to Defendants' list of CQIT indicators dated January 26, 2021 (reattached here for reference).

Thank you,

Cara Trapani



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
ctrapani@rbgg.com

**(Pronouns – she/her/hers)**

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

---

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Tuesday, January 26, 2021 1:16 PM
**To:** Zelia M. Tavares <ztavares@pldolaw.com>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Michael W. Bien <MBien@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Jessica Winter <JWinter@rbgg.com>; Cara Trapani <CTrapani@rbgg.com>; Amy Xu <AXu@rbgg.com>; Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Donald Specter <dspecter@prisonlaw.com>; Steve Fama <sfama@prisonlaw.com>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Bick, Dr. Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Elise Thorn

<Elise.Thorn@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Stafford, Carrie@CDCR
<Carrie.Stafford@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind,
Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Laura Ceballos <laura.ceballos@cdcr.ca.gov>;
Steven Cartwright <Steven.Cartwright@cdcr.ca.gov>; Leidner, David@CDCR
<David.Leidner@cdcr.ca.gov>; Angie Cooper <acooper@pldolaw.com>; Braxton Medlin
<bmedlin@pldolaw.com>; Brian Main <psydocmain@gmail.com>; Cindy Radavsky
<cradavsky@gmail.com>; Jamas DeGroot <upcjdegroot@gmail.com>; Jeffrey Metzner
<jeffrey.metzner@cuanschutz.edu>; Joseph Sorah <jsorah@pldolaw.com>; Kahlil Johnson
<kjohnson@kahliljohnsonpsychiatry.com>; Karen Rea <karenrea01@gmail.com>; Kerry Courtney
Hughes, MD <dockc99@aol.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Kristina Hector
<khector@pldolaw.com>; Lindsay Hayes <lhayesta@msn.com>; Latricea McClendon-Hunt
<lmcclendonhunt@pldolaw.com>; Lana Lopez <llopez@pldolaw.com>; Maria Masotta
<maria@drmariamasotta.com>; Matt Lopes <mlopes@pldolaw.com>; Michael Ryan
<mryan@pldolaw.com>; Mohamedu Jones <mjones@pldolaw.com>; Mary Perrien
<mperrien@aol.com>; Patricia M. Williams <harconwil@gmail.com>; Rachel Gribbin
<rgribbin@pldolaw.com>; Regina Costa <rcosta@pldolaw.com>; Rod Hickman Gmail
<rghickman@gmail.com>; Sharen Barboza <drsbarboza@gmail.com>; Sofia Millham
<smillham@pldolaw.com>; Tim Rougeux <trougeux@hotmail.com>; Damon McClain
<Damon.McClain@doj.ca.gov>; William Trezvant <wtrezvant@pldolaw.com>; Paul B. Mello
(Pmello@hansonbridgett.com) <Pmello@hansonbridgett.com>; Samantha Wolff
(SWolff@hansonbridgett.com) <SWolff@hansonbridgett.com>; 'Silberfeld, Roman M.'
<RSilberfeld@RobinsKaplan.com>; Nina Raddatz <Antonina.Raddatz@dsh.ca.gov>; Christine Ciccotti
(Christine.Ciccotti@dsh.ca.gov) <Christine.Ciccotti@dsh.ca.gov>; Kent, Kristopher@DSH-S
<Kristopher.Kent@dsh.ca.gov>; Ball, Laurie@CDCR <Laurie.Ball@cdcr.ca.gov>; Dan Potter
<dpotter@alumni.brown.edu>; Henry D. Dlugacz <hdlugacz@blhny.com>; Golding, Michael@CDCR
<Michael.Golding@cdcr.ca.gov>

**Subject:** Coleman: List of Indicators in CQIT


All,


Attached is a chart listing the indicators in CQIT. It is not limited to the key indicators. The chart is
being provided to you for discussion purposes in light of the March deadlines and does not represent
Defendants' final work product. Defendants continue to review and analyze the indicators and may
revise the attached chart for various reasons, including changes in EHRS, housing units, or policy.
Also, CDCR is currently working on updated indicators for SPRFIT that may require further
revisions to the chart. As indicated on the chart, the designations of whether an indicator is required
by the Program Guide, Compendium, or prior Court Order are preliminary and do not represent
Defendants' final positions. Defendants will continue to work through the indicators on the list to
determine what, if any, changes may be necessary. In the meantime, we hope the chart will assist the
parties' discussion on CQIT.


Respectfully,


*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov

Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO
NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE
AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the
source of this email and know the content is safe.

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



March 8, 2021


Cara Trapani (ctrapani@rbgg.com)
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105


*VIA EMAIL ONLY*


Dear Cara:

I write in response to Plaintiffs' February 18, 2021 letter regarding updating Continuous Quality Improvement Tool (CQIT) Indicators in Compliance with the December 17, 2020 order. CDCR has not completed our review of the extensive items that Plaintiffs claim should be added to CQIT. But we wanted to get you our thoughts in advance of the parties' discussion tomorrow, therefore, this letter is responsive to only those items that we have reviewed. A response to the other items in Plaintiffs' letter will be provided separately.

CDCR objects to Plaintiffs' attempt to add items to CQIT that were either part of the Program Guide or Court ordered prior to the 2018 version or that are not part of the 2018 Program Guide or Compendium. Plaintiffs' counsel has been part of the CQIT process and has had prior opportunities to request additional measures within CQIT. Despite this, many of the requests in the letter are related to policies that significantly pre-date the 2018 Program Guide or policies or Court related items that occurred well after. Plaintiffs' letter is much broader than the scope of the Court's December 17, 2020 order.

Further, CQIT was created and is designed to review care provided at the institutions. Many of the items you seek to add to CQIT focus on Headquarters-driven processes. The existing CQIT process and the individual institution reports should not include measurements of items that are beyond the institutions' control. Inclusion of such items would be a wholesale change and expansion of CQIT beyond the December 17 order. However, CDCR will consider whether it is proper to include a Headquarters section into the statewide CQIT report, which may include a review of some of the pertinent Headquarters functions.

CDCR's responses to Plaintiffs' counsel's numerous proposed additions to CQIT are broken into three categories: 1. Items Already Measured; 2. Items That CDCR Agrees to Measure or Is Open to Further Discussing; and 3. Items That CDCR Does Not Agree Should Be Measured. Please note that the below responses do not include CDCR's position regarding whether any of the indicators listed are "key indicators." Further, any statement that an indicator or audit may be

related to a Program Guide or Compendium requirement should not be interpreted to mean that the indicator or audit is actually measures a Program Guide or Compendium requirement.

1. Items Already Measured

The items listed below are already measured, whether as part of CQIT, as part of audits, or as part of regular CDCR submissions to Plaintiffs' counsel, the Special Master, or the Court. Whether and in what fashion some of these items should be included in CQIT is under review.  The citation in the parentheses denotes where the request is located within Plaintiffs' letter.

- Reception Center Screening (Page 2, section I, subsection 1)- The Mental Health Screening is currently tracked as part of the Mental Health Screens indicator.

- Reception Center Transfer Timelines (Page 2, section I, subsection 2)- Transfers from Reception Centers are captured under Timely Transfers to CCCMS and EOP, unless the patient is referred to the Mental Health Crisis Bed (MHCB), Acute (APP), or Intermediate Care Facility (ICF) level of care. Those transfers are captured under another CQIT indicator or in regular court reporting.

- Acute and ICF Transfer Timelines (Page 2, section I, subsection 3)- CDCR provides information on APP and ICF Transfer timelines in a monthly report to the Court.  The monthly report shows the following for patients over timelines: IDTT Referral Date, Date Referral was Received, HCPOP Endorsement Date, and the Inpatient Program Admission Date.  It is unnecessary to have a duplicative indicator tracking this information in CQIT.

- Inpatient Referral Process (Page 2, section I, subsection 5)- CDCR evaluates whether patients were referred to an inpatient level of care (MHCB, ICF, or APP) when necessary through the Sustainable Process.  These audits occur on a quarterly basis.  It is unnecessary to have a duplicative indicator assessing whether patients were evaluated for a higher level of care in CQIT.

- Timely Transfer to ASU EOP Hub (Page 3, section I, subsection 10)- Transfers to ASU EOP Hubs is captured in the "MHSDS Inmates in ASU Transferred within Policy Requirements" indicator.

- Suicide Watch and Suicide Precaution (Page 4, section I, subsection 13, paragraph 1)- CQIT contains on-site audits that look at whether staff are following appropriate suicide watch and suicide precaution procedures, such as "Patients Referred to MHCB on Continuous Direct Visual Observation," "Patients in Alt Housing with Watch Staff Actively Watching," "Percentage of Patients in Alt Housing with a Bed," and "Percentage of Nursing Rounds Clearly Marked, On Time, and Documented on the Correct Form."

- Suicide Death Reviews and QIP Procedures Meet All Requirements (Page 4, section I, subsection 13, paragraph 1)- Suicide Death Reviews and QIPs are reviewed as part of the annual suicide reports.  CDCR recently published a compendium suicide report for years 2017 to 2019 and is working on the report reviewing the completed suicides in 2020.

- Patient Access to 7362 Forms (Page 4, section II, subsection 1, paragraph 3)- This is tracked in the indicator titled "Housing Units Where 128 MH-5s are Accessible and Available to Housing Unit Staff."  If patients have concerns regarding access to care, such information will be made available to the auditors during the patient interviews.

- Diversion from RVRs (Page 5, section II, subsection 2, paragraph 5)- Plaintiffs request that CQIT include the number of mandatory or discretionary diversions from the RVR process during the review period.  We believe Plaintiffs are referencing whether an RVR was documented in an alternative manner or mitigated during the review period.  If so, CQIT already includes an a host of on-site measures designed to look at this issue, including "The Percentage of RVRs that Were Mitigated," "RVRs Requiring Mental Health Assessment Where the Officer Agreed with the Mental Health Clinician Recommended Alternative Documentation of Behavior," and "RVRs Recommended for Mitigation with Documentation of Consideration of Mitigation."  However, although these indicators may be related to the Court order and Title 15 and DOM section cited by Plaintiffs' counsel, the indicators are not measuring a requirement as policy only requires that the clinicians' recommendation be considered, not adopted.

- Minimum Treatment Requirements for EOPs in RC ASU (Page 6, section II, subsection 4, paragraph 1)- Treatment provided to EOP patients in RC ASU is captured in the "Treatment Offered" indicator.

- Use of Mechanical Restraints in MHCB Units (Page 6, subsection 5, paragraph 3)- CQIT includes an indicator titled "Percentage of 128B's Indicating the Requirement for Mechanical Restraints that are Present for MHCB Patients."  This on-site audit measure looks at whether non-MAX custody MHCB patients have appropriate documentation allowing the use of mechanical restraints.

- 5-Day Follow Ups for APP/ICF Discharges (Page 7, subsection 6, paragraph 1)- There is an indicator titled "Timely Completion of 5/8 Day Follow Ups" that looks at whether patients discharged from APP/ICF receive appropriate follow-ups.

- Whether SPRFIT Coordinators Attend IAC and IFC Meetings (Page 7, section II, subsection 8)- Although there is not an indicator that measures whether SPRFIT Coordinators attend IAC and IFC meetings, this information is included in CQIT reports.

- Compliance with NDS Procedures, Training, and Other Processes (Page 7, section II, subsection 9)- CQIT includes an on-site indicator titled "Units in which Staff Can Identify NDS Patients and Have Tracking Systems for Phone Calls & Property."  This on-site audit looks at whether segregation units have tracking logs for property and privileges for NDS inmates and whether those patients who are appropriate for accelerated transfer are transferred timely.

- Segregation Reviews (Page 8, section II, subsection 10, paragraph 1)- Plaintiffs state that there should be an indicator for review of patients in SHU or PSU over 150 days.  The indicator that measures review of patients in ASU over 150 days measures review of appropriate patients in all segregation settings.

- Use of Force (Page 8, section II, subsection 11, paragraph 1)- Plaintiffs request an indicator to ensure that clinical input is provided for controlled use of force. CQIT already includes a robust on-site audit that looks at whether the Use of Force Mental Health Assessments met documentation requirements.  As part of that audit, CDCR reviews whether there is documentation of exchanges between mental health, nursing, and custody, specific interventions indicated, an explanation if those interventions were not implemented, and a detailed timeline of actions.  CDCR believes this information is sufficient to determine whether the clinician provided appropriate input in each controlled use of force situation.

- Number of Controlled and Immediate Uses of Force During the Review Period (Page 8, section II, subsection 11, paragraph 4)- Although there is not a specific indicator to track this information, it is included in CQIT reports.

- Psychological Assessment for Case Review and Classification Committees for Inmates Assigned to Segregation (Page 10, section III, subsection 2) and Assistance to Inmates for ASU Classification Hearings (Page 10, section III, subsection 4)- CQIT includes an indicator titled "ICC with MH Clinician Presence and Relevant Information Provided." This on-site audit looks at whether the Mental Health clinician was present and whether appropriate input was provided.  During this audit, staff will note if the appropriate mental health information is not reviewed or considered during ICC and whether the patient received a staff assistant if required.

- Heat Plan (Page 11, section III, subsection 10)- Plaintiffs believe that the indicators currently listed in CQIT do not look at whether staff generate and distribute a daily list of all patients on heat medications and whether reasonable accommodations are provided to heat-risk patients when appropriate.  The indicator titled "Thermometer Checks Completed and Accurate" includes on-site questions regarding whether staff have the daily heat risk list available and whether the Daily Activity Report reflects that alternative out of cell activities were offered when temperatures exceeded 90 degrees.  There is also a separate indicator titled "Percentage of Days Where Heat Plan was Activated and Alternative Out of Cell Activities were Offered to Heat Alert Patients."

- Staffing (Page 12, section IV)- The institution reports include information regarding the number of allocated and filled positions in the key mental health classifications for each institution audited.  Further, Defendants file the Psychiatry Vacancy Report each month reporting the statewide fill rate for staff psychiatrists.

- Regular Mental Health Beds Projections (Page 12, section IV)- CDCR provides Plaintiffs' counsel and the Special Master population projections bi-annually.  Further, bed projections are done on a statewide basis and are not tied to individual institutions.  It is unnecessary to include this information in CQIT.

- Timely Transfer from Desert Institutions (Page 12, section IV)- Defendants file a report each month showing the number of patients who entered the CCCMS or EOP levels of care while housed at a desert institution and whether they transferred to an institution with an appropriate Mental Health program within 14 days.  Defendants also file a report that shows any MHSDS patient transferred to a desert institution and whether the patient

transferred to an institution with an appropriate Mental Health program within timelines. It is unnecessary to have a duplicative indicator within CQIT.

- Planning for and Building of Necessary Mental Health Beds and Clinical Treatment Space (Page 12, section IV)- CDCR provides Plaintiffs' counsel and the Special Master information regarding mission changes as mental health programs are adjusted.  Further, bed planning is controlled by Headquarters.  It is unnecessary to include this information in CQIT.

2. Items That CDCR Agrees to Measure or Is Open to Further Discussing

CDCR either agrees that the topics listed below should be included in CQIT in some form or is open to further discussions on their inclusion. It is important to note that indicators for the below items have not yet been created, and CDCR continues to review how best to measure these issues. CDCR will discuss with the Special Master's team how best to measure these items.

- Reception Center Screening (Page 2, section I, subsection 1)- CDCR is currently working on an indicator to look at the timelines of Mental Health evaluations in Reception Centers.

- Seclusion (Page 3, section I, subsection 3)- CDCR agrees that measuring the frequency and duration of seclusion incidents is important.

- Suicide Prevention (Page 4, section I, subsection 13, paragraph 1)- CDCR agrees that it is important to look at emergency response procedures for self-injurious behaviors and suicide attempts.  However, policy for emergency response timelines currently differ depending on the staff classification.

- Suicide Prevention (Page 4, section I, subsection 13, paragraph 2)- As mentioned during the data meeting on February 23, 2021, CDCR is working on a separate Suicide Prevention CQIT, which will include indicators to measure many of the suicide prevention requirements.  Once these measures have been finalized, the indicators will be incorporated into CQIT.  However, these items are not ready to be included in the March 17, 2021 update to the Court.

- RVRs (Page 5, section II, subsection 2, paragraphs 1-3)- Plaintiffs request indicators to ensure that patients are not receiving RVRs for refusing ducated mental health appointments, for circumstances involving use of force to administer Penal Code 2602, or when behavior is in connections with being placed in medical restraint or seclusion or is an act of self-mutilation or attempted suicide.  Indicators are not created to prove a negative, which is what Plaintiffs seem to be requesting.  However, CDCR will agree to include a question in the on-site audit of RVRs regarding whether any of the RVRs in the sample were given for any of the above behaviors.

- MHCBs (Page 6, section II, subsection 5, paragraph 2)- CDCR already looks at whether patients are receiving appropriate privileges during CQIT audits and is reviewing the creation of an official indicator.

- CCCMS Class Members in MSFs (Page 7, section II, subsection 7)- Plaintiffs request an indicator to show the level of CCCMS access to MSFs. CDCR does not think an indicator is necessary. However, each CQIT report contains census information regarding the institutions various levels of care. CDCR will include the number of CCCMS patients in MSFs at applicable institutions.

3. Items That CDCR Does Not Agree Should Be Measured

CDCR does not agree that the items listed below should be measured in CQIT.

- Reception Center Screening (Page 2, section I, subsection 1)- Plaintiffs request an indicator to measure whether nursing screens in Reception Centers are occurring. The nursing screens are not specific to patients in the MHSDS, but occur for all inmates who enter CDCR. CQIT is meant to focus on the Mental Health program, not standard processes that apply to all inmates.

- Discharge from ASU (Page 2, section I, subsection 4)- Plaintiffs request an indicator to measure whether patients are retained at the EOP level of care for a minimum of 90 days after release from segregation. Such an indicator would create a measurement for something that is not identified as a problem. In other words, Plaintiffs have not identified whether there is an actual issue, such as patient decompensation after release from segregation. CDCR does not believe these process-type indicators are necessary to include in CQIT.

- Quality Management for Implementation of Discharge Planning from MHCB (Page 3, section I, subsection 8)- CQIT includes an audit that reviews whether the clinician at the receiving program reviewed the MHCB discharge summary. From there, the patient's treatment team will determine how best to implement the discharge plan and what adjustments may be necessary. Monitoring whether the Chief of Mental Health is auditing care does not assess whether the patient is receiving appropriate care. Instead, CQIT focuses on whether the patient is being seen when referred, for initial and routine contacts, and is being provided with individual and group treatment.

- DSH Referral and Discharge Process (Page 3, section I, subsection 9)- Plaintiffs' letter is vague as to what is being requested. Plaintiffs claim that there should be an indicator (or multiple indicators) to address whether the DSH referral and discharge processes, including CCAT processes, are meeting all requirements. However, CDCR's CQIT will not audit DSH functions. DSH has a separate audit tool. Further, the DSH referral process is not based at the institutions, but is instead a Headquarters function. As mentioned above, Headquarters-led processes are not appropriately included in individual institution CQIT reports. Finally, CDCR and DSH already provide the Court with monthly reports regarding transfers to DSH. To the extent that any of the information requested by Plaintiffs is duplicative, it is not necessary to include in CQIT.

- PSU Treatment (Page 3, section I, subsection 11)- CDCR does not agree that CQIT should include an audit of whether or not the PSUs have a Behavioral Incentive Program (BIP). This question would only apply to two programs in the state. Currently, both SAC and

CIW PSU have a BIP in place. In fact, Plaintiffs receive information regarding the number of patients in the BIP in the SAC PSU on a monthly basis. An audit question in CQIT on this issue is unnecessary.

- PSU Staffing (Page 3-4, section I, subsection 12)- Plaintiffs' letter indicates that they believe there should be an indicator to determine whether the PSU has mental health staff on duty during Second Watch. All institutions have mental health staff on duty during Second Watch. An audit question in CQIT on this issue is unnecessary.

- Mental Health Referrals (Page 4, section II, subsection 1, paragraph 1)- Plaintiffs request an indicator to show that the Board of Parole Hearing (BPH) is making referrals. A mental health referral from a BPH employee can be made in many ways, including by having other custody, mental health, or medical staff input a referral. CDCR does not have a system in place to track those referrals in an indicator.

- Mental Health Referrals (Page 4, section II, subsection 1, paragraph 2)- Plaintiffs believe there should be an indicator ensuring staff document any mental health referral they receive in person or by phone. CDCR does not have a system in place to include such data in an indicator.

- RVRs (Page 5, section II, subsection 2, paragraph 4)- Plaintiffs request an indicator to measure whether Senior Hearing Officers (SHO) and Hearing Officers (HO) have received the appropriate training prior to certification. Per Title 15, SHOs and HOs cannot be certified without receiving one-time training, which includes training on due process and Mental Health Assessments (MHAs). CQIT currently has indicators that look at whether custody staff are taking clinician recommendations into account when determining whether to mitigation or document behavior in an alternative manner. Although SHOs/HOs should be receiving the appropriate training prior to certification, the focus of the audit should be whether custody staff are considering clinician recommendations in the MHAs, not on whether they received training.

- Documentation (Page 5, section II, subsection 3)- Plaintiffs request an indicator ensuring that all staff members consulted regarding a patient's behavior, functioning, or status are named in the patient's record. CDCR does not have a system in place to include such data in an indicator.

- Reception Centers (Page 6, section II, subsection 4, paragraph 2)- Plaintiffs request an indicator tracking Reception Center Privileges for EOPs. However, patients at the EOP level of care should transfer out of the Reception Center within 60 days. The privileges provided in the April 21, 2017 memo[1] that are specific to MHSDS patients do not become available until the 91st day. CDCR's goal is to transfer patients out within timeframes. If this is accomplished, there will be no need to track whether MHSDS patients received full canteen draw on the 91st day. All other privileges in the memo apply to all inmates and should not be measured in CQIT.

---

[1] The RC Privileges memo is incorrectly dated September 22, 2016 in the Compendium.

- Reception Centers (Page 6, section II, subsection 4, paragraph 3)- Plaintiffs request an indicator ensuring EOP class members are appropriately housed in Reception Centers. The memo requiring EOP class members to be clustered in Reception Centers was issued to the field in 2011. CDCR is not aware of any concerns that EOP class member are being housed sporadically in the Reception Center instead of being clustered. In the absence of a concern, CDCR does not believe that this item should be added to CQIT.

- MHCBs (Page 6, section II, subsection 5, paragraph 1)- Plaintiffs request an indicator to measure documentation required for referrals. As noted above, CDCR already reports on MHCB transfer timelines. CQIT should be focused on end results, such as transfer timelines and whether a patient received treatment, as opposed to process issues. Further, each referral packet is already reviewed by Headquarters upon submission and is sent back if additional information is needed. An additional audit during CQIT is duplicative. Finally, the memo cited by Plaintiffs is pre-EHRS. Now that patient records are kept electronically, many of the documents listed in the November 2014 member are accessible to any permissioned user, making the memo outdated and unnecessary. CDCR recommends the November 2014 Policy 12.05.601 "Documentation Required for Referral to a Mental Health Crisis Bed" be removed from the upcoming 2021 Program Guide.

- MHCBs (Page 6, section II, subsection 5, paragraph 4)- Plaintiffs request an indicator to evaluate whether class members' prior housing is retained for 10 days of an MHCB stay. However, this raises potential cross institution issues that may not appropriately be included in an institution specific CQIT report. Also, as mentioned before, CDCR's focus in CQIT is whether institutions are providing care and quality improvement. While retaining prior housing may encourage patients to report whether they are in crisis, it is not directly related to what kind of care they are receiving to see how that care may be improved. It also does not measure a problem, such as whether patients are reaching out when they are in crisis, but instead measures a proposed solution.

- MHCBs (Page 6, section II, subsection 5, paragraph 5)- Plaintiffs request indicators to assess MHCB referrals, rescissions, and discharges, including whether the MHCB referral was entered within one hour of the clinical decision to refer a patient to MHCB. CQIT already has indicators that measure timely MHCB admissions and timely physical discharges. Many of the other items that Plaintiffs request to measure are purely process based. Others, such as whether the MHCB referral was entered within one hour of the clinical decision to refer a patient to MHCB, are impossible to actually measure. CDCR does not believe indicators that measure processes other than the final outcome are necessary.

- Compliance with NDS Procedures, Training, and Other Processes (Page 7, section II, subsection 9)- As mentioned above, there are already indicators within CQIT that look at unit tracking logs and transfers. However, Plaintiffs also request indicators regarding training and seem to request the CQIT audit whether patients are appropriately placed on NDS status and that they receive the appropriate property. The training referenced in the memos cited by Plaintiffs was a one-time training, and thus is unnecessary to track. Patients NDS status and property are routinely reviewed on-site through classification committees, which occur at least as required by Title 15, more often when needed, or when a patient requests a classification committee. If a patient does not believe that he or she is

classified appropriately, the patient can ask for another program review or submit an appeal.  Given the robust review process already in place, no additional indicators are needed in CQIT.

- Segregation Reviews (Page 8, section II, subsection 10, paragraph 2)- Plaintiffs insist that the current CQIT indicator titled "Cells Reviewed Where Inmates are Allowed Approved Entertainment Devices" is insufficient because it does not measure whether there is a sufficient supply of entertainment devices, whether they are distributed, and whether the devices work.  The current on-site indicator in CQIT looks at whether patients in segregation who are eligible for an electronic device have said device.  If not, then the auditor can review why eligible patients do not have the appropriate devices.  Additional indicators are not necessary.

- Use of Force (Page 8, section II, subsection 11, paragraph 2)- Plaintiffs request an indicator to evaluate whether controlled, immediate, and deadly use of force were used properly.  CDCR already has a robust use of force review process.  Institutions review all use of force incidents.  Headquarters reviews all use of force incidents resulting in great bodily injury or death or any other incident referred to the Headquarters review process.  Given the robust review process already in place, no further indicators are needed.

- Use of Force (Page 9, section II, subsection 11, paragraph 4)- Plaintiffs request an indicator to address the prohibition on the use of Tasers on patients who received any psychotropic medications in the prior six weeks.  CDCR no longer issues Tasers to staff in institutions.  Therefore, an indicator is unnecessary.

- EOP Milestone Credit Earning (Page 9, section II, subsection 12)- Plaintiffs request an indicator for the September 24, 2015 memo regarding EOP Milestone Credit Group Therapy.  The memo at issue simply lists items that institutions shall purchase for facilitators running two specific group therapy programs.  Once again, this request focuses on a process based issue, and this process based is incredibly specific and not related to the large issue of patient care or quality improvement.  Not only is an indicator not required, CDCR recommends that this memo be removed from the upcoming 2021 Program Guide.

- Custody Designations, Credit-Earning, and Work Assignments (Page 9-10, section III, subsection 1)- Plaintiffs request indicators related to custody designations, credit earning, behavioral points, and administrative overrides.  As discussed above, inmates are routinely seen in classification committee.  Inmates are guaranteed a classification committee at least annually, upon transfer, upon placement or release from segregation, and upon request.  Inmates may also appeal classification committee determination if they believe the determinations are incorrect.  Given the robust review process in place, no further indicators are required.

- Serious Rules Violations (Page 10, section III, subsection 3)- Plaintiffs request indicators to ensure that patients receive a staff assistant when they receive a serious RVR.  Plaintiffs also note that inmates may request witnesses attend the RVR hearing and state that there should be an indicator to measure that.  There are many layers of review in the RVR process and many of the process based issues, such as whether an inmate received a staff assistant,

have been limited with the introduction of SOMS.  Further, inmates may appeal any RVR finding if they believe there has been a violation of Title 15, such as not providing a staff assistant or not being allowed to call witnesses.  No further indicators are necessary.

- Assistance for Inmates for ASU Classification Hearings (Page 10, section III, subsection 4)- Plaintiffs request an indicator to measure whether MHSDS patients are assigned staff assistants during ASU classification hearings.  As discussed above, classification hearings are conducted routinely.  Staff are aware of the requirement that MHSDS patients receive a staff assistant.  Failure to provide a staff assistant has not been raised as a pervasive issue.  Further, inmates may appeal any adverse action stemming from a classification committee if they believe there has been a violation of Title 15, such as not providing a staff assistant.  No further indicators are necessary.

- Indecent Exposure ("IEX")(Page 10, section III, subsection 5)- Plaintiffs request an indicator to measure treatment of patients with Exhibitionism or those who engage in IEX or related behaviors.  Plaintiffs cite DOM sections 52100 through 52100.7.  It is unclear exactly what Plaintiffs are requesting be measured.  The cited DOM sections discuss the normal RVR process, security measures for inmates who IEX, and discipline, not treatment for patients.  At most, the section requires that inmates who received RVRs for IEX or related behaviors receive a Mental Health Assessment (MHA).  SOMS automatically send notice for an MHA if one is required.  If Plaintiffs' concern is measuring whether patients are receiving treatment for any diagnosis, then that is already reviewed in CQIT by looking at treatment plans.  No other indicators are necessary.

CDCR will provide a response to the remaining items in Plaintiffs' letter soon.

Respectfully,

*/s/ Melissa C. Bentz*

Melissa C. Bentz
Attorney
Office of Legal Affairs
California Department of Corrections and Rehabilitation

# **APPENDIX E**

| From: | Cara Trapani |
|---|---|
| To: | Melissa Bentz; Coleman Team - RBG Only; Steve Fama; Cooper, Angelyne; Medlin, Braxton H.; Brian Main; cradavsky@gmail.com; hdlugacz@blhny.com; Jamas DeGroot; Metzner, Jeffrey; JP Sorah; Kahlil Johnson; Karen Rea; dockc99@aol.com; Walsh Kerry F.; Hector Kristina; Lindsay Hayes; McClendon-Hunt, LaTri-c-ea; Lopez, Lana L.; maria@drmariamasotta.com; Lopes Matthew; Ryan, Jr., Michael F.; Jones Mohamedu; mperrien@aol.com; harconwil@gmail.com; Gribbin Rachel; Costa Regina; Millham, Sofia A.; trougeux@hotmail.com; Trezvant, William J.; Tavares, Zelia M; Sharen Barboza; Dan Potter |
| Cc: | Elise Thorn; Nick Weber; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR; Stafford, Carrie@CDCR; Samantha Wolff (swolff@hansonbridgett.com); Damon McClain (Damon.McClain@doj.ca.gov); Lucas Hennes; Paul B. Mello; Namrata Kotwani; Christine Ciccotti (Christine.Ciccotti@dsh.ca.gov); Nina Raddatz; Kent, Kristopher@DSH-S; Mehta, Amar@CDCR; Steven Cartwright; Laura Ceballos; Golding, Michael@CDCR |
| Subject: | RE: Coleman: Letter Re: Updating CQIT Indicators in Compliance with 12/17/21 Order, ECF No. 6996 [IWOV-DMS.FID6429] |
| Date: | Wednesday, March 10, 2021 10:28:00 PM |

Melissa,


This is to follow up on our Tuesday discussion.  We continue to review your March 8, 2021 letter, and initially have identified a few items from the "Already Measured" section that do not appear to be reflected in Defendants CQIT chart:

- **Reception Center Screening**.  Your letter explains that the Program Guide requirement that a mental health screening occur within the first 7 days is measured by the Mental Health Screens indicator.  While we can find this indicator in the Heat Grid on OnDemand, we do not see it in Defendants' CQIT chart.

- **Timely Transfer to ASU EOP Hub**.  Your letter explains this is measured by line item 18 in Defendants' CQIT chart – "MHSDS inmates in ASUs transferred within policy requirements." In OnDemand, we found an indicator titled "Placement of ASU EOPs in Appropriate Housing Within Timeframes (204382)."  Is this indicator the same as the one in Defendants' chart at line 18?

- **Patient Access to 7362 Forms**. Your letter explains that line item 15 of the CQIT chart measures "Housing units where 128 MH-5s are accessible and available to housing unit staff" and that if patients have concerns about accessing care, they will report that during patient interviews.  Please clarify whether the indicator at line 15 actually looks at whether 7362 forms are readily available to patients for self-referrals, or whether that indicator only looks at whether 128 MH-5s are available to staff.

- **5-Day Follow Ups for APP/ICF Discharges**.  Your letter explains that this is measured by line item 29 of Defendants' CQIT chart – "Timely Completion of 5/8 day follow ups."  In OnDemand, we found an indicator titled "Discharge Follow Ups (203227)."  Is this indicator the same as the one in Defendants' chart at line 29?

- **On-site audit items.**  Your letter states that while some items do not have indicators, that information is included in CQIT reports.  Why are some of the on-site audit items memorialized in the CQIT chart (i.e., the items highlighted in blue)  while others are not (e.g., whether SPRFIT coordinators attend IAC and IFC meetings, whether NDS patients are transferred timely out of segregation, use of force mental health assessments, controlled vs. immediate use of force incidents, staffing)?  Are these other items memorialized in the CQIT

Report Writing Guide?  Please send the most recent version.

Best,

Cara Trapani



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
ctrapani@rbgg.com

**(Pronouns – she/her/hers)**

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at khansen@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

---

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Monday, March 8, 2021 9:42 PM
**To:** Cara Trapani <CTrapani@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Angie Cooper <acooper@pldolaw.com>; Braxton Medlin <bmedlin@pldolaw.com>; Brian Main <psydocmain@gmail.com>; Cindy Radavsky <cradavsky@gmail.com>; Henry D. Dlugacz <hdlugacz@blhny.com>; Jamas DeGroot <upcjdegroot@gmail.com>; Jeffrey Metzner <jeffrey.metzner@cuanschutz.edu>; Joseph Sorah <jsorah@pldolaw.com>; Kahlil Johnson <kjohnson@kahliljohnsonpsychiatry.com>; Karen Rea <karenrea01@gmail.com>; Kerry Courtney Hughes, MD <dockc99@aol.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Kristina Hector <khector@pldolaw.com>; Lindsay Hayes <lhayesta@msn.com>; Latricea McClendon-Hunt <lmcclendonhunt@pldolaw.com>; Lana Lopez <llopez@pldolaw.com>; Maria Masotta <maria@drmariamasotta.com>; Matt Lopes <mlopes@pldolaw.com>; Michael Ryan <mryan@pldolaw.com>; Mohamedu Jones <mjones@pldolaw.com>; Mary Perrien <mperrien@aol.com>; Patricia M. Williams <harconwil@gmail.com>; Rachel Gribbin <rgribbin@pldolaw.com>; Regina Costa <rcosta@pldolaw.com>; Sofia Millham <smillham@pldolaw.com>; Tim Rougeux <trougeux@hotmail.com>; William Trezvant <wtrezvant@pldolaw.com>; Zelia M. Tavares <ztavares@pldolaw.com>; Sharen Barboza <drsbarboza@gmail.com>; Dan Potter <dpotter@alumni.brown.edu>
**Cc:** Elise Thorn <Elise.Thorn@doj.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Hockerson,

Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR
<Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Samantha
Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Damon McClain
(Damon.McClain@doj.ca.gov) <Damon.McClain@doj.ca.gov>; Lucas Hennes
<Lucas.Hennes@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Namrata Kotwani
<Namrata.Kotwani@doj.ca.gov>; Christine Ciccotti (Christine.Ciccotti@dsh.ca.gov)
<Christine.Ciccotti@dsh.ca.gov>; Nina Raddatz <Antonina.Raddatz@dsh.ca.gov>; Kent,
Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Mehta, Amar@CDCR
<Amar.Mehta@cdcr.ca.gov>; Steven Cartwright <Steven.Cartwright@cdcr.ca.gov>; Laura Ceballos
<laura.ceballos@cdcr.ca.gov>; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: Coleman: Letter Re: Updating CQIT Indicators in Compliance with 12/17/21 Order, ECF
No. 6996 [IWOV-DMS.FID6429]

All,

Attached please find a partial response to Plaintiffs' February 18, 2021 letter. CDCR will provide a
response to the remaining issues in the letter soon.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO
NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE
AUTHOR.

---

**From:** Cara Trapani <CTrapani@rbgg.com>
**Sent:** Thursday, February 18, 2021 9:23 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR
<Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind,
Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR
<Carrie.Stafford@cdcr.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team
<ColemanSpecialMasterTeam@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; CDCR OLA
Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>;
Samantha Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Damon McClain
(Damon.McClain@doj.ca.gov) <Damon.McClain@doj.ca.gov>; Lucas Hennes
<Lucas.Hennes@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Namrata Kotwani
<Namrata.Kotwani@doj.ca.gov>; Roman Siberfeld <RSilberfeld@RobinsKaplan.com>; Glen Danas
<GDanas@RobinsKaplan.com>; Christine Ciccotti (Christine.Ciccotti@dsh.ca.gov)
<Christine.Ciccotti@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent,
Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Adriano Hrvatin (Adriano.Hrvatin@doj.ca.gov)

<Adriano.Hrvatin@doj.ca.gov>; Rashkis, Sean@DSH-S <Sean.Rashkis@dsh.ca.gov>
**Subject:** Coleman: Letter Re: Updating CQIT Indicators in Compliance with 12/17/21 Order, ECF No. 6996 [IWOV-DMS.FID6429]

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear all,

In preparation for next week's Data and CQI Meeting, attached is Plaintiff's letter responding to Defendants' list of CQIT indicators dated January 26, 2021 (reattached here for reference).

Thank you,

Cara Trapani



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
ctrapani@rbgg.com

**(Pronouns – she/her/hers)**

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

---

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Tuesday, January 26, 2021 1:16 PM
**To:** Zelia M. Tavares <ztavares@pldolaw.com>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Michael W. Bien <MBien@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Jessica Winter <JWinter@rbgg.com>; Cara Trapani <CTrapani@rbgg.com>; Amy Xu <AXu@rbgg.com>; Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Donald Specter <dspecter@prisonlaw.com>; Steve Fama <sfama@prisonlaw.com>; Toche, Diana@CDCR

<Diana.Toche@cdcr.ca.gov>; Bick, Dr. Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Laura Ceballos <laura.ceballos@cdcr.ca.gov>; Steven Cartwright <Steven.Cartwright@cdcr.ca.gov>; Leidner, David@CDCR <David.Leidner@cdcr.ca.gov>; Angie Cooper <acooper@pldolaw.com>; Braxton Medlin <bmedlin@pldolaw.com>; Brian Main <psydocmain@gmail.com>; Cindy Radavsky <cradavsky@gmail.com>; Jamas DeGroot <upcjdegroot@gmail.com>; Jeffrey Metzner <jeffrey.metzner@cuanschutz.edu>; Joseph Sorah <jsorah@cdcr.ca.gov>; Kahlil Johnson <kjohnson@kahliljohnsonpsychiatry.com>; Karen Rea <karenrea01@gmail.com>; Kerry Courtney Hughes, MD <dockc99@aol.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Kristina Hector <khector@pldolaw.com>; Lindsay Hayes <lhayesta@msn.com>; Latricea McClendon-Hunt <lmcclendonhunt@pldolaw.com>; Lana Lopez <llopez@pldolaw.com>; Maria Masotta <maria@drmariamasotta.com>; Matt Lopes <mlopes@pldolaw.com>; Michael Ryan <mryan@pldolaw.com>; Mohamedu Jones <mjones@pldolaw.com>; Mary Perrien <mperrien@aol.com>; Patricia M. Williams <harconwil@gmail.com>; Rachel Gribbin <rgribbin@pldolaw.com>; Regina Costa <rcosta@pldolaw.com>; Rod Hickman Gmail <rqhickman@gmail.com>; Sharen Barboza <drsbarboza@gmail.com>; Sofia Millham <smillham@pldolaw.com>; Tim Rougeux <trougeux@hotmail.com>; Damon McClain <Damon.McClain@doj.ca.gov>; William Trezvant <wtrezvant@pldolaw.com>; Paul B. Mello (Pmello@hansonbridgett.com) <Pmello@hansonbridgett.com>; Samantha Wolff (SWolff@hansonbridgett.com) <SWolff@hansonbridgett.com>; 'Silberfeld, Roman M.' <RSilberfeld@RobinsKaplan.com>; Nina Raddatz <Antonina.Raddatz@dsh.ca.gov>; Christine Ciccotti (Christine.Ciccotti@dsh.ca.gov) <Christine.Ciccotti@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Ball, Laurie@CDCR <Laurie.Ball@cdcr.ca.gov>; Dan Potter <dpotter@alumni.brown.edu>; Henry D. Dlugacz <hdlugacz@blhny.com>; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>

**Subject:** Coleman: List of Indicators in CQIT

All,

Attached is a chart listing the indicators in CQIT. It is not limited to the key indicators. The chart is being provided to you for discussion purposes in light of the March deadlines and does not represent Defendants' final work product. Defendants continue to review and analyze the indicators and may revise the attached chart for various reasons, including changes in EHRS, housing units, or policy. Also, CDCR is currently working on updated indicators for SPRFIT that may require further revisions to the chart. As indicated on the chart, the designations of whether an indicator is required by the Program Guide, Compendium, or prior Court Order are preliminary and do not represent Defendants' final positions. Defendants will continue to work through the indicators on the list to determine what, if any, changes may be necessary. In the meantime, we hope the chart will assist the parties' discussion on CQIT.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs

California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO
NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE
AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# **APPENDIX F**

| From: | Bentz, Melissa@CDCR |
|---|---|
| To: | Cara Trapani; Coleman Team - RBG Only; Steve Fama; Cooper, Angelyne; Medlin, Braxton H.; Brian Main; cradavsky@gmail.com; hdlugacz@blhny.com; James DeGroot; Metzner, Jeffrey; JP Sorah; Kahlil Johnson; Karen Rea; dockc99@aol.com; Walsh Kerry F.; Hector Kristina; L Hayes; McClendon-Hunt, LaTri-c-ea; Lopez, Lana L.; maria@drmariamasotta.com; Lopes Matthew; Ryan, Jr., Michael F.; Jones Mohamedu; mperrien@aol.com; harconwil@gmail.com; Gribbin Rachel; Costa Regina; Millham, Sofia A.; trougeux@hotmail.com; Trezvant, William J.; Tavares, Zelia M; Sharen Barboza; Dan Potter |
| Cc: | Elise Thorn; Weber, Nicholas@CDCR; Hockerson, Dillon@CDCR; Thind, Sundeep@CDCR; Stafford, Carrie@CDCR; Samantha Wolff (swolff@hansonbridgett.com); Damon McClain (Damon.McClain@doj.ca.gov); Lucas Hennes; Paul B. Mello; Namrata Kotwani; Christine Ciccotti (Christine.Ciccotti@dsh.ca.gov); Raddatz, Antonina@DSH-S; Kent, Kristopher@DSH-S; Mehta, Amar@CDCR; Cartwright, Steven@CDCR; Ceballos, Laura@CDCR; Golding, Michael@CDCR |
| Subject: | RE: Coleman: Letter Re: Updating CQIT Indicators in Compliance with 12/17/21 Order, ECF No. 6996 [IWOV-DMS.FID6429] |
| Date: | Monday, March 15, 2021 12:41:28 AM |
| Attachments: | MCB-CET Additional CQI Indicators and Indicators to Decommission- 3.14.21.pdf <br> Attachment F Report Writing Outline v62 10.01.18.pdf |

All,

Attached please find a response to the remaining items in Plaintiffs' February 18, 2021 letter, a response to Plaintiffs' March 10, 2021 email, and a list of indicators that CDCR believes should be decommissioned.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Bentz, Melissa@CDCR
**Sent:** Monday, March 8, 2021 9:42 PM
**To:** Cara Trapani <CTrapani@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Angie Cooper <acooper@pldolaw.com>; Braxton Medlin <bmedlin@pldolaw.com>; Brian Main <psydocmain@gmail.com>; Cindy Radavsky (cradavsky@gmail.com) <cradavsky@gmail.com>; Henry Dlugacz (HDlugacz@BLHNY.com) <HDlugacz@BLHNY.com>; James DeGroot <upcjdegroot@gmail.com>; Jeffrey Metzner <JEFFREY.METZNER@CUANSCHUTZ.EDU>; Joseph Sorah <jsorah@pldolaw.com>; Kahlil Johnson <kjohnson@kahliljohnsonpsychiatry.com>; Karen Rea <karenrea01@gmail.com>; 'Kerry C. Hughes, M.D.' (dockc99@aol.com) <dockc99@aol.com>; Kerry Walsh (kwalsh@pldolaw.com) <kwalsh@pldolaw.com>; Kristina Hector (khector@pldolaw.com) <khector@pldolaw.com>; L Hayes <lhayesta@msn.com>; L. McClendon-Hunt <lmcclendonhunt@pldolaw.com>; Lana Lopez <llopez@pldolaw.com>; Maria Masotta <maria@drmariamasotta.com>; Matty Lopes (mlopes@pldolaw.com) <mlopes@pldolaw.com>; Michael Ryan <mryan@pldolaw.com>; Mohamedu Jones (mjones@pldolaw.com) <mjones@pldolaw.com>; mperrien@aol.com; Patricia Williams <harconwil@gmail.com>; Rachel

Gribbin <rgribbin@pldolaw.com>; Regina Costa (rcosta@pldolaw.com) <rcosta@pldolaw.com>;
Sofia Millham <smillham@pldolaw.com>; Tim Rougeux (trougeux@hotmail.com)
<trougeux@hotmail.com>; William Trezvant <wtrezvant@pldolaw.com>; Zelia M. Tavares
<ztavares@pldolaw.com>; Sharen Barboza <drsbarboza@gmail.com>; Dan Potter
<dpotter@alumni.brown.edu>
**Cc:** Elise Thorn <Elise.Thorn@doj.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>;
Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind, Sundeep@CDCR
<SUNDEEP.THIND@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>; Samantha
Wolff (swolff@hansonbridgett.com) <swolff@hansonbridgett.com>; Damon McClain
(Damon.McClain@doj.ca.gov) <Damon.McClain@doj.ca.gov>; Lucas Hennes
<Lucas.Hennes@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Namrata Kotwani
<Namrata.Kotwani@doj.ca.gov>; Christine Ciccotti (Christine.Ciccotti@dsh.ca.gov)
<Christine.Ciccotti@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent,
Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Amar Mehta (Amar.Mehta@cdcr.ca.gov)
<Amar.Mehta@cdcr.ca.gov>; Steven Cartwright (Steven.Cartwright@cdcr.ca.gov)
<Steven.Cartwright@cdcr.ca.gov>; Laura Ceballos (Laura.Ceballos@cdcr.ca.gov)
<Laura.Ceballos@cdcr.ca.gov>; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: Coleman: Letter Re: Updating CQIT Indicators in Compliance with 12/17/21 Order, ECF
No. 6996 [IWOV-DMS.FID6429]

All,

Attached please find a partial response to Plaintiffs' February 18, 2021 letter. CDCR will provide a
response to the remaining issues in the letter soon.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO
NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE
AUTHOR.

---

**From:** Cara Trapani <CTrapani@rbgg.com>
**Sent:** Thursday, February 18, 2021 9:23 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR
<Melissa.Bentz@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind,
Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Stafford, Carrie@CDCR
<Carrie.Stafford@cdcr.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master Team
<ColemanSpecialMasterTeam@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; CDCR OLA
Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>;

Samantha Wolff ([swolff@hansonbridgett.com](mailto:swolff@hansonbridgett.com)) <[swolff@hansonbridgett.com](mailto:swolff@hansonbridgett.com)>; Damon McClain ([Damon.McClain@doj.ca.gov](mailto:Damon.McClain@doj.ca.gov)) <[Damon.McClain@doj.ca.gov](mailto:Damon.McClain@doj.ca.gov)>; Lucas Hennes <[Lucas.Hennes@doj.ca.gov](mailto:Lucas.Hennes@doj.ca.gov)>; Paul B. Mello <[Pmello@hansonbridgett.com](mailto:Pmello@hansonbridgett.com)>; Namrata Kotwani <[Namrata.Kotwani@doj.ca.gov](mailto:Namrata.Kotwani@doj.ca.gov)>; Roman Siberfeld <[RSilberfeld@RobinsKaplan.com](mailto:RSilberfeld@RobinsKaplan.com)>; Glen Danas <[GDanas@RobinsKaplan.com](mailto:GDanas@RobinsKaplan.com)>; Christine Ciccotti ([Christine.Ciccotti@dsh.ca.gov](mailto:Christine.Ciccotti@dsh.ca.gov)) <[Christine.Ciccotti@dsh.ca.gov](mailto:Christine.Ciccotti@dsh.ca.gov)>; Raddatz, Antonina@DSH-S <[Antonina.Raddatz@dsh.ca.gov](mailto:Antonina.Raddatz@dsh.ca.gov)>; Kent, Kristopher@DSH-S <[Kristopher.Kent@dsh.ca.gov](mailto:Kristopher.Kent@dsh.ca.gov)>; Adriano Hrvatin ([Adriano.Hrvatin@doj.ca.gov](mailto:Adriano.Hrvatin@doj.ca.gov)) <[Adriano.Hrvatin@doj.ca.gov](mailto:Adriano.Hrvatin@doj.ca.gov)>; Rashkis, Sean@DSH-S <[Sean.Rashkis@dsh.ca.gov](mailto:Sean.Rashkis@dsh.ca.gov)>
**Subject:** Coleman: Letter Re: Updating CQIT Indicators in Compliance with 12/17/21 Order, ECF No. 6996 [IWOV-DMS.FID6429]

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear all,

In preparation for next week's Data and CQI Meeting, attached is Plaintiff's letter responding to Defendants' list of CQIT indicators dated January 26, 2021 (reattached here for reference).

Thank you,

Cara Trapani



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
[ctrapani@rbgg.com](mailto:ctrapani@rbgg.com)

**(Pronouns – she/her/hers)**

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at [rbgg@rbgg.com](mailto:rbgg@rbgg.com).

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

**From:** Bentz, Melissa@CDCR <[Melissa.Bentz@cdcr.ca.gov](mailto:Melissa.Bentz@cdcr.ca.gov)>

**Sent:** Tuesday, January 26, 2021 1:16 PM
**To:** Zelia M. Tavares <ztavares@pldolaw.com>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>;
Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Adriano
Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Michael W. Bien <MBien@rbgg.com>; Lisa Ells
<LElls@rbgg.com>; Jessica Winter <JWinter@rbgg.com>; Cara Trapani <CTrapani@rbgg.com>; Amy
Xu <AXu@rbgg.com>; Marc Shinn-Krantz <MShinn-Krantz@rbgg.com>; Donald Specter
<dspecter@prisonlaw.com>; Steve Fama <sfama@prisonlaw.com>; Toche, Diana@CDCR
<Diana.Toche@cdcr.ca.gov>; Bick, Dr. Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Nick Weber
<Nicholas.Weber@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Elise Thorn
<Elise.Thorn@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Stafford, Carrie@CDCR
<Carrie.Stafford@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Thind,
Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Laura Ceballos <laura.ceballos@cdcr.ca.gov>;
Steven Cartwright <Steven.Cartwright@cdcr.ca.gov>; Leidner, David@CDCR
<David.Leidner@cdcr.ca.gov>; Angie Cooper <acooper@pldolaw.com>; Braxton Medlin
<bmedlin@pldolaw.com>; Brian Main <psydocmain@gmail.com>; Cindy Radavsky
<cradavsky@gmail.com>; Jamas DeGroot <upcjdegroot@gmail.com>; Jeffrey Metzner
<jeffrey.metzner@cuanschutz.edu>; Joseph Sorah <jsorah@pldolaw.com>; Kahlil Johnson
<kjohnson@kahliljohnsonpsychiatry.com>; Karen Rea <karenrea01@gmail.com>; Kerry Courtney
Hughes, MD <dockc99@aol.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Kristina Hector
<khector@pldolaw.com>; Lindsay Hayes <lhayesta@msn.com>; Latricea McClendon-Hunt
<lmcclendonhunt@pldolaw.com>; Lana Lopez <llopez@pldolaw.com>; Maria Masotta
<maria@drmariamasotta.com>; Matt Lopes <mlopes@pldolaw.com>; Michael Ryan
<mryan@pldolaw.com>; Mohamedu Jones <mjones@pldolaw.com>; Mary Perrien
<mperrien@aol.com>; Patricia M. Williams <harconwil@gmail.com>; Rachel Gribbin
<rgribbin@pldolaw.com>; Regina Costa <rcosta@pldolaw.com>; Rod Hickman Gmail
<rghickman@gmail.com>; Sharen Barboza <drsbarboza@gmail.com>; Sofia Millham
<smillham@pldolaw.com>; Tim Rougeux <trougeux@hotmail.com>; Damon McClain
<Damon.McClain@doj.ca.gov>; William Trezvant <wtrezvant@pldolaw.com>; Paul B. Mello
(Pmello@hansonbridgett.com) <Pmello@hansonbridgett.com>; Samantha Wolff
(SWolff@hansonbridgett.com) <SWolff@hansonbridgett.com>; 'Silberfeld, Roman M.'
<RSilberfeld@RobinsKaplan.com>; Nina Raddatz <Antonina.Raddatz@dsh.ca.gov>; Christine Ciccotti
(Christine.Ciccotti@dsh.ca.gov) <Christine.Ciccotti@dsh.ca.gov>; Kent, Kristopher@DSH-S
<Kristopher.Kent@dsh.ca.gov>; Ball, Laurie@CDCR <Laurie.Ball@cdcr.ca.gov>; Dan Potter
<dpotter@alumni.brown.edu>; Henry D. Dlugacz <hdlugacz@blhny.com>; Golding, Michael@CDCR
<Michael.Golding@cdcr.ca.gov>
**Subject:** Coleman: List of Indicators in CQIT

All,

Attached is a chart listing the indicators in CQIT. It is not limited to the key indicators. The chart is
being provided to you for discussion purposes in light of the March deadlines and does not represent
Defendants' final work product. Defendants continue to review and analyze the indicators and may
revise the attached chart for various reasons, including changes in EHRS, housing units, or policy.
Also, CDCR is currently working on updated indicators for SPRFIT that may require further
revisions to the chart. As indicated on the chart, the designations of whether an indicator is required
by the Program Guide, Compendium, or prior Court Order are preliminary and do not represent
Defendants' final positions. Defendants will continue to work through the indicators on the list to

determine what, if any, changes may be necessary. In the meantime, we hope the chart will assist the parties' discussion on CQIT.

Respectfully,

*Melissa C. Bentz*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



March 14, 2021


Special Master Matthew A. Lopes, Jr.
Pannone Lopes Deverreaux & O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

*Coleman Plaintiffs' Counsel*
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105


*VIA EMAIL ONLY*


Dear Special Master Lopes and Plaintiffs' Counsel:

I write in response to several items related to updating the Continuous Quality Improvement (CQI) indicators, including the remaining items in Plaintiffs' February 18, 2021 letter, the policies provided in the February 19, 2021 email from Kerry Walsh, and questions in the March 10, 2021 email from Cara Trapani. This letter also addresses indicators that CDCR believes should be decommissioned.

CDCR maintains the objections raised in my March 8, 2021 letter responding to the majority of Plaintiffs' February 18, 2021 letter.

    A. **Plaintiffs' February 18, 2021 Letter and February 19, 2021 Email from Deputy Special Master Kerry Walsh**

CDCR's responses to Plaintiffs' counsel's numerous proposed additions to CQI, as well as those policies raised by Deputy Special Master Kerry Walsh, are broken into two categories: 1. Items That CDCR Agrees to Measure or Is Open to Further Discussing and 2. Items That CDCR Does Not Agree Should Be Measured.

        1. Items That CDCR Agrees to Measure or Is Open to Further Discussing

CDCR either agrees that the topics listed below should be included in CQI in some form or requests further discussions on the possibility of their inclusion. Although CDCR may agree to include an indicator to measure the policies listed below, CDCR has not yet created the indicators. CDCR will work with the Special Master's team on how best to measure these items.

Additionally, although CDCR may agree to include an indicator discussed below, CDCR has not yet determined whether any of the indicators are "key indicators." Further, any statement that an indicator or audit may be related to a Program Guide or Compendium requirement should not be interpreted to mean that the indicator or audit actually measures a Program Guide or Compendium requirement.

- MHCB Intake Assessment (Page 3, section I, subsection 6)- CDCR currently measures whether MHCB patients are seen daily by either a primary clinician or a psychiatrist. The Due Dates Reports, which is an operational report for the institutions, also flags when the intake assessment is due. CDCR agrees to include an indicator to measure whether the MHCB Intake Assessment is occurring.

- Custody and Mental Health Partnership Plan (CMHPP)(Page 11, section III, subsection 7)- CDCR agrees that indicators related to CMHPP should be incorporated into the CQI process. However, CDCR is still in the process of identifying what items should be measured and how to audit those items. Therefore, while CDCR agrees to eventually incorporate these items, indicators related to CMHPP will not be added to the CQI indicator list for the March 17, 2021 filing.

- Least Restrictive Housing (LRH)(Page 11, section III, subsection 9)- Plaintiffs request an indicator to measure the requirements of the June 30, 2017 Least Restrictive Housing policy. The CQI process does not currently review the Psychiatric Inpatient Programs (PIPs). CDCR is in the process of developing such an audit, which will include an LRH review. While CDCR agrees that this item is appropriate for eventual incorporation into the CQI process, it would be best to incorporate all PIP measures at once. Therefore, an indicator related to LRH will not be added to the CQI indicator list for the March 17, 2021 filing.

- Heat Plan (Page 11, section III, subsection 10)- Plaintiffs request an indicator to measure whether cooling and hydration measures are offered as required by the Heat Plan. CDCR agrees to add this item as an indicator that will be measured through an on-site audit.

   2.   Items That CDCR Does Not Agree Should Be Measured

CDCR does not agree that the items listed below should be measured in CQI.

- Inpatient Care (Page 7, section II, subsection 6, paragraph 2)- Plaintiffs request an indicator to measure whether patients discharged from the APP or ICF levels of care receive a mental health evaluation within 24 hours of discharge. Upon review of the cited May 9, 2012, memorandum, the main focus of the evaluation seems to be to ensure there is an appropriate hand off of the patient. This was especially important before the lift and shift and the development and implementation of the Electronic Health Records System (EHRS), which is when the May 9, 2012 memorandum was written. However, since the lift and shift and the implementation of EHRS, patient documentation is immediately available and hand-offs between clinicians have improved. CDCR also already has indicators that measure

whether patients who were admitted for "danger to self" receive 5-day follow ups. Therefore, an indicator measuring this issue is not necessary.

- Segregation Reviews (Page 8, section II, subsection 10, paragraph 1)- Plaintiffs request an indicator to measure compliance with the requirements for reviews of class members in SHU or PSU settings over 150 days, citing the September 15, 2014, memorandum. The CQI process already has an indicator that measures whether these case by case review are being conducted for appropriate patients in segregation within the required timeframes. Another indicator regarding this item is not necessary.

- Single Cell Status Due to Mental Health Concerns (Page 11, section III, subsection 6, paragraph 2)- Plaintiffs request an indicator to measure the various requirements for single- and double-celling, and housing for transgender inmates, citing Title 15 section 3269. Housing of transgender inmates has historically not been monitored in *Coleman*. Further, transgender issues have not been litigated in *Coleman*, but have instead been litigated through separate cases. Therefore, an indicator on this issue is not necessary.

- Self-Harm Reporting Incidents (Page 11, section III, subsection 8); DOM section 51030.3- Reportable Incidents (Walsh Email); March 25, 2013 Memo re: Notification of All Attempted or Completed Suicides During Non-Business Hours (Walsh Email)- Plaintiffs request an indicator to measure whether Defendants have a system in place to identify and track self-injurious episodes, citing a July 26, 1999 order. (ECF No. 1055.) Similarly, the Special Master's team noted that they were unable to find an indicator in the CQI list that measured items in DOM section 51030.3 and the March 25, 2013 memo regarding Notification of All Attempted or Completed Suicides During Non-Business Hours. CDCR has a system in place to identify and track all self-injurious episodes and to report attempted or completed suicides. Therefore, an indicator on this issue is not necessary.

- DSH Rules Violation Reporting (Walsh Email)- The Special Master's team noted that there did not seem to be an indicator associated with the July 1, 2017 memorandum regarding DSH Rules Violation Reporting policy. As mentioned above, PIP audit measures are not yet included in the CQI Process. However, even when such an audit is developed, it is unnecessary to include an indicator to measure this issue. The parts of the memorandum applicable to CDCR mirror the current RVR process and are already captured by existing CQI indicators. Therefore, no other indicators are necessary.

- Court Transfer Documentation and Determination of Patient Ability to Attend a Court Hearing (Walsh Email)- The Special Master's team noted that there did not seem to be an indicator associated with the September 5, 2018 memorandum regarding Court Transfer Documentation and Determination of Patient Ability to Attend a Court Hearing. As mentioned before, CDCR's focus for the CQI process is end goals, not process measurements. The memorandum cited above set out a process for CDCR to provide documentation and evaluate whether a patient can safely go out to court. However, the ultimate decision regarding whether a patient transfers is not CDCR's. Therefore, an indicator is not necessary to measure requirements in this memorandum.

- Other Remedial Requirements (Page 12, section IV)- Plaintiffs ask whether CDCR has developed any indicators for a list of policies that were developed after the adoption of the 2018 Program Guide. Some of the policies listed in Plaintiff's letter have not yet been released to the field. As mentioned in my prior letter, CDCR already measures timely desert transfers. CDCR also measures medication non-adherence consults as part of the Mental Health Referrals indicator, although the business rule will be updated to align with the approved policy. CDCR has not created new indicators to measure the other policies listed in Plaintiffs' letter and has not determined whether indicators are even necessary. To the extent that CDCR determines that indicators are necessary to measure items within any policies moving forward, we will bring those to Plaintiffs' counsel and the Special Master's team. At this time, there are no further indicators that need to be added to the CQI indicator list to be filed on March 17, 2021.

B.  Response to Cara Trapani's March 10, 2021 Email

As discussed during on March 9, 2021, my March 8, 2021, letter noted that some policies were already monitored through the CQI process, although those items did not appear on the January 26, 2021, spreadsheet of CQI indicators. Upon review, Mental Health determined that there were some Performance Report indicators omitted from the January 26, 2021 CQI indicator list. The following indicators will either be included in some form or considered for inclusion: Mental Health Screens; Treatment Cancelled; Treatment Refused; MHCB Daily Provider Checks; Timely MH RVR Assessments; Percentage of Patients on 10+ Medications that Have a Completed CDCR 7540 Polypharmacy Review Form Found in the Designated Section of the EHRS Within the Past 12 Months; Percentage of Medications Prescribed by Psychiatrists that are Non-Formulary; Restraint Rate; and Seclusion Rate.

Plaintiffs email also raised several other questions.

- Timely Transfer to ASU EOP Hubs- Plaintiffs ask if the indicator titled "MHSDS inmates in ASU transferred within policy requirements" is the same as the indicator titled "Placement of ASU EOPs in Appropriate Housing Within Timeframes." These indicators are not the same. The "MHSDS inmates in ASU transferred within policy requirements" measures placement for both CCCMS and EOP patients. The "Placement of ASU EOPs in Appropriate Housing Within Timeframes" indicator, which is also on line 115 of the January 26 CQI indicator list, only looks at EOPs. As discussed further below, CDCR recommends combining all of the transfer timeline indicators into one indicator that will allow users to drill down to specific timelines they would like to track.

- Patient Access to 7362 Forms- Plaintiffs ask if the indicator titled "Housing Units Where 128 MH-5s are Accessible and Available to Housing Unit Staff" looks at whether 7362 forms are readily available to patients. It does not.

- 5-Day Follow Ups for APP/ICF Discharges- Plaintiffs ask if the "Timely Completion of 5/8 Day Follow Ups" indicator is that same at the "Discharge Follow Ups" indicator on the Performance Report. It is.

- On-Site Audits Items- Plaintiffs remained confused about what is included on the CQI indicator list and ask why some of the on-site audit items are memorialized on the chart, while other are not. To clarify, the items on the CQI indicator list are those items that CDCR measures or audits within CQI. Each indicator has a business rule or audit questions associated with it that provide more granular information regarding what exactly the indicator is measuring. In my prior letter, I noted several items that were already measured in the CQI process through the audit questions, such as the question of whether NDS patients appropriate for accelerated transfer are transferred timely. These items are not separately mentioned on the indicator list because they are part of the audit question for a current indicator already on the list. Plaintiffs also ask why other items, such as staffing, number of controlled/immediate use of force incidents, and whether SPR FIT coordinators attend inmate council and inmate family council meetings are not on the indicator list, even thought my prior letter indicated that these items were included in the CQI reports. During CQI audits, CDCR gathers information for the CQI indicators and for items in the report writing guide. The items in the report writing guide generally consist of numbers, such as staffing allocations and filled positions and numbers of use of force incidents, as well as answers to yes or no questions. This information is presented in the written parts of the CQI reports, not as separate indicators in the charts. I have attached the most recent report writing guide. Please note that this guide will need to be updated to include the new items added to the CQI indicator list and may need to be restructured to group the indicators in a way similar to what is proposed for the March 17, 2021 filing.

C. CQI Indicators Recommended for Decommissioning or Combining

After reviewing the list of CQI indicators more carefully, CDCR has determined that there are several indicators that are duplicative or no longer necessary. Defendants plan to decommission the following indicators for removal from the CQI indicator list:

- Appointments Canceled Due to Custody (Line 5)[1]- CDCR believes that it is more appropriate to look at the reasons that treatment is canceled if cancelations are an issue at the institution, as opposed to targeting one reason, which may not be the primary barrier. Therefore, CDCR will decommission this indicator and either revise the current "Treatment Canceled" indicator to measure the reason treatment is canceled or create a new indicator that measures all of the reasons that treatment may be canceled.

- Programs with More than One Type of Group Offered (Line 20)- This indicator does not provide information necessary to determine whether appropriate care is being provided at institutions or to assist with quality improvement.

- Percentage of Inmates Screened Negative on the MH Intake Screens Who Were Not Placed in the MHSDS Within 6 Months of Initial Screening (Line 21)- This indicator does not provide information necessary to determine whether appropriate care is being provided at institutions or to assist with quality improvement.

---

[1] The line numbers correspond with the CQI indicator list provided to Plaintiffs' counsel and the Special Master's team on January 26, 2021.

- Satisfactory SPR FIT Meeting (Line 32)- This indicator measures a process instead of an outcome and does not provide information necessary to determine whether appropriate care is being provided at institutions or to assist with quality improvement.

- 837s for Self-Harm Incidents in Which There Was a Delay of More than 4 Minutes from Cell Entry (Line 34)- As noted in my March 8, 2021 letter, the policies for emergency response timelines currently differ based on staff classification. So while the above indicator is on the CQI indicator list, it was never measured due to policy limitations. CDCR recommends removing this indicator from the list and keeping an indicator to measure emergency response procedures for self-injurious behaviors and suicide attempts. CDCR will work with the Special Master's team to determine how best to measure emergency response.

- MHPS Meeting Audit Criteria (Line 67)- This indicator measures a process instead of an outcome and does not provide information necessary to determine whether appropriate care is being provided at institutions or to assist with quality improvement.

- Percentage of High Refusers Due to Custody in Which a Meeting Between MH and Custody was Conducted within 7 Days (Line 75 and Line 125); High Refusers in which 128Bs Were Completed (Line 123)- All three of these indicators measure whether there was a meeting between Mental Health and Custody within 7 days for patients with high refusal rates due to custody. Not only are these indicators duplicative of one another, they measure a process instead of a solution. There is also an indicator on line 122 titled "High Refusers Due to Custody Reasons with Documented Plan of Action" that measures how many 128Bs included a plan of action to address the reasons for high refusals. This is the more appropriate measure that is focused on a solution, rather than a process.

- I/Ps Discharged from DSH with Classification Casework Completed Prior to Transfer When Required (Line 76)- The implementation of EHRS, SOMS, and the lift and shift have remediated this issue. Completed casework is no longer an issue.

- RVRs Recommended for Mitigation That Were Mitigated (Line 80); The Percentage of RVRs That Were Mitigated (Line 81); RVRs Requiring MH Assessments Where the Officer Agreed with the MH Clinicians Recommendation to Document in an Alternative Manner (Line 83); RVRs Where the HO Disagreed with the MH Clinicians Recommendation to Document in an Alternative Manner and Documented the Rationale in a 128B (Line 84)- All four of these indicators measure the same information in a slightly different way and all are duplicative of the indicator titled "RVRs Recommended for Mitigation with Documentation of Consideration of Mitigation" on line 79.

- Percentage of RVRs Issued to Non-MHSDS Participants, CCCMS, EOP, and MHCB Patients (Line 86)- This indicator is duplicative of the indicator on line 77 titled "compare Percent of Inmates Overall that Receive RVRs with the Percent of MH Inmates that Receive RVRs."

- ASU LOS for MHSDS vs. Non-MHSDS (Line 114)- This indicator does not provide information that is necessary to determine whether appropriate care is being provided at

institutions or to assist with quality improvement. Further, Plaintiffs' receive information regarding ASU length of stay from Defendants on a monthly basis.

- Welfare Checks Completed on Time and Staggered (Line 117)- This indicator is repetitive of the indicator on line 116 titled "Percentage of ASU Welfare Checks Audited that were Completed on Time and Staggered."

- Percentage of ASU Welfare Check Summaries Reviewed and Signed by Custody Supervisors (Line 118)- This indicator is no longer necessary due to the implementation of Guard One and the ability to pull automated reports.

- ASU Inmates on 21 Day Intake Status With Markers Posted (Line 119)- This indicator is no longer necessary as intake markers for inmates on intake status in ASU are no longer required.

- Percentage of Unclothed Body Searches Conducted in Private Areas (Line 124)- This is duplicative of the indicator on line 88 titled "Percentage of Unclothed Body Searches Conducted in Private Areas."

- Inmate Who Received ASU MH Guide (Line 128)- This indicator measures a process instead of an outcome and does not provide information that is necessary to determine whether appropriate care is being provided at institutions or to assist with quality improvement.

- Staff That Report Having Computers for All Out of Cell Clinical Appointments (Line 140)- This measure is no longer relevant as all staff now have access to computers.

- MHCB/Alt Housing Cells Clean at the Time of Visit (Line 150)- This indicator is duplicative of the indicator on line 151 titled "Percentage of All MHCB and Alternative Housing Cells Observed that are Clean and Had an Up to Date Cleaning Schedule."

- Number of Safety Cell Placements (Line 160)- This indicator was created pre-EHRS. CDCR now has a seclusion indicator that uses the frequency of seclusion. This indicator is unnecessary.

- Percentage of MH OHU Stays 48 Hours or Less (Line 167)- CDCR no longer has Mental Health OHUs. CDCR audits alternative housing and MHCB transfer timeframes in CQIT in accordance with current policy.

CDCR also recommends combining the following indicators into one "Timely Transfers" indicator": Placement of ASU/SHU CCCMS in STRH/LTRH within Timeframes (Line 17); MHSDS Inmate in ASU Transferred within Policy Requirements (Line 18); Timely Transfers to CCCMS/EOP (Line 19); and Placement of ASU EOPs in Appropriate Housing within Timeframes (Line 115). The "Timely Transfers" indicator would include all of the same information, but in a rolled up format. Users would still be able to drill down to look at various transfer timelines as necessary. For purposes of the March 17, 2021 filing, we recommend removing the various line items and adding "Timely Transfers" under the Access to Care section.

We look forward to our continued discussion on March 15, 2021 regarding the March 17, 2021 filing. Defendants are hopeful that this filing can be resolved amicably and the focus can shift to conducting CQI tours and report writing.

Respectfully,

*/s/ Melissa C. Bentz*

Melissa C. Bentz
Attorney
Office of Legal Affairs
California Department of Corrections and Rehabilitation