**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.

       Plaintiffs,

v.

GAVIN NEWSOM, et al.

       Defendants.

No. 2:90-cv-0520 KJM DB P

**SPECIAL MASTER'S REPORT ON HIS EXPERT'S REPORT ON SUICIDES COMPLETED IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**JANUARY 1, 2018 – DECEMBER 31, 2018**

## I.    INTRODUCTION

Attached is the *Coleman* Special Master's expert's Report on Completed Suicides in the California Department of Corrections and Rehabilitation (CDCR) from January 1, 2018 through December 31, 2018 ("Report"). This is the twentieth report by the Special Master's expert[1] on completed suicides by CDCR inmates. It is submitted as part of the Special Master's overall continuing review of defendants' compliance with court-ordered remediation in this matter.

The Special Master created an internal Suicide Report Workgroup to direct and guide the development of this Report and forthcoming analyses of suicides completed in the CDCR. *See* ECF No. 7038 at 2.[2] The Workgroup is comprised of Lindsay M. Hayes, M.S., Jeffrey L.

---

[1] Members of the Special Master's staff who are mental health experts are referred to collectively as "the Special Master's expert."

[2] References to page numbers for documents filed in the court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system.

Metzner, M.D., Sharen Barboza, Ph.D., Kahlil A. Johnson, M.D., and Kerry C. Hughes, M.D. Sharen Barboza, Ph.D. authored the Report.  In preparing the Report, Dr. Barboza, with support from other *Coleman* experts, conducted in-depth clinical reviews and assessments of the health care records and CDCR death review reports for all CDCR inmate suicide deaths during calendar year 2018.

II.    **FINDINGS**

Among the Special Master's expert's findings in the Report were the following:

- In 2018, there were 34 CDCR inmates who died by suicide, resulting in the highest suicide rate – 26.3 deaths per 100,000 – in the past 20 years.  Report at 5.

- The Special Master's expert determined 32 percent of deaths by suicide in 2018 to have been foreseeable and 53 percent were determined to have been preventable.  *Id.* at 28.

- Seventy-one percent of those who died by suicide in 2018 were Mental Health Services Delivery System (MHSDS) participants.  *Id.* at 3.

- Consistent with prior years, hanging was the primary method used by those who died by suicide in 2018; however, there was a decrease in the percent of suicides by hanging in 2018 (74 percent) compared to 2017 (87 percent).  *Id.* at 8.

- Twenty-nine percent of inmates who died by suicide in 2018 were discovered in rigor mortis, which represented a significant increase compared to 2017 (13 percent).  *Id.* at 10.

- Half of the incarcerated persons who died by suicide in 2018 were Hispanic/Latinx in 2018, continuing a trend that has been noted since 2015.  *Id.* at 11-12.

- Seventy-one percent of incarcerated persons who died by suicide in 2018 had histories of suicide attempts, non-suicidal self-injury, or both, which represented a decrease compared to 2017 (97 percent).  *Id.* at 3.

- Consistent with recent reports of the Special Master's expert, roughly a third of incarcerated persons who died by suicide in 2018 resided in segregated housing. *Id.* at 3.

- Finally, 61 percent of cases where an inmate received a suicide risk evaluation during their most recent incarceration "showed evidence of clinicians failing to identify or document known risk factors during suicide risk evaluations," a significant increase from 2017 (17 percent). *Id.* at 23.

III.   **PARTIES' RESPONSES AND OBJECTIONS**

On March 22, 2021, the Special Master provided the *Coleman* parties with a draft version of the Report ("Draft Report"). In accordance with regular practice for the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the Draft Report. Plaintiffs' counsel submitted their response to the Draft Report on April 20, 2021. *See* Letter from Michael S. Nunez, Esq. to Special Master Lopes (Apr. 20, 2021), attached hereto as Exhibit A. On April 21, 2021, defendants submitted their comments and objections to the Draft Report. *See* Letter from Dillon Hockerson, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (Apr. 21, 2021), attached hereto as Exhibit B. After careful review and consideration, the Special Master's expert has revised and clarified relevant portions of the Report where warranted, as discussed in further detail below.

A.   **Plaintiffs' Response to the Draft Report**

In their response, plaintiffs requested revisions to the Special Master's expert's discussion of emergency response. Exhibit A at 1. Specifically, plaintiffs asked that the Draft Report be revised to include a "discussion of the multiple 2018 suicides that involved delays associated with application of wrist and leg restraints to patients before initiating emergency medical care." *Id.* Plaintiffs acknowledged that the Special Master's expert's case summaries

3

discussed four cases in which wrist or leg restraints were applied to patients prior to initiating

emergency medical care, but requested that these cases be highlighted in the body of the main

report "to document the problem for appropriate Court and public oversight." *Id.* at 2. In

response, the Special Master's expert revised the Report to include a discussion of cases where

restraints were applied to incarcerated persons prior to the initiation of emergency care. *See*

Report at 26.

      B.    **Defendants' Response to the Draft Report**

      In their response to the Draft Report, defendants restated a series of familiar objections

that were included in their responses to the Special Master's expert's 2015, 2016, and 2017

annual suicide reports.[3] These oft-repeated objections included their argument that the Special

Master's expert's report is duplicative of CDCR's suicide report, Exhibit B at 1-2;[4] their

objection to the Special Master's expert's suicide foreseeability and preventability

determinations, *id.* at 1-2, 7-8;[5] their objection to the inclusion of a suicide rate based on

---

[3] *See* Defendants' Objections to the Special Master's Report on His Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017-December 31, 2017, ECF No. 7098 at 2-3 (objecting to the Special Master's expert's report as "redundant"); *id.* at 4-5 (objecting to the Special Master's expert's foreseeability and preventability determinations); *id.* at 4 n.4 (objecting to the inclusion of an in-state population suicide rate); *id.* at 3-4 (objecting to the Special Master's expert's large prison system comparisons); *see also* Defendants' Objections to the Special Master's Report on His Expert's Analysis of CDCR's Annual Suicide Report January 1, 2015 – December 31, 2015 and His Expert's Review of Suicides Completed in CDCR January 1, 2016 – December 31, 2016, ECF No. 7052 at 3-4 (objecting to the Special Master's expert's reports as "redundant" of CDCR's own reports); *id.* at 4 (objecting to the Special Master's suicide foreseeability and preventability determinations).

[4] As noted in defendants' response to the Draft Report, CDCR drafted a compendium suicide report covering calendar years 2017-2019 and posted the report on its website. *See* Exhibit B at 1 n.1. The Special Master notes that his expert's Report, compared to CDCR's 2017-2019 report, provides an opportunity to conduct in-depth analysis and identify disaggregated inmate suicide trend data by year. Moreover, unlike the Special Master's expert's report, CDCR's report does not include detailed individual case summaries. Finally, CDCR stopped conducting foreseeability and preventability analyses in 2017 due to their concerns with potentially admitting liability regarding the suicides that occur in its facilities. *See* ECF No. 7038 at 20. Accordingly, CDCR's compendium report lacks this critical information needed to enable the court to fully evaluate defendants' progress and performance regarding suicide prevention and response.

[5] Defendants again attempt to discredit the Special Master's expert's suicide foreseeability and preventability analyses, describing this reporting as being of questionable utility. *See* Exhibit B at 1-2; *see also id.* at 7-8.

CDCR's in-state inmate population, *id.* at 2-3; and their objection to the comparison of CDCR's suicide rate to that of other large prison systems. *Id.* at 3. Each of these objections is without merit for the reasons articulated in the Special Master's Report on His Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2017 – December 31, 2017. *See* ECF No. 7077 at 4-5 (responding to defendants' assertion that the Special Master's expert's report is "duplicative" of CDCR's suicide report); *id.* at 7 (responding to defendants' objections to the Special Master's expert's suicide foreseeability and preventability determinations); *id.* at 5 (responding to defendants' objection to the inclusion of an in-state only suicide rate calculation); *id.* at 5-6 (responding to defendants' objection to comparisons to other large prison systems).[6] In the interest of judicial economy, the Special

---

Defendants objections are not made in a vacuum. For nearly two decades, defendants have objected to the Special Master's expert's analysis of suicide foreseeability and preventability. *See* ECF No. 1519 at 286-87 (Special Master's report discussing defendants' 2003 opposition to the suicide foreseeability and preventability analyses contained in the Special Master's expert's draft 2001 suicide report). The court has overruled defendants' objections to the Special Master's expert's foreseeability and preventability determinations and highlighted their importance to evaluating defendants' progress in establishing a constitutionally adequate mental health system. *See, e.g.*, ECF No. 4693 at 3 ("Defendants are responsible for development and implementation of a program to 'identify, treat, and supervise inmates at risk for suicide' and *identification of the number of preventable inmate suicides is an integral part of that responsibility*.") (citations omitted) (emphasis added). Moreover, the Supreme Court of the United States highlighted the importance of the foreseeability and preventability determinations in a 2011 opinion. *Brown v. Plata*, 563 U.S. 493, 504 (2011). While defendants readily criticize the Special Master's expert's "outmoded" methods, it is apparent that their true concern is that the expert's analysis will be used as evidence against them in a potential future civil action. *See* ECF No. 7052-1 at 6-7 (attachment to defendants' objections to the Special Master's expert's 2017 suicide report, suggesting that measures of suicide foreseeability and preventability "are susceptible to bad faith manipulations that can expose CDCR to an array of unwarranted civil and criminal liability."). The Special Master has previously provided a thorough overview of the history of the 2015 and 2016 annual suicide report writing process, ECF No. 7038 at 11-17, as well as a detailed history of foreseeability and preventability determinations in this matter, *id.* at 17-22, and will not repeat the same here. As stated in prior reports, the Special Master's expert will continue to report on inmate suicide foreseeability and preventability.

[6] The Special Master's expert's annual suicide reports have included comparisons to other large prison systems since the 2011 annual report. *See* ECF No. 4308 at 1-2. The court has consistently overruled defendants' prior objections to the Special Master's expert's use of statistical comparisons. For instance, responding to defendants' objections to the "methodology underlying the Special Master's" observation that CDCR's increasing suicide rate "substantially exceed[ed] the national average among U.S. state prisons," the court observed:

> The methodology used by the Special Master is the same methodology his expert has used for over a decade in reporting to this court on CDCR inmate suicides. It is neither erroneous nor misleading. Certainly no dispute over methodology can disguise the Special Master's statement that in 2012, as of the time of the writing of the Report, a CDCR inmate was dying by suicide on average nearly every 11 days. That is of concern to the Special Master, and it is of concern to this

Master will not repeat previously filed responses to these objections and will let the record speak for itself.

In addition to repeating previously filed objections, defendants raised new objections and concerns with elements of the Draft Report. First, defendants requested that the Special Master's expert clarify several parts of the Draft Report.[7] After careful consideration of these concerns, the Special Master's expert made clarifying modifications to these elements of the report.[8] The Special Master's expert also corrected statistics that were miscalculated in the Draft Report regarding age as an individual risk factor for suicide. *See* Report at 13. The Special Master's expert did not concur with defendants' request to summarize observed inadequacies in individual suicide case reviews, Exhibit B at 7, because the information defendants sought is discussed in detail in Appendix A of the Report. Finally, the Special Master's expert modified the language in two individual case summaries[9] in accordance with defendants' requests. *See* Exhibit B at 8-9 (requesting modifications to Case A and Case M).

---

court. It should be a primary concern to defendants….After over seventeen years working with defendants on the remedial phase of this action, including increasing focus on the problem of inmate suicides in CDCR prisons, the Special Master is well-qualified to opine on these matters and the court finds no basis for striking his findings or his conclusions.

ECF No. 4361 at 7-8.

[7] Exhibit B at 3-4 (requesting clarification regarding a table displaying the average number of suicides per year); *id.* at 4 (requesting clarification regarding the use of the term "rate" and "percentage"); *id.* (requesting clarification regarding the discussion of incidence of suicide among ethnic groups); *id.* at 5 (requesting clarification regarding the discussion of demographic trends in CDCR suicides); *id.* at 6 (requesting clarification regarding the discussion of suicides by security level); *id.* at 6-7 (requesting clarification regarding discussion of deficiencies in mental health treatment and evaluation).

[8] *See* Report at 7, 7 n.8, 7 n.9 (clarifying discussion of the average number of suicides per year); *id.* at 2, 8, 12, 16, 17, 19, 20, 21, 22, 23, 24, 25, 31 (clarifying the use of the terms "rate" and "percentage" throughout the Report); *id.* at 11-12 (clarifying discussion of incidence of suicide among ethnic groups); *id.* at 8 n.10 (explanatory footnote regarding discussion of demographic trends in CDCR suicides); *id.* at 16 (clarifying discussion of suicide by security level); *id.* at 18-19 (clarifying discussion of suicide by housing type); *id.* at 23, 26 (clarifying discussion of deficiencies in mental health treatment and evaluation).

[9] *See* Appendix A at 7 (revisions to discussion of Case A); *id.* at 58, 61, 62 (revisions to discussion of Case M).

## IV.    <u>CONCLUSION</u>

In 2018, the suicide rate among incarcerated persons in CDCR's custody reached its highest level – 26.3 deaths per 100,000 – in 20 years.  Report at 1.  A CDCR inmate committed suicide every 10.7 days in 2018.  *Id.*  More than half of these deaths by suicide were determined to be foreseeable, preventable, or both.  *Id.* at 29.

The Special Master agrees with the conclusions included in his expert's Report.  Because these conclusions track prior court orders and the general mission of the Suicide Prevention Management Workgroup, they need not be reiterated in additional court orders at this time.  Accordingly, the Special Master requests that the court adopt in full the attached Report by Dr. Sharen Barboza, Ph.D. on Completed Suicides in the California Department of Corrections and Rehabilitation from January 1, 2018 through December 31, 2018.

Respectfully submitted,


<u>/s/ Matthew A. Lopes, Jr., Esq.</u>
Matthew A. Lopes, Jr., Esq.
Special Master

May 13, 2021

# EXHIBIT A



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Michael S. Nunez
Email: mnunez@rbgg.com

April 20, 2021

VIA ELECTRONIC MAIL ONLY

```
┌─────────────────────────┐
│  PRIVILEGED AND         │
│  CONFIDENTIAL           │
│─────────────────────────│
│  SUBJECT TO             │
│  PROTECTIVE ORDERS      │
└─────────────────────────┘
```

Matthew A. Lopes, Jr.                    Nicholas Weber
Coleman Special Master                   Melissa Bentz
Pannone Lopes Devereaux & O'Gara         Sundeep Thind
317 Iron Horse Way, Suite 301            CDCR Office of Legal Affairs
Providence, RI                           Nicholas.Weber@cdcr.ca.gov
mlopes@pldolaw.com                       Melissa.Bentz@cdcr.ca.gov
                                         Sundeep.Thind@cdcr.ca.gov

Re:    *Coleman v. Newsom*:  Plaintiffs' Comments Regarding the Special Master's
       Draft 2018 Annual Suicide Report
       Our File No. 0489-03

Dear Special Master Lopes:

I write to outline Plaintiffs' comments concerning the Special Master's Draft
Report on Suicides Completed in the California Department of Corrections and
Rehabilitation January 1, 2018 – December 31, 2018 ("Draft 2018 Report" or "Report").
We received a copy of this Report on March 22, 2020 and appreciate the thorough review
of these most critical issues.

We request that the Special Master revise Section III(F)(2) of the Draft 2018
Report—the section discussing issues with emergency responses to patients—by adding a
discussion of the multiple 2018 suicides that involved delays associated with application
of wrist and leg restraints to patients before initiating emergency medical care.  This was
a significant problem in 2018, which has persisted and indeed gotten worse in subsequent
years.  The draft Report should be revised to note the problem.

**PRIVILEGED AND CONFIDENTIAL**
Matthew A. Lopes, Jr.
CDCR Office of Legal Affairs
April 20, 2021
Page 2

    In the Appendix, the Special Master's expert identified four 2018 suicides in which first responders applied either wrist or leg restraints to patients before providing emergency medical care. App'x at 8 (Case A); App'x at 59 (Case M); App'x at 107 (Case V); App'x at 157-58 (Case FF). However, the Draft 2018 Report does not address these troubling applications of restraints in the body of the report even though the case reviews note that CDCR revised its suicide prevention curriculum to clarify that "restraints should not be used prior to utilizing the cut-down kit and initiation of CPR with general population inmates." *Id*. at 158.

    Review of the 2019 and 2020 suicides unfortunately makes clear that application of restraints to patients in life threatening situations remains a serious problem despite this revision to the suicide prevention training. From our review, in 2019, at least three suicides across two different institutions, MCSP and CMF, involved application of restraints to patients before initiating emergency medical care. *See* Alberto Ruekel, J18253 (staff applied handcuffs while Mr. Ruekel was rapidly bleeding out); Gabriel Armendariz, AE7243 (Mr. Armendariz had hung himself, and staff handcuffed and secured leg restraints on Mr. Armendariz); Isidro Hernandez, F53537 (Mr. Hernandez had hung himself, and staff handcuffed him before cutting him down and initiating life saving measures).

    In 2020, the troubling application of restraints to patients in need of immediate medical care became more widespread. Last year, our review found that at least seven suicides involved application of restraints to patients before providing them with emergency medical care. *See* Jimmy Martinez, BJ3310, SAC (Mr. Martinez was handcuffed before being cut down); Mitchall Taylor, BD2534, COR (emergency responders did not commence CPR until after applying handcuffs and leg restraints); Alejandro Alaya , BC8490, RJD (staff applied handcuffs to Mr. Ayala before cutting the sheet off his neck and initiating CPR); Clavion Banks, AD5106, SAC (staff did not initiate emergency medical care until after applying handcuffs and leg restraints); Danny Black, E47981, CCI (staff handcuffed Mr. Black before cutting him down and providing emergency medical care); Alvin Luckel, C20324, SAC (staff applied wrist restraints to Mr. Luckel before initiating CPR); Kevin Maldonado, AH2843, MCSP (staff handcuffed Mr. Maldonado before initiating emergency medical care). These incidents occurred at five institutions: SAC, COR, RJD, CCI, and MCSP.

    Particularly because these troubling delays in providing emergency medical care are growing in frequency, it is important that the Special Master directly address this issue in the body of the Report in order to document the problem for appropriate Court and public oversight.

[3722186.3]

**PRIVILEGED AND CONFIDENTIAL**
Matthew A. Lopes, Jr.
CDCR Office of Legal Affairs
April 20, 2021
Page 3


      We appreciate the Special Master's consideration of our comments on the thorough and detailed Draft 2018 Suicide Report.

                             Sincerely,

                             ROSEN BIEN
                             GALVAN & GRUNFELD LLP

                             */s/ Michael S. Nunez*

                    By:   Michael S. Nunez

MSN:can

# EXHIBIT B

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



April 21, 2021

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write in response to your March 22, 2021 draft Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2018 – December 31, 2018 (hereinafter referred to as "the Special Master's Expert's Report" or "2018 Report"). CDCR remains concerned that the Special Master's Expert's Report duplicates self-monitoring already conducted by CDCR. CDCR has established a means of self-monitoring by publishing its own annual reviews of suicides, including those completed in 2018.[1] CDCR critically reviewed every suicide that occurred in 2018, assessed policy violations that occurred in connection with the reported suicides, and implemented corrective actions to prevent the same or similar policy violations in the future.

Your stated purpose for reporting on annual suicides is CDCR's "refus[al] to draft their suicide reports in a manner consistent with existing court orders with respect to foreseeability and preventability determinations." (Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017, ECF No.7077 at 4.) But, as Defendants have repeatedly stated, no court order mandates that annual suicide reports must contain "foreseeability/preventability" determinations. (See Defendants' Objection to the Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017. ECF No. 7098 at 5.) CDCR reiterates that the utility of "foreseeability" and "preventability" determinations are questionable, the analyses are not consistent with current community standards and practices, and the determinations divert attention from systemic improvements that would further enhance suicide prevention efforts and patient safety. (Id. at 5-6.) For these reasons, the field of mortality review has largely shifted away from the narrow foreseeability/preventability determinations to a more holistic approach focused on quality improvement. (Id.) The Special Master's addition of an outmoded "foreseeability" and "preventability" analysis does not warrant the need for the Special Master to produce an entirely separate report.

---

[1] On February 1, 2021, CDCR published its 2017-2019 Aggregate Suicide Report on its public website. CDCR's 2017-2019 Aggregate Suicide Report can be accessed on its public website at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf (last accessed on 2/26/2021.)

Special Master Lopes
Page 2

The Special Master's Expert's report duplicates the data and feedback already found in CDCR's own transparent reporting. CDCR's own reports, as well as CDCR's comprehensive annual suicide prevention report to the Legislature pursuant to Penal Code section 2064.1, provide the feedback and information that will help CDCR prevent suicides within its institutions. CDCR is in a position to take immediate action when identifying suicide trends and policy violations, and CDCR can measure the effectiveness of any Corrective Action Plan or policy revision once implemented.

CDCR provides the following additional detailed comments and objections.

I. **Including an "In-State Only" Suicide Rate per 100,000 Inmates Misleadingly Inflates the Actual Suicide Rate and Fails to Account for All CDCR Inmates.**

The table on page 5 of the Special Master's Expert's Report provides two calculations of CDCR's suicide rates per 100,000 inmates from 1999 to 2018, one of which is based on CDCR's in-state population only. The in-state only calculation misleadingly inflates the suicide rate for all years because it does not include the total population for which CDCR is held accountable. Inmates housed out-of-state are subject to CDCR's suicide prevention policies and Title 15, including conducting a Suicide Report. Because CDCR is responsible for ensuring the safety and security of in-state inmates as well as out-of-state inmates, the Special Master's Expert's Report must include both populations to fairly evaluate CDCR's suicide rate. Reliance upon CDCR's "in-state" only rate is misleading in that it unfairly inflates the suicide rate of the total population for which CDCR is responsible.

In his previous report, the Special Master stated the inclusion of the in-state rate is reasonable because it allows "for comparison between the [Special Master's expert's] 2017 Report and prior annual suicide reports [conducted by the Special Master], which only included in-state inmate suicide rate," and CDCR's own 2015 annual suicide report calculated an "in-state" suicide rate to ensure consistency with past reports prepared by the Special Master's team. (Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017, ECF No.7077, at 5.) Neither reason justifies the continued practice of misleadingly inflating CDCR's suicide rates by including in-state only rates.

First, prior suicide reports by the Special Master's experts have used total, not in-state, population to calculate suicide rates. The 2018 Report states that in-state suicide rates prior to 2015 were taken from the Special Master's expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2014 – December 31, 2014, at page 3 (hereinafter referred to as "2014 Report"). (2018 Report at 5 fn. 4.) However, the 2014 Report uses total, not in-state, population numbers to calculate the suicide rate. The 2014 report states that "[t]he rate of CDCR inmate suicides in 2014 was 16.97 per 100,000 based on a reported CDCR inmate population of 135,481 as of June 30, 2014." (2014 Report, ECF No. 5428 at 2.) CDCR's in-state population was 126,704 on that date, while its out of state population was 8,870, for a total population of 135,481.[2]

---

[2] CDCR Public Website, Population Report, Archives, population as of midnight June 30, 2014.

Second, CDCR's inclusion of in-state population-based suicide rates in its 2015 suicide report reflect CDCR's efforts to reach an agreement with the Special Master to take over reporting requirements.  However, even CDCR's 2015 report noted that in-state population-based suicide rates are inappropriate.  CDCR's 2015 report states that "[t]he rate including the out-of-state population is the more meaningful number, as out of state suicides, when they occur, are included in the rate calculations.  Furthermore, these individuals were remanded to CDCR custody which maintains responsibility for their welfare."  (Special Master's Report on his Expert's Analysis of the California Department of Corrections and Rehabilitation's Annual Suicide Report January 1, 2015 – December 31, 2015 and his Expert's Review of Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2016 – December 31, 2016, Appendix A, ECF No. 7038-1 at 22.)

Lastly, the Special Master fails to provide any justification, utility, or purpose for including in-state only rates.  The use of inflated suicide rates are misleading and not meaningful, and CDCR objects to their inclusion in annual suicide reports on that basis.

## II.     Comparison to Other Large Prison Systems in the Country Is Arbitrary and Lacks Foundation.

The Special Master's Expert's Report at pages 5 and 6 compares CDCR's population and suicide rate with ten other "large prison systems," stating CDCR's "suicide rate is the 4th highest rate out of the ten largest correctional systems."  First, CDCR objects to the comparison because the analysis does not account for the different demographics, populations, applicable laws, and other variables.  Furthermore, the Special Master's rationale that "other large prison systems are '*likely* to be more similar to California in their dynamics and processes'" is without basis and fails to disprove that smaller prison systems might have more relevant policies and procedures to CDCR than larger institutions.  (*See* Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017, ECF No.7077, at 5-6, *emphasis* added.)  In short, a comparison based solely upon size of prison system and no other factors is arbitrary and objectionable.

## III.    Numerous Omissions and Unclear Averages Appear in the Table on Pages 7 through 8.

On pages 7 through 8, the report includes a table of CDCR institutions comparing the number of 2018 suicides, the number of suicides from 1999-2017, the number of suicides from 1999-2018, and the average number of suicides from 1999-2018.  This table is particularly confusing, especially the inclusion of columns showing the number of suicides from 1999-2017 and another column showing suicides from 1999-2018.  Additionally, the table includes only CDCR institutions and omits out-of-state institutions, California City Correctional Facility, and the Department of State Hospitals.

Second, it is unclear how the expert calculated the averages in the last column and whether those calculations are correct.  For instance, California Health Care Facility did not begin receiving patients until August 2013.  Kern Valley State Prison did not open until 2005.  Yet, these two institutions were seemingly included in calculations that predate their delivery of mental

healthcare. Additionally, CDCR began to use out-of-state facilities in the mid-2000s. It is unclear whether the expert calculated the annual average by dividing each institution's total suicide deaths by the number of years listed in the table or the number of years the institution was open. CDCR requests the Special Master's expert include an explanation of how the averages in the last column were calculated.

## IV.    Interchangeable Use of Percentage and Rate on Page 11.

On page 11 the first sentence of the second paragraph reads "the *percentage* of suicides among Hispanic/Latinx inmates, a *rate* that has consistently been increasing since 2015." (*Emphasis* added.) The expert uses percentage and rate interchangeably. Common practice in the Annual Suicide Reports is to use "rate" to refer to suicide rates per 100,000 and "percentage" when referring to a numerator divided by 100. Using rate and percentage interchangeably causes confusion to the reader on what ratios are being referenced. The use of "rate" should be changed to "percentage" to avoid confusion.

## V.    Comparative Proportions of Suicides Among Ethnic Groups Compared to CDCR's Population Are Inaccurate.

On pages 11 and 12, the expert reported comparative proportions of suicide percentages among ethnic groups compared to the proportion of CDCR inmates in the same ethnic groups from 2015 through 2018. The 2018 Report states "[t]hese patterns have remained constant over the previous four years." In 2015 and 2018, there were statistically significant differences between the proportion of different ethnic groups within CDCR and the proportions of different ethnic groups in the suicide population. For instance, in 2015, the suicide population skewed toward Caucasian inmates, whereas in 2018 it skewed toward Hispanic/Latinx inmates. The expert's statement is inaccurate because the patterns were not constant over the four-year period of time. CDCR requests that the expert change the statement to better reflect the data.

It is also unclear why the expert described the percentage of Hispanic/Latinx suicides as a marked increase over the last four years, but the percentage of Caucasians suicides as a slight increase in percentage. (*See* 2018 Report at 11.) The table below shows in 2018 the Caucasian CDCR population to suicide ratio was over-represented by 8% (an over-represented increase of 2% from 2017), whereas Hispanic/Latinx was over-represented by 6% (a 3% increase from 2017). More notably was the "Other" ethnic population that was over-represented by 11%. CDCR requests the expert modify the report accordingly, and strike the misleading and inaccurate conclusions that "Inmates of Hispanic/Latinx ethnicity continued to die by suicide at a higher rate than would be expected given their overall rate within CDCR . . ." (2018 Report at 2, 30.)

| Over/Under Represented | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| African American | -8% | -18% | -8% | -25% |
| Caucasian | 32% | 11% | 6% | 8% |
| Hispanic/Latinx | -26% | 1% | 3% | 6% |
| Other | 1% | 4% | 0% | 11% |

## VI.    Year-Over-Year Comparison of Inmates Who Committed Suicide in Certain Age Groups Lacks Adequate Data.

In the "Age" section of "Individual Suicide Risk Factors," the expert makes demographic comparisons between the CDCR general population and the population of inmates who committed suicide in 2018.  (2018 Report at 12.)  For instance, the expert found that "those aged 45-54 were overrepresented and all other age groups were under represented" because those aged 45-54 make up 43% of the suicides in 2018, but only 18% of the total CDCR population in 2018.

| Age Range | Percentage 2018 CDCR Population | Percentage 2018 Suicides | Percentage 2017 Suicides | Percentage 2016 Suicides | Percentage 2015 Suicides |
|---|---|---|---|---|---|
| 18-24 | 9% | 6% | 16% | 4% | 8% |
| 25-34 | 32% | 23% | 39% | 19% | 33% |
| 35-44 | 26% | 21% | 35% | 41% | 17% |
| 45-54 | 18% | 43% | 6% | 4% | 17% |
| 55+ | 15% | 6% | 3% | 33% | 25% |

However, the expert then determines that suicides in the same age group were under represented in the prior three years.  "When compared to the previous three years, as listed in the table above, 2018 was marked by the highest difference in the 45-54 age range with a much higher percentage of deaths by suicide among that group than in previous years."  (*Id*. at 13.)  CDCR objects to this finding because the expert provides no demographic comparison data for the years 2015 through 2017.  Such a comparison cannot be made without this additional data.

## VII.    Findings That Suicides Amongst Certain Demographics Increased or Decreased Year- Over-Year are Not Controlled for Total CDCR Population.

The following sections include findings of whether certain demographics of the 2018 suicide population increased or decreased as compared to prior years:

- Marital Status
- Education
- Primary Language
- Health Status/Medical Condition
- Security Level
- Crime Type
- Sentencing Factors
- Housing Type
- Housing based on Safety Needs
- Cell Type
- Custody Checks
- Job Placements while Incarcerated
- Interfaculty Transfers
- Rules Violation Reports
- MH Services Levels
- MH Treatment Prior to Incarceration
- Primary Mental Health Diagnosis
- Substance Use History
- Previous Non-suicidal Self-Injury
- Previous Suicide Attempts
- Involuntary Medications
- Trauma History

These sections appear to lack comparable data necessary to make such a finding.  For instance, the marital status section reads:

Of the 34 inmates who died by suicide in 2018, 25 (74 percent) were never married, five (15 percent) were married, two (6 percent) were divorced, and two (6 percent) were widowed. In 2017, 77 percent were never married, 10 percent were married, 7 percent were divorced, and 3 percent were separated. Information was not available regarding the marital status of one inmate who died by suicide in 2017. *When compared to 2015 and 2016, those who were never married made up a higher percentage in 2018, as was true in 2017. In 2016, this group represented 48 percent of the deaths by suicide and in 2015, those who were never married represented 54 percent of the deaths by suicide.*

(2018 Report at 13, *emphasis* added.)  Without considering the total CDCR population, year-over-year changes may be partially or wholly unrelated to suicide risk factors since they could also be attributed to natural changes in the CDCR population over time.  For this reason, suicide rates are reported per 100,000 inmates in order to control for population changes and thereby consistently compare year-over-year changes.  As drafted in these sections, the report improperly suggests that risk factors are rising or falling over previous years.  In order to better make findings of year-over-year factors for these various demographics and risk factors, the report should control for population by reporting on the relative *rate* as compared to prior years.

## VIII.    CDCR Does Report the Actual Number of Inmates Who Meet Criteria for a Given Security Level.

In the "Security Level" discussion on page 15, the expert states, "the CDCR population was examined as a whole, 36.1 percent of beds were classified as Level III and Level IV in 2018…" and notes "the CDCR reports the number of beds allotted to each security level, *rather than the actual number of inmates who meet criteria for a given security level*."  (2018 Report at 15 fn.19, *emphasis* added.)  However, CDCR does report the actual number of inmates in each security level; this information can be found in the same report cited by the expert in Table 1.9, "In Custody Population by Inmate Classification Score" on page 9.  CDCR requests the 2018 Report be updated to reflect the actual number of inmates in each security level, rather than the number of beds, and footnote 19 to be modified accordingly.

## IX.    Request for Clarification Regarding the Two Suicides Occurring in the Correctional Treatment Center.

On page 18, the expert reported that two suicides occurred in the Correctional Treatment Center (CTC).  CDCR believes it would be informative to the reader if the report noted that one patient was in the CTC for medical issues while the other patient was being treated for mental health symptoms.  CDCR requests the report be updated accordingly.

## X.    Request for Clarification Regarding Statistics in Sections E and F of the Expert's Report.

In sections III. E. "Mental Health Evaluation and Treatment Factors" and III. F. "Emergency Response Factors" the expert reports on percentages of cases with noted deficiencies. (2018 Report at 23-25.)  The 2018 Report fails to note whether the percentages derive from the findings in CDCR's Suicide Reports, or from an independent review conducted by the Special

Special Master Lopes
Page 7

Master's experts.  The 2018 Report should be revised to clarify the source of the percentages reported.

## XI.    Defendants Request Specificity Regarding Inadequate Suicide Reports.

Section G, "Individual Suicide Case Reviews," states that only 76% of suicide reports were deemed adequate by the expert.  (*Id*. at 26.)  CDCR requests the expert provide a summary that outlines which reports were found to be deficient in the expert's view and the reasons for those particular deficiencies.  CDCR requires this information so that it can use the 2018 Report to make improvements to the areas deemed inadequate.

## XII.   Determinations of "Foreseeability" and "Preventability" in the Manner Presented in the Report May Be Counterproductive in a Mortality Review Context and Hinders Quality Improvement Effort.

The Special Master's Expert's Report states the "foreseeability" and "preventability" analyses can "describe the adequacy and implications of CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgement, and utilization of clinical and custodial alternatives to reduce the likelihood of completed suicides." (2018 Report at 27.)  The statement that the "foreseeable" and "preventable" analysis can reduce the likelihood of completed suicides is conclusory and not supported by evidence.  In fact, the Special Master ignores this pressing and important argument by simply referencing the court's statement made at the December 18, 2020, Status Conference ("there's a passing acknowledgement of the Court's adoption of those definitions").  (Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017, ECF No.7077 at 4-5 fn.6.)  The Special Master's assumption that the foreseeability and preventability analyses can "reduce the likelihood of completed suicides" lacks factual support, is an outdated manner of conducting mortality reviews, and grossly ignores the evidence of community standards to the contrary.[3]

As previously stated, many experts question the utility of foreseeability and preventability determinations in a mortality review context.  Among other things, foreseeability[4] and preventability determinations in the manner requested by the Special Master not only often result in arbitrary, methodologically unreliable labels, but also do not adequately acknowledge that deaths occur in a complex system and that causative factors beyond proximate cause of death are potentially important for identifying opportunities for improvement.[5]  Ultimately, such narrow foreseeability and preventability determinations frequently divert attention away from opportunities for improvement that will lead to system-wide quality improvement and patient safety.

---

[3] Williams, B., Ahalt, S., Witt, L. (Final Report, Sept. 27, 2018). Assessing Medical Systems for the California Prison Health Care Receivership Corporation: Mortality Review Policy and Practice. The Criminal Justice & Health Program at UCSF, 3-4. https://cchcs.ca.gov/wpcontent/ uploads/sites/60/UCSF/Mortality-Review-Report.pdf

[4] The specific term "foreseeability" is not addressed in Dr. Brie Williams's Final Report. However, the term is as problematic as the term "preventability" because it focuses on identifying past proximate causation rather than future opportunities for improvement.

[5] *Id*. at 4.

That is why the field of mortality reviews itself has largely shifted away from narrow foreseeability and preventability determinations to a more holistic approach that focuses on opportunities for improvement.[6]  Under the modern view, a well-performing mortality review system will identify "opportunities for improvement" leading to "quality improvement, patient safety, and/or clinical education responses (immediate change) or initiatives (longer term) that are then evaluated to determine whether they yielded improvements along relevant clinical benchmarks."[7]  This system requires the buy-in and participation of multiple actors who may be less willing to participate if the focus of the review is on foreseeability and preventability determinations whose purpose is to identify the person (or people) to blame for allegedly causing death.[8]  Accordingly, for the mortality review system to work properly—and to increase motivation for practice modifications and constantly promote organizational learning—there must be a shift away from terms like "foreseeable" and "preventable" and towards assessments that focus on opportunities for improvement.[9]  At the same time, such assessments should include staff level remediation, including training and accountability measures where appropriate.

CDCR objects to section III, *I.* "Foreseeability and Preventability" (2018 Report at 27-29), and requests that section be removed from the Report.

## XIII.  Issues with Case Summaries in Appendix A of the 2018 Report

### A.    Case A: Analysis of Quality Improvement Plan Process

On page 7[10] of Appendix A, the expert states "the use of restraints upon discovery of the inmate was likely unnecessary, given that he was a general population inmate. He had severe wounds on his wrists and was cuffed on two occasions, behind his back and then in front of his body. It is unknown how this process may have affected his care during this critical time."  Use of restraints were necessary and appropriate because the patient was discovered bleeding and had admitted to using a weapon (razor) to cause the injuries.  Proper procedure requires staff to secure the scene and safely provide life saving measures.  CDCR requests the paragraph be struck from Appendix A and the expert update the 2018 Report accordingly.

### B.    Case M: Analysis of Quality Improvement Plan Process

On page 59 of Appendix A, the expert states "[t]he delay in rendering aid due to the custody staffs' retreat from the inmate's cell door, assembling of an emergency extraction team for an inmate described as polite, quiet, and not problematic, and suit up in extraction gear was also not addressed."  The delay resulting in forming an extraction team and donning the appropriate gear was not addressed in the Suicide Report because the responding supervisor made an appropriate executive decision to proceed with entry into the cell after taking necessary precautions for conducting a cell extraction (Patient M was housed in the Adjustment Center, and was a

---

[6] *Id.* at 14-15 (recommending that performance be tracked without relying on subjective and often variable assessments of "preventability" to emphasize quality improvement via identification of opportunities for improvement).
[7] *Id.* at 5.
[8] *Id.* at 4.
[9] *Id.*
[10] Pages referenced are the page numbers found at the bottom of Appendix A, Case Summaries, of the 2018 Report.

Special Master Lopes
Page 9

Condemned patient). (*See* CDCR Departmental Operations Manual, section 51020.12.2 "Extractions.") The patient being described as "polite" and "courteous" would not excuse an immediate supervisor from taking necessary safety precautions to protect staff from a potentially dangerous situations. CDCR requests the expert strike this sentence from the 2018 Report.

Thank you for your consideration of these objections and comments prior to finalizing this report.

Sincerely,

/s/ **Dillon Hockerson**

DILLON HOCKERSON
Attorney
Office of Legal Affairs