**APPENDIX A**

**CASE SUMMARIES**

Case A

I.  <u>Summary of Case</u>

This inmate was a 44-year-old American Indian man who was found by a correctional officer crouched on the floor, his face in the toilet, with blood on his body and on the cell floor in his solely-occupied cell on November 10, 2018.  He was receiving mental health services at the Enhanced Outpatient Program (EOP) level of care at the time of his death.  The results of toxicology testing indicated that methamphetamine intoxication was a contributing factor in his death.  He also had morphine in his system at the time of his death.

The inmate was born and raised in California on tribal lands.  Minimal information about his childhood was available; although records indicated that his father was frequently incarcerated, and his mother was noted to be either absent from the home doing missionary work or neglectful of her children and often under the influence of drugs.  He was sexually abused by his stepfather at age nine.  He was raised by a maternal aunt and later placed in foster homes and group homes.  He reported joining a gang at age 12 and engaging in criminal activity as a juvenile which resulted in placement in detention camps.  His juvenile criminal history included burglary, robbery, assault with a deadly weapon, vehicle theft, and receiving stolen property.

He received the General Educational Development (GED) after dropping out of school in the eleventh grade.  He did not have a significant employment history.  Records indicated that he was married three times and was married at the time of his death; however, he did not maintain contact with his wife.  He had four children during one of his earlier marriages and maintained contact with the mother of his children.  He also had regular contact with his mother and a female friend.  He had visits over the course of his incarceration, the most recent with his mother on October 21, 2018 and his ex-wife and one daughter on October 27, 2018.  He had frequent phone calls with a friend who was barred from visiting him in 2016 due to her passing contraband.  Calls with this friend appeared to center on monetary transactions to other inmates to cover the inmate's drug debts.  Additionally, the inmate mailed a number of boxes filled with his property to this friend approximately one month before his death.  Interviews conducted following the suicide revealed that officers were aware that he had done this.

Records indicated that the inmate had an extensive substance use history beginning at age ten.  He reported using methamphetamine for the first time at age 12.  He also reported using heroin, cocaine, marijuana, and alcohol.  At the time of his death, the inmate was noted to be intoxicated on methamphetamine.

The inmate entered California Department of Corrections and Rehabilitation (CDCR) for his fourth and final period of incarceration in July 2012.  He was sentenced to 20 years and eight months for evading a police office, driving under the influence and a violating his parole.  He had three previous incarcerations in CDCR beginning in 1995.  Previous convictions included second degree attempted murder, great bodily injury, use of a

1

deadly weapon, and evade or attempted evade of a peace officer while driving recklessly. During his first prison term, he affiliated with a gang, but in 2001, he disassociated from the gang. Upon his final incarceration in 2012, he was programmed on a Sensitive Needs Yard (SNY) due to dropping out of the gang during a previous incarceration. He was placed in Administrative Segregation Unit (ASU) on occasion during 2015 and 2016 due to drug-related Rules Violation Reports (RVRs). During the course of his incarceration, he received 14 RVRs, ten of which were for drug-related violations.

Three of his final four RVRs, received between June 2016 and June 2017, were for delaying a peace officer, and the fourth was for arson. At least one of these RVRs was related to his fears of being assaulted by other inmates and mistrust of correctional officers. Records indicated that in June 2016, the inmate reported that he had concerns that other inmates were going to kill him, and he needed to be removed from the yard. Days later, he set his cell on fire. The Suicide Case Review (SCR) noted that the inmate had regularly been expressing safety concerns since 2013 regardless of his setting and his safety concerns were unfounded and uncorroborated. Less than one month later, the inmate reported that an officer let other inmates into his cell to sexually assault him. The SCR noted that a subsequent medical examination noted injuries "that could have been consistent with a sexual assault but the results were inconclusive." Following this report, the inmate also made allegations that his cellmate had videotaped the assault, sent the video to his ex-wife and that nursing staff played the video through the vent each night so he and other inmates could hear it. The inmate made a second allegation of sexual assault by other inmates in June 2017 and accused officers of being part of "the conspiracy." Information related to the forensic medical examination conducted was unavailable in the inmate's records. The inmate filed appeals associated with both of these alleged sexual assaults, however, both were denied due to the issues having been properly addressed.

The inmate reported receiving counseling in 2007 related to divorce and child custody issues. There was no record that he received mental health services in the community or during previous incarcerations. During his most recent incarceration, the inmate was placed at the Correctional Clinical Case Management System (3CMS) level of care in June 2014 and provided with a diagnosis of Adjustment Disorder with anxiety and depressed mood as well as consideration of a diagnosis of Posttraumatic Stress Disorder (PTSD). He remained at this level of care until May 2016 when he was admitted to the Mental Health Crisis Bed (MHCB) level of care following an incident of cutting his wrists with fingernail clippers. At that time, he also expressed bizarre beliefs about officers broadcasting inmate activities on a closed-circuit television network and was observed to be experiencing auditory hallucinations. The inmate shared with MHCB staff that he had been using methamphetamine at the time. He was discharged to the EOP level of care, but quickly returned to the MHCB and eventually he was admitted to a Psychiatric Inpatient Program (PIP) in August 2016.

The inmate received services in the PIP to address depression and psychosis for seven months. He was responsive to treatment, attended groups, was medication adherent, and maintained contact with his family during this time. He was discharged from the PIP in March 2017 to an EOP at the facility where he had reported being sexually assaulted. He vacillated between the EOP and MHCB levels of care during the following months and, as noted above, made an additional allegation of sexual assault. He returned to the PIP in June 2017 for three months. It was noted that when in a PIP, the inmate functioned well, made fewer persecutory statements and demonstrated fewer psychiatric symptoms.

He was discharged from the PIP back to the EOP where he reported being assaulted in September 2017. One month later, he attempted suicide by cutting his wrists. He used methamphetamine the morning of this attempt and believed officers were plotting against him. He was placed at the MHCB level of care for nearly two weeks before being transferred to a PIP on November 10, 2017. He was placed in the acute inpatient program to address his symptoms of depression, mood swings and psychosis. He wanted to avoid returning to the same EOP facility where he reported the previous sexual assaults, and also stated that he wanted to work on anger, paranoia and substance abuse. During that stay, the inmate reported experiencing back pain and difficulty walking.

In February 2018, the inmate was "administratively discharged" from the PIP due to medical complications related to a sepsis infection. He was placed on a five-day follow-up, but he was only seen for four days. The inmate was housed in the Correctional Treatment Center (CTC) where he was placed at the EOP level of care on modified programming. He asked that his treatment focus on reality testing and substance abuse. During the three months in the CTC, he was seen almost weekly by a primary clinician. There were three weeks during this period when he was not seen. These missed appointments were out of compliance with the Program Guide. He returned to the PIP on May 25, 2018. There was no indication that a treatment plan was created at the time of discharge from the EOP back to the PIP, nor was there a consultation note outlining his course of treatment in EOP to include reality testing and substance abuse. The SCR noted that this lack of documentation "contributed to the overall lack of continuity of clinical care."

While in the PIP, he made passive suicidal statements but was seen as having a euthymic mood. He requested treatment to address his substance abuse and to learn coping skills. He reported periodic auditory hallucinations. On June 21, 2018, he was discharged from the PIP acute program to a PIP Intermediate Care Facility (ICF). He continued to report mild and passive suicidal ideation but was noted to function well in the ICF through September 14, 2018, when he reported feeling unsafe on the unit due to problems with other inmates and experiencing suicidal ideation. Later that day, he reported that he had used methamphetamine for the previous five days, which was confirmed by a drug test. On September 26, 2018, the inmate was discharged from the ICF due to drug use without clinically appropriate rationale for the discharge. The SCR noted that recent drug use, paranoia, and safety concerns were precipitants of suicide attempts in the past, all of

3

which were present for the inmate at the time of discharge. Additionally, he was once again scheduled to return to the EOP where he reported feeling unsafe and having been sexually assaulted in the past, as well as the location of two previous suicide attempts. These risk factors were not acknowledged, documented nor raised as concerns by his ICF treatment team.

The inmate returned to the EOP on October 1, 2018. He was seen for five-day follow-up, and on the fourth day he reported using substances two days prior and planned to cut his wrists. He was transferred to the MHCB on October 5, 2018. He reported that he feared for his life from both custody officers and other inmates related to his previous allegations of sexual assault. He reported concerns that officers were assisting other inmates in being able to sexually assault him and reported that he was being taunted by other inmates. He stated that he stayed up at night to avoid being attacked. He was quoted as stating, "I don't want to hurt myself, but I really can't go back there." MHCB treatment focused on helping the inmate return to the EOP and to work with staff there to secure a transfer. His treatment plan and Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) were noted to be comprehensive, individualized, and addressed expectations for treatment in the EOP.

He returned to the EOP on October 9, 2018 and reported anxiety, as well as discord with the correctional officers on his housing unit. He reported "floating" suicidal thoughts, paranoia and feeling targeted by officers, but reported doing well in maintaining his sobriety during a contact with this primary clinician on October 16, 2018. His treatment plan was developed on October 18, 2018 and was noted to target his anger but none of his other reported symptoms or concerns, including suicidal ideation and previous attempts. The plan did not address the fact that the inmate was recently discharged from inpatient settings; this brought into question the thoroughness of a healthcare record review.

A review of his psychiatric care was completed and noted that psychiatry clinical notes were generally adequate in content, and his psychiatry contacts were timely. The review noted two occasions where medication adjustments were not accompanied by clinical documentation.

Over the course of his recent incarceration, the inmate received 23 suicide risk evaluations. His chronic risk was assessed as either moderate or high, and his acute risk ranged from low to high depending on his symptom acuity. The review noted concerns with some suicide risk evaluations and/or the process of evaluating his suicide risk. It was noted that upon transfer from the MHCB to a PIP in October to November 2017, there was no SRASHE completed at the time of discharge from the MHCB, and no admission SRASHE completed at the PIP, despite the fact that a suicide attempt precipitated his inpatient placement. The inmate's suicide risk was not evaluated over a four-month period during this time. In September 2018, he reported suicidal ideation due to safety concerns, and a comprehensive SRASHE was completed. However, a discharge SRASHE completed at the PIP later that month was noted to underestimate his acute risk factors, did not address his modifiable risk factors, warning signs, protective factors, nor

4

did it identify the most suitable level of care to address his needs. As noted earlier, this discharge was precipitated by the inmate's drug use rather than his clinical needs.

Following that discharge, the inmate received a SRASHE on October 5, 2018 during which he reported that he was not feeling well and thinking of cutting his wrist. Subsequent SRASHEs completed due to an MHCB placement were judged to be adequate and highlighted the need for increased monitoring upon return to EOP if his issues with custody officers could not be resolved.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert concluded that this suicide was foreseeable based on the findings that this inmate's previous suicide attempts were precipitated by drug use and feeling unsafe in his environment. Prior to his death, he had used drugs and had expressed fears about his safety within the EOP setting. These factors were not addressed nor considered during his treatment planning in the EOP. Had they been, the Interdisciplinary Treatment Team (IDTT) would have known of the risks and provided reasonable interventions to reduce those risks.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert found that this suicide was preventable based on the fact that the inmate did not receive substance use treatment which appeared to be a primary factor in his suicide attempts and ultimate death by suicide. The inmate reported wanting to receive treatment for substance use on more than one occasion, but instead, was discharged from a PIP following drug use.

Factors during the emergency response also contributed to the determination that this suicide was preventable. These included delays in contacting 911 and the failure of the medical staff to apply a tourniquet to control arterial bleeding. These issues were included in the California Correctional Health Care Services (CCHCS) Death Review Summary as areas for improvement.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case; however, there was no information included in the report about the treatment provided to the inmate, simply referring to treatment planning. Interviews with treatment staff revealed superficial descriptions of

the inmate's demeanor and presentation, but little information was provided about treatment or treatment response. A critical review of the treatment would have enhanced the findings and may have informed areas for improvement. The report included an error in that it stated the inmate was in a double cell but made no mention of a cellmate. The Crime/Incident Report (CDCR 837-A1) indicated that the cell was solely occupied by the inmate.

V.    Analysis of Quality Improvement Plan Process

There were 11 Quality Improvement Plans (QIPs) developed due to the SCR. Eight were related to mental health concerns and included failure to complete all five-day follow-up contacts, failure to engage in weekly EOP contacts while the inmate was on a modified program as required by the Program Guide, failure to include proper clinical rationale for a discharge from PIP following a positive drug test, failure of a treatment plan to address serious symptoms identified by the inmate, failure to complete required SRASHEs, inadequate assessment of risk factors and protective factors as part of a SRASHE intended to identify a suitable level of care, and the lack of psychiatric documentation to support medication changes on two occasions. There was one nursing QIP required to address the delay in activating 911. Two custody concerns required QIPs. One was the delay in activating the emergency medical system, and one was related to conflicting documentation produced during the emergency response. A responding nurse reported that the inmate was combative, yet there was no corroborating report by custody staff.

Two mental health concerns appeared to be adequately and thoroughly reviewed to determine their cause(s), and those causes were properly addressed through training. Issues with treatment planning were completed using record audits. Late SRASHEs were addressed with the use of memos. Poor integration of risk factors along with failure to identify appropriate levels of care were addressed through a memo issued at the statewide level. Additionally, the facility noted that these concerns would be further addressed following the hire of a new Senior Psychologist who would provide additional suicide prevention training for all clinical staff, IDTT training and to ensure supervisory presence in the PIP and in the IDTT meetings. Evidence of the training provided to date was submitted with the QIP. The facility's response included copies of the memos written and signed forms indicating that staff had read the memos. This response failed to determine if the use of memos was effective in correcting the identified issues. Additionally, evidence of training included training sessions that were completed prior to the inmate's death by suicide, and one sheet did not include a date. This response was inadequate.

Failure to include the full spectrum of inmate needs in the final treatment plan developed before his death was addressed by providing rationale for the failures in this one treatment plan and an audit of an additional nine treatment plans. No systematic issues were identified, and the rationale for the poor treatment plan developed prior to his death

was not satisfactory in the opinion of the Special Master's expert. The rationale appeared to be justification for the failures rather than an objective attempt to identify the root of the failures.

The failure of one clinician to complete a SRASHE during an inpatient stay was reviewed and determined to be based on staffing shortages, but also appeared to include the fact that the assigned psychologist did not know how to complete a SRASHE. The QIP response indicated that training was provided previously to all staff. This was inadequate as there was evidence that the previous training proved ineffective for at least one psychologist. Also, the individual psychologist's SRASHEs were noted to have been audited, but there was no evidence of this, and no outcome provided. Further, it appeared to the Special Master's expert that the issue of a psychologist not knowing how complete a suicide risk evaluation, failing to ask for assistance and thus failing to complete required evaluations should have been included in the QIP.

The lack of psychiatric documentation was addressed through discussion at a psychiatry staff meeting. Minutes were provided to demonstrate evidence of the discussion. Additionally, a review by the facility indicated that a note had been entered by the psychiatrist in the IDTT documentation explaining the medication change.

Nursing concerns were addressed through training which included a review of policy.

Both custody concerns were referred for investigation by the Office of Internal Affairs (OIA). The results of these investigations were unknown.

In addition to the above, concerns emerged that did not rise to the level of requiring a QIP. One concern was related to the transition from CTC back to PIP during which the mental health staff at the CTC failed to convey the inmate's request for treatment to address reality testing and substance abuse. The second was related to the fact that no tourniquet was applied during emergency response procedures by nursing staff.

Case B

I.    Summary of Case

This inmate was a 40-year-old Samoan man who was found by a correctional officer lying on his bunk, pale and lifeless with cuts to his neck and both forearms in his single cell in an SNY on June 20, 2018. He was receiving mental health services at the EOP level of care at the time of his death.

The inmate was born in California and was raised by both parents along with five siblings. The family moved often during the inmate's youth as his father was in the U.S. Air Force. The inmate reported that his parents were alcoholics. He reported that he was physically abused as a child but characterized this abuse as positive and a part of the

Samoan culture. The inmate stated that both his parents used objects and weapons to beat him. He reported that his parents were violent toward each other when intoxicated but described his father in very positive terms when he was not intoxicated. Prison records revealed that he had sporadic visits with his mother, a sister and two of his brothers during his incarceration, the last of which occurred in May 2018 while the inmate was in a PIP. The inmate did not have recent phone contact with his family during his incarceration.

The inmate reported fighting frequently during his childhood but denied having discipline problems in high school. He shared that at age five, he stabbed a girl in the palm of her hand because she scribbled on a picture he was coloring. He reported that he shot a dog and "blew up" frogs during childhood as well. His reports related to his education were inconsistent, noting that he either completed school through the eleventh grade or graduated from high school and attended two years of college. He reported that he failed his college coursework due to heavy alcohol use. The inmate reported drinking alcohol with his father at age five and moving to the use of illicit drugs at age 15. He reported using ecstasy, phencyclidine (PCP), marijuana, and methamphetamine.

The inmate never married and had no children. He reported being briefly employed in 2002 but was fired after punching a shoplifter. The inmate reported that he reacted to his termination of employment with severe anger which led to a series of criminal offenses ending in his incarceration for the instant offenses. He reported being intoxicated at the time. Records indicated that he had prior arrests for assault, harassment, and resisting arrest.

The inmate entered CDCR for the first and only time in August 2004 to serve a sentence of life without the possibility of parole for first-degree murder, four counts of attempted murder, assault with a semiautomatic firearm, and three counts of second-degree robbery. The SCR noted that he asked the judge for the death penalty. During the course of his 14-year incarceration, he received 16 RVRs, many of them for violence toward others, and many resulted in placement in the ASU. The victims of his assaults were varied and included an inmate who was a former crime partner, a transgender inmate, and a nurse at a community hospital where he was admitted for medical needs. He also received RVRs related to substance use.

The inmate had a difficult time with programming due to symptoms of his mental illness. His paranoia around staff and other inmates resulted in frequent isolation and removal from prison activities. He was single-celled for much of his incarceration due to his violence and psychosis. The SCR reported that he was given SNY status, but the reason for this status was not provided. The inmate frequently refused medical care including insulin for diabetes, resulting in health problems and contributing to his inability to care for himself.

There was no reported history of mental health treatment prior to incarceration, yet the inmate reported hearing voices and experiencing suicidal ideation as a child. Shortly

following his incarceration in 2004, the inmate was included in the 3CMS level of care after reporting depression and insomnia, and he was prescribed psychotropic medication. He reported additional symptoms of paranoia and irritability and demonstrated problems with his adjustment to prison over the next year. In January 2006, he attempted to kill his previous crime partner and threatened to kill any cellmate in an effort to receive the death penalty. In April 2006, he was transferred to the EOP level of care and was noted to be experiencing severe guilt, grandiose delusions with spiritual themes and suicidal ideation. In 2008, he committed battery on another inmate and was placed at the MHCB level of care. He was nonadherent with treatment, failed to maintain basic hygiene, and appeared more depressed. He reported wanting to die and to be placed on death row. In March 2008, he was placed on an involuntary medication order (PC 2602) due to danger to himself and danger to others. His symptoms did not appear to remit, and he was admitted to a Department of State Hospitals (DSH) inpatient unit in December 2009 and transferred to the ICF level of care in February 2010.

In January 2011, the PC 2602 was not renewed; although, there was no rationale provided for allowing it to lapse. He was admitted to DSH again in 2012 for nearly biting off his pinky finger and responding to command auditory hallucinations he believed to be from God. He was discharged as a treatment failure, the details of which were not reported in the SCR. In July 2015, the PC 2602 order was reinitiated after he seriously lacerated his neck and rammed his head into a wall. He returned to DSH in 2016 due to suicidal ideation and medication nonadherence. The SCR did not clarify how the inmate could be medication nonadherent with a PC 2602 order in place. He was discharged from DSH for reaching "maximum benefit", the details of which were not reported. Over the next two years, the inmate was transferred among various levels of care including EOP, MHCB, and inpatient settings. He continued to report that he believed CDCR planted a chip in his head and reported auditory hallucinations telling him he was the son of God. He was admitted to an MHCB in July 2017 for increased depression, suicidal ideation, a stated desire to die, and violent behavior. Following this MHCB stay, he spent 44 days at a CTC due to medical and psychiatric issues including failure to properly manage his diabetes, poor hydration, and self-starvation.

On October 18, 2017, the inmate cut his neck in a serious and severe attempt to take his life. He required a blood transfusion, needed to be intubated, and spent three days at a community hospital. He was admitted to the MHCB upon his return from the hospital. Documentation reviewed from the inmate's time in the MHCB was noted to be incomplete and of poor quality. Mental health assessments and mental status examinations were incomplete and made it difficult to track the inmate's progress over time. Treatment plans were also noted to be inaccurate, inconsistent, and poorly written.

The inmate was eventually admitted to a PIP for acute care on November 27, 2017 due to his unpredictable behavior and ongoing risk for suicide. The referral request included the need to aid the inmate in his reality testing and managing command auditory hallucinations which led to paranoid and suicidal behaviors. The referral also included a

request for the inmate to be placed at the ICF level of care following his acute treatment to assist with long-term stabilization. Despite the inmate's reports of auditory hallucinations, depression, ongoing suicidal ideation, a desire to die, and delusional ideation, his initial treatment plan was created to target a single symptom – anxiety. Later in the day, the treatment plan was updated to include depression but addressed no other symptoms. In December 2017, delusions were added as targets for treatment. During his inpatient stay, he was isolative but did not engage in self-harm. His delusions continued, but his overall distress had decreased.

On January 11, 2018, he was transferred to an ICF from the acute setting. Treatment planning appeared to address his needs including his psychosis, suicidal ideation, mood, and self-harm. Intermittently, he was removed from programming due to violence and agitation. He also broke a window in his cell and threatened staff. Documentation indicated ongoing delusions about staff spying on him, plotting against him, and poisoning him with insulin. He was treated in the inpatient setting through June 6, 2018.

Upon his return to the EOP, he reported feeling sad and wanted to be alone. He denied suicidal and homicidal ideation, and he rated his depression as low. Initial assessments completed in the EOP were inconsistent, inaccurate and failed to mention his recent PIP stay. His case formulation was based on a single interaction and failed to account for his history and other factors in this case. His treatment plan was developed to address impulsivity. Despite the inmate reporting being "borderline" suicidal, no SRASHE was completed, and no further inquiry into his suicidal thoughts was documented.

A documentation review revealed that the inmate attempted to kill himself during incarceration in 2006, 2008, 2009, 2012, twice in 2015, and in 2017. Suicide risk evaluations completed during the final year of his life were reviewed, beginning with those completed following his suicide attempt in October 2017. The suicide risk evaluation completed at that time was noted to be problematic with regard to documentation of significant risk factors and a poor safety plan. Subsequent SRASHEs completed during his stay in an MHCB were also noted to be poorly completed. A number of risk factors were inaccurate and/or missing, and his overall risk levels were poorly justified and were changed without rationale, and the list of risk factors across SRASHEs appeared unchanged. Three SRASHEs were completed between October 30, 2017 and November 21, 2017, and none included a safety plan; all three incorrectly documented a single suicide attempt in his history rather than the multiple attempts listed in his healthcare record. In the PIP, SRASHEs were not individualized and included content largely copied from previous assessments. Progress and change in risk were not documented until the time of discharge. Information contained in the discharge SRASHE and safety plan were not incorporated into follow-ups upon return to the EOP level of care. It was also noted that one of the five-day follow-up contacts was entered late. The inmate was seen by his primary clinician on June 14, 2018 when he made conflicting statements about suicidality; however, it did not appear that he was considered for a higher level of care. No SRASHE was completed at that time. On the morning of his

death, he submitted a healthcare request for immediate attention as his feet felt blistered, but he refused to participate in the assessment. He was noted to be alert and did not appear to be in any distress at the time.

During interviews conducted with other inmates during the suicide review, it was reported that the inmate was suicidal and made statements about suicide daily. The other inmates reported that staff were aware of the inmate's suicidality but did nothing to prevent it, yet none of the staff interviewed reported being aware of his imminent suicide. The clinical staff who were treating the inmate prior to his suicide reported that they noted no significant changes in the inmate that alerted them to his suicide risk.

II.   <u>Determination of Foreseeability</u>

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert concluded that this suicide was not foreseeable.

III.   <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert found that this suicide was preventable. This was based on the fact that during the final year of his life, clinical staff failed to accurately document and assess the level of risk posed by the inmate and failed to organize treatment to address these risks. Given his psychotic symptoms and the interplay between his psychosis and suicidal behavior, targeted, appropriate assessment and treatment would have reduced the likelihood of death by suicide.

IV.   <u>Critique of Suicide Case Review Report</u>

The SCR was an adequate summary of this case. It provided a thorough summary of the inmate's available criminal, social, and mental health history. It outlined the treatment team's failures and the QIPs followed from the findings in the case.

V.   <u>Analysis of Quality Improvement Plan Process</u>

There were ten QIPs developed due to the SCR, nine related to mental health services and one was a custody concern. The first mental health concern centered around poor and inconsistent documentation during the inmate's treatment in the MHCB in November 2017. Training was conducted, and ongoing mentoring and auditing was provided. Evidence was also provided. This response appeared adequate.

The second mental health concern was required to address the PIP treatment plan which was noted to only address anxiety, despite the inmate's psychotic symptoms and suicidality having precipitated his placement in the acute setting.  The treatment plan in question along with ten additional treatment plans were audited.  Deficiencies were noted throughout and were addressed through training and a memo to all staff.  The response appeared adequate.

The mental health assessment and treatment plan developed in June 2018, less than a week prior to his death, were problematic and required a QIP to address largely copied content, failure to document recent inpatient stay, failure to conduct a thorough records review, failure to address the inmate's psychosis and suicidality in treatment planning, and the inclusion of contradictory information.  Additionally, the primary clinician failed to complete a SRASHE or further inquire into the inmate's reported suicidal ideation.  The QIP response indicated that the clinician's documentation was reviewed and noted similar deficiencies to those found during the suicide review; additionally, the primary clinician's progress notes were noted to be lacking in documentation of treatment.  The primary clinician received mentoring and was transferred to another assignment in the facility under close supervision.  Evidence was provided.  This response appeared adequate.

Five QIPs were required to address problematic SRASHEs created across multiple sites and settings between July and December 2017.  The SRASHEs failed to develop adequate risk ratings based on the documented risk factors and had poor or absent safety plans.  There were also concerns about changes to risk ratings with justification and failure to document changes in dynamic risk over time.  QIP responses included review of risk formulations, audits, monitoring, and continued mentoring.  Evidence was provided.  This response appeared adequate.

The final QIP was required to address five-day follow-ups completed upon the inmate's return from the PIP in June 2018.  It was noted that the discharge safety plan was not incorporated into these follow-up contacts, and a late entry was noted.  In response, all clinicians were trained with regard to five-day follow-up documentation and processes including safety planning and risk formulation.  There was also targeted mentoring for one clinician.  Evidence was provided.  This response appeared adequate.

The custody QIP was required to address the fact that security staff did not document their use of necessary precautions when entering the inmate's cell where blood was present during the emergency response.  The QIP response included training of the identified staff and a memo from the Warden to all staff.  Evidence was provided.  This response appeared adequate.

Case C

I.  Summary of Case

This inmate was a 25-year-old Caucasian man found by a nurse during 15-minute welfare checks.  The inmate was unresponsive with foreign objects lodged in his throat in his solely-occupied MHCB cell on January 21, 2018.  The objects were removed and he was resuscitated but died on January 27, 2018 from respiratory failure and severe anoxic brain injury due to asphyxia.  He was receiving mental health services at the MHCB level of care at the time of his death.

The inmate was raised by his father and grandmother along with one sister who was reportedly diagnosed with schizophrenia and had attempted suicide.  The inmate reported that his family had issues with drugs and alcohol.  He initially denied any history of abuse, but later reported physical and verbal abuse by his grandmother.  He graduated from high school and took some college courses.  He reported periodic use of alcohol and marijuana and denied substance use treatment.  He reported periodic employment in the food services industry prior to incarceration.  The inmate had no history of juvenile arrests; however, he was arrested as an adult for misdemeanor trespassing and driving under the influence.  He received probation, paid restitution, and spent some time in jail.  The inmate had not been incarcerated in CDCR previously.

In February 2015, the inmate attacked his grandmother while intoxicated.  Following his arrest, the inmate was sent to a DSH facility for a competency evaluation.  Although records indicate that the inmate refused water and food for a long period of time while in jail, the evaluation determined he was competent to stand trial.  He was convicted of elder abuse with great bodily harm and use of deadly weapon and sentenced to six years.  The inmate entered CDCR in February 2017.  While incarcerated, he did not receive any RVRs.  The SCR noted that he was assigned to an SNY housing, but the reason for that assignment was not included in the report.

The inmate adjusted adequately to prison and was assigned to work in the kitchen; however, he transferred to work in the laundry following a conflict with another inmate.  The inmate reportedly attended religious services and college courses.  He had one visit from his sister in September 2017, and his cell contained letters from his mother and sister.  Journals in his cell were filled with religiously themed material.  Staff interviewed as part of the suicide review noted that the inmate often isolated himself, appeared paranoid, and had abrupt changes in behavior while communicating with staff.  Staff reported that while talking with staff, he would suddenly disengage, look out the window, and refuse to communicate further.  A prior cellmate of the inmate described him as aloof and his thought process as "not normal."

Upon entry to CDCR, the inmate was evaluated for inclusion in the Mental Health Services Delivery System (MHSDS) after reporting mental health symptoms since the

age of 18.  He reported a history of depression with a loss of appetite, mania, persecutory auditory hallucinations, and religious delusions.  He reported psychiatric hospitalization for these symptoms but denied prior outpatient treatment.  In March 2017, the inmate was included in the MHSDS at the 3CMS level of care with a diagnosis of Unspecified Schizophrenia Spectrum and Other Psychotic Disorders.  He was prescribed antipsychotic medication that he had been prescribed at the jail prior to entering CDCR.

In April 2017, the inmate was referred to mental health due to medication nonadherence, and the inmate reported a return of auditory hallucinations.  He reported that he was able to function without medication as reading the Bible decreased the voices, but eventually agreed to resume medication.  In June 2017, he transferred to another facility and received an initial mental health assessment.  He reported auditory hallucinations, paranoid thoughts, and "seeing eyes in the grain of paper" periodically.  He was generally medication adherent, although frequently asked to have his medications changed or doses reduced reporting his preference for religious interventions to treat his symptoms.  In October 2017, the inmate was refusing his medication and his cellmate reported the inmate was frequently crying, would not leave his bunk, and rarely spoke.  He was seen for an emergent contact by his primary clinician and a psychiatrist.  The primary clinician noted that he had impaired reality testing and the psychiatrist documented that the inmate was "not safe in this facility's level of care due to his mental aberration that impairs his capacity to participate in his treatment plan."  The inmate was not placed at a higher level of care at the time, however, because he was noted to be free from suicidal ideation and able to maintain his activities of daily living.  The primary clinician increased the inmate's contacts to weekly and encouraged medication compliance.

In early November 2017, the inmate reported increased anxiety and depression.  He reported a conflict with another inmate in the kitchen and asked to be reassigned because "I almost had a melt down and almost killed a guy."  By the end of November 2017, he had stopped taking his medication and reported hearing voices.  The inmate's primary clinician noted that the inmate was not in distress and denied suicidal ideation.

In late December 2017, the inmate's level of care increased to EOP due to decreased functioning, an inability to attend programming, and signs of decompensation, yet he remained housed at the same facility awaiting transfer.  The inmate did not want his level of care increased and nursing and custody staff had submitted referrals for the inmate reporting auditory hallucinations.  In early January 2018, the inmate was noted to be increasingly delusional, less responsive, more evasive and guarded.  Custody staff noted that he was "very vocal" about issues that upset him.  His primary clinician was concerned about his vulnerability to victimization by other inmates.

Due to construction at the facility, the inmate was moved from a dormitory setting and placed with a cellmate with whom he felt safe.  The cellmate reported concerns about the inmate, noting he was delusional, had magical beliefs, and was pacing in his cell.  The bunkmate reported that he told porters that the inmate needed to see a doctor.  Around the same time, his primary clinician documented concerns about the severity of the inmate's

symptoms and consulted with custody staff and other mental health clinicians. A plan was developed to transfer the inmate to EOP on January 12, 2018. Documentation and a safety plan developed at that time focused on his transfer to EOP to address his serious decompensation but did not include a safety plan to address his symptoms or to prevent self-harm. On January 10, 2018, the inmate was transferred out of the cell he occupied and away from the cellmate he trusted. The following day, he jumped from a second tier and landed on his head and back. He was transported to a community hospital and treated for his injuries. Upon his return to CDCR, he was placed at the MHCB level of care.

On January 11, 2018, a SRASHE was completed in the MHCB. In addition to information provided in previous SRASHEs, the inmate reported that he had also previously attempted to choke himself by stuffing paper bags down his throat. SRASHEs completed in June 2017 and October 2017 included that the inmate had refused food and fluids while in jail. He reported that auditory hallucinations told him he "had to die for the sins of God, but that was not true…I was going to drink poison." Because he did not have access to poison, he decided to stop eating and drinking in an attempt to kill himself.

During completion of the January 2018 SRASHE, the inmate presented with agitation, pacing, decreased eye contact, confusion, and anxiety. He was noted as impulsive and he reported that his auditory hallucinations had grown more demanding. He reported feeling isolated and in pain. He also endorsed his recent receipt of bad news and reported safety concerns. His protective factors were noted to have decreased as well. He was assessed as having high chronic and acute risk for suicide.

On January 13, 2018, the inmate refused to communicate with a primary clinician and a psychiatrist. He was prescribed medications but refused to take them. Over the following days, he requested to see a clinician in the mornings and insisted that he wanted to leave the MHCB; however, he refused to leave his cell for a confidential contact and also refused the later attempted cell-front contact by the clinician. The inmate participated in his January 14, 2018 IDTT and reported visual and auditory hallucinations. He had difficulty recalling the details of his suicide attempt just days earlier. The resultant treatment plan did not include suicidal ideation nor self-harm in the problem list and did not include goals targeting these issues. The inmate was referred for a psychiatric consultation for involuntary medications consideration.

The inmate was seen cell front on January 16, 2018 by a psychiatrist who noted that the inmate was unaware of his surroundings, displayed rigid psychomotor retardation, flat affect, nonproductive speech, impaired cognition, and appeared catatonic. The psychiatrist ordered a toxicology screen due to the inmate's attempt to minimize his mental illness by claiming his symptoms were related to substance use. The psychiatrist noted that "we do not have information that he used drugs recently" and the inmate refused the drug test. On January 17, 2018, the inmate's healthcare record was reviewed for initiation of the PC 2602 involuntary medication process and a hearing was scheduled for January 31, 2018. At that time, back-up psychotropic medications were not ordered

as the psychiatrist did not see the imminent risk the psychiatrist believed necessary for use of emergency involuntary medications. The healthcare record indicated that the inmate took one dose of risperidone on January 20, 2018.

The SCR noted that during his MHCB stay, the inmate ate most meals and attended some groups out of his cell. He did not engage in self-injurious behavior and did not make any overt suicidal threats or statements. On January 18, 2018, the inmate was referred to a PIP, though he refused to consent. The treatment plan developed on that date did not include suicidal ideation or self-harm on the problem list and did not address these issues on his goals. Additionally, documentation did not include any progress regarding symptom presentation or functioning. The SCR noted that on January 21, 2018, the inmate pushed down his throat two individually cellophane wrapped slices of bread totaling approximately six inches long. Custody reports from the emergency response noted the same, however, the nursing report indicated that they "pulled a bloody intact package of saltines crackers" from his throat.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert concluded that this suicide was foreseeable. Clinicians working in the MHCB were aware that the inmate had attempted to kill himself by jumping from a second tier a few days prior to his admission. Despite this, they failed to recognize the need for treatment goals and interventions addressing the inmate's suicidality. Further, the inmate was noted to be acutely psychotic and reported that his command hallucinations were more demanding. His history included evidence that he previously acted in accordance with command hallucinations, including suicide attempts. Yet, the treatment team failed to see the acute risk stemming from this inmate's extreme psychosis and history of suicidal behavior.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert concluded that this suicide was preventable. First, it is unclear why the inmate was being monitored every 15 minutes rather than constant observation given that he had just engaged in a serious suicide attempt and the referring institution recommended the inmate be placed under constant observation.

Second, there were multiple opportunities in this case to transfer the inmate to a higher level of care given his acute psychosis and failures in daily functioning. Multiple individuals, including other inmates, nurses, and custody staff reported that the inmate

was exhibiting psychosis and abnormal behavior.  Despite this, there appeared to be no urgency on the part of his treatment teams to increase his level of care.  In fact, this inmate only received treatment at the 3CMS level of care and the MHCB level of care (between his suicide attempt on January 11, 2018 and his death on January 27, 2018).  At both levels of care, the inmate engaged in lethal suicidal behavior while awaiting a transfer or increase in level of care.  The inmate was awaiting transfer to an EOP from 3CMS for 20 days.  While this timeframe is not outside of Program Guide requirements, his inability to function at the 3CMS level of care was recognized nearly two months earlier in October 2017.  A psychiatrist recognized the inmate's inability to function at the facility, and a primary clinician recognized that the inmate's needs exceeded 3CMS care levels and scheduled the inmate for weekly contacts.  The inmate decompensated and stopped taking his medication over the subsequent seven weeks.  His level of care was finally increased on December 21, 2017, yet while awaiting transfer to the EOP level of care, he attempted to kill himself on January 11, 2018 and was subsequently admitted to the MHCB level of care.

Following the January 11, 2018 suicide attempt, the inmate remained disengaged, psychotic, agitated, impulsive and anxious.  He reported command auditory hallucinations which he described as more demanding than previously.  He was assessed as being at high risk for suicide, yet the treatment team did not include suicidality as part of his treatment plan and did not refer him to an inpatient level of care until January 18, 2018, one full week after his placement in the MHCB level of care.  Had the treatment teams acted with more urgency to place the inmate in a level of care that met his needs, death by suicide would have been less likely to occur.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case.  It provided a thorough summary of the inmate's available criminal, social and mental health history.  It outlined the deficiencies and concerns in this case adequately, and the QIPs followed from the findings in the case.

V.    Analysis of Quality Improvement Plan Process

There were seven QIPs developed due to the SCR.  There were five required QIPs related to mental health care.  The first required QIP related to mental health included concerns over the failure of the treatment team to refer the inmate to an MHCB on January 10, 2018, and failure to develop an adequate safety plan on that date.  The response from the facility was justification for the decision not to refer the inmate to an MHCB and support for the decision to refer him to an EOP, including that a clinician from the Outpatient Housing Unit (OHU) was consulted.  However, the response did not include a rationale for why there was no documentation regarding the decision not to refer the inmate to an MHCB.  The facility provided evidence of staff training related to documentation of

clinical rationale after consultation with OHU staff. This response was adequate, although marginally.

The second QIP for mental health was related to the lack of goals and interventions on the inmate's MHCB treatment plan to address his suicidal ideation and self-harm behavior following his January 2018 suicide attempt. The QIP response included an audit of 15 treatment plans created within the MHCB that revealed low compliance with standards. Staff was trained, and there was a plan for specific staff to receive individual training and ongoing monitoring to include passing subsequent audits. The plan appeared sound however, the efficacy is unknown as the plan had not been completed at the time of submission.

The third mental health QIP was required to address deficits in safety planning following the SRASHEs dated June 2017 and October 2017. Although both included policy and procedure language, neither targeted individualized interventions and neither addressed modifiable risk factors. The QIP response included an audit of ten SRASHEs completed by each clinician identified as producing problematic safety plans. The audits revealed deficits in safety planning related to individualization and goal-setting. The individual clinicians were provided feedback, and all mental health staff at the facility were trained on safety planning. The identified clinicians were to receive ongoing monitoring, but the response indicated that mentoring was not required. This response appeared adequate.

A fourth QIP was required to address the inmate's placement on 15-minute checks rather than constant observation given his recent serious suicide attempt. A review of the documentation at the facility confirmed that the clinician failed to document rationale for the decision to place the inmate on 15-minute checks despite his risks, and the fact that the referring institution requested constant observation for the inmate upon placement in MHCB. Training was provided to the clinician responsible, but no further follow-up was reported. This response was adequate, although marginally.

The fifth mental health QIP was required to address the fact that despite initiating the PC 2602 involuntary medication process for the inmate, injectable "back-up" medications were not ordered to address the inmate's medication refusal and serious psychotic symptoms. The QIP response included training for psychiatrists on the policy and procedure related to initiation of the PC 2602 process. Evidence of training was provided. This response appeared adequate.

The one nursing concern that required a QIP was due to the mental health observation rounds conducted on January 21, 2018, the date of the inmate's death by suicide, included timeframes that exceeded the 15-minute minimum. The QIP response indicated that the responsible nursing staff reported that the delays were due to interactions with other inmates being monitored. Staff were trained not to interact for long periods of time with any one inmate but to refer the inmates to their primary nurse to address concerns.

There was also a comment in the response that the facility did not receive funding to support positions specifically for rounding, although the unfunded positions would continue to be staffed. Evidence of training was provided and this response appeared adequate.

There was one joint custody/nursing concern that required a QIP to address a delay in the activation of 911 emergency services following the inmate's suicide attempt by jumping off a second tier on January 11, 2018. The response from the facility noted that after jumping, the inmate was lying on the floor and reported no distress or pain and had full range of motion of all extremities. He was transported to the Triage and Treatment Area (TTA), and following a more thorough assessment, the determination was made to call for emergency services. The review revealed no delay in care. The response appeared adequate.

Case D

I.  Summary of Case

This inmate was a 28-year-old Latino man who was found by a correctional officer unresponsive with a ligature tied around his neck and anchored to the bottom of the bunk above in his solely-occupied cell in an ASU on September 29, 2018. He was also noted to have methamphetamine in his blood. He was receiving mental health services at the EOP level of care at the time of his death.

The inmate was born in California but moved to Nevada at age ten where he was raised primarily by his mother, as his father was often incarcerated. The inmate reportedly witnessed domestic violence in the home and indicated that he was a victim of physical abuse. He noted that both parents had substance use issues, and an uncle may have had a psychotic disorder. He was not married and had no children. He became engaged in May 2018 while incarcerated.

Records indicated that the inmate completed school through the eleventh grade and received his GED while in jail in 2010. The inmate reported that he did well in school but was often suspended from school, and he was expelled once due to fighting with peers and one incident of assaulting a principal. He noted that he was employed at a grocery store and moving company prior to incarceration. The inmate reported recreational use of alcohol and marijuana beginning at age 12 and cocaine use starting at age 17. He reported being arrested at age nine and spending time in juvenile detention on three occasions between ages 14 and 16.

The inmate entered CDCR for the first time in November 2011 serving life without the possibility of parole for two counts of first-degree murder and second-degree robbery. Upon incarceration, he requested placement in an SNY for undefined "safety concerns" and was granted that status throughout his incarceration. While he denied gang affiliation, a confidential memo in June 2018 indicated that he may have been affiliated

with a Security Threat Group (STG) and that he may have supplied drugs to other inmates while housed in an ICF.

During his incarceration, he received 10 RVRs, many related to violence. His last RVR was written on September 13, 2018 for delaying a peace officer while housed in a PIP; however, he was placed in ASU after discharge from the PIP on September 21, 2018 due to a previous RVR for overfamiliarity which triggered a staff separation alert. During his Institutional Classification Committee (ICC) meeting on September 24, 2018, he was notified that all EOP placements were now considered to be non-designated placements where SNY and general population inmates could be housed together and that he did not need to waive his SNY designation to be housed in the EOP yard. He reported that he understood and agreed with what was discussed.

Records indicated that he had a visit with his fiancée on September 23, 2018, six days prior to his death. Following his death, his fiancée was contacted and reported that he was angry about his ASU placement during their visit but did not show any signs of depression or suicidality. She stated that he was actively planning their wedding and that paperwork was in the process of completion for the marriage. Phone records revealed that he had frequent contact with his fiancée.

There was no evidence nor reported history of mental health treatment prior to incarceration, and the inmate was not placed in the MHSDS at the time of reception. In November 2012, he was referred to mental health by nursing staff as he was noted to be withdrawn with poor attention, poor appetite, sadness, and anxiety. He was placed at the 3CMS level of care and was initially provided with diagnoses of Depressive Disorder, Not Otherwise Specified (NOS), Adjustment Disorder with depressed mood, and Antisocial Personality Disorder. He was prescribed fluoxetine. In December 2017, he was seen for an emergency consult following an ICC meeting where he was informed that he would be transferring to a desert institution. The inmate was upset about being housed far away from his mother who had been diagnosed with cancer. The inmate reported that he would do whatever he could to transfer to a facility closer to his mother if he were to be transferred to a desert institution. During a SRASHE completed at that time, the inmate denied suicidal ideation and was not placed in an MHCB.

In January 2018, the inmate was placed at the MHCB level of care after reporting suicidal ideation. He reported feeling depressed and was concerned about his mother's health. He also reported feeling hopeless as his most recent appeal challenging his life sentence had been denied. He was initially scheduled to be discharged to the EOP level of care; however, he was retained in the MHCB as the treatment team determined that he was minimizing his symptoms, assessing the inmate as hopeless, teary, and depressed. He engaged in treatment while housed in the MHCB, and he was referred to the PIP acute level of care on January 12, 2018, as he was determined to be an imminent danger to himself.

The inmate was admitted to an acute PIP on January 23, 2018, where he minimized his level of distress and denied depression and suicidal thoughts. He was initially engaged in treatment, but subsequently he became more withdrawn, refusing groups and individual sessions. At one point, he asked to be discharged to the EOP level of care, but he then withdrew the request and admitted needing more treatment. During his individual sessions, the inmate discussed feeling hopeless and depressed over his sentence and was "tired of being in prison." He reported suicidal thoughts, stating that there was "no point in trying to live." The treatment team documented that his family served as a protective factor for him, although no member of his family had visited him since 2012. He was referred to an ICF on February 20, 2018 with a recommendation for an unlocked dorm. Treatment recommendations including learning more coping skills to decrease his depression and hopelessness, as well as reporting an absence of suicidal ideation for 90 consecutive days. His primary diagnosis was Adjustment Disorder with depressed mood.

He arrived at the ICF on March 6, 2018, and initial assessments noted that the inmate was eager for continued treatment. He reported being hopeful about discharging to an EOP closer to his family. The inmate reported that he had not had contact with his mother since being placed in the MHCB and was concerned about that lack of contact. He noted that while he was free of suicidal ideation at the time of admission, he had thought about killing himself the previous week by overdosing on heroin. During his first month of treatment, he endorsed active and passive suicidal ideation and significant symptoms of depression. He reported having difficulty adjusting to the program, did not know how to verbalize what he was experiencing, and felt embarrassed about needing inpatient mental health treatment.

In May 2018, the inmate attended his IDTT meeting and reported that while he was still depressed, he recognized the need for treatment and was no longer suicidal. He was generally adherent with group attendance. In June, he reported to his primary clinician that he did not feel that he was improving, and he had regrets regarding his incarceration since age eight and that effect on his life. He reported that he was no longer engaging in exercise which had been a protective factor for him previously. That month, his group attendance had dropped by 30 percent. He requested medication changes in June 2018 which were made by the psychiatrist. He reported that his mother was having surgery to remove a tumor, and this increased his depression and anxiety.

His treatment participation increased in July 2018, and he denied suicidal ideation. He reported struggling with motivation to remain active in treatment, noting the length of his sentence as the primary factor. He reported to his primary therapist that he was using substances to cope. On July 30, 2018, he had an altercation with another inmate on the unit, and his privilege level was decreased. He denied suicidal ideation and reported that he wanted to continue programming. In early August 2018, the inmate reported that his groups were "going alright", but they failed to address his problems. He reported feeling guilty about being unavailable for his mother.

He was informed on August 7, 2018 that the IDTT planned to discharge him in the next 30 days to the EOP level of care. The inmate reportedly agreed with this decision and was noted by the psychiatrist to be in a "pretty good mood." Despite this, the inmate reported an increase in depressed mood and passive suicidal thoughts the following day, asking the psychiatrist for an increase in the antidepressant dosage. In mid-August, he requested a "timeout" in the observation room, stating that he was not suicidal but just need some time alone. Following his stay in the observation room, he reported hopelessness and passive suicidal ideation to his primary clinician.

Despite the fact that the inmate continued to report substance use, depressive symptoms, and passive suicidal ideation to the psychiatrist and his primary clinician, plans for discharge continued. The inmate reported that he was not ready to be discharged to the EOP and asked for a 30-day extension to his ICF stay. When asked how an additional 30 days would help, the inmate was not able to provide a reason but continued to report passive suicidal ideation. The inmate reported that he had stopped exercising and writing, both of which were coping mechanisms for him. The inmate asked for another "timeout" on August 31, 2018 as he felt that he wanted to give up, and he was unable to contact his family. On September 2, 2018, the inmate reported an intention to kill himself by overdosing on pills, and he was placed on suicide watch status. He reportedly punched the wall in frustration, and his knuckles were swollen. He was decreased to suicide precaution status later that day and then released from precautions on September 4, 2018 after denying suicidal ideation. The IDTT agreed to retain him for another two weeks to allow his family to file a grievance so he could be placed at a facility closer to them.

On September 12, 2018, the inmate reported not feeling well and wanted time to himself. He had refused groups and was reportedly isolative. The following day, he received an RVR for willfully resisting a peace officer, and on September 14, 2018, he reported suicidal ideation and was placed on suicide watch. He was moved to suicide precaution status and then cleared to return to his cell on September 17, 2018. The following day, the inmate was discharged from the ICF to the EOP level of care. During the IDTT meeting, he was described as visibly upset and guarded, remaining mostly silent and responding only with one-word answers. The IDTT did not update his treatment progress during this meeting, and the diagnosis noted on clinical documentation (Major Depressive Disorder) differed from what was entered on the problem list in the electronic health record (Adjustment Disorder with depressed mood).

During phone calls with his fiancée during August and September 2018, the inmate discussed how he did not want to go to an EOP yard and wanted to remain in an inpatient setting. The reasons he expressed to her included wanting to work on their marriage preparation and to avoid conflicts with other inmates on an EOP yard which was "integrated" and would not allow him the protection he needed from conflicts. He also indicated that he would eventually receive RVRs, resulting in segregated housing placement. Following the IDTT's decision to discharge him, he told her that he would

decide whether or not he would stay at the facility where he was being sent. He said that if he was moved far away from her, he would "not be there for long" and stated, "I'm scheming."

The inmate arrived at the EOP level of care on September 20, 2018. He was seen for a five-day follow-up and an initial SRASHE. The clinician who conducted the SRASHE on September 21, 2018 also completed a PIP record review but did not note the recent stays on suicide watch or the inmate's suicidal ideation within the past month. The inmate endorsed passive suicidal ideation and hopelessness during the evaluation. He denied previous suicide attempts. There was no reference to the safety plan created at the PIP. The following day, the inmate was placed in ASU due to a previous RVR for overfamiliarity, discussed earlier.

The next four contacts for the five-day follow-up were completed in ASU. The inmate did not report suicidal ideation but complained about being housed in ASU for non-disciplinary reasons. The primary clinician who completed the initial mental health assessment noted the Adjustment Disorder diagnosis while in the PIP and documented that despite the inmate's long stay in the PIP, the inmate was not provided with a diagnosis of a major mental illness; the clinician suspected the inmate of feigning his symptoms. The clinician also noted that the inmate discussed how difficult it was not being in the inpatient setting. Records indicated that the inmate attended recreation groups on September 25 and 28, 2018 but refused groups on September 26 and 27, 2018. He was adherent with his medications but refused his antidepressant on September 28, 2018. The inmate was found unresponsive in his cell on the morning of September 29, 2018.

The SCR noted that 16 suicide risk evaluations were completed over the course of this inmate's incarceration, with seven of the SRASHEs completed during the final year of his life. The SRASHEs completed over the final year of his life were noted to be variable in their comprehensiveness, consistency and inclusion of viable safety plans. The four SRASHES completed between November 2017 while he was at the 3CMS level of care, and January 2018 when he was admitted to an acute PIP, were noted to have poor safety plans and did not appear to provide reasonable interventions to reduce suicidal ideation. During that period, chronic suicide risk was assessed as increasing from low, to moderate, to high. Rationale for these assessed risk levels were not well justified; however, the risk levels appeared accurate. His acute risk was consistently assessed as moderate.

In March 2018 during his admission to the PIP ICF, chronic risk was assessed as reduced to moderate, and acute risk was assessed as low due to the lack of reported suicidal ideation in the two months prior; there was little additional justification for these changes. The March 2018 SRASHE included a comprehensive safety plan. A SRASHE completed on September 18, 2018 at the time of discharge from the PIP, assessed both acute and chronic suicide risk as moderate but noted that the risk would increase should

his mother pass away. The safety plan was sufficient and included warning signs, coping skills and protective factors; however, it failed to include his fiancée as a protector factor.

The final SRASHE was completed on September 21, 2018 upon return to the EOP from the PIP as noted above. Risk factors remained unchanged from the previous SRASHE but notably omitted reference to placement on suicide watch status for suicidal ideation over the previous month. The risk levels were not justified beyond a listing of the individual risk factors. The safety plan recognized triggers for suicidal ideation and identified protective factors, but also omitted the fiancée as a protective factor.

Reports on the date of the incident revealed that the inmate had covered his cell window and was not asked to remove the covering during custody checks completed at 0614, approximately 30 minutes prior to finding him unresponsive. Documentation indicated that the officer knocked on the door, and the window covering partially fell. The custody officer noted that the inmate's hand moved, and the officer documented that the inmate was sleeping. Additionally, a psychiatric technician noted speaking with the inmate at 0623. The inmate was discovered and found unresponsive at 0644 to 0646. Nursing staff noted "generalized stiffness" in the inmate's body at 0701, and the emergency response team noted rigor mortis present at 0706, indicating that the inmate was likely already dead during the custody check at 0614 and the psychiatric technician contact at 0623. These facts raised questions of the validity of the documentation by the custody officer and psychiatric technician.

An inmate housed next to the inmate reported that on the night of his suicide, the inmate had been yelling that he was suicidal; but he was ignored by custody officers. This account was not corroborated by other inmates or correctional officers on the unit. The officers present at the time of the suicide could not be interviewed by the SCR author as there was an ongoing investigation into the incident.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert concluded that this suicide was foreseeable. This assessment was made based on the confluence of a number of factors. Failure to accurately document the diagnosis of a serious mental illness appeared to have directly led to an underestimation of the inmate's level of distress and subsequent underestimation of suicide risk upon placement in the EOP. Additionally, the clinician conducting the initial mental health assessment upon placement at the EOP level of care in the ASU failed to identify increased risk related to two placements on suicide watch status due to suicidal ideation during the month prior to his suicide. Documentation from the PIP indicated that the inmate had concerns about transfer to a facility away from his family who served as a protective factor. Clinicians in the EOP also failed to contact the inpatient staff, as required by policy. Given the events that transpired upon his placement at the EOP level

24

of care, including movement to the ASU due to an issue of staff separation and discussion with the ICC about lack of protective status in the EOP, it should have been reasonably assessed that the inmate would be concerned about the possibility of transfer to an undesired location. These omissions and errors, if noted, would have provided the information necessary to support the inmate with the appropriate level of intervention. The information was available in the healthcare record or through a required consultation; therefore, this death was considered foreseeable.

III.  Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert found that this suicide was preventable given that additional evaluation and interventions were likely indicated in this case and had they been completed the likelihood of death would have decreased. These omissions included failure to inquire about the inmate's recent suicidal ideation which resulted in two placements on suicide watch, and his current state of hopelessness given his placement in ASU and the possibility of pending transfer.

IV.  Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. It provided a thorough summary of the inmate's available criminal, social and mental health history (over the past year prior to his death). It discussed the positive and the concerning aspects of his care, and the QIPs followed from the findings.

V.  Analysis of Quality Improvement Plan Process

There were ten QIPs developed due to the SCR. Six QIPs were related to mental health care, three were related to custody concerns, and one joint custody/nursing concern was found to require a QIP.

The first mental health concern related to the fact that the inmate's diagnosis was not properly updated in the electronic health record by the PIP staff, and also the fact that the clinician who assessed the inmate following his discharge from the PIP did not recognize the discrepancy between the clinical documentation and the problem list. The QIP response indicated that this was a systemic issue as the staff was unaware of the proper way to document an inmate's diagnosis in the electronic health record. The issue was addressed through training, and evidence was provided. This response appeared adequate.

The inmate's plans of care were not updated consistently while he was treated in the PIP and did not properly reflect his progress toward treatment goals; additionally, there was no plan of care to address the suicidal ideation, which was a treatment target. The QIP response indicated that there was a systemic issue regarding staff not consistently documenting inmate progress in the plans of care and did not appear to audit for the presence of plans of care for all identified issues. The lack of documentation regarding progress was addressed through training by a live presentation. Evidence was provided. This response appeared adequate, although only partially.

The third required QIP for mental health was related to the lack of clinician-to-clinician contact following PIP discharge to the outpatient setting within the required timeframe. Investigation into the incident revealed that the inmate was transferred after his first day, resulting in a change in primary clinician, and it was unclear which clinician was responsible for making the contact. The issue was addressed with both clinicians, and training was provided to all staff. Evidence was provided. This response appeared adequate.

A fourth QIP for mental health was required to address the fact that the primary clinician who completed the initial mental health assessment failed to document that the inmate had been on suicide watch for suicidal ideation on two occasions over the previous month. The issue was addressed directly with the clinician, and training was provided to all staff with evidence of the training. This response appeared adequate.

The fifth mental health QIP was required to address the fact that the five-day follow-up contacts completed with the inmate following PIP discharge did not address the elements of the safety plan. An audit of documentation completed by the clinicians in question was completed which noted deficiencies. These clinicians were trained, and evidence of the audit and training was provided. This response appeared adequate.

The final QIP for mental health was noted to be a statewide concern to address the lack of justification for risk level assessments and the poor quality of safety plans across facilities and programs. The response indicated that training was being created to address the issues which would be submitted once finalized. No further information was available; thus, this response was only partially adequate.

The first custody QIP addressed the inmate's placement in the ASU for a pending staff separation alert related to a previous RVR. The appropriate action would have been to transfer the inmate to another institution within 72-hours. An investigation revealed that the necessary separation alert was not completed timely. On-the-job training was recommended for staff and supervisors involved, and a memo confirming the training was submitted which noted that two of the listed staff had not been trained. One staff member was on leave and was trained upon his return, and the other had been transferred. This response was adequate.

The second custody QIP addressed the inmate segregation record which included missing entries for September 24, 2018 and a misplaced notation which indicated three-and-a-half hours of missed yard and one missed shower. There was a recommendation to provide training to the sergeant on completion of the necessary documentation. Evidence of the training was provided. This response appeared adequate.

The third custody QIP was required to address the RVR for overfamiliarity written in November 2017 which never resulted in a proper staff separation alert following an ICC on December 5, 2017. On-the-job training was recommended for staff and supervisors involved, and evidence of the training was provided. This response appeared adequate.

The joint custody/nursing concern was related to the documentation of observations of a living, breathing, and talking inmate thirty to forty-five minutes prior to the presence of rigor mortis. This incident was referred for investigation by the Office of Internal Affairs (OIA). The results of that investigation were not available to the Suicide Case Review Committee or the Special Master's expert.

Case E

I.  Summary of Case

This inmate was a 41-year-old Caucasian man found by his cellmate, who was returning from education, hanging in his cell in an SNY yard on February 1, 2018. The cellmate alerted correctional officers and life-saving measures were initiated, but the inmate died later that day at a community hospital. Toxicology screening performed at the time of his placement at the community hospital was positive for opioids, amphetamine and cannabis. He was receiving mental health services at the 3CMS level of care at the time of his death.

The inmate was born in California to parents who divorced when he was five years old. He had three siblings. The inmate reported that he was born with the umbilical cord "around my neck" and explained that a procedure was required to ensure he received enough oxygen. The inmate reported no long-term negative consequences as a result of this. He was raised by his mother and saw his father on weekends. His mother eventually remarried, and the inmate reported that his stepfather was physically abusive toward him while his mother was at work.

During adolescence, the inmate began engaging in problematic behavior including drug and alcohol use, theft, lying, and violating his curfew. He was suspended from school in the sixth grade for fighting and being disruptive. Around this time, he became affiliated with a gang. At age 16 he was charged as an adult for second-degree murder and a charge related to the fact that his gun was used by others in the crime (a gang-related shooting). He was sentenced to 16 years to life and was committed to California Youth Authority (CYA) until age 19 when he entered CDCR. The inmate was never married and had no children. Records indicated that he received his GED while incarcerated.

The inmate entered CDCR from CYA in August 1996. Throughout his incarceration, he struggled with substance use and received 22 RVRs related to substance use and/or possession. He received two additional RVRs for possession of a cell phone. Early in his incarceration he completed vocational programs and held work assignments. He was described in positive terms by staff and received average evaluations. The inmate was denied parole on three occasions, stipulated to the board on three occasions and submitted a voluntary waiver twice between June 2002 and May 2017. During his most recent stipulation, in May 2017, the inmate requested a five-year stipulation to have more time to be discipline free, participate in self-help programs, learn a trade, and develop reasonable parole and relapse prevention plans. He received visits from his family and friends over the course of his incarceration; however, there were years-long gaps between visits, and visits from his father ended in 2009.

Records indicated that the inmate reported safety concerns and disaffiliated from his gang in December 2014 after a fight. In January 2015, he was denied a gate pass to work on the "back dock" due to his RVRs and history of substance use. In August 2016, he was granted clearance and was able to get a Prison Industries Authority (PIA) job earning income. In May 2017, however, his clearance was revoked noting that it had been granted in error. This resulted in the loss of work and income. The inmate filed a grievance, but it was denied. He later obtained another paying job assignment.

During his incarceration, the inmate attended a group for previous gang members and engaged with a re-entry program connected to this group. He appeared to work on a re-entry plan; however, he denied substance use problems in his paperwork, despite his significant problems with substance use. In fact, recorded phone calls revealed that the inmate had significant drug debts and was receiving financial support from his father to pay off these debts. In January 2018, he was noted to owe over $1,800, and his father refused to offer any further financial assistance. The inmate had secured an additional paying job assignment by this time, but the loss of support from his father was likely a problem for him related to his large debt.

The inmate was first placed in the MHSDS in June 2008, but he was removed in December 2008. Records indicated that he received mental health services at the 3CMS level of care during that time, but ultimately, he reported that he had only requested services because he believed he would be transferred to a facility closer to his family. When he did not, he asked to be removed from the MHSDS. In December 2014, he self-referred to mental health and was observed crying, disheveled, shaky, and presented with a slumped posture and a cast on his left arm secondary to a fractured wrist he incurred during a fight. This self-referral occurred during the period of time when he had disaffiliated from the gang and requested SNY status due to safety concerns. He was housed in the ASU at the time, and placement at the 3CMS level of care required transfer to a facility with an appropriate mental health mission. He was provided with a diagnosis of Major Depressive Disorder, recurrent, moderate.

The inmate transferred within 30 days and was screened as a new arrival in early February 2015.  The suicide risk evaluation completed at that time noted no history of suicidal thoughts or actions.  It indicated risk factors including substance use, poor impulse control, history of physical abuse, violence, first prison term, and the use of drugs to cope.  He was assessed with low to moderate chronic suicide risk and low acute risk.  The annual assessment completed in January 2016 was thorough but did not include his history of substance abuse.  The resulting safety plan appeared generic and was not individualized to address the needs of the inmate.

The SCR noted that in January 2017, the inmate was found unresponsive in his cell after ingesting a number of pills.  He was taken to the emergency department of a local hospital, where he was found to have antiepileptic medications in his mouth with amphetamines, opiates and vitamins in his urine.  The medications had not been prescribed for the inmate.  The inmate was also found to be suffering from pneumonia.  At the hospital, the inmate denied suicidal intent or ideation and reported that he was not depressed nor had he been attempting to "get high."  The suicide risk evaluation completed upon his return to the facility was noted to be of poor quality and failed to comprehensively inquire into his thoughts and feelings triggering the overdose.  The clinician completing the suicide risk evaluation did not appear to have reviewed the healthcare record regarding the overdose and the ingestion of medications that were not prescribed to him.  His suicide chronic risk was assessed as moderate, and his acute risk was assessed as low.  The inmate was not placed in an MHCB nor on suicide watch but was instead placed on five-day mental health follow-up along with three-day custody follow-up with a referral to see psychiatry in ten days.  The evaluator noted that he had overdosed in an attempt to "get high" yet did not pursue the fact that he previously denied this was his intent.

An IDTT was conducted five days following the overdose event on January 24, 2017.  Documentation generated from the IDTT did not mention the overdose, and that information was not incorporated into the treatment plan.  Instead, documentation focused solely on the inmate's self-report that he was not depressed and did not experience suicidal ideation.  Additionally, the treatment plan referenced medication adherence, yet the inmate was not prescribed psychotropic medications.  He was prescribed oxcarbazepine, an antiseizure medication, by his primary care physician.  While this medication is prescribed for mood stabilization, that was not its intended use for this inmate.  The treatment plan also failed to address the inmate's substance use and did not appear to include a review of his records.

The SCR noted that the inmate was not seen for routine clinical contacts between November 2016 and June 2017 and that overall, six required clinical contacts were missed between November 2016 and January 2018.  The last contact with his primary clinician prior to his death occurred on June 28, 2017, and that contact occurred at cell-front.  A SRASHE was completed on that date which failed to include a specific,

individualized safety plan. The inmate's substance use history was not documented, and the evaluation failed to include the overdose that occurred in January 2017. The inmate was assessed with low chronic and acute risk for suicide, but rationale was not provided for these assessed risk determinations other than stating that he had no previous suicide attempts.

The inmate was last seen by a psychiatrist on January 1, 2018 when the inmate reportedly denied "any urge, thoughts, plans to engage in violence or self-harm." The psychiatrist noted that this report was consistent, and the inmate denied "with seeming competency." An IDTT meeting was conducted on January 2, 2018; although this meeting occurred timely, the IDTT was noted to be problematic. There were no Individualized Plans of Care (IPOCs), and the content appeared to rely solely on the inmate's self-report of stability and lack of substance use. There was no mention of the inmate's history of narcotic dependence and methamphetamine use, only reference to prior use of marijuana and alcohol. The inmate reported that his antiseizure medications also assisted with his mood. The inmate died by suicide approximately one month later. He was found with four suicide notes in his pockets, addressed to his father, mother, stepfather, two biological sisters, a brother and a half-sister.

While there were no documented previous suicide attempts in his record and documentation indicated that the inmate consistently denied suicidal ideation, a cellmate reported that the inmate had attempted suicide in 2014. A review of documentation at the time of the alleged suicide attempt paralleled the inmate's circumstances prior to his completed suicide. The SCR concluded that the inmate's substance use issues and lack of coping skills were not adequately recognized nor addressed in treatment by his mental health treatment teams.

II.     Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert concluded that this suicide was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert found that this suicide was likely preventable. Had his treatment providers adequately recognized his ongoing struggle with addiction and lack of coping skills, they may have provided adequate treatment interventions with more accurate evaluations of suicide risk.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case.  It provided a thorough summary of the inmate's available criminal, social and mental health history.  It outlined the treatment team's failures to identify his needs, his risks and to provide adequate care.  The QIPs followed from the findings.

V.    Analysis of Quality Improvement Plan Process

There were six QIPs developed due to the SCR, all related to mental health.  The first was required to address the fact that the suicide risk evaluation completed in January 2017 was conducted in a non-confidential setting, and no rationale was provided for conducting the evaluation in this setting.  The corresponding QIP indicated that due to limited space in the area at the time, confidential contacts were not provided.  The team noted that this issue had been identified previously and had been corrected.  Additionally, training was provided to all clinical staff related to the importance of confidential contacts, and the need to document rationale when confidentiality was not possible.  Evidence of training and an informational memo were provided.  This response appeared adequate.

The second QIP was required to address the failure of the clinician conducting the suicide risk evaluation in January 2017 to review the documentation related to his recent overdose, utilizing only the inmate's self-report.  Additionally, an adequate safety plan was not created; the safety plan only included policy-based requirements, not individualized interventions for this inmate to reduce his risk.  Protective factors were also inaccurate and included spousal support and positive coping skills.  The QIP included an audit of eight of the clinician's SRASHEs, and deficiencies were identified.  The clinician had since transferred to another facility, and the supervisor at that facility was informed of the audit findings.  The clinician's new supervisor conducted an additional audit of seven SRASHEs and noted improvement in the content, which was determined to be the result of training conducted in February 2018.  The clinician was also provided with on-the-job training.  Evidence of the training was provided.  This response appeared adequate.

A third QIP was required to address the treatment plan created in January 2017 which failed to acknowledge the inmate's recent overdose and documented medication adherence when the inmate was not prescribed psychotropic medications.  No interventions were created to address substance abuse concerns.  Documentation from 15 IDTTs were audited along with corresponding progress notes from the identified primary clinician as part of the QIP response.  Results indicated some deficiencies in IDTT documentation and serious concerns regarding individual clinical contacts.  The clinician was placed on a performance improvement plan, and a peer review facilitated by

headquarters was recommended. The results of the audit were provided. This QIP response appeared adequate.

The SRASHE dated June 2017 was noted to be of poor quality, and the safety plan was not individualized and included a "no harm" contract. It failed to recognize substance abuse issues or the overdose in January 2017 and did not provide rationale for assessed suicide risk levels. This required a QIP. Twenty SRASHEs completed by the clinician were audited which revealed deficiencies. The clinician was placed on a performance improvement plan. The clinician subsequently transferred to another institution, and the new supervisor was advised of the findings and the performance improvement plan. The clinician was also recommended for a peer review facilitated by headquarters. This response appeared adequate.

The fifth mental health QIP was required to address the treatment plan developed in January 2018 which failed to address the inmate's mental health symptoms, relying only on his self-reported absence of symptoms. No IPOCs were created as the inmate was deemed to be "stable"; this indicated that a thorough record review had not been completed. The response to this QIP was addressed simultaneously with the third QIP, the details of which were previously described.

The final QIP was required to address the primary clinician's failure to provide clinical contacts consistent with Program Guide requirements between November 2016 and January 2018. Only one individual session which was conducted at cell-front during June 2017 occurred during this time period. The QIP response noted that in 2017, program supervisors were to send weekly compliance reports to the Chief of Mental Health (CMH) for review. It was reported that these reports were addressed through weekly individual meetings with the supervisors. It was reported that the identified clinician had been placed on a performance improvement plan in January 2018 due to similar issues identified by the supervisor. The clinician reportedly transferred to another facility, and the concerns were shared with the new supervisor. This response appeared adequate.

Case F

I.   Summary of case

This inmate was a 24-year-old Caucasian male who was discovered hanging from a piece of sheet tied to the light fixture in his double occupied cell on February 2, 2018, at approximately 1110 hours. The inmate's cellmate found the inmate hanging after he returned from yard. Although life saving measures were attempted, he was pronounced dead at 1118 hours by the paramedics. The inmate was a participant in the MHSDS at the 3CMS level of care at the time of his death.

The inmate was raised in Washington by his parents until age 11 when he was placed in foster care. He was the youngest of four children with two older brothers and one sister.

He was physically, and possibly sexually abused and witnessed domestic violence while with his family. The inmate attended school up to the tenth grade and was noted to have had behavioral problems. He later obtained his GED and attended some college for performing arts. The inmate's work history included employment at fast food restaurants, demolition, and as a home health aide. He identified as "agnostic." He was homeless at the time of his commitment offense.

The inmate never married but had a girlfriend with whom he had a daughter at the time of his incarceration. He received visits from both his girlfriend and his mother during his incarceration, with the last visit occurring in the fourth quarter of 2017. He spoke to his girlfriend often, sometimes daily. However, his relationship with his girlfriend was erratic based on phone call transcripts, other inmate reports, and a letter found in his belongings to his mother stating they broke up shortly before his death.

The inmate did not have a job assignment in CDCR but was involved minimally in vocational assignments in electronic classes and as a volunteer in GED classes. He refused to attend any classes on the day of his death.

The inmate reported a history of using methamphetamine, alcohol, cocaine, PCP, marijuana, and mushrooms. He admitted involvement with a well-known street gang in California prior to his commitment offense. His criminal history included arrests for providing false statements to a public servant, misdemeanor assault, third-degree malicious mischief, theft, and carrying a loaded firearm. He did not serve jail time until after his commitment offense which occurred on March 25, 2015. The commitment offense was for second-degree robbery with two enhancements, use of a deadly weapon and infliction of great bodily injury. The offense involved physically assaulting the victim in their residence, forcing the victim to retrieve money from his automobile, and then continuing to assault the victim prior to the victim escaping. While at the county jail prior to sentencing, he received a disciplinary infraction for fighting which resulted in segregation placement, loss of privileges and, limited canteen access. The inmate received a sentence of seven years in prison for his commitment offense. He admitted to being high on methamphetamine at the time of the offense and expressed a belief that he felt "the victim was preying on" him due to his past.

The inmate entered CDCR for his first and only prison term on May 22, 2015. He received two RVRs for assaulting another inmate resulting in unconsciousness, for which he served an 18-month Security Housing Unit (SHU) term, and on the day of his death for leaving the area without permission after refusing to participate in volunteer GED work and vocation classes. He had documented enemy concerns with two gangs due to shifting gang allegiances when he entered CDCR and then later after attempting to return to the original gang. As a result, he requested and was placed in an SNY. He was housed in general population at the time of his death. The SCR referenced one appeal on June 5, 2017 to have his property moved from his prior to the current institution. He received a

33

reply that requested an explanation for the delay in his appeal, but the inmate never responded.

According to the SCR, the inmate had a known family history of mental illness that included a father with alcoholism and schizophrenia, an uncle and grandmother who died by suicide, and a brother who attempted suicide. The inmate's mental health treatment prior to incarceration began at age 12 in Washington. He reported prior diagnoses of Attention Deficit Hyperactivity Disorder (ADHD), PTSD and Schizophrenia; however, he denied inpatient psychiatric hospitalization. The inmate reported a history of self-harming behavior between ages 11 and 12, and he attempted suicide at age 15 by jumping from a first story ledge while depressed.

At the reception center, the inmate screened positive for mental illness as he had previously been prescribed psychotropic medications, and he was referred for mental health evaluation by a reception center clinician in June 2015. The clinician determined that the inmate did not meet the criteria for inclusion in the MHSDS at that time. However, after placement in ASU six months later, the inmate requested to be seen by mental health for treatment of PTSD, Schizophrenia and ADHD. He was seen by a clinician in December 2015 when he was provided with diagnoses of Psychotic Disorder, NOS and PTSD. It should also be noted that the inmate was seen three days later by a psychiatrist, when he was prescribed medications to treat PTSD, not psychotic symptoms. It took several more weeks for the inmate to be prescribed an antipsychotic medication, as the psychiatrist indicated doubt regarding the veracity of his reported psychotic symptoms.

During the next four months, the inmate began refusing his antipsychotic medication; he also reported worsening of his psychotic symptoms, including an ongoing and consistent theme that other people were sending him messages that related to his past trauma. He requested placement in the EOP level of care, and he was transferred shortly after. However, upon arrival to the EOP institution, he was quickly transferred to the MHCB after reporting suicidal ideation. Documentation indicated that the inmate had delusional thinking, and at the time of discharge he was scheduled for transfer to a Psychiatric Services Unit (PSU). The inmate was admitted to the MHCB on four more occasions for suicidal ideation before transferring to the PSU. During one MHCB stay in May 2016, concern was raised that the inmate was overstating his symptoms due to reports that he coached other inmates on how to obtain a sedating medication. In June 2016, his primary clinician referred him to an ICF, but he was transferred to the PSU while the ICF transfer was pending.

The inmate reported suicidal ideation the day of his arrival to the PSU as well as on the following day; however, he was not admitted to the MHCB on either occasion due to concern that he was not being truthful regarding the presence of suicidal ideation. He was admitted to the ICF level of care during July 2016, and documentation indicated

improvement over the subsequent six months. In February 2017, he was discharged to the EOP level of care. Upon transfer to the EOP, the inmate reported a suicide attempt while in the ICF that was unreported. During April 2017, the inmate consistently reported suicidal ideation; however, suicide risk evaluations assessed his acute suicide risk as low and his chronic risk as moderate, despite a report of several past suicide attempts. His level of care was changed later that month at his request to the 3CMS level of care, as he indicated a desire to program and to participate in vocational training. Over the next three months, his symptoms worsened; this culminated in the inmate taking an overdose of 49 of his medication pills requiring a brief overnight hospitalization. He was placed on suicide watch upon return to the institution pending transfer to the MHCB. The inmate, however, was never admitted to the MHCB; instead, he was returned to his housing unit. The rationale for not admitting the inmate to the MHCB was the clinician's belief that the inmate was lying about his suicidal ideation for secondary gain. At that time, his acute suicide risk was assessed as low; his acute suicide risk had previously been assessed as high, and there was insufficient rationale provided for this decrease in suicide risk. Additionally, prescribed medications were ordered as "crush and float"; however, that order did not follow the inmate after transfer to another institution in October 2017, as he was noted to be "cheeking" his medications one month after his arrival. In December 2018, the inmate was again described as psychotic, with concerns that people were sending him messages that related to his trauma history. These concerns continued over the next two months and appeared to play a role in his continued decompensation and inability to tolerate three consecutive cellmates. In January 2018, he reported a prior suicide attempt in CDCR during which the "sheet broke", but no SRE was performed at that time.

The SCR identified several factors that may have played a role in the inmate's decision to commit suicide, including conflict with his cellmate at the time of his death due to his cellmate masturbating constantly in the cell, a recent break-up with his girlfriend, not hearing from his mother and worrying about her health, and worsening of his mental health symptoms. Interviews with his friends and girlfriend reported similar concerns.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not indicate whether this inmate's suicide was foreseeable. The Special Master's expert determined the suicide was not foreseeable based on available information.

III.    Determination of Preventability

The Suicide Case Review Committee did not indicate whether this inmate's suicide was preventable.

The Special Master's expert determined the suicide was preventable based on available information. The inmate reported worsening psychotic and PTSD related symptoms; in addition, there were several new and significant stressors that represented loss of suicide protective factors. He also reported a previously unknown suicide attempt by hanging during which the sheet broke, but he was not assessed for suicide risk. The inmate also requested a higher level of care repeatedly. All of these events occurred less than one month prior to his suicide; however, the inmate remained at the 3CMS level of care due to concern over the veracity of his symptoms. Had his symptoms of suicidal ideation, psychosis and PTSD been taken seriously, and his suicide risk assessed, the inmate likely would have been transferred to a higher level of care, and his suicide may have been prevented.

IV.   Critique of Suicide Case Review Report

The SCR provided a minimally adequate summary of this case, including relevant social, criminal, incarceration, substance use and mental health history. The reviewer also included a reasonable assessment of the precipitants to this suicide, and recommendations followed the content and findings of the report. However, there was no assessment of the accuracy of the suicide risk assessments despite indications that suicide attempts reported by the inmate were not appropriately included, and rapid changes in acute risk ratings occurred over a 24-hour period in July 2017.

V.   Analysis of Quality Improvement Plan Process

This case resulted in six required mental health and two nursing QIPs.

The MH required QIPs focused on untimely and inadequate mental health care at a particular institution in 2017. The response from the institution for QIP one blamed the untimely care on mental health understaffing during that time. The same response was provided for QIPs three, four, five and six. For QIP two, the institution provided training to the clinician who provided inadequate care to the inmate with supporting evidence of the training. The responses were adequate.

The two nursing QIPs dealt with failure to refer the inmate to see mental health for routine follow-up after screening in reception in November 2019, and failure to notify the inmate's primary care provider, mental health provider or the facility Lieutenant when he was observed "cheeking" his medication. Training was provided to the nurses involved with documentation to support the intervention. The responses were adequate.

Case G

I.  Summary of case

This inmate was a 71-year-old Caucasian male who was discovered hanging from a piece of white sheet tied to the upper bunk of his bed in his single occupied cell on January 7, 2018 at approximately 1548 hours.  The inmate was found by correctional officers.  Although, life saving measures were attempted, he was pronounced dead at 1604 hours by the paramedics.  The inmate was a participant in the MHSDS at the 3CMS level of care at time of his death.

The inmate was raised in Texas by his parents with his four siblings.  Records differed regarding his reported physical and emotional abuse during childhood.  The inmate attended school to the ninth grade.  He later obtained his GED in 1973, and again in 2007 while incarcerated in the CDCR.  He had no known work history.  He never married and had no children.  He received no visits during his incarceration and had minimal correspondence with anyone other than occasional contact with a lawyer; the last contact occurred in 2011.

The inmate had several job assignments in CDCR and was heavily involved in vocational assignments.  His work assignments included working as a teacher's aide in 2009 and a yard worker from 2014 to 2015 when he stopped working due to medical issues.  The inmate earned a certificate in office services in 2008 or 2009, which included typing, data entry, and computer skills.  He was housed in the Honor Program which was a housing unit solely for inmates involved in programming.  He was also part of the Progressive Programming Facility (PPF) which required participation in a variety of programs; the program also required regular drug testing with close monitoring.  He resided in this program until his death.

The inmate reported a history of using methamphetamine, alcohol, marijuana, and barbiturates; however, he denied any ongoing substance use issues.  His juvenile criminal history included a conviction at age 14 for burglary, attempted rape, and attempted murder.  The inmate spent three years in juvenile detention in Texas from 1962 to 1965.  The inmate's adult criminal history included a 1972 conviction for possession of marijuana in Texas, a 1973 conviction for rape in Texas for which he was sentenced to 30 years in prison but only served ten years, and a 1987 conviction in California for assault with a deadly weapon with an enhancement for prior violent felonies for which he served seven years.

The inmate's commitment offense was first degree murder, oral copulation, and rape by force, for which he was sentenced to life in prison without parole plus five years for prior serious felonies.  The offense occurred in 1985, but he was not arrested until 2004 after a cold case investigation led to his identification as the assailant with DNA evidence.

The inmate entered CDCR for his first term in June 1987; he served seven years. He received four RVRs during his first term for failing to report to his assigned job. His second and final term began in December 2005. He obtained no RVRs during his second term. He served 12 years of his sentence prior to his death. He was housed in general population at the time of his death. In 2014, the inmate submitted two Inmate/Parolee Appeals, one for loss of property in the laundry and one to appeal transfer to a Level II institution. Specifically, he requested to be moved to a Level II institution; he then later appealed the transfer so that it could be delayed until he could transfer to a Level II institution with a PPF. The inmate expressed concern that he was vulnerable to violence from non-PPF inmates due to his older age, medical conditions, and his PPF status. His appeal was rejected due to missing documentation, and the inmate was subsequently endorsed to a non-PPF Level II institution four days before his death. Interviews with other inmates collectively demonstrated surprise that the inmate had killed himself, given statements he made prior to death about his preference in housing in an ASU rather than a non-PPF Level II institution. His primary clinician was, however, not surprised given the inmate's aversion to transfer due to his safety concerns. The inmate was described as an avid reader and walker, who was physically fit.

According to the SCR, the inmate had a family history of mental illness that included a father with alcoholism and a sibling with depression and drug dependence. The inmate received mental health treatment at the county jail prior to his second term in the CDCR. He was prescribed fluoxetine, amitriptyline, and oxcarbazepine for an unstated diagnosis. The inmate had no prior inpatient psychiatric hospitalizations or suicide attempts according to the SCR.

The mental health screening performed by a reception center clinician in 2005 noted the inmate's history of mental illness and prescribed psychotropic medications, and he was referred for mental health evaluation. He was then prescribed fluoxetine and mirtazapine to address depressive symptoms. In CDCR, the inmate was provided with various depression related diagnoses, including Major Depressive Disorder and Adjustment Disorder. He was placed at the EOP level of care due to the severity of his depression and his statements that suicidal thoughts were normal for someone serving a life sentence. Suicide risk was not assessed at that time.

The inmate's level of care was reduced to the 3CMS level of care at the first IDTT in March 2006 as depressive symptoms had stabilized. The depressive symptoms persisted, however, until 2008 after appropriate treatment with mirtazapine. During 2017, the inmate refused to attend the primary clinician appointments; however, he consistently attended his psychiatry follow-up visits. During this time, he reported improvement in depressive symptoms which mirtazapine appeared to address. In September 2017, mirtazapine was reduced from 45 mg to 30 mg prompting the inmate to submit a request to mental health to have his dosage corrected. The dose was corrected at the next psychiatry visit, during which he was described as "irritable and anxious." The inmate

38

did not receive the corrected medication dosage until seven days later.  He was seen by the psychiatrist and the primary clinician for the last time prior to his death in October and November 2017 respectively.  Both visits were uneventful, save the inmate's statement that he would rather be housed in the ASU than to transfer to a non-PPF Level II institution.

The inmate was treated for several medical conditions including gastroesophageal reflux disease, hyperlipidemia, and osteoarthritis of the knees and hip.  He was designated as "mobility impaired" due to the latter which required him to be housed on the ground floor, limited in his use of stairs, and required a bottom sleeping bunk.  He was prescribed several medications to manage these conditions.  He also began to report chest pain, dizziness and loss of balance in the months prior to his death; a medical work-up revealed coronary artery disease.

The SCR identified several factors that may have played a role in the inmate's decision to end his life, including the ICC decision to transfer to a non-PPF Level II institution, worsening of medical symptoms, and the rejection of his appeal not to transfer.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not indicate whether this inmate's suicide was foreseeable.  The Special Master's expert determined the suicide was not foreseeable based on available information.

III.    Determination of Preventability

The Suicide Case Review Committee did not indicate whether this inmate's suicide was preventable.  The Special Master's expert determined the suicide was not preventable based on available information.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate summary of this case, including relevant social, criminal, incarceration, substance use and mental health history.  The reviewer also included a reasonable assessment of the precipitants to this suicide, and recommendations followed the content and findings of the report.  However, there was no suicide assessment at the time of reception when the inmate stated that it was normal for inmates serving a life sentence to be suicidal.

V.    Analysis of Quality Improvement Plan Process

This case resulted in one required mental health and one required nursing QIP.  A custody concern was also noted; however, the concern did not merit designation as a QIP.

39

The custody concern involved one of the officers who was not Cardiopulmonary Resuscitation (CPR) certified at the time of the incident. Documentation of CPR training for the officer was provided to demonstrate this concern was addressed.

The mental health required QIPs focused on the lack of documentation justifying the reduction in the inmate's mirtazapine dosage from 45 mg to 30 mg. Training was provided to the psychiatrist regarding appropriate supporting documentation after a medication dosage change.

The required nursing QIP dealt with the seven-day delay between the mirtazapine dose being processed and filled by the pharmacy and when the inmate actually received the appropriate dosage. Training was provided to the pharmacists and nursing regarding the need to change the Medication Administration Record (MAR) after an order was received for a dosage change. At that time, the paper MAR only changed monthly, which led to the delay. The change to the electronic health record system soon after also corrected the issue.

The QIPs and the interventions were adequate.

Case H

I.   Summary of Case

This inmate was a 27-year-old Latino man who was found hanging in his solely-occupied cell in a general population yard on April 30, 2018. He was not receiving mental health services in the MHSDS at the time of his death.

The inmate was born in California and raised with two older siblings by his mother. He had no contact with his biological father. The inmate reported chaos and violence in his home as a child. He was in an English as a Second Language program at school and did not do well academically. He reported getting into a number of fights at school and was expelled on one occasion. He reported reaching the eleventh grade and then working sporadically as a laborer.

The inmate reported using marijuana and alcohol starting at age 12. He affiliated with a gang during adolescence and was first arrested at age 13 for battery. He was also arrested for robbery and first-degree murder as a juvenile. For this latter crime, he was charged as an adult, spent one year in juvenile detention, and then transferred to CDCR. The murder was reported to be gang-related and occurred when the inmate was 16 years old.

This inmate was never married and had no children.

The inmate was incarcerated in CDCR for the first time in October 2008 for a sentence of life without the possibility of parole for first-degree murder and the intentional discharge of a firearm causing great bodily injury/death. During his incarceration, he received 20 RVRs, many of which were related to drugs and possession of a cell phone. He was

placed in segregated housing on multiple occasions as a result. Records indicated that he received regular visits from his mother, his sisters, his grandfather and a nephew. His last visit occurred in April 2018. He also corresponded through letters with his mother, his sisters and other women, but there was no evidence of phone calls since the date of his most recent facility transfer during February 2018. His mother reported that following this transfer, the inmate was "quiet" and appeared to be "down." She reported that the inmate shared that correctional officers were "bullying" him.

In September 2017, the inmate requested SNY status due to safety concerns related to gang issues. He was designated as SNY status in November 2017. It was also noted that since February 2018 while housed at his final facility, he refused to leave his cell other than when required for cell searches. He did not go to yard and did not shower, but he was not noted to be malodorous. It was unknown if this behavior was a change from his behavior at prior facilities. Additionally, his mother reported to custody staff in April 2018 that the inmate owed drug debts for heroin use and feared for his life. He was transferred to another yard following her report to custody, and he reported no further issues following the transfer.

There was no evidence that the inmate received mental health services prior to or during his incarceration. During routine mental health screenings while incarcerated, he denied prior or current mental health needs consistently. He consistently denied suicidal ideation, and there was no documentation that he engaged in self-injury or prior suicide attempts. Records indicated that he submitted one healthcare request in 2009 for "white spots" on his body that he believed were a result of getting "nervous", and he noted "my nervous system is broken." There was no documentation indicating that the inmate was seen by medical or mental health staff for this issue, however.

In April 2018, the inmate was seen by a nurse for follow-up concerning abdominal pain. When asked about suicidal ideation, the inmate responded, "If I say yes can I go to the hole?" He was redirected to address housing and custody matters through the appropriate channels and was asked to respond to the question. He subsequently denied suicidal ideation. No mental health referral resulted from this interaction.

During an on-site interview following his death, the custody leadership at the facility reported that the inmate had safety concerns as he was homosexual.

II.     Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert concluded that this suicide was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert concluded that this suicide was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case.  It provided a thorough summary of the inmate's available criminal, social, and mental health history.  The QIP followed from the findings.

V.    Analysis of Quality Improvement Plan Process

There was one QIP developed by the SCR to address a joint nursing/custody concern related to delays in providing immediate life support to the inmate after he was cut down, including failure to immediately remove the noose, lack of immediate administration of CPR, and a delay in activating 911.  The case was referred to the OIA following an initial review at the facility.  No further details were available.

Case I

I.    Summary of Case

This inmate was a 52-year-old, Filipino man found hanging in his solely occupied cell in a general population yard on December 5, 2018.  He was receiving mental health services at the 3CMS level of care at the time of his death.

The SCR noted that the inmate was born in the Philippines and moved to the United States as a child.  It was reported that his father struggled with depression, and there was a familial history of suicide.  The SCR noted that the inmate likely experienced challenges in assimilating to the culture in the United States secondary to language barriers and resulting academic challenges.  He attended special education classes for reading and writing and was diagnosed with dyslexia as an adult.  The inmate reported that he received little support at school or at home, resulting in isolation.  Prior to his incarceration, he had a sporadic work history.

The inmate's substance use history included the use of marijuana, methamphetamine and cocaine during adolescence.  He was arrested at age 13 for breaking and entering and was sent to a juvenile detention camp.  During adulthood, the inmate reported use of alcohol but not drugs.  He was arrested in 1990 for driving under the influence but was never charged with any crime.

The inmate entered CDCR for the first time in December 2006 to serve a sentence of 25 years to life for first-degree murder.  The index offense involved the murder of his wife

in March 2005. He strangled her with garbage bags and engaged in intercourse with her while she was unconscious. At the time of his arrest, the inmate was described as "dazed and confused" after ingesting an unknown quantity of prescription medication in a reported suicide attempt. He had been married for 15 years and had three children aged 5 to 11 years. Prior to the murder of his wife, there was a history of emotional and physical abuse toward her. His wife had filed for divorce two weeks prior to her murder. Records indicated that the inmate maintained contact with his children while incarcerated and participated in parenting classes while in the CDCR.

While in the CDCR, the inmate was placed in special education classes and was taking college courses through the education department. He attended Alcoholics Anonymous and Narcotics Anonymous programming from 2010 to 2011. He also participated in domestic violence groups and a "Lifer" group. He worked in the culinary program in 2014, and then from 2016 until his death. He was also noted to have been actively involved in religious services. He received two RVRs while incarcerated, one for failure to comply and one for attempted assault on a peace officer for which he received a five month SHU term. He received his last RVR during 2012.

The inmate spoke to his sister by telephone on a number of occasions in the six months prior to his death. Their conversations focused on mental health issues (his sister suffered from depression) and family events. The SCR noted that the inmate had stopped going to the yard in October 2018, following a riot at the facility. He reported being generally concerned for his safety but had no specific safety concerns. He also stopped calling his sister as frequently and asked that his children stop visiting due to his concerns about gang violence at the facility. During their final telephone call on November 21, 2018, the inmate discussed financial concerns and expressed feelings of anxiety and isolation. Interviews with staff and inmates revealed no warning signs or changes in his behavior prior to his death that led anyone to suspect that he was suicidal. The inmate left two suicide notes dated in October 2018, one to his children and one to his siblings.

The inmate had a history of receiving mental health services for depression and anxiety beginning in adolescence. He was placed in the MHSDS upon entry into the CDCR at the 3CMS level of care due to reported symptoms of depression, anxiety, and a history of psychotropic medication use. The SCR noted that his treatment course was uneventful through 2017. The inmate attended his mental health appointments and was adherent with prescribed medications. Treatment focused on symptoms of anxiety and depression.

In 2017, his mother-in-law, who had been the primary caretaker of his children died, and the inmate was also experiencing stressors in the prison. Although his symptoms reportedly increased, the inmate did not seek emergency services. In May 2018, the primary clinician indicated that his depressive symptoms were in remission; but in July 2018 his symptoms were noted to have increased. The inmate reported increased sleep, programming refusal, social isolation, hopelessness, helplessness, and passive suicidal

ideation.  He denied active suicidal ideation, plan or intent.  He reported that he had to force himself to get out of bed.  Despite his reports, no SRASHE was completed at that time and his treatment plan was not updated to reflect increased symptoms.  There was also no documentation that a level of care change was considered at that time.  The inmate reported some symptom remission in August 2018, but a return of anxiety in September 2018.  The treatment plan was updated to include more frequent clinical contacts, and medication dosages were increased.  However, there was no documentation of level of care change consideration, and the treatment goals remained unchanged.

Progress notes on October 8, October 25 and November 8, 2018, noted that the inmate was "stable" but included ongoing symptom reports of dysphoria, low energy, worthlessness, and social withdrawal.  He denied suicidality and continued to attend his mental health appointments, and he remained mostly adherent with psychotropic medications.  The SCR noted that the inmate's primary clinician reported that contacts with the inmate had returned to monthly during November 2018.  This was also documented in the electronic health record.

A review of psychiatric services noted several medication dose increases beginning in June 2018.  It was reported that the inmate was prescribed sertraline as a keep-on-person (KOP) medication.  Following the inmate's death, over 90 pills were located in his cell.  The psychiatric reviewer explained that this may have been due to the medication dose changes, which would have resulted in reissuance of 30-day supplies of medications prior to previous supplies being used.  The psychiatric reviewer noted, "The medication nurses sometime collect older or previous medication doses when a higher dose is dispensed as a replacement; however, a patient may not bring the previous bottle or packaging and claim that he/she disposed of the previous or remaining medication."  Despite this, the psychiatric reviewer concluded that the inmate was likely not fully adherent with his medication regimen.

Records indicated that the inmate had previously attempted suicide on four occasions; the most recent occurred in 2006 while he was housed in county jail.  He reported attempting suicide twice at age 18 or 19, and then again when he was age 40 when he tried to hang himself and to overdose.  Despite the inmate's arrest record that included a description of an attempted suicide at the time of his index offense, none of the SRASHEs completed during his incarceration included this documented suicide attempt.

During his incarceration, the inmate did not exhibit self-harming behavior or engage in a suicide attempt.  He was never admitted to the MHCB or a PIP.  Suicide risk evaluations completed during his incarceration consistently rated acute risk as low and chronic risk as moderate.  While concerns were noted in SRASHEs completed prior to 2018, the SCR focused on deficiencies in the risk evaluation completed during one year prior to his death.  The single SRASHE completed in January 2018 was noted blank in several sections including most of the suicide and self-harm summary page.  The inmate's

anxiety was noted as an acute risk factor, yet it was not accounted for in the risk formulation and was addressed through the provision of "education of coping skills." The risk formulation also failed to account for the inmate's ongoing depressive symptoms and noted recent stressors, and the safety plan was noted to be inadequate. Despite reports of passive suicidal ideation in July 2018 and an increase in clinical contacts due to an escalation in symptom severity in September 2018, no SRASHEs were completed.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert concluded that this suicide was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert concluded that this suicide was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. It provided a thorough summary of the inmate's available criminal, social, and mental health history. The QIPs followed from the findings, but the issue related to excess medications found in the inmate's cell was not addressed.

V.    Analysis of Quality Improvement Plan Process

There were five QIPs developed due to the SCR. Two QIPs were required to address mental health concerns related to the above discussed deficiencies with regard to the SRASHE completed in January 2018, and the failure to complete a SRASHE in July 2018. The first QIP response included a review of SRASHEs completed by all staff, and no overall deficiencies were found. The clinician who completed the problematic SRASHE had retired from service; thus, no further action was indicated for this clinician directly. Training was provided to clinical staff related to the completion of SRASHEs and the need to conduct a thorough record review. The QIP response noted that all but two staff, who were on extended leave, were trained, yet a review of the sign-in sheets appeared to document lack of participation by seven staff members. No indication of these omissions was noted, nor did the issue appear to be addressed. This response was only partially adequate.

The second QIP was required to investigate the reasons for the failure to complete a SRASHE and to address the identified issues. No investigation was completed. Instead,

the clinician was simply asked why the SRASHE was not completed, and the response was that the clinician "felt it was not clinically indicated." The remedy was to educate the clinician about Program Guide requirements. This response was inadequate, yet it was accepted by the SCRC.

Two custody concerns required QIPs. One was required to address custody staff arrival on the scene with the cut-down tool only, not the entire cut-down kit; and failure of custody staff to document whether the ligature was cut according to policy. Training was provided to a single officer with evidence of training content and completion. There was no inquiry whether this was an isolated problem or a more systemic issue of concern. This response did not appear to be adequate, yet it was accepted by the Suicide Case Review Committee.

A final QIP was required to address a nursing concern related to the failure to document whether orders were provided by the on-call physician during resuscitation efforts. Training was provided to nursing staff with evidence submitted. This response appeared to be adequate.

It was the opinion of the Special Master's expert that an additional QIP was indicated to address the issue related to the excess medications found in the inmate's cell that possibly was not accounted for appropriately following a medication dosage change.

Case J

I.   Summary of case

This inmate was a 34-year-old Hispanic single man who was found by correctional officers hanging in his single cell on August 5, 2018. He was receiving 3CMS level of care at the time of his death.

The SCR indicated that the inmate and his four sisters were raised in an intact family until his mother "disappeared" when he was 15 years old. He graduated high school and worked at a department store in an unknown position. Substance use included amphetamines, cocaine, cannabis, and methamphetamine; further details were not provided.

His first criminal offense of grand theft was at age 16. With the exception of his index offense, subsequent adult offenses were vehicle related and resulted in county jail and/or probation. He entered CDCR for his first term to serve six years in May 2014 for penetration with force/violence/fear of immediate bodily injury.

Upon entry to CDCR, he was placed on an SNY due to concerns of victimization secondary to his offense. He was housed in 14 different institutions during his four years in CDCR custody; reasons for transfers were not provided. During his first two years in CDCR, he received five RVRs, including two violent and one sexual offense. In early

2015, the inmate was placed on single cell status after an in-cell fight; further details about this incident were not provided. He had five placements in restricted housing: two due to disciplinary infractions and the remainder during transfers between institutions when a mainline bed was not available.

According to the SCR, the inmate had regular visits and phone calls with his father. His father reported that his mother "disappeared" when he was 15 years old, at which time his mental health symptoms, described by his father as "bipolar," began. Approximately one year before he was incarcerated, the inmate had three psychiatric hospitalizations due to being "really manic."

During his incarceration, the inmate's level of care began at 3CMS and alternated between EOP, MHCB, and DSH. His four MHCB and three DSH admissions were at the acute level for grave disability and suicidal ideation and occurred during his first three years of incarceration. The inmate was diagnosed with Bipolar I Disorder with Psychotic Features and Polysubstance Dependence/Disorder.

In April 2017, following his last discharge from DSH to EOP, the SCR indicated that the inmate presented as "more stable." On March 22, 2018, he was discharged from EOP to 3CMS level of care where he remained for the next five months until his suicide.

Prior to CDCR incarceration, the inmate attempted suicide two to three times. He reported a hanging attempt in ASU which he recanted shortly thereafter. A total of 15 suicide risk assessments were completed while he was in CDCR. He was generally assessed as low acute and moderate chronic risk.

According to the SCR, on November 4, 2014, he was placed on a PC 2602 order for involuntary psychiatric medication, but the order was not renewed. At the inmate's request, his psychiatric medications were reduced or simplified in the six months before his death. During this time, it was documented that he generally denied or minimized current symptoms. The SCR indicated that according to the treating psychiatrist, his psychiatric medications were "appropriate for his endorsed symptomatology."

Interviewed staff reported that they were surprised by his death. In contrast to mental health staff reports that he did not display symptoms of a severe mental illness and presented as stable, a journal discovered posthumously indicated auditory hallucinations, delusions and suicidal ideation. As an example, it was documented in the SCR that he believed his "only salvation, which would prevent him from committing suicide, would be for him to learn magic to counter the spells being cast on him by his father."

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR was a marginally adequate summary of this case and included discussion of relevant social, criminal, incarceration, and mental health history. Areas in need of improvement were discussion of treatment planning, integration of treatment goals in clinical contacts and substance use discussion (or indication that documentation was not available) given his polysubstance dependance diagnosis. Assessment of precipitants to this inmate's suicide did not consider discontinuation of psychiatric medications in the months prior to his suicide. Relatedly, lack of discussion of the sharp decline in the frequency of mental health contacts when his level of care was reduced from EOP to 3CMS was not discussed and therefore not considered as a precipitant to this inmate's suicide. An independent healthcare record review indicated that following discharge to 3CMS, aside from routine initial assessments and IDTT (which he did not attend) he only had two contacts from his primary clinician and a cell front psychiatric contact on July 23, 2018. Provided recommendations followed from the content and findings of the report.

The SCR discussed delusions regarding his father; however, despite a phone interview with his father, this important information regarding his mental state at the time of his suicide was not included in the SCR. It would have been useful to know whether his father was aware of his decompensation and if he considered alerting CDCR staff. This may have resulted in a QIP to address the need for education to family members and/or barriers to contacting CDCR with concerns.

While unlikely intentional, the tone regarding discussion of the inmate's varying reports of previous suicide attempts appeared pejorative. It was documented that "…the number of alleged dates and attempts changed dependent on the evaluation" and "…there is no documented evidence these endorsed reports actually occurred…claimed incidents occurred prior to incarceration in CDCR, and consequently substantiating documentation is unlikely to be present." It was unclear why the SCR reviewer did not ask the inmate's

father about the suicide attempts and determine if collateral information was sought from the county jail at the time of admission to CDCR. The latter could have led to a QIP.

The SCR did not discuss continuity of care and impact of provider changes on rapport and treatment engagement. In less than three years, the inmate had at least 14 different treatment teams.

V.    Analysis of Quality Improvement Plan Process

This case resulted in one required mental health Quality Improvement Plan. There were no custodial or nursing QIPs.

The one mental health QIP addressed two risk assessments on October 4, 2017 and March 27, 2018 that were assessed as having inadequate risk justification and safety planning. Because this was identified as a state-wide deficiency, it was documented that training was under development and would be implemented system-wide by May 2019, five months after the final QIP report. While it was important that a systemic failure was identified and addressed, this response was inadequate as it did not timely and directly address the two individual clinicians' insufficient documentation. Further, there was no documentation of verification of training or training materials once provided.

A statewide QIP was needed to address transition planning for inmates who discharge from EOP to 3CMS.

Case K

I.    Summary of case

This inmate was a 47-year-old Caucasian man who overdosed on a combination of amlodipine and mirtazapine. Toxicology testing also detected naproxen and a metabolite of oxcarbazepine in his system. He had taken the combination of medications on March 13, 2018 but did not report it to staff until he was experiencing severe abdominal pain. Healthcare records indicated that he reported that he had taken approximately 48 amlodipine tablets and 20 mirtazapine tablets. While awake and alert when taken to the community hospital, he required intubation due to his rapidly deteriorating physical status. The inmate was removed from life support and pronounced dead on March 19, 2018, at approximately 0910 hours. He was not a recipient of mental health services at the time of his death.

The SCR noted that this inmate was serving a four-year, three-month sentence for possession of substance with a firearm, possession of a firearm by a felon, and possession of substance for sale. He was originally arrested in February 2015 and transferred to CDCR for the first time in October 2017. His criminal record included convictions dating back to 1988 across multiple jurisdictions in Florida, Tennessee, and New Jersey

with a three-year prison term in 1994 in New Jersey. Many of his prior convictions were for substance-related crimes but also included burglary, larceny, and sexual assault. The inmate received no RVRs during his brief incarceration. He was assigned a third watch porter job and was also assigned to the "Transitions" program.

There was limited history available for this inmate as he was not included in the MHSDS having reported no symptoms, prior treatment, or suicidality. The reviewer's attempts to contact his mother were unsuccessful resulting in no information from collateral sources regarding the inmate's upbringing, juvenile history, prior treatment, or family history of mental illness. However, the reviewer was able to interview the inmate's cellmate. The cellmate reported that the inmate was "always" under the influence of some contraband substance and that he would trade his canteen to access pills from other inmates. The inmate also spoke frequently to his cellmate about suicide, though he spoke of "suicide by cop." The cellmate did not take the inmate seriously regarding his suicidality because the inmate spoke about it so frequently and was perceived as "quiet" by the cellmate. It was the cellmate who called for assistance on March 13, 2018.

The coroner's office was able to reach the inmate's mother. The inmate maintained consistent written and telephonic communication with his mother and she reported that he experienced depression at times, but he seemed upbeat when she last spoke with him by telephone on February 10, 2018. The inmate was seen by medical staff several times for blood pressure monitoring, a prosthesis for his leg (below-knee amputation reported to have occurred per inmate in 2016), and medical concerns.

According to documentation in the CCHCS Death Summary dated July 18, 2018, on January 4, 2018, the inmate refused his orthopedic appointment for casting for his prosthesis because he would be "paroling in three weeks." This was not consistent with the earliest possible release date on record, which was October 31, 2018, though it was unclear how milestone credits may have impacted his release date. There was no indication in the CDCR suicide report that the inmate was scheduled for release in January or February 2018. On January 20, 2018 , the inmate was seen in the TTA for shortness of breath and chest tightness. An electrocardiogram revealed sinus tachycardia but was otherwise normal. In addition to follow-up with a physician, the inmate also agreed to a consultation referral to mental health for anxiety. He was seen by a mental health clinician on January 24, 2018 while still in the reception center. During that appointment, the inmate reported to the mental health clinician that the referral to mental health was a misunderstanding and he had no mental health concerns, though the police report from his index offense indicated that he had a prescription for medical marijuana due to social anxiety. He was provided education on the self-referral process and no follow-up appointment was scheduled.

Following transfer from the reception center and arrival at a new facility, the inmate again denied mental health concerns and no referrals were generated. He was seen by

medical staff on February 6, 2018 and reported that his prior chest tightness was relieved by heartburn medications. He also requested a change from oxcarbazepine to naproxen, which was ordered as a KOP, as needed medication based on a review of the medication administration records. He received one dose of naproxen on that date but had refused oxcarbazepine since February 10, 2018. The inmate repeatedly refused oxcarbazepine but was not seen by a provider for his medication nonadherence. The inmate also refused to show up to scan his identification for the refusal, and there were typically no reasons for refusal documented by staff. He was medication adherent with his amlodipine.

The telephone call between the inmate and his mother was reviewed after his death. According to the suicide reviewer, this telephone call was noteworthy in that the inmate began the call calmly but became increasingly agitated, telling his mother that he was not doing well, was going crazy, and was stressed out. His mother remained non-confrontational throughout the call. The reviewer described the inmate's speech as fluctuating between monotonic and agitated as he asked his mother during the call about books that he had asked her to order for him. According to the reviewer, the two books appeared to have been about "true stories" of individuals targeted by the U.S. government who had biomedical devices implanted in them resulting in torturous effects. Comments made during the call suggested that this inmate believed that the same had happened to him. He was heard telling his mother that he did not know whether he would make it out and that he would kill himself. It appeared that the inmate may have suffered from undiagnosed mental illness or believed in conspiracy theories according to the reviewer, and that these may have ultimately impacted his decision to kill himself. It is also possible that his ongoing substance abuse may have complicated any possible underlying mental illness. During the call, the inmate reportedly told his mother that he had other warrants out for his arrest. It was not clear whether this was accurate as there was no information regarding any detainers but may have contributed to any feelings of helplessness and hopelessness that he may have been experiencing.

There were no recommendations as a result of this suicide review.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this case was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this case was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case given the limited information available. It provided a summary of the inmate's available criminal, social, and mental health history.  Ideally, there would have been more discussion regarding the mental health clinician who failed to complete a thorough record review prior to seeing the inmate as the result of a referral from medical staff for anxiety.  Had this review occurred, the clinician would have seen that the inmate had a prescription in the community for medical marijuana for social anxiety.  The mental health clinician also did not follow-up to discuss the referral with the referring party to clarify the reason for the referral when the inmate reported it was "a misunderstanding."

V.    Analysis of Quality Improvement Plan Process

This case resulted in no recommendations or QIPs.

Case L

I.    Summary of case

This inmate was a 54-year-old Latino man who hung himself on July 18, 2018 using shoestrings from orthopedic shoes while housed alone in ASU due to an investigation for safety concerns.  Despite his reason for placement and the suspicion of self-injury, the inmate was allowed to keep his durable medical equipment (orthopedic shoes strongly resembling work boots in evidence photos) in his cell.  He used the shoestrings as a noose and he also tied his wrists with a fragment of bedsheet that had been wrapped/tied around his waist.  The inmate was receiving mental health services at the 3CMS level of care at the time of his death.

The inmate grew up in California with two brothers and two sisters.  His biological father left when he was age two and his mother remarried at some point.  The record contained conflicting historical information.  For example, the inmate was described as earning his high school diploma but also indicated he dropped out during his junior year.  It was unclear whether his mother was still alive.  The inmate had a lengthy substance abuse history beginning in 1984, including heroin, cocaine, and intravenous drug use.  He denied inpatient or outpatient treatment for his substance abuse and was noted to have continued use while incarcerated.  The inmate never married, though early in his CDCR incarceration history, he reported that his girlfriend at that time was pregnant with his child, later reported to be a son.

The inmate was serving his fourth term in CDCR which began in April 1998.  He first entered CDCR in January 1985, though his criminal history dated to at least 1981 when he was convicted of burglary and charged with helping undocumented immigrants cross the border.  He received at least 21 RVRs throughout his time in CDCR, most for

substance-related offenses, though he also had several for mutual combat, participation in a riot requiring use of force, and participation in a melee. The inmate was a gang dropout who was housed on an SNY. It was unclear if the yard remained SNY at the time of the suicide or had been changed to a non-designated yard.

The housing unit officer interviewed from the inmate's housing unit was surprised to learn of his suicide, describing the inmate as a programmer who kept to himself, came out every day and did his work, and did not need anyone. This appeared to be based on the inmate's ability to obtain canteen and adequately care for his own needs without having to rely on others. It was unclear whether anyone noticed the inmate's drug use which, according to another inmate, had increased following a Board of Prison Hearing (BPH) in March 2018. While most other inmates described the inmate as introverted, a hard worker, and a "stickler" for rules related to his job, this inmate described him as increasingly consumed by drugs following that hearing with a significant increase approximately 15 days prior to the suicide. The interviewed inmate also described as the inmate as owing drug debts to other inmates on the yard. This information supported the safety concerns of the inmate if he was unable to pay those debts. At the time of his death, the inmate had no money in his trust account and had no outside monetary support.

The SCR noted that the inmate self-referred for mental health services on March 29, 2012 because of depression. The clinician who saw him indicated a diagnosis of Major Depressive Disorder, recurrent, moderate, and Anxiety Disorder NOS, and Opioid and Cocaine Dependence. The inmate had lost 20 pounds in six weeks and was tearful and isolative. The inmate reported to the clinician that he had learned in 2011 that he would not see BPH until 2033, and that while he was not trying to hurt himself, he was not trying to prolong life. He explained this as the underlying reasoning for refusing treatment for his Hepatitis C. The inmate saw psychiatry who prescribed psychotropic medications.

The treatment provided to the inmate varied over the years. In 2013 and 2014, he was reported to have been seen by mental health clinicians more frequently than Program Guide requirements. He was then endorsed for transfer and began to experience increased symptoms as a result of concerns related to that transfer. His psychotropic medications had been discontinued and were restarted at his request. He only spent two months at the new facility before returning.

In January 2017, he was evaluated for a presumed assault by his cellmate. The inmate denied that he had been assaulted and refused contact with his primary clinician at the next scheduled contact. It was not unusual for the inmate to refuse treatment participation when there was change (e.g., different group facilitator) or to request a different primary clinician when experiencing external stressors or if he felt his needs were not being addressed. During this time, the inmate was receiving morphine for pain, but his primary care provider had decided to taper the morphine. The physician referred

the inmate for a suicide risk assessment due to the reduction of morphine, and to a pain management group. Despite the referral, there was no documentation regarding morphine or a pain management group. In fact, though the inmate requested to see his psychiatrist because those medications had been discontinued, he actually refused those medications with increasing frequency up to the time of his suicide.

During his November 2017 IDTT, the inmate specifically requested a substance abuse group. The team noted that he was on waitlists for rehabilitative groups. The inmate also continued to request a change in his primary clinician, noting that they did not see "eye to eye." The primary clinician tried to see him on December 5, 2017, but the inmate refused. He was next seen in March 2018 by a new primary clinician. During that encounter, the inmate discussed being seen by BPH for a "consideration" hearing and was told he would not be seen for another four years. The inmate discussed this as a positive due to concerns about the pressures related to supervision. He also tearfully spoke about the loss of his long-term girlfriend. He further related how he experienced anxiety about treatment groups related to talking in front of people that he did not know.

The inmate refused multiple medical appointments and his previous primary clinician attempted to make contact on April 18, 2018. It was unclear why his previous primary clinician, who he repeatedly requested to have changed would be the person to contact him. The inmate unsurprisingly refused to speak to this primary clinician and only answered limited questions regarding his current functioning. The inmate had a psychiatry appointment the following day but it occurred cell front due to the inmate's refusal, which he claimed was due to feeling sick lately. The inmate attributed all of his refusals to feeling ill. Despite the inmate's denial of mental health symptoms, another clinician saw him on April 19, 2018 and documented that he appeared depressed and documented the same observation on June 18, 2018 when the inmate again refused to meet. On June 17, 2018, the inmate was again seen at cell front for a follow-up appointment and reported that he experienced increased anxiety going out on the yard. He appeared to find the yards scary, as well as freedom post-release to be very frightening and anxiety-provoking. The inmate indicated that he would come to appointments if they were scheduled when there was no yard.

The inmate was placed in ASU on July 16, 2018, after return from a seven-day admission to a community hospital due to an injury to his stomach that required stitches (he reportedly refused while at the hospital), consumption of several bags of amphetamines and opioids resulting in placement in intensive care, intubation, and ongoing hospital care. While at the hospital, the Investigative Services Unit (ISU) searched the inmate's property and found drug paraphernalia (inmate-manufactured syringe) and drugs presumed to be heroin and methamphetamine. The ISU concluded that there were no safety concerns. The inmate reported to custody that he had been slashed when yard opened on a week prior, though nursing documented that he had been slashed by his cellmate following an altercation. The ISU concluded that the inmate cut himself to

54

facilitate transfer to another yard, and that he swallowed the drugs to use them later (note: nursing indicated that the inmate swallowed them at the emergency department bathroom). Consequently, the plan was to release the inmate back to the same facility. Presumably this was conveyed to the inmate and he hung himself shortly thereafter.

The CCHCS death review classified the death as "unexpected with opportunities for improvement."

Eight recommendations and two concerns that did not rise to the level of a quality improvement plan were generated as a result of the CDCR suicide review.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this case was foreseeable. There was information available that indicated the presence of substantial risk for suicide requiring reasonable clinical, custodial, and administrative interventions to mitigate that risk. While the risk may have been somewhat ambiguous due to the inmate's refusals, denial of symptoms at times, and isolation, mental health staff appeared to be overly reliant on his self-report when he denied suicidality and did not properly integrate the inmate's history, static risk factors, and current behaviors into an assessment of risk. The inmate, a Level IV convicted sex offender who was a known gang drop out with a lengthy history of depression and substance abuse experienced safety concerns that he shared including anxiety being on yards so intense he refused appointments if the yard was open. He was previously assaulted, though he denied that victimization despite physical evidence to the contrary. He became increasingly isolated and nonadherent with treatment, though his treatment plan was not updated to reflect such. He was seen by BPH, an event that he reported was stressful and history had shown it to be stressful, but again, treatment was not modified to reflect increased stressors. The inmate expressed to his clinician that he feared freedom, he feared being on the yard and was contemplating a way to move to a lockdown setting (e.g., SHU) where he could feel safer, while maintaining an underlying philosophy that he would not "extend life" that resulted in decisions to refuse significant medical care (i.e., Hepatitis C, liver biopsy, stitches, treatment for secondary infections).

The inmate received a slashing wound referred to as superficial but was at least four inches in length and three-quarters to one inch deep at one end. He had another incised wound that was approximately two-and-a-half inches long. It was not known if these wounds were self-inflicted as ISU suspected, or, if he had been victimized as he reported to his cellmate who reported to mental health. He swallowed several bags of pills requiring intubation and admission to ICU. Again, his intent was unclear. While ISU believed that he swallowed the pills for later use, he could have died from toxicity which

may have been his goal. These behaviors were concerning and known to mental health staff upon his return. While in ASU it is unclear if he was placed in an intake cell despite being on intake status because this was not addressed in any documentation. The inmate was provided with his orthopedic shoes which appear to be work boots, and it was those shoelaces that were used as a noose. After ISU concluded that his wounds were self-inflicted and the drugs were consumed for later use, it was determined that he would be returned to the yard where he had concerns. The rationale for returning the inmate to that yard was unclear in light of other information and risk factors.

The inmate appeared appropriate for admission to the MHCB for further evaluation to assess his behaviors more thoroughly in the context of suicidality, as well as the need for a higher level of care. He could have been monitored by mental health and medical in that setting while custody staff took time to fully investigate his safety concerns. Unfortunately, the inmate was not referred to a higher level of care by mental health.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this case was preventable. Had the clinician completing the SRASHE upon the inmate's return from the hospital completed it properly and integrated the risk factors into a formulation of risk, the clinician may have been able to more accurately identify the level of risk this inmate faced. Proper interventions could have been identified such as referrals to a higher level of care or release to a different yard. The clinician also failed to properly complete safety planning with the inmate, another factor that may have increased risk and reduced the ability to prevent this suicide.

There were several areas where the emergency response was also problematic. Emergency response (911) was not called for 17 minutes and custody responders did not bring the full cutdown kit, further delaying immediate response. While the impact of these delays is hard to predict, staff error clearly caused critical lost time in removing the noose and paramedics' response. It also seems likely that if this inmate had been provided with typical shower shoes rather than his orthopedic shoes while housed on ASU intake status, risk may have been further reduced because he would not have had ready access to shoelaces that fit easily into the vent perforations in his cell.

Several mental health referrals were not addressed in this case during critical time periods during 2017 and 2018 including when his pain medication was tapered and discontinued and when he requested to see another clinician because he did not see "eye to eye" with his primary clinician. These referrals were never completed, and their content not addressed. There were also several time periods during 2017 and 2018 when the inmate

56

was not seen timely pursuant to Program Guide timelines. He was inexplicably seen cell front for his initial ASU evaluation rather than in a confidential setting. For someone with safety concerns, this likely would decrease the chance that he would share sensitive information in this non-confidential setting. While each of these occurrences alone can have a significant impact, the sum of them can be a dramatic negative impact on preventing suicide.

IV.    Critique of Suicide Case Review Report

The SCR does not reconcile some of the conflicting information between custody and medical/mental health documentation. Custody clearly took a position that the inmate was a drug addict who was trying to manipulate the system while nursing appeared less certain of the inmate's intent regarding the swallowing of pills. The possible impact of the perceptions of custody and medical staff on mental health staff's clinical judgement of risk was not included in the analysis.

The SCR does adequately address the problems found in the SRASHE most recently completed prior to the inmate's suicide. It also noted the failure of mental health to fulfill certain Program Guide requirements. However, it did not look at how the various failures on the part of mental health over time combined with the failures of nursing/medical and custody at the time of the incident (i.e., delay in contacting 911, custody not responding with the full cutdown kit) to impact foreseeability and preventability.

V.     Analysis of Quality Improvement Plan Process

This case resulted in eight required QIPs. Five of those QIPs were related to mental health care. Several of the five mental health QIP items were specific to a single clinician that mental health management noted had been a weak clinician who had been on and off an individualized performance improvement plan for years prior to this suicide. There had been issues of concern regarding suicide risk assessment and it took longer than the norm for this primary clinician to complete suicide risk evaluation mentoring. The specific clinician retired, and the facility considered that to close the items. There was no plan for how to prevent maintaining such a clinician in the future or considering not "certifying" someone who requires such extensive efforts in supervision and mentoring in clinical areas.

Regarding the concerns related to the initial evaluation in ASU at cell front, the facility justified this as an acceptable part of their process where clinicians first approach inmates cell front to ask them if they would like to meet out of cell. It was also justified by the facility because there was no confidential space. Despite the primary clinicians' documentation that they would approach the inmate again later that same day and they did not, the facility did not believe training was necessary and did nothing in response to the QIP. One QIP item was blamed on the transition to the electronic health record and

thus no follow-up was required.  The final QIP was related to the SRASHE inadequacies prior to the inmate's suicide.  On this item, the facility agreed and planned to re-mentor the clinician with a future date.  Headquarters responded that the facility had an inadequate response regarding their procedure in ASU for clinical contacts and noted that there is confidential space in the building next to ASU.  Consequently, the facility submitted a second response that they would use that building for contacts in the future.  However, the entire mental health portion of the response seemed somewhat resistant to the QIP process.  Overall, the responses to the required mental health QIPs were inadequate.

Custody provided appropriate documentation for their three QIP items.  Nursing/medical did not have any QIP items despite the fact that they were included in the failure to contact emergency services timely and the failure to apply the cervical collar timely.

In summary, review of the QIP process appears dependent on local administrators' commitment to identifying local problems and then taking action to eliminate those problems.  Headquarters typically makes repeated training suggestions as a function of the QIP even when training has already occurred, or a mentoring program exists.

Case M

I.  Summary of case

This condemned status inmate was a 54-year-old Latino man who was found hanging in his cell in the Adjustment Center (AC) on November 2, 2018, at approximately 2326 hours.  He used a sheet to make a ligature and tie it to bars at the back of his cell.  At the time of his death, he was a Level IV inmate with 60 points and was not receiving services in the MHSDS.

Included in the custody review process of the incident package (Form-837ABC) there was a clarification question as to whether the inmate's body was supported when the noose was cut and the inmate was handcuffed.  The responding sergeant indicated that he placed his hand under the inmate's armpit while cutting and removing the noose and reported that he maintained "control" of the inmate's body throughout the process.  He was not specific as to whether he lifted the inmate up to remove pressure from the ligature or how he was able to control the inmate's body weight once the ligature was removed and prevent further neck injury or if some of the inmate's abrasions may have occurred during this time.

The inmate entered CDCR during October 2018.  While in the county jail, he had at least one mental health hold due to danger to self on August 31, 2018 and several mental health diagnoses including mood disorder, anxiety disorder, and acute stress reaction.  At the time of his arrival into CDCR, this inmate reported that he did have mental illness,

though he denied depression but reported hearing voices.  He also reported a history of antidepressant prescription in the 1990s.

The SCR noted that the inmate was the youngest of six children born in Illinois to a mother who abused alcohol prenatally.  He was beaten and bullied at school from elementary through eighth grade due to his ethnicity, small stature, and Tourette's Syndrome.  He was reportedly close to a brother who was killed in Vietnam.  The loss of that brother led to his mother's depression, leaving her unable to care for this inmate as a child.  Two of his sister's became his primary caretakers.  At age 11, he was reportedly sexually abused by one of his sisters and later by a male cousin.  There was not specific information about the length of the abuse.  He also reportedly beat a family dog to death with a bat at age 13.  The inmate had no documented marriages, significant romantic relationships, or children.  He joined the U.S. Marine Corps from 1984 to 1991 and was stationed in California, later serving in Operation Desert Storm.  He did not engage in combat and was honorably discharged.  The California murders he was convicted of began during this time.

After discharge from the military, he moved back to Illinois.  The inmate was convicted of three murders and sexual offenses in Illinois and was sentenced to death.  The Illinois Governor at the time commuted his sentence.  The inmate was then prosecuted for a previously unsolved case for which he received another death sentence.  In 2011, Illinois abolished the death sentence, and his conviction was again commuted.  Prosecutors in California then sought to extradite the inmate to prosecute him for the cases in California.  He was convicted in June 2018 and sentenced on October 5, 2018.

During his brief incarceration with CDCR, he did not receive any RVRs.  He was single-celled in the AC while staff completed the necessary intake medical and mental health screening and evaluation processes.  The inmate was described by an inmate housed next to him and several custody staff in the unit as extremely quiet, polite, and never an issue.  One behavior noticed by custody was that the inmate never went to yard except on one occasion when it was mandatory.  This led one officer to believe that he was possibly fearful of others.  This inmate had, in fact, been the victim of two assaults by other inmates in county jail.

The inmate received mental health treatment from the Department of Veterans Affairs (VA) for four years in the 1990s.  The treatment was focused on the inmate's history of sexual abuse, sexual harassment, the loss of his brother, and his inability to relate to women.  The provider recalled diagnoses of mild depression and Avoidant Personality Disorder while the inmate had recalled a diagnosis of Dysthymia.  The inmate was prescribed an antidepressant but could not recall if it was effective or the reason he stopped taking the medication.  During the course of his legal proceedings, he was seen by multiple mental health professionals who provided various diagnoses including Bipolar Disorder, PTSD, Panic Disorder with Agoraphobia, Obsessive Compulsive

Disorder, Dissociative Disorder, Psychotic Disorder not otherwise specified, Tourette's Disorder, mild neurological impairment, and organic brain disease as the result of untreated syphilis. While he had intermittent contact with mental health in the Illinois Department of Corrections, it should be noted that their mental health services at that time were ultimately found constitutionally inadequate and may not be used to conclude that this inmate was or was not mentally ill. Even with this concern, mental health staff noted multiple red flags while in the Illinois system. This inmate was noted to exhibit tangential speech and paranoid thoughts that caused one provider to document that he should be "monitored regularly." The SCR also noted that one provider documented following a crisis referral from custody that the inmate had two parallel red marks on the side of his neck about one-and-a-half inches long that he claimed were due to scratching himself.

While in county jail, the inmate self-referred to mental health after he was the victim of an attack by other inmates. He denied suicidality but reported that could change depending on how his case proceeded. He was hyper-verbal, hypervigilant, irritable, and reported flashbacks, decreased appetite, and decreased sleep. The clinician documented that he would need to be assessed prior to returning to prison.

The SCR noted that the inmate was screened positive for mental health services at intake due to positive indicators for a thought and mood disorder. Nursing conducted an ASU pre-placement screen later that day where he denied thoughts of suicide. He met with psychiatry later on October 12, 2018 at his request but denied mental health symptoms. The psychiatrist documented that the inmate was interested in mental health treatment but not psychotropic medication. The psychiatrist indicated that there would be a follow-up visit in one to two weeks. The following day the clinician conducted the intake screening with no indication that the jail records had been reviewed. The clinician did not assess for the presence of a thought disorder despite the positive screen. The primary clinician did note that the inmate's thought process was "circumstantial" but based it on his preoccupation with trying to provide a timeline of incarcerations. The inmate was not included in the MHSDS and was not seen again by psychiatry or the primary clinician prior to his death.

The CCHCS death review committee agreed with the mental health suicide reviewer's classification of the death as "unexpected with no opportunities for improvement."

II.    Determination of Foreseeability

There was no documentation of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this case was not foreseeable.

III.    <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this case was preventable. The intake mental health clinician failed to assess for a thought disorder despite the inmate screening positive for this. This same clinician failed to document review of prior records or incorporate critical mental health information from those records into the intake assessment. That information included prior diagnoses, a recent designation as danger to self from the county jail mental health staff, and two incidents where the inmate had been the victim of assault by other inmates while at county jail prior to arriving at CDCR.

This inmate had a long history of abuse by peers and sought mental health treatment from the VA to address such abuse and other trauma and mental health issues prior to his first incarceration. These recent assaults should have been viewed in the context of a history of trauma and possible ongoing safety concerns. Had a follow-up visit occurred as indicated in the records, mental health may have learned that he was not attending yard and considered safety concerns as another risk factor. Further, there were records from the Illinois Department of Correction that indicated that he may have been experiencing a psychotic disorder and paranoia exacerbated by disappointments in his court cases which at times may have resulted in self-harm. This inmate also had multiple risk factors including that he was a violent sex offender under sentence of death with a history of trauma, possible mental illness demonstrating evidence of safety concerns with no family support, yet he was not considered for a SRASHE. He was housed in an ASU with a solid door for intake. His follow-up by psychiatry did not occur.

IV.    <u>Critique of Suicide Case Review Report</u>

The SCR was an adequate summary of this case given the inmate's limited time within CDCR and subsequent limited information available. It provided a summary of the inmate's available criminal, social, and mental health history.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in three required QIPs. One was related to the clinician who failed to properly assess the thought disorder despite the inmate having screened positive. The QIP process did not address that clinician's failure to review prior records as required by the Program Guide. There was also no QIP regarding the psychiatrist's documentation that there would be a follow-up contact in one to two weeks and the subsequent failure to complete that follow-up contact.

Another QIP addressed how the ligature was cut by custody. Policy requires that staff cut above the knot, yet custody responders cut below the knot. Further, while referenced, the failure to support the body and provide immediate relief to the inmate's airway was not addressed directly in a QIP. Additionally, a discrepancy where ISU noted a towel in evidence that had reportedly been tied around the inmate's feet but was not noted in any onsite staff reports was the subject of the third QIP.

Mental health provided extensive documentation for their QIP response. However, the two custody QIP items included only the memorandum in response and no proof of practice referenced in the response, though it suggested that it had been provided to Headquarters.

Case N

I.   <u>Summary of Case</u>

This inmate was a 26-year-old Caucasian male who was found by a nurse and an escort officer who were performing a routine medication pass hanging in his Short-Term Restricted Housing (STRH) cell on December 26, 2018. He was hanging by a bedsheet anchored to a light fixture. He was transported to the TTA where CPR was continued. Paramedics arrived, assessed him, and pronounced him dead. When the inmate was pronounced dead, he was in full rigor mortis, with his legs and hands stiff and elevated. At the time of his death, he was receiving mental health services at the 3CMS level of care.

The inmate was born in Northern California. His developmental history was unstable and traumatic, starting with his mother's consumption of methamphetamine during pregnancy. Records revealed he was physically and emotionally abused and neglected by his parents, who had histories of drug abuse and criminality resulting in multiple arrests and incarcerations. He was raised primarily by his mother; however, he was removed from the home as a toddler due to her substance use. He had four siblings, two brothers and two half-brothers. When the inmate was age 17, his father died from cirrhosis of the liver, reportedly caused by Agent Orange. His mother reportedly committed suicide by driving her car off a cliff when the inmate was age 19. The inmate's marital relationship status was unclear.

Along with his parents, the inmate had an extensive substance use history, including alcohol, hallucinogens, amphetamines, and opioids. He dropped out of school in the seventh grade; however, he returned and completed high school after a juvenile justice placement. He also attended community college and took a welding class. His employment history consisted of a few jobs in the food service industry.

The inmate's juvenile criminal history included arson and runaway offenses, resulting in juvenile detention placement. His adult criminal history consisted of only substance-use

related offenses, until he was convicted of the controlling offenses. In November 2017, the inmate was charged with 16 felony counts including multiple counts of sexual assault upon a child, solicitation of a minor to use or sell a narcotic, possession or control of child pornography, and criminal threats. These offenses reportedly occurred between November 2014 and May 2016. He was sentenced to serve 90 years to life, plus an additional 13 years and eight months. His early parole date was 2099.

The inmate's institutional adjustment was poor. During his relatively brief 11-month CDCR incarceration, beginning in February 2018 and ending with his death in December 2018, he felt vulnerable and never accepted his long sentence. His vulnerability began during the first month of his incarceration when he requested "sensitive needs placement" because he could be victimized due to his child sexual abuse offenses. Two days after his request, he was the victim of battery. He was placed in ASU and subsequently transferred to complete the reception process. One month later in May 2018, he was transferred again. He received three RVRs for fighting, violence against a peace officer, and refusing a housing assignment. Records revealed that staff's opinions of the inmate's reasons for the housing refusal were divided. Some staff attributed his refusal to safety concerns while others attributed his refusal to manipulation, trying to control his housing placement. The inmate's vulnerability was also revealed in telephone conversations with his family, during which he reported that he did not get out of his cell because of violence at the facility, including frequent stabbings. He frequently requested money from his family who refused to answer his calls after June 2018. Additionally, records revealed that he had no visits during his prison term.

Little was known about the inmate's mental health history prior to incarceration. Records revealed he reported mental health treatment as a child and adolescent, with an unidentified psychiatric medication. He denied any psychiatric hospitalization. While in juvenile detention, he was treated and evaluated by a psychologist in 2009 and 2013. Additionally, he was evaluated by court request in January 2017. The evaluations described him as immature with a mental and emotional age well below his chronological age. It also revealed that he had been diagnosed with a Generalized Anxiety Disorder. Jail records also reported a history of anxiety; however, they did not render a formal diagnosis.

Nine days after arrival to CDCR, the inmate was included in the MHSDS at the 3CMS level of care. His principal diagnosis was an Adjustment Disorder with Anxiety related to safety concerns and his long sentence. In August 2018, his mental health primary clinician expressed concerns about decompensation due to feelings of isolation and loneliness. The primary clinician noted his stress level and fearful thoughts were extreme and being exacerbated by his feelings of isolation; consequently, the clinician briefly considered elevating his level of care to EOP. In September 2018, his tele-psychiatrist noted he was primarily grieving over the life he lost and struggling with his crime and the consequences of incarceration. The tele-psychiatrist noted medication might not be the

best primary therapeutic approach and recommended psychotherapy to help him understand his new life. The inmate denied suicidal ideation, panic, or excessive anxiety; however, from October 2018 forward, the record revealed an increase in his anxiety and depression. On October 19, 2018, psychiatry noted the inmate expressed interest in the Conditional Release Program (CONREP) program at Atascadero State Hospital and in the EOP; however, psychiatry indicated he did not meet criteria for either program. The inmate reportedly did not display signs of suicidality or psychiatric distress until October 31, 2018, when he was admitted to the MHCB for suicidal ideation. His suicidality was triggered by a transfer to a new yard. At that time, he threatened to kill himself if custody left him in the yard. He was discharged from the MHCB on November 5, 2018 and reported suicidal ideation several hours after his MHCB discharge. An emergency consult was completed in response to his report; however, no SRASHE was completed in response to the consultation request.

The inmate became increasingly distressed in November and December 2018. On November 13, 2018, his primary clinician reported that he claimed five inmates from another building came to his building, called him "ChoMo" (child molester), and threatened him with knives. On December 2, 2018 he was once again admitted to the MHCB due to suicidal ideation with a plan, which was reported after he refused housing on the same yard but in a different building. He was perceived as manipulating placement and unwilling to work with custody. After discharge from the MHCB and placement in the STRH on December 10, 2018, he threatened to kill himself, and requested CTC placement. On December 13, 2018, he was referred for a third inpatient admission; however, he was placed in alternative housing for one night due to threats of hanging himself and a desire to die after being informed of the ICC decision to place him in STRH for 154 days. Additionally, he was cleared for double cell housing. The MHCB referral was rescinded even though the discharge summary noted he told custody that he would wrap a sheet around his neck to be sent to CTC. Additionally, the rescission order was never placed in the health record. He was seen by psychiatry on December 14, 2018 and requested EOP placement after disclosing that his mother's voice was telling him to kill himself and that he was psychiatrically hospitalized several times as a child. After that December 13-14, 2018 alternative housing placement, he received his five-day follow-up visits from December 15-19, 2018. The reviewer noted two visits did not refer to the safety plan written in the SRASHE. The treating psychiatrist diagnosed him with an Adjustment Disorder and noted there was a need to make a differential diagnosis of Major Depression with Psychotic Features versus Schizophrenia. Additionally, the treating psychiatrist noted the inmate denied any suicidal ideation, plan, or intent, and had good insight and judgment. His level of care remained at 3CMS, and he was returned to the STRH. The clinical summary of the initial psychological assessment completed on December 19, 2018 noted the inmate was manipulating staff to be transferred to a single cell. Between April 4, 2018 and December 25, 2018, the inmate submitted at least 29 healthcare service requests. Two of the requests were to talk with

his mental health primary clinician, and his final request on December 25, 2018 was to meet with the psychiatrist.

Ten SRASHEs were completed between October 31, 2018 and December 19, 2018. The reviewer cited several concerns. Omission concerns included: omitting static, slowly changing, and short-term dynamic risk factors as well as protective factors; sporadic exclusion of a chronic or acute risk factor; a distinction between passive and active suicidal ideation; warning signs; clinical and behavioral chronic and acute factors as well as correctional and demographic risk factors and protective factors; and a safety plan. Commission concerns included: conflating times when the document was written; conflating times when the SRASHE was completed; assuming the inmate was manipulating staff to be transferred to a single cell; and not collaboratively justifying risk and developing safety plans. Additionally, given his multiple risk factors, few protective factors, and ongoing distress, the treatment team did not reconsider the accuracy of the inmate's working diagnosis nor the effectiveness of the treatment plan and his 3CMS level of care.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this case was not foreseeable.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this case was preventable, had the inmate received an appropriate level of care, accurate and complete evaluations, and adequate treatment. His mental health care was compromised by an overall impression that rather than being distressed, he was manipulating staff for single cell placement. The treatment team adopted the impression that he was manipulating without adequate justification, ignored multiple risk factors, minimized genuine distress and an elevation of his suicide risk level. Despite his efforts to find relief from anxiety, loneliness, alienation, and hopelessness, the inmate felt ignored and became desperate.

IV.   Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. It included relevant social, criminal, institutional, substance use, and mental health histories. It also provided a description of the inmate's behavior, critiques of the suicide risk assessment self-harm evaluations, and the inmate's level of care along with his diagnosis. Additionally, the SCR provided

critiques of the treatment team's inability to integrate information, base their clinical decisions and judgments on documented information, and resolve fundamental conflicting impressions.

V.    Analysis of Quality Improvement Plan Processes

Ten required QIPs followed from the findings in the report. Seven QIPs were related to the delivery of mental health services, primarily involving the primary clinician, and treating psychiatrist. Additionally, one QIP was related to custody, and two QIPs were related to nursing. The required seven mental health QIPs resulted from multiple documentation deficits in ten SRASHEs, an inadequate discharge rationale, inadequate five-day follow-up documentation, a problematic discharge from alternative housing, incomplete treatment documentation, a missed routine psychiatric consult timeline, and an inadequate response to an emergent primary clinician consult. The required custody QIP resulted from the inmate's body being observed to have possible signs of rigor mortis. The two required nursing QIPs resulted from the inmate having rigor mortis in the TTA, and inconsistencies in the administration and documentation of Narcan. The ten QIP responses were appropriate and comprehensive, except for an outdated custody QIP. The status of each QIP is briefly presented below.

The first mental health QIP resulted from the ten SRASHEs having multiple deficits to include: incomplete/blank sections on chronic, acute, or protective factors; poor risk formulation and safety planning; missing information about sources of information whether by checklist or narratives; failure to clarify if the inmate had a spouse; inaccurate information regarding his family contacts; and overall, an apparent underestimation of risk due to a failure to obtain and integrate available information. Facility leadership sent a memo dated March 28, 2019, indicating eight of the identified SRASHEs were reviewed with the chart audit tool (CAT) criteria. Five of the identified SRASHEs did not pass the CAT audit. Four of the five clinicians who performed those SRASHEs received SRE mentoring, while the fifth clinician was out on long-term sick leave. In addition, all clinicians participated in training held on March 26, 2019 focused on clinical decision making and MHCB referrals, completion of five-day follow-up, safety planning, risk formulation and manipulation, and the importance of the central file (C-file) review. The training participation sign in sheets were provided.

The second mental health QIP resulted from the SRASHE dated December 14, 2018, which was identified as being incomplete, inaccurate, and containing multiple deficiencies. An additional five SRASHEs which were completed by the identified clinician were reviewed utilizing the CAT audit criteria. The most common missing information included the incorporation of the modifiable risk, protective factors and warning signs into the safety plan, the identification of sources of information within the narrative, and identification of risk factors in the narrative. The identified clinician participated in mentoring on February 21, 2019, as well as training on March 26, 2019.

66

In addition, a memo addressing the expectations for clinical documentation was submitted to the identified clinician.  The memo and signed training sheets were provided.

The third mental health QIP involved five-day follow-up documentation dated December 15, 2018 and December 16, 2018.  These documents did not include the MHCB safety plan and a sentence addressing his recent suicidal ideation/triggers for his MHCB admission.  The reviewer noted that it was likely the omission of the MHCB safety plan resulted from an underrepresentation of risk level.  A review of the identified five-day follow-up documents and five more five-day follow-ups authored by each of the two clinicians was conducted by the Suicide Prevention and Response Focused Improvement Team (SPRFIT) coordinator using the CAT standards.  Subsequently, five-day follow-up and safety plan training was provided to all mental health clinicians employed at the facility.  One of the identified clinicians was on long-term medical leave but would receive training upon return.  The training participation sign in sheets were provided.

The fourth required mental health QIP involved the MHCB discharge summary, dated December 14, 2018.  This discharge summary did not reflect an inmate who was stable enough for discharge to an outpatient environment.  Additionally, documentation did not contain a comprehensive safety plan consistent with the inmate's risk level, nor did it provide a clinical rationale supporting discharge.  The specific discharge summary was reviewed with the identified clinician who participated in mentoring on February 21, 2019, as well as training held on March 26, 2019.  Additionally, a memo dated March 29, 2019 addressing the expectations for clinical documentation was submitted to the identified clinician.  The memo and signed training sheets were provided.

The fifth required mental health QIP resulted from an overall impression that the inmate's behavior was motivated by secondary gain without comment on the function of the behavior, how to address the behavior clinically, and how to explore its psychological nature and the inmate's level of distress.  Facility mental health leadership reviewed the clinical notes, which revealed the need for training focused on the function of inmate's behavior and how to address it clinically.  All clinicians participated in training which addressed these issues on March 26, 2019.  The signed training sheets were provided.

The sixth required mental health QIP resulted from a missed timeline for a routine psychiatric consult.  The CMH explained the healthcare service request was received and scanned into the inmate chart on a Sunday.  As a result of the facility having no supervisors available to submit contact orders on weekends, the psychiatric consult order should have been submitted on Monday, December 17, 2018 when supervisors were back at the facility.  The senior psychologist, the supervisor responsible for the health care services request triage, retired.  A workflow handout was created by the supervising psychiatric social worker and the CMH, which would be provided to any new supervisors.  The training for the healthcare service requests workflow was provided.

The seventh required mental health QIP resulted from a SRASHE, which was not completed, subsequent to an emergent primary clinician consult dated November 5, 2018. A review of the inmate's chart revealed that a SRASHE was completed on November 5, 2018 at 1200 hours when the inmate was clinically discharged from the MHCB. The inmate reported suicidal ideation upon return to his assigned housing at 1600 hours on November 5, 2018. The report that a SRASHE was not completed in response to the primary clinician's emergency consult ordered at 1600 hours was correct. Mental health staff were reminded of the Program Guide requirement. The memo and signed training forms were attached.

The one required custody QIP was based on reports and information submitted by responding staff that the inmate's body was observed to have possible signs of rigor mortis. This calls into question the thoroughness of the custody welfare checks completed during the prior and current watch. The incident was referred to the OIA. The Warden submitted a CDCR 989, Internal Affairs Investigation Request, based on alleged policy and procedure violations. On April 10, 2019, the Warden stated he did not expect the results of the investigation for months. There was no documentation that the investigation was completed and, assuming it was completed, there was no documentation of the results.

The first required nursing QIP resulted from the inmate having rigor mortis and lividity in the TTA. CPR was performed, and the emergency medical services call was not canceled. All nursing staff were trained regarding occasions when CPR should be stopped and when emergency medical services can be canceled. The training slides and participation sign in sheets were provided.

The second required nursing QIP resulted when a nurse noted that five doses of Narcan were administered but only three (confirmed by MAR review) were documented from the initial responding staff. Medical leadership provided training to nursing staff regarding the administration and documentation of Narcan. Training slides and participation sign in sheets were provided.

Case O

I.  Summary of Case

This inmate was a 22-year-old Latino man who was found on September 6, 2018 by an inmate porter who informed a correctional officer returning to the building that an inmate was hanging. Responding staff reported the inmate was unresponsive and hanging from a sheet attached to the top bunk. An ambulance transported the inmate to a community hospital where he was pronounced dead on September 6, 2018. He was receiving mental health services at the EOP level of care at the time of his death.

The inmate was born in Idaho and raised by both parents in California. He had three siblings, two brothers and a sister. He described his relationship with his father as "all right" and reported his mother contacted him regularly. He was never married and did not have any children. He was employed in 2014 as a laborer. He graduated from high school in 2015. He was affiliated with a gang and was financially supported by his parents. He reported first consuming alcohol at age 12, smoking marijuana at age 13, and smoking methamphetamine at age 20. He continued using marijuana and crystal methamphetamine until he was arrested in 2017.

As a juvenile, he was arrested for burglary and trespassing. As an adult, he was placed on probation for misrepresenting himself as a police officer and for shoplifting. His commitment offense occurred in January 2017 while still on probation. He assaulted a 79-year-old male during a robbery and threatened to rape a female if she did not surrender her purse. He fled on foot with the purse, was captured, arrested, and sentenced to a three-year, eight-month prison term.

The inmate's adjustment to his first prison term was problematic, as illustrated by six transfers within 15 months. He was placed in an SNY for his entire term, due to his affiliation with a gang in the community, and to his disassociation from the gang in prison. Within approximately six months of his CDCR arrival, he received two RVRs, both for battery on a prisoner. He received the first RVR at the reception center, resulting in a transfer to ASU. During the ASU mental health screen, the inmate told a nurse that he was suicidal, resulting in an MHCB placement rather than ASU placement. Approximately five months later, he received the second RVR, resulting in a nine-week STRH placement. Upon release from STRH, he was transferred to another facility and placed in an SNY. After approximately four months, he transferred again because his mental health level of care elevated to EOP. Within the next four months, he was transferred twice as his level of care increased from EOP to ICF, and from ICF to acute psychiatric program. The inmate was treated in an acute inpatient level of care for approximately two weeks, after which time his level of care was reduced to EOP resulting in a transfer.

The inmate's mental health history prior to incarceration in CDCR was obtained by a clinician interview of the inmate's mother, and by review of county jail records and a report from his probation officer. The inmate's mother revealed he was first treated with antipsychotic medication at age 18 in the community. He exhibited bizarre behavior, disorganized/paranoid thinking, and auditory hallucinations. His mother reported that he slept little at night and kept a knife under his pillow to protect himself from enemies who were trying to kill him. She also reported he talked about seeing the devil and did not comply with treatment. Reports from his probation officer and the county jail revealed he was being treated with antipsychotic medication for auditory hallucinations. Records also revealed he attempted to hang himself twice, once in 2015 and once in 2016. Additionally, there was a history of suicidal ideation, suicide threats, and suicide

attempts.  County jail staff reported observing him hallucinate and exhibit grandiose and paranoid delusions.

The inmate's CDCR mental health history began when he arrived in June 2017 with a prescription of antipsychotic medication.  Despite the medication, he was not referred to the MHSDS because he was not exhibiting any active mental health symptoms.  Approximately one month later, a clinician discovered he had a history of suicidality, depression, and anxiety.  The clinician also suspected he was psychotic because of his grandiosity; consequently, he was referred to MHSDS and began receiving 3CMS level of care.

Diagnosing and treating the inmate was difficult because only minimal and questionable historical information was available when he entered CDCR.  Additionally, he was a poor historian and presented contradictory and inconsistent information.  These difficulties were exacerbated by his psychotic and suicidal symptoms waxing and waning.  His symptoms alternated between periods of active psychosis and genuine intentions to die, and periods of attenuated and subclinical symptoms.  His record revealed that his denials of mental health problems and suicidal thoughts and plans were always followed by exhibitions, endorsements, and reports of psychotic symptoms and suicidality.  Despite occasional moments of attenuated or subclinical symptoms, his record revealed overwhelming evidence of active psychotic symptoms and suicidality.  For example, psychotic symptoms were revealed in July 2017 at the reception center when he exhibited grandiose thoughts; in October 2017 when his thoughts were disorganized and grandiose; in May 2018 when his mental status was deteriorating; in June 2018 when his thought processes were decompensating; and in August 2018 when he was disheveled and his speech was rambling and tangential.  Periods of active suicidality were revealed in August 2017 when he told a registered nurse he was suicidal; in June 2018 when he told the treatment team he had suicidal and homicidal ideation; in July 2018 when he asked a licensed vocational nurse if he could kill himself in the shower; in August 2018 when he reported to a nurse, suicidal feelings and command auditory hallucinations telling him to kill himself; and in August 2018 when in response to an emergent referral, he reported feeling suicidal, described a plan to hang himself with a sheet, and disclosed an attempt to hang himself was aborted because he threw up on August 25, 2018.

The alternation between passive/subclinical symptoms and active/clinical psychotic and suicidal symptoms resulted in a need for diagnostic clarification.  For example, on March 14, 2018, the treating psychiatrist diagnosed him with schizophrenia and prescribed medication for treatment of his active psychotic symptoms; however, a psychologist provisionally diagnosed him with an adjustment disorder which was accepted by the IDTT without a clear rationale.  Additionally, the adjustment disorder diagnosis was carried on by treatment teams until his death and may have resulted in a minimization of the severity of his problems, and a perception that he was manipulating/malingering symptoms.  The lack of diagnostic clarity and case

conceptualization resulted in safety plans that did not address his psychotic symptoms which likely triggered his suicidal ideation.

Proximal events to the inmate's death included his return to an EOP level of care from an acute inpatient level of care on August 24, 2018, two weeks before his death. The five-day follow-ups, which started on August 25, 2018, were problematic because there was no mention of his acute discharge safety plan and treatment interventions for his suicidal ideation. On August 29, 2018, one week before his death, the inmate was evaluated due to an emergent referral. An initial assessment and a SRASHE were performed. The clinician noted he denied mental health distress; however, his thought processes were disorganized, his behavior was bizarre, and his thinking was paranoid. The evaluating clinician consulted with the floor custody officers who informed him that the inmate's presentation was the result of manipulation. After speaking with the correctional counselor and the primary clinician, the evaluating clinician recommended he remain at an EOP level of care.

On September 5, 2018, one day before his death, the IDTT met, after an IPOC was initiated on August 29, 2018. During the treatment team meeting, the inmate reported that he was suicidal and wanted to transfer because of safety concerns, while denying a plan or intent. The treatment team neither provided a clinical rationale for activating the IPOC, nor identified how the inmate's statements of suicidality would be addressed. Additionally, the unit classification committee (UCC) met on September 5, 2018. During that meeting, the inmate again reported he would commit suicide if not transferred out of the facility. Despite his suicidal statements at both the IDTT and UCC, no SRASHE was completed.

Thirteen SRASHEs were completed between August 14, 2017 and August 29, 2018. Frequent SRASHE deficiencies consisted of inadequate conceptualization of the case and justification of the risk level. Additionally, safety plans tended to be cursory and lacked necessary detail/individualized interventions to support the inmate in dealing with suicidal ideation.

II.    Determination of Foreseeability

There was no documentation of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this case was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this case was preventable. To accurately assess and treat this relatively complex case, given the clinicians' paucity of information and the inmate's inconsistent and contradictory self-reports, clinicians needed to access historical/collateral information to understand the course of his mental illness. Additionally, clinicians needed to obtain critical information to render a diagnosis, conceptualize the case, and develop a treatment plan. Competing diagnoses and case conceptualizations needed to be identified, discussed, and resolved, and the resolution should have been documented. Due to the lack of diagnostic clarity, descriptions of behavior as malingering and manipulating for secondary gain were used, which minimized the severity of the inmate's distress and compromised the development and implementation of treatment and safety plans. It also impacted clinicians' selection and interpretation of information collected during initial assessments and SRASHEs. These issues resulted in eight mental health QIPs.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this clinically complex case. Given the dearth of historical and collateral information, and the contradictory and inconsistent observations/assessments in the health record, the reviewer had to investigate and access several sources of information to create a context within which this case could be understood. The SCR included relevant social, criminal, institutional, substance use, and mental health histories. It also provided a description of the inmate's symptoms, and critiques of 13 SRASHEs, IDTT documentation, clinical rationales/justifications, diagnoses, safety plans, treatment interventions, and the treatment teams' inability to resolve conflicting clinical impressions.

V.    Analysis of Quality Improvement Plan Processes

Eight required mental health QIPs were developed. There were no custody or nursing QIPs. Four of the eight mental health QIPs identified issues to be addressed by institutional mental health. The eight QIPs clearly resulted from the major findings in the suicide case report. No additional QIPs were needed; however, the second institutional QIP involving IDTT documentation (i.e., clinical rationales), and the second mental health QIP involving diagnostic formulation also needed to address the treatment teams' inability to resolve differing opinions on case conceptualization and diagnosis.

The first institutional mental health QIP resulted from deficiencies found in the five-day follow-ups on this inmate between August 25 - 29, 2018. On three of the five days, the acute inpatient discharge safety plan was not discussed, and safety plan interventions to reduce specific triggers for suicidal ideation were not identified. This information would be helpful to clinicians assessing the inmate's transition from an acute hospital setting to a reduced outpatient level of care. The improvement plan consisted of a senior psychologist supervisor conducting an audit of ten additional five-day follow-ups

completed on inmates released from higher levels of care by the clinician identified in this QIP. A memo from the senior psychologist supervisor dated December 18, 2018 stated a total of ten randomly selected five-day follow-up documents were audited with the chart audit tool for the identified clinician. The audited five-day follow-ups were completed over a four-month period. Overall, the clinician consistently met all audit criteria; however, safety plans needed improvement. Additionally, the SPRFIT coordinator created a training curriculum which covered essential information required when completing five-day follow-up documentation. Training was held during the week of November 12, 2018 for all mental health clinical staff. A few staff were unable to attend due to sickness or vacation; consequently, additional training was provided in December 2018. The training participation sign in sheets were provided. This response appeared adequate.

The second institutional mental health QIP resulted from insufficient documentation on the master treatment plan during the inmate's initial IDTT. The deficiency was related to the absence of a clinical rationale for the activation of a grave disability IPOC and an absence of a strategy to address the inmate's statements of suicidality. The senior psychologist supervisor drafted a memo dated December 18, 2018 stating ten randomly selected master treatment plans were audited using the chart audit tool for the identified clinician. The audited treatment plans were completed over a five-month period. The audit identified several areas for improvement. The overall chart audit tool compliance was 83 percent. Audit results were discussed with the identified clinician, and all mental health program supervisors conducted trainings to review the chart audit tool for treatment planning. The training participation sign in sheets were provided and this response appeared adequate.

The third institutional mental health QIP resulted from the absence of a SRASHE for this inmate on September 5, 2018, despite reports of suicidal ideation during the IDTT and UCC. Pursuant to the Program Guide, "when an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data." The senior psychologist supervisor drafted a memo dated December 18, 2018 indicating the SPRFIT Coordinator discussed information from the suicide prevention summit at an all staff meeting on October 11, 2018. The discussion focused on taking suicidal threats seriously and appropriately assessing all threats. Additionally, the SPRFIT Coordinator and the Inpatient Psychiatric Coordinator reviewed requirements for assessing suicidality with all clinical staff in individual program huddles. The training material and participation sign in sheets were provided. This response appeared adequate.

The fourth institutional mental health QIP resulted from concerns with a SRASHE completed on August 25, 2018. The specific concerns regarded the evaluating clinician largely relying on the inmate's self-reported denials rather than an adequate record review which documented a history of suicidality and psychiatric problems. The senior

psychologist specialist drafted a memo dated December 18, 2018 indicating a total of ten randomly selected SRASHEs, completed by the identified clinician, were audited using the chart audit tool. The overall chart audit tool compliance score was 86 percent. Several deficiencies were found involving safety plans and risk justifications. The results of the audit were discussed with the identified clinician. Additionally, the SPRFIT Coordinator created a training curriculum which covered SRASHE documentation, with an emphasis on risk justification and safety planning. Several trainings were provided in November and December 2018. The training material and the training participation sign in sheets were provided. This response appeared adequate.

The first mental health QIP resulted from deficiencies in SRASHEs completed between August 14, 2017 and August 29, 2018 at five institutions. The deficiencies involved areas of risk justification and safety planning. The statewide SPRFIT division drafted a memo dated November 20, 2018 indicating a training titled "risk assessment and safety planning for suicidal inmates" was anticipated to be delivered to the field during March and April 2019. The training would encompass an evaluation of imminent risk and the development of safety plans which corresponded to that level of suicide risk. Additionally, the training would identify a new requirement; namely, to convene an interdisciplinary treatment team for those inmates who were not referred to an MHCB, but who represent moderate levels of suicide risk. Follow-up documentation on the status of the training materials was not submitted, and no further information was available. This response was deemed partially adequate.

The second, third and fourth mental health QIPs resulted from deficiencies in clarifying diagnoses, utilizing current diagnostic nomenclature, and accessing and reviewing historical records. The mental health administrator from the headquarters Clinical Support Unit drafted a memo dated November 28, 2018. The memo addressed the second, third and fourth QIP's. The second QIP, which involved differential diagnoses, was addressed with a training link that provided diagnostic guides and information on differential diagnosis and case formulation. The third QIP, which involved utilization of current diagnostic nomenclature, clearly stated that a recent update to the electronic health record system was made, requiring psychologists and social workers to only select Diagnostic and Statistical Manual of Mental Disorders – 5th Edition (DSM-5) diagnoses. The fourth QIP, which involved accessing and reviewing historical records, clearly stated that when inmates are received from a county jail, records should be requested and reviewed. This response appeared adequate.

Case P

I.    Summary of Case

This inmate was a 63-year-old Caucasian man who was found on May 12, 2018 by his cellmate who returned from the yard and was at their cell door yelling "man down."

When custody arrived at the cell, they found the inmate unresponsive and hanging by an extension cord tied to the upper bunk. He was pronounced dead at approximately 1031 hours. There were no reports of rigor mortis. The inmate was not receiving mental health services at the time of his death.

The inmate's record contained minimal historical information. The reported information was obtained through an interview with his sister. He was born in Montana and raised in an intact family consisting of his parents and four siblings, two sisters and two brothers. He reportedly witnessed extensive domestic violence throughout his childhood between his parents. Additionally, his father's anger was often directed at him. His family had a history of suicides beginning with his paternal grandfather who went into the mountains and shot himself before the inmate was born. On Mother's Day in 1985, his father committed suicide by overdosing on pills. His family moved to Seattle, Washington in 1967 when he was approximately age 12. He graduated from high school and attended trade school for television repair. He was married and the father of three children, two daughters and one son. On May 12, 1990, his three-year-old son died of leukemia. Subsequently, his relationship with his wife ended and she severed communication with him. The inmate moved to California in 1992. In 1993 he was charged with violation of a custody order and placed in jail for 31 days. While in California, he worked as a mechanic restoring and selling old vehicles. He had few friends and he preferred to read or watch television. He remained close to his two sisters, who were his sole sources of support. Following his current conviction, his brothers never spoke with him again. There was no reported drug or alcohol abuse.

The inmate's commitment offense occurred in April 2012 when a deputy responded to a call of "gunshots fired." The deputy banged on the door and received no response. Consequently, the deputy entered the trailer and found a long rifle near the door. The inmate, who was hearing-impaired, was in his trailer. The inmate reported thinking someone was breaking into his house and he fired at the deputy who in turn fired back. The inmate was shot in his right arm and chest requiring medical attention. He was arrested and convicted of attempted murder (second-degree) of a peace officer. He was sentenced to a term of 27 years.

The inmate's adjustment to prison was good. He arrived in CDCR in March 2014. Custody staff reported he was not a problem. His classification score steadily decreased over the course of his incarceration. At his last UCC meeting on May 1, 2018, his classification was lowered, making him eligible for dorm housing. He held a job as a third watch porter since March 31, 2016. He reportedly complained to other inmates about having difficulty performing his job duties due to the gun shot injuries to his right arm. Because of his injuries, he felt vulnerable and did not want to move from a two-man cell to a dorm. Inmates reported he usually stayed in his cell watching television. They noted he did not talk much and did not understand yard politics. They stated he talked with his sister at least every weekend and told them he would have no reason to live if something happened to her. On May 5, 2018, he told his sister that he was being

transferred to dorm housing.  He said that he was afraid of dorm housing because he could not protect himself.  The inmate also expressed concerns about losing his television.  He repeatedly told her he was being victimized, saying it began on the night of his arrest.  He talked about filing lawsuits for his wrongful arrest and poor medical treatment following his arrest and incarceration in CDCR.  Additionally, the inmate stated his medical treatment reflected cruel and unusual punishment, which was part of an overall conspiracy.  He reported his primary care physician informed him that he would not receive nerve transfer surgery for his arm injuries because the injuries were too old.  He also reported that medical discontinued his pain medication; however, the medication administration record did not reflect discontinuation.  The inmate ended the call telling his sister he wanted to talk with her before he went "man down" due to his pain.

The inmate had no history of receiving mental health services in the community or in CDCR.  He was screened by mental health on April 7, 2014 and was cleared for placement in general population.  Nursing sent a referral to mental health in September 2014 regarding the inmate's uncooperative behavior and possible depression/anxiety.  The evaluating clinician noted the inmate was depressed and frustrated with CDCR's system of healthcare and poor follow-through.  The inmate explained to the clinician how he was shot in the right shoulder and arm five times by police who entered the wrong house looking for a suspect.  Nursing sent another referral to mental health in December 2014 noting possible paranoia.  The evaluating clinician documented the inmate's concerns were realistic, given his chronic pain and medical conditions.  The inmate submitted two requests for services to mental health.  In June 2017, he requested mental health clinicians write a statement recommending him for a single cell because he was vulnerable to victimization due to his right arm disability.  In July, the inmate was notified that he did not meet CDCR criteria for single cell placement; consequently, he felt victimized by authorities.  The inmate was seen by mental health clinicians for follow-up appointments during August, September, and October 2017.  Mental health clinicians, who had concerns about posttraumatic stress disorder symptoms related to the commitment offense, offered him treatment which he refused, saying he feared negative events (i.e., a transfer or being targeted by custody) if he accepted services.  The inmate did not present any psychotic symptoms, nor did he meet criteria for involuntary inclusion in the MHSDS.  The inmate did not submit another request to meet with mental health clinicians after October 2017.

The inmate never reported suicidal ideation and denied a history of suicide attempts.  Additionally, he never revealed his family's history of suicides or the significant loss he experienced when his son died in May 1990.  That information was reported by his sister during an interview with the SCR reviewer.  A suicide risk evaluation was never indicated; however, a note was found in his property stating, "in the time I have been at [institution], I have been completely unable to get any help for the damage to my arm.  I cannot stress enough how pernicious the justice system is.  I know that because my brothers have abandoned me, I have no hope of ever getting my case heard in court.

California courts are corrupt, and I am in too much pain to try any longer to hold out. This is basically it. I want to go be with my son for a while."

The inmate's medical history consisted of hyperlipidemia, hypertension, high triglycerides, and a history of deep vein thrombosis in his right arm. He was hearing-impaired, used hearing aids, and was included in the disability placement program with the designation of permanent hearing impairment. He sustained vascular and nerve damage and had a diagnosis of paraparesis of his right shoulder and arm due to the gunshot wounds sustained during the commitment offense. The first and second fingers of his right hand were paralyzed. He used a sling. Between 2015 and 2018, his medical record contained many progress notes referencing pain control. On May 4, 2018, his primary care physician notified him the request for an outside surgical evaluation for nerve transfer surgery had been denied because the damage was permanent. The physician noted he was upset, threatened a lawsuit, and refused to be examined.

The inmate presented himself as a victim of the criminal justice system, who was frightened of being victimized by inmates and struggled with chronic pain. After he was denied single cell housing and nerve transfer surgery, he called his sister, saying he wanted to speak to her before he went "man down." Four days later, he committed suicide on May 12, the same day his son died. The note found with his property expressed his anger at what he perceived as a conspiracy against him by authority and his hopelessness regarding safety concerns and improvement in his physical/environmental conditions.

## II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this case was not foreseeable.

## III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. Given the inmate's refusal to participate in mental health treatment and the fact that he did not meet criteria for involuntary inclusion in the MHSDS, the Special Master's expert determined that this case was not preventable.

## IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case. The report included relevant social, criminal, institutional, substance use, mental health, and medical histories. Mental health repeatedly offered the inmate services; however, he refused their offers expressing concern that MHSDS involvement could have negative effects.

V.    Analysis of Quality Improvement Plan Processes

As a result of this review, no mental health concerns, custody concerns, or nursing concerns emerged.  There were no recommendations from the suicide review, as no concerns were found.

Case Q

I.    Summary of case

This inmate was a 49-year-old Hispanic male who was housed in a CTC primarily due to permanent bilateral blindness incurred during a physical altercation in May 2016.  On November 7, 2018, nursing staff found him lying in a large pool of blood in his single occupied CTC cell.  The SCR indicated he severed an artery and "almost severed [his] head" with an "altered" state issued razor.  He was provided with a diagnosis of Schizophrenia, paranoid type, and he was prescribed antipsychotic, antidepressant and anxiolytic medications.  He was receiving mental health services at the 3CMS level of care at the time of his death.

The SCR referenced inconsistent historical data throughout the healthcare record and indicated the inmate's reported information may have been "unreliable" as a result of cognitive and memory impairments.

The inmate was born in San Jose, California, and raised primarily by his grandmother.  The SCR referenced a history of sexual and physical abuse during childhood.  His biological parents were deceased and reportedly struggled with substance abuse issues.  His one older brother was incarcerated, and his one younger sister last visited one year prior to his death.  The inmate maintained communication with an aunt through written letters, although the SCR noted this relationship appeared strained based on review of their most recent correspondence.  The reviewer noted it was unclear whether the inmate had ever married, although he had one daughter in her twenties.

He reportedly dropped out of school in the seventh grade and began abusing controlled substances prior to adolescence.  His substance abuse history included inhaling paint, glue, and gasoline, as well as abusing heroin, phencyclidine, methamphetamine, alcohol, and cocaine.  As a juvenile, the inmate had several arrests and convictions for petty theft, one charge for assault with a deadly weapon, and two or more attempted escapes from juvenile facilities.

The SCR noted an extensive adult criminal history that included numerous arrests and convictions for possession and manufacturing of controlled substances, assault with a deadly weapon, burglary, forgery, grand and petty theft.  In 2001 he was accused of molesting a minor, although the charge was apparently dismissed.  The inmate was sentenced to life with parole for the commitment offense of second-degree murder in

78

2008, and his minimum eligible parole date was November 11, 2024.  The SCR indicated the commitment offense involved the inmate hitting an elderly man in the head with a metal pipe, and that he reported it was an act of self-defense against an attempted sexual assault.  He entered CDCR for his seventh and final prison term in March 2010.

Throughout the course of his most recent incarceration, the inmate received seven RVRs, including for violent behavior, possession of a weapon, and possession of controlled substances or paraphernalia.  His most recent RVR was issued in late July 2018 for "fighting" in the CTC.  The SCR referenced a history of gang involvement in CDCR, although he was designated SNY upon returning to CDCR in 2010.  The SCR did not reference any RVR mental health assessments.

The inmate exhibited significant interpersonal issues that appeared related to his mental illness during his most recent and prior prison terms.  In May 2012, he accused a cell mate of attempted sexual assault, although the allegations were not substantiated.  In 2016, he was involved in a physical altercation with a cellmate that resulted in permanent blindness from a caustic substance thrown in his face; he remained housed in a CTC for medical reasons after this incident.  Another CTC inmate interviewed by the reviewer indicated the decedent had no friends on the unit and that his interactions were limited to asking for coffee and yelling at others claiming they were "child molesters."

The inmate initially received mental health services during early childhood to address abuse issues.  The SCR indicated he later had contact with mental health providers in 1998 when he received treatment in three different levels of care, including 3CMS, EOP and inpatient care at the DSH.  The SCR referenced a Mentally Disordered Offender (MDO) evaluation that noted, between 1997 and 2000, the inmate suffered from persecutory delusions, paranoia, auditory hallucinations, and disorganized thinking.  The content of his delusions during this time period included beliefs that other inmates used "telekinetic powers" to harass him with hallucinations and that "child molesters were everywhere" and "putting messages in his mind."  The SCR further noted the inmate was known to be assaultive toward others in the context of his paranoid delusions during this timeframe.

The mental health care provided during his most recent prison term included treatment in EOP, 3CMS, and ICFs on two occasions in 2012 and 2014.  During the 2012 ICF admission, he was described as depressed, psychotic, fixated on "child molesters," and exhibiting memory and cognitive impairments.  He reportedly stabilized on medications and was discharged to the EOP level of care.  The SCR also noted that the inmate periodically complained of auditory hallucinations taking over his body and that he reported being unable to talk due to his psychotic symptoms.  The inmate returned to the ICF in 2014 due to psychotic symptoms and participating in less than 50 percent of EOP treatment; however, his symptoms appeared to worsen during this admission.  Information in the SCR suggested that the inmate was prematurely discharged in March

2015 with a plan to "eventually" refer him to a program for lower functioning inmates; although, the referral never occurred.  Instead, two months later he was reviewed in absentia, and his level of care was reduced to 3CMS due to not taking "advantage of the EOP program offered."  This institution recommended a Developmental Disability Program (DDP) reevaluation due to his apparent cognitive impairments; however, there was no documentation suggesting this was completed.  He remained in the 3CMS level of care until his suicide in early November 2018.

In November 2017, the inmate reported improvements with symptoms, and he began asking about community resources in preparation for parole.  At the same time, he reported feeling anxious about not being able to "survive" outside of a medical treatment facility due to his blindness.  He was described as depressed during the holiday season in 2017 due to being unable to contact his family.  In February 2018, he was referred to mental health by his physician due to increased depression; however, the responding mental health provider noted he refused the interview and that they were unable to assess his mental status and suicidal ideation.  He again refused to meet with the provider one week later when they attempted follow up, and the clinician noted he would be transferred to another CTC due to increased depression over the past two weeks and "not attending to his ADLs [activities of daily living]."  A review of the electronic health record revealed a plan to refer him to psychiatry for a "possible increase of antidepressants," but this did not occur.  The SCR indicated a higher level of care was not considered at that time.

The inmate arrived at his final institution in March 2018.  A review of the electronic health record revealed his treatment team failed to develop a formalized treatment plan or evaluate his suicide risk at the new facility.  He also did not receive an individual psychiatry contact until seven months after his arrival, despite active prescriptions for antipsychotic, anxiolytic, and antidepressant medications.  He was often lying in his CTC bed during contacts with his primary clinician and medical staff, and records suggested he was typically only minimally engaged.  Between March and April 2018, he was consistently described as paranoid, depressed, and dysthymic.  His primary clinician noted he was often not fully oriented and that his thought process was illogical and "not goal oriented."  In June 2018, the primary clinician received collateral information from custody staff indicating he would "sometimes leave feces on the floor," although there was no further information or follow up noted in the clinician's documentation.  The SCR noted that in August 2018 the inmate was diagnosed with polydipsia and placed on water restriction; however, there was no mention of a mental health referral or consult in the SCR or healthcare record, despite medical staff's documented concerns about water overconsumption through November 6, 2018.  A review of the medical provider's documentation revealed a history of hyponatremia and fluid restriction, although mental health staff did not appear aware of this issue either.

The SCR failed to mention the inmate was referred to mental health on September 1, 2018 due to at least two occurrences of urinating in his drinking cup in front of the nurse's station. Although he met with his primary clinician on September 4, 2018, the provider did not mention the incident in their note or indicate whether they were meeting with him in response to a staff referral. The primary clinician noted that he reported missing his family and friends and that he "appeared paranoid" on this date, although the appearance of paranoia was not explained. The primary clinician did not meet with him again prior to his suicide.

The inmate's psychiatric medications included chlorpromazine (antipsychotic), buspirone (anxiolytic), and paroxetine (antidepressant). The reviewer noted "almost perfect" medication adherence with no medication changes since his arrival in March 2018. He received his first and final individual psychiatric contact at the most recent facility on October 24, 2018. The telepsychiatrist noted the inmate had not received an individual psychiatry contact since April 20, 2016. The provider also documented a history of suicide attempts and noted the inmate learned his early medical parole was denied within a few weeks of the contact; however, there was no assessment of suicide risk or consult with his primary clinician completed. There were no other psychiatry contacts prior to his suicide on November 7, 2018.

The SCR indicated there were inconsistent reports regarding prior suicide attempts in records, adding that the discrepancies "may be due to his cognitive decline resulting in memory deficits and confabulations." However, the reviewer noted the inmate consistently reported suicide attempts after 2012, with a total of three to six suicide attempts involving hanging and "overdosing on alcohol." The alcohol overdoses reportedly occurred in 1997, 2008 and 2009. There was also a referral to the MHCB in 2015 following an alcohol overdose; although, the referral was rescinded, and the reviewer stated there was no clinical documentation suggesting this was a suicide attempt. The inmate's last known suicide attempt reportedly occurred in 2010 by hanging while awaiting sentencing for the commitment offense in county jail. The most recent suicide risk evaluation was completed at a prior institution in July 2017, when the clinician rated the inmate's chronic risk as moderate and his acute risk as low. However, a review of the electronic health record revealed the justification of low acute risk stated only that he denied suicidal ideation. While the final institution never formally evaluated his suicide risk, the primary clinician repeatedly wrote in progress notes that he appeared to have low acute and chronic suicide risk without any explanation for the conclusion.

According to the SCR, the inmate had no phone calls during his last three months. He reportedly received a "disparaging letter" from his aunt indicating she may not allow him to live with her following parole. The aunt wrote in the letter that she had already purchased a television and radio for the inmate and that she would not do so again. The reviewer suspected he may have been "victimized" or taken advantage of, as it appeared another inmate was in possession of his television at the time of his death.

The CTC nursing staff informed the reviewer that the inmate "isolated more in the last two to three months." They also reported he was verbally abusive toward nursing staff; although the behaviors were not referred to custody for an RVR, as they were "aware of his mental health symptoms and cognitive impairments." The SCR referenced an interview with the inmate's primary clinician and indicated the inmate made a statement that he was "looking forward to being in a better place with God"; although an incident date was not provided in the report, and a review of the electronic health record revealed it was not documented in the clinician's progress notes. The primary clinician also informed the reviewer that the inmate avoided groups due to being "mistrustful" of peers.

## II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case.

The Special Master's expert determined this inmate's death by suicide was foreseeable based on available information. A review of the SCR and healthcare record suggested he had psychiatrically decompensated since his arrival to the final facility and that his acute risk for suicide was high. Those involved in his care failed to effectively collaborate and share critical information, properly assess risk and higher level of care needs, and appropriately intervene. A suicide risk evaluation was never completed at the receiving facility, and the treatment team failed to review or reference historical suicide information from prior records. Further, the provider repeatedly wrote baseless, inaccurate and misleading claims that his acute and chronic suicide risk were low in progress notes.

Healthcare records since his arrival at the most recent institution noted worsening depressive symptoms, psychotic symptoms, agitation, anxiety due to concerns about "surviving" in the community while blind, denial of parole, feelings of helplessness, increased isolation, negative staff and peer interactions, bizarre behavior, fighting resulting in an RVR, strained family relations, single cell status, and various functional deficits. Although it was not documented in the healthcare record, the primary clinician reported during interview that the inmate stated he was "looking forward to being in a better place with God," and this clearly warranted further exploration, intervention and documentation. Additionally, mental health providers either were not aware or did not intervene when the inmate was noted to defecate on the floor, urinate in his drinking cup at the nurse's station, and consume water at a rate that was potentially life threatening. There was also no mental health assessment or consult to determine the underlying motivation for his polydipsia, which appeared to persist until his death.

## III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined this inmate's death may have been preventable had healthcare staff collaborated and appropriately addressed worsening psychiatric symptoms and suicide risk. The inmate's level of care was inappropriate given the severity of his symptoms and functional deficits; there was no formalized treatment plan developed and no interventions aimed at reducing his acute suicide risk. The inmate's prescribed psychotropic medications were unchanged, and he had no individual contacts with psychiatry for over two years until 14 days prior to his death. Additionally, healthcare staff did not effectively collaborate to share information and develop plans for managing him safely on the unit. Had this seriously mentally ill inmate's level of care been increased based on clinical need, he would have been more closely monitored, and staff would have been required to meet more frequently to share information and develop collaborative interventions aimed at reducing his acute suicide risk. Further, mental health staff failed to intervene appropriately when the inmate reported he was looking forward to being with God and when he informed them his early parole was denied 14 days prior to his suicide. Finally, had the inmate's level of care been increased, at a minimum to EOP, he may not have had access to a state issued razor in his cell.

IV.     Critique of Suicide Case Review Report

While the SCR provided a sufficient summary of the inmate's relevant history and several significant events leading up to his suicide on November 7, 2018, the overall critique was inadequate. The case was reviewed by both a psychologist and a mental health headquarters psychiatrist. However, the Special Master's expert disagreed with some of the reviewers' opinions and determined the reviewers did not sufficiently critique mental health progress notes, treatment plans, treatment interventions, interdisciplinary collaboration efforts, suicide risk evaluation and safety planning practices, or initial assessments. The Special Master's expert reviewed the electronic health record directly to resolve unanswered questions raised in the report and found other important omissions during this record review. For example, the reviewer did not identify the final institution's failures to develop a formalized treatment plan, evaluate the inmate's suicide risk in accordance with the Program Guide and based on clinical indications, sufficiently review records during initial assessments, provide interventions consistent with presenting problems, and collaborate care in the CTC.

The reviewing psychologist indicated that the inmate's 3CMS level of care appeared appropriate "as he had no significant functional impairments due to his mental health issues." In contrast, records between March 2018 and the date of his death indicated the inmate exhibited significant functional deficits since March 2018, including defecating on the floor, urinating in his drinking cup at the nurse's station, problems with ADLs, group treatment refusals due to paranoia, nonadherence with healthcare appointments, placement on water restrictions due to potentially fatal water consumption, increased isolation, delusional outbursts, lack of orientation to year and current situation, and a statement to his clinician that he was "looking forward to being in a better place with

God." The reviewer also failed to note the most recent IDTT documentation did not provide a level of care rationale or indicate whether a higher level of care was ever considered in light of the inmate's symptoms and decline in functioning. Finally, the reviewing psychologist did not reference the inmate's mental health referral on September 1, 2018 for urinating in his drinking cup or comment on the lack of follow up to this referral concern.

While the reviewing mental health headquarters psychiatrist correctly identified concerns with the frequency of psychiatry contacts at the final institution, the reviewer failed to note the inmate had not received an individual psychiatry contact since April 20, 2016, despite active prescriptions for antipsychotic, anxiolytic, and antidepressant medications throughout this timeframe. The reviewing psychiatrist also described the October 24, 2018 telepsychiatry documentation as "thorough" and "excellent." The Special Master's expert reviewed the October 24, 2018 psychiatric evaluation and found that it was inadequate based on the telepsychiatrist's lack of awareness of recent serious events and apparent failure to consult with others involved in the inmate's care since his arrival in March 2018. The evaluation relied almost entirely on the inmate's self-report, despite the SCR noting he was not a reliable historian due to cognitive deficits. The telepsychiatrist did not reference documentation from the inmate's four neurology appointments, which offered a diagnosis of dementia based on MRI results, or medical staff's ongoing documented concerns about the inmate's polydipsia and recent bizarre behaviors. Lastly, the reviewing psychiatrist did not provide an opinion regarding the psychiatrist's failure to consult with the primary clinician and facilitate a suicide risk evaluation 14 days prior to the suicide in response to learning his expected early parole was denied.

V.    Analysis of Quality Improvement Plan Process

Despite numerous deficiencies identified during this suicide review, this case resulted in only two QIPs. The first QIP addressed a prior institution's failure to refer the inmate for a DDP evaluation as planned in January 2018. The inmate's most recent facility responded with a memo indicating they were uncertain about the reason for the dementia diagnosis and that they did not find a DDP evaluation was indicated; however, this was not the institution that recommended the DDP referral. The response to this item further emphasized the need for a diagnostic clarification evaluation and collaboration among treatment teams. The referring institution's response to the QIP was sufficient.

The second QIP targeted the most recent institution's failure to meet Program Guide requirements for 3CMS psychiatry contact frequencies. The institution noted the electronic health record problems would be addressed by mental health headquarters, that the identified psychiatrist received counseling, and that the telepsychiatry policy was updated to include expectations when inmates refuse appointments. This QIP appeared to be sufficiently addressed by mental health headquarters and the identified institution.

The reviewer noted the inmate did not receive suicide risk evaluations every 90 days after his discharge from intermediate care at DSH and that a mental health clinician failed to complete a suicide risk evaluation and consider a higher level of care prior to transfer in February 2018; however, these concerns were not highlighted in their recommendations or QIPs.

The Special Master's expert determined that additional QIPs were needed to address the most recent institution's failures to complete formalized treatment plans and suicide risk evaluations in accordance with Program Guide requirements and in response to increased suicide risk, collaborate care across disciplines in the CTC, clarify diagnostic uncertainties, and document rationales for level of care decisions. Additionally, both mental health providers should participate in suicide risk evaluation training and mentoring to ensure they are able to accurately identify changes in suicide risk and intervene appropriately.

## Case R

I.  Summary of case

This condemned status inmate was a 51-year-old East Indian male who was discovered hanging from a sheet tied to the shelving unit in his single occupied cell on November 4, 2018, at approximately 2215 hours. A custody officer found the inmate hanging during routine security checks on the unit. Although, life saving measures were attempted, responders noted he had no pulse or breathing, was unresponsive and "cold to the touch," and presented with "rigor to jaw, hands, and legs." He was pronounced dead at 2234 hours. The inmate was not a participant in the MHSDS at the time of his death.

The SCR noted the majority of the inmate's background information was obtained from the Probation Officer's Report (POR) and the institution's Initial Condemned Evaluation. The inmate was born in England and immigrated to the United States with his parents and two siblings in 1975. Although his mother was still living, his father reportedly died by heart attack 17 years prior. The inmate's one brother was referenced as a co-defendant in the commitment offense, and he was apparently housed at the same facility. The inmate was married with two children prior to incarceration; however, his wife subsequently filed for divorce and reportedly prevented him from communicating with their two daughters. The SCR noted the inmate "rarely communicated with family," and his brother informed the reviewer he was "closed" and "kept to himself." The reviewer wrote that he had no personal letters in his property and that he made no phone calls during his final year. He did, however, have occasional visits from family, the most recent of which occurred in April 2018.

The inmate graduated from high school and attended some college prior to incarceration. The SCR indicated he was employed in the family business of motel management until his arrest in 2002. He did not have a job assignment in CDCR.

The inmate did not have a significant substance use history. His criminal history included an arrest for robbery at age 15 and a vandalism conviction as an adult in 1988. The commitment offense occurred on May 4, 2002 and involved the inmate and two co-defendants forcibly entering the residence of an acquaintance and his three family members. The four victims were reportedly physically assaulted, strangled, bound, and gagged before they died in a fire set by the inmate and his co-defendants. The inmate received the death penalty following a conviction of robbery, arson of an inhabited structure, and four counts of first-degree murder.

The inmate entered CDCR for his first and only prison term in January 2005. An Immigration and Customs Enforcement (ICE) detainer was entered on March 23, 2007. The inmate remained at one facility for the duration of his incarceration. He never received RVRs or informational chronos for problem behaviors. He had no documented enemy concerns and he was not gang involved. The SCR referenced numerous complaints and appeals related to "living conditions, legal, visiting, medical, and property issues and funds." The reviewer described him as perseverating on unauthorized deposits into his trust account and noted he wrote letters to the Warden expressing frustration with "money of unknown origin" being placed into his closed account. He explained in one letter to the Warden that he felt retaliated against by the trust office supervisor and staff, adding that they were "obsessed on getting even." A related undated paper was found in his property and included some odd statements such as "my conscience and morality will not allow me to participate in a false and untrue system of process…I will not be an attorneys/CDC prostitute…Trump personality…" The most recent appeal referenced in the SCR was dated February 12, 2017.

According to the SCR, the inmate had no known history of mental health treatment or issues prior to incarceration. He was evaluated by a reception center clinician in January 2005, when he was described as tearful and dysphoric. The clinician also noted possible major depression and indicated he was assaulted and injured in a bus accident while in county jail. The bus accident reportedly resulted in lower spinal nerve damage and mobility issues; although the inmate later recovered to the point of being able to run long distances. The evaluating clinician included the inmate in the 3CMS level of care for "medical necessity" with a diagnosis of Adjustment Disorder with depressed mood. However, another mental health clinician removed the inmate from the MHSDS, without a sufficient rationale, when he entered the condemned unit two days later. The inmate subsequently participated in four critical stress debriefings with mental health staff due to death row inmate suicides between 2011 and 2016.

In June 2017, the inmate was referred to the mental health department by custody staff for "planning to send most of his property home." The evaluating mental health clinician documented that he claimed he was sending items home to reduce clutter and that his suicide risk was low. The SCR noted several issues with the mental health clinician's evaluation on June 28, 2017. The clinician reportedly failed to complete a mental status

exam and an adequate safety plan. The reviewer also suggested the inmate's numerous positive risk factors on the SRASHE were incomplete and did not support the clinician's conclusion that the inmate's suicide risk was low. Specifically, the inmate endorsed six out of 13 chronic risk factors, and the clinician omitted the fact that this was his first prison term. Further, the clinician failed to consider the loss of social support and single cell status in their assessment of acute suicide risk. The inmate had no further contact with mental health staff prior to his suicide in November 2018.

Another inmate informed the reviewer during interview that the decedent misrepresented what he was experiencing during the June 2017 evaluation, that he was adamant against speaking with mental health, and that he learned the "red flags" and subsequently hid them around the time of his suicide. A custody officer informed the reviewer that, proximate to the suicide, the inmate was "tidy and neat," had good hygiene, went to yard, "took care of himself well," and exhibited no signs or changes. The SCR further added that no suicide note was found in his property.

## II.    Determination of Foreseeability

The Suicide Case Review Committee did not indicate whether this inmate's suicide was foreseeable. The Special Master's expert determined the suicide was not foreseeable based on available information.

## III.    Determination of Preventability

The Suicide Case Review Committee did not indicate whether this inmate's suicide was preventable. The Special Master's expert determined the suicide was not preventable based on available information.

## IV.    Critique of Suicide Case Review Report

The SCR provided an adequate summary of this case, including relevant social, criminal, incarceration, substance use, and mental health history. The reviewer also included a reasonable assessment of the precipitants to this suicide, and recommendations followed the content and findings of the report.

## V.    Analysis of Quality Improvement Plan Process

This case resulted in two recommendations and one required QIP. The first recommendation stemmed from the institution's removal of the inmate from the MHSDS two days after his inclusion in 2005. The second recommendation addressed the inadequate assessment of suicide risk and insufficient safety planning on June 28, 2017. These recommendations did not rise to the level of QIPs, as they were not proximate to the inmate's death; however, they were appropriately forwarded to the SPRFIT

87

Coordinator at the identified institution with the expectation that they would follow up with clinical administrators to determine the best course of action.

The one required QIP appropriately targeted custody's inadequate safety checks, as documentation suggested checks were completed 45 minutes prior to discovering the inmate's body in a state of rigor mortis. However, the responses from mental health headquarters and the identified institution were concerning. The mental health headquarters memorandum stated, "Thank you for completing the recommended QIP items," adding that further follow up may be necessary following receipt of the medical examiner's report. However, the institution's response suggested they had not taken any action as the Warden wrote on February 26, 2019 that "a determination of what actions/training are necessary cannot be made without the final medical examiners' report." There was no other documentation regarding this QIP in the record, which suggested that it was left unresolved.

Case S

I.  Summary of case

The inmate was a 25-year-old Hispanic male who was found hanging from an air vent in his cell at approximately 1420 hours on February 8, 2018. According to the SCR, the cellmate discovered the inmate's body upon returning from education services and alerted custody staff. Life saving measures were implemented, and the inmate was subsequently transported to a nearby medical center via ambulance at 1444 hours; however, he was pronounced dead by 1508 hours. The inmate had an SNY designation and was receiving mental health services at the 3CMS level of care at the time of his death.

The inmate was born in Central California and raised by his maternal grandmother. He had six siblings including two brothers and four sisters. The SCR indicated his father was incarcerated throughout the inmate's childhood and adolescence. Although he never married, the inmate had eight-year-old twins with whom he had limited contact. The SCR noted his property included several supportive letters from his sister, mother, and father; however, their writings suggested he had not responded in several months. The most recent supportive family letter was dated February 2, 2018. The inmate's most recent recorded phone calls were to his sister, and these occurred on the February 3 and 4, 2018.

According to the SCR, the inmate began abusing substances and became involved with the criminal justice system at an early age. He started abusing marijuana, alcohol, and methamphetamine between ages 12 and 16. The inmate was reportedly gang involved by age eight, and his first arrest occurred at age 13. His juvenile criminal history included five arrests for crimes that involved receiving stolen property, possession of marijuana, and manufacture/sales of dangerous weapons. At age 17, he had two juvenile hall

placements.  The SCR noted he was on probation twice and received multiple violations.  He served a brief first prison term in CDCR beginning August 2011.  The inmate was arrested in 2012 for vehicle theft and in 2013 for petty theft and being under the influence of a controlled substance.  His commitment offense on February 6, 2014 involved stabbing another male multiple times while on probation.  He was subsequently convicted of second-degree attempted murder and sentenced to 17 years in prison.

The inmate entered CDCR for his second prison term on May 30, 2014.  He received an SNY designation due to his "gang dropout" status, and he was classified as Level IV.  He received four RVRs during his most recent prison term.  A total of three RVRs were issued for fighting, and the fourth RVR for possession of an inmate manufactured weapon resulted in three years added to his sentence.  There were no RVRs received after July 1, 2015.  The SCR noted the inmate worked briefly in the dining room in 2017 and was on the waitlist for a job assignment at the time of his death.

The SCR noted the inmate received mental health services for behavioral difficulties as a juvenile and that he was diagnosed as a "paranoid schizophrenic" at some point in his history.  Although the inmate was not included in the MHSDS during his first prison term in 2011, he reportedly attempted suicide and was prescribed Wellbutrin and Remeron at the county jail in 2013.  The SCR also referenced a delusional belief that his children and other family members were missing at the time of his arrest in February 2014.  On June 26, 2014, he was included in the MHSDS at the 3CMS level of care, initially for medical necessity.  He endorsed depressed mood, anxiety, and difficulty sleeping at that time.  The reviewer referenced multiple reports of suicidal ideation while he was in the 3CMS level of care, although records apparently suggested he did so in order to "enact housing changes" and "get transferred."  He was also noted to report "bizarre statements" that he was cursed by a witch and that his family had been kidnapped or murdered.  The SCR indicated these delusional beliefs "continued throughout his mental health treatment" and that, although clinicians initially attributed them to ongoing substance abuse, they later "appeared to be a part of his mental health diagnosis."  However, in March 2015, the inmate was briefly removed from the MHSDS at one of the desert institutions, as they did not believe he met criteria for a major mental health disorder.  By May 11, 2016, the institution determined he required EOP level of care based on his psychiatric symptoms at the time.  Although the SCR did not provide a timeframe, the reviewer noted the inmate reported concerns that others would find him "crazy" and that he had contacted his attorney, child protective services, and the FBI to share his beliefs that his family was in danger.  In April 2016, his diagnosis was changed to Delusional Disorder with a rule out for Methamphetamine Induced Persisting Psychotic Disorder with Delusions.  The inmate was prescribed antipsychotic medication around this time, although the SCR noted it was discontinued in July 2017 and that clinical notes suggested psychotic symptoms were not observed afterward.  The SCR indicated the inmate's level of care was reduced from EOP to 3CMS at his final institution on August 10, 2017 due to meeting "maximum benefit" from EOP, and the treatment team determined he was able

89

to function adequately at the 3CMS level of care. The inmate's diagnoses around this time were Delusional Disorder, Major Depressive Disorder with psychosis, and Amphetamine Type Substance Use Disorder.

Between August and December 2017, the inmate was reportedly non-adherent with his antidepressant medication. On January 22, 2018, he requested removal from the MHSDS and discontinuation of his psychiatric medication. The SCR noted the inmate met with his primary clinician on January 29, 2018 who informed him that he "must wait six months" from the date of medication discontinuation for removal from the MHSDS. However, the SCR failed to mention this final contact with mental health was completed cell front due to refusal, and that the clinician also documented in the plan section of the progress note that he would be discharged from MHSDS "after he is off psych meds for 3 months." Additionally, the inmate's medical record revealed that during the primary clinician contact on January 29, 2018, the inmate reported both that he was taking only a "half dose" of his antidepressant medication and that he was not taking the medication "anymore." The inmate was not referred to psychiatry in response to his January 22, 2018 request or his reported medication non-adherence on January 29, 2018. The Special Master's expert had to rely on electronic health records to determine the date of the inmate's most recent psychiatric contact. His final contact with psychiatry occurred on November 14, 2017, at which time the provider documented a plan to follow up in 30 days; however, the provider did not mention medication non-adherence issues and failed to follow up as planned. The SCR indicated the inmate was not scheduled to meet with psychiatry again until two weeks after his suicide.

The inmate had one recorded suicide attempt in 2013 by cutting while in county jail. A 2014 SRE indicated the inmate reported, "It was related to my case, I didn't want to do this time." The reviewer also referenced January 2015 documentation that indicated he made "superficial scratches to himself" and "claimed suicidal ideation." The inmate reportedly claimed he was attempting to obtain a single cell chrono from MHCB mental health staff at that time, and that he had "no intention of harming himself." The inmate participated in a suicide risk evaluation during March 2017 at his final facility as part of his initial assessment, and the evaluating clinician determined his chronic risk was moderate and his acute risk was low. The most recent SRASHE was completed on August 23, 2017, when his level of care was reduced to 3CMS. He reportedly denied mental health concerns and did not exhibit delusions or depression at that time. This clinician also rated his chronic suicide risk as moderate and his acute risk as low. The SCR indicated a safety plan was completed on this date and that it was adequate.

While the reviewer wrote that methamphetamine use was suspected on the date of the inmate's suicide, the reason for the suspicion was not indicated, and it was not mentioned elsewhere in the SCR. The medical examiner's toxicology screen did not indicate positive results for methamphetamine or other stimulants at the time of the suicide.

Additionally, the cellmate informed the reviewer during interview that he had not observed the inmate under the influence in the past two months.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not indicate whether the inmate's suicide was foreseeable. The Special Master's expert determined the death was not foreseeable based on available information.

III.    Determination of Preventability

The Suicide Case Review Committee did not indicate whether the suicide was preventable. The Special Master's expert determined the suicide was not preventable based on available information.

IV.    Critique of Suicide Case Review Report

The SCR included a sufficient summary of interviews and relevant social, criminal, incarceration, substance use, and mental health history. The reviewer also noted there did not appear to be any significant events that preceded the suicide, and they did not provide recommendations or QIPs.

The Special Master's expert identified a few concerns with the quality of the SCR. The reviewer's timelines were often difficult to follow, and dates of critical events were not consistently provided. The reviewer also failed to highlight the need for diagnostic clarification and critique the recent mental health care provided to the inmate, including medication management and treatment plans. It was most concerning that the reviewer noted medication non-adherence prior to the suicide and indicated the inmate requested discontinuation of his psychiatric medications on January 22, 2018; however, the SCR did not review recent psychiatric documentation to determine when he was last seen, whether medication non-adherence concerns were addressed, or whether a referral to psychiatry was indicated.

V.    Analysis of Quality Improvement Plan Process

The SCR did not include recommendations or QIPs. The Special Master's expert determined that a QIP was needed to address psychiatric monitoring issues discovered during a review of the inmate's electronic health record. The SCR noted medication non-adherence between August and December 2017, and the inmate's final primary clinician contact suggested this problem likely persisted through the date of his suicide; however, mental health providers failed to address or document the medication non-adherence issues. The psychiatrist also failed to follow through with their documented plan to meet with the inmate 30 days after their final psychiatric contact with the inmate on November

91

14, 2017.  On January 10, 2018, the psychiatrist received a message in the electronic health record system to follow up with the inmate; however, medications were instead renewed without a completed contact.  Lastly, the inmate submitted a request to discontinue his psychiatric medication on January 22, 2018; however, despite this request and his claims that he was either no longer taking the medication or possibly taking a "half dose," the inmate was not offered a psychiatric contact at any time before his suicide on February 8, 2018.  According to the SCR, psychiatry did not plan to follow up until two weeks after his death.

Lastly, the recommendations should have addressed the need for diagnostic clarification which is necessary for adequate treatment planning.

Case T

I.  Summary of case

This inmate was a 39-year-old male who was found unresponsive in his solely occupied STRH cell on February 16, 2018 at approximately 0650 hours.  The SCR noted the inmate ingested a lethal dose of his KOP propranolol.  Although lifesaving measures were implemented, the nursing timeline indicated rigor mortis was present, and his body was cold to the touch with a temperature of 34.1 degrees.  The inmate was pronounced dead at 0711 hours.  The reviewer noted the inmate was placed in the STRH unit "due to lack of bed space" one day prior to his death.  The inmate was receiving mental health services at the 3CMS level of care at the time of his death.

The inmate was born in Michigan.  His mother suffered from Schizophrenia and was not involved in his life.  The inmate's father reportedly physically abused and "tortured" him, and he was briefly placed in foster care.  The SCR indicated his grandmother later became his guardian.

The inmate graduated from high school and attended some college.  The SCR noted his work history was unclear; however, he reportedly worked in a hospital and misrepresented himself as a physician at some point prior to incarceration.  In 1998, he joined the United States Air Force, although the reviewer was uncertain about the length of time he served.  The inmate moved to California around 2004.

According to the SCR, the inmate had "no substantive support network other than family."  He maintained a close relationship with his grandmother and corresponded with his father and an aunt while incarcerated.  The inmate had no children and never married.  He was described as "conflicted about his sexuality" and he reportedly engaged in relationships with both men and women.  His commitment offense involved forced sex, coercion, and false imprisonment of males during a six-year period.

The SCR described the inmate's substance abuse history as "mixed." Although timeframes were not provided, the inmate had a history of abusing prescription medications such as lorazepam, morphine, oxycodone, and methadone. He had one arrest for being under the influence of an unknown substance. He was also required to attend counseling for his prescription medication abuse prior to incarceration.

The inmate's first known interaction with the criminal justice system occurred when he was detained in 1997 for "trying to recruit boys for a wrestling team" in Michigan. He was subsequently arrested for "criminal sexual conduct (force and coercion) and unspecified fraudulent activities." The SCR referenced several arrests and criminal charges between 2003 and 2006. Although the charges were ultimately dismissed, they included kidnapping, impersonating a police officer, and false imprisonment. In 2014, the inmate was arrested and charged for crimes committed between 2008 and 2014, including falsely imprisoning, drugging, sexually assaulting, and extorting at least eight undocumented Hispanic males. In February 2015, he was convicted and sentenced to 65-years to life in CDCR.

The inmate entered CDCR in September 2015. At his request, he was designated SNY in November 2015. The SCR referenced five Prison Rate Elimination Act (PREA) allegations beginning in August 2016, all of which included claims of sexual harassment or sexual assault by law enforcement or other inmates. Four of these PREA allegations were filed and investigated between December 2016 and September 2017, although none were substantiated. The SCR described the inmate as "racially provocative" and noted he used racist and derogatory terms when referring to other inmates. He received two RVRs during the course of his incarceration. The first RVR was for statements perceived as threats toward a psychiatrist in October 2016, and the second was issued for engaging in behavior that could lead to violence in February 2017. He was also interviewed by the OIA in February 2017 due to a family member's concern for his safety; however, he reportedly denied any concerns and informed the interviewer he felt safe to return to his housing. In March 2017, he was placed in STRH for protective custody after he was assaulted, and he was subsequently released and maintained on single cell status until August 2017. In September 2017, he alleged another inmate assault; however, custody staff were unable to substantiate his claims and medical staff attributed his injuries to a seizure. Also, in September 2017, the inmate was released to double cell housing, despite his ongoing efforts to obtain permanent single cell status.

According to the SCR, the inmate first accessed mental health services while in the military. He initially was diagnosed and received treatment for PTSD. Between 2011 and 2013 he received treatment for depression, anxiety, and psychotic symptoms at various outpatient clinics. The SCR indicated he preferred psychiatric medication over "talk therapy." Other psychiatric diagnoses prior to incarceration included Major Depressive Disorder, Schizoaffective Disorder, Panic Disorder with Severe Agoraphobia, and a provisional Personality Disorder diagnosis with narcissistic and antisocial traits. In

93

September 2015, he was included in the MHSDS at the 3CMS level of care. In 2016, he reported on two occasions that placement in ASU would "undoubtedly" push him to suicide. In June 2016. the inmate's level of care was increased to EOP due to depression, anxiety, and paranoid delusions. The inmate's numerous PREA complaints appeared linked to his delusions, as he often reported having been sexually harassed or assaulted by law enforcement, custody officers, other inmates, and even individuals identified as victims in his commitment offense. In March 2017, the inmate reported twice that he would no longer inform mental health staff of his suicidal ideation as he preferred to be clean shaven and wanted to avoid razor restrictions. He continued to receive treatment at the EOP level of care until March 2017 when his most recent institution reduced his level of care to 3CMS. At that time, his diagnosis was changed to Mood Disorder Not Otherwise Specified and Narcissistic Personality Disorder. The SCR noted the inmate attended his individual 3CMS treatment contacts, although he refused group treatment when offered. Between April and July 2017, his treating psychiatrist provided a diagnosis of Delusional Disorder and prescribed antipsychotic medication.

In August 2017, the inmate was returned to EOP level of care due to psychiatric decompensation. Prior to the level of care change, he started refusing his Human Immunodeficiency Virus (HIV) medication and he signed a Do Not Resuscitate (DNR) order. The September 13, 2017 IDTT documentation indicated he would not be considered for a lower level of care until he achieved "six months of stability." However, he was subsequently placed in ASU, and his ASU EOP treatment team reduced his level of care to 3CMS two weeks later, on September 26, 2017. The reviewer noted the treatment team also deferred his diagnosis and discontinued his psychiatric medications at that time. In October 2017, the inmate restarted his HIV medication and denied psychiatric symptoms, although his assigned clinician noted, "he might be minimizing symptoms in order to gain discharge from CCCMS." The inmate did not attend any of his assigned group treatment between November 2017 and February 2018, and he was not prescribed psychiatric medication during this time. His last primary clinician contact occurred at cell front due to refusal in January 2018, and he was described as "stable for the past 90 days" on this date.

The SCR noted the inmate had a history of six suicide attempts, five of which involved overdose on prescription medications. He was also placed on the High Risk List twice during his prison term. The inmate's most recent suicide attempt occurred in August 2015, at which time he reportedly overdosed on morphine and other opiate based medications while in county jail. Suicide risk evaluations completed during the year prior to his suicide resulted in ratings of low acute and moderate chronic suicide risk. However, the reviewer noted some risk factors were omitted from these assessments and that risk justifications were consistently "weak." Among the risk factors omitted were chronic pain, chronic and potentially life-threatening medical illness, and "predominantly white" heritage. The reviewer suggested suicide prevention safety plans were generally adequate.

94

During a telephone call in early January 2018, the inmate indicated his family members should prepare themselves as he was "going to take his life." However, this information was not communicated to CDCR staff. On February 15, 2018, the inmate was involved in a "touching" incident with a cellmate, although no further details were provided, and it was unclear which inmate perpetrated the act. The inmate was placed in the STRH on this date "due to a bed shortage," and he ingested a lethal dose of his Propranolol either that evening or the following morning. The SCR did not indicate whether he was in an intake cell at the time.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case. The Special Master's expert determined the inmate's suicide was not foreseeable based on available information.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined this inmate's suicide was preventable based on insufficient interdisciplinary suicide prevention efforts. As indicated in the SCR, the inmate had five suicide attempts involving prescription medication overdose. He was also described as impulsive, and he informed staff twice within the past year he would not disclose suicidal thoughts again. However, the SCR noted he entered ASU one day prior to his death with "a relatively new supply" of KOP Propranolol, one of the most toxic beta blockers available. The inmate also informed a staff member upon entering ASU, "Ad Seg is detrimental to my health"; however, this did not trigger further inquiry or a referral to mental health. Lastly, although the reviewer did not indicate whether the inmate was placed in an intake cell within the STRH, they did report concerns with security/welfare checks on the unit given rigor mortis was present when they entered the cell.

IV.    Critique of Suicide Case Review Report

The SCR adequately summarized this case with relevant social, criminal, incarceration, substance use, and mental health history. The SCR included a sufficient critique of emergency response efforts, suicide risk evaluations, safety and treatment planning, and level of care and diagnostic decisions. The reviewer also provided a reasonable assessment of the precipitants to the inmate's suicide, and their recommendations directly corresponded to problems discussed in the body of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in five required QIPs and two concerns that did not rise to the level of a QIP.  The QIPs addressed the "thoroughness of the Security/Welfare checks" in the STRH unit; inconsistent psychiatric diagnoses over the course of incarceration; various deficiencies noted in the three most recent suicide risk evaluations; treatment planning documentation issues; and level of care reduction concerns in September 2017.

In response to the QIP for security/wellness checks in the ASU, custody staff at the identified institution conducted an inquiry into the guard one checks and provided proof of training on related policies and procedures for custody staff assigned to ASU.  The identified institution's mental health QIPs were addressed through CAT audits and additional training was provided where indicated.  Detailed memorandums and proof of training were included for the mental health QIP items.

The Special Master's expert agreed with the reviewer's recommendations and determined the identified institution's follow up and implementation of QIPs were sufficient. However, the Special Master's expert disagreed with the reviewer's decision to exclude the KOP Propranolol concern from the QIPs, as this was serious enough to warrant a policy review and change at the headquarters level.  As such, although the SCR indicated mental health headquarters was discussing the matter, it was unclear whether changes were implemented in an effort to prevent future similar occurrences.

Case U

I.    Summary of case

This inmate was a 34-year-old Hispanic female inmate who was discovered by one of her cellmates hanging from a shower head on April 23, 2018 at 1534 hours.  The SCR indicated the ligature was untied from around her neck, prior to the cut down kit arriving at the scene, and that life saving measures were implemented.  The inmate was transported to a community hospital at approximately 1608 hours and pronounced dead at 1625 hours.  She was housed in an eight-person cell with five other inmates in the reception center.  The inmate was receiving mental health services at the EOP level of care at the time of her death.

The inmate was born in Southern California and raised by her mother.  The inmate's father was incarcerated throughout most of her childhood and adolescence.  She had one sister.  The SCR noted an extensive history of exposure to parental substance abuse, domestic violence, emotional abuse, and neglect.  The inmate left school prior to completing the eleventh grade, and she did not pursue a GED or high school diploma. The SCR indicated the inmate was intermittently indigent beginning at age 19.  The inmate never married and had three sons in her mother's custody.  She maintained communication with her mother via telephone.

The inmate began abusing substances and engaging in criminal activity at an early age. The SCR noted alcohol and methamphetamine use as early as age 12, and her abuse of these substances continued into adulthood. Her first juvenile arrest was for petty theft at age 14. Her juvenile record also included arrests for grand theft and false identification. Her first adult arrest occurred at age 21, and her adult criminal record was significant for battery on a peace officer, burglary, possession of drug paraphernalia, cruelty to a child, and kidnapping. Prior to the commitment offense she served two prison terms in CDCR in 2005 and 2013. Her second term in 2013 was for kidnapping while under the influence of alcohol and methamphetamine. The SCR indicated she attempted to take the child of another parent, believing he was her son. The inmate reportedly absconded from parole seven times between 2013 and 2017, and she was returned to jail a few times during this period. The inmate entered CDCR for her third and final prison term in February 2018 after receiving a one-year and four-month sentence for a conviction involving arson. Her earliest expected release date was September 6, 2018.

The inmate was in the reception center for 76 days before she committed suicide. She did not receive an RVR or disciplinary chrono during this term. There was no indication she was gang involved. An interviewed housing unit custody officer described the inmate as a "loner" who would occasionally engage with others. The reviewer also noted she had no known problems in the housing unit, she regularly attended institutional programs, and the housing unit officer said he "never saw this coming."

According to the SCR, the inmate had an extensive mental health history with symptoms of depression and anxiety manifesting as early as age eight. The inmate also had several suicide attempts and self-harm incidents that started at age 12 when she intentionally cut her face. The inmate's introduction to CDCR mental health staff occurred in January 2013 when she was included in the 3CMS level of care after reporting a history of Bipolar Disorder and visual and auditory hallucinations. She was initially diagnosed with Alcohol Dependence and Antisocial Personality Disorder with rule-outs for Depression and Malingering. However, in February 2013, her level of care was increased to EOP following self-harm behavior and reported psychotic symptoms. The inmate's self-harming behaviors included hair pulling, biting, and punching herself. The inmate's diagnosis was changed to Psychosis Not Otherwise Specified, and mental health staff noted possible substance induced psychosis at that time. In April 2013, she reportedly displayed symptoms of mania, and her psychiatric diagnosis was changed to Bipolar Disorder. The inmate had multiple MHCB admissions during 2013.

The SCR referenced a suicide attempt by wrist cutting while in county jail in January 2018. She subsequently transferred to CDCR for reception center processing on February 6, 2018 and was included in the EOP level of care. Her diagnoses during this final prison term were Major Depressive Disorder, Unspecified Schizophrenia and Other Spectrum Disorder, and Alcohol Use Disorder, and her psychiatric medications included risperidone (3 mg), sertraline (50 mg), hydroxyzine (100 mg), benztropine (0.5 mg), and

buspirone (10 mg). The SCR described the inmate as medication adherent and indicated she routinely participated in EOP treatment groups and individual contacts. However, despite her involvement in treatment, she continued to report anxiety and angry outbursts that were attributed to living in an eight-person cell.

The inmate was admitted to the MHCB once during her most recent term. On April 1, 2018, she was referred for MHCB placement due to "voices" telling her to kill herself and reporting "the urge to choke herself in the shower." The SCR indicated she remained in the MHCB for eight days, and that she "maintained stability" despite MHCB treatment primarily consisting of medication management. The inmate discharged to EOP level of care on April 9, 2018, and she reportedly requested to return to her unit instead of awaiting double cell placement. Her medication and treatment adherence continued after MHCB discharge. On April 23, 2018, the inmate attended yard and EOP group before returning to her cell and hanging herself in the shower.

According to the SCR, significant events proximate to the inmate's suicide included anxiety related to living in a multi-person cell; learning her grandfather died; recent MHCB placement for danger to self; ongoing isolation; informing a cellmate she wanted to kill herself on April 20, 2018; and crying during a phone call with her mother on April 22, 2018. The reviewer noted correctional staff were not informed of the grandfather's death or the inmate's reported desire to kill herself. Although it was not mentioned in the SCR, the EOP inmate was also on her 76th day in the reception center at the time of her death, despite MHSDS Program Guide requirements for transfer of EOP inmates to mainline facilities within 30 to 60 days.

The SCR identified problems with mental health staff's treatment plans, safety plans, suicide risk evaluations, and other clinical documentation. The reviewer specifically noted concerns that reception center clinicians failed to provide accurate acute suicide risk ratings, inmate specific suicide prevention safety plans, and suicide risk focused treatment plans and interventions. The SCR also noted clinicians did not appropriately review historical records, and that the inmate's suicide history was significantly underrepresented in suicide risk evaluations as a result. While serious deficiencies were also noted in the most recent SRASHE, dated April 17, 2018, the reviewer suggested the suicide risk ratings of moderate acute and high chronic "may have been appropriate."

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability. The Special Master's expert determined this inmate's suicide was not foreseeable based on available information; however, it is important to note that mental health staff may have underestimated the inmate's suicide risk as a result of inaccuracies and omissions found throughout suicide risk evaluations at the reception center.

III.   <u>Determination of Preventability</u>

The Suicide Case Review Committee did not provide a determination regarding preventability.

The Special Master's expert determined there was insufficient information to definitively state the suicide was preventable; however, the SCR noted the inmate's suicide history and acute risk were misrepresented in SRASHEs, that suicide prevention safety planning was inadequate, and that treatment plans and interventions did not sufficiently target suicide risk. The institution should have monitored the inmate more closely or considered an expedited transfer to a mainline institution considering the length of time she was at the reception center and that environmental factors appeared to have contributed to her psychiatric decompensation during the month of her suicide.

IV.   <u>Critique of Suicide Case Review Report</u>

The SCR provided an adequate summary of this case with relevant social, criminal, incarceration, substance use, and mental health history. The reviewer sufficiently critiqued medication management, timeliness of contacts, and the quality of suicide risk evaluations, treatment plans, progress notes, and other clinical documentation. Additionally, the SCR included a reasonable assessment of the precipitants to this suicide, and the reviewer's recommendations were directly linked to issues highlighted in the report. However, while the SCR noted Program Guide compliance related to timely contacts, the reviewer did not mention the reception center's non-compliance with Program Guide transfer guidelines for EOP inmates, which was particularly concerning given the inmate's suicide attempt prior to arrival in January 2018, and her psychiatric decompensation prior to suicide in April 2018.

V.   <u>Analysis of Quality Improvement Plan Process</u>

The case resulted in four required QIPs, all of which were directed at the reception center's mental health department. The Special Master's expert determined the recommended QIPs were appropriate. However, while the identified institution implemented audits and trainings, there was no post training data to indicate whether clinicians demonstrated sufficient competency in suicide risk evaluations, five-day follow-ups, and treatment and safety planning.

The reviewer included two separate QIPs for inadequate suicide risk evaluations and safety plans, and these required supervisory staff to conduct audits and/or provide additional staff training. The institution audited ten suicide risk evaluations for two clinicians and found serious deficiencies in nine of ten audits for one provider, and seven of ten for the other. Although the institution provided suicide risk evaluation mentoring

and training, they did not provide post training audit results to indicate whether the providers' suicide risk evaluations improved in response to remedial efforts.

Another QIP was included to address an identified clinician's failure to target suicide risk in treatment plans. The institution conducted an audit of ten treatment plans and noted that none of the clinician's treatment plans met the audit tool criteria. This clinician was provided additional training, and the institution noted that a supervisor would audit at least two treatment plans per month; however, there was no documentation suggesting remedial efforts resulted in improvements.

The last QIP stemmed from five-day follow-up and safety planning concerns, and this item also required audits to determine the best course of action. The institution noted that four out of five five-day follow-ups failed to meet audit tool criteria and that training was provided to identified staff.

Although the Special Master's expert agreed with the reviewer's QIPs and recommendations, an additional QIP was indicated to address the institution's failure to transfer the EOP inmate from the reception center in accordance with Program Guide requirements. This was especially necessary in this case, as recent events suggested she had periods of psychiatric decompensation due in part to environmental factors prior to suicide.

Case V

I.    Summary of case

This inmate was a 57-year-old Hispanic male who was found hanging in his solely occupied cell on December 12, 2018. At approximately 1700 hours while retrieving food trays from the evening meal, a custody officer discovered the inmate with a black cable extending from around his neck to his upper bunk. The officer used his radio to announce an attempted hanging and summoned the cut down kit before opening the inmate's food port and deploying oleoresin capsicum (OC) pepper spray to his face. Staff entered the cell at approximately 1703 hours, noted the inmate was "observed to be unconscious," and proceeded to place his hands and legs in restraints while CPR was initiated. The inmate was subsequently transported to the TTA and lifesaving measures continued until he was pronounced dead at 1721 hours. The reviewer noted a custody officer handed the inmate a form to sign for indigent envelopes 20-minutes prior to discovering his body on this date. According to the SCR, the inmate was housed in general population. He was receiving mental health services at the EOP level of care at the time of his death.

The reviewer noted the inmate was a "poor historian" and that available historical information was limited and inconsistent. The inmate reportedly moved from Arizona to Central California with his biological parents and five siblings when he was age 4. The

100

SCR indicated he at times reported a family history of alcoholism and domestic violence, as well as sexual abuse by a male cousin. The inmate left school prior to tenth grade and reportedly had "challenges with reading and writing." A review of the electronic health record also suggested a history of traumatic brain injury (TBI).

The inmate reportedly abused various substances during adolescence and adulthood, including alcohol, marijuana, cocaine, PCP, lysergic acid diethylamide (LSD), and psilocybin. The inmate worked on his sobriety while incarcerated, and he did not appear to be abusing substances around the time of his suicide, based on inmate interviews and the medical examiner's report.

The SCR indicated the inmate never married and had three adult daughters. He reportedly maintained written and telephonic communication with siblings, friends, and daughters; however, his family members were unable to visit after he moved to his final institution. The reviewer indicated staff and other inmates described him as quiet, timid, respectful, and someone who kept to himself without bothering anyone.

The inmate's first known arrest occurred at age 22. His criminal record included charges for assault with a deadly weapon with likelihood of great bodily harm; possession and manufacturing of a dangerous weapon; vandalism; drunk driving; resisting a peace officer; battery on a custodial officer; and threatening a victim or witness. He also had a history of non-adherence with court ordered treatment and probation. He was incarcerated in CDCR three times, with his first two terms occurring in 1992 and 1997. Although the inmate reportedly remained in the community for nine years without incurring criminal charges, he was arrested for the commitment offense on November 23, 2011, and subsequently convicted of assault with a deadly weapon, inflicting corporal injury on spouse or cohabitant, and voluntary manslaughter. This conviction resulted in a third strike and he was sentenced to life with the possibility of parole.

The inmate entered CDCR for his most recent prison term in July 2014. The SCR noted he adjusted well without incident until he assaulted three officers within a two-month period in 2016. He also discontinued his gang affiliation and requested SNY designation around this time. During 2017, he programmed well and received certificates for his involvement in various groups and activities. In August 2018, he transferred to a different facility to be closer to family and received visits for the first time. He received three visits from his daughters before he transferred to his final institution on October 23, 2018. Three days later, on October 26, 2018, the inmate was physically assaulted by a cellmate for unknown reasons, and he required treatment for serious injuries at an outside hospital. Although he was briefly placed in ASU upon return, he was no longer in restricted housing at the time of his suicide in December 2018. According to the SCR, a housing unit custody officer described the inmate as "quiet…a programmer…he stuck to himself…didn't come out to dayroom." The inmate's most recent cellmate informed the reviewer he allowed the decedent to borrow his television and assisted him with filling out an appeal before moving out of their shared cell two days prior to the suicide.

The inmate received mental health services beginning in the 1990s. He had several psychiatric hospitalizations in the community and was treated at the 3CMS and EOP levels of care during prior prison terms. The SCR indicated the inmate became assaultive toward himself and others "when unmanaged" and that he had a history of custody staff assaults, some of which resulted in charges that were later dismissed based on Not Guilty by Reason of Insanity (NGRI) findings. In 2002, he received treatment at DSH - Atascadero. After discharging from DSH-Atascadero, he participated in Conditional Release Program (CONREP) services until his arrest for the commitment offense in 2014. Treatment throughout his adulthood primarily targeted mood and psychotic symptoms, including depression, paranoia, and auditory hallucinations with commands to harm himself and others. Although the reviewer noted his reports of suicide attempts were "inconsistent as a result of his poor memory," it appeared he attempted suicide at least twice in the 1990s by stabbing and cutting himself. The inmate also engaged in numerous self-harm acts until 2016, including head banging, biting, and cutting.

During his current prison term, he was hospitalized in the MHCB twice in February 2016. In March 2016, he was referred to an acute psychiatric program (APP); however, while awaiting transfer he required treatment at a community hospital for self-inflicted head wounds. The referring MHCB staff documented "severe paranoia, memory problems, borderline intellectual functioning, low frustration tolerance, poor impulse control, and problems with disinhibition." Upon arrival to the acute program the inmate continued to psychiatrically decompensate, and he repeatedly harmed himself and staff. However, in April 2016, he began stabilizing after his antipsychotic medication was changed, and he subsequently transferred to an ICF until March 2017. At discharge, the inmate's diagnoses were Schizophrenia and Post Traumatic Stress Disorder. Although his psychotic symptoms appeared to persist until around August 2018, he did not attempt to harm himself or others after leaving the acute program.

The SCR indicated the inmate functioned well between August 2018 and early October 2018. He received visits from his family and was described as "happy" during this timeframe. However, around October 9, 2018, he informed mental health staff that he was transferring to his final facility where his daughters would be unable to visit, and he endorsed anxiety and sleep difficulties. Three days after arrival to the final institution, the inmate was assaulted by a cellmate and required treatment for his injuries at a community hospital. His computed tomography (CT) scan revealed "blowout fractures" around his left eye, and he required sutures for a facial laceration.

Upon return to his most recent institution, the inmate's assigned EOP clinician completed the first three contacts at cell front, including the initial assessment. The reviewer indicated the first two primary clinician encounters were limited to non-confidential "wellness checks." A review of the electronic health record revealed this primary clinician never discussed the assault with the inmate. Further, the clinician's initial assessment and treatment plan form were limited to information pulled forward from

another facility's August 2018 documentation. The clinician did not provide their own clinical summary, left several sections blank, failed to develop a treatment plan, and wrote a plan to complete the narrative portion of the suicide attempts and self-harm section at a later date. Additionally, the clinician's progress notes suggested recent stressors were not discussed, and treatment interventions were not implemented during clinical contacts. The remaining three primary clinician contacts were completed confidentially, and the clinician consistently described the inmate as psychiatrically stable on these dates.

A mental health headquarters psychiatrist reviewed the psychiatric contacts and medication management for this inmate. The reviewer did not identify any concerns and indicated the inmate was adherent with all of his medications in November and December 2018. The inmate's last psychiatry contact occurred on November 27, 2018.

According to the SCR, the inmate attended his EOP treatment group "at approximately 1315 hours on the date of his death," and, during on-site interviews, the facilitator for this group stated he behaved "as he normally did" and was "quiet and kept to himself." However, there was no progress note available in the electronic health record to confirm the inmate attended group on that date. The most recent group note was dated, December 11, 2018, and the inmate was documented as a "no show."

The inmate's most recent suicide risk evaluation was completed in September 2017, and the results indicated moderate chronic and low acute risk. In contrast, a suicide risk evaluation completed three months prior resulted in high chronic risk and moderate acute risk. The reviewer did not indicate whether the different risk ratings were sufficiently justified in the clinical documentation or whether one appeared more accurate than the other. The SCR also did not include a review of suicide prevention safety plans.

The reviewer quoted a March 25, 2016 suicide risk evaluation that suggested the inmate "becomes suicidal when he experiences significant stress, which exacerbate his auditory hallucinations that command him to kill himself." The reviewer also wrote, "it is possible that too many sources of stress overwhelmed his ability to cope in light of his mental and cognitive deficits." Although the inmate was described as stable during his last three primary clinician contacts, he experienced a number of stressors prior to his suicide, including moving to a new institution that was too far for his family to visit, sustaining injuries during an "unprovoked" cellmate attack, and losing a cellmate he relied upon.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case. The Special Master's expert determined the inmate's suicide was not foreseeable based on available information.

III.   Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.  The Special Master's expert determined the inmate's suicide was not preventable based on available information.

IV.   Critique of Suicide Case Review Report

The SCR included a reasonable assessment of the precipitants to the suicide and provided relevant social, criminal, incarceration, substance use, and mental health history. However, the SCR did not include a sufficient critique of provided treatment, assessments, suicide risk evaluations, and suicide prevention safety planning.

The Special Master's expert reviewed the electronic health record and identified serious inadequacies in the assessment and care provided at the final institution.  It did not appear the assigned EOP clinician had an accurate understanding of the inmate's current treatment needs, suicide history, or current suicide risk.  The inmate's most recent initial assessment and treatment plan form were incomplete and were limited to brief information pulled forward from August 2018.  His clinical summary also was not updated after August 2018, and a formalized EOP treatment plan was missing from the November 2018 documents.  The clinician wrote in the history of suicide and self-harm section that there was "no narrative history available at this time," instead of reviewing collateral information to determine the inmate's suicide history and potential for self-harm and suicide.  The clinician also failed to address recent significant events during clinical encounters, including discussing the serious physical assault he suffered upon arrival at the institution.

Although the SCR provided results for the most recent suicide risk evaluations, they did not offer an opinion regarding the quality or accuracy of these assessments.  This was necessary as the last two suicide risk evaluations resulted in different opinions regarding chronic risk.  Additionally, the SCR did not include a review of suicide prevention safety planning, despite the inmate's history of suicide attempts and self-harm.

While the reviewer noted a concern regarding the primary clinician's inadequate documentation for three consecutive cell front encounters, this was not addressed in the recommendations.  The reviewer also failed to identify the lack of documentation to confirm the inmate attended group treatment on the date of his suicide.

Lastly, although the inmate was not designated developmentally disabled, the SCR repeatedly referenced cognitive limitations, in addition to noting impairments in memory and a prior diagnosis of Borderline Intellectual Functioning.  The inmate also appeared to rely on his former cellmate for completing forms.  However, the reviewer never indicated

whether the inmate was appropriately referred for evaluations to determine the nature and extent of his cognitive limitations and adaptive support needs.

V.    Analysis of Quality Improvement Plan Process

This case resulted in one QIP.  The QIP required the statewide SPRFIT to review custody staff's practice of placing the unresponsive general population inmate in hand and leg restraints during CPR.  A memo from the statewide SPRFIT coordinator indicated the matter was discussed with various disciplines and that members of the Special Master's team raised the issue "on several occasions" during suicide case review calls.  Meeting minutes for March 4, 2019 and April 15, 2019 were referenced, but not attached.  The memo further explained that the restraint practice was not a violation of policy and that Title 15 indicated that Use of Restraints may be used when there is a "reasonable likelihood that he or she may become violent or attempt escape." As such, although the matter was reviewed and discussed, it appeared the statewide SPRFIT did not agree with the reviewer's concern regarding custody staff's use of restraints in this case.

The Special Master's expert agreed with the reviewer regarding the use of hand and leg restraints on an unresponsive general population inmate during CPR.

The Special Master's expert also determined the custody officer's decision to use OC spray on a visibly asphyxiating inmate through the food port while awaiting the cut down kit should have been addressed in the reviewer's recommendations to the statewide SPRFIT, as this practice was clearly contraindicated and likely to result in further respiratory compromise.

Lastly, QIPs and/or recommendations were also indicated to address inadequate care and assessments at the final institution, as well as for the group facilitator's failure to write a progress note confirming the inmate's attendance on the date of suicide.

Case W

I.    Summary of case

This inmate was a 30-year-old Hispanic man who was found hanging in his single cell in ASU by correctional officers conducting Guard One checks on December 15, 2018.  CPR was performed, an automated external defibrillator was used, and American Medical Response was called and performed life-saving measures before the inmate was pronounced dead.  He was not receiving mental health services at the time of his death or at any other time during his incarceration.

The inmate was born in Mexico and immigrated to California at an unknown time, although records indicate during his childhood or adolescence.  He was undocumented. He was primarily raised by his biological mother and did not have contact with his biological father.  He did not marry or have children.  According to records, his education

level was either the tenth or eleventh grade. He worked in construction for one year before his committing offense. The inmate denied alcohol or illicit substance use before his incarceration, although the POR recorded a possible "substance abuse program." Records indicated he was affiliated with a street gang at a young age.

The inmate served probation for two juvenile convictions for burglary and loitering for drug activity. His adult criminal history included arrests for rape in concert, oral copulation, and sodomy for one incident, and another arrest for assault with a firearm that was released.

The inmate entered his first and only CDCR term in June 2008 for two counts of robbery in the second degree and one enhancement of discharge of a firearm during the robbery. He was serving a 23-year sentence. During this term, he received 14 RVRs and was transferred to seven different institutions. The transfers were predominately related to safety concerns and placement in the California Substance Abuse Treatment Facility (CSATF). He received a new charge of battery with a deadly weapon for an incident on July 18, 2018 that would possibly extend his term and for which he was facing possible district attorney prosecution. During mental health screens, the inmate denied a history of or current suicidal ideation.

The inmate had an "R" suffix since 2009 related to his sex-related charges which he apparently kept hidden from other members of his gang. He requested SNY status on October 27, 2018. This was to be discussed during his (ICC), however he died before the committee occurred. The inmate had stopped going to the yard since October 29, 2018 and would come out of his cell only intermittently for a shower.

According to the POR, and confirmed by telephone conversations with his mother, the inmate did not have a history of mental health issues in the community. He was not a participant in the MHSDS at any time during his incarceration. He denied suicidal ideation and depressive symptoms during four ASU Placement Screens. He also denied mental health issues, suicidal ideation, or homicidal ideation during a social worker screening that occurred on December 5, 2018 after he refused to answer ASU Pre-Placement Screening questions after a court hearing. When seen the following day, the inmate indicated that he preferred to bypass the procedure so that he could return to his cell. No suicide risk assessments were completed. Stressors in the several months preceding his death included loss of social support from his gang, fears of being attacked, and facing more prison time due to the July 18, 2018 offense. The inmate stopped going to the yard on October 29, 2018, and he tested positive for methamphetamine and amphetamine on November 8, 2018. The coroner's report of December 27, 2018 also noted that methamphetamine was detected. It further found that "Rigor mortis is present in the jaw and extremities. Livor mortis involves the face and the posterior, dependent body surfaces with exception of blanched pressure points."

The inmate's mother was contacted after his death and she expressed disbelief that he would commit suicide, that "someone else" killed her son, and that he had "enemies" in

prison, but she did not know of any direct threats. On the day of his suicide, staff members did not note unusual behavior other than his statement to a custody officer during rounds, "I'm not looking for trouble here." An inmate in a nearby cell said that the inmate asked him "what time it was?" but that inmate was transferred and not interviewed during the onsite review. The inmate wrote a suicide note that said, "U [sic] not taking my life for some hyna I didn't rape." "Hyna" loosely translates to woman in Spanish.

The inmate was not prescribed psychotropic medications during his incarceration. His medical history included insomnia, non-specific intermittent abdominal pain, knee pain, hepatitis C, and a sinus infection.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an accurate summary of this case. The SCR included relevant social, criminal, incarceration, substance use, and mental health history. It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in four required QIPs.

The first QIP related to reports that the noose around the inmate's neck was cut below the knot, which is inconsistent with departmental policy. As a result, an inquiry confirmed that the Primary Responding Officer's Incident Report did not note that the noose was cut below the knot. On-the-Job Training and a copy of the January 22, 2018 memorandum "Response to Suicide Attempts by Hanging or Asphyxiation, Introduction of the Replacement Cut Down Tool, and Standardization of the Cut Down Kit" were provided to custody personnel.

The second QIP related to a nonrebreather mask that was used during CPR instead of a bag valve mask (BVM). As a result, an inquiry with staff revealed that the BVM was used during CPR and there was a documentation error that noted the nonrebreather mask was used. On-the-Job Training regarding Suicide Case Review Findings on accurate documentation of BVM use during CPR was provided to nursing staff.

The third QIP related to the incomplete documentation in the MAR of the naloxone administration. As a result, an inquiry with staff revealed documentation of the naloxone administration was incomplete. On-the-Job training regarding Suicide Case Review Findings on accurate and complete documentation of naloxone dose(s) in the MAR and First Medical Responder PowerForm was provided to nursing staff.

The fourth QIP related to the lack of December 6, 2018 primary clinician documentation as to whether the primary clinician was aware that the inmate had just returned from court and the disposition of his court appearance. As a result, language was added to the suicide prevention Local Operating Procedure (LOP) to clarify existing policy.

The QIPs were an appropriate response to the issues identified. Receipt of the coroner's report indicating rigor mortis should have prompted an assessment as to whether Guard One checks were conducted in accordance with policy.

Case X

I.    Summary of case

The inmate was a 46-year-old Puerto Rican man who died on November 19, 2018. He was double celled in an SNY. His cellmate approached an officer and reported that the inmate was sick on November 17, 2018, and responding staff noted that the inmate was conscious but with trouble breathing. Responding medical staff noted he did not have a pulse and performed successful CPR. He was transported to a community hospital and he died two days later. The inmate was receiving mental health services at the 3CMS level of care at the time of his death. The suicide review was delayed because the cause of death was initially suspected to be a drug overdose.

It was noted that the inmate was an inconsistent historian regarding his social and suicide history; as a result, documentation varied. Born and raised in California, his mother died at age 47 due to a brain aneurysm related to polycystic kidney disease, from which the inmate also suffered. According to some records, his father was shot to death; other records noted that his father was alive with dementia. It was unclear how many siblings the inmate had. The stepfather was emotionally and physically abusive to the inmate and his brother. When he was age six, his stepfather cut his face with a broken bottle and "busted his head open" resulting in loss of consciousness, after which the inmate reported experiencing seizures. He lived with his mother until age eight, when he was placed in foster care, group homes and eventually juvenile hall. The inmate reported that he was in

special education and classes for the "severely emotionally disturbed" children in junior high and high school. The POR noted that he graduated from high school in 1989, attended community college and was planning to become an architect but did not complete the degree. In contrast, the inmate reported that he attended school until the tenth grade, but he did not complete high school. Central File prison records indicated that he earned his GED on October 2, 2014 while in CDCR. The inmate reported working since age 12; he worked as a contractor. He worked in construction at the time of his arrest. Records showed that he had been fired from at least two jobs.

The inmate first used alcohol at age 15. He started using marijuana and methamphetamine daily at age 17. He married his wife in 1995, and they became "Christians;" he subsequently separated from his gang and stopped using drugs. His wife died of ovarian cancer in February 2013. After his wife's death, the inmate converted to Islam and became involved in the Muslim faith.

The inmate had a history of gang involvement and arrests since age 13, including theft, assault with a deadly weapon, attempted burglary, burglary and grand theft auto. His offenses as an adult included receipt of stolen property, grand theft, use/under use of narcotics, felon in possession of a firearm, possession of a bad check/money order and contracting without a license.

He first entered CDCR in December 1991; he was released on parole and was returned on parole violations several times. He entered CDCR for his current term in January 2009 for rape/resist with force/violence/fear of bodily injury. He requested and was granted SNY status due to his commitment offense. He was placed in the ASU on September 6, 2012 due to his history of a sex offense and gang disaffiliation. He received three RVRs in the last 18 months of his life, after having received no RVRs for almost four years. At the time of his death, the inmate was pending transfer to a Level II prison. Interviews with other inmates indicated that he was excited about the transfer. His last family visit was from his wife in April 2003, and he did not have phone calls with family or others in the community. It did not appear that he was in regular contact with relatives.

His former cellmate noted that he prayed, stacked medications in his cell because they made him feel worse, and often refused to attend medical appointments believing that medical staff were not helping him. The former cellmate reported never having heard the inmate talk about ending his life but indicated that the inmate sometimes had difficulty breathing. Interviews with other Muslim inmates revealed they did not believe his death was a suicide, because suicide was unacceptable in Islam. At the time of his death, the inmate was the main kitchen kosher lead baker. Other inmates reported that in the days prior to his death, the inmate was in pain and had difficulty breathing.

The primary clinician, with whom the inmate reportedly had a good therapeutic relationship, noted, "He was not about suicide. This isn't who he was." He said the inmate refused his blood pressure medications mostly because they made him "feel sore, lethargic, and left him in greater pain." He described the inmate as "very forward

thinking" and "never suicidal." The inmate was diagnosed with autosomal dominant polycystic kidney disease and hypertension for which he was often treatment nonadherent. At the time of his death, he was prescribed atenolol, minoxidil, amlodipine, hydrochlorothiazide, clonidine, enalapril and sumatriptan. A physician progress note of October 19, 2018 documented that medical staff had expressed concerns about his medication nonadherence. On October 30, 2018, the inmate indicated to his primary clinician that he often refused appointments because he was frustrated with long wait times. Four unopened bubble packs of medication, each with ten minoxidil tablets (10 mg each), were found in his property after his death.

Information concerning the inmate's remote mental health history was incomplete. He reported depression starting around age eight related to severe physical abuse by his stepfather which continued into his teenage years. One progress note indicated a PTSD diagnosis in connection with this abuse. The inmate reported a suicide attempt in 1996 with subsequent community hospitalization in connection with a "trip on meth." He was discharged from the hospital with outpatient follow-up. Records documented community prescriptions of haloperidol and trazodone. One note indicated treatment in the county jail with mirtazapine and quetiapine, but the dates of this treatment were unknown.

During the instant term, the inmate denied a history of suicidal ideation as an adult, as well as a history of suicide attempts; although, it was noted that he was an inconsistent historian and may have exhibited suicidal behavior as a teenager. During previous terms (1998 to 2003), the inmate reported five or six suicide attempts in his youth with few details, including overdoses and at least one hanging attempt from the early 1980s to 1996. During these prior terms at CDCR, he received mental health services at the 3CMS level of care; this treatment initially focused on depression and insomnia, but also included treatment for paranoid ideation, auditory hallucinations (some command for self-harm) and racing thoughts, generally in the context of substance use. He was included in the 3CMS level of care from December 1998 to February 2000, and from September 2001 to April 2003. He was provided with a diagnosis of Psychotic Disorder, NOS, which was later changed to Depressive Disorder, NOS in December 1999. On at least one occasion he received a diagnosis of Schizoaffective Disorder.

The report indicated that it was unclear whether mental health staff had access to the inmate's archived paper mental health records during his final CDCR term; it appeared that the inmate's denial of history of suicide attempts was accepted without question. Additionally, as his prior term was served under a different CDCR number, staff may have been unaware of his prior CDCR discharge number.

The inmate self-referred to mental health twice in 2011 when he reported experiencing depressive symptoms. He indicated that his mother had died from kidney disease, his godfather was dying from kidney disease, and he had knee pain after a fracture and stroke in 2009. He was seen by mental health in November 2012 due to his history of "hoarding medications," but he was noted to be taking his medications, and he was not included in the MHSDS. He was again placed in the 3CMS program on December 27, 2013 after

110

reporting feelings of depression and grief related to his wife's death. The inmate remained in the 3CMS program with a treatment focus on bereavement, intermittent depressive episodes and his failing health until the time of his death. He was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depressed mood, and he denied feeling suicidal. Venlafaxine and hydroxyzine were started. A Suicide Risk Assessment was completed on December 27, 2013, when the inmate denied suicidal ideation and previous suicide attempts. His chronic and acute risk were assessed as low. Some notes indicated that the inmate associated his wife's death with divine retribution for his crime.

His diagnosis was changed in 2014 to Depressive Disorder, NOS, and later to Major Depressive Disorder, recurrent. During 2016 the inmate experienced back pain and depressive symptoms, and he was started on mirtazapine which he later discontinued due to concern about dependence and kidney damage. Removal from the 3CMS program was briefly discussed in 2017, but the inmate's increased physical pain and decreased physical functioning were thought to warrant continued monitoring in the MHSDS. The frequency of contact with the primary clinician, which had been increased as the inmate processed bereavement, was decreased to every 90 days as the grief resolved. He continued to deny suicidal ideation from 2017 to 2018; although he continued to report ongoing pain and frustration. Medication adherence was sporadic throughout 2018. During a primary clinician contact during February 2018, the inmate reported concerns including the anniversary of his wife's death, having been pushed by another inmate while in the pill line, having discontinued his medication, and conflicts with a new cellmate and new primary physician. During primary clinician contacts that occurred in May 2018 and September 2018, the inmate reported feeling more stable, with decreased kidney pain and reduced blood pressure; however, medication nonadherence continued. The last primary clinician contact occurred on October 30, 2018 when the inmate reported preparing for his transfer to a Level II institution. He was described as stable, and "graduation" from the 3CMS program after his transfer was thought to be a possibility.

The coroner ruled the cause of death as amlodipine and atenolol toxicity (three times the therapeutic amount of atenolol was present in the blood sample), and the manner of death was suicide. Significant conditions included polycystic kidney disease, and the autopsy noted fatty liver, mild abdominal aortic atherosclerosis and mild coronary artery atherosclerosis. The institution's Suicide Prevention Coordinator and Mortality Review Coordinator initially concluded there was insufficient evidence to classify the death as a suicide. The committee noted that the inmate did not express plans to commit suicide during assessment for suicidality; no suicide note was found, and there were no specific indicators that pointed to suicide. The institutional Mortality Review Committee determined the cause of death was most likely due to chronic polycystic kidney disease and possible medication issues, and they planned to await the final autopsy and toxicology results. The statewide California Correctional Health Care Services Mortality Review Committee met regarding the inmate's death and submitted a report that the

primary cause of death was amlodipine and atenolol toxicity due to renal failure. The underlying conditions were listed as polycystic kidney disease and hypertension. Following the coroner's report, the death was ultimately classified as a suicide.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an accurate summary of this case. The SCR included relevant social, criminal, incarceration, substance use, and mental health history. It provided a reasonable assessment of the precipitants to this suicide.

V.    Analysis of Quality Improvement Plan Process

This case resulted in no required Quality Improvement Plans. None appeared to be required.

Case Y

I.    Summary of case

This inmate was a 30-year-old Hispanic monolingual, Spanish-speaking man, who was found by a correctional officer conducting count hanging by a noose from the top bunk in his solely occupied cell in a SNY on March 15, 2018. The alarm was sounded, lifesaving measures were initiated, an automated external defibrillator was applied, and CPR continued. Although the cut-down tool was repeatedly requested by responding custody officers and a responding sergeant, it was never produced during the response to the incident. He was transferred to the Triage and Treatment Area and pronounced dead. He was not a participant in the MHSDS at the time of his death.

The inmate was born in Jalisco, Mexico, and came to this country as an undocumented immigrant. He had a good relationship with both parents, who had separated in 2007. His cousin, a co-defendant in the committing offense, and former cellmate reported that the inmate had "good" family support. Some records noted that he left school after the

sixth grade in Mexico, while others reported that he completed high school in Mexico. According to records he lived in Washington State from 2006 to 2008 and moved to Sonoma County and then Ukiah, California. He was in a three-year cohabiting relationship at the time of arrest. He did not have biological children, but his girlfriend had five children who lived with them. He reported skills in construction, farming, and restaurant work. His substance use history was minimal, and his cousin denied knowledge of the inmate having used substances during his incarceration.

He had no juvenile or adult criminal history and no history of gang affiliation. After being arrested for the committing offense, he was housed in protective custody at the county jail.

The inmate entered his first and only CDCR term in April 2017 for second degree murder with the use of a firearm. He was serving a sentence of 25 years to life. He received two RVRs for minor infractions. On April 29, 2017, he was notified of an Immigration Detainer-Notice from the Department of Homeland Security that he was "lacking in immigration status" and was "removable under U.S. immigration law." He was screened for, but not placed in the DDP. Records indicated that he regularly used a Spanish-language interpreter. On June 22, 2017, he requested SNY placement and reported enemy concerns related to a co-defendant who was not his cousin, who the inmate and his cousin considered an enemy. He transferred institutions on August 30, 2017 and was placed on an SNY yard. The inmate shared a cell on the SNY with his cousin from November 8, 2017 to March 9, 2018.

The inmate's cousin was transferred to another institution six days before the inmate committed suicide. His cousin was reported to have been "shocked" by the inmate's suicide. Other inmates were interviewed, and they noted that the inmate had limited ability to interact with other inmates and staff because as he was predominantly Spanish-speaking. One inmate described that he became depressed when thinking about his case. During his term, his girlfriend, his girlfriend's children, friends and family, and his attorney visited him regularly.

The inmate denied a history of mental health issues and was not a participant in the MHSDS in CDCR. During an Initial Health Screening on April 17, 2017, a Mental Health Screening Interview on May 3, 2017, and an Initial Health Screening on August 30, 2017, he denied a history of suicidal ideation and a history of mental illness. He did not receive formal suicide risk evaluations during the course of his incarceration. A history and physical exam on May 9, 2017 noted a heart murmur, heart palpitations, and insomnia. He was not prescribed medications.

The inmate and his cousin-roommate were transferred together on March 9, 2018. Following the transfer, the inmate was single celled until the time of his death. His cousin indicated that the inmate did not demonstrate a change in mood or behavior prior to the suicide. Yet, when they said goodbye, the inmate kissed his cousin on the cheek, which was not a normal gesture. Another inmate on the housing unit said the inmate was "different like, ten days before (the suicide)." He made his last phone call before he died

on March 13, 2018 to his girlfriend when he discussed sending home various books, stamps, certificates and diplomas.  He also gave away some of his items to other inmates.  Three inmates on the same housing unit said that the inmate attended church services on March 14, 2018, the evening before the suicide.  Three notes, two addressed to his girlfriend and one to his younger sister, were found in his cell.  He noted that he felt like a burden and was exhausted by the prison environment.  In these notes, he also noted two prior suicide attempts while he was in county jail.  The county jail was contacted for the report, but their records did not reflect any suicide attempts by the inmate.

The medical examiner's report was received by CDCR.  It indicated that naloxone was present in the inmate's blood sample.  It also indicated that rigor mortis was present in the inmate's upper jaw.  An April 10, 2018 memo indicated that the report was received and that no modifications to the review were necessary.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an overall accurate summary of this case.  The SCR included relevant social, criminal, incarceration, substance use, and mental health history.  It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.  The report failed to consider the possible implications of the medical examiner's report indicating that rigor mortis was present in the inmate's upper jaw.

V.    Analysis of Quality Improvement Plan Process

This case resulted in two required QIPs.

The first related to the incomplete documentation of effective communication for the Mental Health Screening Interview on May 3, 2017; it is unclear if the interview was conducted in Spanish or an interpreter was used.  As a result, an inquiry was conducted about the incident, and it was determined that a translator was used.

The second related to the control booth officer who could not locate and provide the cut-down kit to responding staff.  On the day of the incident, the officer signed the daily

inventory sheet that accounted for all items being present. As a result, an inquiry was conducted. The warden drafted and shared a memo that modified the procedure for cut-down kits. All custody staff at the institution were to receive training on the modified emergency cut-down kit procedures, and training on cut-down kits had a 99 percent completion rating as of January 2018. The warden was also to use the disciplinary process for the control booth officer's actions.

These QIPs were appropriate. The documentation provided demonstrated adequate follow-up concerning all elements of the QIPs, except for the disciplinary process for the control booth officer's actions.

Case Z

I.    Summary of case

This inmate was a 39-year-old Vietnamese man who was found by correctional officers hanging in his single cell on an SNY on May 7, 2018. Staff used a cut-down tool to remove the noose and performed CPR. He was transported to the Triage and Treatment Area, 911 was notified, and paramedics arrived and transported him to a hospital where he was placed on a ventilator. He did not have brain activity, and the ventilator was removed on May 11, 2018 before he was pronounced deceased on May 12, 2018. The autopsy report found the death to be suicide by hanging and noted "[r]igor mortis is full in the upper and lower extremities, neck and jaw." No drugs of abuse were detected in the inmate's liver, but the urine toxicology report was presumptively positive for benzodiazepines, amphetamines, and opiates. The inmate was receiving mental health services at the EOP level of care at the time of his death.

The inmate was born in Saigon, Vietnam and was brought to the United States by his aunt and uncle when he was between ages one and three. He described his upbringing with them as "loving and supportive." At age 11, the inmate discovered they were not his biological parents when his biological parents came to the U.S. The inmate subsequently lived with his biological parents. His father abused substances and left the family during the inmate's adolescence. His father physically abused the inmate and his mother, and at least one relative sexually abused him between ages eight and ten. He earned a high school diploma and GED, and he attended some college. The inmate reported that "everything came crashing down" after his aunt died when he was age 17. Vietnamese was his primary language, but he was fluent in English. The inmate ran away from his mother's home several times and was subsequently homeless. He never married. At the time of the commitment offense, he was in a committed relationship with his girlfriend who was pregnant. He maintained written communication with some relatives, and his mother regularly visited him on weekends while he was incarcerated.

The inmate's substance abuse history began when he was 15 years old and included alcohol, marijuana, cocaine, ecstasy, LSD, mushrooms, acid, heroin, and methamphetamine. He was arrested at age 16 for grand theft auto and had multiple other

arrests and convictions. He tried to escape from a juvenile facility on August 2, 1996. The inmate entered CDCR for his first term in February 2003 for vehicle theft and false personation. He was released on parole on October 9, 2003.

In September 2006, the inmate entered CDCR on his second and final term upon a conviction for murder in the first degree, with the enhancement of intentional discharge of firearm causing great bodily injury/death and criminal gang activity. He was serving a life with the possibility of parole sentence. At the time of the commitment offense, he was on probation from his first term in CDCR. He also had an Immigration and Customs Enforcement detainer.

The inmate was placed in ASU on several occasions during the instant incarceration, mostly related to safety concerns and he received 11 RVRs. He was involved in an in-cell fight on May 15, 2013, and he reported safety concerns for a drug debt as documented in a memorandum of May 17, 2013. The ICC designated him single cell status on June 13, 2013 due to the in-cell fight. He reported safety concerns for a gambling debt as documented in a January 24, 2014 memorandum. The UCC referred to the ICC for double cell suitability on September 14, 2017; this review was pending at the time of his death.

The inmate did not have a history of mental health treatment in the community. He was not a participant in the MHSDS during his first CDCR term but was included in treatment during the current incarceration. He was alternately diagnosed with an Adjustment Disorder and Major Depressive Disorder with psychotic features, and at one point with Post Traumatic Stress Disorder, treated predominantly and at the time of his death with venlafaxine and mirtazapine for depression, buspirone for anxiety, levothyroxine for Hypothyroidism, gemfibrozil for hyperlipidemia, and benzoyl peroxide gel. His adherence to prescribed medication was inconsistent in the six months preceding his death.

On May 17, 2013, while in ASU, the inmate reported he would "be suicidal" if he returned to the yard because of an owed drug debt. The inmate met with a mental health clinician on May 20, 2013, when he denied suicidal ideation but reported a history of suicidal ideation. He was referred for consideration for placement in 3CMS, but on June 6, 2013, he reported suicidal ideation and was placed on suicide watch.

The inmate transferred to another institution and was admitted to an MHCB from June 8, 2013 to June 19, 2013 but was not included in the MHSDS upon discharge. He was discharged back to ASU at the previous institution. The inmate engaged in what was described as superficial cutting in June and July 2013. He was in the 3CMS level of care later in June 2013, and then admitted to an MHCB from July 10, 2013 to July 22, 2013. He experienced symptoms that were similar to methamphetamine withdrawal. He then returned to ASU at EOP level care of care from July 22, 2013 to November 22, 2013. His treatment in ASU focused on depression, substance abuse, and psychotic symptoms. He reported that he would kill himself if his mother passed away and he continued to

116

report conditional suicidal ideation during this incarceration, at times in the context of changes in primary clinicians. He was referred to DSH in October 2013. On November 1, 2013, the inmate reported a suicidal plan after he learned he would change clinicians; however, the change did not occur and the inmate subsequently reported he "retracted" the plan. He was placed on the High Risk List due to chronic suicidal ideation with future plan and transferred to DSH-ICF where he remained until July 25, 2014. The inmate reported a future suicide plan for October 2014, but he later stopped those reports.

The inmate reported feelings of guilt, shame, and inadequacy due to cultural and family issues mostly related to his incarceration. He reported that visits from his mother were the only protective factor that prevented his suicide, although some visits exacerbated his depression due to feelings of disappointing his family. The inmate reported a three-day substance use relapse after learning that his clinician changed, and he was re-referred to DSH-ICF on October 20, 2015 after loss of protective factors (family visits), problems at work, recent substance use, medication non-compliance, and resistance to treatment. He was treated at DSH-ICF from November 19, 2015 to August 23, 2016. During this time, "goodbye" letters that he had written to various family members were found. Following discharge from DSH, he denied current intent or plan to commit suicide. On May 2, 2017, he met with a new clinician, and reported he "wants to be able to talk about his feelings and even those thoughts of suicide without thinking that he is going to act on them." He changed clinicians again in early January 2018, and he reported that he would hang himself or overdose on heroin on an unspecified date. According to documentation on February 12, 2018, the clinician was alerted about the inmate's possible drug use and acknowledged substance use was an identified factor "for increasing depression and potential for escalating SI [suicidal ideation]." The inmate denied substance use when asked about it. He also denied a plan for suicide or self-harm.

In March 2018, the inmate expressed decreased interest in participating in treatment and attending work. In April 2018, he was found with inmate manufactured alcohol, and he expressed interest in attending a substance abuse group; it is unclear why he did not receive a diagnosis regarding substance dependence and whether he was referred to a substance abuse group. On April 5, 2018, he was fired from his job for stealing. Inmates interviewed after his death reported that he felt that the officers were giving him a "hard time." Nonetheless, he eventually returned to the job assignment. He appeared stable during the week before his hanging, including active participation on May 2, 2018 during his weekly primary clinician check-in group. His most recent clinician reported that he did not observe acute indicators for imminent suicide. The inmate's medication adherence was inconsistent during his last six months. IDTTs across the incarceration and during this period noted ongoing substance use issues, but diagnosis and treatment planning did not address this concern.

During a Suicide Risk Evaluation (SRE) of October 26, 2015, the inmate reported two suicide attempts via overdose on an unspecified date, and asphyxiation in DSH between December 2013 and August 2014 which were not in his records. He had 21 documented

SREs during the current term, four occurred in the two years before his death. In the two years preceding his death, the inmate was identified to have moderate chronic risk and acute risk was largely classified as moderate, although it was high in January 2018. The January 2018 SRE contained pertinent errors such as noting that the inmate was double cell status when in fact he was housed in a single cell. As a result, the safety plan did not address the risk posed by his single cell status in the context of ongoing suicidal ideation.

A post-mortem interview with the inmate's brother revealed the brother's belief that he was murdered due to money owed; however, there was no documentation to support this. He was positive for methamphetamine in the hospital on May 7, 2018. His mother's last visit was on May 5, 2018, and he made four calls to her during his last month. An inmate reported the inmate did not engage in conversation after this visit with his mother and did not go to the yard the day after; he normally would engage in those behaviors. The inmate expressed his love for his mother during their calls. Another inmate said he might have had an argument with his mother during the visit if he was under the influence of substances; the inmate also expressed that he believed the suicide was not planned and due to "falling out over family." In his property were letter drafts to his family, letters he received from his family, and "goodbye" letters to relatives and one friend.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was foreseeable. This inmate reported ongoing, conditional suicidal ideation and plan, and experienced a variety of stressors in the period preceding his death increasing his risk including temporary job loss, having art supplies used as part of a coping strategy confiscated, and changes of clinicians.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable. Had additional information been gathered concerning his single cell status and a safety plan addressing his degree of risk developed, had the inmate been placed on the high risk list with attendant increased monitoring, and had substance abuse issues been diagnosed and addressed as a focus of treatment, the likelihood of the completed suicide might have been substantially reduced.

IV.    Critique of Suicide Case Review Report

The SCR was an accurate summary of this case.  The SCR included relevant social, criminal, incarceration, substance use, and mental health history.  It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in four required QIPs.

The first QIP regarded a SRASHE on January 16, 2018 that did not provide sufficient risk levels and identified that the inmate was double celled when in reality he was single cell status.  It was clinically indicated for the safety plan to address his single cell status since he had a history of conditional suicidal ideation if his mother were to pass away.  As a result, an audit of the clinician's additional SRASHEs was completed and it was found that there was a pattern of not addressing protective factors in the case formulation.  CAT Audit criteria for a SRASHE training was conducted.

The second QIP regarded an IDTT on April 4, 2018.  It is unclear why the inmate did not receive a diagnosis reflecting substance dependence, why the IPOCs were not activated for substance use, and whether he was referred to a substance abuse group.  Documentation leading up to the IDTT reported chronic problems with substance abuse.  As a result, supervisors reminded clinicians to assess for substance issues, and if appropriate, include the appropriate substance abuse diagnosis in the treatment plan, activate the appropriate IPOC, and then address substance abuse issues in individual and/or group sessions.  This topic will be addressed during electronic health record system refresher trainings in the future.

The third QIP regarded lack of documentation for which specific interventions were utilized for decreasing suicidal ideation and addressing the inmate's conditional suicidal ideation.  As a result, the institution will enroll three clinicians, at a minimum, in the use of Collaborative Assessment and Management of Suicidality (CAMS) during the next implementation round.

The fourth QIP regarded the delayed activation of the Emergency Medical System (calling 911) about nine minutes into the emergency, which prompted a delayed appropriate medical response.  As a result, LOP #25 will be revised with clarification that all staff activate 911 when necessary, staff will receive training on LOP #25, and first responders in this incident will receive staff-specific training on LOP #25.

There was one mental health concern regarding risk factors in his last four months including substance use, loss of art supplies, difficulty adjusting to change in clinician,

119

and temporary loss of his job.  It would be clinically indicated for him to be on the High Risk List.

The QIPs generally adequately addressed the pertinent concerns.  The mental health concern noted was accurate but should likely have been raised to the level of a QIP.  The rationale for not doing so was two-fold: that the facility had a "superior" local operating procedure on addressing the identification and management of high-risk individuals focusing on imminent risk, and that high-risk designations were being addressed on the headquarters level.  A QIP could have examined the reasons why a comprehensive LOP was not adequately implemented in this case, and also provided follow-up on the headquarters' efforts in this regard and whether they had an impact on the facility level.


Case AA

   I.   <u>Summary of case</u>

This inmate was a 40-year-old African American man who was found by a correctional officer conducting security checks hanging by a torn bedsheet and with superficial lacerations on his forearms in his solely occupied cell on a SNY on October 14, 2018.  His cell windows were covered from the inside with a blanket, and an emergency cell entry was made.  A Code I alarm was triggered, staff cut the noose and performed CPR, and the inmate was transported to the TTA in the CTC for life-saving measures and pronounced dead.  The inmate was receiving mental health services at the EOP level of care at the time of his death.

The inmate was born in Los Angeles, California.  He was raised primarily by his mother as his father was incarcerated during his childhood and adolescence.  He had a brother who was 22 years older than him.  According to records, his early environment was chaotic and involved exposure to substance use by extended family, emotional and sexual abuse, and mental health treatment.  He had a family history of schizophrenia and bipolar disorder, and several members of his family were involved in the criminal justice system.  The inmate was not married and had limited contact with his two adult daughters.  He dropped out of school in the eleventh grade and later received his GED in 2013 after taking classes while incarcerated.  His sporadic employment was often terminated because of fighting or aggressive behavior.  The inmate's substance use history began at age 12 with alcohol, marijuana, methamphetamine, and PCP.  He also had a history of gang involvement.

The inmate entered his first and only CDCR term in May 2004 for murder in the first degree and six additional charges for kidnapping, robbery/rape/oral copulation, kidnap/carjacking, robbery in the first degree, rape with force/violence/fear of bodily injury, and carjacking.  He was serving a life without parole sentence.  He had no juvenile criminal history.  Before his CDCR term, he was arrested one time as an adult

for assault and marijuana possession that was later dismissed. His additional charges were related to an incident that occurred 11 days before his controlling offense.

The inmate was involved with a gang at the time of his entry to CDCR but later dropped out. On March 1, 2006, he requested placement on an SNY due to safety concerns regarding his commitment offense. Following his placement on an SNY, he began associating with a different gang. It was suspected that he was involved with narcotics use and distribution. He received 12 RVRs; three of these RVRs were in the two years before his death (two for disrespect and the most recent one for heroin possession). While incarcerated, the inmate worked as a porter and at the PIA laundry and food service. Before his death, he was on the waiting list for a job assignment.

The inmate identified as both homosexual and bisexual. He had several relationships with other inmates that appeared to be unstable due to repeated substance use and physical violence. His relationships often ended in crisis that involved self-harm behavior or suicidal behavior. Two relationships were identified as stressors in the 17 months preceding his death, the most recent one ended in July 2018.

Pertinent remote history included mental health treatment starting at age 15. Evaluations note an early history of depression, anger difficulties including aggressive behavior and mood lability, difficulties concentrating, and impulsivity. He did not have a documented history of self-harm in the community.

The inmate was transferred to nine institutions, some on multiple occasions, over the course of his incarceration, including several transfers in the last year of his life. The transfers appeared related predominantly to custodial and mental health factors. The last two institutional transfers before his death seemed related to reported safety concerns. At that time, there were four recorded confidential custody memoranda detailing his safety concerns. The first was from May 31, 2018 and related to his second romantic relationship that ended due to the inmate's reported aggressive behavior. His ex-partner was moved to a different yard. The second was from June 18, 2018 and related to the inmate's reported safety concerns. He was moved to the ASU in connection with a heroin-related debt. The third was from July 18, 2018 regarding a sexual assault allegation against the inmate. The fourth was from August 31, 2018 regarding safety concerns again from a heroin-related debt. The result of these reported allegations included the two institutional transfers after the inmate's discharge from the PIP-APP. While incarcerated, he used alcohol, methamphetamine, and intravenous heroin. Substance use was a noted factor that contributed to his unstable relationships, safety concerns related to drug trafficking and drug debts, and increased severity of symptoms.

Upon admission to CDCR, the inmate was placed in general population. On January 18, 2006, he was admitted to an MHCB for 13 days due to reported auditory hallucinations, suicidal ideation, and "feeling stressed out. Upon discharge from the MHCB, he was placed in the 3CMS level of care where he was treated until 2018. During that time, the inmate was evaluated twice for possible transfer to a higher level of care, but on both

occasions, he was thought appropriate to remain in treatment at the 3CMS level of care. The inmate transferred facilities in 2010 after a physical altercation with his cellmate and his report that his "sister" was murdered. At that time, he did not engage in self-harm behavior, but did report suicidal ideation. His self-harm behaviors included lacerations and head banging, but records of these incidents are mostly void of details. Other than referenced in the Power-Forms completed for his three suicide attempts, no self-harm Power-Forms for these behaviors were completed. The inmate remained fairly stable from 2010 to early 2017 and his treatment focused on symptoms of mild to moderate depression, anxiety, and substance use. He was variously diagnosed with Bipolar I, Depression; Depressive Disorder NOS; Polysubstance Dependence; Bipolar Disorder NOS; Bipolar II; Mood Disorder NOS; Antisocial Personality Disorder; Alcohol Use Disorder; Substance Use Disorder; and Schizoaffective Disorder.

The severity of his symptoms began increasing during May 2017. He was admitted to an MHCB on June 6, 2018 after a suicide attempt and again in July 2018. During his MHCB treatment, he was described as having a pattern of denying mental health symptoms; he expressed concerns about his desire to see his cellmate, his canteen, desire to "go sleep," and desire to be discharged to outpatient treatment. Several mental health clinicians noted his poor insight and judgment related to his mental health symptoms and a tendency to minimize the severity of his suicide attempts. On June 11, 2018, he was discharged from the MHCB to EOP treatment. Following a third and serious suicide attempt, he received treatment in the PIP–APP from July 18, 2018 to mid-August 2018. Notes indicated that he stabilized, but also that he had poor insight and judgment and would benefit from continued treatment in the ICF program, which the inmate opposed. The inmate wanted to return to EOP, and he was discharged from the PIP-APP to that level of care at a new institution. At that time, his diagnoses were Antisocial Personality Disorder; Polysubstance Dependence; Major Depressive Disorder; Anxiety Disorder, unspecified; and Bipolar Disorder, unspecified. Clinical treatment team members from the PIP-APP were interviewed as part of the review and noted that the inmate was initially depressed, hopeless about the future, withdrawn, guarded, somewhat argumentative, minimized past suicide attempts, and had difficulties engaging in treatment.

Following this discharge, his five-day follow-up documentation was completed according to Program Guide requirements. He denied suicidality, and treatment focused on grief, managing suicidality, substance use, and mood lability. The inmate was medication adherent but reported that medications were not alleviating his symptoms. He reported ongoing symptoms of depression, mood lability, and anxiety. He was briefly placed in ASU after an RVR for heroin possession in September 2018. It appears that he wrote a suicide letter while in an ASU setting in the three months before his death. During the ASU pre-admission screening, he denied suicidality. The inmate's treatment focused on Dialectical Behavior Therapy (DBT) skills related to ongoing mood lability and impulsive behavior. On October 4, 2018, he transferred institutions while remaining at

the EOP level of care. He denied suicidality and reported difficulties with substance use and symptoms of depression.

The inmate's mental health group attendance decreased during the two weeks before his death. On October 4, 2018 and October 10, 2018, he called his aunt several times and discussed his last wishes to be cremated. His behavior changed the evening before and the morning of his suicide, as other inmates reported he isolated on the housing unit and refused to attend meals in the dining hall and go to the medication line. His neighbor said he was silent for several hours before the custody safety check.

Overall, the time period leading up to his suicide indicated increasing instability. In the six months leading to his death, the inmate was placed in EOP for the first time during his incarceration, had two MHCB admissions, and one PIP-APP admission. In the 17 months before his death, he had three suicide attempts. Stressors related to his prior attempts and his increase in mental health symptoms included the death of his mother on June 10, 2017, the end of two romantic relationships, and suspected substance use. While the inmate minimized the severity of his suicide risk, clinicians noted that his behaviors posed a serious risk and changed his treatment plan or level of care in response. Yet, some evaluations did not accurately reflect his suicide risk. He also reported a sexual assault from May 2018 that resulted in a PREA report. Confidential custodial documents noted this was a dispute with his romantic partner that ended the relationship. In the two years before his death, he was diagnosed with multiple substance use disorders and there was documentation on the effect of substance use on his increased mental health symptoms and suicide history. IDTT records indicated no specific substance-related treatment interventions, and he was not referred to a substance use treatment program. As of October 11, 2018, he was prescribed olanzapine (10 mg), sertraline (100 mg), hydroxyzine (50 mg), oxcarbazepine (900 mg), and mirtazapine (15 mg).

Before 2017, he twice reported suicidal thoughts but did not engage in self-harm behaviors. His first suicide attempt was on May 23, 2017, when he collected approximately "70-80 pills" and overdosed. He suffered further medical complications from falling and injuring his head during a medical cell extraction. Triggers for this attempt reportedly included his mother's placement in an ICU and his cellmate/romantic partner's placement in ASU. After he returned from the hospital and was placed in a MHCB for 11 days before discharge on June 6, 2017, he minimized the severity of this attempt. The SRASHE discharge safety plan noted admission triggers and therapeutic interventions for decreasing ongoing risk and maintaining stability. Two days after discharge from the MHCB, he learned his mother died. He did not endorse suicidality during his five-day follow-up, which was extended for one additional day, although documentation was minimal.

The report noted difficulties with staff's response in connection with the first suicide attempt. Except for staff notification, documentation did not include a plan to decrease the inmate's suicidality and increase his protective factors. The inmate requested placement in the EOP level of care, asked for help and stated that he needed "a lot more

contact" to which staff responded that level of care decisions "take time", and he would be maintained at the 3CMS level of care.

The report noted concerns around a routine 90-day SRASHE conducted on May 24, 2018. It identified 11chronic risk factors, and eight acute risk factors. Chronic suicide risk was evaluated as low and acute risk was considered moderate. According to the report, the SRASHE appeared to correctly identify the inmate's risk for suicide, but the risk determination and formulation appeared to underestimate his actual risk of suicide, particularly given his suicide attempt history. The safety plan was limited to instructing the inmate to contact mental health should he experience suicidal ideation.

His second suicide attempt was on June 2, 2018 when he overdosed on heroin, methamphetamine, and "unknown pills" requiring hospitalization in a community hospital. Triggers for this attempt included the end of his second romantic relationship on May 31, 2018 and his mother's death. He again was reported to have minimized the severity of his suicide attempts. The MHCB initial SRASHE on June 6, 2018 after he returned from the hospital noted that the clinician deemed his chronic risk as moderate and acute risk as moderate. Safety planning was described as minimal in light of the recent suicide attempt. He was discharged from the MHCB on June 11, 2018 and included in the EOP level of care.

On June 28, 2018, the inmate was found with multiple superficial lacerations on his forearms which he connected to his frustration around being unable to transfer to a yard near his significant other. The report indicated that while a SRASHE was completed, no self-harm Power-Form for the incident was found in the records. In contrast to the previous two SRASHEs, a detailed safety plan was formulated.

His third suicide attempt was on July 8, 2018 when he overdosed on mirtazapine, ziprasidone, oxcarbazepine, and acetaminophen, and he set his cell on fire. At the time, he was prescribed oxcarbazepine and citalopram, but not mirtazapine or Geodon. He was hospitalized due to smoke inhalation. He had multiple superficial lacerations on his body. According to records, he also engaged in head banging. His records did not include a hoarding chrono or an over-the-counter medication restriction chrono.

An MHCB SRASHE completed on July 8, 2018 indicated the inmate's chronic and acute risk as moderate. Upon his discharge on July 16, 2018, the MHCB SRASHE accurately assessed his current risk level, and the safety plan changed the level of care to PIP-APP and included detailed recommendations for safety interventions. A SRASHE on August 17, 2018 had several blank areas, and the suicide risk was evaluated as high chronic and low acute. The safety plan was the same as that in the PIP discharge SRASHE, which included inpatient treatment interventions. There were no specific outpatient interventions for reducing suicidality. A SRASHE completed on October 10, 2018 accurately assessed his risk, detailed his suicide attempt history, and included a detailed safety plan regarding suicidal ideation history, depression, and substance use.

One officer interviewed following the inmate's suicide described it as a shock. One interviewed inmate indicated that the inmate might have been under the influence of methamphetamine, and another indicated that the inmate had told custody he was suicidal, but they failed to respond. No records reviewed during the course of the SCR corroborated that information. The inmate spoke to his aunt on seven occasions between October 4 and 12, 2018; three were noted in the report. In the recorded call of October 8, 2018, the inmate noted his wish to be cremated. On October 10, 2018, the inmate reported to his aunt that a custody officer told him: "If you are going to kill yourself, kill yourself. Don't kill yourself on our watch, kill yourself on another watch so we don't have to do the paperwork."

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was foreseeable. The inmate's condition appeared to be deteriorating in the period prior to his death. In the six months leading to his death, his level of care was elevated to EOP for the first time during his incarceration, he required two MHCB admissions, and one PIP-APP admission. In the 17 months before his death, he had three suicide attempts.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable. The report comprehensively identified deficits in suicide risk assessments and safely planning. The likelihood of the completed suicide might have been reduced had additional interventions in this regard been undertaken.

IV.    Critique of Suicide Case Review Report

The SCR was an accurate summary of this case. The SCR included relevant social, criminal, incarceration, substance use, and mental health history. It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report. The report indicated that an inmate interviewed following the death indicated that the inmate had informed custody he was suicidal, but no action was taken. No records corroborated this. A recorded telephone call with the inmate's aunt four days prior to his death revealed the inmate reporting to his aunt that a custody officer stated, "If you are going to kill yourself, kill yourself. Don't kill yourself on our watch, kill yourself on another watch so we don't

have to do the paperwork." This should have been raised as a concern warranting further investigation in response to the suicide.

V.    Analysis of Quality Improvement Plan Process

This case resulted in nine required Quality Improvement Plans (QIPs).

The first QIP related to SRASHEs that included difficulties with accurate risk assessment, risk justification, and safety planning on May 24, 2018; June 6, 2018; July 8, 2018; and August 17, 2018. Given the inmate's suicide history, suicide risk was underestimated and was not included into a clear formulation. In one SRASHE, safety planning was minimal and few clinically relevant interventions for specific risk factors were meaningfully targeted. Risk formulation and safety planning in SRASHE documentation were problematic statewide, and this was to be addressed by the statewide SPRFIT, which will develop and implement revised training on risk assessment and safety planning. A training on "Risk Assessment and Safety Planning for Suicidal Inmates" was to be delivered in March and April 2019. This response appeared adequate.

The second QIP related to problems with the inmate's discharge to EOP as opposed to the ICF level of care. A multi-level plan to address this includes training on selecting a discharge level of care, training on required documentation for all discharges at multiple levels of care, audit process to monitor the completion of discharge documentation, audit process to monitor the quality of discharge documentation, and ongoing method to address clinical quality issues around discharge decisions and documentation. This response appeared adequate.

The third QIP related to the lack of documentation of clinician-to-clinician contact with the PIP clinician after the inmate returned from the PIP-APP. The contact should be completed within five days of physical discharge for all patients who are discharged to an outpatient program. Clinical follow-up is essential for continuity of treatment. Individual training was provided to the primary clinician on January 16, 2019. All mental health clinicians were provided an email on January 23, 2019 that reviewed the clinician-to-clinician contact process required for all inmates returning from DSH/PIP facilities. The daily five-day follow-up log updated by an office technician and emailed to all mental health staff will include a reminder for the mandatory clinician-to-clinician contact. Inpatient Coordinators or designees will provide follow-up to ensure that the contacts and quality documentation are made. This response appeared partially adequate in that no follow-up information was provided.

The fourth QIP related to the lack of documentation of the inmate's self-harm behaviors on the self-injurious behavior (SIB) Power-Form in the electronic health record form. Since this information does not appear to have been tracked, the exact dates, method, and severity of event are unknown. As a result, the CMH for the relevant facility or designee

126

will audit the chart of ten inmates who have engaged in self-harm behavior in the last six months to see if an SIB Power-Form was submitted according to the identified policy and procedure timelines. The ten events were entered within ten days, and items were completed in each form. The self-harm behaviors of inmates were entered except for one incident. This response appeared adequate.

The fifth QIP related to the lack of hoarding chrono or over-the-counter medication restriction chrono in his records, despite his three suicide attempts via overdose. As a result, a review of records occurred, and mental health staff were offered training on January 15, 2019 on the appropriate issue of restriction chronos and reminded that over-the-counter medication restriction should be considered every time an inmate reports recent or current self-harm by overdose. This response appeared adequate.

The sixth QIP related to minimal safety planning on the five-day follow-up documentation from June 6, 2017 to June 11, 2017. The safety plans generally had one sentence on how the inmate could contact mental health, retain in 3CMS, or be given printed information. They did not contain clinician interventions or information from the MHCB discharge SRASHE safety plan. The response included a review of documentation completed by each clinician and necessary training was provided to all clinicians except one who was noted to be on extended leave. Evidence of the content of the training and attendance was provided. On-going mentoring was also planned for all clinicians. No further follow-up information was provided. This response was partially adequate.

The seventh QIP related to the lack of treatment goals and interventions observed in documentation to address substance use, despite documentation that substance use contributed to his suicide attempts, self-injurious behaviors, and safety concerns. There was no documentation that a referral to a substance abuse program was considered and completed. As a result, mental health staff were offered training on utilizing substance abuse interventions on January 15, 2019. This response appeared adequate.

The eighth QIP related to the lack of support of the inmate's body prior to cutting the ligature to relieve pressure on the airway, which is detailed in the Suicide Prevention training and the policy memorandum "Response to Suicide Attempts." The CDCR 837-C, Crime Incident Reports, show his body was not supported before the ligature was cut with the ResQHook so his chest and stomach struck the ground. The warden directed that on-the-job training was to be provided to relevant staff utilizing the policy memorandum "Response to Suicide Attempts" on January 22, 2018. Evidence of training was provided. This response appeared adequate.

The ninth QIP related to the documentation of medication on October 13, 2018 at 1833 hours, but the inmate died at 1440 hours. As a result, this was discussed with the

involved nurse, and a memo was generated on the course of action which included corrective action with the individual employee. This response appeared adequate.

Case BB

I.  Summary of Case

This inmate was a 41-year-old Native American man who was found by a correctional officer conducting institutional count hanging in his single cell on March 19, 2018. The correctional officer activated his personal alarm after he found the inmate hanging from an air vent by a sheet. Responding staff cut down the ligature, performed CPR, and notified 911. An automated external defibrillator was applied, and CPR continued before he was transported to the CTC, where lifesaving efforts were performed and he was pronounced deceased. The inmate was not a participant in the MHSDS at the time of his death; although during the course of his incarceration, his level of care was changed on numerous occasions to include 3CMS, EOP, MHCB and ICF levels of care. The autopsy report indicated moderate rigor mortis and moderate predominantly posterior livor mortis.

The inmate's parents were both half Caucasian and half Native American. He had one sister. The inmate was never in contact with his biological father, and he was raised by his mother who abandoned him between ages six and nine when he went to live with relatives and in foster homes. His mother was an alcoholic, married two other men, and had three additional children. His sister was physically abused by the inmate's stepfathers, and the inmate reported that the children were tied up, neglected, and "made to fight each other for the entertainment of adult relatives." He and his family moved to northern California at age 11. He went to school until the tenth grade and had a history of nonattendance and nonparticipation. He occasionally worked in construction and as a painter. He experimented with methamphetamine and psilocybin mushrooms in 1994, and during the same time he was drinking extensively. The inmate underwent court-mandated substance abuse treatment from 1995 to 1997. During that time, he had one positive test for marijuana in October 1998.

The inmate first appeared in juvenile hall at age ten for an unknown reason. His juvenile criminal history included armed robbery at age 17. In juvenile hall, multiple incident reports noted his fighting and threatening behavior. He entered the CYA in 1994 and served three jail terms, each more than 30 days. He was affiliated with a gang as a teenager; but in October 1999, he was no longer gang-affiliated and noted safety concerns after separating. In the summer of 1999, he committed several crimes that resulted in 48 counts of various crimes and involved at least 12 victims. He received classification and housing changes in August 2000 while in county jail after staff received confidential information that he was planning escape. Prior to his CDCR term, he had one adult arrest and conviction for battery and robbery.

He entered CDCR for his first and only term in November 2000, for multiple counts of kidnap, robbery, burglary, false imprisonment and assault with a deadly weapon, among other charges. He was serving a 116 year (88 years plus 28 years to life), life with parole sentence. He received 17 RVRs, which involved violence or disobeying/disrespect to staff, among other violations. He was stabbed on February 12, 2006 due to debts, and again on May 2, 2014, reportedly due to paperwork that mistakenly listed him as a sex offender. There were possible safety issues given his previous gang affiliation in the community. In CDCR, he worked as a kitchen worker, yard crew and floor porter. According to healthcare records, he did not have chronic medical issues. His older sister regularly visited him, and he corresponded consistently with other family members including his other sisters and aunt. In the six weeks before his death, he spoke to his older sister twice. He attempted phone calls with other family members but did not reach them.

The inmate had a history of one suicide attempt. He lacerated his neck in county jail the day before he entered CDCR.

While in CDCR, the inmate was treated in the MHSDS during two periods of time. The first time was from 2000 to 2004, when he was primarily treated at the 3CMS level of care. From June 2017 to February 2018, he was treated predominantly at the EOP level of care; but he also required an MHCB placement and treatment in a PIP-ICF. He was generally not adherent with prescribed medications. In November 2017, CDCR made a motion to dismiss his PC 2602 petition because the clinician could not testify as to the presence of current symptoms. At the time of his death, he was not included in the MHSDS following his discharge less than one month prior when he was provided with a diagnosis of Adjustment Disorder with disturbance of conduct. However, records indicated a history of various diagnoses including Schizoaffective Disorder, bipolar type, Delusional Disorder and Major Depressive Disorder. The inmate had one significant suicide attempt while in county jail the day prior to his arrival at CDCR.

Upon intake to CDCR, the Receiving and Release intake screening noted that the inmate endorsed suicidal ideation. According to healthcare records from November 2000, he told his family he would kill himself if he received a life sentence; subsequently, he was provided with the diagnosis of Major Depressive Disorder, and he was placed in the EOP. A psychiatrist admitted him to the MHCB on November 9, 2000, where he remained until November 13, 2000 before discharge to the 3CMS level of care. The inmate described the MHCB conditions as "torture", and a clinician noted "I/M [inmate] says he won't work with or trust MH [Mental Health] staff after this 'betrayal'." After discharge, the inmate reported that depression and anxiety impaired his sleep. On June 6, 2002, he reported visual hallucinations of shadows that he believed were "evil spirits," and on June 19, 2002, the IDTT noted that the inmate reported auditory and visual hallucinations and requested medication. He was prescribed olanzapine. In August 2002, he experienced increased depression after his mother died and requested increased psychiatric medication. In late 2002, he stopped taking his antipsychotic medication and

refused mental health contacts for unclear reasons. Olanzapine was discontinued due to the inmate's refusal in early 2013, and he was discharged from the MHSDS on January 28, 2004 due to refusing to actively participate for over one year.

On February 1, 2017, a Health Care Services request dated January 28, 2017 reported various concerns. These included "hearing things outside his window at night," and thinking he is being "watched from the roof and is being videotaped while masturbating." It also stated he "thinks drones are watching him through the window and reports he hears voices in the "white noise." The Health Care Services request also noted that the inmate was also worried his family will see him on Facebook. However, after he was referred to the on-call clinician for a mental health evaluation, the inmate refused evaluation by mental health clinicians for two consecutive days.

On June 28, 2017, he was again placed in the MHSDS, this time at the EOP level of care. This placement occurred after an officer submitted a mental health referral on June 14, 2017, reporting that the inmate believed people were "spraying chemical agents through the vents into his cell." He also stated the "ground in his cell and bunk were vibrating," and staff had been using drones to conduct surveillance on him. He was seen the following day by a mental health clinician, but he was not placed into the MHSDS at that time as he appeared calm and stable. Five days later on June 20, 2017, the on-call psychiatrist received a call from custody indicating that the inmate was "very agitated" and continued to espouse the same persecutory themes. He additionally received an RVR for disrespect the same day. The following day, the on-call psychiatrist noted a second call by custody who were concerned about the inmate's odd, provocative behavior and his level of agitation. Custody additionally noted he was not attending yard, had thrown trash out of his cell at another inmate, and was not getting along well with others. He was seen by mental health staff for an urgent referral on June 21, 2017, when he denied any mental health symptoms. In another meeting with a clinician on June 27, 2017, he stated, "The drones have been documented to be watching and the new staff here just don't know how to use the technology, their covert technology and I know what is going on here and so do other people but I am not going to talk about it." He then stated, "I am going to stop talking now before I say something that is used to make me look crazy."

The inmate was "angry, argumentative, and uncooperative" after learning he was placed in the EOP. He transferred institutions for EOP placement, and after receiving an RVR for refusing to accept his assigned housing; he was placed in the ASU based on his potential threat to the safety and security of the facility. The inmate stated that he was not included in the EOP, as he could not be housed with rapists and child molesters. The inmate noted that the inmates at that institution were "not in good standing", and he would assault them if he were released from segregation. During his initial mental health assessment, he said he had never received mental health treatment and thought he was placed in EOP as "retaliation for getting into arguments with c/o's (correctional officers)." He later made a PREA allegation that officers at a prior institution sexually assaulted him in June 2017; the assessing primary clinician noted delusional thinking, lack of insight into his mental illness and his belief that the PREA allegation would result in removal from the MHSDS. He was placed on daily primary clinician contacts starting on August 15, 2017, due to less than 50 percent EOP treatment compliance. The inmate

was seen daily by mental health staff but continued to refuse treatment groups and individual contacts with his primary clinician as well as medication.

On October 20, 2017 after receiving an additional charge of threatening to kill a public official, the inmate was admitted to the MHCB. On October 27, 2017, he was referred to the PIP-ICF due to delusional and irrational thinking and threats of violence. While at the PIP, he refused medication and most clinical contact, and PIP staff viewed him as not exhibiting significant symptomatology.

On December 22, 2017, he was discharged from ICF to the EOP level of care; subsequently, he was transferred to the ASU EOP for 20 days. His level of care was decreased to the 3CMS level of care on January 11, 2018. A clinician noted he "is adamant he belongs in GP [general population], he functions well, is respectful, he is logical and if he does or had experienced any delusions in the past, he is presenting in a way that does not suggest he does now." On January 11, 2018, the Delusional Disorder diagnosis was discontinued, and the inmate remained with a diagnosis of Adjustment Disorder. He transferred institutions on February 6, 2018, and he was discharged from the MHSDS on February 21, 2018. On March 2, 2018 the inmate wrote but apparently never submitted a request for health services, noting among other complaints pain on a level of ten out of ten. He committed suicide less than one month after his discharge from the MHSDS.

During his CDCR term, one SRE in May 2014 and six SRASHEs in 2017 were completed for this inmate. The inmate was assessed with low acute risk on all evaluations; five noted low chronic risk, one noted moderate chronic risk and another assessed low-moderate chronic risk. A SRASHE completed when the inmate was discharged from the MHCB on October 31, 2017 noted low chronic risk level, but it was unclear how the clinician determined risk as the chronic risk factors were not listed. On SRASHEs completed on November 16, 2017 and December 19, 2017, there were multiple incorrectly marked chronic risk factors since the inmate did not accurately report his symptoms. The following risk factors were incorrectly marked no but should have been documented as yes: current/recent psychotic symptoms, recent violent behavior (threats) and recent serious medical diagnosis. The safety and treatment plans were largely based on Program Guide procedures and were not based on the inmate's individual, specific mental health issues or triggers.

The evaluations failed to note some chronic risk factors such as substance abuse, history of abuse and history of psychiatric disorder. The inmate did not accurately report his mental health history, and paper records from 2000 to 2004 were inaccessible during these evaluations.

The inmate was concerned about what he perceived as CDCR's use of technology in what appeared to be signs of his worsening delusional state. He consulted a prisoners' rights attorney about these concerns and also wrote letters to the Office of the Inspector General and his sister that were found in his property. His family retained the prisoners' rights attorney to see if he could appeal his sentence and receive parole earlier, but the

131

chances of an early release were considered poor.  The suicide case review noted that this may have been a contributing factor to his suicide.  The inmate's neighbor said he heard him ripping laundry at approximately 0230 to 0300 hours on March 19, 2018.  The presence of the noose and other property "point to a sophisticated, well-thought out and pre-planned suicide."

A primary clinician who was interviewed reported that the inmate did not present with clear or obvious mental health symptoms.  An interviewed inmate reported that he told him he "felt alone."  One of the inmates housed near him stated that he regularly used the phone and received packages, and he became agitated once when he was not able to use the phone for over three days.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was foreseeable.  Available information indicated the presence of substantial risk for suicide.  These included multiple chronic risk factors which were unaddressed in assessments of risk, including increasing but undetected delusional thinking, removal from the EOP 20 days after discharge from the PIP, and ultimate removal from the MHSDS 15 days after his arrival at a new facility and less than one month before his death.  The lack of consideration of these chronic risk factors led to an underestimation of the inmate's suicide risk.  The inmate also received bad news from an attorney concerning his prospects for release within the months preceding his death, at which point he should have still been enrolled in mental health treatment.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable.  Had suicide risk assessments more completely weighed all relevant risk factors and had the inmate been enrolled in mental health treatment, the likelihood that the treatment team would have gathered additional information, such as his attorney's report regarding the poor chances of release and his increasing delusional thinking would have increased.  Additional assessment and interventions might have reduced the likelihood of this inmate's suicide.

IV.   Critique of Suicide Case Review Report

The SCR was an accurate summary of this case.  The SCR included relevant social, criminal, incarceration, substance use and mental health history.  It provided a reasonable

assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in six required QIPs.

The first QIP related to the recommendations of mental health clinicians in the EOP and MHCB at one institution for psychological testing to clarify diagnosis. This testing was never completed. As a result, psychological testing for inmate-patients in the MHSDS policy and procedure was evaluated and found to be consistent with current clinical and ethical guidelines. This topic will be added to the monthly Suicide Prevention Videoconference for all CDCR institutions.

The second QIP related to the low chronic suicide risk level on the SRASHE upon discharge from the MHCB; because chronic risk factors were not documented, it was unclear how the clinician determined chronic risk. As a result, the SRASHE was reviewed by the MHCB Supervisor and the SPRFIT Coordinator. Ten SRASHEs by the identified clinician were audited, and significant non-compliance with audit standards was found. The MHCB supervisor provided verbal counseling to the clinician on March 30, 2018, and SRASHE proctoring was completed May 18, 2018. The MHCB supervisor would conduct an additional audit of the clinician's SRASHEs for continued compliance no later than July 14, 2018.

The third QIP related to errors with SRASHEs completed by the same clinician at the PIP on November 16, 2017 and December 19, 2017. On both SRASHEs, several chronic risk factors were incorrectly marked no when they were actually yes, and the following acute risk factors were incorrectly marked: current/recent psychotic symptoms, recent violent behavior (threats) and recent serious medical diagnosis. The safety and treatment plans were largely based on Program Guide procedures and were not based on the inmate's specific mental health issues or triggers. As a result, the two SRASHEs and ten additional random SRASHEs completed by the clinician were audited. Deficiencies were found regarding record review, administration and completion of Columbia-Suicide Severity Rating Scale (C-SSRS), justification of risk and safety planning. SRASHE re-mentoring, C-SSRS administration re-training and safety planning training were recommended. The clinician was provided feedback and training regarding the SRASHE audit on May 17, 2018; re-training was completed on the C-SSRS web training offered on May 30, 2018, a seven-hour SRA training was completed on June 14, 2018 and Safety Planning training was also completed. All PIP psychologists at one institution were provided three sessions of "Suicide Review: Lessons Learned" on May 29, 2018, May 30, 2018 and June 5, 2018. SRASHE re-mentoring was completed on May 30, 2018 and June 7, 2018.

The fourth QIP related to the inmate's removal from the EOP 20 days after discharge from the ICF level of care. As a result, ten patient healthcare records were reviewed, and none of the treatment plans had a passing score of 13 out of 15. Training was conducted

to address the errors in treatment planning.  The clinician was consulted and reported the team's rationale for discharging the inmate; although, this rationale was not clearly documented in the treatment plan.  The clinician received training on June 26, 2018.  Over 90 days, the incoming ASU supervisor was to audit the clinician's treatment plan paperwork and to provide continued monitoring and guidance.  All clinicians and psychiatrists were provided a memo stating that the rationale for lowering the level of care to the 3CMS level of care for an inmate-patient returning from PIP/DSH should be supported by sufficient clinical documentation in the treatment plan.

The fifth QIP related to the inmate's removal from the 3CMS level of care and placement in general population 15 days after arrival at an institution on February 21, 2018, which violated Program Guide requirements.  As a result, ten treatment plans and their respective level of care decisions by the clinician were reviewed.  The documentation was generally thorough and thoughtfully completed.  All staff reviewed discharge criteria from the Program Guide.

The sixth QIP related to an incomplete five-day follow-up on November 5, 2017.  As a result, an inquiry was conducted, and a psychiatric technician missed the follow-up on November 5, 2017.  Compliance data, including weekend holiday five-day follow-ups, was reviewed, and training and instructions were provided to all weekend and holiday PT staff.  Compliance of five-day follow-ups was reviewed from November 2018 to April 2018, and the level of compliance improved from 92 to 98 percent.  Monthly audits were completed and presented to the SPRFIT, and individual training was provided.

Case CC

I.    Summary of Case

This 28-year-old Caucasian male inmate was discovered by correctional officers hanging in his double occupancy, Protective Housing cell on June 8, 2018.  He was receiving mental health services at the 3CMS level of care at a reception center at the time of his death.

This inmate was born in California.  He alternated between his mother's care, who was addicted to crack cocaine and the foster care system since he was a toddler.  He had a history of physical and sexual abuse (perpetrator unknown) between the ages of three and 15.  Educational attainment is unclear.  He worked in retail.  He denied illicit substances and occasionally used alcohol.  As an adult, he had sporadic contact with his mother.

At the time of the offense, he was homeless and had been residing with his brother, with whom he reconnected as an adult.  He abruptly left his brother's home after he was discovered engaging in inappropriate sexual contact with his two nieces (brother's children).

In May 2018, he entered CDCR to serve his first term for a sentence of 45 years to life with the possibility of parole. He was convicted of multiple counts of oral copulation or sexual penetration of a child and lewd and lascivious act upon a child. His nine days of incarceration were unremarkable. There were no disciplinary issues. Housing unit custody staff described him as "quiet" and isolative and indicated that he had consistently refused showers.

As an adolescent he was placed on a psychiatric hold, but the rationale was unclear. There was no other indication of mental health treatment in the community. According to the SCR, his mother described him as "messed up" from the long history of childhood sexual and physical abuse. While in county jail, he was given a diagnosis of Adjustment Disorder with Mixed Anxiety and Depressed mood and prescribed a low dose of trazadone for sleep. His medication was continued upon admission to CDCR and he was diagnosed with Adjustment Disorder with Anxiety and referred to 3CMS level of care. There were no known incidents of previous self-harm, suicidal ideation or suicide attempts.

An independent review of his healthcare record indicated a lack of assessment of clinical signs indicative of more pathology than the provided diagnosis. First, a report of significant weight loss in a short period of time while at county jail was not assessed further. Second, the following odd statement, that he had a "beard and long hair to resemble Jesus" was not assessed further. Lastly, during the psychological assessment, he referenced a "good" and "bad" brother" when discussing his offense. The clinician was unable to verify if he was "referring to himself as two people because he can potentially be disassociated." The SCR did not include the clinician's assessment of possible dissociation and indicated that at the time of the initial psychological assessment, the clinician did not have access to the probation report which may have clarified confusion about the existence of a real brother.

Odd communication was also documented in the SCR but did not result in consideration of alternative diagnosis. Specifically, the day before the suicide, he created a sign entitled "bath time" which he told his cellmate could be used for privacy. Also, presumably to cover up his index offense he told his cellmate he was serving time for "grand theft boat."

According to the SCR, while there was no documentation of specific safety concerns located in his custodial record, he disclosed concerns for his safety on account of his offense during the initial psychological assessment. Specifically, he felt anxious going to the yard, but did not indicate any specific threats. He asked the clinician for a single cell placement but did not disclose any specific issues with his cellmate.

135

II.    <u>Determination of Foreseeability</u>

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.   <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not preventable.

IV.    <u>Critique of Suicide Case Review Report</u>

The SCR provided a thorough summary of this case and included relevant collateral interviews that included relevant social, criminal, incarceration, substance use and mental health history. However, the SCR was assessed as marginally adequate as it lacked critical analysis of the inmate's mental health needs including diagnosis and level of care. Of concern, was the exclusion of the clinician's assessment of dissociation. Relatedly, signs of a more serious mental health issue (oddities in communication with the clinician and cellmate) and significant weight loss were not addressed in the SCR. Additional areas in need of improvement were discussion of lack of request of county mental health records and consideration of a diagnosis of post-traumatic stress disorder given his long history of trauma. Lastly, the SCR did not indicate that he was housed in Protective Housing as indicated in other documentation.

Notwithstanding areas indicated above, the SCR provided a reasonable assessment of the precipitants to this suicide. There were no mental health, custodial or nursing concerns nor recommendations provided.

According to the SCR, custody staff were unable to open the inmate's airway to provide rescue breaths. Consultation with the reviewing Lieutenant indicated that the reason for this was unclear. Consultation with medical staff did not occur but may have provided useful information.

According to the SCR, toxicology and autopsy reports were pending at the time the SCR was completed, over six weeks after the inmate's death. There was no documentation provided that indicated receipt and review of these reports at a later date. Delays in receipt of toxicology and autopsy reports by CDCR warrant review.

V.    <u>Analysis of Quality Improvement Plan Process</u>

There were no QIPs as a result of this case review. However, a review of documentation indicated missed opportunities for QIPs.

A joint, system-wide QIP with mental health and custody staff was needed to improve multidisciplinary communication and response to safety concerns. Clinician documentation suggested that there was no specific threat identified. It was not clear if the lack of threat precluded communication to custody. Regardless, a process is needed to assure inmates of their safety regardless of a specific threat. In addition, there was no documentation that the clinician discussed ways to clinically manage these safety concerns.

QIPs regarding collateral information were needed. There was no documentation located that indicated that county mental health records were requested. Another area in need of consideration was the clinician's lack of access to the probation report in Strategic Offender Management System (SOMS).

Case DD

I.    Summary of case

This inmate was a 29-year-old single Latino man who was found by correctional officers hanging in his single ASU cell on July 17, 2018. He was not included in the MHSDS at the time of his death.

Background information was limited. According to the SCR, the inmate experienced an "unstable and dysfunctional" family life. His school attendance was irregular; and while his educational level was documented as eleventh grade, he never fully learned to read or write. The SCR indicated that he had a girlfriend who provided emotional and financial support. There was no documentation that he had any children. Substance use began during childhood with regular marijuana use at age 12 and regular methamphetamine use at age 14. Documentation indicated that he continued to use substances while incarcerated. While frequency was unknown, documentation indicated his last reported use of heroin and methamphetamine occurred in May 2018.

His first arrest at age 15 for possession of a weapon at school, resulted in school dismissal. Criminal activity continued throughout his adolescence and resulted in probation and placement in juvenile detention. Charges included possession of ammunition, failure to appear, obstructing a police officer and vandalism. Several days after release from juvenile detention, the inmate committed his index offense. Subsequently, at age 18 in October 2007, he was transferred to CDCR to serve 13 years following a conviction of second-degree robbery with a firearm.

Regarding institutional adjustment, the SCR indicated that community gang involvement continued while in CDCR. He received 15 RVRs, generally for possession of a cell phone, use of a controlled substance and battery on an inmate. He participated in substance abuse treatment while incarcerated but was dismissed after lack of treatment progress, presumably attributed to positive drug tests. Despite previous denials of any

137

drug debt, the SCR indicated that a posthumous review of his property suggested otherwise.

According to documentation, on May 17, 2018 the inmate was stabbed multiple times in the chest by his cellmate, a fellow gang member, while sleeping. He received four staples at a local emergency department. Upon return to the institution, he was placed in ASU due to safety concerns while the incident was investigated. According to the SCR, the custody file did not indicate reasons for this incident.

While in ASU, the inmate reported to mental health that he heard other inmates threaten him and his family. The custody file did not include documentation of any threats. While in ASU, he decided to transition to an SNY, thus terminating gang involvement.

The inmate had no history of mental health treatment in the community. Routine mental health screenings throughout his incarceration were unremarkable. His first report of suicidal ideation occurred on July 15, 2018. A SRASHE was completed, and he was assessed with low chronic and moderate acute suicide risk due to safety concerns. The presence of a braided rope in his cell was noted, but the SCR indicated that it "appears the clinician did not believe" he made a hanging attempt. In addition, due to multiple issues identified with the SRASHE, it was determined that acute risk was likely underestimated. The inmate was placed on a 72-hour linen restriction with a plan for a follow-up appointment within five business days. He indicated that he would be fine if relocated to another ASU in the institution, but this was not feasible.

The next day, the inmate was found to have engaged in self-harm behavior very early in the morning. Specifically, he punctured his mid-chest with a piece of plastic and laid on the floor with the plastic protruding from his chest while awaiting staff discovery. He was sent to an outside hospital for medical treatment. Upon return to the institution, he was referred to the MHCB and placed on one-to-one suicide watch in alternative housing by the on-call psychiatrist. The clinician that evaluated him concluded that the inmate was anxious about the pending SNY transfer, and his "focus appeared to revolve around a housing change as opposed to seeking mental health treatment." Consistent with the previous day, he requested a move to another ASU in the facility. It was documented in the SCR that the inmate had made conditional statements of self-harm if not moved. Similar to the previous SRASHE, due to multiple issues identified with the SRASHE, the SCR determined that acute risk, assessed as moderate, was likely underestimated. The safety plan focused on "engagement of self-harm for 'secondary gain' and suggested he was 'misusing' the crisis bed." Consequently, the inmate was not admitted to the MHCB and was returned to ASU with a plan for five-day follow-ups. He died the following day.

Of note, during both clinical contacts, the inmate reported ongoing distress and suicidal ideation for the previous ten years which had been ameliorated by access to a cell phone that he used for distraction. Further, he reported that gang involvement precluded his ability to seek mental health services.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was foreseeable. Available information indicated that the inmate feared for his safety in his current housing unit. Suicide risk was underestimated by the clinicians who completed SRASHEs in the days prior to his suicide. Pertinent clinical factors (recent serious peer assault, gang denouncement, belief that his brother had been killed as a threat to him) contributing to his distress were not thoughtfully considered. His desperation was primarily conceptualized as secondary gain, and genuine distress was overlooked. Clinical and custody interventions were insufficient, and the inmate remained in ASU, a known high-risk environment which he repeatedly indicated was the source of his distress.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable. Clinical assessments narrowly focused on risk assessments which underestimated risk. Clinical interventions for the inmate's level of distress were insufficient. Custodial interventions did not adequately respond to repeated safety concerns disclosed in the days before his death, nor were there any indications that he was assured of his safety.

IV.    Critique of Suicide Case Review Report

The SCR was a thorough summary and provided a critical analysis of this case which included relevant social, criminal, incarceration, substance use and mental health history. It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

The SCR failed to document pertinent provider information. An independent healthcare record review indicated that the July 15, 2018 SRASHE was completed by a "psych intern." There was no co-signature on documentation or indication of supervisory consult which warranted a QIP. It was unclear if the clinician who completed the SRASHE on July 16, 2018 was independently licensed, as the credentials noted that the provider was a "social worker," with no indication of licensure.

Documentation indicated that the Crisis Intervention Team (CIT) had been implemented at the time of the QIP process. However, it was unclear if the CIT had been implemented at the time of the inmate's death. If it was implemented at the time of the inmate's death,

139

there was no discussion in the SCR why CIT was not utilized in the days preceding his suicide.

The SCR indicated that toxicology and autopsy reports were pending at the time the SCR was completed. Both reports were available in the file available for the Special Master expert's review of this case; however, there was no documentation provided that indicated receipt and review of these reports by CDCR. Toxicology results indicated that illicit substance use was negative. Of note, two sentences of the autopsy reports were redacted.

V.    Analysis of Quality Improvement Plan Process

This case resulted in five required mental health QIPs. Of note, proof of practice for all staff training provided a list of staff that attended. However, it was unable to be determined if all required staff received training, as the sign-in sheet only listed those in attendance and not those staff requiring training.

Two of the five QIPs addressed deficient SRASHEs completed by two different clinicians. The QIP required that both clinicians' SRASHEs be audited with direction for training on suicide risk evaluations, proper safety planning and risk justification if the clinician failed the chart audit. Re-mentoring was posed as an option. Both clinicians passed the audit, and training was provided to all mental health staff in accordance with QIP recommendations. Staff that were unavailable for scheduled training dates were scheduled for a later date. While this QIP appeared to address the issue, deficient evaluations by two different clinicians in a short period of time raised a concern with the Special Master's expert that a systemic issue was not appropriately addressed. In addition, this QIP was insufficient as it lacked sustainability which would have been addressed with ongoing audits for a reasonable period of time. Further, the training did not address treatment of inmates assessed as engaging in secondary gain which appeared to contribute to the findings.

One QIP addressed appropriate level of care decisions that originated from the lack of MHCB referral after the SRASHE assessment on July 15, 2018. The QIP was for the institution to investigate the issue and respond with the "best course of action." As proof of practice, a memo that all mental health staff were trained using the headquarters "Levels of Care: Decision Making for Outpatient Levels of care in CDCR" was provided. Training documentation was not provided. Thus, it was unable to be determined if the training directly addressed the specific factors for this particular suicide regarding level of care changes. In addition, this QIP was insufficient as it did not appear to directly address the identified clinician's level of care decision-making skills. A more appropriate response would have been an audit of the identified clinician's documentation regarding level of care decisions.

Another QIP addressed lack of alignment between the five-day follow-up, safety planning and the SRASHE, with direction to audit the clinician's documentation and to provide training if the documentation failed the audit. While documentation passed, deficits were found regarding safety planning which were discussed with the clinician. In addition, all staff were trained on completion of the five-day follow-up. Proof of practice included training materials and staff sign-in sheets. This QIP was insufficient as it lacked sustainability which would have been addressed with audits for a reasonable period of time after the discussion with the identified clinician.

The last QIP addressed the lack of completion of an initial intake assessment once the inmate was discharged from alternative housing. The QIP required the institution to determine the best course of action. As proof of practice, a memo was provided that indicated communication of this requirement to the SPRFIT committee meeting and MHCB staff. This QIP was marginally adequate. Given the movement of staff throughout the system, notification of this requirement, at a minimum, should have included all institutional mental health staff.

The Special Master's expert had recommendations for additional QIPs. A multi-disciplinary debriefing with staff involved in this inmate's care in the days before his suicide could have provided useful information. The MHCB rescission occurred without consultation. While within policy, MHCB rescissions without consultation may be a beneficial area of discussion for CDCR. Lastly, consultation with outside hospital staff following the inmate's self-inflicted chest wounds might have provided useful information.

Case EE

I.   Summary of Case

This inmate was a 22 -year-old Latino man who was found by correctional officers hanging in his single cell in a restricted housing unit on March 30, 2018. He was receiving mental health services at the EOP level of care at the time of his death.

He was raised in California by his mother and stepfather, whom he believed was his biological father. He had no relationship with his biological father who was incarcerated in CDCR for attempted murder since the year of the inmate's birth. As a child the inmate witnessed domestic violence. Educationally, he participated in special education and speech therapy. He completed the eleventh grade and had an Individualized Educational Plan. He was suspended multiple times for violent behavior toward his peers. Similar disruptive behavior led to two calls to Child Protective Services. Use of illicit substances began at a very young age. At age seven, he began using methamphetamine. By age ten he had used marijuana, cocaine and alcohol. He was briefly employed as a laborer.

His criminal history, which coincided with gang involvement, began at age ten for an arson related offense and resulted in placements in juvenile hall, fines and county wardship. He was committed to CDCR for his first term at age 18. After serving two years, he paroled to DSH-Atascadero as a MDO, but his commitment was reversed within six months. Less than a year after release from DSH-Atascadero, he was re-admitted to CDCR for his second term in April 2017 to serve four years for aggravated battery by gassing. He spent the majority of his term in the ASU due to four RVRs for battery on custody and medical/mental health staff, including gassing and physical assault. When the inmate was not in ASU, he was placed on an SNY due to renouncing gang status.

The inmate was a participant in the DDP and classified as DD1 which required adaptive supports such as use of simple language, speaking slowly, providing one or two step instructions, providing help reading and writing CDCR paperwork and giving extra time to adjust to new routines and environments.

Documentation of childhood mental health treatment was limited. As a child, the inmate was treated for ADHD with psychiatric medication. Documentation indicated between one and four suicide attempts during childhood. Also, there were six California Welfare and Institution Code 5150 holds.

Throughout his second and last CDCR term, the inmate's levels of care varied between EOP, MHCB, DSH and PIP. He had seven MHCB admissions; two occurred in March 2018. According to the SCR, for the majority of his time in the MHSDS, he was diagnosed with Schizoaffective Disorder, despite documentation that indicated that observable signs of psychosis were not present. Treatment goals frequently addressed his self-harm behaviors. He was under a PC 2602 order until June 20, 2018 and received injectable antipsychotics in February and March 2018. He was also given various psychiatric medications including anti-depressants, anti-psychotics and mood stabilizers during March 2018.

During his first CDCR term, he engaged in various self-harm behaviors including superficial cutting and foreign body insertion which continued and escalated during his second term. He had a pattern for denying suicidal ideation followed by engaging in self-injurious behavior. In less than one year, there were 42 incidents of self-harm that occurred on 36 days. Notably, his self-injury escalated in frequency. Specifically, during the month of March, he self-injured on 18 days. In addition, four of the six days during which there were at least two incidents of self-injury on the same day occurred between March 9, 2018, and March 25, 2018. Severity of self-injury also escalated in the month before his death. There were new reports of overdose and self-strangulation, behaviors in which he had not engaged previously.

There were 27 risk evaluations completed; the majority of times he was assessed as high chronic and moderate acute risk. The SCR indicated that the majority of assessments

accurately portrayed acute and chronic risk factors. However, it was documented there were indications of underestimation of risk, in part due to inconsistent reporting which likely impeded accurate conceptualization of his risk and safety planning.

Documentation described him as "manipulative" and "demanding" and attributed his self-harm to personality features. He provided varying accounts of reasons for his self-harm behavior including attributing it to hallucinations, emotional distress and to effect change in his environment. Beginning in February 2018, he requested a DSH-Atascadero admission, and his self-injurious behavior was conceptualized as an attempt to secure this admission.

There were two MHCB admissions the month before his death during March 3-12, 2018 and March 18-28, 2018 at two different institutions. During both admissions, the inmate met criteria for a higher level of care, but the treatment team did not believe a referral was appropriate. After discharge from the first March admission, he was placed in STRH, pending transfer to an EOP hub due to a previous assault on a peer. Between March 13, 2018 and March 17, 2018, there were three incidents of self-harm. An emergency use of force (OC pepper spray) was utilized on March 17, 2018 to disrupt his self-harm. He reported that he had ingested 24 Motrin pills and was evaluated at an outside hospital. He was re-admitted to the MHCB where he received treatment between March 18, 2018 through March 28, 2018. While there, he had 11 incidents of self-harm, including feigning a seizure, head banging, superficial cutting, self-strangulation. He used his blood to write a satanic message on his cell wall. He continued to request a referral to a higher level of care and indicated he would hang himself if returned to restricted housing. Documentation the day prior to his discharge indicated that the treatment team would "consider discharge tomorrow as allowing him to blackmail the treatment team only increases his risk for self-harm." The inmate was discharged to EOP and returned to the STRH the next day.

Shortly after the MHCB discharge to STRH at EOP level of care on March 28, 2018, the inmate engaged in self-strangulation and was evaluated at an outside hospital. A risk assessment was conducted the following day due to a report of suicidal ideation, and he was assessed as high chronic and moderate acute risk with poor justification for the assessment. Later that evening, the inmate was sent to an outside hospital due to a possible overdose. Laboratory results were negative for substances and he was returned to the facility and placed on suicide watch. The following morning, he denied that he was suicidal and was assessed as high chronic and low acute risk when evaluated by mental health. He died 11 hours later.

A Senior Psychologist Supervisor reviewed the inmate's record the morning of his death with a focus on the two days since his discharge from the MHCB. His self-harm behavior was assessed as "low risk" or "potentially minimal risk" and that there did not appear to "be a significant change from the formulation of the discharge IDTT on

143

3/28/18" and identified "relapse prevention and harm reduction techniques" to manage his behavior.

According to the SCR, for reasons that were unclear, he was granted single cell status in mid or late March 2018.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was foreseeable. There is a clear pattern of escalation of this inmate's chronic self-harm behaviors in frequency and severity in the month before his death.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable. There were multiple failures by clinical staff across programs and institutions in the provision of clinical interventions and assessments for this individual with chronic self-harm behaviors. In agreement with the SCR, there were multiple incidents of problematic clinical documentation (safety planning, risk assessment) and clinical decision-making. These deficiencies likely impacted appropriate treatment planning. It was also unclear why he was placed in a single cell, a known risk factor, at a time when his self-harm behaviors were escalating.

IV.    Critique of Suicide Case Review Report

The SCR was a marginally adequate summary of this long and complex case. The SCR included discussion of relevant social, criminal, incarceration, substance use and mental health history. The SCR provided a very thorough and critical review of mental health care including risk assessments. Yet, the SCR would have been improved with a more thorough discussion of psychiatric care, which was limited to recent psychiatric medication, and need for diagnostic clarification. A review of electronic health record, for example, revealed a number of instances when the inmate was provided with injectable psychotropic medications for "agitation" noted on the MAR without any corresponding progress notes supporting the use of the medications. These instances required a QIP. Regarding diagnosis, he was consistently diagnosed with schizoaffective disorder and prescribed antipsychotics. However, despite reports of hallucinations, documentation indicated that response to internal stimuli was not observed. The SCR

144

provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report.

Medical interventions, which can convey seriousness of self-injurious behavior, were not included in the SCR. Examples include, reviewed documentation indicating that he received sutures after cutting both wrists on February 7, 2018; that he received 17 stitches at an outside hospital on March 17, 2018 after head banging re-opened a previous wound; or an outside hospital trip on March 28th after a self-strangulation attempt.

The SCR did not indicate placement on suicide watch upon return from an outside hospital after a self-strangulation attempt on March 28, 2018. Documentation of a suicide watch during an independent review of the healthcare record was not located. This necessitates a QIP.

The SCR indicated that in December 2017 the inmate identified as transgender. A consult was requested but there was no further discussion of this issue or the status of the consult request.

There were several systemic areas that warranted discussion that were pertinent to this case and more likely identified by the Special Master's expert's objective view of the system than a failure of the SCR reviewer.

First, the SCR did not discuss the need for collaboration between MHSDS providers and DDP providers. Specifically, it is likely that his cognitive deficits exacerbated his distress and maladaptive coping. It is not clear how adaptive supports, specifically, providing time to adjust to new routines and environments, were feasible with numerous housing and treatment team changes. Relatedly, the SCR did not fully consider continuity of care and impact of provider changes on rapport and treatment engagement. In less than a year, he had at least ten different treatment teams. Third, the SCR did not address any underlying countertransference staff may have had when working with this complex individual which may have impacted objectivity and the provision of care. Fourth, the SCR did not discuss the need for improved treatment planning. First, goals developed to "eliminate" or "refrain" from self-injurious behavior were unrealistic for this inmate. Assessment of baseline frequency with incremental progress toward change was needed. Second, there was varying documentation regarding the function of this inmate's behavior. Continuation of the Positive Behavior Support Team (PBST) plans developed during DSH and PIP admissions or development of a PBST plan within CDCR was not discussed. Lastly, while problems with clinical decision-making were addressed in specific QIPs, there was a pattern of staff overreliance on this inmate's self-report despite proven unreliability and a lack of consideration of objective data that warranted discussion in the SCR.

V.    Analysis of Quality Improvement Plan Process

This case resulted in 12 required Quality Improvement Plans (QIPs); 11 identified mental health issues across two institutions that focused on deficits in mental health documentation.  There was one custody QIP and no nursing concerns.

Four QIPS (1, 5, 8 and 11) addressed problematic discharges, namely documentation and clinical decision making from two different programs (ICF PIP and MHCB) at two different institutions.  Overall, QIPs were inadequate as training did not ensure improved clinical decision making.  Clinical supervision of IDTT meetings and continued review of clinical documentation for a reasonable period of time was needed.  Of note, it was unclear why the eighth QIP addressed Program Guide non-compliance regarding completion of a treatment plan by a social worker in the MHCB, but the completion of the treatment plan by a social worker in the eleventh QIP was not discussed.

The second QIP addressed the lack of an initial IDTT in EOP upon discharge from PIP ICF.  In response to the QIP, staff were provided training.  This response is insufficient as it did not identify factors that contributed to the missed IDTT and did not ensure compliance after the training.

Two QIPs (4 and 7) addressed problematic risk assessments at two different institutions.  The fourth QIP completed audits as required and followed up with training but was inadequate as subsequent assessment was not conducted.  In response to the seventh QIP, re-mentoring was provided, and the clinician was re-assigned to a lower level of care.  In addition, the clinician's probation period was extended.  This response was adequate, assuming probation includes close supervision and documentation review.

The third QIP addressed problematic safety planning and overall poor quality of five-day follow-ups.  Two QIPs (6 and 9) addressed problematic documentation on the initial treatment plan from MHCBs at two different institutions.  Training was a good first step in response to these QIPs.  However, the QIPs were inadequate as continued documentation review for a reasonable period of time was warranted to ensure sustainability.

The tenth QIP addressed an incident of inadequate psychiatric documentation at the MHCB.  Documentation concerns were reviewed with the psychiatrist, but this response is inadequate as sustainability was not provided.

The one custody QIP addressed a lack of clarity regarding whether responding staff took appropriate precautions to avoid exposure to blood borne pathogens.  Following the required inquiry into this issue, a memo was provided wherein staff indicated that while not documented, staff did utilize appropriate Personal Protective Equipment (PPE).  This

146

response was adequate but would have been improved with verification of PPE such as a video review.

Case FF

I.   Summary of Case

This inmate was a 37-year-old Caucasian man who was found by correctional officers unresponsive in his single cell on September 13, 2018.  He was receiving mental health services at the EOP level of care at the time of his death.  His death was determined to be due to an overdose.

This inmate's self-reported history was variable.  He grew up in California.  His parents divorced when he was four or five years old, and he was primarily raised by his mother, aunt, and uncle.  He had at least one sister and possibly eight siblings.  There was documentation that he was sexually assaulted by an uncle that committed suicide.  He dropped out of school in the eleventh grade.  He was never married, but as an adolescent, he was involved in a relationship with a woman that was 15 years his senior.  The couple had one son.  He was employed as a laborer.

He had a long history of substance use which began in adolescence and continued on a regular basis throughout his incarceration.  He first used marijuana at age 12 with regular use between ages 14 to 17.  He first used methamphetamine, his drug of choice, at the age of 14, and daily use at age 16.  Other substances included cocaine, heroin, and alcohol.  He experimented with LSD, ecstasy, and mushrooms.

As an adolescent, he lived on the streets and supported himself by robbing houses and cars.  His criminal history began at age nine when he robbed a house.  This resulted in his first juvenile hall admission, followed by a second admission at age 13 for one year.  He was briefly at Arizona Boys Ranch, which appeared to be a boot camp styled residential program.  There were reports of violent crimes against others, including shooting someone in the neck prior to his index offense.

At age 19, he was admitted to CDCR for his first term on March 15, 2001 to serve life with parole for murder first, assault with a deadly weapon, robbery first in concert/inhabited dwelling, burglary first, vehicle theft, terrorist threat, plus additional enhancements for personal use of a dangerous/deadly weapon.  He was under the influence at the time of the index offenses, which were committed when he was age 17.

While incarcerated, he received 55 RVRs; at least 20 were for violent offenses, many of which were racially motivated.  Consequently, the inmate spent the majority of his incarceration in the ASU or the PSU.  Of significance, on February 9, 2018, the inmate received an additional life term for the murder of his cellmate in October 2016.

147

In 2009, at his request, the inmate was placed on an SNY due to safety concerns. Further details were not provided. He intermittently worked as a porter and also supported himself with his artwork and as a tattoo artist. He had little emotional support from family with whom he terminated contact in 2007 but resumed very limited correspondence a year later. Following a 2003 visit from his mother, he had no other visits until 2017 from a private investigator and staff assistant, presumably related to his murder case, both of which he refused.

Mental health treatment began in childhood with a diagnosis of ADHD. The inmate was treated with methylphenidate (Ritalin). His three to four suicide attempts occurred between ages 14 and 17 via cutting his wrists, overdose, hanging, and jumping off an overpass. As an adolescent, he had at least two psychiatric hospitalizations.

Shortly after entry to CDCR, he was included in the MHSDS at the 3CMS level of care. Except for a brief hiatus from the MHSDS in 2013, mental health treatment continued throughout his incarnation and alternated between 3CMS, EOP, and MHCB levels of care. There were no referrals to DSH or PIP. Documentation indicated that he spent approximately six years in 3CMS and eleven years in EOP level of care. He had seven brief MHCB admissions, which were due to increased distress or self-harm behaviors/suicidal ideation. He was discharged from his last MHCB admission to EOP in December 2014, where he remained until the date of his death. After an initial diagnosis of Mood Disorder, Not Otherwise Specified, he was primarily treated for Bipolar Disorder. According to the SCR, treatment mostly targeted anger, impulsivity, irritability, and hyperactivity, with additional concerns of low frustration tolerance, high entitlement, racing thoughts, expansive mood, nightmares, anxiety, hypervigilance, poor concentration, depressed mood, and hopelessness.

According to the SCR, he was frequently medication non-adherent due to side effects, and there were reports that he abused some medications. Consequently, he was prescribed various psychiatric medications throughout his incarceration. At the time of his death, he was prescribed oxcarbazepine 300 mg, which was determined to be appropriate in the SCR.

According to the SCR, documentation of intermittent passive suicidal ideation occurred throughout his incarceration but increased in frequency after he murdered his cellmate in October 2016 when he was in the SHU. Between October 2016 and mid-January 2018, it was documented that he intended to kill himself via overdose if he received additional prison time for killing his cellmate. A new clinician began treatment with him in mid-January 2018 but did not carry previously documented information regarding conditional suicidal statements or an unresolved treatment goal for suicidal ideation forward.

In March 2018, his SHU term was suspended, and he was transferred to another institution and placed on a mainline EOP yard. According to the SCR, he reported daily suicidal ideation to his primary clinician at the time of the initial evaluation. Reports of increased suicidal ideation to his primary clinician resulted in a consideration of a higher

level of care during his June 27, 2018 IDTT.  He was continued at EOP level of care; however, a treatment goal to address suicidal ideation was not added to his treatment plan.  One month later, on July 23, 2018, it was documented that suicide ideation had increased, and the inmate would not tell anyone if he reached the point of attempting suicide.  Despite multiple reports of suicidal ideation, a suicide risk evaluation was not completed until August 27, 2018, after a correctional officer alerted the clinician via email that the inmate felt like hanging himself.  Like the two prior evaluations completed on September 21, 2017, and October 26, 2017, he was assessed as chronic risk high, acute risk moderate, and returned to EOP.  The SCR indicated that the justification for keeping him in EOP and the safety plan were "thoughtful, well-developed and individualized."  The day before his suicide, the inmate told his clinician he was feeling down, but there were no obvious signs of imminent distress.

According to the SCR, there were no reports from staff or inmates that the inmate displayed "specific behavior or statement indicating [inmates name] possessed imminent threat to end his life on the day of his suicide.  Custody and nursing staff interviews indicated no changes in his demeanor in the days prior to his death.  Interviewed inmates reported that he had talked about committing suicide via heroin overdose in the months before his death.  There were reports that he was using more than normal in the days before his death.  A peer asked him to draw a card by a specific date, and he responded that "I'm not gonna be [sic] be here."

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was foreseeable.  A review of available information indicated that this inmate had been assessed as high risk for taking his life in advance of his stated plan to take his life via overdose if convicted of his cellmate's murder.  He was ultimately convicted of the murder; however, documentation pertinent to his risk was not carried forward after a clinician change.  Also, despite continued reports of suicidal ideation, there were deficits in ongoing risk assessment in the six months before his death, collaborative treatment planning, and referrals to a higher level of care.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable.  Clinical interventions lacked collaboration and were inadequate for his level of risk.  Custodial interventions, including a referral to mental health via email in the weeks before his

suicide, were problematic.  In addition, available documentation indicated that he was cyanotic with rigor mortis, which raises the likelihood that welfare checks were delayed, which in turn delayed emergency response.

IV.    Critique of Suicide Case Review Report

The SCR was a thorough summary of this case and included relevant social, criminal, incarceration, substance use, and mental health history.  Overall, it provided a critical analysis of mental health documentation deficiencies; areas of improvement are discussed below.  The SCR provided a reasonable assessment of the precipitants to this suicide. Provided recommendations followed from the content and findings of the report.

An independent review of the healthcare record indicated that while the SCR identified concerns with treatment planning following the inmate's transfer to a new institution in March 2018, pertinent areas were not discussed in the SCR.  First, the initial primary clinician assessment was not timely and was completed after IDTT.  While the delayed completion of the assessment likely did not substantially impact this inmate's death, the completion of IDTT in advance of the initial assessment was problematic as all team members were not aware of the extent of his daily suicidal ideation.  Relatedly, suicidal ideation was not included as a treatment goal.  Second, it appeared that IDTT documentation was copied from previous IDTT documentation, which was outdated. Specifically, at the time of IDTT on April 4, 2018, the inmate had already been found guilty of the murder of his cellmate.  Yet, similar to IDTT documentation before this conviction, documentation indicated that he "continues to endorse passive SI [suicidal ideation] that if he is found guilty of the murder charge that is when he would consider ending his life possibly by OD [overdose] on heroin…. future oriented to finishing his SHU term…wants to have trial…. Will continue to work close with custody as to I/Ps [inmate/patient's] court appearances…" These concerns warranted QIPs.

The SCR discussed the presence of suicidal ideation in progress notes; however, a closer analysis of clinical documentation was needed.  First, more detail regarding frequency, duration, precipitants, and quality of ideation was needed.  Second, SCR discussion of suicidal ideation was frequently referred to as passive, but at times there was insufficient documentation in the clinical record to make this assessment.  Third, the SCR did not discuss a possible underestimation of risk at the time of the August 27, 2018 risk assessment.  Specifically, the assessment was conducted because the inmate made a statement about hanging himself, but his ideation was assessed as passive, though the stated plan indicated active ideation.  Lastly, clinical documentation beginning on August 6, 2018, through September 12, 2018, that his suicidal ideation improved in the last two or three weeks did not appear individualized.

An independent review of healthcare documentation indicated that the SCR did not address the lack of collaboration regarding treatment of this inmate's suicidal ideation between the psychiatrist and primary clinician.

The SCR failed to discuss appropriate notification of staff when an inmate disclosed suicidal ideation. Specifically, while the SCR indicated that the suicide risk evaluation was completed on August 27, 2018 because the inmate reported to an officer a plan to hang himself, the SCR did not indicate that the officer emailed the clinician to inform him of the inmate's statement. In addition to non-compliance with policy, it is not clear if the inmate minimized his suicidal ideation. Specifically, the inmate reported to the clinician that he told the officer that he was thinking of killing himself a week prior to the clinician's contact. Without verification with the officer, specific details regarding the inmate's statement and mental status were unknown.

The SCR described him as cyanotic upon discovery but did not include documentation of rigor mortis from the Form 837. These signs suggest a delay in security welfare checks with a need for a QIP.

A likely delay in contacting emergency medical services warranted discussion and corresponding QIP. Specifically, the inmate was discovered at 0640 hours. At 0645 hours, the Watch Commander was notified to call for a Code 3 ambulance. However, the county dispatch indicated the call was made/received at 0649 hours.

Discussion of the inmate's regular access to drugs warranted discussion and a corresponding QIP. Documentation indicated staff awareness of access to substances throughout his incarceration. The SCR noted that the following illicit substances were in his bloodstream: methamphetamine, codeine, morphine, and oxycontin in his system. These substances are prohibited on institutional grounds, and investigation into how this inmate obtained access to these substances was warranted.

Reviewed documentation indicated the presence of a suicide note which was not discussed in the SCR.

V.    Analysis of Quality Improvement Plan Process

This case resulted in eight required QIPs; four were related to mental health concerns at two institutions, three were related to custody concerns, and there was one nursing concern. There was one custody concern that did not rise to the level of a QIP; the rationale for this was not provided. Of note, when training was provided to mental health and nursing staff, it was unable to be determined if required staff received training as documentation indicated who attended, but verification of required staff was not provided.

The first mental health concern addressed problematic documentation.  Specifically, documentation regarding suicidal intent and an unresolved treatment goal that targeted suicidality were not continued after a clinician change.  The QIP directed the institution to conduct a documentation audit for the clinician in question and respond accordingly.  In addition, training for all clinical staff on these issues was required.  Proof of practice indicated that the identified clinician was "rejected from probation" and was no longer employed at the institution.  While not clear, it is presumed that this clinician is no longer employed within CDCR.  Proof of practice was a memo distributed to staff that reviewed the importance of healthcare record reviews and treatment goals changes.  The memo was accompanied by staff signatures indicating review of the memo.  Documentation of staff training completed in advance of this inmate's suicide related to concerns identified in the QIP was also provided.  This QIP was insufficient.  The 'read and sign' method does not ensure staff reviewed or allowed discussion and questions.  Further, this response does not assess skill application and sustainability, which would have been achieved with documentation review for a reasonable period of time.  Lastly, this response focuses on a knowledge deficit for a routine clinical skill (importance of seeking collateral documentation) but did not problem-solve potential barriers to completion.

The second mental health QIP addressed the assigned clinician's failure to follow a safety plan developed by a previously assigned clinician that the inmate be evaluated for suicide risk upon return from his court hearing.  The QIP required the institution to ensure that the Suicide Prevention LOP was in alignment with a February 2, 2018 *Enhancements To The Suicide Prevention and Response Focused Improvement Team* memo and train staff accordingly.  While the February 2, 2018 memo was not available for review, according to the SCR, it addressed risk assessment of inmates returning from court and BPH.  QIP proof of practice included an electronically distributed training memo that reviewed existing mechanisms for mental health referrals that complied with the February 2, 2018 memo and a new process to ensure compliance for inmates returning from court that was also added to the institution's LOP.  Similar to the previous QIP, staff were required to sign that they had reviewed the document.  Following a review of proof of practice documentation, two areas needed clarification.  First, the timeliness of clinician follow-up after inmates returned from court was not specified.  Second, the training memo to staff indicated that court returns would be monitored weekly, but this was not stated in the memo.  Regardless, weekly monitoring of court returns could miss inmates.  This QIP was insufficient.  First, the 'read and sign' method does not ensure staff review or allow discussion and questions.  Second, there was no documentation to ensure assessment of implementation.  Lastly, in contrast to the first QIP, where documentation from the identified clinician was reviewed, this was not included in this QIP, which was a critical component of mental health concern.  It was unclear if the SCR reviewer was aware of the clinician's departure thus did not believe documentation review was necessary or if documentation review was not considered.

The third mental health QIP addressed the lack of a needed treatment goal to address suicidal ideation and substance abuse.  According to the QIP, required documentation from the identified clinician was audited, and training was provided to the clinician.  This QIP was insufficient as assessment of skill application following training to ensure sustainability was not conducted.

The fourth mental health QIP addressed the lack of a SRASHE despite reports of daily suicidal ideation.  In compliance with the QIP, the institution investigated the reason the SRASHE was not completed and conducted training with the identified clinician.  This was a good first step, but this QIP response lacked a plan to assess skill application, which could have been achieved with case examples and/or subsequent documentation review.  Consequently, this plan was insufficient.

The three custody QIPs addressed the custody emergency response when this inmate was discovered unresponsive in his cell.  Issues included a five-minute time-lapse between discovery and cell entry, if his cell was processed in accordance with policy, and appropriate incident documentation.  These incidents were referred to the OIA for investigation.  Upon completion of the investigation, the institution was required to submit a memo describing actions taken to address identified problems.  It is unclear if the institution submitted the required memo and/or if it was appropriately reviewed.  As of this writing, the memo had not been received by the Special Master's team.

The nursing QIP addressed the use of only one dose of intranasal Narcan during the emergency response, which resulted in training TTA nursing staff that were involved in the incident and new staff as indicated to utilize five doses of Narcan.  Proof of practice documentation included a statement that training had occurred, accompanied by sign-in sheets.  This QIP was insufficient as it did not address a likely systemic issue and would have been achieved by training, at a minimum, all TTA nursing staff, not just those that were involved.  Further, skill acquirement was not assessed, which would have been achieved via a post-test, but more appropriately by a role-play or drill.  Of note, training materials were not provided.

According to the SCR, a concern regarding the application of restraints prior to the initiation of CPR was forwarded to the Statewide SPRFIT for review.  The status was unknown to the Special Master's expert at the time of this review.

The reviewer identified the following deficiencies that warranted QIPs:

- The ongoing nature of this inmate's suicidal ideation warranted a QIP to address possible failure to refer to a higher level of care.
- Documentation in the SCR indicated that various inmates were aware of his suicidal ideation, but none came forward.  A QIP to further understand this with an appropriate response was warranted.

153

- The impact of clinician changes on therapeutic rapport and treatment participation warranted a system wide QIP to minimize clinician changes.

Case GG

I.   Summary of case

This 46-year-old Hispanic, married man was found by correctional officers hanging in his double occupancy cell. He was incarcerated at an out-of-state facility at the time of his death. He was not a participant in the MHSDS at any time during his incarceration.

According to the SCR, background information was limited. In 2014, the inmate married a woman he had known since childhood. He had two children ages 5 and 15 and two adult stepchildren from his wife's prior relationship. He was described as "always in a good mood." He graduated high school and worked as a custodian.

This inmate's first arrest was at age 14 for second degree burglary. At age 19, he arrested three times and was convicted of fighting in public, burglary and tampering with a vehicle. Each time he received probation and served no more than 90 days in county jail. While he was arrested for driving under the influence in 2015, there was no other indication that he had any substance abuse issues.

This inmate entered CDCR in April 2017. He was transferred to an out-of-state facility less than six months after incarceration. He was sentenced to 20 years for lewd and lascivious behavior with a child under 14 and oral copulation with a victim under 14. The victim was his daughter and occurred during weekly visits when she was five or six years old until she disclosed the abuse to her mother at age 12.

Throughout incarceration, the inmate resided on an SNY. There were reports from family members that he had been assaulted while in CDCR, but there was no documentation to support this. The SCR indicated that he was distressed by his belief that he would be returned to CDCR on a non-designated yard, although there was no documentation to support this belief. In addition to disclosures to family members about his concerns, he spoke with his correctional counselor. His correctional counselor reported that in the weeks prior to his death, the inmate believed he would be stabbed if returned to CDCR. The correctional counselor was able to "allay some of his fears", and he declined a mental health referral. The morning of his death, while he expressed his concern that his wife was going to leave him to the correctional counselor, he did not appear significantly distressed.

The overall institutional adjustment for this inmate was unremarkable. There were no disciplinary issues or ASU placements during his incarceration. While at the out-of-state facility, he worked as a porter and was described as a good worker. He was emotionally

and financially supported by his large extended family, including visits from his wife and stepdaughter in February and March 2018.

A review of the CDCR mental health assessment indicated that the inmate did not have any mental health needs and no history of suicide attempts or suicidal ideation. The SCR indicated similar results when assessed at the out-of-state facility. These records were unavailable for independent review.

According to the SCR, there was no family history of mental illness. His mother described him as "hyperactive" as a child, but there was no reported treatment for this or other mental health issues during his lifetime. His cellmate had not observed any sign of major mental illness and described him as upset when he was unable to reach his family. His cellmate also reported that he had frequent nightmares, and his screams awakened them both. His wife disclosed that many years ago when they had separated, he threatened suicide. She also reported that he had intermittently made statements about ending his life due to the challenge of incarceration, but she did not believe he would act on it. Similar to reports from family members, his cellmate was surprised that he took his life.

The morning of his death, the inmate made 27 phone calls, two of which were connected. During the first call with his wife, he was tearful and stated, the "voices are getting louder and louder." During this 30-minute call, he discussed concerns for his safety, an apparent attack, his distress regarding his absence from her and his belief that out-of-state inmates were currently being returned to CDCR. His wife was supportive, and he ended the call with a plan to call her the next day. The second call, with an unidentified male, occurred minutes after he completed the call with his wife. During the call, he expressed difficulty reaching his wife over the past month. Specifically, he claimed to have only spoken with her "ten minutes all month" in contrast to the recent 30-minute conversation with her.

II.   <u>Determination of Foreseeability</u>

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.   <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case and included relevant social, criminal, incarceration, substance use and mental health history.  There were two minor areas where more detail would have been useful; whether there was collateral information from his wife regarding any previous disclosures of "voices", and the documentation was unclear if his children were from a prior relationship or his current marriage.  The SCR provided a thoughtful, comprehensive and reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

A concern regarding the application of handcuffs during the emergency response was documented in the SCR.  According to the SCR, after applying restraints, the ligature was removed, and the inmate was moved out his cell where life saving measures were applied.  The use of restraints was reviewed with a focus on the impact on provision of adequate care and restraint application with inmates housed in general population.  It was determined that the application of restraints did not impact life saving measures, as the handcuffs were applied in front of the inmate's body.  However, the SCR did not specifically address any potential delay caused by the time utilized to apply the restraints.  In terms of restraint utilization with general population inmates, it was determined that this use was within CDCR policy which allowed discretion "when an inmate's present behavior, apparent emotional state, or other conditions present a reasonable likelihood that he or she may become violent."  In this writer's opinion, the description that he was, "sitting on the floor of his cell…. something white tied to the top bunk and wrapped around [inmate's name] neck…neck was leaning to one side" did not indicate that he posed a likelihood of violence to staff.  Regardless, there was language added to the suicide prevention curriculum that restraints should not be used prior to utilizing the cut-down kit and initiation of CPR with general population inmates.  Similarly, the institution where the suicide occurred incorporated this language into a memo, and subsequent training with staff was conducted.

There was one discrepancy in the SCR, related to the receipt of the coroner's report.  Specifically, the report was listed as pending, but later documentation indicated that the coroner's report was received.  Similarly, the toxicology report was documented as pending.  However, the toxicology report was attached to the coroner's report.  There was no discussion in the SCR that the toxicology report had been reviewed.  Regardless, the toxicology results were negative.

A discrepancy identified by the CCHCS death review summary was not discussed in the SCR.  Specifically, documentation indicated conflicting information regarding a history of suicide attempts in the 7229 B form.

V.    Analysis of Quality Improvement Plan Process

This case resulted in two required custodial QIPs.  The first QIP addressed the cut-down kit which was not requested or brought to the scene of the hanging, a violation of institutional policy.  Documentation indicated that supervisory staff was trained, and a memo was distributed to all staff regarding retrieval of the suicide response kit which includes the cut-down tool.  Documentation indicated a plan to train all custodial staff responders in a reasonable timeframe.  Proof of practice training documentation identified those in attendance; however, because a list of staff assigned to these areas was not utilized, it was unable to be determined if all staff that were required to attend received training.  Of note, the memo that was distributed was not provided for review, nor was there documentation that it was requested from CDCR.  This QIP was insufficient due to the lack of sustainability which would have been achieved with a plan for routine drills for skill application.  Further, proof of practice lacked sufficient detail.

The second QIP addressed a delay in the provision of life-saving measures.  Specifically, the inmate was discovered at 1544 hours, and CPR was administered at 1549.  Institutional policy required that life-saving measures be applied within four minutes.  Documentation indicated disagreement with this analysis.  There was no further documentation between CDCR and the out-of-state facility to better understand the discrepant views.  Nevertheless, rapid response training was provided to supervisory staff with a plan to train custodial staff and medical staff within one month.  As above, proof of practice training documentation identified those in attendance; however, because a list of staff assigned to these areas was not utilized, it was unable to be determined if all required staff received training.  This QIP was insufficient due to the lack of sustainability which would have been achieved with a plan for routine drills for skill application.  Further, proof of practice lacked sufficient detail.

As the inmate's wife was aware of his suicidal statements and reports of hearing voices, a joint custody and healthcare QIP at the headquarters level was needed to ensure that family members were educated via various forums (webpage, during visitation sign-in process, closed circuit television in waiting areas) on identifying areas of concern regarding inmate mental status with a clear, user-friendly process to share information with facility personnel.

Case HH

I.    Summary of case

This 35-year-old Hispanic male inmate was found by correctional officers hanging in his ASU single cell on December 10, 2018.  He was not receiving services from the MHSDS at the time of his death.

Historical information was provided by the inmate's mother as background information in his healthcare record was limited. He was raised by his mother and grandmother in Panorama City, California. His father left the family when he was age four. He did not have contact with his father, who at some point was incarcerated in Arizona, until he was age 18. He did not graduate high school. He was married in 2011 and had a son who he never met. There was documentation that he had a daughter from a different relationship.

This inmate's criminal history began as an adolescent and coincided with gang involvement. He had at least two juvenile placements. In April 2012, he entered CDCR for a second term to serve a life sentence with parole for two counts of first-degree attempted murder of peace officers. Approximately five of his six incarcerated years were spent in the ASU due to multiple violent offenses toward other inmates, including attempted murder of an inmate. His gang involvement continued throughout his incarceration, and he began associating with different gangs. According to the SCR, "His decision to align with different gangs was eventually discovered and his life was in danger from all groups." Further information was not provided.

The SCR indicated problematic drug use. Specifically, a drug debt in June 2014 prompted him to request protective custody. In addition, in September 2014 he needed medical intervention for an imbedded syringe. Further details regarding the specific substance used, onset and frequency of usage were not provided in the SCR; although, information was available in his healthcare record.

Documentation regarding treatment participation while incarcerated as a juvenile varied. There was no history of mental health treatment as an adult in the community. During his second CDCR term, he sought mental health services on five occasions via Requests for Inmate Services (CDCR 7362) between January 2015 and July 2018. Four years into his sentence on April 13, 2016, he sought mental health services and was treated at the 3CMS level of care through February 28, 2018. Treatment occurred at two different institutions and was provided by at least five different clinicians. There was no history of prescribed psychotropic medication for this inmate.

The SCR indicated a primary diagnosis of Antisocial Personality Disorder. While this diagnosis was present for the duration of time he was treated in the MHSDS, an independent healthcare record review indicated that the SCR did not include diagnoses of Depressive Disorder, NOS and Opioid Abuse Disorder that were documented during his first year of treatment. Treatment goals targeted depression and anger, but the SCR did not discuss the lack of clear application of these treatment goals in clinician progress notes. According to the SCR, the inmate began to isolate, and treatment participation declined following an institutional transfer to serve his time in the SHU. He was described as high functioning and lacking a mental illness. Social isolation, which can be a sign of a mental illness, was not considered in clinician documentation or the SCR; nor was a gap in treatment while the inmate was housed in the SHU addressed in the SCR.

158

Specifically, there was a lapse of primary clinician documentation after a contact on October 28, 2016 and a contact on February 7, 2017.

An independent review of his healthcare record indicated that the fourth clinician he was assigned removed diagnoses of Depressive Disorder, NOS and Opioid Abuse with no clear rationale provided. In addition, despite reports of anger and depression (which he attributed to his ongoing time in segregation), treatment solely targeted anger. This treatment plan was continued until he was removed from the MHSDS. Review of the healthcare record indicated that documentation focused on antisocial traits. In addition, relevant prior mental health documentation, specifically previous depressive symptoms and diagnosis were not integrated into later documentation. Prior documentation regarding his hope to transfer to a facility closer to his family was also not included.

When his SHU term was suspended, the inmate was transferred to another facility, which was not the facility he preferred. Less than three months after the transfer, he returned to ASU after receiving an RVR for possession of a deadly weapon, and he was anticipating another SHU term. During the initial mental health assessment, he denied any mental health distress, and at his request was removed from the MHSDS at the initial IDTT. While documentation in the healthcare record was thorough, there was no discussion in the SCR regarding the change in level of care by his new ASU treatment team.

According to the SCR and healthcare record review, less than six months after removal from the MHSDS, the inmate submitted a request to see mental health for depression and anger, and he was seen at his cell front on July 11, 2018. Documentation focused on his anger and frustration, including violent thoughts toward others. There was no assessment of depression; despite depression being, in part, what prompted the mental health request. According to the SCR, his request was opined as "instrumental" as he wanted to return to 3CMS before his anticipated return to the SHU. The inmate was informed that he had been provided with a diagnosis of Antisocial Personality Disorder and according to the SCR, did "not meet criteria for inclusion in the MHSDS." The impact of denial of requested services was not considered in the SCR; further, there was no recognition that he had been discharged from the MHSDS with the same diagnosis less than six months prior, and that discharge documentation indicated that he agreed to access mental health if needed.

There was no history of suicide attempts or self-injurious behaviors. The two administered SREs assessed the inmate with low chronic and acute risk.

Regarding the inmate's suicide, at 0209 hours it was discovered that visual observation into his cell was obstructed. He verbally responded to the officer's prompt and was directed to remove the window covering. At 0238 hours, documentation for the Institutional Count indicated that the window was still covered; however, it was documented that the inmate was sleeping prior to the 0230 hours institutional count. The

cell window was covered when he was discovering hanging between 0245 hours and 0259 hours.

According to the SCR, a goodbye letter to his mother was intercepted the morning of his death in outgoing mail.  Interviews indicated that staff was surprised by this inmate's suicide.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable.  Documentation indicated that the inmate responded to the officer when it was discovered that his cell window was covered.  While he was told to remove the window covering, departmental policy was not followed; as almost 30 minutes later the window remained covered, and the inmate did not respond to prompts from the officer.  The delayed response to gain visual observation of this inmate unnecessarily prolonged assessment of his behavior and emergency response.

IV.    Critique of Suicide Case Review Report

The SCR was an inadequate summary of this case.  Pertinent mental health factors identified by an independent review of the healthcare record were not included in the SCR.  Specifically, lack of clear discussion of depressive symptoms and diagnosis impacted critical analysis of this inmate's mental health.  Relatedly, the SCR did not discuss the potential impact of the changes in primary clinicians (at least five in less than two years), lack of clear documentation of treatment goals in clinician progress notes, lack of consideration of isolation as a sign of mental illness, removal of diagnosis with no clear rationale, gap in treatment despite placement in a high-risk environment and impact this could have on treatment withdrawal, lack of integration of pertinent clinical documentation following clinician change, discussion of removal from the MHSDS shortly after ASU placement by a new treatment team with a possible SHU term, lack of inclusion in the MHSDS less than six months after discharge despite similar symptoms and impact of the institutional transfer (greater distance from his family anticipated).  In addition, healthcare documentation indicated a trauma history but there no discussion of the lack of assessment of trauma symptoms in the SCR.  Lastly, substance abuse details available in the healthcare record were not included in the SCR.  While discussion of

these various areas might not have changed the outcome, inclusion of these areas may have warranted additional QIPs.

Precipitants to this inmate's suicide were identified in the SCR but warranted more discussion. Specifically, it was discussed that safety concerns related to gang involvement may have contributed to this inmate's suicide. Further discussion specifying identified safety concerns and the CDCRs response(s) to safety concerns was needed. This may have required more collaboration between custody and mental health reviewers. There was reference to placement in an SNY, but further details were not provided and would have been useful given reference to safety concerns. Additionally, the lack of return to the MHSDS after he submitted a request to mental health warranted consideration as a precipitant. Relatedly, a QIP regarding documentation that his request to return to the 3CMS program was "instrumental" coupled with a lack of exploration of reasons for said instrumentality and lack of consideration that he could also be genuinely distressed in light of a SHU term was also needed. In addition, consideration of medical diagnoses (HIV and Hepatitis C) and treatment refusals in the year prior to his death were worth consideration. Lastly, discussion of potential precipitant(s) with his mother (which occurred to gain background information) may have provided useful information.

The two recommendations followed from the content and findings of the report. However, as discussed above, discussion of various areas could have resulted in additional recommendations.

There was one mental health concern that for reasons that were not provided did not rise to the level of a QIP. Specifically, concern was raised that documentation addressing the July 7, 2018 request to see mental health did not address the reason for the request. It was also noted that a pattern of lack of responsivity to this inmate's requests existed. A review of dates indicated that this occurred at two different institutions. This suggested the need, at a minimum, for a QIP with both identified institutions. Relatedly, the July 7, 2018 contact occurred at his cell front, and there was no discussion on the lack of documentation regarding attempts for a confidential contact and the impact this may have had on his disclosure.

There were discrepancies in the SCR worth noting. First, the memo that accompanied the SCR indicated that the inmate was in the EOP, but subsequent documentation indicated that he was not a participant in the MHSDS. Second, the SCR indicated that he did not participate in treatment offered to him while he was in juvenile detention, but some documentation from the healthcare record indicated that he did participate in treatment.

Documentation indicated that the autopsy report was completed on December 10, 2018, and the toxicology report was completed on December 12, 2018. According to the SCR, toxicology and autopsy reports were pending at the time the SCR was completed, seven weeks after the inmate's death. Delays in receipt to CDCR warranted review.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in two required QIPs both of which were related to custody concerns.

The first concern addressed the obstructed view of the inmate's cell which raised concern about the thoroughness of Guard One welfare checks.  A CDCR 989, was submitted to the OIA to address this issue.  The investigation was pending at the time of completion of the final QIP.  Upon completion of the investigation, the institution was required to submit a memo describing actions taken to address identified problems.  As of this writing the memo had not been received by the Special Master's team, and the adequacy of the QIP was unable to be determined.

In addition to the OIA referral, the warden circulated a memo that addressed a "zero tolerance" policy for window coverings and conveyed existing policy and expectations to address obstructions to line of sight.  This was a good first step, but it warranted documentation of training and a plan to assess and monitor sustainable staff adherence.

The second QIP addressed timeline discrepancies from outside medical emergency response agencies and institutional staff that may have caused a delay in emergency response.  The QIP was to investigate the incident and to respond accordingly.  Proof of practice included a memo from a Supervising Registered Nurse II that indicated that no delay in emergency response occurred following investigation of timelines.  The memo provided an overview of the timeline documentation, but there was no further inquiry, such as discussion with outside medical response agencies or source verification regarding placement of the 911 call.  The investigation was incomplete and deemed insufficient.

162

**APPENDIX B1**

**INMATE DEMOGRAPHICS**

Inmate Demographics

| Case | Facility | Age | Gender | Ethnicity | Marital Status | LOC | Primary Diagnosis | Current PC2602 | Medical Issues |
|------|----------|-----|--------|-----------|----------------|-----|-------------------|----------------|----------------|
| A | RJD | 44 | Male | Native American | Married | EOP | Mood Disorder | No | Yes |
| B | COR | 40 | Male | Other | Never Married | EOP | Psychotic Disorder | Yes | Yes |
| C | CMC | 25 | Male | Caucasian | Never Married | MHCB | Psychotic Disorder | Yes | No |
| D | COR | 28 | Male | Hispanic/Latinx | Never Married | EOP | Adjustment Disorder | No | No |
| E | KVSP | 41 | Male | Caucasian | Never Married | CCCMS | Mood Disorder | No | Yes |
| F | CCI | 24 | Male | Caucasian | Never Married | CCCMS | Adjustment Disorder | No | No |
| G | LAC | 71 | Male | Caucasian | Never Married | CCCMS | Mood Disorder | No | Yes |
| H | CCI | 27 | Male | Hispanic/Latinx | Never Married | Non-MHSDS | None | No | No |
| I | CTF | 52 | Male | Asian | Widowed | CCCMS | Mood Disorder | No | Yes |
| J | KVSP | 34 | Male | Hispanic/Latinx | Never Married | CCCMS | Mood Disorder | No | Yes |
| K | SVSP | 47 | Male | Caucasian | Married | Non-MHSDS | None | No | Yes |
| L | RJD | 54 | Male | Hispanic/Latinx | Never Married | CCCMS | Mood Disorder | No | Yes |
| M | SQSP | 54 | Male | Hispanic/Latinx | Never Married | Non-MHSDS | None | No | No |
| N | HDSP | 26 | Male | Caucasian | Never Married | CCCMS | Psychotic Disorder | No | No |
| O | KVSP | 22 | Male | Hispanic/Latinx | Never Married | EOP | Psychotic Disorder | No | No |
| P | SOL | 63 | Male | Caucasian | Divorced | Non-MHSDS | Trauma-related Disorder | No | Yes |
| Q | CHCF | 49 | Male | Hispanic/Latinx | Married | CCCMS | Psychotic Disorder | No | No |
| R | SQSP | 51 | Male | Asian | Divorced | Non-MHSDS | None | No | Yes |
| S | KVSP | 25 | Male | Hispanic/Latinx | Never Married | CCCMS | Psychotic Disorder | No | Yes |
| T | RJD | 39 | Male | Caucasian | Never Married | CCCMS | Personality Disorder | No | Yes |
| U | CCWF | 34 | Female | Hispanic/Latinx | Never Married | EOP | Psychotic Disorder | No | No |
| V | SAC | 57 | Male | Hispanic/Latinx | Never Married | EOP | Psychotic Disorder | No | Yes |
| W | CTF | 30 | Male | Hispanic/Latinx | Never Married | Non-MHSDS | None | No | Yes |
| X | MCSP | 46 | Male | Hispanic/Latinx | Widowed | CCCMS | Mood Disorder | No | Yes |
| Y | HDSP | 30 | Male | Hispanic/Latinx | Never Married | Non-MHSDS | None | No | Yes |
| Z | RJD | 39 | Male | Asian | Never Married | EOP | Mood Disorder | No | No |
| AA | LAC | 40 | Male | African-American | Never Married | EOP | Mood Disorder | No | Yes |
| BB | COR | 41 | Male | Native American | Never Married | Non-MHSDS | Adjustment Disorder | No | Yes |
| CC | DVI | 28 | Male | Caucasian | Never Married | CCCMS | Adjustment Disorder | No | No |
| DD | KVSP | 29 | Male | Hispanic/Latinx | Never Married | Non-MHSDS | None | No | No |
| EE | SVSP | 22 | Male | Hispanic/Latinx | Never Married | EOP | Personality Disorder | Yes | Yes |
| FF | SAC | 37 | Male | Caucasian | Never Married | EOP | Mood Disorder | No | Yes |
| GG | OOS | 46 | Male | Hispanic/Latinx | Married | Non-MHSDS | None | No | Yes |
| HH | MCSP | 35 | Male | Hispanic/Latinx | Married | EOP | Personality Disorder | No | Yes |

**APPENDIX B2**

**INMATE HISTORY AND SUICIDE EVENT CHARACTERISTICS**

Inmate History and Suicide Event Characteristics

| Case | Crime Type | Method | Housing | Cell Type | Mental Health History while Incarcerated | Mental Health History Prior to Incarceration | Previous Self-Harm | Previous Suicide Attempt | Substance Use History |
|------|-----------|--------|---------|-----------|------------------------------------------|----------------------------------------------|--------------------|--------------------------|------------------------|
| A | DUI | Cutting | GP (SNY) | Single | Yes | Yes | No | Yes | Yes |
| B | Violent | Cutting | GP (SNY) | Single | Yes | No | Yes | Yes | Yes |
| C | Violent | Other Asphyxiation | CTC | Single | Yes | Yes | Yes | Yes | Yes |
| D | Violent | Hanging | ASU | Single | Yes | No | Yes | No | Yes |
| E | Violent | Hanging | GP (SNY) | Double - cellmate absent | Yes | No | No | Yes | Yes |
| F | Violent | Hanging | GP (SNY) | Double - cellmate absent | Yes | Yes | Yes | Yes | Yes |
| G | Sex Offense | Hanging | GP Yard | Single | Yes | No | No | No | No |
| H | violent | Hanging | GP Yard | Single | No | No | No | No | Yes |
| I | Violent | Hanging | GP Yard | Single | Yes | Yes | No | Yes | No |
| J | sex offense | Hanging | GP Yard | Single | Yes | Yes | No | Yes | Yes |
| K | Non-violent drug | Overdose | GP (SNY) | Double - cellmate present | No | No | No | No | Yes |
| L | Sex Offense | Hanging | ASU | Single | Yes | No | Yes | No | Yes |
| M | Violent | Hanging | Condemned | Single | No | Yes | No | No | Yes |
| N | Sex Offense | Hanging | STRH | Single | Yes | Yes | Yes | Yes | Yes |
| O | Violent | Hanging | GP (SNY) | Single | Yes | Yes | Yes | Yes | Yes |
| P | Violent | Hanging | GP Yard | Double - cellmate absent | No | No | No | No | No |
| Q | Violent | Cutting | CTC | Single | Yes | Yes | No | Yes | Yes |
| R | Violent | Hanging | Condemned | Single | No | No | No | No | No |
| S | Violent | Hanging | GP (SNY) | Double - cellmate absent | Yes | Yes | Yes | Yes | Yes |
| T | Sex Offense | Overdose | STRH | Single | Yes | Yes | No | Yes | Yes |
| U | Violent | Hanging | RC | Dorm | Yes | Yes | Yes | Yes | Yes |
| V | Violent | Hanging | GP Yard | Single | Yes | Yes | Yes | Yes | Yes |
| W | Violent | Hanging | ASU | Single | No | No | No | No | Yes |
| X | Sex Offense | Overdose | GP (SNY) | Double - cellmate present | Yes | Yes | No | Yes | Yes |
| Y | Violent | Hanging | GP (SNY) | Single | No | No | No | No | No |
| Z | Violent | Hanging | GP (SNY) | Single | Yes | No | Yes | Yes | Yes |
| AA | Sex Offense | Hanging | GP (SNY) | Single | Yes | Yes | Yes | Yes | Yes |
| BB | Violent | Hanging | GP Yard | Single | Yes | No | No | Yes | Yes |
| CC | Sex Offense | Hanging | RC | Double - cellmate absent | Yes | Yes | No | No | No |
| DD | Violent | Hanging | ASU | Single | No | No | No | Yes | Yes |
| EE | Violent | Other Asphyxiation | STRH | Single | Yes | Yes | Yes | Yes | Yes |
| FF | Violent | Overdose | GP Yard | Single | Yes | Yes | Yes | Yes | Yes |
| GG | Sex Offense | Hanging | GP (SNY) | Double - cellmate absent | No | No | No | No | No |
| HH | Violent | Hanging | ASU | Single | Yes | No | No | No | Yes |

**APPENDIX B3**

**IDENTIFIED ASSESSMENT, TREATMENT AND
COMMUNICATION CONCERS**

Identified Assessment, Treatment and Communication Concerns

| Case | Suicide Risk Evaluation Omissions | Suicide Risk Level Not Appropriate | Other Suicide Risk Evaluation Issues | Mental Health Assessment Problems | Treatment Planning Problems | Treatment Problems | Failure to Refer to HLOC | Problems with Interdisciplinary Consultation |
|---|---|---|---|---|---|---|---|---|
| A | Yes | Yes | Yes | No | Yes | Yes | No | Yes |
| B | Yes | Yes | Yes | Yes | Yes | Yes | No | No |
| C | No | No | Yes | No | Yes | Yes | Yes | No |
| D | Yes | No | Yes | Yes | Yes | No | No | No |
| E | Yes | Yes | No | Yes | Yes | Yes | Yes | No |
| F | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |
| G | N/A | N/A | N/A | No | No | Yes | No | No |
| H | N/A | N/A | N/A | N/A | N/A | N/A | No | No |
| I | Yes | Yes | Yes | No | Yes | No | No | No |
| J | No | Yes | Yes | No | No | No | No | No |
| K | N/A | N/A | N/A | No | N/A | No | No | No |
| L | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| M | N/A | N/A | N/A | Yes | N/A | N/A | No | No |
| N | Yes | Yes | Yes | Yes | Yes | Yes | No | Yes |
| O | Yes | Yes | Yes | Yes | Yes | Yes | No | No |
| P | No | Yes | No | No | N/A | No | No | No |
| Q | No | Yes | No | No | No | No | Yes | No |
| R | Yes | Yes | Yes | Yes | N/A | No | No | No |
| S | No | N/A | No | No | No | No | No | No |
| T | Yes | Yes | Yes | No | Yes | No | No | Yes |
| U | Yes | Yes | Yes | No | Yes | Yes | No | No |
| V | No | N/A | No | No | No | No | No | No |
| W | No | Yes | No | Yes | N/A | No | No | No |
| X | No | Yes | No | No | No | No | No | No |
| Y | No | N/A | N/A | N/A | N/A | N/A | No | No |
| Z | Yes | Yes | Yes | No | Yes | Yes | No | No |
| AA | Yes | Yes | Yes | No | No | Yes | No | No |
| BB | Yes | No | No | No | Yes | Yes | No | No |
| CC | N/A | N/A | N/A | Yes | N/A | N/A | No | No |
| DD | Yes | No | Yes | Yes | Yes | Yes | Yes | N/A |
| EE | Yes | No | Yes | No | Yes | Yes | No | No |
| FF | No | Yes | Yes | Yes | Yes | Yes | No | No |
| GG | N/A | N/A | N/A | No | N/A | N/A | N/A | N/A |
| HH | No | No | N/A | Yes | No | No | No | No |

**APPENDIX B4**

**COMMON PROBLEMS IDENTIFIED AS REQUIRING A**

**QUALITY IMPROVEMENT PLAN**

Common Problems Identified as Requiring a Quality Improvement Plan

| Identified Issue Requiring Quality Improvement Plan | Number of Cases | Percentage of Cases with QIPs |
|---|---|---|
| Medication Issues | 2 | 7% |
| Over-reliance on Patient Self-Report | 2 | 7% |
| Failure to Conduct Confidential Contacts | 2 | 7% |
| Psychiatric Technician Rounds Not Done/Inaccurate | 3 | 10% |
| Failure to Take Pressure Off Body/Improper Cut-Down Procedure | 3 | 10% |
| Psychiatric Diagnostic Issues | 3 | 10% |
| Failure to Respond with Cut-Down Kit | 4 | 14% |
| CPR/AED Issues | 4 | 14% |
| Incomplete Five-Day Follow Ups | 4 | 14% |
| Failure to Update Mental Health Evaluation | 4 | 14% |
| Failure to Make Adequate Custody Checks | 5 | 17% |
| Treatment and Treatment Plan Disconnect | 5 | 17% |
| Nursing Documentation Issues | 5 | 17% |
| Delays in 911 or alarm activation | 5 | 17% |
| Five-Day Follow Ups Not Tied to Documented Safety Plan | 5 | 17% |
| Failure to Conduct Program Guide Required Contacts | 5 | 17% |
| Failure to Complete Suicide Risk Evaluation | 6 | 21% |
| Poor/Conflicting Emergency Response Documentation | 6 | 21% |
| Failure to Conduct Adequate Record Review | 8 | 28% |
| Inappropriate Level of Care/Not referred to Higher Level of Care | 8 | 28% |
| Communication or Referral Issues | 9 | 31% |
| Inaccurate/ Inadequate Mental Health Documentation | 10 | 34% |
| Inadequate Treatment Planning | 13 | 45% |
| Inadequate Risk Determination | 13 | 45% |
| Poor Risk Determination Rationale | 14 | 48% |
| Poor Safety Planning | 15 | 52% |

**APPENDIX C**

**SPECIAL MASTER'S EXPERTS**

**CURRICULA VITAE**

**Sharen E. Barboza, Ph.D., CCHP-MH, CiWPP**
**Licensed Clinical Psychologist (NY 015436/FL PY9637)**

## EDUCATION

### Fairleigh Dickinson University, Teaneck, New Jersey

*Ph.D., Clinical Psychology*                                                          9/2001
Dissertation                                                                           2/2001
    Discriminant validity of the Abel Screen for Sexual Interest in juvenile sex offenders
    who admit and deny their offenses

### Tufts University, Medford, Massachusetts

*M.S., Experimental Psychology*                                                        5/1994
*B.S., Psychology*, Cum Laude, Magna Cum Laude en thesi                                 5/1992

## CERTIFICATIONS

### Certificate in Wholebeing Positive Psychology

*Wholebeing Institute*                                                                 9/2019

## HONORS/AWARDS

### 2018 B. Jaye Anno Award of Excellence in Communication

*National Commission on Correctional Health Care*                                      10/2018
    This award pays tribute to innovative, well-executed communications that have had a
    positive impact on the field of correctional health care, or to individuals for bodies of
    work. The award is named after NCCHC's cofounder and first vice president.
    https://www.ncchc.org/excellence-in-communication-2018

## WORK EXPERIENCE

### Correctional Mental Health Consultant/Expert/Trainer

*Barboza Consulting, LLC*                                                              5/2013-Present
    Provide consultation to correctional systems on behavioral and mental health services.
    Conduct a comprehensive analysis of current services and programs, comparing those
    to national standards.  Offer training for clinical and correctional staff on the
    implementation of behavioral health programs and services including self-injury
    reduction, suicide prevention, managing mental illness in corrections, correctional
    stress/burnout, and other topics as requested. Provide expert witness evaluation,
    consultation, and opinion.

    ***Court Appointed Expert, Correctional Mental Health*** (3/2020 - present). United
    States District Court of the Eastern District of California – Ordered by Honorable
    Kimberly J. Mueller, Chief United States District Judge, for a class action lawsuit,
    Coleman et. al vs. Newsom et. al. As a member of a multi-disciplinary team,
    provide expert consultation to the Special Master, Mathew A. Lopes, Esq., as part
    of an ongoing monitoring process of the California Department of Corrections and
    Rehabilitation and Department of State Hospitals mental health system.

**Vice President**
**Mental Health/Clinical Operations – Mental Health**

*MHM/Centurion*, Vienna, Virginia                                              9/2014-4/2020

Supervisors:  Jane Haddad, Psy.D.; Julie Mueller, RN, MBA, Johnny Wu, M.D.
Oversaw national clinical operations of mental health services provided by the company.  Supervised the Clinical Operations mental health team, audited clinical services and contract/standards compliance of mental health services being provided within correctional and forensic settings. Created and collaborated on the development of therapeutic program curricula for seriously mentally ill individuals, individuals who engage in self-injury, and sexual offenders.  Developed and delivered training programs to mental health, medical, and corrections professionals. Provided consultation to correctional systems regarding mental health, behavior change and sexual offender programming.  Assisted with new business development.

**Director of Clinical Operations**

*MHM Services, Inc.*, Vienna, Virginia                                         10/2008-9/2014

Supervisor:  Jane Haddad, Psy.D.
Served as a director of the clinical operations team, overseeing the auditing of clinical services and contract compliance of mental health services being provided within correctional and forensic settings.  Created and collaborated on the development of therapeutic program curricula for seriously mentally ill individuals, individuals who self-injure and sexual offenders.  Developed and deliver training programs to mental health, medical health, and corrections professionals.  Provided consultation to correctional systems regarding mental health, behavior change and sexual offender programming.  Assisted with new business development and supervision of clinical operations staff.

**Senior Clinical Operations Specialist**

*MHM Services, Inc.*, Vienna, Virginia                                         2/2007-10/2008

Supervisor:  Jane Haddad, Psy.D.
Served as a senior member of the clinical operations team, auditing clinical services and contract compliance of mental health services being provided within correctional and forensic settings.  Created and collaborated on the development of therapeutic program curricula; developed and delivered training programs to mental health, medical health, and corrections professionals; and provided consultation to correctional systems regarding mental health and sexual offender programming.

### Director, Sex Offender Treatment Program

*NYS OMH & Central New York Psychiatric Center*, Marcy, New York              11/2005-2/2007

> Deputy Commissioner: Richard Miraglia, C.S.W.
>
> Executive Director: Donald Sawyer, Ph.D., MBA
>
> Served as clinical expert consultant in the development of the Sex Offender commitment initiative in New York.  Consulted to the Division of Forensic Services in the development of the comprehensive evaluation and treatment process for civilly committed sex offenders in New York State. Consulted to the Commissioner of OMH and the Department of Budget regarding this initiative.  Provided weekly consultation, staff training, and clinical supervision to multidisciplinary teams at Manhattan Psychiatric Center and Kirby Forensic Psychiatric Center.  Made contacts and visited with civil commitment programs in other states and developed an inpatient treatment program for this population including intake assessment process and outcome measurements.  Participated in all aspects of program development: consulting on construction, developing and implementing policy, hiring staff, creating staff training programs, coordinating risk assessments, supervising clinical and direct care staff, preparing clinicians for court testimony, and overseeing community reintegration planning

### Chief Psychologist

*Central New York Psychiatric Center*, Marcy, New York              1/2004-2/2007

> Executive Director: Donald Sawyer, Ph.D., MBA
>
> Served as Chief of Psychology Department for a state psychiatric facility treating patients incarcerated within New York State; developed, monitored, and maintained standards of performance for psychologists throughout the system; developed policies and procedures related to the delivery of psychological services (e.g., suicide risk assessment and prevention, violence risk assessment and prevention, behavioral management policies and programs, special housing unit (SHU) services, psychological assessment); provided supervision to psychologists and psychology student interns; developed and conducted research regarding initiatives and programs; coordinated system-wide risk assessment initiative; coordinated system-wide implementation and maintenance of behavioral management program; recruited and hired psychologists; consulted to physicians, administration, and risk managers with regard to public safety, accreditation, and quality of care.

### Licensed Psychologist/ Psychologist II

*Bedford Hills Correctional Facility*, Bedford Hills, New York              9/2001-1/2004

> Supervisors: Carolyn Subin, Ph.D., David Stang, Ph.D.
>
> Provided individual psychotherapy to incarcerated women at a maximum security correctional facility; conducted assessments of suicidal and homicidal ideation & intent; provided mental health consultation and assessment to women in solitary confinement; consulted to Department of Corrections regarding mentally ill inmates with lengthy confinement

sanctions; provided supervision to Ph.D. level psychologists for licensure; provided mental health training to Department of Corrections staff; participated in crisis intervention and inpatient referral process.

### Sex Offender Risk Assessment Consultant

*Juvenile Sexual Offender Treatment Program*
*Westchester Jewish Community Services*, Hartsdale, New York          8/2001-10/2003
<u>Supervisor</u>:  Kenneth Lau, CSW
Assessed the re-offense risk for adolescents accused of committing sexual offenses within Westchester County, NY; provided pre-sentencing consultation to the courts regarding supervision and treatment needs as well as further assessments and/or agency involvement

### Director, Adolescent Sexual Abuse Program

*Iowa State Training School for Boys*, Eldora, Iowa          1/1995-8/1996
<u>Supervisor</u>:  William Fields, Clinical Director
Treated adolescent male offenders & victims of sexual abuse using group and individual therapy; assessed adolescents; supervised staff of 15-20 and provided training; provided sex education to delinquent male adolescents; received 175 hours of training meeting certification requirements as Sex Offender Treatment Provider for the State of Iowa. Clinical populations included: BD, LD, ADD, ADHD, Pedophilia, Oppositional-Defiant Disorder, Conduct Disorder.

## EDITORIAL DUTIES
### Health Affairs
*Reviewer*          3/2020 -Present

### International Journal of Prisoner Health
*Editorial Board Member*          10/2013-Present

### Journal of Correctional Health Care
*Reviewer*          10/2018-Present

## EXPERT WITNESS & CASE CONSULTANT

United States Direct Court; Maine
*Retained by defendant – consultation only*          2017

United States Direct Court; Western District of Wisconsin
*Retained by defendant – consultation only*          2020

United States Direct Court; Central District of California
*Retained by plaintiffs*          2021

## COMMITTEE MEMBERSHIPS/AFFILIATIONS
### Mental Health Standards Committee
*Member*

National Commission on Correctional Health Care                                   11/2020 - Present

**NCCHC Correctional Health Foundation**
*Board Member/Chair Elect (2021)*                                                 4/2019-Present
National Commission on Correctional Health Care

**Education Committee**
*Member*                                                                          10/2018-Present
National Commission on Correctional Health Care

**Certified Correctional Healthcare Professionals (CCHP) Mental Health Subcommittee/Task Force**
*Member*                                                                          1/2014-Present
National Commission on Correctional Health Care

**Certified Correctional Healthcare Professionals (CCHP) Board of Trustees**
*Appointed Trustee*                                                               3/2014-11/2017
National Commission on Correctional Health Care                                   11/2020-Present

**Mental Health Subcommittee**
*Member*                                                                          4/2013-4/2017
American Correctional Association

SPECIALIZED TRAINING

**Leading from Your Strengths:  Positive Psychology and Professional Development**
*Kripalu Center for Yoga and Health*
M. Sirois, Psy.D.                                                                 11/2017

**The Prison Rape Elimination Act: Understanding the Law and How to Meet Compliance**
*National Commission on Correctional Healthcare*
A. Moss                                                                           10/2012

**Sex Offender Treatment**
*NYS Office of Mental Health, Division of Forensic Services*
A. Schlank, Ph.D.                                                                 2/2007

**PCL-R Training**
R. Hare, Ph.D., A. Forth, Ph.D.                                                   11/2006

**Using the Structured Risk Assessment Model to Guide Treatment Planning**
D. Thornton, Ph.D., R. Mann, M.Sc. L. Daniels, MSSW                               9/2006

**Penile Plethysmography Training – Level I & Level II**
*Monarch -- Behavioral Technologies Inc.*, Salt Lake City, UT
P. Byrne, Ph.D.                                                                   6/2006

**Sex Offender Risk Assessment**
*NYS Office of Mental Health, Division of Forensic Services.*
D. Doren, Ph.D., D. Epperson, Ph.D., D. Anderson, Ph.D.                    3/2006

**Legal/Ethical Issues in Mental Health**
*Specialized Training Services, Inc.*
Philip Resnick, MD                                                        6/2004

**Risk Assessment of the Mentally Ill**
*Specialized Training Services, Inc.*
Philip Resnick, MD                                                        6/2004

**Intensive DBT Training**
*Behavioral Tech, Inc.*
Cindy Sanderson, Ph.D.                                                    10/2001

TEACHING EXPERIENCE

**Facilitator for Executive Manager in Correctional Healthcare Training (EMCHT)**
*National Institute of Corrections*, Aurora, Colorado            5/2014-9/2015

**Adjunct Professor**
*Hamilton College*, Clinton, New York                           1/2005-5/2005

**Instructor**
*Marist College*, Goshen Extension Site, Goshen, New York        5/2001-8/2001
*Fairleigh Dickinson University*, Teaneck, New Jersey
5/1997–12/1998

**Adjunct Instructor**
*Correctional Release Center*, Newton, Iowa                     8/1994-1/1995
*Des Moines Area Community College*, Ankeny, Iowa               9/1994-12/1994

PUBLICATIONS

Barboza, S., Blair, R., Cook, G., Elliott, W., and Kern, E. (2019). *Suicide Prevention and Resource Guide: National Response for Suicide Prevention in Corrections.* Chicago, IL. National Commission on Correctional Health Care. www.ncchc.org/suicide-prevention-plan

Boren, E. A., Folk, J. B., Loya, J. M., Tangney, J. P., Barboza, S. E. and Wilson, J. S. (2018), The Suicidal Inmate: A Comparison of Inmates Who Attempt Versus Complete Suicide. *Suicide and Life Threatening Behavior*, 48(5), 570-579. DOI: 10.1111/sltb.12374

Folk, J. B., Loya, J. M., Boren, E. A., Tangney, J. P., Wilson, J. S., & Barboza, S. E. (in press). Differences between inmates who attempt suicide and who die by suicide: Staff-identified psychological and treatment-related risk factors. *Psychological Services.*

Folk, J. B., Disabato, D. J., Daylor, J. M., Tangney, J. P., Barboza, S., Wilson, J. S., Bonieskie, L., & Holwager, J. (2016). Effectiveness of a Self-Administered Intervention for Criminal Thinking: Taking a Chance on Change. *Psychological Services*, 13(3), 272-82.

Barboza, S. (2016).  Elevating personality disorders:  Changes and challenges in treating incarcerated patients.  *The International Association for Correctional and Forensic Psychology Newsletter*, 48(2), 11-12.

Disabato, D., Folk, J. Wilson, J.S., Barboza, S., Daylor, J. & Tangney, J.  (2015). Psychometric validation of a simplified form of the PICTS in low-reading level populations.  *Journal of Psychopathology and Behavioral Assessment*,38(3), 456-64.

Andrade, J.T., Wilson, J.S., Franko, E., Deitsch, J. & Barboza, S. (2014).  Developing the Evidence Base for Reducing Chronic Inmate Self-Injury: Outcome Measures for Behavior Management.  *Corrections Today*, 76(6), 30-35.

Barboza, S. & Wilson, J. (2013).  Your Patient is My Patient:  The Need for Integrated Medical-Mental Health Care for Inmates with Serious Mental Illness.  *CorrDocs*, 17(5).

Barboza, S. & Wilson, J.S. (2011).  Behavior Management Plans Decrease Inmate Self-Injury.  *Corrections Today*, 73(5).

Wilson, J. & Barboza, S. (2010). The Looming Challenge of Dementia in Corrections. *CorrectCare*, 24(2), 12-14.

Way, B. B., Sawyer, D. A., Barboza, S., & Nash, R. (2007). Inmate suicide and time spent in special disciplinary housing in New York state prison. *Psychiatric Services*, 58, 558-560.

Abel, G. G., Jordan, A., Rouleau, J. L., Emerick, R., Barboza-Whitehead, S., and Osborn, C. (2004). The use of visual reaction time to identify male adolescent child molesters and the frequencies of their acts. *Sexual Abuse: A Journal of Research and Treatment*, 16 (3), 255-265.

## PRESENTATIONS

Barboza, S. "Understanding Personality Disorders: Practical Insights for Nurses" Workshop presented at the National Commission on Correctional Healthcare Conference, October 2019, Fort Lauderdale, FL.

Barboza, S. "Self-Injurious Behavior and Trauma Informed Care" Keynote at Health Care in Secure Settings Conference, Justice Health and Forensic Mental Health Network, May 2019, Sydney, Australia.

Barboza, S. "Vicarious Trauma and Self-Care" Keynote at Health Care in Secure Settings Conference, Justice Health and Forensic Mental Health Network, May 2019, Sydney, Australia.

Masotta, M. & Barboza, S. "Bipolar Disorder, Borderline Personality Disorder and PTSD: Improving Diagnostic Accuracy" Workshop presented at the National Commission on Correctional Healthcare Conference, April 2019, Nashville, TN.

Riley, K. & Barboza, S. "Continuous Quality Improvement: Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Conference, April 2019, Nashville, TN.

Cox, J & Barboza, S. "An In-Depth Review of NCCHC's 2015 Standards for Mental Health Services" Pre-Conference seminar at National Commission on Correctional Healthcare Conference, November 2017, Chicago, IL; October, 2018, Las Vegas, NV; April 2019, Nashville, TN and October, 2019, Fort Lauderdale, FL.

Barboza, S "Hazardous Duty: The Invisible Effects of Working in Corrections" Workshop presented at the National Commission on Correctional Healthcare National Conference, October 2015, Dallas, TX and October, 2019, Fort Lauderdale, FL.

Barboza, S & Riley, K. "Continuous Quality Improvement: Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S., Andrade, J.T., & Wilson, J.S. "Trauma in the Practice of Correctional Medicine." Workshop presented at the American College of Correctional Physicians Fall Conference, October, 2018, Las Vegas, NV.

Barboza, S. "Strategies for Understanding and Working with Personality-Disordered Patients." Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S. "The Value of Positivity in Correctional Mental Health." Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Gibson, B., Kern, E., Barboza, S. "The National Response Plan for Suicide Prevention in Corrections." Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S. "Measuring Mental Health Treatment Outcomes: Building an Evidence Base" Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S. & Wilson, J.S. "Trauma-Informed Care: How We Can Better Support Our Patients" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S.  "Continuous Quality Improvement:  Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S.  "CCHP-MH Exam Content Review Course" National Commission on Correctional Healthcare sponsored webinar, April 12, 2018.

Barboza, S.  "Use of Behavior Management Plans to Reduce Self-Injury."  National Commission on Correctional Healthcare sponsored webinar, February 21, 2018.

Barboza, S. "Practical Behavior Management Strategies:  Decreasing Self-Injurious Behavior" Luncheon presentation at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S. "CCHP-MH Content Review Course."  Workshop at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S. & Kearns, J.D. "Crisis Intervention:  Planning and Implementing Effective Strategies."  Workshop at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S & Puerini, M.  "Personality Disorder in Corrections – Affliction, Identity, Label" Workshop at the National Commission on Correctional Healthcare Conference, October 2016, Las Vegas, NV

Barboza, S. "Strategies for Understanding and Working with Personality-Disordered Patients" Workshop at the National Commission on Correctional Healthcare Correctional Mental Health Care Conference, July 2016, Boston, MA.

Barboza, S. Wilson, J.S., McGinty, M., and Brown, L.  "Creating Practice-Based Evidence for Mental Health Treatment in Corrections" Workshop presented at the National Commission on Correctional Health Care National Conference, October 2015, Dallas, TX.

Barboza, S "Hazardous Duty:  The Invisible Effects of Working in Corrections" Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2015, New Orleans, LA.

Barboza, S. & McGinty, M.  "Practice-Based Evidence:  Creating Evidence for Mental Health Treatment in Corrections" Workshop presented at the American Correctional Health Services Association National Conference, March 2015, Orlando, FL.

Barboza, S. & Wilson, J.S.  "Hazardous Duty:  The Invisible Effects of Working in Corrections" Workshop presented at the American Correctional Health Services Association Multidisciplinary Educational Conference, March 2014, New Orleans, LA.

Barboza, S. & Ammons, L. "How Can I Tell If It's Working: Measuring Mental Health Treatment Outcomes." Workshop presented at the American Correctional Association Winter Conference, January 2014, Tampa, FL.

Simpson, M. & Barboza, S. "Times They Are a Changing: DSM-5 and the Impact on Corrections." Workshop presented at the American Correctional Association Winter Conference, January 2014, Tampa, FL.

Wilson, J.S., Barboza, S. & Andrade, J. "Behavior Management: Strategies for Individual and Group Programs." Workshop presented at National Commission on Correctional Health Care Correctional Mental Health Care Conference, July 2013, Las Vegas, NV.

Barboza, S. "Mental Health in Corrections: An Overview for Health Care Leaders" Workshop presented at Correctional Health Care Leadership Institute, July 2012, Chicago, IL.

Shaw-Taylor, E.; Baker, M.; Tyler, C. & Barboza, S. "Taking a Chance on Change: In-Cell Programming Success in Maryland" Workshop offered at American Correctional Association Congress of Corrections, July, 2012, Denver, CO.

DeGroot, J.; Cadreche, M.; & Barboza, S. "Managing Self Harm by Standardizing the Definition, Tracking its Prevalence, and Using a Behavioral Plan" Workshop presented at Academic & Health Policy Conference on Correctional Health, March, 2012.

DeGroot, J.; Thompson, J. M.; Jackson, J. & Barboza, S. "It's Not Mental Illness, It's Just Behavior: Identifying and Treating Personality Disorders Rather Than Dismissing Them" Workshop presented at Academic & Health Policy Conference on Correctional Health, March, 2012.

Barboza, S. & Wilson, J.S. "Evidence for the Efficacy of Behavioral Interventions in Reducing Self-Injury" Workshop offered at NCCHC Conference, May, 2011, Phoenix, AZ.

Barboza, S. & Wilson, J.S. "Real Results: Successful Reduction in Self-Injury in Correctional Settings." Workshop offered at American Correctional Health Services Association Conference, April, 2011, Orlando, FL.

Barboza, S. & Wilson, J.S. "Let's Get Practical: Real Answers to Inmate Self-Injury." Workshop offered at North American Association of Wardens and Superintendents Conference, April, 2011, Baton Rouge, LA.

Barboza, S. & Wilson, J.S. "Behavior Management – Effective Reduction in Self-Injury." Workshop offered at American Correctional Association Winter Conference, February, 2011, San Antonio, TX.

Wilson, J.S. & Barboza, S. "Addressing the Rising Prevalence of Dementia in Inmate Populations" Pre-Conference Seminar offered at Updates in Correctional Healthcare, National Commission on Correctional Health Care sponsored, April, 2010, Nashville, TN.

Wilson, J.S.; Barboza, S.; & Andrade, J. "Ending It All: Data Informed Suicide Prevention." Presentation at Updates in Correctional Healthcare, National Commission on Correctional Health Care sponsored, April, 2010, Nashville, TN.

Barboza, S. & Wilson, J.S. "Bringing Recovery Inside the Walls: Recovery-Oriented Treatment Plans." Presentation at CMHS National GAINS Center Conference, February, 2010, Orlando, FL.

Wilson, J.S. & Barboza, S. "In Search of Solutions: Does Behavior Management Work?" Presentation at ACHSA Multidisciplinary Professional Development Conference, February 2010, Portland, OR.

Barboza, S. "Mental Health Risk Management." Invited speaker, Academy of Correctional Health Professionals Regional Seminar, June, 2009, Farmington, CT.

Barboza, S. "Mental Health Risk Management." Invited speaker, Academy of Correctional Health Professionals Regional Seminar, May, 2009, Fairfax, VA.

Andrade, J. T. & Barboza, S. "Taking a Chance on Change: Treating Offenders in Restricted Housing." Presentation at Mental Health in Corrections Conference, Forest Institute sponsored, April, 2009, Kansas City, MO.

Barboza, S. "Prison Rape Elimination Act & Draft Standards: Implications for Mental Health Practice." Presentation at Caulking the Seams of Continuity Conference, Drexel University Behavioral Healthcare Education, December 2008, Grantville, PA.

Barboza, S. "Documenting Progress: Writing Good Progress Notes Based on Good Treatment Plans." Presentation at Unlock the Mystery Conference, Indiana Department of Corrections, June 2008, Indianapolis, IN.

Wilson, J.S., and Barboza, S. "Autonomy, Safety, and Connection: Ethical Challenges in Working with Self-Injurious Inmates" Presentation at Mental Health in Corrections Consortium Symposium, April 2008, Kansas City, MO.

Barboza, S. "Strategies for Modifying Programming for Inmates Significantly Impaired by Mental Illness" Presentation at National Conference on Correctional Health Care, NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE sponsored, October 2007, Nashville, TN.

Abel, G. G., Barboza-Whitehead, S., & Rouleau, J. L. "Usefulness of Visual Reaction Times with Adolescents." Paper presentation at Association for the Treatment of Sexual Abusers Conference, October 2003, Saint Louis, MO

Barboza-Whitehead, S., Abel, G. G., & Reddy, L. A. "A Model for Discriminating Juvenile Sex Offenders Who Deny from Those Who Admit Using the Abel Screen for Sexual Interest." Poster presented at Association for the Treatment of Sexual Abusers Conference, September 1999, Lake Buena Vista, FL

**POSTER**

Folk, J. B., Disabato, D. J., Daylor, J. M., Tangney, J. P., Bonieskie, L.,... Barboza, S. & Wilson, J. S. (2017, November). Effectiveness of a self-administered intervention for criminal thinking among inmates in restrictive housing. Poster to be presented at the Annual Meeting of the Association for Behavioral and Cognitive Therapies, San Diego, CA.

# Kahlil A. Johnson, M.D.

Phone: 240-495-9555
Email: kjohnson@kahliljohnsonpsychiatry.com

## LICENSES AND CERTIFICATIONS:

Current Board Certifications in General and Forensic Psychiatry by the American Board of Psychiatry and Neurology
Current Washington, D.C. and Maryland Medical Licenses
Current Washington, D.C. and Maryland Controlled Substances License
Current DEA License

## POST-GRADUATE TRAINING:

**Forensic Psychiatry Fellow, Saint Elizabeths Hospital, Washington, D.C., July 2016 to June 2017**
Forensic Psychiatry Fellow at Saint Elizabeths Hospital which is part of the Washington D.C. Department of Behavioral Health (DBH). Rotations include: Saint Elizabeths Hospital Forensic Consult Service, Washington D.C. Jail, Comprehensive Psychiatric Emergency Program, Washington D.C. Superior Court Mental Health Urgent Care Clinic, D.C. DBH Outpatient Competency Restoration Program, and the George Washington University Human Rights Clinic.

**Congressional Fellow, American Psychiatric Association, Washington, D.C., January 2009 to November 2009**
Jeanne Spurlock Congressional Health Policy Fellow in the Office of Congressman Edolphus Towns (New York-10[th] Congressional District).

**Psychiatry Resident, George Washington University Hospital, Washington, D.C., June 2005 to June 2009**
Administrative Chief Resident, July 2008 to December 2008; Administrator of Medication Management Clinic, July 2008 to December 2008; Resident Representative, Hospital Emergency Preparedness Committee, July 2006 to December 2009.

## EDUCATION:

**George Washington University School of Public Health, Washington, D.C., September 2006 to July 2008**
Partial coursework completed for a Masters of Public Health

**M.D., Howard University College of Medicine, Washington, D.C., May 2004**
President, Class of 2004 Student Council
Chair, Class of 2004 Scholarship Committee
Recipient, Dr. Charles A. Pinderhughes Psychiatry Scholarship
Delegate, Student National Medical Association
Group Leader, Department of Pediatrics Youth Anger Management Initiative
Student Leader Representative, Liaison Committee for Medical Education
Student Tutor, Howard University College of Medicine Psychiatry Course

**Fellow, University of Regensburg, Regensburg, Germany, September 2003**
Certificate of International Telemedicine Applications, Asklepios International Telemedicine Consortium

**B.S., Howard University, Washington, DC, May 1999**
Major: Biology; Minor: Chemistry

## ACADEMIC APPOINTMENTS:

**Clinical Assistant Professor, May 2020 to Present**
Department of Psychiatry
University of Maryland School of Medicine
Baltimore, MD

**Assistant Professor, August 2017 to Present**
Department of Psychiatry and Behavioral Sciences
George Washington University School of Medicine and Health Sciences
Washington, DC

**Clinical Faculty, July 2015 to 2018**
Forensic Psychiatry Fellowship Program
Saint Elizabeths Hospital
Washington, DC

# WORK EXPERIENCE:

**Emergency Psychiatrist, University of Maryland Medical Center, May 2020 to Present**
- Provide comprehensive emergency psychiatric assessment and treatment, including medication management and crisis and supportive psychotherapy, to patients who are in Psychiatric Emergency Service; and when requested to the hospital psychiatry consultation-liaison service and the emergency department.
- Conduct evaluations for presence of suicidal thoughts, plans and risk as well as evaluations for risk for violence; and, provide evaluation and stabilizing treatment of psychiatric disorders including but not limited to serious mental illnesses, substance use disorders, and underlying medical causes of symptoms presenting as a mental illness.
- Arrange admission to the appropriate level of care for continued treatment when warranted including inpatient, partial hospitalization, and outpatient psychiatric and substance use treatment services.
- Provide clinical and formal instruction on the field of psychiatry to Psychiatry Residents.

**Psychiatric Hospitalist, George Washington University Hospital, August 2017 to Present**
- Provide comprehensive psychiatric assessment and treatment, including medication management and psychotherapy, to inpatients who are on the psychiatry unit, consultation-liaison service, or in the emergency room.
- Conduct evaluations for the decisional capacity, presence of suicidal thoughts, plans and risk as well as evaluations for risk for violence, and underlying medical causes of symptoms presenting as a mental illness.
- Provide clinical and formal instruction on the field of psychiatry to Psychiatry and Neurology Residents, and, Medical and Physician Assistant Students.
- Responsibilities also include: participating in hospital committees, quality improvement endeavors, assisting with educational seminars for residents and medical students, forensic psychiatry evaluations, and participation in research.

**Independent Mental Health Monitor, May 2017 to Present**
- Provide recommendations on evidence-based correctional psychiatry in a jail setting in accordance with the U.S. Department of Justice Consent or Settlement Agreements (CA/SA) with various departments of corrections and/or jail health care provider companies.
- Collaborate with a multi-disciplinary court-appointed team that includes Independent Monitors, Attorneys, and correctional professionals with specialization in correctional standards of operation and policy for officers, evidence-based correctional medicine, and safety in a correctional setting.
- Areas of focus for clinical recommendations include, but are not limited to, psychiatric assessment and treatment, including medication management, psychotherapy, behavioral management, and crisis intervention for patients incarcerated in correctional facilities with psychiatric illness or who presented with psychiatric symptoms.
- Provide recommendations on mental health policies, grievances, quality improvement, and peer review.
- Review incidents of suicide, suicide attempt, self-harm, and violence involving mentally ill patients.
- Work with correctional and correctional health care company leadership on an as needed basis for all areas of focus above.
- Perform site visits to all correctional facilities to assess the progress of all parties towards meeting the

directives in the CA/SA, prepare a report of the findings, and report the findings to the court.
- Provide regular reports to the court regarding the progress of the correctional staff and the correctional health care provider in meeting the directives in the CA/SA.
- Participate in monthly meetings with all parties.

**Owner, Kahlil Johnson Psychiatry, LLC, May 2017 to Present**
- Evaluate and assess human behavior and mental health within a legal context and assist the court, legal professionals, or others with cases involving parties who may have mental disabilities and disorders that interest with my areas of expertise.
- Perform psychiatric assessment and forensic evaluations of persons in correctional institutions, secure hospitals, the community, and other settings.
- Areas of focus include but are not limited to: Correctional Psychiatry, Asylum and Immigration, Competency to Stand Trial, Decisional Capacity, Criminal Responsibility, Risk Assessment, Fitness-for-Duty, and Disability Assessment.

**Psychiatrist, MedOptions, Inc., September 2016 to September 2017**
- Provide psychiatric assessment and treatment, including medication and behavioral management, to patients residing in assisted living and skilled nursing facilities who are in need of evaluation for psychiatric illness or who present with psychiatric symptoms due to underlying medical illness.
- Perform decisional capacity evaluations on patients with dementia or other illnesses.
- Conduct evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence.
- Work with a collaborative treatment team that includes psychiatric nurse practitioners, psychologists, and clinical social workers.
- Coordinate patient care with facility clinicians and administrators.

**Psychiatric Consultant, Bread for the City, May 2013 to July 2016**
- Led monthly on-site meetings to provide training that includes evidenced-based diagnosis, treatment, and best-practice chronic care management of common outpatient psychiatric conditions.
- Reviewed cases with both primary care providers and social work staff and advised on best-practice evidence-based treatment.
- Provided non-urgent Psychiatric consultation via phone, email, or text message with a 24-hour response time and served as an informational resource for psychiatric and mental health service options in the District of Columbia.

**Director of Psychiatry, Unity Health Care, Inc., January 2012 to June 2016**
- Ensured all Psychiatry providers observed HIPAA and other local and federal compliance regulations and functioned collaboratively with the health and human services offered at Unity Healthy Care, Inc. and the Washington, D.C. Department of Corrections and that all personnel of the Department were compliant with the administrative policies and procedures of both organizations.
- Identified, implemented, and supervised the clinical delivery of best practice behavioral healthcare.
- Ensured that Psychiatry providers were fully trained in all aspects of their work; especially in crisis intervention and suicide prevention at the Washington, D.C. Department of Corrections.
- Monitored psychiatric and mental health providers to assure accuracy and quality in their work. Also, periodically monitored psychiatric and mental health records, provided appropriate feedback and took corrective action, when necessary.
- Oversaw and conducted peer review of Psychiatric Providers.
- Established collaborations and partnerships with mental health providers within the District of Columbia and with national networks of Community Health Centers and Departments of Correction.
- Participated effectively as a representative of Unity Health Care, Inc. with the Washington D.C. Departments of Mental Health and Corrections, other offices of the District of Columbia, and local and national community/advocacy groups.
- Prepared testimony on mental health policy and testified under oath on behalf of Unity Health Care, Inc.
- Assessed opportunities to increase reimbursement for mental health services.
- Collaborated with the Medical and Health Center Directors to provide leadership and ensure coverage for all

Unity Health Care, Inc. sites and services.
- Provided leadership with Unity Health Care, Inc. quality improvement efforts, including outside agency evaluation and accreditation review.
- Performed the clinical duties of an adult Psychiatrist at Unity Health Care, Inc. at the Washington, D.C. Department of Corrections, and various Community Health Centers in Washington, D.C.

**Lead Psychiatrist at Washington D.C. Jail, Unity Health Care, Inc., August 2011 to January 2012**
- Developed comprehensive and therapeutic treatment plans for assigned caseload and provided direct services based on established treatment.
- Managed on-site crisis intervention.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.
- Assisted with educational seminars for Unity Health Care, Inc. and the Washington, D.C. Department of Corrections staff, and interviewing potential new hires for psychiatric staff. Supervised the Psychiatrists at the D.C. Central Detention Facility and Central Treatment Facility.
- Performed duties as assigned, which included but were not limited to: psychiatry peer review and quality improvement activities, attending the Washington, D.C. Department of Corrections Quality Improvement monthly meetings, directing the Psychiatry monthly meetings, and attending other meetings as assigned.
- Worked closely with the Mental Health Coordinator, Health Services Administrator, and Medical Director on tasks involving overall mental health care management to effectively promote quality of care, operational efficiency, problem-solving, etc.
- Coordinated psychiatry schedule to include approval of scheduled absences and ensure psychiatry coverage.
- Collaborated to improve or maintain provider/staff/patient satisfaction, quality of care, and productivity, provided feedback to the Medical Director and completed annual psychiatric provider evaluations.
- Represented Unity Health Care, Inc. in city-based mental health functions as determined by the Medical Director of Correctional Medicine.
- Oriented new psychiatric providers to site and served as a psychiatric resource to all providers at site.

**Staff Psychiatrist at Washington D.C. Jail, Unity Health Care, Inc., November 2009 to August 2011**
- Provided comprehensive psychiatric assessment and treatment, including medication management, to inmates who had a previous history of mental illness or who are in need of evaluation for possible mental illness.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.
- Interviewed potential new hires for psychiatric staff.
- Responsibilities also included: participating in quality improvement endeavors at the facility, updating jail mental health policies and clinical procedures, assisting with educational seminars for Unity Health Care, Inc. and Washington, D.C. Department of Corrections staff.

**Congressional Fellow, American Psychiatric Association, January 2009 to November 2009**
- Jeanne Spurlock Congressional Health Policy Fellow in the Office of Congressman Edolphus Towns, Chairman of the Committee on Oversight and Government Reform (NY-10th Congressional District), acting as a liaison between the Congressman, constituents, private and public sector representatives and Congressional staff regarding health policy.
- Advised and briefed the Congressman on proposed legislation, laws and contemporary issues of debate within health policy, including providing the Congressman with talking points for speeches and language regarding health care for presentations and letters to Congressional members and constituents.
- Prepared and delivered remarks on the Congressman's behalf.
- Researched health care issues for the Health Counsel on the Committee of Oversight and Government Reform and interviewed expert and lay witnesses for pre-hearing investigation and information gathering.
- Presented on the Health Care Reform Initiative at a Health Care Town Hall meeting, held in Brooklyn, NY and assisted with its planning.
- Facilitated negotiations to include two of the Congressman's bills in the current House of Representatives Affordable Health Choices Act (H.R. 3200). Duties also included writing and altering bill language before

the presentation of bills to the House of Representatives Clerk's Office for assignment of a bill number, performing district health care site visits on behalf of the Congressional office with the Deputy Chief of Staff and staffing several events for the Congressman.

**PRN Psychiatrist, Washington D.C. Jail, Unity Health Care, Inc., February 2008 to November 2009**
- Provided comprehensive psychiatric assessment and treatment, including medication management, to inmates who have a previous history of mental illness or who are in need of evaluation for possible mental illness.
- Conducted evaluations for the presence of suicidal thoughts, plans, and risk as well as evaluations for risk for violence and underlying medical causes of symptoms presenting as a mental illness.

**Core Member, Homeland Security Institute Panel on Community Perception of New Technology, August 2007 to February 200**
- Worked with a multi-specialty panel of experts drawn from a cross section of all relevant professions to provide expert opinion on the potential population impact of new technologies in consideration for use by the U.S. Department of Homeland Security.
- Provided specific expert opinion on the potential medical, psychiatric, and behavioral impacts of the new technologies under consideration for use.
- Provided written feedback upon request.

**Research Intern, American Psychiatric Association, August 2004 to February 2005**
- Assisted with the implementation and preparation of a grant proposal for a psychiatric study examining first episode of antipsychotic use.
- Conducted literature reviews for treatment patterns of Attention Deficit Hyperactivity Disorder and literature reviews to identify strategies that have been effective in bringing about quality improvement in physicians' practices, and reported that information to the Director of the American Psychiatric Institute for Research and Education for presentation to the American Board of Psychiatry and Neurology for the physician practice recertification proposal.

## PUBLICATIONS & ARTICLES:

- Johnson K.  The Road to Health Policy: One Resident's Story.  American Journal of Psychiatry Resident's Online Journal, pg. 4, May 2009.
- Maxwell C.J., Reddy R., White-Coleman D, Taylor G.L., Johnson K.A.  A Comparison of Pre/Post-Menopausal HIV Infected African American Women at a Minority Teaching Hospital. Presented at the 15th International AIDS Conference, Bangkok (Thailand), July 11- 16, 2004.  Printed in the International Proceedings by Medimond, Bologna, Italy; pg. 127-131.  Vol. ISBN 88-7587-065-9.

## MEDIA:
- Arehart-Treichel, J. Nothing Bars This Psychiatrist From Helping Inmates. Psychiatric News, March 2, 2012, Vol 47 (5), pg. 12-29.
- Hausman, K. Resident Finds Rewards Atop Capitol Hill. Psychiatric News, April 2, 2010, Vol 45 (7), pg. 11.

## PRESENTATIONS:

- **"Excellence in Mental Health Advocacy: Case Studies in the Nongovernmental, Federal, and Legislative Arena"** Session, American Psychiatric Association Annual Meeting, May 2019
- **"Depression in Primary Care"** George Washington University School of Medicine and Health Sciences, recurring 3rd year medical student primary care clerkship lecture, March 2019 to present
- **"Substance Related Disorders"** George Washington University School of Medicine and Health Sciences, part of the annual 2nd year medical student Brain and Behavior lecture series, September 2018 to present
- **"Managing Psychiatric Emergencies: A Brief Guide for the Intern"** George Washington University Department of Psychiatry, Annual Lecture, June 2018

- **"Violence Risk: Practice Relevance"** George Washington University Department of Psychiatry, Grand Rounds, January 2018
- **"Risk Factors for Terrorism: A Literature Review"** St. Elizabeths Hospital Forensic Psychiatry Fellowship, Washington, D.C., Presentation, May 2017
- **"The Appropriateness of Psychiatric Diagnosis and Psychotropic Medication Prescribing"** St. Elizabeths Hospital Forensic Psychiatry Fellowship, at the Washington, D.C. Department of Corrections, QI Study Presentation, December 2016
- **"The Appropriateness of Psychotropic Prescribing Practices"** Unity Health Care, Inc., at the Washington, D.C. Department of Corrections, QI Study Presentation, December 2010
- **"Psychiatric Disorders and Treatment Options"** Unity Health Care, Inc. at the Washington, D.C. Department of Corrections, Quarterly Mental Health Correctional Officer's Training, November 2009 to June 2016
- **"Interactions Between ART and Psychiatric Medications"** with Andrew Catanzaro, M.D., Unity Health Care, Inc., Washington, D.C. Department of Corrections Provider Meeting, May 2010
- **"America Can't Afford to Wait for Healthcare Reform"** Health Reform Town Hall, U.S. Representative Ed Towns, May 2009 **"The Man Who Can't Stop Swallowing Sharp Objects: Medical Ethics and Management Limitations in Patients with Chronic Factitious Disorder"** Issue Workshop, American Psychiatric Association Annual Meeting, May 2008
- **"Factitious Disorder: Clinical, Ethical and Legal Management Issues"** Morbidity and Mortality Conference, November 2007
- **"Dying, Death, and Bereavement"** George Washington University Department of Psychiatry, Medical Illness Conference, August 2007
- **"Uncontrollable Swallowing: A Case Conference"** Medical Illness Conference, July 2007
- **"Near Death Experiences: A Closer Look**" George Washington University Department of Psychiatry, Grand Rounds, January 2007

## PROFESSIONAL MEMBERSHIPS:
American Psychiatric Association
American Academy of Psychiatry and the Law
National Commission on Correctional Health Care

## LANGUAGE PROFICIENCY:
Fluent in English.
Beginners level Spanish

**Mary Perrien, Ph.D.**
3313 W. Cherry Lane, Suite 333
Meridian, ID 83642
(208) 965-0875
mperrien@safesocietysolutions.com

| | | |
|---|---|---|
| **EDUCATION** | **University of Hawaii, Manoa** | |
| | Doctor of Philosophy, Clinical Psychology | 1998 |
| | Master of Arts, Clinical Psychology | 1994 |
| | **San Jose State University** | |
| | Bachelor of Arts, Psychology | 1991 |
| **LICENSURE STATUS** | PSY18582 (California) | |
| | PSY 202317 (Idaho) | |
| **TRAINING** | Internship in Clinical Psychology | 1997-1998 |
| | Atascadero State Hospital | |
| | Atascadero, California | |
| **PROFESSIONAL EXPERIENCE** | **Expert Consultant** | 3/2019-present |
| | Correct Care Solutions, LLC | |
| | **Expert Consultant** | 2017-11/2020 |
| | Alabama Department of Corrections | |
| | **Expert Consultant** | 2014-2015 |
| | Idaho Department of Correction | |
| | **Expert Consultant** | 2012-2014 |
| | Ohio Department of Rehabilitation and Correction | |
| | **Expert Consultant** | 2012-2013 |
| | National Institute of Corrections | |
| | **Expert Consultant** | 2011-2012 |
| | Illinois Department of Corrections | |
| | **Safe Society Solutions, LLC** | 2010 to present |
| | Sole Proprietor, forensic evaluator and expert Witness (for defendants and plaintiffs) practice | |
| | **Expert Consultant** | 2010-present |
| | Department of Homeland Security, Civil Rights and Civil Liberties (function as a subcontractor) | |

**PROFESSIONAL**
**EXPERIENCE**
**Continued**

| | | |
|---|---|---|
| **Expert Consultant** | | 2007 to present |
| United States District Court, Eastern | | |
| District of California (*Coleman et al. v. Newsom et al.*) | | |
| Case No. 90-0520 LKK-JFM | | |

**Chief, Division of Education and Treatment**  2006-2010
Idaho State Department of Correction

**Chief Psychologist/Director of Mental Health**  2005-2006
Idaho State Department of Correction

**Chief Psychologist/Director of Mental Health**  2003-2005
**Services – Correctional Facility**
California State Prison at Corcoran

**Senior Psychologist, Supervisor – Correctional**  2001-2003
**Facility**
California State Prison at Corcoran

**Psychologist - Clinical, Correctional Facility**  2000-2001
California State Prison at Corcoran

**Staff Psychologist**  1998-2000
Federal Correctional Institution, Butner

**Therapist/Researcher**  1996-1997
Honolulu Police Department

**Therapist/Group Facilitator**  1994-1997
Child & Family Services, Hawaii

**Therapist/Group Facilitator**  1994-1997
Department of Public Safety, Hawaii

**TEACHING**
**EXPERIENCE**

**Guest Lecturer, various Psychology and**  2006-2014
**Criminology courses**
**Boise State University**

**Instructor, Correctional Peace Officers Standards**  2006-2014
**& Training Academy (Idaho)**

**Lecturer**  multiple 1994-1997
**Department of Psychology, University of Hawaii**

**PUBLICATIONS &
TECHNICAL
REPORTS**

Perrien, M. and O'Keefe, M. (2015). Disciplinary Infractions and Restricted Housing. In *Oxford Textbook of Correctional Psychiatry.* New York NY: Oxford University Press.

Perrien, M. (2010). Mental Health Guidelines and Documentation for Psychotherapists. In *Manual of Forms and Guidelines for Correctional Mental Health.* Washington DC: American Psychiatric Publications.

Perrien, M. (2009).  Sex offenders:  Analysis of best practice and current practice in Idaho for case disposition, assessment, treatment and supervision.  A Report provided to the Idaho Criminal Justice Commission.

Perrien, M. (2008).  Sex offenders: The current practices in the State of Idaho for case disposition, assessment, treatment and supervision. A Report provided to the Idaho Criminal Justice Commission.

Kunitake, M., Perrien, M., Yokoi, E., Perrone, P., Green, T., Sakamoto-Cheung, S., & Richmond, J. (1997).  Felony sexual assault arrests in Hawaii.  Crime Trend Series:  State of Hawaii Department of the Attorney General, 5(2), 1-9.


**PRESENTATIONS**

Perrien, M. (September 2009).  Presenter at the annual Idaho District Judges Retreat Training, Twin Falls, Idaho.

Perrien, M. (January-March 2009).  Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2009).  Presenter at the annual Idaho District Judges Seminar.  Boise, ID.

Perrien, M. (December 2008).  Educating correctional officers to respond to medical emergencies.  A paper presented at the conference Operational Excellence in Correctional Healthcare, Las Vegas, NV.

Perrien, M. (September 2008).  Panel Presenter at the annual Idaho District Judges Retreat Training.  Sun Valley, Idaho.

Perrien, M. (January-March 2008).  Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2008).  Presenter at the annual Idaho District Judges Seminar.  Boise, ID.

Perrien, M. (September 2007).  Panel Presenter at the annual Idaho District Judges Retreat Training.  Sun Valley, Idaho.

Perrien, M. (January-March 2007).  Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2007).  Panel Presenter at the annual Idaho District Judges Seminar, Boise, Idaho.

**PRESENTATIONS**
**Continued**

Perrien, M. (November 2006).  Suicide Risk Management in Corrections.  Paper presented at the Idaho Suicide Prevention Action Network Conference, Boise, Idaho.

Perrien, M. (November 2006).  Mental Health Care in Corrections and Community Corrections.  Presentation to District 7 Judges, Idaho Falls, Idaho.

Perrien, M. (October 2006).  Correctional Mental Health Care in Idaho.  Presentation to the Mental Health and Substance Abuse Treatment Delivery Systems Interim Legislative Committee.

Perrien, M. and Muller, C. (June 2006).  Cultural Competence and Multi-cultural Psychology.  Paper presented at the Idaho Mental Health Coalition Conference, Boise, Idaho.

Perrien, M. (April 2006).  Sex Offender Treatment in Correctional Setting.  Paper presented at the annual National Commission on Correctional Health Care Updates Conference, Las Vegas, Nevada.

Perrien, M. (November 2005).  Sex Offender Risk Assessment.  A training for clinical staff employed by the Idaho Department of Correction and Corrections Corporation of America.

Perrien, M. (October 2005).  Sex Offender Management.  Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Boise, Idaho.

Perrien, M. (September 2005).  Sex Offender Management.  Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Pocatello, Idaho.

Perrien, M. (April 2003).  Cultural Competence and Multi-cultural Mental Health Services.  A training workshop presented to mental health staff at CSP-Corcoran.

Perrien, M. (2002, multiple).  Forensic Evaluations and Courtroom Expert Testimony. A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2001, multiple).  Psychopathy and the Hare Psychopathy Checklist, Revised.  A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2000, February).  The Assessment, Treatment, Management and Community Supervision of the Sex Offender.  A training workshop provided to U.S.Probation Officers, Long Island, NY.

Perrien, M. (1999, July).  Psychopathy and the Hare Psychopathy Checklist, Revised.  A training workshop for predoctoral interns presented at the Federal Correctional Institution at Butner.

Perrien, M. (1999, April).  Psychopathy and the Hare Psychopathy Checklist Revised.  A training workshop for doctoral and masters level staff in the Sex Offender Treatment Program at the Federal Correctional Institution at Butner.

**PRESENTATIONS**

**Continued**

Perrien, M. & Kunitake, M. (1997, February). Demographic characteristics of felony sex assault arrestees in Hawaii. Paper presented to the Hawaii State Legislature at an Informational Symposium on Community Notification of Sex Offenders in Honolulu, Hawaii.

Perrien, M. & Kunitake, M. (1997, February). Registration and community notification of sex offenders in Hawaii. Paper presented at the annual meeting of the Western Society of Criminology conference in Honolulu, Hawaii.

Perrien, M. & Marsella, A.J. (1996, April). Reported frequencies and perceived severity ratings of traumatic and near-traumatic events among college students. Paper presented at the meeting of the Western Psychological Association, Santa Clara, California.

## ASSOCIATIONS/MEMBERSHIP

American Psychological Association, member
American Psychology-Law Society, member
Association for Behavioral and Cognitive Therapies, member
Association for the Treatment of Sexual Abusers, clinical member
National Commission on Correctional Health Care, member
World Professional Association for Transgender Health, member

## COMMUNITY APPOINTMENTS

Idaho State Planning Council on Mental Health, appointed by the Governor, 2009 and 2010.

## EXPERT WITNESS & CONSULTING

*Abdiwali Musse v King County et al.* (2020 to present) Assessment of adequacy of care and risk assessment in the assault in custody of jail detainee. Pending expert discovery. King County Superior Court, State of Washington, Seattle Courthouse (Retained by plaintiff, report and possible deposition with testimony expected).

*Lorenzo Mays, et al v County of Sacramento.* (2020 to present) Monitoring Expert. Assessment of implementation of consent decree for mental health services in county jail. U.S. District Court, Eastern Division (Appointed via agreement by both parties).

*Toby Meagher, et al v King County, et al.* (2019 to present) Assessment of adequacy of care in the assault in custody of jail detainee. Pending hearing. U.S. District Court, Western District of Washington (Retained by plaintiff, report and deposition with testimony expected).

*Edward Braggs, et al v Jefferson Dunn (ADOC), et al.* (2018-present) Multiple court-ordered assessment reports including suicide prevention and functional segregation. U.S. District Court, Middle District of Alabama, Northern Division (Retained by defendants).

*The estate of Marc Moreno v Benton County Sheriff et al. (December 2017)* Assessment of adequacy of care in the death in custody of jail detainee. Case in mediation. Benton County, Washington. (Retained by plaintiff, report).

*The estate of Mathew Ajibade et al v Wilcher et al. (June 2017)* Assessment of adequacy of care in the death in custody of jail detainee. Case set for trial; deposition taken. U.S. District Court, Southern District of Georgia. (Retained by plaintiff, report and deposition testimony).

**EXPERT WITNESS & CONSULTING Continued**

*Potter v State of Idaho Department of Health and Welfare.* (May 2017) Provided expert testimony regarding the reliability and validity of recovered memories as well as the adequacy of investigations into allegations of sexual abuse. Idaho state hearing, appeal of finding. (Retained by defendant, report and testimony).

*The estate of Gordon Powell v Barnes et al.* (May 2017) Assessment of mental health staff and the adequacy of care in the murder of an inmate. U.S. District Court, Western District of Washington. (Retained by plaintiff, report).

*Edward Braggs v Jeffrey Dunn (Alabama Department of Correction) (2017)* Expert consultation to defendants post-litigation regarding adequacy and needs of current mental health service delivery system; provide expert assistance in mediation process; provide expert testimony and assistance in failed mediation trial matters, conducted staffing and suicide prevention assessment. (Retained by defendant, report and trial testimony)

*Disability Rights Florida, Inc. v Julie Jones, Secretary Florida Department of Corrections, et al.* (2016-2017) Consulting expert to plaintiffs to conduct assessments of the inpatient units at all facilities except for Dade Correctional Institution and develop recommendations on issues of mental health treatment, staffing, training and quality improvement. U.S. District Court, middle District of Florida. (Retained by plaintiff, report)

*Walker v Wall, Director, Rhode Island Department of Corrections et al.* (February 2016) Evaluated adequacy of care in post-PREA incident. Provided deposition testimony. U.S. District Court, District of Rhode Island. (Retained by defendant, report and deposition testimony).

*HENRY A. DLUGACZ*
*99 Park Avenue, 26/PH*
*New York, N.Y. 10016*
*212/490-0400; 646/346.0646*
*hdlugacz@blhny.com*

## EDUCATION

*Juris Doctor*, New York Law School 1991 *cum laude*
Moot Court Certificate of Honor; Notes & Comments Editor, Human Rights Journal

*Master of Social Work*, Hunter College School of Social Work 1981

*Bachelors of Art*, Queens College, 1979 *cum laude*
Departmental honors; honors program in the study of the Humanities

## CURRENT APPOINTMENTS

2009-        *Partner,* Beldock, Levine & Hoffman LLP, New York, N.Y.

2007-        *Expert, Correctional Mental Health*
             *Coleman vs. Schwarzenegger,* 912 F. Supp. 1282 (E.D. Cal. 1995)
             United States District Court, Eastern California
             Member of Special Master's expert panel in remedial phase of class action lawsuit
             involving mental health care in entire California prison system and portions of the
             Department of State Hospitals.

2003-        *Compliance Monitor***,** *Brad H. et al. v City of New York, et al.* 117882/99
             Supreme Court, State of New York, County of New York
             One of two court-appointed monitors monitoring compliance with
             Stipulation involving reentry planning for inmates with mental disabilities
             for entire New York City jail system including hospital forensic units.

1997-        *Assistant Clinical Professor of Psychiatry & Behavioral Science*
             New York Medical College, Valhalla, N.Y.
             Until mid-2010 core faculty in teaching hospital-based forensic psychiatry
             fellowship program: correctional mental health, forensic issues; didactic training;
             evaluation; expert witness training; currently on voluntary faculty.

1993-        **Court Evaluator and Guardian**, New York State Supreme Court
             Certified by Association of the Bar of the City of New York. Appointed by
             judges to perform independent evaluations of alleged incapacitated persons;
             appointed to serve as guardian.

## EXPERIENCE

2000-2018    *Mediator*
             United States District Court for the Eastern District of New York

Mediation and Arbitration Panel for Federal-Court annexed mediation. Appointed to "Superstorm Sandy" Mediation Panel.

2017      **Consulting Expert, Correctional Mental Health**
Disabilities Rights Maryland, Baltimore, Maryland
Guided site visit of North Branch Correctional Institution, the state's "Super-Max" prison; assisted in preparation of report.

2014-2015    **Assistant Monitor**
*Rasho et al. vs. Walker et al.* Case No. 07-1298
United States District Court Central District of Illinois
Assisted in court-appointed monitoring of class action lawsuit involving mental health care in entire Illinois prison system.

2002- 2014    **Adjunct Professor of Law**, New York Law School, N.Y., N.Y.
(Mentor-Professor 2002-2006, Adjunct Professor 2006-2014)
Co-taught in Nicaragua on State Department grant. Co-created interdisciplinary course on Mental Health Issues in Jails and Prisons.

2012      **Expert Consultant, Mentally Disordered Offenders**
Mental Disabilities Rights International/American Bar Association Rule of Law Initiative, Mexico City, Mexico

2012      **Consulting Expert, Correctional Mental Health**
Bureau of Corrections, US Virgin Islands (St. Croix)
*USA v. Virgin Islands et al.* No 86-265 (D.V.I.)
Conducted bureau's "self-assessment" of correctional mental health system.

1993-2010    **Private consulting, monitoring and legal practice**
Focused on mental health; corrections; court monitoring of complex litigations; mediation; forensic and disabilities issues; health-care. Regularly tried cases in Mental Hygiene Parts of Kings County and New York County Supreme Court; appointed as guardian and independent Court Evaluator in guardianship proceedings.

2000-2010    **Private Counsel, Mental Health and Healthcare**
St. Vincent's Catholic Medical Center, N.Y., N.Y.
Represented hospital in mental hygiene hearings in New York State Supreme Court, retention, treatment over objection, guardianships. Advised and conducted negotiations on contracts, student affiliation, and clinical research agreements.

2007-2010     **Expert, Correctional Mental Health,** New Mexico Protection & Advocacy/New Mexico ACLU/Bazelon Center
*Bravo et al v Board of Commissioners of Dona Ana County et al.*
United State District Court for the District of New Mexico
Inspected jail, assessed mental health care, recommended remediation; active participation in successful settlement negotiations of federal class action lawsuit involving mental health care and reentry planning

2009     **Invited Witness, Correctional Mental Health and Reentry**
New Jersey General Assembly, Trenton, New Jersey
Invited to testify at hearings conducted by the Majority Leader. Testified on correctional mental health and reentry planning.

2007-2009     **Expert Consultant, Correctional Mental Health**
*Hadix v. Caruso*, No. 4:92-CV-00110-RAE
United State District Court, Western District of Michigan
Mental Health Consultant to the Office of the Independent Medical Monitor in class action lawsuit involving health and mental health care.

2002-2008     **Founding Co-Chair**, New York State Bar Association, Albany, N.Y.
Committee on Mental Health Issues of Healthcare Law Section

2005-2006     **Mediator,** *Pierce County et al v State of Washington et al,* (03-2-00918-8)
Superior Court, Thurston County, Washington State
Co-mediated settlement of complex class action lawsuit with multiple public and private parties involving funding, discharge planning, and community mental health treatment issues. Appointed by court on consent of the parties as mediator of discharge-planning aspects of settlement.

2001-2006     **Adjunct Professor of Law**
St. John's University School of Law, Queens New York
Taught law school seminar on mental health law.

2005     **Invited Witness**
New York State Assembly, Albany, New York
Invited to testify in hearings before three Assembly Committees concerning enactment of civil commitment statute for sex offenders.

2005     **Expert Trainer**
European Court of Human Rights/ Mental Disability Advocacy Center
Council of Europe, Strasbourg, France
Under auspices of the Council of Europe, Court of Human Rights & MDAC conducted training for lawyers on multi-disciplinary support during litigation for clients with mental disabilities

2001-2005    **Federal Court Monitor/Expert Consultant**
*Rust et al. v. Western State Hospital, et al.* (C00-5749)
Western District of Washington
Federal class-action litigation involving state forensic
hospital. Was lead expert for plaintiffs; later appointed as one of two court
monitors to report on and assist in the attainment of compliance with order
involving active treatment, treatment planning, discharge plans, patient risk
assessment, staffing levels, physical plant issues, hospital census.

2002    **Contributor/Reviewer**, American Public Health Association, Task Force
Standards for Health Services in Correctional Institutions

2001    **Expert Consultant**
Mental Disability Rights International, Washington, D.C.
Conducted inspections of facilities and training in Mexico City.

2000- 2001    **Expert Consultant Corrections (Mental Health and Generalist)**
PricewaterhouseCoopers, Fair Lakes, Virginia
As part of multidisciplinary team, evaluated correctional facilities pursuant to
agreement with the United States Department of Justice, US Marshall Service and
Immigration and Naturalization Service.

2000- 2001    **Expert Consultant/Correctional Mental Health**
Council of State Governments, New York, N.Y.
Consultant to corrections work group of interdisciplinary project
regarding persons with mental disabilities in the criminal justice system.
Worked with State Senators, corrections and mental health commissioners,
service providers and advocates.

**Expert and Mediator, Correctional Mental Health**
*Duran et al v King et al*, (77-0721JB)
Federal Court, District of New Mexico
For Special Master, led team in the monitoring mental health aspects of Consent
Decree in complex, class action lawsuit involving the entire state's prison system:
Assessed quality of care, referral to appropriate levels of care, credentialing of staff,
development of criteria for placement in segregation, evaluation of Quality
Improvement Plan, suicide prevention, postmortem reviews, policies, and
procedures; development of Corrective Action Plans. Co-mediated and monitored
termination plan.

1989-1998    ***Director of Mental Health Services & Acting Assistant Program Director of Healthcare Service***
Saint Vincents Hospital Correctional Health Program, N.Y., N.Y.
(*Director of Mental Health 1989-1998;*
*Acting Assistant Program Director 1996-1998*)
*As Acting Assistant Program Director*, assisted in directing all aspects of NCCHC & Joint Commission accredited, multi-site, ambulatory health care program; administrative oversight department heads including medical, radiology, nursing, dental, and dialysis service at same time ran entire mental health service.
*As Mental Health Director*, developed, implemented and directed entire multi-site JCAHO and NCCHC accredited correctional mental health program; developed and conducted CQI program; recruitment and evaluation of all psychiatrists, psychologists and social workers; developed policies and procedures; oversaw clinical care; conducted post-mortem reviews; implemented new programs such as: family and group therapy services; discharge planning services; developed screening and assessment protocols and instruments, and suicide prevention protocols.

1997-1998    ***Consultant***
American Psychological Association, Washington, D.C.

1992-1994    ***Law Clerk***
Saint Vincents Hospital, Department of Legal Affairs, N.Y., N.Y.

1987-1989    ***Mental Health Unit Chief***
Montefiore Medical Center/Rikers Island Health Service, Bronx, N.Y.
Direct responsibility for all aspects of mental health clinic in NYC jail-system's busiest intake facility; supervision of all mental health staff; decisions regarding appropriate levels of care; implemented new programs such as orientation screening; group therapy; inmate suicide prevention aide and correction officer training.

1987-1989    ***Recruitment and Education Coordinator***
Montefiore Medical Center/ Rikers Island Health Service, Bronx, N.Y.
Actively involved in most aspects of central office activities for entire Rikers Island mental health program including program development, research, development of evaluation instruments. In charge of recruitment and screening of medical and non-medical mental health staff. Developed on-going training programs, and retention activities.

1983-1987    ***Clinical Social Worker***
Montefiore Medical Center/Rikers Island Health Service, Bronx, N.Y.
Assessment, crisis intervention, short-term individual and group treatment of detainee population. Conducted assessment of thousands of individuals: decisions regarding appropriate level of care, and suicide risk level.

1981- 1983    ***Clinical Social Worker***
Mount Sinai Services (Hospital Female Forensic Unit), Elmhurst, N.Y.
Multi-disciplinary treatment/evaluation team member; individual and
family therapy; aided with competency to stand trial evaluations.
Maintained on-going caseload in outpatient psychiatry clinic; covered
Psychiatric Emergency Room.

## PUBLICATIONS

### Books:

**Lawyering Skills in the Representation of Persons with Mental Disabilities,** 2006**,**
Carolina Academic Press, M. Perlin, K. Gould, Cohen, **H. Dlugacz** & R. Friedman

**Mental Health Issues in Jails and Prisons,** 2008, Carolina Academic Press
Michael L. Perlin & **Henry A. Dlugacz**

**Competence in Criminal and Civil Law: From Legal Theory to Clinical
Applications**, 2008, John Wiley
Michael L. Perlin, Pamela Champine, **Henry A. Dlugacz** & Mary Connell

**Re-Entry Planning for Offenders with Mental Disorders: Policy and    Practice,**
2010, Civic Research Institute **Henry A. Dlugacz** (Editor)

**Re-Entry Planning for Offenders with Mental Disorders: Policy and    Practice,
Volume II,** 2015 Civic Research Institute **Henry A. Dlugacz** (Editor)

### Book Chapters:

*Liability Management and the Correctional Psychiatrist: A Review of Key Considerations*,
**Correctional Psychiatry: Practice Guidelines and Strategies**, (**Henry A. Dlugacz** &
Julie Y. Low) (Ole J. Thienhaus and Melissa Piasecki, eds. 2007, Civic Research Institute)

*A Continuum of Care for Adults with Mental Illness Leaving Jail and prison: A review of
essential reentry elements* (**Henry A. Dlugacz**, Nahama Broner, Stacy S. Lamon),
**Correctional Psychiatry: Practice Guidelines and Strategies**, (Ole J. Thienhaus and
Melissa Piasecki, eds.) 2007, Civic Research Institute)

*Clinically Oriented Reentry Planning in Correctional Settings*, **Handbook of
Correctional Mental Health Second Edition,** (Charles L. Scott Ed) 2010, American
Psychiatric Publishing) (**Dlugacz, H**. & Roskes, E.)

*The Criminal Justice System and Offenders Placed in an Outpatient Setting*,
**Handbook of Correctional Mental Health Second Edition,** (Charles L. Scott Ed) 2010,
American Psychiatric Publishing) (Roskes, E., Cooksey, C., Lipford, S., **Dlugacz, H.)**

*Ethical Issues in Correctional Psychiatry in the United States*, Ethical Issues in Prison Psychiatry (Konrad, Norbert; Völlm, Birgit; Weisstub, D.N. (Eds.), Springer Publishing, International Library of Ethics, Law, and the New Medicine, Vol. 46 2013 (**Dlugacz, H.**, Low, J., Wimmer, C., Knox, L.)

*Community Reentry*, **Oxford Textbook of Correctional Psychiatry**, Trestman, R, Metzner, J., Appelbaum, K, Eds**.** 2015 Oxford University Press (**H. Dlugacz**)

*Effective Non-Litigation Advocacy for Incarcerated Clients with Mental Disabilities*, **Representing People with Mental Disabilities: A Practical Guide**, K. Kelley Ed 2018 American Bar Association (**H. Dlugacz**)

**Journals Edited**:

Special Editor, New York State Bar Association Health Law Journal, Special Issue on Mental Health, Spring, 2006.

**Articles**:

*United States v. Charters: A Case in Two Acts: In Search of a Middle Ground* 7  New York L. Sch. J. of Human Rights 311 (1990). (**Dlugacz, H.**)

*Riggins v. Nevada: Towards a Unified Standard for a Prisoner's Right to Refuse Medication?*, 17 Law and Psychology Review 41 (1993). (**Dlugacz, H.**)

*Out-Patient Commitment: Some Thoughts on Promoting a Meaningful Dialogue* 53 New York L. Sch. L. Rev. 79 (2009). (**Dlugacz, H.**)

*It's Doom Alone That Counts: Can International Human Rights Law Be An Effective Source of Rights in Correctional Conditions Litigation?* Special Edition on Correctional Mental Health 27 Behavioral Sciences and Law (2009) (Perlin, M. & **Dlugacz, H.**)

*The Ethics of Representing Clients with Limited Capacity in Guardianship Proceedings,* The Saint Louis University Journal of Health Law & Policy (**Dlugacz, H**. & Wimmer, C.) Saint Louis University Journal of Health Law & Policy Vol. 4 Issue 2, 2011

*The Legal Aspects of Administering Antipsychotic Medications to Jail and Prison Inmates,* (**Dlugacz, H**. & Wimmer, C.) Special Issue of the International Journal of Law and Psychiatry on "Prisons and Mental Health" May-Aug; 36(3-4):213-28 2013

*Correctional Mental Health in the United States***,** Dlugacz, H., International Journal of Prisoner Health Vol. 10 No. 1 pp. 3-26  2014

*The Reach and Limitation of the ADA and its Integration Mandate: Potential Implications for the Successful Reentry of Individuals with Mental Disabilities in a Correctional Population.***, Dlugacz, H.,** & Droubi, L., <u>Behavioral Sciences and Law</u> Vol. 35 p 135 2017

*Custodial Suicide and Class Action Remedies: Current Obstacles and Future Directions,* **Dlugacz, H.,** Droubi, L., Gallagher, M., <u>Behavioral Sciences and Law</u>, Accepted for Publication

### <u>Encyclopedia Entries</u>

*Legal Dimension of Mental Health,* **Encyclopedia of Mental Health 2nd Edition**, Howard Friedman, Ed**.** Elsevier, **Dlugacz, H.,** Wimmer, C.

## <u>ACADEMIC</u>

2017        ***Invited Speaker***, Columbia University Medical Center, Division of Law, Ethics, and Psychiatry, Department of Psychiatry, N.Y., N.Y.

2013        ***Invited Keynote Speaker***, University of Texas, Brownsville, Texas

2012        ***Invited Lecturer,*** Benjamin N. Cardozo School of Law, N.Y., N.Y.

2011        ***Invited Lecturer,*** University of Maryland Schools of Medicine, Law and Social Work, Baltimore, MD

2011        ***Invited Lecturer***, Association of American Law Schools, S.F., CA.

2010        ***Invited Lecturer,*** Benjamin N. Cardozo School of Law, N.Y., N.Y.

2009-2010    ***Invited Reviewer,*** International Journal of Prison Health

2007-2008    ***Invited Reviewer***, John Wiley & Sons, Inc. Reviewed book proposals.

2006        ***Invited Lecturer***, New York State Judicial Institute
            Mental Hygiene Legal Services, First and Second Appellate Divisions

2006        ***Invited Reviewer,*** Journal of the International Academy of Law and Mental Health

2005        ***Faculty Member and Co-program Chair***
            New York State Bar Association, Continuing Legal Education Program on Mental Health Courts

2005        ***Invited Lecturer***, Columbia University Mailman School of Public Health, New York, New York

| | |
|---|---|
| 2003-2011 | ***Instructor for Mediation Exercise,*** New York University School of Law, New York, New York (on annual, volunteer basis) |
| 2002 | ***Invited Lecturer***, New York University School of Law, N.Y., N.Y. |
| 2002 | ***Moot Court Judge***, New York Law School, N.Y., N.Y. |
| 2000 | ***Invited Lecturer***, St. John's University School of Law, Queens, N.Y. |
| 1999 | ***Adjunct Assistant Professor*** Fordham University Graduate School of Social Service, N.Y.C. |
| 1998-1999 | ***Field Work Instructor*** Fordham University School of Social Work, N.Y., N.Y. |
| 1993-1994 | ***Lecturer***, New York University Graduate School of Social Work, N.Y.C. |
| 1992-1994 | ***Attorney-Mentor***, New York Law School, N.Y., N.Y. |
| 1993 | ***Invited Lecturer***, New York University School of Social Work, N.Y.C. |
| 1990 | ***Invited Lecturer,*** New York University School of Medicine, N.Y., N.Y. |
| 1987-1991 | ***Research Assistant*** New York Law School, Professor Michael Perlin |
| 1988-1990 | ***Invited Lecturer,*** New York Law School, N.Y., N.Y. |
| 1988 | ***Invited Lecturer,*** Hofstra University**,** N.Y. Hempstead, N.Y. |
| 1984-1985 | ***Field Work Instructor,*** Hunter College School of Social Work, N.Y.C. |

## Presentations: Legal, Policy, Administrative, Clinical Issues in Mental Health Care

Speaker and Panelist, American Bar Association Webinar, February 2020

Speaker and Panelist, American Psychiatric Association Mental Health Services Meeting, New York, N.Y. October 2019

Invited Speaker, Oklahoma Department of Human Services, The Practice and Policy Lecture Series, Oklahoma City, OK August 2014

Invited Speaker, American Psychological Association/American Bar Association Joint Conference on Violence, Washington DC May 2014

Invited Speaker and Discussant, New York State Psychological Association Forensic Division Conference on Violence Risk Assessment, New York, N.Y. Sept. 2013

Invited by the New York State Commission on Quality of Care to participate in a Roundtable discussion on New York State's "Olmstead Plan" Albany New York 2014)

33rd International Congress on Law and Mental Health, Amsterdam, Netherlands July 2013

Invited Speaker, American Public Health Association, Washington, D.C. November, 2011

Invited Speaker, Association of the Bar of the City of New York, N.Y. Continuing Legal Education Program on representation of clients with diminished capacity, November, 2011

32rd International Congress on Law and Mental Health, Humboldt University, Berlin, Germany July, 2011

31nd International Congress on Law and Mental Health, New York University School of Law, New York, N.Y., June 2009 (paper presented by co-author)

30th International Congress on Law and Mental Health, University of Padua, Padua, Italy, June 2007

Continuing Legal Education Seminar, conducted for Criminal Court Judges of the Manhattan Criminal Court, Brooklyn, N.Y., April, 2007

Lincoln Hospital, Department of Psychiatry, Grand Rounds, November, 2006

New York State Assembly Roundtable on Criminal Penalties and Legislation on Civil Commitment of Sex Offenders. (participant) July, 2005

29th Congres International de Droit et de Santé Mentale/Laboratoire d'Ethique Medicale et de Sante Publique/Faculte de Medecine de Necker, Universite Rene Descartes (International Congress on Law and Mental Health) Paris, France, July 2005

XII World Congress of Psychiatry, Yokohama, Japan, August, 2002

National Association of Developmental Disabilities, New Orleans, Louisiana, October 2001 (paper was presented by a colleague)

XXV Congres International de Droit et de Sante Mentale (International Congress on Law and Mental Health) University of Siena, Siena, Italy July 2000

American Psychology-Law Society and the European Association of Psychology and Law, Trinity College, Dublin, Ireland, July 1999

XXIII Congres International de Droit et de Santé Mentale/Laboratoire d'Ethique Medicale et de Sante Publique/Faculte de Medecine de Necker, Universite Rene Descartes (International Congress on Law and Mental Health) Paris, France, June 1998

New York University, Annual Forensic Mental Health Conference, NY, NY, June, 1998;

Saint Vincents Hospital, Department of Psychiatry Grand Rounds, NY, NY April,1998

Saint Barnabas Hospital, Correctional Health Affiliate, Grand Rounds, Rikers Island, NY, March 1998

American Psychological Association. Annual Meeting, August 1994

Annual Meeting American Academy of Psychiatry and Law, Orlando, Florida, October 1991 (paper profiled in the *Psychiatric News*, November 15, 1991)

American Psychiatric Association Annual Meeting, New York, N.Y. May 1990

Orthopsychiatric Annual Meeting, Miami, Florida, April 1990

Annual Meeting of the American Group Therapy Assn., Boston, Mass, February 1990

American Public Health Assn. Annual Meeting, Chicago, Ill., October 1989

## COMMITTEE MEMBERSHIPS AND ADVISORY BOARDS (past and current)

Association of the Bar of the City of New York, Committee on Legal Issues Affecting People with Disabilities; New York State Bar Association, Dispute Resolution Section; New York State Bar Association, Health Law Section: Founding Co-Chair, Special Committee on Mental Health; Member of Executive Committee; Association of the Bar of the City of New York, Problems of the Mentally Ill; sub-committee on conditions in Prisons; New York State Bar Assn., Committee to Confer with the Medical Society of the State of N.Y.; Committee on Public Health; New York Law School, Advisory Board on Scholarly Publications; Saint Vincent's Hospital and Medical Center of N.Y., Hospital-wide Counsel on Domestic Violence; New York Health and Hospitals Corporation, City-wide Committee on Jail-based Mental Health Services; New York City Department of Mental Health, State-wide Forensic Mental Health Task-force; Advisory Board on the Formation of the New York City Links Program; Advisory Board, Friends of Island Academy, Juvenile NYC Link Program; Reviewer of Articles, International Journal of Prisoner's Health.

## LICENSES, CERTIFICATIONS, ADMISSIONS, RECOGNITIONS

**Attorney** admitted to practice law in the Courts of the State of New York (First Department) and in the Federal Courts of the Southern & Eastern Districts of New York. Accredited for preparation, presentation and prosecution of claims for veterans benefits before the Department of Veterans Affairs (not current).

**Social Worker** Licensed Social Worker, New York State Department of Education

**Court Evaluator** and **Guardian:** certified under Article 81 of the New York State Mental Hygiene Law, Office of Court Administration of the State of New York. Trained by the Association of the Bar of the City of New York.

**Mediator** Advanced Training in Mediation: United States District Court for the Eastern District of New York; The Center for Mediation in Law, N.Y., N.Y. Additional training in the Mediation of Bio-Ethical Disputes (Center for Health Law and Ethics, University of New Mexico, Division of Bioethics, Montefiore Medical Center/Albert Einstein College of Medicine and the United Hospital Fund of New York); Mediation of the Fair Labor Standards Act, The Federal Bar Association, Cornell University Labor and Employment Law Program, Federal Court Eastern District of New York

**"Super Lawyer"** 2012-2020: New York City Metro under *Health Law* category

**LANGUAGES**
Conversational Spanish: Studied in Mexico, certificate awarded: Instituto de Estudios de America Latina, August, 1981, Cuernavaca, Mexico

**REFERENCES:** Available upon request

# Maria Masotta, Psy.D.

Licensed in MA #8411 and CT #003747
maria@drmariamasotta.com
www.drmariamasotta.com
P.O. Box 36, Rockfall, CT  06481
203-747-4443

---

# Education

University of Massachusetts Medical School, Law and Psychiatry Program, Worcester, Massachusetts, Certificate Program in Forensic Mental Health (8/31/06)

Psy.D.     Nova Southeastern University – Fort Lauderdale, Florida
           Clinical Psychology with a Specialization in Forensic Psychology (8/97-8/02)

M.S.       Nova Southeastern University – Fort Lauderdale, Florida  (8/97-6/99)
           Clinical Psychology

B.A.       Hartwick College – Oneonta, New York  (8/93-12/96)
           Major in Psychology

---

# Clinical Experience

**Consultant** – Miami Dade County Corrections and Rehabilitation Department (MDCR) - (6/18-present).  MDCR is large jail system that incarcerates over 5,000 detainees. Provide clinical consultation to MDCR healthcare and custody leadership personnel to assist with compliance with a Department of Justice Consent Agreement.

**Contractor** – Department of Homeland Security/Civil Rights and Civil Liberties – (4/17-present). Conduct assessment of behavioral health programs in detention centers that detain Immigration and Customs Enforcement (ICE) detainees. This includes a review of policies and procedures, interviews with detainees and staff and review of relevant documentation.  Analyses, conclusions and recommendations are provided via a comprehensive summary report.

**Court Appointed Expert, Correctional Mental Health** (8/14- present). United States District Court of the Eastern District of California – Ordered by Honorable Lawrence K. Karlton, Senior District Judge, for a class action lawsuit, Coleman et. al vs. Brown et. al. As a member of a multi-disciplinary team, provide expert consultation to the Special Master, Mathew A. Lopes, Esq., as part of an ongoing monitoring process of the California Department of Corrections and Rehabilitation and Department of State Hospitals mental health system.

***Forensic Psychologist*** – FHS/MHM (5/13-8/17) Worcester District Court Clinic – Worcester, Massachusetts (Center for Health and Development (2/07-12/10) Conduct court-ordered forensic evaluations for central Massachusetts courts.  Evaluations include involuntary commitment for psychiatric treatment, commitment for substance abuse, aid-in-sentencing, competency to stand trial and criminal responsibility.

***Clinical Psychologist*** **–** MedOptions of Massachusetts (10/12-1/15). Provide psycho-diagnostic evaluations, behavioral management, psychological testing, guardianship evaluations and psychotherapy to individuals residing in nursing homes for short- term rehabilitation or long-term care.  Psychological issues range from mild to severe dementia, loss/grief, substance abuse and serious and persistent mental illness.

***Psychologist*** **–** MHM Correctional Services, Inc – Massachusetts Treatment Center, Bridgewater, Massachusetts.  (8/12-10/12).  Provide treatment planning, individual psychotherapy and crisis intervention to incarcerated men who have been convicted of a sexual offense or have been civilly committed as a Sexually Dangerous Person.

***Regional Clinical Director/Regional Comprehensive Quality Improvement Manager*** – MHM Correctional Services, Inc –Regional Office – Norton, Massachusetts  (3/12-8/12).  Provide clinical support, leadership and supervision to clinical staff throughout the mental health prison programs in Massachusetts.  Respond to inmate grievance appeals.  Provide clinical support for Department of Mental Health segregation audits and Department of Corrections quarterly meetings at various prisons. Provide clinical consultation to mental health and correctional staff in the management of mentally ill inmates. Coordinate with the Department of Corrections Training Academy and mental health staff to schedule annual suicide prevention training. Oversee quality improvement activities including staff credentialing and peer reviews.

***Senior Clinical Operations Specialist*** – MHM Correctional Services, Inc.  (10/10 –3/12) This position required travel throughout the United States approximately 50% of the time to provide training and clinical consultation to mental health staff in the management of inmates with severe and persistent mental illness and significant self-injurious behavior. Assist in the development of behavior management treatment plans.  Assist in the implementation of clinical programming and policies. Develop staff training, clinical guidelines and group psychotherapy protocols.  Conduct clinical audits to ensure contract compliance.  Co-facilitate a company-wide conference call focusing on the gender responsive needs of female offenders.

***Mental Health Director*** – MHM/Forensic Health Services - Massachusetts Correctional Institute-Framingham- Framingham, Massachusetts (7/07- 9/10) Supervise multidisciplinary team of social workers, psychologist, and psychiatrists who provide counseling and crisis intervention services to incarcerated women.  Collaborate with correctional and medical personnel in developing treatment plans for women to assist in their ability to manage the penal environment and make recommendations in respect to disciplinary issues.  Serve as the Chief Psychologist for Department of Corrections/MHM system-wide psychologists. On-call for after hours crisis intervention for medical and security personnel. Provide individual, group psychotherapy and crisis intervention serves to incarcerated women.

***Staff Psychologist-*** UMASS Correctional Health- Massachusetts Correctional Institute-Framingham – Framingham, Massachusetts (9/02 – 2/06, 11/06 – 7/07) Serve as designated back-up for mental health director in periods of absence, provide on-site and off-site coverage. Provide treatment planning, individual and group psychotherapy to incarcerated women who are awaiting trial or sentenced for a wide variety of misdemeanor and felony convictions. Treatment typically addresses adjustment issues, trauma history, substance abuse, domestic violence and family discord. Additional responsibilities include conducting intake evaluations, psychological testing, and assessing the mental health status of women housed in segregation. Provide crisis counseling and assess and monitor women who are acutely at risk of harm to themselves or others. Supervise UMASS pre-doctoral clinical psychology interns. Attend and participate in daily triage meetings, educate and consult with corrections staff as indicated. Served as the mental health liaison for the Prison Pup Partnership program, which involves selection of inmates and ongoing evaluation of fitness to serve as a handler, as well as facilitating team-building activities. Developed and co-facilitated intern seminar for master's level interns on various clinical issues. Created administrative forms to facilitate communication between court personnel and prison mental health staff; to document group treatment; to assist with crisis assessment; and to aid in compliance of documentation of clinical issues for quarterly audits. Created and maintained monthly award for clinical excellence for mental health staff. Coordinate monthly crisis coverage schedule. Facilitate monthly staff meeting and quarterly full-day staff seminar. Maintain security of psychological testing materials and assign cases to peers. Developed and facilitate case conferences for challenging clinical cases. Serve as the mental health representative for the institution's training committee and provide weekly training to correctional officers regarding mental health issues. Organized fund raiser for institutional staff, collected and donated money to victims of the 2004 Tsunami.

***Independent Contractor*** – MHM/Forensic Health Services, Worcester County (5/06 – present). Conduct pre-arraignment evaluations pursuant to M.G.L. Chapter 123, Section 18(a). Evaluations are conducted after-hours on an on-call basis for detainees deemed to be experiencing a psychiatric emergency.

***Independent Contractor*** – University of Massachusetts Medical School (10/1/06 – 11/29/06) – Conduct psychological testing at Souza Baranowski Correctional Center, a maximum security penal institution for men.

***Forensic Psychologist*** – Center for Health and Development, Fitchburg District Court Clinic – Fitchburg, Massachusetts (2/06 – 11/06) Conduct court-ordered forensic evaluations for central Massachusetts courts. Evaluations include involuntary commitment for psychiatric treatment, commitment for substance abuse, aid-in-sentencing, competency to stand trial and criminal responsibility.

***Psychology Intern-*** University of Massachusetts Medical School/Worcester State Hospital – Worcester, Massachusetts (9/01- 8/02) Attended seminars on Neuropsychology, Substance Abuse, Malingering, and Psychopharmacology. Attended Law and Psychiatry Rounds and Grand Rounds. Rotations included: Child Family Forensic Center, Outpatient Psychiatry Service-Anger Management Program, Community Healthlink – Homeless Outreach Assistance Program, and Bridgewater State Hospital – Maximum Security Unit. Supervised by: Jack Terry, Ph.D., Bill Warnken, Psy.D., ABPP, Anne Johnson, Ph.D., David Holtzen, Ph.D, Linda Cavallero, Ph.D., Gerri Fuhrman, Ph.D., Gregg Januszewski Psy.D., and Alan Rosenbaum, Ph.D .

Bridgewater State Hospital – Maximum Security Unit – As a member of the multidisciplinary treatment team, provided therapeutic services to patients.  Co-facilitated a unit based violence prevention group and provided individual therapy to patients diagnoses included Schizophrenia, Bipolar Disorder,  Borderline Personality Disorder, and Mood Disorder NOS.   Evaluated a patient diagnosed with Bipolar Disorder and Borderline Personality Disorder for recommitment and wrote the recommitment evaluation.  Conducted psychological testing with patients and communicated results to treatment team.

 Massachusetts Correctional Institute-Framingham – Served as a Primary Care Clinician for female inmates, designed treatment plans, and provided weekly therapy.  Diagnoses included Major Depression, Borderline Personality Disorder, ands Post-Traumatic Stress Disorder.  Conducted psychological testing with inmates and communicated results to referral source.

Child Family Forensic Center – Conducted psychological evaluations with families referred by the Worcester Probate and Family Court.  Assessed inter-parental conflict, domestic violence, substance abuse, and mental health history and made visitation and custody recommendations. Evaluation included an interview with both parents and children and collateral contacts as deemed appropriate.  Appointed and served as a Guardian ad Litem to determine the best interests of the child.  Evaluation included numerous interviews of both parents and child, review of collateral records, and collateral contacts.

Outpatient Psychiatry Service – Anger Management Program – Conducted intakes for anger management program. Co-facilitated a men's anger management group and women's anger management group.  Many of the group members were involved in domestic violence and are referred by the Worcester District Court.

Community Healthlink – Homeless Outreach Assistance  Program  - Conducted psychological testing with  homeless clients as referred by the treatment team.  Communicate results to the treatment team.

***Psychology Trainee*** – Public Defender's Office, Broward County Courthouse – Fort Lauderdale, Florida (8/99-9/00). Conducted full battery psychological evaluations with inmates with violent felony charges. Communicated results to attorneys and peers during case conference.  In addition, assisted with competency and sanity evaluations and conducted an evaluation to determine competency to stand trial with an individual with a felony charge.   Rotated through:  Broward County Main Jail, Broward County Mental Health Court, Juvenile Detention Center, and Crisis Street Stabilization Unit. Supervisors:  Lenore Walker, Ed.D. ABPP, David Shapiro, Ph.D., Hilda Besner, Ph.D., Michael Brannon, Psy.D., and Ross Seligson, Ph.D.

Broward County Main Jail- Evaluated approximately 134 detainees arrested for misdemeanor charges to assess for the presence of mental illness.  Detainees willing to seek mental health treatment were qualified for Mental Health Court.  Made recommendations through consultation with Public Defender and testified as necessary.  Qualified as an expert by magistrate on duty.

Broward County Mental Health Court- Court specializes in mental health treatment for individuals that committed misdemeanor offenses.  Conducted approximately 107 brief psychological assessments with detainee's including evaluation of competency to proceed, risk assessment,

mental status, psychosocial history, treatment compliance, and treatment and placement needs. Made recommendations to the Public Defender and provided testimony as needed to Honorable Judge Ginger Lerner-Wren. Qualified to as an expert to provide testimony.

Juvenile Detention Center- Evaluated approximately 29 female adolescents for competency to proceed and a wide range of factors including educational needs, previous delinquent behavior, medical concerns, mental health history, family issues, and history of abuse. Juveniles ranged from 12-17 years of age, representing a wide range of ethnic and cultural backgrounds. Recommendations provided to Public Defender and Legal Aid attorney assisting the adolescents with civil and legal needs.

Crisis Street Stabilization Unit- Facility is an inpatient psychiatric hospital, primarily providing services for indigent patients. Conducted approximately 38 risk assessment evaluations with involuntarily hospitalized patients. Assessment of ability to care for self and potential for harm to self or others, despite a wide range of psychotic diagnoses, mood disorders, and dual diagnosis issues, was of primary concern. Made dangerousness recommendations to the Public Defender.

***Psychology Trainee -*** Nova Community Clinic for Older Adults (NCCOA), Nova Southeastern University Community Mental Health Center - Fort Lauderdale, Florida (6/98-4/99). NCCOA is a specialty clinic within the Community Mental Health Center that serves clients ages 55 and older. Provided outpatient cognitive-behavioral individual and group psychotherapy, targeting symptoms of depression and anxiety disorders. Duties consisted of treatment planning, medical record, weekly supervision, case presentations, crisis intervention, case presentations, and attending a bi-monthly Cognitive-Behavioral Seminar. Intake evaluations included administration and interpretation of the Structured Clinical Interview for DSM- IV, Mini-Mental Status Exam, Beck Anxiety Inventory, Geriatric Depression Scale, Wolpe Lazarus Assertiveness Scale, and selected subtests from the Wechsler Adult Intelligence Scale-Revised and Wechsler Memory Scale-Revised. Supervisor, William Kelleher, Ph.D.

***Forensic Psychology Assistant*** - The Institute for Behavioral Sciences and the Law - Plantation, Florida (9/00-12/00). This is a private practice that provides both clinical and forensic evaluations. Assisted with psychological evaluations (WAIS-III Rorschach, MMPI-II MCMI-III) and conducted clinical interviews with detainee's pending trial for competency, downward departure, and substance abuse evaluations. Supervisor, Michael Brannon, Psy.D.

***Therapist*** - Broward Partnership for the Homeless Incorporated - Fort Lauderdale, Florida (7/99-6/01). Broward County funded position for one Nova Southeastern student to provide on-site psychological evaluations, crisis intervention, and outpatient therapy, with adults, children, and families residing at the shelter. Group psychotherapy was also conducted in a psycho-educational format focusing on goal achievement and parenting skills. Individuals have presented with a variety of Axis I and Axis II disorders including depression, anxiety, suicidal behavior, bipolar disorder, psychotic disorders, social skills deficits, and substance abuse. Other duties consisted of documentation in medical record, weekly supervision, treatment planning, consultation with Case

Management staff and facilitating educational seminars with Residential Coordinator staff. Supervisor, Ana Martinez, Psy.D.

***Therapist*** - Brown Schools of Florida at Sunrise - Weston, Florida (8/99-12/99). Program is a residential treatment facility for emotionally disturbed adolescents. Provided group psychotherapy several times a week and conducted psychosocial evaluations. Other duties included treatment planning, documentation, crisis intervention, and consultation with the clinical team. Supervisor, Andrew Cutler, M.S.W.

***Psychological Consultant -*** Family Assessment Center, The Brown Schools of Florida - Fort Lauderdale, Florida (2/99-5/99). Program is an emergency shelter that houses children and adolescents that have been detained by the Department of Children and Families.  Conducted mental health screenings and psychological evaluations to assess the child's mental health and made placement recommendations to the Broward County Court System and Department of Children and Families.  Provided crisis intervention.  Supervisor, Michael Brannon, Psy.D.

***Mental Health Consultant*** - M.E. Chiles Program, Nova Southeastern University Community Mental Health Center - Fort Lauderdale, Florida (6/98-12/98). Conducted mental health evaluations at foster homes with children and adolescents detained by the Department of Children and Families. Provided individual psychotherapy with foster children and a court-ordered parent. Duties consisted of assessing the child's mental health  and making placement recommendations to the Broward County Court System and Department of Children and Families. Supervisor, Mary Centrone, Psy.D.

***Recreational Therapist*** - Alzheimer's Resource Center of Connecticut - Southington, Connecticut (1/97-3/97). Facility provides psychological, medical, housing and recreational services to residents diagnosed with Alzheimer's Disease. Facilitated recreational activities with residents including arts and crafts, music therapy, reminisce, nature walks, exercise, and fine dining on a one-on-one or group basis to stimulate their senses and improve their quality of life.

***Certified Hospice Volunteer*** - Catskills Area Hospice - Oneonta, New York (3/96- 12/96). Participated in training that focused on death and dying with the terminally ill and ways to provide support for family members. Co-facilitated a children's bereavement group.

***Pre-School Teacher*** -Young Men's Christian Academy - Southington, Connecticut (Summers of 1995, 1996). Acted as a Pre-School teacher for children ages 3-5. Designed lesson plans appropriate to the children's level of development focusing on safety and awareness, outer space, and the human body. Implemented lesson plan providing education on the human body. Supervised children's activities and intervened as necessary, at times utilizing behavior modification.

---

## Supervisory Experience

***Co-Assistant Director of Psychology Intern Training*** – University of Massachusetts Medical School/ Worcester State Hospital- Worcester, Massachusetts (8/06- 8/07). Program is an American Psychological Association approved training site for pre-doctoral psychology interns. Participate in weekly group supervision, provide individual supervision, assist in the selection of interns, coordinate didactic seminars. Coordinate and develop year-long, weekly didactic seminars.

***Coordinator*** - Nova Community Clinic for Older Adults, Nova Southeastern University Community Mental Health Center - Fort Lauderdale, Florida (6/99- 6/01). Duties included orienting and training first and second year practicum students and serving as a liaison between students, Clinic Director, and the department of Quality Improvement. Co-facilitated bi-monthly staff meetings, conducted chart reviews on student's caseloads to assure compliance with clinic, Medicaid, and Medicare guidelines and screened new clients for intake and assigned to an appropriate student. In addition, monitored students' assessment data to confirm consistency between assessment data and diagnosis. Updated assessment package in collaboration with a graduate assistant, supervisor, and Charles Golden, Ph.D. Also trained students on administration, scoring, and interpretation of assessment packet. Supervisor, William Kelleher, Ph.D.

***Lead Peer Interviewer*** - Nova Southeastern University - Fort Lauderdale, Florida (March 2001, March 2000). Interviewed clinical psychology doctoral applicants to determine appropriateness for program and made recommendations to selection committee as to their suitability.

***Peer Interviewer***- Nova Southeastern University - Fort Lauderdale, Florida (April 1999). Interviewed clinical psychology doctoral applicants to determine appropriateness for program and made recommendations to selection committee as to their suitability.

---

# Presentations

A Forensically-Informed Model for Providing Mental Health Consultations to the Disciplinary Process: National Commission on Correctional Health Care, Las Vegas, Nevada, July 10, 2011. Co-presenter with Stephen DeLisi, PhD.

Self-Harm Behavior and the Female Offender: Minimizing the Risks: National Commission on Correctional Health Care, Phoenix, Arizona, May 24, 2011. Lead presenter with Joel T. Andrade, LICSW, PhD.

Suicide and Self-Harm Risk Assessment within Correctional Settings: Avoiding Common Pitfalls. 4th Annual Academic and Health Policy Conference on Correctional Health, UMASS Medical School , March 10, 2011. Lead presenter with Joel T. Andrade, LICSW, PhD

Vicarious Traumatization in Corrections: Recognition, Response and Prevention: American Correctional Association, San Antonio, Texas, January 30, 2011.

Vicarious Traumatization in Correctional Healthcare: Recognition, Response and Prevention: Educational Luncheon: National Commission on Correctional Health Care, Boston,

Massachusetts. July 11, 2010.

Gender Responsive, Trauma Informed Services for Female Offenders:  Bridging Research and Practice:  3rd Annual Academic and Health Policy Conference on Correctional Health, UMASS Medical School/Nova Southeastern University, Fort Lauderdale, FL.  December 3, 2009.  Co-presenter with Judith Willison, LICSW.

PREA Standards:  Considerations Unique to Female Offenders:  Blending New Challenges with Emerging Ideas, 13th National Workshop on Adult and Juvenile Female Offenders, Jackson, MS. October 10, 2009.  Co-presenter with Sharen Barboza, PhD., and Judith Willison LICSW.

Group Treatment for Newly Incarcerated Women:  Managing Sleep Disturbance, Anxiety and Depression:  National Commission on Correctional Health Care, Chicago, Illinois.  October 22, 2008.  Lead presenter with Morgan McGinty, MSW.

Gender Responsive Services for Girls and Women in the Justice System:  Forensic Health Services, UMASS Boston.  May 6, 2008.

Gender Responsive Training:  New Mexico State University, Grants, New Mexico.  December 17, 2007

Managing the Female Offender:  Trends in the Mental Health Evaluation.  February 1, 2005.

Identifying Mental Illness and Building Rapport. Presented to the staff at the Broward Partnership for the Homeless Incorporated. October 30, 2000

---

# Research Experience

***Doctoral Directed Study*** (Fall 2000) Detecting feigned cognitive deficits by identifying the presence of intact memory using symptom validity testing.  Chairperson, Charlie Golden, Ph.D., ABPP.

***Research Practicum III*** (Fall 2000)  Analyzed data obtained from Juvenile Assessment Questionnaire, to examine contributing factors to delinquent behavior.  Supervised by Lenore Walker, Ed.D., ABPP.

***Research Practicum II*** (Summer 2000)  Developed coding program for data obtained from Juvenile Assessment Questionnaire  in collaboration with Al Sellers, Ph.D. and coded data.  Supervised by Lenore Walker, Ed.D., ABPP.

***Research Practicum I*** *(*Winter 2000). Developed Juvenile Assessment Questionnaire to be utilized with female detainees and trained peers in administration of inventory.  Supervised by Lenore Walker, Ed.D., ABPP.

***Undergraduate Thesis*** (1995). Left-handedness and dyslexia:  An analysis of the higher frequencies of left-handedness in the dyslexic population.  Chairperson, Lynn Elmore, Ph.D.

***Undergraduate Directed Study*** (1995).  Analyzed the controversies surrounding the inclusion of Self-Defeating Personality Disorder in <u>DSM-III,</u> <u>DSM-III-R,</u> and <u>DSM-IV.</u>  Supervised by Ronald Heyduk, Ph.D.

---

## Publications

Masotta, M.  (2011).  Vicarious Traumatization:  Recognition, Response, and Prevention.  *CorrDocs:  Society of Correctional Physician Newsletter.*  Volume 14, Issue 1. Posted June 15, 2011.

Masotta, M (2011).  Vicarious Traumatization:  A Guide to Recognizing, Responding to, and Preventing a Serious Consequence of Providing Mental Health Care in Jails, Prisons and Community Corrections.  *Corrections and Mental Health:  An Update of the National Institute of Corrections.*  March 11, 2011.

---

## Teaching Experience

***Assistant Professor*** – (8/13-5/15) Framingham State University, Department of Psychology and Philosophy, Framingham, MA.  In this full-time position responsibilities include teaching undergraduate psychology courses (Abnormal Psychology, Social Psychology, Human Relations and Group Dynamics).  Responsibilities also include advising 32 undergraduate psychology majors and serving as a member on the Graduate Committee.

***Visiting Assistant Professor*** **–** Framingham State University, Mental Health Counseling Program, Department of Graduate and Continuing Education, Framingham, MA,

    Orientation to Counseling (Fall 2004- 2011, 2013, 2018, 2021)
    Professional Issues in Mental Health Counseling (Spring 2004 – 2013, 2016)
    Assessment, Diagnosis and Treatment Planning (Summer 2012)
    Theories of Psychotherapy and Counseling (Spring 2011)
    Theories and Methods of Psychological Testing (Summer 2004- 2006, 2015)
    Problems of Substance Abuse (Summer 2009, 2011, 2015, 2020)
    Group Processes in Counseling (Summer 2006- 2010, 2014)
    Counseling Internship I (Fall 2005)
    Understanding Social Science Research (Fall 2003, 2 sections)

***Teaching Assistant*** *– Psychobiology; Nova Southeastern University – Fort Lauderdale, Florida (Winter 2000)*

---

## Awards

Recipient of the National Health Service Corps Loan Repayment Program, 2009
Recipient of Department of Correction; Professional Excellence Contract Health Care Award, 2010
Nominated for Department of Correction; Professional Excellence Contract Health Care Award, 2008
Designated Forensic Psychologist, 2008
Departmental Distinction, Hartwick College, 1996
Cum Laude, Hartwick College, 1996
Dean's List, Hartwick College, 1995-1996
Psi Chi National Honor Society, 1995

**JAMES FRANCIS DEGROOT, PH.D.**
Atlanta, GA 30319
Phone: 770-356-1830
upcjdegroot@gmail.com

## Education

WRIGHT STATE UNIVERSITY, DAYTON, OHIO
Psychology Postdoctoral Program 1983-1985

CATHOLIC UNIVERSITY OF AMERICA, WASHINGTON, D.C.
Doctor of Philosophy 1977-1984

ANTIOCH UNIVERSITY, COLUMBIA, MARYLAND
Master of Arts 1974-1977

CARDINAL STRITCH COLLEGE, MILWAUKEE, WISCONSIN
Bachelor of Arts 1967-1971

## License

Licensed Clinical Psychologist in Georgia, 1986 to Present

## Clinical, Correctional and Forensic Experience: Georgia Department of Corrections

➢ **State-Wide Mental Health Consultant,** January 2020-Present (February 2020)
**Employed as a Part-time Employee by Centurion, a vendor contracted by the Georgia Department of Corrections (GDC)**
Consult with the State-Wide Clinical Director and be a liaison between the State-ide Clinical Director and the State-Wide Mental Health Director, focusing on: programs for mentally ill offenders in Restrictive Housing; programs for mentally ill offenders with Substance Use Disorders; and mental health policies and procedures.

➢ **State-Wide Clinical Director**, 2017-2020
**Employed by Centurion, a vendor contracted by the Georgia Department of Corrections (GDC)**
Centurion is responsible for hiring and delivering mental health services to an offender population of approximately 55,000 of whom 11,500 are diagnosed with a mental illness. I directly supervised 18 facility Clinical Directors and 17 staff psychologists, managed 24 facility Mental Health Administrative Directors, collaborated with the Centurion Regional Medical Director (a psychiatrist), oversee 250+ mental healthcare providers, and helped coordinate

operations with the leadership of Georgia Department of Corrections in order to deliver quality and timely mental health services.

➢ **State-Wide Mental Health Director,** 1994-2017
**Employed by the State, Georgia Department of Corrections (GDC)**
Responsible for the delivery of mental health services to inmates and detainees who were diagnosed with a mental illness. I spent much of the fist 10 years working on civil rights litigation with experts and attorneys on two certified class action complaints (Guthrie v Evans and Cason v Seckinger) and on one complaint which was never certified as a class and dropped by plaintiffs after two years, (Fluellen v Wetherington). During that time, we made major revisions to the mental health policies and procedures. The number of offenders receiving mental health services continually grew from 2,000 in 1994 to 11,500 in 2019. The severity, complexity and acuity of mental illness also increased. Consequently, I worked closely with GDC leadership and attorneys from the Attorney General's Office on a myriad of issues to include restrictive housing, implementation of the Prison Rape Elimination Act (PREA), transgender offenders, suicides, drugs, and gangs.

➢ **Staff Psychologist at GA's Maximum-Security Prison,** 2988-1994
**Employed by the State as a part-time employee**
I began working at GA State Prison (GSP) shortly after the tenure of Special Master Vincent Nathan. I was responsible for implementing of a consent decree resulting from Guthrie v Evans and for updating Judge Anthony Alaimo on the status of GSP's mental health delivery system. I worked closely with Warden A. G. Thomas, Commissioner Alan Ault, Assistant AGs, and the Medical College of GA which was providing psychiatric services. During this time, critical incidents at GSP declined and the consent decree became a model for upcoming major revisions in GDC's MH Policies and Procedures.

## Clinical, Correctional and Forensic Experience: Independent Practice

➢ **Mental Health Expert for the Office of the Special Master in the Ninth Circuit on Coleman v Newsom,** October 2019-Present (October 2020)
Responsible for monitoring California Department of Correctional Rehabilitation's (CDCR) implementation of court orders and writing reports for the Special Master.

➢ **Mental Health Expert for the Department of Homeland Security (DHS),** 2016-Present
(February 2020)
**Subcontracted to work as part of a team investigating OIG mental health complaints from
ICE detainees.**
Responsible for investigating both the specific detainee complaints on the delivery of mental
health services and the facility's overall mental health compliance with the National Detention
Standards, other applicable professional standards, and best practices. The results of the
investigation are presented to facility leadership during an out-briefing and a formal report is
written by each team member for DHS.

➢ **Independent Forensic Mental Health Evaluator of VA Complaints,** 2013-Present (February
2020)
Conduct a comprehensive mental health assessment on Viet Nam, Iraqi, and Afghanistan veterans
complaining of combat related PTSD and TBI. The evaluation consists of reviewing the veteran's
medical and military records, interviewing both collateral informants and the veteran, and
administering psychological tests. The results are discussed with a team of attorneys who are
Emory University fellows from the Emory Veteran's Clinic, and supervising attorneys from King
& Spalding and/or from Ogletree, Deakins, Nash, Smoak & Stewart. A formal report is written
for a VA hearing.

➢ **Contracted with the Dept. of Labor as an Independent Forensic Mental Health Evaluator,**
2008-Present (February 2020)
Evaluate individuals who filed disability claims with the Social Security Administration. The
claimants are interviewed, psychological tests are usually administered, collateral informants are
interviewed, and collateral documents are reviewed. Formal reports are written and submitted in a
timely manner for an administrative hearing.

➢ **Psychology Consultant and Direct Care Provider for the GA Department of Juvenile
Justice**, 2008-2016
Worked part-time, providing: direct care at a number of facilities (Augusta Youth Development
Center, Bill Ireland YDC, and Emanuel YDC); consultation with DJJ leadership by performing
psychological autopsies on two juveniles who committed suicide; consultation to DJJ HR by
performing Fitness-for-Duty evaluations on custody staff; and clinical supervision for direct care
providers in the field.

➤ **Independent Clinical & Forensic Mental Health Evaluator on Miscellaneous Cases,** 1988-2014

Over 26 years, I served as plaintiff and defendant expert on variety of cases. For example, I testified for a number of defendants on deliberate indifference and wrongful death cases in county jails. I also served as an expert witness in adult and juvenile criminal cases, performing competency and responsibility evaluations. I was an expert in one capital punishment case, testifying on behalf of the defendant who was represented by the Southern Center for Human Rights.

In 2010 and 2011 I consulted with The Moss Group as a PREA auditor, participating in PREA audits of ICE facilities managed by Correctional Corporation of America (CCA).

While practicing on St. Simon's Island and in Atlanta, I had contracts with Glynn County School System and with Atlanta City Schools to perform psychological evaluations on students to determine if they qualified for special education services.

Additionally, while teaching at the Medical College of GA, I worked for Richmond County Family Court performing evaluations on families to assist two judges with cases involving custody and termination of parental rights.

## Clinical, Correctional and Forensic Experience: Elected /Appointed Professional Positions

➤ **International Association for Correctional and Forensic Psychology (IACFP)**

**At-Large Board Member** and Chair of the Nominating Committee, January 2019-Present (February 2020)

**Past President** and Chair of the Nominating Committee, January 2017-December 2018

**President**, January 2015-December 2016

**President-Elect**, January 2013-December 2014

➤ **American Board of Correctional Psychology (ABCP)**

**At-Large Board Member**, January 2018-Present (August 2019)

Working with the American Board of Professional Psychology (ABPP), the American Psychological Association and other professional associations to create an ABPP subspecialty board certification for Correctional Psychology.

➤ **National Institute of Corrections, Mental Health Network (NIC)**

**Administrative Committee, Chair**, 2014-2015

**Administrative Committee, Member,** 2011-2014

**Steering Committee, Member,** 2010-2011

**Suicide & Self Injurious Behavior Committee, Chair**,2009-2010

➢ **GA's National Alliance for the Mentally Ill (NAMI)**
   **Board Member and Nominating Committee Chair**, 2011-2014

➢ **GA's Crisis Intervention Team (CIT)**
   **Advisory Board Member**, 2007-2010
   **Steering Committee Member**, 2008-2011

➢ **The Governor's Mental Health Summit**
   **Member**, 2006-2009

➢ **GA's Reentry Impact Program**
   **Member**, 2005-2008

➢ **GA's Mental Health Planning & Advisory Council (GMHPAC)**
   **Member** 2006-2015

➢ **Association for the Advancement of Behavior Therapy (AABT)**
   **Legislative Committee, Chair**, 2000-2003

## ACADEMIC APPOINTMENTS

2007-2013 Member of GA State University Institutional Review Board, Atlanta, GA

1990-2016 Clinical Professor of Psychiatry, the Medical College of Georgia, Augusta, GA

1987-1990 Assistant Professor of Psychiatry, the Medical College of Georgia, Augusta, GA

1986-1988 Clinical Faculty, Psychiatry Residence & Child Psychiatry Fellowship at Eisenhower Army Medical
          Center, Fort Gordon, GA

1986-1988 Clinical Psychology Internship at Eisenhower Army Medical Center, Fort Gordon, GA.

1981-1983 Clinical Faculty for the General Psychiatry Residence and Child Psychiatry Fellowship at            Letterman Army Medical Center, San Francisco, California.

1978-1979  Psychology Instructor, Prince's George's Community College, Largo, Maryland

1977-1979  Teaching Assistant, Catholic University of American, Washington, D.C.

# Military Service

➢ **Duties**

I served as a Captain in the US Army. I worked as a clinical psychologist at Eisenhower Army Medical Center (Fort Gordon, Georgia) and at Letterman Army Medical Center (Presidio in San Francisco, CA). During both tours of duty, I provided direct care to active duty service members and their dependents and I clinically supervised psychology practicum students, psychology interns, and child-adolescent psychiatry fellows.

➢ **MILITARY EDUCATION**

1987 Command and General Staff College, Correspondence
1986 Officer Advanced Courses at the Academy of Health Sciences, San Antonio, Texas
1981 Officer Basic Course at the Academy of Health Sciences, San Antonio, Texas

➢ **MILITARY AWARDS**

1986        Army Commendation Medal
1981 Army Commendation Medal

# PROFESSIONAL PRESENTATIONS

**1994-Current**

As the current State-wide Clinical Director and previous Mental Health Director for Georgia Department of Corrections, between 1994 and 2019 I've presented papers at state, national and international professional meetings and universities at least every few months.  I also testified in numerous hearings to include a PREA Commission Hearing while they were writing the Prison Rape Elimination Act of 2003 and a NIC Advisory Board Public Hearing entitled "Balancing Fiscal Challenges, Performance-Based Budgeting and Public Safety". Details for any of the above will be provided upon request.

**NATIONAL**

June 1995        "What's Love Got to Do With It?  The Dynamics of Family Violence and Its Implications for the Criminal Justice and Mental Health Systems," (with Annette Z. Henderson).  Presented at the Fifth Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri.

August 1994        "When Staff Burn Out, Students Follow: The Mental Health Consultant's Role in Attenuating Staff's Stress through Consultation and Training." Presented at Job Corps Annual Meeting for Mental Health Consultants in Los Angeles, California.

May 1994        "The Inevitability of the Mental Health Professional Being Sued by Inmates,"(with Margaret Severson).  Presented at the Fourth Annual

|            | Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
|------------|--------|
| March 1994 | "An Update on the Georgia Prison Study," (with A.R. Bruhn and K. Feigenbaum).  Presented at the Society of Personality Assessment's Mid-Winter Meeting in Chicago, Illinois. |
| May 1993 | "Identification of Unsolved Issues with the Early Memory Procedures: Assessing Violence Potential."  Presented at the Third Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
| March 1993 | "Predicting Aggression Potential with the Early Memory Procedure: The Georgia Prison Study," (with A.R. Bruhn and K. Feigenbaum).  Presented at the Society of Personality Assessment's Mid-Winter Meeting in San Francisco, California. |
| May 1992 | "Hurdles in the Implementation of Treatment Programs in Correctional Settings: A Constructivist's Ruminations from a Maximum Security Prison," (with Joe Owens and Janice Deal).  Presented at the Second Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
| March 1992 | "Identifying and Treating the Basis for Delinquent Behavior via Early Memories."  Presented at the Society of Personality Assessment's Mid-winter meeting in Washington, D.C. |
| August 1989 | Effects of Abuse on Perspective-Talking Skills in Children," (with Fred Garland as primary, Linda Christiansen and Anthony Zold).  Presented at the American Psychological Association's Annual Convention in New Orleans, Louisiana. |
| August 1989 | "The World According to a Distressed Truck Driver: Constructivist Perspectives," (with Fred Garland).  Presented at the American Psychological Association's Annual Convention in New Orleans, Louisiana. |
| March 1989 | "The Rorschach As a Measure of Behavior."  Presented to graduate students and faculty at Stanford University in Palo Alto, California. |
| February 1989 | "Continuity-Discontinuing in Child-Adult Psychopathology: A Structural-Developmental Perspective," (with Stephen N. Xenakis).  Presented at the AMEDD Clinical Psychology Short Course, sponsored by the Office of the Surgeon General and held in Augusta, Georgia. |
| October 1988 | "Clinical Consideration in Using Parent-Child Rating Scales," (with P.S. Jensen and S.N. Xenakis).  Presented at the 35th Annual Meeting of the American Academy of Child and Adolescent Psychiatry held in Seattle, Washington. |
| October 1988 | "Parents at Risk: An Epidemiological Investigation," (with P.S. Jenson and L.J. Bloedan).  Presented at the World Psychiatric Association Regional Symposium held in Washington, D.C. |

August 1988     "Children at Risk: Psychopathology Correlates in Clinical and Community Samples," (with L.J. Bloedan and P.S. Jensen). Presented at the annual meeting of the American Psychological Association held in Atlanta, Georgia.

May 1988     "Concept of Self in ADD Children: An Application of Piaget and Projective Testing." Presented as part of a symposium entitled "ADD: Psychosocial Issues in Treatment and Research." Presented at the 41st Annual Meeting of the American Psychiatric Association held in Montreal, Canada.

May 1988     "Contributions and Limitations of Projective Tests in the Diagnosis and Treatment of ADHA." Paper presented to Seoul National Psychiatric Institute in Seoul, Korea.

October 1987     "Interrater Agreement Vis-a-Vis Child Behavior Problems: Research Issues, New Evidence, and Future Direction," (with P.S. Jensen). Presented at the Annual Meeting of the American Academy of Child and Adolescent Psychiatry, Washington, D.C.

March 1987     "A Model of Psychological Interventions for Consultations and Liasion with Medical Clinics," (with R.C. Hulsebus, F.M. Tomayo and R. Sullivan). Presented at the U.S. Army Neuropsychology and Behavioral Medicine Conference, San Francisco, California.

March 1987     "Relationships Between Parents' Self-Reported Symptoms and Their Perceptions of Their Children's Symptoms: Implications for Using Parent-Child Rating Scales," (with P.S. Jenson and S.N. Xenakis). Presented at the U.S. Army Neuropsychology and Behavioral Medicine Conference, San Francisco, California.

February 1987     "A Constructivist-Structural Model of Development with Clinical Implications." Presented at the U.S. Army Child and Family Psychiatry Conference, Honolulu, Hawaii.

## STATE

May 1988     "The Mind of the Hyperactive Child." Paper presented at a one-ay seminar entitled, "Working with Families: Parenting the Behavior Disorder Child," sponsored by Charter Hospital of Augusta and the Medical College of Georgia; held in August, Georgia.

February 1988     "Therapeutic Consideration with Military Families. "Presented at the Georgia Psychological Association's Mid-winter Conference, Calloway Gardens, Pine Mountain, Georgia.

February 1988     "Identifying and Managing Problems in Preschool Children." Presented at Open Door Preschool for the Staff Development in August, Georgia.

October 1987     "Working with Resistant Families." Presented at one-day continuing education workshop for public school teachers, sponsored by Charter

|               | Hospital of August and the Medical College of Georgia; held in August, Georgia. |
|---------------|---|
| April 1987    | "Typical and Atypical Development Problems."  Presented to the Mothers' League of Augusta, sponsored by St. Joseph's Hospital in Augusta, Georgia. |
| February 1987 | "Learning Disabilities: A Development-Neuropsychological Perspective." Presented at a one-day continuing education workshop for special education teachers, sponsored by Richmond County Public School and the Medical College of Georgia, August, Georgia. |
| October 1986  | "Developmental Issues and the Foster Child."  Presented to the Foster Parent Associations of Colombia County in Martinez, Georgia. |
| February 1988 | "A Constructivist Approach to Moral Development."  Presented in Psychiatry Grand Rounds, Medical College of Georgia, Augusta, Georgia. |
| December 1987 | "Instruments and Interview: How to Make Them Work."  Presented a the Research Workshop sponsored by Eisenhower Army Medical Center and the Medical College of Georgia, Fort Gordon, Georgia. |
| November 1987 | "A Developmental Model of the Self."  Presented at Psychiatry Grand Rounds, Eisenhower Army Medical Center, Fort Gordon, Georgia. |

## Professional Publications

DeGroot, J.F., (2015). A Roadmap for Providing Psychiatric Services to Incarcerated Veterans: A challenging Subspecialty. In R. L. Trestman et. al. (Ed.), *Correctional Psychiatry* (pp. 310-314). Oxford Press.

DeGroot, J.F." Behavior Therapy in Correctional Settings." The Behavior Therapist, 2003, Vol.26#1.

Jensen, P.S., Xenakis, S.N., Davis, H., and DeGroot, J.F.: "Child Psychopathology Rating Scales and Interrater Agreement:  Child and Family Characteristics." American Academy of Child and Adolescent Psychiatry, 1988, 17:4, p. 451-461

Jensen, P.S., Xenakis, S.N., Davis, H., and DeGroot, J.F.: "Child Psychopathology Rating Scales and Interrater Agreement:  Child and Family Characteristics." American Academy of Child and Adolescent Psychiatry, 1988, 17:4, p. 451-461.

DeGroot, J.F., Hulsebus, R.C. Tamayo, F.M., and Sullivan, R: "A Model of Psychological Interventions for Consultation and Liaison with Medical Clinics." Proceedings of the 1987 AMEDD Clinical Psychology Short Course, 1987, p. 103-112.

DeGroot, J.F., Jensen, P.S., and Xenakis, S.N.: "Relationships Between Parents: Self-Reported Symptoms and Their Perceptions of Their Children's Symptoms:

Implications for Using Parent-Child Scales." <u>Proceeding for the 1987 AMEDD Clinical Psychology Short Course</u>, 1987, p. 153-162.


DeGroot, J.F.: "Effects of Person Perception on the Development of Children's Moral Judgment." <u>The Journal of Genetic Psychology</u>, 1982, 141, p. 41-48.

Ross, B. and DeGroot, J.F.: "How Adolescents Combine Probabilities." <u>The Journal of Psychology</u>, 1982, 110, p. 75-90.

**APPENDIX D**

**ACRONYMS AND ABBREVIATIONS**

**ACRONYMS AND ABBREVIATIONS**

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Management System |
| AC: | Adjustment Center |
| ADHD: | Attention Deficit Hyperactivity Disorder |
| ADLs: | Activities of Daily Living |
| AED: | Automatic External Defibrillator |
| AIMS: | Abnormal Involuntary Movement Scale |
| APP: | Acute Psychiatric Program |
| ASH: | Atascadero State Hospital |
| ASP: | Avenal State Prison |
| ASU: | Administrative Segregation Unit |
| ATP: | Adenosine Triphosphate |
| BPH: | Board of Prison Hearing |
| BVM: | Bag Valve Mask |
| CAMS: | Collaborative Assessment and Management of Suicidality |
| CAP: | Corrective Action Plan |
| CAT: | Chart Audit Tool |
| CBT: | Cognitive Behavioral Therapy |
| CCC: | California Correctional Center |
| CCHCS: | California Correctional Health Care Services |

CCI:                    California Correctional Institution

CCWF:                   Central California Women's Facility

CDCR:                   California Department of Corrections and Rehabilitation

Centinela:              Centinela State Prison

CHCF:                   California Health Care Facility

CIM:                    California Institution for Men

CIT:                    Crisis Intervention Team

CIW:                    California Institution for Women

CMC:                    California Men's Colony

CME:                    Chief Medical Executive

CMF:                    California Medical Facility

CMH:                    Chief of Mental Health

CONREP:                 Conditional Release Program

COVID-19:               Coronavirus Disease 2019

CPR:                    Cardiopulmonary Resuscitation

CQI:                    Continuous Quality Improvement

CQIT:                   Continuous Quality Improvement Tool

CRC:                    California Rehabilitation Center

CSATF:                  California Substance Abuse Treatment Facility

CSP/Corcoran:           California State Prison/Corcoran

CSP/LAC:                California State Prison/Los Angeles County

| | |
|---|---|
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| C-SSRS: | Columbia-Suicide Severity Rating Scale |
| CT: | computed tomography |
| CTC: | Correctional Treatment Center |
| CTF: | Correctional Training Facility |
| CVSP: | Chuckawalla Valley State Prison |
| CYA: | California Youth Authority |
| DAI: | Division of Adult Institutions |
| DBT: | Dialectical Behavior Therapy |
| DCHCS: | Division of Correctional Health Care Services |
| DDP: | Developmental Disability Program |
| DEC: | Disability and Effective Communication |
| DNR: | Do Not Resuscitate |
| DRC: | Death Review Committee |
| DSH: | Department of State Hospitals |
| DSM-5: | Diagnostic and Statistical Manual of Mental Disorders – 5th Edition |
| DVI: | Deuel Vocational Institution |
| ECF: | Electronic Case File |
| EHRS: | Electronic Health Records System |

ETOH:              Ethyl Alcohol

EOP:               Enhanced Outpatient Program

FIT:               Focused Improvement Team

Folsom:            Folsom State Prison

FWF:               Folsom Women's Facility

GED:               General Educational Development

GP:                General Population

HDSP:              High Desert State Prison

HIV/AIDS:          Human Immunodeficiency Virus/Acquired Immunodeficiency Syndrome

HLOC:              Higher Level of Care

HQ:                Headquarters

HRL:               High Risk List

HS:                *Hora Somni*/Hour of Sleep

ICC:               Institutional Classification Committee

ICE:               Immigration and Customs Enforcement

ICF:               Intermediate Care Facility

ISU:               Investigative Services Unit

IP:                Inmate Patient

IPOC:              Individualized Plan of Care

IDTT:              Interdisciplinary Treatment Team

IEX:                    Indecent Exposure

ISP:                    Ironwood State Prison

KOP:                    Keep On Person

KVSP:                   Kern Valley State Prison

LOC:                    Level of Care

LOP:                    Local Operating Procedure

LRH:                    Least Restrictive Housing

LSD:                    lysergic acid diethylamide

LTRH:                   Long-Term Restricted Housing

MAR:                    Medication Administration Record

MCSP:                   Mule Creek State Prison

MDO:                    Mentally Disordered Offender

MHCB:                   Mental Health Crisis Bed

MHSDS:                  Mental Health Services Delivery System

MHPC:                   Mental Health Primary Clinician

MHTS:                   Mental Health Tracking System

NGRI:                   Not Guilty by Reason of Insanity

NKSP:                   North Kern State Prison

NOS:                    Not Otherwise Specified

NPPC:                   Nursing Professional Practice Committee

OC:                         oleoresin capsicum

OHU:                        Outpatient Housing Unit

OIA:                        Office of Internal Affairs

OLA:                        Office of Legal Affairs

PAD:                        Personal Alarm Device

PBSP:                       Pelican Bay State Prison

PBST:                       Positive Behavioral Support Team

PC:                         California Penal Code

PIA:                        Prison Industries Authority

PIP:                        Psychiatric Inpatient Program

POLST:                      Physician Orders for Life Sustaining Treatment

POR:                        Probation Officer Report

PPE:                        Personal Protective Equipment

PPF:                        Progressive Programming Facility

PREA:                       Prison Rape Elimination Act

PRN:                        *pro re nata* (when necessary)

PSH:                        Patton State Hospital

PSU:                        Psychiatric Services Unit

PTSD:                       Posttraumatic Stress Disorder

PVSP:                       Pleasant Valley State Prison

QIP:                    Quality Improvement Plan

R&R:                    Receiving and Release

RC:                     Reception Center

RJD:                    Richard J. Donovan Correctional Facility

RVR:                    Rules Violation Report

SCC:                    Sierra Conservation Center

SCR:                    Suicide Case Review

SCRC:                   Suicide Case Review Committee

SCU:                    Supportive Care Unit

SHU:                    Security Housing Unit

SI:                     Suicidal Ideation

SIB:                    Self-Injurious Behavior

SMHP:                   Statewide Mental Health Program

SNY:                    Sensitive Needs Yard

SOMS:                   Strategic Offender Management System

SPMW:                   Suicide Prevention Management Workgroup

SPRFIT:                 Suicide Prevention and Response Focused Improvement Team

SQ:                     San Quentin State Prison

SRASHE:                 Suicide Risk Assessment and Self-Harm Evaluation

SRE:                    Suicide Risk Evaluation

SSI:                    Supplemental Security Income

STG:                    Security Threat Group

STRH:                   Short-Term Restricted Housing

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison

TABE:                   Test of Adult Basic Education

TBI:                    Traumatic Brain Injury

TCMP:                   Transitional Case Management Program

TTA:                    Triage and Treatment Area

UCC:                    Unit Classification Committee

VA:                     Department of Veterans Affairs

VSP:                    Valley State Prison

WIC:                    California Welfare and Institutions Code

WSP:                    Wasco State Prison