1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF CALIFORNIA
2                        --oOo--

3   RALPH COLEMAN, ET AL,      ) Docket No. 90-CV-520
                               ) Sacramento, California
4              Plaintiffs,     ) May 14, 2021
                               ) 10:09 a.m.
5          v.                  )
                               )
6   GAVIN NEWSOM, ET AL.,      ) Re: Status conference
                               ) Plaintiffs' motion to clarify
7              Defendants.     )

8         TRANSCRIPT OF PROCEEDINGS (Held via Zoom)
        BEFORE THE HONORABLE KIMBERLY J. MUELLER
9              UNITED STATES DISTRICT JUDGE

10  APPEARANCES (Via Zoom):

11  For the Plaintiffs:     ROSEN BIEN GALVAN & GRUNFELD, LLP by
                            MR. MICHAEL BIEN
12                          MS. LISA ADRIENNE ELLS
                            MS. CARA ELIZABETH TRAPANI
13                          MR. ERNEST GALVAN
                            MR. ALEXANDER ROSS GOURSE
14                          101 Mission Street, Sixth Floor
                            San Francisco, CA 94105
15
                            PRISON LAW OFFICE by
16                          MR. STEVE FAMA
                            1917 Fifth Street
17                          Berkeley, CA 94710

18
        (Appearances continued next page.)
19

20

21
                 JENNIFER COULTHARD, RMR, CRR
22                  Official Court Reporter
                   501 I Street, Suite 4-200
23                  Sacramento, CA 95814
                   jenrmrcrr2@gmail.com
24                     (530)537-9312

25  Reported using mechanical steno - computer-aided transcription

```
1    APPEARANCES (Via Zoom cont'd)

2    For the Defendant:      OFFICE OF THE ATTORNEY GENERAL by
                             MS. ELISE THORN
3                            1300 I Street, Suite 125
                             Sacramento, CA 94244
4
                             MR. DAMON GRANT McCLAIN
5                            455 Golden Gate Avenue, Suite 11000
                             San Francisco, CA 94102
6
                             HANSON BRIDGETT, LLP by
7                            MS. SAMANTHA DERIN WOLFF
                             425 Market Street, 26th Floor
8                            San Francisco, CA 94105

9                            MR. PAUL B. MELLO
                             1676 North California Blvd., Suite 620
10                           Walnut Creek, CA 94596

11   Also Present:           Special Master Matthew Lopes
                             Secretary Kathleen Allison,
12                           Dr. Joseph Bick
                             Dr. Amar Mehta
13                           Dr. Katherine Wharburton
                             Dr. Travis Williams
14

15

16

17

18

19

20

21

22

23

24

25
```

1          SACRAMENTO, CALIFORNIA, FRIDAY, MAY 14, 2021

2                            --oOo--

3      (Open court via Zoom.)

4          THE CLERK:  Calling civil case 90-520, Coleman,

5    et al. v. Newsome, et al.  This is on for a further status

6    conference and a motion hearing.

7          THE COURT:  All right.  Good morning.  For the

8    plaintiffs, Mr. Bien, you're present as lead counsel?

9          MR. BIEN:  Yes, Your Honor.  And with me appearing

10   today are Lisa Ells, Earnest Galvan, Jessica Winter, Cara

11   Trapani and Alex Gourse.

12         THE COURT:  Did you say Mr. Fama as well?

13         MR. BIEN:  Steve Fama is here from the Prison Law

14   Office, too, yes.  Thank you, Your Honor.

15         THE COURT:  All right.  All right.  Good morning to

16   all of you.

17         As has become our custom, I'll call on you, Mr. Bien,

18   but you may yield to a member of your team depending on subject

19   area expertise.

20         For the defense we have both tracks here, private lit

21   counsel, but I gather you're serving as lead counsel,

22   Mr. Mello?

23         MR. MELLO:  Yes, Your Honor.  Paul Mello and Samantha

24   Wolff for defendants as well as Elise Thorn for defendants.

25   Can you hear me?

1           THE COURT:  You're a little muffled, and the court

2     reporter is not, so more importantly.

3           MR. MELLO:  How about now, madam court reporter, can

4     you hear me better?  Okay.  Thank you.

5           This is Paul Mello and Samantha Wolff from Hanson

6     Bridgett for defendants.

7           THE COURT:  And so lead for the State?

8           MS. THORN:  Yes, Your Honor.  Elise Thorn, and along

9     with me is Damon McClain.

10          THE COURT:  All right.  Good morning to all of you.

11          So this is on for a further status and plaintiffs'

12    motion to clarify.

13          I'd like to proceed in the following order:  First,

14    we'll talk a bit about CQIT; secondly, the roadmap to reopening

15    as related to the delivery of mental healthcare, staffing --

16    and it's during our discussion of staffing that I'll have a few

17    questions about the motion for clarification.

18          I'd like to touch briefly on the PIP staffing plan,

19    the labor economist's report and then suicide prevention and

20    then other matters, including the setting of an in-camera

21    status, as I had signaled I'm interested in doing at our last

22    session.  And we can touch base on outstanding issues and set a

23    next status date.

24          Let me just ask, Mr. Bien, is there any other agenda

25    item you would like to cover today?

1          MR. BIEN:  No, Your Honor.  I think you have raised

2     all the issues that we consider necessary today.

3          THE COURT:  All right.  Mr. Mello?

4          MR. MELLO:  Nothing further, Your Honor.

5          THE COURT:  There's a muffling effect, Mr. Mello.  I

6     don't know if it has to do with -- we haven't experienced that

7     in the past with you.

8          MR. MELLO:  I'm going to take the headphones out, and

9     then you can let me know if it's still a problem.  I apologize.

10    I took them out.  There's just some noise in my house, so I

11    apologize for that in advance.  How about now?

12         THE COURT:  It's about the same.

13         Is that better for you madam court reporter?  All

14    right.  Without the --

15         MR. MELLO:  I'll just talk loud, which many people can

16    attest is probably typical.  Can you hear me now?

17         THE COURT:  Yes.

18         MR. MELLO:  Okay.  I'll do my best to speak loudly.

19    And if I ever get really loud, I apologize if it sounds like

20    yelling.  I'm just going to speak at a higher level.  Thank

21    you.

22         THE COURT:  All right.  Ms. Thorn, anything else that

23    you want covered this morning?

24         MS. THORN:  No, Your Honor.

25         THE COURT:  And I acknowledge the presence of

1    Secretary Allison as always.  Thank you, Secretary Allison, for

2    being here.  And I will call on you throughout the hearing to

3    ask if you have things you'd like me to know.

4           So on CQIT, it's timely to touch base on this, given

5    that the Special Master is planning on resuming monitoring.

6    He's informed me that in-person monitoring will begin later

7    this month, I believe on or about the 24th beginning with CMF.

8    And he'll provide a report at a later time in the hearing, and

9    I'll ask him at various junctures if he wants to weigh in.

10          I've taken a look at the parties' -- at the special

11   master's report, which I find very helpful.  It is an executive

12   summary in parts.  It has helpful graphics.  It's

13   understandable, it's clear, and it makes clear recommendations.

14          My understanding is the Special Master plans to use

15   the list of proposed indicators that he's provided to the Court

16   as he begins monitoring.  That said, the Court's understanding

17   is that there's an objection period, and the parties could file

18   objections.  And even if the Special Master is moving forward

19   on a parallel track, I will entertain objections and ultimately

20   rule on them.

21          I believe the Special Master's report to the Court was

22   filed on May 6, so I'd just like to understand, does any party

23   plan to file objections and, if so, does that party assume it

24   has 30 days from May 6th?  Mr. Bien?

25          MR. BIEN:  Mr. Galvan is going to address CQIT for us.

1          THE COURT:  All right.  Mr. Galvan?

2          MR. GALVAN:  The answer, Your Honor, is we don't know

3    yet whether we're going to file objections.  And we also don't

4    know whether the 30 days should count from May 6th or whether

5    it should count from today, in the sense that Your Honor is

6    today inviting objections, but we are -- we will meet either

7    deadline, whatever is set.

8          THE COURT:  All right.  Mr. Mello?

9          MR. MELLO:  I concur with the words of Mr. Galvan.  We

10   are still analyzing it and we anticipate if we have a response,

11   it will be timely, 30 days based on either the May 7th date or

12   today's date, Your Honor.  Thank you.  I'm hoping you can hear

13   me.

14         THE COURT:  We can.

15         Ms. Thorn, anything different?

16         MS. THORN:  No, Your Honor.

17         THE COURT:  All right.  Let me just ask the Special

18   Master.  Is there anything more you'd like to say about the

19   resumption of monitoring, which is very good news, I believe

20   for all of us?

21         SPECIAL MASTER LOPES:  Thank you, Your Honor.

22         Yes.  We will resume monitoring tours starting on May

23   24th, and we will visit one facility per month over the summer,

24   concluding with San Quentin where we will visit from October

25   25th through October 29th.  And then we will hopefully roll

1    into the unmet bed needs study for the remainder of the fall

2    and resume touring again at the beginning of 2022.  That's all

3    I have to report, Your Honor.

4        THE COURT:  All right.  And can you clarify?  I

5    believe you have indicated to the Court that you're conducting

6    monitoring in the same way you have in the past, but there may

7    be some expansion of methodology.  I'm using the wrong words, I

8    think.  Can you explain what you shared with the Court so

9    everyone hears that?

10        SPECIAL MASTER LOPES:  Yes, Your Honor.

11        What we are doing that's different at the beginning of

12   this round is we are looking at the continuum of care in the

13   first five facilities because they're so-called "PIP"

14   facilities.  So we'll measure compliance and evaluate the

15   delivery of mental health services in the CCC program or C3MS

16   program, the BOP program, the MACBs, ICF and acute care.  So

17   we'll follow the continuum of delivery of services right

18   through from when someone walks in to when they, sadly, would

19   need in-patient care.

20        And that's what we'll do for the first five

21   facilities, CMF, CHCF, Salinas Valley, CIW and San Quentin,

22   because all of those facilities have PIPs.

23        Then when we tour and resume touring the other

24   facilities, it will be more of a standard review because the

25   other facilities don't have in-patient care that's being

 1   provided.

 2           THE COURT:  All right.  Thank you.  Let me ask

 3   Secretary Allison is there anything you would like the Court to

 4   know based on your views of CQIT from where you sit?

 5           SECRETARY ALLISON:  Nothing in addition, ma'am.

 6           THE COURT:  All right.  All right.  There's not a huge

 7   difference between May 6th and today, and so I would say any

 8   objections are due within 30 days of today.  Again, it won't

 9   affect the Special Master's plans.  He will monitor the list

10   he's proposed to the Court.  If I sustain objections, it may be

11   that certain information is not given weight in the monitoring

12   round report as ultimately accepted by the Court, but I don't

13   think it -- there's no reason for the Special Master to delay

14   his plans.

15           Anything more on CQIT that any party wants me to know?

16   Mr. Galvan?

17           MR. GALVAN:  No, Your Honor.  Thank you.

18           THE COURT:  Mr. Mello?

19           MR. MELLO:  Nothing, Your Honor.

20           THE COURT:  Ms. Thorn?

21           MS. THORN:  No, Your Honor.

22           THE COURT:  All right.  Let's talk about the roadmap

23   to reopening, which also provides some hopeful signs.  I would

24   note it is the case that TMHU use has ended as of April 2nd; is

25   that correct, Mr. Bien?  I know Ms. Ells has been a point

1    person, but that's your understanding?

2          MR. BIEN:  That's my understanding.  That's what

3    defendants report to us, and we -- it is a very good sign.

4          THE COURT:  All right.  And defendants are confirming

5    that is, in fact, accurate information?

6          MR. MELLO:  Correct.

7          THE COURT:  All right.  And also, all inmates and

8    staff have been offered the vaccine as of the end of April.

9    That is correct.  Is Dr. Bick the person to confirm that

10   information?

11         MR. MELLO:  So I don't know if all have because,

12   again, there are people who come in to the system in reception,

13   and there are some delays, so it depends on the definition of

14   "all," but I think Dr. Bick could speak to that issue, Your

15   Honor.

16         THE COURT:  Dr. Bick?

17         DR. BICK:  Your Honor, what was the specific question?

18         THE COURT:  Well, I understood from the report I'm

19   looking at that all inmates -- I had a follow-up question about

20   intake, so we can get there.  Putting aside intake, have all

21   inmates and staff been offered the vaccine as of the end of

22   April?

23         DR. BICK:  Yes, Your Honor, at least once.

24         THE COURT:  All right.  How's uptake going with staff?

25         DR. BICK:  It's improving slowly.  We still have a

1    ways to go, but I remain optimistic.

2          THE COURT:  All right.  What is the plan for intake

3    going forward?  Will all inmates be vaccinated upon intake or

4    at least offered the vaccine?

5          DR. BICK:  Yes, Your Honor.  Every incoming

6    incarcerated person from a jail setting is being offered the

7    vaccine during their reception process with the goal of getting

8    as many of them vaccinated prior to moving to institutions as

9    possible.

10          THE COURT:  All right.  And the time in intake allows

11    for a full vaccination; two shots, if needed?

12          DR. BICK:  It does, although we are taking advantage

13    of the one-shot vaccine as much as possible to increase the

14    likelihood that people will complete their series before they

15    leave reception.

16          THE COURT:  All right.  In terms of the roadmap

17    itself, just certain content, I'm remembering Dr. Mehta's

18    statements to the Court at our last session in March and

19    specifically headlining that the updated roadmap would contain

20    a lot of very specific information about the size of the

21    groups, how to set things up and what different phases the

22    institution has to be in, in order to accommodate different

23    levels of treatment.

24          I've looked at the roadmap to reopening as updated,

25    and I'm seeing references to groups, but I'm not seeing the

1   level of detail I thought might be there, and so I'd like to

2   turn back to Dr. Mehta and just ask you to share with me --

3   does what's been provided to the Court reflect everything you

4   were signaling has been developed, or is there another document

5   out there?

6           You're muted.  You're still muted.

7           Ms. Schultz, are we in a position to adjust

8   Dr. Mehta's microphone?

9           THE CLERK:  I've sent a message to ask him to unmute.

10  That might be easier.

11          THE COURT:  There we go.

12          DR. MEHTA:  Okay.  Sorry about that.  When I hit it

13  before, it wouldn't let me, but thank you.

14          And you're absolutely right, Your Honor.  When we were

15  in the workgroup with the roadmap, as we were developing it, it

16  was considered to be really a high-level umbrella document, and

17  then the different departments could kind of slot in their own

18  pieces there.  We ended up putting in the tier chart a lot of

19  that information.

20          I do want to also defer to Dr. Bick in case he wanted

21  to make any comment on that.

22          DR. BICK:  No.  That's accurate, Your Honor.

23          And one of the challenges, obviously, is the unique

24  physical plant for each institution and the need to be able to

25  be flexible in how we move forward.

1      THE COURT:  So is there a companion document that's

2  really incorporated by reference in the roadmap to reopening

3  that does provide the level of detail the Court had thought it

4  would see in the current update, Dr. Bick?

5      DR. BICK:  Not at this time, Your Honor.  And although

6  the document we provided is only 20, 21 days old, that's really

7  a long time in terms of how quickly things are moving, so we

8  already have more significant changes in how we are programming

9  with respect to COVID.  So I expect that we'll continue to

10  update this document regularly as we go forward.

11      DR. MEHTA:  If I may, Your Honor.

12      THE COURT:  All right.  Dr. Mehta.

13      DR. MEHTA:  Thank you.  So at the last few pages of

14  our filing of the roadmap, the part that's in the table format,

15  the tier chart, that's the sort of mental health slot-in for

16  that.  It has some more information specifically on -- we

17  aligned our tiers with the roadmap phases and made sure that

18  they're saying the same thing and then providing more detail on

19  the mental health piece specifically.

20      So we talked about how to do groups in different

21  outbreak conditions and updated all the previous information we

22  had about how to triage different levels of need within the

23  institution when they're suffering from an outbreak.

24      THE COURT:  All right.  Let me ask plaintiffs.  I

25  don't know who's covering this, but do plaintiffs believe

1    they're receiving adequate information on size of groups,

2    setting up of groups, institution-by-institution

3    considerations, Mr. Bien?

4          MR. BIEN:  We detect the same deficiency that Your

5    Honor detected in the new roadmap and the new tiers.  They do

6    not have the level of detail that we had hoped for.  I think

7    the good news I can report to the Court is that we had a

8    productive meeting with defendants and the Special Master this

9    week.  We've had a response to our questions and there's a

10   meeting next week planned to discuss some data issues that

11   emerged that make it difficult for us to understand exactly

12   what treatment is actually happening at each institution.

13          We understand that there, of course -- as Dr. Bick

14   pointed out, each institution has different physical facilities

15   and staffing challenges.  And also, obviously the outbreak is

16   not -- the pandemic is not over, and each institution will have

17   different conditions to deal with, but we do think that there

18   needs to be -- and we've talked to defendants about it and they

19   seem willing to talk about it -- additional refinements so that

20   we know what are their expectations for treatment levels at

21   each tier level; what are the public health guidance about the

22   size of groups.  And, you know, of course this is ever

23   changing.

24          Again, the Centers for Disease Control, as you may

25   know, issued new guidelines yesterday.  You know, we're all

1    just looking at them and some of them apply broadly, some of

2    them carve out correctional institutions, but I do think that

3    one issue we brought up, should vaccinated incarcerated people

4    be treated differently.

5          Centers for Disease Control made a big point about the

6    fact that to encourage people to take vaccines it's important

7    to reward the vaccinated people and treat them differently and

8    that there is, you know, very little risk with vaccinated

9    people.

10         However, they also are very aware -- CDC is very aware

11   of the risk of congregant crowded settings, like prisons and

12   jails, so they still are advocating caution there.  Anyway,

13   it's still moving.  Obviously everything is still moving.

14         We do think that there needs to be more detail, needs

15   to be more guidance from headquarters and the reporting needs

16   to be more transparent, and we're going to work with defendants

17   on those issues.  And we don't see a need for a court order at

18   this point, but we do want to make sure that people continue to

19   interact with us and discuss these important issues as we move

20   forward.

21         THE COURT:  So the existing workgroup setting is

22   working well at this point?

23         MR. BIEN:  Yes.  And we were concerned that -- anyway,

24   maybe just in reaction to our filing defendants seem to

25   indicate that maybe they were not willing to discuss these

1    things, but from our perspective, they are willing to discuss

2    these issues, and we appreciate that.

3             THE COURT:  All right.  Let me ask you this:  To the

4    extent the roadmap is updated, does it make sense for this

5    Court to request that each time the roadmap is updated, to the

6    extent the updates relate to mental healthcare should I request

7    a copy or should I wait for the parties to bring to my

8    attention any issues I might need to address with respect to

9    the roadmap?

10            MR. BIEN:  I think it would be -- the issues that

11   we're facing are clearly Coleman issues.  I think that roadmap

12   updates should be provided to the Court, including tier

13   updates, which are -- as Dr. Mehta pointed out are specific --

14   the tier chart is specific to mental health.  And I think

15   that's really going to be the challenge as, you know, what is

16   the new normal.  Defendants use that term in their -- in the

17   roadmap.  What is the new normal?  What are the expectations?

18   I think, as we all know, this could be a very long period ahead

19   of us of the new normal and how do we address that.

20            So, for example, if public health says we can't have

21   full groups, how are defendants going to provide additional

22   groups for those people?  Are they going to have groups in the

23   evenings or weekends?  Are they going to find additional

24   spaces?  Because no one -- no public health guidance advocates,

25   you know, denial of healthcare because of the pandemic.  So I

1  think we're getting to that point of the new normal, and we

2  really need to define what it is and how we're going to meet

3  those expectations.

4      THE COURT:  All right.  Mr. Mello, if you're the

5  person to answer this question, any reason I shouldn't direct

6  the defendants to file any updates to the roadmap to reopening

7  within a few days of the update being finalized?

8      MR. MELLO:  I am the person who can speak to that

9  issue.  May I also speak to some of the issues raised by

10  counsel?

11      THE COURT:  You may.

12      MR. MELLO:  We will, of course, if there is an update

13  to the roadmap or the tier chart, it will be filed with the

14  Court.  Defendants have never been unwilling to share

15  information and communicate with plaintiffs' counsel on these

16  issues.

17      Defendants did think it was inappropriate for

18  plaintiffs to request relief in response to our filing of the

19  roadmap and tier chart.

20      And defendants believe that it is important for the

21  Court to understand that public health guidance and science

22  continue to evolve.  It's evolved since the filing of the

23  roadmap and the tier chart, and it will continue to evolve.

24  And as much as we would like for there to be simple benchmarks

25  and a date certain for COVID-19 to be over, that just isn't the

1    reality, and so we will continue to communicate with and we

2    will continue to rely upon public health experts.

3         And again, Dr. Bick can speak to those issues more,

4    but we will update the Court if there are formalized updates to

5    the roadmap or tier chart, Your Honor.  Thank you.

6         THE COURT:  All right.  So I'll look for those

7    updates, review them and let the parties know if I require any

8    input.

9         On this, Special Master Lopes, anything you'd like to

10   say?  The workgroup process is working well in this respect,

11   from your point of view?

12        SPECIAL MASTER LOPES:  Yes, it is, Your Honor, and

13   we'll continue to meet and discuss these topics.

14        THE COURT:  All right.  Anything, Secretary Allison,

15   you'd like the Court to know?  You're muted.

16        SECRETARY ALLISON:  No, ma'am.  Thank you.

17        THE COURT:  All right.  In terms of how the specific

18   issues related to Coleman move forward, here are the Court's

19   thoughts, just so you're clear.  In terms of the plaintiffs'

20   request at 7141 and then the defendant's response at ECF 7155,

21   here's an observation:  I don't feel the need to resolve

22   anything, assuming you don't talk me out of that in responding

23   to what I have to say next in substance, but I would observe

24   that ECF No. 7155, cosigned by Ms. Wolff, who is present here

25   today, and Mr. Hennes who is not, I believe, unless he is

1    monitoring, it does not comply with this Court's order at ECF

2    No. 5726.  And so I'm just reminding parties that that's an

3    order, a standing order, and the Court requires compliance with

4    it.  And given that the filing at ECF No. 7155 does not comply,

5    I'm disregarding it.

6          In terms of the process going forward, I note the

7    parties continue to file stipulations with respect to

8    departures from the program guide.  And obviously plaintiffs

9    don't have a gun to their head in agreeing to stipulations; and

10   so on the one hand, I would assume if at any point the

11   defendants believe they have no choice but to depart from the

12   program guide and the plaintiffs won't stipulate to that, then

13   it's the defendants who would come forward and request the

14   filing of a motion to depart.

15         So, in my mind, it's those stipulations that let the

16   Court know what the parties are agreeing to without the Court's

17   blessing.  And if the plaintiffs at any point withdraw a

18   stipulation, then there's an issue that's joined and the Court

19   should address it promptly.

20         It may also be, given lessons learned, that there may

21   be some stipulated, proposed modifications to the program

22   guide, which, of course, the Court would consider and

23   ultimately then decide if I'm going to bless those.

24         And there might be some disputed changes to the

25   program guide; the defendants say there needs to be a change

1    here, plaintiffs disagree, then those disputes the Court would

2    resolve.

3            Why is it not sufficient to have the -- it's

4    effectively monthly, right -- the monthly stipulation process

5    determine disputes that this Court may need to resolve?

6            At some point the Court may look askance at

7    stipulations.  I'm not there, but at some point I may say to

8    the plaintiffs, "Well, why are these stipulations still coming

9    in."  Is that not the process that maximizes exhausting meeting

10   and conferring and narrowing disputes that the Court may have

11   to resolve or stipulations that the Court may think hard about

12   blessing?  Mr. Bien?

13           MR. BIEN:  Your Honor, we agree with your analysis of

14   where we are now in terms of modifying the program guide for

15   purposes of the pandemic.  It's been done through the

16   stipulation process and, you know, we have raised in workgroup

17   meetings the fact that we may not stipulate unless we can get

18   information or otherwise, so that's -- I think it's an

19   appropriate way of moving forward.

20           And again, if we cannot -- our goal, of course, is not

21   to relitigate anything, and we're trying to keep away from

22   having to do that; again, because the science is changing and

23   things are moving, but we do think it is important to make sure

24   that, you know, minimally adequate mental healthcare is

25   provided.

1          And for example, if a particular place -- if the

2     reason mental healthcare is not being provided is a staffing

3     shortage, not pandemic related, we need to be able to focus on

4     that and address it.  So I agree that the procedure the Court

5     has outlined makes sense as a way of moving forward.

6          THE COURT:  The monthly reports -- the stipulations

7     could start to take on the form of a deactivation schedule

8     actually, so some columns could be added.  I think it would be

9     good for the parties to talk about whether or not that starts

10    to make some sense.  So column date by which the parties

11    currently think this departure can be lifted, you know, and

12    then an actual date.  I would strongly suggest that you start

13    providing those stipulations in that format to help the Court

14    follow where you are with these things.

15         Does that make sense to you, Mr. Mello?

16         MR. MELLO:  So I'm confused by the word

17    "stipulations," because these are monthly reports, but we agree

18    to meet and confer with plaintiffs on this issue and to provide

19    updates, continue to provide updates on these issues, and we

20    would like that column to be included.  Proposed, of course,

21    subject to the big caveat that COVID is evolving and

22    circumstances are changing.  Of course we will meet and confer

23    under the supervision of the Special Master on this issue about

24    those reports and the information the Court requests.

25         THE COURT:  All right.  Ms. Thorn, anything other than

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1   that?

2           MS. THORN:  No, Your Honor.

3           THE COURT:  All right.  Secretary Allison, anything to

4   say on this process, the process of effectively starting to

5   think of these monthly reports as morphing into deactivation

6   schedules?  Does that work for you?

7           SECRETARY ALLISON:  I think I'm a little confused

8   here, but I certainly rely on my counsel's recommendation as

9   far as the monthly reports and keeping you informed through

10  that process.

11          THE COURT:  All right.  The point is that there have

12  been these temporary departures from the program guide that are

13  not permanent, and so that is -- I'm trying to get clarity on,

14  as things move forward, even if there is -- the horizon is not

15  yet entirely clear, but certain horizons seem to be coming

16  clear as we gain more experience, for example, with vaccination

17  status.  It's how can the Court monitor and do its part to

18  facilitate meeting and conferring, exhausting of meeting and

19  conferring and narrowing of disputes with respect to when the

20  current departures from the program guide are lifted?  Does

21  that make senses in terms of the way you think about it,

22  Secretary Allison?

23          SECRETARY ALLISON:  Yes, ma'am.

24          THE COURT:  All right.  All right.  Well, I'll

25  continue to look at those monthly reports closely, and I'll

1   look for columns with target dates for lifting of departures

2   and any other notes the parties wish to share.  And as soon as

3   there's a dispute the Court needs to resolve, either party can

4   let me know, on established procedures.

5         On staffing with respect to plaintiffs' motion for

6   clarification, I have a few questions here.

7         This is Mr. Gourse for the plaintiffs?

8         MR. BIEN:  Yes, Your Honor.

9         MR. GOURSE:  Yes, Your Honor.

10        THE COURT:  And Mr. Mello and Ms. Thorn cosigned the

11  brief.  Who is taking the lead on the argument here?

12        MR. MELLO:  Me, Your Honor.

13        THE COURT:  All right.  So Mr. Mello, it's not

14  disputed that the chief supervising psychiatrists perform

15  clinical functions, right?

16        MR. MELLO:  And so is the question if, on occasion,

17  chiefs and supervisors provide patient care in 2021?  I don't

18  know how much evidence there is in the record.

19        Is the question whether that was the basis for the

20  2002 recommendation by Special Master Keating and the

21  objections filed by the parties and the order by Judge Karlton?

22  That's a different question.

23        Is it disputed that on occasion in 2021 chiefs and

24  supervisors performed direct patient care?  The answer is I'm

25  sure on occasion that occurs.

1          THE COURT:  All right.  It appears I don't need to

2     have the court reporter read back the question.  Are you

3     limiting your answer to only 2021?  You think that's the only

4     relevant year?

5          MR. MELLO:  So as our briefing indicated, Your Honor,

6     and as plaintiffs conceded in their briefing, what's relevant

7     to discerning the intent of the Court's order in 2002 was the

8     events and the facts present at that time that the Special

9     Master made its recommendation that was adopted by the Court.

10         So I do think it is irrelevant if we are discerning

11    what the order was meant to remedy in 2002 to consider what's

12    happening in 2021 for that purpose because it is I think

13    without dispute that the Court did not consider 2021 -- did not

14    have information on 2021 when it issued its order.  That would

15    be chronologically impossible, I think.  That's my

16    understanding, Your Honor.  That would be the relevant issue.

17    And I'm glad to speak more to that, if you would like.

18         THE COURT:  Is it possible to look at the entirety of

19    the record here and conclude that the Court, and the Special

20    Master, as the arm of the Court, was assuming 100 percent fill

21    rate of chiefs and supervising psychiatrists?

22         MR. MELLO:  I don't think that that speculation can be

23    made based upon the record before the Court in 2002.  It is

24    devoid in the Special Master's report.  It is not addressed by

25    defendants or plaintiffs in their response to the Special

1   Master's report in 2002.

2          In fact, if the Court looks at plaintiffs' response to

3   defendant's objections, they point out what this particular

4   issue was about in their mind, and that was about ensuring that

5   line staff remained filled.  It was about ensuring that the

6   State continue to use contractors to provide line staff

7   services in the face of the 2002 crisis and concerns about

8   budget reductions.  That is clear.

9          If you look at plaintiffs' response to that brief,

10  docket 1365, lines 3 -- I mean page 3, lines 1 through 7,

11  plaintiffs quite clearly demonstrate what they thought the

12  issue was about.

13         I can read that to the Court, if the Court would like

14  those quotes, but they acknowledge that this was about ensuring

15  that contractors and the continued use of contractors to

16  provide line staff services continued.  And they say -- they

17  close their quote which, again, page 3, lines 1 to 7 saying

18  "This is necessary and narrowly drawn."

19         Now, after the fact plaintiffs are saying let's not

20  comply with the PLRA, let's not consider what's narrowly drawn,

21  what's necessary; let's expand the injunction that was issued

22  in 2002 based upon the facts in 2002 and let's just ask for

23  more, and let's make more reporting.  And that's just not

24  what's permitted under the PLRA.  And moreover, it just ignores

25  the context of the issuance of the 2002 recommendation and the

1    2002 order.

2           THE COURT:  Again, just looking at the record as a

3    whole, isn't it clear that the role of supervisors was

4    recognized as essential, given the number of short-term

5    contracted psychiatrists, given the need for formulary

6    oversight, given the need for a supervisory role with respect

7    to local operating procedures?  Even if not explicit, isn't

8    there an assumption that supervisory roles are filled?

9           MR. MELLO:  So -- and again, when you talk about the

10   record, I'm focused on the record in 2002 because what happened

11   after the fact is largely irrelevant in discerning what the

12   2002 order meant, but there's nothing in the record.  It wasn't

13   a source for the issuance of this recommendation.  It wasn't

14   even on the Special Master's mind.

15          Now, plaintiffs have gone through the record prior to

16   2002 recognizing the shortcomings of their arguments and

17   plucked identification or references to the import of

18   supervisors and chiefs, but it was not the basis for the order

19   of the Court in 2002.

20          And it is not a clear and unambiguous order when you

21   file a motion to clarify 19 years after, as opposed to a motion

22   to enforce.  That's self-defeating.

23          And so, again, what's relevant was what the order was

24   trying to remedy, what the recommendation was trying to remedy,

25   and it was with respect to line staff.

1          THE COURT:  I understand that argument.

2          Is there no inference to be drawn about what that

3    means for supervisors?  Or let's just cut to the chase.  I can

4    ask Secretary Allison her position on this as a merits matter,

5    but what does the record tell the Court about supervisor fill

6    rate?  Is it just completely unaddressed; and therefore, the

7    defendants are free to live with whatever rate happens to be

8    calculated at any given time?

9          MR. MELLO:  So, Your Honor, we're here on a motion to

10   clarify an order in 2002.  We are not here -- I don't believe

11   the issue for the Court, pursuant to the PLRAs is:  Don't we

12   need to fill supervisors and chief positions and don't they

13   have an important role?  The question is what was the intent in

14   2002?  Those can be separate issues in terms of performing and

15   continuing to provide service to patients and to the residents

16   of CDCR.  That's a vastly different issue.  But we're here on

17   plaintiffs' motion to clarify the 2002 order, not on how to run

18   the system and whether you need to fill supervisor positions,

19   which I think would be undisputed by anybody, Dr. Mehta,

20   Dr. Bick, that of course you need supervisors.

21         But if we are complying with the PLRA and if we are

22   discerning the intent of the 2002 order, it doesn't just morph

23   into "of course it included supervisors and chiefs," because

24   that's not the record that was before the Court, and that's not

25   the basis for the Court's order.  That's all I'm saying.

1    That's a separate issue from whether or not Secretary Allison

2    and Dr. Bick and Dr. Mehta believe that we should have

3    supervisors.  That's a totally separate issue from plaintiffs'

4    motion that's before the Court.

5         THE COURT:  But in arguing your interpretation of the

6    2002 order, you are saying that the entirety of the balance of

7    the record, as relevant to that interpretation question, is

8    silent as to the fill rate for supervisors, correct?

9         MR. MELLO:  I am saying that in 2002 when the order

10   was issued that it was not the basis for the order, correct.

11        THE COURT:  And no course of conduct since the

12   issuance of that order makes any difference, correct?  That's

13   your view?

14        MR. MELLO:  So I don't think -- I think it's my view

15   as to what the PLRA requires.  It's my view as to what the

16   basis of the order was.

17        It's a vastly different question as to whether chiefs

18   and supervisors are monitored and considered in the defendants'

19   efforts to fill those positions.  That's a vastly different

20   issue than an order that requires us to have a certain fill

21   rate with respect to staff persons.

22        Two things can be true, but one thing can't be true,

23   which was that there was any evidence -- that this was the

24   issue that the Special Master was trying to address in 2002

25   when the Court then adopted his recommendation.  That's all I'm

1    saying, Your Honor.

2          THE COURT:  All right.  Mr. Gourse, are there any

3    assumptions that were clear that informed the Court's adoption

4    of the 2002 order?

5          I've read the briefing.  You know, I understand the

6    Latin concepts bandied about.  It's a great regret to me that I

7    didn't take Latin at the little teeny, tiny Iowa high school I

8    went to, even though the person who taught calculous also

9    offered Latin, but I understand what the terms mean.

10          As you can tell, I'm focused on the context, and, I

11    mean, you're saying 90 percent minimum applied across the

12    board.  I look at some of what seems to have mattered even in

13    2002, and it appears to the Court it might have been that there

14    was an assumption that supervisors are filled at a hundred

15    percent.  You would say that conclusion is wrong from a very

16    different point of view, correct, than that articulated by

17    Mr. Mello?

18          MR. GOURSE:  I don't think that that conclusion is

19    wrong.  I think the assumption in 2002 was that there is a

20    problem in defendants' psychiatry programs stemming from

21    widespread vacancies in precisely these same psychiatrist

22    supervisor positions that are still vacant today.

23          And the assumption was that those positions need to be

24    filled.  And to the extent that the defendants were having

25    difficulty complying with the original 1999 order, which I

1    think then sort of moved things back and set both a deadline

2    for them to comply and set the fill rate at 75 percent, and it

3    also ordered them to limit their use of contractors.

4         The assumption underlying the 2002 order was that 90

5    percent was a realistic benchmark for them to achieve and that

6    the optimal fill rate is obviously 100 percent.  But, in the

7    near term, the assumption was that 90 percent would be a clear

8    benchmark that was attainable for them.

9         THE COURT:  Do you happen to know that there's a

10   February 2002 report referring to vacancy rates and contract

11   hours?

12        MR. GOURSE:  I am not familiar with that particular

13   report, Your Honor.

14        THE COURT:  I believe it's February 26, 2002.

15        MR. GOURSE:  So February 26th, 2002, is the date that

16   the Special Master issued his report and -- his underlying

17   report that led to the 2002 order.  Are you referring to a

18   separate report about contractors that was issued on the same

19   date?

20        THE COURT:  It's the Special Master's report, I

21   believe.  I'm just wondering if that -- is it your position

22   that those numbers talk about all psychiatrists or only staff

23   psychiatrists?

24        MR. GOURSE:  So to the extent that the question is --

25   I just want to make sure I understand Your Honor.  If the

1    question is what a specific report about contractors that was

2    issued on that date meant, I can't answer the question because

3    I'm not familiar with the report.

4           To the extent that the question is what the Special

5    Master's underlying report that led to the 2002 order was, and

6    I believe -- just to make sure I've got the docket number

7    right, I'm going to just look at the briefing here for one

8    second.  But if the Court's question is what that underlying

9    Special Master report that led to the 2002 order meant by the

10   term "psychiatrists," yes, our position is that it did include

11   all supervisory psychiatrists as well as line psychiatrists.

12          THE COURT:  Mr. Mello, do you read the February 2002

13   report differently, as capturing different data?

14          MR. MELLO:  It captured data, but I'm reading for

15   purposes of plaintiffs' motion to clarify, the actual

16   recommendation in the report.  And also I'm looking at

17   plaintiffs' response, again, at docket 1365, page 3, where they

18   note that this is about line staff.

19          And so while the report may have included an

20   attachment that reported on data, it spoke specifically -- it

21   was speaking to and the parties were referencing line

22   positions.  And again, I encourage the Court to look at

23   plaintiffs' objections since they just avoid it because it's so

24   telling in their briefing.

25          MR. GOURSE:  I can respond to that, Your Honor.

1          THE COURT:  All right.  Briefly.

2          MR. GOURSE:  We did not avoid the issue of our

3     objections.  We discussed them in our reply brief.  The fact

4     that plaintiffs were concerned about making contractor

5     positions or about potential layoffs of contractors is in no

6     way inconsistent with the argument that the Court and the

7     Special Master and plaintiffs were all concerned about vacant

8     supervisory positions precisely because defendants were using

9     contractors so heavily.  Those are two perfectly consistent

10    things to be concerned about.  And the assumption defendants

11    make that the only thing the parties or the Court or the

12    Special Master was concerned about at that point is precisely

13    the kind of cherrypicking of the historical record that they

14    normally fault plaintiffs for in the briefing.

15         THE COURT:  So Mr. Gourse, if the Court decides

16    against the plaintiffs on this motion, is there a gap after all

17    these many years that needs to be filled to address the fill

18    rate for supervisors?

19         MR. GOURSE:  Yes is our short answer.

20         The reason that we chose -- if I could actually just

21    get some clarification from the Court about what you mean by

22    "is there a gap."  I understood you to mean is there a gap in

23    terms of the applicable remedy, or is it a gap in terms of

24    something else?

25         THE COURT:  The fill rate for supervisors, for chiefs

 1    and supervisors.  So let's say --

 2              MR. GOURSE:  Yes.

 3              THE COURT:  -- that the 90 percent applies only to

 4    line personnel, but, you know, clearly the Court has

 5    contemplated -- has thought about supervisors even if it didn't

 6    make express what it was thinking.  So should this Court now

 7    initiate proceedings?  This is all -- I'm just testing your

 8    arguments here, you know --

 9              MR. GOURSE:  Understood, Your Honor.

10              THE COURT:  -- so you know where I'm going with this.

11    So the question is assume for sake of argument I find the

12    defendants are correct on this point, on the legal point.  Does

13    the fill rate for supervisors need to be clarified as a matter

14    of law?

15              MR. GOURSE:  I understand better your question now,

16    Your Honor.  Thank you.

17              No.  If the Court decides against plaintiffs on this,

18    the benchmark is actually 100 percent.  That is the underlying

19    assumption, as the Court correctly points out.

20              The alternative to that would be that there is -- that

21    there isn't any benchmark if the Court were to decide against

22    plaintiffs on this motion.  And that is I think -- that's just

23    implausible, given that the parties are currently in the midst

24    of trying to identify clear benchmarks that can bring an end to

25    this case.  The defendants -- I'll stop there.

1          THE COURT:  All right.  Anything to say, Mr. Mello, in

2     response to what Mr. Gourse just said, that the default is 100

3     percent if the Court grants or sides with you on this issue?

4          MR. MELLO:  Again, this Court in the court ruling in

5     2002 was subject to application of the Prison Litigation Reform

6     Act, which would require a needs, narrowness and intrusiveness

7     finding.  I cannot believe that 100 percent compliance on an

8     issue would be the default position and satisfy the requisites

9     or the requirements of the Prison Litigation Reform Act.

10         And it is not necessary that the Court issue an order

11    on every particular aspect of the department.  The fact that

12    the department can report fill rate information to the parties

13    and to the Special Master is one thing.  That the Court issues

14    an order one way or the other after the fact that 100 percent

15    compliance or 90 percent compliance was what was required in

16    2002 and going forward, I'm almost without words, but I don't

17    have anything further, Your Honor.

18         THE COURT:  All right.  Well, I have my questions

19    answered.  I'm going to submit the motion and resolve the legal

20    questions.  I would just, I believe -- I know we're waiting on

21    the PIP staffing plan, and we're going to talk about that next

22    briefly, but if the Court's calculations are correct, if I were

23    to decide this motion in favor of plaintiffs, I believe it

24    would require the hiring of 1.8, so 2 chief psychiatrists and

25    2.05 additional senior psychiatrist positions, so we're talking

1    about 4 positions.  And I just wondered if Secretary Allison

2    has anything to say about that.  There are four positions.  I

3    know there have been -- for the entire time this Court has been

4    presiding, there have been staffing issues.

5        Practically speaking -- I know you have spoken at

6    times, refreshingly, in practical terms.  Supervisors, in a

7    hierarchical system where there's going to be accountability

8    and management of a bureaucracy, supervisors are important

9    regardless of what the fill rate is.  So is it that the defense

10    is unable to fill to 90 percent at this point in time?

11        SECRETARY ALLISON:  Ma'am, I just have to be honest.

12    I'm very very confused with all the back and forth on this

13    issue.  I do believe supervisor staff is important, but I would

14    have to defer to my counsel as it relates to this argument that

15    is before us today.  I'm sorry.

16        THE COURT:  All right.  I may want to discuss the

17    practical implications of whatever I decide and specifically

18    where we are with filling supervisory positions, even assuming

19    it's a 90 percent fill rate or something lower, as evidently

20    suggested by the defense.

21        Anything you have to say on this point, Special Master

22    Lopes, before we move on?

23        SPECIAL MASTER LOPES:  No, Your Honor.

24        THE COURT:  All right.  On the CDCR PIP staffing plan,

25    I understand that there has been good progress here.  This is a

1   highlight.  There's agreement in principle, and a plan will be

2   filed with the Court soon.  And so I'd ask Special Master Lopes

3   to provide any update he has.

4          My question would be can I say that the CDCR PIP

5   staffing plan will be filed within 30 days as an outside date?

6   Special Master Lopes first.

7          SPECIAL MASTER LOPES:  Thank you, Your Honor.  Since

8   the defendants filed their PIP staffing plan, we've held a

9   series of meetings with the parties.  There's general agreement

10  regarding the plan with only a few questions remaining from the

11  plaintiffs.

12         The Coleman experts have reviewed the plan extensively

13  and do not have any objections to its provisions or its

14  implementation at this time.

15         Defendants have stated that they would prefer to wait

16  to file the plan until the May revised budget comes out, which,

17  coincidentally, is supposed to be today, before producing an

18  updated written plan to determine if the funding would be

19  provided for the plan.  And in their minds, full implementation

20  of the plan will not be possible until legislative approval of

21  the budget granting authority for the positions is in place.

22  And that could -- that's expected sometime around the end of

23  June or the beginning of July.

24         But again, in principle there is an agreement on the

25  plan and I think a general consensus that even the questions

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1    that plaintiffs may have regarding the plan have to be -- the

2    only way to get the answers is to monitor and evaluate the plan

3    as it's being rolled out.

4            THE COURT:  All right.  So anything to add to that?

5    And is 30 days at the outside sufficient to finalize the plan

6    and file it, Mr. Bien?

7            MR. BIEN:  Ms. Ells is going to address this, Your

8    Honor.

9            THE COURT:  All right.  Ms. Ells?

10           MS. ELLS:  Good morning, Your Honor.

11           You are correct that we have made good progress in

12   negotiating with defendants.  I can also say that the May

13   revise has been released, and it does appear that this plan is

14   in the budget.

15           We continue to have some significant concerns, given

16   the status of the PIPs, as dangerously unconstitutional, which

17   they have been for some time now.  There have been four

18   suicides in the PIPs since October, which is outrageous for an

19   in-patient program and unprecedented in the history of this

20   case.  And we are quite concerned that there will be some cuts

21   to mental health staffing from the levels that CDCR employs

22   today when we include yet the funding and positions that are

23   included from the blanket.  There are also reductions from

24   where the levels were set at the point of lift and shift.

25           And we are especially concerned about the adequacy of

1    staffing for the max custody units where people are really

2    suffering and receiving next to no care at this point.

3            So with that said, however, we do feel like defendants

4    have made some very positive steps towards defining and

5    preparing to fund a full staffing plan, and that includes

6    nursing and custody as well as mental health positions.  And we

7    are hopeful that if fully funded, which hopefully, given the

8    budget surplus it will be, that it is worth monitoring to see

9    if this staffing level, in addition to other remedial changes

10   that need to be made in the PIPs, can achieve constitutionally

11   adequate care in the PIPs.

12           So the short answer to your question is I think 30

13   days is more than sufficient.  I'm pretty sure, although

14   defendants can speak for themselves, that the plan can be filed

15   much more quickly than that, given the status of our

16   negotiations and discussions, but I'll leave that answer to

17   them.  Thirty days is more than sufficient though.

18           THE COURT:  All right.  Mr. Mello, this is you?

19           MR. MELLO:  Yes, ma'am.

20           Defendants can file their proposed PIP staffing plan

21   that was included in the May revised, that was vetted through

22   the Special Master's team and was negotiated with plaintiffs'

23   counsel.  We can file that in less than 30 days, recognizing we

24   can't file the final plan until the actual completion of the

25   legislative process and the budget being filed.  But yes, we

1   can file it sooner than that.  And yes, it will look like the

2   March 22nd filing with the updates or the results of the

3   meetings with the Special Master's team and sharing of

4   information with plaintiffs' counsel.  So we can file it sooner

5   than 30 days, Your Honor, but if this Court would like a final

6   one, we can file that shortly after the budget is signed.

7          And in addition, since the budget was signed at some

8   point, though Secretary Allison does have to leave, because

9   several items in that May revised may be of interest to the

10  Court, she is willing to talk to you very high level about a

11  couple of those items because they may touch upon some of the

12  issues today, including the fact that, as Ms. Ells indicated,

13  that the PIP staffing plan is in the May revised.

14         THE COURT:  All right.  Well, I'd direct the filing of

15  the provisional plan subject to the budget being finalized,

16  filing within 30 days at the outside and then final plan once

17  the budget is adopted.

18         We can move the labor economist's report to the end of

19  the substantive matters to accommodate Secretary Allison,

20  particularly given past discussions about suicide prevention.

21         So Secretary Allison, I'd allow you to tell me

22  anything you want me to know about the May revised, which I do

23  see is out.  But I also wanted to acknowledge the updated

24  suicide prevention activation schedules.  I've looked at those.

25  That appears to be a very useful tool, management tool, and it

1    provides, in an easily digestible form, very important

2    information.

3         I had two questions.  I note that some things are

4    marked completed, but also subject to the Special Master's

5    expert's review, and so I'm assuming there will be a further

6    update based on that review, not an assumption that that's a

7    final report on completion.

8         And then my thought would be to direct that the

9    activation schedules be filed at any time when a project slips,

10   when a projected date is not met.  So those are my two thoughts

11   about the activation schedules.

12        Perhaps, Secretary Allison, we could start with

13   suicide prevention.  I know that's a high priority for you.  It

14   continues to be a serious problem.  So anything you want me to

15   know and any response to what I've observed about the

16   activation schedules?

17        SECRETARY ALLISON:  I'm going to defer to Dr. Williams

18   on that.

19        THE COURT:  All right.  Dr. Williams.

20        DR. WILLIAMS:  Of course.  Good morning.  I think that

21   those things are appropriate.  We can manage that with this

22   implementation.

23        With regard -- go ahead.  I'm sorry.

24        THE COURT:  Is there more you wanted to tell me?

25        DR. WILLIAMS:  No.  I have nothing further unless you

1    have more questions.

2            THE COURT:  Well, I don't want to give the subject

3    short shrift.  I think there is appropriate focus being brought

4    to bear.  I think the activation schedule approach is very

5    important, and so I want to -- even though we may not spend

6    very much time on it today, I do want to just say how important

7    that activation schedule is and compliance and transparency.

8            DR. WILLIAMS:  Yes.  And I would agree this is

9    obviously one of the top focuses that I have as the manager of

10   this E unit.  While there are some extensions of deadlines, I

11   think that it led to the fact we are working very hard on all

12   of these items.  A lot of them had a lot more clinical nuances

13   as we delved into them that required additional time so that we

14   can ensure that they are completed accurately and that we have

15   substantive solutions to these concerns that the Special Master

16   team has raised.  So we continue to be committed to resolving

17   all of these issues in a timely manner.

18           THE COURT:  All right.  Secretary Allison, anything

19   else you'd like to say, including on any subject you want to

20   provide a summary on with respect to the May revised or

21   otherwise?

22           SECRETARY ALLISON:  Thank you very much.  I'm actually

23   very excited to be able to report some of these items to the

24   Court today and to plaintiffs and all interested parties on

25   this call.

1          I will say it's been a long, hard fight as we go

2    through the May revised process, but as everyone knows, there

3    was some surplus, and we kind of took advantage of that.

4          I am pleased to announce that we will have cameras in

5    all of our institutions.  We are funded for nine this year, and

6    then we're doing about nine to ten a year until we are done.

7          For those of us who have support cameras, I really do

8    believe in my heart of hearts that this makes us a transparent

9    organization for what is happening within our institutions.  So

10   very excited to be able to announce that, support that as we,

11   you know, go forward as an agency.  That's a really significant

12   commitment from both the administration as well as department

13   of finance.

14         There's also funding for really significant changes to

15   our staff complaint process, so very excited about that as

16   well.  More to come.

17         We're still working with experts and the legislature

18   as well as the Office of Inspector General as we finalize what

19   the total plan will look like.  We're very excited.

20         Another really big deal for those of us who grew up in

21   this business is to bring back third day visiting.  Many years

22   ago we had three days of visiting.  We actually used to have

23   four, long, long time ago.  And third day visiting has come and

24   gone over the years and it is funded to return -- to include

25   funding for transportation assistance for families where we

1   contract with charter buses to bring families to some remote

2   locations, and we have a whole process for that.  And of

3   course, as has already been discussed, the PIP staffing.

4        There are a lot of things in the May revise, but those

5   are really the top priority items that wanted to make sure you

6   were aware of.

7        And as Mr. Mello said, I am going to have to possibly

8   leave before the end of this so I can notify all of our

9   institutions and set some very clear expectations that I have

10  as relates to cameras and implementation.

11       THE COURT:  All right.

12       SECRETARY ALLISON:  As well as all of our other items.

13       THE COURT:  On the cameras, just so I --

14       SECRETARY ALLISON:  Thank you.

15       THE COURT:  -- I may not be completely -- does that go

16  beyond what a federal court has ordered?

17       SECRETARY ALLISON:  Oh, yes.

18       THE COURT:  Yeah, all right.

19       SECRETARY ALLISON:  We have five institutions.

20       THE COURT:  But you're saying every institution?

21  Every institution?

22       SECRETARY ALLISON:  Yeah.  Every institution.

23       THE COURT:  Right.

24       SECRETARY ALLISON:  So it's the five, four -- and it's

25  fixed cameras.  I want to make sure I'm very clear.  It's fixed

1  cameras and body-worn cameras at the 5 that we have ordered and

2  then fixed cameras for the remaining institutions this year.

3  So completion of this year we hope to get 8 to 9 in and then

4  the subsequent years 9 to 10 based on availability of cameras,

5  contractors and other things to get the project done, but it is

6  a commitment to get our entire institution with cameras.

7          THE COURT:  And so that will capture the PIPs, for

8  example, in areas where mental health is being delivered,

9  mental health treatment?

10          SECRETARY ALLISON:  Yes.  Yes, ma'am.

11          THE COURT:  All right.  All right.  Well, thank you

12  very much.  That does sound encouraging.

13          And Secretary Allison, as far as I'm concerned, you're

14  excused if you do need to send some critical messages out at

15  this point in time.

16          All right.  Just briefly on the labor economist's

17  report, that was the homework I assigned myself at the end of

18  the last hearing.  I've gone back and looked at the record on

19  that and frankly, at this point, given the water under the

20  bridge, my question is, is there any problem, from any party's

21  point of view, if I note that that report is in the record,

22  that it's a tool available to the parties without doing

23  anything more with it or resolving any objections?

24          I just -- at this point in time, given the time that

25  has passed, I'm not saying it's valueless, but I see it as a

1    tool available to the defendants, to the parties.  Does anyone

2    really need me to issue something formally on this, apart from

3    accepting the report and declining to resolve the objections?

4         Mr. Bien?

5         MR. BIEN:  Ms. Ells will address it.

6         THE COURT:  Ms. Ells?

7         MS. ELLS:  Pardon me.  Your Honor, we are okay with

8    that approach.  However, I do note that particularly the

9    problems with recruitment and retention in the desert

10   institutions, which is one of the recommendations to provide

11   for differential pay in those institutions, remains a pretty

12   significant problem.

13        There are multiple institutions that are only

14   approaching or at the 90 percent threshold with the use of

15   PNPs, yet they don't have enough supervisors to comply with the

16   PNP policy, so -- and those include North Kern and SATF,

17   according to the most recent filed report on the Court's docket

18   at ECF 7148.

19        So we do remain concerned that there are problems with

20   staffing that are not appearing to resolve on their own, and we

21   remain concerned that the salaries continue to lag compared

22   to -- or at least not be competitive enough, given the work

23   environment in CDCR, and -- in order to attract and retain

24   people appropriately, especially at these places that have

25   historically been very difficult to recruit and retain at.

1          So we have long-standing problems and we have concerns

2    that defendants -- as the population continues to go up, which

3    we expect that it will, given the more than 8,000 people still

4    in the county jails that are awaiting to come to CDCR, we

5    anticipate that the problems are not permanently resolved.  So

6    in terms of a durable remedy, I think it is okay at this point

7    to note that report, and we hope defendants will take heed of

8    it, because we do not think that this problem is resolved.

9          THE COURT:  All right.  Understood.  And you know how

10   to seek permission to file a motion, if need be.

11         MS. ELLS:  Yes, Your Honor.

12         THE COURT:  Mr. Mello, any problem with the Court's

13   approach to the labor economist's report, tentative?

14         MR. MELLO:  I don't know if it's my computer or

15   everybody's, but people are breaking up.

16         And so to answer your question directly and only your

17   question, we have no problem with the approach that you

18   suggested, Your Honor.

19         THE COURT:  All right.  I think it might be your

20   computer, but you obviously heard my question and you

21   responded, so . . .

22         MR. MELLO:  Yes.  Yes.

23         THE COURT:  I'm otherwise hearing everyone.

24         All right.  That covers our substantive agenda.  I'm

25   going to ask the Special Master if he has anything else he'd

1    like to say.  I didn't ask you if you had more to say on

2    suicide prevention.  You could cover that as well as any other

3    topic you want to make certain the parties hear from you about

4    today.  Special Master Lopes.

5        SPECIAL MASTER LOPES:  Thank you, Your Honor.  I

6    wanted to report that we had our 50th task force meeting, which

7    was held on April 27th, and that was the last task force

8    meeting that will be convened because now we'll resume

9    quarterly policy all-parties' meetings with the plaintiffs and

10   defendants because we'll start touring again May 24th.

11       The small workgroup meetings, however, with CDCR and

12   DSH will continue to occur but will be dependent on the

13   availability of team members and the parties who will be

14   touring with us starting at the end of the month.  And I'll

15   continue to have briefings with the plaintiffs and the

16   defendants as we go along throughout the summer.

17       Again, we will tour May -- the May-June time frame.

18   We'll have a tour in July, August, September, October just to

19   get an analysis of the facilities with the PIPs in them.

20       Simultaneously, the fifth re-audit of CDCR suicide

21   prevention practices by Lindsay Hayes will resume on May 24th

22   as well.  So Mr. Hayes will be touring throughout the summer,

23   and he will be closely evaluating what's in the activation

24   schedules.

25       He's been working closely with the defendants on the

1    suicide prevention measures and any -- all the activation

2    schedule changes or adjustments that have been made, have been

3    made with his input.

4         And I believe that with one coordination issue that we

5    may have to work through, and I think it will be worked

6    through, on nursing issues, Mr. Hayes is pleased with the

7    defendant's progress on deactivation schedules.

8         In the last few weeks, Your Honor, I think that we

9    have filed three or, excuse me, we filed two reports with the

10   Court on the 6th of May.  We had the indicators report, which

11   you referred to and has been discussed regarding CQIT.  We have

12   sent out in draft form to the parties the report on completed

13   suicides in 2019 and we filed with the Court the report on

14   completed suicides in 2018.  That would mark 13 compliance

15   reports that have been filed with the Court since the beginning

16   of the pandemic, and I believe that at this point we have

17   cleared out any backlog of reports that have been ordered by

18   the Court to this point.

19        I did want to also state, Your Honor, that I thought

20   your point earlier on working on deactivation schedules is a

21   sound one as it applies to the program guide departures report,

22   and it will dovetail or should dovetail with the further

23   filings that occur on the roadmap to reopening because as the

24   reopenings occur then the deactivation of -- the deactivation

25   schedule should apply.  The two reports should dovetail nicely,

1    and I just wanted to note that.  I didn't have an opportunity

2    to weigh in earlier.

3            Your Honor, I believe that that's all that I have to

4    report.

5            THE COURT:  All right.  Thank you Special Master

6    Lopes, and thanks for that last observation.

7            If, in communicating to the parties, you'd like to

8    propose a way of concurrent filings of roadmap updates and

9    those monthly reports, I'm open to that, but I also -- despite

10   the length of the docket, I can find matters even if they are

11   filed separately on slightly separate schedules.

12           All right.  Thank you.  And again, good news that

13   you're resuming monitoring and that your staff is able to do

14   that.

15           Here's the Court's thought that I've been thinking

16   about -- we're setting our statuses organically, that is,

17   setting a date that's based on when there's a need.  My current

18   thinking is this:  I would like, now that the Attorney General

19   has been confirmed and seated, I would like to have --

20   hopefully mid-litigation is a misnomer, but an in-camera status

21   conference just to talk about where we are with the case.  And

22   I would hope that the Attorney General would be briefed

23   beforehand on the program guide, on CQIT, on the roadmap to

24   recovery and whatever else his counsel would like to brief him

25   on.  I would like the Attorney General to attend.  Again, it

1   will be in camera, and I will let the parties know who will

2   attend that.  I would anticipate it being in person.  I would

3   convene it in the Court's ceremonial courtroom.  I would not

4   preside, I wouldn't wear my robe, but we would meet in the

5   ceremonial courtroom in order to have space for distancing

6   because I anticipate our court, even if we're moving towards

7   some partial reopening, if not full reopening to the public,

8   that we will continue to abide by the public health measures in

9   effect at the time.  So I would look for this in camera status

10  in about 30 days and then another status like this in about 60

11  days.

12          Let me just ask, any objection to that rough schedule?

13  I'll have the courtroom deputy, with input from Special Master

14  Lopes, identify specific dates.  Any objection to that schedule

15  for our next steps, Mr. Bien?

16          MR. BIEN:  No, Your Honor.

17          THE COURT:  Mr. Mello?

18          MR. MELLO:  Your Honor, I'd refer to Mr. McClain on

19  this issue.

20          THE COURT:  Ah.  Mr. McClain.

21          MR. MCCLAIN:  Thank you, Your Honor.  No objection.

22          In our view this is an extraordinary request.  As the

23  Court knows, the Attorney General leads California's Department

24  of Justice, which is a large 5,000-person organization

25  responsible for many State functions, including representing

1    officials and departments in litigation like this case and

2    thousand of other cases.  That said, the Attorney General would

3    be pleased to appear for the in camera conference.

4         As far as scheduling that goes, it sounds like you're

5    looking at about 30 days out.  I would propose that I contact

6    the Attorney General's scheduling unit to figure out what his

7    availability is around that time, and we could potentially

8    share several potential dates with the Court that might work.

9         Thank you for providing -- giving us an idea of what

10   you would like to talk to him about.  That's very helpful.  If

11   there's anything else more specific that you would like on the

12   agenda of issues to be discussed, please let us know preferably

13   ahead of time so that we can prepare the Attorney General.

14         THE COURT:  All right.  I may direct the filing of a

15   joint status report.  I'll let you know.  And it's good to know

16   that you're the person to communicate with.

17         Ms. Schultz, in addition to being an expert

18   multitasker, is the person who will reach out to you.  And so

19   we'll confirm that date and then set another status along these

20   lines for about 60 days out.

21         One issue for sure that will be on that calendar will

22   be an update on data and data certification where I know that

23   issue is out there and we need to turn back to it.  And I

24   believe there will be enough meaningful progress that we can

25   talk about that.

JENNIFER COULTHARD - UNITED STATES DISTRICT COURT - (530)537-9312

1          MR. MCCLAIN:  Your Honor --

2          THE COURT:  Yes.

3          MR. MCCLAIN:  -- I apologize.  One other question

4    about the in-camera conference.  We would also like to

5    understand whether that will be on the record or not.

6          THE COURT:  It will not be on the record.  This Court

7    rarely -- this is, you know, taking a page from a very old

8    fashioned approach to cases.  And so if we were not still in

9    the COVID zone, I would have the parties into my chambers,

10   which, you know, those of us who are old of enough, maybe not

11   including you, Mr. McClain, remember going into judge's

12   chambers for scheduling conferences.  It's only because of the

13   COVID pandemic that I'm talking about using a courtroom as

14   providing sufficient space.  But no, it would be off the

15   record.  It's a deviation from this Court's practice.  I

16   believe in full transparency, but I also -- it's time for me to

17   engage.  I expect this to be a one-off, as my British

18   brother-in-law would say.  But depending on what happens in

19   that session, maybe something like that would be productive

20   going forward.  So we'll just see.

21         It will be a chance for me to share observations, ask

22   questions.  Of course, if the Attorney General has something he

23   wants me to know, he'll be able to tell me in camera off the

24   record.

25         MR. MCCLAIN:  Very good.  Thank you.

1          THE COURT:  As will everyone else there.

2          All right.  So I'll see some of you in about 30 days

3    and all of you who are tasked with attending in 60 days.

4          Thank you very much for everything you are doing,

5    particularly the line members of CDCR and the medical staff

6    working to move things forward.

7          All right.  We're in recess.

8      (Concluded at 11:36 a.m.)

9

10              C E R T I F I C A T E

11

12    I certify that the foregoing is a true and correct

13    transcript of the record of proceedings in the above-entitled

14    matter.

15    _____          May 17, 2021

16    JENNIFER L. COULTHARD, RMR, CRR                DATE
     Official Court Reporter

17

18

19

20

21

22

23

24

25