1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  DAMON MCCLAIN, State Bar No. 209508
   Supervising Deputy Attorney General
3  ELISE OWENS THORN, State Bar No. 145931
   LUCAS HENNES, State Bar No. 278361
4  NAMRATA KOTWANI, State Bar No. 308741
   Deputy Attorneys General
5    1300 I Street, Suite 125
     P.O. Box 944255
6    Sacramento, CA 94244-2550
     Telephone:  (916) 210-7318
7    Fax:  (916) 324-5205
     E-mail:  Elise.Thorn@doj.ca.gov
8  *Attorneys for Defendants*

   HANSON BRIDGETT LLP
   PAUL B. MELLO, SBN 179755
   SAMANTHA D. WOLFF, SBN 240280
   DAVID C. CASARRUBIAS, SBN 321994
   1676 N. CALIFORNIA BLVD., SUITE 620
   WALNUT CREEK, CALIFORNIA 94596
   TELEPHONE:    925-746-8460
   FACSIMILE:    925-746-8490
   *Attorneys for Defendants*

   ROMAN M. SILBERFELD, State Bar No. 62783
   GLENN A. DANAS, State Bar No. 270317
   ROBINS KAPLAN LLP
     2049 Century Park East, Suite 3400
     Los Angeles, CA 90067-3208
     Telephone:  (310) 552-0130
     Fax:  (310) 229-5800
     E-mail:  RSilberfeld@RobinsKaplan.com
   *Special Counsel for Defendants*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.<br><br>  Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT ON HIS EXPERT'S REPORT ON SUICIDES COMPLETED IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION JANUARY 1, 2018- DECEMBER 31, 2018**<br><br>Judge:   Hon. Kimberly J. Mueller |

# INTRODUCTION

Defendants submit the following objections to the Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2018 – December 31, 2018 (hereafter the "Special Master's 2018 Suicide Report" or "Report"). (ECF No. 7161.) As Defendants explained in their previous objections to the Special Master's and his expert's suicide reports, the Special Master's expert's report mostly duplicates self-monitoring already conducted by CDCR and CDCR's own comprehensive report on suicides that occurred in 2018. As discussed in more detail below, CDCR's own self-critical, independent review of suicides completed in 2018, published on February 1, 2021, is just one component of a robust suicide prevention system found in no other state correctional system.[1] That review includes not only CDCR's findings but also identifies a range of measures to enhance suicide prevention and response efforts. (ECF No. 7052 at 3.)[2] Duplicative and costly reports by the Special Master do nothing to further the goal of ending this case and provide no additional information or greater transparency than that already included in Defendants' robust reports.

## OBJECTIONS TO THE SPECIAL MASTER'S REPORT

**A.  The Report is redundant, provides only limited additional information than CDCR's own Suicide Report, and largely confirms the findings and conclusions in CDCR's annual report.**

Defendants object to the Special Master's 2018 Suicide Report in its entirety on the ground that it largely "duplicates the data and feedback already found in CDCR's own transparent reporting." (*See* ECF No. 7161 at 13-14 (CDCR's objection to Special Master's draft 2018 Suicide Report because it duplicates self-monitoring already conducted by CDCR).)  The primary difference between the Special Master's expert's Report and CDCR's own report, is that the former includes a problematic and outmoded foreseeability/preventability analysis, and the latter

---

[1] On February 1, 2021, CDCR published its 2017-2019 Aggregate Suicide Report on its public website.  CDCR's 2017-2019 Aggregate Suicide Report can be accessed on its public website at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf (last accessed on 05/18/2021).

[2] References to page numbers for documents filed in the Court's Electronic Case Filing (ECF) system are to page numbers assigned by the ECF system.

does not.³ (*See* § B, *infra* (highlighting issues with the foreseeability/preventability analysis).) Otherwise, CDCR and the Special Master's expert are crafting very similar reports.

CDCR published its 2018 suicide statistics in its 2017-2019 Aggregate Suicide Report, reflecting CDCR's commitment to advancing its robust self-monitoring efforts and to transparency by allowing mental health clinicians, nurses, and custody staff who work directly with the inmate population to have access to this valuable information. (*See* CDCR's 2017-2019 Aggregate Suicide Report available at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf (last accessed on 05/18/2021).) CDCR's own suicide report demonstrates that CDCR honestly and critically assessed every suicide that occurred in 2018, including assessing policy violations and implementing corrective actions to prevent future violations. (*Compare id. with* ECF No. 7161-1.) As a direct result of Defendants' reports, including CDCR's comprehensive annual suicide prevention report to the Legislature pursuant to California Penal Code section 2064.1, Defendants will be better able to prevent and reduce the number of completed suicides within its institutions.

Furthermore, and as Defendants noted in their previous objections to the Special Master's suicide reports, Defendants are unaware of any other prison system in the country that reviews each suicide as thoroughly and rigorously as CDCR, and then seeks to incorporate lessons from each suicide into its practice.⁴ (ECF Nos. 7052 at 3; 7098 at 2.) This demonstrates CDCR's commitment to best practices, critical self-analysis, and improvement. This Court should encourage the Special Master to take steps that support and enhance these efforts, not pursue his

---

³ The Special Master notes that his expert's report is not duplicative because it provides an opportunity to conduct in-depth analysis and identify disaggregated inmate suicide trend data by year. (ECF No. 7161 at 4 n.4.) This distinction is not meaningful—it is simply a different way of presenting statistics. In any event, Defendants note that their upcoming 2020 Suicide Report *will* identify disaggregated inmate suicide trend data by year.

⁴ Notably, CDCR prepares a comprehensive suicide report for every suicide as required by the Program Guide. (*See* ECF No. 5864-1 at 190-91 (Program Guide's "Suicide Death Review" requirement); *cf.* ECF No. 7161 at 4 n.4 (Special Master observing that "CDCR's report does not include detailed individual case summaries").) Should the Court remand suicide reporting responsibilities back to Defendants, they could *and would* include individualized case summaries in their reporting to the Court.

own parallel track.

As such, Defendants request that the Court sustain Defendants' objections so that the Special Master can focus his time and energy not on matters that are the subject of multiple reports by CDCR but on issues that require additional work to fully achieve a sustainable remedy. (*See* ECF No. 6996 (order acknowledging a variety of interim steps that still need to be monitored and completed to attain a full and durable remedy).)

**B.  The Report, as with prior reports, includes overly simplistic determinations of "foreseeability" and "preventability" that are counterproductive in a mortality review context and hinder quality improvement.**

The Report continues to include an overly simplistic analysis of foreseeability and preventability even though a chorus of experts question the utility of these determinations in a mortality review context.[5] The Special Master's insistence on including these determinations in suicide reports (ECF No. 7077 at 2, 4-5) not only sometimes results in arbitrary, methodologically unreliable labels, but also fails to acknowledge that deaths occur in a complex system and that causative factors beyond proximate cause of death are potentially important for identifying opportunities for improvement.[6]

The Special Master says that the Court has consistently overruled Defendants' objections on this point and highlighted the importance of foreseeability and preventability determinations. (ECF No. 7161 at 5 n.5 citing ECF No. 4693 (Court opining that "identification of the number of preventable inmate suicides" is integral).) The Special Master's position is inaccurate. The Court's prior orders never overruled Defendants' objections to the Special Master including an outdated foreseeability/preventability analysis in his expert's suicide reports. Rather, those orders merely reflect that if the Special Master's suicide report is going to include a foreseeability/preventability

---

[5] Williams, B., Ahalt, S., Witt, L. (Final Report, Sept. 27, 2018). Assessing Medical Systems for the California Prison Health Care Receivership Corporation: Mortality Review Policy and Practice. The Criminal Justice & Health Program at UCSF, 3-4. https://cchcs.ca.gov/wp-content/uploads/sites/60/UCSF/Mortality-Review-Report.pdf (last accessed on 03/22/2021) (hereafter "Williams"). While the specific term "foreseeability" is not addressed in Dr. Williams's Final Report, the term is as problematic as the term "preventability" because it focuses on identifying past proximate causation rather than future opportunities for improvement.

[6] *Id.* at 4.

analysis, that analysis may use the Court-approved definitions for those terms. (*See*, ECF No. 4693 (order affirming the Special Master's definitions of "foreseeable" and "preventable" without mandating that he include a foreseeability/preventability analysis in future suicide reports).) Defendants' objection on this specific point has never been overruled.

In any event, and more importantly, the science no longer supports foreseeability and preventability analyses. As Defendants have previously shown, narrow and methodologically problematic foreseeability and preventability determinations frequently divert attention away from opportunities for improvement that will lead to system-wide quality improvement *and patient safety*. Under the modern view, a well-performing mortality review system will identify "opportunities for improvement" leading to "quality improvement, patient safety, and/or clinical education responses (immediate change) or initiatives (longer term) that are then evaluated to determine whether they yielded improvements along relevant clinical benchmarks."[7] This system requires the buy-in and participation of multiple actors who may be less willing to participate if the focus of the review is on foreseeability and preventability determinations whose purpose is to identify the person (or people) to blame for allegedly causing death.[8] Accordingly, for the mortality review system to work properly—and to increase motivation for practice modifications and constantly promote organizational learning—there must be a shift away from terms like "foreseeable" and "preventable" and towards assessments that focus on opportunities for improvement.[9]

As such, Defendants object to the entirety of Section III, subsection I, "Foreseeability and Preventability" of the Special Master's expert's report.[10] (*See* ECF No. 7161 at 13, 19-20 (CDCR's response to Special Master's draft 2017 Suicide Report reflecting CDCR's objection to the entirety of the Special Master's expert's foreseeability/preventability analysis).)

---

[7] Williams, *supra* note 2, at 5.

[8] *Id.* at 4.

[9] *Id.*

[10] To be clear, this objection is aimed at the entirety of the foreseeability/preventability *analysis* and not merely at how those terms are specifically defined.

**C.  The Report includes an "in-state only" suicide rate per 100,000 inmates that misleadingly inflates the actual suicide rate and fails to account for all CDCR inmates.**

CDCR objects to the Special Master's inclusion of a methodologically-problematic suicide rate that is based only on the in-state population.  (*See* ECF No. 7161 at 14-15 (CDCR's response to Special Master's draft 2018 Suicide Report reflecting CDCR's objection to calculating the suicide rate based only on the in-state population).) Defendants have consistently maintained that there is no reason to continue calculating and publishing a suicide rate based solely on the in-state population when inmates housed out-of-state are subject to CDCR's suicide prevention policies and Title 15 of the California Code of Regulations, including conducting Suicide Case Review Reports as necessary. Indeed, inmates housed out-of-state are unfairly included in the numerator of the suicide-rate calculation, but not the denominator, resulting in a skewed and misleading calculation.

Additionally, Reliance upon CDCR's "in-state" only rate is misleading for several reasons. First, prior suicide reports by the Special Master's experts have used the total, not just the in-state, population to calculate suicide rates. The 2018 Report states that in-state suicide rates prior to 2015 were taken from the Special Master's expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2014 – December 31, 2014, at page 3 (hereinafter referred to as "2014 Report"). (ECF No. 7161-1 at 5 n.4.) However, the 2014 Report uses total, not in-state, population numbers to calculate the suicide rate. The 2014 report states that "[t]he rate of CDCR inmate suicides in 2014 was 16.97 per 100,000 based on a reported CDCR inmate population of 135,481 as of June 30, 2014." (ECF No. 5428 at 2 (2014 Report).) CDCR's in-state population was 126,704 on that date, while its out of state population was 8,870, for a total population of 135,481.[11] The Special Master offers no explanation for this departure.

Second, CDCR's inclusion of in-state population-based suicide rates in its 2015 suicide report reflects CDCR's efforts to reach an agreement with the Special Master to take over reporting requirements. However, even CDCR's 2015 report noted that in-state population-based

---

[11] CDCR Public Website, Population Report, Archives, population as of midnight June 30, 2014.

suicide rates are inappropriate. CDCR's 2015 report states that "[t]he rate including the out-of-state population is the more meaningful number, as out of state suicides, when they occur, are included in the rate calculations. Furthermore, these individuals were remanded to CDCR custody which maintains responsibility for their welfare." (ECF No. 7038-1 at 22.)

Lastly, the Special Master fails to provide any justification, utility, or purpose for including in-state only rates. The use of inflated suicide rates are misleading and not meaningful, and CDCR objects to their inclusion in annual suicide reports on that basis.

**D.    The Report provides arbitrary comparisons to other large prison systems in the country.**

The Special Master's expert's report continues to compare CDCR's suicide rate with other "large prison systems," and ultimately concludes that CDCR's "suicide rate is the 4th highest out of the ten largest correctional systems." (ECF No. 7161-1 at 5.) However, the report fails to include any analysis that accounts for the different demographics, population, applicable laws, and other variables that would make this a meaningful, rather than an arbitrary, comparison.

Citing to an entirely different line of objections that are not related to the arbitrary comparisons at issue here, the Special Master notes that the Court "has consistently overruled defendants' prior objections to the Special Master's expert's use of statistical comparisons." (ECF No. 7161 at 5-6 n.6.) Notwithstanding, the Court has neither previously overruled Defendants' instant objection, nor has it endorsed the Special Master's expert's methodology (or lack thereof) as it relates to comparisons to other large prison systems in the country. Accordingly, Defendants object to the Special Master's expert comparing CDCR to an arbitrary list of other "large prison systems" without the necessary methodology to make it a valid comparison. (*See* ECF No. 7161 at 15 (CDCR's response to Special Master's draft 2018 Suicide Report reflecting CDCR's objection to the Special Master's expert's report arbitrarily comparing CDCR to other large prisons).)

**E.    The Report erroneously includes Tallahatchie County Correctional Facility and various unclear suicide averages in the table appearing on pages 7 through 8.**

On pages 7 through 8, the Report includes a table of CDCR institutions comparing the number of 2018 suicides, the number of suicides from 1999-2017, the number of suicides from

1999-2018, and the average number of suicides from 1999-2018. (ECF No. 7161-1 at 7-8.) Though the table purports to *not* include out-of-state facilities (*see id.* at 7 n.8), it lists Tallahatchie County Correctional Facility, which was a prison in Mississippi run by a private contractor as part of CDCR's out-of-state program (*id.* at 7). Tallahatchie should be removed from this table.

Furthermore, how the expert calculated the averages in the last column in the table appearing on pages 7 through 8—and whether those calculations for each institution are correct—remains unclear. (*See* ECF No. 7161 at 15-16 (CDCR's response to Special Master's draft 2018 Suicide Report reflecting CDCR's objection to the Special Master's expert's report including an unclear averages in the table on pages 7 through 8).) The Special Master's expert suggests that a 20-year period was used. (*Id.* at 7 n.9.) But the numbers listed do not reflect a 20-year average. Take Central California Women's Facility. The Report notes ten suicides in the 20-year period, but calculates the average as 0.53. (ECF No. 7161-1 at 7.) However, 10 divided by 20 does not equal 0.53; it equals 0.50. When the same math is applied to the entirety of the table, the figures change as reflected in the "Corrected Average" column below:

| Facility | 2018 Suicides | 1999-2018 Suicides | 1999-2018 Average[9] | Corrected Average |
|---|---|---|---|---|
| California Rehabilitation Center | 0 | 1 | 0.05 | 0.05 |
| Chuckawalla Valley State Prison | 0 | 1 | 0.05 | 0.05 |
| ~~Tallahatchie County Correctional Facility~~ | ~~0~~ | ~~1~~ | ~~0.05~~ | ~~0.05~~ |
| Ironwood State Prison | 0 | 2 | 0.11 | 0.10 |
| Valley State Prison | 0 | 2 | 0.11 | 0.10 |
| California Correctional Center | 0 | 4 | 0.21 | 0.20 |
| Calipatria State Prison | 0 | 5 | 0.26 | 0.25 |
| Sierra Conservation Center | 0 | 5 | 0.26 | 0.25 |
| Centinella State Prison | 0 | 6 | 0.32 | 0.30 |
| Avenal State Prison | 0 | 7 | 0.37 | 0.35 |
| California Health Care Facility | 1 | 2 | 0.40 | 0.40 |
| Central California Women's Facility | 1 | 10 | 0.53 | 0.50 |
| California Institution for Women | 0 | 11 | 0.58 | 0.55 |
| North Kern State Prison | 0 | 11 | 0.58 | 0.55 |
| California State Prison, Solano | 1 | 12 | 0.63 | 0.60 |
| California Substance Abuse Treatment Facility | 0 | 15 | 0.79 | 0.75 |

| | | | |
|---|---|---|---|
| Pleasant Valley State Prison | 0 | 15 | 0.79 | 0.75 |
| Wasco State Prison | 0 | 17 | 0.89 | 0.85 |
| California Training Facility | 2 | 18 | 0.95 | 0.90 |
| Mule Creek State Prison | 2 | 18 | 0.95 | 0.90 |
| Pelican Bay State Prison | 0 | 18 | 0.95 | 0.90 |
| High Desert State Prison | 2 | 19 | 1.00 | 0.95 |
| Folsom State Prison | 0 | 20 | 1.05 | 1.00 |
| California Correctional Institution | 2 | 21 | 1.11 | 1.05 |
| California Institution for Men | 0 | 23 | 1.21 | 1.15 |
| California Medical Facility | 0 | 24 | 1.26 | 1.20 |
| Deuel Vocational Institute | 1 | 27 | 1.42 | 1.35 |
| Kern Valley State Prison | 5 | 20 | 1.54 | 1.54 |
| California State Prison, Los Angeles County | 2 | 30 | 1.58 | 1.50 |
| California State Prison, Corcoran | 3 | 31 | 1.63 | 1.55 |
| RJ Donovan Correctional Facility | 4 | 31 | 1.63 | 1.55 |
| California Men's Colony | 1 | 34 | 1.79 | 1.70 |
| San Quentin State Prison | 2 | 36 | 1.89 | 1.80 |
| Salinas Valley State Prison | 2 | 37 | 1.95 | 1.85 |
| California State Prison, Sacramento | 2 | 41 | 2.16 | 2.05 |

The incorrect values for the 20-year average suicides in the Special Master's expert's report should be corrected as reflected above.

**F.   The Report includes typographical errors.**

Footnote 8 in the Special Master's Report includes a few incorrect citations to the expert's report that should be corrected for the sake of accuracy:

- The Special Master's citation to ECF No. 7161-1 at 16 for the following parenthetical "(clarifying discussion of suicide by security level)" should be corrected to cite ECF No. 7161-1 at 15 where that information actually appears;

- The Special Master's citation to ECF No. 7161-1 at 26 for the following parenthetical "(clarifying discussion of deficiencies in mental health treatment and evaluation)" should be correct to cite ECF No. 7161-1 at 25 where that information actually appears.

/ / /

**G. The Report should provide Defendants a summary that outlines which suicide reports the Special Master's expert found to be deficient and the reasons for those particular deficiencies.**

Section G, "Individual Suicide Case Reviews," states that only 76% of suicide reports were deemed adequate by the expert. (*Id*. at 26.) CDCR requested that the expert provide a summary that outlines which reports were found to be deficient in the expert's view and the reasons for those particular deficiencies. (ECF No. 7161 at 19 (CDCR's response to Special Master's draft 2018 Suicide Report reflecting CDCR's request to the Special Master that his expert's report provide a summary regarding inadequate suicide reports).) CDCR requires this information to make improvements to future Suicide Case Review Reports in the areas that the Special Master's expert deemed inadequate.[12] The Special Master provides similar summaries for "inmate demographics," "inmate history and suicide event characteristic," and "identified assessment, treatment and communication concerns." (*E.g.* ECF No. 7161-2 at 164-69 (Appendices B1-B3).)

## CONCLUSION

The Special Master's suicide report is largely duplicative of CDCR's own suicide report. Defendants' Suicide Reports demonstrate that CDCR honestly and critically assessed every suicide that occurred in 2018 and show that CDCR has a sustainable process in place for assessing policy violations and implementing corrective action. The Court should sustain Defendants' objections.

## CERTIFICATION

In preparing these objections, Defendants counsel reviewed the following Court orders relevant to the issues in this filing, ECF Nos.: 1536, 4394, 4539, 4693, and 6996.

---

[12] The Special Master's expert disagreed with CDCR's request because the information sought is scattered throughout the 162 pages that is Appendix A. (ECF No. 7161 at 6.)

| | | |
|---|---|---|
| 1 | DATED:  May 24, 2021 | HANSON BRIDGETT LLP |

By: _____*s/ Samantha D. Wolff*_____
PAUL B. MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS
Attorneys for Defendants

DATED:  May 24, 2021                Respectfully Submitted,

R<small>OB</small> B<small>ONTA</small>
Attorney General of California
Damon McClain
Supervising Deputy Attorney General

By: _____*s/ Elise Owens Thorn*_____
ELISE OWENS THORN
Deputy Attorney General
Attorneys for Defendants