UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB P |
| Plaintiffs, | |
| v. | ORDER |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

As directed by the court, ECF Nos. 7112, 7143, the Special Master has filed a Report on the Continuous Quality Improvement Tool Key Indicators ("Report"). ECF No. 7151. Plaintiffs have timely responded to the Report, ECF No. 7195, and defendants have timely filed objections, ECF No. 7197. *See* ECF No. 7162 (setting timeframe for filing responses to Report). For the reasons explained below, the court adopts the Special Master's recommendations to provisionally approve a preliminary list of CQIT indicators, to direct him to "test and monitor the functionality and efficacy of these preliminary CQIT indicators" during his Twenty-Ninth Monitoring Round, and to order him to report his findings in the Twenty-Ninth Round Monitoring Report. ECF No. 7151 at 21. The court modifies the provisionally approved list in light of one of defendants' specific objections. The Special Master is, as always, authorized to

continue discussions with the parties as necessary to ensure the final list of proposed indicators will serve its intended purpose.

I. <u>INTRODUCTION</u>

The Report before the court is the result of work that defendants began in 2012[1], under the supervision of the Special Master, to develop the continuous quality improvement tool (CQIT). CQIT is "a comprehensive tool that, once finalized, defendants will ultimately use as part of a process to 'self-monitor' the key components of the remedy in this action." September 3, 2020 Order, ECF No. 6846, at 10 (citing ECF No. 5439 at 108).[2] Seven years after defendants began developing CQIT, the court held that remedial planning in this action was complete, opening the door to updating and finalizing CQIT. July 9, 2019 Order, ECF No. 6214, at 17-18.

The "primary court-approved remedial documents in this action are the California Department of Corrections and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guide (Program Guide) and the Compendium of Custody Related Remedial Measures (Compendium)." ECF No. 6846 at 4 (citing August 3, 2020 Order, ECF No. 6806, at, *e.g.*, 9). The court has approved several additional remedial plans in aid of the primary remedies, including "a court-ordered mental health staffing plan, *see* ECF Nos. 3613 at 2 (court order), 3693 (staffing plan), regular mental health bed projections, *see* ECF No. 3629, and concomitant planning for and building of necessary mental health beds and clinical treatment space, *see, e.g.*,

---

[1] Defendants' assertion that the continuous quality improvement process (CQI) "has been twenty-six years in the making," ECF No. 7197 at 14, is incorrect. As the Special Master explains, while the need for a quality management system was identified in 1994, "[d]efendants first had to ensure that clinical functions were routinely occurring as required and that they had a quality assurance structure in place across institutions to track this." ECF No. 7151 at 2-3. After almost seventeen years, the quality assurance committee structure at individual prisons was "predominately in place" and, "[i]n 2012, defendants, working under the guidance of the Special Master with input from the plaintiffs" began identifying CQIT indicators "and developing a more robust, central-office-driven CQI system capable of improving the quality of care delivered to the *Coleman* class." *Id*. at 3-4.

[2] Citations to page numbers in documents filed in this action are to the page number assigned by the Court's Electronic Case Filing (ECF) system located in the upper right hand corner of the page.

ECF No. 3556." July 9, 2019 Order, ECF No. 6214, at 2. It is "established that the Program Guide sets out the objective standards that the Constitution requires" for the delivery of adequate mental health care to members of the plaintiff class. *Coleman v. Brown*, 756 Fed. Appx. 677, 679 (9th Cir. 2018). Since 2006, defendants have been under court order to "immediately implement" the Program Guide's provisions. ECF No. 6214 at 10 (quoting March 3, 2006 Order, ECF No. 1773, at 2).³ Durable implementation of each component of the remedy, including but not limited to the Program Guide, is essential to full remediation of the Eighth Amendment violation. *See, e.g.*, ECF No. 6214 at 6-7.

An adequate quality improvement process is also an essential component of the remedy. The court has repeatedly stated

> that defendants' development and implementation of an improved quality improvement process is fundamental to ending federal court oversight in this action. It is grounded in this court's obligation to end its supervision of defendants' delivery of mental health care to members of the plaintiff class when defendants have implemented a durable remedy for the Eighth Amendment violations in the delivery of that care. A key component of a durable remedy is the development and implementation of an adequate quality improvement process by which defendants will self-monitor, and as necessary, self-correct inadequacies in the delivery of mental health care to the thousands of seriously mentally ill inmates incarcerated in California's prisons.

ECF No. 6846 at 10 (quoting February 27, 2014 Order, ECF No. 5092, at 4-5); *see also* ECF No. 6846 at 15 (quoting August 9, 2016 Order, ECF No. 5477, at 3). As the court has emphasized, and defendants have recognized, completion and successful implementation of CQIT is integral to full implementation of an adequate quality improvement process and the end of federal court supervision. *See* ECF No. 6846 at 15 (citing ECF No. 5477 at 8); *see also* December 17, 2020 Order, ECF No. 6996, at 5.

---

³ While the March 3, 2006 order focused on all undisputed provisions of the Revised Program Guide presented to the court in January 2006, save for a discrete list of disputed issues that remained at that time, *see* ECF No. 6214 at 10 & n.10, the overarching direction to implement the provisions of the Program Guide took effect with that order and remains in effect.

3

The "key indicators" in CQIT "signify the material provisions of the Program Guide and the Compendium that must be durably implemented" in order to satisfy the Eighth Amendment. ECF No. 6846 at 28; *see also* ECF No. 6996 at 8. The degree of compliance for each indicator remains for the court to determine by subsequent order, *id*. at 9, which it will now do following review of the Special Master's upcoming Twenty-Ninth Round Monitoring Report. In that upcoming Report, as required by this order, the Special Master will report on the "functionality and utility" of the key indicators.

On December 17, 2020, the court ordered defendants, under the supervision of the Special Master, to file within three months an updated list of key indicators to be used in CQIT. The Special Master was authorized to "seek input from plaintiffs as appropriate" and consistent with the direction the court provided in that order. ECF No. 6996, *passim*. On March 17, 2021, defendants filed their proposed updated list. ECF No. 7089. With leave of court, ECF No. 7102, on March 23, 2021, plaintiffs filed objections to defendants' proposed list. ECF No. 7101. At a status conference on March 25, 2021, the court issued a bench order granting defendants' request to respond to plaintiffs' objections. *See* ECF No. 7112. At the March 25, 2021 status conference the Special Master confirmed the parties' inability to reach agreement on an updated list of key indicators. Reporter's Transcript of Proceedings (3/25/21 RT) at 10-13. The court referred the matter to the Special Master "as soon as the defense reply" was filed, for the filing of a report and recommendations before April 29, 2021. ECF No. 7112. After receiving an extension of time, the Special Master filed his Report on May 6, 2021. ECF No. 7151. The parties timely filed their responses on June 14, 2021. ECF Nos. 7195 (Plaintiffs' Response), 7197 (Defendants' Objections).

II.  DEFENDANTS' OBJECTIONS

    A.  Duplicative Indicators

Defendants identify seven indicators on the Special Master's proposed list, which they contend are duplicative, as follows:

- "Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers." This indicator appears twice as items 4 and 8 in the "Quality of Care" section. ECF No. 7151 at 23.

4

- "Percentage of IDTTs Observed in which a Health Record and C-File were Available." This indicator appears twice as item 12 in the "Access to Care" section and as item 30 in the "Restricted Housing" section. *Id.* at 22, 25.

- "Percentage of Health Care Staff with Suicide Prevention Training." This indicator appears twice as item 19 in the "Suicide Prevention" section and as item 13 in the "Staffing" section. *Id.* at 22, 26.

- "Observed RC Screens Conducted in a Confidential Setting." This indicator appears as item 15 in the "Access to Care" section. *Id.* at 22. There is also an indicator titled "Percentage of Observed R&R and Reception Center Screens in Confidential Setting and Correct Documentation Used" that appears in the "Suicide Prevention" section. *Id.* at 22 (Suicide Prevention No. 10). Both indicators measure whether Reception Center screens were conducted in a confidential setting. [Footnote: That said, Reception Center screens and R&R screens should remain separate.]

- "Percentage of MH-7s required completed prior to ASU placement" appears as item 38 in the "Restricted Housing" section. *Id.* at 25. This item seems to be duplicative of the "ASU Pre-Screens" indicator, which also appears in the "Restricted Housing" section. *Id.* at 24 (Restricted Housing No. 4).

- "MH Screens." This indicator appears as item 16 in the "Access to Care" section. *Id.* at 22. The current MH Screens indicator on the Mental Health Performance Report measures several types of Mental Health screens, including Reception Center screens and ASU pre-screens. As mentioned above, there is already an ASU Pre-Screens indicator that appears in the "Restricted Housing" section of the Special Master's list. *Id.* at 24 (Restricted Housing No. 4). If the MH Screens indicator on the list is meant to capture Reception Center screens, then it should be renamed. Otherwise, the indicator is duplicative of another indicator already on the list.

- "Timely Admissions to Inpatient Care" and "Inpatient Transfer Deadlines for PIPs and DSH." These new indicators appear as items 8 and 9 in the "Access to Care" section. *Id.* at 21-22. Both indicators seem to measure transfer timelines to the Acute and ICF levels of care. If so, one should be eliminated.

ECF No. 7197 at 9-10. This objection is sustained as to the first indicator identified by defendants, Treatment Plans with Reason for Refusal and Intervention Documented for High Refusers. *Id.* at 9. The language of items 4 and 8 is identical, and they appear under the same topic heading on the indicator list. For this reason, this indicator as it appears as item 8 in the Quality of Care section will be stricken.

1 | The next two indicators on the list appear under two separate topics on the
2 | proposed indicator list. Given their inclusion under two separate topics, the court cannot
3 | determine from this record whether they are duplicative or, instead, intended to capture different
4 | information related to the specific topic under which they are listed.
5 | Regarding the remaining pairs of four indicators, defendants use conditional
6 | language, i.e., "seem to measure" or "if . . . then," in describing the alleged duplication. None of
7 | the four is characterized by identical language. Given this, the court cannot find these items are
8 | in fact duplicative.
9 | For these reasons, defendants have not met their burden of establishing that six of
10 | the seven indicators they identify are duplicative or that the Special Master's inclusion of these
11 | remaining items was clearly erroneous; these aspects of the objection are overruled. That said,
12 | the defendants have identified potential issues for the Special Master to carefully consider. Over
13 | the course of the upcoming monitoring round, the Special Master shall review the six remaining
14 | indicators to which defendants object as duplicative, and shall recommend adoption of a final list
15 | of key indicators that eliminates all duplications.

        B.    <u>Recommendation for Provisional Approval</u>

Defendants object that the Special Master's recommendation for provisional approval of the list of key indicators appended to the Report "leads to indefinite uncertainty." ECF No. 7197 at 11. Although they "understand and agree that CQI[T] indicators will necessarily evolve as CDCR' policies change," defendants contend "this case lacks clear benchmarks with no finality on the horizon." *Id*. The suggestion there are no clear benchmarks in this action or no "finality on the horizon" borders on frivolous and, in any event, is entirely meritless. *See*, *e.g.*, ECF No. 6846, *passim.*

Finality is on the horizon if defendants keep their eye on the remedial ball: it will arrive when defendants fully and durably implement the remedial plans that have been developed and finalized through careful, considered work of the parties, with court oversight. The court's most recent status conferences, attended by principals in leadership roles, make clear the defendants themselves are fully aware of the requirements of the remedial plans and what is

required to implement them.  The Special Master's recommendation to test the proposed list of key indicators for one monitoring round, after which he will report to the court on a recommended final list of key indicators, keeps the case moving forward.  Once the list is finalized, the process the court will use to confirm compliance rates for key indicators is already defined.  ECF No. 6996 at 9.  Completion of this core task, essential to finality, is well underway.

Defendants' objection to provisional approval of the proposed list, as modified, is overruled.

### C. Placeholders

Defendants' final objection is to inclusion of a list of eight indicators, which they represent the Special Master "expects . . . to be more fully developed during the course of his Twenty-Ninth Monitoring Round."  ECF No. 7197 at 12-15.  Defendants contend "full and final development" of these indicators "will unnecessarily delay the CQIT process . . . because they have not been the subject of the parties' prior extensive conversations on the subject of key CQI indicators."  *Id*. at 15.  This objection is addressed in section III immediately below, together with plaintiffs' response to the Report.

### III. PLACEHOLDERS/PLAINTIFFS' RESPONSE

As noted above, defendants object to several proposed indicators included in the Special Master's list that they contend are not fully developed.[4]  They contend these indicators should not be fully developed because doing so will slow the process and because the indicators have not been the subject of prior discussions.  Plaintiffs' response to the Report, on the other

---

[4] It appears defendants actually challenge nine proposed indicators on this ground; they provide a bullet point list of eight proposed indicators but include two separate proposed indicators in one of those bullet points.  *See* ECF No. 7197 at 12:23-26.  The list is as follows: "Emergent/urgent MH referrals that result in SRASHEs," ECF No. 7151 at 22 (Suicide Prevention No. 2); "Suicide-resistant MHCBs," *id*. at 22 (Suicide Prevention No. 4);  "Additional Use of Force (Specificity to be determined)," *id*. at 23 (Specialized Custody No. 11); "Additional MAPIP (Specific medication monitoring, other MAPIP measures related to psychiatric medication monitoring not included here)," *id.* at 24 (Medication Management No. 15); "Allocated and filled positions," *id.* at 26 (Staffing/Personnel Training, and Staff Resources No. 14); "Sustainability Process," *id*. at 26 (Additional Key Indicators No. 1); "ASU EOP Hub Certification," *id*. (Additional Key Indicators No. 2); "PIP (To be developed)," *id.* (Additional Key Indicators No. 3); "Custody and Mental Health Partnership Collaboration," *id*. at 26 (Additional Key Indicators No. 4).  *See* ECF No. 7197 at 12-15.

hand, consists entirely of a list of ten indicators they contend are not on the proposed list but should appear on the final approved list; plaintiffs "provide this list to ensure that these additional indicators are considered during the period in which the Special Master employs the provisional list." ECF No. 7195 at 1-2.

As the court previously has observed, the current proposed list of key indicators must "'reflect any changes required by the 2018 update to the Program Guide . . . [and] identify key indicators for CQIT to reflect the material provisions of the Compendium.'" ECF No. 6996 at 4 (quoting ECF No. 6846 at 25, 26). At the same time, the court made clear this direction was "neither an opportunity to reinvent the wheel, including through revisiting the set of key indicators agreed to in 2012 and 2013, except as minimally necessary to bring them current with the 2018 Update to the Program Guide; nor is it an invitation to depart from the law of the case." ECF No. 6846 at 25. The task now is straightforwardly to "complete a necessary task" on the road to finalizing the remedy. *Id*. at 26.

Defendants have not demonstrated how the eight proposed items they identify on the Special Master's list exceed the scope of indicators that must be included on the final list. Their objection is overruled for this reason. The court directs the Special Master to finalize these indicators, without delaying the monitoring process, by the end of the Twenty-Ninth Monitoring Round.

Plaintiffs' list is accepted as presented, but also as proposed and subject to consideration and efficient refinement during the upcoming Monitoring Round. The Special Master shall report on these proposed indicators and whether they should be incorporated into the final proposed list of CQIT key indicators in the Twenty-Ninth Round Monitoring Report.

IV.     DEFENDANTS' ADDITIONAL ASSERTIONS

Defendants make several general assertions that are not properly before the court. The court addresses them only briefly here.

    A.     "Redundancies and Discrepancies"

Defendants assert the Special Master's proposed list is "inchoate" because the Special Master used an early draft of key indicators created by defendants to develop his list,

failed to omit "numerous redundancies and discrepancies" that were ultimately omitted by defendants from their final proposed list filed March 17, 2021, and "filed his Report without first giving the Defendants an opportunity to review it and provide informal comments or objections, as required by the Court's scheduling order." ECF No. 7197 at 5, 9.

As the Special Master explains in his Report, the list of CQIT indicators defendants developed beginning in September 2012 "became known as 'key indicators' because they were culled from the 'material' requirements of the Program Guide, relevant Court orders, and the collaborative identification of additional indicators central to the provision of adequate mental health treatment and its monitoring." ECF No. 7151 at 7.[5] It is plain this initial list

---

[5] On August 2, 2013, the Special Master filed a report on defendants' quality improvement process that included a "List of Areas Covered within the Continuous Quality Improvement Tool (CQIT). *See* ECF No. 4730. The Special Master did not recommend any court orders in that report. *See id.* at 29-31. However, on August 16, 2013, plaintiffs moved for court-ordered relief based on that report, principally directed at the timeline for testing CQIT and the attendant monitoring process; defendants objected to the request. In its order denying plaintiffs' request, the court observed that

> while defendants' objections to the orders requested by plaintiffs miss the mark, issuance of the requested orders will not adequately serve the underlying goal of the court's August 30, 2012 order and the Special Master's recommendation on which that order is based.
>
> By its terms, the order is directed at ending federal court oversight of the delivery of mental health care in California's prisons. Defendants did not object to the Special Master's recommendation that they be ordered to review and assess their existing quality assurance process and develop an improved quality improvement process as part of the transition to self-monitoring and the end of federal court oversight; indeed, as the court noted in the August 30, 2012 order, they acquiesced in the recommendation. *See id.* at 3.
>
> . . .
>
> Rather than set a new deadline, the court will reiterate that defendants' development and implementation of an improved quality improvement process is fundamental to ending federal court oversight in this action. It is grounded in this court's obligation to end its supervision of defendants' delivery of mental health care to members of the plaintiff class when defendants have implemented a *durable* remedy for the Eighth Amendment violations in the delivery of that care. *See Horne v. Flores*, 557 U.S. 433, 450 (2009). A key component of a durable remedy is the development and implementation of an adequate quality improvement process by which defendants will self-monitor and, as necessary, self-correct

informed the Special Master's creation of the current proposed list, reasonably so. *Id*. at 17, 21 (footnote omitted). The Special Master also considered all of the material presented during discussions after the court's December 17, 2020 order requiring an updated list. *See id*. at 15-19. While not a final list, the Special Master's list is comprehensive, which he appropriately characterizes as "preliminary" in the sense that he recommends he be ordered to test its "functionality and efficacy" during the Twenty-Ninth Monitoring Round. ECF No. 7151 at 21-26.

Defendants' contention that the Special Master's proposed list was "developed from a *draft* list of all CQIT indicators initially created by Defendants that contained numerous redundancies and discrepancies," ECF No. 7197 at 5 (emphasis in original), is speculative. *See* Ex. B to Decl. of Mello, ECF No. 7197-3 at 3 (June 1, 2021 Letter from Melissa C. Bentz, Esq. to Special Master Lopes). Defendants do not object to the relevant facts and thorough description of the process followed as presented by the Special Master. *See* ECF No. 7151 at 15-20. Their speculative contention is not a proper objection.

Finally, the court did not require the Special Master to provide defendants with an opportunity to review his Report before it was filed with the court. It was only after the parties were unable to come to agreement after an extensive process supervised by the Special Master that the court ordered the current Report. Defendants do not identify the "scheduling order" referred to in their objections, and neither the bench order requiring the Report nor the Order of Reference required the Special Master to do more. *See* 3/25/2021 RT, ECF No. 7111, at 14, 17; ECF No. 7112; *see also* ECF No. 640 (requiring "draft compliance reports" to be circulated to the

> inadequacies in the delivery of mental health care to the thousands of seriously mentally ill inmates incarcerated in California's prisons. Defendants are required to work under the guidance of the Special Master, with input from plaintiffs' counsel, on this task until it is completed. The court expects that the Special Master will report to the court in due course when this necessary step has been accomplished.

ECF No. 5092, at 4-5 (footnote omitted).

parties before filing)[6]; ECF No. 6230 (setting a thirty day objection period for Special Master reports not circulated to the parties prior to filing). The court directed the Special Master to file "a written report by April 29th with intensive sessions with the parties in the interim." 3/25/2021 RT, ECF No. 7111, at 17. Both the Report and the Special Master's request for a one week extension of the April 29, 2021 deadline reflect his compliance with the court's direction. *See* ECF No. 7151 at 18; ECF No. 7142.[7] The parties were granted thirty days to file objections to the Report, consistent with the time frame set by the court for objection to any report from the Special Master not circulated to the parties before filing. *See* ECF No. 6230.

B. "Key" versus "Informational" Indicators

Defendants object to the Special Master's purported failure to distinguish in his proposed list between "key" indicators and what defendants characterize as "informational" indicators. ECF No. 7197 at 7-8 & Ex. A. As noted above, the court has previously provided a description of what a key indicator is. *See* Section I, *supra* (quoting ECF No. 6846 at 28). Defendants now seek to define "informational" indicators as those that "do not measure Program Guide, Compendium, or court-ordered requirements, or they do not measure material provisions of the Program Guide, Compendium, or court orders, but are included within CQI to aid quality improvement." ECF No. 7197-2 at 2. Though defendants introduce the word "informational" in an attempt to distinguish a subset of indicators, in its December 17, 2020 order the court resolved the issues associated with this contention.

Specifically, the court rejected defendants' proposed distinction between CQIT indicators that measure constitutional requirements and those defendants contended were "designed to inspire best practices and for administrative coordination . . . [and] are used to enhance or improve performance." ECF No. 6996 at 5 (quoting ECF No. 6936 at 8, 9). The

---

[6] The Report currently before the court is not a "compliance report" within the meaning of the Order of Reference. *See* ECF No. 640 at 4-5.

[7] Specifically, the Special Master reports plaintiffs declined his offer for further negotiations and that a further meeting with defendants did not result in agreement between defendants and the Special Master and his experts. ECF No. 7151 at 18.

11

court held defendants' "contentions misperceive the remedial function of the quality improvement process and CQIT," that the continuous quality improvement (CQI) process "is essential to a durable remedy in this action," and that full implementation of "all components of CQIT is essential" to the proper functioning of the CQI. ECF No. 6996 at 5. The court also clarified it had not invited "parsing" of CQIT "in any way that would impede" its core function in the quality improvement process or achievement of a durable remedy. *Id*. For the same reasons, the court rejected defendants' suggestion that the proposed distinction between indicators that reflect constitutional requirements and others that are, in defendants' view, "aspirational" was necessary to avoid "'running afoul of the needs-narrowness-intrusiveness requirement of the Prison Litigation Reform Act.'" *Id*. at 7 (quoting ECF No. 6936 at 11). The court reiterated

> the quality improvement process serves an integral remedial function in this action: defendants' assumption of responsibility for self-monitoring the adequacy of mental health care delivered to the plaintiff class. This function is as essential to the constitutional remedy as are individual components measured by CQIT. Viewed through this lens, defendants' contention that CQIT includes components that exceed constitutional minima is misplaced. While key CQIT indicators must be identified as an aid to measurement of compliance with remedial plans in this action, namely the Program Guide and the Compendium, that identification is but a component of full implementation of CQIT and the quality improvement process. . . . full implementation of CQIT and the quality improvement process is required as part of the constitutional remedy in this action to the same extent as all other court-ordered remedies.

ECF No. 6996 at 7-8.

Renaming as "informational" the indicators defendants previously contended were only "used to enhance or aid performance" cannot evade the fact that the court has already ruled against defendants' attempt to use this conceptual distinction to limit the list of key indicators. Defendants provide no support for their suggestion that the Special Master should have differentiated between "key" and "informational" indicators, given the court's December 17, 2020 order.

    C.    <u>Measurement of Constitutionally Adequate Mental Health Care</u>

Defendants also contend "not all of the specific Program Guide, Compendium, or court-ordered requirements that may be tracked by an indicator reflect a constitutional

12

requirement" and that "CDCR could provide constitutionally adequate mental healthcare irrespective of its performance on several indicators." ECF No. 7197 at 6. This argument is at odds with defendants' long-standing recognition that "'[t]he program guide is the remedial plan designed to get the State up to a constitutional level of care. . . .'" ECF No. 4539 at 30 n.30 (quoting RT, ECF No. 4538, at 27:5-7). If this is yet another attempt by defendants to relitigate a long-standing, foundational finding of this court, it is deeply disappointing. The court's finding has guided remediation in this action for years and been expressly confirmed by the United States Court of Appeals for the Ninth Circuit: "the Program Guide sets out the objective standards that the Constitution requires" for the delivery of adequate mental health care to members of the plaintiff class. *Coleman v. Brown*, 756 Fed. Appx. at 679; *see also* ECF No. 4539 at 30 n.30 (denying defendants' termination motion, noting "the degree to which defendants are complying with the Revised Program Guide is an appropriate way to assess whether defendants are meeting their constitutional obligations."). More narrowly, defendants' argument here either ignores or betrays a fundamental misunderstanding of the court's extended discussion in its December 17, 2020 order, referenced above.[8] Relitigation of these issues in the guise of an objection is improper; any such objection is disregarded.

D. "Decommissioned" Indicators

Finally, defendants also suggest the Special Master's proposed list "includes several indicators that have been decommissioned." ECF No. 7197 at 10. Defendants' "evidence" for this position is a March 14, 2021 letter to the Special Master from Melissa Bentz, Esq., informing the Special Master that "defendants plan to decommission" several indicators. *See id.* & ECF No. 7151 at 93. The letter is not evidence that the indicators either have been or could or should be "decommissioned."[9] The Special Master may assess and report as appropriate

---

[8] To date the court has not enforced the certification requirement with respect to objections to reports from the Special Master. It may in the future if purported objections appear to ignore or disregard prior court orders.

[9] Although the issue has not been tendered to the court, it is not at all clear that defendants may unilaterally "decommission" CQIT indicators, given the long-standing and well-established remedial process of supervision by the Special Master.

13

on the information contained in Ms. Bentz's letter during the Twenty-Ninth Monitoring Round, which will be the first time the Special Master and his team will return to on-site monitoring since the onset of the COVID-19 pandemic.

In accordance with the above, IT IS HEREBY ORDERED that:

1. With the exception of Indicator 8 on the list of key indicators for Access to Care, on page 21 of the Report, the Special Master's May 6, 2021 Report on the Continuous Quality Improvement Tool Key Indicators, ECF NO. 7151, is ADOPTED;

2. Indicator 8 on the list of key indicators for Access to Care, on page 21 of the Report, is stricken as duplicative;

3. As modified by this order, the list of key indicators at pages 21 through 26 of the Report is provisionally approved; and

4. The Special Master shall test and monitor the functionality and efficacy of the indicators on the provisionally approved list during his Twenty-Ninth Monitoring Round and shall report his findings to the court in his Twenty-Ninth Monitoring Round Report.

DATED: June 30, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE