**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **RALPH COLEMAN, et al.** | |
| **Plaintiffs,** | |
| **v.** | **No. 2:90-cv-0520 KJM DB P** |
| **GAVIN NEWSOM, et al.** | |
| **Defendants.** | |

**SPECIAL MASTER'S REPORT ON HIS EXPERT'S REPORT ON SUICIDES
COMPLETED IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND
REHABILITATION, JANUARY 1, 2019 – DECEMBER 31, 2019**

## I.      INTRODUCTION

Attached is the *Coleman* Special Master's expert's Report on Completed Suicides in the California Department of Corrections and Rehabilitation (CDCR) from January 1, 2019 through December 31, 2019 ("Report"). This is the twenty-first report by the Special Master's expert[1] on completed suicides by CDCR inmates. It is submitted as part of the Special Master's overall continuing review of defendants' compliance with court-ordered remediation in this matter.

The Special Master created an internal Suicide Report Workgroup to direct and guide the development of this Report and forthcoming analyses of suicides completed in the CDCR. *See* ECF No. 7038 at 2.[2] The Workgroup is comprised of Lindsay M. Hayes, M.S., Jeffrey L. Metzner, M.D., Sharen Barboza, Ph.D., Kahlil A. Johnson, M.D., and Kerry C. Hughes, M.D.

---

[1] Members of the Special Master's staff who are mental health experts are referred to collectively as "the Special Master's expert."

[2] References to page numbers for documents filed in the court's Electronic Case Filings (ECF) system are to page numbers assigned by the ECF system.

Dr. Sharen Barboza authored the Report. In preparing the Report, Dr. Barboza, with support from other *Coleman* experts, conducted in-depth clinical reviews and assessments of the health care records and CDCR death review reports for all CDCR inmate suicide deaths during calendar year 2019.

## II.    <u>**FINDINGS**</u>

Among the Special Master's expert's findings in the Report were the following:

- In 2019, there were 38 incarcerated individuals in CDCR custody who died by suicide, resulting in the highest suicide rate—30.3 per 100,000—in the past 21 years. Report at 1.

- Of the deaths by suicide in 2019, the Special Master's expert determined that 14 or 36.8 percent were foreseeable and 23 or 60.5 percent were preventable. *Id.* at 30.

- Seventy-one percent of those who died by suicide in 2019 were Mental Health Services Delivery System (MHSDS) participants. *Id.* at 20.

- Consistent with prior years, hanging was the primary method used by those who died by suicide in 2019. *Id.* at 7.

- Thirteen percent of patients who died by suicide in 2019 were discovered in rigor mortis, which represented a decrease from 2018. *Id.* at 9.

- There was a decrease in the proportion of Hispanic/Latinx inmates who died by suicide in 2019 (28.9 percent) compared to 2018 (50 percent). *Id.* at 10-11.

- More than three-quarters of incarcerated persons who died by suicide in 2019 had histories of suicide attempts, non-suicidal self-injury, or both. *Id.* at 22.

- Consistent with recent reports of the Special Master's expert, just under a third of incarcerated persons who died by suicide in 2019 resided in some form of segregated housing. *Id.* at 17.

2

- Finally, 75 percent of cases where an inmate received a suicide risk evaluation during their most recent incarceration "showed evidence of clinicians failing to identify or document known risk factors during suicide risk evaluations," an increase from 2018 (61 percent). *Id.* at 23.

III. <u>**PARTIES' RESPONSES AND OBJECTIONS**</u>

On May 13, 2021, the Special Master provided the *Coleman* parties with a draft version of the Report ("Draft Report"). In accordance with regular practice of the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the Draft Report. On June 14, 2021, defendants submitted their comments and objections to the Draft Report. *See* Letter from Dillon Hockerson, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (June 14, 2021), attached hereto as Exhibit A. Plaintiffs did not submit comments or objections to the Draft Report. After careful review and consideration, the Special Master's expert has revised and clarified relevant portions of the Report where warranted, as discussed in further detail below.

A. <u>**Defendants' Response to the Draft Report**</u>

In their response to the Draft Report, defendants rehashed several familiar objections to previously filed suicide reports,[3] including their argument that the Special Master's expert's

---

[3] *See* Defendants' Objections to the Special Master's Report on His Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2018 – December 31, 2018, ECF No. 7182 at 2-4 (objecting to the Special Master's expert's 2018 suicide report as "redundant"); *id.* at 4-5 (objecting to the Special Master's expert's suicide foreseeability and preventability determinations); *id.* at 7 (objecting to the Special Master's expert's comparison between CDCR's suicide rate and that of other large prison systems); *see also* Defendants' Objections to the Special Master's Report on His Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2017 – December 31, 2017, ECF No. 7098 at 2-3 (objecting to the Special Master's expert's report as "redundant"); *id.* at 4-5 (objecting to the Special Master's expert's foreseeability and preventability determinations); *id.* at 3-4 (objecting to the Special Master's expert's comparison between CDCR's suicide rate and that of other large prison systems).

report is duplicative of CDCR's suicide report, Exhibit A at 1;[4] their objection to the Special

Master's expert's inclusion of suicide foreseeability and preventability determinations, *id.* at 1-2,

8-9;[5] and their objection to the inclusion of comparisons between CDCR's suicide rate and that

of other large prison systems. *Id.* at 2-3.[6]  These objections lack merit and the Special Master

---

[4] CDCR drafted a compendium suicide report covering suicides completed in calendar years 2017-2019 and posted the same on its website. *See* Exhibit A at 1.  The Special Master notes that this expert's Report, compared to CDCR's compendium report, provides an opportunity to conduct in-depth analysis and identify inmate suicide trend data by year.  Moreover, unlike the Special Master's expert's Report, CDCR's compendium report does not include detailed individual case summaries.  Finally, CDCR stopped conducting foreseeability and preventability analyses in 2017 due to their concerns with potentially admitting liability regarding the suicides that occur in its facilities.  *See* ECF No. 7038 at 20.  Accordingly, CDCR's compendium report lacks this critical information needed to enable the court to fully evaluate defendants' progress and performance regarding suicide prevention and response.

[5] Once again, defendants seek to discredit the Special Master's expert's suicide foreseeability and preventability analyses, describing this reporting as being of questionable utility.  *See* Exhibit A at 1; *see also id.* at 8-9.  Defendants' objections are not made in a vacuum.  For nearly two decades, defendants have objected to the Special Master's expert's analysis of suicide foreseeability and preventability.  *See* ECF No. 1519 at 286-87 (Special Master's report discussing defendants' 2003 opposition to the suicide foreseeability analysis contained in the Special Master's expert's draft 2001 suicide report).  The court has overruled these objections and discussed the importance of suicide foreseeability and preventability determinations to evaluating defendants' progress in establishing a constitutionally adequate mental health system.  *See, e.g.*, ECF No. 4693 at 3 ("Defendants are responsible for development and implementation of a program to 'identify, treat, and supervise inmates at risk for suicide' and *identification of the number of preventable inmate suicides is an integral part of that responsibility*.") (citations omitted) (emphasis added).  Moreover, the Supreme Court of the United States highlighted the importance of foreseeability and preventability determinations in a 2011 opinion.  *Brown v. Plata*, 563 U.S. 493, 504 (2011).  While defendants readily criticize the Special Master's expert's "outmoded" methods, it is apparent that their true concern is that the Special Master's expert's analysis will be used as evidence against them in a potential future civil action.  *See* ECF No. 7052-1 at 6-7 (attachment to defendants' objections to the Special Master's expert's 2017 report, suggesting that measures of suicide foreseeability and preventability "are susceptible to bad faith manipulations that can expose CDCR to an array of unwarranted civil and criminal liability.").  The Special Master has previously provided a thorough overview of the history of foreseeability and preventability determinations in this matter and will not repeat the same here.  ECF No. 7038 at 17-22.  The Special Master's expert will continue to report on inmate suicide foreseeability and preventability.

[6] The Special Master's expert's annual suicide reports have included comparisons to other large prison systems since the 2011 annual report.  *See* ECF No. 4308 at 1-2.  The court has consistently overruled defendants' prior objections to the Special Master's expert's use of statistical comparisons.  For instance, responding to defendants' objection to the "methodology underlying the Special Master's" observation that CDCR's increasing suicide rate "substantially" exceeded the national average, the court observed:

> The methodology used by the Special Master is the same methodology his expert has used for over a decade in reporting to this court on CDCR inmate suicides.  It is neither erroneous nor misleading.  Certainly no dispute over methodology can disguise the Special Master's statement that in 2012, as of the time of the writing of the Report, a CDCR inmate was dying by suicide on average nearly 11 days.  That is of concern to the Special Master, and it is of concern to this court. It should be a primary concern to defendants…. After over seventeen years working with defendants on the remedial phase of this action, including increasing focus on the problem of inmate suicides in CDCR prisons, the Special Master is well-qualified to opine on these matters and the court finds no basis for striking his findings or his conclusions.

will not provide detailed responses to them because they have been discussed at length in prior

filings. *See* ECF No. 7077 at 4-5 (responding to defendants' assertion that the Special Master's

expert's report is "duplicative" of the CDCR's suicide report); *id.* at 7 (responding to defendants'

objection to the Special Master's expert's suicide foreseeability and preventability

determinations); *id.* at 5-6 (responding to defendants' objection to large prison system suicide

rate comparisons).

    In addition to restating previously filed objections, defendants raised new objections and

concerns with the Draft Report.  First, defendants requested that the Special Master's expert

clarify several parts of the Draft Report.  Exhibit A at 3 (requesting clarifications to a statistical

table displaying suicide statistics by CDCR institution included in the Draft Report).  After

careful consideration of these concerns, the Special Master's expert's included clarifying

modifications to these elements of the report, including updated statistical calculations, as

requested.  Report at 7.

    Defendants also provided extensive comments on the Special Master's expert's critique

of CDCR's suicide case reviews (SCRs).  Specifically, defendants objected to the

characterization of several SCRs as "marginally adequate."  Exhibit A at 4-5.  In response, the

Special Master's expert revised the Report to include these marginal cases as "adequate" and

characterized certain criticisms of these SCRs as "opportunities for improvement."  Report at 27-

28.  The Special Master's expert also modified the language in one individual case summary,

Appendix A to Report at 118-19 (Special Master's expert's revisions to Case V), in response to

defendants' comments and concerns.  Exhibit A at 5-7.  As was the case with the 2018 suicide

report, the Special Master's expert did not concur with the defendants' request to summarize

---

ECF No. 4361 at 7-9.

observed inadequacies in individual suicide case reviews in the body of the Report, Exhibit A at 7, because the information defendants sought is discussed in detail in Appendix A of the Report. *See* Report at 27; *see also* ECF No. 7161 at 6 (responding to defendants' same request regarding the Special Master's expert's 2018 suicide report).  Finally, the Special Master's expert modified the Report's discussion regarding the omission of documentation of the county coroner's autopsy reports in suicide case review reports based on updated information received from defendants since the Draft Report was distributed to the parties.  *See* Report at 29, 34; *see also* Exhibit A at 8 (defendants' request regarding county coroner autopsy report discussion).[7]

## IV.    CONCLUSION AND RECOMMENDATION

In 2019, the suicide rate among incarcerated persons in CDCR's custody reached a new high, 30.3 deaths per 100,000, continuing an upward trend observed in recent reports of the Special Master's expert regarding completed suicides.  Report at 1.  On average, a CDCR inmate died by suicide every 9.6 days in 2019.  *Id.*  More than 60 percent of these deaths by suicide were determined to be foreseeable, preventable, or both.  *Id.* at 30.

The Special Master agrees with the conclusions included in his expert's Report.  Because these conclusions track prior court orders and the general mission of the Suicide Prevention Management Workgroup, they need not be reiterated in additional court orders at this time. Accordingly, the Special Master requests that the court adopt in full the attached Report by Dr. Sharen Barboza, Ph.D. on Completed Suicides in the California Department of Corrections and Rehabilitation from January 1, 2019 through December 31, 2019.

---

[7] At the time the Draft Report was written, memoranda documenting CDCR's review of the county coroner's autopsy report were not included in the documents provided to the Special Master's expert.  Those memoranda have since been produced, making the Special Master's expert's concerns on this issue moot.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr., Esq.
Special Master

July 16, 2021

**Sharen Barboza, Ph.D.**
**37 Norton Avenue**
**Clinton, NY 13323**
**sharen@sharenbarboza.com**

**REPORT ON SUICIDES COMPLETED IN THE**
**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**JANUARY 1, 2019 – DECEMBER 31, 2019**

## I.     <u>Introduction and Summary of the Findings</u>

This report is the *Coleman* Special Master's expert's review of the 38 deaths by suicide of inmates incarcerated within the California Department of Corrections and Rehabilitation (CDCR) in 2019. It is submitted as part of the Special Master's continuing review of the defendants' compliance with court-ordered remediation in the matter of *Coleman v. Newsom*, No. CIV S-90-0520 KJM KJN E.D. Cal.

This report is similar to other reports in that five other experts from the Special Master's team assisted in its preparation by reviewing records and reports related to the 38 suicides in 2019.  All five of these experts are nationally recognized in the field of correctional mental health.  They are Mary Perrien, Ph.D., Henry A. Dlugacz, J.D., MSW, Maria Masotta, Psy.D., James DeGroot, Ph.D., and Brian Main, Psy.D.[1]

The sources of information for this report were individual Suicide Case Reviews (SCRs) completed by members of CDCR's Statewide Mental Health Program (SMHP) in collaboration with input and feedback from the Suicide Case Review Committee (SCRC); the reports on implementation of Quality Improvement Plans (QIPs) submitted by each institution and/or headquarters in response to the recommendations in each SCR; individual inmate healthcare records; coroners' reports; California Correctional Health Care Services (CCHCS) Final Combined Death Review Summaries; CDCR Initial Inmate Death Reports (Form 7229-A); CDCR Inmate Suicide reports (Form 7229-B); and CDCR Crime/Incident Reports (Form 837).

The findings can be summarized as follows:

- CDCR's suicide rate in 2019, 30.3 deaths per 100,000, was its highest in the past 21 years.

- The number of suicides in 2019 corresponds to a death every 9.6 days.[2]  This represents an incremental increase over the past six years.  In 2018, the rate was one suicide every 10.7 days, in 2017, a suicide every 12.1 days, in 2016 a suicide every 13.5 days, in 2015 a suicide every 15.2 days, and in 2014 a suicide every 15.9 days.

- Hanging was the primary method used by those who died by suicide in 2019, representing 86.8 percent of the deaths.

---

[1] Each expert's curriculum vitae appears in Appendix C.

[2] This value is calculated by taking 365 days and dividing by the number of deaths by suicide in the year (i.e., 38).

- The highest number of deaths by suicide was seen in August 2019 (nine deaths or 26.5 percent).

- There was a decrease in the percentage of inmates discovered in rigor mortis[3] in 2019 (13.2 percent) from 2018 (30 percent). One of the inmates found in rigor mortis in 2019 was housed in restrictive housing.

- Rates of death by suicide for male inmates increased from 26.7 deaths per 100,000 inmates in 2018 to 30.9 deaths per 100,000 inmates in 2019.

- There was an increase in the percentage of suicides among Caucasian inmates in 2019.

- African American inmates died by suicide at a lower percentage than would be expected given their overall percentage of the CDCR population. This trend had been consistent over the past five years.

- For the first time since 2016, Hispanic/Latinx inmates died by suicide with lower comparative frequency than would have been expected given their overall percentage of the CDCR population.

- Those who died by suicide in 2019 were older, on average, than those who died by suicide in 2017 and 2018.

- Among those who died by suicide in 2019, the majority (73.7 percent) were not married at the time of death.

- Nearly eight percent of inmates who died by suicide in 2019 did not speak English as their primary language. This represents a decrease from 2018 (12 percent) and 2017 (20 percent).

- Over half (52.6 percent) of those who died by suicide in 2019 were diagnosed with a medical condition associated with a higher risk for suicide.

- High-security inmates were overrepresented among those who died by suicide, 73.7 percent, when compared to their overall percentage of the CDCR population, 39.9 percent.

- Those incarcerated for violent crimes, including sexual offenses, comprised 92.1 percent of those who died by suicide in 2019.

- Just under one-third of inmates (31.6 percent) were residing in segregated housing at the time of their deaths by suicide in 2019.

- In 2019, 39.4 percent of those who died by suicide were placed in housing specifically to address their personal safety concerns. This was a decrease from 2018, when 50 percent of those who died by suicide were placed in housing to address their personal safety concerns.

---

[3] Rigor mortis is "the state of postmortem stiffening." It "starts developing within 1 to 2 hours after death," "becomes apparent in the small muscle groups first" including "eyelids, lower jaw, face," "but on an average it may be said to commence 2-4 hours after death…" Kori (2018). Time since death from rigor mortis: Forensic perspective," *Journal of Forensic Sciences and Criminal Investigation, 9 (5), 1-9.*

- Of the 28 inmates who died by suicide in 2019, 92.1 percent were alone in their cells at the time of their suicidal acts. Twenty-nine inmates (76.3 percent) were assigned to single cells.

- One inmate died by suicide while housed in an Administrative Segregation Unit (ASU) intake cell in 2019.

- Of those inmates who died by suicide in 2019, 63.1 percent were not assigned to a job placement at the time of death.

- In 2019, 71.1 percent of those who died by suicide were receiving services within Mental Health Services Delivery System (MHSDS).

- There was an increase in the percentage of inmates who died by suicide receiving services at the Enhanced Outpatient Program (EOP) level of care in 2019 (42.1 percent) over the previous two years.

- Two inmates who died by suicide in 2019 (5.3 percent) were placed in the Developmental Disability Program (DDP) while incarcerated.

- Substance use or abuse was present in the histories of 92.1 percent of the inmates who died by suicide in 2019.

- Of the 38 inmates who died by suicide in 2019, 68.4 percent attempted suicide previously.

- In 2019, 76.3 percent of those who died by suicide had histories positive for suicide attempts, non-suicidal self-injury, or both.

- In 2019, 10.5 percent of those who died by suicide were under a court order (PC 2602) for involuntary psychotropic medication.

- Seventeen (44.7 percent) of the 38 inmates who died by suicide in 2019 had histories positive for trauma exposure.

- Of the inmates whose histories were positive for trauma, 29.4 percent received formal treatment for trauma and/or had a trauma-related diagnosis while incarcerated.

- Seventy-five percent of the cases (24 inmates) with completed suicide risk evaluations showed evidence of clinicians failing to identify or document known risk factors during suicide risk evaluations and 43.8 percent demonstrated inappropriate risk determinations derived from the identified risk factors.

- Of the cases where inmates died by suicide in 2019 and had treatment plans developed during their incarceration, there were problems noted within the treatment plans in 64.5 percent of cases.

- Of those who died by suicide in 2019 and received mental health services, 64.5 percent of cases evidenced problems related to the delivery of those services.

- Four cases, or 10.5 percent, evidenced treatment or assessment problems related to poor supervision by unlicensed clinicians.

3

- In 2019, there was an increase in the identification of problems related to higher level of care needs (42.1 percent) when compared to 2018 (18 percent).

- Six inmates (15.8 percent) of those who died by suicide in 2019 had been discharged from an inpatient setting within one week of their deaths.  This was over twice the percentage found in 2018 (6 percent).

- In 2019, 36.8 percent of the deaths by suicide were determined to have been foreseeable and 60.5 percent were determined to have been preventable.  These percentages were increases over the findings in 2018.

## II.    Format

The following report is presented in a narrative format supported by graphs and tables.  It includes a summary of findings related to the deaths by suicide in 2019, including comparisons with previous years, when available.  The report ends with conclusions.

Findings and discussion of the findings are organized according to identified risk factors and other elements of analysis including:

- Suicide Incident Factors
- Individual Risk Factors
- Institutional/Environmental Risk Factors
- Mental Health Risk Factors
- Mental Health Evaluation and Treatment Factors
- Emergency Response Factors
- Individual Suicide Case Review Analyses
- Quality Improvement Plan Content and Analyses
- Foreseeability and Preventability Determinations

Appendices are attached to this report, including:

- Appendix A – Summaries of Individual Cases
- Appendix B – Tables
    - ~ B1 – Inmate Demographics
    - ~ B2 – Inmate History and Suicide Event Characteristics
    - ~ B3 – Identified Assessment, Treatment, and Communication Concerns
    - ~ B4 – Common Problems Identified as Requiring a Quality Improvement Plan
- Appendix C – Experts' Curricula Vitae
- Appendix D – Acronyms and Abbreviations

## III.    Findings and Discussion

On June 30, 2019, the inmate population included 125,472 inmates (119,781 males and 5,691 females).  The 2019 suicide rate within CDCR was the highest it has been over the past 21 years.  Moreover, there were more suicides in 2019 (38) than in any year for the past 21 years, except 2006 when there were 43 deaths by suicide.  The table below includes prior rates, by year, for comparison purposes.

4

CDCR Suicide Rates per 100,000
1999-2019

| Year | CDCR Suicide Rate |
|------|-------------------|
| 1999 | 14.8 |
| 2000 | 9.3 |
| 2001 | 18.6 |
| 2002 | 13.9 |
| 2003 | 23.0 |
| 2004 | 15.9 |
| 2005 | 22.5 |
| 2006 | 24.9 |
| 2007 | 19.6 |
| 2008 | 21.1 |
| 2009 | 14.9 |
| 2010 | 21.1 |
| 2011 | 20.3 |
| 2012 | 24.4 |
| 2013 | 22.6 |
| 2014 | 17.0 |
| 2015 | 18.6 |
| 2016 | 21.0 |
| 2017 | 22.9 |
| 2018 | 26.3 |
| 2019 | 30.3 |

CDCR's suicide rate of 30.3 suicides per 100,000 inmates in 2019 places it above its 21-year average of 20.1 suicides per 100,000. When compared to other large prison systems in the country, California's 2019 suicide rate is the 4th highest out of the ten largest correctional systems. This relative position is unchanged from 2017.

| Correctional System[4] | 2019 Population | 2019 Suicides | 2019 Suicide Rate per 100,000 |
|------------------------|-----------------|---------------|-------------------------------|
| Illinois | 38,259 | 4 | 10.5 |
| Ohio | 50,338 | 8 | 15.9 |
| Arizona | 42,441 | 7 | 16.5 |
| Federal Bureau of Prisons | 175,116 | 29 | 16.6 |
| Texas | 158.429 | 34 | 21.5 |
| Florida | 96,009 | 26 | 27.1 |
| **California** | **125,472** | **38** | **30.3** |
| New York | 43,500 | 18 | 41.4 |
| Pennsylvania | 45,702 | 19 | 41.6 |
| Georgia | 54,816 | 23 | 42 |

---

[4] Yearly data on inmate suicides were obtained directly from each state's correctional department and the Federal Bureau of Prisons (inmate population data includes prisoners held in non-secure, privately operated community corrections facilities, and juveniles held in contract facilities).

A. <u>Suicide Incident Factors</u>

This section reviews the factors associated with the suicidal event, including its location, method, and timing.  The presence of rigor mortis upon discovery was also reviewed.

**1. Facility Locations**

In 2019, all deaths by suicide (100 percent) occurred within a CDCR facility.  Thirty-eight suicides occurred across 19 CDCR facilities.  Ten facilities experienced one suicide, six facilities experienced two suicides, one facility experienced three suicides, one facility experienced four suicides, and one facility experienced nine suicides.

| Facility | Number of 2019 Suicides | Percentage of 2019 Suicides |
|---|---|---|
| California Health Care Facility (CHCF) | 1 | 2.6% |
| California Institution for Men (CIM) | 1 | 2.6% |
| California Institution for Women (CIW) | 1 | 2.6% |
| California Men's Colony (CMC) | 1 | 2.6% |
| Correctional Training Facility (CTF) | 1 | 2.6% |
| High Desert State Prison (HDSP) | 1 | 2.6% |
| Pleasant Valley State Prison (PVSP) | 1 | 2.6% |
| California Substance Abuse Treatment Facility (SATF) | 1 | 2.6% |
| San Quentin State Prison (SQ) | 1 | 2.6% |
| Salinas Valley State Prison (SVSP) | 1 | 2.6% |
| California Correctional Institute (CCI) | 2 | 5.3% |
| California Medical Facility (CMF) | 2 | 5.3% |
| Kern Valley State Prison (KVSP) | 2 | 5.3% |
| California State Prison, Los Angeles County (CSP/LAC) | 2 | 5.3% |
| Mule Creek State Prison (MCSP) | 2 | 5.3% |
| North Kern State Prison (NKSP) | 2 | 5.3% |
| Deuel Vocational Institution (DVI) | 3 | 7.9% |
| California State Prison, Corcoran (CSP/Corcoran) | 4 | 10.5% |
| California State Prison, Sacramento (CSP/Sac) | 9 | 23.7% |

Four facilities that experienced more than one suicide in 2019 have historically had over 1.5 suicides per year on average.[5]  These facilities included CSP/LAC, CSP/Corcoran, CSP/Sac, and KVSP.  These four facilities also experienced more than one suicide in 2018.  The table that follows includes the total number of suicides experienced by each facility in 2019 as well as the average number of suicides each year inclusive of 2019 (20 years).

---

[5] The total number of suicides prior to 2015 was taken from CDCR's *Annual Report on Suicide in the California Department of Corrections and Rehabilitation January 1, 2015-December 31, 2015*. https://cchcs.ca.gov/wp-content/uploads/sites/60/SR/2015-Annual-Suicide-Report.pdf

| Facility[6] | 2019 Suicides | 1999-2019 Suicides | 1999-2019 Average[7] |
|---|---|---|---|
| California Rehabilitation Center | 0 | 1 | 0.05 |
| Chuckawalla Valley State Prison | 0 | 1 | 0.05 |
| Ironwood State Prison | 0 | 2 | 0.10 |
| Valley State Prison | 0 | 2 | 0.10 |
| California Correctional Center | 0 | 4 | 0.19 |
| Calipatria State Prison | 0 | 5 | 0.24 |
| Sierra Conservation Center | 0 | 5 | 0.24 |
| Centinela State Prison | 0 | 6 | 0.29 |
| Avenal State Prison | 0 | 7 | 0.33 |
| Central California Women's Facility | 0 | 10 | 0.48 |
| California Health Care Facility | 1 | 3 | 0.50 |
| California Institution for Women | 1 | 12 | 0.57 |
| California State Prison, Solano | 0 | 12 | 0.57 |
| North Kern State Prison | 2 | 13 | 0.62 |
| Pleasant Valley State Prison | 1 | 16 | 0.76 |
| California Substance Abuse Treatment Facility | 1 | 16 | 0.76 |
| Wasco State Prison | 0 | 17 | 0.81 |
| Pelican Bay State Prison | 0 | 18 | 0.86 |
| California Training Facility | 1 | 19 | 0.90 |
| High Desert State Prison | 1 | 20 | 0.95 |
| Mule Creek State Prison | 2 | 20 | .095 |
| Folsom State Prison | 0 | 20 | 0.95 |
| California Correctional Institution | 2 | 23 | 1.10 |
| California Institution for Men | 1 | 24 | 1.14 |
| California Medical Facility | 2 | 26 | 1.24 |
| Deuel Vocational Institute | 3 | 30 | 1.43 |
| RJ Donovan Correctional Facility | 0 | 31 | 1.48 |
| California State Prison, Los Angeles County | 2 | 32 | 1.52 |
| Kern Valley State Prison | 2 | 22 | 1.57 |
| California Men's Colony | 1 | 35 | 1.67 |
| California State Prison, Corcoran | 4 | 35 | 1.67 |
| San Quentin State Prison | 1 | 37 | 1.76 |
| Salinas Valley State Prison | 1 | 38 | 1.81 |
| California State Prison, Sacramento | 9 | 50 | 2.38 |

## 2. Method of Suicide

The majority of deaths by suicide in 2019, (33 cases, 86.8 percent) occurred by hanging.[8]  Three inmates, or 7.9 percent, died by cutting, one inmate, or 2.6 percent, died by jumping and one inmate, or 2.6 percent, died by asphyxiation by a method other than hanging.  In 2018, 74 percent

---

[6] The table includes only CDCR facilities and is not inclusive of deaths by suicide which occurred in out-of-state facilities or DSH inpatient locations.

[7] The average was calculated by dividing the number of suicides by the number of years (i.e., 21).  The averages for CHCF and KVSP were adjusted to include only their years of operation (6 years and 14 years, respectively).

[8] While percentage comparisons to previous years are made throughout this report, it is important to note that minor changes may appear significant given the low base number of suicides in a given year.  Additionally, percentages among those who died by suicide do not account for changes in base rates among the CDCR population across years.

of the deaths by suicide occurred by hanging, 12 percent died by overdose, 9 percent died by cutting, and 6 percent died by asphyxiation by a method other than hanging. In 2017, 87 percent of the deaths by suicide occurred by hanging, 10 percent by cutting, and 3 percent by jumping.



### 3. Temporal Factors

In 2019, a death by suicide occurred at least once in each month except during the month of July. The average number of deaths by suicide was 3.2 per month. In 2018, the average number of deaths per month was 2.8 and in 2017, it was 2.5. Monthly suicides in 2019 ranged from no deaths in July to nine deaths, or 26.5 percent of 2019 suicides, in August.

| Month | Number of 2019 Suicides | Percentage of 2019 Suicides |
|---|---|---|
| January | 5 | 14.7% |
| February | 1 | 2.9% |
| March | 3 | 8.8% |
| April | 3 | 8.8% |
| May | 1 | 2.9% |
| June | 3 | 8.8% |
| July | 0 | 0.0% |
| August | 9 | 26.5% |
| September | 3 | 8.8% |
| October | 4 | 11.8% |
| November | 2 | 5.9% |
| December | 4 | 11.8% |

Prior to 2018, annual suicide reports noted that deaths by suicide tended to occur most often in the Spring months. In 2018, there was a spike in deaths by suicide in November and December. In 2019, the highest number of suicides occurred in August followed by five deaths in January. These

spikes represent a change from the pattern seen in previous years.  The chart that follows illustrates suicides by month over the past five years (2015-2019).



Deaths by suicide occurred most frequently on Mondays (26.5 percent), Wednesdays (20.6 percent), and Fridays (20.6 percent).  Deaths by suicide occurred 14.7 percent of the time on Thursdays and 11.8 percent of the time on Tuesdays and Saturdays.  Deaths by suicide occurred least frequently on Sundays (5.9 percent).  The only commonalities with 2018 regarding day of the week was the high frequency on Wednesdays and Fridays.  A high percentage of suicides occurred on Wednesdays in 2017 as well.

### 4.  Rigor Mortis

Upon discovery, five inmates, or 13.2 percent, were noted to have rigor mortis present, meaning they had muscle stiffening, or a decrease in body temperature signifying that they had likely been dead for at least two hours prior to discovery.[9]  There has been variability in the percentages of rigor mortis among those who died by suicide over a six-year period as noted in the table below.

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| **Percentage Discovered in Rigor Mortis** | 17% | 8% | 33% | 13% | 30% | 13.2% |

In 2019, one of the five inmates found in rigor mortis (20 percent) was housed in a restrictive housing unit (PSU) indicating that custody checks were likely not completed as required.  One (20 percent) was housed in a PIP and the three others (60 percent) were housed in general population, one of whom was in Sensitive Needs Yard (SNY) housing.  In 2018, 40 percent of the inmates found in rigor mortis were housed in a restrictive housing unit, and 50 percent were housed in

---

[9] Kori (2018). Time since death from rigor mortis: Forensic perspective," *Journal of Forensic Sciences and Criminal Investigation, 9 (5), 001-009.*

general population, with three of the five inmates in general population being housed in an SNY. In 2017, 75 percent of those found in rigor mortis were housed in a restrictive housing unit and 25 percent were in general population SNY housing.

B.  Individual Risk Factors

Findings related to characteristics of individual inmates who died by suicide are reviewed in the sections that follow, including gender, ethnicity, age, marital status, education level, primary language, and health concerns.

### 1.  Gender

In 2019, 97.4 percent of those who died by suicide were male.  One female inmate died by suicide in 2019.  No transgender or nonbinary inmates died by suicide in 2019.  Suicide rates per 100,000 inmates were calculated by gender.  The rate for male inmates was 30.9 deaths per 100,000 inmates in 2019.  This was an increase over the rate of 26.7 deaths per 100,000 male inmates in 2018, 22.3 per 100,000 in 2017, 19.5 per 100,000 in 2016 and 17.8 per 100,000 in 2015.  For female inmates, the rate was 17.6 deaths per 100,000 in 2019, a slight increase over the rate in 2018 (16.9 deaths per 100,000 inmates).  The rate was 16.7 deaths per 100,000 in 2017, 52.0 deaths per 100,000 inmates in 2016, and 35.5 deaths per 100,000 inmates in 2015.[10]

### 2.  Ethnicity

Fifteen (39.5 percent) of the inmates who died by suicide in 2019 were Caucasian.  Eleven (28.9 percent) were Hispanic/Latinx, eight (21.1 percent) were African American, two (5.3 percent) were of Asian descent, and two (5.3 percent) were considered as "other" ethnicity (i.e., Pacific Islanders).  These findings represented a major change in the ethnicity of those who died by suicide when compared to the previous three years when the largest percentage of deaths by suicide were found among those of Hispanic/Latinx ethnicity.  Caucasian inmates had not made up the largest percentage of deaths by suicide since 2015.



2019 Suicides by Ethnicity

---

[10] Female suicide rates vary widely based on a smaller overall population than males.  Specifically, the large fluctuations in rates represents a difference of one, two and three deaths per year (one death 2019, 2018, and 2017; three in 2016 and two in 2015)

Also, for the first time since 2015, Caucasian inmates died by suicide disproportionate to their percentage within the larger CDCR population.  While 39.5 percent of those who died by suicide were Caucasian, in June 2019 they made up 20.9 percent of the overall inmate population.  Additionally, Hispanic/Latinx inmates died by suicide with less relative frequency (28.9 percent) than would be expected by their overall representation among the CDCR population (44.2 percent).  This has not been the case since 2015.   African American inmates died by suicide with comparatively less frequency, 21.1 percent, than would be expected by their overall percentage of the CDCR population (28.3 percent) which has been the case for the past five years.  Those whose ethnicity was listed as other[11] were overrepresented in deaths by suicide (10.6 percent) given their percentage within the CDCR population (6.6 percent).  The graph below includes the percentages of deaths by suicide by ethnicity over the past five years along with comparative percentages of the overall population by ethnicity as of December of each year[12] except 2019, as data through June 2019 were the only available data.



### 3.  Age

With regard to age, those who died by suicide in 2019 were older overall, with an average age of 39.9 years, than those who died by suicide in 2018 (39.1 years) and 2017 (33.5 years), but younger on average than those who died by suicide in 2016 (43.6 years), 2015 and (42.9 years).  In June 2019, CDCR reported that the average age across the inmate population was 40.1 years,[13]

---

[11] Data available from CDCR identified Asian, Native/Indigenous American, Hawaiian/Pacific Islander and those for whom race was not identified as "Other." Subsequently, those groups are reported together in the chart.

[12] *CDCR Offender Data Points – Offender Demographics for the 24-month period ending June, 2019.* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/201906-DataPoints.pdf.

[13] *Id.*

indicating that those who died by suicide in 2019 were similar in age to the average CDCR inmate, which was also the case in 2018.

Categorically, inmates aged 35-44 (39.5 percent) died with the highest frequency, followed by those aged 25-34 (26.3 percent), those aged 45-54 (23.7 percent), those aged 55 and older (7.9 percent) and those aged 18-24 (2.6 percent) in 2019. In 2018, inmates aged 25-34 died with the highest frequency (32 percent) followed by those aged 35-44 (29 percent), those aged 45-54 (21 percent), those aged 18-24 and those aged 55 and older (9 percent each).



### 4. Marital Status

Of the 38 inmates who died by suicide in 2019, 28 (73.7 percent) were never married, five (13.2 percent) were divorced, three (7.9 percent) were married, one (2.6 percent) was separated, and one (2.6 percent) was widowed. This pattern has been relatively consistent over time.



### 5.   Education

In 2019, individuals with a high school or a General Educational Development (GED) diploma (36.9 percent), those with some college education (26.3 percent), and those who completed eighth through eleventh grade without obtaining a diploma (26.3 percent) each comprised close to one-third of those who died by suicide.  Three inmates (7.9 percent) who died by suicide in 2019 completed less than an eighth-grade education, and one inmate (2.6 percent) reported attending graduate school.  In 2018, individuals with a high school or a GED diploma comprised the highest percentage (47 percent) of those who died by suicide.  Those who completed eighth through eleventh grade without obtaining a diploma and those who completed some college each made up 26 percent of those who died by suicide in 2018.

### 6.   Primary Language

English was noted to be the primary language for 35 inmates, or 92.1 percent of the 38 inmates who died by suicide in 2019.  Three inmates (7.9 percent) did not speak English as their primary language.  These inmates were noted as speaking Spanish, Armenian, and Tagalog as their primary languages.  The inmate whose primary language was Tagalog (Case S) was noted to have a low TABE score, and there was clinical documentation of a possible language barrier.  The SCR did not include discussion of the need for translation services, however.

### 7.   Health Status/Medical Conditions

Research[14] has shown that certain medical conditions are related to an increased risk for suicide, including asthma, back pain, brain injury, cancer, congestive heart failure, chronic obstructive pulmonary disorder, diabetes, epilepsy, HIV/AIDS, heart disease, hypertension, migraine, Parkinson's disease, psychogenic pain, renal disorder, sleep disorders, and stroke.  In 2019, 20 inmates, or 52.6 percent, of those who died by suicide, were diagnosed with at least one of these conditions.  A table comparing percentages of medical conditions among those who died by suicide over the past four years is included below.

| Year | Percentage of Cases with Medical Condition(s) Identified |
|------|---------------------------------------------------------|
| 2016 | 70% |
| 2017 | 50% |
| 2018 | 65% |
| 2019 | 52.6% |

### C.   Institutional/Environmental Risk Factors

In this section, issues related to institutional and environmental factors among those who died by suicide are reviewed. These include security level, crime type, sentencing factors, housing location, cell type, issues with custody checks, job placements, institutional transfers, and rules violation reports.

---

[14] Ahmedani, et al.  Major Physical Health Conditions and Risk of Suicide. *American Journal of Preventive Medicine*, 2017; DOI: 10.1016/j.amepre.2017.04.001

### 1. Security Level[15]

Twenty-five inmates, or 65.8 percent, who died by suicide in 2019 were classified as Level IV. Five inmates, or 13.2 percent, were classified as Level II, three (7.9 percent) were classified as Level III, three (7.9 percent) were unclassified, one inmate (2.6 percent) was classified as Level I; for one inmate (2.6 percent), the security level could not be determined from available information.[16]  In 2018, 62 percent of those who died by suicide in 2018 were classified as Level IV, 18 percent were classified as Level II, 12 percent were classified as Level III, six percent were unclassified, and three percent were classified as Level I.

High security inmates, those classified as either Level III or Level IV, made up 73.7 percent of the inmates who died by suicide in 2019.  This represented a similar percentage to that found in 2018, 2016, and 2015.  It was an increase over the percentage in 2017. When the CDCR population was examined as a whole, 39.9 percent of inmates were classified as Level III and Level IV in June 2019,[17] indicating an overrepresentation of this group within those who died by suicide in 2019, as has been true in prior years

### 2. Crime Type

Thirty inmates, or 78.9 percent of the inmates who died by suicide in 2019 were convicted of violent crimes, and five inmates, or 13.2 percent, were convicted of sexual offenses. Consequently, 92.1 percent of inmates who died by suicide in 2019 committed violent crimes against other persons.  As of June 2019, crimes of this type were committed by 76.6 percent of the CDCR population.[18]  With regard to other crimes committed by those who died by suicide in 2019, three inmates (7.9 percent) were convicted of non-violent property offenses.

In 2018, 94 percent of those who died by suicide committed violent crimes against other persons. In 2017, 87 percent of the inmates who died by suicide were convicted of violent crimes; in 2016, the percentage was 81 percent and in 2015, it was 75 percent.

---

[15] "CDCR categorizes its facilities that house male inmates into security levels ranging from Level I (lowest security) to Level IV (highest security). (Facilities that house female inmates are not classified into different security levels as female facilities generally have similar levels of security.)"  From The Legislative Analyst's Office of California, "Improving California's Prison Inmate Classification System" May 2019 https://lao.ca.gov/Publications/Report/4023#:~:text=CDCR%20categorizes%20its%20facilities%20that,have%20similar%20levels%20of%20security.

[16] Security level information was obtained from the information documented within individual SCRs and CDCR Crime/Incident Reports (Form 837), when available.  Specifically, thirty-two cases (84.2 percent) included consistent information in both the SCR and Form 837 with regard to security level.  Three cases (8.1 percent) had security level information contained within the SCR but no security information was included in Form 837 and two cases (5.3 percent) had security levels that differed between the SCR and Form 837.  In these cases, the information on Form 837 was used. As noted above, the remaining case (the female inmate) had no security information contained in the SCR or Form 837.

[17] *CDCR Offender Data Points – Offender Demographics for the 24-month period ending June, 2019.* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/201906-DataPoints.pdf.

[18] *Id.*

3. **Sentencing Factors**

Twenty-three individuals, or 60.5 percent, of those who died by suicide in 2019 were serving sentences of over 21 years. This included 17 inmates, 44.7 percent, who were serving sentences up to and including life in prison. In 2018, 71 percent of those who died by suicide were serving sentences of over 21 years, with 65 percent serving sentences up to and including life in prison. In 2017, 50 percent were serving sentences over 21 years, and 37 percent were serving sentences up to including life.

One inmate (2.6 percent) who died by suicide in 2019 was condemned to death, five (13.2 percent) were serving life without the possibility of parole, and two inmates (5.3 percent) were serving sentences up to and including life with minimums of over 150 years. In total, 21.1 percent of those who died by suicide would have ultimately spent their lives in prison. As of June 30, 2019, 4 percent of the overall CDCR population was serving a sentence of life without the possibility of parole, and 0.6 percent of the CDCR population were condemned[19] as compared to 15.2 percent of those who died by suicide in 2019. Deaths by suicide of inmates serving these sentences were over-represented when compared to the CDCR inmate population.

| Sentence Length | Number of 2019 Suicides | Percentage of 2019 Suicides | Percentage of 2018 Suicides | Percentage of 2017 Suicides |
|---|---|---|---|---|
| 1-5 years | 2 | 5.3% | 12% | 23% |
| 6-10 years | 4 | 10.5% | 9% | 17% |
| 11-20 years | 9 | 23.7% | 9% | 7% |
| 21+ years | 6 | 15.8% | 6% | 33% |
| Life with the Possibility of Parole | 11[20] | 28.9% | 44% | 17% |
| Life without the Possibility of Parole | 5 | 13.2% | 15% | 0% |
| Condemned | 1 | 2.6% | 6% | 0% |
| Sentencing information unavailable | 0 | 0% | 0% | 3% |

When examining the amount of time served at the time of death, 12 inmates, or 31.6 percent, had served 11 to 20 years, ten inmates, or 26.3 percent had served one to five years, seven inmates, or 18.4 percent, had served six to ten years, six inmates or 15.8% had served less than one year, and the remaining three inmates, or 7.9 percent, had served over 21 years.

In 2018, percentages were found to be relatively consistent across three time ranges: Inmates who served one to five years comprised 29 percent, six to ten years comprised 24 percent and 11 to 20 years comprised 26 percent of those who died by suicide. Eighteen percent had served less than one year, and one inmate had served over 21 years. In 2017, the majority of inmates who died by suicide (73 percent) had served less than five years.

---

[19] *Id.*

[20] Includes the two inmates who were serving minimum sentences of over 150 years.



A comparison of these data regarding time served among those who died by suicide since 2015 is illustrated in the chart below.



When determining the amount of time remaining on an inmate's sentence, the Special Master's expert used the longest possible sentence, up to and including life. The majority of inmates who died by suicide in 2019, 18 inmates or 47.4 percent, had over 21 years remaining on their sentences, including those serving up to life and the one condemned inmate. Nine inmates, or 23.7 percent had 11 to 20 years remaining, five (13.2 percent) had six to ten years remaining, and six inmates, or 15.8 percent, had one to five years remaining. In 2018 inmates with over 21 years left to serve comprised 65 percent of those who died by suicide. In 2017, this group comprised 37 percent of those who died by suicide; and in 2016, this group comprised 70 percent of those who died by suicide.



### 4. Housing Type

At the time of their suicidal acts, five inmates, or 13.2 percent, were housed in an ASU, five inmates, or 13.2 percent, were in a Psychiatric Services Unit (PSU), one (2.6 percent) was housed in Short-Term Restricted Housing (STRH), and one inmate (2.6 percent) was living in condemned housing. Taken together, 31.6 percent of those who died by suicide in 2019 were in some form of segregated housing. This is similar to the findings for the prior three years. As of June 30, 2019, it was reported that 3.7 percent of the CDCR inmate population was housed in a restrictive housing unit (not including condemned housing),[21] indicating that suicides in those settings were highly overrepresented. Of those who died by suicide in 2019, 29 percent of the inmates were housed in restrictive housing, not including condemned housing, indicating an over-representation of this group among those who died by suicide.

Twenty-one inmates (55.3 percent) were in general population, and four (10.5 percent) were housed in a Reception Center (RC). In total, 65.8 percent of inmates who died by suicide in 2019 were housed in a general population setting. In 2018, the percentage of inmates who died by suicide in general population housing was 70 percent, in 2017 it was 40 percent, and in 2016 it was 63 percent. One inmate who died by suicide in 2019 (2.6 percent) was housed in a Psychiatric Inpatient Program (PIP).

---

[21] *CDCR Offender Data Points – Offender Demographics for the 24-month period ending June, 2019.* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/201906-DataPoints.pdf.



In 2019, one inmate (2.6 percent) was noted to have been placed in an ASU intake cell. The SCR determined that the inmate was able to find a tie-off point within his retrofitted cell and hanged himself. This resulted in an inspection and renovation of retrofitted cells at the facility.

**5. Housing Based on Safety Needs**

With regard to safety needs, 12 inmates (31.6 percent) who died by suicide in 2019 were living in a general population SNY, one inmate (2.6 percent) was assigned to SNY status while in a RC, and two inmates (5.3 percent) housed in a segregated setting were noted to have been placed there for safety reasons. Taken together, a total of 15 inmates, or 39.4 percent, of those who died by suicide in 2019 were placed in housing specifically to address safety concerns. In 2018, 50 percent of those who died by suicide were placed in housing specifically to address safety concerns and in 2017, it was 53 percent.

**6. Cell Type**

Of the 38 inmates who died by suicide in 2019, 29, or 76.3 percent engaged in their suicidal acts while housed in single cells. Six inmates, or 15.8 percent, were housed in double cells but engaged in lethal behavior when their cellmates were absent from the cell. Three inmates (7.9 percent) engaged in suicidal acts while outside of their cells. In total, 92.1 percent of those who died by suicide in 2019 engaged in suicide acts when alone in their cells. In 2018, 92 percent engaged in suicide acts when alone in their cells; in 2017 it was 97 percent, in 2016 it was 82 percent, and in 2015, it was 92 percent. Consistently over the past five years, the vast majority of inmates who died by suicide did so while alone in their cells.

**7. Custody Checks**

In 2019, five cases (13.2 percent) included concerns about inadequate custody/welfare checks related to the deaths by suicide. Three of these inmates (60 percent) were in segregated housing (i.e., PSU, condemned). In 2018, 12 percent of the deaths by suicide included concerns about inadequate custody checks, all in segregated housing. In 2017, 20 percent of the cases identified custody/welfare checks as problematic with 83 percent of those occurring in a segregation unit. In 2016, 19 percent of the cases included concerns about inadequate custody/welfare checks as

possible precipitants related to the deaths by suicide, and one of those cases (20 percent) occurred in a segregation unit.

### 8. Job Placements while Incarcerated

Of those who died by suicide in 2019, 23 inmates, or 60.5 percent, had at least one job placement while incarcerated. Ten, or 26.3 percent, had no evidence of job placements during their incarceration. For four inmates (10.5 percent), job placement information was not available and for one inmate, who died after only three days of incarceration, the issue was not applicable. In 2018, 59 percent of those who died by suicide had at least one job placement while incarcerated, and 35 percent had no evidence of job placements during their incarceration. In 2017, 47 percent of those who died by suicide had at least one job placement during their incarceration, and 50 percent had no history of job placements while incarcerated. In 2016, of those who died by suicide, 63 percent had at least one job placement during incarceration, and 37 percent had no history of job placements while incarcerated.

Twenty-four (63.1 percent) of the inmates who died by suicide in 2019 were noted to be unassigned with regard to job placement at the time of their deaths. Eleven (28.9 percent) of the inmates who died by suicide in 2019 were noted to be assigned to a job placement at the time of their deaths. For two inmates (5 percent), their job placement status at the time of death could not be determined, and as noted above, the issue was irrelevant for the inmate who had only been incarcerated for three days. In 2018, 62 percent of those who died by suicide were noted to be unassigned at the time of their deaths; in 2017, 77 percent of inmates who died by suicide were assigned to a job placement at the time of their deaths, and in 2016, it was 89 percent. Of the 23 inmates who ever had a job placement during incarceration and died by suicide in 2019, nine (39 percent) were unassigned at the time of their deaths.

### 9. Interfacility Transfers[22]

Male inmates who died by suicide in 2019 experienced between zero and 48 interfacility transfers over the course of their incarcerations. When examined in relation to the number of years served by each individual, the average was 1.4 transfers per year or one transfer every eight to nine months, the same as seen in 2018. In 2017, the average was 1.5 transfers per year, or one every eight months and in 2016, the average was 2.2 transfers per year or more than one transfer every six months.

### 10. Rules Violation Reports

There were a total of 497 rules violation reports (RVRs) received by the inmates who died by suicide in 2019, or 13.1 per inmate on average during their most recent incarceration within CDCR. Totals for each inmate ranged from zero to 150 RVRs. When examined in relation to the number of years served by each individual, the average was 1.9 RVRs per year. These averages were slightly higher than findings from previous years and did not appear to be an artifact of the inmate who received 150 RVRs during his incarceration, as the averages remained close to those values (9.4 per inmate; 1.7 per year) even when the outlier was removed from calculations.

---

[22] Interfacility transfers were reviewed only for male inmates, as there was a single death by suicide of a female inmate in 2019 and there are fewer women's facilities than men's facilities (i.e., 3 vs. 32) resulting in fewer opportunities for transfer among female inmates.

    D.  Mental Health Risk Factors

This section reviews mental health conditions and mental health risk factors known to be associated with suicide.  More specifically, issues related to inmates' levels of care, mental health treatment histories, primary diagnoses, prior suicide attempts, prior self-injurious behaviors, substance use, court-ordered involuntary medications, and trauma histories are discussed.

    1.  **Mental Health Service Levels**

Twenty-seven inmates, or 71.1 percent of those who died by suicide in 2019 were actively receiving services in CDCR's MHSDS at the time of death.  According to CDCR,[23] 28.6 percent of the inmate population was receiving services within MHSDS as of June 2019.  Thus, as has been true in previous years, the MHSDS population was overrepresented with respect to those who died by suicide, which is expected given the likely mental health needs of this group of inmates. The percentage rate of participation in MHSDS among those who died by suicide continues to be the majority, with evidence of variability in the overall percentage as indicated in the table below.

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| **MHSDS Participation Among Those Who Died by Suicide** | 53% | 91% | 58% | 81% | 67% | 71% | 71.1% |

Of those who died by suicide in 2019, eleven inmates, or 28.9 percent, were receiving MHSDS services at the Correctional Clinical Case Management System (3CMS) level of care and 16, or 42.1 percent, were receiving services at the EOP level of care.  The one inmate who was housed in the PIP at the time of his suicide had been discharged from the acute level of care to the EOP level of care two days prior to his death and was awaiting transfer out of the PIP.

In 2018, 35 percent of those who died by suicide were receiving MHSDS services at the 3CMS level of care, 32 percent were receiving services at the EOP level of care, and 3 percent were receiving services at the Mental Health Crisis Bed (MHCB) level of care.  In 2017, 27 percent of those who died by suicide were receiving 3CMS level of care services, 33 percent were receiving services at the EOP level of care, and 7 percent were receiving services at the MHCB level of care.  In 2016, levels of care percentages were 26 percent at 3CMS and 56 percent at the EOP levels of care.

Of the eleven inmates who were not actively receiving services within MHSDS at the time of their deaths in 2019, five, or 45.5 percent, had received mental health services previously in their incarceration.

    2.  **Mental Health Treatment Prior to Incarceration**

According to available documentation, 20 inmates, or 52.6 percent, of the inmates who died by suicide in 2019 had received mental health services in the community prior to incarceration.  In 2018, the findings were similar (53 percent).  Three inmates (7.9 percent) who were not actively receiving services at the time of their deaths in 2019 had received mental health services prior to

---

[23] *CDCR Offender Data Points – Offender Demographics for the 24-month period ending June, 2019.* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/201906-DataPoints.pdf.

incarceration.  One inmate who was not enrolled in MHSDS at the time of his death by suicide had received mental health services both prior to and during incarceration.

### 3. Primary Mental Health Diagnosis

Primary mental health diagnoses were analyzed in order to assess the mental health conditions afflicting those who died by suicide in 2019.  Several of the inmates were noted to have multiple diagnoses, some of which changed over time.  The graph below represents the major categories of disorders with which the inmates were diagnosed at the time of their deaths.  Only the primary diagnosis was included for each inmate.

Of those who died by suicide in 2019, 13 inmates (34.2 percent) were diagnosed with a primary psychotic disorder, nine inmates (23.7 percent) were diagnosed with a primary mood disorder, three inmates (7.9 percent) were diagnosed with an adjustment disorder, and one inmate each (2.6 percent) was diagnosed with a primary personality disorder, primary substance use disorder, or an anxiety disorder.  Of note, one of the inmates who was not actively enrolled in MHSDS had a diagnosis on record.  Ten inmates (26.3 percent) had no psychiatric diagnosis on record.  In 2018, 29 percent of those who died by suicide were diagnosed with a primary mood disorder, 24 percent were diagnosed with a primary psychotic disorder, 12 percent were diagnosed with an adjustment disorder, nine percent were diagnosed with a primary personality disorder, and three percent were diagnosed with trauma-related disorder.  Twenty-four percent had no psychiatric diagnosis on record.



Two, or 5.3 percent, of the 38 inmates who died by suicide in 2019 were placed in the Developmental Disability Program while incarcerated in CDCR.  In 2018, one inmate who died by suicide had this placement.

### 4. Substance Use History

Thirty-five inmates (92.1 percent) who died by suicide in 2019 reported histories which included substantial and/or problematic substance use beyond experimentation.  Three inmates (7.9 percent) denied substance use beyond experimentation.  In 2018, 79 percent of those who died by suicide

had a substantial substance use problem. In 2017, 97 percent of inmates who died by suicide had a significant substance use history and in 2016, it was 89 percent.

### 5. Previous Non-suicidal Self-Injury

Of the 38 inmates who died by suicide in 2019, 18 inmates, or 47.4 percent, had histories that included acts of self-injury that were determined not to have been attempts at suicide. This is slightly higher than the findings in 2018 (41 percent) and 2017 (37 percent) but lower than what was found among those who died by suicide in 2016, when it was 67 percent.

### 6. Previous Suicide Attempts

Twenty-six (68.4 percent) of the 38 inmates who died by suicide in 2019 had reported histories of suicide attempts. This was lower than the percentages in 2018 (71 percent), 2017 (73 percent), and 2016 (74 percent).

Sixteen inmates, or 42.1 percent, had histories positive for engaging in both suicide attempts and non-suicidal self-injury in 2019. In total, 29 inmates, or 76.3 percent, had histories positive for either suicide attempts, non-suicidal self-injury, or both in 2019. In 2018, 71 percent of the inmates who died by suicide had engaged in either or both of these behaviors. In 2017, it was 97 percent and in 2016, it was 78 percent.

### 7. Involuntary Medications

Four inmates, or 10.5 percent, who died by suicide in 2019 were under a court order (PC 2602) for involuntary psychotropic medications at the time of death. Three of those inmates were under these orders for danger to self, and one was under the order for grave disability. One of those inmates had also previously been under a PC 2602 order that expired in 2014 but was renewed in January 2019. In addition to those four inmates, three of the inmates who died by suicide in 2019 (7.9 percent) had previously been under PC 2602 orders that were allowed to expire prior to their deaths. For one inmate, the expiration occurred less than one month prior to his death by suicide (June 2019); for another it expired approximately five months prior to his suicide (October 2019); and the third had not been provided medications under a court order since 2016. In the two cases where the PC 2602 was not renewed in 2019, the expiration of the involuntary medication orders was considered problematic and required that QIPs be developed. One inmate (2.6 percent) had been under a PC 2602 order during a previous incarceration, and while a PC 2602 order was considered during his most recent incarceration, it was ultimately not sought.

In 2018, nine percent of the inmates who died by suicide were under a court order for involuntary psychotropic medications at the time of death. In 2017, three percent of those who died by suicide were under a PC 2602 order.

### 8. Trauma History

Documentation indicated that 17, or 44.7 percent, of the 38 inmates who died by suicide in 2019 had histories positive for trauma. Of those 17 inmates, five, or 29.4 percent, received formal treatment to address symptoms of trauma while incarcerated. In 2018, 56 percent of those who died by suicide had histories positive for trauma, and 32 percent received treatment to address the trauma. In 2017, 53 percent of inmates who died by suicide had a reported history of trauma with 31 percent of that group receiving treatment while incarcerated. In 2016, the percentages were 59 percent and 38 percent, respectively.

The Special Master's expert is not in a position to determine whether or not the effects of the trauma experienced by individual inmates warranted treatment or a diagnosis. This information is being included so that it can be tracked over time. The above data reveal a decline regarding the percentage of those who died by suicide having reported histories of trauma, as well as in the percentage of inmates who died by suicide with reported histories of trauma who received treatment to address their trauma.

Additionally, of the 17 inmates with trauma histories, six inmates (35.3 percent) were placed in housing locations for safety reasons at the time of their deaths by suicide in 2019. This percentage is lower than the overall percentage of those who died by suicide in 2019 who were housed in locations for their safety (39.4 percent) as discussed earlier in this report.

E. Mental Health Evaluation and Treatment Factors

In this section, issues related to the evaluation and treatment of the inmates' identified mental health needs are reviewed. This section examines the quality and content of suicide risk evaluations, mental health evaluations, treatment plans, treatment implementation, higher level of care needs, recent inpatient placements, and concerns related to interdisciplinary communication regarding inmate care as identified within the SCRs.

**1. Suicide Risk Evaluations**

Of those who died by suicide in 2019, six inmates (15.8 percent) were not evaluated for suicide risk at any time during their most recent periods of incarceration. Of the remaining 32 cases, 24 cases, or 75 percent, showed evidence of clinicians failing to identify or document known risk factors during suicide risk evaluations. These omissions likely resulted in an underestimation of the inmate's risk for suicide. Specifically, 24 cases, or 75 percent, evidenced omissions with regard to static/historical risk factors; 20 cases, or 62.5 percent evidenced omissions with regard to dynamic/situational risk factors; and 18 cases, or 56.3 percent, evidenced omissions with regard to acute risk factors. Twenty-two cases (68.8 percent) showed evidence of omissions in more than one category. In 2018, 61 percent of cases showed evidence of clinicians failing to identify or document known risk factors during suicide risk evaluations. In 2017, 17 percent of cases showed evidence of clinicians failing to identify or document known risk factors during suicide risk evaluations and in 2016, it was 33 percent. The results from 2019 showed an increase in omission of known risk factors during the suicide risk evaluation process when compared to prior years.

One additional concern noted in 2019 was that in nine cases (23.7 percent), the acute risk level was underestimated and assessed to be "low" and thus a formal safety plan was not required. This issue was noted by the Special Master's expert and in the SCR reports as concerning because the inmates' documented, and in some cases previously identified, risk factors were not accounted for in the risk formulation. This failure resulted in the lack of a safety plan to mitigate risk and intervene with regard to known warning signs.

In 2019, the suicide risk level determination was not clearly derived from the suicide risk evaluation and/or other information available regarding the inmate's level of risk in 14 cases, or 43.8 percent of those with completed suicide risk evaluations. In other words, based on the information documented at the time, the risk level (i.e., low, moderate, high) did not appear to be accurate. In 2018, this was true in 56 percent of cases, in 2017 it was 43 percent of cases, and in

2016, 56 percent of the suicide risk level determinations were not clearly derived from the suicide risk evaluation and/or other information available regarding the inmate's level of risk.

Additionally, 25 cases, or 65.8 percent, evidenced other problems related to suicide risk evaluations. These included failures to complete evaluations when required, inconsistencies in documentation, and other concerns unrelated to risk factors and/or risk determinations.[24] In 2018, other suicide risk evaluation problems were identified in 64 percent of cases, in 2017, this was the case in 63 percent of the cases, and in 2016, 56 percent of the cases evidenced other problems related to suicide risk evaluations.

### 2. Mental Health Assessments

Sixteen cases, or 42.1 percent, evidenced problems related to the completion of mental health assessments. These problems included failure to complete assessments that were required, incomplete assessments, inaccurate assessments, and assessments that were not timely. In 2018, 41 percent of the cases evidenced problems related to mental health assessments; in 2017, it was 53 percent and in 2016, it was 56 percent of cases.

The Special Master's expert noted that in 2019, six cases (15.8 percent) included concerns related to the completion of mental health assessments associated with RVRs. More specifically, mental health assessments were conducted to determine if the inmates' mental illnesses were contributory to rule violations, and the assessments determined that the illnesses were not contributory when there was evidence that symptoms of mental illness played a role in the rule violation. Two of these cases included requirements for formal QIPs to address the issue and in one case, the mental health assessment was noted as a concern but did not rise to the level of requiring a formal QIP. In the remaining three cases, there was no discussion of the RVR mental health assessments in the SCR, yet evidence of psychiatric instability and associated RVRs in the year prior to the inmates' deaths were present in the inmates' healthcare records. This was a concern as the SCRs omitted a review of these assessments and failed to identify the need for corrective action in these cases.

### 3. Treatment Planning

Thirty-one cases (81.6 percent) were noted to have treatment plans developed at some point during their incarceration, either in the form of Interdisciplinary Treatment Team (IDTT) master treatment plans or safety plans developed to mitigate suicide risk in 2019. In 20 of those cases, or 64.5 percent, there was evidence of problems related to treatment planning. These problems included failure to complete a treatment plan as required, failure to identify the inmate's mental health needs within the treatment plan despite those needs being documented elsewhere, poor goal-setting, lack of interventions to treat the inmate's identified needs, inconsistencies within the treatment plan, lack of required membership in the IDTT, and failure to properly account for risks or develop interventions to target known risks in safety plans. In 2018, 68 percent of cases evidenced problems with treatment planning, in 2017, it was 53 percent and in 2016, 59 percent of cases evidenced such problems.

### 4. Treatment Services

---

[24] These issues included problems such as incomplete Suicide Risk Assessment and Self-Harm Evaluations (SRASHEs), SRASHEs that were not appropriately updated, no identification of protective factors, and poorly written narratives.

In 2019, 31 cases (81.6 percent) identified treatment interventions being required for the inmate, either related to routine treatment for mental health needs or interventions to reduce the risk for suicide. The review revealed that in 20 of these 31 cases, or 64.5 percent, there were issues and problems related to the delivery of mental health treatment. These problems primarily included failure to provide interventions as outlined in the treatment plan or safety plan or as required by the Program Guide. In 2018, 55 percent of cases revealed these issues, in 2017, it was 67 percent and in 2016, 59 percent of the cases evidenced problems related to the delivery of basic mental health treatment.

The Special Master's expert noted that there were four cases (10.5 percent) in 2019 where concerns were noted with regard to the provision of treatment by unlicensed clinicians who were not properly supervised and/or did not have proper supervisor sign-off on documented treatment interventions or evaluations. Two of these cases resulted in formal QIP requirements to address the identified issues which included discrepancies between MHCB orders by the psychiatrist and observations documented by unlicensed clinicians and a concern related to conclusions on a suicide risk evaluation that was not co-signed by a supervisor.

In 2019, there were also noted to be six cases (15.8 percent) where mental health staff failed to request prior treatment records for inmates who had histories of mental health treatment prior to incarceration. In four of these cases, the failure to request these records was significant enough to warrant development of a QIP to address the lapse in continuity of care, and in one case, the concern was noted in the SCR but did not rise to the level of requiring a QIP. The remaining case was noted to be a concern by the Special Master's expert, as there was no documented attempt on the part of the clinician conducting in the inmate's initial mental health assessment to obtain prior records despite the inmate reporting a psychiatric hospitalization and a suicide attempt in county jail.

### 5. Higher Level of Care Needs

In sixteen cases, or 42.1 percent of those who died by suicide in 2019, there was evidence of a failure to refer the inmate to a higher level of care when clinically indicated or required by the Program Guide. In many cases, this finding resulted from the fact that despite the inmate meeting criteria for consideration of referral to a higher level of care, the IDTT failed to refer the inmate. Additionally, some cases were related to an inappropriate reduction in the inmate's level of care without clear justification or rationale. The percentage in 2018 was 18 percent of cases, while in 2017 and 2016, these issues were noted in 53 percent and 67 percent of the cases, respectively.

### 6. Inpatient Placement Within Past Year

Fourteen inmates, or 36.8 percent, of those who died by suicide in 2019 had been admitted to an inpatient setting within the 12 months prior to their suicidal acts. Six inmates, or 15.8 percent had been discharged from an inpatient setting within one week of their deaths.[25] One inmate was housed in an inpatient setting when he died by suicide but had been officially discharged from inpatient care two days prior, and one inmate had been discharged from inpatient care on the day of his death. Across all inmates who died by suicide in 2019, 23 (60.5 percent) had been admitted to an inpatient setting at some point during their incarceration.

---

[25] This issue was also noted and raised in the SMHP's Suicide Prevention and Response Team's "Suicide Prevention Video Conference," January 8, 2020

Of those who died by suicide in 2018, 32 percent had been admitted to an inpatient setting in the 12 months prior to their suicidal acts, 6 percent had been discharged from an inpatient setting within one week of their deaths, and one inmate was being treated in an inpatient setting when they engaged in acts of suicide.  In 2017, 33 percent of those who died by suicide had been admitted to an inpatient setting in the previous 12 months and in 2016, it was 48 percent.

Across CDCR, it was reported that a total of 1,743 inmates were designated at the inpatient level of care (i.e., Mental Health Crisis Bed, Intermediate Care Facility or Acute Psychiatric Program) as of June 2019.[26]  Using that number as a point of comparison, the 14 inmates who died by suicide in 2019 who had been in an inpatient setting during the previous 12 months represented approximately 0.8 percent of the entire inpatient population.

### 7. Interdisciplinary Consultation

In ten cases, or 26.3 percent, there were problems related to communication between disciplines. These problems included failures to communicate mental health concerns or incidents of self-injury to mental health staff, discrepancies in documentation between treatment providers without evidence of an attempt to resolve the discrepancies, failure to consult across clinicians at times of level of care changes, and failure to communicate impressions of inmate functioning between mental health and custody staff.

This represented an increase in such problems over 2018, when the finding was 12 percent.  In 2017, interdisciplinary communication issues were noted in 27 percent of the cases, and in 2016 they were noted in 52 percent of the cases.

### F. Emergency Response Factors

This section examines staff response after discovery of the inmate following the suicidal act. Included here are any identified issues related to Cardiopulmonary Resuscitation (CPR)/Automated External Defibrillator (AED) or other identified problems with the emergency response process as identified within the SCRs.

### 1. CPR/AED Issues

Six cases (15.8 percent) included documented problems related to CPR and/or AED use during the emergency response procedures.  This represented an increase in such issues over 2018, when CPR/AED problems were noted in 12 percent of the cases.  In 2017, these issues were noted in only one case, or 3 percent, and in 2016, 26 percent of the cases evidenced problems with CPR/AED applications.

### 2. Other Emergency Response Issues

Sixteen, or 42.1 percent of the 38 cases, included documented problems associated with emergency response procedures other than those related to CPR/AED use in 2019.  These issues included delays in activating 911, failure to arrive at the scene with the full cut-down kit, failure to properly support the inmate's body during cut-down from hanging, and poor documentation of emergency response.  In 2018, 38 percent of the cases included documented problems associated with

---

[26] *CDCR Offender Data Points – Offender Demographics for the 24-month period ending June, 2019.* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/201906-DataPoints.pdf.

emergency response procedures other than those related to CPR/AED use, and in 2017, it was 60 percent.

In 2019, there were three cases (7.9 percent) in which custody staff applied restraints/handcuffs to inmates prior to the initiation of emergency care. California Code of Regulations Title 15, Section 3628.2(b) states, "Mechanical means of physical restraint may be used only under the following circumstances: (1) When transporting a person between locations. (2) When a person's history, present behavior, apparent emotional state, or other conditions present a reasonable likelihood that he or she may become violent or attempt to escape. (3) When directed by licensed health care clinicians, to prevent a person from attempting suicide or inflicting injury to himself or herself." All three inmates were housed in ASU at the time of their deaths. In two cases, the inmates were noted to be unresponsive when the restraints were applied, and in the third case metal restraints needed to be removed and replaced by plastic restraints prior to the use of an AED. The SCRs in these cases were silent with respect to the use of restraints during the emergency response to a potential suicide. While the Special Master's expert could not determine if the application of restraints/handcuffs affected emergency response interventions, there is concern that the application of restraints could have negatively impacted life-saving measures.

G. <u>Individual Suicide Case Reviews</u>

All deaths by suicide of inmates in the custody of CDCR in 2019 were reviewed by a member of the SMHP resulting in a formal SCR report. SCRs are discussed during SCRC meetings prior to finalization. The Special Master's experts are participants in the SCRC and provide immediate feedback during discussions of each case.

Of the 38 SCR reports reviewed for 2019 deaths by suicide, 37 SCRs (97.4 percent) were determined to be adequate summaries of the cases. Adequacy was determined based on descriptions of each inmate's history along with a critical discussion of the evaluations, assessments and mental health treatment provided to the inmates, factors precipitating the deaths by suicide, and critical review of practices across disciplines with regard to adherence to Program Guide requirements, policies and local operating procedures. In most of these reports, recommendations and requirements for corrective action followed clearly from the findings in the SCR and addressed the salient and relevant concerns of the case. In a handful of SCRs, however, the Special Master's expert noted opportunities for improvement. Specifically, the expert noted in some cases that the SCR failed to consider or critically evaluate components of the inmate's treatment or management adequately in the report. Issues that were noted included incomplete analyses of mental health assessments, suicide risk evaluations and safety plans; lack of identification of concerns regarding emergency response procedures; and absence of a review of the mental health treatment services provided to the inmate during the final year of his/her incarceration. Cases that were identified as providing opportunities for improvement included Cases I, L, T, V, Y, BB, FF, and KK. Specific findings for each case are discussed in Appendix A.

One SCR (2.6 percent) was determined to be an inadequate summary of the case. In that case, the Special Master's expert noted serious concerns in the delivery of mental health services that were not reviewed in any capacity within the SCRs. In this case, there was a failure to identify a missed clinical contact, no consideration of a discontinued antidepressant medication in the months prior to the inmate's death by suicide, no discussion of the lack of timely transfer to an STRH, no criticism of the lack of proper supervision/sign-off for unlicensed clinicians, failure to require

investigation into the fact that the inmate wrote in his suicide note that his wife had contacted CDCR the week prior to request a mental health referral, and omission of interviews with staff (including the inmate's primary clinician) because they were not at the facility at the time of the on-site review.

These results were similar to those noted in 2018, when 3 percent of the SCRs were determined to be inadequate summaries of the cases. In 2017, 17 percent were determined to be inadequate summaries of the cases.

## H. Quality Improvement Plan Content and Analyses

Of the 38 deaths by suicide in 2019, 35 SCRs (92 percent) required the development of Quality Improvement Plans (QIPs). In total, these 35 deaths by suicide required 253 QIPs, with an average of 7.2 QIPs per case. For individual cases, the range was from one to 23 QIPs. QIPs were developed by the individual facilities or headquarters staff to investigate and set forth a plan to address the concerns identified in the SCRs. The Special Master's expert reviewed the reports on implementation of QIPs submitted by each facility and/or headquarters staff. For the 35 suicides that required QIPs, analyses revealed 36 common issues or problems. The most common problem identified in 18 cases (50 percent) was poor rationale for the inmate's suicide risk determinations. The second most common factor found in 17 cases (47 percent) was the inmate's placement at an inappropriate level of care, including the failure to refer the inmate to a higher level of care when indicated or inappropriate reduction in the inmate's level of care. Sixteen cases, or 44 percent, required QIPs to address inadequate treatment planning, and in 15 cases (42 percent), the SCRs noted that there was a failure in completing SRASHEs when indicated and/or required by the Program Guide. A table of all common issues/problems is found in Appendix B4. In 2019, there were common problems identified that had not been common problems in the previous four years. These newly identified common issues included the following:

- Local operating procedure only allowed psychiatrists to issue orders for MHCB placement and privileges.
- Failure to identify or adequately describe an inmate's protective factors within a SRASHE.
- Failure to log, track, or properly document self-injurious behavior or suicide attempts, including failure to complete a Power-Form.
- Failure to request prior treatment records.
- Inappropriate, or absence of, documentation for huddles.
- Failure to retain the inmate's property following death by suicide for the SCR.
- Inappropriate cell placement given the inmate's status.

The majority of QIPs included training for staff for which evidence was provided through inclusion of the training curricula and staff attendance records in the reports on the implementation of QIPs. What was not possible to determine was whether all required staff actually received the training. Most training rosters that were submitted included hand-written sign-in forms without any master list to indicate that all staff had been trained. When pre-printed rosters were submitted, they rarely included training verification for all staff listed on the roster. Training was frequently supplemented by mental health record audits and mentoring to target the specific needs of individual staff members when indicated. A few cases included performance improvement plans for individual staff members. What was missing from many QIPs was follow-up to ensure that training and mentoring had the desired effect and was sustainable over time.

28

Nine cases (23.6 percent) included QIPs that could not be developed nor implemented secondary to investigation requests being submitted to the Office of Internal Affairs (OIA) for possible staff misconduct. The Suicide Prevention and Response Unit (SPRU) reported that Division of Adult Institutions (DAI) had one year to close an investigation regarding alleged custody misconduct and health care had three years. Although the SPRU tried to periodically follow up with facilities to receive the subsequent memorandum regarding completed investigations, to date, these efforts had not been successful, and Wardens had not been submitting the findings to either the SPRU or DAI. Of note, in a tenth case (Case KK) the OIA investigation was completed, and the results were submitted with the QIP which was a positive finding.

In addition to the lack of follow-up regarding cases referred to OIA, the Special Master's expert noted that a number of QIP responses included plans for action to be taken in the future, without any follow-up being provided to demonstrate that the action occurred. There was no indication that the statewide mental health leadership required institutions to submit additional information to ensure that the full QIP was implemented. An example included the fact that a number of QIPs were required of the CHCF PIP across more than one case. These were responded to with a memorandum dated March 20, 2020 which discussed the development of the PIP Integration Plan to address the issues identified in the many QIPs. An update of the PIP Integration Plan was to be provided by April 17, 2020, but there was no further information available regarding the implementation or efficacy of this plan. Additionally, there was no evidence that follow-up was sought by statewide mental health leadership to hold the team accountable for these plans.

Lack of follow-up creates an inadequate QIP process. Quality improvement is founded in a process that includes identification of problems, completion of analyses to understand the root of the problems, development of corrective action plans to target the identified root causes, and then the measurement of the efficacy of those corrective action plans to determine if further action is required. The QIP process appears to end with either the creation of a plan or the implementation of a plan without any evidence of a measurement of efficacy. Unless the efficacy is measured, there is no way to know if the identified problem had been properly addressed in a manner to avoid emergence of the same issue in the future.

I.   Foreseeability and Preventability

The terms "foreseeable" and "preventable" are used in this report as they have been in previous reports authored by the Special Master's expert. They describe the adequacy and implications of CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgment, and utilization of clinical and custodial alternatives to reduce the likelihood of completed suicides. The definitions below are the court-approved definitions of foreseeable and preventable.

> The term "foreseeable" refers to those cases in which available information about an inmate indicates the presence of substantial or high risk for suicide, and requires reasonable clinical, custodial, and/or administrative intervention(s). Assessment of the degree of risk may be high, moderate, or low to none. This is an important component in determining foreseeability. In contrast to a high and immediately detectable risk, a "moderate risk" of suicide indicates a more ambiguous set of circumstances that requires significant clinical judgment based on adequate training, as well as timely assessment, to determine the level of risk in the most appropriate manner and relevant interventions to prevent suicide. Interventions

may include but are not limited to changes in clinical level of care, placement on suicide precautions or suicide watch, and changes in housing including utilization of safe cells and transfers to higher levels of care, as well as clinically appropriate treatment and management services which may include but not be limited to increased contacts/assessments by mental health professionals, medication management review and changes, other therapeutic interventions and measures, and/or changes in level of care, including short-term changes such as utilization of MHCBs and/or longer term level-of-care changes including transfer to DSH programs. Individuals evaluated as "low risk," "no risk," or "negligible risk" may continue to require some degree of clinical and custodial monitoring and subsequent evaluation with appropriate treatment and management by clinical staff of the potential for self-injury and/or suicidal ideation or activity.

The term "preventable" refers to those cases in which the likelihood of completed suicide might have been reduced substantially had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required by existing policy, reflected in the Program Guide and/or local operating procedures. Suicides that may have been preventable include not only cases in which additional information might have been gathered or additional interventions undertaken, but also cases involving issues with emergency response by custody and clinical staff. The emergency response is reviewed not only by DCHCS mental health staff but also by DCHCS medical staff as part of the death review summary process, as well as by this reviewer.

In 2019, CDCR's SCRC did not determine whether a death by suicide was foreseeable and/or preventable.

The Special Master's expert determined that 14 or 36.8 percent of the suicides in 2019 were foreseeable, and 23, or 60.5 percent of the suicides in 2019 were preventable. In total, 23 or 60.5 percent of the suicides were determined to be either foreseeable, preventable or both. The table below lists the cases and determinations made by the Special Master's expert. Specific rationales for the determinations by the Special Master's expert are included in the case summaries in Appendix A.

| Case | Foreseeable | Preventable |
|------|-------------|-------------|
| A | Yes | Yes |
| B | Yes | Yes |
| C | Yes | Yes |
| D | No | Yes |
| E | No | No |
| F | No | Yes |
| G | Yes | Yes |
| H | No | Yes |
| I | No | No |
| J | Yes | Yes |
| K | No | No |
| L | Yes | Yes |

| | | |
|---|---|---|
| M | No | No |
| N | No | Yes |
| O | No | No |
| P | No | No |
| Q | Yes | Yes |
| R | Yes | Yes |
| S | Yes | Yes |
| T | No | No |
| U | No | No |
| V | No | No |
| W | Yes | Yes |
| X | No | Yes |
| Y | No | No |
| Z | No | Yes |
| AA | No | Yes |
| BB | Yes | Yes |
| CC | No | No |
| DD | No | Yes |
| EE | No | No |
| FF | No | No |
| GG | No | No |
| HH | No | No |
| II | Yes | Yes |
| JJ | Yes | Yes |
| KK | Yes | Yes |
| LL | No | Yes |

The table below includes the Special Master's expert's findings of the percentage of cases that were determined to foreseeable, preventable or both for the years 2014-2019.

| | Foreseeable | Preventable | Either Foreseeable or Preventable |
|---|---|---|---|
| **2014** | 52% | 65% | 74% |
| **2015** | 54% | 79% | 79% |
| **2016** | 59% | 85% | 89% |
| **2017** | 43% | 77% | 77% |
| **2018** | 32% | 53% | 53% |
| **2019** | 36.8% | 60.5% | 60.5% |

## IV.    Conclusions

Despite the ongoing, considerable efforts on the part of CDCR to address and reduce deaths by suicide, the suicide rate continues to rise, and 2019 was noted to be the highest in over 21 years.[27] Additionally, the 38 individuals who died by suicide in 2019 represented the second-highest

---

[27] Based on data included in CDCR's *Annual Report on Suicide in the California Department of Corrections and Rehabilitation January 1, 2015-December 31, 2015*. https://cchcs.ca.gov/wp-content/uploads/sites/60/SR/2015-Annual-Suicide-Report.pdf and subsequent Annual Reports drafted by the Special Master's expert.

number of deaths by suicide in a single year within CDCR over the previous 21 years. The foregoing discussion of factors related to deaths by suicide has resulted in the following conclusions regarding suicide prevention efforts.

- The rate of suicide within CDCR has grown steadily over the past six years.

- The QIP process would be greatly enhanced by follow-up on corrective actions that are planned for the future and inclusion of the expectation that the efficacy of plans be measured over time.

- In 2019, it was noted that a number of cases included documentation by unlicensed clinicians without corresponding evidence of supervisory review. Consideration of a method of ensuring supervisory review of the clinical documentation of unlicensed clinicians appears indicated.

- There were a number of concerns identified in 2019 in more than one death by suicide that had not been common concerns in prior years. It is likely worthwhile to review these issues for possible inclusion in statewide plans for improvement. These issues included:

  o Local operating procedure only allowed for psychiatrist to issue orders for MHCB placement and privileges.[28]
  o Failure to identify or adequately describe an inmate's protective factors within a SRASHE.
  o Failure to log, track, or properly document self-injurious behavior or suicide attempts, including failure to complete a Power-Form.
  o Failure to request prior treatment records.
  o Inappropriate or lack of documentation for huddles.
  o Failure to retain the inmate's property following death by suicide for the SCR.
  o Inappropriate cell placement given the inmate's status.

- Clinicians continue to struggle with the identification of the risk factors that impact suicide, determination of the patient's level of risk as derived from identified risk factors, and the documentation of appropriate rationale to support risk level determinations.

- Results from OIA investigations are not provided to the SPRU and DAI, resulting in QIPs that are delayed or stopped secondary to OIA investigations. These failures impact the development of adequate corrective actions required to reduce suicides within the CDCR.

The Special Master will continue to provide support to CDCR on addressing deficiencies noted in this report. Additionally, the Special Master's experts will continue to provide guidance to CDCR during their Suicide Case Review process, development and review of suicide-related policies and procedures, as well as quality improvement initiatives and sustainable process efforts.

---

[28] In one of these cases, the QIP indicated that the local operating procedure allowed for both psychiatrists and psychologists to issue orders, but the practice was for only psychiatrist to issue these orders and in the other case, the QIP indicated that "PIP Integration Plan" was being developed to address the issue but further information was not available.

Respectfully Submitted,


*/s/ Sharen Barboza*

Sharen Barboza, Ph.D.

# EXHIBIT A



**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001

June 14, 2021

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write in response to your May 13, 2021 draft Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2019 – December 31, 2019 ("the Special Master's Expert's Report" or "2019 Report").  CDCR continues to object to these reports because the Special Master's Expert's Report duplicates self-monitoring already conducted by CDCR.  CDCR has established a means of self-monitoring by publishing its own annual reviews of suicides, including those completed in 2019.[1]  CDCR critically reviewed every suicide that occurred in 2019, assessed policy violations that occurred in connection with the reported suicides, and implemented corrective actions to prevent the same or similar policy violations in the future.[2]

Your basis for reporting on annual suicides is CDCR's "refus[al] to draft their suicide reports in a manner consistent with existing court orders with respect to foreseeability and preventability determinations."  (Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017, ECF No.7077 at 4.)  But, as Defendants have repeatedly stated, no court order mandates that annual suicide reports must contain a "foreseeability/preventability" determination.  (*See* Defendants' Objection to the Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017, ECF No. 7098 at 5.)  Moreover, the utility of "foreseeability" and "preventability" determinations are questionable, the analyses are not consistent with current community standards and practices, and the determinations divert attention from systemic improvements that would further enhance suicide prevention efforts and patient safety.  (ECF No. 7098, at 5-6.)  As discussed in Section VI, the field of mortality review has largely shifted away

---

[1] On February 1, 2021, CDCR published its 2017-2019 Aggregate Suicide Report on its public website.  CDCR's 2017-2019 Aggregate Suicide Report can be accessed on its public website at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf (last accessed on 2/26/2021.)

[2] CDCR conducts individualized suicide reviews in accordance with its Program Guide.  (*See* ECF No. 58641 at 190-91.)  CDCR's individualized reports are heavily relied upon by the Special Master's experts when drafting their own reports, including providing case summaries, and forming foreseeable and preventable conclusions.  (Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2018 – December 31, 2018, ECF No. 7161-1 at 23, 26), (*see generally* Appendix A, ECF No. 7161-2.)

from the narrow foreseeability/preventability determinations to a more holistic approach focused on quality improvement. (*Id.*) The Special Master's addition of an outmoded "foreseeability" and "preventability" analysis does not enhance or improve CDCR's suicide review process, nor does it warrant the production of an entirely separate report.

Further, the Special Master's Expert's Report duplicates the data and feedback already found in CDCR's own transparent reporting. CDCR's own reports, as well as CDCR's comprehensive annual suicide prevention report to the Legislature pursuant to Penal Code section 2064.1, provide the necessary feedback and information that will enable CDCR to fully and fairly evaluate suicides that occur within its institutions and help reduce the number of future suicides. The 2019 Report duplicates data regarding suicide trends and policy violations, and unlike CDCR, the Special Master's experts are not in a position to implement and measure the effectiveness of any Corrective Action Plans or policy revisions.

Particularly troubling about the 2019 Report is the expert's apparent unfamiliarity with CDCR's Suicide Case Review (SCR) process. Since 2015, a group of the Special Master's experts, led by Drs. Hughes and Metzner, have attended nearly every SCR and have been provided with draft reports in advance of each case conference. This report, drafted apparently by an entirely separate group of experts, criticizes aspects of that same SCR process. However, the criticisms leveled in the current report were not provided to Defendants at the time of these SCR with the group of experts led by Drs. Hughes and Metzner. It is unclear why the experts most familiar with CDCR's suicide case review process are not involved in the present report, or why it appears there is no coordination between these experts.

This inconsistent level of monitoring, years after the fact, is further punctuated by grossly inaccurate criticisms of CDCR's SCR reports, discussed in Section III. These criticisms are baffling given the Special Master's longstanding support of CDCR's suicide case review reports. Lindsay Hayes, who attends many SCR conferences, has referred to the reports as a "considerable strength of the CDCR suicide prevention program" that are "not only…very comprehensive but provide[] thoughtful and targeted [Quality Improvement Plan]s for correcting deficiencies and improving suicide prevention practices." (ECF No. 6897-1 at 37, *See also* ECF No. 5993-1 at 29-30.) No recommendations for improvement were offered. (ECF No. 6897-1 at 38, ECF No 5993-1 at 30.)

CDCR provides the following additional detailed comments and objections.

I.      **Comparison to Other Large Prison Systems in the Country Is Arbitrary and Lacks Foundation.**

The Special Master's Expert's Report at page 5 compares CDCR's population and suicide rate with ten other "large prison systems," stating CDCR's "suicide rate is the 4th highest out of the ten largest correctional systems." First, CDCR objects to the comparison because the analysis does not account for the different demographics, populations, applicable laws, and other variables among these jurisdictions. Such comparisons "fail[] to control for demographics of each state's inmate population; the statistics are therefore of limited value in comparing states." (Three-Judge Court Opinion Order, ECF No. 3641, at 88.) Second, the Special Master's rationale that "other large prison systems are '*likely* to be more similar to California in their dynamics and processes'"

Special Master Lopes
Page 3

is without basis and fails to account for the fact that smaller prison systems might in some cases have more relevant policies and procedures than larger institutions.[3] (*See* Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2017 – December 31, 2017, ECF No.7077, at 5-6, emphasis added.) In short, a comparison based solely upon size of prison system and no other factors is arbitrary and objectionable. CDCR requests the Special Master strike this comparison from the 2019 Report.

## II. The Table on page 7 Is Flawed because It Includes an Out-of-State Facility and Improperly Calculated the Average.

Page 7 of the 2019 Report includes a table of CDCR institutions and compares the number of 2019 suicides, the number of suicides from 1999-2019, and the average number of suicides from 1999-2019. The expert notes the table does not include deaths by suicide which occurred in out-of-state facilities (2019 Report at 7 fn.6), but mistakenly includes Tallahatchie County Correctional Facility, an out-of-state facility. CDCR requests data from Tallahatchie County Correctional Facility be stricken from the table on page 7 for purposes of accuracy.

Additionally, the expert calculated each institutions' average "by dividing the numbers of suicides by the number of years (i.e. 20.)" (*Id*. at 7 fn.7.) However, the correct averages should have been calculated for a period of 21 years, not 20 years (1/1/1999 through 12/31/2019 is 21 years). A twenty-year average would have been based on years 2000-2019. The table below shows the correct averages in gray boxes. CDCR requests the Special Master's expert correct and update the averages in the table on page 7.

| Institution | 2019 | 1999-2019 | Average | 21-Year Average |
|---|---|---|---|---|
| California Rehabilitation Center | 0 | 1 | 0.05 | 0.05 |
| Chuckawalla Valley State Prison | 0 | 1 | 0.05 | 0.05 |
| Tallahatchie County Correctional Facility | 0 | 1 | 0.05 | |
| Ironwood State Prison | 0 | 2 | 0.10 | 0.10 |
| Valley State Prison | 0 | 2 | 0.10 | 0.10 |
| California Health Care Facility *(6 years)* | 1 | 3 | 0.50 | 0.50 |
| California Correctional Center | 0 | 4 | 0.20 | 0.19 |
| Calipatria State Prison | 0 | 5 | 0.25 | 0.24 |
| Sierra Conservation Center | 0 | 5 | 0.25 | 0.24 |
| Centinela State Prison | 0 | 6 | 0.30 | 0.29 |
| Avenal State Prison | 0 | 7 | 0.35 | 0.33 |
| Central California Women's Facility | 0 | 10 | 0.50 | 0.48 |
| California Institution for Women | 1 | 12 | 0.60 | 0.57 |
| California State Prison, Solano | 0 | 12 | 0.60 | 0.57 |
| North Kern State Prison | 2 | 13 | 0.65 | 0.62 |

---

[3] The Special Master failed to acknowledge and respond to CDCR's argument raised in its Objection Letter to the Special Master's Expert's 2018 Annual Suicide Report "in the interest of judicial economy." (*See* Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation January 1, 2018 – December 31, 2018, the Special Master, ECF No. 7161, at 5.)

Special Master Lopes
Page 4

| California Substance Abuse Treatment Facility | 1 | 16 | 0.80 | 0.76 |
|---|---|---|---|---|
| Pleasant Valley State Prison | 1 | 16 | 0.80 | 0.76 |
| Wasco State Prison | 0 | 17 | 0.85 | 0.81 |
| Pelican Bay State Prison | 0 | 18 | 0.90 | 0.86 |
| California Training Facility | 1 | 19 | 0.95 | 0.90 |
| Folsom State Prison | 0 | 20 | 1.00 | 0.95 |
| High Desert State Prison | 1 | 20 | 1.00 | 0.95 |
| Mule Creek State Prison | 2 | 20 | 1.00 | 0.95 |
| Kern Valley State Prison *(14 years)* | 2 | 22 | 1.57 | 1.57 |
| California Correctional Institution | 2 | 23 | 1.15 | 1.10 |
| California Institution for Men | 1 | 24 | 1.20 | 1.14 |
| California Medical Facility | 2 | 26 | 1.30 | 1.24 |
| Deuel Vocational Institute | 3 | 30 | 1.50 | 1.43 |
| RJ Donovan Correctional Facility | 0 | 31 | 1.55 | 1.48 |
| California State Prison, Los Angeles County | 2 | 32 | 1.60 | 1.52 |
| California Men's Colony | 1 | 35 | 1.75 | 1.67 |
| California State Prison, Corcoran | 4 | 35 | 1.75 | 1.67 |
| San Quentin State Prison | 1 | 37 | 1.85 | 1.76 |
| Salinas Valley State Prison | 1 | 38 | 1.90 | 1.81 |
| California State Prison, Sacramento | 9 | 50 | 2.50 | 2.38 |

## III.    Defendants Object to the Expert's Critique of Individual Suicide Case Reviews.

As noted above, Defendants object to the expert's critique of CDCR's SCR reports. (*Id.* at 27-28) (*See* Appendix A, Case Summaries.) Since 2015, members of the Special Master's team have attended nearly every SCR conference. Those same experts are provided draft copies of the SCR report in advance of the case conference, have the ability to provide edits and feedback to the document, and participate during the teleconference.[4] Despite this direct participation and involvement in the process, the 2019 Report deems only 76 percent of CDCR's SCR reports to be "adequate." Two reports (5.3 percent) were found to have "inadequate summaries of the case" and another seven reports (18.4 percent) were found to be "marginally adequate." The reason for the disconnect is unclear, though it appears that the group of experts involved in the drafting of the 2019 Report are not the same group of experts who participated in each SCR. It is unclear why the experts most familiar with CDCR's SCR would not take lead in the development of a monitoring report on CDCR's suicides.

The expert's criticism of CDCR's SCR reports is questionable for additional reasons. First, the use of the term "marginally adequate" is vague and ambiguous. This subjective term provides insufficient guidance to determine whether a SCR was compliant with the Special Master's experts' standards. A lack of clear methodology or standardized audit criteria further clouds the issue. CDCR audits its own individual suicide reports for its annual suicide reports. Between 2017 and 2019, individual suicide reports were found to be 96% compliant using fifteen

---

[4] "The Special Master's experts are participants in the [Suicide Case Review Committee]," and the experts "provide immediate feedback during discussions of each case." (2019 Report at 27.)

standardized audit criteria.[5]  CDCR requests the Special Master strike Section G and relevant portions of Appendix A.

Second, the expert's analysis of the "inadequate" SCR reports is inaccurate and evidences a lack of familiarity with the review process.  The criticism of Case V is particularly alarming: arguing that a "closer analysis of clinical documentation in the inmate's health record was needed," the expert proceeds to expand with examples – none of which are accurate.  (Appendix at page 118.)

- "Between January 2018 and January 2019, the inmate was seen by three different clinicians with no clear explanation for these changes. There was no documentation indicating that treating clinicians considered the impact on continuity of care with these clinician changes with the possible negative effect on treatment alliance and engagement." (*Id.*)

While this may be a routine standard of care in a community-based program, in a correctional setting, particularly as large as CDCR, changes in clinical providers is not uncommon and often unavoidable.  CDCR continues to strive to improve continuity of care, but a suicide case review would not flag clinician changes as a policy violation requiring a Quality Improvement Plan (QIP) because there is no policy violation when an inmate is treated by a new clinician.

- "Additionally, the frequency of mental health contacts did not occur as clinically indicated. As an example, documentation indicated that on April 13, 2018, there was an increase in passive suicidal ideation compared to January 3, 2018; however, the inmate was not seen by his clinician until more than two months later. At that time, he reported a decrease in passive suicidal ideation; however, there was no inquiry about factors that could have impacted the change. Of note was the change in primary clinician that occurred at this time." (*Id.*)

First, the documentation that noted an increase in passive suicidal ideation occurred on April 3, 2018, not April 13th.  Second, the SCR report accurately and comprehensively identifies patterns in the patient's behavior and statements that warrant further assessment and consideration for higher levels of care.  In fact, this very issue is discussed on page 16 of CDCR's SCR report for Case V:

> The primary goal and focus in treatment was to manage [Case V's] suicidal ideation as reflected in the Master Treatment Plans, [Interdisciplinary Plan of Cares], and [Patient Level Outcomes]. However, there were no [Suicide Risk Analysis and Self-Harm Evaluation]s completed in 2018 or 2019 **despite ongoing reports of passive suicidal ideation to his PC**, as documented in progress notes (last progress note, dated January 4, 2019). Without completion of these SRASHEs, **there was no way to determine current risk, adequately assess risk when it changed, or appropriately assess for the need for a higher level of care.** Per the Mental Health Program Guide, 2009 Revision, 12-10-8: "When an inmate expresses

---

[5] https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf at page 42.  Accessed June 1, 2021.

Special Master Lopes
Page 6

current suicidal ideation, or makes threats or attempts, a suicide risk assessment
shall be made by collecting, analyzing, and documenting data.

(Emphasis added.)  The Special Master's expert's criticism is inaccurate and appear to reflect the
expert's unfamiliarity of the function with the SRASHE's, Interdisciplinary Plan of Cares, and
Patient Level Outcomes (PLO) in assisting in ongoing clinical assessments for treatment planning.

- "During the July 2018 IDTT, a treatment goal to address suicidal ideation remained
  unchanged, despite ongoing symptomatology since the previous IDTT that occurred one
  year prior." (Appendix at 118.)

This issue was also addressed in the SCR report in the second QIP.  It is furthermore
inaccurate to say that his treatment goal went unchanged.  Case V received regular PLOs which
are ongoing assessments during clinical contacts to assess the patient's functioning compared to
their baseline when they start treatment.  These PLOs are clearly documented in the patient's
Electronic Healthcare Record System chart.

- "The SCR also did not address the psychiatrist's assessment of the inmate with low chronic
  suicide risk, in contrast to the alternative suicide risk evaluation of moderate risk. This was
  indicative of the need for improved collaboration between treatment providers." (*Id.*)

The moderate chronic risk assessments occurred on July 26 and 27, 2017.  However, the
psychiatrist's assessment for a lower chronic risk occurred a significant amount of time later in
2018.  A review of the record shows that the psychiatrist in 2018 adequately documented his
rationale for determining low chronic risk.  In fact the SCR report found that the psychiatrist notes
in 2018 were well written and "provided more than adequate treatment rationale."  (Case V's SCR
Report at page 11.)

- "Lastly, the SCR did not discuss the inmate's diagnoses." (Appendix at 118.)

Patient diagnoses are addressed in every SCR report.  Case V's SCR report, at page 11,
included his diagnoses history.  His mental health history was also discussed throughout the report.

A PC last saw [Case V] on January 4, 2019.  At that contact, documentation
indicated he presented as euthymic, and although he reported his suicidal thoughts
decreased, he also reported experiencing passive suicidal ideation without intent.
Treatment during this contact focused on utilizing coping skills and identifying
things he looked forward to doing.  Specifically during this contact, it did not appear
[Case V] told his PC about his interpersonal difficulties with his girlfriend.  These
difficulties were discovered as part of the review of his telephone records.
Documentation on January 4, 2019, indicated mental health treatment would
continue to address his ongoing depressive symptoms at the CCCMS LOC.

| MENTAL HEALTH SERVICES DELIVERY SYSTEM | | |
| --- | --- | --- |
| **Inclusion Dates** | **Level of Care** | **Diagnoses** |
| 07/27/2017 | CCCMS | Depressive Disorder; Antisocial Personality Disorder |
| 07/17/2018 | CCCMS | Depressive Disorder; Antisocial Personality Disorder |

- "The discussion section of the SCR documented 'multiple crisis bed admissions.' This statement was confusing, as earlier documentation indicated no MHCB admissions or psychiatric hospitalizations." (Appendix at 119.)

This statement is inaccurate. Case V had multiple crisis bed admissions while in county jail, though no admissions while at CDCR. The executive summary page of the SCR report states: "He remained at the CCCMS LOC during his incarceration with no Mental Health Crisis Bed (MHCB) or Psychiatric Inpatient Program (PIP) admissions." The discussion section also states that "[h]is new reality of prison life was a wakeup call. He reported a difficult and stressful transition while in jail marked by a lengthy trial, multiple crisis bed admissions and two suicide attempts."

- "Relatedly, an independent review of the health record indicated that the inmate had been placed on suicide watch numerous times while in county jail. This was not documented in the SCR." (Appendix at 119.)

This last statement is also inaccurate. The executive summary of the SCR report states that "[a]lthough medical records from the Los Angeles County Jail were not accessible at the time of this report, [Case V] reported two suicide attempts by hanging and overdose during his incarceration in jail." This suicide history is discussed again in more detail beginning at the bottom of page 11.

In sum, the expert's criticisms of CDCR's SCRs are rife with factual errors and misunderstandings. They are also inconsistent with the monitoring conducted by the Special Master's experts who attend the SCR conference. Accordingly, the 2019 Report and Appendix A must be revised to accurately reflect CDCR's SCR reports.

## IV.    Defendants Request Specificity Regarding Inadequate Suicide Reports.

Section G, "Individual Suicide Case Reviews," states that only 76.3% of suicide reports "were determined to be adequate summaries of the cases." (*Id.* at 27.) CDCR renews its request for the Special Master's expert to identify which SCR reports were found to be deficient in the expert's view and the reasons for those particular deficiencies. The requested information would assist CDCR in identifying the seven SCRs that were found to be "marginally adequate." (*Id.*) Appendix A includes six cases that were explicitly deemed marginally adequate, but the expert's critique in four of those cases was not clear enough to determine whether the SCR was marginally adequate.[6] To help alleviate this confusion, CDCR requests that the Special Master include a summary table in the 2019 Report, setting forth which SCR reports were deficient and why.

---

[6] The four cases where the expert's critique is not clear are: Case U (expert noting the SCR was an adequate summary of the case, but continues to list several deficiencies with the SCR), Case W (expert noting the SCR was an adequate summary of the case, but continues to list several deficiencies with the SCR), Case Y ("[t]he SCR was an adequate but marginal summary of this case, as lapses in psychiatric care were not discussed"), and Case Z (expert noting the SCR was an adequate summary of the case, but continues to list several deficiencies with the SCR).

## V.    CDCR Updates Its Suicide Case Review Reports If the County Coroner's Autopsy Report Determination of Death Conflicts with CDCR's Determination of a Suicide.

On page 28 of the 2019 Report, the expert notes her concerns that some of the SCR reports lacked documentation of reviewing the autopsy findings from the county coroner's reports. However, SCRs must be completed within sixty days of a suicide death, which is generally far quicker than any county can conduct an autopsy and finalize a coroner report.

CDCR's SCR report will note the county coroner's report as pending when the coroner's report has not been received by the time the SCR report is finalized. CDCR already updates its SCR reports if the coroner's determination of death is inconsistent with CDCR's determination of a suicide. However, updating the final SCR report merely to reflect that the coroner's report is consistent with CDCR's own report is unnecessary and wasteful. CDCR requests the Special Master strike the last paragraph in section G on page 28, and the conclusion on page 33.

## VI.    Determinations of "Foreseeability" and "Preventability" in the Manner Presented in the Report Are Counterproductive in a Mortality Review Context and Hinders Quality Improvement Effort.

The Special Master's Expert's Report states the "foreseeability" and "preventability" analyses can "describe the adequacy and implications of CDCR suicide prevention policies and procedures, staff training and supervision, clinical judgement, and utilization of clinical and custodial alternatives to reduce the likelihood of completed suicides." (2019 Report at 30.) The Special Master's assumption that the foreseeability and preventability analyses can "reduce the likelihood of completed suicides" lacks factual support, is an outdated manner of conducting mortality reviews, and grossly ignores the evidence of community standards to the contrary.[7]

As previously stated, many experts question the utility of foreseeability and preventability determinations in a mortality review context. Among other things, foreseeability[8] and preventability determinations in the manner requested by the Special Master often result in arbitrary, methodologically unreliable labels, and also do not adequately acknowledge that deaths occur in a complex system and that causative factors beyond proximate cause of death are potentially important for identifying opportunities for improvement.[9] Ultimately, such narrow foreseeability and preventability determinations frequently divert attention away from opportunities for improvement that will lead to system-wide quality improvement and patient safety.

That is why the field of mortality reviews itself has largely shifted away from narrow foreseeability and preventability determinations to a more holistic approach that focuses on

---

[7] Williams, B., Ahalt, S., Witt, L. (Final Report, Sept. 27, 2018). Assessing Medical Systems for the California Prison Health Care Receivership Corporation: Mortality Review Policy and Practice. The Criminal Justice & Health Program at UCSF, 3-4. https://cchcs.ca.gov/wpcontent/ uploads/sites/60/UCSF/Mortality-Review-Report.pdf

[8]  The specific term "foreseeability" is not addressed in Dr. Brie Williams's Final Report. However, the term is as problematic as the term "preventability" because it focuses on identifying past proximate causation rather than future opportunities for improvement.

[9] *Id.* at 4.

Special Master Lopes
Page 9

opportunities for improvement.[10]  Under the modern view, a well-performing mortality review system will identify "opportunities for improvement" leading to "quality improvement, patient safety, and/or clinical education responses (immediate change) or initiatives (longer term) that are then evaluated to determine whether they yielded improvements along relevant clinical benchmarks."[11]  This system requires the buy-in and participation of multiple actors who may be less willing to participate if the focus of the review is on foreseeability and preventability determinations whose purpose is to identify the person (or people) to blame for allegedly causing death.[12]  Accordingly, for the mortality review system to work properly—and to increase motivation for practice modifications and constantly promote organizational learning—there must be a shift away from terms like "foreseeable" and "preventable" and towards assessments that focus on opportunities for improvement.[13]  At the same time, such assessments should include staff level remediation, including training and accountability measures where appropriate.

CDCR objects to section III, *I*. "Foreseeability and Preventability" (2019 Report at 30-32), and conclusions drawn from the analyses (*id*. at 4).  CDCR requests that section be removed from the 2019 Report.

## VII.    The Expert's Foreseeable and Preventable Analyses are Subjective, Outmoded, and Lack Any Causal Relation Between Mental Health Care Provided and Suicide.

The Special Master's expert's determinations of foreseeable and preventable analyses are scattered throughout Appendix A of the 2019 Report.  The determinations are highly subjective, speculative, and some analyses lack a nexus between the intervention that should have been taken and the suicide.  For instance, the expert determined Case N's death was "*potentially preventable*" had CDCR staff referred Case N for a mental health assessment that "*might have* detected an elevated risk had they occurred, and successful interventions *might have happened*, notwithstanding the inmate's *general lack of engagement* over the course of his incarceration." (2019 Report Appendix A, at 79, emphasis added.)  The expert is assuming Case N, an inmate who was never a participant in the Mental Health Services Delivery System, and who had consistently denied prior suicide attempts or ideation during his incarceration, and generally lacked engagement with Mental Health staff, would not have committed suicide had CDCR implemented speculative interventions.  The expert fails to provide a causal relationship between Case N's suicide and "potential" interventions that "might" have detected an elevated risk for suicide.

The expert's analyses often rely on little more than speculation, further undermining the utility of the foreseeable and preventable analyses.  For instance, the Special Master's expert speculates the suicide of Case LL was preventable because the "*likelihood of suicide would have been decreased*" had Case LL been referred to a higher level of care (*id*. at 195, emphasis added); Case C the Special Master's expert assumes the suicide was preventable because had staff properly assessed Case C's level of distress "*they may have been able to assess his suicide risk more accurately*" (*id*. at 19, emphasis added); and Case H "[t]he Special Master's expert determined the inmate's death *may*

---

[10] *Id.* at 14-15 (recommending that performance be tracked without relying on subjective and often variable assessments of "preventability" to emphasize quality improvement via identification of opportunities for improvement).

[11] *Id.* at 5.

[12] *Id.* at 4.

[13] *Id.*

Special Master Lopes
Page 10

*have been preventable* had CDR been aware of the county jail's recent suicide concern and the discontinuation of psychiatric medication one day prior to his arrival." (*Id*. at 51, emphasis added.) CDCR requests the Special Master to strike the outmoded foreseeable and preventable determinations from the 2019 Report because the analyses are speculative, subjective, and fail to provide an immediate nexus between the missed intervention and cause of death.

Thank you for your consideration of these objections and comments prior to finalizing this report.

Sincerely,

/s/ **Dillon Hockerson**

DILLON HOCKERSON
Attorney
Office of Legal Affairs