**APPENDIX A**


**CASE SUMMARIES**

Case A

I.    Summary of Case

This inmate was a 49-year-old man who was found hanging by an inmate-manufactured noose on December 31, 2019, in his solely occupied Administrative Segregation Cell (ASU) cell.  His ethnicity was listed as Latino in the Suicide Case Review (SCR); however, the California Correctional Health Care Services (CCHCS) death review report noted his ethnicity as Asian-Indian.  On the day of his death, the inmate was discharged from a Mental Health Crisis Bed (MHCB) to the Enhanced Outpatient Program (EOP) level of care in ASU.  The inmate had previously discharged from the Psychiatric Inpatient Program (PIP) Intermediate Care Facility (ICF) level of care on November 15, 2019; he was housed in that setting for over seven months to address chronic suicidality.

The inmate never married, and little was known about his prior relationships or his three children; although the mother of the two youngest children was the victim in his commitment offense (corporal injury to a spouse/inhabitant, criminal threat to cause great bodily injury and false imprisonment), and subsequent review of telephone calls indicated that he remained in contact with her.  The inmate was noted at times to be an unreliable historian due to providing inconsistent information regarding his childhood and history.  At the time of his commitment offense arrest, his eldest child was age 24, and the two younger children were ages seven and eight.  On May 1, 2019, the inmate was informed that his eldest son had a rare and chronic serious illness, and he was reportedly worried about his son.

The inmate reportedly began selling narcotics for the Mexican Mafia at age 16.  He left school during the ninth grade, but he did receive a high school diploma.  He was enrolled in adult basic education and voluntary college during his last incarceration, but no educational documentation was located in his records, according to the SCR.  The inmate worked in construction when in the community; he worked as a porter in CDCR when not housed in restricted housing.  He was unassigned regarding education and work at the time of his death.

The inmate first arrived within the California Department of Corrections and Rehabilitation (CDCR) in 1999.  The most recent incarceration was his third CDCR incarceration which began in October 2014.  He was serving a sentence of seven years.  While incarcerated, he received an additional four-year sentence resulting from an assault he committed on another inmate in the reception center.  The inmate faced additional legal difficulties with the possibility of a life sentence based on health record documentation and the SCR.  He received numerous Rules Violation Reports (RVRs) throughout his incarceration, including three in 2019; the most recent RVR was due to a prisoner in possession of a deadly weapon.  In fact, the inmate was interviewed by mental health staff on the date of his death for a mental health assessment due to the RVR.

The SCR indicated a significant history of substance abuse. The inmate reported smoking methamphetamine at age 13, consuming alcohol at age 15, and smoking marijuana at age 18. Despite this substance use and reports that he sold drugs for the Mexican Mafia, the inmate had no juvenile criminal history. Methamphetamine use continued throughout the inmate's life. He also received multiple RVRs while incarcerated for methamphetamine and alcohol use. The SCR reported that PIP staff suspected that the inmate had continued using illicit substances there; however, no evidence was provided, and the inmate did not receive any disciplinary actions due to substance use while housed in the PIP. The inmate's parole was violated on many occasions due to methamphetamine use.

While the inmate reported significant involvement with the Mexican Mafia, the SCR noted that correctional records indicated that he was never a validated gang member or associate. During the reception process in 2014, he requested Sensitive Needs Yard (SNY) status because he identified himself as a "dropout" from the Mexican Mafia. Several weeks after that request, the inmate attacked another inmate for which he received the four-year additional sentence. Since that time, the inmate was frequently placed in ASUs due to safety concerns, with additional placements in an SNY or non-designated yard. He reportedly did not adjust well to SNY status, and he reported in treatment that he believed the "PC (protective custody) label" was "messing" with his head. In July 2019, the inmate was interviewed by the gang unit investigative services when they noted that the inmate had a Playboy bunny tattoo; this tattoo was consistent with gang imagery and the inmate's self-report of being a member of the Northern Rider gang. He was ultimately referred for validation status on August 30, 2019. He reported to custody staff on December 2, 2019, that he had been given an order to kill another inmate, which he refused; therefore, he required ASU placement. On that same date, he was referred to mental health for evaluation of suicidality after he reported taking several medications in an effort to kill himself by overdose.

An Investigative Services Unit (ISU) officer reported that the inmate had provided information to law enforcement, including information regarding a cold case in which he was involved. This officer was aware that the inmate had court cases in multiple jurisdictions that were pending; the officer stated that the inmate wanted to "make right" and to clear his conscience by doing the right thing, even if it meant that he would never leave prison. The inmate clearly had multiple significant stressors, some of which may not have been fully shared with his treatment team, although the information was generally available. Some treatment team members, including nursing and custody staff, were aware of some of those stressors, making the lack of inclusion of this information in some Suicide Risk Assessment and Self-Harm Evaluations (SRASHEs) concerning.

The inmate was visited by his family since 2018. Letters from friends and family that indicated support and love from them were located in his property. The last letter was from his sister in October 2019 that discussed his eldest son's rare illness and symptoms.

The inmate had telephone calls with the mother of his two younger children; the last call occurred on December 17, 2019.

The inmate had a history of six hanging attempts documented in the health record. However, the SCR noted that at least one suicide attempt was not included in the documentation. The SCR also noted that the inmate had been inappropriately discharged to the Correctional Clinical Case Management Services (3CMS) level of care at the time of the initial Interdisciplinary Treatment Team (IDTT), following arrival to a Psychiatric Services Unit (PSU) in early 2019. The inmate arrived at the PSU on January 11, 2019, and he was discharged to the lower level of care on January 23, 2019. As a result of that decrease in level of care, the inmate was transferred to another facility, where he was placed in the Long Term Restrictive Housing (LTRH) in February 2019. While housed in the LTRH, the inmate had several MHCB admissions that ultimately resulted in the referral to the PIP acute care program on April 12, 2019. He spent 27 days at the acute level of care before being referred and ultimately transferred to the ICF level of care for approximately six months. He was discharged to the EOP level of care on November 15, 2019. The inmate remained housed in the mainline EOP until he was placed in the ASU EOP Hub on December 2, 2019. On December 2, 2019, he was taken to the Triage and Treatment Area (TTA); he reported suicidality and stated that he had taken approximately 25 olanzapine and hydroxyzine tablets. The inmate was monitored by medical staff, but he refused an intravenous line and laboratory testing recommended by Poison Control. Custody reported to medical staff that the inmate did not want to be on the yard and "went suicidal." An emergent mental health referral was generated, yet the inmate was cleared to return to the ASU EOP hub by the social worker.

When seen by a psychiatrist on December 6, 2019, the inmate denied suicidality, but he was transferred on a gurney to the TTA again due to suicidality on December 22, 2019. He was discovered by custody staff with a noose around his neck, leaning forward while on his knees in a similar position that he was found on the day of his death. He was admitted to the MHCB on December 22, 2019. The MHCB staff indicated that they believed that the inmate was "over-reporting" his suicidality and making conditional threats of suicide at the IDTT. According to nursing documentation, the inmate was discharged from the MHCB; at the time of discharge, he remained with active suicidality, he refused discharge instructions, he reported a plan to hang himself, and he rated his depression at the highest level (ten of ten on a scale of one to ten).

MHCB officers interviewed after the inmate's death reported that they completed a "direct discharge," in which officers escorted the inmate to his ASU housing. He was escorted in boxers, a t-shirt, and a suicide smock ("for warmth"). It was unclear why the inmate was not provided with appropriate clothing prior to MHCB discharge, particularly if the IDTT believed that he was stable enough for discharge. The MHCB reportedly did not have a jumpsuit in stock at the time of discharge; however, this explanation was inadequate, as there was no documentation of efforts to acquire one. The escort officers

stated that the inmate exclaimed, "those doctors are fucking up.  This is bullshit!" during the escort.

The inmate was provided with diagnoses of Antisocial Personality Disorder, Major Depression, recurrent, moderate, and Psychotic Disorder due to another medical condition with hallucinations (command).  He had a history of multiple inpatient treatment admissions and mental health treatment services provided at multiple levels of care during his CDCR incarcerations.  The inmate had a history of self-injurious behavior, including cutting and ingestion of pills or objects.  The most recent suicide attempt, also by hanging, occurred on December 22, 2019; this attempt resulted in the MHCB admission just prior to his death.  There were at least two other suicide attempts by hanging, and the inmate reported an intent to hang himself while housed in the MHCB.

A review of health records indicated that the inmate received treatment for Posttraumatic Stress Disorder (PTSD) and depression during much of his last incarceration.  He was described as having conditional suicidality following a reduction from the EOP to the 3CMS level of care in August 2017.  This determination appeared to influence the perception by mental health staff that the inmate's self-injurious behavior resulted from secondary gain in an attempt to manipulate various situations; this view was maintained despite the inmate's serious suicide attempts.  Multiple MHCB admissions due to suicidality occurred between August 2017 and December 2017; he was subsequently referred to the PIP.  Records also indicated that the inmate was discharged from inpatient treatment in the MHCB and the PIP prior to psychiatric stabilization and clinical appropriateness for discharge.  There was a lack of documentation regarding the rationale for not referring the inmate to a higher level of care while in the MHCB in December 2019.  He repeatedly stated in treatment that he was struggling with his identity following separation from gang activity.  Interviewed mental health staff repeatedly reported that the inmate's sadness and depression were perceived as genuine.

II.   Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case.

The Special Master's expert determined that this death was foreseeable.  There were multiple incidents of inadequate care and suicide risk evaluations. There was extensive information available to treating clinicians regarding this inmate's suicidality, recent suicide attempts, and risk of further self-harm.  The inmate had clear stressors known to the mental health staff, including continued placement in restricted housing, a mental health assessment for an existing RVR that occurred on the date of death, and potential return to the same PSU that had previously prematurely reduced his level of care.  The reduced level of care resulted in the inmate's transfer to an LTRH earlier in 2019; this

may have provided the inmate with yet another stressor. He clearly disagreed with this decrease in level of care. Additionally, the inmate had reported gang involvement with related safety concerns. The inmate also appeared to have ongoing substance use. On the day of his death, the inmate was seen by the MHCB IDTT when he continued to report suicidal intent and plan by hanging. Despite this, he was discharged shortly after the IDTT to return to segregated housing.

The inmate had a history of self-injurious behavior and inpatient admissions due to suicidality. He had recently been discharged from the ICF, and he was referred for suicidality on at least two occasions. His behavior had escalated from reporting an attempted overdose using mental health medications to being found in his cell with a noose around his neck, kneeling on the ground and leaning forward. While he was not unconscious after this incident, this behavior was a clear escalation in symptomatology. The inmate was admitted to the MHCB due to that suicide attempt; however, he was discharged nine days later while still reporting suicidality.

III.   Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined that this suicide was preventable. There were multiple intervention opportunities that may have prevented the inmate's suicide. The inmate was prematurely discharged from the MHCB. This was consistent with the staff's impression that the inmate exaggerated his suicidality and used reports of suicide attempts or suicidal ideation to "manipulate" his housing. There were repeated inadequate suicide risk evaluations, premature discharges from inpatient care, and inadequate mental health treatment in light of the inmate's degree of suicide risk. These inadequacies resulted in the inmate's premature discharge from the MHCB while he was psychiatrically unstable. He remained with stated extreme depression and active suicidality; he informed the treatment team that he would hang himself. Despite these circumstances, he was discharged to ASU housing. The inmate's depression, hopelessness, and suicidality were likely exacerbated by a mental health assessment that was completed soon after he was discharged from the MHCB. The clinician completing the mental health assessment did not assess for suicidality; despite the inmate's ongoing symptoms and documentation in the health record by the MHCB staff, which would have warranted such assessment.

Custody and mental health staff missed multiple opportunities to intervene and to reduce the risk of suicide for this inmate. If these failures had been adequately addressed, this suicide might have been prevented.

IV.   Critique of Suicide Case Review Report

The SCR provided a comprehensive and adequate summary of this case and included relevant social, criminal, incarceration, substance use, and mental health history. It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

V.   Analysis of Quality Improvement Plan Process

This case resulted in 16 required Quality Improvement Plans (QIPs). Thirteen QIPs were mental health-related, and one QIP was a joint custody-mental health issue. Two custody QIPs were also identified.

The first mental health QIP was required to address the inappropriate level of care change from the EOP to the 3CMS level of care on January 23, 2019, during the inmate's initial IDTT. The rationale for the decrease in level of care did not include consideration of recent stressors, including new arrival to the PSU, reported symptoms of depression, recent stay in the PIP five months prior, recurrent MHCB admissions during the preceding year, and stress regarding legal cases that would likely impact his prison sentence.

The second QIP was required to address the treatment plan developed while the inmate was housed in the MHCB during March 2019. It noted that reported suicidal ideation was conditional to his safety concerns, yet at the time of his discharge, the treatment team increased the level of mental health services from the 3CMS to the EOP level of care. It was noted that the inmate had been placed on property restriction with a 90-day razor restriction as a result of superficially cutting his arm two days prior, and he continued to report suicidal ideation during his treatment in the MHCB. These observations indicated that the inmate was not psychiatrically stable enough for discharge to an outpatient setting.

The third QIP addressed an incident on March 25, 2019; the inmate was housed in the MHCB, and nursing staff observed the inmate hoarding medication. Later that same day, he reportedly ingested a razor blade and cut his arm. Nursing records noted that he had multiple superficial lacerations on his left forearm, but there was no redness or active bleeding. A SRASHE was not completed to assess acute suicide risk; this was indicated as the inmate had cut his forearm and was witnessed by nursing staff hoarding medication. Per policy, an assessment of suicidality must be conducted following an incident of self-harm.

A fourth QIP addressed an unlicensed mental health clinician assessment on April 1, 2019, following the inmate's return from the hospital after a serious suicide attempt. At the time of the assessment, the inmate was referred to the MHCB; however, concern was

noted regarding the completion of the SRASHE, which determined moderate acute suicide risk. The risk justification did not include any acute risk factors, such as recent hoarding of medication, recent self-harm behavior by cutting, stressors related to court cases, the prospect of a longer prison sentence, and safety concerns. In addition, there were no imminent risk factors or protective factors identified; these failures and omissions likely resulted in an underestimation of acute suicide risk.

The fifth mental health QIP was required to address multiple concerns with SRASHEs completed while the inmate received treatment in the PIP-ICF. They included inadequate justification for suicide risk determinations, failure to include risk factors clearly present for the inmate, failure to identify warning signs, and failure to document protective factors.

The sixth QIP addressed the lack of adequate treatment planning and treatment modifications, including a lack of change in level of suicide observation and property issue despite the inmate's report of recurrent suicidal ideation during clinical contacts with his primary clinician. The facility's local operating procedure assigned the responsibility for the completion of observation orders to the psychiatrist only, and it did not permit a licensed psychologist to complete these observation orders. This local operating procedure was inconsistent with statewide policy.

The seventh mental health QIP was required to address the failure of the PIP-ICF treatment team to address treatment goals, the rationale for PIP discharge, or to provide adequate discharge planning, including recommendations after return to the EOP level of care. Documentation did not support the inmate's appropriateness for discharge.

The eighth QIP was required to address the discharge SRASHE dated November 14, 2019, which estimated the inmate's chronic suicide risk as moderate and acute risk as high. Although these risk determinations were likely an accurate estimation of suicide risk, justification for these determinations was inadequate, as current stressors were not documented, nor were protective factors identified. Further, the SRASHE did not include recommendations for treatment interventions to address the identified suicide risk.

The ninth mental health QIP addressed CDCR headquarters; an agreement was made to conduct a Coordinated Clinical Assessment Team (CCAT) meeting prior to the inmate's discharge from the PIP-ICF; however, the CCAT meeting never occurred.

The tenth QIP identified multiple issues regarding the assessment of suicide risk in SRASHEs completed during November and December 2019; these issues included inadequate suicide risk justification, addressing the decrease in acute suicide risk from high to low risk, failure to identify known risk factors, and limited documentation of protective factors. The safety plan was also noted to have included previously documented but irrelevant historical information.

The eleventh QIP addressed an incident on December 30, 2019, when the inmate was housed in the MHCB; he was found with a piece of metal that he used to scratch his forearm superficially. Nursing documentation noted that there was no active bleeding, but the scratches were reddened. The inmate also informed nursing staff that he felt anxious, and he was observed pacing in his cell with pressured speech. The treatment plan nor the level of observation were modified in response to this incident. Additionally, the SRASHE completed at that time failed to assess suicide risk appropriately.

The twelfth QIP addressed the problematic discharge from the MHCB level of care on December 31, 2019. Multiple concerns were noted, including unclear rationale for discharge, a poorly completed SRASHE, and inadequate safety planning. Additionally, the inmate was "direct discharged" to the ASU in both partial issue and a safety smock. These concerns were troubling, as the inmate's presentation likely warranted consideration of referral to a higher level of care rather than transfer to a high-risk environment, such as an ASU.

The final mental health QIP was required of CDCR headquarters to address documentation that indicated the belief by staff that inmates must be discharged from the MHCB level of care within ten days according to CDCR policy.

The one joint mental health and custody QIP was required to address the "direct discharge" of the inmate from the MHCB to the ASU clothed in underclothing and a safety smock. The issuance of a safety smock after discharge from an MHCB was not in compliance with statewide policy and procedures regarding MHCB discharges. Additionally, there appeared to be clinical staff confusion regarding what constituted "full issue" versus "partial issue."

The two custody concerns included failure to document that the inmate was offered the required number of showers during the week of December 9, 2019, and the inmate did not possess any personal entertainment appliances; nor was he provided a state-issued hand-cranked radio or tablet when he was returned to the ASU on December 3 1. 2019.

The QIP process was adequate to the degree that continued training and memoranda regarding expectations for staff (e.g., a clinical supervisor should review unlicensed clinician's SRASHEs) could be satisfactory measures to address concerns; however, ultimately, staff accountability should include follow-up regarding the efficacy of training on clinical practice. Such follow-up was typically absent from the QIP responses accepted by the SCR reviewers.

Case B

I.    Summary of Case

This inmate was a 37-year-old African American man who was discovered hanging using an inmate-manufactured noose (torn sheet) in his solely occupied SNY cell on January 30, 2019. Responding staff was initially unable to open the cell door because items had been inserted into the door track; they gained entry only after forcing the door open. The inmate was receiving mental health services at the 3CMS level of care at the time of his death.

The inmate began his first term in CDCR in 2004, serving a sentence of life without parole. His commitment offense included strangling a woman who refused to give him money and then sexually assaulting his girlfriend; she then provided law enforcement with details regarding the murder and sexual assault. He received ten RVRs throughout his incarceration. The most recent RVRs included one for delaying an officer after starting a cell fire as a suicide attempt on January 18, 2019, and another on January 29, 2019, for destruction of state property, after the inmate destroyed a mattress also in a suicide attempt.

Based on the SCR, the inmate was associated with a security threat group. He requested SNY placement in 2009, and he was suspected of extensive distribution of narcotics and cell phones within CDCR, although he received no related RVRs. Evidence supporting the suspicion included large deposits to his trust account and other inmates disclosing rumors of his trafficking as part of the SCR process. Custody staff acknowledged that they were unable to corroborate the rumors, and cell searches were unproductive. The inmate reported to mental health and custody staff concerns about his sexual offense conviction, but custody staff denied that he expressed specific concerns related to his commitment offense.

The inmate had a chaotic childhood. He was exposed to substance abuse in his home, with multiple incarcerations of his parents and mental illness in family members, including his mother with depression and several extended relatives with schizophrenia. Although documentation conflicted regarding whether the inmate was married, he fathered two children with the same woman. Records indicated ongoing contact with his children throughout his incarceration, including visits earlier in the incarceration. The inmate left school in the eleventh grade, and he earned his General Educational Development (GED) diploma in 2016 while incarcerated.

The inmate reported a lengthy substance abuse history, including methamphetamine, alcohol, marijuana, and experimentation with other unspecified drugs. The inmate reported that his drug use continued intermittently during incarceration; however, he received no related disciplinary infractions as was previously stated.

The inmate was provided with active diagnoses of Adjustment Disorder with mixed anxiety and depression and Substance Use Disorder. Past diagnoses included Major Depressive Disorder, Depressive Disorder, Not Otherwise Specified (NOS), Antisocial Personality Disorder, Mood Disorder NOS, and Dysthymia. The inmate initially received mental health treatment as a teenager for Attention Deficit Hyperactivity Disorder (ADHD). Although he was not initially placed into the MHSDS at the time of reception center intake, he was included at the 3CMS level of care within approximately five months of his arrival to the CDCR. Mental health treatment in CDCR focused primarily on depression, and while substance use was identified as a problem area, he was never referred for substance abuse treatment. The inmate was admitted to the MHCB in 2008 for suicidal ideation, and he remained relatively stable for the next ten years. He requested discontinuation of his psychiatric medication during a psychiatric appointment on July 20, 2017, and he requested discharge from the MHSDS on October 9, 2018.

The inmate was not included in the MHSDS again until January 2019, following a suicide attempt. On January 18, 2019, the inmate was admitted to the MHCB after starting a cell fire and reporting suicidal ideation. While he initially stated that he started the cell fire to be moved from his yard, it should be noted that the cell door was jammed by the inmate, necessitating the use of the "jaws of life" to enter the cell and to retrieve the inmate. During a mental health assessment, the inmate indicated that he had started the fire to be moved from the yard after custody staff made public his sexual offense history; subsequently, he reported suicidal ideation because he believed custody did not care and would return him to the same yard. At that time, he informed mental health staff that he had been using methamphetamine and marijuana during the prior several months.

During his MHCB admission, the inmate was seen by three different psychiatrists and eight different primary clinicians; three were unlicensed clinicians. A psychiatrist provided a diagnosis of Psychotic Disorder due to methamphetamine and marijuana use at the time of admission. The inmate remained on one-to-one suicide watch for the duration of the stay; however, the documentation did not provide sufficient rationale for this level of observation. This omission apparently occurred as the clinician entering the order was often not the clinician writing the progress notes. There was also no documentation of orders from January 19, 2019 through January 23, 2019; despite this, nursing staff continued monitoring the inmate. When seen on January 20, 2019, the inmate reported safety concerns, and he stated that he was the target of an attack on the yard. He also stated that he would continue to try to kill himself until he felt safe. The inmate reported suicidality to mental health clinicians throughout his admission. He was described as disruptive and agitated on the morning of January 28, 2019; the psychiatric technician saw the inmate at the cell front. The inmate had a screw in his hand that he refused to relinquish. The psychiatric technician then notified custody staff, and the inmate ultimately relinquished the screw.

10

Two of the treating psychiatrists documented attempts to achieve medication adherence; however, the inmate only agreed to accept a low dosage of hydroxyzine for sleep and anxiety.

On January 28, 2019, the inmate was described as tangential and disorganized; nursing staff documented that he had not slept for 24 hours.  He also exhibited paranoia, stating, "I'm going to get killed in this crisis cell."  Psychiatry documented consideration of referral to a higher level of care if the inmate's symptoms continued to worsen; they also ordered a urinalysis test due to concern that the observed behavior was due to substance use.

The inmate refused psychotropic medications, and he remained agitated.  The psychiatrist prescribed an immediate olanzapine intramuscular injection at that time.  The level of suicide observation was inexplicably decreased to suicide precautions, although the privilege level remained unchanged, and the inmate remained clothed in a safety smock. He continued to exhibit agitated behavior on January 29, 2019, and he destroyed his mattress in a reported effort to kill himself.  Nursing staff documented that the inmate had an object around his neck which was not attached to an anchor point.  This observation was not noted in any mental health documentation on that date, including IDTT documentation.  It should be noted that the inmate was not invited to attend the IDTT, as the treatment team feared his reaction to the IDTT outcome.  When seen by psychiatry later that day, the inmate was described as calm and cooperative, and he was discharged to the 3CMS level of care.  The urine screen results were returned after the inmate's MHCB discharge, and the screen was positive for amphetamine.  At discharge, the MHCB clinician wrote a "safety chrono," and the facility sergeant interviewed the inmate prior to return to outpatient housing.  Of concern was the lack of documentation that this significant risk factor was addressed prior to the MHCB discharge.  According to the SCR, the inmate did not disclose to custody staff any specific safety concerns or his inability to program on the yard.  Therefore, the SCR indicated that he was returned to the mainline cell without a cellmate.

Interviewed inmate-peers reported that the decedent was not acting "like himself" on the day prior to and the day of his suicide.  One inmate-peer reported informing custody staff of statements the deceased inmate made that were concerning and appeared suicidal, such as "I don't want to be here anymore," however, no documentation of this report was located according to the SCR.  This same inmate-peer reported that the deceased inmate had experienced a recent family death that was a stressor, but this information also was not corroborated.  The inmate-peer reported seeing the decedent hanging in his cell.  He stated that he reported this information to custody staff on the day of the suicide; however, custody documentation of the incident was not consistent with this report.

The inmate received no visits since 2006.  Most of the letters in his property were dated 2015.  The only recent letter was from his mother, dated November 15, 2018, which

expressed love and family support.  A suicide note was located; it contained an apology to two people, likely his two children, in which he stated that he knew that they needed him but that he did not feel strong enough to continue and that he was in a "bad place." On January 26, 2019, he placed two telephone calls while still housed in the MHCB. Where earlier calls with his mother focused on family issues and the inmate discussing how he wanted his mother to parent his children, this call was different.  He reported losing everything and having to start over once he was discharged, as well as safety concerns regarding other inmates and custody staff who he believed would harm him.  He instructed his mother whom to call for assistance regarding his safety concerns.  He reassured her at the end of the first call that everything would be okay.  The inmate called her again on the evening of January 26, 2019.  This call included directions for his mother regarding the money that he sent her.  He stated that he had lost three jobs, and he had "no choice but to go suicidal."

The inmate's mother did contact mental health staff on January 29, 2019, after the inmate's discharge from the MHCB.  Staff reportedly provided information regarding the discharge plan, including custody follow-up of the inmate's safety concerns.  The mother was referred to the Family Access Line, manned by a mental health clinician, who further described the process when a safety chrono was provided to custody staff.  Both staff who spoke to the mother noted that her concern was focused on her son's safety issues; she appeared satisfied with the information provided.  The mother did not provide information regarding concerns of suicidality or mental health issues for her son; however, she did inform the staff that she was concerned about her son and the reasons for MHCB admission, specifically the severity of his safety concerns.  The lack of recognition of this issue by treating mental health staff was concerning.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case.

The Special Master's expert found that the death was foreseeable.  There was extensive information available to the treatment team regarding this inmate's suicidality, recent suicide attempts, and risk of further self-harm.  There were also multiple incidents of inadequate care and inadequate suicide risk evaluation.  The inmate's self-injurious behavior continued to escalate, including during his admission to the MHCB.  The inmate continued to report suicidality, safety concerns, and an intent to kill himself when released; however, his behavior was generally described as cooperative.  As discharge approached, the inmate grew increasingly agitated, disoriented, and paranoid.  Nursing documentation indicated that the inmate hit his head and tore his mattress to create a noose that he placed around his neck while attempting to locate a tie-off point.  This incident required custody staff intervention.  Despite these symptoms and recent incident, there was a lack of documentation indicating consideration of a referral to a higher level

of care or appropriate intervention beyond immediate medication administration. MHCB discharge also occurred despite this troubling presentation. While staff suspected ongoing substance abuse, this was not confirmed until after discharge, and the risk of intoxication was not adequately factored into suicide risk evaluations or discharge decisions.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined that this case was preventable. There were multiple intervention opportunities that may have prevented the inmate's suicide. The inmate was prematurely discharged from the MHCB while still unstable and actively using substances; this greatly increased his acute suicide risk. There were several inadequate suicide risk evaluations, a lack of continuity of care while in the MHCB, and poor safety planning. Mental health treatment was inadequate considering the inmate's degree of suicide risk. Clinical orders were provided by clinicians who were not present at the MHCB IDTT or had not completed progress notes with a personal evaluation of the inmate. This was due in part to the use of three unlicensed providers in the MHCB and social workers who could not provide medical orders.

The inmate continued to express suicidal ideation throughout his MHCB admission, even telling his treatment team that he would continue to try to kill himself until he felt safe. Despite this, he was released back to the SNY without any documentation that his safety concerns were addressed prior to discharge. It was unclear whether the correctional counselor's lack of a regular presence in the MHCB IDTT may have also negatively impacted the inmate's treatment needs. There was no documentation of discussion with the correctional counselor regarding the inmate's safety concerns or a plan to address those concerns prior to discharge.

Regarding emergency response, custody may not have appropriately monitored the inmate by timely welfare checks, as there was the presence of rigor mortis upon discovery and during the emergency response. Custody may have also failed to identify the emergency needs of the inmate timely, and an emergency was not immediately announced as required.

Custody and mental health staff failed to intervene at multiple opportunities to reduce the risk of suicide for this inmate. Had that occurred, the suicide may have been prevented.

IV.   <u>Critique of Suicide Case Review Report</u>

The SCR provided a comprehensive and adequate summary of this case and included relevant social, criminal, incarceration, substance use and mental health history. It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

The review identified multiple inadequacies and analyzed the impact on this inmate's determination of suicide risk and ultimate death. Despite this, areas of needed improvement were noted regarding the SCR. The psychiatry section of the SCR failed to adequately characterize the identified concerns already established elsewhere in the SCR. Instead, this psychiatric review focused on favorable aspects of the care rather than deviations from the Program Guide and opportunities for improvement. This section of the report was inconsistent with the recommendations from the report. Additionally, the SCR did not note that the inmate was inappropriately issued RVRs for suicidal behavior.

V.   <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in 12 required QIPs. Eight QIPs addressed mental health-related deficiencies. There were three custody QIPs that addressed welfare rounds, failure of the first responder to announce the emergency, and lack of a correctional counselor consistently in the MHCB IDTT. There was one nursing QIP related to improper documentation during suicide watch, including documentation of observation times prior to actual observation when using paper documentation. A referral to the OIA was made regarding custody welfare checks and the failure to announce the emergency resulting in a delay in emergency response.

The QIP process was adequate to the degree that continued training and memoranda regarding expectations for staff (e.g., a clinical supervisor should review problematic clinician's SRASHEs) could be satisfactory measures to address concerns. There was a lack of comprehensive problem-solving demonstrated by mental health management when problems were identified. For example, the emergency consultation following the inmate's suicide attempt on January 18, 2019, was not conducted in a confidential setting. For this QIP, the facility reported that the clinician indicated difficulty in conducting a confidential evaluation due to the lack of escorts or available treatment space. Rather than addressing those larger systemic issues directly, the QIP required that mental health supervisory staff simply review memoranda and other guidance with mental health staff, including additional training; this did not directly address the problem with a lack of custody escorts and appropriate treatment space.

Corrective action was directed at MHCB clinical staff; however, it was unclear if this action appropriately addressed all necessary staff. The primary clinician was reassigned from the MHCB. The treating psychiatrist was a contract employee, and a headquarters-

14

assisted assessment found that there was no evidence that the psychiatrist had a pattern of such premature discharges. Peer review was ordered for the contract psychiatrist, and the results of that review were incomplete at the time of the QIP response. Instruction and training were recommended, and the peer review committee acknowledged that the task was incomplete. It was unclear if other treatment team members were addressed for corrective action. CDCR headquarters mental health staff were responsive by increasing supervision of the MHCB IDTTs; this was noted as a positive development.

Overall, the response from the facility was incomplete, requiring follow-up by the CDCR headquarters' Suicide Prevention and Response Focused Improvement Team (SPRFIT) to obtain additional information and to ensure that the QIP process was completed.

Case C

I.   Summary of Case

This inmate was a 37-year-old Hispanic/Latino man who was discovered hanging in his solely occupied PSU cell using a sheet secured to the vent above the toilet on September 9, 2019, at approximately 1845 hours. The inmate was receiving mental health services at the 3CMS level of care and was awaiting transfer at the time of his death.

The inmate began his second term in CDCR in 2008 with a sentence of 26 years for attempted second-degree murder and assault with force with enhancements for a prior prison sentence and felony. He had one juvenile conviction for possession of a narcotic and received probation. While incarcerated for his commitment offense, he was charged and convicted of assault by a prisoner with a deadly weapon or force likely to cause grave bodily harm and battery on a non-prisoner. His earliest possible release date was September 16, 2043. He received approximately 18 RVRs during his incarceration, the most recent occurred on January 8, 2019, for battery on a peace officer. His RVRs ranged from "willfully attempting murder" on staff to failure to program/work. His inmate trust account had no funds at the time of his death, and he was the recipient of indigent supplies during his incarceration. The inmate was described by interviewed custody staff as quiet and respectful, and he rarely left his cell, except for showers.

The inmate was born in California to a relatively stable and intact home with both of his biological parents. He had four brothers and three sisters. The inmate never married. He reported two biological children with a previous girlfriend. He did not report familial substance abuse or mental illness. The inmate left high school in the ninth or tenth grade, but he later resumed school and obtained a high school diploma. Despite this, the inmate scored at a 4.9 grade level on the Test of Adult Basic Education. He reported working as a forklift driver prior to incarceration.

The inmate reported a significant substance abuse history beginning at age 16, which included alcohol and marijuana use. A pre-sentence report noted that the inmate began using methamphetamine daily at age 17, and he self-reported sporadic use of cocaine

beginning at age 19. The autopsy report indicated that no alcohol or drugs were noted at the time of death.

Based on the SCR, the inmate was associated with a security threat group, and he reported safety concerns in 2009 after a fight with another gang member which violated internal gang rules. He denounced his gang affiliation in January 2015, and subsequently, he was released to an SNY. In 2017, the inmate was referenced in a confidential memorandum in which another inmate reported owing money to the decedent that, if unpaid, would result in the reporting inmate's assault.

The inmate did not receive mental health services in the community or during his prior incarceration. He was provided with diagnoses of Antisocial Personality Disorder, Unspecified Anxiety Disorder, and Malingering. The inmate was placed in the MHSDS in 2009; however, the rationale for placement was unclear, as the earliest documentation in the health record was dated 2011. The inmate was initially placed at the 3CMS level of care; however, the level of care was changed to EOP in April 2010. The SCR noted a history of multiple MHCB admissions, one Department of State Hospitals (DSH) acute hospitalization, and two PIP hospitalizations, one intermediate and one acute. The inmate was referred for inpatient treatment in 2016 and 2017 due to reported command hallucinations to hurt himself and others. The inmate received several effective medication adjustments while in inpatient care, and he reportedly participated well in treatment groups prior to his discharge to the EOP level of care on June 13, 2017. The inmate returned to the acute level of care on April 5, 2018, with discharge on May 9, 2018. He was re-hospitalized due to command hallucinations to harm others with suicidality. He reported that he had harmed officers and felt unable to control himself. The inmate received three RVRs during this hospitalization, including battery on a non-peace officer, battery on a peace officer, and failure to program. The treating psychiatrist noted that the inmate displayed no symptoms of a psychotic disorder, and he was discharged to the EOP level of care despite requesting intermediate care placement for additional group treatment.

In September 2018, the inmate was seen by the IDTT, where it was noted that he participated in less than 50-percent of treatment. The inmate stated that he failed to attend treatment due to auditory hallucinations causing insomnia, resulting in morning fatigue. The inmate's medication was adjusted, and he reported decreased auditory hallucinations and improved sleep. Medication adjustments to address the inmate's symptoms continued through the end of 2018, with self-reported improvement in symptom severity.

The inmate was seen urgently on December 12, 2018, when he expressed difficulty adjusting to the non-designated EOP mainline setting following discharge from the PSU. On December 14, 2018, he was referred, but not admitted, to the MHCB due to danger to self. During a mainline EOP IDTT, the inmate reported safety concerns to the

correctional counselor and inquired about the process to report enemies. On January 8, 2019, the inmate saw his primary clinician and requested placement in the MHCB or segregated housing. Neither occurred, and the inmate received an RVR for battery on a peace officer later that day, which resulted in placement in the ASU EOP Hub. He was returned to the PSU on May 6, 2019. The inmate continued to vacillate between requesting a reduction in care to the 3CMS program and remaining at the EOP level of care. The IDTT continued to question the validity of the inmate's reported psychotic symptoms. His participation in treatment remained erratic.

On June 13, 2019, a SRASHE and the Miller Forensic Assessment of Symptoms Test (M-FAST) were completed. The assessment concluded that the inmate was feigning symptoms of a psychotic disorder. The inmate requested placement in the MHCB and endorsed suicidal ideation when queried; however, the primary clinician indicated that this self-report was not credible, and suicide risk determinations were justified inappropriately by the M-FAST. The following week, the primary clinician and inmate discussed a level of care change to the 3CMS program. Yet, shortly thereafter, during a psychiatry contact, the inmate requested an increase in medication due to worsening mood symptoms. The psychiatrist documented concerns that the inmate had decompensated due to discontinuation of risperidone. However, one week later, in IDTT on July 10, 2019, the IDTT reduced the inmate's level of care to 3CMS without resolution of his poor group attendance that he attributed to ongoing mood symptoms. Mental health staff appeared unfamiliar with the M-FAST and the indication to use a more comprehensive tool, such as the Structured Interview of Reported Symptoms, to obtain more detailed and definitive information if feigning was indicated by the M-FAST results. Instead, the IDTT assigned the diagnosis of Malingering on that date and decreased his level of care without proper comprehensive assessment. There was no documentation that the psychiatrist's concerns the prior week were addressed by the treatment team. The diagnosis of Schizoaffective Disorder, bipolar type, was removed on July 23, 2019, not in IDTT. Instead, a provisional diagnosis of Unspecified Anxiety Disorder was provided to reflect the inmate's stress and anxiety. The inmate was seen by the IDTT again on July 24, 2019, but the clinical summary reported no updated information. The change in diagnosis was not discussed based upon treatment team documentation.

On August 15, 2019, the inmate submitted a health care services request stating that he was experiencing auditory hallucinations and he wanted to see the doctor. During nursing triage, he reported suicidal and homicidal ideation. A SRASHE was completed; the assessment documented that the inmate denied intent or plan to harm himself, and he reported that his primary concern was his psychotropic medication. Suicide risk determinations were again justified through inappropriate utilization of the M-FAST.

The last clinical contact occurred on August 20, 2019, in a non-confidential setting. On the day of his death, the inmate participated in a recreation therapist-led treatment group;

he reportedly told the recreation therapist that he believed the recreation therapist could read his mind.

The inmate was prescribed buspirone, diphenhydramine, venlafaxine, divalproex sodium, and ziprasidone at the time of his death.

The inmate was inconsistent in his report of past suicide attempts and suicidal ideation. There were 35 suicide risk evaluations and 22 SRASHEs completed for the inmate. His chronic suicide risk was frequently rated as moderate, while his acute risk fluctuated from low to high; most of the high-risk determinations occurred at times of crisis or when the inmate reported suicidal ideation. The last SRASHE was completed on August 15, 2019 and may have underestimated suicide risk due to the incorporation of recent findings from the M-FAST. While the inmate subsequently denied suicidality during that evaluation, he did report concerns about his medications. He was told that the clinician would inform the treating psychiatrist. There was no documentation that this communication occurred or that a referral of any type was submitted to psychiatry.

An interviewed inmate-peer reported that the decedent was distressed that his level of care was reduced from the EOP to the 3CMS level of care. This peer alleged that the decedent had reported suicidality to a correctional officer who refused to inform mental health at approximately 1300 to 1400 hours. The SCR noted that the inmate was escorted to the treatment center at 1300, where he remained until after 1500 hours, and he did not report suicidal ideation to mental health staff while there. The peer alleged that the inmate was not trying to kill himself but that he wanted to return to the EOP level of care.

The inmate received no visits, based on the SCR. There was also no record of any telephone calls. The interviewed inmate-peer reported that he had spoken to the deceased inmate about his sister, as the deceased inmate was frustrated that she had not sent him a package for some time. The inmate's property included old letters, legal paperwork, incomplete mental health homework, and his television. The only recent letter was from the inmate to his sister, dated September 5, 2019. The letter expressed love toward his sister and inquired regarding his package. He encouraged her to write to him. No suicide note was documented in the SCR.

The CCHCS death review classified the death as "unexpected with no opportunities for improvement."

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this case was foreseeable. There was extensive information available regarding the inmate's safety concerns and anxiety, yet those safety concerns were never adequately addressed based on mental health documentation. The inmate repeatedly expressed suicidal ideation but was generally viewed as exaggerating psychiatric symptoms. The inmate's distress and anxiety were inadequately assessed and treated. The suicide risk evaluations did not adequately address and incorporate the inmate's safety concerns, which began in 2009, into the determination of risk. Acute risk appeared to have been underestimated at times based upon this omission. Instead, the mental health staff administered a test to screen for malingering and assigned a diagnosis of Malingering without completing further indicated assessment. Unfortunately, the provision of a diagnosis of Malingering can negatively impact all subsequent clinical contacts. While psychiatry at times questioned the inmate's credibility, the psychiatrist also documented concerns that the inmate may have decompensated due to discontinuation of psychotropic medication. Mental health staff did not adequately address the inmate's suicide risk, his ongoing distress, or his poor treatment participation. Lastly, although mental health staff indicated that the inmate exaggerated symptoms for secondary gain, there was no documentation that those motivators were adequately assessed, other than vague references to "safety concerns."

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this case was preventable, as there were multiple intervention opportunities that may have prevented the inmate's suicide. The inmate did not receive appropriate clinical assessment and evaluation, and he was prematurely labeled with Malingering. Had the mental health staff properly assessed the inmate's distress and safety concerns, they may have been able to assess his suicide risk more accurately. Mental health staff did not document adequate assessment of the secondary gain that was suspected.

IV.   Critique of Suicide Case Review Report

The SCR provided a comprehensive and adequate summary of this case and included relevant social, criminal, incarceration, substance use and mental health history. It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

V.   Analysis of Quality Improvement Plan Process

This case resulted in eight required mental health QIPs. The mental health QIPs were required to address the failure to update the inmate's clinical summary during IDTTs

conducted between September 2018 and April 2019, poor safety planning, poor rationale for risk determinations, misuse of the M-FAST for diagnostic and risk determinations, improper reduction in the inmate's level of care, removal of a diagnosis without an IDTT meeting and failure to properly refer the inmate to be seen by psychiatry.

While the concerns of the SCR were typically supported by the further assessment completed by mental health supervisory staff, interventions were limited to additional training. The QIP process was adequate; however, this over-reliance on training was inconsistent with the level of clinical inadequacy. For example, documentation by unlicensed staff responding to emergency consultations was not reviewed or co-signed by a clinical supervisor, and a review of SRASHEs resulted in the identified staff failing across multiple critical areas of the SRASHE. Training on SRASHEs was planned to address the matter. There was no documentation that those staff were prohibited from responding to emergency referrals or performing SRASHEs pending completion of training.

Case D

I.    Summary of Case

The inmate was a 26-year-old African American man who was found by a psychiatric technician during rounds on August 17, 2019, at approximately 0718 hours. The inmate was lying covered on his mattress and had three ligatures wrapped around his neck. The ligatures were removed with the cutdown kit. He was in rigor mortis when discovered. The inmate had been discharged from PIP-Acute Psychiatric Program (APP) and was receiving mental health services at the EOP level of care for two days at the time of his death.

Records regarding the inmate's history prior to incarceration were unclear due to conflicting and missing information. Some records indicated he was born in Tonga and others indicated California. Custody records revealed he was a naturalized citizen who emigrated to the United States as a pre-adolescent. Additionally, records showed his biological mother died in May 2017, though his visitation list approved his mother (biological/adoptive). There were conflicting reports of physical and emotional abuse and problematic childhood behaviors (torturing animals and arrest for arson). He reportedly had nine siblings and one son. There was no information regarding the mother of his son. In 2019, the inmate struggled with three family losses: his son's death in February, his father's death in May, and his brother's death in June.

Educational history and cognitive/adaptive behavior abilities were also unclear. The inmate reportedly did not graduate from high school. Participation in special education services for academic problems, behavioral difficulties, and/or developmental delays was also unclear. CDCR evaluated him several times for eligibility in the Developmental

Disability Program (DDP).  While in DSH in 2015, a psychological evaluation suggested the inmate's intellectual deficits met the criteria for an intellectual disability and raised concerns about possible victimization by other inmates.  These results were not included in the discharge documentation when he returned to CDCR.  However, in 2017 and 2019, the inmate was again assessed to determine DDP eligibility because the staff was concerned with his childlike behavior, problems with activities of daily living, and questionable cognitive abilities.  Both assessments designated him as Negative Developmental Disability (NDD), though staff continued to question the evaluations.  A review of the 2019 California Adaptive Support Evaluation (CASE) results revealed deficiencies in the evaluation.  Additionally, interviews with members from two PIP treatment teams revealed that mental health, medical, and custody staff suspected cognitive deficits because of his childlike behavior, concrete thinking, need for prompting, and victimization concerns.

Substance use began at age 13 with alcohol, cocaine, and marijuana.  Over time, his substance use included methamphetamine, spice, heroin, and phencyclidine.  Substance use continued during incarceration resulting in safety concerns due to drug debts which exacerbated his mental health symptoms (depression, suicidal ideation, and self-injurious behavior).

The inmate's juvenile criminal history began at age 13; however, records revealed his first arrest at age 19, and he was sentenced to three years of probation.  Adult arrests included receiving stolen property and other property offenses.  His controlling offense involved a two-week period of multiple robberies of fast-food restaurants and convenience stores at gunpoint.  The inmate related the robberies to gang membership, whom he was attempting to impress.  He was charged with multiple counts of second-degree robbery with enhancements and sentenced to 38 years.

Because of his unstable mental status, the inmate's adjustment to incarceration in jail and prison was poor.  During his approximately seven months in jail, he was described as impulsive and emotionally reactive and exhibited behavioral outbursts, including kicking the door, yelling, and throwing food.  During his approximately six years in CDCR, he was transferred several times, usually due to mental health issues.  His adjustment difficulties were evidenced by institutional movement, RVRs, gang designation, and drug debts.  Due to his gang designation and drug debts, he was placed on an SNY from 2013 to 2018.  His SNY designation was removed in 2018 because all EOP yards became non-designated yards.  The inmate was described by staff and inmates as childlike, impulsive, unpredictable, and emotional.

The inmate's mental health history prior to incarceration was largely unknown; however, according to a 2015 psychological assessment, he reported several early behavioral problems (mutilating animals, starting fires, and expulsion from school).  He also

reported a diagnosis of ADHD as a child. Psychotic and depressive symptoms were not reported until he was incarcerated.

While in county jail, clinicians diagnosed the inmate with an Adjustment Disorder with Depressed Mood and two rule-out diagnoses including, Schizophrenia and Malingering. Psychiatric services were provided, and he was hospitalized several times for suicidal ideation. The inmate was described as delusional, grandiose, impulsive, and emotionally reactive. He repeatedly reported suicidal ideation, anxiety, depression, and hallucinations.

Within five days of arrival in CDCR, the inmate was included in the MHSDS at the 3CMS level of care. During his incarceration, the inmate continually repeated two behavioral patterns. The first pattern began with self-injurious behavior followed by a minimization of the injuries and denials of suicidal ideation. This pattern repeated more than thirty times, and the inmate's injuries included hanging, suffocation, overdose, ingestion, and lacerations. The second pattern included rapid alternations in his level of care between inpatient treatment in the intermediate or acute care units and outpatient treatment at the EOP level of care.

Within one month of arrival in CDCR, the inmate was admitted to the MHCB because of suicidal/homicidal ideation and command hallucinations. Over the next four years, from July 2013 to July 2017, he was admitted to the MHCB eight times and an inpatient program five times. During his July 2017 admission to an acute program, a positive behavior support team plan (PBSTP) focusing on disruptive and self-injurious behaviors was developed and implemented. The inmate was placed on an involuntary medication order (PC 2602) for danger to himself/others and grave disability. This PC 2602 order was renewed through 2019. During his July 12, 2017 IDTT in the PIP, he requested a discharge to an EOP and subsequently inquired daily about his discharge status. On August 1, 2017, the inmate attempted suicide by hanging, attributing his behavior to wanting discharge to an EOP. At that time, the treatment team noted that his instrumental/impulsive self-injurious behavior could result in accidental suicide.

In June 2018, he was referred to an MHCB for the eleventh time. Two days after his admission, he was discharged to an EOP for eight months, until February 23, 2019. During his eight months in the EOP, he was referred but not admitted to the MHCB five times (twice in August, once in September, once in October, and once in January 2019). His treatment plan included an interdisciplinary plan of care (IPOC) and focused on decreasing depression, self-injurious behavior, and impulsivity while increasing distress tolerance and adaptive coping skills.

On February 22, 2019, the inmate reported wanting a transfer to an inpatient unit, stating he would injure himself to be transferred. On February 23, 2019, he was found in his cell, face down, surrounded by a pool of blood with a four-inch laceration on his neck

after using methamphetamine and being told he would be transferred to a facility he found undesirable.  After returning from an outside hospital, he was placed in the MHCB for the twelfth time and referred to the PIP for the seventh time.  On March 1, 2019, he was transferred to a PIP for acute treatment.  During two weeks in the PIP, he injured himself seven times and wrapped torn clothing around his neck when he was removed from one-to-one observation.  His behavior escalated through April 2019, despite implementing a PBSTP and the renewal of his PC 2602.  The inmate related his suicidal ideation and self-harm to drug debts, expressing recurrent fears for his safety.  By May 2019, the inmate achieved his identified treatment goals and was referred to an ICF level of care with the PBSTP as adjunctive treatment.  On May 9, 2019, he was transferred to an ICF.  Within approximately one month, he was informed his brother died by suicide.  The next day, he covered his window, took methamphetamine, and was found on the floor with a noose around his neck.  He was placed on a one-to-one watch; however, a SRASHE was not completed.  On July 6, 2019, he again covered his window, made a noose, and put it around his neck.  On July 8, 2019, he was referred to the APP.

On July 12, 2019, the inmate was transferred to an APP, where he remained until his death on August 17, 2019.  Provider contacts and the quality of documentation were variable, and adjunctive treatment (i.e., PBSTP) was discontinued.  On July 19, 2019, psychiatry noted self-inflicted abrasions on his arms and reported increased command hallucinations, telling him to harm himself.  Despite his unstable mental status, he was not seen for the next six days until the IDTT meeting on July 25, 2019.  Prior to the IDTT, his observation level was decreased with no explanation or order on July 22, 2019.  Several documentation and treatment deficiencies were identified throughout July 2019, partially attributable to the discontinuation of DSH administrative directives and the initiation of local operating procedures.  After August 1, 2019, the inmate's behavior on the unit was unremarkable.  Staff described him as childlike and impulsive.  His frustration tolerance was low, and his behavior was often perceived as "attention seeking."  He generally attended to his activities of daily living, ate his meals, and followed redirection.

On August 15, 2019, the inmate was discharged from acute to EOP level of care after not engaging in self-injurious behavior for two weeks.  The team's decision to discharge him resulted from a focus on his brief time in the unit rather than on the total picture of his functioning.  He was described as jovial and outgoing in the days leading up to and after discharge.  The treatment team's decision to discharge him to an EOP appeared to be a combination of the inmate's desire to be discharged and the absence of self-injurious behavior during the past two weeks.

During 2019, the inmate's diagnoses included Schizoaffective Disorder and Borderline Personality Disorder.  Psychotropic medication trials were reasonable, along with attempts to adjust medications to mitigate targeted psychotic and personality disorder

symptoms. Specific psychiatric issues in 2019 included limited psychiatric contacts, missing appointments, and insufficient/inadequate psychiatric documentation.

The total number of suicide attempts while in CDCR ranged from 30 to 35 attempts. Before incarceration, he reportedly attempted suicide once at 16 years of age and three times in the county jail. During his last 12 months in prison, from July 2018 to August 2019, mental health completed 20 SRASHEs, many of which underestimated his acute and chronic suicide risk levels and recommended minimal interventions.

## II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined this case was not foreseeable.

## III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined this case was preventable had the inmate received an appropriate level of care, quality evaluations, and adequate treatment. His mental health care was compromised by focusing on the brief time he was in the unit rather than placing his behavior into a historical context. This perspective also appeared to impact psychiatry, as they continued to adjust his psychotropic medication, despite his history of being unresponsive to medication.

## IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this lengthy and complex case. It included relevant social, criminal, institutional, substance use, and mental health histories. It also provided a description of the inmate's behavior and critiques of clinical issues (SRASHEs, levels of care, and diagnoses) and statewide headquarters' policies. The review resulted in nine mental health QIPs falling into five categories (Administration, Documentation, Diagnoses, Evaluations, and Treatment) involving five separate programs; two psychiatry QIPs involving clinicians; one nursing QIP involving providers; and six headquarter QIPs involving policies. The SCR was comprehensive and far-reaching, impacting individuals and systems at both facility and statewide levels.

Concerns that did not rise to the level of a QIP included a tendency to limit clinical decisions by primarily utilizing current behavior devoid of any historical information, be it proximal or distal information. Clinical decisions appeared to be based on a myopic conceptualization of the inmate's issues, instead of a holistic and integrative

understanding of possible adult ADHD, an extensive history of substance use, a primitive personality structure and traits, subthreshold cognitive deficits, and periodic psychotic symptoms related to increased stress which impaired his fragile coping skills and judgment. By not considering his extensive drug history, cognitive limitations, personality traits, and the possibility of adult ADHD while developing and implementing treatment plans, providers compromised treatment. Additionally, given his positive response to PBSTP, it needed to be used more along with strength-based interventions.

V.    Analysis of Quality Improvement Plan Processes

This case resulted in 21 concerns which rose to the level of a QIP. Seventeen QIPs were required to address mental health concerns, three were required to address custody concerns, and one was required to address a nursing concern.

The 17 mental health QIPs involved four institutions and headquarters. The 17 concerns were related to diagnoses, documentation, records request, SRASHEs, procedure/policy violations, the CASE, PBSTP, levels of care, and medication noncompliance. The headquarters issues involved SPRFIT and Inpatient Review Unit (IRU) policies and procedures.

The first QIP was required to address the fact that the inmate was referred to MHCB after swallowing a piece of his eyeglasses without completing the self-harm Power-Form. The QIP response included a chart audit of ten inmates who engaged in self-harming behavior within the last six months. The audit results revealed that in 60 percent of the charts, self-harm data was not entered within three calendar days after the incident. In 20 percent of the charts, a self-harm Power-Form was not completed. In response to these results, the SPRFIT coordinator conducted a training on entering self-harm data for all senior psychologist specialists. The training was documented. Moving forward, the SPRFIT coordinator or backup senior psychologist specialist will analyze and enter all self-harm data on a self-harm Power-Form daily. Data from weekends and holidays would be entered on the first working day following the weekend and/or holiday. The response was adequate, although evidence of follow-up was not provided.

A chart audit tool (CAT) review of the CASE, administered on January 24, 2019, revealed the CASE did not pass the DDP audit criteria. The two deficient areas were an inadequate exploration of victimization concerns and incomplete or blank domain summaries. This was the target for the second QIP. The QIP response included a review of ten additional CASEs randomly selected between June 2019 and December 2019. The review revealed that the previously noted concerns appeared to be an isolated issue. Despite these findings, plans were developed to cross-train senior psychologist specialists on an overview of DDP and CASE to ensure that current standards were maintained. The response was adequate.

25

The third QIP was required to address the fact that IDTTs never requested the inmate's mental health records from the county jail. The county jail records could have provided a significant amount of information which would have been helpful to CDCR's treatment teams. Responses were provided from each institution. One institution drafted a local memorandum that reviewed the clinical necessity of obtaining past records, outlined the procedure for doing so, and the local plan was to create a learning management system (LMS) module based on the draft memorandum. The response was adequate. A second facility issued a memorandum to all clinicians emphasizing the importance of requesting inmates to sign an authorization for release of protected health information to obtain previous records. The response was marginally adequate. A third facility, a PIP, noted that headquarters and the regional healthcare administration developed an integration plan. This integration plan encompassed a comprehensive, multidisciplinary work plan to evaluate the needs of all levels of functioning within the PIP and identified action plans for areas that were included in the previously identified QIPs. An update of the PIP integration plan was to be provided by April 17, 2020. Since updates were not available for the current review, an adequate review of this response was not possible.

There were multiple issues identified in the SRASHE risk assessments completed across multiple treatment teams and institutions that were compiled together to be addressed by a fourth QIP. The SRASHE, completed on August 17, 2018, underestimated both chronic and acute risks while acknowledging an extensive history of self-injurious behavior and conceptualizing these behaviors as "high rescue low risk behaviors." The SPRFIT coordinator wrote a memorandum dated November 27, 2019. He reported auditing five randomly selected SRASHEs with the CAT for the clinician identified in QIP #4. Overall, the identified clinician met audit criteria outlined in the CAT at 90 percent compliance. The results of this audit were discussed with the identified clinician. Additionally, the SPRFIT coordinator provided training on both the SPI and the SRASHE in November 2019. The identified clinician was also mentored on two SRASHEs. The response was adequate. Three SRASHEs completed underestimated both acute and chronic risk. Additionally, the recommended interventions were minimal. The MHCB senior psychologist specialist wrote a memorandum dated November 27, 2019, stating the identified SRASHE in QIP #4 was reviewed, and the results were discussed with the evaluating clinician. Additionally, five recent SRASHEs completed by this clinician were reviewed using the CAT audit criteria. Four out of the five SRASHEs met passing criteria, and the findings on the other SRASHE were discussed with the evaluator. Lastly, the evaluator received the updated SRASHE and safety planning training. The response was adequate. SRASHEs completed on five separate dates underestimated acute risk, given the severity of the inmate's symptoms and grief over the reported loss of three family members. The Warden, Chief Executive Officer, and Chief of Mental Health wrote a memorandum dated December 2, 2019, addressing QIP #4. The clinicians were offered updated SRASHE and safety planning training on multiple occasions since July 2019. SRASHE training compliance was 86 percent, and SPI training compliance was 74 percent. Additionally, the authoring clinician received

26

training on June 13, 2019, and August 13, 2019. An additional ten SRASHEs completed by the authoring clinician during the next four months were reviewed and discussed. Three consistent weaknesses resulted in on-the-job training, which was provided on November 26, 2019. The response was adequate. Two SRASHEs completed underestimated acute risk, given the severity of the inmate's symptoms noted in the ICF discharge documentation. Authoring clinicians received the updated seven-hour SRASHE and safety planning training. Additionally, five SRASHEs were audited for each clinician. Several deficiencies were found, resulting in one of the clinicians being re-mentored. The response was adequate. A SRASHE completed on August 16, 2019, underestimated acute risk, given the minimal protective factors, multiple suicide attempts, multiple familial losses, substance use, impulsivity, and emotional dysregulation. The response included a memorandum from mental health leadership dated March 20, 2020, which discussed the development of the PIP Integration Plan addressing the issues identified in the QIPs. An update of the PIP Integration Plan was to be provided by April 17, 2020. Since updates were not available for the current review, an adequate review of this response was not possible.

A fifth QIP was required to address the fact that despite having an extensive history of reported substance use at CDCR facilities, the inmate was never given a substance use diagnosis in 2018 or 2019. The responses from each institution were reviewed. At one facility, all mental health staff was trained on substance use, utilizing slides from the Suicide Prevention Summit in 2018. Additional slides addressed the important case factors related to this case. Attendance rosters were attached. The response was adequate. At one of the PIPs, training on substance-related disorders was provided, and at another PIP, on-the-job training was completed for the treatment team on November 25, 2019. These appeared adequate. Finally, at the remaining PIP, the memorandum from mental health leadership, dated March 20, 2020, discussed the development of the PIP Integration Plan, which addressed the issues identified in the QIPs. An update of the PIP Integration Plan was to be provided by April 17, 2020. Since updates were not available for the current review, an adequate review of this generic response was not possible.

A sixth QIP was required to address the fact that despite the escalation of self-injurious behaviors, the inmate's observation level was recurrently decreased, clinical justifications were missing, and observations were usually documented by unlicensed clinicians rather than a psychiatry provider who placed the orders. One PIP did not have an approved policy that required the documentation of a justification for certain levels of observation. Consequently, a memorandum was drafted addressing the need to document clinical justifications for observations. The memorandum, which was presented to the SPRFIT committee, was expected to be approved and distributed by December 2019. Additionally, electronic healthcare record provisioning errors were addressed, limiting documentation by uncredentialed staff. The response was adequate. The second PIP submitted the memorandum from mental health leadership dated March 20, 2020, which

27

discussed the development of the PIP Integration Plan addressing the issues identified in the QIPs. An update of the PIP Integration Plan was to be provided by April 17, 2020. Since updates were not available for the current review, an adequate review of this response was not possible.

The seventh QIP was required to address the fact that the inmate was included in the positive behavioral support team (PBST) program while in a PIP; however, the program was discontinued during his transition to ICF. The response indicated that the ICF did not have a PBST program; consequently, the acute treatment team made an unattainable clinical recommendation. Training for all staff to complete clinician-to-clinician contact was completed by the end of December 2019. The response was inadequate. Clinician-to-clinician contact was good, but there was no information on the continuity of care details related to the positive behavior support plan.

After suffering several familial losses and increased self-injurious behavior, the inmate was placed in an APP where his self-harm behaviors decreased. Despite his improvement, he continued to have difficulties with impulsivity and was observed giving away hygiene items. Given his mental health history of attempting suicide after being discharged from inpatient units, placement in ICF rather than an EOP was indicated. This was the target for the eighth QIP. The response was the memorandum from mental health leadership dated March 20, 2020, which discussed the development of the PIP Integration Plan, which addressed the issues identified in the QIPs. An update of the PIP Integration Plan was to be provided by April 17, 2020. Since updates were not available for the current review, an adequate review of this response was not possible.

A ninth QIP was required to address the fact that medical documentation revealed noncompliance with anti-seizure medication, which likely contributed to increased seizure activity. Given his increased symptoms, a plan to address medication noncompliance should have been part of his treatment plan. The response was the memorandum from mental health leadership dated March 20, 2020, which discussed the development of the PIP Integration Plan, which addressed the issues identified in the QIPs. An update of the PIP Integration Plan was to be provided by April 17, 2020. Since updates were not available for the current review, an adequate review of this response was not possible.

DSH completed a psychological evaluation that recommended the inmate be considered for inclusion in the DDP in 2015. Since the DSH evaluation was not included as part of the discharge documentation, the cognitive concerns were not addressed until he was reassessed in 2017. This was the target of the tenth QIP. A memorandum of understanding (MOU) dated November 20, 2019, between CDCR and DSH included the requirement to provide psychological testing reports as part of the discharge documentation. The response was adequate.

Despite multiple treatment team members identifying signs and symptoms requiring an assessment for inclusion in DDP, there were no policies that addressed assessment and the treatment of DDP inmates in the PIPs.  The clinical operations and support unit developed a standardized, statewide policy to address and support DDP assessments and treatment in the PIPs.  The response was adequate.

A QIP was required to address the fact that the PIPs did not have a policy regarding self-harm documentation in the electronic health record.  The lack of this documentation likely impacted suicide risk determinations during transitions between inpatient levels of care.  A memorandum dated November 20, 2019, identified the action taken by the statewide mental health program SPRFIT.  A PIP suicide prevention policy was being drafted.  Upon completion of the draft, the policy would begin routing for review through the various stakeholders.  Updates would be provided on the bimonthly QIP update.  The response was adequate, although no evidence of updates was included.

The thirteenth QIP was required to address the lack of a standardized PBST program policy across PIP settings resulting in the unavailability of this treatment for inmates in need and likely impacted the treatment teams' ability to address identified treatment goals.  A memorandum dated November 20, 2019 from statewide mental health leadership noted the statewide SPRFIT discussed possible methods for standardizing PBST training, resources, and procedures across PIPs.  This discussion would be continued during the next SPRFIT meeting on December 16, 2019.  This response could not adequately be reviewed without more information.

A fourteenth QIP was required to address the fact that there was a significant difference between the treatment provided at two PIP acute settings.  At one program, the inmate received frequent contacts with multiple members of the treatment team and adjunctive treatment as part of PBST.  At the other program, treatment contacts were minimal, documentation was less detailed, and adjunctive treatment was lacking.  The lack of PIP policy regarding standardization of treatment likely impacted treatment offered and contributed to the significant differences observed.  A memorandum from statewide mental health leadership dated November 21, 2019 stated the headquarters IRU was working on the most critical statewide standardized PIP policy since lift and shift. Several policies had been completed and implemented, and others were in progress.  The IRU administrator maintained a tracking log to monitor the status of all pending policies. As of November 19, 2019, the administrator met with mental health leadership and CDCR legal staff to review the tracking log and to ensure policies were routing for approval.  There was no additional follow-up noted, so the adequacy of this response could not be determined.

The timelines regarding the completion of initial documentation varied between all three PIP settings.  Except for initial psychiatry documentation, there was no current statewide PIP policy that addressed this issue.  The lack of policy likely contributed to the variation

in completion of initial documentation, some of which was never completed or completed within weeks of discharge. This was the target of the fifteenth QIP. The memorandum from statewide mental health leadership dated November 21, 2019, cited above, was used to respond to QIP #15. The response was adequate.

The sixteenth QIP addressed the fact that a review of the electronic health record did not locate any psychiatry notes indicating that the inmate had face-to-face psychiatry contacts during January 2019. A memorandum from the Chief Psychiatrist dated November 25, 2019 revealed that the contract of the registry psychiatrist who did not write an entry in the electronic health record was terminated. The response was adequate.

The final mental health QIP resulted from a review of the electronic health record which revealed that psychiatry's documentation was insufficient in July and August 2019. The memorandum from mental health leadership dated March 20, 2020 discussed the development of the PIP Integration Plan, which addressed the issues identified in the QIPs. An update of the PIP Integration Plan was to be provided by April 17, 2020. Since updates were not available for the current review, an adequate review of this response was not possible.

There were three custody concerns involving security/wellness checks, property, and RVRs. The first was required to address the fact that custody staff did not appear to routinely perform the required security/wellness hourly checks of all inmates. The facility administration initiated a confidential request for an OIA investigation into this matter. The results of the investigation were not available.

The second custody QIP was required to address ongoing issues related to inmates not receiving their property in the PIP in a timely manner. In September 2019, the facility converted two medical technician assistant positions to correctional officer positions. The purpose of the conversion was to initiate a property program in the PIPs. The positions would work together with the IDTT to ensure inmates received their property. The response appeared adequate, but there was no further information provided about the efficacy of this change.

The third custody QIP was required to address the fact that staff reportedly informed custody that the inmate was actively using drugs. Despite receipt of this information, there were no RVRs issued to him for use or possession of drugs. An investigation revealed medically ordered drug tests were positive for methamphetamine; however, these results were unavailable to custody for the purpose of an RVR due to Health Insurance Portability and Accountability Act (HIPAA). The response was marginally adequate as it did not provide a potential solution to the issue.

The one nursing concern involved resuscitation being initiated on an inmate with rigor mortis. Training was provided to nursing and completed on December 13, 2019. The response appeared adequate.

Case E

I.   Summary of Case

This inmate was a 42-year-old Hispanic/Latinx male who was found by an officer in the Short Term Restrictive Housing (STRH) exercise yard on his knees with a noose tied around his neck and attached to a pull-up bar. The SCR revealed the noose was manufactured from a torn state-issued bedsheet. The inmate was receiving mental health services at the 3CMS level of care at the time of this death.

According to the SCR, the inmate was born in California and raised by both biological parents. He had an older brother and an 18-year-old daughter. It was unclear if he was married due to conflicting information. He also had a girlfriend who kept in touch with him via visits, phone calls, and letters. He reported dropping out of school in the sixth or seventh grade with a history of altercations and diagnoses of ADHD and a Learning Disability. As an adult, he periodically worked as a carpenter. His primary source of income was Supplemental Security Income (SSI). It was unclear when and why he received SSI. He denied a history of substance use, reporting infrequent use of marijuana and alcohol.

His record revealed he was first arrested at the age of 14 for vandalism, resulting in community camp placement. He was again arrested at ages 14 and 15 for terroristic threats, contempt of court, disturbing the peace, and battery on a custodial officer and was sentenced to California Youth Authority (CYA). As an adult, he was arrested multiple times and served four prior prison terms. His offenses included charges for possession of a deadly weapon, grand theft, battery, burglary, and inflicting corporal injury on a cohabitant. His commitment offenses included first-degree murder, attempted robbery, and attempted robbery with conspiracy. He was sentenced to life in prison without the possibility of parole.

The inmate remained in county jail for 16 months. His institutional functioning was problematic, evidenced by multiple infractions for creating a disturbance, possession of dangerous contraband, and insubordination. He arrived at CDCR for his fifth and final incarceration in May 2015. At the reception center, safety concerns were identified related to gang affiliation; consequently, he signed the renunciation of his security threat group and was placed on SNY status. During his incarceration, he received 13 RVRs for assault, possession of a weapon, possession of a cellular phone, fighting, alteration of state clothing, failure to meet work expectations, and disrespect with potential for violence. His CDCR history was characterized by violence, especially during his fourth

term when he underwent surgery for stab wounds on his face, neck, and left chest he suffered during an assault.  On June 6, 2010, the inmate told a mental health evaluator that he stabbed a cellmate 23 times, and in return, that cellmate stabbed him.

During his fifth prison term, he had frequent visits and phone calls from his girlfriend and mother.  He also had several visits from his father and daughter.  On January 26, 2019, during a visit with his girlfriend, custody officers observed her attempting to give him cocaine hidden on the girlfriend's disabled daughter.  The estimated value of the cocaine was approximately $39,000.  During this incident, he assaulted officers in an attempt to avoid the search.  His girlfriend was arrested and transported to the county jail.  He was given an RVR, his custody status was changed to maximum, and he was placed in ASU.

Staff and inmate interviews suggested the inmate had problems with anger management; however, he was seldom physically aggressive.  Inmates reported he talked about committing suicide.  One inmate, housed in an adjacent cell, described him as "on the edge," talking about "losing it."  An interview with his mother revealed he "always thought about committing suicide."  She noted he endorsed suicidal ideation while in the community, county jail, and prison.  Before his commitment offense, he made statements of "wanting to end it all."  In his last letter to his mother, he wrote that he was planning to be with his best friend soon.  She interpreted his letter as a suicide letter, informing her that he was joining his deceased grandfather.  She reportedly did not read the letter until after being informed of his suicide.

A review of his property revealed numerous legal documents and several letters from his girlfriend and mother.  Recent letters from his girlfriend expressed frustration with him and regret for her behavior, saying she would not visit him again.  She remained in touch with him, attempting to be positive and supportive, discussing his upcoming court date on May 20, 2019, and informing him that his daughter would be graduating from high school on May 30, 2019.  A letter from his mother dated May 20, 2019, stated she completely forgot to go to his court hearing on May 20, 2019 and suggested he should have reminded her.  In a subsequent letter, she wrote, "stop being so hard.  We all have stress.  Don't make life harder for ourselves."

The inmate was reportedly diagnosed with ADHD and a Learning Disability as a child and was committed to a community hospital for being a danger to himself; however, he could not provide an approximate date of this hospitalization.  During his first three prison terms, he was not in the MHSDS.  He was evaluated four times for a possible referral as a Mentally Disordered Offender (MDO) during his fourth prison term.  One evaluation stated he met the criteria for MDO; however, the other three stated he did not meet the criteria.  His diagnoses during the fourth term included a Mood Disorder NOS with Psychotic Features, Psychotic Disorder NOS, PTSD, and Antisocial Personality Disorder.  During that prison term, he endorsed auditory hallucinations, visual hallucinations, and paranoid delusions; however, clinicians reported no objective signs

that he was suffering from psychotic symptoms.  He was treated with antipsychotic medication and with an anticholinergic medication which could be abused for euphoric effects.  When his treating psychiatrist attempted to change the anticholinergic medication, he became angry and threatened to write a complaint.

During his most recent fifth prison term, he was placed in the 3CMS level of care upon arrival, despite not being diagnosed or prescribed medication by the county jail.  He was initially diagnosed with an Adjustment Disorder and was not prescribed psychotropic medication.  In September 2015, he requested the antipsychotic and anticholinergic medications he received during his fourth prison term.  His treating psychiatrist informed him that he would not receive the same anticholinergic medication, resulting in his refusal of all psychotropic medications.  In September 2016, he met with his primary clinician and discussed coping skills used to manage auditory hallucinations.  After the session, his primary clinician changed his diagnosis to a Psychotic Disorder NOS, justifying his diagnosis with the inmate's endorsement.  In November 2017, psychiatry prescribed antipsychotic and anticholinergic medications to help decrease his endorsement of hallucinations and paranoia.  One week later, he reported the auditory hallucinations told him to kill whoever was assigned to live with him, making it clear he would kill any cellmate.  His primary clinician discussed the severity of his symptoms and talked about referring him to an EOP level of care.  The inmate refused to go to EOP and stated there would be problems if he was referred.  The inmate also noted that if he killed a potential cellmate, he would declare that he warned staff about this danger, holding them accountable for his behavior.  He subsequently refused all psychotropic medication.  In May 2018, the inmate talked about how his mother, girlfriend, and children were strong supports to help him cope with stress.  In subsequent sessions, he denied psychotic symptoms and focused on his struggles with stress related to an upcoming court hearing.

The incident with his girlfriend on January 26, 2019 exacerbated the inmate's stress level.  On January 30, 2019, he talked about "acting out" if his legal property was not moved to his ASU cell.  On February 14, 2019, he was transferred and placed in the STRH unit.  On May 8, 2019, he discovered that his court hearing was postponed, and on May 22, 2019, he was informed that his STRH placement would be extended for 90 days.  During this time, he refused to see his primary clinician for confidential treatment sessions, only meeting at the cell front where he denied suicidal ideation and endorsed significant distress.  On May 30, 2019, he briefly met with his primary clinician at the cell front, saying he was doing well and would talk later in the week.  Additionally, his daughter was graduating from high school that day.  Later in the afternoon, he committed suicide in the "walk-alone" yard.

Ten suicide-related evaluations were performed during his four-year prison term, five Suicide Risk Evaluations, and five SRASHEs.  Two evaluations were completed within the last year of his life.  SRASHEs completed on January 30, 2019, and February 20,

2019, assessed moderate chronic risk and low acute risk. His chronic risk level of moderate was appropriate given his life sentence, history of mental health symptoms, the recent loss of protective factors, and his history of violence. His acute risk level of low was also appropriate due to his lack of suicidal ideation and functional impairments. Additionally, his safety plan included the assistance of custody officers and the use of exercise, reading, and meditation to help decrease stress.

II.    <u>Determination of Foreseeability</u>

There was no determination of foreseeability made by the Suicide Review Committee for this case. The Special Master's expert determined this case was not foreseeable.

III.    <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Review Committee for this case.

The Special Master's expert determined this case was not preventable from a mental health perspective. There was no evidence of acute psychosis or overwhelming depression/anxiety. On the last day of his life, he concealed his dysphoria, distress, intent, and plan, telling his primary clinician they would have a confidential session later in the week. There was inadequate information to determine if the suicide was preventable from a monitoring standpoint, as inadequate body searches and custody monitoring were under investigation, and the results of that investigation were not available.

IV.    <u>Critique of Suicide Case Review Report</u>

Overall, the SCR was an adequate review of this case, involving an inmate who became involved with the criminal justice system during childhood. The SCR included relevant social, criminal, institutional, substance use, and mental health histories. It also provided a description of his behavior and critiques of his mental health evaluations and treatment and of custody's compliance with procedures.

A concern that did not rise to the level of a QIP was mental health's equivocation on diagnostic clarification, never considering the diagnosis of a severe personality disorder which became disorganized and fragmented under stress, impairing judgment and problem solving.

V.   Analysis of Quality Improvement Plan Processes

This case resulted in two concerns that rose to the level of QIPs. One QIP was required to address a mental health concern, and the other QIP was required to address a custody concern. No nursing concerns were reported.

On May 15, 2019, the IDTT conducted an in-absentia meeting since the inmate refused to attend. The higher level of care section on the treatment plan noted the inmate had three RVR mental health assessments in the last 90 days, without a referral to a higher level of care or identification of treatment modifications. This finding was later discovered to be marked in error. It was also noted that the inmate was on the high-risk list, and there did not appear to be an accurate assessment of risk at the time of his placement on the high-risk list. In response to the QIP, facility leadership wrote a memorandum focused on the following issues: when a risk assessment should be completed; what is a SRASHE; what is a high risk list and what are the minimum documentation requirements; and what are the higher level of care indicators and the minimum documentation requirements. The PowerPoint presentation was included along with the attendance rosters. This response adequately addressed the QIP.

The custody QIP was required to address the fact that there were approximately 36 minutes when staff was not monitoring recreational yards. Additionally, given the utilization of an altered state sheet, the thoroughness of the required unclothed body search prior to the yard release was questioned. The Warden responded to this QIP in a memorandum dated August 28, 2019. He reported that the facility referred the incident to the Office of Internal Affairs (OIA) for investigation by the hiring authority. This response adequately addressed the QIP; however, there was no update on the status of the investigation by OIA.

Case F

I.   Summary of Case

The inmate was a 59-year-old male who was found hanging by officers conducting count on August 28, 2019. He had a ligature wrapped around his neck and affixed to a sprinkler head in the ceiling of his cell. The inmate was receiving mental health services at the EOP level of care at the time of his death.

Records revealed that the inmate was born in Armenia and emigrated to the United States in 1978 when he was approximately age 18. Nine years later, in 1987, he was arrested for receiving stolen property. The inmate reportedly had an eighth-grade education. He married in 1993 had two daughters. He was unemployed three years into his marriage in 1996 and reportedly attempted suicide by cutting his wrists in 1999. There was no evidence of a substance use history.

35

The commitment offense occurred on the inmate's birthday in 2001 when he shot his brother-in-law. The inmate picked up the victim from his home and shot him twice in the chest and once in the stomach. The victim escaped the car; however, the inmate chased the brother-in-law, kicked him, and shot him in the neck. An eyewitness drove the victim to the hospital, where he told police his sister's husband shot him. The motive for the crime was unclear, although family members attributed it to jealousy. The inmate was arrested and spent approximately three years in jail before sentencing. Prior to his trial, the inmate was diagnosed with Schizophrenia, Paranoid Type. He was found guilty and sentenced to 50 years to life for murder in the first degree with enhancements.

The inmate's adjustment to county jail was poor, evidenced by a significant history of disciplinary problems for creating a disturbance multiple times, acts of insubordination, threatening staff, possession of contraband, starting fights with other inmates, and attacking officers. Force was used several times to stop the disturbances.

The inmate arrived in CDCR in July 2004 at age 44. He spent the next 15 years in prison. His overall prison adjustment was poor, primarily due to his unstable mental status. One day after his arrival, he initiated an altercation with officers during his escorting to his two-man cell. He was placed in the ASU, charged with serious battery on a peace officer, and given his first Security Housing Unit (SHU) term. He received several SHU terms, usually served in a PSU due to battery charges on custody officers and medical staff. His explanation for his violent behavior was always bizarre and illogical. In 2008, he was charged with destruction of state property after removing a metal stool seat from its stand in his cell and breaking two cell windows with the seat. An RVR mental health assessment revealed the action resulted from delusional thinking. In addition to staff assaults, he assaulted other inmates and was assaulted by them. He reportedly had a list of nonconfidential enemies in at least four institutions. When he attended classification committee meetings, his statements related to the RVRs reflected perceptual distortions, grandiose delusions, and disorganized thinking. Due to his disciplinary issues and unstable mental status, he seldom worked or attended vocational training during his incarceration.

During his incarceration, the inmate received several visits from his mother, father, cousins, and unknown people, revealing a support system. From 2005 to 2009, his parents visited him at least annually. From 2010 to 2014, they visited him twice a year, and from 2015 to 2017, they visited him three to four times a year. In 2018, they visited him five times, and in 2019, they visited him at a PIP.

The inmate was placed in eight different facilities, spending approximately seven years at one, three years at another, six months at a PIP, and nine months at another PIP. He was housed in APP for approximately ten weeks and in ICF for 14 weeks. While he was in an APP, he was verbally aggressive and retained on maximum security custody until he

began to stabilize with psychotropic medication. He was transferred to ICF, where he began appropriately interacting with staff; however, he continued to exhibit paranoid and grandiose delusions. The inmate's final level of care placement was in EOP for one week prior to committing suicide.

The inmate's final EOP housing was in a general population cell which did not require retrofitting of ligature points. The reviewer interviewed his cellmate of two days, who reported that the inmate hit himself in the head and repeatedly said, "I want to kill myself." This cellmate requested a move to another cell. However, there were no comments in the housing unit logbook and no referrals from custody staff explaining the reason for the request. This cellmate was moved to the adjacent cell, where he continued hearing the inmate repeatedly say, "I want to kill myself." This other inmate also reported that custody and nursing staff took the inmate out of his cell for approximately 40 minutes the night before he died. When he returned to his cell, the inmate-peer described the inmate as looking "miserable." The reviewer also interviewed the inmate's mother, who stated her son was innocent and would never kill himself. Her beliefs of his innocence and the possibility that he was a victim of homicide appeared to reflect the family's cultural and spiritual beliefs. Her son occasionally expressed these beliefs during his incarceration.

The inmate's history of mental health issues prior to incarceration was unclear. Documents revealed at least one psychiatric hospitalization in the community and reports that he was unable to maintain employment from 1996 until he was arrested in 2001. During his last five years in the community, he was reportedly receiving SSI and was psychiatrically hospitalized in 1999 and diagnosed with Schizophrenia, Undifferentiated Type. He also received outpatient psychiatric care. The inmate's symptoms included paranoid and grandiose delusions, auditory hallucinations, and suicidal ideation. In 1999, he reportedly attempted to kill himself by cutting both wrists. During his trial, forensic psychiatrists found him to be severely mentally ill; however, they also discovered that he had planned the offense. While in county jail, he received psychiatric treatment; however, the treatment details were not included in the SCR.

The inmate's history of mental health treatment for serious and persistent mental illness during his 15 years of incarceration was characterized by MHCB admissions for being a danger to himself; PC 2602 orders for being a danger to himself and others and for grave disability; inpatient admissions to the ICF and APP units for stabilization; an EOP level of care when he was relatively stable; and multiple ASU, SHU, and PSU placements. He struggled with psychotic symptoms, including paranoid and grandiose delusions, pronounced hallucinations, illogical thinking, and disorganized/destructive/assaultive behaviors. Additionally, he struggled with intense anxiety and depression, resulting in suicidal ideation, suicide attempts, and an inability to perform activities of daily living.

During his 15-year incarceration in CDCR, he functioned best at an EOP level of care between the third quarter of 2015 and the middle of 2018; however, he continued to present with anxiety and delusions during this time. Between January 2008 and January 2015, 14 PC 2602 petitions were granted. Throughout his incarceration, he was diagnosed with either Schizophrenia or Schizoaffective Disorder. He participated in limited mental health programming and treatment when he was not acutely psychotic or severely anxious/depressed. The inmate's behavior was unpredictable, and he was at the highest risk when he reported significant anxiety, agitation, insomnia, restlessness, and hallucinations.

The inmate's treatment teams usually worked well together; however, there were exceptions. In July and August 2018, the treating psychiatrist and the primary clinician had conflicting perspectives, which were never resolved, resulting in an inappropriate referral. Treatment teams also tended to be responsive to his needs; however, at times, they did not follow up on significant cues, violating Program Guide requirements. Two examples occurred in July 2018. First, there were no follow-up questions or referrals for medical evaluation after the inmate reported constant pain and feeling ignored. He reported a willingness to tolerate the pain until April 1, 2018, after which time he would kill himself to end the pain. In the second example, there was no documentation indicating that clinicians considered making a higher level of care referral after he received three RVR's in six weeks.

A review of his suicide history revealed at least one reported suicide attempt prior to incarceration in 1999, when he cut both wrists. While incarcerated in CDCR, he also attempted suicide at least once in 2011 by hanging. There were many incidents of reported suicidal ideation, starting in October 2004. At times, there was no evidence of suicidal ideation for years, while at other times, he was seriously considered death. His suicidal thoughts were often related to auditory hallucinations urging self-harm and severe anxiety attacks with insomnia and restlessness. During the last month of his life, the inmate kicked the door and banged his head on the door, seeking stronger pro re nata (PRN; taken as needed) medications.

There were three SRASHEs completed two weeks before his death. On August 14, 2019, the inmate was interviewed prior to discharge from ICF. During the interview, the inmate stated he wished to die, and he was tired of living in prison, saying it was like living in hell; however, he denied current plans to kill himself. Additionally, he reported two aborted suicide attempts, one in 2006 and the other in 2017, and denied an apparent attempt in 2011. Despite these reports being inconsistent with documentation in his mental health record, the evaluator never asked him to reconcile the discrepancies. On August 23, 2019, a SRASHE was administered when the inmate transferred to an EOP. He refused to participate in the evaluation, denying thoughts of harming himself or others. After reviewing the record and collateral information, the evaluator concluded his chronic suicide risk was moderate to high, noting reports of up to three past attempts. On

August 27, 2019, a SRASHE was completed following an emergent nursing referral for suicidal ideation. The inmate complained of anxiety and reported suicidal thoughts. He refused to answer questions about protective factors or to identify triggers resulting in anxiety, saying medication would make his anxiety better. Despite reporting suicidal ideation related to anxiety and previously listing anxiety and suicidal ideation as warning signs, the evaluator believed the inmate's statement that he would be safe back in his cell after taking medication. The safety treatment plan underestimated his acute risk as low and erroneously concluded his level of care did not need to be changed.

## II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined this case was not foreseeable.

## III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined this case was preventable had staff recognized and connected historical events to current risk factors, triggers, and stressors, and had he received adequate evaluations, an appropriate level of care, and appropriate interventions. His mental health care was compromised by staff minimizing his distress and unfamiliarity with the case's historical context.

## IV.    Critique of Suicide Case Review Report

Overall, the SCR was an adequate summary of an inmate diagnosed with a serious and persistent mental illness. It included relevant social, criminal, institutional, substance use, and mental health histories. It also provided a description of his behavior and critiques of the SRASHEs, decisions made by clinicians and IDTT teams, and his level of care. Recommendations followed from the findings in the report.

Several concerns did not rise to the level of a QIP, including mental health evaluations underestimating the role of mental illness in his behavior; late RVR mental health evaluations; and a lack of documentation about and/or utilization of protective cultural and spiritual beliefs which were not identified in the Hope and Spirituality Tab. In addition to the identified concerns, there was another significant concern related to interdisciplinary treatment teams' inability to discuss and constructively resolve conflicting clinical opinions. This inability resulted in questionable psychotropic prescriptions in September and October 2018 and questionable levels of care in June 2018 and August 2018. Other recurring concerns that pervaded multiple issues were

minimizing suicide risk and psychiatric symptoms/distress and the staff's tendency to focus on the immediate rather than placing his current presentation into a historical context.

V.    Analysis of Quality Improvement Plan Processes

This case resulted in 11 concerns which rose to the level of requiring QIPs. Ten QIPs were required to address mental health concerns, and one QIP was required to address a nursing concern. No custody concerns were identified.

The first QIP was required to address the fact that a review of a SRASHE dated June 21, 2018, revealed an error in the documentation of his suicide history. The Senior Psychologist Supervisor wrote a memorandum dated December 19, 2019, stating that the primary clinician had completed all required SRASHE and safety planning trainings, as well as re-mentoring since the date of the clinical contact in question. Additionally, the primary clinician would be clinically supervised on a weekly basis for 12 weeks, which a review of five SRASHEs would follow to ensure competence. This response was adequate, although no further follow-up was noted.

Despite a provider documenting a statement on July 26, 2018, involving constant pain, hopelessness, and suicide threats, the provider neither made a referral to medical nor evaluated suicide risk, both of which were required by the Program Guide. This was the focus of the second QIP. The Senior Psychologist Supervisor wrote a memorandum dated December 19, 2019, stating that the primary clinician had completed all required SRASHE and safety planning trainings, as well as re-mentoring since the date of the clinical contact in question. Additionally, the primary clinician would be clinically supervised on a weekly basis for 12 weeks, which a review of five SRASHEs would follow to ensure competence. There was no mention of the clinician's failure to refer the inmate for medical care. This response was partially adequate.

A third QIP was required to address the fact that on August 27, 2018, the IDTT failed to refer the inmate to a higher level of care and failed to adequately reflect their rationale for keeping him in his current level of care in light of his deterioration. The treatment team appeared to minimize the severity of the inmate's mental illness, deteriorating course, and need for a higher level of care. Additionally, inconsistent psychiatry assignment in his care likely contributed to the difficulties in addressing the treatment plan. The facility's response was a memorandum from a Senior Psychologist Supervisor dated December 20, 2019, stating mental health treatment plans performed by the ASU EOP treatment team over the past six months were reviewed. The review methods included utilizing the quarterly CAT and the institutional review process for a higher level of care consideration via the sustainable process report. The review yielded 50 percent compliance on the CAT and 80 percent compliance on the higher level of care considerations. The ASU EOP Hub's documentation on 30 treatment plans for the last

two quarters was 53 percent on the CAT. During the last two quarters, the ASU EOP Hub's performance on the higher level of care audit of 48 IDTT meetings yielded a performance average of 90 percent. To address documentation deficiencies in the ASU EOP Hub, the Senior Psychologist Supervisor facilitated peer process meetings focusing on improvement in this area for all clinical staff. Attendance rosters for six weeks were included. This response was marginally adequate because it was unclear how and if the team's minimization of the inmate's deteriorating mental status was addressed and how psychiatry's inconsistent assignments were addressed.

A fourth QIP was required to address the fact that the primary clinician who completed the discharge SRASHE on August 14, 2019, did not indicate the presence or absence of imminent risk signs. The clinician documented the presence of anxiety and hopelessness, which were known warning signs for suicide. Additionally, the clinician documented a wish to be dead. Since these warning signs for suicide were not considered, the acute risk for suicide in this case was underestimated. A response memorandum dated March 20, 2020, discussed the development of the PIP Integration Plan, which addressed the issues identified in the QIPs for the identified APP. An update of the PIP Integration Plan was to be provided by April 17, 2020. Since updates were not available for the current review, an adequate review of this response was not possible.

The fifth mental health QIP was required to address the fact that on August 20, 2019, the IDTT made a PIP discharge decision despite recent and ongoing episodes of panic attacks and/or hallucinations, related insomnia and agitation, the existence of significant symptoms of psychosis, and the fact that treatment goals were not being met. During that IDTT, the inmate was noted to be paranoid, grandiose, and unable to report his distress level. A memorandum from mental health leadership dated March 20, 2020, discussed the development of the PIP Integration Plan, which addressed the issues identified in the QIPs for the identified APP. An update of the PIP Integration Plan was to be provided by April 17, 2020. Despite the clinical significance of this QIP, updates were not available for the current review; consequently, an adequate review of this response was not possible.

An emergency mental health consult and SRASHE completed on August 27, 2019, were inadequate and required a QIP. The response to the emergency consult, which did not consider historical factors, was conducted in an extremely brief manner, and the SRASHE was incomplete, contributing to an inadequate assessment of suicidal thoughts, precipitating factors, and warning signs. While suicidal ideation and anxiety were both marked under warning signs, they were not thoroughly discussed and considered, resulting in an underestimation of acute suicide risk and an inadequate risk justification. The Senior Psychologist Specialist wrote a memorandum dated December 10, 2019, in response. The memorandum stated the identified clinician received the safety planning training on July 10, 2019, and the updated Suicide Prevention and SRASHE training on July 31, 2019. Additionally, the clinician received SRASHE re-mentoring, and all

clinical staff was retrained on the importance of recognizing imminent warning signs and accurately documenting them within the risk justification. The response appeared adequate; however, it was unclear if the training stressed the importance of placing an accurate assessment of the current situation into a historical context.

The seventh QIP was required to address the fact that a lack of regular contacts with the primary clinician may have contributed to misunderstandings that placed the inmate at risk for suicide, namely, agitation, severe anxiety, and/or hallucinations. A memorandum from mental health leadership dated March 20, 2020, discussed the development of the PIP integration plan, which addressed the issues identified in the QIPs for the identified APP. An update of the PIP integration plan was to be provided by April 17, 2020. Since updates were not available for the current review, an adequate review of this response was not possible.

The eighth mental health QIP was to address that while in the MHCB in November 2018, the inmate was psychotic and gravely disabled, and unable to survive outside the structure and supervision of an inpatient setting. Despite his condition, no antipsychotic medications were ordered, likely due to 1) psychiatry's opinion that he did not meet the criteria for involuntary forced medications; and 2) psychiatry's concern that he did not provide written consent for antipsychotic medication. The Chief Psychiatrist wrote a memorandum dated October 28, 2019, in response, stating the inmate was not an imminent danger to himself or others since he was eating his meals and able to function at a level to meet his basic care needs. Two psychiatrists ruled out an emergent PC 2602 and felt they did not have adequate evidence to support a nonemergent PC 2602. The psychiatrists assumed that with a higher level of care, the inmate would be observed more carefully to recognize such evidence or lack thereof. This response was marginally adequate because it appeared the IDTT team was unable to discuss and resolve conflicting clinical opinions collaboratively.

A ninth QIP was required to address the fact that while the inmate was housed in the APP during February and March 2019, he consistently refused oral psychotropic medications that were ordered as daily standing medications. When he refused oral psychotropic medications, no PC 2602 backup medications were administered. The rationale for the medication orders and the approach to noncompliance were not sufficiently detailed in the notes. A memorandum from mental health leadership dated March 20, 2020, discussed the development of the PIP integration plan, which addressed the issues identified in the QIPs for the identified APP. An update of the PIP integration plan was to be provided by April 17, 2020. Since updates were not available for the current review, an adequate review of this response was not possible.

The tenth required QIP was to address the finding that the frequency of psychiatry documentation crafted during the inmate's stay in the APP and the ICF at California Health Care Facility (CHCF) was insufficient. Psychiatric notes were not in keeping with

contact timelines and expectations. A memorandum from mental health leadership dated March 20, 2020, discussed the development of the PIP integration plan, which addressed the issues identified in the QIPs for the identified APP. An update of the PIP integration plan was to be provided by April 17, 2020. Since updates were not available for the current review, an adequate review of this response was not possible.

The nursing QIP was required to address the fact that a psychiatric technician's weekly summaries from November 30, 2018, through December 30, 2018, were documented late and at the same time. The clinical administrator and coordinator of nursing services wrote a memorandum dated January 3, 2020, stating all psychiatric technician's weekly notes and all registered nurse's monthly notes would be submitted on time. The respective nursing notes would not be recopied for previous submissions and would include updated inmate information, reflecting the inmate's recent functioning and clinical presentation. Nursing staff would review previous submissions of nursing notes to ensure accuracy of progress and alleviate any conflicting information being reported by other treatment teams. This response was marginally adequate because it lacked details on how these actions were going to be monitored.

## Case G

I.    Summary of Case

This inmate was a 22-year-old Hispanic/Latinx man who was discovered hanging in his solely occupied cell by custody staff on April 11, 2019, at approximately 0938 hours. First responders initiated cardiopulmonary resuscitation (CPR) and were able to restore a pulse. The inmate was transported to a community hospital by paramedics for further treatment; however, his health deteriorated, and he died on April 15, 2019. The inmate was receiving mental health services at the EOP level of care at the time of his death.

According to the SCR, the inmate was "a poor historian and provided inconsistent details of his past." The reviewer also indicated the Probation Officer's Report (POR) was unavailable for review and that the inmate's mother supplemented the limited historical information during her interview. The inmate was born in Arizona and primarily raised by his mother and stepfather. The inmate intermittently reported a history of child abuse and neglect. The SCR indicated the inmate was involved in fights at school, suffered from a learning disability, and ultimately dropped out of school in the eleventh grade. The inmate's mother reported that the inmate was often bullied in school.

The SCR noted that little information was available regarding the inmate's substance abuse history. The inmate briefly experimented with alcohol, marijuana, and methamphetamine in late adolescence and early adulthood.

According to the SCR, the inmate's custody file contained no information of arrests or convictions before the commitment offense. The commitment offense occurred at the inmate's place of employment in June 2016. He had been employed for one week prior to the incident. The inmate reportedly hit a coworker in the face with a hammer in response to being called derogatory names. The inmate's mother informed the reviewer that his coworkers had been "tampering with his food" and "picking on him." She also reported that the inmate was afraid of his coworkers and that he had attempted suicide by overdose three days prior to the assault. The inmate received an 11-year sentence for second-degree murder, inflicting great bodily injury, and personal use of a dangerous weapon.

The inmate entered CDCR for his first and only prison term in April 2017. The SCR described the inmate's adjustment to incarceration as difficult, and he received his first RVR for assaulting another inmate three months after his arrival date. The inmate received 11 RVRs during two years of incarceration. Seven RVRs were issued within six months of his suicide, of which five were issued for assaultive behaviors. In October 2017, the inmate was designated SNY after reporting safety concerns and gang involvement at an earlier age. The SCR noted the inmate was assigned to work in the dining room and as a satellite kitchen worker, although dates for those assignments were not provided.

The reviewer indicated there were no recent phone records to review. However, the inmate received visits from a female friend and his mother throughout his incarceration. His most recent visit occurred on March 23, 2019.

Regarding the inmate's mental health history, the inmate's mother reported that her son "snapped" at age 18. He exhibited psychotic symptoms and required psychiatric hospitalization for six months around this time. His next known contact with mental health occurred during incarceration. In July 2017, three months after entry to CDCR, the inmate submitted two mental health services requests. He requested help with managing his anger and other emotions but denied depression and psychotic symptoms, and the clinician determined he did not meet MHSDS inclusion criteria.

On June 15, 2018, the inmate submitted a request for a psychiatry contact. The inmate informed the responding psychiatrist that he was "ashamed" to discuss his psychiatric symptoms. However, he admitted to experiencing depression, anxiety, and auditory hallucinations with voices commanding him to harm others. The psychiatrist prescribed antipsychotic medication and described the inmate as "confused," "withdrawn," and "spaced out." However, the inmate was not included in MHSDS and did not receive any follow-up mental health contacts until more than three months later, in September 2018. By that time, the inmate's symptoms and functioning had worsened, and staff determined he met the criteria for inclusion in the MHSDS. He was included at the EOP level of care to address his mood and psychotic symptoms, including continued auditory

hallucinations with violent content.  In October and November 2018, the inmate continued to exhibit signs of psychiatric decompensation, refused mental health appointments, and became "severely guarded."  In November 2018, the inmate reported being distracted by "voices," and he rated the symptom severity at a ten out of ten.  The inmate also received two RVRs for fighting and was placed in the ASU during November 2018.  ASU mental health staff initially noted objective signs of psychosis, including paranoia and auditory hallucinations.  The inmate was placed on modified EOP programming in November 2018, as his paranoia appeared to contribute to his "overall lack of programming with groups."  The SCR noted that EOP clinicians failed to offer weekly contacts on two occasions and that higher level of care non-referral rationales were inadequate around this time.

In late January 2019, the inmate began refusing to speak with mental health staff.  An ASU clinician suggested that the inmate's behaviors were volitional, including his "selective mutism."  According to the SCR, this clinician also wrote "unverified" claims that the inmate was likely hiding out in ASU due to drug debts.  On February 14, 2019, the inmate assaulted another inmate during transport to a different facility for which he received an RVR.  The SCR indicated that the inmate's communications were primarily non-verbal, with head nods and hand gestures around this time.  There was no change in the inmate's presentation or programming through March 2019.

On March 23, 2019, the inmate endorsed daily suicidal ideation, although he was not referred to MHCB level of care until March 31, 2019.  At that time, the inmate engaged in self-harm and continued to report suicidal thoughts.  During his MHCB admission, the inmate continued to communicate nonverbally, refused medication and most mental health contacts, assaulted another inmate, repeatedly knocked on the cell door for hours, continued to report suicidal ideation, and began making sexually inappropriate statements and body movements.  On April 7, 2019, MHCB staff documented that the inmate was "sweating with flat affect, naked, disheveled, making fists, and thrusting his hips."  On April 8, 2019, during a cell-front psychiatry contact, the inmate requested discharge from the MHCB, claimed he was not suicidal, and subsequently could not be redirected from making sexually inappropriate statements.  Although the inmate was diagnosed with Schizophrenia and prescribed antipsychotic medication, the MHCB psychiatrist inaccurately wrote that the inmate had no documented history of psychosis, depression, or mania and that there were "no grounds" for a PC 2602 involuntary medication order.

The next day, the referring institution was contacted to discuss the inmate's discharge.  The MHCB discharge documentation was inaccurate and misleading, as it stated that the inmate did not display any mental health symptoms while in the MHCB, that he was amenable to treatment, and "functional without medication."  The inmate was discharged to the EOP level of care and returned to his final institution on April 10, 2019.  Upon arrival to the institution, an emergent mental health referral was submitted because the inmate endorsed suicidal thoughts and made a sexually inappropriate statement to nursing

staff.  The responding Crisis Intervention Team (CIT) clinician completed a suicide risk evaluation and cleared the inmate for EOP housing.  The inmate committed suicide the following day, on April 11, 2019.

In June 2018, the inmate was diagnosed with Schizophrenia and prescribed ten milligrams of olanzapine targeting auditory hallucinations.  According to the SCR, the psychiatric follow-up appointment and order for MHSDS inclusion were never entered into the electronic health system.  This error was not identified until the inmate was seen for an urgent referral in September 2018.  In August 2018, the inmate was described as largely nonadherent with his olanzapine.  In October 2018, the inmate's olanzapine was increased to 15 milligrams to target refractory hallucinations; however, in December 2018, the medication was discontinued after several weeks of medication nonadherence.  The inmate's olanzapine was only briefly renewed during his MHCB admission from April 5, 2019, through April 8, 2019. The SCR noted, "By not identifying current symptoms and behaviors may pose a danger outside the structure of an inpatient setting, opportunities to pursue non-emergent PC2602 involuntary medication orders…may have been missed."  The inmate was not prescribed psychiatric medication at the time of his death.

According to the SCR, the inmate's reports of prior suicide attempts were inconsistent during his suicide risk evaluations.  In September 2018, he reported a previous hanging attempt.  In October 2018, he indicated he attempted to hang himself one month prior, although he subsequently denied the incident.  Additionally, the inmate's mother informed the reviewer that the inmate attempted suicide by overdose three days before his arrest for the commitment offense during June 2016.  The inmate had one documented self-injurious behavior incident on March 30, 2019, which resulted in a "superficial scratch on his left wrist."  According to the SCR, this incident was not documented as self-harm until April 16, 2019, five days after his suicide.  It was unclear whether the SPRFIT coordinator was informed in a timely manner.  The SCR noted serious deficiencies in at least eight of the most recent suicide risk evaluations completed between January 2018 and April 2019, with consistent inaccurate risk information, underestimated chronic and acute suicide risk, and insufficient safety planning and risk mitigation efforts.

II.     Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case.

The Special Master's expert determined this inmate's death was foreseeable based on the SCR's findings.  The inmate was actively psychotic, medication and treatment nonadherent, depressed and frequently endorsing suicidal ideation, and clearly in need of a higher level of care for several months prior to the suicide.  However, as indicated in

the SCR, providers wrote misleading and unsubstantiated information regarding the contributing factors to his psychiatric presentation and suicide risk. As such, the inmate's suicide risk was underestimated, involuntary medication and higher levels of care were not appropriately pursued, his MHCB discharge was premature, and his behaviors in the context of psychiatric decompensation were inappropriately dismissed as "volitional" to avoid safety concerns.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined the suicide was preventable based on the SCR's findings. This inmate clearly suffered from acute mood and psychotic symptoms identified as far back as June 2018; however, mental health staff failed to effectively intervene during the subsequent ten-month period, despite continued evidence of deterioration until the date of his suicide on April 11, 2019.

In September 2018, mental health staff responded to an urgent referral and discovered that the inmate was prescribed antipsychotic medication since June 2018. However, he received no follow-up mental health appointments or inclusion in the MHSDS as required in the Program Guide. By the time the error was discovered, the inmate's symptoms and functioning had worsened, and he required more intensive care in the EOP. Between November 2018 and February 2019, mental health providers documented ongoing concerns regarding medication and treatment nonadherence, worsening mood and psychotic symptoms, multiple RVRs, disinhibition, withdrawal, and other functional impairments. However, treatment teams failed to recognize that the inmate required a higher level of care, and the SCR noted higher level of care non-referral rationales were inadequate.

The SCR indicated mental health staff failed to adequately identify and address the inmate's increasing suicide risk between January and April 2019. In March 2019, the inmate began endorsing frequent suicidal thoughts, and he subsequently engaged in self-harm resulting in MHCB admission. During the MHCB admission, the inmate presented with acute psychotic and mood symptoms, refused medication and treatment, assaulted another inmate, exhibited disinhibition and hypersexuality, and reported suicidal ideation through April 8, 2019. However, despite the clear higher level of care referral indications, the MHCB treatment team inappropriately discharged the inmate to a lower level of care on April 10, 2019. The MHCB psychiatrist discontinued the inmate's antipsychotic medication, wrote that there were "no grounds" for pursuing a PC 2602 order, and inaccurately documented the inmate "did not have a history of psychosis, depression, or mania." The SCR noted the MHCB treatment team "did not adequately document why [the inmate] was not referred to a higher level of care" and that

47

opportunities to pursue non-emergent PC 2602 orders "may have been missed." The reviewer further stated, [MHCB] "treatment team members did not identify the psychiatric symptoms or behaviors as dangerous or possibly posing a serious and chronic risk, especially in the less structured environment of an EOP setting."

Lastly, after the inmate's return from MHCB level of care on April 10, 2019, nursing staff submitted an emergent referral for the inmate's suicidal and inappropriate sexual comments. However, the CIT clinician failed to accurately identify the inmate's suicide risk and implement effective interventions to ensure his safety, although it is possible that inaccuracies in the MHCB discharge documentation may have influenced the clinician's judgment. The inmate committed suicide the following day, on April 11, 2019.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use and mental health history. The reviewer included a reasonable assessment of the precipitants to this suicide, and their recommendations followed the content and findings of the report. The SCR's critique was thorough and brought to light numerous deficiencies in the care and assessments provided to this inmate. However, the SCR should have included a review of RVR Mental Health Assessments, as the inmate received six RVRs within five months of his suicide, five of which involved violent behaviors during periods of psychiatric instability.

V.    Analysis of Quality Improvement Plan Process

This case resulted in 13 required QIPs and two concerns that did not result in formal QIPs.

There were 11 QIPs for mental health staff that addressed deficient suicide risk evaluations and safety plans between November 2018 and April 2019; various practice concerns that resulted in premature MHCB discharge on April 10, 2019; a policy violation for delayed self-harm documentation and SPRFIT coordinator reporting (the March 30, 2019 incident was not documented until five days after the inmate's suicide); "questionable" level of care decisions, poor treatment planning and case conceptualizations; non-compliant mental health treatment contacts; and one facility's failure to include the inmate in the MHSDS and schedule follow up appointments for more than three months after antipsychotic medication was prescribed.

One QIP was included for custody staff to address a CIT policy violation on April 10, 2019. The reviewer noted that a correctional sergeant was used in place of a lieutenant upon activation of the CIT. One QIP for nursing staff addressed missed documentation for AED periodic checks and results from the time of placement to the time of arrival at the TTA.

48

The SCR included two concerns that did not result in QIPs. Both concerns were related to delays in transferring the inmate to an appropriate facility for medical care. The SCR noted that paramedic documentation attributed delays in hospital transport to "custody not being ready for transport," although no further details were provided. Paramedic documentation also differed from CDCR's about time of departure, as paramedics noted they left the facility at 1034 hours, while CDCR recorded a departure time of 1000 hours. Lastly, the SCR noted the community hospital delayed the inmate's transfer to a tertiary facility for neurological services, as he did not leave their emergency department until the following day.

The Special Master's expert reviewed available documentation related to QIP implementation and determined the responses were generally adequate. For the QIP addressing MHCB psychiatry practices, the identified psychiatrist was required to participate in relevant trainings and one hour of weekly supervision with the Chief Psychiatrist for 12 weeks. For one of the suicide risk evaluation QIPs, the institution reported that all ten of the CIT provider's suicide risk evaluations failed to achieve a passing score (average score was 48 percent). The facility planned to implement mentoring, weekly supervision, and suicide prevention and safety planning training. However, it was unclear whether the institution planned to continue monitoring the clinician's suicide risk evaluations after they received two consecutive passing scores, which is necessary to ensure sustainable improvements.

Case H

I.    Summary of Case

This inmate was a 44-year-old Caucasian man who was found hanging in his cell on November 11, 2019 at approximately 1437 hours. The SCR indicated that his cellmate left for recreation yard approximately two hours before the inmate's body was discovered. The inmate arrived at the reception center from county jail only three days before his suicide. He was not a participant in the MHSDS.

According to the SCR, CDCR did not have any information regarding the inmate's mental health history prior to the suicide. The POR was not received until two days after his death, and county jail records were unavailable at the time of initial mental health screenings.

The inmate was born in California. He never married and had two adult children. The inmate graduated from high school and completed one year of community college. He also attended basic police academy in 2004; however, he primarily worked in construction and auto repair when employed. The inmate was unemployed and residing with his mother at the time of his arrest for the commitment offense.

The SCR noted that the inmate had a significant substance use history, including abuse of methamphetamine, cocaine, alcohol, heroin, "crack," and marijuana. The reviewer indicated he continued to use methamphetamine in county jail until around September 2019. The inmate's records were inconsistent regarding a history of criminal behavior, as some suggested no arrest history while another referenced more than one arrest "20 years prior."

Prior to the commitment offense, on July 7, 2019, the inmate incurred criminal charges for vandalizing a residence and a vehicle by breaking windows and spraying a fire extinguisher. He reportedly believed his children were in the residence and repeatedly asked officers to enter the residence to check on his children. Charges related to this incident were ultimately dismissed as a result of a plea agreement in the commitment offense.

The commitment offense involved the inmate chasing and intentionally crashing into the victim's vehicle on September 9, 2019. Police officers described the inmate as animated and manic when they arrived at the scene. The inmate reported to the officers that he believed his girlfriend had been kidnapped and was inside the victim's vehicle. He subsequently apologized and fled the scene, which resulted in a motor vehicle pursuit, property damage, and use of road spikes to detain him. Although the SCR noted the inmate denied recent substance use at the time of arrest, it did not indicate whether a toxicology screen was completed on the two offense dates. The SCR referenced a follow-up interview with law enforcement, during which the inmate reported he had observed his girlfriend being kidnapped, that she was kicking and screaming, and that she was forcibly exchanged between multiple vehicles. The inmate also informed the officer he and his girlfriend had argued about "seeking help" for his mental health issues on this date.

The inmate was ultimately sentenced to three years and eight months for assault with a deadly weapon. He arrived at CDCR's reception center from county jail for his first and only prison term in November 2019, and he had minimal interactions with staff prior to his suicide three days later. According to the SCR, the inmate had no phone records, no visits, and no RVRs during his very brief time in CDCR. Custody staff informed the reviewer that the inmate was "quiet and kept to himself."

The SCR indicated the inmate's POR and county jail records revealed a history of mental health issues, including one or two psychiatric hospitalizations. The inmate's girlfriend informed police officers that the inmate began exhibiting delusions and symptoms of PTSD following his escape from the 2018 wildfires in California. Statements from the inmate and his girlfriend suggested the inmate was "delusional" for three to four months prior to his arrest, that he often believed he needed to rescue his girlfriend and children from fires and kidnappers, and that these delusions influenced his behavior on both offense dates. While in county jail, between July and September 2019, the inmate

presented with mood and psychotic symptoms, including auditory hallucinations, paranoid delusions, agitation, affect lability, and suicidal and homicidal ideation. The inmate also had problems attending to activities of daily living (ADLs), threw fecal matter at jail staff on one occasion, and was placed in physical restraints. According to the SCR, county jail records indicated the inmate stabilized with psychiatric medication (haloperidol, lorazepam, and benztropine) by November 2019; however, all psychiatric medications were discontinued one day prior to his transfer for reasons that were not clearly documented.

CDCR staff informed the reviewer that the inmate's POR and county jail records were not available for review, and they referred to the issue as a "gap in the system." The inmate reportedly denied past and current mental health issues during the initial health screening and initial mental health screening, and there were no additional follow ups with mental health staff as a result. Another inmate informed the reviewer that the inmate was depressed and "dealing with suicidal thoughts," and that he did not seek mental health treatment in CDCR as doing so would have resulted in fire camp exclusion.

The inmate denied thoughts of suicide and prior suicide attempts to CDCR staff, and as a result, he was not evaluated for suicide. However, his county jail records referenced a suicide attempt six years prior to incarceration as well as several suicide watch placements while in the jail between July and September 2019. The SCR further noted, "[the inmate] made several statements that he was suicidal with intent to end his life" and that a sheet was found hanging in his jail cell on September 12, 2019. Although the inmate claimed he did not hang the sheet, he reportedly stated, "If I had known it was there, I would have used it." By November 2019, the inmate no longer reported suicidal ideation. Although the inmate informed his CDCR cellmate of his mental health symptoms and suicidal thoughts, the SCR indicated this was never reported to CDCR staff.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case. The Special Master's expert determined the inmate's suicide was not foreseeable based on available information.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined the inmate's death may have been preventable had CDCR been aware of the county jail's recent suicide concerns and the discontinuation of psychiatric medication one day prior to his arrival. CDCR's review of

51

records would have warranted inclusion in the MHSDS, closer monitoring by mental health staff, a suicide risk evaluation, safety planning, and a medication evaluation by psychiatry. The lack of appropriate care coordination between the two facilities resulted in missed opportunities to assess suicide risk and appropriately intervene prior to the inmate's death.

IV.     Critique of Suicide Case Review Report

The SCR provided an adequate summary of this case, with relevant social, criminal, incarceration, substance use, and mental health history. The reviewer also included a reasonable assessment of precipitants to the suicide and recommendations that corresponded to SCR findings.

V.     Analysis of Quality Improvement Plan Process

This case resulted in two QIPs. The first QIP addressed a statewide coordination of care problem due to CDCR's inability to review county jail records during initial reception center mental health screenings. The response from CDCR's Statewide Mental Health Program's (SMHP) SPRFIT indicated the SPRFIT coordinator in mental health headquarters (MHHQ) would explore the concern with the Board of State and Community Corrections (BSCC) and that, at a minimum, the MHHQ SPRFIT would provide quarterly responses regarding progress. The MHHQ memorandum indicated that the first update would be submitted in March 2020; however, proof of practice was not available for the Special Master's expert to review at the time of this report on March 22, 2021.

The second QIP addressed the facility's airway management practices during emergency response, as two related concerns were identified in the SCR. First, a non-rebreathing (NRB) mask was used on the non-breathing inmate instead of an artificial manual breathing unit (AMBU) bag. Second, documentation suggested oral suctioning was not provided, despite references to reddish vomitus in the inmate's mouth. The identified facility submitted relevant training materials and several in service training sheets as proof of practice to address this QIP.

Case I

I.     Summary of Case

This inmate was a 43-year-old Pacific Islander man who was found unresponsive on the floor of his cell with a ligature tied around his neck on August 9, 2019. The SCR found that custody staff delayed emergency response efforts while awaiting a supervisor's arrival before entering the inmate's cell. Additionally, the SCR and CCHCS death review summary noted a six-minute delay in 911 activation; that staff failed to document

initial administration times for oxygen and Automated External Defibrillator (AED) shock; and that documentation was unclear regarding the amount, frequency, and method of naloxone administered. The inmate did not regain a pulse, and he was pronounced dead approximately one hour after discovery. The inmate was receiving mental health services at the 3CMS level of care at the time of his death.

The inmate was raised by his mother in Nevada until age 11. He then moved to California to live with his biological father. Prior to leaving Nevada, the inmate reportedly endured daily physical abuse by his stepfather. The SCR referenced a statement in the POR that indicated the inmate had "violent tendencies toward animals" and was involved in fights while growing up. Although the inmate left high school during his senior year, he completed his GED during his first prison term. After leaving high school, the inmate briefly worked in construction and roofing jobs. According to the SCR, the inmate was divorced and had three sons and one grandson. The inmate remained in contact with his father and two of his sons throughout his CDCR term.

The inmate had an extensive substance abuse history, with a preference for alcohol and methamphetamine, and abused other illicit drugs, including marijuana and cocaine. However, the reviewer's onsite interviews with staff and inmate peers suggested the inmate was not exhibiting signs of drug use around the time of his suicide. At the time of this review, the Special Master's expert did not have access to the toxicology report for confirmation. Further, there was no information about those results in the available reports reviewed.

The inmate had prior juvenile and adult arrests. As a juvenile, he was arrested for first-degree burglary and other property offenses. The inmate's adult criminal history included arrests for battery, defrauding an innkeeper, arson, vandalism, criminal threats, robbery, and attempted burglary. The inmate served one six-year prior prison term in Nevada. Regarding the commitment offense, the inmate had engaged in "a pattern of domestic violence, threats, assault, and false imprisonment" toward multiple significant others between January 2008 and December 2010. His charges also included ex-felon in possession of a firearm, attempt to evade a peace officer while driving recklessly, and possession of a controlled substance. He was convicted and sentenced to a term of 177-years to life.

The inmate entered his first and only prison term in CDCR in June 2012. The SCR described the inmate's initial adjustment to incarceration as difficult. In 2013, he was the victim of an assault related to drug debts; he was subsequently designated SNY at his request. The inmate received a total of six RVRs between 2013 and 2016; five were issued for violence or threats of violence. The inmate became actively involved in prison recovery programs around 2015. In 2016, he was designated single-cell status due to prior in-cell violence and threats to harm any inmate placed in his cell. In March 2016, the inmate received a job assignment as an Americans with Disability Act (ADA) worker.

53

The inmate arrived at his final institution in November 2017, and, although he was retained on single-cell status, the SCR suggested he had no further issues with staff or other inmates. The inmate remained in his job assignment as an ADA worker and also served as a Men's Advisory Council representative at his final institution until his death.

According to the SCR, the inmate's family frequently visited between June 2012 and September 2015; however, there were no documented visits between September 2015 and his final visit with his father in October 2018. The inmate's last recorded telephone contact was with his father on August 2, 2019. The inmate reportedly asked his father whether his sister had committed suicide during this call. His father replied that he would inquire with the family and contact the inmate the following day. There were no other calls on his telephone records after this date.

The inmate initially accessed mental health services in a county jail facility and Nevada prison between 2003 and 2005. The inmate had reported auditory hallucinations related to methamphetamine use, and he was prescribed divalproex sodium and quetiapine around that time. The SCR also indicated he was briefly prescribed divalproex sodium in 2008. The inmate subsequently participated in a few mental health contacts in CDCR between April 2013 and December 2017. During these mental health encounters, the inmate presented with anxiety, depressive symptoms, and what appeared to be amphetamine-induced hallucinations and insomnia. However, clinicians determined he did not meet MHSDS inclusion criteria at that time. On December 27, 2017, the inmate was included in the MHSDS at the 3CMS level of care to address "anger management, reducing violence, and maintaining sobriety." The inmate was initially diagnosed with Methamphetamine Use Disorder, Mood Disorder, and Substance Induced Mood Disorder. The assigned primary clinician typically met with the inmate once per month in 2018 and 2019. Therapeutic sessions and in-cell assignments often focused on prior trauma, hallucinations, anxiety, "flashbacks," and intrusive violent fantasies. In November 2018, the inmate's grandmother died, and he informed his primary clinician his emotions were "fueling" his homicidal fantasies.

According to the SCR, the inmate's most recent IDTT documentation, dated December 12, 2018, was inadequate. The reviewer noted the IDTT failed to discuss the inmate's symptom progression, document psychiatry input, refer the inmate for a psychiatric consult, and incorporate hallucinations, grief, and substance use into the treatment plan. The inmate's depressive symptoms also were not addressed in the plan of care, despite depressed mood referenced in several documents. Further, the SCR indicated the inmate's need for monthly contacts suggested that he may have required more intensive treatment than could be provided in the 3CMS level of care and that the IDTT's level of care rationale was insufficient.

In January and February 2019, the inmate discussed further trauma experiences during primary clinician encounters, including a sexual assault in high school. On May 12,

2019, he reported frequently checking under his bed and indicated he scrubbed his walls to "distort" the faces he saw in them.  On May 14, 2019, the inmate reported increased anxiety, and the primary clinician added Other Specified Anxiety Disorder to his list of diagnoses.  Although the 3CMS clinician continued to meet with the inmate monthly and attempted to teach coping skills, the inmate's symptoms worsened around this time. He had not demonstrated progress in treatment during the year preceding his suicide.  Still, the primary clinician failed to refer the inmate to psychiatry for a medication evaluation or to the IDTT for a higher level of care consideration.  Further, the clinician never updated the inmate's treatment plan to address depression, hallucinations, and PTSD symptoms.  During the inmate's final primary clinician contact on July 9, 2019, the inmate reported a desire to demonstrate improvements before a Board of Parole Hearing (BPH).  The inmate also stated he "felt depressed on days when his [violent] fantasies were strong," while also reporting he was "gaining increased control over his violent experiences." The inmate had no further contact with mental health staff after this date, and he committed suicide one month later, on August 9, 2019.

The inmate was not on psychotropic medication while in CDCR.  The SCR noted that the inmate had no referrals or contacts with psychiatry during the year preceding his death. The reviewer expressed concern that the psychiatrist failed to provide input and write comments in the medication section of the treatment plan during the most recent IDTT.

According to the SCR, the inmate had two prior suicide attempts.  The inmate had an attempted hanging in 2004 after losing custody of his son and an attempted overdose in 2012 in response to his lengthy sentence for the commitment offense.  The reviewer also referenced a separate accidental overdose, although no further details were available. The inmate had two suicide risk evaluations completed in CDCR.  The most recent suicide risk evaluation, dated December 26, 2017, resulted in low acute and moderate chronic risk ratings.  The clinician noted that the inmate endorsed depressed mood, anger, and substance-induced hallucinations at that time.  The SCR did not review suicide prevention safety planning for this inmate.

During the reviewer's onsite interviews, housing unit officers and other inmates described the inmate as "funny," "upbeat," "happy," and "outgoing."  These interviewees denied observing signs of drug use or suicide around the time of his death.  However, according to the SCR, "multiple inmates and staff" reported the inmate received news confirming his sister died by suicide within a week of his death.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case.  The Special Master's expert determined the inmate's death was not foreseeable based on available information.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.  The Special Master's expert determined there was insufficient information available to suggest the inmate's death was preventable.  However, the quality of care was clearly inadequate.  The SCR appropriately determined the inmate should have been considered for a higher level of care and that his psychotic symptoms, mood symptoms, and homicidal thoughts "went psychiatrically untreated" in the 3CMS program.  Additionally, the Special Master's expert determined treatment planning suffered as a result of inadequate case conceptualizations and diagnostic assessments and that these issues should have been resolved through IDTT consultation or referrals.

IV.    Critique of Suicide Case Review Report

The SCR was marginally adequate.  The reviewer provided relevant social, criminal, incarceration, substance use, and mental health history.  The SCR's assessment of suicide precipitants was sufficient, and recommendations followed the content and findings of the report.  However, the SCR did not include a review of mental health assessments or a critique of the quality or accuracy of suicide risk evaluations.  Suicide prevention safety planning was not mentioned anywhere in the report, despite the inmate's history of suicide attempts.  Additionally, the SCR did not identify the need for a diagnostic clarification evaluation, despite the clinician's inadequate case conceptualizations and apparent diagnostic uncertainties.  The six-minute delay in 911 activation during emergency response also was not mentioned in the SCR, although this issue was highlighted in the CCHCS death review summary.

The SCR noted CDCR staff was aware that the inmate's sister died by suicide one week prior to his death; however, the reviewer did not indicate whether staff became aware of the information before or after the inmate's suicide.  In the event CDCR staff knew about the sister's suicide before the inmate's death, the inmate should have been referred to the mental health department in accordance with policy, and a QIP should have been included to address this concern.

V.    Analysis of Quality Improvement Plan Process

This case resulted in three required QIPs.  The first QIP addressed numerous mental health treatment planning deficiencies, including the facility's failure to refer and consult with psychiatry, to document symptom progression, to discuss higher level of care needs with the IDTT, to sufficiently justify the current level of care, and to address the inmate's hallucinations, grief, and substance use in treatment plans.  In response to this QIP, the identified institution audited five of the clinician's treatment plans; four failed to meet the CAT criteria.  The clinician subsequently received headquarters-developed IDTT case

formulation training.  The institution also reported that post-training treatment plan audits would occur for 30-days; however, the results of those audits were not available for review.

The second QIP targeted emergency response delays caused by custody staff waiting for a supervisor's arrival before entering the inmate's cell.  The identified facility submitted a memorandum indicating the matter was forwarded to the OIA; however, the investigation results were not available at the time of the Special Master's expert's review.

The last QIP addressed several emergency response documentation issues by nursing staff.  The Chief Nursing Executive at the identified institution submitted a memorandum indicating nursing staff received relevant training, and in-service training sheets were attached as proof of practice.

The Special Master's expert determined the initial response from the identified institution was sufficient; however, the results of post-training audits for the first and third QIP were not provided to demonstrate improvements occurred.  For the second QIP, there was no information confirming the OIA started or completed their investigation.

Case J

I.   Summary of Case

This inmate was a 35-year-old Hispanic/Latino male inmate who was discovered by a correctional officer hanging in his solely occupied ASU cell on September 11, 2019, at 1420 hours.  The ligature tied around the inmate's neck was affixed to the vent above his head, and he was unresponsive. Despite lifesaving efforts, the inmate was pronounced dead in the TTA at 1450 hours.  The inmate was receiving mental health services at the EOP level of care at the time of his death.

According to the SCR, the inmate was born and raised in Mexico until the age of 14, when he moved to the United States to live with his brother.  The SCR noted that the inmate received minimal adult supervision during adolescence and struggled with acculturation issues as an undocumented immigrant.  The inmate also reported a history of sexual abuse during childhood.

The inmate graduated from high school and completed two years of community college. He briefly held jobs in maintenance and food service, although he was unemployed at the time of his commitment offense arrest.  The inmate never married.  He had two sons and one daughter with whom he had occasional contacts, according to the SCR.

Regarding substance use history, there were reports the inmate began abusing alcohol at age six, marijuana at age eight, and methamphetamine at age 17.  Methamphetamine

appeared to be the inmate's preferred substance during adulthood, and he reported continued intermittent methamphetamine use during incarceration.

According to the SCR, the inmate had an extensive history of criminal behavior beginning in childhood. Prior to age 12, the inmate reportedly set fire to a cornfield, vandalized property, stabbed two individuals, and started selling drugs. The inmate's juvenile record included charges for sexual battery, petty theft, and possession of a controlled substance. The SCR noted that the inmate's adult criminal record listed only minor offenses prior to his arrest for the commitment offense. In 2006, the inmate was sentenced to life in prison with the possibility of parole for kidnapping, robbery, oral copulation, lewd and lascivious acts with a child under 14 with force and violence, and criminal threat to cause great bodily injury or death.

In December 2006, the inmate entered CDCR for his first and only prison term. The SCR indicated that the inmate had difficulty adjusting to prison and accepting his sentence. The inmate consistently reported safety concerns related to the nature of his crimes, and he was designated SNY status in 2017. The inmate received 19 RVRs during incarceration, including two for indecent exposure, three for violent behavior, and two for attempted escapes. There were three RVRs issued within 12 months of the inmate's death, including possession of dangerous contraband, escape with force or violence, and refusing to accept assigned housing. The SCR did not include a review of RVR mental health assessments.

In 2010, the inmate's request to serve the remainder of his sentence in Mexico was denied; however, he reportedly remained hopeful his sentence would be reduced due to changes in case law around this time. The SCR suggested that the inmate may have lost hope of an early release around June 2019, as he attempted to escape from a community hospital that month. On September 10, 2019, the inmate was scheduled to transfer to a PSU to serve his SHU term for attempted escape; however, the transfer was postponed for one day due to an incident at the receiving facility. The inmate was found hanging in his ASU cell the following day. The SCR indicated there were no recent phone records and the inmate's last visit occurred in May 2019.

The SCR described the inmate as a poor historian, and his mental health history revealed inconsistent reports. Some documents suggested the inmate experienced depression during childhood and participated in a juvenile sex offender program during adolescence. The inmate accessed CDCR's mental health services for the first time in September 2007, and he was included in the 3CMS level of care to address anxiety, depression, and incarceration adjustment issues. A few months later, the inmate's level of care was increased to EOP to address suicidal ideation, paranoia, and auditory hallucinations. He was diagnosed with Schizoaffective Disorder and Psychotic Disorder, Not Otherwise Specified, during that time. Although in December 2008, the inmate's level of care was

briefly reduced to 3CMS, he was returned to EOP level of care after ingesting a razor blade and reporting auditory hallucinations and safety concerns.

The inmate was referred to the MHCB level of care several times in 2009 and 2010 for danger to himself. However, the inmate subsequently had a period of relative stability and was maintained in 3CMS until June 2013. The inmate's diagnosis was changed to Major Depressive Disorder during this period. In June 2013, the inmate was referred to the MHCB for suicidal ideation and auditory hallucinations with commands to harm himself. Although the inmate was discharged to the EOP level of care, his presentation remained the same, and he required treatment at an ICF for a period of five months. The inmate was subsequently relatively stable, and he was maintained at the 3CMS level of care from July 2015 through March 2017. The inmate reportedly attributed his auditory hallucinations to occasional drug use during this period.

In March 2017, the inmate transferred to a new facility to serve a SHU term for indecent exposure. While at this facility, the inmate frequently endorsed suicidal ideation and hallucinations and was referred to the MHCB on multiple occasions. There was also at least one incident of foreign body ingestion. According to the SCR, mental health staff suspected the inmate reported symptoms for secondary gain and documented that there were no observable signs of psychosis during this period. However, the treatment team subsequently referred the inmate to the PIP for acute care in May 2017. In June 2017, the inmate discharged from the PIP acute program to the EOP level of care. The SCR noted he continued to report safety concerns, depression, auditory hallucinations, and thoughts of suicide. The frequency of self-harm incidents appeared to increase around this time, and the inmate's level of care vacillated between MHCB and EOP through February 2019. In April 2019, the inmate transferred to the PIP acute program due to repeated acts of self-harm and suicidal ideation. In April 2019, the inmate's diagnosis was changed to "Other (or unknown) substance-induced psychotic disorder, without use disorder; Methamphetamine Dependence," and according to the SCR, these were the only psychiatric diagnoses listed until his death in September 2019.

The inmate received PIP acute program care from April 15, 2019, through May 14, 2019. The SCR noted PIP discharge documentation inaccurately claimed the inmate maintained stability on the unit and met his treatment goals, despite other treatment records indicating none of the treatment objectives were achieved by discharge. During the PIP admission, the inmate reported ongoing anxiety and safety concerns, ingested foreign objects on two occasions, and did not participate in any group treatment. Following the premature discharge to the EOP level of care, the inmate continued to endorse suicidal ideation and safety concerns, and he engaged in self-harm by inserting fingernail clippers into his anus. In late June 2019, the inmate ingested a razor blade and required treatment at a community hospital. The SCR noted that the inmate fled the hospital after throwing a blanket over the observing custody officer, and, after a pursuit, the inmate was detained

by local law enforcement. During the inmate's interaction with local police, he reportedly yelled, "Shoot me! Kill me man! I don't want to go back to prison!"

The inmate returned to CDCR and was admitted to the MHCB on June 24, 2019, for nine days and on July 5, 2019, for four days. The inmate subsequently endorsed suicidal ideation during a five-day follow-up contact on July 11, 2019; however, he was not referred to the MHCB. The following day, the inmate informed his ASU primary clinician he attempted suicide by hanging on July 11, 2019, and the clinician observed ligature marks around his neck. Additionally, a suicide note addressed to the inmate's family was found in his cell. The note included asking God for forgiveness, requesting burial next to his father, and expressing fears that other inmates were out to harm him. During onsite interviews, this ASU primary clinician reported that the inmate had a "deep hopelessness" and "appeared to be giving up on life" around this time. Upon transferring to the MHCB on July 12, 2019, the inmate informed staff he would attempt suicide again as soon as he had the opportunity. The inmate also stated he had enemies and that it would be "better to just end [his] life." MHCB staff appropriately referred the inmate to a PIP acute program.

The inmate received PIP acute treatment from July 23, 2019, through August 20, 2019. The SCR noted the inmate denied suicidal ideation upon arrival, requested discharge as soon as possible, and did not engage in self-harm during the PIP admission. The inmate did, however, continue to report anxiety and stress related to safety concerns. According to the SCR, half of the PIP clinical encounters were completed at the cell front, no group treatment was offered, and the inmate discharged to the EOP level of care when it was "not clinically justified." During onsite interviews, the inmate's PIP clinician indicated the inmate was "very paranoid" and "truly felt people were out to get him as he perceived a threat."

The inmate returned to his final institution on August 20, 2019, and he was admitted to the MHCB two days later for reporting suicidal ideation and ingestion of razor blades. During this final MHCB admission, the inmate reported hearing other inmates through the vents conspiring to cut off his head and rape him. The inmate was also observed shaking while stating he was scared other inmates were trying to get to him. The SCR noted that, although an officer reportedly spoke to the inmate about his safety concerns during the MHCB admission, the outcome of this discussion was not documented. The inmate was discharged to the EOP level of care on August 29, 2019; however, the SCR determined that the inmate would have benefitted from a referral to a higher level of care and that MHCB records "did not describe someone who was clinically appropriate for discharge."

During the last two weeks of the inmate's life, he was evaluated several times for reporting suicidal ideation and ingestion of foreign objects. There was at least one confirmed incident of self-harm during this period as well. According to the SCR, on

September 3, 2019, an excessive amount of dental floss was found in the inmate's cell, and the inmate informed his primary clinician he learned "string and soap can cut through metal." However, the reviewer noted that the clinician did not document whether they considered the inmate might have been preparing for another suicide attempt on this date. The SCR suggested the September 4, 2019 IDTT treatment plan was inadequate, as it included an inappropriate higher level of care non-referral rationale and failed to address the inmate's anxiety and paranoid thoughts. The reviewer added that the inmate required more intensive treatment that was not offered in an outpatient setting. On September 9, 2019, the inmate reported to his primary clinician that he was "scared of how he was going to die," and he explained that these fears resulted in a desire to take his own life "to get it over with." However, the inmate was not referred to a higher level of care. A wellness check was completed at the cell front on September 10, 2019, at which time the inmate stated he was "okay today." On September 11, 2019, the inmate was discovered hanging in his cell.

The SCR noted the inmate maintained "fair compliance" with psychiatric medications, which included buspirone (15 mg), fluoxetine (30 mg), hydroxyzine (50 mg), mirtazapine (45 mg), olanzapine (20 mg), and oxcarbazepine (1200 mg).

The inmate had a total of four documented suicide attempts in CDCR beginning in June 2018. The inmate also engaged in repeated acts of self-harm beginning in December 2008, which included cutting, headbanging, and foreign object ingestion and insertion. The SCR reviewed numerous suicide risk evaluations completed within 12 months of the inmate's suicide and consistently found multiple deficiencies. The reviewer determined the inmate's suicide risk was underestimated in 12 suicide risk evaluations, with "significant" underestimations of risk in three SRASHEs completed within two weeks of the inmate's suicide. Inadequate safety planning interventions were consistently identified in SRASHEs completed in August and September 2019. The SCR also found seven incidents of self-harm were not logged for tracking purposes in accordance with policy.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case.

The Special Master's expert determined the inmate's death was foreseeable. The inmate was prematurely discharged from MHCB two weeks before his death and subsequently demonstrated he could not be safely managed in the outpatient setting. The SCR and the Special Master's expert opined that the inmate's acute risk for suicide was high. However, although the inmate received multiple suicide risk evaluations within two weeks of his death, the SCR found clinicians repeatedly underestimated the inmate's

suicide risk, provided inadequate safety planning interventions, and failed to refer the inmate to a higher level of care as was clinically indicated.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined the inmate's death was preventable.  The SCR noted that the inmate was prematurely discharged from the PIP's acute program and the MHCB in August 2019.  The inmate was subsequently evaluated for suicide in the outpatient setting on multiple occasions without referrals to higher levels of care and adequate safety planning interventions.  During this timeframe, the inmate repeatedly endorsed suicidal ideation, engaged in self-harm, reported duress related to safety concerns and stated he should take his own life before other inmates have the opportunity.  The SCR also noted that one week prior to the inmate's suicide, the ASU EOP treatment team failed to refer the inmate to a "clinically warranted" higher level of care where he could receive "intensive treatment not offered in an outpatient setting." The Special Master's expert found that the likelihood of completed suicide might have been reduced substantially had CDCR staff accurately assessed the inmate's suicide risk and appropriately intervened during the last two weeks of the inmate's life.

IV.    Critique of Suicide Case Review Report

The SCR provided a detailed summary of this case with relevant social, criminal, incarceration, substance use and mental health history.  The SCR's evaluation of care was thorough and sufficiently critical of clinical practice concerns and Program Guide and policy violations.  Numerous deficiencies were identified in the SCR, and the reviewer appropriately addressed these concerns in their 18 recommendations for corrective action.

A review of CDCR's crime incident report suggested that, during emergency response, responding ASU custody staff placed the inmate in restraints prior to lifting the inmate's body and cutting him free of the ligature; however, cuffing of the inmate was not mentioned anywhere in the SCR report or timeline.  This concern should have resulted in further inquiry and corrective action, as the practice unjustifiably delayed lifesaving measures.

Additionally, the Special Master's expert found diagnostic clarification concerns in this case that were not addressed in the SCR, and this finding was relevant as an accurate diagnosis likely would have improved treatment decisions and care plans.

V.    Analysis of Quality Improvement Plan Process

This case resulted in one QIP for nursing and 18 QIPs for mental health.  The one nursing QIP addressed numerous missed safety observation checks in the PIP acute setting during July 2019.  In response to this QIP, the Chief Nursing Executive indicated a new safety observation weekly audit would be developed and that training would be provided.  The Special Master's Expert determined this QIP response was sufficient.

The mental health QIPs addressed MHCB and EOP contact compliance issues in February and April 2019; repeated failures to complete suicide risk evaluations and document self-harm incidents in accordance with policy at the final institution; failure to initiate suicide watch and complete a suicide risk evaluation, self-harm form, and treatment plan modification in response to an incident of self-injury in the PIP in April 2019; failure to document level of safety observation and allowable items during two acute PIP admissions in May and August 2019; multiple suicide risk evaluation issues identified during MHCB and acute PIP admissions; mental health contact frequency concerns and documentation issues in the acute PIP; multiple acute PIP discharge concerns in May and August 2019; a noncompliant emergent referral response in August 2019; the MHCB treatment team's inappropriate discharge to a lower level of care and failure to address safety concerns and refer the inmate to higher level of care in late August 2019; multiple suicide risk evaluation issues in August and September 2019; and incomplete five-Day Follow-Up documentation following MHCB discharge in August and September 2019.  Additionally, one of the mental health QIPs required the statewide SPRFIT to develop a self-harm tracking policy in the PIPs, as the SCR noted the lack of self-harm documentation "may have impacted suicide risk determinations" in this case.

The Special Master's expert reviewed the various institutions' responses regarding mental health QIP implementation and determined that seven were inadequate, despite CDCR's memorandum indicating the problems were resolved and that no further action was necessary.

QIP #7 required an audit of ten SRASHEs for each of the identified clinicians to determine the best course of action; however, the facility reported only that "a review" was completed for one of the two clinicians, and the results were not provided.  Further, there was no indication that remedial actions were implemented as the institution only reported a plan to provide training and mentoring at a later date.

QIP #8 addressed documentation issues and mental health contact frequencies in the acute PIP.  The responses for this QIP indicated mental health headquarters planned to complete a statewide work plan to address this issue in December 2019, that the institution would discuss increasing contacts and out-of-cell time, and that the Chief Psychologist would monitor compliance reports and require staff to pre-schedule appointments.  It was unclear whether the identified issues in the acute PIP were resolved

or whether remedial efforts are ongoing, as there was no additional information in the suicide case file.

QIP #10 required the acute PIP to review discharge concerns noted in the report, develop a local operating procedure, "establish a mentor process where all discharges are reviewed for clinical decision making," develop a tracking system to ensure the reviews occur timely, and collaborate with the regional mental health team to identify a new procedure for reviewing all discharges. However, while responses referenced a PIP integration plan that was in progress, the institution reported that their current process does not allow a supervisor to attend all IDTTs, that there is "still need for better oversight," and that a related draft memorandum had not yet been signed. As such, there was no documentation suggesting this QIP was successfully implemented.

QIP #12 addressed MHCB treatment concerns, inappropriate discharge, and failure to refer the inmate to a higher level of care two weeks prior to the inmate's suicide. While the institution submitted proof of practice indicating the identified MHCB staff were retrained on existing policies, the Special Master's expert determined local leadership should have been required to conduct post-training audits to determine whether this intervention resulted in improvements.

QIP #13 addressed numerous deficiencies identified in three separate suicide risk evaluations at one facility, including two that resulted in significant risk underestimations within two weeks of the inmate's suicide. The facility audited ten suicide risk evaluations for two separate clinicians and found that one clinician failed to meet requirements in all ten, while the other clinician produced only one suicide risk evaluation that met audit criteria. The facility provided a brief individual training to the identified clinicians and noted a plan to provide suicide risk evaluation mentoring at a later date. However, given the concerning audit results and the potential for very serious negative outcomes, the Special Master's expert determined the clinicians should not have conducted subsequent suicide risk evaluations without supervision until they demonstrated sufficient competency.

QIP #14 addressed missing safety planning interventions in five-day follow-ups completed within two weeks of the inmate's suicide. Despite records suggesting the facility very recently provided safety planning intervention training to their mental health staff, the corrective action only involved a brief individual retraining on the same subject matter. The Special Master's expert determined local leadership should have conducted post-training audits to observe whether performance improved or whether additional remedial efforts were indicated.

QIP #15 addressed the final institution's failure to refer the inmate to a higher level of care based on psychiatric symptom acuity during the last month of his life. The SCR required the facility to train all outpatient mental health staff on assessment of acute risk

and higher level of care needs; however, the institution's response to this QIP indicated training was limited to emailing training materials to staff. The Special Master's expert determined emailing training materials was insufficient. Further, higher level of care referral considerations and non-referral rationales should have been audited for a period of time after adequate training was provided.

Case K

I.    Summary of Case

This inmate was a 36-year-old Caucasian man who was found hanging in his solely occupied cell in the reception center on August 26, 2019, at approximately 1103 hours. Custody and medical staff implemented life-saving measures until paramedics arrived; however, the inmate remained unresponsive and was pronounced dead at 1118 hours. Although the inmate had an assigned cellmate, he was alone in the cell at the time of death. The inmate arrived at the reception center approximately 97 days prior to his suicide; he was not a participant in the MHSDS at the time of his death.

The reviewer indicated there was "minimal background information" available in the inmate's records. The inmate was born in Texas. His cellmate informed the reviewer that the inmate had a "dysfunctional family," that both of his parents abused substances and had criminal records, and that the inmate had a "scary" childhood. However, the inmate maintained communication with his mother during incarceration, and the SCR indicated that he called her on three occasions while in the reception center.

According to the SCR, the inmate's historical education and employment information were "scant" in records. Available information indicated that the inmate completed his GED during a prior prison term in 2010, worked minimally in "general labor" while in the community, and was unemployed and homeless at the time of his arrest for the commitment offense.

The inmate's substance abuse information was also limited. The inmate's suicide note and other records suggested he had a significant methamphetamine abuse history. The inmate participated in substance abuse treatment while in the community, although no further details were available.

According to the SCR, the inmate and his ex-wife were notified of court hearings related to their parental rights. The inmate's ex-wife also reportedly struggled with substance abuse issues. The SCR indicated that the inmate received paperwork related to the court hearing four or five days prior to his suicide.

The inmate had an extensive criminal behavior history. He spent time in juvenile hall as a minor, had three arrests and one prison term in Nevada between 2005 and 2008, and he

served one prior CDCR term between 2009 and 2012. His crimes included vehicle theft, burglary, stealing automated teller machines, and assaulting a peace officer with a deadly weapon (vehicle). His commitment offense involved several criminal acts completed over a five-month period in 2017 and 2018, including vehicle and property theft. The inmate received his second strike and was sentenced to 16 years in prison for the commitment offense.

According to the SCR, the inmate first accessed mental health services in county jail before his most recent prison term. The inmate met with a social worker at the county jail on May 13, 15, and 18 of 2019. County jail records indicated that although the inmate had no history of mental health treatment, he was "struggling emotionally with issues pertaining to his wife and children," was "mildly depressed," and was feeling "betrayed and abandoned." On May 15, 2019, the inmate discussed another inmate's suicide in the jail. The inmate's CDCR cellmate referenced this suicide during an on-site interview, wherein he stated, "His best friend in jail hung himself and it messed him up real bad." During his final contact with the county jail social worker on May 18, 2019, the inmate discussed "ongoing challenges" and processed his history and family relationships. However, there was some indication he was future-oriented and optimistic about "making a better life for himself" on this date. The inmate transferred to CDCR four days later. A county jail transfer document indicated that the inmate reported "anxiety about going to prison" on May 22, 2019; however, there were no further details provided and no indication he was referred to mental health for follow-up.

The inmate entered CDCR's reception center for his second and final prison term in May 2019, and he remained at the same facility until his suicide 97 days later. The SCR noted the reception center did not obtain or request the inmate's county jail records, and CDCR staff was not aware of his recent county jail mental health contacts or incarceration adjustment issues as a result. The inmate's Initial Health Screen and Initial Mental Health Screening Interview indicated he denied current and prior mental health concerns upon arrival at the facility, and he was not seen by mental health staff after the screens were administered. During on-site interviews, custody staff described the inmate as a quiet and "good programming inmate" who "kept to himself." The inmate reportedly had no RVRs, no problems with staff or other inmates, and no gang involvement.

There were no suicide risk evaluations completed for this inmate. The SCR indicated the inmate denied suicidal ideation and prior attempts in county jail and during CDCR mental health screenings.

On August 26, 2019, the inmate was discovered hanging in his cell. According to the SCR, the inmate left behind a brief suicide note, in which he referenced experiencing hatred toward himself, a sense of failure as a father and as a man, and a perception that he "wasted" his life on "drugs and crime."

II.     <u>Determination of Foreseeability</u>

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case. The Special Master's expert determined the inmate's suicide was not foreseeable. Although the inmate received treatment for "mild" depressive symptoms and incarceration adjustment issues while in county jail, the SCR suggested he consistently denied a history of suicide attempts, suicidal ideation, and prior mental health treatment. He also was never formally diagnosed with a mental illness.

III.    <u>Determination of Preventability</u>

The Suicide Case Review Committee did not provide a determination of preventability for this case. The Special Master's expert determined the inmate's suicide was not preventable based on available information. The Special Master's expert agreed with the SCR's finding that, although county jail records should have been requested and reviewed upon the inmate's arrival to CDCR's reception center, the standard of care departure was not proximate to the inmate's suicide, and there was insufficient information to suggest the availability of these records would have prevented his death.

IV.     <u>Critique of Suicide Case Review Report</u>

The SCR provided an adequate summary and assessment of precipitating events to the inmate's suicide, despite noting limited information at the time of their review. The reviewer also included relevant social, criminal, incarceration, substance use, and mental health history. Although there were no recommendations, the reviewer appropriately highlighted their concern regarding the reception center's failure to request county jail records upon arrival.

V.      <u>Analysis of Quality Improvement Plan Process</u>

There were no formal Quality Improvement Plans for this case. However, the reviewer noted the reception center "should review their local policy around requesting outside records and determine if any adjustments are necessary." The Special Master's expert believes a statewide QIP to address continuity of care issues resulting from unavailable county jail mental health records upon arrival at reception centers should have been required, as this issue was identified as a contributing factor to suicide in other 2019 deaths by suicide.

Case L

I.    Summary of Case

This inmate was a 32-year-old Hispanic/Latinx male who was discovered by correctional officers hanging in his solely-occupied ASU cell on January 11, 2019, at approximately 2132 hours.  According to the SCR, the inmate tied the end of a ligature to the top bunk in his orientation cell.  The SCR noted custody staff failed to activate their personal alarm device during emergency response.  Custody staff entered the unresponsive inmate's cell, cut the noose, and secured the inmate's arms and legs in metal restraints prior to implementing lifesaving measures.  The metal restraints were subsequently replaced with "plastic cuffs" to safely utilize the AED device.  During transport to the TTA, the medical response vehicle repeatedly malfunctioned by coming to a stop every few feet.  A second medical cart arrived and transported the inmate to the TTA, where he arrived around 2145 hours.  The inmate was pronounced dead at 2206 hours.  The inmate was a new arrival to ASU for safety concerns.  He was receiving mental health services at the 3CMS level of care at the time of his death.

According to the SCR, the inmate was born and raised in Central California.  He was the youngest of five children.  The inmate previously reported that his father was an alcoholic and a domestic violence abuser.  Although the inmate did not graduate from high school, he completed his GED and two years of community college.  The inmate worked in plumbing, construction, and restaurants prior to his incarceration for the commitment offense.

The inmate never married.  He had one daughter with a former girlfriend.  According to the SCR, the ex-girlfriend informed law enforcement the inmate was abusive on several occasions.  She attributed the inmate's violent behavior to methamphetamine use and "possibly psychological disorders."  There was minimal information regarding substance use in the SCR.  The reviewer noted that the inmate had a history of using alcohol, tobacco, and ecstasy prior to age 18 and that he used methamphetamine for the first time at age 22.  It appeared there was a period of abstinence, as the SCR referenced a relapse on methamphetamine around the time of his arrest for the commitment offense.

The SCR's description of the inmate's criminal history was difficult to follow.  The inmate previously reported involvement in the criminal justice system as early as age 14, although his first arrest on record occurred at age 17.  As an adult, the inmate incurred charges for willful child cruelty and assaulting a child under the age of eight; however, it appeared these charges were later dismissed.  Although the reviewer referenced two prior prison terms and indicated the inmate had an "extensive criminal history," the behaviors and convictions resulting in incarceration were not clearly stated.  The inmate received a 12-year sentence for the commitment offense, which involved evading a peace officer

causing serious bodily injury, hit and run causing injury of a person other than self, and false imprisonment with violence.

The inmate entered CDCR for his third and final prison term in November 2017. During his incarceration, the inmate worked in the dining room, garment factory, and kitchen. He also held jobs in masonry and as a porter. The inmate received a total of nine RVRs during his most recent prison term; all were received between December 2017 and December 2018. Only the December 2017 RVR involved violent behavior. The SCR was unclear regarding the inmate's SNY status; however, it appeared the SNY designation might have carried over from a prior prison term. Still, the inmate continued to voice safety concerns between May 2018 and January 7, 2019. The reviewer noted the inmate was uncooperative with custody staff when they attempted to address his safety concerns. According to the SCR, the inmate contacted a sexual assault hotline on January 6, 2019, to report staff threats. On January 7, 2019, four days prior to his suicide, the inmate was placed in ASU for his safety after he alleged three inmates had made sexual comments toward him. The inmate reportedly had no visitors and no other phone calls during his current term.

The SCR indicated the inmate had no record of mental health treatment prior to incarceration. During the inmate's first prison term in 2011, he endorsed auditory hallucinations, had multiple Outpatient Housing Unit (OHU) placements, and two MHCB admissions. The SCR suggested the inmate's hallucinations may have been related to methamphetamine use around that time. The inmate also accessed mental health services during his second prison term in 2014, at which time he was diagnosed with Depressive Disorder, NOS, and included in the 3CMS level of care. After returning to CDCR for his third term in November 2017, the inmate met with mental health staff on at least four occasions prior to MHSDS inclusion. In March 2018, the inmate requested 3CMS level of care and reported his daughter was removed from the home by Child Protective Services (CPS); however, the SCR noted the inmate transferred to a desert facility in April 2018 "before the initial mental health evaluation to re-evaluate his level of care was completed." In May 2018, the inmate submitted a written request for antidepressant medication. He subsequently reported agitation, sleep disturbance, and being "bed-bound" as a result of migraines, tinnitus, and chronic pain. Mental health staff subsequently responded to an urgent referral in June 2018 and noted the inmate complained of vertigo and chronic pain. The SCR indicated the inmate was also experiencing conflicts with custody staff around this time.

On July 6, 2018, the inmate was included in the MHSDS at the 3CMS level of care. The SCR found that a psychiatric diagnosis was not documented during this time, despite the inmate reporting symptoms of anxiety and depression for a "few months" and the clinician noting he suffered from moderate depression. The 3CMS psychiatrist diagnosed the inmate with Borderline Personality Disorder, noted he had "unrealistic expectations of situations/others," and prescribed no medication.

69

Between August and September 2018, the inmate's symptom severity and functioning appeared to worsen.  In August 2018, the inmate was admitted to the MHCB level of care after reporting, "I felt like killing myself.  I had the blade open and thought about doing it, killing myself."  The inmate attributed his psychiatric symptoms to chronic pain, including his depression, anxiety, and desire to die.  The MHCB treatment team diagnosed the inmate with Dysthymic Disorder, prescribed antidepressant medication (mirtazapine 15 mg), and discharged the inmate to 3CMS level of care after ten days.  A brain computerized tomography (CT) scan was ordered during the MHCB admission, although the SCR noted the order was "not properly reconciled during the transfer process," and it was never completed.  On September 13, 2018, approximately two weeks after MHCB discharge, the 3CMS psychiatrist began tapering the inmate's mirtazapine due to reported weight gain, and the provider documented a plan to replace the medication with another antidepressant (sertraline).  However, the psychiatrist never followed up regarding the new medication, and the inmate was not prescribed psychotropic medication again.  The SCR also noted there was no psychiatrist in attendance at the inmate's subsequent IDTT in October 2018.

The inmate met with mental health staff in response to a self-referral related to symptoms of anxiety and depression on September 18, 2018.  On September 21, 2018, the inmate submitted a medical request form, noting it was his third attempt to "get an appointment and follow up on CT scan."  On September 27, 2018, the inmate threatened to harm himself or others, expressed safety concerns, and requested MHCB placement.  Although a counselor reportedly tried to address the inmate's safety concerns on this date, the SCR noted that the inmate responded to each suggestion with "another form of violent threat."  The SCR found that the inmate was not evaluated for "suicide risk or MHCB placement" on this date, despite his threats of harm, recent MHCB discharge, and recent antidepressant medication discontinuation.  There was also no referral submitted for psychiatry.

The Special Master's expert reviewed the inmate's most recent treatment plan, dated October 24, 2018, and found only depressed mood was included as a treatment target.  The planned intervention to foster a therapeutic alliance and provide empathy was insufficient.  The inmate's anxiety and chronic pain were not addressed in the treatment plan, despite the inmate identifying these issues as triggers for suicidal ideation.  The inmate's RVR behaviors also were not considered, which was especially concerning given the inmate received four RVRs since his inclusion in the MHSDS two months prior.  The 3CMS level of care justification stated only that the inmate "has ongoing depression," and he was not considered for a higher level of care.  The 3CMS treatment team also changed the inmate's diagnosis to Adjustment Disorder, with mixed disturbance of emotion and conduct, despite evidence of a more serious mental disorder; this diagnosis was retained until his suicide in January 2019.

The SCR offered inconsistent descriptions of the inmate's presentation during the last months of his life. In one section, the reviewer noted a stable presentation without "decompensating mental health symptoms in the several months leading to [the inmate's] suicide." In another section, the reviewer stated, "In the last six months of [the inmate's] life, he indicated an increase in depression and anxiety attributed to chronic medical concerns and conflicts with CDCR staff and other inmates."

One day prior to the inmate's suicide, he submitted a request form indicating he wanted to speak with mental health staff about his confused thinking and his hearing going out. On the date of the inmate's suicide, custody staff submitted an emergent mental health referral in response to the inmate reporting suicidal thoughts. Custody officers informed the evaluating clinician the inmate reported auditory hallucinations and asked, "Is that real?" and "Are you talking about me?" on this date. The SCR indicated the clinician attempted to interview the inmate in a holding cell located in the middle of the dayroom floor in ASU "without accommodating for confidentiality." The inmate did not respond to the clinician's questions during the non-confidential interview, although he repeatedly asked custody when he would be released to his cell. The clinician ultimately cleared the inmate to return to his cell without completing a mental status exam and ensuring his safety, and the inmate completed suicide later that evening.

The SCR referenced two undated suicide notes discovered in the inmate's cell posthumously, both of which provided further evidence of psychotic symptoms around the time of his death. The inmate wrote, "Everyone is looking at me crazy…and whispering like this is some kind of crazy place" and "I have nothing to lose, and more so I'm going to die in this cell because that's what the people want me to do to die in this cell." The SCR hypothesized the inmate might have been abusing stimulants around the time of his death, considering he had a documented history of psychotic symptoms during periods of methamphetamine use. However, the medical examiner's toxicology screen found no evidence of substance use.

During the inmate's final month, he requested medical services twice for "severe gastrointestinal discomfort," including bloody stool, stomach pain, and vomiting; however, the SCR noted he refused a related medical exam that was offered on the date of his suicide. The SCR referenced an undated letter found in the inmate's cell that suggested he was dissatisfied with medical staff and that they had referred to him as "J-Cat" and "weirdo."

The SCR provided a critique of several suicide risk evaluations completed within a year of the inmate's suicide. The inmate had three prior suicide attempts noted in the record, with the most recent involving an attempted hanging during a prior prison term in 2009. The reviewer noted inadequacies in all of the SRASHEs reviewed, including risk formulations and justifications, safety planning, information integration, and incomplete sections that were necessary for determining suicide risk. The SCR found that the

71

inmate's November 26, 2018 SRASHE provided inaccurate suicide risk information, outdated mental status examination data pulled forward from a prior SRASHE, and inadequate safety planning that was limited to one statement, "[Inmate] will report suicidal ideation to staff in living unit."

The Special Master's expert reviewed the inmate's final suicide risk evaluation in the electronic health record, as the SCR did not review the document for accuracy. The Special Master's expert determined the clinician underestimated the inmate's acute suicide risk on the date of his suicide, likely due to insufficient record review. The clinician marked "no" for several acute risk factors that were in fact present, documented no history of suicidal ideation or suicide attempts in CDCR, and provided misleading information regarding protective factors. Additionally, the clinician did not complete a mental status examination, and there was no indication the inmate was no longer experiencing thoughts of suicide when he returned to his cell on this date.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case.

The Special Master's expert determined the inmate's death was foreseeable based on available information. The inmate's prior suicide risk evaluations were deemed inadequate by the SCR, and the numerous omissions and inaccuracies offered misleading information for subsequent clinicians to consider in determining risk and necessary interventions. The Special Master's expert reviewed the SRASHE completed on the date of the inmate's suicide and found the clinician underestimated the inmate's acute suicide risk factors, overestimated his protective factors, and inaccurately stated he had no prior suicidal ideation or suicide attempts in CDCR. The clinician likely would not have cleared the inmate to return to his cell without further assessment and intervention had they been aware of his suicide history and actual suicide risk on the date of his death.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case.

The Special Master's expert determined the inmate's death was preventable based on the following information. The inmate reported symptoms of depression and anxiety that were exacerbated by chronic pain, perceived inadequate medical care, and safety concerns since his inclusion in the MHSDS in July 2018. At times, he experienced increased hopelessness, thoughts of suicide, and psychosis, and he often sought mental health intervention to address these concerns through self-referrals and reports to custody. However, clinicians did not appear to have an adequate conceptualization of this case,

and they failed to resolve diagnostic uncertainties, consider higher levels of care when criteria were present, provide appropriate monitoring and follow up by psychiatry, accurately assess suicide risk, develop effective safety planning, ensure care continuity, and provide evidence-based interventions to address depression and chronic pain.

The Special Master's expert reviewed the inmate's most recent treatment plan and found it was seriously deficient, as it only offered one generic intervention for depression while failing to address the inmate's chronic pain, suicidal ideation, RVR behaviors, and anxiety. Mental health staff also failed to advocate for the inmate by consulting with medical staff regarding his scheduled CT scan and other medical issues, despite the impact these concerns had on his mental status. On the date of the suicide, custody staff appropriately referred the inmate for an emergent mental health contact due to suicidal ideation and statements suggesting possible paranoia and auditory hallucinations. However, as the SCR noted, the evaluating clinician only offered a non-confidential interview in the middle of the ASU dayroom floor, despite evidence of paranoia. The Special Master's expert agreed with the SCR's findings that the decision to return the inmate to his cell was not appropriately justified. It appeared the clinician did not conduct a thorough chart review on this date, as the clinician documented that the inmate had no prior suicidal ideation or suicide attempts in CDCR, despite numerous documents indicating otherwise. There was also no documented plan or resolution to the inmate's reported suicidal thoughts and psychotic symptoms on this date. Lastly, the SCR noted the inmate was able to use the top bunk in his ASU orientation cell as a "tie-off point" due to a gap located behind the bed.

IV.    Critique of Suicide Case Review Report

The SCR was marginally adequate. At times, the report was difficult to follow, and the Special Master's expert had to rely on the electronic health record for missing information and clarification. Problem areas included incomplete historical information, conflicting descriptions of the inmate's presentation during the last few months of his life, and insufficient critique of treatment plans, progress notes, and initial assessments. Additionally, although the SCR offered a fairly detailed review of prior SRASHEs and noted concerns during the crisis evaluation process on the date of his death, the reviewer failed to assess the accuracy of the final SRASHE. Lastly, the reviewer did not address delayed emergency response interventions during the initial metal cuffing of the unresponsive inmate's arms and legs and again when custody changed the metal cuffs to plastic restraints in order to safely use the AED.

V.    Analysis of Quality Improvement Plan Process

This case resulted in 14 required QIPs. The reviewer also noted issues during the emergency response that did not result in QIPs, including a delay in increased oxygen flow rate in the TTA and failures to initiate C-spine and a blood glucose level. The

Special Master's expert determined additional QIPs were needed to address diagnostic clarification issues, inadequate care collaboration and coordination, deficient treatment plans, poor case conceptualizations, and the treatment team's failure to provide effective and evidence-based treatments for depression, suicidal ideation, and chronic pain.

There were six QIPs required for mental health that focused on the following: the clinician's failure to complete a SRASHE in accordance with Program Guide requirements in September 2018; the psychiatrist's failure to follow up with the inmate after documenting a plan to consider a different antidepressant medication in September 2018; psychiatry's absence during the October 2018 IDTT; failure to provide a psychiatric diagnosis upon MHSDS placement; numerous suicide risk evaluation deficiencies found in SRASHEs completed in June, July, August, September, and November 2018; the clinician's failure to complete a mental status exam, offer a confidential interview, and document a sufficient rationale for clearing the inmate to return to his cell on the date of his suicide; and inadequate safety planning.

The five QIPs required for custody addressed the gap behind the upper bunk in the ASU orientation cell that was used as a tie-off point for the ligature; custody staff's failure to follow policy by activating their personal alarm device during emergency response; delayed TTA transport during emergency response caused by a malfunctioning emergency response cart; incident reporting documentation issues; and ASU staff's failure to document morning huddles in the unit's isolation logbook in accordance with policy.

There were three QIPs required for nursing that targeted poor documentation during emergency response; failure to document Narcan administration in the Medication Administration Record (MAR); and failure to ensure the inmate received a CT scan that was approved in August 2018 by reconciling the order during the transfer process.

The Special Master's expert reviewed all QIP responses and proof of practice materials for the identified facilities and determined QIP implementation was adequate for all disciplines.

## Case M

### I. Summary of Case

This inmate was a 32-year-old African American male who was discovered unresponsive and hanging from an extension cord tied to the top bunk in his solely occupied cell on September 20, 2019, at 0445 hours. According to the custody emergency response timeline, the first responding officer could not use his radio to notify central control due to a depleted battery. The timeline also suggested custody staff yelled to the control booth officer to active their personal alarm device (PAD) instead of activating their own,

that custody failed to retrieve the full cut down kit from the control booth, and that there was a six-minute delay in requesting an emergency response vehicle. The inmate was transported to a community hospital, where he was pronounced dead at 0604 hours. The inmate was not a participant in the MHSDS at the time of his death.

According to the SCR, the inmate was raised by his biological parents until his grandmother became his guardian. The inmate's mother reportedly abused alcohol and was physically and emotionally abusive. The inmate's father was incarcerated for bank robbery, and his mother was incarcerated for attempted murder during the inmate's adolescence.

The inmate received his high school diploma while in custody at the CYA. Regarding employment history, the SCR noted only that the inmate detailed motor vehicles at age 19 and that he was unemployed at the time of his arrest. Substance use information was limited in the SCR, as the reviewer only noted that the inmate experimented with wine at the age of 11, marijuana at the age of 14, and morphine and ecstasy during his "late teenage years."

According to the SCR, the inmate had been gang-involved since childhood, and he was arrested for the first time at age 13. At the age of 16, the inmate was arrested for robbery and assault with a deadly weapon, tried as an adult, and sentenced to two years in prison. The inmate subsequently violated his probation conditions for possession of cannabis, and he received an additional three years of probation. In 2007, the inmate was reportedly involved in the murder of two victims, although he was not convicted of this crime until 2012. The inmate pleaded guilty and was sentenced to life without parole for first- and second-degree murder and for a felon in possession of a firearm.

The inmate entered CDCR for his second and final prison term in January 2012. In 2014, the inmate received an SNY designation at his request; however, the SCR noted the inmate was involved in a "Security Threat Group II" and acquired multiple enemies for threatening and carrying out gang-related violence between 2015 and 2017. The inmate received a total of nine RVRs during incarceration, of which seven involved violence and two involved controlled substances. The inmate's most recent RVR was issued for battery on an inmate with a deadly weapon in September 2018, and this offense resulted in eight years added to his sentence. The SCR noted the inmate worked as a member of the yard crew, although a timeframe for this job assignment was not provided. During incarceration, the inmate remained in contact with his grandmother, girlfriend, and his three children. The inmate received a total of nine visits, the most recent of which occurred with his sister in September 2019.

According to the SCR, the inmate had no history of mental health treatment in the community. The inmate accessed mental health services for the first time at a desert institution in April 2015. At that time, he submitted a request form indicating he suffered

from "Bipolar Disorder" and wanted "help." Although he was not included in the MHSDS, a clinician met with the inmate in April and May 2015 in response to the inmate's request for services. In August 2015, the inmate submitted another request indicating he was "miserable" and experiencing "a lot of mental highs and lows." The inmate was subsequently included in the MHSDS at the 3CMS level of care in September 2015 to address his anxiety, sadness, lethargy, anhedonia, isolation, and sleep difficulties. The SCR indicated staff planned to provide Cognitive Behavioral Therapy (CBT) to achieve a treatment goal of mood regulation. The inmate was also prescribed antidepressant medication in December 2015. The SCR noted the inmate participated in 3CMS treatment and exhibited improvements between April 2016 and August 2018. In August 2018, the inmate requested discontinuing his psychotropic medication and began preparing for discharge from the MHSDS. The inmate subsequently received an RVR in September 2018, which resulted in an additional eight years added to his sentence. The inmate also began refusing mental health treatments offered in the STRH around this time. The inmate's primary clinician retained the inmate in the MHSDS for further monitoring during his transition out of the STRH unit. The inmate's psychiatric diagnoses of Adjustment Disorder with mixed Anxiety and Depressed Mood and Adult Antisocial Behavior remained unchanged during his inclusion in the MHSDS between September 2015 and April 2019.

The inmate transferred to his final institution in April 2019, and he was removed from the MHSDS following an initial evaluation and IDTT on April 9, 2019. The SCR suggested the rationale for removal was appropriate at that time, as the IDTT determined the inmate met his treatment goal and was no longer exhibiting mental health symptoms. The inmate had no further contact with mental health staff after this date. The inmate also had no further altercations with other inmates or staff.

According to the SCR, custody staff reported the inmate was "productive and respectful" and "always smiling." The reviewer referenced a JPay correspondence from September 15, 2019, that indicated that the inmate was "not in a good headspace" and that his grandmother was ill. A subsequent JPay message on September 17, 2019, suggested the inmate was more hopeful, that he planned to make some "mental changes" in his life, and that he would attend yard, exercise, and "get some fresh air." The inmate's cellmate of one year moved out of their shared cell one day prior to the suicide. The former cellmate informed the reviewer that the inmate was "really stressed" and "deeply upset by the lack of visits" from his children. However, this information was not reported to staff. The inmate was found hanging on September 20, 2019. The suicide note discovered in the inmate's cell suggested the inmate was experiencing guilt and that he believed suicide was "the only way" to make amends for his "wrongs."

The SCR noted the inmate consistently denied prior suicide attempts, self-harm, and suicidal thoughts. As such, there was only one SRASHE available for review. The results of the January 24, 2017 SRASHE indicated the inmate's chronic and acute suicide

76

risk was low. The reviewer noted that the accompanying risk justification and safety plan were inadequate and that the Columbia Suicide Severity Rating Scale was not appropriately integrated into the narrative. The suicide prevention safety plan was also concerning, as it was limited to one statement that read, "Currently safe."

II.   Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination regarding foreseeability for this case. The Special Master's expert determined the inmate's death was not foreseeable.

III.   Determination of Preventability

The Suicide Case Review Committee did not provide a determination regarding preventability for this case. The Special Master's expert determined the inmate's death was not preventable.

IV.   Critique of Suicide Case Review Report

The SCR provided an adequate summary of this case with relevant social, criminal, incarceration, substance use, and mental health history. The SCR included a review of relevant components of care over time and appropriately noted concerns with the 2017 SRASHE and suicide prevention safety plan. However, these issues did not result in a QIP as they were not proximate to the inmate's suicide. While the SCR's recommendations were consistent with the report findings, the Special Master's expert determined the reviewer failed to identify a few additional emergency response issues that required further inquiry and QIPs.

V.   Analysis of Quality Improvement Plan Process

The SCR recommended one QIP to address custody staff's failure to follow the policy of retrieving the complete cut-down kit during emergency response. The Special Master's expert determined the identified facility's QIP implementation was appropriate.

The Special Master's expert determined further inquiries and QIPs were needed to address additional concerns noted in custody staff's emergency response timeline. First, although the SCR reported that the responding officer activated his personal alarm device after discovering the inmate unresponsive, the custody timeline indicated that the officer instead yelled to the control booth officer to activate their personal alarm device. Second, a depleted radio battery rendered the first responding custody officer's radio "unusable," which prevented the officer from announcing the emergency to the central control officer. Third, although it may be related to the radio malfunction, there was a six-minute delay in requesting an emergency response vehicle after the inmate's body was discovered.

Case N

I.     Summary of Case

This inmate was a 52-year-old Caucasian man who was found face down in a pool of blood in his solely occupied ASU cell by a correctional officer on January 6, 2019.  Staff responded, CPR was initiated, and he was transported to the Triage Treatment Area. Exsanguination secondary to laceration was the cause of death.  He was not a participant in the MHSDS at the time of his death.

The inmate was born in Germany and was raised by his biological parents.  He had little contact with his biological father after he moved to the United States at age five.  He received his GED.  He previously worked in plumbing, the heating industry, and telemarketing.  He did not marry or have children.  His substance abuse history began in high school, included cannabis and methamphetamine, and was described as a "significant contributing factor" to the commitment offense.  The autopsy report dated May 14, 2019, indicated the presence of methadone in the inmate's blood, but no other common acidic, neutral, or basic drugs were detected, including ethyl alcohol.  He did not have a juvenile arrest history.  He was first arrested in 1990 for assault with a deadly weapon.

The inmate entered the CDCR in April 1994 for second-degree murder with a firearm. He was serving an 18-year-to-life sentence.  During his incarceration, he received approximately 28 RVRs; the most recent on October 17, 2018, for in custody attempted murder.  This RVR resulted in an additional 12-year sentence.  The inmate held several work positions while incarcerated.  He was also affiliated with a gang during his incarceration.  He reported believing he would not be paroled, and the BPH referenced his lack of interest in proactive programming.  He had six opportunities to appear before the BPH but attended only one on August 23, 2007.  His view of the hearing was reflected in the following statement made during a psychological evaluation in 2005: "I am never going to get parole."  He was given a denial during a hearing on May 30, 2018 and deferred for 15 years.  He was not referred to mental health after receiving the parole deferral or the 12-year sentence.

The inmate's property revealed correspondence with his mother, his most supportive relationship.  His brother told him that his mother passed away on May 8, 2018, and the inmate told his brother, "I don't know how much longer I am going to last."  The inmate sent packages of family photos to his brother after his mother's death, and his brother reportedly called the prison to inquire about his well-being; he was informed that he was "fine."  His brother was not surprised that the inmate had committed suicide, saying, "After our mom died, it seemed like it was going to happen."  His brother visited him for the last time on November 17, 2018.

The inmate denied prior suicide attempts and suicidal ideation during the course of routine mental health screenings during his incarceration. He was never a participant in the MHSDS, and he was only seen once by mental health during his 24-year incarceration at CDCR. He met with a social worker on November 16, 2016, after expressing frustrations with his medical care. He received routine periodic psychological evaluations in 1998, 2005, 2007, and 2012 as part of the BPH process. Diagnoses included polysubstance dependence in a controlled environment and adult antisocial personality disorder. He had several medical problems, including chronic pain, although that was not believed to be a significant driver of his suicide. The suicide report notes a lack of hope, loss of support, and use of violence as the inmate's primary means of conflict resolution.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was potentially preventable. There were a number of significant stressors leading up to the suicide, including the death of the inmate's mother, who was his primary source of support, the denial of parole, and the receipt of a 12-year additional sentence. It is possible that timely referral to mental health for assessment might have detected an elevated risk had they occurred, and successful interventions might have happened, notwithstanding the inmate's general lack of engagement over the course of his incarceration.

IV.    Critique of Suicide Case Review Report

The SCR was an accurate summary of this case. The SCR included relevant social, criminal, incarceration, and substance use history. It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

With regard to the lack of mental health follow up after the inmate was denied parole in May of 2018 and after he received a 12-year sentence, the SCR report indicated that a procedure was in place for nursing to screen all inmates returning from court for bad news and mental health symptoms, including suicidality, and that referrals are made to mental health as necessary. It was unclear whether this screening occurred in this

instance, and that should have been further explored. The inmate's brother reported concern about the inmate giving away possessions in the time leading up to his suicide and having called the facility to inquire about his well-being and being told that he was "fine." He could not recall the name of the person he spoke with, and there were apparently no records concerning this potentially significant event.

V.    Analysis of Quality Improvement Plan Process

This case resulted in four required QIPs. The first QIP regarded no mental health contact after being denied parole in May 2018 and after receiving an additional 12-year sentence for assault with a deadly weapon during his incarceration. As a result, mental health staff received training on the policy regarding BPH clinical follow-ups on April 11, 2019, and training on the Release of Information call-in line policy and procedure, also on April 11, 2019.

The second QIP regarded a nine-minute time lapse between the initial time that staff requested a Code 3 ambulance at 0245 hours and the time of the actual call to request EMS at 0254 hours. As a result, this was addressed during a training on report writing on March 20, 2019.

The third QIP regarded an inadequate timeline of significant events on the CDCR 837s submitted by responding staff. There were also discrepancies in timeline entries between reports that were submitted by responding staff. As a result, atomic clocks were purchased and deployed in all Program Lieutenant Offices, Watch Office, Central Control, B-1, Mental Health Crisis Bed, and 64-Bed, to prevent different times being reported. Staff previously used standard wall clocks or a wristwatch to report times, although these devices display different times.

The fourth QIP regarded an approximately three-week time-lapse between the time the Institutional Classification Committee action was finalized on December 19, 2018 and the time that the Statewide Scheduling Transportation Unit requested a bus sheet for the inmate's transfer. The response indicated agreement that the delay in transporting the inmate appeared to be "lengthy or untimely." As a result, training was to be provided to all Correctional Counselor II (CC-II) Supervisors/Specialists to ensure proper procedures are followed. A memorandum detailed the appropriate response in these situations.

The QIPs and the responses were generally adequate.

Case O

I.    Summary of Case

This inmate was a 38-year-old Caucasian woman who was found by her cellmate hanging in her shared cell on August 26, 2019. A custody officer was notified, responded, and called for a Code 1 medical emergency, and 911 activation was requested. Responding staff cut down the ligature and initiated CPR. The inmate was receiving mental health services at the 3CMS level of care at the time of her death.

The inmate was raised by both of her parents in southern California. Her parents divorced when she was a teenager, and she subsequently lived with her mother. Her father was reported to abuse alcohol, and she eventually lost contact with him. Records suggest a history of physical and sexual abuse; her alcohol abuse coincided with the outset of the abuse. She graduated from high school and spent six months at a community college. When she was 18 years old, she had a daughter with her undocumented immigrant boyfriend. He left the U.S. shortly after the daughter's birth. During this time, her emotional distress and alcohol use intensified. The inmate reported that by 2016, she was regularly consuming a 750 ml bottle of hard alcohol each evening. Her brother is incarcerated in CDCR, and they had occasional contact through letters. The inmate was arrested nine times over 15 years for alcohol-related, non-violent offenses. She received probation for each offense and spent a total of 43 days in jail.

The inmate entered CDCR for her first and only term in November 2018 for assault with a semiautomatic firearm with multiple enhancements for abuse/endanger health of a child, discharge firearm into inhabited dwelling, and criminal threat to great bodily injury/death. She was serving a 16-year sentence, and her earliest possible release date was December 10, 2032. She did not receive any RVRs during her incarceration. During her term, she attended college classes and worked as a sewing machine operator.

The inmate was seen by medical staff for chronic lower back pain treated with Ibuprofen, Capsaicin, and physical therapy.

The inmate reported one prior suicide attempt at age 13 by overdose, but she also reported inconsistent information about her suicidal history and intermittent suicidal ideation following her arrival at CDCR. She reported a history of depression, anxiety, and anger issues that she apparently tried to mask with extensive alcohol use. Her alcohol consumption affected her sleep, and she was prescribed medication for insomnia. There are no records that she received any formal substance abuse treatment. The county jail records indicate she was diagnosed with mood disorder unspecified, psychosis unspecified, and noted insomnia, and there are no documented suicide attempts or self-harm behaviors. She was treated with hydroxyzine and quetiapine, but records indicated frequent refusal of prescribed medications.

81

She reported suicidal ideation but had no known suicide attempts at CDCR. Following her reception screening, reports of difficulties with other inmates, increasing realization of her sentence, and difficulties surrounding adjustment to prison life, the inmate was included in the MHSDS at the 3CMS level of care. During her incarceration, she was diagnosed with alcohol abuse, severe; adjustment disorder with mixed anxiety and depressed mood; and borderline personality disorder. She was treated variously with haloperidol, olanzapine, aripiprazole, quetiapine, escitalopram, and mirtazapine with inconsistent adherence and multiple requests for medication changes. Her early incarceration was characterized by requests for bed moves and requests to be seen by mental health. She reported conditional suicidality if she was unable to speak to the sergeant about a bed change and ongoing difficulty with cellmates. During mental health contacts in connection with these requests, she denied suicidality. She was granted a change to a different unit. She had subsequent frequent clinical contacts and expressed the desire to obtain quetiapine and higher dosages of haloperidol. Many psychiatry notes observed her to exhibit "intimidating" and medication-seeking behavior. She reported anxiety, depression, racing thoughts, auditory hallucinations, pounding chest, and paranoia. Other inmates described that she did not engage with others, kept to herself, and did not have friends on the unit.

After reporting suicidal ideation with depression, anxiety, and an intent to hang herself, she was referred to an MHCB on April 19, 2019. Treatment goals were to address her anxiety, depression, and suicidal ideation. She was discharged from the MHCB back to the 3CMS level of care on April 26, 2019. She later expressed her desire to discontinue her medication, and they were stopped on June 4, 2019. She submitted 22 Healthcare Services Request Forms related to her wish to be seen by a psychiatrist for medication concerns and that her mental health needs were not addressed. Although responses to these referrals were found to be within the required timeframes for routine referrals, some should have been identified as urgent referrals.

The inmate received seven suicide risk evaluations at CDCR. Chronic and acute risk were both assessed as low or moderate on all occasions. It was unclear why substance abuse treatment was not part of her treatment goals and safety plans. Her last documented mental health appointment to see a psychologist was on July 30, 2019, but she declined to attend. Prior to that, her last mental health appointment where she was seen was on July 25, 2019.

The inmate had an anticipated visit with her daughter on August 24, 2019, but she was denied visitation access due to "pending approval." During a phone call with her daughter the next day, which was the last time they spoke, she said she felt "pretty depressed yesterday" and "really stressed out and depressed." She ended the call by saying "I love you" and "I will try to call you this week coming up." Her daughter said this conversation was not out of the ordinary. Her daughter was asked what might have contributed to her mother ending her life, and her daughter said her mother's inability to cope with depression without alcohol and being incarcerated. Her cellmate at the time of

her death reported that the inmate said she "couldn't do this" when discussing the length of her sentence but that she did not make statements about ending her life. In her last entry for her creative writing course on the day of her death, she wrote, "I recently discovered that my life seems to get worse on a daily?. . .I've decided I'm done!" The instructor reviewed the entry the following day and reported it to the institutional staff the day after her suicide.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death not preventable. Substance abuse treatment should have been included in both treatment and safety planning, but this did not rise to the level of rendering the suicide preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an accurate summary of this case. The SCR included relevant social, criminal, incarceration, substance use, and mental health history. It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in two required QIPs, which were consistent with the findings of the SCR. The first QIP was related to the lack of substance abuse treatment as a recommendation for this inmate, given her extensive history with alcoholism, medication-seeking behaviors, and Alcohol Use Disorder diagnosis. As a result, the institution planned on providing supplemental training on best practices in the integration of substance use assessment data in treatment planning and documentation for all primary clinicians. Then, the training effectiveness was to be measured through an audit of treatment plan documentation from a sample of inmates with a substance use disorder diagnosis. A committee was to monitor progress until the training material had been integrated into treatment planning documentation. In addition, the chief of mental health and chief psychologist met with Integrated Substance Use Disorder Treatment (ISUDT) nursing staff on November 4, 2019, where it was found that improved referral coordination of substance use services needed a local meeting of current provider stakeholders.

The second QIP related to the 22 Health Care Services Requests that were submitted by the inmate. Seven were submitted between April 29, 2019, and May 31, 2019. The requests were responded to within policy timelines for routine referrals, although there were referrals that were not processed and identified as urgent, and the psychiatric consult order was not utilized to schedule an appointment. The errors are not consistent with Program Guide timelines and the institution's local operating procedures. As a result, the institution reinstated a nursing triage process for mental health referrals. There was to be a monitoring process for timely healthcare request processing. Training regarding recognition of mental health symptoms and decompensation signs was to be provided to nursing staff who process healthcare requests at the institution.

Although the QIPs were consistent with issues identified in the review, and the cover memorandum to the final QIP report indicated that QIP items had been completed, there was no documentation that the planned corrective actions outlined were taken. The QIP report indicated that follow-up was to be provided within 90 days of November 19, 2019. The statewide mental health program leadership accepted the report on November 26, 2019, despite the lack of implementation of the required QIPs. The Special Master's expert requested information from CDCR regarding follow-up on the QIPs as part of developing this report. Results from that request yielded additional information concerning substance abuse treatment and training for nursing staff processing healthcare requests on recognizing mental health symptoms and signs of decompensation. The substance abuse treatment training appeared responsive to the QIP's requirement but took place in January and February 2020, after the acceptance of the report by mental health leadership. While relevant in content and dated November 2019, the nursing training was not accompanied by sign-in sheets or other proof of attendance for relevant staff.

Case P

I.   <u>Summary of Case</u>

This inmate was a 48-year-old African American man who was found by correctional officers hanging in his single cell in condemned housing on August 29, 2019. Because the noose was anchored to the door, staff could only partially open the door until they cut down the noose. Life-saving measures were performed, including CPR and administrations of naloxone. He was not a participant in the MHSDS at the time of his death. He was a custody level IV inmate.

The inmate was born in Phoenix, Arizona, and moved to the Los Angeles area when he was age seven or eight. According to a pen pal application found in his property, he grew up in Compton, California. He had a difficult childhood, where he witnessed abuse and was abused himself. The inmate indicated that he witnessed his father getting shot 20 times and being left to die in the street. In his personal writing, the inmate wrote that his mother was very supportive of him; his mother died in 2014, and his writing indicated he

was upset about her death.  According to the POR, he graduated from high school in 1989; in contrast, the health record reports he had a formal education through elementary school.  He worked as a barber, childcare worker, construction worker, convention center worker, warehouseman, and security guard in the community, although his primary source of income was criminal activity.  Starting at age 11, he had a history of alcohol, marijuana, cocaine, methamphetamines, and tobacco cigarettes use.  Documentation notes he affiliated with a gang and was considered a "high ranking member" at the time of his death.

The inmate's criminal history began when he was age 13 and included multiple arrests. He first entered CDCR on May 21, 1991.  He re-entered CDCR two more times on March 3, 1994, for a separate conviction and again on November 1, 1996, for a parole violation.  He entered CDCR for the committing offense on April 17, 2000, for a conviction of homicide, attempted homicide, second-degree robbery, and second-degree burglary.  He was serving a death sentence plus 25 years to life.

He was in a voluntary GED program at CDCR.  He mainly lived in condemned housing from April 17, 2000, until his death.  He was housed in the adjustment center on four occasions for ASU placement following RVRs.  He received a total of three RVRs, the most on being October 12, 2018, for possession of a wireless communication device.

The inmate did not have a history of mental health treatment and was not an MHSDS participant.  He denied a history of suicide attempts.  The suicide report notes that he generally programmed well and that he had support from family and friends.  He was described as programming well during the course of his incarceration.  Interviews with staff and other inmates revealed he was seen as having a "strong character," was described as "upbeat," and a "motivator." He was known to spend a considerable amount of time exercising.

The inmate appeared to have strong family support.  He was visited by many family members and friends and had many photos and cards from them.  He was married but had two women listed as his wife on his visitor list.  There is another reference to his third wife, who was identified as a "friend" on the visitor log.  According to interviews, the inmate told custody staff several days before his death that his wife might leave him, and a staff member reported another inmate told him the inmate's step-daughter had to be hospitalized.

His wife was interviewed and said he was "very lonely" in prison and had a very difficult childhood.  He grew up practicing Islam, which she said prohibited him from seeking professional mental health treatment, and that he must have been "very tired" to end his life since this is forbidden in Islam.

Medical conditions included hypertension, vitamin D deficiency, hypothyroidism, and Grave's disease with exophthalmos. His last medical appointment was on July 29, 2019, when follow-up tests related to the hypothyroidism were ordered, and he was referred to optometry. The inmate had surgery on his right wrist in May 2018 to repair a fracture and at times reported significant related pain.

The inmate was not enrolled in mental health treatment during any of his incarcerations in CDCR. He was not prescribed psychotropic medications. Overall, he had minimal contact with mental health staff. Two suicide risk evaluations were completed in 2013, one was routine, and one was for a "TTA call" when he reportedly "hinted to custody that he might be suicidal." The evaluations found no prior suicide attempts. On both occasions, he was assessed as having low chronic and acute risk for suicide. It appears he occasionally dealt with depression, isolation, and potentially suicidal ideation, but he did not disclose this to the staff at his last institution. A Mental Health Evaluation notes that the inmate stated that his attorney told him to never "talk with mental health." Closer to the time of his death, in October 2018, he was screened for mental health concerns before placement in ASU. He was additionally seen for two wellness checks in November 2018 and March 2018, the first following the suicide of another inmate in the adjustment center and the second following the Governor's moratorium on the use of the death penalty. He denied any mental health concerns on both occasions. The report notes he was likely unwilling to seek mental health treatment because he was also involved with a gang.

Although most of the writing found in the inmate's possessions was indicative of strong family support, there were several concerning letters and poetry that he wrote, including a possible suicide note found in his cell. In one letter addressed to his cousin, he wrote, "… suicide is not the answer you don't want to lose your soul that something that whould (sic) be lost forever." In a possible suicide note found, he wrote, "I had a winning hand, but as fate would have it, no matter how I played it, the end was very clear." There were indications of growing tension with his wife, which the report speculates were connected with his use of drugs. One inmate said he went by the inmate's cell earlier on August 29, 2019 and saw him with an inmate-manufactured noose around his throat and smelled methamphetamines on him. While finding that the death was a suicide, the autopsy report noted acute methamphetamine intoxication and hypertensive cardiovascular disease as other significant conditions contributing to the inmate's death. The inmate reportedly removed the noose from his neck and apologized. It did not appear that the inmate who witnessed this alerted staff.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an accurate summary of this case. The SCR included relevant social, criminal, incarceration, and substance use history. It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report. Missing from the SCR were determinations of foreseeability and preventability.

V.    Analysis of Quality Improvement Plan Process

This case resulted in two required QIPs. The first QIP related to the inmate not being offered or attending yard between August 6-24, 2019, which was noted during the review of the Inmate Segregation Record CDC 114-A. As a result, a review of the Re-integrated Mixed Condemned Yard #2 (The inmate's assigned yard) from August 6-26, 2019, revealed that he elected to attend yard five times and refused yard ten times. Four yard lists were missing, and there were two instances of missed entries due to construction. The response indicated that staff is logging all yard information on the 114-A Inmate Segregation Record. Second and third watch Unit Lieutenants conduct audits weekly to ensure staff is properly logging the appropriate information 100 percent of the time.

The second QIP related to daily huddles between custody and mental health clinicians that had not been documented, which was noted during the review of the housing unit logbook. As a result, the Division of Adult Institutions and Statewide Mental Health have incorporated the partnership huddles into the institution's condemned programs via the updated Partnership Operational Procedure (OP). The updated OP was sent to the Special Master's team on November 8, 2019 and was pending review and approval at the time of the QIP report.

The QIP report, while generally adequate, should have followed up on one issue. After review and comment by the Special Master's team, the adequacy of the response regarding incorporating the partnership huddles into the condemned programs should have been revisited.

Case Q

I.    Summary of Case

This inmate was a 32-year-old Caucasian man who was found hanging in his single cell on January 21, 2019.  PSU staff during custody checks in the PSU noticed a "privacy curtain" in his "pitch black" cell, and that inmate did not respond.  Upon entering the cell, they saw the inmate hanging from the light fixture with an inmate-manufactured noose made from a bedsheet.  They cut the noose and began life-saving measures.  The psychiatric technician observed that the inmate "was in rigor mortis and instructed custody officers to stop life-saving measures."  The inmate was mental health services at the EOP level of care in the PSU at the time of his death.

This inmate was born in California.  His biological parents were involved in the criminal justice system; therefore, he was primarily raised by his grandparents and in group or foster homes.  He was physically abused in foster care and group homes.  He did not maintain contact with his mother and his father, a high-profile offender who passed away in prison from medical complications in December 2007.  The probation report notes that he dropped out of school in the seventh grade and did not receive a GED, though health records document that he completed the eleventh grade and received a GED while in juvenile hall.  The inmate reported a learning disability diagnosis related to his reading comprehension.  He was inconsistent about his number of children, at times reporting three biological children and no children at other times.  He reported a substance use history, including alcohol, marijuana, ecstasy, cocaine, and mushrooms, as well as methamphetamine and heroin during his incarceration.

His juvenile criminal history includes multiple arrests.  The inmate entered CDCR for his first and only term in April 2007 for voluntary manslaughter with use of a firearm.  He was serving a 16-year sentence, and his earliest possible release date was August 12, 2023.  An additional two years and eight months were added to his sentence after being convicted of resisting an officer with threat of violence.  He received approximately 17 RVRs during his term.  He was described in a custody memorandum as "an influential white inmate who promotes violence and threatens to retaliate against other white inmates who refuse to participate in the violence."  After reporting that a gang had a plan to assault him, on July 7, 2013, he requested and was granted an SNY placement for safety concerns.  He remained housed at an SNY for the rest of his incarceration.

The inmate was transferred to a total of 22 institutions, some multiple times, largely for ASU placement animated by safety concerns and custody status.  Custody officers reported he routinely had a privacy curtain in his cell, although they could still see him.  A number of undated letters and drawings were found in his cell related to various topics, including mysticism and Gnostic/Germanic religion, some authored by an "..influential voice in neo-fascism."

He had minimal mental health history before entering CDCR. He reported that he participated in family counseling and was prescribed bupropion as a teenager for unknown reasons. The inmate was not placed in the MHSDS when he first entered CDCR, at which point he denied suicidal ideation, paranoia, and other psychotic symptoms to mental health clinicians. Starting in 2013, staff submitted a number of mental health referrals concerning the inmate indicating that he appeared paranoid. Upon evaluation, he denied symptoms and was not enrolled in treatment. On August 14, 2013, the inmate requested a mental health referral related to anxiety. On September 3, 2013, he was included in the MHSDS at the 3CMS level of care due to impulse control issues and aggressive behavior. He was initially diagnosed with a Mood Disorder, NOS. During his incarceration, he was additionally and alternatively diagnosed with Schizoaffective Disorder, Bipolar Type; Major Depressive Disorder, Recurrent with Psychotic Features; Psychotic Disorder NOS; PTSD; Schizotypal and Antisocial Personality Disorders, and a rule out of ADHD. He was treated variously with valproic acid, haloperidol, and ziprasidone. Although he was not a participant in the MHSDS from 2007 to 2013, after September 2, 2013, he was treated at the 3CMS, EOP, MHCB, ICF, and APP levels of care.

The inmate was admitted to an MHCB on April 25, 2014, for possible danger to self after he reported it was the two-year anniversary of his sister and grandmother's deaths, and his depressive symptoms were increasing. He denied suicidal ideation, and several days later, he was discharged to the 3CMS level of care. He was again referred to an MHCB on July 8, 2015, for suicidal ideation and smashing himself into the holding cell's plexiglass. He reported being afraid to go back to the yard. He denied suicidal ideation and was discharged to the 3CMS level of care following one week of treatment in the MHCB.

On November 14, 2015, the inmate expressed increasing anxiety and paranoia that contributed to significant suicidal ideation. He stated that "everybody after [sic] me all the time" and that he was hallucinating. He was referred to DSH at the APP level of care. Psychotic Disorder NOS was added to his diagnoses in response to his reported auditory hallucinations. During his hospitalization, he responded well to olanzapine and divalproex sodium, which were reported to assist his mood regulation and impulsivity.

On June 19, 2017, the inmate expressed unspecific suicidal ideation, and he was experiencing delusions and hallucinations that others were "talking about him." He was referred to the MHCB, where he continued to report hallucinations and was referred to the APP level of care. He was admitted to the APP on July 11, 2017, where he endorsed paranoia, among other symptoms, along with intermittent suicidal ideation. During the course of hospitalization, he consistently refused psychotropic medications, which thwarted plans to remove him from maximum custody status. The SCR notes that overall, the inmate spent 76 percent of his incarceration on maximum custody status in a single cell setting and that his "MAX" status significantly restricted his access to

treatment during his PIP stay. He remained adamant he did not have a mental health disorder and was discharged to the EOP level of care in the ASU after he stopped endorsing suicidal ideation, anxiety, or depressive symptoms.

Approximately 40 days post-discharge, he was referred to the PIP at the ICF level of care, where he transferred on January 3, 2018. Documentation noted that he refused sessions and medication, although he later became adherent with psychotropic medications. During his IDTT meeting on February 28, 2018, he asked to be discharged from the PIP. He was not discharged because the treatment team wished to see greater adherence with psychotropic medications. He again requested discharge at his March 28, 2018 IDTT, which was granted because he had not engaged in suicidal behavior, maintained psychiatric medication adherence, and had not been acutely psychotic for several months.

The inmate was discharged from the PIP to ASU on March 29, 2018. He was again referred to the MHCB on the fourth day of his five-day follow-up on April 2, 2018, for ongoing suicidality and expressed paranoia regarding others. He was discharged from the MHCB on April 16, 2018, to EOP level of care and returned to the ASU. The inmate had several clinical contacts in the coming months, during which he denied suicidal and homicidal ideations on several occasions. His treatment attendance, however, was consistently under 50 percent. The inmate did not attend his IDTT on June 19, 2018. The team believed that his continued low engagement in treatment was less related to symptomatology, which he mostly denied, and more connected to his being "bored" with treatment activities which he found to be ineffective.

The inmate transferred to the PSU at another facility on July 20, 2018. He did not attend his IDTT on July 31, 2018. When previously at that institution, he expressed concern that the Aryan Brotherhood had been planning to assault him. He had a confidential contact with his primary clinician on August 1, 2018, where he endorsed auditory and visual hallucinations but was not thought to be responding to internal stimuli. The psychiatrist attempted a cell-front contact on August 8, 2018, to discuss the inmate's refusal of medications, but the inmate was asleep and declined to participate. The inmate was seen in a confidential setting by his primary clinician on August 22, 2018, when he reported feeling agitated and anxious. Although denying suicidal ideation, he expressed concerns about custody and his perception that his psychiatrist was not including his input with regards to his medications. His psychiatrist met with the inmate at the cell front the following day after he refused a confidential appointment. Among other things, he reported that his medication refusals were time-connected with feelings of depression and not wanting to "get up." Although denying suicidal ideation, the inmate endorsed hallucinations and feelings of paranoia when around other people.

His IDTT meeting on September 25, 2018, was held without his presence. He was noted to have continued paranoia and treatment attendance below 50 percent, but this was not

attributed to mental health symptoms. Instead, the team believed that his continued hallucinations and delusional thought content had stabilized sufficiently so that he could attend treatment if he chose. In September and October 2018, he continued to refuse confidential sessions. A psychologist attempted to see the inmate on November 8, 2018, following a court appearance. The inmate refused to speak with the psychologist but was assessed as presenting with significant paranoia. There was no documentation as to whether increased suicidal risk was present or if he received bad news during the court appearance. He had, in fact, received a significant enhancement to his sentence. The inmate refused a confidential session with his primary clinician on December 12, 2018, and when seen at the cell front, continued his request to be moved to the 3CMS level of care. On January 2, 2019, he was again seen at the cell front by this primary clinician when he reported doing "terribly." While exhibiting paranoia, he denied suicidal ideation. During this time, his treatment attendance remained below 50 percent. The next day, the psychiatrist saw the inmate at the cell front when he continued to refuse psychotropic medications. He refused to speak with the primary clinician on January 9, 2019, or attend his IDTT of January 15, 2019, when an IPOC related to treatment refusal was added.

The inmate's last clinical contact was with his psychologist at the cell front on January 16, 2019, and he reported frustration with his postponed ICC committee hearing, noting that "other people should start doing their jobs around here." He denied suicidal and homicidal ideation.

His reported history of suicide attempts is inconsistent. He reported previous attempts in some risk assessments, while he denied prior attempts in other assessments, including during suicide risk evaluations from 2014 to 2016 and a SRASHE on January 12, 2018. Twenty-six Suicide Risk Evaluations (SREs) and 11 SRASHEs were completed during his term, including six SREs within the last year of his life. His chronic risk was rated either moderate or high, and his acute risk ranged from low to high.

Some documentation noted that he stopped a hanging attempt in June 2013 and performed self-harm behavior via cutting in 2015 and 2017. An inmate interviewed said, "I knew he was going to do it," but did not provide further details. Another inmate stated that the inmate screamed he was suicidal on December 31, 2018, and custody officers "did not do anything. They didn't pull him out," and that he talked about suicide two or three days before his death and had a plan to hang himself. This inmate did not report these statements to staff. Some of the inmate's SREs and SRASHEs contained incorrect information, including an incomplete listing of all documented suicide attempts or were not completed as required, and some appeared to underestimate the inmate's chronic risk.

The SCR noted significant pre-suicidal events might have included his transfer to PSU for his SHU term on June 20, 2018, at the institution where a gang was planning to assault him in 2012; the anniversary of his father's death on December 12, 2018 (he died

in 2007); his last six months were primarily isolative; the additional 32 months added to his sentence on November 16, 2018; and, the date of the super blood wolf moon on January 20, 2019, which he referenced in his writings and appeared to hold significance to the inmate.

II.   Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was foreseeable.  The inmate's continued disengagement with treatment, receipt of a significant enhancement in his prison term, and ongoing reports of significant symptoms should have prompted consideration of transfer to inpatient care for further assessment.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable.  Had suicide risk evaluations more consistently contained all relevant risk factors, the inmate's risk level could have been reassessed, which may have substantially reduced the risk or led to added interventions.  Further review of consideration for transfer to inpatient treatment could have further reduced risk.  There was insufficient follow-up in the QIP as to whether Guard One rounds were conducted as required; consequently, it is unknown whether rounds conducted in accordance with policy would have further reduced risk.

IV.   Critique of Suicide Case Review Report

The SCR was an accurate summary of this case.  The SCR included relevant social, criminal, incarceration, substance use, and minimal mental health history.  It provided a reasonable assessment of the precipitants to this suicide and the recommendations provided followed from the content and findings of the report.  The SCR should have assessed the appropriateness of the IDTT's consideration for possible referral to inpatient treatment.  Missing from the SCR were determinations of foreseeability and preventability.

V.   Analysis of Quality Improvement Plan Process

This case resulted in six required QIPs.  The first QIP regarded that the inmate did not receive a discharge SRASHE upon discharge from PIP to EOP level of care on March 28, 2018.  A discharge SRASHE was required by PIP policy Treatment and Planning

Procedures: Discharge Policy and Procedure 12.11.2101 (B). As a result, the inmate's mental health record was audited, and no discharge SRASHE was located. Training was provided to identified staff. An additional 100 discharges were audited, and on March 21, 2019, staff were reminded of the PIP policy regarding required documentation for discharge during a Psychology Service meeting. Training was provided to the identified clinician regarding the missed SRASHE. Beginning on March 12, 2019, APP and ICF Psychologist Supervisors reviewed the institution PIP Master Discharge Disposition Tracker daily and are responsible for identifying new discharges and seeing that all required discharge documentation is completed. This response appeared adequate.

The second QIP regarded a lack of clinician-to-clinician contact documentation when the inmate was discharged from PIP to another institution on March 29, 2018. Clinician-to-clinician contact was required by PIP policy Treatment and Planning Procedures: Discharge Policy and Procedure 12.11.2101 (B). As a result, an audit was completed by the ASU Senior Psychologist-Supervisor on March 12, 2018, and none of the ASU cases were out of compliance, according to the On Demand Due Dates report. This response appeared adequate.

The third QIP regarded clinician-to-clinician contact attempted on November 6, 2018, and November 7, 2018; this contact was achieved according to the primary clinicians but not documented in the electronic health record. This contact was required by ASU policy Mental Health Clinician to Mental Health Clinician Contact in the ASU 12.06.401. As a result, the primary clinician and entire ASU-EOP treatment team received training on May 1, 2019, and the PSU and STRH staff received training on May 8, 2019. Policy 12.06.401 was used. This response appeared adequate.

The fourth QIP regarded a primary clinician who was aware of the inmate's court appearance on November 7, 2018 but was not aware that the inmate had received an additional sentence of 32 months. This could have contributed to an underestimation of his suicide risk. As a result, a Performance Improvement Work Plan (PIWP) team planned to create ways to implement a more effective procedure for assessing inmates returning from court. After the PIWP is completed, staff will be provided training on new procedures, and OP 115 will be revised. The adequacy of this response was unable to be determined as it was not completed.

The fifth QIP regarded SRASHEs on November 6, 2018 and March 30, 2018, which listed the inmate's chronic suicide risk as moderate even though there were three previous suicide attempts that would indicate he was a high chronic risk. The SRASHEs had inaccurate information about his suicide attempt history and did not contain appropriate justification for risk level based on the information. As a result, an audit was conducted by the ASU Senior Psychologist-Supervisor and ten others, and there was an 80 percent passing score. The clinician received proctoring on April 12, 2018, as the result of a prior QIP, which occurred after the SRASHE. The clinician reviewed 1:1

feedback on errors from the supervisor. Until the clinician consistently passes two in a row, the supervisor will review future SRASHE documentation. This response did not appear adequate as prior training did not appear to impact the clinician's performance. Without further information regarding follow-up, it is not possible to determine if training will be effective this time.

The sixth QIP regarded thoroughness of previous Guard One Welfare checks during the prior and current watch. According to responding staff reports, the inmate was observed to have possible signs of rigor mortis from his body's generalized stiffness, and his cell window was obstructed with a bedsheet during Guard One Security Welfare checks. There is a possibility that his window was fully obstructed during the prior Guard One Security Welfare check. As a result, a memorandum was provided, and an investigative log number was opened. The QIP report does not include further details about corrective actions for this QIP due to the pending investigation. This should have been followed up on given the potential significance of the completion of Guard One checks in accordance with policy in the context of the reports that the inmate had signs of rigor mortis when discovered. This response was not adequate.

Case R

I.   Summary of Case

This inmate was a 50-year-old South Korean man who was discovered hanging in his solely-occupied cell in the PSU on March 20, 2019. The inmate was receiving mental health services at the EOP level of care at the time of his death.

The inmate was born and raised in South Korea by his parents, along with five siblings. His parents divorced when he was in his early teens, and he resided primarily with his mother. He graduated from high school in South Korea and attended some college. He reported that he immigrated to the U.S. at age 20 with his father and brother, where he received a GED diploma and attended nursing school. He reportedly had difficulties in relationships, challenges maintaining employment, and struggles to maintain housing. He never married and had no children. His longest romantic relationship reportedly lasted six months. There was no evidence of a significant substance use history.

The inmate had no prior criminal history and entered CDCR for the first time in July 2017 to serve a sentence of life without parole for seven counts of first-degree murder with additional enhancements and three counts of attempted first-degree murder with additional enhancements. He entered his former nursing school and opened fire in a classroom. He intended to kill the administrator and then himself in retaliation for the alienation he experienced at the school and his failure to get his money refunded. After the incident, he called his father, who instructed him to turn himself in, which he did, and he was arrested without incident.

Following his arrest, the inmate was placed at a DSH facility for a psychiatric hold, where he remained for five years due to a finding of incompetency to stand trial. Before entering the hospital, he was placed in the county jail, where he struggled with weight loss, extreme isolative behavior, two suicide attempts, physical altercations with inmates and staff, and refusal to eat or take showers. At the hospital, he underwent psychological testing, which resulted in findings of extreme symptoms of dysphoria, ongoing passive suicidal ideation, paranoia/persecutory beliefs, and delusional thought patterns. He was diagnosed with Schizoaffective Disorder, Depressed Type. After being found competent to stand trial, he was discharged from the DSH facility in July 2017. His discharge diagnoses were Schizophrenia and Autism Spectrum Disorder, and he was prescribed clozapine, lithium carbonate, and venlafaxine.

During interviews as part of the SCR, the inmate was described as "quiet" and kept to himself. He received two RVRs while incarcerated. One was for an in-cell altercation with his cellmate, which left the inmate with orbital fractures and facial lacerations. The other was for battery on a non-prisoner (throwing bodily fluids) in December 2018, which resulted in his placement in a PSU.

This inmate's mental health history was positive for at least two prior suicide attempts; the last attempt occurred in county jail in 2012. He had a history of depression that started in 1993 and included recurrent suicidal thoughts and isolation. Records show a pattern of the inmate facing difficulties with interpersonal relationships, isolative behavior, paranoia, and suspiciousness of others in his adolescence and early adulthood. He did not have suicide attempts or exhibit self-harm behaviors at CDCR, and his history with both behaviors was not in the CDCR records.

The inmate was included in the MHSDS at the 3CMS level of care on August 2, 2017, after thoughts of harming himself and of having someone else kill him. He was admitted to an MHCB on August 7, 2017, after an altercation with his cellmate. The inmate was discharged from the MHCB on August 18, 2017, and then re-admitted on August 19, 2017, after safety concerns and his expressed desire for a single cell. Initial clinical impressions included that the inmate was "malingering" and was described as "narcissistic and grandiose." He was largely uncooperative with treatment and refused all psychiatric medication. He was referred to a PIP for acute level of care on August 29, 2017 and was nonadherent with treatments and assessments and refused medications. He was discharged to the EOP level of care on November 14, 2017, after reaching "maximum benefit." Of note, there is no evidence that prior treatment records were requested.

Within two days, the inmate was re-admitted to the MHCB and later referred to a PIP-ICF on December 1, 2017, due to grave disability, ongoing paranoia, and persecutory delusions, guarded and uncooperative behavior, auditory and visual hallucinations, hyper-religious thoughts, and need for longer-term stability in an inpatient unit. His diagnosis

largely remained Schizophrenia, Paranoid Type during his treatment. The MHCB discharging psychiatrist recommended a non-emergent involuntary medication order.

The inmate was admitted to the PIP-ICF on December 8, 2017. Interviews with the PIP treatment team revealed the inmate was largely disengaged with treatment. The inmate refused to sign a ROI for the treatment team to request his records from the hospital where he was admitted before incarceration and for the team to speak with his mother, who called the PIP-ICF and wished to speak to her son. The inmate also refused his father to visit him because he did not want his father to feel shame when visiting his son, who was incarcerated. The ICF treatment team noted the recommendation for involuntary medications; however, the process was never initiated as the team reportedly could not find a basis for the order because the inmate was articulate and able to maintain his activities of daily living. Over the course of his year-long treatment in the ICF, the inmate lost approximately 51 pounds; he often refused meals due to paranoia and suspiciousness of staff who worked during second watch. He did not seem to have any problems with staff during the other shifts, even if it was the same staff member. The weight loss did not cause any medical concerns.

In December 2018, the inmate began exhibiting periods of rage, such as verbal aggression toward staff and acting out behavior, including throwing urine on staff and urinating out of the food port on his cell door. The incident of throwing urine resulted in an RVR. The mental health assessment completed in conjunction with the RVR noted that despite paranoia playing a role in his behavior, the act was premeditated. The only recommendation was that the inmate not be sent to a SHU. The SCR noted that the assessment appeared to focus solely on the inmate's current functioning and not his overall clinical picture. As a result, the inmate was ultimately placed in a PSU.

On August 27, 2018, the PIP treatment team and MHHQ IRU held a CCAT meeting to discuss the lack of progress and recommendations for treatment. Of note, the SCR noted that the CCAT occurred on December 27, 2018, which was the date of his discharge from the PIP. An independent review of the electronic health record resulted in a determination of the correct date. The SCR also noted that no progress note was found in the records about the outcome of the CCAT. The Special Master's expert was only able to find single-sentence references to the meeting, which summarized the recommendations. Recommendations included obtaining records from the inmate's hospital stay prior to incarceration, which was unsuccessful; a non-emergent PC 2602 involuntary medication order, which was not pursued; and in the event a PC 2602 order was not granted, coordination between MHHQ IRU and the PIP treatment team for long-term Outpatient Housing Unit placement, which did not result in a follow-up. The IDTT ultimately determined that the inmate "was unable to benefit from the treatment offered," and he was discharged from the PIP-ICF to an EOP on December 27, 2018; none of the recommendations from the CCAT were fulfilled. A SRASHE on this date revealed the inmate's suicide risk would increase when he had to deal with "stressors" of the prison

yard and may attempt to commit suicide. Staff noted they felt he did not function well in a prison environment, but there were no alternatives since he did not have a medical condition that required a medical bed placement. His previous RVR resulted in his placement at an ASU EOP pending resolution of the RVR.

An interview with the primary clinician revealed the ASU EOP treatment team did not feel that the inmate had been sufficiently stabilized for discharge from the PIP. He was paranoid, guarded, and refused to attend treatment appointments in the ASU EOP. He was often not responsive during daily housing count and required cell extraction. Nursing notes also recorded concern that the inmate was at risk of self-harm. The inmate requested to be removed from the MHSDS at this time. The inmate was referred by nursing staff for an emergent mental health consult on March 5, 2019, as he was unresponsive during custody checks and required a cell extraction. Initially, a clinician assessed him to not be at risk, despite the inmate refusing to answer any questions, and he was returned to his cell. He was reassessed the following day after referral for a similar incident, which resulted in a referral to the MHCB due to grave disability with a recommendation for a PC 2602 involuntary medication order. He was transferred to an MHCB on March 7, 2019. The inmate continued to refuse most clinical contacts during admission. He refused questions about suicidality and denied he had a mental illness. The psychiatrist on the MHCB consulted with the PIP ICF team and decided not to pursue the involuntary medication order because the inmate was able to attend to his activities of daily living. The inmate was discharged from the MHCB on March 13, 2019, and physically moved on March 15, 2019. The discharge decision appeared to focus on the inmate's current presentation without considering his history or broader clinical picture.

On day one of his five-day follow-up contacts, the inmate remained underneath his bed and refused to interact with staff and take meals. A recommendation was made for his referral to an MHCB and pursual of a PC 2602 involuntary medication order. He was placed in alternative housing but cleared to be placed in PSU housing on March 17, 2019, as the clinician did not note any "acute risk factors" and believed a higher level of care was not indicated. On the first day of his five-day follow-up on March 18, 2019, he was verbally combative, was under his bed, and refused meals and custody officer wellness checks. This behavior continued on March 19, 2019. During his five-day follow-up, he told his primary clinician during his last clinical contact before his suicide, "I have a theory that staff want me to kill myself. They have given me plenty of opportunity, so if I was going to do it (kill himself), I would have already done it." The clinician described him as combative, verbally abusive toward staff, hiding under his bed, and refusing to eat. She noted that he did not make direct statements endorsing suicidality.

A review of this inmate's psychiatric care noted the failure across multiple psychiatrists to pursue an involuntary medication order and also failure to update the "Medication

Review" portion of the inmate's treatment plan over a long period of time. Both of these issues were considered to be systemic lapses that required large-scale training.

During interviews after his death, clinical staff reported that they were not surprised that the inmate had committed suicide and that the PSU environment significantly increased his suicide risk. The inmate reported originally seeking the death penalty, according to a treating psychologist at the PIP-ICF. Seventeen suicide risk evaluations were completed during the last two years of his life, seven of which were completed in March 2019. His suicide risk factors were accurately identified in most of the evaluations, although there were some problems, several of which are addressed in the QIPs. There were serious concerns noted in the final SRASHE completed on March 19, 2019, worth mentioning here. During the evaluation, the inmate reported, "I think you're mocking me. PSU is some kind of suicide unit," and then explained that custody staff had left materials in his cell for him to make a noose as if they were encouraging him to kill himself. Despite these statements and statements that he intended to refuse all food and water until removed from the PSU, the clinician rated the inmate's acute suicide risk as "low" and chronic risk as "moderate" with the justification that his behavior was "volitional" and "a means to get his need met." Additionally, the developed safety plan was unrealistic and unachievable given that it relied on the inmate's interactions with mental health staff, which he consistently refused. Also, on that same date, the inmate was seen for a five-day follow-up contact which noted no warning signs, despite the behaviors described in the SRASHE and a statement from the inmate noting, "I know you are in it too, you all want me to kill myself." Further, the inmate had to be extracted from the cell for the interview, and the clinician documented that the inmate was "informed that his behavior is staff manipulation for secondary gain, and he could receive an RVR because he is misusing staff resources." The inmate was cleared to return to his PSU cell and died by suicide in less than 24 hours.

II.   <u>Determination of Foreseeability</u>

The Suicide Case Review Committee did not provide a determination of foreseeability for this case.

The Special Master's expert determined this inmate's death was foreseeable based on his suicidal statements made hours before his death.

III.   <u>Determination of Preventability</u>

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined the suicide was preventable based on the fact that the inmate was clearly a decompensated, unmedicated individual with a history of

Schizophrenia, Autism Spectrum Disorder, and violent, impulsive behavior who was placed in a restrictive housing setting with little to no treatment or meaningful assessment of his mental health needs. Documentation indicated that the treatment team saw him as intentionally feigning symptoms, despite his lengthy history of serious mental illness. Further, multiple treatment teams failed to pursue involuntary medication orders for the inmate based on what appeared to be rationale that he maintained his hygiene and was articulate. It appeared that the treatment teams believed the court would not grant their petitions, as thus never attempted to get this inmate the treatment he required. Finally, the inmate's level of care was inappropriately reduced and often not increased based on the unsound rationale in what appeared to be staff simply giving up on attempting to engage the inmate.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary. It included relevant social, criminal, incarceration, substance use, and mental health history. The reviewer included a reasonable assessment of the precipitants to this suicide, and the recommendations followed the content and findings of the report. There was one error that required clarification through examination of the electronic health record.

V.    Analysis of Quality Improvement Plan Process

This case resulted in nine required QIPs. The first QIP regarded a joint concern that CDCR did not obtain the inmate's medical records from the hospital where he was detained before incarceration. There was a misperception that a ROI was needed to obtain the hospital records, but according to policy, the hospital can release pre-incarceration records to CDCR without an ROI when needed for continuity of care. An emergency provision also allows CDCR staff to obtain state hospital records. The lack of records compromised this inmate's treatment. There was also a misperception that staff could not speak with relatives without an ROI. As a result, a policy and procedure concerning DSH records request was under revision. In the meantime, a June 19, 2019 email to all CDCR Chiefs of Mental Health outlined the records request workflow and that an ROI is not needed for receiving information from family members. Mental health staff should utilize local operating procedures (LOP) for contact with family members. This response appeared adequate.

The second QIP regarded the inmate's discharge to the EOP level of care on December 27, 2018. The treatment team noted the inmate had reached full treatment benefit and needed longer placement in a mental health program. Yet, the inmate had a documented increase in mental health symptoms and recent CCAT with follow-up recommendations, and the discharging psychologist noted he was a potential danger to others resulting in a single-cell chrono, and he faced increased suicide risk in a prison setting. As a result, his case was reviewed on May 9, 2019, at a management meeting and on May 14, 2019, at

99

the monthly Risk Reduction and Suicide Prevention Committee. This resulted in several corrective action plans, and several actions were taken. A meeting with the treatment team on June 4, 2019, covered missed risk factors in the suicide review report and re-training on the PIP discharge policies and procedures. A second round of the local Mental Health Treatment Team training was offered to clinicians on June 11, 2019 through June 13, 2019. One institution's PIP clinicians were also enrolled in PIP IDTT training from the Division of Health Care Services Training Unit. One institution's PIP staff reviewed an addendum to the PIP discharge policy and procedure in a June 3, 2019 email. Last, on May 23, 2019, the Senior Management Team Committee was presented with the recommendation of increasing supervisory oversight. This response was partially adequate as the impact of the interventions was not tracked nor reported.

The third QIP regarded the inmate's ongoing erratic behavior in EOP from December 27, 2018 to March 5, 2019. He may have benefited from a higher level of care before he was admitted to an MHCB on March 6, 2019. As a result, an audit of ten patient cases from PIP ICF/Acute level of care to the institution's EOP ASU revealed that eight cases were at an appropriate level of care in the period of EOP ASU treatment review. The remaining two cases needed further consideration of a higher level of care. They were lacking in risk assessment and identification of apparent stressors/warning signs that could warrant a return to IDTT. Review of all cases showed there could be a need for more thorough documentation on other topics as well, yet there was no indication that any further action was taken. This response was not adequate.

The fourth QIP regarded suicide risk that was likely underestimated on SRASHEs completed on March 5, 2019, March 6, 2019, and March 13, 2019. The three SRASHEs noted that the inmate did not have protective factors, was uncooperative in answering questions related to suicide, and was described to be chronically mentally ill. Risk was likely underestimated. As a result, the clinician who completed the SRASHE on March 5, 2019 received training. The clinician who completed the SRASHE on March 6, 2019 also received training. Social workers, psychologists, and psychiatrists, including chiefs and seniors, received a two-hour training. A seven-hour SRASHE training was implemented, and all SRASHE training was scheduled to be completed by July 1, 2019. An upcoming training was also to be implemented on improving differential diagnosis, assessing risk, and developing treatment for patients. This response was partially adequate as it was only partially implemented, and no further information was provided.

The fifth QIP regarded problems with SRASHEs completed on March 17, 2019, and March 19, 2019. The inmate's acute risk was "low," which appeared to be an underestimation of suicide risk. Suicide risk may have also been underestimated because clinical interviews revealed a perception that the inmate's behavior was an attempt to influence housing. In addition, the inmate had mental health symptoms, yet the low risk ratings within the SRASHEs resulted in the MHCB referral being rescinded on March 17, 2018, and the determination that an EOP level of care was appropriate on March 19,

2019. As a result, the March 19, 2019 SRASHE and ten other SRASHEs completed by the primary clinician were reviewed. Underestimation of acute risk was not a concern in the audit. Three of the ten SRASHEs passed the chart audit. The primary clinician received SRASHE re-mentoring on June 17, 2019, and the primary clinician applied feedback from re-mentoring in a SRASHE that was submitted. The primary clinician also signed up for a new Safety Planning Intervention on June 25, 2019 and was to be included in a seven-hour training in July 2019. The March 17, 2019 SRASHE and ten other SRASHEs completed by the primary clinician were reviewed. Underestimation of acute risk was a concern in two out of the ten SRASHEs. Five of the ten SRASHEs passed the chart audit. The primary clinician received SRASHE re-mentoring on June 17, 2019, and Risk Justification training on June 18, 2019. The primary clinician was scheduled for Safety Planning Intervention on June 24, 2019, and seven-hour training in the near future. The clinician will be evaluated on future SRASHEs until there are three consecutive passes on chart audit items. This response was partially adequate as it was only partially implemented, and no further information was provided.

The sixth QIP regarded problems with a five-day follow-up on March 19, 2019. On day two, March 19, 2019, records indicate the inmate was uncooperative with the evaluation; there were no noted warning signs, he made multiple statements that "I know you are in it too, you all want me to kill myself," but was cleared to return to his housing. The clinician noted the inmate was "informed that his behavior is staff manipulative of staff for secondary gain, and he could receive an RVR because he is misusing staff resources" and was at the appropriate level of care, despite his mental health symptoms. As a result, the five-day follow-up and ten others completed by the primary clinician were reviewed based on chart audit criteria. The ten follow-ups passed audit criteria and the document in question as an isolated incident. The primary clinician's SRASHEs were to be audited until three consecutive SRASHEs pass chart audit criteria. PSU staff were to receive training on June 19, 2019, and also material from new Safety Planning Intervention and seven-hour trainings. This response was partially adequate as it was only partially implemented, and no further information was provided.

The seventh QIP regarded psychiatrists not pursuing a non-emergent PC 2602 largely due to their current understanding of PC 2602 regulation language concerning criteria and evidence considered. They may have focused on current symptoms and behaviors rather than total symptoms over several months. As a result, there was a verbal presentation, discussion, and a PowerPoint handout concerning the pursuit of non-emergent PC 2602 court orders. There were also to be revisions to Title 15 sections concerning non-emergent PC 2602 language. This response appeared adequate, although its efficacy was not measured.

The eighth QIP regarded psychiatrists not adding content to or updating the "Medication Review" tab of the master treatment plan Power-Form. As a result, there was a verbal presentation, discussion, and a video about completing documentation on the medication

review tab located in the master treatment team Power-Form. All staff psychiatrists received this training. The response appeared adequate, although its efficacy was not measured.

The ninth QIP regarded activation of the Emergency Medical System (calling 911) that took place 11 minutes into the emergency and caused a delay in medical response. As a result, training was provided to assigned Watch Commanders. Operational Procedures 139, Emergency Medical Response System, was also updated. The response appeared adequate.

Case S

I.    Summary of Case

This inmate was a 37-year-old Filipino man who was found by correctional officers hanging in his single cell on August 28, 2019. A custody officer reported that the inmate was not in his cell during count. When custody staff subsequently tried to enter the cell, they were unable because the door was obstructed. When they did enter, the inmate was found hanging behind a blanket that obstructed the view of his body but not the view into the cell. An alarm was sounded, a cut-down kit was retrieved, the inmate was lowered to the cell floor, and CPR was performed. He was transported to the TTA, and life-saving measures continued.

The inmate was receiving mental health services at the EOP level of care at the time of his death. Toxicology reports indicated the presence of ethanol, amphetamines, and methamphetamine, as well as various prescribed medications.

The inmate was born and raised in the Philippines before moving to the United States in 2002 at approximately age 21. His family lived in poverty, and his father was murdered in 1986 when the inmate was age five. The inmate attended elementary school in the Philippines but did not have further education. In 2002, the inmate and his younger sister moved to live with his grandmother in the United States. He intended to move temporarily "to make a new start" but then stayed longer when his girlfriend became pregnant.

The inmate started using methamphetamine, cannabis, and alcohol at age 15 while in the Philippines. He was arrested for possession of methamphetamine at age 15. After arriving in the United States in 2005, the inmate was convicted of assault with a deadly weapon, making terrorist threats against his pregnant girlfriend, and being under the influence of methamphetamine.

The inmate entered the CDCR for his first and only term in January 2009 for first-degree murder with a five-year case enhancement for prior felony convictions. He was serving a

sentence of life without parole, and he was allegedly affiliated with a gang. In February 2010, Immigration and Customs Enforcement (ICE) placed a detainer for his deportation.

Issues regarding the cultural sensitivity of the treatment provided and concerning adequate communication with the inmate, for whom English was a second language, were noted in the SCR. The SCR contained general information regarding the Philippines' culture and the importance it placed on family in the context of the ongoing theme of the inmate's fear of being ostracized by his family, losing their support, and the connection between these concerns and the severity of his reported symptoms. The SCR noted that cultural differences were not adequately considered in the inmate's treatment or treatment planning. The report noted that the inmate was raised in "abject" poverty and that economically disadvantaged groups in the Philippines tend to speak indigenous languages other than English. Upon his incarceration, the inmate requested English as a second language classes, and his ability to read and write English was described as rudimentary. During a clinical encounter in the reception center, the inmate requested an interpreter; however, the request was denied because the clinician believed the language barrier was insufficiently significant to warrant this accommodation. A clinical note during February 2019 noted a "slight" language barrier, particularly regarding the inmate's ability to describe his emotions. It was thought that this made it difficult to evaluate the inmate's reported psychotic symptoms.

The inmate received nine RVRs during his incarceration, including one for an attempted murder in 2013 and most recently for battery with a deadly weapon in 2017.

From 2017 to 2019, the inmate received a total of eight suicide risk evaluations. His chronic risk was variously assessed as low, medium or high, while his acute risk ranged from low to medium.

The inmate reported that he was prescribed antidepressant medication in the county jail; although, this was not reflected in the health records. He reported depression and passive suicidal ideation, and he stated belief that he would not survive in prison without his family's support.

During the course of his CDCR incarceration, the inmate was variously diagnosed with Major Depressive Disorder (without and subsequently with psychotic features), Mood Disorder, NOS, and Schizoaffective Disorder, depressive type. He was treated predominantly with phenothiazine, mirtazapine, and buspirone.

The inmate received mental health services at various levels of care. From February 2009 to December 2010, the inmate was treated at the EOP level of care; he was subsequently lowered to the 3CMS level of care. From December 15, 2015 to December 28, 2015, he was placed at the MHCB level of care with discharge to the EOP level of

103

care. He was again admitted to the MHCB in June 2016 with discharge to the EOP, where he remained until his death in 2019.

After his initial mental health assessment in the CDCR, the inmate was included in the MHSDS at the 3CMS level of care on January 29, 2009. He was provided with a diagnosis of Major Depressive Disorder, single episode without psychotic features, and he was prescribed an antidepressant medication. At that time, he reported passive suicidal ideation due to the length of his sentence. He was included in the EOP level of care in February 2009 after reporting auditory and visual hallucinations. According to documentation, he requested a language interpreter; although, the clinician did not believe he needed this accommodation. He began to report command auditory hallucinations to harm others. His diagnosis was changed to Major Depressive Disorder, single episode, severe with psychotic features. Subsequent clinical interactions frequently focused on his family.

The inmate continued to report command auditory hallucinations to hurt himself and others, and commentary hallucinations, which told him that his family did not care about or support him. The command hallucinations appeared to coincide with methamphetamine use. The commentary hallucinations were at times associated with a lack of communication with his family. In December 2010, the inmate's level of care was lowered to 3CMS, where he was treated until December 2015.

The inmate was placed in the Alternative Housing Unit (AHU) in May 2013 after the alleged attempted murder of his cellmate. He received an RVR and was placed on suicide watch. He reported that he had been smoking methamphetamine continuously for two weeks prior. He later attacked another inmate with a weapon and received an additional four years to his sentence. He reported wanting to remain in the AHU due to safety concerns. He was placed in the AHU again in November 2013 and again monitored on suicide watch.

The inmate's symptoms increased in July 2015, after he reported that his family discontinued all communication. He was admitted to the MHCB on December 15, 2015, after making superficial lacerations, and he experienced hallucinations that told him to hurt himself. He later reported that he had been high on methamphetamine. He was discharged to an EOP on December 28, 2015, where he remained until 2018. His symptoms varied depending on his communication with his family. Notes indicated that he seemed happier after receiving a letter from his mother in July 2018, after not communicating with her for five years, yet records indicated that communication stopped in July 2015.

The inmate reported cutting himself because of the "voices" on January 4, 2019. The clinician noted that the inmate appeared to relieve stress and to engage in self-harm, possibly to affect his housing. There was a noted "slight" language barrier with the

inmate describing his emotions in February 2019, and he received two SRASHEs for suicidal ideation within 24 hours.  On March 6, 2019, a housing officer reported that he had cut down the inmate from a hanging attempt during his time at an institution from August 26, 2009 to February 25, 2014, but this suicide attempt was not included in the mental health documentation.  In March 2019, the inmate reported that other inmates had connections who harassed his family, and his family had been "distant in communication" since.  On June 19, 2019, he reported contact with his family and depressed mood because of "voices," but he denied suicidal and homicidal ideation.

There was no evidence of suicidal or homicidal ideation or psychological distress in the last clinical contact note on August 28, 2019.  The IDTT on August 21, 2019 noted social isolation and self-harm symptoms.  The inmate was prescribed phenothiazine, mirtazapine, and buspirone at the time of his death.  In the three to four days prior to his death, he was intermittently nonadherent with his prescribed medications.

The inmate had two prior suicide attempts that were documented in the health record: in 2013 by jumping from a chair and in 2015 by cutting his stomach.  However, the SCR noted report of a suicide attempt during CDCR incarceration that was not included in the appropriate documentation.  Therefore, this important information was not adequately considered during assessments of suicide risk.

Inmate-peers who were interviewed for the SCR reported that the decedent was "always smiling and happy," and he kept busy at his porter job; they were surprised that he would kill himself.  One inmate-peer reported that the inmate must have ended his life because "it must have been about his family," and the other inmate-peer agreed.  They reported that the inmate had not been in touch with his family for "a while." One inmate reported he thought that the inmate discontinued his medications approximately four days before the suicide and that he recently isolated more in his cell. The primary clinician was interviewed and reported that the inmate was "always happy" and talked about his family "all the time."  The clinician noted that the inmate had been isolating and expressed the view that he would quickly decompensate if his level of care changed from EOP to the 3CMS level of care.  The inmate had one family visit on September 22, 2012 from his mother, friend, nephew, and "brother," although he did not have a brother listed in documentation.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was foreseeable.  The available information indicated an ongoing risk of suicide related to concerns around family rejection.  Treatment planning, safety planning, and suicide risk evaluations did not take

into account all risk factors, including a suicide attempt at a prior institution, and in one instance, the failure to conduct a suicide risk evaluation as required by policy. Language and cultural issues were not adequately addressed. Addressing these deficiencies could have resulted in better engagement with the inmate and elicited a more robust picture of risk leading to more targeted interventions and safety planning.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable. The risk of suicide may have been substantially reduced had all relevant information been taken into account when assessing risk and planning for safety. Significant deficiencies in clinical documentation in the period of time leading up to the inmate's suicide, including surrounding questions of when the inmate was seen by clinical staff and whether the contacts were confidential, confounded the assessment of the adequacy of treatment. One suicide risk evaluation contained information copied from a previous assessment, and in another instance, a risk evaluation did not occur as required by policy.

IV.    Critique of Suicide Case Review Report

The SCR was an accurate summary of this case. The SCR included relevant social, criminal, incarceration, substance use and mental health history. It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in nine required QIPs. The first QIP concerned SRASHEs dated February 27, 2019, and February 28, 2019; self-harm behavior was noted, but the self-harm Power-Forms were not completed, and the inmate was not referred for a medical evaluation. According to policy, the institutional SPRFIT should "Monitor and track all self-harm incidents… the SPRFIT shall accurately enter all self-harm incidents in the electronic healthcare record within three calendar days after the incident occurred." As a result, an audit was conducted of ten inmates who exhibited self-harm behaviors to identify whether a SIB Power-Form was completed. Ten Power-Forms were included in the record, and eight forms were included within 72 hours. SPRFIT meetings would include notification of late entry into the health record, and barriers to compliance with 72-hour mandates would be discussed.

The second QIP concerned the inmate's reports of scratching and cutting himself due to "voices" and showing the lacerations to his primary clinician on January 4, 2019. The

clinician noted this was a new self-harm act since the inmate had been included in his or her caseload. A suicide risk evaluation was not conducted, although the Program Guide, Chapter 12-10-8 notes, "When an inmate expresses current suicidal ideation or makes threats or attempts, a suicide risk evaluation shall be made by collecting, analyzing and documenting data." As a result, a memorandum was provided to staff; additionally, senior supervisors addressed this issue during a staff meeting. Mandated staff-wide training was also planned.

The third QIP concerned a housing unit officer who cut the inmate down from a suicide attempt on March 6, 2019. This incident was not included in the suicide grid/suicide attempt history in suicide risk evaluation, which likely resulted in an underestimation of suicide risk. As a result, a memorandum was provided to staff; additionally, senior supervisors addressed this issue during a staff meeting. Mandated staff-wide training was also planned regarding the quality improvement process, including review of QIPs and suicide related information.

The fourth QIP concerned inadequate documentation by a primary clinician. Notes were infrequent from March 2018 to August 2019, and the mental health assessments in clinical notes were occasionally copied and pasted beginning on August 15, 2018; this was particularly noted in the February 28, 2019 SRASHE.

The fifth QIP concerned clinical contacts conducted in a confidential setting 44 times between May 2018 and August 2019. Information regarding the location of these sessions was unclear or contradictory.

The sixth QIP concerned a primary clinician who denied seeing the inmate on the day of his death; however, a progress note documented a confidential individual session with the inmate on that morning. The clinician reported seeing the inmate on August 27, 2019 (the day prior); although, there was no progress note in the health record by the clinician on that date. The clinician reported that on Mondays, he often informed inmates of their appointments for the week, and this was documented as the week's clinical contact if an inmate did not attend the scheduled appointment.

As a result of QIPs four through six, weekly audits of ten case notes were reviewed from the primary clinician. The Senior Psychologist provided weekly feedback.

The seventh QIP concerned observations that the inmate exhibited impulsivity, anger, anxiety, and paranoia symptoms during IDTTs between September 9, 2018 and May 29, 2019; self-harm treatment was included, but no IPOCs were initiated. The effectiveness of treatment could not be tracked without the initiation of IPOCs. Reasons were not provided for the inmate's absence at IDTTs on June 27, 2018, September 9, 2018, and August 21, 2019. As a result, an audit of ten treatment plans and notes for six months was completed. Seven of the ten treatment plans failed audits, and there were instances

when the IPOCs did not correlate with reported symptoms or focus of treatment documented. Additionally, all ten notes revealed copy and paste concerns. Ten weekly progress notes will be reviewed by the senior psychologist supervisor, and feedback and revisions will occur for three months. Progress notes will be monitored, and treatment plans will be addressed for corrective action.

The eighth QIP concerned documentation that stated "no warning signs endorsed"; despite concerns noted in the safety plan included in the February 27, 2019, and February 28, 2019 SRASHEs. As a result, an audit of ten randomly selected SRASHEs for the two clinicians was completed. The clinicians received re-mentoring and training on the importance of recognizing and documenting imminent warning signs. Also, personal laminated cards were provided that included imminent indicators, risky times and places that could elevate suicide risk, and procedures for completion of the suicide risk evaluation.

The ninth QIP concerned insufficient descriptions of sertraline adjustments in notes dated May 9, 2019, June 7, 2019, and June 25, 2019. As a result, an evaluation was conducted, with subsequent comprehensive discussion and instruction provided by the chief psychiatrist for the clinician.

While the SCR noted cultural and language barriers as a concern, these should have risen to the level of requiring a QIP, as insufficient attention to these issues could have impeded engagement with the inmate and the detection of suicide risk.

The SCR noted significant lapses in treatment documentation; for example, there was an instance in which portions of a suicide risk evaluation were copied from a previous document. The corrective action included a review by facility leadership to determine the best course of action. The QIP report indicated plans for follow-up, such as reviewing a sample of a clinician's suicide risk evaluations. Where the result indicated significant concerns about the documentation and assessment of suicide risk level leading to a decision to closely monitor the assessments for a three-month period, the results of the follow-up regarding this type of significant concern should have been revisited and included as an amendment to the report.

Case T

I.  Summary of Case

This inmate was a 28-year-old African American widowed man who was found by correctional officers unresponsive in his solely occupied cell on November 23, 2019. He was housed in a designated alternative housing cell. A white cloth that had been tied around his neck and connected to the cell door pulled away from his neck as custody staff entered the cell. He was not a participant in the MHSDS at the time of his death.

According to the SCR, the inmate was raised by his mother, who had a drug problem, and grandmother in California. His father was incarcerated in CDCR for the majority of his childhood. The SCR indicated that he had a sister and three brothers who were in foster care. The inmate was a high school graduate, and he held various menial jobs. Limited information was available regarding his marriage; his wife died in 2015, and the couple had no children. Regarding substance use, he reported use of alcohol and marijuana as an adolescent. While documentation indicated only social alcohol use, additional documentation indicated the completion of an inpatient treatment program in 2016.

The inmate's first arrest occurred at age 10 for receiving stolen property. Criminal involvement continued into adolescence and included several arrests (terrorist threats, petty theft with prior, possession of a weapon, and battery), which resulted in probation; however, due to noncompliance, he was remanded to juvenile detention. As an adult, he was arrested for second-degree robbery, and he served his first CDCR term between 2009 and 2014. He began his second CDCR term in January 2018 to serve a 14-year sentence for two counts of second-degree robbery, with enhancements for use of a deadly weapon.

While in CDCR, the inmate held various jobs, but he was unassigned at the time of his death due to one of eight RVRs. The majority of his RVRs were for disobeying an order and work absences with two serious infractions (possession of a cell phone and distribution of a controlled substance). He was released from his most recent ASU placement in March 2019. He denied gang involvement; although, there was documentation that he may have been gang involved.

According to the SCR, there was no documented history of community mental health treatment. Similarly, while in CDCR custody, all required mental health screens were negative until November 20, 2019, when the inmate requested to speak to mental health via custody staff. He was escorted to the TTA and evaluated by nursing staff. The SCR noted that the TTA log recorded the nature of referral "as 'SI' (suicidal ideation) with the disposition recorded as auditory hallucinations." He denied suicidal ideation to the nurse but endorsed command auditory hallucinations. The inmate was placed on suicide watch in alternative housing by telephone order from the on-call psychiatrist.

The following day, a suicide risk evaluation was conducted at the cell front as the inmate refused to leave the cell. He was assessed with low chronic and acute suicide risk. According to the SCR, the inmate denied suicidality. He attributed the alternative housing placement to a "misunderstanding" and that he had wanted to be "alone." He was discharged and placed on five-day follow-up monitoring. He was seen at the cell front for the first five-day follow-up contact, which was unremarkable. He died on the following day.

II.     <u>Determination of Foreseeability</u>

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.    <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case.  Based on available information, the Special Master's expert determined that this death was not preventable.

IV.     <u>Critique of Suicide Case Review Report</u>

The SCR provided a marginally adequate review of this case.  While an adequate summary of relevant social, criminal, incarceration, substance use and mental health history was provided, a more critical analysis of factors was needed.  Regardless, the SCR provided a reasonable assessment of the precipitants to this suicide. The recommendations provided followed from the content and findings of the report, although further analysis, as previously noted, may have led to additional QIPs.

A discrepancy in the TTA log warranted further inquiry. The SCR indicated that on the night the inmate was escorted to the TTA and placed on suicide watch, the TTA log noted the nature of referral as "SI" (suicidal ideation) and also an indication of auditory hallucinations.  In contrast, he denied suicidal ideation to the TTA nurse.  Clarification regarding the report of suicidal ideation was not sought as the names of the custody officers were not documented by the TTA nurse.  It was unclear why the identification of the escort officers was not sought by other means.  Relatedly, it was unclear why the Chief Nursing Executive was interviewed regarding the circumstances with the initiation of suicide watch on November 20, 2019, instead of the nurse that assessed the inmate.

The SCR indicated that an interview with the inmate's former cellmate was not feasible, as the former cellmate had transferred to another institution prior to the SCR reviewer's site visit.  It was unclear why the reviewer could not visit the institution where the former cellmate had transferred.  While a recorded interview with the inmate's prior cellmate conducted by the ISU was utilized, a direct interview by the mental health reviewer could have provided additional information.

The review of the clinician's documentation warranted closer scrutiny.  The SCR indicated that the clinician "consulted appropriately"; however, there was no documentation by the clinician located after an independent review of the health record regarding the nature and outcome of the consultation and with whom she consulted.  Additionally, the SCR did not discuss the clinician's failure to query why the inmate

wanted time alone. There was also no documentation indicating that the clinician explored the reason for the inmate's unwillingness to leave the cell for a confidential interview. Lastly, the SCR raised a question about the assessment of low risk based on incomplete documentation but did not fully address insufficient clinical justification for the low risk assessment identified during an independent health record review.

Of concern, the SCR did not discuss the type of unit where the alternative housing occurred. The SCR made reference to the inmate being placed in "B1" but did not clarify if this was an ASU or general population unit. The use of a cell in an ASU housing unit for alternative housing would not be in alignment with CDCR headquarters policy and the Program Guide.

Of note, the toxicology and coroner's reports were documented as pending in the SCR. The report was located in Sharepoint and was dated November 26, 2019. There was no corresponding memorandum indicating review of these reports, which documented that the inmate tested positive for methamphetamine. Lastly, for unclear reasons, a few sentences were redacted.

V.     <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in five required QIPs; two that pertained to mental health; two custody recommendations, and one nursing recommendation. In all instances where training was provided, documentation of staff trained was provided, although that documentation did not allow for a determination whether the required staff was present.

The first mental health recommendation addressed documentation issues with the SRASHE completed on November 21, 2019. The documentation raised questions regarding the justification of the low acute suicide risk determination. In accordance with the QIP, the audit conducted of the identified clinician's recent SRASHEs indicated an overall pass rate of 80 percent, and results were discussed with the clinician. Aside from providing a copy of the CAT for risk assessments, no further intervention was conducted. Notably, the one identified deficiency was similar to the deficiency that warranted the QIP. This response was insufficient, as it was not responsive to the underlying issue, which should have included a plan for auditing subsequent SRASHEs and mentoring.

The second mental health recommendation addressed the lack of completion of the MHCB discharge custody check sheet after cell-side completion of the first five-day follow-up contact. In response, staff was trained on the completion of the identified form. This response was insufficient, as it did not target the identified clinician's oversight which would have been better addressed individually with an audit, education, and assessment of skill application. A process map regarding completion of the form was also developed for inclusion in the Suicide Prevention LOP. Additionally, all CDCR staff were trained on the requirement to complete mental health evaluations in

confidential settings.  This response was insufficient, as it did not assess skill application, particularly for the identified clinician.  Further, assessment of factors that contributed to refusals was not addressed, nor was there a requirement that the inmate's reasoning for the refusal be assessed and documented.  This was particularly important for this case, as the alternative housing cell was located in a housing unit.  While unknown for this facility, other institutions did not allow an inmate on suicide watch to change from the tear-resistant smock to a department uniform when escorted to a confidential area; this may have been a disincentive to agreeing to a confidential interview.

The first custody QIP addressed the emergency response.  Specifically, the cut-down kit was not brought to the incident in accordance with policy.  Training was conducted with responding staff.  This response was insufficient, as the nature of the deficiency suggested an institutional deficit.  Further, simulation such as intermittent drills would have better replicated the incident and allowed for improved skill application and sustainability.

The second custody QIP addressed the continued housing of the inmate in the same alternative housing cell despite discharge from alternative housing.  It was determined that the LOP did not provide clear direction regarding returning inmates to their previous housing within 24 hours of discharge from alternative housing.  The LOP was updated accordingly, and training was provided to facility supervisors.   This response was marginally sufficient, as there was no indication of how line staff would be informed regarding this policy update.

The one nursing QIP addressed missing documentation.  Specifically, there was no suicide watch order or MHCB plan for the placement in alternative housing on November 20, 2019.  The response identified this as an isolated incident, and training was provided to the identified staff.  This response was insufficient, as it lacked proof of practice and methodology of the review process.  Further, while training was beneficial, post-training audits ensuring skill acquisition and sustainability were not provided.

A review of the SCR indicated the need for additional QIPs.  On November 22, 2019, a CC-II informed the inmate that his mother had died; he had a close relationship with his mother.  The CC-II was unaware that the inmate was being monitored on five-day follow-up contacts as there was an institutional power outage that day.  A QIP to address alternative means of communication regarding critical information despite a power outage was indicated.  A QIP to address the inmate's access to methamphetamine was also needed.  Lastly, the inmate's removal from suicide watch without consultation warranted consideration by CDCR headquarters, as changes in levels of care routinely required an IDTT meeting; however, removal from an alternative housing placement did not.  This issue should be reviewed by statewide mental health leadership.

Case U

I.    Summary of Case

This inmate was a 36-year-old single Hispanic man who was found by correctional officers hanging in his solely occupied cell on June 14, 2019.  He was not a participant in the MHSDS at any time during his incarceration.

This inmate and his four brothers were raised by his mother in California, who was deported to Mexico in 2013.  He had no relationship with his father.  He attended some college and worked sporadically as an electrician.  He began using marijuana and alcohol at age 16 and cocaine at age 20; further details were not provided.  His gang involvement began as an adult and continued through his incarceration.

His criminal history began at age 16 when he received probation for a sex offense.  As an adult, he had multiple arrests for weapons possession, resisting arrest, assault and battery, and substance-related offenses.  He was transferred to CDCR for his first term in May 2012, and he served four years, eight months.  He returned to CDCR for his second term in September 2017 to serve 21 years for his involvement in a gang-motivated shooting for which he was charged with voluntary manslaughter and assault with force likely to cause great bodily injury with enhancements.

His institutional functioning was dominated by his gang involvement and later by his attempt to disassociate from the gang.  Of significance, his most serious RVR, a gang-motivated incident, occurred on October 3, 2017, when he was charged with attempted murder of an inmate.  This RVR was referred to the District Attorney, which resulted in multiple out-to-court proceedings during 2018 and 2019.  While in CDCR during this time, he was housed in the ASU.

On May 9, 2019, the inmate was released from the ASU and placed in the reception center general population.  According to the SCR, the RVR that he received shortly after admission and his multiple outings to court delayed reception center processing.  One month later, on June 8, 2019, he requested protective custody/SNY related to concerns for his safety which he attributed to disassociating from the gang.  He was subsequently placed in ASU overflow due to construction in the institution's ASU.  While housed in the ASU, the inmate remained isolated in his cell, refusing showers and yard.

On June 13, 2019, the inmate attended his Institutional Classification Committee (ICC) meeting and was agreeable to the committee's decision to transfer him from ASU to the reception center Special Processing Unit/SNY pending reception center processing and out-to-court proceedings.  Less than one hour later, he was discovered hanging.

According to the SCR, there was no documentation of prior mental health distress, mental health treatment, suicidal ideation, or suicide attempts in either the community or within CDCR.  All required mental health evaluations in CDCR were negative for mental health concerns.  The most recent mental health screening occurred on June 8, 2019, as an ASU screening with a psychiatric technician.  In response to questions that assessed nervousness, restlessness, or feeling fidgety in the past 30 days, the inmate responded affirmatively, stating "a little."  His responses did not warrant further mental health referral.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case and included relevant social, criminal, incarceration, substance use and mental health history.  It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

The SCR indicated that when the inmate was discovered during the completion of welfare checks, his cell window was covered.  A discussion of whether the window was covered at the time of the previous welfare check would have been useful.

Some minor issues of concern were noted regarding the SCR review.  The SCR did not review mental health rounds (and/or summary) as required by the Program Guide for all inmates in ASU.  Documentation of rounds or a summary of what was completed during the ASU stay was not located by the Special Master's expert in the health record.  Additionally, cell-front completion of the ASU Screening Questionnaire was not documented or considered in the SCR.  Relatedly, a review of the ASU Screening Questionnaire form indicated that the clinician was not required to assess the reason for the refusal and any possible accommodations that could be made to provide an out-of-cell interview.  Adding prompts to assess this information should be considered.  A review of the daily "check in" meeting between mental health and custody, as required by the Program Guide, might also provide useful information.  Lastly, a review of the ASU

114

Screening Questionnaire indicated that there was no prompt for the clinician to offer mental health follow-up when a mental health referral was not required. Adding this to the form could be useful in cases such as this in which the inmate indicated minor distress but did not reach the threshold for mental health referral.

It was unclear why out-to-court proceedings delayed reception center processing. Specifically, the attempted murder RVR occurred in early October 2018, and there was no documented out-to-court appearance in the SCR until six months later, on April 5, 2018. The delay in reception center processing warranted the development of a QIP.

Individual narratives from staff who responded to the discovery of the inmate hanging and subsequent interventions were not available for review.

Of note, the Death Review Summary provided by CCHCS indicated that there were three lapses in care; but for unclear reasons, only one resulted in a QIP. The remaining two issues were: "1) he was carried down two flights of stairs before CPR was initiated and 2) the C-collar was placed on him sixteen minutes after the incident." The potential delay in CPR by carrying the inmate from the third tier to the first tier warranted discussion in the SCR, as after CPR was initiated, the inmate had a carotid pulse.

V.    Analysis of Quality Improvement Plan Process

This case resulted in six required QIPs, five custody recommendations, and one nursing recommendation. There were no mental health recommendations. The provided documentation of required trainings did not allow for a determination of whether the required participants were in attendance, as the documentation only included signatures of those in attendance. Improved documentation was needed to determine whether the required staff received training.

The first QIP addressed the responding officer's failure to comply with departmental policy regarding lack of visibility into the inmate's cell, as the inmate covered the cell window. As proof of practice, individual training regarding departmental policy was provided to the identified officer. Operating on the assumption that there was an individual knowledge deficit, this response was adequate. However, the response would have been strengthened if there was a clear indication that a knowledge deficit led to the poor response. Further, the response would have been strengthened with skill application by routine drills.

The second QIP addressed the finding that the noose remained loosely around the inmate's neck for up to six minutes after he was cut down from the vent to which he attached the noose. As proof of practice, a departmental memorandum issued on January 22, 2018 from the Director of the Division of Adult Institutions (DAI) was provided regarding response to suicide attempts, which indicated that no policy violation occurred.

115

This response was adequate, as there was no indication in the documentation provided that the presence of the noose interfered with life-saving measures or prevented airway access.

The third QIP addressed the documentation of security/welfare checks in which times for the entire shift were pre-filled and accompanied by staff signatures. The Warden initiated the 989 process, a Request for Administrative Review. Proof of practice regarding the outcome was not included. The referral for further investigation was appropriate; however, the lack of proof of practice was problematic, as it did not allow for systemic improvement. The process for providing this proof of practice documentation required improvement to ensure transparency and accountability without identifying specific staff.

The fourth QIP targeted the processing of the inmate's cell. Specifically, state property items that were visible in photographs were not available for onsite reviewers. As proof of practice, a memorandum from an ISU staff member reviewed steps taken to process the cell and indicated compliance with departmental policy. The memorandum also indicated that the items that were unavailable onsite for reviewers were deemed not pertinent. This response was inadequate for two reasons. Determination that items were not pertinent to the case was not a decision clearly permitted by departmental policy ("Make personal property available to employees authorized to examine it." Department Operations Manual, Section 51070.15). Additionally, the response did not address any needed remediation.

The fifth QIP addressed the finding that the inmate was not placed in a retrofitted intake cell for the first 72 hours of ASU placement, an identified protective factor in that high-risk environment. In response, proof of practice regarding the completion of training for this requirement for three officers was provided. This response was insufficient. Training all ASU custodial line and supervisory staff was needed. Also, assessment of skill application by subsequent random audits regarding the proper use of intake cells was indicated.

The sole nursing QIP addressed delayed placement of the AED, which was not applied until seven minutes after the inmate was discovered hanging. As proof of practice, verification of training with response staff and a plan for regular drills was provided. This response was adequate.

According to the SCR, when the inmate was placed in ASU for protective custody, inmates who were affiliated with the gang that he was disassociating from were also housed in the same unit. A QIP to address this issue and to minimize future incidents should have also been considered.

Case V

I.    Summary of Case

This inmate was a 25-year-old African American man who was found by correctional officers hanging in his single cell on February 7, 2019.  He was receiving mental health services at the 3CMS level of care at the time of his death.

Based on the limited background information available to the SCR reviewer, it was documented that the inmate was raised by his mother and stepfather.  For reasons that were unknown, he spent two years in the foster care system and group homes as an adolescent. He completed the eleventh grade, and he was typically employed at unskilled jobs.  He had a long-term girlfriend who was his primary support, although documentation revealed a conflicted relationship.  He had a three-year-old son; it was unknown if the son was a product of this relationship.  He began using substances as a teenager and at some point used alcohol, ecstasy, and alprazolam daily.

The inmate's criminal history began at age 16 when he was sent to juvenile hall for threatening with intent to terrorize.  A year later, he was convicted of burglary.  As an adult, he spent time in county jail following convictions for inflicting corporal injury on a spouse/cohabitant and driving on a suspended license.

In March 2017, the inmate transferred to the CDCR for his first term to serve a 21-year, four-month sentence for two counts of rape with force and kidnapping.  His institutional functioning was generally unremarkable.  He received four RVRs for fighting, possession of alcohol, failure to respond to notices, and possession of a cell phone.

There was no history of psychiatric hospitalizations in the community or in CDCR.  Mental health treatment in the community was related to behavioral difficulties and criminal involvement during adolescence.  He reported that he received mental health treatment in county jail prior to transfer to CDCR.  He began receiving mental health services at the 3CMS level of care on April 25, 2017.  According to the SCR, treatment focused on depression, prison adjustment, and suicidal ideation.  At his request, Remeron, an antidepressant, was discontinued in early 2018, and the psychiatrist followed him for six months.

The inmate reported a total of ten suicide attempts, two of which occurred in county jail prior to his transfer to CDCR.  There was variability in the report of timeframes regarding the suicide attempts in county jail, ranging from the day before to six months prior to CDCR transfer.  He reported passive suicidal ideation during initial assessments and throughout his incarceration at CDCR.  During his time in CDCR, two suicide risk evaluations were completed, both in July 2017.  The first was completed as an update to his health record, as a risk assessment had not been completed previously.  The second

risk assessment was completed the next day after the inmate reported intermittent passive
suicidal ideation during IDTT.  Both times he was assessed with moderate chronic and
acute risk for suicide.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review
Committee for this case.  The Special Master's expert determined that this death was not
foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review
Committee for this case.  The Special Master's expert determined that this death was not
preventable.

IV.    Critique of Suicide Case Review Report

The SCR was marginally adequate summary of this case.  While relevant social, criminal,
incarceration, and substance use history were reviewed, several areas of mental health
treatment lacked sufficient critical review.  The SCR provided a reasonable assessment of
the precipitants to this suicide, and the recommendations provided followed from the
content and findings of the report.  Due to some points in the SCR not being clear and
omissions noted related to a critical evaluation of the inmate's care, a closer analysis of
clinical documentation in the inmate's health record was needed.

Upon review of the inmate's healthcare record a number of concerns related to continuity
of care were identified that were not mentioned nor addressed in the SCR.  Between
January 2018 and January 2019, the inmate was seen by three different clinicians without
clear rationale for these changes.  There was no documentation that treating clinicians
considered the impact on continuity of care when these changes occurred.  While changes
in clinicians can occur, consideration should be given to the possible negative effect these
changes can have on treatment alliance and engagement.  There was no documentation
indicating that these effects were explored with the inmate or considered by the three
clinicians.  Additionally, the frequency of mental health contacts did not occur as
clinically indicated and this may have been impacted by changes in the inmate's primary
clinician.  As an example, documentation indicated that on April 3, 2018, there was an
increase in passive suicidal ideation compared to January 3, 2018.  While the SCR
identified the need for a risk assessment, it failed to consider the delay of appropriate
clinical follow-up as the inmate was not seen by his clinician until more than two months
later.  The clinician who saw him at the time was different from the previous clinician
and noted that the patient reported a decrease in passive suicidal ideation; however, there
was no inquiry about factors that could have impacted the change.  Another concern

related to poor continuity of care that was not addressed in the SCR was the fact that a treatment goal to address suicidal ideation remained unchanged despite failure on the part of the inmate to make any progress toward that goal between a July 2017 and July 2018 IDTT. A review of the healthcare record revealed that inmate progress toward the goal was assessed regularly with PLOs, however, lack of progress and ongoing symptomatology was not discussed. Standards of care indicate that when a patient's current treatment plan fails to adequately address a patient's needs and a patient fails to demonstrate progress under a plan of care, the plan should be adjusted to account for the ongoing needs. Lastly, there was a need for improved collaboration between treatment providers. As an example, a review of the healthcare record revealed discrepancies between the psychiatrist and the primary clinician with regard to the patient's level of chronic suicide risk as well as his diagnostic profile. Neither of these discrepancies were addressed during the inmate's treatment nor were they identified as issues in the SCR.

Of note was a mental health assessment completed in April 2018, after the inmate received an RVR for possession of alcohol. The clinician stated that there was no indication of psychiatric distress that could have influenced his behavior; however, there was no consideration that the inmate could have been using alcohol in an attempt to self-medicate, as clinical documentation around that time indicated symptoms of anxiety, depression and passive suicidal ideation. The SCR did not mention this as a concern.

V.   Analysis of Quality Improvement Plan Process

This case resulted in six required mental health QIPs and one nursing concern that, for unknown reasons, did not rise to the level of a QIP. The SCR indicated that although the first three QIPs addressed incidents that occurred outside the typical 12-month review period preceding an inmate's suicide, it was opined that deficiencies impacted subsequent assessments and underestimation of suicide risk. Of note, the fifth QIP was also outside the 12-month timeframe, but no such explanation was provided. There were no custody recommendations.

The first QIP addressed the lack of attempt to obtain treatment records from the county jail prior to the inmate's CDCR incarceration. In response to this QIP, all staff was trained on the importance of requesting county records and the process to obtain information. Proof of practice included training materials and trainee sign-in documentation. The provided documentation did not allow for a determination of whether the required staff was in attendance for the training. This response was marginally adequate. Post-training audits of record requests were needed. Additionally, to expedite the receipt of records from county facilities, CDCR should consider pursuing a MOU with county facilities to address the sharing of mental health documentation.

The second QIP addressed a delay in the completion of the initial mental health assessment. In accordance with the QIP, an inquiry was conducted to evaluate the policy

violation, which suggested that implementation of the electronic health record system could have contributed to the delay. The QIP also required that any current compliance issues be addressed. Current compliance was at 94 percent. This response was adequate but could have been strengthened by reviewing the identified clinician's compliance for completion of initial mental health assessment during that timeframe.

The third QIP addressed the lack of a suicide risk evaluation at the time of the completion of the initial mental health assessment. While CDCR no longer employed the identified clinician, all staff were trained regarding the requirements of the completion of a suicide risk evaluation. The provided documentation did not allow for a determination of whether the required staff was in attendance for the training. Training materials focused on policy requirements and would have been improved with skill application through clinical scenarios. This response was inadequate. Post-training audits to ensure sustainability were also indicated, given the significance of this deficiency.

The fourth QIP addressed a delayed mental health contact that exceeded the 90-day routine contact requirement. An electronic health record inquiry indicated that the completion of an IDTT likely reset the clock for compliance, and thus a contact was not noted as due until 30 days after the IDTT. This was confusing, as clinical contacts are required at least every 90 days for 3CMS inmates; thus, the clock should have been reset for 90 days. Regardless, this response was limited and insufficient; although the reason for the missed contact was identified, a resolution was not specified.

The fifth QIP addressed deficiencies in suicide risk evaluations; specifically, underestimation of risk, inadequate consideration of factors that could increase risk, modifiable risk factors, warning signs, protective factors, lack of a comprehensive safety plan, and lack of consideration for referral to a higher level of care. In response, an audit of the identified clinician's available risk assessments was completed. Improvement after completion of the evaluations in question was noted in the three reviewed risk evaluations. Training was to be completed in an upcoming risk assessment training. This response was inadequate given the gravity of the deficiency. At a minimum, pending completion of training, close supervision of completion of risk assessments and post-training audits for this clinician was indicated.

In response to the last QIP, which addressed the lack of suicide risk evaluations since July 2017, documentation for two identified clinicians was reviewed; however, the majority of reviewed documentation was for inmates that did not warrant the completion of a risk assessment. Regardless, completion of training was recommended; although, the timeframe was not provided. This response was inadequate for several reasons. A review of the health record indicated that documentation from only two of the several clinicians that failed to complete a risk assessment were reviewed. Regarding the review that was completed, a timeframe for training was needed. Additionally, a review for each clinician regarding the lack of suicide risk evaluation for this inmate was needed; the

majority of documentation reviewed was irrelevant to the issue at hand. It was possible that relevant documentation was unavailable; if so, case examples to assess clinical judgment would have been useful.

The one nursing concern indicated that nursing documentation did not include detail regarding the incident. It was documented that the nurse professional council would address documentation issues. Proof of practice was not provided; thus, adequacy could not be assessed.

It was unclear why a delayed urgent referral to mental health due to a report of suicidal ideation at the time of admission was not included as a QIP. While it was outside the 12-month review timeframe typical of SCRs, four QIPs in this case that occurred outside the 12-month timeframe were recommended

Case W

I.  Summary of Case

This inmate was a 33-year-old Caucasian single man who was found by correctional officers hanging in his single cell on January 8, 2019. He was receiving mental health services at the EOP level of care at the time of his death.

This inmate was raised by his mother in California after his parents' divorce when he was age four. He left school in the eleventh grade but obtained his GED. He was in a motor vehicle accident at age 17, which resulted in a traumatic brain injury. There was a family history of mental illness (Bipolar Disorder and suicide) and substance use. The onset of alcohol use began during childhood, and by adolescence, he was using methamphetamine daily.

He was transferred to CDCR in August 2017 to serve a five-year sentence for his first offense, assault with a deadly weapon and infliction of great bodily injury. Due to the committing offense (assault of a friend with a crowbar 30 times, reportedly unprovoked), he was endorsed to a single cell on an SNY. While in CDCR, the inmate had two RVRs, both for assaultive behavior, one of which he attributed to auditory hallucinations.

Prior to incarceration, his mental health treatment was limited to a few outpatient sessions in 2013 for anxiety due to methamphetamine use. He also received treatment in the emergency room in June 2017 for suicidality and "chronic psychosis with hallucinations and addiction."

According to the SCR, throughout his time in CDCR, the inmate was described as psychotic with symptoms of hallucinations, bizarre and disorganized behavior, and paranoid delusions, which, at times, prevented him from eating. Although he

experienced chronic psychotic symptoms, his symptom severity varied.  He was consistently provided with a diagnosis of Bipolar I Disorder; in the months prior to his death, a diagnosis of Schizophrenia was also added.  Mental health treatment in CDCR generally addressed depression, hallucinations, and suicidality.  The inmate minimized the severity of his symptoms, and he had poor insight regarding his mental health needs.  He tended to isolate and was largely treatment-resistant, refusing psychiatric medications, group attendance, and confidential contacts; however, he generally agreed to participate in cell-front contacts.  Findings from suicide risk evaluations were variable; chronic risk was assessed as moderate and high, and acute risk assessed was assessed as low, moderate and high.

According to the SCR, shortly after admission, the inmate was placed at the 3CMS level of care after reporting daily paranoia and "voices."  Within three months, he was elevated to the EOP level of care due to decompensation.  After another three months, he decompensated further; and for the first time during his CDCR incarceration, he reported a plan to hang himself.  He disclosed that he had wrapped a sheet around his neck and passed out two months prior.  He was admitted to his first of four MHCB placements in five months.

The most recent MHCB admission in June 2018 was precipitated by an intention to hang himself.  Shortly after admission to the MHCB, the inmate denied suicidal ideation and was returned to the EOP.  There were no major issues noted in the SCR until July 3, 2018, when he reported command auditory hallucinations that caused him to feel "scared."   He was referred for a PC 2602 involuntary medication order; however, no documentation was located regarding the outcome.  He continued to report hallucinations with intermittent refusal to eat and to engage with mental health staff.

An institutional transfer occurred approximately two months after the last MHCB discharge.  During that period (August 2018 to November 2018), the inmate was minimally engaged in treatment.  Psychiatric documentation was present indicating a plan to monitor for involuntary medication criteria.

Another institutional transfer occurred in November 2018.  Within eight days of the transfer, the SCR indicated that the inmate presented with bizarre behavior (running in place in his cell while naked) and behavior indicative of suicidal ideation (observed with rope or string around his neck, gave away his canteen) that led to three custody referrals to mental health in eight days.  The inmate was evaluated by mental health on all three occasions; after each evaluation, he remained at the EOP level of care.  An IDTT was conducted during this period, where it was decided that the inmate would be maintained at the EOP level of care.  The SCR assessed that treatment goals of encouraging medication adherence and the use of relaxation skills to manage the inmate's psychotic symptoms were inadequate.

Institutional staff who were interviewed for the SCR expressed surprise that the inmate killed himself. He reportedly appeared to be improving as assessed by his increased activity of going to chow and yard and his interacting with peers and staff. The primary clinician reported that his mood had improved in the month preceding his death. Similarly, an interviewed inmate peer observed a decrease in the inmate's isolation, and he was also surprised by his suicide.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was foreseeable. There was a history of multiple MHCB admissions in a short period of time for suicidal ideation and untreated psychosis; while the inmate's psychotic symptoms stabilized, his treatment resistance persisted. The most recent risk assessment on November 28, 2018 underestimated suicide risk, as it did not include documentation of a suicidal statement that precipitated the mental health referral, did not include an assessment of imminent risk factors and did not consider multiple recent behaviors that placed the inmate at elevated suicide risk. This deficient narrowly focused assessment did not fully consider the inmate's untreated mental illness in the overall context of his history, treatment needs, and treatment resistance. These deficiencies negatively impacted timely and appropriate clinical interventions.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable. There were multiple missed opportunities during the CDCR incarceration when the inmate's symptomatology warranted higher level of care consideration and referral; as recently as two months prior to the suicide, the inmate exhibited such bizarre and suicidal behavior. Relatedly, clinical justification for non-referral to a higher level of care and proposed treatment modifications at the most recent IDTT were inadequate.

IV.    Critique of Suicide Case Review Report

The SCR was an adequate summary of this case and included relevant social, criminal, incarceration, substance use and mental health history. It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

123

Despite the adequate summary, there were multiple instances where critical analysis of deficiencies in mental health care was needed, all of which warranted QIPs. The SCR was not sufficiently critical of multiple missed opportunities to refer this individual to a higher level of care, including referral delays when the inmate was at the MHCB and EOP levels of care. Additionally, there was limited assessment of the appropriateness of non-referral clinical justification and treatment modifications. There were at least six documented references to consideration of obtaining a PC 2602 involuntary medication order in the SCR, but critical analysis of the rationale for non-referral was not documented. As an example, psychiatric documentation from November 20, 2018 noted a plan to observe the inmate to determine if involuntary medication criteria were met. However, an independent review of the health record did not provide subsequent documentation regarding the status of this determination. Another area of needed assessment was the inmate's chronic treatment resistance that resulted in cell-front contacts, which did not allow for a comprehensive clinical assessment. All of these issues of concern regarding clinical decision-making were not discussed in the SCR.

Another pertinent area of concern that was not discussed in the SCR was the need for collaborative treatment planning. As an example, the SCR indicated that psychiatric documentation from November 20, 2018 indicated the need to "strongly consider for higher level of care," but no such documentation was located after an independent review of the treatment plan. Relatedly, a senior psychologist supervisor did not consider this psychiatric documentation the following day when it was documented that "There appears to be no objective signs that the behavior last night was manifesting from a substantial psychiatric decline, and housing staff observations describe a stable, non-problematic, consistent routine for this patient. No additional follow-ups [sic] will be arranged…" Consideration of the impact of multiple treatment team changes with institutional transfers on continuity of care was not considered. In a period of just over two years, this inmate had at least nine different treatment teams, three of which occurred during the last six months of his life.

Additional areas of concern that may not have affected the outcome of this case were also noted. A concerning suicide risk evaluation that resulted in a QIP was completed by a post-doctoral intern, an unlicensed clinician. This clinician's documentation should have been co-signed and reviewed by a licensed clinician. There was no discussion and subsequent QIP to address this lack of supervision. Additionally, there was no discussion of placement in the 3CMS program shortly after transfer to CDCR, despite reports of daily paranoia and auditory hallucinations for this first-term inmate. There was also no discussion regarding these symptoms and the provision of a diagnosis of mood disorder which was inconsistent.

Of note, the toxicology and coroner's reports were documented as pending in the SCR yet were available in Sharepoint and there was no corresponding memorandum indicating a review of the report by the Suicide Case Review Committee.

V.    Analysis of Quality Improvement Plan Process

This case resulted in nine required QIPs, which included four institutions.  There were seven mental health concerns, one custody concern, and one multidisciplinary concern.  Of note, for all recommendations where training was provided, the provided documentation did not allow for a determination whether the required staff received training.

The first recommendation addressed the need to obtain full jail health records for newly admitted inmates and the clinician's failure to review available documentation.  In response to this QIP, the institution indicated a plan to develop a local operating procedure within one month to address this issue, with a plan to train all staff.  While not recommended as part of the QIP, the identified clinician was provided with training on this issue.  The institution's response to the QIP was adequate.  However, the QIP itself fell short.  Specifically, this was not the first indication of a failure to obtain collateral information for newly admitted inmates in an SCR.  As this appeared to be a systemic issue, it was recommended that CDCR seek an MOU regarding the expeditious sharing of healthcare information with county facilities and any other agency transferring individuals to CDCR.

The second recommendation addressed the quality of a suicide risk evaluation completed on February 17, 2018, when the inmate was a participant in the EOP.  Audit findings of the identified clinician found consistently poor risk assessments.  Re-mentoring was previously completed several times with minimal improvement.  Re-mentoring was completed again in response to this QIP with a plan for monthly review and daily review of completed risk assessments.  This response was inadequate.  Given ongoing problems with suicide risk evaluation documentation despite multiple interventions, a more appropriate response would have been for future risk assessments to be referred to another clinician and to consider re-directing this clinician to a lower level of care where risk assessments would occur less frequently.

The third recommendation addressed a conversation between a clinician and the inmate's mother that provided information regarding a history of suicidal ideation that was not integrated into documentation for subsequent providers to review.  In accordance with the recommendation, the facility indicated that the original release of information could not be located, and staff was trained on the process to obtain and disseminate information from collateral sources.  This response was sufficient.

The fourth and fifth recommendations addressed the lack of completion of a suicide risk evaluation on two occasions by two different clinicians.  Regarding the first case, the institution responded that a suicide risk evaluation was not required by policy. The discrepancy between the SCR recommendation and the institutional response warranted clarification.  Despite re-mentoring and training, the first clinician continued to have

125

difficulty with the completion of suicide risk evaluations, with subsequent removal from the CIT and the implementation of corrective action. Training, re-mentoring, and regular supervision were documented as plans for the other clinician in addition to corrective action. Additionally, all CIT staff were provided training regarding when to complete a suicide risk evaluation. This response was sufficient. Of note, while outside the scope of the QIP, the finding that two CIT members evidenced problematic suicide risk evaluations warranted closer examination of all suicide risk evaluations by CIT members at this institution with intervention provided as needed.

Part of the fourth recommendation involved discussion of the plan to place the inmate in alternative housing for overnight observation; this did not occur as the inmate refused to transfer. There was no specific QIP, but the institution indicated that the identified clinician received training on the controlled use of force process. It was unclear why training did not include custodial staff who were involved in the response. Relatedly, CDCR might want to consider alternative interventions other than the use of force for similar scenarios in which there was a need for increased observation that did not rise to the level of imminent risk.

This sixth recommendation addressed an underestimation of suicide risk regarding a suicide risk evaluation completed on November 28, 2018. Audited risk assessments of the identified clinician indicated multiple deficiencies in the completion of the evaluation, despite previous trainings. Subsequently, the clinician was counseled with a plan to supervise future suicide risk evaluations. This response was insufficient. Given the significant deficiencies, completion of future suicide risk evaluations should have been referred to another clinician, and the clinician should have been re-assigned to a lower level of care.

The seventh recommendation addressed a clinician's failure to accept information from the inmate's mother when she contacted the facility and to utilize a previously documented release of information to correspond with the inmate's mother. Of note, the reference to the previous release of information was confusing, as the SCR previously indicated that it could not be located (third recommendation). In response to the recommendation, all staff was trained on the release of information policy.

The eighth and final mental health recommendation addressed various concerns identified during the most recent IDTT on November 29, 2018, including lack of identification of higher level of care considerations and inadequate interventions. Audits of the identified clinician's treatment plans were noted as "highly problematic." In response, the clinician was counseled with a plan to provide extensive training and close supervision of all subsequent treatment plans. Further, it was indicated that as a contract employee, the contract would be subject to termination if remediation efforts were inadequate. This response was adequate.

The one custody recommendation addressed the lack of completion of mental health referrals for documentation of bizarre behavior in the custody logbook. In response, unit custody staff was trained, with a plan to train all custody staff.

Two issues identified in the SCR warranted QIPs. The first was related to staff failure to recognize that repeated MHCB admissions were a "trigger for referral to a higher level of care" and consideration of non-emergent involuntary medication. The second was an inability to locate documentation for a PC 2602 referral in July 2018.

Case X

I.    Summary of Case

This inmate was a 47-year-old married Hispanic man who was found by his cellmate hanging in his double-occupied cell in an SNY on December 27, 2019. He was receiving mental health services at the 3CMS level of care at the time of his death.

This inmate and his eight siblings were raised in California by his mother and stepfather. He left school in the tenth grade, but he obtained his GED. While in CDCR, he completed some college coursework. Prior to incarceration, he supported himself financially through physical labor employment, and criminal activity. There was a family history of substance abuse and suicide. His substance use history, including alcohol, narcotics, steroids, cannabis, cocaine, and ecstasy, dated back to adolescence; after a period of sobriety, he resumed use in December 2019. A divorce was pending with his second wife in 2016. He had three children with whom he had minimal contact.

The inmate had an extensive juvenile and adult criminal history. He was incarcerated for his first CDCR term for voluntary manslaughter serving a ten-year term; he paroled after serving six years. On February 27, 2006, he began his second CDCR term after being sentenced to seven years and eight months for attempted criminal threats to cause great bodily injury or death/threatening a witness. This sentence was to run concurrently with a 35 years-to-life plus ten years due to his extensive criminal history and incarceration.

He received seven RVRs during his second term; most resulted from aggressive behavior, and the most recent occurred six months prior to his death. In October 2009, the inmate disassociated from the gang he was involved with since adolescence; this resulted in an SNY designation.

According to the SCR, there was no history of mental health treatment in the community. The inmate received mental health treatment in county jail after his first known suicide attempt by cutting his wrist. He did not receive mental health treatment in CDCR until 2013 when he was placed in the MHCB due to suicidal ideation with thoughts of overdosing. He was discharged to the 3CMS level of care, where he remained for the

duration of his incarceration. He was provided with a diagnosis of Depressive Disorder, NOS, and he reported benefit from antidepressant medication treatment.

The SCR described the inmate as engaged in treatment. Except for two "minor delays," contacts occurred timely. During the year prior to his suicide, there were two reports of suicidal statements for which the inmate was evaluated and returned to his housing. The first incident occurred in March 2019, when the inmate made suicidal statements to a physician after he was not prescribed pain medication for a kidney stone. One week prior to his suicide, the inmate reported suicidal ideation, and the CIT evaluated him. Nursing documentation noted observation and treatment of a superficial cut to his wrist. The SCR determined that the suicide risk evaluation underestimated the inmate's suicide risk.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.   Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable. In the three months prior to his suicide, this inmate's mental health care was provided by two unlicensed clinicians who were inadequately supervised. Initial assessments, two suicide risk evaluations, one routine contact, and the CIT contact one week before the suicide were not co-signed by a licensed supervisor. Co-signature ensures real-time supervision of an inmate's care. Of note, the SCR indicated that the suicide risk evaluation completed by the CIT clinician "significantly underestimated risk." Real-time supervision should have identified the noted deficiencies. More importantly, the assignment of a licensed clinician to the CIT was indicated.

IV.    Critique of Suicide Case Review Report

The SCR was an inadequate summary of this case. While relevant social, criminal, incarceration history was discussed, given the inmate's relapse just prior to his death, a more thorough discussion of substance use history was needed. More importantly, the SCR did not discuss treatment goals, quality of mental health contacts, and alignment of treatment goals with the treatment provided. The SCR provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

Of importance was a discrepancy noted regarding the last mental health contact that occurred on December 6, 2019. An independent review of healthcare documentation indicated that the inmate refused the contact, stating, "I am doing good and do not want to be seen today." In contrast, the SCR indicated that the inmate was seen on that date, as evidenced by a statement about his depression and anxiety. However, that information was pulled forward from the initial assessment three months prior, and it was not representative of a contact occurring on December 6, 2019. This illustrated the need for improved review of the quality of mental health contacts, which was previously stated.

Other mental health care areas that were not addressed in the SCR included the following:

1) the impact that discontinuation of antidepressant medication between mid-September 2019 and November 15, 2019, may have had on the inmate's mental status in the time preceding his suicide,
2) the lack of timely transfer to an STRH after ASU placement; this resulted in the inmate not receiving the required level of mental health services in an STRH,
3) documentation indicating that the CIT clinician and primary clinician were unlicensed clinicians, and a licensed clinician did not co-sign their documentation, and
4) discussion of the suicide note in which the inmate stated that his wife contacted CDCR approximately one week before his suicide to request a mental health referral.

The SCR indicated that during the on-site suicide review, some responding staff and the primary clinician were not on-site; therefore, they were unavailable for interview. It was unclear why additional efforts, such as a telephone interview, were not initiated.

Based on the discussion of the CIT assessment, it was unclear if the contact intervention occurred in alignment with CDCR headquarters policy, which required CIT members to meet with inmates together. It was also unclear if the mental health clinician was aware of the self-injurious behavior that the nurse observed and treated.

V.    Analysis of Quality Improvement Plan Process

This case resulted in four required QIPs that included two institutions. Three QIPs were mental health-related, and one was custody-related. One mental health concern and one custody concern did not rise to the level of a QIP.

The first mental health QIP addressed an urgent referral which the clinician downgraded to a routine referral. The precipitating event was that the inmate made a suicidal statement, but no suicide risk evaluation was completed. The individual staff member was trained regarding the appropriate completion of the suicide risk evaluation. A

memorandum that outlined the process for downgrading referrals was distributed to staff, and the identified clinician was trained. This was a marginally adequate response which would have been improved with subsequent documentation audits post-training.

The second mental health QIP addressed delayed documentation of self-injurious behavior as self-harm. As a result, it was unclear if the incident was timely reported to the suicide prevention coordinator. This QIP resulted in the finalization of a local operating procedure, and staff training was provided. The response was adequate.

The third mental health QIP addressed the poor quality of a suicide risk evaluation and safety planning completed on December 20, 2019. In response, a review of the identified clinician's risk evaluations resulted in re-assignment and close supervision. This response was marginally adequate. Co-signature by a licensed supervisor of this unlicensed clinician's clinical documentation daily was indicated.

The fourth was a joint nursing and mental health QIP that addressed problematic documentation of a CIT contact. In response, a memorandum was issued regarding the completion of documentation, and staff received training. In addition, ten percent of CIT SRASHEs were reviewed, with a plan to train those staff not achieving 90 percent on the audit. This response was adequate; however, the provided documentation did not allow for a determination of whether the required staff received training.

The mental health concern addressed problematic treatment plans dated March 27, 2019 and July 3, 2019. Based upon the concerns noted in the SCR, including the lack of "updated, individualized, measurable interventions" identified in these documents "did not appear to impact his overall treatment and were not identified as a nexus to his suicide;" it was unclear why this concern did not rise to the level of a QIP. A formal QIP appeared indicated.

The custody concern addressed the improper use of the cut-down tool. As this concern was addressed during the institution's internal review and corrected by training, it did not rise to the level of a QIP.

The Special Master's expert review identified the need for additional QIPs as follows:

- The SCR indicated that documentation in the SRASHE changed with the "cutover" notes to the electronic health record system. Thus, prior documentation of a suicide attempt by cutting while in county jail was not brought forward and impacted subsequent risk assessments. A system-wide inquiry was needed to assess the loss of pertinent clinical documentation due to the electronic health record system cut over.
- An independent review of the health record indicated documentation from the CIT clinician and primary clinician was not co-signed by a licensed supervisor. A

system-wide process to ensure daily review and co-signature of unlicensed staff's documentation was necessary. Further, the assignment of an unlicensed staff to the CIT was problematic and warranted policy review to ensure assignment of only licensed staff.

- A process was needed to alert mental health staff and to better communicate incidents of drug use involving MHSDS participants. In this case, a physician was aware that the inmate was using illicit substances in mid-December 2019; a referral to mental health would have provided useful information. Additionally, the inmate's roommate was also aware of his drug use. CDCR should consider implementing an anonymous referral process that would not result in disciplinary action for any involved party.

Case Y

I. <u>Summary of Case</u>

This inmate was a 39-year-old single Caucasian man who was found by correctional officers hanging in his double-occupancy cell in an SNY on October 29, 2019. He was receiving mental health services at the 3CMS level of care at the time of his death.

This inmate was raised by his mother and stepfather in California in a home where both parents had a history of substance abuse. He never knew his biological father. He left school in the eleventh grade and obtained his GED diploma. His work consisted of unskilled jobs, and he had no children. He had an extensive substance abuse history that began in adolescence with marijuana and alcohol use which progressed to daily methamphetamine use at age 16 and heavy heroin use at age 23.

Criminal activity began during adolescence and continued through adulthood. The inmate reported that he was under the influence of methamphetamine during the majority of his crimes, which he mainly committed to support his drug use.

The first CDCR term began at age 23. Between the release from his first CDCR term in 2008 and his fourth term, he had one federal prison incarceration. The inmate had multiple parole violations, typically related to treatment program failures. He was incarcerated for his fourth CDCR term in March 2019 for attempted robbery in the second degree, and he was sentenced to two years with a five-year enhancement for prior felony conviction of a serious offense.

The inmate's institutional adjustment was unremarkable. He did not receive any RVRs. As a gang drop-out, placement in an SNY was initiated during previous terms and continued during his fourth term. During this term, he participated in the ISUDT and MAT program. He was prescribed naltrexone.

This inmate's mental health history began during childhood when he was diagnosed with Attention Deficit Disorder; he was described as a "severely emotionally disturbed child." He was prescribed methylphenidate (i.e., Ritalin) for most of his childhood. As an adolescent, he had two psychiatric hospitalizations, as well as group home and residential program placements due to problematic behavior. As an adult, he was treated for depression with antidepressant medications.

During previous CDCR incarcerations, the inmate received mental health services primarily at the 3CMS level of care, with brief placements in the EOP and two MHCB admissions for suicidal ideation. Following his return to CDCR for his fourth term, the inmate reported mild depression and anxiety, and he was placed in the 3CMS program. He was provided with diagnoses of Unspecified Anxiety Disorder, Methamphetamine Use Disorder, and Opioid Use Disorder. According to the SCR, the inmate had one suicide attempt in the community and several incidents of suicidal ideation. Suicide risk assessments conducted in CDCR provided determinations of moderate chronic and low acute risk for suicide. Between the initial psychiatric and primary clinician assessments in April 2019, and the last primary clinician contact on October 22, 2019, there was no indication of acute mental health distress, including suicidal ideation and paranoia.

At the time of the initial psychiatric assessment, mirtazapine was discontinued due to medication side effects. At that time, the inmate declined alternative medication treatment, and psychiatric documentation indicated no clear clinical indication for antidepressant treatment. The inmate was seen one month later for a psychiatric contact due to his request to resume mirtazapine. The SCR noted that he did not "verbalize specific symptoms that would benefit from psychiatric medication." An independent health record review indicated that the psychiatric contact occurred in a non-confidential setting. Laboratory tests were ordered, and a plan was made for follow-up in one week. The inmate, however, was not seen until one month later due to an institutional transfer. At the initial psychiatric assessment at the new institution, the inmate declined medication treatment, and documentation did not support an indication for such treatment. An independent review of documentation noted a plan for follow-up in two weeks which did not occur.

Peer interviews indicated that the inmate was preoccupied with the Mexican cartel and discussed "elaborate scenarios" of how the cartel would torture him. As an example, he believed that on Halloween (two days after his suicide), "the cartel would pay someone to beat him up, he would be sent off in an ambulance, the ambulance members would be members of the cartel, and they would torture him" and "custody officers and hospital staff would be paid off and [sic] cartel would be disguised." Another example of paranoid symptomatology occurred when the inmate experienced dizziness after eating food provided by an inmate-peer; he concluded that the food had been poisoned.

II.    <u>Determination of Foreseeability</u>

There was no determination of foreseeability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not foreseeable.

III.    <u>Determination of Preventability</u>

There was no determination of preventability made by the Suicide Case Review Committee for this case.  The Special Master's expert determined that this death was not preventable.

IV.    <u>Critique of Suicide Case Review Report</u>

The SCR was an adequate but marginal summary of this case, as lapses in psychiatric care were not discussed.  Specifically, an independent health record review noted two instances in which psychiatric documentation indicated a planned timeframe for follow-up, which did not occur.  Additionally, the SCR did not consider that the lack of confidential psychiatric contact may have inhibited disclosure.

The SCR included relevant social, criminal, incarceration, substance use, and mental health history.  Of concern, the SCR did not address the lack of integration of prior CDCR mental health history into current mental health documentation; this could have impacted his current treatment.  The SCR provided a reasonable assessment of the precipitants to this suicide, but it did not consider the inmate's history of paranoia.  Specifically, the SCR determined that the inmate's fears of cartel retaliation were realistic due to his history of transporting undocumented immigrants.  The SCR failed to consider earlier signs of paranoia and previous diagnoses of Psychotic Disorder, NOS, and Amphetamine-Induced Psychotic Disorder with delusions, which were provided during prior CDCR incarcerations.

Recommendations provided followed from the content and findings of the report.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in one custody, and one nursing-required QIP and a mental health concern that did not rise to the level of a QIP.  The custody QIP addressed emergency response; the cut-down kit was not brought to the incident scene.  In response, the institution updated the suicide prevention local operating procedure.  Additionally, a memorandum was distributed to all staff, and training was provided to responding staff.  This response was marginally sufficient.  Institutional drills were needed to ensure skill application.  The nursing QIP addressed the CPR response.  Training was provided to the identified staff.  This response was sufficient.

133

The mental health concern addressed a logistical issue in which the substance use disorder diagnosis from the primary clinician assessment was not listed in the diagnosis and problems list section in the health record, the place of record. The SCR indicated that the lack of documentation did not appear to impact treatment; therefore, it did not rise to the level of a QIP.

Two additional QIPs were indicated. A QIP was needed to address coordination of care between the MAT and mental health staff due to discrepant reports regarding recent substance use. Additionally, during the initial primary clinician assessment, collateral health records were not requested regarding the history of psychiatric hospitalization in 2018 and a suicide attempt in county jail in 2018.

Case Z

   I.   Summary of Case

This inmate was a single 38-year-old African American man who was found by correctional officers hanging in his single cell in the PSU on June 11, 2019. He was receiving mental health services at the EOP level of care at the time of his death.

The inmate was raised by his mother in Mississippi and had a chaotic childhood which included physical abuse and homelessness. As an adolescent, he had several group home placements until he moved to California to live with his grandparents, as his mother refused attempts to regain custody of him. He did not complete high school, but he later obtained his GED diploma. He had a history of significant substance use, including heroin, alcohol, marijuana, and methamphetamine that began at age 14. His alcohol and drug use were discontinued after the arrest for his commitment offense in February 1999.

The inmate's criminal history began in adolescence and resulted in juvenile hall commitment until his eighteenth birthday. He was transferred to the CDCR in August 1999 for his first term to serve life-with-parole for three counts of robbery in the second degree with a firearm enhancement. He had a significant CDCR disciplinary history, receiving between 100 to 200 RVRs; most of the RVRs were due to indecent exposure. During the 11 years preceding his death, the inmate was housed in restricted housing 33.9 percent of his incarceration; 66 percent of his incarceration occurred while he was housed in an inpatient setting.

As an adolescent, the inmate was provided with a diagnosis of ADHD. There was no documentation of mental health treatment in the community as an adult. The inmate received mental health services at the EOP level of care throughout his incarceration, with multiple MHCB and PIP admissions. Provided diagnoses included Schizoaffective Disorder, Exhibitionism and Antisocial Personality Disorder. According to the SCR, the

inmate had a history of chronic "severe persecutory and paranoid delusions," auditory hallucinations, "persistent suicidal ideation," and self-injurious behavior.

The inmate received his psychotropic medications by PC 2602 order since at least 2008 due to danger to self and others. The SCR indicated that the inmate's psychiatric symptoms "tended to wax and wane, and given symptoms were most often refractory/unresponsive to medications, substantive and sustained improvements were elusive." Multiple medication adjustments occurred, and the SCR concluded that "treatment rationale and chosen medications were within clinical standards."

During the majority of the six months prior to his death, the inmate was housed in an inpatient setting. On January 3, 2019, he was admitted to the MHCB for suicidal ideation, persecutory delusions, auditory hallucinations, and depressive symptoms. He engaged in superficial self-injurious behavior, which he attributed to distraction from auditory hallucinations; he was monitored on suicide watch for the duration of his MHCB stay. He was referred to the acute level of care where his psychotic symptoms continued; he remained on suicide watch until transfer to the intermediate level of care on March 12, 2019. While in intermediate care, the inmate was placed on suicide watch and suicide observation for suicidal ideation and self-injurious behaviors. Reports by the inmate of suicidal ideation were assessed by staff as purposeful to facilitate placement on a suicide watch, where he could engage in indecent exposure.

Psychotic symptoms, which were initially assessed during the intermediate hospitalization as due to secondary gain, continued; however, clinicians determined that these symptoms had stabilized on the current medication regimen by mid-May 2019. Subsequently, the inmate was discharged during a special IDTT. At the time of his discharge, he had abstained from self-harm behaviors for approximately one month, and the treatment team determined that he met his treatment goals.

The inmate was discharged to the EOP level of care on May 20, 2019. The SCR indicated that he continued to experience auditory hallucinations and persecutory delusions, which increased his depressive symptoms. Medications were adjusted in response to his symptoms, but subsequent requests by the inmate to see the psychiatrist did not occur.

Documentation regarding the history of suicide attempts varied. There was a report of three suicide attempts by hanging, but it was also noted that these could have been suicidal statements with plan rather than actual hanging attempts. CDCR suicide risk evaluations primarily assessed the inmate with moderate chronic and acute risk for suicide.

II.    Determination of Foreseeability

There was no determination of foreseeability made by the Suicide Case Review Committee for this case. The Special Master's expert determined that this death was not foreseeable.

III.    Determination of Preventability

There was no determination of preventability made by the Suicide Case Review Committee for this case.

The Special Master's expert determined that this death was preventable. As identified by the SCR, there were multiple suicide risk evaluations that underestimated the level of suicide risk, and safety planning was inadequate. This was particularly problematic, as the inmate was housed in restricted housing, a high-risk environment for suicide.

IV.    Critique of Suicide Case Review Report

The SCR provided a comprehensive and adequate summary of this case and included relevant social, criminal, incarceration, substance use, and mental health history. It provided a reasonable assessment of the precipitants to this suicide, and the recommendations provided followed from the content and findings of the report.

The SCR did not consider the impact of several pertinent clinical factors affecting this inmate's mental health care, including cell-front contacts and numerous institutional transfers; he had 49 total transfers. There was a lack of documentation to indicate that consideration of whether placement in restricted housing was contraindicated for this individual; this was of significance, as the inmate spent two-thirds of the last ten years in an inpatient setting. It also did not appear that the SCR considered that the inmate did not attend group treatment intended to mitigate the impact of isolation. Further, other than a brief reference to a behavioral plan, there was no discussion of the need to implement a behavior plan with incentives to facilitate behavior change, including decrease in self-harm statements and behavior, as well as indecent exposure. The required functional analysis of a behavior plan would have determined whether the inmate's suicidal statements were made to increase his opportunity to engage in indecent exposure as indicated in the PIP documentation. Lastly, following the initial medication adjustment upon discharge to the EOP, the inmate requested to see the psychiatrist through his primary clinician on June 5, 2019, and the psychiatric technician on June 10, 2019; however, no follow-up occurred.

Other areas warranted further discussion regarding the mental health services provided at the intermediate level of care. It was noted that when the inmate was discharged from the intermediate level of care, he had met his treatment goals "to the best of his ability;"

however, progress toward treatment goals and the appropriateness of discharge was not critically analyzed. Additionally, discharge documentation indicated that the inmate endorsed suicidal ideation, which brought into question whether the inmate had met treatment goals and the appropriateness of intermediate care discharge. A posthumous interview with the treatment team that "opined a symptom of hypersexuality from his psychosis and bipolar features may have had a contributory factor in his indecent exposure behavior" was also not discussed. This inmate was also monitored alternately on suicide watch and suicide observation; the SCR did not evaluate the rationale provided in the determination of these levels of observation. This was of particular importance, as the treatment team documented their impression that the inmate reported suicidal ideation for placement on suicide watch with subsequent indecent exposure.

Of note, the toxicology and coroner's reports were documented as pending in the SCR. The report was available at the time of this writing, but there was no documentation indicating review by the Suicide Case Review Committee.

V.    Analysis of Quality Improvement Plan Process

This case resulted in 13 required QIPs, including 12 mental health and one custody QIP, which involved two facilities. There were three mental health concerns. Regarding training, the provided documentation did not allow for a determination of whether the required staff received training.

Two QIPs (first and seventh) addressed the premature discharge from inpatient treatment that was not in alignment with PIP discharge policy. An institutional inquiry determined that the problematic discharges stemmed from the lack of consistent supervision and training. In response, identified staff were trained, and a supervisory schedule was developed. This response was marginally adequate. Audits to assess skill acquisition were needed, and the involvement of two treatment teams suggested a systemic issue that warranted training of all staff.

The second QIP addressed continuity of care in which clinician-to-clinician contact did not occur when the inmate was discharged from an inpatient setting to the EOP on two separate occasions; this QIP addressed the inpatient programs and the EOP institutions. In response, the inpatient facility indicated a plan to re-train staff on the process that had been implemented several months prior to the suicide. This response was problematic for several reasons; there was no inquiry to determine the reason for the breakdown in the existing process, and the process was specific for the identified programs and not generalized for all CDCR outpatient programs. The EOP facility determined that the clinician-to-clinician contact did not occur due to a knowledge deficit in which staff was unclear which facility should initiate the contact. Subsequently, staff was re-trained. This response was inadequate, as it failed to consider the long-standing requirement for clinician-to-clinician contacts. Post-training documentation audits were needed. The

SCR also failed to consider the systemic issue in which the location of physical discharge was not readily known until sometimes the day of discharge.

The third QIP addressed non-compliance with safety measures, missed five-day follow-up, and no suicide risk evaluation upon return to an outpatient setting from the inpatient hospital. In response, an inquiry was conducted, and training was completed on policy requirements. This response was insufficient, as it did not address the hypothesized reasons for noncompliance. Further, post-training audits were needed to ensure compliance.

Three QIPs (fourth, fifth and eighth) addressed problematic SRASHEs in which suicide risk was underestimated. In response, state-wide training, which included revised suicide risk evaluation and safety planning, was completed in the summer of 2019. This response was marginally adequate; post-training audits were needed to ensure skill application.

The sixth QIP addressed the removal of a long-standing diagnosis of Schizoaffective Disorder, bipolar type, without clinical rationale, despite ongoing treatment for psychosis at two institutions. In response to an inquiry, one institution provided diagnosis and treatment planning training to identified staff. Additionally, all staff was to be included in an upcoming IDTT training. At the outpatient program, an inquiry indicated staff training deficiency, and training was provided. However, the inquiry failed to address continuity of care issues; consequently, this response was marginally adequate.

The ninth recommendation addressed the inappropriate use of a special IDTT to discharge the inmate to a lower level of care. An inquiry determined that lack of training contributed to this use of a special IDTT; training with identified staff was provided. Additionally, all staff would be included in an upcoming IDTT training. This response was adequate and would have been improved with documentation audits for a reasonable period of time to ensure compliance.

The tenth recommendation addressed problematic treatment planning, whereby treatment goals for symptoms were not developed. An audit was completed in which multiple issues were identified; however, the status of the initial problem was unclear. Regardless, all clinicians would be included in an upcoming IDTT training (date unknown), and audit results would be discussed at an upcoming clinical and QIP subcommittee meeting. Insufficient information was available to assess the adequacy of this response fully.

The eleventh QIP addressed problematic IDTT documentation. An audit of the identified clinician's documentation indicated ongoing problematic IDTT documentation. A discussion occurred with the identified clinician, and targeted training was provided. There was a plan to re-audit the clinician's treatment plans during the next 30 days, but no further information was available. Insufficient information was available to assess the adequacy of this response fully.

The final mental health QIP addressed problematic documentation in which suicidal ideation was not assessed. A documentation audit of the identified clinician indicated that this was an ongoing issue of concern. Training was completed, with subsequent document audits to be completed. This response was adequate.

The one custody QIP addressed allegations of noncompliant welfare checks. This issue was referred to the OIA. Investigation findings were not provided; this was problematic as it did not allow for systemic resolution of noncompliance with safety and suicide prevention policies.

Three concerns that did not rise to the level of a QIP were identified; two of the concerns addressed inpatient treatment, and one concern addressed CDCR headquarters. The first concern addressed the lack of treatment modules to provided group treatment for maximum custody inmates. The second concern addressed the lack of documentation to clinically support discharge to a lower level of care. Due to the importance of this issue, a QIP was indicated. The last concern addressed a finding in which overdue SRASHEs were not identified in the On Demand report. The concern noted that the institution would file a solution ticket to address this issue. It was unclear if this issue was specific to the identified institution or if the issue was problematic at other CDCR institutions.

## Case AA

I.  Summary of Case

This inmate was a 31-year-old African American male who was discovered hanging in his solely occupied cell on June 3, 2019. The inmate was receiving mental health services at the EOP level of care at the time of his death.

Records indicated that the inmate was born into an intact family, including one half-brother who previously served prison time in CDCR. Following the inmate's death, an interview with his mother indicated that he also had a sister. The inmate completed the eleventh grade and was involved in many fights in school. He began using methamphetamine at age 12 and also used alcohol, cannabis, ecstasy, heroin, and cocaine. He was arrested as a juvenile, spent time in detention attending a year-long drug treatment program, and was incarcerated within CYA. The inmate's criminal behavior continued into adulthood and included over ten arrests. The inmate reported a gang affiliation. The inmate had one son.

This inmate entered CDCR in February 2014 to serve a 17-year sentence for second-degree kidnapping and assault with force likely to produce great bodily injury. At the time of his index offense, the inmate was on probation for a previous burglary charge. The offense involved the assault of his girlfriend at the time. The inmate was noted to have had disciplinary problems while in county jail, which continued in CDCR. During

his incarceration, he received 15 RVRs. During the final year of his life, there were no records of visits or phone calls, yet his mother indicated that she spoke with the inmate routinely on the phone and that he also had contact with a brother, a sister, and his son via telephone.

Prior to his incarceration in CDCR, the inmate received mental health services in the county jail. County jail reports noted "extreme sleep disturbance," and he was prescribed fluoxetine in jail. The inmate reported a history of two psychiatric hospitalizations in 2011. The SCR noted that the record also indicated another psychiatric hospitalization in 2012. During his reception screening into CDCR, the inmate reported depression. He was referred for a mental health evaluation following a positive mental health screening. He was not placed in the MHSDS after denying all mental health symptoms upon further evaluation. He was seen for numerous mental health contacts related to disciplinary problems and placement in ASU. At one point in March 2015, restraints and force were required to remove the inmate from his cell. Mental health was contacted but documented that the inmate "just wanted to be left alone" and required no mental health services.

In December 2015, the inmate was noted to be exhibiting bizarre behavior and talking to himself. He was referred to mental health staff but denied mental health symptoms. Two days later, he was placed in ASU for a fight and engaged in another fight on December 17, 2015, while in a holding cell awaiting a medical appointment. He was again referred to mental health for acting bizarre and making bizarre statements on that same date. He was placed back in ASU and seen by mental health on December 21, 2015. He was included in the MHSDS at the 3CMS level of care with a diagnosis of Psychotic Disorder NOS. Despite ongoing violence, bizarre behavior, and the receipt of several SHU terms, his IDTT did not elevate his level of care until January 26, 2016. At that time, he was placed at the EOP level of care. The inmate largely refused all mental health and medical services and frequently yelled at staff to leave him alone. He was referred to an ICF but refused to transfer, requiring a *Vitek* hearing. He was eventually admitted to a psychiatric inpatient setting in March 2016, where he remained for nine months. In June 2016, he was found with a piece of glass and a torn sheet tied to a cable in the shape of a noose. He refused to discuss the incident and did not submit to an evaluation. A July 2016 PC 2602 hearing resulted in an order for involuntary medications due to grave disability. The original PC 2602 petition also included concerns about the danger to himself. His functioning improved over the following three to four months, and he was discharged to the EOP level of care on December 19, 2016. A suicide risk evaluation completed at that time noted his chronic and acute risk as low.

Following his hospitalization, he appeared to stabilize and functioned well, attending educational and vocational classes. He regularly attended treatment groups yet appeared focused on getting off court-ordered involuntary medications as he did not believe he had a mental illness. Mental health documentation included speculation that his psychosis may have been due to substance use during this time. His group attendance became

irregular in June 2017 and following the continuation of his PC 2602 order in July 2017, he stopped attending treatment groups and chose only to attend recreational and social groups. In November 2017, the inmate resumed some group attendance. He reported some understanding of his need for medications in March 2018 and stated that he would "probably" continue taking his medications without a court order. Late in 2018, the inmate complained of galactorrhea and said that he wanted to be moved to the 3CMS level of care. His psychotropic medications were changed from one injectable antipsychotic (paliperidone palmitate) to an oral antipsychotic medication (aripiprazole) during the transition to the injectable form of that same medication. However, the injectable form was never prescribed, and he was instead maintained on oral aripiprazole with backup haloperidol injection should he refuse the oral medication. In January 2019, the inmate began missing groups and admitted to using methamphetamine. However, he returned to programming in February and March 2019.

The inmate expressed concerns, possibly paranoid concerns, about the 3CMS level of care, but the IDTT indicated a plan to decrease his level of care during his IDTT meeting in March 2019. On March 22, 2019, the psychiatrist decided the PC 2602 involuntary medication order was no longer necessary based on the inmate's adherence to oral medications, increased level of insight, and general treatment response. In April 2019, the inmate complained of auditory hallucinations and paranoia that began after his change of medications months prior. Despite this, plans to discontinue his PC 2602 order and decrease his level of care continued. During a psychiatry contact in April 2019, an increase in psychotic symptoms was reported, and olanzapine was added to his medication regimen. The psychiatrist indicated the inmate's reported symptoms as "an acute exacerbation of schizophrenia." Over the following weeks, the inmate complained of increasing hallucinations, both auditory and visual. His primary clinician dismissed his reports of visual hallucinations as "questionable" and suggested the inmate was exaggerating his symptoms due to his fears about transitioning to the 3CMS level of care. The inmate complained his olanzapine was ineffective, and the psychiatrist discontinued it on April 30, 2019. The inmate's PC 2602 order expired on May 3, 2019.

Throughout May 2019, the inmate complained of increasing auditory hallucinations and poor sleep due to his hallucinations. On May 20, 2019, he bloodied his hands punching the wall, but the issue was not referred to mental health nor mentioned in any mental health documentation. During an individual session with his primary clinician on May 23, 2019, he abruptly stood up, threw his chair, yelled profanity, and then sat down and quietly waited for custody to arrive. The incident did not appear directed at the primary clinician, and the inmate later reported it was related to auditory hallucinations. The psychiatrist was consulted and noted that the inmate was documented as taking his medications as ordered but "may not be taking his medication or cheeking given these new onset symptoms." On May 25, 2019, the inmate engaged in an unprovoked attack of a peer inmate, and then another unprovoked attack of a porter on May 30, 2019. A mental health evaluation related to the first assault noted that the inmate's mental health

symptoms did not contribute to the incident as the clinician did not observe acute psychosis or distress. A mental health evaluation for the second assault did not occur as it was scheduled after the inmate's death by suicide. On June 1, 2019, the inmate was seen by the psychiatrist to discuss changing medications and/or route of administration. The inmate did not want a change, and none was made. This was the final contact prior to his death on June 3, 2019. A review of psychiatric care noted the lack of consideration of a higher level of care or a change in medication, given the inmate's escalation in symptoms required a QIP.

## II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case. The Special Master's expert determined this inmate's death was not foreseeable.

## III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined the suicide was preventable based on the inmate's significant change in functioning and increased symptoms, impulsivity and unprovoked violence in the month before his death. There was clear evidence of a connection between this decline in functioning and the change in the inmate's medications. During a previous episode of psychosis, the inmate demonstrated suicidal behavior. Mental health staff did not consider the inmate's history of decompensation or increased risk with the reemergence of psychosis. Had the need for a higher level of care been considered, rather than a discussion of a decrease in level of care, the likelihood for suicide may have been reduced.

## IV.    Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use and mental health history. The reviewer included a reasonable assessment of the precipitants to this suicide and the recommendations followed the content and findings of the report.

## V.    Analysis of Quality Improvement Plan Process

This case resulted in five required QIPs, three related to mental health, one related to custody, and one for the facility SPRFIT. The first mental health QIP was required to address the fact that in the weeks prior to the suicide, the IDTT did not consider referral to an inpatient setting or reconsider the decision to reinstitute or continue the inmate's

142

involuntary medication order.  The response indicated that the psychiatrist received additional training regarding criteria for referring to a higher level of care and referral process.  An attorney also trained all psychiatrists on the PC 2602 criteria and process.  This response appeared partially adequate as training for the primary clinician was likely indicated as well.

The second QIP for mental health was required to address the fact a formal suicide risk evaluation was not completed despite the inmate's increased symptomatology.  The last formal suicide risk evaluation, documented in 2017, was noted to be incomplete.  All mental health staff was trained on suicide risk evaluations and safety planning.  The identified clinician was also to be re-mentored, but no follow-up was provided regarding this plan.  The response was partially adequate.

The third mental health QIP was required to address the mental health assessment completed following the inmate's RVR for fighting.  There were two mental health assessments completed on the same day for two incidents.  One found that the inmate's mental health symptoms were contributory, while the other did not.  The clinician who completed the assessment indicating that the inmate's mental illness did not contribute to his violent behavior did not complete a review of the health record.  The response indicated that five mental health evaluations for RVRs were audited for the identified clinician.  During the audit, one additional concern was noted regarding a comprehensive health record review.  A plan was created to train the clinician on proper record review and incorporation into mental health assessments for RVRs.  There was also a plan to audit "up to three" additional mental health assessments following the training.  No further follow-up was provided, but the response appeared adequate if the plan was followed as written.

The one custody QIP was required to address a malfunction in the cut-down kit causing it not to open.  The QIP required a review of how to ensure this would not happen in the future.  The response indicated that a lieutenant toured "all affected areas" and ensured that clips were not placed on cut-down kits.  This response appeared adequate, provided that "affected areas" were indeed a comprehensive list.

The final QIP was for the facility's SPRFIT to address the fact that the inmate punched his cell wall and reported the behavior was due to agitation from his auditory hallucinations, yet no referral was made to mental health, and there was no documentation of the incident in any mental health notes.  The response noted that local policy was reviewed.  A decision was made to specifically include that the crisis line should be contacted for any self-harm incidents.  Staff was trained on the updated policy.  This response appeared adequate.

Case BB

I.   Summary of Case

This inmate was a 35-year-old Hispanic/Latinx man who was discovered hanging in his solely occupied SNY cell by custody staff after the inmate failed to show for pill line on March 9, 2019.  A toothbrush had been utilized to obstruct the door of his cell, which delayed opening.  The inmate was receiving mental health services at the 3CMS level of care at the time of his death.

The inmate reported having five siblings and was raised by his parents in an intact home. Both parents were pastors and were often out of the home.  His mother reportedly had depression, and his father used physical punishment in the home.  The inmate reported engaging in numerous fights in school, leading to suspensions, an expulsion, attendance at continuing school, and eventually placement in juvenile hall.  The inmate left school in the eleventh grade. The inmate never married, and he had one daughter with whom he remained in contact during his incarceration.  She visited him twice during his incarceration in 2016.

The inmate began using marijuana and alcohol regularly at age 13.  He reportedly used methamphetamine for a week continuously prior to his index offense.  He was first arrested at age 14 for possession of marijuana for sale.  Eleven days later, he was again arrested for attempted second-degree robbery and assault with a deadly weapon.  He was placed in a number of settings to address his criminality, but he continued to engage in criminal behavior and was arrested again at age 19 for vandalism and robbery.  He spent one year in jail and three years on probation at that time.

This inmate entered CDCR for the first time in May 2003 to serve a sentence of 22 years and four months for first-degree robbery with use of a deadly weapon after breaking into a home with a co-defendant and holding the residents at gunpoint.  The inmate was placed in ASU for safety concerns in 2006 and on two other occasions that year for fighting and possession of a weapon.  In total, he received nine RVRs while incarcerated, four related to violence and two related to substance use.  In October 2018, the inmate received one of his RVRs for battery on an inmate and required placement at the MHCB level of care.  During that placement, he admitted to using marijuana and methamphetamine.  One month later, he was readmitted to the MHCB, where he admitted that he bought $300 worth of methamphetamine and could not pay his debt.  He was housed for his safety following this admission.  The SCR noted that due to transfers related to his MHCB placements, the inmate was without his property from October 2018 until the day prior to his death.

The inmate denied any mental health treatment prior to incarceration.  Upon reception into CDCR, this inmate was not a participant in the MHSDS.  In 2006, he was placed in

144

the OHU due to safety concerns after verbalizing that he would rather kill himself than be killed by others. He was returned to the yard and did not seek mental health treatment again until October 2010. He submitted a healthcare request and was seen to address complaints of anxiety, depression, insomnia, and poor appetite. He was placed at the 3CMS level of care in November 2010 and attended routine treatment contacts. By May 2011, he was transferred to the ASU, and he denied further mental health needs. He was removed from the MHSDS on July 12, 2011.

In October 2018, the inmate left his desk in education, walked into another classroom, and began hitting another inmate. During the ASU pre-placement screening, he reported thoughts of killing himself, and he was referred for further evaluation. He was referred to the MHCB by the psychiatrist who completed the evaluation. The inmate was prescribed mirtazapine, and he reported ongoing suicidal ideation by hanging or hitting his head. The inmate reported two prior suicide attempts by cutting his wrists; the first occurred in county jail when he learned of his sentence length, and the second occurred in CDCR in 2006. He reported that he was troubled about his recent drug use, and his daughter was unable to continue visiting. He reported that the medications helped him to sleep and that his symptoms had improved. He was discharged to the 3CMS level of care on October 26, 2018. He was seen for five-day follow-up and initial assessments, all of which noted that he was adjusting well.

On November 19, 2018, the inmate reported thoughts of self-harm to custody staff, and his primary clinician saw him for an emergency consultation. He was described as "hopeless, helpless, seeing no options for himself other than to take his own life." A SRASHE was completed, which noted high chronic and acute suicide risk. He was placed at the MHCB level of care in the OHU while awaiting transfer. The following day, he reported that his main concern was related to safety, and he was seen by a sergeant. He began hitting his head on the cell door while talking to the sergeant, and he reported that he was doing this to be taken seriously. He reported that he had been mistaken for someone else on the yard and did not feel safe there. He was returned to the same yard with five-day follow-up scheduled. On November 21, 2018, the inmate was described with paranoid thinking, possibly related to methamphetamine use. A SRASHE completed that day assessed acute risk as low and chronic risk as moderate; this assessment of suicide risk was reduced from that noted in the prior SRASHE. The following day, the inmate superficially cut his wrists and reported feeling suicidal with a plan to hang himself. He was referred to the MHCB. While there, he reported having concerns about his father and not being able to see his daughter. He requested placement at the EOP level of care but could not explain why he needed treatment. On November 28, 2018, the inmate reported that he had an enemy and a drug debt. He was discharged from the MHCB on the following day with a plan to discuss his safety concerns with custody.

Upon return to his original facility, the inmate was seen for five-day follow-up contacts and was noted: "feeling better but still stressed." He was housed in a facility other than where he had enemy concerns. He denied suicidal ideation during all five-day contacts and met with the primary clinician and IDTT in December 2018. He was provided with a diagnosis of Adjustment Disorder with mixed disturbance of emotions and conduct. The inmate indicated that his biggest concern was being housed on a Level IV yard despite his Level III status. The SCR noted that there was no updated documentation by the psychiatrist in the treatment plans dated December 18, 2018, and February 26, 2019.

The inmate was seen for four SRASHEs during February 2019. The same primary clinician completed three. On February 6, 2019, the inmate reported active suicidal ideation with intent and a plan to hang himself. He was positive for a number of risk factors and warning signs, yet these were not explained in the documentation. There was also no mental status examination completed. The inmate was assessed with moderate chronic and acute risk for suicide. He was placed in alternative housing with a plan for follow-up the next day. He was seen the following day when he reported mild suicidal ideation with no plan or intent. There was a notable decrease in the number of warning signs assessed without explanation. Acute risk was decreased from moderate to low, again without further explanation. The safety plan did not address risk factors nor warning signs. The inmate was not referred to a higher level of care.

On February 16, 2019, the inmate was seen for an emergency consultation by another primary clinician after reporting suicidal ideation. When seen by this clinician, he was unwilling to discuss his concerns further and "demanded MHCB." It was documented that he had significant anxiety due to safety concerns but was returned to the yard with a plan to work with his primary clinician on coping skills. A SRASHE was completed but failed to provide clear justification for suicide risk and contained an inadequate safety plan. Chronic risk was decreased from moderate to low without rationale. On February 20, 2019, the inmate was seen for a 90-day follow-up to his most recent MHCB placement. The contact was completed at the cell front as the inmate refused to participate. He denied current thoughts of suicide, and his mental status was unremarkable but noted to have been copied from the mental status examination completed on February 7, 2019. A SRASHE was completed, but it was noted to be inaccurate and clearly underestimated suicide risk level as it omitted a number of known risk factors. The safety plan was inadequate, focusing on Program Guide requirements rather than an individualized plan.

The inmate refused to attend his IDTT on February 26, 2019. His primary clinician met with him at his cell door and encouraged attendance at future appointments. The primary clinician again attempted to meet with him on March 1, 2019, but the inmate again refused. The inmate reported that he was waiting for a transfer to a Level III institution and would attend his appointments at the next institution. He died eight days later.

146

II.    <u>Determination of Foreseeability</u>

The Suicide Case Review Committee did not provide a determination of foreseeability for this case.

The Special Master's expert determined this inmate's death was foreseeable as the inmate verbalized suicidal ideation with intent and a plan at least three times during the final month of his life. Suicide risk evaluations and safety plans were inaccurate and inadequate, despite documentation of risk concerns and the need for increased support for the inmate. Further, the inmate had indications that required consideration of referral to a higher level of care, such as MHCB placements, which the IDTT did not recognize. Had the IDTT and primary clinician listened to the inmate's verbalized suicidal ideation, intent, and plans, they would have accurately assessed his increased risk for suicide.

III.    <u>Determination of Preventability</u>

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined the suicide was preventable based on the fact that there were a number of indicators during the final month of the inmate's life that warranted an increase in his level of care and the need for direct interventions to support his safety. Neither of these was provided. Additionally, the sole IPOC for this inmate was related to self-harm behaviors, and it was not updated or addressed at any point during the final three months of his life. Additionally, the inmate who had been asking for help began refusing all contacts with his primary clinician; there was no documentation that attempts were made to address the refusals beyond "encouraging" him to attend future sessions. Documentation showed evidence of cursory care and attention to the inmate's needs, as evidenced by copied documentation and failure to update information from session to session and from previous IDTTs. Had the inmate been provided with appropriate care at the appropriate level of care, the likelihood of death by suicide would have been decreased.

IV.    <u>Critique of Suicide Case Review Report</u>

The SCR provided a marginally adequate clinical summary. It included relevant social, criminal, incarceration, substance use and mental health history but failed to address the adequacy of the treatment planning and treatment provided to the inmate. Other than the incidents when the inmate was seen for crisis evaluations, there was no discussion of treatment goals, the presence or absence of IPOCs, the provision of treatment interventions, the efficacy of those interventions, or any evaluation of the inmate's treatment progress. In this case, as the inmate was clearly requesting increased attention

147

through requests for higher levels of care, it appeared warranted that the provision of care should have been analyzed.

The Special Master's expert conducted a direct review of the health record and noted that there was an IPOC to address self-harm behavior (cutting) but nothing to address the inmate's anxiety and safety fears, which were his primary concerns. Additionally, there were no treatment interventions provided to the inmate from his 3CMS primary clinician beyond evaluations for suicide risk. IPOCs were not used to assess change in the inmate's symptoms or functioning. A psychiatrist saw him on two occasions, and those contacts appeared clinically appropriate. The lack of appropriate clinical intervention and lack of updates to the inmate's IPOCs warranted additional QIPs in this case.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in five required QIPs, four to address mental health concerns and one to address a custody concern. The first mental health QIP was required to address the three SRASHEs completed by the primary clinician during February 2019. These SRASHEs failed to adequately address the inmate's acute risk factors that may have led to an underestimation of his current level of risk. Warning signs and protective factors were not adequately explored or integrated into the overall risk determinations, and none contained a comprehensive safety plan to address the inmate's ongoing suicidal ideation at his current level of care. Specific treatment interventions to address suicidal ideation, anxiety, or safety concerns were not noted. The response included a review of the SRASHE in question and an audit of ten additional SRASHEs completed by the identified clinician. Eight of the ten SRASHEs were noted to have passed the audit, and the clinician was scheduled for additional mentoring but gave her notice to leave employment prior to that date. This response was only partially adequate, as it did not provide the results of the audits, only the listed names and identification numbers of the SRASHEs reviewed.

The second mental health QIP was required to address the SRASHE completed by a different clinician on February 16, 2019. No sources of information were included, and the risk evaluation failed to consider imminent warning signs. The mental status examination was insufficient, and risk justifications were inadequate. The safety plan failed to address risk factors and lacked specific interventions. The response included a review of the SRASHE in question and an audit of ten additional SRASHEs completed by the identified clinician. Six of the ten SRASHEs passed the audit, and it was determined that the clinician required re-mentoring, which was received. The clinician was scheduled for the next safety planning training. Supporting material for only one health record audit was included in the response. This response appeared largely adequate.

The third mental health QIP was required to address the lack of updated psychiatric information in the treatment plans from December 8, 2018, and February 26, 2019. The response indicated that training was provided to all psychiatrists working at the facility on proper IDTT documentation. This response appeared adequate.

The last mental health QIP was required to address the fact that despite the inmate having had three or more MHCB admissions in the previous six months, he was not assessed for the need for a higher level of care during the IDTT on February 26, 2019. The response indicated that the senior psychologist supervisor met with the identified clinician to demonstrate how to access necessary Sustainable Process reports and review policy and documentation expectations. This response would be appropriate if the reason the information was omitted was a lack of knowledge by the clinician; however, this was unclear.

The custody QIP was required to address concerns related to the classification process and timelines. Deficiencies were noted regarding the timeliness of a confidential disclosure form in December 2018. Additionally, there was a lapse between committee action on February 7, 2019, and referral to a Classification Services Representative on March 5, 2019. A review of the case was completed, and direction was given to the correctional counselor supervisor to provide training to all counselors working on the identified yard. Additionally, a review of the documentation completed by the identified counselor revealed that the delay in this case was due to the death of the inmate. This was unclear, as the delay exceeded 30 days prior to the death of the inmate. This response was partially adequate, as the training appeared indicated, but the determination that the delay in this case was due to the inmate's death did not appear accurate. The Suicide Case Review Committee appeared to have accepted this inaccurate response, however.

Case CC

I.   Summary of Case

This inmate was a 50-year-old Caucasian male who was discovered hanging in his SNY cell by his cellmate on August 2, 2019. The inmate was transported to a community hospital and died on August 6, 2019. The inmate was not a participant in the MHSDS at any point during his incarceration.

The SCR noted that there was limited social history available for this inmate, as he refused to speak with evaluators following the commission of his crime. He was reportedly born in 1968 and raised in an intact family in Wisconsin with one younger sister. His family relocated to Utah when the inmate was age three. His mother died when he was age 12, and thereafter, he was raised by his father. At the time of his crime, the inmate was reportedly living in Oregon. The inmate completed high school and

obtained his bachelor's degree. He was variously employed in sales and real estate. At the time of his arrest, he was self-employed at a car dealership in Oregon. The inmate had been married with one daughter, but he was separated from his wife at the time of his arrest. His wife divorced him while he was incarcerated.

Records suggested that the inmate had a substance use history which included cocaine, methamphetamine, marijuana, and alcohol use. He denied having problems with substances but had prior arrests for distribution of a controlled substance and driving under the influence on two occasions. He had no known gang affiliation and no juvenile criminal record.

This inmate entered the CDCR for the first and only time in August 2013 to serve a sentence of 350 years to life for ten counts of first-degree attempted murder on a peace officer or firefighter with enhancements, assault on a peace officer with a semi-automatic firearm, willful harm of a police dog/horse, evading officer with disregard for public safety and possession of an assault weapon. These charges resulted from a car chase and subsequent shooting at a police officer. He was noted as having made bizarre comments after being shot during the crime. While incarcerated, he received three RVRs; two for possession of a cell phone and one for refusal to perform assigned duties. In 2018, it was determined that the inmate could no longer program safely due to enemy concerns, and he was placed in an SNY. Additionally, in 2018, there were a number of requests submitted by the inmate, his father, and his attorney requesting that the inmate be relocated to a facility closer to Oregon. His last visit before his death was with his father and daughter on December 23, 2018. During an interview after the death by suicide, the inmate's father reported that the inmate called his father using a cell phone moments prior to hanging himself. His death occurred on the anniversary of his sentencing date.

In the community, the inmate received mandatory alcohol treatment following his arrest for driving under the influence but had no other mental health treatment. Following his reception into CDCR, he was screened and assessed for mental health services but did not meet the criteria for placement in the MHSDS. The inmate denied prior or current mental health symptoms and suicidal ideation. The SCR noted that the inmate underwent a competency evaluation following the commission of his crime but refused to participate. The inmate underwent four routine screenings during his incarceration related to institutional movements; he screened negative each time, denying symptoms or suicidality.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case. The Special Master's expert determined this inmate's death was not foreseeable.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case. The Special Master's expert determined the suicide was not preventable.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use, and mental health history. The reviewer included a reasonable assessment of the precipitants to this suicide, and the recommendations followed the content and findings of the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in one required QIP. The QIP was required to address a custody concern regarding a delay in the initiation of CPR. The response indicated that a request for an OIA investigation was submitted, and no further information was available. This response was inadequate in that no follow-up was completed.

Case DD

I.    Summary of Case

This inmate was a 47-year-old Caucasian male who was discovered on December 20, 2019, in his solely occupied reception center cell with a large laceration on his neck. The inmate was not a participant in the MHSDS at the time of death.

The inmate arrived in CDCR three days prior to his death; consequently, there was limited information available about his developmental or family history. The inmate was born in Massachusetts and completed his education through middle school. At the time of his index offense, the inmate was unemployed and did not have permanent housing. He was in a dating relationship, and his girlfriend was the victim of his crime.

The inmate's substance use history was positive for alcohol, methamphetamine, and cocaine dependence. He reported that he started using drugs at age 34 and used substances up until his arrest. He had no history of substance use treatment. This inmate had no juvenile criminal history but had two prior adult convictions; one for driving while under the influence of alcohol and one for obstruction/making false statements to police officers. The inmate received no disciplinary actions while in county jail, where he resided for nearly two and a half years prior to incarceration within CDCR. There was no indication of gang affiliation.

The inmate entered CDCR for the first time in December 2019. He was sentenced to serve 13 years for attempted murder, torture, and injuring a spouse/cohabitant/fiancé/boyfriend/girlfriend/child's parent. He received no RVRs and experienced no facility transfers as he was only incarcerated for three days prior to his death. He was placed in a double cell with a cellmate until December 19, 2019, when his cellmate was moved.

The inmate's mental health history prior to incarceration was not known, but his probation report noted that "according to the Consolidated Criminal History Reporting System, the defendant is classified as mentally disturbed." County jail records indicated a number of potential diagnoses for the inmate, including mood disorder, psychotic disorder, substance-induced disorders, substance use disorders, anxiety disorders, and personality disorders. He was noted to have legal issues, relationship problems, substance abuse issues, homelessness, mental illness, and a history of self-inflicted lacerations to the neck and left forearm. He was prescribed aripiprazole, benztropine, and citalopram.

While the inmate was not included in the MHSDS, he arrived in CDCR with an active prescription for psychotropic medications from the county jail. A psychiatrist saw him for an initial assessment on the day of his arrival. He reported increased anxiety, depressed mood, racing thoughts, and mood swings but denied suicidal and homicidal ideation. He was noted to be hyperverbal and was speaking at a rapid rate. The psychiatrist provided a diagnosis of Unspecified Bipolar Disorder and changed his medications to include a mood stabilizer. The inmate reported being "happy" with the change. He was prescribed aripiprazole, benztropine, buspirone, and lithium.

A clinician saw the inmate for a mental health screening interview and a DDP screening on December 19, 2019. He screened negative for placement in DDP but had a positive screening for suicide risk, depressive disorder, and significant psychiatric history. The inmate reported two prior suicide attempts, and the clinician noted observable scars on the inmate's wrists from a suicide attempt over two years prior. The inmate stated that he had "brief but not serious" thoughts about suicide. The clinician reviewed the inmate's county jail records and spoke with the nurse who completed the inmate's initial screening. Because the screening was positive for mental health needs, the inmate was scheduled for an assessment with a primary clinician within ten days. The clinician who completed the screening did not refer the inmate for a SRASHE because it was scheduled to be completed during the full assessment. The clinician reported that SRASHEs were not completed by the clinician completing the screening in reception but were referred to the crisis clinician if indicated.

II.    <u>Determination of Foreseeability</u>

The Suicide Case Review Committee did not provide a determination of foreseeability for this case. The Special Master's expert determined this inmate's death was not foreseeable.

III.    <u>Determination of Preventability</u>

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined the suicide was likely preventable had a suicide risk evaluation been completed at the time that possible suicide risk was identified during intake interviews.

IV.    <u>Critique of Suicide Case Review Report</u>

The SCR provided an adequate clinical summary with discussion of available social, criminal, incarceration, substance use and mental health history.  The reviewer included a reasonable assessment of the precipitants to this suicide, and the recommendations followed the content and findings of the report.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in two required QIPs; one for mental health and one for custody.  The mental health QIP was required to address the fact that no SRASHE was completed along with the reception screening, despite evidence of passive suicidal ideation and a history of suicide attempts.  A review indicated that the presence of passive suicidal ideation resulted in "no order for SRASHE" being "triggered" in the electronic health record, and the clinician expected that completion of a SRASHE within ten days would be adequate. Training was provided to the clinician with evidence of completion. This response appeared adequate.

The custody QIP was required to address the fact that staff identified a significant amount of blood upon discovering the inmate, but documentation failed to indicate if staff used appropriate precautions by donning personal protective equipment.  In response, training was provided to the involved staff.  Unfortunately, there was no evidence that a review of the event was completed to determine if staff donned appropriate protection during their emergency response.  If staff were unaware that they should have worn protective equipment and failed to, training would be the appropriate response.  However, it is not known what occurred during the response; therefore, the adequacy of this response cannot be determined.

Case EE

I.    Summary of Case

This inmate was a 67-year-old Caucasian male who was discovered by other inmates walking on the edge of a roof on March 18, 2019.  Custody officers tried to talk the inmate down from the roof.  He responded verbally, threw a piece of paper off the roof (later discovered to be a suicide note), then ran and jumped head-first to the ground.  The inmate was initially responsive but then stopped breathing.  CPR was initiated, but the inmate later died at a community hospital.  The cause of death was determined to be blunt force trauma to the torso.  The inmate was not a participant in the MHSDS at the time of his death.

This inmate was born in Minnesota and was primarily raised by his biological parents, five brothers, and one sister.  His family moved to California in 1962.  There was no indication of abuse or trauma in the inmate's childhood or adolescence.  He received a high school diploma and attended junior college but did not receive a degree.   He was married twice, once for two years and once for seven years.  He fathered a daughter during each marriage.  One report indicated that at the time of his offense, the inmate owned and operated a production company with his second wife, but another report indicated that he was unemployed at the time, and his wife supported him.

Prior to incarceration, the inmate reported abusing alcohol multiple times per week.  He also reported experimenting with marijuana as an adolescent.  He had no juvenile criminal history but was arrested four times as an adult for possession of a switchblade, assault with a deadly weapon, possession of a controlled substance, and battery. The inmate was convicted of only the first offense listed when he was age 18.

The inmate entered CDCR in June 1997 for the first time to serve life with the possibility of parole for first-degree murder after he shot and killed the romantic partner of his second wife while intoxicated.  They were separated at the time, and the wife had been granted full custody of their daughter.  In 2006, the inmate was placed in ASU due to safety concerns.  He reported that at least four other inmates had a plan to assault him for being a "snitch."  He was placed on SNY status in February 2007 and remained under this designation until his death.  He received one RVR while incarcerated in 2016 for being out of bounds.  In February 2018, the inmate requested a waiver for his parole hearing for three years so he could "work on programming, release plans, and remain discipline (free)."  This request was approved on February 20, 2018.

In 2019, the inmate made eight telephone calls to one of his brothers; the most recent in February 2019 was to request money.  The inmate's last visit was on June 12, 2010 with his ex-wife.  Interviews with his brothers following his death revealed that the inmate was focused on his finances and his health.  They reported that he had stopped eating

meat to avoid getting dementia, as both his parents were diagnosed with the disease. According to his brothers, there was no evidence that the inmate had symptoms of dementia. However, a letter written by his first wife expressing concerns that the inmate was developing dementia was found in the inmate's property.

The inmate had minimal mental health services before his incarceration. Records indicated that he and his second wife had received couples' therapy. He reported that his wife wanted him to address his alcohol use and anger, but the inmate abruptly stopped attending sessions. Upon his arrival in CDCR, records indicated that he had not received mental health services while in county jail. In July 1997, he was placed in the MHSDS at the 3CMS level of care after reporting depression and sleep disturbance symptoms. He was diagnosed with Depressive Disorder, NOS. He did not report suicidal ideation but reported that in 1995, while in jail, he "punctured his arm" in a suicide attempt. As mentioned above, there was no evidence of this attempt in records received by CDCR from the county jail. The inmate did not want to take antidepressant medication but agreed to take diphenhydramine to assist with sleep. He was discharged from the MHSDS after 26 days when he denied depressive symptoms.

In December 2006, the inmate was placed in ASU related to safety concerns and reported sleep difficulty, dysphoria, loss of appetite, and decreased energy due to isolation. He also reported being concerned about his mother's declining health. In May 2007, he submitted a healthcare request to be placed on medication and was prescribed antidepressant medications. The inmate was placed at the 3CMS level of care in June 2007 due to increasing symptoms of depression. At his request, his medications were discontinued in August 2007. He was discharged from the MHSDS in November 2007 after being designated as SNY status; however, he was not removed from the 3CMS roster until January 2008. The inmate was seen in response to an urgent referral in 2009 after making statements that he would be released from prison soon, despite his life sentence. A suicide risk evaluation was completed, and he reported no suicidal ideation. He was not assessed as meeting the criteria for placement in the MHSDS at that time.

In June 2015, the inmate was seen by a social worker after expressing concerns that he might be developing dementia and a vague reference to suicide. He denied suicidal ideation and showed no evidence of dementia. He was seen again in September 2015 after reporting symptoms of depression to nursing staff. He reported to the social worker completing the assessment that he had potential signs of dementia such as "walking into the wrong dorm twice" and "forgetting his errands." The assessment noted that the inmate reported that he gave away his television because it was "too confusing" and he "lost his sense of smell and taste." He was noted to be fully oriented and alert during the session. The inmate was given a mini-mental status examination by a physician later that week and scored within normal limits. He had no further contact with mental health clinicians following this encounter.

II.    <u>Determination of Foreseeability</u>

The Suicide Case Review Committee did not provide a determination of foreseeability for this case.  The Special Master's expert determined this inmate's death was not foreseeable.

III.    <u>Determination of Preventability</u>

The Suicide Case Review Committee did not provide a determination of preventability for this case.  The Special Master's expert determined the suicide was not preventable.

IV.    <u>Critique of Suicide Case Review Report</u>

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use, and mental health history.  The reviewer included a reasonable assessment of the precipitants to this suicide, given the limited information available.

V.    <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in no required QIPs, but one concern did not rise to the level of a QIP.  The concern was related to discovering that another inmate may have assisted the inmate in accessing the roof.  An investigation was completed, and the other inmate was given an RVR.  The case was referred for consideration of criminal charges.

Case FF

I.    <u>Summary of Case</u>

This inmate was a 36-year-old Caucasian man who was discovered hanging in his solely occupied cell by custody staff during institution count on April 10, 2019.  The inmate was receiving mental health services at the EOP level of care at the time of his death.

This inmate was born in California and was primarily raised by his biological father until the age of eight, when he was placed in the foster care system for "incorrigible behavior." He was placed with his biological mother at age 15 but returned to foster care after a few months.  He reported physical abuse by his stepmother as a child.

It was reported that the inmate dropped out of school in either tenth or eleventh grade.  He received his GED while incarcerated.  He was enrolled in special education classes starting at age seven for problems related to reading and attention.  The inmate reported that he often was in trouble at school for fighting and truancy, experienced multiple suspensions and at least one expulsion.  He began using substances during adolescence,

starting with marijuana. He used marijuana daily as he considered it "medicinal" because it helped keep him calm, manage his stress, and help with his chronic pain. He also reported using alcohol and methamphetamine intermittently and experimented with cocaine, hallucinogens, ecstasy, heroin, and methadone as an adult. The inmate did not consider his substance use as problematic. He had a sporadic and brief work history but reported receiving SSI as his primary means of financial support. He never married and had no children.

The inmate was arrested for the first time at age 16 for lewd and lascivious conduct; he was not convicted. At age 17, he was convicted of breaking and entering. He absconded from his group home on multiple occasions as a juvenile. As an adult, he was arrested multiple times and served two prior prison terms. Previous crimes included possession of stolen property, burglary, contributing to the delinquency of a minor, theft, breaking and entering, possession of drug paraphernalia, and resisting arrest. Records indicated that during a previous term within CDCR, the inmate was assaulted by two other inmates due to an indication in his record that he had previously committed a sexual offense. Despite this attack, the inmate did not testify against the other inmates and did not request SNY placement.

The inmate entered CDCR for the third time in October 2013 to serve nine years and four months for vehicle theft with prior vehicle-related theft convictions and evading or attempting to evade a peace officer while driving recklessly. His earliest possible release date would have been less than two weeks after his death (April 23, 2019). In December 2013, a confidential memorandum indicated that another inmate attempted to murder the inmate following a number of altercations with other inmates, possibly related to his previous sex offender designation. Despite the attack's seriousness, the inmate failed to testify and refused SNY placement even though custody staff strongly encouraged the placement. He was placed in SNY from December 2014 through January 2018 following the inmate's request due to "unspecified" safety concerns. The inmate received 16 RVRs during his incarceration, eight related to violence or threats against others. He received his final RVR in January 2019 for mutual combat with another inmate. The inmate had no recent phone calls or visits prior to his death.

During childhood and adolescence, the inmate was treated for ADHD with medications. He reported a two-week hospitalization as an adolescent due to aggressiveness. Records indicated that he was diagnosed with ADHD, Oppositional Defiant Disorder, and substance abuse as a teenager. During his first term in CDCR, he was included in the MHSDS at the 3CMS level of care. During his second term, he was not included in the MHSDS for four years, then placed at the EOP level of care and was eventually medicated involuntarily due to grave disability. During his most recent term, the inmate was initially placed at the 3CMS level of care but was changed to EOP level of care in February 2014 after reporting auditory hallucinations and demonstrating impulsive and unpredictable behavior toward peers and staff. At that time, he was diagnosed with

Psychotic Disorder, NOS, with a rule-out for Schizophrenia. He was referred to DSH ICF in June 2014 due to disorganized thinking, bizarre delusions of grandiosity, ideas of reference, paranoia, and an inability to function in the outpatient environment.

While at DSH, the inmate was not fully medication adherent though he was not viewed as meeting the criteria for consideration of involuntary medications. He refused to attend any groups due to his reported paranoia and was discharged from DSH in December 2014 after reaching "maximum benefit." He returned to the EOP level of care with diagnoses of Schizophrenia, Paranoid Type, and Antisocial Personality Disorder. In 2016, his diagnoses were changed to ADHD, PTSD, Antisocial Personality Disorder, and Cannabis Dependence in a Controlled Environment, with Bipolar Disorder and Schizophrenia listed as possible rule-out conditions. This change was made after the inmate reported feigning prior symptoms and functioning well without psychotropic medications for some time. In October 2017, the inmate punched a wall repeatedly and was admitted to an MHCB. He was reportedly distressed and worried about his family, who lived in wildfire-ravaged areas. While in the MHCB, he denied suicidal ideation. He was discharged to EOP level of care with a diagnosis of Schizoaffective Disorder without a clear rationale for the change. He was not prescribed psychotropic medication.

In January 2018, the inmate was placed in ASU after receiving an RVR for threatening staff. IDTT documentation indicated that the inmate was "high functioning" but required an EOP level of care due to his poor insight, impulsivity, and poor coping skills. He denied depressive, anxiety, or psychotic symptoms, as well as suicidal or homicidal ideation. He was transferred to another facility's ASU in February 2018 without a clinician-to-clinician contact. Following the transfer, the inmate reported anxiety regarding his upcoming parole and his ability to manage challenges, including getting his identification card and obtaining his SSI. During that time, his treatment was noted as unremarkable and focused on practical concerns related to his parole. He was released from ASU in May 2018 and returned to a mainline EOP yard. He was noted to have a high treatment refusal rate, and during his IDTT on May 30, 2018, he reported "deep sadness" but could not explain why beyond a statement of what could be interpreted as regret. The inmate was not provided with a diagnosis at that time, except a rule-out for Schizoaffective Disorder.

The inmate was placed in the Correctional Treatment Center (CTC) for medical reasons in June 2018 and continued to refuse participation in much of his treatment. A higher level of care was not pursued given his medical needs that required CTC level of care, but the IDTT noted that the inmate reported depression and anger. He reported some improvements in the following months. In October 2018, the inmate refused to attend his IDTT meeting, and the team noted that he consistently denied depressive or anger symptoms but reported that he wished to remain in treatment to help control these symptoms. According to policy, the inmate should have been considered for a higher level of care given his high refusal rate, but there was no indication that this occurred.

He had two IPOCs, one for depression and one for anger, but neither was updated regularly. There was no IPOC to address treatment refusal. There were similar concerns with his treatment plan developed in December 2018 with regard to failing to consider a higher level of care secondary to his frequent refusals and only one IPOC to address depressive symptoms. There was no mention of treatment for anger or treatment refusal despite three RVRs and participation in less than the minimum required hours of treatment.

In early 2019, the inmate appeared focused on practical concerns related to his upcoming release, yet also spent four days in ASU after fighting with his cellmate. During his February 2019 IDTT, the inmate complained of symptoms of ADHD. The treatment team addressed the inmate's high refusal rate with plans to use "Glasser's Reality Therapy" and "Jacobson's Progressive Self Relaxation Training and Mindfulness" to reframe his "irrational beliefs central to fear, anxiety, and paranoia." The treatment plan noted that he would be considered for an inpatient referral if his participation did not improve over the following 90 days, but noted that the inmate attended meals, had good hygiene, a clean cell, and had not demonstrated paranoia, mood symptoms, anxiety, or other mental health symptoms. These statements clearly contradicted the interventions listed to address his refusals. The only IPOC included with his treatment plan was to address depressed mood, but progress was not routinely documented. Diagnoses at that time included ADHD, Adult Antisocial Behavior, Major Depressive Disorder, and Multiple Substance Abuse.

In March and April, the inmate's clinical contacts were noted to be focused on his upcoming parole, and the inmate reported to be doing well. He reported to the psychiatrist that his medications were working, and he denied suicidal ideation, homicidal ideation, mood symptoms, or psychotic symptoms. He was prescribed clonidine and venlafaxine. He was last seen by a psychiatrist on April 9, 2019 and reported that the medications were effective. Records indicated that despite his focus on his upcoming release, the inmate refused to go to all pre-release groups but denied any anxiety about his release to his primary clinician. A review of psychiatric care during the final year of the inmate's life revealed no concerns.

The inmate consistently denied any history of suicide attempts. During his incarceration, early suicide risk evaluations noted his chronic and acute risk to be low, except in November 2015, when his chronic risk was assessed to be moderate secondary to his history of psychosis, depression, poor impulse control, substance use, and chronic pain. Subsequent to that evaluation, his chronic risk was consistently assessed to be moderate until May 2018, when it was reduced to low risk because of his lack of previous suicide attempts, lack of suicidal ideation in the last three months, and protective factors of family support, family contact, exercise, meditation, reading and listening to music. The safety plan developed at that time was noted to be inadequate. It failed to discuss how the inmate would address risk factors that would be present during times of elevated risk

or how the inmate would manage his upcoming parole. His SRASHE completed in July 2018 was noted to be brief with his safety plan providing for CBT to address anger and depressive symptoms. The SRASHE completed in October 2018 also indicated that CBT would be implemented as part of his safety plan. His final SRASHE was completed in December 2018 and focused on the risk associated with his anger and depressive symptoms.

II.   Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case. The Special Master's expert determined this inmate's death was not foreseeable.

III.   Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case. The Special Master's expert determined the suicide was not preventable.

IV.   Critique of Suicide Case Review Report

The SCR provided a marginally adequate clinical summary with relevant social, criminal, incarceration, substance use and mental health history. The reviewer included a reasonable assessment of the precipitants to this suicide and the recommendations followed the content and findings of the report. Of concern was the fact that the reviewer did not discuss the treatment provided to the inmate. Beyond a brief discussion of treatment planning and diagnoses, there was no review of the provision of care to address the inmate's identified issues, despite placement at the EOP level of care. The inmate had a high refusal rate, yet any review of what was provided to the inmate in terms of care was omitted from the report. If treatment was not provided, this lack of treatment was not addressed.

V.   Analysis of Quality Improvement Plan Process

This case resulted in three required mental health QIPs. The first QIP was required to address the fact that no clinician-to-clinician contact was documented when the inmate transferred from one ASU to another in February 2018. In response, the facility conducted an audit and determined that the contact occurred but was not properly documented in the electronic health record. Training was provided to staff on proper documentation. This response appeared adequate.

The second QIP was required to address the lack of consideration of a higher level of care by the IDTT in October 2018, despite the inmate's high refusal rate. Additionally, no IPOC was created to address the inmate's refusal. These omissions were seen as

160

contributing to underestimating the severity of the inmate's mental illness and his overall suicide risk. Ten treatment plans completed by the identified IDTT were audited. It was noted that while the inmate's primary clinician largely authored the problematic treatment plan, a different clinician covered the IDTT meeting. As such, five treatment plans authored by each clinician were reviewed. Concerns regarding poor documentation of rationale for not considering higher levels of care were present in treatment plans written by both clinicians. The facility noted that training would only partially address the issue, yet nothing beyond training was provided to both clinicians. As a result, this response was only partially adequate.

The third QIP was required to address the IDTT held in December 2018, which included similar concerns to those listed in QIP number two. The SCR noted that the facility identified these oversights during their internal review, and training was provided to the involved clinicians. In response, ten treatment plans were audited and noted to be appropriate concerning consideration for a higher level of care with appropriate rationale. However, the treatment plans were found to have areas for improvement, including IPOC goals that were neither measurable nor individualized. Also, the treatment plans did not include meaningful discharge plans. The review also revealed that approximately half of the treatment plans lacked rationale to support the inmate's current level of care. Training was provided to the clinician with ongoing supervision to be provided. No further follow-up was provided. The response was mostly adequate, although follow-up on the efficacy of the remedies was absent.

## Case GG

I.  Summary of Case

This inmate was a 50-year-old Caucasian man who was discovered hanging from a supply closet door in the visiting area by custody staff on October 28, 2019. He was taken to a community hospital via helicopter but died on November 8, 2019. The inmate was removed from the 3CMS level of care in March 2019 and was not a participant in the MHSDS at the time of his death.

The inmate was born and raised in California by his parents. There were reports of domestic violence within the home, and both parents had significant alcohol use histories. Despite this, the inmate mainly described his childhood as "good"; however, at other times, he reported that he suffered physical abuse as a child. His parents divorced when he was age 17. The inmate reported that he graduated from high school and attended approximately three years of college, yet CDCR documentation confirmed that he received a GED diploma. The inmate reported using alcohol and marijuana daily starting at age 15. He reported using methamphetamine daily for about five years, beginning at age 23, and then began using again at age 40. He was married and had two children. He had no gang affiliation.

The inmate had no juvenile criminal history but was arrested 11 times during adulthood for crimes related to burglary, receiving stolen property, driving with a suspended license, contempt of court, possession of a controlled substance, and tampering with a vehicle. He entered CDCR for his second term in October 2017 to serve a six-year sentence for first-degree burglary with a five-year enhancement for a prior felony conviction of a serious crime. Soon after incarceration, the inmate requested SNY status for an "alternative lifestyle," and it was granted in December 2017. The inmate received one RVR while incarcerated for being under the influence of alcohol in August 2019.

He received no visits while incarcerated and had a total of 12 telephone calls, the most recent occurring in September 2019 with his daughter and his wife. During that final call, he was noted to be tearful, expressed concerns about his worsening health, and asked for money from his wife, who denied the request. After his death, it was learned that his wife had suffered a heart attack and required surgery and thus had been unable to work or to provide financial support to the inmate. His wife reported receiving "the darkest letter" from the inmate in October 2019 related to her inability to send him money. The wife also reported that the inmate had reached out to mental health for support in August of 2019, but "they did nothing for him."

The inmate was not placed in the MHSDS during his first incarceration. During his second incarceration, he was included in the MHSDS at the 3CMS level of care following reception center evaluations. The inmate was previously prescribed venlafaxine, hydroxyzine, and mirtazapine while in county jail for depression and sleep disturbance symptoms. His venlafaxine was discontinued within a week of inclusion in the 3CMS level of care due to non-adherence and reports to the psychiatrist that the inmate could not tolerate the medication. The inmate continued to report depressive symptoms but denied suicidal ideation at that time, and also during a session with a psychiatrist in March 2018. In March, sertraline was ordered, and his mirtazapine was discontinued. The inmate reported sleep disturbance and anxiety during a session with his primary clinician on March 9, 2018 but denied suicidality. He requested a psychiatric contact in April 2018 when his sertraline was discontinued, and mirtazapine was restarted. In May 2018, the inmate requested to have his medication discontinued, and all medications were stopped. Of note, there was an error in the SCR, which noted this as occurring in May 2019.

On August 11, 2018, the inmate was seen for an emergency consult after reporting suicidal ideation with an undisclosed plan. He stated that he had been feeling suicidal for a while and asked, "to go somewhere where I can sit in a room and catch my breath…I just need a moment alone to catch my breath I won't get that here." Documentation indicated that the inmate denied offers for mental health assistance beyond placement in the MHCB. The clinician noted that the inmate denied specific triggers or precipitants, and when the inmate believed that he would not be sent to the MHCB, he began yelling that he had a noose in his locker. A cell search revealed no noose, and the inmate yelled,

"I can't believe this! You're supposed to be mental health! You're supposed to help!" The inmate further complained that it appeared he needed to hurt himself in order to get help. Three days later, he was seen by a psychiatrist and reported that he was working on his coping skills and felt that talking with the clinician had been helpful. He denied suicidal ideation during that session. He was seen again by his primary clinician on August 18, 2018 and apologized for his behavior the week prior. He stated that he felt overwhelmed after watching the wildfires on television and stated that it brought back memories of his time as a firefighter, a career which he believed was no longer attainable. The inmate denied suicidal ideation, and the session included a discussion of coping skills and distraction techniques. The following week, he reported that he had been feeling overwhelmed by marital concerns on August 11, 2018, but this inconsistency was not explored during a session with his primary clinician. There was no documentation of an assessment of suicidal ideation during that session.

In November 2018, the inmate reported having physical problems and was unhappy with his current work assignment. He reported that he was assigned to sewing but did not like to sit all day. He discussed his work history as a firefighter and a roofer and wanted to talk with his correctional counselor about a more appropriate work assignment. The inmate reported that he believed he had melanoma lesions on his face, and his primary clinician encouraged him to request a medical appointment to confirm his suspicions of melanoma. The inmate denied suicidal ideation.

In February 2019, the inmate reported to his primary clinician that he was having problems with "a blood disorder and headaches." The inmate reported he was being treated by medical staff for these concerns. A review of medical documentation revealed that the inmate was being treated for polycythemia vera, migraine headaches, obesity, paroxysmal atrial fibrillation, and ankle pain. He denied suicidal ideation and reported that he was enjoying his current prison job. During his IDTT meeting on March 13, 2019, the inmate was discharged from the 3CMS level of care and moved to the non-MHSDS level of care after he reported feeling "pretty good" and asked to be discharged from the 3CMS level of care. He denied significant depressive and anxiety symptoms and had been without medications since May 2018. He denied suicidal ideation and presented as stable for the previous six months.

The inmate was seen for a routine mental health consult on August 15, 2019, after being found intoxicated on alcohol, which he made from hand sanitizer and salt, on August 10, 2019. He reported feeling "down" and "felt like having a drink." He received an RVR for drinking while working but reported to the clinician that he did not wish to discuss his problems any further. As a result, he was removed from his job in water treatment. This was the last time the inmate was seen by mental health before his death in October 2019. Following this session, the inmate learned that his wife had suffered a heart attack and his daughter had been the victim of domestic violence. Subsequent contacts with his wife were noted to have been negative.

163

There were four SRASHEs completed with the inmate during his incarceration. Self-reported information regarding this inmate's suicide attempt history was inconsistent. During most suicide risk evaluations, he reported that he had no prior suicide attempts; however, the inmate stated that he had attempted suicide on two previous occasions when seen for an emergency consult on August 11, 2018. As a result, two SRASHEs, completed in October 2017 and March 2018, rated his chronic and acute suicide risk as low, but his acute risk was raised to moderate when initially evaluated on August 11, 2018. A second SRASHE was completed on that same date after custody staff found that the inmate did not have a noose in his cell as he had reported. The second SRASHE reduced his acute risk level to low. The SCR noted that the chronic risk ratings were appropriate, but the low acute rating may have been an underestimation of risk at the time, given his statements of suicidal ideation. The rationale provided for the low acute risk rating was noted as resulting from the fact that he appeared primarily interested in securing a placement in the MHCB. The safety plan developed at the time was for the inmate to be seen weekly to assess his level of suicidality, work on identifying "dysfunctional schemas," and develop coping skills. He was seen weekly for two weeks following this evaluation.

## II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case. The Special Master's expert determined this inmate's death was not foreseeable.

## III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case. The Special Master's expert determined the suicide was not preventable.

## IV.    Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use and mental health history. The reviewer included a reasonable assessment of the precipitants to this suicide and the recommendations followed the content and findings of the report.

## V.    Analysis of Quality Improvement Plan Process

This case resulted in no required QIPs; however, one concern that did not result in formal QIP was generated from the findings. This was related to his primary clinician's routine contact in August 2018, where the clinician failed to assess or document the inmate's suicidal ideation.

Case HH

I.    Summary of Case

This inmate was a 41-year-old Caucasian man who was discovered hanging in his solely occupied general population cell by custody staff on August 25, 2019.  The inmate was receiving mental health services at the EOP level of care at the time of his death.

Records indicated that the inmate was born in Massachusetts and raised by his biological parents in a home free from abuse.  The family moved to California when the inmate was six or seven years old. The inmate had one younger sister.  He was diagnosed with an unspecified genetic disorder at the age of 12 and was prescribed growth hormone as treatment for the condition.  He was an active athlete during his adolescence, graduated from high school, and completed two years of college.  He reported using methamphetamine, alcohol, and marijuana daily beginning in adolescence.  He also reported experimentation with cocaine, psilocybin, and lysergic acid diethylamide (LSD).  Prior to his arrest for the index offense, the inmate had recently moved out of a sober living home, and his father was managing his finances in an effort to avoid a substance use relapse.  The inmate was never married and did not have any children.

The inmate had no juvenile criminal history but had been treated at a youth camp for substance use issues on two occasions.  He had 12 misdemeanor convictions as an adult for resisting arrest, assault, being under the influence of a controlled substance, possession of a controlled substance, receiving stolen property, and contributing to the delinquency of a minor.

The inmate entered CDCR for the first time in October 2011 to serve a sentence of 16 years to life for second-degree murder with an enhancement for use of a deadly weapon.  In 2006, he killed his landlord and attempted to conceal the crime by setting a fire.  He was found incompetent to stand trial on two occasions and was committed to Atascadero State Hospital for restoration.  He was restored to competency in April 2010, after being in the psychiatric hospital for over one year, and pled nolo contendere to the crime.  While incarcerated, he received four RVRs, with the most recent occurring in 2013.  Three of the RVRs were related to violence toward other inmates, and the fourth was for willfully delaying a peace officer.  The inmate spoke with his mother via telephone every two to three weeks and received visits once a year.  His father passed away in 2015.

Regarding his mental health history, the inmate began receiving psychotropic medication in late adolescence for social phobia.  In early adulthood, he was admitted to emergency psychiatric services on five occasions.  He was diagnosed with drug-induced psychosis, major depressive disorder, and methamphetamine abuse.  He also received substance use treatment in adulthood and resided in a number of sober living homes.  Following his arrest for the index offense, he needed hospitalization twice while in jail.  In August

2007, the hospitalization was triggered by his threats to jump off the second tier of his housing unit. He was treated with sertraline and diphenhydramine at that time. While in jail, he was admitted to Atascadero State Hospital for restoration from June through August 2008 and from January 2009 to April 2010. He was initially diagnosed with Schizophrenia, Paranoid Type but later received diagnoses of Schizoaffective Disorder, Depressive Type and Polysubstance Dependence. While in the hospital, he was treated with olanzapine and sertraline for symptoms including auditory hallucinations, paranoia, depression, and anxiety. He was noted to have poor group attendance but was not a behavior problem.

Upon entry to CDCR, the inmate was included in the MHSDS at the 3CMS level of care, but his level of care increased to an EOP level of care just over two weeks later. He remained at the EOP level of care, except for two MHCB admissions in 2013 and one DSH ICF admission from 2013 to 2014. The MHCB admissions resulted from suicidal ideation in January 2013 and a suicide attempt by hanging in June 2013. During that admission, he was noted to be disorganized, non-adherent with treatment, responding to internal stimuli, agitated and aggressive. As a result, a PC 2602 involuntary medication order was obtained on July 11, 2013, and he was referred to an ICF. During the ICF admission, he was noted to be aloof with little to no insight into his mental illness. In June 2014, he was discharged from ICF to an EOP level of care, where he remained until his death. The inmate was treated under a PC 2602 order through 2016 when it was allowed to expire. It appeared that the inmate remained largely medication adherent following the expiration of the order.

In the year before his death, the SCR noted that IDTT documentation included no updates regarding the inmate's current symptoms, functional impairments, or relevant treatment. He was not participating in the minimum amount of treatment required and was noted to be on a modified treatment plan to encourage participation. IPOCs were developed to address the inmate's hallucinations and paranoia, but nothing to address his social anxiety, which appeared to be the reason for his lack of treatment participation. Further, the modifications indicated on the IDTT treatment plan were not implemented, nor were the planned interventions to address his group attendance. The IDTT also indicated plans to move the inmate to a unit within the facility designed to support treatment participation among lower-functioning inmates with serious mental illness. This transfer occurred in December 2018 and appeared to result in an improvement in treatment engagement. However, his IDTT in April 2019 noted that he was still participating in less than the required minimum hours in treatment. The IDTT noted that his social anxiety hampered his engagement in groups, and modifications to his treatment were noted. Still, no IPOC was created to address his anxiety or track his progress.

In the following months, individual sessions with his primary clinician and psychiatrist appeared to target his anxiety and noted no evidence or reports of suicidal ideation. In July 2019, there was an IDTT, but the documentation was unclear as to whether the

inmate participated. The IDTT noted that while documentation indicated that the inmate was not participating in the minimum number of treatment hours, he was participating in groups that he was not scheduled to attend; thus, his treatment participation was not accurately reflected in his IDTT documentation.  His schedule was updated to better reflect the groups he wanted to attend, yet at his IDTT in August 2019, his participation was noted as still less than required.  It was noted that the inmate was not provided with a copy of his schedule and so was not aware of what groups he was scheduled to attend.

The inmate was seen for his last two sessions with his primary clinician at the cell front in August 2019.  One of those sessions was held at the cell front due to a canceled case management group, but it was not clear why the inmate was seen at the cell front on August 23, 2019.  Documentation indicated that the inmate denied suicidal ideation, psychosis or distressing mood, yet he died by suicide two days later.

While the inmate had 11 suicide risk evaluations completed during his incarceration, none had been completed since September 2017.  Prior risk evaluations generally rated his chronic risk as moderate and his acute risk as low, except for a high acute risk determination following his suicide attempt in June 2013.

## II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case.  The Special Master's expert determined this inmate's death was not foreseeable.

## III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case.  The Special Master's expert determined the suicide was not preventable.

## IV.    Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use, and mental health history.  A critical review was completed regarding the inmate's treatment and the recommendations followed from the findings in the report.

## V.    Analysis of Quality Improvement Plan Process

This case resulted in five required QIPs; three were required to address mental health concerns, and two were required to address custody concerns.  There were no nursing concerns. The first mental health QIP was required to address the fact that IDTT documentation from August through December 2018 did not update the inmate's clinical

summary to include current symptoms, functional impairment, and relevant treatment history. There was no assessment of treatment progress. The response indicated that ten of the clinician's treatment plans were reviewed, and some noted deficiencies in including updates, and did not describe treatment progress. All ten failed to include adequate interventions. The clinician was provided training, and evidence was included with the response; however, this training outcome was not provided.

The second mental health QIP was required to address the fact that the modifications indicated to increase the inmate's treatment participation were not employed as documented. Seventeen progress notes were reviewed, and only two included the provision of interventions, yet the interventions were not those included on the inmate's treatment plans. The clinician was provided training, and evidence was included with the response; however, this training outcome was not provided.

The third mental health QIP was required to address the fact that despite indications that social anxiety was the root cause of the inmate's lack of treatment participation, no IPOC was created to address this issue. The response indicated that the inmate had four primary clinicians in the year before his death, and none developed an IPOC to address his anxiety. This was noted as a systemic concern, and all staff was to be provided with training. Initially, the sign-in sheets for the training indicated that not all staff were trained. The statewide mental health team noted these omissions and asked for an update, which appeared to have been provided.

The first custody QIP was required to address the delay in calling for an ambulance. It was noted that the Warden initiated a CDCR 989 Request for Investigation. Additionally, custody staff was trained on responding to suicide attempts. Evidence of training was provided, but the outcome of the investigation was not.

The second custody QIP was required to address the fact that the inmate's cell window was noted as covered. The officer was interviewed and did not recall whether the inmate's window had been covered during prior checks. As a result, training was provided to all staff, and evidence of that training was included with the response.

Case II

I.  Summary of Case

This inmate was a 45-year-old Hispanic/Latinx man who was discovered hanging in his solely occupied PSU cell by custody staff on December 13, 2019. The inmate was receiving mental health services at the EOP level of care at the time of his death.

This inmate was born in California and raised by his biological mother. His father was addicted to drugs and absent from the inmate's life. Records indicated that the inmate's

168

mother was addicted to drugs; however, it was unknown if she actively used while raising her children. The inmate reported physical abuse by his mother during childhood. His mother died in 1997. The inmate reported completing high school or receiving a GED diploma while in juvenile detention. He reported attending special education classes but could not recall the reason. He reported regular use of methamphetamine, cocaine, marijuana, and alcohol starting in adolescence and the occasional use of LSD. He was reportedly affiliated with a gang while in the community but indicated that his violent behavior was not related to his gang involvement. The inmate never married and had no children.

The inmate had a juvenile criminal record beginning at age 14 and was arrested seven times for crimes including battery, assault with a deadly weapon, brandishing a weapon, truancy, and murder. As an adult, he was arrested six times for crimes including escape, battery, receiving stolen property, possession of a firearm, and attempted murder.

The inmate entered CDCR for the fourth time in August 2005 to serve 36 years to life for second-degree attempted murder, discharging a firearm causing great bodily injury, and a felon in possession of a firearm. He was arrested for shooting a fellow gang member without provocation. He pled not guilty by reason of insanity (NGRI) but was found guilty and sane. Additionally, in June 2010, the inmate was found NGRI for assault with a deadly weapon by a life prisoner with a prior felony conviction while incarcerated after attempting to strangle another patient while housed at a DSH facility. He was mandated to be admitted to a state hospital for a maximum term of 18 years to life. DSH petitioned the court to maintain the inmate at CDCR given his status as too violent, too aggressive, or too much of an escape risk to be held at a DSH facility under Welfare and Institutions Code (WIC) 7301. In September 2010, the Departmental Review Board approved his retention within CDCR until he was found to either satisfactorily program at the EOP level of care for 18 months or not receive any RVRs for violence, threats, or behavior that could lead to violence for 24 months. The inmate never met these criteria before his death.

The inmate received 30 RVRs while incarcerated, the most recent in October 2019 for assault with a deadly weapon. Most of the RVRs were issued for violence but also included possession of contraband, positive urinalysis for alcohol, threatening staff, introduction of a controlled substance into the facility, misuse of state property, possession of a weapon, and refusing to accept assigned housing. Institutional records indicated that the inmate was gang-affiliated while incarcerated. He spent over half of his incarceration in a segregated setting, with his longest period out of that setting from June 28, 2012, to January 11, 2016. The inmate did not receive any visits or make any phone calls during his incarceration.

Records indicated that this inmate's mental health treatment history began during adolescence, and he reportedly suffered from auditory hallucinations since age 11. In

1989, at age 15, he was admitted to an inpatient psychiatric hospital for approximately three weeks after being found psychotic and dangerous. The Probation Officer Report (POR) indicated that the inmate was prescribed psychotropic medications while on parole. However, he only briefly adhered to his medication regimen, resulting in him absconding from parole. During prior terms in CDCR, the inmate routinely received mental health services at the 3CMS and EOP levels of care. He had some admissions to the MHCB, as well as one acute and one ICF admission.

Beginning in 2007, the inmate was under a PC 2602 order for involuntary medications due to danger to self and others. This order remained in place until his death. He was admitted to DSH in 2009, and during that admission, he attempted to kill another patient. Following discharge from DSH, he remained primarily at the EOP level of care from 2009 to 2017, with multiple placements in ASU or PSU. During this period, the inmate had three admissions to the MHCB, for imminent danger to himself and others, due to auditory command hallucinations and for a medication adjustment. During this time, most of his treatment focused on delusions and auditory command hallucinations that contributed to his homicidal and passive suicidal ideation. The inmate's last MHCB admission occurred from April 13, 2017, to April 18, 2017, due to increased delusions contributing to homicidal ideation. Following a medication adjustment, he was returned to the EOP level of care.

In December 2018, the inmate expressed feeling hopeless about eventually returning to DSH. He noted that his auditory hallucinations were "too bad" and caused him to "act out." He noted that a Satanic Bible said to kill rapists and child molesters and that he intended to kill a child molester to get the death penalty. However, his clinician documented that he denied homicidal ideation during the session. In January 2019, the inmate reported experiencing suicidal ideations but noted, "it just crosses my mind." The psychiatrist documented that the inmate was not at increased risk for suicide, given his chronic history of reporting passive suicidal ideation. An IDTT was held on January 23, 2019, and the decision was made to retain him at the EOP level of care and require weekly monitoring due to his ongoing psychotic and depressive symptoms. The clinical summary on the treatment plan was not updated with current symptoms or functional impairments.

The inmate was assessed following receipt of an RVR for possessing a deadly weapon on February 7, 2019. The assessing clinician determined that his mental illness did not play a role in his behavior, leading to the RVR. However, during a session later that day, the inmate told his primary clinician that auditory hallucinations instructed him to possess two weapons in order to "shed the blood of sheep and build my army." Later in the month, the inmate was seen for a routine psychiatric assessment which also served as an evaluation for the renewal of involuntary medications. The inmate initially denied having a mental illness or requiring medication but eventually discussed how his antipsychotic medication helped decrease his agitation despite ongoing auditory

170

hallucinations. The inmate also discussed his need for buspirone and venlafaxine when he became concerned that they would be discontinued. From this session, the psychiatrist noted a suspicion that the inmate was malingering psychosis. Despite this suspicion, the involuntary medication renewal was completed. The inmate continued to describe psychotic symptoms to his primary clinician during March 2019. Yet, the psychiatrist again noted no objective signs of psychosis and recommended an assessment to rule out malingering of psychotic symptoms.

In April 2019, the inmate refused a primary clinician session because his assigned primary clinician was unavailable. During a subsequent contact with psychiatry that month, he expressed thoughts of suicide without a plan or intent. The psychiatrist noted no objective signs of distress despite the inmate's statement and concluded that his risk for suicide had not increased. During his primary clinician contact in May 2019, the inmate again alluded to suicide as an option, although unacceptable according to "Lucifer." Despite the inmate's statements, the clinician documented that the inmate denied suicidal ideation, and no SRASHE was completed.

An IDTT was conducted on May 22, 2019, beyond the required Program Guide timeline. The decision was made to retain the inmate at the EOP level of care and noted that the inmate was being referred for psychological testing due to inconsistencies in his reported experiences and his observed behavior. Following this meeting, the inmate wrote a letter to the WIC 7301 coordinator stating that he felt his primary clinician was "detrimental" to his mental health. The SCR noted that the inmate was evaluated by the WIC 7301 coordinator but did not discuss the outcome of that evaluation beyond the inmate's mood and symptom reports during the session. A review of the electronic health record revealed that the inmate expressed a desire to return to DSH and the evaluator noted the need to speak with the PSU supervisor if the inmate wanted to change his primary clinician. The coordinator noted that an appointment would be scheduled "in a few weeks" in preparation for his NGRI court report. There was no mention of whether or not this evaluation occurred.

On June 11, 2019, the inmate refused his medications. The psychiatrist saw him on June 12, 2019. The inmate expressed frustration with remaining in the PSU and with his primary clinician. In July 2019, both his primary clinician and his psychiatrist noted distress and increased delusional content during sessions. The psychiatrist noted rapid speech and documented that the inmate mentioned that he had been thinking about "going after someone and hurting or killing them." The psychiatrist noted that the inmate did not have a specific target and his homicidal ideation was "vague." The psychiatrist also noted the continued suspicion that the inmate was not being sincere but was attempting to be perceived as dangerous. At the end of July 2019, the inmate was seen by his primary clinician and was noted to be less delusional, denied psychotic symptoms, and discussed treatment participation.

171

During his IDTT in August 2019, there was again mention of a referral for psychological testing. The team did not document any doubt about the inmate's mental illness but possibly some exaggeration of symptoms. The decision was made to retain the inmate at the EOP level of care, and the inmate discussed his motivation to be released from the PSU. During sessions over the next two months, the inmate reported being angry and stressed, with references to violence, and expressed that he did not find his medications effective. It was noted that the inmate denied homicidal and suicidal ideation during these sessions. In October 2019, the inmate was evaluated following receipt of an RVR for possession of a deadly weapon, and it was concluded that his mental illness did not contribute to his behavior, citing previous clinical contacts did not note acute distress.

The inmate refused medications on October 10, 2019, and also refused a backup injection; use of force was required. The inmate reported refusing medications in order to go to DSH. At the time, the supervising psychologist noted suspicions of substance use. The inmate attempted to stab an officer with a manufactured weapon during the cell extraction, resulting in an RVR. As a result of this incident, the psychiatrist changed the inmate's medication to a monthly injectable antipsychotic medication. The mental health assessment conducted related to this RVR again resulted in the determination that the inmate's mental illness did not contribute to his behavior despite the inmate reporting auditory hallucinations telling him to shed blood and documentation that his psychiatric diagnosis may negatively impact his thoughts, moods, and behaviors. He was seen by his treating psychiatrist at the cell front on October 28, 2019, after refusing a confidential session. The inmate asked to have his buspirone and venlafaxine restarted as he endorsed depressive symptoms but denied hallucinations. He also asked to be removed from the involuntary medication order. The inmate denied suicidal and homicidal ideation.

In November 2019, the inmate complained of feeling slowed down by his injectable medication and reported continued auditory hallucinations despite the medication change. He also endorsed symptoms of hopelessness, guilt, and depression. He stated that he wondered why he was still alive and that he thought he was a horrible person. Despite these statements, the clinician noted that the inmate denied suicidal ideation, and there was no change in his suicide risk. He was seen for an IDTT on November 7, 2019, but the documentation was sparse. There was a reference to his cell extraction and suspicion that he was intoxicated and that the venlafaxine may need to be discontinued. Instead, the dosage was decreased. During his session with his primary clinician on November 18, 2019, the inmate was informed that his primary clinician would be unavailable for the next few routine sessions. (The SCR noted that the clinician ultimately left the institution but did not disclose this to the inmate. It was believed that he heard of the clinician's departure from other inmates.) He denied distress, suicidal ideation, and homicidal ideation but endorsed delusions and demonstrated a continued lack of insight into his mental illness. When seen by an alternate clinician on November 25, 2019, the inmate expressed delusions related to Satan and the need for sacrifice. Despite this, the clinician

documented that he had no active plan to harm anyone and did not warrant referral to an MHCB.

On December 5, 2019, the inmate submitted a healthcare request to psychiatry asking for "more meds" as his anxiety had increased. He was seen by a clinician on the same date and noted that he felt like he could not relax. He complained of command hallucinations telling him to kill people and feelings of being "trapped in a box." Despite this, the clinician documented that the inmate denied homicidal ideations as well as suicidal ideations. In a group session later that day, the inmate reported, "I'm not suicidal, but one day I will do something." There was no referral for the patient to be assessed for suicide risk despite this statement. When seen by his psychiatrist on December 6, 2019, the inmate requested to be put back on his buspirone, and the medication was restarted. The inmate was seen at the cell front by a psychology intern on December 12, 2019, noting that he was "restricted" from being seen out of cell, yet there was no indication of any restriction. He was noted to have denied suicidal and homicidal ideation. This was the inmate's final clinical contact prior to his death. He died on Friday the 13[th,] which members of his treatment team noted as significant given his religious beliefs.

Records noted that a psychological assessment was initiated in October 2019 by a psychology intern who saw the inmate for four sessions. However, the testing was never completed due to the inmate's death. Additionally, during an interview following the inmate's death, a recreation therapist reported that the inmate consistently stated that "he wakes up suicidal and goes to be homicidal" during nearly every check-in for the previous 18 months.

The SCR noted that the inmate identified one suicide attempt in 2004 or 2005 while in county jail, with more recent suicide risk evaluations noting an attempt when the inmate was age 15. There were 11 suicide risk evaluations completed during the final four years of the inmate's life, with the most recent occurring in July 2018. He was consistently rated to be at high chronic risk and low acute risk for suicide during 2018. The SCR noted these risk ratings to have been adequate.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case.

The Special Master's expert determined this inmate's death was foreseeable based on the SCR's findings, including increased suicidal statements, hopelessness, and distress noted in the final months of his life.

III.  <u>Determination of Preventability</u>

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined the suicide was preventable based on the fact that despite the inmate's increased suicidal ideation, hopelessness, agitation, and concerns over losing his primary clinician, the inmate was not formally evaluated for suicide risk and was not referred to a higher level of care.  Additionally, the inmate reported thoughts of suicide during group encounters, yet referrals were not generated for further evaluation.  Had these steps been taken, they likely would have reduced the likelihood of suicide.

IV.  <u>Critique of Suicide Case Review Report</u>

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use and mental health history.  It was sufficiently critical of clinical documentation and noted concerns about the lack of consideration for a higher level of care.  It noted that treatment plans were adequate but lacked details about the inmate's functioning and overall response to treatment.

The Special Master's expert was concerned that the SCR noted a number of instances where the inmate made statements related to thinking of homicide or suicide, yet the clinician documented an absence of suicidal ideation or homicidal ideation in the same progress note.  The SCR author was not critical of these contradictions.

Also, the SCR failed to note that the inmate refused medications in June 2019 while under a PC 2602 order, and no action was taken.  The on-call psychiatrist referred the issue to the inmate's treating psychiatrist despite an order for a backup injection.

V.  <u>Analysis of Quality Improvement Plan Process</u>

This case resulted in eight required QIPs and one "concern" that did not result in formal QIPs.  The concern was related to the fact that the WIC 7301 coordinator did not routinely communicate with the treatment team.  While this was noted not to be a policy violation, the SCR author noted that involvement could have been helpful to the inmate's treatment.

Five mental health concerns required a QIP.  The first was related to the fact that a WIC 7301 MOU required a joint conference to occur every six months with the DSH team and the CDCR team.  These meetings did not happen, and the SCR noted that "for several years," these meetings were not held due to a "disagreement on the utility" of joint

conferences. The QIP response noted that a decision was made on March 4, 2020, to resume these joint conferences and update the MOU. This response appeared adequate.

The second mental health QIP was required to address the fact that the IDTT held in May 2019 was late. The response indicated that the reason for the late meeting was not known, but an audit of ten records revealed that this was not a pattern in all records, including timely IDTT meetings. As a result, no further action was taken. This response appeared adequate.

The third mental health QIP was required to address the fact that on December 9, 2019, the inmate stated that he was not suicidal but "may do something one day" and that he regularly reported waking up suicidal and going to bed homicidal, yet no referrals were ever generated as a result. The response included issuing a memorandum to all recreation therapists to elevate concerns to the treatment team when inmates express suicidal ideation and activate a crisis response. Recreation therapists were also trained, and evidence was provided. This response appeared adequate.

A QIP for mental health was required to address the fact that there were multiple opportunities to assess the inmate's suicide risk in 2019, yet no formal evaluations were completed. The inmate expressed hopelessness and passive suicidal ideation during at least three clinical contacts. The fact that no formal SRASHE had been completed denied the treatment team an understanding of the inmate's baseline suicide risk and the ability to account for this risk during treatment planning. The facility leadership noted that the issue was investigated, was found to be systemic, and not isolated to the institution. As a result, the statewide SPRFIT was to develop a memorandum to address the issue. No further follow-up was provided, and as such, this response was only partially adequate.

The fifth required mental health QIP was related to the fact that despite the inmate's statements and variable clinical presentation over the prior year, including a cell extraction and an RVR for attacking a custody officer and suspicion of intoxication, no higher level of care was considered. The response included training for all staff, including the seven indicators of the need for a higher level of care, and a memorandum was sent to all staff to clarify these points. The facility also provided evidence of increased referrals to higher levels of care following the actions taken. This response was adequate.

The final mental health QIP was required to address the cell-front contact that occurred on December 12, 2019, which noted the inmate was restricted from attending the session in a confidential setting. There was no indication that the inmate was restricted from attending sessions. The response indicated that "various programs had used the behavioral incentive program (BIP) for restriction to all treatment centers. In collaboration with custody and mental health staff, standardized language for Treatment Center Restrictions was created." Additionally, the response noted that training could not

be completed due to the COVID-19 pandemic, and training was to be completed by March 27, 2020. Evidence of training was provided. This response appeared adequate.

There was one custody-required QIP to address the fact that the entire cut down kit was not brought to the scene, which was a policy violation. In response, training was provided to all "available" housing unit staff, and plans were in place to train all unavailable staff upon their return. Evidence of training was provided. Additionally, inspections were completed to ensure that cut-down kits were complete and available. This response appeared adequate.

One nursing concern resulted in a required QIP to address the fact that during the period from December 4, 2019, to December 12, 2019, psychiatric technician rounds documentation was incomplete. Documentation failed to note if the inmate was moving or breathing when lying in bed, and there was no inquiry into his suicidal ideation on these dates. The response included the submission of a memorandum praising staff for their documentation and providing audit results that indicated high levels of compliance. The memorandum noted the need to "readjust back to completing all information" for inmates on forms. It was not clear how high compliance ratings were achieved when documentation was found incomplete. This response was not adequate as it did not refer to the inmate's suicide or the seriousness of the lapses in the documentation.

Case JJ

I.    Summary of Case

This inmate was a 31-year-old African American man who was discovered hanging in his solely occupied cell by custody staff while delivering meals on April 13, 2019. The inmate was receiving mental health services at the 3CMS level of care at the time of his death.

The inmate was born in California. His mother was noted to have substance abuse problems, and his father was largely absent from his life. Both parents had histories of incarceration in CDCR; as a result, the inmate and his two brothers were primarily raised by their maternal grandmother. Records indicated no history of childhood abuse. The SCR noted that the inmate's two brothers were incarcerated in CDCR at the time of the inmate's death. Records also reflected that the inmate began engaging in criminal activity at the age of nine and began using alcohol and cannabis prior to reaching adolescence. He started running away from home at age 11. He was eventually suspended from elementary school and engaged in robbery and vandalism. His gang affiliation began in childhood. At age 13, the inmate committed forced sodomy on a 12-year-old boy and served seven months in juvenile detention. While on parole for this offense at age 14, the inmate participated in a home invasion with subsequent rape and

forced oral copulation on the female homeowner. This was the inmate's commitment crime, and he was incarcerated from that time until his death.

Records indicated that the inmate dropped out of school in ninth grade and had no community work experience. He obtained his GED while incarcerated. He never married and had no children. The inmate identified as bisexual and was known to have engaged in sexual relationships while incarcerated. There was no evidence of telephone calls since at least February 2019.

The inmate entered CDCR for his first term in August 2003 to serve a 45-year sentence for oral copulation with force/violence, rape with force/violence, first-degree robbery and second-degree robbery. The SCR noted that while incarcerated, the inmate admitted to participating in his crime as the youngest member of a group coached by older peers on how to commit the crime. He acted as a full and willing participant, and he reported a sense of power during his crime and enjoyed being able to do what he wanted. During an assessment for parole in 2016, the inmate expressed some remorse for the crime. However, he admitted ongoing issues related to violence and agreed that he was unsuitable for parole due to disciplinary problems, substance abuse and failure to engage in programming. Despite his intentions, the inmate was unable to adhere to rules and to cease violent behavior. He received his last RVR in January 2019 for behavior that could lead to violence.

While incarcerated, the inmate was known to use methamphetamine and/or heroin daily and often identified his substance use as the root of his disciplinary problems. He reported that he was likely under the influence of drugs 95 percent of the time when he received RVRs.

The inmate was assigned as a porter as well as a Prison Industry Authority worker. His last supervisor described him as "capable, quiet and unproblematic." Because of his classification as a sexual offender, he was vigilant of others' awareness of his crime. Before his suicide, the inmate reported that he believed staff and other inmates were revealing the nature of his crime, which would result in him being a target of violence. He reported feeling that his life was in danger. He was also noted to have drug debts at the time of his death.

Prior to incarceration, there was no documentation of mental health treatment. The inmate was placed in the CYA at age 15, where he reported receiving treatment for depression. Upon entry to CDCR at age 18, he was included in the MHSDS at the 3CMS level of care. During his CDCR incarceration, the inmate spent approximately 83 percent of his incarceration receiving mental health services at the 3CMS level of care and the remaining time at the EOP level of care. Over the course of his nearly 15 years in CDCR, he had two MHCB admissions, totaling 16 days. The first MHCB admission followed a suicide attempt in May 2014. The circumstances of that attempt were similar

177

to those present at the time of his death. At that time, he reported that he needed a higher level of care and more frequent contact with his mental health treatment team. He reported worsening depression, anxiety and feelings of isolation. When the inmate perceived that his concerns were ignored, he tied a sheet around the top bunk and a knot around his neck. This was the method he later used to kill himself following a decrease in his level of care, which he opposed.

The inmate was discharged from the MHCB at the EOP level of care. He remained in the EOP through June 2016, when he was decreased to the 3CMS level of care. In March 2017, the inmate was referred to the MHCB for suicidal ideation, but he was not admitted due to the determination that he wanted placement for secondary gain. The 3CMS services were "enhanced" through increased frequency of contacts to address symptoms of depression, substance use, anger and impulse control.

The inmate was transferred to another institution in June 2018; shortly following the transfer, he requested return to the EOP level of care. His IDTT indicated that the 3CMS level of care was appropriate, and he was not referred to a higher level of care. The inmate filed a grievance related to this issue but ultimately withdrew the request because the frequency of his 3CMS clinical contacts increased. Documentation indicated that the IDTT considered his past suicidal behavior and triggers and was mindful of his dynamic risk for self-harm. Treatment focused on addressing the inmate's impulsivity, drug use, depression and anxiety. An IPOC was created addressing impulsivity after a formal assessment placed the inmate's impulsivity in the severe range. A SRASHE was completed in July 2018, and the inmate was assessed with moderate chronic and acute risk for suicide.

Primary clinician documentation in August 2018 noted that the inmate was possibly in distress and needed more frequent contacts. He was seen every two weeks, and the treatment team considered placement at the EOP level of care. In December 2018, documentation reflected that while the inmate's primary needs were associated with substance use, his acute and imminent risk factors warranted transfer to a higher level of care for stabilization. At the January 2, 2019 IDTT meeting, the decision was made to place the inmate at the EOP level of care. On January 14, 2019, the inmate reported stress regarding his suspicion that his sex offender status was being shared, and he had safety concerns related to drug use. He had also recently received an RVR. As a result, he was admitted to the MHCB where he quickly stabilized. He denied suicidal ideation at this time. Based on safety concerns, custody staff initiated a transfer to another facility, and the IDTT recommended retention at the EOP level of care following the transfer. The inmate was transferred on February 4, 2019.

Documentation by mental health staff following the transfer lacked detail. The initial treatment plan included diagnoses of substance use disorders and Antisocial Personality Disorder. IPOCs were created to address danger to self, substance use and depressed

mood. The treatment plan did reference the MHCB discharge recommendations and the inmate's elevated suicide risk due to his active heroin use; however, the plan appeared to focus on minimizing interpersonal conflict without acknowledgment of the inmate's suicide risk. Documentation continued to reflect the treatment team focus that the inmate's depressive symptoms were due to drug use and safety concerns.

In March 2019, the inmate's primary clinician documented that the inmate explicitly expressed safety concerns that his sex offender status was known by others, and the primary clinician referred the inmate to custody staff. The inmate explained that custody staff was part of his safety concern. The primary clinician dismissed his concerns and noted, "the inmate is attempting to control his level of care and placement with this reported safety concern as he is wanting PC [primary clinician] to document this event."

The inmate missed several scheduled appointments for individual and group sessions. Missed groups included relapse and recovery group, despite the identification of substance use as a primary concern. The group facilitator noted that the inmate did not likely have a genuine drug problem, although this opinion was not consistently noted in the health record.

On or about April 10, 2019, the IDTT determined that the inmate's issues were related to his drug use. Because substance use treatment was not available on his current yard, the treatment team recommended the 3CMS level of care where he could receive such treatment. The team noted that the inmate denied suicidal ideation, homicidal ideation, and hallucinations; and he had no recent MHCB admissions. Documentation included a suspicion that he was distributing drugs on the yard. There was not documentation that the treatment team considered the inmate's suicide risk given previous triggers and concerns that the inmate had for his safety. Additionally, his primary clinician's documentation indicated that the decision to downgrade the inmate to the 3CMS level of care was made prior to the IDTT meeting. The inmate shared at the IDTT meeting his concern that the decision to transfer to the 3CMS level of care did not include him and was made prior to the IDTT meeting, but the primary clinician documented "this is not true" despite conflicting evidence documented the day prior. The inmate killed himself three days later in a manner consistent with his prior attempt, as noted above.

A review of psychotropic medications revealed the inmate was prescribed buspirone, clonidine, fluoxetine, hydroxyzine and gabapentin. The psychiatrist who reviewed the provided psychiatric treatment in the SCR noted that "a more aggressive approach toward treatment" of his anxiety may have been indicated, but given the inmate's drug use and intermittent nonadherence, this was difficult to achieve. Psychiatric contacts were noted to be timely. It was also noted that the inmate might have been a candidate for medication-assisted treatment to address his substance use.

In addition to the 2014 suicide attempt, the inmate reported that he attempted suicide by hanging in 2003 while in county jail, but this attempt was not verified in available records. During his incarceration, seven SRASHEs were completed for the inmate; four were completed in 2019. Despite his suicide attempt history, active substance use, safety concerns, and severe impulsivity; chronic risk was typically assessed as moderate. The last SRASHE was completed on February 11, 2019, following the transfer to his final institution. At that time, chronic risk was assessed as high, and acute risk was moderate. The risk evaluation appeared accurate, but the risk formulation and resulting safety plan were poor. The safety plan noted some triggers related to suicidal ideation; however, it failed to address the role of substance use in the inmate's overall mental health and suicide risk.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case.

The Special Master's expert determined this inmate's death was foreseeable based on his suicide attempt history related to changes in levels of care. Additionally, the treatment team had access to information regarding the inmate's treatment needs and triggers yet formed the opinion that the inmate did not require a higher level of care within approximately two months. During that period, the inmate had only five clinical contacts and five cell-front contacts. Additionally, the inmate's previous treatment team and the inmate had clearly opined that the inmate's level of care should not be reduced.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined the suicide was preventable due to the inappropriate reduction in the inmate's level of care as well as inadequate treatment and safety planning to address the inmate's clinical needs. Additionally, the treatment team failed to recognize the impact of substance use affecting the inmate's mental health and suicide risk.

IV.    Critique of Suicide Case Review Report

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use and mental health history. The reviewer included a reasonable assessment of the precipitants to this suicide, and the recommendations followed the content and findings of the report. The author was insightful and drew a clear distinction between the effective assessments, treatment and responsivity of the

initial treatment team, and the less attentive and dismissive methods utilized by the subsequent treatment team. One omission in the SCR likely required a QIP; the primary clinician made a clearly untrue statement to the inmate and documented the same regarding the decision to decrease the inmate's level of care prior to the IDTT meeting.

V.    Analysis of Quality Improvement Plan Process

This case resulted in two required QIPs, both related to mental health. The first was required to address the problematic reduction in the inmate's level of care from EOP to 3CMS three days prior to his suicide. The recommendation noted the need to address the lack of responsiveness to the inmate's increased symptoms, failure to recognize the recommendations of the prior treatment team which did not support a lower level of care, and a lack of understanding of the role that substance use played in the inmate's mental health stability and level of suicide risk. The response included a review of ten cases of reductions in levels of care and found justifications to be generally inadequate. It noted that clinicians failed to document issues inherent to level of care decisions. The review also noted that inmates whose level of care was reduced had not shown a clear pattern of abatement or absence of symptoms that would justify a level of care change. Documentation regarding the inmate's clinical presentation was not updated, treatment response was not documented, and discharge plans were inadequate. The facility noted that they already had two psychologist specialists in place to monitor the quality of treatment plans, and they would improve monitoring with the addition of quality improvement monitoring by a Mental Health Program Supervisor once per week for 90 days. The response further noted that clinicians demonstrating difficulties would be provided on-the-job training. If deficiencies persisted beyond 90 days, additional training would be provided. While mostly adequate, this response raised further concerns for the Special Master's expert regarding the adequacy of the quality improvement monitoring at the facility that previously failed to recognize the identified issues. A thorough QIP would have also addressed this issue. Additionally, no further follow-up information was available to verify the outcome of the training.

A second QIP was required to address the poor risk formulation and safety plan in the SRASHE completed on February 11, 2019. The response indicated that five SRASHEs written by the clinician were reviewed and noted to be "thoughtful and generally comprehensive." Safety plans were noted to be briefer than recommended but individualized. Justifications for risk assessments were found to be inadequate. In addition to the training provided in July 2019, the individual clinician was noted to have been provided with seven hours of additional training. The response noted that more training "should not be required" if the clinician followed protocols provided in these trainings. This response was not fully adequate, because there was no provision to indicate how the clinician's risk evaluations would be monitored going forward to ensure that additional training was not required. Additionally, the facility provided training forms for seven hours of training for a number of staff. It was not the case that the

clinician in question was provided with "additional" training, as it appeared that the training was provided to several other staff.

Case KK

I.   Summary of Case

This inmate was a 59-year-old Caucasian man who was discovered hanging in his solely occupied cell by custody staff while delivering meals on October 7, 2019.  The inmate was receiving mental health services at the EOP level of care at the time of his death.

The inmate's history included several inconsistencies. The inmate was an unreliable historian who often confabulated information when he failed to remember details, a common behavior among those with mental illness and low intellectual functioning.  As such, the SCR attempted to integrate as much consistent information as possible into the report.

The inmate was born in California and raised by his mother and stepfather and had two younger siblings.  His family history was positive for alcoholism, drug use, mental illness, and suicidal behavior among his parents, siblings, and extended family.  The inmate and his mother were reportedly victims of violence from the inmate's stepfather when the stepfather was intoxicated.  The inmate also reported being the victim of sexual abuse by a neighbor at the age of ten.  The inmate reported being placed in special education classes during childhood for ADHD and was prescribed a stimulant (i.e., methylphenidate/Ritalin).  There were also indications in the record that he was prescribed the antipsychotic medication thioridazine as a child.  Despite his placement in special education classes, he failed a number of grades, had difficulty with peers, was teased, and reported being beaten up by other students.  The inmate reported these issues were related to drug use.  During his first year, he dropped out of high school and reported working with his stepfather as a landscaper.  He was eventually fired because of drug use, erratic behavior, and repeated incarcerations.  At the time of his arrest for the index offense, he was indigent and homeless (living under a bridge).  He never married and had no children.

The inmate reported that he began using alcohol at age 13 and methamphetamine at age 14.  Methamphetamine was noted as his drug of choice, which he used intravenously and he continued to use into his late-30s, including while incarcerated.  He also reported experimentation with a number of other drugs.  He noted that his substance use resulted in financial, legal, and familial problems and also resulted in contracting Hepatitis C from intravenous drug use.  While he had no juvenile criminal record, the inmate was arrested and violated parole on a number of occasions as an adult, dating back to 1978 for crimes including burglary, robbery, driving under the influence, theft, battery, assault on a peace officer, receiving stolen property, forgery, possession of a controlled substance, vehicle

theft, grand theft, and murder. He was incarcerated on two prior occasions and engaged in criminal activity while incarcerated and while on parole. Records indicated that he was gang-affiliated while incarcerated but was placed on an SNY in 1996 after disassociating.

The inmate entered CDCR in November 1994 for his third and final term to serve a sentence of 15 years to life for second-degree murder. He committed his crime while on parole. Records indicated that he received 11 RVRs while incarcerated during the current term; they were all received prior to September 2001 for the destruction of state property, mutual combat, possession of inmate-manufactured alcohol, possession of an inmate-manufactured syringe, possession of drug paraphernalia, and failure to report to a job assignment. Records indicated that the inmate was assigned to a recycling team at the time of his death; however, he did not actually engage in any work. He reported that his job duties included checking in at the job location and then returning to his cell. He also had previously been assigned as a porter but lost the position following a transfer for mental health treatment.

The inmate was a participant in the DDP at the development disability 2 level, indicating that he had cognitive deficits and needed adaptive support and monitoring for potential victimization. He was not placed in DDP during previous incarcerations, nor when initially incarcerated for the current term. In 2019, the inmate was referred for further evaluation by his primary clinician due to his inability to read and write. Records indicated that the inmate was victimized by other inmates, including an attempted sexual assault in 1982; physical assaults which resulted in a broken jaw in 1995 and a black eye in 2001; and intimidation. He was noted to be immature, passive, insecure, emotionally inadequate, socially naïve, and criminally unsophisticated. Early in his current prison term, he served time in a SHU for stabbing an inmate during a previous term. Records also indicated that in March 2019, the inmate's mother reported receiving a threatening letter from another inmate regarding the inmate's debts on the yard. The letter stated that both his mother and her granddaughter were "being watched" and should blame the inmate if anything happened to them. An investigation into this incident resulted in a separation alert. In August 2019, the inmate reported a safety concern to his primary clinician related to threats by another inmate who was taking the inmate's canteen. The inmate denied placement in segregated housing for his own safety, stating that he had done nothing wrong. The inmate was assaulted on the following day.

The SCR noted that the inmate made 27 telephone calls to his mother in the year before his death. The content of these calls mainly included the inmate requesting packages. The inmate often asked his mother to visit, but she stated she did not like the visitation procedures. He told his mother that he requested a transfer to a facility closer to her, but she responded by saying she was planning to move out of state within the next two years. He also discussed the possibility of parole with his mother, who was often discouraging about the idea and noted that she would not support him. During his final phone call with

his mother on October 4, 2019, he asked if she would write a letter supporting his parole. She stated that she would contact his attorney, but she could not support him in the community beyond assisting him with managing his Social Security income.

The inmate reported minimal psychiatric treatment as an adult prior to incarceration. He reported receiving outpatient mental health services and also treatment while in county jail. He was first included in the MHSDS in 1995 at the 3CMS level of care. He reported difficulty adjusting to the fact that he murdered someone, intrusive auditory and visual hallucinations, nightmares, and paranoia. His diagnoses at that time included Alcohol-Induced Persistent Amnestic Disorder, Provisional Korsakoff's Syndrome, Antisocial Personality Disorder, and a rule-out for PTSD. At the time of his death, he was diagnosed with Major Depressive Disorder, recurrent, with psychotic features but had previously been diagnosed with Schizoaffective Disorder, Depressive Type.

The inmate's first admission to the MHCB occurred on July 7, 1999, followed by readmission on July 11, 1999, for suicidal ideation, self-injurious behavior, command auditory hallucinations, anxiety, and paranoia. Subsequently, he had long periods of stability within the 3CMS level of care with intermittent periods of more frequent or more intensive services. In August 2017, he appeared to decline and was admitted to the MHCB for suicidal ideation with a plan to hang himself after he lost his cellmate of seven years. He was discharged from the MHCB at the EOP level of care and continued to report symptoms of auditory hallucinations, depression, hopelessness, paranoia, and anger. He reported difficulty coping with loud voices. He was readmitted to the MHCB in October 2017 with suicidal thoughts of hanging himself. He was admitted to the APP and then transferred to an ICF at DSH. Upon returning to CDCR, he was admitted to the MHCB for a final time on August 28, 2018 for suicidal ideation, as custody staff found a noose in his cell. He was discharged to the EOP level of care, where he remained until his death.

Four IDTTs were completed during the final year of his life to address his symptoms of chronic paranoia, auditory hallucinations, depression, and passive suicidal ideations. An IPOC was initiated in December 2018 to reduce feelings of distress, reduce frequency of hallucinations, decrease delusional statements, learn coping skills, and display behavior appropriate for a lower level of care. The SCR noted four concerns with his treatment plan. The first was that the only treatment intervention listed was to work on coping strategies "to deal with or attitudes towards hearing voices." This failed to address all of his reported symptoms. The second concern addressed the delays in his referral, evaluation, and placement in the DDP. Finally, only the primary clinician and correctional counselor participated in the IDTT, not the entire team.

The inmate was seen for an IDTT on March 21, 2019, and the content of associated documentation was largely unchanged except for the addition of an IPOC to address treatment adherence. While the inmate denied suicidal ideation at the time, he reported

that auditory hallucinations told him that people were out to get him and he should hang himself. He also reported visual hallucinations of "people hanging" and said he saw himself hanging. He reported being bullied over a jar of coffee and indicated this was the reason he was not attending groups; however, he denied safety concerns. To address the inmate's concerns, the treatment team added that his participation would be monitored, as would his mood, paranoia, and feelings of being unsafe due to negative peer interactions. The inmate was to be educated about healthy boundaries. The primary clinician was to use active listening and Cognitive Behavioral Therapy to address his negative thoughts, rumination and provide education toward building awareness of physical and emotional cues and the need to self-isolate. Reality-based therapy was to be provided to address his paranoia, and the inmate was to be encouraged to self-advocate for his safety concerns. Custody staff and his DDP officer were to follow up with the inmate regarding safety concerns, and psychiatry would see the inmate every 90 days. The SCR noted an absence of interventions to address suicidal ideation, failure to complete a risk evaluation, and discussion of the inmate's DDP status did not include specific adaptive supports. Additionally, there were changes to the IDTT plan on four dates during March 2019, without the inmate's involvement.

During his June 2019 IDTT, which was held one week late, the inmate reported engaging in headbanging to relieve stress and anxiety. His group attendance had improved, and new IPOCs were added to address headbanging, depressed mood, and hallucinations. However, a risk evaluation was not completed, and there was no discussion of the inmate's DDP status. During his final IDTT on September 26, 2019, documentation was found to be largely unchanged. While the inmate reported no new symptoms and was noted to be attending treatment sessions, the plan failed to note that he had been victimized over the previous 90 days and did not discuss his DDP status. During treatment sessions in the months before his death, the inmate reported difficulty sleeping, nightmares, command auditory hallucinations, sadness, urges to bang his head, and noted that his medications were not working. He was not referred for follow-up concerning these issues. Additionally, documentation indicated that the inmate denied suicidal ideation, plans, or intent despite his reported symptoms.

The inmate was seen for routine psychiatry appointments, however, and medication adjustments were made. The psychiatrist noted that the inmate "looked much better" after the adjustments, but the SCR noted that the documentation also referenced the inmate being a sex offender, which he was not, so could have reflected documentation regarding another inmate. The psychiatrist questioned the inmate's level of care and noted that the inmate was likely in EOP to "hide out." An overall review of psychiatric care noted appropriate medication interventions but a failure to meet scheduling orders in August and September 2019. The inmate had been scheduled for monthly contacts and was scheduled to be seen following a healthcare request, but he was not seen between July 19 and September 26, 2019.

After the inmate's death, an interviewed psychiatric technician noted that the inmate began to function poorly after his cellmate transferred in August 2019. The psychiatric technician reported that the inmate struggled with auditory hallucinations and developed an infected abscess on his arm from intravenous drug use. The inmate denied wanting to go to the MCHB but frequently complained about auditory hallucinations. The inmate was afraid that if he went to the MCHB, he would not return to the same unit. The psychiatric technician stated that the facility lost psychiatric coverage during this period, and there was no one available to address the inmate's needs, not even telepsychiatry.

Records indicated that the inmate reported that he attempted to kill himself and engaged in self-injurious behavior; however, his reports were inconsistent. He denied attempts in the community and reported that one attempt occurred in county jail in 1978 by cutting his wrists. Records indicated that the inmate reported that he stabbed himself in the abdomen in 1999, attempted hanging in 1998, 2003, and 2007, attempted suicide in 2017, and reported suicidal ideation along with constructing a noose in August 2018. Additionally, the inmate engaged in headbanging, at times to the point of unconsciousness. The SCR noted that no Power-Forms were used to document his self-injurious behavior despite these behaviors, making verification of these events challenging. Over the course of his most recent incarceration, two suicide risk evaluations and 14 SRASHEs were completed.

In the year before his death, a quarterly SRASHE was completed in November 2018 and was found to be insufficient due to internal inconsistencies, failure to document events accurately, an incomplete mental status examination, assignment of low acute risk for suicide despite active command auditory hallucinations telling the inmate to kill himself, failure to address imminent warning signs, and a poor safety plan which was not individualized and failed to account for the inmate's intellectual deficits. In February 2019, a SRASHE was completed following an inpatient discharge. It was noted to be problematic; it was modified multiple times, did not include the quality of protective factors, underestimated his acute risk based on available risk factors, and failed to include an adequate safety plan. A 90-day follow-up SRASHE was completed in May 2019 and was concerning in that it underestimated the inmate's acute risk and included an inadequate safety plan that failed to address his DDP status. The inmate was seen for a final 90-day follow-up SRASHE in July 2019. He reported command auditory hallucinations to hang himself and reported that he intended to act on those thoughts but had no plan. He reported engaging in self-injury within the prior week, experiencing nightmares where he saw himself hanging, and experiencing symptoms of suicidal ideation, anxiety, feeling trapped, and hopelessness. This SRASHE was noted to have five areas of concern, including a failure to document previous suicide attempts consistently within the document, inaccurately documented active suicidal ideation as passive, did not document the quality of protective factors, failed to adequately justify a low acute risk determination, and included a written safety plan that was shared with the inmate, despite his inability to read, and noted at the top that the inmate's cellmate would

read it to the inmate during times of distress.  First, inmates should not be placed in the role of providing care to other inmates, and second, the inmate was housed alone at the time of his death.  This second fact was not considered during an IDTT in September 2019, when the plan should have been updated to reflect this change.

II.    Determination of Foreseeability

The Suicide Case Review Committee did not provide a determination of foreseeability for this case.

The Special Master's expert determined this inmate's death was foreseeable because clinicians failed to accurately evaluate the inmate's risk for suicide despite evidence of significant risk factors and absence of protective factors.  Additionally, there were clear indications of the inmate's worsening suicidality, including suicidal ideation, command hallucinations to kill himself, visual hallucinations and nightmares related to his own hanging, and insufficient supports for the inmate during this time, given his DDP status.

III.    Determination of Preventability

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined the suicide was preventable based on the fact that despite increased symptom reports, including suicidal ideation, command hallucinations, and urges to engage in self-harm, the inmate was not referred for a psychiatric evaluation and/or a higher level of care.  Further, routine treatment planning failed to account for these factors and address them adequately.

IV.    Critique of Suicide Case Review Report

The SCR provided a marginally adequate clinical summary with relevant social, criminal, incarceration, substance use and mental health history.  The reviewer included a reasonable assessment of the precipitants to this suicide and the recommendations followed the content and findings of the report.  The SCR did not critically evaluate the treatment provided to the inmate beyond a review of psychiatric care.  While the report was critical of the inmate's treatment plans, it failed to include a review of the consistency between planned treatment and the treatment that was actually provided to the inmate.  This was a significant omission.

V.    Analysis of Quality Improvement Plan Process

This case resulted in 11 required QIPs, nine related to mental health and two related to custody.  The first QIP was required to address several concerns related to the treatment

plans developed in December 2018 and March 2019. The concerns included insufficient interventions to address his identified symptoms, inconsistencies related to his DDP evaluation, insufficient staff participation, and delays in completing the December plan. The March plan was problematic because it did not consider the inmate's suicidality, failed to include a risk assessment, failed to address the inmate's need for adaptive supports given his DDP status, and multiple modifications on different dates, which failed to include the inmate's participation. The response indicated that audits were completed over six months and revealed a pattern of concerns in the majority of records reviewed. The action taken was that the individual clinician was trained on the identified issues, yet there was no plan in place to assess the impact of that training. The response was partially adequate.

The second mental health QIP was required to address a late IDTT in June 2019. The response indicated that a psychiatrist was not available to attend the meeting the week before; therefore, it was delayed. A review of compliance with timelines across the facility noted that this was not a systemic concern. This response appeared adequate, although it would have been more important to focus the review on the IDTT in question rather than across the institution, which likely diluted the findings.

The third QIP was required to address the fact that no self-harm Power-Forms were developed, nor a suicide risk evaluation completed, which led to an underestimation of the inmate's risk. The response indicated that a new LOP would be developed to address self-harm, staff was provided with the Power-Form, a tracking mechanism was put in place to support timely completion, and training was provided to staff. There were a number of training forms submitted, but the Special Master's expert was unable to determine if all staff were trained. This response was largely adequate.

A delay in completion of a CASE was noted as requiring a fourth QIP. The response indicated that a review of ten CASEs was completed, and seven were delayed. The response indicated that during that time, there were a number of referrals for CASEs, there were staff vacancies, and the facility experienced staff turnover. It was noted that the backlog had been addressed, and a new coordinator was assigned. Further, a tracking mechanism was put in place. This response appeared adequate.

A fifth QIP was required to address concerns noted in the SRASHEs completed in November 2018, February 2019, May 2019, and July 2019. As the concerns were similar, these were included in a single QIP. The concerns included a number of omissions, inconsistencies, failure to include risk factors, failure to evaluate the quality of protective factors, insufficient justification for risk levels, and poor safety plans which were not individualized and/or failed to address the need for adaptive supports given the inmate's DDP status. The response noted that four clinicians had completed these evaluations. One clinician had left the facility at the time of the response. For that clinician, a memorandum was sent to the clinician's current institution to complete a

review.  The review noted no pattern of concerns.  For the remaining three clinicians, five SRASHEs were audited, and patterns of problems were identified for each.  All three clinicians were provided training on the specific issues identified during the reviews. This response appeared adequate.

The sixth mental health QIP was required to address that the inmate reported an increase in symptoms in the month prior to his death, and appropriate referrals to psychiatry were not made.  The response indicated that the facility already had a performance improvement plan in place at the time to address concerns related to psychiatry referrals but that the process was ineffective due to the high vacancy rate for psychiatry.  A memorandum reminding staff how to submit psychiatry referrals was generated, and the staff sign-in sheet for this training was blank.  This response was not adequate, though the statewide SPRFIT committee accepted it.

A seventh mental health QIP was required to address the fact that during the September 2019 IDTT, the treatment plan remained largely unchanged from prior plans despite changes in symptoms, reports about victimization from other inmates, and engagement in self-injurious behavior.  These changes clearly warranted consideration of a higher level of care.  The response indicated that staff were trained on treatment planning and recognizing the signs of acute mental illness but did not address the issues related to referring an inmate to a higher level of care.  This response was not adequate.

The eighth QIP for mental health was required to address the fact that the inmate reported an increase in auditory hallucinations to the psychiatric technician on a number of occasions, and the psychiatric technician did not refer the inmate to psychiatry for further evaluation.  The facility's response included training regarding submitting referrals based on inmate needs rather than on the perception of available staff to respond to referrals. Evidence of training was provided.  This response appeared adequate.

The final mental health QIP was required to address scheduling errors and omissions related to psychiatric appointments resulting in missed sessions and fewer sessions than indicated between July and September 2019.  The response included a review of the omissions and missed appointments and a discussion of the psychiatry vacancies at the facility at the time.  A memorandum was created to address the errors in scheduling. This response was partially adequate.

The custody QIP was required to address a delay in the activation of a 911 emergency call.  A request for an investigation was submitted as a result of this finding, but the SCR required action following the investigation results.  The results of the investigation were available and included a review of the incident, as well as the training that had been provided to the correctional officers who responded.  The officer who responded was noted to be on "apprenticeship" and sought guidance from his partner.  On-the-job training was provided to the officer.  Additionally, training records revealed that officers'

training related to the timeliness of activation of 911 did not include specific timeframes and that the five-minute delay was not unreasonable. No further action was required, according to the response. As the statewide SPRFIT accepted the response, it appears that the five-minute delay was not a problem.

A final custody QIP to address the delay in activation of 911 required staff training. Evidence of training was provided. This response appeared adequate.

Case LL

I.  Summary of Case

This inmate was a 27-year-old Hispanic/Latinx man who was discovered hanging in his solely occupied ASU cell on October 16, 2019. He was included in the DDP program and designated as developmental disability 2, indicating cognitive deficits and the need for adaptive supports. The inmate was receiving mental health services at the EOP level of care at the time of his death.

Consistent historical information was difficult to obtain as the inmate's accounts of history were unreliable and inconsistent. He was born in California to an intact family that included both parents and two siblings. He denied a history of abuse, neglect, or exposure to substance use in the home. The inmate reported that his mother was diagnosed with Bipolar Disorder and his grandmother had Down's Syndrome. The inmate reported completing school through the eleventh grade and did not participate in special education. He reportedly failed to finish high school due to incarceration in juvenile detention, and he never obtained his GED. The inmate was never married and had no children.

The inmate had a juvenile criminal history beginning at age 15 when he was arrested for theft. He also reported that his extensive use of substances started at age 15 and included alcohol, methamphetamine, marijuana, and crack cocaine. He reported using drugs until his incarceration within CDCR. As a juvenile, he was arrested for trespassing, battery on a person, and vandalism. He was sent to juvenile hall on multiple occasions but did not have any known history of gang involvement.

This inmate entered CDCR in May 2012 at the age of 18 for his first term to serve a six-year sentence for assault with the intent to commit a sex act. While incarcerated, he received 16 RVRs; one resulted in an additional four-year sentence for battery on a peace officer. In the three months prior to his death, he received RVRs for battery on a prisoner, battery on a non-prisoner, and indecent exposure. Records indicated that the inmate had no phone calls or visits during the final six months of his life.

Upon his entry into CDCR, the inmate was placed in ASU due to safety concerns.  Two days later, he was admitted to the MHCB and included in the MHSDS.  Records indicated that the inmate had significant challenges adjusting to incarceration, as evidenced by his RVR history.  He also reported having safety concerns throughout his incarceration.  During the week of his arrival into CDCR, he was stabbed in the chest, experienced blunt force trauma to the head, and received a facial contusion following an attack by another inmate.  The stab wound resulted in a collapsed lung.  The inmate was never placed in SNY housing; however, he was housed in EOP settings.  Custody documentation from 2015 through 2018 noted that the inmate agreed to suspend SNY placement in order to remain at his current facility, which did not have an EOP SNY.

In 2012, the inmate was given a CASE after failing initial cognitive screenings.  The initial CASE found that he was ineligible for the DDP as it was determined that he could self-advocate, self-initiate, comprehend information, and independently complete activities of daily living.  He was re-evaluated in 2015, after he presented with cognitive deficits, poor social skills, and exhibited the need for adaptive support services in the domain of communication.  He was not placed in DDP at that time.  The evaluator determined that his needs were met by placement in EOP, although he was referred for neuropsychological testing.  In May 2016, another CASE was completed after the neuropsychological testing revealed that his mental health symptoms exacerbated cognitive and adaptive impairments.  He was determined to be at risk for victimization by other inmates, and he had impairments in social skills, self-advocacy, reading, writing, and communication.  He was included in the DDP at that time.  A number of additional CASEs were completed between 2017 and 2019 to update his adaptive support needs.

The SCR noted concerns specifically related to the inmate's DDP status.  In August 2019, the inmate was placed in ASU following an RVR for battery on a non-prisoner.  Policy requires that DDP inmates receive weekly checks by the DDP clinician while housed in ASU.  Weekly checks did not occur for three weeks in August 2019.  Additionally, inmates in the DDP are required to hold Interdisciplinary Support Team (IDST) committee meetings regularly to include the DDP clinician and ensure that the inmate's adaptive support needs are being met, regardless of their housing assignment.  For this inmate, committee meetings were to be held every six months.  A record review revealed that IDST committee meetings were documented in April 2018 and July 2018.  An IDST committee meeting was held in August 2019, but it was not documented, and the inmate did not participate.

The SCR noted that there were also concerns related to the RVR mental health assessments completed in June and August 2019.  These assessments failed to document a review of the Adaptive Support Forms and the Electronic Health Record System or consultation with the inmate's primary clinician as data sources for the assessment.  Additionally, there were errors on the completed assessments, and the clinician completing the assessment did not appear to conduct a personal evaluation of the inmate.

Instead, the clinician used narrative information from another clinician's assessment of the inmate. The RVR assessment failed to include historical information in the recommendations, did not explore victimization concerns, and had vague or contradictory information.

The inmate reported that he first received mental health treatment at the age of 15 for "Down's Syndrome" and continued to receive these services until placed in juvenile hall at age 17. There were no records or indications to corroborate this claim. At other times, the inmate reported experiencing auditory hallucinations in adolescence. From available records, it did not appear that the inmate received mental health services prior to incarceration. As noted earlier, the inmate was admitted to the MHCB during the reception center processing. The admission appeared to be precipitated by an attack from another inmate. At that time, the inmate reported suicidal ideation, command hallucinations, appeared confused, and was observed to have a flat affect. At discharge from the MHCB, he was placed at the EOP level of care and provided diagnoses of Psychosis NOS and Polysubstance Use Disorder. He had a number of admissions to the MHCB and DSH over the course of his incarceration, often precipitated by reported suicidal ideation, self-injurious behavior, increased auditory hallucinations, disorganized thinking, and difficulty attending to his activities of daily living. While at a DSH ICF beginning in April 2014, an emergent PC 2602 order was granted based on dangerousness toward others. Several medications were attempted with little success in addressing his disorganized and psychotic state. In July 2014, the inmate was started on a clozapine trial and stabilized along with the use of divalproex sodium, mirtazapine, and fluoxetine. He was discharged from the MHCB in February 2015 with a diagnosis of Schizoaffective Disorder. The discharge summary noted strong opinions that the inmate should be maintained on involuntary medications and included descriptions of the inmate's dangerous thoughts and behaviors when not adherent with psychotropic medication.

The inmate was admitted to the MHCB in July 2015 based on grave disability. At that time, he was housed in a PSU, was noted to be disorganized, reported suicidal ideation, appeared to have impaired cognitions, and was not attending to his activities of daily living. Following his discharge from the MHCB on July 13, 2015, the inmate was maintained at the EOP level of care until his death. The PC 2602 remained in effect through May 2019, when the order was allowed to expire. Records indicated that the inmate remained fairly stable at the EOP level of care with DDP adaptive supports in place beginning in May 2016. In 2017, his diagnosis was changed to Schizophrenia, Paranoid Type.

In April 2018, the inmate received an RVR for battery causing severe bodily injury after a fight with another inmate in the housing unit day room. As a result, he was placed in an ASU EOP. He ultimately transferred to the PSU after receiving a SHU term for the incident. While in the PSU, he refused most mental health services and was seen

primarily at the cell front.  He exhibited no signs of decompensation and was returned to a mainline EOP in August 2018.  He remained stable at that level of care, continued to refuse groups, but attended mental health individual sessions, and occasionally attended yard.  Treatment planning in December 2018 failed to note what modifications were put in place to support more active programming.

In January 2019, the inmate was seen for a routine psychiatric appointment, and the psychiatrist noted that the inmate's PC 2602 order would not be renewed.  The psychiatrist justified the decision based on the inmate's continued medication adherence and the lack of an RVR in nine months.  However, a review of the records revealed that the inmate was intermittently non-adherent and at times required backup medications.  Around that same time, the inmate submitted a request for transfer to a facility closer to his family.  In February 2019, a psychiatrist progress note documented that the inmate stated that he was not interested in taking psychotropic medications but maintained his adherence.  On June 6, 2019, the inmate's clozapine had to be discontinued due to dangerous medical side effects (eosinophilia).  The following day, the inmate engaged in headbanging that required six staples to close the wound.  He reported the headbanging was secondary to auditory hallucinations and being angry at another inmate, yet he denied suicidal ideation.  When seen by a psychiatrist that same day, his PC 2602 order had expired, and the inmate refused the option of restarting clozapine.  The psychiatrist noted that there were "no acute safety issues" identified, and a SRASHE and self-harm Power-Form were completed.  The SRASHE assessed his acute suicide risk to be low and appeared to justify this risk rating primarily on the inmate's self-reported lack of suicidal ideation and none of the objective risk factors evident at the time. The safety plan was inadequate as it failed to address the inmate's self-injurious behavior.

From May to August 2019, the inmate received four RVRs ranging from refusal to attend work to battery.  There were no modifications made to his treatment plan during this time.  The plan focused on the treatment of Schizophrenia, self-injurious behavior, and maintenance of his activities of daily living.  Documentation from his primary clinician evidenced supports and modifications to encourage the inmate to attend to treatment.  Documentation did not indicate any signs or symptoms that appeared to warrant referral to a higher level of care during this period of time.

On August 2, 2019, the inmate was placed back in the ASU EOP after receiving two RVRs for battery on the same day.  One was toward staff, and one was toward another inmate.  During an IDTT meeting on August 8, 2019, documentation revealed that the inmate was not considered for a higher level of care as the mental health assessment conducted in response to his RVRs concluded that his mental illness did not contribute to his behavior.  A treatment plan was developed to focus on decreasing the inmate's negative symptoms of Schizophrenia and increasing his participation in mental health services.  On August 19, 2019, the inmate engaged in headbanging, and a SRASHE was completed in response to an emergent referral.  The inmate refused to participate in the

SRASHE and reported that he was banging his head in response to auditory hallucinations and was "no longer suicidal." His acute risk was again assessed as low, based primarily on his denial of suicidal ideation. As a result of this low acute rating, a safety plan was not created. There was no inclusion of his recent RVRs or consideration of his increased symptoms. The SRASHE noted that the inmate would receive a radio, but there was no record that this occurred, and no radio was found in his property. No modifications were made to his treatment plan, and a self-harm Power-Form was not completed.

On August 26, 2019, the inmate was added to the high refuser report and was seen weekly for individual contacts. He reported ongoing auditory hallucinations that were "dark" and "they try to get me to do things." He noted feeling pressured by the voices. On August 30, 2019, the inmate was noted to have bloodstains on his shirt and reported they were the result of headbanging. No self-harm Power-Form nor SRASHE were completed. His IDTT on September 5, 2019, noted that his treatment would continue to focus on negative symptoms and hallucinations. There was no mention of his self-injurious behavior or recent RVRs. He remained medication adherent during this time and denied mental health symptoms during weekly clinical contacts. He was noted to have a bleeding wound on his forehead on September 19, 2019 but reported that he had picked at a previous wound and denied recent headbanging. No SRASHE nor self-harm Power-Form were completed. Primary clinician documentation indicated that the inmate was encouraged to attend programming.

There were no changes made to his treatment goals during his final IDTT held on October 3, 2019. On October 5, 2019, the inmate submitted a request to be seen by psychiatry. He was seen on October 9, 2019, by a psychiatrist. The progress noted included two sentences, "the patient was seen today. Despite his consult, the inmate denied having any psychiatric issues at this time." The inmate was noted to have a fresh injury on his forehead and blood on his shirt during an individual primary clinician contact on October 10, 2019 but denied self-injury by explaining that he had fallen. No SRASHE nor self-harm Power-Form were completed. He was seen for individual sessions with his primary clinician on October 15 and 16, 2019, during which he denied all symptoms, including auditory hallucinations. He refused to be seen out of his cell, denied suicidality, and requested more paper for drawing. He died from suicide on the evening of October 16, 2019.

After his death, a review of psychiatric services indicated that ziprasidone had been prescribed after the inmate's clozapine was discontinued in June 2019. The inmate was also prescribed valproic acid and fluoxetine at the time of his death. The review noted that despite the inmate's refusal of medications under his PC 2602 order requiring the use of backup medications in January 2019, the psychiatrist submitted a PC 2602 non-renewal form that same month. In the following months, the inmate reported that he did not want to take medications, yet the decision not to renew his PC 2602 order was not

reconsidered. The review was also critical of the brief psychiatric progress note in October 2019, which was deemed inadequate.

The inmate's suicidal history was indicated to be inconsistent and noted reports of attempts at the age of 15 by cutting his wrists and one attempted hanging while in CDCR that was stopped by his cellmate. Neither attempt was verified through records.

Of note, nursing and psychiatric technician documentation continued to indicate that the inmate was under an active PC 2602 order through the date of his death. In fact, the Mortality Review report conducted following this inmate's death by suicide noted that his PC 2602 order was in place through May 2020.

II.    <u>Determination of Foreseeability</u>

The Suicide Case Review Committee did not provide a determination of foreseeability for this case. The Special Master's expert determined that this inmate's death was not foreseeable.

III.    <u>Determination of Preventability</u>

The Suicide Case Review Committee did not provide a determination of preventability for this case.

The Special Master's expert determined that the suicide was preventable based on multiple opportunities to assess the inmate for risk of suicide, refer the inmate to a higher level of care, and provide treatment interventions to specifically address his needs that were not done by the treatment team. Had the staff recognized the numerous signs and symptoms of the inmate's decline in functioning, a higher level of care referral would have been made, and the likelihood of suicide would have been decreased. Additionally, when the inmate was assessed for suicide risk, his risk was underestimated based primarily on the inmate's self-reported denial of suicidal ideation despite clear evidence of frequent and increasing self-injury, impulsivity, and lack of participation in treatment.

IV.    <u>Critique of Suicide Case Review Report</u>

The SCR provided an adequate clinical summary with relevant social, criminal, incarceration, substance use, and mental health history. The SCR was sufficiently critical of all aspects of the inmate's care, including the inadequacies and deficiencies over time and across disciplines. The findings and recommendations were clearly derived from the findings in the report.

V.    Analysis of Quality Improvement Plan Process

This case resulted in 11 required QIPs; nine related to mental health, one related to custody, and one related to nursing.  The first mental health QIP was required to address the fact that the inmate was not seen for weekly DDP checks while in ASU in August 2019.  The narrative response indicated that an audit of the DDP had been conducted in April 2019, and a number of deficiencies were noted.  It also included a statement that a psychologist "conducted an audit of 10 DDP patients placed into ASU to determine if weekly rounds were completed per DDP treatment guidelines."  The supporting documentation included audit results from August through November 2019, and several missed requirements were noted but appeared to improve over time.  However, the narrative failed to describe the full findings over that period.  Minutes and informational slides were provided.  This response was not adequate as there was conflicting information provided in the narrative versus the data.  Further, the response failed to address the fact that identified issues were not resolved for many months.

A second mental health QIP was required to address the lack of IDST documentation in health records and the DDP clinician not attending these meetings regularly.  The response was similar to the response above, citing an audit conducted in April 2019 that found the identified deficiencies six months before the inmate's suicide.  Again, data was provided from audits conducted from August to November. Yet, the data contradicted the narrative response and failed to address the fact that identified issues were not resolved over a period of many months.  This response was not adequate.

Multiple deficiencies noted in the RVR mental health assessments required a third mental health QIP.  Because this was recognized as a statewide concern, the development of this QIP was assigned to headquarters.  The response indicated that standardized, statewide training was developed to improve the quality of RVR mental health assessments, including a component for DDP inmates.  The response indicated that the curriculum would be completed by June 2020, with a trial program to be implemented at two institutions.  No further information was provided.  This response appeared partially adequate.

A fourth mental health QIP was required to address the lack of documentation regarding consideration of a higher level of care or modification to the inmate's treatment plan during October 2019 when the inmate was engaging in self-harm, refusing treatment, receiving RVRs, and demonstrating difficulty maintaining his activities of daily living.  The response indicated that senior psychologists "reviewed the importance of recognizing acute mental health symptomatology and appropriately assessing negative symptoms" with their programs.  The response did not appear to meet the concerns noted in this item, that the inmate had positive symptoms and was not referred to a higher level of care.  This response was not adequate.

196

The fifth QIP for mental health was required to address a delay in the psychiatry response to a consult submitted on December 12, 2018.  The response indicated that there was "confusion" related to the ability of a primary clinician to refer to psychiatry within the electronic health record system versus emails.  A memorandum was sent to clarify the process.  It was not entirely obvious how this action addressed the problem of a delayed psychiatry contact.  This response might have been adequate if the reason for the delay was that the consultation was not properly entered, but that was not explicitly stated in the SCR nor the response.

A mental health QIP was required to address the multiple incidents when the inmate was found with blood on his shirt and wounds on his head that were not documented on self-harm Power-Forms, and SRASHEs were also not completed at those times.  The response indicated that the SPRFIT monitored the completion of Power-Forms yet failed to indicate how the omissions occurred.  The response noted that all staff was trained regarding when a SRASHE was required and when to alert SPRFIT of a self-harm incident.  It also noted that a "source of information" column was being added to the tracking forms for accountability.  This response appeared adequate, although it would have been improved by plans to follow up on the plan's efficacy.

Multiple concerns were found within the SRASHEs complete don June 7, 2019, and August 8, 2019.  A mental health QIP was required to address the underestimation of acute risk (rated as low) based on an overreliance on the inmate's self-report and a failure to account for a number of risk factors present for the inmate.  Additionally, neither SRASHE resulted in an adequate safety plan.  Audits were conducted to review SRASHEs completed by these clinicians, and multiple deficiencies were found.  Both clinicians were assigned for re-mentoring and were individually re-trained on a number of issues.  Laminated cards with warning signs were provided to staff, and headquarters' staff were shadowing facility staff.  This response appeared partially adequate as there were no provisions to track the quality of the SRASHEs for these clinicians going forward.

An eighth mental health QIP was required to address psychiatric care and documentation related to the decision not to renew the PC 2602 order for the inmate.  First, documentation regarding the status of the PC 2602 order was confusing, irregular, and contradictory.  Second, the decision not to renew the order was made six days after the inmate refused medication that had to be provided via injection.  Third, in the three months following the initial decision not to renew the PC 2602 order, there were many indications that the inmate did not want to take his prescribed medications.  A chief psychiatrist reviewed the documentation and noted that the inmate was seen by a number of providers over this period.  The chief psychiatrist found the decision not to renew the involuntary order to be appropriate as the inmate had been adherent with medications 98 percent of the time over the previous six months.  It appeared that the backup injection order was not discontinued until September 2019.  This issue was seen as an error and

was addressed by stressing the importance of accurate documentation regarding PC 2602 orders with individual clinicians.  This appeared to be partially adequate given the serious nature of the "error," and there was no consideration of whether there was a pattern of such errors.

The ninth QIP was required to address inadequate psychiatric documentation entered into the health record on October 9, 2019.  This psychiatrist was counseled individually by the chief psychiatrist about the quality of the documentation.  This response appeared partially adequate, as other documentation was not reviewed to see if a pattern existed.

The custody QIP was required to address that the entire cut-down kit was not brought in response to the hanging.  Training was provided to three officers.  This response was partially adequate in that the breadth of the issue was not explored, and it was unknown if additional officers required training.

The nursing QIP was required to address inaccurate documentation of the results of the AED application and failure to document actions taken resulting from the AED application.  A discussion was had with the individual nurse.  This response was partially adequate in that the breadth of the issue was not explored, and it was not known if there was a pattern of poor documentation.

**APPENDIX B1**

**INMATE DEMOGRAPHICS**

Inmate Demographics

| Case | Facility | Age | Gender | Ethnicity | Marital Status | LOC | Primary Diagnosis | Current PC2602 | Medical Issues |
|------|----------|-----|--------|-----------|----------------|-----|-------------------|----------------|----------------|
| A | SAC | 49 | Male | Hispanic/Latinx | Never Married | EOP | Mood Disorder | No | Yes |
| B | COR | 37 | Male | African-American | Never Married | CCCMS | Mood Disorder | No | Yes |
| C | SAC | 37 | Male | Hispanic/Latinx | Never Married | CCCMS | Personality Disorder | No | Yes |
| D | CHCF | 26 | Male | Other | Never Married | EOP | Psychotic Disorder | Yes | Yes |
| E | PVSP | 42 | Male | Hispanic/Latinx | Never Married | CCCMS | Mood Disorder | No | No |
| F | SAC | 59 | Male | Caucasian | Married | EOP | Psychotic Disorder | Yes | Yes |
| G | COR | 22 | Male | Hispanic/Latinx | Never Married | EOP | Psychotic Disorder | No | No |
| H | DVI | 44 | Male | Caucasian | Never Married | Non-MHSDS | None | No | No |
| I | HDSP | 43 | Male | Other | Divorced | CCCMS | Substance Use Disorder | No | No |
| J | MCSP | 35 | Male | Hispanic/Latinx | Never Married | EOP | Psychotic Disorder | No | Yes |
| K | DVI | 36 | Male | Caucasian | Divorced | Non-MHSDS | None | No | No |
| L | MCSP | 32 | Male | Hispanic/Latinx | Never Married | CCCMS | Adjustment Disorder | No | Yes |
| M | KVSP | 32 | Male | African-American | Never Married | Non-MHSDS | None | No | No |
| N | CMF | 52 | Male | Caucasian | Never Married | Non-MHSDS | None | No | No |
| O | CIW | 38 | Female | Caucasian | Never Married | CCCMS | Adjustment Disorder | No | Yes |
| P | SQSP | 48 | Male | African-American | Married | Non-MHSDS | None | No | Yes |
| Q | SAC | 32 | Male | Caucasian | Divorced | EOP | Psychotic Disorder | No | No |
| R | SAC | 50 | Male | Asian | Never Married | EOP | Psychotic Disorder | No | No |
| S | SAC | 37 | Male | Asian | Never Married | EOP | Psychotic Disorder | No | Yes |
| T | KVSP | 28 | Male | African-American | Widowed | Non-MHSDS | None | No | Yes |
| U | DVI | 36 | Male | Hispanic/Latinx | Never Married | Non-MHSDS | None | No | Yes |
| V | NKSP | 25 | Male | African-American | Never Married | CCCMS | Mood Disorder | No | No |
| W | CMC | 33 | Male | Caucasian | Never Married | EOP | Psychotic Disorder | No | Yes |
| X | COR | 47 | Male | Hispanic/Latinx | Separated | CCCMS | Mood Disorder | No | Yes |
| Y | SATF | 39 | Male | Caucasian | Never Married | CCCMS | Anxiety Disorder | No | No |
| Z | SAC | 38 | Male | African-American | Never Married | EOP | Psychotic Disorder | Yes | yes |
| AA | LAC | 31 | Male | African-American | Never Married | EOP | Psychotic Disorder | No | No |
| BB | CCI | 35 | Male | Hispanic/Latinx | Never Married | CCCMS | Adjustment Disorder | No | No |
| CC | CTF | 50 | Male | Caucasian | Divorced | Non-MHSDS | None | No | Yes |
| DD | NKSP | 47 | Male | Caucasian | Never Married | Non-MHSDS | Mood Disorder | No | No |
| EE | CIM | 67 | Male | Caucasian | Divorced | Non-MHSDS | None | No | No |
| FF | LAC | 36 | Male | Caucasian | Never Married | EOP | Mood Disorder | No | Yes |
| GG | CCI | 50 | Male | Caucasian | Married | Non-MHSDS | None | No | Yes |
| HH | CMF | 41 | Male | Caucasian | Never Married | EOP | Psychotic Disorder | No | No |
| II | SAC | 45 | Male | Hispanic/Latinx | Never Married | EOP | Psychotic Disorder | Yes | No |
| JJ | COR | 31 | Male | African-American | Never Married | CCCMS | Mood Disorder | No | No |
| KK | SVSP | 59 | Male | Caucasian | Never Married | EOP | Mood Disorder | No | Yes |
| LL | SAC | 27 | Male | Hispanic/Latinx | Never Married | EOP | Psychotic Disorder | No | Yes |

**APPENDIX B2**


**INMATE HISTORY AND SUICIDE EVENT CHARACTERISTICS**

Inmate History and Suicide Event Characteristics

| Case | Crime Type | Method | Housing | Cell Type | MH Hx while Incarcerated | MH Hx Before Incarceration | Prior Self-Harm | Previous Suicide Attempt | Substance Use Hx |
|------|-----------|--------|---------|-----------|--------------------------|----------------------------|-----------------|--------------------------|------------------|
| A | Violent | Hanging | ASU | Single | Yes | No | Yes | Yes | Yes |
| B | Violent | Cutting | GP Yard | Single | Yes | Yes | Yes | Yes | Yes |
| C | Violent | Hanging | PSU | Single | Yes | No | No | Yes | Yes |
| D | Violent | Other Asphyxiation | PIP | Single | Yes | Yes | Yes | Yes | Yes |
| E | Violent | Hanging | STRH | Outside of cell | Yes | Yes | No | No | No |
| F | Violent | Hanging | GP Yard | Single | Yes | Yes | Yes | Yes | No |
| G | Violent | Hanging | GP Yard | Single | Yes | Yes | Yes | Yes | Yes |
| H | Violent | Hanging | RC | Double - cellmate absent | No | Yes | No | No | Yes |
| I | Violent | Hanging | GP Yard | Single | Yes | No | No | Yes | Yes |
| J | Sex Offense | Hanging | ASU | Single | Yes | Yes | Yes | Yes | Yes |
| K | Non-viol prop | Hanging | RC | Double - cellmate absent | No | No | No | No | Yes |
| L | Violent | Hanging | ASU | Single | Yes | No | Yes | Yes | Yes |
| M | Violent | Hanging | GP Yard | Single | Yes | No | No | No | Yes |
| N | Violent | Cutting | ASU | Single | No | No | No | No | Yes |
| O | Violent | Hanging | GP Yard | Double - cellmate absent | Yes | No | No | Yes | Yes |
| P | Violent | Hanging | Condemned | Single | No | No | No | No | Yes |
| Q | Violent | Hanging | PSU | Single | Yes | Yes | Yes | Yes | Yes |
| R | Violent | Hanging | PSU | Single | Yes | Yes | Yes | Yes | No |
| S | Sex Offense | Hanging | GP Yard | Single | Yes | No | Yes | Yes | Yes |
| T | Violent | Hanging | GP Yard | Single | Yes | No | No | No | Yes |
| U | Violent | Hanging | RC | Single | No | No | No | No | Yes |
| V | Sex Offense | Hanging | GP Yard | Single | Yes | Yes | No | Yes | Yes |
| W | Violent | Hanging | GP Yard | Single | Yes | Yes | No | Yes | Yes |
| X | Violent | Hanging | GP Yard | Double - cellmate absent | Yes | No | Yes | Yes | Yes |
| Y | Violent | Hanging | GP Yard | Double - cellmate absent | Yes | Yes | No | Yes | Yes |
| Z | Violent | Hanging | PSU | Single | Yes | No | Yes | Yes | Yes |
| AA | Violent | Hanging | GP Yard | Single | Yes | Yes | Yes | No | Yes |
| BB | Violent | Hanging | GP Yard | Single | Yes | No | Yes | Yes | Yes |
| CC | Violent | Hanging | GP Yard | Double - cellmate absent | Yes | No | No | No | Yes |
| DD | Violent | Cutting | RC | Single | No | Yes | Yes | Yes | Yes |
| EE | Violent | Jumping | GP Yard | Outside of cell | Yes | Yes | No | Yes | Yes |
| FF | Non-viol prop | Hanging | GP Yard | Single | Yes | Yes | No | No | Yes |
| GG | Non-viol prop | Hanging | GP Yard | Outside of cell | Yes | No | No | Yes | Yes |
| HH | Violent | Hanging | GP Yard | Single | Yes | Yes | Yes | Yes | Yes |
| II | Violent | Hanging | PSU | Single | Yes | Yes | No | Yes | Yes |
| JJ | Sex Offense | Hanging | GP Yard | Single | Yes | No | No | Yes | Yes |
| KK | Violent | Hanging | GP Yard | Single | Yes | Yes | Yes | Yes | Yes |
| LL | Sex Offense | Hanging | ASU | Single | Yes | Yes | Yes | No | Yes |

**APPENDIX B3**

**IDENTIFIED ASSESSMENT, TREATMENT AND**

**COMMUNICATION CONCERS**

Identified Assessment, Treatment and Communication Concerns

| Case | Suicide Risk Evaluation Omissions | Suicide Risk Level Not Appropriate | Other Suicide Risk Evaluation Issues | Mental Health Assessment Problems | Treatment Planning Problems | Treatment Problems | Failure to Refer to HLOC | Problems with Interdisciplinary Consultation |
|---|---|---|---|---|---|---|---|---|
| A | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes |
| B | Yes | No | Yes | Yes | Yes | Yes | Yes | No |
| C | Yes | No | Yes | Yes | Yes | Yes | Yes | No |
| D | Yes | No | Yes | Yes | No | Yes | Yes | No |
| E | Yes | Yes | No | No | No | No | No | No |
| F | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes |
| G | Yes | No | Yes | Yes | Yes | Yes | Yes | No |
| H | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| I | Yes | N/A | N/A | N/A | Yes | Yes | Yes | Yes |
| J | No | No | Yes | No | Yes | Yes | Yes | No |
| K | N/A | N/A | N/A | No | No | No | No | No |
| L | Yes | No | Yes | Yes | Yes | Yes | N/A | Yes |
| M | Yes | Yes | Yes | No | No | No | No | No |
| N | N/A | N/A | N/A | Yes | N/A | N/A | No | No |
| O | Yes | Yes | No | No | Yes | Yes | No | No |
| P | Yes | Yes | No | No | N/A | N/A | N/A | N/A |
| Q | Yes | Yes | Yes | No | No | Yes | No | No |
| R | Yes | No | Yes | Yes | Yes | Yes | Yes | No |
| S | No | No | Yes | Yes | Yes | Yes | No | No |
| T | No | Yes | Yes | No | No | No | No | No |
| U | N/A | N/A | N/A | No | N/A | N/A | N/A | N/A |
| V | No | Yes | Yes | Yes | No | Yes | No | No |
| W | No | Yes | Yes | Yes | No | No | No | No |
| X | No | No | Yes | No | Yes | No | No | Yes |
| Y | No | No | No | No | No | No | No | No |
| Z | No | Yes | Yes | No | Yes | No | No | No |
| AA | Yes | Yes | Yes | Yes | No | No | Yes | Yes |
| BB | Yes | No | Yes | Yes | Yes | Yes | Yes | No |
| CC | N/A | N/A | No | No | N/A | N/A | No | No |
| DD | N/A | N/A | Yes | No | N/A | N/A | No | No |
| EE | Yes | Yes | No | No | N/A | N/A | No | No |
| FF | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes |
| GG | Yes | Yes | No | No | No | No | No | No |
| HH | Yes | Yes | No | No | Yes | Yes | No | No |
| II | Yes | Yes | Yes | No | Yes | No | Yes | Yes |
| JJ | Yes | No | Yes | No | Yes | Yes | Yes | No |
| KK | Yes | No | Yes | No | Yes | Yes | Yes | Yes |
| LL | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes |

**APPENDIX B4**

**COMMON PROBLEMS IDENTIFIED AS REQUIRING A**

**QUALITY IMPROVEMENT PLAN**

Common Problems Identified as Requiring a Quality Improvement Plan

| Identified Issue Requiring Quality Improvement Plan | Number of Cases | Percentage of Cases with QIPs |
|---|---|---|
| Only psychiatrist had privileges to issue MHCB orders | 2 | 6% |
| Failure to take pressure off body/improper cut down | 2 | 6% |
| Over-reliance on Inmate self-report | 2 | 6% |
| Psychiatric Technician rounds not completed/inaccurate | 2 | 6% |
| Huddles not appropriately documented | 2 | 6% |
| Inmate property not retained for SCR | 2 | 6% |
| Scheduling Issues | 2 | 6% |
| Inappropriate cell placement | 2 | 6% |
| Failure to conduct adequate record review | 3 | 8% |
| Poor/Conflicting emergency response documentation | 3 | 8% |
| Treatment and treatment plan disconnect | 3 | 8% |
| Cell/structural safety issues | 3 | 8% |
| Failure to address inmate refusals | 3 | 8% |
| Failure to provide required property/privileges | 3 | 8% |
| Failure to request prior treatment records | 3 | 8% |
| Failure to conduct confidential contacts | 4 | 11% |
| Failure to update mental health evaluation/clinical assessment | 4 | 11% |
| Incomplete 5-Day follow-ups | 4 | 11% |
| Diagnostic issues | 5 | 14% |
| Failure to identify/describe protective factors | 5 | 14% |
| CPR/AED Issues | 6 | 17% |
| Cut down kit not brought to seen/incomplete | 6 | 17% |
| Failure to make adequate custody checks | 6 | 17% |
| Medication issues | 6 | 17% |
| Nursing documentation issues | 6 | 17% |
| Failure to log/track or document self-harm/suicide attempt on Power-Form | 7 | 19% |
| Delays in 9-1-1, alarm activation, ambulance contact or emergency response | 9 | 25% |
| Inaccurate/inadequate mental health documentation (includes copy/paste issues) | 9 | 25% |
| Referral or mental health contact timelines not met | 9 | 25% |
| Communication or referral issues | 14 | 39% |
| Inadequate risk determination | 14 | 39% |
| Poor safety planning | 14 | 39% |
| Failure to complete SRE | 15 | 42% |
| Inadequate treatment planning | 16 | 44% |
| Inappropriate LOC/Not referred to Higher LOC | 17 | 47% |
| Poor risk determination rationale/justification | 18 | 50% |

**APPENDIX C**

**SPECIAL MASTER'S EXPERTS**

**CURRICULA VITAE**

**Sharen E. Barboza, Ph.D., CCHP-MH, CiWPP**
Licensed Clinical Psychologist (NY 015436/FL PY9637)

## EDUCATION

### Fairleigh Dickinson University, Teaneck, New Jersey

*Ph.D., Clinical Psychology*                                                   9/2001

Dissertation                                                                        2/2001

Discriminant validity of the Abel Screen for Sexual Interest in juvenile sex offenders
who admit and deny their offenses

### Tufts University, Medford, Massachusetts

*M.S., Experimental Psychology*                                            5/1994

*B.S., Psychology*, Cum Laude, Magna Cum Laude en thesi            5/1992

## CERTIFICATIONS

### Certificate in Wholebeing Positive Psychology

*Wholebeing Institute*                                                            9/2019

## HONORS/AWARDS

### 2018 B. Jaye Anno Award of Excellence in Communication

*National Commission on Correctional Health Care*                    10/2018

This award pays tribute to innovative, well-executed communications that have had a
positive impact on the field of correctional health care, or to individuals for bodies of
work. The award is named after NCCHC's cofounder and first vice president.
https://www.ncchc.org/excellence-in-communication-2018

## WORK EXPERIENCE

### Correctional Mental Health Consultant/Expert/Trainer

*Barboza Consulting, LLC*                                                    5/2013-Present

Provide consultation to correctional systems on behavioral and mental health services.
Conduct a comprehensive analysis of current services and programs, comparing those
to national standards.  Offer training for clinical and correctional staff on the
implementation of behavioral health programs and services including self-injury
reduction, suicide prevention, managing mental illness in corrections, correctional
stress/burnout, and other topics as requested. Provide expert witness evaluation,
consultation, and opinion.

***Court Appointed Expert, Correctional Mental Health*** (3/2020 - present). United
States District Court of the Eastern District of California – Ordered by Honorable
Kimberly J. Mueller, Chief United States District Judge, for a class action lawsuit,
Coleman et. al vs. Newsom et. al. As a member of a multi-disciplinary team,
provide expert consultation to the Special Master, Mathew A. Lopes, Esq., as part
of an ongoing monitoring process of the California Department of Corrections and
Rehabilitation and Department of State Hospitals mental health system.

**Vice President**
**Mental Health/Clinical Operations – Mental Health**
*MHM/Centurion*, Vienna, Virginia                                    9/2014-4/2020
> Supervisors:  Jane Haddad, Psy.D.; Julie Mueller, RN, MBA, Johnny Wu,
> M.D.
> Oversaw national clinical operations of mental health services provided by
> the company.  Supervised the Clinical Operations mental health team,
> audited clinical services and contract/standards compliance of mental
> health services being provided within correctional and forensic settings.
> Created and collaborated on the development of therapeutic program
> curricula for seriously mentally ill individuals, individuals who engage in
> self-injury, and sexual offenders.  Developed and delivered training
> programs to mental health, medical, and corrections professionals.
> Provided consultation to correctional systems regarding mental health,
> behavior change and sexual offender programming.  Assisted with new
> business development.

**Director of Clinical Operations**
*MHM Services, Inc.*, Vienna, Virginia                                  10/2008-9/2014
> Supervisor:  Jane Haddad, Psy.D.
> Served as a director of the clinical operations team, overseeing the
> auditing of clinical services and contract compliance of mental health
> services being provided within correctional and forensic settings.  Created
> and collaborated on the development of therapeutic program curricula for
> seriously mentally ill individuals, individuals who self-injure and sexual
> offenders.  Developed and deliver training programs to mental health,
> medical health, and corrections professionals.  Provided consultation to
> correctional systems regarding mental health, behavior change and sexual
> offender programming.  Assisted with new business development and
> supervision of clinical operations staff.

**Senior Clinical Operations Specialist**
*MHM Services, Inc.*, Vienna, Virginia                                  2/2007-10/2008
> Supervisor:  Jane Haddad, Psy.D.
> Served as a senior member of the clinical operations team, auditing clinical
> services and contract compliance of mental health services being provided
> within correctional and forensic settings.  Created and collaborated on the
> development of therapeutic program curricula; developed and delivered
> training programs to mental health, medical health, and corrections
> professionals; and provided consultation to correctional systems regarding
> mental health and sexual offender programming.

**Director, Sex Offender Treatment Program**

*NYS OMH & Central New York Psychiatric Center*, Marcy, New York          11/2005-2/2007

   Deputy Commissioner: Richard Miraglia, C.S.W.

   Executive Director:  Donald Sawyer, Ph.D., MBA

   Served as clinical expert consultant in the development of the Sex
   Offender commitment initiative in New York.  Consulted to the Division of
   Forensic Services in the development of the comprehensive evaluation and
   treatment process for civilly committed sex offenders in New York State.
   Consulted to the Commissioner of OMH and the Department of Budget
   regarding this initiative.  Provided weekly consultation, staff training, and
   clinical supervision to multidisciplinary teams at Manhattan Psychiatric
   Center and Kirby Forensic Psychiatric Center.   Made contacts and visited
   with civil commitment programs in other states and developed an
   inpatient treatment program for this population including intake
   assessment process and outcome measurements.  Participated in all
   aspects of program development: consulting on construction, developing
   and implementing policy, hiring staff, creating staff training programs,
   coordinating risk assessments, supervising clinical and direct care staff,
   preparing clinicians for court testimony, and overseeing community
   reintegration planning

**Chief Psychologist**

*Central New York Psychiatric Center*, Marcy, New York          1/2004-2/2007

   Executive Director:  Donald Sawyer, Ph.D., MBA

   Served as Chief of Psychology Department for a state psychiatric facility
   treating patients incarcerated within New York State; developed,
   monitored, and maintained standards of performance for psychologists
   throughout the system; developed policies and procedures related to the
   delivery of psychological services (e.g., suicide risk assessment and
   prevention, violence risk assessment and prevention, behavioral
   management policies and programs, special housing unit (SHU) services,
   psychological assessment); provided supervision to psychologists and
   psychology student interns; developed and conducted research regarding
   initiatives and programs; coordinated system-wide risk assessment
   initiative; coordinated system-wide implementation and maintenance of
   behavioral management program; recruited and hired psychologists;
   consulted to physicians, administration, and risk managers with regard to
   public safety, accreditation, and quality of care.

**Licensed Psychologist/ Psychologist II**

*Bedford Hills Correctional Facility*, Bedford Hills, New York          9/2001-1/2004

   Supervisors:  Carolyn Subin, Ph.D., David Stang, Ph.D.

   Provided individual psychotherapy to incarcerated women at a maximum
   security correctional facility; conducted assessments of suicidal and
   homicidal ideation & intent; provided mental health consultation and
   assessment to women in solitary confinement; consulted to Department of
   Corrections regarding mentally ill inmates with lengthy confinement

sanctions; provided supervision to Ph.D. level psychologists for licensure;
provided mental health training to Department of Corrections staff;
participated in crisis intervention and inpatient referral process.

### Sex Offender Risk Assessment Consultant

*Juvenile Sexual Offender Treatment Program*
*Westchester Jewish Community Services*, Hartsdale, New York          8/2001-10/2003
<u>Supervisor</u>:  Kenneth Lau, CSW
Assessed the re-offense risk for adolescents accused of committing
sexual offenses within Westchester County, NY; provided pre-sentencing
consultation to the courts regarding supervision and treatment needs as
well as further assessments and/or agency involvement

### Director, Adolescent Sexual Abuse Program

*Iowa State Training School for Boys*, Eldora, Iowa          1/1995-8/1996
<u>Supervisor</u>:  William Fields, Clinical Director
Treated adolescent male offenders & victims of sexual abuse using group
and individual therapy; assessed adolescents; supervised staff of 15-20 and
provided training; provided sex education to delinquent male adolescents;
received 175 hours of training meeting certification requirements as Sex
Offender Treatment Provider for the State of Iowa. Clinical populations
included: BD, LD, ADD, ADHD, Pedophilia, Oppositional-Defiant Disorder,
Conduct Disorder.

## EDITORIAL DUTIES

### Health Affairs
*Reviewer*          3/2020 -Present

### International Journal of Prisoner Health
*Editorial Board Member*          10/2013-Present

### Journal of Correctional Health Care
*Reviewer*          10/2018-Present

## EXPERT WITNESS & CASE CONSULTANT

United States Direct Court; Maine
*Retained by defendant – consultation only*          2017

United States Direct Court; Western District of Wisconsin
*Retained by defendant – consultation only*          2020

United States Direct Court; Central District of California
*Retained by plaintiffs*          2021

## COMMITTEE MEMBERSHIPS/AFFILIATIONS

### Mental Health Standards Committee
*Member*

National Commission on Correctional Health Care                   11/2020 - Present

**NCCHC Correctional Health Foundation**
*Board Member/Chair Elect (2021)*                                 4/2019-Present
National Commission on Correctional Health Care

**Education Committee**
*Member*                                                          10/2018-Present
National Commission on Correctional Health Care

**Certified Correctional Healthcare Professionals (CCHP) Mental Health Subcommittee/Task Force**
*Member*                                                          1/2014-Present
National Commission on Correctional Health Care

**Certified Correctional Healthcare Professionals (CCHP) Board of Trustees**
*Appointed Trustee*                                               3/2014-11/2017
National Commission on Correctional Health Care                   11/2020-Present

**Mental Health Subcommittee**
*Member*                                                          4/2013-4/2017
American Correctional Association

SPECIALIZED TRAINING

**Leading from Your Strengths:  Positive Psychology and Professional Development**
*Kripalu Center for Yoga and Health*
M. Sirois, Psy.D.                                                 11/2017

**The Prison Rape Elimination Act: Understanding the Law and How to Meet Compliance**
*National Commission on Correctional Healthcare*
A. Moss                                                           10/2012

**Sex Offender Treatment**
*NYS Office of Mental Health, Division of Forensic Services*
A. Schlank, Ph.D.                                                 2/2007

**PCL-R Training**
R. Hare, Ph.D., A. Forth, Ph.D.                                   11/2006

**Using the Structured Risk Assessment Model to Guide Treatment Planning**
D. Thornton, Ph.D., R. Mann, M.Sc. L. Daniels, MSSW              9/2006

**Penile Plethysmography Training – Level I & Level II**
*Monarch -- Behavioral Technologies Inc.*, Salt Lake City, UT
P. Byrne, Ph.D.                                                   6/2006

**Sex Offender Risk Assessment**
*NYS Office of Mental Health, Division of Forensic Services.*
    D. Doren, Ph.D., D. Epperson, Ph.D., D. Anderson, Ph.D.                    3/2006

**Legal/Ethical Issues in Mental Health**
*Specialized Training Services, Inc.*
    Philip Resnick, MD                                                        6/2004

**Risk Assessment of the Mentally Ill**
*Specialized Training Services, Inc.*
    Philip Resnick, MD                                                        6/2004

**Intensive DBT Training**
*Behavioral Tech, Inc.*
    Cindy Sanderson, Ph.D.                                                   10/2001

TEACHING EXPERIENCE

**Facilitator for Executive Manager in Correctional Healthcare Training (EMCHT)**
*National Institute of Corrections*, Aurora, Colorado                    5/2014-9/2015

**Adjunct Professor**
*Hamilton College*, Clinton, New York                                    1/2005-5/2005

**Instructor**
*Marist College*, Goshen Extension Site, Goshen, New York                5/2001-8/2001
*Fairleigh Dickinson University*, Teaneck, New Jersey
    5/1997–12/1998

**Adjunct Instructor**
*Correctional Release Center*, Newton, Iowa                              8/1994-1/1995
*Des Moines Area Community College*, Ankeny, Iowa                        9/1994-12/1994

PUBLICATIONS

Barboza, S., Blair, R., Cook, G., Elliott, W., and Kern, E. (2019). *Suicide Prevention and Resource Guide: National Response for Suicide Prevention in Corrections.* Chicago, IL. National Commission on Correctional Health Care. www.ncchc.org/suicide-prevention-plan

Boren, E. A., Folk, J. B., Loya, J. M., Tangney, J. P., Barboza, S. E. and Wilson, J. S. (2018), The Suicidal Inmate: A Comparison of Inmates Who Attempt Versus Complete Suicide. *Suicide and Life Threatening Behavior*, 48(5), 570-579. DOI: 10.1111/sltb.12374

Folk, J. B., Loya, J. M., Boren, E. A., Tangney, J. P., Wilson, J. S., & Barboza, S. E. (in press). Differences between inmates who attempt suicide and who die by suicide: Staff-identified psychological and treatment-related risk factors. *Psychological Services.*

Folk, J. B., Disabato, D. J., Daylor, J. M., Tangney, J. P., Barboza, S., Wilson, J. S., Bonieskie, L., & Holwager, J. (2016). Effectiveness of a Self-Administered Intervention for Criminal Thinking: Taking a Chance on Change. *Psychological Services*, 13(3), 272-82.

Barboza, S. (2016).  Elevating personality disorders:  Changes and challenges in treating incarcerated patients.  *The International Association for Correctional and Forensic Psychology Newsletter*, 48(2), 11-12.

Disabato, D., Folk, J. Wilson, J.S., Barboza, S., Daylor, J. & Tangney, J.  (2015). Psychometric validation of a simplified form of the PICTS in low-reading level populations.  *Journal of Psychopathology and Behavioral Assessment*,38(3), 456-64.

Andrade, J.T., Wilson, J.S., Franko, E., Deitsch, J. & Barboza, S. (2014).  Developing the Evidence Base for Reducing Chronic Inmate Self-Injury: Outcome Measures for Behavior Management.  *Corrections Today*, 76(6), 30-35.

Barboza, S. & Wilson, J. (2013).  Your Patient is My Patient:  The Need for Integrated Medical-Mental Health Care for Inmates with Serious Mental Illness.  *CorrDocs*, 17(5).

Barboza, S. & Wilson, J.S. (2011).  Behavior Management Plans Decrease Inmate Self-Injury.  *Corrections Today*, 73(5).

Wilson, J. & Barboza, S. (2010). The Looming Challenge of Dementia in Corrections. *CorrectCare*, 24(2), 12-14.

Way, B. B., Sawyer, D. A., Barboza, S., & Nash, R. (2007). Inmate suicide and time spent in special disciplinary housing in New York state prison. *Psychiatric Services*, 58, 558-560.

Abel, G. G., Jordan, A., Rouleau, J. L., Emerick, R., Barboza-Whitehead, S., and Osborn, C. (2004). The use of visual reaction time to identify male adolescent child molesters and the frequencies of their acts. *Sexual Abuse: A Journal of Research and Treatment*, 16 (3), 255-265.

## PRESENTATIONS

Barboza, S. "Understanding Personality Disorders: Practical Insights for Nurses" Workshop presented at the National Commission on Correctional Healthcare Conference, October 2019, Fort Lauderdale, FL.

Barboza, S. "Self-Injurious Behavior and Trauma Informed Care" Keynote at Health Care in Secure Settings Conference, Justice Health and Forensic Mental Health Network, May 2019, Sydney, Australia.

Barboza, S. "Vicarious Trauma and Self-Care" Keynote at Health Care in Secure Settings Conference, Justice Health and Forensic Mental Health Network, May 2019, Sydney, Australia.

Masotta, M. & Barboza, S. "Bipolar Disorder, Borderline Personality Disorder and PTSD:  Improving Diagnostic Accuracy" Workshop presented at the National Commission on Correctional Healthcare Conference, April 2019, Nashville, TN.

Riley, K. & Barboza, S.  "Continuous Quality Improvement:  Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Conference, April 2019, Nashville, TN.

Cox, J & Barboza, S.  "An In-Depth Review of NCCHC's 2015 Standards for Mental Health Services" Pre-Conference seminar at National Commission on Correctional Healthcare Conference, November 2017, Chicago, IL; October, 2018, Las Vegas, NV; April 2019, Nashville, TN and October, 2019, Fort Lauderdale, FL.

Barboza, S "Hazardous Duty:  The Invisible Effects of Working in Corrections" Workshop presented at the National Commission on Correctional Healthcare National Conference, October 2015, Dallas, TX and October, 2019, Fort Lauderdale, FL.

Barboza, S & Riley, K.  "Continuous Quality Improvement:  Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S., Andrade, J.T., & Wilson, J.S.  "Trauma in the Practice of Correctional Medicine."  Workshop presented at the American College of Correctional Physicians Fall Conference, October, 2018, Las Vegas, NV.

Barboza, S. "Strategies for Understanding and Working with Personality-Disordered Patients."  Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S. "The Value of Positivity in Correctional Mental Health."  Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Gibson, B., Kern, E., Barboza, S. "The National Response Plan for Suicide Prevention in Corrections."  Workshop presented at the National Commission on Correctional Healthcare Conference, October 2018, Las Vegas, NV.

Barboza, S.  "Measuring Mental Health Treatment Outcomes: Building an Evidence Base" Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S. & Wilson, J.S.  "Trauma-Informed Care:  How We Can Better Support Our Patients" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S.  "Continuous Quality Improvement:  Strategies to Measure Change" Pre-Conference Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2018, Minneapolis, MN.

Barboza, S.  "CCHP-MH Exam Content Review Course" National Commission on Correctional Healthcare sponsored webinar, April 12, 2018.

Barboza, S.  "Use of Behavior Management Plans to Reduce Self-Injury."  National Commission on Correctional Healthcare sponsored webinar, February 21, 2018.

Barboza, S. "Practical Behavior Management Strategies:  Decreasing Self-Injurious Behavior" Luncheon presentation at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S. "CCHP-MH Content Review Course."  Workshop at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S. & Kearns, J.D. "Crisis Intervention:  Planning and Implementing Effective Strategies."  Workshop at the National Commission on Correctional Healthcare Mental Health Care Conference, July 2017, Las Vegas, NV

Barboza, S & Puerini, M.  "Personality Disorder in Corrections – Affliction, Identity, Label" Workshop at the National Commission on Correctional Healthcare Conference, October 2016, Las Vegas, NV

Barboza, S. "Strategies for Understanding and Working with Personality-Disordered Patients" Workshop at the National Commission on Correctional Healthcare Correctional Mental Health Care Conference, July 2016, Boston, MA.

Barboza, S. Wilson, J.S., McGinty, M., and Brown, L.  "Creating Practice-Based Evidence for Mental Health Treatment in Corrections" Workshop presented at the National Commission on Correctional Health Care National Conference, October 2015, Dallas, TX.

Barboza, S "Hazardous Duty:  The Invisible Effects of Working in Corrections" Workshop presented at the National Commission on Correctional Healthcare Spring Conference, April 2015, New Orleans, LA.

Barboza, S. & McGinty, M.  "Practice-Based Evidence:  Creating Evidence for Mental Health Treatment in Corrections" Workshop presented at the American Correctional Health Services Association National Conference, March 2015, Orlando, FL.

Barboza, S. & Wilson, J.S.  "Hazardous Duty:  The Invisible Effects of Working in Corrections" Workshop presented at the American Correctional Health Services Association Multidisciplinary Educational Conference, March 2014, New Orleans, LA.

Barboza, S. & Ammons, L. "How Can I Tell If It's Working: Measuring Mental Health Treatment Outcomes." Workshop presented at the American Correctional Association Winter Conference, January 2014, Tampa, FL.

Simpson, M. & Barboza, S. "Times They Are a Changing: DSM-5 and the Impact on Corrections." Workshop presented at the American Correctional Association Winter Conference, January 2014, Tampa, FL.

Wilson, J.S., Barboza, S. & Andrade, J. "Behavior Management: Strategies for Individual and Group Programs." Workshop presented at National Commission on Correctional Health Care Correctional Mental Health Care Conference, July 2013, Las Vegas, NV.

Barboza, S. "Mental Health in Corrections: An Overview for Health Care Leaders" Workshop presented at Correctional Health Care Leadership Institute, July 2012, Chicago, IL.

Shaw-Taylor, E.; Baker, M.; Tyler, C. & Barboza, S. "Taking a Chance on Change: In-Cell Programming Success in Maryland" Workshop offered at American Correctional Association Congress of Corrections, July, 2012, Denver, CO.

DeGroot, J.; Cadreche, M.; & Barboza, S. "Managing Self Harm by Standardizing the Definition, Tracking its Prevalence, and Using a Behavioral Plan" Workshop presented at Academic & Health Policy Conference on Correctional Health, March, 2012.

DeGroot, J.; Thompson, J. M.; Jackson, J. & Barboza, S. "It's Not Mental Illness, It's Just Behavior: Identifying and Treating Personality Disorders Rather Than Dismissing Them" Workshop presented at Academic & Health Policy Conference on Correctional Health, March, 2012.

Barboza, S. & Wilson, J.S. "Evidence for the Efficacy of Behavioral Interventions in Reducing Self-Injury" Workshop offered at NCCHC Conference, May, 2011, Phoenix, AZ.

Barboza, S. & Wilson, J.S. "Real Results: Successful Reduction in Self-Injury in Correctional Settings." Workshop offered at American Correctional Health Services Association Conference, April, 2011, Orlando, FL.

Barboza, S. & Wilson, J.S. "Let's Get Practical: Real Answers to Inmate Self-Injury." Workshop offered at North American Association of Wardens and Superintendents Conference, April, 2011, Baton Rouge, LA.

Barboza, S. & Wilson, J.S. "Behavior Management – Effective Reduction in Self-Injury." Workshop offered at American Correctional Association Winter Conference, February, 2011, San Antonio, TX.

Wilson, J.S. & Barboza, S. "Addressing the Rising Prevalence of Dementia in Inmate Populations" Pre-Conference Seminar offered at Updates in Correctional Healthcare, National Commission on Correctional Health Care sponsored, April, 2010, Nashville, TN.

Wilson, J.S.; Barboza, S.; & Andrade, J. "Ending It All: Data Informed Suicide Prevention." Presentation at Updates in Correctional Healthcare, National Commission on Correctional Health Care sponsored, April, 2010, Nashville, TN.

Barboza, S. & Wilson, J.S. "Bringing Recovery Inside the Walls: Recovery-Oriented Treatment Plans." Presentation at CMHS National GAINS Center Conference, February, 2010, Orlando, FL.

Wilson, J.S. & Barboza, S. "In Search of Solutions: Does Behavior Management Work?" Presentation at ACHSA Multidisciplinary Professional Development Conference, February 2010, Portland, OR.

Barboza, S. "Mental Health Risk Management." Invited speaker, Academy of Correctional Health Professionals Regional Seminar, June, 2009, Farmington, CT.

Barboza, S. "Mental Health Risk Management." Invited speaker, Academy of Correctional Health Professionals Regional Seminar, May, 2009, Fairfax, VA.

Andrade, J. T. & Barboza, S. "Taking a Chance on Change: Treating Offenders in Restricted Housing." Presentation at Mental Health in Corrections Conference, Forest Institute sponsored, April, 2009, Kansas City, MO.

Barboza, S. "Prison Rape Elimination Act & Draft Standards: Implications for Mental Health Practice." Presentation at Caulking the Seams of Continuity Conference, Drexel University Behavioral Healthcare Education, December 2008, Grantville, PA.

Barboza, S. "Documenting Progress: Writing Good Progress Notes Based on Good Treatment Plans." Presentation at Unlock the Mystery Conference, Indiana Department of Corrections, June 2008, Indianapolis, IN.

Wilson, J.S., and Barboza, S. "Autonomy, Safety, and Connection: Ethical Challenges in Working with Self-Injurious Inmates" Presentation at Mental Health in Corrections Consortium Symposium, April 2008, Kansas City, MO.

Barboza, S. "Strategies for Modifying Programming for Inmates Significantly Impaired by Mental Illness" Presentation at National Conference on Correctional Health Care, NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE sponsored, October 2007, Nashville, TN.

Abel, G. G., Barboza-Whitehead, S., & Rouleau, J. L. "Usefulness of Visual Reaction Times with Adolescents." Paper presentation at Association for the Treatment of Sexual Abusers Conference, October 2003, Saint Louis, MO

Barboza-Whitehead, S., Abel, G. G., & Reddy, L. A. "A Model for Discriminating Juvenile Sex Offenders Who Deny from Those Who Admit Using the Abel Screen for Sexual Interest."  Poster presented at Association for the Treatment of Sexual Abusers Conference, September 1999, Lake Buena Vista, FL

**POSTER**

Folk, J. B., Disabato, D. J., Daylor, J. M., Tangney, J. P., Bonieskie, L.,… Barboza, S. & Wilson, J. S. (2017, November). Effectiveness of a self-administered intervention for criminal thinking among inmates in restrictive housing. Poster to be presented at the Annual Meeting of the Association for Behavioral and Cognitive Therapies, San Diego, CA.

**Mary Perrien, Ph.D.**
**3313 W. Cherry Lane, Suite 333**
**Meridian, ID 83642**
**(208) 965-0875**
**mperrien@safesocietysolutions.com**

| | | |
|---|---|---|
| **EDUCATION** | **University of Hawaii, Manoa** | |
| | Doctor of Philosophy, Clinical Psychology | 1998 |
| | Master of Arts, Clinical Psychology | 1994 |
| | | |
| | **San Jose State University** | |
| | Bachelor of Arts, Psychology | 1991 |
| | | |
| **LICENSURE STATUS** | PSY18582 (California) | |
| | PSY 202317 (Idaho) | |
| | | |
| **TRAINING** | Internship in Clinical Psychology | 1997-1998 |
| | Atascadero State Hospital | |
| | Atascadero, California | |
| | | |
| **PROFESSIONAL EXPERIENCE** | **Expert Consultant** | 3/2019-present |
| | Correct Care Solutions, LLC | |
| | | |
| | **Expert Consultant** | 2017-11/2020 |
| | Alabama Department of Corrections | |
| | | |
| | **Expert Consultant** | 2014-2015 |
| | Idaho Department of Correction | |
| | | |
| | **Expert Consultant** | 2012-2014 |
| | Ohio Department of Rehabilitation and Correction | |
| | | |
| | **Expert Consultant** | 2012-2013 |
| | National Institute of Corrections | |
| | | |
| | **Expert Consultant** | 2011-2012 |
| | Illinois Department of Corrections | |
| | | |
| | **Safe Society Solutions, LLC** | 2010 to present |
| | Sole Proprietor, forensic evaluator and expert Witness (for defendants and plaintiffs) practice | |
| | | |
| | **Expert Consultant** | 2010-present |
| | Department of Homeland Security, Civil Rights and Civil Liberties (function as a subcontractor) | |

**PROFESSIONAL**
**EXPERIENCE**
**Continued**

| | | |
|---|---|---|
| **Expert Consultant** | 2007 to present |
| United States District Court, Eastern District of California (*Coleman et al. v. Newsom et al.*) Case No. 90-0520 LKK-JFM | |
| **Chief, Division of Education and Treatment** Idaho State Department of Correction | 2006-2010 |
| **Chief Psychologist/Director of Mental Health** Idaho State Department of Correction | 2005-2006 |
| **Chief Psychologist/Director of Mental Health Services – Correctional Facility** California State Prison at Corcoran | 2003-2005 |
| **Senior Psychologist, Supervisor – Correctional Facility** California State Prison at Corcoran | 2001-2003 |
| **Psychologist - Clinical, Correctional Facility** California State Prison at Corcoran | 2000-2001 |
| **Staff Psychologist** Federal Correctional Institution, Butner | 1998-2000 |
| **Therapist/Researcher** Honolulu Police Department | 1996-1997 |
| **Therapist/Group Facilitator** Child & Family Services, Hawaii | 1994-1997 |
| **Therapist/Group Facilitator** Department of Public Safety, Hawaii | 1994-1997 |

**TEACHING**
**EXPERIENCE**

| | | |
|---|---|---|
| **Guest Lecturer, various Psychology and Criminology courses** **Boise State University** | 2006-2014 |
| **Instructor, Correctional Peace Officers Standards & Training Academy (Idaho)** | 2006-2014 |
| **Lecturer** **Department of Psychology, University of Hawaii** | multiple 1994-1997 |

**PUBLICATIONS &
TECHNICAL
REPORTS**

Perrien, M. and O'Keefe, M. (2015). Disciplinary Infractions and Restricted Housing. In *Oxford Textbook of Correctional Psychiatry.* New York NY: Oxford University Press.

Perrien, M. (2010). Mental Health Guidelines and Documentation for Psychotherapists. In *Manual of Forms and Guidelines for Correctional Mental Health.* Washington DC: American Psychiatric Publications.

Perrien, M. (2009).  Sex offenders:  Analysis of best practice and current practice in Idaho for case disposition, assessment, treatment and supervision.  A Report provided to the Idaho Criminal Justice Commission.

Perrien, M. (2008).  Sex offenders: The current practices in the State of Idaho for case disposition, assessment, treatment and supervision. A Report provided to the Idaho Criminal Justice Commission.

Kunitake, M., Perrien, M., Yokoi, E., Perrone, P., Green, T., Sakamoto-Cheung, S., & Richmond, J. (1997).  Felony sexual assault arrests in Hawaii.  Crime Trend Series:  State of Hawaii Department of the Attorney General, 5(2), 1-9.

**PRESENTATIONS**

Perrien, M. (September 2009).  Presenter at the annual Idaho District Judges Retreat Training, Twin Falls, Idaho.

Perrien, M. (January-March 2009).  Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2009).  Presenter at the annual Idaho District Judges Seminar.  Boise, ID.

Perrien, M. (December 2008).  Educating correctional officers to respond to medical emergencies.  A paper presented at the conference Operational Excellence in Correctional Healthcare, Las Vegas, NV.

Perrien, M. (September 2008).  Panel Presenter at the annual Idaho District Judges Retreat Training.  Sun Valley, Idaho.

Perrien, M. (January-March 2008).  Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2008).  Presenter at the annual Idaho District Judges Seminar.  Boise, ID.

Perrien, M. (September 2007).  Panel Presenter at the annual Idaho District Judges Retreat Training.  Sun Valley, Idaho.

Perrien, M. (January-March 2007).  Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2007).  Panel Presenter at the annual Idaho District Judges Seminar, Boise, Idaho.

**PRESENTATIONS**
**Continued**

Perrien, M. (November 2006).  Suicide Risk Management in Corrections.  Paper presented at the Idaho Suicide Prevention Action Network Conference, Boise, Idaho.

Perrien, M. (November 2006).  Mental Health Care in Corrections and Community Corrections.  Presentation to District 7 Judges, Idaho Falls, Idaho.

Perrien, M. (October 2006).  Correctional Mental Health Care in Idaho.  Presentation to the Mental Health and Substance Abuse Treatment Delivery Systems Interim Legislative Committee.

Perrien, M. and Muller, C. (June 2006).  Cultural Competence and Multi-cultural Psychology.  Paper presented at the Idaho Mental Health Coalition Conference, Boise, Idaho.

Perrien, M. (April 2006).  Sex Offender Treatment in Correctional Setting.  Paper presented at the annual National Commission on Correctional Health Care Updates Conference, Las Vegas, Nevada.

Perrien, M. (November 2005).  Sex Offender Risk Assessment.  A training for clinical staff employed by the Idaho Department of Correction and Corrections Corporation of America.

Perrien, M. (October 2005).  Sex Offender Management.  Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Boise, Idaho.

Perrien, M. (September 2005).  Sex Offender Management.  Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Pocatello, Idaho.

Perrien, M. (April 2003).  Cultural Competence and Multi-cultural Mental Health Services.  A training workshop presented to mental health staff at CSP-Corcoran.

Perrien, M. (2002, multiple).  Forensic Evaluations and Courtroom Expert Testimony. A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2001, multiple).  Psychopathy and the Hare Psychopathy Checklist, Revised.  A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2000, February).  The Assessment, Treatment, Management and Community Supervision of the Sex Offender.  A training workshop provided to U.S.Probation Officers, Long Island, NY.

Perrien, M. (1999, July).  Psychopathy and the Hare Psychopathy Checklist, Revised.  A training workshop for predoctoral interns presented at the Federal Correctional Institution at Butner.

Perrien, M. (1999, April).  Psychopathy and the Hare Psychopathy Checklist Revised.  A training workshop for doctoral and masters level staff in the Sex Offender Treatment Program at the Federal Correctional Institution at Butner.

**PRESENTATIONS**

**Continued**          Perrien, M. & Kunitake, M. (1997, February).  Demographic characteristics of
                       felony sex assault arrestees in Hawaii.  Paper presented to the Hawaii
                       State Legislature at an Informational Symposium on Community
                       Notification of Sex Offenders in Honolulu, Hawaii.

                       Perrien, M. & Kunitake, M. (1997, February).  Registration and community
                       notification of sex offenders in Hawaii.  Paper presented at the annual
                       meeting of the Western Society of Criminology conference in Honolulu,
                       Hawaii.

                       Perrien, M. & Marsella, A.J. (1996, April).  Reported frequencies and perceived
                       severity ratings of traumatic and near-traumatic events among college
                       students.  Paper presented at the meeting of the Western Psychological
                       Association, Santa Clara, California.

**ASSOCIATIONS/MEMBERSHIP**
          American Psychological Association, member
          American Psychology-Law Society, member
          Association for Behavioral and Cognitive Therapies, member
          Association for the Treatment of Sexual Abusers, clinical member
          National Commission on Correctional Health Care, member
          World Professional Association for Transgender Health, member

**COMMUNITY APPOINTMENTS**
Idaho State Planning Council on Mental Health, appointed by the Governor, 2009 and 2010.

**EXPERT WITNESS & CONSULTING**
*Abdiwali Musse v King County et al.* (2020 to present) Assessment of adequacy of care and risk
assessment in the assault in custody of jail detainee. Pending expert discovery. King County Superior
Court, State of Washington, Seattle Courthouse (Retained by plaintiff, report and possible deposition with
testimony expected).

*Lorenzo Mays, et al v County of Sacramento.* (2020 to present) Monitoring Expert. Assessment of
implementation of consent decree for mental health services in county jail. U.S. District Court, Eastern
Division (Appointed via agreement by both parties).

*Toby Meagher, et al v King County, et al.* (2019 to present) Assessment of adequacy of care in the
assault in custody of jail detainee. Pending hearing. U.S. District Court, Western District of Washington
(Retained by plaintiff, report and deposition with testimony expected).

*Edward Braggs, et al v Jefferson Dunn (ADOC), et al.* (2018-present) Multiple court-ordered assessment
reports including suicide prevention and functional segregation. U.S. District Court, Middle District of
Alabama, Northern Division (Retained by defendants).

*The estate of Marc Moreno v Benton County Sheriff et al. (December 2017)* Assessment of adequacy of
care in the death in custody of jail detainee. Case in mediation. Benton County, Washington. (Retained by
plaintiff, report).

*The estate of Mathew Ajibade et al v Wilcher et al. (June 2017)* Assessment of adequacy of care in the
death in custody of jail detainee. Case set for trial; deposition taken. U.S. District Court, Southern District
of Georgia. (Retained by plaintiff, report and deposition testimony).

**EXPERT WITNESS & CONSULTING Continued**

*Potter v State of Idaho Department of Health and Welfare.* (May 2017) Provided expert testimony regarding the reliability and validity of recovered memories as well as the adequacy of investigations into allegations of sexual abuse. Idaho state hearing, appeal of finding. (Retained by defendant, report and testimony).

*The estate of Gordon Powell v Barnes et al.* (May 2017) Assessment of mental health staff and the adequacy of care in the murder of an inmate. U.S. District Court, Western District of Washington. (Retained by plaintiff, report).

*Edward Braggs v Jeffrey Dunn (Alabama Department of Correction) (2017)* Expert consultation to defendants post-litigation regarding adequacy and needs of current mental health service delivery system; provide expert assistance in mediation process; provide expert testimony and assistance in failed mediation trial matters, conducted staffing and suicide prevention assessment. (Retained by defendant, report and trial testimony)

*Disability Rights Florida, Inc. v Julie Jones, Secretary Florida Department of Corrections, et al.* (2016-2017) Consulting expert to plaintiffs to conduct assessments of the inpatient units at all facilities except for Dade Correctional Institution and develop recommendations on issues of mental health treatment, staffing, training and quality improvement. U.S. District Court, middle District of Florida. (Retained by plaintiff, report)

*Walker v Wall, Director, Rhode Island Department of Corrections et al.* (February 2016) Evaluated adequacy of care in post-PREA incident. Provided deposition testimony. U.S. District Court, District of Rhode Island. (Retained by defendant, report and deposition testimony).

### HENRY A. DLUGACZ
*99 Park Avenue, 26/PH*
*New York, N.Y. 10016*
*212/490-0400; 646/346.0646*
*hdlugacz@blhny.com*

## EDUCATION

***Juris Doctor***, New York Law School 1991 *cum laude*
Moot Court Certificate of Honor; Notes & Comments Editor, <u>Human Rights Journal</u>

***Master of Social Work***, Hunter College School of Social Work 1981

***Bachelors of Art***, Queens College, 1979 *cum laude*
Departmental honors; honors program in the study of the Humanities

## CURRENT APPOINTMENTS

2009-          ***Partner,*** Beldock, Levine & Hoffman LLP, New York, N.Y.

2007-          ***Expert, Correctional Mental Health***
               *Coleman vs. Schwarzenegger,* 912 F. Supp. 1282 (E.D. Cal. 1995)
               United States District Court, Eastern California
               Member of Special Master's expert panel in remedial phase of class action lawsuit
               involving mental health care in entire California prison system and portions of the
               Department of State Hospitals.

2003-          ***Compliance Monitor***, *Brad H. et al. v City of New York, et al.* 117882/99
               Supreme Court, State of New York, County of New York
               One of two court-appointed monitors monitoring compliance with
               Stipulation involving reentry planning for inmates with mental disabilities
               for entire New York City jail system including hospital forensic units.

1997-          ***Assistant Clinical Professor of Psychiatry & Behavioral Science***
               New York Medical College, Valhalla, N.Y.
               Until mid-2010 core faculty in teaching hospital-based forensic psychiatry
               fellowship program: correctional mental health, forensic issues; didactic training;
               evaluation; expert witness training; currently on voluntary faculty.

1993-          **Court Evaluator and Guardian**, New York State Supreme Court
               Certified by Association of the Bar of the City of New York. Appointed by
               judges to perform independent evaluations of alleged incapacitated persons;
               appointed to serve as guardian.

## EXPERIENCE

2000-2018      ***Mediator***
               United States District Court for the Eastern District of New York

Mediation and Arbitration Panel for Federal-Court annexed mediation. Appointed to "Superstorm Sandy" Mediation Panel.

2017      **Consulting Expert, Correctional Mental Health**
Disabilities Rights Maryland, Baltimore, Maryland
Guided site visit of North Branch Correctional Institution, the state's "Super-Max" prison; assisted in preparation of report.

2014-2015      **Assistant Monitor**
*Rasho et al. vs. Walker et al.* Case No. 07-1298
United States District Court Central District of Illinois
Assisted in court-appointed monitoring of class action lawsuit involving mental health care in entire Illinois prison system.

2002- 2014      **Adjunct Professor of Law**, New York Law School, N.Y., N.Y.
(Mentor-Professor 2002-2006, Adjunct Professor 2006-2014)
Co-taught in Nicaragua on State Department grant. Co-created interdisciplinary course on Mental Health Issues in Jails and Prisons.

2012      **Expert Consultant, Mentally Disordered Offenders**
Mental Disabilities Rights International/American Bar Association Rule of Law Initiative, Mexico City, Mexico

2012      **Consulting Expert, Correctional Mental Health**
Bureau of Corrections, US Virgin Islands (St. Croix)
*USA v. Virgin Islands et al.* No 86-265 (D.V.I.)
Conducted bureau's "self-assessment" of correctional mental health system.

1993-2010      **Private consulting, monitoring and legal practice**
Focused on mental health; corrections; court monitoring of complex litigations; mediation; forensic and disabilities issues; health-care. Regularly tried cases in Mental Hygiene Parts of Kings County and New York County Supreme Court; appointed as guardian and independent Court Evaluator in guardianship proceedings.

2000-2010      **Private Counsel, Mental Health and Healthcare**
St. Vincent's Catholic Medical Center, N.Y., N.Y.
Represented hospital in mental hygiene hearings in New York State Supreme Court, retention, treatment over objection, guardianships. Advised and conducted negotiations on contracts, student affiliation, and clinical research agreements.

2007-2010      **Expert, Correctional Mental Health,** New Mexico Protection & Advocacy/New Mexico ACLU/Bazelon Center
*Bravo et al v Board of Commissioners of Dona Ana County et al.*
United State District Court for the District of New Mexico
Inspected jail, assessed mental health care, recommended remediation; active participation in successful settlement negotiations of federal class action lawsuit involving mental health care and reentry planning

2009      **Invited Witness, Correctional Mental Health and Reentry**
New Jersey General Assembly, Trenton, New Jersey
Invited to testify at hearings conducted by the Majority Leader. Testified on correctional mental health and reentry planning.

2007-2009      **Expert Consultant, Correctional Mental Health**
*Hadix v. Caruso*, No. 4:92-CV-00110-RAE
United State District Court, Western District of Michigan
Mental Health Consultant to the Office of the Independent Medical Monitor in class action lawsuit involving health and mental health care.

2002-2008      **Founding Co-Chair**, New York State Bar Association, Albany, N.Y.
Committee on Mental Health Issues of Healthcare Law Section

2005-2006      **Mediator,** *Pierce County et al v State of Washington et al,* (03-2-00918-8)
Superior Court, Thurston County, Washington State
Co-mediated settlement of complex class action lawsuit with multiple public and private parties involving funding, discharge planning, and community mental health treatment issues. Appointed by court on consent of the parties as mediator of discharge-planning aspects of settlement.

2001-2006      **Adjunct Professor of Law**
St. John's University School of Law, Queens New York
Taught law school seminar on mental health law.

2005      **Invited Witness**
New York State Assembly, Albany, New York
Invited to testify in hearings before three Assembly Committees concerning enactment of civil commitment statute for sex offenders.

2005      **Expert Trainer**
European Court of Human Rights/ Mental Disability Advocacy Center
Council of Europe, Strasbourg, France
Under auspices of the Council of Europe, Court of Human Rights & MDAC conducted training for lawyers on multi-disciplinary support during litigation for clients with mental disabilities

2001-2005     **Federal Court Monitor/Expert Consultant**
              *Rust et al. v. Western State Hospital, et al.* (C00-5749)
              Western District of Washington
              Federal class-action litigation involving state forensic
              hospital. Was lead expert for plaintiffs; later appointed as one of two court
              monitors to report on and assist in the attainment of compliance with order
              involving active treatment, treatment planning, discharge plans, patient risk
              assessment, staffing levels, physical plant issues, hospital census.

2002          **Contributor/Reviewer**, American Public Health Association, Task Force
              Standards for Health Services in Correctional Institutions

2001          **Expert Consultant**
              Mental Disability Rights International, Washington, D.C.
              Conducted inspections of facilities and training in Mexico City.

2000- 2001    **Expert Consultant Corrections (Mental Health and Generalist)**
              PricewaterhouseCoopers, Fair Lakes, Virginia
              As part of multidisciplinary team, evaluated correctional facilities pursuant to
              agreement with the United States Department of Justice, US Marshall Service and
              Immigration and Naturalization Service.

2000- 2001    **Expert Consultant/Correctional Mental Health**
              Council of State Governments, New York, N.Y.
              Consultant to corrections work group of interdisciplinary project
              regarding persons with mental disabilities in the criminal justice system.
              Worked with State Senators, corrections and mental health commissioners,
              service providers and advocates.

              **Expert and Mediator, Correctional Mental Health**
              *Duran et al v King et al*, (77-0721JB)
              Federal Court, District of New Mexico
              For Special Master, led team in the monitoring mental health aspects of Consent
              Decree in complex, class action lawsuit involving the entire state's prison system:
              Assessed quality of care, referral to appropriate levels of care, credentialing of staff,
              development of criteria for placement in segregation, evaluation of Quality
              Improvement Plan, suicide prevention, postmortem reviews, policies, and
              procedures; development of Corrective Action Plans. Co-mediated and monitored
              termination plan.

1989-1998    ***Director of Mental Health Services & Acting Assistant Program Director of Healthcare Service***
Saint Vincents Hospital Correctional Health Program, N.Y., N.Y.
(*Director of Mental Health 1989-1998;*
*Acting Assistant Program Director 1996-1998*)
*As Acting Assistant Program Director*, assisted in directing all aspects of NCCHC & Joint Commission accredited, multi-site, ambulatory health care program; administrative oversight department heads including medical, radiology, nursing, dental, and dialysis service at same time ran entire mental health service.
*As Mental Health Director*, developed, implemented and directed entire multi-site JCAHO and NCCHC accredited correctional mental health program; developed and conducted CQI program; recruitment and evaluation of all psychiatrists, psychologists and social workers; developed policies and procedures; oversaw clinical care; conducted post-mortem reviews; implemented new programs such as: family and group therapy services; discharge planning services; developed screening and assessment protocols and instruments, and suicide prevention protocols.

1997-1998    ***Consultant***
American Psychological Association, Washington, D.C.

1992-1994    ***Law Clerk***
Saint Vincents Hospital, Department of Legal Affairs, N.Y., N.Y.

1987-1989    ***Mental Health Unit Chief***
Montefiore Medical Center/Rikers Island Health Service, Bronx, N.Y.
Direct responsibility for all aspects of mental health clinic in NYC jail-system's busiest intake facility; supervision of all mental health staff; decisions regarding appropriate levels of care; implemented new programs such as orientation screening; group therapy; inmate suicide prevention aide and correction officer training.

1987-1989    ***Recruitment and Education Coordinator***
Montefiore Medical Center/ Rikers Island Health Service, Bronx, N.Y.
Actively involved in most aspects of central office activities for entire Rikers Island mental health program including program development, research, development of evaluation instruments. In charge of recruitment and screening of medical and non-medical mental health staff.
Developed on-going training programs, and retention activities.

1983-1987    ***Clinical Social Worker***
Montefiore Medical Center/Rikers Island Health Service, Bronx, N.Y.
Assessment, crisis intervention, short-term individual and group treatment of detainee population. Conducted assessment of thousands of individuals: decisions regarding appropriate level of care, and suicide risk level.

1981- 1983     ***Clinical Social Worker***
Mount Sinai Services (Hospital Female Forensic Unit), Elmhurst, N.Y.
Multi-disciplinary treatment/evaluation team member; individual and
family therapy; aided with competency  to stand trial evaluations.
Maintained on-going caseload in outpatient psychiatry clinic; covered
Psychiatric Emergency Room.

## PUBLICATIONS

### Books:

**Lawyering Skills in the Representation of Persons with Mental Disabilities,** 2006**,**
Carolina Academic Press, M. Perlin, K. Gould, Cohen, **H. Dlugacz** & R. Friedman

**Mental Health Issues in Jails and Prisons,** 2008, Carolina Academic Press
Michael L. Perlin & **Henry A. Dlugacz**

**Competence in Criminal and Civil Law: From Legal Theory to Clinical
Applications**, 2008, John Wiley
Michael L. Perlin, Pamela Champine, **Henry A. Dlugacz** & Mary Connell

**Re-Entry Planning for Offenders with Mental Disorders: Policy and    Practice,**
2010, Civic Research Institute **Henry A. Dlugacz** (Editor)

**Re-Entry Planning for Offenders with Mental Disorders: Policy and    Practice,
Volume II,** 2015 Civic Research Institute **Henry A. Dlugacz** (Editor)

### Book Chapters:

*Liability Management and the Correctional Psychiatrist: A Review of Key Considerations*,
**Correctional Psychiatry: Practice Guidelines and Strategies**, (**Henry A. Dlugacz** &
Julie Y. Low) (Ole J. Thienhaus and Melissa Piasecki, eds. 2007, Civic Research Institute)

*A Continuum of Care for Adults with Mental Illness Leaving Jail and prison: A review of
essential reentry elements* (**Henry A. Dlugacz**, Nahama Broner, Stacy S. Lamon),
**Correctional Psychiatry: Practice Guidelines and Strategies**, (Ole J. Thienhaus and
Melissa Piasecki, eds.) 2007, Civic Research Institute)

*Clinically Oriented Reentry Planning in Correctional Settings*, **Handbook of
Correctional Mental Health Second Edition,** (Charles L. Scott Ed) 2010, American
Psychiatric Publishing) (**Dlugacz, H**. & Roskes, E.)

*The Criminal Justice System and Offenders Placed in an Outpatient Setting*,
**Handbook of Correctional Mental Health Second Edition,** (Charles L. Scott Ed) 2010,
American Psychiatric Publishing) (Roskes, E., Cooksey, C., Lipford, S., **Dlugacz, H.**)

*Ethical Issues in Correctional Psychiatry in the United States*, Ethical Issues in Prison Psychiatry (Konrad, Norbert; Völlm, Birgit; Weisstub, D.N. (Eds.), Springer Publishing, International Library of Ethics, Law, and the New Medicine, Vol. 46 2013 (**Dlugacz, H.**, Low, J., Wimmer, C., Knox, L.)

*Community Reentry*, **Oxford Textbook of Correctional Psychiatry**, Trestman, R, Metzner, J., Appelbaum, K, Eds**.** 2015 Oxford University Press (**H. Dlugacz**)

*Effective Non-Litigation Advocacy for Incarcerated Clients with Mental Disabilities,* **Representing People with Mental Disabilities: A Practical Guide**, K. Kelley Ed 2018 American Bar Association (**H. Dlugacz)**

**Journals Edited**:

Special Editor, New York State Bar Association Health Law Journal, Special Issue on Mental Health, Spring, 2006.

**Articles**:

<u>*United States v. Charters:*</u> *A Case in Two Acts: In Search of a Middle Ground* 7 <u>New York L. Sch. J. of Human Rights</u> 311 (1990). (**Dlugacz, H.**)

<u>*Riggins v. Nevada*</u>: *Towards a Unified Standard for a Prisoner's Right to Refuse Medication?*, 17 <u>Law and Psychology Review</u> 41 (1993). (**Dlugacz, H.**)

*Out-Patient Commitment: Some Thoughts on Promoting a Meaningful Dialogue* 53 <u>New York L. Sch. L. Rev. 79 </u>(2009). (**Dlugacz, H.**)

*It's Doom Alone That Counts: Can International Human Rights Law Be An Effective Source of Rights in Correctional Conditions Litigation?* Special Edition on Correctional Mental Health 27 <u>Behavioral Sciences and Law</u> (2009) (Perlin, M. & **Dlugacz, H.)**

*The Ethics of Representing Clients with Limited Capacity in Guardianship Proceedings,* <u>The Saint Louis University Journal of Health Law & Policy</u> (**Dlugacz, H**. & Wimmer, C.) Saint Louis University Journal of Health Law & Policy Vol. 4 Issue 2, 2011

*The Legal Aspects of Administering Antipsychotic Medications to Jail and Prison Inmates,* (**Dlugacz, H**. & Wimmer, C.) Special Issue of the <u>International Journal of Law and Psychiatry on "Prisons and Mental Health"</u> May-Aug; 36(3-4):213-28 2013

*Correctional Mental Health in the United States***,** Dlugacz, H., <u>International Journal of Prisoner Health</u> Vol. 10 No. 1 pp. 3-26  2014

*The Reach and Limitation of the ADA and its Integration Mandate: Potential Implications for the Successful Reentry of Individuals with Mental Disabilities in a Correctional Population*,**, Dlugacz, H.,** & Droubi, L., <u>Behavioral Sciences and Law</u> Vol. 35 p 135 2017

*Custodial Suicide and Class Action Remedies: Current Obstacles and Future Directions,* **Dlugacz, H.,** Droubi, L., Gallagher, M., <u>Behavioral Sciences and Law</u>, Accepted for Publication

### <u>Encyclopedia Entries</u>

*Legal Dimension of Mental Health,* **Encyclopedia of Mental Health 2ⁿᵈ Edition**, Howard Friedman, Ed**.** Elsevier, **Dlugacz, H.,** Wimmer, C.

## <u>ACADEMIC</u>

2017        ***Invited Speaker***, Columbia University Medical Center, Division of Law, Ethics, and Psychiatry, Department of Psychiatry, N.Y., N.Y.

2013        ***Invited Keynote Speaker***, University of Texas, Brownsville, Texas

2012        ***Invited Lecturer,*** Benjamin N. Cardozo School of Law, N.Y., N.Y.

2011        ***Invited Lecturer,*** University of Maryland Schools of Medicine, Law and Social Work, Baltimore, MD

2011        ***Invited Lecturer***, Association of American Law Schools, S.F., CA.

2010        ***Invited Lecturer,*** Benjamin N. Cardozo School of Law, N.Y., N.Y.

2009-2010        ***Invited Reviewer,*** International Journal of Prison Health

2007-2008        ***Invited Reviewer***, John Wiley & Sons, Inc. Reviewed book proposals.

2006        ***Invited Lecturer***, New York State Judicial Institute
           Mental Hygiene Legal Services, First and Second Appellate Divisions

2006        ***Invited Reviewer,*** Journal of the International Academy of Law and Mental Health

2005        ***Faculty Member and Co-program Chair***
           New York State Bar Association, Continuing Legal Education Program on Mental Health Courts

2005        ***Invited Lecturer***, Columbia University Mailman School of Public Health, New York, New York

2003-2011    ***Instructor for Mediation Exercise,*** New York University School of Law, New York, New York (on annual, volunteer basis)

2002    ***Invited Lecturer***, New York University School of Law, N.Y., N.Y.

2002    ***Moot Court Judge***, New York Law School, N.Y., N.Y.

2000    ***Invited Lecturer***, St. John's University School of Law, Queens, N.Y.

1999    ***Adjunct Assistant Professor***
Fordham University Graduate School of Social Service, N.Y.C.

1998-1999    ***Field Work Instructor***
Fordham University School of Social Work, N.Y., N.Y.

1993-1994    ***Lecturer***, New York University Graduate School of Social Work, N.Y.C.

1992-1994    ***Attorney-Mentor***, New York Law School, N.Y., N.Y.

1993    ***Invited Lecturer***, New York University School of Social Work, N.Y.C.

1990    ***Invited Lecturer,*** New York University School of Medicine, N.Y., N.Y.

1987-1991    ***Research Assistant*** New York Law School, Professor Michael Perlin

1988-1990    ***Invited Lecturer,*** New York Law School, N.Y., N.Y.

1988    ***Invited Lecturer,*** Hofstra University**,** N.Y. Hempstead, N.Y.

1984-1985    ***Field Work Instructor,*** Hunter College School of Social Work, N.Y.C.


## Presentations: Legal, Policy, Administrative, Clinical Issues in Mental Health Care

Speaker and Panelist, American Bar Association Webinar, February 2020

Speaker and Panelist, American Psychiatric Association Mental Health Services Meeting, New York, N.Y. October 2019

Invited Speaker, Oklahoma Department of Human Services, The Practice and Policy Lecture Series, Oklahoma City, OK August 2014

Invited Speaker, American Psychological Association/American Bar Association Joint Conference on Violence, Washington DC May 2014

Invited Speaker and Discussant, New York State Psychological Association Forensic Division Conference on Violence Risk Assessment, New York, N.Y. Sept. 2013

Invited by the New York State Commission on Quality of Care to participate in a Roundtable discussion on New York State's "Olmstead Plan" Albany New York 2014)

33rd International Congress on Law and Mental Health, Amsterdam, Netherlands July 2013

Invited Speaker, American Public Health Association, Washington, D.C. November, 2011

Invited Speaker, Association of the Bar of the City of New York, N.Y. Continuing Legal Education Program on representation of clients with diminished capacity, November, 2011

32rd International Congress on Law and Mental Health, Humboldt University, Berlin, Germany July, 2011

31nd International Congress on Law and Mental Health, New York University School of Law, New York, N.Y., June 2009 (paper presented by co-author)

30th International Congress on Law and Mental Health, University of Padua, Padua, Italy, June 2007

Continuing Legal Education Seminar, conducted for Criminal Court Judges of the Manhattan Criminal Court, Brooklyn, N.Y., April, 2007

Lincoln Hospital, Department of Psychiatry, Grand Rounds, November, 2006

New York State Assembly Roundtable on Criminal Penalties and Legislation on Civil Commitment of Sex Offenders. (participant) July, 2005

29th Congres International de Droit et de Santé Mentale/Laboratoire d'Ethique Medicale et de Sante Publique/Faculte de Medecine de Necker, Universite Rene Descartes (International Congress on Law and Mental Health) Paris, France, July 2005

XII World Congress of Psychiatry, Yokohama, Japan, August, 2002

National Association of Developmental Disabilities, New Orleans, Louisiana, October 2001 (paper was presented by a colleague)

XXV Congres International de Droit et de Sante Mentale (International Congress on Law and Mental Health) University of Siena, Siena, Italy July 2000

American Psychology-Law Society and the European Association of Psychology and Law, Trinity College, Dublin, Ireland, July 1999

XXIII Congres International de Droit et de Santé Mentale/Laboratoire d'Ethique Medicale et de Sante Publique/Faculte de Medecine de Necker, Universite Rene Descartes (International Congress on Law and Mental Health) Paris, France, June 1998

New York University, Annual Forensic Mental Health Conference, NY, NY, June, 1998;

Saint Vincents Hospital, Department of Psychiatry Grand Rounds, NY, NY April,1998

Saint Barnabas Hospital, Correctional Health Affiliate, Grand Rounds, Rikers Island, NY, March 1998

American Psychological Association. Annual Meeting, August 1994

Annual Meeting American Academy of Psychiatry and Law, Orlando, Florida, October 1991 (paper profiled in the *Psychiatric News*, November 15, 1991)

American Psychiatric Association Annual Meeting, New York, N.Y. May 1990

Orthopsychiatric Annual Meeting, Miami, Florida, April 1990

Annual Meeting of the American Group Therapy Assn., Boston, Mass, February 1990

American Public Health Assn. Annual Meeting, Chicago, Ill., October 1989

**COMMITTEE MEMBERSHIPS AND ADVISORY BOARDS** (past and current)

Association of the Bar of the City of New York, Committee on Legal Issues Affecting People with Disabilities; New York State Bar Association, Dispute Resolution Section; New York State Bar Association, Health Law Section: Founding Co-Chair, Special Committee on Mental Health; Member of Executive Committee; Association of the Bar of the City of New York, Problems of the Mentally Ill; sub-committee on conditions in Prisons; New York State Bar Assn., Committee to Confer with the Medical Society of the State of N.Y.; Committee on Public Health; New York Law School, Advisory Board on Scholarly Publications; Saint Vincent's Hospital and Medical Center of N.Y., Hospital-wide Counsel on Domestic Violence; New York Health and Hospitals Corporation, City-wide Committee on Jail-based Mental Health Services; New York City Department of Mental Health, State-wide Forensic Mental Health Task-force; Advisory Board on the Formation of the New York City Links Program; Advisory Board, Friends of Island Academy, Juvenile NYC Link Program; Reviewer of Articles, International Journal of Prisoner's Health.

**LICENSES, CERTIFICATIONS, ADMISSIONS, RECOGNITIONS**

**Attorney** admitted to practice law in the Courts of the State of New York (First Department) and in the Federal Courts of the Southern & Eastern Districts of New York. Accredited for preparation, presentation and prosecution of claims for veterans benefits before the Department of Veterans Affairs (not current).

**Social Worker** Licensed Social Worker, New York State Department of Education

**Court Evaluator** and **Guardian:** certified under Article 81 of the New York State Mental Hygiene Law, Office of Court Administration of the State of New York. Trained by the Association of the Bar of the City of New York.

**Mediator** Advanced Training in Mediation: United States District Court for the Eastern District of New York; The Center for Mediation in Law, N.Y., N.Y. Additional training in the Mediation of Bio-Ethical Disputes (Center for Health Law and Ethics, University of New Mexico, Division of Bioethics, Montefiore Medical Center/Albert Einstein College of Medicine and the United Hospital Fund of New York); Mediation of the Fair Labor Standards Act, The Federal Bar Association, Cornell University Labor and Employment Law Program, Federal Court Eastern District of New York

**"Super Lawyer"** 2012-2020: New York City Metro under *Health Law* category

<u>**LANGUAGES**</u>
Conversational Spanish: Studied in Mexico, certificate awarded: Instituto de Estudios de America Latina, August, 1981, Cuernavaca, Mexico

<u>**REFERENCES:**</u> Available upon request

# Maria Masotta, Psy.D.

Licensed in MA #8411 and CT #003747
maria@drmariamasotta.com
www.drmariamasotta.com
P.O. Box 36, Rockfall, CT  06481
203-747-4443

---

## Education

University of Massachusetts Medical School, Law and Psychiatry Program, Worcester, Massachusetts, Certificate Program in Forensic Mental Health (8/31/06)

Psy.D.      Nova Southeastern University – Fort Lauderdale, Florida
Clinical Psychology with a Specialization in Forensic Psychology (8/97-8/02)

M.S.       Nova Southeastern University – Fort Lauderdale, Florida  (8/97-6/99)
Clinical Psychology

B.A.       Hartwick College – Oneonta, New York  (8/93-12/96)
Major in Psychology

---

## Clinical Experience

***Consultant*** – Miami Dade County Corrections and Rehabilitation Department (MDCR) - (6/18-present).  MDCR is large jail system that incarcerates over 5,000 detainees. Provide clinical consultation to MDCR healthcare and custody leadership personnel to assist with compliance with a Department of Justice Consent Agreement.

***Contractor*** – Department of Homeland Security/Civil Rights and Civil Liberties – (4/17-present). Conduct assessment of behavioral health programs in detention centers that detain Immigration and Customs Enforcement (ICE) detainees. This includes a review of policies and procedures, interviews with detainees and staff and review of relevant documentation.  Analyses, conclusions and recommendations are provided via a comprehensive summary report.

***Court Appointed Expert, Correctional Mental Health*** (8/14- present). United States District Court of the Eastern District of California – Ordered by Honorable Lawrence K. Karlton, Senior District Judge, for a class action lawsuit, Coleman et. al vs. Brown et. al. As a member of a multi-disciplinary team, provide expert consultation to the Special Master, Mathew A. Lopes, Esq., as part of an ongoing monitoring process of the California Department of Corrections and Rehabilitation and Department of State Hospitals mental health system.

*Forensic Psychologist* – FHS/MHM (5/13-8/17) Worcester District Court Clinic – Worcester, Massachusetts (Center for Health and Development (2/07-12/10) Conduct court-ordered forensic evaluations for central Massachusetts courts. Evaluations include involuntary commitment for psychiatric treatment, commitment for substance abuse, aid-in-sentencing, competency to stand trial and criminal responsibility.

*Clinical Psychologist* – MedOptions of Massachusetts (10/12-1/15). Provide psycho-diagnostic evaluations, behavioral management, psychological testing, guardianship evaluations and psychotherapy to individuals residing in nursing homes for short- term rehabilitation or long-term care. Psychological issues range from mild to severe dementia, loss/grief, substance abuse and serious and persistent mental illness.

*Psychologist* – MHM Correctional Services, Inc – Massachusetts Treatment Center, Bridgewater, Massachusetts. (8/12-10/12). Provide treatment planning, individual psychotherapy and crisis intervention to incarcerated men who have been convicted of a sexual offense or have been civilly committed as a Sexually Dangerous Person.

*Regional Clinical Director/Regional Comprehensive Quality Improvement Manager* – MHM Correctional Services, Inc –Regional Office – Norton, Massachusetts (3/12-8/12). Provide clinical support, leadership and supervision to clinical staff throughout the mental health prison programs in Massachusetts. Respond to inmate grievance appeals. Provide clinical support for Department of Mental Health segregation audits and Department of Corrections quarterly meetings at various prisons. Provide clinical consultation to mental health and correctional staff in the management of mentally ill inmates. Coordinate with the Department of Corrections Training Academy and mental health staff to schedule annual suicide prevention training. Oversee quality improvement activities including staff credentialing and peer reviews.

*Senior Clinical Operations Specialist* – MHM Correctional Services, Inc. (10/10 –3/12) This position required travel throughout the United States approximately 50% of the time to provide training and clinical consultation to mental health staff in the management of inmates with severe and persistent mental illness and significant self-injurious behavior. Assist in the development of behavior management treatment plans. Assist in the implementation of clinical programming and policies. Develop staff training, clinical guidelines and group psychotherapy protocols. Conduct clinical audits to ensure contract compliance. Co-facilitate a company-wide conference call focusing on the gender responsive needs of female offenders.

*Mental Health Director* – MHM/Forensic Health Services - Massachusetts Correctional Institute-Framingham- Framingham, Massachusetts (7/07- 9/10) Supervise multidisciplinary team of social workers, psychologist, and psychiatrists who provide counseling and crisis intervention services to incarcerated women. Collaborate with correctional and medical personnel in developing treatment plans for women to assist in their ability to manage the penal environment and make recommendations in respect to disciplinary issues. Serve as the Chief Psychologist for Department of Corrections/MHM system-wide psychologists. On-call for after hours crisis intervention for medical and security personnel. Provide individual, group psychotherapy and crisis intervention serves to incarcerated women.

***Staff Psychologist-*** UMASS Correctional Health- Massachusetts Correctional Institute- Framingham – Framingham, Massachusetts (9/02 – 2/06, 11/06 – 7/07) Serve as designated back-up for mental health director in periods of absence, provide on-site and off-site coverage. Provide treatment planning, individual and group psychotherapy to incarcerated women who are awaiting trial or sentenced for a wide variety of misdemeanor and felony convictions. Treatment typically addresses adjustment issues, trauma history, substance abuse, domestic violence and family discord. Additional responsibilities include conducting intake evaluations, psychological testing, and assessing the mental health status of women housed in segregation. Provide crisis counseling and assess and monitor women who are acutely at risk of harm to themselves or others. Supervise UMASS pre-doctoral clinical psychology interns. Attend and participate in daily triage meetings, educate and consult with corrections staff as indicated. Served as the mental health liaison for the Prison Pup Partnership program, which involves selection of inmates and ongoing evaluation of fitness to serve as a handler, as well as facilitating team-building activities. Developed and co-facilitated intern seminar for master's level interns on various clinical issues. Created administrative forms to facilitate communication between court personnel and prison mental health staff; to document group treatment; to assist with crisis assessment; and to aid in compliance of documentation of clinical issues for quarterly audits. Created and maintained monthly award for clinical excellence for mental health staff. Coordinate monthly crisis coverage schedule. Facilitate monthly staff meeting and quarterly full-day staff seminar. Maintain security of psychological testing materials and assign cases to peers. Developed and facilitate case conferences for challenging clinical cases. Serve as the mental health representative for the institution's training committee and provide weekly training to correctional officers regarding mental health issues. Organized fund raiser for institutional staff, collected and donated money to victims of the 2004 Tsunami.

***Independent Contractor*** – MHM/Forensic Health Services, Worcester County (5/06 – present). Conduct pre-arraignment evaluations pursuant to M.G.L. Chapter 123, Section 18(a). Evaluations are conducted after-hours on an on-call basis for detainees deemed to be experiencing a psychiatric emergency.

***Independent Contractor*** – University of Massachusetts Medical School (10/1/06 – 11/29/06) – Conduct psychological testing at Souza Baranowski Correctional Center, a maximum security penal institution for men.

***Forensic Psychologist*** – Center for Health and Development, Fitchburg District Court Clinic – Fitchburg, Massachusetts (2/06 – 11/06) Conduct court-ordered forensic evaluations for central Massachusetts courts. Evaluations include involuntary commitment for psychiatric treatment, commitment for substance abuse, aid-in-sentencing, competency to stand trial and criminal responsibility.

***Psychology Intern-*** University of Massachusetts Medical School/Worcester State Hospital – Worcester, Massachusetts (9/01- 8/02) Attended seminars on Neuropsychology, Substance Abuse, Malingering, and Psychopharmacology. Attended Law and Psychiatry Rounds and Grand Rounds. Rotations included: Child Family Forensic Center, Outpatient Psychiatry Service-Anger Management Program, Community Healthlink – Homeless Outreach Assistance Program, and Bridgewater State Hospital – Maximum Security Unit. Supervised by: Jack Terry, Ph.D., Bill Warnken, Psy.D., ABPP, Anne Johnson, Ph.D., David Holtzen, Ph.D, Linda Cavallero, Ph.D., Gerri Fuhrman, Ph.D., Gregg Januszewski Psy.D., and Alan Rosenbaum, Ph.D .

Bridgewater State Hospital – Maximum Security Unit – As a member of the multidisciplinary treatment team, provided therapeutic services to patients.  Co-facilitated a unit based violence prevention group and provided individual therapy to patients diagnoses included Schizophrenia, Bipolar Disorder,  Borderline Personality Disorder, and Mood Disorder NOS.   Evaluated a patient diagnosed with Bipolar Disorder and Borderline Personality Disorder for recommitment and wrote the recommitment evaluation.  Conducted psychological testing with patients and communicated results to treatment team.

 Massachusetts Correctional Institute-Framingham – Served as a Primary Care Clinician for female inmates, designed treatment plans, and provided weekly therapy.  Diagnoses included Major Depression, Borderline Personality Disorder, ands Post-Traumatic Stress Disorder.  Conducted psychological testing with inmates and communicated results to referral source.

Child Family Forensic Center – Conducted psychological evaluations with families referred by the Worcester Probate and Family Court.  Assessed inter-parental conflict, domestic violence, substance abuse, and mental health history and made visitation and custody recommendations. Evaluation included an interview with both parents and children and collateral contacts as deemed appropriate.  Appointed and served as a Guardian ad Litem to determine the best interests of the child.  Evaluation included numerous interviews of both parents and child, review of collateral records, and collateral contacts.

Outpatient Psychiatry Service – Anger Management Program – Conducted intakes for anger management program. Co-facilitated a men's anger management group and women's anger management group.  Many of the group members were involved in domestic violence and are referred by the Worcester District Court.

Community Healthlink – Homeless Outreach Assistance  Program  - Conducted psychological testing with  homeless clients as referred by the treatment team.  Communicate results to the treatment team.

***Psychology Trainee*** – Public Defender's Office, Broward County Courthouse – Fort Lauderdale, Florida (8/99-9/00). Conducted full battery psychological evaluations with inmates with violent felony charges. Communicated results to attorneys and peers during case conference.  In addition, assisted with competency and sanity evaluations and conducted an evaluation to determine competency to stand trial with an individual with a felony charge.   Rotated through:  Broward County Main Jail, Broward County Mental Health Court, Juvenile Detention Center, and Crisis Street Stabilization Unit. Supervisors:  Lenore Walker, Ed.D. ABPP, David Shapiro, Ph.D., Hilda Besner, Ph.D., Michael Brannon, Psy.D., and Ross Seligson, Ph.D.

Broward County Main Jail- Evaluated approximately 134 detainees arrested for misdemeanor charges to assess for the presence of mental illness.  Detainees willing to seek mental health treatment were qualified for Mental Health Court.  Made recommendations through consultation with Public Defender and testified as necessary.  Qualified as an expert by magistrate on duty.

Broward County Mental Health Court- Court specializes in mental health treatment for individuals that committed misdemeanor offenses.  Conducted approximately 107 brief psychological assessments with detainee's including evaluation of competency to proceed, risk assessment,

mental status, psychosocial history, treatment compliance, and treatment and placement needs. Made recommendations to the Public Defender and provided testimony as needed to Honorable Judge Ginger Lerner-Wren. Qualified to as an expert to provide testimony.

Juvenile Detention Center- Evaluated approximately 29 female adolescents for competency to proceed and a wide range of factors including educational needs, previous delinquent behavior, medical concerns, mental health history, family issues, and history of abuse.  Juveniles ranged from 12-17 years of age, representing a wide range of ethnic and cultural backgrounds. Recommendations provided to Public Defender and Legal Aid attorney assisting the adolescents with civil and legal needs.

Crisis Street Stabilization Unit- Facility is an inpatient psychiatric hospital, primarily providing services for indigent patients.  Conducted approximately 38 risk assessment evaluations with involuntarily hospitalized patients.  Assessment of ability to care for self and potential for harm to self or others, despite a wide range of psychotic diagnoses, mood disorders, and dual diagnosis issues, was of primary concern.  Made dangerousness recommendations to the Public Defender.

***Psychology Trainee -*** Nova Community Clinic for Older Adults (NCCOA), Nova Southeastern University Community Mental Health Center - Fort Lauderdale, Florida (6/98-4/99). NCCOA is a specialty clinic within the Community Mental Health Center that serves clients ages 55 and older. Provided outpatient cognitive-behavioral individual and group psychotherapy, targeting symptoms of depression and anxiety disorders. Duties consisted of treatment planning,  medical record, weekly supervision, case presentations, crisis intervention, case presentations, and attending a bi-monthly Cognitive-Behavioral Seminar. Intake evaluations included administration and interpretation of the Structured Clinical Interview for DSM- IV, Mini-Mental Status Exam, Beck Anxiety Inventory, Geriatric Depression Scale, Wolpe Lazarus Assertiveness Scale, and selected subtests from the Wechsler Adult Intelligence Scale-Revised and Wechsler Memory Scale-Revised.  Supervisor, William Kelleher, Ph.D.

***Forensic Psychology Assistant*** - The Institute for Behavioral Sciences and the Law - Plantation, Florida (9/00-12/00). This is a private practice that provides both clinical and forensic evaluations. Assisted with psychological evaluations (WAIS-III Rorschach, MMPI-II MCMI-III) and conducted clinical interviews with detainee's pending trial for competency, downward departure, and substance abuse evaluations.  Supervisor, Michael Brannon, Psy.D.

***Therapist*** - Broward Partnership for the Homeless Incorporated - Fort Lauderdale, Florida (7/99-6/01). Broward County funded position for one Nova Southeastern student to provide on-site psychological evaluations, crisis intervention, and outpatient therapy, with adults, children, and families residing at the shelter. Group psychotherapy was also conducted in a psycho-educational format focusing on goal achievement and parenting skills. Individuals have presented with a variety of Axis I and Axis II disorders including depression, anxiety, suicidal behavior, bipolar disorder, psychotic disorders, social skills deficits, and substance abuse. Other duties consisted of documentation in medical record, weekly supervision, treatment planning, consultation with Case

Management staff and facilitating educational seminars with Residential Coordinator staff. Supervisor, Ana Martinez, Psy.D.

**Therapist** - Brown Schools of Florida at Sunrise - Weston, Florida (8/99-12/99). Program is a residential treatment facility for emotionally disturbed adolescents. Provided group psychotherapy several times a week and conducted psychosocial evaluations. Other duties included treatment planning, documentation, crisis intervention, and consultation with the clinical team. Supervisor, Andrew Cutler, M.S.W.

**Psychological Consultant -** Family Assessment Center, The Brown Schools of Florida - Fort Lauderdale, Florida (2/99-5/99). Program is an emergency shelter that houses children and adolescents that have been detained by the Department of Children and Families.  Conducted mental health screenings and psychological evaluations to assess the child's mental health and made placement recommendations to the Broward County Court System and Department of Children and Families.  Provided crisis intervention.  Supervisor, Michael Brannon, Psy.D.

**Mental Health Consultant** - M.E. Chiles Program, Nova Southeastern University Community Mental Health Center - Fort Lauderdale, Florida (6/98-12/98). Conducted mental health evaluations at foster homes with children and adolescents detained by the Department of Children and Families. Provided individual psychotherapy with foster children and a court-ordered parent. Duties consisted of assessing the child's mental health  and making placement recommendations to the Broward County Court System and Department of Children and Families. Supervisor, Mary Centrone, Psy.D.

**Recreational Therapist** - Alzheimer's Resource Center of Connecticut - Southington, Connecticut (1/97-3/97). Facility provides psychological, medical, housing and recreational services to residents diagnosed with Alzheimer's Disease. Facilitated recreational activities with residents including arts and crafts, music therapy, reminisce, nature walks, exercise, and fine dining on a one-on-one or group basis to stimulate their senses and improve their quality of life.

**Certified Hospice Volunteer** - Catskills Area Hospice - Oneonta, New York (3/96- 12/96). Participated in training that focused on death and dying with the terminally ill and ways to provide support for family members. Co-facilitated a children's bereavement group.

**Pre-School Teacher** -Young Men's Christian Academy - Southington, Connecticut (Summers of 1995, 1996). Acted as a Pre-School teacher for children ages 3-5. Designed lesson plans appropriate to the children's level of development focusing on safety and awareness, outer space, and the human body. Implemented lesson plan providing education on the human body. Supervised children's activities and intervened as necessary, at times utilizing behavior modification.

---

## Supervisory Experience

***Co-Assistant Director of Psychology Intern Training*** – University of Massachusetts Medical School/ Worcester State Hospital- Worcester, Massachusetts (8/06- 8/07). Program is an American Psychological Association approved training site for pre-doctoral psychology interns. Participate in weekly group supervision, provide individual supervision, assist in the selection of interns, coordinate didactic seminars. Coordinate and develop year-long, weekly didactic seminars.

***Coordinator*** - Nova Community Clinic for Older Adults, Nova Southeastern University Community Mental Health Center - Fort Lauderdale, Florida (6/99- 6/01). Duties included orienting and training first and second year practicum students and serving as a liaison between students, Clinic Director, and the department of Quality Improvement. Co-facilitated bi-monthly staff meetings, conducted chart reviews on student's caseloads to assure compliance with clinic, Medicaid, and Medicare guidelines and screened new clients for intake and assigned to an appropriate student. In addition, monitored students' assessment data to confirm consistency between assessment data and diagnosis. Updated assessment package in collaboration with a graduate assistant, supervisor, and Charles Golden, Ph.D. Also trained students on administration, scoring, and interpretation of assessment packet. Supervisor, William Kelleher, Ph.D.

***Lead Peer Interviewer*** - Nova Southeastern University - Fort Lauderdale, Florida (March 2001, March 2000). Interviewed clinical psychology doctoral applicants to determine appropriateness for program and made recommendations to selection committee as to their suitability.

***Peer Interviewer***- Nova Southeastern University - Fort Lauderdale, Florida (April 1999). Interviewed clinical psychology doctoral applicants to determine appropriateness for program and made recommendations to selection committee as to their suitability.

---

# Presentations

A Forensically-Informed Model for Providing Mental Health Consultations to the Disciplinary Process: National Commission on Correctional Health Care, Las Vegas, Nevada, July 10, 2011. Co-presenter with Stephen DeLisi, PhD.

Self-Harm Behavior and the Female Offender: Minimizing the Risks: National Commission on Correctional Health Care, Phoenix, Arizona, May 24, 2011. Lead presenter with Joel T. Andrade, LICSW, PhD.

Suicide and Self-Harm Risk Assessment within Correctional Settings: Avoiding Common Pitfalls. 4th Annual Academic and Health Policy Conference on Correctional Health, UMASS Medical School , March 10, 2011. Lead presenter with Joel T. Andrade, LICSW, PhD

Vicarious Traumatization in Corrections: Recognition, Response and Prevention: American Correctional Association, San Antonio, Texas, January 30, 2011.

Vicarious Traumatization in Correctional Healthcare: Recognition, Response and Prevention: Educational Luncheon: National Commission on Correctional Health Care, Boston,

Massachusetts. July 11, 2010.

Gender Responsive, Trauma Informed Services for Female Offenders: Bridging Research and Practice: 3rd Annual Academic and Health Policy Conference on Correctional Health, UMASS Medical School/Nova Southeastern University, Fort Lauderdale, FL. December 3, 2009. Co-presenter with Judith Willison, LICSW.

PREA Standards: Considerations Unique to Female Offenders: Blending New Challenges with Emerging Ideas, 13th National Workshop on Adult and Juvenile Female Offenders, Jackson, MS. October 10, 2009. Co-presenter with Sharen Barboza, PhD., and Judith Willison LICSW.

Group Treatment for Newly Incarcerated Women: Managing Sleep Disturbance, Anxiety and Depression: National Commission on Correctional Health Care, Chicago, Illinois. October 22, 2008. Lead presenter with Morgan McGinty, MSW.

Gender Responsive Services for Girls and Women in the Justice System: Forensic Health Services, UMASS Boston. May 6, 2008.

Gender Responsive Training: New Mexico State University, Grants, New Mexico. December 17, 2007

Managing the Female Offender: Trends in the Mental Health Evaluation. February 1, 2005.

Identifying Mental Illness and Building Rapport. Presented to the staff at the Broward Partnership for the Homeless Incorporated. October 30, 2000

---

# Research Experience

***Doctoral Directed Study*** (Fall 2000) Detecting feigned cognitive deficits by identifying the presence of intact memory using symptom validity testing. Chairperson, Charlie Golden, Ph.D., ABPP.

***Research Practicum III*** (Fall 2000)  Analyzed data obtained from Juvenile Assessment Questionnaire, to examine contributing factors to delinquent behavior. Supervised by Lenore Walker, Ed.D., ABPP.

***Research Practicum II*** (Summer 2000)  Developed coding program for data obtained from Juvenile Assessment Questionnaire  in collaboration with Al Sellers, Ph.D. and coded data. Supervised by Lenore Walker, Ed.D., ABPP.

***Research Practicum I*** (Winter 2000). Developed Juvenile Assessment Questionnaire to be utilized with female detainees and trained peers in administration of inventory. Supervised by Lenore Walker, Ed.D., ABPP.

***Undergraduate Thesis*** (1995). Left-handedness and dyslexia:  An analysis of the higher frequencies of left-handedness in the dyslexic population.  Chairperson, Lynn Elmore, Ph.D.

***Undergraduate Directed Study*** (1995).  Analyzed the controversies surrounding the inclusion of Self-Defeating Personality Disorder in <u>DSM-III,</u> <u>DSM-III-R,</u> and <u>DSM-IV.</u>  Supervised by Ronald Heyduk, Ph.D.

---

## Publications

Masotta, M.  (2011).  Vicarious Traumatization:  Recognition, Response, and Prevention.  *CorrDocs:  Society of Correctional Physician Newsletter.*  Volume 14, Issue 1. Posted June 15, 2011.

Masotta, M (2011).  Vicarious Traumatization:  A Guide to Recognizing, Responding to, and Preventing a Serious Consequence of Providing Mental Health Care in Jails, Prisons and Community Corrections.  *Corrections and Mental Health:  An Update of the National Institute of Corrections.*  March 11, 2011.

---

## Teaching Experience

***Assistant Professor*** – (8/13-5/15) Framingham State University, Department of Psychology and Philosophy, Framingham, MA.  In this full-time position responsibilities include teaching undergraduate psychology courses (Abnormal Psychology, Social Psychology, Human Relations and Group Dynamics).  Responsibilities also include advising 32 undergraduate psychology majors and serving as a member on the Graduate Committee.

***Visiting Assistant Professor*** **–** Framingham State University, Mental Health Counseling Program, Department of Graduate and Continuing Education, Framingham, MA,

> Orientation to Counseling (Fall 2004- 2011, 2013, 2018, 2021)
> Professional Issues in Mental Health Counseling (Spring 2004 – 2013, 2016)
> Assessment, Diagnosis and Treatment Planning (Summer 2012)
> Theories of Psychotherapy and Counseling (Spring 2011)
> Theories and Methods of Psychological Testing (Summer 2004- 2006, 2015)
> Problems of Substance Abuse (Summer 2009, 2011, 2015, 2020)
> Group Processes in Counseling (Summer 2006- 2010, 2014)
> Counseling Internship I (Fall 2005)
> Understanding Social Science Research (Fall 2003, 2 sections)

***Teaching Assistant*** *– Psychobiology; Nova Southeastern University – Fort Lauderdale, Florida (Winter 2000)*

---

## Awards

Recipient of the National Health Service Corps Loan Repayment Program, 2009
Recipient of Department of Correction; Professional Excellence Contract Health Care Award, 2010
Nominated for Department of Correction; Professional Excellence Contract Health Care Award, 2008
Designated Forensic Psychologist, 2008
Departmental Distinction, Hartwick College, 1996
Cum Laude, Hartwick College, 1996
Dean's List, Hartwick College, 1995-1996
Psi Chi National Honor Society, 1995

**JAMES FRANCIS DEGROOT, PH.D.**
Atlanta, GA 30319
Phone: 770-356-1830
upcjdegroot@gmail.com

## Education

WRIGHT STATE UNIVERSITY, DAYTON, OHIO
Psychology Postdoctoral Program 1983-1985

CATHOLIC UNIVERSITY OF AMERICA, WASHINGTON, D.C.
Doctor of Philosophy 1977-1984

ANTIOCH UNIVERSITY, COLUMBIA, MARYLAND
Master of Arts 1974-1977

CARDINAL STRITCH COLLEGE, MILWAUKEE, WISCONSIN
Bachelor of Arts 1967-1971

## License

Licensed Clinical Psychologist in Georgia, 1986 to Present

## Clinical, Correctional and Forensic Experience: Georgia Department of Corrections

➢ **State-Wide Mental Health Consultant,** January 2020-Present (February 2020)
**Employed as a Part-time Employee by Centurion, a vendor contracted by the Georgia Department of Corrections (GDC)**
Consult with the State-Wide Clinical Director and be a liaison between the State-ide Clinical Director and the State-Wide Mental Health Director, focusing on: programs for mentally ill offenders in Restrictive Housing; programs for mentally ill offenders with Substance Use Disorders; and mental health policies and procedures.

➢ **State-Wide Clinical Director**, 2017-2020
**Employed by Centurion, a vendor contracted by the Georgia Department of Corrections (GDC)**
Centurion is responsible for hiring and delivering mental health services to an offender population of approximately 55,000 of whom 11,500 are diagnosed with a mental illness. I directly supervised 18 facility Clinical Directors and 17 staff psychologists, managed 24 facility Mental Health Administrative Directors, collaborated with the Centurion Regional Medical Director (a psychiatrist), oversee 250+ mental healthcare providers, and helped coordinate

operations with the leadership of Georgia Department of Corrections in order to deliver quality and timely mental health services.

➢ **State-Wide Mental Health Director,** 1994-2017
   **Employed by the State, Georgia Department of Corrections (GDC)**
   Responsible for the delivery of mental health services to inmates and detainees who were diagnosed with a mental illness. I spent much of the fist 10 years working on civil rights litigation with experts and attorneys on two certified class action complaints (Guthrie v Evans and Cason v Seckinger) and on one complaint which was never certified as a class and dropped by plaintiffs after two years, (Fluellen v Wetherington). During that time, we made major revisions to the mental health policies and procedures. The number of offenders receiving mental health services continually grew from 2,000 in 1994 to 11,500 in 2019. The severity, complexity and acuity of mental illness also increased. Consequently, I worked closely with GDC leadership and attorneys from the Attorney General's Office on a myriad of issues to include restrictive housing, implementation of the Prison Rape Elimination Act (PREA), transgender offenders, suicides, drugs, and gangs.

➢ **Staff Psychologist at GA's Maximum-Security Prison,** 2988-1994
   **Employed by the State as a part-time employee**
   I began working at GA State Prison (GSP) shortly after the tenure of Special Master Vincent Nathan. I was responsible for implementing of a consent decree resulting from Guthrie v Evans and for updating Judge Anthony Alaimo on the status of GSP's mental health delivery system. I worked closely with Warden A. G. Thomas, Commissioner Alan Ault, Assistant AGs, and the Medical College of GA which was providing psychiatric services. During this time, critical incidents at GSP declined and the consent decree became a model for upcoming major revisions in GDC's MH Policies and Procedures.

## Clinical, Correctional and Forensic Experience: Independent Practice

➢ **Mental Health Expert for the Office of the Special Master in the Ninth Circuit on Coleman v Newsom,** October 2019-Present (October 2020)
   Responsible for monitoring California Department of Correctional Rehabilitation's (CDCR) implementation of court orders and writing reports for the Special Master.

➢ **Mental Health Expert for the Department of Homeland Security (DHS),** 2016-Present (February 2020)

**Subcontracted to work as part of a team investigating OIG mental health complaints from ICE detainees.**

Responsible for investigating both the specific detainee complaints on the delivery of mental health services and the facility's overall mental health compliance with the National Detention Standards, other applicable professional standards, and best practices. The results of the investigation are presented to facility leadership during an out-briefing and a formal report is written by each team member for DHS.

➢ **Independent Forensic Mental Health Evaluator of VA Complaints,** 2013-Present (February 2020)

Conduct a comprehensive mental health assessment on Viet Nam, Iraqi, and Afghanistan veterans complaining of combat related PTSD and TBI. The evaluation consists of reviewing the veteran's medical and military records, interviewing both collateral informants and the veteran, and administering psychological tests. The results are discussed with a team of attorneys who are Emory University fellows from the Emory Veteran's Clinic, and supervising attorneys from King & Spalding and/or from Ogletree, Deakins, Nash, Smoak & Stewart. A formal report is written for a VA hearing.

➢ **Contracted with the Dept. of Labor as an Independent Forensic Mental Health Evaluator,** 2008-Present (February 2020)

Evaluate individuals who filed disability claims with the Social Security Administration. The claimants are interviewed, psychological tests are usually administered, collateral informants are interviewed, and collateral documents are reviewed. Formal reports are written and submitted in a timely manner for an administrative hearing.

➢ **Psychology Consultant and Direct Care Provider for the GA Department of Juvenile Justice**, 2008-2016

Worked part-time, providing: direct care at a number of facilities (Augusta Youth Development Center, Bill Ireland YDC, and Emanuel YDC); consultation with DJJ leadership by performing psychological autopsies on two juveniles who committed suicide; consultation to DJJ HR by performing Fitness-for-Duty evaluations on custody staff; and clinical supervision for direct care providers in the field.

> **Independent Clinical & Forensic Mental Health Evaluator on Miscellaneous Cases,** 1988-2014

Over 26 years, I served as plaintiff and defendant expert on variety of cases. For example, I testified for a number of defendants on deliberate indifference and wrongful death cases in county jails. I also served as an expert witness in adult and juvenile criminal cases, performing competency and responsibility evaluations. I was an expert in one capital punishment case, testifying on behalf of the defendant who was represented by the Southern Center for Human Rights.

In 2010 and 2011 I consulted with The Moss Group as a PREA auditor, participating in PREA audits of ICE facilities managed by Correctional Corporation of America (CCA).

While practicing on St. Simon's Island and in Atlanta, I had contracts with Glynn County School System and with Atlanta City Schools to perform psychological evaluations on students to determine if they qualified for special education services.

Additionally, while teaching at the Medical College of GA, I worked for Richmond County Family Court performing evaluations on families to assist two judges with cases involving custody and termination of parental rights.

## Clinical, Correctional and Forensic Experience: Elected /Appointed Professional Positions

> **International Association for Correctional and Forensic Psychology (IACFP)**
> **At-Large Board Member** and Chair of the Nominating Committee, January 2019-Present (February 2020)
> **Past President** and Chair of the Nominating Committee, January 2017-December 2018
> **President**, January 2015-December 2016
> **President-Elect**, January 2013-December 2014

> **American Board of Correctional Psychology (ABCP)**
> **At-Large Board Member**, January 2018-Present (August 2019)
> Working with the American Board of Professional Psychology (ABPP), the American Psychological Association and other professional associations to create an ABPP subspecialty board certification for Correctional Psychology.

> **National Institute of Corrections, Mental Health Network (NIC)**

**Administrative Committee, Chair**, 2014-2015

**Administrative Committee, Member,** 2011-2014

**Steering Committee, Member,** 2010-2011

**Suicide & Self Injurious Behavior Committee, Chair,**2009-2010

➢ **GA's National Alliance for the Mentally Ill (NAMI)**
**Board Member and Nominating Committee Chair**, 2011-2014

➢ **GA's Crisis Intervention Team (CIT)**
**Advisory Board Member**, 2007-2010
**Steering Committee Member**, 2008-2011

➢ **The Governor's Mental Health Summit**
 **Member**, 2006-2009

➢ **GA's Reentry Impact Program**
**Member**, 2005-2008

➢ **GA's Mental Health Planning & Advisory Council (GMHPAC)**
**Member** 2006-2015

➢ **Association for the Advancement of Behavior Therapy (AABT)**
**Legislative Committee, Chair**, 2000-2003

## ACADEMIC APPOINTMENTS

2007-2013 Member of GA State University Institutional Review Board, Atlanta, GA

1990-2016 Clinical Professor of Psychiatry, the Medical College of Georgia, Augusta, GA

1987-1990 Assistant Professor of Psychiatry, the Medical College of Georgia, Augusta, GA

1986-1988 Clinical Faculty, Psychiatry Residence & Child Psychiatry Fellowship at Eisenhower Army Medical
        Center, Fort Gordon, GA

1986-1988 Clinical Psychology Internship at Eisenhower Army Medical Center, Fort Gordon, GA.

1981-1983 Clinical Faculty for the General Psychiatry Residence and Child Psychiatry Fellowship at Letterman Army Medical Center, San Francisco, California.

1978-1979  Psychology Instructor, Prince's George's Community College, Largo, Maryland

1977-1979  Teaching Assistant, Catholic University of American, Washington, D.C.

# Military Service

➢ **Duties**

I served as a Captain in the US Army. I worked as a clinical psychologist at Eisenhower Army Medical Center (Fort Gordon, Georgia) and at Letterman Army Medical Center (Presidio in San Francisco, CA). During both tours of duty, I provided direct care to active duty service members and their dependents and I clinically supervised psychology practicum students, psychology interns, and child-adolescent psychiatry fellows.

➢ **MILITARY EDUCATION**

1987 Command and General Staff College, Correspondence
1986 Officer Advanced Courses at the Academy of Health Sciences, San Antonio, Texas
1981 Officer Basic Course at the Academy of Health Sciences, San Antonio, Texas

➢ **MILITARY AWARDS**

1986        Army Commendation Medal
1981 Army Commendation Medal

## PROFESSIONAL PRESENTATIONS

**1994-Current**

As the current State-wide Clinical Director and previous Mental Health Director for Georgia Department of Corrections, between 1994 and 2019 I've presented papers at state, national and international professional meetings and universities at least every few months.  I also testified in numerous hearings to include a PREA Commission Hearing while they were writing the Prison Rape Elimination Act of 2003 and a NIC Advisory Board Public Hearing entitled "Balancing Fiscal Challenges, Performance-Based Budgeting and Public Safety". Details for any of the above will be provided upon request.

**NATIONAL**

June 1995        "What's Love Got to Do With It?  The Dynamics of Family Violence and Its Implications for the Criminal Justice and Mental Health Systems," (with Annette Z. Henderson).  Presented at the Fifth Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri.

August 1994        "When Staff Burn Out, Students Follow: The Mental Health Consultant's Role in Attenuating Staff's Stress through Consultation and Training." Presented at Job Corps Annual Meeting for Mental Health Consultants in Los Angeles, California.

May 1994        "The Inevitability of the Mental Health Professional Being Sued by Inmates,"(with Margaret Severson).  Presented at the Fourth Annual

|  |  |
|---|---|
|  | Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
| March 1994 | "An Update on the Georgia Prison Study," (with A.R. Bruhn and K. Feigenbaum).  Presented at the Society of Personality Assessment's Mid-Winter Meeting in Chicago, Illinois. |
| May 1993 | "Identification of Unsolved Issues with the Early Memory Procedures: Assessing Violence Potential."  Presented at the Third Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
| March 1993 | "Predicting Aggression Potential with the Early Memory Procedure: The Georgia Prison Study," (with A.R. Bruhn and K. Feigenbaum).  Presented at the Society of Personality Assessment's Mid-Winter Meeting in San Francisco, California. |
| May 1992 | "Hurdles in the Implementation of Treatment Programs in Correctional Settings: A Constructivist's Ruminations from a Maximum Security Prison," (with Joe Owens and Janice Deal).  Presented at the Second Annual Midwestern Mental Health in Corrections Symposium in Kansas City, Missouri. |
| March 1992 | "Identifying and Treating the Basis for Delinquent Behavior via Early Memories."  Presented at the Society of Personality Assessment's Mid-winter meeting in Washington, D.C. |
| August 1989 | Effects of Abuse on Perspective-Talking Skills in Children," (with Fred Garland as primary, Linda Christiansen and Anthony Zold).  Presented at the American Psychological Association's Annual Convention in New Orleans, Louisiana. |
| August 1989 | "The World According to a Distressed Truck Driver: Constructivist Perspectives," (with Fred Garland).  Presented at the American Psychological Association's Annual Convention in New Orleans, Louisiana. |
| March 1989 | "The Rorschach As a Measure of Behavior."  Presented to graduate students and faculty at Stanford University in Palo Alto, California. |
| February 1989 | "Continuity-Discontinuing in Child-Adult Psychopathology: A Structural-Developmental Perspective," (with Stephen N. Xenakis).  Presented at the AMEDD Clinical Psychology Short Course, sponsored by the Office of the Surgeon General and held in Augusta, Georgia. |
| October 1988 | "Clinical Consideration in Using Parent-Child Rating Scales," (with P.S. Jensen and S.N. Xenakis).  Presented at the 35th Annual Meeting of the American Academy of Child and Adolescent Psychiatry held in Seattle, Washington. |
| October 1988 | "Parents at Risk: An Epidemiological Investigation," (with P.S. Jenson and L.J. Bloedan).  Presented at the World Psychiatric Association Regional Symposium held in Washington, D.C. |

August 1988 — "Children at Risk: Psychopathology Correlates in Clinical and Community Samples," (with L.J. Bloedan and P.S. Jensen). Presented at the annual meeting of the American Psychological Association held in Atlanta, Georgia.

May 1988 — "Concept of Self in ADD Children: An Application of Piaget and Projective Testing." Presented as part of a symposium entitled "ADD: Psychosocial Issues in Treatment and Research." Presented at the 41st Annual Meeting of the American Psychiatric Association held in Montreal, Canada.

May 1988 — "Contributions and Limitations of Projective Tests in the Diagnosis and Treatment of ADHA." Paper presented to Seoul National Psychiatric Institute in Seoul, Korea.

October 1987 — "Interrater Agreement Vis-a-Vis Child Behavior Problems: Research Issues, New Evidence, and Future Direction," (with P.S. Jensen). Presented at the Annual Meeting of the American Academy of Child and Adolescent Psychiatry, Washington, D.C.

March 1987 — "A Model of Psychological Interventions for Consultations and Liasion with Medical Clinics," (with R.C. Hulsebus, F.M. Tomayo and R. Sullivan). Presented at the U.S. Army Neuropsychology and Behavioral Medicine Conference, San Francisco, California.

March 1987 — "Relationships Between Parents' Self-Reported Symptoms and Their Perceptions of Their Children's Symptoms: Implications for Using Parent-Child Rating Scales," (with P.S. Jenson and S.N. Xenakis). Presented at the U.S. Army Neuropsychology and Behavioral Medicine Conference, San Francisco, California.

February 1987 — "A Constructivist-Structural Model of Development with Clinical Implications." Presented at the U.S. Army Child and Family Psychiatry Conference, Honolulu, Hawaii.

## STATE

May 1988 — "The Mind of the Hyperactive Child." Paper presented at a one-ay seminar entitled, "Working with Families: Parenting the Behavior Disorder Child," sponsored by Charter Hospital of Augusta and the Medical College of Georgia; held in August, Georgia.

February 1988 — "Therapeutic Consideration with Military Families. "Presented at the Georgia Psychological Association's Mid-winter Conference, Calloway Gardens, Pine Mountain, Georgia.

February 1988 — "Identifying and Managing Problems in Preschool Children." Presented at Open Door Preschool for the Staff Development in August, Georgia.

October 1987 — "Working with Resistant Families." Presented at one-day continuing education workshop for public school teachers, sponsored by Charter

|  | Hospital of August and the Medical College of Georgia; held in August, Georgia. |
|---|---|
| April 1987 | "Typical and Atypical Development Problems."  Presented to the Mothers' League of Augusta, sponsored by St. Joseph's Hospital in Augusta, Georgia. |
| February 1987 | "Learning Disabilities: A Development-Neuropsychological Perspective." Presented at a one-day continuing education workshop for special education teachers, sponsored by Richmond County Public School and the Medical College of Georgia, August, Georgia. |
| October 1986 | "Developmental Issues and the Foster Child."  Presented to the Foster Parent Associations of Colombia County in Martinez, Georgia. |
| February 1988 | "A Constructivist Approach to Moral Development."  Presented in Psychiatry Grand Rounds, Medical College of Georgia, Augusta, Georgia. |
| December 1987 | "Instruments and Interview: How to Make Them Work."  Presented a the Research Workshop sponsored by Eisenhower Army Medical Center and the Medical College of Georgia, Fort Gordon, Georgia. |
| November 1987 | "A Developmental Model of the Self."  Presented at Psychiatry Grand Rounds, Eisenhower Army Medical Center, Fort Gordon, Georgia. |

## Professional Publications

DeGroot, J.F., (2015). A Roadmap for Providing Psychiatric Services to Incarcerated Veterans: A challenging Subspecialty. In R. L. Trestman et. al. (Ed.), *Correctional Psychiatry* (pp. 310-314). Oxford Press.

DeGroot, J.F." Behavior Therapy in Correctional Settings." The Behavior Therapist, 2003, Vol.26#1.

Jensen, P.S., Xenakis, S.N., Davis, H., and DeGroot, J.F.: "Child Psychopathology Rating Scales and Interrater Agreement:  Child and Family Characteristics." American Academy of Child and Adolescent Psychiatry, 1988, 17:4, p. 451-461

Jensen, P.S., Xenakis, S.N., Davis, H., and DeGroot, J.F.: "Child Psychopathology Rating Scales and Interrater Agreement:  Child and Family Characteristics." American Academy of Child and Adolescent Psychiatry, 1988, 17:4, p. 451-461.

DeGroot, J.F., Hulsebus, R.C. Tamayo, F.M., and Sullivan, R: "A Model of Psychological Interventions for Consultation and Liaison with Medical Clinics." Proceedings of the 1987 AMEDD Clinical Psychology Short Course, 1987, p. 103-112.

DeGroot, J.F., Jensen, P.S., and Xenakis, S.N.: "Relationships Between Parents: Self-Reported Symptoms and Their Perceptions of Their Children's Symptoms:

Implications for Using Parent-Child Scales." <u>Proceeding for the 1987 AMEDD Clinical Psychology Short Course</u>, 1987, p. 153-162.


DeGroot, J.F.: "Effects of Person Perception on the Development of Children's Moral Judgment." <u>The Journal of Genetic Psychology</u>, 1982, 141, p. 41-48.

Ross, B. and DeGroot, J.F.: "How Adolescents Combine Probabilities." <u>The Journal of Psychology</u>, 1982, 110, p. 75-90.

# BRIAN JOSEPH MAIN, Psy.D.

## CLINICAL & FORENSIC PSYCHOLOGIST

9655 Granite Ridge Drive • Ste 200 • San Diego, CA 92123
Phone: (619) 316-1466 • e-mail: PsyDocMain@gmail.com
CA License # PSY23222

---

## SPECIALTY AREAS

Forensic Evaluations / Expert Testimony
Clinical Consultation
Risk Assessment & Management
Correctional Psychology
Suicide Prevention
Healthcare Quality Management

Cognitive Behavioral Therapy
Personality Disorders / Malingering
Cultural Diversity/ LGBTQ
Domestic Violence / Sexual Assault
Complex Trauma / PTSD
Substance Abuse / Relapse Prevention

## PROFESSIONAL EXPERIENCE

**FEDERAL COURT APPOINTED EXPERT - CORRECTIONAL MENTAL HEALTH –** California                                                             10/2019 –Present
*Federal Court Expert in Class Action Lawsuit (Coleman vs Brown et al.)*
- Provide expert consultation to Special Master, Mathew A. Lopes, Esq., and his team.
- Monitor the mental health care provided in the California Department of Corrections and Rehabilitation (CDCR) and Department of State Hospitals (DSH), including suicide prevention practices, inpatient and outpatient treatment, and quality management
- Serve as part of an interdisciplinary team with a common goal of ensuring identified class members receive constitutionally adequate mental health care within CDCR and DSH


**FORENSIC HEALTH SERVICES** (MHM) – Massachusetts                      01/2016 – 5/2019
*Forensic Psychologist*
- Conduct court ordered forensic evaluations for district and superior courts: Competency to Stand Trial; Criminal Responsibility; Civil Commitments, Aid in Sentencing, etc.
- Testify as an Expert Witness
- Provide consultation to judges, attorneys, probation officers/law enforcement
- Facilitate psychoeducation to court personnel and members of the community

**CALIFORNIA DEPARTMENT OF CORRECTIONS - RICHARD J. DONOVAN CORRECTIONAL FACILITY -** San Diego, CA                           06/2014 – 12/2015
*Chief Psychologist*
- Provide management/oversight for one of the largest correctional mental health programs in California with inpatient/outpatient programs for offenders with high acuity mental illness, intellectual disabilities, high risk medical issues, end of life care, high risk suicide/self-harm, transgender support needs, protective custody, and segregation

- Collaborate with correctional healthcare and custody staff to ensure compliance with evidence based and court ordered treatment mandates
- Participate in the recruitment and retention of correctional health care staff
- Participate in quality management efforts and chair various committees
- Develop, implement, and refine programs and healthcare policies and procedures
- Implement progressive discipline measures for staff accountability and patient safety
- Provide consultation to other state and county facilities regarding best practices for treatment and offender management

## DEPARTMENT OF STATE HOSPITALS - Sacramento, CA                    12/2013 – 06/2014
*Consulting Forensic Psychologist*
- Conducted evaluations of individuals referred as potentially Mentally Disordered Offenders and Sexually Violent Predators (SVP)
- Conducted in depth forensic reports based on forensic interview, testing, and chart review
- Testify at Sexually Violent Predator & Mentally Disordered Offender hearings
- Quality reviews of forensic evaluations authored by other evaluators for quality assurance
- Conducted risk assessments for Sexually Violent Predators/ Mentally Disordered Offenders

## RICHARD J. DONOVAN CORRECTIONAL FACILITY - San Diego, CA      8/2011 – 12/2013
*Senior Psychologist Specialist; Inpatient Unit Clinical Director; Suicide Prevention and Response Coordinator*
- Served as the mental health clinical director of  a 14 bed inpatient psychiatric unit
- Developed, implemented, and provided oversight of mental health policies and procedures
- Facilitated trainings for various healthcare disciplines and custody staff on emergency response and suicide prevention
- Quality management through extensive healthcare record reviews, staff training, and development/implementation of quality improvement plans
- Developed and chaired multidisciplinary clinical case conferences for high risk patients
- Developed tools for tracking inmate suicide/self-injury risk, high utilization of inpatient services, and hospital transfers
- Interviewed and hired contract mental health staff

## NORTH KERN STATE PRISON - Delano, CA                    5/2009 – 8/2011
*Clinical Psychologist; Chief of Mental Health*
- Management and oversight for all mental health programs in the institution
- Developed, implemented, and provided oversight of mental health policies and procedures
- Ensured compliance with court mandates and best practices for mental health services
- Maintained appropriate staffing through effective recruitment and retention efforts
- Provided ongoing training and progressive discipline to all mental health staff as needed
- Diagnostic screening of mental illness and developmental disabilities
- Psychological Assessment and intervention for inmates with rape and exhibitionism offenses during incarceration
- Emergency "on-call" crisis intervention and suicide risk assessment
- Psycho-education and process groups with chronically and severely mentally disordered offenders, including intellectually disables inmates
- Long-term weekly individual treatment for mainline "lifer" inmates

- ▪ Facilitate weekly individual/group supervision for pre-licensed clinicians accruing their post-doctoral hours

**SHARPER FUTURE -** San Diego, CA                                    8/2005 – 10/2007; 11/2008 – 5/2009
*Psychologist-Court Mandated Offender Evaluator and Treatment Provider*
- ▪ Group and individual therapy sessions with a diverse group of adult *male and female* perpetrators of sexual assault, including *developmentally delayed* offenders
- ▪ Psychological assessments for the courts/probation/parole departments for the purpose of diagnosis, treatment planning, and recommendations for managing offenders' risk in the community.
- ▪ Psychological testing: Static-99, Abel (measure of sexual interest), SONAR, MCMI-III, MMPI-II, K-BIT, HCL-R, and other measures as needed
- ▪ Psychoeducation on topics of healthy sexuality, interpersonal skills, relapse prevention, victim empathy, self-esteem, criminal thinking, and emotion regulation
- ▪ Psychological Assessment of parents for the Child Welfare Department
- ▪ Group/individual psychotherapy for dually diagnosed federal probationers and parolees
- ▪ Initiate and maintain ongoing communication with persons responsible for the supervision of offenders in the community to enhance public safety

**James Reavis, Psy.D. - Psychological Corporation -** San Diego, CA             11/2007 – 11/2008
*Sex Offender Treatment Provider and Evaluator*
- ▪ In depth forensic evaluations on pre-adjudicated and adjudicated sexual offenders
- ▪ Facilitate psychodynamic group and individual psychotherapy with adult male and female perpetrators of sexual assault
- ▪ Psychoeducation on topics of healthy sexuality, interpersonal skills, relapse prevention, victim empathy, criminal thinking, emotion regulation, and self-care
- ▪ Administer and score a variety of psychological tests including Cognistat, AASI- Screening Measure of Sexual Interest, SONAR, MCMI-III, HCL-R, and Static-99
- ▪ Adhere to the "Containment Model" for risk management (e.g. open communication with the County Probation Department regarding changes in offenders' risk for recidivism)

**D. Wexler, Ph.D. - Relationship Training Institute (RTI) -** San Diego, CA        6/2007 – 6/2008
*Domestic Violence Offender Treatment Provider*
*Individual/Couples/Family Therapy Provider*
- ▪ Group and individual psychotherapy with court mandated male and female *perpetrators* of intimate partner violence (CBT-Relapse Prevention and Interpersonal Therapy methods)
- ▪ Group psychotherapy targeting the impact of substance abuse and other risk factors on parenting and intimate relationships
- ▪ Individual counseling to *victims* of intimate partner violence
- ▪ Assessment and treatment for *children* who have been exposed to intimate partner/family violence
- ▪ Interpret and synthesize data from psychological testing to identify, classify, and develop treatment plans for a range of psychological disorders
- ▪ Provide treatment to community based referrals in San Diego County

**Ellen G. Stein, Ph.D. - Clinical and Forensic Psychology -** San Diego, CA      9/2006 – 4/2008
*Private Practice Clinician* - Psychological Assistant to Ellen G. Stein, Ph.D.

- Individuals, couples, and group short-term and long-term psychotherapy
- Targets in treatment: chemical dependency, PTSD, anxiety and mood disorders, LGBT, sexuality, trauma, personal growth, and phase of life problems
- Routine Assessment of clients and administration of psychological testing for diagnostic and treatment purposes

**Community Research Foundation -** San Diego, CA                    6/2004 – 10/2005
*Psychosocial Rehabilitation Specialist* – Residential Inpatient Facility
- Group and individual brief therapy to homeless and mentally ill patients in acute crisis
- Treatment targets: substance abuse, emotion regulation, activities of daily living, coping and interpersonal skills, and emotion regulation
- Psychological testing for diagnostic and treatment purposes using the MCMI-III and MMPI-II
- Ongoing assessment and monitoring of indicators for suicidality, homicidality, and grave disability

**EDUCATION – APA ACCREDITED UNIVERSITY FOR MASTERS AND DOCTORATE**
*California School of Professional Psychology/Alliant University*-San Diego, CA  8/2005 - 5/2008
Psy.D. in Clinical Psychology, *Forensic Emphasis,* GPA: 3.8

*California School of Professional Psychology/Alliant University*-San Diego, CA  9/2003 – 5/2005
M.A. in Psychology, GPA: 3.8

*California State University, Long Beach*-Long Beach, CA               1/2002 – 5/2003
B.A. in Psychology, *Magna Cum Laude,* GPA: 3.9

**REFERENCES AVAILABLE UPON REQUEST**

# APPENDIX D

## <u>ACRONYMS AND ABBREVIATIONS</u>

3CMS:    Correctional Clinical Case Management System

AC:     Adjustment Center

ADA:    Americans with Disabilities Act

ADHD:    Attention Deficit Hyperactivity Disorder

ADLs:    Activities of Daily Living

AED:     Automatic External Defibrillator

AHU:    Alternative Housing Unit

AIMS:    Abnormal Involuntary Movement Scale

APP:     Acute Psychiatric Program

ASH:     Atascadero State Hospital

ASP:     Avenal State Prison

ASU:     Administrative Segregation Unit

ATP:     Adenosine Triphosphate

BPH:     Board of Prison Hearing

BVM:     Bag Valve Mask

CAMS:    Collaborative Assessment and Management of Suicidality

CAP:     Corrective Action Plan

CASE:    Clark Adaptive Support Evaluation

CAT:     Chart Audit Tool

| | |
|---|---|
| CBT: | Cognitive Behavioral Therapy |
| CCAT: | Coordinated Clinical Assessment Team |
| CCC: | California Correctional Center |
| CCHCS: | California Correctional Health Care Services |
| CCI: | California Correctional Institution |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| Centinela: | Centinela State Prison |
| CHCF: | California Health Care Facility |
| CIM: | California Institution for Men |
| CIT: | Crisis Intervention Team |
| CIW: | California Institution for Women |
| CMC: | California Men's Colony |
| CME: | Chief Medical Executive |
| CMF: | California Medical Facility |
| CMH: | Chief of Mental Health |
| CONREP: | Conditional Release Program |
| COVID-19: | Coronavirus Disease 2019 |
| CPR: | Cardiopulmonary Resuscitation |
| CQI: | Continuous Quality Improvement |
| CQIT: | Continuous Quality Improvement Tool |

CRC:                California Rehabilitation Center

CSATF:              California Substance Abuse Treatment Facility

CSP/Corcoran:       California State Prison/Corcoran

CSP/LAC:            California State Prison/Los Angeles County

CSP/Sac:            California State Prison/Sacramento

CSP/Solano:         California State Prison/Solano

C-SSRS:             Columbia-Suicide Severity Rating Scale

CT:                 computed tomography

CTC:                Correctional Treatment Center

CTF:                Correctional Training Facility

CVSP:               Chuckawalla Valley State Prison

CYA:                California Youth Authority

DAI:                Division of Adult Institutions

DBT:                Dialectical Behavior Therapy

DCHCS:              Division of Correctional Health Care Services

DDP:                Developmental Disability Program

DEC:                Disability and Effective Communication

DNR:                Do Not Resuscitate

DRC:                Death Review Committee

DSH:                Department of State Hospitals

| | |
|---|---|
| DSM-5: | Diagnostic and Statistical Manual of Mental Disorders – 5th Edition |
| DVI: | Deuel Vocational Institution |
| ECF: | Electronic Case File |
| EHRS: | Electronic Health Records System |
| ETOH: | Ethyl Alcohol |
| EOP: | Enhanced Outpatient Program |
| FIT: | Focused Improvement Team |
| Folsom: | Folsom State Prison |
| FWF: | Folsom Women's Facility |
| GED: | General Educational Development |
| GP: | General Population |
| HDSP: | High Desert State Prison |
| HIV/AIDS: | Human Immunodeficiency Virus/Acquired Immunodeficiency Syndrome |
| HLOC: | Higher Level of Care |
| HQ: | Headquarters |
| HRL: | High Risk List |
| HS: | *Hora Somni*/Hour of Sleep |
| ICC: | Institutional Classification Committee |
| ICE: | Immigration and Customs Enforcement |
| ICF: | Intermediate Care Facility |

| | |
|---|---|
| IDTT: | Interdisciplinary Treatment Team |
| IDST: | Interdisciplinary Support Team |
| IEX: | Indecent Exposure |
| IP: | Inmate Patient |
| IPOC: | Individualized Plan of Care |
| IRU: | Inpatient Review Unit |
| ISP: | Ironwood State Prison |
| ISU: | Investigative Services Unit |
| KOP: | Keep On Person |
| KVSP: | Kern Valley State Prison |
| LOC: | Level of Care |
| LOP: | Local Operating Procedure |
| LRH: | Least Restrictive Housing |
| LSD: | lysergic acid diethylamide |
| LTRH: | Long-Term Restricted Housing |
| MAR: | Medication Administration Record |
| MCSP: | Mule Creek State Prison |
| MDO: | Mentally Disordered Offender |
| MHCB: | Mental Health Crisis Bed |
| MHSDS: | Mental Health Services Delivery System |

| | |
|---|---|
| MHPC: | Mental Health Primary Clinician |
| MHTS: | Mental Health Tracking System |
| MOU: | Memorandum of Understanding |
| NGRI: | Not Guilty by Reason of Insanity |
| NKSP: | North Kern State Prison |
| NOS: | Not Otherwise Specified |
| NPPC: | Nursing Professional Practice Committee |
| OC: | oleoresin capsicum |
| OHU: | Outpatient Housing Unit |
| OIA: | Office of Internal Affairs |
| OLA: | Office of Legal Affairs |
| PAD: | Personal Alarm Device |
| PBSP: | Pelican Bay State Prison |
| PBST: | Positive Behavioral Support Team |
| PC: | California Penal Code |
| PIA: | Prison Industries Authority |
| PIP: | Psychiatric Inpatient Program |
| PIWP: | Performance Improvement Work Plan |
| POLST: | Physician Orders for Life Sustaining Treatment |
| POR: | Probation Officer Report |

PPE:                    Personal Protective Equipment

PPF:                    Progressive Programming Facility

PREA:                   Prison Rape Elimination Act

PRN:                    *pro re nata* (when necessary)

PSH:                    Patton State Hospital

PSU:                    Psychiatric Services Unit

PTSD:                   Posttraumatic Stress Disorder

PVSP:                   Pleasant Valley State Prison

QIP:                    Quality Improvement Plan

R&R:                    Receiving and Release

RC:                     Reception Center

RJD:                    Richard J. Donovan Correctional Facility

RVR:                    Rules Violation Report

SCC:                    Sierra Conservation Center

SCR:                    Suicide Case Review

SCRC:                   Suicide Case Review Committee

SCU:                    Supportive Care Unit

SHU:                    Security Housing Unit

SI:                     Suicidal Ideation

SIB:                    Self-Injurious Behavior

SMHP:                   Statewide Mental Health Program

| | |
|---|---|
| SNY: | Sensitive Needs Yard |
| SOMS: | Strategic Offender Management System |
| SPMW: | Suicide Prevention Management Workgroup |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ: | San Quentin State Prison |
| SRASHE: | Suicide Risk Assessment and Self-Harm Evaluation |
| SRE: | Suicide Risk Evaluation |
| SSI: | Supplemental Security Income |
| STG: | Security Threat Group |
| STRH: | Short-Term Restricted Housing |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| TABE: | Test of Adult Basic Education |
| TBI: | Traumatic Brain Injury |
| TCMP: | Transitional Case Management Program |
| TTA: | Triage and Treatment Area |
| UCC: | Unit Classification Committee |
| VA: | Department of Veterans Affairs |
| VSP: | Valley State Prison |
| WIC: | California Welfare and Institutions Code |

WSP:                    Wasco State Prison