DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
|---|---|
| Plaintiffs, | **PLAINTIFFS' REPLY TO DEFENDANTS' LESSONS LEARNED FROM THE COVID-19 PANDEMIC [ECF NO. 7196]** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | Judge:   Hon. Kimberly J. Mueller |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

I.    Incarcerated People Experienced Mass Trauma from COVID-19 ............................ 2

II.    Defendants' Takeaway that the Pandemic Correlated with Positive Patient Outcomes Is Misguided and Premature ....................................................... 7

III.    Defendants Should Focus on "Resilience" of the Overall Mental Health System, in Addition to that of Patients ........................................................ 12

IV.    Defendants Should Consider Clustering to Enhance Continuity of Care ............... 13

V.    Use of Telehealth, Patient Outcomes, and Staffing Rates Must Be Even More Closely Monitored Now that Pandemic Restrictions Are Lifting ........................... 15

VI.    The Data Used in Defendants' Report Has Not Been Certified .............................. 22

CONCLUSION ................................................................................................... 25

# INTRODUCTION

If Defendants' *Lessons Learned During the COVID-19 Pandemic* Report (ECF No. 7196, hereafter "Defendants' Report" or "Report") details the full extent of the lessons learned by CDCR's Statewide Mental Health Program during the pandemic, then Defendants learned the wrong lessons. Not only is there little mention of the extreme suffering and loss of life wrought by COVID-19 in California's prisons, but the takeaway that *Coleman* patients remained resilient and required less mental health treatment in light of increased use of telehealth and heavy restrictions on inter-facility movement is misguided and premature. Defendants fail to draw meaningful conclusions about the resilience of the Mental Health Program as a whole, or describe how they will plan for the next emergency. The Report emphasizes literature about the value of continuity of care as if it were a novel concept, but the Court and Special Master have for years urged Defendants to take this issue seriously and cluster the mental health population.

The Report also spotlights Defendants' eagerness to expand telehealth with few limitations. But Defendants do not consider the danger of increased use of telepsychiatry at cell-front and in inpatient levels of care. Indeed, they admit they have no reliable way of assessing patient outcomes on a systemic level due to deficiencies in EHRS that prevent them from distinguishing telepsychiatry from in-person contacts. Nor do Defendants disclose any sort of proposal for a governing policy for psychologists and social workers to work remotely in perpetuity. All told, the Report raises serious concerns about whether Defendants remain committed to the heavily negotiated, court-approved Provisional Telepsychiatry Policy.

Finally, the Report relies heavily on Defendants' flawed data without acknowledging that the Special Master's data certification process is ongoing. Even if the underlying data were accurate (and given the 2019 evidentiary hearing, the Court should not presume that it is), many of the Report's methodologies are flawed or entirely undisclosed.

## I.    Incarcerated People Experienced Mass Trauma from COVID-19

For eighteen months, the pandemic has exacted an excruciating toll on incarcerated people.  Overcrowding, unsanitary conditions, lack of adequate ventilation, and inability to socially distance created a tinderbox for the virus.  *See, e.g.*, Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. Times (Apr. 10, 2021), https://www.nytimes.com/interactive/2021/04/10/us/covid-prison-outbreak.html?smid=url-share; Assembly Budget Subcommittee No. 5 on Public Safety, Feb. 8, 2021 at 1:38:25 *et seq.*, https://www.assembly.ca.gov/media/budget-subcommittee-5-public-safety-20210208/video (quoting *Plata* Receiver as stating, "If the coronavirus were designing its ideal home, it would build a prison").  In CDCR, incarcerated people are infected by COVID-19 at a rate approximately five times higher than both the national and California averages.  *See* Cal. Dep't of Corr. & Rehab., *Population COVID-19 Tracking* (last visited July 19, 2021), https://www.cdcr.ca.gov/covid19/population-status-tracking/.  The death rate for people incarcerated in California prisons (234.3 deaths per 100,000)[1] is also higher than the national rate (185.4 deaths per 100,000).  *See* Johns Hopkins Univ. of Medicine, *Coronavirus Resource Ctr.: Mortality Analysis* (last visited July 16, 2021), https://coronavirus.jhu.edu/data/mortality.

The impact on the *Coleman* class has been even more devastating.  *Coleman* patients are at heightened risk of death and severe complications from COVID-19.  *See* Pls.' Brief Re: Evid. Supporting Serious Mental Illness As Risk Factor For COVID-19, ECF No. 6751 at 4-14 (July 2, 2020) (collecting studies and data showing serious mental illness is a well-established COVID-19 risk factor); Decl. of Don Specter in Supp. of Pls.' Emergency Mot., ECF No. 6559, Ex. B at 17 (Apr. 1, 2020) (showing data, provided by the California Correctional Health Care Services ("CCHCS"), that 49% of CCCMS, 52%

---

[1] The CDCR death rate per 100,000 is calculated from 229 deaths shown on CDCR's COVID-19 tracker, as of July 16, 2021, https://www.cdcr.ca.gov/covid19/population-status-tracking/, and CDCR's population of 97,753 at the approximate chronological midpoint of the pandemic on November 11, 2020, https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/11/Tpop1d201111.pdf.

of EOP, and 46% of patients at higher levels of care had at least one risk factor for adverse outcomes from the virus).  A disproportionate 35% of those who have been hospitalized from complications due to COVID-19 in CDCR were *Coleman* patients.  *See* Fourteenth Jt. Update on Work of COVID-19 Task Force, ECF No. 7152 at 3 (May 7, 2021).  And *Coleman* patients comprise a staggering 39% of those who have died.  *Id.*

Defendants' Report asserts that, "excluding unavoidable restrictions on groups … telehealth has allowed many institutions broadly to maintain Program Guide-equivalent care."  Report at 10;[2] *see also id.* at 52 ("[Mental health] outcomes did not seem to worsen.").  These claims are dangerous and unsupported.  Before the pandemic, *Coleman* patients were not receiving mental health care at constitutionally adequate levels.  *See, e.g.*, Apr. 4, 2020 Order, ECF No. 6574 at 15 (Mueller, J. concurring); Special Master's Amended Report on Current Status of *Coleman* Class Members' Access to Inpatient Care, ECF No. 6579 at 19-30 (Apr. 6, 2020).  Access to mental health care severely diminished during the pandemic.  Use of solitary confinement-like conditions increased, while access to out-of-cell treatment, yard, family visiting, and other activities decreased or ceased altogether.  *See, e.g.*, Twenty-Eighth Round Monitoring Report of the Special Master, ECF No. 7074 at 56, 200, 208 (Mar. 5, 2021); Decl. of Jessica Winter in Supp. of Aug. 21, 2020 Program Guide Departures Update & Jt. Report, ECF No. 6829 at ¶¶ 3, 5-7 & Ex. B (Aug. 21, 2020) (showing patients in CMF's L1 Psychiatric Inpatient Program ("PIP") received zero structured treatment hours for months, and many patients waiting to transfer to higher levels of care often received little or no yard and group time, and lacked access to entertainment appliances).  *Coleman* patients were stuck for months at desert institutions without established mental health programs.  *See, e.g.*, Defs.' Compliance Reports for Transfers of Class Members Out of Desert Institutions, ECF No. 7022 at 2 (Jan. 15, 2021) ("[A]s of the report's January 1, 2021 date, one hundred and twenty-six patients in the Mental Health Services Delivery System remained in the desert institutions in December

---

[2] Page references for e-filed documents (including Defendants' Report) are to the ECF numbers at the top right-hand corner of the page.

1   2020 beyond the fourteen-day transfer timeline.").  Those who were ready to discharge

2   from segregation often languished due to lack of patient movement.  *See, e.g.*, CDCR

3   Monthly Maps, ECF No. 7020 at 26, 38, 57 (Jan. 15, 2021) (showing numerous patients

4   referred to the ICF level of care housed in EOP ASU Hubs or the PSU).  Clinical contacts

5   frequently occurred cell-front, to the extent they occurred at all.  *See* Twenty-Eighth

6   Round Monitoring Report of the Special Master, ECF No. 7074 at 199, 201, 371, 435-37,

7   856, 859, 869, 872 (Mar. 5, 2021); *see also* July 15, 2020 Stip. & Update Addressing

8   Current COVID-19-Related Departures from Program Guide Requirements, ECF No. 6761

9   at Ex. 5 at 105-139 (July 15, 2020) (showing scores of patients listed on the Temporary

10  Mental Health Housing Unit ("TMHU") patient registry receiving non-confidential, cell-

11  front contacts).  Most group therapy ceased system-wide, and is still lagging despite high

12  vaccination rates in the population.  *See* Report at 46 ("[M]ost out-of-cell activities were

13  either halted or were severely restricted."); July 15, 2021 Jt. Report Addressing Current

14  COVID-19-Related Departures from Program Guide Requirements, ECF No. 7237 at 44-

15  45 (July 15, 2021) (describing how, under Defendants' May 28, 2021 COVID-19 Mental

16  Health Delivery of Care Guidance and Tier document, groups may continue to be severely

17  curtailed or not offered at all depending on a program's outbreak status).  The TMHUs,

18  which Defendants developed as alternatives to transferring patients to higher levels of care,

19  "lack[ed] a therapeutic milieu and offer[ed] limited programming, treatment services and

20  multi-disciplinary collaboration."  Twenty-Eighth Round Monitoring Report of the Special

21  Master, ECF No. 7074 at 200 (Mar. 5, 2021).

22          Clinicians were instructed that patients could not transfer to higher levels of mental

23  health care except in "imminent, life-threatening emergenc[ies]."  *See* July 15, 2020

24  Stip. & Update Addressing Current COVID-19-Related Departures from Program Guide

25  Requirements, ECF No. 6761 at 19 (July 15, 2020).  These heavy restrictions on transfers

26  correlated with plummeting inpatient referrals.  *See, e.g.*, July 15, 2021 Jt. Report

27  Addressing Current COVID-19-Related Departures from Program Guide Requirements,

28  ECF No. 7237 at 208 (July 15, 2021) (COVID-19 dashboard providing historical data

comparing 2019 to 2020 showing MHCB, Acute, and ICF referrals for the first three months of 2020 were all higher than the same months in 2019, and then plummeted with the onset of pandemic restrictions to fractions of their 2019 levels for the rest of 2020). Even those patients referred to crisis care saw their referrals rescinded at rates much higher than pre-pandemic. *Id.* (COVID-19 dashboard reporting 2020 rates of rescission well above those of 2019, including rates of 10% or higher one or more days after referral for many 2020 months as compared to essentially 0% in 2019). Given these movement restrictions, the decrease in inpatient referrals is hardly "unexpected," as Defendants claim. *See* Report at 12. Indeed, it follows an established pattern in this case whereby clinicians who have no reasonable expectation that their patients will actually transfer to the higher levels of care they need will not bother to refer them. *See* Decl. Pablo Stewart, M.D., in Supp. of Pls.' Br. on Evid. Hr'g Re: Order to Show Cause Why Empty DMH Beds Cannot Be Filled with CDCR Inmates & in Supp. of Add'l Relief, ECF No. 4055, at ¶¶ 52-115 (Aug. 11, 2011) ("Simply put, clinicians will not bother to refer patients for care they have no likelihood of receiving in a remotely timely fashion."); *see also, e.g.*, *id.* at ¶¶ 42-51. Given that pent up unmet need for higher levels of care pre-dated the pandemic at sufficient levels to trigger the Court to order the forthcoming study, it is alarming that Defendants appear to view the dramatically decreased referrals during the pandemic as a sign the system is working. *See* Oct. 8, 2019 Order, ECF No. 6312 at 5-6 (noting probable need for unmet needs study in 2019); Mar. 25, 2021 Status Conf. Tr., ECF No. 7111 at 49:7-10 (ordering unmet needs study to be conducted as early as this fall).

Defendants' Treatment Offered interactive dashboard, which illustrates in weekly increments the amount of structured treatment offered at each institution and in each level of care, *see* June 15, 2021 Joint Report Addressing Current COVID-19 Related Departures From Program Guide Requirements, ECF No. 7203 at 4-5, shows how few treatment hours have been offered during the pandemic:[3]

---

[3] This chart, showing data as of July 15, 2021 at 5:01 a.m., is copied and pasted from the (footnote continued)



In addition, despite that CDCR's total population decreased during the pandemic, the percentage of the population participating in the statewide Mental Health Services Delivery System ("MHSDS") increased. *See* Report at 43. Defendants' Report shows that the percentage of CDCR's population in the EOP level of care increased by 20% (from 5 to 6%), and the percentage of people at an inpatient level of care increased from 1 to 2%. *Id.*[4] These changes are not "minor," as Defendants assert. Report at 42. Further research is needed to determine whether the population reduction measures instituted during the pandemic contributed to this ongoing trend of the *Coleman* class increasing in concentration vis-a-vis the total CDCR population. *Cf.* Sept. 3, 2020 Order, ECF No. 6846 at 29 ("While the overall prison population has declined, seriously mentally ill inmates

parties' July 15, 2021 Joint Report Addressing Current COVID-19-Related Departures from Program Guide Requirements. *See* ECF No. 7237 at 250. Additional charts attached to that same Joint Report show similarly steep declines in treatment scheduled, treatment attended, PIP treatment hours, and non-clinical out-of-cell activity ("NCAT") for PIP patients. *See id.* at 251-54.

[4] Also, according to Defendants, many people not even enrolled in the MHSDS received "a significant amount of care" during the pandemic, suggesting that the percentage of people struggling with mental health problems in CDCR's population may be even greater than reported. *See* Report at 22.

1  continue to comprise approximately thirty-one percent of the total prison population, and

2  serious questions remain about whether the number of seriously mentally ill inmates

3  exceeds the resources the prison system can bring to the daunting task of providing

4  adequate mental health care in a prison context.")

5  **II.    Defendants' Takeaway that the Pandemic Correlated with Positive Patient**
   **Outcomes Is Misguided and Premature**

6

7          Defendants' Report fails to discuss studies showing how quarantine and isolation

8  seriously and negatively affect mental health, especially for those with preexisting mental

9  illness.[5]  Although the Report acknowledges two studies that found mental health

10 symptoms worsened during COVID-19, *see* Report at 29-30, Defendants bizarrely ignore

11 those findings when the time comes to draw conclusions from the literature they cite.

12 Instead, Defendants prefer to focus on patients' "resilience" and a purported reduction in

13 negative outcomes.  *See, e.g.*, Report at 19-20.  For example, in response to one

14 psychiatrist's report that his patients "were more psychiatrically acute and faring worse in

15 terms of their [mental health]" during the pandemic, Defendants conclude that even if there

16 was a "subset of patients who did fare worse," it was for "unknown reasons."  Report at

17 26.  The lack of discussion about numerous studies finding a major increase in mental

18 health symptoms in the community during the pandemic[6] is perplexing.

19

20 [5] *See, e.g.*, Yunhe Wang et al., *The Impact of Quarantine on Mental Health Status Among General Population in China During the COVID-19 Pandemic*, Molecular Psychiatry

21 (2021) ("[Q]uarantine measures … are associated with increased risk of experiencing mental health burden, especially for vulnerable groups."), https://doi.org/10.1038/s41380-

22 021-01019-v; Balansakar Ganesan et al., *Impact of Coronavirus Disease 2019 (COVID-19) Outbreak Quarantine, Isolation, and Lockdown Policies on Mental Health*

23 *and Suicide*, Front Psychiatry 12 (Apr. 16, 2021) ("In extreme cases, social distancing or social isolation may increase the risk of suicide."),

24 https://dx.doi.org/10.3389%2Ffpsyt.2021.565190; Samantha K. Brooks et al., *The Psychological Impact of Quarantine and How to Reduce It: Rapid Review of the Evidence*,

25 Lancet 395 (10227) P912-920 (Mar. 14, 2020), https://doi.org/10.1016/S0140-6736(20)30460-8 ("Most reviewed studies reported negative psychological effects

26 including post-traumatic stress symptoms, confusion, and anger.").

27 [6] *See, e.g.*, Duncan Thomas et al., *Prevalence, Severity and Distribution of Depression and Anxiety Symptoms Using Observational Data Collected Before and Nine Months Into The*

28 *Pandemic*, The Lancet Regional Health – Americas (July 9, 2021), (footnote continued)

1    Defendants' Report equates reduced mental health referrals and access to treatment

2 during the pandemic with decreased need for mental health services, and then concludes

3 from this faulty premise that patients must have been faring well.  Report at 12-13; *see*

4 *also id.* at 50 ("[A] more stable population marked by less movement occurred during the

5 same time that the population was less distressed in terms of both emotion and behavior.").

6 But in the community, "demand" for all medical services during the pandemic declined,

7 notwithstanding the need for such services.[7]  Hospitals and medical offices cancelled or

8 postponed numerous types of non-emergency care, and many patients were frightened to

9 go to a doctor or the emergency room for fear of catching COVID.[8]

10    Defendants acknowledge that most studies showing decreased mental health visits

11 in the community during the pandemic "may not directly correlate to a lower prevalence of

14 ──────────────────────

15 https://doi.org/10.1016/i.lana.2021.100009: Jiaqi Xiong et al., *Impact of COVID-19 pandemic on mental health in the general population: A systematic review*, J. Affective Disord. 277:55-64 (Dec. 2020), https://doi.org/10.1016/j.jad.2020.08.001; Tibor V. Varga et al., *Loneliness, Worries, Anxiety, and Precautionary Behaviors In Response to the COVID-19 Pandemic: A Longitudinal Analysis of 200,000 Western and Northern Europeans*, Lancet Regional Health - Europe 2:100020 (Mar. 1, 2021), https://doi.org/10.1016/j.lanepe.2020.100020.

18 [7] *See, e.g.*, Kathryn E. Mansfield et al., *Indirect Acute Effects of the COVID-19 Pandemic on Physical and Mental Health in the UK: a Population-Based Study*, Lancet Digital Health (Apr. 1, 2021) ("Primary care contacts for almost all conditions dropped considerably after the introduction of population-wide restrictions."), https://doi.org/10.1016/S2589-7500(21)00017-0; Andrew S. Oseran et al., *Changes In Hospital Admissions for Urgent Conditions During COVID-19 Pandemic*, Am. J. of Managed Care 26(8) (Aug. 2020) (finding admissions rates for acute medical conditions lower during the pandemic, suggesting patients were deferring care), https://www.ajmc.com/view/changes-in-hospital-admissions-for-urgent-conditions-during-covid19-pandemic; Kathleen P. Hartnett et al., *Impact of the COVID-19 Pandemic on Emergency Dep't Visits – United States, Jan. 1, 2019-May 30, 2020*, CDC Morbidity & Mortality Weekly Report 69:699-704 (June 3, 2020) ("[E]mergency department (ED) visits declined 42% during the early COVID-19 pandemic…."), http://dx.doi.org/10.15585/mmwr.mm6923e1.

26 [8] *See, e.g.*, Mohammed J. Abbas et al. *The Early Impact of the COVID-19 Pandemic on Acute Care Mental Health Services,* Psychiatric Services 72:242-246 (2021) ("We speculate that, with the COVID-19 outbreak at the forefront of individuals' concerns, psychiatric patients were more reluctant to seek treatment, following a pattern of behavior seen in other medical fields."), https://ps.psychiatryonline.org/doi/pdf/10.1176/appi.ps.202000467.

1    [mental health] distress." Report at 29.[9]  The Report also notes that many patients reported

2    "concern for their own health and safety, worry about loved ones, and frustration and

3    boredom from decreased recreational opportunities," and "refused to leave their cell due to

4    fear of infection." Report at 26. But this fundamentally contradicts Defendants' "lesson

5    learned" that class members were resilient, and received the care they needed. *See, e.g.*,

6    Report at 19, 52. Data purportedly showing a reduced "demand" for mental health

7    services is more readily explained by the way CDCR reduced the supply of mental health

8    services during the pandemic. The Report does not fully consider additional obvious

9    explanations for why patients saw their clinicians less, including staffing shortages,

10   policies restricting patient movement and treatment opportunities, patients' fear of coming

11   out of their cells, and major outbreaks resulting in quarantine and isolation for extended

12   periods. To say that the mental health care actually delivered by CDCR during the

13   pandemic was sufficient and that "resilience" and "continuity of care" correlated with

14   "better patient outcomes" is wrongheaded and unsupported.

15           Defendants' Report also appears to argue that referred patients did not need to move

16   to higher levels of care for treatment because they experienced sufficiently positive

17   outcomes while being "treated in place" or in the TMHUs. *See* Report at 9-10, 20.

18   Defendants spend time discussing patients who "could be stabilized quickly in the TMHU,

19   [then] discharged back to their previous yards at CCCMS or EOP." Report at 26.

20   However, the Report makes no attempt to meaningfully analyze the outcomes for patients

21   who experienced extreme delays in accessing a higher level of care, or who were denied

22   care altogether. The fact is, delays in necessary inpatient hospitalization cause suffering

23   and harm that may be irreparable. *See* Tr. for Oct. 23, 2020 Evid. Hr'g on Transfers to

24   Inpatient Care, ECF No. 6935 at 258:20-259:13 (Dr. Pablo Stewart's testimony); Stewart

25

26   [9] *See also* Jason M. Nagata et al. *Prevalence and Sociodemographic Correlates of Unmet
     Need for Mental Health Counseling Among Adults During the COVID-19 Pandemic*,
27   Psychiatric Services Online (June 30, 2021) (finding that people in need of mental health
     care were not able to access it during the pandemic),
28   http://dx.doi.org/10.1176/appi.ps.202100111.

1   Decl. Re Defs.' Delayed Transfers to DSH, ECF No. 6948-1 ¶¶ 12-14 (Nov. 13, 2020)

2   (delays of even days in accessing inpatient treatment "causes unnecessary, avoidable, harm

3   and suffering," and can result "in a worse prognosis over the lifetime of the illness").

4   Defendants provide no evidence to the contrary here or otherwise.  Nor is there discussion

5   of the Special Master's finding that "SRASHEs and safety plans were not appropriately

6   completed in multiple TMHUs," and daily clinical contacts "in some cases were conducted

7   in non-confidential settings."  Twenty-Eighth Round Monitoring Report of the Special

8   Master, ECF No. 7074 at 200 (Mar. 5, 2021); *see also* July 14, 2021 Order, ECF No. 7229

9   at 8 (anticipating adoption of the Twenty-Eighth Round Monitoring Report).

10          Defendants also cite reductions in self-harm and suicides in 2020 to support other

11   research and findings "that suggest a reduced need for services during COVID-19."

12   Report at 49.  But the unsourced self-harm data cited in the Report conflicts with data from

13   Defendants' COVID-19 dashboard that incidents of self-injurious behavior, including with

14   intent to die, either remained roughly the same or actually increased in 2020 as compared

15   to 2019, despite significant population reductions in 2020.  *See* Dec. 15, 2020 Jt. Report

16   Addressing Current COVID-19-Related Departures from Program Guide Requirements,

17   ECF No. 6988 at 175 (Dec. 15, 2020).[10]  Although Defendants' Report acknowledges

18   limits in the self-harm data that "may have skewed the results," Report at 49 n.62, it is

19   unclear whether the data they reference is drawn from the same or a different source than

20   the COVID-19 dashboard they filed with the Court on a monthly basis.  Regardless, the

21   data is plainly unreliable, as is all of Defendants' data, which continues to undergo an

22   intensive overhaul under the guidance of the Special Master's data expert in an effort to

23   cure the serious deficiencies uncovered in the wake of Dr. Michael Golding's

24   whistleblower report and the ensuing evidentiary hearing.  *See* Section VI, *infra*.

---

25   [10] This data also shows numbers of completed SRASHEs—even when supplemented with
26   the use of the inferior Columbia Screeners—plummeted in 2020 by upwards of 40 percent
     when compared to 2019 despite the persistent numbers of self-harm incidents .  *Id.*  This
27   too likely also contributed to the drop in MHCB referrals during the pandemic, as patients
     were not being screened for suicidality in the first place despite the troubling self-harm
28   trends.

1    Defendants' discussion of the 2020 suicide rate is equally incomplete, and indeed

2    fundamentally misleading.  In highlighting that 2020 was the first year in five years to see

3    a decreased suicide rate, Report at 49, Defendants omit the critical fact that, excluding the

4    2019 suicide rate (30.3 per 100,000), the 2020 rate (27.3 per 100,000) was the highest on

5    record since CDCR began measuring suicides.  Cal. Dep't of Corr. & Rehab., *Annual*

6    *Report on Suicide Prevention and Response* at 8 (Oct. 1, 2020), https://cchcs.ca.gov/wp-

7    content/uploads/sites/60/MH/CDCR-2019-SB-960.pdf.  Indeed, despite the significant

8    reductions in the overall prison population, 31 people died by suicide in CDCR in 2020.

9    Defendants' Report also attempts to draw conclusions from the literature regarding

10    natural disasters.  Report at 30-33.  COVID-19 is a years-long public health emergency,

11    not a seconds-long earthquake.  Any attempt to analogize to natural disaster studies is of

12    limited value given the inapt comparison.  Moreover, even if the studies of natural

13    disasters were analogous to the present pandemic circumstances, Defendants take the

14    wrong conclusions from those studies.  The cited studies find that the prevalence of severe

15    mental illness and suicides tends to increase after a brief drop right after a disaster occurs.

16    *See* Report at 30, 32-33.  Instead of concluding that a substantial rise in psychiatric

17    symptoms and suicidal ideation may be imminent in CDCR, Defendants appear to draw

18    the opposite conclusion.  *See* Report at 44.  To do so, Defendants rely on data showing

19    reduced Rules Violation Reports ("RVRs"), mental health referrals, and overdose

20    hospitalizations.  Yet, as Defendants acknowledge, all of those numbers are almost

21    certainly skewed by CDCR's widespread lockdowns and related policy decisions, such as

22    cancellation of visitation, during the pandemic.  *Id.*

23    A key lesson missing from Defendants' Report is the idea that, especially in the

24    coming months, all efforts must be made to provide care above and beyond what is

25    required by the Program Guide to protect against the risk of a delayed rise in mental health

26    decompensation.[11]  Defendants state that "in the months following mass traumatic

---

[11] *See* Matthew J. Carr et al., *Effects of the COVID-19 Pandemic on Primary Care-*
(footnote continued)

1  events …. [t]reatment activities targeting action-based activities, improving patient educa-

2  tion, and focusing behaviors towards those within their control (i.e., utilizing good sleep

3  hygiene, healthy eating, exercise, meditation, and outdoor activities) are found to be most

4  beneficial" to prevent increased symptoms of depression, anxiety, and PTSD.  Report at

5  37.  But the Report provides no assurances that *Coleman* patients have meaningful access

6  to these necessary coping skills, or what steps Defendants are taking to ensure they do.

7  **III.    Defendants Should Focus on "Resilience" of the Overall Mental Health**
           **System, in Addition to that of Patients**

8

9          Defendants repeatedly use the word "resilience" in discussing class members'

10  purported ability to respond to traumatic events.  *See* Report at 30-31, 37-38.  However,

11  Defendants' Report is silent as to the resilience of the Statewide Mental Health Program.

12  Defendants have historically treated the Program Guide requirements as the maximum

13  standard for treatment.  But the Program Guide was always meant to represent the

14  constitutional floor, not ceiling.  By targeting Program Guide requirements designed to set

15  outside limits, Defendants have created a system that runs entirely at the edge of deadlines,

16  staffing levels, and bed capacities.  For example, if a patient must be transferred within 30

17  days, Defendants deploy the resources needed to transfer patients on the thirtieth day if

18  everything goes right, and only after contempt proceedings forced such action.  In response

19  to the Court threatening enforcement unless Defendants reach a 90% staffing rate,

20  Defendants target 90%, leaving the system 10% understaffed.  *Cf.* Sept. 3, 2020 Order,

21  ECF No. 6846 at 23 ("In a prison system where the size of the mentally ill inmate

22  population is approximately 30,000 inmates, even a 90 percent compliance standard risks

23  leaving thousands of mentally ill inmates without access to one or more components of a

24  constitutionally adequate mental health delivery system or receiving custodial treatment

25

26  *Recorded Mental Illness and Self-Harm Episodes in the UK: A Population-Based Cohort*
    *Study*, Lancet Public Health 6:2 (Feb. 1, 2021) **(**finding that delays in accessing mental
27  health care during the pandemic could lead to "more patients subsequently presenting with
    greater severity of mental illness and increasing incidence of non-fatal self-harm and
28  suicide"), https://doi.org/10.1016/S2468-2667(20)30288-7.

1   that falls below constitutional minimum requirements.").  And Defendants operate

2   inadequate unlicensed inpatient beds for decades, and fill them to the hilt over and over

3   again, even while they employ bed planning assumptions, such as an occupancy standard

4   well above the community rate, that perpetually leave them at or over the brink of their

5   capacity levels.  *See* Defs.' Census Waitlists & Transfer Timelines Reports, ECF No. 7234

6   (July 15, 2021) at 10, 13 (showing more class members waiting than available PIP beds);

7   *see also* Mar. 24, 2017 Order, ECF No. 5583 at 14 (citations omitted) (encouraging

8   Defendants "to seriously consider using an 80 or 85 percent occupancy standard for bed

9   planning purposes going forward to avoid any shortfall in capacity," consistent with the

10  standard used in other inpatient systems).

11      This framing leaves no leeway to address emergencies like the pandemic and its

12  aftermath.  Indeed, as detailed in Sections I and II, *supra*, mental health treatment dropped

13  precipitously at the outset of COVID, and has yet to recover to pre-pandemic, let alone

14  constitutionally adequate, levels.  A resilient system would have some reserve for times of

15  crisis.  Transfer timelines, provision of structured therapeutic treatment, and frequency of

16  clinical contacts would be routinely met with room for error.  When faced with an

17  important meeting, a reasonable person takes an early train to provide a buffer for any

18  problems that may arise, not the last one that will get there precisely at the start time.  This

19  should be one of the biggest lessons learned from the pandemic.  But Defendants' Report

20  says nothing about this.

21  **IV.    Defendants Should Consider Clustering to Enhance Continuity of Care**

22      The idea that increased continuity of care correlates with improved patient

23  outcomes, *see* Report at 50, is not a novel concept.  For years, the Special Master has

24  reported on concerns about lack of continuity of care in CDCR's mental health program.

25  *See, e.g.*, Twenty-Seventh Monitoring Report of the Special Master, ECF No. 5779 at 376

26  (Feb. 13, 2018); Twenty-Sixth Monitoring Report of the Special Master, ECF No. 5439 at

27  613 (May 6, 2016); Twentieth Monitoring Report of the Special Master, ECF No. 3029-11

28  at 146 (Sept. 12, 2008); Fourteenth Monitoring Report of the Special Master, ECF No.

1  1649 at 131 (Feb. 11, 2005).  Continuity of care concerns combined with CDCR's

2  intractable staffing shortages led the Court and Special Master to urge Defendants to

3  consider clustering MHSDS patients in institutions where appropriate levels of mental

4  health staff can be recruited and retained.  *See, e.g.*, Aug. 9, 2016 Order, ECF No. 5477 at

5  8; Oct. 10, 2017 Order, ECF No. 5711 at 25-26; Feb. 15, 2018 Order, ECF No. 5786 at 3-

6  4.  Defendants have historically resisted these efforts, arguing that "further clustering of

7  high-acuity patients may negatively impact care."  Defs.' Resp. to the Special Master's

8  Report on Status of Mental Health Staffing, ECF No. 5591 at 17 (Mar. 30, 2017); *see also*

9  Jt. Status Report Re Oct. 11, 2018 Status Conf., ECF No. 5922 at 10 (Sept. 14, 2018)

10  ("CDCR has determined that further clustering of the EOP populations is not a viable

11  solution …..").; Jt. Status Report Re: June 28, 2018 Status Conf. Re: Staffing, ECF No.

12  5841 at 5 (June 21, 2018) ("Defendants do not believe that further clustering presents a

13  workable solution.").

14      On December 18, 2018, the Court ordered the parties to participate in a settlement

15  conference regarding "whether mentally ill inmates can be located in fewer total

16  institutions to address persistent impediments to Program Guide compliance in the areas of

17  staffing, bed transfers and cultural compliance training."  Dec. 18, 2018 Minute Order,

18  ECF No. 6050.  Although the parties reached several agreements at the February 21, 2019

19  settlement conference, the meeting "did not result in the complete closure and

20  consolidation of any of CDCR's CCCMS, EOP, or MHCB program locations."  Jt. Status

21  Report Re: Settlement Conf. & Custody & Mental Health P'ship Plan, ECF No. 6103 at 3

22  (Mar. 8, 2019).

23      Defendants' Report appears to show they have changed their position in favor of

24  clustering, and the continuity of care benefits that come with it.  *See* Report at 52-53.

25  Plaintiffs are open to discussing options for additional clustering, but note that Defendants'

26  apparent interest in expanding the number of EOP programs rather than consolidating

27  them, *see, e.g.*, *id.* at 49, will have serious ramifications for staffing and space planning

28  that Defendants make no attempt to grapple with.

1    **V.     Use of Telehealth, Patient Outcomes, and Staffing Rates Must Be Even More**
2           **Closely Monitored Now that Pandemic Restrictions Are Lifting**

3          On one hand, Defendants' Report argues that "[t]elemental health must continue to

4 be taken more seriously" and that "[t]here was never a clear data-focused justification for

5 the imposed limitations."[12]  Report at 14.  On the other hand, Defendants concede that

6 "[t]elehealth services should not replace traditional in-person treatment."  *Id.* at 51; *see*

7 *also id.* at 27 ("onsite staff are still required to respond to emergent patient issues").  From

8 these seemingly conflicting statements, it is unclear whether Defendants remain committed

9 to the heavily negotiated, court-approved Provisional Telepsychiatry Policy, which already

10 allows for vast use of telepsychiatry at the CCCMS level of care and, under specified

11 circumstances, higher levels of care.  *See* Stip. & Order Approving CDCR's

12 Telepsychiatry Policy, ECF No. 6539 at 5 (Mar. 27, 2020); *see also* July 3, 2018 Order,

13 ECF No. 5850 at 5-6 (holding that "the Revised Program Guide makes clear EOP is a

14 residential program, synonymous with an inpatient setting").

15          The studies Defendants cite in support of expanded use of telehealth almost

16 exclusively focus on outpatient, non-correctional populations.  *See* Report at 16, nn. 5-

17 20.[13]  As noted above, telepsychiatry is already widely allowed in the outpatient level of

18 care in CDCR.  Moreover, carceral settings are not comparable to community-based

19 settings.  Incarcerated patients not only have a substantially higher acuity of medical and

20 mental illness than community-based patients, but are also subjected to vastly different,

21

---

22 [12] Defendants' claim that the limitations imposed by this Court, at the recommendation of
23 the Special Master and his deeply knowledgeable experts, are unjustified is puzzling.
Defendants filed objections to the limitations they claim are unsupported by data, which
24 included a review of the literature by their Statewide Chief of Mental Health who admitted
no serious studies had been conducted in correctional populations. *See* Decl. of Michael
25 Golding, M.D., in Supp. of Defs.' Resp. to Special Master's Report on Status of Mental
Health Staffing, ECF No. 5591-1 at ¶ 2 (Mar. 30, 2017).  That remains true today.
26 Defendants chose not to appeal the order overruling those objections, or to prove at trial
that the limitations were unsupported when given the chance.  *See* Oct. 10, 2017 Order,
27 ECF No. 5711 at 22-23.

28 [13] Many of the authors of these studies also disclose that they are employed by, paid by, or
own their own telepsychiatry companies.

1    and often more stressful and traumatic, environments.  Of the three articles Defendants cite

2    that address forensic telepsychiatry, two focus on outpatient settings, including one that

3    consisted of a patient satisfaction survey of just 43 patients.[14]  The last article reviewed

4    whether patients found not guilty by reason of insanity and who were housed at a

5    maximum security forensic unit in a State Hospital in Virginia could be effectively

6    assessed with the Brief Psychiatry Rating Scale-Anchored Version (BPRS-A) via video

7    conference.[15]  Not only is a state hospital a vastly different environment than a prison, but,

8    as the authors state, the study was limited by the fact that "[i]nterviews with standardized

9    instruments [like the BPRS-A] constitute only one aspect of mental health and forensic

10   assessments and cannot be substituted for complete evaluations."[16]

11          Defendants acknowledge that some studies identify "concerns or uncertainty" about

12   using telepsychiatry for higher acuity patients.  *See* Report at 17.  This is consistent with

13   Defendants' Provisional Telepsychiatry Policy, which is rooted in the Special Master's

14   findings, adopted by this Court over Defendants' objections, that "[t]elepsychiatry should

15   not be a frontline approach for psychiatric services for inmates with the most intensive or

16   emergent needs."  Oct. 10, 2017 Order, ECF No. 5711 at 21 (internal quotations omitted).

17   Other literature similarly cautions against using telepsychiatry with high-needs popula-

18   tions.[17]  In addition, studies have raised concerns about the use of telepsychiatry to treat

19

20   [14] *See* Benjamin B. Brodey et al., *Satisfaction of Forensic Psychiatric Patients with Remote Telepsychiatric Evaluation*, Psychiatric Servs., 51(10) 1305-1307 (2000), https://doi.org/10.1176/appi.ps.51.10.1305.

21
22   [15] *See* Frances J. Lexcen et al., *Use of Video Conferencing for Psychiatric and Forensic Evaluations*, Psychiatric Servs., 57(5) 713-715 (2006), https://ps.psychiatryonline.org/doi/full/10.1176/ps.2006.57.5.713.

23   [16] *Id.*

24   [17] *See, e.g.*, Guinart et al. *Mental Health Care Providers' Attitudes Toward Telepsychiatry: A Systemwide, Multisite Survey During the COVID-19 Pandemic*, Psychiatric Servs.

25   72:704-707 (2021) ("Psychotic disorders were considered the least appropriate diagnosis to conduct telehealth."), https://ps.psychiatryonline.org/doi/10.1176/appi.ps.202000441;

26   David Farabee et al., *An Experimental Comparison of Telepsychiatry and Conventional Psychiatry for Parolees*, Psychiatric Servs. 67(5) 562-565 (2016) (highlighting poorer

27   therapeutic alliances in patients treated through telepsychiatry in study involving California parolees), https://doi.org/10.1176/appi.ps.201500025; Subho Chakrabarti,

28   (footnote continued)

1    psychotic patients who have ideas of reference that incorporate technology (*e.g.*, a

2    psychotic delusion in which the patient believes he receives messages from the tele-

3    vision).[18]  Other studies indicate that recognizing patient self-neglect, a critical aspect in

4    diagnosing and treating many psychotic disorders, can be more effective in-person.[19]

5    These and other correctional-based scholarly findings support the Provisional Tele-

6    psychiatry Policy's edict, incorporating the Court's October 10, 2017 rule, that "[t]ele-

7    psychiatry may supplement on-site psychiatry at the EOP level of care, but it should not

8    replace on-site psychiatry."  *See* Stip. & Order Approving CDCR's Telepsychiatry Policy,

9    ECF No. 6539 at 7 (Mar. 27, 2020).[20]

10           As set forth in the stipulated order regarding the Provisional Telepsychiatry Policy,

11   Defendants must "provide regular updates to Plaintiffs' counsel and the Special Master

12   regarding the progress of developing and implementing the internal monitoring process [of

13   the policy]."  *Id.* at 2.  Although nearly a year has elapsed in the policy's eighteen-month

14   provisional period (which began on October 1, 2020, *see* Sept. 21, 2020 Order, ECF No.

15

16   *Usefulness of Telepsychiatry: A Critical Evaluation of Videoconferencing-Based
     Approaches*, World J. of Psychiatry 5 (3) 286-304 (2015) (noting that telepsychiatric

17   interventions are inferior to in-person psychiatry for populations with substance abuse
     problems), https://dx.doi.org/10.5498%2Fwjp.v5.i3.286; *see also* Jay H. Shore et al.,

18   *Diagnostic Reliability of Telepsychiatry in American Indian Veterans*, Am. J. of Psychiatry
     Volume 164 (No. 1): 115-118 (2007) (noting use of telepsychiatry resulted in diminished

19   rates of reliability in diagnosing outpatients with long-term substance or alcohol abuse
     issues), https://ajp.psychiatryonline.org/doi/10.1176/ajp.2007.164.1.115; Richard O'Reilly

20   et al., *Is Telepsychiatry Equivalent to Face-to-Face Psychiatry? Results from a
     Randomized Controlled Trial*, Psychiatric Servs., 58 (6) 836-843 (2007) (noting that "there

21   appears to be a group of individuals who are averse to the use of telepsychiatry"),
     https://ps.psychiatryonline.org/doi/full/10.1176/ps.2007.58.6.836.

22   [18] Philip R Magaletta & Thomas J. Fagan, *Telehealth in the Federal Bureau of Prisons:
     Inmates' Perceptions*, Professional Psychology: Research & Practice 31(5) 497-502

23   (2000), https://psycnet.apa.org/doi/10.1037/0735-7028.31.5.497.

24   [19]Ian R. Sharp, *The Use of Videoconferencing with Patient with Psychosis: A Review of the
     Literature*, Annals of General Psychiatry 10(14) 1-11 (2011), https://doi.org/10.1186/1744-

25   859x-10-14.

26   [20] *See also* Chakrabarti (2015), *supra*, n.17 ("[A]t present telepsychiatric services can only
     serve as an adjunct to the more traditional modes of service-delivery, but can never replace

27   them"); *see also* Sarah Leonard, *The Development and Evaluation of a Telepsychiatry
     Service for Prisoners*, J. of Psychiatric and Mental Health Nursing 11:461-468 (2004) ("It

28   is not anticipated that telepsychiatry will replace existing services or reduce the need for
     face-to-face contact"), https://doi.org/10.1111/j.1365-2850.2004.00747.x.

6874 at 6), Defendants concede that they still lack "a validated data metric to distinguish telehealth appointment[s] from face to face encounters."  Report at 22 n.27.  Defendants' Report is silent as to how they are tracking and evaluating each institution's compliance with the telepsychiatry policy absent such automated reporting mechanisms.  Their plan to make it possible to track in EHRS which providers are telepsychiatrists versus on-site providers in order to evaluate patient outcomes, *see* Report at 27, is a positive first step, and a deficiency Plaintiffs first noted two years ago during the evidentiary hearing regarding Dr. Golding's whistleblower report.  Rather than reviewing outside studies, a more useful exercise would be to study, under the guidance of the Special Master, how well telepsychiatry is working in CDCR under the provisional policy.  In that context, Plaintiffs are open to discussing ways to make Defendants' use of telepsychiatry more efficient, effective, and susceptible to monitoring.[21]

A more pressing concern that Defendants' Report fails to acknowledge is that telepsychiatrists were often used to treat the most acutely mentally ill patients in the PIPs during the pandemic.  Data from Defendants' psychiatry vacancy reports shows sustained use of telepsychiatrists in inpatient units, notwithstanding the Provisional Telepsychiatry Policy's prohibition on telepsychiatry in these settings "except as a last resort in emergency situations."  *See, e.g.*, Defs.' Monthly Psychiatry Vacancy Report, ECF No. 7214 at 5 (June 30, 2021) (showing 1 telepsychiatrist in the CMF PIP); Defs.' Monthly Psychiatry Vacancy Report, ECF No. 7011 at 5 (Dec. 31, 2020) (showing 4.06 telepsychiatrists in the CHCF PIP, and 1 telepsychiatrist in the CMF PIP); Defs.' Monthly Psychiatry Vacancy Report, ECF No. 6929 at 5 (Oct. 30, 2020) (showing 5.64 telepsychiatrists in the CHCF PIP, 1.97 telepsychiatrists in the CMF PIP, and 1 telepsychiatrist in the SVSP PIP).

---

[21] Plaintiffs may be willing to discuss Defendants' proposal that certain subsets of telepsychiatrists be allowed to telework from home indefinitely, such as those treating CCCMS class members.  *See* Report at 52; *see also* Defs.' Resp. to Nov. 4, 2020 Order, ECF No. 6978-1 at 26-31 (Dec. 11, 2020) (CDCR's Telepsychiatry from Home Plan).  Important issues to consider include, *inter alia*, enhanced supervision and on-site visiting requirements, especially for those not familiar with the prison environment, and availability of alternative locations if internet outages occur.

1    Moreover, despite improved psychiatry staffing rates system-wide—for which Defendants

2    should be commended—the CHCF and CMF PIP programs remain dangerously short-

3    staffed.  Defs.' Monthly Psychiatry Vacancy Report, ECF No. 7214 at 5 (June 30, 2021)

4    (showing a psychiatry staffing rate of just 64% in the CHCF PIP and just 54% in the CMF

5    PIP).  And other allocated psychiatry positions throughout the system (including tele-

6    psychiatry) remain unfilled.  *See id.*  Issues such as salary and unsatisfactory employment

7    conditions must also be addressed if staffing rates are to be durably sustained.  *See, e.g.*,

8    Special Master's Report on His Expert's Analysis of Psychiatrist Employment Conditions

9    & Compensation, ECF No. 6695 at 18-20 (May 29, 2020).[22]

10          During the pandemic, Defendants have permitted the use of cell-front telepsychiatry

11    for isolated or quarantined patients.  *See, e.g.*, Lauren Smith, *San Quentin Prison Health*

12    *Officials Take Hot Seat in COVID-19 Court Hearings*, Davis Vanguard (June 4, 2021)

13    (quoting testimony from San Quentin's Chief Psychiatrist that telehealth encounters

14    sometimes occurred through the food slot or by yelling through the door),

15    https://www.davisvanguard.org/2021/06/san-quentin-prison-health-officials-take-hot-seat-

16    in-covid-19-court-hearings/; July 15, 2020 Stip. & Update Addressing Current COVID-19-

17    Related Departures from Program Guide Requirements, ECF No. 6761 at Ex. 5 at 105-139

18    (July 15, 2020) (documenting numerous instances of cell-front contacts for patients in

19    TMHUs).  Defendants' Report acknowledges that cell-side mental health appointments

20    occurred "when a confidential setting was not feasible," Report at 19, but remains mum

21    regarding the rate at which cell-front, as opposed to confidential, treatment occurred.

22    Defendants did not identify any lessons learned regarding how to creatively tackle

23    persistent treatment space shortages, custody shortages and other limitations that

24    contribute to their reliance on cell-front care.

25          Defendants' Report concludes that "telepsychology and tele-social work services

26

27    ──────────────────────
      [22] Defendants recently gave on-site psychiatrists a higher bonus, which is a positive step.
      *See* Andrew Sheeler, *California Prison Psychiatrists Could Earn $10,000 in Bonuses*,
28    Sacramento Bee (June 16, 2021), https://www.sacbee.com/article252132278.html.

1    from home can be provided safely and effectively when clear standards are enforced and

2    secure, and functional equipment is deployed." Report at 27.  While Plaintiffs supported

3    Defendants' decision to allow clinicians to work remotely during the pandemic as an

4    emergency measure to address severe staffing shortages and lack of access to treatment,

5    this issue must be carefully analyzed before it is allowed to continue in perpetuity.

6    Although Plaintiffs may be willing to consider the limited use of telepsychology or tele-

7    social work governed by an appropriate operating policy, Plaintiffs have grave concerns

8    about the use of those modalities above the CCCMS level of care or for some types of

9    treatment, like group therapy.  In addition, it is critical that a significant number of mental

10   health clinicians work onsite in each prison to fully observe and participate in day to day

11   life in the prison.

12         Defendants' Report states that "[p]rovision of telehealth by psychologists and social

13   workers was modeled upon existing telepsychiatry service delivery….[and] applied with

14   strict adherence to community standards and current ethical guidelines for the provision of

15   telehealth services." Report at 21.  Defendants initially authorized telework for social

16   workers and psychologists on May 22, 2020 for clinicians who could not safely work on-

17   site due to risk factors or being under quarantine. *See* July 15, 2020 Stip. & Update

18   Addressing Current COVID-19-Related Departures from Program Guide Requirements,

19   ECF No. 6761 at 44 (July 15, 2020).  Defendants extended that authorization in their

20   May 28, 2021 Updated Mental Health Delivery of Care Guidance. *See* June 15, 2021 Jt.

21   Report Addressing COVID-19 Related Departures from Program Guide Requirements,

22   ECF No. 7203 at 80-81 (June 15, 2021).  However, neither the May 2020 nor the May

23   2021 guidance memos provide anywhere near the level of detail contained in Defendants'

24   Provisional Telepsychiatry Policy, nor have Defendants disclosed any sort of proposal for

25   a governing policy.  Those guidance memos are not appropriate for non-emergency

26   circumstances.  For instance, the existing pandemic documents encourage remote

27   psychologists and social workers to join already-in-progress telepsychiatry sessions, rather

28   than meet with the patient one-on-one, which would seriously degrade care required by the

1 Program Guide if permitted absent emergency circumstances.

2       In addition, further research is needed on how best to adapt evidence-based

3 treatments to telepsychology.[23]  One community-based study found that patients with

4 anxiety disorders may be more likely to prematurely discontinue psychotherapy delivered

5 remotely as compared with in-person.[24]  As common sense suggests, other studies show

6 that the therapeutic alliance often declines when mental health groups are conducted

7 remotely.[25]  Given these issues and the ongoing restrictions on care due to social

8 distancing precautions, Defendants should push to re-instate more live care, with more

9 staff who are vaccinated (including the custody staff used for escorts).

10       Plaintiffs support Defendants' use of tablets to augment treatment and provide

11 additional recreational and educational opportunities for *Coleman* patients.  *See* Report at

12 23, 14.  Indeed, Plaintiffs have urged Defendants to make the policies increasing patients'

13 access to phone calls and electronic appliances permanent.  July 15, 2021 Jt. Report

14 Addressing Current COVID-19-Related Departures from Program Guide Requirements,

15 ECF No. 7237 at 53-54 (July 15, 2021).  However, Defendants' statement that expanded

16 use of tablets would "decrease the space needs in an institution" raises concerns that

17

18 [23] *See, e.g.*, Scott H. Waltman et al., *Delivering Evidence-Based Practices via
Telepsychology: Illustrative Case Series from Military Treatment Facilities*, American
19 Psychological Association, Vol. 51, No. 3 205-213 (2020),
http://dx.doi.org/10.1037/pro0000275.

20 [24] Lisa M. Valentine et al., *Demographic and psychiatric Predictors of Engagement In
Psychotherapy Services Conducted Via Clinical Video Telehealth*, J. of Telemedicine and
21 Telecare, Vol. 26 (1-2) 113-118 (2020), http://dx.doi.org/10.1177/1357633X18801713.

22 [25] *See, e.g.*, H. Weinberg, *Online Group Psychotherapy: Challenges and Possibilities
During COVID-19-A Practice Review*, Group Dynamics: Theory, Research & Practice
23 24(3) 201-211 ("The absence of eye contact is especially relevant for group therapists.
Presence is difficult to achieve through screen relations."),
24 https://psycnet.apa.org/doi/10.1037/gdn0000140; Amy Lopez et al., *Therapeutic Groups
Via Video Teleconferencing and the Impact on Group Cohesion*, Nat'l Ctr. for
25 Biotechnology Information 6(13) (Apr. 2020) ("[G]roup members found it was harder to
connect with each other in the virtual environment."),
26 https://dx.doi.org/10.21037%2Fmhealth.2019.11.04; Carolyn J. Greene, *How Does Tele-
Mental Health Affect Group Therapy Process?* APA PsychNet Direct 78(5) 746-750 (Oct.
27 2010) ("[I]ndividuals in the [video teleconferencing] condition exhibited lower alliance
with the group leader than those in the in-person condition."),
28 https://psycnet.apa.org/buy/2010-19874-015.

1   Defendants are proposing that care be swapped to virtual, in-cell activity.  Report at 14.

2   Plaintiffs would strongly oppose any such proposition.  Tablets should augment, not

3   replace, out-of-cell treatment and leisure opportunities.

4   **VI.    The Data Used in Defendants' Report Has Not Been Certified**

5           Dr. Michael Golding's whistleblower report and the evidentiary hearing that

6   followed uncovered serious concerns about the misleading and unreliable nature of

7   Defendants' data, as well as their representations about what that data showed with respect

8   to patient care and compliance.  *See* Dec. 17, 2019 Order, ECF No. 6427 at 20, 22.  To

9   remedy these issues, the Special Master requested, and the Court appointed, a data expert

10  to assist in validating Defendants' data.  *See* Special Master's Request for Appointment of

11  Additional Staff, ECF No. 6604 at 3-4 (Apr. 13, 2020); Apr. 29, 2020 Order, ECF No.

12  6646 at 1; May 8, 2020 Order, ECF No. 6661 at 18 (citations omitted) (ordering the

13  Special Master to report on the data expert's review of data underlying Defendants'

14  EOP/ASU Hub certifications and recommendations on how to make them "fully

15  transparent and completely usable"); *see generally* Special Master's Initial Report on Data

16  Issues, ECF No. 6705 (June 8, 2020).  The data certification process is ongoing, and none

17  of the dashboard indicators (including those cited in Defendants' Report) have been fully

18  verified, much less any of the other data described, often with little to no detail regarding

19  sources or methodology, in Defendants' Report.  *See* Twenty-Eighth Round Monitoring

20  Report of the Special Master, ECF No. 7074 at 54-55 (Mar. 5, 2021).  Because the process

21  is not complete, and stems from findings that Defendants' data systems are flawed and

22  have been used to manipulate and mislead the Court, the Court should not presume that

23  that the data underlying Defendants' Report is accurate.  More research about the effects of

24  the pandemic will be necessary once the data certification process is complete.

25          Independent of these overarching data problems, there are specific flaws in the way

26  Defendants use data in their Report.  For example, to verify that the reduced referrals

27  stemming from Sustainable Process considerations were accurate, Defendants tasked

28  Regional mental health clinicians with reviewing 100 randomly-selected Master Treatment

1   Plans and 50 Self-Harm forms.  Report at 35-36.  A sample truly designed to test inpatient

2   need would have reviewed treatment plans from the pool of patients who had been

3   considered for referral to a higher level of care but ultimately were *not* referred.  It is

4   unclear why Defendants chose not to focus on that category of patients.  Also, the fact that

5   the Regional teams still disagreed with 5% of the cases they reviewed—a substantial

6   amount given that the *Coleman* class is comprised of more than 30,000 patients—raises

7   concerns about how many more cases they would disagree with had the sample

8   appropriately focused on people considered for referral but not referred, or those who had

9   engaged in self harming behavior without moving to a higher level of care.  And the fact

10  that the Court has required an unmet need study, based on evidence that clinicians were

11  under-referring patients in need of inpatient care even before the pandemic  completely

12  disrupted patient access to higher levels of care, suggests that Defendants' conclusion that

13  patients are being properly referred is dubious at best.  *See* Oct. 8, 2019 Order, ECF No.

14  6312 at 5-6 (noting probable need for unmet needs study in 2019); Mar. 25, 2021 Status

15  Conf Tr., ECF No. 7111 at 49:7-10 (ordering unmet needs study to be conducted as early

16  as this fall).

17          Defendants also discuss that out of four patients highlighted by Plaintiffs and the

18  Special Master as potentially needing a referral to a higher level of care, they only

19  determined that one patient did in fact need to transfer.  *See* Report at 28.  Although it is

20  foolhardy to glean anything of significance from this tiny sample size, a compliance rate of

21  only 75% is hardly cause for celebration.

22          Other data used in the Report lacks any identifiable source, and is therefore difficult

23  to assess, much less use as the basis for any firm conclusions.  For example, the Report

24  asserts many claims based on reports from patients and staff.  *See, e.g.*, Report at 19

25  ("Patients reported they were seen even more frequently than they would have requested

26  and had no new issues to raise."), 26 ("Many patients reported COVID-19-related concerns

27  shared by the general population – concern for their own health and safety, worry about

28  loved ones, and frustration and boredom from decreased recreational opportunities. Many

of these same patients also refused to leave their cell due to fear of infection."). The statement that patients said they were "seen more frequently than they would have requested" has no value at all without some information about how this information was collected, from what sample of patients in what locations, and with what prompts. Defendants should not base conclusions about one of the central questions in this case on such slim evidence of purported patient satisfaction. Similarly, the "2020 Region 4 Desert Facilities Completed Mental Health Contacts" graph, *see* Report at 21, shows an increase in mental health contacts at the desert facilities. But it is unclear how this data was collected, what type of contacts were counted (such as minutes-long wellness checks), and whether the contacts include cell-front contacts, in addition to those conducted in a confidential setting.

Other statements and methodologies are inconsistent. For example, when analyzing continuity of care issues, Defendants compared data from a pre-COVID period of May 3, 2019 through March 30, 2020, to data from a COVID period of April 1, 2020 through February 28, 2021. Report at 40. In looking at the effect of telepsychiatry on patient care, Defendants defined the pre-COVID period as March 1, 2019 through February 28, 2020, and the COVID period as March 2, 2020 through March 31, 2021. Report at 25. In reviewing Sustainable Process data, Defendants defined the pre-COVID period as April 2019 to December 2019, and the COVID period as April 2020 to December 2020. Report at 34. The Report is silent as to why different time periods were chosen for each of these analyses. The notion that Defendants may once again be trying to find data to support the conclusions they prefer cannot be dismissed out of hand.

Also in support of their continuity of care analysis, Defendants analyzed several treatment metrics in the "Changes in Treatment Continuity During Pandemic" graph. Report at 41. However, this analysis is limited by Defendants' definition of "continuity of care," which considers only "EOP patient[s] who ha[ve] remained in the same housing program at the same institution without interruption for the entirety of the past six months." Report at 40. There does not appear to be a way to measure continuity of care

1 | for patients in inpatient levels of care or the CCCMS program, or even for EOP patients

2 | who have remained in the same housing location for fewer than six months.

3 |       Another inconsistency is that one of Defendants' key "lessons learned" is that

4 | "demand for mental health services decreased during COVID-19." Report at 28. But in a

5 | different section of the Report, Defendants state that "[q]uarantine and transfer restrictions

6 | *increased* demand for [mental health] services as patients were 'treated in place' while

7 | awaiting transfer to a facility with [a mental health] mission for their assigned level of

8 | care." Report at 9-10 (emphasis added).

9 |       Similarly, on the one hand, Defendants claim there are no known negative impacts

10 | of telehealth, but then concede that "[d]ata specific to outcomes of care provided

11 | exclusively via telehealth are currently difficult to obtain in the EHRS tracking system."

12 | Report at 27. Conducting a full and thorough evaluation of the efficacy of Defendants' use

13 | of telepsychiatry is precisely the reason the parties and Special Master are in the midst of

14 | an eighteen-month trial period of the Provisional Telepsychiatry Policy.

15 | **CONCLUSION**

16 |       For more than a year, this historic pandemic has completely upended patient care

17 | along with all of the rest of Defendants' systems, with the tragic effects still reverberating.

18 | However, for all the foregoing reasons, Defendants are drawing the wrong lessons from

19 | these experiences. Highlighting that fact, Defendants complain that "[a]pproval by court

20 | monitors was required for every incremental policy change." Report at 23; *see also id.* at

21 | 53 ("CDCR and the court system as a whole have assumed that all of the treatment choices

22 | made in the last few decades are responsible for any positive outcomes in the patient

23 | population. When CDCR was forced to make drastic changes to many operations and

24 | policies due to COVID-19, the expectation following that assumption would be that patient

25 | outcomes would drop precipitously; that did not occur."). The implication that but for the

26 | monitoring efforts of this Court, the Special Master, and Plaintiffs, Defendants would have

27 | been able to provide constitutionally adequate care to the *Coleman* class during the

28 | pandemic is completely baseless. As the Court has found, Defendants' "suggestion there

1    are no clear benchmarks in this action or no 'finality on the horizon' borders on frivolous,

2    and, in any event, is entirely meritless."  July 1, 2021 Order, ECF No. 7216 at 6-7 (citing

3    ECF No. 6846, *passim*).  As the Court has repeatedly ordered, Defendants must "fully and

4    durably implement the remedial plans that have been developed."  *Id.*  But Defendants'

5    Report is replete with unsupported claims as to why they believe patients fared better with

6    less mental health care and why "a fundamental re-think in the organization's approach"—

7    which Plaintiffs' take to mean a "fundamental re-think" of the *Coleman* remedies—could

8    lead to "immense" benefits.  Report at 53.  If this is the grand takeaway from the last

9    eighteen months, then clearly Defendants have moved even further from constitutional

10   compliance and a legitimate pathway towards ending federal oversight.

11                                    **CERTIFICATION**

12          Plaintiffs' counsel reviewed the following orders relevant to this filing: July 14,

13   2021 Order, ECF No. 7229; July 1, 2021 Order, ECF No. 7216; May 12, 2021 Order, ECF

14   No. 7159; Mar. 29, 2021 Status Conf. Minutes, ECF No. 7112; Mar. 25, 2021 Status Conf.

15   Tr., ECF No. 7111; Sept. 21, 2020 Order, ECF No. 6874; Sept. 3, 2020 Order, ECF No.

16   6846; Stip. & Order Extending Time to File Report on Lessons Learned during COVID-19

17   and Plaintiffs' Response to Report, ECF No. 7159 (May 12, 2021); May 8, 2020 Order,

18   ECF No. 6661; Apr. 29, 2020 Order, ECF No. 6646; Apr. 4, 2020 Order, ECF No. 6574;

19   Stip. & Order Approving CDCR's Telepsychiatry Policy, ECF No. 6539 at 5 (Mar. 27,

20   2020); Dec. 17, 2019 Order, ECF No. 6427; Oct. 8, 2019 Order, ECF No. 6312; Dec. 18,

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1  2018 Minute Order, ECF No. 6050; July 3, 2018 Order, ECF No. 5850; Feb. 15, 2018

2  Order, ECF No. 5786; Oct. 10, 2017 Order, ECF No. 5711; Mar. 24, 2017 Order, ECF No.

3  5583; Aug. 9, 2016 Order, ECF No. 5477.

4

5  DATED:  July 19, 2021                  Respectfully submitted,

6                                         ROSEN BIEN GALVAN & GRUNFELD LLP

7                                         By:  /s/ Cara E. Trapani

8                                              Cara E. Trapani

9                                         Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28