ROB BONTA, State Bar No. 202668
Attorney General of California
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
LUCAS HENNES, State Bar No. 278361
NAMRATA KOTWANI, State Bar No. 308741
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
LAUREL E. O'CONNOR, SBN 305478
DAVID C. CASARRUBIAS, SBN 321994
1676 N. CALIFORNIA BLVD., SUITE 620
WALNUT CREEK, CALIFORNIA 94596
TELEPHONE: 925-746-8460
FACSIMILE: 925-746-8490
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.<br><br>    Defendants. | Case No. 2:90-CV-00520- KJM-DB<br><br>**DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT ON HIS EXPERT'S REPORT ON SUICIDES COMPLETED IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, JANUARY 1, 2019- DECEMBER 31, 2019 [ECF No. 7239]**<br><br>Judge:   Hon. Kimberly J. Mueller |

**INTRODUCTION**

Defendants submit the following objections to the Special Master's Report on his Expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2019 – December 31, 2019 (hereafter the "Special Master's 2019 Suicide Report" or "Report"). ECF No. 7239. As Defendants explained in their previous objections to the Special Master's and his expert's suicide reports, the Special Master's expert's report mostly duplicates self-monitoring already conducted by CDCR and CDCR's own comprehensive report on suicides that occurred in 2019. As discussed in more detail below, CDCR's own self-critical, independent review of suicides completed in 2019, published on February 1, 2021, is just one component of a robust suicide prevention system found in no other state correctional system.[1] That review includes not only CDCR's findings but also identifies a range of measures to enhance suicide prevention and response efforts. ECF No. 7052 at 3.[2] Duplicative and costly reports by the Special Master do nothing to further the goal of ending this case and provide no additional information or greater transparency than that already included in Defendants' robust reports.

**OBJECTIONS TO THE SPECIAL MASTER'S REPORT**

**A.   The Report is redundant, provides only limited additional information than CDCR's own Suicide Report, and largely confirms the findings and conclusions in CDCR's annual report.**

Defendants object to the Special Master's 2019 Suicide Report in its entirety on the ground that it largely "duplicates the data and feedback already found in CDCR's own transparent reporting." *See* ECF No. 7239 at 42 (CDCR's objection to Special Master's draft 2019 Suicide Report because it duplicates self-monitoring already conducted by CDCR). The primary difference between the Special Master's expert's Report and CDCR's own report, is that the former includes

---

[1] On February 1, 2021, CDCR published its 2017-2019 Aggregate Suicide Report on its public website. CDCR's 2017-2019 Aggregate Suicide Report can be accessed on its public website at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf (last accessed on 07/22/2021.)

[2] References to page numbers for documents filed in the Court's Electronic Case Filing (ECF) system are to page numbers assigned by the ECF system.

a problematic and outmoded foreseeability/preventability analysis, and the latter does not.[3] *See* § B, *infra* (highlighting issues with the foreseeability/preventability analysis). Otherwise, CDCR and the Special Master's expert are crafting very similar reports.

CDCR published its 2019 suicide statistics in its 2017-2019 Aggregate Suicide Report, reflecting CDCR's commitment to advancing its robust self-monitoring efforts and to transparency by allowing mental health clinicians, nurses, and custody staff who work directly with the inmate population to have access to this valuable information. *See* CDCR's 2017-2019 Aggregate Suicide Report available at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf (last accessed on 07/22/2021). CDCR's own suicide report demonstrates that CDCR honestly and critically assessed every suicide that occurred in 2019, including assessing policy violations and implementing corrective actions to prevent future violations. *Compare id. with* ECF No. 7239 at 8-40. As a direct result of Defendants' reports, including CDCR's comprehensive annual suicide prevention report to the Legislature pursuant to California Penal Code section 2064.1, Defendants will be better able to prevent and reduce the number of completed suicides within its institutions.

Furthermore, and as Defendants noted in their previous objections to the Special Master's suicide reports, Defendants are unaware of any other prison system in the country that reviews each suicide as thoroughly and rigorously as CDCR, and then seeks to incorporate lessons from each suicide into its practice.[4] ECF Nos. 7052 at 3; 7098 at 2; 7182 at 3. This demonstrates

---

[3] The Special Master notes that his expert's report is not duplicative because it provides an opportunity to conduct in-depth analysis and identify disaggregated inmate suicide trend data by year. ECF No. 7239 at 4 n.4. This distinction is not meaningful—it is simply a different way of presenting statistics. In any event, Defendants note that their upcoming 2020 Suicide Report *will* identify disaggregated inmate suicide trend data by year.

[4] Notably, CDCR prepares a comprehensive suicide report for every suicide as required by the Program Guide. *See* ECF No. 5864-1 at 190-91 (Program Guide's "Suicide Death Review" requirement); *cf*. ECF No. 7239 at 4 n.4 (Special Master observing that "CDCR's compendium report does not include detailed individual case summaries"). Further, draft reports are provided to the Special Master for his and his expert's review, and final reports are provided to both the Special Master and Plaintiffs' counsel. *See* Declaration of Dr. Amber Carda, Psy.D. ("Carda Dec.") ¶ 2. Should the Court remand suicide reporting responsibilities back to Defendants, they could *and would* include individualized case summaries in their reporting to the Court.

CDCR's commitment to best practices, critical self-analysis, and improvement. This Court should encourage the Special Master to take steps that support and enhance these efforts, not pursue his own parallel track.

As such, Defendants request that the Court sustain Defendants' objections so that the Special Master can refocus his time and energy from matters that are already the subject of multiple monitoring reports by CDCR to issues that require additional work to fully achieve a sustainable remedy. *See* ECF No. 6996 (order acknowledging a variety of interim steps that still need to be monitored and completed to attain a full and durable remedy).

**B.   Objections related to problematic foreseeability/preventability determinations.**

   1. The Report, as with prior reports, includes overly simplistic determinations of "foreseeability" and "preventability" that are counterproductive in a mortality review context and hinder quality improvement.

The Report continues to include an overly simplistic analysis of foreseeability and preventability even though a chorus of experts question the utility of these determinations in a mortality review context.[5] The Special Master's insistence on including these determinations in suicide reports (ECF No. 7239 at 29-31) not only sometimes results in arbitrary, methodologically unreliable labels, but also fails to acknowledge that deaths occur in a complex system and that causative factors beyond proximate cause of death are potentially important for identifying opportunities for improvement.[6]

The Special Master says that, for nearly two decades, the Court has consistently overruled Defendants' objections on this point and highlighted the importance of foreseeability and preventability determinations. ECF No. 7239 at 4 n.5 citing ECF No. 4693 (Court opining that "identification of the number of preventable inmate suicides" is integral). The Special Master's

---

[5] Williams, B., Ahalt, S., Witt, L. (Final Report, Sept. 27, 2018). Assessing Medical Systems for the California Prison Health Care Receivership Corporation: Mortality Review Policy and Practice. The Criminal Justice & Health Program at UCSF, 3-4. https://cchcs.ca.gov/wp-content/uploads/sites/60/UCSF/Mortality-Review-Report.pdf (last accessed on 07/22/2021) (hereafter "Williams"). While the specific term "foreseeability" is not addressed in Dr. Williams's Final Report, the term is as problematic as the term "preventability" because it focuses on identifying past proximate causation rather than future opportunities for improvement.

[6] *Id.* at 4.

position is inaccurate. The Court's prior orders never overruled Defendants' objections to the Special Master including an outdated foreseeability/preventability analysis in his expert's suicide reports. Rather, those orders merely reflect that if the Special Master's suicide report is going to include a foreseeability/preventability analysis, that analysis may use the Court-approved definitions for those terms. *See*, ECF No. 4693 (order affirming the Special Master's definitions of "foreseeable" and "preventable" without mandating that he include a foreseeability/preventability analysis in future suicide reports). Defendants' objection on this specific point has never been overruled.

In any event, and more importantly, the science no longer supports foreseeability and preventability analyses. As Defendants have previously shown, narrow and methodologically problematic foreseeability and preventability determinations frequently divert attention away from opportunities for improvement that will lead to system-wide quality improvement *and patient safety*. Under the modern view, a well-performing mortality review system will identify "opportunities for improvement" leading to "quality improvement, patient safety, and/or clinical education responses (immediate change) or initiatives (longer term) that are then evaluated to determine whether they yielded improvements along relevant clinical benchmarks."[7] This system requires the buy-in and participation of multiple actors who may be less willing to participate if the focus of the review is on foreseeability and preventability determinations whose purpose is to identify the person (or people) to blame for allegedly causing death.[8] Accordingly, for the mortality review system to work properly—and to increase motivation for practice modifications and constantly promote organizational learning—there must be a shift away from terms like "foreseeable" and "preventable" and towards assessments that focus on opportunities for improvement.[9]

As such, Defendants object to the entirety of Section III, subsection I, "Foreseeability and

---

[7] Williams, *supra* note 2, at 5.

[8] *Id.* at 4.

[9] *Id.*

Preventability" of the Special Master's expert's report.[10] *See* ECF No. 7239 at 42-43, 49-51 (CDCR's response to Special Master's draft 2019 Suicide Report reflecting CDCR's objection to the entirety of the Special Master's expert's foreseeability/preventability analysis).

        2.        The Report's foreseeable and preventable analyses are speculative, subjective, outmoded, and lack any causal relation between the mental health care provided and suicide.

The Special Master's expert's determinations of foreseeable and preventable analyses are scattered throughout Appendix A of the 2019 Report. ECF No. 7239-1 at 1-199. The determinations are highly subjective, speculative, and some analyses lack a nexus between the intervention that should have been taken and the suicide. For instance, the expert determined Case N's death was "*potentially preventable*" had CDCR staff referred Case N for a mental health assessment that "*might have* detected an elevated risk had they occurred, and successful interventions *might have happened*, notwithstanding the inmate's *general lack of engagement* over the course of his incarceration." *Id.* at 80, emphasis added. The expert is assuming Case N, an inmate who was never a participant in the Mental Health Services Delivery System, and who had consistently denied prior suicide attempts or ideation during his incarceration, and generally lacked engagement with Mental Health staff, would not have committed suicide had CDCR implemented speculative interventions. *See id.* at 79-81. The expert fails to provide a causal relationship between Case N's suicide and "potential" interventions that "might" have detected an elevated risk for suicide.

    The expert's analyses often rely on little more than speculation, further undermining the utility of the foreseeable and preventable analyses. For instance, the Special Master's expert speculates the suicide of Case LL was preventable because the "*likelihood of suicide would have been decreased*" had Case LL been referred to a higher level of care (*id.* at 196, emphasis added); for Case C, the Special Master's expert assumes the suicide was preventable because had staff properly assessed Case C's level of distress "*they may have been able to assess his suicide risk more accurately*" (*id.* at 20, emphasis added); and, Case H "[t]he Special Master's expert

---

[10] To be clear, this objection is aimed at the entirety of the foreseeability/preventability *analysis* and not merely at how those terms are specifically defined. (ECF No. 7239 at 29-31.)

determined the inmate's death *may have been preventable* had CDCR been aware of the county jail's recent suicide concern and the discontinuation of psychiatric medication one day prior to his arrival" (*id.* at 52, emphasis added).

For these reasons, CDCR informally objected to the Special Master's expert's outmoded foreseeable and preventable determinations in the 2019 Report, and requested that they be stricken, because the analyses are speculative, subjective, and fail to provide an immediate nexus between the missed intervention and cause of death. ECF No. 7239 at 50-51. The Special Master wholly disregarded Defendants' objection. *Id., passim.* Accordingly, Defendants reassert their objections here and ask that the court strike all of the Special Master's expert's outmoded foreseeable and preventable determinations in the 2019 Report.

### C. The Report provides arbitrary comparisons to other large prison systems in the country.

The Special Master's expert's report continues to compare CDCR's suicide rate with other "large prison systems," and ultimately concludes that CDCR's "suicide rate is the 4th highest out of the ten largest correctional systems." ECF No. 7239 at 12. However, the report fails to include any analysis that accounts for the different demographics, population, applicable laws, and other variables that would make this a meaningful, rather than an arbitrary, comparison.

Citing to an entirely different line of objections that are not related to the arbitrary comparisons at issue here, the Special Master notes that the Court "has consistently overruled defendants' prior objections to the Special Master's expert's use of statistical comparisons." ECF No. 7239 at 4-5 n.6. That is not accurate. The Court has neither previously overruled Defendants' instant objection, nor has it endorsed the Special Master's expert's methodology (or lack thereof) as it relates to comparisons to other large prison systems in the country. Accordingly, Defendants object to the Special Master's expert comparing CDCR to an arbitrary list of other "large prison systems" without the necessary methodology to make it a valid comparison. *See* ECF No. 7239 at 43-44 (CDCR's response to Special Master's draft 2019 Suicide Report reflecting CDCR's objection to the Special Master's expert's report arbitrarily comparing CDCR to other large prisons).

D.  **The Report includes puzzling critiques of CDCR's Individual Suicide Case Reviews (SCRs) despite the Office of the Special Master's heavy involvement in the SCR process.**

Defendants object to the expert's critique of CDCR's SCR reports. *Id.* at 34-35; *see also* ECF No. 7239-1 at 1-199 (Appendix A, Case Summaries). Since 2015, members of the Special Master's team have attended nearly every SCR conference. Carda Dec., ¶ 2. Those same experts are provided draft copies of the SCR report in advance of the case conference, have the ability to provide edits and feedback to the document, and participate during the teleconference.[11] *Id.* Despite this direct participation and involvement in the process, the 2019 Report concludes that one SCR report was found to have "inadequate summaries of the case."[12] *See* ECF No. 7239-1 at 129 (Case X).

What is particularly troubling about the 2019 Report is the Special Master's expert's apparent unfamiliarity with CDCR's SCR process. Since 2015, a group of the Special Master's experts, led by Drs. Hughes and Metzner, have attended nearly every SCR and have been provided with draft reports in advance of each case conference. Carda Dec., ¶ 2. The 2019 Report, drafted apparently by an entirely separate group of experts from the Special Master's team, criticizes aspects of that same SCR process. However, it appears that the criticisms leveled in the current 2019 Report were not provided to Defendants at the time of these SCRs so that they could be addressed in real time.[13] Carda Dec., ¶ 3. It is also unclear why the experts most familiar with CDCR's SCR process are not involved in the present report, or why it appears there is no

---

[11] "The Special Master's experts are participants in the [Suicide Case Review Committee]," and the experts "provide immediate feedback during discussions of each case." ECF No. 7239 at 27.

[12] The reason for the disconnect is unclear, though it appears that the group of experts involved in the drafting of the 2019 Report are not the same group of experts who participated in each SCR. It is unclear why the experts most familiar with CDCR's SCR would not take lead in the development of a monitoring report on CDCR's suicides—if the Special Master intends to continue to issue duplicative reports.

[13] Lindsay Hayes, who attends many SCR conferences, has referred to the reports as a "considerable strength of the CDCR suicide prevention program" that are "not only . . . very comprehensive but provide[] thoughtful and targeted [Quality Improvement Plan]s for correcting deficiencies and improving suicide prevention practices." ECF No. 6897-1 at 37; *see also* ECF No. 5993-1 at 29-30. No recommendations for improvement were offered. ECF No. 6897-1 at 38, ECF No 5993-1 at 30.

coordination between these experts.

Additionally, the 2019 Report uses vague and ambiguous terminology to criticize case summaries as "marginally adequate." ECF No. 7239-1 at 57 (Case I), 74 (Case L), 111 (Case T); *see also id.* at 119 (Case V), 134 (Case Y), 148 (Case BB), 161 (Case FF), 188 (Case KK).) The subjective term "marginally" that permeates throughout does not clearly indicate whether an SCR was compliant with the Special Master's experts' standards. A lack of clear methodology or standardized audit criteria further clouds the issue. CDCR audits its own individual suicide reports for its annual suicide reports. Between 2017 and 2019, individual suicide reports were found to be 96% compliant using fifteen standardized audit criteria. *See* CDCR's 2017-2019 Aggregate Suicide Report available at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/2017-19_Aggregate-Suicide-Report.pdf (last accessed on 07/22/2021) at 42. Accordingly, to avoid this vague and ambiguous terminology, Defendants request that the Court order the Special Master to amend the SCR sections for Cases I, L, T, V, Y, BB, FF, KK to reflect that they are "adequate," or alternatively, "adequate with opportunities for improvement." Doing so would be consistent with the Special Master's own findings on page 34 of his expert's report finding that the reports for these cases were adequate with opportunities for improvement. ECF No. 7239 at 34 ("Of the 38 SCR reports reviewed for 2019 deaths by suicide, 37 SCRs (97.4 percent) *were determined to be adequate summaries of the cases.*"[14] (emphasis added); "Cases that were identified as providing *opportunities for improvement* included Cases I, L, T, V, Y, BB, FF, and KK.") (emphasis added).

In sum, and as noted in Defendants' informal objections, the expert's criticisms of CDCR's SCRs are inconsistent with the monitoring conducted by the Special Master's experts who attend the SCR conference. *See* ECF No. 7239 at 43, 45-48. Accordingly, Defendants request that the Court sustain their objections.

E.     **The Report includes typographical errors.**

The Special Master's expert's report includes a typographical error that appeared after Defendants provided their informal letter objections. Specifically, in the table of suicides

---

[14] Only Case X was found to be "inadequate." ECF No. 7239-1 at 129.

experienced by each facility in 2019, as well as the average number of suicides each year inclusive of 2019, the 1999-2019 average for Mule Creek State Prison appears as follows:

| Mule Creek State Prison | 2 | 18 | .095 |
|---|---|---|---|

It appears that the decimal point inadvertently shifted to the left, reporting the 21-year average as less that one tenth instead of "0.95." The decimal point should be shifted to the right by one space for the sake of accuracy.

A separate, but related, error appears on the preceding page. The Special Master's expert says: "The table that follows includes the total number of suicides experienced by each facility in 2019 as well as the average number of suicides each year inclusive of 2019 (*20 years*)." ECF No. 7239 at 13, emphasis added. However, and as Defendants explained in their informal objections, the average for the period between 1/1/1999 through 12/31/2019 is *21 years*, not 20 years. *See id.* at 44. The parenthetical should be corrected for the sake of accuracy.

## CONCLUSION

The Special Master's suicide report is largely duplicative of CDCR's own suicide report. Defendants' Suicide Reports demonstrate that CDCR honestly and critically assessed every suicide that occurred in 2019 and show that CDCR has a sustainable process in place for assessing policy violations and implementing corrective action. The Court should sustain Defendants' objections.

## CERTIFICATION

In preparing these objections, Defendants counsel reviewed the following Court orders relevant to the issues in this filing, ECF Nos.: 1536, 4394, 4539, 4693, and 6996.

DATED: July 26, 2021

HANSON BRIDGETT LLP

By: *s/ Samantha D. Wolff*
PAUL B. MELLO
SAMANTHA D. WOLFF
LAUREL E. O'CONNOR
DAVID C. CASARRUBIAS
Attorneys for Defendants

DATED: July 26, 2021

Respectfully Submitted,

ROB BONTA
Attorney General of California
Damon McClain
Supervising Deputy Attorney General

By: *s/ Elise Owens Thorn*
ELISE OWENS THORN
Deputy Attorney General
Attorneys for Defendants